No. 22-10312

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ELIZABETH A. HOLMES

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 5:18-CR-00258
Hon. Edward J. Davila

---

## EXCERPTS OF RECORD
## VOL. I of LVII | ER-1 to ER-290

---

JOHN D. CLINE
LAW OFFICE OF JOHN D. CLINE
  600 Stewart Street
  Suite 400
  Seattle, WA 98101
  (360) 320-6435

KEVIN M. DOWNEY
LANCE A. WADE
AMY MASON SAHARIA
KATHERINE A. TREFZ
WILLIAMS & CONNOLLY LLP
  680 Maine Ave. S.W.
  Washington, D.C. 200024
  (202) 434-5000
  asaharia@wc.com

AO 245B (Rev. AO 09/19-CAN 12/19) Judgment in Criminal Case

# UNITED STATES DISTRICT COURT
## Northern District of California

| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
|---|---|---|
| v. | ) | |
| Elizabeth Holmes | ) | USDC Case Number:  CR-18-00258-001 EJD |
| | ) | BOP Case Number:  DCAN518CR00258-001 |
| | ) | USM Number:  24965-111 |
| | ) | Defendant's Attorney:  Kevin M. Downey (Retained) |
| | | Katherine A. Trefz (Retained) |
| | | Lance A. Wade (Retained) |
| | | Amy M. Saharia (Retained) |
| | | Jean R. Fleurmont (Retained) |
| | | Richard S. Cleary Jr. (Retained) |
| | | John D. Cline (Retained) |

**THE DEFENDANT:**

☐   pleaded guilty to count(s):

☐   pleaded nolo contendere to count(s): which was accepted by the court.

☑   was found guilty on counts: <u>One and Six through Eight of the Third Superseding Indictment</u> after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1349 | Conspiracy to Commit Wire Fraud Against Theranos Investors | 2015 | 1 |
| 18 U.S.C. § 1343 | Wire Fraud | 02/06/2014 | 6 |
| 18 U.S.C. § 1343 | Wire Fraud | 10/31/2014 | 7 |
| 18 U.S.C. § 1343 | Wire Fraud | 10/31/2014 | 8 |

The defendant is sentenced as provided in pages 2 through  7  of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☑   The defendant has been found not guilty on counts: <u>Two and Ten through Twelve of the Third Superseding Indictment.</u>

☑   Counts <u>Three through Five and Nine</u> are dismissed on the motion of the United States.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

11/18/2022
Date of Imposition of Judgment

Signature of Judge
The Honorable Edward J. Davila
United States District Judge
Name & Title of Judge

January 11, 2023
Date

AO 245B (Rev. AO 09/19-CAN 12/19) Judgment in Criminal Case

---

DEFENDANT:  Elizabeth Holmes                                                                          Judgment - Page 2 of 7
CASE NUMBER:  CR-18-00258-001 EJD

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:
    135 months. This term consists of terms of 135 months on each of Counts 1 and 6 through 8, all counts to be served concurrently.

The appearance bond is hereby exonerated, or upon surrender of the defendant as noted below.  Any cash bail plus interest shall be returned to the owner(s) listed on the Affidavit of Owner of Cash Security form on file in the Clerk's Office.

☑ The Court makes the following recommendations to the Bureau of Prisons:
    The defendant be designated to the Federal Prison Camp at Bryan, Texas. The Court finds that family visitation enhances rehabilitation.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at  on  (no later than 2:00 pm).

    ☐ as notified by the United States Marshal.

☑ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☑ on 4/27/2023 (no later than 2:00 pm).

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____ at
_____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By   _____
DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. AO 09/19-CAN 12/19) Judgment in Criminal Case
_____

DEFENDANT: Elizabeth Holmes
Judgment - Page 3 of 7
CASE NUMBER: CR-18-00258-001 EJD

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of: 3 years. This term consists of terms of three years on each of Counts 1 and 6 through 8, all such terms to run concurrently.

## MANDATORY CONDITIONS OF SUPERVISION

1)     You must not commit another federal, state or local crime.

2)     You must not unlawfully possess a controlled substance.

3)     You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

        ☑ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*

4) ☐   You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*

5) ☑   You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*

6) ☐   You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*

7) ☐   You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245B (Rev. AO 09/19-CAN 12/19) Judgment in Criminal Case

| | |
|---|---|
| DEFENDANT:  Elizabeth Holmes | Judgment - Page 4 of 7 |
| CASE NUMBER:  CR-18-00258-001 EJD | |

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court, and bring about improvements in your conduct and condition.

1)   You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of RELEASE, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2)   After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3)   You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4)   You must follow the instructions of the probation officer related to the conditions of supervision.
5)   You must answer truthfully the questions asked by your probation officer.
6)   You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with, for example), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
7)   You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by these and the special conditions of your supervision that he or she observes in plain view.
8)   You must work at least part-time (defined as 20 hours per week) at a lawful type of employment unless excused from doing so by the probation officer for schooling, training, community service or other acceptable activities. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
9)   You must not communicate or interact with someone you know is engaged in criminal activity. You must not associate, communicate, or interact with any person you know has been convicted of a felony, unless granted permission to do so by the probation officer.
10)   If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
11)   You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12)   You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).

☐   If the probation officer determines that you pose a risk to a third party, the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk. *(check if applicable)*

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions.  I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision upon a finding of a violation of probation or supervised release.

(Signed) _____          _____
          Defendant                                                       Date


          _____          _____
          U.S. Probation Officer/Designated Witness              Date

AO 245B (Rev. AO 09/19-CAN 12/19) Judgment in Criminal Case

| | |
|---|---|
| DEFENDANT: Elizabeth Holmes | Judgment - Page 5 of 7 |
| CASE NUMBER: CR-18-00258-001 EJD | |

## SPECIAL CONDITIONS OF SUPERVISION

1.     You must have no contact with the investor victims, unless otherwise directed by the probation officer.

2.     You must pay any restitution and special assessment that is imposed by this judgment and that remains unpaid at the commencement of the term of supervised release.

3.     You must provide the probation officer with access to any financial information, including tax returns, and must authorize the probation officer to conduct credit checks and obtain copies of income tax returns.

4.     You must not open any new lines of credit and/or incur new debt without the prior permission of the probation officer.

5.     You must not maintain a position of fiduciary capacity without the prior permission of the probation officer.

6.     You must participate in a mental health treatment program, as directed by the probation officer. You are to pay part or all cost of this treatment, at an amount not to exceed the cost of treatment, as deemed appropriate by the probation officer. Payments must never exceed the total cost of mental health counseling. The actual co-payment schedule must be determined by the probation officer.

7.     You must cooperate in the collection of DNA as directed by the probation officer.

8.     You must submit your person, residence, office, vehicle, or any property under your control, including any computers, cell phones, and other electronic devices, to a search. Such a search must be conducted by a United States Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release. Failure to submit to such a search may be grounds for revocation. You must warn any residents that the premises may be subject to searches.

AO 245B (Rev. AO 09/19-CAN 12/19) Judgment in Criminal Case

| | |
|---|---|
| DEFENDANT:  Elizabeth Holmes | Judgment - Page 6 of 7 |
| CASE NUMBER:  CR-18-00258-001 EJD | |

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments.

| | Assessment | Fine | Restitution | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 400.00 | Waived | To Be Determined | N/A | N/A |

☑ The determination of restitution is deferred until a date to be determined. An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| **TOTALS** | $  0.00 | $  0.00 | |

☐ Restitution amount ordered pursuant to plea agreement $

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ the interest requirement is waived for the.

    ☐ the interest requirement is waived for the  is modified as follows:

---

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. AO 09/19-CAN 12/19) Judgment in Criminal Case

| | |
|---|---|
| DEFENDANT:  Elizabeth Holmes | Judgment - Page 7 of 7 |
| CASE NUMBER:  CR-18-00258-001 EJD | |

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows*:

**A** ☐ Lump sum payment of _____ due immediately, balance due

      ☐ not later than  , or
      ☐ in accordance with    ☐ C,  ☐ D, or  ☐ E, and/or  ☐ F below); or

**B** ☐ Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

**C** ☐ Payment in equal  (e.g., weekly, monthly, quarterly) installments of  _ over a period of  (e.g., months or years), to
commence  (e.g., 30 or 60 days) after the date of this judgment; or

**D** ☐ Payment in equal  (e.g., weekly, monthly, quarterly) installments of  _ over a period of  (e.g., months or years), to
commence  (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within  (e.g., 30 or 60 days) after release from
imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☑ Special instructions regarding the payment of criminal monetary penalties:
**It is further ordered that the defendant shall pay to the United States a special assessment of $400. Payments shall
be made to the Clerk of U.S. District Court, 450 Golden Gate Ave., Box 36060, San Francisco, CA 94102. During
imprisonment, payment of criminal monetary penalties are due at the rate of not less than $25 per quarter and
payment shall be through the Bureau of Prisons Inmate Financial Responsibility Program.**

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is
due during imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons'
Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number Defendant and Co-Defendant Names (including defendant number) | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate |
|---|---|---|---|
| | | | |
| | | | |

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

☐ The Court gives notice that this case involves other defendants who may be held jointly and severally liable for payment of all
or part of the restitution ordered herein and may order such payment in the future, **but such future orders do not affect the
defendant's responsibility for the full amount of the restitution ordered.**

---

* Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment,
(5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of
prosecution and court costs.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| USA,<br><br>             Plaintiff,<br><br>     v.<br><br>ELIZABETH A. HOLMES,<br><br>             Defendant. | Case No.   5:18-cr-00258-EJD-1<br><br>**ORDER ON SENTENCING** |

On January 3, 2022, the jury found Defendant Elizabeth A. Holmes guilty of one count of conspiracy to commit wire fraud, 18 U.S.C. § 1349, and three counts of wire fraud, 18 U.S.C. § 1343, against Theranos investors.

In their respective sentencing memoranda, the government and Defendant dispute several findings and conclusions in the Presentence Investigation Report ("PSR"), including the probation officer's application of the U.S. Sentencing Guidelines ("U.S.S.G.").  Revised Presentence Investigation Report, ECF No. 1640; *see also* Ms. Holmes' Sentencing Memorandum ("Def.'s Sent'g Mem."), ECF No. 1641-3; United States' Sentencing Memorandum ("Gov't Sent'g Mem."), ECF No. 1649.  The Court addressed the parties' objections and disputes at Defendant's sentencing hearing on November 18, 2022.  This Order memorializes the Court's reasoning in support of its determinations and sentence imposed at that hearing.

For the reasons stated on the record at the November 18, 2022 hearing and in this order, the Court finds that (A) the loss in this case can be reasonably found to be $120,146,247; (B) the offense involved 10 or more victims; (C) the offense as to Defendant did not involve a conscious or reckless risk of death or serious bodily injury; (D) the Defendant was not an organizer, leader,

manager, or supervisor in the criminal activity; and (E) the Defendant has not clearly demonstrated acceptance of responsibility for her offense.  These findings yielded an offense level of 33 and an undisputed Criminal History Category I.  *See* Gov't Sent'g Mem. 15.

## I.    LEGAL STANDARD

"All sentencing proceedings begin with the district court's calculations of the applicable Guidelines range."  *United States v. Prien-Pinto*, 917 F.3d 1155, 1157 (9th Cir. 2019); *see also United States v. Staten*, 466 F.3d 708, 710 (9th Cir. 2006) ("[A]lthough district courts are no longer required to follow the United States Sentencing Guidelines . . . 'the [Sentencing Reform] Act nonetheless requires judges to take account of the Guidelines together with other sentencing goals.'" (quoting *United States v. Booker*, 543 U.S. 220, 259 (2005))).

The government bears the burden of proving the facts necessary to enhance a defendant's offense level under the Guidelines.  *United States v. Burnett*, 16 F.3d 358, 361 (9th Cir. 1994); *accord United States v. Ameline*, 409 F.3d 1073, 1086 (9th Cir. 2005) (*en banc*) ("[W]hen the government seeks an upward adjustment, it bears the burden of proof." (citation omitted)).  While "the district court may rely on undisputed statements in the PSR at sentencing," if the defendant objects to those statements "the district court is obligated to resolve the factual dispute, and the government bears the burden of proof to establish the factual predicate. . . .  The court may not simply rely on the factual statements" in that report.  *Ameline*, 409 F.3d at 1085-86; *see also* Fed. R. Crim. P. 32(i)(3)(B).  In making factual determinations, "a sentencing judge is generally not restricted to evidence that would be admissible at trial.  However, 'inadmissible evidence cannot be considered [at sentencing] if it lacks sufficient indicia of reliability to support its probable accuracy.'"  *United States v. Egge*, 223 F.3d 1128, 1132 (9th Cir. 2000) (citation omitted, alternation in original).

## II.    GUIDELINES CALCULATION

### A.    Loss Enhancement, U.S.S.G. § 2B.1(b)(1)

The commentary to the U.S. Sentencing Guidelines provides that courts "need only make a reasonable estimate of the loss," which is defined as "the greater of actual loss or intended loss."

U.S.S.G. § 2B1.1 cmt 3(A), 3(C).  Actual loss is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense," whereas intended loss is "the pecuniary harm that the defendant purposely sought to inflict."  U.S.S.G. § 2B1.1 cmt 3(A)(i)-(ii).  The Ninth Circuit recognizes that the guidelines "do not present a single universal method for loss calculation under § 2B1.1—nor could they, given the fact-intensive and individualized nature of the inquiry." *United States v. Zolp*, 479 F.3d 715, 718 (9th Cir. 2007).  The district court's obligation is to "adopt a reasonable 'realistic, economic' projection of loss based on the evidence presented." *United States v. W. Coast Aluminum Heat Treating Co.*, 265 F.3d 986, 991 (9th Cir. 2001).

Defendant had raised several objections to the PSR's calculation of the loss enhancement, which the Court resolved on the record at the sentencing hearing and arrived at a final loss amount.  Here, the Court provides the specifics of its loss calculation, which reflects the rulings on Defendant's objections.

### 1. Standard of Proof

The government and Defendant dispute the correct standard of proof the Court should apply in this case.  During sentencing and in its analysis below, the Court applied the "preponderance of the evidence" standard for facts underlying the loss calculation.

"As a general rule, factual findings underlying a sentencing enhancement need only be found by a preponderance of the evidence," particularly where the enhancements are based on convictions.  *United States v. Lonich*, 23 F.4th 881, 910 (9th Cir. 2022); *United States v. Hymas*, 780 F.3d 1285, 1289–90 (9th Cir. 2015).  However, in instances where the "enhancement has an [] extremely disproportionate impact on the sentence," the Ninth Circuit has held "that due process may require the government to demonstrate facts underlying disputed enhancements by clear and convincing evidence."  *Lonich*, 23 F.4th at 910 (internal quotation marks omitted).  When determining "whether a disproportionate effect on sentencing may require the application of a heightened standard of proof," courts consider the "totality of the circumstances."  *Hymas*, 780 F.3d at 1289; *United States v. Valle*, 940 F.3d 473, 479 (9th Cir. 2019).  The Ninth Circuit has focused on three primary factors in assessing disproportionality: (1) whether the increase in

sentence is based on the extent of a conspiracy; (2) whether the increase in the number of offense levels is less than or equal to four; and (3) whether the length of the enhanced sentence more than doubles the length of the sentence authorized by the initial sentencing guideline range. *See Lonich*, 23 F.4th at 910–16.

Here, the jury convicted Defendant of conspiracy to commit wire fraud against Theranos investors, as well as three counts of wire fraud. Given that actual loss is measured by the "reasonably foreseeable pecuniary harm that resulted from the offense," U.S.S.G. § 2B1.1 cmt 3(A)(i), the Court's task begins by identifying which investments were "reasonably foreseeable" from Defendant's conspiracy. In other words, whether a particular investment should be included in the loss calculation is based on the extent of the conspiracy, and therefore need only be established by a "preponderance of the evidence." *Lonich*, 23 F.4th at 914. Several courts have "declined to apply the clear and convincing standard of proof when the enhancement at issue was based entirely on the extent of the conspiracy . . . regardless of whether the disputed sentencing enhancements resulted in an increase of the offense level by more than four points or whether it resulted in a Guidelines range that more than doubled." *Id.* (internal citations and quotation marks omitted). The Ninth Circuit has also repeatedly held that "where sentencing enhancements for financial loss are based on the extent of the fraud conspiracy . . . facts underlying the disputed enhancements need only be found by a preponderance of the evidence." *United States v. Berger*, 587 F.3d 1038, 1048 (9th Cir. 2009) (collecting cases); *see also United States v. Laurienti*, 611 F.3d 530, 556 (9th Cir. 2010) ("Because each Defendant was convicted of conspiracy, and because the losses were incurred because of that conspiracy, the 'preponderance of the evidence' standard applies."); *United States v. Riley*, 335 F.3d 919, 926 (9th Cir. 2003) ("[T]his enhancement is based on the extent of the conduct to which [defendant] pled guilty (the amount of loss intended by the conspiracy's fraud).");  *Hymas*, 780 F.3d at 1289 ("District courts generally use the 'preponderance of the evidence standard of proof when finding facts at sentencing, such as the amount of loss caused by a fraud.'") (quoting *United States v. Treadwell*, 593 F.3d 990, 999 (9th Cir. 2010), overruled on other grounds by *United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020)). Because

the loss calculation in this case is based on the extent of the investor fraud conspiracy (*i.e.*, which Series C investments and corresponding losses were incurred because of the conspiracy), the correct standard of proof is "preponderance of the evidence."

Defendant nonetheless contended that the Court should apply the clear and convincing standard of proof, relying in part on *Lonich*.  Def.'s Sent'g Mem. 30.  However, the facts here are distinguishable from those in *Lonich*, where the government sought to incorporate losses associated with a bank's total collapse into the loss calculation of a loan fraud conspiracy conviction.  23 F.4th at 915.  In holding that the clear and convincing standard applied in *Lonich*, the Ninth Circuit emphasized that the reasons for the bank's failure included a "substantial amount of uncharged and acquitted conduct" and was too attenuated from the convicted conspiratorial conduct.  *Id.* at 915.  By contrast, there is no such intervening causal factor here, where the evidence at Defendant's trial and in various victim impact statements indicated that the investments were a result of the convicted conduct, *i.e.*, misrepresentations of Theranos technology.  *See infra* Section II(B).  On these facts, this case more closely resembles the investor fraud in *Laurienti*, where the Ninth Circuit held that it was "reasonable to infer that *all clients of Defendants who purchased the* [] *stocks* were duped by the conspiracy."  611 F.3d at 556–57 (emphasis added).  Indeed, even *Lonich* acknowledges that "[t]he preponderance of the evidence standard might have been appropriate if, for example, the loss enhancements were based on the value of [the] defaulted [] loans," 23 F.4th at 915, an approach that is analogous to the Court's loss calculation here using the value of certain Series C investments.  *See infra* at Section II(A)(2).

Because this sentencing enhancement is based on the extent of Ms. Holmes' convicted conspiracy, the Court applied the preponderance standard to any facts supporting the loss calculation for U.S.S.G. § 2B1.1(b)(1).

### 2.    Investment Calculation

Probation in the PSR calculated the total loss sustained by the Series C investors to be $730,840,209 across 29 separate investors.  PSR ¶ 105.  The Defendant objected to this calculation and the government bears the burden of proof to establish the total loss amount by a

preponderance of the evidence.  *See Ameline*, 409 F.3d at 1086; *see supra* Section II(A)(1).

The Ninth Circuit applies a general loss causation principle at sentencing, "permitting a district court to impose sentencing enhancements only for losses that 'resulted from' the defendant's fraud." *United States v. Berger*, 587 F.3d 1038, 1043 (9th Cir. 2009) (citing *United States v. Hicks*, 217 F.3d 1038, 1048 (9th Cir. 2000)).

After reviewing the evidence presented by the government, the Court found by a preponderance of the evidence that Defendant's fraudulent representations resulted in at least ten (10) victims investing a total of $381,197,283.[1]  The table below sets forth this list of investors, the relevant individual who testified to the investment, and an accounting and totaling of their investment amounts:

| Investor (Testifying Individual) | Shares | Share Price | Investment Amount |
|---|---|---|---|
| **Hall Group** (Bryan Tolbert) | 325,000 | $15.00 | **$4,875,000** |
| **Richard Kovacevich** (Self) | 276,666 | $15.00 | **$4,149,990** |
| **Lucas Venture Group** (Donald A. Lucas) | 504,667 | $15.00 | **$7,570,005** |
| **Mendenhall TF Partners** (Pat Mendenhall) | 87,500 | $15.00 | **$1,312,500** |
| **Black Diamond Ventures** (Chris Lucas) | 356,660 | $15.00 | **$5,349,900** |
| **Peer Ventures Group** (Mark Campbell) | 1,169,995 | $15.00 | **$17,549,925** |
| **Peer Ventures Group** (Mark Campbell) | 779,411 | $17.00 | **$13,249,987** |
| **PFM Funds** (Brian Grossman) | 5,655,294 | $17.00 | **$96,139,998** |
| **Mosley Family Holdings** (Daniel Mosley) | 352,941 | $17.00 | **$5,999,997** |
| **RDV Corporation** (Lisa Peterson) | 5,882,352 | $17.00 | **$99,999,984** |
| **Keith Rupert Murdoch** (Natalie Ravitz) | 7,352,941 | $17.00 | **$124,999,997** |
| **TOTAL INVESTMENT AMOUNT** | | | **$381,197,283** |

In reaching this count and figure, the Court only included those investors who indicated they had relied on or reviewed the Theranos misrepresentations propagated by Defendant's conspiratorial conduct, instead of counting every Series C investor as the PSR does.[2]  *See infra*

---

[1] At the sentencing hearing, the Court had provided a mistakenly tallied sum, resulting in a slightly higher loss calculation.  The difference, however, does not affect the loss enhancement determination, and the figures in this Order provide the corrected calculations.
[2] Though the Court did not adopt it, the PSR's approach nonetheless appear to have some support

Section II(B); *see also* Leach Decl., Ex. B, ECF No. 1644-1.  The total investment amount,

however, was not the end of the Court's loss calculation analysis.

### 3. Share Value Offset

In addition to calculating loss as either actual or intended loss, the Sentencing Guidelines

also require that a victim's loss be offset by the victim's benefits received when calculating loss.

U.S.S.G. § 2B1.1 cmt 3(E)(i); *see also W. Coast Aluminum Heat Treating Co.*, 265 F.3d at 992.

In the context of fraud cases involving induced stock purchases of an otherwise legitimate

company, this principle has been interpreted to mean that district courts "may not assume that the

loss inflicted equals the full pre-disclosure value of the stock." *Zolp*, 479 F.3d at 719.  Rather,

courts must "disentangle the underlying value of the stock" and identify "inflation of that value

due to the fraud." *Id.*

The Court found that, at the time the investor victims purchased their shares, Theranos

stock was not "practically worthless" and retained some intrinsic value separate from the

fraudulent representations.  *See Laurienti*, 611 F.3d at 558 (citing *Zolp*, 479 F.3d at 719).

Therefore, to "reasonably estimate" the loss amounts attributable to Defendant's offense, the Court

reduced the total investment amount identified in the preceding section by the "underlying value"

of the Theranos shares had no fraud occurred.  *See, e.g.*, *Berger*, 587 F.3d at 1046–47 (instructing

the district court to apply a loss calculation method that "attempt[s] to gauge the difference

between [the] share price—as inflated through fraudulent representation—and what that price

would have been absent the misrepresentation"); *United States v. Geringer*, 672 F. App'x 651, 653

(9th Cir. 2016) (finding district court erred by failing to "determine the actual value, if any, of the

fund, and to deduct that value from the amount of loss"); *United States v. Evans*, 744 F.3d 1192,

1196 (10th Cir. 2014) (finding district court erred by not "inquir[ing] into what loss, if any, the

investors would have suffered if [defendant] had come clean regarding the status of the

in the Ninth Circuit.  Given the extent of Defendant's misrepresentations in widespread marketing
materials and to the media for publication, it may be "reasonable to infer that all [Series C
investors] were duped by the conspiracy." *Laurienti*, 611 F.3d at 557.  The Court, however,
declined to make such an inference in this case.

securities"); *United States v. Leonard*, 529 F.3d 83, 93 (2d Cir. 2008) (finding "district court erred in not deducting from the purchase price the actual value of . . . illiquid securities").

The government sought to distinguish *Zolp* on two grounds: (1) *Zolp* involved a public company with liquid and market-responsive share prices that readily lent themselves to an investor impact analysis; and (2) the Theranos investors never received *any* value in return because the shares ultimately became worthless without any liquidation opportunity.  With respect to the first point, the Court acknowledges that valuing illiquid securities without a public market is certainly more difficult than valuing publicly traded securities.  However, the language in *Zolp* does not provide such a basis to distinguish the loss calculations for public securities from those involving private securities.  The Court also cannot avoid its obligation to conduct a "reasonable estimate" simply because a particular metric is not immediately available, a point that other courts have acknowledged in the private company context.  *See Leonard*, 529 F.3d at 93 ("We are mindful that illiquid securities for which there is no public market can be extremely difficult to value. . . . [W]e can only call on the district court to make a 'reasonable estimate' of the loss amount.").

As to the government's second point, the Court is persuaded by the Ninth Circuit's reasoning in *Lonich* where it held that the district court erred by attributing losses associated with a bank's ultimate collapse to the defendant's loan fraud.  23 F.4th at 918–19.  Analogously, the government here had not established—by either a preponderance or clear and convincing standard—that Theranos' ultimate collapse was the result of Defendant's conspiratorial conduct and should therefore be reflected in her loss calculation.  The fact that the investors did not have— and never will have—an opportunity to liquidate their shares is undoubtedly unfortunate, but illiquidity and resale difficulty does not deprive Defendant of credit for the inherent value of Theranos shares.  *See Leonard*, 529 F.3d at 93; *United States v. Crandall*, 525 F.3d 907, 913 (9th Cir. 2008) (finding district court erred by failing to credit the value of fraudulent condominiums, "even though the units may have been difficult or impossible to resell").

Accordingly, the Court concluded that the total investment amount was subject to a reduction based on the inherent value of Theranos stock absent Defendant's fraud.

### 4.      Net Loss Calculation

The final determination in the Court's loss calculation analysis involved reasonably estimating of Theranos' inherent value and deducting that value from the total investment amount to arrive at the actual loss that is attributable to Defendant's fraud.

Determining what the Theranos share price would have been if there had been no fraud is admittedly a difficult task, made all the more difficult by Theranos' status as a private company. The Court, however, is not "obligated to search for the perfect theoretical or statistical fit" but need only adopt a reasonable, realistic, economic, projection of loss based on evidence presented. *W. Coast Aluminum Heat Treating Co.*, 265 F.3d at 991.  To that end, the Court found that the government's expert, Mr. Carl Saba, provided a reasonable protocol in arriving at a loss amount that contains several indicia of reliability and incorporates multiple assumptions favorable to Defendant and Theranos.  ECF No. 1645 ("Saba Report").  The Court first summarizes the Saba Report's methodologies and evidence before addressing the figures it adopted from the Report.

The Saba Report provides valuations of 100% Theranos equity on three dates (February 7, 2014; December 31, 2014; and October 15, 2015) and then, from those valuations, extrapolates an estimate of what the share price would have been on each date.  For each date, the Saba Report provides two valuations using two different methods, each reflecting a different company metric generally recognized by the appraisal profession.  Saba Report ¶¶ 59, 65.  The first valuation is a combination of the "discounted cash flow" method and the "guideline public company" method (collectively, the "Income Method"), which reflects Theranos' earnings, cash flow, and standing in relation to similar public companies.  *Id.* ¶¶ 61-62; 65.  The Saba Report's second valuation uses the "adjusted net asset value" method ("Asset Method"), which values Theranos based on its then-present assets and liabilities.  *Id.* ¶ 77.  Generally, the Income Method yielded a higher Theranos valuation—and therefore a lower loss proportion and amount—than the Asset Method.  Once these two valuations were calculated, the Saba Report allocated those valuations to Theranos' shares using a methodology called "option pricing equity allocation" model.  *Id.* ¶ 111.  This method models the possible exit values for Theranos shares on a bell curve distribution, resulting

in a projection of what the share price would have been on a selected date. *Id.* ¶¶ 111-15.

Additionally, the Saba Report's valuation figures reflect several assumptions drawn in Theranos' favor. For instance, the Saba Report assumes that Theranos would continue to operate as a going concern, *i.e.*, it was not in distress or facing near-term dissolution; Theranos' significant technology challenges would be successfully resolved; Theranos would realize high revenue growth in the near term; and it would earn significantly above industry margins. *Id.* ¶¶ 7, 16.

Most critically, the Saba Report does not rely on Theranos forecasts provided to investors, which were "associated with misrepresentations made to investors, and reflect extremely optimistic assumptions." *Id.* ¶ 84. Instead, the Report relies on certain IRC 409A forecasts prepared by an external professional services firm "for purposes of determining the fair market value of Theranos stock, and as a basis for federal tax reporting." *Id.* ¶ 86. Defendant does not object to the Saba Report's reliance on these 409(A) forecasts. *See* Def.'s Sent'g Mem. 38-39. Because the 409A forecasts were prepared for internal management use, were not provided to investors, and are "optimistic" but "orders of magnitude lower than those in the investor forecasts" (Saba Report ¶ 86), the Court was satisfied that the Saba Report's reliance on the 409A forecasts provided a reasonable, realistic, and economic estimate of Theranos' inherent valuation with minimal influence from Defendant's fraudulent representations.

Defendant objected that the Report purportedly provides a "loss range of nearly $100 million" and does not account for the revenue Theranos could have received by licensing its intellectual property. Def.'s Sent'g Mem. 38-39. First, the Court rejected Defendant's characterization of the Saba Report's loss range as $100 million—this range is the delta between the upper limit of the Saba Report's *primary* loss estimate and the lower limit of the Report's *alternative* loss estimate. *See* Saba Report ¶ 15. When viewed in their respective contexts, the Saba Report's estimated loss ranges are closer to $36–38 million. *Id.* Regarding Defendant's objection as to the value of Theranos' patent portfolio, the Court notes that the Asset Method does account for "Theranos' underlying technology and brand intangible assets," by measuring the "cost to obtain or reproduce functionally similar or identical assets." Saba Report ¶¶ 77, 106.

This "cost to recreate" method is appropriate where the intangible asset is not the type that generates a measurable amount of income, *id.* ¶ 106 n.55, and there is no indication that Theranos was licensing its patents in 2015.[3]  For these reasons, Defendant's objections did not undermine the Saba Report's ability to assist the Count in reaching a "reasonable estimate of the loss."

Having outlined the Saba Report's methods, the Court proceeds to its assessment of the various methods and dates that the Saba Report's present as potential valuations.  At the sentencing hearing, the Court noted that it adopted the Income Method calculation to estimate Theranos actual share price absent fraud.  These valuations and metrics are more appropriate for valuing ongoing—as opposed to non-operating—businesses and yield a higher company valuation and a higher offset to Defendant's loss calculation.  *Id.* ¶ 64.  In identifying the proper valuation date, the Court selected the date closest in time to the last of the Series C investments, which is December 31, 2014.  This date also results in a higher company valuation than the February 2014 date, which again is more favorable to Defendant.  The Court declined to use the October 2015 Valuation Date (*i.e.*, when Defendant's fraud was exposed), because the Sentencing Guidelines only contemplate crediting value that was provided to the victim *before* the offense was detected. U.S.S.G. § 2B1.1, cmt. 3(E)(i).  In sum, the Court considered the Asset Method and December 31, 20214 valuation date to be the most appropriate—and the most Defendant-favorable—foundation for its reasonable estimate of the loss resulting from Defendant's offense.

Using the Saba Report's estimate of Theranos' share prices on December 31, 2014, the Court found that the $15 Series C-1 price would have been $10.36 absent the fraud ($4.64 net loss per share); and the $17 Series C-2 price would have been $11.63 ($5.37 net loss per share).  When multiplied by the total number of the identifiable victims' shares—2,720,488 Series C-1 shares and 20,022,939 Series C-2 shares, *see supra* Section II(A)(2)—the total loss in share value attributable to Ms. Holmes' fraud is approximately $120,146,247.  This figure is 31.5% of the

---

[3] In any event, as discussed below, the Court does not adopt the Asset Method and instead uses the Income Method valuation in its loss calculation, which yields a higher Theranos valuation, a lower proportion attributable to Defendant's fraud, and is generally more favorable to Defendant.

total investment value—in other words, Theranos stock would have been approximately 31.5% less expensive if there had been no fraud.

Based on the foregoing analysis and calculation, the Court reasonably estimated the loss resulting from Defendant's offenses to be $120,146,247. Because this amount is more than $65 million and less than $150 million, the loss amount falls under row M of U.S.S.G. § 2B1.1(b)(1), and the Court accordingly increased Defendant's offense level by 24 levels.

### B.      Victim Number Enhancement, U.S.S.G. § 2B1.1(b)(2)(A)(i)

The government has sufficiently shown by a preponderance of the evidence that at least ten or more victims suffered a financial loss as a result of the conspiracy to commit wire fraud.

Section 2B1.1(b)(2)(A)(i) of the Sentencing Guidelines supports a 2-level enhancement if the offense "involved 10 or more victims." U.S.S.G. § 2B1.1(b)(2)(A)(i). The guidelines define a "victim" as a person, including a corporation, "who sustained any part of the actual loss determined under subsection (b)(1)." U.S.S.G. § 2B1.1(b)(1), cmt. 1. Similar to estimating losses, a district court need only "make a reasonable estimate . . . based on the available information" in counting victims. *United States v. George*, 949 F.3d 1181, 1186 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 605 (2020) (quoting *Zolp*, 479 F.3d at 719).

The PSR included a 2-level enhancement based on the number of victims. PSR ¶ 106. The government alleges that there are 29 victims who suffered a financial loss in the Series C round of investments, summarized in the spreadsheet attached as Exhibit B to its supporting declaration.[4] ECF Nos. 1644-1;1643 at 20–21. The government directs the Court to the testimony at trial, U.S. Securities Exchange Commission ("SEC") depositions, Federal Bureau of Investigation ("FBI") investigative reports, and victim impact statements. Gov't Sent'g Mem. 3–8, 20–21; ECF No. 1644. In reviewing the record, the Court finds that the government has met its burden of showing that at least ten investors relied on Ms. Holmes' fraudulent statements in

---

[4] The government's spreadsheet includes 37 entries, which the PSR interprets as 29 victim investors, stating "[t]here are a total of 37 investors in the C-1 and C-2 groups; some of those are grouped (i.e., Lucas Venture Funds and PFM). As such, the number of 29 ensures none of the grouped investors are counted twice." PSR ¶ 92.

making their decision to invest.  The evidence supports a finding that the following investors satisfy the definition of "victim" under the Sentencing Guidelines: (1) Partner Investments L.P., PFM Healthcare Master Fund, L.P., and PFM Healthcare Principals Fund, L.P. (collectively, "PFM"); (2) Mosley Family Holdings LLC; (3) RDV Corporation (Dynasty Financial II, LLC); (4) Keith Rupert Murdoch; (5) Richard Kovacevich; (6) Peer Venture Partners (Peer Ventures Group IV, L.P., or "PVP"); (7) Lucas Venture Group (Lucas Venture Group IV LP and Lucas Venture Group XI); (8) Mendenhall TF Partners; (9) Hall Group (Hall Black Diamond II, LLC); and (10) Black Diamond Venture (Black Diamond Ventures XII-B, LLC).  Accordingly, all ten victims' losses are reflected in the loss calculation.

Investors PFM, Mosley Family Holdings LLC, and RDV Corporation undoubtedly qualify as victims, as Defendant was convicted of wire fraud against all three investors beyond a reasonable doubt.  Gov't Sentencing Memo. at 17–18; *see also* ECF Nos. 1235 at 2, 469 at 9, 1644-1.  Defendant does not dispute that these investments were made in Theranos.  She asserts, however, that "there was no evidence as to why the vast majority of the investments the government seeks to include in the loss amount . . . were made—even though . . . each investor's investment experience was different."  Def.'s Sent'g Mem. 31 (emphasis omitted).  The Court agrees that investors' experiences with Ms. Holmes varied to some degree, but the Court rejects Defendant's characterization of the record as devoid of evidence regarding what information Ms. Holmes provided investors prior to their investments.  Rather, the preponderance of the evidence supports a finding that seven additional investors qualify as victims for sentencing purposes.

For example, representatives testified at trial on behalf of Hall Group, Black Diamond Venture, and Mendenhall TF Partners as to the companies' reliance on the fraudulent statements made by Ms. Holmes in their conversations with her and the 2013 Wall Street Journal ("WSJ") promotion in reaching their decision to invest in the company.[5]  Bryan Tolbert, the Vice President

---

[5] Mr. Pat Mendenhall testified on behalf of Mendenhall TF Partners during Ramesh "Sunny" Balwani's trial.  5:18-cr-00258-EJD-2, ECF No. 1537.  All citations to Mr. Mendenhall's testimony relate to his appearance as a witness in that matter on April 29, 2022.

of Finance at Hall Group who was responsible for overseeing the company's investment portfolio during the relevant years, testified that Ms. Holmes' misrepresentations in his December 20, 2013 phone call with her were influential considerations in his company's decision to invest in Theranos.  10/22/21 Hr'g Tr. 4480:20–4484:2, 4486:13–4489:4, 4491:10–4493:3, 4497:7–4499:6, 4501:4–24, 4511:2–4513:24, 4515:4–4516:17.  Similarly, Chris Lucas of Black Diamond Venture and Pat Mendenhall of Mendenhall TF Partners testified at trial that Ms. Holmes' 2013 WSJ article was significant in making their investment decisions.  11/4/21 Hr'g Tr. 5407:1–5410:18; Mendenhall 4/29/22 Hr'g Tr.4275:3–4278:4.

Testimony before the SEC also reveals investor reliance by PVP, Lucas Venture Group, and Rupert Murdoch on Ms. Holmes' misrepresentations.  For example, Natalie Ravitz, the Chief of Staff to Rupert Murdoch in 2014–2015 and the advisor and manager of his personal investments, testified before the SEC that Ms. Holmes personally provided binders containing financial and visionary materials about Theranos (including information containing misrepresentations) to Mr. Murdoch.  ECF No. 1644-9 at 10:11–13:1, 16:21–20:24, 33:2–16, 34:3–21; *see also* 10/19/21 Hr'g Tr. 3996:16–4001:21 (trial testimony of Daniel Edlin regarding binders created for Mr. Murdoch).  Ms. Ravitz further stated that, based on their conversations with Ms. Holmes, she and Mr. Murdoch believed that the blood testing was performed on Theranos' proprietary devices, not third-party devices.  ECF No. 1644-9 at 76:8–78:17, 85:4–13.  Ms. Ravitz also testified that the knowledge that blood tests were not actually being performed on Theranos devices "would have changed how we thought about certainly the financial aspects of it, if there wasn't an actual piece of technology that they had developed."  *Id.* at 78:18–25; *see also id.* at 78:25–79:10.

Similarly, based on SEC interview memoranda,[6] representatives of PVP and Lucas

---

[6] "In making factual determinations, a sentencing judge is generally not restricted to evidence that would be admissible at trial," so long as the evidence contains "sufficient indicia of reliability to support its probable accuracy."  *United States v. Egge*, 223 F.3d 1128, 1132 (9th Cir. 2000).  The Court here is satisfied and finds that the SEC interview memoranda and sworn deposition testimony submitted by the government bear such hallmarks and indicia of reliability.

Venture Group testified that they were told by Ms. Holmes that Theranos proprietary devices were being used in combat and medevac helicopters, and both investors indicated in their SEC testimony that they were not aware that testing was being done on non-proprietary devices despite meeting with Ms. Holmes. *See* ECF Nos. 1644-6; 1644-7. In fact, Mark Campbell of PVP was surprised to learn through the subsequent 2015 WSJ article that Theranos was not using their proprietary device to run tests, which Theranos had never discussed. ECF No. 1644-7 at 5. Mr. Campbell further noted that Theranos provided letters from Celgene and GlaxoSmithKline validating its technology. *Id.* at 2. During trial, however, the government presented evidence that Celgene had *not* comprehensively validated Theranos' technology. 9/29/21 Hr'g Tr. 2296:14– 2297:10, 2316:9–2318:7. Similarly, Donald A. Lucas testified during his SEC interview that during his meeting with Holmes prior to investing he was told "Theranos could run 50-75 simultaneous tests from one drop of blood," and he was not told that testing was done on non-proprietary devices. ECF No. 1644-6 at 1–3. He believed that the blood collected from one finger prick went into the Theranos device for analysis and that results were returned in 60 minutes. *Id.* at 3. Ms. Holmes also told him that Theranos' devices were being used on modified Humvees in Afghanistan and medevac helicopters. *Id.* at 1–2.

Finally, the government produced an FBI memorandum summarizing its interview with Richard Kovacevich during its investigation. ECF No. 1644-5. The memorandum indicated that, before investing, Mr. Kovacevich was told that Theranos' proprietary devices were being used in military operations and that these devices were cheaper, better, and faster than any other devices on the market. *Id.* at 2. It also states that in 2013, neither Mr. Kovacevich nor any board member knew that the proprietary device could only run twelve tests, and he did not recall Ms. Holmes ever providing this information. *Id.* Mr. Kovacevich indicated that it mattered to him that Theranos was able to run all the tests on its own proprietary devices, and that he did not learn that the devices could not do so until the 2015 WSJ article. *Id.* at 2, 3. The FBI memorandum also noted that Mr. Kovacevich received an email from Ms. Holmes containing materials about Theranos, including valuation reports done by an "outside company." *Id.* at 1. He indicated

during his interview that outside valuation was also important to him, and, in fact, was so significant that Mr. Kovacevich resigned from the board after third-party valuation never materialized. *Id.* at 3.

In sum, the Court finds that the preponderance of the evidence supports the conclusion that the aforementioned ten investors invested significant sums in reliance on Ms. Holmes' misrepresentations. At sentencing, it is reasonable to infer that investors who were told or received information containing misrepresentations—including misrepresentations about the financial projections of Theranos, the capabilities of its proprietary technology, the use of Theranos' technology by the military, the company's reliance on third-party machines, and valuations of the technology's performance—some time before deciding to invest thus relied on such information in assessing their investment risk, which in turn affected whether they *would* invest and the *amount* they chose to invest. *See* PSR ¶ 18.

Although the Court counted ten victims, the reality may be that Defendant's fraud affected many more qualifying investor victims. Beginning in 2014 and 2015, binders were provided to investors containing false information about Theranos. Gov't Sent'g Mem. 3. Daniel Edlin, a Theranos project manager who reported to Ms. Holmes, testified that he prepared these binders based on an approved checklist and stated that the binders were reviewed by Ms. Holmes before they were provided to investors. 10/19/21 Hr'g Tr. 3993:15–14, 3995:7–23; 3996:18–4001:25. Furthermore, Defendant provided false information to news reporters who then published and circulated that information widely beyond potential investors. PSR ¶¶ 27, 39, 42. It would not be an unreasonable inference to conclude that all potential C-1 and C-2 investors received fraudulent information via Edlin's binders or were exposed to one of the multiple publications containing Defendant's misrepresentations. Gov't Sent'g Mem. 18, 20–21; *see George*, 949 F.3d at 1186 (noting that "the sentencing court reasonably [was allowed] to infer a pattern" in identifying the number of victims of defendant's bank fraud scheme) (quoting *United States v. Pham*, 545 F.3d 712, 720 n.3 (9th Cir. 2008)); *Laurienti*, 611 F.3d at 557 (noting that "it is reasonable to infer that all clients of Defendants who purchased the house stocks were duped by the conspiracy" where

Defendants were convicted of criminal conspiracy to defraud clients).  However, because the Court has already identified ten victims whose losses do not require such an inference, the Court need not—and declined to expand—the scope of victims to all investors who had received an investor binder or read any of the misleading press releases.

Accordingly, the Court is satisfied that the preponderance of the evidence supports a finding that at least these ten or more investors qualify as a victim under the Guidelines in support of a 2-level enhancement to Ms. Holmes' sentence under U.S.S.G. § 2B1.1(b)(2)(A)(i).

### C.   Risk of Death or Serious Bodily Injury Enhancement, U.S.S.G. § 2B.1(b)(16)(A)

The Guidelines permit a 2-level increase in offense level where "an offense involved [] the conscious or reckless risk of death or serious bodily injury."  U.S.S.G. § 2B.1(b)(16)(A). To establish that a defendant's conduct warrants the application of § 2B.1(b)(16)(A), the government "need not show actual injury to any particular victim" and must instead focus on a defendant's "disregard of risk."  *United States v. Henderson*, 893 F.3d 1338, 1351–52 (11th Cir. 2018). Ignorance of the risk is not a defense to the application of this enhancement.  *United States v. Johansson*, 249 F.3d 848, 859 (9th Cir. 2001).

The PSR does not apply this enhancement, but the government argues that such an enhancement is warranted because Ms. Holmes' conduct created a significant risk of death or bodily injury to Theranos patients as a result of misdiagnosis.  Gov't Sent'g Mem. 21.  However, Ms. Holmes was acquitted of conspiracy to commit fraud against Theranos patients (Count Ten), and the wire fraud charges with respect to specific Theranos patients (Counts Ten through Twelve).  *See* ECF No. 1235.  The government urges the Court to consider acquitted conduct for the purposes of sentencing because the conduct has been proven by a preponderance of the evidence.  *United States v. Watts*, 519 U.S. 148, 157 (1997) (holding that a sentencing court may consider conduct underlying an acquitted charge where such conduct has been proven by a preponderance of the evidence).  In considering acquitted conduct, "sentencing enhancements do not punish a defendant for crimes of which he was not convicted, but rather increase his sentence

because of the manner in which he [or she] committed *the crime of conviction*." 515 U.S. at 402–03 (emphasis added).

The government asserts that Ms. Holmes continued to offer tests to patients "[d]espite knowing of the serious flaws in Theranos' testing" and that medical doctors and patients would rely on these test results to make medical decisions. *Id.* In reaching this conclusion, the government relies on Ms. Holmes' conviction for conspiring to defraud Theranos investors, arguing that her patient-related conduct was "part of the same course of conduct and scheme or plan as their fraud on investors." *Id.* at 24–25. The government theorizes that, in order to persuade investors to purchase Theranos stock, Defendants needed Theranos' technology to appear "market-ready" and equipped for clinical patient testing so as to reduce the risk associated with investing in an early-stage start-up that lacks fully developed technology. *Id.* at 25. It also notes that Ms. Holmes Co-Defendant, Mr. Balwani, was convicted on the count alleging a conspiracy between Ms. Holmes and Mr. Balwani to defraud patients "based on substantially overlapping evidence." *Id.* at 24

Here, the link between the convicted crime, *i.e.* conspiracy to commit defraud investors, is too attenuated to connect Ms. Holmes to the risk of death or serious bodily injury to the patients receiving Theranos' blood tests absent more evidence. The Court acknowledges that some of Ms. Holmes' actions, such as publicly touting the capabilities and accuracy of Theranos' technology in furtherance of the conspiratorial conduct in media and news outlets (such as the 2013 WSJ promotion or the June 2014 Roger Parloff article published in Fortune Magazine), may have had a downstream effect of influencing patients and medical practitioners to use Theranos' proprietary technology and rely on its test results. *See* Gov't Sentencing Memo. at 18. However, the government has not shown by a preponderance of the evidence that Ms. Holmes disregarded the risk of harm to Theranos patients when she committed the conduct for which she was convicted, *i.e.*, making fraudulent misrepresentations to Theranos investors. *See* PSR ¶¶ 27, 42.

Accordingly, Defendant's acquitted conduct has not been used to calculate the guidelines nor considered in the Court's sentencing decision in this case. The Court sustained Defendant's

objection and declined to enhance Ms. Holmes' sentence pursuant to U.S.S.G. § 2B.1(b)(16)(A).

### D.   Aggravating Role Adjustment, U.S.S.G. § 3B.1(a)

The PSR included a 4-level upward adjustment based on Defendant's aggravating role as an "organizer or leader of a criminal activity" pursuant to U.S.S.G. § 3B.1(a).  PSR ¶ 108. Defendant objected to this enhancement, and the Court sustained the objection at Defendant's sentencing hearing.

The "organizer" enhancement is applied if Defendant "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."  U.S.S.G. § 3B.1(a).  To impose the enhancement, the government must show that "the defendant had control over other participants or organized other participants for the purpose of carrying out" the charged crimes."  *United States v. Holden*, 908 F.3d 395, 402 (9th Cir. 2018) (alteration and internal quotation marks omitted).  "Participants" are defined as individuals who are "criminally responsible for the commission of the offense"—therefore, a person who is not criminally responsible is not a "participant."  U.S.S.G. § 3B.1 cmt. 1.  "Mere facilitation of criminal activity is not sufficient to support the enhancement.  Nor is it sufficient for a defendant to have organized property or activities—the defendant must have organized participants."  *Holden*, 908 F.3d at 402 (internal citation omitted).

At Defendant's sentencing hearing, the Court found that, although Defendant was certainly an organizer or leader of her company, there was insufficient evidence to conclude that she was an "organizer or leader" of the *criminal activity*, *i.e.*, fraud and conspiracy to commit fraud against Theranos investors.  *See* PSR ¶ 108; Gov't Sent'g Mem. 26–27.  The PSR and the government's sentencing memorandum focus on Defendant's deep involvement in Theranos' operations, but the evidence indicated that Theranos was a "real company," not a criminal enterprise.  9/8/21 Hr'g Tr. 553:7-8.  To qualify for this enhancement, Defendant must have "organized other *participants for the purpose of carrying out the crime*."  *United States v. Whitney*, 673 F.3d 965, 975 (9th Cir. 2012) (emphasis added) (quoting *United States v. Ingham*, 486 F.3d 1068, 1074 (9th Cir. 2007)). Indeed, the Sentencing Guidelines accounts for circumstances involving a defendant's control over

unwitting *non-participant* individuals, which is reflected in the "otherwise extensive" element but not the "organizer or leader" element. *See* U.S.S.G. § 3B1.1 cmt. 3 ("[A] fraud that involved only three participants but used the unknowing services of many outsiders could be considered *extensive*.") (emphasis added). Accordingly, Defendant's control and organization of other employees at Theranos do not satisfy the "organizer or leader" requirement; she must control or organize other participants in the criminal activity.

The only other participant in the criminal activity that the government has identified is Co-Defendant Balwani. Although the government frequently mention Defendants together when referencing the scheme to defraud investors, the evidence presented by the government does not support a finding that Ms. Holmes exercised control or otherwise organized Mr. Balwani, only that Defendants acted as co-equals. *See*, *e.g.*, PSR ¶¶ 18, 21-22, 26-31; Gov't Sent'g Mem. 26–30. The Ninth Circuit has expressly held that "co-equal" conspirators who are not "in charge" of each other do not exhibit sufficient control to qualify for even the 2-level aggravated role enhancement. *Holden*, 908 F.3d at 402–03. Here, the only pertinent evidence identified by the government is that Ms. Holmes had the "power to terminate anyone at the company, including second-in-command Balwani." Gov't Sent'g Mem. 27. This fact—in and of itself and without further evidence that Holmes directed or instructed Balwani's criminal activity—does not support a finding that Holmes exercised control over Balwani, such that the Court can "apportion relative responsibility" to Holmes. *Holden*, 908 F.3d at 403.

Accordingly, the Court held that Defendant did not qualify for an aggravated role enhancement under any sub-section of U.S.S.G. § 3B1.1.

### E.      Acceptance of Responsibility Adjustment, U.S.S.G. § 3E1.1(a)

Finally, the Guidelines permit a 2-level deduction if the defendant "clearly demonstrates acceptance of responsibility for his [or her] offense." U.S.S.G. § 3E1.1(a). At Defendant's sentencing, the Court found that Ms. Holmes does not qualify for this deduction.

The Sentencing Guideline Commentary instructs that "[t]his adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the

essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. § 3E1.1(a), cmt. 2.  The comments provide a non-exhaustive list of considerations that are appropriate to determine whether a defendant qualifies under subsection (a), including whether the defendant truthfully admitted the conduct comprising the offenses of conviction and whether the defendant truthfully admitted any additional relevant conduct.  U.S.S.G. § 3E1.1(a), cmt. 1(A).

In this case, Ms. Holmes was found guilty of conspiring to commit wire fraud and committing wire fraud against the investors of her company.  At sentencing, Ms. Holmes apologized more generally for Theranos and its "failings," but did not acknowledge nor accept responsibility for her conduct giving rise to her criminal convictions such that the reduction is appropriate.  11/18/22 Hr'g Tr. 121:23, 122:17–18.  Defendant has not clearly demonstrated acceptance of responsibility for her offenses that permit her an acceptance of responsibility reduction; such an outcome would make meaningless the spirit of the reduction for defendants who make wholehearted and unqualified statements accepting responsibility.  In reaching this decision the Court does not consider nor penalize the Defendant for maintaining her innocence.

### F.    Final Guidelines Calculation

Based on the foregoing reasoning, the Court made the following findings at Defendant's sentencing hearing:

1.  The base offense level for violations of 18 U.S.C. § 1343 is 7 (U.S.S.G. § 2B1.1(a)(1));

2.  The total loss to identified investor victims is $120,146,247, which increases the offense level by 24 levels (§ 2B1.1(b)(1)(M);

3.  There are ten or more victims, which increases the offense level by 2 levels (§ 2B1.1(b)(2)(A)(i)); and

4.  There is insufficient evidence to support sentencing adjustments for risk of death or serious bodily injury, aggravating role as an organizer or leader, and acceptance of responsibility (§§ 2B1.1(b)(16); 3B1.1(a); 3E1.1).

Accordingly, the Sentencing Guidelines calculation resulted in an offense level of 33.

Combined with Defendant's Category I Criminal History, this yielded a Guideline sentencing range of 135 – 168 months.

### III.    INDIVIDUALIZED § 3553(A) ANALYSIS

Once it arrived at the appropriate Sentencing Guidelines range at Defendant's sentencing hearing, the Court proceeded to impose a sentence that is "sufficient, but not greater than necessary to comply with the purposes" of sentencing.  18 U.S.C.S. § 3553.  In doing so, the Court recognized that the Sentencing Guidelines' range is advisory, and it did not presume that the Guidelines' sentence was reasonable.  *See Gall v. United States*, 552 U.S. 38, 46, 49–50 (2007).  Instead, the Court conducted "an individualized assessment based on the facts" of the case, keeping in mind the factors listed at § 3553(a).

In determining the sentence, the Court considered the arguments and points presented in both parties' memoranda and heard statements from Ms. Holmes and a victim present at the sentencing hearing.  The Court considered the history and characteristics of the Defendant, as well as the nature and circumstances of the offense.  The Court recognized that Defendant's sentence must reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and afford adequate deterrence in criminal conduct.

### IV.    SENTENCE

Having considered the § 3553 factors, the Court imposed a sentence of 135 months' imprisonment, 3 years' supervised release with conditions adopted from the PSR's recommendations for supervised release, and a special assessment of $400 ($100 per Count).  Defendant's surrender date was set for April 27, 2023.  The parties were ordered to meet and confer to determine a date for the restitution hearing.

Dated: January 10, 2023

EDWARD J. DAVILA
United States District Judge

1

```
 1
 2                    UNITED STATES DISTRICT COURT
 3                  NORTHERN DISTRICT OF CALIFORNIA
 4                         SAN JOSE DIVISION
 5
      UNITED STATES OF AMERICA,        )
 6                                     )  CR-18-00258-EJD
                       PLAINTIFF,      )
 7                                     )  SAN JOSE, CALIFORNIA
             VS.                       )
 8                                     )  NOVEMBER 18, 2022
      ELIZABETH A. HOLMES,             )
 9                                     )  PAGES 1 - 135
                       DEFENDANT.      )
10    _____  )  SENTENCING
11
               TRANSCRIPT OF SENTENCING PROCEEDINGS
12           BEFORE THE HONORABLE EDWARD J. DAVILA
                   UNITED STATES DISTRICT JUDGE
13
      A P P E A R A N C E S:
14
      FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
15                          BY:  JOHN C. BOSTIC
                                 JEFFREY B. SCHENK
16                          150 ALMADEN BOULEVARD, SUITE 900
                            SAN JOSE, CALIFORNIA 95113
17
                            BY:  ROBERT S. LEACH
18                               KELLY VOLKAR
                            1301 CLAY STREET, SUITE 340S
19                          OAKLAND, CALIFORNIA 94612
20    U.S. PROBATION:       KYLE POLLAK
                            JESSICA GOLDSBERRY
21
                 (APPEARANCES CONTINUED ON THE NEXT PAGE.)
22
23    OFFICIAL COURT REPORTER:
                            IRENE L. RODRIGUEZ, CSR, RMR, CRR
24                          CERTIFICATE NUMBER 8074
25        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
               TRANSCRIPT PRODUCED WITH COMPUTER
```

2

```
 1      A P P E A R A N C E S: (CONT'D)

 2

 3      FOR DEFENDANT HOLMES:   WILLIAMS & CONNOLLY LLP
                                BY:  KEVIN M. DOWNEY
 4                                   LANCE A. WADE
                                     AMY SAHARIA
 5                                   KATHERINE TREFZ
                                     J.R. FLEURMONT
 6                                   RICHARD CLEARY
                                     PATRICK LOOBY
 7                                   ANDREW LEMENS
                                725 TWELFTH STREET, N.W.
 8                              WASHINGTON, D.C. 20005

 9                              LAW OFFICE OF JOHN D. CLINE
                                BY:  JOHN D. CLINE
10                              ONE EMBARCADERO CENTER, SUITE 500
                                SAN FRANCISCO, CALIFORNIA 94111
11

12      ALSO PRESENT:           FEDERAL BUREAU OF INVESTIGATION
                                BY:  ADELAIDA HERNANDEZ
13
                                OFFICE OF THE U.S. ATTORNEY
14                              BY:  LAKISHA HOLLIMAN, PARALEGAL
                                     MADDI WACHS, PARALEGAL
15                                   SUSAN KREIDER

16

17

18

19

20

21

22

23

24

25
```

3

```
       1    SAN JOSE, CALIFORNIA                    NOVEMBER 18, 2022

       2                    P R O C E E D I N G S

10:10AM  3        (COURT CONVENED AT 10:10 A.M.)

10:10AM  4             THE COURT:  WE'LL NOW CALL OUR MORNING MATTER.  THIS

10:10AM  5    IS 18-258, UNITED STATES VERSUS ELIZABETH HOLMES.

10:11AM  6        LADIES AND GENTLEMEN, WE ARE HERE BECAUSE OF THE

10:11AM  7    COMMUNITY'S VERDICT IN A JURY TRIAL THAT WAS HELD IN THIS

10:11AM  8    COURTROOM.  THE TRIAL LASTED FOR MONTHS.  THE JURY DELIBERATED

10:11AM  9    FOR SEVERAL DAYS, AND THEIR DECISION, THAT IS THE COMMUNITY'S

10:11AM 10    DECISION, IS WORTHY OF RESPECT, THAT'S WHY WE'RE HERE TODAY.

10:11AM 11        THE JURY WAS VERY CONSCIENTIOUS IN THEIR DELIBERATIONS.

10:11AM 12    THEY HEARD THE ARGUMENTS OF COUNSEL, THEY HEARD THE EVIDENCE,

10:11AM 13    THEY DELIBERATED, AS I SAID, FOR SEVERAL DAYS.

10:11AM 14        AND WHEN THE CASE WAS SUBMITTED TO THEM, AFTER RECEIVING

10:11AM 15    INSTRUCTIONS FROM THE COURT, THE JURY RETURNED WITH THE

10:11AM 16    COMMUNITY'S VERDICT, AND THAT VERDICT WAS -- AS MANY OF YOU

10:11AM 17    KNOW, THE GOVERNMENT DID NOT, DID NOT MEET THEIR BURDEN OF

10:11AM 18    PROOF AS TO THE PATIENT COUNTS AND AS TO ONE INVESTOR COUNT.

10:12AM 19        THE COMMUNITY, THROUGH THE JURY, FOUND THAT THE GOVERNMENT

10:12AM 20    HAD MET THEIR BURDEN AS TO THE CONSPIRACY TO COMMIT WIRE FRAUD

10:12AM 21    COUNT AND TO SPECIFIC INVESTOR COUNTS.  THAT'S WHAT BRINGS US

10:12AM 22    HERE TODAY, RESPECT FOR THE JURY'S VERDICT AND THE COURT'S

10:12AM 23    OBLIGATION TO IMPOSE SENTENCE SUBSEQUENT TO THAT VERDICT.

10:12AM 24        LET ME THEN CALL ON THE PARTIES TO PLEASE STATE THEIR

10:12AM 25    APPEARANCE.
```

4

| | | |
|---|---|---|
| 10:12AM | 1 | WHO APPEARS FOR THE GOVERNMENT? |
| 10:12AM | 2 | MR. LEACH:  GOOD MORNING, YOUR HONOR. |
| 10:12AM | 3 | ROBERT LEACH ON BEHALF OF THE UNITED STATES. |
| 10:12AM | 4 | I'M JOINED BY JOHN BOSTIC, JEFF SCHENK, AND KELLY VOLKAR. |
| 10:12AM | 5 | THE COURT:  THANK YOU.  GOOD MORNING. |
| 10:12AM | 6 | AND WHO APPEARS FOR THE DEFENSE? |
| 10:12AM | 7 | MR. DOWNEY:  GOOD MORNING, YOUR HONOR. |
| 10:12AM | 8 | KEVIN DOWNEY FOR MS. HOLMES. |
| 10:12AM | 9 | WITH ME IS LANCE WADE, KATIE TREFZ, JOHN CLINE. |
| 10:12AM | 10 | MS. HOLMES IS PRESENT IN COURT. |
| 10:13AM | 11 | I ALSO WANT TO LET THE COURT KNOW THAT SOME OF THE LAWYERS |
| 10:13AM | 12 | WHO APPEARED DURING THE CASE IN FRONT OF YOUR HONOR ARE HERE: |
| 10:13AM | 13 | J.R. FLEURMONT, RICHARD CLEARY, PATRICK LOOBY, AND |
| 10:13AM | 14 | ANDREW LEMENS. |
| 10:13AM | 15 | THE COURT:  THANK YOU.  I RECOGNIZE THEM.  IT'S NICE |
| 10:13AM | 16 | TO SEE YOU ALL AGAIN.  THANK YOU. |
| 10:13AM | 17 | MR. DOWNEY:  YOUR HONOR, NOT TO GET AHEAD OF |
| 10:13AM | 18 | YOURSELF, AND I KNOW YOUR HONOR IS AWARE OF THIS, BUT I THINK |
| 10:13AM | 19 | YOU MISSPOKE IN REFLECTING THE JURY'S VERDICT. |
| 10:13AM | 20 | THE JURY DID NOT RETURN A VERDICT WITH REGARD TO THREE |
| 10:13AM | 21 | INDIVIDUAL INVESTOR COUNTS.  I THINK YOUR HONOR MISSPOKE. |
| 10:13AM | 22 | THE COURT:  YES, I MAY HAVE.  YES.  THANK YOU. |
| 10:13AM | 23 | I ALSO WANT TO INDICATE, MR. DOWNEY, THAT THROUGHOUT THESE |
| 10:13AM | 24 | PROCEEDINGS, IF YOUR CLIENT WISHES TO REMAIN SEATED, I'M |
| 10:13AM | 25 | CERTAINLY WILLING TO ACCOMMODATE THAT. |

5

10:13AM  1          MR. DOWNEY:  THANK YOU, YOUR HONOR.

10:13AM  2          THE COURT:  YOU'RE WELCOME.  LET ME ASK FOR

10:13AM  3   PROBATION'S APPEARANCE, FIRST OF ALL.  WHO APPEARS FOR

10:13AM  4   PROBATION?

10:13AM  5          PROBATION OFFICER:  YES, YOUR HONOR.

10:13AM  6      KYLE POLLAK FOR PROBATION.

10:14AM  7          THE COURT:  YES.  THANK YOU.  GOOD MORNING.

10:14AM  8      I WANT TO INDICATE THE DOCUMENTS THAT I HAVE READ AND

10:14AM  9   REVIEWED.

10:14AM  10     THE COURT HAS RECEIVED DOCUMENT 164, WHICH IS THE REVISED

10:14AM  11  PROBATION REPORT.  LET ME ASK YOU, ARE THERE ANY CHANGES,

10:14AM  12  ADDITIONS, DELETIONS IN THAT REPORT?

10:14AM  13         PROBATION OFFICER:  NOT THAT I'M AWARE OF.

10:14AM  14         THE COURT:  ALL RIGHT.  THANK YOU.

10:14AM  15     THE COURT HAS ALSO READ AND REVIEWED DOCUMENT 1641, WHICH

10:14AM  16  IS THE SEALED SENTENCING MEMORANDUM OF THE DEFENSE, AND ALL OF

10:14AM  17  THE EXHIBITS ATTACHED THERETO.

10:14AM  18     THE COURT HAS ALSO READ DOCUMENT 1649, WHICH IS THE

10:14AM  19  CORRECTED GOVERNMENT SENTENCING MEMORANDUM.

10:14AM  20     THE GOVERNMENT HAS ALSO SUPPLIED 1644, WHICH WERE

10:14AM  21  EXHIBITS, AND THE COURT HAS READ AND REVIEWED THOSE.

10:14AM  22     THE COURT HAS ALSO READ AND REVIEWED 1645, WHICH IS

10:14AM  23  DR. SABA'S REPORT.

10:15AM  24     AND THE COURT HAS ALSO READ AND REVIEWED DOCUMENT 1650,

10:15AM  25  WHICH IS MS. HOLMES'S RESPONSE TO THE GOVERNMENT'S SENTENCING

6

10:15AM  1     MEMORANDUM.

10:15AM  2          THE COURT HAS ALSO RECEIVED OVER -- SINCE THOSE

10:15AM  3     SUBMISSIONS, I HAVE RECEIVED FROM THE PARTIES ADDITIONAL

10:15AM  4     LETTERS AS RECENT AS LAST NIGHT.

10:15AM  5          LAST NIGHT THE COURT RECEIVED LETTERS, I THINK THESE ARE

10:15AM  6     FROM THE DEFENSE, A COUPLE OF LETTERS LAST NIGHT.  ONE WAS IN

10:15AM  7     SPANISH.  I'M SURE YOU SHARED THOSE WITH COUNSEL.

10:15AM  8          I DON'T KNOW IF YOU SHARED WITH THEM AN INTERPRETED COPY

10:15AM  9     OF THAT OR NOT.

10:15AM 10               MR. DOWNEY:  WE DID NOT, YOUR HONOR.  WE CAN DO

10:15AM 11     THAT, BUT WE DID NOT.

10:15AM 12               THE COURT:  OKAY.  DID YOU RECEIVE A COPY OF THESE

10:15AM 13     LETTERS?

10:15AM 14               MR. LEACH:  WE DID, YOUR HONOR.  THANK YOU.

10:15AM 15               THE COURT:  THANK YOU.

10:15AM 16          THE COURT ALSO RECEIVED YESTERDAY, I THINK IT WAS

10:15AM 17     3:00 P.M., ANOTHER CHART FROM THE GOVERNMENT ABOUT LOSS, LOSS

10:15AM 18     CHART.

10:15AM 19          DID YOU GET THAT?

10:15AM 20               MR. DOWNEY:  WE DID, YOUR HONOR.

10:15AM 21               THE COURT:  OKAY.  THANK YOU.

10:15AM 22          THE COURT HAS READ AND REVIEWED EXHIBITS, INCLUDING THE

10:15AM 23     LETTERS THAT WERE SUBMITTED TO THE COURT.

10:15AM 24          ARE THERE ANY OTHER DOCUMENTS THAT THE PARTIES WISH TO

10:16AM 25     CALL TO MY ATTENTION?

7

| | | |
|---|---|---|
| 10:16AM | 1 | MR. LEACH:  NO, YOUR HONOR. |
| 10:16AM | 2 | MR. DOWNEY:  NO, YOUR HONOR. |
| 10:16AM | 3 | THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH. |
| 10:16AM | 4 | WHAT I WOULD LIKE TO DO FIRST, FOLKS, IS TO GO THROUGH THE |
| 10:16AM | 5 | OBJECTIONS OF THE -- BEFORE WE TALK ABOUT ANY GUIDELINE |
| 10:16AM | 6 | CALCULATIONS, I'D LIKE TO RESOLVE OBJECTIONS THAT WERE FILED ON |
| 10:16AM | 7 | BEHALF OF MS. HOLMES.  AND THERE ARE OBJECTIONS TO THE PSR |
| 10:16AM | 8 | ADDENDUM IN 1640, WHICH IS THE PSR DOCUMENT.  I'D LIKE TO GO |
| 10:16AM | 9 | THROUGH THOSE, PLEASE, IF WE MAY. |
| 10:16AM | 10 | AND THEN FOLLOWING THAT WE'LL GO THROUGH APPENDIX A |
| 10:16AM | 11 | OBJECTIONS.  THERE WERE SEVERAL OF THOSE. |
| 10:16AM | 12 | I'VE READ AND REVIEWED THE OBJECTIONS.  WHAT WE'LL DO IS |
| 10:16AM | 13 | WE'LL GO THROUGH EACH OF THOSE, AND I'M HAPPY TO HEAR FROM |
| 10:17AM | 14 | COUNSEL IF YOU WISH. |
| 10:17AM | 15 | I'VE READ THE BRIEFINGS.  THAT'S BEEN VERY HELPFUL TO THE |
| 10:17AM | 16 | COURT. |
| 10:17AM | 17 | WHEN WE GET TO THE APPENDIX, LET ME SAY I DON'T THINK I'M |
| 10:17AM | 18 | GOING TO NEED EXTENSIVE CONVERSATION ON THOSE. |
| 10:17AM | 19 | MR. DOWNEY:  I THINK, YOUR HONOR, FROM OUR |
| 10:17AM | 20 | PERSPECTIVE, WE AGREE. |
| 10:17AM | 21 | I THINK MOST OF THE ISSUES THAT ARE PRESENTED THERE ARE |
| 10:17AM | 22 | CAPTURED IN THE EIGHT OBJECTIONS, SO IF THERE'S AN EXCEPTION, |
| 10:17AM | 23 | I'LL LET THE COURT KNOW, BUT I CAN'T IMAGINE THAT WILL BE |
| 10:17AM | 24 | NECESSARY. |
| 10:17AM | 25 | THE COURT:  ALL RIGHT.  THANK YOU. |

8

| | | |
|---|---|---|
| 10:17AM | 1 | WHAT I'LL DO, TO LET YOU KNOW IN ADVANCE, WHAT I INTEND TO |
| 10:17AM | 2 | DO AFTER WE FINISH OUR WORK ON 1640, I'LL TURN TO APPENDIX A, |
| 10:17AM | 3 | AND I'M JUST GOING TO READ THE PSR PARAGRAPH BY PARAGRAPH.  I |
| 10:17AM | 4 | THINK IT'S IMPORTANT THAT I DO ADDRESS EACH OF THOSE ON THE |
| 10:17AM | 5 | RECORD AND INDICATE WHAT THE COURT'S DECISION IS.  SO WE'LL |
| 10:17AM | 6 | JUST MARSHAL THROUGH THAT. |
| 10:17AM | 7 | BUT FIRST LET'S START WITH OBJECTION A TO THE PSR.  AND |
| 10:17AM | 8 | THIS IS MS. HOLMES'S OBJECTION TO ANY ENHANCEMENT BASED ON |
| 10:18AM | 9 | ACQUITTED CONDUCT. |
| 10:18AM | 10 | WILL YOU BE SPEAKING ON THESE OBJECTIONS? |
| 10:18AM | 11 | MR. DOWNEY:  YES, YOUR HONOR. |
| 10:18AM | 12 | THE COURT:  OKAY. |
| 10:18AM | 13 | MR. LEACH:  YOUR HONOR, IF I MAY, MR. BOSTIC WILL BE |
| 10:18AM | 14 | SPEAKING TO THE OBJECTIONS AND THE ADDENDUM TO THE PSR. |
| 10:18AM | 15 | WHEN WE GET TO APPENDIX A, I WILL BE COVERING THAT ON |
| 10:18AM | 16 | BEHALF OF THE GOVERNMENT TO THE EXTENT THAT THE COURT WANTS |
| 10:18AM | 17 | ARGUMENT. |
| 10:18AM | 18 | AND AS WE PROGRESS, MR. SCHENK WILL BE ADDRESSING THE |
| 10:18AM | 19 | 3553(A) FACTORS IF THAT'S OKAY WITH THE COURT. |
| 10:18AM | 20 | THE COURT:  OKAY.  THANK YOU.  THANKS VERY MUCH. |
| 10:18AM | 21 | EXCUSE ME. |
| 10:18AM | 22 | ALL RIGHT.  WELL, LET'S BEGIN THEN WITH THE OBJECTIONS TO |
| 10:18AM | 23 | NUMBER ONE. |
| 10:18AM | 24 | MR. DOWNEY, WHAT WOULD YOU LIKE ME TO KNOW ABOUT THAT? |
| 10:18AM | 25 | MR. DOWNEY:  YOUR HONOR, I DON'T WANT TO BE |

9

10:18AM 1    REDUNDANT WITH THE BRIEFING, BUT I WOULD SIMPLY SAY THREE

10:18AM 2    THINGS, AND I'M HAPPY TO HAVE A FURTHER CONVERSATION IF IT'S

10:18AM 3    HELPFUL TO THE GOVERNMENT OR TO THE COURT.

10:19AM 4        THE FIRST ISSUE WITH REGARD TO THE ACQUITTED CONDUCT I

10:19AM 5    KNOW THE COURT IS VERY FAMILIAR WITH, BUT I WANT TO MAKE CLEAR

10:19AM 6    ON THE RECORD THAT WE ARE PRESERVING OUR OBJECTION UNDER THE

10:19AM 7    CONSTITUTION TO THE USE OF ACQUITTED CONDUCT TO FACTOR INTO

10:19AM 8    MS. HOLMES'S SENTENCE IN ANY WAY, AND I RECOGNIZE AS OF TODAY

10:19AM 9    THAT'S AN ISSUE THE SUPREME COURT HAS NOT DECIDED.  WE APPEAR

10:19AM 10   TO HAVE ONE AND MAYBE TWO JUSTICES OF THE SUPREME COURT THAT

10:19AM 11   ARE SYMPATHETIC TO THAT POSITION, AND I WON'T FORECAST WHERE

10:19AM 12   THE OTHERS MAY END UP, BUT I DO WANT TO PRESERVE THAT POSITION.

10:19AM 13       SECOND, YOUR HONOR, AS TO THE CONDUCT ON WHICH THE

10:19AM 14   GOVERNMENT RELIES TO DEMONSTRATE RELEVANT CONDUCT IN CONNECTION

10:19AM 15   WITH PATIENTS, YOUR HONOR WILL RECALL THAT WE TWICE RAISED AS

10:19AM 16   PART OF MOTIONS TO DISMISS THE LEGAL ISSUE THAT WE DID NOT

10:19AM 17   THINK THAT THAT CONDUCT CONSTITUTED CRIMINAL CONDUCT EVEN AS

10:20AM 18   ALLEGED AND THAT THOSE COUNTS SHOULD HAVE BEEN DISMISSED.

10:20AM 19       YOUR HONOR DISAGREED WITH US.  I THINK THAT'S DOCKET 500

10:20AM 20   AND 552 IF I'M REMEMBERING, BUT WE PRESERVE OUR OBJECTION TO

10:20AM 21   THAT HERE AS WELL.

10:20AM 22       LAST AND MAYBE FUNDAMENTALLY HERE YOUR HONOR HAS SPOKEN TO

10:20AM 23   IT ALREADY IN HIS INTRODUCTORY REMARKS, I THINK THAT THE

10:20AM 24   CONDUCT AS TO THE ALLEGED PATIENT CONSPIRACY WAS CONSIDERED

10:20AM 25   AMPLY DURING THE COURSE OF THE TRIAL.

10

| | | |
|---|---|---|
| 10:20AM | 1 | WE'VE LAID OUT IN A SENTENCING MEMORANDUM THE DIFFERENCE |
| 10:20AM | 2 | BETWEEN THE FACTS AS ALLEGED IN THE INDICTMENT AND WHAT THE |
| 10:20AM | 3 | ACTUAL FACTS WERE AS TO THE STRUCTURE OF THE LAB, |
| 10:20AM | 4 | RESPONSIBILITY WITHIN THE LAB, AFTER PROBLEMS, WHICH THE |
| 10:20AM | 5 | GOVERNMENT IDENTIFIED WERE RAISED, RESPONSES TO THOSE PROBLEMS |
| 10:20AM | 6 | THAT HAPPENED WITHIN A STRUCTURE THAT WAS VERY THOUGHTFUL. |
| 10:20AM | 7 | I'M HAPPY TO COMMENT ON THAT FURTHER, BUT SIMPLY WILL SAY |
| 10:21AM | 8 | AT THIS POINT THAT I THINK THE JURY RETURNED A VERDICT OF |
| 10:21AM | 9 | ACQUITTAL IN THAT INSTANCE BECAUSE THE RECORD AMPLY SUPPORTS |
| 10:21AM | 10 | THAT THERE WAS NOT CRIMINAL CONDUCT THERE. |
| 10:21AM | 11 | AS THE COURT IS WELL AWARE, UNDER THE GUIDELINES FOR |
| 10:21AM | 12 | CONDUCT TO BE RELEVANT CONDUCT, IT MUST BE CRIMINAL CONDUCT. |
| 10:21AM | 13 | NOT ONLY HAS THAT NOT BEEN PROVEN, BUT IT'S NOT THE CASE |
| 10:21AM | 14 | LEGALLY OR FACTUALLY. |
| 10:21AM | 15 | THE COURT: THANK YOU. I DIDN'T ASK FOR PROBATION'S |
| 10:21AM | 16 | RESPONSE TO THE OBJECTION. |
| 10:21AM | 17 | IT'S NOTED IN THE PROBATION REPORT, AND I THINK IN |
| 10:21AM | 18 | PARAGRAPH 5 OF THE ADDENDUM, MR. POLLAK, YOU SUGGEST THAT |
| 10:21AM | 19 | MS. HOLMES'S ACQUITTED CONDUCT WAS NOT ACCOUNTED FOR UNDER THE |
| 10:21AM | 20 | GUIDELINES; IS THAT CORRECT? |
| 10:21AM | 21 | PROBATION OFFICER: THAT'S CORRECT, YOUR HONOR. |
| 10:21AM | 22 | THE COURT: THANK YOU. AND YOU RECOGNIZE THAT. |
| 10:21AM | 23 | MR. DOWNEY: YES. |
| 10:21AM | 24 | MS. BOSTIC: THANK YOU, YOUR HONOR. GOOD MORNING. |
| 10:21AM | 25 | I WANT TO MAKE SURE THAT I'M RESPONDING TO THE COURT'S |

10:21AM 1    QUESTIONS.

10:21AM 2        THE ISSUE ABOUT THE RELIANCE ON ACQUITTED CONDUCT BEARS

10:22AM 3    MOSTLY ON WHETHER THE COURT SHOULD APPLY AN ENHANCEMENT UNDER

10:22AM 4    THE GUIDELINES FOR THE CONSCIOUS OR RECKLESS RISK OF --

10:22AM 5    CONSCIOUS OR RECKLESS DISREGARD OF RISK OF DEATH OR BODILY HARM

10:22AM 6    TO PATIENTS, BUT I WANT TO MAKE SURE THAT I RESPONDED TO THE

10:22AM 7    COURT'S QUESTION AND NOT GET AHEAD OF OURSELVES AND TALK ABOUT

10:22AM 8    THAT GUIDELINE ENHANCEMENT, BUT I'M HAPPY TO TALK ABOUT THAT

10:22AM 9    TOO.

10:22AM 10        THE COURT:  WELL, I WAS GOING TO TALK ABOUT THAT.

10:22AM 11   THAT WAS YOUR REQUEST.  THAT WASN'T A GUIDELINE CALCULATION

10:22AM 12   THAT WAS SUGGESTED BY PROBATION.  I WAS GOING TO BRING THAT UP

10:22AM 13   DURING THE COURT'S RECITATION OF GUIDELINE, BUT YOU'VE GOT THE

10:22AM 14   FLOOR NOW, SO WHY DON'T YOU TALK ABOUT THAT IF YOU WOULD LIKE,

10:22AM 15   WHY YOU THINK THE COURT SHOULD APPLY THAT, AND THEN I'LL ASK

10:22AM 16   MR. DOWNEY'S COMMENTS.

10:22AM 17        MS. BOSTIC:  YES, YOUR HONOR.

10:22AM 18        AND I'LL START WITH THE ISSUE OF RELIANCE ON ACQUITTED

10:22AM 19   CONDUCT HERE, BECAUSE, FIRST OF ALL, IT'S IMPORTANT TO NOTE

10:22AM 20   THAT USE OF ACQUITTED CONDUCT IN SENTENCING IS, OF COURSE,

10:22AM 21   CONSISTENT WITH THE LAW.  THAT'S UNITED STATES VERSUS WATTS, A

10:23AM 22   SUPREME COURT CASE FROM 1997.  I DON'T THINK THERE'S A DISPUTE

10:23AM 23   BETWEEN THE PARTIES THAT THE LAW PERMITS THE COURT TO CONSIDER

10:23AM 24   ACQUITTED CONDUCT.

10:23AM 25        TO THE EXTENT THAT THERE HAVE BEEN SOME OPINIONS OR

10:23AM 1    INDIVIDUAL JUDGES VOICING CONCERN ABOUT THAT PRACTICE AND HOW

10:23AM 2    IT MIGHT BE UNFAIR IN SOME SITUATIONS, THE GOVERNMENT SUBMITS

10:23AM 3    THAT THIS IS NOT ONE OF THOSE SITUATIONS.

10:23AM 4        THE COURT COULD IMAGINE A CASE WHERE A DEFENDANT WAS

10:23AM 5    ACQUITTED OF CONDUCT OR ACQUITTED OF CHARGES IN A WAY THAT

10:23AM 6    CAUSED THE COURT TO CONCLUDE THAT THE JURY FOUND THAT DEFENDANT

10:23AM 7    DIDN'T ENGAGE IN SOME ACTION OR SOME CONDUCT.

10:23AM 8        IF A DEFENDANT, FOR EXAMPLE, WAS CHARGED WITH COMMITTING

10:23AM 9    TWO ROBBERIES AND ACQUITED OF ONE, THE COURT COULD CONCLUDE

10:23AM 10   FROM THAT, THAT THE JURY FOUND THAT THE DEFENDANT SIMPLY DIDN'T

10:23AM 11   PARTICIPATE IN THAT SECOND OFFENSE, WAS NOT THERE, WAS WRONGLY

10:23AM 12   IDENTIFIED, SOMETHING LIKE THAT.

10:23AM 13       HERE MS. HOLMES'S CONDUCT TOWARDS PATIENTS IS IN THE

10:23AM 14   RECORD.  IT'S ESTABLISHED.  THERE'S NOT A FACTUAL DISPUTE ABOUT

10:24AM 15   WHAT DECISIONS SHE MADE AND WHEN.

10:24AM 16       THE DISPUTE BETWEEN THE PARTIES IS OVER THINGS LIKE HER

10:24AM 17   INTENT, AND, OF COURSE, THE JURY ACQUITTED FINDING THAT THE

10:24AM 18   CHARGED CRIMES OF WIRE FRAUD AND CONSPIRACY TO COMMIT WIRE

10:24AM 19   FRAUD AS TO PATIENTS HAD NOT BEEN PROVEN BEYOND A REASONABLE

10:24AM 20   DOUBT, BUT WE DON'T KNOW WHY THE JURY MADE THAT DECISION.  THAT

10:24AM 21   CANNOT BE KNOWN.

10:24AM 22       SO THE POINT IS THAT APPLYING AN ENHANCEMENT IN THIS CASE,

10:24AM 23   FINDING THAT MS. HOLMES EXHIBITED A RECKLESS DISREGARD TO THE

10:24AM 24   RISK TO PATIENTS DOESN'T REQUIRE THE COURT TO DISAGREE WITH THE

10:24AM 25   JURY'S FINDINGS.

10:24AM 1    THE JURY FOUND APPARENTLY THAT MS. HOLMES DID NOT HAVE THE

10:24AM 2    INTENT TO DEFRAUD PATIENTS, BUT THAT DOES NOT MEAN THAT SHE DID

10:24AM 3    NOT HAVE A RECKLESS OR CONSCIOUS DISREGARD OF THE RISK THAT

10:24AM 4    THERANOS'S ACTIONS WERE POSING TO PATIENTS.

10:24AM 5    AND, IN FACT, THE EVIDENCE THAT THE COURT HAS SEEN OVER

10:25AM 6    THE COURSE OF THIS CASE IN BOTH TRIALS SHOWS THAT MS. HOLMES

10:25AM 7    DID HAVE THAT DISREGARD FOR THE RISK THAT PATIENTS WERE

10:25AM 8    INCURRING AS A RESULT OF THERANOS'S ACCURACY AND RELIABILITY

10:25AM 9    PROBLEMS IN ITS TEST, AND I'M HAPPY TO GO OVER THAT BRIEFLY,

10:25AM 10   BUT I WANT TO PAUSE TO SEE IF THE COURT HAS ANY QUESTIONS SO

10:25AM 11   FAR.

10:25AM 12       THE COURT:  WELL, I SUPPOSE FOCUSSING ON THIS

10:25AM 13   FACTOR, WHAT DO YOU BELIEVE, AND I'LL ASK MR. DOWNEY TO

10:25AM 14   RESPOND, WHAT DO YOU BELIEVE, WHAT FACT OR FACTS DO YOU BELIEVE

10:25AM 15   ARE THE BEST SUPPORT FOR THE COURT APPLYING THIS FACTOR?

10:25AM 16       MS. BOSTIC:  YES, YOUR HONOR.

10:25AM 17   SO I THINK A LARGE PORTION OF BOTH TRIALS IN THIS CASE

10:25AM 18   FOCUSSED ON NOT ONLY THE PROBLEMS WITH THERANOS'S TECHNOLOGY

10:25AM 19   AND THE WAY THAT THOSE PROBLEMS HAD AN ADVERSE IMPACT ON THE

10:25AM 20   ACCURACY OF THE TEST, BUT ALSO SPECIFICALLY THE DEFENDANT'S

10:25AM 21   KNOWLEDGE OF THOSE PROBLEMS, BOTH MS. HOLMES AND MR. BALWANI.

10:26AM 22   AND THE GOVERNMENT'S SENTENCING MEMORANDUM HIGHLIGHTS A

10:26AM 23   FEW KEY EXAMPLES SHOWING THAT MS. HOLMES KNEW THAT THERE WERE

10:26AM 24   SERIOUS PROBLEMS.

10:26AM 25   EVEN YEARS BEFORE THERANOS OFFERED ITS TESTS, MS. HOLMES

10:26AM 1     HAD A CONVERSATION WITH A CONSULTANT HIRED BY WALGREENS TO

10:26AM 2     ASSESS THERANOS'S TECHNOLOGY.

10:26AM 3         WHEN THAT CONSULTANT RAISED CONCERNS, ASKED QUESTIONS

10:26AM 4     ABOUT WHAT SUBSTANTIATED THERANOS'S CLAIMS, AND WARNED

10:26AM 5     MS. HOLMES THAT INACCURATE TEST RESULTS WERE A SERIOUS THING

10:26AM 6     AND COULD POTENTIALLY LAND HER IN JAIL, THAT'S WHAT THIS

10:26AM 7     CONSULTANT TOLD HER, SHE RESPONDED GLIBLY ACCORDING TO THAT

10:26AM 8     CONSULTANT.  SHE SAID SOMETHING TO THE EFFECT OF "THEY DON'T

10:26AM 9     PUT ATTRACTIVE PEOPLE LIKE ME IN JAIL."

10:26AM 10        YEARS LATER WHEN THE COMPANY WAS ABOUT TO LAUNCH ITS

10:26AM 11    SERVICES TO THE PUBLIC, MS. HOLMES'S LAB DIRECTOR CAME TO HER

10:26AM 12    INDICATING THAT HE HAD TO RAISE ALARM BILLS BECAUSE THE COMPANY

10:26AM 13    WAS NOT READY TO LAUNCH IN SOME IMPORTANT RESPECTS.  THE LAUNCH

10:27AM 14    WENT FORWARD ANYHOW.

10:27AM 15        AFTER THE LAUNCH WENT FORWARD, AS THE COURT SAW, THERE

10:27AM 16    WERE NUMEROUS INCIDENTS WHERE PROBLEMS AROSE WITH THE

10:27AM 17    PERFORMANCE OF THERANOS'S TECHNOLOGY AND PROBLEMS THAT WOULD

10:27AM 18    HAVE A DIRECT IMPACT ON WHETHER PATIENTS COULD ACTUALLY RELY ON

10:27AM 19    THESE TESTS TO MAKE THE IMPORTANT MEDICAL DECISIONS THAT WOULD

10:27AM 20    BE MADE BASED ON THE CLINICAL BLOOD TEST.  THOSE ARE ALSO

10:27AM 21    HIGHLIGHTED IN THE GOVERNMENT'S BRIEFING.

10:27AM 22        THOSE ALERTS CAME FROM STAFF WHO WERE WORKING WITH THE

10:27AM 23    TECHNOLOGY ITSELF.  THEY CAME FROM THE LAB DIRECTOR, THEY CAME

10:27AM 24    FROM OTHER PERSONNEL AT THERANOS, INCLUDING THE GRANDSON OF ONE

10:27AM 25    OF THE BOARD MEMBERS WHO SENT A VERY DETAILED MESSAGE TO

10:27AM 1    MS. HOLMES LAYING OUT REASONS WHY HE THOUGHT THE COMPANY MIGHT

10:27AM 2    BE OVERSTATING THE PERFORMANCE AND ACCURACY OF ITS TESTS.

10:27AM 3        AND MS. HOLMES WAS ALSO AWARE OF MANY INSTANCES WHERE

10:27AM 4    PATIENTS GOT INACCURATE RESULTS ON IMPORTANT MEDICAL TESTS AND

10:28AM 5    SITUATIONS WHERE EMPLOYEES EXPRESSED DOUBTS OR MISGIVINGS OR

10:28AM 6    CONCERNS ABOUT THE TESTS THAT THERANOS WAS PROVIDING TO

10:28AM 7    PATIENTS.

10:28AM 8        MS. HOLMES RESPONDED TO THESE SITUATIONS IN A VARIETY OF

10:28AM 9    WAYS, SOMETIMES WITH INDIGNATION, SOMETIMES WITH ANXIETY,

10:28AM 10   SOMETIMES WITH DISMISSIVENESS, AND THE IMPORTANT THING, THOUGH,

10:28AM 11   IS THAT IN NONE OF THOSE SITUATIONS DID MS. HOLMES OR

10:28AM 12   MR. BALWANI TAKE THOSE CONCERNS TO HEART AND STOP OFFERING

10:28AM 13   THESE PROBLEMATIC TESTS.

10:28AM 14       SO THIS ENHANCEMENT IS NOT ABOUT WHETHER HARM WAS DONE.

10:28AM 15   THE GOVERNMENT IS NOT REQUIRED TO SHOW THAT PATIENTS ACTUALLY

10:28AM 16   SUFFERED HARM, ALTHOUGH THE GOVERNMENT HAS SHOWN THAT.

10:28AM 17       THE GOVERNMENT IS NOT REQUIRED EVEN TO SHOW THAT THE

10:28AM 18   DEFENDANT WAS SUBJECTIVELY AWARE OF THE RISK, AND THAT'S THE

10:28AM 19   CASES THAT THE GOVERNMENT HAS CITED.

10:28AM 20       IN EXAMPLES CITED IN OUR BRIEFING, SITUATIONS WHERE A

10:29AM 21   DEFENDANT CAUSED FALSE ENTRIES TO APPEAR IN A PATIENT RECORD

10:29AM 22   SYSTEM, THAT WAS SUFFICIENT FOR THIS ENHANCEMENT TO APPLY.

10:29AM 23       THE ENHANCEMENT ALSO APPLIED IN A SITUATION WHERE THE

10:29AM 24   DEFENDANTS RAN A HEALTH CARE FACILITY AND ADMITTED ELDERLY

10:29AM 25   DEMENTIA PATIENTS WHEN THE FACILITY AND THE STAFF WERE NOT

10:29AM  1    EQUIPPED TO CARE FOR THEM.  SITUATIONS LIKE THOSE DON'T INVOLVE

10:29AM  2    A CERTAINTY OF HARM TO THE VICTIMS, AND THEY DON'T INVOLVE THE

10:29AM  3    DEFENDANTS DIRECTLY HARMING THE VICTIMS, BUT THEY WERE

10:29AM  4    SUFFICIENT IN THOSE CASES FOR THIS KIND OF ENHANCEMENT TO

10:29AM  5    APPLY.

10:29AM  6        AND THE SAME SHOULD APPLY HERE, ESPECIALLY WHEN THE COURT

10:29AM  7    CONSIDERS THAT RELEVANT CONDUCT FOR SENTENCING PURPOSES

10:29AM  8    INCLUDES EVERYTHING THAT THE DEFENDANT DOES AND IN SOME

10:29AM  9    SITUATIONS OTHERS LIKE MR. BALWANI IN THIS CASE, IN FURTHERANCE

10:29AM 10    OF THIS SCHEME TO DEFRAUD AND THE OPERATION OF THERANOS'S LAB,

10:29AM 11    THE OFFERING OF CLINICAL TEST RESULTS TO PATIENTS WAS IN

10:29AM 12    FURTHERANCE OF MS. HOLMES'S SCHEME TO DEFRAUD INVESTORS.

10:30AM 13        THE GOVERNMENT EXPLAINS WHY IN ITS BRIEFING, BUT IN SHORT,

10:30AM 14    THE OPERATION OF THAT LAB TURNED THERANOS FROM A SPECULATIVE

10:30AM 15    INVESTMENT IN THE EYES OF THE INVESTORS TO CLOSE TO A SURE

10:30AM 16    THING.  IT SIGNALLED TO THEM THAT THE TECHNOLOGY WAS MATURE AND

10:30AM 17    THAT THERE WAS LESS RISK INVOLVED IN ENTRUSTING THEIR MONEY TO

10:30AM 18    THE COMPANY.

10:30AM 19        AND THE COURT KNOWS THAT THE EVIDENCE SHOWS THAT THAT

10:30AM 20    METHOD WORKED.  WHEN MS. HOLMES TOUTED THE LAUNCH AND

10:30AM 21    PUBLICIZED IT, THE INVESTMENTS POURED IN, AND THE VAST MAJORITY

10:30AM 22    OF THE INVESTMENT CAPITAL THAT THE COMPANY RAISED CAME AFTER

10:30AM 23    THE COMPANY PUBLICIZED ITS LAUNCH AND BEGAN OFFERING ITS TEST

10:30AM 24    RESULTS.

10:30AM 25        FINALLY, BECAUSE THE RELEVANT FACTS ONLY NEED TO BE SHOWN

|         |    |                                                                   |
|---------|----|-------------------------------------------------------------------|
| 10:30AM | 1  | BY A PREPONDERANCE OF THE EVIDENCE, THE FACT THAT THE JURY IN      |
| 10:30AM | 2  | THE BALWANI CASE CONVICTED ON ALL COUNTS, INCLUDING THE PATIENT    |
| 10:30AM | 3  | COUNTS, INCLUDING THE CONSPIRACY COUNT ALLEGING THAT               |
| 10:30AM | 4  | MR. BALWANI AND MS. HOLMES ENGAGED IN A CONSPIRACY TO DEFRAUD      |
| 10:31AM | 5  | PATIENTS, THE COURT SHOULD BE COMFORTABLE FINDING THAT THOSE       |
| 10:31AM | 6  | FACTS HAVE BEEN ESTABLISHED BY A PREPONDERANCE HERE SUPPORTING     |
| 10:31AM | 7  | THIS ENHANCEMENT.                                                  |
| 10:31AM | 8  | THE COURT:  THANK YOU.                                             |
| 10:31AM | 9  | MR. DOWNEY, DO YOU WISH TO BE HEARD?                               |
| 10:31AM | 10 | MR. DOWNEY:  YOUR HONOR, I THOUGHT THAT THE COURT                  |
| 10:31AM | 11 | HAD ASKED MR. BOSTIC WHAT WAS PROVEN THAT DEMONSTRATED THAT        |
| 10:31AM | 12 | THIS ENHANCEMENT WOULD BE APPROPRIATE, AND MR. BOSTIC RETREATED    |
| 10:31AM | 13 | TO DESCRIBING THE STATEMENTS OF TWO WITNESSES WHO WEREN'T PART     |
| 10:31AM | 14 | OF PROOF AT TRIAL, WEREN'T SUBJECT TO CROSS-EXAMINATION, WHOSE     |
| 10:31AM | 15 | EVIDENCE IS NOT BEFORE THE COURT AND WHOSE EVIDENCE, IF BEFORE     |
| 10:31AM | 16 | THE COURT, WOULD LOOK VERY DIFFERENT, KEVIN HUNTER AND             |
| 10:31AM | 17 | TYLER SHULTZ, TWO WITNESSES THAT WE DID NOT SEE DURING THE         |
| 10:31AM | 18 | COURSE OF THE TRIAL AND ABOUT WHOM NOTHING WAS PROVEN, BUT I'LL    |
| 10:31AM | 19 | TALK ABOUT THEM SPECIFICALLY IN A MINUTE.                          |
| 10:31AM | 20 | LET ME JUST REMIND THE COURT OF WHAT THE OVERALL EVIDENCE          |
| 10:32AM | 21 | DURING THE COURSE OF THE TRIAL SHOWED AS TO THE OPERATION OF       |
| 10:32AM | 22 | THE LAB, AND THIS IS NOT ONLY FROM MS. HOLMES'S TESTIMONY BUT      |
| 10:32AM | 23 | FROM THE GOVERNMENT'S OWN WITNESSES.                               |
| 10:32AM | 24 | THIS IS A LAB IN WHICH OVER 8 MILLION BLOOD TESTS WERE             |
| 10:32AM | 25 | PERFORMED.  THE COURT WILL REMEMBER NUMBERS IN THAT RANGE.         |

18

10:32AM  1          SECOND, MANY WITNESSES DURING THE COURSE OF THE TRIAL,

10:32AM  2     DR. ROSENDORFF AND OTHERS, TESTIFIED THAT PARENT LABORATORY

10:32AM  3     TESTS IN AND OF THEMSELVES ARE AN EXPECTED PART OF LABORATORY

10:32AM  4     PROCEDURE.  IT'S UNFORTUNATE AND IT CAN BE -- IT'S SOMETHING

10:32AM  5     THAT THE LABS WANT TO STAY ON TOP OF.  THE EVIDENCE SHOWED IT

10:32AM  6     WAS SOMETHING THAT THERANOS WAS PARTICULARLY ZEALOUS ABOUT

10:32AM  7     STAYING ON TOP OF, BUT STATISTICALLY IT'S SOMETHING THAT

10:32AM  8     HAPPENS AND WHEN YOU RUN 8 MILLION TESTS, THERE ARE SOME TESTS

10:33AM  9     THAT ARE ERRANT.

10:33AM 10          ALSO, WITH RESPECT TO THE RESULTS, WE LEARNED THAT THERE

10:33AM 11     ARE WIDE RANGES OF RESULTS WITHIN A PARTICULAR TEST THAT ARE

10:33AM 12     CONSIDERED ACCURATE EVEN THOUGH THEY APPEAR TO BE WIDELY

10:33AM 13     DIVERGENT.  THAT'S THE BROADER CONTEXT IN WHICH LABORATORY

10:33AM 14     TESTING IS CONDUCTED.

10:33AM 15          IT'S HARD TO FIGURE OUT IN ANY PARTICULAR CASE WHY A TEST

10:33AM 16     IS WRONG.  WHAT DID THE GOVERNMENT'S CASE CONSIST OF?

10:33AM 17          LARGELY, THE GOVERNMENT'S CASE CONSISTED OF SOME THERANOS

10:33AM 18     INDIVIDUAL, EITHER ON THEIR OWN INITIATIVE OR IN RESPONSE TO A

10:33AM 19     QUESTION FROM A DOCTOR OR IN MORE LIMITED CASES A PATIENT,

10:33AM 20     RAISED A QUESTION AS TO THIS TEST SEEMS ERRANT OR THERE SEEMS

10:33AM 21     TO BE A PROBLEM WITH REGARD TO THIS TEST.

10:33AM 22          NOW, THIS ENHANCEMENT WOULD APPLY IN A SITUATION WHERE IN

10:33AM 23     REACTION TO THAT THE EVIDENCE SHOWED NOTHING WAS DONE.

10:33AM 24          WHAT DID THE ACTUAL EVIDENCE DURING THE COURSE OF THE CASE

10:34AM 25     SHOW?

19

10:34AM 1       WELL, THE COURT CAN LOOK BACK AT THE RECORD AT TRIAL,

10:34AM 2    EXHIBIT 9907, AND IT LAID OUT EXACTLY WHAT THERANOS DID IN

10:34AM 3    RESPONSE TO THOSE KIND OF INQUIRIES AS A MATTER OF PROCEDURE,

10:34AM 4    AND THEN THAT WAS DESCRIBED AND DOCUMENTS CONFIRMING IT

10:34AM 5    INTRODUCED DURING THE COURSE PRINCIPALLY OF DR. ROSENDORFF'S

10:34AM 6    CROSS-EXAMINATION.

10:34AM 7       WHEN THERE WAS AN ISSUE WITH A TEST, MUCH OF WHAT

10:34AM 8    MR. BOSTIC JUST TALKED ABOUT, THE LAB DIRECTOR IN THE FIRST

10:34AM 9    INSTANCE WAS DIRECTED TO CONDUCT AN INVESTIGATION.  AT THERANOS

10:34AM 10    SOMETIMES INDIVIDUALS OTHER THAN THE LAB DIRECTOR, LAB STAFF

10:34AM 11    AND SO FORTH, GOT INVOLVED IN THE INVESTIGATION.

10:34AM 12       THE LAB THEN LOOKED AT THE QUESTION OF WHY DO WE HAVE THIS

10:34AM 13    PROBLEM?  WE SAW THIS ACROSS NUMEROUS TESTS.  IS THIS AN ERROR

10:34AM 14    WITH REGARD TO THIS PARTICULAR TEST?  WAS THERE SOMETHING WITH

10:34AM 15    RESPECT TO HOW THE TEST WAS ACTUALLY PERFORMED?  THAT KIND OF

10:34AM 16    INQUIRY WAS DONE WITH RESPECT TO TESTS.

10:35AM 17       AND THEN A CORRECTIVE ACTION WAS TAKEN.  SOMETIMES IT

10:35AM 18    RELATED TO SOME ALTERATION IN THE ASSAY ITSELF.  OFTEN IT

10:35AM 19    RELATED TO CORRECTING IN A PARTICULAR FACILITY ERRORS WHICH

10:35AM 20    WERE OCCURRING WITH RESPECT TO A PARTICULAR TEST, BUT IN

10:35AM 21    INSTANCES WHERE PROBLEMS WERE IDENTIFIED, THERE WAS A REACTION

10:35AM 22    ON THE PART OF THERANOS PERSONNEL.

10:35AM 23       AND THIS WAS DEMONSTRATED ACROSS A WIDE RANGE OF EXHIBITS,

10:35AM 24    NOT INTRODUCED BY THE GOVERNMENT, BUT INTRODUCED ON

10:35AM 25    DR. ROSENDORFF'S CROSS-EXAMINATION.

20

10:35AM 1    WITH RESPECT TO MS. HOLMES, WAS SHE DEEPLY INVOLVED IN ALL

10:35AM 2    OF THAT?  WELL, SOMETIMES THERE WERE INSTANCES WHERE SHE KNEW

10:35AM 3    ABOUT A CHALLENGE WITH REGARD TO A PARTICULAR TEST, BUT IN THE

10:35AM 4    MAIN, SHE BELIEVED WHAT DR. ROSENDORFF TESTIFIED TO ON THE

10:35AM 5    STAND, THAT HE FOLLOWED THESE PROCEDURES, THAT HE BELIEVED THAT

10:35AM 6    EVERY SINGLE ASSAY THAT WAS BEING OFFERED IN THE LAB WAS IN

10:36AM 7    FACT AN ASSAY THAT SHOULD BE OFFERED IN THE LAB, AND THAT IF HE

10:36AM 8    THOUGHT ANY TEST OUT OF THE MILLIONS OF TESTS THAT WERE

10:36AM 9    PERFORMED WAS UNRELIABLE, HE DID NOT AUTHORIZE THAT RESULT TO

10:36AM 10   GO OUT OF THE LAB.

10:36AM 11       THAT WAS NOT ONLY DR. ROSENDORFF HIMSELF, BUT YOUR HONOR

10:36AM 12   SAW THROUGHOUT THE COURSE OF THE TRIAL LARGE ORGANIZATIONAL

10:36AM 13   CHARTS WHICH SHOWED THE NUMBER OF INDIVIDUALS WORKING WITHIN

10:36AM 14   THE LAB WHO WERE THERE TO ENSURE THAT THOSE KIND OF SAFETY

10:36AM 15   CONSCIOUS POLICIES WERE ENACTED.

10:36AM 16       THE JURY HEARD ALL THAT AS IT DELIBERATED ON THE CHARGE

10:36AM 17   RELATED TO PATIENTS AND TO SUGGEST THAT AFTER THE JURY'S

10:36AM 18   HEARING THAT AND REACHING A DETERMINATION THAT IN FACT THERE

10:36AM 19   WAS A CONSCIOUS DISREGARD OF SAFETY ON MS. HOLMES'S PART WOULD

10:36AM 20   I THINK BE NOT ONLY CONTRARY TO AND DISRESPECTFUL OF THEIR

10:36AM 21   VERDICT, BUT IT WOULD ACTUALLY BE CONTRARY TO A REVIEW OF THE

10:36AM 22   RECORD WHICH THE COURT COULD INDEPENDENTLY CONDUCT.

10:37AM 23       THE COURT:  THANK YOU.

10:37AM 24       MR. BOSTIC, IS IT YOUR SUGGESTION THAT BECAUSE THE TESTING

10:37AM 25   WAS NOT EITHER 100 PERCENT ACCURATE OR ACCURATE IN SOME

10:37AM 1    MEASURE, THAT THIS ENHANCEMENT SHOULD BE IMPOSED?  JUST THE

10:37AM 2    FACT THAT AT SOME POINT IN TIME THE MACHINERY DIDN'T PERFORM AS

10:37AM 3    REPRESENTED, AND IT SOUNDS LIKE WHAT YOU'RE SUGGESTING IS THAT

10:37AM 4    THERE IS SCIENTER, SHE KNEW IT WOULDN'T FUNCTION, AND,

10:37AM 5    THEREFORE, THIS SHOULD BE APPLIED?

10:37AM 6        MS. BOSTIC:  I THINK THAT'S WHAT THE EVIDENCE SHOWS,

10:37AM 7    YOUR HONOR.

10:37AM 8     I WOULD STATE IT A LITTLE DIFFERENTLY.  I DON'T THINK ANY

10:37AM 9    DEGREE OF INACCURACY OR PROBLEMS WITH THE TESTS WOULD

10:37AM 10    NECESSARILY SUPPORT THIS ENHANCEMENT.

10:37AM 11     I THINK IT CAN BE A LINE DRAWING QUESTION IN SOME CASES.

10:37AM 12    MR. DOWNEY IS CORRECT THAT INACCURATE TEST RESULTS DO HAPPEN IN

10:37AM 13    ANY LAB, BUT I THINK THE EVIDENCE AT TRIAL AMPLY SHOWED THAT

10:37AM 14    THE ISSUES AT THERANOS WENT FAR BEYOND WHAT WOULD BE EXPECTED

10:38AM 15    AT A CLINICAL LAB.

10:38AM 16     THE EVIDENCE THAT THE COURT WILL REMEMBER SHOWED THAT THE

10:38AM 17    THERANOS SPECIFIC TECHNOLOGY FAILED QUALITY CONTROL TESTS AT AN

10:38AM 18    INCREDIBLY HIGH RATE.

10:38AM 19     I THINK OVERALL, A TYPICAL FAILURE RATE WAS ABOUT IN THE

10:38AM 20    25 OR 26 PERCENT, MEANING THAT WHEN EMPLOYEES WERE ABLE TO TEST

10:38AM 21    THE TESTS TO DETERMINE WHETHER IT WAS RETURNING ACCURATE

10:38AM 22    RESULTS, IT WAS UNABLE TO DO THAT IN A QUARTER OF THE

10:38AM 23    SITUATIONS.

10:38AM 24     AND SOME OF THE TESTS, SOME OF THE SPECIFIC ASSAYS FAILED

10:38AM 25    EVEN MORE FREQUENTLY WITH ONE BEING UNRELIABLE MORE THAN

10:38AM 1    50 PERCENT OF THE TIME.

10:38AM 2        DR. ROSENDORFF, DR. PANDORI, ERIKA CHEUNG AND OTHERS

10:38AM 3    TESTIFIED THAT THE THERANOS TECHNOLOGY PERFORMED SIGNIFICANTLY

10:38AM 4    WORSE THAN THE CONVENTIONAL TECHNOLOGY.

10:38AM 5        AND SKIPPING TO THE END OF THE STORY, IT'S IMPORTANT TO

10:38AM 6    REMEMBER THAT WHEN CMS CAME AND INSPECTED THERANOS LOOKING AT,

10:39AM 7    AMONG OTHER THINGS, THE RELIABILITY AND THE ACCURACY OF THE

10:39AM 8    TEST THAT THIS LAB IS GENERATING, IT FOUND SERIOUS PROBLEMS AND

10:39AM 9    THERANOS ITSELF WAS FORCED TO ADMIT BASED ON THAT INSPECTION

10:39AM 10   THAT THERE WAS A POTENTIAL PATIENT IMPACT FOR EVERY TEST THAT

10:39AM 11   HAD BEEN PERFORMED ON THE THERANOS TECHNOLOGY, AND AS A RESULT,

10:39AM 12   THE COMPANY ACTUALLY TOOK A STEP OF VOIDING EVERY SINGLE TEST

10:39AM 13   RUN ON ITS EDISON ANALYZER.

10:39AM 14       SO TO STAND HERE TODAY AND ARGUE THAT INACCURATE TESTING

10:39AM 15   IS A FACT OF LIFE, THAT IT'S UNAVOIDABLE, THAT THIS WAS PART

10:39AM 16   NORMAL LAB PRACTICE I THINK IS INCONSISTENT WITH THAT PROOF AT

10:39AM 17   TRIAL.

10:39AM 18       AND IN TERMS OF MS. HOLMES'S NOTICE, YES, I THINK THE

10:39AM 19   EVIDENCE AT TRIAL AND THE THINGS THAT I JUST RECOUNTED TO THE

10:39AM 20   COURT DO SHOW THAT MS. HOLMES WAS AWARE OF THAT, AND, YES,

10:39AM 21   ACTION WAS TAKEN IN RESPONSE TO THESE ISSUES.

10:39AM 22       BUT THE STANDARD DOESN'T REQUIRE INDIFFERENCE TO THE RISK

10:40AM 23   OR INACTION IN RESPONSE TO THE RISK.  IT REQUIRES A CONSCIOUS

10:40AM 24   DISREGARD OR RECKLESSNESS, AND THAT'S WHAT MS. HOLMES SHOWED

10:40AM 25   WHEN SHE AND MR. BALWANI CONTINUED TO OFFER THESE TESTS.

10:40AM 1      THERE WERE SCIENTISTS AT THE COMPANY RUNNING STUDIES TO

10:40AM 2   TRY TO SOLVE THESE ISSUES AND CERTAINLY, YOU KNOW, IT MAY BE

10:40AM 3   THE CASE THAT MS. HOLMES WOULD HAVE PREFERRED THAT THE

10:40AM 4   TECHNOLOGY WORKED BETTER, BUT SHE WAS AWARE THAT IT WASN'T

10:40AM 5   WORKING WELL ENOUGH FOR USE ON PATIENTS AND KEPT CAUSING THE

10:40AM 6   COMPANY TO OFFER THOSE TESTS ANYHOW, DESPITE WARNINGS FROM LAB

10:40AM 7   DIRECTORS, OTHER STAFF, EVEN HER OWN BROTHER AS AN EMPLOYEE OF

10:40AM 8   THE COMPANY REACHING OUT TO HER TO TRY TO HAVE A CANDID

10:40AM 9   CONVERSATION ABOUT WHETHER IT MADE SENSE TO STOP OFFERING SOME

10:40AM 10  OF THESE PROBLEMATIC TESTS WHILE THE ISSUES WERE RESOLVED.

10:40AM 11      THE COURT:  MR. DOWNEY.

10:40AM 12      MR. DOWNEY:  WELL, I GUESS, YOUR HONOR, I'M TEMPTED

10:40AM 13  TO ECHO A GREAT CALIFORNIAN AND SAY, "THERE YOU GO AGAIN."

10:41AM 14      THE ANECDOTES THAT MR. BOSTIC REFERENCES, FOR EXAMPLE,

10:41AM 15  QUALITY CONTROL RATES AND KNOWLEDGE OF QUALITY CONTROL RATES, I

10:41AM 16  THINK MR. BOSTIC IS AWARE THAT THOSE RELATE TO WHETHER OR NOT A

10:41AM 17  TEST IS OFFERED, NOT THE OFFERING OF PATIENT TESTS.  IT'S THAT

10:41AM 18  KIND OF CONFLATION OF FACTS THAT IS THE CASE THAT THE

10:41AM 19  GOVERNMENT PRESENTED OR WANTED TO PERSUADE A JURY, AND OTHERS,

10:41AM 20  INDICATED SCIENTER, DISREGARD ON MS. HOLMES'S BEHALF FOR

10:41AM 21  PATIENT SAFETY OR IN THE CASE OF COUNTS THAT WERE CHARGED, NOT

10:41AM 22  GIVING TO PATIENTS THE BENEFIT OF THE BARGAIN THAT THEY HAD

10:41AM 23  PURCHASED WHEN THEY BOUGHT A BLOOD TEST.  THAT WAS DISBELIEVED

10:41AM 24  BECAUSE IN EVERY ANECDOTE, AND WE CAN GO THROUGH THE 25 OR SO

10:41AM 25  INSTANCES THAT WERE REFERENCED IN DR. ROSENDORFF'S DIRECT

10:41AM 1    EXAMINATION AND DURING THE COURSE OF HIS CROSS-EXAMINATION, BUT

10:41AM 2    WE'VE HAD A TRIAL AND THAT WAS DONE, AND IN EVERY INSTANCE IT

10:42AM 3    DID NOT ADD UP TO THE BASIC PICTURE THAT THE GOVERNMENT WAS

10:42AM 4    ATTEMPTING TO PAINT OF INDIFFERENCE ON MS. HOLMES'S PART OR

10:42AM 5    AWARENESS THAT WHAT WAS BEING DONE IN THE LAB WAS EITHER

10:42AM 6    RECKLESS OR DID NOT OFFER A BLOOD TEST THAT WOULD BE A BLOOD

10:42AM 7    TEST THAT PATIENTS WOULD BUY.

10:42AM 8          THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.  THANK

10:42AM 9    YOU BOTH FOR THAT.

10:42AM 10      LET'S MOVE TO OBJECTION NUMBER TWO.  THIS IS AN OBJECTION

10:42AM 11    TO 28 REGARDING THE C1, C2 INVESTMENTS.

10:42AM 12          MR. DOWNEY:  YOUR HONOR, FOR ORGANIZATIONAL

10:42AM 13    PURPOSES, I GUESS I WOULD SAY THAT THERE'S A SERIES OF

10:42AM 14    OBJECTIONS HERETO.

10:42AM 15          THE COURT:  YES.

10:42AM 16          MR. DOWNEY:  AND TO SOME EXTENT EVEN MORE THAN JUST

10:42AM 17    RELATED TO THE LOSS ADJUSTMENT.  WHEN WE GET TO NUMBER OF

10:43AM 18    VICTIMS, THESE ISSUES ALL, TO SOME EXTENT, TOUCH EACH OTHER.

10:43AM 19          THE COURT:  THERE'S SOME OVERLAP.

10:43AM 20          MR. DOWNEY:  YES.  SO I DON'T KNOW WHAT WOULD BE

10:43AM 21    HELPFUL TO THE COURT HERE.  I'M CERTAINLY HAPPY TO IDENTIFY,

10:43AM 22    AND MAYBE THIS IS A SENSIBLE WAY TO GO ABOUT IT, I'M HAPPY TO

10:43AM 23    IDENTIFY WHAT I THINK THE EVIDENCE IS BEFORE THE COURT AS TO

10:43AM 24    THE 29 INVESTORS WHO WERE ON THE SPREADSHEET THAT WAS PART OF

10:43AM 25    PROBATION'S ANALYSIS, AND I THINK THAT IS OBJECTION NUMBER TWO,

| | | |
|---|---|---|
| 10:43AM | 1 | AND THEN THAT FLOWS THROUGH, I THINK TO SOME EXTENT, TO THE |
| 10:43AM | 2 | THREE OBJECTIONS THAT FOLLOW. |
| 10:43AM | 3 | THE COURT:  I THINK OBJECTION FOUR PARLAYS INTO THIS |
| 10:43AM | 4 | AS WELL. |
| 10:43AM | 5 | LET ME DO THIS, LET'S PASS OVER TWO FOR JUST A MOMENT. |
| 10:43AM | 6 | MR. DOWNEY:  SURE. |
| 10:43AM | 7 | THE COURT:  AND LET'S LOOK AT THREE. |
| 10:43AM | 8 | THIS IS THE OBJECTION TO PARAGRAPH 44 AND 93 REGARDING |
| 10:44AM | 9 | MS. PETERSON'S TESTIMONY IN REGARDS TO THE RDV INVESTMENT. |
| 10:44AM | 10 | ANYTHING MORE YOU WANT ME TO KNOW? |
| 10:44AM | 11 | MR. DOWNEY:  I REALLY DON'T HAVE ANYTHING BEYOND THE |
| 10:44AM | 12 | PAPERS, YOUR HONOR.  I THINK YOU ARE AWARE OF THE ISSUE THERE. |
| 10:44AM | 13 | THE COURT:  OKAY.  ANYTHING FURTHER ON THAT? |
| 10:44AM | 14 | MS. BOSTIC:  YOUR HONOR, JUST ON THAT POINT.  I |
| 10:44AM | 15 | THINK THE EVIDENCE AT TRIAL SHOWED THAT MS. PETERSON NEEDED TO |
| 10:44AM | 16 | HAVE KNOWLEDGE OF WHAT WAS IMPORTANT TO HER ORGANIZATION AND |
| 10:44AM | 17 | WHAT MOTIVATED THAT INVESTMENT DECISION IN ORDER TO DO HER JOB, |
| 10:44AM | 18 | WHICH SHE DID FOR YEARS PRIOR TO HER INVOLVEMENT IN THE |
| 10:44AM | 19 | THERANOS TRANSACTION.  SO I THINK THAT SHE WAS A SUITABLE |
| 10:44AM | 20 | WITNESS TO TESTIFY ON THOSE TOPICS. |
| 10:44AM | 21 | IN THE SAME WAY THAT SHE TESTIFIED ABOUT MATERIALITY, I |
| 10:44AM | 22 | THINK HER TESTIMONY GIVES THE COURT WHAT IT NEEDS TO MAKE ANY |
| 10:44AM | 23 | NECESSARY INFERENCES WHEN IT COMES TO RELIANCE. |
| 10:44AM | 24 | THE COURT:  OKAY.  THANK YOU. |
| 10:44AM | 25 | LET ME -- WHAT I AM GOING TO DO IS -- PARDON ME.  WE'LL |

10:44AM  1    GET THE SINGLES OUT OF THE WAY BEFORE WE MOVE INTO THE

10:45AM  2    MULTIPLE --

10:45AM  3              MR. DOWNEY:  DO THE BOTTOM OF THE LINE-UP FIRST?

10:45AM  4              THE COURT:  YES.  I'M IN THE WRONG SEASON, AREN'T I?

10:45AM  5        LET'S LOOK AT OBJECTION SEVEN, AND I BELIEVE THIS IS THE

10:45AM  6    OBJECTION TO THE PROBATION OFFICER NOT GIVING THE ACCEPTANCE OF

10:45AM  7    RESPONSIBILITY UNDER 3E1.1.

10:45AM  8        ANYTHING ELSE YOU WANT ME TO KNOW ABOUT THIS?

10:45AM  9              MR. DOWNEY:  YOUR HONOR, I THINK THE FRAMEWORK HERE

10:45AM  10   IS WELL-KNOWN TO YOUR HONOR.  OBVIOUSLY WE DON'T HAVE AN

10:45AM  11   ADMISSION OF GUILT ON THE PART OF THE DEFENDANT'S PART.

10:45AM  12       WE DO HAVE IN THE NINTH CIRCUIT UNDER UNITED STATES

10:45AM  13   CORTEZ, 299 F.3D 1030, WHICH IS A 2002 CASE, AND OTHER CASES,

10:45AM  14   THE RECOGNITION THAT AN ADMISSION OF GUILT IS NOT REQUIRED TO

10:45AM  15   OBTAIN AN ACCEPTANCE OF RESPONSIBILITY REDUCTION.

10:46AM  16       I WOULD SAY, YOUR HONOR, AS WE OUTLINED IN THE SENTENCING

10:46AM  17   MEMO, THE NORMAL BEHAVIOR THAT ONE SEES OUT OF SOMEONE WHO

10:46AM  18   ULTIMATELY BECOMES A CRIMINAL DEFENDANT IN THESE KINDS OF

10:46AM  19   CIRCUMSTANCES IS NOT TO REACT TO A CORPORATE PROBLEM THAT HAS

10:46AM  20   BEEN IDENTIFIED IN THE WAY THAT MS. HOLMES DID HERE.

10:46AM  21       YOU'LL RECALL THE TESTIMONY AT TRIAL FROM DR. DAS, WHICH

10:46AM  22   HIGHLIGHTED HOW SHE WANTED TO APPROACH THE POSSIBILITY THAT

10:46AM  23   THERE WERE PROBLEMS IN THE OPERATION OF THERANOS THAT MIGHT

10:46AM  24   TOUCH THE LAB, MIGHT TOUCH THE TECHNOLOGY.  SHE DID NOT SAY

10:46AM  25   LET'S FIGURE THIS OUT AND NOT TALK TO ANYONE ELSE.  SHE SAID

10:46AM 1     FIND IT.

10:46AM 2         YOUR HONOR HAS IN FRONT OF HIM A LETTER FROM THE OTHER LAB

10:47AM 3     DIRECTOR WHO SERVED AT THERANOS DURING THE SAME PERIOD,

10:47AM 4     DR. TSCHIRHART.  HE ECHOES DR. DAS AND SAYS HER CONCERN WAS TO

10:47AM 5     ROOT OUT WHATEVER PROBLEMS THERE WERE AND TO TRY TO CORRECT

10:47AM 6     THEM.

10:47AM 7         THAT IS ECHOED ACROSS THE LETTERS YOUR HONOR HAS RECEIVED

10:47AM 8     FROM EVERY BOARD MEMBER AT THERANOS IN THE POST-2015 PERIOD AND

10:47AM 9     THE COMMENT OF A NUMBER OF EMPLOYEES, FOR EXAMPLE, MR. LIPSIT

10:47AM 10    WHO WAS A COMPLIANCE EMPLOYEE WHO WORKED WITH MR. HOLMES IN

10:47AM 11    THAT PERIOD AFTER.

10:47AM 12        SO IN ANY WAY ATTEMPTING TO CONCEAL WHATEVER THE FACTS

10:47AM 13    WERE AS TO ANY PROBLEMS, WE KNOW THAT WAS NOT PART OF

10:47AM 14    MS. HOLMES'S CONDUCT.

10:47AM 15        ALSO, YOUR HONOR, I THINK BOTH PUBLICALLY IN HER S.E.C.

10:47AM 16    TESTIMONY AND EVEN DURING THE COURSE OF THIS CASE, MS. HOLMES

10:47AM 17    ACKNOWLEDGED FAILINGS ACROSS A WIDE RANGE OF AREAS AND

10:48AM 18    RESPONSIBILITY FOR A NUMBER OF TOPICS THAT SUBSEQUENTLY BECAME

10:48AM 19    CONTROVERSIAL.

10:48AM 20        SHE CONTESTED HER INTENT WITH REGARD TO THOSE ISSUES.  BUT

10:48AM 21    THE FACTS WITH REGARD TO THOSE ISSUES WERE NOT CONTESTED, AND I

10:48AM 22    THINK HER RESPONSIBILITY, NOT CRIMINALLY, BUT HER

10:48AM 23    RESPONSIBILITY AS A LEADER AND MANAGER FOR THOSE ISSUES.

10:48AM 24        SO IN THE CORPORATE CONTEXT, THIS IS AS PARADIGMATIC A

10:48AM 25    CASE TO JUSTIFY TREATMENT AS CORTEZ IS IN A VERY DIFFERENT

10:48AM 1    CONTEXT, WHICH YOUR HONOR IS FAMILIAR WITH.

10:48AM 2        SO I THINK THAT REDUCTION IS APPROPRIATE IN THESE

10:48AM 3    CIRCUMSTANCES.

10:48AM 4            THE COURT:  THANK YOU.  MR. BOSTIC.

10:48AM 5            MS. BOSTIC:  THANK YOU, YOUR HONOR.

10:48AM 6        I THINK WE SHOULD START WITH WHAT THE GUIDELINES

10:48AM 7    THEMSELVES TELL US ABOUT APPLICATION OF THIS REDUCTION.

10:48AM 8        THE GUIDELINES IN NOTE 2 OF 3E1.1 SAYS THAT THIS

10:48AM 9    ADJUSTMENT IS NOT INTENDED TO APPLY TO A DEFENDANT WHO PUTS THE

10:48AM 10   GOVERNMENT TO ITS BURDEN OF PROOF AT TRIAL BY DENYING THE

10:49AM 11   ESSENTIAL FACTUAL ELEMENTS OF GUILT AND THEN IS CONVICTED AND

10:49AM 12   ONLY THEN ADMITS GUILT AND EXPRESSES REMORSE.

10:49AM 13       MS. HOLMES STILL HAS NOT ADMITTED GUILT OR EXPRESSED

10:49AM 14   REMORSE FOR THE CRIMINAL CONDUCT IN THIS CASE, AND SHE

10:49AM 15   ABSOLUTELY DID PUT THE GOVERNMENT TO ITS BURDEN OF PROOF AT

10:49AM 16   TRIAL NOT ADMITTING THE CRIMINAL CONDUCT THAT WAS AT ISSUE.

10:49AM 17       THAT SAME NOTE GOES ON TO SAY THAT IN RARE SITUATIONS A

10:49AM 18   DEFENDANT MAY CLEARLY DEMONSTRATE AN ACCEPTANCE OF

10:49AM 19   RESPONSIBILITY, EVEN THOUGH EXERCISING THE CONSTITUTIONAL RIGHT

10:49AM 20   TO TRIAL, FOR EXAMPLE, WHERE A DEFENDANT GOES TO TRIAL TO

10:49AM 21   ASSERT AND PRESERVE ISSUES THAT DO NOT RELATE TO FACTUAL GUILT.

10:49AM 22       SO, FOR EXAMPLE, THE CONSTITUTIONALITY OF A STATUTE, OR

10:49AM 23   SOMETHING ALONG THOSE LINES, WHERE THE DEFENDANT IS SAYING I

10:49AM 24   ENGAGED IN THIS CRIME, BUT IT SHOULD NOT BE A CRIME, AND HERE'S

10:49AM 25   WHY.  THAT'S NOT THE CASE HERE.

10:49AM 1    THE DEFENDANT SINCE DAY ONE AND CERTAINLY THROUGHOUT THE

10:49AM 2    PROSECUTION IN THIS CASE HAS DENIED COMMITTING ANY WRONGDOING,

10:50AM 3    HAS DENIED THAT ANY CRIME OCCURRED HERE, BOTH WHEN SHE WAS ON

10:50AM 4    THE STAND AND THROUGH HER COUNSEL, THOSE ARE THE ARGUMENTS THAT

10:50AM 5    SHE HAS MADE.

10:50AM 6    SHE HAS NOT ADMITTED OR CONFESSED TO ANY CRIMINAL CONDUCT,

10:50AM 7    NOT EVEN A SINGLE COUNT IN THE INDICTMENT, NOT A SINGLE

10:50AM 8    ELEMENT.  AT TRIAL THE COURT MAY RECALL THAT THE DEFENSE DID

10:50AM 9    EVEN NOT STIPULATE TO THE INTERSTATE WIRE ELEMENT FOR THE WIRE

10:50AM 10    FRAUD COUNTS REQUIRING THE GOVERNMENT TO SUBPOENA AND CALL A

10:50AM 11    WITNESS FROM FEDWIRE JUST TO SHOW THAT THE WIRE TRANSFERS

10:50AM 12    INVOLVED HERE ACTUALLY CROSSED STATE LINES.

10:50AM 13    SO THE TWO POINTS THAT WE'RE TALKING ABOUT HERE DON'T

10:50AM 14    RELATE TO HOW MUCH WORK THE GOVERNMENT HAD TO DO, BUT THAT IS

10:50AM 15    EMBLEMATIC OF THE FACT THAT EVERYTHING IN THIS CASE HAS BEEN

10:50AM 16    CONTESTED.  MS. HOLMES HAS NOT ADMITTED WRONGDOING.

10:50AM 17    HER STATEMENTS POST-2015 ACKNOWLEDGING THAT THERE WERE

10:51AM 18    PROBLEMS AT THERANOS AND TAKING RESPONSIBILITY FOR THOSE

10:51AM 19    PROBLEMS AS CEO ARE, FRANKLY, THE KIND OF PLATITUDES THAT WE

10:51AM 20    ALWAYS HEAR FROM LEADERS WHO ARE ATTEMPTING TO DO DAMAGE

10:51AM 21    CONTROL AFTER SOMETHING GOES WRONG AT THEIR ORGANIZATION.  THAT

10:51AM 22    IS NOT THE SAME THING AS ACCEPTING RESPONSIBILITY FOR THE

10:51AM 23    ACTUAL CRIMINAL CONDUCT IN THIS CASE.

10:51AM 24    MS. HOLMES HAS NOT DONE THAT HERE.  SHE CERTAINLY HASN'T

10:51AM 25    DONE IT CLEARLY AS IS REQUIRED FOR THIS REDUCTION TO APPLY.

10:51AM 1          THE COURT:  THANK YOU.  ANYTHING FURTHER?

10:51AM 2          MR. DOWNEY:  WELL, JUST TO MAKE THE ISSUE CLEAR FOR

10:51AM 3   YOUR HONOR'S DECISION.  OF COURSE SHE DID NOT AND DOES NOT

10:51AM 4   ACKNOWLEDGE GUILT WHICH, IF NECESSARY TO OBTAIN THIS REDUCTION,

10:51AM 5   SHE WOULD NOT BE ENTITLED TO IT.

10:51AM 6          I WOULD SAY THAT THE INTERPRETATION THAT MR. BOSTIC GIVES

10:51AM 7   TO THIS GUIDELINES PROVISION IS CONSTITUTIONALLY SUSPECT.  WE

10:51AM 8   DON'T PUNISH DEFENDANTS FOR EXERCISING THEIR TRIAL RIGHT, EVEN

10:52AM 9   IN CIRCUMSTANCES WHERE GUILT IS CONTESTED AS IT WAS HERE.

10:52AM 10         IF THERE IS A MEASURE, AS ARTICULATED IN CORTEZ IS, IS

10:52AM 11  THERE GENUINE CONTRITION?

10:52AM 12         IT IS CERTAINLY THE CASE, AS MR. BOSTIC SAYS, THAT MANY

10:52AM 13  CORPORATE LEADERS SAY THINGS WHICH ARE EMPTY.  WE KNOW THAT

10:52AM 14  FROM EVERY DAY LIFE.  THAT'S DIFFERENT FROM WHAT HAPPENED HERE.

10:52AM 15         WE HAD A COMPLETE OVERHAUL OF THIS COMPANY IN BUSINESS

10:52AM 16  MODEL, IN THE EVALUATION OF ITS TECHNOLOGY, IN THE OPERATION OR

10:52AM 17  CEASING OF OPERATION OF ITS LAB, AND ALL OF THAT WAS DONE

10:52AM 18  DURING A PERIOD WHERE MS. HOLMES WAS OFFERING TO FOREGO SALARY

10:52AM 19  SO THAT THE COMPANY COULD CONTINUE ROOT THOSE PROBLEMS OUT AND

10:52AM 20  MOVE FORWARD.

10:52AM 21         NOW, I ACKNOWLEDGE IT IS NOT THE CLASSIC SITUATION WHERE

10:52AM 22  THIS DOWNWARD DEPARTURE IS GRANTED, BUT I WOULD SAY ON THESE

10:53AM 23  FACTS IT'S APPROPRIATE.

10:53AM 24         THE COURT:  ALL RIGHT.

10:53AM 25         MS. BOSTIC:  VERY BRIEFLY, YOUR HONOR.  SORRY.

10:53AM 1        THE OFFENSE THAT MS. HOLMES WAS CONVICTED OF WAS ABOUT

10:53AM 2    DEFRAUDING INVESTORS.  I HAVEN'T HEARD ANYTHING SUGGESTING THAT

10:53AM 3    SHE IS ACCEPTING RESPONSIBILITY FOR THAT OFFENSE CONDUCT.

10:53AM 4        THE COURT:  ALL RIGHT.  THANK YOU.

10:53AM 5      LET ME MOVE TO OBJECTION EIGHT.  WELL, LET ME --

10:53AM 6    MR. POLLAK, DID YOU HAVE ANYTHING YOU WANTED TO ADD FROM

10:53AM 7    PROBATION?

10:53AM 8        PROBATION OFFICER:  NO, YOUR HONOR.

10:53AM 9        THE COURT:  ALL RIGHT.  THANK YOU.

10:53AM 10      LET'S MOVE TO OBJECTION EIGHT, PLEASE.  AND THIS SEEMS TO

10:53AM 11   BE -- PARDON ME.  I DON'T MEAN TO DISPARAGE IT, BUT IT SEEMS TO

10:53AM 12   BE JUST KIND OF A CATCHALL TYPE OF OBJECTION TO THE LACK OF

10:53AM 13   SUFFICIENT INFORMATION.

10:53AM 14         MR. DOWNEY:  ACTUALLY, YOUR HONOR, I THINK THIS WAS

10:53AM 15   REALLY RESOLVED BETWEEN THE DRAFT AND THE FINAL, SO FROM MY

10:53AM 16   PERSPECTIVE, THERE'S -- WE ACCEPT HOW THE PSR RESOLVED THE

10:53AM 17   ISSUES IN THE DRAFT.  SO I DON'T THINK -- IF WITHDRAWING IT FOR

10:53AM 18   THE RECORD MAKES IT MORE EFFICIENT, THAT'S OKAY.

10:53AM 19         THE COURT:  IF YOU PREFER THAT TO AN OVERRULING, I'M

10:54AM 20   HAPPY TO ACCEPT THAT.

10:54AM 21         MS. BOSTIC:  NOTHING TO ADD, YOUR HONOR.

10:54AM 22         THE COURT:  OBJECTION EIGHT IS WITHDRAWN.  THANK

10:54AM 23   YOU.

10:54AM 24      LET ME ASK AND LET ME JUST TURN TO THE GOVERNMENT ON

10:54AM 25   OBJECTION SIX.  PARDON ME.  AND THIS IS THE 4 LEVEL ENHANCEMENT

10:54AM  1    FOR BEING AN ORGANIZER OF THE CRIMINAL ACTIVITY.

10:54AM  2        I'VE READ THE REPORT AND THE PSR ON THIS AND THE REASONS

10:54AM  3    WHY IT SHOULD BE GIVEN, AND I JUST WANTED TO ASK YOUR -- THE

10:54AM  4    GOVERNMENT'S THOUGHTS ABOUT THIS.  I LOOK AT HOLDEN, 908 FED.3D

10:54AM  5    THAT GAVE SOME GUIDANCE, BUT I'M HAPPY TO HEAR YOUR COMMENT.

10:54AM  6        MR. BOSTIC.

10:54AM  7          MS. BOSTIC:  OF COURSE, YOUR HONOR.  I'M HAPPY TO

10:55AM  8    RESPOND TO ANY SPECIFIC QUESTIONS THAT THE COURT HAS, BUT JUST

10:55AM  9    TO GIVE AN OVERVIEW OF THE GOVERNMENT'S POSITION.

10:55AM 10        MS. HOLMES WAS THE FOUNDER, THE CHIEF EXECUTIVE OFFICER,

10:55AM 11    AND THE CHAIR PERSON OF THE BOARD OF A COMPANY AT THE CENTER OF

10:55AM 12    A MULTI-YEAR AND COMPLICATED FRAUD.

10:55AM 13        AND I SAY, THE COMPANY WAS AT THE CENTER OF IT, PARTLY

10:55AM 14    BECAUSE OF THE WAY THAT MS. HOLMES USED THE APPARATUS OF THE

10:55AM 15    COMPANY TO FURTHER THAT FRAUD.

10:55AM 16        GRANTED, COMMITTING THE FRAUD MAY NOT HAVE BEEN THE CHIEF

10:55AM 17    REASON WHY SHE FOUNDED THE COMPANY, THE GOVERNMENT HAS NOT

10:55AM 18    ALLEGED THAT.

10:55AM 19        AND THE VAST MAJORITY OF THE PEOPLE WHO WORKED FOR HER

10:55AM 20    WERE NOT KNOWING OR VOLUNTARY PARTICIPANTS IN THE FRAUD, BUT

10:55AM 21    NONETHELESS THEIR WORK CONTRIBUTED TO IT AND MS. HOLMES USED

10:55AM 22    THEM TO FURTHER THAT FRAUD AND MAKE IT REMARKABLY SUCCESSFUL.

10:55AM 23        THE EVIDENCE AT TRIAL SHOWED THAT MS. HOLMES'S POSITION AT

10:55AM 24    THERANOS, HER AUTHORITY, WAS SECOND TO NONE.  SHE TESTIFIED

10:55AM 25    THAT SHE HAD THE AUTHORITY TO TERMINATE ANY OTHER EMPLOYEE OF

10:56AM 1      THE COMPANY, INCLUDING THE CODEFENDANT, MR. BALWANI, TO DISMISS

10:56AM 2      MEMBERS OF THE BOARD.  SHE WAS ALSO THE MAJOR SHAREHOLDER IN

10:56AM 3      THE COMPANY, SO SHE HAD THAT VOTING POWER.

10:56AM 4           THE COURT:  PARDON ME FOR INTERRUPTING YOU.

10:56AM 5      SO I HAVE NO DISAGREEMENT WITH THAT.  I DON'T THINK YOUR

10:56AM 6      COLLEAGUE OPPOSITE WOULD DISAGREE WITH THAT.

10:56AM 7      WHAT I'M MORE INTERESTED IN IS NOT SO MUCH HER LEADERSHIP

10:56AM 8      ROLE IN THE COMPANY, BUT WHAT ESTABLISHES A LEADERSHIP ROLE IN

10:56AM 9      THE CRIMINAL CONDUCT WITH THE CODEFENDANT THAT WOULD PERMIT

10:56AM 10     THIS ENHANCEMENT TO BE PERMITTED?

10:56AM 11     AND IS THERE A LEADERSHIP ROLE VIS-À-VIS MR. BALWANI, THE

10:56AM 12     CODEFENDANT, THAT WOULD ALLOW THIS?  AND THAT'S WHAT THE HOLDEN

10:56AM 13     CASE TALKS ABOUT.  THAT'S WHAT I NEED SOME HELP ON FROM YOU.

10:56AM 14          MS. BOSTIC:  UNDERSTOOD, YOUR HONOR.

10:56AM 15     I THINK THAT THE DEFENSE'S ARGUMENT THAT MS. HOLMES NEEDED

10:57AM 16     TO BE A LEADER EVEN VIS-À-VIS MR. BALWANI, IS NOT CORRECT BASED

10:57AM 17     ON THE LAW.

10:57AM 18     THE GUIDELINE SAYS THAT THIS ENHANCEMENT WILL APPLY WHEN A

10:57AM 19     DEFENDANT IS A LEADER OR AN ORGANIZER IN CRIMINAL CONDUCT THAT

10:57AM 20     INVOLVES FIVE OR MORE PARTICIPANTS OR IS OTHERWISE EXTENSIVE.

10:57AM 21     SO HERE I THINK THIS ENHANCEMENT SHOULD APPLY BECAUSE THE

10:57AM 22     CRIMINAL CONDUCT WAS OTHERWISE EXTENSIVE.

10:57AM 23          THE COURT:  RIGHT.  THERE'S NO FIVE PARTICIPANTS.

10:57AM 24     WE KNOW -- THE GUIDELINES TELLS PARTICIPANTS ARE THE

10:57AM 25     ACTUAL DEFENDANTS, IF YOU WILL.  WE HAVE TWO OF THOSE.

34

| | | |
|---|---|---|
| 10:57AM | 1 | SO I SUPPOSE THE EXTENSIVE IS WHAT YOU'RE GOING TO TALK TO |
| 10:57AM | 2 | ME ABOUT, AND THEN THE LEADERSHIP, I GUESS, IS THE OTHER ISSUE |
| 10:57AM | 3 | THAT I'M CURIOUS ABOUT. |
| 10:57AM | 4 | MS. BOSTIC:  THAT'S RIGHT, YOUR HONOR. |
| 10:57AM | 5 | SO BECAUSE THE GOVERNMENT IS NOT REQUIRED TO SHOW FOR THIS |
| 10:57AM | 6 | THAT THERE WERE FIVE PARTICIPANTS OR ANY OTHER PARTICIPANTS, IT |
| 10:57AM | 7 | DOESN'T MATTER WHAT MS. HOLMES'S POWER DYNAMIC WAS RELATIVE TO |
| 10:57AM | 8 | THE OTHER PARTICIPANT HERE, THE OTHER CONFIRMED PARTICIPANT, |
| 10:58AM | 9 | MR. BALWANI. |
| 10:58AM | 10 | WHAT MATTERS IS THE DEGREE OF CONTROL THAT SHE EXERCISED |
| 10:58AM | 11 | OVER OTHERS WHO WERE UNKNOWING PARTICIPANTS IN THE OFFENSE, AND |
| 10:58AM | 12 | THIS IS LAID OUT IN THE GOVERNMENT'S SENTENCING MEMORANDUM. |
| 10:58AM | 13 | THE COURT:  WELL, PARTICIPANTS. |
| 10:58AM | 14 | MS. BOSTIC:  NOT PARTICIPANTS UNDER THE DEFINITION |
| 10:58AM | 15 | OF THE GUIDELINE. |
| 10:58AM | 16 | THE COURT:  RIGHT. |
| 10:58AM | 17 | MS. BOSTIC:  BUT INDIVIDUALS WHOSE EFFORTS FURTHERED |
| 10:58AM | 18 | THE FRAUD, EVEN THOUGH THEY WERE SIMPLY DOING THEIR JOBS. |
| 10:58AM | 19 | THE COURT:  UNKNOWING EMPLOYEES WHO WERE UNDER HER |
| 10:58AM | 20 | GUIDANCE AND UNBEKNOWNST TO THEM, THEIR WORK SUSTAINED AND |
| 10:58AM | 21 | HELPED PERPETUATE THE FRAUD.  THAT'S WHAT YOU'RE TALKING ABOUT. |
| 10:58AM | 22 | MS. BOSTIC:  EXACTLY, YOUR HONOR. |
| 10:58AM | 23 | SO WITHIN THERANOS, WE'RE TALKING ABOUT PEOPLE LIKE THE |
| 10:58AM | 24 | EMPLOYEES WHO SET UP THE DEMOS FOR VIP'S, PEOPLE WHO PLACED |
| 10:58AM | 25 | NEXT GENERATION DEVICES IN ROOMS SO THAT MS. HOLMES COULD |

10:58AM 1    MISLEAD INVESTORS INTO THINKING THAT THOSE WERE THE DEVICES

10:58AM 2    THAT THERANOS WAS USING TO CONDUCT ITS CLINICAL TESTING.

10:59AM 3         ON THE BACK END, THE INDIVIDUALS WHO COLLECTED SAMPLES

10:59AM 4    FROM THOSE VIP'S AND THEN RAN THOSE SAMPLES ON CONVENTIONAL

10:59AM 5    ANALYZERS, NON-THERANOS EQUIPMENT, COMPLETING THAT CYCLE OF

10:59AM 6    DECEPTION.

10:59AM 7         WE HEARD TESTIMONY FROM ERIKA CHEUNG AND DANIEL EDLIN AND

10:59AM 8    OTHERS ABOUT ALL OF THE ACTIVITY, THE FLURRY OF ACTIVITY THAT

10:59AM 9    IS REQUIRED TO SUPPORT THOSE DEMOS AND THE WAY THAT MS. HOLMES

10:59AM 10   KIND OF MARSHALLED THOSE MANY EMPLOYEES TO CREATE THAT

10:59AM 11   DECEPTIVE IMAGE.

10:59AM 12        I'M ALSO TALKING ABOUT THE EMPLOYEES WHO WORKED ON

10:59AM 13   THERANOS'S WEBSITE CONTENT, FOR EXAMPLE.  WE SAW EVIDENCE OF

10:59AM 14   HOW MANY PEOPLE WERE INVOLVED IN CRAFTING AND WERE FIGHTING,

10:59AM 15   CONSULTING ON THAT LANGUAGE.  AT THE END OF THE DAY, IT WAS UP

10:59AM 16   TO MS. HOLMES TO APPROVE IT.  AND WE KNOW FROM THE EVIDENCE IN

10:59AM 17   THE TWO TRIALS THAT THAT WEBSITE ENDED UP CONTAINING A NUMBER

10:59AM 18   OF DEMONSTRABLY MISLEADING STATEMENTS THAT WERE IN FURTHERANCE

10:59AM 19   OF THE SCHEME TO DEFRAUD INVESTORS WHO VIEWED THAT WEBSITE.

11:00AM 20        I'M ALSO TALKING ABOUT EMPLOYEES WHO INTERFACED WITH

11:00AM 21   PEOPLE OUTSIDE OF THERANOS LIKE THOSE WHO HANDLED THE

11:00AM 22   RELATIONSHIPS WITH PHARMACEUTICAL COMPANIES, THE U.S. MILITARY,

11:00AM 23   AND OTHER ENTITIES, INCLUDING WALGREENS.  THOSE INDIVIDUALS

11:00AM 24   ACTED AS THERANOS'S POINTS OF CONTACT FOR THOSE ENTITIES, BUT

11:00AM 25   WE HEARD EVIDENCE ABOUT HOW MS. HOLMES WAS DEEPLY INVOLVED IN

11:00AM 1    THE MESSAGING THROUGH THOSE EMPLOYEES TO THOSE OUTSIDE ENTITIES

11:00AM 2    AND HOW THAT WAS IN FURTHERANCE OF THE SCHEME TO DEFRAUD

11:00AM 3    INVESTORS.

11:00AM 4         CUSTOMER SERVICE PEOPLE AT THERANOS.  CUSTOMER SERVICE

11:00AM 5    STAFF WHO RESPONDED TO QUESTIONS AND CONCERNS ABOUT INACCURATE

11:00AM 6    TEST RESULTS, THEIR FUNCTION AT THE COMPANY WAS PARTLY TO

11:00AM 7    PLACATE CUSTOMERS AND PATIENTS SO THAT CONCERNS WERE NOT

11:00AM 8    ELEVATED SO THAT THERANOS'S REPUTATION WAS PROTECTED, SO THAT

11:00AM 9    WORD DIDN'T GET OUT ABOUT HOW UNTRUSTWORTHY THE TEST RESULTS

11:01AM 10   THAT THERANOS WAS PUTTING OUT WERE.

11:01AM 11        AND THE COURT SAW EVIDENCE, INCLUDING THE BALWANI TRIAL,

11:01AM 12   ABOUT HOW THOSE CUSTOMER SERVICE STAFF MANAGED THEIR MESSAGING

11:01AM 13   TO PATIENTS TO STEER PEOPLE AWAY FROM SUSPECTING PROBLEMS WITH

11:01AM 14   THE TECHNOLOGY.

11:01AM 15        WHEN WE THINK ABOUT ALL OF THOSE PEOPLE WITHIN THERANOS

11:01AM 16   WHOSE EFFORTS UNKNOWINGLY, UNWILLINGLY CONTRIBUTED TO THIS

11:01AM 17   FRAUD, TO THE OPERATION OF THE COMPANY, BUT NOT JUST THAT, TO

11:01AM 18   THE WAYS THAT MS. HOLMES USED THAT APPARATUS TO DECEIVE

11:01AM 19   INVESTORS, THAT'S WHY IT SHOWS THAT THIS ENHANCEMENT APPLIES,

11:01AM 20   TO SAY NOTHING OF THE PEOPLE OUTSIDE OF THERANOS LIKE THE FOLKS

11:01AM 21   AT CHIAT DAY WHO WERE DEVELOPING MARKETING MATERIALS BASED ON

11:01AM 22   FALSE AND MISLEADING INFORMATION FROM THE DEFENDANTS,

11:01AM 23   JOURNALISTS WHO WERE FED FALSE AND MISLEADING INFORMATION THAT

11:01AM 24   THEY THEN PROPAGATED UNKNOWINGLY, LAWYERS DRAFTING THE INVESTOR

11:02AM 25   AGREEMENTS, INCLUDING ANY NAYSAYERS INSIDE AND OUTSIDE OF THE

| | | |
|---|---|---|
| 11:02AM | 1 | COMPANY, AND DISCOURAGING THE MEDIA FROM PUBLICIZING NEGATIVE |
| 11:02AM | 2 | INFORMATION.  ALL OF THESE PEOPLE UNKNOWINGLY HELPED MS. HOLMES |
| 11:02AM | 3 | COMMIT THAT FRAUD, AND THAT IS WHAT MAKES THIS OTHERWISE |
| 11:02AM | 4 | EXTENSIVE CONDUCT, AND IT SHOWS THAT SHE WAS A LEADER AND |
| 11:02AM | 5 | ORGANIZER. |
| 11:02AM | 6 | MR. DOWNEY:  WELL, YOUR HONOR -- |
| 11:02AM | 7 | THE COURT:  OKAY. |
| 11:02AM | 8 | MR. DOWNEY:  YOUR HONOR, I THINK -- I'M NOT GOING TO |
| 11:02AM | 9 | RESPOND TO ALL OF MR. BOSTIC'S COMMENTS, BUT I DO THINK THAT IT |
| 11:02AM | 10 | IS IMPORTANT TO STEP BACK AND LOOK AT THE PURPOSE OF THIS |
| 11:02AM | 11 | GUIDELINE AND THE LANGUAGE OF THE CONDUCT. |
| 11:02AM | 12 | FIRST OF ALL, AS YOUR HONOR ALLUDES TO AND AS MR. BOSTIC I |
| 11:02AM | 13 | THINK RECOGNIZES THE FIVE PARTICIPANT ALTERNATIVE DOES NOT |
| 11:02AM | 14 | APPLY BECAUSE THERE HAS NEVER BEEN AN ALLEGATION THAT THERE ARE |
| 11:02AM | 15 | OTHER PARTICIPANTS. |
| 11:02AM | 16 | MR. BOSTIC THEN TRIES TO SOLVE THAT PROBLEM BY SORT OF |
| 11:02AM | 17 | BACKDOORING NON-CRIMINAL PARTICIPANTS THROUGH THE OTHER |
| 11:03AM | 18 | GATEWAY, WHICH IS OTHERWISE EXTENSIVE. |
| 11:03AM | 19 | THE PROBLEM IS THAT THAT'S NOT WHAT THIS GUIDELINE IS |
| 11:03AM | 20 | ABOUT.  EVERYTHING THAT MR. BOSTIC JUST DESCRIBED IS REALLY NOT |
| 11:03AM | 21 | WHAT THE PURPOSE OF THE GUIDELINE IS. |
| 11:03AM | 22 | THE GUIDELINE IS ABOUT A SITUATION WHERE THERE IS |
| 11:03AM | 23 | CRIMINALITY AMONGST A NUMBER OF INDIVIDUALS, AND THAT MAY |
| 11:03AM | 24 | RESULT IN AN ANOMALOUS SITUATION WHERE INDIVIDUALS ARE |
| 11:03AM | 25 | CONVICTED OF THE SAME OFFENSE, BUT, IN FACT, THE LEADER OR THE |

11:03AM 1    INDIVIDUAL WHO PUT THAT CRIMINAL ACTIVITY TOGETHER IS TREATED

11:03AM 2    IN THE SAME MANNER AS SOMEONE MUCH LOWER WHO MIGHT HAVE

11:03AM 3    PERFORMED A SMALL NUMBER OR ONE ACT IN CONNECTION WITH IT,

11:03AM 4    THAT'S WHY WE'RE TOLD BY EGGE AND HOLDEN AND THE OTHER CASES

11:03AM 5    THAT THIS IS REALLY ABOUT RELATIVE RESPONSIBILITY WITHIN A SET

11:03AM 6    OF CRIMINAL CONDUCT.

11:04AM 7        IT'S NOT ABOUT WHETHER, YOU KNOW, THE GOVERNMENT OR

11:04AM 8    SOMEONE ELSE CAN IDENTIFY ALL OF THE ELEMENTS OF WHAT THEY

11:04AM 9    ALLEGE IS CRIMINAL.  IT'S ABOUT WE WANT TO STOP THE LEADERS,

11:04AM 10   AND WE ALSO WANT TO PUNISH THOSE WHO, IN SETTING THE OFFENSE,

11:04AM 11   PROFIT MOST FROM THE OFFENSE.

11:04AM 12       WE KNOW NEITHER OF THOSE FACTORS IS HERE.  IT'S CONCEDED

11:04AM 13   THAT THERE ARE NOT A LOT OF PARTICIPANTS, I THINK, AND WE KNOW

11:04AM 14   THAT THE CONCERN ABOUT PROFITING FROM THIS OFFENSE DOESN'T

11:04AM 15   TOUCH MS. HOLMES IN THIS INSTANCE.

11:04AM 16       SO I JUST THINK THAT THIS ADJUSTMENT IS JUST DESIGNED AT A

11:04AM 17   GENERAL LEVEL FOR A DIFFERENT SITUATION THAN WE HAVE HERE.

11:04AM 18           THE COURT:  THANK YOU.

11:04AM 19       ANYTHING FURTHER, MR. BOSTIC?

11:04AM 20           MS. BOSTIC:  JUST BRIEFLY, YOUR HONOR.

11:04AM 21       I DON'T THINK THAT'S CORRECT.  I DON'T THINK THAT THIS

11:04AM 22   GUIDELINE SECTION IS LIMITED TO SITUATIONS WHERE THERE ARE

11:04AM 23   MULTIPLE CRIMINALLY RESPONSIBLE PERSONS, JUST BY ITS TEXT IT'S

11:05AM 24   NOT.

11:05AM 25       IT ALSO INVOLVES OR APPLIES TO SITUATIONS WHERE A

11:05AM 1    DEFENDANT MARSHALED THE UNKNOWING SERVICES OF MANY OTHERS.  AND

11:05AM 2    THE GOVERNMENT CITES THE GOVIN CASE WHERE A CONSPIRACY WAS

11:05AM 3    FOUND OTHERWISE EXTENSIVE BY VIRTUE OF INTERSTATE TRAVEL, A

11:05AM 4    LARGE NUMBER OF VICTIMS, AND NEARLY 100,000 IN ROBBERY

11:05AM 5    PROCEEDS.

11:05AM 6        HERE THE FRAUD SPANNED THE COUNTRY AND EVEN OTHER

11:05AM 7    COUNTRIES.  THERE WAS A LARGE NUMBER OF VICTIMS, AND THE LOSS

11:05AM 8    AMOUNT IS IN THE NINE FIGURES.

11:05AM 9        AND WHEN IT COMES TO MS. HOLMES PROFITING, I DON'T AGREE

11:05AM 10   WITH THE DEFENSE THAT THERE WAS NO PROFIT HERE.

11:05AM 11       THE FACT THAT MS. HOLMES NEVER CONVERTED HER SHARES TO

11:05AM 12   CASH, TO LIQUID, DOES NOT MEAN THAT SHE DIDN'T PROFIT.  ON

11:05AM 13   PAPER SHE HAD BILLIONS OF DOLLARS.  SHE WAS HOLDING AN ASSET

11:05AM 14   THAT WAS WORTH A TEN FIGURE AMOUNT, AND THAT SHOULD BE FACTORED

11:05AM 15   IN UNDER THE GUIDELINES AS WELL.

11:05AM 16           THE COURT:  OKAY.  THANK YOU.

11:05AM 17       MR. POLLAK, ANYTHING FURTHER ON THIS FROM PROBATION?

11:06AM 18           PROBATION OFFICER:  NOTHING FURTHER.

11:06AM 19           THE COURT:  ALL RIGHT.  THANK YOU.  LET'S GO

11:06AM 20   BACKWARDS UP THE CHAIN.  THAT LOOKS LIKE NUMBER SIX.

11:06AM 21       THIS IS THE NUMBER OF VICTIMS UNDER 2B1.1(B)(2).

11:06AM 22           MR. DOWNEY:  I'M SORRY, YOUR HONOR.  AM I CONFUSED?

11:06AM 23   THIS IS FIVE?

11:06AM 24           THE COURT:  YES, FIVE.

11:06AM 25           LET ME START WITH YOU.  WHAT IS THE DEFENSE POSITION HERE

40

11:06AM 1    AS TO WHETHER OR NOT THERE ARE TEN OR MORE VICTIMS?

11:06AM 2    MR. DOWNEY:  I THINK, YOUR HONOR, THIS MIGHT BE THE

11:06AM 3    TIME TO JUST LAY OUT THE RELATIONSHIP BETWEEN THE FACTS AND THE

11:06AM 4    29 ENTITIES THAT ARE ON THE SPREADSHEET THAT MR. POLLAK RELIED

11:06AM 5    ON AND THAT RESULT IN WHAT THE FINDING OF THE PSR IS WITH

11:06AM 6    RESPECT TO THAT.

11:06AM 7    I WILL SAY, I AM GOING TO BE CHEATING BECAUSE I MADE

11:06AM 8    MYSELF A SORT OF COLOR CODED CATEGORY, WHICH I MADE COPIES FOR

11:07AM 9    MR. BOSTIC AS WELL.  I'M HAPPY TO JUST SHARE THAT FOR EASE OF

11:07AM 10   FOLLOWING, BUT THERE'S NO ADVOCACY WITH RESPECT TO IT EXCEPT

11:07AM 11   MY -- WHAT I'LL SAY ABOUT IT ORALLY.

11:07AM 12   THE COURT:  YOU'RE SHARING YOUR NOTES?

11:07AM 13   MR. DOWNEY:  YES.

11:07AM 14   THE CLERK:  (HANDING.)

11:07AM 15   THE COURT:  THANK YOU.  IS THIS A ONE PAGE DOCUMENT?

11:07AM 16   MR. DOWNEY:  IT IS JUST ONE PAGE.

11:07AM 17   THE COURT:  OKAY.  SO ARE YOU GOING TO -- DO YOU

11:07AM 18   INTEND, MR. DOWNEY, IN THE COURSE OF THIS DISCUSSION, TO

11:07AM 19   RESPOND TO THE TEN OR MORE VICTIMS AS WELL AS THE LOSS AMOUNT,

11:07AM 20   THAT IS, THE NUMBER OF VICTIMS AS IDENTIFIED IN THE FIRST

11:07AM 21   SPREADSHEET THAT HAD I THINK IT WAS 29 VICTIMS?

11:07AM 22   MR. DOWNEY:  I DO, YOUR HONOR.  AND I THINK THOSE

11:07AM 23   ISSUES -- I THINK THERE ARE OTHER ISSUES, AND THERE'S A

11:08AM 24   SEPARATE OBJECTION WITH REGARD TO THE LOSS CALCULATION THAT

11:08AM 25   WE'LL BE DISCUSSING.  BUT I THINK REALLY AS TO WHAT IS IN

41

| | | |
|---|---|---|
| 11:08AM | 1 | ESSENCE OBJECTION TWO, AND THEN OBJECTION FIVE, IN A SENSE THAT |
| 11:08AM | 2 | RELATIONSHIP SORT OF STARTS WITH OBJECTION FIVE AND ASKS THE |
| 11:08AM | 3 | QUESTION WHO IS ACTUALLY PROPERLY IDENTIFIED AS A VICTIM OF |
| 11:08AM | 4 | WIRE FRAUD ON THESE FACTS, IF THAT IS SENSIBLE TO THE COURT. |
| 11:08AM | 5 | WHAT I'VE DONE, SIMPLY DONE WITH REGARD TO THIS SHEET IS |
| 11:08AM | 6 | TO TAKE THE 29 INVESTORS AND TO CATEGORIZE THEM AS "AND DO WE |
| 11:08AM | 7 | HAVE A JURY'S CONVICTION WITH RESPECT TO THIS INDIVIDUAL?" |
| 11:08AM | 8 | WHICH IS OBVIOUSLY A VERY STRONG CASE, THAT THEY BE CONSIDERED |
| 11:08AM | 9 | VICTIMS, AND I WON'T HAVE MUCH OF A COMMENT WITH RESPECT TO |
| 11:08AM | 10 | THAT. THAT'S ONE CATEGORY. |
| 11:08AM | 11 | WE HAVE A SECOND CATEGORY, WHICH IS THE INDIVIDUALS WHO |
| 11:09AM | 12 | WERE IN BLUE. THOSE ARE INDIVIDUALS FOR WHOM THEY WERE CHARGED |
| 11:09AM | 13 | AS VICTIMS OF A CONSPIRACY, OF A WIRE FRAUD CONSPIRACY, BUT THE |
| 11:09AM | 14 | JURY DID NOT RETURN A VERDICT. |
| 11:09AM | 15 | THOSE WHO ARE LISTED HERE IN YELLOW ARE INDIVIDUALS WHOSE |
| 11:09AM | 16 | NAMES WERE MENTIONED I THINK DURING THE COURSE OF THE TRIAL, |
| 11:09AM | 17 | BUT AS TO WHOM THE MENTION WAS EITHER IN PASSING OR |
| 11:09AM | 18 | INSUFFICIENT TO ESTABLISH, IN ANY EVENT, THAT THEY WERE VICTIMS |
| 11:09AM | 19 | WITH RESPECT TO WIRE FRAUD. |
| 11:09AM | 20 | AND THEN THERE'S A SEPARATE GROUP WHICH CONSISTS OF EIGHT |
| 11:09AM | 21 | INVESTORS WHO WERE NEVER EVEN MENTIONED PRIOR TO APPEARING ON |
| 11:09AM | 22 | THE SPREADSHEET IN FRONT OF THE COURT. |
| 11:09AM | 23 | AND I WILL TAKE A REALLY BEYOND WHAT I SAID WITH RESPECT |
| 11:09AM | 24 | TO OBJECTION THREE. THE ONLY COMMENT I HAVE AS TO THE |
| 11:10AM | 25 | INVESTORS FOR WHOM THERE IS A CONVICTION IS THIS: AS |

11:10AM 1        YOUR HONOR KNOWS, AS A MATTER OF GUIDELINE CALCULATIONS, SO

11:10AM 2        WHEN WE GO BACK TO THE LOSS ISSUE, IN ADDITION TO THE ELEMENTS

11:10AM 3        OF THE OFFENSE, WHEN WE LOOK AT CALCULATING LOSS, RELIANCE

11:10AM 4        BECOMES IMPORTANT, AS IT WAS NOT DURING THE COURSE OF THE

11:10AM 5        TRIAL.  I'LL MAKE SOME COMMENT WITH RESPECT TO THAT.

11:10AM 6            OTHER THAN THAT, UNLESS THE COURT HAS A QUESTION WITH

11:10AM 7        REGARD TO THOSE THREE, I DON'T HAVE ANY COMMENT WITH REGARD TO

11:10AM 8        THAT.

11:10AM 9            THE SECOND CATEGORY HERE ARE THE SEVEN INDIVIDUALS OR

11:10AM 10       ENTITIES WHOSE INVESTMENTS IN SOME WAY OR ANOTHER WERE EITHER

11:10AM 11       THE SUBJECT OF A WIRE FRAUD COUNT OR THEY RELATE TO AN

11:10AM 12       INDIVIDUAL WHOSE INVESTMENT WAS THE SUBJECT OF A WIRE FRAUD

11:11AM 13       COUNT.

11:11AM 14           SO, FOR EXAMPLE, WITH RESPECT TO MR. EISENMAN, HE

11:11AM 15       TESTIFIED DURING THE COURSE OF THE TRIAL, BUT THE ENTITIES

11:11AM 16       CROFTON CAPITAL AND GORDON FAMILY TRUST ARE ENTITIES RELATED TO

11:11AM 17       HIM THROUGH HIS WIFE'S FAMILY, AND OF COURSE HIS WIFE IS ALSO

11:11AM 18       SEPARATELY IDENTIFIED AS AN INVESTOR HERE;

11:11AM 19           THE COURT WILL RECALL THAT MR. TOLBERT TESTIFIED WITH

11:11AM 20       RESPECT TO THE HALL/BLACK DIAMOND INVESTMENT; AND,

11:11AM 21           THAT CHRIS LUCAS TESTIFIED WITH REGARD TO LUCAS VENTURE

11:11AM 22       AND DBV.

11:11AM 23           WITH RESPECT TO THIS CATEGORY OF INVESTORS, YOUR HONOR, WE

11:11AM 24       KNOW THAT EVIDENCE CONSTITUTING THE CIRCUMSTANCES SURROUNDING

11:11AM 25       THEIR INVESTMENT WAS PRESENTED TO A JURY.

11:12AM   1          WITH RESPECT TO ALL THREE INVESTORS, THEY HAD BEEN IN

11:12AM   2     TOUCH WITH THERANOS OVER A LONG PERIOD OF TIME BECAUSE THEY HAD

11:12AM   3     PRIOR INVESTMENTS WITH THERANOS DATING BACK TO 2005 OR IN SOME

11:12AM   4     CASES 2006.

11:12AM   5          THE REPRESENTATIONS THAT THEY RECEIVED WERE COMPLETELY

11:12AM   6     DIFFERENT IN MANY RESPECTS FROM THE REPRESENTATIONS THAT WERE

11:12AM   7     RECEIVED BY THE INVESTORS WHO INVESTED IN THE C2 SERIES.

11:12AM   8          THEY DID NOT, FOR EXAMPLE, RECEIVE THE SAME MATERIALS.

11:12AM   9     TWO OF THE INVESTORS HERE, WHICH REALLY CONSTITUTES THREE

11:12AM  10     BECAUSE OF THE SPLIT OF THE ENTITIES, PARTICIPATED IN A

11:12AM  11     TELEPHONE CALL WITH MS. HOLMES, WHICH AS THE COURT WILL RECALL,

11:12AM  12     WAS THE SUBJECT OF AN ILLEGAL RECORDING BY MR. TOLBERT.

11:12AM  13          THE JURY HEARD THAT DURING THE COURSE OF THE TRIAL, AND AS

11:12AM  14     THE COURT WILL RECALL, THEY ASKED TO HEAR IT AGAIN DURING

11:13AM  15     DELIBERATIONS.  SO WE KNOW THAT THAT WAS BOTH A FOCUS OF THE

11:13AM  16     TESTIMONY OF MR. LUCAS AND MR. TOLBERT, AND THEN IT BECAME A

11:13AM  17     FOCUS OF THE JURY.

11:13AM  18          AND THE JURY DID NOT, IN CONNECTION WITH THAT, RETURN A

11:13AM  19     VERDICT OF GUILTY.

11:13AM  20          I THINK FOR THE COURT TO THEN INFER FROM THAT, THAT THESE

11:13AM  21     INVESTORS SHOULD BE TREATED AS PART OF THE LOSS CALCULATION,

11:13AM  22     WHEREAS VICTIMS IT MUST DO SO OF ITS OWN ACCORD.  BECAUSE THE

11:13AM  23     COURT IS GOING TO DO THAT IN THE CONTEXT WHERE IT WILL EXPAND

11:13AM  24     LOSS, I THINK THE CASES REQUIRE THE COURT TO MAKE THAT

11:13AM  25     DETERMINATION UNDER THE CLEAR AND CONVINCING STANDARD AS

11:13AM 1      OPPOSED TO UNDER THE MERE PREPONDERANCE STANDARD.

11:13AM 2            THE COURT:  WHAT DOES LAURIENTI TEACH ABOUT THAT?

11:13AM 3            MR. DOWNEY:  WELL, AS TO THE BURDEN?

11:13AM 4            THE COURT:  YES.

11:13AM 5            MR. DOWNEY:  WELL, I THINK THAT THE -- I THINK THE

11:14AM 6      ISSUE IS WHAT IS EXPANDED AS A RESULT OF INCLUDING THESE PEOPLE

11:14AM 7      AS VICTIMS?

11:14AM 8        I THINK THE DISCUSSION IN LONICH, THE MOST RECENT

11:14AM 9      PRONOUNCEMENT, MAKES QUITE CLEAR THAT IF THERE'S AN EXPANSION

11:14AM 10     OF LOSS AS A RESULT OF COUNTING THESE INDIVIDUALS AS VICTIM, IT

11:14AM 11     HAS TO BE EVALUATED AFTER CONSIDERATION OF THE SIX FACTOR

11:14AM 12     NINTH CIRCUIT TEST.

11:14AM 13       AND THEN IN CONNECTION WITH THE MOST -- WHAT IS

11:14AM 14     CHARACTERIZED AS THE MOST IMPORTANT FACTORS, WHICH IDENTIFIES

11:14AM 15     AS FIVE AND SIX, THE QUESTION IS WHAT IMPACT IS THAT GOING TO

11:14AM 16     HAVE?

11:14AM 17           THE COURT:  IS LONICH FACTUALLY, IS THAT SOMETHING

11:14AM 18     THAT WE CAN LOOK AT FOR GUIDANCE FACTUALLY IN REGARDS TO THE

11:14AM 19     LOSS?  I THINK THERE WAS A BANK THAT WAS BEING LOOKED AT

11:14AM 20     SEPARATELY.  AND DOES THAT REALLY APPLY HERE?

11:14AM 21           MR. DOWNEY:  WELL, I THINK THE DISCUSSION WAS

11:14AM 22     STANDARD.  I WAS JUST REACTING TO YOUR HONOR'S COMMENT IN

11:14AM 23     CONNECTION WITH THE QUESTION ABOUT WHAT STANDARD APPLIES.

11:14AM 24           THE COURT:  RIGHT.

11:14AM 25           MR. DOWNEY:  I THINK AS A CONSTITUTIONAL MATTER, THE

11:15AM 1    QUESTION OF WHAT STANDARD APPLIES IS NOT AS DEPENDENT ON THE

11:15AM 2    FACTUAL CONTEXT WHEN EVALUATING UNDER THE -- OF COURSE IT'S A

11:15AM 3    DIFFERENT CASE, AND IT'S A DIFFERENT TYPE OF INVESTMENT.  IN

11:15AM 4    SOME RESPECTS IT'S ANALOGOUS AND IN SOME RESPECTS IT'S NOT.

11:15AM 5        JUST AS THAT'S TRUE OF ALMOST ALL CASES BECAUSE ACTUALLY

11:15AM 6    WE HAVE VERY FEW CASES WHICH ARE LIMITED TO A CONTEXT LIKE THIS

11:15AM 7    WHICH IS A PURE LARGE PUBLIC COMPANY INVESTMENT OR A PURPORTED

11:15AM 8    LARGE PRIVATE COMPANY INVESTMENT.  A LOT OF THE CASES --

11:15AM 9            THE COURT:  THIS IS NOT ON THE MARKET.

11:15AM 10           MR. DOWNEY:  IT IS NOT ON THE MARKET.  IT'S NOT SORT

11:15AM 11   OF NECESSARILY FUNGIBLE.  WE DON'T HAVE INDIVIDUALS WHO ARE THE

11:15AM 12   SUBJECT OF THE SAME REPRESENTATIONS.  THE FORMAL POSITION IS

11:15AM 13   THAT YOU AS AN INVESTOR DON'T GET ANY REPRESENTATIONS, YOU HAVE

11:15AM 14   TO EVALUATE THIS ON YOUR OWN.

11:15AM 15       AND WHAT THE CASE REALLY TURNED ON HERE IS THE INDIVIDUAL

11:15AM 16   SAID, WELL, MS. HOLMES SAID SOMETHING TO ME BEYOND THE

11:15AM 17   REPRESENTATION OF THE FORMAL DOCUMENTS.  THAT ALSO, LIKE THE

11:16AM 18   BANK CASES, TAKES A LOT OF THE LAW AND MAKES IT LOOK VERY

11:16AM 19   DIFFERENT.

11:16AM 20       BUT HERE I THINK THE WAY THAT THAT PLAYS INTO IT IS IT

11:16AM 21   REALLY MEANS YOU HAVE TO LOOK AT EVERY INDIVIDUAL INVESTOR

11:16AM 22   BECAUSE THEY'RE HEARING DIFFERENT THINGS.  AND WHAT --

11:16AM 23           THE COURT:  I'M SORRY.

11:16AM 24           MR. DOWNEY:  YES.

11:16AM 25           THE COURT:  YOU'RE ADVOCATING, JUDGE, THE COURT

11:16AM 1    NEEDS TO DO AN INDIVIDUALIZED EVALUATION AS OPPOSED TO A

11:16AM 2    SHOTGUN, I'LL USE THAT NOT PEJORATIVELY BUT YOU CAN'T JUST GET

11:16AM 3    THIS SHEET OF 29 AND SAY THEY WERE IN THE CASE, AND, THEREFORE,

11:16AM 4    THEY'RE VICTIMS.

11:16AM 5        YOU'RE ADVOCATING, JUDGE, YOU HAVE TO DRILL DOWN A LITTLE

11:16AM 6    FURTHER, A LITTLE DEEPER TO SEE WHAT AND IF ANY OF THOSE

11:16AM 7    RECEIVED INFORMATION FROM MS. HOLMES OR RELIED ON INFORMATION

11:16AM 8    IN REGARDS TO THEIR INVESTMENT?

11:16AM 9            MR. DOWNEY:  I THINK, YOUR HONOR, GENERALLY

11:17AM 10   SPEAKING, THAT IS CORRECT.  I THINK THE WAY I'VE THOUGHT ABOUT

11:17AM 11   IT, IF THIS IS HELPFUL TO THE COURT, AND IT'S REALLY WHY

11:17AM 12   OBJECTIONS TWO AND FOUR ARE A LITTLE BIT DIFFERENT.  I THINK

11:17AM 13   THE QUESTION THAT IS PRESENTED BY OBJECTION TWO IS REALLY ARE

11:17AM 14   THESE INDIVIDUALS VICTIMS OF A FRAUD AT ALL?  RIGHT?

11:17AM 15       IS THERE ANYTHING THAT HAPPENED WITH REGARD TO THEIR

11:17AM 16   INVESTMENT THAT DEMONSTRATES TO THE COURT THAT THIS INDIVIDUAL

11:17AM 17   WAS DEFRAUDED?

11:17AM 18       EVEN IF THERE ARE CONVICTIONS WITH REGARD TO OTHER COUNTS

11:17AM 19   WHERE THOSE INVESTORS TESTIFIED AND THE COURT CONCLUDES THAT

11:17AM 20   WAS VALID, ARE THEY INVESTORS AT ALL?

11:17AM 21       SO, YES, TO ANSWER THE COURT'S QUESTION DIRECTLY, BECAUSE

11:17AM 22   OF THE CIRCUMSTANCE HERE I THINK WE HAVE TO DO A BIT ON THAT.

11:17AM 23           THE COURT:  OKAY.  LET ME STOP YOU.

11:17AM 24           MR. DOWNEY:  AND LET ME JUST SAY, I DON'T DISPUTE

11:17AM 25   PROBATION'S -- I DISPUTE THAT LEGAL, THE LEGAL INFERENCE WHICH

11:17AM 1    IS I THINK APPROPRIATELY DECIDED BY THE COURT IN ANY EVENT.

11:17AM 2        I THINK THE INDIVIDUALS LISTED IN PROBATION'S REPORT ARE

11:18AM 3    ALL, IN FACT, THE GROUP TO BE CONSIDERED.

11:18AM 4            THE COURT:  OKAY.  MR. BOSTIC, AS TO THESE POINTS?

11:18AM 5            MR. BOSTIC:  YES, YOUR HONOR.

11:18AM 6        SO, FIRST, WHEN IT COMES TO DETERMINING WHETHER

11:18AM 7    ENHANCEMENT APPLIES, IT'S IMPORTANT TO REMEMBER THAT THE

11:18AM 8    NINTH CIRCUIT TELLS US -- ACTUALLY STEERS US AWAY FROM THE NEED

11:18AM 9    TO IDENTIFY INDIVIDUAL VICTIMS.  THAT'S THE GEORGE CASE AT 949

11:18AM 10   F.3D 1181.  IN THAT CASE THE NINTH CIRCUIT DISAGREED WITH THE

11:18AM 11   APPELLANT THAT THERE WAS A NEED FOR THE DISTRICT COURT TO

11:18AM 12   IDENTIFY SPECIFIC VICTIMS IN ORDER TO REACH THAT LEVEL OF TEN

11:18AM 13   VICTIMS.

11:18AM 14       THE COURT SAID INSTEAD IT WAS SUFFICIENT FOR THE

11:18AM 15   GOVERNMENT TO PRODUCE EVIDENCE FOR ENOUGH OF THE VICTIMS TO

11:18AM 16   ALLOW A SENTENCING COURT REASONABLY TO INFER A PATTERN.

11:18AM 17       AND THAT'S THE POSITION THAT THE COURT IS IN HERE.  THE

11:18AM 18   COURT HAS HEARD FROM A NUMBER OF VICTIMS OF MS. HOLMES'S SCHEME

11:18AM 19   TO DEFRAUD INVESTORS, INCLUDING THE SEVERAL WHO TESTIFIED IN

11:19AM 20   BOTH TRIALS HERE, AND THAT'S ONE POINT TO NOTE ALSO.

11:19AM 21       THE COURT NEED NOT LIMIT ITSELF TO THE EVIDENCE AT THE

11:19AM 22   HOLMES TRIAL.  THERE WAS ANOTHER TRIAL IN THIS CASE WHERE AT

11:19AM 23   LEAST ONE ADDITIONAL INVESTOR, PATRICK MENDENHALL, TESTIFIED.

11:19AM 24   THERE'S NO REASON THAT HE SHOULD NOT BE CONSIDERED A VICTIM OF

11:19AM 25   THE DEFENDANT'S JOINT SCHEME TO DEFRAUD INVESTORS.

11:19AM 1       THE PATTERNS -- ALTHOUGH EACH INVESTOR IN SOME CASES

11:19AM 2   RECEIVED INFORMATION THAT ANOTHER MIGHT NOT HAVE, THERE WERE

11:19AM 3   TOOLS THAT MS. HOLMES USED THAT WERE COMMON TO ALL OF THEM,

11:19AM 4   INCLUDING THE USE OF MISLEADING STATEMENTS ON THE THERANOS

11:19AM 5   WEBSITE, MISLEADING STATEMENTS THAT MS. HOLMES PLANTED IN THE

11:19AM 6   MEDIA BY PROVIDING THEM TO JOURNALISTS, FALSE AND MISLEADING

11:19AM 7   STATEMENTS IN PRESS RELEASES, AND THE COURT KNOWS FROM HEARING

11:19AM 8   THIS TESTIMONY FROM MULTIPLE INVESTORS THAT THEY ALL CONSUMED

11:20AM 9   THAT CONTENT VERACIOUSLY.

11:20AM 10      PEOPLE WHO WERE OWNING A STAKE IN THIS COMPANY, PAID

11:20AM 11  ATTENTION TO WHAT WAS GOING ON IN THE COMPANY, THEY READ EVERY

11:20AM 12  ARTICLE THE DAY IT CAME OUT, THEY VISITED THE THERANOS WEBSITE

11:20AM 13  MULTIPLE TIMES.  THAT'S WHY THESE WERE EFFECTIVE TOOLS TO USE

11:20AM 14  TO MISLEAD THE INVESTORS AND POTENTIAL INVESTORS, AND THOSE

11:20AM 15  TOOLS WERE EFFECTIVE IN THIS CASE.  THE COURT HEARD THAT

11:20AM 16  EVIDENCE.

11:20AM 17      THERE IS ALSO CASE LAW, AND WE CAN TALK ABOUT THIS MORE IN

11:20AM 18  THE CONTEXT OF THE LOSS AMOUNT, BUT THERE IS CASE LAW SHOWING

11:20AM 19  THAT INDIVIDUALIZED PROOF OF RELIANCE OR CAUSATION IS NOT

11:20AM 20  NECESSARY IN MANY CASES.

11:20AM 21      THAT'S THE BERGER CASE, FOR EXAMPLE, WHERE ALTHOUGH

11:20AM 22  INVOLVING A PUBLIC COMPANY, IT WAS A CASE LIKE THIS WHERE THE

11:20AM 23  VALUE OF A SECURITY HAD BEEN INFLATED BY A DEFENDANT'S FRAUD,

11:20AM 24  AND THE COURT IN THAT CASE FOUND THAT THE DEFENDANT MAY HAVE

11:20AM 25  CAUSED AN AGGREGATE LOSS IN THE AMOUNT OF THE FRAUD INDUCED

11:21AM 1    OVER VALUATION EVEN IF VARIOUS INDIVIDUAL VICTIMS RESPECTIVE

11:21AM 2    LOSSES COULD NOT BE PRECISELY DETERMINED OR LINKED TO THE

11:21AM 3    FRAUD.

11:21AM 4        THE COURT CAN TAKE THE SAME APPROACH HERE.  THE EVIDENCE

11:21AM 5    SHOWS THAT WHEN EACH OF THESE INVESTORS PAID MONEY TO BUY A

11:21AM 6    SHARE OF THERANOS, THEY OVERPAID.  THE PRICE WAS NOT SET IN A

11:21AM 7    BILATERAL NEGOTIATION BETWEEN THE COMPANY AND THE INDIVIDUAL

11:21AM 8    INVESTOR AND SAID THE PRICE WAS THE PRICE, AND THAT PRICE WAS

11:21AM 9    INFLATED BASED ON THE FRAUDULENT REPRESENTATIONS CONCERNING THE

11:21AM 10   COMPANY.  AND THAT'S LAID OUT IN DETAIL IN THE EXPERT REPORT

11:21AM 11   THAT THE GOVERNMENT HAS SUBMITTED IN CONNECTION WITH THE

11:21AM 12   SENTENCING.

11:21AM 13       SO BECAUSE AT THE MOMENT OF INVESTING EACH INVESTOR

11:21AM 14   OVERPAID BY SOME SIGNIFICANT AMOUNT FOR WHAT THEY WERE

11:21AM 15   ACQUIRING, THEY ARE EACH VICTIMS OF THE FRAUD REGARDLESS OF

11:21AM 16   WHAT SPECIFICALLY WAS MOTIVATING THEM AT THAT TIME, WHAT

11:21AM 17   SPECIFIC STATEMENTS THEY MAY HAVE HEARD FROM MS. HOLMES.  THEY

11:22AM 18   OVERPAID BY VIRTUE OF THE FRAUD, AND SOME OF THE LOSS SHOULD

11:22AM 19   COME FROM THAT OVERPAYMENT, WHICH ISN'T DEPENDENT, AGAIN, ON

11:22AM 20   THE INVESTOR'S SUBJECTIVE MENTAL STATE.

11:22AM 21           MR. DOWNEY:  WELL, I WOULD SAY, YOUR HONOR, THE

11:22AM 22   PRINCIPLE THAT MR. BOSTIC ATTEMPTS TO APPLY HERE IS DISPROVEN

11:22AM 23   BY WHAT HAS HAPPENED IN THIS COURT OVER THE COURSE OF THE LAST

11:22AM 24   YEAR.

11:22AM 25       WE KNOW THAT SIX INVESTMENTS WERE PRESENTED TO THIS JURY.

50

11:22AM 1          THE ARGUMENTS THAT MR. BOSTIC JUST ARTICULATED WERE

11:22AM 2    ADVANCED TO THAT JURY, AND THAT JURY CONVICTED WITH REGARD TO

11:22AM 3    SOME OF THOSE INVESTORS AND NOT WITH REGARD TO OTHERS.

11:22AM 4          WE ALSO KNOW THAT THERE WERE DIFFERENCES IN INFORMATION AS

11:22AM 5    TO EACH, FRANKLY, AS TO ALL SIX INVESTORS.  THERE WERE

11:22AM 6    DIFFERENCES ABOUT SOURCES OF INFORMATION, WHAT THEY RECEIVED,

11:23AM 7    EVEN IF THEY RECEIVED IT, WHAT DID THEY REVIEW, WHAT DID THEY

11:23AM 8    THINK WAS IMPORTANT, ET CETERA, IN EACH CASE.

11:23AM 9          THERE'S NOT ANY REASON TO INFER FROM THE VERDICT THAT WE

11:23AM 10   HAVE HERE THAT THE JURY DIDN'T EVALUATE THOSE SITUATIONS

11:23AM 11   INDIVIDUALLY.  IT'S QUITE THE OPPOSITE.

11:23AM 12         IN A SITUATION OF A SPLIT VERDICT WITH REGARD TO

11:23AM 13   INVESTORS, I JUST DON'T THINK IT'S APPROPRIATE TO TRY TO APPLY

11:23AM 14   SOME GENERAL PRESUMPTION WHEN THE QUESTION IS NOT AS OF RIGHT

11:23AM 15   NOW EVEN HOW DO WE CALCULATE LOSS.

11:23AM 16         THE QUESTION RIGHT NOW IS, IS THIS PERSON EVEN A VICTIM?

11:23AM 17   IS THIS SOMEBODY WE SHOULD BE LOOKING AT FOR LOSS OR SHOULD

11:23AM 18   THEY BE EXCLUDED BEFORE WE GET TO SOME OF THE QUESTIONS OF

11:23AM 19   CALCULATION?

11:23AM 20              THE COURT:  ARE THOSE SEVERABLE?

11:23AM 21              MR. DOWNEY:  THEY ARE ELEMENTS OF ULTIMATELY GETTING

11:23AM 22   TO THE SAME JUDGMENT, BUT THE FIRST QUESTION IS ALMOST AKIN TO

11:24AM 23   A BUT FOR CAUSATION.

11:24AM 24         AND THEN THE SECOND QUESTION IS REALLY A PROXIMATE CAUSE

11:24AM 25   TYPE QUESTION WHICH IS, YOU KNOW, AND I ACTUALLY THINK THAT

| | | |
|---|---|---|
| 11:24AM | 1 | MR. BOSTIC'S COMMENTS TO A CERTAIN EXTENT CONCEDE IT BECAUSE |
| 11:24AM | 2 | THIS ISN'T A CASE WITH A SITUATION WHERE A BANK LOAN HAS BEEN |
| 11:24AM | 3 | OBTAINED WITH REPRESENTATION THAT THERE IS A SECURING |
| 11:24AM | 4 | COLLATERAL THAT IS -- WILL COVER THE BANK LOAN, BUT RATHER THIS |
| 11:24AM | 5 | IS REALLY SORT OF THE VALUATION OF AN EQUITY INTEREST IN A |
| 11:24AM | 6 | COMPANY. |
| 11:24AM | 7 | I THINK WE ALL RECOGNIZE THAT THERE WAS VALUE, RIGHT, IN |
| 11:24AM | 8 | CONNECTION WITH WHAT THESE INVESTORS DID? |
| 11:24AM | 9 | THE QUESTION IS HOW MUCH OF THAT VALUE, IF ANY, WAS |
| 11:24AM | 10 | REDUCED BY THE FRAUDULENT REPRESENTATIONS FOR WHICH THERE HAS |
| 11:24AM | 11 | BEEN A CONVICTION?  I THINK IT'S SLIGHTLY DIFFERENT. |
| 11:24AM | 12 | THE COURT:  WELL, THAT TAKES US TO THE SABA REPORT. |
| 11:24AM | 13 | MR. DOWNEY:  IT TAKES US TO THE SABA REPORT AND SOME |
| 11:25AM | 14 | OTHER QUESTIONS THAT I THINK REALLY RELATE TO OBJECTION FOUR |
| 11:25AM | 15 | MORE. |
| 11:25AM | 16 | BUT I THINK THE GATEWAY ISSUE, WHICH I THINK THIS IS, WHO |
| 11:25AM | 17 | ARE WE TALKING ABOUT? |
| 11:25AM | 18 | THE COURT:  WELL, LET'S ASK MR. BOSTIC. |
| 11:25AM | 19 | WHO ARE WE TALKING ABOUT, MR. BOSTIC? |
| 11:25AM | 20 | MS. BOSTIC:  SO, YOUR HONOR, WE TALKED ABOUT |
| 11:25AM | 21 | ACQUITTED CONDUCT BEFORE, AND I POINTED THE COURT TO THE |
| 11:25AM | 22 | SUPREME COURT AUTHORITY CONFIRMING THAT EVEN RELYING ON |
| 11:25AM | 23 | ACQUITTED CONDUCT IS ACTUALLY PROPER. |
| 11:25AM | 24 | HOW MUCH MORE OF THAT SHOULD APPLY TO THE CONDUCT THAT WAS |
| 11:25AM | 25 | THE SUBJECT OF A HUNG COUNT? |

52

| | | |
|---|---|---|
| 11:25AM | 1 | MR. DOWNEY SUGGESTION THAT BECAUSE THE JURY FAILED TO |
| 11:25AM | 2 | CONVICT ON CERTAIN INVESTORS, THE COURT IS UNABLE TO CONSIDER |
| 11:25AM | 3 | THOSE INVESTORS AS VICTIMS DOESN'T HOLD WATER. |
| 11:25AM | 4 | THE COURT NEEDS TO MAKE ITS OWN INDEPENDENT DETERMINATION |
| 11:25AM | 5 | ABOUT WHETHER THE EVIDENCE ESTABLISHES THAT THOSE INDIVIDUALS |
| 11:25AM | 6 | ARE VICTIMS AND IN DOING THAT THE COURT SHOULD APPLY THE |
| 11:25AM | 7 | PREPONDERANCE OF EVIDENCE STANDARD. |
| 11:25AM | 8 | THE DEFENDANT'S ARGUMENTS WHEN IT COMES TO THE CLEAR AND |
| 11:26AM | 9 | CONVINCING STANDARD RELATE TO THE FIFTH AND SIXTH VALENSIA |
| 11:26AM | 10 | FACTORS, BUT THOSE ARGUMENTS DON'T APPLY HERE GIVEN THE |
| 11:26AM | 11 | RELATIVELY SMALL IMPACT THAT THIS MORE THAN TEN VICTIMS |
| 11:26AM | 12 | ENHANCEMENT HAS ON THE GUIDELINES AS COMPARED TO THE LOSS |
| 11:26AM | 13 | AMOUNT CALCULATION. |
| 11:26AM | 14 | THE COURT: THANK YOU. DOES COUNT ONE FALL INTO ANY |
| 11:26AM | 15 | OF THIS, THAT IS, THE OVERALL CONSPIRACY, COUNT ONE? HOW DOES |
| 11:26AM | 16 | THAT APPLY, IF AT ALL, TO THIS QUESTION? |
| 11:26AM | 17 | MR. DOWNEY: I THINK ON THE FACTS WE HAVE NOT AT |
| 11:26AM | 18 | ALL. LET ME ACKNOWLEDGE TO THE COURT THAT THERE IS DISCUSSION |
| 11:26AM | 19 | IN THE CASES THAT A CONSPIRACY COUNT CAN ALLOW THE SWEEPING IN |
| 11:26AM | 20 | OF OTHER CONDUCT, BUT I REITERATE MY COMMENTS WITHOUT REPEATING |
| 11:26AM | 21 | WHAT I SAID ABOUT THE SITUATION THAT WE HAVE HERE WITH A SPLIT |
| 11:26AM | 22 | VERDICT AND WITH DIFFERENT INFORMATION TRANSMITTED TO EACH |
| 11:26AM | 23 | INVESTOR DIFFERENTLY. |
| 11:26AM | 24 | IT IS CERTAINLY THE CASE THAT IN CONSPIRACY CASES YOU CAN |
| 11:26AM | 25 | EXPAND THE LOSS NUMBER IF THE RECORD IS APPROPRIATE FOR IT, |

11:27AM 1      IT'S JUST NOT HERE.

11:27AM 2              MS. BOSTIC:  THE GOVERNMENT DISAGREES.

11:27AM 3          THE COURT COULD PROPERLY FIND THAT MS. HOLMES'S CONVICTION

11:27AM 4      ON COUNT ONE IS DISPOSITIVE ON THESE ISSUES BECAUSE MS. HOLMES

11:27AM 5      WAS CONVICTED OF ENTERING INTO A CONSPIRACY TO DEFRAUD

11:27AM 6      INVESTORS SPANNING FROM 2010 TO 2015, AND ALL OF THE

11:27AM 7      INDIVIDUALS THAT THE GOVERNMENT IS POINTING TO AS INVESTOR

11:27AM 8      VICTIMS INVESTED DURING THAT TIME PERIOD WHEN THAT CONSPIRACY

11:27AM 9      WAS ACTIVE.

11:27AM 10         AND IN FURTHERANCE OF THAT CONSPIRACY, THE COURT KNOWS

11:27AM 11     FROM THE EVIDENCE AT TRIAL THAT MS. HOLMES WAS DISSEMINATING

11:27AM 12     MATERIAL MISSTATEMENTS AND MISLEADING INFORMATION ABOUT THE

11:27AM 13     COMPANY.  SO INVESTORS WHO INVESTED DURING THAT TIME PERIOD

11:27AM 14     WHEN THIS SCHEME WAS ACTIVE ARE VICTIMS OF THAT CONSPIRACY

11:27AM 15     COUNT.

11:27AM 16         AND THAT DOES A COUPLE OF THINGS.  FOR ONE THING, UNDER

11:27AM 17     THE VALENSIA FACTORS IT TRIGGERS FACTOR FOUR, WHERE THE LOSS

11:28AM 18     AMOUNT AND NOW ALSO THE NUMBER OF VICTIMS TURN ON THE EXTENT OF

11:28AM 19     THE CONSPIRACY.

11:28AM 20         THE LAW TELLS US THAT FACTOR CAN ACTUALLY TRUMP FIVE AND

11:28AM 21     SIX AND BRING US BACK TO A PREPONDERANCE OF THE EVIDENCE

11:28AM 22     STANDARD IN A CASE THAT OTHERWISE MIGHT REQUIRE A CLEAR AND

11:28AM 23     CONVINCING EVIDENCE STANDARD.

11:28AM 24         THE LONICH CASE CONFIRMS THAT, CONFIRMS THAT THAT'S HOW

11:28AM 25     THE ANALYSIS WORKS.

54

11:28AM 1        IN THAT CASE THE COURT DID NOT APPLY THE PREPONDERANCE OF

11:28AM 2    THE EVIDENCE STANDARD FOR SPECIFIC REASONS.  THERE WERE REASONS

11:28AM 3    WHY FOR CERTAIN DEFENDANTS THERE WAS A MISMATCH BETWEEN THE

11:28AM 4    SCOPE OF THE CHARGED CONSPIRACY AND THE HARM THAT THE

11:28AM 5    GOVERNMENT WAS SEEKING TO HOLD THE DEFENDANTS ACCOUNTABLE FOR.

11:28AM 6        THOSE CIRCUMSTANCES DON'T APPLY HERE.  IN FACT, IN THAT

11:28AM 7    CASE I BELIEVE FOR ONE OF THE DEFENDANTS THE LOSS AMOUNT HELD

11:28AM 8    OUT BY THE GOVERNMENT WAS BASED ON LOANS THAT HAPPENED BEFORE

11:29AM 9    THAT DEFENDANT EVEN JOINED THE CONSPIRACY.  ISSUES LIKE THAT,

11:29AM 10   PROBLEMS LIKE THAT JUST AREN'T PRESENT IN THIS CASE WHERE

11:29AM 11   MS. HOLMES WAS A MEMBER OF THE CONSPIRACY THE ENTIRE TIME, WAS

11:29AM 12   ACTUALLY A LEADER AND ORGANIZER OF IT.  IT'S PROPER UNDER THOSE

11:29AM 13   CIRCUMSTANCES TO HOLD HER RESPONSIBLE FOR ALL OF THE HARM DONE

11:29AM 14   AS A RESULT OF THAT BROAD CONSPIRACY.

11:29AM 15        THE COURT:  THANK YOU.

11:29AM 16      MR. DOWNEY, ANYTHING ELSE ON THIS?

11:29AM 17        MR. DOWNEY:  ONLY ONE RESPONSE THERE WHICH RELATES

11:29AM 18   TO THE SIGNIFICANCE OF WHO GETS INCLUDED ON THIS CHART.

11:29AM 19        IF YOU MOVE BEYOND THE THREE INVESTORS AS TO WHOM THERE

11:29AM 20   HAS BEEN A CONVICTION, OBVIOUSLY THERE ARE GRADATIONS IN

11:29AM 21   BETWEEN, BUT IF YOU TAKE THE THREE COUNTS AS TO WHICH THERE WAS

11:29AM 22   A CONVICTION AND YOU LOOK AT THE SABA ANALYSIS AND CONCEDE IT,

11:30AM 23   YOU CAN COME UP WITH THE AMOUNT OF THE LOSS ADJUSTMENT.

11:30AM 24        IF YOU THEN FOLLOW THE PATH THAT MR. BOSTIC IS

11:30AM 25   RECOMMENDING, YOU CAN DO THAT AS WELL, OF COURSE, BECAUSE

11:30AM 1    THAT'S JUST AT THE END OF THE DAY MATH ADDING UP.  THIS IS MY

11:30AM 2    OWN MATH SO -- WHICH IS DANGEROUS, BUT IT WAS CONFIRMED BY

11:30AM 3    SOMEONE WHO WAS NOT USING AN ABACUS.

11:30AM 4        THE DIFFERENCE BETWEEN THOSE NUMBERS CAN GO ALL OF THE WAY

11:30AM 5    FROM A 22 TO A 30.  SO WE'RE IN THE RANGE OF LARGE ADJUSTMENT.

11:30AM 6    AND I UNDERSTAND HERE, GIVEN WHAT WE HAVE REQUESTED, YOU KNOW,

11:30AM 7    THE 8 MAY NOT AT THE END OF THE DAY BE OF GREAT EFFECT, BUT, OF

11:30AM 8    COURSE, I KNOW THE REASON WE'RE GOING THROUGH THE OBJECTIONS IS

11:30AM 9    THE SAME REASON WE ALWAYS DO IN THIS SITUATION WHICH IS WE HAVE

11:30AM 10   TO DO THE CALCULATION, WE HAVE TO DO IT CORRECTLY, AND THAT'S A

11:30AM 11   BIG DIFFERENCE.

11:30AM 12       THE COURT:  ALL RIGHT.  LET'S TALK ABOUT LOSS

11:31AM 13   AMOUNT.  I THINK WE CAN SEGUE INTO THAT NOW.  IT SEEMS LIKE

11:31AM 14   THAT IS A GOOD TOPIC.

11:31AM 15       AND THIS WOULD BE OBJECTION FOUR, I BELIEVE.  IT OVERLAPS

11:31AM 16   WITH TWO AS WELL, I BELIEVE, AND I THINK THAT MIGHT BE THE LAST

11:31AM 17   OF THE OUTSTANDING OBJECTIONS.

11:31AM 18       SO WHY DON'T I HEAR FROM -- WE'VE SEEN THE PSR.  WE'VE

11:31AM 19   LOOKED AT WHAT MR. POLLAK SUGGESTS THE LOSS AMOUNT SHOULD BE.

11:31AM 20       AND, MR. BOSTIC, WHAT WOULD -- I REALIZE THIS IS THE

11:31AM 21   OBJECTION OF THE DEFENDANT AS TO LOSS AMOUNT.

11:31AM 22       DO YOU WANT TO SUPPORT -- OR ARGUE FIRST OR SUPPORT THE

11:31AM 23   PSR?

11:31AM 24       MS. BOSTIC:  YES, YOUR HONOR, I'LL TAKE THE COURT'S

11:31AM 25   INVITATION.

11:31AM 1           THE COURT:  SURE.

11:31AM 2           MS. BOSTIC:  SO JUST GOING BACK TO BASICS VERY

11:32AM 3    BRIEFLY.

11:32AM 4      THE COURT KNOWS FROM THE GUIDELINES THAT IN CALCULATING A

11:32AM 5    LOSS AMOUNT, THE COURT NEED ONLY MAKE, EXCUSE ME, A REASONABLE

11:32AM 6    ESTIMATE OF THE LOSS.  AND THE CASE LAW IS UNDERSTANDING OF THE

11:32AM 7    FACT THAT IN COMPLICATED CASES IT MAY BE DIFFICULT, CHALLENGING

11:32AM 8    TO PIN DOWN AN EXACT LOSS AMOUNT.

11:32AM 9      THE CASE LAW, THE GUIDELINES DO NOT REQUIRE PRECISION IN

11:32AM 10    THIS WAY.

11:32AM 11      THE GUIDELINES REQUIRE US TO FIND WHAT THE REASONABLY

11:32AM 12    FORESEEABLE PECUNIARY HARM IS IN THIS CASE, AND HERE THAT

11:32AM 13    SHOULD CORRESPOND TO THE ENTIRE AMOUNT THAT C1 AND C2 INVESTORS

11:32AM 14    PUT INTO THERANOS.  WHEN MS. HOLMES --

11:32AM 15           THE COURT:  I'M SORRY.  THIS IS IN YOUR CHART THAT

11:32AM 16    YOU PROVIDED?

11:32AM 17           MS. BOSTIC:  YES, YOUR HONOR.

11:32AM 18           THE COURT:  AND TO BE CLEAR, THERE ARE TWO CHARTS.

11:32AM 19           MS. BOSTIC:  YES, YOUR HONOR.  I THINK WE ONLY NEED

11:32AM 20    ONE OF THEM DEPENDING ON WHICH PATH THE COURT DECIDES TO TAKE.

11:32AM 21      WHEN MS. HOLMES WAS COLLECTING MONEY FROM C1 AND C2

11:33AM 22    INVESTORS DURING THE TIME PERIOD OF THE SCHEME TO DEFRAUD, SHE

11:33AM 23    KNEW THAT THEY WERE INVESTING IN THERANOS BASED ON A FALSE

11:33AM 24    PREMISE.  SHE WAS AWARE OF THE LIMITATIONS OF THE COMPANY'S

11:33AM 25    TECHNOLOGY, SHE WAS AWARE OF THE MISMATCH BETWEEN THE IMAGE

11:33AM 1    THAT SHE WAS PRESENTING TO INVESTORS AND REALITY.

11:33AM 2        SO SHE KNEW BY VIRTUE OF THAT, THAT INVESTORS WERE TAKING

11:33AM 3    ON A MUCH GREATER RISK THAN SHE LED THEM TO BELIEVE.

11:33AM 4        SHE KNEW THAT THERE WAS A RISK THAT IF THAT INFORMATION

11:33AM 5    CAME TO LIGHT, THE INVESTORS WOULD LOSE ALL OF THEIR MONEY AND

11:33AM 6    THAT THE COMPANY WOULD FAIL.  THAT'S WHY SHE WORKED SO HARD TO

11:33AM 7    KEEP THAT FROM HAPPENING.

11:33AM 8        SO BECAUSE THAT'S TRUE, MS. HOLMES KNEW AND COULD

11:33AM 9    REASONABLY FORESEE THAT THE ENTIRE AMOUNTS THAT SHE WAS

11:33AM 10   RECEIVING FROM INVESTORS WERE AT RISK AND WERE LIKELY TO BE

11:33AM 11   LOST.

11:33AM 12       SO UNDER THE GUIDELINES, AGAIN, MILITATES IN FAVOR OF

11:33AM 13   CALLING THE LOSS AMOUNT THE AMOUNT THAT THE INVESTOR VICTIMS

11:34AM 14   LOST, AND IT CAN BE AS SIMPLE AS THAT.

11:34AM 15       THE DEFENSE SUGGESTS THAT THIS NEEDS TO BE SHOWN BY A

11:34AM 16   PREPONDERANCE -- I'M SORRY, BY A CLEAR AND CONVINCING EVIDENCE

11:34AM 17   STANDARD.  THE GOVERNMENT DISAGREES FOR THE REASONS THAT WE

11:34AM 18   DISCUSSED, PARTLY BECAUSE OF THE CONSPIRACY COUNT.

11:34AM 19       THE NINTH CIRCUIT'S OPINIONS IN LAURIENTI AND IN LONICH

11:34AM 20   INSTRUCT THAT THAT CONSPIRACY COUNT ALLOWS THE COURT TO USE THE

11:34AM 21   PREPONDERANCE STANDARD BECAUSE THIS ENHANCEMENT IS BASED ON THE

11:34AM 22   EXTENT OF THAT CONSPIRACY, IT'S BASED ON CONDUCT THAT THE JURY

11:34AM 23   CONVICTED BASED ON.

11:34AM 24       WHEN IT COMES TO WHETHER INDIVIDUALIZED PROOF OF RELIANCE

11:34AM 25   OR CAUSATION IS NEEDED, THE CASE LAW IS INSTRUCTIVE THERE AS

11:34AM  1    WELL.

11:34AM  2        I MENTIONED THE BERGER CASE ALREADY.  ALSO IN LAURIENTI,

11:34AM  3    THAT COURT FOUND THAT UNDER THOSE FACTS IT WAS REASONABLE TO

11:34AM  4    INFER THAT ALL CLIENTS OF DEFENDANTS WHO PURCHASED THE HOUSE

11:35AM  5    STOCKS IN THAT CASE WERE DUPED BY THE CONSPIRACY, NOT REQUIRING

11:35AM  6    INDIVIDUALIZED PROOF OF THAT.

11:35AM  7        UNITED STATES VERSUS STEIN, THAT'S AN ELEVENTH CIRCUIT

11:35AM  8    CASE CITED BY THE DEFENSE, ALSO RECOGNIZED THAT QUOTE,

11:35AM  9    "REQUIRING INDIVIDUALIZED PROOF OF RELIANCE FOR EACH INVESTOR

11:35AM 10    IS OFTEN INFEASIBLE OR IMPOSSIBLE."  AND THAT COURT NOTED THAT

11:35AM 11    IN THAT CASE THERE WAS THE OPTION FOR THE GOVERNMENT TO OFFER

11:35AM 12    SPECIFIC CIRCUMSTANTIAL EVIDENCE FROM WHICH THE DISTRICT COURT

11:35AM 13    COULD REASONABLY CONCLUDE THAT ALL OF THE INVESTORS RELIED ON

11:35AM 14    THE DEFENDANT'S FRAUDULENT INFORMATION.

11:35AM 15        THE COURT HAS ACCESS TO THAT KIND OF CIRCUMSTANTIAL

11:35AM 16    EVIDENCE IN THIS CASE AS WELL, AND IT'S WHAT I DISCUSSED

11:35AM 17    EARLIER IN TERMS OF THE PUBLIC INFORMATION THAT THE DEFENDANT

11:35AM 18    CAUSED TO BE OUT THERE SO THAT POTENTIAL INVESTORS COULD

11:35AM 19    CONSUME IT AND RELY ON IT.

11:35AM 20        I MENTIONED EARLIER THAT INVESTOR VICTIMS ARE VICTIMS NOT

11:36AM 21    JUST BECAUSE THEY WERE FRAUDULENTLY INDUCED TO INVEST IN

11:36AM 22    THERANOS, BUT ALSO BECAUSE THEY OVERPAID.  AND THAT IS ANOTHER

11:36AM 23    REASON WHY THE COURT DOESN'T NEED TO DELVE INTO THE QUESTION OF

11:36AM 24    INDIVIDUAL RELIANCE AND WHAT WAS IN THE MIND OF A SPECIFIC

11:36AM 25    INVESTOR WHEN HE OR SHE DECIDED TO INVEST.

11:36AM 1    WHEN THERANOS INVESTORS OVERPAID FOR THEIR SHARES, THEY

11:36AM 2    WERE ALREADY HARMED.  THEY WERE OUT THE DIFFERENCE BETWEEN THE

11:36AM 3    ELEVATED PRICE THAT THEY HAD PAID AND WHAT THE THERANOS SHARES

11:36AM 4    WERE ACTUALLY WORTH.

11:36AM 5         THE COURT:  EVEN IF THEY WERE UNAWARE OF THAT?

11:36AM 6         MS. BOSTIC:  YES, YOUR HONOR.

11:36AM 7         THE COURT:  SO THERE IS EVIDENCE THAT ONE INVESTOR,

11:36AM 8    I THINK IT WAS FADIL, I BELIEVE, MS. FADIL INVESTED, I THINK

11:36AM 9    THERE'S TESTIMONY -- NOT TESTIMONY.  I THINK THERE'S A

11:36AM 10   STATEMENT FROM HER THAT SAID, WELL, I INVESTED -- BECAUSE HERS

11:36AM 11   WAS 75,000.  I INVESTED BECAUSE I SAW THE BIG NAMES OF

11:36AM 12   EVERYBODY ELSE WHO WAS INVESTING, AND SO I THOUGHT THAT THIS

11:37AM 13   WAS A GOOD INVESTMENT BECAUSE OF THAT.

11:37AM 14       DOESN'T THERE HAVE TO BE A SHOWING THAT SHE RELIED ON SOME

11:37AM 15   FALSEHOODS OTHER THAN THE IMPRIMATUR OF INTELLIGENT INVESTORS

11:37AM 16   WHO SHE BELIEVED WERE INTELLIGENT INVESTORS?

11:37AM 17        MS. BOSTIC:  IF THE THEORY OF LOSS WERE BASED ONLY

11:37AM 18   ON THE FRAUDULENT INDUCEMENT TO INVEST, THEN PERHAPS, BUT IT'S

11:37AM 19   NOT.

11:37AM 20       REGARDLESS OF THE REASON WHY AN INVESTOR CHOSE TO INVEST

11:37AM 21   IN THERANOS, THE FACT IS THAT THEY OVERPAID BY VIRTUE OF THE

11:37AM 22   FRAUD THAT WAS ONGOING AT THE TIME.

11:37AM 23        THE COURT:  THAT THE COMPANY, THE STOCK WAS ALSO

11:37AM 24   ALREADY WEAKENED IN ITS FINANCIAL POSITION BECAUSE OF THE

11:37AM 25   FRAUD?

60

| | | |
|---|---|---|
| 11:37AM | 1 | MS. BOSTIC: YES, YOUR HONOR, THAT IT WAS WEAKENED |
| 11:37AM | 2 | BECAUSE OF THE FRAUD AND THAT ITS PRICE WAS FRAUDULENTLY |
| 11:37AM | 3 | INFLATED. |
| 11:37AM | 4 | THE PRICES PAID BY THE INVESTORS WERE NOT FAIR PRICES. |
| 11:37AM | 5 | THEY WERE FRAUDULENT PRICES BASED ON THE FACT THAT THEY WERE |
| 11:38AM | 6 | SET BASED ON A FALSE PREMISE OR A SERIES OF FALSE PREMISES. |
| 11:38AM | 7 | SO THAT WAS STAGE 1 FOR HARMING THE INVESTORS, WHEN THEY |
| 11:38AM | 8 | PURCHASED SHARES FOR MORE MONEY THAN THE CHARGES WERE WORTH. |
| 11:38AM | 9 | BUT THE DEFENDANT'S FRAUD WASN'T FINISHED WITH THEM YET. |
| 11:38AM | 10 | THEY WERE HARMED IN A SECOND STAGE, AND THAT WAS WHEN THE FRAUD |
| 11:38AM | 11 | WAS EVENTUALLY REVEALED, WHEN THE TRUTH CAME OUT ABOUT THE |
| 11:38AM | 12 | COMPANY BECAUSE THAT SET INTO MOTION A SERIES OF EVENTS THAT |
| 11:38AM | 13 | ULTIMATELY RENDERED THE COMPANY DEFUNCT AND CAUSED THE INVESTOR |
| 11:38AM | 14 | SHARES TO BECOME WORTHLESS. |
| 11:38AM | 15 | SO THE LATER REDUCTION OF THE VALUE OF THEIR SHARES TO |
| 11:38AM | 16 | ZERO WAS ALSO A CAUSE OR AN EFFECT OF THE FRAUD AND THAT SHOULD |
| 11:38AM | 17 | BE ACCOUNTED FOR IN THE LOSS AS WELL. |
| 11:38AM | 18 | FROM OCTOBER 2015 ON, THERANOS COULD BE COMPARED TO AN |
| 11:38AM | 19 | AIRPLANE FLYING WITH A BROKEN ENGINE. |
| 11:39AM | 20 | THE WRITING WAS ON THE WALL THE COMPANY WAS GOING TO FAIL. |
| 11:39AM | 21 | THE QUESTION WAS JUST WHEN. |
| 11:39AM | 22 | AND THE COMPANY, THE EVIDENCE SHOWS, WAS ABLE TO GLIDE FOR |
| 11:39AM | 23 | SOME TIME. IT HAD A LOT OF ITS ILL-GOTTEN GAINS FROM ITS |
| 11:39AM | 24 | INVESTORS STILL IN ITS BANK ACCOUNTS, IT WAS ALSO ABLE TO |
| 11:39AM | 25 | LEVERAGE SOME OF ITS ASSET TO BUY ITSELF SOME MORE TIME, BUT |

| | | |
|---|---|---|
| 11:39AM | 1 | BECAUSE THE TECHNOLOGY WAS NOT THERE, BECAUSE THE COMPANY'S |
| 11:39AM | 2 | INFLATED REPUTATION, ITS SUCCESS HAD BEEN BASED ON DECEPTION |
| 11:39AM | 3 | THAT WAS THEN REVEALED, THE COMPANY WAS NEVER GOING TO SUCCEED |
| 11:39AM | 4 | FROM THAT POINT AND THE INVESTORS THE EVIDENCE ALSO SHOWED WERE |
| 11:39AM | 5 | LOCKED IN THAT AIRPLANE ALSO. THERE WAS NO WAY FOR THEM TO |
| 11:39AM | 6 | ESCAPE. THEY COULDN'T UNLOAD THEIR SHARES. THERE WAS NO |
| 11:39AM | 7 | MARKET FOR IT. AND CERTAINLY WHEN THE COMPANY WENT OUT OF |
| 11:39AM | 8 | BUSINESS, NONE OF THEM TOOK ANYTHING FROM THEIR INVESTMENT. |
| 11:39AM | 9 | AND BECAUSE THE INVESTORS INVESTED THOSE HUNDREDS OF MILLIONS |
| 11:39AM | 10 | OF DOLLARS AND TOOK NOTHING OUT, THE TOTAL AMOUNT OF THE LOSS |
| 11:40AM | 11 | SHOULD BE EVERYTHING THEY LOST. |
| 11:40AM | 12 | THE COURT: I WANT TO MOVE INTO THE SABA REPORT. |
| 11:40AM | 13 | DO YOU WANT TO RESPOND TO ANYTHING THAT MR. BOSTIC SAID? |
| 11:40AM | 14 | MR. DOWNEY: ONLY TO SAY THAT WHEN EVALUATING THE |
| 11:40AM | 15 | LOSS, THE GUIDELINES AND THE LAW IS CLEAR THAT AS TO AN |
| 11:40AM | 16 | INVESTOR, RELIANCE BY THAT INVESTOR HAS TO BE DEMONSTRATED. |
| 11:40AM | 17 | WITH REGARD TO, YOU KNOW, 20 OR SO INVESTORS HERE, WE |
| 11:40AM | 18 | AREN'T EVEN CLOSE TO THEM. WE DON'T KNOW ANYTHING ABOUT THE |
| 11:40AM | 19 | CIRCUMSTANCE. |
| 11:40AM | 20 | THE COURT: ON THE SHEET. |
| 11:40AM | 21 | MR. DOWNEY: ON THE SHEET, YEAH. WHOEVER'S SHEET |
| 11:40AM | 22 | YOU USE, YOU KNOW, FRANKLY, 20 OR SO OF THE INVESTORS, WE JUST |
| 11:40AM | 23 | HAVE VERY LITTLE OR NO INFORMATION ABOUT THEM. |
| 11:40AM | 24 | I DON'T THINK THE PREMISES THAT MR. BOSTIC IS TRYING TO |
| 11:40AM | 25 | REPORT -- I UNDERSTAND WHY HE'S TRYING TO IMPORT THEM, BUT THEY |

62

| | | |
|---|---|---|
| 11:40AM | 1 | ACTUALLY DON'T APPLY ON AN APPROPRIATE LOSS CALCULATION. |
| 11:40AM | 2 | THE COURT: THANK YOU. I'D LIKE TO MOVE INTO THE |
| 11:40AM | 3 | SABA REPORT AND THAT ANALYSIS. |
| 11:40AM | 4 | LET ME JUST STATE AT A HIGH LEVEL, IT SEEMS THAT THE SABA |
| 11:41AM | 5 | REPORT DID CALCULATIONS, DID ANALYSES AND PROVIDES PROTOCOLS |
| 11:41AM | 6 | FOR PERHAPS THREE DIFFERENT PATHS TO THE LOSS DETERMINATION. |
| 11:41AM | 7 | MR. DOWNEY, YOUR OBJECTIONS SPEAK TO A BROAD DELTA BETWEEN |
| 11:41AM | 8 | THESE FIGURES, AND I RECOGNIZE THAT. |
| 11:41AM | 9 | BUT LET ME JUST TELL AT A HIGH LEVEL AT LEAST WHEN I LOOK |
| 11:41AM | 10 | AT IT, THE SABA REPORT REDUCES THAT DELTA SOMEWHAT, STILL A |
| 11:41AM | 11 | DELTA AND THERE'S STILL A DIFFERENCE, BUT IT SEEMS TO ME THAT |
| 11:41AM | 12 | IT'S NOT THE EXTENT THAT YOU SUGGEST IN YOUR OBJECTIONS, AND |
| 11:41AM | 13 | THAT'S WHY I WOULD LIKE TO TALK ABOUT THAT NOW AND HEAR YOUR |
| 11:41AM | 14 | THOUGHTS ABOUT WHAT IS, AT LEAST IN THE COURT'S VIEW AT THIS |
| 11:41AM | 15 | POINT, WHAT IS THAT REDUCED AMOUNT PURSUANT TO THE ANALYSIS |
| 11:41AM | 16 | THAT DR. SABA SUGGESTS. I THINK THERE WERE THREE DIFFERENT, |
| 11:41AM | 17 | PERHAPS THREE DIFFERENT WAYS OF LOOKING AT THIS. |
| 11:41AM | 18 | MR. BOSTIC, WHY DON'T YOU GO FIRST SO YOU CAN TELL US HOW |
| 11:42AM | 19 | TO INTERPRET HIS REPORT. |
| 11:42AM | 20 | MS. BOSTIC: YES, YOUR HONOR. SO ASSUMING THAT THE |
| 11:42AM | 21 | COURT WISHES TO PROCEED USING THIS APPROACH THAT IS BASED ON |
| 11:42AM | 22 | DETERMINING THE DIFFERENTIAL BETWEEN WHAT THE INVESTORS PAID |
| 11:42AM | 23 | AND WHAT THE SHARES WERE ACTUALLY WORTH, I THINK THE REPORT |
| 11:42AM | 24 | IDENTIFIES VALUATIONS OF THE COMPANY AND EXTRAPOLATES FROM THAT |
| 11:42AM | 25 | RANGES OF LOSS AMOUNTS FOR THE INVESTORS BASED ON VALUATIONS ON |

63

11:42AM 1    DIFFERENT DATES.

11:42AM 2        SO I THINK IT IS THE COURT'S DECISION WHICH DATE TO FOCUS

11:42AM 3    ON AND WHETHER A SPECIFIC TIME PERIOD IS THE APPROPRIATE TIME

11:42AM 4    PERIOD FROM WHICH TO MEASURE THE INVESTOR'S LOSS.

11:42AM 5        AS I MENTIONED EARLIER, THE DATES OF THE INVESTMENTS ARE

11:42AM 6    APPROPRIATE BECAUSE, AS I SAID, AT THE MOMENT OF INVESTING, AN

11:42AM 7    INVESTOR HAD ALREADY LOST BECAUSE THEY HAD OVERPAID, AND I

11:42AM 8    THINK THE SABA REPORT PUTS SOME GRANULARITY ON THAT BY

11:43AM 9    ATTACHING QUANTITIES TO HOW MUCH THOSE INVESTORS OVERPAID BY.

11:43AM 10       IN APPENDIX A-1 OF THE SABA REPORT, AND THAT'S ON

11:43AM 11   ECF PAGE 61 OF 156 OF ECF NUMBER 1645, THE REPORT LAYS OUT

11:43AM 12   THOSE LOSS RANGES FOR THOSE DIFFERENT DATES.  THESE ARE RANGES,

11:43AM 13   AS THE COURT NOTED AND AS THE DEFENSE HAD NOTED, BUT THAT DOES

11:43AM 14   NOT DISQUALIFY THE COURT FROM RELYING ON THEM.

11:43AM 15       THE COURT IS WELCOME TO CHOOSE THE MIDDLE OF THE RANGE OR

11:43AM 16   THE LOW END OF THE RANGE IF THE COURT FEELS THAT THAT IS

11:43AM 17   APPROPRIATE.

11:43AM 18       AND I'LL ALSO POINT OUT THAT EXHIBIT A-2, WHICH IS PAGE 62

11:43AM 19   ON THE ECF FILED VERSION, LISTS INDIVIDUAL INVESTOR LOSSES FOR

11:43AM 20   SPECIFIC INVESTORS IN CASE THAT'S USEFUL TO THE COURT IN

11:43AM 21   CALCULATING THE LOSS HERE.

11:44AM 22            THE COURT:  MR. DOWNEY, DO YOU WANT TO TALK ABOUT

11:44AM 23   THIS?

11:44AM 24            MR. DOWNEY:  FIRST OF ALL, IF I'M CONFUSED AS TO

11:44AM 25   THIS, I KNOW THE COURT AND MR. BOSTIC WILL -- I THINK THE RANGE

11:44AM 1   IS ABOUT SOMEWHERE JUST SHY OF $80 MILLION OFF OF A BASE OF

11:44AM 2   ABOUT $237 MILLION.

11:44AM 3       SO, IN OTHER WORDS, WE ARE NOT WITHIN A RANGE OF, YOU

11:44AM 4   KNOW, REASONABLE MATERIALITY.  WE'RE IN A RANGE OF ABOUT

11:44AM 5   33 PERCENT OFF OF THE BASE NUMBERS.

11:44AM 6       SO, YOU KNOW, THE COURT CAN EVALUATE THAT AND WHAT THAT

11:44AM 7   MEANS ON ITS OWN, BUT WHETHER THAT COMPLIES WITH THE

11:44AM 8   REQUIREMENT OF A REASONABLE ESTIMATE I THINK IS SUBJECT TO

11:44AM 9   DOUBT.

11:44AM 10      SECOND, I THINK -- I HAVE NO REASON TO CRITICIZE

11:44AM 11  MR. SABA'S ANALYSIS, BUT I THINK THAT THE ANALYSIS IS LIMITED

11:44AM 12  AS FAR AS IT GOES.

11:44AM 13      WE KNOW THAT THERANOS HAD AN INCREDIBLY VALUABLE

11:45AM 14  INTELLECTUAL PROPERTY PORTFOLIO.  THERE'S TESTIMONY AT TRIAL TO

11:45AM 15  THAT EFFECT.  THE BOARD WAS PRESENTED WITH VALUATIONS.  SOME OF

11:45AM 16  THAT IS REITERATED IN MR. CARROLL'S LETTER TO YOUR HONOR AS

11:45AM 17  PART OF THESE PROCEEDINGS, BUT, YOU KNOW, LICENSING REVENUES IN

11:45AM 18  PARTICULAR YEARS IS TOTALLY IN THE HUNDREDS OF MILLIONS AND

11:45AM 19  PERHAPS MAYBE BILLIONS OF DOLLARS.

11:45AM 20      THE SABA REPORT DOESN'T EVALUATE ANY OF THAT AS A BUSINESS

11:45AM 21  LINE OF THERANOS.

11:45AM 22      SO I THINK WHEN LOOKING AT THE EVENTS AS THEY ACTUALLY

11:45AM 23  HAPPENED AND CONSIDERING THE VALUE, I THINK IT'S A GLARING

11:45AM 24  DEFICIENCY IN THE REPORT THAT IT IS DESCRIBING A BUSINESS THAT

11:45AM 25  IS VERY DIFFERENT FROM A BUSINESS THAT WE KNOW THAT THERANOS

11:45AM 1    WAS TRYING TO DEVELOP.

11:45AM 2        SO IN ADDITION TO THE RANGE BEING A LITTLE BIT BROAD TO

11:45AM 3    CONSIDER IT AS A REASONABLE ESTIMATE, THE INPUTS TO CALCULATING

11:46AM 4    THAT ARE I THINK SUSPECT, AND WHAT EFFECT THAT WOULD HAVE IF IT

11:46AM 5    WERE INCLUDED ON THE OVERALL RANGE, I DON'T KNOW.

11:46AM 6        BUT I SUSPECT THAT THAT WOULD APPLY IN EXACTLY THE

11:46AM 7    METHODOLOGY THAT HE IDENTIFIES, IT WOULD EXPAND THAT RANGE

11:46AM 8    QUITE A BIT MORE, FRANKLY, YOU KNOW, PERHAPS TO OUR FAVOR.  I

11:46AM 9    DON'T KNOW, BUT I ASSUME SO.

11:46AM 10        THE COURT:  MR. BOSTIC, IS THERE ANY CONCERN ABOUT

11:46AM 11    THE LACK OF EXPRESSION OF ANY PATENT PORTFOLIO THAT THE COMPANY

11:46AM 12    HAD AT THE TIME?

11:46AM 13        MS. BOSTIC:  NO, YOUR HONOR.  I THINK THERE'S A

11:46AM 14    REASON WHY MR. SABA, WHO IS AN EXPERT IN THIS FIELD AND DOES

11:46AM 15    THIS FOR A LIVING, DID NOT CONSIDER THE IP PORTFOLIO, AND

11:46AM 16    THAT'S BECAUSE IT'S NOT RELEVANT TO WHAT THE INVESTORS GAINED

11:46AM 17    WHEN THEY PURCHASED THERANOS SHARES, IT'S NOT RELEVANT TO HOW

11:46AM 18    MUCH THEY LOST.

11:46AM 19        THERANOS WAS NOT AN IP LICENSING COMPANY.  THAT WAS NOT

11:46AM 20    ITS BUSINESS MODEL.  THAT'S NOT THE BUSINESS THAT THE INVESTORS

11:46AM 21    BELIEVED OR UNDERSTOOD THEY WERE INVESTING IN.

11:46AM 22        SPECULATION ABOUT HOW THE COMPANY MIGHT HAVE BEEN ABLE TO

11:47AM 23    MONETIZE ITS IP PORTFOLIO HAD IT REMAINED A GOING CONCERN I

11:47AM 24    THINK IS BEYOND THE SCOPE OF WHAT THE COURT NEEDS TO CONSIDER

11:47AM 25    HERE TODAY.

11:47AM 1    IT'S ALSO VERY IMPORTANT TO NOTE THAT WHEN THE INVESTOR

11:47AM 2    VICTIMS LOST ALL OF THEIR MONEY, WHEN THE COMPANY CRATERED,

11:47AM 3    THEY WERE UNABLE TO OBTAIN ANY VALUE FROM ANY OF THE COMPANY'S

11:47AM 4    ASSETS, INCLUDING THE IP PORTFOLIO.

11:47AM 5    SO REGARDLESS OF HOW MUCH IT WAS WORTH, THE REALITY IS, TO

11:47AM 6    BORROW MR. DOWNEY'S WORDS, LOOKING AT THE FACTS OF WHAT

11:47AM 7    ACTUALLY HAPPENED HERE, THE REALITY IS THAT THE INVESTORS

11:47AM 8    RECEIVED NO BENEFIT FROM THAT AND THAT THEY ALL LOST THEIR

11:47AM 9    INVESTMENTS IN TOTAL.

11:47AM 10    THE COURT:  OKAY.

11:47AM 11    MR. DOWNEY:  THE ONLY THING I WOULD SAY IN RESPONSE,

11:47AM 12    YOUR HONOR, IS RATHER IT'S AN EXTRAORDINARY STATEMENT TO SAY IT

11:47AM 13    MAKES NO DIFFERENCE WHAT THAT PORTFOLIO WOULD DO TO THE

11:47AM 14    EFFECTIVE VALUE.  WE KNOW THAT IT WOULD GENERATE INCOME.  WE

11:47AM 15    KNOW IT'S THE MOST SIGNIFICANT ASSET THAT THE COMPANY HAS.

11:48AM 16    THE TWO METHODOLOGIES THAT MR. SABA, OR DR. SABA USES IN

11:48AM 17    CONNECTION WITH THE VALUATION ARE INCOME AND ASSET VALUE.  HE

11:48AM 18    IGNORES THE ASSET AND THE CORRESPONDING INCOME.  THAT'S NOT A

11:48AM 19    TRIVIAL MATTER.

11:48AM 20    MS. BOSTIC:  MY FINAL POINT, YOUR HONOR, WOULD JUST

11:48AM 21    BE THAT ONE OF THE REASONS WHY THE INVESTORS WERE UNABLE TO

11:48AM 22    RECOUP ANY OF THE VALUE IN THE IP PORTFOLIO IS THAT THERANOS

11:48AM 23    HAD TO PUT UP THAT IP PORTFOLIO AS COLLATERAL TO OBTAIN THE

11:48AM 24    FORTRESS LOAN TO CONTINUE OPERATIONS, AND THE REASON IT WAS IN

11:48AM 25    THAT POSITION IS BECAUSE IT WAS UNABLE TO RAISE ANY MONEY OR

11:48AM 1    ANY ADDITIONAL MONEY FROM OTHER INVESTORS BECAUSE THE FRAUD HAD

11:48AM 2    BEEN REVEALED.

11:48AM 3        SO, AGAIN, THERE'S A DIRECT CAUSAL LINE BETWEEN THE FRAUD

11:48AM 4    THAT THE DEFENDANT ENGAGED IN AND THE INVESTOR VICTIMS BEING

11:48AM 5    UNABLE TO RECOUP ANY OF THEIR INVESTMENT.

11:48AM 6        THE COURT: OKAY. THANK YOU.

11:48AM 7        ANYTHING FURTHER ON THE LOSS CALCULATION? AND THIS IS THE

11:49AM 8    TIME THAT I WOULD LIKE TO HEAR YOUR THOUGHTS ABOUT THAT.

11:49AM 9        I KNOW THAT OBJECTION NUMBER FOUR, I THINK YOU HAD FIVE OR

11:49AM 10   SIX DIFFERENT SPECIFIC -- FIVE DIFFERENT TOPICS.

11:49AM 11       IF YOU'VE COVERED THEM, MR. DOWNEY, THAT'S FINE, I'M HAPPY

11:49AM 12   TO RECEIVE THAT.

11:49AM 13       IS THERE ANYTHING ELSE YOU WANT TO EXPAND ON?

11:49AM 14       MR. DOWNEY: I DON'T, YOUR HONOR. BUT IF IT WOULD

11:49AM 15   BE HELPFUL TO THE COURT, I COULD GIVE THE RANGES UNDER THESE

11:49AM 16   JUST FOR PURPOSES OF THE RECORD, BUT I DON'T WANT TO BURDEN THE

11:49AM 17   COURT IF THAT'S NOT HELPFUL TO THE COURT.

11:49AM 18       THE COURT: WELL, YOU'VE TOLD ME ABOUT YOUR SKILL

11:49AM 19   WITH MATH, AND I'M NOT CERTAIN I WANT TO --

11:49AM 20       MR. DOWNEY: WELL, I THINK I'VE DEMONSTRATED IT BY

11:49AM 21   THE NUMBER OF THE OTHER -- YES.

11:49AM 22       THE COURT: BUT I'M NOT GOING TO PRECLUDE YOU FROM

11:49AM 23   PUTTING ANYTHING ON THE RECORD THAT YOU FEEL IS IMPORTANT TO

11:49AM 24   ADVOCATE FOR YOUR CLIENT. BUT IF YOU WANT TO TELL ME WHAT YOU

11:49AM 25   FEEL THE NUMBERS ARE, WE CAN RECEIVE THOSE FOR THE RECORD IF

11:49AM 1     YOU WOULD LIKE.

11:49AM 2                 MR. DOWNEY:  WELL, SURE, YOUR HONOR.  WHY DON'T I

11:50AM 3     JUST DO IT IN THE MOST BASIC FORM.

11:50AM 4                 THE COURT:  SURE.

11:50AM 5                 MR. DOWNEY:  I'M AWARE OF THE GRADATIONS IN BETWEEN,

11:50AM 6     BUT I DON'T THINK IT IS PROFITABLE TO DO THAT, YOU KNOW,

11:50AM 7     SCENARIO BY SCENARIO.

11:50AM 8         I THINK AS TO THE CONVICTED C2 COUNTS, I THINK THAT THE

11:50AM 9     APPROPRIATE LOSS AMOUNT, EVEN TAKING INTO ACCOUNT THE SABA

11:50AM 10    REPORT AS A VALID EXERCISE IS $48 MILLION WITH RESPECT TO THE

11:50AM 11    COUNTS ON WHICH THERE HAS BEEN A CONVICTION.

11:50AM 12        WE HAVE THE ISSUE WITH REGARD TO MS. PETERSON'S TESTIMONY

11:50AM 13    THAT WE IDENTIFIED THAT WOULD REDUCE THE NUMBER TO A SLIGHT

11:50AM 14    AMOUNT, BUT I ACTUALLY DON'T THINK IN ANY MATERIAL RESPECT FOR

11:50AM 15    PURPOSES OF THE ADJUSTMENT.  IT WOULD REDUCE IT TO ABOUT

11:50AM 16    $44.3 MILLION.

11:50AM 17        I THINK THE GOVERNMENT CALCULATION IN ITS MOST ROBUST

11:51AM 18    FORM, WHICH IS THE $803 MILLION, IS SIGNIFICANTLY HIGHER, AS I

11:51AM 19    SAID BEFORE, ABOUT 8 LEVELS HIGHER.  I THINK THAT ADJUSTS THE

11:51AM 20    LOST CALCULATION TO ABOUT 30.

11:51AM 21        AS YOUR HONOR KNOWS, WITH RESPECT TO THE APPROPRIATE

11:51AM 22    CALCULATION OF LOSS HERE, I'D BE HAPPY TO ADDRESS THIS

11:51AM 23    SEPARATELY, BUT WITH RESPECT TO USING GAIN, GIVEN THE DEGREE OF

11:51AM 24    AMBIGUITY, THERE'S A SIGNIFICANT EFFECT, DEPENDING ON WHAT TIME

11:51AM 25    PERIOD IS USED FOR EVALUATING GAIN TO MS. HOLMES.  IT'S EITHER

69

| | | |
|---|---|---|
| 11:51AM | 1 | A 14 OR A 16 LEVEL ADJUSTMENT. |
| 11:51AM | 2 | SO THESE NUMBERS GET QUITE LARGE, AND I WOULD SAY GIVEN |
| 11:51AM | 3 | THAT THE BREADTH OF THOSE NUMBERS, I FEEL THE NEED FOR, YOU |
| 11:51AM | 4 | KNOW, WITHIN THE GENERAL CONCEPT OF REASONABLE ESTIMATE |
| 11:52AM | 5 | ABILITY, THE NEED FOR FINDING AN ESTIMATE THAT BEARS SOME |
| 11:52AM | 6 | RELATIONSHIP OTHER THAN JUST A THEORETICAL EXERCISE IS |
| 11:52AM | 7 | IMPORTANT. |
| 11:52AM | 8 | THE COURT:  OKAY.  MR. BOSTIC. |
| 11:52AM | 9 | MS. BOSTIC:  YOUR HONOR, I'LL JUST ADD THAT ONE OF |
| 11:52AM | 10 | THE REASONS THAT THE GUIDELINES ARE IMPORTANT IS TO CAPTURE THE |
| 11:52AM | 11 | EXTENT OF THE FRAUD AND THE SERIOUSNESS OF THE CONDUCT. |
| 11:52AM | 12 | ONE OF THE THINGS THAT MAKES MS. HOLMES'S FRAUD REMARKABLE |
| 11:52AM | 13 | IS ITS SUCCESS, THE SCALE OF ITS SUCCESS, HOW LONG IT LASTED, |
| 11:52AM | 14 | AND THE AMOUNT OF MONEY INVOLVED. |
| 11:52AM | 15 | SO THAT'S WHY THIS IS IMPORTANT.  THAT'S WHY THE |
| 11:52AM | 16 | GOVERNMENT IS ADVOCATING STRONGLY FOR A GUIDELINES ADJUSTMENT |
| 11:52AM | 17 | THAT ACCOUNTS FOR THE SCALE OF THE FRAUD. |
| 11:52AM | 18 | THE COURT:  OKAY.  THANK YOU. |
| 11:52AM | 19 | LET ME ASK YOU, DOES THAT EXHAUST YOUR COMMENTS, |
| 11:52AM | 20 | MR. DOWNEY, ON YOUR OBJECTIONS TO THE ADDENDUM IN 1640? |
| 11:52AM | 21 | MR. DOWNEY:  IT DOES, YOUR HONOR.  I'LL ONLY REPEAT, |
| 11:52AM | 22 | BUT NOT IN ANY LENGTH, THE CONCERN THAT WE HAVE IN THE BRIEF |
| 11:53AM | 23 | ABOUT THE NUMBER OF IDENTIFIED ALTERNATIVE CAUSES FOR DETRIMENT |
| 11:53AM | 24 | TO VALUE IN THE PERIOD BETWEEN THE DATE OF THE PURPORTED LOSS |
| 11:53AM | 25 | AND THE TIME IN WHICH THE COMPANY ULTIMATELY WAS LIQUIDATED. |

70

| | | |
|---|---|---|
| 11:53AM | 1 | THOSE ARE IDENTIFIED AND DISCUSSED AT SOME LENGTH IN OUR |
| 11:53AM | 2 | MEMORANDA, SO I WILL NOT DISCUSS HERE. |
| 11:53AM | 3 | THE COURT:  THANK YOU. |
| 11:53AM | 4 | MR. BOSTIC, ANYTHING ELSE THAT YOU WOULD LIKE ME TO KNOW, |
| 11:53AM | 5 | AT LEAST AS FAR AS THE OBJECTIONS FOR THE 1640 OBJECTIONS? |
| 11:53AM | 6 | MS. BOSTIC:  NOT AT THIS TIME.  THANK YOU. |
| 11:53AM | 7 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 11:53AM | 8 | LET ME TURN TO PROBATION. |
| 11:53AM | 9 | MR. POLLAK, ANYTHING YOU WOULD LIKE TO ADD TO PROBATION'S |
| 11:53AM | 10 | RESPONSE TO THE OBJECTIONS THAT WE HAVEN'T TALKED ABOUT OR THAT |
| 11:53AM | 11 | YOU HAVEN'T INDICATED IN YOUR PSR? |
| 11:53AM | 12 | PROBATION OFFICER:  NO, YOUR HONOR. |
| 11:53AM | 13 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 11:53AM | 14 | MR. DOWNEY, HOW ARE WE DOING?  DO YOU OR ANY OF YOUR TEAM |
| 11:54AM | 15 | NEED A BREAK? |
| 11:54AM | 16 | MR. BOSTIC, ANYBODY NEED A BREAK?  WOULD YOU LIKE TO |
| 11:54AM | 17 | CHECK? |
| 11:54AM | 18 | MR. DOWNEY:  MAY I JUST CHECK? |
| 11:54AM | 19 | THE COURT:  SURE. |
| 11:54AM | 20 | (DISCUSSION OFF THE RECORD.) |
| 11:54AM | 21 | MR. DOWNEY:  WOULD IT BE POSSIBLE, YOUR HONOR, JUST |
| 11:54AM | 22 | TO TAKE A VERY BRIEF BREAK? |
| 11:54AM | 23 | THE COURT:  SURE.  OF COURSE.  SHOULD WE TAKE |
| 11:54AM | 24 | 15 MINUTES, FOLKS?  LET'S DO THAT.  LET'S TAKE 15 MINUTES. |
| 11:54AM | 25 | WE'LL COME BACK AND, AS I SAID, I'LL ADDRESS THE 1640 |

71

| | | |
|---|---|---|
| 11:54AM | 1 | OBJECTIONS, WE'LL GO THROUGH THE APPENDIX A, I BELIEVE, |
| 11:54AM | 2 | OBJECTIONS.  I HOPE I THEN CAN GIVE YOU THE COURT'S VIEW OF |
| 11:54AM | 3 | GUIDELINE CALCULATIONS, AND THEN WE'LL PROCEED FURTHER. |
| 11:54AM | 4 | I DON'T KNOW -- DO YOU HAVE A PROTOCOL ABOUT PEOPLE COMING |
| 11:54AM | 5 | BACK AND COMING IN? |
| 11:54AM | 6 | THE CLERK:  YES.  I'LL LET THEM KNOW ACTUALLY. |
| 11:54AM | 7 | THE COURT:  OKAY.  THERE IS A PROTOCOL ABOUT THE |
| 11:55AM | 8 | PUBLIC GETTING THEIR SEATING AND OUR COURTROOM DEPUTY WILL |
| 11:55AM | 9 | EXPLAIN THAT. |
| 11:55AM | 10 | OKAY.  WE'LL BE IN RECESS FOR 15 MINUTES, PLEASE. |
| 11:55AM | 11 | MR. DOWNEY:  OKAY.  THANK YOU. |
| 11:55AM | 12 | (RECESS FROM 11:55 A.M. UNTIL 12:21 P.M.) |
| 12:21PM | 13 | THE COURT:  WE'RE BACK ON THE RECORD. |
| 12:21PM | 14 | THE PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN. |
| 12:21PM | 15 | ALL RIGHT.  THANK YOU. |
| 12:21PM | 16 | ANYTHING FURTHER ON ANY OF THE OBJECTIONS THAT WE'VE |
| 12:21PM | 17 | DISCUSSED?  ANYTHING FURTHER FROM PROBATION? |
| 12:21PM | 18 | PROBATION OFFICER:  NO, YOUR HONOR. |
| 12:22PM | 19 | THE COURT:  MR. DOWNEY? |
| 12:22PM | 20 | MR. DOWNEY:  NO, YOUR HONOR. |
| 12:22PM | 21 | MS. BOSTIC:  NO, YOUR HONOR. |
| 12:22PM | 22 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 12:22PM | 23 | AS I INDICATED, WHAT I'D LIKE TO DO NOW IS TO JUST SHARE |
| 12:22PM | 24 | WITH THE PARTIES THE COURT'S RULINGS ON THE OBJECTIONS, AND |
| 12:22PM | 25 | WE'LL START, AS I SAID, WITH THE ADDENDUM TO 1640. |

72

12:22PM 1     AS TO THE DEFENSE FIRST OBJECTION, OBJECTION NUMBER ONE

12:22PM 2  REGARDING ENHANCEMENT OF THE SENTENCE ON ACQUITTED CONDUCT, THE

12:22PM 3  CONDUCT, AS THE PROBATION OFFICER INFORMED US, HAS NOT, NOT

12:22PM 4  BEEN USED TO CALCULATE GUIDELINES IN THE CASE, AND THE COURT

12:22PM 5  WILL NOT USE THAT IN ITS GUIDELINE CALCULATION.

12:23PM 6     PART OF THE DISCUSSION HERE I THINK ALSO RAISED -- I THINK

12:23PM 7  WE TALKED ABOUT THE GOVERNMENT'S DESIRE FOR THE COURT TO IMPOSE

12:23PM 8  AN ENHANCEMENT PURSUANT TO 2B1.1(6), THE RISK OF BODILY HARM.

12:23PM 9  THE COURT IS GOING TO DENY THAT REQUEST.  I WILL NOT GIVE THE 2

12:23PM 10  POINT ENHANCEMENT FOR RISK OF BODILY HARM.  THE COURT FINDS

12:23PM 11  THAT THE EVIDENCE DOES NOT SUPPORT THAT ENHANCEMENT.

12:23PM 12     THE COURT OTHERWISE OVERRULES OBJECTION NUMBER ONE

12:23PM 13  RECOGNIZING, HOWEVER, THAT, AS I PREVIOUSLY STATED, THAT

12:23PM 14  CONDUCT IS NOT AND WAS NOT USED BY PROBATION IN THE GUIDELINE

12:23PM 15  CALCULATION.

12:23PM 16     OBJECTION NUMBER TWO RELATES TO SOME OF THE OTHER

12:23PM 17  OBJECTIONS THAT WE DISCUSSED REGARDING LOSS AMOUNTS.  OBJECTION

12:23PM 18  NUMBER TWO REFERS TO PARAGRAPH 28 REGARDING THE C INVESTMENTS.

12:24PM 19  TO THE EXTENT THAT THIS OBJECTION RELATES TO THE AGGREGATION OF

12:24PM 20  C1 AND C2 INVESTMENTS FOR LOSS CALCULATION, THE OBJECTION IS

12:24PM 21  SUSTAINED.  I'LL TALK A LITTLE BIT MORE ABOUT THE LOSS AMOUNT

12:24PM 22  IN THE OTHER OBJECTIONS.

12:24PM 23     OBJECTION NUMBER THREE IS THE OBJECTION TO THE USE OF

12:24PM 24  MS. PETERSON'S TESTIMONY IN PARAGRAPHS 44 AND 93.  THE COURT

12:24PM 25  WILL OVERRULE THIS OBJECTION CITING TO, AS THE PROBATION

12:24PM 1    DEPARTMENT DID IN THE PSR, GUIDELINES 6A1.3(A) THAT THE COURT

12:24PM 2    CAN CONSIDER RELEVANT, RELEVANT INFORMATION AND TESTIMONY.

12:24PM 3    ALSO, UNITED STATES CODE SECTION 18 UNITED STATES CODE 3661

12:24PM 4    PROVIDES THIS RELIEF FOR THE COURT AS WELL.

12:24PM 5        IN THIS CASE THE GOVERNMENT DID CALL MS. PETERSON AS A

12:25PM 6    WITNESS TO TESTIFY AS TO RDV'S INVESTMENT IN THERANOS, AND

12:25PM 7    ULTIMATELY MS. HOLMES WAS CONVICTED OF CONSPIRING TO COMMIT

12:25PM 8    WIRE FRAUD AGAINST THE INVESTORS AND FOR COMMITTING WIRE FRAUD

12:25PM 9    AGAINST CERTAIN SPECIFIC INVESTORS.  AS SUCH, THIS INFORMATION

12:25PM 10   WAS APPROPRIATELY CONSIDERED IN THE PRESENTENCE REPORT.

12:25PM 11       THIS WITNESS TESTIFIED IN GREAT DETAIL REGARDING THE

12:25PM 12   MEETINGS WITH MS. HOLMES, THE INFORMATION RECEIVED, HER, THE

12:25PM 13   WITNESS'S, MEMORIALIZING THAT INFORMATION AS WELL AS SHARING

12:25PM 14   THAT INFORMATION AND HER RECOLLECTION OF THE INVESTMENT

12:25PM 15   DECISION OF HER EMPLOYER.

12:25PM 16       THIS WITNESS WAS ALSO THOROUGHLY CROSS-EXAMINED BY THE

12:25PM 17   DEFENSE SUCH THAT THE JURY COULD HAVE REASONABLY FOUND HER

12:25PM 18   TESTIMONY TO BE ACCURATE AND CREDIBLE.

12:25PM 19       AS TO OBJECTION NUMBER FOUR, THIS IS THE LOSS CALCULATION

12:26PM 20   DISCUSSION WE HAD, AND THERE WERE, AT LEAST AS I COUNT, I THINK

12:26PM 21   THERE WERE FIVE COMPONENTS, DIFFERENT COMPONENTS TO THE DEFENSE

12:26PM 22   OBJECTION AS TO THIS.

12:26PM 23       THE FIRST OBJECTION WAS AS TO THE STANDARD, THE STANDARD

12:26PM 24   OF PROOF, WHETHER IT SHOULD BE CLEAR AND CONVINCING OR

12:26PM 25   OTHERWISE, AND THE COURT FINDS THAT I OVERRULE THE OBJECTION AS

74

12:26PM  1    TO CLEAR AND CONVINCING.  THIS EVIDENCE, THE STANDARD THAT THE

12:26PM  2    COURT FINDS FOR THE EVALUATION OF THIS EVIDENCE IS THE

12:26PM  3    PREPONDERANCE OF THE EVIDENCE.

12:26PM  4        THE COURT -- WE TALKED ABOUT LAURIENTI AND LONICH, THE

12:26PM  5    COURT TALKED ABOUT THE DISTINCTIONS AND FINDS AS TO THAT

12:26PM  6    EVIDENCE AND THE LOSS CALCULATION IN THIS CASE IS BASED ON THE

12:26PM  7    EXTENT OF THE INVESTOR FRAUD CONSPIRACY THAT THE DEFENDANT WAS

12:27PM  8    CONVICTED OF BEYOND A REASONABLE DOUBT, THE SERIES C

12:27PM  9    INVESTMENTS AND THAT FALL WITHIN THE SCOPE OF THE CONSPIRACY,

12:27PM  10   AND, THEREFORE, THE CORRECT STANDARD OF PROOF IS A

12:27PM  11   PREPONDERANCE OF THE EVIDENCE.

12:27PM  12       THE SECOND COMPONENT OF THIS OBJECTION IS MS. HOLMES'S

12:27PM  13   OBJECTION AND THE BELIEF THAT EACH INVESTOR AND ASSOCIATED LOSS

12:27PM  14   MUST BE CONSIDERED SEPARATELY AS OPPOSED TO THE AGGREGATE.  AND

12:27PM  15   I'LL SUSTAIN THAT OBJECTION.  THE COURT FINDS THAT -- I'LL JUST

12:27PM  16   CITE TO HICKS, 217 FED. 3D.  IT SUGGESTS THAT THE GOVERNMENT IS

12:27PM  17   REQUIRED TO SHOW LOSS CALCULATION, THOUGH IT MAY DO SO, AGAIN,

12:27PM  18   UNDER THE PREPONDERANCE OF THE EVIDENCE STANDARD.

12:27PM  19       THE COURT IS NOT GOING TO CALCULATE LOSS BASED ON THE

12:27PM  20   AGGREGATE OF THE C INVESTMENTS.  THAT IS THE 730 MILLION AND

12:27PM  21   200 INVESTORS JUST BY ITSELF.

12:28PM  22       THE COURT HAS REVIEWED THE TRIAL TESTIMONY AS WELL AS THE

12:28PM  23   VICTIM IMPACT STATEMENTS THAT HAVE BEEN PROVIDED TO DETERMINE

12:28PM  24   WHETHER THE PREPONDERANCE OF THE EVIDENCE INDICATES A

12:28PM  25   PARTICULAR INVESTMENT WAS THE RESULT OF THE DEFENDANT'S

75

12:28PM 1    FRAUDULENT REPRESENTATIONS.

12:28PM 2        THE THIRD SET AS TO THIS OBJECTION IS MS. HOLMES'S

12:28PM 3    ARGUMENT THAT THE CALCULATION, THAT IS, THE LOSS CALCULATION

12:28PM 4    MUST BE OFFSET BY THE INVESTMENT'S UNDERLYING VALUE, WHICH IS

12:28PM 5    THE SHARE'S VALUE WITHOUT ANY INFLATION CAUSED BY THE LOSS, AND

12:28PM 6    THE COURT WILL SUSTAIN THIS OBJECTION.  AND I'LL TALK MORE

12:28PM 7    ABOUT THIS WHEN WE GET TO THE LOSS CALCULATION.

12:28PM 8        THE COURT HAS RELIED ON ZOLP, Z-O-L-P, 479 FED. 3D.  THAT

12:28PM 9    HAS BEEN HELPFUL TO THE COURT.  AND THE LANGUAGE THERE WAS TO

12:28PM 10   DISENTANGLE THE UNDERLYING VALUE OF THE STOCK AND IDENTIFY THE

12:29PM 11   VALUATION, AND THE COURT FINDS THAT AT THE TIME THE INVESTOR

12:29PM 12   VICTIMS PURCHASED THEIR SHARES, THE STOCK WAS NOT, WAS NOT

12:29PM 13   PRACTICALLY WORTHLESS, THEREFORE, THE COURT MUST REDUCE THE

12:29PM 14   TOTAL INVESTMENT AMOUNTS BY THE UNDERLYING VALUE.

12:29PM 15       THE ZOLP CASE HELPS US IN THAT REGARD AS DOES THE LEONARD

12:29PM 16   CASE WHICH IS AT 529 FED. 3D 83.  AND THE LEONARD CASE TALKS

12:29PM 17   ABOUT DIRECTION TO THE COURT, GIVING THE COURT DIRECTION THAT

12:29PM 18   THE COURT CAN MAKE A REASONABLE ESTIMATE ON THE LOSS AMOUNT.

12:29PM 19       THE COURT DECLINES TO COUNT THE FULL INVESTMENT AS LOSSES

12:29PM 20   HERE BECAUSE THE COURT FINDS THERE'S INSUFFICIENT EVIDENCE TO

12:29PM 21   SHOW THAT THE DEFENDANT'S FRAUD AND CONSPIRACY WAS THE SOLE

12:29PM 22   CAUSE OF THE COMPANY'S ULTIMATE COLLAPSE.

12:29PM 23       NOW, THE CAUSATION, I THINK MR. DOWNEY POINTED OUT, AS DID

12:30PM 24   MR. BOSTIC, THIS WAS A UNIQUE SITUATION.  THIS WAS NOT A PUBLIC

12:30PM 25   COMPANY.  THIS WAS A PRIVATE COMPANY WITH LARGELY ILLIQUID

76

| | | |
|---|---|---|
| 12:30PM | 1 | SHARES AND THE ASSETS, AS WE KNOW, ULTIMATELY WERE REPOSSESSED |
| 12:30PM | 2 | AND IN ANOTHER COURT. |
| 12:30PM | 3 | THE REALITY IS THAT NONE OF THE INVESTOR VICTIMS ARE |
| 12:30PM | 4 | LIKELY TO RECEIVE ANY RETURN ON THEIR INVESTMENTS, BUT VALUING |
| 12:30PM | 5 | THE SHARES, HAD THERE BEEN NO FRAUD, IS CHALLENGING. I THINK |
| 12:30PM | 6 | WE ALL RECOGNIZE THAT. |
| 12:30PM | 7 | THE COURT FINDS THAT THE GOVERNMENT'S EXPERT, |
| 12:30PM | 8 | DR. CARL SABA, PROVIDES A REASONABLE PROTOCOL, AND THAT |
| 12:30PM | 9 | CONTAINS SEVERAL INDICIA OF RELIABILITY AND INCORPORATES |
| 12:30PM | 10 | SEVERAL ASSUMPTIONS THAT ARE ACTUALLY FAVORABLE TO THE |
| 12:30PM | 11 | DEFENDANT AND TO THERANOS. |
| 12:30PM | 12 | AGAIN, THE COURT IS NOT REQUIRED AND OBLIGATED TO SEARCH |
| 12:31PM | 13 | FOR THE PERFECT THEORETICAL OR STATISTICAL FIT. THE COURT'S |
| 12:31PM | 14 | OBLIGATION IS TO FIND, IS TO ADOPT A REASONABLE REALISTIC |
| 12:31PM | 15 | ECONOMIC PROJECTION OF LOSS BASED ON THE EVIDENCE THAT HAS BEEN |
| 12:31PM | 16 | PRESENTED. |
| 12:31PM | 17 | THE SABA REPORT PROVIDES, THE COURT FINDS, THE ESTIMATED |
| 12:31PM | 18 | VALUATION OF THERANOS ON THREE DATES: IT WAS THE FEBRUARY 2014 |
| 12:31PM | 19 | DATE, THE DECEMBER 2014 DATE, AND THE OCTOBER 2015 DATE. |
| 12:31PM | 20 | THE COURT IS GOING TO SELECT A DATE THAT IS CLOSEST IN |
| 12:31PM | 21 | TIME TO THE LAST C INVESTMENT, AND THAT'S DECEMBER 21, 2014. |
| 12:31PM | 22 | THE SABA REPORT PROVIDES VALUATION USING THE TWO DIFFERENT |
| 12:31PM | 23 | METHODS, INCOME AND COMPANY COMPARISON, AND THE COURT IS GOING |
| 12:31PM | 24 | TO ADOPT THE FIRST METHOD, INCOME PLUS COMPANY COMPARISON, |
| 12:31PM | 25 | BECAUSE IT'S MORE APPROPRIATE FOR GOING FORWARD FOR GROWING |

12:32PM 1    COMPANIES, AND, CANDIDLY, IT'S MORE FAVORABLE TO THE DEFENDANT.

12:32PM 2        USING EITHER METHOD WOULD NOT CHANGE THE ENHANCEMENT

12:32PM 3    SIGNIFICANTLY, BUT THE COURT WILL APPLY THE NET LOSS RULE HERE,

12:32PM 4    AND THE COURT FINDS THAT THE SABA REPORT PROVIDES A RELIABLE

12:32PM 5    AND HELPFUL BASIS FOR THE COURT TO REASONABLY PROVIDE THIS LOSS

12:32PM 6    VALUE.

12:32PM 7        THE FOURTH ELEMENT OF THIS OBJECTION IS THAT MS. HOLMES

12:32PM 8    CLAIMS THAT THE LOSS CANNOT BE REASONABLY ESTIMATED, AND,

12:32PM 9    THEREFORE, THE COURT SHOULD USE A GAIN TO THE DEFENDANT

12:32PM 10   ANALYSIS, AND THE COURT WILL OVERRULE THIS OBJECTION FOR THE

12:32PM 11   REASONS PREVIOUSLY STATED.

12:32PM 12       THE FIFTH ELEMENT IS MS. HOLMES'S OBJECTION TO THE USE OF

12:32PM 13   LOSS ON A POLICY BASIS AND POLICY MATTER.  AND THE COURT

12:32PM 14   OVERRULES THAT AS WELL.

12:32PM 15       THE COURT FINDS HERE THAT THE GUIDELINES HERE PROVIDE

12:32PM 16   ADEQUATE MEASURE OF DIRECTION AND INTENT FOR THE USE OF LOSS.

12:32PM 17   SO THE COURT WILL OVERRULE THAT.

12:33PM 18       LET ME SAY ALSO THAT IT'S THE COURT'S INTENT TO GIVE --

12:33PM 19   I'M GIVING YOU THE COURT'S RULINGS FROM THE BENCH HERE, BUT I

12:33PM 20   WILL FILE AN ORDER THAT WILL CONTAIN THE COURT'S FORMAL

12:33PM 21   DECISIONS AS TO EACH OF THESE OBJECTIONS AS WELL AS THE

12:33PM 22   APPENDIX.

12:33PM 23       OBJECTION NUMBER FIVE IS MS. HOLMES'S OBJECTION TO THE

12:33PM 24   CALCULATION OF VICTIMS.  THIS IS DESCRIBED IN PARAGRAPH 106.

12:33PM 25   AND THE ALLEGATION HERE OR THE OBJECTION IS THAT THE COURT IS

78

12:33PM 1      NOT PERMITTED TO ESTIMATE, ESTIMATE THE NUMBER OF VICTIMS.

12:33PM 2          THE COURT FINDS THAT THE PREPONDERANCE OF THE EVIDENCE IN

12:33PM 3      THE RECORDS DOES SUPPORT A FINDING THAT THERE ARE TEN OR MORE

12:33PM 4      VICTIMS WHO SUFFERED A LOSS CONNECTED TO MS. HOLMES'S

12:33PM 5      CONVICTION FOR CONSPIRACY TO COMMIT WIRE FRAUD AGAINST THERANOS

12:33PM 6      INVESTORS.  THIS IS IN DOCKET 1235, THE CONVICTION.

12:34PM 7          2B1.1(B)(2)(A)(I) OF THE GUIDELINES SUPPORTS A 2 POINT

12:34PM 8      ENHANCEMENT IF THE OFFENSE INVOLVED TEN OR MORE VICTIMS, AND WE

12:34PM 9      HAVE THE DEFINITION OF VICTIMS THERE IN THAT GUIDELINE.

12:34PM 10         I KNOW THE GOVERNMENT ALLEGES THAT THERE ARE 29 VICTIMS

12:34PM 11     WHO SUFFERED FINANCIAL LOSS.  THE COURT HAS REVIEWED THE LIST

12:34PM 12     AS I HAVE INDICATED, AND THE COURT DOES FIND THAT THERE ARE TEN

12:34PM 13     OR MORE VICTIMS WHO DO QUALIFY AS VICTIMS.

12:34PM 14         THE TOTALITY OF THE EVIDENCE AND THE CIRCUMSTANCES IN THIS

12:34PM 15     CASE REVEAL THE BROAD SCOPE OF THE CONSPIRACY TO COMMIT WIRE

12:34PM 16     FRAUD AGAINST THERANOS INVESTORS.  IT LASTED FIVE YEARS.  IT

12:34PM 17     INVOLVED NOT ONLY IN-PERSON INVESTOR MEETINGS AND CALLS WITH

12:34PM 18     MS. HOLMES BUT FAR REACHING MEDIA COVERAGE, IT INCLUDED

12:34PM 19     PUBLICATIONS, CONTINUED FRAUDULENT OR MISREPRESENTED

12:35PM 20     INFORMATION ABOUT THERANOS INCLUDING "THE WALL STREET JOURNAL"

12:35PM 21     2013 PROMOTION, THE SEPTEMBER 2013 PRESS RELEASE REGARDING

12:35PM 22     WALGREENS, AND THE JUNE 2014 ROGER PARLOFF ARTICLE.  THESE ARE

12:35PM 23     CAPTURED IN THE GOVERNMENT'S SENTENCING MEMORANDUM AT PAGE

12:35PM 24     18 -- THEIR SENTENCING MEMO, PARDON ME.

12:35PM 25         THE COURT HAS CONSIDERED THE TESTIMONY AT TRIAL AS WELL AS

79

12:35PM 1    THE S.E.C. DEPOSITIONS, THE FBI MEMOS, AND THE VICTIM IMPACT

12:35PM 2    STATEMENTS PRODUCED BY THE GOVERNMENT TO ASSIST IT IN

12:35PM 3    IDENTIFYING THE NUMBER OF VICTIMS HERE.

12:35PM 4        ALL OF THAT EVIDENCE SUPPORTS THEN THAT THE FOLLOWING TEN

12:35PM 5    INVESTORS FROM THE GOVERNMENT'S LIST MEET THE DEFINITION OF

12:35PM 6    "VICTIM" UNDER THE SENTENCING GUIDELINES.  I'LL JUST LIST THESE

12:35PM 7    FOR YOU, PLEASE.

12:35PM 8        1.  PFM;

12:36PM 9        2.  MOSLEY FAMILY HOLDINGS;

12:36PM 10       3.  RDV CORPORATION;

12:36PM 11       4.  KEITH RUPERT MURDOCH;

12:36PM 12       5.  RICHARD KOVACEVICH;

12:36PM 13       6.  PEER VENTURE GROUP;

12:36PM 14       7.  LUCAS VENTURE GROUP;

12:36PM 15       8.  MENDENHALL;

12:36PM 16       9.  HALL/BLACK DIAMOND; AND,

12:36PM 17       10.  BLACK DIAMOND VENTURE.

12:36PM 18       ACCORDINGLY, EACH OF THESE VICTIM'S LOSSES REFLECTED IN

12:36PM 19   THE LOSS AMOUNT, AND THAT TOTALS $384,047,273.

12:36PM 20       NOW, THE COURT RECOGNIZES THAT THERE MAY BE MORE INVESTOR

12:36PM 21   VICTIMS.  MR. EDLIN, DANIEL EDLIN WHO WAS A PROJECT MANAGER AT

12:36PM 22   THERANOS TESTIFIED THAT HE PREPARED BINDERS THAT WERE GIVEN TO

12:36PM 23   INVESTORS, AND THOSE BINDERS CONTAINED INFORMATION THAT WAS

12:36PM 24   APPROVED BY A CHECKLIST AND WAS OTHERWISE APPROVED AND REVIEWED

12:36PM 25   AND ANY CONDUCT IN THOSE BINDERS WAS APPROVED BY MS. HOLMES

12:37PM  1    BEFORE THEY WERE PROVIDED TO INVESTORS.  THIS IS FOUND IN

12:37PM  2    MR. EDLIN'S TESTIMONY IN DOCKET 1276 BEGINNING AT PAGE 3993.

12:37PM  3       THE GOVERNMENT SUBMITS THAT IT IS REASONABLE, THEREFORE,

12:37PM  4    TO CONCLUDE THAT ALL POTENTIAL C1 AND C2 INVESTORS RECEIVED

12:37PM  5    FRAUDULENT INFORMATION THROUGH THOSE BINDERS AND WERE EXPOSED

12:37PM  6    TO SIMILAR PUBLIC INFORMATION THAT CONTAINED

12:37PM  7    MISREPRESENTATIONS.  THE COURT RECOGNIZES THIS POSSIBILITY BUT

12:37PM  8    I AM LIMITING -- THE COURT LIMITS ITS FINDINGS TO WHAT IS

12:37PM  9    SUPPORTED BY THE RECORD FOR PURPOSES OF THIS DISCUSSION AND

12:37PM 10    THIS ENHANCEMENT.

12:37PM 11       THE COURT IS SATISFIED, THEREFORE, THAT THE PREPONDERANCE

12:37PM 12    OF THE EVIDENCE SUPPORTS A FINDING THAT AT LEAST TEN INVESTORS

12:37PM 13    QUALIFY AS VICTIM UNDER THE GUIDELINES, AND, THEREFORE, SUPPORT

12:37PM 14    A 2 POINT ADJUSTMENT TO MS. HOLMES'S SENTENCING UNDER

12:38PM 15    UNITED STATES SENTENCING GUIDELINES 2B1.1(B)(2)(A)(I).

12:38PM 16       OBJECTION NUMBER SIX IS THE OBJECTION TO THE 4 LEVEL

12:38PM 17    ENHANCEMENT SUGGESTED BY PROBATION FOR AN ORGANIZER OR LEADER

12:38PM 18    IN CRIMINAL ACTIVITY, AND THIS IS IN PARAGRAPH 108 OF THE PSR.

12:38PM 19    THE COURT WILL SUSTAIN THAT OBJECTION.  THE COURT FINDS THAT TO

12:38PM 20    SATISFY THIS LEVEL, THERE ARE TWO PRONGS.  WE TALKED ABOUT

12:38PM 21    THEM.

12:38PM 22       THE DEFENDANT WAS AN ORGANIZER OR LEADER OF CRIMINAL

12:38PM 23    ACTIVITY, NOT THE CORPORATION, NOT THE BUSINESS, BUT OF THE

12:38PM 24    CRIMINAL ACTIVITY THAT WAS INVOLVED, AND THAT THE CRIMINAL

12:38PM 25    ACTIVITY WAS OTHERWISE EXTENSIVE.

| | | |
|---|---|---|
| 12:38PM | 1 | THE COURT CITED TO THE <u>HOLDEN</u> CASE THAT IS INSTRUCTIVE, |
| 12:38PM | 2 | THE NINTH CIRCUIT CASE, THAT IS INSTRUCTIVE AND TEACHES IN THIS |
| 12:38PM | 3 | AREA IS AT 908 FED. 3D 395.  AND, AGAIN, THERE'S NO DISPUTE |
| 12:39PM | 4 | THAT MS. HOLMES WAS THE LEADER OF THE COMPANY, BUT THE EVIDENCE |
| 12:39PM | 5 | DOESN'T SUPPORT THAT SHE WAS ACTUALLY THE LEADER OF THE |
| 12:39PM | 6 | CRIMINAL ACTIVITY, THAT IS, THE FRAUD AND CONSPIRACY, IN |
| 12:39PM | 7 | REGARDS TO THE TWO PARTICIPANTS, MS. HOLMES AND MR. BALWANI, |
| 12:39PM | 8 | AND THE COURT FINDS THAT THAT HAS NOT BEEN MET. |
| 12:39PM | 9 | WHILE SHE WAS THE LEADER OF THE COMPANY, THE OTHERWISE |
| 12:39PM | 10 | EXTENSIVE PRONG, THE COURT FINDS THAT THAT DOESN'T AND HASN'T |
| 12:39PM | 11 | BEEN MET, AND I'LL OTHERWISE SUSTAIN THE OBJECTION FOR A |
| 12:39PM | 12 | 4 LEVEL ENHANCEMENT HERE. |
| 12:39PM | 13 | OBJECTION NUMBER SEVEN IS THE OBJECTION THAT THE PSR AND |
| 12:39PM | 14 | PROBATION DOES NOT GIVE AN EXCEPTION FOR EXPRESSION OF REMORSE. |
| 12:39PM | 15 | AND THIS IS THE DEFENSE -- I HEARD MR. DOWNEY'S COMMENT THAT |
| 12:40PM | 16 | HER COMMENTS DURING THE EMPLOYMENT AND HER ACTIONS TAKEN BY THE |
| 12:40PM | 17 | COMPANY DURING HER LEADERSHIP WOULD SATISFY, OTHERWISE SATISFY |
| 12:40PM | 18 | AN ACCEPTANCE OF RESPONSIBILITY. |
| 12:40PM | 19 | AND THE COURT HAS LOOKED AT COMMENT NOTE 2 TO 3E1.1 AND |
| 12:40PM | 20 | THE CASES THERE, AND MR. BOSTIC INFORMS US OF WHAT THAT NOTE |
| 12:40PM | 21 | ACTUALLY SAYS AND WHAT THE SPIRIT OF THAT IS. |
| 12:40PM | 22 | MS. HOLMES WAS FOUND GUILTY OF CONSPIRING TO COMMIT WIRE |
| 12:40PM | 23 | FRAUD AND COMMITTING WIRE FRAUD AGAINST INVESTORS OF HER |
| 12:40PM | 24 | COMPANY. |
| 12:40PM | 25 | WHILE SHE DOES NOT NEED TO, AND WE RECOGNIZE THAT AND |

12:40PM 1    ACCEPT THE GOVERNMENT'S VIEW OF EVERY FACT IN THIS COMPLEX

12:40PM 2    CASE, SHE DOES MAINTAIN HER INNOCENCE ALL THE WHILE BEING

12:40PM 3    CONVICTED OF NUMEROUS COUNTS.  SHE DID NOT ACCEPT

12:40PM 4    RESPONSIBILITY FOR PURPOSES OF THIS GUIDELINE.  SHE MAINTAINED

12:40PM 5    SHE DID NOTHING WRONG, AND HER DISAGREEMENT DOES NOT PERMIT HER

12:41PM 6    ACCEPTANCE OF RESPONSIBILITY REDUCTION.  THAT WOULD MAKE

12:41PM 7    MEANINGLESS THE SPIRIT OF THE REDUCTION FOR DEFENDANTS WHO DO

12:41PM 8    MAKE EXPRESSIONS OF ACCEPTANCE AND OTHERWISE EXPRESS

12:41PM 9    CONTRITION.

12:41PM 10        OBJECTION NUMBER EIGHT WAS WITHDRAWN, AND THE COURT NEED

12:41PM 11   NOT RULE ON THAT.

12:41PM 12        LET ME TURN NOW TO THE APPENDIX, PLEASE, THE APPENDIX A

12:41PM 13   OBJECTIONS.

12:41PM 14        AS I SAID, YOU'LL GET AN ORDER ON THESE.  I'LL READ

12:41PM 15   THROUGH THE PARAGRAPHS.  I'LL CITE THE PARAGRAPHS AND THEN GIVE

12:41PM 16   THE COURT'S RULING.  THERE MAY BE FOR PROBATION, THERE MAY

12:41PM 17   BE -- THERE IS -- I AM GOING TO SUSTAIN A COUPLE OF THE

12:41PM 18   OBJECTIONS AS TO LANGUAGE THAT WOULD BE STRICKEN AND OTHERWISE

12:41PM 19   ADDED, SO I'LL INVITE PROBATION TO LISTEN FOR THAT.

12:41PM 20        THE FIRST IS -- AND AGAIN, I'M JUST GOING TO GO THROUGH

12:42PM 21   THESE PARAGRAPHS -- 8.  WHEN I SAY THE NUMBER, IT MEANS THE

12:42PM 22   PSR PARAGRAPH NUMBER.

12:42PM 23        8.  THE COURT REFERS TO ITS EARLIER RULING ON DEFENDANT'S

12:42PM 24   PSR OBJECTION NUMBER ONE REGARDING SUBSTANTIALLY THE SAME

12:42PM 25   POINTS.

83

12:42PM 1      16.  PER FEDERAL RULE OF CRIMINAL PROCEDURE 32(I)(3)(B),

12:42PM 2  THE COURT DETERMINES THAT RULING ON THIS OBJECTION IS

12:42PM 3  UNNECESSARY BECAUSE THE COURT WILL NOT CONSIDER THIS MATTER IN

12:42PM 4  SENTENCING.

12:42PM 5      24.  THE SAME.  THE COURT WILL FIND THE DECISION IS

12:42PM 6  UNNECESSARY FOR THE SAME RULE.

12:42PM 7      28.  THE COURT REFERS TO ITS EARLIER RULING ON DEFENDANT'S

12:42PM 8  PSR OBJECTIONS NUMBER TWO AND FOUR REGARDING THE SAME POINTS.

12:42PM 9      31.  AGAIN, PURSUANT TO 31(I)(3)(B), IT'S UNNECESSARY FOR

12:42PM 10 THE COURT TO RULE ON THIS OBJECTION.

12:43PM 11      34.  THE SAME.  32(I)(3)(B), IT'S UNNECESSARY FOR THE

12:43PM 12 COURT TO RULE ON THIS OBJECTION.

12:43PM 13      36.  THE SAME.  32(I)(3)(B), IT'S UNNECESSARY TO RULE ON

12:43PM 14 THIS OBJECTION.  AND I STATE THAT, AGAIN, STATING THAT THE

12:43PM 15 COURT IS NOT GOING TO CONSIDER AND WILL NOT CONSIDER THIS

12:43PM 16 MATTER IN SENTENCING.

12:43PM 17      44.  THE COURT REFERS TO ITS EARLIER RULING ON THE PSR

12:43PM 18 OBJECTION NUMBER THREE REGARDING SUBSTANTIVELY SIMILAR POINTS.

12:43PM 19      47.  THE COURT REFERS TO ITS RULING ON PSR OBJECTION

12:43PM 20 NUMBER TWO AND FOUR REGARDING THE SAME POINTS.

12:43PM 21      48 AND 60.  THE COURT REFERS TO ITS RULING ON PSR

12:43PM 22 OBJECTION NUMBER ONE, AGAIN, THE SAME POINTS.

12:43PM 23      PARAGRAPH 58, PSR 58.  THE COURT WILL SUSTAIN THIS

12:44PM 24 OBJECTION AND DIRECTS PROBATION TO THE PARAGRAPH THAT IS

12:44PM 25 REQUESTED BY THE DEFENDANT HERE TO BE ADDED JUST BELOW THE

12:44PM 1    FINAL PARAGRAPH IN THAT SECTION.

12:44PM 2        IS THAT CLEAR, MR. POLLAK?

12:44PM 3            PROBATION OFFICER:  YES, YOUR HONOR.

12:44PM 4            THE COURT:  60.  THE COURT REFERS TO ITS EARLIER

12:44PM 5    RULING ON OBJECTION NUMBER ONE REGARDING SIMILAR TOPICS.

12:44PM 6        92.  THE COURT REFERS TO ITS EARLIER RULING ON OBJECTION

12:44PM 7    NUMBERS TWO AND FOUR REGARDING THE SAME TOPICS.

12:44PM 8        93.  THE COURT REFERS TO ITS EARLIER RULING ON OBJECTION

12:44PM 9    NUMBER THREE REGARDING THE SAME TOPICS.

12:44PM 10       94.  THE COURT WILL ACCEPT MR. HALL'S STATEMENT AS A

12:44PM 11   VICTIM IMPACT STATEMENT.  THIS OBJECTION IS OVERRULED.

12:44PM 12       95.  PER 32 FEDERAL RULE CRIMINAL PROCEDURE 32(I)(3)(B),

12:45PM 13   IT'S UNNECESSARY FOR A RULING ON THIS.  THE COURT WILL NOT

12:45PM 14   CONSIDER THIS IN ITS SENTENCING.

12:45PM 15       97 THROUGH 101.  THE COURT REFERS TO ITS EARLIER RULING ON

12:45PM 16   OBJECTION NUMBER SEVEN.  THE OBJECTION IS OTHERWISE OVERRULED.

12:45PM 17       102 TO 113, THE COURT REFERS TO ITS EARLIER RULING ON

12:45PM 18   OBJECTIONS TWO, FOUR, FIVE, AND SIX.

12:45PM 19       105.  THE COURT REFERS TO ITS EARLIER RULING ON OBJECTIONS

12:45PM 20   TWO AND FOUR.

12:45PM 21       106.  THE COURT REFERS TO ITS EARLIER RULING ON PSR

12:45PM 22   OBJECTION NUMBER FIVE.

12:45PM 23       108.  THE COURT REFERS TO ITS EARLIER RULING ON OBJECTION

12:45PM 24   NUMBER SIX.

12:45PM 25       126.  THIS OBJECTION IS WITHOUT OPPOSITION FROM THE

85

12:45PM 1    GOVERNMENT. THE COURT SUSTAINS THE OBJECTION AND DIRECTS THE

12:45PM 2    PSR TO BE MODIFIED AS REQUESTED BY THE DEFENDANT.

12:46PM 3        127. THIS IS WITHOUT OPPOSITION. THE COURT SUSTAINS THE

12:46PM 4    OBJECTION AND DIRECTS THE PSR TO BE MODIFIED AS REQUESTED BY

12:46PM 5    THE DEFENDANT.

12:46PM 6        129. IT'S WITHOUT OBJECTION. THE COURT SUSTAINS THE

12:46PM 7    OBJECTION AND -- EXCUSE ME. WITHOUT OPPOSITION, THE COURT

12:46PM 8    SUSTAINS THE OBJECTION AND DIRECTS THE PSR TO BE MODIFIED AS

12:46PM 9    REQUESTED BY THE DEFENDANT.

12:46PM 10       PSR 153. THE COURT SUSTAINS IN PART THIS OBJECTION, AND

12:46PM 11   THE COURT WILL CHANGE THE LANGUAGE, THE OBJECTIVE LANGUAGE.

12:46PM 12   THE PHRASE THAT'S "TO EVALUATE HOLMES'S CLAIM," WILL BE CHANGED

12:46PM 13   TO "TO EVALUATE AND REBUT DR. MECHANIC'S OPINIONS REGARDING

12:46PM 14   MS. HOLMES'S ALLEGATIONS REGARDING HER RELATIONSHIP WITH

12:46PM 15   MR. BALWANI."

12:47PM 16       154. THE COURT SUSTAINS THIS OBJECTION, AND THE PSR WILL

12:47PM 17   BE MODIFIED TO INCLUDE THE FACT THAT DRS. MECHANIC AND DUTTON

12:47PM 18   WERE RETAINED BY THE DEFENDANT AND DRS. BINDER AND MARTELL WERE

12:47PM 19   RETAINED BY THE GOVERNMENT.

12:47PM 20       LET ME CONFIRM THOSE RETENTIONS.

12:47PM 21       IS THAT CORRECT?

12:47PM 22           MR. DOWNEY: THAT'S CORRECT, YOUR HONOR.

12:47PM 23           MR. LEACH: YES, YOUR HONOR

12:47PM 24           THE COURT: ALL RIGHT. THANK YOU.

12:47PM 25       166. THE COURT SUSTAINS IN PART THIS OBJECTION. THE

12:47PM 1    COURT WILL STRIKE THE PHRASE THAT BEGINS "WHICH SUGGESTS" AND

12:47PM 2    ENDS WITH "HIDDEN," THAT PHRASE WILL BE STRICKEN.

12:47PM 3        167 THROUGH 180.  THE COURT REFERS TO IT ITS EARLIER

12:47PM 4    RULING ON OBJECTION NUMBER FOUR.

12:47PM 5        169.  THE COURT REFERS TO ITS EARLY RULING ON OBJECTION

12:48PM 6    NUMBER TWO, FOUR, FIVE, AND SIX.

12:48PM 7        181.  I WILL SET A RESTITUTION HEARING IN THE FUTURE AT

12:48PM 8    THE CONVENIENCE OF COUNSEL.  I'M GOING TO ASK COUNSEL TO PLEASE

12:48PM 9    MEET AND CONFER AS TO A DATE FOR THAT RESTITUTION HEARING.

12:48PM 10       MR. DOWNEY, I'M ALSO GOING TO ASK IF YOU COULD CONSULT

12:48PM 11   WITH YOUR CLIENT TO DETERMINE IF YOUR CLIENT WISHES TO WAIVE

12:48PM 12   HER APPEARANCE AT ANY RESTITUTION HEARING.  AND IF SHE DOES,

12:48PM 13   AND YOU FILE THE APPROPRIATE STIPULATION OR DOCUMENT, I'LL

12:48PM 14   RECEIVE THAT.

12:48PM 15       I AM GOING TO ASK YOU TO MEET AND CONFER.  WE'RE GOING TO

12:48PM 16   DO A RESTITUTION HEARING, NOT TODAY, BUT WE'LL DO THAT IN THE

12:48PM 17   FUTURE.  UNDERSTOOD?

12:48PM 18           MR. DOWNEY:  WE'LL DO THAT, YOUR HONOR.

12:48PM 19           THE COURT:  ALL RIGHT.  IS THAT ALL RIGHT WITH YOU?

12:48PM 20           MR. LEACH:  IT IS, YOUR HONOR.  THANK YOU.

12:48PM 21           THE COURT:  THANK YOU.

12:48PM 22       191.  THE COURT REFERS TO ITS EARLIER RULING ON THE

12:48PM 23   OBJECTION NUMBER FOUR REGARDING THE SAME POINTS.

12:49PM 24       FINALLY, THE ADDENDUM, 10 TO 15, PARAGRAPHS NUMBER 10 TO

12:49PM 25   15.  PARDON ME.  THE COURT REFERS TO ITS EARLIER RULING ON THE

87

12:49PM 1    OBJECTION NUMBER FOUR WHICH INCLUDES DISCUSSION OF THE LOSS

12:49PM 2    AMOUNT.

12:49PM 3        ANY QUESTIONS ABOUT THE COURT'S RULINGS ON THE APPENDIX A

12:49PM 4    BEFORE WE GO FURTHER?

12:49PM 5        AGAIN, I'M GOING TO MEMORIALIZE THIS IN A WRITTEN ORDER

12:49PM 6    FOR YOU.  YOU WILL HAVE THAT.

12:49PM 7        ALL RIGHT.  THE COURT WILL NOW INDICATE ITS FINDINGS AS TO

12:49PM 8    THE GUIDELINE CALCULATIONS.  I'LL REFERENCE THE PSR PARAGRAPH

12:50PM 9    NUMBERS.

12:50PM 10       PARAGRAPH 104 -- FIRST OF ALL, PARAGRAPH 103 SUGGESTS THAT

12:50PM 11   THERE SHOULD BE GROUPING FOR GUIDELINE CALCULATION PURPOSES

12:50PM 12   PURSUANT TO 3D1.2(D).

12:50PM 13       AND PARAGRAPH 104 THE COURT FINDS THAT THE BASE OFFENSE

12:50PM 14   LEVEL IS 7.

12:50PM 15       THE COURT FINDS THEN UNDER THE 2B1 -- THIS IS IN PARAGRAPH

12:50PM 16   105, 2B1.1 LOSS VALUATION.

12:50PM 17       AFTER OFFSETTING THE VALUE THAT THE STOCK WOULD HAVE HAD

12:50PM 18   ABSENT THE DEFENDANT'S MISREPRESENTATION, THE COURT FINDS THAT

12:50PM 19   THE REASONABLE TOTAL LOSS TO IDENTIFIED INVESTOR VICTIMS IS

12:50PM 20   $121.1 MILLION.  THIS FALLS UNDER 2B1.1(M), WHICH IS A 24 LEVEL

12:51PM 21   ENHANCEMENT.

12:51PM 22       THE COURT HAS RELIED ON THE SABA ESTIMATE OF SHARE PRICES,

12:51PM 23   AND THE COURT FINDS THAT ON DECEMBER 31, 2014 THE $15.00

12:51PM 24   C1 PRICE WOULD HAVE BEEN $10.36 ABSENT THE FRAUD, AND THE

12:51PM 25   $17.00 C2 PRICE WOULD HAVE BEEN $11.63.

12:51PM 1    WHEN MULTIPLIED BY THE NUMBER OF IDENTIFIABLE VICTIM

12:51PM 2    SHARES, THE TOTAL LOSS IN SHARE VALUE ATTRIBUTABLE TO THE

12:51PM 3    DEFENDANT'S FRAUD, THAT IS, HOW MUCH THE SHARES WERE INFLATED

12:51PM 4    BASED ON THE FRAUD, IS $121,093,891.00.  THIS IS APPROXIMATELY

12:51PM 5    ABOUT A 31.5 PERCENT OF THE TOTAL INVESTMENT VALUE.

12:51PM 6        IN OTHER WORDS, THE STOCK WOULD HAVE BEEN 31.5 PERCENT

12:52PM 7    CHEAPER IF THERE HAD BEEN NO FRAUD.

12:52PM 8        PARAGRAPH 106, THE COURT FINDS PURSUANT TO 2B1.1(B)(A)(I)

12:52PM 9    A 2 LEVEL INCREASE PURSUANT TO TEN OR MORE VICTIMS.

12:52PM 10       THE COURT WILL NOT FIND THAT THERE'S AN ACCEPTANCE OF

12:52PM 11   RESPONSIBILITY REDUCTION.

12:52PM 12       THE ADJUSTED OFFENSE LEVEL THEREFORE IS 33, AND THE TOTAL

12:52PM 13   OFFENSE LEVEL IS 33.

12:52PM 14       THE CRIMINAL HISTORY CATEGORY IS I, AND THAT YIELDS THEN A

12:52PM 15   GUIDELINE RANGE OF 135 MONTHS TO 168 MONTHS.

12:52PM 16       THE COURT WILL FIND THAT THAT IS THE GUIDELINE CALCULATION

12:52PM 17   FOR PURPOSES OF PROCEEDING TO SENTENCING IN THIS MATTER.

12:53PM 18       LET ME NOW TURN TO THE PARTIES TO ASK WHETHER OR NOT THE

12:53PM 19   PARTIES WISH TO BE HEARD AS TO SENTENCING IN THIS MATTER.

12:53PM 20       LET ME TURN FIRST TO THE GOVERNMENT.

12:53PM 21       MR. SCHENK, DO YOU WISH TO BE HEARD?

12:53PM 22           MR. SCHENK:  YES.  THANK YOU VERY MUCH, YOUR HONOR.

12:53PM 23       YOUR HONOR, AS THE GOVERNMENT'S PAPERS NOTE, THE

12:53PM 24   APPROPRIATE SENTENCE IN THIS CASE IS FOUND AFTER CONSULTATION

12:53PM 25   WITH 3553(A).

12:53PM 1          THE GOVERNMENT BELIEVES THAT THE COURT SHOULD SENTENCE

12:53PM 2     MS. HOLMES TO 180 MONTHS OR 15 YEARS IN CUSTODY.  THAT SENTENCE

12:53PM 3     IS SUFFICIENT BUT NOT GREATER THAN NECESSARY TO ACHIEVE THE

12:53PM 4     AIMS OF 3553(A).

12:53PM 5          LET ME BEGIN BY HIGHLIGHTING A FEW REASONS.  THE FIRST IS,

12:53PM 6     AND AS WE HAVE DISCUSSED TODAY, THE CASE INVOLVES FRAUDULENT

12:53PM 7     STATEMENTS THAT THE DEFENDANT REPEATEDLY MADE TO INVESTORS.  IT

12:53PM 8     DOES NOT INVOLVE DISCRETE CONDUCT.

12:54PM 9          THE SECOND IS THE EXTENSIVENESS AND THE SOPHISTICATION OF

12:54PM 10    THE SCHEME.  THE SCHEME INVOLVED FRAUDULENT STATEMENTS ON AN

12:54PM 11    ARRAY OF TOPICS AND FRAUDULENT STATEMENTS MADE IN AN ARRAY OF

12:54PM 12    SOURCES.  ALL OF THEM WERE TRANSFERRED TO THE INVESTORS AND

12:54PM 13    THEN RELIED UPON BY THE INVESTORS WHEN THEY MADE THEIR

12:54PM 14    INVESTMENT DECISION.

12:54PM 15         AND THE LAST THAT I'LL HIGHLIGHT INITIALLY, THE LAST

12:54PM 16    REASON IS MS. HOLMES'S TREAD ON THE CREDIBILITY OF THE BOARD OF

12:54PM 17    DIRECTORS, OF THE UNITED STATES MILITARY, OF THE MEDIA, THOSE

12:54PM 18    ARE ALL AGGRAVATING FACTORS THAT I'LL TOUCH ON IN A MOMENT, BUT

12:54PM 19    BIG PICTURE, THOSE ARE MANY OF THE REASONS WHY A SIGNIFICANT

12:54PM 20    CUSTODIAL SENTENCE IS IMPORTANT.

12:54PM 21         AND LET ME ACKNOWLEDGE, THE GOVERNMENT'S RECOMMENDATION IS

12:54PM 22    HIGHER THAN THE GUIDELINE RANGE THAT THE COURT JUST FOUND.

12:54PM 23         THE COURT'S GUIDELINE RANGE DOES NOT AFFECT THE

12:54PM 24    GOVERNMENT'S RECOMMENDATION BECAUSE THE GOVERNMENT'S

12:55PM 25    RECOMMENDATION IS DRIVEN BY A 3553(A) ANALYSIS THAT I WILL WALK

12:55PM  1    THROUGH IN A MOMENT.

12:55PM  2        THE COURT, THROUGH THIS SENTENCE, IS MAKING A STATEMENT

12:55PM  3    THAT THE ENDS DO NOT JUSTIFY THE MEANS.  IN OTHER WORDS, WHEN

12:55PM  4    FACED WITH A CHOICE OF ALLOWING THERANOS TO FAIL, MS. HOLMES

12:55PM  5    MADE THE CHOICE TO DEFRAUD HER INVESTORS.  THAT CHOICE, THAT

12:55PM  6    PARTICULAR DECISION BY MS. HOLMES IS WHAT THE COURT IS ASKED TO

12:55PM  7    ADDRESS WITH THIS SENTENCE, AND A SIGNIFICANT CUSTODIAL

12:55PM  8    SENTENCE IS A STATEMENT, BUT THAT CHOICE WAS THE WRONG CHOICE.

12:55PM  9        THE COURT'S IMPOSITION OF A SIGNIFICANT CUSTODIAL SENTENCE

12:55PM 10    IN THIS CASE IS NOT A STATEMENT OR NOT A PUNISHMENT FOR

12:55PM 11    MS. HOLMES'S DREAM.  IT IS NOT A STATEMENT OR A PUNISHMENT FOR

12:55PM 12    MS. HOLMES'S ORIGINAL INTENT IN THE CASE, THE ORIGINAL REASON

12:55PM 13    THAT SHE STARTED THERANOS.

12:55PM 14        INSTEAD, A 15-YEAR SENTENCE IS THE RIGHT SENTENCE BECAUSE

12:56PM 15    IT'S THE SENTENCE THAT FOLLOWS THE LAW.

12:56PM 16        LET ME BEGIN BY FIRST THE 3553(A) FACTOR THE SAME WAY THAT

12:56PM 17    THE COURT BEGAN THE ANALYSIS, AND THAT IS BY FOCUSSING ON THE

12:56PM 18    NATURE AND CIRCUMSTANCES OF THE OFFENSE.

12:56PM 19        I WANT TO POINT OUT TO THE COURT THAT AS I WALK THROUGH

12:56PM 20    THESE FACTORS, I WILL DO MY BEST TO HIGHLIGHT WHICH ONES ARE

12:56PM 21    AGGRAVATING AND WHICH ONES ARE MITIGATING FACTORS SO THAT I

12:56PM 22    INTEND TO ACKNOWLEDGE WHEN A PARTICULAR FACTOR CUTS IN FAVOR OF

12:56PM 23    A LOWER SENTENCE FOR THE DEFENDANT, AND IF THE COURT IS

12:56PM 24    INCLINED TO OFFER A VARIANCE, THERE ARE A PARTICULAR BASES THAT

12:56PM 25    THE GOVERNMENT WANTS TO ACKNOWLEDGE WOULD BE AN APPROPRIATE

91

12:56PM 1    PLACE TO VARY.

12:56PM 2      THIS FIRST ONE, THOUGH, THE NATURE AND CIRCUMSTANCES OF

12:56PM 3    THE OFFENSE, IS AN AGGRAVATING FACTOR.

12:56PM 4      I WANT TO NOTE THAT IN THE DEFENSE FILING, THEY DISCUSS

12:56PM 5    OTHER FRAUD CASES WHERE THERE'S A VERY HIGH LOSS NUMBER, BUT

12:56PM 6    UNDER THE NATURE AND CIRCUMSTANCES OF THE OFFENSE, A JUDGE

12:57PM 7    VARIES.  FOR INSTANCE, THE RAKOFF OPINIONS IN THE SOUTHERN

12:57PM 8    DISTRICT OF NEW YORK OFTEN TALK ABOUT THIS.

12:57PM 9      THOSE ARE OF A DIFFERENT SORT, THOUGH.  OFTEN IN INSIDER

12:57PM 10    TRADING CASES WHERE A DEFENDANT ON ONE DAY OR A SECOND DAY TIPS

12:57PM 11    MATERIAL NON-PUBLIC INFORMATION, IT IS A DISCRETE ACT BY THE

12:57PM 12    DEFENDANT.  THAT'S VERY UNLIKE THE CASE HERE.

12:57PM 13      HERE WHAT WE HAVE IS OVER THE COURSE OF A FIVE YEAR

12:57PM 14    CONSPIRACY DAY AFTER DAY, WEEK AFTER WEEK, MONTH AFTER MONTH,

12:57PM 15    AND FINALLY YEAR AFTER YEAR MS. HOLMES MADE THE DECISION TO

12:57PM 16    DEFRAUD HER INVESTORS, AND IT WASN'T A DISCRETE TIP THAT WAS

12:57PM 17    PROVIDED TO PROFIT FROM INSIDER TRADING LIKE THOSE CASES

12:57PM 18    DISCUSSED.

12:57PM 19      INSTEAD, THE NATURE OF THIS OFFENSE IS A PARTICULARLY

12:57PM 20    PROTRACTED AND EXTENSIVE FRAUD.  THAT'S WHY THE NATURE OF THIS

12:57PM 21    OFFENSE IS UNLIKE OTHER OFFENSES AND IS AN AGGRAVATING FACTOR.

12:58PM 22      THE DEFENSE HIGHLIGHTS FOR THE COURT THE STATISTICS

12:58PM 23    REGARDING START-UP FAILURES AND ARGUES TO THE COURT THAT IT

12:58PM 24    SHOULD CONSIDER THAT WHEN ANALYZING THE NATURE AND

12:58PM 25    CIRCUMSTANCES OF THE OFFENSE.  IT THOUGH IS A LOGICAL FALLACY

92

12:58PM  1    TO SUGGEST THAT START-UPS FAIL, THERANOS WAS A START-UP, AND,

12:58PM  2    THEREFORE, THERANOS FAILED BECAUSE IT WAS A START--UP.

12:58PM  3        THAT IS NOT TRUE.  WHAT HAPPENED HERE WAS THE COURT SAW

12:58PM  4    EVIDENCE THAT IN THE 2013 TIMEFRAME AND ON A PRIOR OCCASION,

12:58PM  5    THERANOS WAS RUNNING OUT OF MONEY, AND IT WAS RUNNING OUT OF

12:58PM  6    MONEY BECAUSE ITS TECHNOLOGY DID NOT WORK.  IT WAS ON THAT

12:58PM  7    OCCASION THAT MS. HOLMES MADE THE DECISION TO DEFRAUD.

12:58PM  8        MS. HOLMES, RATHER THAN SHUT DOWN THERANOS IN 2013,

12:58PM  9    DECIDED TO GO LIVE WITH WALGREENS, DECIDED TO RECRUIT

12:58PM  10   ADDITIONAL INVESTORS.  IT FAILED BECAUSE ITS TECHNOLOGY DIDN'T

12:58PM  11   WORK.  IT DIDN'T FAIL BECAUSE A VERY HIGH PERCENTAGE OF

12:58PM  12   START-UPS FAILED.

12:58PM  13       IT IS, AGAIN, THE CASE THAT THE NATURE AND CIRCUMSTANCES

12:59PM  14   OF THIS OFFENSE ARE A PARTICULARLY AGGRAVATING FACTOR FOR THE

12:59PM  15   COURT TO CONSIDER WHEN IT ANALYZES 3553(A).

12:59PM  16       AT THE SAME TIME, THOUGH, THE DEFENSE ASKED THE COURT TO

12:59PM  17   RECOGNIZE THE LACK OF FINANCIAL GAIN BY MS. HOLMES AND THAT IS

12:59PM  18   A MITIGATING FACTOR.  THE COURT SHOULD NOTE IN ITS ANALYSIS

12:59PM  19   THAT MS. HOLMES DID NOT PROFIT.  HER INTENT IN ESTABLISHING

12:59PM  20   THERANOS DOES NOT APPEAR TO REALIZE SOME FINANCIAL GAIN, SHE

12:59PM  21   DIDN'T SELL STOCK, SHE DIDN'T REALIZE FINANCIAL GAIN FOR THAT

12:59PM  22   REASON.

12:59PM  23       AND WHEN THE COURT THINKS ABOUT INCENTIVIZING CONDUCT

12:59PM  24   THROUGH ITS SENTENCE, THERE'S AN OPPORTUNITY HERE TO RECOGNIZE

12:59PM  25   THE FORK IN THE ROAD, THE DIFFERENCE BETWEEN INDIVIDUAL

| | | |
|---|---|---|
| 12:59PM | 1 | DEFENDANTS WHO COMMIT FRAUD FOR FINANCIAL GAIN AND THOSE WHO DO |
| 12:59PM | 2 | NOT, AND THE GOVERNMENT ACKNOWLEDGES THAT THIS IS A PROPER |
| 12:59PM | 3 | BASIS FOR A VARIANCE. |
| 12:59PM | 4 | AT THE SAME TIME, THOUGH, TO PUT TOO MUCH WEIGHT ON IT, TO |
| 01:00PM | 5 | GRANT TOO LARGE A VARIANCE IGNORES THE NON-FINANCIAL BENEFITS |
| 01:00PM | 6 | THAT MS. HOLMES REALIZED THROUGH THE FRAUD, THE FAME, THE |
| 01:00PM | 7 | ADMIRATION, THE LIFESTYLE.  THESE ARE BENEFITS THAT SHE'S STILL |
| 01:00PM | 8 | RECEIVING. |
| 01:00PM | 9 | THE COURT SAW DOZENS OF LETTERS OF SUPPORT FILED ON BEHALF |
| 01:00PM | 10 | OF MS. HOLMES IN THIS CASE.  MANY OF THEM WERE THROUGH |
| 01:00PM | 11 | RELATIONSHIPS THAT SHE ESTABLISHED WHILE RUNNING THERANOS. |
| 01:00PM | 12 | THAT IS A NON-FINANCIAL BENEFIT THAT THE DEFENDANT RECEIVED |
| 01:00PM | 13 | THROUGH THE FRAUD, AND THAT'S WHY, WHILE WE RECOGNIZE THE LACK |
| 01:00PM | 14 | OF A FINANCIAL GAIN AS AN APPROPRIATE BASIS TO VARY, IT SHOULD |
| 01:00PM | 15 | BE A MODEST VARIANCE TO THE EXTENT THAT THE COURT THINKS THE |
| 01:00PM | 16 | REST OF THE NATURE AND CIRCUMSTANCES OF THE OFFENSE ARE AS THE |
| 01:00PM | 17 | GOVERNMENT SUGGESTS QUITE AGGRAVATING FACTORS. |
| 01:00PM | 18 | THE NEXT FACTOR I'LL ADDRESS IS THE HISTORY AND |
| 01:00PM | 19 | CHARACTERISTICS OF THE DEFENDANTS.  AGAIN, IN MANY INSTANCES |
| 01:01PM | 20 | THIS WOULD BE A PROPER BASIS TO VARY. |
| 01:01PM | 21 | THE COURT NOTED CRIMINAL HISTORY CATEGORY I, THAT |
| 01:01PM | 22 | MS. HOLMES HAS NO PRIOR CRIMINAL HISTORY.  THAT'S CERTAINLY |
| 01:01PM | 23 | AMONG THE MOST SIGNIFICANT FOR THE COURT TO CONSIDER SHOULD IT |
| 01:01PM | 24 | DECIDE TO VARY.  THOUGH, THAT IS ACCOUNTED FOR IN THE |
| 01:01PM | 25 | GUIDELINES.  THERE'S NOTHING PARTICULARLY UNIQUE ABOUT THIS |

94

01:01PM 1    DEFENDANT'S LACK OF CRIMINAL HISTORY.  SO THE COURT SHOULDN'T

01:01PM 2    OVEREMPHASIZE THAT, AND, IN FACT, THERE IS AN AGGRAVATING

01:01PM 3    NATURE TO HER HISTORY AND CHARACTERISTICS AND THAT IS THE

01:01PM 4    EXTENSIVE SUPPORT NETWORK THAT COMES THROUGH IN THE LETTERS.

01:01PM 5        ORDINARILY DEFENDANTS COME BEFORE THE COURT, AND IF THEY

01:01PM 6    HAVE AN EXTENSIVE SUPPORT NETWORK, A SENTENCING COURT MAY FEEL

01:01PM 7    IT NEED NOT IMPOSE SUCH A SIGNIFICANT CUSTODIAL SENTENCE OR IT

01:01PM 8    MAY NOT NEED TO ADDRESS THE CONCERNS OF SPECIFIC DETERRENCE,

01:01PM 9    SOMETHING I'LL GET TO IN A MOMENT BECAUSE AN EXTENSIVE SUPPORT

01:01PM 10   NETWORK MIGHT SPEAK TO HOW THE DEFENDANT WILL PERFORM

01:01PM 11   POST-RELEASE, THAT RECIDIVISM RATES GO DOWN WITH INDIVIDUALS

01:02PM 12   WHO HAVE EXTENSIVE SUPPORT NETWORKS.

01:02PM 13       THE LETTERS THAT MS. HOLMES PROVIDED TO THE COURT

01:02PM 14   CERTAINLY SUGGESTS THE PRESENCE OF AN EXTENSIVE SUPPORT

01:02PM 15   NETWORK.

01:02PM 16       THE PROBLEM WITH THIS AND THE REASON THIS IS AN

01:02PM 17   AGGRAVATING FACTOR IS BECAUSE THAT NETWORK WAS LARGELY PRESENT

01:02PM 18   DURING THE EXISTENCE OF THE FRAUD.

01:02PM 19       MS. HOLMES HAD THAT NETWORK AT THE TIME OF THE FRAUD AND

01:02PM 20   IN FACT IT WAS BECAUSE OF THAT NETWORK THAT SOME OF THE

01:02PM 21   INVESTORS WERE RECRUITED, AND THAT DIDN'T PREVENT THE FRAUD.

01:02PM 22       SO WHILE AN EXTENSIVE SUPPORT NETWORK ORDINARILY AS A

01:02PM 23   FACTOR OR A CHARACTERISTIC OF THE DEFENDANT MAY BE A MITIGATING

01:02PM 24   FACTOR THAT THE COURT SHOULD CONSIDER, IN THIS INSTANCE IT IS

01:02PM 25   NOT.

01:02PM 1      IN THIS INSTANCE IT IS AN AGGRAVATING FACTOR BECAUSE

01:02PM 2  NOTWITHSTANDING THE EXTENSIVE SUPPORT NETWORK, NOTWITHSTANDING

01:02PM 3  THE EDUCATIONAL OPPORTUNITIES, THE FINANCIAL HEALTH AND

01:02PM 4  STABILITY THAT MS. HOLMES GREW UP IN, THE PRIVILEGE, SHE STILL

01:02PM 5  COMMITTED THE CRIME AND IT IS BECAUSE OF THOSE REASONS THIS

01:02PM 6  FACTOR IS NOT A MITIGATING FACTOR THAT THE COURT SHOULD

01:03PM 7  CONSIDER, BUT, IN FACT, I'LL GET TO IT IN A MOMENT, SHOULD GIVE

01:03PM 8  THE COURT CONCERN WHEN WE ADDRESS SPECIFIC DETERRENCE BECAUSE

01:03PM 9  THE NETWORK EXISTED AND THE CRIME STILL OCCURRED.

01:03PM 10     THE NEXT FACTOR I WILL TURN TO IS UNDER (A)(2),

01:03PM 11  3553(A)(2), THE NEED FOR A SENTENCE IMPOSED TO REFLECT THE

01:03PM 12  SERIOUSNESS OF THE OFFENSE.  I WANT TO HIGHLIGHT FOR THE COURT

01:03PM 13  THE SPECIFIC LANGUAGE IN 3553(A)(2) BECAUSE IT RESPONDS TO AN

01:03PM 14  ARGUMENT THAT THE DEFENSE HAS MADE REGARDING COLLATERAL

01:03PM 15  CONSEQUENCES.

01:03PM 16     AS THE COURT KNOWS, (A)(2) BEGINS THE NEED FOR THE

01:03PM 17  SENTENCE IMPOSED TO REFLECT THE SERIOUSNESS OF THE OFFENSE.

01:03PM 18  THE REASON I HIGHLIGHT THAT FOR THE COURT IS THAT THE COURT,

01:03PM 19  THEREFORE, CANNOT OUTSOURCE THE WORK OF ITS SENTENCE TO THE

01:03PM 20  COLLATERAL CONSEQUENCES THAT MS. HOLMES HAS BEEN FACING BECAUSE

01:03PM 21  OF THE PUBLICITY OR NOTORIETY OR WILL CONTINUE TO FACE.

01:04PM 22     THE SENTENCE IMPOSED HAS TO DO THE WORK OF REFLECTING THE

01:04PM 23  SERIOUSNESS OF THE OFFENSE, AND THE COURT SHOULD NOT OUTSOURCE

01:04PM 24  THAT WORK TO THE COLLATERAL CONSEQUENCES.  THIS BEGS A

01:04PM 25  DISCUSSION OF A BROADER DISCUSSION OF GENERAL DETERRENCE.

96

01:04PM 1       GENERAL DETERRENCE IS PARTICULARLY IMPORTANT IN WHITE

01:04PM 2    COLLAR CASES.  THE COURT KNOWS THERE'S A LINE OF CASES THAT

01:04PM 3    DISCUSS HOW OFTEN WHITE COLLAR FRAUD CASES INVOLVE COLD,

01:04PM 4    CALCULATED DECISIONS TO COMMIT A CRIME, NOT THE IN THE HEAT OF

01:04PM 5    PASSION TYPE OF CRIME THAT ARE A LITTLE BIT HARDER TO DETER.

01:04PM 6    IN THIS INSTANCE IT OFTEN BEGS A COST BENEFIT ANALYSIS, THE

01:04PM 7    AMOUNT TO BE GAINED OR THE HARM TO BE AVOIDED THROUGH THE

01:04PM 8    POTENTIAL PUNISHMENT IMPOSED.

01:04PM 9       AND IN WHITE COLLAR OFFENSES, THERE IS THE PARTICULAR

01:04PM 10   OPPORTUNITY TO ACHIEVE THE AIMS OF GENERAL DETERRENCE THROUGH A

01:05PM 11   SIGNIFICANT CUSTODIAL SENTENCE, AGAIN, THROUGH THE SENTENCE

01:05PM 12   IMPOSED NOT THROUGH THE PREEXISTING OR CURRENTLY EXISTING

01:05PM 13   COLLATERAL CONSEQUENCES.

01:05PM 14      THERE ALSO IS AN OPPORTUNITY FOR GENERAL DETERRENCE

01:05PM 15   BECAUSE OF THE EXTENSIVE COVERAGE OF THIS CASE.  AND I WANT TO

01:05PM 16   TOUCH ON SOMETHING THAT THIS DISCUSSION BEGS, AND THAT IS, IT

01:05PM 17   MAY BE UNCOMFORTABLE FOR SENTENCING COURTS, AND THEY MAY BE

01:05PM 18   RIGHT TO BE APPREHENSIVE ABOUT IMPOSING A SIGNIFICANT CUSTODIAL

01:05PM 19   SENTENCE IN A CASE THAT HAPPENS TO HAVE MEDIA ATTENTION AS

01:05PM 20   OPPOSED TO CASES THAT DON'T.

01:05PM 21      MEDIA ATTENTION PROVIDES THE OPPORTUNITY FOR GENERAL

01:05PM 22   DETERRENCE TO A GREATER DEGREE THAN IF THERE WERE NO COVERAGE.

01:05PM 23      THAT TYPE OF ARGUMENT MAY BE UNCOMFORTABLE BECAUSE IT

01:05PM 24   SEEMS TO INVITE SOMETHING THAT THE DEFENDANT HAS NO CONTROL

01:05PM 25   OVER INTO THIS COURT'S SENTENCING ANALYSIS.

01:05PM 1         THE REASON WHY THAT ISN'T A CONCERN IN THIS CASE IS

01:05PM 2    BECAUSE THE ATTENTION WAS BROUGHT BY THE DEFENDANT.  THE

01:06PM 3    DEFENDANT APPRECIATED, IN FACT, HE USED AS A TOOL OF THE FRAUD

01:06PM 4    JOURNALISTS AND MEDIA ATTENTION, AND IT IS NOW THAT SHE'S

01:06PM 5    DISCUSSING THESE SIGNIFICANT COLLATERAL CONSEQUENCES WHEN THE

01:06PM 6    ARTICLES ARE NEGATIVE, MS. HOLMES WANTS A BENEFIT FOR THE

01:06PM 7    COLLATERAL CONSEQUENCES, BUT WHEN THEY WERE POSITIVE, THEY WERE

01:06PM 8    A TOOL OF THE FRAUD.

01:06PM 9        THE COURT A MOMENT AGO NOTED, AND I'LL REMIND THE COURT OF

01:06PM 10    THE 2013 "WALL STREET JOURNAL" ARTICLE, MS. HOLMES HAD A COPY

01:06PM 11    OF THE ARTICLE PREPUBLICATION, SAW ITS FALSE STATEMENTS, STILL

01:06PM 12    APPROVED IT, AND THEN SENT THE ARTICLE TO INVESTORS.

01:06PM 13        THE SAME IS TRUE OF THE 2014 ROGER PARLOFF PIECE IN

01:06PM 14    "FORTUNE," AND ROGER PARLOFF IN FACT A YEAR LATER IN 2015 HAD

01:06PM 15    TO WRITE A PIECE THAT WAS TITLED "HOW THERANOS MISLED ME."

01:06PM 16        IT IS BECAUSE OF THAT, THAT THE COURT SHOULD NOT HAVE THE

01:06PM 17    SAME CONCERNS REGARDING THE EMPHASIS ON GENERAL DETERRENCE THAT

01:07PM 18    IT MIGHT IN OTHER INSTANCES.  THE COURT MIGHT FEEL IT UNFAIR TO

01:07PM 19    TAKE ADVANTAGE OF AN OPPORTUNITY TO PROMOTE GENERAL DETERRENCE

01:07PM 20    IF THE DEFENDANT HAD NO CONTROL OVER THE MAGNIFICATION OF THE

01:07PM 21    NOTICE OF THE SENTENCE.  THAT ISN'T THE CASE HERE.

01:07PM 22        THE FACTS ARE THE ATTENTION WAS DESIRED BY MS. HOLMES, WAS

01:07PM 23    BROUGHT IN AND ACTUALLY WAS A TOOL OF THE FRAUD, AND IT'S FOR

01:07PM 24    THAT REASON THAT I THINK THE COURT CAN EMPHASIZE THE PARTICULAR

01:07PM 25    VALUE OF GENERAL DETERRENCE, NOT JUST IN WHITE COLLAR CASES

98

01:07PM 1    BROADLY, BUT IN THIS CASE SPECIFICALLY.

01:07PM 2        LET ME NOW TURN TO SPECIFIC DETERRENCE.

01:07PM 3        THE DEFENSE SUGGESTS THAT THERE IS ESSENTIALLY NO CHANCE

01:07PM 4    MS. HOLMES RUNS A PUBLIC COMPANY.  WHILE THE S.E.C. RESOLUTION

01:07PM 5    ONLY INCLUDED A TEN YEAR BAN, THE CHANCES THAT MS. HOLMES RUNS

01:07PM 6    A COMPANY IN THE FUTURE ARE QUITE LOW, AND FOR THAT REASON THE

01:07PM 7    COURT SHOULD NOT FEEL THE NEED TO DETER HOLMES FROM FUTURE

01:08PM 8    CRIMES.

01:08PM 9        THAT THOUGH MISSES THE POINT.  THE MOST SIGNIFICANT FACTOR

01:08PM 10   THAT THE COURT SHOULD CONSIDER IN EVALUATING HOW MUCH IT NEEDS

01:08PM 11   TO EMPHASIZE SPECIFIC DETERRENCE IS ACKNOWLEDGEMENT OF THE

01:08PM 12   FRAUD BY THE DEFENDANT.

01:08PM 13       WHEN DEFENDANTS COME BEFORE THE COURT AND THE COURT HEARS

01:08PM 14   STATEMENTS OR OBSERVES CONDUCT THAT GIVES THE COURT CONFIDENCE

01:08PM 15   THAT THE DEFENDANT REALLY UNDERSTANDS WHAT SHE OR HE DID, THE

01:08PM 16   COURT CAN THEN LOWER ITS EMPHASIS ON THE NEED TO SPECIFICALLY

01:08PM 17   DETER THIS DEFENDANT AND FIND THIS FACTOR TO BE MITIGATED.

01:08PM 18       THAT IS, AGAIN, NOT THE CASE HERE.  THIS IS AN AGGRAVATING

01:08PM 19   FACTOR BECAUSE THERE IS NO ACKNOWLEDGEMENT BY MS. HOLMES OF THE

01:08PM 20   FRAUDULENT NATURE OF HER CONDUCT.

01:08PM 21       THE COURT WILL RECALL DURING TESTIMONY IN TRIAL WHEN

01:08PM 22   MS. HOLMES ADDRESSED THIS IDEA, SHE OFTEN USED A PASSIVE VOICE,

01:08PM 23   FOR INSTANCE, MISTAKES WERE MADE AT THERANOS.  THAT'S A VERY

01:08PM 24   DIFFERENT SORT THAN THE TYPE OF STATEMENTS THAT THE COURT

01:09PM 25   SHOULD EXPECT TO HEAR IF IT WANTS TO DEVALUE SPECIFIC

01:09PM  1    DETERRENCE.

01:09PM  2        I WILL REMIND THE COURT BUT NOT REPEAT THE ARGUMENTS I

01:09PM  3    MADE A MOMENT AGO ABOUT THE EXTENSIVE SUPPORT NETWORK THAT

01:09PM  4    MS. HOLMES ENJOYED DURING THE EXISTENCE OF THE FRAUD AND THAT

01:09PM  5    COME THROUGH IN THE SUPPORT LETTERS.

01:09PM  6        AN EXTENSIVE SUPPORT NETWORK SHOULD GIVE THE COURT IN MANY

01:09PM  7    INSTANCES COMFORT THAT SPECIFIC DETERRENCE IS A FACTOR AND IT

01:09PM  8    CAN WEIGH LESS SIGNIFICANTLY, EXCEPT IN THIS CASE THAT NETWORK

01:09PM  9    EXISTED DURING THE FRAUD.  SO THE KINDS OF THINGS THAT WOULD

01:09PM  10   GIVE THE COURT COMFORT TO DEVALUE SPECIFIC DETERRENCE ARE NOT

01:09PM  11   PRESENT HERE, AND FOR THAT REASON SPECIFIC DETERRENCE ALSO IS

01:09PM  12   SOMETHING THAT WEIGHS IN FAVOR OF A SIGNIFICANT CUSTODIAL

01:09PM  13   SENTENCE.

01:09PM  14       THIS PART OF SECTION 3553 ALSO ASKS THE COURT TO CONSIDER

01:09PM  15   JUST PUNISHMENT AND RESPECT FOR THE LAW, AND I WANT TO REMIND

01:10PM  16   THE COURT OF THE ARGUMENTS I MADE A MOMENT AGO ABOUT THE

01:10PM  17   SENTENCE IMPOSED NEEDING TO DO THAT WORK.  IT IS NOT THE

01:10PM  18   COLLATERAL CONSEQUENCES OR THE OTHER EFFECTS OF THE

01:10PM  19   PROSECUTION, THE TRIAL, THE CONVICTION, OR THIS SENTENCING

01:10PM  20   PROCEEDING THAT CAN TAKE THE PLACE OF THE SENTENCE ITSELF.  THE

01:10PM  21   SENTENCE IS THE THING THAT CAUSES THE RESPECT FOR THE LAW, THAT

01:10PM  22   ACKNOWLEDGES THE SERIOUSNESS OF THE OFFENSE.

01:10PM  23       I WILL REMIND THE COURT THAT THIS CASE, THE CONVICTIONS

01:10PM  24   RECOGNIZED REAL HARMS THAT WERE COMMITTED THROUGH THE OFFENSE.

01:10PM  25       THE COURT MAY RECALL MS. HOLMES PROVIDED A SECOND SET OF

01:10PM 1    SUPPORT LETTERS AND TITLED THEM APPENDIX A-1, AND THEY CAME IN

01:10PM 2    AFTER THE ORIGINAL GROUP OF LETTERS.

01:10PM 3        IN THAT PACKAGE THERE WAS A LETTER FROM AN INDIVIDUAL WHO

01:10PM 4    DISCUSSED A MEDICAL CONDITION AND BECAUSE OF THAT MEDICAL

01:10PM 5    CONDITION ASKED THE COURT NOT TO SENTENCE MS. HOLMES TO CUSTODY

01:10PM 6    BECAUSE IF THE COURT DID, IT WOULD DISCOURAGE OTHER INVENTORS

01:11PM 7    FROM INVENTING A TYPE OF TECHNOLOGY OR MEDICINE THAT THIS

01:11PM 8    AUTHOR NEEDED, AND THE CONCERN EXPRESSED WAS THAT PEOPLE WON'T

01:11PM 9    WANT TO ENGAGE IN THIS TYPE OF, YOU KNOW, INNOVATION IF THE

01:11PM 10   COURT IMPRISONS MS. HOLMES, AND THE GOVERNMENT SUBMITS THAT THE

01:11PM 11   AUTHOR GETS IT ACTUALLY WRONG.

01:11PM 12       ACTUALLY, WHAT HAPPENED HERE IS INVESTORS WHO WOULD HAVE

01:11PM 13   FUNDED LEGITIMATE TECHNOLOGY, NOT JUST REAL COMPANIES BUT

01:11PM 14   COMPANIES WITH REAL PRODUCTS, INSTEAD FUNDED THIS COMPANY.  IT

01:11PM 15   WAS AN OPPORTUNITY COST ARGUMENT.

01:11PM 16       PFM, FOR INSTANCE, FUNDS TECHNOLOGY IN THE HEALTH CARE

01:11PM 17   SPACE.  THEY FUNDED THERANOS AND NOT SOMETHING ELSE.  IT IS

01:11PM 18   PRECISELY THE HARM CAUSED BY RECRUITING INVESTOR FUNDS THAT

01:11PM 19   MEANS OTHER PREMISING TECHNOLOGY WAS NOT FUNDED AND THAT IS A

01:11PM 20   REAL WORLD HARM.

01:11PM 21       WE'RE HAVING THIS DISCUSSION IN SILICON VALLEY.  THE COURT

01:12PM 22   KNOWS THAT THAT WORK BEGS A RELATIONSHIP BETWEEN INVESTORS AND

01:12PM 23   INNOVATOR, THAT IT IS OFTEN THE CASE THAT AN INVENTION IN A

01:12PM 24   COMPANY NEED FUNDING BEFORE THEY'RE PROFITABLE.

01:12PM 25       THAT RELATIONSHIP BETWEEN INNOVATORS AND INVESTORS RELIES

01:12PM 1    AT LEAST IN PART ON TRUST.  MS. HOLMES AND THERANOS DESTROYED

01:12PM 2    THAT TRUST.  IT HURT THE ECONOMY, NOT JUST THE LOCAL ECONOMY,

01:12PM 3    BUT THE WORK THAT'S DONE IN THE VALLEY WHEN THAT TRUST IS

01:12PM 4    DESTROYED.  AND THE COURT IMPOSING A SIGNIFICANT CUSTODIAL

01:12PM 5    SENTENCE DOES THE WORK OF REPAIRING THAT TRUST SO THAT

01:12PM 6    PRECISELY THE TYPE OF INVENTIONS THAT THE AUTHOR OF THIS LETTER

01:12PM 7    IS BEGGING THE COURT TO ALLOW TO PROCEED BECOME POSSIBLE

01:12PM 8    THROUGH A SIGNIFICANT CUSTODIAL SENTENCE.

01:12PM 9        WHEN THIS COURT IMPOSES A SENTENCE, IT DOES THE WORK OF

01:12PM 10   REPAIRING THAT RELATIONSHIP BETWEEN INNOVATORS AND INVESTORS SO

01:13PM 11   THAT THE NEXT GENERATION OF TECHNOLOGICAL INNOVATION CAN OCCUR

01:13PM 12   AND SO THAT THE TRUST THAT IS NECESSARY IS REPAIRED.

01:13PM 13       TO THINK OTHERWISE, TO THINK THAT A SIGNIFICANT VARIANCE

01:13PM 14   WOULD BE APPROPRIATE, TO THINK THAT THE GOVERNMENT'S SENTENCE

01:13PM 15   IS TOO HIGH OR A GUIDELINE SENTENCE IS TOO HIGH IN THIS CASE,

01:13PM 16   OVEREMPHASIZES THINGS LIKE MS. HOLMES'S ORIGINAL INTENT WHEN

01:13PM 17   SHE ESTABLISHED THERANOS, IT OVEREMPHASIZES THE STORY OF

01:13PM 18   MS. HOLMES THAT'S PAINTED IN THE SUPPORT LETTER BECAUSE ALL OF

01:13PM 19   THAT, HER ORIGINAL INTENT AND THE STORY PAINTED IN THE LETTERS,

01:13PM 20   IGNORES THE GRAVITY OF THE OFFENSE.  IT IGNORES THE FIVE YEARS

01:13PM 21   OF FRAUD.  IT IGNORES THE DAY-AFTER-DAY FALSE STATEMENTS THAT

01:13PM 22   WERE COMMUNICATED TO INVESTORS.

01:13PM 23       IN ORDER TO CONCLUDE THAT A SENTENCE THAT MIRRORS THE

01:13PM 24   SENTENCE REQUESTED BY THE DEFENSE, IN ORDER TO CONCLUDE THAT

01:14PM 25   THAT IS A REASONABLE SENTENCE, THE COURT WOULD OVEREMPHASIZE

102

01:14PM 1    THINGS LIKE HER ORIGINAL INTENT AND THE SUPPORT LETTERS AND NOT

01:14PM 2    PLACE ENOUGH WEIGHT, MAYBE NOT PLACE ANY WEIGHT, ON THE CRIME

01:14PM 3    AT HAND, THE EXTENSIVE NATURE OF THE CRIME.

01:14PM 4        AND WHEN THE COURT PROPERLY BALANCES, WHEN IT RECOGNIZES

01:14PM 5    BOTH THE NATURE AND CIRCUMSTANCES OF THE OFFENSE AND THE

01:14PM 6    HISTORY AND CHARACTERISTICS OF MS. HOLMES WITH THE FACTS THAT

01:14PM 7    THE DEFENSE IS ASKING THE COURT TO CONSIDER, THINGS LIKE HER

01:14PM 8    ORIGINAL INTENT AND THE SUPPORT LETTERS, THE COURT REALIZES

01:14PM 9    THAT A PROPER SENTENCE IS CONSISTENT WITH THE SENTENCE THAT THE

01:14PM 10    GOVERNMENT IS REQUESTING IN THIS CASE.

01:14PM 11    THE GOVERNMENT WOULD ASK THE COURT TO IMPOSE 15 YEARS.

01:14PM 12    THANK YOU.

01:14PM 13        THE COURT:  THANK YOU.

01:14PM 14    MR. DOWNEY, DO YOU WISH TO BE HEARD?

01:14PM 15        MR. DOWNEY:  I DO, YOUR HONOR.

01:15PM 16    LET ME SAY, YOUR HONOR, AS WE'VE REACHED THE POINT WHERE

01:15PM 17    THE COURT IMPOSES SENTENCE, IT'S ALMOST BECOME A TRITE

01:15PM 18    STATEMENT TO SAY THAT THIS CASE HAS BEEN THE SUBJECT OF

01:15PM 19    SIGNIFICANT PUBLIC ATTENTION, BUT IT HAS ALSO BEEN THE SUBJECT

01:15PM 20    OF SIGNIFICANT COURT ATTENTION AND SIGNIFICANT JUDICIAL

01:15PM 21    ATTENTION.  WE'VE HAD DOZENS OF PRETRIAL HEARINGS, AND WE HAD A

01:15PM 22    LENGTHY TRIAL.  OF COURSE THERE WAS A RELATED TRIAL.

01:15PM 23    SO I WANT TO SAY THAT I AM KEENLY AWARE THAT THE COURT IS

01:15PM 24    AWARE OF THE FACTS OF THE CASE AND THE FULL RECORD IN

01:15PM 25    CONNECTION WITH THE CASE, AND IT'S BEEN A SIGNIFICANT MATTER

01:15PM 1    FOR EVERYONE INVOLVED, FOR THE LAWYERS, FOR THE COURT STAFF AND

01:15PM 2    THE COURT, BUT, OF COURSE, THE PERSON FOR WHOM IT IS MOST

01:16PM 3    SIGNIFICANT AT THIS POINT IS MS. HOLMES WHOM THERE IS ABOUT TO

01:16PM 4    BE IMPOSED A SENTENCE, AND IT IS ALSO SIGNIFICANT FOR THOSE

01:16PM 5    INDIVIDUALS INVOLVED IN THE OFFENSES THAT HAVE BEEN THE SUBJECT

01:16PM 6    OF A CONVICTION BY THE JURY.

01:16PM 7        I THINK THE METHOD THAT I'D LIKE TO GO THROUGH IS SIMILAR

01:16PM 8    TO MR. SCHENK'S METHOD OF REVIEWING THE STATUTORY FACTORS, BUT

01:16PM 9    I THINK THAT HE EMPHASIZES CERTAIN OF THE FACTORS AND IGNORES

01:16PM 10   OTHERS THAT ARE QUITE IMPORTANT, SO I'D LIKE TO DEVOTE SOME

01:16PM 11   ATTENTION TO THOSE FACTORS.

01:16PM 12       AS THE COURT KNOWS, WE HAVE REQUESTED A VARIANCE FROM THE

01:16PM 13   RECOMMENDATION OF PROBATION IN THE CASE.  WE, AGAIN, REQUEST

01:16PM 14   THAT VARIANCE IN CONNECTION WITH THE COURT'S RECOMMENDATION OR

01:16PM 15   THE COURT'S GUIDELINE CALCULATION.

01:16PM 16       THE COURT WELL KNOWS, ALTHOUGH WE START WITH THE

01:16PM 17   GUIDELINES, THAT'S NEVER AN ENDING ANALYSIS, AND THE COURT

01:16PM 18   PERFORMS ITS OWN ANALYSIS AS TO WHAT IS A REASONABLE SENTENCE.

01:17PM 19       I'D LIKE TO START WITH WHAT THE STATUTE TEACHES US IS THE

01:17PM 20   FIRST FACT, THE NATURE AND CIRCUMSTANCES OF THE OFFENSE AND THE

01:17PM 21   CHARACTERISTICS OF THE DEFENDANT.

01:17PM 22       I WOULD SAY VERY LITTLE REALLY WAS SAID BY MR. SCHENK

01:17PM 23   ABOUT THE CHARACTERISTICS OF THE DEFENDANT, AND SO I'LL COMMENT

01:17PM 24   ON THAT A BIT MORE.  BUT LET ME TALK ABOUT THE NATURE AND

01:17PM 25   CIRCUMSTANCES OF THIS OFFENSE.

01:17PM 1      THE OFFENSE, OF COURSE, IS WIRE FRAUD.  AND AS THE COURT

01:17PM 2   KNOWS THAT EVERY GREAT CRIME, BE IT FRAUD OR SOMETHING ELSE,

01:17PM 3   HAS A MOTIVE, BE IT ANGER, BE IT JEALOUSY, BE IT AS ALLEGED IN

01:17PM 4   MANY CASES INVOLVING WIRE FRAUD, BE IT GREED.

01:17PM 5      AND IT IS, OF COURSE, A CASE THAT I THINK ALMOST EVERY

01:17PM 6   SINGLE CASE CITED AS COMPARATORS IN THE GOVERNMENT'S MEMORANDA,

01:17PM 7   THERE WERE ACTS IN CONNECTION WITH THOSE CASES OF TREMENDOUS

01:18PM 8   GREED, INDIVIDUALS PARTICIPATING IN ACTS, NOT ONLY ACTS THAT

01:18PM 9   WERE THE SUBJECT CHARGED, BUT THEIR BEHAVIOR THROUGHOUT THEIR

01:18PM 10  TIME RUNNING THEIR COMPANIES THAT SPOKE OF TREMENDOUS GREED AND

01:18PM 11  LED TO THE CONDUCT THAT WAS ULTIMATELY THE SUBJECT OF

01:18PM 12  CONVICTION.

01:18PM 13     WE LOOK HERE AT THE CONDUCT THAT OCCURRED DURING THE

01:18PM 14  OFFENSE PERIOD WITH REGARD TO ANY MOTIVE OF GREED.  WE DON'T

01:18PM 15  SEE THAT.

01:18PM 16     BUT IT'S NOT SOMETHING TO GIVE SHORT SHRIFT TO BECAUSE THE

01:18PM 17  GOVERNMENT'S THEORY IS THAT MS. HOLMES WAS BUILDING THIS

01:18PM 18  COMPANY, THAT ULTIMATELY PERHAPS THERE WAS SOME FINANCIAL

01:18PM 19  BENEFIT FOR HER IN IT.

01:18PM 20     BUT WHAT DO WE ACTUALLY SEE IN THE RECORD OF THE CASE?  WE

01:18PM 21  SEE THAT YEAR IN AND YEAR OUT OPPORTUNITIES WERE PRESENTED TO

01:18PM 22  MS. HOLMES TO BECOME A VERY WEALTHY INDIVIDUAL, WEALTHY BEYOND

01:19PM 23  HER WILDEST IMAGINATION.

01:19PM 24     THE RECORD AT TRIAL REFLECTED THAT SHE WAS OFFERED TENS OF

01:19PM 25  MILLIONS OF DOLLARS FOR STOCK.  IN 2010, BEFORE THE CONSPIRACY

01:19PM 1   BEGAN, SHE DECLINED THAT OFFER.

01:19PM 2       WE KNOW THAT IN CONNECTION WITH THE PEER ENTITY THAT

01:19PM 3   YOUR HONOR MENTIONED IN CONNECTION WITH HIS GUIDELINE

01:19PM 4   CALCULATION, THAT THERE WERE INVESTORS RELATED TO THAT ENTITY

01:19PM 5   WHO ASKED HER TO SELL STOCK TO THEM AT A SIGNIFICANT PREMIUM

01:19PM 6   WHICH SHE DECLINED IN 2011 AND 2012.

01:19PM 7       WE KNOW IN THE FALL OF 2014 WHEN TWO OF THE OFFENSES THAT

01:19PM 8   ARE THE SUBJECT OF CONVICTION OF CONDUCT THAT RELATES TO THEM

01:19PM 9   WAS ONGOING.  WE KNOW THAT MS. HOLMES WAS OFFERED THE

01:19PM 10  OPPORTUNITY BY ANOTHER INVESTOR TO PARTICIPATE IN A CONVERTIBLE

01:19PM 11  FACILITY WHERE SHE COULD HAVE ACCESSED HUNDREDS OF MILLIONS OF

01:20PM 12  DOLLARS, HUNDREDS OF MILLIONS OF DOLLARS.  SHE DECLINED.  SHE

01:20PM 13  DECLINED ENTERING INTO THE ARRANGEMENT AT ALL.

01:20PM 14      THE COURT KNOWS FROM OUR CALCULATION OF GAIN WHICH WE

01:20PM 15  PROPOSE IN CONNECTION WITH THE GUIDELINE CALCULATION, THAT

01:20PM 16  MS. HOLMES'S SALARY WAS NOT THE TYPE OF SALARY THAT WE

01:20PM 17  TYPICALLY HEAR IN CONNECTION WITH THESE KINDS OF CASES.

01:20PM 18      SO, YOUR HONOR, WE KNOW THE CASES THAT DRAW A STIFF

01:20PM 19  SENTENCE AND THE CASES WHERE GUIDELINES -- THE GUIDELINES ARE

01:20PM 20  ADHERED TO, AND THEY OFTEN ARE FOR WIRE FRAUD, AND I

01:20PM 21  ACKNOWLEDGE THAT.

01:20PM 22      BUT THOSE ARE THE CASES, YOUR HONOR, WITH THE YACHTS AND

01:20PM 23  WITH THE PLANES AND WITH THE LARGE MANSIONS AND WITH THE

01:20PM 24  PARTIES BOUGHT BY THE PROCEEDS OF THE CRIME.

01:20PM 25      WHAT DID THIS WOMAN DO IN CONNECTION WITH THE MONIES THAT

01:21PM 1    ARE THE SUBJECT OF CONVICTION?  SHE BUILT TECHNOLOGY.  THE

01:21PM 2    MONEY THAT IS THE SUBJECT OF CONVICTION HERE WAS NOT USED FOR

01:21PM 3    ANY PERSONAL BENEFIT, IT WAS USED TO BUILD MEDICAL TECHNOLOGY.

01:21PM 4        NOW, MR. SCHENK SAYS IN PASSING, THE TECHNOLOGY DIDN'T

01:21PM 5    WORK.  THAT'S WHAT MR. SCHENK SAID.

01:21PM 6        WELL, WHAT IN FRONT OF YOUR HONOR TELLS YOU EXACTLY THE

01:21PM 7    OPPOSITE?  WE KNOW THAT A PORTFOLIO OF INTELLECTUAL PROPERTY

01:21PM 8    WAS BUILT AND IT WAS WORTH HUNDREDS OF MILLIONS OF DOLLARS.

01:21PM 9        BOARD MEMBERS OF THERANOS FROM THE PERIOD AFTER 2015 HAVE

01:21PM 10   WRITTEN TO YOU AND SAID THIS WAS ABOUT TO BE MADE COMMERCIAL

01:21PM 11   WHEN THE GOVERNMENT RETURNED ITS INDICTMENT IN THAT MATTER.

01:21PM 12       THOSE WHO EVALUATED THE TECHNOLOGY AS PART OF OUTSIDE

01:21PM 13   EVALUATIONS THAT THERANOS ASKED FOR, DR. SUE EVANS, WROTE TO

01:21PM 14   YOUR HONOR AND SAID THIS TYPE OF TECHNOLOGY WAS INCREDIBLY

01:21PM 15   PROMISING AND OTHERS ARE EXPLOITING THAT TECHNOLOGY TODAY.

01:22PM 16       SO WE DON'T HAVE A CRIME ALONG THE LINES OF A GREAT CRIME

01:22PM 17   WHERE THERE IS A MOTIVATION THAT IS ROOTED IN THE AVARICE OF

01:22PM 18   THE DEFENDANT.

01:22PM 19       WE HAVE A CONVICTION FOR A CRIME WHERE THE DEFENDANT'S

01:22PM 20   MOTIVE WAS TO BUILD MEDICAL TECHNOLOGY, WHERE THAT DEFENDANT

01:22PM 21   SUCCEEDED IN SUBSTANTIAL PART IN BUILDING THAT MEDICAL

01:22PM 22   TECHNOLOGY, AND ALONG THE WAY HAD THE OPPORTUNITY, WHETHER BY

01:22PM 23   LEGITIMATE MEANS OR ILLEGITIMATE MEANS, TO ENRICH HERSELF, AND

01:22PM 24   SHE NEVER DID THAT, DID NOT TAKE A SINGLE PENNY ALONG THOSE

01:22PM 25   LINES.

01:22PM 1      TO SENTENCE HER IN A MANNER THAT IS CONSISTENT WITH

01:22PM 2    WORLDCOM AND ENRON AND ADELPHIA AND COMPUTER ASSOCIATES IS TO

01:22PM 3    PUT HER IN A CATEGORY THAT DOESN'T MATCH THE UNDERLYING

01:22PM 4    BEHAVIOR SHE WAS ENGAGED IN DURING THE OFFENSE CONDUCT

01:22PM 5    WHATSOEVER.

01:22PM 6      NOW, I WANT TO TALK ABOUT THE GENERAL CHARACTERISTICS OF

01:23PM 7    THE OFFENDER.  THAT WAS SOMETHING THAT MR. SCHENK ACKNOWLEDGED

01:23PM 8    IN PASSING AS AN ELEMENT OF WHAT THE COURT HAD TO CONSIDER, BUT

01:23PM 9    IT WAS NOT SOMETHING THAT HE DWELLED ON.

01:23PM 10      I THINK THE BEST WINDOW INTO THAT HAS BEEN LAID FOR

01:23PM 11   YOUR HONOR BY THE LETTERS THAT HAVE BEEN SUBMITTED TO THE COURT

01:23PM 12   IN CONNECTION WITH THIS SENTENCING PROCEEDING.

01:23PM 13      BUT WHAT I WOULD SAY TO THE COURT IS THAT YOU CAN HEAR

01:23PM 14   EVERYTHING THAT THE GOVERNMENT HAS SAID THROUGHOUT THE CASE,

01:23PM 15   WHAT MR. BOSTIC SAID THIS MORNING, WHAT MR. SCHENK SAID THIS

01:23PM 16   AFTERNOON, AND YOU CAN COMPARE IT TO WHAT THE PEOPLE WHO

01:23PM 17   ACTUALLY KNOW MS. HOLMES HAVE SAID ABOUT HER CHARACTERISTICS AS

01:23PM 18   AN INDIVIDUAL.

01:23PM 19      SO THEIR RECITATION OF WHO MS. HOLMES IS, IS THAT SHE IS

01:24PM 20   SOMEONE WHO IGNORED EMPLOYEE WARNINGS, FOR EXAMPLE, ABOUT

01:24PM 21   SAFETY, WHO WAS DISRESPECTFUL OF EMPLOYEE'S OPINIONS ON THE

01:24PM 22   TECHNOLOGY.

01:24PM 23      YOU HAVE LETTERS IN FRONT OF YOU FROM ANY NUMBER OF

01:24PM 24   EMPLOYEES SAYING THAT SHE WAS THE BEST CEO THAT I EVER WORKED

01:24PM 25   FOR, SHE WAS AN EMPLOYEE-FOCUSSED CEO, SHE WAS AN EMPLOYEE WHO

108

01:24PM 1    WANTED TO KNOW OUR OPINIONS, SHE WAS AN EMPLOYEE WHO ASKED US

01:24PM 2    WHETHER WHAT WAS BEING DONE WAS THE CORRECT APPROACH, AND

01:24PM 3    THAT'S NOT MERELY, YOUR HONOR, POST-2015.

01:24PM 4        YOU HAVE BEFORE YOU LETTERS FROM THERANOS EMPLOYEES

01:24PM 5    DURING -- FROM THE TIME PERIOD, THE FIRST DAY THERANOS WAS

01:24PM 6    OPENED UNTIL THE DAY THERANOS CLOSED IN 2018, AND YOU HAVE ALL

01:24PM 7    KINDS OF EMPLOYEES WHO HAVE SUBMITTED LETTERS IN CONNECTION AT

01:24PM 8    WHATEVER FUNCTION, MACHINIST, SECURITY PERSONNEL, SCIENTIST,

01:24PM 9    PEOPLE WHO WORKED AT DIFFERENT ELEMENTS OF MANUFACTURING,

01:25PM 10   PEOPLE WHO WORK IN DIFFERENT ELEMENTS OF EVALUATION OF THE

01:25PM 11   TECHNOLOGY, AND THEY HAVE ALL SPOKEN OF MS. HOLMES AS

01:25PM 12   OPEN-MINDED, COMPASSIONATE, WANTING TO KNOW WHERE THE COMPANY

01:25PM 13   WAS OFF TRACK AND REACTIVE TO RECOMMENDATIONS AS TO HOW THE

01:25PM 14   COMPANY COULD GET BACK ON TRACK.

01:25PM 15       THAT, YOUR HONOR, IS A VERY DIFFERENT OFFENDER THAN ANY

01:25PM 16   OFFENDER WHO RECEIVES A SENTENCE IN THE RANGE EITHER THAT IS

01:25PM 17   THE GUIDELINE CALCULATION ORIGINALLY PUT FORWARD BY PROBATION,

01:25PM 18   YOUR HONOR'S GUIDELINE CALCULATION, OR EVEN I WOULD SAY,

01:25PM 19   YOUR HONOR, THE RECOMMENDATION FOR THE SENTENCE THAT IS

01:25PM 20   ULTIMATELY MADE IN CONNECTION WITH THE PSR.

01:25PM 21       LET ME NOW TURN TO SOME OF THE FACTORS ENUMERATED IN

01:25PM 22   3553(B).  LET ME FIRST TALK, YOUR HONOR, ACTUALLY ABOUT BOTH

01:26PM 23   FORMS OF DETERRENCE, AND LET ME ADDRESS SOME OF THE COMMENTS

01:26PM 24   THAT MR. SCHENK MADE AS TO THE ROLE THAT DETERRENCE PLAYS IN

01:26PM 25   CONNECTION WITH THIS PARTICULAR MATTER.

01:26PM 1          I THINK THE FIRST PREMISE WHICH MR. SCHENK ARTICULATES,

01:26PM 2    WHICH HAS BEEN ARTICULATED BY THE GOVERNMENT THROUGHOUT THE

01:26PM 3    CASE IS THAT MS. HOLMES SOUGHT THIS MEDIA COVERAGE, AND,

01:26PM 4    THEREFORE, IF THERE HAS BEEN A PUNITIVE COMPONENT THAT

01:26PM 5    ACCOMPANIES THE MEDIA COVERAGE, THAT THAT IS IN ESSENCE

01:26PM 6    SELF-INFLICTED.

01:26PM 7          WELL, YOUR HONOR, THAT'S NOT CONSISTENT WITH THE RECORD

01:26PM 8    THAT WAS SUBMITTED IN CONNECTION WITH THE CASE.  WE KNOW THAT

01:26PM 9    MS. HOLMES RECEIVED ADVICE IN THE FALL OF 2012 FROM COMMERCIAL

01:26PM 10   PARTNERS, WALGREENS AND SAFEWAY, THAT SHE WAS NOT TAKING THE

01:26PM 11   STEPS THAT SHE NEEDED TO TAKE TO PUBLICIZE THE COMPANY SO THAT

01:27PM 12   THE PRODUCT WOULD BE KNOWN, SO THAT WHEN THERE WAS A COMMERCIAL

01:27PM 13   LAUNCH OF THE PROGRAM, THERE WOULD BE ENTHUSIASM ABOUT THERANOS

01:27PM 14   AND ABOUT THERANOS'S TECHNOLOGY.  THAT IS THE BEGINNING OF A

01:27PM 15   MEDIA RELATIONSHIP FOR THERANOS.

01:27PM 16         IN FACT, THAT WAS FOLLOWED BY ADVICE FROM BOARD MEMBERS AT

01:27PM 17   THERANOS AS HOW TO DO THAT, TO FOCUS ON PARTICULAR ELEMENTS OF

01:27PM 18   MESSAGING, TO FOCUS ON MS. HOLMES AS AN INVENTOR, ET CETERA,

01:27PM 19   ET CETERA, ET CETERA.

01:27PM 20         I DON'T THINK IN THE GOVERNMENT'S HEART OF HEARTS THEY

01:27PM 21   REALLY BELIEVE THAT MS. HOLMES DESERVES THE MEDIA ATTENTION

01:27PM 22   THAT SHE HAS RECEIVED IN A NEGATIVE FASHION.

01:27PM 23         I THINK THEY SAY THAT TO YOU BECAUSE THEY WANTED TO

01:27PM 24   MINIMIZE THE SIGNIFICANCE THAT ATTACHES TO IT IN ORDER FOR THE

01:27PM 25   COURT'S CONSIDERATION OF THE SENTENCE.

110

01:27PM 1    I WOULD SAY MR. SCHENK'S CONSTRUCTION OF THE STATUTE, WITH

01:28PM 2    ALL DUE RESPECT, IS FLAWED.  A DEFENDANT IS SENTENCED.  IT'S

01:28PM 3    NOT AN ABSTRACT SENTENCE.  A PARTICULAR DEFENDANT IS SENTENCED

01:28PM 4    EVERY TIME THAT THERE IS A SENTENCE.

01:28PM 5    AND IN THIS INSTANCE, THIS IS A DEFENDANT WHO HAS BEEN

01:28PM 6    SUBJECT EFFECTIVELY TO FORMS OF CONFINEMENT THAT GO WAY BEYOND

01:28PM 7    WHAT IS THE NORMAL SITUATION FOR A DEFENDANT ON SUPERVISED

01:28PM 8    RELEASE AND HAS BEEN PUNISHED IN THAT WAY TO DATE.

01:28PM 9    THAT WILL CONTINUE.  THERE'S NOTHING THAT WE CAN DO ABOUT

01:28PM 10   IT, AND I'M NOT COMPLAINING ABOUT IT, BUT I'M SAYING IT IS NOT

01:28PM 11   THE RESULT OF MS. HOLMES'S DESIRE TO COURT PUBLICITY.

01:28PM 12   MR. SCHENK ALSO COMMENTS ON THE SUPPORT NETWORK THAT

01:28PM 13   MS. HOLMES HAD IN PLACE.  AND IT IS TRUE, I THINK THE COURT CAN

01:28PM 14   KNOW THIS FROM THE LETTERS AND FROM OTHER PRESENTATIONS IN THE

01:28PM 15   CASE, THAT MS. HOLMES COMES FROM A WONDERFUL, VERY LOVING

01:29PM 16   FAMILY.

01:29PM 17   BUT WHAT MR. SCHENK'S COMMENTS IGNORE IS THAT DURING THE

01:29PM 18   PERIOD OF THE OFFENSE CONDUCT, MS. HOLMES WAS DEPRIVED OF THAT

01:29PM 19   SUPPORT NETWORK FOR REASONS THAT HAVE BEEN ARTICULATED IN THE

01:29PM 20   CASE OVER MANY, MANY MONTHS THROUGH DIFFERENT HEARINGS, AND I

01:29PM 21   WON'T COMMENT ON THEM AGAIN, BUT THEY'RE ADDRESSED IN

01:29PM 22   ADDITIONAL LETTERS THAT ARE BEFORE THE COURT AS PART OF THE

01:29PM 23   SENTENCING PROCESS.

01:29PM 24   AND THAT IS THAT IN HER PERSONAL RELATIONSHIP, HER

01:29PM 25   RELIANCE ON THAT SUPPORT NETWORK, WHICH WAS SUBSTANTIAL BOTH

01:29PM 1    BEFORE 2013 TO 2015 AND SUBSTANTIAL AFTER, HAD LONG CEASED TO

01:29PM 2    BE A NETWORK FOR HER TO RELY.

01:29PM 3        SO I THINK, YOUR HONOR, THE CONCEPT THAT SHE SHOULD BE IN

01:29PM 4    SOME SENSE PUNISHED FOR COMING FROM A GOOD SUPPORT NETWORK I

01:29PM 5    THINK IS NOT CONSISTENT WITH THE INTENT OF THE STATUTE.

01:30PM 6        LET ME TALK ABOUT GENERAL DETERRENCE IN CONNECTION WITH

01:30PM 7    THIS OFFENSE.

01:30PM 8        I THINK, YOUR HONOR, THAT MR. SCHENK HAS IT TO SOME EXTENT

01:30PM 9    COMPLETELY BACKWARDS IN HOW HE THINKS ABOUT WHAT MESSAGE THIS

01:30PM 10   CASE WILL SEND.  I THINK, YOUR HONOR, HE COMMENTS ON HIS OWN

01:30PM 11   VIEW OF THE OPPORTUNITY COSTS WITH RESPECT TO THE INVESTMENTS.

01:30PM 12   PERHAPS.

01:30PM 13       BUT WE HAVE HEARD FROM PEOPLE WHO ACTUALLY PARTICIPATE IN

01:30PM 14   THAT INDUSTRY AS A RESULT OF -- WE HAVE HEARD FROM THEM AS A

01:30PM 15   RESULT OF THIS CASE, SO THEY THEMSELVES ARE VENTURE CAPITALISTS

01:30PM 16   OR INDIVIDUALS WHO PARTICIPATE IN RAISING VENTURE CAPITAL.

01:30PM 17       AND ALL OF THOSE INDIVIDUALS HAVE SAID THIS CASE IS

01:30PM 18   DIFFERENT FROM A CASE OF NORMAL CORPORATE GREED BECAUSE THE

01:30PM 19   ENVIRONMENT IN WHICH REPRESENTATIONS ARE MADE AND THE

01:31PM 20   ENVIRONMENT IN WHICH YOUNG PEOPLE PARTICIPATE IN THE INDUSTRY

01:31PM 21   IS DIFFERENT.

01:31PM 22       SO WILL THERE BE A SIGNIFICANT DETERRENCE OF WHAT HAPPENS

01:31PM 23   IN THE VENTURE SPACE?  I DON'T KNOW.  BUT IT'S CERTAINLY NOT

01:31PM 24   THE CASE THAT THE GOVERNMENT IS REMEDYING ANYTHING, AND THOSE

01:31PM 25   WHO PARTICIPATE IN THAT INDUSTRY HAVE TOLD YOUR HONOR WE THINK

01:31PM 1    THERE IS GOING TO BE AN EFFECT ON THE VENTURE FIELD.

01:31PM 2         AND ALTHOUGH MR. SCHENK ACKNOWLEDGES BUT TRIES TO DOWNPLAY

01:31PM 3    THE GOOD INTENTIONS OF THERANOS, I THINK WE WILL SEE SOME

01:31PM 4    EFFECT OVER TIME ON THE WILLINGNESS TO TRY TO INTEREST OTHERS

01:31PM 5    IN A PARTICULAR DREAM OF AN ENTREPRENEUR.

01:31PM 6         I WANT TO NOW JUST RETURN TO 3553(A), AND I WANT THE COURT

01:31PM 7    TO CONSIDER WHAT WILL HAPPEN ONCE IT IMPOSES THE SENTENCE HERE

01:32PM 8    WITH RESPECT TO THIS DEFENDANT AND WHAT WE CAN KNOW, AS WE SIT

01:32PM 9    HERE TODAY, AND WHAT WE DON'T KNOW.

01:32PM 10        I THINK WE KNOW THAT THIS IS AN OFFENSE PERHAPS LIKE ANY

01:32PM 11   OTHER THAT WILL COME BEFORE THE COURT.  IT OCCURRED IN A

01:32PM 12   CONTEXT WHERE THE DEFENDANT WAS A VERY YOUNG INDIVIDUAL IN AN

01:32PM 13   ENVIRONMENT WHERE IT'S NOT ALWAYS COMMON THAT YOUNG PEOPLE ARE

01:32PM 14   PLAYING THE ROLE THAT SHE PLAYED.

01:32PM 15        SHE HAD WHAT I WILL DESCRIBE AS FOR PRESENT PURPOSES AN

01:32PM 16   UNUSUAL PERSONAL SITUATION WITH WHICH YOUR COURT IS WELL

01:32PM 17   FAMILIAR.  AND THIS IS AN INDIVIDUAL WHO IN THE FACE OF MANY,

01:32PM 18   MANY OPPORTUNITIES TO PROFIT FROM WHAT SHE HAD ACHIEVED CHOSE

01:32PM 19   NOT TO BECAUSE SHE BELIEVED IN THE DREAM THAT SHE HAD COME TO

01:33PM 20   NUTURE FOR MANY, MANY, MANY YEARS, AND WE HAVE A CONVICTION FOR

01:33PM 21   CONDUCT IN CONNECTION WITH THAT.

01:33PM 22        BUT WE KNOW ABOUT THIS DEFENDANT FUNDAMENTALLY, THAT THIS

01:33PM 23   DEFENDANT DOES NOT FIT THE CHARACTERISTIC PATTERN OF

01:33PM 24   INDIVIDUALS TYPICALLY CONVICTED OF THIS CRIME.

01:33PM 25        SHE ACTED WITHOUT GREED, SHE ACTED RESPECTING THE PEOPLE

01:33PM 1     WHO WORKED FOR HER.  SHE CONTINUES TO BE A COMPASSIONATE AND

01:33PM 2     SUPPORTING PERSON.  AND WHEN THE COURT IMPOSES A SENTENCE, IT

01:33PM 3     OFTEN ASKS ITSELF THE QUESTION, YOU KNOW, WHAT WILL HAPPEN TO A

01:33PM 4     DEFENDANT AFTER THIS SENTENCE IS IMPOSED WHEN NO ONE IS

01:33PM 5     LOOKING?  WHEN THE GLARE OF THE MEDIA IS GONE, WHAT KIND OF

01:33PM 6     PERSON IS THIS WHO IS BEING SENTENCED?

01:34PM 7         THE COURT KNOWS THAT MS. HOLMES IS A DAUGHTER AND A

01:34PM 8     PARTNER AND A MOTHER, BUT THE COURT ALSO KNOWS FROM LETTERS

01:34PM 9     THAT HAVE BEEN WRITTEN THAT THIS IS AN INDIVIDUAL WHO WILL DO

01:34PM 10    GOOD GOING FORWARD, HER ENORMOUS PROFESSIONAL POTENTIAL AS

01:34PM 11    IDENTIFIED IN BOTH THE TESTIMONY THAT WE HEARD DURING THE

01:34PM 12    COURSE OF THE TRIAL AND IN CORRESPONDENCE THAT HAS BEEN

01:34PM 13    SUBMITTED TO THE COURT.

01:34PM 14        BUT MORE FUNDAMENTALLY, THIS IS AN INDIVIDUAL WHO OUTSIDE

01:34PM 15    OF THIS CONTEXT IS AN INDIVIDUAL WHO IS NOTICED BY THE

01:34PM 16    INDIVIDUAL THAT SHE ENCOUNTERS WHEN THEY DON'T KNOW AND SHE

01:34PM 17    DOESN'T KNOW THAT IT WILL EVER MATTER, A GENTLEMAN WHO MANAGES

01:34PM 18    HER BUILDING, PEOPLE WHO PROVIDE OUR SECURITY SERVICES, FIRE

01:34PM 19    SERVICES, POLICE SERVICES, A RESTAURANT MANAGER, PEOPLE WHO

01:34PM 20    HAVE INTERACTED WITH MS. HOLMES IN ENVIRONMENTS WHERE PEOPLE

01:35PM 21    WILL THINK NO ONE WILL BE LOOKING, AND THEY ALL UNIFORMLY HAVE

01:35PM 22    DESCRIBED HER, YOUR HONOR, AS A PERSON WHO IS DECENT, A PERSON

01:35PM 23    WHO IS THOUGHTFUL, A PERSON WHO IS COMPASSIONATE, AND A PERSON

01:35PM 24    WHO IS LOOKING FOR WAYS TO HELP OTHERS.

01:35PM 25        DURING THE COURSE OF HER ENTIRE LIFE, GOING BACK TO WHEN

01:35PM  1      SHE WAS IN HIGH SCHOOL, SHE HAS ALWAYS TRIED TO DEDICATE

01:35PM  2      HERSELF TO FINDING A WAY TO BETTER THE LIVES OF OTHERS.

01:35PM  3          WE HEARD FROM THE PRESIDENT OF SAVE THE CHILDREN AS PART

01:35PM  4      OF THIS SUBMISSION, WE KNOW ABOUT THE THERANOS MISSION, AND WE

01:35PM  5      KNOW THAT SINCE SHE'S BEEN WORKING AS A CRISIS COUNSELLOR OVER

01:35PM  6      THE PAST EIGHT TO NINE MONTHS.

01:35PM  7          THERE'S A LOT THAT CAN BE GIVEN TO SOCIETY BY A DEFENDANT

01:35PM  8      WITH THESE CHARACTERISTICS.  THERE'S VERY LITTLE DANGER TO

01:35PM  9      SOCIETY AS A RESULT OF THIS DEFENDANT BEING -- A DEFENDANT WHO

01:36PM 10      IS NOT INCARCERATED ALONG THE LINES OF WHAT IS TYPICALLY DONE

01:36PM 11      WITH AN OFFENSE AND THIS LOSS LEVEL, AND I WOULD ASK THE COURT,

01:36PM 12      THAT THE COURT CONSIDER THOSE CHARACTERISTICS WITH THE NATURE

01:36PM 13      OF THE UNDERLYING OFFENSE AND ISSUE A VARIANCE THAT RESULTS IN

01:36PM 14      A SENTENCE ALONG THE LINES OF WHAT IS DESCRIBED IN OUR

01:36PM 15      SENTENCING MEMORANDUM.

01:36PM 16          THE COURT:  THANK YOU, MR. DOWNEY.

01:36PM 17      MR. LEACH, ARE THERE ANY VICTIMS PRESENT THAT WISH TO BE

01:36PM 18      HEARD?

01:36PM 19          MR. LEACH:  YOUR HONOR, MY UNDERSTANDING IS -- WELL,

01:36PM 20      IT'S MORE THAN MY UNDERSTANDING.  I KNOW ALEX AND JANEL SHULTZ,

01:36PM 21      WHO ARE THE PARENTS OF TYLER SHULTZ AND THE SON AND

01:36PM 22      DAUGHTER-IN-LAW OF GEORGE SHULTZ WHO'S PASSED AWAY AND WHO WAS

01:36PM 23      A MEMBER OF THERANOS BOARD, ARE HERE TODAY.

01:36PM 24          MY UNDERSTANDING IS THAT THEY DON'T WISH TO SPEAK, BUT

01:37PM 25      THEY'RE SITTING IN THE FRONT ROW OF THE COURT.  I WANT TO

01:37PM 1    ACKNOWLEDGE THAT THEY'RE HERE, AND I WANTED TO ACKNOWLEDGE THAT

01:37PM 2    THEIR SON, ONE OF THE EMPLOYEES WHO WORKED FOR MS. HOLMES AND

01:37PM 3    WHO THE COURT HAS HEARD INFORMATION ABOUT, THAT THEY'RE HERE

01:37PM 4    AND IN COURT TODAY.

01:37PM 5        I'M NOT AWARE OF INVESTOR VICTIMS HERE IN THE COURT.  I'M

01:37PM 6    SURE THEY WILL CORRECT ME IF I'M WRONG, BUT OTHER THAN THAT

01:37PM 7    THEY ARE NOT HERE TO SPEAK.

01:37PM 8            THE COURT:  THANK YOU.  I DID RECEIVE THE LETTERS

01:37PM 9    THAT YOU SUPPLIED FROM THE VICTIM'S PERSPECTIVES.

01:37PM 10       LET ME ASK, ARE THERE ANY VICTIMS PRESENT IN THE COURTROOM

01:37PM 11   THAT WISH TO BE HEARD?

01:37PM 12       I SEE OR HEAR NO RESPONSE.  I AM SORRY.

01:37PM 13           MR. SHULTZ:  ALEX SHULTZ.

01:37PM 14           THE COURT:  DO YOU WISH TO BE HEARD, SIR?

01:37PM 15           MR. SHULTZ:  SURE.

01:37PM 16           THE COURT:  WHY DON'T YOU COME FORWARD.

01:37PM 17           MR. SHULTZ:  YES, YOUR HONOR.

01:37PM 18           THE COURT:  IF YOU WOULD STEP TO THE LECTERN HERE.

01:37PM 19   IF YOU COULD PLEASE STATE YOUR NAME AND THEN SPELL IT, PLEASE.

01:38PM 20           MR. SHULTZ:  MY NAME IS ALEX SHULTZ.  A-L-E-X,

01:38PM 21   S-H-U-L-T-Z.

01:38PM 22           THE COURT:  THANK YOU.  GOOD AFTERNOON.

01:38PM 23       WHAT IS IT YOU WOULD LIKE ME TO KNOW, SIR?

01:38PM 24           MR. SHULTZ:  THANK YOU, YOUR HONOR.

01:38PM 25       WELL, AS YOU KNOW, MY FATHER IS GEORGE SHULTZ.  MY SON IS

01:38PM 1    TYLER SHULTZ.  MY WIFE AND I ARE HERE.  WE'RE HAPPY THAT THIS

01:38PM 2    IS FINALLY COMING TO AN END.

01:38PM 3        THIS IS A LITTLE UNEXPECTED SO I'M NOT EXACTLY SURE WHERE

01:38PM 4    THIS WILL LEAD.  I HAVE SOME THOUGHTS IN MY MIND.  I CAME BACK

01:38PM 5    TO A THOUGHT WHEN ELIZABETH JOINED US THE DAY AFTER CHRISTMAS

01:38PM 6    ONE YEAR, NOT ONLY WAS MY DAD INVOLVED AS A BOARD MEMBER BUT AS

01:38PM 7    AN INVESTOR, BUT HE ALSO INVESTED ON MY BEHALF, MY FAMILY'S

01:38PM 8    BEHALF, AND FOR HIS GREAT GRANDCHILDREN.  AND HE ORGANIZED US

01:38PM 9    TOGETHER TO HEAR ELIZABETH, AND SHE TALKED ABOUT HOW THEY WERE

01:39PM 10   THE MOST ACCURATE --

01:39PM 11       THIS IS 2015, JANEL?

01:39PM 12           MS. SHULTZ:  A LITTLE EARLIER.

01:39PM 13           MR. SHULTZ:  '14.

01:39PM 14       -- MOST ACCURATE, FASTEST, SMALLEST AMOUNT OF BLOOD.

01:39PM 15       MY NIECE'S HUSBAND SAID, "WELL, WHAT IS THE HITCH?"

01:39PM 16       AND ELIZABETH SAID, "THERE IS NO HITCH.  WE'VE BEEN IN

01:39PM 17   STEALTH MODE FOR TEN YEARS, AND WE HAVE IT DOWN WHERE WE'RE THE

01:39PM 18   MOST ACCURATE, FASTEST."

01:39PM 19       MY WIFE WAS AN INTENSIVE CARE NURSE AND ON OUR WAY HOME

01:39PM 20   SHE SAID, "YOU KNOW, WHEN I WAS IN ICU THIRTY YEARS AGO AND I

01:39PM 21   NEEDED BLOOD WORK DONE STAT, WE COULD GET IT DONE WITHIN HALF

01:39PM 22   AN HOUR."  SHE SAID, "THAT SPEED IS NOTHING REVOLUTIONARY."

01:39PM 23   THAT WAS MY FIRST KIND OF RED FLAG.

01:40PM 24       I SYMPATHIZE WITH YOU (LOOKING AT ELIZABETH).  I READ PART

01:40PM 25   OF YOUR LETTER ABOUT HOW PEOPLE FOLLOWED YOU AND THINGS LIKE

01:40PM 1     THAT. I KNOW FIRSTHAND --

01:40PM 2         THE COURT: MR. SHULTZ, I'M GOING TO ASK YOU TO

01:40PM 3     ADDRESS YOUR COMMENTS TO THE COURT IF YOU WOULD, PLEASE. THANK

01:40PM 4     YOU.

01:40PM 5         MR. SHULTZ: OKAY. I UNDERSTAND EXACTLY HOW THEY

01:40PM 6     FEEL BECAUSE ELIZABETH HIRED A PRIVATE INVESTIGATOR TO FOLLOW

01:40PM 7     MY SON AND PROBABLY MY WIFE AND I IN A VERY INTIMIDATING WAY.

01:40PM 8       MY SON SLEPT WITH A KNIFE UNDER HIS PILLOW EVERY NIGHT

01:40PM 9     THINKING THAT SOMEONE WAS GOING TO COME AND MURDER HIM IN THE

01:40PM 10     MIDDLE OF THE NIGHT.

01:40PM 11       WE CELEBRATED MY WIFE'S BIRTHDAY IN YOSEMITE ABOUT A MONTH

01:40PM 12     AND A HALF AFTER THIS WHOLE THING HAPPENED, AND IT WAS

01:40PM 13     DISCLOSED THAT TYLER WAS INVOLVED IN THIS. AND WE HAD DINNER

01:41PM 14     AT THE AHWAHNEE HOTEL AND TYLER HAD TO LEAVE EARLY BEFORE

01:41PM 15     DESSERT. JANEL WATCHED TYLER WALK AWAY AND BROKE DOWN AND

01:41PM 16     SOBBED UNCONTROLLABLY FOR AT LEAST TEN MINUTES.

01:41PM 17       IT WAS A GRUELING EXPERIENCE TO GO THROUGH. I FEEL LIKE

01:41PM 18     YOU -- MY FAMILY HOME WAS DESECRATED BY ELIZABETH AND THE

01:41PM 19     LAWYERS.

01:41PM 20       MY FATHER CALLED AND SAID -- ASKED IF TYLER HAD SPOKEN TO

01:41PM 21     A "WALL STREET JOURNAL" AND I SAID, "I HAVE NO IDEA BUT HE'S

01:41PM 22     COMING OVER FOR DINNER TONIGHT, AND I'LL ASK HIM."

01:41PM 23       I CONFRONTED TYLER, AND HE SAID, "YES." AND I SAID,

01:41PM 24     "WELL, YOU NEED TO CALL YOUR GRANDDAD AND TELL HIM." SO HE

01:41PM 25     DID.

01:41PM 1       AND TYLER SAID, I WAS STANDING RIGHT NEXT TO HIM, "BEFORE

01:42PM 2    WE TALK, I WANT TO TALK TO YOU WITHOUT ANY LAWYERS."  AND HE

01:42PM 3    LEFT TO GO UP TO PALO ALTO.

01:42PM 4       MY SON, PATRICK, AND MY WIFE AND I, WE HELD HANDS AROUND

01:42PM 5    OUR KITCHEN, AND WE SAID A PRAYER FOR TYLER, THAT HE COULD HAVE

01:42PM 6    THE COURAGE TO GO FORWARD AND TELL HIS GRANDFATHER EVERYTHING

01:42PM 7    THAT HE KNEW WAS GOING ON.

01:42PM 8       HE ARRIVED AT THE HOUSE ABOUT 20 MINUTES BEFORE 9:00.

01:42PM 9    THEY WERE GOING TO MEET AT 9:00.  HE DIDN'T SEE ANYONE GO IN OR

01:42PM 10    OUT OF THE HOUSE.  HE TOLD MY FATHER EVERYTHING THAT HE KNEW

01:42PM 11    TRYING TO CONVINCE HIM AGAIN THAT ELIZABETH IS NOT TELLING YOU

01:42PM 12    THE TRUTH ABOUT ANY OF THIS.  AND THEY KIND OF CONCLUDED, AND

01:42PM 13    SUDDENLY LAWYERS COME DOWN THE STAIRS AND CONFRONT TYLER.  AND

01:42PM 14    IT WAS LIKE AN ENTRAPMENT.  I DON'T KNOW.  MY DAD GOT ON THE

01:43PM 15    PHONE AND CALLED ELIZABETH AND SAID, "THIS IS NOT WHAT WE

01:43PM 16    AGREED TO."

01:43PM 17       I DON'T KNOW WHAT IT WAS THAT YOU TOLD HIM TO CONVINCE HIM

01:43PM 18    TO PUT LAWYERS IN THE HOUSE LIKE THAT WITH TYLER NOT HAVING ANY

01:43PM 19    LEGAL REPRESENTATION AT ALL TO DEFEND HIMSELF (LOOKING AT

01:43PM 20    ELIZABETH).

01:43PM 21       AND I'LL NEVER BE ABLE TO -- THAT HOUSE IS SOLD, BUT EVERY

01:43PM 22    TIME I WENT INTO THE HOME WHERE YOU -- IT'S THE SAFE PLACE FOR

01:43PM 23    THE FAMILY, RIGHT?  AND LIKE I SAID, I WAS DESECRATED BY THIS.

01:43PM 24    I COULD NEVER SEE IT THE SAME WAY AGAIN.

01:43PM 25       I UNDERSTAND THAT FROM THE HOLMES'S POINT OF VIEW -- AND

01:43PM 1   ONE OF THE HARDEST THINGS THAT MY WIFE AND I WENT THROUGH, WE

01:43PM 2   WERE DETERMINED TO KEEP OUR FAMILY TOGETHER THROUGH THIS.  AND

01:44PM 3   MY DAD'S 95TH BIRTHDAY WAS COMING UP, AND I GOT HOME FROM WORK

01:44PM 4   AND JANEL SAID, "SHE WON."  AND I SAID, "WHAT DO YOU MEAN 'SHE

01:44PM 5   WON'?"

01:44PM 6        AND SHE SAID, "ELIZABETH WON."

01:44PM 7        AND I SAID, "WHAT DO YOU MEAN?"

01:44PM 8        AND SHE SAID, "WELL, CHARLOTTE JUST CALLED AND ASKED THAT

01:44PM 9   TYLER NOT COME TO HIS 95TH BIRTHDAY."  AND WE KNEW THEN THAT HE

01:44PM 10  WAS ON HER SIDE.

01:44PM 11       AND I THINK IN ELIZABETH'S MIND IT WAS A LITMUS TEST.  I

01:44PM 12  THINK THAT SHE DELAYED RESPONDING TO THE INVITATION, AND THEN

01:44PM 13  MY DAD INQUIRED AND MAYBE HE SAID I DON'T KNOW, I DON'T WANT TO

01:44PM 14  MAKE PEOPLE UNCOMFORTABLE SO I'M NOT GOING TO GO.  THIS IS JUST

01:44PM 15  ME THINKING THROUGH HOW COULD MY DAD DO THIS?  "NEEDLESS TO

01:45PM 16  SAY, JANEL AND I DIDN'T GO TO THE BIRTHDAY, EITHER.

01:45PM 17       I KNOW THAT THE HOLMES -- THERE'S A LOT OF TALK ABOUT

01:45PM 18  SUNNY AND ELIZABETH, HOW IT CHANGED THE NATURE.

01:45PM 19       FROM MY FAMILY'S PERSPECTIVE, ELIZABETH IS THEIR

01:45PM 20  SUNNY BALWANI.  THEY TOOK ADVANTAGE OF MY DAD.  SHE TOOK -- SHE

01:45PM 21  FIGURED OUT HIS WEAKNESS.

01:45PM 22       JOHN CARREYROU GOT IT WRONG WHEN HE THOUGHT THAT MONEY WAS

01:45PM 23  THE MAIN MOTIVATION.  IT WAS THAT MY DAD NEVER WANTED TO BECOME

01:45PM 24  IRRELEVANT.  HE WENT TO WORK EVERY DAY AND TRIED TO MAKE THE

01:45PM 25  WORLD BETTER, AND HE DID A HELL OF A JOB.  HE WORKED EVERY

01:45PM 1    SINGLE DAY, BUT HE ALWAYS WANTED TO BE IN THE GAME AND HE

01:45PM 2    ALWAYS WANTED TO MAKE A DIFFERENCE, AND I THINK ELIZABETH

01:45PM 3    RECOGNIZED THAT WEAKNESS, TARGETED HIM, AND WAS PART OF THE

01:45PM 4    WINDOW DRESSING THAT LEGITIMIZED HIM.  SHE USED HIS IMPECCABLE

01:46PM 5    CAREER.

01:46PM 6        WHEN I WAS YOUNG WE WOULD PLAY GOLF AND HE WOULD BE

01:46PM 7    PLAYING WITH HIS -- BEFORE HE WAS EVER SECRETARY OF ANYTHING,

01:46PM 8    HE WOULD GET TOGETHER WITH HIS WORLD WAR II PEOPLE AND PLAY

01:46PM 9    GOLF AND HIS NAME WAS HONEST GEORGE.

01:46PM 10        ANYWAY, MY WIFE AND I ARE HAPPY THAT THIS HAS FINALLY COME

01:46PM 11   TO AN END.  AND THANK YOU FOR LETTING ME HAVE THIS OPPORTUNITY.

01:46PM 12        THE COURT:  YOU'RE WELCOME.  THANK YOU, SIR.

01:46PM 13        AND YOU ALSO SUBMITTED A LETTER WHICH I ALSO READ --

01:46PM 14        MR. SHULTZ:  YES.

01:46PM 15        THE COURT:  -- WITH ATTACHMENTS.  THANK YOU.

01:46PM 16        ARE THERE ANY OTHER VICTIMS PRESENT THAT WISH TO BE HEARD?

01:46PM 17   MA'AM?

01:47PM 18        PATIENT:  ARE CANCER PATIENTS CONSIDERED A VICTIM

01:47PM 19   HERE?

01:47PM 20        THE COURT:  MA'AM, ARE YOU RELATED TO THE LITIGATION

01:47PM 21   IN ANY WAY?

01:47PM 22        PATIENT:  I'M A CANCER PATIENT.

01:47PM 23        THE COURT:  MA'AM, DID YOU SEND A LETTER TO THE

01:47PM 24   COURT?

01:47PM 25        PATIENT:  I DID.

| | | |
|---|---|---|
| 01:47PM | 1 | THE COURT: IF YOU SENT A LETTER, I'VE READ IT. |
| 01:47PM | 2 | PATIENT: THANK YOU. |
| 01:47PM | 3 | THE COURT: THANK YOU FOR BEING HERE. |
| 01:47PM | 4 | THANK YOU. I APPRECIATE IT. |
| 01:47PM | 5 | ARE THERE ANY OTHER VICTIMS PRESENT THAT WISH TO BE HEARD? |
| 01:47PM | 6 | I SEE OR HEAR NO RESPONSE. |
| 01:47PM | 7 | BEFORE WE GO FURTHER, ANYTHING FURTHER FROM THE |
| 01:47PM | 8 | PROSECUTION? |
| 01:47PM | 9 | MR. LEACH: NO, YOUR HONOR. |
| 01:47PM | 10 | MR. DOWNEY: NO, YOUR HONOR. |
| 01:47PM | 11 | THE COURT: ALL RIGHT. THANK YOU. |
| 01:47PM | 12 | MS. HOLMES, YOU HAVE THE RIGHT TO BE HEARD AT YOUR |
| 01:47PM | 13 | SENTENCING? IS THERE ANYTHING YOU WOULD LIKE TO SAY OR |
| 01:47PM | 14 | ANYTHING YOU WOULD LIKE ME TO KNOW BEFORE I IMPOSE SENTENCE? |
| 01:47PM | 15 | THE DEFENDANT: YES, YOUR HONOR. |
| 01:47PM | 16 | THE COURT: YOU CAN COME FORWARD, PLEASE. |
| 01:48PM | 17 | THE DEFENDANT: YOUR HONOR, THANK YOU FOR THE |
| 01:48PM | 18 | OPPORTUNITY TO SPEAK TODAY. THERE IS SO MUCH I HAVE WANTED TO |
| 01:48PM | 19 | SAY, AND I AM GRATEFUL FOR THIS CHANCE. |
| 01:48PM | 20 | I FIRST WANT TO THANK THE COURT AND ALL WHO WORK FOR IT |
| 01:48PM | 21 | FOR THE COURTESY AND RESPECT THAT YOU HAVE SHOWN ME THROUGHOUT |
| 01:48PM | 22 | THIS PROCESS. IT HAS MEANT SO MUCH TO ME. |
| 01:48PM | 23 | I STAND BEFORE YOU TAKING RESPONSIBILITY FOR THERANOS. I |
| 01:48PM | 24 | LOVED THERANOS. IT WAS MY LIFE'S WORK. OUR TEAM, ADVISORS, |
| 01:49PM | 25 | BOARD MEMBERS, AND THE PEOPLE WHO BELIEVED IN US MEANT THE |

122

01:49PM 1    WORLD TO ME.  THEY WANTED TO MAKE A DIFFERENCE IN THE WORLD AND

01:49PM 2    WORKED TIRELESSLY TO GIVE A BETTER FUTURE TO PEOPLE WHO

01:49PM 3    COULDN'T AFFORD TESTING.

01:49PM 4        THE PEOPLE I TRIED TO GET INVOLVED WITH THERANOS WERE THE

01:49PM 5    PEOPLE THAT I LOVED AND RESPECTED THE MOST.

01:49PM 6        I AM DEVASTATED BY MY FAILINGS.  EVERY DAY FOR THE PAST

01:49PM 7    YEARS I HAVE FELT DEEP PAIN FOR WHAT PEOPLE WENT THROUGH

01:49PM 8    BECAUSE I FAILED THEM.  THE INCREDIBLE TEAM MEMBERS AND

01:49PM 9    INVESTORS THAT WE HAD IN OUR COMPANY, THOSE PEOPLE WHO BELIEVED

01:49PM 10   IN US AND THE PATIENTS WE WORKED SO HARD TO SERVE, TO EACH OF

01:50PM 11   THEM I AM SO, SO SORRY.

01:50PM 12       I GAVE EVERYTHING I HAD TO BUILDING OUR COMPANY AND TRYING

01:50PM 13   TO SAVE OUR COMPANY, AND I WILL GIVE EVERYTHING IN ME TO MAKE

01:50PM 14   IT UP TO THEM WITH MY LIFE AHEAD.

01:50PM 15       IN LOOKING BACK, THERE ARE SO MANY THINGS THAT I WOULD DO

01:50PM 16   DIFFERENTLY IF I HAD THE CHANCE.  I TRIED TO REALIZE MY DREAM

01:50PM 17   TOO QUICKLY AND DID TOO MANY THINGS AT THE SAME TIME.  I REGRET

01:50PM 18   MY FAILINGS WITH EVERY CELL IN MY BODY.

01:50PM 19       I'VE TRIED TO SPEND THESE YEARS INGRAINING THE LESSONS

01:50PM 20   THAT I'VE LEARNED WITHIN MYSELF TO DO GOOD WITH MY LIFE IN THE

01:50PM 21   YEARS AHEAD, WHATEVER THAT HOLDS.

01:50PM 22       THERE'S A QUOTE BY THE POET RUMI THAT READS, "YESTERDAY I

01:51PM 23   WAS CLEVER, SO I WANTED TO CHANGE THE WORLD.  TODAY I'M WISE,

01:51PM 24   SO I'M CHANGING MYSELF."  I'VE TRIED TO APPLY THAT TO EVERY

01:51PM 25   ASPECT OF MY LIFE.  I DID TRY TO CHANGE THE WORLD THROUGH

01:51PM 1   BUILDING THERANOS BUT AMONGST MANY OTHER LEARNINGS, I LEARNED

01:51PM 2   THERE ARE NO GREATER ACT THAN HELPING ONE PERSON IN THEIR TIME

01:51PM 3   OF NEED.

01:51PM 4       THERE IS SO MUCH I WANT TO DO TO CONTRIBUTE TO OUR WORLD

01:51PM 5   PERSON BY PERSON, ONE PERSON AT A TIME, AND TO APPLY THE

01:51PM 6   LESSONS THAT I HAVE LEARNED FROM MY FAILINGS, FOR THE PEOPLE

01:51PM 7   THAT I FAILED THROUGH THERANOS, THE PEOPLE I LOVED, FOR OTHER

01:51PM 8   YOUNG WOMEN WHO HAVE A DREAM THEY WANT TO GIVE THEIR LIFE TO,

01:51PM 9   FOR MY PARTNER, BILLY, AND MY CHILDREN AND MY FAMILY AND

01:52PM 10  FRIENDS WHO HAVE STOOD ON MY SIDE, ON MY FAITH, I PROMISE THAT

01:52PM 11  I WILL MAKE THAT IMPACT FOR THEM, AND YOU WILL SEE IT THROUGH

01:52PM 12  THE ACTIONS THAT I TAKE IN MY LIFE AHEAD.  THANK YOU.

01:52PM 13          THE COURT:  THANK YOU, MS. HOLMES.

01:52PM 14      ANYTHING FURTHER?

01:52PM 15          MR. SCHENK:  NO, YOUR HONOR.

01:52PM 16          THE COURT:  MR. DOWNEY?

01:52PM 17          MR. DOWNEY:  NO, YOUR HONOR.

01:52PM 18          THE COURT:  THANK YOU.

01:52PM 19      THANK YOU FOR YOUR COMMENTS, COUNSEL, THIS AFTERNOON AND

01:52PM 20  THROUGHOUT THIS TRIAL.  THIS PROCESS WAS LONG.  WE SPENT MUCH

01:52PM 21  TIME TOGETHER IN THE LITIGATION PROCESS.  THAT IS THE NATURE OF

01:52PM 22  LITIGATION.  AND I THINK TO MR. DOWNEY'S POINT, WE PROBABLY ALL

01:53PM 23  GOT TO KNOW EACH OTHER A LITTLE BIT.

01:53PM 24      THE JURY HEARD THE CASE, AS I MENTIONED EARLIER IN MY

01:53PM 25  INITIAL COMMENTS, THEY DELIBERATED, THEY WERE THOROUGH, THEY

01:53PM 1    TESTED THE EVIDENCE AS PRESENTED BY THE DEFENSE, AND THEIR

01:53PM 2    VERDICT, AS I SAID EARLIER, IS WHY WE ARE HERE TODAY.  AND I

01:53PM 3    THINK COUNSEL RECOGNIZED THAT THE CULMINATION OF A TRIAL WHEN

01:53PM 4    THERE IS A CONVICTION, THE OBLIGATION OF THE COURT IS TO IMPOSE

01:53PM 5    A SENTENCE THAT IS SUFFICIENT BUT NOT GREATER THAN NECESSARY TO

01:53PM 6    CARRY OUT THE SPIRIT OF 3553.

01:53PM 7        THE COURT, AS COUNSEL HAVE INDICATED, CONSIDERS THE NATURE

01:53PM 8    AND CIRCUMSTANCES OF THE OFFENSE, THE HISTORY AND

01:54PM 9    CHARACTERISTICS OF THE DEFENDANT AND IN THIS MEASURE, IN THIS

01:54PM 10   MEASURE BALANCES ALL OF THOSE AND TRIES TO DETERMINE, IT DOES

01:54PM 11   THE BEST THAT IT CAN TO DETERMINE WHAT IS THE APPROPRIATE

01:54PM 12   SENTENCE GIVEN, GIVEN AND GUIDED BY THE GUIDELINES 3553 AND

01:54PM 13   PERHAPS THE FACTS OF THE CASE AND THE HISTORY AND

01:54PM 14   CHARACTERISTICS OF THE DEFENDANT, AND PERHAPS IT'S A CHALLENGE

01:54PM 15   FOR ALL JUDGES.  SENTENCING IS THE HARDEST THING A JUDGE DOES

01:54PM 16   IN HER CAREER.

01:54PM 17       I LOOKED AT THIS CASE -- AND LET ME JUST SAY, IT WAS SUCH

01:54PM 18   A GREAT PRIVILEGE FOR ME TO BE WITH YOU, LAWYERS.  I THOROUGHLY

01:54PM 19   ENJOYED YOUR COMPANY, YOUR PRESENTATION.  IT WAS MY GREAT

01:54PM 20   PRIVILEGE TO SIT IN THIS CASE.

01:54PM 21       AND I THOUGHT ABOUT THIS CASE AND I -- SOME OF YOU KNOW

01:54PM 22   I'M A NATIVE.  I WAS BORN UP THE STREET, AND I REMEMBER THIS

01:55PM 23   VALLEY, AND THE INNOVATION OF THIS VALLEY.  THE RICHNESS OF THE

01:55PM 24   EARTH THAT IS BELOW US HERE IN THIS VALLEY AT ONE TIME WAS

01:55PM 25   AGRICULTURE.  THESE PICTURES THAT ARE IN MY COURTROOM EXPRESS

01:55PM 1    SOME OF THAT.

01:55PM 2        WE KNOW THAT THIS VALLEY AT ONE TIME FROM THE RICH EARTH

01:55PM 3    HERE SUPPORTED THE WORLD.  FOOD CAME FROM THIS VALLEY.

01:55PM 4    RANCHERS, FARMERS CAME TO THIS VALLEY FROM EUROPE, FROM ASIA,

01:55PM 5    FROM OUR NEIGHBORS SOUTH, AND INDIVIDUALS WHO HAVE HELD LAND

01:55PM 6    FROM SPANISH, SPANISH LAND GRANTS, THEY FARMED THIS LAND, THEY

01:55PM 7    FARMED THIS RICH LAND, AND THEY PRODUCED THEM, THIS WAS THE

01:56PM 8    CENTER FOR THE WORLD, THIS AGRICULTURE.  THAT'S WHAT PROVIDED

01:56PM 9    AND DROVE THIS AREA'S ECONOMY.  AND FARMERS, RANCHERS, THEY

01:56PM 10   DEVELOPED THIS LAND.

01:56PM 11       THEY MADE THEIR AGREEMENTS, THEY EXCHANGED BUSINESS

01:56PM 12   DEALINGS, AND I'M INFORMED THAT MORE OFTEN THAN NOT THOSE

01:56PM 13   BUSINESS DEALINGS WERE SEALED WITH A HANDSHAKE, THEY WERE

01:56PM 14   SEALED WITH AN EYE-TO-EYE PROMISE TO PERFORM, "I'LL BRING THIS

01:56PM 15   MANY BUSHELS, TONS OF TOMATOES, YOU WILL HAVE STRAWBERRIES, YOU

01:56PM 16   WILL HAVE CHERRIES, YOU WILL HAVE ARTICHOKES, YOU WILL HAVE ALL

01:56PM 17   OF THE RICHES THAT THE EARTH BELOW US IN THIS WONDERFUL,

01:56PM 18   WONDERFUL LAND PRODUCES."

01:56PM 19       BUT AS ALL THINGS DO, TIMES CHANGE.  AND ON A LITTLE SIDE

01:56PM 20   STREET IN PALO ALTO IN A LITTLE WOODEN GARAGE, A SINGLE CAR

01:57PM 21   GARAGE, WE KNOW THE HISTORY.  WE KNOW WHAT HAPPENED THERE.  TWO

01:57PM 22   INDIVIDUALS PUT THEIR MINDS TOGETHER AND THEY CREATED

01:57PM 23   SOMETHING, THEY DEVELOPED SOME INDUSTRY AND PUT THEIR HARD WORK

01:57PM 24   TO TASK AND CREATED INNOVATION, AND THAT CHANGED THIS VALLEY

01:57PM 25   FOREVER.

01:57PM 1      THE COMMERCE OF THIS VALLEY SHIFTED THEN, DIDN'T IT, FROM

01:57PM 2   AGRICULTURE TO TECHNOLOGY?

01:57PM 3      AND THOSE TWO INDIVIDUALS IN THAT SMALL WOODEN GARAGE IN

01:57PM 4   PALO ALTO, THEY CREATED THE TECHNOLOGY THAT CHANGED THE

01:57PM 5   AGRICULTURAL ECONOMY FOR THIS AREA.  THIS AREA NO LONGER

01:57PM 6   PRODUCED THE STRAWBERRIES, THE APRICOTS, THE CHERRIES, THE

01:57PM 7   ARTICHOKES, AND THE TOMATOES THAT IT ONCE DID IN THAT GREAT

01:57PM 8   ABUNDANCE, BUT RATHER THE TECHNOLOGY CHANGED, DIDN'T IT?

01:57PM 9      SO THE PAGE MILL ROAD WHERE WE SEE A LOT OF INNOVATION,

01:58PM 10  SAND HILL ROAD, THE VALLEYS HERE, THEY CHANGED, THOSE FARMS ARE

01:58PM 11  GONE, AND IN THEIR PLACE ARE THE TITANS OF INDUSTRY THAT HAVE

01:58PM 12  DEVELOPED FROM THAT SMALL GARAGE.  WE KNOW THIS LOCAL HISTORY.

01:58PM 13  IT'S NOT FOLKLORE.  IT'S THE HISTORY OF THIS AREA.

01:58PM 14     WHEN THEY CREATED, THOSE TWO INDIVIDUALS, THEY CREATED

01:58PM 15  WHAT THEY DID, AND THEY ALSO, IN CREATING THEIR COMPANY, THEY

01:58PM 16  ALSO CREATED AN ETHOS AND THEY CREATED A WAY OF CONDUCTING

01:58PM 17  THEIR BUSINESS CREATING WHAT THEY DO, TREATING THEIR EMPLOYEES

01:58PM 18  AND THEIR BUSINESS PARTNERS IN A WAY THAT SOUGHT TO CONTINUE

01:58PM 19  INNOVATION, TO PRODUCE INNOVATION RECOGNIZING THAT THIS AREA

01:58PM 20  WOULD SOON BE THE CRUCIBLE FOR INNOVATION AROUND THE WORLD AS

01:58PM 21  IT IS TODAY.  AND THE WORLD NOW LOOKS TO THIS AREA NOT SO MUCH

01:58PM 22  FOR THE AGRICULTURAL GIFTS FROM THE RICH EARTH BELOW US, BUT

01:59PM 23  FROM THE TECHNOLOGY, THE IDEAS THAT SPRING FORTH FROM THE MANY

01:59PM 24  BRIGHT MINDS THAT COME HERE, AND WE WELCOME THEM.  WE'RE

01:59PM 25  GRATEFUL FOR THAT TECHNOLOGY THAT COMES FORWARD, AND THE WORLD

01:59PM 1    RELIES ON IT.  THEY REALLY DO RELY ON IT.

01:59PM 2         CONCURRENT WITH THAT IS -- WITH THOSE BUSINESSES ARE HOW

01:59PM 3    DO WE FUND THAT?  HOW DO WE CREATE THAT?  HOW DO WE KEEP THAT

01:59PM 4    GOING?  AND THAT'S THE ISSUE OF FUNDING FOR BUSINESS THAT WE

01:59PM 5    SEE.

01:59PM 6         THIS CASE IS SO TROUBLING ON SO MANY, SO MANY LEVELS.

01:59PM 7         THERE'S NO QUESTION THAT MS. HOLMES IS BRIGHT.  I'VE READ

01:59PM 8    HER BACKGROUND.  WE READ ABOUT HER.  WE KNOW WHAT SHE HAS DONE.

01:59PM 9    WE KNOW WHAT SHE CREATED.  AT AN EARLY AGE, 19, GOING TO A

01:59PM 10   PRESTIGIOUS UNIVERSITY.  I THINK THAT THE PSR HAD TO BE

01:59PM 11   CORRECTED AS TO THE AGE.

02:00PM 12        AND SHE CREATED THIS AND IMMERSED HERSELF FORWARD.

02:00PM 13   PEOPLE GRAVITATED TOWARDS HER IDEA.

02:00PM 14        SHE JUST TOLD US ABOUT HER COMPANY'S WHAT DROVE HER.  AND

02:00PM 15   IT'S CLEAR FROM HER COMMENTS THAT THAT SPIRIT, HER DESIRE TO

02:00PM 16   PRODUCE, TO MAKE HER COMPANY SUCCESSFUL PERHAPS IS WHAT CAUSED

02:00PM 17   HER TO, AS SHE TOLD US JUST A MOMENT AGO, MAKE CERTAIN

02:00PM 18   MISTAKES.

02:00PM 19        THE INDUSTRY THAT WE KNOW OF HERE REGRETTABLY FINDS

02:00PM 20   VECTORS WITH THE FINANCIAL AND PERSONAL GAIN THAT CLOUDS

02:00PM 21   SOMETIMES THE GOOD JUDGMENT OF INDIVIDUALS, AND WE SEE THAT.

02:00PM 22        AND MR. DOWNEY TELLS US THIS WAS NOT A PURSUIT OF MONEY.

02:00PM 23   THIS WAS NOT A PURSUIT OF -- IT'S NOT LIKE OTHER WIRE FRAUD

02:00PM 24   CASES WHERE AN INDIVIDUAL SOUGHT RICHES TO BUY YACHTS, CARS,

02:01PM 25   AND ALL OF THOSE THINGS, AND LIVE A LAVISH LIFESTYLE.

128

02:01PM 1        BUT WHAT WAS IT THEN?  WHAT WAS IT THAT CAUSED MS. HOLMES,

02:01PM 2    REGRETTABLY, TO MAKE THOSE DECISIONS THAT SHE DID?

02:01PM 3        AND THE JURY HEARD AT LEAST THE EVIDENCE, HEARD THE

02:01PM 4    EVIDENCE THAT THE GOVERNMENT PUT FORWARD, STATEMENTS FROM

02:01PM 5    VICTIMS, STATEMENTS FROM OTHER INDIVIDUALS ABOUT

02:01PM 6    REPRESENTATIONS THAT WERE MADE.  AND THAT'S THE TROUBLING PART

02:01PM 7    OF THIS.  WAS THERE A LOSS OF A MORAL COMPASS HERE?  COULD,

02:01PM 8    REGRETTABLY, MS. HOLMES PARTAKE IN THE FRAUD THAT THE JURY

02:01PM 9    FOUND EXISTED, THE CONSPIRACY, AND THE THREE COUNTS THAT THEY

02:01PM 10    FOUND THAT HER CULPABLE OF?

02:01PM 11        THEY HEARD THE EVIDENCE.  THEY HEARD THE STATEMENTS THAT

02:01PM 12    WERE MADE TO THEM.  THEY HEARD, SAW THE TEXTS, THE CHAIN, THE

02:01PM 13    MESSAGES, THE COLLABORATION, IF YOU WILL, BETWEEN THE

02:02PM 14    CODEFENDANTS, AND THEY SAW THAT.

02:02PM 15        THE TRAGEDY OF THIS CASE IS THAT MS. HOLMES IS BRILLIANT.

02:02PM 16    SHE HAD CREATIVE IDEAS.  SHE IS A BIG THINKER.  SHE WAS A WOMAN

02:02PM 17    MOVING INTO AN INDUSTRY THAT WAS DOMINATED BY, AND LET'S FACE

02:02PM 18    IT, MALE EGO.  THAT YOUNG WOMEN ENTREPRENEURS ARE REGRETTABLY

02:02PM 19    DENIED ACCESS TO, BUT SHE MADE THAT.  SHE MADE THAT.  SHE GOT

02:02PM 20    INTO THAT WORLD.

02:02PM 21        AND AS WE'VE READ AND WE'VE HEARD, WE HAVE HEARD EVIDENCE

02:02PM 22    AND WE HAVE HEARD OTHER INDIVIDUALS TESTIFY IN THE TRIAL AS TO

02:02PM 23    VARIOUS REASONS HOW, HOW THEY CAME TO KNOW HER AND HOW THEY

02:02PM 24    CAME TO BELIEVE HER STATEMENTS, AND BELIEVE THE PRODUCT THAT

02:02PM 25    SHE WAS SELLING THAT WE KNOW, WE KNOW FROM THE TESTIMONY OF

02:03PM  1    WITNESSES WAS NOT WORKING.  IT DIDN'T WORK.  IT WAS SENT TO

02:03PM  2    WALGREENS.  I READ SOMETHING THAT SUGGESTS WALGREENS HAD THE

02:03PM  3    OPPORTUNITY TO TEST IT.  THEY COULD HAVE TESTED IT.  IT WAS

02:03PM  4    GIVEN TO THEM.  THEY COULD HAVE LOOKED AT IT, BUT -- AND THEN

02:03PM  5    WE LEARNED THAT THERE WAS TAPE PERHAPS, THERE WERE SECURED

02:03PM  6    MACHINES, THE EDISONS WERE SECURED.  THE PROPER APPROPRIATE

02:03PM  7    DEVICES WERE NOT GIVEN TO THEM SO THEY COULD ACCURATELY TEST

02:03PM  8    IT.

02:03PM  9         THERE WAS SIGNIFICANT EVIDENCE ABOUT MANIPULATION AND

02:03PM  10   UNTRUTHS THAT WERE BEING USED IN THE NEGOTIATION OF THE

02:03PM  11   BUSINESS.  AND WHAT IS IT THAT CAUSED THAT?  WAS IT HUBRIS?

02:03PM  12   WHAT CAUSED THAT?  WAS IT INTOXICATION WITH THE FAME THAT COMES

02:03PM  13   WITH BEING A YOUNG ENTREPRENEUR?

02:04PM  14        AND MR. DOWNEY SUGGESTS SHE DID NOT GO TO THAT, IT CAME TO

02:04PM  15   HER.  AND PERHAPS THAT'S THE REAL PITY OF IT.

02:04PM  16        THE LETTERS THAT WERE REFERENCED, I'VE READ THEM, THEY

02:04PM  17   WERE MEANINGFUL.  THESE ARE LETTERS IN SUPPORT OF MS. HOLMES.

02:04PM  18   THEY SPOKE TO A DIFFERENT INDIVIDUAL PERHAPS THAT THE JURY

02:04PM  19   HEARD.  THEY WEREN'T HERE.  MANY OF THE LETTER WRITERS WEREN'T

02:04PM  20   AT THE TRIAL I DON'T BELIEVE, BUT THEY SPOKE TO A DIFFERENT

02:04PM  21   INDIVIDUAL AND THEIR EXPERIENCES.  AND THEY WERE MOVING.

02:04PM  22        THEY TALKED ABOUT HOW MS. HOLMES WOULD VISIT WHEN THEY

02:04PM  23   WERE ILL, WHEN THEY HAD A PROBLEM, SHE WAS SO GIVING, SHE WAS

02:04PM  24   ALWAYS THERE.

02:04PM  25        THE LETTERS REFERENCED BY VENTURE CAPITALISTS AND OTHERS

02:04PM 1    WHO MENTIONED INNOVATION AND THEY TALK ABOUT THE VC WORLD AND

02:04PM 2    THOSE TYPES OF THINGS.  ONE THING THAT WAS MISSING FROM THOSE

02:04PM 3    LETTERS WAS -- AND I DIDN'T SEE IT, THEY TALKED ABOUT, WELL, IN

02:05PM 4    THE INDUSTRY IN THIS VALLEY FAILURE IS QUITE NORMAL.

02:05PM 5    BUSINESSES FAIL ALL OF THE TIME.  WE, VC'S, WE INVEST IN

02:05PM 6    BUSINESSES, AND IF WE GET A 10 PERCENT RETURN, WE'RE

02:05PM 7    SUCCESSFUL, IT'S THE NEXT BIG THING, THAT'S WHAT WE'RE LOOKING

02:05PM 8    FOR.  SO FAILURE IS NOT UNCOMMON, AND YOU SHOULD RECOGNIZE

02:05PM 9    THAT, THEY SUGGEST.

02:05PM 10        ONE THING THAT THE LETTERS OMIT, THOUGH, THEY DID NOT SAY,

02:05PM 11   THEY DID NOT SAY ANYTHING ABOUT, NOR DID THEY ENDORSE FAILURE

02:05PM 12   BY FRAUD.  THEY DID NOT SAY, WELL, IT'S OKAY, FRAUD IS OKAY,

02:05PM 13   AND THAT'S PART OF FAILURE.  THEY DIDN'T TALK ABOUT THAT.

02:05PM 14        AND I DON'T THINK THAT THEY COULD.  I DON'T THINK THAT

02:05PM 15   THEY WOULD, THEY WOULD CONDONE FRAUD.  THEY COULDN'T DO THAT.

02:06PM 16        THESE LETTERS SPEAK TO A RECOGNITION THAT COMPANIES FAIL,

02:06PM 17   THEY FALTER.  THERE WAS ONE LETTER -- I WROTE THE QUOTE DOWN.

02:06PM 18   IT'S, "WE BELIEVE THAT NO ONE SHOULD INVEST NO MORE THAN THEY

02:06PM 19   ARE EXPECTED TO LOSE."

02:06PM 20        SO INVESTORS, SOPHISTICATED INVESTORS, IT'S ALL RIGHT TO

02:06PM 21   INVEST AND LOSE MONEY, THAT'S THE EXPECTATION, BUT THE PUBLIC

02:06PM 22   AND SOPHISTICATED INVESTORS THAT MAKE THOSE INVESTMENTS, THEY

02:06PM 23   TAKE THOSE RISKS.  THEY SHOULD TAKE THOSE RISKS FREE FROM LIES

02:06PM 24   AND MISREPRESENTATION.  THAT'S THE FOUNDATION OF INNOVATION AND

02:06PM 25   INVESTMENT, HONESTY IN THE MARKET.

02:06PM 1        THOSE LETTER WRITERS DID NOT CONDONE MISREPRESENTATIONS,

02:06PM 2    MANIPULATION.  AND I KNOW ABOUT ALL OF THE GOOD THINGS THAT THE

02:06PM 3    INDIVIDUALS SAID ABOUT MS. HOLMES, AND I RESPECT THAT, AND IT'S

02:06PM 4    HELPFUL TO THE COURT.

02:06PM 5        HOWEVER, IF IT WAS REVEALED TO THEM WHAT THIS JURY HEARD

02:06PM 6    AND OF THE CONDUCT THAT WAS ENGAGED IN, I AM QUITE CONFIDENT

02:07PM 7    THAT THEY WOULD NOT, THEY WOULD NOT CONDONE THAT.

02:07PM 8        SO WHAT WAS IT THAT CAUSED -- WAS IT INTOXICATION, AS I

02:07PM 9    SAID, WITH THE FAME?

02:07PM 10        WE KNOW, THE RECORD SHOWS, THAT THE MISREPRESENTATION,

02:07PM 11    THERE WERE MANY.  THE TEXTS BETWEEN MS. HOLMES AND MR. BALWANI

02:07PM 12    SUPPORTED THE JURY'S FINDING OF THE CONSPIRACY.

02:07PM 13        ONE LETTER MENTIONED MERCY AND THE WORK OF

02:07PM 14    BRYAN STEVENSON.  WE ALL ARE FAMILIAR WITH THE WORK OF

02:07PM 15    BRYAN STEVENSON.  HE REPRESENTS MANY WHO FIND THEMSELVES

02:07PM 16    DISPROPORTIONATELY INSINUATED INTO THE CRIMINAL JUSTICE SYSTEM

02:07PM 17    BECAUSE OF POVERTY, LACK OF EDUCATION, OPPORTUNITY FOR FAMILY

02:07PM 18    SUPPORT, AND HIS WORK EXPOSES THE INEQUITIES OF THE TREATMENT

02:08PM 19    OF MANY IN OUR CRIMINAL JUSTICE SYSTEM.  AND THE AUTHOR DID NOT

02:08PM 20    SUGGEST THAT THIS CASE, THIS CASE WAS A CASE THAT WAS THE TYPE

02:08PM 21    OF CASE THAT MR. STEVENSON WOULD HANDLE, BUT THE LETTER DID USE

02:08PM 22    THE WORD "MERCY" AND SUGGESTED THEN THAT IS SOMETHING THAT THE

02:08PM 23    COURT SHOULD ALSO CONSIDER.

02:08PM 24        THIS IS A FRAUD CASE WHERE AN EXCITING VENTURE WENT

02:08PM 25    FORWARD WITH GREAT EXPECTATIONS AND HOPE ONLY TO BE DASHED BY

02:08PM 1  UNTRUTH, MISREPRESENTATIONS, HUBRIS, AND PLAIN LIES.

02:08PM 2  I SUPPOSE WE STEP BACK AND WE LOOK AT THIS, AND WE THINK

02:08PM 3  WHAT IS THE PATHOLOGY OF FRAUD?  IS IT THE INABILITY OR THE

02:09PM 4  REFUSAL TO ACCEPT RESPONSIBILITY OR EXPRESS CONTRITION IN ANY

02:09PM 5  WAY?

02:09PM 6  NOW, PERHAPS THAT IS THE CAUTIONARY TALE THAT WILL GO

02:09PM 7  FORWARD FROM THIS CASE.

02:09PM 8  YOU'LL RECALL THE WONDERFUL INNOVATION OF THOSE TWO

02:09PM 9  INDIVIDUALS IN THAT SMALL GARAGE IN PALO ALTO.  NO EXOTIC

02:09PM 10  AUTOMOBILES OR LAVISH LIFESTYLE, JUST A DESIRE TO CREATE FOR

02:09PM 11  SOCIETY'S BENEFIT THROUGH HONEST HARD WORK, AND THAT I WOULD

02:09PM 12  HOPE WOULD BE THE CONTINUING STORY, THE LEGACY AND PRACTICE OF

02:09PM 13  SILICON VALLEY.

02:09PM 14  IN THIS MATTER, THE COURT IS GOING TO IMPOSE A SENTENCE

02:09PM 15  THAT THE COURT FINDS IS SUFFICIENT BUT NOT GREATER THAN

02:09PM 16  NECESSARY TO COMPLY WITH THE PURPOSES SET FORTH IN 18 UNITED

02:10PM 17  STATES CODE SECTION 3553.

02:10PM 18  THE COURT HAS CONSIDERED THE HISTORY AND CHARACTERISTICS

02:10PM 19  OF THE DEFENDANT AND THE NATURE AND CIRCUMSTANCES OF THE

02:10PM 20  OFFENSE, INCLUDING THOSE ITEMS THAT I MENTIONED.

02:10PM 21  THE COURT HAS RECOGNIZED THAT THE SENTENCE NEEDS TO BE

02:10PM 22  IMPOSED TO REFLECT THE SERIOUSNESS OF THE OFFENSE AND TO

02:10PM 23  PROMOTE RESPECT FOR THE LAW AND TO PROVIDE JUST PUNISHMENT FOR

02:10PM 24  THE OFFENSE, TO AFFORD ADEQUATE DETERRENCE IN CRIMINAL CONDUCT.

02:10PM 25  IN THIS REGARD, THE COURT WILL IMPOSE THE FOLLOWING

02:10PM 1    SENTENCE:

02:10PM 2        THE COURT WILL IMPOSE A SPECIAL ASSESSMENT OF $400, THAT'S

02:10PM 3    $100 FOR EACH COUNT.

02:10PM 4        THE COURT WILL ASK THAT THE PARTIES MEET AND CONFER

02:11PM 5    REGARDING A RESTITUTION HEARING DATE THAT WE WILL SET IN THE

02:11PM 6    FUTURE.

02:11PM 7        AS I'VE SAID, I'VE ASKED DEFENSE COUNSEL TO PLEASE CHECK

02:11PM 8    WITH YOUR CLIENT TO SEE IF SHE WISHES TO WAIVE HER APPEARANCE

02:11PM 9    FOR THAT.  THE COURT WOULD ACCEPT THAT.

02:11PM 10        THE COURT IS NOT GOING TO IMPOSE A FINE IN THIS MATTER.

02:11PM 11    THE COURT HAS REVIEWED THE FINANCIAL STATEMENTS FILED IN THIS

02:11PM 12    CASE, AND THE COURT WILL NOT IMPOSE A FINE.

02:11PM 13        THE COURT WILL IMPOSE A PERIOD OF SUPERVISED RELEASE OF

02:11PM 14    THREE YEARS AS TO EACH COUNT.  THOSE ARE CONCURRENT, CONCURRENT

02:11PM 15    AS TO EACH COUNT.

02:11PM 16        THE COURT WILL ADOPT THE RECOMMENDATIONS OF SUPERVISED

02:11PM 17    RELEASE AS INDICATED IN THE PSR.  THE COURT HAS REVIEWED THOSE

02:11PM 18    AND FINDS THAT THEY ARE APPROPRIATE, AND THE COURT WILL ORDER

02:12PM 19    THOSE.

02:12PM 20        IN THIS MATTER, HAVING FOUND THE GUIDELINES AS INDICATED,

02:12PM 21    THE COURT IS GOING TO IMPOSE A GUIDELINE SENTENCE OF

02:12PM 22    135 MONTHS.  THE COURT IMPOSES THIS SENTENCE AFTER CONSULTING

02:12PM 23    THE UNITED STATES SENTENCING GUIDELINES AND IN LIGHT OF THE

02:12PM 24    STATUTORY CONCERNS EXPRESSED IN 18 UNITED STATES CODE SECTION

02:12PM 25    3553(A).

134

| | | |
|---|---|---|
| 02:12PM | 1 | THE COURT IS GOING TO SET A SURRENDER DATE OF APRIL 27, |
| 02:12PM | 2 | 2023 AT 2:00 P.M. |
| 02:12PM | 3 | THE COURT WILL, IF YOU WISH -- MR. DOWNEY, DO YOU WANT TO |
| 02:12PM | 4 | RECOMMEND A PLACE AND A LOCATION?  SHOULD THAT BE AT A LOCATION |
| 02:12PM | 5 | AS CLOSE AS POSSIBLE TO NORTHERN CALIFORNIA TO ALLOW FOR |
| 02:12PM | 6 | VISITATION? |
| 02:12PM | 7 | MR. DOWNEY:  ACTUALLY, NO, YOUR HONOR. |
| 02:12PM | 8 | I WONDER IF I COULD -- I DON'T KNOW IF THE COURT PLANS TO |
| 02:12PM | 9 | ACTUALLY ENTER TODAY, BUT IF THE COURT COULD WAIT UNTIL MONDAY, |
| 02:13PM | 10 | I CAN NOTIFY THE COURT ON A LOCATION WE WOULD REQUEST A |
| 02:13PM | 11 | RECOMMENDATION OF. |
| 02:13PM | 12 | THE COURT:  THAT'S FINE.  THAT'S FINE. |
| 02:13PM | 13 | MS. HOLMES, YOU HAVE THE RIGHT TO APPEAL, INCLUDING THE |
| 02:13PM | 14 | RIGHT TO APPOINTED COUNSEL IF YOU CANNOT AFFORD COUNSEL FOR |
| 02:13PM | 15 | APPEAL. |
| 02:13PM | 16 | ANY APPEAL MUST BE FILED WITHIN 14 DAYS OF TODAY'S DATE. |
| 02:13PM | 17 | DO YOU UNDERSTAND THAT? |
| 02:13PM | 18 | THE DEFENDANT:  YES. |
| 02:13PM | 19 | THE COURT:  ANYTHING FURTHER? |
| 02:13PM | 20 | MR. SCHENK:  NO, YOUR HONOR. |
| 02:13PM | 21 | MR. DOWNEY:  YOUR HONOR, I THINK IT WOULD BE OUR |
| 02:13PM | 22 | INTENTION TO MOVE FOR BAIL PENDING APPEAL.  I GUESS I WOULD |
| 02:13PM | 23 | LIKE GUIDANCE FROM THE COURT. |
| 02:13PM | 24 | THE COURT:  SURE. |
| 02:13PM | 25 | MR. DOWNEY:  I'M HAPPY TO EXPLAIN OUR THINKING, BUT |

135

02:13PM 1     I DON'T THINK THE COURT --

02:13PM 2          THE COURT:  I SET THE SURRENDER DATE.  I HOPE YOU

02:13PM 3     RECOGNIZE THE TIME AND APPRECIATE THE TIMING OF THAT.

02:13PM 4          IF YOU WISH TO FILE -- I THINK IT'S APPROPRIATE TO FILE

02:14PM 5     SOME DOCUMENTS.  THE SURRENDER DATE CERTAINLY PROVIDES YOU AN

02:14PM 6     OPPORTUNITY TO DO THAT.

02:14PM 7          MR. DOWNEY:  WE'LL DO IT IN THAT FORM, AND I'LL ONLY

02:14PM 8     SAY, OBVIOUSLY, IT'S A VERY LONG TRIAL, AND THERE ARE A NUMBER

02:14PM 9     OF ISSUES, SO WE EXPECT APPEALS ARISING OUT OF THAT, AND WE'LL

02:14PM 10    CONSULT WITH THE GOVERNMENT AS TO A SCHEDULE THAT WE MAY

02:14PM 11    PROPOSE.

02:14PM 12         THE COURT:  THAT WOULD BE FINE.  THANK YOU VERY

02:14PM 13    MUCH.  THANK YOU.

02:14PM 14      ANYTHING FURTHER?

02:14PM 15      ARE THERE -- LET ME ASK THIS, WERE THERE COUNTS THAT WERE

02:14PM 16    SUBMITTED FOR DISMISSAL THAT HAVE NOT YET BEEN RULED ON?

02:14PM 17         MR. LEACH:  THERE WERE, YOUR HONOR.  COUNTS --

02:14PM 18         THE COURT:  WHATEVER COUNTS WERE SUBMITTED FOR

02:14PM 19    DISMISSAL BY THE GOVERNMENT, I'LL GRANT THAT RELIEF REQUESTED,

02:14PM 20    AND THOSE COUNTS ARE DISMISSED.

02:14PM 21         MR. LEACH:  COUNTS THREE THROUGH FIVE, YOUR HONOR.

02:14PM 22         THE COURT:  THOSE ARE DISMISSED.  THANK YOU.

02:14PM 23      THANK YOU EVERYONE.

02:15PM 24      (COURT CONCLUDED AT 2:15 P.M.)

25

1

2

3                           CERTIFICATE OF REPORTER

4

5

6

7           I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE

8     UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9     CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10    HEREBY CERTIFY:

11          THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16                         _____
                           IRENE RODRIGUEZ, CSR, RMR, CRR
17                         CERTIFICATE NUMBER 8074

18

19                         DATED:  NOVEMBER 21, 2022

20

21

22

23

24

25

UNITED STATES COURT REPORTERS

**ER-166**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

### CRIMINAL MINUTES

| | | |
|---|---|---|
| **Date:** November 18, 2022 | **Time:** 10:11-11:55 AM; 12:21-2:15 PM | **Judge:** Edward J. Davila |

**Total Time:** 3 hr, 38 min.

**Case No.:** 5:18-CR-00258-1 EJD   **Case Name:** *United States v. Elizabeth Holmes* (P) (NC)

**Attorney for Plaintiff:**    Robert Leach, John Bostic, Jeffrey Schenk, Kelly Volkar

**Attorney for Defendant**    Kevin Downey, Lance Wade, Amy Saharia, Katie Trefz, Patrick Looby, Andrew Lemens, JR Fleurmont, Richard Cleary, John Cline

**Deputy Clerk:** Cheré Robinson          **Court Reporter:** Irene Rodriguez

**Probation Officer:** Kyle Pollak

### PROCEEDINGS - SENTENCING

Defendant present and not in custody.  Hearing held.

The Court addresses objections to the Presentence Investigation Report.  Arguments of Counsel heard.

The Court rules on objections; separate Order to issue.

The Court sentences Defendant as follows:

> Defendant is sentenced to 135 months as to Counts One, Six, Seven and Eight of the Third Superseding Indictment (ECF No. 469, filed July 28, 2020), to be served concurrently.  Defendant is committed to the Bureau of Prisons to be imprisoned for said term.

> Upon release from imprisonment, the Defendant shall serve a term of 3 years supervised release as to Counts One, Six, Seven and Eight of the Third Superseding Indictment to be served concurrently.  The Court adopts the Probation Officer's recommendations as to the standard and special conditions of supervised release.

> A special assessment fee of $400 is imposed.  The Court imposes no fine.

Defendant shall self-surrender on April 27, 2023, at 2:00 PM to the designated facility; if a facility has not been designated, Defendant shall self-surrender to the U.S. Marshal's office.  All present conditions of release remain in effect until such surrender.

The Court makes the following recommendation:  The Defendant be designated to the Federal Prison Camp at Bryan, Texas.  The Court finds that family visitation enhances rehabilitation.

The Court requests Counsel meet and confer on a date for a restitution hearing and provide the Court with proposed dates.

**Cheré Robinson**
**Courtroom Deputy**
Original: Efiled
CC:

P/NP: Present, Not Present
C/NC: Custody, Not in Custody
I: Interpreter

1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

USA,

           Plaintiff,

    v.

ELIZABETH A. HOLMES,

          Defendant.

Case No.   5:18-cr-00258-EJD-1

**ORDER DENYING MS. HOLMES'
MOTION TO STRIKE**

Re: Dkt. No. 1191

On November 19, 2021, Ms. Holmes moved to strike Trial Exhibit 4621 ("the CMS Report") and testimony related to the exhibit. *See* Transcript of Oral Argument at 7085. Thereafter, on December 10, 2021, this Court requested briefing on the motion to strike. *See* Dkt. No. 1191; *see also* Ms. Holmes' Supplemental Brief in Support of Motion to Strike ("Mot"), Dkt. No. 1191; United States' Opposition to Defendant's Motion to Strike ("Opp."), Dkt. No. 1192. Having read the Parties' briefs and having had the benefit of oral argument on December 13, 2021, the Court **DENIES** Ms. Holmes' motion to strike.

During the examination of Dr. Kingshuk Das, the Government introduced the cover letter that accompanied the CMS Report and excerpts of the Report. The CMS Report and its accompanying cover letter were referred to as Exhibit 4621. However, the CMS Report and its accompanying cover letter were submitted into evidence as separate exhibits, with the cover letter being labeled "4621A" and excerpts of the Report being labeled "4621B." Until this separation, the Court and Parties had understood the CMS Report and the cover letter to be a single document. *See* Dkt. No. 989 at 7 n.1. During the charging conference, the Parties informed the Court that there was a dispute about how Exhibits 4621A and 4621B could be used. The Government argued

that because Ms. Holmes did not object on hearsay grounds to the introduction of Exhibit 4621A, the exhibit could be admitted for the truth of the matter asserted therein. The Government, however, agreed that Exhibit 4621B was introduced only to demonstrate Ms. Holmes' state of mind, a nonhearsay purpose. After reviewing the record, it appears that Ms. Holmes did object to the introduction of Exhibit 4621A. *See* Transcript at 5801. This objection referenced the Court's earlier discussion with counsel in which the Government asserted that the CMS Report was being introduced only for state of mind purposes. *Id.* 5693. Based on this colloquy, the Court determined that Exhibit 4621A[1] was introduced for state of mind purposes and not for the truth of the matter asserted therein. *See* Transcript of Oral Argument at 8888.

Ms. Holmes argues that Exhibits 4621A and 4621B should be excluded under Federal Rule of Evidence 403. The Court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needless presenting cumulative evidence. Fed. R. Evid. 403. The Court holds that the probative value of the CMS Report, its cover letter, and Dr. Das's testimony as to the Report is not substantially outweighed by the danger of unfair prejudice or confusion. The CMS Report and the testimony about the Report were probative in that they revealed knowledge by Ms. Holmes' of the state of the CLIA Lab in late 2015 (when the CMS inspection was ongoing) and early 2016 (when the CMS Report was received by Theranos). The Report and the accompanying testimony are thus highly relevant as they tend to make it more likely that Ms. Holmes also knew about the condition of the lab during the charging period. *See* Dkt. No. 798 at 12–13, 20 (determining that post-charging period events are relevant, non-excludable propensity evidence that is probative of Ms. Holmes' state of mind, intent, and knowledge). Additionally, because the CMS Report and its accompanying cover letter are being used only for state of mind, there is a minimal risk that the jury will be confused or mislead by the

---

[1] Because of this determination, Exhibits 4621A and 4621B will be relabeled as "Exhibit 4621." The Court does not address Ms. Holmes' Confrontation Clause arguments as Exhibit 4621 is not being introduced for a hearsay purpose.

Report.  Further, Ms. Holmes had an opportunity to cross examine Dr. Das and was able to introduce comparable exhibits that demonstrate her absence of intent.  Therefore, the risk of unfair prejudice, if any, is minimized.  The Court **DENIES** Ms. Holmes' motion to strike CMS Report and Dr. Das's testimony about the Report on Rule 403 grounds.

       **IT IS SO ORDERED.**

Dated: December 13, 2021

EDWARD J. DAVILA
United States District Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| USA, | Case No. 5:18-cr-00258-EJD-1 |
| Plaintiff, | **ORDER DENYING MS. HOLMES'** |
| | **MOTION TO ADMIT PRIOR** |
| v. | **TESTIMONY OF RAMESH "SUNNY"** |
| | **BALWANI** |
| ELIZABETH A. HOLMES, | |
| Defendant. | Re: Dkt. No. 1163 |

Defendant Elizabeth Holmes moves to admit prior deposition testimony of her co-defendant Ramesh "Sunny" Balwani under either Federal Rule of Evidence 804(b)(1) or (b)(3). Ms. Holmes' Motion to Amit Prior Testimony of Ramesh "Sunny" Balwani ("Mot."), Dkt. No. 1163. The Government opposes this motion and argues that neither exception to the rule against hearsay identified by Ms. Holmes applies. United States' Opposition to Holmes' Motion to Admit Prior Testimony of Ramesh "Sunny" Balwani ("Opp."), Dkt. No. 1166.

Federal Rule of Evidence 804(b)(1) requires Ms. Holmes to demonstrate that Mr. Balwani made the proffered statements during a lawful deposition and that the party against whom the statements are offered had an opportunity and similar motive to develop the testimony through direct, cross, or redirect examination. Even if the Securities Exchange Commission ("SEC") and Department of Justice ("DOJ") are the same party, the Ninth Circuit's precedent indicates that the SEC's motive in developing Mr. Balwani's testimony at the time of the deposition was different from that of the DOJ at trial. *See SEC v. Jasper*, 678 F.3d 1116, 1128–29 (9th Cir. 2012).

Federal Rule of Evidence 804(b)(3) requires Ms. Holmes to demonstrate that Mr. Balwani's statements are inculpatory and are supported by corroborating circumstances that "clearly indicate" trustworthiness.  Ms. Holmes has not met this burden.  First, it is unclear how the identified statements expose Mr. Balwani to civil or criminal liability.  Second, to the extent corroborating circumstances exist, they do not "clearly indicate" trustworthiness.

Accordingly, based on these reasons and the analysis below, this Court **DENIES** Ms. Holmes' motion to admit Mr. Balwani's prior testimony.

## I.     BACKGROUND

In August 2017, the SEC deposed Mr. Balwani and asked him questions about his role at Theranos.  Thereafter, on June 14, 2018, both Ms. Holmes and Mr. Balwani were criminally indicted for wire fraud and conspiracy to commit wire fraud.  Dkt. No. 1.  Mr. Balwani's criminal trial is scheduled for January 2022, after the conclusion of Ms. Holmes' criminal trial.

Given Mr. Balwani's upcoming trial and his Fifth Amendment protections, Ms. Holmes argues Mr. Balwani is unavailable as a witness for her trial and seeks to introduce Mr. Balwani's out-of-court statements under Federal Rules of Evidence 804(b)(1) and/or (b)(3).  Ms. Holmes' motion focuses on four categories of statements made by Mr. Balwani in his SEC deposition: his testimony about the null protocol and his testimony that he was responsible for managing the CLIA lab, Theranos' financial modeling, and the Walgreens and Safeway relationships.  *See* Mot. at 4.

Ms. Holmes withdrew the portion of the motion regarding null protocol.  Transcript of Oral Argument at 7950–51.  The Court determined that statements in Exhibit C regarding Mr. Balwani's role in managing the CLIA lab were unduly cumulative and excluded them under Federal Rule of Evidence 403.  Transcript of Oral Argument at 8193–94.  This extends to statements regarding the CLIA lab in Exhibit A.

On November 30, 2021, Mr. Balwani's counsel, Jeffrey Coopersmith, told the Court that if Mr. Balwani were called as a witness by Ms. Holmes, Mr. Balwani would "assert his Fifth

Amendment rights with respect to any substantive question, including on topics" regarding "his role in the CLIA lab," "his role in financial modeling," and "his role in the Walgreens and Safeway relationships."  Transcript of Oral Argument at 8195–98.  Based on these representations, the Court determined that Mr. Balwani was "unavailable" within the meaning of Federal Rule of Evidence 804(b).  *See United States v. Oropeza*, 564 F.2d 316, 325 n.8 (9th Cir. 1977) (noting that invocation of the privilege against self-incrimination could support a finding of unavailability).

## II.      LEGAL STANDARDS

The Federal Rules of Evidence prohibit parties from introducing out-of-court statements for the truth of the matter asserted therein unless an exception or exemption to the rule against hearsay applies.  Fed. R. Evid. 801(c), 802.  Two such exceptions are Federal Rule of Evidence 804(b)(1) and (b)(3).

To admit statements under Federal Rule of Evidence 804(b)(1), the proponent must demonstrate that the unavailable declarant's testimony occurred during a prior trial, hearing, or lawful deposition and that the party against whom the testimony is offered had an opportunity or similar motive to develop the prior testimony through direct, cross, or redirect examination.

To admit statements under Federal Rule of Evidence 804(b)(3), the proponent must demonstrate that (1) the declarant is unavailable, (2) a reasonable person in the declarant's position would have made the statement only if the person believed it to be true because, when made, it exposed the declarant to civil or criminal liability, and (3) if, as here, the statements are offered in a criminal case and tend to expose the declarant to criminal liability, the statements must be supported by corroborating circumstances that clearly indicate the statements' trustworthiness.

## III.      DISCUSSION

Mr. Balwani's invocation of his Fifth Amendment privilege makes him unavailable.  Therefore, to introduce prior, out-of-court testimony by Mr. Balwani, Ms. Holmes must demonstrate either that the Government had prior opportunity and motive to cross examine Mr.

Balwani or that the statements made in that testimony expose him to either criminal or civil liability and, to the extent the statements tend to expose Mr. Balwani to criminal liability, are corroborated by circumstances that clearly indicate trustworthiness. The Court addresses each exception in turn.

### A. Federal Rule of Evidence 804(b)(1)

This Court must decide whether the SEC and DOJ are the "same party" and, if so, whether the SEC, in its civil investigation of Theranos, had both the opportunity and a similar motive to the DOJ in developing Mr. Balwani's testimony.

#### 1. Same Party

There is limited case law on the issue of whether the SEC and DOJ are the "same party" for Rule 804(b)(1) purposes. *See United States v. Baker*, 923 F.3d 390, 399 (5th Cir. 2019) ("The case law on this issue is limited, and no court has expressly held that the SEC and the DOJ are the same party."); *United States v. Sklena*, 692 F.3d 725, 731 (7th Cir. 2012) ("There is very little law on the question whether two government agencies, or as in this case the United States and a subsidiary agency, should be considered as different parties for litigation purposes, or if they are both merely agents of the United States."). The Ninth Circuit has not specifically addressed this question, but *Federal Deposit Insurance Corp. v. Glickman*, 450 F.2d 416 (9th Cir. 1971) supports treating the SEC and DOJ as separate parties. There, the Ninth Circuit found that the Federal Deposit Insurance Corporation ("FDIC"), a federal agency, and the United States Government were not the "same party" simply because both were federal agencies. *Id.* at 418. Instead, the FDIC was a "different party" because it was standing in the shoes of the insolvent bank and was thus acting in its capacity as a receiver of the bank and not in its capacity as a Government actor, as it would have been if it were "represented in [the] litigation by the United States Attorney." *Id.* While the logic is not exactly applicable to this case, since both the SEC and DOJ are "government actors," it does demonstrate that government agencies are not the "same party" by virtue of their federal agency status. It also indicates that the DOJ's role in litigation distinguishes

it from other federal agencies.

Like *Glickman*, the Fifth Circuit in *Baker* found that two federal agencies are not "the same party" simply because of their federal agency status.  In *Baker*, the Fifth Circuit held that the SEC and DOJ are separate parties.  923 F.3d at 399–401.  In making this determination, the Fifth Circuit noted that the SEC conducted its own, independent investigation, that the DOJ was not present at any of the SEC's depositions, that an SEC attorney was not cross-designated or assigned to the DOJ prosecution team, and that the DOJ did not provide the SEC with materials from its investigation.  *Id.* at 400–01.  While there was some "cooperation" between the agencies, it was not enough to demonstrate that the SEC and DOJ were the "same party" within the meaning of Rule 804(b)(1).  *Id.*

Likewise, in this case, while there has been cooperation between the SEC and DOJ, there is no evidence that the two agencies coordinated their investigations.  The defense focuses on the provision in the SEC subpoenas that say that the SEC can share information with the DOJ, but that is not sufficient to show coordination between the two agencies.  Indeed, as defense counsel admitted, there was no United States Attorney representing the DOJ or the prosecution at the SEC depositions, nor was there any DOJ agent present at the depositions.  Transcript of Oral Argument at 7704; *see also* Opp. at 6 (stating that members of the prosecution did not attend the SEC deposition of Mr. Balwani and did not contribute input to the questions as by the SEC); *United States v. Stringer*, 535 F.3d 929, 933 (9th Cir. 2008) ("Federal securities laws authorize the SEC to transmit evidence it has gathered to the [United States Attorneys' Office] to facilitate a criminal investigation by [the Office].").  Thus, as in *Baker*, while there was some cooperation between the two agencies, it was not extensive enough for the SEC and the DOJ to be deemed the same party.

*Sklena*, which held that the Community Futures Trading Commission ("CFTC") and the DOJ are the same party under Rule 804(b)(1), does not require a different result.  692 F.3d at 731–32.  Unlike the SEC, the CFTC is statutorily required to report to the DOJ and must cooperate with the DOJ.  *See id.* ("[The] statutory control mechanism suggests to us that, had the [DOJ]

wished, it could have ensured that the CFTC lawyers included questions of interest to the United States [during the deposition].").  The SEC is an independent agency with its own litigating authority.  *Baker*, 923 F.3d at 401; *see also SEC v. Robert Collier & Co.*, 76 F.2d 939, 940 (2d Cir. 1935) ("[T]he [SEC] [has] complete autonomy in civil prosecutions.").

### 2.  Opportunity and Similar Motive

Even if the SEC and DOJ are deemed to be the same party, they did not share a sufficiently similar motive in developing Mr. Balwani's testimony.  The Ninth Circuit has distinguished a party's motive during the investigatory process and the accusatory stage of proceedings.  *See Jasper*, 678 F.3d at 1128–29.  In *Jasper*, the defendant in an SEC enforcement action sought to introduce the investigative testimony of a lower-level employee that was taken by the SEC before the formal complaint was filed.  *Id.* at 1127–29.  The employee was unavailable to testify at trial because he had invoked his Fifth Amendment right against self-incrimination.  *Id.*  The Ninth Circuit affirmed the district court's decision that the employee's prior testimony was inadmissible against the SEC because the motivations during early investigation, "at which open-ended questions are typically asked without expectation the witness will be needed at trial," are different from the motivations at later stage adverse witness depositions, when "battle lines have already been drawn and necessary witnesses identified."  *Id.* at 1128–29.

As in *Jasper*, the SEC deposition occurred in the early stages of investigation, almost a year before any criminal indictment was filed.  Most of the questions identified in Exhibits A, B, and C of the motion are open-ended and not leading and seem to be posed to gather information about Theranos and Mr. Balwani's role at the company rather than to gather information against an adverse witness.  *Compare* Exhibit A at ECF 3 ("[C]an you briefly explain how that -- . . . what – got added to your portfolio?"); Exhibit B at ECF 5 ("Was there anyone else from Theranos who was working on the model while you were working on it?"); Exhibit C at ECF 3 ("Who at Theranos made the determination of what device to use for patient testing in the CLIA lab?"), *with* Exhibit D (SEC deposition in July 2019 that occurred after the first criminal indictment was filed)

at ECF 4 ("At the time you joined Theranos . . . Theranos was on the verge of running out of money, correct?").  The Court holds that the SEC's motivation during the early 2017 stage of the investigation was not like the motive of the DOJ today and thus the party against whom the statements are offered did not have "an opportunity and similar motive to develop [the testimony] by direct, cross, or redirect examination."  Fed. R Evid. 804(b)(1)(B).  Ms. Holmes motion to admit Mr. Balwani's statements under Federal Rule of Evidence 804(b)(1) is thus **DENIED.**

### B.  Federal Rule of Evidence 804(b)(3)

The Court must decide whether the statements made by Mr. Balwani in his SEC deposition are statements against interest.  The Court only answers this question as to statements regarding the Safeway and Walgreens relationship and the financial model.  *See supra* (null protocol statements not at issue and statements regarding the CLIA lab were denied under Federal Rule of Evidence 403 as unduly cumulative).

"Whether a statement is in fact against interest must be determined from the circumstances of each case, and can only be determined by viewing [the statement] in context."  *United States v. Paguio*, 114 F.3d 928, 933 (9th Cir. 1997) (quotation marks and citation omitted).  The test involves the perception of a reasonable person in Mr. Balwani's position, not of Mr. Balwani himself.  *United States v. Satterfield*, 572 F.2d 687, 691 n.1 (9th Cir. 1978).  Rule 804(b)(3)'s use of "tending" broadens the phrase, so that the statement need not be a "plain confession making the difference between guilty and not guilty."  *Id.*  However, a statement that curries favor or deflects and shares blame are not "truly self-inculpatory" for purposes of Rule 804(b)(3) because they do not expose the declarant himself to criminal liability.  *United States v. Gadson*, 763 F.3d 1189, 1200 (9th Cir. 2014).

Ms. Holmes identifies the following underlined statements as statements against interest:

1. "Q: And so you -- you mentioned that over time, sort of your responsibilities grew.  Can you -- can you briefly explain how that -- . . . what got added to your portfolio?"

   "A: And then 2010 March, February time frame, I was also spending time on the road, me

and Elizabeth Holmes, meeting with the retail pharmacy businesses, and as that evolved, <u>I took the leadership role there in negotiations and contracts."</u>  Exhibit A at ECF 3-4.

2.  "Q: What about Safeway?"

   "A: So [Ms. Holmes] spent a lot of time on Safeway initially, but ultimately, <u>I took that over also</u>."  Exhibit A at ECF 4–5.

3.  "Q: What were your responsibilities with respect to the company's financials when you -- early on in that president and COO role?"

   "A: Around 2010 when we started engaging with the retail pharmacies, Safeway and Walgreens, I started building a financial model with the help initially from Safeway and Walgreens that <u>I owned and -- until I left the company."</u>  Exhibit A at ECF 6.

4.  "Q: Who was working with you on the financial model?"

   "A: And – and over time, it was raw data coming from the field as I learned, you know, how much -- how much dollars per requisition we were making from the field.  So as I -- over time, I think it was more input from a lot of people.  <u>As the information came into me, I would, you know, update the model and keep it updated."</u>  Exhibit B at ECF 3–4.

5.  "Q: Was there anyone else from Theranos who was working on the model while you were working on it?"

   "A: <u>I don't think so."</u>  Exhibit B at ECF 5.

6.  "Q: To your knowledge, Elizabeth Holmes understood that you maintained a financial model for the company; right?"

   "A: Correct."

   "Q: And that -- that model was based on certain assumptions based on -- in terms of the business and its R&D; is that fair?"

   "A: And a bunch of other inputs.  But yes, that's fair."

   "Q: And she was generally familiar with the kinds of inputs that went into the financial model?"

"A: She may have been at some point, <u>but I was revving the model and adding so many assumptions that she may not be familiar with all of them or even most of them.</u>  So I -- I wouldn't make that -- that blanket statement."

"Q: Did she ever edit the model?"

"A: To the best of my knowledge, no.  And there was one time I actually had a couple of questions for her, and I had put a model with her name on it so she could edit, but I don't think she ever did because I continued with my assumptions and I never even looked at that model.  <u>So my -- I think my answer is: No.</u>"  Exhibit B at ECF 6.

First, to the extent Mr. Balwani's statements regarding the Safeway and Walgreens relationships are inculpatory, they share blame with Ms. Holmes and are thus not admissible under Rule 804(b)(3).  *See Gadson*, 763 F.3d at 1200.  Mr. Balwani's statements that he took over the Safeway relationship and managed the Walgreens relationship must be read in context.  He goes on to testify that *both* he in Ms. Holmes were involved in the pharmacy relationships "from the start," but that their respective involvement shifted over time.  The two shared the relationships.  Moreover, according to the testimony in this case, by the time Mr. Burd left Safeway, and Mr. Balwani "took lead" on the Safeway relationship, Safeway had already made its investment into Theranos.  It is therefore unclear how his testimony that he "took over" the Safeway relationship would inculpate him in any criminal wrongdoing.

Second, Mr. Balwani's statements about "owning" the financial modeling of the company are not inculpatory.  They do not, by themselves, expose Mr. Balwani to civil or criminal liability.  *Paguio* serves a helpful contrast.  There, the declarant specifically claimed to take lead on the fraud to the exclusion of others.  *See* 114 F.3d at 931 n.1 (testimony that the declarant took responsibility for the crime, described the fraud, and disavowed the involvement of specific people).  It is not a crime to create a financial model.  It is also not a crime to take ownership over the creation of a financial model.  It *might* be a crime to use fraudulent assumptions in the model and then share those assumptions to investors.  Likewise, it *might* be a crime to mislead investors

into believing a financial model is a financial projection.  But Mr. Balwani does not claim to have done either of those things.  He only testifies to creating a financial model; there is no testimony that he shared his model or used faulty assumptions in the model.  The Court thus cannot find that a reasonable person in Mr. Balwani's position would have believed that the statements would expose them to civil or criminal liability.

Finally, even if Mr. Balwani's statements regarding the financial modeling inculpate him, the record does not contain corroborating circumstances that "clearly indicate" the trustworthiness of his testimony.  Instead, the record contains evidence that Ms. Holmes texted Mr. Balwani that they needed to "work together on the rev [sic] piece."  Transcript of Ms. Holmes Cross Examination at 8030.  Ms. Holmes admitted on cross examination that this "could" be a reference to revenue as the two had been texting about revenue.  *Id.* at 8031.  Likewise, in the SEC deposition, Mr. Balwani testified that he gave Ms. Holmes access to the models and asked her to make edits.  This demonstrates that Ms. Holmes may have been involved with revenue and financial modeling and undercuts a clear finding of trustworthiness that Mr. Balwani alone "owned" the financial modeling.  Ms. Holmes' motion to admit Mr. Balwani's statements under Federal Rule of Evidence 804(b)(3) is thus **DENIED.**

IV.    **CONCLUSION**

Ms. Holmes' motion to admit prior testimony of Mr. Balwani is **DENIED.**

**IT IS SO ORDERED.**

Dated: December 2, 2021

EDWARD J. DAVILA
United States District Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ELIZABETH A. HOLMES,<br><br>Defendant. | Case No.   5:18-cr-00258-EJD-1<br><br>**ORDER RE PRE-TRIAL MOTIONS**<br><br>Re: Dkt. Nos. 892, 895, 897, 899 |

On July 28, 2020, a federal grand jury returned a Third Superseding Indictment, charging Defendants Elizabeth Holmes and Ramesh "Sunny" Balwani with ten counts of wire fraud ("Counts 3 through 12"), in violation of 18 U.S.C. § 1343, and two counts of conspiracy to commit wire fraud ("Counts 1 through 2"), in violation of 18 U.S.C. § 1349.  Third Superseding Indictment ("TSI"), Dkt. No. 469.  Defendants were charged with making deceptive representations about their company, Theranos, and its technology. In anticipation of trial, Holmes and the Government each filed motions in limine ("MIL"), which the Court ruled on.  Mots. in Limine, Dkt. Nos. 560-578, 588; Order re: Mots. in Limine ("MIL Order"), Dkt. No. 798.

Holmes filed additional pre-trial motions now before the Court.  Dkt. Nos. 892, 895, 897, 899.  The Court heard oral argument on the motions on August 20, 2021.  Dkt. No. 926.  Having considered the parties' arguments, the relevant law, and the record in this case, the Court DENIES and DEFERS the following pre-trial motions, as set forth below.

**I.      BACKGROUND**

The background of the case is set forth in the MIL Order and will not be recited herein.  In

brief, Holmes is charged with conspiring to commit and committing fraud.  Holmes allegedly made several misrepresentations to investors regarding (1) Theranos's proprietary analyzer (the TSPU, Edison, or minilab), (2) approval from government agencies, and (3) Theranos's financial condition.

## II.    LEGAL STANDARD

Motions in limine are a "procedural mechanism to limit in advance testimony or evidence in a particular area."  *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009).  Like other pretrial motions, motions in limine are "useful tools to resolve issues which would otherwise clutter up the trial."  *City of Pomona v. SQM N. Am. Corp.*, 866 F.3d 1060, 1070 (9th Cir. 2017).  Accordingly, "a ruling on a motion in limine is essentially a preliminary opinion that falls entirely within the discretion of the district court."  *Id.*; *see Luce v. United States*, 469 U.S. 38, 41 n.4 (1984) (explaining that a court may rule in limine "pursuant to the district court's inherent authority to manage the course of trials").

In many instances, however, rulings "should be deferred until trial, so that questions of foundation, relevancy, and potential prejudice may be resolved in proper context."  *United States v. Pac. Gas & Elec. Co.* ("*PG&E*"), 178 F. Supp. 3d 927, 941 (N.D. Cal. 2016).  For example, in order to exclude evidence on a motion in limine, "the evidence must be inadmissible on all potential grounds."  *McConnell v. Wal-Mart Stores, Inc.*, 995 F. Supp. 2d 1164, 1167 (D. Nev. 2014).  Thus, denial of a motion in limine to exclude certain evidence does not mean that all evidence contemplated by the motion will be admitted, only that the court is unable to make a comprehensive ruling in advance of trial.  *Id.* at 1168.  Moreover, even if a district court does rule in limine, the court may "change its ruling at trial because testimony may bring facts to the district court's attention that it did not anticipate at the time of its initial ruling."  *City of Pomona*, 866 F.3d at 1070; *see also Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000) ("[I]n limine rulings are not binding on the trial judge, and the judge may always change his mind during the course of a trial.").

### III.   DISCUSSION

#### A.   Holmes's Motion to Strike Improper and Untimely Expert Disclosure and to Preclude Expert Opinion Testimony of Dr. Kingshuk Das (Dkt. No. 892)

In November 2019, pursuant to the parties' agreement, the Court entered an order requiring the Government to serve a summary for each expert witness it intended to call under Federal Rule of Criminal Procedure 16 by March 6, 2020.  Dkt. No. 170 at 13; Dkt. No. 171.  At that time, jury selection was scheduled to begin July 28, 2020 with the first day of trial to take place on August 4, 2020.  Dkt. No. 170-6; Dkt. No. 171.  The Government served its Rule 16 disclosures on March 6, 2020.

Jury selection has since been continued to August 31, 2021, owing in part to the ongoing COVID-19 pandemic.  Dkt. No 484; Dkt. No. 650; Dkt. No. 756.  In February and June 2021, the Government interviewed Dr. Kingshuk Das, former lab director of Theranos, and disclosed interview memoranda for him to Holmes after each interview.  Ms. Holmes's Mot. to Strike Improper and Untimely Expert Disclosure and to Preclude Expert Opinion Testimony of Dr. Kingshuk Das ("892 Mot."), Dkt. No. 892, at 3; U.S.'s Omnibus Resp. to Def. Holmes' Mots. To Reconsider or Clarify the Court's Order on Mots. In Limine ("Opp'n"), Dkt. No. 906, at 11.  On July 29, 2021, the Government informed Holmes that it intended to call Dr. Das as a witness in an email as follows:

> Further, although we submit it is not necessary, we are supplementing our Rule 16(a)(1)(G) disclosure to advise you the government intends to offer testimony from Dr. Kings[h]uk Das. A summary of his anticipated testimony is set forth in the memoranda of interview that have previously been produced to you. The bases for his opinions, to the extent they constitute expert opinion testimony, are set forth in those memoranda of interview, THPFM00004005199[1], and the list of documents at ECF 842-1 pp.10-15.

892 Mot. at 2.  Holmes now moves to strike the Government's July 29, 2021 supplemental disclosure and to preclude the Government from eliciting any expert opinion from Dr. Das at trial.  *Id.* at 1.

The parties' fundamental disagreement concerns Dr. Das's status as a witness.  The Government asserts that it has always believed Dr. Das to be a percipient witness, that it does not

intend to elicit any expert opinion or testimony from him, and that it made its supplemental disclosure out of an abundance of caution once it realized that Holmes perceived him to be an expert witness.  Opp'n at 11–16.  Holmes argues that Dr. Das's testimony will be based at last in part on scientific, technical, or other specialized knowledge that renders him an expert witness subject to Rule 16 and Federal Rule of Evidence 702.  892 Mot. at 3–4.  In particular, Holmes focuses on Dr. Das's "Six Sigma" analysis of Edison data and his resulting conclusion that Edison devices did not perform well and did not meet the necessary accuracy and precision requirements. *Id.*

At the hearing, the Government provided further clarification on the testimony it intends to elicit from Dr. Das.  Based on those representations, the Court is persuaded that Dr. Das may proceed as a percipient witness.  However, the parties are on notice that specific details of particular scientific procedures or analyses that would require specialized knowledge to understand and interpret—including the Six Sigma analysis—would move Dr. Das's testimony from percipient to expert.  If expert testimony is introduced, Holmes may object at that time.  A *Daubert* hearing will be sufficient to address any prejudice to Holmes, particularly in light of the fact that the parties intend to conduct a *Daubert* hearing mid-trial for the Government's expert witness, Dr. Stephen Master.

Accordingly, the Court DEFERS ruling on Holmes's motion unless and until Dr. Das offers expert witness testimony at trial.

### B.    Holmes's Renewed Motion to Exclude Certain News Articles (Dkt. No. 895)

In her renewed motion, Holmes moves to exclude seven news articles not previously submitted to the Court with her original motion in limine.  Ms. Holmes' Renewed Mot. to Exclude Certain News Articles, Dkt. No 895 ("895 Mot.").  The Government, however, calls the present motion premature and potentially unnecessary given presentation of evidence has not begun, and the Court agrees.  Opp'n at 3–4; Aug. 20, 2021 Hr'g Tr. ("8/20/2021 Tr."), Dkt. No. 939, at 7:21 – 8:2, 13:15–14:1.

In its opposition and at the August 20, 2021 hearing on this motion, the Government

committed to not referencing these articles, or any information contained in them, in its opening statement.  Opp'n at 3; 8/20/2021 Tr. at 10:9-21.  The Government also maintained it would provide advance notice and lay foundation for admissibility if it subsequently intends to introduce any of the seven articles.  *Id*.  The Court takes the Government at its word and thus DEFERS ruling on the motion unless and until the Government seeks introduction of any of the seven articles at trial.

**C.    Holmes's Motion to Partially Redact Government Agency Reports (Dkt. No. 897)**

In its MIL Order, the Court deferred ruling on Holmes's Motion to Exclude FDA Inspection Evidence.  MIL Order at 16.  The Court held that "evidence arising out of the FDA inspection" was relevant, more probative than prejudicial, and not excludable under Rule 404(b).  *Id*. at 11–13.  Regarding the two FDA inspection reports (referred to as Form FDA-483s), the Court held they were admissible under Federal Rule of Evidence 803(8)(A)(ii) because they "consist[] largely of observations" comparable to those made by "government employees such as city building inspectors, medical examiners, and prison case managers."  *Id*. at 14 (citing cases).  The Court noted that there were portions of the report that go beyond mere observations.  The Court expressed its openness to continued discussions regarding the issue should Holmes wish to raise arguments as to certain specific pieces of evidence within the FDA inspection evidence that involve such a high degree of observer analysis that they might not be admissible under Rule 803(A)(ii).  *Id*.

Also, in the MIL Order, the Court denied Holmes's Motion to Exclude Evidence of CMS Survey Findings and granted the Government's corresponding motion to admit the Form CMS-2567.  *Id*. at 20.  The Court held that "evidence of CMS survey findings and sanctions" was relevant to questions about Holmes's state of mind, intent, and knowledge regarding the alleged misrepresentations about the accuracy and reliability of Theranos' blood tests."  *Id*. at 18.  The Court rejected Holmes's hearsay argument for the same reasons it rejected the argument as to the FDA inspection reports.  *Id*. at 20.  The Court, however, acknowledged "the possibility for further

side bar discussions on this matter, should [the] parties wish to specify certain exhibits within this collection of evidence and make new arguments as to why these particular exhibits should still be excluded." *Id.*

Without waiving her objections, Holmes moves to redact three of the Government's exhibits: a Form FDA-483 for Theranos's Palo Alto facility, a form FDA-483 for the Newark facility, and a Form CMS-2567, as well as the cover letter accompanying the Form CMS-2567. Ms. Holmes' Mot. to Partially Redact Gov't Agency Reports ("897 Mot.), Dkt. No. 896; *see* Decl. of Amy Mason Saharia in Supp. of Ms. Holmes' Mot. to Partially Redact Gov't Agency Reports, Dkt. No. 898, Exs. 4-6. Specifically, Holmes proposes redacting (1) what she perceives as high-level subjective conclusions of the reports' authors such that only the factual observations of the authors will be admitted at trial; (2) purported double-hearsay; and (3) tests not identified in the Bill of Particulars.

### 1.    Form FDA-483 Palo Alto Facility (Exhibit 4)

The Court finds that the proposed redactions to Exhibit 4, Form FDA-483 for the Palo Alto Facility, consist of observations that fall within Rule 803(8)(A)(ii), and therefore are admissible. The Form FDA-483, which was issued to Holmes, recites that "[t]his document lists observations made by the FDA representative(s) during the inspection of your facility"; that they are "inspectional observations" and do not represent a final Agency determination regarding compliance. Dkt. No. 898-4 at 2. Holmes proposes redactions to four sentences summarizing observations regarding lack of documentation. For example, the proposed redaction for "Observation 1" merely summarizes the FDA representative's observation that the documents reviewed by the representative did not address certain assays and that there was an absence of documentation regarding investigation for other assays. *Id.* Similarly, the proposed redaction for "Observation 2" summarizes the FDA representative's observation that the design validation plan lacks information such as the TSCD lot numbers used. These sentences do not reflect such a high degree of observer analysis that they fall outside the purview of Rule 803(A)(ii).

Accordingly, the Court DENIES Holmes's motion as to Exhibit 4.

**2.      Form FDA-483 Newark Facility (Exhibit 5)**

Most of the observations set forth in the Form FDA-483 for the Newark Facility are similar in kind and character to those described above.  One exception is the proposed redactions under the "Observation 1" heading.  These proposed redactions are provisionally approved because at present, the redacted portions lack foundation.  If a proper foundation is laid, the Government may seek reconsideration of the Court's ruling.

Holmes also requests redaction of the five-step procedure under the "Observation 2" heading, asserting that it is hearsay.  The hearsay objection is overruled; the five-step procedure is not an out-of-court statement being offered to prove the truth of the matter asserted.

The Court DENIES Holmes's motion as to Exhibit 5, except that the Court provisionally approves the proposed redactions under the "Observation 1" heading.

**3.      Cover Letter and Form CMS-2567 (Exhibit 6)**

Holmes proposes extensive redactions to the cover letter and Form CMS-2567.  The Court previously held that both are more probative than prejudicial and not hearsay.  MIL Order at 12.[1]  The Court agrees with the Government that Holmes's present motion is essentially a motion for reconsideration for which no new arguments have been presented to justify the breadth of the redactions requested.

Nevertheless, rather than deny the motion outright, the Court DEFERS ruling on the proposed redactions until the Government seeks to introduce the cover letter and Form CMS-2567 at trial.  The Government shall provide Holmes and the Court with advance notice of the portions

---

[1] The Court rejects Holmes's assertions that the cover letter is "new" and not covered in the MIL Order.  Holmes previously sought to "exclude evidence relating to the findings of surveys of Theranos' clinical laboratories conducted by the Centers for Medicare & Medicaid Services' ("CMS") in 2015 and 2016, including the survey reports and sanctions imposed by CMS."  Dkt. No. 574 at 1.  In that motion in limine, Holmes referred to the cover letter and the Form 2567 collectively as the "January 2016 CMS Report."  *Id*. at 3.  According to Holmes, in the January 2016 CMS Report, "CMS asserted Theranos's California lab was in violation of various CLIA requirements and warned that if Theranos did not remediate these deficiencies within 10 days, CMS would impose sanctions."  *Id*.  Holmes argued that the "findings that Theranos had violated CLIA regulations are irrelevant."  *Id*. at 3.  Therefore, the Court construed Holmes's motion in limine as seeking exclusion of both the cover letter and the Form 2567.

of the cover letter and Form CMS-2567 it intends to offer.

### D.    Holmes's Renewed Motion to Exclude Certain Doctor Testimony (Dkt. No. 899)

Next, Holmes renews her motion to exclude certain doctor testimony.  Holmes's Renewed Mot. to Exclude Certain Doctor Testimony ("899 Mot."), Dkt. No. 899.  Previously, Holmes sought to exclude expert testimony from nine medical professionals whose patients received allegedly inaccurate Theranos tests results during the period of the charged conspiracy.  *See* Holmes's Mot. in Limine to Exclude Expert Opinion Testimony of Fact/Percipient Witnesses Under Rules 401-403 and 702, Dkt. No. 561.  Holmes argued in part that for a number of these doctors, the Government had failed to disclose the test results and customers on which their opinions would be based.  *Id.* at 10–12.  In its ruling on Holmes's motion, the Court "agree[d] with Holmes that the disclosures [were] lacking in information necessary for her to adequately prepare for trial," but, based on the Government's representation that it would provide an updated disclosure, denied the motion to exclude "without prejudice, subject to renewal should the Government fail to provide updated disclosures in advance of trial."  MIL Order at 55–56.

Following the Court's ruling, Holmes met and conferred with the Government regarding a due date for updated disclosures.  The parties agreed that the Government would "provide an amended set of disclosures for all physician witnesses" by July 30, 2021.  Decl. of Amy Saharia in Supp. of Holmes's Renewed Mot. to Exclude Expert Testimony, Dkt. No. 900, Ex. B at 1.  On July 30, 2021, the Government provided its amended disclosure.  *See id.*, Ex. D.  The disclosure identified the seven physicians who would testify as well as the number of customers and which assays the physicians would discuss.  *Id.*, Ex. D at 2–10.  Additionally, the Government stated that its July 30, 2021 disclosure "supersedes" its prior disclosures.  *Id.*, Ex. D at 1.

Still, Holmes now asks the Court for an order excluding any doctor testimony not disclosed in the Government's July 30, 2021 amended disclosure.  The Court, however, afforded Holmes the opportunity to renew her motion to exclude expert testimony of physician witnesses if the Government failed to provide updated disclosures in advance of trial.  Given the Government's

July 30, 2021 amended disclosure, the Court sees no reason to depart from its previous MIL Order and finds that a further order is unnecessary at this time.

Accordingly, the Court DENIES Holmes's renewed motion to exclude certain doctor testimony.

**IT IS SO ORDERED.**

Dated:  August 30, 2021

EDWARD J. DAVILA
United States District Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ELIZABETH A. HOLMES,<br><br>Defendant. | Case No.  5:18-cr-00258-EJD-1<br><br>**ORDER RE: MOTIONS IN LIMINE**<br><br>Re: Dkt. Nos. 561-578, 588 |

On July 28, 2020, a federal grand jury returned a Third Superseding Indictment, charging Defendants Elizabeth Holmes and Ramesh "Sunny" Balwani with ten counts of wire fraud ("Counts 3 through 12"), in violation of 18 U.S.C. § 1343, and two counts of conspiracy to commit wire fraud ("Counts 1 through 2"), in violation of 18 U.S.C. § 1349.  Third Superseding Indictment ("TSI"), Dkt. No. 469.  Defendants were charged with making deceptive representations about their company, Theranos, and its technology.

In anticipation of trial, Holmes and the Government each filed motions in limine ("MIL").  Mots. in Limine, Dkt. Nos. 560-578, 588.  Both parties timely opposed and replied in support of their respective motions.  Dkt. Nos. 659-670, 672-678, 682, 704-721, 726, 740.  The Court conducted hearings on May 4-6, 2021.  Trs. of Proceedings, Dkt. Nos. 792-794.  Having considered the parties' arguments, the relevant law, and the record in this case, the Court **GRANTS** in part and **DENIES** in part the following motions in limine, as set forth below.

## I.    BACKGROUND

Holmes founded Theranos, a health care and life sciences company, in 2003.  TSI ¶ 1.  Holmes served as the company's Chief Executive Officer.  *Id*.  Balwani was a board member,

President, and Chief Operating Officer of Theranos.  *Id.* ¶ 2.

Theranos' stated mission was to revolutionize medical laboratory testing through its allegedly innovative methods of drawing and testing blood and diagnosing patients.  *Id.* ¶ 4. During the company's first ten years, its scientists worked toward developing proprietary technology that could run clinical tests using only tiny drops of blood.  *Id.* ¶ 5.  Theranos also worked toward developing a method for drawing a few drops of capillary blood from a patient's finger using a small lancet.  *Id.*  The blood was then stored in a "nanotainer."  *Id.*  Theranos sought to develop a second device called the Theranos Sample Processing Unit ("the TSPU," "Edison," or "miniLab") that could quickly and accurately analyze blood samples stored in the nanotainer.  *Id.* The Government contends that the promises of these devices were never realized; the devices "consistently" produced inaccurate and unreliable results.  *Id.* ¶ 16.  Despite this, Defendants began a publicity campaign to promote the company and its devices.  *Id.* ¶¶ 6-9.  In September 2013, Theranos offered blood testing at Walgreens' "Wellness Centers" in California and Arizona. *Id.* ¶ 10.

The Government argues that Defendants conspired to commit and committed fraud through two fraudulent schemes: one to defraud investors and another to defraud doctors and patients.  The Court outlines these schemes below.

**Scheme to Defraud Investors.**  Defendants allegedly made materially false and misleading statements and failed to disclose material facts to investors.  Based on the false statements, investors invested money in Theranos.  Specifically, from 2013 to 2015, Defendants allegedly made misstatements regarding:

1. Theranos' proprietary analyzer: Defendants allegedly made misstatements about Theranos' proprietary analyzer—the TSPU, Edison, or miniLab—when they claimed the analyzer was presently capable of accomplishing certain tasks, with more precision than other blood tests, and at a faster rate, when they knew these statements were false.  *Id.* ¶ 12(A).

2. Theranos' financial health: Defendants allegedly misrepresented Theranos' financial well-being when they told investors the company was financially strong and stable and would

make huge profits in 2014 and 2015 when, in fact, they knew Theranos would only generate modest revenue.  *Id*. ¶ 12(B).

3. Technology demonstrations: Defendants allegedly deceived investors through misleading technology demonstrations intended to cause potential investors to believe blood tests were being conducted on Theranos' proprietary analyzer when Defendants knew the analyzer was operating in "null protocol."  *Id*. ¶ 12(C).

4. Walgreens partnership: Defendants allegedly misled investors when they told them Theranos had an expanding partnership with Walgreens when the Walgreens rollout had stalled due to concerns with Theranos' performance.  *Id*. ¶ 12(D).

5. United States Department of Defense ("DOD") relationship: Defendants allegedly told investors the company had a profitable and revenue-generating business relationship with the DOD and that Theranos technology was deployed on the battlefield.  Defendants allegedly knew that Theranos had limited revenue from military contracts and that its technology was not used in the battlefield.  *Id*. ¶ 12(E).

6. Food and Drug Administration ("FDA") approval: Defendants allegedly misled investors when they told them that Theranos did not need the FDA to approve its proprietary analyzer and tests when Defendants knew this to be false.  *Id*. ¶ 12(F).

7. Patient testing: Defendants allegedly told investors that patient tests were conducted using Theranos manufactured analyzers.  Defendants allegedly knew that Theranos used third-party, commercially available analyzers.  *Id*. ¶ 12(G).

8. Peer review: Defendants allegedly falsely told investors that several national or multinational pharmaceutical companies and research institutions had examined, used, and validated Theranos technology.  *Id*. ¶ 12(H).

9. Media representations: Defendants allegedly made the false and misleading statements described above to reporters and then shared the resulting articles directly with potential investors and via Theranos' website.  *Id*. ¶ 12(I).

**Scheme to Defraud Doctors and Patients.**  The Government argues that, from 2013 to 2016, Defendants advertised and marketed Theranos technology to doctors and patients, and falsely claimed that the tests were accurate and reliable.  *Id*. ¶¶ 14-15.  Their claims about Theranos technology were implicit and explicit.  *Id*. ¶ 15.  Despite knowing that Theranos' technology suffered from recurring accuracy and reliability problems, Defendants allegedly advertised the tests as accurate and reliable.  *Id*. ¶¶ 16-17.  Specifically, Defendants used materially false and misleading marketing materials and advertisements, and transmitted Theranos blood results that Defendants knew contained, or likely contained, inaccurate information.  *Id*. ¶¶ 16-18.  For instance, Theranos' public website touted its lab's ability to perform tests "quickly and accurately on samples as small as a single drop."  *Id*. ¶ 9.  Defendants also allegedly provided patients with reports that contained or were likely to contain: (1) inaccurate and unreliable results; (2) improperly adjusted reference ranges defining a normal or healthy result for a given test; (3) improperly removed "critical" results, i.e., results suggesting a patient needed medical attention; and (4) results generated from improperly validated assays, further decreasing the reliability of those tests.  *Id*. ¶ 17(C).

## II.    LEGAL STANDARD

Motions in limine are a "procedural mechanism to limit in advance testimony or evidence in a particular area."  *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009).  Like other pretrial motions, motions in limine are "useful tools to resolve issues which would otherwise clutter up the trial."  *City of Pomona v. SQM N. Am. Corp.*, 866 F.3d 1060, 1070 (9th Cir. 2017).  Accordingly, "a ruling on a motion in limine is essentially a preliminary opinion that falls entirely within the discretion of the district court."  *Id*.; *see Luce v. United States*, 469 U.S. 38, 41 n.4 (1984) (explaining that a court may rule in limine "pursuant to the district court's inherent authority to manage the course of trials").

In many instances, however, rulings "should be deferred until trial, so that questions of foundation, relevancy, and potential prejudice may be resolved in proper context."  *United States v. Pac. Gas & Elec. Co.* ("*PG&E*"), 178 F. Supp. 3d 927, 941 (N.D. Cal. 2016).  For example, in

order to exclude evidence on a motion in limine, "the evidence must be inadmissible on all potential grounds." *McConnell v. Wal-Mart Stores, Inc.*, 995 F. Supp. 2d 1164, 1167 (D. Nev. 2014). Thus, denial of a motion in limine to exclude certain evidence does not mean that all evidence contemplated by the motion will be admitted, only that the court is unable to make a comprehensive ruling in advance of trial. *Id.* at 1168. Moreover, even if a district court does rule in limine, the court may "change its ruling at trial because testimony may bring facts to the district court's attention that it did not anticipate at the time of its initial ruling." *City of Pomona*, 866 F.3d at 1070; *see also Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000) ("[I]n limine rulings are not binding on the trial judge, and the judge may always change his mind during the course of a trial.").

### A.    Federal Rule of Evidence 401

Under Rule 401 of the Federal Rules of Evidence, evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence . . . and the fact is of consequence in determining the action." Fed. R. Evid. 401(a)-(b). "Relevancy simply requires that the evidence logically advance a material aspect of the party's case." *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188 (9th Cir. 2019) (internal quotations omitted).

### B.    Federal Rule of Evidence 403

Even if evidence is relevant, it must be excluded if its "probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403. Evidence is unfairly prejudicial when it has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). "Unfair prejudice can result from evidence that makes it more likely for a juror 'to defer to findings and determinations relevant to credibility made by an authoritative, professional factfinder rather than determine those issues for themselves.'" *United States v. Sine*, 493 F.3d 1021 (9th Cir. 1992).

### C.    Federal Rule of Evidence 802

Hearsay evidence is inadmissible unless otherwise provided for under a federal statute, the

Federal Rules of Evidence, or "other rules prescribed by the Supreme Court."  Fed. R. Evid. 802.

Hearsay is a statement "the declarant does not make while testifying at the current trial or hearing"

and which "a party offers in evidence to prove the truth of the matter asserted in the statement."

Fed. R. Evid. 801.  "Hearsay within hearsay" is only admissible "if each part of the combined

statements conforms with an exception to the rule."  Fed. R. Evid. 805.

### III.      HOLMES'S MOTIONS IN LIMINE AND RELATED GOVERNMENT MOTIONS

#### A.      Holmes's MIL to Exclude Evidence Concerning Wealth, Spending, And Lifestyle (Dkt. No. 567)

The Government argues that during her tenure as founder and Chief Executive Officer

("CEO") of Theranos, Holmes engaged in a widespread fraudulent scheme to defraud investors

and obtain money and property under false pretenses.  In addition to amassing millions of dollars

for the company, Holmes obtained significant personal benefits arising from her position.  She

received a generous salary, which allowed her to live a luxurious lifestyle replete with an

expensive rental home, a luxury SUV, and assorted high-end merchandise.  Decl. of Amy Mason

Saharia in Supp. of Holmes's Mot. to Strike Rule 404(b) Notice or, in the Alternative, Compel

Adequate Rule 404(b) Disclosure, Dkt. No. 421-1, Ex. A at 9.  Holmes also utilized company

funds to pay for luxury travel and accommodations.  *Id*.  Additionally, she routinely assigned her

personal assistant to non-company tasks, such as personal shopping and product returns.  *Id*.

The Government argues these benefits extend to non-tangible experiences that enhanced

Holmes's status in society.  *Id*.  In particular, she was hailed as a visionary businesswoman in

numerous publications.  *Id*.  This increased publicity allowed her to associate with "celebrities,

dignitaries, and other wealthy and powerful individuals."  *Id*.

The Government seeks to introduce evidence of these tangible and non-tangible benefits to

show Holmes's motive, opportunity, intent, preparation, plan, knowledge, identity, consciousness

of guilt, or absence of mistake or accident under Federal Rule of Evidence 404(b).  Holmes moves

to preclude the government from introducing this evidence on two grounds.  *See* Holmes's Mot. in

Limine to Exclude Evidence Concerning Wealth, Spending and Lifestyle Under Rules 401-403

("Holmes 567 Mot."), Dkt. No. 567.  First, Holmes argues this evidence is irrelevant to any fact of consequence in this proceeding.  Fed. R. Evid. 401, 402.  Second, even if deemed relevant, Holmes argues the probative value of this evidence is substantially outweighed by the prejudicial danger of misleading the jury to base their decision on improper basis, as well as confusing the issue and needlessly wasting the Court's time.  Fed. R. Evid. 403.

The issue of evidence of wealth, particularly lack thereof, "is something of an old chestnut in the law of evidence." *United States v. Mitchell*, 172 F.3d 1104, 1108 (9th Cir. 1999).  In *Mitchell*, the trial court admitted evidence of the defendant's poverty to prove motive to commit a bank robbery.  *Id*.  The Ninth Circuit reversed because evidence of wealth or poverty without a nexus to an "inclination, desperation, or other evidence that the person was likely to commit the crime" is not relevant.  *Id*. at 1109.  Ultimately, the evidence must show "more that the mere fact that the defendant is poor." *Id*. (quoting *United States v. Jackson*, 882 F.2d 1444, 1449 (9th Cir. 1989) (upholding trial court's admission of evidence of financial difficulty given the "unexplained and abrupt change in that status")).

However, the force of *Mitchell*'s holding is diminished because "wealth evidence, unlike poverty evidence, does not entail the same risk of unfair prejudice."  *United States v. Flores*, 510 F. App'x 594, 595 (9th Cir. 2013).  As with evidence of poverty, evidence of wealth or lavish lifestyle is not admissible standing alone but may be admissible to prove motive, knowledge, or intent.  *See United States v. Weygandt*, 681 F. App'x 630, 633 (9th Cir. 2017) (evidence of wealth admissible to show defendant could have purchased necessary equipment but chose not to in order to enhance wealth); *United States v. Reyes*, 660 F.3d 454, 464 (9th Cir. 2011) (evidence of gains from stock option backdating is admissible to permit "jury to draw a reasonable inference that [defendant] knew what he was doing").  Nonetheless, evidence of an individual's lavish spending habits, without a connection to an individual's participation in criminal activity, is irrelevant.  *See United States v. Hatfield*, 685 F. Supp. 2d 320, 326 (E.D.N.Y. 2010) ("[I]t is irrelevant if [defendant] spent his fortune on lavish parties, instead of donating it to starving Malawian orphans.").

Holmes argues that evidence regarding her wealth and lifestyle is irrelevant because it has no bearing on any fact of consequence.  She notes the factual issues for the jury are whether she participated in (1) a scheme to defraud investors or paying patients, through (2) the use of wire, radio or television and with (3) a specific intent to defraud those investors and paying patients. Holmes 567 Mot. at 2.  Holmes argues that the evidence of wealth and lavish lifestyle lack a "particularized connection to the alleged conduct."  Holmes Reply Br. In Supp. of Holmes's 567 Mot. ("Holmes 567 Reply"), Dkt. No. 710, at 2.  The Government contends that the evidence is relevant because it represents the fruit of Holmes's fraudulent scheme.  Gov't Opp'n to Holmes's 567 Mot. ("Gov't 567 Opp'n"), Dkt. No. 663, at 2.  Further, the accumulation of these items indicates that "she intended to defraud in order to obtain those benefits" and further motivated her "to continue and conceal her fraud."  *Id.*

The Government's arguments come close to the impermissible use of evidence to show Holmes was wealthy and wished to become wealthier.  On its face, this does not appear to have the requisite connection to the alleged conduct required under case law.  Despite this shortcoming, the Government's theory of relevance has some merit.  As in *Reyes*, each time Holmes made an extravagant purchase, it is reasonable to infer that she knew her fraudulent activity allowed her to pay for those items.  *See Reyes*, 660 F.3d at 464.  While the benefits of these purchases are not as directly tied to the fraud as backdating stocks was in *Reyes*, it may still be probative of Holmes's scienter.  Therefore, this evidence passes the minimal threshold for relevance.

Nevertheless, the Court in its discretion "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice."  Fed. R. Evid. 403.  Unfair prejudice "speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged."  *Old Chief*, 519 U.S. at 180.  In this particular context, evidence of Holmes's wealth can be construed as "appeals to class prejudice" which are considered "highly improper" because they "may so poison the minds of jurors even in a strong case that an accused may be deprived of a fair trial."  *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 239–40 (1940).  Appeals to class prejudice that

are "obvious" and "persistent" are unfairly prejudicial.  *United States v. Stahl*, 616 F.2d 30, 32–33 (2d Cir. 1980) (discussing an overzealous prosecutor's entire trial strategy centered on inflaming prejudice against the defendant's wealth, readily apparent from the prosecutor's opening argument, witness interrogation, and closing argument).

At the hearing, the Government indicated that Holmes's desire to maintain her lifestyle as Theranos CEO and founder and all the accompanying celebrity and benefits (financial or otherwise) were motivating factors for her to continue to engage in the fraudulent conduct alleged in the indictment.  The Government argues that its case does not center on a persistent appeal to class prejudice, as in *Stahl*, but rather that the desire for wealth is a piece in a complex puzzle comprising Holmes's intent to perpetuate this broad-ranging fraud.  However, this balance is complicated by the fact that the evidence of her wealth and fame is not highly (or even moderately) probative of intent to defraud.  When one combines the fact that this case implicates potentially dangerous technology with an argument concerning an individual's greed, jurors could easily "judge the merits of this matter by their attitudes about such things."  Holmes 567 Reply at 5.

The evidence of Holmes's position as CEO and founder will undoubtedly be introduced at trial.  As discussed at the hearing, it is common knowledge that CEOs and heads of Silicon Valley technology companies enjoy lifestyles commensurate with those positions that are significantly different than those of the general public.  The Government may introduce evidence that Holmes enjoyed a lifestyle as Theranos CEO that is comparable to those of other tech company CEOs.  This includes salary, travel, celebrity, and other perks and benefits commensurate with the position.  However, references to specific purchases or details reflecting branding of clothing, hotels, or other personal items is not relevant, and the prejudicial effect of that evidence outweighs any probative value.

Based on the foregoing, the Court **GRANTS IN PART** Holmes's MIL to exclude evidence referencing her wealth, spending, and lifestyle that is outside the general nature of her position as Theranos CEO.  As noted at the hearing, the Court may revisit this ruling should

circumstances warrant.

**B.    Holmes's MIL to Exclude FDA Inspection Evidence (Dkt. No. 573)**

In August of 2013, "Theranos contacted [the] FDA (the Food and Drug Administration) with a proposal to submit for FDA clearance the [laboratory developed tests] that would be run on Theranos' proprietary devices in its . . . laboratory."  Holmes's Mot. in Limine to Exclude FDA Inspection Evidence Under Rules 401-404 and 801-803 ("Holmes 573 Mot."), Dkt. No. 573, at 2. By the winter of 2013, "Theranos and [the] FDA agreed to a submission plan to accomplish that goal."  *Id*.  One aspect of this plan concerned Theranos' nanotainer.  *See id*.  On August 25, 2015, "FDA conducted unannounced inspections at Theranos' laboratories in California and Arizona." *Id*.  These inspections partly focused on making sure the nanotainers were properly classified and identifying whether certain regulations applied to them.  *Id*. at 3.  The FDA ceased its inspection of Theranos' Arizona lab "without making any observations, but continued its inspection of the California laboratory until September 16, 2015."  *Id*. at 2–3.

Holmes now moves to exclude "evidence of or reference to, [the FDA's] 2015 inspections of Theranos."  *Id.* at 1.  Holmes's motion refers specifically to 27 exhibits that "relate to FDA's inspections," and that were "identified by the Government . . . as proposed exhibits."  *Id*. at 3. These exhibits ("the FDA inspection evidence") encompass the documented observations of the FDA (Forms 483),[1] internal emails among FDA agents, and records of communications between Holmes and Ramesh "Sunny" Balwani made during and about the FDA inspection.  *Id*. at 1–4. Holmes argues that "[t]hese documents should be excluded along with any corresponding testimony offered by the government."[2]  *Id*. at 3–4.

---

[1] In her motion, Holmes explains Forms 483 by referencing a website, "FDA Form 483 Frequently Asked Questions," https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-references/fda-form-483-frequently-asked-questions.  *See* Holmes 573 Mot. at 3, n.6.  This website states, among other things, the following: "An FDA Form 483 is issued to firm management at the conclusion of an inspection when an investigator(s) has observed any conditions that in their judgment may constitute violations of the Food Drug and Cosmetic (FD&C) Act and related Acts.

[2] Holmes specifically mentions that "the [G]overnment has indicated that it intends to elicit testimony from FDA's Director of Chemistry and Toxicology Devices, Dr. Courtney Lias, during

Holmes argues that the FDA inspection evidence should be excluded for four reasons: it is not relevant; it is unfairly prejudicial under Rule 403; it is inadmissible character and propensity evidence, under Rule 404; and it is inadmissible hearsay.

### 1. Relevance

The Court finds that evidence arising out of the FDA inspection of the Theranos lab in California is relevant as to Holmes's state of mind, intent, and knowledge regarding the alleged misrepresentations about the accuracy and reliability of Theranos' blood tests. The FDA inspection evidence would have a tendency to show knowledge of issues with the nanotainer and failings in Theranos' technology. This, in turn, could support the Government's theory of the case: that Holmes made representations that Theranos could provide accurate, fast, reliable, and cheap blood tests and test results despite knowing that their technology was not capable of doing so.

Holmes asserts several reasons why the FDA inspection evidence is irrelevant. Holmes 573 Mot. at 5–6. For example, Holmes asserts that the last equity round closed before the inspection took place, and therefore, the FDA inspection evidence could not have informed her knowledge, state of mind, or motive at the time of the alleged misstatements to investors. Holmes further argues that the FDA inspection evidence does not prove FDA approvals or clearances for any Theranos product were, in fact, required. Holmes also suggests that the FDA inspection pertained primarily to nanotainers, whereas the FDA-related allegation in the indictment refers to Theranos' proprietary analyzer and tests. More generally, Holmes states that the FDA inspection is too limited in scope because, for example, "[t]he FDA inspectors made no findings regarding the performance of Theranos' laboratory or the accuracy and reliability of Theranos' blood tests." Holmes's Reply Br. in Supp. of Holmes 573 Mot. ("Holmes 573 Reply"), Dkt. No. 716, at 3. In the end, however, the Federal Rules of Evidence set a low bar for relevance. *See* Fed. R. Evid. 401 (defining "relevant evidence" as "evidence having any tendency to make the existence of any

the case in chief." Holmes 573 Mot. at 4.

fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence").  "[T]he requirements of Federal Rule of Evidence 401 are not especially stringent."  *Rios v. Tilton*, No. 2:07-cv-0790 KJN P, 2016 WL 29567, at *6 (E.D. Cal. Jan. 4, 2016) (citing *Slaughter-Payne v. Shinseki*, 522 F. A'ppx 409, 410 (9th Cir. 2013) (noting the "low bar for relevancy under Federal Rule of Evidence 401.")); *see also United States v. Miranda-Uriarte*, 649 F.2d 1345, 1353 (9th Cir. 1981) (same); *Sandoval v. Cty. of San Diego*, 985 F.3d 657, 666 (9th Cir. 2021) (same).

### 2.  Unfair prejudice

Holmes argues that admitting the FDA inspection evidence would be unfairly prejudicial. According to Holmes, admitting such evidence presents a risk that the jury would perceive the FDA's unannounced inspections of Theranos and the technical and purportedly authoritative forms and communications arising out of those inspections as indicative of guilt.  Holmes cites as analogs *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 673 (5th Cir. 1999) (holding that Mississippi Department of Environmental Quality evidence was properly excluded, in part, because "[that agency's] evidence of likely violations of environmental regulations would have been unduly prejudicial due to its apparent official nature"), and *Smith v. I-Flow Corp.*, No. 09 C 3908, 2011 WL 12627557, at *2 (N.D. Ill. June 15, 2011) (holding that an FDA warning letter was to be excluded as unfairly prejudicial).  Holmes 573 Mot. at 7.  These cases are unhelpful.  In *Curtis*, the primary basis for evidence exclusion was that the evidence was cumulative, and *Smith* lacks a meaningful analysis.

Having weighed the risk of unfair prejudice against the probative value of the evidence, the Court finds that the evidence is more probative than prejudicial.  The nature and scope of inspections can be explored through witness testimony to provide information and context of the process.

### 3.  Inadmissible character and propensity evidence

Holmes next argues that the FDA inspection evidence should be excluded per Rule 404. Holmes is concerned that the Government will proffer evidence of purported pushback by

Theranos personnel on FDA's tactics and theories during the inspection as improper propensity evidence against Holmes.

The Court finds that the FDA inspection evidence is not propensity evidence, but rather evidence that is probative of Holmes's state of mind, intent, and knowledge. Specifically, the evidence has a tendency to show Holmes' state of mind regarding Theranos' interactions with the regulatory agencies, the extent to which Holmes knew or should have known that Theranos was failing to meet certain federal regulations, and whether Holmes intended to mislead investors regarding the accuracy and reliability of Theranos' technology. The Court declines to exclude the evidence on Rule 404 grounds at this time.

### 4. Inadmissible hearsay

Holmes also argues that the FDA inspection evidence is inadmissible hearsay. Specifically, Holmes relies on Rule 803(8)(A)(iii), which provides that public records that contain factual findings from legally authorized investigations are admissible only "in a civil case or against the government in a criminal case." Fed. R. Evid. 808(8)(A)(iii)). Citing *United States v. Orellana-Blanco*, 294 F.3d 1143, 1149 (9th Cir. 2002), Holmes argues that because the FDA inspection evidence constitutes public records prepared by a government agency and because the evidence is not being used in a civil case or against the government in a criminal case, the evidence is inadmissible. Holmes 573 Mot. at 8.

In opposition, the Government looks to Rule 803(8)(A)(ii), which states that the rule against hearsay does not exclude "[a] record or statement of a public official . . . [setting out] a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel." Fed. R. Evid. 803(8)(A)(ii).

The Court finds the FDA inspection was a "matter observed while under a legal duty to report." Fed. R. Evid. 803(8)(A)(ii); *see, e.g.*, *United States v. Fryberg*, 854 F.3d 1126, 1131 (9th Cir. 2017) (holding that "[t]he pertinent question [as to what is a 'matter observed while under a legal duty to report'] is whether the creation and maintenance of the record at issue is appropriate to the function of the relevant government office, given the nature of the responsibilities assigned

to that office" (internal citations omitted)).  The FDA's inspection report consists largely of observations and, in that sense, is comparable to reports prepared by non-law enforcement civil government employees such as city building inspectors, medical examiners, and prison case managers.  *See, e.g.*, *United States v. Hansen*, 583 F.2d 325, 333 (7th Cir. 1978) (building inspectors enforcing building code did not qualify as law enforcement personnel under Rule 803(8)(A)(ii)); *United States v. Rosa*, 11 F.3d 315 (2d Cir. 1993) (medical examiners required to investigate unnatural deaths and to refer situations indicating criminality to a district attorney did not qualify as law enforcement personnel under Rule 803(8)(A)(ii)); *Manocchio v. Moran*, 919 F.2d 770, 777 (1st Cir. 1990) (medical examiner's autopsy report should not be excluded under Rule 803(8)(A)(ii)); *United States v. Edelmann*, 458 F.3d 791, 813–14 (8th Cir. 2006) (report made by an inmate systems manager should not be excluded under Rule 803(8)(A)(ii) because the manager was not law enforcement personnel and the report was produced in the normal course of duties).  There are portions of the report that go beyond mere observations and include some level of analysis by FDA inspectors; however, those portions comprise only a minor portion of the report.  As noted below, the Court is open to continued discussions on this issue should Holmes wish to raise arguments to certain specific pieces of evidence within the FDA inspection evidence that involve such a high degree of observer analysis that they might not be admissible under Rule 803(8)(A)(ii).[3]

Holmes argues that even if Rule 803(8)(A)(ii) applies, the FDA inspectors were acting as law enforcement personnel because the inspection was unannounced, the FDA has the power to levy criminal sanctions (including terms of imprisonment), and "[t]he [G]overnment's case agent for this prosecution is a Special Agent in FDA's Office of Criminal Investigations."  Holmes 716 Reply at 5–9.  Holmes argues that the FDA is similar to the IRS, which the Second Circuit has described as having a "law enforcement function.  *Id*. at 7 (citing *United States v. Ruffin*, 575 F.2d

---

[3] Holmes's reply brief inaccurately represents the holding of *United States v. Cerda-Ramirez*, 730 F. App'x 449, 452 (9th Cir. 2018).  Holmes 573 Reply at 8.  The Ninth Circuit's decision hinged at least partly on the presence of an adversarial setting, and not solely on whether an independent judgment was made by the observer.  *See Cerda-Ramirez*, 730 F. App'x at 452.

346, 356 (2d Cir. 1978)).

For the purposes of determining whether the FDA inspectors acted as law enforcement personnel, the Court applies the case law of the Ninth Circuit and finds that the FDA inspectors did not act as law enforcement personnel.  Under the Ninth Circuit's "narrow understanding of the law enforcement exception [of Rule 803(8)(A)(ii)]," "the purpose of the law enforcement exception is to exclude observations made by officials at the scene of the crime or apprehension, because observations made in an adversarial setting are less reliable than observations made by public officials in other situations." *Fryberg*, 854 F.3d at 1132 (citations omitted).  The FDA inspectors, in carrying out their duties of inspecting the Theranos lab, do not appear to have been making observations in an adversarial setting that raises doubts about the reliability of the observations.  *Compare id. with Ruffin*, 575 F.2d 346 (Second Circuit applied a relatively expansive reading of the 'law-enforcement personnel' exclusion of Rule 803(8)(A)(ii)).

The FDA's inspection appears to have been at least to some extent unannounced, and in oral arguments before the court, the two parties presented differing accounts as to whether the inspection is more properly characterized as having been part of a for-cause reactionary process prompted by complaints and/or concerns regarding Theranos, or as part of a routine process that Theranos itself requested.  May 5, 2021 Hr'g Tr., Dkt. 793, at 104:22-23 ("Mr. Looby (for Holmes): This [was] a for[-]cause inspection that was initiated by the FDA and [was] actually more or less unannounced."); *but see id.* at 118:14–120:3 ("The Court: So I asked Mr. Looby (Counsel for Holmes) a question about the timing of this inspection and whether it was a request or . . . voluntary.  And I think he said no, it was not [voluntary]. . . .  Didn't Theranos . . . seek approval from the FDA in 2013 and then were was – between 2013 and 2015 obviously there were, I presume, some conversations [between Theranos and the FDA], and then ultimately unannounced the FDA shows up to do the inspection for that request I suppose for certification.  Is that the event here?  Mr. Leach (for the Government): That is largely correct, Your Honor. . . .  There was a dialogue between Theranos and the FDA throughout 2013 and 2014.  The 2015 inspection is unannounced.  The Court: Was [the FDA's] showing up [at the Theranos laboratory],

it sounds like it was connected to [Theranos'] original request to approve [Theranos'] device.  Mr. Leach: I guess that's a fair inference, Your Honor.")).  Nevertheless, the inspectors who carried out the inspection were not part of a criminal division of the FDA.  While the atmosphere at the California laboratory during the inspections may have been contentious, and while there may have been the latent threat of sanctions given the regulatory nature of the FDA, the collection of the FDA inspection evidence is more like the routine, ministerial work of the recording of the license plates in *United States v. Orozco*, 590 F.2d 789 (9th Cir. 1979), and less like the adversarial work of the administering of the immigration interview in *Orellana-Blanco*, or the filing of the criminal complaint and affidavit in *Cerda-Ramirez*.

Lastly, Holmes's Rule 803(8)(B) argument is undeveloped and unsupported.  For the reasons given above, the Court declines to exclude the FDA inspection evidence on hearsay grounds at this time.

The motion to exclude FDA inspection evidence is **DEFERRED**.  The Court acknowledges the possibility for further side bar discussions on this matter, should Holmes wish to specify certain exhibits within this collection of evidence and make new arguments as to why these particular exhibits should still be excluded.

### C.    Holmes's MIL to Exclude Evidence of CMS Survey Findings and Sanctions (Dkt. No. 574)

CMS "audits laboratories to identify non-compliance with [the mandates of the Clinical Laboratory Improvement Amendments of 1988 ('CLIA')]."  Holmes's Mot. in Limine to Exclude Evidence of CMS Survey Finding and Sanctions Pursuant to Rules 401-403 and 801-803 ("Holmes 574 Mot."), Dkt. No. 574, at 1–2.  Because Theranos "perform[ed] clinical diagnostic testing on human samples," its laboratories were required to be in compliance with CLIA.  *Id.* at 1.  In September and November 2015, CMS conducted a recertification and complaint survey of Theranos' Newark lab.  *Id.* at 2.  According to Holmes, usually a state agency carries out recertification surveys, but in this case CMS decided to carry out the survey "due to the media attention Theranos was receiving at the time and due to complaints CMS had received about

Theranos."[4]  *Id*. at 2 (citing Saharia Decl., Ex. 34, Dkt. No. 584 at 2-3).  Holmes suggests "[i]t was unusual for CMS both to conduct the survey and to send 'central office personnel . . . out on the Theranos survey."  *Id*. (citing Saharia Decl., Ex. 34, Dkt. No. at 3).

On January 25, 2016, CMS issued a letter and a Form 2567 summarizing the findings of the survey.  *Id*.  These documents stated that "Theranos' California laboratory was in violation of various CLIA requirements," and "warned Theranos that if it did not remediate these deficiencies within 10 days, CMS would impose sanctions."  *Id*. at 3.  Subsequently, Theranos and CMS engaged in communications that included Theranos' "outlin[ing] steps it was taking to resolve CMS's claimed deficiencies."  *Id*. (citing Saharia Decl., Ex. 27, Dkt. No. 583-1 at 2).  CMS did impose sanctions on Theranos' Newark laboratory.  *Id*. (citing Saharia Decl., Ex. 30, Dkt. No. 583-4).  Shortly thereafter, CMS surveyed Theranos' Arizona laboratory, cited it for various CLIA violations and imposed sanctions.  *Id*.  (citing Saharia Decl., Exs. 31-33, Dkt. No. 584-1, 584-2).  Theranos appealed both sets of sanctions, but Theranos and CMS made settlements before the adjudication of these appeals.[5]  *Id*.

Holmes moves to exclude "evidence relating to the findings of surveys of Theranos' clinical laboratories conducted by [CMS] in 2015 and 2016, including survey findings and sanctions imposed by CMS."  Holmes 574 Mot. at 1.  Holmes argues that the evidence of CMS survey findings and sanctions should be excluded as irrelevant, unfairly prejudicial, and inadmissible hearsay.

Relatedly, the Government moves to include "CMS'[s] January 26, 2016 Form CMS-2567, Statement of Deficiencies."  United States' Mots. In Limine ("Gov't Mot.") at 8-10, Dkt. No. 588.  The Government argues that the January 26, 2016 Form CMS-2567, Statement of Deficiencies— which appears to fall within the set of CMS evidence Holmes moves to exclude—should be

---

[4] Holmes suggests that, in making this decision, CMS may have been influenced by Wall Street Reporter John Carreyrou.  Dkt. No. 574 at 2, n. 1 (citing Saharia Decl., Ex. 34 at 3).
[5] Evidence regarding these settlements and "the remedial measures that Theranos . . . adopted in response to the CMS survey findings" are the subjects of a separate motion(s) to exclude evidence. Dkt. No. 574 at 3, n. 1.

admitted for reasons that overlap with the arguments provided in the Government's opposition to Holmes's motion to exclude the CMS survey.  *See* Gov't Opp'n to Holmes 675 Mot. ("Gov't 574 Opp'n"), Dkt. No. 675.  Accordingly, the Court will focus on the arguments both parties made regarding Holmes's motion to exclude the evidence of CMS survey findings and sanctions.  The outcome of this analysis is also determinative of the arguments pertaining to the Government's MIL No. 6 to admit the January 2016 CMS form.

### 1.  Relevance

The Court finds that the evidence of CMS survey findings and sanctions meets Rule 401's low bar for relevancy.  Although the purpose of the CMS survey was not to assess either the accuracy or reliability of Theranos technology, the CMS survey findings and sanctions indicate violations of federal regulations that themselves are meant to ensure, among other things, the accuracy and reliability of certain kinds of clinical laboratory work.  The evidence therefore appears to be relevant to questions about Holmes's state of mind, intent, and knowledge regarding the alleged misrepresentations about the accuracy and reliability of Theranos' blood tests.

Holmes cites *PG&E*, where a court found that a report by the National Transportation Safety Board was inadmissible in an action against a company because, even though the report noted regulatory violations made by the company, the report did not pertain to the allegations against the company.  178 F. Supp. 3d 927 (N.D. Cal. 2016).  That case, however, is distinguishable for the reasons the Government articulates.  In *PG&E*, the court excluded a report about a company's culpability for causing an explosion because the company's alleged obstruction of the investigation was at issue, not the explosion.  *Id.* at 947–48.  Whereas a report about a company's role in causing an explosion may not be relevant to that company's alleged obstruction of an investigation, a report indicating a company's CLIA violations may be relevant to that company's alleged misrepresentations of the accuracy and reliability of its products.

Holmes also argues that the evidence of CMS survey findings and sanctions cannot be used to show her intent for alleged actions that occurred prior to the CMS surveys, because there is no showing that she was aware of the information in the reports.  The argument misconstrues

the Government's point.  The Government is not arguing that Holmes's actual knowledge of the evidence of CMS survey findings and sanctions indicates that Holmes must have known she was participating in a fraudulent scheme.  The Government is instead arguing that the evidence tends to show Holmes's state of mind, knowledge, and intent regarding her representations to investors regarding the accuracy and reliability of Theranos' technology.

### 2.  Unfair prejudice

Holmes argues that the evidence of CMS survey findings and sanctions is unfairly prejudicial, raising the same points she stated to argue relevancy, which the Court will not revisit here.  Holmes makes the additional argument that the potential for unfair prejudice is great primarily because (1) the jury will put special weight on the CMS survey findings and (2) the jury might improperly equate CMS's findings with the government's allegation that Theranos technology was not capable of producing accurate and reliable results.  Holmes is particularly concerned with the Government's repeated references to the CMS's finding of "immediate jeopardy."  Holmes cites to *United States v. Wolf*, 820 F.2d 1499, 1504 (9th Cir. 1987), *United States v. White Eagle*, 721 F.3d 1108, 1114 (9th Cir. 2013), *United States v. Christo*, 614 F.2d 486, 492 (5th Cir. 1980), and *United States v. Riddle*, 103 F.3d 423, 431 (5th Cir. 1997).

The Court does not see that the evidence in question raises the same kind of unfair prejudice concerns indicated in *Wolf*, *White Eagle*, and *Christo*.  In each of these cases except *Riddle*, the courts found Rule 403 violations when parties relied on evidence of violations of civil regulations to prove similar criminal violations.  Here, the Government is attempting to introduce evidence of violations of civil regulations for the purposes of showing Holmes's state of mind, intent, and knowledge, not for the purpose of arguing that Holmes is guilty of committing a criminal violation parallel to the civil violations indicated by the CMS survey findings and sanctions.  *Riddle* is inapposite because in that case the court found that the evidence in question was largely irrelevant to the charges brought.  103 F.3d at 431.  Having weighed the risk of unfair prejudice against the probative value of the evidence, the Court at this time finds that the evidence is more probative than prejudicial.

### 3. Inadmissible hearsay

Holmes argues that evidence of CMS survey findings and sanctions is hearsay.  Holmes's arguments are effectively the same hearsay arguments made with respect to the FDA inspection evidence, and the Court will not address them again here.[6]  *See supra* Section III.B.  Holmes relies on an additional case, *United States v. Murgio*, No. 15-cr-769(AJN), 2017 WL 365496, at *7, 9 (S.D.N.Y. Jan. 20, 2017), in support of her hearsay objection; however, the case is distinguishable. In *Murgio*, the court found that the evidence alleged to be hearsay not only included legal conclusions and evaluative conclusions, but also was itself based partially on evidence not directly observed by the relevant public agency.  *See id.* at *9–10 ("[T]he Government itself admits that the findings in the [evidence alleged to be inadmissible hearsay] are based upon (1) the [agency's] own observations and records gathered during the course of [the] examinations . . . and (2) the [agency's] independent evaluation of evidence gathered in the criminal investigation, which the Government supplied to the [agency]." (internal quotation marks removed)).   Moreover, *Murgio* appears to follow the Second Circuit's relatively expansive reading of the 'law-enforcement personnel' exclusion of Rule 803(8)(A)(ii), which contrasts with the Ninth Circuit's more narrow reading.  *Compare Ruffin*, 575 F.2d at 356 *with Fryberg*, 854 F.3d at 1132.

For the reasons given above, the Court **DENIES** Holmes's motion to exclude the evidence arising out of the CMS surveys in question.  The Court **GRANTS** the Government's motion to admit the January 26, 2016 Form CMS-2567, Statement of Deficiencies.  The Court acknowledges the possibility for further side bar discussions on this matter, should parties wish to specify certain exhibits within this collection of evidence and make new arguments as to why these particular exhibits should still be excluded.

---

[6] Holmes raises one additional argument: that the Evidence of CMS Survey Findings and Sanctions itself contains out-of-court statements made by Theranos personnel that are inadmissible hearsay within hearsay.  In response, the Government argues that the statements by Theranos employees that were included in CMS's Form 2567 report are not inadmissible hearsay because the statements were authorized admissions and statements of an agent or employee within the meaning of Federal Rule of Evidence 80[1](d)(2).  This argument is addressed later in the context of the Government's MIL No. 8.

**D.**   **Holmes's MIL to Exclude Evidence Relating to Theranos' Interactions with Government Regulatory Agencies (Dkt. No. 575)**

Holmes moves to exclude certain evidence relating to Theranos' interactions with government agencies. Holmes's Mot. in Limine to Exclude Certain Evidence Relating to Theranos' Interactions with Government Regulatory Agencies Under Rules 401-404 and 801-803 ("Holmes 575 Mot."), Dkt. No. 575, at 1. Specifically, she seeks to exclude three categories of evidence involving two agencies over a period of two years: (1) an on-site inspection performed by the California Department of Public Health ("CDPH") in December 2013; (2) interactions between Theranos representatives and the Centers for Medicare & Medicaid Studies ("CMS") in September 2015; and (3) Theranos' decision to employ a CMS-qualified laboratory director, Dr. Sunil Dhawan, in 2014 and 2015. *Id.* Holmes also refers to a fourth category of evidence that includes unidentified evidence of representations made by Theranos to other regulatory organizations. *See id*. at 16. The Court addresses each category in turn.

### 1.   Evidence relating to the December 2014 CDPH inspection

Under the Clinical Laboratory Improvement Amendments Act of 1988 ("CLIA"), 42 U.S.C. § 263a, CMS regulates all laboratory testing performed on human samples in the United States. Holmes 575 Mot. at 2. CMS deputizes certain accreditation responsibilities to qualified state agencies—in California, the CDPH's Laboratory Field Services section is responsible for accreditation and compliance of CLIA-certified laboratories. *Id.* As part of the accreditation and compliance process, CDPH generally performs biennial onsite inspections for CLIA laboratories in California. *Id.*

In December 2013, CDPH inspected a Theranos laboratory. *See id*. at 5. Pursuant to this inspection, CDPH produced a report that identified three deficiencies, which the Government seeks to introduce this report as evidence probative of Holmes's state of mind, intent, and knowledge regarding the status of Theranos' laboratories and technology. *Id.* (citing Decl. of Amy Saharia in Support of Holmes's Mots. in Limine and *Daubert* Mots. to Exclude Expert Testimony ("Saharia Decl."), Dkt. No. 579, Ex. 2 at 12–13 (Apr. 3, 2020 Gov't Supp. Rule 404(b) Notice)). The Government also seeks to introduce (1) an FBI report summarizing an interview of

a Theranos CLIA lab employee, and (2) an email from Theranos employee Daniel Young to then-laboratory director Adam Rosendorff. *Id.* (citing Saharia Decl., Ex. 3 at 13, 65). The Government seeks to introduce this memorandum and email as evidence probative of Holmes's state of mind, intent, and knowledge, under the theory that the memorandum and email show that Balwani and others "misled an inspector into believing that the Theranos CLIA laboratory was limited to a single area." *Id.* (citing Saharia Decl., Ex. 1 at 7 (Mar. 6, 2020 Gov't Rule 404(b) Notice)).

Holmes argues that the CDPH inspection evidence should be excluded as irrelevant under Rules 401 and 402, as unfairly prejudicial under Rule 403, as improper propensity evidence under Rule 404, and inadmissible hearsay.

### a. Relevance

Holmes argues the evidence is irrelevant for four reasons. First, she argues the CDPH report does not indicate that Holmes made misrepresentations about Theranos' ability to provide accurate and reliable results. Holmes 575 Mot. at 6. Second, Holmes contends the CDPH inspection findings do not tend to show that Theranos was unable to provide accurate and reliable results. *Id.* (citing Saharia Decl., Ex. 3 at 65). Third, Holmes says the Government has not sufficiently shown that the alleged misleading of the CDPH inspector amounted to a false representation, or that Holmes had sufficient knowledge or intent regarding that incident. *Id.* at 7–8. Fourth, Holmes contends that "the evidence relating to . . . Balwani's supposed directions to staff [allegedly misleading the CDPH inspector] does not bear on the accuracy and reliability of Theranos' test results," suggesting that  any directions regarding where to lead an inspector may have been made for legitimate and regulation-compliant reasons, such as avoiding the disruption of lab work. *Id.* at 8–9.

Holmes's arguments go to the weight of the evidence, not admissibility. The Court finds that the CDPH inspection evidence is relevant under Rule 401. The CDPH report appears to indicate violations of federal regulations that themselves are meant to ensure, among other things, the accuracy and reliability of certain kinds of clinical laboratory work. The fact that the CDPH later noted that the violations had been addressed satisfactorily does not negate the report's

probative value regarding Holmes's state of mind, intent, and knowledge as to the accuracy and reliability of Theranos' laboratory procedures and blood tests.  The FBI memorandum and Young's email also appear relevant to and probative of her knowledge, intent, notice, and absence of mistake regarding the status and capabilities of Theranos' laboratories and technology. Holmes's position at Theranos and her pre-inspection communications with Young connect her to the email.

### b.  Unfair prejudice

Holmes argues that the CDPH inspection evidence is unfairly prejudicial under Rule 403 because it may give the jurors the "misimpression that the laboratory was unsafe" or confuse the jurors with "industry-specific jargon."  Holmes 575 Mot. at 9–10.  In particular, she says that without an expert witness to properly interpret and contextualize the report, the jury would "overestimate its probative value by equating regulatory citations with proof of fraud . . . ." Holmes Reply Br. in Supp. of Holmes's 575 Mot. ("Holmes 575 Reply"), Dkt. No. 718, at 9–10. Holmes relies on *United States v. Riddle*, in which the Fifth Circuit held that the district court erred in permitting extensive evidence about a federal regulator's appraisal of a bank's general health and its failure to comply with regulations.  103 F.3d 423, 431 (5th Cir. 1997).

The Court finds that the evidence in question does not raise the same unfair prejudice concerns indicated in *Riddle*.  In that case the court found that the evidence in question was largely irrelevant to the charges brought.  *See id.*  As described above, the Court has determined that the CDPH report is relevant.  While the CDPH report may contain technical information that may be difficult for jurors to interpret, such a challenge is unavoidable in a case involving purportedly innovative and advanced technology.  Having weighed the risk of unfair prejudice against the probative value of the evidence, the Court at this time finds the CDPH inspection evidence is more probative than prejudicial.  The parties will have the opportunity to examine and cross-examine witnesses to clarify and assist the jury in understanding the evidence.

### c.  Inadmissible character and propensity evidence

Holmes argues that the CDPH inspection evidence should be excluded under Rule 404.

*See* Holmes 575 Mot. at 10.  She references Rule 401 arguments, suggesting that "[t]he [G]overnment's theory of relevance hinges on propensity: the notion that, because others at Theranos allegedly misled CDPH officials in December 2013, [Holmes] is more likely to have possessed the specific intent to defraud investors and patients as alleged in the indictment."  *Id*. Holmes contends that the evidence in question does not qualify as "inextricably intertwined" with the charged crime under the Ninth Circuit's interpretation of the concept as articulated in *United States v. Vizcarra-Martinez*, 66 F.3d 1006 (9th Cir. 1995).  Dkt. No. 718 at 5 (citing *Vizcarra-Martinez*, 66 F.3d at 1012–13).  Instead, she argues more generally that the evidence in question is "classic other-acts evidence that should be excluded as irrelevant or unfairly prejudicial."  *Id*.

Assuming without deciding that the CDPH inspection evidence does not meet the Ninth Circuit's interpretation of the term "inextricably intertwined" with the charged crime, the evidence as described nevertheless appears probative of Holmes's intent, state of mind, and knowledge. Specifically, the evidence has a tendency to show her state of mind regarding Theranos' interactions with regulatory agencies, the extent to which she knew or should have known that Theranos was failing to meet certain federal regulations, and whether she intended to mislead investors regarding the accuracy and reliability of Theranos' technology.  The Court therefore declines to exclude the evidence on Rule 404 grounds at this time.

### d.  Inadmissible hearsay

Holmes argues that the CDPH inspection evidence is inadmissible hearsay in violation of Rule 803(8), as the report constitutes "factual findings from a legally authorized investigation" and it is not being used in a civil case or against the government in a criminal case.  Holmes 575 Mot. at 10–11.  This argument is effectively the same hearsay argument Holmes made in her motions in limine concerning FDA inspection evidence and evidence of CMS survey findings and sanctions. Holmes 573 Mot.; Holmes 574 Mot.

The Court declines to exclude the CDPH inspection evidence on hearsay grounds at this time for the same reasons it denied Holmes's MILs to exclude FDA inspection evidence and evidence of CMS survey findings and sanctions.  *See supra* Section III.B, C.  The evidence in

question appears to be objective observations, rather than the factual findings of an investigation. The CDPH inspector, in carrying out the duties of inspecting the Theranos lab, did not make observations in an adversarial setting that raises doubts about the reliability of the observations. The inspector who carried out the inspection was not part of a criminal division of the CDPH. The collection of the CDPH inspection evidence appears to have been routine, ministerial, and non-adversarial. *See Orellana-Blanco*, 294 F.3d at 1150.

Moreover, as explained in the Court's ruling on the Government's MIL No. 8, *see infra* Section IV.H, the Court sees insufficient reason at this time to exclude the statements of Theranos employees captured within or in response to the CDPH report. The statements as described satisfy Federal Rule of Evidence 801(d)(2).

### 2. Evidence relating to Theranos' September 2015 communications with CMS

In September 2015, Theranos provided to CMS a document ("the CMS Letter") stating that the company's decision to use different devices in its CLIA laboratory "does not reflect on the reliability or accuracy of any platform." Holmes 575 Mot. at 11 (citing Saharia Decl., Ex. 3 at 64). The Government seeks to introduce this letter as Rule 404(b) evidence indicating an "intent to defraud" and "consciousness that full regulatory scrutiny would expose that Theranos' [proprietary device] was unable to provide accurate and reliable test results." *Id.* (citing Saharia Decl., Ex. 3 at 65); *see also* Gov't Opp'n to Holmes's 576 Mot. ("Gov't 575 Opp'n"), Dkt. No. 677, at 14. Holmes contends that the CMS Letter is irrelevant, unfairly prejudicial under Rule 403, and introduced for improper propensity arguments. Holmes 575 Mot. at 11–12.

#### a. Relevance

Holmes argues that the CMS Letter is irrelevant for two reasons. Holmes 575 Mot. at 11–12. First, she says that the Government has not connected her to the statement in the CMS Letter. *Id.* at 11–12. Second, Holmes contends that the Government has not shown that the CMS Letter evinces an intent to defraud or consciousness of guilt, but rather may indicate only negligence or some other "less culpable mental state." *Id.* at 12. In response, the Government points to evidence that Holmes monitored and directed Theranos' responses to the CMS survey. Gov't 575

Opp'n at 13–14 (citing Dkt. No. 596 at THER-2566768–769).  The Government asserts that the CMS Letter is "an admission that Theranos was not even using its blood analyzer at the time of the [CMS] survey," which tended to show that the technology was not as Holmes claimed it was to investors and that Theranos could not consistently produce accurate and reliable tests.  *Id.*

The Court finds that the CMS Letter meets Rule 401's low bar for relevance.  Holmes's communications with Theranos employees and her involvement in the inspection process sufficiently links her to the CMS Letter, such that the CMS Letter is probative of Holmes's state of mind, knowledge, intent, and lack of mistake regarding the alleged misrepresentation of the accuracy and reliability of Theranos' technology.  The CMS Letter also appears relevant for its truth—that is, it is relevant because it indicates the nature and extent of Theranos' use of its analyzer, a piece of technology about which Holmes made various representations.  The Court agrees with the Government that *Miller* and *Brown* are inapposite.  For the purposes of determining the relevancy of the CMS Letter, it is not necessary for the Court to decide here whether the Government has sufficiently established a foundation for making a hearsay exclusion argument.  The Court finds no reason to exclude the evidence as irrelevant at this time.

### b. Unfair prejudice

Holmes argues that the CMS Letter would be unfairly prejudicial under Rule 403 in that its admission would "invite[] the jury to convict based on the acts of persons other than [Holmes]," since the Government has not connected Holmes to the CMS Letter.  *See* Holmes 575 Mot. at 12–13.  Holmes also complains that "it would mislead and confuse the jury to admit this document into evidence without substantial context on the responsibilities of CMS, the requirements under the CLIA statute, implementing regulations and relevant guidance, the nature of the specific disclosure requests made by CMS to Theranos, and the legal justification for those requests."  *Id.*

As discussed above, the Court finds that the Government has sufficiently linked Holmes to the CMS Letter for the purposes of introducing the CMS Letter.  The CMS Letter also appears relevant for its truth.  While the evidence may be complicated and may require contextualization, such challenges are inevitable for a case involving allegations of misrepresentations of purportedly

advanced technology.  Moreover, communications from Theranos to CMS regarding the use of Theranos' technology, or lack thereof, appears probative as to Holmes's knowledge of the accuracy and reliability of Theranos' technology.  Therefore, the Court at this time declines to exclude the CMS Letter.  The probative value of the evidence outweighs any potential prejudicial effect to Holmes.

### c.  Inadmissible character and propensity evidence

Holmes argues that the CMS Letter should be excluded per Federal Rule of Evidence 404 because the Government has not shown that the CMS Letter is connected to Holmes and has not explained how the CMS Letter "constitute[s] a false or misleading representation under CMS regulations."  Holmes 575 Mot. at 13 (internal quotation marks omitted).  Holmes argues that "this evidence does little more than show propensity, [i.e.], suggest that because [Holmes'] associates may have committed one 'bad act,' [Holmes] is likely to have committed another."  *Id.*

For the reasons stated above, the Court finds that the Government has sufficiently demonstrated Holmes's connection to the CMS Letter.  To the extent that the CMS Letter indicates a prior bad act, the Court finds that the CMS Letter as described is probative of Holmes's intent, state of mind, and knowledge.  Specifically, the CMS Letter has a tendency to show Holmes's state of mind regarding Theranos' interactions with the regulatory agencies, the extent to which Holmes knew or should have known that Theranos' technology had deficiencies, and whether Holmes intended to mislead investors regarding the accuracy and reliability of Theranos' technology.  The evidence also appears relevant for its truth.  The Government does not appear to argue that the CMS Letter indicates that Holmes made a misrepresentation and therefore Holmes has a propensity for making misrepresentations or that the CMS Letter is admissible because it indicates a violation of CMS regulations.

### 3.  Evidence relating to the hiring and retention of Dr. Dhawan

In addition to regulating laboratory practices, CMS administers regulations concerning laboratory personnel, including laboratory directors.  42 C.F.R. § 493.1443.  The Government seeks to introduce evidence concerning the employment of Dr. Sunil Dhawan, Theranos' former

laboratory director.  Holmes 575 Mot. at 13.  Holmes now seeks to exclude this evidence as irrelevant, unfairly prejudicial, and introduced for improper propensity arguments.  *Id.* at 13–16.

### a. Relevance

Holmes argues that the Dhawan evidence is irrelevant under Rule 401.  Holmes 575 Mot. at 13–15.  She asserts that the Government fails to show that the employment of Dr. Dhawan amounted to a violation of CMS regulations, and that even if the Government had so demonstrated, the evidence in question would still not be relevant for what she believes are "inflammatory Rule 404(b) purposes."  Holmes 575 Reply at 14.  She contends that the employment of Dr. Dhawan does not reveal anything about her control of Theranos.

The Government responds that it intends to introduce this evidence not to show that Holmes violated CMS regulations, but rather for her intent and state of mind.  Gov't 575 Opp'n at 11, 12.  The Government argues that Defendants' decisions to hire Balwani's friend who was previously in private practice rather than a laboratory manager, give him little responsibility pay him handsomely, and often not require him to be present at the laboratory all indicate that Defendants were not serious about keeping a professional laboratory and/or had a desire to place someone they could control in the position.  *See id.*

The Court finds that the Dhawan evidence meets the low bar for relevance under Rule 401, because the evidence has a tendency to show Holmes's state of mind and intent regarding alleged misrepresentations about Theranos' technology.  Specifically, the evidence tends to show Holmes's state of mind regarding the management of Theranos' CLIA laboratory, and whether Holmes intended to mislead investors regarding the accuracy and reliability of Theranos' technology.  As the Government correctly observes, the evidence need not indicate a regulatory violation in order to be relevant.  The Court finds Holmes is sufficiently connected to the hiring of Dhawan for the evidence of Dhawan's employment to be relevant.

### b. Unfair prejudice

Holmes argues that the Dhawan evidence is unfairly prejudicial, misleading, and confusing under Rule 403.  *See* Holmes 575 Mot. at 15.  Holmes argues that the evidence the Government

seeks to introduce is unfair because it "preys on lay impressions of the role a lab director should play, rather than what the law actually requires."  *Id.*

Although the Government does not directly address Rule 403 arguments in its opposition brief, the Court finds the Government's arguments on relevance and probity persuasive.  *See* Gov't 575 Opp'n at 11–12.  Having weighed the risk of unfair prejudice against the probative value of the evidence, the Court finds that the evidence is more probative than prejudicial at this time.  The Court does not find that the Dhawan evidence is meant to, or is likely to, mislead a jury about the nature of a lab director's role.  In contrast, the probative value of the evidence as Holmes's state of mind and intent is clear.

### c.  Inadmissible character and propensity evidence

Holmes argues that the Dhawan evidence should be excluded under Rule 404 for reasons similar to her arguments concerning Rule 401.  *See* Holmes 575 Mot. at 16 (referencing "foregoing reasons [given in the motion]"; citing *Brown*, 880 F.2d at 1016).  Holmes argues that the Government seeks to introduce this "bad act" as evidence that Holmes failed to properly address problems in Theranos' CLIA laboratory.  *See* Holmes 575 Reply at 8–9 (citing Gov't 575 Opp'n at 11, 12).  This argument is similar to her argument concerning the CDPH inspection evidence, stating that the evidence in question does not qualify as "inextricably intertwined [with the charged crime]" under the Ninth Circuit's interpretation of the concept.  *Id.* at 5 (citing *Vizcarra-Martinez*, 66 F.3d at 1012–13).

The Dhawan evidence does not appear to indicate a prior bad act.  To the extent that it does, and regardless of whether the evidence meets the Ninth Circuit's interpretation of the term "inextricably intertwined" with the charged crime, the evidence as described appears probative of Holmes's state of mind and intent.  Specifically, the evidence tends to show her state of mind regarding the management of Theranos' CLIA laboratory, and whether she intended to mislead investors regarding the accuracy and reliability of Theranos' technology.  The Government does not appear to argue that the Dhawan evidence is admissible because it indicates a violation of CMS regulations that in turn reveals a propensity for Holmes to engage in other wrongdoing.  The

Court declines to exclude the evidence on Rule 404 grounds at this time.

### 4. Evidence relating to other unidentified regulatory agencies

Holmes asserts that the Government's Rule 404(b) correspondence included a notice of intent to introduce evidence relating to "representations made to FDA, CMS, CDPH, and other regulatory organizations." Holmes 575 Mot. at 16 (citing Saharia Decl., Ex. 1 at 7; Ex. 2 at 12; Ex. 3 at 63) (internal quotation marks omitted). Because the Government has failed to identify any of the unspecified "other regulatory organizations," Holmes seeks to exclude such evidence. *See id.*; Fed. R. Evid. 404(b)(2)(A) (requiring "reasonable notice of the general nature of any . . . evidence that the prosecutor intends to offer at trial").

Neither the Government's opposition brief nor Holmes's reply address this issue further. The Court will not issue a broad exclusion at this time. If the Government seeks to introduce evidence not yet disclosed, it must provide notice to Holmes and the Court and include its reasons for late disclosure. The Court will revisit the issue with counsel at the appropriate time.

### 5. Summary

For the reasons given above, the Court **DENIES** the motion to exclude certain evidence relating to Theranos' interactions with government agencies. The Court acknowledges the possibility for further discussions on these matters, should the parties wish to specify certain exhibits under this broad category of evidence and offer new arguments as to why those particular exhibits should still be excluded.

### E. Holmes's MIL to Exclude Evidence of Remedial Measures and Settlements (Dkt. No. 572)

Holmes requests an "order precluding the [G]overnment from introducing any evidence of subsequent remedial measures taken by Theranos, including voiding or refunding of tests, and the settlements with CMS and the Arizona Attorney General Office." Holmes's Mot. in Limine to Exclude Evidence of Remedial Measures and Settlements Under Rules 401-403, 407, and 408 ("Holmes 572 Mot."), Dkt. No. 572, at 10. For the reasons stated below, the motion is granted in part.

### 1. CMS findings and settlement

On January 25, 2016, CMS issued a letter to Theranos summarizing its finding of a recent review of Theranos' laboratory in Newark, California, pursuant to the CLIA which specifies the legal requirements for engaging in medical testing and is broadly administered under the CMS. Saharia Decl., Ex. 12. The letter stated that as a result of the onsite survey of the laboratory, "it was determined that [Theranos] is not in compliance with all of the Conditions required for certification in the CLIA program." *Id*. at 2. In addition, the letter stated:

> [I]t was determined that the deficient practices of the laboratory pose immediate jeopardy to patient health and safety. (Immediate jeopardy is defined by the CLIA regulations as a situation in which immediate corrective action is necessary because the laboratory's non-compliance with one or more Condition-level requirements has already caused, is causing, or is likely to cause, at any time, serious injury or harm, or death, to individuals served by the laboratory or to the health and safety of the general public.)

*Id*. The letter listed five CMS findings Theranos was instructed to correct. *Id*. at 1–2. Three of the condition-level requirements concerned issues with Theranos laboratory personnel. *Id.* at 1. The other two condition-level requirements concerned Theranos' compliance with CLIA regulations governing laboratory issues. *Id.*

The letter included a 121-page "Form CMS-2567" with a list of numerous deficiencies. The Government highlights five of the listed deficiencies:

> (1) Theranos ran patient tests after failing QC (ECF No. 581-1 at 43-46); (2) QC results for multiple assays, for weeks on end, were at least two standard deviations from the mean (*id.* at 45-46); (3) QC results for multiple assays had coefficients of variation as high as 63.8% (*id.* at 55-56); (4) the overall percentage of QC samples on all tests on all devices was at or in excess of 20% (*id.* at 57-58); and (5) accuracy, precision, reportable range, and allowable bias for multiple assays did not meet even Theranos's criteria (*id.* at 80-81).

Gov't Opp'n to Holmes's 572 Mot. (Gov't 572 Opp'n"), Dkt. No. 673, at 3.

CMS did not include any findings regarding the accuracy or reliability of Theranos' blood tests. CMS warned Theranos that if it did not provide "a credible allegation of compliance and acceptable evidence of correction documenting that the immediate jeopardy has been removed and that action has been taken to correct all of the Condition-level deficiencies" within 10 days, CMS

would impose sanctions.  Saharia Decl., Ex. 12 at ECF p. 3.

In a letter to CMS dated April 1, 2016, Theranos Laboratory Director Dr. Kingshuk Das

stated:

> The laboratory has undertaken aggressive corrective actions.  For example, out of an extreme abundance of caution and based on its dissatisfaction with prior [quality assurance] oversight the laboratory . . . voided all results reported for the assays run on the Theranos Proprietary System 3.5 (TPS) in 2014 and 2015 and all reported PT/INR tests run on the Siemens Advia BCS XP instrument [from] October 2014 through September of 2015.

Saharia Decl., Ex. 27, Dkt. No. 583-1 at ECF p. 3.  Elsewhere in the letter, Dr. Das stated:

> The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was fully retired in early-August 2015. As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment's program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends with the TPS 3.5. . . . Based upon its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015. As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015."

*Id*. at ECF pp. 14–15.

Despite Theranos' corrective actions, CMS imposed sanctions.  Theranos appealed the

sanctions, and on April 14, 2017, CMS entered a civil settlement ("the CMS Settlement") with

Theranos, Dr. Sunil Dhawan, and Balwani.  The preamble to the CMS Settlement recited, among

other things, that Dr. Dhawan directed the Newark Laboratory during the relevant period; that

Balwani owned the Newark Lab; that Theranos had decided to close the Newark Laboratory; that

"Theranos, Dhawan, and Balwani, in order to avoid the costs and burden of litigation, and without

admitting or contesting the underlying actions, desire to settle this matter and acknowledge that

the imposition of sanctions against Theranos, Dhawan, and Balwani is solely as described in the

Agreement."  Saharia Decl., Ex. 29, Dkt. No. 583-3 at ECF pp. 2–3.  The CMS Settlement: (i)

resolved all outstanding legal and regulatory proceedings between CMS and Theranos; (ii)

reduced Theranos' total civil monetary penalty to $30,000; (iii) prevented Theranos from owning

or operating a clinical lab for two years; (iv) withdrew CMS's revocation of Theranos' CLIA

operating certificates; and (v) withdrew Theranos' appeal of CMS's sanctions. *Id.* Holmes was

not a party to the CMS Settlement.

## 2. Arizona Attorney General's Office settlement

After the CMS Settlement, the Arizona Attorney General's Office ("AGO") brought a

consumer fraud action against Theranos that also resolved through a settlement. The Arizona

AGO alleged that:

1) Between 2013 and 2016, Defendant sold approximately 1,545,339 blood tests to approximately 175,940 Arizona consumers, which yielded 7,862,146 test results.

2) Defendant ultimately voided or corrected approximately 834,233, or 10.6% of these test results.

3) The sales of the blood tests were made without the informed consent of the consumers because Defendant misrepresented, omitted, and concealed material information regarding its testing service's methodology, accuracy, reliability, and essential purpose.

4) Defendant intended for its customers to rely on its misrepresentations, omissions, and concealments in their decision to purchase its testing services.

Saharia Decl., Ex. 28, Dkt. No. 583-2 at ECF p. 3. Theranos expressly denied the Arizona AGO's

allegations. *Id.* The settlement with the Arizona AGO included a consent decree ("the Arizona

Settlement") requiring that Theranos: (i) not own, operate, or direct any CLIA lab in Arizona for

two years; and (ii) pay $4.65 million in consumer restitution. *Id.* at 4. Theranos reimbursed each

Arizona customer the full amount paid for testing—regardless of whether the results were voided

or corrected. *Id.* at 5.

## 3. The Government's proffer of evidence

The Government notified Holmes of its intent to introduce evidence of Theranos' voiding

of test results "to show Theranos was unable to produce accurate and reliable test results." Saharia

Decl., Ex. 3, Dkt. No. 580-2 at ECF p. 5. The Government's Rule 404(b) notice specifically

points to five Theranos customers who allegedly received voided test results. *Id.* at 3–6. The

Government also asserts that "[e]vidence Theranos voided tests is an admission its prior statements [regarding the accuracy and reliability of Theranos technology] were false." *Id.* at 69. The Government also intends to introduce evidence of voided tests to show "Defendants' intent to defraud patients by depriving them of the information they believed they would receive when patronizing Theranos'[] services." *Id.* at 75–76. Holmes also expects the Government to introduce evidence of Theranos' decision to provide refunds to customers as part of the Arizona Settlement to show that Theranos' technology was not capable of producing accurate and reliable test results. *See* Dkt. No. 267 at 2–3.

### 4.  Evidence of Theranos' voiding of tests

#### a.  Rule 407

Under Rule 407, evidence of subsequent remedial measures is not admissible to prove culpable conduct by the party taking those measures or "a defect in a product or its design," but is admissible for another purpose, such as impeachment. Fed. R. Evid. 407. The purpose of Rule 407 is to encourage parties to improve safety conditions "without fear that subsequent measures will be used as evidence against them." *Gauthier v. AMF, Inc.*, 788 F.2d 634, 637 (9th Cir. 1986). "An exception to Rule 407 is recognized for evidence of remedial action mandated by superior governmental authority . . . because the policy goal of encouraging remediation would not necessarily be furthered by exclusion of such evidence." *O'Dell v. Hercules, Inc.*, 904 F.2d 1194, 1204 (8th Cir. 1990); *see also In re Aircrash in Bali, Indonesia*, 871 F.2d 812, 817 (9th Cir. 1989) ("The purpose of Rule 407 is not implicated in cases involving subsequent measures in which the defendant did not voluntarily participate. . . . In this case, Pan Am's management, although to be commended for its cooperation, nonetheless was legally obligated to cooperate with the FAA's investigation.").

Here, Holmes relies on Rule 407 to support her argument that Theranos made a voluntary decision to void test results, and therefore evidence of the void test results is inadmissible to prove culpability—i.e., to prove the Government's allegation that she falsely stated that Theranos' tests were accurate and reliable and as an admission that their prior statements about Theranos'

technology were false.  In contrast, the Government relies on the exception to Rule 407, asserting that the voiding of blood tests was not voluntary.  Thus, the applicability of Rule 407 turns on whether Theranos' decision to void the test results was voluntary or involuntary—an issue the parties strongly dispute.

There is evidence in the record to support both parties' position.  Holmes cites to a portion of a FDA Office of Criminal Investigation interview with CMS employee Sarah Bennett that states, "Theranos made the decision to void the test results; CMS didn't tell them to do that." Saharia Decl., Ex. 34, Dkt. 584-3 at ECF p. 7.  Read in isolation, this statement tends to support Holmes's position.  When it is read in a fuller context, however, it also lends support to the Government's position that CMS required Theranos to cooperate with the inspection, to take immediate action to fix deficiencies, to remove the immediate jeopardy Theranos was causing patients, and to come into condition-level compliance:

> In Theranos's written responses to CMS in which they attempted to show they had corrected the cited deficiencies, Theranos would send CMS a copy of a faxed sheet saying something was corrected along with a corrected report, but CMS could never marry the two together; so, CMS never knew if Theranos actually notified all of their affected patients.  Bennett said that over 50,000 patient test results were implicated.  To date, CMS doesn't know if all of the affected patients have been notified.  Theranos made the decision to void the test results; CMS didn't tell them to do that.  CMS tells the laboratory they must fix a deficiency and the laboratory decides how they're going to fit it.

*Id*.  Even if Theranos had a choice in how to "fix" the deficiency, it was nonetheless required to address the deficiency.

Holmes asserts separately that Theranos did not void tests in response to CMS's January 2016 finding of immediate jeopardy, but rather took that step voluntarily months after the 10-day deadline to cure.  *Id*., Ex. 27 at 3.  This argument overlooks the fact that CMS found Theranos' initial response to the January 2016 finding insufficient and that "the evidence did not support a credible allegation of compliance."  *Id*., Ex. 27 at 1; Saharia Decl., Ex. 34 at 6.  CMS sent Theranos another letter in March 2016 that "tells them exactly why their response was not credible."  *Id*., Ex. 34 at 6.  Theranos' April 1, 2016 letter notifying CMS of the decision to void

tests was sent in response to CMS's March letter.  Therefore, the timing of Theranos' decision to void tests does not, without more, suggest that the decision was entirely voluntary.

Because there is a factual dispute over the voluntariness of Theranos' decision to void tests, it is premature for the Court to decide now whether evidence of the voided tests must be precluded under Rule 407.

### b.  Rule 403

Holmes next contends that evidence of the invalidated test results is irrelevant because it was the product of an investigation into whether Theranos deviated from lab operating procedures and documentation, not from a finding that the tests were inaccurate or unreliable or that Theranos' tests negatively affected a statistically significant number of customers.  Moreover, Holmes contends that evidence of the invalidated test results will confuse the issues in the case and invite the jury to assume that Theranos admitted that the testing data was invalid—an assumption Holmes contends would be misleading and highly prejudicial.

The Court agrees with the Government that Holmes's decision to void blood tests is relevant.  She made the decision to void tests in the context of discussions with CMS regarding deficiencies in lab procedures, including quality controls and quality assurance programs.  These deficiencies were so serious that CMS found that the Theranos lab posed "immediate jeopardy to patient health and safety."  *Id.*, Ex. 12 at 1.  It is reasonable to infer that test results from a lab fraught with quality control and quality assurance issues are, at a minimum, unreliable.  And it is reasonable to infer that Theranos' decision to void the test results after CMS issued its findings is an implicit acknowledgement that the test results were unreliable.

Holmes argues that Theranos did not specifically admit its lab produced inaccurate results.  Nevertheless, that is a reasonable inference from Theranos' decision to void test results.  As the Government points out, if Holmes had confidence in the test results, or if she could ascertain the correct value, there would have been no need to void the test results.  Indeed, the Form CMS-2567 indicates that Theranos was able to ascertain corrected values for certain tests.  *See id.*, Ex. 12 at ECF p. 80 ("VitD, HCG[,] and SHBG validation reports included 'Theranos-corrected' results").

Holmes offers alternative explanations for voiding the tests, including that it was "due to uncertainty with how prior lab leadership operated the laboratory and in an abundance of caution." Holmes 572 Mot. at 4. Holmes attempted "to show a willingness to take seriously the cited issues in the Report, the majority of which concerned negligent lab practices such as failure to maintain proper documentation—issues that the [G]overnment's own witness stated are common among laboratories." *Id.* Although Holmes may have alternative explanations for voiding the tests that are unrelated to the accuracy and reliability of the tests, the fact remains that the circumstances surrounding the decision to void the tests are relevant to show whether Theranos was able to produce reliable and accurate test results. As such, evidence of Theranos' decision to void tests meets the "very low bar" of Rule 401. *United States v. Rodriguez-Soler*, 773 F.3d 289, 293–94 (1st Cir. 2014) (relevancy requirement is "a very low bar" that "is not very hard to meet").

Holmes next cites *PG&E* for the proposition that evidence of remedial measures a government agency imposes on a defendant is unduly prejudicial. 178 F. Supp. 3d 927. In *PG&E*, the defendant was charged with, among other things, violating federal safety standards for transportation of natural gas by pipeline. The court excluded remedial measures that the California Public Utilities Commission ("CPUC")—"an authoritative government agency"— specifically ordered, reasoning that although remedial measures aimed at charged Pipeline Safety Act regulations would be highly probative, there was a substantial risk that the jury might assume that if CPUC imposed the remedial measures, then PG&E "is deserving of punishment." *Id.* at 949. The court concluded that this risk substantially outweighed the probative value of the CPUC remedial measures. *Id.* (citing *Angelo v. Bacharach Instrument Co.*, 555 F.2d 1164, 1176 (3rd Cir. 1977)). Although evidence of Theranos' decision to void test results has some potential to be unduly prejudicial, this case is distinguishable from *PG&E* in that Holmes has taken the position that CMS did not require Theranos to void the test results; rather, Holmes asserts that Theranos did so voluntarily—a position that undercuts Holmes's claim of prejudice.

Holmes's most persuasive argument is that admitting evidence of Theranos' decision to void tests would be unfairly prejudicial because that decision was not made until 2016 and

therefore is not probative of her intent during 2010-2015—the years that are the subject of the indictment.  The Court shares Holmes's concern that the jury could convict her for failing to uncover laboratory issues, a negligence standard, rather than for knowingly misrepresenting false, material information during the charged conspiracy.

Moreover, Holmes raises other legitimate concerns about admitting Theranos' decision to void test results, including (a) confusion of the issues because Theranos' lab practices were not placed at issue in the indictment, and (b) undue consumption of time because it would require Holmes to present extensive evidence about the decision to void the tests, including the regulatory backdrop for CMS's actions.

Accordingly, the Court defers ruling on the admissibility of Theranos' decision to void test results until the Government makes a proffer of evidence that clearly ties the events in 2016 to the charged conduct, as well as presents a factual basis for its assertion that Theranos' decision was involuntary for purposes of Rule 407.

### 5.  CMS Settlement and Arizona Settlement

Rule 408 limits the admission of evidence of compromise offers and negotiations.  It provides:

> (a) Prohibited Uses. Evidence of the following is not admissible – on behalf of any party – either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:
>
> > (1) furnishing, promising, or offering – or accepting, promising to accept, or offering to accept – a valuable consideration in compromising or attempting to compromise the claim; and
> >
> > (2) conduct or a statement made during compromise negotiations about the claim – except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.
>
> (b) Exceptions. The court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Fed. R. Evid. 408.  "Rule 408 is designed to ensure that parties may make offers during settlement

negotiations without fear that those same offers will be used to establish liability should settlement efforts fail." *Rhoades v. Avon Prods.*, 504 F.3d 1151, 1161 (9th Cir. 2007). If, however, statements made during settlement are introduced for a purpose unrelated to liability, then "the policy underlying Rule 408 is not injured." *Id.*

In response to Holmes's motion, the Government represents that it does not presently intend to offer evidence of the CMS Settlement or the Arizona Settlement. The parties also agree that Rule 408(a)(2) makes an exception for statements made in negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority when offered in a criminal case. *See* Holmes 572 Mot. at 6; Gov't 572 Opp'n at 8. Thus, statements by Theranos and Holmes to the Arizona AGO in the course of its investigation and CMS in the course of its survey and subsequent proceedings are not subject to exclusion under Rule 408. At present, the Government has not identified any such statements that it seeks to admit.

Because the Government does not oppose Holmes's motion to exclude the two settlements, the Court grants her motion. Holmes's motion for an order precluding the Government from introducing any evidence of subsequent remedial measures taken by Theranos, including voiding or refunding of tests, and the settlements with CMS and the Arizona AGO is **GRANTED in part**. The Government is precluded from introducing the CMS Settlement and the Arizona Settlement (including the refunds associated with the Arizona Settlement). The Court **DEFERS** any ruling as to the admissibility of statements by Theranos and Holmes to the Arizona AGO in the course of its investigation and CMS in the course of its survey and subsequent proceedings. As to the admissibility of Theranos' decision to void the tests, the Court **DEFERS** ruling until the Government proffers evidence to show the voluntariness of Theranos' decision and to tie the events in 2016 to the charged conduct.

### F.    Holmes's MIL to Exclude Certain News Articles (Dkt. No. 578)

Holmes moves to exclude certain news articles under Federal Rules of Evidence 403 and 802. Holmes's Mot. in Limine to Exclude Certain News Articles Under Rule 403 and 802

("Holmes 578 Mot."), Dkt. No. 578. Holmes seeks a blanket order excluding over fifty articles by journalists not testifying at trial. *Id.* at 1. The Court held a hearing on this motion on May 6, 2021. May 6, 2021 Hr'g Tr., Dkt. No. 794. Having considered the parties' papers, the arguments made at the hearing, and the relevant legal authority, the Court issues the following order.

### 1. Articles not specifically identified and submitted to the Court

Holmes generally seeks a broad exclusion of "over 50 articles" written by "journalists who will not testify at trial" (those being "journalists other than Mr. Parloff and Dr. Topol"). Holmes 578 Mot. at 1. Holmes only specifically identified and submitted to the Court seven of the fifty plus articles. "The failure to specify the evidence that a motion in limine seek[s] to exclude constitutes a sufficient basis upon which to deny th[e] motion." *Shenwick v. Twitter, Inc.*, No. 16-cv-05314-JST, 2021 WL 1232451, at *12 (N.D. Cal. Mar. 31, 2021) (quoting *Bullard v. Wastequip Mfg. Co. LLC*, No. 14-CV-01309-MMM (SSx), 2015 WL 13757143, at *7 (C.D. Cal. May 4, 2015) (internal quotations omitted)). It would be premature to address a motion in limine when the defendant has not identified any "particular objectionable statement" she seeks to preclude. *Engman v. City of Ontario*, No. EDCV 10–284 CAS (PLAx), 2011 WL 2463178, at *4 (C.D. Cal. June 20, 2011).

Given that Holmes largely fails to identify the evidence that would be excluded should her motion be granted, the Court **DENIES** the motion without prejudice as to all the articles not specifically identified and filed with the motion and its accompanying declarations and exhibits. The Court next addresses the specifically identified articles in turn.

### 2. Articles specifically identified and submitted to the Court (Saharia Decl., Ex. 48, Dkt. No. 586)

#### a. "Blood, Simpler" (Saharia Decl., Ex. 48 at ECF pp. 32-49)

"Blood, Simpler" appeared in the December 15, 2014 issue of *The New Yorker*. Saharia Decl., Ex. 48. It was published ten months prior to the article from *The Wall Street Journal* ("WSJ") which the Government says "exposed" Holmes's alleged fraud. Gov't Opp'n to Holmes's 578 Mot. ("Gov't 578 Opp'n"), Dkt. No. 667, at 2. The Government intends to use

articles published prior to the WSJ article for the non-hearsay purposes of showing "the favorable press coverage of Theranos" in the public realm prior to the discovery of the fraud, and the articles' effects on the readers. *Id.* Additionally, the Government claims that Holmes and/or her employees disseminated some articles published prior to that WSJ article to potential investors and the public, though there is no indication in the record that the "Blood, Simpler" article was among them.

News articles themselves are generally held to be inadmissible hearsay as to their content. *Larez v. Los Angeles*, 946 F.2d 630, 642 (9th Cir. 1991). Articles that feature quotations from people other than their authors constitute hearsay within hearsay when the article and the quotations within are offered to prove the truth of the matter asserted, and therefore the articles and the quotations within are inadmissible unless both levels of hearsay fall under an exception to the rule against hearsay. *See id*.

The Government relies on judicial notice cases to provide support for its assertion that articles can be used to show the favorable press coverage available in the public realm. Generally, when courts take judicial notice of what information is "available in the public realm," they take notice of the fact that articles on the topics in question *were written*[7], and do not take notice of the actual articles or their contents. In cases involving a market fraud theory,[8] courts take judicial notice of articles and/or their contents to show what information was available to the market, as all information available to the public impacts the market and stock prices regardless of whether people actually rely and act on that information. Because the Government intends to use the

---

[7] *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010), *overruled on other grounds by Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119, 1125–26 (9th Cir. 2002); *Ochoa v. Santa Clara Cty. Office of Educ.*, No. 16-cv-03283-HRL, 2017 U.S. Dist. LEXIS 131658, at *4–5 (N.D. Cal. Aug. 17, 2017).

[8] *Basic Inc. v. Levinson*, 485 U.S. 224, 244–47 (1988) (discussing the admission of news articles because they show what information the market was aware of, which—regardless of its truth—impacts the market, and adopting fraud on the market theory); *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999) (taking judicial notice "that the market was aware of the information contained in news articles" and of the contents of the articles).

article itself and show that it had an effect on the reader(s)—investors and/or consumers were influenced by and/or relied on that information when making decisions—the judicial notice cases the Government cites are not applicable here.

However, articles offered not for the truth of the matter asserted but to show their effect on the reader are not hearsay and are therefore not subject to exclusion. *See, e.g.*, *United States v. Payne*, 944 F.2d 1458, 1472 (9th Cir. 1991) (statement introduced not for the truth of the matter but rather to show the effect on the listener was not hearsay). Thus, the use of the article "Blood, Simpler" to show its effect on the reader constitutes a non-hearsay use.

Holmes argues that admission of this particular (overall positive) article would be unfairly prejudicial, given the author's "subjective opinions"[9] about Holmes and quoted statements[10] of concern and skepticism in the article. "The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief*, 519 U.S. at 180. Evidence is unfairly prejudicial if it has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.* (citation and internal quotation marks omitted). Neither statements about Holmes's appearance or mannerisms nor claims of concern or skepticism suggest guilt or innocence on an improper basis, and they would not provide the jury with grounds to make a determination that goes against offense-specific proof. Therefore, admission of this article would not be unfairly prejudicial.

Holmes also argues generally that admission of any article would result in confusion of the issues. This particular article largely contains information about Holmes and her family's history,

---

[9] Holmes says the author has "subjective opinions" about "how Ms. Holmes presents both in her physical presentation and how she presents when talking to rooms full of people." May 6, 2021 Hr'g Tr., Dkt. No. 794, at 99:4-8.

[10] One quotation Holmes finds troubling is the statement "some observers are troubled by Theranos'[] secrecy." May 6, 2021 Hr'g Tr., Dkt. No. 794, at 99:2-3. Holmes is also concerned about "quotes from Quest Diagnostics executives taking issue with several of Theranos'[] claims about its technology and [their] saying broadly that fingerstick blood tests aren't reliable for clinical diagnostic tests." *Id*. at 99:9-12.

her mission in founding Theranos, and the company's work and goals, with a few questions and statements of concern or skepticism. This largely biographical article will not cause confusion of the issues regarding Holmes's alleged fraud.

Because any prejudicial effect is outweighed by the article's high probative value for the purpose stated—showing its effect on readers—there is no basis for this article's exclusion under Rule 403. A limiting instruction will issue at the appropriate time. The Court **DENIES** the motion as to the "Blood, Simpler" article.

### b. Remaining six identified articles (Saharia Decl., Ex. 48 at ECF pp. 2–31, 50–58)

The Government stated it intends to use articles published between 2015 and 2016 "that portray Theranos negatively" only "sparingly," and not for the truth of the matter asserted in the articles but for the non-hearsay purpose of providing "*context*" for subsequent events. Gov't 578 Opp'n at 8 (emphasis added). In particular, the Government states that the jury's review of the WSJ article[11] that "exposed Theranos'[] deception" is "necessary in order to understand Holmes's response to that reporting in the months that followed—a time period that saw Holmes double down on her fraud and make additional misleading statements about recent press coverage." *Id.* at 8.

However, for the articles to provide context, one would need to look past the mere existence of the articles to the contents of the articles for their truth. If the authors of these articles do not testify to the articles' contents, the articles are inadmissible as hearsay, unless they fall within an exception to the rule against hearsay.

If "the inference the plaintiff [seeks] to draw[] depend[s] on the truth of [the third party's] statement," the statement is hearsay, regardless of the purpose for which the party proffering the evidence offers it. *Mahone v. Lehman*, 347 F.3d 1170, 1173 (9th Cir. 2003) (quotation and internal quotation marks omitted). But "[i]f the significance of an out-of-court statement lies in

---

[11] The Government calls this article an "important landmark . . . [that] shows when knowledge of the alleged fraud became public." May 6, 2021 Hr'g Tr., Dkt. No. 794, at 110:9-11.

the fact that the statement was made and not in the truth of the matter asserted, then the statement is not hearsay." *Calmat Co. v. U.S. Dep't of Labor*, 364 F.3d 1117, 1124 (9th Cir. 2004).  For the statement to truly be offered for a non-hearsay purpose, its significance must come solely from the fact the statement was made, and the truth of the statement must be entirely irrelevant.

The inference the Government seeks to draw depends on the truth of the articles' contents. The Government intends to show that, because the articles' contents were true, Holmes "double[d] down" on the fraud.  Thus presented, the articles' significance lies not in the fact they were written, but in the truth of the matter asserted within them.  These articles and their contents are inadmissible hearsay (and hearsay within hearsay) not subject to any exception.  Therefore, the Court **GRANTS** the motion as to the remaining six articles.

For the foregoing reasons, the Court **DENIES** the motion without prejudice as to the articles not specifically identified and filed with the motion and its accompanying declarations and exhibits.  Regarding the articles specifically identified and submitted to the Court, the Court **DENIES** the motion as to the "Blood, Simpler" article (Saharia Decl., Ex. 48 at ECF pp. 32–49) and **GRANTS** the motion as to the other six articles (*Id*. at ECF pp. 2–31, 50–58).

### G.    Holmes's MIL to Exclude Evidence of Settlements (Dkt.  No. 571)

Holmes moves to exclude evidence regarding civil or regulatory settlements entered into by Theranos, Holmes, or Balwani, including evidence regarding the negotiation of those settlements and any evidence pertaining to Theranos' ongoing civil litigation.[12]  Holmes's Mot. in Limine to Exclude Evidence of Settlements Under Rules 401-403 and 408 ("Holmes 571 Mot."), Dkt. No. 571.  Holmes is party to multiple lawsuits arising from Theranos' alleged fraudulent schemes, some of which have settled and some of which continue to be litigated.  *See Partner Invs. v. Theranos, Inc.*, (defendants agreed to settle the litigation with a payment); *Colman v. Theranos, Inc*., Case No. 16-CV-6822-NC, Dkt. No.  314 (N.D. Cal. July 24, 2018) (defendants agreed to a stipulation leading to the dismissal of the case); *see also* Jan. 8, 2021 Decl. of AUSA

---

[12] The Court took the motion under submission on the papers after the parties did not request oral argument.

Robert S. Leach in Supp. of United States' Opp'ns to Def.'s Mots. in Lim. ("Leach Opp'ns Decl."), Dkt. No. 679, Ex. 2 ( settlement agreement with investor Keith Rupert Murdoch); *id.*, Ex. 3 at THPFM0003022508 (discussing defendants' negotiated agreement with Safeway in which Safeway released its claims against Theranos in return for a payment); *Walgreens Co. v. Theranos, Inc.*, No. 16-CV-1040-RGA, Dkt. No. 26 (D. Del. Aug. 25, 2017) (stipulated dismissal upon settlement); *SEC v. Holmes*, No. 18-CV-1602-EJD, Dkt. Nos. 9, 10 (N.D. Cal. Mar. 27, 2018) (defendants agreed to settle allegations against them by paying monetary penalties in addition to agreeing to reduce corporate voting rights and individual equity); *In re Ariz. Theranos, Inc. Litig.*, No. 16-CV-2138 HRH (D. Ariz.) (ongoing class action litigation against defendants).

Holmes argues against the inclusion of settlement evidence on three grounds. First, she contends that Rule 408 prohibits any evidence of settlements and settlement negotiation. Even if Rule 408 does not apply, Holmes says such evidence of settlements is irrelevant under Rules 401 and 402. Holmes notes that neither she nor Theranos ever admitted liability in those settlements, nor did they admit to any of the allegations in the complaints of the lawsuits. Finally, Holmes argues that the prejudicial nature of the settlement evidence substantially outweighs any minimal probative value, rendering such evidence inadmissible under Rule 403. Specifically, she contends that admission of settlement evidence would lead to jury confusion, improperly influence the jury into believing that the settlements show a consciousness of guilt, or create prolonged unnecessary litigation on collateral matters during the trial.

The Government agrees that neither party should use evidence of settlements to prove the validity or invalidity of a disputed claim and maintains that any order should be limited to prohibiting the use of settlement agreements for that purpose. Nonetheless, the Government opposes the motion insofar as it seeks to prevent the Government from using settlement evidence for purposes not prohibited by Rule 408, namely using conduct or statements from past litigation that are outside the scope of "compromise negotiations," using settlement evidence that arose from a public office exercising its enforcement authority, and for cross-examination purposes.

Rule 408 governs the admissibility of evidence of conduct or statements made during settlement negotiations. It provides that such evidence is not admissible when offered to prove liability but may be admitted for other purposes. Fed. R. Evid. 408; *see also Rhoades*, 504 F.3d at 1161. Other purposes for which settlement evidence is admissible and not prohibited under Rule 408 can include "proving a witness's bias or prejudice." *See Rhoades*, 504 F.3d at 1161 (citing *United States v. Technic Servs., Inc.,* 314 F.3d 1031, 1045 (9th Cir. 2002)).

Turning to the settlement evidence that Holmes seeks to prohibit in its entirety, Rule 408(b) is clear that there are instances in which settlement evidence is permissible, particularly when "proving a witness's bias or prejudice." Fed. R. Evid. 408(b). Assuming that such evidence does not run afoul of any other Federal Rule of Evidence (e.g., Rule 403), the Government is entitled to use such settlement evidence for purposes permissible under Rule 408(b). Gov't Opp'n to Holmes's 571 Mot. ("Gov't 571 Opp'n"), Dkt. No. 671, at 3, Dkt. No. 671 ("Cross-examination of witnesses may make one or more of the Settlement Agreements relevant to a witness's bias or credibility."). The Government suggests that it may seek to introduce Theranos' settlement agreements with Safeway and Walgreens to rebut any potential argument that Safeway or Walgreens believed that Theranos performed adequately under their service agreements. *Id.* at 4. It remains to be seen whether any of these scenarios will come to pass. At this stage of the proceedings, a broad limitation on the Government's ability to fully cross-examine witnesses would be inappropriate in the absence of information on exactly how and for what purpose any potential settlement evidence may elicited.

Furthermore, Rule 408 provides that does not bar "conduct or a statement made during compromise negotiations . . . related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority." Fed. R. Evid. 408(a)(2). The Securities and Exchange Commission ("SEC") qualifies as such a public office. Thus, evidence relating to Holmes's conduct or statements made during the compromise negotiations with the SEC fall squarely within Rule 408's public office exception and are not inadmissible under Rule 408—although such evidence may still be inadmissible for other reasons, such as unfair prejudice under Rule 403.

However, a Rule 403 analysis cannot be conducted in a vacuum without knowing how and for what purpose the evidence is offered.

Because Rule 408 permits certain comment on ongoing litigation when unrelated to a compromise offer or negotiation, the Court declines at this time to completely bar the Government from commenting on or presenting evidence related to Holmes's ongoing civil litigation.  The Government is not precluded from its use of Holmes's compromise negotiations with the SEC as conduct or statements made during settlement negotiations with a public entity exercising its enforcement authority, as those communications do not fall under Rule 408's prohibitions. Finally, the Court reserves judgment on the remainder of Holmes's motion as it pertains to the Government's desire to potentially use settlement evidence for impeachment purposes.  The motion is **DEFERRED.**

### H.   Holmes's MILs to Exclude Anecdotal Evidence of Test Results, Customer Impact, Expert Testimony of Physician Witnesses, and the Laboratory Information System (Dkt. Nos. 561, 562, 563)

As evidence of the scheme to defraud doctors and patients alleged above, the Government anticipates presenting testimony from approximately eleven patients who received inaccurate tests from Theranos and nine treating physicians whose patients received inaccurate tests from Theranos, all during the period of the charged conspiracy.

In separate motions in limine, Holmes seeks to preclude these witnesses from providing "anecdotal testimony" regarding inaccurate results or testimony regarding the ramifications of inaccurate results on customers.  Holmes's Mot. in Limine to Exclude Evidence of Anecdotal Test Results Under Rules 401-403 ("Holmes 563 Mot."), Dkt. No. 563; Holmes's Mot. in Limine to Exclude Customer Impact Evidence Under Rules 401-403 ("Holmes 562 Mot."), Dkt. No. 562. Holmes further seeks to exclude the expert physician witnesses entirely.  Holmes's Mot. in Limine to Exclude Expert Opinion Testimony of Fact/Percipient Witnesses Under Rules 401-403 and 702 ("Holmes 561 Mot."), Dkt. No. 561.  Relatedly, the Government's MIL No. 10 seeks to admit testimony from these (and perhaps other) patient witnesses regardless of whether those patients paid for their test themselves.  Gov't Mot. at 20–24.

Because these motions raise overlapping arguments as to relevance and prejudice, the Court addresses all four together as follows.

### 1.   Anecdotal evidence of test results (Dkt. No. 563)

As noted above, the Government plans to introduce testimony from both patients and physicians who received inaccurate test results from Theranos during the period of the charged conspiracy. Holmes seeks to exclude all such "anecdotal" testimony as irrelevant and unduly prejudicial under Rules 401-403.

### a.   Relevance

Holmes argues that anecdotal patient or physician testimony about inaccurate results does not "tend to prove that 'Theranos's technology was, in fact, not capable of consistently producing accurate and reliable results.'" Holmes 563 Mot. at 5 (quoting TSI ¶ 16). According to Holmes, Theranos generated 7 to 10 million test results for patients. Both parties agree that all blood tests, regardless of laboratory, produce some amount of expected error. *See generally* Saharia Decl., Ex. 6 (Expert Report of Stephen Master explaining that some "bias" or deviation from pure accuracy "is a normal and expected feature of laboratory tests"). Holmes argues that the Government "cannot show that its anecdotal examples fall outside the expected error rate for laboratories; [and] it cannot show that Theranos' error rate was meaningfully different than that of other laboratories." Holmes 563 Mot. at 5. Thus, Holmes concludes that evidence of individual inaccurate results, without more, does not tend to prove that Theranos tests were inaccurate or unreliable overall, and is therefore not relevant to proving that her statements were false.

The Court does not find this argument persuasive. The Government alleges that Holmes committed fraud by making misrepresentations about the accuracy and reliability of Theranos' tests, inducing customers to pay for tests. Testimony describing patients' inaccurate test results, therefore, tends to prove the fraud by showing that patients did not get what they paid for. Although these eleven inaccurate results may not amount to statistical proof that the Theranos tests were generally inaccurate, the Court finds that consideration to affect the weight of the evidence, not its admissibility. Evidence of even one inaccurate result tends to show that

Theranos was producing inaccurate results, even if it does not fully prove the point. Holmes is correct to conclude that this evidence does not demonstrate that Theranos tests produced inaccurate results at an unacceptable rate, but that does not render the "anecdotal" testimony irrelevant.

Holmes next argues that the patient testimony should be excluded because there is no evidence about what caused the erroneous results. Inaccurate results might stem from mishandling, human error, patient-specific conditions like diet, or any number of other potential factors. A juror "cannot draw any conclusions about causation from isolated, anecdotal examples of incorrect or unexpected blood tests." *Id.* Holmes cites to *Daubert* decisions in which courts found various expert opinions unreliable because they were based on "anecdotal" evidence. For example, she cites *Vollrath Co. v. Sammi Corp.*, 9 F.3d 1455, 1462 (9th Cir. 1993), an antitrust case in which the plaintiff alleged attempted monopolization of the "stainless steel steamer" market. The *Vollrath* court found that the expert's opinion that stainless steel steamers could be treated as a product distinct from other steamers such that they constituted a market of their own to be unpersuasive, in part because "[t]here was no detailed examination of market data or any analysis of cost . . . The opinion was based on limited anecdotal evidence." *Id.*

The plaintiff in *Vollrath*, however, was required to define and prove the relevant market and the parties' market share as an element of the monopolization claim, which necessarily required concrete market data and analysis. The same is not true in the present case. Causation is not an element of wire fraud that the Government must prove. Each time a Theranos customer allegedly paid for an accurate and reliable blood test based on Holmes's representations and did not receive such a test, that experience on its own is evidence of the fraud.

Moreover, because expert witnesses are intended to help the jury understand the facts, courts act as a gatekeeper to ensure that experts' opinion of those facts is reliable and based on sound scientific methodology. Holmes in this case appears to be arguing that the Court should similarly act as a gatekeeper to prevent the Government from presenting fact evidence and argument that is not based on sound scientific methodology. That is not the Court's role. The Court, therefore, finds the *Daubert*-related cases Holmes cites distinguishable.

### b. Prejudice

Holmes further asserts that "[e]ven if these anecdotes had some minimal probative value, the Rule 403 considerations would substantially outweigh that probative value." Holmes 563 Mot. at 5. Rule 403 allows the Court to exclude relevant evidence if its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403.

Holmes argues that the patient testimony could confuse and mislead the jury about what is at issue in this case. "The jury will be tempted to infer from this evidence that Theranos was incapable of generating accurate and reliable test results—even though one cannot reliably draw that inference from this evidence." Holmes 563 Mot. at 6. Testimony about eleven inaccuracies (out of millions of tests) may have relatively low probative value towards proving that the tests were inaccurate overall, but for the same reason, they are unlikely to create unfair prejudice.

Finally, Holmes objects that patient and physician testimony about receiving inaccurate test results are likely to be emotional and therefore highly prejudicial. For example, one proposed patient witness would potentially testify about receiving test results indicating that she had miscarried, when in fact, she later found out her pregnancy was still viable. As discussed further with respect to Holmes's motion to exclude evidence of customer impact below, the Court agrees with Holmes that such testimony would be unfairly prejudicial and of limited probative value. Evidence is unfairly prejudicial when it has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *See PG&E*, 178 F. Supp. 3d at 941 (citing *Old Chief*, 519 U.S. at 180). While the fact of inaccurate test results in itself is relevant to proving that Theranos tests were unreliable, the collateral consequences of receiving an inaccurate test result are not.

The Court finds that anecdotal evidence of test results is relevant and admissible. Accordingly, the Court DENIES the Motion. Patients, physicians, and other witnesses who may testify about receiving test results will not be permitted to testify about any physical, financial, or emotional harm they may have experienced beyond simply paying for the test.

## 2.   Evidence of customer impact (Dkt. No. 562)

Holmes brings this separate motion seeking to exclude evidence of collateral emotional effects suffered by Theranos customers who believe that they received erroneous results as well as hypothetical harms that can result from medical decisions based on erroneous results.  Holmes notes that because this is a wire fraud case, the only harm that is relevant to the case is the financial harm allegedly caused by paying for an unreliable test.

As an initial matter, the Government recognizes, as it must, that Rule 403 would undoubtedly "step in" at some point to prevent certain evidence of such collateral consequence. *See* May 5, 2021 Hr'g Tr., Dkt. No 793, at 150:25–151:4.  The Government nevertheless argues that this type of testimony must be allowed for three reasons:  (1) customers experienced harm in the form of not only pure financial loss but also by not receiving the "benefit of the bargain" that they expected to receive, namely the ability to make timely and important medical decisions; (2) some evidence of impact on customers is relevant to show materiality; and (3) customer impact is relevant to Holmes's fraudulent intent.

The Court generally agrees with Holmes that the limited relevance and high risk of prejudice likely to result from evidence about the impact of inaccurate results; however, the Court also agrees with the Government that the Court need not take an "all or nothing" approach.  At the May 5, 2021 hearing, the Court engaged in a line-drawing exercise with the parties, which Government counsel summarized as follows:

> Mr. Schenk:  . . .  If I can repeat back what the court said?  I think if a patient were to take the stand and say, to use the court's example, I received a Theranos test and I thought I had cancer, or I thought I had a severe condition, and one thing I did in response to it was to go get other tests, and after I received a second test and then consulted with my physician, I determined, or my physician told me I didn't have cancer. I think that's appropriate and the court could limit it there. I agree with the Court, there is not the need then for the patient to say, there was two weeks between those two tests and here's how I felt during those two weeks.

May 5, 2021 Hr'g Tr., Dkt. No. 793, at 156:3–157:22.  Holmes also agreed that as to the Rule 403 analysis, "that is potentially a fair line to draw." *Id.* at 157:4-10.

Accordingly, the Court **GRANTS** Holmes's motion to the extent it seeks to exclude emotional, graphic, or otherwise inflammatory evidence relating to the impact or potential impact on customers of inaccurate test results.

### 3.   Expert testimony of physician witnesses (Dkt. No. 561)

As noted above, the Government has disclosed as experts nine medical professionals whose patients received allegedly inaccurate Theranos tests results during the period of the charged conspiracy.  Holmes seeks to exclude testimony from these doctors because the doctors do not meet the standards for expert witness testimony under Rule 702, and their testimony is irrelevant and unfairly prejudicial.  She further contends that the testimony should be excluded because the Government failed to provide adequate disclosures regarding the proposed testimony under Federal Rule of Criminal Procedure 16.

### a.   Rule 702

Holmes argues that pursuant to Rule 702, (1) these witnesses are not qualified to testify about the accuracy and reliability of Theranos tests overall, and (2) the opinions that they are qualified to give—i.e., opinions about their patients' specific test results—are irrelevant to this case.  In its opposition brief, the Government clarified that it did not intend for the physician witnesses to opine about the accuracy or reliability of the tests overall, explaining that "the doctors on the [G]overnment's expert list will be called primarily as fact witnesses to testify about their experiences reviewing certain results from Theranos in connection with patients under their care." Gov't Opp'n to Holmes's 561 Mot. ("Gov't 561 Opp'n"), Dkt. No. 660, at 3.  The Government further clarified that the physicians' testimonies will be limited to the specific results their own patients received from Theranos.  The physicians will only act as expert witnesses to the extent they provide background information that the jury needs in order to understand the use and significance of the blood test being discussed and to explain why the doctor believed the test results to be inaccurate.

At the hearing on this motion, the Government affirmed these representations; however, the parties diverged on whether the physicians would be permitted to conclude that an inaccurate

test result was due to "lab error."  *See* May 5, 2021 Hr'g Tr., Dkt. No. 73, at 112:4–115:21.
Because of the possible confusion involved in attributing an inaccurate result to "lab error," the
Court finds it unnecessary for these physicians to use that particular phrase.  More broadly, as
established at the hearing, the physicians are not permitted to testify about accuracy or reliability
of testing overall or about any flaw in the Theranos technology.  *Id.* at 115:17-20.

      Holmes also challenged certain physician's ability to provide any testimony about whether
even an individual test results was inaccurate based on the physician's background and experience.
The Court finds that a physician may testify about her patients' test results and her conclusions
about those results as a matter of fact, not opinion, even where they involve an explanation of the
witness's medical judgment.  Holmes may challenge the physician's credibility or judgment
through cross-examination.  The Court finds no need for a *Daubert* hearing to assess these
physicians' ability to offer what is essentially factual testimony.

### b.  Relevance

      Holmes's relevance arguments as to the physician witnesses is substantially the same as
her relevance arguments with respect to anecdotal evidence, discussed above.  The difference is
that these witnesses are offered as both fact and expert witnesses, meaning that not only must their
testimony be relevant, but their opinions must also "fit the case."  *Daubert v. Merrell Dow
Pharms., Inc. (Daubert II)*, 43 F.3d 1311, 1321 n.17 (9th Cir. 1995); *Messick v. Novartis Pharms.
Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014) (expert testimony "logically advance[] a material
aspect of the proposing party's case") (citation omitted).

      For the same reasons that the Court concluded that anecdotal evidence of inaccurate test
results is relevant, the Court finds that the physician testimony sufficiently "fits" the questions that
the jury must answer.

### c.  Prejudice

      Holmes argues that even if this expert testimony has some probative value, it should be
excluded under Rule 403 because that value is outweighed by the prejudicial effect of the
emotional charged anecdotes that these witnesses may share.  Specifically, Holmes argues that the

experts should not be permitted to hypothesize about "the potentially catastrophic medical consequences that could follow from inaccurate blood tests that were not flagged as inaccurate— even though those hypothetical consequences did not occur in this case." Holmes 561 Mot. at 20.

For example, the Government anticipates that Dr. Szmuc might provide testimony concerning the potential consequences of ectopic pregnancies, including rupturing, significant hemorrhaging "or the worst-case scenario of patient death." Dr. Linnerson might similarly testify that in cases of ectopic pregnancy, a doctor "must poison the embryo and cause it to dissolve in the tube to avoid danger to the mother." *Id.* at 21.

The Court finds these excerpts to be of little value to the jury and to present a significant risk of unfair prejudice. Much of this potential testimony is covered by the Court's ruling on customer impact evidence outlined above. For the same reasons and for the avoidance of doubt, the physicians will not be permitted to testify about emotional, graphic, or inflammatory harms that could hypothetically result from an inaccurate blood test. The physicians will, however, be permitted to provide general background on a test, including what it is used for, when it is prescribed, and what medical decisions may flow from the results.

### d. Rule 16

Lastly, Defendant argues that the Government has failed to provide adequate disclosures about the physician witnesses pursuant to Federal Rule of Criminal Procedure 16. Rule 16 requires the government to provide a "written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial." Fed. R. Crim. P. 16(a)(1)(G). The "summary provided . . . must describe the witness's opinions [and] the bases and reasons for those opinions." *Id.*; *see also United States v. Cervantes*, No. CR 12-792 YGR, 2015 WL 7734281, at *2 (N.D. Cal. Dec. 1, 2015) ("Rule 16 requires that the government summarize each specific opinion to be offered along with the basis for it."). This requirement "is intended to minimize surprise that often results from unexpected expert testimony, [to] reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." Fed.

R. Crim. P. 16 advisory committee's note to 1993 amendment.

The Government served its Rule 16 summaries on March 6, 2020.  Holmes asserts that for a number of the physicians, these disclosures do not identify the number of patients the physician will testify about, the patient names, or the test results on which the physician is basing the opinions.  According to Holmes, she repeatedly requested that the government provide more information to no avail.  In July 2020, Holmes moved to compel adequate summaries.  Dkt. No. 435.  At the hearing on that motion, the Court stated that "it may be necessary to have the government offer additional information in regards to some of the witness's testimony and the basis and reasons if that testimony is going to leave and move from treatment into other opinions that they wish to speak about."  July 20, 2020 Hr'g Tr., Dkt. No. 463, at 59:12-18; *see also id.* at 59:26–60:3 ("I do think that the government is going to be required to produce some additional foundational information and background on some of this testimony.").  The Court did not rule on the motion because the Government's decision to issue a superseding indictment would require revised disclosures in any event.  *See id.* at 60:4-9.

The Government maintains that it has provided the Defendant with all of the information available to it.  The Government claims that there is no deficiency of information with respect to Drs. Zachman, Burnes, Couvaras, and Asin, though it acknowledges that "there is still information outstanding from several of these providers regarding the specific patients who received inaccurate Theranos tests."  Gov't 561 Opp'n at 9.  The Government further argues that it has made significant efforts to obtain the missing information but that these doctors are under extraordinary demands due to the pandemic.  In its January 8, 2021 opposition brief, the Government noted that it "plans to serve Rule 17 subpoenas on the medical service providers immediately" and requested that the Court defer ruling on the motion until the witnesses have had time to produce the requested information.  As of the May 6, 2021 hearing, the Government had not served Rule 17 subpoenas, and had provided some but not all of Holmes's requested additional information.

The Court agrees with Holmes that the disclosures are lacking in information necessary for her to adequately prepare for trial.  The Government has represented that it will make every effort

to timely supplement the disclosures.  May 5, 2021 Hr'g Tr., Dkt. No. 793, at 105:25–106:2 ("It is our plan to continue those efforts [to obtain information] and also to provide updated disclosure to the defense listing the new details that we have obtained from those doctors").  In light of the Government's representation and the time remaining before trial, the Court finds no need to exclude any testimony on the basis of an inadequate disclosure at this stage.

The Court, therefore, **DENIES** Holmes's motion without prejudice, subject to renewal should the Government fail to provide updated disclosures in advance of trial.

### 4.   Laboratory Information System

Animating much of the conversation about the relevancy of anecdotal testimony in general is Holmes's overarching argument that the Government lacks the necessary scientific evidence to prove the scientific proposition that Theranos tests were inaccurate and unreliable.  According to Holmes, the Government lacks that information because of its failure to investigate and preserve the Laboratory Information System ("LIS") database—a bespoke database that housed, among other things, all patient test results and all quality control data at Theranos.  According to the Government, Theranos improperly destroyed that database while it was subject to a grand jury subpoena without providing a working copy of the database to the Government.

The parties generally dispute the importance of the database to the Government's case. *Compare* May 5, 2021 Hr'g Tr., Dkt. No. 793, at 47:20-21 (defense counsel stating that the "failure to obtain this evidence is a gaping hole in the Government's case"), *with id*. at 82:15-16 (Government counsel stating that "the LIS was not critical to the charging in this case nor is it critical to the proof at trial").  The parties also dispute the factual background leading up to the deconstruction of the LIS database.  *See* Gov't 561 Opp'n at 2–8; Holmes Reply Br. in Supp. of Holmes's 561 Mot. ("Holmes 561 Reply"), Dkt. No. 575 at 7–20.

The Court need not wade into the disputed issue of fault at this stage.  The questions presently before the Court are (1) whether to preclude evidence of the destruction of the LIS database offered by the Government in its case-in-chief (*see* Holmes's Mot. in Limine to Exclude Bad Acts and False or Misleading Statements of Theranos Agents and Employees ("Holmes 565

Mot."), Dkt. No. 565, at 4); (2) whether to preclude Holmes from raising the Government's failure to obtain the LIS evidence in her defense; and (3) if Holmes is permitted to raise such a defense, whether the Government will then be permitted to offer evidence of Theranos' destruction of the database in response.  The Court address each in turn.

First, the Government has argued that large-scale statistical analysis of Theranos' test results is not necessary to prove the elements of wire fraud in this case.  *See, e.g.*, *id.* at 79:10–80:9 (Government explaining that while the LIS database would have been a "powerful tool" to identify patient victims and identify which assays Theranos was running and when, "the Government has been able to capture that information in various other ways"); *id.* at 80:14–81:2 (stating that "this case is not about overall failure rate" nor about "determining what percentage of Theranos' tests were inaccurate").  Moreover, the Government has not presented any evidence tending to show Holmes's involvement in what the Government would characterize as the nefarious destruction of the LIS database.  As discussed in more detail above on Holmes's MIL regarding Rule 404(b) evidence, the Government must establish some connection between an alleged bad act and Holmes before evidence of that bad act becomes relevant.  Thus, the Court finds that evidence tending to show Theranos' nefarious destruction of the LIS database, without more, is not relevant under Rules 401 and 404(b).  The Court **GRANTS** Holmes's motion to exclude such evidence without prejudice.  The Government may seek to introduce such evidence upon a foundational showing establishing a connection to Holmes.

Second, the Government argues that Holmes should not be permitted to argue that the Government's evidence is "anecdotal" because it failed to conduct a statistical analysis of Theranos test results.  The Government contends that such an analysis is not necessary, would likely not have been possible on the LIS database, and risks misleading the jury about what the Government is required to prove.  Holmes maintains that fundamentally, she must be permitted to argue that the Government has failed to meet its burden of proof in this case.  The Court agrees. Holmes has a right to put on a defense of her choosing, including an argument that the Government has failed to meet its burden of proof.  *See, e.g.*, *Conde v. Henry*, 198 F.3d 734, 739

(9th Cir. 2000) ("precluding [defendant's] attorney from arguing his theory of the defense in closing arguments" "violated [defendant's] right to counsel"); *United States v. Solorio-Soto*, 300 F. App'x 487, 488–90 (9th Cir. 2008) (limitation on cross-examination "prevented [defendant] from arguing" that government's Rule 404(b) evidence did not establish element of the offense and violated his right to present a complete defense).

The Court declines to preclude Holmes from raising the lack of "statistical" or "scientific" evidence as a defense, from characterizing that missing evidence as critical to the Government's case, or from arguing about the statistical insignificance of individual patient or physician testimony. Thus, to the extent the Government's opposition brief seeks to preclude Holmes from offering such arguments, the Court denies that request.

Finally, the question remains whether, if Holmes argues that the LIS database is unavailable because of the Government's failure to obtain it, that argument opens the door to the Government presenting evidence of Theranos' culpability in the destruction of the LIS. At the motion hearing, the Court expressed its preliminary view that an argument of this nature from the Holmes would likely introduce a fact issue for the jury to decide. Whether it is necessary for the jury to hear evidence regarding fault in the destruction of the database will depend on what arguments Holmes raises at trial and whether she seeks any sort of jury instruction on the issue. The Court will defer ruling on this question unless and until it becomes relevant at trial.

### 5. Summary

In conclusion, the Court finds evidence of anecdotal testimony relevant and admissible, and therefore **DENIES** Holmes's motion to exclude evidence of anecdotal test results.

The Court **GRANTS** Holmes's motion to exclude customer impact evidence, but will permit witnesses to testify in accordance with the parameters laid out above.

The Court **DENIES** Holmes's motion to exclude expert physician witnesses without prejudice to renewal if the Government fails to timely supplement its Rule 16 disclosures.

Finally, the Court further **GRANTS** Holmes's motion to preclude evidence of Theranos' involvement in the destruction of the LIS database, unless and until the Government lays a proper

foundation at trial or Holmes puts the factual dispute in issue.

**I.     Holmes's MIL to Exclude Bad Acts and False or Misleading Statements of Theranos Agents and Employees (Dkt. No. 565)**

Holmes moves to preclude the Government from introducing "evidence of bad acts or false or misleading statements of Theranos agents or employees other than her alleged co-conspirators and alleged accomplices, at least absent a sufficient advance showing from the [G]overnment pursuant to Rule 104."  Holmes Reply Br. in Supp. of Holmes's 565 Mot. ("Holmes 565 Reply"), Dkt. No. 708, at 4; *see also* Holmes 565 Mot.  Holmes contends that the evidence is irrelevant, and even if it has some probative value, the combined prejudice, confusion, and time lost in mini-trials resulting from admitting the evidence would together substantially outweigh the limited probative value.  In particular, Holmes provides the following examples of anticipated evidence and arguments regarding Theranos agents and employees that she contends the Government has not connected to any knowledge or conduct on her part.

> 1.  "The government identifies the experiences of seven patients as evidence that Ms. Holmes knew Theranos was unable to provide accurate and reliable test results, [sic] but it does not identify any evidence that Ms. Holmes was ever informed about three of these patients' experiences.  Ex. 3 at 5-6 (Sept. 28, 2020 Rule 404(b) Notice.  For example, with respect to R.G., the government claims only that '[n]umerous employees reporting to Holmes and Balwani became aware of the test.'  *Id.* at 6."
>
> 2.  "The government again alleges that 'Defendants *and their agents* made statements directly to doctors in connection with Theranos's tests and specific results.'  Ex. 3 at 12-15 (emphasis added).  This portion of the supplemental 404(b) disclosure identifies numerous statements by unidentified 'Theranos representatives' that the government intends to introduce. Illustrative examples include the following: *id.* at 12 ('A Theranos representative told Dr. Jessica Bramstedt that Theranos would conduct micro-testing on blood samples drawn from the fingertip; that Theranos was equivalent to other major labs like LabCorp and Sonora Quest, and that when Theranos lost its lab license, it was merely a slap on the wrist that would have a temporary effect on the company.'(internal quotation marks omitted); *id.* ('Theranos representative Kimberly Alfonzo told Dr. Gerald Asin that Theranos could do all blood tests with a fingerstick draw . . .'); *id.* ('A Theranos sales representative told Dr. Nathan Matthews that Theranos's testing was accurate . . .'); *id.* at 13 ('Theranos representatives told Dr. Steve Linnerson that the company's device was FDA-approved and that it had met all

the national laboratory standards . . .'); *id.* at 14 ('Results from each of these types of HbA1c tests were provided to doctors without explanation as to the types of analyzers used to conduct the assays, creating a situation where doctors did not have the information they needed to place the results in context.')."

3. "The government makes various allegations related to Theranos' process for setting reference ranges that have no connection to Ms. Holmes (or Mr. Balwani). *Id.* at 71."

4. "The government alleges that '[w]hen Theranos obtained critical test results for chloride, it conducted a redraw and/or rerun rather than reporting the critical value,' with no connection to Ms. Holmes. *Id.* at 73."

5. "According to the government, 'Results from . . . HbA1c tests were provided to doctors without explanation as to the types of analyzers used to conduct the assays, creating a situation where doctors did not have the information they needed to place the results in context. This was especially problematic in situations where a single patient had multiple Theranos assays conducted using different methods, yielding different results that falsely suggested to the doctor that the patient's analyte values had changed. This was the case with a patient treated by Dr. Phelan, who was the subject of internal emails at Theranos.' The government does not tie this allegation to Ms. Holmes."

6. "The government asserts, in inflammatory language, that Theranos 'senior managers' destroyed Theranos' database of patient data in 2018. *Id.* at 79-80. According to the government, Theranos produced the database to the government but failed to provide a password needed to access the database; Theranos employees and consultants then dissembled the hardware that housed the database. *Id.* The government claims that these actions 'place the government's evidence in context as part of a larger fraud scheme, one which Theranos was attempting to hide and conceal even after the indictment in this case.' *Id.* at 81. The government does not tie these wild accusations to Ms. Holmes, nor could it, as Ms. Holmes had not been part of company management for several months and had no involvement in responding to these requests."

7. "The government alleges that acts by David Boies, a lawyer for Theranos and Ms. Holmes, and by Theranos' then-General Counsel Heather King are evidence of Ms. Holmes' mental state. Specifically, it alleges that '[o]n or about September 8, 2015, David Boies, at Theranos's direction, wrote to the Editor-in-Chief of Dow Jones [which publishes the *Wall Street Journal*] in an attempt to quash [journalist John] Carreyrou's pending story' on Theranos. *Id.* at 60. The government further alleges that '[o]n or about October 8, 2015, Boies and Heather King (Theranos's General Counsel) spoke to the Dow Jones' Editor-in-Chief and others in an attempt to quash Carreyrou's pending story.' *Id.* The government makes no allegation about Ms.

Holmes' role in these actions."

Holmes 565 Mot.at 3–4.

It is well settled that "guilt" is an "individual and personal" matter, and thus vicarious liability "has no place in the criminal law as our Rules of Evidence recognize." *United States v. Cadden*, No. 14-10363-RGS, 2018 WL 2108243, at *6 (D. Mass. May 7, 2018); *see also Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1367 (11th Cir. 1999) ("[D]ue process prohibits the state from imprisoning a person without proof of some form of personal blameworthiness more than [an agency relationship]."). A defendant may be liable for the actions of another in only limited circumstances, such as where there is conspiracy liability. *United States v. Tarallo*, 380 F.3d 1174, 1184 (9th Cir. 2004), *amended*, 413 F.3d 928 (9th Cir. 2005). Evidence of "guilt by association" is improper. *See United States v. Dunn*, 640 F.2d 987, 989 (9th Cir. 1981) (vacating conviction where government "concentrated on the criminal convictions of other members of [defendant's] family" and impeached witness through "the crimes of her brother").

Here, the Government does not specifically address the so-called bad acts, with one exception. Instead, the Government focuses on actions that it alleges Holmes took herself. For example, the Government intends to call witnesses at trial to testify about Holmes's role in assembling and approving materials that went to potential and actual investors in the company. These materials contain the numerous allegedly false and misleading statements about Theranos' technology, including the number of tests it could perform and the level of accuracy it could achieve. The Government also intends to present testimony from investors regarding their conversations with Holmes and the ways she misled them about the regulatory status of Theranos and the military's purported use of the company's analyzer. Holmes also repeated to members of the media the allegedly false statements she delivered to potential investors.

The Government also intends to present evidence of Holmes's role in responding to customer inquiries. For example, the Government intends to present evidence that in August 2014, Holmes directed Theranos employees regarding how to respond to customer inquiries about withheld test results. Specifically, Theranos representatives were to respond that "$CO_2$ results

were not reported due to temporary unavailability of this test for this sample" and note that the company was growing as fast as it could.  Gov't Opp'n to Holmes 565 Mot. ("Gov't 565 Opp'n"), Dkt. No. 662, at 3.  In February 2015, Holmes allegedly approved a script for Theranos representatives to use when explaining changes to its Complete Metabolic Panel (CMP) tests to customers.

The problem with the Government's argument is Holmes's motion is not directed to evidence of her role in preparing materials for investors, her presentations to investors, or to her personal engagement with the media.  Nor is Holmes's motion directed to evidence of her role in responding to customer inquiries.  And indeed, evidence of Holmes's direct participation in these activities is relevant to the alleged fraud.  *See, e.g.*, *United States v. Blitz*, 151 F.3d 1002, 1006 (9th Cir. 1998) (evidence of personal contact with prospective victims was sufficient to sustain conviction for knowing participation in fraudulent scheme); *United States v. Lothian*, 976 F.2d 1257, 1267–68 (9th Cir 1992) (evidence that defendant made misrepresentations to customers about company was sufficient to prove fraud); *United States v. Peters*, 962 F.2d 1410, 1414 (9th Cir. 1992) (upholding conviction for fraud because appellant knew of complaints from victims about money they were promised, continued to do administrative tasks, and deposited fraudulently acquired checks).  Rather, Holmes seeks to exclude "bad acts" that she contends the Government has not connected to her.

The only other evidence the Government proffers to connect Holmes to the "bad acts" is her status as founder and CEO of Theranos.  The Government contends that Holmes was involved in virtually every aspect of the company and that she possessed final authority over decisions on virtually any issue facing the company.  In other words, Holmes exerted "influence" over all facets of the company's operations.  Gov't 565 Opp'n at 3.  For example, the Government contends that as CEO, Holmes was the primary contact for David Boies, and therefore "[i]t is implausible that Defendant did not play a significant role in influencing Boies's actions during that time period." *Id.* at 5.

The Government's proffered evidence is not enough to connect Holmes to Boies. To do so would invite the jury to potentially find Holmes vicariously liable for the actions of others based on nothing more than her "influence." The only case the Government cites in support of this "influence" theory is *United States v. Ciccone*, 219 F.3d 1078, 1083–85 (9th Cir. 2000). But the Government's attempt to analogize this case to *Ciccone* is strained. In *Ciccone*, the owner of a telemarking company designed a "pitch" for his solicitors to use in order to persuade people to send money to his company. *Id.* at 1080. On appeal, the defendant argued that there was insufficient evidence to permit a jury to convict because he did not call the victims; his solicitors did. *Id.* at 1084. The Ninth Circuit rejected that argument because there was evidence in the record that he did make some calls himself, and even if he did not himself make the calls, "[t]he defendant need not personally have mailed the letter or made the telephone call; the offense may be established where one acts with the knowledge that the prohibited actions will follow in the ordinary course of business or where the prohibited acts can reasonably be foreseen." *Id.* at 184 (quoting *Lothian*, 976 F.2d at 1262). *Ciccone* in no way suggests that the defendant was convicted based on evidence of his "influence" over his company. The Government may attempt to hold Holmes liable for her own acts, as in *Ciccone*. But it cannot attribute the acts of others to her without evidence that causally connects her with those actions. *Lady J. Lingerie*, 176 F.3d at 1367; *see also United States v. Rank*, 805 F.2d 1037, at *4 (6th Cir. 1986) ("declin[ing] to adopt the government's theory, akin to a respondeat superior basis for criminal liability" for president and CEO of a company in a mail fraud case).

Perhaps in implicit recognition of the need for evidence of a causal connection between Holmes and the so-called "bad acts," the Government represents that it is likely that further trial preparation will lead to former Theranos employees who "will have additional information about the control Defendant had over employee's knowledge of key facts and their responses to questions other posed about the company." Gov't 565 Opp'n at 5. Because pretrial preparation is ongoing, the Court is not inclined to issue a pretrial order precluding evidence of all "bad acts." Nevertheless, it is incumbent upon the Government to come forward with proof of a sufficient

connection between Holmes and each "bad act" so that the Court may assess the relevance and potential prejudice of each "bad act." Fed. R. Evid. 104(b) ("When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist."). Further, Rule 104(c)(3) requires a hearing out of the presence of the jury to consider whether the Government has presented sufficient evidence of a connection to justify admissibility of any particular bad act, to avoid Rule 403 issues. Fed. R. Evid. 104(c)(3) ("The court must conduct any hearing on a preliminary question so that the jury cannot hear it if . . . (3) justice so requires."); *see also United States v. Evans*, 728 F.3d 953, 957 (9th Cir. 2013) (describing a Rule 104 pretrial hearing for such a purpose in the proceedings below). This approach will "insure[] that the jury will not be tainted by hearing prejudicial evidence—or learning of its existence—until the [Government] has demonstrated that it will be able to provide an adequate foundation for admission." *United States v. Branch*, 970 F.2d 1368, 1371 (4th Cir. 1992).

Holmes's motion is **DEFERRED** pending the Government's establishment of the necessary foundation for the evidence it seeks to introduce.

### J.    Holmes's MIL to Exclude Evidence of Theranos' Trade Secrets Practices (Dkt. No. 566)

Holmes next moves to preclude the Government from introducing evidence of Theranos' trade secrets practices. Holmes's Mot. in Limine to Exclude Evidence of Theranos' Trades Secrets Practices Under Rules 401-404 ("Holmes 566 Mot."), Dkt. No. 566. The motion primarily concerns three categories of evidence about Holmes playing a role in: (1) fostering a culture of secrecy and forcing employees and others to sign non-disclosure agreements; (2) restricting access to laboratory areas within Theranos; and (3) threatening or intimidating employees or former employees. *See* Saharia Decl., Ex. 1, Dkt. No. 580 at 4–6. The Government states evidence related to these categories "tends to show consciousness of guilt and tends to show a belief that transparency would expose the falsity of what [Holmes] claimed to investors, patients, and others." *See id*., Ex. 3, Dkt. No. 580-2 at 55, 57, 63. Moreover, the Government stated at the

hearing that it "wants to offer this evidence to say that these were practices at Theranos to prevent the discovery of the fraud." May 6, 2020 Hr'g Tr., Dkt. No. 794, at 46:24–47:1.

Holmes argues that these actions largely reflect common measures that California law requires companies like Theranos to adopt to protect their trade secrets. According to Holmes, evidence concerning Theranos' trade secrets practices has no probative value and will confuse, mislead, and prejudice the jury because the noticed categories of evidence merely depict a company protecting its trade secrets. Holmes also argues that these categories of evidence are inadmissible character evidence under Rule 404(b) because they are too different and unrelated to the charged offense.

The Court first addresses Holmes's Rule 404(b) argument. Although Holmes correctly notes that evidence of another act is admissible evidence of intent only if the other act is "similar to the offense charged," a review of the three categories suggests that this evidence should not be considered "acts" for purposes of Rule 404(b). *United States v. Mayans*, 17 F.3d 1174, 1181 (9th Cir. 1994). The Ninth Circuit has held that "evidence should not be considered 'other crimes' or 'other act' evidence within the meaning of Rule 404(b) if 'the evidence concerning the 'other' act and the evidence concerning the crime charged are inextricably intertwined.'" *United States v. Dorsey*, 677 F.3d 944, 951 (9th Cir. 2012) (quoting *United States v. Soliman*, 813 F.2d 277, 279 (9th Cir. 1987)). This doctrine applies when the acts in question are so interwoven with the charged offense that they should not be treated as other crimes or acts for purposes of Rule 404(b). There are generally two categories of cases in which the Ninth Circuit has concluded that "other act" evidence is inextricably intertwined with the charged crime and therefore need not meet the requirements of Rule 404(b). *Vizcarra-Martinez*, 66 F.3d at 1012. First, evidence constituting a part of the transaction that serves as the basis for the criminal charge is admissible. *Id.* Second, "other act" evidence may be admissible if necessary to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime. *Id.* at 1012–13. "[I]t is obviously necessary in certain cases for the government to explain either the circumstances under which particular evidence was obtained or the events surrounding the commission of the crime."

*Id.*

Under these authorities, even if the identified categories of evidence dealing with trade secrets practices at issue were not part of the crime charged, they are not subject to exclusion because they allow the Government to offer a coherent and comprehensible story regarding the commission of the charged crime.  The Government seeks to introduce this evidence to show that these practices at Theranos were intended to prevent the discovery of the alleged fraud.  These acts relate to the alleged scheme to defraud as a whole.

Moreover, much of the evidence discussed in these categories is evidence that can be introduced not as Rule 404(b) evidence but as factual evidence.  In particular, former employees of Theranos may testify largely about their observations and experiences while working at the company.  Their personal experiences and observations related to some of the trade secrets practices Theranos implemented is not inadmissible character evidence for this purpose.

The Court finds that Rule 403 does not prohibit the admission of this evidence.  The evidence the Government anticipates it will introduce is highly probative of a specific element of the charged offense—namely, Holmes's alleged scheme to defraud and the steps she took to continue the scheme.  Holmes argues that presentation of evidence concerning Theranos' trade secrets practices would create a series of mini-trials as she would be unduly forced to introduce expert testimony to try to establish that Theranos' trade secrets practices were not improper.  This disagreement about particular trade secrets practices and when and how they were employed is a factual dispute.  Additionally, although evidence related to threatening or intimidating employees or former employees of Theranos may be prejudicial, the evidence is relevant as to how Holmes was operating the company and therefore does not rise to the level of unfair prejudice.  Finally, the Court does note that for some of these practices, it will be incumbent upon the Government to come forward with a sufficient connection between Holmes and Theranos' implementation of particular trade secrets practices, including threatening and intimidating employees or former employees of the company.

For these reasons, Holmes's motion to exclude evidence of Theranos' trade secrets practices is **DENIED** at this time.  Holmes may raise pertinent objections at trial if the Government has not established a sufficient connection between Holmes and Theranos' trade secrets practices.

### K.  Holmes's MIL to Exclude Certain Evidence and Argument Regarding Third-Party Testing Platforms (Dkt. No. 576)

In this motion Holmes moves to exclude evidence and argument that Theranos "tampered with" and "concealed" commercially available third-party diagnostic testing platforms.  Holmes's Mot. in Limine to Exclude Certain Evidence and Argument Regarding Third-Party Testing Platforms Under Rules 401-403, 404(b), and 702 ("Holmes 576 Mot."), Dkt. No. 576.  Holmes, however, is not arguing that the Government should be precluded from introducing evidence related to the modifications or the tests run on the modified testing platforms.  Rather, Holmes argues the Government should be precluded from insinuating there was anything improper about such modifications or that the modifications violated the manufacturer's specifications or from presenting any evidence of the same.  *Id.* at 4.  Additionally, Holmes asserts the Government should be precluded from suggesting that the measures Theranos implemented to protect these trade secrets were improper or an attempt to "conceal" information.  *Id.*

The Government responded in its opposition and at the hearing that it does not intend to introduce testimony or argument that Theranos' modifications of third-party analyzers violated industry standards or manufacturer agreements, or that those modifications were wrong or unethical in and of themselves.  Gov't Opp'n to Holmes's 576 Mot. ("Holmes 576 Opp'n"), Dkt. No. 666, at 2; May 6, 2021 Hr'g Tr., Dkt. No. 794 at 65:9-12.  Still, while the Government will be able to present evidence related to modifications Theranos made to third-party testing platforms, the use of the phrase "tampered" goes beyond the scope of proposed witness testimony and opinions related to third-party testing platform modifications.  The Government has not presented any opinions from qualified experts under Rule 702 to establish whether and to what extent certain modifications to third-party testing platforms may be considered "tampering."

Thus, while the Government can introduce evidence related to the modifications or the tests run on third-party platforms, it will not be able to frame its evidence and argument in a way to suggest the third-party platforms were "tampered" with until and unless that has been proven by appropriate evidence.

Holmes also argues the Government should be precluded from introducing evidence about what was or was not "concealed" or shared with manufacturers of the third-party testing platforms. Holmes contends there is no probative value to this evidence, and it will only serve to unfairly prejudice her for conduct related to protecting trade secrets. For similar reasons discussed in Holmes motion to exclude evidence about Theranos' trade secrets practices, the Court finds this type of fact evidence to be probative and not so unfairly prejudicial it outweighs the probative value. Theranos' use of third-party platforms and what Holmes and Theranos disclosed about its use correlates to key events at issue in this case. The Court, therefore, finds evidence relating to what Theranos disclosed and did not disclose about modifications to third-party platforms is relevant and not unfairly prejudicial.

Accordingly, the Court **GRANTS IN PART** and **DENIES IN PART** Holmes's motion to exclude certain evidence and argument regarding third-party testing platforms.

### L. Holmes's MIL to Exclude Evidence of Alleged Blaming and Vilifying of Competing Companies and Journalists (Dkt. No. 577)

The Government intends to present evidence under Rule 404(b) that Defendants blamed or vilified competing companies and journalists. *See* Holmes's Mot. in Limine to Exclude Evidence of Alleged Blaming and Vilifying of Competing Companies and Journalists Under Rules 401-403 and 404 ("Holmes 577 Mot."), Dkt. No. 577. Specifically, the Government identifies five acts that it intends to introduce at trial:

1) A Theranos employee will testify that Holmes and Balwani led a group of employees in a chant of "Fuck you, Sonora Quest," with the implication that competitors such as Sonora Quest and Quest were "behind the questioning of Theranos." Saharia Decl., Ex. 3 at 59.

2) A Walgreens employee will testify that Holmes stated that "Theranos' competitors were sending people into Walgreens to order esoteric blood tests in order to throw off the blood draw percentages." *Id.* at 61.

3) Another Walgreens employee will testify that "Balwani advised Walgreens that the reasons for the high number of venous blood draws included the cartridges not being ready for tests that were being ordered, LabCorp and Quest sending people in to order tests which required venous blood draws, and doctors ordering esoteric tests." *Id.* at 61–62.

4) A Theranos employee will testify that he learned at "an all-hands meeting" of an impending WSJ article by John Carreyrou.  At that meeting, "the attendees were told the article made several allegations that were false, and that this story was being pushed by LabCorp and Quest." *Id.* at 62.

5) A Theranos employee will testify that Holmes and Balwani led a group of employees in a chant of "Fuck you, Carreyrou." *Id.* at 59.

Holmes argues that this evidence is irrelevant under Rules 401, 402 and 404, and that if the Government intends to introduce this evidence under Rule 404(b) as false statements, the Government has not complied with its obligation to identify evidence of falsity under Criminal Local Rule 16-1(c)(3).  Holmes 577 Mot. at 3–4; Holmes Reply Br. in Supp. of Holmes's 577 Mot. ("Holmes 577 Reply"), Dkt. No. 720, at 1–4.

The Government concedes that the evidence concerning "Fuck you" chants is "somewhat inflammatory," but argues that Holmes's "extreme response to media criticism" is probative of her "*mens rea* and consciousness of guilt."  Gov't Opp'n to Holmes 577 Mot. ("Gov't 577 Opp'n"), Dkt. No. 678, at 3–4.  With respect to the statements Defendants made to Walgreens employees and the all-hands meeting concerning the impending WSJ article, the Government contends such statements are admissible "to provide 'a coherent and comprehensible story regarding the commission of the crime'" and that they are probative of Holmes's intent, knowledge, and consciousness of guilt. *Id.* at 4–5 (quoting *United States v. DeGeorge*, 380 F.3d 1203, 1220 (9th Cir. 2004)).

The Court agrees with Holmes that the chants have little probative value as to whether Theranos' technology was accurate or reliable, or whether Holmes made false statements to investors or customers.  Fed. R. Evid. 401, 402.  Whatever minimal probative value this evidence

offers is outweighed by the potential for prejudice.  Fed. R. Evid. 403.

As to the statements made at the all-hands meeting regarding the WSJ article and the statements Defendants made to Walgreens employees, the Court finds significant the Government's inability to point to any evidence in its Rule 404(b) disclosure showing that those statements were false.  The Government says only that "[t]he evidence at trial *will* show that these are misrepresentations, made to Walgreens in an attempt to explain why Theranos was failing to do what it claimed it could do" and that "[t]hese misrepresentations are therefore inextricably intertwined with the alleged investor fraud and should be admitted."  Gov't 577 Opp'n at 4 (emphasis original).  The Government does not explain what evidence will prove falsity, and the Court therefore cannot say at this time whether the statements should be excluded.  The Court declines the Government's invitation to allow the Government to escape its Criminal Local Rule 16-1(c)(3) obligations by admitting the statements as part of an overall narrative, particularly when the Government has not adequately explained why statements about potential sabotage by Theranos competitors tends to shed any light on investor fraud.

Accordingly, the Court **GRANTS** Holmes's motion as to the chants, but **DEFERS** ruling on the statements to Walgreens employees and the all-hands meeting statements.

### M.   Holmes's MIL to Exclude Evidence of Alleged Violations of Industry Standards and Government Regulations (Dkt. No. 569)

In this motion, Holmes seeks to exclude evidence regarding Theranos' purported "[v]iolations of industry standards and government regulations or rules regarding research and development procedures, medical devices and clinical laboratory practices."  Holmes's Mot. in Limine to Exclude Evidence of Alleged Violation of Industry Standards and Government Regulations Under Rules 401-403 ("Holmes 569 Mot."), Dkt. No. 569, at 1–2 (citing Saharia Decl., Ex. 1, Dkt. No. 580 at 7).  The Government's 404(b) notice states, "[i]n furtherance of their scheme to defraud, Defendants disregarded and failed to conform to industry standards as well as government regulations or rules regarding research and development procedures, medical devices and clinical laboratory standards."  Saharia Decl., Ex. 1, Dkt. No. 580 at 7.  Specifically, Holmes

seeks to exclude any testimony offered suggesting that Theranos violated any industry standard or federal regulation. *See* May 4, 2021 Hr'g Tr., Dkt. No. 792, at 170:14-18.

Holmes, for example, points to the Government's intent to introduce as part of Dr. Rosendorff's testimony, evidence that after Theranos began using the Theranos blood analyzer ("Edison 3.5") in the CLIA lab in November 2013, Dr. Rosendorff advised Balwani by email: "we are currently not compl[iant] in terms of CLIA law." *See* Leach Opp'ns Decl., Ex. 45, Dkt. No. 681-9. Dr. Rosendorff also highlighted how Theranos had not established the upper end of reportable reference ranges for tests. *Id.* Holmes has identified four subcategories of evidence disclosed by the Government she believes are at issue in this motion and should not be introduced to suggest Theranos violated industry standards or federal regulations : (1) research and development validation studies; (2) clinical trials; (3) CMS and CDPH reports and correspondence; (4) Theranos' control over its laboratory. Holmes 569 Mot. at 4–5. To support her request, Holmes argues that (1) the Government's evidence of alleged violations of industry standards and government regulations requires impermissible legal opinions and (2) alleged violations of industry standards and government regulations are irrelevant and prejudicial.

### 1.   The Government's evidence of alleged violations of industry standards and federal regulations does not require impermissible legal opinions

Holmes is correct that experts may interpret and analyze factual evidence but may not testify about the law. *See S.E.C. v. Capital Consultant, LLC*, 397 F.3d 733, 749 (9th Cir. 2005). Indeed, testimony that is "couched . . . in the form of a legal conclusion—ostensibly based on what appears to be [the witness'] own survey of state laws . . . is improper and must be excluded." *Lukov v. Schindler Elevator Corp.*, No. 5:11–cv–00201 EJD, 2012 WL 2428251, at *2 (N.D. Cal. June 26, 2012).

Here, however, the Government is not seeking to introduce impermissible legal opinions related to important legal questions for the case. Instead, The Government want to introduce evidence, like Dr. Rosendorff's statements about CLIA regulations and industry standards, because they are relevant to central issues regarding notice to Holmes and her state of mind.

Specifically, the Government seeks to use Dr. Rosendorff's statements about Theranos' compliance with industry standards and federal regulations to introduce into evidence how Holmes responded when these issues were brought to her attention by Theranos' laboratory director.  Gov't Opp'n to Holmes 569 Mot. ("Gov't 569 Opp'n"), Dkt. No. 670, at 5–6.  Citing *United States v. Graf*, 610 F.3d 1148, 1164 (9th Cir. 2010), the Government argues this purpose is consistent with Ninth Circuit case law.  In *Graf*, the court affirmed admission of statements relating to legal conclusions communicated to a defendant because the evidence was relevant to the defendant's state of mind.  610 F.3d at 1164.

Accordingly, while the Government cannot offer evidence detailing violations of industry standards or government regulations solely to support an element of the charged offense, the Court will allow statements made to Holmes which concerned perceived violations of industry standards and government regulations to be admitted. A curative instruction will be given to the jury dictating that this evidence is being offered only to show notice was given to Holmes and her state of mind.  The evidence will not be introduced for the purpose of establishing that Theranos' laboratory practices violated industry standards or government regulations.

### 2.  Evidence of alleged violations of industry standards and federal regulations is relevant and not unduly prejudicial

Because the Government asserts that evidence relating to alleged violations of industry standards and government regulations relates to Holmes's knowledge and response to certain laboratory conditions, Holmes's Rules 401 and 403 arguments lack merit.  Each of the subcategories identified by Holmes concern aspects of Theranos' laboratory practices, and are probative because of the notice given to Holmes about different aspects of the lab and her state of mind after she was given notice.  The TSI pointedly puts this evidence at issue.  The Court's curative instruction to the jury also helps to eliminate the risk of undue prejudice.

Accordingly, the Court **DENIES** Holmes's motion to exclude evidence of alleged violations of industry standards and government regulations.

**N.      Holmes's MIL to Exclude Theranos Customer Service Spreadsheets (Dkt. No. 570)**

Holmes moves on hearsay, prejudice, and improper character evidence grounds to preclude the Government from introducing Theranos' customer-service spreadsheets, which purportedly contain summaries of various customer-service communications.  Holmes's Mot. in Limine to Exclude Theranos' Customer-Service Spreadsheets Under Rules 401-404 and 801-803 ("Holmes 570 Mot."), Dkt. No. 570.  The Government intends to offer these spreadsheets to demonstrate that Holmes "knew that Theranos' tests . . . suffered from accuracy problems that rendered them unreliable and not suitable for informing clinical treatment decisions."  Saharia Decl., Ex. 1, Dkt. No. 580 at 2; *id*, Ex. 3, Dkt. No. 580-2.

The Government opposes this motion, rejecting Holmes's argument that the customer-service spreadsheets are hearsay (and their contents double hearsay).  According to the Government, the customer-service spreadsheets are admissible as business records and probative of Holmes's intent to defraud because they help show that Holmes had notice of "shortcomings" with the technology she was marketing to patients.  Gov't Opp'n to Holmes's 570 Mot. ("Gov't 570 Opp'n"), Dkt. No. 665, at 1.  Holmes argues the Government has not established she reviewed, was familiar with, or even had access to the spreadsheets.  Holmes 570 Mot. at 6.  In addition, Holmes argues the Court should preclude the Government from introducing the customer-service spreadsheets at trial pursuant to Rule 403.  *Id.* at 7.  In contrast, the Government argues Holmes is prematurely seeking to have the Court sustain objections to the purported business records before the Government has had the opportunity to obtain certificates of business records or call custodians at trial to meet the Federal Rule of Evidence 803(6) standard and lay foundation for how Holmes was kept informed of customer complaints.  Gov't 570 Opp'n at 3–5.

Under Rule 803(6), business records fall within an exception to the hearsay rule.  For a document to be considered a business record, the following criteria must be satisfied: "(A) the record was made at or near the time by--or from information transmitted by--someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making the record was a regular

practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness."  Fed. R. Evid. 803(6).

The Court cannot rule on the business records issue until trial.  The Government states it intends to introduce the proper custodians and certificates and lay foundation connecting these spreadsheets to Holmes at trial.  Gov't 570 Opp'n at 3–5.  The Court does find, however, that the contents of the spreadsheets, i.e., the purported summaries of customer communications, can be introduced to show notice.  Such evidence would not run afoul of Rule 801(c) because it would not be offered for the truth of the matter asserted that there were "shortcomings" with Theranos' technology.  *See White v. Ford Motor Co.*, 312 F.3d 998, 1009 (9th Cir. 2002) (upholding the use of customer reports to show notice without concluding that the reports were admissible for their truth); *see also United States v. Moseley*, 890 F.3d 9, 13 (2d Cir. 2020) (evidence of "complaints which were called to a defendant's attention" are "relevant to the issue of the defendant's intent.").

Although specific customer complaints included in the spreadsheets that focus on Theranos' testing cannot be considered to prove the truth of the matter asserted, complaints about Theranos' technology can be admissible to show Theranos received such complaints.  Moreover, this evidence could help establish Holmes state of mind or knowledge related to specific allegations in the TSI.

With respect to Holmes's Rule 403 objection, her knowledge or notice is an essential element of the alleged scheme to defraud.  However, introduction into evidence of the specific details of the customer complaints that address Theranos' tests would be a waste of time, could confuse and mislead the jury, and be prejudicial to Holmes.  Accordingly, the Court would only allow the Government to present evidence that customer complaints focusing on Theranos' tests exist but will not be allowed to introduce the specific details of the complaints.  The Court would also give the jury a limiting instruction that such evidence is admissible only for the purpose of

establishing Holmes's notice of those complaints and cannot be used to establish there were actual issues with Theranos' technology or for any other purpose.

Accordingly, the Court declines to issue an order broadly precluding the customer-service spreadsheets or evidence that those summaries of customer communications about Theranos' testing technology exists and **DEFERS** ruling until trial.

### O. Holmes's MIL to Exclude Certain Rule 404(b) Evidence for Lack of Expert Support (Dkt. No. 564)

Holmes next moves to exclude three subcategories of evidence disclosed in the Government's Rule 404(b) notice dealing with aspects of Theranos' laboratory practices: (1) multiplexing test results and disregarding outliers to mask inconsistency; (2) improperly setting and altering reference ranges; and (3) withholding important information from doctors and patients. *See generally* Holmes's Mot. in Limine to Exclude Certain Rule 404(b) Evidence For Lack of Expert Support Under Rules 401-403 and 701-702 ("Holmes 564 Mot."), Dkt. No. 564.

Holmes argues the Government cannot prove that Theranos' laboratory practices violated industry standards or were otherwise improper in part because these are issues "based on scientific, technical, other specialized knowledge," that require expert testimony. Fed. R. Evid. 701. Holmes adds that the Government has disclosed no such expert testimony and that no expert will be able to opine that these aspects of Theranos' laboratory practices rendered Theranos' tests inaccurate or unreliable. Thus, this evidence is irrelevant, any connection between this evidence and Holmes's intent is speculative, and the Court should exclude it under Rules 401-403 and 701-702.

Although included in the Government's Rule 404(b) notice, the Court recognizes the majority of evidence within these three subcategories as fact evidence not necessitating evaluation under Rule 404(b). These subcategories also correlate to key allegations raised in the TSI, or are probative to what Holmes's knew about laboratory practices and not unduly prejudicial.

### 1. Multiplexing test results and disregarding outliers to mask inconsistency

With respect to the use of "multiplexing," the Government alleges that Theranos "operated

its analyzers according to a protocol that included running each individual test [six] times [on a given sample in parallel] and then multiplexing the test results in order to drive the final, reported result."  Saharia Decl., Ex. 1 at 8.  When a patient's sample was inserted into the Theranos device, six pipette tips would simultaneously draw six portions of blood from the larger sample.  Each of those six portions would then be tested for the target analyte, i.e., the substance that was being measured. Those six tests would then yield six results.  Theranos' algorithm would then review the set of six numerical values and discard any that were outliers.  The remaining values were then averaged, and the combined average value was reported to the patient.  According to the Government, "this approach tended to mask consistency problems with Theranos' tests."  *Id*.  In support, the Government relies on statements regarding the efficacy of multiplexing made by Theranos' former lab director Dr. Adam Rosendorff.  For example, Dr. Rosendorff would testify that the multiplexing process he used in real time as Theranos' laboratory director was "not good laboratory practice," "not ideal," and that "it would be better to run the assay a single time using a highly accurate and reliable method, and report that result."  Saharia Decl., Ex. 3 (Sept. 28, 2020 Gov't Suppl. Rule 404(b) Notice); ; *see also id*., Ex. 5 at 13 (Rosendorff's belief that "[t]his process was not ideal because it *may* have tended to increase the appearance of precision beyond a lab test's true performance" (emphasis added)).

        Holmes argues this evidence would require an expert opinion rooted in sufficient data and a reliable methodology, to prove that Theranos' multiplexing method actually masked precision problems with Theranos' tests.  *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  The Court does not agree, because an explanation of what multiplexing entailed does not involve the application of any technical algorithms or procedures.  Dr. Rosendorff's background as a laboratory director gives him a sufficient basis on which to present his observations and beliefs about Theranos' use of multiplexing and his experience employing the method.  Moreover, the change in Dr. Rosendorff's view of the multiplexing method is not a basis to disqualify him from testifying about multiplexing.  Holmes is entitled to explore these issues on cross-examination.  Accordingly, the Court finds that a blanket exclusion of evidence relating to

Theranos' multiplexing method is not warranted at this time.

### 2.   Improperly setting and altering reference ranges

For reference ranges, the Court also does not believe evidence the Government intends to offer on this topic requires expert analysis.  The Government revealed in its 404(b) notice that Dr. Rosendorff may testify that he was involved in setting reference ranges for Theranos tests.  Dr. Rosendorff may testify that Theranos launched its clinical testing services in 2013 without conducting a formal reference range study to determine the appropriate reference range values because Theranos was "in a hurry" to launch, and that it would have been preferable to establish reference ranges before the launch.  Saharia Decl., Ex. 3 at 71-72.  Separately, Dr. Rosendorff may testify that Holmes and Balwani were resistant to the idea of establishing and disclosing reference ranges that were specific for Theranos' capillary blood tests and distinct from the venous sample tests that Theranos ran on third-party devices.  *Id*.

This testimony is based on Dr. Rosendorff's percipient observations while at Theranos as well as his judgment and experience as a certified laboratory director.  Because the evidence will not be introduced to argue that Theranos' reference ranges were violating industry standards, the introduction of a scientific basis and methodology pursuant to Rule 702 is not needed.  Therefore, the Court declines to issue a blanket exclusion of evidence relating to Theranos' reference ranges.

### 3.   Withholding important information from doctors and patients

Lastly, the Government seeks to introduce evidence that Theranos "withheld" from doctors and patients information such as "what type of analyzer had been used for a given test," "the fact that Theranos' tests were not FDA approved," that Theranos "relied on third-party analyzers for many of its tests."  Saharia Decl., Ex. 1 at 8.  In its supplemental disclosure, the Government explains that Dr. Rosendorff advocated stating on laboratory reports whether the blood was collected by fingerstick or venous draw, but this was ultimately not done.  *Id*., Ex. 3 at 74.  Holmes argues this evidence should be excluded because the Government has not disclosed any reliable opinion to establish Theranos did anything improper or that its practices had any impact on the adequacy and reliability of its technology.

For reasons discussed above, the Court finds that evidence regarding information Theranos allegedly withheld from doctors and patients should not be excluded for lack of expert opinion. The evidence presented is fact evidence about information Theranos disclosed and did not disclose to investors and patients.  Although the Court notes Holmes's argument that the Government cannot use this evidence to establish Theranos was violating industry standards without proper expert opinion, the jury can consider what decisions Holmes and Theranos made about certain disclosures when evaluating Holmes's intent and the alleged scheme to defraud. Thus, because the evidence will be used as fact evidence, a blanket order at this stage excluding evidence relating to withheld information is not warranted.

Accordingly, the Court **DENIES** Holmes's motion to exclude certain Rule 404(b) evidence for lack of expert support.

### P. Holmes's MIL to Exclude Evidence and Argument as to the Purported Inaccuracy or Unreliability of Tests Not Identified in the Bill of Particulars (Dkt. No. 568)

Holmes next moves to preclude the Government from introducing at trial evidence and argument regarding the purported inaccuracy and unreliability of tests not identified in the Government's Bill of Particulars.[13]  *See generally* Holmes's Mot. in Limine to Exclude Evidence and Argument by the Government as to the Purported Inaccuracy or Unreliability of Tests Not Identified in the Bill of Particulars ("Holmes 568 Mot."), Dkt. No. 568.  Holmes is not seeking a blanket ruling precluding any mention of other tests offered by Theranos that were not included in the Government's Bill of Particulars.  Holmes Reply Br. in Supp. of Holmes's 568 Mot. ("Holmes 568 Reply"), Dkt. No. 711, at 2.  Rather, for tests not listed in the Bill of Particulars, Holmes requests that the Court require the Government to provide notice of exhibits and testimony related to these unidentified tests so that any anticipated issues can be raised outside of the presence of the jury.

---

[13] The Court took the motion under submission on the papers after the parties did not request oral argument.

Recognizing that Holmes should not be forced to prepare unnecessary defenses for evidence the Government would not raise at trial, the Court ordered the Government to identify "the particular tests that the Government claims Theranos was not capable of consistently producing." Dkt. No. 330 at 16 (citing *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d. Cir. 1987)). The Government's March 2020 Bill of Particulars ("the Bill of Particulars") identified twenty-five tests. Dkt. No. 377 at 25. The TSI also listed the same twenty-five tests. TSI ¶ 16. In June 2020, however, the Government's initial exhibit list included several exhibits which addressed tests not identified in the Bill of Particulars. Holmes states that the potential evidence addressing additional unlisted tests comes in many different forms including exhibits and potential witness testimony discussing test results data, individual patient results, and reruns of certain tests. Holmes 568 Mot. at 2.

The Government responds that it has no plans to introduce evidence or argument about tests, other than those disclosed in the indictment, for the purpose of "attacking their accuracy and reliability." Gov't Opp'n to Holmes 568 Mot. ("Gov't 568 Opp'n"), Dkt. No. 664, at 2. Nevertheless, the Government argues evidence regarding additional tests is still admissible for purposes unrelated to the accuracy and reliability of those tests. *Id*. The Government explains evidence related to additional unlisted tests could be used to demonstrate the number and types of tests that Theranos offered at a given time and which devices and methods Theranos used to perform those tests. *Id*. at 3. Similarly, the Government contends that evidence referencing additional unlisted tests is relevant to the extent it shows Theranos' general practices in connection with developing, offering, conducting, and reporting results of its assays. *Id*. at 3. The Court finds that the Government should not be precluded from introducing all evidence related to additional unlisted tests. Indeed, Holmes recognizes that there may be permissible purposes for the introduction of such evidence, which still comport with the Court's Order directing a Bill of Particulars about the tests that the Government claims Theranos was not capable of consistently producing. Holmes 568 Reply at 2.

Accordingly, Holmes's motion to exclude evidence and argument regarding tests not listed in the Bill of Particulars is **GRANTED.** The Government is precluded from introducing any evidence or argument regarding the purported inaccuracy and unreliability of tests not identified in the Government's Bill of Particulars. The Government may still introduce evidence or testimony about tests not listed in the Bill of Particulars for purposes unrelated to the accuracy and reliability of those tests. The Government shall provide notice of exhibits or testimony that may involve tests not identified in the Bill of Particulars prior to their introduction so that the parties and Court can address any issues, in the context of specific evidence, outside the presence of the jury.

## IV.   GOVERNMENT'S MOTIONS IN LIMINE AND RELATED DEFENSE MOTIONS

### A.   MIL No. 1 to Preclude Defendant from Offering an Improper Defense of Blaming Her Victims and Selective Prosecution

The Government moves to preclude Holmes from offering a defense of blaming her victims for failing to exercise greater diligence in their dealings with Theranos. Gov't Mot. The Government further seeks to preclude Holmes from introducing a related defense regarding the Government's selective prosecution of Holmes and Theranos amongst a range of similar abuses perpetuated by other Silicon Valley startups. Holmes opposes both arguments asserted in the Government's motion. Holmes's Opp'n to Gov't Mots. In Limine ("Holmes Opp'n"), Dkt. No. 659. The Court addresses each argument in turn.

#### 1.   Victim blaming

The Government first argues that a fraud victim's naiveté or gullibility is not a defense to criminal charges under federal fraud statutes. According to the Government, excluding this defense is necessary to prevent distraction from the key issues of the case: "Defendant's intent to defraud and the falsity and materiality of her statements." Gov't Mot. at 1. However, Holmes argues such preclusion is overbroad because it will forestall the introduction of evidence on these very points. Holmes Opp'n at 2. Specifically, Holmes contends that evidence of circumstances surrounding a victim's engagement with Theranos directly relate to the element of "materiality" and could potentially be used for impeachment purposes.

"Materiality of falsehood" is an essential element of wire fraud.  *Neder v. United States*, 527 U.S. 1, 25 (1999).  The test to determine materiality is whether the statement "has a natural tendency to influence, or was capable of influencing, the decision of the decision-making body to which it was addressed."  *United States v. Peterson*, 538 F.3d 1064, 1072 (9th Cir. 2008) (quoting *Kungys v. United States*, 485 U.S. 759, 770 (1988)).  This is an objective test.  *Id.*

It is well settled that a victim's negligence is not a defense to wire fraud.  *United States v. Lindsey*, 850 F.3d 1009, 1015 (9th Cir. 2017).  Unlike common law fraud, reliance upon the defendant's misrepresentations has no place in criminal fraud cases.  *Neder*, 527 U.S. at 25.  Moreover, "[i]t is immaterial whether only the most gullible would have been deceived by the defendants' scheme."  *Ciccone*, 219 F.3d at 1083 (quoting *United States v. Hanley*, 190 F.3d 1017, 1023 (9th Cir. 1999)) (alteration in original).  However, evidence of the circumstances surrounding a victim's entanglement in the fraudulent scheme may be admissible for other purposes.  Indeed, documents and other information available to the parties can be useful for determining materiality.  *United States v. Bogucki*, No. 18-cr-00021-CRB-1, 2019 WL 1024959, at *4 (N.D. Cal. Mar. 4, 2019).  In *Bogucki*, the court granted defendant's Rule 29 motion for acquittal after finding no reasonable jury could find the defendant made materially false statements.  *Id.* at *7.  In reaching this decision, the court considered five pieces of evidence, including call transcripts and PowerPoint presentations.  *Id.* at *4-6.  While the *Bogucki* court ultimately found this evidence did not satisfy the materiality requirement, this highlights the necessity of evaluating the information available to victims in order to determine if the alleged false statements had the capacity to mislead.  Relatedly, as Holmes notes, a victim's knowledge of the fraud could serve as relevant impeachment evidence.  *United States v. Yang*, No. 16-cr-00334-LHK, 2019 WL 5536213, at *3 (N.D. Cal. Oct. 25, 2019).  The Court agrees that the way "victims reacted to alleged misrepresentations . . . is highly relevant to their credibility."  659 Opp'n at 2.

Based on the foregoing, the Court **GRANTS** the Government's motion to the extent Holmes attempts to utilize victim blaming as a defense.  However, the Court **DENIES** the Government's motion with respect to precluding Holmes from introducing admissible

impeachment evidence and other admissible evidence bearing on materiality.  The Court will review and hear from the parties as to any specific evidence sought to be introduced prior to its presentation during the trial.

### 2.  Selective prosecution

The Government seeks to further preclude Holmes from introducing a defense focused "on the culture of Silicon Valley startups."  Gov't Mot. at 3.  In particular, the Government asks to exclude potential evidence regarding other startup founders engaging in similar exaggerated and "dramatic promises to generate . . . capital."  *Id.*  While not entirely clear, the Government appears to assert these claims amount to an improper selective prosecution defense.  This request is overbroad.

A selective prosecution claim is an "assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution."  *United States v. Armstrong*, 517 U.S. 456, 463 (1996).  To establish a prima facie showing of selective prosecution, a defendant must establish:

> (1) that, while others similarly situated have not generally been proceeded against because of conduct of the types forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights.

*United States v. DiStefano*, 129 F. Supp. 2d 342, 347 (S.D.N.Y. 2001).

At the hearing, the Government indicated its concerns that Holmes would argue that her conduct was in line with Silicon Valley startup culture and thus she was singled out for prosecution where other entrepreneurs were not.  Holmes disavowed advancement of a selective prosecution argument at trial, and the Court takes her at her word.

The Government further expressed concern that Holmes would comment on the culture of Silicon Valley startups, including aggressive marketing or exaggeration.  The Court recognizes that evidence in this case will undoubtedly touch on the nature of startup companies, including financing, funding, industry protocols, and other issues common to the technology industry in

Silicon Valley.  The Court will permit general fair comment on the marketing of new ventures, including statements concerning investment and the nature of the firm, product, or technology.

### B.    MIL No. 2 to Preclude the Defense from Referencing Punishment in Front of The Jury

The Government moves to preclude any reference by the defense to Holmes's alleged or potential punishment during any trial stage (including jury selection, opening statements, examination of witnesses, and summation).  The Government seeks to preclude these references to punishment as irrelevant and/or unfairly prejudicial under Federal Rules of Evidence 401, 402, and 403.  The Government provides examples of both overt and subtle references to punishment that it seeks to preclude during trial.  An overt example of a reference to punishment could be "[t]he defendant is facing a prison term if convicted."  Gov't Mot. at 4.  In contrast, the Government's examples of subtler references to punishment include statements such as "the Defendant is facing a lot of time," "the case has serious consequences for the Defendant," "the Defendant's liberty is at stake in this trial," or "your decision will have consequences for a long time to come."  *Id*.  The Government maintains that once a jury is exposed to statements regarding Holmes's potential punishment or other such consequences, this information cannot be forgotten nor can the circumstances be remedied by a curative instruction.

Holmes acknowledges that would be inappropriate for her to reference any potential imprisonment before the jury.  However, she disagrees with the Government's motion to the extent it seeks to prohibit the "subtler" references to punishment that the Government has identified, such as "the case has serious consequences for the Defendant" or "the Defendant's liberty is at stake in this trial."  Holmes Opp'n at 5; Gov't Mot. at 4.

Both sides are correct.  "It has long been the law that it is inappropriate for a jury to consider or be informed of the consequences of their verdict."  *United States v. Frank*, 956 F.2d 872, 879 (9th Cir. 1992).  Any commentary to the jury on a defendant's potential penalty or punishment "draw[s] the attention of the jury away from their chief function as the sole judges of the facts, opens the door to compromise verdicts, and confuses the issues to be decided."  *United*

*States v. Olano*, 62 F.3d 1180, 1202 (9th Cir. 1995); *see also Shannon v. United States*, 512 U.S. 573, 579 (1994); *Zal v. Steppe*, 968 F.2d 924, 930 (9th Cir. 1992) (stating that any verdict "must be based on the law and evidence, not on jury nullification as urged by either litigant").

However, "[s]ubtle references such as the one mentioned above are not really referencing punishment." *United States v. Williams*, No. 3:13-cr-00764-WHO-1, 2017 WL 4310712, at *8 (N.D. Cal. Sept. 28, 2017).  In *Williams*, the court's primary focus was whether the defense should be allowed to reference the punishment of cooperating witnesses for impeachment purposes, which is not a question before this Court.  Nevertheless, *Williams* is instructive in its ruling that "defendants are precluded from referencing the particulars of any past or potential punishment in an attempt to elicit the sympathies of the jury." *Williams*, 2017 WL 4310712, at *8.  Further, the *Williams* court reasoned that some subtler references to punishment, such as stating that "this case has serious consequences for the defendant," are "not really about punishment." *Id.*

During the hearing the Court discussed the issue with counsel and granted the Government's motion from the bench.  The Court recognized, however, that comments of counsel about the serious task the jurors will undertake with this case and the opportunity to remind them of their oath to serve are appropriate.  The Court indicated it would allow Holmes to make careful, cautious, and appropriate comments when talking about the nature of the case to the jury.

The Government's MIL No. 2 to preclude the defense from referencing punishment in front of the jury is **GRANTED**.

### C.   **MIL No. 3 to Preclude an Improper Advice-Of-Counsel Defense**

The Government moves to preclude Holmes from asserting "an improper advice-of-counsel defense." Mot. at 5.  More specifically, the Government seeks to preclude both (1) testimony suggesting that attorneys made statements to Holmes or that she relied upon such statements to negate intent; and (2) a formal advice-of-counsel defense and the associated jury instruction.  *Id.*

An advice-of-counsel defense "is not regarded as a separate and distinct defense but rather as a circumstance indicating good faith which the trier of fact is entitled to consider on the issue of

fraudulent intent." *Bisno v. United States*, 299 F.2d 711, 719 (9th Cir. 1961).  In order for Holmes "[t]o qualify for an advice of counsel instruction, the defendant must show that there was full disclosure to his attorney of all material facts, and that he relied in good faith on the specific course of conduct recommended by the attorney." *United States v. Ibarra-Alcarez*, 830 F.2d 968, 973 (9th Cir. 1987).  Furthermore, when a defendant presents an advice-of-counsel defense, she waives her previous attorney-client privilege as to the communications at issue.  *See Hunt v. Blackburn*, 128 U.S. 464, 470 (1888); *see generally Bittaker v. Woodford*, 331 F.3d 715, 718 (9th Cir. 2003).

Here, the Government indicates that Holmes has provided no notice to the Government of any intent to assert an advice-of-counsel defense and that Holmes has not waived any attorney-client privilege as a prerequisite to asserting such a defense. Gov't Mot. at 5.  As such, the Government argues, it is appropriate to preclude her from asserting an advice-of-counsel defense at this stage.  *Id*.  Even in the absence of a properly asserted advice-of-counsel defense, the Government is concerned that Holmes may attempt to elicit testimony from her attorneys that suggest that they made certain statements to her upon which she detrimentally relied.  *Id*. Regardless, the overarching focus of the Government's motion is to preclude any defense efforts to elicit statements by attorneys, made to the Holmes or other Theranos employees, as evidence negating Holmes's allegedly fraudulent intent.  *Id*. at 5–6.

Holmes contends that barring an advice-of-counsel defense long before proposed jury instructions are due and before the Government presents its case-in-chief is premature.  Holmes Opp'n at 6.  She also suggests that much of Theranos' dealings with its many attorneys will likely be highly relevant to the Government's case and thus it would be improper to preclude all testimony by Holmes or others concerning statements attorneys made to them.  *Id*.  Holmes additionally notes that the Government has indicated its intent to introduce evidence of certain nonprivileged attorney-client communications, and therefore it would be inappropriate to preclude Holmes from commenting on statements her attorneys may have made to her.  *Id*.  In response, the Government states that it is concerned only with statements made by attorneys used as evidence to

negate intent.  United States' Reply in Support of its Mots. In Limine ("Gov't Reply") at 3, Dkt. No. 726.

The Court finds that ruling on this motion would be premature at this juncture.  Holmes will have an opportunity to defend herself against the Government's allegations with appropriate legal theories and within the confines of the law.  Prior to invoking an advice-of-counsel defense, however, Holmes must establish the foundational prerequisites for the advice-of-counsel defense, namely: (1) waiver of the applicable attorney-client privilege, (2) demonstrating that there was a full disclosure to her attorney of all material facts, (3) and that she relied in good faith on the specific course of conduct the attorney recommended.

For the reasons stated above and at the hearing, the Government's MIL No. 3 is **DEFERRED**.

### D. MIL No. 4 to Preclude a Defense Argument That the Government's Charging Decisions Were Influenced by Coordination with Journalists or Competitors

The Government seeks to preclude Holmes from arguing that its charging decisions were influenced by "coordination" with journalists or competitors.  Gov't Mot. at 6.  In particular, the Government seeks to preclude any argument that its investigation or charging decisions were unduly influenced by the input of other lab testing companies, such as Quest or LabCorp, or journalists, such as John Carreyrou.  First, the Government argues that there is no factual basis for such an argument because it did not actually coordinate with any lab testing companies or journalists.  Specifically, the Government represents that no attorney or agent on the prosecution team has ever had a substantive conversation with Quest, LabCorp, or Mr. Carreyrou in connection with this case.  Second, the Government argues that any evidence regarding its charging decisions is irrelevant under Federal Rule of Evidence 402.

In response, Holmes contends the Government's investigatory process is relevant and should be presented to the jury.  According to Holmes, "'media attention' related to Mr. Carreyrou's back-channel communications with CMS about Theranos caused CMS to use different procedures for surveying Theranos than it normally would have used."  Holmes Opp'n at

8 (citing Saharia Decl., Ex. 34 at 3).  The FDA's interview report with CMS employee Sarah

Bennett recounted Ms. Bennett's explanation:

> Normally, re-certification surveys are conducted by the state agency,
> but because of the media attention associated with Theranos, the
> decision was made to send [CMS employee Gary] Yamamoto and
> Bennett.  John Carreyou [sic] (a reporter for the Wall Street
> Journal) had been in contact with CMS about an article he was
> writing on Theranos. Carreyou [sic] talked to Dyer about the
> article.  He has never spoken with Bennett.  The CMS regional
> office conducts federal jurisdictional surveys. . . . Bennett was a
> natural to ask to do the survey because she has survey experience,
> and she had done it twice before.

*Id.* at 3.  Relying exclusively on Bennett's explanation above, Holmes contends that "[t]he

existence of secret communications between Carreyou and government investigators undoubtedly

bears on the 'quality of the investigation' on which the government developed its case."  Holmes

Opp'n at 8.

Evidence regarding the Government's investigation may be relevant and admissible at trial.

*United States v. Sager*, 227 F.3d 1138, 1145 (9th Cir. 2000).  For example, "[d]etails of the

investigatory process potentially affect[] [the investigating agent's] credibility and, perhaps more

importantly, the weight to be given to evidence produced by his investigation."  *Id.*; *see also*

*United States v. Howell*, 231 F.3d 615, 625 (9th Cir. 2000) (explaining utility of evidence that

"raises[s] the opportunity to attack the thoroughness, and even good faith, of the investigation").

Here, the Government does not seek exclusion of evidence regarding the investigatory

process.  Instead, the Government seeks only to exclude a defense argument that its charging

decisions were influenced by "coordination" with journalists or competitors.  The only evidence of

"coordination" Holmes proffers is Bennett's interview with the FDA.  Bennett's interview,

however, is not evidence of "coordination" with journalists or competitors.  Instead, Bennett

explains that a reporter contacted CMS, and that the decision was made to have two CMS

employees conduct the certification survey rather than the state agency.  In the absence of

evidence of actual coordination, neither *Sager* nor *Howell* support Holmes's position.  In *Sager*,

the defense sought to question the Postal Inspector about "aspects of his investigation" into

possible fraudulent charges on a credit card issued to Trevor Post ("Post"). *Sager*, 227 F.3d at 1143. The trial judge interrupted defense counsel and questioned the relevance of the cross-examination and eventually instructed the jury: "What I am telling you is that you are not here to grade his investigation. You are here to grade the product of that investigation, that is, the evidence." *Id.* The Ninth Circuit held that the trial court committed error, reasoning that "[t]o tell the jury that it may assess the product of an investigation, but that it may not analyze the quality of the investigation that produced the product, illogically removes from the jury potentially relevant information." *Id.* at 1145. In the present case, however, precluding Holmes from arguing that there was no "coordination" based on Bennett's interview with the FDA will not remove from the jury potentially relevant information.

In *Howell*, the defendant claimed that the prosecutor's failed to inform the defense of material mistakes in two police reports. *Howell*, 231 F.3d at 623–24. On appeal, the *Howell* court rejected the government's contention that it had no duty to disclose the mistake to the defense. *Id.* at 625. Here, in contrast, the Government is not seeking to exclude evidence of any mistake in the investigation.

The Government's MIL No. 4 to exclude the defense's argument that the charging decisions were influenced by "coordination" with journalists or competitors is **GRANTED**. Nothing in this Order is intended to preclude Holmes from presenting evidence or argument regarding the details, thoroughness, or good faith of the criminal investigation.

### E.   MIL No. 5 to Preclude Defendant From Presenting an Improper Good Faith Defense

The Government next moves to preclude Holmes from "presenting an improper good faith defense." Gov't Mot. at 7–8. In its motion, the Government notes the following:

> [Holmes] might attempt to present evidence or argument that she should be acquitted because she acted in good faith. Defendant might claim, despite her deception of investors, that she always intended to make those victims' investments profitable, such that the victims would suffer no loss when all was said and done.

*Id.* at 7. The Government argues that "[this] argument—and any argument along those lines—

should be barred, as they do not constitute recognized legal defenses to charges and are therefore improper and irrelevant." *Id.* (citing *United States v. Benny*, 786 F.2d 1410, 1417 (9th Cir. 1986) ("While an honest, good-faith belief in the truth of the misrepresentations may negate intent to defraud, a good-faith belief that the victim will be repaid and will sustain no loss is no defense at all"); *United States v. Hickey*, 580 F.3d 922, 931 (9th Cir. 2009)).

In opposition, Holmes states that "[t]he law of this Circuit draws a distinction between a good-faith belief in the truth of a misrepresentation (which can negate fraudulent intent) and a good-faith belief that a knowingly fraudulent scheme will eventually lead to a favorable outcome for the victim." Holmes Opp'n at 8 (comparing *United States v. Ghilarducci*, 220 F. App'x 496, 501 (9th Cir. 2007) (as an example of the former), with *Tijani v. Holder*, 628 F.3d 1071, 1077 (9th Cir. 2010) (as an example of the latter)). Holmes argues the Government's request "would be overly broad and would conflate the two [different kinds of] good-faith arguments." *Id.* at 9. Holmes cites to *United States v. Barreiro*, where the court denied a similar motion to preclude the defendants' good-faith defense argument, stating that "[the defendants] [were] entitled to argue that they lacked intent to defraud because they believed, in good faith, that any alleged misrepresentations were true and that [the alleged scheme] was a legitimate business." No. 13-CR-00636-LHK, 2015 WL 7734139, at *1 (N.D. Cal. Dec. 1, 2015) (citation omitted).

The Government states it is not attempting to preclude Holmes from arguing that she had a good-faith belief that her alleged misrepresentations were true. *See* Gov't Reply at 5–6 ("An argument that [Holmes] thought she was telling the truth is obviously permissible. . . . The [G]overnment fully expects that [Holmes] will deny intentionally misleading victims regarding the achievements of Theranos").

The Court agrees with the Government (and with Holmes) that a defendant may not provide as a defense the argument that the defendant knowingly made false misrepresentations but nevertheless had a good-faith belief that the defendant's victims would be repaid or otherwise suffer no harm. *See Benny*, 786 F.2d at 1417. *Barreiro* is inapposite because in that case the court denied a motion to preclude the argument that "[the defendants] thought that they were acting

lawfully." *Barreiro*, 2015 WL 7734139, at *1.  Here, the Government's motion is not as broad, and seeks to preclude only the argument that Holmes knowingly made misrepresentations but had a good-faith belief that her alleged victims would be repaid or otherwise suffer no harm.

For the reasons above, the Court **GRANTS** the Government's MIL No. 5 to preclude Holmes from presenting an improper good faith defense outside of Ninth Circuit precedent.

### F.   MIL No. 6 to Admit CMS's January 26, 2016 Form CMS-2567, Statement of Deficiencies

The Government seeks to admit CMS Form CMS-2567, dated January 26, 2016, which lists the deficiencies observed during CMS's September 2015 recertification and survey of Theranos' Newark laboratory.  Gov't Mot. at 8–10.  As described above concerning Holmes's MIL to exclude evidence of the CMS survey findings, the Court GRANTS the Government's MIL No. 6 to admit the CMS January 2, 2016 Form CMS-2567, Statement of Deficiencies.  *See supra* Section III.C.

### G.   MIL No. 7 to Admit Text Messages Between Holmes and Balwani Offered by The Government

The SEC conducted a parallel investigation into Theranos.  On September 6, 2016, the SEC issued a subpoena to Theranos requesting production of communications between Holmes and Balwani beginning January 1, 2010.  Nov. 20, 2020 Decl. of AUSA Robert S. Leach in Support of United States' Mots. in Limine ("Leach Decl."), Dkt. No. 588-1, Ex. F.  On July 7, 2017, an attorney from Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale"), who represented Theranos at the time, produced to the SEC a document Bates-numbered TS1036239 through TS1036827 (the "SEC Spreadsheet"), which he represented to be "a spreadsheet containing business-related text messages, iMessages, and Skype exchanges between Elizabeth Holmes and Sunny Balwani."  *Id*, Ex. G.  On July 11 and 13, 2017, Holmes testified under oath before the SEC.  During her testimony, the SEC Spreadsheet was marked as an exhibit and the following exchange occurred:

> Q   Exhibit 221 purports to be an Excel file that includes a number

of rows of font.  The starting Bates number is TS-1036239.  Have you seen Exhibit 221 before?

A        I think I've seen some of the content in it.  I've never seen it like this.

Q        Does this – I'll represent to you that these are – this is the file that Theranos provided to the SEC pursuant to subpoena which is supposed to reflect the text messages between you and Mr. Balwani on your Theranos-issued cell phone.

A        Yep.

Q        Do you have any reason to believe that this isn't a true collection of those text messages from your work cell phone?

A        No.

*Id.*, Ex. H ("SEC Testimony") at ECF p. 13 (SEC Testimony 376:4-19).  Subsequently, a second WilmerHale attorney submitted to the SEC a declaration under penalty of perjury certifying records of regularly conducted activity, which stated: "I certify that the document produced at TS-1036239 through TS-1036827 is a spreadsheet containing Theranos business-related text messages, iMessages, and Skype exchanges between Ms. Holmes and Mr. Balwani.  These messages and exchanges were sourced from images taken of Ms. Holmes'[s] business phones, as well as messaging applications on Ms. Holmes' computer."  Leach Decl., Ex. I.

On November 7, 2017, in response to a grand jury subpoena, WilmerHale produced to the FBI a document Bates-numbered THER-2566547 through THER-2567135 (the "DOJ Spreadsheet"), which WilmerHale represented to be "a spreadsheet reflecting text messages sent to and from Elizabeth Holmes and Ramesh Balwani as collected from Elizabeth Holmes's Company-issued devices.  These text messages were originally produced at TS-1036239 through TS-1036827 and are being reproduced today with revised redactions pursuant to the guidelines discussed on our October 2, 2017 call with Mr. Schenk and Mr. Bostic."  *Id.*, Ex. K.  The DOJ Spreadsheet generally has fewer redactions from the SEC Spreadsheet.

The Government now seeks an order admitting portions of the SEC and DOJ Spreadsheets containing certain text messages between Holmes and Balwani.  The Government references six specific excerpts and requests that the Court admit "any similar ones offered by the government"

as well.  Gov't Mot. at 11–14.  At the May 6, 2021 hearing, the Government clarified that it was not seeking a blanket order admitting the entirety of both spreadsheets but anticipates introducing additional excerpts as they become relevant at trial.  Holmes objects to admission of the excerpted spreadsheets on the grounds that neither their relevance nor their authenticity can be determined at this stage.  Holmes Opp'n at 13.

### 1.  Relevance

The Government seeks to introduce six excerpts from between November 2013 and October 2015.  These dates correlate to key events at Theranos within the charging period, about which the Government plans to introduce other evidence.  For example, the Government seeks to introduce an excerpt from November 19, 2014, which was around the time Theranos' former lab director, Dr. Adam Rosendorff, expressed his misgivings about the company and was eventually terminated.  *See* Gov't 575 Opp'n at 3–4 (explaining that Dr. Rosendorff told Holmes on November 14, 2014 that he felt "really uncomfortable with . . . what is happening right now in this company . . . I am feeling pressured to vouch for results that I cannot be confident in.").  In the text exchange days later, Mr. Balwani wrote a number of texts to Holmes generally relating to the "lab" and leadership of the lab (e.g., "Need to focus on op. Getting hurt in market"; "Lab . . . need[s] director level people"; "We need[ t]he lab and call center fixed"; and "New lab dirs., lab manager like Tracy").  Holmes expressed agreement (e.g., "Fundamentally we need to stop fighting fires by not creating them . . . Need to fix root cause here . . . Yes . . . Exactly").  Likewise, the November 28, 2014 texts (including Mr. Balwani's statement that the "Normandy lab is a fucking disaster zone") were close in time to Dr. Rosendorff's departure.  Given the temporal proximity of the messages to the events involving Dr. Rosendorff, and the centrality of those events to the Government's case, the Court finds this excerpt relevant.

Each of the remaining excerpts are similarly correlated to key events at issue in this case, or else are on their face plainly relevant to Holmes's knowledge.  Holmes did not raise specific relevance objections to any particular excerpts at the hearing.  The Court, therefore, finds that the excerpts provided are relevant to show, at a minimum, Holmes's knowledge.

### 2.  Authenticity

"To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a); *see United States v. Aldaco-Lopez*, 956 F.2d 1168 (9th Cir. 1992).  The Government need only make a prima facie showing of authenticity "so that a reasonable juror could find in favor of authenticity or identification."  *United States v. Blackwood*, 878 F.2d 1200, 1202 (9th Cir. 1989) (per curiam) (quoting *United States v. Black*, 767 F.2d 1334, 1342 (9th Cir. 1985), *cert. denied*, 474 U.S. 1022 (1985) (quoting 5 J. Weinstein & M. Merger, Weinstein's Evidence, ¶ 901(a) [01] at 901–16 to –17 (1983)).

The Government argues that there is sufficient evidence to support a finding that the spreadsheets are in fact compilations of messages between Holmes and Balwani from Holmes's Theranos-issued devices because (1) it was Holmes's counsel that produced the spreadsheets to the SEC and DOJ, attesting to their authenticity; and (2) Holmes did not challenge the authenticity of the spreadsheets at her SEC deposition.

Holmes argues that WilmerHale did not represent Ms. Holmes in her personal capacity, rather, it represented Theranos as corporate counsel.  The transcript of Holmes's SEC deposition testimony shows that there were two sets of outside counsel present at the deposition: counsel from Cooley LLP, who represented "Ms. Holmes in all capacities," and counsel from WilmerHale, who represented "the company and Ms. Holmes as CEO."  Leach Decl., Ex. H at ECF p. 5 (SEC Testimony at 12:8-13:19).  While there is some ambiguity about the extent of WilmerHale's representation of Theranos and Holmes "as CEO," the Court is not prepared to interpret WilmerHale's production of the spreadsheets as an admission from Holmes that they are authentic.  Indeed, Holmes indicated in her SEC deposition testimony that she had never seen the spreadsheets before.

Holmes further argues that because WilmerHale did not represent her in a personal capacity, the certifications of the spreadsheets and the cover letters accompanying the productions are inadmissible hearsay and therefore cannot be used to authenticate the spreadsheets.  The Court

agrees.  Because the spreadsheets contain data from multiple devices compiled by attorneys with the ability to select and redact material at will, the Court finds that the documents require authentication.  Without some admissible evidence explaining how the spreadsheets were compiled, the Court cannot determine authenticity at this stage.  The Court notes, however, that the burden on the Government to produce such evidence is slight.  *United States v. Whitworth*, 856 F.2d 1268, 1282–83 (9th Cir. 1988) ("Evidence is admissible under Rule 901(a) once a prima facie case has been made on the issue").  Once a prima facie case has been made, "the matter is committed to the trier of fact to determine the evidence's credibility and probative force."  *Id.*

Accordingly, the Court **DENIES** the Government's MIL No. 7 without prejudice.  The Government may renew its motion upon its introduction of additional evidence as to authenticity.

### H.   MIL No. 8 to Admit Statements By Theranos And Theranos Employees And Agents Offered by The Government

In MIL No. 8, the Government moves to admit two categories of statements.  First, the Government moves to admit against Holmes "relevant statements by Theranos agents and employees on matters within the scope of that relationship and while it existed," asserting that these statements are admissible under Federal Rule of Evidence 801(d)(2)(D).  Gov't Mot. at 17. Second, the Government moves to admit against Holmes "statements by Theranos that she authorized or manifested that she adopted or believed to be true," namely interrogatory responses that Theranos made in civil litigation.  The Government contends that the interrogatory responses are admissible under Federal Rule of Evidence 801(d)(2)(B) and (C).  *Id.*

The Federal Rules of Evidence define hearsay as: "(A) statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801(c).  Federal Rule of Evidence 801(d)(2) excludes from the hearsay definition (and thus the rule against hearsay) statements offered against an opposing party and  (A) made by the party in an individual or representative capacity; (B) one the party manifested that it adopted or believed to be true; (C) made by a person whom the party authorized to make a statement on the subject; (D) made by the party's agent or employee on a matter within

the scope of that relationship and while it existed; or (E) made by the party's coconspirator during and in furtherance of the conspiracy.  Fed R. Evid. 801(d)(2) & 802.

Here, the Government relies on Rule 801(d)(2)(D) to seek admission of statements by Theranos agents and employees.  In *United States v. Kirk*, 844 F.2d 660 (9th Cir. 1988), the government charged the founder of a time share venture with conspiracy, wire fraud, and other offenses.  Defendant Kirk "ran the day-to-day operations" and exercised "control over the time share scheme." *Id.* at 661.  On appeal, the defendant argued, among other things, that the district court erred in admitting hearsay testimony of the company's salespeople.  The Ninth Circuit concluded that the statements were admissible as nonhearsay statements of agents or employees under Fed. R. Evid. 801(d)(2)(D).  *Id.* at 663.  Similarly, in *United States v. Gibson*, 690 F.2d 697, 699 (9th Cir. 1982), the government brought mail fraud, wire fraud, and other charges against Gibson, the founder, sole shareholder, chairman, and president of Gibson Marketing International, Inc. ("GMI"), which sold franchises and franchise distributorship rights.  *Id.* at 697.  At trial, the government introduced evidence of statements by GMI employees and salesmen against Gibson.  On appeal, the Ninth Circuit found no error in admitting the statements. The Ninth Circuit held that testimony by investors as to statements made by GMI employees were not hearsay, and even if the testimony did fall within the hearsay definition, the testimony was admissible under either Rule 801(d)(2)(D) (statements by an agent) or Rule 801(d)(2)(E) (statements by a co-conspirator). *Id.* at 701.

Although *Kirk* and *Gibson* support the Government's position, it is premature for the Court to issue a categorical ruling admitting any and all testimony of Theranos agents and employees on matters within the scope of that relationship and while it existed.  Under general agency principles, Theranos employees were not Holmes's agents; they were Theranos' agents.  *See Boren v. Sable*, 887 F.2d 1032 (10th Cir. 1989) (an employee's "mere occupation of a subordinate position in the corporate chain of command" is sufficient to establish an "agency relationship" for the purpose of admission under Rule 801(d)(2)).  The Government does not cite, and this Court is unaware of, any case supporting the admission of the statements of hundreds of employees to a corporate CEO

under Rule 801(d)(2)(D).  Moreover, in *United States v. Bonds*, 608 F.3d 495, 504 (9th Cir. 2010), the Ninth Circuit instructed that to determine whether statements are admissible under Rule 801(d)(2)(D), a court must "undertake a fact-based inquiry applying common law principles of agency." *NLRB v. Friendly Cab Co., Inc.*, 512 F.3d 1090, 1096 (9th Cir. 2008); *see also U.S. v. Agne*, 214 F.3d 47, 54–55 (1st Cir. 2000) ("Whether the statements of a corporate employee may be admitted against a corporate officer depends upon the relationship between the employee and the officer; 'if the factors which normally make up an agency relationship are present the evidence should not be excluded simply because the statement is offered against a corporate officer, rather than the corporation.'").  Under common law principles of agency, an agent is one who "act[s] on the principal's behalf and subject to the principal's control." *Bonds*, 608 F.3d at 506 (quoting Restatement (Third) Agency § 1.01).  "To form an agency relationship, both the principal and the agent must manifest assent to the principal's right to control the agent. *Id.*  The Government has not attempted to make this showing for all of the hundreds of Theranos employees.

As to the interrogatory responses, the Government specifically seeks admission of Theranos' admissions that:  Theranos earned less than $500,000 from blood testing revenue from 2013 to 2015; that its contracts with the Department of Defense were limited to three agreements producing de minimus revenue; that it modified third-party analyzers in order to process blood tests; that only 12 tests were ever run on a Theranos-manufactured device in its clinical lab; and that Theranos ceased all testing on Theranos-manufactured devices by June 2015.  *See* Leach Decl., Ex. P at 35–38, Ex. Q at 22–24, 36-39, at Ex. R 22–23.  These admissions were made by Theranos in a prior civil suit, *Partner Investments v. Theranos*, C.A. No. 12816-VCL.  *Id.*, Exs. P, Q, R.  The Government contends that the interrogatory responses are admissible under Rule 801(d)(2)(B) and (C) on the theory that Holmes authorized her company's interrogatory responses and manifested that she adopted or believed them to be true.  The Government reasons that "Holmes was a co-defendant in the lawsuit at the time the statements were made and her own interrogatory responses made reference to Theranos' statements (*see, e.g.*, Leach Decl., Ex. N at 16–18)—compelling the inference that she authorized her company's statements and manifested

that she adopted or believed them to be true."  Gov't Mot. at 17.

The Government has presented some evidence tending to show Holmes authorized Theranos' interrogatory responses in the *Partner Investments* suit and manifested that she adopted or believed them to be true.  Specifically, during her deposition in a separate suit brought by the SEC, Holmes was shown Theranos' interrogatory responses, and conceded "I certainly was engaged with our legal team on responding to them" and added "I'm sure I talked with our team about them."  Feb. 16, 2021 Decl. of AUSA Robert S. Leach in Supp. of United States' Reply in Supp. of its Mot. in Limine, Dkt. No. 727, Ex. U at 143; *id.* at 149 ("I worked with our legal teams as we worked to respond to PFM").  Holmes's involvement in preparing Theranos' interrogatory responses in the SEC litigation is circumstantial evidence that she was also involved in and authorized preparing Theranos' responses in the *Partner Investments* litigation.  However, this proffered evidence, without more, is insufficient to support admission of the under Rule 801(d)(2)(B) and (C).

The Government next contends that Holmes's "coordination with Theranos" and the repeated cross-references to Theranos' responses in her own interrogatory responses that give rise to the inference that she knew of and approved Theranos' responses.  Gov't Reply at 13.  However, as Holmes points out, she and Theranos were represented by separate counsel in the *Partner Investments* litigation and prepared separate responses to interrogatories.  The cross-referencing tends to show some coordination, but is no basis to conclude that Holmes adopted all of Theranos' responses.

The Government also relies on the fact that Theranos' interrogatory responses were signed by Holmes's brother and some of the most senior officers of the company whom she supervised.  Familial status is not enough to show Holmes authorized her brother's responses.  Furthermore, at present, there is no evidence whatsoever that Holmes authorized her brother or the other senior officers to prepare the company's interrogatory responses.

The Government's MIL No. 8 is **DEFERRED** pending the Government's establishment of the necessary foundation for the evidence it seeks to introduce.

I.   **MIL No. 9 to Exclude Self-Serving Hearsay Statements Made And Offered By Holmes**

The Government represents that through its investigation, it "has collected extensive evidence of previous statements by Defendant regarding Theranos' technology, business relationships, financial health, regulatory status, and other key topics," which the Government will seek to introduce at trial. Gov't Mot. at 17. The Government now moves to prevent Holmes from similarly introducing "witness testimony or direct evidence of self-serving statements she has made to the press, to victims, or in her testimony to the SEC." *Id.* at 18.

Holmes argues that this motion is premature because the Government has not identified any particular statements that it seeks to exclude, and because the admissibility of Holmes's out-of-court statements will necessarily depend on the purpose for which they are offered at trial. Holmes Opp'n at 19. Holmes also argues that certain of her hearsay statements may be admissible under the common law rule of completeness or Federal Rule of Evidence 106.

Under Federal Rule of Evidence 801(d)(2)(A), an out-of-court statement is admissible if (1) made by the defendant and (2) offered against the defendant. Fed. R. Evid. 801(d)(2)(A); *see also United States v. Pelisamen*, 641 F.3d 399, 410 (9th Cir. 2011) (defendant's own statements made during television interview admissible over hearsay objection). It is also well-settled that a defendant may not "place [her] exculpatory statements before the jury without subjecting [herself] to cross-examination." *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000) (affirming exclusion of defendant's "non-self-inculpatory" statements as hearsay).

The Court agrees with the Government that Rule 801(d)(2)(A) applies only to party-opponent statements and that under *Ortega*, Holmes is not permitted to introduce exculpatory statements without testifying in court. At the hearing, Holmes represented that she understood and would adhere to this rule. *See* May 6, 2021 Hr'g Tr., Dkt. No. 794, at 4:14-5:2 ("We agree with your honor that *Ortega* implements Rule 801 which prohibits us from introducing Ms. Holmes'[s] statements if they are hearsay . . . of course, we intend to comply with *Ortega*.").

Accordingly, bearing in mind *Ortega* and other Ninth Circuit precedent, the Court will not rule at this time that all of Holmes's out-of-court statements are inadmissible hearsay. "The

admissibility of a particular statement depends on the content of the statement and the purpose for which the party seeks to introduce that statement into evidence." *Yang*, 2019 WL 5536213, at *4. Without additional context, the Court cannot say that a currently unidentified out-of-court statement by Holmes would be hearsay, let alone that an exception to hearsay does not apply. For the same reason, the Court defers addressing Holmes's arguments regarding the rule of completeness or Federal Rule of Evidence 106 until the Court has before it particular statements and context to consider.

Accordingly, the Court **GRANTS** the Government's motion (to the extent that Holmes's out-of-court statements are inadmissible for the reasons stated in Rule 801 and *Ortega*). The Government may object in due course to specific evidence submitted at trial. Holmes shall provide the Government and Court fair warning when she believe the issue is about to arise at trial, so the Court can then address the issue outside the presence of the jury.

### J. MIL No. 10 to Admit Relevant Testimony From 'Non-Paying' Patient Witnesses (Dkt. No. 588)

Testimony from non-paying patient witnesses concerning their experience with Theranos testing is relevant and admissible for the reasons described above with respect to Holmes's MIL to exclude anecdotal evidence of test results. *See supra* Section III.H.1. Accordingly, the Court **GRANTS** the Government's MIL No. 10. Patients, physicians, and other witnesses who may testify about receiving test results will not be permitted to testify about any physical, financial, or emotional harm they may have experienced beyond simply paying for the test.

### K. MIL No. 11 to Order Defendant to Produce Reverse *Jencks* Including Any *in Camera* Proffers

The Government asks the Court to order Holmes to produce witness statements under Rule 26.2(a) of the Federal Rules of Criminal Procedure. During the May 6, 2021 hearing, Holmes represented that the Rule 26.2(a) materials were produced that morning. The Government's MIL

///

///

///

No. 11 is **DEEMED MOOT**.

**IT IS SO ORDERED.**

Dated:  May 21, 2021

EDWARD J. DAVILA
United States District Judge

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 17, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Amy Mason Saharia*
AMY MASON SAHARIA

April 17, 2023