No. 22-10312

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ELIZABETH A. HOLMES

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 5:18-CR-00258
Hon. Edward J. Davila

---

## EXCERPTS OF RECORD
## VOL. III of LVII | ER-501 to ER-799

---

JOHN D. CLINE
LAW OFFICE OF JOHN D. CLINE
  600 Stewart Street
  Suite 400
  Seattle, WA 98101
  (360) 320-6435

KEVIN M. DOWNEY
LANCE A. WADE
AMY MASON SAHARIA
KATHERINE A. TREFZ
WILLIAMS & CONNOLLY LLP
  680 Maine Ave. S.W.
  Washington, D.C. 200024
  (202) 434-5000
  asaharia@wc.com

1

1

2                   UNITED STATES DISTRICT COURT

3                  NORTHERN DISTRICT OF CALIFORNIA

4                      SAN JOSE DIVISION

5

      UNITED STATES OF AMERICA,          )
6                                        )   CR-18-00258-EJD
                      PLAINTIFF,         )
7                                        )   SAN JOSE, CALIFORNIA
              VS.                        )
8                                        )   MARCH 17, 2023
      ELIZABETH A. HOLMES,               )
9                                        )   PAGES 1 - 63
                      DEFENDANT.         )
10    _____   )

11

                      TRANSCRIPT OF PROCEEDINGS
12             BEFORE THE HONORABLE EDWARD J. DAVILA
                    UNITED STATES DISTRICT JUDGE
13

14    A P P E A R A N C E S:

15    FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                             BY:  JOHN C. BOSTIC
16                                JEFFREY B. SCHENK
                             150 ALMADEN BOULEVARD, SUITE 900
17                           SAN JOSE, CALIFORNIA 95113

18                           BY:  ROBERT S. LEACH
                                  KELLY VOLKAR
19                           1301 CLAY STREET, SUITE 340S
                             OAKLAND, CALIFORNIA 94612

20            (APPEARANCES CONTINUED ON THE NEXT PAGE.)

21

      OFFICIAL COURT REPORTER:
22                           IRENE L. RODRIGUEZ, CSR, RMR, CRR
                             CERTIFICATE NUMBER 8074
23

24       PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
              TRANSCRIPT PRODUCED WITH COMPUTER
25

1    A P P E A R A N C E S: (CONT'D)

2

3    FOR DEFENDANT HOLMES:   WILLIAMS & CONNOLLY LLP
                             BY:  KEVIN M. DOWNEY
4                                 LANCE A. WADE
                                  AMY SAHARIA
5                                 KATHERINE TREFZ
                                  PATRICK LOOBY
6                            725 TWELFTH STREET, N.W.
                             WASHINGTON, D.C. 20005
7

8    U.S. PROBATION:         BY:  KYLE POLLAK
     (TELEPHONICALLY)
9

10   ALSO PRESENT:           FEDERAL BUREAU OF INVESTIGATION
                             BY:  CHRISTOPHER MCCOLLOW
11
                             OFFICE OF THE U.S. ATTORNEY
12                           BY:  MADDI WACHS, PARALEGAL
                                  SARAH SLATTERY
13

14

15

16

17

18

19

20

21

22

23

24

25

3

|  |  |  |
|--|--|--|
|  | 1 | SAN JOSE, CALIFORNIA                    MARCH 17, 2023 |
|  | 2 | P R O C E E D I N G S |
|  | 3 |  |
| 10:10AM | 4 | (COURT CONVENED AT 10:10 A.M.) |
| 10:10AM | 5 | THE COURT:  THIS IS 18-258, UNITED STATES VERSUS |
| 10:10AM | 6 | ELIZABETH HOLMES. |
| 10:10AM | 7 | LET ME FIRST CAPTURE THE APPEARANCE OF THE PARTIES, |
| 10:10AM | 8 | PLEASE. |
| 10:10AM | 9 | WHO APPEARS FOR THE GOVERNMENT? |
| 10:10AM | 10 | MS. VOLKAR:  GOOD MORNING, YOUR HONOR. |
| 10:10AM | 11 | KELLY VOLKAR ON BEHALF OF THE UNITED STATES. |
| 10:10AM | 12 | I'M JOINED AT COUNSEL TABLE BY ROBERT LEACH, JOHN BOSTIC, |
| 10:10AM | 13 | AND JEFF SCHENK. |
| 10:10AM | 14 | THE COURT:  THANK YOU.  GOOD MORNING. |
| 10:10AM | 15 | MS. VOLKAR:  GOOD MORNING. |
| 10:10AM | 16 | THE COURT:  AND FOR THE DEFENDANT? |
| 10:10AM | 17 | MS. SAHARIA:  GOOD MORNING, YOUR HONOR. |
| 10:10AM | 18 | AMY SAHARIA FOR MS. HOLMES.  WITH ME AT COUNSEL TABLE IS |
| 10:10AM | 19 | KEVIN DOWNEY, LANCE WADE, KATIE TREFZ, AND PATRICK LOOBY. |
| 10:10AM | 20 | MS. HOLMES IS PRESENT. |
| 10:10AM | 21 | THE COURT:  THANK YOU. |
| 10:10AM | 22 | MS. SAHARIA:  AND FOR THE COURT'S AWARENESS, |
| 10:10AM | 23 | MR. LEACH WILL BE ADDRESSING RESTITUTION, AND THEN I WILL BE |
| 10:10AM | 24 | ADDRESSING THE MOTION FOR RELEASE. |
| 10:10AM | 25 | THE COURT:  THANK YOU VERY MUCH.  GOOD MORNING |

4

10:10AM 1    EVERYONE.

10:10AM 2        WHAT I THOUGHT I WOULD LIKE TO DO IS TO DO THE RESTITUTION

10:11AM 3    DISCUSSION FIRST, PLEASE, IF WE COULD DO THAT.

10:11AM 4        AND THEN WE WOULD MOVE TO THE OTHER, THE OTHER MOTION

10:11AM 5    ABOUT RELEASE, MS. SAHARIA, IF THAT'S OKAY WITH YOU?

10:11AM 6            MS. SAHARIA:  YES, THAT'S FINE, YOUR HONOR.

10:11AM 7            THE COURT:  GREAT.  LET'S DO THAT.

10:11AM 8        LET'S HEAR ABOUT RESTITUTION FIRST.  MR. LOOBY, IT'S NICE

10:11AM 9    TO SEE YOU AGAIN.

10:11AM 10           MR. LOOBY:  VERY GOOD TO BE BACK.

10:11AM 11           THE COURT:  I BEG YOUR PARDON, LET ME ALSO INTRODUCE

10:11AM 12   MR. POLLAK.  YOU'RE HERE FROM PROBATION, AND YOU'RE APPEARING

10:11AM 13   TELEPHONICALLY?

10:11AM 14           PROBATION OFFICER:  YES, YOUR HONOR.

10:11AM 15       KYLE POLLAK FOR U.S. PROBATION.

10:11AM 16           THE COURT:  THANK YOU.  THANK YOU VERY MUCH.

10:11AM 17       LET ME TURN TO THE GOVERNMENT FIRST AS TO RESTITUTION.

10:11AM 18           MR. LEACH:  GOOD MORNING, YOUR HONOR.

10:11AM 19       ROBERT LEACH FOR THE UNITED STATES.

10:11AM 20       I'M PLEASED TO RESPOND TO ANY QUESTIONS THAT THE COURT

10:11AM 21   HAS.  I THINK THE FUNDAMENTAL POINT I WANTED TO MAKE AND WHICH

10:11AM 22   WE MADE AT MR. BALWANI'S RESTITUTION HEARING IS THAT

10:11AM 23   RESTITUTION IS MANDATORY UNDER THE MVRA, RESTITUTION IS

10:12AM 24   DIFFERENT FROM LOSS FOR PURPOSES OF THE SENTENCING GUIDELINES.

10:12AM 25   THE DEFINITION OF RESTITUTION, WHICH I DON'T THINK THE

5

10:12AM 1    DEFENDANT ADDRESSES OR DISPUTES IN HER RESPONSE TO THE

10:12AM 2    GOVERNMENT'S SUBMISSION, IS TO MAKE THE DEFENDANTS WHOLE AND TO

10:12AM 3    PUT THEM IN THE POSITION THAT THEY WERE BEFORE THE FRAUDULENT

10:12AM 4    CONDUCT.  AND FOR THE REASONS SET FORTH IN OUR BRIEF, WE

10:12AM 5    BELIEVE THE APPROPRIATE AMOUNT OF RESTITUTION IS THE ENTIRE

10:12AM 6    AMOUNT OF THE C1 AND C2 INVESTMENTS.

10:12AM 7        AT A MINIMUM, IT SHOULD BE FOR THE INVESTORS WHO THE COURT

10:12AM 8    FOUND SUFFICIENT FOR LOSS PURPOSES AND THE TOTAL AMOUNT THAT

10:12AM 9    THEY INVESTED OR IN THE ALTERNATIVE, TO THE AMOUNTS CALCULATED

10:12AM 10   PURSUANT TO THE SABA REPORT.

10:12AM 11       UNLESS THE COURT HAS ANY QUESTIONS, WE'LL SUBMIT ON THE

10:12AM 12   BRIEFS.

10:12AM 13           THE COURT:  ALL RIGHT.  THANK YOU.

10:12AM 14       LET ME INDICATE THAT THE BRIEFING ON THIS IS 1727, THAT'S

10:12AM 15   YOUR DOCKET 1727, AND IN THAT YOU ADOPT 1726, I BELIEVE?

10:13AM 16           MR. LEACH:  YES, YOUR HONOR.

10:13AM 17           THE COURT:  AND MS. HOLMES'S REPLY, EXCUSE ME, HER

10:13AM 18   BRIEF IS 1741, MR. LOOBY?

10:13AM 19           MR. LOOBY:  THAT'S CORRECT, YOUR HONOR.

10:13AM 20           THE COURT:  THANK YOU.  I JUST WANT TO GET THOSE

10:13AM 21   RIGHT.

10:13AM 22       I'M SURE YOU'RE GOING TO RAISE THESE AND YOU'VE RAISED

10:13AM 23   THEM IN YOUR PLEADINGS, MR. LOOBY.

10:13AM 24       MR. LEACH, LET ME JUST ASK YOU, THERE -- MS. HOLMES'S

10:13AM 25   SUGGESTIONS, HER PLEADINGS THAT THE COURT SHOULD GO THROUGH

6

10:13AM 1    SOME TYPE OF EVALUATION TYPE OF ANALYSIS SIMILAR TO WHAT WE DID

10:13AM 2    FOR GUIDELINES CALCULATIONS.

10:13AM 3         WHY IS THAT NOT THE APPROPRIATE PROTOCOL TO TAKE HERE?

10:13AM 4              MR. LEACH:  I CERTAINLY THINK THEY'RE SIMILAR,

10:13AM 5    YOUR HONOR.  AND WE MADE THE ARGUMENT FOR LOSS PURPOSES THAT

10:13AM 6    BUT FOR CAUSATION AND PROXIMATE CAUSATION COULD BE INFERRED OR

10:13AM 7    DETERMINED BY THE OVERALL COURSE OF CONDUCT AND THAT THERE WAS

10:13AM 8    TYPICALLY A PACKET OF MATERIALS THAT THE MISREPRESENTATIONS

10:14AM 9    WENT TO THE CORE OF WHAT THE COMPANY WAS HOLDING ITSELF OUT TO

10:14AM 10   BE THAT IT COULD PERFORM ALL OF THE TESTS AVAILABLE WITH A

10:14AM 11   SMALL PIN PRICK OF BLOOD ON A DEVICE THAT THEY HAD MADE OR

10:14AM 12   THROUGH OTHER MEANS.

10:14AM 13        AND SO I DO -- I THINK WE MADE THE POINT AT SENTENCING

10:14AM 14   THAT THE COURT COULD MAKE THAT INFERENCE FOR LOSS.  THE COURT

10:14AM 15   SAID IN ITS ORDER ON SENTENCING THAT CERTAINLY IT WAS A

10:14AM 16   REASONABLE INFERENCE TO MAKE.  IT ULTIMATELY DIDN'T MAKE THAT

10:14AM 17   INFERENCE.  SO FOR ALL OF THOSE SAME REASONS, WE THINK IT'S

10:14AM 18   APPROPRIATE.

10:14AM 19        BUT AT A MINIMUM, THERE ARE MORE THAN TEN INVESTORS FOR

10:14AM 20   WHOM THE COURT FOUND THAT RELIANCE, FOR LACK OF A BETTER WORD,

10:14AM 21   HAD BEEN ESTABLISHED.  THOSE FINDINGS ARE EQUALLY APPLICABLE

10:14AM 22   HERE IN THE RESTITUTION CONTEXT.

10:14AM 23             THE COURT:  OKAY.  SO MS. HOLMES'S SUGGESTION IN HER

10:14AM 24   PLEADINGS, AND I DON'T MEAN TO TAKE ANY THUNDER AWAY FROM YOU,

10:15AM 25   MR. LOOBY, BEFORE YOU SPEAK, BUT SEEMS TO SUGGEST, THAT, WELL,

10:15AM 1    JUDGE, YOU NEED TO DO EITHER SOME TYPE OF OFFSET OR LOOK AT

10:15AM 2    WHAT WAS THE ACTUAL LOSS OF THE INVESTORS.

10:15AM 3        AND THIS IS A QUESTION FOR MR. LOOBY.  I'M GIVING HIM A

10:15AM 4    PREVIEW OF IT.  BUT ISN'T THE LOSS THE AMOUNT THAT THEY PAID,

10:15AM 5    AND ISN'T THAT WHAT THE LOSS IS VIS-A-VIS ANYTHING ELSE?

10:15AM 6            MR. LEACH:  THE ANSWER IS, YES, YOUR HONOR.  THE

10:15AM 7    LOSS IS THE AMOUNT THAT THEY PAID.

10:15AM 8        THESE INVESTORS HERE GOT NOTHING BACK.  PFM -- PUTTING

10:15AM 9    ASIDE THE SETTLEMENTS, WHICH WE DO ACKNOWLEDGE ARE APPROPRIATE

10:15AM 10   OFFSETS, THESE INVESTORS PUT IN MONEY.  AND LET'S JUST TAKE

10:15AM 11   RDV, FOR EXAMPLE, IT GOT NOTHING BACK.  AND THE GOAL OF

10:15AM 12   RESTITUTION IS TO MAKE THEM WHOLE.

10:15AM 13       NOW, THE ARGUMENT IS THAT WHEN "THE WALL STREET JOURNAL"

10:15AM 14   ARTICLE CAME OUT IN OCTOBER OF 2015, THERANOS WAS WORTH

10:15AM 15   SOMETHING.  BUT INVESTORS GOT NOTHING BACK AND TO MAKE THEM

10:16AM 16   WHOLE, YOU NEED TO PUT THEM IN THE POSITION WHERE THEY WERE

10:16AM 17   BEFORE THEY MADE THEIR INVESTMENT.

10:16AM 18       SO OUR POSITION IS THAT IT'S THE TOTAL AMOUNT OF THE

10:16AM 19   INVESTMENT FOR CERTAIN, YOU KNOW, INVESTORS WERE BUT FOR

10:16AM 20   CAUSATION AND PROXIMATE CAUSATION IS ESTABLISHED.

10:16AM 21       AND I WOULD ARGUE, YOU KNOW, IN A PUBLIC COMPANY CONTEXT

10:16AM 22   WHERE BAD NEWS COMES OUT ABOUT A COMPANY AND INVESTORS CAN

10:16AM 23   EVALUATE WHAT DOES THIS PARTICULAR PIECE OF INFORMATION MEAN

10:16AM 24   FOR THE LONG TERM HEALTH OF THE COMPANY, YOU CAN TELL BY A

10:16AM 25   REDUCTION IN THE STOCK PRICE, YOU KNOW, WHAT THAT PARTICULAR

10:16AM 1    PIECE OF NEWS MEANT.

10:16AM 2         YOU CAN'T REALLY DO THAT IN A PRIVATE COMPANY CONTEXT

10:16AM 3    HERE.

10:16AM 4         WHEN "THE WALL STREET JOURNAL" ARTICLE CAME OUT, YOU KNOW,

10:16AM 5    IT RAISED ALLEGATIONS THAT WENT TO THE CORE OF WHAT THIS

10:16AM 6    COMPANY WAS ALL ABOUT.  BUT THERE WAS NO MARKET WHERE YOU COULD

10:16AM 7    TELL, YOU KNOW, WHAT WENT -- WHAT DOES THE STOCK PRICE GO DOWN

10:17AM 8    WHEN THIS COMES OUT.

10:17AM 9         WE KNOW AT THE END OF THE DAY THAT THESE ARE ALLEGATIONS

10:17AM 10   THAT THE COMPANY COULD NEVER RECOVER FROM, AND THEY WENT TO

10:17AM 11   WHAT THE COMPANY WAS ALL ABOUT.  COULD THEY DO ALL OF THE BLOOD

10:17AM 12   TESTS?  DID THEY HAVE TECHNOLOGY OR OTHER MEANS TO DO THE

10:17AM 13   TESTING?

10:17AM 14        THE ANSWER TO THOSE QUESTIONS WERE NO.  AND THERANOS

10:17AM 15   DIDN'T FAIL BECAUSE OF SOME REASON EXTRANEOUS TO THE COMPANY

10:17AM 16   LIKE IT PUT ITS MONEY IN SILICON VALLEY BANK AND COULDN'T GET

10:17AM 17   THE MONEY BACK OR BECAUSE THERE WAS AN EARTHQUAKE AND IT

10:17AM 18   DESTROYED ALL OF THE FACILITIES.

10:17AM 19        THERANOS ULTIMATELY FAILED BECAUSE THE PROMISES THAT IT

10:17AM 20   HAD BEEN MAKING TO ITS INVESTORS BEFORE THE FRAUD WAS REVEALED

10:17AM 21   SIMPLY WEREN'T TRUE, AND THE ONLY WAY TO PUT THESE INVESTORS

10:17AM 22   BACK INTO THE POSITION THAT THEY WERE BEFORE THIS CRIMINAL

10:17AM 23   CONDUCT TOOK PLACE IS AN AWARD OF THE FULL AMOUNT OF THEIR

10:17AM 24   INVESTMENTS.

10:17AM 25             THE COURT:  THEIR PURCHASE PRICE OF THEIR

10:17AM 1    INVESTMENT?

10:17AM 2         MR. LEACH:  YES.

10:17AM 3         THE COURT:  AND MY NEXT QUESTION IS, IS THE

10:17AM 4    GOVERNMENT ASKING THAT THE COURT ORDER RESTITUTION AS TO

10:17AM 5    MS. HOLMES AS TO THE EISENMANS?

10:18AM 6         MR. LEACH:  YES, YOUR HONOR.

10:18AM 7    THE DEFENDANT WAS CONVICTED IN COUNT ONE OF A CONSPIRACY

10:18AM 8    TO DEFRAUD INVESTORS DURING THE PERIOD 2010 TO 2015.

10:18AM 9    MR. EISENMAN AND HIS WIFE, SHERRIE, WERE INVESTORS DURING

10:18AM 10    THAT TIME PERIOD.  THEY'RE COVERED BY THE CONSPIRACY COUNTS.

10:18AM 11    THE FACT THAT THERE WAS A -- NO VERDICT RETURNED ON THAT

10:18AM 12    PARTICULAR COUNT IS A NON-EVENT.  WE SIMPLY -- AND THE STANDARD

10:18AM 13    HERE IS PREPONDERANCE.  SO THE VERDICT HERE SIMPLY DOESN'T

10:18AM 14    PRECLUDE IT, AND WE ARGUE THAT IT'S COVERED BY THE CONSPIRACY

10:18AM 15    COUNTS.

10:18AM 16    THE COURT HEARD FROM MR. EISENMAN IN TWO TRIALS.  I DON'T

10:18AM 17    THINK THERE'S A DOUBT HE RELIED ON THE REPRESENTATIONS FROM

10:18AM 18    MS. HOLMES.  SO WE THINK IT'S COMPLETELY APPROPRIATE TO INCLUDE

10:18AM 19    HIM IN THE RESTITUTION CALCULATION.

10:18AM 20         THE COURT:  WELL, THAT WAS A QUESTION THAT I HAD.

10:18AM 21    MR. LOOBY, YOU'LL HELP US WITH THAT AS WELL.

10:19AM 22    IF THERE WAS NO FINDING OF GUILT AS TO THE EISENMANS, WHAT

10:19AM 23    IS THE AVENUE OF RESTITUTION FOR THEM?  AND WHAT YOU'RE

10:19AM 24    SUGGESTING IS BECAUSE MS. HOLMES, THE JURY FOUND HER GUILTY OF

10:19AM 25    COUNT ONE, THE CONSPIRACY, THE CONSPIRACY, WHICH THE INDICTMENT

10:19AM 1    ALLEGES, I THINK IT'S PARAGRAPHS 1 THROUGH 18, ALLEGED A

10:19AM 2    CONDUCT THAT SHE ENGAGED IN, AND THAT CONDUCT YOU SUGGEST

10:19AM 3    INCLUDES THE EISENMANS?

10:19AM 4        MR. LEACH:  YES, YOUR HONOR.

10:19AM 5        THE COURT:  OKAY.

10:19AM 6     MR. LOOBY.

10:19AM 7        MR. LOOBY:  YES, YOUR HONOR.

10:19AM 8    SO OF COURSE THERE'S THE THRESHOLD ISSUE OF INVESTOR

10:19AM 9    RELIANCE.  I'LL JUST SPEAK VERY BRIEFLY TO THAT, AND THEN I'LL

10:19AM 10    MOVE ON TO THE ISSUE OF CALCULATING LOSS AND WHETHER OR NOT THE

10:19AM 11    FULL INVESTMENT AMOUNT IS THE CORRECT AMOUNT.

10:19AM 12    BUT JUST NOT TO PUT THE CART BEFORE THE HORSE, THERE IS

10:19AM 13    THE FIRST QUESTION OF HAS THE GOVERNMENT SHOWN INVESTOR

10:19AM 14    RELIANCE?

10:19AM 15    I THINK WE ALL AGREE FROM IT THE SENTENCING PROCEEDINGS

10:19AM 16    THAT THE GOVERNMENT NEEDS TO SHOW RELIANCE.  THE GOVERNMENT

10:19AM 17    HERE FOR ITS BROADER ROUGHLY $800 MILLION RESTITUTION REQUEST

10:20AM 18    IS INSISTING ON THE SAME PRESUMPTION OF INVESTOR WIDE RELIANCE

10:20AM 19    THAT THE COURT PREVIOUSLY DECLINED TO ADOPT.

10:20AM 20    THE GOVERNMENT'S RESTITUTION SUBMISSION DOES NOT PROVIDE

10:20AM 21    ANY ADDITIONAL EVIDENCE OR REALLY ARGUMENT TO SUPPORT THAT

10:20AM 22    FINDING.

10:20AM 23    THE RECORD HERE DOES NOT SUPPORT THAT FINDING FOR ANY OF

10:20AM 24    THE INVESTORS BEYOND THE TEN WHO WERE INCLUDED IN THE

10:20AM 25    RESTITUTION, IN THE GUIDELINES CALCULATION.

10:20AM 1    SO WE THINK BECAUSE THE GOVERNMENT HAS THE BURDEN TO

10:20AM 2    ESTABLISH RESTITUTION, BOTH RELIANCE AND THE AMOUNTS UNDER THE

10:20AM 3    MVRA, THAT FOR THIS REASON ALONE THE COURT SHOULD DENY THE

10:20AM 4    REQUEST FOR RESTITUTION TO THE BROADER CLASS OF C1 AND C2

10:20AM 5    INVESTORS.

10:20AM 6    TURNING TO THE QUESTION OF RELIANCE FOR THE TEN WHO WERE

10:20AM 7    INCLUDED IN THE SENTENCING GUIDELINES CALCULATIONS.  WE DO

10:20AM 8    AGREE THAT THE INQUIRY OF WHETHER OR NOT AN INVESTOR HAS RELIED

10:20AM 9    DOES CARRY THROUGH TO BOTH SENTENCING GUIDELINES LOSS AND

10:21AM 10   RESTITUTION, BUT THERE'S A DIFFERENCE IN RESTITUTION WHEREBY

10:21AM 11   THE GOVERNMENT BEARS THE BURDEN TO SHOW BOTH THE -- THAT A

10:21AM 12   PERSON IS A VICTIM AND TO CALCULATE THEIR LOSS.

10:21AM 13   AND HERE IN PARTICULAR, WE HAVE MEMBERS OF THE TEN

10:21AM 14   INVESTORS WHOM THE COURT INCLUDED IN THE GUIDELINES

10:21AM 15   CALCULATIONS FOR WHOM WE HAVE BOTH NO TRIAL TESTIMONY AND ALSO

10:21AM 16   NOW IN THE RESTITUTION CONTEXT, NO VICTIM IMPACT STATEMENT, NO

10:21AM 17   REQUEST FOR RESTITUTION, AND NO CLAIM FOR LOSS.

10:21AM 18   SO THESE ARE THE MENDENHALL PARTNERS GROUP,

10:21AM 19   MR. KOVACEVICH, PIER VENTURES, LUCAS VENTURES GROUP, AND

10:21AM 20   MR. MURDOCH.  FOR THESE, WE SUBMIT THE COURT SHOULD NOT INCLUDE

10:21AM 21   A RESTITUTION ORDER FOR THESE INDIVIDUALS FOR LACK OF

10:21AM 22   DEMONSTRATION OF RELIANCE, AND THE DIFFERENCE HERE BETWEEN

10:21AM 23   SENTENCING AND RESTITUTION IS WHILE VICTIMS ARE NOT REQUIRED TO

10:21AM 24   PARTICIPATE IN THE SENTENCING TO SUBMIT A RESTITUTION, A VICTIM

10:22AM 25   IMPACT STATEMENT, WE CONSIDER THAT PART, THAT MEANS THE

12

10:22AM 1    GOVERNMENT HAS TO DO MORE.

10:22AM 2        IT'S THEIR PREROGATIVE NOT TO PARTICIPATE, BUT THE

10:22AM 3    GOVERNMENT HASN'T DEMONSTRATED AND MARSHALLED SUFFICIENT

10:22AM 4    EVIDENCE TO SHOW, A, THAT THEY'RE VICTIMS AND WHAT THEIR

10:22AM 5    CLAIMED LOSSES WOULD BE.

10:22AM 6            THE COURT:  WHAT THE -- PARDON ME FOR INTERRUPTING

10:22AM 7    YOU.

10:22AM 8        WHAT INQUIRY IS PERMITTED FOR THE COURT TO, ON THE COURT'S

10:22AM 9    OWN, AS I LOOK AT THE PLEADINGS, LOOKING AT THE CASE AND/OR

10:22AM 10   SITTING THROUGH THE TRIAL, WHAT EVIDENCE CAN THE COURT LOOK AT

10:22AM 11   ON ITS OWN?  WHAT KIND OF SCRUTINY CAN THE COURT GIVE?

10:22AM 12           MR. LOOBY:  RIGHT.  I THINK THE TRIAL RECORD IS FAIR

10:22AM 13   GAME FOR THE COURT, AND I SUBMIT -- OR WE SUBMIT THAT THE TRIAL

10:22AM 14   RECORD SHOULD BE KIND OF WHERE THE INQUIRY ENDS.  AND I KNOW

10:22AM 15   THAT THE COURT DID RELY ON TESTIMONY IN MR. BALWANI'S TRIAL AS

10:22AM 16   WELL AS CERTAIN GOVERNMENT INTERVIEW MEMORANDA AND S.E.C.

10:22AM 17   TESTIMONY WHEN IT CAME TO THE GUIDELINES CALCULATION AT THAT

10:23AM 18   MOMENT.

10:23AM 19       THE DIFFERENCE BETWEEN THAT SITUATION AND HERE IS THAT

10:23AM 20   THERE WE WERE IN A SITUATION WHERE THE COURT HAD TO CALCULATE A

10:23AM 21   GUIDELINE RANGE AND THE QUESTION WAS WHETHER OR NOT THE

10:23AM 22   GOVERNMENT HAD MET THE TEN OR MORE VICTIMS BURDEN.

10:23AM 23       HERE WE'RE TALKING ABOUT ASSIGNING RESTITUTION, SPECIFIC

10:23AM 24   RESTITUTION AMOUNTS TO SPECIFIC VICTIMS.  AND HERE, IN ADDITION

10:23AM 25   TO THE LACK OF SUFFICIENT EVIDENCE OF RELIANCE, WHICH WE

10:23AM 1   MAINTAINED AT SENTENCING AND WE MAINTAIN NOW, IS NOT THERE IN

10:23AM 2   THE RECORD.  WE ALSO HERE HAVE THE LACK OF THE VICTIM IMPACT

10:23AM 3   STATEMENT, THE LACK OF THE REQUEST FOR RESTITUTION.  SO THAT'S

10:23AM 4   WHY WE SUBMIT THAT THE COURT SHOULD NOT ORDER RESTITUTION TO

10:23AM 5   THE PEOPLE WHO DIDN'T TESTIFY AT TRIAL AS WELL AS -- AND THIS

10:23AM 6   GOES TO THE EISENMAN, THE QUESTION OF THE EISENMANS, BUT ALSO

10:23AM 7   THE HALL GROUP AND THE BLACK DIAMOND VENTURES GROUP, THE COUNTS

10:23AM 8   THAT WERE HUNG.

10:23AM 9       WE THINK THAT -- YOU KNOW, WE AGREE THAT THE COURT'S

10:24AM 10  INQUIRY IS A PREPONDERANCE, BUT WE SUBMIT THAT THE JURY'S

10:24AM 11  VERDICT OR ITS FAILURE TO RETURN A VERDICT IS OWED RESPECT IN

10:24AM 12  THAT CASE AND SHOULD WEIGH AGAINST A FINDING OF RELIANCE ON A

10:24AM 13  PREPONDERANCE STANDARD.

10:24AM 14      AND IN PARTICULAR WITH THE EISENMANS, THEY DID MAKE AN

10:24AM 15  INVESTMENT INTO THE C1 ROUND, BUT AS THE COURT WILL RECALL, THE

10:24AM 16  TESTIMONY SURROUNDING MR. EISENMAN'S INTERACTIONS WITH

10:24AM 17  MS. HOLMES GENERALLY PREDATED THE ALLEGED CONSPIRACY PERIOD BY

10:24AM 18  A BIT.  AND HE DIDN'T HAVE VERY MUCH CONTACT WITH MS. HOLMES OR

10:24AM 19  MUCH NEW INFORMATION WHEN HE DID MAKE THAT INVESTMENT THAT

10:24AM 20  QUALIFIED UNDER THE INDICTMENT.

10:24AM 21      SO WE SUBMIT THAT THE EVIDENCE IN PARTICULAR FOR

10:24AM 22  MR. EISENMAN AND FOR MS. SHERRIE EISENMAN AND FOR ENTITIES

10:24AM 23  AFFILIATED WITH THEM, THERE IS JUST NOT EVIDENCE OF RELIANCE.

10:24AM 24          THE COURT:  ARE THERE CASES THAT SUGGEST -- THANK

10:24AM 25  YOU FOR THAT.

14

10:24AM 1    ARE THERE CASES THAT SUGGEST THAT THE COURT IS NOT LIMITED

10:24AM 2    TO THE STATUTE OF LIMITATIONS PERIOD, FOR EXAMPLE, OR OTHER

10:24AM 3    LIMITATIONS WHEN IT CONSIDERS RESTITUTION?  AREN'T THERE CASES

10:25AM 4    THAT SUGGEST THAT THE COURT CAN LOOK TO THE BROAD CATEGORY OF

10:25AM 5    CONDUCT IN A CONSPIRACY SETTING?

10:25AM 6         MR. LOOBY:  YES.  I BELIEVE -- I DON'T HAVE A CASE

10:25AM 7    ON THE TOP OF MY MIND, BUT I THINK A CONSPIRACY CONVICTION DOES

10:25AM 8    ALLOW THE COURT TO CONSIDER CONDUCT THAT IT WOULD CONSIDER, THE

10:25AM 9    OFFENSE CONDUCT, SO WHAT WAS THE SCOPE OF THE CONSPIRACY, WHAT

10:25AM 10   WAS ITS DURATION.

10:25AM 11        BUT, AGAIN, THE PARTICULARS OF WHAT THE COURT WOULD LOOK

10:25AM 12   AT THE BEST EVIDENCE OF THAT IS THE TRIAL TESTIMONY IN THE

10:25AM 13   RECORD AT THE TRIAL, WE SUBMIT.  AND WE SUBMIT THAT RELYING ON

10:25AM 14   EXTRA RECORD TESTIMONY IN THAT CASE, WHILE PERHAPS NOT

10:25AM 15   PROHIBITED BY A CASE OR RULE, IN THIS INSTANCE IT'S NOT

10:25AM 16   WARRANTED.

10:25AM 17        THE COURT:  I THINK THERE ARE CASES THAT SAY THAT

10:25AM 18   THE RESTITUTION IS NOT LIMITED JUST TO THE CONDUCT BUT IT GOES

10:25AM 19   TO THE ENTIRETY OF THE FRAUD SCHEME?  ARE YOU FAMILIAR WITH

10:26AM 20   CASES THAT SUGGEST THAT?

10:26AM 21        MR. LOOBY:  WELL, I THINK THERE ARE TWO DIFFERENT

10:26AM 22   QUESTIONS, WHICH IS ARE WE TALKING ABOUT WHO QUALIFIES AS A

10:26AM 23   VICTIM FOR PURPOSES OF RESTITUTION.

10:26AM 24        AND THEN --

10:26AM 25        THE COURT:  THAT'S FIRST NUMBER ONE, ISN'T IT?

15

10:26AM  1          MR. LOOBY:  RIGHT.  AND I THINK WE'RE STILL KIND AT

10:26AM  2    THAT THRESHOLD QUESTION.

10:26AM  3          I THINK IN ORDER TO QUALIFY AS A VICTIM, AND I APOLOGIZE

10:26AM  4    FOR NOT HAVING A CASE CITATION READY FOR THIS PROPOSITION, BUT

10:26AM  5    I WOULD SAY THAT THEY WOULD HAVE TO HAVE RELIED ON THE OFFENSE

10:26AM  6    CONDUCT.

10:26AM  7          I THINK THE STEIN CASE OUT OF THE ELEVENTH CIRCUIT WHICH

10:26AM  8    WE CITE IN OUR BRIEF IS GOOD ON THIS BECAUSE IT DEALS WITH BOTH

10:26AM  9    LOSS CALCULATION AND RESTITUTION.

10:26AM 10          THE DIFFERENCE FROM THE ZOLP CASE IN THE NINTH CIRCUIT

10:26AM 11    WHICH WE ALSO CITE IN WHICH WE DISCUSSED IN THE CONTEXT OF

10:26AM 12    SENTENCING, I THINK WOULD COUNSEL FOR THE THRESHOLD QUESTION

10:26AM 13    BEING, WELL, WHAT WAS THE OFFENSE CONDUCT HERE?  ARE THERE

10:26AM 14    SPECIFIC MISREPRESENTATIONS THAT INVESTORS CLAIMING TO HAVE

10:26AM 15    RELIED ON?  IS THERE EVIDENCE IN THE RECORD THAT THAT MADE THE

10:27AM 16    DIFFERENCE FOR THEM?

10:27AM 17          AND FOR THIS BROADER CLASS OF INVESTORS, AS THE COURT

10:27AM 18    NOTED, THERE'S NOTHING THERE.  WE HAVE THIS LEDGER OF THESE

10:27AM 19    NAMES, AND THERE'S NARY A MENTION OF THEM IN THE TRANSCRIPT.

10:27AM 20          THE COURT:  THIS IS THE EXCEL LEDGER THAT YOU'RE

10:27AM 21    SPEAKING OF?

10:27AM 22          MR. LOOBY:  YES.  THAT'S THE SUPPORT FOR THE ROUGHLY

10:27AM 23    $807 MILLION RESTITUTION.

10:27AM 24          THE COURT:  WELL, I'LL TELL YOU, AS I DID IN THE

10:27AM 25    PREVIOUS CASE, THAT YOU KNOW THE WEIGHT THAT THE COURT GAVE TO

10:27AM 1    THAT, AND MR. LEACH WON'T BE SURPRISED.  MY SENSE IS THAT I'M

10:27AM 2    GOING TO BE CONSISTENT WITH AT LEAST AS TO THAT AND THE WEIGHT

10:27AM 3    TO GIVE TO THAT EXCEL SHEET AS TO VICTIM STATEMENTS OR WHAT THE

10:27AM 4    COURT SHOULD DO WITH THAT.  I THINK I'LL BE CONSISTENT WITH

10:27AM 5    THAT.

10:27AM 6        BUT THIS OTHER ISSUE ABOUT -- I WAS CURIOUS ABOUT THE

10:27AM 7    EISENMANS IN PARTICULAR BECAUSE THEY WERE -- MS. HOLMES WAS NOT

10:27AM 8    CONVICTED.  THE JURY DID NOT SEE FIT TO CONVICT OF HER THOSE

10:27AM 9    PARTICULAR COUNTS, BUT THEY DID SEE FIT TO FIND GUILT AS TO

10:28AM 10   COUNT ONE, WHICH WAS THE OVERALL CONSPIRACY AS YOU KNOW.

10:28AM 11       AND HOW FAR DOES THAT REACH THEN -- I'M ASKING THE

10:28AM 12   QUESTION AGAIN I SUPPOSE -- THE CONSPIRACY COUNT?  DOES THAT

10:28AM 13   THEN -- WOULD THAT, AS MR. LEACH SUGGESTS, WOULD THAT THEN

10:28AM 14   INCLUDE THE EISENMANS AND ANY OTHERS?

10:28AM 15           MR. LOOBY:  RIGHT.  I THINK THE DATES ON THE

10:28AM 16   INDICTMENT FOR COUNT ONE DATE BACK TO 2010, BUT I THINK

10:28AM 17   YOUR HONOR IS CORRECT THAT THERE'S TWO DIFFERENT GROUPINGS, THE

10:28AM 18   C1 AND THE C2 GROUP, AND I THINK WE CAN INFER FROM THE JURY'S

10:28AM 19   VERDICTS, OR NON-VERDICT, ON THE PARTICULAR WIRE FRAUD COUNTS

10:28AM 20   WHAT IT THOUGHT OF THE SUFFICIENCY OF THE GOVERNMENT'S EVIDENCE

10:28AM 21   AS IT RELATED TO THE EARLIER HALF OF THAT CONSPIRACY PERIOD.

10:28AM 22       SO I THINK THAT THE HUNG COUNTS, I THINK THEY CERTAINLY

10:28AM 23   ESTABLISH THAT THE GOVERNMENT DID NOT PROVE BEYOND A REASONABLE

10:28AM 24   DOUBT THAT THOSE PARTICULAR INVESTORS WERE WIRE FRAUD VICTIMS

10:28AM 25   AND WHETHER OR NOT THEY ARE PROPERLY INCLUDED UNDER THE

10:28AM 1    CONSPIRACY COUNT I THINK, I THINK THAT THAT JURY -- THE

10:29AM 2    NON-VERDICT SPEAKS VOLUMES AND I THINK THAT IT SHOULD GUIDE THE

10:29AM 3    COURT IN DETERMINING WHETHER OR NOT THERE IS RECORD EVIDENCE

10:29AM 4    THAT SATISFIES THE STANDARD.

10:29AM 5         THE COURT:  THAT WAS MY QUESTION.

10:29AM 6     WHAT SHOULD I DO WITH THIS?  THE JURY DID NOT CONVICT AND,

10:29AM 7    OF COURSE, THAT WAS PROOF BEYOND A REASONABLE DOUBT, WASN'T IT?

10:29AM 8    AND THE STANDARD HERE IS A LITTLE DIFFERENT.

10:29AM 9     AND THEN WHAT SHOULD THE COURT DO?  HOW MUCH WEIGHT AND

10:29AM 10   WHAT WEIGHT DOES THE COURT GIVE OR WHAT -- WHAT SHOULD THE

10:29AM 11   COURT DO WITH THE JURY'S FINDING AS THAT VIS-A-VIS THE

10:29AM 12   CONVICTION OF COUNT ONE?

10:29AM 13    AND FOR THE PURPOSES OF RESTITUTION, SOME CASES SUGGEST

10:29AM 14   THAT, WELL, FOR RESTITUTION PURPOSES, YOU MAY BE ABLE TO LOOK

10:29AM 15   AT EVEN COUNTS THAT WEREN'T CHARGED, CONDUCT, IT'S CONDUCT

10:29AM 16   RELATED.  SO THAT'S WHY I'M ASKING YOUR GUIDANCE ON THAT FROM

10:29AM 17   YOUR POSITION, YOUR THOUGHT.

10:30AM 18         MR. LOOBY:  YES, YOUR HONOR.  AND I BELIEVE THE

10:30AM 19   SCOPE OF THE COURT'S REVIEW WOULD PROBABLY BE SIMILAR TO THE

10:30AM 20   GUIDELINES CALCULATION, AND OUR ARGUMENT WOULD BE NOT THAT THE

10:30AM 21   COURT IS, YOU KNOW, PRECLUDED FROM CONSIDERING THE HUNG COUNTS,

10:30AM 22   BUT THAT IT SHOULDN'T ORDER RESTITUTION FOR THOSE COUNTS BOTH

10:30AM 23   BECAUSE OF THE LACK OF RELIANCE IN THE RECORD AND THEN ALSO AS

10:30AM 24   AN ADDED FACTOR THAT IS SPECIFIC TO THE RESTITUTION CONTEXT,

10:30AM 25   THE LACK OF THE VICTIM IMPACT STATEMENT, THE LACK OF A REQUEST

10:30AM 1    FOR A SPECIFIC DOLLAR AMOUNT, THE LACK OF A CLAIM OF "I'VE BEEN

10:30AM 2    HARMED HERE, I'M A VICTIM, I'M OWED SPECIFIC RECOMPENSE."

10:30AM 3        SO WHEN THE QUESTION IS ORDERING A SPECIFIC DOLLAR AMOUNT

10:30AM 4    TO A PERSON, WE BELIEVE THAT THE GOVERNMENT HAS NOT MET THEIR

10:30AM 5    BURDEN IN PARTICULAR FOR THE HUNG COUNTS, AND THEN AMONGST THE

10:30AM 6    TEN, THE INDIVIDUALS WHO DIDN'T TESTIFY AT TRIAL WHO I

10:30AM 7    MENTIONED EARLIER.

10:30AM 8        THE COURT:  MAY I LEAVE YOU FOR JUST A MINUTE?  I'M

10:30AM 9    EAGER TO HEAR MR. LEACH'S COMMENT ON THIS.

10:30AM 10       MR. LEACH, THE JURY FOUND FIT NOT TO FIND MS. HOLMES

10:31AM 11   GUILTY, AT LEAST WITH THE EISENMANS.  LET ME START WITH THEM.

10:31AM 12       AND WHAT I HEAR MR. LOOBY SAYING IS, JUDGE, THE JURY

10:31AM 13   DIDN'T FIND GUILTY, AND SO IT'S REALLY NOT APPROPRIATE FOR YOU

10:31AM 14   TO LOOK TO THEM AS VICTIMS.

10:31AM 15       WHAT SHOULD I DO WITH THAT?

10:31AM 16       MR. LEACH:  WELL, YOU SHOULD LOOK TO THE DEFINITION

10:31AM 17   OF "VICTIM" WHICH IS IN 18 U.S.C. 3663(A), WHICH SAYS IT IS A

10:31AM 18   PERSON DIRECTLY AND PROXIMATELY HARMED AS A RESULT OF THE

10:31AM 19   COMMISSION OF AN OFFENSE."  THE OFFENSE IS CONSPIRACY WITH

10:31AM 20   RESPECT TO THE EISENMANS.

10:31AM 21       I WOULD SAY THAT WE KNOW THEY CONVICTED ON CONSPIRACY.  WE

10:31AM 22   DON'T KNOW WHAT HAPPENED ON THOSE THREE OTHER COUNTS.  THERE'S

10:31AM 23   NO DECISION THERE.

10:31AM 24       THE COURT:  YOU DISMISSED THOSE COUNTS?

10:31AM 25       MR. LEACH:  WE DID DISMISS THOSE COUNTS.

10:31AM 1    BUT MY POINT IS THAT IT COULD BE FOR LACK OF A WIRE.  IT

10:31AM 2    COULD BE FOR -- WE DON'T KNOW WHICH PARTICULAR ELEMENT WAS THE

10:31AM 3    HANG UP THERE.  IT'S NOT A FINDING THAT THEY WEREN'T A VICTIM.

10:31AM 4    AND THERE ARE DIFFERENT STANDARDS OF PROOF HERE, YOUR HONOR.

10:32AM 5    FOR THE CONVICTION, IT'S BEYOND A REASONABLE DOUBT.

10:32AM 6    FOR RESTITUTION PURPOSES, IT'S FOR PREPONDERANCE.

10:32AM 7    SO OUR CLAIM HERE IS THE CONSPIRACY.  IF YOU LOOK AT THE

10:32AM 8    INDICTMENT, IT'S 2010 TO 2015.  THE EISENMANS, LIKE ALL OF THE

10:32AM 9    C1 AND C2 INVESTORS, FALL WITHIN THAT TIME PERIOD.

10:32AM 10   THE COURT CAN MAKE A FINDING BASED ON MR. EISENMAN'S

10:32AM 11   TESTIMONY IN BOTH THE HOLMES CASE AND THE BALWANI CASE AND HIS

10:32AM 12   VICTIM IMPACT STATEMENT THAT HE RELIED ON THE STATEMENTS BY A

10:32AM 13   PREPONDERANCE.

10:32AM 14   I APPRECIATE THAT THERE'S -- WE DON'T KNOW WHY THEY DIDN'T

10:32AM 15   RETURN A VERDICT ON THOSE PARTICULAR COUNTS, BUT THERE'S NO

10:32AM 16   LOGICAL REASON WHY THEY'RE NOT COVERED BY THE CONSPIRACY COUNT

10:32AM 17   AND WHY THE COURT CAN'T MAKE THAT FINDING BASED ON THE

10:32AM 18   PREPONDERANCE STATEMENT.

10:32AM 19   AND RESTITUTION DOES HAVE A BROADER PURPOSE THAN TO

10:32AM 20   RECOMPENSE VICTIMS HERE.  IT'S SOMETHING THAT CONGRESS HAS

10:33AM 21   MANDATED THROUGH THE MVRA.  WE HAVE A CONVICTION ON THE

10:33AM 22   CONSPIRACY COUNT, AND THAT SHOULD COVER THOSE THREE VICTIMS.

10:33AM 23   THE COURT:  OKAY.  THANK YOU.

10:33AM 24   MR. LOOBY:  I WOULD JUST SAY THAT AS THE STEIN CASE

10:33AM 25   ELABORATES, THE INQUIRY OF PROXIMATE CAUSE AND BUT FOR

10:33AM 1    CAUSATION OR AT LEAST THE BUT FOR CAUSATION OF THE RELIANCE ON

10:33AM 2    THE MISREPRESENTATION THAT CONSTITUTE THE OFFENSE CONDUCT IS

10:33AM 3    THE SAME.  SO EVEN IF THE MANDATORY VICTIMS RESTITUTION ACT HAS

10:33AM 4    DIFFERENT POLICY MOTIVATIONS AND AIMS, THAT'S A REQUIREMENT

10:33AM 5    THAT IS THE SAME ACROSS THE TWO.

10:33AM 6         AND SO, YOU KNOW, WE HAVE IN OUR PAPERS IN CONNECTION WITH

10:33AM 7    SENTENCING AND THEN HERE I HAVE EXPLAINED WHY WE DON'T THINK

10:33AM 8    THERE'S A PREPONDERANCE OF EVIDENCE OF RELIANCE FOR AT A

10:33AM 9    MINIMUM THE LARGER GROUP THAT WE WERE TALKING ABOUT, THE 807

10:33AM 10   MILLION, BUT ALSO MEMBERS WITHIN THE TEN THAT THE COURT DID

10:33AM 11   INCLUDE IN ITS SENTENCING.

10:33AM 12        AND I THINK THE JURY'S REACTION TO THE GOVERNMENT'S CASE

10:34AM 13   AND ITS RESULT I THINK SHOULD BE A CONSIDERABLE FACTOR IN THE

10:34AM 14   COURT'S DISCRETION THERE ABOUT WHETHER OR NOT THE GOVERNMENT

10:34AM 15   HAS MET ITS BURDEN UNDER THE MVRA, WHICH VERY SQUARELY LAYS IT

10:34AM 16   OUT TO MARSHAL THE EVIDENCE THAT ARISE.

10:34AM 17        THE COURT:  OKAY/  THANK YOU.

10:34AM 18        MR. LOOBY:  I CAN TURN YOUR HONOR TO OUR OBJECTIONS

10:34AM 19   TO THE GOVERNMENT'S CALCULATION OF ACTUAL LOSS BECAUSE IN A WAY

10:34AM 20   THIS REALLY IN EFFECT MOOTS THE INITIAL QUESTION BECAUSE THE

10:34AM 21   GOVERNMENT'S -- IT MOOTS THE INITIAL QUESTION OF RELIANCE

10:34AM 22   BECAUSE FOR WHOMEVER QUALIFIES AS A VICTIM IN THAT THEY HAVE

10:34AM 23   BEEN PROVEN TO HAVE RELIED ON THE OFFENSE CONDUCT UNDER THE

10:34AM 24   MVRA, THE GOVERNMENT'S ALL OR NOTHING APPROACH IS INCONSISTENT

10:34AM 25   WITH THE MANDATES OF THE CASE LAW AND REALLY LEAVES US WITH

10:34AM 1      NOTHING TO GO ON IN TERMS OF WHAT IS THE EXACT CALCULATION OF

10:34AM 2      ANY VICTIM'S LOSS HERE.

10:34AM 3           THE COURT:  ARE YOU REFERRING TO THE GOVERNMENT'S

10:34AM 4      REQUEST FOR THE 900 MILLION, WHATEVER THAT IS?

10:34AM 5           MR. LOOBY:  IT'S ACTUALLY BOTH OF THE REQUESTS.  SO

10:35AM 6      THE $807 MILLION, THAT'S THE C1 AND C2, EVERYBODY, BUT THE

10:35AM 7      AMOUNT THAT THEY'RE REQUESTING IS JUST THEIR FULL INVESTMENT

10:35AM 8      AMOUNT.

10:35AM 9           AND THEN THE NARROWER GROUP, THE ROUGHLY $444 MILLION

10:35AM 10     REQUEST IS THE TEN INDIVIDUALS, I SUPPOSE PLUS THE EISENMANS,

10:35AM 11     THAT THE COURT FOUND AT SENTENCING.

10:35AM 12          BUT, AGAIN, IT'S THEIR FULL RESTITUTION AMOUNT.  SO UNLIKE

10:35AM 13     AT SENTENCING, THE GOVERNMENT HAS NOT PROPOSED A MIDDLE GROUND.

10:35AM 14     IT HAS SAID IN ITS BRIEFING AND THEN HERE TODAY IT HAS SAID

10:35AM 15     IT'S BASICALLY ALL OR NOTHING.

10:35AM 16          AND THE GOVERNMENT HAS THE BURDEN TO ESTABLISH THE LOSS

10:35AM 17     WITH PRECISION.  AND THE GOVERNMENT -- I'VE HEARD THEM SAY IN

10:35AM 18     THEIR BRIEF AND I'VE HEARD THEM SAY TODAY THAT RESTITUTION IS

10:35AM 19     DIFFERENT.  AND ON THAT MUCH WE AGREE, IT IS DIFFERENT, BECAUSE

10:35AM 20     IN THE RESTITUTION CONTEXT, THE COURT IS CONSTRAINED TO AWARD

10:35AM 21     THE ACTUAL LOSS, AND THE CASES MAKE CLEAR THAT A RESTITUTION

10:35AM 22     AWARD IN THE AMOUNT ABOVE THE ACTUAL LOSS IS IMPERMISSIBLE.

10:36AM 23          THE COURT:  THEY'RE NOT ENTITLED TO A DOUBLE

10:36AM 24     RECOVERY OR ANYTHING MORE THAN A VICTIM IS ACTUALLY -- THE LOSS

10:36AM 25     THAT THEY SUSTAINED.

10:36AM 1          MR. LOOBY:  RIGHT, YOUR HONOR.  AND THERE'S --

10:36AM 2          THE COURT:  SO WHY ISN'T THE LOSS WHAT THEY --

10:36AM 3    WHATEVER THEIR INVESTMENT WAS?  THEY WROTE A CHECK FOR $100 FOR

10:36AM 4    SO MANY SHARES.  WHY SHOULDN'T THEY GET $100 BACK IN MY

10:36AM 5    HYPOTHETICAL?

10:36AM 6          MR. LOOBY:  RIGHT.  SO, YOUR HONOR, I THINK THERE

10:36AM 7    ARE TWO MAIN ISSUES WITH THAT.

10:36AM 8       THE FIRST ONE IS -- IT FOLLOWS FROM THE GERINGER CASE IN

10:36AM 9    THE NINTH CIRCUIT AND THEN THE PROCEEDINGS BEFORE YOUR HONOR --

10:36AM 10          THE COURT:  I REMEMBER THE CASE.

10:36AM 11          MR. LOOBY:  YES, I'M SURE YOU DO.

10:36AM 12       AND WHAT THAT CASE TEACHES US, AND THIS IS CONSISTENT FROM

10:36AM 13    THE ZOLP HOLDING IN THE GUIDELINES PURPOSES, BUT IN GERINGER AT

10:36AM 14    LEAST IT WAS BOTH FOR GUIDELINES LOSS CALCULATION AND

10:36AM 15    RESTITUTION, IS WHEN INVESTORS OWN A SHARE OF THE COMPANY AND

10:36AM 16    THE OFFENSE CONDUCT IS REVEALED, THEN THERE IS SOME SORT OF

10:36AM 17    IMPAIRMENT TO THE VALUE OF THE COMPANY THAT THEY OWN, BUT THEN

10:37AM 18    THERE IS RESIDUAL VALUE IN THE COMPANY, THERE NEEDS TO BE AN

10:37AM 19    OFFSET OF THE VALUE OF WHAT THEY OWN AT THE CONCLUSION OF THE

10:37AM 20    OFFENSE CONDUCT.  AND THAT'S TRUE.

10:37AM 21       IN GERINGER, AS IN HERE, REGARDLESS OF WHETHER OR NOT THE

10:37AM 22    INVESTORS ULTIMATELY ARE ABLE TO RECOUP ANY OF THOSE ASSETS, IN

10:37AM 23    GERINGER YOUR HONOR WILL RECALL THAT THEY DID NOT.  THE COMPANY

10:37AM 24    WAS PUT INTO A RECEIVERSHIP, AND THERE WERE EFFORTS MADE TO

10:37AM 25    MONETIZE CERTAIN OF ITS ASSETS, AND THEY ULTIMATELY FAILED AND

23

10:37AM 1    THE INVESTORS DIDN'T GET ANYTHING.  AND THAT'S UNFORTUNATE AND

10:37AM 2    IT'S UNFORTUNATE HERE.

10:37AM 3        BUT THE SIMILARITY IS THAT HERE THE OFFENSE CONDUCT, AND

10:37AM 4    THE COURT HAS FOUND THAT THE GOVERNMENT HAS NOT PROVEN BY A

10:37AM 5    PREPONDERANCE OF THE EVIDENCE THAT THE 2018 FAILURE OF THERANOS

10:37AM 6    IS CAUSED BY THE OFFENSE CONDUCT.

10:37AM 7        THE COMPANY CONTINUED FOR SEVERAL YEARS.  IT UNDOUBTEDLY

10:37AM 8    HAD VALUE.  IT HAD VALUE BEFORE THE OFFENSE CONDUCT.  IT HAD

10:37AM 9    VALUE AFTER THE OFFENSE CONDUCT.

10:37AM 10       THE BURDEN WAS ON THE GOVERNMENT TO COME UP WITH NUMBERS

10:38AM 11   TO OFFSET THAT VALUE.  GERINGER IS VERY CLEAR ON THAT.  AND

10:38AM 12   THE -- FOR EXAMPLE, THE COMPANY'S VALUABLE INTELLECTUAL

10:38AM 13   PROPERTY PORTFOLIO THAT WAS -- THAT VARIOUS ESTIMATES OF ITS

10:38AM 14   VALUE ARE IN THE HUNDREDS OF MILLIONS OF DOLLARS.  THOSE ARE

10:38AM 15   ASSETS THAT THE INVESTORS OWNED IN 2016.  THOSE ARE ASSETS THAT

10:38AM 16   THE INVESTORS OWNED IN 2017.

10:38AM 17       ULTIMATELY THEY WERE NOT ABLE TO RECOUP THEIR INVESTMENT,

10:38AM 18   BUT IT DOESN'T FLOW FROM THE CASE LAW THAT THE RESTITUTION

10:38AM 19   AMOUNT THAT THEIR ACTUAL LOSS SHOULD INCLUDE THAT RESIDUAL

10:38AM 20   VALUE.  THE GOVERNMENT HASN'T PROFFERED TO VALUE THAT.

10:38AM 21       NOW, THERE'S A SEPARATE BUCKET OF ISSUES, WHICH I'LL CALL

10:38AM 22   THE OFFSETS, AND THIS RELATES TO PROPERTY RETURNED.  SO IT'S A

10:38AM 23   SEPARATE QUESTION FROM WHAT VALUE DID THE COMPANY HAVE AFTER

10:38AM 24   THE OFFENSE CONDUCT.  AND THEN THERE ARE CERTAIN OFFSETS THAT

10:39AM 25   HAPPENED LATER WHERE THERE ARE EVENTS THAT OCCURRED LIKE THE C2

10:39AM 1   DEAL WITH THE C2 SHAREHOLDERS WHERE THERE'S A NEGOTIATION AND

10:39AM 2   ULTIMATELY A NEGOTIATED AGREEMENT WHEREBY THEY RETAINED OR

10:39AM 3   OBTAINED SHARES THAT HAD GREATER DEMOCRATIC POWER WITHIN THE

10:39AM 4   COMPANY FOR VALUE.

10:39AM 5       THERE WAS ALSO THE 2018 S.E.C. SETTLEMENT WHERE

10:39AM 6   MS. HOLMES'S SHARES WERE RETURNED TO THE COMPANY.

10:39AM 7       THESE ARE INSTANCES WHERE YEARS AFTER THE OFFENSE CONDUCT

10:39AM 8   THERE IS VALUE CHANGING HANDS.  THERE IS MONEY GOING BACK AND

10:39AM 9   FORTH.

10:39AM 10      THE COURT HAS HELD THAT IT IS NOT ALL DOWNSTREAM OF THE

10:39AM 11  OFFENSE CONDUCT.

10:39AM 12      THE GOVERNMENT -- THE RECORD IN THIS CASE DOES NOT HAVE

10:39AM 13  THE ANSWER TO KIND OF WHAT THE NUMBERS OF THESE VALUES SHOULD

10:39AM 14  BE.  THE GOVERNMENT HAD THE BURDEN TO INTRODUCE THAT EVIDENCE

10:39AM 15  IN CONNECTION WITH RESTITUTION.  IT HAS NOT.

10:39AM 16      WE KNOW THAT THE FULL INVESTMENT AMOUNT IS THE INCORRECT

10:39AM 17  AMOUNT.  WE DON'T KNOW WHAT THE CORRECT NUMBER IS, BUT IT HAS

10:40AM 18  TO BE LESS THAN THAT, YOUR HONOR.

10:40AM 19          THE COURT:  WHAT DOES ROBERS TELL US ABOUT THIS?

10:40AM 20          MR. LOOBY:  SO ROBERS DOES NOT TELL US MUCH,

10:40AM 21  YOUR HONOR.  AND THAT IS -- THAT IS A CASE THAT RELATES

10:40AM 22  SPECIFICALLY TO THE QUESTION OF WHAT IS THE PROPERTY TO BE

10:40AM 23  VALUED WHEN IT IS RETURNED?  SO IT IS THAT PORTION OF THE MVRA

10:40AM 24  STATUTE THAT IS ABOUT RETURNING VALUE.  IT'S NOT ABOUT THE

10:40AM 25  RESIDUAL VALUE IN THE INVESTMENT.  IT'S NOT THE -- IT'S NOT IN

| | | |
|---|---|---|
| 10:40AM | 1 | THE GERINGER LANE OF CASES. IT'S IN THE -- IT WOULD BE |
| 10:40AM | 2 | RELEVANT PERHAPS TO THE OFFSETS THAT ARE THE C2 INVESTMENT DEAL |
| 10:40AM | 3 | AND THE S.E.C. SETTLEMENT BECAUSE THAT INVOLVES, WELL, WHAT IS |
| 10:40AM | 4 | THE PROPERTY THAT IS BEING RETURNED. |
| 10:40AM | 5 | AND IN THAT CASE THE QUESTION BEFORE THE COURT WAS VERY |
| 10:40AM | 6 | NARROW. IT WAS, YOU KNOW, WHEN ARE WE VALUING THIS REAL ESTATE |
| 10:40AM | 7 | COLLATERAL? |
| 10:40AM | 8 | AND HERE WE ARE JUST NOT -- IT DOESN'T HAVE A WHOLE LOT TO |
| 10:40AM | 9 | TELL US ABOUT -- IT HAS NOTHING TO TELL US ABOUT WHAT WAS THE |
| 10:40AM | 10 | VALUE OF THE COMPANY AT THAT TIME. THAT IS A GERINGER |
| 10:41AM | 11 | QUESTION. THAT IS THAT RUTSKOKE -- R-U-T-S-K-O-K-E, FOR THE |
| 10:41AM | 12 | COURT REPORTER -- OUT OF THE SECOND CIRCUIT. THOSE ARE |
| 10:41AM | 13 | SEPARATE QUESTIONS FROM THAT. |
| 10:41AM | 14 | SO ROBERS DOES NOT SPEAK TO REALLY THE BIGGEST ISSUE WITH |
| 10:41AM | 15 | THE GOVERNMENT'S REQUEST FOR THE FULL INVESTMENT AMOUNT. |
| 10:41AM | 16 | THE COURT: OKAY. THANK YOU. |
| 10:41AM | 17 | SO I'M CURIOUS TO KNOW WHAT IS MS. HOLMES'S POSITION AS TO |
| 10:41AM | 18 | WHAT THE COURT SHOULD ORDER FOR RESTITUTION? |
| 10:41AM | 19 | MR. LOOBY: SO, YOUR HONOR, OUR POSITION IS THAT THE |
| 10:41AM | 20 | GOVERNMENT HAS NOT MET ITS BURDEN TO ESTABLISH A NUMBER THAT IS |
| 10:41AM | 21 | SUFFICIENTLY PRECISE TO SATISFY THE STANDARDS OF THE MVRA. |
| 10:41AM | 22 | OUR POSITION IS NOT NECESSARILY THAT IT WOULD BE |
| 10:41AM | 23 | IMPOSSIBLE TO DO, ALTHOUGH IT WOULD BE EXCEEDINGLY COMPLEX. |
| 10:41AM | 24 | AND THAT IS OUR SEPARATE ARGUMENT UNDER THE COMPLEXITY |
| 10:41AM | 25 | EXCEPTION. |

10:41AM 1    BECAUSE I DID HEAR MR. LEACH SAY, YOU KNOW, THIS ISN'T A

10:41AM 2  PUBLIC COMPANY.  IT'S -- I THINK HE SAID IT WAS -- IT'S NOT

10:42AM 3  LIKE WE CAN LOOK AT THE TRAJECTORY OF THE SHARE PRICE THAT

10:42AM 4  DROPS AFTER THE OFFENSE CONDUCT IS REVEALED AND EASILY ASSIGN A

10:42AM 5  NUMBER TO IT.

10:42AM 6    BUT AS YOUR HONOR RECOGNIZED IN THE SENTENCING CONTEXT,

10:42AM 7  THE CASES DON'T DISTINGUISH BETWEEN ILLIQUID AND LIQUID ASSETS

10:42AM 8  AND TO BE SURE IT IS MUCH HARDER IN OUR SITUATION.  IT'S VERY

10:42AM 9  COMPLEX.

10:42AM 10   THE GOVERNMENT PROFFERED AN EXPERT IN CONNECTION WITH

10:42AM 11  SENTENCING TO TRY TO SOLVE SOME OF THOSE ISSUES WITH

10:42AM 12  SENTENCING, AND IT HASN'T MADE ANY EFFORT TO DO THAT WORK IN

10:42AM 13  CONNECTION WITH RESTITUTION.  AND SO BASED ON THE GOVERNMENT'S

10:42AM 14  SUBMISSION, THERE IS NO RESTITUTION ORDER THAT SHOULD ISSUE.

10:42AM 15    THE COURT:  THE GOVERNMENT HASN'T MET THEIR BURDEN

10:42AM 16  IN MS. HOLMES'S POSITION, AND, THEREFORE, IT WOULD BE

10:42AM 17  INAPPROPRIATE FOR THE COURT TO ORDER RESTITUTION?

10:42AM 18    MR. LOOBY:  THAT'S, YOUR HONOR, THE --

10:42AM 19    THE COURT:  I'M SORRY.

10:42AM 20    MR. LOOBY:  SORRY.  I DIDN'T MEAN TO SPEAK OVER YOU.

10:42AM 21    THE COURT:  NO, NO, I INTERRUPTED YOU.  GO AHEAD.

10:42AM 22    MR. LOOBY:  YES.  AND IT'S REALLY A CONSEQUENCE OF

10:43AM 23  THE GOVERNMENT'S ALL OR NOTHING APPROACH HERE.  THEY HAVE SAID

10:43AM 24  THAT IT'S THE FULL INVESTMENT AMOUNT.  WE KNOW THAT THAT'S NOT

10:43AM 25  RIGHT.

10:43AM 1     THE COURT: OKAY. LET ME ASK A QUESTION THAT I
10:43AM 2  PROBABLY KNOW THE ANSWER TO, BUT HAS THE NINTH CIRCUIT EVER
10:43AM 3  UPHELD AN APPLICATION OF THE MVRA'S COMPLEXITY ISSUE?
10:43AM 4     MR. LOOBY: IT HAS -- I DO NOT THINK IT HAS EVER
10:43AM 5  AFFIRMED A GOVERNMENT APPEAL FROM THAT.
10:43AM 6     AND THEN I THINK THAT THERE'S BEEN A CASE OR TWO WHERE IT
10:43AM 7  MAY HAVE REVERSED, BUT I THINK THIS IS -- AND I THINK THE
10:43AM 8  REASON WHY, THE REASON WHY THE EXCEPTION REALLY WORKS HERE I
10:43AM 9  THINK IS SPELLED OUT IN THE SECOND CIRCUIT CASE THAT WE CITE IN
10:43AM 10  OUR BRIEF, THE REIFLER CASE. I MIGHT BE BUTCHERING THAT AS
10:43AM 11  WELL.
10:43AM 12     BUT A LOT OF THE SAME SITUATION THAT THE COURT THERE NOTED
10:44AM 13  APPLIES HERE, WHICH IS THERE'S AN ASSET THAT THE INVESTORS
10:44AM 14  HOLD. IT'S DAMAGED, BUT ITS VALUE IS NOT REDUCED TO NOTHING.
10:44AM 15  SLOWLY OVER TIME UNFORTUNATELY THE ASSET BECOMES VALUELESS.
10:44AM 16  DETERMINING WHEN THE MOMENT OF HARM WAS, WHAT THE DEGREE OF
10:44AM 17  HARM WAS, WHERE TO STOP THE CAUSAL CHAIN, THESE ARE EXCEEDINGLY
10:44AM 18  COMPLEX QUESTIONS.
10:44AM 19     AND IN THAT SECOND CIRCUIT CASE, WHICH THE COURT
10:44AM 20  ULTIMATELY REMANDED THE CASE, IT WENT OUT OF ITS WAY TO SUGGEST
10:44AM 21  THAT THIS MIGHT BE A COMPLEXITY EXCEPTION CASE, AND WE SUBMIT
10:44AM 22  THAT THIS IS ONE AS WELL.
10:44AM 23     THE COURT: OKAY. THANK YOU.
10:44AM 24     SO IT'S MORE THAN IN MY HYPOTHETICAL I PAID $100 FOR
10:44AM 25  WHATEVER AMOUNT OF SHARES, AND IRRESPECTIVE OF WHAT HAPPENED, I

10:44AM 1    LOST MY INVESTMENT.  THAT'S NOT ENOUGH?

10:44AM 2          MR. LOOBY:  THAT'S RIGHT, YOUR HONOR.  THAT'S NOT

10:44AM 3    THE INQUIRY OF ACTUAL LOSS BECAUSE OF THE PROXIMATE CAUSE

10:44AM 4    REQUIREMENT AND THE INTERVENING CAUSE DOCTRINES THAT ARE

10:45AM 5    EMBEDDED IN THE RESTITUTION CASE LAW, WHICH THE COURT HAS FOUND

10:45AM 6    THAT THE COMPANY -- THE OFFENSE CONDUCT DID NOT CAUSE OR THE

10:45AM 7    GOVERNMENT HAS NOT PROVEN BY A PREPONDERANCE OF THE EVIDENCE

10:45AM 8    THAT THE OFFENSE CONDUCT IS WHAT LED TO THE COMPANY'S

10:45AM 9    SHUDDERING.

10:45AM 10         WE KNOW THAT THE COMPANY RETAINED VALUE DURING THAT TIME

10:45AM 11   PERIOD.  THE INVESTORS OWNED THAT VALUE.

10:45AM 12         WHATEVER CAUSED THAT LOSS, IT WASN'T -- IT HAS NOT BEEN

10:45AM 13   SHOWN THAT IT WAS THE OFFENSE CONDUCT, AND SO IT CANNOT COUNT

10:45AM 14   AS ACTUAL LOSS.

10:45AM 15         AND I KNOW IT'S A LITTLE COUNTERINTUITIVE BECAUSE THEY

10:45AM 16   DIDN'T GET ANYTHING BACK, BUT THAT'S JUST THE WAY THAT THE

10:45AM 17   DOCTRINE INTERACTS WITH THE FACTS OF OUR CASE.

10:45AM 18         THE COURT:  WELL, THAT'S WHAT THE MVRA IS SUPPOSED

10:45AM 19   TO AND THE LAW WAS CHANGED IN THAT REGARD.  THE SPIRIT WAS TO

10:45AM 20   AFFORD AN OPPORTUNITY FOR VICTIMS, FIRST OF ALL, THERE HAS TO

10:45AM 21   BE IDENTIFICATION OF A VICTIM, IT PROVIDES AN OPPORTUNITY FOR

10:45AM 22   VICTIMS TO BE RECOMPENSED FULLY TO THEIR LOSS.

10:46AM 23         AND YOU'RE SAYING, YOUR ARGUMENT IS THAT THAT DOES NOT IN

10:46AM 24   ANY WAY OFFEND THE SPIRIT OF THE MVRA.

10:46AM 25         MR. LOOBY:  IT DOESN'T BECAUSE THE MVRA PUTS THE

10:46AM 1    BURDEN ON THE GOVERNMENT TO COME UP WITH A CALCULATION OF

10:46AM 2    ACTUAL LOSS THAT IS CONSISTENT WITH THE MANDATES OF THE

10:46AM 3    GOVERNING CASE LAW, AND HERE THEY HAVE NOT DONE THAT.

10:46AM 4        SO THE OUTCOME HERE WOULD BE NOT INCONSISTENT WITH THE

10:46AM 5    DIRECTION AND THE STRUCTURE OF THE MVRA.

10:46AM 6            THE COURT:  OKAY.  THANK YOU.

10:46AM 7        MR. LEACH.

10:46AM 8            MR. LEACH:  YOUR HONOR, I THINK ROBERS IS ON POINT,

10:46AM 9    AND IF YOU ACCEPT WHAT THE DEFENSE IS ARGUING HERE, YOU WOULD

10:46AM 10   HAVE THE CONTEXT WHERE IF I'M DEFRAUDED INTO MAKING LOANS TO A

10:46AM 11   COMPANY, MY LOSS IS THE FULL AMOUNT OF THE LOAN.  BUT IF I'M

10:46AM 12   DEFRAUDED IN MAKING AN INVESTMENT, SOMEHOW THE VALUE OF THE

10:46AM 13   SHARES AT SOME AMORPHOUS PERIOD OF TIME NEEDS TO BE THE

10:46AM 14   REDUCTION TO THAT.  AND THAT'S NOT WHAT 3663(A) SAYS.

10:46AM 15       IT SAYS, "THE ORDER OF RESTITUTION SHALL REQUIRE THAT SUCH

10:47AM 16   DEFENDANTS IN THE CASE OF AN OFFENSE RESULTING IN DAMAGE OR

10:47AM 17   LOSS OR DESTRUCTION OF PROPERTY OF A VICTIM OF THE OFFENSE

10:47AM 18   RETURN THE PROPERTY."

10:47AM 19       THE PROPERTY HERE IS MONEY.  YOU KNOW, YOU CAN TRY TO

10:47AM 20   ESTIMATE WHAT THERANOS WAS WORTH ON ANY OTHER DAY, BUT THAT'S

10:47AM 21   THE SAME THING THAT WAS HAPPENING IN ROBERS WHERE THE DEFENDANT

10:47AM 22   WAS TRYING TO SAY, YOU KNOW, THE HOUSE CHANGED IN VALUE BETWEEN

10:47AM 23   DIFFERENT PERIODS OF TIME THE AND THE LENDER TOOK POSSESSION OF

10:47AM 24   THE HOUSE AND WE SHOULD GET THAT OFFSET BECAUSE THE HOUSE IS

10:47AM 25   WORTH SOMETHING.

30

10:47AM 1       NO.  IT'S THE MONEY THAT IS THE PROPERTY HERE.

10:47AM 2       AND THE FACT THAT SHARES HYPOTHETICALLY COULD HAVE HAD A

10:47AM 3   VALUE ON SOME DAY REALLY IS A DISCONNECT FROM WHAT THESE

10:47AM 4   INVESTORS REALLY FEEL THEIR LOSS IS.  THEY GOT NOTHING BACK.

10:47AM 5   THEY COULDN'T SELL THOSE PIECES OF PAPER THAT WERE SUPPOSEDLY

10:47AM 6   BACKED BY PATENTS.  MS. HOLMES CONTROLLED THOSE.

10:47AM 7       THERE'S SOME SUGGESTION THAT THERE WAS A CHANGE OF MONEY

10:47AM 8   AFTER THE FACT.  THAT'S JUST NOT TRUE.  THERE WAS, YOU KNOW,

10:48AM 9   THE INVESTORS MS. HOLMES GAVE UP OWNERSHIP OF HER COMPANY, BUT

10:48AM 10   THEY NEVER GOT THEIR CASH BACK, AND THAT'S THE PROPERTY THAT

10:48AM 11   THE COURT SHOULD BE FOCUSSED ON HERE.

10:48AM 12       IT'S NOT AN ALL OR NOTHING APPROACH, YOUR HONOR.  OUR

10:48AM 13   ARGUMENT IS THAT IT'S THE AMOUNT OF THE INVESTMENT.  I THINK IF

10:48AM 14   YOU ASK -- JUST APPLY COMMON SENSE, IT'S THE MONEY THAT THESE

10:48AM 15   PEOPLE LOST WAS THE MONEY THAT THEY PUT IN.  BUT I THINK THE

10:48AM 16   SABA REPORT IN TERMS OF ITS ESTIMATE OF WHAT THE VALUE OF

10:48AM 17   THERANOS WAS ON A PARTICULAR DATE, WHICH THE COURT USED FOR

10:48AM 18   SENTENCING, IS AN ALTERNATIVE WAY TO GO ABOUT IT.

10:48AM 19       BUT I STICK TO THE PROPOSITION THAT THE MONEY THAT THESE

10:48AM 20   INVESTORS LOST IS THE MONEY THAT THEY LOST AT THE END OF THE

10:48AM 21   DAY.

10:48AM 22       MR. LOOBY:  YES, YOUR HONOR.

10:48AM 23   ON ROBERS, I THINK THE KEY DIFFERENCE IS THE DIFFERENCE

10:48AM 24   BETWEEN A LOAN AND AN INVESTMENT IN A COMPANY WITH VALUE.  SO

10:48AM 25   THE LOAN IS YOU'RE EXCHANGING MONEY AND AS A PROMISE TO GET A

10:49AM 1    STREAM OF INTEREST.  AND WHEN THAT STREAM RUNS OUT, THERE'S

10:49AM 2    NOTHING LEFT.  THERE'S NO VALUE THERE.

10:49AM 3        HERE THERE IS AN EXCHANGE OF MONEY FOR SHARES IN A

10:49AM 4    COMPANY, THE COMPANY THAT RETAINED VALUE AFTER THE OFFENSE

10:49AM 5    CONDUCT CONCLUDED PER THE COURT'S FACTUAL FINDINGS THAT IT HAS

10:49AM 6    ALREADY MADE AND SO THERE HAS TO BE A CALCULATION OF THE

10:49AM 7    INHERENT VALUE OF THE COMPANY.  THAT'S THE GERINGER CASE.  IT'S

10:49AM 8    JUST MORE ON POINT THAN THE ROBERS CASE, WHICH I THINK IS JUST

10:49AM 9    TOO FAR AFIELD IN TERMS OF ITS FACTS TO BE VERY HELPFUL TO US

10:49AM 10   HERE.

10:49AM 11       AND THEN JUST VERY BRIEFLY, YOUR HONOR, ON THE SABA

10:49AM 12   REPORT, THERE'S A -- WE OUTLINED IN OUR BRIEF A FEW REASONS WHY

10:49AM 13   THE REPORT ISN'T PARTICULARLY A GOOD FIT FOR CALCULATING THAT

10:49AM 14   RESIDUAL VALUE IN THE COMPANY.

10:49AM 15       THE METHODOLOGY FROM THE SABA REPORT THAT THE COURT

10:49AM 16   ADOPTED FOCUSSED ON A HARM THAT PURPORTEDLY OCCURRED AT THE

10:49AM 17   MOMENT OF INVESTMENT, AND THE COURT PICKED DECEMBER OF 2014,

10:50AM 18   ROUGHLY THE CLOSE OF THE C2 ROUND, AS AN APPROPRIATE DATE FOR

10:50AM 19   SENTENCING PURPOSES TO ESTIMATE THE ASSERTED INFLATION IN THE

10:50AM 20   SHARE PRICE.  SO IT'S ESSENTIALLY WHAT THEY OVERPAID AT THE

10:50AM 21   TIME.

10:50AM 22       THE QUESTION FOR RESTITUTION IS, WELL, WHAT HAPPENED NEXT?

10:50AM 23   WHAT HAPPENED AFTER?  WHAT HAPPENED AFTER THE OFFENSE CONDUCT?

10:50AM 24   WHAT VALUE DID THE INVESTORS RETAIN IN THEIR SHARES IN THE

10:50AM 25   COMPANY?

10:50AM 1      AND THE SABA REPORT DOESN'T PURPORT TO ANSWER THAT

10:50AM 2   QUESTION.

10:50AM 3      SO THAT'S KIND OF THE BIG PICTURE REASON WHY IT DOESN'T

10:50AM 4   FIT.  AND THEN WE HAVE SEVERAL OTHER OBJECTIONS FOR WHY AT

10:50AM 5   RESTITUTION, AT LEAST PUTTING ASIDE WHETHER OR NOT IT IS USEFUL

10:50AM 6   IN THE SENTENCING CONTEXT, THERE ARE CERTAIN ASPECTS OF

10:50AM 7   RESTITUTION THAT MAKE IT LESS USEFUL, ONE OF WHICH IS THE

10:50AM 8   FAILURE TO ACCOUNT FOR THE FULL VALUE OF THE COMPANY'S IP.

10:50AM 9      THE COMPANY CONTINUED TO GET PATENTS GRANTED IN 2015 AND

10:51AM 10  2016.  IT'S IP PORTFOLIO WAS UNDOUBTEDLY A VALUABLE ASSET THAT

10:51AM 11  THE INVESTORS OWNED, THE INCOME METHODOLOGY THAT THE COURT

10:51AM 12  ADOPTED FROM THE SABA REPORT DIDN'T PURPORT TO COVER THAT.

10:51AM 13     SO IF THE QUESTION IS, AND IT IS IN RESTITUTION, WELL,

10:51AM 14  WHAT VALUE DID THE INVESTORS RETAIN, UM, NOTWITHSTANDING THE

10:51AM 15  OFFENSE CONDUCT, THEN THE SABA REPORT ISN'T GOING TO ANSWER OUR

10:51AM 16  QUESTION.

10:51AM 17     AND THEN SIMILARLY, WE -- AS WE MAINTAINED IN CONNECTION

10:51AM 18  WITH SENTENCING, THE REPORT DOES MAKE A NUMBER OF ASSUMPTIONS

10:51AM 19  THAT DO LEAD TO KIND OF RANGES IN THE TENS OF MILLIONS OF

10:51AM 20  DOLLARS DEPENDING UPON CERTAIN ASSUMPTIONS OR DIFFERENT

10:51AM 21  METHODOLOGIES, AND THE COURT FOUND THAT THAT WAS REASONABLY --

10:51AM 22  IT WAS REASONABLY ACCURATE OR INFORMATIVE FOR THE GUIDELINES

10:51AM 23  PURPOSES.

10:51AM 24     BUT WHEN WE'RE TALKING ABOUT RESTITUTION, A DIFFERENCE OF

10:51AM 25  $30, $40, $50 MILLION HERE, $50 MILLION THERE, IN TERMS OF AN

10:52AM 1    ORDER REQUIRING OUR CLIENT TO PAY SPECIFIC INDIVIDUALS MONEY,

10:52AM 2    THE UNCERTAINTY THAT COMES WITH THE SABA REPORTS METHODOLOGY

10:52AM 3    BECOMES INTOLERABLE IN THIS CONTEXT, AND THERE'S A REAL RISK

10:52AM 4    THAT PEOPLE WOULD BECOME OVERCOMPENSATED.  SO WE SUBMIT THAT

10:52AM 5    THE SABA REPORT FOR THOSE REASONS IS NOT HELPFUL GROUND.

10:52AM 6         THERE IS METHODOLOGY IN THE CASE LAW IN THE SECOND CIRCUIT

10:52AM 7    CASES THAT WE CITE, THE DDNY CASES THAT WE CITE, THAT TALK

10:52AM 8    ABOUT HOW THESE VALUATIONS MIGHT OCCUR.  THEY'RE CONCEDEDLY

10:52AM 9    DIFFICULT, THE CASES WITH ILLIQUID SECURITIES.  BUT AS THE

10:52AM 10   COURT FOUND AT SENTENCING, DIFFICULT DOESN'T MEAN THAT YOU

10:52AM 11   DON'T HAVE TO TRY, AND THE GOVERNMENT DIDN'T TRY.

10:52AM 12        THE COURT:  OKAY.  THANK YOU.

10:52AM 13        SO YOU'RE NOT SAYING THAT THERE ARE NO VICTIMS HERE,

10:52AM 14   YOU'RE NOT SAYING THAT?  YOU'RE NOT SAYING, WELL, THERE'S

10:52AM 15   NOBODY THAT LOST MONEY?

10:52AM 16        MR. LOOBY:  NO, NO.  WE RECOGNIZE THAT THE INVESTORS

10:52AM 17   DID NOT GET THEIR MONEY BACK.

10:52AM 18        THE COURT:  AND YOU'RE SAYING -- I THINK YOU HAVE

10:53AM 19   ALSO SUGGESTED IN YOUR PLEADINGS, JUDGE, IF YOU ORDER

10:53AM 20   RESTITUTION, IT SHOULD BE LIMITED TO THE TEN THAT YOU FOUND IN

10:53AM 21   THE PREVIOUS CASE.

10:53AM 22        BUT EVEN IF YOU IDENTIFY AND ORDER RESTITUTION AS TO THOSE

10:53AM 23   TEN, OR ACTUALLY YOU SHOULDN'T ORDER RESTITUTION TO THOSE TEN

10:53AM 24   BECAUSE OF A FAILURE OF PROOF BY THE GOVERNMENT?

10:53AM 25        MR. LOOBY:  RIGHT.  SO ONCE WE PASSED THE THRESHOLD

10:53AM 1    ISSUE OF WHO IS A VICTIM.  AND WE BELIEVE AT A MINIMUM THE TEN,

10:53AM 2    OF COURSE, SHOULD BE THE LIMITED UNIVERSE.

10:53AM 3        AS WE'VE BEEN DISCUSSING TODAY, WE HAVE SPECIFIC

10:53AM 4    OBJECTIONS TO SOME OF THOSE TEN IN TERMS OF WHETHER OR NOT FOR

10:53AM 5    RESTITUTION PURPOSES IT'S APPROPRIATE TO INCLUDE THEM IN THE

10:53AM 6    ORDER.

10:53AM 7        BUT YOU'RE RIGHT, YOUR HONOR, THAT THE GOVERNMENT'S

10:53AM 8    FAILURE TO CALCULATE ACTUAL LOSS, IT PERMEATES THE ENTIRE

10:53AM 9    DISCUSSION BECAUSE THEY HAVE PROPOSED THE FULL AMOUNT OF

10:53AM 10   INVESTMENT FOR ALL INVESTORS, WHETHER IT'S THE BROADER CLASS OR

10:53AM 11   THE NARROWER CLASS, AND WE KNOW THAT THAT'S NOT RIGHT.

10:53AM 12       THE COURT:  OKAY.  I'M GOING TO ASK MR. LEACH IF HE

10:54AM 13   HAS A FINAL COMMENT AND YOU'LL GET THE LAST WORD.

10:54AM 14       MR. LEACH:  I DON'T, YOUR HONOR.

10:54AM 15       THE COURT:  OKAY.  GREAT.

10:54AM 16   ANYTHING FURTHER, MR. LOOBY?

10:54AM 17       MR. LOOBY:  NO, YOUR HONOR.

10:54AM 18       THE COURT:  GREAT.  THANK YOU VERY MUCH.  THANK YOU.

10:54AM 19   ALL RIGHT.  LET'S TURN TO THE MOTION FOR RELEASE PENDING

10:54AM 20   APPEAL.

10:54AM 21   LET ME -- WHILE THESE PARTIES COME FORWARD, I WOULD LIKE

10:54AM 22   YOU TO KNOW THAT I AM GOING TO TAKE THE MATTERS, ALL OF THESE

10:54AM 23   UNDER SUBMISSION TODAY.  I'M NOT GOING TO ENTER A DECISION FROM

10:54AM 24   THE BENCH TODAY.

10:54AM 25       AND JUST IN THE SPIRIT OF FULL TRANSPARENCY, I DON'T

10:54AM 1    EXPECT TO GET AN ORDER OUT UNTIL THE END OF THE MONTH, FRANKLY.

10:54AM 2    SO I JUST WANT TO LET YOU KNOW THAT.

10:54AM 3              MS. SAHARIA:  THAT'S HELPFUL FOR PLANNING PURPOSES,

10:54AM 4    YOUR HONOR.

10:54AM 5              THE COURT:  EXACTLY.  OKAY.  THANK YOU.

10:54AM 6              MS. SAHARIA:  THANK YOU, YOUR HONOR.

10:54AM 7         I'M HAPPY TO PROCEED HOWEVER IS HELPFUL TO THE COURT.  I

10:55AM 8    CAN WALK THROUGH THE FOUR FACTORS, BUT IF THERE ARE PARTICULAR

10:55AM 9    QUESTIONS ON THE COURT'S MIND, I'M HAPPY TO JUST TURN DIRECTLY

10:55AM 10   TO THOSE QUESTIONS.  IT'S UP TO THE COURT'S DIRECTION.

10:55AM 11             THE COURT:  SURE.  I DON'T THINK THERE'S ANY,

10:55AM 12   THERE'S ANY ISSUE ABOUT DANGER TO THE COMMUNITY OR ANY OF THOSE

10:55AM 13   THINGS, MS. SAHARIA.  I DON'T FIND THOSE TO BE AT ISSUE HERE AS

10:55AM 14   TO THAT FACTOR.

10:55AM 15        I THINK THE FACTORS THAT REALLY I'D LIKE TO HEAR MORE

10:55AM 16   ABOUT ARE FLIGHT RISK TYPE CONVERSATION.  IT SEEMS THERE'S A

10:55AM 17   LOT OF DISCUSSION IN YOUR PLEADINGS ABOUT THAT.

10:55AM 18             MS. SAHARIA:  SURE.

10:55AM 19             THE COURT:  SO SHALL WE START WITH THAT?

10:55AM 20             MS. SAHARIA:  SURE, LET'S START WITH FLIGHT RISK.

10:55AM 21        THE COURT HAS ALREADY FOUND MULTIPLE TIMES THAT MS. HOLMES

10:55AM 22   IS NOT A FLIGHT RISK.  PROBATION AND PRETRIAL SERVICES HAS

10:55AM 23   FOUND MULTIPLE TIMES THROUGHOUT THIS CASE THAT MS. HOLMES IS

10:55AM 24   NOT A FLIGHT RISK.  AND THE GOVERNMENT, UNTIL THIS OPPOSITION

10:56AM 25   BRIEF, HAS CONSISTENTLY TAKEN THE POSITION THAT MS. HOLMES IS

10:56AM 1    NOT A FLIGHT RISK.

10:56AM 2        THE COURT ALLOWED MS. HOLMES TO REMAIN ON RELEASE POST

10:56AM 3    CONVICTION.  AND SEVERAL DEVELOPMENTS SINCE THEN CONFIRM THAT

10:56AM 4    SHE'S NOT A FLIGHT RISK.

10:56AM 5        FIRST, FOLLOWING CONVICTION, HER BOND WAS UPDATED TO BE

10:56AM 6    SECURED BY HER PARENTS' ONLY HOME, AND THAT REMAINS THE CASE

10:56AM 7    TODAY.

10:56AM 8        MS. HOLMES MOVED TO ANOTHER DISTRICT IN CALIFORNIA AND

10:56AM 9    APPROPRIATELY COORDINATED THAT MOVE WITH PRETRIAL SERVICES.

10:56AM 10   SHE NOW REPORTS TO TWO PRETRIAL SERVICES OFFICERS BOTH IN THAT

10:56AM 11   DISTRICT AND IN THIS DISTRICT AND REMAINS IN FULL COMPLIANCE

10:56AM 12   WITH HER CONDITIONS OF RELEASE.

10:56AM 13       AND MS. HOLMES RECENTLY HAD A SECOND CHILD TO PROVIDE YET

10:56AM 14   ADDITIONAL MOTIVATION NOT TO FLEE.

10:56AM 15       SO I SUBMIT THAT ALL OF THOSE FACTORS SIMPLY SHOULD CEMENT

10:56AM 16   THE COURT'S PRIOR RULINGS THAT SHE IS NOT A FLIGHT RISK.

10:56AM 17       NOW, THE GOVERNMENT IN ITS OPPOSITION BRIEF HIGHLIGHTED AN

10:57AM 18   INCIDENT, OR NOT EVEN AN INCIDENT BECAUSE IT NEVER TURNED INTO

10:57AM 19   AN INCIDENT, IN JANUARY OF 2022 WITH RESPECT TO A FLIGHT TICKET

10:57AM 20   THAT MS. HOLMES'S PARTNER HAD PURCHASED TO GO TO A WEDDING IN

10:57AM 21   MEXICO OF FRIENDS.

10:57AM 22       THE GOVERNMENT HAD FULL DETAILS OF THAT INCIDENT IN

10:57AM 23   JANUARY OF 2022.  THEY DID NOT PROVIDE THE FULL DETAILS OF THAT

10:57AM 24   INCIDENT TO THE COURT IN THEIR PAPERS, BUT WE HAVE PROVIDED

10:57AM 25   THOSE FULL DETAILS INCLUDING THE FULL COMMUNICATIONS BETWEEN

37

10:57AM 1    THE PARTIES ABOUT THAT INCIDENT TO THE COURT.  THE GOVERNMENT

10:57AM 2    KNEW ABOUT THAT IN JANUARY OF 2022.

10:57AM 3        NOTWITHSTANDING THAT, IN FEBRUARY OF 2022, WHEN THE

10:57AM 4    PARTIES CAME TO THE COURT AND ASKED THE COURT TO APPROVE THE

10:57AM 5    UPDATED BOND, THE GOVERNMENT SAID NOT A WORD ABOUT THAT

10:57AM 6    INCIDENT, NEVER ARGUED SHE WAS A FLIGHT RISK.  THEY JUST DIDN'T

10:57AM 7    DO ANYTHING ABOUT IT FOR AN ENTIRE YEAR.

10:58AM 8        I UNDERSTAND THAT MS. HOLMES HAS DISCUSSED THAT INCIDENT

10:58AM 9    SINCE THE GOVERNMENT'S OPPOSITION BRIEF WITH PRETRIAL SERVICES,

10:58AM 10   AND AS FAR AS I KNOW PRETRIAL SERVICES HAS NOT COME TO THE

10:58AM 11   COURT AND SAID ALL OF A SUDDEN THAT MS. HOLMES IS A FLIGHT RISK

10:58AM 12   BECAUSE HER PARTNER BOUGHT A TICKET TO MEXICO HOPING THAT SHE

10:58AM 13   WOULD BE ACQUITTED.

10:58AM 14       ONCE SHE WAS NOT ACQUITTED ON ALL COUNTS, OF COURSE SHE

10:58AM 15   WAS NOT GOING TO GO TO MEXICO.

10:58AM 16       I JUST THINK RESPECTFULLY TO THE GOVERNMENT, THIS IS A

10:58AM 17   COMPLETE NON-ISSUE.  THEY HAVE KNOWN ABOUT IT FOR A YEAR.  IF

10:58AM 18   THEY REALLY THOUGHT SHE WAS A FLIGHT RISK, SURELY THEY WOULD

10:58AM 19   HAVE COME TO THE COURT, SURELY THEY WOULD HAVE GONE TO PRETRIAL

10:58AM 20   SERVICES OR PROBATION.

10:58AM 21       MS. HOLMES DID NOT ATTEMPT TO FLEE.  THE GOVERNMENT MADE

10:58AM 22   FALSE REPRESENTATIONS IN THEIR PAPERS WITH RESPECT TO THAT.  I

10:58AM 23   UNDERSTAND THAT THEY DID NOT KNOW THAT THEY WERE FALSE, BUT WE

10:58AM 24   BROUGHT THAT TO THEIR ATTENTION PROMPTLY WITH RESPECT TO

10:59AM 25   MS. HOLMES PARTNER'S TRAVEL.

38

10:59AM 1        SO THIS SHOULD JUST BE A NON-ISSUE, YOUR HONOR, GIVEN THE

10:59AM 2    MANY, MANY YEARS OF PERFECT COMPLIANCE, THE MANY FACTORS THAT

10:59AM 3    TIE MS. HOLMES TO THE UNITED STATES, TO HER COMMUNITY, TO HER

10:59AM 4    FAMILY.  THERE'S SIMPLY NO REASON FOR HER TO FLEE.

10:59AM 5        I'LL PAUSE THERE.

10:59AM 6            THE COURT:  THANK YOU.

10:59AM 7        MS. VOLKAR.

10:59AM 8            MS. VOLKAR:  THANK YOU, YOUR HONOR.

10:59AM 9        MS. SAHARIA I THINK MISSES ONE KEY PART IN THIS PART OF

10:59AM 10   THE DISCUSSION, AND THAT IS THE BURDEN.

10:59AM 11       SO, FIRST OF ALL, MS. SAHARIA SAYS THAT THE COURT HAS

10:59AM 12   REPEATEDLY FOUND MULTIPLE TIMES THAT MS. HOLMES IS NOT A FLIGHT

10:59AM 13   RISK.  THAT'S NOT ACTUALLY TRUE.  IF YOU GO BACK TO THE RECORD,

10:59AM 14   THE COURT DID AGREE THAT SHE COULD BE OUT ON BOND.  THE COURT

10:59AM 15   DID NOT MAKE EXPLICIT FINDINGS THAT SHE'S NOT A FLIGHT RISK.

10:59AM 16       NOW, MS. SAHARIA WOULD SAY IMPLIED IN THAT FINDING, OF

10:59AM 17   COURSE, IS THAT UNDER THE STANDARD AND THE BURDEN AT THAT TIME,

10:59AM 18   WHICH WAS ON THE GOVERNMENT UP UNTIL THE CONVICTION, THAT THE

10:59AM 19   COURT FOUND THE GOVERNMENT COULD NOT MEET ITS BURDEN TO SHOW

10:59AM 20   THAT SHE WAS A FLIGHT RISK.

11:00AM 21       MS. SAHARIA SIMILARLY SAYS THAT THE GOVERNMENT HAS

11:00AM 22   REPEATEDLY SAID THAT SHE'S NOT A FLIGHT RISK.  THAT'S ALSO

11:00AM 23   FALSE.  THE GOVERNMENT HAS NEVER SAID THAT IT DOES NOT FIND

11:00AM 24   SHE'S A FLIGHT RISK.  THE GOVERNMENT DID NOT PUT FORWARD

11:00AM 25   ANYTHING TO MEET A BURDEN THAT WAS ON IT PRIOR TO THE

11:00AM 1    CONVICTION THAT SHE WAS A FLIGHT RISK.

11:00AM 2        SO I'M TALKING ABOUT THE BURDEN HERE.  AND THE BURDEN,

11:00AM 3    ONCE MS. HOLMES WAS FOUND GUILTY BY A JURY ON THE FOUR COUNTS

11:00AM 4    RELATED TO INVESTOR FRAUD, THE BURDEN SHIFTED TO WHERE SHE HAD

11:00AM 5    TO SHOW BY CLEAR AND CONVINCING EVIDENCE THAT SHE WAS NOT A

11:00AM 6    FLIGHT RISK.

11:00AM 7        NOW, AT THE END OF THE TRIAL THE COURT DID ASK IF THE

11:00AM 8    GOVERNMENT HAD A POSITION ON WHETHER OR NOT TO INCREASE THE

11:00AM 9    BOND, AND THE GOVERNMENT SOUGHT TO REQUIRE A SECURED BOND, AND

11:00AM 10   THAT WAS SECURED BY HER PARENT'S HOUSE.  AT THAT MOMENT WHEN

11:00AM 11   THE GOVERNMENT ASKED THAT, THE GOVERNMENT DID NOT KNOW THAT

11:00AM 12   MS. HOLMES HAD A FLIGHT TO MEXICO.  THE GOVERNMENT WAS NOT

11:00AM 13   AWARE OF THAT INFORMATION.

11:00AM 14       THE GOVERNMENT, WHEN IT BECAME AWARE OF THE INFORMATION,

11:01AM 15   AND AS MUCH AS MS. HOLMES CONTINUES TO SAY THAT THE GOVERNMENT

11:01AM 16   MADE FALSE MISREPRESENTATIONS, THERE ARE NO FALSE

11:01AM 17   MISREPRESENTATIONS THAT THEY HAVE POINTED TO IN OUR BRIEF.

11:01AM 18       THE FACTS ARE THE GOVERNMENT FOUND OUT ON JANUARY 23RD,

11:01AM 19   2022, THAT MS. HOLMES HAD AN ACTIVE ONE-WAY TICKET TO MEXICO

11:01AM 20   THAT WAS SCHEDULED TO LEAVE IN A FEW DAYS, SHORTLY, A FEW WEEKS

11:01AM 21   AFTER THE CONVICTION ON FOUR FELONY COUNTS.

11:01AM 22       THE GOVERNMENT IMMEDIATELY UPON LEARNING THIS INFORMATION,

11:01AM 23   REACHED OUT TO MS. HOLMES'S COUNSEL BECAUSE AS THE GOVERNMENT

11:01AM 24   COUNSEL SAID IN ITS EMAIL, "THIS IS CONCERNING.  WE MIGHT NEED

11:01AM 25   TO RAISE THIS WITH THE COURT."

40

11:01AM 1       MS. HOLMES COUNSEL SAID IT WAS A TICKET PURCHASED FOR A

11:01AM 2   WEDDING IN MEXICO AND, OF COURSE, SHE'S NOT PLANNING TO GO.

11:01AM 3   WE'LL CANCEL IT.

11:01AM 4       AND THE GOVERNMENT SAID WE'LL WAIT TO SEE IF YOU CANCEL

11:01AM 5   IT.

11:01AM 6       SHE DID CANCEL IT, AND HER PARTNER DID IN FACT LEAVE ON

11:01AM 7   THAT, A ONE-WAY TICKET TO MEXICO FOR A WEDDING.  HER PARTNER,

11:02AM 8   APPARENTLY, CONTINUED TO TRAVEL AND ULTIMATELY WAS IN

11:02AM 9   SOUTH AFRICA.

11:02AM 10      THE GOVERNMENT'S POSITION RIGHT NOW -- AND NONE OF THOSE

11:02AM 11  STATEMENTS ARE FALSE AND NONE OF THOSE STATEMENTS ARE REALLY

11:02AM 12  CHALLENGED BY THE DEFENSE.  THE GOVERNMENT'S POSITION RIGHT NOW

11:02AM 13  IS MS. HOLMES COMES BEFORE THE COURT WITH A CLEAR AND

11:02AM 14  CONVINCING EVIDENCE BURDEN ON HER, AND IT'S NOT ENOUGH NOW TO

11:02AM 15  LOOK AT JUST HER PRETRIAL RECORD, AND IT'S NOT ENOUGH TO LOOK

11:02AM 16  AT THE HISTORY OF HER COMPLIANCE WITH PRETRIAL SERVICES.

11:02AM 17      THE COURT NOW HAS TO THINK THAT MS. HOLMES IS FACING A

11:02AM 18  NEARLY A 11 YEAR SENTENCE FOR HER 4 FELONY CONVICTIONS, AND SHE

11:02AM 19  DID AT ONE POINT IN TIME PURCHASE A TICKET, EVEN THOUGH SHE DID

11:02AM 20  NOT GET ON THAT.

11:02AM 21      AND THE GOVERNMENT'S POSITION IS THAT WHEN YOU LOOK AT ALL

11:02AM 22  OF THE FACTS TOGETHER AND THE FACT THAT NOW MS. HOLMES IN

11:02AM 23  APPROXIMATELY A MONTH, MAYBE SIX WEEKS IS SET TO GO TO JAIL AND

11:03AM 24  FACE A SIGNIFICANT SENTENCE.  AND I DO THINK THAT THE KHAN CASE

11:03AM 25  FROM JUDGE GONZALEZ ROGERS IN THIS DISTRICT IS INDICATIVE ON

41

11:03AM 1  THIS POINT AND ALSO YOUR HONOR'S CASE IN KAKKAR WHERE THE

11:03AM 2  PERSON WAS FACING A SIGNIFICANT PRISON SENTENCE.  IT DOES

11:03AM 3  CHANGE THE CALCULUS.

11:03AM 4      SO I THINK THE BIGGEST PIECE THAT IS MISSING FROM

11:03AM 5  MS. SAHARIA'S RECOUNT OF THE FACT IS THE BURDEN SHIFTING, AND

11:03AM 6  THE BURDEN IS NO LONGER ON THE GOVERNMENT.  THE BURDEN IS NOW

11:03AM 7  SQUARELY ON MS. HOLMES TO PROVE BY CLEAR AND CONVINCING

11:03AM 8  EVIDENCE THAT SHE IS NOT A FLIGHT RISK WHEN SHE IS FACING A

11:03AM 9  SUBSTANTIAL SENTENCE BASED ON FOUR SERIOUS FELONY COUNTS, AND

11:03AM 10  SHE HAS THE MEANS AND THE MOTIVE TO FLEE, AND SHE ALSO

11:03AM 11  DEMONSTRATED AT LEAST AT ONE POINT IN TIME THAT THERE WAS AN

11:03AM 12  OPPORTUNITY FOR THAT BACK IN JANUARY OF 2022.  THAT IS THE

11:04AM 13  GOVERNMENT'S POSITION.

11:04AM 14          THE COURT:  THANK YOU.

11:04AM 15      SO, MS. SAHARIA, I THINK THE FOCUS IS A ONE-WAY TICKET.

11:04AM 16  AND WHEN SOMEONE PURCHASES, WHEN A ROUNDTRIP TICKET IS

11:04AM 17  PURCHASED, I THINK WE CAN EXPECT THAT THAT EVINCES AN INTENT TO

11:04AM 18  RETURN, COMING BACK.

11:04AM 19      WHEN THERE'S A ONE-WAY TICKET PURCHASED, IT SUGGESTS THAT

11:04AM 20  THE RETURN PLANS HAVE NOT YET BEEN ACHIEVED OR MADE.

11:04AM 21      AND I THINK WHAT I HEAR MS. VOLKAR SAYING IS THAT THAT

11:04AM 22  SHOULD RAISE SOME CONCERN HERE, NOTWITHSTANDING THE TIME SPAN,

11:04AM 23  BUT THE FACT THAT THAT PURCHASE WAS MADE SUGGESTS SOMETHING

11:04AM 24  THAT THE COURT SHOULD CONSIDER IN A NEGATIVE WAY AS TO YOUR

11:04AM 25  CLIENT, AS TO HER INTENT AND THE FLIGHT RISK.

| | | |
|---|---|---|
| 11:04AM | 1 | MS. SAHARIA:  SURE.  SO LET ME RESPOND TO THAT |
| 11:04AM | 2 | QUESTION, AND LET ME RESPOND MORE GENERALLY TO THE GOVERNMENT'S |
| 11:05AM | 3 | COMMENTS. |
| 11:05AM | 4 | I MEAN, THE REALITY, YOUR HONOR, IS THAT THEY DIDN'T KNOW |
| 11:05AM | 5 | HOW LONG THEY WERE GOING TO STAY IN MEXICO AND THEY WENT FOR A |
| 11:05AM | 6 | WEDDING -- OR THE INTENT WAS TO GO FOR A WEDDING, AND I BELIEVE |
| 11:05AM | 7 | MS. HOLMES HAS PROVIDED THE DETAILS OF THAT WEDDING TO PRETRIAL |
| 11:05AM | 8 | SERVICES.  SHE'S PROVIDED A COPY OF THE WEDDING INVITATION. |
| 11:05AM | 9 | BUT THEY WERE -- |
| 11:05AM | 10 | THE COURT:  YOU KNOW, THAT WASN'T -- THAT'S NOT IN |
| 11:05AM | 11 | ANY OF THE PLEADINGS. |
| 11:05AM | 12 | MS. SAHARIA:  I UNDERSTAND THAT, YOUR HONOR. |
| 11:05AM | 13 | THE COURT:  RIGHT. |
| 11:05AM | 14 | MS. SAHARIA:  AND THEY WERE HOPING SHE WOULD BE |
| 11:05AM | 15 | ACQUITTED, AND, OF COURSE, HOPING THAT THEY COULD STAY AND |
| 11:05AM | 16 | RELAX. |
| 11:05AM | 17 | YOU KNOW, I -- AND MEXICO IS A PLACE WHERE YOU DON'T NEED |
| 11:05AM | 18 | TO FLY BACK.  ACTUALLY WE KNOW FROM THE RECORD THAT MR. EVANS |
| 11:05AM | 19 | RETURNED BY CAR.  IT APPEARS THAT MAY BE WHY THE GOVERNMENT |
| 11:05AM | 20 | FALSELY STATED THAT HE WENT TO MEXICO AND THEN GALAVANTED ALL |
| 11:05AM | 21 | OF THE WAY TO SOUTH AFRICA FROM MEXICO BECAUSE HE ACTUALLY |
| 11:05AM | 22 | RETURNED BY CAR THROUGH TIJUANA.  THAT'S SOMETHING THAT YOU CAN |
| 11:06AM | 23 | DO WHEN YOU'RE GOING TO MEXICO. |
| 11:06AM | 24 | THE COURT:  I THINK HE TOOK THE OTAY MESA WAY BACK |
| 11:06AM | 25 | IN WHICH IS -- I LOOKED AND I THOUGHT, WELL, THAT'S |

11:06AM 1    INTERESTING.  THAT'S ABOUT 20, 30 MILES FROM TIJUANA PROPER,

11:06AM 2    BUT I THINK TIJUANA BORDER CROSSING IS THE BIGGEST BORDER

11:06AM 3    CROSSING IN THE WORLD.  TWO MILLION PEOPLE CROSS EVERY MONTH I

11:06AM 4    THINK.

11:06AM 5        SO THE OTAY MESA CROSSING, WHICH YOUR EXHIBIT SUGGESTS

11:06AM 6    THAT HE CROSSED AT OTAY MESA, IT'S ABOUT 20 MILES I THINK,

11:06AM 7    MAYBE 30 MILES EAST OF TIJUANA.  I SUPPOSE THAT HE DID THAT

11:06AM 8    BECAUSE IT'S MORE CONVENIENT THAN GOING THROUGH TIJUANA PROPER.

11:06AM 9            MS. SAHARIA:  I CAN'T SPEAK TO THAT, YOUR HONOR.

11:06AM 10   BUT I DON'T KNOW HOW THE COURT COULD DRAW ANY NEGATIVE

11:06AM 11   INFERENCE FROM WHICH BORDER CROSSING HE HAPPENED TO COME BACK

11:06AM 12   THROUGH.

11:06AM 13       MR. EVANS'S FAMILY DOES LIVE IN SOUTHERN CALIFORNIA.

11:06AM 14   THAT'S WHERE HIS IMMEDIATE FAMILY RESIDES.  SO IT'S NOT

11:06AM 15   SURPRISING THAT HE WOULD CHOOSE, INSTEAD OF FLYING BACK TO

11:06AM 16   NORTHERN CALIFORNIA, THAT HE WOULD CROSS THE BORDER TO

11:07AM 17   SOUTHERN CALIFORNIA, WHICH IS WHERE HIS FAMILY HAPPENS TO

11:07AM 18   RESIDE.

11:07AM 19           THE COURT:  SO DOES THE CHANGE OF PLANS IN TRAVEL

11:07AM 20   MEAN ANYTHING AT ALL?  IS IT A ROUNDTRIP TICKET?  A

11:07AM 21   ONE-WAY TICKET?

11:07AM 22       THE TICKET TO MEXICO IS NOT IN THE EXHIBITS.  THERE WERE

11:07AM 23   SOME EXHIBITS OF OTHER TRAVEL BY MS. HOLMES'S PARTNER.

11:07AM 24           MS. SAHARIA:  THAT'S CORRECT, YOUR HONOR.  WE DON'T

11:07AM 25   DISPUTE THAT THE TICKET THAT WAS PURCHASED WAS A

11:07AM 1    ONE-WAY TICKET.

11:07AM 2              THE COURT:  I SEE.  OKAY.

11:07AM 3              MS. SAHARIA:  I DON'T THINK THE COURT SHOULD DRAW

11:07AM 4    ANY CONCLUSIONS FROM THAT FACT BECAUSE OF THE FACT THAT THEY

11:07AM 5    SIMPLY DIDN'T KNOW HOW LONG THEY WANTED TO STAY.  AND WE KNOW

11:07AM 6    FROM THE RECORD THAT MR. EVANS RETURNED BY CAR, WHICH IS

11:07AM 7    SOMETHING THAT IS EASY TO DO FROM MEXICO, AND IT MAKES SENSE

11:07AM 8    GIVEN THAT HIS FAMILY LIVES IN SOUTHERN CALIFORNIA.

11:07AM 9              SO THE COURT SHOULD NOT DRAW ANY INFERENCE FROM THE FACT

11:07AM 10   THAT IT HAPPENED TO BE A ONE-WAY TICKET.  THAT IS SOMETHING

11:07AM 11   THAT PEOPLE DO WHEN THEY DON'T KNOW HOW LONG THEY PLAN TO STAY

11:07AM 12   IN A CERTAIN LOCATION.

11:08AM 13             NOW, IF I COULD JUST ADDRESS THE MORE GENERAL POINT THAT

11:08AM 14   THE GOVERNMENT MADE ABOUT THE BURDEN SHIFTING.  THE BURDEN

11:08AM 15   SHIFTED UPON CONVICTION.  THAT WAS IN JANUARY OF 2022.

11:08AM 16             AND I THINK THE REALLY KEY POINT IS THAT MS. HOLMES BORE

11:08AM 17   THAT BURDEN IN FEBRUARY OF 2022 WHEN THE GOVERNMENT CAME TO THE

11:08AM 18   COURT WITH THE DEFENSE AND ASKED THE COURT TO APPROVE THE

11:08AM 19   UPDATED BOND SECURING HER RELEASE, WHICH WAS UPDATED TO BE

11:08AM 20   SECURED BY HER PARENTS' HOME.  THEY DID THAT AT A TIME WHEN

11:08AM 21   THEY KNEW ALL OF WHAT WE ARE TALKING ABOUT NOW.  AND IF THEY

11:08AM 22   REALLY THOUGHT THIS WAS AN ATTEMPT TO FLEE, IF THEY WERE REALLY

11:08AM 23   TROUBLED BY THE FACT THAT THIS WAS A ONE-WAY TICKET, AND IF

11:08AM 24   THEY REALLY THOUGHT THAT SOMEHOW MEANT THAT MS. HOLMES COULDN'T

11:08AM 25   SATISFY HER BURDEN AT THAT TIME, SHE BORE THE BURDEN THEN, THEY

11:08AM 1    WOULD HAVE SAID SOMETHING.  AND THEY JUST SAID NOTHING.

11:08AM 2         AND INSTEAD THEY APPARENTLY THOUGHT IT WAS FINE FOR

11:08AM 3    MS. HOLMES TO BE OUT ON RELEASE FOR THE ENTIRE PAST YEAR

11:08AM 4    WITHOUT UTTERING A PEEP ABOUT WHAT THEY KNEW IN JANUARY OF

11:09AM 5    2022.

11:09AM 6         SO THE COURT SHOULD NOT CREDIT THIS CLAIM THAT SHE

11:09AM 7    ATTEMPTED TO FLEE WHEN THEY'VE KNOWN ABOUT IT FOR A YEAR AND

11:09AM 8    APPARENTLY TOOK NO STEPS TO ASK THE COURT TO CHANGE HER

11:09AM 9    CONDITIONS OF RELEASE, TO ORDER HER TO BE DETAINED, ALL OF THE

11:09AM 10   TIME SHE BORE THE BURDEN TO PROVE BY CLEAR AND CONVINCING THAT

11:09AM 11   SHE WAS NOT A FLIGHT RISK, AND THEY JUST WERE NOT TROUBLED BY

11:09AM 12   IT UNTIL THIS MOTION.

11:09AM 13            THE COURT:  THANK YOU.

11:09AM 14        SO REFRESH MY RECOLLECTION.  AFTER THE JURY'S VERDICT, THE

11:09AM 15   GOVERNMENT ASKED FOR AN INCREASE IN SECURITY, AND THERE WAS

11:09AM 16   A -- I THINK WE TOOK A BREAK TO ALLOW FOR PRETRIAL SERVICES TO

11:09AM 17   DO AN INVESTIGATION OF WHAT WOULD BE USED FOR THAT INCREASED

11:09AM 18   SECURITY.

11:09AM 19            MS. SAHARIA:  I DON'T REMEMBER IF THE GOVERNMENT

11:09AM 20   ASKED FOR AN INCREASE, BUT THEY DID ASK FOR THE BOND TO BE

11:09AM 21   SECURED.

11:09AM 22            THE COURT:  YES.

11:09AM 23            MS. SAHARIA:  AND THEN THERE WAS A PAUSE AND THE

11:09AM 24   PARTIES COMMUNICATED ABOUT THAT.

11:10AM 25        OF COURSE, MS. HOLMES HAD TO COMMUNICATE WITH HER PARENTS

46

11:10AM 1 AND HER PARENTS HAD TO WORK TO GET A BOND THAT WAS SECURED BY

11:10AM 2 THE HOME.

11:10AM 3      AND WE WERE IN CONSTANT COMMUNICATION WITH THE GOVERNMENT

11:10AM 4 ABOUT THAT BOND, AND ULTIMATELY BROUGHT THAT BOND TO THE COURT

11:10AM 5 IN FEBRUARY OF 2022 AFTER THESE INCIDENTS AND ASKED THE COURT

11:10AM 6 TO APPROVE THAT BOND SECURING HER RELEASE.  AND AGAIN, THERE

11:10AM 7 WAS NO DISCUSSION OF THESE EVENTS.

11:10AM 8         THE COURT:  WHEN WAS THE COLLOQUY BETWEEN YOUR YOUNG

11:10AM 9 PARTNER, MR. WADE, AND MR. SCHENK?  WHEN WAS THAT COLLOQUY?

11:10AM 10         MS. SAHARIA:  WHEN WAS THE EMAIL COLLOQUY?

11:10AM 11         THE COURT:  YES.

11:10AM 12         MS. SAHARIA:  THAT WAS IN JANUARY OF 2022.

11:10AM 13         THE COURT:  OKAY.  THANK YOU.

11:10AM 14         MS. VOLKAR:  THANK YOU, YOUR HONOR.

11:10AM 15      SO FIRST JUST BRIEFLY ON MR. EVANS'S TRAVEL BECAUSE I DO

11:10AM 16 THINK IT'S A LITTLE BIT OF A SIDE ISSUE.  BUT MR. EVANS FLEW TO

11:10AM 17 PUERTO VALLARTA AS MS. HOLMES AND MR. EVANS WERE ORIGINALLY

11:10AM 18 SCHEDULED TO DO.  HE WENT ON THAT ONE-WAY FLIGHT, AND HE

11:11AM 19 APPARENTLY DROVE BACK THROUGH OTAY MESA.  I KNOW YOUR HONOR IS

11:11AM 20 FAMILIAR.  MEXICO IS A QUITE LARGE COUNTRY.  THAT IS QUITE A

11:11AM 21 DRIVE AND IT IS SURPRISING THAT THAT WOULD NOT BE DONE VIA A

11:11AM 22 PLANE FLIGHT BUT INSTEAD OUR GOVERNMENT RECORDS SHOW THAT THE

11:11AM 23 NEXT TIME THAT HE ENTERED THE COUNTRY BY A PLANE FLIGHT WAS

11:11AM 24 FROM SOUTH AFRICA.

11:11AM 25      I WILL SUBMIT ON THE PAPERS OTHERWISE ON THAT POINT.

11:11AM 1      MOVING TO WHAT THE GOVERNMENT KNEW.  SO AS YOU HAVE SEEN

11:11AM 2  FROM THE CORRESPONDENCE, THE GOVERNMENT WAS VERY TROUBLED WHEN

11:11AM 3  IT FOUND OUT ABOUT THIS PLANE FLIGHT.  THE EMAILS SHOW THAT.

11:11AM 4      AND, YES, AN EXPLANATION WAS PROVIDED.  BUT ALSO, THE

11:11AM 5  GOVERNMENT ASKED WHETHER OR NOT WE NEEDED TO BRING THIS TO THE

11:11AM 6  ATTENTION OF THE COURT.

11:11AM 7      MS. HOLMES'S DEFENSE COUNSEL VEHEMENTLY DID NOT WANT THAT.

11:11AM 8  AND SO THE PARTIES NEGOTIATED.  AND WHEN THE PARTIES CAME IN IN

11:11AM 9  FEBRUARY OF 2022, IT WAS A -- MS. HOLMES HAD ALREADY SUBMITTED

11:11AM 10 ALL OF THE BOND MODIFICATION PAPERWORK TO PRETRIAL AND THE

11:11AM 11 COURT.  IT WAS SIMPLY THE PROCESS OF FORMALIZING WHAT HAD BEEN

11:12AM 12 DECIDED AT THE TIME OF THE JURY'S VERDICT THAT DAY BACK IN

11:12AM 13 JANUARY.

11:12AM 14     AND THE GOVERNMENT DECIDED THAT WHEN -- AND ALSO I WILL

11:12AM 15 SAY THAT THE NORMAL COURSE OF THINGS IS THAT WHEN A JURY

11:12AM 16 REACHES A GUILTY VERDICT AND THE COURT SENTENCES A DEFENDANT,

11:12AM 17 THE DEFENDANT GOES TO JAIL.  CONGRESS HAS BEEN VERY CLEAR THAT

11:12AM 18 IT IS AN UPHILL BATTLE TO OBTAIN BAIL PENDING APPEAL, AND SO

11:12AM 19 THIS IS THE NEXT BAIL DETERMINATION BEFORE YOUR HONOR.

11:12AM 20     AND ALTHOUGH WE'RE CURRENTLY ON THE FLIGHT RISK SECTION,

11:12AM 21 THIS IS ONE OF FOUR FACTORS THAT MS. HOLMES BEARS THE BURDEN

11:12AM 22 FOR.  AND THE POINT THAT THE GOVERNMENT IS MAKING IS THAT SHE

11:12AM 23 HAS AN UPHILL BATTLE HERE, AND THIS IS A FACTOR THAT THE COURT

11:12AM 24 SHOULD BE AWARE OF, THAT THE COURT SHOULD CONSIDER, AND THAT

11:12AM 25 DOES NOT WEIGH IN HER FAVOR.

48

11:12AM 1       THE COURT:  SO THE -- THANK YOU.  THE BURDEN IS

11:13AM 2  CLEAR AND CONVINCING EVIDENCE BY THE DEFENDANT THAT THERE'S NO

11:13AM 3  LIKELIHOOD OF FLIGHT.  I THINK THAT'S WHAT WE'RE TALKING ABOUT.

11:13AM 4      I'VE INDICATED THAT I DON'T FIND THAT SHE IS A DANGER OR

11:13AM 5  THREAT TO THE COMMUNITY.  I DON'T SEE THAT.

11:13AM 6      I DON'T THINK THIS APPEAL IS ALSO GENERATED FOR TACTICAL

11:13AM 7  DELAY OR ANYTHING.  I DON'T THINK THAT'S A FACTOR HERE ALSO.

11:13AM 8      SO, MS. SAHARIA, YOU CAN -- I DON'T KNOW IF YOU WANT TO

11:13AM 9  TALK ABOUT THAT, BUT YOU DON'T HAVE TO.

11:13AM 10      MS. SAHARIA:  THANK YOU.

11:13AM 11      THE COURT:  BUT I SUPPOSE -- ARE THERE ANY

11:13AM 12  SUBSTANTIAL QUESTIONS OF LAW THAT NEED TO BE CONSIDERED HERE?

11:13AM 13      MS. SAHARIA:  WELL, WE BELIEVE SO, YOUR HONOR.  IF I

11:13AM 14  CAN JUST HAVE A FINAL WORD ON FLIGHT?

11:13AM 15      THE COURT:  YES.

11:13AM 16      MS. SAHARIA:  I WOULD JUST LIKE TO READ FOR THE

11:13AM 17  COURT INTO THE RECORD WHICH IS AT ECF 1722-2.  THIS IS

11:13AM 18  MR. SCHENK'S FINAL RESPONSE TO MR. WADE ABOUT THIS POINT, WHICH

11:13AM 19  IS JANUARY 24TH, 2022.

11:13AM 20      "THANK YOU AGAIN FOR THE BACKGROUND INFORMATION

11:13AM 21  CONFIRMATION AND FOR ADDRESSING THIS SITUATION QUICKLY.  I DO

11:14AM 22  NOT BELIEVE THAT THERE IS NEED FOR US TO DISCUSS THIS FURTHER,

11:14AM 23  AND I CERTAINLY WILL BE IN TOUCH IF THAT CHANGES, AND PLEASE

11:14AM 24  FEEL FREE TO REACH OUT IF YOU DISAGREE.  REGARDS, JEFF."

11:14AM 25      THE NEXT BAIL DECISION BY THE COURT IS NOT THIS ONE.  IT

11:14AM 1    WAS THE ONE IN FEBRUARY OF 2022 WHEN IT APPROVED THE UPDATED

11:14AM 2    BOND.  AND THE NOTION THAT THE GOVERNMENT THOUGHT THIS WAS AN

11:14AM 3    ATTEMPT AT FLIGHT AND DIDN'T SAY ANYTHING TO THE COURT THEN, I

11:14AM 4    THINK JUST DEFIES BELIEF.

11:14AM 5        SO I'LL JUST CONCLUDE ON FLIGHT ON THAT POINT AND TURN

11:14AM 6    TO SUBSTANTIAL --

11:14AM 7            THE COURT:  LET ME ASK MS. VOLKAR IF SHE HAS ANY

11:14AM 8    COMMENT?

11:14AM 9            MS. VOLKAR:  NOTHING FURTHER, YOUR HONOR.

11:14AM 10           THE COURT:  OKAY.  MS. VOLKAR, SHOULD THE COURT ALSO

11:14AM 11   IN THE FLIGHT RISK ANALYSIS, MS. SAHARIA HAS INDICATED IN HER

11:14AM 12   PLEADINGS ALSO THAT MS. HOLMES HAS TWO YOUNG CHILDREN AND THAT

11:14AM 13   THE COURT SHOULD CONSIDER THAT ALSO AS EVIDENCE OF REASONS NOT

11:14AM 14   TO FLEE.

11:14AM 15       ANY COMMENT ON THAT?

11:15AM 16           MS. VOLKAR:  NOT REALLY, YOUR HONOR.  I THINK THE

11:15AM 17   ONLY I GUESS FACT THAT I'LL STATE IS THAT SHE DID, OF COURSE,

11:15AM 18   HAVE ONE YOUNG INFANT AT THE TIME THAT SHE PURCHASED THIS

11:15AM 19   ONE-WAY TICKET TO MEXICO.  SO IT HASN'T NECESSARILY CHANGED.

11:15AM 20   AND SHE IS FACING SIGNIFICANT PRISON SENTENCE.  SHE CLEARLY HAS

11:15AM 21   FAMILY SUPPORT HERE IN THE UNITED STATES.

11:15AM 22       SO I THINK I'LL JUST SUBMIT ON THAT POINT.

11:15AM 23           THE COURT:  OKAY.  THANK YOU.  SORRY.

11:15AM 24           MS. SAHARIA:  THANK YOU.

11:15AM 25       SO, YOUR HONOR, TURNING TO THE SUBSTANTIAL QUESTION, WE

11:15AM 1    SUBMIT THAT THERE ARE MULTIPLE SUBSTANTIAL QUESTIONS, AND I

11:15AM 2    DON'T WANT TO TAKE THE COURT'S TIME TO WALK THROUGH ALL OF THE

11:15AM 3    ONES THAT WE'VE OUTLINED.

11:15AM 4        THE COURT:  YOU SAID IN YOUR PLEADINGS IT'S TEAMING

11:15AM 5    WITH ISSUES.

11:15AM 6        MS. SAHARIA:  WE THINK THE RECORD IS TEAMING WITH

11:15AM 7    ISSUES, YOUR HONOR.

11:15AM 8        AND I DO THINK THAT WHEN THE NINTH CIRCUIT LOOKS AT THE

11:15AM 9    HISTORY OF THIS CASE, SOME THINGS ARE JUST GOING TO STRIKE THE

11:15AM 10   COURT AS UNUSUAL.  AND THESE ISSUES WERE HARD FOUGHT ISSUES,

11:16AM 11   LITIGATED BEFORE TRIAL, DURING TRIAL, THEY'RE COMPLEX ISSUES.

11:16AM 12       AND AGAIN, I DON'T WANT TO WALK THROUGH ALL OF THEM, BUT

11:16AM 13   LET ME JUST HIGHLIGHT A FEW THINGS THAT I THINK WILL STRIKE THE

11:16AM 14   NINTH CIRCUIT AS -- YOU KNOW, THAT WILL CATCH THE COURT'S

11:16AM 15   ATTENTION.

11:16AM 16       THE FIRST IS THE TESTIMONY OF DR. DAS, AND THIS IS

11:16AM 17   SOMETHING THAT IS DIFFERENT IN THIS CASE.  DR. DAS DID NOT

11:16AM 18   TESTIFY IN MR. BALWANI'S CASE.

11:16AM 19       I THINK IT STRIKES THE COURT AS UNUSUAL THAT FIVE WEEKS

11:16AM 20   BEFORE TRIAL THE GOVERNMENT SERVES A DISCLOSURE ON THE DEFENSE

11:16AM 21   SAYING WE ARE GOING TO CALL DR. DAS AND TO THE EXTENT HIS

11:16AM 22   TESTIMONY STRIKES OR CROSSES THE LINE INTO EXPERT TESTIMONY,

11:16AM 23   THE BASES FOR HIS OPINIONS ARE THE SAME BASES AS THE OPINION OF

11:16AM 24   OUR RETAINED EXPERT, DR. MASTER.

11:16AM 25       THAT'S UNUSUAL.  THE GOVERNMENT DOESN'T USUALLY DO THAT.

11:16AM 1        AND THAT WILL SIGNAL TO THE COURT THAT THIS IS WORTHY OF

11:17AM 2  ATTENTION BECAUSE THE GOVERNMENT ITSELF DREW A LINE FROM HIS

11:17AM 3  TESTIMONY TO THE OPINIONS OF ITS RETAINED EXPERT, WHO WE ALL

11:17AM 4  AGREE WAS SUBJECT TO RULE 702, AND DR. DAS HAD TESTIFIED TO A

11:17AM 5  COMPREHENSIVE DATA ANALYSIS THAT HE DID THAT IS VERY MUCH LIKE

11:17AM 6  WHAT THE GOVERNMENT TRIED TO GET ITS RETAINED EXPERT,

11:17AM 7  DR. MASTER, TO DO, BUT THEN DIDN'T CALL HIM AFTER THE COURT

11:17AM 8  ORDERED A DAUBERT HEARING.  SO I THINK THAT'S GOING TO CATCH

11:17AM 9  THE COURT'S ATTENTION.

11:17AM 10       SO, TOO, IS CMS.  THE GOVERNMENT ASSURED THE COURT

11:17AM 11  MULTIPLE TIMES THAT IT WAS GOING TO CALL A CMS WITNESS TO

11:17AM 12  TESTIFY ABOUT THE CMS REPORT THAT SHOULD ALLEVIATE THE COURT'S

11:17AM 13  403 OBJECTIONS OR CONCERNS AND BECAUSE WE WOULD BE ABLE TO

11:17AM 14  CROSS-EXAMINE THAT WITNESS.  AND THEN THEY NEVER CALLED THAT

11:17AM 15  WITNESS.

11:17AM 16       INSTEAD, THEY PUT IT IN THROUGH DR. DAS.  AND TO KIND OF

11:17AM 17  MAKE THAT PIVOT, THEY PIVOTED TO A NOTICE THEORY, BUT WE'VE --

11:18AM 18  THE GOVERNMENT HAS NOT POINTED TO ANY REPRESENTATION TO ANYONE,

11:18AM 19  WHETHER AN INVESTOR OR A PATIENT THAT POST DATED THAT CMS

11:18AM 20  REPORT, NOR COULD IT.  THERE ARE NONE.

11:18AM 21       AND SO WE THINK THERE ARE SOME FUNDAMENTAL PROBLEMS WITH

11:18AM 22  THIS NOTICE THEORY THAT THEY PIVOTED TO MID-TRIAL WHEN THEY

11:18AM 23  DECIDED NOT TO CALL THE CMS WITNESS, AND I THINK THAT, TOO, IS

11:18AM 24  GOING TO CATCH THE COURT'S ATTENTION.

11:18AM 25       I'LL JUST QUICKLY TOUCH ON TWO MORE ISSUES.  ANOTHER ONE

52

11:18AM 1    THAT IS DISTINCT FROM OUR CASE COMPARED TO THE BALWANI CASE OF

11:18AM 2    COURSE IS THE EXCLUSION OF MR. BALWANI'S DEPOSITION TESTIMONY

11:18AM 3    RELATED TO HIS OWNERSHIP OF THE FINANCIALS.

11:18AM 4          THE COURT:  IS THIS THE S.E.C.?

11:18AM 5          MS. SAHARIA:  HIS S.E.C. TESTIMONY, EXACTLY,

11:18AM 6    YOUR HONOR.

11:18AM 7       AND I DO THINK THERE'S A SUBSTANTIAL QUESTION ON THAT ONE

11:18AM 8    AS TO WHETHER HIS STATEMENTS WERE SUFFICIENTLY INCULPATORY.

11:18AM 9       HE WAS ASKED THOSE QUESTIONS AT A TIME WHEN BOTH THE

11:19AM 10   S.E.C. AND THE GRAND JURY WERE INVESTIGATING THERANOS AND HAD

11:19AM 11   SUBPOENAED THERANOS FOR RELEVANT DOCUMENTS AND THE FACT THAT

11:19AM 12   THE S.E.C. IN THE COURSE OF AN INVESTIGATION WAS ASKING

11:19AM 13   MR. BALWANI ABOUT THOSE FINANCIAL PROJECTIONS WOULD AT LEAST

11:19AM 14   PUT HIM ON NOTICE OF POTENTIAL CIVIL LIABILITY IF NOT CRIMINAL

11:19AM 15   LIABILITY WITH RESPECT TO THOSE PROJECTIONS AND THE MODELS, AND

11:19AM 16   SO WE THINK THAT THERE'S AT LEAST A FAIRLY DEBATABLE QUESTION

11:19AM 17   AS TO WHETHER THE COURT ERRED IN EXCLUDING THAT TESTIMONY AND

11:19AM 18   THAT LIKELY COULD HAVE AFFECTED THE JURY.

11:19AM 19      THE FINAL ONE I'LL JUST NOTE IS OUR ARGUMENT WITH RESPECT

11:19AM 20   TO THE DEPARTMENT OF DEFENSE.  I JUST WANTED TO COMMENT ON THIS

11:19AM 21   ONE IN LIGHT OF THE COURT'S RULING WITH RESPECT TO MR. BALWANI

11:19AM 22   ON THIS POINT BECAUSE I THINK AS TO THE DEPARTMENT OF DEFENSE,

11:19AM 23   THE ISSUE IS A LITTLE BIT DIFFERENT THAN THE WAY THE COURT

11:19AM 24   UNDERSTOOD IT IN YOUR RULING WITH RESPECT TO MR. BALWANI.

11:19AM 25      OUR ARGUMENT IS NOT ABOUT THE EFFECT OF THE EVIDENCE ABOUT

11:20AM  1    MISREPRESENTATIONS TO THE DEPARTMENT OF DEFENSE AS IT RELATES

11:20AM  2    TO THE ALLEGATIONS ABOUT REPRESENTATIONS ABOUT THE DEPARTMENT

11:20AM  3    OF DEFENSE.

11:20AM  4        THE ISSUE IS A BROADER ONE.  IT'S THAT THE EVIDENCE THAT

11:20AM  5    MS. HOLMES PURPORTEDLY MADE MISREPRESENTATIONS TO THE

11:20AM  6    DEPARTMENT OF DEFENSE WAS IMPROPER CHARACTER EVIDENCE THAT

11:20AM  7    PORTRAYED HER AS A LIAR.  THAT THEN INFECTED ALL OF THE ALLEGED

11:20AM  8    MISREPRESENTATIONS BECAUSE IT WAS EVIDENCE FROM WHICH THE JURY

11:20AM  9    COULD HAVE CONCLUDED IMPROPERLY THAT IF SHE HAD MADE A

11:20AM  10   MISREPRESENTATION TO THE DEPARTMENT OF DEFENSE, SHE MIGHT HAVE

11:20AM  11   MADE MISREPRESENTATIONS MORE BROADLY TO INVESTORS.

11:20AM  12       SO I'LL PAUSE THERE.  IF THE COURT HAS QUESTIONS ON THOSE,

11:20AM  13   I CAN TURN TO THE FINAL FACTOR, LIKELY TO RESULT IN A NEW

11:20AM  14   TRIAL, OR YOU CAN HEAR FROM MS. VOLKAR FIRST.  UP TO THE COURT.

11:20AM  15           THE COURT:  WELL, LET'S HEAR FROM MS. VOLKAR.

11:21AM  16   I DON'T HAVE ANY QUESTIONS.

11:21AM  17           MS. SAHARIA:  GREAT.

11:21AM  18           THE COURT:  THANK YOU FOR RAISING IT.

11:21AM  19           MS. VOLKAR:  THANK YOU, YOUR HONOR.

11:21AM  20       MS. SAHARIA GUESSED WHERE I WAS GOING TO GO.  I HAVE

11:21AM  21   PLENTY OF RESPONSES ON THE SUBSTANTIAL QUESTION POINT, BUT NONE

11:21AM  22   OF THE ISSUES THAT MS. SAHARIA REFERENCED NOR ANY THAT ARE

11:21AM  23   RAISED IN THE PLEADINGS WOULD BE LIKELY TO RESULT IN REVERSAL

11:21AM  24   ON THE COUNTS OF CONVICTION BECAUSE NOT A SINGLE ONE OF THOSE

11:21AM  25   ISSUES THAT THEY RAISED WOULD DISTURB ANY OF THE PROOF AT TRIAL

11:21AM 1    THAT MS. HOLMES ALTERED THE PHARMACEUTICAL REPORTS AND THEN

11:21AM 2    PROVIDED THEM TO INVESTORS.

11:21AM 3        AND WE'VE HEARD FROM LISA PETERSON AND DAN MOSLEY THAT

11:21AM 4    THOSE REPORTS MATTERED TO THEM, THAT THEY WERE MATERIAL.  AND

11:21AM 5    THAT WAS JUST ONE OTHER CATEGORY OF FALSE MISREPRESENTATIONS

11:21AM 6    NOT IMPACTED BY A SINGLE ONE OF THE ISSUES RAISED IN

11:21AM 7    MS. HOLMES'S BRIEF.

11:21AM 8        AND ANOTHER BIG CATEGORY OF MISREPRESENTATIONS THAT IS NOT

11:21AM 9    AT ALL AFFECTED IS THE FACT THAT MS. HOLMES HID THAT THERANOS

11:21AM 10   WAS USING THIRD PARTY COMMERCIAL DEVICES FROM INVESTORS AND, IN

11:22AM 11   FACT, THE FIRST TWO ISSUES THAT MS. SAHARIA RAISED AND THE

11:22AM 12   FIRST THREE ISSUES IN MS. HOLMES'S BRIEF, THE FACT THAT

11:22AM 13   DR. DAS'S TESTIMONY, THE CMS INVESTIGATION AND REPORT, AND THE

11:22AM 14   VOIDING OF THE TESTS BY THERANOS, THOSE WERE ALL EVENTS THAT

11:22AM 15   OCCURRED IN LATE 2015 AND EARLY 2016.  THAT'S ACTUALLY PART OF

11:22AM 16   THE DEFENSE'S POINT, THAT IT WAS LATE IN THE GAME.  IT WAS

11:22AM 17   DURING THE PATIENT COUNT SCHEME TO DEFRAUD, BUT IT WAS RIGHT AT

11:22AM 18   THE TAIL END AND OUTSIDE OF THE INVESTOR SCHEME TO DEFRAUD.

11:22AM 19       BUT ONE OF THE THINGS THAT IS KEY IN THAT TIMELINE IS IN

11:22AM 20   OCTOBER OF 2015 PREDATING ALL OF THESE ITEMS, THERE WAS A VERY

11:22AM 21   NEGATIVE "WALL STREET JOURNAL" ARTICLE AS IT WAS DESCRIBED AS

11:22AM 22   TRIAL THAT CAME OUT THAT INVESTORS TESTIFIED WAS THE FIRST TIME

11:22AM 23   THEY HAD ANY IDEA THAT THERANOS MIGHT HAVE BEEN USING

11:22AM 24   COMMERCIAL DEVICES AND NOT ITS OWN PROPRIETARY ANALYZER TO RUN

11:23AM 25   BLOOD TESTS, AND THAT WAS SHOCKING TO THE INVESTORS.

55

11:23AM 1    MS. PETERSON TESTIFIED ABOUT IT.  I BELIEVE MR. GROSSMAN

11:23AM 2    TESTIFIED ABOUT IT.  AND THAT IS SOMETHING WHERE -- SO LET'S

11:23AM 3    SAY THAT THE NINTH CIRCUIT WERE TO RULE FAVORABLY FOR

11:23AM 4    MS. HOLMES, AND I DON'T THINK THEY WILL FOR REASONS I'LL GET TO

11:23AM 5    IN A MOMENT, BUT LET'S SAY THE NINTH CIRCUIT WERE, HOW CAN

11:23AM 6    YOU -- HOW CAN MS. HOLMES ARGUE THAT THAT'S NOT HARMLESS WHEN

11:23AM 7    THERE'S OTHER ENTIRE CATEGORIES OF MISREPRESENTATIONS, AND I'VE

11:23AM 8    ONLY SCRATCHED THE SURFACE OF THEM, THAT INVESTORS HEARD THAT

11:23AM 9    NONE OF THESE ISSUES AFFECT ONE IOTA?

11:23AM 10    SO I THINK THAT THERE'S NO LIKELIHOOD OF REVERSAL, AND I

11:23AM 11    THINK THAT CUTS ACROSS ALL OF MS. HOLMES'S ARGUMENTS BECAUSE I

11:23AM 12    THINK THAT SHE CAN'T OVERCOME THAT LAST REQUIREMENT.

11:23AM 13    BUT GOING TO THE SUBSTANCE OF THE ISSUES THAT MS. SAHARIA

11:23AM 14    RAISED.  DR. DAS, WE'VE OF COURSE DISCUSSED THIS MANY TIMES.

11:23AM 15    THE GOVERNMENT NEVER THOUGHT OF HIM AS AN EXPERT.  THE

11:24AM 16    DISCLOSURE THAT MS. SAHARIA REFERENCES WAS AFTER THE DEFENSE

11:24AM 17    ESSENTIALLY TOOK -- YOU'VE SEEN THE EMAIL EXCHANGES AND WE'VE

11:24AM 18    BRIEFED IT, BUT THE DEFENSE ESSENTIALLY CLAIMED THAT HE WAS AN

11:24AM 19    EXPERT AND THEY WERE GOING TO MOVE UNDER RULE 16 TO EXCLUDE

11:24AM 20    HIM.  SO THE GOVERNMENT RESPONDED TO THAT BY SAYING IN THE

11:24AM 21    EVENT THAT YOU THINK HE'S AN EXPERT, WE'LL DISCLOSE HIM AS AN

11:24AM 22    EXPERT, WE CONTINUE TO THINK HE'S A PERCIPIENT WITNESS.

11:24AM 23    AND THEN WE CAME BEFORE YOUR HONOR, MS. SAHARIA AND I, IN

11:24AM 24    AUGUST OF 2021, TO ARGUE ABOUT THAT EVEN BEFORE THE TRIAL

11:24AM 25    BEGAN.  AND YOUR HONOR GAVE VERY CLEAR GUIDELINES OF WHAT WOULD

56

11:24AM 1    STRAY INTO RULE 702 TERRITORY, WHAT WOULD CROSS THAT LINE INTO

11:24AM 2    EXPERT TESTIMONY, THE SIGMA METRIC. I BELIEVE IT'S DANGEROUS

11:24AM 3    TO DO IT OFF MEMORY, BUT I THINK IT WAS ECF 810 IS YOUR HONOR'S

11:24AM 4    ORDER ON THAT POINT.

11:24AM 5        AND THE GOVERNMENT TOOK THAT TO HEART, IF WE STRAY INTO

11:24AM 6    THOSE AREAS, THAT WILL BECOME EXPERT TESTIMONY AND WE RISK IT

11:24AM 7    BEING EXCLUDED BY YOUR HONOR.

11:24AM 8        WHAT DR. DAS TESTIFIED TO WAS WHAT HE WAS HIRED TO DO BY

11:25AM 9    MS. HOLMES, WHICH WAS TO COME IN AND RESPOND TO THE NEGATIVE

11:25AM 10   CMS REPORT, THAT WAS HIS JOB DUTIES. HE BOTH TOOK THE CMS

11:25AM 11   REPORT AND THEN HE DID HIS OWN ANALYSIS, AND THEN HE REPORTED

11:25AM 12   TO MS. HOLMES'S FINDINGS, AND THAT'S WHAT HE TESTIFIED TO.

11:25AM 13       THE CMS REPORT, WE ALSO HAD MUCH LITIGATION ABOUT THAT.

11:25AM 14   YOUR HONOR KNOWS IT WAS A VERY LONG TRIAL. AND THERE WERE, I

11:25AM 15   THINK, DOZENS OF WITNESSES THAT THE GOVERNMENT NOTICED THAT IT

11:25AM 16   EXPECTED TO CALL AND DIDN'T HAVE TIME OR DIDN'T ULTIMATELY CALL

11:25AM 17   -- OR I'M SORRY, NOT DIDN'T HAVE TIME BUT CHOSE NOT TO CALL.

11:25AM 18       SO THE CMS REPORT, WHEN IT DID COME IN, IT CAME IN FOR A

11:25AM 19   VERY LIMITED PURPOSE, WHICH WAS NOTICE TO MS. HOLMES. AND OF

11:25AM 20   THE 120 PAGE REPORT, I BELIEVE IT'S SIX OR SEVEN PAGES THAT

11:25AM 21   WERE ULTIMATELY ADMITTED TO THE JURY AND FOR A VERY LIMITED

11:25AM 22   PURPOSE.

11:25AM 23       THE S.E.C., MR. BALWANI'S TESTIMONY, FIRST OF ALL,

11:25AM 24   YOUR HONOR WILL RECALL THE QUOTATIONS THAT MS. HOLMES SOUGHT TO

11:26AM 25   ADMIT WERE THINGS SUCH AS IN CONJUNCTION WITH SAFEWAY AND

11:26AM 1    WALGREENS I MADE A MODEL.  BDT ALSO HAD SOME INPUT.  WHAT ABOUT

11:26AM 2    PROJECTIONS?  OH, I THINK THAT MIGHT HAVE BEEN THIS EMAIL.

11:26AM 3        WHAT MR. BALWANI SAID IN THAT S.E.C. TESTIMONY, IF YOU GO

11:26AM 4    BACK TO THAT TRANSCRIPT, WAS NOT I DID IT, IT WAS ME, THE

11:26AM 5    FINANCIAL PROJECTIONS WERE ALL ON ME AND MS. HOLMES HAD NOTHING

11:26AM 6    TO DO WITH IT.

11:26AM 7        IF HE DID SAY THAT, WE MIGHT BE HAVING A VERY DIFFERENT

11:26AM 8    CONVERSATION AND YOUR HONOR MIGHT HAVE REACHED A DIFFERENT

11:26AM 9    RULING.  BUT THAT'S NOT WHAT HE SAID IN THE S.E.C. TESTIMONY.

11:26AM 10   HE SHARED BLAME, HE DEFLECTED, AND IN ANSWER TO MULTIPLE

11:26AM 11   QUESTIONS HE SAID THAT MS. HOLMES HAD ACCESS OR -- AND THAT HE

11:26AM 12   THINKS SHE MIGHT HAVE EVEN EDITED IT AT ONE POINT IN TIME.

11:26AM 13       AND THEN IN THE TEXT MESSAGES, WHEN YOUR HONOR LOOKED TO

11:26AM 14   WHAT WOULD CORROBORATE HIS TESTIMONY, IN THE TEXT MESSAGES

11:26AM 15   THEY'RE TALKING ABOUT WE NEED TO WORK ON THE REV PIECE, WE NEED

11:26AM 16   TO TALK ABOUT -- ARE YOU COMFORTABLE WITH THE FINANCIAL

11:26AM 17   PROJECTIONS.  THERE WAS OTHER EVIDENCE IN THE TRIAL, AND THE

11:27AM 18   TEXT MESSAGES IS JUST ONE EXAMPLE OF THE TWO OF THEM WORKING

11:27AM 19   TOGETHER ON THE FINANCIAL PIECES.

11:27AM 20       AND AGAIN, I GO BACK TO EVEN IF THE NINTH CIRCUIT WERE TO

11:27AM 21   RULE FAVORABLY ON THE SUBSTANTIAL QUESTION, IT RELATES TO

11:27AM 22   FINANCIAL PROJECTIONS, ONE CATEGORY OF FALSE MISREPRESENTATIONS

11:27AM 23   OF APPROXIMATELY AT LEAST SEVEN DIFFERENT LARGE CATEGORIES IN

11:27AM 24   THE THIRD SUPERSEDING INDICTMENT.

11:27AM 25       THE DOD.  FURTHER REASONS STATED IN OUR BRIEF AND AT

11:27AM 1    TRIAL, THIS WAS INEXTRICABLY INTERTWINED.  THE DOCUMENTS THAT

11:27AM 2    WERE ADMITTED, AND WE ARE TALKING ABOUT ADMISSION OF EVIDENCE

11:27AM 3    WHICH, OF COURSE, IS AN ABUSE OF DISCRETION STANDARD ON APPEAL,

11:27AM 4    THE EVIDENCE THAT WAS ADMITTED WAS TO SHOW WHY THE DEPARTMENT

11:27AM 5    OF DEFENSE WAS INTERESTED AT ALL IN THIS TECHNOLOGY, WHY THEY

11:27AM 6    WERE ABLE TO GET SOMEONE LIKE GENERAL JAMES MATTIS ON THE BOARD

11:27AM 7    WHO BELIEVED THERE WAS ONE DEVICE WHO COULD RUN OVER 1,000

11:28AM 8    TESTS.

11:28AM 9         AND SO, AGAIN, I DON'T WANT TO BELABOR THE POINT, BUT THEY

11:28AM 10   WERE -- THE DOCUMENTS THAT WERE ADMITTED WERE INEXTRICABLY

11:28AM 11   INTERTWINED WITH THE SCHEME TO DEFRAUD, AND THAT IS WHY

11:28AM 12   YOUR HONOR ADMITTED THEM.

11:28AM 13        BUT I'LL JUST CIRCLE BACK AND END ON WHERE MS. SAHARIA

11:28AM 14   WILL PICK UP, WHICH IS THAT THEY JUST CAN'T OVERCOME THE LAST

11:28AM 15   REQUIREMENT THAT IT'S LIKELY TO LEAD TO REVERSAL ON ALL COUNTS

11:28AM 16   OF CONVICTION.

11:28AM 17             THE COURT:  THANK YOU.

11:28AM 18        MS. SAHARIA.

11:28AM 19             MS. SAHARIA:  LET ME PICK UP THERE.  I THINK THERE

11:28AM 20   WAS ONE POINT THAT MR. LEACH MADE IN HIS RECITATION ARGUMENT

11:28AM 21   THAT I ACTUALLY AGREED WITH, WHICH WAS THAT HE SAID THAT WE

11:28AM 22   CAN'T KNOW WHY THE JURY HUNG ON THE C1 INVESTORS.  I AGREE WITH

11:28AM 23   THAT.

11:28AM 24        WE ALSO DON'T KNOW WHY THE JURY CONVICTED AS TO THE C2

11:28AM 25   INVESTORS.

11:28AM 1      THIS WAS A GENERAL VERDICT.  THIS WAS A HARD FOUGHT CASE.

11:28AM 2    WE HAD DEFENSES, 12 OF THE GOVERNMENT'S ALLEGED

11:28AM 3    MISREPRESENTATIONS, AND THIS WAS A CLOSE CASE.  THE JURY FOUND

11:29AM 4    THE GOVERNMENT PREVAILED ON ONLY 4 OF 12 COUNTS.

11:29AM 5      THE ALLEGATIONS THAT MS. HOLMES MADE MISREPRESENTATIONS

11:29AM 6    ABOUT THE TECHNOLOGY WERE CENTRAL TO THIS CASE.  THE GOVERNMENT

11:29AM 7    TOLD THE JURY IN CLOSING THAT THEY WERE CENTRAL TO THE CASE.

11:29AM 8    WE QUOTE THOSE STATEMENTS IN OUR BRIEF.

11:29AM 9      MS. HOLMES'S ROLE IN THE COMPANY FOCUSSED ON THE

11:29AM 10    TECHNOLOGY THAT THE GOVERNMENT TOLD THE JURY AND IN CLOSING

11:29AM 11    THAT MS. HOLMES HAD CERTAIN ROLES AND MR. BALWANI HAD CERTAIN

11:29AM 12    ROLES, AND MS. HOLMES'S ROLE WAS THE TECHNOLOGY.

11:29AM 13      AND SO WE THINK THAT THAT MAKES THAT PARTICULAR ALLEGATION

11:29AM 14    CENTRAL.  THE GOVERNMENT LINKED THAT ALLEGATION, AS WE POINT

11:29AM 15    OUT IN OUR REPLY BRIEF, TO ALL OF THE OTHER ALLEGATIONS IN ITS

11:29AM 16    INDICTMENT, AGAIN, IN CLOSING AND OPENING AND THROUGHOUT ITS

11:29AM 17    EXAMINATION OF THE WITNESSES, THAT WAS THE CORE OF THE CASE.

11:29AM 18      WE FOUGHT TOOTH AND NAIL ON EVERYTHING IN THE CASE.  WE

11:29AM 19    HAD DEFENSES TO THE PHARMACEUTICAL REPORTS.  WE PRESENTED

11:29AM 20    PLENTY OF EVIDENCE THAT MS. HOLMES WAS NOT HIDING THE FACT THAT

11:30AM 21    THE LAB WAS CONDUCTING VENOUS TESTING ON THIRD PARTY DEVICES.

11:30AM 22      SO I SUBMIT FOR ALL OF THOSE REASONS THAT THE

11:30AM 23    NINTH CIRCUIT IS NOT GOING TO BE ABLE TO CONCLUDE THAT THESE

11:30AM 24    ERRORS WERE HARMLESS BECAUSE WE CAN'T KNOW WHAT THE JURY RESTED

11:30AM 25    ON AND THIS PARTICULAR ALLEGATION ABOUT THE TECHNOLOGY WAS

11:30AM 1    REALLY THE CORE OF THE GOVERNMENT'S CASE AGAINST MS. HOLMES.

11:30AM 2              THE COURT:  THANK YOU.

11:30AM 3              MS. VOLKAR:  NOTHING FURTHER, YOUR HONOR, UNLESS YOU

11:30AM 4    HAVE QUESTIONS.

11:30AM 5              THE COURT:  ANYTHING FURTHER, MS. SAHARIA?

11:30AM 6              MS. SAHARIA:  NO, YOUR HONOR.

11:30AM 7              THE COURT:  I DO WANT TO TAKE UP ONE THING THAT I

11:30AM 8    APOLOGIZE I DIDN'T DO EARLIER, WHICH WAS DOCUMENT 1722, WHICH

11:30AM 9    WAS YOUR MOTION TO STRIKE.

11:30AM 10             MS. SAHARIA:  YES, YOUR HONOR.

11:30AM 11             THE COURT:  YES.  AND LET ME JUST TELL YOU, I'VE

11:30AM 12   READ THE MOTION AND THE RESPONSIVE PLEADINGS TO THAT, AND I

11:30AM 13   THINK YOUR OPPOSITION WAS 1723, I THINK.

11:30AM 14             MS. VOLKAR:  THAT'S CORRECT, YOUR HONOR.

11:30AM 15             MS. SAHARIA:  SORRY.

11:30AM 16             THE COURT:  I DON'T SEE THE NEED TO STRIKE -- LET ME

11:30AM 17   TELL YOU, I UNDERSTAND THE CONCERN ABOUT SOME OF THE

11:31AM 18   INFORMATION THAT, MS. SAHARIA, YOUR TEAM SUGGESTED THAT THE

11:31AM 19   GOVERNMENT SHOULD NOT HAVE PUT IN RELATED TO FINANCES AND THOSE

11:31AM 20   TYPES OF THINGS.

11:31AM 21             MS. SAHARIA:  EXACTLY, YOUR HONOR.

11:31AM 22             THE COURT:  AND LET ME JUST TELL YOU, I'M NOT

11:31AM 23   CONSIDERING THAT IN ANY WAY FOR ANY OF THE DECISIONS THAT THE

11:31AM 24   COURT IS MAKING TODAY.  I THINK THAT RELATES PRIMARILY TO THE

11:31AM 25   MOTION TO STAY PENDING APPEAL, AND THAT'S NOT PART OF MY

11:31AM 1  CALCULUS.

11:31AM 2          MS. SAHARIA:  YES, YOUR HONOR.

11:31AM 3          THE COURT:  I DON'T FIND THAT HELPFUL IN ANY WAY,

11:31AM 4  BOTH POSITIVE OR NEGATIVE.  SO I JUST WANT YOU TO KNOW I'M NOT

11:31AM 5  CONSIDERING THAT.

11:31AM 6          MS. SAHARIA:  THANK YOU.

11:31AM 7          THE COURT:  I DON'T NEED TO STRIKE IT.

11:31AM 8          MS. SAHARIA:  OUR CONCERN WAS NOT THAT IT WAS

11:31AM 9  IMPROPERLY BEFORE THE COURT.  WE THINK THE GOVERNMENT COULD

11:31AM 10  HAVE PRESENTED IT TO THE COURT UNDER SEAL.

11:31AM 11          THE COURT:  SURE.

11:31AM 12          MS. SAHARIA:  THE CONCERN WAS THAT THE GOVERNMENT

11:31AM 13  PRESENTED THE FINANCES OF MS. HOLMES'S PARTNER, WHICH WERE

11:31AM 14  PROVIDED CONFIDENTIALLY TO PROBATION, THAT IT JUST BLURTED THEM

11:31AM 15  OUT IN A PUBLIC FILING, WHICH IS WHY WE MOVED TO STRIKE.

11:31AM 16      BUT TO BE FRANK, THE DAMAGE IS DONE.  IT'S BEEN OUT THERE

11:32AM 17  IN THE PUBLIC DOMAIN NOW FOR A MONTH OR SO.

11:32AM 18          THE COURT:  ALL RIGHT.

11:32AM 19          MS. SAHARIA:  BUT THAT'S WHY WE FILED THE MOTION,

11:32AM 20  YOUR HONOR.

11:32AM 21          THE COURT:  I APPRECIATE THAT.

11:32AM 22      AND JUST TO BE CLEAR, IT WASN'T A FINANCIAL STATEMENT OF

11:32AM 23  YOUR CLIENT'S PARTNER.  IT WAS A REFERENCE TO PERHAPS INCOME OR

11:32AM 24  STATUS OR SOMETHING.  BUT ANYHOW.  IT WAS NOT MOVING TO THE

11:32AM 25  COURT IN ANY WAY, I JUST WANT YOU TO KNOW THAT.

| | | |
|---|---|---|
| 11:32AM | 1 | MS. SAHARIA:  THANK YOU, YOUR HONOR. |
| 11:32AM | 2 | THE COURT:  SO HAVING SAID THAT, I'M GOING TO |
| 11:32AM | 3 | RESPECTFULLY DECLINE YOUR INVITATION TO STRIKE AND/OR SEAL.  I |
| 11:32AM | 4 | DON'T FIND THAT NECESSARY. |
| 11:32AM | 5 | MS. SAHARIA:  THANK YOU. |
| 11:32AM | 6 | THE COURT:  ANYTHING FURTHER? |
| 11:32AM | 7 | MS. VOLKAR:  NOTHING FROM THE GOVERNMENT, |
| 11:32AM | 8 | YOUR HONOR. |
| 11:32AM | 9 | THE COURT:  ANYTHING FURTHER AS TO ANY OF THE |
| 11:32AM | 10 | MOTIONS BEFORE THE COURT FOR TODAY OR ANY OTHER PARTY WISH TO |
| 11:32AM | 11 | BE HEARD AS TO ANY OTHER MATTER IN REGARDS TO THIS CASE TODAY? |
| 11:32AM | 12 | MS. SAHARIA:  NOT FROM US, YOUR HONOR. |
| 11:32AM | 13 | MS. VOLKAR:  NOT AT THIS TIME.  THANK YOU. |
| 11:32AM | 14 | THE COURT:  OKAY.  THANK YOU. |
| 11:32AM | 15 | THANK YOU FOR YOUR HELP THIS MORNING ON ALL OF THESE |
| 11:32AM | 16 | ISSUES. |
| 11:32AM | 17 | MS. SAHARIA:  THANK YOU. |
| 11:32AM | 18 | THE COURT:  I APPRECIATE THAT.  I WILL -- AS I |
| 11:32AM | 19 | INDICATED, I'M GOING TO TAKE THE MATTERS UNDER SUBMISSION, AND |
| 11:32AM | 20 | I WILL NOT -- YOU WON'T GET SOMETHING FROM ME UNTIL PROBABLY |
| 11:33AM | 21 | THE FIRST WEEK IN APRIL.  I JUST WANTED YOU TO KNOW THAT FOR |
| 11:33AM | 22 | YOUR TIMING AS YOU'VE INDICATED AND OTHERWISE. |
| 11:33AM | 23 | AND I JUST WANT TO ONCE AGAIN STATE MY GRATITUDE TO BOTH |
| 11:33AM | 24 | SIDES.  IT'S BEEN A PLEASURE WORKING WITH ALL OF YOU, AND I'M |
| 11:33AM | 25 | GRATEFUL FOR YOUR HELP.  YOU'VE ALL BEEN PROFESSIONAL IN YOUR |

11:33AM 1    PRESENTATIONS IN THIS TRIAL, AND I APPRECIATE IT.

11:33AM 2        THANK YOU.

11:33AM 3        THE MATTER IS UNDER SUBMISSION.

11:33AM 4            MS. VOLKAR:  THANK YOU, YOUR HONOR.

11:33AM 5            MS. SAHARIA:  THANK YOU, YOUR HONOR.

11:33AM 6    YOU KNOW THAT WE VERY MUCH APPRECIATE THE COURT'S STAFF AS

11:33AM 7    WELL.

11:33AM 8        (COURT CONCLUDED AT 11:33 A.M.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2
3                       CERTIFICATE OF REPORTER
4
5
6
7        I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE
8   UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
9   CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO
10  HEREBY CERTIFY:
11       THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS
12  A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE
13  ABOVE-ENTITLED MATTER.
14
15
16       IRENE RODRIGUEZ, CSR, RMR, CRR
         CERTIFICATE NUMBER 8074
17
18
         DATED:  MARCH 20, 2023
19
20
21
22
23
24
25

STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS S. COLTHURST (CABN 99493)
Chief, Criminal Division

JEFFREY B. SCHENK (CABN 234355)
JOHN C. BOSTIC (CABN 264367)
ROBERT S. LEACH (CABN 196191)
KELLY I. VOLKAR (CABN 301377)
Assistant United States Attorneys

     150 Almaden Boulevard, Suite 900
     San Jose, California 95113
     Telephone: (408) 535-5061
     Fax: (408) 535-5066
     Kelly.Volkar@usdoj.gov

Attorneys for United States of America

<div align="center">
UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION
</div>

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>ELIZABETH HOLMES,<br><br>    Defendant. | Case No. 18-CR-00258 EJD<br><br>UNITED STATES' OPPOSITION TO DEFENDANT ELIZABETH HOLMES' MOTION FOR RELEASE PENDING APPEAL<br><br>Date:   March 17, 2023<br>Time:  10:00 a.m.<br>Court: Hon. Edward J. Davila |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................1

LEGAL STANDARD ..........................................................................................................2

ARGUMENT ........................................................................................................................4

    A.    Defendant Has Not Met Her Burden of Showing by Clear and Convincing Evidence That She Is Not a Flight Risk ..............................................................5

    B.    Defendant Has Not Met Her Burden of Showing by Clear and Convincing Evidence That She Is Not a Danger to the Community ......................................6

    C.    The Questions Defendant Has Presented Are Not Likely to Result in Reversal or an Order for a New Trial on All Counts of Conviction....................................9

    D.    Defendant Has Not Met Her Burden of Showing That the Appeal Raises a Substantial Question of Law or Fact..................................................................13

        1.    The Court Properly Admitted Testimony of Dr. Kingshuk Das, the Patient Impact Assessment, the CMS Report, and Theranos' 2016 Voiding of All Tests Run on Theranos' Proprietary Blood Analyzer ..................13

        2.    The Court Did Not Err in Its Relevant Rulings Regarding the LIS Database..........................................................................................................16

        3.    The Court Properly Excluded Balwani's Prior Testimony Before the SEC ...................................................................................................................18

        4.    The Court Did Not Err in Its Relevant Rulings Regarding Dr. Rosendorff.......................................................................................................19

        5.    The Court Did Not Err in Its Remaining Rulings .................................21

CONCLUSION....................................................................................................................22

## TABLE OF AUTHORITIES

**Cases**

*Morison v. United States*,
    486 U.S. 1306 (1988) ................................................................................ 4

*United States v. Abel*
    469 U.S. 45 (1984) ................................................................................... 20

*United States v. Bayko*,
    774 F.2d 516 (1st Cir. 1985) ................................................................. 4, 5

*United States v. Bilanzich*,
    771 F.2d 292 (7th Cir. 1985) ................................................................. 4, 5

*United States v. Gadson*,
    763 F.3d 1189 (9th Cir. 2014) ................................................................. 18

*United States v. Gerald N.*,
    900 F.2d 189 (9th Cir. 1990) (per curiam) .............................................. 3

*United States v. Giancola*,
    754 F.2d 898 (11th Cir. 1985) .................................................................. 3

*United States v. Handy*,
    761 F.2d 1279 (9th Cir. 1985) ......................................................... *passim*

*United States v. Hankey*,
    203 F.3d 1160 (9th Cir. 2000) ................................................................. 20

*United States v. Kakkar, No. 5:13-CR-00736-EJD*,
    2017 WL 4163291 (N.D. Cal. Sept. 20, 2017) .................................. 5, 6, 7

*United States v. Khan, No. 12-CR-0860-YGR*,
    2014 WL 2930656 (N.D. Cal. June 27, 2014) ...................................... 3, 6

*United States v. Lindsey*,
    680 F. App'x 563 (9th Cir. 2017) ............................................................. 7

*United States v. McCahill*,
    765 F.2d 849 (9th Cir. 1985) .................................................................... 2

*United States v. Mett*,
    41 F.3d 1281 (9th Cir. 1994) .................................................................... 3

*United States v. Miller*,
    753 F.2d 19 (3d Cir. 1985) ................................................................. 3, 4, 5

*United States v. Montoya*,
    908 F.2d 450 (9th Cir. 1990) ........................................................... 3, 5, 13

*United States v. Reynolds*,
    956 F.2d 192 (9th Cir. 1992) .................................................................... 7

**Statutes**

18 U.S.C. § 3142 ................................................................................................................ 9

18 U.S.C. § 3143 ............................................................................................................. 2, 3

**Federal Rules**

Federal Rule of Criminal Procedure 29 ............................................................................. 2

Federal Rule of Criminal Procedure 33 ............................................................................. 2

Federal Rule of Criminal Procedure 46 ............................................................................. 3

Federal Rule of Evidence 403 ......................................................................................... 20

Federal Rule of Evidence 608 ......................................................................................... 20

Federal Rule of Evidence 804 ......................................................................................... 18

## INTRODUCTION

The government opposes Defendant Elizabeth Holmes' Motion for Release Pending Appeal.  *See* ECF No. 1676 ("Motion").  More than a year ago, Defendant was found guilty on four felony fraud-related counts associated with a loss to victims of at least $120 million.  The Court imposed a sentence of 135 months of imprisonment along with other conditions on November 18, 2022, but provided a generous self-surrender date almost six months out at least in part because Defendant informed the Court that she became pregnant with her second child between the jury returning a guilty verdict against her and her sentencing date.  While facing these serious felony charges at trial and awaiting the Court's sentence, Defendant has lived on an estate with reportedly more than $13,000 in monthly expenses for upkeep and has conceived two children with her current partner.  Defendant continues to show no remorse to her victims.  While the criminal justice system presumes at this point that a criminal defendant would begin serving his or her custodial sentence, Defendant seeks, instead, to loosen the restrictions placed on her region of travel based upon vague references to her partner's work commitments.  Defendant, however, cannot meet the stringent standard for release pending appeal mandated by Congress.  There are not two systems of justice—one for the wealthy and one for the poor—there is one criminal justice system in this country.  And under that system, the time has come for Elizabeth Holmes to answer for her crimes committed nearly a decade ago, as found by a jury made up of a fair cross section of individuals from this community, and to begin serving the term of imprisonment imposed by this Court as sufficient but not greater than necessary to account for those crimes.  The government respectfully requests the Court deny Defendant's Motion.

## BACKGROUND

On July 28, 2020, the government filed the Third Superseding Indictment ("TSI"), charging Defendant Holmes and co-Defendant Ramesh "Sunny" Balwani with ten counts of wire fraud (Counts 3-12) and two counts of conspiracy to commit wire fraud (Counts 1-2).  ECF No. 469.  The Court severed the case in March 2020.  ECF No. 362.  Beginning on August 31, 2021, Defendant's trial spanned four months, during which over 900 exhibits were admitted and 32 witnesses testified.  *See generally* ECF Nos. 1256–1306, 1324.  On January 3, 2022, the jury found Defendant Holmes guilty of four counts charging conspiracy to commit wire fraud during the period 2010 to 2015 and wire fraud against

three specific investors in Theranos.  ECF No. 1235.  The jury did not reach a unanimous verdict with respect to the remaining investor-related counts and acquitted Defendant on the patient-related counts. *Id.*  Co-Defendant Balwani's separate trial began in March 2022 on the same twelve counts.  Following a comparably lengthy trial, the jury found Balwani guilty of all twelve counts.  ECF No. 1507.

Defendant moved for acquittal under Federal Rule of Criminal Procedure 29 ("Rule 29").  On September 6, 2022, the Court denied Defendant's Rule 29 motion.  ECF No. 1575.  Defendant subsequently filed three separate motions for a new trial purportedly based on newly discovered evidence under Federal Rule of Criminal Procedure 33 ("Rule 33").  ECF Nos. 1574, 1576, 1577.  The Court held an evidentiary hearing in connection with one of the Rule 33 motions and ultimately denied all three of Defendant's Rule 33 motions.  ECF Nos. 1607, 1636.

On November 18, 2022, the Court calculated the applicable U.S. Sentencing Guidelines range to be 135 to 168 months of imprisonment, in part based upon a finding that a reasonable estimate of the loss to investor-victims was more than $120 million, and sentenced Defendant to 135 months' imprisonment, at the low-end of the Guidelines range, on each count to run concurrently.  ECF No. 1712; 11/18/22 Tr. at 87–88, 132–33.  Over the government's objection, the Court did not consider patient-related conduct in its Guidelines calculation.  ECF No. 1712 at 17–19.  The Court set Defendant's self-surrender date on April 27, 2023.  *Id.* at 22.  On December 7, 2022, the Court made similar findings for the Guidelines calculation and sentenced co-Defendant Balwani to 155 months of imprisonment, among other conditions.  ECF No. 1682; 12/07/2022 Tr. at 92–93, 148–49.

## LEGAL STANDARD

Detention is the mandatory, routine norm for any defendant following conviction and the imposition of a custodial sentence.  18 U.S.C. § 3143(b)(1).  The Bail Reform Act of 1984 ("the Act") provides that after conviction and imposition of sentence, detention is mandatory absent clear and convincing evidence that a defendant is not a flight risk or danger to the community.  Congress enacted the Act to "toughen the law with respect to bail pending appeal" and to "make[ ] it considerably more difficult for a defendant to be released on bail pending appeal."  *United States v. Handy*, 761 F.2d 1279, 1283 (9th Cir. 1985); *see also United States v. McCahill*, 765 F.2d 849, 850 (9th Cir. 1985) (Kennedy, J.).  "Once a person has been convicted and sentenced to jail, there is absolutely no reason for

the law to favor release pending appeal or even permit it in the absence of exceptional circumstances." *United States v. Miller*, 753 F.2d 19, 22 (3d Cir. 1985) (quoting H. Rep. No. 907, 91st Cong., 2d Sess. 186–87 (1970) (discussing model for § 3143 within the Act)). Otherwise, "release of a criminal defendant into the community, even after conviction," runs the risk of "destroy[ing] whatever deterrent effect remains in the criminal law." *Id.* (internal quotation omitted).

Unlike in the pretrial-detention context, every defendant seeking bail pending appeal after her conviction and sentencing is presumed to be a danger and a flight risk—and it is the defendant's burden to overcome that presumption. *See United States v. Khan*, No. 12-CR-0860-YGR, 2014 WL 2930656, at *2 (N.D. Cal. June 27, 2014) ("Through this statute Congress created a presumption of detention and shifted the burden of proof to the defendant to show otherwise." (citing *Handy*, 761 F.2d at 1283)); *see also United States v. Giancola*, 754 F.2d 898, 900–01 (11th Cir. 1985) ("The 1984 Act was intended to change the presumption so that the conviction is presumed correct and the burden is on the convicted defendant to overcome that presumption."); *Miller*, 753 F.2d at 22 ("The Bail Reform Act of 1984 was enacted because Congress wished to reverse the presumption in favor of bail" for defendants seeking release pending appeal). As a result, "under the Bail Reform Act of 1984 it is no easy matter to obtain bail pending appeal." *United States v. Gerald N.*, 900 F.2d 189, 191 (9th Cir. 1990) (per curiam).

To overcome this legislative mandate, a defendant must prove: (1) by clear and convincing evidence that she is not a flight risk or a danger to the community; and (2) that her appeal is not for the purpose of delay and (3) raises a substantial question of law or fact that is (4) likely to result in (i) reversal, (ii) an order for a new trial, (iii) a sentence that does not include a term of imprisonment, or (iv) a reduced sentence to less than time served. 18 U.S.C. § 3143(b)(1); *see also United States v. Mett*, 41 F.3d 1281, 1282 n.3 (9th Cir. 1994) (listing requirements). Where a defendant fails to satisfy her burden in every respect, a request for bail pending appeal must be denied. *See United States v. Montoya*, 908 F.2d 450, 451 (9th Cir. 1990); Fed. R. Crim. P. 46(c).

A "substantial question" refers to a legal issue that is "fairly debatable" or "fairly doubtful" and "is one of more substance than would be necessary to a finding that it was not frivolous." *Handy*, 761 F.2d at 1283 (adopting the interpretation set forth in *Miller* and *Giancola*). "Fairly debatable" questions are those that are novel or not readily answerable, or that pose issues "debatable among jurists of

reason." *Id.* at 1281–82 (internal quotations and citations omitted). "'[L]ikely to result in reversal' defines the type of question that must be presented." *Id.* at 1281. This requirement "has generally been read to mean that if error is found, it must not be harmless or unprejudicial error." *United States v. Bayko*, 774 F.2d 516, 522 (1st Cir. 1985); *see also United States v. Bilanzich*, 771 F.2d 292, 299 (7th Cir. 1985) ("For example, harmless errors, errors that have no prejudicial effect, or errors that have been insufficiently preserved would not justify a court's granting bail."). Thus, a "substantial" question "may, nonetheless, in the circumstances of a particular case, be considered harmless, to have no prejudicial effect, or to have been insufficiently preserved" such that the question would not be likely to result in reversal. *Miller*, 753 F.2d at 23; *see Handy*, 761 F.2d at 1280, 1283 (adopting interpretation of the standard set forth in *Miller*). Put differently, "[a] court may find that reversal or a new trial is 'likely' only if it concludes that the question is so integral to the merits of the conviction on which defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the conviction or a new trial." *Miller*, 753 F.2d at 23. In sum, while this standard is not so strict as to require that reversal be more likely than not, *Handy*, 761 F.2d at 1280–81, neither is it so toothless that it eviscerates Congress' intent to "tighten[ ] the standards for bail pending appeal." *Id.* at 1283.

Furthermore, a defendant must prove that her appeal is likely to result in reversal or an order for a new trial on *all counts* for which imprisonment has been imposed. *See, e.g.*, *Morison v. United States*, 486 U.S. 1306, 1306–07 (1988) (Rehnquist, C.J., in chambers, denying defendant's application for bail pending resolution of certiorari petition because even if he raised a "substantial question" with respect to certain counts of conviction, he had not done so with respect to *all counts* of conviction); *Handy*, 761 F.2d at 1283 (listing fourth requirement for granting bail pending appeal as "if that substantial question is determined favorably to defendant on appeal, that decision is likely to result in reversal or an order for a new trial of *all counts* on which imprisonment has been imposed" (emphasis added)).

## ARGUMENT

Because the burden has shifted at this stage post-conviction and post-sentencing, Defendant's cursory arguments that she is not a flight risk or economic danger to the community do not suffice to meet the clear and convincing standard she faces. Furthermore, none of the arguments she has raised pose a substantial question, as described further below. Regardless of whether any of the topics she has

asserted do raise a substantial question, Defendant cannot meet the final requirement because each of the topics relate to harmless or non-prejudicial errors that do not affect all counts of conviction. *See Bayko*, 774 F.2d at 522; *Bilanzich*, 771 F.2d at 299; *Miller*, 753 F.2d at 23. Therefore, the Court should deny Defendant's Motion for bail pending appeal.

### A.   Defendant Has Not Met Her Burden of Showing by Clear and Convincing Evidence That She Is Not a Flight Risk

Defendant asserts in cursory fashion that she is not a flight risk by relying on an overview of her pretrial record. Mot. at 7. However, that the parties had previously agreed upon—and the Court approved—conditions of release pre-trial and pre-sentencing does not alone meet the heightened burden Defendant now faces. As described above, after conviction and imposition of sentence, the burden of proof shifts from the government to the Defendant to demonstrate by clear and convincing evidence that she is not a flight risk. *See Handy*, 761 F.2d at 1283. The Ninth Circuit has held that this change, along with "[e]ach of the changes contained in the Bail Reform Act of 1984[,] makes it considerably more difficult for a defendant to be released on bail pending appeal." *Id.* The Ninth Circuit has also rejected cursory motions on contested issues given it is the defendant's burden to establish each requirement. *See*, *e.g.*, *Montoya*, 908 F.2d at 451. This Court, too, has rejected similar arguments from a defendant convicted of wire fraud given, among other factors, the "undeniably compelling motivation to flee given the convictions[ and] the length of the sentence imposed[.]" *United States v. Kakkar*, No. 5:13-CR-00736-EJD, 2017 WL 4163291, at *2 (N.D. Cal. Sept. 20, 2017).

Contrary to Defendant's assertion that she has a "flawless record with U.S. Pretrial Services" and claim that no evidence suggests she will flee while she pursues her appeal (Mot. at 7), the incentive to flee has never been higher and Defendant has the means to act on that incentive. As an initial matter, Defendant's record with Pretrial Services and the Court does not account for her attempt to flee the country shortly after she was convicted. The government became aware on January 23, 2022, that Defendant Holmes booked an international flight to Mexico departing on January 26, 2022, without a scheduled return trip. Declaration of Kelly I. Volkar in support of United States Opposition to Defendant's Motion for Release Pending Appeal ("Volkar Decl."), Exhibit 1. Only after the government raised this unauthorized flight with defense counsel was the trip canceled.

*Id.* On information and belief, Defendant's partner, William Evans, left on the scheduled date with a one-way ticket and did not return until approximately six weeks later, returning from a different continent. Volkar Decl. ¶ 3. The government anticipates Defendant will note in reply that she did not in fact leave the country as scheduled—but it is difficult to know with certainty what Defendant would have done had the government not intervened. *See, e.g.*, *Khan*, 2014 WL 2930656, at *4 (canceling a flight ticket did not outweigh other indicators that defendant was a risk of flight).

Indeed, another judge in this District analyzed several factors that are also present here and found the defendant failed to meet his burden of proving he was not a flight risk. For example, Defendant "never fully appreciated that [s]he would be incarcerated" based on "ill-founded hopes that the Court would give [her] a probationary sentence." *Id.* Moreover, Defendant has never "demonstrated . . . in [her] words or manner, a genuine acceptance that [s]he stole a significant amount of money from [investors] by lying and falsifying documents[.]" *Id.* The court there also referred to a potential flight to Portland, Oregon, and noted "[t]he Canadian border is not that far from Portland and the defendant has . . . assets to assist him if necessary." *Id.* So too here. Defendant has lived on an estate for over a year where, based upon the monthly cash flow statement Defendant provided to the U.S. Probation Office, monthly expenses exceed $13,000 per month. Defendant asserted that her partner pays the monthly bills rather than her but also listed her significant other's salary as "$0." Nevertheless, at the same time when her incentive to flee has never been higher, Defendant has requested the Court ease the restrictions on her travel, permitting her to travel outside of the Northern District of California and perhaps out of the state altogether "due to her significant other's employment." ECF No. 1695.

In sum, as the court found in *Khan*, this Court should find that Defendant "has both the means and the motive to flee." *Khan*, 2014 WL 2930656, at *4; *see also Kakkar*, 2017 WL 4163291, at *2. Defendant's cursory—and incomplete—overview of her record on pretrial release does not meet her heightened burden now that she has been convicted and sentenced to a term of imprisonment.

### B.    Defendant Has Not Met Her Burden of Showing by Clear and Convincing Evidence That She Is Not a Danger to the Community

Similarly, Defendant's one-sentence assertion that she poses no threat of potential future pecuniary harm does not satisfy her heightened burden at this stage, either. *Cf.* Mot. at 7. Danger to the

community is not limited to physical violence but rather can encompass pecuniary or economic harm, as well. *See, e.g.*, *United States v. Reynolds*, 956 F.2d 192, 192–93 (9th Cir. 1992); *Kakkar*, 2017 WL 4163291, at *2 (citing *Reynolds*); *see also United States v. Lindsey*, 680 F. App'x 563, 567–68 (9th Cir. 2017) (upholding denial of bail pending appeal where defendant's "elaborate mortgage fraud scheme" caused the loss of millions of dollars and "targeted vulnerable and impoverished individuals").

Defendant asserts summarily that she presents "no threat of . . . causing pecuniary harm given her substantial notoriety." Mot. at 7. But Defendant's resourcefulness has shown itself over and over again throughout trial and sentencing. First and foremost, as summarized at a high level below and in more detail in prior filings, whenever different revenue sources dried up for Theranos, Defendant effortlessly switched to new targeted sources—from pharmaceutical companies to retail services to the Department of Defense to private investors. *See generally* ECF Nos. 1395, 1486, 1643. Second, despite her "substantial notoriety[,]" Defendant submitted over a hundred letters of support—including from a U.S. Senator—before her sentencing (although as the Court noted not all of those supporters may have been aware of the extent of Defendant's fraudulent conduct). *See* 11/18/22 Tr. at 6, 129–32. Indeed, according to documents Defendant provided to the Probation Office, she secured $450,000 in so-called loans from individuals in New York, Montana, DC, Illinois, and the Philippines purportedly to fund the monetary portion of Defendant's settlement with the SEC in March 2018. Third, Defendant has shown no remorse to the victims of her fraud, despite an associated loss that the Court found was at least $120 million. *See* ECF No. 1712. Fourth, Defendant shows no indication of changing course—the statements she provided to the Probation Office list patents she either holds or intends to work on as potential future sources of income. Finally, despite the breadth of her conduct, Defendant has not acknowledged the fraudulent nature of her conduct, rendering it more likely that she will repeat it in the future. *See* 11/18/22 Tr. at 98–99.

The government has described Defendant's conduct in detail elsewhere (*see*, *e.g.*, ECF Nos. 1395, 1486, 1643)—and the Court is familiar with the facts of this case having sat through two trials spanning nearly a year—but in brief summary of Defendant's elaborate scheme to defraud investors about the capabilities of her blood-testing device:

Defendant secured dozens of investors in Theranos over several years by falsely claiming that Theranos had manufactured one single, proprietary blood analyzer device (the Edison, minilab, TSPU, etc.) that could run any blood test that was run by conventional labs, all from a blood sample drawn via a fingerstick rather than the traditional draw from a vein, with higher accuracy and less variability than traditional methods, due in part to its more automated process that reduced human error inherent in running blood tests in a laboratory.  To support her bold claims, Holmes repeatedly told potential investors that Theranos' technology had been comprehensively validated by multiple major pharmaceutical companies, and was being used in the battlefield by the Department of Defense to treat wounded soldiers.  Defendant also asserted that Theranos was a profitable company and had a healthy ongoing relationship with retail pharmacy company Walgreens, through which it provided blood tests to patients beginning in September 2013.  Not only did several representatives of investors testify that Defendant made these statements to them in meetings, Defendant also began providing written materials and binders to investors in 2014 and 2015 that contained these false statements.

In truth, scientists who had worked at Theranos testified that Theranos' proprietary device could never complete more than 12 types of blood tests, often with less accuracy, less automation, and more variability than traditional "predicate" machines manufactured by third-party companies, such as Siemens AG.  Because of these shortcomings, pharmaceutical companies curtailed their modest work with Theranos and did not validate its technology, and the Department of Defense never used Theranos' analyzer to clinically treat soldiers.  Defendant admitted while testifying that she had altered and enhanced reports purportedly authored by pharmaceutical companies and then subsequently provided those reports to investors.  Theranos had zero revenue in 2012 and 2013 and desperately needed new sources of cash.  Defendant hid the shortcomings of Theranos' proprietary device by using—without telling potential investors—modified and unmodified third-party machines to fulfill the remainder of Theranos' available blood test menu to patients at Walgreens stores.  As a result, Theranos' relationship with Walgreens was faltering because the percentage of traditional venous draws was too high.  But none of this information was shared with investors in Theranos.

In sum, Defendant committed an elaborate fraud scheme that resulted in more than a hundred million dollars of loss, with no consideration of the patients she endangered and with no remorse to this

day toward the investor-victims. Given the nature and magnitude of the crime, as well as her lack of remorse and indicated willingness to continue operating in similar fields in the future, Defendant cannot meet her burden of demonstrating by clear and convincing evidence that she does not present a danger to the community under the relevant factors of 18 U.S.C. § 3142(g).

**C.    The Questions Defendant Has Presented Are Not Likely to Result in Reversal or an Order for a New Trial on All Counts of Conviction**

Even if Defendant has presented a substantial question—which she has not for reasons stated below—she cannot meet her burden of proving the final requirement for bail pending appeal because she cannot demonstrate that favorable resolution on any of the questions she has presented would be likely to result in reversal of, or a new trial on, all counts of conviction. *Cf.* Mot. at 9–20. Given that each question presented addresses at most one subpart of Defendant's scheme to defraud investors, even if the Ninth Circuit were to find error, such error would be harmless or non-prejudicial in light of the overwhelming amount of evidence regarding Defendant's multi-faceted misrepresentations.

Fundamentally, seven of the ten issues Defendant has presented correspond almost entirely to the patient-related counts—not the investor-related counts on which she was convicted. *See* ECF No. 1235. Specifically:

- Defendant challenges the characterization of Dr. Kingshuk Das' testimony, even though Dr. Das began working for Theranos full-time in 2016 after the investor fraud was already completed (but not the patient fraud), and the admission through Dr. Das of a patient impact assessment where Dr. Das informed Defendant that there was a possible patient impact for every test ever run on Theranos' proprietary device. *See* Mot. at 9–10.

- Similarly, Defendant challenges the admission for a limited purpose of CMS's January 2016 findings that led Dr. Das to the conclusion he reached and ultimately led to Theranos voiding all patient blood tests run on Theranos' proprietary device. *See* Mot. at 10–12. Defendant also renews the challenges raised in her motion to suppress and motion to strike, which sought to preclude the same evidence (in addition to the testimony of actual patients themselves). *Id.*

- Defendant challenges the testimony of Dr. Adam Rosendorff, who was Theranos' laboratory director from 2013–2014 within the investor fraud period, but who did not have an externally facing role with investors. *See* Mot. at 14–16. *But see* ECF No. 1636 at 8.

- Finally, Defendant renews once again her LIS-related challenges. *See* Mot. at 18–19. *But see* ECF No. 1636 at 12–15 (holding Defendant was not prejudiced on this same topic).

One straightforward way of identifying the harmlessness of the patient-related errors that Defendant asserts, is that investors testified that the negative October 2015 *Wall Street Journal* article exposed the fraud and spurred questions from investors to Defendant about whether Theranos was using third party machines and the true capabilities of Theranos' proprietary device—and that article predated CMS' findings, Defendant's hiring of Dr. Das, Theranos' voiding all tests run on the Edison, and the LIS-related challenges that Defendant asserts. *See*, *e.g.*, 10/26/21 Tr. at 4698–4710; 11/02/21 Tr. at 4959. And, while Dr. Rosendorff's testimony demonstrated the falsity of claims Defendant made to investors about the capabilities of Theranos' analyzer, the government called several other witnesses who also provided overlapping evidence of falsity. *See* ECF Nos. 1395 at 13–23, 1587 at 18–19, 1636 at 5–6.

In an attempt to overcome this fatal disconnect, Defendant notes that the questions she has raised relate to "the accuracy and reliability of Theranos' technology"—citing TSI ¶ 12(A)—and selectively quotes from the government's closing argument. Mot. at 10–11, 18. But Defendant's argument asks the Court to rely on a logical fallacy confusing a sufficient condition as a necessary one. While the government has always argued that Defendant's misrepresentations about the accuracy and reliability of Theranos' testing would be sufficient to support a verdict on all counts alleged in the TSI and is the key overlapping misrepresentation between the two fraud schemes, it is far from a necessary finding, particularly on the investor fraud counts. As the government argued in closing, "[i]t's not the case that every investor heard every [kind of false] statement[,]" although some were more common than others, "especially this first one about the capabilities of the analyzer, and in particular its accuracy" because false statements about the accuracy is "the underlying false statement in the case" between the two fraud schemes—"but it is certainly not the only false statement." 12/16/21 at 8959. Indeed, the government recently argued that the patient-related conduct gave a sense of legitimacy to the product that aided in defrauding investors (ECF No. 1649 at 28–30), but the Court rejected that connection as "too attenuated" to justify a sentencing enhancement. *See* ECF No. 1712 at 18. The same holds true here.

TSI ¶ 12(A) alleges at least four deficiencies with the capabilities of Theranos' proprietary analyzer about which Defendant misled investor-victims—and the accuracy and reliability problems are only one deficiency. ECF No. 469 ¶ 12(A). Critically, ¶ 12(A) alleges that Defendants made false

statements to investor-victims that Theranos' analyzer "was presently capable of accomplishing certain tasks, such as performing the full range of clinical tests" when, in fact, Defendants knew the analyzer "performed a limited number of tests[.]" *Id.* The paragraph also references the speed of returning test results and the method of testing patients' blood, all in addition to Defendants' claim that Theranos' analyzer was "more accurate and reliable than those yielded by conventional methods[.]" *Id.* And, of course, Defendant's lies to investors regarding the capabilities of Theranos' proprietary device are themselves only one category among several misrepresentations she made. *See, e.g., id.* ¶ 12(A)–(H); ECF No. 1575 at 4–5 (referencing other misrepresentations to investor-victims in denying Defendant's Rule 29 motion). As described further below, these other misrepresentations mattered to investors and cannot be discounted.

The link Defendant asserts between the investor-related counts she was convicted on and one subpart within a subpart of categories of false misrepresentations she made to investors is far too attenuated to meet her burden of showing likely reversal or a new trial on the relevant counts. The three remaining questions that Defendant has presented do not fare any better when stacked up against the overwhelming evidence that the government presented at trial and would also present harmless or non-prejudicial errors at best:

- Defendant challenges the Court's exclusion of portions of co-Defendant Balwani's SEC deposition testimony, which she claims shows that Defendant "Holmes had little involvement with the financial projections sent to the investors." *See* Mot. at 12–14.

- Defendant challenges admission of certain trial exhibits showing that Defendant made similar statements to representatives of the Department of Defense that she made to investors. *See* Mot. at 16–17.

- Defendant challenges a few lines plucked out of context from the government's rebuttal argument in the trial of her co-Defendant Balwani as inconsistent with the government's argument in her trial. *See* Mot. at 17–18. *But see* ECF No. 1636 at 8–10 (holding same statements were not likely to result in an acquittal).

However, even if Defendant were to prevail on the substance of these claims (which is unlikely as described in the next section below), any errors would be deemed harmless or non-prejudicial in the context of the entire trial and thus unlikely to result in reversal or any other alternative outcome. None of the errors Defendant has asserted would alter the admission of the text messages between Defendants,

which is strong evidence supporting Defendant's conviction on the conspiracy to defraud investor count. *See* ECF No. 1395 at 7–9.  Furthermore, a sampling of the testimony of representatives of the three substantive investor-related wire fraud convictions, testifying about what was material to them, demonstrates that entire categories of false statements Defendant made to investors would not be affected *at all*, even if the Ninth Circuit were to resolve every question Defendant has posed favorably to her.  For example, Daniel Mosley and Lisa Peterson, who testified as a representative of investor RDV Corporation ("RDV"), both identified, among other misrepresentations, the altered report purportedly written by Pfizer touting Theranos' capabilities as important to their decision to invest.  10/26/21 Tr. at 4666–67, 4681–83; 11/02/21 Tr. at 5100–01, 5107–10; *see also* 11/16/21 Tr. at 6426 (Grossman testified it would have been important to him to know that Theranos had zero revenue from pharmaceutical companies in 2013, contrary to Defendants' claims).  Brian Grossman, the managing partner and chief investment officer at PFM Health Sciences ("PFM"), identified the fact that Defendants claim that Theranos was "vertically integrated"—"meaning that they made their own analyzers as opposed to using third parties" and "which was unusual for companies in the diagnostic space"—as a "very [ ] important part" of the information provided to them before investing.  11/16/21 Tr. at 6432–34, 6382–84; *see also* 10/26/21 Tr. at 4657–59 (Peterson testifying that Defendants told RDV that Theranos uses their own analyzer equipment and that was important to RDV).  Similarly, Grossman testified that the number of tests Theranos could perform—"over a thousand CPT codes with their technology"—was impressive to learn before PFM invested, and as a result he felt duped when he learned Theranos' proprietary device could never do more than a handful of tests.  *See* 11/16/21 Tr. at 6379–84, 6395–96, 6400–03, 6413–15, 6442–48.

Tellingly, even if every issue Defendant has raised in her Motion for bail pending appeal was resolved favorably to her, it would not impact any of the material misrepresentations listed above, which are themselves only a small sampling of false statements that Defendant made to investors connected to the counts on which Defendant was convicted.  Therefore, Defendant cannot meet her burden of demonstrating that reversal, a new trial, or a different sentence on all counts of conviction would result from the questions she has posed, and the Court should deny her Motion.

**D.      Defendant Has Not Met Her Burden of Showing That the Appeal Raises a Substantial Question of Law or Fact**

Defendant presents ten issues that she might raise on appeal that she asserts raise substantial questions. *Cf.* Mot. at 9–19. But what counts as a substantial question is not measured by the number of possible arguments. For reasons stated in the government's prior briefing on these topics and the Court's ruling on them, these ten issues do not present substantial questions. Furthermore, to the extent Defendant references vague other issues that might constitute substantial questions (*id.* at 9), the Ninth Circuit has explicitly held that "cursory motion[s]" with "vague presentations" of issues are insufficient to meet the substantial question standard and are thus barred. *See*, *e.g.*, *Montoya*, 908 F.2d at 451.

**1.      The Court Properly Admitted Testimony of Dr. Kingshuk Das, the Patient Impact Assessment, the CMS Report, and Theranos' 2016 Voiding of All Tests Run on Theranos' Proprietary Blood Analyzer**

The government incorporates by reference its prior briefing on these topics and the Court's corresponding orders. *See*, *e.g.*, ECF Nos. 588, 675, 726, 798, 906, 926, 989, 1133, 1181, 1192. As the government argued during the trial when seeking admission of this very same evidence: "The government submits that the evidence and testimony it seeks to admit is directly relevant to prove allegations against Defendant in the TSI—specifically with respect to the conspiracy to defraud Theranos's patients from 2013 to 2016—and is necessary to rebut the presently misleading impression Defendant has introduced at trial that her state of mind in 2016 was solely that the technology worked when she was being told a different story internally by Dr. Das and through the January 2016 CMS Report and subsequent interactions with CMS. Indeed, Theranos's decision in March 2016 to void all test results on its proprietary device from 2014 and 2015 as a result of the CMS Report and findings, and Dr. Das's internal review of those findings, demonstrates Defendant's knowledge of the severity of the inaccuracy and unreliability problems with Theranos's blood analyzer during the charged period." ECF No. 1133 at 5; *cf.* Mot. at 9–12.

The January 2016 CMS Report (and letter) were properly admitted as Trial Exhibits 4621A and 4621B for the limited purpose of showing Defendant's state of mind as to the state of the CLIA lab (Theranos' clinical lab responsible for processing patient samples) in late 2015 and early 2016. ECF

No. 1196.  The Court originally admitted the CMS report without any limitation in its pretrial order on the parties' respective motions *in limine*.  ECF No. 798 at 16–20.  Defendant proceeded to re-raise the issue multiple times throughout the trial, and the Court ultimately reconsidered its pretrial ruling and admitted the exhibits solely for a limited purpose.  *See* ECF Nos. 1133 at 5–8, 1192 at 2–4 (detailing procedural history).  Defendant also moved to strike admission of the CMS Report and Dr. Das' accompanying testimony at the end of the government's case-in-chief.  *See* ECF No. 1196.  As the government argued previously, the CMS Report and findings were relevant to show the ongoing notice to Defendant of problems with Theranos' clinical testing, as scientists had been raising to Defendants for years, not unduly prejudicial (contrary to her claims elsewhere), and particularly proper to show Defendant's state of mind regarding the state of Theranos' technology, given the evidence Defendant had already introduced to date at the trial claiming Defendant believed Theranos' technology worked (when it didn't) and her purported good intentions in 2016.  *See* ECF No. 1133 at 6–8 (detailing evidence admitted at trial for Defendant's state of mind after the January 2016 CMS Report).

Dr. Kingshuk Das testified at Defendant's trial as a percipient witness who described what he observed while performing the job Defendant hired him to do—namely, respond to the CMS deficiency findings including those detailed in the January 2016 CMS Report and elsewhere.  *See* ECF Nos. 906, 1133.  Defendant hired Dr. Das as Theranos' laboratory director in winter 2015 and full-time in spring 2016—in large part to analyze the findings described in the CMS Report and respond to questions posed by CMS.  *See* ECF No. 727-2 at 2.  Within the scope of his duties as lab director, and while attempting to respond to CMS as he was hired for his ability to do, Dr. Das observed concerns with certain lab practices—in particular with Theranos' proprietary blood analyzer device—and communicated those concerns to Defendant Holmes.  *See* ECF Nos. 727-2, 846-2.  At its core, that is fact witness testimony, even if it involved an explanation of his professional judgment as a lab director.  *See* ECF Nos. 798 at 47–54, 70–72, 75–78, 989.  As the Court previously found, the government was permitted to call Dr. Das to testify about his job, what he was hired by Defendant to do, what he discovered in performing the tasks the Defendant asked him to do (namely, investigate CMS's findings and concerns), and his perspective of the resulting discussion of what he discovered with senior management.  Each of those topics are squarely within his percipient knowledge.  Throughout Dr. Das' trial testimony, Defendant

repeatedly raised Rule 702 objections and the Court sustained some and overruled others.  *See* 11/09/21 Tr. (holding oral arguments at outset of trial day regarding Dr. Das as an expert among other issues and defense counsel raising Rule 702 objections periodically during Dr. Das' testimony).

Tellingly, it was during Defendant's *cross-examination* that Dr. Das was asked to expand on more technical aspects—including the Sigma metric, which the Court had previously ruled would stray into Rule 702 territory—rather than in response to the government's questions.  *See, e.g.*, 11/10/21 Tr. at 5941–42 (cited by Mot. at 9).  There is no substantial question regarding whether the Court abused its discretion in admitting and precluding certain testimony from Dr. Das pursuant to Rule 702.  Dr. Das' testimony was properly admitted as percipient testimony and appropriate guardrails were enforced by the Court throughout his testimony.

Dr. Das did the job that Defendant asked him to do—to analyze the findings in the CMS Report—and reported back to Defendant that Dr. Das had concerns with results from Theranos' proprietary blood analyzer.  11/09/21 Tr. at 5781–835.  Based on his discussion with Defendant, he prepared on behalf of Theranos a Patient Impact Assessment, which was provided in response to CMS's concerns, and concluded that there was "a global and long-term failure of the quality control program for this instrument" and, as such, "[t]he laboratory has concluded that there is a possible patient impact for every test reported from the laboratory's TPS 3.5 instruments [Theranos' proprietary analyzer]."  *Id.* at 5832; TX 4943.  Dr. Das found Theranos' analyzer "to be unsuitable for clinical use" and urged Defendant to void all patient tests ever run on the device.  11/09/21 Tr. at 5833–35, 5860–61.  Theranos did so shortly after Dr. Das recommended this course of action.  *Id.*  Dr. Das was obligated under relevant CLIA regulations to void tests on behalf of Theranos and the fact that Defendant had to be persuaded to follow Dr. Das' recommended course of action goes directly to the core of Defendant's intent and knowledge.  Defendant asserts the voiding of tests run on Theranos' proprietary device is irrelevant to the investor counts—which supports the government's point made above that any error would be harmless—and now argues that admission of such evidence was unduly prejudicial, ignoring the relevance to the patient counts.  *See* Mot. at 11.  The Court properly admitted evidence of Theranos voiding all patient tests run on its proprietary device as relevant to the charged conduct and involuntary (thus not barred by Rule 407).

In sum, none of the above topics raise a substantial question, nor does Defendant's repackaging of them in her motion to suppress and motion to strike, and, even if there were error, it would likely be harmless and non-prejudicial given Defendant's acquittal on the patient-related counts.

**2.      The Court Did Not Err in Its Relevant Rulings Regarding the LIS Database**

The Court has heard the facts surrounding the nature and destruction of Theranos' LIS on numerous occasions, and the government incorporates by reference its prior filings and arguments on this subject.  *See, e.g.*, ECF Nos. 682, 846, 1181, 1426, 1440, 1454, 1586; 05/04/21 Tr. at 45–68, 79–85; 07/07/21 Tr.; 11/10/21 Tr. at 5877–5889; 11/19/21 Tr. at 7100–7104; 02/08/22 Tr.; 05/11/22 Tr. at 5291–5329; 05/23/22 Tr.  Neither Defendant's motion to suppress on this basis nor motion for a new trial on LIS-related emails raises a substantial question, particularly where this Court has been given multiple opportunities to revisit the same topic and reach the same reasoned results.  *Cf.* Mot. at 11–12, 18–19.

The Court did not err in denying Defendant's motion to suppress several categories of evidence regarding the patient-related counts based on the absence of the LIS database because Defendant cannot demonstrate the exculpatory value of data within the LIS database and, in any event, the government did not act in bad faith.  *See* ECF Nos. 887, 1326 at 20–21, 30–37.  Regardless, any error is harmless given Defendant was acquitted on the patient-related counts.  ECF No. 1235.  Prior to her trial, Defendant repeatedly asserted the missing LIS database was a reason to preclude patient-victims from testifying about the inaccuracy and unreliability of Theranos tests—along with suppressing the CMS report, voiding of all tests, and other evidence demonstrating the inability of Theranos' proprietary analyzer to produce accurate and reliable results to patients—because Defendant would be unable to show the "statistical insignificance" of their testimony without the LIS.  *See, e.g.*, 5/4/21 Tr. at 40–100; 07/07/21 Tr. at 34–36 ("[W]ith respect **to the patient counts** that [information in LIS] would be exculpating evidence, your honor, because their claim is that Theranos technology was incapable of producing accurate and reliable results." (emphasis added)); ECF No. 810; *see also* ECF No. 846 (government's opposition).

The government has repeatedly argued that the LIS database would have been a "powerful tool" to identify additional patient-victims and quality-control data, but it would not have allowed the parties

to sort accurate from inaccurate patient results or determine an overall failure rate for Theranos' blood tests.  *See, e.g.*, ECF Nos. 846 at 7–8, 1440 at 5–7; 05/04/21 Tr. at 67, 70–72, 81–84, 95 (defense counsel acknowledging LIS does not have an accuracy field); 10/05/21 Tr. at 2734–37 (Dr. Rosendorff testifying that extrinsic factors that identify whether a patient's result is accurate were not stored in the LIS database).  And, of course, Defendant had access to the LIS database in her role as Chief Executive Officer (until approximately June 2018) and thereafter Chair of Theranos' Board (until the company dissolved) throughout multiple lawsuits and—if she truly thought it contained exculpatory data—she would have obtained a functioning copy of the LIS database long ago rather than waiting until the eve of her trial to characterize the evidence as critical.  *See* ECF No. 887 at 9 (finding no support for Defendant Holmes' assertion that she always considered the database would be exculpatory); *see also* ECF No. 846 at 11.  Because of Defendant's continued position of power on Theranos' Board of Directors when the only functioning copy of the LIS database was destroyed, Defendant just as vigorously argued that what happened to the LIS database and who was responsible for its destruction was irrelevant at trial.  *See, e.g.*, 5/4/21 Tr. at 49–50, 54–58, 93–98.

The Court denied Defendant's motion to suppress in part because the Court found that the government did not act in bad faith and "[t]he LIS database information alone would not provide a conclusive determination of whether the Theranos blood tests were accurate, and *it could just as likely contain incriminating evidence to the contrary*.  Any exculpatory value is therefore speculative in nature."  ECF No. 887 at 10 (emphasis added).  The evidence supports this conclusion.

Subsequently, Defendant moved for a new trial claiming a *Brady* violation based on eleven emails the government produced during co-defendant Balwani's trial that provided substantively the same information as the government provided to both defense counsel in a letter in October 2020.  *See* ECF No. 1577; *see also* ECF No. 1586.  The Court held that the government did not suppress the relevant information and Defendant was not prejudiced as a result.  ECF No. 1636 at 12–15.  Specifically, the Court held that the eleven LIS-related emails do "not undermine confidence in the outcome of the trial, nor would [they] have been reasonably likely to change the result."  *Id.* at 14.  Indeed, the Court found the identities of government prosecutors—what Defendant again asserts is a

basis for a substantial question on appeal—had "*de minimis* relevance, if any, . . . on the issues at trial[.]"  *Id.*

In sum, for reasons stated here and in the government's prior arguments on this topic, Defendant does not raise a substantial question with respect to the LIS database that Theranos destroyed.

### 3.  The Court Properly Excluded Balwani's Prior Testimony Before the SEC

There is no substantial question about whether the Court properly excluded co-defendant Balwani's prior self-serving testimony about his role in creating financial models at Theranos under Federal Rule of Evidence 804(b)(3) because the statements largely deflect or share blame by pointing to others and, to the extent Balwani inculpates himself and exculpates Holmes, there is insufficient indication of trustworthiness.  *See* ECF Nos. 1166, 1175.  The Court properly found co-Defendant's statements insufficiently inculpatory given that, during the testimony before the SEC, Balwani described how he created a financial model—rather than projections—and he did so with input from Safeway and Walgreens and later from individuals at potential investor BDT.  *See* ECF No. 1163-2 at 6–7; ECF No. 1163-3 at 3–5.  The SEC asked Balwani who labeled the document "projections"—and he deflected by pointing to Danise Yam's and BDT's roles.  ECF No. 1163-3 at 4–5.  The Ninth Circuit has held that "[s]tatements that curry favor or deflect (or share) blame do not fall within the scope of Rule 804(b)(3)(A)."  *United States v. Gadson*, 763 F.3d 1189, 1200 (9th Cir. 2014) (internal quotation omitted).  As the Court noted, Balwani's prior statement that he "owned" the model does not in itself denote a crime, rather "[i]t *might* be a crime to use fraudulent assumptions in the model and then share those assumptions to investors"—but Balwani did not make statements to that effect.  ECF No. 1175 at 7–10.

Furthermore, the Court did not err in finding that the record supports the government's position that Defendants worked together on the revenue piece and thus there was insufficient corroborating evidence to demonstrate Balwani alone "was responsible for the financial model[.]"  Mot. at 12–14; *see* ECF No. 1175 at 10.  Defendants texted repeatedly about the financial state of Theranos and in his prior testimony before the SEC, co-Defendant Balwani stated he shared the financial models with Defendant Holmes.  ECF No. 1175 at 10.  The Defendants' contemporaneous text messages contradict some of Balwani's prior testimony before the SEC, further undermining its trustworthiness.  *Compare* TX 5387

at 34, 36 (Balwani referring to projections—rather than model—and asking if Holmes is comfortable with explaining it to potential investors), *with* ECF No. 1163-3 at 6 (Balwani testifying that Holmes was not familiar with the financial model he prepared).  Their collaboration on misleading financial projections provided to investors is further corroborated by investors and their representatives who testified that they heard about the financial status of the company from both Defendants.  *See, e.g.*, 11/16/21 Tr. at 6383–84 (Defendants told PFM that Theranos had historically earned over $200 million in revenue, primarily from the company's work with the Department of Defense); 10/26/21 Tr. at 4645–50, 4680 (Lisa Peterson testified about a phone call between RDV representatives and Defendant Holmes—without co-Defendant Balwani—where Defendant discussed financial projections based on Theranos providing testing in 900 Walgreens locations in 2015 despite Defendant knowing at the time of the phone call that Walgreens was scaling back).  For the same reasons, there is no due process violation.  *Cf.* Mot. at 13–14.

####    4.    The Court Did Not Err in Its Relevant Rulings Regarding Dr. Rosendorff

Defendant does not present a substantial question regarding the extent of her cross-examination of Dr. Adam Rosendorff or his post-trial statements at her residence.  *Cf.* Mot. at 14–16.  Dr. Adam Rosendorff worked as the CLIA laboratory director at Theranos from April 2013 until he resigned in November 2014.  Since then, he has worked at a number of other large companies, some of which have faced scrutiny from government entities.  Despite some of that scrutiny relating to time periods when Dr. Rosendorff did not work for the relevant company or conduct wholly unrelated to his role in the company, Defendant sought to use the simple fact of investigations at companies where he once worked to impugn Dr. Rosendorff's competence and his motives for testifying in this trial.  *See* ECF No. 1405.  The Court permitted Defendant to make limited inquiry about a then-ongoing investigation of the lab Dr. Rosendorff had been working at during the trial where one possible outcome was a sanction that could have involved Dr. Rosendorff's professional license.  10/05/21 Tr. at 2567–68, 2717–20.  Subsequently, that investigation resolved without any sanctions imposed whatsoever.  *See* ECF Nos. 1405, 1405-2, 1405-3.

Based on the above facts, there is no substantial question that the Court properly held that Defendant sought to introduce "inappropriate character evidence" that was more prejudicial than

probative for purposes of Federal Rule of Evidence 403. 10/05/21 Tr. at 2707–14. The Court also referenced Federal Rule of Evidence 608 and its purpose of "avoid[ing] mini trials," and found that the proposed cross examination would also be cumulative after the cross had spanned over four trial days and covered a vast array of topics in great detail. *Id.* The evidence about Dr. Rosendorff's post-Theranos employment did not constitute evidence of bias. "The point of a bias inquiry is to expose to the jury the witness' special motive to lie by revealing facts such as interest in the outcome of the trial or personal animosity or favoritism toward the defendant" or prosecution. *United States v. Hankey*, 203 F.3d 1160, 1171 (9th Cir. 2000) (internal citations omitted) (citing *United States v. Abel*, 469 U.S. 45 (1984)). For example, in *Abel*, the Supreme Court held that evidence showing defendant and a defense witness were both members in a gang and one of the gang's tenets required its members to lie to protect each other was admissible as bias evidence against that witness. 469 U.S. at 52–53. By contrast, here, Defendant has not shown—and cannot show—that subsequent investigations of companies where Dr. Rosendorff worked at certain times after he resigned from Theranos gives rise to a motive for Dr. Rosendorff to lie or slant his testimony. Furthermore, each of the investigations Defendant references began in 2021 *after* Dr. Rosendorff had already given prior consistent statements regarding his percipient observations while working at Theranos in civil depositions and multiple interviews with the FBI related to this case—cutting strongly against Defendant's claim that questioning regarding these three companies would show Dr. Rosendorff's motive to slant his testimony favorably for the prosecution. *Compare* ECF No. 1401-3 at 92, 105 (Invitae subpoena announced November 2021), 273 (uBiome indictment announced March 2021), 279 (CMS sends findings to CDPH Branch Lab in February 2021), *with*, *e.g.*, 09/28/21 Tr. at 1976:4–13 (describing civil deposition in February 2019).

Similarly, there is no substantial question regarding Dr. Rosendorff's post-trial statements to Defendant's partner at her residence given that the Court held an evidentiary hearing on this topic and Dr. Rosendorff clarified under oath what he meant. *See* 10/17/22 Tr.; ECF No. 1636 at 3–8. Specifically, Dr. Rosendorff repeatedly "testified that he did *not* believe the government was making things sound worse than they were at trial" and clarified that his statements about employees working hard to do something good at Theranos "did not intend to include Ms. Holmes and Mr. Balwani[.]" ECF No. 1636 at 3–8. The Court further found that Dr. Rosendorff's post-trial statements were

"too vague and general to imply any specific [prior] testimony was actually false or misleading" and thus failed under *Napue*. *Id.* at 6–8. Regardless, the Court held that the statements were immaterial and unlikely to affect the counts of conviction given that "Dr. Rosendorff's post-trial statements only pertained to the *internal* operations at Theranos and, therefore, are unlikely to affect the Defendant's convictions for investor fraud that featured Defendant's representations of Theranos's *external* partnerships." *Id.* at 8. Thus, even if there were error—which there is not—it would be harmless.

### 5.   The Court Did Not Err in Its Remaining Rulings

Defendant's two remaining issues do not raise substantial questions, either. *Cf.* Mot. at 16–18.

First, the false statements that Defendant made to the Department of Defense were inextricably intertwined with the investor-related fraud counts because Theranos had to get the military branch interested in its product to have something to exaggerate and misrepresent to investors later and, even more importantly, the evidence was important to show Defendant's intent and knowledge that the statements she made to investor-victims about Theranos' work with the Department of Defense were, in fact, false. *See* 10/19/21 Tr. at 3896–99. Regardless, even if it were fairly debatable, any error would be harmless and non-prejudicial to all counts of conviction. *See* ECF No. 1575 at 4 n.1 (noting there is sufficient evidence to uphold Defendant's conviction even setting aside false statements about Theranos' work with the Department of Defense). Defendant cannot show in a case involving lies on multiple topics to investors and patients that somehow lies to the Department of Defense tipped the balance.

Second, the government's closing and rebuttal arguments in both trials were entirely consistent and each elaborated on the evidence at the respective trials demonstrating that the two Defendants worked in tandem, wielded the most power and control within Theranos, communicated constantly, and had the ability to influence one another. *See* ECF Nos. 1585, 1636. The Court did not err in holding that the government's opinion of the relationship between Defendants is not material and would be unlikely to alter the outcome of a new trial, particularly given Defendant herself testified during her trial that Balwani did not force her to make statements and all decisions were made jointly by her and Balwani at Theranos. *See* ECF No. 1636 at 10. Regardless, even if it were fairly debatable, any error would be harmless and non-prejudicial to all counts of conviction. *See* ECF No. 1636 at 10–11 (finding

statements are not material and would not be likely to result in acquittal as bases for denying

Defendant's motion for a new trial on this ground).

## CONCLUSION

For the reasons stated above, the government respectfully requests that the Court deny Defendant

Holmes' Motion for release pending appeal.

DATED:  January 19, 2023                            Respectfully submitted,

                                                    STEPHANIE M. HINDS
                                                    United States Attorney

                                                    _/s/ Kelly I. Volkar_
                                                    JEFFREY B. SCHENK
                                                    JOHN C. BOSTIC
                                                    ROBERT S. LEACH
                                                    KELLY I. VOLKAR
                                                    Assistant United States Attorneys

JOHN D. CLINE (CA State Bar No. 237759)
600 Stewart Street, Suite 400
Seattle, WA 98101
Telephone: (360) 320-6435
Email: cline@johndclinelaw.com

KEVIN M. DOWNEY (Admitted Pro Hac Vice)
LANCE A. WADE (Admitted Pro Hac Vice)
AMY MASON SAHARIA (Admitted Pro Hac Vice)
KATHERINE TREFZ (CA State Bar No. 262770)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, S.W.
Washington, D.C. 20024
Telephone: (202) 434-5000 │Facsimile: (202) 434-5029
Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

Attorneys for Defendant ELIZABETH A. HOLMES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>ELIZABETH HOLMES and<br>RAMESH "SUNNY" BALWANI,<br><br>　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. CR-18-00258-EJD<br><br>**MS. HOLMES' AMENDED NOTICE OF APPEAL**<br><br>Hon. Edward J. Davila |

## AMENDED NOTICE OF APPEAL

Notice is given that Defendant Elizabeth Holmes hereby appeals to the United States Court of Appeals for the Ninth Circuit from the final judgment of the district court entered in this action on January 11, 2023 ("Judgment") (ECF No. 1716); from any and all adverse rulings incorporated in, antecedent to, or ancillary to the Judgment; and from any and all adverse interlocutory orders, judgments, decrees, decisions, rulings, and opinions that merged into and became part of the Judgment, that shaped the Judgment, that are related to the Judgment, or upon which the Judgment is based.

Dated:  January 17, 2023                    Respectfully submitted,


                                            /s/ Amy Mason Saharia
                                            KEVIN DOWNEY
                                            LANCE WADE
                                            AMY MASON SAHARIA
                                            KATHERINE TREFZ
                                            Attorneys for Elizabeth Holmes

## CERTIFICATE OF SERVICE

I hereby certify that on January 17, 2023 a copy of this filing was delivered via ECF on all counsel of record.


/s/ Amy Mason Saharia
AMY MASON SAHARIA
Attorney for Elizabeth Holmes

# Exhibit M
# (PREVIOUSLY FILED UNDER SEAL)

United States v. Holmes, et al.

Case # 18-CR-00258

Expert Report of Carl S. Saba, MBA, CVA, ASA, ABV

Confidential

## Table of Contents

I.   Qualifications ................................................................................................................... 1

II.  Assignment ...................................................................................................................... 2

III. Evidence Relied Upon ...................................................................................................... 5

IV. Summary of Opinions ...................................................................................................... 5

V.  Introduction .................................................................................................................... 8

    A.   Standard and Premise of Value ............................................................................... 8

    B.   Statement of Scope and Limitations ...................................................................... 10

    C.   Statement of Disinterest ........................................................................................ 11

VI. Theranos Background .................................................................................................... 11

VII. Industry Analysis .......................................................................................................... 14

VIII. Economic Conditions ................................................................................................... 15

IX. Financial Review ............................................................................................................ 16

    A.   Adjustments to Reported Financial Statements ..................................................... 17

    B.   Balance Sheet Review ............................................................................................. 18

    C.   Income Statement Review ...................................................................................... 19

    D.   Financial Ratios Review .......................................................................................... 19

X.  Estimate of Value .......................................................................................................... 20

XI. Value of Theranos at February 7, 2014 ......................................................................... 29

    A.   Income Approach – Discounted Cash Flow Method ................................................ 29

    B.   Asset Approach – Adjusted Net Asset Value .......................................................... 39

    C.   Conclusion of 100% Equity Value ........................................................................... 42

    D.   Equity Allocation Models ........................................................................................ 42

XII. Value of Theranos at December 31, 2014 .................................................................... 44

XIII. Value of Theranos at October 15, 2015 ...................................................................... 45

XIV. Conclusion of Values ................................................................................................... 46

XV. Appendix ...................................................................................................................... 47

    A.   Investor Financings – Back-solve Methods ............................................................. 47

B.  Investor Forecasts – DCF Models ............................................................................. 48

C.  Assumptions and Limiting Conditions .................................................................... 51

D.  Certifications and Representation ........................................................................... 53

XVI. Exhibits ............................................................................................................................ 55

**I.   Qualifications**

1.   I am a Partner in the Financial and Forensic Consulting Group at Hemming Morse, LLP. I received a Bachelor of Science degree in Business Administration and Finance from The Haas School of Business at the University of California (Berkeley) in 1995. I received an M.B.A. with an emphasis in Finance from the Marshall School of Business at the University of Southern California, where I graduated with honors in 2003. I have been designated as a Certified Valuation Analyst (CVA) by the National Association of Certified Valuators and Analysts (NACVA). I am an Accredited Senior Appraiser ("ASA") by the American Society of Appraisers and Accredited in Business Valuation ("ABV") by the American Institute of Certified Public Accountants. Prior to Hemming Morse, I was the Partner in Charge of the valuation and financial Consulting Practice at Burr Pilger Mayer, Inc., a regional certified public accounting firm with approximately 400 employees.

2.   I have twenty-six years of experience in the valuation of businesses, analyzing the financial condition of businesses, and consulting to businesses and business owners. The last eighteen years of my experience have focused on business valuation, economic damages analyses, transaction due diligence support, and fraud and forensic investigations. In that period, I have been retained to prepare over eight hundred valuations of businesses, intellectual property, debt instruments, and complex derivatives. These valuations have been prepared for litigation, tax reporting, financial reporting, and transaction support purposes, including bankruptcy. The majority of my valuations have focused on my expertise

with technology, life sciences, and medical device companies, from very early stages of development through late stage publicly traded companies.

3.    I am the Co-Founder and Chair of the Fair Value Forum, a San Francisco Bay Area based business valuation expert group that meets periodically to discuss technical issues and best practices in the profession. I was formerly on the Board of the Valuation Roundtable of San Francisco for several years and served a term as President of that organization. I have presented in a number of national conferences on the topic of business valuation and have authored articles and publications on the same. Many of my presentations and publications are focused on the valuation issues specific to technology, life sciences, and medical device companies. As an example, in 2013 I co-authored the valuation section of *The 409A Administration Handbook, Compliance and Company Valuation*, published by Thomson Reuters. My current curriculum vitae is attached to this report as Appendix Exhibit H and provides additional details.

4.    My employer Hemming Morse, LLP is being compensated at an hourly rate of $560 for my time, and at hourly rates ranging from $280 to $400 for employees who assisted me on this assignment.

## II.    Assignment

5.    I have been retained through my employer, Hemming Morse, LLP, Certified Public Accountants and Financial and Forensic Consultants by the U.S. Attorney's Office, Northern District of California ("USAO" or "Counsel") in the matter of United States v. Holmes, et al.,

to estimate the fair market values of 100% of the equity in Theranos, Inc. (referred to as "Theranos" or "Company"), on a controlling, marketable basis as of the following dates:

- February 7, 2014 (the "2/7/2014 Valuation Date");

- December 31, 2014 (the "12/31/2014 Valuation Date"); and

- October 15, 2015 (the "10/15/2015 Valuation Date"); (collectively, the "Valuation Dates").

6. My assignment included allocating the above equity values of Theranos to all of the securities in the Company's capital structure. I have also been asked to calculate the loss to Theranos Series C-1 and Series C-2 Preferred Stock investors resulting from the difference between my concluded values for their shares and their initial investment purchase price of $15.00 and $17.00 per share, respectively.

7. In carrying out my assignment, my objective was to define a minimum range of loss to investors, and I have applied several assumptions that provide a favorable interpretation of the equity value of Theranos on the Valuation Dates. These assumptions include adopting optimistic management forecasts that assume Theranos' significant technology challenges will be successfully resolved, that the Company will realize high revenue growth in the near term, and that it will earn significantly above industry margins. I have further applied target investor rates of return that are on the low end of the applicable range for these forecasts.

8. Another favorable set of assumptions I have made is that Theranos' historical expenditures were primarily directed towards research and development efforts, that such expenditures were productively spent and created value, and the large majority of such

expenditures do not relate to technology that is obsolete on the Valuation Dates. Wherever I have faced limitations in information available to conduct this assignment, I have applied an interpretation that is most favorable to the value of Theranos, and that leads to a minimum range of investor loss. My significant valuation assumptions are more fully explained throughout this report.

9.  This report summarizes my current opinions given the information available to me to date; I may consider any additional materials that become available and amend or supplement my opinions and this report, if appropriate.

10.  In connection with my anticipated testimony, I may be asked to create, from various documents produced in this litigation and obtained through independent research, demonstrative schedules which refer or relate to the matters discussed in this report.  I have not yet created such demonstrative schedules.

11.  In my work I have been assisted by others in my firm who have acted under my direction and control. However, the opinions in this report are my own.

12.  I understand that this report may be made available to other parties in this litigation, to their counsel and experts, as well as to the Court in connection with sentencing. It has been prepared for use in this action. In all other respects, this report is confidential. It should not be used, reproduced or circulated for any other purpose, in whole or in part, without my prior written consent. No other party is entitled to rely on this report for any purpose whatsoever.

### III.    Evidence Relied Upon

13.  My understanding of the relevant facts comes from the documents provided by

Counsel, transcripts of interviews and trial testimony, and materials I gathered through my

research[1]. I have been provided internal Company and investor communications, transcripts

of trial testimony by employees, investors, prospective and actual business partners to

Theranos, and significant documents with regards to the Company's assets and liabilities,

historical and future performance, and business operations. I was not able to interview

Theranos' management or employees directly.  The documents I considered or relied upon

are identified in Appendix Exhibit I.

### IV.    Summary of Opinions

14.  My opinions of value are based on consideration and application of the three categories

of widely accepted valuation methods; the income, market, and asset / cost approaches. I

applied the discounted cash flow method (income approach) in combination with the

guideline public company method (market approach) to define the upper bound of

Theranos' value on the three Valuation Dates. I also applied the adjusted net asset value

method and the cost to recreate method[2] to define the lower bound of Theranos' value on

the Valuation Dates, resulting in a range of value. Finally, I applied the back-solve method

(market approach) to infer the value of Theranos based on the price paid by investors for

their Series C-2 Preferred Stock. This back-solve method value is not my opinion of Theranos'

fair market value, it was prepared to demonstrate the implied value placed on the Company

---

[1] My research includes information available through a subscription to the S&P Capital IQ database.
[2] Also referred to as "reproduction cost new" in business valuation guidance.

by investors.   A summary of my estimated fair market values is outlined below, and these
include the Company's substantial cash balances:

| 100% Company Equity Value Range (In Thousands) | | | | Cash Balance Included in Equity Value (Thousands) | Series C-1 Per Share Value Range | | | | Series C-2 Per Share Value Range | | | | Valuation Date | Report Exhibit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $ 378,000 | - | $ 431,000 | $ | 151,912 | $ 8.77 | - | $ 9.39 | $ 9.90 | - | $ 10.59 | | 02-07-14 | Exhibit A.3 |
| $ 827,000 | - | $ 951,000 | $ | 465,933 | $ 9.61 | - | $ 10.36 | $ 10.80 | - | $ 11.63 | | 12-31-14 | Exhibit A.4 |
| $ 1,051,000 | - | $ 1,184,000 | $ | 496,919 | $ 10.14 | - | $ 10.81 | $ 11.37 | - | $ 12.11 | | 10-15-15 | Exhibit A.5 |

15.   One method to calculate the loss to Theranos investors is to determine the difference
between their initial investment price and their ultimate recovery in the dissolution of the
Company[3]. The method I applied is based on my estimates of the above fair market values
for Theranos' equity, which leads to a smaller loss figure. I have calculated the aggregate
Series C-1 and C-2 investor losses to range between **$277.965 million** and **$315.884 million**
per Exhibit A.1 to this report. This loss is measured as the difference between the price paid
by investors and my estimated value above on the date closest to when the investment was
made. I have been asked to prepare an alternate calculation of investor loss based on my
estimated values as of only the 10/15/2015 Valuation Date, which results in a range of
aggregate loss between **$237.323 million** and **$273.646 million**.

16.   The above equity values and investor loss calculation are based on the favorable
premise that Theranos will continue to operate as a going concern, as explained in the next
section of this report. If the Company were facing near term dissolution on the Valuation

---

[3] I understand that many investors did not recover any portion of their initial purchase price. The method
discussed here is not meant to reflect any specific legal guidance on loss calculations.

Dates, its recoverable equity value would be substantially lower. In such a scenario, the

Company would be forced to sell its technology assets under distressed sale conditions. In

addition, the Company's Edison device capabilities were still far behind that of conventional

laboratory equipment[4].

17.  One data point that is informative as to the value of Theranos' technology under such a

scenario is a loan extended to the Company by Fortress Credit Corporation in December

2017. The loan totaled $65 million in initial funds disbursed, with the remaining $35 million

contingent on the Company achieving development milestones. The loan was secured with

all assets of the Company including its patents and patent applications[5]. Fortress made this

loan based on their consideration of the value of Theranos' intellectual property collateral in

a potential default scenario.[6]

18.  Under a liquidation premise and if the maximum loan amount of $100 million were

assumed to be the recoverable value of Theranos' technology in a dissolution, the

Company's resulting equity values would be approximately $138 million, $416 million, and

$448 million respectively on 2/7/14, 12/31/14, and 10/15/15[7]. This would result in larger

investor losses than my calculations above.

19.  Because I am using a going-concern premise, it is important to note that even if the

value of the Company exceeds the liquidation preference of the Series C-1 and C-2 shares,

---

[4] Refer to Theranos Background section of this report for discussion on state of the Company's technology.
[5] Exhibit 191 to Deposition of Erez Levy, Fortress Credit Corp Investment Memorandum, December 2, 2017.
[6] Deposition of Erez Levy, Managing Director at Fortress, September 24, 2019, p.31:7-14, p. 68:16-25.
[7] These values are based on my adjusted net asset value methods on Exhibits E.1, H.1, and K.1, with a substitution of intangible asset value in those methods with $100 million.

Page 7

that does not mean the Series C-1 and C-2 investors have not incurred losses as of the Valuation Dates. This is because, as a going concern, there are a wide range of possible future outcomes for the Company. Some outcomes may be extremely favorable and some may result in no return for any of the investors. The standard way of valuing specific classes of stock is to use option pricing theory which is what I have done. This makes it is possible to consider the range of outcomes and derive a value for each class of stock. This is more fully described in the "Equity Allocation Models" section of this report.

### V. Introduction

#### A. Standard and Premise of Value

20. As the standard of value for this report, I have employed a definition of fair market value used in appraisal practice,[8] originally found in Section 20.2031-1(b) of the Estate Tax Regulations and Section 25.2512-1 of the Gift Tax Regulations and incorporated into Section 2.02 of Revenue Ruling 59-60. That definition is:

> *"The price at which the property would change hands between a willing buyer*
> *and a willing seller when the former is not under any compulsion to buy and*
> *the latter is not under any compulsion to sell, both parties having reasonable*
> *knowledge of relevant facts."*

---

[8] This definition, or one very similar, has been adopted by The Institute of Business Appraisers, The National Association of Certified Valuation Analysts, The American Society of Appraisers, and The Appraisal Foundation.

Page 8

21.  Court decisions frequently state[9] in addition that the hypothetical buyer and seller are assumed to be able, as well as willing, to trade and to be well informed about the property and concerning the market for such property. Fair market value is defined in the U.S. tax regulations, and it is a widely used standard of value for non-tax related matters. Although I assume a buyer of Theranos was accurately informed as to its financial condition, its state of development, and the capabilities of its technology, I ignore for purposes of my valuation the occurrence of misrepresentations made by Company management to investors and other third parties. Such misrepresentations can damage a company's brand image, its ability to raise capital and continue operating as a going concern, and may result in significant litigation related liabilities. These negative factors are excluded from my estimates of value[10].

22.  I have appraised Theranos's stock under a going concern premise. This premise assumes that the Company is an ongoing business enterprise with management operating in a rational way with a goal of maximizing owner value[11]. This will be discussed more fully in the valuation section of this report.  And, as mentioned above, using a liquidation premise as of the Valuation Dates would result in a substantially lower values for Theranos' equity and the Series C-1 and C-2 shares.

---

[9] In the *Estate of Kaufman*, TCM 1999-119, the court noted that "[t]he hypothetical willing buyer and the hypothetical willing seller both aim to maximize their profit from the hypothetical sale of the property."
[10] Excluding these factors results in a higher estimated value, and a lower investor loss calculation.
[11] A going concern premise assumes the business is not about to be dissolved or liquidated.

**B. Statement of Scope and Limitations**

23. This Summary Report was prepared, and my analyses, opinion and conclusions were developed, in conformity with the American Institute of Certified Public Accountants' Statement on Standards for Valuation Services No. 1 ("SSVS") and USPAP of the Appraisal Foundation.

24. This report was prepared subject to certain Assumptions and Limiting Conditions included in the appendix to this report. My Certifications and Representations are also included in the appendix to this report.

25. I obtained a variety of financial, operational, economic, and industry documents and information from Counsel as well as from outside sources. I have assumed all information is accurate and complete. I was unable to have direct communication with management and employees of Theranos in this assignment.

26. This report reflects my understanding of facts and conditions existing at the Valuation Dates. Subsequent events have not been considered unless they were known or knowable on the Valuation Dates[12], and I have no obligation to update my report for such events and conditions. However, I reserve the right to update my report for new information that is provided to me.

---

[12] I have also considered subsequent events that provide evidence of facts and conditions existing as of the valuation date.

Page 10

### C. Statement of Disinterest

27.  I have no present or contemplated future interest in the subject property of this Appraisal Report. I have no interest in or bias with respect to the subject property or the owners thereof.

### VI.   Theranos Background

28.  On the Valuation Dates, Theranos operated clinical laboratories in Newark, California, and Scottsdale, Arizona. In addition, Theranos was in continued development of its immunoassay blood testing device (the Edison), with the objective of providing faster, more accurate results at a lower price point to patients than traditional laboratories, while requiring patient samples with only a few drops of blood. Historically, Theranos had entered into contracts with pharmaceutical companies to provide testing services in support of clinical trials. On the Valuation Dates, these agreements and related revenues had terminated.

29.  Theranos' business model on the Valuation dates encompassed a vision for its Edison device to provide a wide variety of tests to patients in the retail market with the following advantages over reference labs such as Labcorp and Quest Diagnostics[13]:

- *Faster Results* – four hours for test results in a retail setting and one hour in a hospital setting

---

[13] Trial testimony of Brian Grossman, November 16, 2021, 6379:8 – 6382:1, 6392:16 – 6395:10, 6404:19 -6406:24

- *Higher Accuracy* – less variability in test results than conventional lab, due to higher automation of processes within the device and less exposure to human error.

- *Lower Pricing* – at 50% of Medicare reimbursement rates.

- Ability to run a large array of tests, and to match the broad menu of tests offered by Labcorp and Quest Diagnostics.

- Use of few drops of blood obtained through a finger prick rather than a traditional venipuncture procedure requiring larger blood draw from patients.

- A processing device that was much smaller than traditional lab equipment and that could eventually be placed in locations outside a laboratory[14] such as retail pharmacies.

30. As of the Valuation Dates, Theranos had not achieved the above capabilities for its technology, and significant development and operational risks faced the company. Ms. Holmes testified that only 12 assays were offered when the analysis was performed on the miniaturized Theranos device, in the CLIA laboratory,[15] and that this was one of the central issues raised by the Wall Street Journal regarding the state of development of Theranos' technology.[16] Ms. Holmes also testified that its newest device the Minilab, which was part of the 4 series, was never used for patient testing, was never put in use in the CLIA laboratory in California, and as of October 15, 2015, had been approved by the FDA in use for a single

---

[14] Placing the Company's device outside of its laboratory would have required FDA approval, which Theranos had not obtained on the Valuation Dates.
[15] Trial Cross-examination of Elizabeth Holmes, November 30, 2021, 8003:7-15.
[16] Cross-examination of Elizabeth Holmes, 8003:16-8004:21.

Page 12

assay, the Herpes test assay.[17] Ms. Holmes also testified that the only Theranos

manufactured analyzer that was ever used in the CLIA laboratory in California was the Edison

3.5, which was used for immunoassays only, rather than for general chemistry, cytometry or

nucleic acid amplification.[18]

31.  Ms. Holmes further testified that it was the Edison 3.5, one of Theranos' earlier models,

rather than the Minilab, that was used to perform 12 assays in the CLIA laboratory in

California between September 2013 and June 2015, and that by the time of the CMS

inspection in September 2015, Theranos was not using any of its manufactured analyzers in

the CLIA laboratory.[19]  Similarly, Ms. Holmes testified that Theranos did not use its own

technology, including the Minilab, to run tests at its Arizona Moderate Complexity

Laboratory, but rather used commercially available equipment.[20] Mrs. Holmes further

explained that in order to perform the majority of the 200-some tests on its menu (beyond

the 12 tests discussed above), Theranos was dependent on machines from third parties such

as Siemens, Beckman Coulter or Becton Dickinson.[21]

32.  Testimony from Surekha Gangakhedkar and Erika Cheung was similar regarding the

state of the Company's technology. Ms. Gangakhedkar testified that the Edison 3.0 and the

Minilab 4.0 was not ready due to reliability issues that were unresolved[22]. Ms. Cheung

testified that the Edison could only run one type of assay on one patient at a time while third

---

[17]Trial cross-examination of Elizabeth Holmes, November 30, 2021, 8014:24-8015:20 and 8018:6-8.
[18] Cross-examination of Elizabeth Holmes, 8015:21-8016:11.
[19] Cross-examination of Elizabeth Holmes, 8016:12-8017:25.
[20] Cross-examination of Elizabeth Holmes, 8019:4-8020:13.
[21] Cross-examination of Elizabeth Holmes, 8018:9-8019:3
[22] Trial testimony of Surekha Gangakhedkar, September 17, 2021, 1185:5-1188:12.

party machines could process 30-40 patients at one time while conducting several different tests for each patient[23]. In addition, the Edison could run "between 4 and max 12"[24] immunoassay tests, not the hundreds management had envisioned.

33. Starting in February 2014, and ending in April 2015, Theranos raised $734 million in capital from various investors through the sale of Series C-2 Preferred stock. In addition, the Company raised $112.5 million in Series C-1 Preferred stock capital between August 2011 and January 2014[25]. Because it is my understanding that these capital raises were based on misrepresentations to investors regarding the capabilities of the Company's technology and progress with the Company's business model, I did not rely on these transactions to estimate the fair market value of Theranos on the Valuation Dates.

**VII.    Industry Analysis[26]**

34. Theranos operates in the Scientific Research and Development industry in the US which includes companies and organizations that are involved in physical, engineering or life sciences research and development (R&D).

35. Over the past five years, the industry has performed well despite challenging conditions presented by the recession, which have caused many industries to decline.  Indeed, industry growth is expected to be limited in the next two years, before strengthening in the second half of the next five-year period as falling federal funding for defense and weak government

---

[23] Trial testimony of Erika Cheung, September 14, 2021, 807:19-809:9
[24] Trial testimony of Erika Cheung, September 14, 2021, 805:21-24, 812:10-11
[25] This figure includes promissory notes convertible to Series C-1 Preferred Stock. The majority of C-1 sales occurred in calendar year 2013.
[26] IBISWorld, *IBISWorld Industry Report 54171, Scientific Research & Development in the US*, December 2014.

investment will mitigate industry growth. That said, improving private investment from major industries, such as oil and health, will help long-term growth. The industry is projected to continue to grow at an average annual rate of 2.4%[27] to $147.3 billion over the five years to 2019.

## VIII.     Economic Conditions[28]

36.  The relevant time periods for a review of the state of the U.S. economy are the Valuation Dates. Throughout 2014, the majority of U.S. economic indicators continued to improve.

37.  Although growth in gross domestic product ("GDP") declined slightly in the first quarter of 2014, by year end GDP growth had rebounded to 2.6% following two quarters of rapid growth (4.6% and 5.0%, respectively). Health care spending as a share of GDP remained stable for the past two years. Unemployment which wavered around 6.7% in February continued to decline through December to 5.6%. Construction starts, manufacturing activity and productivity were improved in both periods and throughout 2014. Personal income and consumer spending improved  in February which continued through December. Despite some intra-year fluctuation, all major stock market indices ended 2014 higher than at the end of 2013. Inflation remained subdued and these trends were expected to remain steady through 2015.

---

[27] This represents an inflation adjusted real growth figure. Forecasts in an income approach to valuation make use of nominal figures that include inflation.

[28] KeyValueData, "National Economic Report", February 2014 and December 2014; JT Research LLC, "Overview of the U.S. Economy", Fourth Quarter 2014; and Federal Reserve Bank of Philadelphia Research Department, "Survey of Professional Forecasters", Fourth Quarter 2014.

### IX.   Financial Review

38.  In valuing Theranos, it is useful to examine the financial position of the company. This allows the appraiser to review the history of Theranos, compare it to its industry, and use the analysis to assist in assessing the future prospects of the company.

39.  I have analyzed Theranos's financial statements for the years ended December 31, 2007, to December 31, 2015, the period closest to the last of my three Valuation Dates.[29] Interim financial statements between calendar year ends 2013 and 2015 were not available.

40.  Theranos's historical financial statements are presented in Exhibits B.1 through B.6 which include common size presentations and comparative industry metrics. My analysis includes a comparison of Theranos to industry averages of a guideline public company peer group, and industry data published by RMA and Bizminer as shown in Exhibits B.4 – B.6.[30]  I have used data for companies defined in Exhibit D.3 as a peer group to Theranos.

41.  I note that because Theranos was not a mature company and had not reached profitability or meaningful revenues from core services on the Valuation Dates, future results were expected to deviate from past results.  In the valuation section of this report, I discuss in greater detail the financial projections used for valuing Theranos.

---

[29] The 2007 – 2008 financial statements were audited, the remainder are internally prepared [KPMG_Theranos_000164-000188].
[30] The guideline public company data was obtained from S&P Capital IQ, and the selection of these companies is discussed in the estimate of value section of this report.
https://www.spglobal.com/marketintelligence/en/solutions/sp-capital-iq-platform

### A. Adjustments to Reported Financial Statements

42. In analyzing a company's historical earnings as a guide to estimating the company's earnings base, it is important to make the distinction between past earnings that represent ongoing earning power and those that do not. Financial statements should be adjusted to eliminate the effect of past items that would tend to distort the company's current and future earning power, such as items that are unusual or non-recurring in nature, occur infrequently, are discretionary, or are derived from non-operating sources, such as interest income.

43. Based on my review, I identified items that require adjustments in Theranos's financial statements. These adjustments to the income statement were related to removing non-recurring or non-operating expenses, and included interest and other income. These adjustments provide a consistent basis (by only considering operating income) by which to compare Theranos to other publicly traded companies whose financials were reported by Capital IQ using the same method. It is noted that these adjustments to the financial statements were very small in relation to the total revenues and expenses for each period, and are shown in Exhibit B.3.

44. In addition to the above adjustments, I also adjusted out a "miscellaneous receipts liability", that equals a portion of proceeds from the 2013 and 2014 capital raises, and compensation of service providers with preferred stock, for which I understand the stock was not yet issued. Since Theranos would satisfy the miscellaneous receipts liability by issuing the corresponding stock, and such stock was included the capitalization tables as of

Page 17

**ER-615**

my Valuation Dates, I removed these liabilities. The amount of these liabilities totaled $45.187 million as of 12/31/13 and $390.375 million as of 12/31/14.[31]

### B.   Balance Sheet Review

45.   Theranos's adjusted historical balance sheet is shown in Exhibit B.4.

46.   **Assets**.  Theranos's assets were primarily comprised of cash generated by proceeds from the sale of preferred and common shares. Compared to its peer group, Theranos was far heavier in its cash holdings, at $424 million at 12/31/15.  Theranos also carried low levels of inventory on its balance sheet, similar to its peer group.  Adding non-current receivables of $27 million, Theranos' assets summed to $535 million at 12/31/15.

47.   **Liabilities and Equity**.  Theranos had little current liabilities in relation to its cash holdings.  Theranos did carry significant amounts of long term liabilities in the form of customer deposits / deferred revenue of $136 million, notes payable in the amount $41 million and other non-current liabilities of $35 million at 12/31/15, for total liabilities of $250 million.  As a result, Theranos' equity was significantly positive at 12/31/14 and 12/31/15. For a company that was not mature and still investing in growth, this conservatively levered balance sheet appears appropriate.  Compared to its peer group, Theranos was similarly heavy on equity versus both current liabilities and debt.

---

[31] The $45.187 liability as of 12/31/13 reconciles closely to the proceeds of 2.683 million Series C-1 shares issued between 8/1/13 and 12/31/13 at $15 per share, plus additional shares issued to directors and legal service providers [THPFM0004648099, lines 82-88 of Excel KPMG auditor workpaper]. The $390.375 million liability as of 12/31/14 reconciles closely to the proceeds of 22.838 million Series C-2 shares issued 10/31/14 through 12/31/14 at $17 per share and marked as "subscribed" in Theranos capitalization tables.

### C.  Income Statement Review

48.  Theranos's historical income statement, adjusted as described above, is shown in Exhibit B.5.

49.  *Sales and Cost of Goods Sold*.  Theranos' revenue was minimal in the years leading to 12/31/14 and 12/31/14, in keeping with the fact that Theranos was a near pre-revenue and pre-profit company.  Revenues in the period 2009-2011, at under $3 million per annum, resulted from contracts with pharmaceutical companies such as Celgene to provide testing services that would support clinical trials. These revenues terminated in 2011 and did not recur thereafter.

50.  *Operating Expenses*.  Operating expenses were significant and increasing in the years leading up to 12/31/14 and 12/31/15, with research & development, and general and administrative costs of $97 million and $76 million in 2015, respectively.

51.  *Net Income*.  Like many growing and young companies, Theranos had incurred significant losses through 2015, with losses of $184 million in 2015.

### D.  Financial Ratios Review

52.  I have reviewed Theranos's financial ratios shown in Exhibit B.6 and compared them to a peer group.[32] The purpose of financial ratios review is to compare Theranos' historic financial performance with benchmark data available in the marketplace, i.e., the peer group I have selected.  The financial ratios reflect the fact that Theranos was a near pre-revenue

---

[32] The peer group is comprised of public companies identified as having similar characteristics to Theranos, as shown in Exhibit D.3.

and pre-profit company as of 12/31/14 and 12/31/15 and that it retained large amounts of cash proceeds from investor financings. Its current ratio was well above that of its peers. Certain other metrics were not meaningful, as Theranos had negative earnings and operational metrics, and low levels of fixed assets.

53. **Summary:** In conclusion, Theranos's financial metrics and financial condition at the Valuation Dates are in keeping with the fact that it was an early stage near pre-revenue and pre-profit company.

### X.   Estimate of Value

54. The value of a closely held business is derived not from a formula, but from the relevant facts and circumstances of a company and is based on informed judgment with regard to those facts. In determining fair market value, I considered available financial data, as well as all relevant factors affecting the fair market value. One of the first issues to address in valuing an interest is whether that interest has control and is marketable. As discussed directly below, the 100% equity interests I valued in Theranos were considered both controlling and marketable at the Valuation Dates.

#### Controlling Interest Consideration

55. The 100% interests being valued in Theranos on the Valuation Dates represented majority ownership interests in the entire company, and therefore possessed the ability to control management and financial decisions impacting the entire company or the business segment. These decisions included the ability to elect directors and appoint management, determine management compensation and perquisites, set policy, acquire and liquidate

assets, determine dividend distribution policy, and other significant policies. Accordingly, I have considered valuation methods which yield an estimate of value on a controlling basis.

56.   It is noted that when I allocated Theranos' value to different share classes, the investors in these shares did not hold controlling interests in the Company[33]. I did not discount the preferred shares held by investors for lack of control, which results in a higher fair market value for their shares, and lower calculated investor loss than had I applied such a discount. Preferred stock investors in early-stage companies often collectively exert elements of influence or control over the companies they invest in[34].

### Marketability Consideration

57.   A major component of a security being valued is its marketability. All other things being equal, an investment is worth more if it is marketable than if it is not, since investors prefer liquidity over lack of liquidity. Investments that lack the inherent liquidity of publicly traded securities are, all else being equal, less attractive investments. Given that the 100% equity interests that I valued in Theranos are controlling interests in the entire company, the owner of such interests would have had control over the decision to sell the entire company to achieve liquidity. As such, I applied valuation methods that yielded an estimate of value on a marketable basis, and no lack of marketability discount was applied.

---

[33] Mrs. Holmes testified that she was the founder of Theranos, the only CEO Theranos had ever had, and that at various points in time before 2016 she owned a majority of the voting shares in Theranos. At the end of 2016, Mrs. Holmes owned more than 51% of the Class B common stock in Theranos [Cross-examination of Elizabeth Holmes, 8004:22-8005:6, 8013:18-8014:15].

[34] AICPA Practice Aid:  Valuation of Privately-Held-Company Equity Securities Issued as Compensation, 2013, Sections 7.08, 7.11 [accessed via Commerce Clearing House Accounting Research Manager Subscription]

58. The investors in Series C-1 and C-2 shares did not hold controlling interests in the Company as noted above, and could not make a decision to sell the entire company to achieve liquidity. Under valuation theory, it is generally accepted that the level of marketability of senior preferred securities and the entire early-stage enterprise (such as Theranos) are comparable[35]. The entire early-stage enterprise is less liquid than an established, profitable company due to negative cash flows and a more limited pool of prospective buyers. The senior preferred securities such Series C-1 and C-2 shares in Theranos have significant liquidation preferences in first order of priority ahead of all of other securities, which render them more marketable. In addition, preferred investors typically have access to information that would make it easier to access an exit market for their securities. As such, I have not applied a lack of marketability discount to Series C-1 and C-2 preferred shares as compared to entire value of Theranos' equity.

**Valuation Methodologies**

59. The appraisal profession generally recognizes three primary approaches to determine value: the income approach, the market approach, and the asset approach.  Each approach is distinctive and contains many variations. While all valuation approaches are generally considered, not all may be used; which approach or approaches are used depends upon the specific facts of that engagement.

60. In valuing the Interest in Theranos, I considered several valuation methods:

---

[35] AICPA Practice Aid:  Valuation of Privately-Held-Company Equity Securities Issued as Compensation, 2013, Sections 7.18 – 7.19 [accessed via Commerce Clearing House Accounting Research Manager Subscription]

**Income Approaches:**

Capitalization of Earnings Method

Discounted Cash Flow Method

**Market Approaches:**

Guideline Public Company Method

Merger and Acquisition Method

Back-Solve Method (Investor Financing)

**Asset and Cost Approaches:**

Net Asset Value Method

Adjusted Net Asset Value Method

Cost To Recreate Method (Technology and Branding Assets)

61.  Income approaches value a company with reference to various measures of the earnings
or cash flows generated by that company, with the assumption that such earnings or cash
flows sooner or later will be paid out to shareholders in the form of dividends.

62.  Market approaches value a company by comparison with transactions in similar
businesses, business interests, or securities.

63.  Asset approaches value a company, often one that is capital-intensive, with reference to
the stated or calculated net worth of that company, with the assumption that such net
worth sooner or later will be paid out to shareholders in liquidation.

**ER-621**

64.  The focus on liquidation value utilized by asset-based approaches tends to limit their applicability to the value of a non-operating business such as a holding company, early stage enterprises with an unproven product or service, or one that will be liquidated.  In the alternative, income and market approaches are most appropriate when valuing ongoing businesses.

### Selection of Valuation Methods

65.  In valuing Theranos, I considered the methods listed above.  I chose the discounted flow method combined with the guideline public company method (to support the Company's exit value), and the adjusted net asset value method combined with the cost to recreate method (for the Company's technology and branding assets) as suitable methods for valuing the Company's equity.

66.  As discussed in the appendix to this report, I explain my use of the back-solve method to infer the value Theranos based on certain Series C-2 financing rounds.  Because it is my understanding that investors were provided inaccurate information regarding Theranos' business operations and capabilities of its technology, I did not rely on this method to define the value of the Company.  The following summarizes the methods considered and my reasoning for my selection.

### Capitalization of Earnings Method

67.  The capitalization of earnings method is an abridged version of the discounted cash flow method.  This method seeks to determine an estimate of value by projecting a single period's expected economic amount and converting that amount to a value by dividing it by a "capitalization rate."  The capitalization rate is a derivative of the discount rate, i.e., the

discount rate minus the annually compounded expected growth rate, in perpetuity, of the variable being capitalized.

68.   This method is appropriate when the projected single period expected economic amount is indicative of future operations, assuming a normal and constant growth rate.   On the Valuation Dates, Theranos was a young pre-profit development stage company that had a small revenue base, and that had not reached long term mature growth levels or margins. The capitalization of earnings method cannot accommodate changing growth rates or margin assumptions in future periods.   Accordingly, I did not consider the capitalization of earnings method an appropriate valuation method for Theranos.

**Discounted Cash Flow Method**

69.   The discounted cash flow method is based on the theory that the total value of a business is the present value of the projected future earnings plus the present value of the terminal value.   This method requires that a terminal value assumption be made.   The amounts of projected earnings and the terminal value are discounted to the present using an appropriate discount rate.   The discounted cash flow method relies on the ability of the appraiser and management to reasonably forecast cash flows and assess the risks associated with those cash flows.

70.   I was provided with detailed forecasts that reflected management's contemporaneous expectations at the Valuation Dates[36]. It is my opinion that at the Valuation Dates the

---

[36] The forecasts spanned the 2014 – 2018 calendar years, and were contained in IRC 409A valuation prepared for Theranos by Aranca. The 409A valuation dates were 9/30/13, 12/15/14, and 3/25/15. Email correspondence between the Theranos management team and Aranca indicated that management provided input regarding forecast expectations that were integrated into the valuation approaches [examples include Trial Exhibits 5206, 5085, 3527]

projections in the Aranca 409(a) Reports provided the best estimate of future anticipated operating results that were available on the Valuation dates, and that the discounted cash flow method is an appropriate method for valuing Theranos. I note that I do not consider the Aranca forecasts to represent a realistic estimate of future results for reasons discussed later in this report, they represented the best choice available of management prepared forecasts.

**Guideline Public Company Method**

71. The guideline public company method develops an estimate of value based on prices at which stocks of similar companies are trading in a public market. The estimate of value is derived by value multipliers such as price to earnings and price to cash flow. These value multipliers are then adjusted and applied to the subject company's fundamental data to reach an estimate of value for the subject company.

72. Application of the guideline public company method requires the selection of sufficient "comparable companies" to facilitate the determination of a value conclusion for the subject company. In selecting comparable guideline companies, "the standard sought is usually one of reasonable and justifiable similarity."[37]

73. I have not used the guideline public company method to value Theranos as of any of the valuation dates. I did however use this method to estimate the terminal value of Theranos at the end of the projection period in 2018, under the discounted cash flow method. The 2014-2018 forecasts provided to me assume that Theranos will continue to experience high

---

[37] Frank M. Burke Jr., Valuation and Valuation Planning for Closely Held Businesses (Englewood Cliffs, NJ: Prentice-Hall, 1981), p. 49.

revenue growth in 2018, and a standard perpetuity formula for the terminal value cannot accommodate varying future growth rates. In addition, if Theranos were to achieve its forecasts, it would be significantly more comparable at the end of 2018 to the guideline public companies I selected than it is on the Valuation Dates. Accordingly, the guideline public company method is an appropriate method for valuing Theranos as of 12/31/2018, at the end of management and Aranca's forecast horizon.

### Merger and Acquisition Method

74. The merger and acquisition method derives an estimate of value of the subject company based on merger and acquisition transactions involving companies or operating units of companies in similar industries to the subject company.  I did not apply this method because Theranos did not have meaningful revenues or positive earnings to which valuation multiples could be applied on the Valuation Dates.

### The Back-Solve (Investor Transactions) Method

75.  I applied the back-solve method to infer the value of Theranos' equity based on purchases by investors of Series C-2 Preferred Stock at $17 per share. Because it is my understanding that these capital raises were based on misrepresentations to investors regarding the capabilities of the Company's technology and progress with the Company's business model, I did not consider the back-solve method to provide a reliable indication of the Company's fair market value. The implementation of this method is discussed in the appendix to this report.

### Net Asset Value Method

76. The net asset value method values a company at the book value of its stockholders' equity. The historical cost bases of assets, however, usually bear very little relationship to true market values. The method only reflects accounting history expressed in nominal dollars and not the potential of a going concern. Because of this limitation inherent in the net asset value method and because I was able to apply more appropriate methods, I did not use the net asset value method to value Theranos.

### Adjusted Net Asset Method

77. Under the adjusted net asset method, the assets and liabilities of Theranos are expressed at their current market values with an offsetting adjustment to equity. The adjusted net asset method is generally appropriate for businesses that are early stages of development with unproven products or services (such as Theranos), about to be liquidated, or that have substantial capital investments in tangible assets such as real property. I have used the net asset value method to value Theranos. In applying this method, Theranos' underlying technology and brand intangible assets were adjusted to estimated fair market values by applying the cost to recreate method. This method considers that a buyer of the assets would contemplate the cost of developing such assets as an alternative to purchasing them.[38]

---

[38] AICPA Practice Aid: Valuation of Privately-Held-Company Equity Securities Issued as Compensation, 2013, Sections 4.42 – 4.44 [accessed via Commerce Clearing House Accounting Research Manager Subscription]

**XI.     Value of Theranos at February 7, 2014**

78.  The following discussion describes my process in estimating the fair market value of a 100% equity interest in Theranos as of February 7, 2014.

**A.     Income Approach – Discounted Cash Flow Method**

79.  As discussed previously, the discounted cash flow method is based upon the theory that the total value of a business is equal to the present value of the forecast future cash flows plus the present value of the terminal value. The present value determination is based on using a discount rate that reflects the expected rate of return that the market requires in order to attract funds to the particular investment. This rate is often referred to as a company's "cost of capital."

***Earnings Base***

80.  My determination of value was calculated using a free cash flow to invested capital[39] earnings base. An invested capital earnings base considers the cash flows of the subject company available to both debt and equity holders, which permits comparability of firms with differing capital structures. For my calculations, I defined debt as all interest-bearing debt, which includes capital leases. These invested capital earnings-based cash flows are calculated for a period through 2018 as shown in Exhibit C.6.

---

[39] Invested Capital is defined as "…the sum of equity and debt in a business enterprise.  Debt is typically either (a) all interest-bearing debt or (b) long-term interest-bearing debt.  When the term is used, it should be supplemented by a specific definition in the given valuation context." In the International Glossary of Business Valuation Terms as published in Valuing a Business: The Analysis and Appraisal of Closely Held Companies by Shannon P. Pratt and Alina V. Niculita, 5th Edition, Appendix A, p. 1072.

81.  The fair market value of Theranos's invested capital was equal to the present value of Theranos's free cash flow to invested capital. Theranos's free cash flow to invested capital was determined as follows for a five-year period (as shown in Exhibit C.5):

Net Income (after tax, excluding interest expense)

+        Depreciation and Amortization

+/−      Increases or Decreases in Working Capital

−        Capital Expenditures

=        Free Cash Flow to Invested Capital

82.  For the free cash flow to invested calculation, I established a Weighted Average Cost of Capital ("WACC") using the Modified Capital Asset Pricing Model ("CAPM") for the cost of equity component of the WACC. The terminal value was determined by applying a market derived exit multiple to Theranos' projected revenue and earnings before interest, taxes, depreciation, and amortization ("EBITDA"). The guideline public company peer group selection and analysis to support the terminal value is discussed in the next section of this report.

### Selection of Forecasts

83.  For purposes of my analysis, I requested from Counsel any available forecasts that the Company prepared in close proximity to the Valuation Dates. The available documents contained forecasts that were provided to investors[40], forecasts that appeared to be

---

[40] Mosley Materials, pp. 370-372, Summary Cap and Projected Income -KRM, pp. 3-5, Theranos Revenue Model_PFM, Trial Exhibit 4859 Projected Statement of Income, 2_SEC-USAO-EPROD-001215410_native

internally prepared for which I did not have record that they were provided to investors[41], and the forecasts contained within the Aranca IRC 409A valuations as of 9/30/13, 12/15/14, and 3/25/15[42].

84. The forecasts provided to investors who participated in the 2014 and early 2015 financings were much more aggressive in terms of revenue growth than the forecasts applied by Aranca in the same time periods. Because these forecasts are associated with misrepresentations made to investors, and reflect extremely optimistic assumptions regarding near term revenue growth and profitability, I did not consider them reliable for implementing an income approach to the valuation of Theranos.

85. The internally prepared forecasts that I reviewed and did not have evidence as to whether they were provided to investors, contained revenue growth and operating margin assumptions that were very similar to the investor forecasts. I did not consider these forecasts to be reliable for the same reason as that cited above for investor forecasts.

86. The Aranca forecasts contained optimistic assumptions of high revenue growth and above industry operating margins, however their growth assumptions were orders of magnitude lower than those in the investor forecasts. A comparison is contained in Appendix Exhibits B.1 through B.3. Management prepared and accepted these forecasts for purposes of determining the fair market value of Theranos stock, and as a basis for Federal tax reporting for compensatory grants made to employees. In addition, I noted that Theranos'

---

[41] Projected Statement on Income_Jan 2015, Projected Statement on Income_Jan 2015-1, SEC-USAO-EPROD-000808915, SEC-USAO-EPROD-000809708, SEC-USAO-EPROD-000875621, SEC-USAO-EPROD-001247904, SEC-USAO-EPROD-001519025, 10.08.13 board docs.
[42] Trial Exhibits 5141, 5190, 5206 Attachment, 5209.

Page 31

Board of Directors was presented forecasts in October 2013[43] that were very similar to those adopted by Aranca in their 9/30/13 409A[44], and that these forecasts were much lower than those presented to investors in January 2014[45]. Finally, I observed that the Aranca forecasts were relatively consistent across the three IRC 409A reports that I reviewed with valuation dates between September 2013 and March 2015. For all of these reasons, I determined that the Aranca forecasts most closely aligned with management's expectations on the Valuation Dates[46]. I relied on these forecasts as a starting point for applying my discounted cash flow method.

### Key Assumptions

87.  The key assumptions incorporated in the cash flow forecasts are set forth in Exhibit C.1 to C.3. My assumptions are based balance sheet, income, expense, and capital expenditure forecasts that were developed in communications between Theranos management and Aranca[47]. In vetting these forecasts, I considered the historical operations of Theranos, the Company's stage of development, historical and forecast industry growth information, and economic conditions.

88.  My key assumptions as shown in Exhibits C.1 through C.3 and in D.1 are explained as follows:

---

[43] 10.08.13 Board Docs, pp. 15-16, NUNN_THERANOS_0000665 - 0000666

[44] Trial Exhibit 5141, p. 59.

[45] Theranos Revenue Model_PFM (this document contains worksheet tabs that represent the two year forecast provided by Theranos management to PFM in January 2014).

[46] Despite the Aranca forecasts being the best choice available among management prepared projections, I still considered them overly optimistic for reasons explained in the discount rate selection section of this report.

[47] Trial Exhibits 3527, 5190.

89. *Revenue:* Revenue was forecast to grow significantly through 2018, at which point it would still be higher than a long-term sustainable level, at 55.6% annual growth. Revenues are based on laboratory test services provided through retail pharmacies, physician's offices, and hospitals. Because Theranos' Edison device was not FDA approved, and could not perform many of the tests offered, the ability to generate these revenues in the near term were dependent on operation of Theranos' laboratories in CA and AZ, with significant use of third party purchased equipment[48]. In the long term, Theranos' ability to successfully capture market share from companies such as Quest Diagnostics was highly dependent on successful development of its device, FDA approval, and ability to deliver a superior alternative to conventional laboratory tests.

90. *Cost of Revenues:* Cost of revenues was forecast to be equal to 35.3% in of revenue in 2014, decreasing to 30% in 2018.

91. *Operating Expenses:* Operating expense levels were forecast to decrease from being significantly greater than revenue in 2014 to 24.7% of revenue in 2018. The forecasted operated expenses and cost of revenues result in an EBITDA margin of 45.3% in 2018 which is significantly above BizMiner and RMA industry medians of 11.2% and 8.8% respectively (Exhibit B.5). In addition, Theranos' forecasted EBITDA margin is more than twice the upper quartile range of the guideline public companies of 20.7% (Exhibit D.2). I did not alter these very optimistic margin assumptions applied by Aranca and Theranos management, however

---

[48] Cross-examination of Elizabeth Holmes, 8016:12-8017:25, 8019:4-8020:13.

Page 33

I did consider this variable in determining the appropriate WACC discount rate to apply to the forecasts.

92. *Capital Expenditures:* Capital expenditures ("Capex") were forecast to decrease from being significantly greater than revenue in 2014 to 11.8% of revenue in 2018. Over the forecast period, the projected capital expenditures significantly exceed industry metrics as a percentage of revenue. The upper quartile of the public company peer group is 6.5% of revenue (Exhibit D.2). I noted that Theranos appeared to classify its Edison "manufactured device" as a fixed asset rather than as consumable inventory. This along with its large investment in manufacturing equipment for the device may explain why the Company required significantly higher capital expenditures than its peer group. This factor also mitigates to a limited extent the Company's very optimistic EBITDA margins as discussed above.

93. *Depreciation and Amortization:* As shown in Exhibit C.3, depreciation was forecast to decrease from significantly greater than revenue to 5.7% in 2018. Projected depreciation is based on an estimated economic life of 7.5 years for new purchases, and 5 years of existing fixed assets. These lives were inferred based on an analysis of historical depreciation and accumulated depreciation relative to cost basis for the Company's fixed assets.

94. *Income Tax Rate:* I applied a 40% income tax rate which approximates combined CA State and Federal statutory corporate tax rates on the Valuation Dates.

95. *Working Capital:* Theranos' forecasted working capital was based on the projected difference between current operating assets and operating liabilities adopted by Aranca.

Page 34

Aranca's analysis did not include required operating cash which I added to the forecasts based on 180 days of operating expenses. This results in working capital stabilizing at 18.6% or revenue in 2018, as shown in Exhibit C.3. This is at the lower bound of the 22.8% to 48.7% range based on industry comparable data.

96. *Exit Multiple - Guideline Public Companies:*  The Company's projected high revenue growth rate in 2018 is the reason why I estimated Theranos' terminal value at 12/31/2018 using an exit multiple under the guideline public company method, as shown in Exhibit D.1. Exhibit D.3 outlines the guideline public companies that I deem comparable to Theranos. I selected publicly traded companies that offer medical diagnostic tests in a laboratory setting, or rapid point of care tests outside of laboratory. These selected companies included Quest Diagnostics and Labcorp Diagnostics, which were discussed as comparators in Company management discussions with Mr. Grossman during Partner Fund Management's ("PFM") due diligence for its February 2014 investment in Theranos[49]. I also selected companies that developed diagnostic equipment for medical testing, such as Cepheid or Illumina, which were also discussed as comparators between Mr. Grossman and Theranos management. My selected peer group has a large degree of overlap with the guideline public companies selected by Aranca and Company management for IRC 409A purposes.

97. *Exit Multiple Selection:*  In Exhibit D.4, I compare Theranos at the end of the forecast period in 12/31/18 to the guideline public companies for a series of financial metrics, as of the 2/7/2014 Valuation Date.  In Exhibit D.2, I have listed financial metrics of the guideline

---

[49] Trial testimony of Brian Grossman, November 16, 2021, 6381:5-11.

public companies as of 2/7/2014 and indicated with bordering those combinations of public
guideline company and metrics that I consider most comparable to Theranos.

98.  If Theranos were to meet its forecasts through 2018, it would be of similar revenue size
to the guideline public companies, it would have experienced higher growth in the historical
period, it would be expected to realize modestly higher growth in the near future, it would
generate higher profit margins than the peer group, and it would require significantly larger
capital expenditures to sustain the Company compared to the peer group. I selected a MVIC
(market value of invested capital)/Revenue multiple of 6.10x, which is near the mean of the
peer group, and significantly above the median and upper quartile. This recognizes the
higher assumed profitability and growth of Theranos in 2018 compared to the peer group,
while accounting for the higher required capital expenditures of the Company. I selected
12.60x MVIC/EBITDA multiple that is between the median and lower quartile of the peer
group. Theranos' higher profitability is inherent in the EBITDA figure, and should not be
reflected in the multiple. In addition, the higher capital expenditure requirements for
Theranos have a negative impact on the applicable multiple.

### Discount Rate

99.  When considering any investment, an investor is exposed to various risks. These include
company, industry, economic, market, interest rate, and credit risks. The riskier the
investment, the higher the return expected. Discount and capitalization rates, as used in an
Income Approach to value a business, represent the return an investor would require in
order to choose a particular investment. It represents anticipated future return; past
returns, however, are often used to help determine a reasonable future rate.

100. In order to determine the appropriate discount rate that equity investors in Theranos required - the cost of equity of Theranos – I considered several commonly accepted approaches. Two widely used approaches for privately held companies are the Modified Capital Asset Pricing Model ("Modified CAPM"), and the Ibbotson's Build-Up Model.  Given the level of risk, and the resulting required rate of return of investor for an early-stage investment such as Theranos, I did not use either of the above methods, and instead estimated Theranos' WACC using venture capital rates of return from several studies that are widely cited.[50]

101. As shown in Exhibit C.4, I selected a venture capital cost of equity of 45%.  The next step was to develop a WACC.  This was derived by weighting the cost of equity and the after-tax cost of debt by their respective amounts in Theranos's invested capital (based on industry capital structure).  Because the industry use of debt was so low (only 3.0% of invested capital), the WACC ended up being 44% (rounded).

102. Table 1 of Exhibit C.4 presents actual rates of return achieved on venture backed portfolio companies at different stages of development, and over different time horizons. The annual rates of return for a Seed/Early-Stage company such as Theranos are 25.5% to 34.9% over a 10-year period. Such returns are appropriate if a forecast reflects expected value, which is a weighted average of possible future results. The Aranca forecasts I adopted are the most realistic version that was available in the documents that I reviewed, but they do not represent expected value.

---

[50] See footnotes 1 through 7 of Exhibit C.7.

103.The Aranca forecasts do not consider downside risk, and early-stage companies face significant statistical risk of failure or under-performance[51]. In addition, the forecasted revenues are predicated on Theranos' ability to implement on its vision to offer very broad array of faster, lower cost, more accurate tests in a miniaturized device that would displace traditional labs such as Quest Diagnostics. As discussed in the background section to this report, this vision was unrealized on the Valuation Dates and the Company faced significant remaining development risk. I further note that the Edison was not FDA approved, and Theranos lab operations were likely not in compliance with CLIA quality standards on all of the Valuation Dates[52], and the forecasts assumed that Theranos would realize outsized 45% EBITDA margins that were far above industry norms. For all of these reasons, the Aranca forecasts did not reflect expected value, and therefore the applicable rate of return required an upwards adjustment to those demonstrated in Table 1 of Exhibit C.4.

104.Tables 2 and 3 of Exhibit C.4 demonstrate *target* rates of return; the returns expected by Venture Capital investors if the investment is successful. These higher *target* rates of return (compared to *actual* returns) compensate for downside risk that is not included in a "success scenario" forecast such as the one applied by Aranca that I relied upon. The range of most target annual rates of return for Seed, Start-up and "early development" companies such as Theranos on the Valuation Dates is between *28% and 75%*. When I derived the implied

---

[51] AICPA Accounting and Valuation Guide, *Valuation of Portfolio Company Investments of Venture Capital and Private Equity Funds and Other Investment Companies*, May 1, 2019, Part II- Appendixes A-C, B.04.04. Also refer to graphic entitled "Venture Capital is an Unusual Creature" directly following this section.
[52] Therano-no: Key CLIA Compliance Issues, Loyola University Chicago School of Law, May 5, 2022. http://blogs.luc.edu/compliance/?p=4681

annual rates of return that would reconcile forecasts provided by Theranos to investors to prices paid by those same investors in 2014 and 2015[53], the resulting range was similar at *36% to 82%* (Exhibit C.4). Based on this data for target rates of return applicable to Theranos on the Valuation Dates, I selected a cost of equity of 45% with a resulting WACC of 44%. My cost of equity selection is in the low end of the applicable target rates of return, as well as those inferred from investor forecasts. This favorable assumption results in a higher value for a Theranos, and a lower calculated investor loss.

105. Utilizing a discounted cash flow to invested capital method with a WACC of 44.0%, I derived an estimate of value for Theranos of **$431 million** (rounded), on a 100% –controlling, marketable interest basis, as shown in Exhibit C.6.  This is inclusive of Series C-1 and C-2 financing proceeds through 2/7/2014 not included on the 12/31/2013 balance sheet.  This is also net of interest-bearing debt.

### B.  Asset Approach – Adjusted Net Asset Value

106. In Exhibit E.1, I have estimated the value of Theranos using the adjusted net asset value method combined with a cost to recreate approach for Theranos' technology and branding assets.  The basis for application of this method is that Theranos was a near pre-revenue[54], pre-profit early-stage company with largely unproven technology on the Valuation Dates. The Company's stage of development renders going concern income and market approaches

---

[53] Please refer to Appendix for an explanation of reconciliation of discounted cash flow approaches based on forecasts provided to investors, to the $17 per share they agreed to invest at for Theranos Series C-2 Preferred Stock.

[54] Theranos had revenues of $116,000 and $391,000 in calendar years 2014 and 2015, which were far below its near-term management forecast expectations.

to valuation less reliable, as future results may deviate significantly from forecasted expectations, due to development delays, technical failures, inability to obtain regulatory approvals, low market adoption and other factors. For such early-stage companies, adjusted net asset approaches are often applied, which reflect the fair market value of the company's assets less its liabilities. In addition, intangible assets of such early-stage companies are often measured through cost approaches[55], which measure the cost to obtain or reproduce functionally similar or identical assets.

107.I started with Theranos' 12/1/2013 balance sheet and made three adjustments. I have added to cash those Series C-1 and C-2 financing proceeds through 2/7/2014 not included on the 12/31/2013 balance sheet. I have removed from other current liabilities the "miscellaneous receipts" liability that represents proceeds from the 2013 capital raises for which stock was not yet issued (for the reasons explained earlier in this report). Finally, I added the value of Theranos' technology and branding assets, which I have estimated using the cost to recreate method, as shown in Exhibit E.2.

108.In Exhibit E.2, I have categorized Theranos' historical operating expenses based on trial balances prepared by the Company. My objective was to include any historical expenses that related to development of Theranos' technology, and to developing recognition of the Theranos brand[56]. I excluded any expenses that related to capital raising for Theranos, as

---

[55] AICPA *Intangible Asset Valuation Cost Approach Methods and Procedures*, p.25. Reasons to use the cost approach include "if the subject intangible asset is not the type of asset that generates a measurable amount of income".

[56] Inclusion of expenditures related to developing Theranos brand recognition is favorable to the Company's value as it ignores the impact of management misrepresentations made to investors and business partners that would damage the brand and potentially render it worthless.

this would not create an intangible asset, and the cash proceeds of capital raises are included in my adjusted net asset method. Theranos' largest categories of operating expenses such as salaries and wages did not include functional allocations to categories research and development, capital raising and investor relations, and general and administrative support. In such instances, I made a favorable assumption by including all expenses in my cost approach. This results in a higher valuation for Theranos and a lower calculated investor loss.

109. Exhibit E.2 details my allocations of historical costs incurred by Theranos to the value of its technology and brand, and they result in capture of over 95% of Theranos operating expenses between 2004 and the Valuation Dates. I have then grown the allocated expenses at historical inflation rates to the Valuation Dates, deducted a 4% functional obsolescence adjustment which represents 50% of 2004-2006 expenses[57], and added a 14% developer profit margin[58] to result in a cost to recreate value for Theranos' technology and brand of $340.370 million. My valuation of Theranos' technology and brand through a cost approach makes a favorable assumption that the Company's significant historical expenditures into these assets have been productively spent, and that less than 5% of these expenditures are obsolete on the valuation date. The final step was to integrate this value into the adjusted net asset approach in Exhibit E.1 to result in a value of Theranos' equity of **$378 million** (rounded) as of the 2/7/2014 Valuation Date.

---

[57] It is my understanding that Theranos began development of the Edison in 2007, and carried forward some of the technology from the prior version of its device.
[58] This is based on the upper quartile of the guideline public company peer group EBIT margins in Exhibit D.2.

### C. Conclusion of 100% Equity Value

110. My analysis results in a fair market value of Theranos on the 2/7/2014 Valuation Date in

the range of **$378 million to $431 million** per Exhibit A.3. Allocation of these values to the

different share classes (including Series C-2 Preferred Stock), warrants and options is also

shown in Exhibit A.3, based on the equity allocation models developed in Exhibits L.1 and

L.2, and Exhibits M.1 and M.2 which explained in the following section.

### D. Equity Allocation Models

111. After I concluded my estimate of Theranos' entire equity value, I allocated the

Company's value to its capital structure. The methodology that is commonly applied to

allocate value to a complex capital structure for a going concern business is the option

pricing equity allocation model ("OPM"), where common stock and each security in a

company are treated as a call option on total company value.[59] The OPM will model future

possible exit values for the company on a lognormal (bell shaped) distribution curve,[60] based

on an estimated current equity value for the company, and an estimated volatility of the

company's equity in the future. The key inputs that the OPM requires to estimate a

distribution of future possible exit values from a liquidity event include equity value on the

valuation date, a risk-free rate of return, an estimated term to a future liquidity event, and

an estimated volatility of the underlying equity value of the company. The higher the

---

[59] AICPA Practice Aid: Valuation of Privately-Held-Company Equity Securities Issued as Compensation, 2013,
Sections 6.30 – 6.41. [accessed via Commerce Clearing House Accounting Research Manager Subscription]
[60] The distribution of percentage returns on the stock are normally distributed in the option pricing model, creating
a symmetrical bell shaped curve. The distribution of stock prices (or company exit values) are lognormally
distributed creating a bell shaped curve that is asymmetrical, with a longer tail on the right side of the curve. This
occurs because as stock prices are constrained at zero on the left side of the curve, they cannot become negative.

volatility input and the longer the term to liquidity, the more widely dispersed will be the resulting possible exit values on the bell-shaped distribution curve.

112. The OPM considers the rights and preferences of each security, and at each possible future total exit value (typically from an IPO or sale of the company) it will allocate proceeds from that exit value to each class of securities. At high exit values, preferred stock will convert to common[61]. At low exit values preferred stock will not convert to retain their liquidation preferences that exceed the value of common stock. At very low exit values, there may be zero payout to common stock and the preferred securities may not recover their full liquidation preferences. As a final step, the OPM will aggregate all the payouts to each security under future possible exits to determine the probability weighted present value of each class of securities. All the securities will sum to the total value of the company on the valuation date.

113. I applied the OPM to allocate Theranos' equity value to its securities, taking into account the first priority liquidation preferences of Series C, C-1 and C-2[62], the second priority liquidation preferences of Series A and B[63], and the fact that all preferred stock had participation rights with common stock in a liquidity event[64]. I estimated an approximate 4 year term to a liquidity event from the 2/7/2014 Valuation Date based on observation that

---

[61] In the case of Theranos, preferred stock retains participation rights with common stock. Preferred stock holders receive their liquidation preferences + equal sharing with common stock in any residual exit value that exceeds these preferences.
[62] Series C, C-1, C-2 preferred stock are repaid first in a liquidation or sale of the company, for an amount equal to their initial investment prices of $0.564, $3.00 & $15.00, and $17.00 respectively. [Articles_Jan 2014, pp. 5-6, *Liquidation Rights*. Certificate of Designation of Series C-2 Preferred Stock_2014.02.07, pp. 1-2, *Liquidation Rights*]
[63] Series A, B preferred stock are repaid second in a liquidation or sale of the company, for an amount equal to their initial investment prices of $$0.15 and $0.1846 respectively. [Articles_Jan 2014, pp. 5-6, *Liquidation Rights*]
[64] All preferred stock share in any remaining residual liquidation or sale value equally with common stock without having to convert to common stock. [Articles_Jan 2014, pp. 5-6, *Liquidation Rights*]

Page 43

the Company's forecasts estimated mature operating profit margins between 2017 and 2018, that the Company would become more attractive and saleable to an industry buyer within that timeframe, that Aranca in their discussions with management had assumed a company exit in 2018, and a 4 year term to liquidity in their 12/15/14 IRC 409A valuation.

114.Another significant input into the OPM is an estimate of Theranos' future equity volatility between the Valuation Dates and the date of the estimated liquidity event. I analyzed the asset and equity volatilities of the same 22 guideline public company peer group discussed earlier in this report. The median and average asset volatility of the peer group was between 39% and 40%, and the upper quartile was 47% per Exhibit R.1. I selected an asset volatility of 50% for Theranos, taking into account that it was earlier stage and significantly smaller than the peer group companies as measured by revenues and market value. Earlier stage companies are generally more volatile due to higher remaining development and implementation risks. This is confirmed by the smallest companies in the public peer group having asset volatilities that range between 47% and 101%. My final step was to calculate the corresponding equity volatility of 55% for Theranos given the proportion of financing debt and equity in its capital structure.

115.My analysis results in a range of per share values on a controlling marketable basis for Theranos securities on the 2/7/14 Valuation Date shown in the lower section of Exhibit A.3.

**XII.    Value of Theranos at December 31, 2014**

116.Using the same adjusted net asset value and discounted cash flow methods as those used to value Theranos at the 2/7/2014 Valuation Date, including identical Aranca IRC 409A

Page 44

**ER-642**

forecasts, the resulting fair market value of Theranos's equity on the 12/31/2014 Valuation Date was in the range **$827 million** to **$951 million** as shown in Exhibit A.4. Allocation of these values to the different share classes, warrants and options is also shown in Exhibit A.4, based on the equity allocation models developed in Exhibits N.1 and N.2, and Exhibits O.1 and O.2. The volatility used in the equity allocations was developed in Exhibit R.2.

117. The discounted cash flow and guideline public company methods are outlined in Exhibits F and G respectively. The adjusted net asset method combined with the cost to recreate method are outlined in Exhibits H.1 and H.2.

### XIII.    Value of Theranos at October 15, 2015

118. Using the same adjusted net asset value and the discounted cash flow methods as those used to value Theranos at the 2/7/2014 Valuation Date, which included nearly identical Aranca IRC 409A forecasts[65], the resulting fair market value of Theranos on the 10/15/2015 Valuation Date was in the range of **$1,051 million** to **$1,184 million** as shown in Exhibit A.5. Allocation of these values to the different share classes, warrants and options is also shown in Exhibit A.5, based on the equity allocation models developed in Exhibits P.1 and P.2, and Exhibits Q.1 and Q.2. The volatility used in the equity allocations was developed in Exhibit R.3.

---

[65] I applied the Aranca 3/25/15 IRC 409A forecasts to this valuation date, which are nearly identical to the 12/15/14 IRC 409A forecasts.

119.The discounted cash flow and guideline public company methods are outlined in

Exhibits I and J respectively. The adjusted net asset method combined with the cost to

recreate method are outlined in Exhibits K.1 and K.2.

### XIV.    Conclusion of Values

120..   A summary of my estimated fair market values is outlined below, and these include

the Company's substantial cash balances:

| 100% Company Equity Value Range (In Thousands) | | | Cash Balance Included in Equity Value (Thousands) | Series C-1 Per Share Value Range | | | Series C-2 Per Share Value Range | | | Valuation Date | Report Exhibit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| $  378,000 | - | $  431,000 | $  151,912 | $  8.77 | - | $  9.39 | $  9.90 | - | $ 10.59 | 02-07-14 | Exhibit A.3 |
| $  827,000 | - | $  951,000 | $  465,933 | $  9.61 | - | $ 10.36 | $ 10.80 | - | $ 11.63 | 12-31-14 | Exhibit A.4 |
| $ 1,051,000 | - | $ 1,184,000 | $  496,919 | $ 10.14 | - | $ 10.81 | $ 11.37 | - | $ 12.11 | 10-15-15 | Exhibit A.5 |

121. The aggregate Series C-1 and C-2 investor losses based on the Company values in the

tables above range between **$277.964 million** and **$315.884 million** per Exhibit A.1 to this

report. I have been asked to prepare an alternate calculation of investor loss based on my

estimated values as of only the 10/15/2015 Valuation Date, which results in a range of

aggregate loss between **$237.323 million** and **$273.646 million**.

Dated:  September 8, 2022

Carl S. Saba, MBA, CVA, ASA, ABV

Page 46

**ER-644**

### XV.    Appendix

#### A.  Investor Financings – Back-solve Methods

122. There are two general processes for establishing the value of an enterprise and its
associated classes of stock.  The first is a top-down process that establishes the fair market
value of the enterprise and then allocates this value among the various classes of equity.
The second, and the way that I used under the back-solve method, is a bottom-up process
that uses the pricing of a recent stock transaction to infer the value of the other classes of
equity. This in turn establishes an implied total equity value for the subject company.
Inferring value from investments in a company is a form of the market approach referred to
as the back-solve method. This approach is frequently applied to early stage companies and
is discussed in the AICPA Practice Aid on *Valuation of Privately-Held-Company Equity
Securities Issued as Compensation*.  The back-solve method utilizes the same OPM
framework discussed earlier in this report that I used to allocate my estimated values for
Theranos to its securities.

123. I applied the back-solve method with the same OPM assumptions used for the equity
allocation models previously described on the three Valuation Dates. The primary difference
in this analysis is that I did not have an established value for Theranos' equity. I instead
solved for the implied value of Theranos' equity based on the $17.00 per share paid by
Series C-2 investors throughout 2014. I performed this analysis as of the 2/7/14 Valuation
Date, and 12/31/14 Valuation Date. In addition, I approximated the implied equity value of
Theranos as of 2/13/15, the investment date for Mr. Murdoch, by adding his $125 million
investment amount to the 12/31/14 back-solve value. The resulting implied equity values for

Page 47

Theranos based on investor pricing of Series C-2 preferred stock is **$1,510 million**, **$2,250 million** and **$2,375 million**[66] as of 2/7/14, 12/31/14, and 2/13/15 respectively (Appendix Exhibit A). The supporting back-solve models are contained in the Appendix Exhibits C.1 – C.3, and D.1 – D.3 respectively for the first two valuation dates.

### B.   Investor Forecasts – DCF Models

124.As part of my analysis, I have also reviewed the forecasts provided to investors as part of their due diligence process at various points in time in the period from February 2014 to April 2015.  As discussed earlier in this report, the forecasts provided to investors presented revenue growth rates and thresholds that were orders of magnitude higher than those provided to Aranca for IRC 409A purposes (and also shared with the Theranos Board in October 2013) in the same approximate time frame. The comparison of revenues, gross margin, and EBITDA margin between forecasts provided to investors vs. Aranca is contained in Appendix Exhibits B.1 – B.3. An example of the significant discrepancies is a comparison of projected revenues in Exhibit B.1 for calendar year 2015. Forecasts provided to investors assumed Theranos' revenue would range between $990 million and $1,677 million, which is approximately *9 to 15 times higher* than the forecasts provided to Aranca with revenues of $112 to $113 million.

---

[66] These are not my opinions of the equity value of Theranos, they represent the values assigned to the Company based on investors' willingness to pay the $17 per share for Series C-2 preferred offered by Theranos management. There are a number of references in press articles to a valuation for Theranos of approximately $9 billion in this timeframe. My inferred values are substantially lower due to the back-solve model's recognition of superior economic rights (such as liquidation preferences) to Series C-2 preferred stock as compared to all other inferior securities. The approximate $9 billion figure can be achieved by multiplying *all* shares outstanding for Theranos on these dates by the $17 per share paid for Series C-2. This simplified post-money approach would incorrectly assume that all securities have equal value to the most senior Series C-2 preferred stock.

125. Given that investors reviewed the forecasts provided to them as one of the factors that they considered in their decision to invest in Series C-2 at $17 per share, I considered that it would be informative to estimate the implied annual rates of return that investors placed on those forecasts, and to compare those rates of return to the target VC rates of return study data. This would provide additional information to consider in selecting my discount rate for the income approach described in the main section of this report.

126. I applied income approaches with a market derived exit multiple (similar to that discussed in the main section of this report) using the following investor forecasts:

- Management prepared two-year forecasts provided to PFM in January 2014 for their 2/7/14 investment (Appendix Exhibit E.1 – E.3).

- Financial model developed by PFM based on the management forecasts above, which extend the two-year forecast horizon to a ten year period. I relied on PFM's "base case" version of the model (Appendix Exhibit E.4 – E.5).

- Management prepared two-year forecasts provided to Daniel Mosley and RDV Corporation for their October 2014 investment (Appendix Exhibit F.1 -F.3).

- Management prepared two-year forecasts provided to Rupert Murdoch for his February 2015 investment (Appendix Exhibit G.1 – G.3).

127. In each instance, I translated the investor two-year forecasts into a discounted cash flow method, and estimated a market exit multiple of revenue or EBITDA applicable to Theranos at the end each forecast period (similar to that described in the main section of this report). For the PFM financial model, I did not apply a market exit multiple as the forecast horizon

Page 49

**ER-647**

was extended far enough to allow for Theranos to reach steady state growth rates and margins. This allowed me to apply a standard perpetuity formula to capture all cash flows that would follow the discrete forecast period.

128. My final step was to solve for the rate of return that would be required to reconcile the Theranos equity value resulting from investor forecast discounted cash flow methods to the back-solve values of Theranos from investor pricing discussed earlier. That reconciliation is shown on Exhibit A, and results in annual rates of return on investor proceeds ranging from 36% to 82%. As discussed in the section of this report where I explained my selection of the discount rate under the income approach, these rates of return are generally consistent with target VC rates of return study data for companies at early stages of development (refer to Exhibit C.4 for comparison).

### C. Assumptions and Limiting Conditions

In addition to those cited elsewhere in this report, other assumptions and limiting conditions pertaining to the estimate of value stated in this report are summarized below.

1. The estimates of value arrived at herein are valid only for the stated purpose as of the dates of the valuations.

2. Public information and industry and statistical information have been obtained from sources I believe to be reliable. However, I make no representation as to the accuracy or completeness of such information and have performed no procedures to corroborate the information.

3. No change of any item in this report shall be made by anyone other than Hemming Morse, LLP, and I shall have no responsibility for any unauthorized change.

4. I have not conducted interviews with the management of Theranos concerning the past, present, and prospective operating results of the Company. I have instead relied upon materials itemized in Appendix Exhibit I, Evidence Relied Upon in the determination of my opinions of value.

5. This report reflects facts and conditions existing at the Valuation Dates. Subsequent events have not been considered unless they evidence facts and circumstances that were known or knowable on the Valuation Dates, and I have no obligation to update my report for such events.

6. This report is designed to give estimates of value. It does not purport to be a comprehensive list of all of the considerations undertaken in order to arrive at my estimates

Page 51

of value. It is not an accounting report, and it should not be relied on to disclose unreported assets or liabilities, or to verify financial reporting.

7. This report contains a review and discussion of information contained in trial balances, financial statements, and tax returns prepared by Theranos. The majority of this financial data is not CPA Audited, Reviewed, or Compiled. I have applied some procedures to corroborate financial information on the Company between different sources, and have generally assumed this information to be a reliable representation of Theranos' books and records.

### D. Certifications and Representation

I certify and represent that, to the best of my knowledge and belief:

1.  the statements of fact in this report are true and correct;

2.  the reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, unbiased professional analyses, opinions, and conclusions;

3.  Hemming Morse, LLP and its employees have no present or prospective interest in or bias with respect to the property that is the subject of this report, and the employees of Hemming Morse, LLP and I have no personal interest or bias with respect to the parties involved;

4.  I have performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment;

5.  my engagement in this assignment was not contingent upon developing or reporting predetermined results;

6.  my fee for completing this assignment is not contingent upon the development or reporting of a predetermined values or direction in values that favor the cause of the client, the amount of the value opinions, the attainment of stipulated results, or the occurrence of any subsequent events directly related to the intended use of this appraisal;

7. my analyses, opinions, and conclusions were developed, and this report has been prepared in conformity with Uniform Standards of Professional Appraisal Practice and with the American Institute of Certified Public Accountants' Statement on Standards for Valuation Services No. 1 ("SSVS");

8. Brian Zacharias, Claudia Stern, and Sacha Zadmehran provided significant business and/or intangible asset appraisal assistance to the person signing this certification/representation;

9. the analyses, opinions, and conclusions of value included in the valuation report are subject to the specified assumptions and limiting conditions, and they are the personal analyses, opinions, and conclusions of value of the valuation analyst;

10. the economic and industry data included in the valuation report have been obtained from various printed or electronic reference sources that the valuation analyst believes to be reliable. The valuation analyst has not performed any corroborating procedures to substantiate that data;

11. the parties, for whom the information and use of the valuation report is restricted, are identified; the valuation report is not intended to be and should not be used by anyone other than such parties;

12. I have no obligation to update the report or the opinions of value for information that comes to my attention after the date of the report;

Dated: September 8, 2022

Carl S. Saba, MBA, CVA, ASA, ABV

Page 54

**ER-652**

## XVI. Exhibit List

| | |
|---|---|
| Investor Loss Calculation | Exhibit A.1 |
| Series C-1 & C-2 Investor Details List | Exhibit A.2 |
| Value Summary 2/7/14 | Exhibit A.3 |
| Value Summary 12/31/14 | Exhibit A.4 |
| Value Summary 10/15/15 | Exhibit A.5 |

### 2/7/2014 Valuation Date

| | |
|---|---|
| Historical Balance Sheets | Exhibit B.1 |
| Historical Income Statements | Exhibit B.2 |
| Adjustments to Financial Statements | Exhibit B.3 |
| Adjusted Balance Sheets | Exhibit B.4 |
| Adjusted Income Statements | Exhibit B.5 |
| Comparative Financial Ratios | Exhibit B.6 |
| | |
| Discounted Cash Flow Key Assumptions | Exhibit C.1 |
| Adjusted Working Capital Analysis | Exhibit C.2 |
| Depreciation & Capital Expenditure Analysis | Exhibit C.3 |
| Discount Rate - Venture Capital Rates of Return | Exhibit C.4 |
| Forecast Free Cash Flow to Invested Capital | Exhibit C.5 |
| Discounted Cash Flow Method Value Summary | Exhibit C.6 |
| | |
| Guideline Public Company Method | Exhibit D.1 |
| Guideline Public Company Key Financial Ratios | Exhibit D.2 |
| Guideline Public Company Descriptions | Exhibit D.3 |
| Guideline Public Company Ranking | Exhibit D.4 |
| | |
| Adjusted Net Asset Value | Exhibit E.1 |
| Cost to Recreate Method - Technology and Branding Assets | Exhibit E.2 |

### 12/31/2014 Valuation Date

| | |
|---|---|
| Discounted Cash Flow Key Assumptions | Exhibit F.1 |
| Adjusted Working Capital Analysis | Exhibit F.2 |
| Depreciation & Capital Expenditure Analysis | Exhibit F.3 |
| Discount Rate - Venture Capital Rates of Return | Exhibit F.4 |
| Forecast Free Cash Flow to Invested Capital | Exhibit F.5 |
| Discounted Cash Flow Method Value Summary | Exhibit F.6 |
| | |
| Guideline Public Company Method | Exhibit G.1 |
| Guideline Public Company Key Financial Ratios | Exhibit G.2 |
| Guideline Public Company Descriptions | Exhibit G.3 |
| Guideline Public Company Ranking | Exhibit G.4 |
| | |
| Adjusted Net Asset Value | Exhibit H.1 |
| Cost to Recreate Method - Technology and Branding Assets | Exhibit H.2 |

### 10/15/2015 Valuation Date

| | |
|---|---|
| Discounted Cash Flow Key Assumptions | Exhibit I.1 |
| Adjusted Working Capital Analysis | Exhibit I.2 |
| Depreciation & Capital Expenditure Analysis | Exhibit I.3 |
| Discount Rate - Venture Capital Rates of Return | Exhibit I.4 |
| Forecast Free Cash Flow to Invested Capital | Exhibit I.5 |
| Discounted Cash Flow Method Value Summary | Exhibit I.6 |
| | |
| Guideline Public Company Method | Exhibit J.1 |
| Guideline Public Company Key Financial Ratios | Exhibit J.2 |
| Guideline Public Company Descriptions | Exhibit J.3 |
| Guideline Public Company Ranking | Exhibit J.4 |

Adjusted Net Asset Value     Exhibit K.1
Cost to Recreate Method - Technology and Branding Assets     Exhibit K.2

## Equity Allocation Models

NAV Equity Allocation 2/7/14 - Step 1     Exhibit L.1
NAV Equity Allocation 2/7/14 - Step 2     Exhibit L.2

DCF Equity Allocation 2/7/14 - Step 1     Exhibit M.1
DCF Equity Allocation 2/7/14 - Step 2     Exhibit M.2

NAV Equity Allocation 12/31/14 - Step 1     Exhibit N.1
NAV Equity Allocation 12/31/14 - Step 2     Exhibit N.2

DCF Equity Allocation 2/7/14 - Step 1     Exhibit O.1
DCF Equity Allocation 2/7/14 - Step 2     Exhibit O.2

NAV Equity Allocation 10/15/15 - Step 1     Exhibit P.1
NAV Equity Allocation 10/15/15 - Step 2     Exhibit P.2

DCF Equity Allocation 10/15/15 - Step 1     Exhibit Q.1
DCF Equity Allocation 10/15/15 - Step 2     Exhibit Q.2

## Volatility Models

Volatility Analysis 2/7/14     Exhibit R.1
Volatility Analysis 12/31/14     Exhibit R.2
Volatility Analysis 10/15/15     Exhibit R.3

## Appendix

Summary of Investor Values     Appendix Exhibit A

Summary of Revenue Forecasts     Appendix Exhibit B.1
Summary of Gross Profit Forecasts     Appendix Exhibit B.2
Summary of EBITDA Forecasts     Appendix Exhibit B.3

Backsolve Method Value Summary 2/7/14     Appendix Exhibit C.1
Backsolve Method 2/7/14 - Step 1     Appendix Exhibit C.2
Backsolve Method 2/7/14 - Step 2     Appendix Exhibit C.3

Backsolve Method Value Summary 12/31/14     Appendix Exhibit D.1
Backsolve Method 12/31/14 - Step 1     Appendix Exhibit D.2
Backsolve Method 12/31/14 - Step 2     Appendix Exhibit D.3

PFM Forecast - Depreciation & Capital Expenditure Analysis     Appendix Exhibit E.1
PFM Forecast Free Cash Flow to Invested Capital     Appendix Exhibit E.2
PFM Forecast - Discounted Cash Flow Method     Appendix Exhibit E.3

PFM (Base Model) Forecast Free Cash Flow to Invested Capital     Appendix Exhibit E.4
PFM (Base Model) Forecast - Discounted Cash Flow Method     Appendix Exhibit E.5

Mosley-RDV Forecast - Depreciation & Capital Expenditure Analysis     Appendix Exhibit F.1
Mosley-RDV Forecast Free Cash Flow to Invested Capital     Appendix Exhibit F.2
Mosley-RDV Forecast - Discounted Cash Flow Method     Appendix Exhibit F.3

Murdoch Forecast - Depreciation & Capital Expenditure Analysis     Appendix Exhibit G.1
Murdoch Forecast Free Cash Flow to Invested Capital     Appendix Exhibit G.2
Murdoch Forecast - Discounted Cash Flow Method     Appendix Exhibit G.3

Carl Saba Curriculum Vitae     Appendix Exhibit H

Documents Considered or Relied Upon     Appendix Exhibit I

**US v. Elizabeth Holmes**  **Exhibit A.1**
Valuation of Theranos, Inc.  Investor Loss Calculation
*(USD)*

| Incremental Loss Date | Series C-1 Shares [1] | Series C-2 Shares [2] | Low Value | High Value | Series C-1 Purchase Price | Series C-2 Purchase Price | Investor Loss Value Range [3] Low | - | High |
|---|---|---|---|---|---|---|---|---|---|
| 2/7/2014 | | 9,669,998 | $   9.90 | $   10.59 | | $   17.00 | $   62,004,902 | - $ | 68,689,534 |
| 2/7/2014 | 7,500,032 | | 8.77 | 9.39 | 15.00 | | 42,100,107 | | 46,740,488 |
| 12/31/2014 | N/A | 32,808,227 | 10.80 | 11.63 | N/A | 17.00 | 124,318,072 | - | 143,386,658 |
| 10/15/2015 | N/A | 42,947,639 | 11.37 | 12.11 | N/A | 17.00 | 49,541,379 | - | 57,067,784 |
| | | | | | | **Total Loss** | $   **277,964,460** | - $ | **315,884,464** |
| 10/15/2015 | 6,563,232 | | 10.14 | 10.81 | $   15.00 | | $   27,479,453 | $ | 31,923,063 |
| 10/15/2015 | | 42,947,639 | 11.37 | 12.11 | | 17.00 | 209,843,062 | - | 241,722,753 |
| | | | | **Total Loss, Alternate Calculation [4]** | | | $   **237,322,514** | - $ | **273,645,817** |

**Notes:**
[1] Preferred Series C-1 shares with an issue price and liquidation preference of $15.0 per share.
[2] Preferred Series C-2 shares with an issue price and liquidation preference of $17.0 per share.
[3] Losses calculated at each date based on incremental increase in share count relative to prior date.
[4] The alternate calculation measures loss based on the value of all Series C-1 and C-2 shares as of 10/15/15, rather than the valuation date closest to when the investment was made.
[5] Share counts presented above do not include shares held by Defendant.



US v. Elizabeth Holmes
Valuation of Theranos, Inc.

Exhibit A.2
Series C-1 & C-2 Investor Details List
(USD)

| Investor Name | Class of Stock | Certificate Date | Shares | Investment Amount | Price Paid Per Share | Fair Market Value Per Share | | | Investor Loss | | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Walgreen | Series C-2 | 01/07/14 | 2,941,176 | $ 49,999,992 | $ 17.00 | $ 9.90 | - | $ 10.59 | $ 18,859,086 | - $ 20,892,249 | Convertible Note |
| CENTRAL VALLEY ADMINISTRATORS INC | Series C-2 | 02/07/14 | 294,117 | 4,999,989 | 17.00 | 9.90 | - | 10.59 | 1,885,905 | - 2,089,221 | |
| PARTNER INVESTMENTS, LP | Series C-2 | 02/07/14 | 3,263,529 | 55,479,993 | 17.00 | 9.90 | - | 10.59 | 20,926,043 | - 23,182,041 | |
| PEER VENTURES GROUP IV L.P. | Series C-2 | 02/07/14 | 779,411 | 13,249,987 | 17.00 | 9.90 | - | 10.59 | 4,997,654 | - 5,536,442 | |
| PFM HEALTHCARE MASTER FUND, LP | Series C-2 | 02/07/14 | 2,255,096 | 38,336,632 | 17.00 | 9.90 | - | 10.59 | 14,459,879 | - 16,018,772 | |
| PFM HEALTHCARE PRINCIPALS FUND, LP | Series C-2 | 02/07/14 | 136,669 | 2,323,373 | 17.00 | 9.90 | - | 10.59 | 876,334 | - 970,810 | |
| RILEY P. BECHTEL & SUSAN P. BECHTEL | Series C-2 | 03/18/14 | 8,823 | 149,991 | 17.00 | 10.80 | - | 11.63 | 47,405 | - 54,676 | |
| RILEY P. BECHTEL & SUSAN P. BECHTEL | Series C-2 | 03/18/14 | 291,177 | 4,950,009 | 17.00 | 10.80 | - | 11.63 | 1,564,448 | - 1,804,412 | |
| ANDREAS C. DRACOPOULOS | Series C-2 | 10/31/14 | 1,470,588 | 24,999,996 | 17.00 | 10.80 | - | 11.63 | 7,901,238 | - 9,113,174 | |
| LAKESHORE CAPTL MGMT | Series C-2 | 10/31/14 | 5,882,352 | 99,999,984 | 17.00 | 10.80 | - | 11.63 | 31,604,954 | - 36,452,695 | |
| MOSLEY FAMILY HOLDINGS LLC | Series C-2 | 10/31/14 | 352,941 | 5,999,997 | 17.00 | 10.80 | - | 11.63 | 1,896,297 | - 2,187,161 | |
| Cox Investment Holdings, Inc. | Series C-2 | 11/03/14 | 5,882,352 | 99,999,984 | 17.00 | 10.80 | - | 11.63 | 31,604,954 | - 36,452,695 | |
| MADRONE PARTNERS, LP | Series C-2 | 12/15/14 | 5,882,352 | 99,999,984 | 17.00 | 10.80 | - | 11.63 | 31,604,954 | - 36,452,695 | |
| SODA SPRING PARTNERS, LP | Series C-2 | 12/15/14 | 2,941,176 | 49,999,992 | 17.00 | 10.80 | - | 11.63 | 15,802,477 | - 18,226,347 | |
| THE HENRY A. KISSINGER 2014 | Series C-2 | 12/15/14 | 176,470 | 2,999,990 | 17.00 | 10.80 | - | 11.63 | 948,146 | - 1,093,577 | |
| BENDEL FUND | Series C-2 | 12/31/14 | 249,998 | 4,249,966 | 17.00 | 10.80 | - | 11.63 | 1,343,200 | - 1,549,227 | |
| K.R. Murdoch | Series C-2 | 02/13/15 | 7,352,941 | 124,999,997 | 17.00 | 11.37 | - | 12.11 | 35,926,623 | - 41,384,653 | |
| David Boies | Series C-2 | 03/06/15 | 17,647 | 299,999 | 17.00 | 11.37 | - | 12.11 | 86,224 | - 99,323 | |
| EOSon Investments M Ltd. | Series C-2 | 03/30/15 | 1,058,823 | 17,999,991 | 17.00 | 11.37 | - | 12.11 | 5,173,431 | - 5,959,387 | |
| EOSon Investments N Ltd. | Series C-2 | 03/30/15 | 117,647 | 1,999,999 | 17.00 | 11.37 | - | 12.11 | 574,826 | - 662,154 | |
| Robert Kraft Attn: Michael Joyce | Series C-2 | 03/31/15 | 58,823 | 999,991 | 17.00 | 11.37 | - | 12.11 | 287,410 | - 331,074 | |
| INMOBILIARIA CARSO, SA de CV | Series C-2 | 04/16/15 | 1,764,705 | 29,999,985 | 17.00 | 11.37 | - | 12.11 | 8,622,386 | - 9,932,312 | |
| | | TOTAL | 43,178,813 | $ 734,039,821 | | | | | $ 236,593,874 | $ 270,445,096 | [1] |
| | | | | | | | | | | | |
| Safeway | Series C-1 | 08/19/11 | 1,000,000 | $ 15,000,000 | $ 15.00 | $ 8.77 | - $ | 9.39 | $ 5,613,324 | - $ 6,232,038 | Convertible Note |
| Walgreen | Series C-1 | 06/14/12 | 2,000,000 | 30,000,000 | 15.00 | 8.77 | - | 9.39 | 11,226,647 | - 12,464,077 | Convertible Note |
| George Shultz | Series C-1 | 02/19/13 | 200,000 | 3,000,000 | 15.00 | 8.77 | - | 9.39 | 1,122,665 | - 1,246,408 | |
| PEER VENTURES GROUP IV, L.P. | Series C-1 | 06/10/13 | 1,180,000 | 17,700,000 | 15.00 | 8.77 | - | 9.39 | 6,623,722 | - 7,353,805 | |
| Richard Kovacevich | Series C-1 | 08/01/13 | 10,000 | 150,000 | 15.00 | 8.77 | - | 9.39 | 56,133 | - 62,320 | |
| Richard Kovacevich | Series C-1 | 08/02/13 | 133,333 | 1,999,995 | 13.00 | 8.77 | - | 9.39 | 748,441 | - 830,936 | |
| Lucas Venture Group XI | Series C-1 | 09/30/13 | 261,334 | 3,920,010 | 15.00 | 8.77 | - | 9.39 | 1,466,932 | - 1,628,644 | |
| Lucas Venture Group IV LP | Series C-1 | 09/30/13 | 33,334 | 500,010 | 15.00 | 8.77 | - | 9.39 | 187,115 | - 207,739 | |
| PEER VENTURES GROUP IV, L.P. | Series C-1 | 09/30/13 | 1,000,000 | 15,000,000 | 15.00 | 8.77 | - | 9.39 | 5,613,324 | - 6,232,038 | |
| Lucas Venture Group XI | Series C-1 | 10/01/13 | 126,666 | 1,899,990 | 15.00 | 8.77 | - | 9.39 | 711,017 | - 789,387 | |
| Lucas Venture Group XI | Series C-1 | 10/02/13 | 45,000 | 675,000 | 15.00 | 8.77 | - | 9.39 | 252,600 | - 280,442 | |
| Lucas Venture Group XI | Series C-1 | 10/07/13 | 15,000 | 225,000 | 15.00 | 8.77 | - | 9.39 | 84,200 | - 93,481 | |
| Lucas Venture Group XI | Series C-1 | 10/09/13 | 11,667 | 175,005 | 15.00 | 8.77 | - | 9.39 | 65,491 | - 72,709 | |
| Lucas Venture Group XI | Series C-1 | 10/15/13 | 10,000 | 150,000 | 15.00 | 8.77 | - | 9.39 | 56,133 | - 62,320 | |
| Lucas Venture Group XI | Series C-1 | 10/30/13 | 1,666 | 24,990 | 15.00 | 8.77 | - | 9.39 | 9,352 | - 10,383 | |
| Alan Eisenman | Series C-1 | 12/30/13 | 6,666 | 99,990 | 15.00 | 8.77 | - | 9.39 | 37,418 | - 41,543 | |
| Gordon Family Trust | Series C-1 | 12/30/13 | 20,000 | 300,000 | 15.00 | 8.77 | - | 9.39 | 112,266 | - 124,641 | |
| Crafton Capital GP | Series C-1 | 12/30/13 | 20,000 | 300,000 | 15.00 | 8.77 | - | 9.39 | 112,266 | - 124,641 | |
| Sherrie Eisenman | Series C-1 | 12/30/13 | 3,333 | 49,995 | 15.00 | 8.77 | - | 9.39 | 18,709 | - 20,771 | |
| PEER VENTURES GROUP IV, L.P. | Series C-1 | 12/31/13 | 169,995 | 2,549,925 | 15.00 | 8.77 | - | 9.39 | 954,237 | - 1,059,415 | |
| Hall Black Diamond II, LLC | Series C-1 | 12/31/13 | 325,000 | 4,875,000 | 15.00 | 8.77 | - | 9.39 | 1,824,330 | - 2,025,413 | |
| Black Diamond Ventures XII-B, LLC | Series C-1 | 12/31/13 | 356,660 | 5,349,900 | 15.00 | 8.77 | - | 9.39 | 2,002,048 | - 2,222,719 | |
| Richard Kovacevich | Series C-1 | 12/18/13 | 133,333 | 1,999,995 | 15.00 | 8.77 | - | 9.10 | 748,441 | - 830,936 | |
| Colin Carter | Series C-1 | 01/06/14 | 16,666 | 249,990 | 15.00 | 8.77 | - | 9.39 | 93,552 | - 103,863 | |
| Daniel C. Carter | Series C-1 | 01/07/14 | 5,000 | 75,000 | 15.00 | 8.77 | - | 9.39 | 28,067 | - 31,160 | |
| Mordenhall TF Partners | Series C-1 | 01/14/14 | 87,500 | 1,312,500 | 15.00 | 8.77 | - | 9.39 | 491,166 | - 545,302 | |
| Kendra Fadd | Series C-1 | 01/14/14 | 5,000 | 75,000 | 15.00 | 8.77 | - | 9.39 | 28,067 | - 31,160 | |
| Boies, Schiller & Flexner LLP | Series C-1 | 01/14/14 | 322,879 | 4,843,185 | 15.00 | 8.77 | - | 9.39 | 1,812,424 | - 2,012,194 | |
| | | TOTAL | 7,500,032 | $ 112,500,480 | | | | | $ 42,100,107 | $ 46,740,498 | |

Notes:
[1] Series C-2 shares per investor detail above exceed share count in Aranca 3/25/15 409A by 231,174 shares.


HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

**US v. Elizabeth Holmes**                                                                                                    **Exhibit A.3**
Valuation of Theranos, Inc.                                                                                      Value Summary 2/7/14
As of February 7, 2014                                                            *(thousands of USD, except Per Share Value)*

**Equity Value**

| | | **Indicated Value Range** | | |
|---|---|---|---|---|
| **Valuation Methods** | **Ref.** | **Low** | **--** | **High** |
| Adjusted Net Asset Value Method | Exhibit E.1 | $ 378,000 | | |
| Discounted Cash Flow Method | Exhibit C.6 | | | $ 431,000 |

**Per Share Value**

| | | **Adj. Net Asset Value Method Value Allocation** | | **Discounted Cash Flow Method Value Allocation** | |
|---|---|---|---|---|---|
| **Share Classes** | **Shares Outstanding** | **Present Value Marketable** | **Present Value Per Share Marketable** | **Present Value Marketable** | **Present Value Per Share Marketable** |
| Preferred Shares | | | | | |
| Series A @ $0.150 | 46,320,045 | $ 15,971,798 | $ 0.34 | $ 19,704,031 | $ 0.43 |
| Series B @ $0.1846 | 54,162,965 | 19,200,011 | 0.35 | 23,640,024 | 0.44 |
| Series C @ $0.564 | 58,896,105 | 36,586,427 | 0.62 | 42,179,901 | 0.72 |
| Series C-1 @ $3.00 | 25,175,001 | 50,247,440 | 2.00 | 54,863,296 | 2.18 |
| Series C-1 @ $15.00 | 7,500,032 | 65,759,992 | 8.77 | 70,400,373 | 9.39 |
| Series C-2 @ $17.00 | 9,669,998 | 95,700,432 | 9.90 | 102,385,064 | 10.59 |
| Total Preferred Shares | 201,724,146 | 283,466,099 | | 313,172,690 | |
| Warrants on Common | | | | | |
| Exercise Price @ $0.072 | 741,665 | 202,862 | 0.27 | 254,789 | 0.34 |
| Common - Outstanding | 302,640,465 | 91,674,991 | 0.30 | 114,224,663 | 0.38 |
| Options on Common | | | | | |
| Exercise Price @ $0.015 | 350,000 | 104,602 | 0.30 | 130,472 | 0.37 |
| Exercise Price @ $0.030 | 1,227,125 | 359,949 | 0.29 | 449,631 | 0.37 |
| Exercise Price @ $0.066 | 552,500 | 155,386 | 0.28 | 194,741 | 0.35 |
| Exercise Price @ $0.072 | 3,092,715 | 845,929 | 0.27 | 1,062,459 | 0.34 |
| Exercise Price @ $0.094 | 312,500 | 81,901 | 0.26 | 103,201 | 0.33 |
| Exercise Price @ $0.170 | 3,990,167 | 953,270 | 0.24 | 1,209,524 | 0.30 |
| Exercise Price @ $0.206 | 703,195 | 155,010 | 0.22 | 197,832 | 0.28 |
| Total Options Outstanding | 10,228,202 | 2,656,047 | | 3,347,859 | |
| **Total Outstanding** | **515,334,478** | **$ 378,000,000** | | **$ 431,000,000** | |


HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

US v. Elizabeth Holmes | | | | | | | | **Exhibit A.4**
Valuation of Theranos, Inc. | | | | | | | | Value Summary 12/31/14
As of December 31, 2014 | | | | | | | | *(thousands of USD, except Per Share Value)*

**Equity Value**

| Valuation Methods | Ref. | Low | Indicated Value Range | High |
|---|---|---|---|---|
| Adjusted Net Asset Value Method | Exhibit H.1 | $ 827,000 | — | |
| Discounted Cash Flow Method | Exhibit F.6 | | | $ 951,000 |

**Per Share Value**

| Share Classes | Shares Outstanding | Adj. Net Asset Value Method Value Allocation | | Discounted Cash Flow Method Value Allocation | |
|---|---|---|---|---|---|
| | | Present Value Marketable | Present Value Per Share Marketable | Present Value Marketable | Present Value Per Share Marketable |
| **Preferred Shares** | | | | | |
| Series A @ $0.150 | 46,320,045 | $ 32,977,000 | $ 0.71 | $ 41,348,789 | $ 0.89 |
| Series B @ $0.1846 | 54,134,965 | 39,131,429 | 0.72 | 49,002,864 | 0.91 |
| Series C @ $0.564 | 58,896,105 | 58,956,625 | 1.00 | 70,461,233 | 1.20 |
| Series C-1 @ $3.00 | 25,175,001 | 61,774,321 | 2.45 | 69,038,049 | 2.74 |
| Series C-1 @ $15.00 | 7,500,032 | 72,077,495 | 9.61 | 77,684,547 | 10.36 |
| Series C-2 @ $17.00 | 32,808,227 | 354,428,619 | 10.80 | 381,466,406 | 11.63 |
| Total Preferred Shares | 224,834,375 | 619,345,489 | | 689,001,888 | |
| **Warrants on Common** | | | | | |
| Exercise Price @ $0.072 | 741,665 | 466,518 | 0.63 | 591,355 | 0.80 |
| Common - Outstanding | 302,965,725 | 201,372,919 | 0.66 | 254,016,501 | 0.84 |
| **Options on Common** | | | | | |
| Exercise Price @ $0.015 | 350,000 | 231,008 | 0.66 | 291,581 | 0.83 |
| Exercise Price @ $0.030 | 1,170,875 | 765,136 | 0.65 | 966,622 | 0.83 |
| Exercise Price @ $0.066 | 547,500 | 349,798 | 0.64 | 442,794 | 0.81 |
| Exercise Price @ $0.072 | 2,579,175 | 1,622,338 | 0.63 | 2,056,464 | 0.80 |
| Exercise Price @ $0.094 | 312,500 | 191,946 | 0.61 | 243,815 | 0.78 |
| Exercise Price @ $0.170 | 3,972,457 | 2,317,274 | 0.58 | 2,956,570 | 0.74 |
| Exercise Price @ $0.206 | 606,365 | 337,573 | 0.56 | 432,410 | 0.71 |
| Total Options Outstanding | 9,538,872 | 5,815,073 | | 7,390,256 | |
| **Total Outstanding** | **538,080,637** | **$ 827,000,000** | | **$ 951,000,000** | |



| US v. Elizabeth Holmes | | | | | | | Exhibit A.5 |
|---|---|---|---|---|---|---|---|
| Valuation of Theranos, Inc. | | | | | | | Value Summary 10/15/15 |
| As of October 15, 2015 | | | | | | | *(thousands of USD, except Per Share Value)* |

**Equity Value**

| | | Indicated Value Range | | | | |
|---|---|---|---|---|---|---|
| **Valuation Methods** | **Ref.** | **Low** | | **--** | | **High** |
| Adjusted Net Asset Value Method | Exhibit K.1 | $ | 1,051,000 | | | |
| Discounted Cash Flow Method | Exhibit I.6 | | | | $ | 1,184,000 |

**Per Share Value**

| | | Adj. Net Asset Value Method Value Allocation | | | Discounted Cash Flow Method Value Allocation | |
|---|---|---|---|---|---|---|
| **Share Classes** | **Shares Outstanding** | **Present Value Marketable** | **Present Value Per Share Marketable** | **Present Value Marketable** | **Present Value Per Share Marketable** |
| Preferred Shares | | | | | | |
| Series A @ $0.150 | 46,320,045 | $ 42,593,795 | $ 0.92 | $ 51,570,875 | $ 1.11 |
| Series B @ $0.1846 | 54,162,965 | 50,438,016 | 0.93 | 61,011,415 | 1.13 |
| Series C @ $0.564 | 58,896,105 | 71,702,077 | 1.22 | 83,840,633 | 1.42 |
| Series C-1 @ $3.00 | 21,947,001 | 59,748,688 | 2.72 | 66,016,108 | 3.01 |
| Series C-1 @ $15.00 | 6,563,232 | 66,525,417 | 10.14 | 70,969,027 | 10.81 |
| Series C-2 @ $17.00 | 42,947,639 | 488,387,110 | 11.37 | 520,266,801 | 12.11 |
| Total Preferred Shares | 230,836,987 | 779,395,102 | | 853,674,858 | |
| | | | | | |
| Warrants on Common | | | | | |
| Exercise Price @ $0.072 | 741,665 | 615,782 | 0.83 | 751,426 | 1.01 |
| | | | | | |
| Common - Outstanding | 302,965,725 | 263,274,450 | 0.87 | 320,141,665 | 1.06 |
| | | | | | |
| Options on Common | | | | | |
| Exercise Price @ $0.015 | 350,000 | 302,400 | 0.86 | 367,883 | 1.05 |
| Exercise Price @ $0.030 | 1,170,875 | 1,003,355 | 0.86 | 1,221,403 | 1.04 |
| Exercise Price @ $0.066 | 547,500 | 460,518 | 0.84 | 561,402 | 1.03 |
| Exercise Price @ $0.072 | 2,579,175 | 2,141,411 | 0.83 | 2,613,120 | 1.01 |
| Exercise Price @ $0.094 | 312,500 | 254,377 | 0.81 | 310,879 | 0.99 |
| Exercise Price @ $0.170 | 3,972,457 | 3,097,888 | 0.78 | 3,798,228 | 0.96 |
| Exercise Price @ $0.206 | 606,365 | 454,717 | 0.75 | 559,136 | 0.92 |
| Total Options Outstanding | 9,538,872 | 7,714,666 | | 9,432,051 | |
| | | | | | |
| **Total Outstanding** | **544,083,249** | **$ 1,051,000,000** | | **$ 1,184,000,000** | |



**US v. Elizabeth Holmes**    **Exhibit B.1**
Valuation of Theranos, Inc.   Historical Balance Sheets
As of February 7, 2014   *(thousands of USD)*

| | As of 12-31-07 | As of 12-31-08 | As of 12-31-09 | As of 12-31-10 | As of 12-31-11 | As of 12-31-12 | As of 12-31-13 | As of 12-31-14 | As of 12-31-15 |
|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | |
| Current Assets | | | | | | | | | |
| Current Operating Assets | | | | | | | | | |
| Cash & Equivalents | $ 14,509 | $ 1,884 | $ 3,690 | $ 36,718 | $ 88,056 | $ 51,785 | $ 30,966 | $ 465,933 | $ 424,278 |
| Accounts Receivable | - | 215 | 29 | 55 | - | - | - | - | - |
| Inventory | - | - | 581 | - | - | 1,733 | 3,777 | 2,383 | 13,331 |
| Other Current Assets | 412 | 250 | 195 | 827 | 665 | 1,882 | 1,780 | 12,788 | 5,114 |
| Total Current Operating Assets | 14,921 | 2,349 | 4,495 | 37,600 | 88,721 | 55,401 | 36,523 | 481,104 | 442,723 |
| Total Current Non-Operating Assets | - | - | - | - | - | - | - | - | - |
| Total Current Assets | 14,921 | 2,349 | 4,495 | 37,600 | 88,721 | 55,401 | 36,523 | 481,104 | 442,723 |
| Total Fixed Assets - Net | 1,795 | 2,211 | 1,766 | 2,630 | 4,648 | 19,557 | 22,021 | 53,366 | 64,803 |
| **Non Current Assets** | | | | | | | | | |
| Total Intangible Assets - Net | - | - | - | - | - | - | - | - | - |
| Total Long Term Receivables | - | - | - | - | - | - | - | 27,045 | 27,513 |
| Total Other Non-Current Assets | - | - | - | - | - | - | - | - | - |
| Total Non Current Assets | - | - | - | - | - | - | - | 27,045 | 27,513 |
| **Total Assets** | $ 16,716 | $ 4,560 | $ 6,260 | $ 40,230 | $ 93,369 | $ 74,958 | $ 58,543 | $ 561,515 | $ 535,039 |
| **Liabilities and Equity:** | | | | | | | | | |
| Liabilities | | | | | | | | | |
| Current Liabilities | | | | | | | | | |
| Current Operating Liabilities | | | | | | | | | |
| Accounts Payable | $ 1,683 | $ 549 | $ 560 | $ 440 | $ 1,238 | $ 7,669 | $ 7,430 | $ 16,633 | $ 18,692 |
| Deferred Revenue | 500 | 244 | 1,663 | 257 | 7 | 7 | 7 | - | - |
| Other Current Liabilities | 1,821 | 1,306 | 950 | 1,298 | 2,845 | 7,714 | 50,017 | 400,359 | 19,175 |
| Total Current Operating Liabilities | 4,004 | 2,099 | 3,173 | 1,995 | 4,090 | 15,390 | 57,454 | 416,992 | 37,867 |
| Total Current Debt Obligations | - | - | 8,061 | - | - | - | - | - | - |
| Total Current Liabilities | 4,004 | 2,099 | 11,234 | 1,995 | 4,090 | 15,390 | 57,454 | 416,992 | 37,867 |
| **Non Current Liabilities** | | | | | | | | | |
| Long Term Debt | | | | | | | | | |
| Note Payable 1 | - | - | - | - | - | - | - | - | - |
| Note Payable 2 | - | - | - | - | - | 40,173 | 40,489 | 40,805 | 41,121 |
| Noncurrent capital lease | 3 | - | - | 42 | 101 | 231 | 1,897 | - | - |
| Total Long Term Debt | 3 | - | - | 42 | 101 | 40,404 | 42,386 | 40,805 | 41,121 |
| Other Non Current Liabilities | | | | | | | | | |
| Deferred Rent | - | 643 | 723 | 759 | 767 | 1,572 | 1,857 | - | - |
| Deferred Revenue, LT | - | - | 2,146 | 3,808 | 3,801 | 3,801 | 3,801 | - | - |
| Customer Deposits | - | - | - | - | 73,500 | 69,500 | 80,000 | 143,846 | 136,346 |
| Other Non-current liabilities | 29 | 73 | 807 | 1,847 | 5,959 | 3,425 | 1,866 | 33,750 | 34,508 |
| Total Other Non Current Liabilities | 29 | 716 | 3,676 | 6,414 | 84,027 | 78,297 | 87,525 | 177,596 | 170,854 |
| Total Non Current Liabilities | 32 | 716 | 3,676 | 6,456 | 84,128 | 118,702 | 129,911 | 218,401 | 211,975 |
| **Total Liabilities** | 4,036 | 2,815 | 14,910 | 8,451 | 88,218 | 134,092 | 187,365 | 635,393 | 249,842 |
| **Total Equity** | 12,680 | 1,745 | (8,649) | 31,779 | 5,151 | (59,134) | (128,821) | (73,878) | 285,197 |
| **Total Liabilities and Equity** | $ 16,716 | $ 4,560 | $ 6,260 | $ 40,230 | $ 93,369 | $ 74,958 | $ 58,543 | $ 561,515 | $ 535,039 |



HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

US v. Elizabeth Holmes                                                                          Exhibit B.2
Valuation of Theranos, Inc.                                                   Historical Income Statements
As of February 7, 2014                                                                   (thousands of USD)

| | FYE 12-31-07 | FYE 12-31-08 | FYE 12-31-09 | FYE 12-31-10 | FYE 12-31-11 | FYE 12-31-12 | FYE 12-31-13 | FYE 12-31-14 | FYE 12-31-15 |
|---|---|---|---|---|---|---|---|---|---|
| Total Revenue | $ - | $ 1,799 | $ 2,794 | $ 1,401 | $ 518 | $ - | $ - | $ 116 | $ 391 |
| Total Cost of Sales | - | - | - | - | - | - | - | - | - |
| Gross Profit | - | 1,799 | 2,794 | 1,401 | 518 | - | - | 116 | 391 |
| Total Operating Expenses | 16,728 | 12,615 | 13,597 | 16,801 | 27,173 | 64,015 | 85,605 | 122,756 | 173,246 |
| EBITDA | (16,728) | (10,816) | (10,804) | (15,399) | (26,655) | (64,015) | (85,605) | (122,640) | (172,855) |
| Depreciation & Amortization | | | | | | | | | |
| Depreciation | 672 | 740 | 626 | 771 | 1,025 | 2,654 | 5,573 | 7,247 | 10,162 |
| Amortization | - | - | - | - | - | - | - | - | - |
| Total Depreciation & Amortization | 672 | 740 | 626 | 771 | 1,025 | 2,654 | 5,573 | 7,247 | 10,162 |
| EBIT | (17,400) | (11,556) | (11,430) | (16,170) | (27,680) | (66,670) | (91,178) | (129,888) | (183,017) |
| Gain/(Loss) on Sale of Fixed Asse | - | - | - | - | - | (9) | (849) | (1) | - |
| Total Misc Inc/(Exp) | 1,132 | 264 | 8 | 42 | 146 | 27 | (807) | 528 | 1,984 |
| Interest Expense | 3 | 1 | 46 | 88 | 3 | 196 | 383 | 474 | 537 |
| Pre-Tax Income | (16,271) | (11,294) | (11,467) | (16,216) | (27,536) | (66,838) | (92,368) | (129,834) | (181,570) |
| Less: Income Taxes/(Benefit) | - | - | - | - | - | - | - | - | - |
| Net Income/(Loss) | $ (16,271) | $ (11,294) | $ (11,467) | $ (16,216) | $ (27,536) | $ (66,838) | $ (92,368) | $ (129,834) | $ (181,570) |


HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

**US v. Elizabeth Holmes**                                                                                          **Exhibit B.3**
Valuation of Theranos, Inc.                                                       Adjustments to Financial Statements
As of February 7, 2014                                                                        *(thousands of USD)*

| | FYE 12-31-09 | FYE 12-31-10 | FYE 12-31-11 | FYE 12-31-12 | FYE 12-31-13 | FYE 12-31-14 | FYE 12-31-15 |
|---|---|---|---|---|---|---|---|
| **Balance Sheet Adjustments:** | | | | | | | |
| Cash & Equivalents | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Miscellaneous Receipts Liability | - | - | - | - | 45,187 | 390,375 | - |
| Other | - | - | - | - | - | - | - |
| **Total Balance Sheet Adjustments** | $ - | $ - | $ - | $ - | $ 45,187 | $ 390,375 | $ - |
| | | | | | | | |
| **Income Statement Adjustments:** | | | | | | | |
| | | | | | | | |
| Revenue | | | | | | | |
| Revenue 1 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Revenue 2 | - | - | - | - | - | - | - |
| Revenue 3 | - | - | - | - | - | - | - |
| Total Revenue | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | |
| Total Cost of Sales | - | - | - | - | - | - | - |
| | | | | | | | |
| Gross Profit | - | - | - | - | - | - | - |
| | | | | | | | |
| Total Operating Expenses | - | - | - | - | - | - | - |
| | | | | | | | |
| Total Officers' Compensation | - | - | - | - | - | - | - |
| | | | | | | | |
| **EBITDA** | - | - | - | - | - | - | - |
| | | | | | | | |
| Total Depreciation & Amortization | - | - | - | - | - | - | - |
| | | | | | | | |
| **EBIT** | - | - | - | - | - | - | - |
| | | | | | | | |
| Miscellaneous Income/(Expense) | | | | | | | |
| Interest Income | (8) | (42) | (146) | (37) | (42) | (529) | (1,984) |
| Gain/(Loss) on Sale of Fixed Assets | - | - | - | 9 | 849 | 1 | - |
| Other Income/(Expense) | - | - | - | - | - | - | - |
| Total Misc Inc/(Exp) | (8) | (42) | (146) | (27) | 807 | (528) | (1,984) |
| | | | | | | | |
| Interest Expense | - | - | - | - | - | - | - |
| | | | | | | | |
| Pre-Tax Income | (8) | (42) | (146) | (27) | 807 | (528) | (1,984) |
| Less: Income Taxes/(Benefit) | - | - | - | - | - | - | - |
| | | | | | | | |
| **Total Income Statement Adjustments** | $ (8) | $ (42) | $ (146) | $ (27) | $ 807 | $ (528) | $ (1,984) |



**US v. Elizabeth Holmes**  
Valuation of Theranos, Inc.  
As of February 7, 2014

Exhibit B.4  
Adjusted Balance Sheets  
*(thousands of USD)*

| | Subject Company - Adjusted | | | | | | | Subject Company Common Size | | | | | Benchmark Common Size | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | As of 12-31-09 | As of 12-31-10 | As of 12-31-11 | As of 12-31-12 | As of 12-31-13 | As of 12-31-14 | As of 12-31-15 | As of 12-31-11 | As of 12-31-12 | As of 12-31-13 | As of 12-31-14 | As of 12-31-15 | Comp. [1] LTM | RMA [2] 2016-16 | BizMiner [3] 2017 |
| **Assets** | | | | | | | | | | | | | | | |
| Current Assets | | | | | | | | | | | | | | | |
| Current Operating Assets | | | | | | | | | | | | | | | |
| Cash & Equivalents | $ 3,690 | $ 36,718 | $ 88,056 | $ 51,785 | $ 30,966 | $ 465,933 | $ 424,278 | 94.3% | 69.1% | 52.9% | 83.0% | 79.3% | 16.3% | 24.7% | 15.9% |
| Accounts Receivable | 29 | 55 | - | - | - | - | - | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 10.1% | 12.2% | 12.0% |
| Inventory | 581 | - | 1,733 | 3,777 | 2,383 | 13,331 | 0.0% | 2.3% | 6.5% | 0.4% | 2.5% | 5.1% | 1.1% | 3.0% | |
| Other Current Assets | 195 | 827 | 665 | 1,882 | 1,780 | 12,788 | 5,114 | 0.7% | 2.5% | 3.0% | 2.3% | 1.0% | 2.1% | 7.5% | 12.4% |
| Total Current Operating Assets | 4,495 | 37,600 | 88,721 | 55,401 | 36,523 | 481,104 | 442,723 | 95.0% | 73.9% | 62.4% | 85.7% | 82.7% | 33.6% | 45.5% | 43.2% |
| Total Current Non-Operating Assets | | | | | | | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | NA | NA | NA |
| Total Current Assets | 4,495 | 37,600 | 88,721 | 55,401 | 36,523 | 481,104 | 442,723 | 95.0% | 73.9% | 62.4% | 85.7% | 82.7% | 33.6% | 45.5% | 43.2% |
| Total Fixed Assets - Net | 1,766 | 2,630 | 4,648 | 19,557 | 22,021 | 53,366 | 64,803 | 5.0% | 26.1% | 37.6% | 9.5% | 12.1% | 8.3% | 25.0% | 21.9% |
| Non Current Assets | | | | | | | | | | | | | | | |
| Total Intangible Assets - Net | - | - | - | - | - | - | - | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 31.8% | 9.9% | NA |
| Total Long Term Receivables | - | - | - | - | - | 27,045 | 27,513 | 0.0% | 0.0% | 0.0% | 4.8% | 5.1% | NA | NA | NA |
| Total Other Non-Current Assets | - | - | - | - | - | - | - | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 26.2% | 19.6% | 34.9% |
| Total Non Current Assets | - | - | - | - | - | 27,045 | 27,513 | 0.0% | 0.0% | 0.0% | 4.8% | 5.1% | 58.1% | 29.5% | 34.9% |
| **Total Assets** | $ 6,260 | $ 40,230 | $ 93,369 | $ 74,968 | $ 58,543 | $ 561,515 | $ 535,039 | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| **Liabilities and Equity:** | | | | | | | | | | | | | | | |
| Liabilities | | | | | | | | | | | | | | | |
| Current Liabilities | | | | | | | | | | | | | | | |
| Current Operating Liabilities | | | | | | | | | | | | | | | |
| Accounts Payable | $ 560 | $ 440 | $ 1,238 | $ 7,669 | $ 7,430 | $ 16,633 | $ 18,692 | 1.3% | 10.2% | 12.7% | 3.0% | 3.5% | 3.0% | 10.2% | 5.4% |
| Deferred Revenue | 1,663 | 257 | 7 | 7 | 7 | - | - | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.4% | NA | NA |
| Other Current Liabilities | 950 | 1,298 | 2,845 | 7,714 | 4,830 | 9,984 | 19,175 | 3.0% | 10.3% | 8.3% | 1.8% | 3.6% | 5.8% | 10.5% | 18.0% |
| Total Current Operating Liabilities | 3,173 | 1,995 | 4,090 | 15,390 | 12,267 | 26,617 | 37,867 | 4.4% | 20.5% | 21.0% | 4.7% | 7.1% | 9.3% | 20.7% | 23.4% |
| Total Current Debt Obligations | 8,061 | - | - | - | - | - | - | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 2.0% | 4.2% |
| Total Current Liabilities | 11,234 | 1,995 | 4,090 | 15,390 | 12,267 | 26,617 | 37,867 | 4.4% | 20.5% | 21.0% | 4.7% | 7.1% | 9.4% | 22.7% | 27.6% |
| Non Current Liabilities | | | | | | | | | | | | | | | |
| Total Long Term Debt | - | 42 | 101 | 40,404 | 42,386 | 40,605 | 41,121 | 0.1% | 53.9% | 72.4% | 7.3% | 7.7% | 0.6% | 11.3% | 26.2% |
| Other Non Current Liabilities: | | | | | | | | | | | | | | | |
| Deferred Rent | 723 | 759 | 767 | 1,572 | 1,857 | - | - | 0.8% | 2.1% | 3.2% | 0.0% | 0.0% | NA | NA | NA |
| Deferred Revenue, LT | 2,146 | 3,808 | 3,801 | 3,801 | 3,801 | - | - | 4.1% | 5.1% | 6.5% | 0.0% | 0.0% | NA | NA | NA |
| Customer Deposits | - | - | 73,500 | 69,500 | 80,000 | 143,846 | 136,346 | 78.7% | 92.7% | 136.7% | 25.6% | 25.5% | NA | NA | NA |
| Other Non-current liabilities | 807 | 1,847 | 5,959 | 3,425 | 1,866 | 33,750 | 34,508 | 6.4% | 4.6% | 3.2% | 6.0% | 6.4% | 17.5% | 3.4% | NA |
| Total Other Non Current Liabilities | 3,676 | 6,414 | 84,027 | 78,297 | 87,525 | 177,596 | 170,854 | 90.0% | 104.5% | 149.5% | 31.6% | 31.9% | 17.5% | 3.4% | NA |
| Total Non Current Liabilities | 3,676 | 6,455 | 84,128 | 118,702 | 129,911 | 218,401 | 211,975 | 90.1% | 158.4% | 221.9% | 38.9% | 39.6% | 18.1% | 14.7% | 26.2% |
| **Total Liabilities** | 14,910 | 8,451 | 88,218 | 134,092 | 142,178 | 245,018 | 249,842 | 94.5% | 178.9% | 242.9% | 43.6% | 46.7% | 27.5% | 37.4% | 53.8% |
| **Total Equity** | (8,649) | 31,779 | 5,151 | (59,134) | (83,634) | 316,497 | 285,197 | 5.5% | -78.9% | -142.9% | 56.4% | 53.3% | 72.5% | 62.7% | 46.2% |
| **Total Liabilities and Equity** | $ 6,260 | $ 40,230 | $ 93,369 | $ 74,968 | $ 58,543 | $ 561,515 | $ 535,039 | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.2% | 100.0% |

**Notes:**  
[1] Source: Refer to report for selection of public comparables group. Figures represent median of dataset as reported by S&P CapitalIQ.  
[2] Source: The Risk Management Association; NAICS 54171N. Research and Development in the Physical, Engineering, and Life Sciences (non-Cost of Sales) for firms with annual revenues greater than $25MM  
[3] Source: BizMiner Industry Financial Analysis Profile; NAICS 5417: Scientific Research & Development Services for firms with annual revenues between $100MM - $250MM


HEMMING | MORSE  
FORENSIC & FINANCIAL CONSULTANTS

US v. Elizabeth Holmes — Exhibit B.5
Valuation of Theranos, Inc.
As of February 7, 2014

Adjusted Income Statements
(thousands of USD)

| | Subject Company - Adjusted | | | | | | | Subject Company Common Size | | | | | Benchmark Common Size | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FYE 12-31-09 | FYE 12-31-10 | FYE 12-31-11 | FYE 12-31-12 | FYE 12-31-13 | FYE 12-31-14 | FYE 12-31-15 | FYE 12-31-11 | FYE 12-31-12 | FYE 12-31-13 | FYE 12-31-14 | FYE 12-31-15 | Comp. [1] LTM | RMA [2] 2015-16 | BizMiner [3] 2017 |
| Total Revenue | 2,794 | 1,401 | 518 | - | - | 116 | 391 | 100.0% | 0.0% | 0.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Total Cost of Sales | - | - | - | - | - | - | - | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 50.7% | 0.0% | 28.6% |
| Gross Profit | 2,794 | 1,401 | 518 | - | - | 116 | 391 | 100.0% | 0.0% | 0.0% | 100.0% | 100.0% | 49.3% | 100.0% | 71.4% |
| Operating Expenses | | | | | | | | | | | | | | | |
| Research & Development | 10,257 | 13,594 | 22,018 | 52,890 | 66,757 | 73,459 | 97,159 | 4248.5% | 0.0% | 0.0% | 63326.4% | 24848.9% | NA | NA | NA |
| General and Administrative | 3,341 | 3,206 | 5,155 | 11,125 | 18,848 | 49,288 | 76,087 | 994.8% | 0.0% | 0.0% | 42498.1% | 19459.6% | NA | NA | NA |
| Total Operating Expenses | 13,597 | 16,801 | 27,173 | 64,015 | 85,605 | 122,756 | 173,246 | 5243.3% | 0.0% | 0.0% | 105824.5% | 44308.5% | 33.7% | 84.4% | 57.8% |
| Total Officers' Compensation | - | - | - | - | - | - | - | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | NA | 6.8% | 2.4% |
| EBITDA | (10,804) | (15,399) | (26,655) | (64,015) | (85,605) | (122,640) | (172,855) | -5143.3% | 0.0% | 0.0% | -105724.5% | -44208.5% | 16.6% | 8.8% | 11.2% |
| Depreciation & Amortization | | | | | | | | | | | | | | | |
| Depreciation | 626 | 771 | 1,025 | 2,654 | 5,573 | 7,247 | 10,162 | 197.7% | 0.0% | 0.0% | 6247.6% | 2598.9% | NA | NA | NA |
| Amortization | - | - | - | - | - | - | - | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | NA | NA | NA |
| Total Depreciation & Amortization | 626 | 771 | 1,025 | 2,654 | 5,573 | 7,247 | 10,162 | 197.7% | 0.0% | 0.0% | 6247.6% | 2598.9% | 11.5% | 2.4% | 4.2% |
| EBIT | (11,430) | (16,170) | (27,680) | (66,670) | (91,178) | (129,888) | (183,017) | -5341.0% | 0.0% | 0.0% | -111972.1% | -46807.4% | 4.2% | 8.8% | 7.1% |
| Gain/(Loss) on Sale of Fixed Assets | - | - | - | - | - | - | - | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | NA | NA | NA |
| Total Miscellaneous Income/(Expense) | - | - | - | - | - | - | - | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | -2.1% | 0.8% | 0.0% |
| Interest Expense | 46 | 88 | 3 | 196 | 383 | 474 | 537 | 0.5% | 0.0% | 0.0% | 408.5% | 137.3% | 1.2% | NA | 2.9% |
| Pre-Tax Income | (11,476) | (16,258) | (27,682) | (66,865) | (91,561) | (130,362) | (183,554) | -5341.5% | 0.0% | 0.0% | -112380.7% | -46944.8% | 0.8% | 9.6% | 4.2% |
| Less: Income Taxes/(Benefit) | - | - | - | - | - | - | - | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | -4.4% | NA | 2.6% |
| Net Income/(Loss) | $ (11,476) | $ (16,258) | $ (27,682) | $ (66,865) | $ (91,561) | $ (130,362) | $ (183,554) | -5341.5% | 0.0% | 0.0% | -112380.7% | -46944.8% | 5.2% | 9.6% | 1.6% |

| Growth Analysis: | | | | Revenue Growth | | | | | EBITDA Margin Growth | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Subject - 1 year | | n/a | -63.0% | -100.0% | NA | NA | 237.1% | 362.9% | -100.0% | #DIV/0! | #DIV/0! | -58.2% |
| Guidline Public Company Group [4] - 1 year | | | 8.4% | 6.5% | 10.6% | 3.7% | 4.2% | 11.3% | 5.6% | -3.5% | -2.3% | 5.5% |
| Industry [5] - 1 year [Nominal Growth Rate] | | n/a | 9.7% | 3.2% | -1.6% | 0.0% | 1.1% | NA | NA | NA | NA | NA |
| Subject - 3 year | | | | -100.0% | -100.0% | -39.3% | NA | | -100.0% | -100.0% | 173.9% | NA |
| Guideline Public Company Group - 3 year | | | | 5.5% | 7.2% | 4.9% | 9.2% | | 4.7% | 8.7% | 2.6% | -0.9% |
| Industry [5] - 3 year [Nominal Growth Rate] | | | | NA | 3.7% | 0.5% | -0.2% | | NA | NA | NA | NA |

**Notes:**
[1] Source: Refer to report for selection of public comparables group. Figures represent median of dataset as reported by S&P CapitalIQ.
[2] Source: The Risk Management Association; NAICS 54171N: Research and Development in the Physical, Engineering, and Life Sciences (non-Cost of Sales) for firms with annual revenues greater than $25MM.
[3] Source: BizMiner Industry Financial Analysis Profile; NAICS 5417: Scientific Research & Development Services for firms with annual revenues between $100MM - $250MM.
[4] Figures represent median of dataset as reported by S&P CapitalIQ.
[5] Source: IBISWorld. NAICS 54171 (real growth) plus inflation from https://www.usinflationcalculator.com/inflation/current-inflation-rates/.


HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

**US v. Elizabeth Holmes**                                                                                          **Exhibit B.6**
Valuation of Theranos, Inc.                                                                          Comparative Financial Ratios
As of February 7, 2014

|  | Subject Company | | | | | | Benchmark | | |
|---|---|---|---|---|---|---|---|---|---|
|  | FYE 12-31-10 | FYE 12-31-11 | FYE 12-31-12 | FYE 12-31-13 | FYE 12-31-14 | FYE 12-31-15 | Comp. [1] LTM | RMA [2] 2015-16 | BizMiner [3] 2017 |
| **Liquidity Ratios** | | | | | | | | | |
| Current Ratio | 18.8 | 21.7 | 3.6 | 3.0 | 18.1 | 11.7 | 3.5 | 2.2 | 1.6 |
| Quick (Acid-Test) Ratio | 18.4 | 21.5 | 3.4 | 2.5 | 17.5 | 11.2 | 2.2 | 1.5 | 1.0 |
| Working Capital as a % of Revenue | 2083.1% | 116.6% | N/A | N/A | 262013.8% | 66883.6% | 48.7% | 36.1% | 22.8% |
| Days' Receivables | 10.8 | 19.3 | NA | NA | NA | NA | 57.8 | 37.2 | 63.3 |
| Days' Inventory | NA | NA | NA | NA | NA | NA | 103.6 | N/A | 55.7 |
| Days' Payables | NA | NA | NA | NA | NA | NA | 42.3 | N/A | 100.3 |
| **Coverage Ratios** | | | | | | | | | |
| Times Interest Earned | (183.9) | (10,229.0) | (340.4) | (238.4) | (274.0) | (340.8) | 5.3 | 20.4 | 3.9 |
| NI+Non-Cash Expenditures / Current L.T. Debt | NA | NA | NA | NA | NA | NA | NA | | 1.51 |
| **Leverage Ratios** | | | | | | | | | |
| Fixed Assets/Tangible Worth | 0.1 | 0.9 | -0.3 | -0.3 | 0.2 | 0.2 | 0.2 | 0.3 | 0.5 |
| Debt-to-Equity | 0.0 | 0.0 | -0.7 | -0.5 | 0.1 | 0.1 | 0.1 | 0.2 | 0.7 |
| **Operating Ratios** | | | | | | | | | |
| EBT/Tangible Worth | -51.2% | -537.4% | 113.1% | 109.5% | -41.2% | -64.4% | NA | 7.7% | 11.4% |
| EBT/Total Assets | -40.4% | -29.6% | -89.2% | -156.4% | -23.2% | -34.3% | NA | 4.9% | 5.3% |
| Fixed Asset Turnover | 0.5 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 7.5 | 10.3 | 3.1 |
| Total Asset Turnover | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.6 | 0.7 | 0.7 |
| Total Officers' Compensation | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | NA | 6.8% | 2.4% |

**Notes:**
[1] Source: Refer to report for selection of public comparables group. Figures represent median of dataset as reported by S&P CapitalIQ.
[2] Source: The Risk Management Association; NAICS 54171N: Research and Development in the Physical, Engineering, and Life Sciences (non-Cost of Sales) for firms with annual revenues greater than $25MM.
[3] Source: BizMiner Industry Financial Analysis Profile; NAICS 5417: Scientific Research & Development Services for firms with annual revenues between $100MM - $250MM.


HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

US v. Elizabeth Holmes                                                                                          Exhibit C.1
Valuation of Theranos, Inc.                                                        Discounted Cash Flow Key Assumptions
As of February 7, 2014                                                                                  *(thousands of USD)*

| | Basis | For the Twelve Month Period Ending December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2014 | 2015 | 2016 | 2017 | 2018 |
| Total Revenue | Annual Growth Rate | N/A | 75534.7% | 97.0% | 44.8% | 55.6% |
| Terminal Value | Exit Multiple, Ex. D.1 | | | | | 4.0% |
| Total Cost of Revenue | % of Revenue | 35.3% | 35.0% | 32.0% | 32.0% | 30.0% |
| Total Operating Expenses | % of Revenue | 66687.3% | 85.5% | 44.7% | 33.7% | 24.7% |
| Depreciation & Amortization | Exhibit C.3 | 3041.6% | 6.8% | 5.8% | 6.3% | 5.7% |
| Interest Expense | N/A | N/A | N/A | N/A | N/A | N/A |
| Income Taxes | % of Pre-Tax Net Income | 40.0% | 40.0% | 40.0% | 40.0% | 40.0% |
| Adjusted Operating Working Capital | Exhibit C.2 | -19704.4% | 4.0% | 10.5% | 14.8% | 18.6% |
| Adjusted Operating Working Capital | | (29,557) | 4,593 | 23,523 | 47,806 | 93,778 |
| Yr/yr Working Capital (Increase)/Reduction | | (33,712) | (34,150) | (18,930) | (24,283) | (45,972) |
| Capital Expenditures | % of Revenue | 5502.0% | 29.2% | 20.6% | 20.3% | 11.8% |
| Interest-Bearing Debt | own Sch, If Used Enter # on Ex. List | | | | | |



**US v. Elizabeth Holmes**  
Valuation of Theranos, Inc.  
As of February 7, 2014

Exhibit C.2  
Adjusted Working Capital Analysis  
*(thousands of USD)*

| | | FYE 12-31-09 | FYE 12-31-10 | FYE 12-31-11 | FYE 12-31-12 | FYE 12-31-13 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | For the Twelve Month Period Ending December 31, | | | |
| **Working Capital** | | | | | | | | | | | |
| Total Revenue | [1] $ | 2,794 | $ 1,401 | $ 518 | $ - | $ - | $ 150 | $ 113,452 | $ 223,452 | $ 323,452 | $ 503,452 |
| Total COS | | - | - | - | - | - | 53 | 39,708 | 71,505 | 103,505 | 151,036 |
| Total Operating Expenses | | 13,597 | 16,801 | 27,173 | 64,015 | 85,605 | 100,031 | 97,025 | 99,961 | 108,977 | 124,401 |
| | | | | | | | | | | | |
| **Operating Assets** | | | | | | | | | | | |
| Cash & Equivalents | [2] $ | 3,690 | $ 36,718 | $ 88,056 | $ 51,785 | $ 30,966 | $ 49,330 | $ 47,846 | $ 49,296 | $ 53,742 | $ 61,348 |
| Accounts Receivable | | 29 | 55 | - | - | - | - | - | - | - | - |
| Inventory | | 581 | - | - | 1,733 | 3,777 | 8,874 | 3,404 | 6,704 | 9,704 | 15,104 |
| Other Current Assets | | 195 | 827 | 665 | 1,882 | 1,780 | 18,362 | 4,838 | 5,080 | 5,334 | 5,601 |
| Note Receivable | | - | - | - | - | - | 27,236 | 57,539 | 50,055 | 42,303 | 58,453 |
| Total Operating Assets | | 4,495 | 37,600 | 88,721 | 55,401 | 36,523 | 103,802 | 113,629 | 111,135 | 111,083 | 140,506 |
| | | | | | | | | | | | |
| **Operating Liabilities** | | | | | | | | | | | |
| Accounts Payable | | 560 | 440 | 1,238 | 7,669 | 7,430 | 8,340 | 13,879 | 16,480 | 16,174 | 22,774 |
| Deferred Revenue | | 1,663 | 257 | 7 | 7 | 7 | - | - | - | - | - |
| Other Current Liabilities | | 950 | 1,298 | 2,845 | 7,714 | 4,830 | 12,239 | 7,073 | 8,265 | 9,453 | 11,521 |
| Deferred Rent | | 723 | 759 | 767 | 1,572 | 1,857 | - | - | - | - | - |
| Deferred Revenue, LT | | 2,146 | 3,808 | 3,801 | 3,801 | 3,801 | - | - | - | - | - |
| Customer Deposits | | - | - | 73,500 | 69,500 | 80,000 | 93,808 | 70,356 | 46,904 | 23,452 | - |
| Other Non-current liabilities | | 807 | 1,847 | 5,959 | 3,425 | 1,866 | 18,972 | 17,728 | 15,963 | 14,198 | 12,433 |
| Total Operating Liabilities | | 6,849 | 8,409 | 88,117 | 93,687 | 99,791 | 133,359 | 109,036 | 87,612 | 63,277 | 46,728 |
| | | | | | | | | | | | |
| Net Operating Working Capital | $ | (2,354) | $ 29,191 | $ 604 | $ (38,287) | $ (63,268) | $ (29,557) | $ 4,593 | $ 23,523 | $ 47,806 | $ 93,778 |
| Net Operating Working Capital as % of Revenue | | -84.3% | 2083.1% | 116.6% | 0.0% | 0.0% | -19704.4% | 4.0% | 10.5% | 14.8% | 18.6% |
| Yr/yr Working Capital (Increase)/Reduction | | - | (31,545) | 28,587 | 38,891 | 24,981 | (33,712) | (34,150) | (18,930) | (24,283) | (45,972) |
| | | | | | | | | | | | |
| BizMiner Working Capital as a % of Revenue | | | | | | | 22.8% | | | | |
| RMA Working Capital as a % of Revenue | | | | | | | 36.1% | | | | |
| Comparable Group Working Capital as a % of Revenue | | | | | | | 48.7% | | | | |
| | | | | | | | | | | | |
| Days' Operating Expenses in Cash | | 99 | 798 | 1,183 | 295 | 132 | 180 | 180 | 180 | 180 | 180 |
| Days' Sales Outstanding | | 4 | 14 | - | - | - | - | - | - | - | - |
| Days' Inventory | | - | - | - | - | - | 61,113 | 31 | 34 | 34 | 37 |
| Other Current Assets as a % of Revenue | | 7.0% | 59.0% | 128.4% | 0.0% | 0.0% | 12241.3% | 4.3% | 2.3% | 1.6% | 1.1% |
| Note Receivable as a % of Revenue | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 18157.3% | 50.7% | 22.4% | 13.1% | 11.6% |
| Days' Payables | | - | - | - | - | - | 57,436 | 128 | 84 | 57 | 55 |
| Deposits & Deferred Revenue as a % of Revenue | | 136.3% | 290.1% | 14917.2% | 0.0% | 0.0% | 62538.7% | 62.0% | 21.0% | 7.3% | 0.0% |
| Other Current Liabilites as a % of Opex | | 7.0% | 7.7% | 10.5% | 12.1% | 5.6% | 12.2% | 7.3% | 8.3% | 8.7% | 9.3% |
| Deferred Rent as a % of Opex | | 5.3% | 4.5% | 2.8% | 2.5% | 2.2% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Other Non-current liabilities as a % of Opex | | 5.9% | 11.0% | 21.9% | 5.4% | 2.2% | 19.0% | 18.3% | 16.0% | 13.0% | 10.0% |

**Notes:**  
[1] Historical balances are per Adjusted Income Statement. Refer to Exhibit B.5. Operating Expenses exclude Depreciation & Amortization.  
[2] Estimated operating cash levels equal to 6 months of operating expenses



| US v. Elizabeth Holmes | | | | | | Exhibit C.3 |
|---|---|---|---|---|---|---|
| Valuation of Theranos, Inc. | | | | | | Depreciation & Capital Expenditure Analysis |
| As of February 7, 2014 | | | | | | *(thousands of USD)* |

| | | | | For the Twelve Month Period Ending December 31, | | | |
|---|---|---|---|---|---|---|
| **Forecast Depreciation** | | 2014 | 2015 | 2016 | 2017 | 2018 |
| Total Revenue | $ | 150 | $ 113,452 | $ 223,452 | $ 323,452 | $ 503,452 |
| Beginning Balance - Total Fixed Assets | | 22,021 | 25,711 | 51,123 | 84,125 | 129,327 |
| Capital Expenditures | | 8,253 | 33,134 | 45,970 | 65,569 | 59,240 |
| Fixed Assets | | 30,274 | 58,845 | 97,093 | 149,694 | 188,567 |
| *Capital Expenditures as a % of Revenue* | | *5502.04%* | *29.21%* | *20.57%* | *20.27%* | *11.77%* |
| Depreciation | | | | | | |
| Assumptions as to Depreciable Lives: | | | | | | |
| Beg. Dep. Existing Fixed Assets - avg life | **5.0** | | | | | |
| Capital Additions - avg life | **7.5** | | | | | |
| Beginning Balance | $ | 4,061 | $ 4,430 | $ 4,430 | $ 4,430 | $ 4,430 |
| 2014 Additions | | 502 | 1,095 | 1,095 | 1,095 | 1,095 |
| 2015 Additions | | | 2,198 | 4,395 | 4,395 | 4,395 |
| 2016 Additions | | | | 3,049 | 6,098 | 6,098 |
| 2017 Additions | | | | | 4,349 | 8,698 |
| 2018 Additions | | | | | | 3,929 |
| Total Depreciation | $ | 4,562 | $ 7,722 | $ 12,969 | $ 20,366 | $ 28,644 |
| *As a % of Revenue* | | *3041.6%* | *6.8%* | *5.8%* | *6.3%* | *5.7%* |
| Net Fixed Assets | $ | 25,711 | $ 51,123 | $ 84,125 | $ 129,327 | $ 159,923 |
| *As a % of Revenue* | | *17140.8%* | *45.1%* | *37.6%* | *40.0%* | *31.8%* |

| **Historical Capital Expenditure Analysis** | | FYE 12-31-09 | FYE 12-31-10 | FYE 12-31-11 | FYE 12-31-12 | FYE 12-31-13 |
|---|---|---|---|---|---|---|
| Net FA | $ | 1,766 | $ 2,630 | $ 4,648 | $ 19,557 | $ 22,021 |
| Chg from PY | | N/A | 864 | 2,018 | 14,909 | 2,463 |
| Depreciation | | 626 | 771 | 1,025 | 2,654 | 5,573 |
| (Gain)/Loss | | - | - | - | 9 | 849 |
| Capital Expenditures | | N/A | 1,635 | 3,043 | 17,572 | 8,885 |

| | Average | | | | | | |
|---|---|---|---|---|---|---|---|
| Fixed Assets | $ 10,124 | $ | 1,766 | $ 2,630 | $ 4,648 | $ 19,557 | $ 22,021 |
| *Fixed Assets as a % of Revenue* | *1074.0%* | | *63.2%* | *187.7%* | *896.9%* | *N/A* | *N/A* |
| Capital Expenditures | 7,784 | | N/A | 1,635 | 3,043 | 17,572 | 8,885 |
| *Capital Expenditures as a % of Revenue* | *825.7%* | | *N/A* | *116.7%* | *587.1%* | *N/A* | *N/A* |


HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

US v. Elizabeth Holmes
Valuation of Theranos, Inc.
As of February 7, 2014

Exhibit C.4
Discount Rate - Venture Capital Rates of Return

| Company Name | Ticker Symbol | Market Capitalization | Interest Bearing Debt | Trading Volume [7] | LTM Revenue | 1-Year Growth Rate | Equity as a % of Total Capital |
|---|---|---|---|---|---|---|---|
| OraSure Technologies, Inc. | OSUR | $ 337,504 | $ - | 713 | $ 98,940 | 12.7% | 100.0% |
| Trinity Biotech plc | TRIB | 545,805 | - | 68 | 91,216 | 10.6% | 100.0% |
| Enzo Biochem, Inc. | ENZ | 138,102 | 3,992 | 209 | 92,829 | -7.3% | 97.3% |
| QuidelOrtho Corporation | QDEL | 964,525 | 9,567 | 193 | 177,325 | 13.9% | 99.4% |
| Exact Sciences Corporation | EXAS | 665,903 | 1,711 | 739 | 4,144 | 0.0% | 99.8% |
| OPKO Health, Inc. | OPK | 3,106,222 | 227,744 | 4,304 | 96,530 | 105.2% | 93.2% |
| PerkinElmer, Inc. | PKI | 4,920,548 | 934,728 | 829 | 2,157,586 | 2.5% | 84.0% |
| Quest Diagnostics Incorporated. | DGX | 7,315,200 | 3,366,000 | 2,520 | 7,146,000 | -3.2% | 68.5% |
| Laboratory Corporation of America Holdings | LH | 7,791,710 | 3,000,400 | 1,101 | 5,808,300 | 2.4% | 72.2% |
| Myriad Genetics, Inc. | MYGN | 2,351,996 | - | 2,462 | 737,115 | 35.2% | 100.0% |
| Illumina, Inc. | ILMN | 19,831,532 | 868,563 | 1,595 | 1,421,178 | 23.7% | 95.8% |
| Qiagen N.V. | QGEN | 5,280,047 | 850,202 | 892 | 1,301,984 | 3.8% | 86.1% |
| Alere Inc. | IQT2622336 | 2,819,163 | 3,841,104 | 654 | 2,608,636 | 8.9% | 42.3% |
| Luminex Corporation | IQT2627430 | 734,789 | 1,657 | 170 | 213,423 | 5.4% | 99.8% |
| Abaxis, Inc. | IQT2586525 | 824,250 | 706 | 187 | 179,781 | 0.6% | 99.9% |
| CombiMatrix Corporation | IQT36390071 | 25,342 | 233 | 75 | 5,367 | 19.0% | 99.1% |
| Affymetrix Inc. | IQT2587418 | 518,522 | 144,461 | 1,231 | 330,399 | 11.8% | 78.2% |
| Genomic Health, Inc. | IQT24111615 | 815,172 | - | 218 | 261,595 | 11.2% | 100.0% |
| Cepheid | IQT2599314 | 3,328,683 | - | 809 | 401,292 | 21.2% | 100.0% |
| Nanosphere, Inc. | IQT38720096 | 169,146 | 11,815 | 33 | 10,002 | 97.0% | 93.5% |
| GenMark Diagnostics, Inc. | IQT106626443 | 513,559 | 37 | 240 | 27,404 | 33.9% | 100.0% |
| Bio-Reference Laboratories, Inc. | IQT2594421 | 723,947 | 52,630 | 424 | 735,368 | 15.5% | 93.2% |
| **Average** | | **2,905,526** | **605,072** | **886** | **1,086,705** | **19.3%** | **91.0%** |
| **Median** | | **845,076** | **4,780** | **632** | **237,509** | **11.0%** | **98.1%** |
| **Selected** | | | | | | | **97.0%** |

**Industry Capital Structure**

| | |
|---|---|
| Equity | 97.0% |
| Interest Bearing Debt | 3.0% |
| Tax Rate | 40.0% |

**Cost of Equity**

Table 1: Venture Capital Average Actual Rates of Return for the Period ended September 30, 2008    Ref. [1]

| Stage of Development | 5-year Return | | 10-year Return | | 20-year Return | |
|---|---|---|---|---|---|---|
| | 2002 | 2008 | 2002 | 2008 | 2002 | 2008 |
| Seed/Early Stage | 51.4% | 3.0% | 34.9% | 25.5% | 20.4% | 22.1% |
| Balanced | 20.9% | 7.5% | 20.9% | 12.0% | 14.3% | 14.8% |
| Later Stage | 10.6% | 8.1% | 21.6% | 7.3% | 15.3% | 14.7% |
| All Ventures | 28.3% | 5.7% | 26.3% | 13.4% | 16.6% | 17.2% |

Table 2: Target Rates of Return    [2-5]

| Stage of Development | Plummer | Scherlis and Sahlman | Sahlman, Stevenson, and Bhide | Everett | Everett Median Returns |
|---|---|---|---|---|---|
| Start-up | 50% - 70% | 50% - 70% | 50% - 100% | 30% - 40% | 33.0% |
| First stage or "early development" | 40% - 60% | 40% - 60% | 40% - 60% | 25% - 38% | 28.0% |
| Second stage or "expansion" | 35% - 50% | 30% - 50% | 30% - 40% | 19% - 32% | 25.0% |
| Bridge/IPO | 25% - 35% | 20% - 35% | 20% - 30% | 18% - 38% | 25.0% |

Table 3: Target Rates of Return    [6]

| | Ruhnka / Young | Wetzel | Plummer / Qed Range of Discount Rates Used | |
|---|---|---|---|---|
| Stage of Development | | | High | Low |
| Seed | 73.0% | 50.0% | 75.4% | 49.2% |
| Start-up | 54.8% | 50.0% | 59.6% | 40.6% |
| 3rd Stage | 42.2% | 37.5% | 49.3% | 34.7% |
| Fourth Stage | 35.0% | 30.0% | 45.7% | 31.2% |
| Exit Stage | 35.0% | 22.5% | 40.8% | 28.1% |

Table 4: Theranos Investor Forecasts Implied Internal Rate of Return (Feb 2014 - Feb 2015)    [6]

| Investor Group | IRR |
|---|---|
| PFM Forecast | 75.5% |
| PFM Model | 35.5% |
| Mosley and RDV Forecast | 54.0% |
| Murdoch Forecast | 82.0% |

| Selected Venture Capital Cost of Equity | 45.0% |    [7]
|---|---|

**Weighted Average Cost of Capital**

| | | |
|---|---|---|
| Equity as a % of total capital | 97.0% | |
| Cost of Equity (above) | 45.0% | |
| Weighted Cost of Equity | | 43.7% |
| | | |
| Debt as a % of total capital | 3.0% | |
| Cost of Debt [4] | 25.0% | |
| After Tax Cost of Debt (tax rate above) | 15.0% | |
| Weighted After Tax Cost of Debt | | 0.5% |
| **Weighted Average Cost of Capital** | | **44.1%** |
| **Weighted Average Cost of Capital (rounded)** | | **44.0%** |

Notes:
[1] Source: Thomson Financial. The average annual return is based upon Thomson Financials' Private Equity Performance Index (PEPI).
The PEPI is based on the latest quarterly statistics from Thomson Financials' Private Equity Performance Database analyzing the cashflows and returns for over 1400 US venture capital and private equity partnerships.
[2] Plummer, James L., QED Report on Venture Capital Financial Analysis.
[3] Scherlis, Daniel R. and William A. Sahlman, "A Method for Valuing High-Risk, Long Term, Investments. The Venture Capital Method."
Harvard Business School Teaching Note 9-288-006, Boston: Harvard Business School Publishing, 1989.
[4] William A. Sahlman, Howard H. Stevenson, Amar V. Bhide, et al., "Financing Entrepreneurial Ventures,"
Business Fundamental Series (Boston: Harvard Business School Publishing, 1998).
Craig R. Everett, "2021 Private Capital Markets Report" (Malibu: Pepperdine University Graziadio School of Business and Management, 2021), Table
[5] 1, p. 5. Note that this publication also includes rates of return for many other types of private capital investments, as well as summaries of other information captured in Pepperdine's annual industry survey.
[6] Dorsey, Terry, "A Portfolio Model for Venture Capital Performance Measurement and Investment Selection," Polaris Group, Inc. January 2000.
[7] Refer to the report for discussion of the selected Venture Capital Rate of Return



**US v. Elizabeth Holmes**                                                  **Exhibit C.5**
Valuation of Theranos, Inc.                                         Forecast Free Cash Flow to Invested Capital
As of February 7, 2014                                                   *(thousands of USD)*

| | | | For the Twelve Month Period Ending December 31, | | | |
|---|---|---|---|---|---|
| | **2014** | **2015** | **2016** | **2017** | **2018** |
| Total Revenue | $ 150 | $ 113,452 | $ 223,452 | $ 323,452 | $ 503,452 |
| Total Cost of Revenue | 53 | 39,708 | 71,505 | 103,505 | 151,036 |
| Gross Margin | 97 | 73,744 | 151,947 | 219,947 | 352,416 |
| *GM %* | *64.7%* | *65.0%* | *68.0%* | *68.0%* | *70.0%* |
| | | | | | |
| Total Operating Expenses | 100,031 | 97,025 | 99,961 | 108,977 | 124,401 |
| *Operating Expense %* | *66687.3%* | *85.5%* | *44.7%* | *33.7%* | *24.7%* |
| | | | | | |
| **EBITDA** | **(99,934)** | **(23,281)** | **51,986** | **110,970** | **228,015** |
| *EBITDA %* | *-66622.7%* | *-20.5%* | *23.3%* | *34.3%* | *45.3%* |
| | | | | | |
| Less:  Partial Period Adjustment | 8,328 | - | - | - | - |
| **Adjusted EBITDA** | **(91,606)** | **(23,281)** | **51,986** | **110,970** | **228,015** |
| | | | | | |
| Depreciation & Amortization | 4,562 | 7,722 | 12,969 | 20,366 | 28,644 |
| | | | | | |
| **EBIT** | **(96,169)** | **(31,003)** | **39,017** | **90,604** | **199,371** |
| *EBIT %* | *-64112.3%* | *-27.3%* | *17.5%* | *28.0%* | *39.6%* |
| | | | | | |
| Interest Expense | - | - | - | - | - |
| | | | | | |
| Earnings Before Taxes | (96,169) | (31,003) | 39,017 | 90,604 | 199,371 |
| Income Taxes | - | - | - | - | 42,265 |
| | | | | | |
| **Forecast After-Tax Income** | **$ (96,169)** | **$ (31,003)** | **$ 39,017** | **$ 90,604** | **$ 157,106** |
| *NPAT %* | *-64112.3%* | *-27.3%* | *17.5%* | *28.0%* | *31.2%* |
| | | | | | |
| **Cash Flow** | | | | | |
| Add:   Depreciation & Amortization | 4,562 | 7,722 | 12,969 | 20,366 | 28,644 |
| After-Tax Gross Cash Flow | (91,606) | (23,281) | 51,986 | 110,970 | 185,750 |
| | | | | | |
| Decrease / (Increase) in Working Capital | (33,712) | (34,150) | (18,930) | (24,283) | (45,972) |
| Less:  Capital Expenditures | (8,253) | (33,134) | (45,970) | (65,569) | (59,240) |
| | | | | | |
| **Free Cash Flow** | **$ (133,571)** | **$ (90,565)** | **$ (12,914)** | **$ 21,118** | **$ 80,538** |


HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

US v. Elizabeth Holmes | | | | | Exhibit C.6
---|---|---|---|---|---
Valuation of Theranos, Inc. | | | | Discounted Cash Flow Method Value Summary |
As of February 7, 2014 | | | | *(thousands of USD)* |

| Forecast Period | Base Cash Flow | | Period | Discount Rate | PV Factor [2] | Discounted Cash Flow [3] | |
|---|---|---|---|---|---|---|---|
| 2014 | $ | (133,571) | 0.45 | 44.0% | 0.8494 | $ | (113,454) |
| 2015 | | (90,565) | 1.40 | 44.0% | 0.6012 | | (54,450) |
| 2016 | | (12,914) | 2.40 | 44.0% | 0.4175 | | (5,392) |
| 2017 | | 21,118 | 3.40 | 44.0% | 0.2899 | | 6,123 |
| 2018 | | 80,538 | 4.40 | 44.0% | 0.2013 | | 16,216 |
| Terminal Value [1] | | 3,000,000 | 4.90 | 44.0% | 0.1678 | | 503,372 |

| | | |
|---|---|---|
| **Indicated Value** | $ | **352,416** |
| Add: C-2 Financing Proceeds not on 12/31/13 balance sheet | | 114,390 |
| Add: C-1 Financing Proceeds not on 12/31/13 balance sheet | | 6,556 |
| Deduct: Interest Bearing Debt | | (42,386) |
| **Total Equity Value - Controlling, Marketable Basis** | $ | **430,975** |
| **Total Equity Value - Controlling, Marketable Basis (rounded)** | $ | **431,000** |

**Notes:**
[1] Refer to Exhibit D.1
[2] 1 / (1 + Discount Rate) ^ Period.
[3] Base Cash Flow x PV Factor.



US v. Elizabeth Holmes
Valuation of Theranos, Inc.
As of February 7, 2014

Exhibit D.1
Guideline Public Company Method
(thousands of USD)

| Name | Ticker | Market Cap | Debt, Pref Shr & Min Int. | Cash | MVIC [1] | Revenue LTM | Revenue 2014E | EBITDA LTM | EBITDA 2014E | EBIT LTM | Market Value of Invested Capital / Revenue LTM | Revenue 2014E | EBITDA LTM | EBITDA 2014E | EBIT LTM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OraSure Technologies, Inc. | OSUR | $ 337,504 | $ - | $ 93,191 | $ 244,313 | $ 98,940 | $ 104,732 | $ (13,910) | $ (11,967) | $ (20,462) | 2.47x | 2.33x | NA | NA | NA |
| Trinity Biotech plc | TRIB | 545,805 | - | 22,317 | 523,488 | 91,216 | 110,443 | 19,006 | NA | 15,416 | 5.74x | 4.74x | 27.54x | NA | 33.96x |
| Enzo Biochem, Inc. | ENZ | 138,102 | 3,992 | 7,621 | 134,473 | 92,929 | 97,348 | (11,277) | (9,200) | (15,573) | 1.45x | 1.38x | NA | NA | NA |
| QuidelOrtho Corporation | QDEL | 964,525 | 5,587 | 8,388 | 961,704 | 177,325 | 199,864 | 30,867 | 53,570 | 8,667 | 5.42x | 4.81x | 31.16x | 17.95x | 144.25x |
| Exact Sciences Corporation | EXAS | 865,903 | 1,711 | 133,259 | 734,355 | 4,144 | 28,311 | (45,343) | (49,052) | (46,761) | NA | 25.94x | NA | NA | NA |
| OPKO Health, Inc. | OPK | 3,106,223 | 224,313 | 185,798 | 3,144,737 | 96,530 | 102,743 | (57,459) | NA | (72,685) | 32.58x | 30.61x | NA | NA | NA |
| PerkinElmer, Inc | PKI | 4,920,548 | 934,728 | 173,242 | 5,682,034 | 2,157,586 | 2,283,660 | 389,970 | 444,503 | 263,091 | 2.63x | 2.49x | 14.57x | 12.78x | 21.60x |
| Quest Diagnostics Incorporated. | DGX | 7,315,200 | 3,391,000 | 187,000 | 10,519,200 | 7,146,000 | 7,204,659 | 1,439,000 | 1,425,874 | 1,155,000 | 1.47x | 1.46x | 7.31x | 7.38x | 9.10x |
| Laboratory Corporation of America Holdings | LH | 7,791,710 | 3,019,800 | 404,000 | 10,407,510 | 5,808,300 | 5,920,847 | 1,203,500 | 1,176,931 | 1,012,700 | 1.79x | 1.76x | 8.65x | 8.84x | 10.28x |
| Myriad Genetics, Inc. | MYGN | 2,351,966 | - | 353,595 | 1,998,371 | 737,115 | 712,147 | 300,472 | 239,880 | 291,227 | 2.71x | 2.81x | 6.65x | 8.33x | 6.86x |
| Illumina, Inc. | ILMN | 19,831,532 | 868,593 | 1,165,603 | 19,534,522 | 1,421,178 | 1,671,408 | 363,622 | 493,335 | 265,697 | 13.75x | 11.69x | 53.72x | 39.60x | 73.52x |
| Qiagen N.V. | QGEN | 5,280,047 | 659,741 | 380,226 | 5,759,562 | 1,301,984 | 1,371,150 | 382,685 | 457,917 | 188,130 | 4.42x | 4.20x | 15.05x | 12.59x | 30.61x |
| Alere Inc. | IQT2622336 | 2,819,163 | 4,452,454 | 356,289 | 6,915,328 | 2,608,036 | 3,085,506 | 546,428 | 673,094 | 171,771 | 2.65x | 2.24x | 12.66x | 10.27x | 40.26x |
| Luminex Corporation | IQT2627430 | 734,789 | 1,657 | 72,441 | 664,005 | 213,423 | 230,083 | 25,707 | 50,037 | 9,785 | 3.11x | 2.89x | 25.83x | 13.27x | 67.86x |
| Abaxis, Inc. | IQT2586525 | 824,250 | 706 | 101,830 | 723,126 | 179,781 | 191,556 | 31,269 | 33,025 | 23,944 | 4.02x | 3.78x | 23.11x | 21.90x | 30.20x |
| CombiMatrix Corporation | IQT38309071 | 25,342 | 233 | 14,036 | 11,539 | 6,367 | 8,959 | (5,353) | NA | (6,051) | 1.81x | 1.66x | NA | NA | NA |
| Affymetrix Inc. | IQT2587418 | 518,522 | 144,461 | 57,126 | 605,855 | 330,399 | 335,643 | 45,802 | 43,787 | 5,814 | 1.83x | 1.81x | 13.23x | 13.84x | 88.91x |
| Genomic Health, Inc. | IQT24111615 | 815,172 | - | 105,380 | 709,822 | 261,595 | 286,115 | (5,508) | (18,086) | (11,832) | 2.71x | 2.48x | NA | NA | NA |
| Cepheid | IQT2599314 | 3,328,663 | - | 74,939 | 3,253,754 | 401,292 | 458,698 | 8,477 | 16,305 | (14,710) | 8.11x | 7.12x | NA | NA | NA |
| Nanosphere, Inc. | IQT38720098 | 169,146 | 11,815 | 41,467 | 139,494 | 10,002 | 19,719 | (31,689) | (29,322) | (33,721) | 13.95x | 7.07x | NA | NA | NA |
| GenMark Diagnostics, Inc. | IQT106626443 | 513,559 | 37 | 105,589 | 408,007 | 27,404 | 26,812 | (27,134) | (33,133) | (29,362) | 14.89x | 15.22x | NA | NA | NA |
| Bio-Reference Laboratories, Inc. | IQT2594421 | 723,947 | 52,630 | 14,533 | 762,044 | 735,368 | 801,467 | 93,075 | 115,197 | 72,094 | 1.04x | 0.95x | 8.19x | 6.62x | 10.57x |

| | | | | | | Revenue LTM | Revenue 2014E | EBITDA LTM | EBITDA 2014E | EBIT LTM |
|---|---|---|---|---|---|---|---|---|---|---|
| Correlation to MVIC | | | | | | 0.65 | 0.67 | 0.61 | 0.66 | 0.57 |
| Correlation to Price | | | | | | 0.49 | 0.51 | 0.44 | 0.48 | 0.44 |

| | Revenue LTM | Revenue 2014E | EBITDA LTM | EBITDA 2014E | EBIT LTM |
|---|---|---|---|---|---|
| Upper Quartile | 5.74x | 6.51x | 25.83x | 14.67x | 67.86x |
| Mean | 6.12x | 6.34x | 19.05x | 14.45x | 43.59x |
| Median | 2.71x | 2.85x | 14.57x | 12.88x | 30.61x |
| Lower Quartile | 1.83x | 1.91x | 8.65x | 8.71x | 10.57x |

| | Revenue LTM | Revenue 2014E | EBITDA LTM | EBITDA 2014E | EBIT LTM |
|---|---|---|---|---|---|
| Selected Multiple | 9.10x | | 12.60x | | - |
| Subject Company Base Value | $ 503,452 | $ - | $ 228,015 | $ - | $ 199,371 |
| Indicated Equity Value | $ 3,071,067 | $ - | $ 2,872,989 | $ - | $ - |
| Weighting | 33.3% | 0.0% | 66.7% | 0.0% | 0.0% |

| | |
|---|---|
| Indicated Value | $ 2,939,012 |
| Add: Subject Company Cash | 61,348 |
| Total Invested Capital Value at 12/31/18 Exit - Controlling, Marketable Basis | $ 3,000,360 |
| Total Invested Capital Value at 12/31/18 Exit - Controlling, Marketable Basis (rounded) | $ 3,000,000 |

Notes:
Source: S&P Capital IQ
[1] MVIC = Market Value of Invested Capital. Presented as net of cash.



US v. Elizabeth Holmes | Exhibit D.2
Valuation of Theranos, Inc. | Guideline Public Company Key Financial Ratios
As of February 7, 2014 | (thousands of USD)

| Name | Ticker | Market Cap | Trading Volume [1] | LTM Revenue | CAGR Revenue [2] 1 Year | 3 Year | Forward Growth 2014E | 2015E | 2016E | GM | EBITDA | As a % of Revenue D&A | EBIT | Capex | WC [3] | Current Ratio | Debt to Equity | Debt to TNW |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OraSure Technologies, Inc. | OSUR | $ 337,504 | 713 | $ 98,940 | 12.7% | 9.7% | 5.9% | 14.5% | 10.9% | 59.2% | -14.1% | 0.0% | -20.7% | 2.5% | 195.9% | 6.30 | 0.0% | 0.0% |
| Trinity Biotech plc | TRIB | 545,805 | 69 | 91,216 | 10.8% | 0.6% | 21.1% | 14.5% | NA | -49.8% | 20.8% | 0.0% | 16.9% | 4.9% | 81.1% | 3.68 | 0.0% | 0.0% |
| Enzo Biochem, Inc. | ENZ | 138,102 | 209 | 92,929 | -7.3% | -1.8% | 4.8% | 12.4% | 15.2% | 41.8% | -12.1% | 0.0% | -16.8% | 0.9% | 8.6% | 1.35 | 12.4% | 25.5% |
| QuidelOrtho Corporation | QDEL | 964,525 | 193 | 177,325 | 13.9% | 16.1% | 12.7% | 18.0% | 13.2% | 62.2% | 17.4% | 4.6% | 3.8% | 11.7% | 30.8% | 3.27 | 2.5% | 6.9% |
| Exact Sciences Corporation | EXAS | 865,903 | 739 | 4,144 | NA | -8.1% | N/A | 212.6% | 90.4% | 100.0% | NA | 0.0% | -1128.4% | N/A | 3081.7% | 17.47 | 1.3% | 1.3% |
| OPKO Health, Inc. | OPK | 3,106,222 | 4,324 | 96,530 | 105.2% | 50.2% | 6.4% | 41.0% | 62.2% | 31.1% | -59.5% | 11.5% | -75.3% | 4.1% | 156.3% | 2.64 | 26.1% | -102.9% |
| PerkinElmer, Inc. | PKI | 4,920,548 | 829 | 2,157,586 | 2.5% | 8.2% | 5.8% | 5.3% | 5.1% | 45.3% | 18.1% | 0.0% | 12.2% | 1.8% | 20.5% | 1.73 | 46.9% | -153.5% |
| Quest Diagnostics Incorporated | DGX | 7,315,200 | 2,520 | 7,146,000 | -3.2% | -0.5% | 0.8% | 1.1% | 0.5% | 40.1% | 20.1% | 1.1% | 16.2% | 3.2% | 3.5% | 1.22 | -84.7% | -130.9% |
| Laboratory Corporation of America | LH | 7,791,710 | 1,101 | 5,808,300 | 2.4% | 5.1% | 1.9% | 2.1% | 2.6% | 38.3% | 20.7% | 1.4% | 17.4% | 3.5% | 12.0% | 1.95 | 119.5% | -144.0% |
| Myriad Genetics, Inc. | MYGN | 2,351,966 | 2,462 | 737,115 | 35.2% | 25.0% | -3.4% | 9.7% | -18.1% | 87.2% | 40.8% | 0.0% | 39.5% | 1.7% | 52.5% | 6.74 | 0.0% | 0.0% |
| Illumina, Inc. | ILMN | 19,831,532 | 1,595 | 1,421,178 | 23.7% | 16.3% | 17.6% | 18.3% | 19.0% | 68.3% | 25.6% | 2.4% | 18.7% | 5.6% | 91.2% | 5.02 | 58.7% | 181.3% |
| Qiagen N.V. | QGEN | 5,280,047 | 892 | 1,301,984 | 3.8% | 6.2% | 5.3% | 6.2% | 6.1% | 55.7% | 29.4% | 2.7% | 14.4% | 6.5% | 44.8% | 2.73 | 31.2% | 1093.2% |
| Alere Inc. | IQT2622336 | 2,819,163 | 654 | 2,608,636 | 8.9% | 6.6% | 18.3% | 5.4% | 4.1% | 50.6% | 20.9% | 0.0% | 6.6% | 3.8% | 38.4% | 2.30 | 184.8% | -151.0% |
| Luminex Corporation | IQT2627430 | 734,789 | 170 | 213,423 | 5.4% | 14.7% | 7.8% | 8.8% | 8.7% | 68.5% | 12.0% | 1.9% | 4.6% | 8.5% | 55.2% | 5.14 | 0.6% | 1.0% |
| Abaxis, Inc. | IQT2586525 | 824,250 | 187 | 179,781 | 0.6% | 8.7% | 6.5% | 12.3% | NA | 49.1% | 17.4% | 0.0% | 13.3% | 3.1% | 84.0% | 9.42 | 0.4% | 0.4% |
| CombiMatrix Corporation | IQT36309071 | 25,342 | 75 | 6,367 | 19.0% | 21.5% | 9.3% | 16.2% | 16.3% | 44.6% | -84.1% | 2.4% | -95.0% | 4.8% | 218.7% | 7.62 | 1.6% | 1.6% |
| Affymetrix Inc. | IQT2587418 | 516,522 | 1,231 | 330,399 | 11.8% | 2.1% | 1.6% | 2.7% | 2.5% | 59.3% | 13.9% | 0.0% | 2.1% | 1.5% | 29.9% | 2.28 | 53.2% | -682.8% |
| Genomic Health, Inc. | IQT2411615 | 815,172 | 218 | 261,595 | 11.2% | 13.7% | 9.4% | 12.8% | 30.6% | 79.6% | -2.1% | 0.0% | -4.5% | 4.2% | 44.0% | 4.86 | 0.0% | 0.0% |
| Cepheid | IQT2599314 | 3,328,663 | 609 | 401,292 | 21.2% | 23.6% | 13.6% | 15.5% | 15.5% | 48.5% | 2.1% | 0.0% | -3.7% | 11.8% | 37.0% | 2.56 | 0.0% | 0.0% |
| Nanosphere, Inc. | IQT38720096 | 169,146 | 33 | 10,002 | 97.0% | 70.3% | 97.1% | 70.7% | 64.2% | -149.9% | N/A | 0.0% | -337.1% | 14.0% | 465.0% | 8.17 | 27.4% | 29.0% |
| GenMark Diagnostics, Inc. | IQT108626443 | 513,559 | 240 | 27,404 | 33.9% | 120.3% | -2.2% | 57.7% | 78.2% | 47.5% | -99.0% | 0.0% | -107.1% | 15.6% | 368.1% | 10.85 | 0.0% | 0.0% |
| Bio-Reference Laboratories, Inc. | IQT2594421 | 723,947 | 424 | 735,388 | 15.5% | 15.2% | 9.0% | NA | NA | 46.3% | 12.7% | 2.9% | 9.8% | 3.1% | 22.2% | 2.20 | 19.1% | 23.5% |
| **Upper Quartile** | | $ 3,273,053 | 1,049 | $ 1,180,767 | 21.2% | 20.2% | 12.7% | 18.0% | 24.8% | 64.9% | 20.7% | 2.3% | 14.2% | 6.5% | 140.0% | 6.63 | 43.0% | 5.6% |
| **Mean** | | 2,905,528 | 886 | 1,086,705 | 20.2% | 19.3% | 11.9% | 20.5% | 22.5% | 47.0% | 0.1% | 1.4% | -73.3% | 5.6% | 232.8% | 4.98 | 30.4% | -0.1% |
| **Median** | | 845,076 | 632 | 237,509 | 11.8% | 11.7% | 6.5% | 12.8% | 13.2% | 49.3% | 15.6% | 0.0% | 4.2% | 4.1% | 48.7% | 3.47 | 7.4% | 0.0% |
| **Lower Quartile** | | 525,342 | 197 | 93,829 | 3.8% | 5.4% | 4.8% | 6.2% | 4.6% | 44.8% | -4.6% | 0.0% | -19.7% | 3.1% | 30.1% | 2.29 | 0.1% | -77.2% |
| **Theranos, Inc. (at 12/31/18)** | | NA | NA | $ 503,452 | 55.6% | 64.3% | 28.0% | NA | NA | 70.0% | 45.3% | 5.7% | 39.6% | 11.8% | 16.6% | 2.39 | N/A | N/A |

Notes:
Source: S&P Capital IQ.
[1] Represents trailing 3-month average daily trading volume (in thousands)
[2] CAGR = Compound Annual Growth Rate
[3] Working capital excludes cash


HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

US v. Elizabeth Holmes
Valuation of Theranos, Inc.
As of February 7, 2014

Exhibit D.3
Guideline Public Company Descriptions

| Name | Ticker | Description |
|---|---|---|
| OraSure Technologies, Inc. | OSUR | OraSure Technologies, Inc., together with its subsidiaries, develops, manufactures, markets, and sells oral fluid diagnostic products and specimen collection devices in the United States, Europe, and internationally. |
| Trinity Biotech plc | TRIB | Trinity Biotech plc acquires, develops, manufactures, and markets medical diagnostic products for the clinical laboratory and point-of-care (POC) segments of the diagnostic market in the Americas, Africa, Asia, and Europe. |
| Enzo Biochem, Inc. | ENZ | Enzo Biochem, Inc., an integrated diagnostics, clinical lab, and life sciences company, researches, develops, manufactures, and markets diagnostic and research products based on genetic engineering, biotechnology, and molecular biology. |
| QuidelOrtho Corporation | QDEL | QuidelOrtho Corporation focuses on the development and manufacture of diagnostic testing technologies across the continuum of healthcare testing needs. |
| Exact Sciences Corporation | EXAS | Exact Sciences Corporation provides cancer screening and diagnostic test products in the United States and internationally. |
| OPKO Health, Inc. | OPK | OPKO Health, Inc., a healthcare company, engages in the diagnostics and pharmaceuticals businesses in the United States, Ireland, Chile, Spain, Israel, Mexico, and internationally. |
| PerkinElmer, Inc. | PKI | PerkinElmer, Inc. provides products, services, and solutions to the diagnostics, life sciences, and applied services markets worldwide. |
| Quest Diagnostics Incorporated | DGX | Quest Diagnostics Incorporated provides diagnostic testing, information, and services in the United States and internationally. |
| Laboratory Corporation of America Holdings | LH | Laboratory Corporation of America Holdings operates as a global life sciences company that provides vital information to help doctors, hospitals, pharmaceutical companies, researchers, and patients make clear and confident decisions. |
| Myriad Genetics, Inc. | MYGN | Myriad Genetics, Inc., a genetic testing and precision medicine company, develops and commercializes genetic tests in the United States and internationally. |
| Illumina, Inc. | ILMN | Illumina, Inc. provides sequencing and array-based solutions for genetic and genomic analysis. |
| Qiagen N.V. | QGEN | QIAGEN N.V. offers sample to insight solutions that transform biological materials into molecular insights worldwide. |
| Alere Inc. | IQT2622336 | Alere Inc. provides diagnostic tests for infectious disease, cardiometabolic disease, and toxicology in the United States and internationally. |
| Luminex Corporation | IQT2627430 | Luminex Corporation develops, manufactures, and sells proprietary biological testing technologies and products for the diagnostics, pharmaceutical, and research industries worldwide. |
| Abaxis, Inc. | IQT2586525 | Abaxis, Inc. develops, manufactures, markets, and sells portable blood analysis systems for use in human or veterinary patient care to provide rapid blood constituent measurements for clinicians worldwide. |
| CombiMatrix Corporation | IQT36309071 | CombiMatrix Corporation provides clinical molecular diagnostic laboratory services in the United States. |
| Affymetrix Inc. | IQT2587418 | Affymetrix, Inc. provides life science products and molecular diagnostic products that enable parallel analysis of biological systems at the gene, protein, and cell level. |
| Genomic Health, Inc. | IQT24111615 | Genomic Health, Inc., a healthcare company, provides clinically actionable genomic information to personalize cancer treatment decisions in the United States and internationally. |
| Cepheid | IQT2599314 | Cepheid, a molecular diagnostics company, develops, manufactures, and markets integrated systems for testing in the clinical and non-clinical markets. |
| Nanosphere, Inc. | IQT38720096 | Nanosphere, Inc. develops, manufactures, and markets molecular diagnostic tests for infectious diseases and associated drug resistance markers for earlier disease detection, optimal patient treatment, and improved healthcare economics. |
| GenMark Diagnostics, Inc. | IQT106626443 | GenMark Diagnostics, Inc. designs and manufactures multiplex molecular diagnostic solutions to enhance patient care, improve quality metrics, and reduce the total cost-of-care for laboratory professionals, healthcare providers, and customers in the United States and internationally. |
| Bio-Reference Laboratories, Inc. | IQT2594421 | Bio-Reference Laboratories, Inc. provides clinical laboratory testing services for the detection, diagnosis, evaluation, monitoring, and treatment of diseases in the United States. |

Notes:
Source: S&P Capital IQ.



HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

US v. Elizabeth Holmes | | Exhibit D.4
Valuation of Theranos, Inc. | | Guideline Public Company Ranking
As of February 7, 2014 | | (thousands of USD)

| Size (Revenue, millions) | | Liquidity (Operating Net Working Capital-to-Revenue) | | Liquidity (Current Ratio) | |
|---|---|---|---|---|---|
| Quest Diagnostics Incorporated | $ 7,146,000 | Quest Diagnostics Incorporated | 3.5% | Exact Sciences Corporation | 17.47 |
| Laboratory Corporation of America Holdi | 5,808,300 | Enzo Biochem, Inc. | 8.6% | GenMark Diagnostics, Inc. | 10.85 |
| Alere Inc. | 2,608,636 | Laboratory Corporation of America Holdi | 12.0% | Abaxis, Inc. | 9.42 |
| PerkinElmer, Inc. | 2,157,586 | Theranos, Inc. (at 12/31/18) | 18.6% | Nanosphere, Inc. | 8.17 |
| Illumina, Inc. | 1,421,178 | PerkinElmer, Inc. | 20.5% | CombiMatrix Corporation | 7.62 |
| Qiagen N.V. | 1,301,984 | Bio-Reference Laboratories, Inc. | 22.2% | Myriad Genetics, Inc. | 6.74 |
| Myriad Genetics, Inc | 737,115 | Affymetrix Inc. | 29.9% | OraSure Technologies, Inc | 6.30 |
| Bio-Reference Laboratories, Inc. | 735,368 | QuidelOrtho Corporation | 30.8% | Luminex Corporation | 5.14 |
| Theranos, Inc. (at 12/31/18) | 603,482 | Cepheid | 37.0% | Illumina, Inc. | 5.02 |
| Cepheid | 401,292 | Alere Inc. | 38.4% | Genomic Health, Inc. | 4.86 |
| Affymetrix Inc. | 330,399 | Genomic Health, Inc. | 44.0% | Trinity Biotech plc | 3.66 |
| Genomic Health, Inc. | 261,595 | Qiagen N.V. | 44.8% | QuidelOrtho Corporation | 3.27 |
| Luminex Corporation | 213,423 | Myriad Genetics, Inc. | 52.5% | Qiagen N.V. | 2.73 |
| Abaxis, Inc. | 179,781 | Luminex Corporation | 55.2% | OPKO Health, Inc. | 2.64 |
| QuidelOrtho Corporation | 177,325 | Trinity Biotech plc | 61.1% | Cepheid | 2.56 |
| OraSure Technologies, Inc. | 98,940 | Abaxis, Inc. | 64.0% | Theranos, Inc. (at 12/31/18) | 2.29 |
| OPKO Health, Inc. | 96,630 | Illumina, Inc. | 91.2% | Alere Inc. | 2.30 |
| Enzo Biochem, Inc. | 92,929 | OPKO Health, Inc. | 156.3% | Affymetrix Inc. | 2.28 |
| Trinity Biotech plc | 91,216 | OraSure Technologies, Inc. | 195.9% | Bio-Reference Laboratories, Inc | 2.20 |
| GenMark Diagnostics, Inc. | 27,404 | CombiMatrix Corporation | 218.7% | Laboratory Corporation of America Holdi | 1.95 |
| Nanosphere, Inc. | 10,002 | GenMark Diagnostics, Inc. | 368.1% | PerkinElmer, Inc. | 1.73 |
| CombiMatrix Corporation | 6,357 | Nanosphere, Inc. | 465.0% | Enzo Biochem, Inc. | 1.35 |
| Exact Sciences Corporation | 4,144 | Exact Sciences Corporation | 3081.7% | Quest Diagnostics Incorporated | 1.22 |

| Operational Efficiency (Capital Expenditures) | | Growth (Historical 1-year Growth Rate) | | Growth (Historical 3-year CAGR) | |
|---|---|---|---|---|---|
| Enzo Biochem, Inc. | 0.9% | OPKO Health, Inc. | 105.2% | GenMark Diagnostics, Inc. | 120.3% |
| Affymetrix Inc. | 1.5% | Nanosphere, Inc. | 97.0% | Nanosphere, Inc. | 70.3% |
| Myriad Genetics, Inc. | 1.7% | Theranos, Inc. (at 12/31/18) | 56.6% | Theranos, Inc. (at 12/31/18) | 64.3% |
| PerkinElmer, Inc. | 1.8% | Myriad Genetics, Inc. | 35.2% | OPKO Health, Inc. | 50.2% |
| OraSure Technologies, Inc. | 2.5% | GenMark Diagnostics  Inc. | 33.9% | Myriad Genetics, Inc. | 25.0% |
| Abaxis, Inc. | 3.1% | Illumina, Inc. | 23.7% | Cepheid | 23.6% |
| Bio-Reference Laboratories, Inc. | 3.1% | Cepheid | 21.2% | CombiMatrix Corporation | 21.5% |
| Quest Diagnostics Incorporated | 3.2% | CombiMatrix Corporation | 19.0% | Illumina, Inc. | 18.3% |
| Laboratory Corporation of America Holdi | 3.5% | Bio-Reference Laboratories, Inc. | 15.5% | QuidelOrtho Corporation | 16.1% |
| Alere Inc. | 3.8% | QuidelOrtho Corporation | 13.9% | Bio-Reference Laboratories, Inc. | 15.2% |
| OPKO Health, Inc. | 4.1% | OraSure Technologies, Inc | 12.7% | Luminex Corporation | 14.7% |
| Genomic Health, Inc. | 4.2% | Affymetrix Inc. | 11.8% | Genomic Health, Inc. | 13.7% |
| CombiMatrix Corporation | 4.8% | Genomic Health, Inc. | 11.2% | OraSure Technologies, Inc. | 9.7% |
| Trinity Biotech plc | 4.9% | Trinity Biotech plc | 10.6% | Abaxis, Inc. | 8.7% |
| Illumina, Inc. | 5.6% | Alere Inc. | 8.9% | PerkinElmer, Inc. | 8.2% |
| Qiagen N.V. | 6.5% | Luminex Corporation | 5.4% | Alere Inc. | 8.6% |
| Luminex Corporation | 8.5% | Qiagen N.V. | 3.8% | Qiagen N.V. | 8.2% |
| QuidelOrtho Corporation | 11.7% | PerkinElmer, Inc. | 2.5% | Laboratory Corporation of America Holdi | 5.1% |
| Theranos, Inc. (at 12/31/18) | 11.8% | Laboratory Corporation of America Holdi | 2.4% | Affymetrix Inc. | 2.1% |
| Cepheid | 11.8% | Abaxis, Inc. | 0.6% | Trinity Biotech plc | 0.6% |
| Nanosphere, Inc. | 14.0% | Quest Diagnostics Incorporated | -3.2% | Quest Diagnostics Incorporated | -0.5% |
| GenMark Diagnostics, Inc. | 15.6% | Enzo Biochem, Inc. | -7.3% | Enzo Biochem, Inc. | -1.8% |
| | | | | Exact Sciences Corporation | -9.1% |

| Growth (Forward 1-year Growth Rate) | | Profitability (Historical EBITDA Margin 1-year) | | Operational Efficiency (Return on Equity) | |
|---|---|---|---|---|---|
| Nanosphere, Inc. | 97.1% | Theranos, Inc. (at 12/31/18) | 46.3% | Myriad Genetics, Inc. | 27.2% |
| Theranos, Inc. (at 12/31/18) | 28.0% | Myriad Genetics, Inc. | 40.6% | Bio-Reference Laboratories, Inc. | 15.3% |
| Trinity Biotech plc | 21.1% | Qiagen N.V. | 29.4% | Laboratory Corporation of America Holdi | 11.6% |
| Alere Inc. | 18.3% | Illumina, Inc. | 25.6% | Quest Diagnostics Incorporated | 9.7% |
| Illumina, Inc. | 17.5% | Alere Inc. | 20.9% | Abaxis, Inc. | 9.5% |
| Cepheid | 13.8% | Trinity Biotech plc | 20.8% | Illumina, Inc. | 7.3% |
| QuidelOrtho Corporation | 12.7% | Laboratory Corporation of America Holdi | 20.7% | PerkinElmer, Inc. | 5.7% |
| Genomic Health, Inc. | 9.4% | Quest Diagnostics Incorporated | 20.1% | Trinity Biotech plc | 5.5% |
| CombiMatrix Corporation | 9.3% | PerkinElmer, Inc. | 18.1% | Qiagen N.V. | 3.3% |
| Bio-Reference Laboratories, Inc. | 9.0% | QuidelOrtho Corporation | 17.4% | Luminex Corporation | 2.3% |
| Luminex Corporation | 7.8% | Abaxis, Inc. | 17.4% | QuidelOrtho Corporation | 1.9% |
| Abaxis, Inc. | 6.5% | Affymetrix Inc. | 13.9% | Alere Inc. | 1.8% |
| OPKO Health, Inc. | 6.4% | Bio-Reference Laboratories, Inc. | 12.7% | Affymetrix Inc. | 1.0% |
| OraSure Technologies, Inc. | 5.9% | Luminex Corporation | 12.0% | Theranos, Inc. (at 12/31/18) | 0.0% |
| PerkinElmer, Inc. | 5.8% | Cepheid | 2.1% | Cepheid | -3.4% |
| Qiagen N.V. | 5.3% | Genomic Health, Inc. | -2.1% | Genomic Health, Inc. | -5.5% |
| Enzo Biochem, Inc. | 4.8% | Enzo Biochem, Inc. | -12.1% | OPKO Health, Inc. | -6.8% |
| Laboratory Corporation of America Holdi | 1.9% | OraSure Technologies, Inc. | -14.1% | OraSure Technologies, Inc. | -7.7% |
| Affymetrix Inc. | 1.6% | OPKO Health, Inc. | -59.5% | GenMark Diagnostics, Inc. | -22.1% |
| Quest Diagnostics Incorporated | 0.8% | CombiMatrix Corporation | -84.1% | Exact Sciences Corporation | -24.6% |
| GenMark Diagnostics, Inc. | -2.2% | GenMark Diagnostics, Inc. | -99.0% | Enzo Biochem, Inc. | -25.1% |
| Myriad Genetics, Inc. | -3.4% | | | Nanosphere, Inc. | -43.4% |
| | | | | CombiMatrix Corporation | -51.6% |


HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

| **US v. Elizabeth Holmes** | | | | | | | **Exhibit E.1** |
|---|---|---|---|---|---|---|---|
| Valuation of Theranos, Inc. | | | | | | | Adjusted Net Asset Value |
| As of February 7, 2014 | | | | | | | *(thousands of USD)* |

| | | 12/31/2013 Unadjusted | | Adjustments | | Adjusted | |
|---|---|---|---|---|---|---|---|
| **Assets:** | | | | | | | |
| Current Assets | | | | | | | |
| Current Operating Assets | | | | | | | |
| Cash & Equivalents | [1] | $ | 30,966 | $ | 120,946 | $ | 151,912 |
| Accounts Receivable | | | - | | - | | - |
| Inventory | | | 3,777 | | - | | 3,777 |
| Other Current Assets | | | 1,780 | | - | | 1,780 |
| Total Current Operating Assets | | | 36,523 | | 120,946 | | 157,469 |
| Total Current Non-Operating Assets | | | - | | - | | - |
| Total Current Assets | | | 36,523 | | 120,946 | | 157,469 |
| | | | | | | | |
| Total Fixed Assets - Net | | | 22,021 | | - | | 22,021 |
| | | | | | | | |
| Other Assets | | | | | | | |
| Intangible Assets | | | | | | | |
| Goodwill | | | - | | - | | - |
| Other Intangible Assets | [2] | | - | | 340,370 | | 340,370 |
| Total Intangible Assets - Net | | | - | | 340,370 | | 340,370 |
| Total Long Term Receivables | | | - | | - | | - |
| Total Other Non-Current Assets | | | - | | - | | - |
| Total Non Current Assets | | | - | | 340,370 | | 340,370 |
| | | | | | | | |
| **Total Assets** | | **$** | **58,543** | **$** | **461,316** | **$** | **519,859** |
| | | | | | | | |
| **Liabilities and Equity:** | | | | | | | |
| | | | | | | | |
| Liabilities | | | | | | | |
| Current Liabilities | | | | | | | |
| Current Operating Liabilities | | | | | | | |
| Accounts Payable | | $ | 7,430 | | | $ | 7,430 |
| Deferred Revenue | | | 7 | | | | 7 |
| Other Current Liabilities | [3] | | 50,017 | | (45,187) | | 4,830 |
| Total Current Operating Liabilities | | | 57,454 | | (45,187) | | 12,267 |
| Total Current Debt Obligations | | | - | | - | | - |
| Total Current Liabilities | | | 57,454 | | (45,187) | | 12,267 |
| | | | | | | | |
| Non Current Liabilities | | | | | | | |
| Total Long Term Debt | | | 42,386 | | - | | 42,386 |
| Other Non Current Liabilities | | | | | | | |
| Deferred Rent | | | 1,857 | | - | | 1,857 |
| Deferred Revenue, LT | | | 3,801 | | - | | 3,801 |
| Customer Deposits | | | 80,000 | | - | | 80,000 |
| Other Non-current liabilities | | | 1,866 | | - | | 1,866 |
| Total Other Non Current Liabilities | | | 87,525 | | - | | 87,525 |
| Total Non Current Liabilities | | | 129,911 | | - | | 129,911 |
| | | | | | | | |
| **Total Liabilities** | | **$** | **187,365** | **$** | **(45,187)** | **$** | **142,178** |
| | | | | | | | |
| **Total Equity Value - Controlling, Marketable Basis** | | | | | | **$** | **377,682** |
| | | | | | | | |
| **Total Equity Value - Controlling, Marketable Basis (rounded)** | | | | | | **$** | **378,000** |

**Notes:**
[1] Add Series C-1 and C-2 Preferred Stock proceeds through 2/7/14 that are not on 12/31/13 balance sheet.
[2] Add value of technology and branding assets under cost to recreate method (Exhibit E.2)
[3] Adjust out "miscellaneous receipts" liability that represents proceeds received from 2013 capital raises, for which stock had not been issued yet.



**US v. Elizabeth Holmes**
Valuation of Theranos, Inc.
As of February 7, 2014

Exhibit 5.2
Cost to Recreate Method - Technology and Branding Assets
(USD)

| Functional Category | Calendar Year 2009 | | | Calendar Year 2010 | | | Calendar Year 2011 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Total Cost [1] | Allocation to Technology and Branding Brand [2] | Allocated Cost | Total Cost [1] | Allocation to Technology and Branding Brand [2] | Allocated Cost | Total Cost [1] | Allocation to Technology and Branding Brand [2] | Allocated Cost |
| Salaries, Wages & SBC | $ 6,717,962 | 100% | $ 6,717,962 | $ 7,485,020 | 100% | $ 7,485,020 | $ 10,069,033 | 100% | $ 10,069,033 |
| Payroll Taxes & Processing | 483,606 | 100% | 483,606 | 568,593 | 100% | 568,593 | 784,642 | 100% | 784,642 |
| Health Insurance | 417,083 | 100% | 417,083 | 493,526 | 100% | 493,526 | 767,508 | 100% | 767,508 |
| Other benefits | 114,239 | 100% | 114,239 | 180,253 | 100% | 180,253 | 773,318 | 100% | 773,318 |
| Sales Commissions | 5,000 | 0% | - | - | 0% | - | - | 0% | - |
| **Subtotal Employees** | **$ 7,737,890** | | **$ 7,732,890** | **$ 8,727,402** | | **$ 8,727,402** | **$ 12,394,501** | | **$ 12,394,501** |
| Contractor Services | 488,192 | 100% | 488,192 | 518,786 | 100% | 518,786 | 1,637,549 | 100% | 1,637,549 |
| **Subtotal for All Labor Costs** | **$ 8,226,082** | | **$ 8,221,082** | **$ 9,246,188** | | **$ 9,246,188** | **$ 14,032,050** | | **$ 14,032,050** |
| Facility Costs | $ 2,145,779 | 99.9% | $ 2,144,392 | $ 3,064,230 | 100.0% | $ 3,064,230 | $ 2,724,300 | 100.0% | $ 2,724,300 |
| R&D Materials, Parts, Biological Compounds | 935,138 | 100% | 935,138 | 3,786,184 | 100% | 3,786,184 | 5,955,745 | 100% | 5,955,745 |
| Conf., Website, Market Studies, Trademark Costs | 56,925 | 100% | 56,925 | 75,422 | 100% | 75,422 | 13,452 | 100% | 13,452 |
| Legal, Tax, Accounting Services - General | 120,887 | 50% | 60,349 | 284,905 | 50% | 142,303 | 339,145 | 50% | 169,582 |
| Legal Regulatory and Patents Costs | 313,058 | 100% | 313,058 | 492,136 | 100% | 492,136 | 1,307,280 | 100% | 1,307,280 |
| Legal Costs for Litigation | - | 0% | - | - | 0% | - | 885,895 | 0% | - |
| Expensed Equip., Software, and Maintenance | 148,010 | 100% | 148,010 | 226,101 | 100% | 226,101 | 820,302 | 100% | 820,302 |
| Dues, Subscriptions, Licenses and Supplies | 85,853 | 100% | 85,853 | 233,858 | 100% | 233,858 | 447,380 | 100% | 447,380 |
| Recruiting Costs | 192,343 | 99.9% | 192,219 | 212,706 | 100.0% | 212,706 | 300,466 | 100.0% | 300,466 |
| Travel Expenses | 226,711 | 50% | 113,355 | 134,949 | 50% | 77,474 | 398,622 | 50% | 199,411 |
| Interest (Income), Expense & Bank Charges | 109,143 | 0% | - | 70,077 | 0% | - | (132,532) | 0% | - |
| Supporting G&A Expenses | 274,158 | 99.9% | 273,981 | 361,955 | 100.0% | 361,955 | 455,201 | 100.0% | 455,201 |
| Relocation Expenses | 27,220 | 0% | - | 9,272 | 0% | - | 66,194 | 0% | - |
| Supplies for Manufacturing / Operations | 754,146 | 100% | 754,146 | 432,293 | 100% | 432,293 | 77,829 | 100% | 77,829 |
| Inventory | - | 100% | - | (13,583) | 100% | (13,583) | (5,337) | 100% | (5,337) |
| Capital Expenditures | 180,627 | 100% | 180,627 | 1,635,110 | 100% | 1,635,110 | 3,042,848 | 100% | 3,042,848 |
| Other Costs | 17,441 | 0% | - | 17,845 | 0% | - | 15,027 | 0% | - |
| **Subtotal for Indirect Costs** | **$ 5,589,248** | | **$ 5,260,052** | **$ 10,540,161** | | **$ 10,540,161** | **$ 9,730,772** | | **$ 15,307,450** |
| | | Yrs | | | Yrs | | | Yrs | |
| Inflation Adjusted Total Expenses [4] | 2.3% | 4.61 | $ 14,583,679 | 2.3% | 3.61 | $ 30,623,946 | 2.3% | 2.61 | $ 31,148,641 |

| Functional Category | Calendar Year 2012 | | | Calendar Year 2013 | | | Calendar Year 2014 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Total Cost [1] | Allocation to Technology and Branding Brand [2] | Allocated Cost | Total Cost [1] | Allocation to Technology and Branding Brand [2] | Allocated Cost | Total Cost [1] | Allocation to Technology and Branding Brand [2] | Allocated Cost |
| Salaries, Wages & SBC | $ 20,228,277 | 100% | $ 20,228,277 | $ 29,829,686 | 100% | $ 29,829,686 | $ 46,389,000 | 8% | $ 3,864,083 |
| Payroll Taxes & Processing | 1,581,834 | 100% | 1,581,834 | 2,246,298 | 100% | 2,246,298 | 3,450,000 | 8% | 287,500 |
| Health Insurance | 1,429,986 | 100% | 1,429,986 | 2,161,519 | 100% | 2,161,519 | 3,325 | 8% | 277 |
| Other benefits | 2,374,572 | 100% | 2,374,572 | 3,255,991 | 100% | 3,255,991 | 8,112,675 | 8% | 676,056 |
| Sales Commissions | - | 0% | - | 78 | 0% | 78 | 312,000 | 0% | - |
| **Subtotal Employees** | **$ 25,604,469** | | **$ 25,604,469** | **$ 37,493,572** | | **$ 37,493,494** | **$ 58,247,000** | | **$ 4,827,917** |
| Contractor Services | 3,073,543 | 100% | 3,073,543 | 5,372,096 | 100% | 5,372,096 | 7,885,000 | 8% | 657,083 |
| **Subtotal for All Labor Costs** | **$ 28,678,011** | | **$ 28,678,011** | **$ 42,865,668** | | **$ 42,865,590** | **$ 66,132,000** | | **$ 5,485,000** |
| Facility Costs | $ 7,375,665 | 100.0% | $ 7,375,665 | $ 7,140,632 | 100.0% | $ 7,140,617 | $ 16,776,000 | 8% | $ 1,390,512 |
| R&D Materials, Parts, Biological Compounds | 11,136,534 | 100% | 11,136,534 | 10,099,736 | 100% | 10,099,736 | 10,638,000 | 8% | 886,500 |
| Conf., Website, Market Studies, Trademark Costs | 1,274,910 | 100% | 1,274,910 | 7,684,778 | 100% | 7,684,778 | 3,087,000 | 8% | 257,250 |
| Legal, Tax, Accounting Services - General | 1,400,908 | 50% | 700,454 | 709,758 | 50% | 354,878 | 1,051,000 | 4% | 43,792 |
| Legal Regulatory and Patents Costs | 1,750,963 | 100% | 1,750,963 | 1,913,373 | 100% | 1,913,373 | 2,169,000 | 8% | 180,250 |
| Legal Costs for Litigation | 1,829,174 | 0% | - | 6,197,019 | 0% | - | 3,899,000 | 0% | - |
| Expensed Equip., Software, and Maintenance | 1,084,748 | 100% | 1,084,748 | 1,657,749 | 100% | 1,657,745 | 1,792,000 | 8% | 149,333 |
| Dues, Subscriptions, Licenses and Supplies | 1,211,673 | 100% | 1,211,673 | 1,522,924 | 100% | 1,522,924 | 3,583,000 | 8% | 298,583 |
| Recruiting Costs | 796,875 | 100.0% | 796,875 | 552,947 | 100.0% | 552,946 | 1,147,000 | 8% | 95,071 |
| Travel Expenses | 267,524 | 50% | 133,762 | 787,042 | 50% | 393,531 | 1,170,000 | 4% | 48,750 |
| Interest (Income), Expense & Bank Charges | 143,630 | 0% | - | 382,053 | 0% | - | (27,000) | 0% | - |
| Supporting G&A Expenses | 934,674 | 100.0% | 934,674 | 1,185,138 | 100.0% | 1,185,135 | 2,335,000 | 8% | 193,341 |
| Relocation Expenses | 65,758 | 0% | - | 24,763 | 0% | - | 43,000 | 0% | - |
| Supplies for Manufacturing / Operations | 895,721 | 100% | 895,721 | 1,574,094 | 100% | 1,574,094 | 1,952,000 | 0% | - |
| Inventory | 6,865,924 | 100% | 6,865,924 | 1,742,884 | 100% | 1,742,884 | 1,145,000 | 8% | 95,417 |
| Capital Expenditures | 17,572,491 | 100% | 17,572,491 | 9,884,766 | 100% | 9,884,769 | 38,594,066 | 8% | 3,216,172 |
| Other Costs | 90,432 | 0% | - | (44,941) | 0% | - | 30,000 | 0% | - |
| **Subtotal for Indirect Costs** | **$ 54,657,992** | | **$ 51,694,503** | **$ 51,984,722** | | **$ 44,677,410** | **$ 89,414,066** | | **$ 6,858,171** |
| | | Yrs | | | Yrs | | | Yrs | |
| Inflation Adjusted Total Expenses [3] | 2.3% | 1.61 | $ 82,390,084 | 2.3% | 0.61 | $ 88,771,777 | 2.3% | 0 | $ 12,343,171 |

| | |
|---|---|
| 2004-2006 Expenses, Inflation Adjusted [4] | $ 23,743,086 |
| 2007 Expenses, Inflation Adjusted [5] | 20,247,539 |
| 2008 Expenses, Inflation Adjusted [5] | 15,187,171 |
| 2009-2014 Expenses, Inflation Adjusted | 251,261,278 |
| **Total Direct and Indirect Development Costs** | **$ 310,439,074** |
| Obsolescence Adjustment [6] | 4% (11,871,543) |
| **Subtotal Cost** | **$ 298,567,531** |
| Add Developer Profit Margin [7] | 14% 41,799,454 |
| **Total Pretax Development Cost** | **$ 340,366,985** |
| **Total Pretax Development Cost (Rounded)** | **$ 340,370,000** |

Notes
[1] Per company prepared trial balances.
[2] Allocations based on relevance of costs to developing Theranos technology and branding assets. 2014 is adjusted for partial period to valuation date.
[3] Adjust allocated expenses for average annual inflation of 2.3% over historical period.
[4] 2004 - 2006 expenses based on retained earnings deficit at 12/31/07 less operating loss reported for calendar year 2007. Expenses are adjusted for inflation of 2.3% from midpoint of period to valuation date.
[5] 2007 - 2008 expenses based on audited financial statements. Excludes financing costs and interest income. Expenses are adjusted for inflation of 2.3% from midpoint of each period to valuation date.
[6] Adjusted for estimated 50% of historical development efforts between 2004-2006 that represent obsolete technology on valuation date.
[7] Developer margin based on median EBIT margin of peer group of firms in Exhibit D.2.




HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

ER-677

**US v. Elizabeth Holmes**                                                                    **Exhibit F.1**

Valuation of Theranos, Inc.                                          Discounted Cash Flow Key Assumptions
As of December 31, 2014                                                                    *(thousands of USD)*

| | | For the Twelve Month Period Ending December 31, | | | |
| --- | --- | --- | --- | --- | --- |
| | **Basis** | **2015** | **2016** | **2017** | **2018** |
| Total Revenue | Annual Growth Rate | 97703.4% | 97.0% | 44.8% | 55.6% |
| Terminal Value | Exit Multiple, Ex. G.1 | | | | 4.0% |
| Total Cost of Revenue | % of Revenue | 35.0% | 32.0% | 32.0% | 30.0% |
| Total Operating Expenses | % of Revenue | 85.5% | 44.7% | 33.7% | 24.7% |
| Depreciation & Amortization | Exhibit F.3 | 9.3% | 6.9% | 7.0% | 6.0% |
| Interest Expense | N/A | N/A | N/A | N/A | N/A |
| Income Taxes | % of Pre-Tax Net Income | 40.0% | 40.0% | 40.0% | 40.0% |
| Adjusted Operating Working Capital | Exhibit F.2 | 4.0% | 10.5% | 14.8% | 18.6% |
| Adjusted Operating Working Capital | | 4,593 | 23,523 | 47,806 | 93,778 |
| Yr/yr Working Capital (Increase)/Reduction | | 299,343 | (18,930) | (24,283) | (45,972) |
| Capital Expenditures | % of Revenue | 29.2% | 20.6% | 20.3% | 11.8% |



**US v. Elizabeth Holmes**  
Valuation of Theranos, Inc.  
As of December 31, 2014

**Exhibit F.2**  
Adjusted Working Capital Analysis  
*(thousands of USD)*

| Working Capital | | FYE 12-31-09 | | FYE 12-31-10 | | FYE 12-31-11 | | FYE 12-31-12 | | FYE 12-31-13 | | FYE 12-31-14 | | For the Twelve Month Period Ending December 31, | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | 2015 | 2016 | 2017 | 2018 |
| Total Revenue | [1] $ | 2,794 | $ | 1,401 | $ | 518 | $ | - | $ | - | $ | 116 | $ | 113,452 | $ | 223,452 | $ | 323,452 | $ | 503,452 |
| Total COS | | - | | - | | - | | - | | - | | - | | 39,708 | 71,505 | 103,505 | 151,036 |
| Total Operating Expenses | | 13,597 | | 16,801 | | 27,173 | | 64,015 | | 85,605 | | 122,756 | | 97,025 | 99,961 | 108,977 | 124,401 |
| | | | | | | | | | | | | | | | | | | |
| Operating Assets | | | | | | | | | | | | | | | | | | |
| Cash & Equivalents | [2] $ | 3,690 | $ | 36,718 | $ | 88,056 | $ | 51,785 | $ | 30,966 | $ | 465,933 | $ | 47,846 | $ | 49,296 | $ | 53,742 | $ | 61,348 |
| Accounts Receivable | | 29 | | 55 | | - | | - | | - | | - | | - | - | - | - |
| Inventory | | 581 | | - | | - | | 1,733 | | 3,777 | | 2,363 | | 3,404 | 6,704 | 9,704 | 15,104 |
| Other Current Assets | | 195 | | 827 | | 665 | | 1,882 | | 1,780 | | 12,788 | | 4,838 | 5,080 | 5,334 | 5,601 |
| Note Receivable | | - | | - | | - | | - | | - | | 27,045 | | 57,539 | 50,055 | 42,303 | 58,453 |
| Total Operating Assets | | 4,495 | | 37,600 | | 88,721 | | 55,401 | | 36,523 | | 508,149 | | 113,629 | 111,135 | 111,083 | 140,506 |
| | | | | | | | | | | | | | | | | | | |
| Operating Liabilities | | | | | | | | | | | | | | | | | | |
| Accounts Payable | | 560 | | 440 | | 1,238 | | 7,669 | | 7,430 | | 16,633 | | 13,879 | 16,480 | 16,174 | 22,774 |
| Deferred Revenue | | 1,663 | | 257 | | 7 | | 7 | | 7 | | - | | - | - | - | - |
| Other Current Liabilities | | 950 | | 1,298 | | 2,845 | | 7,714 | | 4,830 | | 9,984 | | 7,073 | 8,265 | 9,453 | 11,521 |
| Deferred Rent | | 723 | | 759 | | 767 | | 1,572 | | 1,857 | | - | | - | - | - | - |
| Deferred Revenue, LT | | 2,146 | | 3,808 | | 3,801 | | 3,801 | | 3,801 | | - | | - | - | - | - |
| Customer Deposits | | - | | - | | 73,500 | | 69,500 | | 80,000 | | 143,846 | | 70,356 | 46,904 | 23,452 | - |
| Other Non-current liabilities | | 807 | | 1,847 | | 5,959 | | 3,425 | | 1,866 | | 33,750 | | 17,728 | 15,963 | 14,198 | 12,433 |
| Total Operating Liabilities | | 6,849 | | 8,409 | | 88,117 | | 93,687 | | 99,791 | | 204,213 | | 109,036 | 87,612 | 63,277 | 46,728 |
| | | | | | | | | | | | | | | | | | | |
| Net Operating Working Capital | | $ (2,354) | $ | 29,191 | $ | 604 | $ | (38,287) | $ | (63,268) | $ | 303,936 | $ | 4,593 | $ | 23,523 | $ | 47,806 | $ | 93,778 |
| *Net Operating Working Capital as % of Revenue* | | -84.3% | | 2083.1% | | 116.6% | | 0.0% | | 0.0% | | 262013.8% | | 4.0% | 10.5% | 14.8% | 18.6% |
| *Yr/yr Working Capital (increase)/Reduction* | | - | | (31,545) | | 28,587 | | 38,891 | | 24,981 | | (367,204) | | 299,343 | (18,930) | (24,283) | (45,972) |
| | | | | | | | | | | | | | | | | | | |
| *BizMiner Working Capital as a % of Revenue* | | | | | | | | | | | | | | | 22.8% | | | |
| *RMA Working Capital as a % of Revenue* | | | | | | | | | | | | | | | 36.1% | | | |
| *Comparable Group Working Capital as a % of Revenue* | | | | | | | | | | | | | | | 58.0% | | | |
| | | | | | | | | | | | | | | | | | | |
| Days' Operating Expenses in Cash | | 99 | | 798 | | 1,183 | | 295 | | 132 | | 1,385 | | 180 | 180 | 180 | 180 |
| Days' Sales Outstanding | | 4 | | 14 | | - | | - | | - | | - | | - | - | - | - |
| Days' Inventory | | - | | - | | - | | - | | - | | - | | 31 | 34 | 34 | 37 |
| Other Current Assets as a % of Revenue | | 7.0% | | 59.0% | | 128.4% | | 0.0% | | 0.0% | | 11024.1% | | 4.3% | 2.3% | 1.6% | 1.1% |
| Note Receivable as a % of Revenue | | 0.0% | | 0.0% | | 0.0% | | 0.0% | | 0.0% | | 23314.7% | | 50.7% | 22.4% | 13.1% | 11.6% |
| Days' Payables | | - | | - | | - | | - | | - | | - | | 128 | 84 | 57 | 55 |
| Deposits & Deferred Revenue as a % of Revenue | | 136.3% | | 290.1% | | 14917.2% | | 0.0% | | 0.0% | | 124005.2% | | 62.0% | 21.0% | 7.3% | 0.0% |
| Other Current Liabilites as a % of Opex | | 7.0% | | 7.7% | | 10.5% | | 12.1% | | 5.6% | | 8.1% | | 7.3% | 8.3% | 8.7% | 9.3% |
| Deferred Rent as a % of Opex | | 5.3% | | 4.5% | | 2.8% | | 2.5% | | 2.2% | | 0.0% | | 0.0% | 0.0% | 0.0% | 0.0% |
| Other Non-current liabilities as a % of Opex | | 5.9% | | 11.0% | | 21.9% | | 5.4% | | 2.2% | | 27.5% | | 18.3% | 16.0% | 13.0% | 10.0% |

**Notes:**
[1] Historical balances are per Adjusted Income Statement. Refer to Exhibit B.5. Operating Expenses exclude Depreciation & Amortization.
[2] Estimated operating cash levels equal to 6 months of operating expenses


HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

**US v. Elizabeth Holmes**      **Exhibit F.3**

Valuation of Theranos, Inc.      Depreciation & Capital Expenditure Analysis

As of December 31, 2014      *(thousands of USD)*

| Forecast Depreciation | | For the Twelve Month Period Ending December 31, | | | |
| --- | --- | --- | --- | --- | --- |
| | | 2015 | 2016 | 2017 | 2018 |
| Total Revenue | | $ 113,452 | $ 223,452 | $ 323,452 | $ 503,452 |
| | | | | | |
| Beginning Balance - Total Fixed Assets | | 53,366 | 75,963 | 106,437 | 149,519 |
| Capital Expenditures | | 33,134 | 45,970 | 65,569 | 59,240 |
|    Fixed Assets | | 86,500 | 121,933 | 172,006 | 208,759 |
| *Capital Expenditures as a % of Revenue* | | *29.21%* | *20.57%* | *20.27%* | *11.77%* |
| | | | | | |
| Depreciation | | | | | |
|   Assumptions as to Depreciable Lives: | | | | | |
|   Beg. Dep. Existing Fixed Assets - avg life | **6.3** | | | | |
|   Capital Additions - avg life | **8.0** | | | | |
| | | | | | |
|   Beginning Balance | | $ 8,460 | $ 8,460 | $ 8,460 | $ 8,460 |
|   2015 Additions | | 2,077 | 4,154 | 4,154 | 4,154 |
|   2016 Additions | | | 2,881 | 5,763 | 5,763 |
|   2017 Additions | | | | 4,110 | 8,220 |
|   2018 Additions | | | | | 3,713 |
| | | | | | |
| Total Depreciation | | $ 10,537 | $ 15,496 | $ 22,487 | $ 30,310 |
| *As a % of Revenue* | | *9.3%* | *6.9%* | *7.0%* | *6.0%* |
| | | | | | |
| Net Fixed Assets | | $ 75,963 | $ 106,437 | $ 149,519 | $ 178,448 |
| *As a % of Revenue* | | *67.0%* | *47.6%* | *46.2%* | *35.4%* |

| Historical Capital Expenditure Analysis | | FYE 12-31-10 | FYE 12-31-11 | FYE 12-31-12 | FYE 12-31-13 | FYE 12-31-14 |
| --- | --- | --- | --- | --- | --- | --- |
| Net FA | | 2,630 | 4,648 | 19,557 | 22,021 | 53,366 |
| Chg from PY | | N/A | 2,018 | 14,909 | 2,463 | 31,345 |
| Depreciation | | 771 | 1,025 | 2,654 | 5,573 | 7,247 |
| (Gain)/Loss | | - | - | 9 | 849 | 1 |
| Capital Expenditures | | N/A | 3,043 | 17,572 | 8,885 | 38,594 |
| | Average | | | | | |
| Fixed Assets | 20,444 | 2,630 | 4,648 | 19,557 | 22,021 | 53,366 |
| *Fixed Assets as a % of Revenue* | *5021.8%* | *187.7%* | *896.9%* | *N/A* | *N/A* | *46005.2%* |
| | | | | | | |
| Capital Expenditures | 17,024 | N/A | 3,043 | 17,572 | 8,885 | 38,594 |
| *Capital Expenditures as a % of Revenue* | *4181.6%* | *N/A* | *587.1%* | *N/A* | *N/A* | *33270.7%* |



HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

US v. Elizabeth Holmes | | | | | | | Exhibit F-4
Valuation of Theranos, Inc. | | | | | | | Discount Rate - Venture Capital Rates of Return
As of December 31, 2014

| Company Name | Ticker Symbol | Market Capitalization | Interest Bearing Debt | Trading Volume [7] | LTM Revenue | 1-Year Growth Rate | Equity as a % of Total Capital |
|---|---|---|---|---|---|---|---|
| OraSure Technologies, Inc. | OSUR | $ 568,416 | $ - | 641 | $ 105,464 | 7.6% | 100.0% |
| Trinity Biotech plc | TRIB | 392,493 | | 135 | 104,872 | 15.0% | 100.0% |
| Enzo Biochem, Inc. | ENZ | 216,928 | 4,038 | 188 | 98,637 | 4.8% | 98.2% |
| Quidel/Ortho Corporation | QDEL | 995,180 | 143,084 | 302 | 184,168 | 3.9% | 87.4% |
| Exact Sciences Corporation | EXAS | 2,430,718 | 3,760 | 1,974 | 1,798 | -86.6% | 99.8% |
| OPKO Health, Inc. | OPK | 4,337,104 | 147,343 | 2,446 | 91,125 | -5.6% | 96.7% |
| PerkinElmer, Inc. | PKI | 4,936,652 | 1,046,468 | 1,017 | 2,089,880 | -4.1% | 82.5% |
| Qiest Diagnostics Incorporated | DGX | 9,892,485 | 3,770,000 | 1,637 | 7,435,000 | 4.0% | 72.0% |
| Laboratory Corporation of America Holdings | LH | 9,117,350 | 3,029,800 | 1,264 | 6,011,800 | 3.5% | 75.1% |
| Myriad Genetics, Inc. | MYGN | 2,485,880 | - | 749 | 724,873 | -1.7% | 100.0% |
| Illumina, Inc. | ILMN | 26,210,360 | 1,291,036 | 1,158 | 1,861,358 | 31.0% | 95.3% |
| Qiagen N.V. | QGEN | 5,425,829 | 1,173,204 | 705 | 1,344,777 | 3.3% | 82.2% |
| Alere Inc. | IQT2622336 | 3,175,126 | 3,726,094 | 493 | 2,577,001 | -1.2% | 46.0% |
| Luminex Corporation | IQT2627430 | 803,551 | | 243 | 226,983 | 6.4% | 100.0% |
| Abaxis, Inc. | IQT2586525 | 1,282,721 | 505 | 202 | 162,777 | 1.7% | 100.0% |
| CombiMatrix Corporation | IQT36309071 | 14,271 | 405 | 7 | 8,042 | 26.3% | 97.2% |
| Affymetrix Inc. | IQT2587418 | 726,274 | 127,950 | 703 | 349,019 | 5.9% | 85.0% |
| Genomic Health, Inc | IQT24111615 | 1,014,152 | | 151 | 275,706 | 5.4% | 100.0% |
| Cepheid | IQT2599314 | 3,815,841 | 278,213 | 620 | 470,141 | 17.2% | 93.2% |
| Nanosphere, Inc | IQT38720096 | 45,675 | 9,716 | 117 | 14,290 | 42.9% | 82.5% |
| GenMark Diagnostics, Inc. | IQT106626443 | 568,004 | - | 185 | 30,594 | 11.6% | 100.0% |
| Bio-Reference Laboratories, Inc. | IQT2594421 | 890,901 | 55,429 | 212 | 832,282 | 15.3% | 94.1% |
| **Average** | | 3,597,694 | 673,052 | 680 | 1,136,335 | 8.2% | 90.3% |
| **Median** | | 1,147,437 | 32,573 | 556 | 251,345 | 5.1% | 96.0% |
| **Selected** | | | | | | | 97.0% |

**Industry Capital Structure**

| | |
|---|---|
| Equity | 95.0% |
| Interest Bearing Debt | 5.0% |
| Tax Rate | 40.0% |

**Cost of Equity** Ref. [1]

Table 1: Venture Capital Average Actual Rates of Return for the Period ended September 30, 2008

| | 5-year Return | | 10-year Return | | 20-year Return | |
|---|---|---|---|---|---|---|
| Stage of Development | 2002 | 2008 | 2002 | 2008 | 2002 | 2008 |
| Seed/Early Stage | 51.4% | 3.0% | 34.9% | 25.5% | 20.4% | 22.1% |
| Balanced | 20.9% | 7.5% | 20.9% | 12.0% | 14.3% | 14.6% |
| Later Stage | 10.6% | 8.1% | 21.6% | 7.3% | 15.3% | 14.7% |
| All Ventures | 28.3% | 5.7% | 26.3% | 13.4% | 16.6% | 17.2% |

Table 2: Target Rates of Return [2-5]

| Stage of Development | Plummer | Scherlis and Sahlman | Sahlman, Stevenson, and Bhide | Everett | Everett Median Returns |
|---|---|---|---|---|---|
| Start-up | 50% - 70% | 50% - 70% | 50% - 100% | 30% - 40% | 33.0% |
| First stage or 'early development' | 40% - 60% | 40% - 60% | 40% - 60% | 23% - 38% | 28.0% |
| Second stage or 'expansion' | 35% - 50% | 30% - 50% | 30% - 40% | 19% - 32% | 25.0% |
| Bridge/IPO | 25% - 35% | 20% - 35% | 20% - 30% | 18% - 38% | 25.0% |

Table 3: Target Rates of Return [6]

| | Ruhnka / | | Plummer / Qed Range of Discount Rates Used | |
|---|---|---|---|---|
| Stage of Development | Young | Wetzel | High | Low |
| Seed | 73.0% | 50.0% | 75.4% | 49.2% |
| Start-up | 54.8% | 50.0% | 59.6% | 40.6% |
| 3rd Stage | 42.2% | 37.5% | 49.3% | 34.7% |
| Fourth Stage | 35.0% | 30.0% | 45.7% | 31.2% |
| Exit Stage | 35.0% | 22.5% | 40.8% | 28.1% |

Table 4: Theranos Investor Forecasts Implied Internal Rates of Return (Feb 2014 - Feb 2015) [6]

| Investor Group | IRR |
|---|---|
| PFM Forecast | 75.5% |
| PFM Model | 35.5% |
| Mosley and RDV Forecast | 54.0% |
| Murdoch Forecast | 82.0% |

| Selected Venture Capital Cost of Equity | | 45.0% | [7] |
|---|---|---|---|

**Weighted Average Cost of Capital**

| | | | |
|---|---|---|---|
| Equity as a % of total capital | | 95.0% | |
| Cost of Equity (above) | | 45.0% | |
| Weighted Cost of Equity | | | 42.8% |
| | | | |
| Debt as a % of total capital | | 5.0% | |
| Cost of Debt [4] | 25.00% | | |
| After Tax Cost of Debt (tax rate above) | | 15.0% | |
| Weighted After Tax Cost of Debt | | | 0.8% |
| | | | |
| **Weighted Average Cost of Capital** | | | **43.5%** |
| | | | |
| **Weighted Average Cost of Capital (rounded)** | | | **44.0%** |

Notes:
[1] Source: Thomson Financial. The average annual return is based upon Thomson Financials' Private Equity Performance Index (PEPI).
The PEPI is based on the latest quarterly statistics from Thomson Financials' Private Equity Performance Database analyzing the cashflows and
returns for over 1400 US venture capital and private equity partnerships.
[2] Plummer, James L., QED Report on Venture Capital Financial Analysis.
[3] Scherlis, Daniel R. and William A. Sahlman, "A Method for Valuing High-Risk, Long Term, Investments 'The Venture Capital Method."
Harvard Business School Teaching Note 9-288-006, Boston: Harvard Business School Publishing, 1989.
[4] William A. Sahlman, Howard H. Stevenson, Amar V. Bhide, et al., "Financing Entrepreneurial Ventures."
Business Fundamental Series (Boston: Harvard Business School Publishing, 1998).
Craig R. Everett, "2021 Private Capital Markets Report" (Malibu: Pepperdine University Graziadio School of Business and Management, 2021), Table
[5] 1, p. 5. Note that this publication also includes rates of return for many other types of private capital investments, as well as summaries of other information captured in Pepperdine's annual industry survey.
[6] Dorsey, Terry, "A Portfolio Model for Venture Capital Performance Measurement and Investment Selection," Polaris Group, Inc. January 2000
[7] Refer to the report for discussion of the selected Venture Capital Rate of Return



**US v. Elizabeth Holmes**  **Exhibit F.5**

Valuation of Theranos, Inc.  Forecast Free Cash Flow to Invested Capital

As of December 31, 2014  *(thousands of USD)*

| | For the Twelve Month Period Ending December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2015 | 2016 | 2017 | 2018 |
| Total Revenue | $ 113,452 | $ 223,452 | $ 323,452 | $ 503,452 |
| Total Cost of Revenue | 39,708 | 71,505 | 103,505 | 151,036 |
| Gross Margin | 73,744 | 151,947 | 219,947 | 352,416 |
| GM % | *65.0%* | *68.0%* | *68.0%* | *70.0%* |
| | | | | |
| Total Operating Expenses | 97,025 | 99,961 | 108,977 | 124,401 |
| *Operating Expense %* | *85.5%* | *44.7%* | *33.7%* | *24.7%* |
| | | | | |
| **EBITDA** | **(23,281)** | **51,986** | **110,970** | **228,015** |
| *EBITDA %* | *-20.5%* | *23.3%* | *34.3%* | *45.3%* |
| | | | | |
| Less:  Partial Period Adjustment | – | – | – | – |
| **Adjusted EBITDA** | **(23,281)** | | | |
| Depreciation & Amortization | 10,537 | 15,496 | 22,487 | 30,310 |
| | | | | |
| **EBIT** | **(33,818)** | **36,490** | **88,483** | **197,705** |
| *EBIT %* | *-29.8%* | *16.3%* | *27.4%* | *39.3%* |
| | | | | |
| Interest Expense | – | – | – | – |
| | | | | |
| Earnings Before Taxes | (33,818) | 36,490 | 88,483 | 197,705 |
| Income Taxes | – | – | – | 32,350 |
| | | | | |
| **Forecast After-Tax Income** | $ **(33,818)** | $ **36,490** | $ **88,483** | $ **165,354** |
| *NPAT %* | *-29.8%* | *16.3%* | *27.4%* | *32.8%* |
| | | | | |
| **Cash Flow** | | | | |
| Add:  Depreciation & Amortization | 10,537 | 15,496 | 22,487 | 30,310 |
| After-Tax Gross Cash Flow | (23,281) | 51,986 | 110,970 | 195,665 |
| | | | | |
| Decrease / (Increase) in Working Capital | 299,343 | (18,930) | (24,283) | (45,972) |
| Less:  Capital Expenditures | (33,134) | (45,970) | (65,569) | (59,240) |
| | | | | |
| **Free Cash Flow** | $ **242,928** | $ **(12,914)** | $ **21,118** | $ **90,453** |



US v. Elizabeth Holmes | **Exhibit F.6**
---|---
Valuation of Theranos, Inc. | Discounted Cash Flow Method Value Summary
As of December 31, 2014 | *(thousands of USD)*

| Forecast Period | Base Cash Flow | | Period | Discount Rate | PV Factor [2] | Discounted Cash Flow [3] | |
|---|---|---|---|---|---|---|---|
| 2015 | $ | 242,928 | 0.50 | 44.0% | 0.8334 | $ | 202,464 |
| 2016 | | (12,914) | 1.50 | 44.0% | 0.5788 | | (7,475) |
| 2017 | | 21,118 | 2.50 | 44.0% | 0.4020 | | 8,489 |
| 2018 | | 90,453 | 3.50 | 44.0% | 0.2791 | | 25,250 |
| Terminal Value [1] | | 3,282,000 | 4.00 | 44.0% | 0.2326 | | 763,471 |

| | | |
|---|---|---|
| **Indicated Value** | $ | **992,199** |
| Add: C-2 Financing Proceeds | | - |
| Deduct: Interest Bearing Debt | | (40,805) |
| Add: Other non-operating assets | | - |
| **Total Equity Value - Controlling, Marketable Basis** | $ | **951,394** |
| **Total Equity Value - Controlling, Marketable Basis (rounded)** | $ | **951,000** |

**Notes:**
[1] Refer to Exhibit G.1
[2] 1 / (1 + Discount Rate) ^ Period.
[3] Base Cash Flow x PV Factor.



US v. Elizabeth Holmes
Valuation of Theranos, Inc.
As of December 31, 2014

Exhibit G.1
Guideline Public Company Method
(thousands of USD)

| Name | Ticker | Market Cap | Debt, Pref Shr & Min Int. | Cash | MVIC [1] | Revenue LTM | Revenue 2015E | EBITDA LTM | EBITDA 2015E | EBIT LTM | MVIC / Revenue LTM | Revenue 2015E | EBITDA LTM | EBITDA 2015E | EBIT LTM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OraSure Technologies, Inc | OSUR | $ 568,416 | $ - | $ 97,867 | $ 470,549 | $ 108,484 | $ 121,370 | $ (3,595) | $ 9,187 | $ (10,302) | 4.42x | 3.88x | NA | 51.33x | NA |
| Trinity Biotech plc | TRIB | 392,493 | - | 9,102 | 383,391 | 104,872 | 113,729 | 19,933 | 28,853 | 15,438 | 3.66x | 3.37x | 19.23x | 13.29x | 24.83x |
| Enzo Biochem, Inc | ENZ | 218,928 | 4,038 | 16,591 | 206,375 | 96,637 | 104,929 | (8,660) | NA | (12,544) | 2.14x | 1.97x | NA | NA | NA |
| QuidelOrtho Corporation | QDEL | 905,160 | 143,084 | 200,895 | 937,349 | 184,158 | 204,235 | 20,540 | 37,389 | (6,560) | 5.09x | 4.59x | 45.64x | 25.07x | NA |
| Exact Sciences Corporation | EXAS | 2,430,718 | 3,760 | 282,758 | 2,151,722 | 1,798 | 76,142 | (96,829) | (98,642) | (100,539) | NA | 27.54x | NA | NA | NA |
| OPKO Health, Inc. | OPK | 4,337,104 | 140,940 | 98,907 | 4,381,137 | 91,125 | 136,930 | (94,387) | (102,502) | (109,314) | 48.08x | 32.00x | NA | NA | NA |
| PerkinElmer, Inc. | PKI | 4,939,852 | 1,045,488 | 174,821 | 5,811,499 | 2,069,680 | 2,339,190 | 291,561 | 466,729 | 181,098 | 2.81x | 2.48x | 19.93x | 12.45x | 32.09x |
| Quest Diagnostics Incorporated | DGX | 9,692,486 | 3,799,000 | 192,000 | 13,299,486 | 7,435,000 | 7,571,881 | 1,433,000 | 1,507,392 | 1,119,000 | 1.79x | 1.76x | 9.28x | 8.82x | 11.89x |
| Laboratory Corporation of America Holdings | LH | 9,117,566 | 3,047,500 | 580,000 | 11,585,066 | 6,011,600 | 6,532,839 | 1,152,500 | 1,282,404 | 945,500 | 1.93x | 1.77x | 10.05x | 9.03x | 12.25x |
| Myriad Genetics, Inc. | MYGN | 2,485,680 | - | 165,115 | 2,320,765 | 724,873 | 879,890 | 191,786 | 258,525 | 170,797 | 3.20x | 2.64x | 12.10x | 8.98x | 13.59x |
| Illumina, Inc. | ILMN | 26,210,360 | 1,291,036 | 1,338,371 | 26,163,025 | 1,801,356 | 2,260,107 | 604,746 | 767,868 | 492,172 | 14.08x | 11.58x | 43.26x | 34.07x | 53.15x |
| Qiagen N.V. | QGEN | 5,425,828 | 1,181,459 | 576,703 | 6,030,584 | 1,344,777 | 1,424,763 | 395,375 | 482,243 | 200,793 | 4.49x | 4.23x | 15.25x | 12.51x | 30.03x |
| Alere Inc. | IQT2622336 | 3,175,128 | 4,338,708 | 378,720 | 7,133,116 | 2,577,001 | 2,773,166 | 505,722 | 569,942 | 169,693 | 2.77x | 2.57x | 14.10x | 12.52x | 42.04x |
| Luminex Corporation | IQT2627430 | 803,551 | - | 91,894 | 711,657 | 226,963 | 243,469 | 45,424 | 52,461 | 31,219 | 3.14x | 2.92x | 15.67x | 13.57x | 23.80x |
| Abaxis, Inc. | IQT2590525 | 1,280,721 | 605 | 109,278 | 1,172,048 | 182,777 | 209,201 | 43,819 | 45,639 | 36,400 | 6.41x | 5.11x | 26.75x | 25.68x | 32.20x |
| CombiMatrix Corporation | IQT36309071 | 14,271 | 405 | 5,240 | 9,436 | 8,042 | 10,972 | (5,137) | NA | (6,454) | 1.17x | 0.86x | NA | NA | NA |
| Affymetrix Inc. | IQT2587418 | 726,274 | 127,950 | 79,923 | 774,301 | 349,019 | 357,448 | 42,586 | 50,612 | 11,880 | 2.22x | 2.17x | 18.19x | 15.24x | 65.13x |
| Genomic Health, Inc. | IQT24111815 | 1,014,152 | - | 103,690 | 910,482 | 275,708 | 311,059 | (16,757) | (9,280) | (23,827) | 3.30x | 2.93x | NA | NA | NA |
| Cepheid | IQT2590214 | 3,815,841 | 278,213 | 293,392 | 3,800,662 | 470,141 | 543,680 | 12,257 | 22,071 | (14,086) | 8.08x | 6.99x | NA | NA | NA |
| Nanosphere, Inc. | IQT38720098 | 45,675 | 9,716 | 21,053 | 34,338 | 14,290 | 23,424 | (35,822) | (31,955) | (37,690) | 2.40x | 1.47x | NA | NA | NA |
| GenMark Diagnostics, Inc. | IQT106626443 | 568,004 | - | 70,506 | 497,498 | 30,594 | 38,324 | (36,389) | (45,700) | (39,054) | 16.26x | 12.98x | NA | NA | NA |
| Bio-Reference Laboratories, Inc. | IQT2594421 | 890,901 | 55,429 | 17,507 | 928,823 | 832,282 | 978,442 | 108,586 | NA | 83,425 | 1.12x | 0.95x | 8.55x | NA | 11.13x |
| Correlation to MVIC |  |  |  |  |  | 0.63 | 0.65 | 0.68 | 0.73 | 0.66 |  |  |  |  |  |
| Correlation to Price |  |  |  |  |  | 0.50 | 0.53 | 0.56 | 0.61 | 0.57 |  |  |  |  |  |

|  | Revenue | | EBITDA | | EBIT |
|---|---|---|---|---|---|
|  | LTM | 2015E | LTM | 2015E | LTM |
| Upper Quartile | 5.09x | 4.98x | 19.93x | 25.07x | 34.88x |
| Mean | 8.60x | 6.22x | 19.05x | 18.66x | 29.26x |
| Median | 3.30x | 2.93x | 15.67x | 13.29x | 27.43x |
| Lower Quartile | 2.22x | 2.02x | 12.10x | 12.45x | 13.25x |

| Selected Multiple | 5.60x | | 13.90x | | |
| Subject Company Base Value | $ 503,452 | $ - | $ 228,015 | $ - | $ - |

| Indicated Value | 3,322,783 | - | 3,169,409 | - | - |
| Interest Bearing Debt | NA | NA | NA | NA | NA |

| Indicated Equity Value | $ 3,322,783 | $ - | $ 3,169,409 | $ - | $ - |
| Weighting | 33.2% | 0.0% | 66.7% | 0.0% | 0.0% |

Indicated Value $ 3,220,533
Add: Subject Company Cash 61,348

Total Invested Capital Value at 12/31/18 Exit - Controlling, Marketable Basis $ 3,281,882

Total Invested Capital Value at 12/31/18 Exit - Controlling, Marketable Basis (rounded) $ 3,282,000

Notes:
Source: S&P Capital IQ
[1] MVIC = Market Value of Invested Capital. Presented as net of cash


HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

ER-684

US v. Elizabeth Holmes
Valuation of Theranos, Inc.
As of December 31, 2014

Exhibit G.2
Guideline Public Company Key Financial Ratios
(thousands of USD)

| Name | Ticker | Market Cap | Trading Volume [1] | LTM Revenue | CAGR Revenue [2] 1 Year | 3 Year | Forward Growth 2015E | 2016E | 2017E | GM | As a % of Revenue EBITDA | EBIT | Capex | WC [3] | Current Ratio | Debt to Equity | Debt to TNW |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OraSure Technologies, Inc. | OSUR | $ 568,416 | 641 | $ 108,464 | 7.8% | 9.1% | 14.0% | 13.4% | 44.6% | 62.6% | -3.8% | -9.7% | 2.8% | 190.3% | 4.96 | 0.0% | 0.0% |
| Trinity Biotech plc | TRIB | 392,493 | 135 | 104,672 | 15.0% | 10.4% | 8.4% | 9.5% | NA | 47.1% | 19.0% | 14.7% | 7.9% | 44.7% | 3.13 | 0.0% | 0.0% |
| Enzo Biochem, Inc. | ENZ | 218,928 | 188 | 96,637 | 4.8% | -1.8% | 8.6% | 7.4% | 8.1% | 43.6% | -9.0% | -13.0% | 0.8% | 15.8% | 1.62 | 11.2% | 19.1% |
| QuidelOrtho Corporation | QDEL | 995,160 | 302 | 184,158 | 3.9% | 5.1% | 10.9% | 8.7% | 6.3% | 59.2% | 11.2% | -3.6% | 6.1% | 129.3% | 7.54 | 58.4% | 116.9% |
| Exact Sciences Corporation | EXAS | 2,430,718 | 1,974 | 1,798 | -56.5% | -24.4% | N/A | 189.9% | 68.1% | -140.5% | N/A | -5591.7% | N/A | ###### | 16.65 | 1.3% | 1.3% |
| OPKO Health, Inc. | OPK | 4,337,104 | 2,446 | 91,125 | -5.6% | 48.2% | 50.3% | 141.4% | 178.9% | 3.5% | -103.6% | -120.0% | 5.2% | 65.6% | 1.72 | 17.6% | -60.3% |
| PerkinElmer, Inc. | PKI | 4,939,852 | 1,017 | 2,069,880 | -4.1% | 2.6% | 13.0% | 4.5% | 4.2% | 45.3% | 14.1% | 8.7% | 1.3% | 22.8% | 1.79 | 51.2% | -142.8% |
| Quest Diagnostics Incorporated | DGX | 9,692,466 | 1,637 | 7,435,000 | 4.0% | 0.2% | 1.8% | 2.3% | 4.9% | 38.3% | 19.3% | 15.1% | 4.1% | -1.4% | 0.94 | 87.1% | -136.0% |
| Laboratory Corporation of America Holdi | LH | 9,117,550 | 1,264 | 6,011,600 | 3.5% | 2.7% | 8.7% | 0.0% | 0.8% | 36.6% | 19.2% | 15.7% | 3.4% | 11.9% | 1.73 | 106.8% | -174.4% |
| Myriad Genetics, Inc. | MYGN | 2,485,880 | 749 | 724,873 | -1.7% | 17.8% | 21.4% | -3.7% | 6.5% | 82.0% | 26.5% | 23.6% | 3.3% | 35.9% | 5.35 | 0.0% | 0.0% |
| Illumina, Inc. | ILMN | 26,210,360 | 1,158 | 1,861,358 | 31.0% | 20.8% | 21.4% | 19.9% | 14.9% | 71.8% | 32.5% | 28.4% | 5.7% | 62.7% | 2.62 | 88.3% | 304.9% |
| Qiagen N.V. | QGEN | 5,425,828 | 705 | 1,344,777 | 3.3% | 4.8% | 5.9% | 7.2% | 7.5% | 66.3% | 29.4% | 14.9% | 6.4% | 53.3% | 2.66 | 44.1% | 2720.7% |
| Alere Inc. | IQT2622336 | 3,175,128 | 493 | 2,577,001 | -1.2% | 2.6% | 7.8% | 1.8% | NA | 47.5% | 19.6% | 6.6% | 3.9% | 41.1% | 2.37 | 194.4% | -159.9% |
| Luminex Corporation | IQT2627430 | 803,551 | 243 | 226,983 | 6.4% | 7.2% | 7.3% | 10.9% | 10.9% | 71.0% | 20.0% | 13.8% | 7.5% | 64.6% | 5.83 | 0.0% | 0.0% |
| Abaxis, Inc. | IQT2586525 | 1,280,721 | 202 | 182,777 | 1.7% | 6.5% | 25.4% | 13.0% | NA | 56.0% | 24.0% | 19.9% | 3.4% | 85.5% | 0.12 | 0.3% | 0.3% |
| CombiMatrix Corporation | IQT36309071 | 14,271 | 7 | 8,042 | 26.3% | 20.0% | 36.4% | 39.6% | 29.2% | 44.9% | -76.3% | -80.3% | 2.6% | 82.6% | 6.19 | 5.7% | 5.7% |
| Affymetrix Inc. | IQT2587418 | 726,274 | 703 | 349,010 | 5.6% | 9.3% | 2.4% | 4.0% | 2.6% | 60.3% | 12.2% | 3.4% | 2.3% | 35.6% | 2.87 | 47.0% | 1283.9% |
| Genomic Health, Inc. | IQT24111615 | 1,014,152 | 151 | 275,706 | 5.4% | 10.2% | 12.8% | 13.7% | 12.0% | 81.1% | -6.1% | -8.6% | 3.8% | 40.0% | 3.87 | 0.0% | 0.0% |
| Cepheid | IQT2599314 | 3,815,841 | 620 | 470,141 | 17.2% | 19.2% | 15.6% | 18.1% | 16.3% | 51.2% | 2.6% | -3.0% | 10.0% | 81.1% | 3.77 | 78.5% | 98.3% |
| Nanosphere, Inc | IQT38720096 | 45,675 | 117 | 14,290 | 42.9% | 78.0% | 63.9% | 27.1% | 76.1% | -111.1% | N/A | -263.8% | 17.7% | 136.1% | 2.24 | 38.4% | 39.5% |
| GenMark Diagnostics, Inc. | IQT106626443 | 568,004 | 185 | 30,594 | 11.6% | 82.8% | 25.3% | 58.5% | 61.6% | 57.1% | -119.0% | -127.7% | 18.7% | 215.1% | 6.35 | 0.0% | 0.0% |
| Bio-Reference Laboratories, Inc. | IQT2594421 | 890,901 | 212 | 832,282 | 16.3% | 16.8% | 17.5% | 10.1% | NA | 46.8% | 13.0% | 10.0% | 1.9% | 24.9% | 2.43 | 17.4% | 20.6% |
| **Upper Quartile** | | $ 4,206,788 | 950 | $ 1,218,653 | 14.1% | 15.9% | 21.4% | 19.5% | 49.7% | 62.0% | 19.7% | 14.9% | 6.4% | 84.8% | 5.71 | 56.6% | 34.8% |
| **Mean** | | 3,597,694 | 689 | 1,136,335 | 6.2% | 15.8% | 18.0% | 27.1% | 30.8% | 37.3% | -2.8% | -274.9% | 5.7% | 758.4% | 4.22 | 38.4% | 179.0% |
| **Median** | | 1,147,437 | 556 | 251,345 | 5.1% | 9.2% | 13.0% | 10.0% | 11.5% | 49.4% | 13.6% | 5.0% | 3.9% | 58.0% | 3.00 | 17.5% | 0.1% |
| **Lower Quartile** | | 607,881 | 192 | 98,686 | 2.1% | 3.2% | 8.4% | 5.2% | 6.3% | 43.9% | -4.3% | -12.2% | 2.8% | 35.7% | 2.27 | 0.1% | 0.0% |
| Theranos, Inc. (at 12/31/15) | | NA | NA | $ 503,452 | 55.6% | 64.3% | 25.0% | NA | NA | 0.0% | 45.3% | 39.3% | 11.8% | 18.6% | 2.39 | N/A | N/A |

Notes:
Source: S&P Capital IQ
[1] Represents trailing 3-month average daily trading volume (in thousands).
[2] CAGR = Compound Annual Growth Rate
[3] Working capital excludes cash


HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

**US v. Elizabeth Holmes**
Valuation of Theranos, Inc.
As of December 31, 2014

Exhibit G.3
Guideline Public Company Descriptions

| Name | Ticker | Description |
|------|--------|-------------|
| OraSure Technologies, Inc. | OSUR | OraSure Technologies, Inc., together with its subsidiaries, develops, manufactures, markets, and sells oral fluid diagnostic products and specimen collection devices in the United States, Europe, and internationally. |
| Trinity Biotech plc | TRIB | Trinity Biotech plc acquires, develops, manufactures, and markets medical diagnostic products for the clinical laboratory and point-of-care (POC) segments of the diagnostic market in the Americas, Africa, Asia, and Europe. |
| Enzo Biochem, Inc. | ENZ | Enzo Biochem, Inc., an integrated diagnostics, clinical lab, and life sciences company, researches, develops, manufactures, and markets diagnostic and research products based on genetic engineering, biotechnology, and molecular biology. |
| QuidelOrtho Corporation | QDEL | QuidelOrtho Corporation focuses on the development and manufacture of diagnostic testing technologies across the continuum of healthcare testing needs. |
| Exact Sciences Corporation | EXAS | Exact Sciences Corporation provides cancer screening and diagnostic test products in the United States and internationally. |
| OPKO Health, Inc. | OPK | OPKO Health, Inc., a healthcare company, engages in the diagnostics and pharmaceuticals businesses in the United States, Ireland, Chile, Spain, Israel, Mexico, and internationally. |
| PerkinElmer, Inc. | PKI | PerkinElmer, Inc. provides products, services, and solutions to the diagnostics, life sciences, and applied services markets worldwide. |
| Quest Diagnostics Incorporated | DGX | Quest Diagnostics Incorporated provides diagnostic testing, information, and services in the United States and internationally. |
| Laboratory Corporation of America Holdings | LH | Laboratory Corporation of America Holdings operates as a global life sciences company that provides vital information to help doctors, hospitals, pharmaceutical companies, researchers, and patients make clear and confident decisions. |
| Myriad Genetics, Inc. | MYGN | Myriad Genetics, Inc., a genetic testing and precision medicine company, develops and commercializes genetic tests in the United States and internationally. |
| Illumina, Inc. | ILMN | Illumina, Inc. provides sequencing and array-based solutions for genetic and genomic analysis. |
| Qiagen N.V. | QGEN | QIAGEN N.V. offers sample to insight solutions that transform biological materials into molecular insights worldwide. |
| Alere Inc. | IQT2622336 | Alere Inc. provides diagnostic tests for infectious disease, cardiometabolic disease, and toxicology in the United States and internationally. |
| Luminex Corporation | IQT2827430 | Luminex Corporation develops, manufactures, and sells proprietary biological testing technologies and products for the diagnostics, pharmaceutical, and research industries worldwide. |
| Abaxis, Inc. | IQT2586525 | Abaxis, Inc. develops, manufactures, markets, and sells portable blood analysis systems for use in human or veterinary patient care to provide rapid blood constituent measurements for clinicians worldwide. |
| CombiMatrix Corporation | IQT36309071 | CombiMatrix Corporation provides clinical molecular diagnostic laboratory services in the United States. |
| Affymetrix Inc. | IQT2587418 | Affymetrix, Inc. provides life science products and molecular diagnostic products that enable parallel analysis of biological systems at the gene, protein, and cell level. |
| Genomic Health, Inc. | IQT24111615 | Genomic Health, Inc., a healthcare company, provides clinically actionable genomic information to personalize cancer treatment decisions in the United States and internationally. |
| Cepheid | IQT2599314 | Cepheid, a molecular diagnostics company, develops, manufactures, and markets integrated systems for testing in the clinical and non-clinical markets. |
| Nanosphere, Inc. | IQT38720098 | Nanosphere, Inc. develops, manufactures, and markets molecular diagnostic tests for infectious diseases and associated drug resistance markers for earlier disease detection, optimal patient treatment, and improved healthcare economics. |
| GenMark Diagnostics, Inc. | IQT108626443 | GenMark Diagnostics, Inc. designs and manufactures multiplex molecular diagnostic solutions to enhance patient care, improve quality metrics, and reduce the total cost-of-care for laboratory professionals, healthcare providers, and customers in the United States and internationally. |
| Bio-Reference Laboratories, Inc. | IQT2594421 | Bio-Reference Laboratories, Inc. provides clinical laboratory testing services for the detection, diagnosis, evaluation, monitoring, and treatment of diseases in the United States. |

**Notes:**
Source: S&P Capital IQ.



US v. Elizabeth Holmes — Valuation of Theranos, Inc. — As of December 31, 2014

Exhibit Q-4 — Guideline Public Company Ranking — (thousands of USD)

**Size (Revenue, millions)**

| Company | Value |
|---|---|
| Quest Diagnostics Incorporated | $ 7,435,000 |
| Laboratory Corporation of America Holdi | 6,011,600 |
| Alere Inc. | 2,577,001 |
| PerkinElmer, Inc. | 2,069,880 |
| Illumina, Inc. | 1,861,358 |
| Qiagen N.V. | 1,344,777 |
| Bio-Reference Laboratories, Inc. | 832,282 |
| Myriad Genetics, Inc. | 724,873 |
| Theranos, Inc. (at 12/31/18) | 503,482 |
| Cepheid | 470,141 |
| Affymetrix Inc. | 349,019 |
| Genomic Health, Inc. | 275,706 |
| Luminex Corporation | 226,983 |
| QuidelOrtho Corporation | 184,158 |
| Abaxis, Inc. | 182,777 |
| OraSure Technologies, Inc. | 106,464 |
| Trinity Biotech plc | 104,872 |
| Enzo Biochem, Inc. | 96,637 |
| OPKO Health, Inc. | 91,125 |
| GenMark Diagnostics, Inc. | 30,594 |
| Nanosphere, Inc. | 14,290 |
| CombiMatrix Corporation | 8,042 |
| Exact Sciences Corporation | 1,798 |

**Liquidity (Operating Net Working Capital-to-Revenue)**

| Company | Value |
|---|---|
| Quest Diagnostics Incorporated | -1.4% |
| Laboratory Corporation of America Holdi | 11.9% |
| Enzo Biochem, Inc. | 15.8% |
| Theranos, Inc. (at 12/31/18) | 18.6% |
| PerkinElmer, Inc. | 22.8% |
| Bio-Reference Laboratories, Inc. | 24.9% |
| Myriad Genetics, Inc. | 35.6% |
| OraSure Technologies, Inc. | 35.9% |
| Genomic Health, Inc. | 40.0% |
| Alere Inc. | 41.1% |
| Trinity Biotech plc | 44.7% |
| Qiagen N.V. | 53.3% |
| Illumina, Inc. | 62.7% |
| Luminex Corporation | 64.6% |
| OPKO Health, Inc. | 65.6% |
| Cepheid | 81.1% |
| CombiMatrix Corporation | 82.6% |
| Abaxis, Inc. | 85.5% |
| QuidelOrtho Corporation | 129.3% |
| Nanosphere, Inc. | 136.1% |
| OraSure Technologies, Inc. | 190.3% |
| GenMark Diagnostics, Inc. | 215.1% |
| Exact Sciences Corporation | 15247.6% |

**Liquidity (Current Ratio)**

| Company | Value |
|---|---|
| Exact Sciences Corporation | 16.65 |
| QuidelOrtho Corporation | 7.54 |
| GenMark Diagnostics, Inc. | 6.35 |
| CombiMatrix Corporation | 6.19 |
| Abaxis, Inc. | 6.12 |
| Luminex Corporation | 5.83 |
| Myriad Genetics, Inc. | 5.35 |
| OraSure Technologies, Inc. | 4.96 |
| Genomic Health, Inc. | 3.87 |
| Cepheid | 3.77 |
| Trinity Biotech plc | 3.13 |
| Affymetrix Inc. | 2.87 |
| Qiagen N.V. | 2.86 |
| Illumina, Inc. | 2.62 |
| Bio-Reference Laboratories, Inc. | 2.43 |
| Theranos, Inc. (at 12/31/18) | 2.39 |
| Alere Inc. | 2.37 |
| Nanosphere, Inc. | 2.24 |
| PerkinElmer, Inc. | 1.78 |
| Laboratory Corporation of America Holdi | 1.73 |
| OPKO Health, Inc. | 1.72 |
| Enzo Biochem, Inc. | 1.62 |
| Quest Diagnostics Incorporated | 0.94 |

**Operational Efficiency (Capital Expenditures)**

| Company | Value |
|---|---|
| Enzo Biochem, Inc. | 0.8% |
| PerkinElmer, Inc. | 1.3% |
| Bio-Reference Laboratories, Inc. | 1.9% |
| Affymetrix Inc. | 2.3% |
| CombiMatrix Corporation | 2.6% |
| OraSure Technologies, Inc. | 2.6% |
| Myriad Genetics, Inc. | 3.3% |
| Trinity Biotech plc | 3.4% |
| GenMark Diagnostics, Inc. | 3.4% |
| Abaxis, Inc. | 3.4% |
| Genomic Health, Inc. | 3.8% |
| Alere Inc. | 3.9% |
| Quest Diagnostics Incorporated | 4.1% |
| OPKO Health, Inc. | 5.2% |
| Illumina, Inc. | 5.7% |
| QuidelOrtho Corporation | 6.1% |
| Qiagen N.V. | 6.4% |
| Luminex Corporation | 7.5% |
| Trinity Biotech plc | 7.9% |
| Cepheid | 10.5% |
| Theranos, Inc. (at 12/31/18) | 11.6% |
| Nanosphere, Inc. | 17.7% |
| GenMark Diagnostics, Inc. | 18.7% |

**Growth (Historical 1-year Growth Rate)**

| Company | Value |
|---|---|
| Theranos, Inc. (at 12/31/18) | 55.5% |
| Nanosphere, Inc. | 42.9% |
| Illumina, Inc. | 31.0% |
| CombiMatrix Corporation | 26.3% |
| Cepheid | 17.2% |
| Bio-Reference Laboratories, Inc. | 16.3% |
| Trinity Biotech plc | 15.0% |
| GenMark Diagnostics, Inc. | 11.6% |
| OraSure Technologies, Inc. | 7.6% |
| Luminex Corporation | 6.4% |
| Genomic Health, Inc. | 5.6% |
| Affymetrix Inc. | 5.4% |
| Enzo Biochem, Inc. | 4.8% |
| Quest Diagnostics Incorporated | 4.0% |
| QuidelOrtho Corporation | 3.9% |
| Laboratory Corporation of America Holdi | 3.5% |
| Qiagen N.V. | 3.3% |
| Abaxis, Inc. | 1.7% |
| Alere Inc. | -1.2% |
| Myriad Genetics, Inc. | -1.7% |
| PerkinElmer, Inc. | -4.1% |
| Quest Diagnostics Incorporated | -5.6% |
| Enzo Biochem, Inc. | -59.6% |

**Growth (Historical 3-year CAGR)**

| Company | Value |
|---|---|
| GenMark Diagnostics, Inc. | 82.8% |
| Nanosphere, Inc. | 78.5% |
| Theranos, Inc. (at 12/31/18) | 64.3% |
| OPKO Health, Inc. | 46.2% |
| Illumina, Inc. | 20.8% |
| CombiMatrix Corporation | 20.0% |
| Cepheid | 19.2% |
| Myriad Genetics, Inc. | 17.8% |
| Bio-Reference Laboratories, Inc. | 16.8% |
| Trinity Biotech plc | 10.4% |
| Genomic Health, Inc. | 10.2% |
| Affymetrix Inc. | 9.3% |
| OraSure Technologies, Inc. | 9.1% |
| Luminex Corporation | 7.2% |
| Abaxis, Inc. | 6.5% |
| QuidelOrtho Corporation | 5.1% |
| Qiagen N.V. | 4.8% |
| Laboratory Corporation of America Holdi | 2.7% |
| Alere Inc. | 2.6% |
| PerkinElmer, Inc. | 2.6% |
| Quest Diagnostics Incorporated | 0.2% |
| Enzo Biochem, Inc. | -1.8% |
| Exact Sciences Corporation | -24.4% |

**Growth (Forward 1-year Growth Rate)**

| Company | Value |
|---|---|
| Nanosphere, Inc. | 63.9% |
| OPKO Health, Inc. | 50.3% |
| CombiMatrix Corporation | 36.4% |
| Theranos, Inc. (at 12/31/18) | 26.0% |
| Abaxis, Inc. | 25.4% |
| GenMark Diagnostics, Inc. | 25.3% |
| Illumina, Inc. | 21.4% |
| Myriad Genetics, Inc. | 21.4% |
| Bio-Reference Laboratories, Inc. | 17.5% |
| Cepheid | 15.6% |
| OraSure Technologies, Inc. | 14.0% |
| PerkinElmer, Inc. | 13.0% |
| Genomic Health, Inc. | 12.6% |
| QuidelOrtho Corporation | 10.9% |
| Laboratory Corporation of America Holdi | 8.7% |
| Enzo Biochem, Inc. | 8.6% |
| Trinity Biotech plc | 8.4% |
| Alere Inc. | 7.6% |
| Luminex Corporation | 7.3% |
| Qiagen N.V. | 5.9% |
| Affymetrix Inc. | 2.4% |
| Quest Diagnostics Incorporated | 1.6% |

**Profitability (Historical EBITDA Margin 1-year)**

| Company | Value |
|---|---|
| Theranos, Inc. (at 12/31/18) | 46.3% |
| Illumina, Inc. | 32.5% |
| Qiagen N.V. | 29.4% |
| Myriad Genetics, Inc. | 26.5% |
| Abaxis, Inc. | 24.0% |
| Luminex Corporation | 20.0% |
| Alere Inc. | 19.8% |
| Quest Diagnostics Incorporated | 19.3% |
| Laboratory Corporation of America Holdi | 19.2% |
| Trinity Biotech plc | 19.0% |
| PerkinElmer, Inc. | 14.1% |
| Bio-Reference Laboratories, Inc. | 13.0% |
| Affymetrix Inc. | 12.2% |
| QuidelOrtho Corporation | 11.2% |
| Cepheid | 2.6% |
| OraSure Technologies, Inc. | -3.8% |
| Genomic Health, Inc. | -6.1% |
| Enzo Biochem, Inc. | -9.0% |
| CombiMatrix Corporation | -76.3% |
| OPKO Health, Inc. | -103.6% |
| GenMark Diagnostics, Inc. | -119.0% |

**Operational Efficiency (Return on Equity)**

| Company | Value |
|---|---|
| Myriad Genetics, Inc. | 15.6% |
| Bio-Reference Laboratories, Inc. | 15.1% |
| Illumina, Inc. | 11.9% |
| Abaxis, Inc. | 11.5% |
| Laboratory Corporation of America Holdi | 10.4% |
| Quest Diagnostics Incorporated | 9.1% |
| Luminex Corporation | 8.6% |
| Trinity Biotech plc | 5.1% |
| PerkinElmer, Inc. | 3.8% |
| Qiagen N.V. | 3.4% |
| Alere Inc. | 1.8% |
| Affymetrix Inc. | 1.6% |
| Theranos, Inc. (at 12/31/18) | 0.0% |
| QuidelOrtho Corporation | -1.3% |
| Cepheid | -1.9% |
| OraSure Technologies, Inc. | -4.0% |
| OPKO Health, Inc. | -9.6% |
| Genomic Health, Inc. | -10.2% |
| Enzo Biochem, Inc. | -20.1% |
| GenMark Diagnostics, Inc. | -26.1% |
| Exact Sciences Corporation | -29.2% |
| CombiMatrix Corporation | -36.0% |
| Nanosphere, Inc. | -51.6% |



HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

**US v. Elizabeth Holmes**                                                          **Exhibit H.1**
Valuation of Theranos, Inc.                                          Adjusted Net Asset Value
As of December 31, 2014                                                    *(thousands of USD)*

|  | | 12/31/2014 Unadjusted | | Adjustments | | Adjusted |
|---|---|---|---|---|---|---|
| **Assets:** | | | | | | |
| Current Assets | | | | | | |
| Current Operating Assets | | | | | | |
| Cash & Equivalents | | $ | 465,933 | $ | - | $ | 465,933 |
| Accounts Receivable | | | – | | – | | – |
| Inventory | | | 2,383 | | – | | 2,383 |
| Other Current Assets | | | 12,788 | | – | | 12,788 |
| Total Current Operating Assets | | | 481,104 | | – | | 481,104 |
| Total Current Non-Operating Assets | | | – | | – | | – |
| Total Current Assets | | | 481,104 | | – | | 481,104 |
| | | | | | | |
| Total Fixed Assets - Net | | | 53,366 | | – | | 53,366 |
| | | | | | | |
| Other Assets | | | | | | |
| Intangible Assets | | | | | | |
| Goodwill | | | – | | – | | – |
| Other Intangible Assets | [1] | | – | | 510,570 | | 510,570 |
| Total Intangible Assets - Net | | | – | | 510,570 | | 510,570 |
| Total Long Term Receivables | | | 27,045 | | – | | 27,045 |
| Total Other Non-Current Assets | | | – | | – | | – |
| Total Non Current Assets | | | 27,045 | | 510,570 | | 537,615 |
| | | | | | | |
| **Total Assets** | | **$** | **561,515** | **$** | **510,570** | **$** | **1,072,085** |
| | | | | | | |
| **Liabilities and Equity:** | | | | | | |
| | | | | | | |
| Liabilities | | | | | | |
| Current Liabilities | | | | | | |
| Current Operating Liabilities | | | | | | |
| Accounts Payable | | $ | 16,633 | | | $ | 16,633 |
| Deferred Revenue | | | – | | | | – |
| Other Current Liabilities | [2] | | 400,359 | | (390,375) | | 9,984 |
| Total Current Operating Liabilities | | | 416,992 | | (390,375) | | 26,617 |
| Total Current Debt Obligations | | | – | | – | | – |
| Total Current Liabilities | | | 416,992 | | (390,375) | | 26,617 |
| | | | | | | |
| Non Current Liabilities | | | | | | |
| Total Long Term Debt | | | 40,805 | | – | | 40,805 |
| Other Non Current Liabilities | | | | | | |
| Deferred Rent | | | – | | | | – |
| Deferred Revenue, LT | | | – | | | | – |
| Customer Deposits | | | 143,846 | | | | 143,846 |
| Other Non-current liabilities | | | 33,750 | | | | 33,750 |
| Total Other Non Current Liabilities | | | 177,596 | | – | | 177,596 |
| Total Non Current Liabilities | | | 218,401 | | – | | 218,401 |
| | | | | | | |
| **Total Liabilities** | | **$** | **635,393** | **$** | **(390,375)** | **$** | **245,018** |
| | | | | | | |
| | | | | | | |
| **Total Equity Value - Controlling, Marketable Basis** | | | | | | **$** | **827,067** |
| | | | | | | |
| **Total Equity Value - Controlling, Marketable Basis (rounded)** | | | | | | **$** | **827,000** |

**Notes:**
[1] Add value of technology and branding assets under cost to recreate method (Exhibit H.2)
[2] Adjust out "miscellaneous receipts" liability that represents proceeds received from 2014 capital raises, for which stock had not
    been issued yet.



HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

US v. Elizabeth Holmes
Valuation of Theranos, Inc.
As of December 31, 2014

Exhibit H.2
Cost to Recreate Method - Technology and Branding Assets
(USD)

| Functional Category | Calendar Year 2009 Total Cost [1] | Allocation to Technology and Brand [2] | Allocated Cost | Calendar Year 2010 Total Cost [1] | Allocation to Technology and Brand [2] | Allocated Cost | Calendar Year 2011 Total Cost [1] | Allocation to Technology and Brand [2] | Allocated Cost |
|---|---|---|---|---|---|---|---|---|---|
| Salaries, Wages & SBC | $ 8,717,962 | 100% | $ 8,717,962 | $ 7,485,029 | 100% | $ 7,485,029 | $ 10,069,033 | 100% | $ 10,069,033 |
| Payroll Taxes & Processing | 483,906 | 100% | 483,906 | 568,593 | 100% | 568,593 | 784,642 | 100% | 784,642 |
| Health Insurance | 417,083 | 100% | 417,083 | 493,526 | 100% | 493,526 | 767,506 | 100% | 767,506 |
| Other benefits | 114,239 | 100% | 114,239 | 180,253 | 100% | 180,253 | 773,318 | 100% | 773,318 |
| Sales Commissions | 5,000 | 0% | - | - | 0% | - | - | 0% | - |
| **Subtotal Employees** | **$ 7,737,890** | | **$ 7,732,890** | **$ 8,727,402** | | **$ 8,727,402** | **$ 12,394,501** | | **$ 12,394,501** |
| Contractor Services | 488,192 | 100% | 488,192 | 518,786 | 100% | 518,786 | 1,637,549 | 100% | 1,637,549 |
| **Subtotal for All Labor Costs** | **$ 8,226,082** | | **$ 8,221,082** | **$ 9,246,188** | | **$ 9,246,188** | **$ 14,032,050** | | **$ 14,032,050** |
| Facility Costs | $ 2,145,779 | 99.9% | $ 2,144,392 | $ 2,064,230 | 100.0% | $ 2,064,230 | $ 2,724,300 | 100.0% | $ 2,724,300 |
| R&D Materials, Parts, Biological Compounds | 935,138 | 100% | 935,138 | 3,786,184 | 100% | 3,786,184 | 5,955,745 | 100% | 5,955,745 |
| Conf., Website, Market Studies, Trademark Costs | 58,925 | 100% | 58,925 | 15,422 | 100% | 15,422 | 13,452 | 100% | 13,452 |
| Legal, Tax, Accounting Services - General | 120,697 | 50% | 60,349 | 284,605 | 50% | 142,303 | 339,165 | 50% | 169,582 |
| Legal Regulatory and Patents Costs | 313,058 | 100% | 313,058 | 492,136 | 100% | 492,136 | 1,307,265 | 100% | 1,307,265 |
| Legal Costs for Litigation | | 0% | - | | 0% | - | 685,695 | 0% | - |
| Expensed Equip., Software, and Maintenance | 148,010 | 100% | 148,010 | 226,101 | 100% | 226,101 | 620,302 | 100% | 620,302 |
| Dues, Subscriptions, Licenses and Supplies | 85,853 | 100% | 85,853 | 233,858 | 100% | 233,858 | 447,386 | 100% | 447,386 |
| Recruiting Costs | 190,343 | 99.9% | 190,216 | 212,706 | 100.0% | 212,706 | 300,466 | 100.0% | 300,466 |
| Travel Expenses | 226,711 | 50% | 113,355 | 154,948 | 50% | 77,474 | 396,822 | 50% | 198,411 |
| Interest (Income), Expense & Bank Charges | 109,143 | 0% | - | 70,077 | 0% | - | (132,632) | 0% | - |
| Supporting G&A Expenses | 374,156 | 99.9% | 373,981 | 361,655 | 100.0% | 361,655 | 455,201 | 100.0% | 455,201 |
| Relocation Expenses | 27,220 | 0% | - | 8,272 | 0% | - | 66,194 | 0% | - |
| Supplies for Manufacturing / Operations | 754,146 | 100% | 754,146 | 432,293 | 100% | 432,293 | 77,829 | 100% | 77,829 |
| Inventory | | 100% | - | (13,583) | 100% | - | (5,337) | 100% | (5,337) |
| Capital Expenditures | 180,627 | 100% | 180,627 | 1,635,110 | 100% | 1,635,110 | 3,042,848 | 100% | 3,042,848 |
| Other Costs | 17,441 | 0% | - | 17,845 | 0% | - | 15,927 | 0% | - |
| **Subtotal for Indirect Costs** | **$ 5,589,245** | | **$ 5,260,052** | **$ 10,040,181** | | **$ 9,739,772** | **$ 16,290,629** | | **$ 15,307,430** |
| | | Yrs | | | Yrs | | | Yrs | |
| **Inflation Adjusted Total Costs [4]** | **2.3%** | **5.51** | **$ 15,294,693** | **2.3%** | **4.51** | **$ 21,051,759** | **2.3%** | **3.51** | **$ 31,794,773** |

| Functional Category | Calendar Year 2012 Total Cost [1] | Allocation to Technology and Brand [2] | Allocated Cost | Calendar Year 2013 Total Cost [1] | Allocation to Technology and Brand [2] | Allocated Cost | Calendar Year 2014 Total Cost [1] | Allocation to Technology and Brand [2] | Allocated Cost |
|---|---|---|---|---|---|---|---|---|---|
| Salaries, Wages & SBC | $ 20,238,277 | 100% | $ 20,238,277 | $ 29,829,686 | 100% | $ 29,829,686 | $ 48,369,000 | 100% | $ 48,369,000 |
| Payroll Taxes & Processing | 1,561,634 | 100% | 1,561,634 | 2,246,298 | 100% | 2,246,298 | 3,450,000 | 100% | 3,450,000 |
| Health Insurance | 1,429,986 | 100% | 1,429,986 | 2,161,519 | 100% | 2,161,519 | 2,325 | 100% | 2,325 |
| Other benefits | 2,374,572 | 100% | 2,374,572 | 3,255,991 | 100% | 3,255,991 | 8,112,675 | 100% | 8,112,675 |
| Sales Commissions | | 0% | - | 78 | 0% | - | 312,000 | 0% | - |
| **Subtotal Employees** | **$ 25,604,469** | | **$ 25,604,469** | **$ 37,493,572** | | **$ 37,493,494** | **$ 58,247,000** | | **$ 57,933,000** |
| Contractor Services | 3,073,543 | 100% | 3,073,543 | 5,372,096 | 100% | 5,372,096 | 7,885,000 | 100% | 7,885,000 |
| **Subtotal for All Labor Costs** | **$ 28,678,011** | | **$ 28,678,011** | **$ 42,865,668** | | **$ 42,865,590** | **$ 66,132,000** | | **$ 65,820,000** |
| Facility Costs | $ 7,375,665 | 100.0% | $ 7,375,665 | $ 7,140,632 | 100.0% | $ 7,140,617 | $ 18,770,000 | 99.5% | $ 18,688,139 |
| R&D Materials, Parts, Biological Compounds | 11,136,524 | 100% | 11,136,524 | 10,069,736 | 100% | 10,069,736 | 10,638,000 | 100% | 10,638,000 |
| Conf., Website, Market Studies, Trademark Costs | 1,274,910 | 100% | 1,274,910 | 7,684,776 | 100% | 7,684,776 | 3,087,000 | 100% | 3,087,000 |
| Legal, Tax, Accounting Services - General | 1,400,908 | 50% | 700,454 | 709,759 | 50% | 354,879 | 1,051,000 | 50% | 525,500 |
| Legal Regulatory and Patents Costs | 1,750,963 | 100% | 1,750,963 | 1,913,373 | 100% | 1,913,373 | 2,199,000 | 100% | 2,199,000 |
| Legal Costs for Litigation | 1,829,174 | 0% | - | 6,197,019 | 0% | - | 3,889,000 | 0% | - |
| Expensed Equip., Software, and Maintenance | 1,084,748 | 100% | 1,084,748 | 1,657,745 | 100% | 1,657,745 | 1,792,000 | 100% | 1,792,000 |
| Dues, Subscriptions, Licenses and Supplies | 1,211,873 | 100% | 1,211,873 | 1,522,924 | 100% | 1,522,924 | 3,583,000 | 100% | 3,583,000 |
| Recruiting Costs | 795,675 | 100.0% | 795,675 | 552,947 | 100.0% | 552,948 | 1,147,000 | 99.5% | 1,140,808 |
| Travel Expenses | 267,524 | 50% | 133,762 | 787,042 | 50% | 393,521 | 1,170,000 | 50% | 585,000 |
| Interest (Income), Expense & Bank Charges | 143,830 | 0% | - | 382,003 | 0% | - | (27,000) | 0% | - |
| Supporting G&A Expenses | 934,674 | 100.0% | 934,674 | 1,185,138 | 100.0% | 1,185,135 | 2,335,000 | 99.5% | 2,322,493 |
| Relocation Expenses | 65,736 | 0% | - | 24,763 | 0% | - | 43,000 | 0% | - |
| Supplies for Manufacturing / Operations | 855,721 | 100% | 855,721 | 1,574,084 | 100% | 1,574,084 | 1,952,000 | 100% | 1,952,000 |
| Inventory | 6,865,924 | 100% | 6,865,924 | 1,742,894 | 100% | 1,742,894 | 1,145,000 | 100% | 1,145,000 |
| Capital Expenditures | 17,572,491 | 100% | 17,572,491 | 8,884,769 | 100% | 8,884,769 | 38,594,000 | 100% | 38,594,000 |
| Other Costs | 90,432 | 0% | - | (44,941) | 0% | - | 30,000 | 0% | - |
| **Subtotal for Indirect Costs** | **$ 54,657,393** | | **$ 51,694,585** | **$ 51,984,722** | | **$ 44,677,410** | **$ 89,416,000** | | **$ 84,250,054** |
| | | Yrs | | | Yrs | | | Yrs | |
| **Inflation Adjusted Total Expenses [3]** | **2.3%** | **2.50** | **$ 85,119,967** | **2.3%** | **1.50** | **$ 90,613,216** | **2.3%** | **0.50** | **$ 151,813,823** |

| 2004-2006 Expenses, Inflation Adjusted [4] | $ 24,235,601 |
|---|---|
| 2007 Expenses, Inflation Adjusted [5] | 20,667,544 |
| 2008 Expenses, Inflation Adjusted [5] | 15,502,206 |
| 2009-2014 Expenses, Inflation Adjusted | 395,687,942 |
| **Total Direct and Indirect Development Costs** | **$ 456,093,294** |
| Obsolescence Adjustment [6]   3% | (12,117,801) |
| **Subtotal Cost** | **$ 443,975,493** |
| Add Developer Profit Margin [7]   15% | 66,596,324 |
| **Total Pretax Development Cost** | **$ 510,571,817** |
| **Total Pretax Development Cost (Rounded)** | **$ 510,570,000** |

**Notes**
[1] Per company prepared trial balances
[2] Allocations based on relevance of costs to developing Theranos technology and branding assets.
[3] Adjust allocated expenses for average annual inflation of 2.3% over historical period
[4] 2004 - 2006 expenses based on retained earnings deficit at 12/31/07 less operating loss reported for calendar year 2007. Expenses are adjusted for inflation of 2.3% from midpoint of period to valuation date
[5] 2007 - 2008 expenses based on audited financial statements. Excludes financing costs and interest income. Expenses are adjusted for inflation of 2.3% with midpoint of each period to valuation date
[6] Adjusted for estimated 50% of historical development efforts between 2004-2006 that represent obsolete technology on valuation date.
[7] Developer margin based on median EBIT margin of peer group of firms in Exhibit G.2.


HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

**US v. Elizabeth Holmes**                                                                                      **Exhibit I.1**
Valuation of Theranos, Inc.                                                          Discounted Cash Flow Key Assumptions
As of October 15, 2015                                                                                *(thousands of USD)*

| | Basis | For the Twelve Month Period Ending December 31, | | | |
| --- | --- | --- | --- | --- | --- |
| | | **2015** | **2016** | **2017** | **2018** |
| Total Revenue | Annual Growth Rate | 97703.4% | 97.0% | 44.8% | 55.6% |
| Terminal Value | Exit Multiple, Ex. J.1 | | | | 4.0% |
| Total Cost of Revenue | % of Revenue | 35.0% | 32.0% | 32.0% | 30.0% |
| Total Operating Expenses | % of Revenue | 85.4% | 44.6% | 33.6% | 24.7% |
| Depreciation & Amortization | Exhibit I.3 | 1.7% | 6.2% | 6.6% | 6.0% |
| Interest Expense | N/A | N/A | N/A | N/A | N/A |
| Income Taxes | % of Pre-Tax Net Income | 40.0% | 40.0% | 40.0% | 40.0% |
| Adjusted Operating Working Capital | Exhibit I.2 | 19.6% | 14.4% | 21.3% | 19.2% |
| Adjusted Operating Working Capital | | 22,272 | 32,154 | 68,786 | 96,480 |
| Yr/yr Working Capital (Increase)/Reduction | | 281,664 | (9,883) | (36,631) | (27,694) |
| Capital Expenditures | % of Revenue | 10.3% | 27.8% | 17.8% | 16.9% |



**US v. Elizabeth Holmes**

Valuation of Theranos, Inc.
As of October 15, 2015

**Exhibit I.2**

Adjusted Working Capital Analysis
*(thousands of USD)*

| Working Capital | | FYE 12-31-09 | FYE 12-31-10 | FYE 12-31-11 | FYE 12-31-12 | FYE 12-31-13 | FYE 12-31-14 | For the Twelve Month Period Ending December 31, | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 2015 | 2016 | 2017 | 2018 |
| Total Revenue | [1] $ | 2,794 | $ 1,401 | $ 518 | $ - | $ - | $ 116 | $ 113,452 | $ 223,452 | $ 323,452 | $ 503,452 |
| Total COS | | - | - | - | - | - | - | 39,708 | 71,505 | 103,505 | 151,036 |
| Total Operating Expenses | | 13,597 | 16,801 | 27,173 | 64,015 | 85,605 | 122,756 | 96,881 | 99,784 | 108,780 | 124,204 |
| **Operating Assets** | | | | | | | | | | | |
| Cash & Equivalents | [2] $ | 3,690 | $ 36,718 | $ 88,056 | $ 51,785 | $ 30,968 | $ 465,933 | $ 95,554 | $ 98,397 | $ 107,290 | $ 122,503 |
| Accounts Receivable | | 29 | 55 | - | - | - | - | - | - | - | - |
| Inventory | | 581 | - | - | 1,733 | 3,777 | 2,383 | 3,404 | 6,704 | 9,704 | 15,104 |
| Other Current Assets | | 195 | 827 | 665 | 1,882 | 1,780 | 12,788 | 4,838 | 5,080 | 5,334 | 5,601 |
| Note Receivable | | - | - | - | - | - | 27,045 | 27,512 | 9,585 | 9,735 | - |
| **Total Operating Assets** | | 4,495 | 37,600 | 88,721 | 55,400 | 36,523 | 508,149 | 131,308 | 119,766 | 132,063 | 143,208 |
| **Operating Liabilities** | | | | | | | | | | | |
| Accounts Payable | | 560 | 440 | 1,236 | 7,669 | 7,430 | 16,633 | 13,879 | 16,480 | 16,174 | 22,774 |
| Deferred Revenue | | 1,663 | 257 | 7 | 7 | 7 | 7 | - | - | - | - |
| Other Current Liabilities | | 950 | 1,298 | 2,845 | 7,714 | 4,830 | 9,984 | 7,073 | 8,265 | 9,453 | 11,521 |
| Deferred Rent | | 723 | 759 | 767 | 1,572 | 1,857 | - | - | - | - | - |
| Deferred Revenue, LT | | 2,146 | 3,808 | 3,801 | 3,801 | 3,801 | - | - | - | - | - |
| Customer Deposits | | - | - | 73,500 | 69,500 | 80,000 | 143,846 | 70,356 | 46,904 | 23,452 | - |
| Other Non-current liabilities | | 807 | 1,847 | 5,959 | 3,425 | 1,866 | 33,750 | 17,728 | 15,963 | 14,198 | 12,433 |
| **Total Operating Liabilities** | | 6,849 | 8,409 | 88,117 | 93,687 | 99,791 | 204,213 | 109,036 | 87,612 | 63,277 | 46,728 |
| **Net Operating Working Capital** | $ | (2,354) | $ 29,191 | $ 604 | $ (38,287) | $ (63,268) | $ 303,936 | $ 22,272 | $ 32,154 | $ 68,786 | $ 96,480 |
| *Net Operating Working Capital as % of Revenue* | | -84.3% | 2083.1% | 116.6% | 0.0% | 0.0% | 262013.8% | 19.6% | 14.4% | 21.3% | 19.2% |
| *Yr/yr Working Capital (Increase)/Reduction* | | - | (31,545) | 28,587 | 38,891 | 24,981 | (367,204) | 281,664 | (9,883) | (36,631) | (27,694) |
| *BizMiner Working Capital as a % of Revenue* | | | | | | | | 22.8% | | | |
| *RMA Working Capital as a % of Revenue* | | | | | | | | 36.1% | | | |
| *Comparable Group Working Capital as a % of Revenue* | | | | | | | | 60.2% | | | |
| Days' Operating Expenses in Cash | | 99 | 798 | 1,183 | 295 | 132 | 1,385 | 360 | 360 | 360 | 360 |
| Days' Sales Outstanding | | 4 | 14 | - | - | - | - | - | - | - | - |
| Days' Inventory | | - | - | - | - | - | - | 31 | 34 | 34 | 37 |
| Other Current Assets as a % of Revenue | | 7.0% | 59.0% | 128.4% | 0.0% | 0.0% | 11024.1% | 4.3% | 2.3% | 1.6% | 1.1% |
| Note Receivable as a % of Revenue | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 23314.7% | 24.2% | 4.3% | 3.0% | 0.0% |
| Days' Payables | | - | - | - | - | - | - | 128 | 84 | 57 | 55 |
| Deposits & Deferred Revenue as a % of Revenue | | 136.3% | 290.1% | 14917.2% | 0.0% | 0.0% | 124005.2% | 62.0% | 21.0% | 7.3% | 0.0% |
| Other Current Liabilities as a % of Opex | | 7.0% | 7.7% | 10.5% | 12.1% | 5.6% | 8.1% | 7.3% | 8.3% | 8.7% | 9.3% |
| Deferred Rent as a % of Opex | | 5.3% | 4.5% | 2.8% | 2.5% | 2.2% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Other Non-current liabilities as a % of Opex | | 5.9% | 11.0% | 21.9% | 5.4% | 2.2% | 27.5% | 18.3% | 16.0% | 13.1% | 10.0% |

**Notes:**

[1] Historical balances are per Adjusted Income Statement. Refer to Exhibit B.5. Operating Expenses exclude Depreciation & Amortization.
[2] Estimated operating cash levels equal to 6 months of operating expenses



HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

| US v. Elizabeth Holmes | | | | | | | | | Exhibit I.3 |
|---|---|---|---|---|---|---|---|---|---|
| Valuation of Theranos, Inc. | | | | | | | | Depreciation & Capital Expenditure Analysis | |
| As of October 15, 2015 | | | | | | | | *(thousands of USD)* | |

| | | For the Twelve Month Period Ending December 31, | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Forecast Depreciation** | | 2015 | | 2016 | | 2017 | | 2018 | |
| Total Revenue | $ | 113,452 | $ | 223,452 | $ | 323,452 | $ | 503,452 | |
| Beginning Balance - Total Fixed Assets | | 53,366 | | 63,121 | | 111,409 | | 147,752 | |
| Capital Expenditures | | 11,670 | | 62,104 | | 57,667 | | 85,125 | |
| Fixed Assets | | 65,036 | | 125,225 | | 169,076 | | 232,877 | |
| *Capital Expenditures as a % of Revenue* | | *10.29%* | | *27.79%* | | *17.83%* | | *16.91%* | |
| Depreciation | | | | | | | | | |
| Assumptions as to Depreciable Lives: | | | | | | | | | |
| Beg. Dep. Existing Fixed Assets - avg life | 6.3 | | | | | | | | |
| Capital Additions - avg life | 8.0 | | | | | | | | |
| Beginning Balance | $ | 1,763 | $ | 8,460 | $ | 8,460 | $ | 8,460 | |
| 2015 Additions | | 152 | | 1,463 | | 1,463 | | 1,463 | |
| 2016 Additions | | | | 3,893 | | 7,786 | | 7,786 | |
| 2017 Additions | | | | | | 3,615 | | 7,229 | |
| 2018 Additions | | | | | | | | 5,336 | |
| Total Depreciation | $ | 1,915 | $ | 13,816 | $ | 21,324 | $ | 30,274 | |
| *As a % of Revenue* | | *1.7%* | | *6.2%* | | *6.6%* | | *6.0%* | |
| Net Fixed Assets | $ | 63,121 | $ | 111,409 | $ | 147,752 | $ | 202,603 | |
| *As a % of Revenue* | | *55.6%* | | *49.9%* | | *45.7%* | | *40.2%* | |

| **Historical Capital Expenditure Analysis** | | FYE 12-31-10 | | FYE 12-31-11 | | FYE 12-31-12 | | FYE 12-31-13 | | FYE 12-31-14 |
|---|---|---|---|---|---|---|---|---|---|---|
| Net FA | $ | 2,630 | $ | 4,648 | $ | 19,557 | $ | 22,021 | $ | 53,366 |
| Chg from PY | | N/A | | 2,018 | | 14,909 | | 2,463 | | 31,345 |
| Depreciation | | 771 | | 1,025 | | 2,654 | | 5,573 | | 7,247 |
| (Gain)/Loss | | - | | - | | 9 | | 849 | | 1 |
| Capital Expenditures | | N/A | | 3,043 | | 17,572 | | 8,885 | | 38,594 |

| | Average | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Fixed Assets | $ 20,444 | $ | 2,630 | $ | 4,648 | $ | 19,557 | $ | 22,021 | $ | 53,366 |
| *Fixed Assets as a % of Revenue* | *5021.8%* | | *187.7%* | | *896.9%* | | *N/A* | | *N/A* | | *46005.2%* |
| Capital Expenditures | 17,024 | | N/A | | 3,043 | | 17,572 | | 8,885 | | 38,594 |
| *Capital Expenditures as a % of Revenue* | *4181.6%* | | *N/A* | | *587.1%* | | *N/A* | | *N/A* | | *33270.7%* |


HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

US v. Elizabeth Holmes
Valuation of Theranos, Inc.
As of October 15, 2015

Exhibit L4
Discount Rate - Venture Capital Rates of Return

| Company Name | Ticker Symbol | Market Capitalization | Interest Bearing Debt | Trading Volume [7] | | LTM Revenue | 1-Year Growth Rate | Equity as a % of Total Capital |
|---|---|---|---|---|---|---|---|---|
| OraSure Technologies, Inc | OSUR | $ 267,169 | $ - | 586 | $ | 116,018 | 8.9% | 100.0% |
| Trinity Biotech plc | TRIB | 271,392 | 99,069 | 121 | | 101,392 | -1.5% | 73.3% |
| Enzo Biochem, Inc. | ENZ | 181,945 | 3,566 | 135 | | 97,599 | 1.7% | 98.1% |
| GuidedOrtho Corporation | QDEL | 609,241 | 146,657 | 240 | | 205,670 | 22.0% | 80.9% |
| Exact Sciences Corporation | EXAS | 713,931 | 6,156 | 2,658 | | 26,521 | 1694.1% | 99.1% |
| OPKO Health, Inc. | NasdaqGS:OPK | 5,015,072 | 145,354 | 5,704 | | 241,080 | -179.4% | 97.2% |
| PerkinElmer, Inc. | PKI | 5,470,749 | 1,028,378 | 753 | | 2,262,633 | 1.9% | 84.2% |
| Quest Diagnostics Incorporated | DGX | 9,197,441 | 3,731,000 | 1,043 | | 7,527,000 | 3.0% | 71.1% |
| Laboratory Corporation of America Holdings | LH | 11,684,918 | 6,681,200 | 1,063 | | 7,773,600 | 31.0% | 63.6% |
| Myriad Genetics, Inc. | MYGN | 2,711,591 | - | 817 | | 737,800 | -0.9% | 100.0% |
| Illumina, Inc. | ILMN | 21,921,248 | 1,110,101 | 1,992 | | 2,140,593 | 23.3% | 95.2% |
| Qiagen N.V. | QGEN | 5,912,561 | 1,056,906 | 962 | | 1,292,856 | -3.9% | 84.8% |
| Alere Inc. | IQT2622330 | 3,975,232 | 2,601,525 | 602 | | 2,483,562 | -4.0% | 52.5% |
| Luminex Corporation | IQT2627430 | 789,484 | - | 298 | | 235,365 | 5.1% | 100.0% |
| Abaxis, Inc. | IQT2586525 | 1,017,036 | 530 | 177 | | 217,133 | 29.6% | 99.9% |
| CombiMatrix Corporation | IQT36309071 | 13,695 | 344 | 2 | | 9,621 | 27.0% | 97.5% |
| Affymetrix Inc. | IQT2587418 | 714,389 | 124,950 | 688 | | 357,744 | 2.8% | 85.1% |
| Genomic Health, Inc. | IQT24111615 | 715,559 | - | 221 | | 281,451 | 2.2% | 100.0% |
| Cepheid | IQT2599314 | 2,388,029 | 265,406 | 1,075 | | 523,099 | 15.8% | 89.3% |
| Nanosphere, Inc. | IQT38720096 | 15,632 | 15,474 | 245 | | 18,871 | 44.5% | 51.8% |
| GenMark Diagnostics, Inc. | IQT106526443 | 353,067 | 9,794 | 225 | | 36,051 | 34.0% | 97.3% |
| Bio-Reference Laboratories, Inc. | IQT2594431 | - | 69,849 | 316 | | 892,467 | 16.1% | 9.0% |
| Average | | 3,362,788 | 823,560 | 899 | | 1,253,101 | 106.0% | 82.8% |
| Median | | 752,522 | 84,459 | 584 | | 261,266 | 12.3% | 92.3% |
| Selected | | | | | | | | 97.0% |

**Industry Capital Structure**

| | |
|---|---|
| Equity | 95.0% |
| Interest Bearing Debt | 5.0% |
| Tax Rate | 40.0% |

**Cost of Equity**

Table 1: Venture Capital Average Actual Rates of Return for the Period ended September 30, 2008

| Stage of Development | 5-year Return | | 10-year Return | | 20-year Return | | Ref. |
|---|---|---|---|---|---|---|---|
| | 2002 | 2008 | 2002 | 2008 | 2002 | 2008 | [1] |
| Seed/Early Stage | 51.4% | 3.0% | 34.9% | 25.5% | 20.4% | 22.1% | |
| Balanced | 20.9% | 7.5% | 20.9% | 12.0% | 14.3% | 14.6% | |
| Later Stage | 10.6% | 8.1% | 21.6% | 7.3% | 15.3% | 14.7% | |
| All Ventures | 28.3% | 5.7% | 26.3% | 13.4% | 16.6% | 17.2% | |

Table 2: Target Rates of Return

| Stage of Development | Plummer | Scherlis and Sahlman | Sahlman, Stevenson, and Bhide | Everett | Everett Median Returns | [2-5] |
|---|---|---|---|---|---|---|
| Start-up | 50% - 70% | 50% - 70% | 50% - 100% | 30% - 40% | 33.0% | |
| First stage or "early development" | 40% - 60% | 40% - 60% | 40% - 60% | 25% - 38% | 30.0% | |
| Second stage or "expansion" | 35% - 50% | 30% - 50% | 30% - 40% | 19% - 32% | 25.0% | |
| Bridge/IPO | 25% - 35% | 20% - 35% | 20% - 30% | 18% - 38% | 23.0% | |

Table 3: Target Rates of Return

| | Ruhnka / Young | Wetzel | Plummer / Qed Range of Discount Rates Used | | [6] |
|---|---|---|---|---|---|
| Stage of Development | | | High | Low | |
| Seed | 73.0% | 50.0% | 75.4% | 49.2% | |
| Start-up | 54.8% | 50.0% | 59.6% | 40.6% | |
| 3rd Stage | 42.2% | 37.5% | 49.3% | 34.7% | |
| Fourth Stage | 35.0% | 30.0% | 45.7% | 31.2% | |
| Exit Stage | 35.0% | 22.5% | 40.8% | 28.1% | |

Table 4: Theranos Investor Forecasts Implied Internal Rates of Return (Feb 2014 - Feb 2015)

| Investor Group | IRR | [6] |
|---|---|---|
| PFM Forecast | 75.5% | |
| PFM Model | 35.5% | |
| Mosley and RDV Forecast | 54.0% | |
| Murdoch Forecast | 82.0% | |

| | | |
|---|---|---|
| Selected Venture Capital Cost of Equity | | 45.0% | [7] |

**Weighted Average Cost of Capital**

| | | |
|---|---|---|
| Equity as a % of total capital | 95.0% | |
| Cost of Equity (above) | 45.0% | |
| Weighted Cost of Equity | | 42.8% |
| Debt as a % of total capital | 5.0% | |
| Cost of Debt [4] | 25.00% | |
| After Tax Cost of Debt (tax rate above) | 15.0% | |
| Weighted After Tax Cost of Debt | | 0.6% |
| Weighted Average Cost of Capital | | 43.5% |
| Weighted Average Cost of Capital (rounded) | | 44.0% |

Notes:
[1] Source: Thomson Financial. The average annual return is based upon Thomson Financials' Private Equity Performance Index (PEPI)
    The PEPI is based on the latest quarterly statistics from Thomson Financials' Private Equity Performance Database analyzing the cashflows and
    returns for over 1400 US venture capital and private equity partnerships.
[2] Plummer, James L., QED Report on Venture Capital Financial Analysis.
[3] Scherlis, Daniel R. and William A. Sahlman, "A Method for Valuing High-Risk, Long-Term, Investments, The Venture Capital Method,"
    Harvard Business School Teaching Note 9-288-006, Boston: Harvard Business School Publishing, 1989.
[4] William A. Sahlman, Howard H. Stevenson, Amar V. Bhide, et al., "Financing Entrepreneurial Ventures,"
    Business Fundamental Series (Boston: Harvard Business School Publishing, 1998)
[5] Craig R. Everett, "2021 Private Capital Markets Report" (Malibu: Pepperdine University Graziadio School of Business and Management, 2021), Table
    1, p. 5. Note that this publication also includes rates of return for many other types of private capital investments, as well as summaries of other
    information captured in Pepperdine's annual industry survey.
[6] Dorsey, Terry, "A Portfolio Model for Venture Capital Performance Measurement and Investment Selection," Polaris Group, Inc. January 2000.
[7] Refer to the report for discussion of the selected Venture Capital Rate of Return.


HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

**ER-693**

**US v. Elizabeth Holmes**

Valuation of Theranos, Inc.

As of October 15, 2015

**Exhibit I.5**

Forecast Free Cash Flow to Invested Capital

*(thousands of USD)*

| | For the Twelve Month Period Ending December 31, | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | 2015 | | 2016 | | 2017 | | 2018 |
| Total Revenue | $ | 113,452 | $ | 223,452 | $ | 323,452 | $ | 503,452 |
| Total Cost of Revenue | | 39,708 | | 71,505 | | 103,505 | | 151,036 |
| Gross Margin | | 73,744 | | 151,947 | | 219,947 | | 352,416 |
| *GM %* | | *65.0%* | | *68.0%* | | *68.0%* | | *70.0%* |
| Total Operating Expenses | | 96,881 | | 99,764 | | 108,780 | | 124,204 |
| *Operating Expense %* | | *85.4%* | | *44.6%* | | *33.6%* | | *24.7%* |
| **EBITDA** | | **(23,137)** | | **52,183** | | **111,167** | | **228,212** |
| *EBITDA %* | | *-20.4%* | | *23.4%* | | *34.4%* | | *45.3%* |
| Less:  Partial Period Adjustment | | 18,317 | | - | | - | | - |
| **Adjusted EBITDA** | | **(4,820)** | | | | | | |
| Depreciation & Amortization | | 1,915 | | 13,816 | | 21,324 | | 30,274 |
| **EBIT** | | **(6,735)** | | **38,367** | | **89,843** | | **197,938** |
| *EBIT %* | | *-5.9%* | | *17.2%* | | *27.8%* | | *39.3%* |
| Interest Expense | | - | | - | | - | | - |
| Earnings Before Taxes | | (6,735) | | 38,367 | | 89,843 | | 197,938 |
| Income Taxes | | - | | - | | - | | - |
| **Forecast After-Tax Income** | $ | **(6,735)** | $ | **38,367** | $ | **89,843** | $ | **197,938** |
| *NPAT %* | | *-5.9%* | | *17.2%* | | *27.8%* | | *39.3%* |
| **Cash Flow** | | | | | | | | |
| Add:  Depreciation & Amortization | | 1,915 | | 13,816 | | 21,324 | | 30,274 |
| After-Tax Gross Cash Flow | | (4,820) | | 52,183 | | 111,167 | | 228,212 |
| Decrease / (Increase) in Working Capital | | 281,664 | | (9,883) | | (36,631) | | (27,694) |
| Less:  Capital Expenditures | | (11,670) | | (62,104) | | (57,667) | | (85,125) |
| **Free Cash Flow** | $ | **265,174** | $ | **(19,804)** | $ | **16,869** | $ | **115,393** |


HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

**US v. Elizabeth Holmes**

Valuation of Theranos, Inc.

As of October 15, 2015

**Exhibit I.6**

Discounted Cash Flow Method Value Summary

*(thousands of USD)*

| Forecast Period | Base Cash Flow | Period | Discount Rate | PV Factor [2] | Discounted Cash Flow [3] |
|---|---|---|---|---|---|
| 2015 | $ 265,174 | 0.11 | 44.0% | 0.9623 | $ 255,175 |
| 2016 | (19,804) | 0.71 | 44.0% | 0.7717 | (15,282) |
| 2017 | 16,869 | 1.71 | 44.0% | 0.5359 | 9,040 |
| 2018 | 115,393 | 2.71 | 44.0% | 0.3721 | 42,943 |
| Terminal Value [1] | 2,909,000 | 3.21 | 44.0% | 0.3101 | 902,132 |

| | |
|---|---|
| **Indicated Value** | $ 1,194,008 |
| Add: C-2 Financing Proceeds not on 12/31/14 Balance Sheet | 176,300 |
| Operating Losses for 2015 prorated to 10/15/15 | (145,314) |
| Deduct: Interest Bearing Debt | (40,805) |
| **Total Equity Value - Controlling, Marketable Basis** | $ 1,184,189 |
| **Total Equity Value - Controlling, Marketable Basis (rounded)** | $ 1,184,000 |

**Notes:**

[1] Refer to Exhibit J.1

[2] 1 / (1 + Discount Rate) ^ Period.

[3] Base Cash Flow x PV Factor.



**US v. Elizabeth Holmes**
Valuation of Theranos, Inc.
As of October 15, 2015

Exhibit J.1
Guideline Public Company Method
*(thousands of USD)*

| Name | Ticker | Market Cap | Debt, Pref Shr & Min Int. | Cash | MVIC [1] | Price [1] | Revenue 3-year | Revenue 5-year | Revenue LTM | Revenue 2016E | EBITDA LTM | EBITDA 2016E | EBIT LTM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OraSure Technologies, Inc. | OSUR | $ 267,159 | $ - | $ 108,189 | $ 158,970 | $ 158,970 | $ 100,050 | $ 96,505 | $ 116,018 | $ 129,998 | $ 7,237 | $ 12,850 | $ 1,403 |
| Trinity Biotech plc | TRIB | 271,362 | 99,069 | 104,289 | 266,142 | 167,073 | 99,362 | 94,508 | 101,392 | 115,039 | 17,182 | 24,972 | 12,657 |
| Enzo Biochem, Inc. | ENZ | 181,945 | 3,586 | 18,109 | 167,422 | 163,836 | 96,400 | 97,407 | 97,599 | NA | (8,875) | NA | (12,664) |
| QuidelOrtho Corporation | QDEL | 620,241 | 146,697 | 182,560 | 584,378 | 437,681 | 188,888 | 179,185 | 205,670 | 224,952 | 36,098 | 52,014 | 12,039 |
| Exact Sciences Corporation | EXAS | 713,931 | 6,156 | 343,509 | 376,578 | 370,422 | 14,395 | 10,877 | 26,521 | 117,061 | (144,373) | (154,902) | (151,231) |
| OPKO Health, Inc. | isdaqGS:O | 5,015,072 | 143,954 | 212,144 | 4,946,882 | 4,802,928 | 164,731 | 128,548 | 241,080 | 1,239,762 | (64,542) | 78,008 | (88,273) |
| PerkinElmer, Inc. | PKI | 5,470,749 | 1,028,376 | 195,066 | 6,304,059 | 5,275,683 | 2,227,989 | 2,174,950 | 2,262,633 | 2,374,847 | 355,149 | 485,963 | 241,489 |
| Quest Diagnostics Incorporated | DGX | 9,197,441 | 3,832,000 | 123,000 | 12,906,441 | 9,074,441 | 7,393,534 | 7,370,262 | 7,527,000 | 7,622,205 | 1,449,000 | 1,521,683 | 1,140,000 |
| Laboratory Corporation of America Holdings | LH | 11,664,918 | 6,696,700 | 713,000 | 17,648,618 | 10,951,918 | 6,828,200 | 6,445,160 | 7,773,600 | 9,131,565 | 1,578,200 | 1,878,324 | 1,213,700 |
| Myriad Genetics, Inc | MYGN | 2,711,591 | - | 155,400 | 2,556,191 | 2,556,191 | 730,777 | 678,158 | 737,800 | 779,683 | 193,300 | 227,461 | 167,500 |
| Illumina, Inc. | ILMN | 21,971,248 | 1,142,229 | 1,439,406 | 21,674,071 | 20,531,842 | 1,872,918 | 1,661,529 | 2,140,593 | 2,576,267 | 766,572 | 913,442 | 642,982 |
| Qiagen N.V. | QGEN | 5,912,561 | 1,061,204 | 429,529 | 6,544,236 | 5,483,032 | 1,309,484 | 1,287,628 | 1,292,856 | 1,402,013 | 384,361 | 471,991 | 179,795 |
| Alere Inc. | IQT262233 | 3,975,232 | 4,212,525 | 479,538 | 7,708,219 | 3,495,694 | 391 | 196 | 2,483,662 | 2,652,810 | 533,132 | 605,209 | 214,215 |
| Luminex Corporation | IQT262743 | 789,484 | - | 131,559 | 657,925 | 657,925 | - | - | 235,365 | 246,841 | 52,993 | 48,894 | 39,990 |
| Abaxis, Inc. | IQT258652 | 1,017,036 | 530 | 133,141 | 884,425 | 883,895 | 391 | - | 217,133 | 243,580 | 46,272 | 53,433 | 39,654 |
| CombiMatrix Corporation | QT3630907 | 13,695 | 344 | 5,549 | 8,490 | 8,146 | - | - | 9,621 | 15,845 | (5,995) | NA | (6,304) |
| Affymetrix Inc. | IQT258741 | 714,389 | 124,950 | 137,593 | 701,746 | 576,796 | - | - | 357,744 | 374,639 | 46,644 | 66,154 | 28,487 |
| Genomic Health, Inc. | QT2411161 | 715,559 | - | 98,013 | 617,546 | 617,546 | - | - | 281,451 | 335,207 | (24,677) | 10,950 | (31,426) |
| Cepheid | IQT259931 | 2,388,029 | 285,406 | 326,184 | 2,347,251 | 2,061,845 | (514) | (2,645) | 523,099 | 626,028 | 6,250 | 50,077 | (24,425) |
| Nanosphere, Inc. | QT387200 | 16,632 | 15,474 | 12,339 | 19,767 | 4,293 | 16,647 | 18,759 | 18,871 | 24,880 | (29,703) | NA | (31,532) |
| GenMark Diagnostics, Inc. | IT1066264 | 353,067 | 9,794 | 54,178 | 308,683 | 298,889 | (9,938) | (10,408) | 36,051 | 52,729 | (38,446) | (44,875) | (41,732) |
| Bio-Reference Laboratories, Inc. | IQT259442 | - | 69,849 | 25,146 | 44,703 | (25,146) | 28,752 | 27,994 | 882,467 | NA | 115,980 | NA | 89,519 |
| *Correlation to MVIC* | | | | | | | *0.71* | *0.69* | *0.77* | *0.80* | *0.85* | *0.87* | *0.85* |
| *Correlation to Price* | | | | | | | *0.58* | *0.55* | *0.63* | *0.65* | *0.71* | *0.73* | *0.73* |

| Name | Market Value of Invested Capital / Revenue LTM | Revenue 2016E | EBITDA LTM | EBITDA 2016E | EBIT LTM |
|---|---|---|---|---|---|
| OraSure Technologies, Inc. | 1.37x | 1.22x | 21.97x | 12.37x | 113.31x |
| Trinity Biotech plc | 2.62x | 2.31x | 15.49x | 10.66x | 21.03x |
| Enzo Biochem, Inc. | 1.72x | NA | NA | NA | NA |
| QuidelOrtho Corporation | 2.84x | 2.60x | 16.19x | 11.24x | 48.54x |
| Exact Sciences Corporation | NA | 3.22x | NA | NA | NA |
| OPKO Health, Inc. | 20.52x | 3.99x | NA | 63.41x | NA |
| PerkinElmer, Inc. | 2.79x | 2.65x | 17.75x | 12.97x | 26.10x |
| Quest Diagnostics Incorporated | 1.71x | 1.69x | 8.91x | 8.48x | 11.32x |
| Laboratory Corporation of America Holdings | 2.27x | 1.93x | 11.18x | 9.40x | 14.54x |
| Myriad Genetics, Inc | 3.46x | 3.28x | 13.22x | 11.24x | 15.26x |
| Illumina, Inc. | 10.13x | 8.41x | 28.27x | 23.73x | 33.71x |
| Qiagen N.V. | 5.06x | 4.67x | 17.96x | 13.87x | 36.40x |
| Alere Inc. | 3.10x | 2.91x | 14.46x | 12.74x | 35.98x |
| Luminex Corporation | 2.80x | 2.64x | 12.42x | 13.46x | 16.45x |
| Abaxis, Inc. | 4.07x | 3.63x | 19.11x | 16.55x | 22.30x |
| CombiMatrix Corporation | 0.88x | 0.54x | NA | NA | NA |
| Affymetrix Inc. | 1.96x | 1.87x | 15.04x | 10.61x | 24.63x |
| Genomic Health, Inc. | 2.19x | 1.84x | NA | 56.40x | NA |
| Cepheid | 4.49x | 3.75x | NA | 46.87x | NA |
| Nanosphere, Inc. | 1.05x | 0.79x | NA | NA | NA |
| GenMark Diagnostics, Inc. | 8.56x | 5.85x | NA | NA | NA |
| Bio-Reference Laboratories, Inc. | 0.05x | NA | 0.39x | NA | 0.50x |

| | Revenue LTM | Revenue 2016E | EBITDA LTM | EBITDA 2016E | EBIT LTM |
|---|---|---|---|---|---|
| Upper Quartile | 4.07x | 3.66x | 17.91x | 18.35x | 35.42x |
| Mean | 3.98x | 2.99x | 15.17x | 20.87x | 30.01x |
| Median | 2.79x | 2.65x | 15.27x | 12.65x | 23.47x |
| Lower Quartile | 1.72x | 1.87x | 12.62x | 11.09x | 15.56x |
| **Selected Multiple** | 4.00x | | 13.90x | | - |
| Subject Company Base Value | $ 503,452 | $ - | $ 228,212 | $ - | $ - |
| **Indicated Value** | 2,013,808 | - | 3,172,147 | - | - |
| Interest Bearing Debt | N/A | N/A | N/A | N/A | N/A |
| **Indicated Equity Value** | $ 2,013,808 | $ - | $ 3,172,147 | $ - | $ - |
| Weighting | 33.3% | 0.0% | 66.7% | 0.0% | 0.0% |
| **Indicated Value** | | | | | $ 2,786,934 |
| Add: Subject Company Cash | | | | | 122,503 |
| **Total Invested Capital Value at 12/31/18 - Controlling, Marketable Basis** | | | | | $ 2,908,636 |
| **Total Invested Capital Value at 12/31/18 - Controlling, Marketable Basis (rounded)** | | | | | $ 2,909,000 |

**Notes:**
Source: S&P Capital IQ.
[1] MVIC = Market Value of Invested Capital. Presented as net of cash

HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

US v. Elizabeth Holmes
Valuation of Theranos, Inc.
As of October 15, 2015

Exhibit J.2
Guideline Public Company Key Financial Ratios
(thousands of USD)

| Name | Ticker | Market Cap | Trading Volume [1] | LTM Revenue | CAGR Revenue [2] 1 Year | 3 Year | Forward Growth 2016E | 2017E | 2018E | As a % of Revenue GM | EBITDA | EBIT | Capex | WC [3] | Current Ratio | Debt to Equity | Debt to TNW |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OraSure Technologies, Inc. | OSUR | $ 267,159 | 568 | $ 116,018 | 8.9% | 9.1% | 12.0% | 10.8% | NA | 65.8% | 6.2% | 1.2% | 2.2% | 1.89858 | 4.78 | 0.0% | 0.0% |
| Trinity Biotech plc | TRIB | 271,362 | 121 | 101,392 | -1.5% | 7.5% | 13.5% | 16.1% | NA | 47.5% | 16.9% | 12.5% | 8.3% | 0.23082 | 8.54 | 47.0% | 181.2% |
| Enzo Biochem, Inc. | ENZ | 161,945 | 135 | 97,599 | 1.7% | -1.8% | NA | NA | NA | 43.9% | -9.1% | -13.0% | 1.8% | 0.29082 | 1.94 | 8.4% | 12.4% |
| QuidelOrtho Corporation | QDEL | 620,241 | 240 | 205,670 | 22.0% | 13.6% | 8.4% | 8.4% | NA | 64.1% | 17.6% | 5.9% | 7.1% | 1.04416 | 6.91 | 86.9% | 140.3% |
| Exact Sciences Corporation | EXAS | 713,931 | 2,658 | 26,521 | 1894.1% | 85.6% | NA | 96.5% | 71.7% | 23.7% | N/A | -570.2% | N/A | 12.6831 | 15.28 | 1.7% | 1.7% |
| OPKO Health, Inc. | NasdaqGS:OPK | 5,015,072 | 5,704 | 241,080 | 179.4% | 87.5% | 414.3% | 26.5% | 30.0% | 38.3% | -26.8% | -36.6% | 2.2% | 0.86296 | 1.45 | 7.4% | -54.9% |
| PerkinElmer, Inc. | PKI | 5,470,749 | 753 | 2,262,633 | 1.9% | 2.8% | 5.0% | 4.5% | 5.5% | 45.5% | 15.7% | 10.7% | 1.1% | 0.22963 | 1.94 | 50.1% | -164.8% |
| Quest Diagnostics Incorporated | DGX | 9,197,441 | 1,043 | 7,527,000 | 3.0% | 0.7% | 1.3% | 2.3% | 4.1% | 38.2% | 19.3% | 15.1% | 3.4% | 0.05842 | 1.45 | 79.8% | -168.9% |
| Laboratory Corporation of America Hold | LH | 11,664,918 | 1,063 | 7,773,600 | 31.0% | 11.3% | 17.5% | 4.9% | 3.2% | 34.9% | 20.3% | 15.6% | 2.8% | 0.11098 | 1.47 | 135.5% | -142.1% |
| Myriad Genetics, Inc. | MYGN | 2,711,591 | 817 | 737,800 | -0.9% | 12.4% | 5.7% | 0.7% | 22.1% | 79.8% | 25.2% | 22.7% | 1.8% | 0.33654 | 5.21 | 0.0% | 0.0% |
| Illumina, Inc. | ILMN | 21,971,248 | 1,950 | 2,140,593 | 23.3% | 25.3% | 20.4% | 16.5% | 14.9% | 73.3% | 35.8% | 30.0% | 6.6% | 0.75987 | 3.79 | 58.4% | 119.9% |
| Qiagen N.V. | QGEN | 5,912,581 | 862 | 1,292,656 | -3.9% | 1.3% | 8.4% | 6.8% | 6.5% | 65.3% | 28.2% | 13.9% | 7.3% | 0.54094 | 3.52 | 42.0% | 2753.9% |
| Alere Inc. | IQT2622336 | 3,975,232 | 602 | 2,483,662 | -4.0% | -2.9% | 6.8% | 3.7% | 8.0% | 47.1% | 21.5% | 8.6% | 3.8% | 0.30828 | 1.68 | 171.3% | -197.6% |
| Luminex Corporation | IQT2627430 | 789,484 | 258 | 235,365 | -5.1% | 6.5% | 5.7% | 8.2% | 22.6% | 71.5% | 22.5% | 17.0% | 8.7% | 0.74435 | 7.57 | 0.0% | 0.0% |
| Abaxis, Inc. | IQT2586525 | 1,017,036 | 177 | 217,133 | 29.6% | 9.2% | 12.2% | NA | NA | 54.6% | 21.3% | 18.3% | 2.2% | 0.83656 | 7.33 | 0.2% | 0.2% |
| CombiMatrix Corporation | IQT36309071 | 13,695 | 2 | 9,821 | 27.0% | 23.4% | 64.7% | 36.8% | 34.5% | 45.1% | -62.3% | -85.5% | 1.3% | 0.70835 | 4.77 | 4.7% | 4.7% |
| Affymetrix Inc. | IQT2587418 | 714,389 | 688 | 357,744 | 2.8% | 9.0% | 4.7% | 3.5% | 5.4% | 63.3% | 13.0% | 8.0% | 3.6% | 0.5037 | 3.54 | 37.6% | 177.0% |
| Genomic Health, Inc. | IQT24111615 | 715,559 | 221 | 281,451 | 2.2% | 7.3% | 19.1% | 11.8% | 13.0% | 78.2% | -8.8% | -11.2% | 7.4% | 0.34992 | 3.26 | 0.0% | 0.0% |
| Cepheid | IQT2599314 | 2,388,029 | 1,075 | 523,099 | 15.8% | 17.9% | 19.7% | 16.1% | 17.2% | 50.7% | 1.6% | -4.7% | 7.4% | 0.79831 | 3.88 | 77.8% | 95.0% |
| Nanosphere, Inc. | IQT38720096 | 16,632 | 245 | 18,871 | 44.5% | 63.3% | 31.8% | 64.8% | NA | -57.8% | N/A | -167.1% | 8.2% | 0.21424 | 1.18 | 107.2% | 123.5% |
| GenMark Diagnostics, Inc. | IQT106626443 | 353,067 | 225 | 36,051 | 34.0% | 40.3% | 46.3% | 57.9% | 56.2% | 59.9% | -106.6% | -115.8% | 13.6% | 1.40426 | 5.41 | 18.1% | 18.9% |
| Bio-Reference Laboratories, Inc. | IQT2594421 | - | 376 | 882,467 | 18.1% | 14.4% | NA | NA | NA | 47.4% | 13.1% | 10.1% | 2.7% | 0.24663 | 2.34 | 20.7% | 24.3% |
| **Upper Quartile** | | $ 4,755,112 | 997 | $ 1,190,259 | 28.9% | 22.0% | 20.0% | 21.5% | 26.3% | 65.0% | 21.3% | 14.8% | 7.4% | 82.7% | 5.36 | 64.2% | 113.7% |
| **Mean** | | 3,362,788 | 899 | 1,253,101 | 106.0% | 20.2% | 37.8% | 21.0% | 21.0% | 49.1% | 3.3% | -36.1% | 4.9% | 118.8% | 4.42 | 42.4% | 132.9% |
| **Median** | | 752,522 | 584 | 261,286 | 12.3% | 10.3% | 12.2% | 10.8% | 14.9% | 49.1% | 16.3% | 8.3% | 3.6% | 60.2% | 3.66 | 29.2% | 3.2% |
| **Lower Quartile** | | 291,789 | 229 | 105,049 | 2.0% | 6.7% | 6.3% | 4.7% | 6.0% | 44.2% | -1.0% | -12.5% | 2.2% | 26.2% | 1.94 | 2.5% | 0.0% |
| **Theranos, Inc. (at 12/31/15)** | | NA | NA | $ 503,452 | 55.6% | 64.3% | 28.0% | NA | NA | 0.0% | 45.3% | 39.3% | 16.9% | 19.2% | 2.39 | N/A | N/A |

Notes:
Source: S&P Capital IQ.
[1] Represents trailing 3-month average daily trading volume (in thousands)
[2] CAGR = Compound Annual Growth Rate
[3] Working capital excludes cash


HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

US v. Elizabeth Holmes
Valuation of Theranos, Inc.
As of October 15, 2015

Exhibit J.3
Guideline Public Company Descriptions

| Name | Ticker | Description |
|---|---|---|
| OraSure Technologies, Inc. | OSUR | OraSure Technologies, Inc., together with its subsidiaries, develops, manufactures, markets, and sells oral fluid diagnostic products and specimen collection devices in the United States, Europe, and internationally. |
| Trinity Biotech plc | TRIB | Trinity Biotech plc acquires, develops, manufactures, and markets medical diagnostic products for the clinical laboratory and point-of-care (POC) segments of the diagnostic market in the Americas, Africa, Asia, and Europe. |
| Enzo Biochem, Inc. | ENZ | Enzo Biochem, Inc., an integrated diagnostics, clinical lab, and life sciences company, researches, develops, manufactures, and markets diagnostic and research products based on genetic engineering, biotechnology, and molecular biology. |
| QuidelOrtho Corporation | QDEL | QuidelOrtho Corporation focuses on the development and manufacture of diagnostic testing technologies across the continuum of healthcare testing needs. |
| Exact Sciences Corporation | EXAS | Exact Sciences Corporation provides cancer screening and diagnostic test products in the United States and internationally. |
| OPKO Health, Inc. | NasdaqGS:OPK | OPKO Health, Inc., a healthcare company, engages in the diagnostics and pharmaceuticals businesses in the United States, Ireland, Chile, Spain, Israel, Mexico, and internationally. |
| PerkinElmer, Inc. | PKI | PerkinElmer, Inc. provides products, services, and solutions to the diagnostics, life sciences, and applied services markets worldwide. |
| Quest Diagnostics Incorporated | DGX | Quest Diagnostics Incorporated provides diagnostic testing, information, and services in the United States and internationally. |
| Laboratory Corporation of America Holdings | LH | Laboratory Corporation of America Holdings operates as a global life sciences company that provides vital information to help doctors, hospitals, pharmaceutical companies, researchers, and patients make clear and confident decisions. |
| Myriad Genetics, Inc. | MYGN | Myriad Genetics, Inc., a genetic testing and precision medicine company, develops and commercializes genetic tests in the United States and internationally. |
| Illumina, Inc. | ILMN | Illumina, Inc. provides sequencing and array-based solutions for genetic and genomic analysis. |
| Qiagen N.V. | QGEN | QIAGEN N.V. offers sample to insight solutions that transform biological materials into molecular insights worldwide. |
| Alere Inc. | IQT2622338 | Alere Inc. provides diagnostic tests for infectious disease, cardiometabolic disease, and toxicology in the United States and internationally. |
| Luminex Corporation | IQT2627430 | Luminex Corporation develops, manufactures, and sells proprietary biological testing technologies and products for the diagnostics, pharmaceutical, and research industries worldwide. |
| Abaxis, Inc. | IQT2586525 | Abaxis, Inc. develops, manufactures, markets, and sells portable blood analysis systems for use in human or veterinary patient care to provide rapid blood constituent measurements for clinicians worldwide. |
| CombiMatrix Corporation | IQT36309071 | CombiMatrix Corporation provides clinical molecular diagnostic laboratory services in the United States. |
| Affymetrix Inc. | IQT2587418 | Affymetrix, Inc. provides life science products and molecular diagnostic products that enable parallel analysis of biological systems at the gene, protein, and cell level. |
| Genomic Health, Inc. | IQT24111615 | Genomic Health, Inc., a healthcare company, provides clinically actionable genomic information to personalize cancer treatment decisions in the United States and internationally. |
| Cepheid | IQT2599314 | Cepheid, a molecular diagnostics company, develops, manufactures, and markets integrated systems for testing in the clinical and non-clinical markets. |
| Nanosphere, Inc. | IQT38720096 | Nanosphere, Inc. develops, manufactures, and markets molecular diagnostic tests for infectious diseases and associated drug resistance markers for earlier disease detection, optimal patient treatment, and improved healthcare economics. |
| GenMark Diagnostics, Inc. | IQT106626443 | GenMark Diagnostics, Inc. designs and manufactures multiplex molecular diagnostic solutions to enhance patient care, improve quality metrics, and reduce the total cost-of-care for laboratory professionals, healthcare providers, and customers in the United States and internationally. |
| Bio-Reference Laboratories, Inc. | IQT2594421 | Bio-Reference Laboratories, Inc. provides clinical laboratory testing services for the detection, diagnosis, evaluation, monitoring, and treatment of diseases in the United States. |

Notes:
Source: S&P Capital IQ



US v. Elizabeth Holmes                                                                                          Exhibit J.4
Valuation of Theranos, Inc.                                                              Guideline Public Company Ranking
As of October 15, 2015                                                                                    (thousands of USD)

| Size (Revenue, millions) | | Liquidity (Operating Net Working Capital-to-Revenue) | | Liquidity (Current Ratio) | |
|---|---|---|---|---|---|
| Laboratory Corporation of America Holdi | 7,773,600 | Quest Diagnostics Incorporated | 6.6% | Exact Sciences Corporation | 15.28 |
| Quest Diagnostics Incorporated | 7,527,000 | Laboratory Corporation of America Holdi | 11.1% | Trinity Biotech plc | 6.54 |
| Alere Inc. | 2,483,662 | **Theranos, Inc. (at 12/31/15)** | **19.2%** | Luminex Corporation | 7.57 |
| PerkinElmer, Inc. | 2,262,633 | Nanosphere, Inc. | 21.4% | Abaxis, Inc. | 7.33 |
| Illumina, Inc. | 2,140,593 | PerkinElmer, Inc. | 23.0% | Quidel/Ortho Corporation | 6.91 |
| Qiagen N.V. | 1,292,956 | Enzo Biochem, Inc. | 23.1% | GenMark Diagnostics, Inc | 5.41 |
| Bio-Reference Laboratories, Inc. | 882,487 | Bio-Reference Laboratories, Inc. | 24.7% | Myriad Genetics, Inc. | 5.21 |
| Myriad Genetics, Inc. | 737,600 | Alere Inc. | 30.6% | OraSure Technologies, Inc. | 4.78 |
| Cepheid | 523,099 | Myriad Genetics, Inc. | 33.7% | CombiMatrix Corporation. | 4.77 |
| **Theranos, Inc. (at 12/31/15)** | **503,462** | Genomic Health, Inc | 35.0% | Cepheid | 3.98 |
| Affymetrix Inc. | 357,744 | Affymetrix Inc. | 50.4% | Illumina, Inc. | 3.70 |
| Genomic Health, Inc. | 281,451 | Qiagen N.V. | 54.1% | Affymetrix Inc. | 3.54 |
| OPKO Health, Inc. | 241,080 | OPKO Health, Inc. | 66.3% | Qiagen N.V. | 3.52 |
| Luminex Corporation | 235,365 | CombiMatrix Corporation | 70.8% | Genomic Health, Inc. | 3.26 |
| Abaxis, Inc. | 217,133 | Luminex Corporation | 74.4% | **Theranos, Inc. (at 12/31/15)** | **2.39** |
| Quidel/Ortho Corporation | 205,670 | Illumina, Inc. | 76.0% | Bio-Reference Laboratories, Inc. | 2.34 |
| OraSure Technologies, Inc. | 116,018 | Cepheid | 79.8% | Enzo Biochem, Inc. | 1.94 |
| Trinity Biotech plc | 101,392 | Abaxis, Inc. | 83.7% | PerkinElmer, Inc. | 1.94 |
| Enzo Biochem, Inc. | 97,599 | Quidel/Ortho Corporation | 104.4% | Alere Inc. | 1.68 |
| GenMark Diagnostics, Inc | 36,051 | GenMark Diagnostics, Inc. | 140.4% | Laboratory Corporation of America Holdi | 1.47 |
| Exact Sciences Corporation | 26,521 | Trinity Biotech plc | 146.7% | Quest Diagnostics Incorporated | 1.45 |
| Nanosphere, Inc. | 18,871 | OraSure Technologies, Inc. | 189.9% | OPKO Health, Inc. | 1.45 |
| CombiMatrix Corporation | 9,821 | Exact Sciences Corporation | 1268.3% | Nanosphere, Inc. | 1.18 |

| Operational Efficiency (Capital Expenditures) | | Growth (Historical 1-year Growth Rate) | | Growth (Historical 3-year CAGR) | |
|---|---|---|---|---|---|
| PerkinElmer, Inc. | 1.1% | Exact Sciences Corporation | 1894.1% | OPKO Health, Inc. | 87.5% |
| CombiMatrix Corporation | 1.3% | OPKO Health, Inc. | 179.4% | Exact Sciences Corporation | 85.6% |
| Myriad Genetics, Inc. | 1.8% | **Theranos, Inc. (at 12/31/15)** | **55.6%** | **Theranos, Inc. (at 12/31/15)** | **64.3%** |
| Enzo Biochem, Inc. | 1.8% | Nanosphere, Inc. | 44.5% | Nanosphere, Inc. | 63.3% |
| OPKO Health, Inc. | 2.2% | GenMark Diagnostics, Inc | 34.0% | GenMark Diagnostics, Inc | 40.3% |
| OraSure Technologies, Inc. | 2.2% | Laboratory Corporation of America Holdi | 31.0% | Illumina, Inc. | 25.3% |
| Abaxis, Inc. | 2.2% | Abaxis, Inc. | 29.6% | CombiMatrix Corporation | 23.4% |
| Bio-Reference Laboratories, Inc. | 2.7% | CombiMatrix Corporation | 27.0% | Cepheid | 17.9% |
| Laboratory Corporation of America Holdi | 2.8% | Illumina, Inc. | 23.3% | Bio-Reference Laboratories, Inc. | 14.4% |
| Quest Diagnostics Incorporated | 3.4% | Quidel/Ortho Corporation | 22.0% | Quidel/Ortho Corporation | 13.6% |
| Affymetrix Inc. | 3.6% | Bio-Reference Laboratories, Inc. | 18.1% | Myriad Genetics, Inc. | 12.4% |
| Alere Inc. | 3.8% | Cepheid | 15.8% | Laboratory Corporation of America Holdi | 11.3% |
| Illumina, Inc. | 6.6% | OraSure Technologies, Inc. | 8.9% | Abaxis, Inc. | 9.2% |
| Quidel/Ortho Corporation | 7.1% | Luminex Corporation | 5.1% | OraSure Technologies, Inc. | 9.1% |
| Qiagen N.V. | 7.3% | Quest Diagnostics Incorporated | 3.0% | Affymetrix Inc. | 9.0% |
| Cepheid | 7.4% | Affymetrix Inc. | 2.8% | Trinity Biotech plc | 7.5% |
| Genomic Health, Inc. | 7.4% | Genomic Health, Inc. | 2.2% | Genomic Health, Inc. | 7.3% |
| Nanosphere, Inc. | 8.2% | PerkinElmer, Inc. | 1.9% | Luminex Corporation | 6.5% |
| Trinity Biotech plc | 8.3% | Enzo Biochem, Inc. | 1.7% | PerkinElmer, Inc. | 2.8% |
| Luminex Corporation | 8.7% | Myriad Genetics, Inc. | -0.9% | Qiagen N.V. | 1.3% |
| GenMark Diagnostics, Inc | 13.6% | Trinity Biotech plc | -1.5% | Quest Diagnostics Incorporated | 0.7% |
| **Theranos, Inc. (at 12/31/15)** | **16.9%** | Qiagen N.V. | -3.9% | Enzo Biochem, Inc. | -1.8% |
| | | Alere Inc. | -4.0% | Alere Inc. | -2.9% |

| Growth (Forward 1-year Growth Rate) | | Profitability (Historical EBITDA Margin 1-year) | | Operational Efficiency (Return on Equity) | |
|---|---|---|---|---|---|
| OPKO Health, Inc. | 414.3% | **Theranos, Inc. (at 12/31/15)** | **48.3%** | Myriad Genetics, Inc. | 10.0% |
| CombiMatrix Corporation | 64.7% | Illumina, Inc. | 35.8% | Bio-Reference Laboratories, Inc. | 14.8% |
| GenMark Diagnostics, Inc | 46.3% | Qiagen N.V | 28.2% | Illumina, Inc. | 14.3% |
| Nanosphere, Inc. | 31.8% | Myriad Genetics, Inc. | 26.2% | Abaxis, Inc. | 11.4% |
| **Theranos, Inc. (at 12/31/15)** | **28.0%** | Luminex Corporation | 22.5% | Laboratory Corporation of America Holdi | 8.7% |
| Illumina, Inc. | 20.4% | Alere Inc. | 21.5% | Quest Diagnostics Incorporated | 8.6% |
| Cepheid | 19.7% | Abaxis, Inc. | 21.3% | Luminex Corporation | 7.8% |
| Genomic Health, Inc. | 19.1% | Laboratory Corporation of America Holdi | 20.3% | PerkinElmer, Inc. | 5.0% |
| Laboratory Corporation of America Holdi | 17.5% | Quest Diagnostics Incorporated | 19.3% | Affymetrix Inc. | 4.2% |
| Trinity Biotech plc | 13.5% | Quidel/Ortho Corporation | 17.6% | Trinity Biotech plc | 3.1% |
| Abaxis, Inc. | 12.2% | Trinity Biotech plc | 16.9% | Qiagen N.V | 3.0% |
| OraSure Technologies, Inc. | 12.0% | PerkinElmer, Inc. | 15.7% | Quidel/Ortho Corporation | 2.6% |
| Quidel/Ortho Corporation | 9.4% | Bio-Reference Laboratories, Inc. | 13.1% | Alere Inc. | 2.4% |
| Qiagen N.V | 8.4% | Affymetrix Inc. | 13.0% | OraSure Technologies, Inc. | 0.5% |
| Alere Inc. | 6.8% | OraSure Technologies, Inc. | 6.2% | **Theranos, Inc. (at 12/31/15)** | **0.0%** |
| Luminex Corporation | 5.7% | Cepheid | 1.6% | Cepheid | -2.4% |
| Myriad Genetics, Inc. | 5.7% | Genomic Health, Inc. | -8.8% | OPKO Health, Inc. | -3.5% |
| PerkinElmer, Inc. | 5.0% | Enzo Biochem, Inc. | -9.1% | Genomic Health, Inc. | -14.2% |
| Affymetrix Inc. | 4.7% | OPKO Health, Inc. | -26.8% | Enzo Biochem, Inc. | -19.2% |
| Quest Diagnostics Incorporated | 1.3% | CombiMatrix Corporation | -62.3% | Exact Sciences Corporation | -32.4% |
| | | GenMark Diagnostics, Inc | -105.6% | GenMark Diagnostics, Inc | -35.1% |
| | | | | CombiMatrix Corporation | -47.1% |
| | | | | Nanosphere, Inc. | -68.6% |



| US v. Elizabeth Holmes | | | | | | | Exhibit K.1 |
|---|---|---|---|---|---|---|---|
| Valuation of Theranos, Inc. | | | | | | | Adjusted Net Asset Value |
| As of October 15, 2015 | | | | | | | (thousands of USD) |

| | | 12/31/2014 Unadjusted | | Adjustments | | Adjusted | |
|---|---|---|---|---|---|---|---|
| **Assets:** | | | | | | | |
| Current Assets | | | | | | | |
| Current Operating Assets | | | | | | | |
| Cash & Equivalents | [1] | $ | 465,933 | $ | 30,986 | $ | 496,919 |
| Accounts Receivable | | | - | | | | - |
| Inventory | | | 2,383 | | - | | 2,383 |
| Other Current Assets | | | 12,788 | | - | | 12,788 |
| Total Current Operating Assets | | | 481,104 | | 30,986 | | 512,090 |
| Total Current Non-Operating Assets | | | - | | - | | - |
| Total Current Assets | | | 481,104 | | 30,986 | | 512,090 |
| | | | | | | | |
| Total Fixed Assets - Net | | | 53,366 | | - | | 53,366 |
| | | | | | | | |
| Other Assets | | | | | | | |
| Intangible Assets | | | | | | | |
| Goodwill | | | - | | - | | - |
| Other Intangible Assets | [2] | | - | | 703,330 | | 703,330 |
| Total Intangible Assets - Net | | | - | | 703,330 | | 703,330 |
| Total Long Term Receivables | | | 27,045 | | - | | 27,045 |
| Total Other Non-Current Assets | | | - | | - | | - |
| Total Non Current Assets | | | 27,045 | | 703,330 | | 730,375 |
| | | | | | | | |
| **Total Assets** | | **$** | **561,515** | **$** | **734,316** | **$** | **1,295,831** |
| | | | | | | | |
| **Liabilities and Equity:** | | | | | | | |
| | | | | | | | |
| Liabilities | | | | | | | |
| Current Liabilities | | | | | | | |
| Current Operating Liabilities | | | | | | | |
| Accounts Payable | | $ | 16,633 | $ | - | $ | 16,633 |
| Deferred Revenue | | | - | | - | | - |
| Other Current Liabilities | [3] | | 400,359 | | (390,375) | | 9,984 |
| Total Current Operating Liabilities | | | 416,992 | | (390,375) | | 26,617 |
| Total Current Debt Obligations | | | - | | - | | - |
| Total Current Liabilities | | | 416,992 | | (390,375) | | 26,617 |
| | | | | | | | |
| Non Current Liabilities | | | | | | | |
| Total Long Term Debt | | | 40,805 | | - | | 40,805 |
| Other Non Current Liabilities | | | | | | | |
| Deferred Rent | | | - | | - | | - |
| Deferred Revenue, LT | | | - | | - | | - |
| Customer Deposits | | | 143,846 | | - | | 143,846 |
| Other Non-current liabilities | | | 33,750 | | - | | 33,750 |
| Total Other Non Current Liabilities | | | 177,596 | | - | | 177,596 |
| Total Non Current Liabilities | | | 218,401 | | - | | 218,401 |
| | | | | | | | |
| **Total Liabilities** | | **$** | **635,393** | **$** | **(390,375)** | **$** | **245,018** |

| | | |
|---|---|---|
| **Total Equity Value - Controlling, Marketable Basis** | **$** | **1,050,813** |
| | | |
| **Total Equity Value - Controlling, Marketable Basis (rounded)** | **$** | **1,051,000** |

**Notes:**

[1] Add proceeds from 2015 capital raises of C-2 Preferred not on 12/31/14 balance sheet, minus pro-rated operating loss through 10/15/15.

[2] Add value of technology and branding assets under cost to recreate method (Exhibit K.2).

[3] Adjust out "miscellaneous receipts" liability that represents proceeds received from 2014 capital raises, for which stock had not been issued yet.



HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS



US v. Elizabeth Holmes
Valuation of Theranos, Inc.
As of October 15, 2015

Exhibit K.2
Cost to Recreate Method - Technology and Branding Assets
(USD)

| | Calendar Year 2009 | | | Calendar Year 2010 | | | Calendar Year 2011 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Total Cost [1] | Allocation to Technology and Brand [2] | Allocated Cost | Total Cost [1] | Allocation to Technology and Brand [2] | Allocated Cost | Total Cost [1] | Allocation to Technology and Brand [2] | Allocated Cost |
| **Functional Category** | | | | | | | | | |
| Salaries, Wages & SBC | $ 6,717,962 | 100% | $ 6,717,962 | $ 7,485,029 | 100% | $ 7,485,029 | $ 10,069,033 | 100% | $ 10,069,033 |
| Payroll Taxes & Processing | 483,606 | 100% | 483,606 | 568,593 | 100% | 568,593 | 784,642 | 100% | 784,642 |
| Health Insurance | 417,083 | 100% | 417,083 | 493,526 | 100% | 493,526 | 767,508 | 100% | 767,508 |
| Other benefits | 114,239 | 100% | 114,239 | 180,253 | 100% | 180,253 | 773,318 | 100% | 773,318 |
| Sales Commissions | 5,000 | 0% | - | - | 0% | - | - | 0% | - |
| **Subtotal Employees** | $ 7,737,890 | | $ 7,732,890 | $ 8,727,402 | | $ 8,727,402 | $ 12,394,501 | | $ 12,394,501 |
| Contractor Services | 488,192 | 100% | 488,192 | 518,786 | 100% | 518,786 | 1,637,549 | 100% | 1,637,549 |
| **Subtotal for All Labor Costs** | $ 8,226,082 | | $ 8,221,082 | $ 9,246,188 | | $ 9,246,188 | $ 14,032,050 | | $ 14,032,050 |
| Facility Costs | $ 2,145,779 | 99.9% | $ 2,144,392 | $ 2,064,230 | 100.0% | $ 2,064,230 | $ 2,724,390 | 100.0% | $ 2,724,390 |
| R&D Materials, Parts, Biological Compounds | 935,138 | 100% | 935,138 | 3,786,184 | 100% | 3,786,184 | 5,955,745 | 100% | 5,955,745 |
| Conf., Website, Market Studies, Trademark Costs | 58,925 | 100% | 58,925 | 75,422 | 100% | 75,422 | 13,452 | 100% | 13,452 |
| Legal, Tax, Accounting Services - General | 120,697 | 50% | 60,349 | 284,605 | 50% | 142,303 | 339,165 | 50% | 169,583 |
| Legal Regulatory and Patents Costs | 313,058 | 100% | 313,058 | 492,136 | 100% | 492,136 | 1,307,265 | 100% | 1,307,265 |
| Legal Costs for Litigation | - | 0% | - | - | 0% | - | 665,695 | 0% | - |
| Expensed Equip., Software, and Maintenance | 148,010 | 100% | 148,010 | 226,101 | 100% | 226,101 | 620,302 | 100% | 620,302 |
| Dues, Subscriptions, Licenses and Supplies | 85,853 | 100% | 85,853 | 233,858 | 100% | 233,858 | 447,386 | 100% | 447,386 |
| Recruiting Costs | 192,343 | 99.9% | 192,219 | 212,706 | 100.0% | 212,706 | 300,466 | 100.0% | 300,466 |
| Travel Expenses | 226,711 | 50% | 113,355 | 154,949 | 50% | 77,474 | 396,822 | 50% | 198,411 |
| Interest (Income), Expense & Bank Charges | 109,143 | 0% | - | 70,077 | 0% | - | (132,632) | 0% | - |
| Supporting G&A Expenses | 274,158 | 99.9% | 273,981 | 361,955 | 100.0% | 361,955 | 455,201 | 100.0% | 455,201 |
| Relocation Expenses | 27,220 | 0% | - | 6,272 | 0% | - | 56,194 | 0% | - |
| Supplies for Manufacturing / Operations | 754,146 | 100% | 754,146 | 432,293 | 100% | 432,293 | 77,829 | 100% | 77,829 |
| Inventory | - | 100% | | (13,583) | 100% | | (5,337) | 100% | (5,337) |
| Capital Expenditures | 180,627 | 100% | 180,627 | 1,635,110 | 100% | 1,635,110 | 3,042,848 | 100% | 3,042,848 |
| Other Costs | 17,441 | 0% | - | 17,845 | 0% | - | 15,927 | 0% | - |
| **Subtotal for Indirect Costs** | $ 5,589,348 | | $ 5,260,052 | $ 10,040,161 | | $ 9,739,772 | $ 16,290,629 | | $ 15,307,450 |
| | | Yrs | | | Yrs | | | Yrs | |
| **Inflation Adjusted Total Expenses [4]** | 2.3% | 6.30 | $ 15,573,573 | 2.3% | 5.30 | $ 21,435,892 | 2.3% | 4.30 | $ 32,374,935 |

| | Calendar Year 2012 | | | Calendar Year 2013 | | | Calendar Year 2014 | | | Calendar Year 2015 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total Cost [1] | Allocation to Technology and Brand [2] | Allocated Cost | Total Cost [1] | Allocation to Technology and Brand [2] | Allocated Cost | Total Cost [1] | Allocation to Technology and Brand [2] | Allocated Cost | Total Cost [1] | Allocation to Technology and Brand [2] | Allocated Cost |
| **Functional Category** | | | | | | | | | | | | |
| Salaries, Wages & SBC | $ 20,238,277 | 100% | $ 20,238,277 | $ 29,829,688 | 100% | $ 29,829,688 | $ 46,369,000 | 100% | $ 46,369,000 | $ 64,272,000 | 88% | $ 56,238,000 |
| Payroll Taxes & Processing | 1,561,634 | 100% | 1,561,634 | 2,246,298 | 100% | 2,246,298 | 3,450,000 | 100% | 3,450,000 | 4,573,000 | 88% | 4,001,375 |
| Health Insurance | 1,429,986 | 100% | 1,429,986 | 2,161,519 | 100% | 2,161,519 | 3,325 | 100% | 3,325 | 4,800 | 88% | 4,200 |
| Other benefits | 2,374,572 | 100% | 2,374,572 | 3,255,991 | 100% | 3,255,991 | 8,112,675 | 100% | 8,112,675 | 11,562,200 | 88% | 10,116,925 |
| Sales Commissions | - | 0% | - | 78 | 0% | - | 312,000 | 0% | - | 453,000 | 0% | - |
| **Subtotal Employees** | $ 25,604,469 | | $ 25,604,469 | $ 37,493,572 | | $ 37,493,494 | $ 58,247,000 | | $ 57,935,000 | $ 80,865,000 | | $ 70,360,500 |
| Contractor Services | 3,073,543 | 100% | 3,073,543 | 5,372,096 | 100% | 5,372,096 | 7,885,000 | 100% | 7,685,000 | 9,673,000 | 88% | 8,463,875 |
| **Subtotal for All Labor Costs** | $ 28,678,011 | | $ 28,678,011 | $ 42,865,668 | | $ 42,865,590 | $ 66,132,000 | | $ 65,620,000 | $ 90,538,000 | | $ 78,824,375 |
| Facility Costs | $ 7,375,665 | 100.0% | $ 7,375,665 | $ 7,140,632 | 100.0% | $ 7,140,617 | $ 16,776,000 | 99.5% | $ 16,686,139 | $ 16,980,000 | 87.0% | $ 14,774,269 |
| R&D Materials, Parts, Biological Compounds | 11,136,524 | 100% | 11,136,524 | 10,069,736 | 100% | 10,069,736 | 10,638,000 | 100% | 10,638,000 | 13,621,000 | 88% | 11,918,375 |
| Conf., Website, Market Studies, Trademark Costs | 1,274,910 | 100% | 1,274,910 | 7,684,778 | 100% | 7,684,778 | 3,087,000 | 100% | 3,087,000 | 7,974,000 | 88% | 6,977,250 |
| Legal, Tax, Accounting Services - General | 1,400,908 | 50% | 700,454 | 709,756 | 50% | 354,878 | 1,051,000 | 50% | 525,500 | 15,181,000 | 44% | 6,641,688 |
| Legal Regulatory and Patents Costs | 1,750,963 | 100% | 1,750,962 | 1,913,373 | 100% | 1,913,373 | 2,199,000 | 100% | 2,199,000 | 5,612,000 | 88% | 4,910,500 |
| Legal Costs for Litigation | 1,829,174 | 0% | - | 6,197,019 | 0% | - | 3,899,000 | 0% | - | 4,872,000 | 0% | - |
| Expensed Equip., Software, and Maintenance | 1,084,748 | 100% | 1,084,748 | 1,657,745 | 100% | 1,657,745 | 1,792,000 | 100% | 1,792,000 | 2,691,000 | 88% | 2,354,625 |
| Dues, Subscriptions, Licenses and Supplies | 1,211,873 | 100% | 1,211,873 | 1,522,924 | 100% | 1,522,924 | 3,583,000 | 100% | 3,583,000 | 4,508,000 | 88% | 3,944,500 |
| Recruiting Costs | 796,875 | 100.0% | 796,875 | 552,947 | 100.0% | 552,946 | 1,147,000 | 99.5% | 1,140,856 | 1,337,000 | 87.0% | 1,163,321 |
| Travel Expenses | 267,524 | 50% | 133,762 | 787,042 | 50% | 393,521 | 1,170,000 | 50% | 585,000 | 3,004,000 | 44% | 1,314,250 |
| Interest (Income), Expense & Bank Charges | 143,830 | 0% | - | 382,053 | 0% | - | (27,000) | 0% | - | (1,336,000) | 0% | - |
| Supporting G&A Expenses | 934,674 | 100.0% | 934,674 | 1,185,138 | 100.0% | 1,185,135 | 2,335,000 | 99.5% | 2,322,493 | 3,041,000 | 87.0% | 2,645,969 |
| Relocation Expenses | 65,756 | 0% | - | 24,763 | 0% | - | 43,000 | 0% | - | 162,000 | 0% | - |
| Supplies for Manufacturing / Operations | 855,721 | 100% | 855,721 | 1,574,094 | 100% | 1,574,094 | 1,952,000 | 100% | 1,952,000 | 2,286,000 | 88% | 2,000,250 |
| Inventory | 6,865,924 | 100% | 6,865,924 | 1,742,694 | 100% | 1,742,694 | 1,145,000 | 100% | 1,145,000 | 1,959,000 | 88% | 1,714,125 |
| Capital Expenditures | 17,572,491 | 100% | 17,572,491 | 8,884,769 | 100% | 8,884,769 | 38,594,066 | 100% | 38,594,066 | 21,598,615 | 88% | 18,898,788 |
| Other Costs | 90,432 | 0% | - | (44,941) | 0% | - | 30,000 | 0% | - | 294,000 | 0% | - |
| **Subtotal for Indirect Costs** | $ 54,697,893 | | $ 91,694,585 | $ 51,994,722 | | $ 44,677,410 | $ 89,414,066 | | $ 84,250,054 | $ 103,784,615 | | $ 79,257,911 |
| | | Yrs | | | Yrs | | | Yrs | | | Yrs | |
| **Inflation Adjusted Total Expenses [3]** | 2.3% | 3.29 | $ 98,673,058 | 2.3% | 2.29 | $ 92,266,644 | 2.3% | 1.29 | $ 154,583,595 | 2.3% | 0.39 | $ 159,518,037 |

| | | |
|---|---|---|
| 2004-2006 Expenses, Inflation Adjusted [4] | | $ 24,677,830 |
| 2007 Expenses, Inflation Adjusted [5] | | 21,044,667 |
| 2008 Expenses, Inflation Adjusted [5] | | 15,785,077 |
| 2009-2015 Expenses, Inflation Adjusted | | 562,426,134 |
| **Total Direct and Indirect Development Costs** | | $ 623,933,708 |
| Obsolescence Adjustment [6] | 2% | (12,338,915) |
| **Subtotal Cost** | | $ 611,594,793 |
| Add Developer Profit Margin [7] | 15% | 91,739,219 |
| **Total Pretax Development Cost** | | $ 703,334,012 |
| **Total Pretax Development Cost (Rounded)** | | $ 703,330,000 |

**Notes**
[1] Per company prepared trial balances.
[2] Allocations based on relevance of costs to developing Theranos technology and branding assets. 2015 adjusted for partial year.
[3] Adjust allocated expenses for average annual inflation of 2.3% over historical period.
[4] 2004 - 2006 expenses based on retained earnings deficit at 12/31/07 less operating loss reported for calendar year 2007. Expenses are adjusted for inflation of 2.3% from midpoint of period to valuation date.
[5] 2007 - 2008 expenses based on audited financial statements. Excludes financing costs and interest income. Expenses are adjusted for inflation of 2.3% from midpoint of each period to valuation date.
[6] Adjusted for estimated 50% of historical development efforts between 2004-2006 that represent obsolete technology on valuation date.
[7] Developer margin based on median EBIT margin of peer group of firms in Exhibit J.2.

HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

US v. Elizabeth Holmes | | | | | | | | | Exhibit L.1
Valuation of Theranos, Inc. | | | | | | | | | NAV Equity Allocation 2/7/14 - Step 1
As of February 7, 2014 | | | | | | | | | (USD)

**Break Point Calculation**

| Share Class | Number of Shares | Series C, C-1, C-2 Liq. Preference | Series A, B Liq. Preference | $0.015 Options Exercise | $0.03 Options Exercise | $0.066 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.094 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | $0.015 | $0.030 | $0.066 | $0.072 | $0.094 | $0.170 | $0.206 |
| **Preferred Share Classes** | | | | | | | | | | |
| Series A @ $0.150 | 46,320,045 | $ - | $ 6,948,007 | $ 7,642,807 | $ 9,032,409 | $ 12,089,532 | $ 15,424,575 | $ 19,778,659 | $ 27,653,067 | $ 37,194,996 |
| Series B @ $0.1846 | 54,162,965 | - | 10,000,000 | 10,812,444 | 12,437,333 | 16,012,089 | 19,911,822 | 25,003,141 | 34,210,845 | 45,368,416 |
| Series C @ $0.964 | 58,896,105 | 33,217,403 | 33,217,403 | 34,100,845 | 35,887,728 | 39,754,817 | 43,985,390 | 49,531,624 | 59,543,982 | 71,676,660 |
| Series C-1 @ $3.00 | 25,175,001 | 75,525,003 | 75,525,003 | 75,902,628 | 76,657,878 | 78,319,428 | 80,132,028 | 82,498,478 | 86,778,228 | 91,964,279 |
| Series C-1 @ $15.00 | 7,500,032 | 112,500,480 | 112,500,480 | 112,612,980 | 112,837,981 | 113,332,984 | 113,872,986 | 114,577,989 | 115,852,994 | 117,398,001 |
| Series C-2 @ $17.00 | 9,669,998 | 164,389,966 | 164,389,966 | 164,535,016 | 164,825,116 | 165,463,336 | 166,159,576 | 167,068,555 | 168,712,455 | 170,704,475 |
| **Warrants on Common** | | | | | | | | | | |
| Exercise Price @ $0.072 | 741,665 | - | - | - | - | - | - | 16,317 | 72,683 | 99,383 |
| **Common** | 302,640,465 | - | - | 4,539,607 | 9,079,214 | 19,974,271 | 21,790,113 | 28,448,204 | 51,448,879 | 62,343,336 |
| **Options on Common** | | | | | | | | | | |
| Exercise Price @ $0.015 | 350,000 | - | - | - | 5,250 | 17,850 | 19,950 | 27,650 | 54,250 | 65,850 |
| Exercise Price @ $0.030 | 1,227,125 | - | - | - | - | 44,177 | 51,539 | 78,536 | 171,798 | 215,374 |
| Exercise Price @ $0.066 | 552,500 | - | - | - | - | - | 3,315 | 15,470 | 57,460 | 77,350 |
| Exercise Price @ $0.072 | 3,092,715 | - | - | - | - | - | - | 68,040 | 303,086 | 414,424 |
| Exercise Price @ $0.094 | 312,500 | - | - | - | - | - | - | - | 23,750 | 35,000 |
| Exercise Price @ $0.170 | 3,990,167 | - | - | - | - | - | - | - | - | 143,646 |
| Exercise Price @ $0.206 | 703,195 | - | - | - | - | - | - | - | - | - |
| | 515,334,478 | 385,632,852 | 402,580,859 | 410,146,328 | 420,742,909 | 445,008,536 | 461,361,295 | 487,112,663 | 544,883,458 | 597,703,289 |

| | | Series C, C-1, C-2 Liq. Preference | Series A, B Liq. Preference | $0.015 Options Exercise | $0.03 Options Exercise | $0.066 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.094 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise |
|---|---|---|---|---|---|---|---|---|---|---|
| **Inputs** | | | | | | | | | | |
| Stock Price Now | $ 378,000,000 | $ 378,000,000 | $ 378,000,000 | $ 378,000,000 | $ 378,000,000 | $ 378,000,000 | $ 378,000,000 | $ 378,000,000 | $ 378,000,000 | $ 378,000,000 |
| Volatility | 55.0% | 55.0% | 55.0% | 55.0% | 55.0% | 55.0% | 55.0% | 55.0% | 55.0% | 55.0% |
| Risk-free Rate - Annual | 1.07% | 1.07% | 1.07% | 1.07% | 1.07% | 1.07% | 1.07% | 1.07% | 1.07% | 1.07% |
| Exercise Price | $ 0.00 | $ 385,632,852 | $ 402,580,859 | $ 410,146,328 | $ 420,742,909 | $ 445,008,536 | $ 461,361,295 | $ 487,112,663 | $ 544,883,458 | $ 597,703,289 |
| Time To Maturity - Years | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 |
| **Outputs** | | | | | | | | | | |
| d1 | 37.38 | 0.57 | 0.53 | 0.51 | 0.49 | 0.44 | 0.41 | 0.36 | 0.26 | 0.17 |
| d2 | 36.28 | (0.53) | (0.57) | (0.59) | (0.61) | (0.66) | (0.69) | (0.74) | (0.84) | (0.93) |
| N(d1) | 1.000 | 0.716 | 0.702 | 0.697 | 0.688 | 0.670 | 0.658 | 0.640 | 0.601 | 0.568 |
| N(d2) | 1.000 | 0.298 | 0.285 | 0.279 | 0.271 | 0.255 | 0.244 | 0.229 | 0.199 | 0.177 |
| Call Price (V_c) | $ 378,000,000 | $ 160,373,387 | $ 155,639,607 | $ 153,595,412 | $ 150,800,657 | $ 144,686,429 | $ 140,776,792 | $ 134,938,116 | $ 123,102,911 | $ 113,598,649 |
| -d1 | -37.383 | -0.571 | -0.531 | -0.515 | -0.491 | -0.440 | -0.408 | -0.358 | -0.256 | -0.172 |
| -d2 | -36.283 | 0.529 | 0.569 | 0.585 | 0.609 | 0.660 | 0.692 | 0.742 | 0.844 | 0.928 |
| N(-d1) | 0.000 | 0.284 | 0.298 | 0.303 | 0.312 | 0.330 | 0.342 | 0.360 | 0.399 | 0.432 |
| N(-d2) | 0.000 | 0.702 | 0.715 | 0.721 | 0.729 | 0.745 | 0.756 | 0.771 | 0.801 | 0.823 |
| Put Price (P_a) | $ 0 | $ 151,923,279 | $ 163,430,682 | $ 168,636,436 | $ 175,996,328 | $ 193,135,721 | $ 204,896,844 | $ 223,735,566 | $ 267,261,803 | $ 308,374,502 |
| **Fair Market Value** | $ 378,000,000 | $ 160,373,387 | $ 155,639,607 | $ 153,595,412 | $ 150,800,657 | $ 144,686,429 | $ 140,776,792 | $ 134,938,116 | $ 123,102,911 | $ 113,598,649 |



HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

US v. Elizabeth Holmes
Valuation of Theranos, Inc.
As of February 7, 2014

Exhibit L.5
NAV Equity Allocation 2/7/14 - Step 2
(USD)

| | Series C, C-1, C-2 Liq. Preference | Series A, B Liq. Preference | $0.015 Options Exercise | $0.03 Options Exercise | $0.064 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.094 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise | All Classes Participate |
|---|---|---|---|---|---|---|---|---|---|---|
| High call option | $ 378,000,000 | $ 160,373,387 | $ 155,639,607 | $ 153,595,412 | $ 150,802,657 | $ 144,689,429 | $ 140,776,792 | $ 134,938,116 | $ 123,102,911 | $ 113,598,649 |
| Less low call option | 160,373,387 | 155,639,607 | 153,595,412 | 150,802,657 | 144,689,429 | 140,776,792 | 134,938,116 | 123,102,911 | 113,598,649 | |
| Total Value to Allocate | $ 217,626,613 | $ 4,733,780 | $ 2,044,195 | $ 2,794,755 | $ 6,114,228 | $ 3,909,638 | $ 5,838,675 | $ 11,835,205 | $ 9,504,262 | $ 113,598,649 |

Preferred Share Classes
| Series A @ $0.150 | - | 9,948,007 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 |
| Series B @ $0.1846 | - | 10,000,000 | 54,162,965 | 54,162,965 | 54,162,965 | 54,162,965 | 54,162,965 | 54,162,965 | 54,162,965 | 54,162,965 |
| Series C @ $0.564 | 33,217,403 | - | 58,866,105 | 58,866,105 | 58,866,105 | 58,866,105 | 58,866,105 | 58,866,105 | 58,866,105 | 58,866,105 |
| Series C-1 @ $3.00 | 75,523,003 | - | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 |
| Series C-1 @ $15.00 | 112,500,480 | - | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 |
| Series C-2 @ $17.00 | 164,389,966 | - | 9,669,998 | 9,669,998 | 9,669,998 | 9,669,998 | 9,669,998 | 9,669,998 | 9,669,998 | 9,669,998 |

Warrants on Common
| Exercise Price @ $0.072 | - | - | - | - | - | - | 741,665 | 741,665 | 741,665 | 741,665 |

| Common | - | - | 302,640,465 | 302,640,465 | 302,640,465 | 302,640,465 | 302,640,465 | 302,640,465 | 302,640,465 | 302,640,465 |

Options on Common
| Exercise Price @ $0.015 | - | - | - | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 |
| Exercise Price @ $0.030 | - | - | - | - | 1,227,125 | 1,227,125 | 1,227,125 | 1,227,125 | 1,227,125 | 1,227,125 |
| Exercise Price @ $0.066 | - | - | - | - | - | 552,500 | 552,500 | 552,500 | 552,500 | 552,500 |
| Exercise Price @ $0.072 | - | - | - | - | - | - | 3,092,715 | 3,092,715 | 3,092,715 | 3,092,715 |
| Exercise Price @ $0.094 | - | - | - | - | - | - | - | 312,500 | 312,500 | 312,500 |
| Exercise Price @ $0.170 | - | - | - | - | - | - | - | - | 3,990,167 | 3,990,167 |
| Exercise Price @ $0.206 | - | - | - | - | - | - | - | - | - | 703,195 |
| | 385,632,852 | 16,948,007 | 504,384,611 | 504,714,611 | 505,041,736 | 506,494,236 | 510,328,616 | 510,641,116 | 514,631,283 | 515,334,478 |

Distribution Percentage
Preferred Share Classes
| Series A @ $0.150 | 0.0% | 41.0% | 9.2% | 9.2% | 9.2% | 9.1% | 9.1% | 9.1% | 9.0% | 9.0% |
| Series B @ $0.1846 | 0.0% | 59.0% | 10.7% | 10.7% | 10.7% | 10.7% | 10.6% | 10.6% | 10.5% | 10.5% |
| Series C @ $0.564 | 8.6% | 0.0% | 11.7% | 11.7% | 11.6% | 11.6% | 11.5% | 11.5% | 11.4% | 11.4% |
| Series C-1 @ $3.00 | 19.6% | 0.0% | 5.0% | 5.0% | 5.0% | 5.0% | 4.9% | 4.9% | 4.9% | 4.9% |
| Series C-1 @ $15.00 | 29.2% | 0.0% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% |
| Series C-2 @ $17.00 | 42.6% | 0.0% | 1.9% | 1.9% | 1.9% | 1.9% | 1.9% | 1.9% | 1.9% | 1.9% |

Warrants on Common
| Exercise Price @ $0.072 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% |

| Common | 0.0% | 0.0% | 60.0% | 60.0% | 59.9% | 59.8% | 59.3% | 59.3% | 58.8% | 58.7% |

Options on Common
| Exercise Price @ $0.015 | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% |
| Exercise Price @ $0.030 | 0.0% | 0.0% | 0.0% | 0.0% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% |
| Exercise Price @ $0.066 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% |
| Exercise Price @ $0.072 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.6% | 0.6% | 0.6% | 0.6% |
| Exercise Price @ $0.094 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% |
| Exercise Price @ $0.170 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.8% | 0.8% |
| Exercise Price @ $0.206 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% |
| | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

Allocation of Value
Preferred Share Classes
| Series A @ $0.150 | $ - | $ 1,940,661 | $ 167,736 | $ 256,488 | $ 559,771 | $ 357,545 | $ 529,946 | $ 1,073,567 | $ 855,441 | $ 10,210,639 |
| Series B @ $0.1846 | - | 2,793,119 | 219,523 | 299,916 | 654,551 | 418,085 | 619,679 | 1,255,543 | 1,000,287 | 11,939,507 |
| Series C @ $0.564 | 18,745,786 | - | 238,706 | 326,125 | 711,750 | 454,620 | 673,631 | 1,365,044 | 1,087,669 | 12,982,865 |
| Series C-1 @ $3.00 | 42,621,500 | - | 102,035 | 139,496 | 304,236 | 194,326 | 286,027 | 583,485 | 464,934 | 5,549,495 |
| Series C-1 @ $15.00 | 63,489,104 | - | 30,386 | 41,530 | 90,637 | 57,893 | 85,608 | 173,829 | 138,511 | 1,653,283 |
| Series C-2 @ $17.00 | 92,771,224 | - | 39,193 | 53,546 | 116,860 | 74,643 | 110,635 | 224,123 | 178,588 | 2,131,623 |

Warrants on Common
| Exercise Price @ $0.072 | - | - | - | - | - | - | 8,485 | 17,193 | 13,697 | 163,490 |

| Common | - | - | 1,226,605 | 1,675,810 | 3,657,363 | 2,336,087 | 3,462,513 | 7,014,343 | 5,589,195 | 66,713,075 |

Options on Common
| Exercise Price @ $0.015 | - | - | - | 1,938 | 4,230 | 2,702 | 4,004 | 8,112 | 6,464 | 77,153 |
| Exercise Price @ $0.030 | - | - | - | - | 14,830 | 9,472 | 14,040 | 28,441 | 22,683 | 270,503 |
| Exercise Price @ $0.066 | - | - | - | - | - | 4,265 | 6,321 | 12,805 | 10,204 | 121,791 |
| Exercise Price @ $0.072 | - | - | - | - | - | - | 35,384 | 71,680 | 57,117 | 681,748 |
| Exercise Price @ $0.094 | - | - | - | - | - | - | - | 7,243 | 5,771 | 68,860 |
| Exercise Price @ $0.170 | - | - | - | - | - | - | - | - | 73,691 | 879,579 |
| Exercise Price @ $0.206 | - | - | - | - | - | - | - | - | - | 155,010 |
| | $ 217,626,613 | $ 4,733,780 | $ 2,044,195 | $ 2,794,755 | $ 6,114,228 | $ 3,909,638 | $ 5,838,675 | $ 11,835,205 | $ 9,504,262 | $ 113,598,649 |

| Share Class | Number of Shares | Total Value | Per Share Marketable |
|---|---|---|---|
| **Preferred Share Classes** | | | |
| Series A @ $0.150 | 46,320,045 | $ 15,971,796 | $ 0.34 |
| Series B @ $0.1846 | 54,162,965 | 19,200,011 | 0.35 |
| Series C @ $0.564 | 58,866,105 | 36,586,427 | 0.62 |
| Series C-1 @ $3.00 | 25,175,001 | 50,247,449 | 2.00 |
| Series C-1 @ $15.00 | 7,500,032 | 65,759,992 | 8.77 |
| **Series C-2 @ $17.00** | **9,669,998** | **$ 95,700,432** | **$ 9.90** |
| Warrants on Common | | | |
| Exercise Price @ $0.072 | 741,665 | 202,662 | 0.27 |



HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

US v. Elizabeth Holmes — Valuation of Theranos, Inc — As of February 7, 2014

Exhibit M.1 — DCF Equity Allocation 2/7/14 - Step 1 — (USD)

**Break Point Calculation**

| | | | | $0.015 | $0.030 | $0.066 | $0.072 | $0.094 | $0.170 | $0.206 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Share Class | Number of Shares | Series C, C-1, C-2 Liq. Preference | Series A, B Liq. Preference | $0.015 Options Exercise | $0.03 Options Exercise | $0.066 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.094 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise |
| **Preferred Share Classes** | | | | | | | | | | |
| Series A @ $0.150 | 46,320,045 | $ - | $ 6,948,007 | $ 7,642,807 | $ 9,032,409 | $ 12,089,532 | $ 15,424,575 | $ 19,778,659 | $ 27,653,087 | $ 37,194,896 |
| Series B @ $0.1846 | 54,162,965 | - | 10,000,000 | 10,812,444 | 12,437,333 | 16,012,089 | 19,911,822 | 25,003,141 | 34,210,845 | 45,368,416 |
| Series C @ $0.964 | 56,896,105 | 33,217,403 | 33,217,403 | 34,100,845 | 35,867,728 | 39,754,871 | 43,995,390 | 49,531,624 | 59,543,962 | 71,676,560 |
| Series C-1 @ $3.00 | 25,175,001 | 75,525,003 | 75,525,003 | 75,902,628 | 76,657,878 | 78,319,428 | 80,132,028 | 82,498,478 | 86,778,228 | 91,964,279 |
| Series C-1 @ $15.00 | 7,500,032 | 112,500,480 | 112,500,480 | 112,612,980 | 112,837,981 | 113,332,984 | 113,872,986 | 114,577,989 | 115,852,994 | 117,398,001 |
| Series C-2 @ $17.00 | 9,669,998 | 164,389,966 | 164,389,966 | 164,535,016 | 164,825,116 | 165,463,336 | 166,159,576 | 167,068,555 | 168,712,455 | 170,704,475 |
| **Warrants on Common** | | | | | | | | | | |
| Exercise Price @ $0.072 | 741,665 | - | - | - | - | - | - | 16,317 | 72,683 | 99,383 |
| **Common** | 302,640,465 | - | - | 4,539,607 | 9,079,214 | 19,974,271 | 21,790,113 | 28,448,204 | 51,448,879 | 62,343,936 |
| **Options on Common** | | | | | | | | | | |
| Exercise Price @ $0.015 | 350,000 | - | - | - | 5,250 | 17,850 | 19,950 | 27,650 | 54,250 | 66,850 |
| Exercise Price @ $0.030 | 1,227,125 | - | - | - | - | 44,177 | 51,539 | 78,536 | 171,798 | 215,974 |
| Exercise Price @ $0.066 | 552,500 | - | - | - | - | - | 3,315 | 15,470 | 57,460 | 77,350 |
| Exercise Price @ $0.072 | 3,092,715 | - | - | - | - | - | - | 68,040 | 303,086 | 414,424 |
| Exercise Price @ $0.094 | 312,500 | - | - | - | - | - | - | - | 23,750 | 35,000 |
| Exercise Price @ $0.170 | 3,990,167 | - | - | - | - | - | - | - | - | 143,646 |
| Exercise Price @ $0.206 | 703,195 | - | | | | | | | | |
| | 515,334,478 | 385,632,852 | 402,580,859 | 410,146,328 | 420,742,909 | 445,008,536 | 461,361,295 | 487,112,663 | 544,883,458 | 597,703,289 |

| | Series C, C-1, C-2 Liq. Preference | Series A, B Liq. Preference | $0.015 Options Exercise | $0.03 Options Exercise | $0.066 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.094 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **Inputs** | | | | | | | | | |
| Stock Price Now | $ 431,000,000 | $ 431,000,000 | $ 431,000,000 | $ 431,000,000 | $ 431,000,000 | $ 431,000,000 | $ 431,000,000 | $ 431,000,000 | $ 431,000,000 |
| Volatility | 55.0% | 55.0% | 55.0% | 55.0% | 55.0% | 55.0% | 55.0% | 55.0% | 55.0% |
| Riskfree Rate - Annual | 1.07% | 1.07% | 1.07% | 1.07% | 1.07% | 1.07% | 1.07% | 1.07% | 1.07% |
| Exercise Price | $ 0.00 | $ 385,632,852 | $ 402,580,859 | $ 410,146,328 | $ 420,742,909 | $ 445,008,536 | $ 461,361,295 | $ 487,112,663 | $ 544,883,458 | $ 597,703,289 |
| Time To Maturity - Years | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 |
| **Outputs** | | | | | | | | | |
| d1 | 37.50 | 0.69 | 0.65 | 0.63 | 0.61 | 0.56 | 0.53 | 0.48 | 0.38 | 0.29 |
| d2 | 36.40 | (0.41) | (0.45) | (0.47) | (0.49) | (0.54) | (0.57) | (0.62) | (0.72) | (0.81) |
| N(d1) | 1.000 | 0.755 | 0.742 | 0.737 | 0.729 | 0.712 | 0.701 | 0.683 | 0.646 | 0.615 |
| N(d2) | 1.000 | 0.341 | 0.327 | 0.321 | 0.312 | 0.294 | 0.283 | 0.267 | 0.234 | 0.209 |
| Call Price ($V_i$) | $ 431,000,000 | $ 199,382,497 | $ 193,963,436 | $ 191,617,587 | $ 188,404,768 | $ 181,352,863 | $ 176,826,793 | $ 170,042,554 | $ 156,196,002 | $ 144,980,775 |
| -d1 | -37.502 | -0.690 | -0.651 | -0.634 | -0.611 | -0.560 | -0.527 | -0.477 | -0.378 | -0.291 |
| -d2 | -36.402 | 0.410 | 0.449 | 0.466 | 0.489 | 0.540 | 0.573 | 0.623 | 0.724 | 0.809 |
| N(-d1) | 0.000 | 0.245 | 0.258 | 0.263 | 0.271 | 0.288 | 0.299 | 0.317 | 0.354 | 0.385 |
| N(-d2) | 0.000 | 0.659 | 0.673 | 0.679 | 0.688 | 0.706 | 0.717 | 0.733 | 0.766 | 0.791 |
| Put Price ($P_a$) | $ 0 | $ 137,932,389 | $ 148,754,512 | $ 153,658,611 | $ 160,600,439 | $ 176,802,154 | $ 187,946,845 | $ 205,840,004 | $ 247,354,895 | $ 286,756,628 |
| **Fair Market Value** | $ 431,000,000 | $ 199,382,497 | $ 193,963,436 | $ 191,617,587 | $ 188,404,768 | $ 181,352,863 | $ 176,826,793 | $ 170,042,554 | $ 156,196,002 | $ 144,980,775 |



HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

US v. Elizabeth Holmes
Valuation of Theranos, Inc.
As of February 7, 2014

Exhibit M.2
DCF Equity Allocation 2/7/14 - Step 2
(USD)

| | Series C, C-1, C-2 Liq. Preference | Series A, B Liq. Preference | $0.016 Options Exercise | $0.52 Options Exercise | $0.066 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.094 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise | All Classes Participate |
|---|---|---|---|---|---|---|---|---|---|---|
| High call option | $ 431,000,000 | $ 199,382,497 | $ 193,963,436 | $ 191,617,587 | $ 188,404,766 | $ 181,352,863 | $ 176,826,793 | $ 170,042,554 | $ 156,190,002 | $ 144,980,775 |
| Less low call option | 199,382,497 | 193,963,436 | 191,617,587 | 188,404,766 | 181,352,863 | 176,826,793 | 170,042,554 | 156,190,002 | 144,980,775 | |
| Total Value to Allocate | $ 231,617,503 | $ 5,419,061 | $ 2,345,849 | $ 3,212,819 | $ 7,051,905 | $ 4,526,070 | $ 6,784,239 | $ 13,848,551 | $ 11,215,227 | $ 144,980,775 |
| **Preferred Share Classes** | | | | | | | | | | |
| Series A @ $0.150 | - | 6,946,007 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 |
| Series B @ $0.1846 | - | 10,000,000 | 54,162,965 | 54,162,965 | 54,162,965 | 54,162,965 | 54,162,965 | 54,162,965 | 54,162,965 | 54,162,965 |
| Series C @ $0.564 | 23,217,403 | - | 58,696,105 | 58,696,105 | 58,696,105 | 58,696,105 | 58,696,105 | 58,696,105 | 58,696,105 | 58,696,105 |
| Series C-1 @ $3.00 | 75,525,003 | - | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 |
| Series C-1 @ $15.00 | 112,500,480 | - | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 |
| Series C-2 @ $17.00 | 184,389,966 | - | 9,669,998 | 9,669,998 | 9,669,998 | 9,669,998 | 9,669,998 | 9,669,998 | 9,669,998 | 9,669,998 |
| **Warrants on Common** | | | | | | | | | | |
| Exercise Price @ $0.072 | - | - | - | - | - | - | 741,665 | 741,665 | 741,665 | 741,665 |
| Common | - | - | 302,640,465 | 302,640,465 | 302,640,465 | 302,640,465 | 302,640,465 | 302,640,465 | 302,640,465 | 302,640,465 |
| **Options on Common** | | | | | | | | | | |
| Exercise Price @ $0.015 | - | - | - | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 |
| Exercise Price @ $0.030 | - | - | - | - | 1,227,125 | 1,227,125 | 1,227,125 | 1,227,125 | 1,227,125 | 1,227,125 |
| Exercise Price @ $0.066 | - | - | - | - | - | 552,500 | 552,500 | 552,500 | 552,500 | 552,500 |
| Exercise Price @ $0.072 | - | - | - | - | - | - | 3,092,715 | 3,092,715 | 3,092,715 | 3,092,715 |
| Exercise Price @ $0.094 | - | - | - | - | - | - | - | 312,500 | 312,500 | 312,500 |
| Exercise Price @ $0.170 | - | - | - | - | - | - | - | - | 3,990,167 | 3,990,167 |
| Exercise Price @ $0.206 | - | - | - | - | - | - | - | - | - | 703,195 |
| | 395,632,852 | 16,946,007 | 504,364,611 | 504,714,611 | 505,941,736 | 506,494,236 | 510,326,616 | 510,641,116 | 514,631,283 | 515,334,478 |

**Distribution Percentage**

| **Preferred Share Classes** | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Series A @ $0.150 | 0.0% | 41.0% | 9.2% | 9.2% | 9.2% | 9.1% | 9.1% | 9.1% | 9.0% | 9.0% |
| Series B @ $0.1846 | 0.0% | 59.0% | 10.7% | 10.7% | 10.7% | 10.7% | 10.6% | 10.6% | 10.5% | 10.5% |
| Series C @ $0.564 | 5.9% | 0.0% | 11.7% | 11.7% | 11.6% | 11.6% | 11.5% | 11.5% | 11.4% | 11.4% |
| Series C-1 @ $3.00 | 19.1% | 0.0% | 5.0% | 5.0% | 5.0% | 5.0% | 4.9% | 4.9% | 4.9% | 4.9% |
| Series C-1 @ $15.00 | 29.2% | 0.0% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% |
| Series C-2 @ $17.00 | 42.6% | 0.0% | 1.9% | 1.9% | 1.9% | 1.9% | 1.9% | 1.9% | 1.5% | 1.9% |
| **Warrants on Common** | | | | | | | | | | |
| Exercise Price @ $0.072 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% |
| Common | 0.0% | 0.0% | 60.0% | 60.0% | 59.8% | 59.8% | 59.3% | 59.3% | 58.8% | 58.7% |
| **Options on Common** | | | | | | | | | | |
| Exercise Price @ $0.015 | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% |
| Exercise Price @ $0.030 | 0.0% | 0.0% | 0.0% | 0.0% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% |
| Exercise Price @ $0.066 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% |
| Exercise Price @ $0.072 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.6% | 0.6% | 0.6% | 0.6% |
| Exercise Price @ $0.094 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% |
| Exercise Price @ $0.170 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.8% | 0.8% |
| Exercise Price @ $0.206 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% |
| | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

**Allocation of Value**

| **Preferred Share Classes** | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Series A @ $0.150 | $ - | $ 2,221,569 | $ 215,430 | $ 294,856 | $ 645,917 | $ 413,919 | $ 615,772 | $ 1,256,015 | $ 1,008,441 | $ 13,031,373 |
| Series B @ $0.1846 | - | 3,197,462 | 251,917 | 344,781 | 754,933 | 484,004 | 720,035 | 1,468,884 | 1,180,380 | 15,237,848 |
| Series C @ $0.564 | 19,950,925 | - | 273,932 | 374,910 | 820,504 | 526,300 | 782,957 | 1,597,028 | 1,283,506 | 16,569,439 |
| Series C-1 @ $3.00 | 45,381,572 | - | 117,091 | 160,254 | 350,884 | 224,966 | 334,673 | 682,646 | 549,632 | 7,082,567 |
| Series C-1 @ $15.00 | 67,569,659 | - | 34,883 | 47,742 | 104,537 | 67,021 | 99,704 | 203,371 | 163,446 | 2,110,009 |
| Series C-2 @ $17.00 | 98,725,347 | - | 44,976 | 61,535 | 134,782 | 86,412 | 128,552 | 262,212 | 210,736 | 2,720,493 |
| **Warrants on Common** | | | | | | | | | | |
| Exercise Price @ $0.072 | - | - | - | - | - | - | 9,860 | 20,111 | 15,163 | 208,650 |
| Common | - | - | 1,407,611 | 1,928,493 | 4,218,256 | 2,704,418 | 4,023,261 | 8,206,403 | 6,595,366 | 85,142,858 |
| **Options on Common** | | | | | | | | | | |
| Exercise Price @ $0.015 | - | - | - | 2,228 | 4,878 | 3,126 | 4,653 | 9,491 | 7,627 | 98,467 |
| Exercise Price @ $0.030 | - | - | - | - | 17,104 | 10,966 | 16,313 | 33,275 | 26,742 | 345,231 |
| Exercise Price @ $0.066 | - | - | - | - | - | 4,937 | 7,345 | 14,982 | 12,040 | 155,437 |
| Exercise Price @ $0.072 | - | - | - | - | - | - | 41,114 | 83,862 | 67,399 | 870,084 |
| Exercise Price @ $0.094 | - | - | - | - | - | - | - | 8,474 | 6,810 | 87,917 |
| Exercise Price @ $0.170 | - | - | - | - | - | - | - | - | 86,957 | 1,122,567 |
| Exercise Price @ $0.206 | - | - | - | - | - | - | - | - | - | 197,632 |
| | $ 231,617,503 | $ 5,419,061 | $ 2,345,849 | $ 3,212,819 | $ 7,051,905 | $ 4,526,070 | $ 6,784,239 | $ 13,848,551 | $ 11,215,227 | $ 144,980,775 |

| Share Class | Number of Shares | Total Value | Per Share Marketable |
|---|---|---|---|
| **Preferred Share Classes** | | | |
| Series A @ $0.150 | 46,320,045 | $ 19,704,031 | $ 0.43 |
| Series B @ $0.1846 | 54,162,965 | 23,840,524 | 0.44 |
| Series C @ $0.564 | 58,696,105 | 42,179,501 | 0.72 |
| Series C-1 @ $3.00 | 25,175,001 | 54,863,266 | 2.18 |
| Series C-1 @ $15.00 | 7,500,032 | 70,450,373 | 9.39 |
| **Series C-2 @ $17.00** | **9,669,998** | **102,385,064** | **10.59** |
| **Warrants on Common** | | | |
| Exercise Price @ $0.072 | 741,665 | 254,789 | 0.34 |

HM  HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

US v. Elizabeth Holmes — Exhibit N.1
Valuation of Theranos, Inc.
As of December 31, 2014 — NAV Equity Allocation 12/31/14 - Step 1 (USD)

**Break Point Calculation**

| Share Class | Number of Shares | Series C, C-1, C-2 Liq. Preference | Series A, B Liq. Preference | $0.015 Options Exercise | $0.03 Options Exercise | $0.066 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.094 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise |
|---|---|---|---|---|---|---|---|---|---|---|
| **Preferred Share Classes** | | | | | | | | | | |
| Series A @ $0.150 | 46,320,045 | $ - | $ 6,948,007 | $ 7,642,807 | $ 9,032,409 | $ 12,089,532 | $ 15,424,575 | $ 19,778,659 | $ 27,653,067 | $ 37,194,996 |
| Series B @ $0.1846 | 54,134,965 | - | 9,994,830 | 10,808,855 | 12,430,904 | 16,003,811 | 19,901,529 | 24,990,216 | 34,193,160 | 45,344,962 |
| Series C @ $0.564 | 58,896,105 | 33,217,403 | 33,217,403 | 34,100,645 | 35,867,728 | 39,754,871 | 43,995,340 | 49,531,624 | 59,543,962 | 71,676,560 |
| Series C-1 @ $3.00 | 25,175,001 | 75,525,003 | 75,525,003 | 75,502,628 | 78,657,878 | 78,319,428 | 80,132,026 | 82,498,479 | 86,778,228 | 91,964,279 |
| Series C-1 @ $15.00 | 7,500,032 | 112,500,480 | 112,500,480 | 112,612,980 | 112,837,981 | 113,332,984 | 113,872,986 | 114,577,989 | 115,852,994 | 117,398,001 |
| Series C-2 @ $17.00 | 32,808,227 | 557,739,859 | 557,739,859 | 558,231,982 | 559,216,229 | 561,381,572 | 563,743,765 | 566,827,738 | 572,405,136 | 579,163,631 |
| **Warrants on Common** | | | | | | | | | | |
| Exercise Price @ $0.072 | 741,665 | - | - | - | - | - | - | 16,317 | 72,683 | 99,383 |
| **Common** | 302,965,725 | - | - | 4,544,486 | 9,088,972 | 19,995,738 | 21,813,532 | 28,478,778 | 51,504,173 | 62,410,939 |
| **Options on Common** | | | | | | | | | | |
| Exercise Price @ $0.015 | 350,000 | - | - | - | 5,250 | 17,850 | 19,950 | 27,650 | 54,250 | 66,850 |
| Exercise Price @ $0.030 | 1,170,875 | - | - | - | - | 42,152 | 49,177 | 74,936 | 163,923 | 206,074 |
| Exercise Price @ $0.066 | 547,500 | - | - | - | - | - | 3,285 | 15,330 | 56,940 | 76,650 |
| Exercise Price @ $0.072 | 2,579,175 | - | - | - | - | - | - | 56,742 | 252,759 | 345,609 |
| Exercise Price @ $0.094 | 312,500 | - | - | - | - | - | - | - | 23,750 | 35,000 |
| Exercise Price @ $0.170 | 3,972,457 | - | - | - | - | - | - | - | - | 143,008 |
| Exercise Price @ $0.206 | 606,365 | - | - | - | - | - | - | - | - | - |
| | 538,080,637 | 778,982,745 | 795,925,582 | 803,842,584 | 815,137,351 | 840,937,937 | 858,956,217 | 886,874,457 | 948,555,026 | 1,006,125,944 |

| | | Series C, C-1, C-2 Liq. Preference | Series A, B Liq. Preference | $0.015 Options Exercise | $0.03 Options Exercise | $0.066 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.094 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise |
|---|---|---|---|---|---|---|---|---|---|---|
| **Inputs** | | | | | | | | | | |
| Stock Price Now | $ 827,000,000 | $ 827,000,000 | $ 827,000,000 | $ 827,000,000 | $ 827,000,000 | $ 827,000,000 | $ 827,000,000 | $ 827,000,000 | $ 827,000,000 | $ 827,000,000 |
| Volatility | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% |
| Riskfree Rate - Annual | 1.38% | 1.38% | 1.38% | 1.38% | 1.38% | 1.38% | 1.38% | 1.38% | 1.38% | 1.38% |
| Exercise Price | $ 0.00 | $ 778,982,745 | $ 795,925,582 | $ 803,842,584 | $ 815,137,351 | $ 840,937,937 | $ 858,956,217 | $ 886,874,457 | $ 948,555,026 | $ 1,006,125,944 |
| Time To Maturity - Years | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 |
| **Outputs** | | | | | | | | | | |
| d1 | 39.50 | 0.64 | 0.62 | 0.61 | 0.60 | 0.57 | 0.55 | 0.52 | 0.45 | 0.40 |
| d2 | 38.44 | (0.42) | (0.44) | (0.45) | (0.46) | (0.49) | (0.51) | (0.54) | (0.61) | (0.66) |
| N(d1) | 1.000 | 0.738 | 0.732 | 0.729 | 0.724 | 0.714 | 0.708 | 0.697 | 0.675 | 0.654 |
| N(d2) | 1.000 | 0.337 | 0.329 | 0.326 | 0.321 | 0.311 | 0.304 | 0.293 | 0.272 | 0.254 |
| Call Price (V₁) | $ 827,000,000 | $ 362,434,456 | $ 357,095,687 | $ 354,641,163 | $ 351,182,763 | $ 343,468,924 | $ 338,230,551 | $ 330,345,757 | $ 313,865,295 | $ 299,558,358 |
| -d1 | -39.503 | -0.638 | -0.618 | -0.609 | -0.596 | -0.566 | -0.546 | -0.516 | -0.453 | -0.397 |
| -d2 | -38.443 | 0.422 | 0.442 | 0.451 | 0.464 | 0.494 | 0.514 | 0.544 | 0.607 | 0.663 |
| N(-d1) | 0.000 | 0.262 | 0.268 | 0.271 | 0.276 | 0.286 | 0.292 | 0.303 | 0.325 | 0.346 |
| N(-d2) | 0.000 | 0.663 | 0.671 | 0.674 | 0.679 | 0.689 | 0.696 | 0.707 | 0.728 | 0.746 |
| Put Price (P₁) | $ - | $ 272,730,055 | $ 283,427,430 | $ 288,466,230 | $ 295,698,159 | $ 312,404,192 | $ 324,219,853 | $ 342,759,259 | $ 384,658,539 | $ 424,841,621 |
| **Fair Market Value** | $ 827,000,000 | $ 362,434,456 | $ 357,095,687 | $ 354,641,163 | $ 351,182,763 | $ 343,468,924 | $ 338,230,551 | $ 330,345,757 | $ 313,865,295 | $ 299,558,358 |



HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

US v. Elizabeth Holmes
Valuation of Theranos, Inc.
As of December 31, 2014

Exhibit # 2
NAV Equity Allocation 12/31/14 - Step 2
(USD)

| | Series C, C-1, C-2 Liq. Preference | Series A, B Liq. Preference | $0.015 Options Exercise | $0.37 Options Exercise | $0.069 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.084 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise | All Classes Participate |
|---|---|---|---|---|---|---|---|---|---|---|
| High call option | $ 627,000,000 | $ 362,434,456 | $ 357,995,687 | $ 304,641,163 | $ 351,182,763 | $ 342,488,924 | $ 338,230,551 | $ 330,345,757 | $ 313,865,295 | $ 299,558,358 |
| Less low call option | 362,434,456 | 357,095,687 | 304,641,163 | 351,182,763 | 343,488,924 | 338,230,551 | 330,345,757 | 313,865,295 | 299,558,358 | |
| Total Value to Allocate | $ 464,565,544 | $ 5,338,769 | $ 2,454,524 | $ 3,458,400 | $ 7,713,839 | $ 5,258,373 | $ 7,884,794 | $ 16,480,462 | $ 14,306,937 | $ 299,558,358 |

**Preferred Share Classes**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Series A @ $0.150 | - | 6,948,007 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 |
| Series B @ $0.1846 | - | 9,994,830 | 54,134,965 | 54,134,965 | 54,134,965 | 54,134,965 | 54,134,965 | 54,134,965 | 54,134,965 | 54,134,965 |
| Series C @ $0.564 | 33,217,403 | - | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 |
| Series C-1 @ $3.00 | 75,525,503 | - | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 |
| Series C-1 @ $15.00 | 112,500,480 | - | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 |
| Series C-2 @ $17.00 | 557,739,850 | - | 32,808,227 | 32,808,227 | 32,808,227 | 32,808,227 | 32,808,227 | 32,808,227 | 32,808,227 | 32,808,227 |

**Warrants on Common**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Exercise Price @ $0.072 | - | - | - | - | - | - | 741,665 | 741,665 | 741,665 | 741,665 |

| Common | - | - | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 |

**Options on Common**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Exercise Price @ $0.015 | - | - | - | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 |
| Exercise Price @ $0.030 | - | - | - | - | 1,170,875 | 1,170,875 | 1,170,875 | 1,170,875 | 1,170,875 | 1,170,875 |
| Exercise Price @ $0.066 | - | - | - | - | - | 547,500 | 547,500 | 547,500 | 547,500 | 547,500 |
| Exercise Price @ $0.072 | - | - | - | - | - | - | 2,579,175 | 2,579,175 | 2,579,175 | 2,579,175 |
| Exercise Price @ $0.084 | - | - | - | - | - | - | - | 312,500 | 312,500 | 312,500 |
| Exercise Price @ $0.170 | - | - | - | - | - | - | - | - | 3,972,457 | 3,972,457 |
| Exercise Price @ $0.206 | - | - | - | - | - | - | - | - | - | 608,365 |
| | 778,982,745 | 16,942,837 | 527,800,100 | 528,150,100 | 529,320,975 | 529,868,475 | 533,189,315 | 533,501,815 | 537,474,272 | 538,080,637 |

**Distribution Percentage**

**Preferred Share Classes**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Series A @ $0.150 | 0.0% | 41.0% | 8.8% | 8.8% | 8.8% | 8.7% | 8.7% | 8.7% | 8.6% | 8.6% |
| Series B @ $0.1846 | 0.0% | 59.0% | 10.3% | 10.2% | 10.2% | 10.2% | 10.2% | 10.1% | 10.1% | 10.1% |
| Series C @ $0.564 | 4.3% | 0.0% | 11.2% | 11.2% | 11.1% | 11.1% | 11.0% | 11.0% | 11.0% | 10.9% |
| Series C-1 @ $3.00 | 9.7% | 0.0% | 4.8% | 4.8% | 4.8% | 4.8% | 4.7% | 4.7% | 4.7% | 4.7% |
| Series C-1 @ $15.00 | 14.4% | 0.0% | 1.4% | 1.4% | 1.4% | 1.4% | 1.4% | 1.4% | 1.4% | 1.4% |
| Series C-2 @ $17.00 | 71.6% | 0.0% | 6.2% | 6.2% | 6.2% | 6.2% | 6.2% | 6.1% | 6.1% | 6.1% |

**Warrants on Common**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Exercise Price @ $0.072 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% |

| Common | 0.0% | 0.0% | 57.4% | 57.4% | 57.2% | 57.2% | 56.8% | 56.8% | 56.4% | 56.3% |

**Options on Common**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Exercise Price @ $0.015 | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% |
| Exercise Price @ $0.030 | 0.0% | 0.0% | 0.0% | 0.0% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% |
| Exercise Price @ $0.066 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% |
| Exercise Price @ $0.072 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.5% | 0.5% | 0.5% | 0.5% |
| Exercise Price @ $0.084 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% |
| Exercise Price @ $0.170 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.7% | 0.7% |
| Exercise Price @ $0.206 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% |
| | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

**Allocation of Value**

**Preferred Share Classes**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Series A @ $0.150 | $ - | $ 2,189,350 | $ 215,410 | $ 303,310 | $ 675,026 | $ 457,928 | $ 884,960 | $ 1,430,877 | $ 1,232,985 | $ 25,287,132 |
| Series B @ $0.1846 | - | 3,149,419 | 251,754 | 354,493 | 788,913 | 535,188 | 800,547 | 1,672,389 | 1,441,010 | 30,137,827 |
| Series C @ $0.564 | 19,810,016 | - | 273,865 | 385,680 | 858,298 | 582,257 | 870,955 | 1,816,986 | 1,567,745 | 32,788,432 |
| Series C-1 @ $3.00 | 45,041,190 | - | 117,375 | 164,849 | 366,877 | 248,884 | 372,267 | 777,684 | 670,129 | 14,015,338 |
| Series C-1 @ $15.00 | 67,093,432 | - | 34,879 | 49,111 | 109,299 | 74,147 | 110,910 | 231,684 | 199,842 | 4,175,391 |
| Series C-2 @ $17.00 | 332,621,900 | - | 152,574 | 214,833 | 478,117 | 324,348 | 485,167 | 1,013,482 | 873,317 | 16,204,861 |

**Warrants on Common**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Exercise Price @ $0.072 | - | - | - | - | - | - | 10,968 | 22,911 | 19,742 | 412,897 |

| Common | - | - | 1,408,936 | 1,983,862 | 4,415,145 | 2,995,172 | 4,480,252 | 9,358,947 | 9,064,594 | 168,988,013 |

**Options on Common**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Exercise Price @ $0.015 | - | - | - | 2,292 | 5,101 | 3,460 | 5,176 | 10,812 | 9,317 | 194,851 |
| Exercise Price @ $0.030 | - | - | - | - | 17,063 | 11,575 | 17,315 | 36,172 | 31,167 | 651,845 |
| Exercise Price @ $0.066 | - | - | - | - | - | 5,413 | 8,098 | 18,913 | 14,574 | 304,802 |
| Exercise Price @ $0.072 | - | - | - | - | - | - | 38,141 | 79,874 | 68,055 | 1,435,869 |
| Exercise Price @ $0.084 | - | - | - | - | - | - | - | 9,693 | 8,316 | 173,974 |
| Exercise Price @ $0.170 | - | - | - | - | - | - | - | - | 105,742 | 2,211,532 |
| Exercise Price @ $0.206 | - | - | - | - | - | - | - | - | - | 337,573 |
| | $ 464,565,544 | $ 5,338,769 | $ 2,454,524 | $ 3,458,400 | $ 7,713,839 | $ 5,258,373 | $ 7,884,794 | $ 16,480,462 | $ 14,306,937 | $ 299,558,358 |

| Share Class | Number of Shares | Total Value | Per Share Marketable | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Preferred Share Classes** | | | | | | | | | | |
| Series A @ $0.150 | 46,320,045 | $ 32,977,000 | $ 0.71 | | | | | | | |
| Series B @ $0.1846 | 54,134,965 | 39,131,420 | 0.72 | | | | | | | |
| Series C @ $0.564 | 58,896,105 | 58,936,625 | 1.00 | | | | | | | |
| Series C-1 @ $3.00 | 25,175,001 | 61,774,321 | 2.45 | | | | | | | |
| Series C-1 @ $15.00 | 7,500,032 | 72,077,495 | 9.61 | | | | | | | |
| Series C-2 @ $17.00 | 32,808,227 | 354,428,819 | 10.80 | | | | | | | |
| **Warrants on Common** | | | | | | | | | | |
| Exercise Price @ $0.072 | 741,665 | 460,516 | 0.62 | | | | | | | |


HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

US v. Elizabeth Holmes
Valuation of Theranos, Inc.
As of December 31, 2014

Exhibit O.1
DCF Equity Allocation 2/7/14 - Step 1
(USD)

**Break Point Calculation**

| Share Class | Number of Shares | Series C, C-1, C-2 Liq. Preference | Series A, B Liq. Preference | $0.015 Options Exercise | $0.03 Options Exercise | $0.066 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.094 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | $0.015 | $0.030 | $0.066 | $0.072 | $0.094 | $0.170 | $0.206 |
| **Preferred Share Classes** | | | | | | | | | | |
| Series A @ $0.150 | 46,320,045 | $ - | $ 6,948,007 | $ 7,642,807 | $ 9,032,409 | $ 12,089,532 | $ 15,424,575 | $ 19,778,659 | $ 27,653,067 | $ 37,194,996 |
| Series B @ $0.1846 | 54,134,965 | - | 9,994,630 | 10,805,855 | 12,430,904 | 16,003,811 | 19,901,529 | 24,990,216 | 34,193,160 | 45,344,962 |
| Series C @ $0.564 | 58,896,105 | 33,217,403 | 33,217,403 | 34,100,845 | 35,867,728 | 38,754,871 | 43,995,390 | 49,531,624 | 59,543,982 | 71,676,560 |
| Series C-1 @ $3.00 | 25,175,001 | 75,525,003 | 75,525,003 | 75,902,628 | 76,657,878 | 78,319,428 | 80,132,028 | 82,498,478 | 86,778,228 | 91,964,279 |
| Series C-1 @ $15.00 | 7,500,032 | 112,500,480 | 112,500,480 | 112,612,980 | 112,837,981 | 113,332,984 | 113,872,986 | 114,577,989 | 115,852,994 | 117,396,001 |
| Series C-2 @ $17.00 | 32,808,227 | 557,739,859 | 557,739,859 | 558,231,982 | 559,216,229 | 561,381,572 | 563,743,765 | 566,827,738 | 572,405,136 | 579,163,631 |
| **Warrants on Common** | | | | | | | | | | |
| Exercise Price @ $0.072 | 741,665 | - | - | - | - | - | - | 16,317 | 72,683 | 99,383 |
| **Common** | 302,965,725 | - | - | 4,544,486 | 9,088,972 | 19,995,738 | 21,813,532 | 28,478,778 | 51,504,173 | 62,410,939 |
| **Options on Common** | | | | | | | | | | |
| Exercise Price @ $0.015 | 350,000 | - | - | - | 5,250 | 17,850 | 19,950 | 27,650 | 54,250 | 66,850 |
| Exercise Price @ $0.030 | 1,170,876 | - | - | - | - | 42,152 | 49,177 | 74,938 | 163,923 | 206,074 |
| Exercise Price @ $0.066 | 547,500 | - | - | - | - | - | 3,285 | 15,330 | 56,940 | 76,650 |
| Exercise Price @ $0.072 | 2,579,175 | - | - | - | - | - | - | 58,742 | 252,759 | 345,609 |
| Exercise Price @ $0.094 | 312,500 | - | - | - | - | - | - | - | 23,750 | 35,000 |
| Exercise Price @ $0.170 | 3,972,457 | - | - | - | - | - | - | - | - | 143,008 |
| Exercise Price @ $0.206 | 606,385 | - | - | - | - | - | - | - | - | - |
| | 538,080,637 | 778,982,745 | 795,925,582 | 803,842,584 | 815,137,351 | 840,937,937 | 858,956,217 | 886,874,457 | 948,555,026 | 1,006,125,944 |

| | Series C, C-1, C-2 Liq. Preference | Series A, B Liq. Preference | $0.015 Options Exercise | $0.03 Options Exercise | $0.066 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.094 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise |
|---|---|---|---|---|---|---|---|---|---|
| **Inputs** | | | | | | | | | |
| Stock Price Now | $ 951,000,000 | $ 951,000,000 | $ 951,000,000 | $ 951,000,000 | $ 951,000,000 | $ 951,000,000 | $ 951,000,000 | $ 951,000,000 | $ 951,000,000 |
| Volatility | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% |
| Riskfree Rate - Annual | 1.38% | 1.38% | 1.38% | 1.38% | 1.38% | 1.38% | 1.38% | 1.38% | 1.38% |
| Exercise Price | $ 0.00 | $ 778,982,745 | $ 795,925,582 | $ 803,842,584 | $ 815,137,351 | $ 840,937,937 | $ 858,956,217 | $ 886,874,457 | $ 948,555,026 | $ 1,006,125,944 |
| Time To Maturity - Years | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 |
| **Outputs** | | | | | | | | | |
| d1 | 39.63 | 0.77 | 0.75 | 0.74 | 0.73 | 0.70 | 0.68 | 0.65 | 0.58 | 0.53 |
| d2 | 38.57 | (0.29) | (0.31) | (0.32) | (0.33) | (0.36) | (0.38) | (0.41) | (0.48) | (0.53) |
| N(d1) | 1.000 | 0.779 | 0.773 | 0.770 | 0.766 | 0.757 | 0.751 | 0.741 | 0.720 | 0.702 |
| N(d2) | 1.000 | 0.386 | 0.378 | 0.375 | 0.370 | 0.359 | 0.351 | 0.340 | 0.317 | 0.298 |
| Call Price (V$_c$) | $ 951,000,000 | $ 456,633,546 | $ 450,506,701 | $ 447,685,948 | $ 443,707,334 | $ 434,815,355 | $ 428,762,774 | $ 419,630,618 | $ 400,456,912 | $ 383,715,353 |
| -d1 | -39.635 | -0.770 | -0.750 | -0.740 | -0.727 | -0.698 | -0.678 | -0.648 | -0.584 | -0.529 |
| -d2 | -38.575 | 0.290 | 0.310 | 0.320 | 0.333 | 0.362 | 0.382 | 0.412 | 0.476 | 0.531 |
| N(-d1) | 0.000 | 0.221 | 0.227 | 0.230 | 0.234 | 0.243 | 0.249 | 0.259 | 0.280 | 0.298 |
| N(-d2) | 0.000 | 0.614 | 0.622 | 0.625 | 0.630 | 0.641 | 0.649 | 0.660 | 0.683 | 0.702 |
| Put Price (P$_a$) | $ - | $ 242,930,144 | $ 252,838,444 | $ 257,511,015 | $ 264,222,730 | $ 279,750,623 | $ 290,752,076 | $ 308,044,119 | $ 347,230,156 | $ 384,998,615 |
| **Fair Market Value** | $ 951,000,000 | $ 456,633,546 | $ 450,506,701 | $ 447,685,948 | $ 443,707,334 | $ 434,815,355 | $ 428,762,774 | $ 419,630,618 | $ 400,456,912 | $ 383,715,353 |



**HEMMING | MORSE**
FORENSIC & FINANCIAL CONSULTANTS

US v. Elizabeth Holmes
Valuation of Theranos, Inc.
As of December 31, 2014

Exhibit 0.2
DCF Equity Allocation 2/7/14 - Step 2
(USD)

| | Series C, C-1, C-2 Liq. Preference | Series A, B Liq. Preference | $6,016 Options Exercise | $9.03 Options Exercise | $0.066 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.084 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise | All Classes Participate |
|---|---|---|---|---|---|---|---|---|---|---|
| High call option | $ 951,500,000 | $ 456,833,546 | $ 450,506,701 | $ 447,685,948 | $ 443,707,334 | $ 434,815,355 | $ 426,782,774 | $ 419,630,618 | $ 400,456,912 | $ 383,715,353 |
| Less low call option | 456,633,546 | 450,506,701 | 447,685,948 | 443,707,334 | 434,815,355 | 426,782,774 | 419,630,618 | 400,456,912 | 383,715,353 | |
| Total Value to Allocate | $ 494,366,454 | $ 6,126,844 | $ 2,820,753 | $ 3,978,614 | $ 8,891,979 | $ 6,052,581 | $ 9,132,156 | $ 19,173,706 | $ 16,741,559 | $ 383,715,353 |
| | | | | | | | | | | |
| **Preferred Share Classes** | | | | | | | | | | |
| Series A @ $0.150 | – | 6,948,007 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 |
| Series B @ $0.1846 | – | 9,994,830 | 54,134,985 | 54,134,985 | 54,134,985 | 54,134,985 | 54,134,985 | 54,134,985 | 54,134,985 | 54,134,985 |
| Series C @ $0.564 | 33,217,403 | – | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 |
| Series C-1 @ $3.00 | 73,525,000 | – | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 |
| Series C-1 @ $15.00 | 112,500,460 | – | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 |
| Series C-2 @ $17.00 | 557,739,859 | – | 32,808,227 | 32,808,227 | 32,808,227 | 32,808,227 | 32,808,227 | 32,808,227 | 32,808,227 | 32,808,227 |
| | | | | | | | | | | |
| **Warrants on Common** | | | | | | | | | | |
| Exercise Price @ $0.072 | – | – | – | – | – | – | 741,665 | 741,665 | 741,665 | 741,665 |
| | | | | | | | | | | |
| Common | – | – | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 |
| | | | | | | | | | | |
| **Options on Common** | | | | | | | | | | |
| Exercise Price @ $0.015 | – | – | – | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 |
| Exercise Price @ $0.030 | – | – | – | – | 1,170,875 | 1,170,875 | 1,170,875 | 1,170,875 | 1,170,875 | 1,170,875 |
| Exercise Price @ $0.066 | – | – | – | – | – | 547,500 | 547,500 | 547,500 | 547,500 | 547,500 |
| Exercise Price @ $0.072 | – | – | – | – | – | – | 2,579,175 | 2,579,175 | 2,579,175 | 2,579,175 |
| Exercise Price @ $0.084 | – | – | – | – | – | – | – | 312,500 | 312,500 | 312,500 |
| Exercise Price @ $0.170 | – | – | – | – | – | – | – | – | 3,972,457 | 3,972,457 |
| Exercise Price @ $0.206 | – | – | – | – | – | – | – | – | – | 606,365 |
| | 778,982,745 | 16,942,837 | 527,800,100 | 528,150,100 | 529,320,975 | 529,868,475 | 533,189,315 | 533,501,815 | 537,474,272 | 538,080,637 |

| **Distribution Percentage** | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Preferred Share Classes** | | | | | | | | | | |
| Series A @ $0.150 | 0.0% | 41.0% | 8.8% | 8.8% | 8.8% | 8.7% | 8.7% | 8.7% | 8.6% | 8.6% |
| Series B @ $0.1846 | 0.0% | 59.0% | 10.3% | 10.2% | 10.2% | 10.2% | 10.2% | 10.1% | 10.1% | 10.1% |
| Series C @ $0.564 | 4.3% | 0.0% | 11.2% | 11.2% | 11.1% | 11.1% | 11.0% | 11.0% | 11.0% | 10.9% |
| Series C-1 @ $3.00 | 9.7% | 0.0% | 4.8% | 4.8% | 4.8% | 4.8% | 4.7% | 4.7% | 4.7% | 4.7% |
| Series C-1 @ $15.00 | 14.4% | 0.0% | 1.4% | 1.4% | 1.4% | 1.4% | 1.4% | 1.4% | 1.4% | 1.4% |
| Series C-2 @ $17.00 | 71.6% | 0.0% | 6.2% | 6.2% | 6.2% | 6.2% | 6.2% | 6.1% | 6.1% | 6.1% |
| | | | | | | | | | | |
| **Warrants on Common** | | | | | | | | | | |
| Exercise Price @ $0.072 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% |
| | | | | | | | | | | |
| Common | 0.0% | 0.0% | 57.4% | 57.4% | 57.2% | 57.2% | 56.8% | 56.8% | 56.4% | 56.3% |
| | | | | | | | | | | |
| **Options on Common** | | | | | | | | | | |
| Exercise Price @ $0.015 | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% |
| Exercise Price @ $0.030 | 0.0% | 0.0% | 0.0% | 0.0% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% |
| Exercise Price @ $0.066 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% |
| Exercise Price @ $0.072 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.5% | 0.5% | 0.5% | 0.5% |
| Exercise Price @ $0.084 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% |
| Exercise Price @ $0.170 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.7% | 0.7% |
| Exercise Price @ $0.206 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% |
| | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

| **Allocation of Value** | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Preferred Share Classes** | | | | | | | | | | |
| Series A @ $0.150 | $ – | $ 2,512,526 | $ 247,501 | $ 348,934 | $ 778,123 | $ 529,105 | $ 793,343 | $ 1,664,712 | $ 1,442,804 | $ 33,031,689 |
| Series B @ $0.1846 | – | 3,614,316 | 289,317 | 407,805 | 909,405 | 618,373 | 927,192 | 1,945,575 | 1,686,237 | 36,624,655 |
| Series C @ $0.564 | 21,080,788 | – | 314,762 | 443,671 | 989,386 | 672,758 | 1,009,738 | 2,116,687 | 1,834,530 | 41,989,913 |
| Series C-1 @ $3.00 | 47,930,494 | – | 134,544 | 189,646 | 422,911 | 287,589 | 431,163 | 904,773 | 784,165 | 17,952,763 |
| Series C-1 @ $15.00 | 71,396,271 | – | 40,083 | 56,499 | 125,992 | 85,671 | 128,456 | 269,549 | 233,615 | 5,348,413 |
| Series C-2 @ $17.00 | 353,958,901 | – | 175,339 | 247,148 | 551,140 | 274,762 | 561,920 | 1,179,108 | 1,021,930 | 23,390,159 |
| | | | | | | | | | | |
| **Warrants on Common** | | | | | | | | | | |
| Exercise Price @ $0.072 | – | – | – | – | – | – | 12,703 | 26,655 | 23,102 | 526,865 |
| | | | | | | | | | | |
| Common | – | – | 1,619,157 | 2,282,275 | 5,089,473 | 3,460,717 | 5,169,020 | 10,868,393 | 9,436,952 | 216,050,517 |
| | | | | | | | | | | |
| **Options on Common** | | | | | | | | | | |
| Exercise Price @ $0.015 | – | – | – | 2,637 | 5,880 | 3,998 | 5,995 | 12,579 | 10,902 | 249,592 |
| Exercise Price @ $0.030 | – | – | – | – | 19,669 | 13,375 | 20,054 | 42,080 | 36,471 | 834,973 |
| Exercise Price @ $0.066 | – | – | – | – | – | 6,254 | 9,377 | 19,677 | 17,054 | 390,432 |
| Exercise Price @ $0.072 | – | – | – | – | – | – | 44,175 | 92,694 | 80,338 | 1,636,258 |
| Exercise Price @ $0.084 | – | – | – | – | – | – | – | 11,231 | 9,734 | 222,850 |
| Exercise Price @ $0.170 | – | – | – | – | – | – | – | – | 123,736 | 2,832,833 |
| Exercise Price @ $0.206 | – | – | – | – | – | – | – | – | – | 432,410 |
| | $ 494,366,454 | $ 6,126,844 | $ 2,820,753 | $ 3,978,614 | $ 8,891,979 | $ 6,052,581 | $ 9,132,156 | $ 19,173,706 | $ 16,741,559 | $ 383,715,353 |

| Share Class | Number of Shares | Total Value | Per Share Marketable |
|---|---|---|---|
| **Preferred Share Classes** | | | |
| Series A @ $0.150 | 46,320,045 | $ 41,348,789 | $ 0.89 |
| Series B @ $0.1846 | 54,134,985 | 49,002,864 | 0.91 |
| Series C @ $0.564 | 58,896,105 | 70,461,233 | 1.20 |
| Series C-1 @ $3.00 | 25,175,001 | 69,036,049 | 2.74 |
| Series C-1 @ $15.00 | 7,500,032 | 77,684,547 | 10.36 |
| Series C-2 @ $17.00 | 32,808,227 | 381,406,405 | 11.63 |
| **Warrants on Common** | | | |
| Exercise Price @ $0.072 | 741,665 | 591,355 | 0.80 |

HM HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

US v. Elizabeth Holmes — Exhibit P.1
Valuation of Theranos, Inc. — NAV Equity Allocation 10/15/15 - Step 1
As of October 15, 2015 — (USD)

**Break Point Calculation**

| Share Class | Number of Shares | Series C, C-1, C-2 Liq. Preference | Series A, B Liq. Preference | $0.015 Options Exercise | $0.030 Options Exercise | $0.066 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.094 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise |
|---|---|---|---|---|---|---|---|---|---|---|
| **Preferred Share Classes** | | | | | | | | | | |
| Series A @ $0.150 | 46,320,045 | $ - | $ 6,948,007 | $ 7,642,807 | $ 9,032,409 | $ 12,089,532 | $ 15,424,575 | $ 19,778,659 | $ 27,653,067 | $ 37,194,996 |
| Series B @ $0.1846 | 54,162,965 | - | 10,000,000 | 10,812,444 | 12,437,333 | 16,012,089 | 19,911,822 | 25,053,141 | 34,210,845 | 45,368,416 |
| Series C @ $0.564 | 58,896,105 | 33,217,403 | 33,217,403 | 34,100,845 | 35,867,728 | 39,754,871 | 43,995,390 | 49,531,624 | 59,543,962 | 71,676,560 |
| Series C-1 @ $3.00 | 21,947,001 | 65,841,003 | 65,841,003 | 66,170,208 | 66,829,618 | 68,277,120 | 69,857,304 | 71,920,322 | 75,651,312 | 80,172,395 |
| Series C-1 @ $15.00 | 6,563,232 | 98,448,480 | 98,448,480 | 98,546,928 | 98,743,825 | 99,176,999 | 99,649,551 | 100,266,495 | 101,382,245 | 102,734,270 |
| Series C-2 @ $17.00 | 42,947,639 | 730,109,863 | 730,109,863 | 730,754,078 | 732,042,507 | 734,877,051 | 737,969,281 | 742,006,359 | 749,307,458 | 758,154,671 |
| | | | | | | | | | | |
| **Warrants on Common** | | | | | | | | | | |
| Exercise Price @ $0.072 | 741,665 | - | - | - | - | - | - | 16,317 | 72,683 | 99,383 |
| | | | | | | | | | | |
| Common | 302,965,725 | - | - | 4,544,486 | 9,088,972 | 19,995,738 | 21,813,532 | 28,478,778 | 51,504,173 | 62,410,939 |
| | | | | | | | | | | |
| **Options on Common** | | | | | | | | | | |
| Exercise Price @ $0.015 | 350,000 | - | - | - | 5,250 | 17,850 | 19,950 | 27,650 | 54,250 | 66,850 |
| Exercise Price @ $0.030 | 1,170,875 | - | - | - | - | 42,152 | 49,177 | 74,936 | 163,923 | 206,074 |
| Exercise Price @ $0.066 | 547,500 | - | - | - | - | - | 3,285 | 15,330 | 56,940 | 76,650 |
| Exercise Price @ $0.072 | 2,579,175 | - | - | - | - | - | - | 56,742 | 252,759 | 345,609 |
| Exercise Price @ $0.094 | 312,500 | - | - | - | - | - | - | - | 23,750 | 35,000 |
| Exercise Price @ $0.170 | 3,972,457 | - | - | - | - | - | - | - | - | 143,008 |
| Exercise Price @ $0.206 | 606,365 | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | |
| | 544,083,249 | 927,616,749 | 944,564,756 | 952,571,797 | 964,046,642 | 990,243,401 | 1,008,693,868 | 1,037,176,354 | 1,099,877,367 | 1,158,684,823 |

| Inputs | | Series C, C-1, C-2 Liq. Preference | Series A, B Liq. Preference | $0.015 Options Exercise | $0.03 Options Exercise | $0.066 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.094 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise |
|---|---|---|---|---|---|---|---|---|---|---|
| Stock Price Now | $ 1,051,000,000 | $ 1,051,000,000 | $ 1,051,000,000 | $ 1,051,000,000 | $ 1,051,000,000 | $ 1,051,000,000 | $ 1,051,000,000 | $ 1,051,000,000 | $ 1,051,000,000 | $ 1,051,000,000 |
| Volatility | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% |
| Riskfree Rate - Annual | 1.12% | 1.12% | 1.12% | 1.12% | 1.12% | 1.12% | 1.12% | 1.12% | 1.12% | 1.12% |
| Exercise Price | $ 0.00 | $ 927,616,749 | $ 944,564,756 | $ 952,571,797 | $ 964,046,642 | $ 990,243,401 | $ 1,008,693,868 | $ 1,037,176,354 | $ 1,099,877,367 | $ 1,158,684,823 |
| Time To Maturity - Years | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 |
| | | | | | | | | | | |
| **Outputs** | | | | | | | | | | |
| d1 | 39.72 | 0.69 | 0.67 | 0.67 | 0.65 | 0.63 | 0.61 | 0.58 | 0.53 | 0.48 |
| d2 | 38.66 | (0.37) | (0.39) | (0.39) | (0.41) | (0.43) | (0.45) | (0.48) | (0.53) | (0.58) |
| N(d1) | 1.000 | 0.755 | 0.750 | 0.747 | 0.743 | 0.735 | 0.729 | 0.721 | 0.702 | 0.684 |
| N(d2) | 1.000 | 0.356 | 0.349 | 0.346 | 0.342 | 0.333 | 0.327 | 0.317 | 0.298 | 0.281 |
| Call Price (V<sub>w</sub>) | $ 1,051,000,000 | $ 477,913,125 | $ 472,200,133 | $ 469,536,516 | $ 465,758,297 | $ 457,301,157 | $ 451,481,656 | $ 442,712,541 | $ 424,280,684 | $ 408,011,420 |
| | | | | | | | | | | |
| -d1 | -39.720 | -0.690 | -0.673 | -0.665 | -0.654 | -0.628 | -0.611 | -0.585 | -0.529 | -0.480 |
| -d2 | -38.680 | 0.370 | 0.387 | 0.395 | 0.406 | 0.432 | 0.449 | 0.475 | 0.531 | 0.580 |
| N(-d1) | 0.000 | 0.245 | 0.250 | 0.253 | 0.257 | 0.265 | 0.271 | 0.279 | 0.298 | 0.316 |
| N(-d2) | 0.000 | 0.644 | 0.651 | 0.654 | 0.658 | 0.667 | 0.673 | 0.683 | 0.702 | 0.719 |
| Put Price (P<sub>p</sub>) | $ - | $ 313,889,779 | $ 324,382,279 | $ 329,374,905 | $ 336,568,803 | $ 353,160,708 | $ 364,983,335 | $ 383,448,851 | $ 424,970,994 | $ 464,932,755 |
| | | | | | | | | | | |
| Fair Market Value | $ 1,051,000,000 | $ 477,913,125 | $ 472,200,133 | $ 469,536,516 | $ 465,758,297 | $ 457,301,157 | $ 451,481,656 | $ 442,712,541 | $ 424,280,684 | $ 408,011,420 |



HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

US v. Elizabeth Holmes
Valuation of Theranos, Inc.
As of October 15, 2015

Exhibit P.2
NAV Equity Allocation 10/15/15 - Step 2
(USD)

| | Series C, C-1, C-2 Liq. Preference | Series A, B Liq. Preference | $0.015 Options Exercise | $0.03 Options Exercise | $0.066 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.094 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise | All Classes Participate |
|---|---|---|---|---|---|---|---|---|---|---|
| High call option | $ 1,651,000,000 | $ 477,913,125 | $ 472,290,133 | $ 468,536,516 | $ 465,758,297 | $ 457,301,157 | $ 451,481,656 | $ 442,712,541 | $ 424,280,584 | $ 408,011,420 |
| Less low call option | | 477,913,125 | 472,290,133 | 469,536,515 | 465,758,297 | 457,301,157 | 451,481,656 | 442,712,541 | 424,280,584 | 408,011,420 |
| Total Value to Allocate | $ 573,086,875 | $ 5,712,992 | $ 2,663,616 | $ 3,778,219 | $ 8,457,140 | $ 5,819,502 | $ 8,769,115 | $ 18,431,857 | $ 16,269,264 | $ 408,011,420 |
| **Preferred Share Classes** | | | | | | | | | | |
| Series A @ $0.150 | - | 6,948,007 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 |
| Series B @ $0.1846 | - | 10,000,000 | 54,162,965 | 54,162,965 | 54,162,965 | 54,162,965 | 54,162,965 | 54,162,965 | 54,162,965 | 54,162,965 |
| Series C @ $0.564 | 33,217,403 | - | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 |
| Series C-1 @ $3.00 | 65,841,003 | - | 21,947,001 | 21,947,001 | 21,947,001 | 21,947,001 | 21,947,001 | 21,947,001 | 21,947,001 | 21,947,001 |
| Series C-1 @ $15.00 | 98,448,485 | - | 6,563,232 | 6,563,232 | 6,563,232 | 6,563,232 | 6,563,232 | 6,563,232 | 6,563,232 | 6,563,232 |
| Series C-2 @ $17.00 | 730,109,863 | - | 42,947,639 | 42,947,639 | 42,947,639 | 42,947,639 | 42,947,639 | 42,947,639 | 42,947,639 | 42,947,639 |
| **Warrants on Common** | | | | | | | | | | |
| Exercise Price @ $0.072 | - | - | - | - | - | - | 741,665 | 741,665 | 741,665 | 741,665 |
| **Common** | | | | | | | | | | |
| Exercise Price @ $0.072 | - | - | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 |
| **Options on Common** | | | | | | | | | | |
| Exercise Price @ $0.015 | - | - | - | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 |
| Exercise Price @ $0.030 | - | - | - | - | 1,170,875 | 1,170,875 | 1,170,875 | 1,170,875 | 1,170,875 | 1,170,875 |
| Exercise Price @ $0.066 | - | - | - | - | - | 547,500 | 547,500 | 547,500 | 547,500 | 547,500 |
| Exercise Price @ $0.072 | - | - | - | - | - | - | 2,579,175 | 2,579,175 | 2,579,175 | 2,579,175 |
| Exercise Price @ $0.094 | - | - | - | - | - | - | - | 312,500 | 312,500 | 312,500 |
| Exercise Price @ $0.170 | - | - | - | - | - | - | - | - | 3,972,457 | 3,972,457 |
| Exercise Price @ $0.206 | - | - | - | - | - | - | - | - | - | 606,365 |
| | 927,616,749 | 16,948,007 | 533,502,712 | 534,152,712 | 535,323,587 | 535,871,087 | 539,191,927 | 539,504,427 | 543,476,884 | 544,083,249 |
| **Distribution Percentage** | | | | | | | | | | |
| **Preferred Share Classes** | | | | | | | | | | |
| Series A @ $0.150 | 0.0% | 41.0% | 8.7% | 8.7% | 8.7% | 8.6% | 8.6% | 8.6% | 8.5% | 8.5% |
| Series B @ $0.1846 | 0.0% | 59.0% | 10.1% | 10.1% | 10.1% | 10.1% | 10.0% | 10.0% | 10.0% | 10.0% |
| Series C @ $0.564 | 3.6% | 0.0% | 11.0% | 11.0% | 11.0% | 11.0% | 10.9% | 10.9% | 10.8% | 10.8% |
| Series C-1 @ $3.00 | 7.1% | 0.0% | 4.1% | 4.1% | 4.1% | 4.1% | 4.1% | 4.1% | 4.0% | 4.0% |
| Series C-1 @ $15.00 | 10.6% | 0.0% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% |
| Series C-2 @ $17.00 | 78.7% | 0.0% | 8.0% | 8.0% | 8.0% | 8.0% | 8.0% | 8.0% | 7.9% | 7.9% |
| **Warrants on Common** | | | | | | | | | | |
| Exercise Price @ $0.072 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% |
| **Common** | | | | | | | | | | |
| Exercise Price @ $0.072 | 0.0% | 0.0% | 56.8% | 55.7% | 56.6% | 56.5% | 56.2% | 56.2% | 55.7% | 55.7% |
| **Options on Common** | | | | | | | | | | |
| Exercise Price @ $0.015 | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% |
| Exercise Price @ $0.030 | 0.0% | 0.0% | 0.0% | 0.0% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% |
| Exercise Price @ $0.066 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% |
| Exercise Price @ $0.072 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.5% | 0.5% | 0.5% | 0.5% |
| Exercise Price @ $0.094 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% |
| Exercise Price @ $0.170 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.7% | 0.7% |
| Exercise Price @ $0.206 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% |
| | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| **Allocation of Value** | | | | | | | | | | |
| **Preferred Share Classes** | | | | | | | | | | |
| Series A @ $0.150 | $ - | $ 2,342,099 | $ 231,132 | $ 327,635 | $ 731,773 | $ 503,031 | $ 753,323 | $ 1,582,498 | $ 1,385,615 | $ 34,735,690 |
| Series B @ $0.1846 | - | 3,370,893 | 270,267 | 383,111 | 855,676 | 588,204 | 880,876 | 1,850,448 | 1,621,397 | 40,617,145 |
| Series C @ $0.564 | 20,521,900 | - | 293,885 | 416,589 | 930,451 | 639,605 | 957,853 | 2,012,151 | 1,763,086 | 44,166,556 |
| Series C-1 @ $3.00 | 40,876,944 | - | 109,513 | 155,238 | 346,723 | 238,342 | 356,934 | 749,807 | 656,985 | 16,458,193 |
| Series C-1 @ $15.00 | 60,822,028 | - | 32,750 | 46,424 | 103,687 | 71,276 | 106,741 | 224,229 | 196,474 | 4,921,809 |
| Series C-2 @ $17.00 | 451,066,001 | - | 214,304 | 303,761 | 678,495 | 466,407 | 698,476 | 1,467,281 | 1,285,660 | 32,206,702 |
| **Warrants on Common** | | | | | | | | | | |
| Exercise Price @ $0.072 | - | - | - | - | - | - | 12,062 | 25,339 | 22,202 | 556,179 |
| **Common** | | | | | | | | | | |
| Exercise Price @ $0.072 | - | - | 1,511,765 | 2,142,965 | 4,786,308 | 3,290,175 | 4,927,264 | 10,350,649 | 9,069,437 | 227,195,866 |
| **Options on Common** | | | | | | | | | | |
| Exercise Price @ $0.015 | - | - | - | 2,476 | 5,529 | 3,801 | 5,692 | 11,958 | 10,477 | 262,467 |
| Exercise Price @ $0.030 | - | - | - | - | 18,498 | 12,716 | 19,042 | 40,002 | 35,051 | 878,046 |
| Exercise Price @ $0.066 | - | - | - | - | - | 5,946 | 8,904 | 18,705 | 16,392 | 410,574 |
| Exercise Price @ $0.072 | - | - | - | - | - | - | 41,846 | 88,116 | 77,209 | 1,934,139 |
| Exercise Price @ $0.094 | - | - | - | - | - | - | - | 10,876 | 9,355 | 234,346 |
| Exercise Price @ $0.170 | - | - | - | - | - | - | - | - | 118,918 | 2,978,970 |
| Exercise Price @ $0.206 | - | - | - | - | - | - | - | - | - | 454,717 |
| | $ 573,086,875 | $ 5,712,992 | $ 2,663,616 | $ 3,778,219 | $ 8,457,140 | $ 5,819,502 | $ 8,769,115 | $ 18,431,857 | $ 16,269,264 | $ 408,011,420 |



HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

US v. Elizabeth Holmes — Exhibit Q.1
Valuation of Theranos, Inc. — DCF Equity Allocation 10/15/15 - Step 1
As of October 15, 2015 — (USD)

**Break Point Calculation**

| Share Class | Number of Shares | Series C, C-1, C-2 Liq. Preference | Series A, B Liq. Preference | $0.015 Options Exercise | $0.03 Options Exercise | $0.066 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.094 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise |
|---|---|---|---|---|---|---|---|---|---|---|
| **Preferred Share Classes** | | | | | | | | | | |
| Series A @ $0.150 | 46,320,045 | $ - | $ 6,948,007 | $ 7,842,807 | $ 9,032,409 | $ 12,089,532 | $ 15,424,575 | $ 19,778,659 | $ 27,653,087 | $ 37,194,996 |
| Series B @ $0.1846 | 54,162,965 | - | 10,000,000 | 10,812,444 | 12,437,333 | 16,012,086 | 19,911,822 | 25,033,141 | 34,210,845 | 45,368,416 |
| Series C @ $0.564 | 58,896,105 | 33,217,403 | 33,217,403 | 34,100,845 | 35,667,728 | 39,754,871 | 43,995,390 | 49,531,524 | 59,543,962 | 71,676,560 |
| Series C-1 $3.00 | 21,947,001 | 65,841,003 | 65,841,003 | 66,170,208 | 66,828,618 | 68,277,120 | 69,867,304 | 71,920,322 | 75,651,312 | 80,172,395 |
| Series C-1 @ $15.00 | 6,563,232 | 98,448,480 | 98,448,480 | 98,546,928 | 98,743,825 | 99,176,999 | 99,649,551 | 100,266,495 | 101,382,245 | 102,734,270 |
| Series C-2 @ $17.00 | 42,947,639 | 730,109,863 | 730,109,863 | 730,754,078 | 732,042,507 | 734,877,051 | 737,969,281 | 742,006,359 | 749,307,458 | 758,154,671 |
| **Warrants on Common** | | | | | | | | | | |
| Exercise Price @ $0.072 | 741,665 | - | - | - | - | - | - | 16,317 | 72,683 | 99,383 |
| **Common** | 302,965,725 | - | - | 4,544,486 | 9,088,972 | 19,995,738 | 21,813,532 | 28,478,778 | 51,504,173 | 62,410,939 |
| **Options on Common** | | | | | | | | | | |
| Exercise Price @ $0.015 | 350,000 | - | - | - | 5,250 | 17,850 | 19,950 | 27,650 | 54,250 | 66,850 |
| Exercise Price @ $0.030 | 1,170,875 | - | - | - | - | 42,152 | 49,177 | 74,936 | 163,923 | 206,074 |
| Exercise Price @ $0.066 | 547,500 | - | - | - | - | - | 3,285 | 15,330 | 56,940 | 76,650 |
| Exercise Price @ $0.072 | 2,579,175 | - | - | - | - | - | - | 56,742 | 252,759 | 345,609 |
| Exercise Price @ $0.094 | 312,500 | - | - | - | - | - | - | - | 23,750 | 35,000 |
| Exercise Price @ $0.170 | 3,972,457 | - | - | - | - | - | - | - | - | 143,008 |
| Exercise Price @ $0.206 | 606,365 | - | - | - | - | - | - | - | - | - |
| | 544,083,249 | 927,616,749 | 944,564,756 | 952,571,797 | 964,046,642 | 990,243,401 | 1,008,693,868 | 1,037,176,354 | 1,099,877,367 | 1,159,684,823 |

| | Series C, C-1, C-2 Liq. Preference | Series A, B Liq. Preference | $0.015 Options Exercise | $0.03 Options Exercise | $0.066 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.094 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise |
|---|---|---|---|---|---|---|---|---|---|
| **Inputs** | | | | | | | | | |
| Stock Price Now | $ 1,184,000,000 | $ 1,184,000,000 | $ 1,184,000,000 | $ 1,184,000,000 | $ 1,184,000,000 | $ 1,184,000,000 | $ 1,184,000,000 | $ 1,184,000,000 | $ 1,184,000,000 |
| Volatility | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% |
| Riskfree Rate - Annual | 1.12% | 1.12% | 1.12% | 1.12% | 1.12% | 1.12% | 1.12% | 1.12% | 1.12% |
| Exercise Price | $ 0.00 | 927,616,749 | 944,564,756 | 952,571,797 | 964,046,642 | 990,243,401 | 1,008,693,868 | 1,037,176,354 | 1,099,877,367 | 1,159,684,823 |
| Time To Maturity - Years | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 |
| **Outputs** | | | | | | | | | |
| d1 | 39.83 | 0.80 | 0.79 | 0.78 | 0.77 | 0.74 | 0.72 | 0.70 | 0.64 | 0.59 |
| d2 | 38.77 | (0.26) | (0.27) | (0.28) | (0.29) | (0.32) | (0.34) | (0.36) | (0.42) | (0.47) |
| N(d1) | 1.000 | 0.789 | 0.784 | 0.782 | 0.778 | 0.771 | 0.765 | 0.757 | 0.739 | 0.723 |
| N(d2) | 1.000 | 0.398 | 0.392 | 0.389 | 0.384 | 0.375 | 0.368 | 0.358 | 0.338 | 0.320 |
| Call Price ($V_a$) | $ 1,184,000,000 | 580,651,525 | 574,248,897 | 571,260,795 | 567,019,077 | 557,510,633 | 550,956,552 | 541,063,210 | 520,199,568 | 501,705,043 |
| -d1 | -39.832 | -0.802 | -0.785 | -0.777 | -0.766 | -0.741 | -0.723 | -0.697 | -0.642 | -0.593 |
| -d2 | -38.772 | 0.258 | 0.275 | 0.283 | 0.294 | 0.319 | 0.337 | 0.363 | 0.418 | 0.467 |
| N(-d1) | 0.000 | 0.211 | 0.216 | 0.218 | 0.222 | 0.229 | 0.235 | 0.243 | 0.261 | 0.277 |
| N(-d2) | 0.000 | 0.602 | 0.608 | 0.611 | 0.616 | 0.625 | 0.632 | 0.642 | 0.662 | 0.680 |
| Put Price ($P_a$) | $ - | 293,628,179 | 293,431,043 | 298,099,164 | 304,829,583 | 320,370,184 | 331,458,231 | 348,799,520 | 387,889,878 | 425,626,378 |
| **Fair Market Value** | $ 1,184,000,000 | 580,651,525 | 574,248,897 | 571,260,795 | 567,019,077 | 557,510,633 | 550,956,552 | 541,063,210 | 520,199,568 | 501,705,043 |



HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

US v. Elizabeth Holmes
Valuation of Theranos, Inc.
As of October 15, 2015

Exhibit Q.2
DCF Equity Allocation 10/15/15 - Step 2
(USD)

| | Series C, C-1, C-2 Liq. Preference | Series A, B Liq. Preference | $0.015 Options Exercise | $0.03 Options Exercise | $0.066 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.094 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise | All Classes Participate |
|---|---|---|---|---|---|---|---|---|---|---|
| High call option | $ 1,184,000,000 | $ 580,651,525 | $ 574,248,897 | $ 571,260,795 | $ 567,019,077 | $ 557,510,633 | $ 550,956,552 | $ 541,063,210 | $ 520,189,568 | $ 501,705,043 |
| Less low call option | 580,651,525 | 574,248,897 | 571,260,795 | 567,019,077 | 557,510,633 | 550,956,552 | 541,063,210 | 520,189,568 | 501,705,043 | |
| Total Value to Allocate | $ 603,348,475 | $ 6,402,628 | $ 2,988,102 | $ 4,241,718 | $ 9,508,444 | $ 6,554,081 | $ 9,893,342 | $ 20,863,642 | $ 18,494,525 | $ 501,705,043 |
| **Preferred Share Classes** | | | | | | | | | | |
| Series A @ $0.150 | - | 6,945,007 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 |
| Series B @ $0.1846 | - | 10,000,000 | 54,162,965 | 54,162,965 | 54,162,965 | 54,162,965 | 54,162,965 | 54,162,965 | 54,162,965 | 54,162,965 |
| Series C @ $0.564 | 33,217,403 | - | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 |
| Series C-1 @ $3.00 | 65,841,003 | - | 21,947,001 | 21,947,001 | 21,947,001 | 21,947,001 | 21,947,001 | 21,947,001 | 21,947,001 | 21,947,001 |
| Series C-1 @ $15.00 | 88,448,480 | - | 6,563,232 | 6,563,232 | 6,563,232 | 6,563,232 | 6,563,232 | 6,563,232 | 6,563,232 | 6,563,232 |
| Series C-2 @ $17.00 | 730,109,863 | - | 42,947,639 | 42,947,639 | 42,947,639 | 42,947,639 | 42,947,639 | 42,947,639 | 42,947,639 | 42,947,639 |
| **Warrants on Common** | | | | | | | | | | |
| Exercise Price @ $0.072 | - | - | - | - | - | - | 741,665 | 741,665 | 741,665 | 741,665 |
| **Common** | - | - | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 |
| **Options on Common** | | | | | | | | | | |
| Exercise Price @ $0.015 | - | - | - | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 |
| Exercise Price @ $0.030 | - | - | - | - | 1,170,875 | 1,170,875 | 1,170,875 | 1,170,875 | 1,170,875 | 1,170,875 |
| Exercise Price @ $0.066 | - | - | - | - | - | 547,500 | 547,500 | 547,500 | 547,500 | 547,500 |
| Exercise Price @ $0.072 | - | - | - | - | - | - | 2,579,175 | 2,579,175 | 2,579,175 | 2,579,175 |
| Exercise Price @ $0.094 | - | - | - | - | - | - | - | 312,500 | 312,500 | 312,500 |
| Exercise Price @ $0.170 | - | - | - | - | - | - | - | - | 3,972,457 | 3,972,457 |
| Exercise Price @ $0.206 | - | - | - | - | - | - | - | - | - | 606,365 |
| | 927,616,749 | 16,945,007 | 533,802,712 | 534,152,712 | 535,323,587 | 535,871,087 | 539,191,927 | 539,504,427 | 543,476,884 | 544,083,249 |
| **Distribution Percentage** | | | | | | | | | | |
| **Preferred Share Classes** | | | | | | | | | | |
| Series A @ $0.150 | 0.0% | 41.0% | 8.7% | 8.7% | 8.7% | 8.6% | 8.6% | 8.6% | 8.5% | 8.5% |
| Series B @ $0.1846 | 0.0% | 59.0% | 10.1% | 10.1% | 10.1% | 10.1% | 10.0% | 10.0% | 10.0% | 10.0% |
| Series C @ $0.564 | 3.6% | 0.0% | 11.0% | 11.0% | 11.0% | 11.0% | 10.9% | 10.9% | 10.8% | 10.8% |
| Series C-1 @ $3.00 | 7.1% | 0.0% | 4.1% | 4.1% | 4.1% | 4.1% | 4.1% | 4.1% | 4.0% | 4.0% |
| Series C-1 @ $15.00 | 10.6% | 0.0% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% |
| Series C-2 @ $17.00 | 78.7% | 0.0% | 8.0% | 8.0% | 8.0% | 8.0% | 8.0% | 8.0% | 7.9% | 7.9% |
| **Warrants on Common** | | | | | | | | | | |
| Exercise Price @ $0.072 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% |
| **Common** | 0.0% | 0.0% | 56.8% | 56.7% | 56.6% | 56.5% | 56.2% | 56.2% | 55.7% | 55.7% |
| **Options on Common** | | | | | | | | | | |
| Exercise Price @ $0.015 | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% |
| Exercise Price @ $0.030 | 0.0% | 0.0% | 0.0% | 0.0% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% |
| Exercise Price @ $0.066 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% |
| Exercise Price @ $0.072 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.5% | 0.5% | 0.5% | 0.5% |
| Exercise Price @ $0.094 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% |
| Exercise Price @ $0.170 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.7% | 0.7% |
| Exercise Price @ $0.206 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% |
| | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| **Allocation of Value** | | | | | | | | | | |
| **Preferred Share Classes** | | | | | | | | | | |
| Series A @ $0.150 | $ - | $ 2,624,622 | $ 259,289 | $ 367,828 | $ 822,739 | $ 566,527 | $ 849,502 | $ 1,791,282 | $ 1,576,272 | $ 42,712,314 |
| Series B @ $0.1846 | - | 3,777,406 | 303,191 | 430,106 | 962,245 | 662,451 | 993,807 | 2,094,583 | 1,843,166 | 49,944,255 |
| Series C @ $0.564 | 21,605,546 | - | 329,666 | 467,695 | 1,046,116 | 720,341 | 1,080,653 | 2,277,922 | 2,004,235 | 54,308,735 |
| Series C-1 @ $3.00 | 42,824,872 | - | 122,854 | 174,282 | 389,824 | 268,427 | 402,694 | 848,731 | 745,857 | 20,237,567 |
| Series C-1 @ $15.00 | 64,033,708 | - | 36,739 | 52,119 | 116,576 | 80,273 | 120,425 | 253,812 | 223,347 | 6,052,027 |
| Series C-2 @ $17.00 | 474,884,348 | - | 240,411 | 341,046 | 762,838 | 525,380 | 788,023 | 1,660,865 | 1,461,509 | 59,802,482 |
| **Warrants on Common** | | | | | | | | | | |
| Exercise Price @ $0.072 | - | - | - | - | - | - | 13,608 | 28,662 | 25,239 | 683,897 |
| **Common** | - | - | 1,695,931 | 2,405,657 | 5,381,292 | 3,705,484 | 5,558,965 | 11,710,248 | 10,309,927 | 279,367,959 |
| **Options on Common** | | | | | | | | | | |
| Exercise Price @ $0.015 | - | - | - | 2,779 | 6,217 | 4,281 | 6,422 | 13,535 | 11,911 | 322,739 |
| Exercise Price @ $0.030 | - | - | - | - | 20,797 | 14,321 | 21,484 | 45,280 | 39,845 | 1,079,976 |
| Exercise Price @ $0.066 | - | - | - | - | - | 6,696 | 10,040 | 21,173 | 18,631 | 504,856 |
| Exercise Price @ $0.072 | - | - | - | - | - | - | 47,324 | 99,742 | 87,769 | 2,378,265 |
| Exercise Price @ $0.094 | - | - | - | - | - | - | - | 12,083 | 10,634 | 288,160 |
| Exercise Price @ $0.170 | - | - | - | - | - | - | - | - | 135,183 | 3,663,046 |
| Exercise Price @ $0.206 | - | - | - | - | - | - | - | - | - | 569,136 |
| | $ 603,348,475 | $ 6,402,628 | $ 2,988,102 | $ 4,241,718 | $ 9,508,444 | $ 6,554,081 | $ 9,893,342 | $ 20,863,642 | $ 18,494,525 | $ 501,705,043 |


HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

**ER-713**

| US v. Elizabeth Holmes | | | | | | | | Exhibit R.1 |
|---|---|---|---|---|---|---|---|---|
| Business Valuation | | | | | | | | Volatility Analysis 2/7/14 |
| As of February 7, 2014 | | | | | | | | *(thousands of USD)* |

| Guideline Companies | Ticker | LTM Rev. Size | Market Capitalization | Revenue Growth 1 Year | Revenue Growth 3 Year | Enterprise Value | Debt | Equity Volatility [1] | Asset Volatility |
|---|---|---|---|---|---|---|---|---|---|
| Quest Diagnostics Incorporated | DGX | $ 7,146,000 | $ 7,315,200 | -3.2% | -0.5% | $ 10,681,200 | $ 3,386,000 | 21.1% | 15.0% |
| Enzo Biochem, Inc. | ENZ | 92,929 | 138,102 | -7.3% | -1.8% | 142,094 | 3,992 | 52.1% | 50.7% |
| Exact Sciences Corporation | EXAS | 4,144 | 865,903 | 0.0% | -8.1% | 867,614 | 1,711 | 46.9% | 46.8% |
| Illumina, Inc. | ILMN | 1,421,178 | 19,831,532 | 23.7% | 16.3% | 20,700,125 | 868,593 | 43.6% | 41.9% |
| Standard BioTools Inc. | LAB | 71,183 | 1,104,200 | 36.0% | 28.5% | 1,104,200 | - | 38.7% | 38.7% |
| Laboratory Corporation of America Holdings | LH | 5,808,300 | 7,791,710 | 2.4% | 5.1% | 10,792,110 | 3,000,400 | 18.2% | 13.3% |
| Myriad Genetics, Inc. | MYGN | 737,115 | 2,351,966 | 35.2% | 25.0% | 2,351,966 | - | 40.0% | 40.0% |
| OraSure Technologies, Inc. | OSUR | 98,940 | 337,504 | 12.7% | 9.7% | 337,504 | - | 50.0% | 50.0% |
| PerkinElmer, Inc. | PKI | 2,157,586 | 4,920,548 | 2.5% | 8.2% | 5,855,276 | 934,728 | 27.0% | 22.9% |
| QuidelOrtho Corporation | QDEL | 177,325 | 964,525 | 13.9% | 16.1% | 970,092 | 5,567 | 31.5% | 31.3% |
| Qiagen N.V. | QGEN | 1,301,984 | 5,280,047 | 3.8% | 6.2% | 6,130,249 | 850,202 | 25.0% | 21.6% |
| Trinity Biotech plc | TRIB | 91,216 | 545,805 | 10.6% | 0.6% | 545,805 | - | 27.8% | 27.8% |
| Alere Inc. | IQT2622336 | 2,608,636 | 2,819,163 | 8.9% | 6.6% | 6,660,267 | 3,841,104 | 37.0% | 21.5% |
| Luminex Corporation | IQT2627430 | 213,423 | 734,789 | 5.4% | 14.7% | 736,446 | 1,657 | 34.5% | 34.4% |
| Abaxis, Inc. | IQT2586525 | 179,781 | 824,250 | 0.6% | 8.7% | 824,956 | 706 | 35.8% | 35.6% |
| CombiMatrix Corporation | IQT36309071 | 6,367 | 25,342 | 19.0% | 21.5% | 25,575 | 233 | 101.9% | 101.1% |
| Affymetrix Inc. | IQT2587418 | 330,399 | 518,522 | 11.8% | 2.1% | 662,983 | 144,461 | 56.4% | 46.8% |
| Genomic Health, Inc. | IQT24111615 | 261,595 | 815,172 | 11.2% | 13.7% | 815,172 | - | 39.3% | 39.3% |
| Cepheid | IQT2599314 | 401,292 | 3,328,663 | 21.2% | 23.6% | 3,328,663 | - | 42.2% | 42.2% |
| Nanosphere, Inc. | IQT38720096 | 10,002 | 169,146 | 97.0% | 70.3% | 180,961 | 11,815 | 73.8% | 69.8% |
| GenMark Diagnostics, Inc. | IQT106626443 | 27,404 | 513,559 | 33.9% | 120.3% | 513,596 | 37 | 49.7% | 49.7% |
| Bio-Reference Laboratories, Inc. | IQT2594421 | 735,368 | 723,947 | 15.5% | 15.2% | 776,577 | 52,630 | 40.1% | 37.5% |

| | | | | |
|---|---|---|---|---|
| | Upper Quartile | | | 46.8% |
| | Lower Quartile | | | 28.7% |
| | Average | | | 39.9% |
| | Median | | | 39.0% |
| | Selected Asset Volatility | | | **50.0%** |

**Relevered for Subject Company Capital Structure**

| | | LTM Rev. Size | Market Capitalization | Revenue Growth 1 Year | Revenue Growth 3 Year | Enterprise Value | Debt | Equity Volatility [1] | Asset Volatility |
|---|---|---|---|---|---|---|---|---|---|
| Theranos, Inc. | | $ - | $ 404,500 | NA | NA | $ 446,886 | $ 42,386 | 55.0% | 50.2% |

| | |
|---|---|
| Selected Equity Volatility | **55.0%** |

**Notes:**
[1] Source: Capital IQ.
[2] Note: Ticker symbols beginning with IQT represent companies that have been acquired since the valuation date and necessary to access the historical data using CapitalIQ.



| US v. Elizabeth Holmes | | | | | | | | Exhibit R.2 |
| Business Valuation | | | | | | | | Volatility Analysis 12/31/14 |
| As of December 31, 2014 | | | | | | | | *(thousands of USD)* |

| Guideline Companies | Ticker | LTM Rev. Size | Market Capitalization | Revenue Growth 1 Year | Revenue Growth 3 Year | Enterprise Value | Debt | Equity Volatility [1] | Asset Volatility |
|---|---|---|---|---|---|---|---|---|---|
| Quest Diagnostics Incorporated | DGX | $ 7,435,000 | $ 9,692,466 | 4.0% | 0.2% | $ 13,462,466 | $ 3,770,000 | 20.8% | 15.6% |
| Enzo Biochem, Inc. | ENZ | 96,637 | 218,928 | 4.8% | -1.8% | 222,966 | 4,038 | 52.1% | 51.3% |
| Exact Sciences Corporation | EXAS | 1,798 | 2,430,718 | -56.6% | -24.4% | 2,434,478 | 3,760 | 45.0% | 44.9% |
| Illumina, Inc. | ILMN | 1,861,358 | 26,210,360 | 31.0% | 20.8% | 27,501,396 | 1,291,036 | 44.1% | 42.1% |
| Standard BioTools Inc. | LAB | 116,456 | 953,006 | 63.6% | 39.5% | 1,148,461 | 195,455 | 43.8% | 37.1% |
| Laboratory Corporation of America Holdings | LH | 6,011,600 | 9,117,550 | 3.5% | 2.7% | 12,147,350 | 3,029,800 | 18.7% | 14.3% |
| Myriad Genetics, Inc. | MYGN | 724,873 | 2,485,880 | -1.7% | 17.8% | 2,485,880 | – | 40.5% | 40.5% |
| OraSure Technologies, Inc. | OSUR | 106,464 | 568,416 | 7.6% | 9.1% | 568,416 | – | 50.3% | 50.3% |
| PerkinElmer, Inc. | PKI | 2,068,880 | 4,939,852 | -4.1% | 2.6% | 5,986,320 | 1,046,468 | 25.1% | 21.0% |
| QuidelOrtho Corporation | QDEL | 184,158 | 995,160 | 3.9% | 5.1% | 1,138,244 | 143,084 | 31.9% | 28.1% |
| Qiagen N.V. | QGEN | 1,344,777 | 5,425,828 | 3.3% | 4.8% | 6,599,032 | 1,173,204 | 23.8% | 19.8% |
| Trinity Biotech plc | TRIB | 104,872 | 392,493 | 15.0% | 10.4% | 392,493 | – | 25.5% | 25.5% |
| Alere Inc. | IQT2622336 | 2,577,001 | 3,175,128 | -1.2% | 2.6% | 6,901,222 | 3,726,094 | 35.8% | 21.3% |
| Luminex Corporation | IQT2627430 | 226,983 | 803,551 | 6.4% | 7.2% | 803,551 | – | 35.2% | 35.2% |
| Abaxis, Inc. | IQT2586525 | 182,777 | 1,280,721 | -1.7% | 6.5% | 1,281,326 | 605 | 34.5% | 34.6% |
| CombiMatrix Corporation | IQT36309071 | 8,042 | 14,271 | 26.3% | 20.0% | 14,876 | 405 | 100.5% | 98.5% |
| Affymetrix Inc. | IQT2587418 | 349,019 | 726,274 | 5.6% | 9.3% | 854,224 | 127,950 | 50.6% | 43.9% |
| Genomic Health, Inc. | IQT24111615 | 275,706 | 1,014,152 | 5.4% | 10.2% | 1,014,152 | – | 36.7% | 36.7% |
| Cepheid | IQT2599314 | 470,141 | 3,815,841 | 17.2% | 19.2% | 4,094,054 | 278,213 | 39.2% | 36.6% |
| Nanosphere, Inc. | IQT38720096 | 14,290 | 45,675 | 42.9% | 78.0% | 55,391 | 9,716 | 82.1% | 73.6% |
| GenMark Diagnostics, Inc. | IQT106626443 | 30,594 | 568,004 | 11.6% | 82.8% | 568,004 | – | 46.7% | 46.7% |
| Bio-Reference Laboratories, Inc. | IQT2594421 | 832,282 | 890,901 | 16.3% | 16.8% | 946,330 | 55,429 | 39.7% | 37.5% |

| | | | | | Upper Quartile | | | 44.7% |
| | | | | | Lower Quartile | | | 26.2% |
| | | | | | Average | | | 38.9% |
| | | | | | Median | | | 36.9% |
| | | | | | | | | |
| | | | | | Selected Asset Volatility | | | **50.0%** |

**Relevered for Subject Company Capital Structure**

| US v. Elizabeth Holmes | | $ - | $ 889,000 | NA | NA | $ 929,805 | $ 40,805 | 52.6% | 50.4% |

| | | | | | Selected Equity Volatility | | | **53.0%** |

**Notes:**
[1] Source: Capital IQ.
[2] Note: Ticker symbols beginning with IQT represent companies that have been acquired since the valuation date and necessary to access the historical data using CapitalIQ.



US v. Elizabeth Holmes     Exhibit R.3
Business Valuation     Volatility Analysis 10/15/15
As of October 15, 2015     *(thousands of USD)*

| Guideline Companies | Ticker | LTM Rev. Size | Market Capitalization | Revenue Growth 1 Year | Revenue Growth 3 Year | Enterprise Value | Debt | Equity Volatility [1] | Asset Volatility |
|---|---|---|---|---|---|---|---|---|---|
| Quest Diagnostics Incorporated | DGX | $ 7,527,000 | $ 9,197,441 | 3.0% | 0.7% | $ 12,928,441 | $ 3,731,000 | 20.7% | 15.3% |
| Enzo Biochem, Inc. | ENZ | 97,599 | 181,945 | 1.7% | -1.8% | 185,531 | 3,586 | 51.2% | 50.2% |
| Exact Sciences Corporation | EXAS | 26,521 | 713,931 | 1894.1% | 85.6% | 720,087 | 6,156 | 57.5% | 57.0% |
| Illumina, Inc. | ILMN | 2,140,593 | 21,971,248 | 23.3% | 25.3% | 23,081,349 | 1,110,101 | 37.8% | 36.0% |
| Standard BioTools Inc. | LAB | 117,480 | 266,171 | 13.1% | 33.2% | 461,797 | 195,626 | 53.0% | 38.3% |
| Laboratory Corporation of America Holdings | LH | 7,773,600 | 11,664,918 | 31.0% | 11.3% | 18,346,118 | 6,681,200 | 18.3% | 12.0% |
| Myriad Genetics, Inc. | MYGN | 737,800 | 2,711,591 | -0.9% | 12.4% | 2,711,591 | - | 40.2% | 40.2% |
| OraSure Technologies, Inc. | OSUR | 116,018 | 267,159 | 8.9% | 9.1% | 267,159 | - | 46.9% | 46.9% |
| PerkinElmer, Inc. | PKI | 2,262,633 | 5,470,749 | 1.9% | 2.8% | 6,499,125 | 1,028,376 | 22.9% | 19.5% |
| QuidelOrtho Corporation | QDEL | 205,670 | 620,241 | 22.0% | 13.6% | 766,938 | 146,697 | 32.3% | 26.4% |
| Qiagen N.V. | QGEN | 1,292,856 | 5,912,561 | -3.9% | 1.3% | 6,971,467 | 1,058,906 | 22.3% | 19.0% |
| Trinity Biotech plc | TRIB | 101,392 | 271,362 | -1.5% | 7.5% | 370,431 | 99,069 | 27.3% | 20.4% |
| Alere Inc. | IQT2622336 | 2,483,662 | 3,975,232 | -4.0% | -2.9% | 7,576,757 | 3,601,525 | 32.8% | 19.9% |
| Luminex Corporation | IQT2627430 | 235,365 | 789,484 | 5.1% | 6.5% | 789,484 | - | 33.0% | 33.0% |
| Abaxis, Inc. | IQT2586525 | 217,133 | 1,017,036 | 29.6% | 9.2% | 1,017,566 | 530 | 31.8% | 31.9% |
| CombiMatrix Corporation | IQT36309071 | 9,621 | 13,695 | 27.0% | 23.4% | 14,039 | 344 | 100.5% | 98.6% |
| Affymetrix Inc. | IQT2587418 | 357,744 | 714,389 | 2.8% | 9.0% | 839,339 | 124,950 | 45.1% | 38.9% |
| Genomic Health, Inc. | IQT24111615 | 281,451 | 715,559 | 2.2% | 7.3% | 715,559 | - | 35.8% | 35.8% |
| Cepheid | IQT2599314 | 523,099 | 2,388,029 | 15.8% | 17.9% | 2,673,435 | 285,406 | 36.7% | 32.9% |
| Nanosphere, Inc. | IQT38720096 | 18,871 | 16,632 | 44.5% | 63.3% | 32,106 | 15,474 | 81.6% | 66.3% |
| GenMark Diagnostics, Inc. | IQT106626443 | 36,051 | 353,067 | 34.0% | 40.3% | 362,861 | 9,794 | 46.6% | 45.4% |
| Bio-Reference Laboratories, Inc. | IQT2594421 | 882,467 | - | 16.1% | 14.4% | 69,849 | 69,849 | 41.4% | 20.5% |

| | | | | | | Upper Quartile | | | 44.1% |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Lower Quartile | | | 20.4% |
| | | | | | | Average | | | 36.6% |
| | | | | | | Median | | | 34.4% |
| | | | | | | | | | |
| | | | | | | Selected Asset Volatility | | | **50.0%** |

**Relevered for Subject Company Capital Structure**

| US v. Elizabeth Holmes | | $ - | $ 1,117,500 | NA | NA | $ 1,158,305 | $ 40,805 | 52.3% | 50.5% |
|---|---|---|---|---|---|---|---|---|---|

| | | | | | | Selected Equity Volatility | | **53.0%** | |
|---|---|---|---|---|---|---|---|---|---|

**Notes:**
[1] Source: Capital IQ.
[2] Note: Ticker symbols beginning with IQT represent companies that have been acquired since the valuation date and necessary to access the historical data using CapitalIQ.


HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

| US v. Elizabeth Holmes | | | | Appendix Exhibit A |
| --- | --- | --- | --- | --- |
| Valuation of Theranos, Inc. | | | | Summary of Investor Values |
| Feb 2014 - Feb 2015 | | | | *(thousands of USD)* |

| Method | Reference | Value | Implied Annual Internal Rate of Return | Implied MVIC / EBITDA Exit Multiple |
| --- | --- | --- | --- | --- |
| Investor Financing - Backsolve Method as of 2/7/14 | Appendix Exhibit C.2 | $ 1,510,000 | N/A | |
| PFM Forecast - Income Approach with Market Exit as of 2/7/14 | Appendix Exhibit E.3 | 1,490,000 | 76% | 11.60x |
| PFM Model - Income Approach as of 2/7/14 | Appendix Exhibit E.5 | 1,500,000 | 36% | |
| Investor Financing - Backsolve Method as of 12/31/14 | Appendix Exhibit D.2 | $ 2,250,000 | N/A | |
| Mosley and RDV Forecast - Income Approach with Market Exit as of 12/31/14 | Appendix Exhibit F.3 | 2,250,000 | 54% | 13.90x |
| Investor Financing - Backsolve Method as of 2/13/15 | [1] | $ 2,375,000 | N/A | |
| Murdoch Forecast - Income Approach with Market Exit as of 2/13/15 | Appendix Exhibit G.3 | 2,370,000 | 82% | 12.10x |

**Notes:**
[1] 12/31/14 Backsolve Value + $125 million additional C-2 proceeds.



US v. Elizabeth Holmes
Valuation of Theranos, Inc.
Feb 2014 - Feb 2015

Appendix Exhibit B.1
Summary of Revenue Forecasts
*(thousands of USD)*

| | 11 Mo. Ended 12/31/2014 | For the Twelve Month Period Ending December 31, | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | 2015 | 2016 | 2017 | 2018 | 2019 |
| **Management Forecasts Provided to PFM - Feb 2014 Investment** | | | | | | |
| Lab Services from US Retail Pharmacies | $ 109,000 | $ 750,000 | | | | |
| Lab Services Revenue from Physicians Offices (courier) | 72,000 | 342,000 | | | | |
| Lab Services Revenue from Hospitals (courier) | 50,000 | 225,000 | | | | |
| OnSite Services Revenue from Hospitals | – | 240,000 | | | | |
| Pharmaceuticals Services | 30,000 | 120,000 | | | | |
| **Total Revenue** | $ 261,000 | $ 1,677,000 | N/A | N/A | N/A | N/A |
| | | | | | | |
| **PFM Financial Model (Base Case) - Feb 2014 Investment** | | | | | | |
| Retail Revenue | $ 198,986 | $ 1,063,582 | $ 2,172,705 | $ 2,871,036 | $ 2,914,101 | $ 2,960,241 |
| Physicians Office Revenue | 32,571 | 222,965 | 346,500 | 388,060 | 429,660 | 469,455 |
| Hospital (Courier) Revenue | 43,313 | 134,009 | 187,511 | 192,638 | 215,754 | 238,408 |
| Hospital (OnSite) Revenue | – | 122,400 | 360,000 | 432,000 | 504,000 | 576,520 |
| Pharmaceutical Services Revenue | 30,000 | 120,000 | 170,000 | 220,000 | 270,000 | 323,386 |
| **Total Revenue** | $ 304,869 | $ 1,662,956 | $ 3,216,716 | $ 4,103,754 | $ 4,333,516 | $ 4,568,011 |
| | | | | | | |
| **Management Forecasts Provided to Daniel Mosley - Oct 2014** | | | | | | |
| Lab Services from US Retail Pharmacies | $ 42,000 | $ 470,000 | | | | |
| Lab Services Revenue from Physicians Offices | 11,000 | 161,000 | | | | |
| Lab Services Revenue from Hospitals | 47,000 | 290,000 | | | | |
| OnSite Services Revenue from Hospitals | – | 11,000 | | | | |
| Pharmaceuticals Services | 40,000 | 62,000 | | | | |
| **Total Revenue** | $ 140,000 | $ 994,000 | N/A | N/A | N/A | N/A |
| | | | | | | |
| **Management Forecasts Provided to RDV Corporation - Oct 2014** | | | | | | |
| Lab Services from US Retail Pharmacies | $ 42,000 | $ 470,000 | | | | |
| Lab Services Revenue from Physicians Offices | 11,000 | 160,000 | | | | |
| Lab Services Revenue from Hospitals | 47,000 | 290,000 | | | | |
| OnSite Services Revenue from Hospitals | – | 10,000 | | | | |
| Pharmaceuticals Services | 40,000 | 60,000 | | | | |
| **Total Revenue** | $ 140,000 | $ 990,000 | N/A | N/A | N/A | N/A |
| | | | | | | |
| **Management Forecasts Provided to Rupert Murdoch - Feb 2015** | | | | | | |
| Lab Services from US Retail Pharmacies | | $ 425,376 | $ 993,720 | | | |
| Lab Services Revenue from Physicians Offices | | 193,920 | 380,160 | | | |
| Lab Services Revenue from Hospitals | | 301,500 | 489,600 | | | |
| OnSite Services Revenue from Hospitals | | 15,000 | 20,160 | | | |
| Pharmaceuticals Services | | 58,500 | 93,600 | | | |
| **Total Revenue** | N/A | $ 994,296 | $ 1,977,240 | N/A | N/A | N/A |
| | | | | | | |
| **Management Forecasts Provided to Aranca - 9/30/13 Valuation** | | | | | | |
| **Total Revenue** | $ 89,702 | $ 112,202 | $ 131,702 | $ 143,402 | N/A | N/A |
| | | | | | | |
| **Management Forecasts Provided to Aranca - 12/15/14 Valuation** | | | | | | |
| **Total Revenue** | $ 150 | $ 113,452 | $ 223,452 | $ 323,452 | $ 503,452 | N/A |
| | | | | | | |
| **Management Forecasts Provided to Aranca - 3/25/15 Valuation** | | | | | | |
| **Total Revenue** | N/A | $ 113,452 | $ 223,452 | $ 323,452 | $ 503,452 | N/A |



HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

US v. Elizabeth Holmes — Appendix Exhibit B.2
Valuation of Theranos, Inc. — Summary of Gross Profit Forecasts
Feb 2014 - Feb 2015 — (thousands of USD)

| | 11 Mo. Ended 12/31/2014 | 2015 | For the Twelve Month Period Ending December 31, 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|
| **Management Forecasts Provided to PFM - Feb 2014 Investment** | | | | | | |
| Lab Services from US Retail Pharmacies | $ 55,000 | $ 412,000 | | | | |
| Lab Services Revenue from Physicians Offices (courier) | 50,000 | 239,000 | | | | |
| Lab Services Revenue from Hospitals (courier) | 35,000 | 157,000 | | | | |
| OnSite Services Revenue from Hospitals | - | 168,000 | | | | |
| Pharmaceuticals Services | 25,000 | 102,000 | | | | |
| **Total Gross Profit** | $ 165,000 | $ 1,078,000 | N/A | N/A | N/A | N/A |
| Margin % | 63% | 64% | | | | |
| **PFM Financial Model (Base Case) - Feb 2014 Investment** | | | | | | |
| Retail Revenue | $ 100,406 | $ 584,261 | $ 1,215,266 | $ 1,634,576 | $ 1,688,236 | $ 1,744,569 |
| Physicians Office Revenue | 22,619 | 155,815 | 242,145 | 271,202 | 300,259 | 328,069 |
| Hospital (Courier) Revenue | 30,319 | 93,508 | 116,886 | 134,418 | 150,549 | 166,356 |
| Hospital (OnSite) Revenue | - | 85,680 | 252,000 | 302,400 | 352,800 | 403,564 |
| Pharmaceutical Services Revenue | 25,000 | 102,000 | 144,500 | 187,000 | 229,500 | 274,878 |
| **Total Gross Profit** | $ 178,343 | $ 1,021,264 | $ 1,970,797 | $ 2,529,597 | $ 2,721,344 | $ 2,917,437 |
| Margin % | 58% | 61% | 61% | 62% | 63% | 64% |
| **Management Forecasts Provided to Daniel Mosley - Oct 2014** | | | | | | |
| Lab Services from US Retail Pharmacies | $ 26,000 | $ 282,000 | | | | |
| Lab Services Revenue from Physicians Offices | 7,000 | 97,000 | | | | |
| Lab Services Revenue from Hospitals | 33,000 | 203,000 | | | | |
| OnSite Services Revenue from Hospitals | - | 8,000 | | | | |
| Pharmaceuticals Services | 35,000 | 50,000 | | | | |
| **Total Gross Profit** | $ 101,000 | $ 640,000 | N/A | N/A | N/A | N/A |
| Margin % | 72% | 64% | | | | |
| **Management Forecasts Provided to RDV Corporation - Oct 2014** | | | | | | |
| Lab Services from US Retail Pharmacies | $ 26,000 | $ 282,000 | | | | |
| Lab Services Revenue from Physicians Offices | 7,000 | 96,000 | | | | |
| Lab Services Revenue from Hospitals | 33,000 | 203,000 | | | | |
| OnSite Services Revenue from Hospitals | - | 7,000 | | | | |
| Pharmaceuticals Services | 35,000 | 48,000 | | | | |
| **Total Gross Profit** | $ 101,000 | $ 636,000 | N/A | N/A | N/A | N/A |
| Margin % | 72% | 64% | | | | |
| **Management Forecasts Provided to Rupert Murdoch - Feb 2015** | | | | | | |
| Lab Services from US Retail Pharmacies | | $ 255,226 | $ 645,918 | | | |
| Lab Services Revenue from Physicians Offices | | 135,744 | 285,120 | | | |
| Lab Services Revenue from Hospitals | | 211,050 | 342,720 | | | |
| OnSite Services Revenue from Hospitals | | 10,500 | 14,112 | | | |
| Pharmaceuticals Services | | 46,800 | 74,880 | | | |
| **Total Gross Profit** | N/A | $ 659,320 | $ 1,362,750 | N/A | N/A | N/A |
| Margin % | | 66% | 69% | | | |
| **Management Forecasts Provided to Aranca - 9/30/13 Valuation** | | | | | | |
| **Total Gross Profit** | $ 77,478 | $ 95,978 | $ 108,151 | $ 118,159 | N/A | N/A |
| Margin % | 86% | 86% | 82% | 82% | | |
| **Management Forecasts Provided to Aranca - 12/15/14 Valuation** | | | | | | |
| **Total Gross Profit** | $ 97 | $ 73,744 | $ 151,947 | $ 219,947 | $ 352,416 | N/A |
| Margin % | 65% | 65% | 68% | 68% | 70% | |
| **Management Forecasts Provided to Aranca - 3/25/15 Valuation** | | | | | | |
| **Total Gross Profit** | N/A | $ 73,744 | $ 151,947 | $ 219,947 | $ 352,416 | N/A |
| Margin % | | 65% | 68% | 68% | 70% | |


HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

**US v. Elizabeth Holmes**           **Appendix Exhibit B.3**
Valuation of Theranos, Inc.           Summary of EBITDA Forecasts
Feb 2014 - Feb 2015           *(thousands of USD)*

| | | For the Twelve Month Period Ending December 31, | | | | |
|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
| **Management Forecasts Provided to PFM - Feb 2014 Investment** | | | | | | |
| Total EBITDA | $ (36,000) | $ 408,000 | N/A | N/A | N/A | N/A |
| Margin % | -14% | 24% | | | | |
| **PFM Financial Model (Base Case) - Feb 2014 Investment** | | | | | | |
| Total EBITDA | $ (22,657) | $ 351,264 | $ 1,146,797 | $ 1,623,197 | $ 1,758,932 | $ 1,895,357 |
| Margin % | -7% | 21% | 36% | 40% | 41% | 41% |
| **Management Forecasts Provided to Daniel Mosley - Oct 2014** | | | | | | |
| Total EBITDA | $ (1,000) | $ 241,000 | N/A | N/A | N/A | N/A |
| Margin % | -1% | 24% | | | | |
| **Management Forecasts Provided to RDV Corporation - Oct 2014** | | | | | | |
| Total EBITDA | $ (1,000) | $ 237,000 | N/A | N/A | N/A | N/A |
| Margin % | -1% | 24% | | | | |
| **Management Forecasts Provided to Rupert Murdoch - Feb 2015** | | | | | | |
| Total EBITDA | N/A | $ 338,411 | $ 861,192 | N/A | N/A | N/A |
| Margin % | | 34% | 44% | | | |
| **Management Forecasts Provided to Aranca - 9/30/13 Valuation** | | | | | | |
| Total EBITDA | $ 8,827 | $ 22,566 | $ 31,850 | $ 38,793 | N/A | N/A |
| Margin % | 10% | 20% | 24% | 27% | | |
| **Management Forecasts Provided to Aranca - 12/15/14 Valuation** | | | | | | |
| Total EBITDA | $ (99,934) | $ (23,281) | $ 51,986 | $ 110,970 | $ 228,015 | N/A |
| Margin % | -66623% | -21% | 23% | 34% | 45% | |
| **Management Forecasts Provided to Aranca - 3/25/15 Valuation** | | | | | | |
| Total Gross Profit | N/A | $ (23,137) | $ 52,183 | $ 111,167 | $ 228,212 | N/A |
| Margin % | | -20% | 23% | 34% | 45% | |



| US v. Elizabeth Holmes | Appendix Exhibit C.1 |
|---|---|
| Valuation of Theranos, Inc. | Backsolve Method Value Summary 2/7/14 |
| As of February 7, 2014 | *(thousands of USD, except Per Share Value)* |

|  | Ref. | Fair Market Value |
|---|---|---|
| Indicated Value – 100% Controlling, Marketable Interest Basis | Appendix Exhibit C.3 | $ 1,510,461 |
| Indicated Value – 100% Controlling, Marketable Interest Basis (rounded) |  | $ 1,510,000 |

**Per Share Value**

| Share Classes | Shares Outstanding | Present Value Marketable | Present Value Per Share Marketable |
|---|---|---|---|
| Preferred Shares |  |  |  |
| Series A @ $0.150 | 46,320,045 | $ 109,791,828 | $ 2.37 |
| Series B @ $0.1846 | 54,162,965 | 129,749,930 | 2.40 |
| Series C @ $0.564 | 58,896,105 | 161,956,174 | 2.75 |
| Series C-1 @ $3.00 | 25,175,001 | 122,398,158 | 4.86 |
| Series C-1 @ $15.00 | 7,500,032 | 114,495,374 | 15.27 |
| Series C-2 @ $17.00 | 9,669,998 | 164,389,966 | 17.00 |
| Total Preferred Shares | 201,724,146 | 802,781,429 |  |
| Warrants on Common |  |  |  |
| Exercise Price @ $0.072 | 741,665 | 1,616,109 | 2.18 |
| Common - Outstanding | 302,640,465 | 684,230,716 | 2.26 |
| Options on Common |  |  |  |
| Exercise Price @ $0.015 | 350,000 | 787,519 | 2.25 |
| Exercise Price @ $0.030 | 1,227,125 | 2,742,677 | 2.24 |
| Exercise Price @ $0.066 | 552,500 | 1,216,223 | 2.20 |
| Exercise Price @ $0.072 | 3,092,715 | 6,739,113 | 2.18 |
| Exercise Price @ $0.094 | 312,500 | 670,277 | 2.14 |
| Exercise Price @ $0.170 | 3,990,167 | 8,264,639 | 2.07 |
| Exercise Price @ $0.206 | 703,195 | 1,411,858 | 2.01 |
| Total Options Outstanding | 10,228,202 | 21,832,305 |  |
| **Total Outstanding** | **515,334,478** | **$ 1,510,460,559** |  |



US v. Elizabeth Holmes — **Appendix Exhibit C.2**
Valuation of Theranos, Inc. — Backsolve Method 2/7/14 - Step 1
As of February 7, 2014 — (USD)

**Break Point Calculation**

| Share Class | Number of Shares | Series C, C-1, C-2 Liq. Preference | Series A, B Liq. Preference | $0.015 Options Exercise | $0.03 Options Exercise | $0.066 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.094 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise |
|---|---|---|---|---|---|---|---|---|---|---|
| Break Point → | | | | $0.015 | $0.030 | $0.066 | $0.072 | $0.094 | $0.170 | $0.206 |
| **Preferred Share Classes** | | | | | | | | | | |
| Series A @ $0.150 | 46,320,045 | $ - | $ 6,948,007 | $ 7,842,807 | $ 9,032,409 | $ 12,089,532 | $ 15,424,575 | $ 19,778,659 | $ 27,653,067 | $ 37,191,996 |
| Series B @ $0.1846 | 54,162,965 | - | 10,000,000 | 10,812,444 | 12,437,333 | 16,012,089 | 19,911,822 | 25,003,141 | 34,210,845 | 45,368,416 |
| Series C @ $0.564 | 58,896,105 | 33,217,403 | 33,217,403 | 34,100,845 | 35,867,728 | 39,754,871 | 43,989,390 | 49,531,624 | 59,543,982 | 71,676,560 |
| Series C-1 @ $3.00 | 25,175,001 | 75,525,003 | 75,525,003 | 75,902,628 | 76,657,878 | 78,319,428 | 80,132,028 | 82,498,478 | 88,778,228 | 91,964,279 |
| Series C-1 @ $15.00 | 7,500,032 | 112,500,480 | 112,500,480 | 112,812,980 | 112,837,981 | 113,332,984 | 113,872,986 | 114,577,989 | 115,852,994 | 117,398,001 |
| Series C-2 @ $17.00 | 9,669,998 | 164,389,966 | 164,389,966 | 164,535,016 | 164,825,116 | 165,463,336 | 166,159,576 | 167,068,555 | 168,712,455 | 170,704,475 |
| **Warrants on Common** | | | | | | | | | | |
| Exercise Price @ $0.072 | 741,665 | - | - | - | - | - | - | 16,317 | 72,683 | 99,383 |
| **Common** | 302,640,465 | - | - | 4,539,607 | 9,079,214 | 19,974,271 | 21,790,113 | 28,448,204 | 51,448,879 | 62,343,936 |
| **Options on Common** | | | | | | | | | | |
| Exercise Price @ $0.015 | 350,000 | - | - | - | 5,250 | 17,850 | 19,950 | 27,650 | 54,250 | 66,850 |
| Exercise Price @ $0.030 | 1,227,125 | - | - | - | - | 44,177 | 51,539 | 78,535 | 171,798 | 215,974 |
| Exercise Price @ $0.066 | 552,500 | - | - | - | - | - | 3,315 | 15,470 | 57,460 | 77,350 |
| Exercise Price @ $0.072 | 3,092,715 | - | - | - | - | - | - | 68,040 | 303,086 | 414,424 |
| Exercise Price @ $0.094 | 312,500 | - | - | - | - | - | - | - | 23,750 | 35,000 |
| Exercise Price @ $0.170 | 3,990,167 | - | - | - | - | - | - | - | - | 143,646 |
| Exercise Price @ $0.206 | 703,195 | - | - | - | - | - | - | - | - | - |
| | 515,334,478 | 385,632,852 | 402,580,859 | 410,146,328 | 420,742,909 | 445,008,536 | 461,361,295 | 487,112,663 | 544,883,458 | 597,703,289 |

| | Series C, C-1, C-2 Liq. Preference | Series A, B Liq. Preference | $0.015 Options Exercise | $0.03 Options Exercise | $0.066 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.094 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise |
|---|---|---|---|---|---|---|---|---|---|
| **Inputs** | | | | | | | | | |
| Stock Price Now | $ 1,510,460,559 | $ 1,510,460,559 | $ 1,510,460,559 | $ 1,510,460,559 | $ 1,510,460,559 | $ 1,510,460,559 | $ 1,510,460,559 | $ 1,510,460,559 | $ 1,510,460,559 |
| Volatility | 55.0% | 55.0% | 55.0% | 55.0% | 55.0% | 55.0% | 55.0% | 55.0% | 55.0% |
| Riskfree Rate - Annual | 1.07% | 1.07% | 1.07% | 1.07% | 1.07% | 1.07% | 1.07% | 1.07% | 1.07% |
| Exercise Price | $ 0.00 | $ 385,632,852 | $ 402,580,859 | $ 410,146,328 | $ 420,742,909 | $ 445,008,536 | $ 461,361,295 | $ 487,112,663 | $ 544,883,458 | $ 597,703,289 |
| Time To Maturity - Years | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 |
| **Outputs** | | | | | | | | | |
| d1 | 38.64 | 1.83 | 1.79 | 1.77 | 1.75 | 1.70 | 1.67 | 1.62 | 1.52 | 1.43 |
| d2 | 37.54 | 0.73 | 0.69 | 0.67 | 0.65 | 0.60 | 0.57 | 0.52 | 0.42 | 0.33 |
| N(d1) | 1.000 | 0.966 | 0.963 | 0.962 | 0.960 | 0.955 | 0.952 | 0.947 | 0.935 | 0.924 |
| N(d2) | 1.000 | 0.767 | 0.755 | 0.750 | 0.742 | 0.726 | 0.715 | 0.698 | 0.661 | 0.630 |
| Call Price (V_c) | $ 1,510,460,559 | $ 1,176,113,924 | $ 1,163,751,179 | $ 1,158,295,777 | $ 1,150,719,580 | $ 1,133,651,949 | $ 1,122,367,229 | $ 1,104,943,328 | $ 1,067,342,573 | $ 1,034,676,463 |
| -d1 | -38.642 | -1.830 | -1.791 | -1.774 | -1.751 | -1.700 | -1.667 | -1.616 | -1.516 | -1.432 |
| -d2 | -37.542 | -0.730 | -0.691 | -0.674 | -0.651 | -0.600 | -0.567 | -0.518 | -0.416 | -0.332 |
| N(-d1) | 0.000 | 0.034 | 0.037 | 0.038 | 0.040 | 0.045 | 0.048 | 0.053 | 0.065 | 0.076 |
| N(-d2) | 0.000 | 0.233 | 0.245 | 0.250 | 0.258 | 0.274 | 0.285 | 0.302 | 0.339 | 0.370 |
| Put Price (P_a) | $ - | $ 35,203,257 | $ 39,081,695 | $ 40,876,242 | $ 43,454,692 | $ 49,640,681 | $ 54,026,722 | $ 61,280,217 | $ 79,040,906 | $ 96,991,757 |
| **Fair Market Value** | $ 1,510,460,559 | $ 1,176,113,924 | $ 1,163,751,179 | $ 1,158,295,777 | $ 1,150,719,580 | $ 1,133,651,949 | $ 1,122,367,229 | $ 1,104,943,328 | $ 1,067,342,573 | $ 1,034,676,463 |



HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

US v. Elizabeth Holmes
Valuation of Theranos, Inc.
As of February 7, 2014

Appendix Exhibit C.2
Backsolve Method 2/7/14 - Step 2
(USD)

| | Series C, C-1, C-2 Liq. Preference | Series A, B Liq. Preference | $0.015 Options Exercise | $0.03 Options Exercise | $0.066 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.094 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise | All Classes Participate |
|---|---|---|---|---|---|---|---|---|---|---|
| High call option | $ 1,510,402,559 | $ 1,178,113,924 | $ 1,183,751,178 | $ 1,158,285,277 | $ 1,150,710,580 | $ 1,133,651,949 | $ 1,122,367,229 | $ 1,104,943,326 | $ 1,067,342,573 | $ 1,034,676,463 |
| Less low call option | 1,176,113,924 | 1,183,751,178 | 1,158,285,277 | 1,150,710,580 | 1,133,651,949 | 1,122,367,229 | 1,104,943,326 | 1,067,342,573 | 1,034,676,463 | |
| Total Value to Allocate | $ 334,346,635 | $ 12,362,745 | $ 5,455,402 | $ 7,576,197 | $ 17,067,632 | $ 11,284,720 | $ 17,423,903 | $ 37,600,753 | $ 32,666,109 | $ 1,034,676,463 |

**Preferred Share Classes**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Series A @ $0.150 | - | 8,948,007 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 49,330,045 | 46,330,045 |
| Series B @ $0.1646 | - | 10,000,000 | 54,162,965 | 54,162,965 | 54,162,965 | 54,162,965 | 54,162,965 | 54,162,965 | 54,162,965 | 54,162,965 |
| Series C @ $0.564 | 33,217,403 | - | 58,696,105 | 58,696,105 | 58,696,105 | 58,696,105 | 58,696,105 | 58,696,105 | 58,696,105 | 58,696,105 |
| Series C-1 @ $3.00 | 75,525,003 | - | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 |
| Series C-1 @ $15.00 | 112,500,480 | - | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 |
| Series C-2 @ $17.00 | 164,389,988 | - | 9,689,998 | 9,089,998 | 9,689,998 | 9,689,998 | 9,689,998 | 9,689,998 | 9,689,998 | 9,689,998 |

**Warrants on Common**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Exercise Price @ $0.072 | - | - | - | - | - | - | 741,665 | 741,665 | 741,665 | 741,665 |

| Common | - | - | 302,640,465 | 302,640,465 | 302,640,465 | 302,640,465 | 302,640,465 | 302,640,465 | 302,640,465 | 302,640,465 |

**Options on Common**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Exercise Price @ $0.015 | - | - | - | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 |
| Exercise Price @ $0.030 | - | - | - | - | 1,227,125 | 1,227,125 | 1,227,125 | 1,227,125 | 1,227,125 | 1,227,125 |
| Exercise Price @ $0.066 | - | - | - | - | - | 552,500 | 552,500 | 552,500 | 552,500 | 552,500 |
| Exercise Price @ $0.072 | - | - | - | - | - | - | 3,092,715 | 3,092,715 | 3,092,715 | 3,092,715 |
| Exercise Price @ $0.094 | - | - | - | - | - | - | - | 312,500 | 312,500 | 312,500 |
| Exercise Price @ $0.170 | - | - | - | - | - | - | - | - | 3,990,167 | 3,990,167 |
| Exercise Price @ $0.206 | - | - | - | - | - | - | - | - | - | 703,185 |
| | 385,632,652 | 18,948,007 | 504,364,611 | 504,714,611 | 505,941,736 | 506,494,236 | 510,328,616 | 510,641,116 | 514,631,283 | 515,334,478 |

**Distribution Percentage**

Preferred Share Classes

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Series A @ $0.150 | 0.0% | 41.0% | 9.2% | 9.2% | 9.2% | 9.1% | 9.1% | 9.1% | 9.0% | 9.0% |
| Series B @ $0.1646 | 0.0% | 59.0% | 10.7% | 10.7% | 10.7% | 10.7% | 10.6% | 10.6% | 10.5% | 10.5% |
| Series C @ $0.564 | 8.6% | 0.0% | 11.7% | 11.7% | 11.6% | 11.6% | 11.5% | 11.5% | 11.4% | 11.4% |
| Series C-1 @ $3.00 | 19.6% | 0.0% | 5.0% | 5.0% | 5.0% | 5.0% | 4.9% | 4.9% | 4.9% | 4.9% |
| Series C-1 @ $15.00 | 29.2% | 0.0% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% |
| Series C-2 @ $17.00 | 42.6% | 0.0% | 1.9% | 1.9% | 1.9% | 1.9% | 1.9% | 1.9% | 1.9% | 1.9% |

**Warrants on Common**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Exercise Price @ $0.072 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% |

| Common | 0.0% | 0.0% | 60.0% | 60.0% | 59.8% | 59.8% | 59.3% | 59.3% | 58.8% | 58.7% |

**Options on Common**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Exercise Price @ $0.015 | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% |
| Exercise Price @ $0.030 | 0.0% | 0.0% | 0.0% | 0.0% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% |
| Exercise Price @ $0.066 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% |
| Exercise Price @ $0.072 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.6% | 0.6% | 0.6% | 0.6% |
| Exercise Price @ $0.094 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% |
| Exercise Price @ $0.170 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.8% | 0.8% |
| Exercise Price @ $0.206 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% |
| | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

**Allocation of Value**

Preferred Share Classes

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Series A @ $0.150 | $ - | $ 5,068,232 | $ 501,015 | $ 695,303 | $ 1,562,578 | $ 1,032,013 | $ 1,581,483 | $ 3,410,749 | $ 2,940,155 | $ 93,000,299 |
| Series B @ $0.1646 | - | 7,294,513 | 585,847 | 813,032 | 1,827,154 | 1,206,754 | 1,840,260 | 3,989,258 | 3,437,882 | 108,747,129 |
| Series C @ $0.564 | 28,799,743 | - | 637,043 | 884,081 | 1,986,824 | 1,312,208 | 2,010,861 | 4,336,779 | 3,738,418 | 118,250,217 |
| Series C-1 @ $3.00 | 65,483,786 | - | 272,302 | 377,899 | 849,263 | 560,900 | 859,538 | 1,853,746 | 1,597,929 | 50,545,776 |
| Series C-1 @ $15.00 | 97,538,777 | - | 81,123 | 112,562 | 253,009 | 167,101 | 256,070 | 552,280 | 476,053 | 15,058,368 |
| Series C-2 @ $17.00 | 142,527,359 | - | 104,594 | 145,155 | 326,211 | 215,448 | 330,158 | 712,045 | 613,801 | 19,415,195 |

**Warrants on Common**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Exercise Price @ $0.072 | - | - | - | - | - | - | 25,322 | 54,812 | 47,077 | 1,468,008 |

| Common | - | - | 3,273,476 | 4,542,862 | 10,209,389 | 6,742,848 | 10,332,907 | 22,284,750 | 19,210,038 | 607,634,419 |

**Options on Common**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Exercise Price @ $0.015 | - | - | - | 5,254 | 11,807 | 7,798 | 11,950 | 25,772 | 22,216 | 702,722 |
| Exercise Price @ $0.030 | - | - | - | - | 41,386 | 27,340 | 41,897 | 90,359 | 77,891 | 2,463,763 |
| Exercise Price @ $0.066 | - | - | - | - | - | 12,310 | 18,864 | 40,693 | 35,070 | 1,109,297 |
| Exercise Price @ $0.072 | - | - | - | - | - | - | 105,593 | 227,730 | 196,309 | 6,209,481 |
| Exercise Price @ $0.094 | - | - | - | - | - | - | - | 23,011 | 19,836 | 627,430 |
| Exercise Price @ $0.170 | - | - | - | - | - | - | - | - | 253,275 | 8,011,364 |
| Exercise Price @ $0.206 | - | - | - | - | - | - | - | - | - | 1,411,858 |
| | $ 334,346,635 | $ 12,362,745 | $ 5,455,402 | $ 7,576,197 | $ 17,067,632 | $ 11,284,720 | $ 17,423,903 | $ 37,600,753 | $ 32,666,109 | $ 1,034,676,463 |

| Share Class | Number of Shares | Total Value | Per Share Marketable |
|---|---|---|---|
| **Preferred Share Classes** | | | |
| Series A @ $0.150 | 46,330,045 | $ 109,791,828 | $ 2.37 |
| Series B @ $0.1646 | 54,162,965 | 129,749,930 | 2.40 |
| Series C @ $0.564 | 58,696,105 | 161,996,174 | 2.75 |
| Series C-1 @ $3.00 | 25,175,001 | 123,398,156 | 4.86 |
| Series C-1 @ $15.00 | 7,500,032 | 114,485,374 | 15.27 |
| **Series C-2 @ $17.00** | **9,689,998** | **164,389,966** | **17.00** |
| **Warrants on Common** | | | |
| Exercise Price @ $0.072 | 741,665 | 1,816,109 | 2.18 |


HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

**US v. Elizabeth Holmes**    **Appendix Exhibit D.1**

Valuation of Theranos, Inc.   Backsolve Method Value Summary 12/31/14

As of December 31, 2014   *(thousands of USD, except Per Share Value)*

| | Ref. | Fair Market Value |
|---|---|---|
| Indicated Value – 100% Controlling, Marketable Interest Basis | Appendix Exhibit D.3 | $ 2,247,529 |
| Indicated Value – 100% Controlling, Marketable Interest Basis (rounded) | | $ 2,250,000 |

**Per Share Value**

| Share Classes | Shares Outstanding | Present Value Marketable | Present Value Per Share Marketable |
|---|---|---|---|
| **Preferred Shares** | | | |
| Series A @ $0.150 | 46,320,045 | $ 141,823,753 | $ 3.06 |
| Series B @ $0.1846 | 54,134,965 | 166,985,536 | 3.08 |
| Series C @ $0.564 | 58,896,105 | 201,942,073 | 3.43 |
| Series C-1 @ $3.00 | 25,175,001 | 136,956,824 | 5.44 |
| Series C-1 @ $15.00 | 7,500,032 | 115,114,977 | 15.35 |
| Series C-2 @ $17.00 | 32,808,227 | 557,739,835 | 17.00 |
| Total Preferred Shares | 224,834,375 | 1,320,562,999 | |
| **Warrants on Common** | | | |
| Exercise Price @ $0.072 | 741,665 | 2,140,841 | 2.89 |
| Common – Outstanding | 302,965,725 | 897,714,632 | 2.96 |
| **Options on Common** | | | |
| Exercise Price @ $0.015 | 350,000 | 1,033,652 | 2.95 |
| Exercise Price @ $0.030 | 1,170,875 | 3,441,670 | 2.94 |
| Exercise Price @ $0.066 | 547,500 | 1,592,180 | 2.91 |
| Exercise Price @ $0.072 | 2,579,175 | 7,444,876 | 2.89 |
| Exercise Price @ $0.094 | 312,500 | 891,811 | 2.85 |
| Exercise Price @ $0.170 | 3,972,457 | 11,056,985 | 2.78 |
| Exercise Price @ $0.206 | 606,365 | 1,649,600 | 2.72 |
| Total Options Outstanding | 9,538,872 | 27,110,774 | |
| **Total Outstanding** | 538,080,637 | $ 2,247,529,245 | |



US v. Elizabeth Holmes
Valuation of Theranos, Inc.
As of December 31, 2014

Appendix Exhibit D.2
Backsolve Method 12/31/14 - Step 1
(USD)

**Break Point Calculation**

| Share Class | Number of Shares | Series C, C-1, C-2 Liq. Preference | Series A, B Liq. Preference | $0.015 Options Exercise | $0.03 Options Exercise | $0.066 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.094 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise |
|---|---|---|---|---|---|---|---|---|---|---|
| | | $0.015 | $0.030 | $0.066 | $0.072 | $0.094 | $0.170 | $0.206 |
| **Preferred Share Classes** | | | | | | | | | | |
| Series A @ $0.150 | 46,320,045 | $ - | $ 5,948,007 | $ 7,642,807 | $ 9,032,409 | $ 12,089,532 | $ 15,424,575 | $ 19,778,659 | $ 27,653,067 | $ 37,194,996 |
| Series B @ $0.1646 | 54,134,965 | - | 9,994,830 | 10,806,855 | 12,430,904 | 16,003,811 | 19,901,529 | 24,990,218 | 34,193,160 | 45,344,962 |
| Series C @ $0.564 | 58,896,105 | 33,217,403 | 33,217,403 | 34,100,845 | 35,867,728 | 39,754,871 | 43,695,360 | 49,531,624 | 59,543,962 | 71,676,560 |
| Series C-1 @ $3.00 | 25,175,001 | 75,525,003 | 75,525,003 | 75,902,628 | 76,657,878 | 78,319,428 | 80,132,028 | 82,498,478 | 86,778,228 | 91,964,279 |
| Series C-1 @ $15.00 | 7,500,032 | 112,500,480 | 112,500,480 | 112,612,980 | 112,837,981 | 113,332,984 | 113,872,986 | 114,577,989 | 115,852,994 | 117,398,001 |
| Series C-2 @ $17.00 | 32,808,227 | 557,739,859 | 557,739,859 | 558,231,982 | 559,216,229 | 561,381,572 | 563,743,765 | 566,827,738 | 572,405,138 | 579,163,631 |
| **Warrants on Common** | | | | | | | | | | |
| Exercise Price @ $0.072 | 741,665 | - | - | - | - | - | - | 16,317 | 72,683 | 99,383 |
| **Common** | 302,965,725 | - | - | 4,544,486 | 9,088,972 | 19,995,738 | 21,813,532 | 28,476,776 | 51,504,173 | 62,410,939 |
| **Options on Common** | | | | | | | | | | |
| Exercise Price @ $0.015 | 350,000 | - | - | - | 5,250 | 17,850 | 19,950 | 27,650 | 54,250 | 66,850 |
| Exercise Price @ $0.030 | 1,170,875 | - | - | - | - | 42,152 | 49,177 | 74,936 | 163,923 | 206,074 |
| Exercise Price @ $0.066 | 547,500 | - | - | - | - | - | 3,285 | 15,330 | 56,940 | 76,650 |
| Exercise Price @ $0.072 | 2,579,175 | - | - | - | - | - | - | 56,742 | 252,759 | 345,609 |
| Exercise Price @ $0.094 | 312,500 | - | - | - | - | - | - | - | 23,750 | 35,000 |
| Exercise Price @ $0.170 | 3,972,457 | - | - | - | - | - | - | - | - | 143,008 |
| Exercise Price @ $0.206 | 606,365 | - | - | - | - | - | - | - | - | - |
| | 538,080,637 | 778,982,745 | 795,925,582 | 803,842,584 | 815,137,351 | 840,937,937 | 858,956,217 | 886,874,457 | 948,555,026 | 1,006,125,944 |

| | Series C, C-1, C-2 Liq. Preference | Series A, B Liq. Preference | $0.015 Options Exercise | $0.03 Options Exercise | $0.066 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.094 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise |
|---|---|---|---|---|---|---|---|---|---|
| **Inputs** | | | | | | | | | |
| Stock Price Now | $ 2,247,529,245 | $ 2,247,529,245 | $ 2,247,529,245 | $ 2,247,529,245 | $ 2,247,529,245 | $ 2,247,529,245 | $ 2,247,529,245 | $ 2,247,529,245 | $ 2,247,529,245 |
| Volatility | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% |
| Riskfree Rate - Annual | 1.38% | 1.38% | 1.38% | 1.38% | 1.38% | 1.38% | 1.38% | 1.38% | 1.38% |
| Exercise Price | $ 0.00 | $ 778,982,745 | $ 795,925,582 | $ 803,842,584 | $ 815,137,351 | $ 840,937,937 | $ 858,956,217 | $ 886,874,457 | $ 948,555,026 | $ 1,006,125,944 |
| Time To Maturity - Years | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 |
| **Outputs** | | | | | | | | | |
| d1 | 40.45 | 1.58 | 1.56 | 1.55 | 1.54 | 1.51 | 1.49 | 1.46 | 1.40 | 1.34 |
| d2 | 39.39 | 0.52 | 0.50 | 0.49 | 0.48 | 0.45 | 0.43 | 0.40 | 0.34 | 0.28 |
| N(d1) | 1.000 | 0.943 | 0.941 | 0.940 | 0.938 | 0.934 | 0.932 | 0.928 | 0.919 | 0.910 |
| N(d2) | 1.000 | 0.699 | 0.692 | 0.689 | 0.684 | 0.673 | 0.668 | 0.655 | 0.631 | 0.610 |
| Call Price (V_c) | $ 2,247,529,245 | $ 1,604,322,756 | $ 1,593,170,677 | $ 1,587,998,486 | $ 1,580,662,164 | $ 1,564,089,715 | $ 1,552,667,500 | $ 1,535,211,428 | $ 1,497,662,065 | $ 1,463,834,334 |
| -d1 | -40.446 | -1.582 | -1.561 | -1.552 | -1.539 | -1.509 | -1.489 | -1.459 | -1.396 | -1.340 |
| -d2 | -39.386 | -0.522 | -0.501 | -0.492 | -0.479 | -0.449 | -0.429 | -0.399 | -0.336 | -0.280 |
| N(-d1) | 0.000 | 0.057 | 0.059 | 0.060 | 0.062 | 0.066 | 0.068 | 0.072 | 0.081 | 0.090 |
| N(-d2) | 0.000 | 0.301 | 0.308 | 0.311 | 0.316 | 0.327 | 0.334 | 0.345 | 0.369 | 0.390 |
| Put Price (P_d) | $ - | $ 94,089,110 | $ 98,973,174 | $ 101,294,307 | $ 104,648,315 | $ 112,495,738 | $ 118,127,957 | $ 127,095,084 | $ 147,926,065 | $ 168,568,351 |
| **Fair Market Value** | $ 2,247,529,245 | $ 1,604,322,756 | $ 1,593,170,677 | $ 1,587,998,486 | $ 1,580,662,164 | $ 1,564,089,715 | $ 1,552,667,500 | $ 1,535,211,428 | $ 1,497,662,068 | $ 1,463,834,334 |


HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

US v. Elizabeth Holmes
Valuation of Theranos, Inc.
As of December 31, 2014

Appendix Exhibit D.3
Backsolve Method 12/31/14 - Step 2
(USD)

| | Series C, C-1, C-2 Liq. Preference | Series A, B Liq. Preference | $0.015 Options Exercise | $0.03 Options Exercise | $0.066 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.084 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise | All Classes Participate |
|---|---|---|---|---|---|---|---|---|---|---|
| High call option | $ 2,247,529,245 | $ 1,604,322,756 | $ 1,593,170,677 | $ 1,587,986,486 | $ 1,580,662,164 | $ 1,564,089,715 | $ 1,552,687,500 | $ 1,535,211,428 | $ 1,497,662,068 | $ 1,463,834,334 |
| Less low call option | 1,604,322,756 | 1,593,170,677 | 1,587,986,486 | 1,580,662,164 | 1,564,089,715 | 1,552,687,500 | 1,535,211,428 | 1,497,662,068 | 1,463,834,334 | |
| Total Value to Allocate | $ 643,206,489 | $ 11,152,079 | $ 5,172,191 | $ 7,336,322 | $ 16,572,449 | $ 11,422,215 | $ 17,456,072 | $ 37,549,362 | $ 33,827,732 | $ 1,463,834,334 |

Preferred Share Classes
| Series A @ $0.150 | | 6,948,007 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 |
| Series B @ $0.1846 | | 9,994,830 | 54,134,965 | 54,134,965 | 54,134,965 | 54,134,965 | 54,134,965 | 54,134,965 | 54,134,965 | 54,134,965 |
| Series C @ $0.564 | 53,217,403 | – | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 |
| Series C-1 @ $3.00 | 75,525,003 | – | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 |
| Series C-1 @ $15.00 | 112,500,460 | – | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 |
| Series C-2 @ $17.00 | 557,739,899 | – | 32,808,227 | 32,808,227 | 32,808,227 | 32,808,227 | 32,808,227 | 32,808,227 | 32,808,227 | 32,808,227 |

Warrants on Common
| Exercise Price @ $0.072 | | | | | | 1 | 741,685 | 741,685 | 741,685 | 741,685 |

| Common | – | – | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 |

Options on Common
| Exercise Price @ $0.015 | – | – | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 |
| Exercise Price @ $0.030 | – | – | | 1,170,875 | 1,170,875 | 1,170,875 | 1,170,875 | 1,170,875 | 1,170,875 | 1,170,875 |
| Exercise Price @ $0.066 | – | – | | | 547,500 | 547,500 | 547,500 | 547,500 | 547,500 | 547,500 |
| Exercise Price @ $0.072 | – | – | | | | 2,579,175 | 2,579,175 | 2,579,175 | 2,579,175 | 2,579,175 |
| Exercise Price @ $0.094 | – | – | | | | | 312,500 | 312,500 | 312,500 | 312,500 |
| Exercise Price @ $0.170 | – | – | | | | | | 3,572,457 | 3,572,457 | 3,572,457 |
| Exercise Price @ $0.206 | | | | | | | | | 606,365 | 606,365 |
| | 776,982,745 | 16,942,837 | 527,600,100 | 528,150,100 | 529,520,975 | 529,868,475 | 533,189,315 | 533,501,615 | 537,474,272 | 538,080,637 |

Distribution Percentage
Preferred Share Classes
| Series A @ $0.150 | 0.0% | 41.0% | 9.8% | 8.8% | 8.6% | 8.7% | 8.7% | 8.7% | 8.6% | 8.6% |
| Series B @ $0.1846 | 0.0% | 59.0% | 10.3% | 10.2% | 10.2% | 10.2% | 10.2% | 10.1% | 10.1% | 10.1% |
| Series C @ $0.564 | 4.3% | 0.0% | 11.2% | 11.2% | 11.1% | 11.1% | 11.0% | 11.0% | 11.0% | 10.9% |
| Series C-1 @ $3.00 | 9.7% | 0.0% | 4.8% | 4.8% | 4.8% | 4.8% | 4.7% | 4.7% | 4.7% | 4.7% |
| Series C-1 @ $15.00 | 14.4% | 0.0% | 1.4% | 1.4% | 1.4% | 1.4% | 1.4% | 1.4% | 1.4% | 1.4% |
| Series C-2 @ $17.00 | 71.9% | 0.0% | 6.2% | 6.2% | 6.2% | 6.2% | 6.2% | 6.1% | 6.1% | 6.1% |

Warrants on Common
| Exercise Price @ $0.072 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% |

| Common | 0.0% | 0.0% | 57.4% | 57.4% | 57.2% | 57.2% | 56.8% | 56.8% | 56.4% | 56.3% |

Options on Common
| Exercise Price @ $0.015 | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% |
| Exercise Price @ $0.030 | 0.0% | 0.0% | 0.0% | 0.0% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% |
| Exercise Price @ $0.066 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% |
| Exercise Price @ $0.072 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.5% | 0.5% | 0.5% | 0.5% |
| Exercise Price @ $0.094 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% |
| Exercise Price @ $0.170 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.7% | 0.7% |
| Exercise Price @ $0.206 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% |
| | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

Allocation of Value
Preferred Share Classes
| Series A @ $0.150 | $ – | $ 4,573,301 | $ 453,915 | $ 643,413 | $ 1,450,229 | $ 998,507 | $ 1,516,471 | $ 3,260,135 | $ 2,915,306 | $ 126,012,474 |
| Series B @ $0.1846 | | 6,578,777 | 530,497 | 751,967 | 1,694,905 | 1,166,971 | 1,772,323 | 3,810,171 | 3,407,164 | 147,272,780 |
| Series C @ $0.564 | 27,427,628 | – | 577,154 | 818,162 | 1,843,511 | 1,269,606 | 1,926,198 | 4,145,274 | 3,706,822 | 160,225,317 |
| Series C-1 @ $3.00 | 62,361,037 | – | 246,703 | 349,696 | 788,201 | 542,650 | 824,204 | 1,771,888 | 1,584,472 | 68,487,933 |
| Series C-1 @ $15.00 | 92,801,709 | – | 73,497 | 104,180 | 234,816 | 161,676 | 245,543 | 527,873 | 472,039 | 20,403,641 |
| Series C-2 @ $17.00 | 460,526,114 | – | 321,505 | 455,726 | 1,027,189 | 707,237 | 1,074,108 | 2,309,136 | 2,064,895 | 89,253,926 |

Warrants on Common
| Exercise Price @ $0.072 | | | – | | | | 24,281 | 52,000 | 46,629 | 2,017,080 |

| Common | | | 2,968,921 | 4,208,378 | 9,485,519 | 6,530,941 | 9,918,787 | 21,323,582 | 19,068,156 | 824,210,350 |

Options on Common
| Exercise Price @ $0.015 | | | | 4,862 | 10,958 | 7,545 | 11,459 | 24,634 | 22,028 | 952,166 |
| Exercise Price @ $0.030 | | | | | 36,658 | 25,240 | 38,333 | 82,409 | 73,693 | 3,185,335 |
| Exercise Price @ $0.066 | | | | | | 11,802 | 17,925 | 38,535 | 34,459 | 1,489,459 |
| Exercise Price @ $0.072 | | | | | | | 84,440 | 181,530 | 162,329 | 7,016,578 |
| Exercise Price @ $0.094 | | | | | | | | 21,993 | 19,668 | 850,148 |
| Exercise Price @ $0.170 | | | | | | | | | 250,220 | 10,806,999 |
| Exercise Price @ $0.206 | | | | | | | | | | 1,649,600 |
| | $ 643,206,489 | $ 11,152,079 | $ 5,172,191 | $ 7,336,322 | $ 16,572,449 | $ 11,422,215 | $ 17,456,072 | $ 37,549,362 | $ 33,827,732 | $ 1,463,834,334 |

| Share Class | Number of Shares | Total Value | Per Share Marketable |
|---|---|---|---|
| Preferred Share Classes | | | |
| Series A @ $0.150 | 46,320,045 | $ 141,823,753 | $ 3.06 |
| Series B @ $0.1846 | 54,134,965 | 166,985,536 | 3.08 |
| Series C @ $0.564 | 58,896,105 | 201,942,073 | 3.43 |
| Series C-1 @ $3.00 | 25,175,001 | 136,956,824 | 5.44 |
| Series C-1 @ $15.00 | 7,500,032 | 115,114,977 | 15.35 |
| Series C-2 @ $17.00 | 32,808,227 | $ 557,719,836 | $ 17.00 |
| Warrants on Common | | | |
| Exercise Price @ $0.072 | 741,685 | 2,145,841 | 2.89 |


HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

**US v. Elizabeth Holmes**　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　**Appendix Exhibit E.1**
Valuation of Theranos, Inc.　　　　　　　　　　　　PFM (Base) Forecasts - Depreciation & Capital Expenditure Analysis
As of February 7, 2014　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　*(thousands of USD)*

| Forecast Depreciation | 11 Mo. Ended 12/31/2014 | For the Twelve Month Period Ending December 31, | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | 2015 | 2016 | 2017 | 2018 | 2019 |
| Total Revenue | $ 239,250 | $ 1,677,000 | $ - | $ - | $ - | $ - |
| Beginning Balance - Total Fixed Assets | 22,021 | 62,901 | 240,017 | 202,545 | 165,074 | 127,603 |
| Capital Expenditures | 47,850 | 201,240 | - | | | |
| Fixed Assets | 69,871 | 264,141 | 240,017 | 202,545 | 165,074 | 127,603 |
| *Capital Expenditures as a % of Revenue* | *20.00%* | *12.00%* | *0.00%* | *0.00%* | *0.00%* | *0.00%* |



| US v. Elizabeth Holmes | | Appendix Exhibit E.2 |
| --- | --- | --- |
| Valuation of Theranos, Inc. | | PFM (Base) Forecast Free Cash Flow to Invested Capital |
| As of February 7, 2014 | | *(thousands of USD)* |

| | | 11 Mo. Ended 12/31/2014 | For the Twelve Month Period Ending December 31, 2015 |
| --- | --- | --- | --- |
| Total Revenue | $ | 261,000 | $ 1,677,000 |
| Total Cost of Revenue | | 96,000 | 599,000 |
| Gross Margin | | 165,000 | 1,078,000 |
| *GM %* | | *63.2%* | *64.3%* |
| Total Operating Expenses | | 201,000 | 670,000 |
| *Operating Expense %* | | *77.0%* | *40.0%* |
| **EBITDA** | | **(36,000)** | **408,000** |
| *EBITDA %* | | *-13.8%* | *24.3%* |
| Partial period Adjustment | | 3,000 | – |
| **Adjusted EBITDA** | | **(33,000)** | |
| Depreciation & Amortization | | 3,667 | 21,000 |
| **EBIT** | | **(36,667)** | **387,000** |
| *EBIT %* | | *-14.0%* | *23.1%* |
| Interest Expense | | – | – |
| Earnings Before Taxes | | (36,667) | 387,000 |
| Income Taxes | 40% | – | 101,670 |
| **Forecast After-Tax Income** | $ | **(36,667)** | $ **285,330** |
| *NPAT %* | | *-14.0%* | *17.0%* |
| **Cash Flow** | | | |
| Add:  Depreciation & Amortization | | 3,667 | 21,000 |
| After-Tax Gross Cash Flow | | (33,000) | 306,330 |
| Decrease / (Increase) in Working Capital | | (111,885) | (263,760) |
| Less:  Capital Expenditures | | (47,850) | (201,240) |
| **Free Cash Flow** | $ | **(192,735)** | $ **(158,670)** |



US v. Elizabeth Holmes

**Appendix Exhibit E.3**

Valuation of Theranos, Inc.

PFM (Base) Forecast - Discounted Cash Flow Method

As of February 7, 2014

*(thousands of USD)*

| Forecast Period | | Base Cash Flow | Period | Discount Rate | PV Factor [1] | | Discounted Cash Flow [2] |
|---|---|---|---|---|---|---|---|
| 2014 - Mar to Dec | $ | (192,735) | 0.45 | 75.5% | 0.7773 | $ | (149,809) |
| 2015 | | (158,670) | 1.40 | 75.5% | 0.4561 | | (72,362) |
| Terminal Value | | 4,732,800 | 1.90 | 75.5% | 0.3443 | | 1,629,279 |

| | | |
|---|---|---|
| **Indicated Value** | $ | **1,407,108** |
| Add: Series C-2 proceeds not on balance sheet | | 114,390 |
| Add: Series C-1 proceeds not on balance sheet | | 6,556 |
| Deduct: Note Payable, Long Term | | (40,489) |
| Deduct: Capital Lease, LT Portion | | (1,897) |
| **Total Equity Value - Non-Controlling, Marketable Basis** | $ | **1,485,668** |
| **Total Equity Value - Non-Controlling, Marketable Basis (rounded)** | $ | **1,490,000** |

| | LTM Revenue | 1YR Growth Revenue | 1YR Forward Revenue Growth | EBITDA Margin | D&A Margin | EBIT Margin | Capex % Revenue | Working Capital % Revenue |
|---|---|---|---|---|---|---|---|---|
| Upper Quartile | 1,160,767 | 21.2% | 12.7% | 20.7% | 2.3% | 14.2% | 6.5% | 140.0% |
| Mean | 1,086,705 | 20.2% | 11.9% | 0.1% | 1.4% | -73.3% | 5.6% | 232.8% |
| Median | 237,509 | 11.8% | 6.5% | 15.6% | 0.0% | 4.2% | 4.1% | 48.7% |
| Lower Quartile | 93,829 | 3.8% | 4.8% | -4.6% | 0.0% | -19.7% | 3.1% | 30.1% |
| Theranos, Inc. (at 12/31/15) | $ 1,677,000 | 542.5% | N/A | 24.3% | 1.3% | 23.1% | 12.0% | 18.6% |

| | | MVIC / LTM Revenue | MVIC / LTM EBITDA |
|---|---|---|---|
| Upper Quartile | | 5.74x | 25.83x |
| Mean | | 6.12x | 19.05x |
| Median | | 2.71x | 14.57x |
| Lower Quartile | | 1.83x | 8.65x |
| **Selected Multiple** | | **4.40x** | **11.60x** |
| Subject Company Base Value | $ | 1,677,000 | $ 408,000 |
| **Indicated Value at 12/31/15** | | **7,378,800** | **4,732,800** |

**Notes:**
[1] 1 / (1 + Discount Rate) ^ Period
[2] Base Cash Flow x PV Factor


HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

US v. Elizabeth Holmes
Valuation of Theranos, Inc.
As of February 7, 2014

Appendix Exhibit E.4
PFM (Model) Forecast Free Cash Flow to Invested Capital
*(thousands of USD)*

| | | 11 Mo. Ended 12/31/2014 | | 2015 | | 2016 | | 2017 | | 2018 | | 2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | For the Twelve Month Period Ending December 31, | | | | | | | |
| **Revenue** | | | | | | | | | | | | |
| Lab Services from US Retail Pharmacies | $ | 199,986 | $ | 1,063,582 | $ | 2,172,705 | $ | 2,871,036 | $ | 2,914,101 | $ | 2,960,241 |
| Lab Services Revenue from Physicians Offices (courier) | | 32,571 | | 222,965 | | 346,500 | | 388,080 | | 429,660 | | 469,455 |
| Lab Services Revenue from Hospitals (courier) | | 43,313 | | 134,009 | | 167,511 | | 192,638 | | 215,754 | | 238,408 |
| OnSite Services Revenue from Hospitals | | - | | 122,400 | | 360,000 | | 432,000 | | 504,000 | | 576,520 |
| Pharmaceuticals Services | | 30,000 | | 120,000 | | 170,000 | | 220,000 | | 270,000 | | 323,386 |
| Total Revenue | $ | 304,869 | $ | 1,662,956 | $ | 3,216,716 | $ | 4,103,754 | $ | 4,333,516 | $ | 4,568,011 |
| Total Cost of Revenue | | 126,526 | | 641,692 | | 1,245,920 | | 1,574,157 | | 1,612,172 | | 1,650,574 |
| Gross Margin | | 178,343 | | 1,021,264 | | 1,970,797 | | 2,529,597 | | 2,721,344 | | 2,917,437 |
| *GM %* | | *58.5%* | | *61.4%* | | *61.3%* | | *61.6%* | | *62.8%* | | *63.9%* |
| Total Operating Expenses | | 201,000 | | 670,000 | | 824,000 | | 906,400 | | 962,412 | | 1,022,080 |
| *Operating Expense %* | | *65.9%* | | *40.3%* | | *25.6%* | | *22.1%* | | *22.2%* | | *22.4%* |
| **EBITDA** | | (22,657) | | 351,264 | | 1,146,797 | | 1,623,197 | | 1,758,932 | | 1,895,357 |
| *EBITDA %* | | *-7.4%* | | *21.1%* | | *35.7%* | | *39.6%* | | *40.6%* | | *41.5%* |
| Partial period Adjustment | | 1,888 | | | | | | | | | | |
| **Adjusted EBITDA** | | (20,769) | | | | | | | | | | |
| Depreciation & Amortization | | 3,667 | | 21,000 | | 96,501 | | 205,188 | | 216,676 | | 228,401 |
| **EBIT** | | (24,435) | | 330,264 | | 1,050,295 | | 1,418,009 | | 1,542,256 | | 1,666,956 |
| *EBIT %* | | *-8.0%* | | *19.9%* | | *32.7%* | | *34.6%* | | *35.6%* | | *36.5%* |
| Interest Expense | | - | | - | | - | | - | | - | | - |
| Earnings Before Taxes | | (24,435) | | 330,264 | | 1,050,295 | | 1,418,009 | | 1,542,256 | | 1,666,956 |
| Income Taxes    40% | | - | | 83,868 | | 420,118 | | 567,204 | | 616,903 | | 666,782 |
| **Forecast After-Tax Income** | $ | (24,435) | $ | 246,396 | $ | 630,177 | $ | 850,805 | $ | 925,354 | $ | 1,000,174 |
| *NPAT %* | | *-8.0%* | | *14.8%* | | *19.6%* | | *20.7%* | | *21.4%* | | *21.9%* |
| **Cash Flow** | | | | | | | | | | | | |
| Add:  Depreciation & Amortization | | 3,667 | | 21,000 | | 96,501 | | 205,188 | | 216,676 | | 228,401 |
| After-Tax Gross Cash Flow | | (20,769) | | 267,396 | | 726,679 | | 1,055,993 | | 1,142,030 | | 1,228,574 |
| Decrease / (Increase) in Working Capital | | (9,146) | | (49,889) | | (96,501) | | (123,113) | | (130,005) | | (137,040) |
| Less:  Capital Expenditures | | (30,800) | | (134,750) | | (160,836) | | (205,188) | | (216,676) | | (228,401) |
| **Free Cash Flow** | $ | (60,715) | $ | 82,757 | $ | 469,341 | $ | 727,693 | $ | 795,348 | $ | 863,133 |


HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

**US v. Elizabeth Holmes**  **Appendix Exhibit E.5**

Valuation of Theranos, Inc.  PFM (Model) Forecast - Discounted Cash Flow Method

As of February 7, 2014  *(thousands of USD)*

| Forecast Period | Base Cash Flow | Period | Discount Rate | PV Factor [1] | Discounted Cash Flow [2] |
|---|---|---|---|---|---|
| 2014 - Mar to Dec | $ (60,715) | 0.45 | 35.5% | 0.8728 | $ (52,990) |
| 2015 | 82,757 | 1.40 | 35.5% | 0.6544 | 54,154 |
| 2016 | 469,341 | 2.40 | 35.5% | 0.4829 | 226,661 |
| 2017 | 727,693 | 3.40 | 35.5% | 0.3564 | 259,356 |
| 2018 | 795,348 | 4.40 | 35.5% | 0.2630 | 209,202 |
| 2019 | 863,133 | 5.40 | 35.5% | 0.1941 | 167,551 |
| Terminal Value | 2,849,710 | 5.40 | 35.5% | 0.1941 | 553,185 |

| | | |
|---|---|---|
| **Indicated Value** | $ | **1,417,121** |
| Add: Series C-2 proceeds not on balance sheet | | 114,390 |
| Add: Series C-1 proceeds not on balance sheet | | 6,556 |
| Deduct: Note Payable, Long Term | | (40,489) |
| Deduct: Capital Lease, LT Portion | | (1,897) |
| **Total Equity Value - Non-Controlling, Marketable Basis** | $ | **1,495,680** |
| **Total Equity Value - Non-Controlling, Marketable Basis (rounded)** | $ | **1,500,000** |

**Notes:**
[1] 1 / (1 + Discount Rate) ^ Period.
[2] Base Cash Flow x PV Factor.



**US v. Elizabeth Holmes**
Valuation of Theranos, Inc.
As of December 31, 2014

**Appendix Exhibit F.1**
Mosley-RDV Forecast - Depreciation & Capital Expenditure Analysis
*(thousands of USD)*

| Forecast Depreciation | For the Twelve Month Period Ending December 31, | | | | |
|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 |
| Total Revenue | $    990,000 | $        - | $        - | $        - | $        - |
| Beginning Balance - Total Fixed Assets | 53,366 | 164,287 | 148,528 | 132,769 | 117,010 |
| Capital Expenditures | 118,800 | - | - | - | - |
| Fixed Assets | 172,166 | 164,287 | 148,528 | 132,769 | 117,010 |
| *Capital Expenditures as a % of Revenue* | *12.00%* | *0.00%* | *0.00%* | *0.00%* | *0.00%* |



| US v. Elizabeth Holmes | Appendix Exhibit F.2 |
|---|---|
| Valuation of Theranos, Inc. | Mosley-RDV Forecast Free Cash Flow to Invested Capital |
| As of December 31, 2014 | (thousands of USD) |

|  | For the Twelve Month Period Ending December 2015 |
|---|---|
| **Revenue** | |
| Lab Services from US Retail Pharmacies | $ 470,000 |
| Lab Services Revenue from Physicians Offices (courier) | 160,000 |
| Lab Services Revenue from Hospitals (courier) | 290,000 |
| OnSite Services Revenue from Hospitals | 10,000 |
| Pharmaceuticals Services | 60,000 |
| **Total Revenue** | $ 990,000 |
|  | |
| **Cost of Revenue** | |
| Lab Services from US Retail Pharmacies | 188,000 |
| Lab Services Revenue from Physicians Offices (courier) | 64,000 |
| Lab Services Revenue from Hospitals (courier) | 87,000 |
| OnSite Services Revenue from Hospitals | 3,000 |
| Pharmaceuticals Services | 12,000 |
| **Total Cost of Revenue** | 354,000 |
| **Gross Margin** | 636,000 |
| *GM %* | *64.2%* |
|  | |
| **Operating Expenses** | |
| Research & Development (including Killer software apps & support) | 127,000 |
| CLIA Lab Operations | 76,000 |
| Data Center | 25,000 |
| Sales, Marketing & Branding | 76,000 |
| G&A | 95,000 |
| **Total Operating Expenses** | 399,000 |
| *Operating Expense %* | *40.3%* |
|  | |
| **EBITDA** | **237,000** |
| *EBITDA %* | *23.9%* |
|  | |
| Depreciation & Amortization | 21,000 |
|  | |
| **EBIT** | **216,000** |
| *EBIT %* | *21.8%* |
|  | |
| Interest Expense | - |
|  | |
| Earnings Before Taxes | 216,000 |
| Income Taxes                      40% | 47,937 |
|  | |
| **Forecast After-Tax Income** | $ 168,063 |
| *NPAT %* | *17.0%* |
|  | |
| **Cash Flow** | |
| Add:   Depreciation & Amortization | 21,000 |
| After-Tax Gross Cash Flow | 189,063 |
|  | |
| Decrease / (Increase) in Working Capital | 119,528 |
| Less:  Capital Expenditures | (118,800) |
|  | |
| **Free Cash Flow** | $ 189,791 |



HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

**US v. Elizabeth Holmes**
Valuation of Theranos, Inc.
As of December 31, 2014

**Appendix Exhibit F.3**
Mosley-RDV Forecast - Discounted Cash Flow Method
*(thousands of USD)*

| Forecast Period | Base Cash Flow | Period | Discount Rate | PV Factor [1] | Discounted Cash Flow [2] |
|---|---|---|---|---|---|
| 2015 | 189,791 | 0.50 | 54.0% | 0.8058 | 152,938 |
| Terminal Value | 3,294,300 | 1.00 | 54.0% | 0.6494 | 2,139,156 |

| | | | | | |
|---|---|---|---|---|---|
| **Indicated Value** | | | | $ | 2,292,094 |
| Add: Series C-2 proceeds | | | | | |
| Deduct: Note Payable, Long Term | | | | | (40,805) |
| Deduct: Capital Lease, LT Portion | | | | | - |
| **Total Equity Value - Non-Controlling, Marketable Basis** | | | | $ | 2,251,289 |
| **Total Equity Value - Non-Controlling, Marketable Basis (rounded)** | | | | $ | 2,250,000 |

| | LTM Revenue | 1YR Growth Revenue | 1YR Forward Revenue Growth | EBITDA Margin | D&A Margin | EBIT Margin | Capex % Revenue | Working Capital % Revenue |
|---|---|---|---|---|---|---|---|---|
| Upper Quartile | 1,216,653 | 14.1% | 21.4% | 19.7% | 1.6% | 14.9% | 6.4% | 84.8% |
| Mean | 1,136,335 | 6.2% | 18.0% | -2.8% | 1.3% | -274.9% | 5.7% | 758.4% |
| Median | 251,345 | 5.1% | 13.0% | 13.6% | 0.0% | 5.0% | 3.9% | 58.0% |
| Lower Quartile | 98,696 | 2.1% | 8.4% | -4.3% | 0.0% | -12.2% | 2.8% | 35.7% |
| **Theranos, Inc. (at 12/31/15)** | $ 990,000 | 607.1% | N/A | 23.9% | 2.1% | 21.8% | 12.0% | 18.6% |

| | MVIC / LTM Revenue | MVIC / LTM EBITDA |
|---|---|---|
| Upper Quartile | 5.09x | 19.93x |
| Mean | 6.60x | 19.85x |
| Median | 3.20x | 15.67x |
| Lower Quartile | 2.22x | 12.10x |
| **Selected Multiple** | 4.90x | 13.90x |
| Subject Company Base Value | $ 990,000 | $ 237,000 |
| **Indicated Value at 12/31/15** | 4,851,000 | 3,294,300 |

**Notes:**
[1] 1 / (1 + Discount Rate) ^ Period.
[2] Base Cash Flow x PV Factor.


HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

**US v. Elizabeth Holmes**  Appendix Exhibit G.1
Valuation of Theranos, Inc.  Murdoch Forecast - Depreciation & Capital Expenditure Analysis
As of February 13, 2015  *(thousands of USD)*

| Forecast Depreciation | 11 Mo. Ended 12/31/15 | For the Twelve Month Period Ending December 31, | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | 2016 | 2017 | 2018 | 2019 | 2020 |
| Total Revenue | $ 911,438 | $ 1,977,240 | $ - | $ - | $ - | $ - |
| Beginning Balance - Total Fixed Assets | 22,021 | 120,683 | 323,277 | 272,866 | 222,454 | 172,043 |
| Capital Expenditures | 109,373 | 237,269 | - | - | - | - |
| Fixed Assets | 131,393 | 357,952 | 323,277 | 272,866 | 222,454 | 172,043 |
| *Capital Expenditures as a % of Revenue* | *12.00%* | *12.00%* | *0.00%* | *0.00%* | *0.00%* | *0.00%* |



| US v. Elizabeth Holmes | | | Appendix Exhibit G.2 |
|---|---|---|---|
| Valuation of Theranos, Inc. | | | Murdoch Forecast Free Cash Flow to Invested Capital |
| As of February 13, 2015 | | | (thousands of USD) |

|  | 11 Mo. Ended 12/31/15 | | For the Twelve Month Period Ending December 2016 |
|---|---|---|---|
| Total Revenue | $ | 994,296 | $ 1,977,240 |
| Total Cost of Revenue |  | 334,976 | 614,490 |
| Gross Margin |  | 659,320 | 1,362,750 |
| GM % |  | 66.3% | 68.9% |
| Total Operating Expenses |  | 320,909 | 501,558 |
| Operating Expense % |  | 32.3% | 25.4% |
| **EBITDA** |  | **338,411** | **861,192** |
| EBITDA % |  | 34.0% | 43.6% |
| Partial period Adjustment |  | (28,201) | - |
| **Adjusted EBITDA** |  | **310,210** |  |
| Depreciation & Amortization |  | 8,000 | 19,772 |
| **EBIT** |  | **302,210** | **841,420** |
| EBIT % |  | 30.4% | 42.6% |
| Interest Expense |  | - | - |
| Earnings Before Taxes |  | 302,210 | 841,420 |
| Income Taxes | 40% | 82,421 | 336,568 |
| **Forecast After-Tax Income** | $ | **219,789** | $ **504,852** |
| NPAT % |  | 22.1% | 25.5% |
| **Cash Flow** |  |  |  |
| Add:   Depreciation & Amortization |  | 8,000 | 19,772 |
| After-Tax Gross Cash Flow |  | 227,789 | 524,624 |
| Decrease / (Increase) in Working Capital |  | 118,728 | (183,094) |
| Less:   Capital Expenditures |  | (109,373) | (237,269) |
| **Free Cash Flow** | $ | **237,144** | $ **104,262** |



HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

US v. Elizabeth Holmes

Valuation of Theranos, Inc.

As of February 13, 2015

Appendix Exhibit G.3

Murdoch Forecast – Discounted Cash Flow Method

*(thousands of USD)*

| Forecast Period | Base Cash Flow | Period | Discount Rate | PV Factor [1] | Discounted Cash Flow [2] |
|---|---|---|---|---|---|
| 2015 - Mar to Dec | $  237,144 | 0.44 | 82.0% | 0.7685 | $     182,244 |
| 2016 | 104,262 | 1.38 | 82.0% | 0.4378 | 45,642 |
| Terminal Value | 6,327,168 | 1.88 | 82.0% | 0.3245 | 2,053,136 |

| | | | | | |
|---|---|---|---|---|---|
| Indicated Value | | | | | $  2,281,022 |
| Add: Series C-2 proceeds | | | | | 125,000 |
| Deduct: Note Payable, Long Term | | | | | (40,805) |
| Deduct: Capital Lease, LT Portion | | | | | - |
| | | | | | |
| Total Equity Value - Non-Controlling, Marketable Basis | | | | | $  2,365,217 |
| | | | | | |
| Total Equity Value - Non-Controlling, Marketable Basis (rounded) | | | | | $  2,370,000 |

| | LTM Revenue | 1YR Growth Revenue | 1YR Forward Revenue Growth | EBITDA Margin | D&A Margin | EBIT Margin | Capex % Revenue | Working Capital % Revenue |
|---|---|---|---|---|---|---|---|---|
| Upper Quartile | 1,216,653 | 14.1% | 21.4% | 19.7% | 1.6% | 14.9% | 6.4% | 84.8% |
| Mean | 1,136,335 | 6.2% | 18.0% | -2.8% | 1.3% | -274.9% | 5.7% | 758.4% |
| Median | 251,345 | 5.1% | 13.0% | 13.6% | 0.0% | 5.0% | 3.9% | 58.0% |
| Lower Quartile | 98,696 | 2.1% | 8.4% | -4.3% | 0.0% | -12.2% | 2.8% | 35.7% |
| | | | | | | | | |
| Theranos, Inc. (at 12/31/16) | $   1,977,240 | 98.9% | N/A | 43.6% | 1.0% | 42.6% | 12.0% | 18.6% |

| | MVIC / LTM Revenue | MVIC / LTM EBITDA |
|---|---|---|
| Upper Quartile | 5.09x | 19.93x |
| Mean | 6.60x | 19.85x |
| Median | 3.20x | 15.67x |
| Lower Quartile | 2.22x | 12.10x |
| | | |
| Selected Multiple | 3.20x | 12.10x |
| Subject Company Base Value | $     1,977,240 | $     861,192 |
| | | |
| Indicated Value at 12/31/15 | 6,327,168 | 10,420,429 |

Notes:

[1] 1 / (1 + Discount Rate) ^ Period.

[2] Base Cash Flow x PV Factor.





**CURRICULUM VITAE**

**HEMMING | MORSE**
FORENSIC & FINANCIAL CONSULTANTS

**Appendix Exhibit H**

**SAN MATEO OFFICE**
177 Bovet Road, Suite 525
San Mateo, CA 94402
T: 415.836.4000
F: 415.777.2062

## CARL S. SABA, MBA, CVA, ASA, ABV

HEMMING.COM

### Executive Summary

Carl Saba is a Partner in the Forensic and Financial Consulting Service Group at Hemming Morse, LLP.
He is a recognized leader within the business valuation community, with over twenty three years of experience
advising companies on complex financial analysis and valuation issues for litigation, mergers and acquisitions, tax,
and financial reporting matters. His valuation expertise spans business valuation, valuation of intellectual property
and other intangible assets, and valuation of options and other derivatives.

Carl has led in excess of 800 valuation engagements over the last fifteen years across a broad range of industries
with niche expertise in the areas of Technology, Life Sciences, and Medical Device. He has assisted clients
as a valuation expert in initial public offerings, acquisitions, corporate restructure transactions, and bankruptcy
reorganizations with transaction values exceeding $1 billion. He has also assisted clients with resolving valuation
disputes with the Internal Revenue Service (IRS), and addressing valuation inquiries and reviews by the Public
Companies Oversight Board (PCAOB), and Securities and Exchange Commission (SEC).

On litigation matters, Carl has served as an expert and testified on a wide range of complex business disputes
involving economic damages. These have included shareholder dissolution actions, business interruption,
unfair competition, patent infringement, alter ego, lost wages, and fraud claims. In most cases, he has been
successful in contributing to a favorable award for clients and out of court settlement of the dispute.

Carl also has significant financial advisory experience in mergers and acquisitions due diligence and turnaround
management. He has lead due diligence efforts that have assisted his clients in negotiating key deal terms,
negotiated with creditors to recapitalize companies, and helped management teams define strategic direction.

Contributing to thought leadership within the valuation community is something Carl is passionate about. He
co-founded and currently Chairs the Executive Committee of the Fair Value Forum, a business valuation expert
group dedicated to defining best practices within the profession. He also served a term as President of the
Valuation Roundtable of San Francisco and was a board member for several years. Carl has authored
several articles on cutting edge valuation topics, and teaches and lectures on the topic frequently.

Carl has an MBA from the Marshall School of Business at the University of Southern California where he graduated
with Honors. He earned his Bachelor's degree at U.C. Berkeley's Haas School of Business. He is a Certified Valuation
Analyst with the National Association of Certified Valuators and Analysts. He is also an Accredited Senior Appraiser
with the American Society of Appraisers, and Accredited in Business Valuation with the American Institute of Certified
Public Accountants.



CURRICULUM VITAE

**SAN MATEO OFFICE**
177 Bovet Road, Suite 525
San Mateo, CA 94402
T: 415.836.4000
F: 415.777.2062

## CARL S. SABA, MBA, CVA, ASA, ABV

HEMMING.COM

### Employment & Education

| | |
|---|---|
| 2013 – Present | **Hemming Morse, LLP** |
| | **Certified Public Accountants, Forensic and Financial Consultants** |
| | Partner |
| | |
| 2004 – 2013 | **Burr Pilger Mayer, Inc.** |
| | **Certified Public Accountants and Consultants** |
| | Shareholder, Consulting Practice Group Leader |
| | |
| 2003 – 2004 | **Comerica Bank, Palo Alto** |
| | Vice President / Team Leader |
| | |
| 2003 | **University of Southern California** |
| | MBA, Finance Emphasis |
| | – Graduated in top tier of class with honors |
| | – Extensive graduate level coursework in finance theory, valuation, options and decision analysis, statistics, and business strategy |
| | |
| 2002 | **Decision Education Foundation, Menlo Park** |
| | Strategy Consultant, Strategic Decisions Group (Summer Internship) |
| | |
| 1999 – 2001 | **Comerica Bank, Palo Alto** |
| | Vice President / Corporate Banking Officer |
| | |
| 1996 – 1999 | **Manufacturers Bank, San Jose** |
| | Assistant Vice President / Corporate Banking Officer |
| | |
| 1995 | **University of California, Berkeley** |
| | Bachelors degree in Business Administration and Finance |

**ER-739**



# CURRICULUM VITAE

**HEMMING | MORSE**
FORENSIC & FINANCIAL CONSULTANTS

**SAN MATEO OFFICE**
177 Bovet Road, Suite 525
San Mateo, CA 94402
T: 415.836.4000
F: 415.777.2062

## CARL S. SABA, MBA, CVA, ASA, ABV

HEMMING.COM

### Professional Credentials

- **Accredited in Business Valuation (ABV)**
  American Institute of Certified Public Accountants

- **Accredited Senior Appraiser (ASA)**
  American Society of Appraisers

- **Certified Valuation Analyst (CVA)**
  National Association of Certified Valuators and Analysts

- **Graduate of Leadership San Francisco**
  Class of 2008

### Professional Affilliations

- **Fair Value Forum**
  - Co-Founder
  - Chair, Executive Committee, 2012-Present
  - Executive Committee, 2006-Present

- **Valuation Roundtable of San Francisco**
  - President, 2011-2012
  - Board Member, 2009-2014

- **National Association of Certified Valuation Analysts**

- **American Society of Appraisers**

- **American Institute of Certified Public Accountants**

- **Community Legal Services, East Palo Alto**
  - Executive Committee Board Member
  - Treasurer

- **Beta Gamma Sigma** – National Business Honor Society

### Publications

- **"Quantifying Personal Goodwill by Analyzing Customer Retention"**, BVR Business Valuation Update Vol. 23 No. 11, November 2017

- **Co-author of the valuation section of The 409A Administration Handbook**, Thomson Reuters, 2013 Edition

- **"Due Diligence Can Attract, Support an Acquisition"**, North Bay Business Journal, April 2013

- **"Purchase Price Allocations Under ASC 805"**, A Guide to Allocating Purchase Price for Business Combinations, BPM Insights, July 2012

- **"A Fresh Start for Your Financials After Chapter 11, Fair Value Measurements in Reorganization"**, BPM Insights, March 2012

- **"Valuation Challenges for Early Stage Companies"**, BV Wire Issue 97-4, October 2010



CURRICULUM VITAE

**HEMMING | MORSE**
FORENSIC & FINANCIAL CONSULTANTS

**SAN MATEO OFFICE**
177 Bovet Road, Suite 525
San Mateo, CA 94402
T: 415.836.4000
F: 415.777.2062

## CARL S. SABA, MBA, CVA, ASA, ABV

HEMMING.COM

### Publications continued

- "Valuation Challenges for Early Stage Companies", BV Wire Issue 97-4, October 2010

- "Stock Options for Life Science Companies, Understanding the Risks, Realizing the Rewards", CFO.com, 2009

- "Future Equity Financing in Early Stage Company Valuations", Fair Value Forum Whitepaper, 2009

- "Finding Value in Valuations" – The Importance of Valuations for Biotech Companies, Smart Business, 2008

- "Accounting Practices for Medical Technology", MX Magazine, July/August 2007

- "Hot Issues in Biotech and Life Sciences", California CPA, March/April 2006.

### Instructions and Seminars

- "Preparing your Business for a Successful 2022", Associated General Contractors (AGC) California, June 2022

- "Experts In Uncharted Waters", Association of Business Trial Lawyers Conference , October 2021

- "Auditing IRC 409A and ASC 805 Valuations", OUM & CO, September 2020

- "Fair Value Forum Case Study – Unpacking Differences Between Diverse Valuation Opinions", American Society of Appraisers 2018 Fair Value Summit, November 2018

- "Case Studies in 409A Valuations", American Society of Appraisers 2017 Fair Value Summit, November 2017

- "To Dissolve or Not to Dissolve, Navigating the Waters of Shareholder Disputes", Beverly Hills Bar Association, June 2017

- "To Dissolve or Not to Dissolve, Overview of Section 2000 of the California Corporations Code", Ventura County Bar Association, May 2017

- "To Dissolve or Not to Dissolve, the Pros and Cons of Section 2000 of the California Corporations Code", ProVisors Lawyers and Legal Professionals Affi nity Group, April 2017

- "409A and Private Companies Valuation Update", American Society of Appraisers 2016 Fair Value Summit, November 2016

- "Developments in the Valuation of Early Stage Companies", AICPA Webcast, June 2016

- "Business Valuation in Litigation: Overview and Case Studies", American Society of Appraisers Northern California Chapter, June 2016

- "Hot Topics in Early Stage Company Valuations", Montgomery & Hansen LLP, April 2016



**CURRICULUM VITAE**

**SAN MATEO OFFICE**
177 Bovet Road, Suite 525
San Mateo, CA 94402
T: 415.836.4000
F: 415.777.2062

## CARL S. SABA, MBA, CVA, ASA, ABV

HEMMING.COM

### Instructions and Seminars continued

- "What CPAs Should Know About Business Valuation for Estate and Gift Tax Matters", Crawford Pimentel, January 2016

- "409A Valuation Issues Update", American Society of Appraisers 2015 Fair Value Summit, November 2015

- "Developments in the Valuation of Early Stage Companies", AICPA Forensic and Valuation Services Conference, November 2015

- "Stock Transactions as an Indication of Fair Value in Common Stock Valuations", American Society of Appraisers 2014 Fair Value Summit, November 2014

- "Valuation of Winery Brand and Operations, Building Value in the Wine Business", The Seminar Group, November 2014

- "Valuation in Dissenting Shareholder Actions, Estate and Gift Tax Matters, and Transactions", McCormick Barstow LLP, September 2014

- "Damages and Valuation for New or Unestablished Businesses", Winston & Strawn, May 2014

- "The Continued Appraisal Attack", 2013 California Tax Policy Conference of the California Tax Bar, November 2013

- "Equity Compensation Valuation Issues - Addressing Situational Requirements When the Guidance is Insufficient", American Society of Appraisers 2013 Fair Value Summit, November 2013

- "Mergers & Acquisitions: Better Decision Making Through Financial Modeling", AICPA Controllers Conference, November 2013

- "Auditing Fair Value Measurements under IRC 409, ASC 718, and ASC 805", OUM & Co. LLP, September 2013

- "Valuation Issues in Chapter 11 Reorganizations, Inns of Court", San Jose Federal Courthouse, July 2013

- "Panelist on Valuation Issues in Bankruptcy and Financial Reporting", Association of Insolvency and Restructuring Advisors National Conference, June 2011

- "Alternative Investments, Fair Value Issues", San Francisco Nonprofit Roundtable, 2009

- "The Guideline Public Company Valuation Method and Minority versus Control Value Conclusion", Valuation Roundtable of San Francisco, 2009

- "Modeling Techniques for Future Rounds of Equity Financing in Early Stage Technology and Biotech Companies", Fair Value Forum, 2009

- "Acquired Intangible Assets and Impairment Testing Under FAS 141, 142, 144", San Francisco State University, 2008

- "FAS 157 and Mark-to-Market or Mark-to-Make Believe Accounting?", Golden Gate University, 2008



CURRICULUM VITAE

**HEMMING | MORSE**
FORENSIC & FINANCIAL CONSULTANTS

SAN MATEO OFFICE
177 Bovet Road, Suite 525
San Mateo, CA 94402
T: 415.836.4000
F: 415.777.2062

## CARL S. SABA, MBA, CVA, ASA, ABV                    HEMMING.COM

### Instructions and Seminars continued

- "Analyzing Financial Statements, and Interpreting Financial Ratios", Building Owners and Managers Association (BOMA), 2005-2007

- "Valuations of Early Stage Companies", Frost, and Sullivan Medical Devices Conference, 2007

- "Complex Capital Structures – DCF with Future Capital Requirements and the Impact of Existing Shareholders", Valuation Roundtable of San Francisco Annual Seminar, 2007

- "Audits of Investments in Private Equity Securities, Are you Ready?", San Francisco Nonprofit Roundtable, 2007

- "Valuation and Accounting under FAS 123R", Cal Society East Bay Business & Industry Group, 2006

- "Panelist on Implementation and Valuation Considerations Under FAS 123R", Cal Society Life Sciences Industry Group, 2006

### Testimony

#### Trial and Arbitration

- Facebook, Inc. & Subsidiaries v. Commissioner of Internal Revenue (2022), United States Tax Court, San Francisco, California, Docket No. 21959-16

- Dr. Albert Cha v. Vivo Capital, LLC and Vivo Ventures VII, LLC (2022), JAMS Arbitration, San Francisco, California, Case No. 1100110703

- Jaspindar Sandhu v. Eximius Design, LLC, et. al. (2021) JAMS Arbitration, Case No. 1100104731

- Shasikant Patel v. Nitin Desai, Town Green Enterprises, LLC, Windsor Hospitality Group. LLC (2021) JAMS Arbitration, San Francisco, California, Case No. 1100107540

- Yuhui Chen v. Zining Wu, InnoGrit Corporation, Shanghai Yingren Chuang Information Technology Co., Ltd. (2020) JAMS Arbitration, San Jose, California, Case No. 1110024169

- Omega Electric Supply, LLC, et al. v. Estate of Todd G. Lewis, et al. (2019) JAMS Arbitration, Case No. 1100091778

- David Senescu v. The Keating Group, Inc., et al. (2019), JAMS Arbitration, Case No. 1110022437

- San Jose, California Unlimited Prepaid, Inc. v. Air Voice Wireless, LLC (2018), JAMS Arbitration, Case No. 1220055749

- Robert Kindrachuk v. Norcal Urology Medical Group, Inc. (2018), ADR Services, Inc., Case No. 17-7127-HD

- Domain Associates, L.L.C, et al. v. Nimesh S. Shah (2018), Court of Chancery Delaware, Case No. 12921-VCL



CURRICULUM VITAE

**HEMMING | MORSE**
FORENSIC & FINANCIAL CONSULTANTS

**SAN MATEO OFFICE**
177 Bovet Road, Suite 525
San Mateo, CA 94402
T: 415.836.4000
F: 415.777.2062

## CARL S. SABA, MBA, CVA, ASA, ABV

HEMMING.COM

### Testimony continued

#### Trial and Arbitration continued

- Michael DiSanto v. Bingham McCutchen LLP (2016), JAMS Arbitration, San Francisco County, California, Case No. 1110017742

- Gerald Laurence Trebesch v. Fall Line Capital LLC (2015), American Arbitration Association (AAA), San Francisco County, California, Arbitration No. 01-14-001-0482

- Ellen Pao v. Kleiner Perkins Caufield & Byers (2015), Superior Court, San Francisco County, California, Case Number CGC-12-520719

- Roxanne E. Doherty v. Michael Doherty (2015), Superior Court, Calaveras County, California, Case Number 11CV37584

- Lehman Brothers Holdings Inc., as Assignee of Lehman Brothers Inc. v. Christopher J. Clifford (2014), Financial Industry Regulatory Authority (FINRA), San Francisco County, California, Arbitration No. 10-04109

- Evan MacMillan v. Groupon, Inc. (2014, American Arbitration Association, San Francisco County, California, Case Number 74 460 00054 13

- Scomas Restaurant, Inc. (2009) San Francisco County, California

#### Deposition

- Annette P. Cowan v. Allergy Asthma Clinic Burlingame, Inc. et al. (2021), Superior Court San Mateo County, California, Case No. 19-CIV-00235

- Dr. Albert Cha v. Vivo Capital, LLC and Vivo Ventures VII, LLC (2021), JAMS Arbitration, San Francisco, California, Case No. 1100110703

- Jaspindar Sandhu v. Eximius Design, LLC, et. al. (2021) JAMS Arbitration, Case No. 1100104731

- Kouji Yamada v. Lateef Management, LLC (2021), JAMS Arbitration, Case No. 1100109005

- Jaspindar Sandhu v. Eximius Design, LLC, et al. (2021), JAMS Arbitration, Case No. 1100104731

- Anthony Scott Levandowski v. Uber Technologies, Inc. (2021), United States Bankruptcy Court, Northern District of California, San Francisco Division, Case No. 20-30242 (HLB)

- Graystone Mortgage, LLC v. Network Funding, L.P. (2021), United States District Court, District of Utah Central Division, Case No. 2:19-cv-00383-JNP

- John Nypl, et al. v. JP Morgan Chase & CO., et al. (2021), United States District Court, Southern District of New York, Case No. 15 Civ. 9300 (LGS)

- Yuhui Chen v. Zining Wu, InnoGrit Corporation, Shanghai Yingren Chuang Information Technology Co., Ltd. (2020) JAMS Arbitration, San Jose, California, Case No. 1110024169



CURRICULUM VITAE

SAN MATEO OFFICE
177 Bovet Road, Suite 525
San Mateo, CA 94402
T: 415.836.4000
F: 415.777.2062

## CARL S. SABA, MBA, CVA, ASA, ABV

HEMMING.COM

### Testimony continued

#### Deposition continued

- Matthew Pliskin, Trustee of ICPW Nevada Trust v. BDO USA, LLP (2020), American Arbitration Association (AAA) Dallas, Texas, Case No. 01-19-0000-4459

- Zwick Partners, LP and Aparna Rao v. Quorum Health Corporation, et al. (2019), United States District Court Middle District of Tennessee, Case No. 3:16-cv-02475

- MD Anis Uzzaman and Fenox Venture Capital Inc. v. Brandon Hill (2019), Superior Court San Mateo County, California, Case No. 17-CIV-02443

- Omega Electric Supply, LLC, et al. v. Estate of Todd G. Lewis, et al. (2019), JAMS Arbitration, Case No. 1100091778

- Donald Norman v. Patrick Strateman, et al. and Intersango LLC (2019), Superior Court San Francisco County, California, Case Number CGC-17-556483

- David Senescu v. The Keating Group, Inc., et al. (2019), JAMS Arbitration, San Jose, California, Case No. 1110022437

- Unlimited Prepaid, Inc. v. Air Voice Wireless, LLC (2018), JAMS Arbitration, Case No. 1220055749

- Julia Bernstein, et al. v. Virgin America, Inc, et al. (2018), United States District Court, Northern District of California, Case No. 15-cv-02277-JST

- Domain Associates, L.L.C, et al. v. Nimesh S. Shah (2017), Court of Chancery Delaware, Case No. 12921-VCL

- State of California, et al. v. BP America Production Company, et al. (2017), Superior Court, San Francisco County, California, Case No CGC-12-522063

- Tamara B. Pow v. Mark Figueiredo (2017), Superior Court, Santa Clara County, California, Case Number 1-15-CV-282824

- Glen Ocal v. Kenneth S. Thom, Pier 39 Maritime Business Facilities, LLC dba SOMAcentral (2017), Superior Court Santa Clara County, California, Case Number 114CV266597

- Stacy Guthmann v. CC-Palo Alto, Inc. D/B/A VI at Palo Alto; Classic Residence Management Limited Partnership, et al (2017), United States District Court, Northern District of California San Jose Division, Case Number 16-CV-02680-LHK

- Crossfit, Inc. v. Jeff Martin, et al. (2017), United States District Court, District of Arizona, Case Number 2:14-cv- 02277-JJT

- Joel Simkhai and Grindr Holdings Company v. KL Grindr Holdings Inc., et al. (2017), American Arbitration Association, Los Angeles County, California, Case Number 01-16-0003-7637

- Clyde Berg v. Speech Morphing Systems (2016), Superior Court, San Francisco County, California, Case Number 2014-1-CV-264586

PAGE 8 OF 9



**CURRICULUM VITAE**

**SAN MATEO OFFICE**
177 Bovet Road, Suite 525
San Mateo, CA 94402
T: 415.836.4000
F: 415.777.2062

## CARL S. SABA, MBA, CVA, ASA, ABV



HEMMING.COM

**Testimony** continued

Deposition continued

- California Crane School Incorporated v. National Commission for the Certification of Crane Operators (2016), Superior Court, Tuolumne County, California, Case Number CV53859

- Dellon Chen v. Standard Fiber LLC (2015), Superior Court San Mateo County, California, Case Number CIV521306

- Lloyds TSB Bank, PLC v. Michael J. Kilroy (2015), Superior Court, Riverside County, California, Case Number INC 1202040

- Ellen Pao v. Kleiner Perkins Caufield & Byers (2015), Superior Court, San Francisco County, California, Case Number CGC-12-520719

- Biotechnology Value Fund, L.P. v. Celera Corporation, Credit Suisse Securities LLC (2014), United States District Court, Northern District of California San Francisco Division, Case Number CV-13-3248-DMR

- Saul R. Flores v. Group One Construction Inc (2014), Superior Court, Santa Clara County, California, Case Number 112CV215989

- John K. Palladino v. John Palladino Jr. (2014, Superior Court, San Mateo County, California, Case Number CIV512247

- Roxanne E. Doherty v. Michael Doherty (2014), Superior Court, Calaveras County, California, Case Number 11CV37584

- Evan MacMillan v. Groupon, Inc. (2013), American Arbitration Association, San Francisco County, California, Case Number 74 460 00054 13

- Margery Raffanti v. Estate of Robert Raffanti (2010), Superior Court, Santa Clara County, California

- Scomas Restaurant, Inc. (2009) San Francisco County, California

**ER-746**

US v. Elizabeth Holmes
List of Documents Considered
Appendix Exhibit I

| File Name | File name |
|---|---|
| 0578N | FTR 2013 |
| 0792 | FTR 2014 |
| 0792N-1 | FTR 2015 |
| 1901 | Mosley Materials 2 |
| 1901N | Mosley Materials 3 |
| 3233 | Mosley Materials 4 |
| 3283 | Mosley Materials 5 |
| 3283N | Mosley Materials 6 |
| 3527 | Mosley Materials 7 |
| 3533 | Mosley Materials |
| 4859 | Confidential Disclosure Agreement |
| 5085 | Confidential Overview 2_KRM |
| 5141 | Confidential Overview 3_KRM |
| 5172 | Confidential Overview 4_KRM |
| 5190 | Confidential Overview 5_KRM |
| 5206 Attachment | Confidential Overview 6_KRM |
| 5206 | Confidential Overview 7_KRM |
| 5209 | Confidential Overview 8_KRM |
| 5209n | Confidential Overview 9_KRM |
| 5797 | Confidential Overview 10_KRM |
| 7753 | Confidential Overview 11_KRM |
| 7753N | Confidential Overview _KRM |
| 7753N2 | Murcoch Letter and Docs |
| 13711 | Summary Cap and Projected Income-KRM |
| 040522(Vol 13) | Theranos Summary |
| Trial Exh. 2623 Email from DY to EAH | Master Signature Page_PFM |
| Trial Exh. 5454 Email | Summary Cap Table_2014.02.03 |
| 2021.11.12 Expert Disclosures | Theranos Revenue Model_PFM |
| 2021.11.13 Supplemental Expert Disclosures | Trial Exh. 4077 Email |
| 27084 | Series C-1 Transaction Documents_PVP |
| 27085 | Master Signature Page_RDV |
| 27086 | Theranos Slide Deck_RDV |
| 27087 | Trial Exh. 4859 Projected Statement of Income |
| 27088 | Amended and Restated Certificate of Inc_2010.06.30 |
| 27089 | Amended and Restated Certificate of Inc_2013.03.28 |
| 27090 | Amended and Restated Investor Rights Agreement_2014.01.14 |
| 27091 | Amended and Restated Investor Rights Agreement_2014.02.07 |
| 27092 | Amended and Restated Series C-1 Preferred Strock Purchase Agreement_2010.07.01 |
| 27093 | Amended and restated Voting Agreement |
| 27094 | Amendment No 2 to the Series C-2 Preferred Stock Purchase Agreement_July 2014 |
| 27095 | Amendment No 3 to the Series C-2 Preferred Stock Purchase Agreement_July 2015 |
| 27096 | C-2 Certificate of Designation_2014.02.07 |
| 27097 | C-2 Preferred Stock Purchase Agreement_2017.02.03 |
| 27098 | C-2 Preferred Stock Purchase Agreement_2017.02.07 |
| 27099 | Certificate of Amendment of Amended and Restated Certificate of Incorporation_2015.03.06 |
| 27100 | Certificate of Correction_2014.01.14 |
| 27101 | Certificate of Designation of Series C-2 Preferred Stock_2014.02.07 |
| 27102 | Certificate of Increase of Series C-2 Preferred Stock_2015.03.06 |
| 27103 | Investor Deck_DEC 2016 |
| 27104 | Stockholder Confidentiality Agreement_2014.02.07 |
| 27105 | Projected Statement on Income_Jan 2015 |
| 27106 | Projected Statement on Income_Jan 2015-1 |

**US v. Elizabeth Holmes**                                                                    Appendix Exhibit I
List of Documents Considered

| File Name | File name |
|---|---|
| 27107 | SEC-USAO-EPROD-000808915 |
| 27108 | SEC-USAO-EPROD-000809708 |
| 27109 | SEC-USAO-EPROD-000875621 |
| 27110 | SEC-USAO-EPROD-001247904 |
| 27111 | SEC-USAO-EPROD-001519025 |
| 27112 | 2_SEC-USAO-EPROD-001215410_native |
| 27113 | Cleveland Clinic Financials_Mar 2015 |
| 27114 | SEC-USAO-EPROD-001028741 |
| 27115 | 01.14.13 - Board Meeting Docs including cap tables and articles |
| 27116 | 10.08.13 board docs |
| 27117 | BOD Meeting Binder_2014.07.15 |
| 27118 | BOD Meeting Minutes_2013.01.14 |
| 27119 | BOD Meeting Minutes_compiliation 2013-2014 |
| 27120 | BOD Meeting Minutes_Jan and Apr 2015 |
| 27121 | BOD Presentation_2014.07.15 |
| 27122 | Financials for BOD_Jan 2015 |
| 27123 | Amended  and Restated...Jun 2010 |
| 27124 | Amended  and Restated...March 2013 |
| Balwani-USAO | Articles_Jan 2014 |
| FIG 703 | Certificate of Amendment...March 2015 |
| FIG 704 | Certificate_Dec 2014 |
| FIG 914 | Certificate_Mar 2015 |
| FIG 915 | Cap Summary_Feb 2014 |
| FIG 920 | SEC2-USAO-EPROD-000509036 |
| FIG 921 | SEC2-USAO-EPROD-000550002 |
| FIG 1137 | SEC-USAO-EPROD-001038026 |
| FIG 1139 | SEC-USAO-EPROD-001064861 |
| FIG 1140 | SEC-USAO-EPROD-001240711 |
| FIG 1141 | SEC-USAO-EPROD-002733592 |
| FIG 1143 | SEC-USAO-EPROD-002788863 |
| FIG 1143 (excel) | SEC-USAO-EPROD-002788979 |
| FIG 1285 | SEC-USAO-EPROD-003873663 |
| FIG 1287 | SEC-USAO-EPROD-005037217 |
| FIG 1288 | SEC-USAO-EPROD-005071687 |
| FIG 1290 | THER-2393504 |
| FIG 1291 | TS-0939601 |
| FIG 1307 | 6379-6382 |
| FIG 1331 | 6392-6393 |
| FIG 1372 | 6394-6395 |
| FIG 1461 | 6396 |
| FIG 1463 | 6401 |
| FIG 1476 | 6404-6406 |
| FIG 1478 | 6408 |
| FIG 1479 | 6413-6414 |
| FIG 1484 | 6416-6417 |
| FIG 1488 | 6418-6419 |
| FIG 1720 | 6420-6422 |
| FIG 1722 | 6425-6429 |
| FIG 1723 | 6435 |
| FIG 1725 | 111621TT(vol 33)public |
| FIG 1731 | Trial Exh. 0504 Email |
| FIG 1781 | Trial Exh. 1633 email |
| FIG 1783 | Trial Exh. 3231 email |
| FIG 1845 | page 17 |
| FIG 1849 | page 19 |
| FIG 1855 | page 21 |
| FIG 1860 | page 64 |

US v. Elizabeth Holmes                                                                          Appendix Exhibit I
List of Documents Considered

| File Name | File name |
|-----------|-----------|
| FIG 2070 | page 66 |
| FIG 2072 | page 67 |
| FIG 2083 | page 69 |
| FIG 2290 | page 95 |
| FIG 2292 | Trial Exh. 4077 email |
| FIG 2298 | Trial Exh. 4182 email |
| FIG 2301 | Trial Exh. 4533 email |
| FIG 2309 | Copy of Trial Exh. 5127 Native |
| FIG 2310 | Trial Exh. 5127 email |
| FIG 2379 | Trial Exh. 5421 email |
| FIG 2394 | 2021.10.22 TT(Vol 23) - Shane Weber & Bryan Tolbert |
| FIG 2246 | 2021.10.26 TT(Vol 24)PUBLIC - Lisa Peterson |
| FIG 2447 | 2021.11.02 TT(Vol 26) - Lisa Peterson & Dr. Connie Cullen & Dan Mosley |
| FIG 2448 | 2021.11.03 TT(Vol 27) - Dan Mosley |
| FIG 2449 | 2021.11.04 TT(Vol 28) - Chris Lucas & Dr. Lynette Sawyer |
| FIG 2450 | 2021.11.10 TT(Vol 31) - Dr. Kingshuk Das & Alan Eisenman |
| FIG 2451 | 2021.11.15 TT(Vol 32) - Alan Eisenman |
| FIG 2452 | 2021.11.16 TT(Vol 33)PUBLIC - Danise Yam (recall) & Brian Grossman |
| FIG 2453 | 2021.11.17 TT(Vol 34) - Brian Grossman & Erin Tompkins |
| FIG 2468 | 2022.04.26 (Vol 22) - Dr. Adam Rosendorff & Lisa Peterson |
| FIG 6419 | 2022.04.27 (Vol 23) - Lisa Peterson & Dr. Sunil Dhawan |
| FIG 6420 | 2022.04.29 (Vol 24) - Patrick Mendenhall & Bryan Tolbert |
| FIG 6538 | 2022.05.10 (Vol 27) - Sarah Bennett & Daniel Mosley |
| FIG 6539 | 2022.05.11 (Vol 28) - Daniel Mosley & Alan Eisenman & Dr. Lynette Sawyer |
| FIG 6543 | 2022.05.13 (Vol 29) - Dr. Lynette Sawyer & Chris Lucas & Dr. Audra Zachman & Brittany Gould |
| FIG 6544 | 2022.05.20 (Vol 32) - Brian Grossman & Defense Witness Dr. Tracy Wooten |
| FIG 6548 | SEC-TX-000002116_image |
| FIG 6706 | 2021.09.08 TT(Vol 4) - Opening Statements & Danise Yam |
| FIG 6707 | 2021.09.14 TT(Vol 6) - Danise Yam & Erika Cheung |
| FIG 6735 | 2022.04.05 (Vol 13) - Danise Yam |
| FIG 6736 | 07753 Attachment 1 |
| FIG 6801 | 07753 Attachment 2 |
| FIG 7680 | 07753 D. Yam Email 11.03.2016 |
| FIG 7685 | Interview_of_CASS_GRANDONE |
| FIG 7690 | Trial Exh. 7098 Email |
| FIG 7752 | SEC3-USA-EPROD-000010390_image |
| FIG 7774 | SEC3-USA-EPROD-000016979_image |
| FIG 8151 | SEC-EMAIL-2441_image |
| FIG 8152 | SEC2-USAO-EPROD-001071042 |
| FIG 8168 | SEC2-USAO-EPROD-001071047 |
| FIG 8227 | SEC2-USAO-EPROD-001071050 |
| FIG 8384 | SEC2-USAO-EPROD-001071051 |
| FIG 8385 | SEC2-USAO-EPROD-005034793 |
| FIG 8394 | SEC2-USAO-EPROD-005034794 |
| FIG 8396 | SEC2-USAO-EPROD-005034795 |
| FIG 8409 | SEC2-USAO-EPROD-005034796 |
| FIG 8413 | SEC2-USAO-EPROD-005034797 |
| FIG 8426 | TS-0272877 |
| FIG 8413 | THPFM000306874 |
| FIG 8426 | THPGM000648099 |
| FIG 8431 | TS-0338670 |
| FIG 8443 | TS-00338703 |

3 of 4

**US v. Elizabeth Holmes**                                                                    **Appendix Exhibit I**
List of Documents Considered

| File Name | File name |
|---|---|
| Transcripts-001962 8412 | TS-0341544 |
| 2008 Financial Statements | MOI_TShultz_2018.01.10 |
| FTR 2010 | SHULTZ_TYLER-02-10-21 |
| FTR 2011 | 091721TT(Vol 8) |
| FTR 2012 | 113021(Vol 40) |
| S&P Capital IQ; | |
| https://www.spglobal.com/marketintelligence/en/solutions/sp-capital-iq-platform | IBISWorld, *IBISWorld Industry Report 54171, Scientific Research & Development in the US* , December 2014 |
| AICPA Statement on Standards for Valuation Services No. 1 | Appraisal Foundation, Uniform Standards of Professional Appraisal Practice (USPAP) |
| *Estate of Kaufman* , TCM 1999-119 | KeyValueData, "National Economic Report", February 2014 and December 2014 |
| https://www.nacva.com/cvaqualifications | JT Research LLC, "Overview of the U.S. Economy", Fourth Quarter 2014 |
| AICPA Accounting and Valuation Guide, *Valuation of Portfolio Company Investments of Venture Capital and Private Equity Funds and Other Investment Companies* , 2019, [accessed via Commerce Clearing House Accounting Research Manager Subscription] | Federal Reserve Bank of Philadelphia Research Department, "Survey of Professional Forecasters", Fourth Quarter 2014 |
| AICPA *Intangible Asset Valuation Cost Approach Methods and Procedures* | AICPA Practice Aid:  *Valuation of Privately-Held-Company Equity Securities Issued as Compensation* , 2013, [accessed via Commerce Clearing House Accounting Research Manager Subscription] |
| Frank M. Burke Jr., *Valuation and Valuation Planning for Closely Held Businesses* (Englewood Cliffs, NJ: Prentice-Hall, 1981). | Therano-no: Key CLIA Compliance Issues, Loyola University Chicago School of Law, May 5, 2022. http://blogs.luc.edu/compliance/?p=4681 |
| International Glossary of Business Valuation Terms as published in *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* by Shannon P. Pratt and Alina V. Niculita, 5th Edition, Appendix A. | CMS, Letter to Theranos, July 7, 2016 |
| BizMiner Industry Financial Analysis Profile; NAICS 5417: Scientific Research & Development Services | Plummer, James L., QED Report on Venture Capital Financial Analysis |
| The Risk Management Association; NAICS 54171N: Research and Development in the Physical, Engineering, and Life Sciences (non-Cost of Sales) | Scherlis, Daniel R. and William A. Sahlman, "A Method for Valuing High-Risk, Long Term, Investments: The Venture Capital Method," Harvard Business School Teaching Note 9-288-006, Boston: Harvard Business School Publishing, 1989 |
| IBISWorld, NAICS 54171 (real growth) | William A. Sahlman, Howard H. Stevenson, Amar V. Bhide, et al., "Financing Entrepreneurial Ventures," Business Fundamental Series (Boston: Harvard Business School Publishing, 1998) |
| https://www.usinflationcalculator.com/inflation/current-inflation-rates/ | Craig R. Everett, "2021 Private Capital Markets Report" (Malibu: Pepperdine University Graziadio School of Business and Management, 2021) |
| Thomson Financials Private Equity Performance Index | Dorsey, Terry, "A Portfolio Model for Venture Capital Performance Measurement and Investment Selection," Polaris Group, Inc. January 2000 |
| Thomson Financials Private Equity Performance Database | |

4 of 4

**ER-750**

JOHN D. CLINE (CA State Bar No. 237759)
600 Stewart Street, Suite 400
Seattle, WA 98101
Telephone: (360) 320-6435
Email: cline@johndclinelaw.com

KEVIN M. DOWNEY (Admitted Pro Hac Vice)
LANCE A. WADE (Admitted Pro Hac Vice)
AMY MASON SAHARIA (Admitted Pro Hac Vice)
KATHERINE TREFZ (CA State Bar No. 262770)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, S.W.
Washington, D.C. 20024
Telephone: (202) 434-5000 │Facsimile: (202) 434-5029
Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

Attorneys for Defendant ELIZABETH A. HOLMES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR-18-00258-EJD |
| Plaintiff, | **DECLARATION OF KATHERINE TREFZ IN SUPPORT OF MS. HOLMES' SENTENCING MEMORANDUM** |
| v. | |
| ELIZABETH HOLMES and RAMESH "SUNNY" BALWANI, | Hon. Edward J. Davila |
| Defendants. | **UPDATED TO REMOVE REDACTIONS** |

DECLARATION OF KATHERINE TREFZ
CR-18-00258-EJD

I, KATHERINE TREFZ, declare as follows:

1.      I represent Defendant Elizabeth Holmes and am a member of the Bar of this Court. Pursuant to Criminal Local Rule 56-1(c) and Civil Local Rule 7-11, I submit this declaration in support of Ms. Holmes' Sentencing Memorandum.

2.      Attached as Exhibit A is a true and correct copy of a collection of letters addressed to the Court submitted in support of Ms. Holmes.  (A redacted version is being filed publicly.  An unredacted version is being filed under seal.)

3.      Attached as Exhibit B is a true and correct copy of U.S. Patent No. 11,385,252 B2, issued by the United States Patent and Trademark Office on July 12, 2022.

4.      Attached as Exhibit C is a true and correct copy of a letter from Ms. Holmes to her parents written when Ms. Holmes was in high school

5.      Attached as Exhibit D is a true and correct copy of a handwritten note written by Ms. Holmes' father dated October 16, 2003.

6.      Attached as Exhibit E is a true and correct copy of a handwritten letter written from Ms. Holmes' father to her dated January 4, 2004.

7.      Attached as Exhibit F is a true and correct copy of a photo of Sunny Balwani, Ms. Holmes, and another individual taken in China in August 2002.

8.      Attached as Exhibit G is a true and correct copy of document bearing the Bates label PC0000001 through PC0000047, as produced by Perkins Coie LLP.  The redactions appeared in the produced version.

9.      Attached as Exhibit H is a true and correct copy of an email dated May 8, 2018, from David Taylor to Erez Levy, cc'ing Elizabeth Holmes and Jeffrey Finger, and its attachment.

10.     Attached as Exhibit I is a true and correct copy a document bearing the Bates labels Dynasty003466 through Dynasty003475.

11.     Attached as Exhibit J is a true and correct copy of a document bearing the Bates labels SEC-DEPO-004639 through SEC-DEPO-004704.

12.     Attached as Exhibit K is a true and correct copy of excerpts of the deposition of Fortress

DECLARATION OF KATHERINE TREFZ
CR-18-00258-EJD

1   executive Erez Levy, bearing the Bates labels SEC-DEPO-004615, SEC-DEPO-004622, and SEC-

2   DEPO-004637.

3        13.    Attached as Exhibit L is a true and correct copy of a June 12, 2016 press release issued

4   by Walgreens.

5        14.    Attached as Exhibit M is a true and correct copy of the Expert Report of Carl S. Saba,

6   served on Ms. Holmes by the government on September 9, 2022.  Exhibit M does not have a cover

7   sheet, as the underlying file is secured.  (Filed under seal.)   [no longer under seal]

8        15.    Attached as Exhibit N is a true and correct copy of an excerpt from Ms. Holmes'

9   Objections and Responses to Plaintiffs' First Set of Interrogatories in *Partner Investments, L.P., et al. v.*

10  *Theranos, Inc. et al.*, Delaware Court of Chancery Civil Action Number 12816-VCL.

11       16.    Attached as Exhibit O is a true and correct copy of a July 20, 2016 email and attachment

12  bearing the Bates labels THER-1498421 through THER-1498424.

13       17.    Attached as Exhibit P is a true and correct copy of the FDA label for the Siemens HIV

14  1/O/2 Enhanced EHIV downloaded from the FDA's website (https://www.fda.gov/vaccines-blood-

15  biologics/approved-blood-products/advia-centaur-hiv-1o2-enhanced-readypack-reagents (last visited

16  November 7, 2022)).

17       18.    Attached as Exhibit Q is a true and correct copy of an April 9, 2013 statement by the

18  American College of Physicians regarding prostate cancer screening, as available on the organization's

19  website as of August 9, 2021.

20       19.    Attached as Exhibit R is a true and correct copy of a document bearing the Bates label

21  THPFM0004198593 through THPFM0004198594, also referenced on the FDA's website at

22  https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfres/res.cfm?id=140899 (last visited November 7,

23  2022).

24       20.    Attached as Exhibit S is a true and correct copy of a document bearing the Bates label

25  THER-AZ-05097313, also referenced on the FDA's website at

26  https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfres/res.cfm?id=143007 (last visited November 7,

27  2022).

28  DECLARATION OF KATHERINE TREFZ
    CR-18-00258-EJD

21.     Attached as Exhibit T is a true and correct copy of excerpts of Ms. Holmes' testimony in the SEC investigation.

22.     Attached as Exhibit U is a true and correct copy of an email dated June 7, 2015 from Ryan Karpel to Elizabeth Holmes, copying Daniel Edlin, and its attachments.  Patient names have been redacted.

23.     Attached as Exhibit V is a true and correct copy of an email dated March 15, 2015 from Ryan Karpel to Elizabeth Holmes, copying Daniel Edlin, and its attachments.  Patient names have been redacted.

24.     Attached as Exhibit W is a true and correct copy of an email dated August 23, 2015 from Ryan Karpel to Elizabeth Holmes, copying Daniel Edlin, and its attachments.  Patient names have been redacted.

25.     Attached as Exhibit X is a true and correct copy of excerpts of the deposition testimony of Wade Miquelon taken in *In re Arizona Theranos, Inc. Litigation* on August 9, 2019.  (Filed under seal.)  [no longer under seal]

26.     Attached as Exhibits Y-1 and Y-2 are true and correct copies of a screen capture of results of the United States Sentencing Commission's Interactive Data Analyzer titled "Sentence Imposed Relative to the Guideline Range Over Time" for fiscal years 2015-2021.  Based on the filters used, this data reflects the Sentencing Commission's data for the North District of California where the primary guideline was § 2B1.1.  Exhibit Y-1 includes all criminal history categories, while Exhibit Y-2 includes only criminal history category I.

27.     Exhibit Z is a true and correct copy of a screen capture of results of the United States Sentencing Commission's Interactive Data Analyzer titled "Average and Median Sentence Length" and "Average and Median Imprisonment Length" for fiscal years 2015-2021.  Based on the filters used, this data reflects the Sentencing Commission's data for the Northern District of California where the primary guideline was § 2B1.1, the sentencing zone was Zone D, and the criminal history category was I.

28.     Exhibits AA-1 and AA-2 are true and correct copies of screen captures of results of the United States Sentencing Commission's Interactive Data Analyzer titled "Sentence Imposed Relative to

DECLARATION OF KATHERINE TREFZ
CR-18-00258-EJD

the Guideline Range Over Time" for fiscal years 2015-2021.  Based on the filters used, this data reflects the Sentencing Commission's data for cases nationwide where the primary guideline was § 2B1.1. Exhibit AA-1 includes all criminal history categories, while Exhibit AA-2 includes only criminal history category I.

29.    Exhibit BB is a true and correct copy of a screen capture of results of the United States Sentencing Commission's Interactive Data Analyzer titled "Average and Median Sentence Length" and "Average and Median Imprisonment Length" for fiscal years 2015-2021.  Based on the filters used, this data reflects the Sentencing Commission's data for cases nationwide where the primary guideline was § 2B1.1, the sentencing zone was Zone D, and the criminal history category was I.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed this 10th day of November 2022 in Washington, D.C.

KATHERINE TREFZ
Attorney for Elizabeth Holmes

DECLARATION OF KATHERINE TREFZ
CR-18-00258-EJD

STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

JEFF SCHENK (CABN 234355)
JOHN C. BOSTIC (CABN 264367)
ROBERT S. LEACH (CABN 196191)
KELLY I. VOLKAR (CABN 301377)
Assistant United States Attorneys

     150 Almaden Boulevard, Suite 900
     San Jose, California 95113
     Telephone: (408) 535-5061
     Fax: (408) 535-5066
     Email:  Robert.Leach@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 18-CR-00258 EJD |
|     Plaintiff, | ) ) | UNITED STATES' SENTENCING MEMORANDUM |
|   v. | ) ) | Date:  November 18, 2022 |
| ELIZABETH A. HOLMES, | ) ) | Time:  10:00 a.m. Court: Hon. Edward J. Davila |
|     Defendant. | ) ) | |
| | ) | |

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................1

INTRODUCTION ........................................................................................................1

FACTS .........................................................................................................................2

I.      THE OFFENSE CONDUCT ............................................................................2

      A.     The Investor Fraud ..............................................................................2

      B.     The Impact on Patients.........................................................................8

      C.     The Cover Up.....................................................................................13

II.     PROCEDURAL HISTORY.............................................................................15

THE SENTENCING GUIDELINES CALCULATION ...........................................15

I.      LOSS MORE THAN $550,000,000 ..............................................................16

II.     OFFENSE INVOLVING 10 OR MORE VICTIMS .....................................20

III.    OFFENSE INVOLVING CONSCIOUS OR RECKLESS RISK
OF DEATH OR  SERIOUS BODILY INJURY ............................................21

      A.     Defendant's Conduct Created a Risk of Serious Harm to Theranos Patients...................21

      B.     Holmes' Treatment of Theranos Patients is Relevant Conduct ..........................................24

IV.    ROLE IN THE OFFENSE...............................................................................26

      A.     Holmes Was a Leader and Organizer ................................................26

      B.     Holmes' Fraud Was "Otherwise Extensive".....................................27

ARGUMENT ..............................................................................................................31

I.      LEGAL STANDARD......................................................................................31

II.     GOVERNMENT RECOMMENDATION .....................................................32

      A.     The Nature and Circumstances of Holmes' Crimes (18 U.S.C. § 3553(a)(1))...................32

      B.     The History and Characteristics of Holmes (18 U.S.C. § 3553(a)(1)) .............................34

      C.     The Need to Reflect the Seriousness of the Offense, Promote Respect for the
Law, and Provide Just Punishment for the Offense (18 U.S.C.
§ 3553(a)(2)(A))................................................................................35

      D.     The Need to Afford Adequate Deterrence to Criminal Conduct (18 U.S.C.
§ 3553(a)(2)(B))................................................................................35

E.      The Need to Protect the Public From Future Crimes by Holmes (18 U.S.C. § 3553(a)(2)(C)) ................................................................................................36

F.      The Properly Calculated Sentencing Guideline Range and Pertinent Policy Statements Provided by the Sentencing Commission (18 U.S.C. §§ 3553(a)(4) & 3553(a)(5)) ............................................................................................................37

G.      The Need to Avoid Unwarranted Disparities (18 U.S.C. § 3553(a)(6)) ...........38

H.      The Need to Provide Restitution to Any Victim ................................................40

III.    RESTITUTION AND FINE ........................................................................................40

CONCLUSION ..................................................................................................................41

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Gall v. United States*,
   552 U.S. 38 (2007)............................................................................................................ 31

*United States v. Bakhit*,
   218 F. Supp. 2d 1232 (C.D. Cal. 2012) ........................................................................... 16

*United States v. Berger*,
   587 F.3d 1038 (9th Cir. 2009) ......................................................................................... 16

*United States v. Booth*,
   309 F.3d 566 (9th Cir. 2002) ..................................................................................... 28, 29

*United States v. Bright*,
   353 F.3d 1114 (9th Cir. 2004) ......................................................................................... 17

*United States v. Bryson*,
   101 F. Supp. 3d 147 (D. Conn. 2015).............................................................................. 17

*United States v. Byors*,
   586 F.3d 222 (2d Cir. 2009)............................................................................................. 17

*United States v. Carty*,
   520 F.3d 984 (9th Cir. 2008) ........................................................................................... 31

*United States v. George*,
   949 F.3d 1181 (9th Cir. 2020) ......................................................................................... 20

*United States v. Goffer*,
   721 F.3d 113 (2nd Cir. 2013)........................................................................................... 36

*United States v. Govan*,
   152 F.3d 1088 (9th Cir.1998) .......................................................................................... 30

*United States v. Henderson*,
   893 F.3d 1338 (11th Cir. 2018) ............................................................................ 21, 22, 23

*United States v. Johansson*,
   249 F.3d 848 (9th Cir. 2001) ........................................................................................... 21

*United States v. Laurienti*,
   611 F.3d 530 (9th Cir. 2010) ........................................................................................... 17

*United States v. Leung,*
    35 F.3d 1402 (9th Cir. 1994) ................................................................ 28

*United States v. Martin,*
    796 F.3d 1101 (9th Cir. 2015) .............................................................. 19

*United States v. Moran,*
    778 F.3d 942 (11th Cir. 2015) .............................................................. 22

*United States v. Musgrave,*
    761 F.3d 602 (6th Cir. 2014) ................................................................ 36

*United States v. Pham,*
    545 F.3d 712 (9th Cir. 2008) ................................................................ 20

*United States v. Popov,*
    555 F. App'x 671 (9th Cir. 2014) ......................................................... 22

*United States v. Ressam,*
    679 F.3d 1069 (9th Cir. 2012) .............................................................. 31

*United States v. Rose,*
    20 F.3d 367 (9th Cir.1994) ................................................................... 30

*United States v. Turk,*
    626 F.3d 743 (2d Cir. 2010) ................................................................. 17

*United States v. Watts,*
    519 U.S. 148 (1997) ...................................................................... 24, 33

*United States v. Zolp,*
    479 F.3d 715 (9th Cir. 2007) ................................................................ 16

**Statutes**

18 U.S.C. § 3553 ............................................................................................ 2, 7
18 U.S.C. § 3553(a) ........................................................................... 31, 32, 38
18 U.S.C. § 3553(a)(1) ....................................................................... 32, 33, 34
18 U.S.C. § 3553(a)(2)(A) ............................................................................ 35
18 U.S.C. § 3553(a)(2)(B) ............................................................................ 35
18 U.S.C. § 3553(a)(2)(C) ............................................................................ 36
18 U.S.C. § 3553(a)(6) ........................................................................... 38, 39
18 U.S.C. § 3663A(a)(1) .............................................................................. 40
18 U.S.C. § 3664(d)(5) ................................................................................. 41

## INTRODUCTION

Over the course of many years, Elizabeth Holmes defrauded dozens of investors of hundreds of millions of dollars.  Time and again, she chose deceit over candor.  She forged her own endorsements.  She preyed on hopes of her investors that a young, dynamic entrepreneur had changed healthcare.  She leveraged the credibility of her illustrious board.  And, through her deceit, she attained spectacular fame, adoration, and billions of dollars of wealth.

When a journalist dared to ask questions about Theranos' actual achievements, she tried to dupe him and then attacked him, along with his sources.  After her fraud was revealed, she lied, obfuscated, and concealed.  At trial, she blamed her COO (and longtime boyfriend), her board, her scientists, her business partners, her investors, her marketing firm, her attorneys, the media—everyone, that is, but herself.

She also put patients at risk.  As money was drying up, she went to market with an unproven and unreliable medical device.  When her lead assay developer quit as Theranos launched, she chillingly told the scientist: "she has a promise to deliver to the customer, she doesn't have much of a choice but to go ahead with the launch."  Trial Transcript ("Tr.") at 1216.  As her lab director kept encountering issues with Theranos' device and tests, she chose "PR and fundraising" over patient care.  Tr. at 1703.  During her fraud scheme, women received wrong tests about their pregnancies, Theranos generated wrong results for cancer tests, and one victim was led to believe she had the virus that causes AIDS.  Even after Theranos itself concluded that there was a possible patient impact for every single test run for patients on its "Edison" device and voided all Edison tests, Holmes minimized its primary regulator's findings of immediate jeopardy and condition-level deficiencies as not "major."  Tr. at 4709.

Holmes speaks eloquently about her desire to innovate and improve healthcare.  She has demonstrated a strong work ethic, charisma, and ambition.  But she is blinded by that ambition.  Her reality distortion field put, and will continue to put, people in harm's way.  She stands before the Court remorseless.  She accepts no responsibility.  Quite the opposite, she insists she is the victim.

She is not.  Holmes was the CEO and the Chairperson of Theranos.  She repeatedly chose lies, hype, and the prospect of billions of dollars over patient safety and fair dealing with investors.  Elizabeth

Holmes' crimes were not failing, they were lying—lying in the most serious context, where everyone needed her to tell the truth.

The Sentencing Guidelines appropriately recognize that Holmes' crimes were extraordinarily serious, among the most substantial white collar offenses Silicon Valley or any other District has seen. According to the Presentence Investigation Report ("PSR"), they yield a recommended custodial sentence beyond the statutory maximum. The factors set forth in 18 U.S.C. § 3553—notably the nature and circumstances of the offense, the need for the sentence to reflect the seriousness of the offense and promote respect for the law, and the need for both specific deterrence and general deterrence—demand a significant custodial sentence. With these factors in mind, the government respectfully recommends a sentence of 180 months in custody. The Court should also order Holmes to serve a three-year term of supervised release, pay full restitution to her investors (including Walgreens and Safeway), and pay the required special assessment for each count.

## FACTS

### I.      THE OFFENSE CONDUCT

#### A.      The Investor Fraud

Through numerous misrepresentations and half-truths, Holmes sold investors on the fact that Theranos had a customer-ready device—proven through its use and validation by several large pharmaceutical companies, the Department of Defense, and Walgreens—that analyzed tiny drops of blood taken from the finger to produce better, faster, cheaper, more accurate laboratory test results. Specifically, Holmes secured dozens of investors in Theranos over several years by falsely claiming that Theranos had manufactured one single, proprietary blood analyzer device that could run any blood test that was run by conventional labs, all from a blood sample drawn via a fingerstick rather than the traditional draw from a vein, with higher accuracy and less variability than traditional methods, due in part to its more automated process that reduced human error inherent in running blood tests in a laboratory. To support her bold claims, Holmes repeatedly told potential investors that Theranos' technology had been comprehensively validated by multiple major pharmaceutical companies and was being used in the battlefield by the Department of Defense to treat wounded soldiers. Holmes also asserted that Theranos was a profitable company and had a healthy ongoing relationship with retail

pharmacy company Walgreens, through which it provided blood tests to patients beginning in September 2013.  Not only did several representatives of investors testify that Holmes made these statements to them in meetings, Holmes also began providing written materials and binders to investors in 2014 and 2015 that contained these false statements.

In truth, scientists who had worked at Theranos testified that Theranos' proprietary device could never complete more than 12 types of blood tests, often with less accuracy, less automation, and more variability than traditional "predicate" machines manufactured by third-party companies, such as Siemens AG.  Because of these shortcomings, pharmaceutical companies did very little work with Theranos and did not validate its technology, and the Department of Defense never used Theranos' analyzer to clinically treat soldiers.  Theranos had zero revenue in 2012 and 2013 and desperately needed new sources of cash.  Holmes hid the shortcomings of Theranos' proprietary device by using— without telling potential investors—modified and unmodified third-party machines to fulfill the remainder of Theranos' available blood test menu to patients at Walgreens stores.  As a result, Theranos' relationship with Walgreens was faltering because the percentage of traditional venous draws was too high.  But none of this information was shared with investors in Theranos.

As but a few examples of misrepresentations made by Holmes to Theranos investors:

- In April 2010, Holmes emailed executives of Walgreens reports with favorable conclusions about Theranos' technology that were emblazoned with logos of large pharmaceutical companies Pfizer, GlaxoSmithKline, and Schering Plough (now Merck) and Holmes described the attached reports as "three independent due diligence reports on Theranos systems" that were "from" those companies.  However, at trial, Holmes admitted that she added the logos of the pharmaceutical companies to reports written by Theranos and enhanced the conclusions shortly before sending to Walgreens.  And, while a Pfizer representative testified at trial that he told Holmes directly that Pfizer did not see a use for Theranos' technology in 2009, Holmes continued to send the doctored Pfizer report to investors throughout 2014 and 2015.

- In 2010, Holmes told Steve Burd, then-CEO of Safeway, that Theranos was cash flow neutral and projected revenue for 2011 of $223 million when, in truth, Theranos' revenue was steadily declining from approximately $2.8 million in 2009 to less than $600,000 in 2011.  Despite Theranos

earning *zero* revenue in 2012 and 2013, Holmes and COO Ramesh Balwani provided investors with projections that Theranos would earn $140 million in revenue for 2014 and nearly $1 billion in 2015. Indeed, Holmes told one investor in December 2013 that Theranos had historically earned over $200 million from its work with the Department of Defense and pharmaceutical companies, when, in reality, Theranos had never earned more than $10 million from both sources combined.

- In August and September 2013, internal Theranos scientists, including long-time employee Surekha Gangakhedkar and then-laboratory director Dr. Adam Rosendorff warned Holmes that Theranos' proprietary device was not able to reliably test patient samples. They both testified that Holmes pressured and rushed the scientists to quickly validate assays for clinical use in advance of the launch with Walgreens. Ms. Gangakhedkar and other scientists ultimately resigned shortly before the Walgreens launch because of concerns with reliability of running patient tests on Theranos' proprietary device, but when Ms. Gangakhedkar informed Holmes of her concerns, Holmes responded that she had made a promise to deliver to the customer (Walgreens) that she must fulfill. Despite these internal concerns being voiced repeatedly to Holmes, Holmes reviewed and approved an article in *The Wall Street Journal* claiming Theranos' device could run 1,000 laboratory tests with more accuracy than conventional methods. Holmes shared the article with investors.

- In 2013 and 2014, Holmes repeatedly told investors that the Department of Defense was using Theranos' proprietary analyzer on medevac helicopters, in the battlefield, or to treat soldiers in Afghanistan or Iraq. In truth, the Department of Defense never used Theranos' device to clinically treat patients, nor did it ever move out of initial testing phases. One investor victim impact statement captures the depravity of Holmes' lies in this respect as follows: "I feel strongly that the sentencing should take into account Defendants' intentional decision to prey upon investors' reverence for our servicemen and servicewomen in the Armed Forces. Our country's freedom is protected everyday by the courageous and selfless service of these men and women, and the Defendants took advantage of investors' patriotic feelings for selfish gain through deceit. Indeed, Elizabeth Holmes lied to me about saving soldiers' lives through military contracts and Theranos' use of 'proprietary technology' on military helicopters. Simply put, Holmes's actions were loathsome and un-American." Victim Impact Statement of Craig Hall dated Sept. 6, 2022, at p.1.

- In August 2014, Balwani forwarded to Holmes an email from Walgreens executives expressing a desire to reduce venous draws to below 10% (whereas they had been hovering around 40% for most of the year) before expanding further.  Nevertheless, Holmes presented financial projections to at least one investor in October 2014 that projected Theranos would increase from being in a few dozen Walgreens stores to being in 900 locations by 2015.

Holmes exploited investors' altruistic motives to dupe investors of all experience levels to invest in Theranos.  Holmes fooled investors who were new to the healthcare investment sphere as well as investors with deep sophistication and experience in the healthcare and bio-tech sector, such as PFM, a regulated investment entity, led by managing partner and chief investment officer Brian Grossman, who had over twenty years of experience analyzing or investing in companies like Theranos.  Mr. Grossman testified that he sent lengthy due diligence questions to Holmes and Balwani to ensure there was no ambiguity about the limitations of Theranos' proprietary technology, and yet he was shocked to learn more than eighteen months after his investment that Theranos used third-party commercial machines and not exclusively Theranos' proprietary device as Holmes had previously led him to believe.  Former Secretary of State George Shultz invested in Theranos on behalf of his family members and, as his son and daughter-in-law described in their victim impact statement, "[Holmes] succeeded by using my father (and others) and played him for the fool."  Victim Impact Statement of Alex & Janel Shultz at p.1. Holmes often seized upon investors' desire to make the world a better place in order to lure them into believing her lies.  For example, Lisa Peterson, a representative of investor RDV Corporation, was moved by Holmes' pitch because she could envision the benefits Holmes promised Theranos could deliver on her husband's health condition.  Holmes and Balwani knew this and even sent text messages to each other such as "[t]hey also care about our mission to do good because they are a religious org" to which Holmes responds "Good[.]"  TX 5387D at 21.

While Holmes was publicly touting Theranos as a revolution in healthcare, she and Balwani quietly and repeatedly acknowledged the dark reality within Theranos to each other.  For example, they texted as follows:

| Date | Exchange | TX 5387D page |
|---|---|---|
| 5/9/2012 | EAH: "We have to work together on the rev piece" | 7 |

|  | SB: "you are the company.  we need revenue . . . ." |  |
|---|---|---|
| 11/20/2013 | SB: "Pissing me off we don't have anyone managing PSC, ctn production, cart production, elisa assays, TSH"  EAH: "I know." | 14-15 |
| 11/19/2014 | SB: "Need to focus on ops. . . . Lab, customer service, tat, all need director level people . . . . We need. The lab and call center fixed. . . . Rebuild."  EAH:  "Fundamentally we need to stop fighting fires by not creating them . . .  Need to fix root cause here . . . Yes" | 23-24 |
| 11/19/2014 | SB: "We can't scale with wag." | 24 |
| 11/28/2014 | SB: "Normand lab is a fucking disaster zone." | 29 |
| 4/10/2015 | SB: "The point about narrowing down menu to hit high fs % came to me like gift of God. . . . We must hit our volume goals now.  We need to make it a matter of life and death. Survival.  We must not lose" | 43 |
| 4/25/2015 | SB: "I am worried about over exposure without solid substance which is lacking right now.  We can talk tomorrow about over exposure."  EAH: "Agree." | 54 |
| 4/28/2015 | SB: "It is most maddening there is no focus in any chem teams and no product coming out."  EAH: "I know." | 58 |
| 5/6/2015 | SB: "We need our heads down and execute.  Bring billion equity and billion revenue."  EAH: "I know.  Thinking same." | 68 |
| 5/13/2015 | SB: "We need a better strategy for Normandy.  For a long time to come we will have hybrid solutions. . . ."  EAH: "I agree." | 78 |
| 6/3/2015 | SB: "We need to focus on being a technology company.  We spend all our time with CLIA morons."  EAH: "Yes"  SB: "I deal with CLIA everyday and I hate the low quality of people in lab . . . ."  EAH: "I was thinking about the exact same." | 83 |

| 7/28/2015 | SB: "We need to commit to each other and get out of this hell so we can live in paradise we both have." | 90 |
|---|---|---|
| | EAH: "I have literally been meditating on exact same. Whole time I was running was thinking that. . . ." | |
| | SB: "We need to commit to focusing and getting in paradise." | |
| | EAH: "Product company.  Winning" | |
| 9/22/2015 | SB: "Our validation reports are terrible.  Really painful going thru this process.  Same issues fda pointed out. . . . Going bad so far.  Pray.  Daniel has nothing ready . . . ." | 107 |
| | EAH: "Praying" | |

In a note to herself, Holmes said Balwani was "[c]onvinced never happen ever.  Not thanksgiving not ever."  TX 7534.  Balwani, Holmes wrote, bemoaned there was "[n]o product" and the "[f]ucking mediocre quality of this piece of shit company."  *Id.*  When they drew government scrutiny, Holmes and Balwani bragged about their ability to "run circles around others and fda by manipulating their game."  TX 5387D at 102; *id.* (EAH: "We can definitely run circles.").

Holmes' fraud was spectacularly successful.  At the peak, she was "one of the richest and most celebrated woman leaders in our [country's] history."  Victim Impact Statement of Alex and Janel Shultz at 2.  By the end of 2014, Holmes' shares in Theranos were valued at more than **$4 billion**.  Tr. at 8014.  She took home hundreds of thousands of dollars in annual salary.  PSR ¶ 162.  She traveled in a Theranos-paid private jet.  Tr. at 721-22; TX 5387D at 3 (Holmes and Balwani musing about "get[ting] a plane for these short journeys after C2 [a reference to the C-2 investment round]").  She and Balwani ruled Theranos from a $15 million mansion in Atherton.  PSR ¶ 166 at p. 44.  She donned the cover of *Fortune*, *Forbes*, *Inc.*, *Glamour*, and *T: The New Your Times Style Magazine*.  *See* https://www.nytimes.com/2015/10/30/business/the-narrative-frays-for-theranos-and-elizabeth-holmes.html.  She dined at the White House; she gave the commencement address at Pepperdine University; she joined the Board of Fellows of Harvard Medical School; and at the peak of the fraud was named by *Time* as one of the 100 Most Influential People in the World.  *Id.*; TX 5387D at 34;

https://blogs.bmj.com/bmj/2019/04/12/jeffrey-flier-elizabeth-holmes-and-harvard-medical-school-board-of-fellows-a-cautionary-tale/.

Between 2010, when she induced Walgreens and Safeway to invest based on false pharmaceutical company endorsements and fantastical revenue projections, and March 2015, Holmes raised hundreds of millions of dollars. As the PSR notes, $730,840,309 came from "Series C-1" and "Series C-2" investors who invested subsequent to Theranos' public relations push in September 2013 during the conspiracy. Representatives of seven such investors testified in the trials: Alan Eisenman, Brian Grossman (Partner Investments LP/PFM Healthcare), Chris Lucas (Black Diamond Ventures XII-B, LLC), Pat Mendenhall (Mendenhall TF Partners), Daniel Mosley (Mosley Family Holdings LLC), Lisa Peterson (RDV Corporation/Dynasty Financial II/Lakeshore Capital Management), and Bryan Tolbert (Hall Black Diamond II LLC). At least eight additional investor/investor representatives (including three board members) were interviewed by the government, testified before the SEC, or submitted victim impact statements: David Boies (Boies, Schiller & Flexner LLP), Kendra Fadil, Frank Gordon (Crofton Capital/Gordon Family Trust), Henry Kissinger, Richard Kovacevich, Don Lucas Jr. (Lucas Venture Group), Mark Campbell and Jared Hutchings (Peer Ventures Group), and Natalie Ravitz (Rupert Murdoch). *See* 11/11/2022 Decl. of AUSA Robert S. Leach in Support of U.S.' Sentencing Memorandum, Exhibits B-L, filed concurrently. The $730,840,309 in C-1 and C-2 investments does *not* include an additional $70 invested by Walgreens and Safeway on account of convertible promissory notes and $3 million invested by director George Shultz, who testified in PFM's civil action against Holmes and whose family also submitted a victim impact statement.

### B.    The Impact on Patients

Throughout the relevant time period, Holmes touted Theranos as a company that would revolutionize blood testing, making health information more reliable and more accessible. Beginning in late 2013, Theranos actually offered clinical blood testing services to the public, first in the Bay Area, then in Arizona. To jumpstart the process of making its tests available to the public, and to reach as many patients as it could, Theranos partnered with retail pharmacy chain Walgreens—a company with a nationwide footprint that could make Theranos' product accessible to most of the country's population. In so doing, Holmes and Balwani benefitted from goodwill and credibility associated with the

Walgreens name.  There can be no doubt that, as with investors, patients were more comfortable trusting Theranos because they assumed that an established business like Walgreens would not promote a service that was not similarly legitimate and reputable.  Thus, Walgreens was not only Theranos' launchpad but also its de facto ambassador.  Throughout the partnership with Walgreens, Defendants pushed for wider and faster expansion, with Walgreens holding back and expressing concerns over Theranos' inability conduct much of its testing using its vaunted fingerstick method, among other things.  Despite Walgreens' hesitations about expanding the Theranos partnership more rapidly, thousands of patients ended up receiving blood test services from Theranos between 2013 and 2015.

The evidence at trial revealed something Holmes and Balwani worked hard to hide from those patients:  Theranos' proprietary testing was not reliable.  Theranos' homegrown "TSPU" device—used for several important tests including HCG (to assess the presence and stage of a pregnancy), PSA (to check for potentially lethal prostate cancer), and TSH (a measure of thyroid health) (TX 4533)—was plagued by issues.  It broke down frequently and, when it did return results, it suffered from serious accuracy problems.  *See* TX 1587, 1633.  Erika Cheung, a Theranos employee who operated the TSPU to generate patient test results, had the following to say about her faith in the technology:

> I was really stressed and uncomfortable with what was going on because I had at that
> point amassed a lot of evidence to suggest that the technology, the Edison device
> specifically, were not adequate to test on patients, and I did not feel comfortable running
> patient samples.

9/15/21 Tr. at 968.  Ms. Cheung went on to explain that she was concerned about patients, who "think that they're getting accurate results, and they're making very important medical decisions about what their treatments are, what their diagnoses are, what medications they take…." *Id.* at 969.  Dr. Rosendorff agreed that the Edison device was flawed, explaining that he resigned from his job as Theranos lab director partly because he was being asked to vouch for tests that he did not have confidence in, and he felt that the testing platform "was not allowing [him] to function effectively as a lab director."  9/24/21 Tr. at 1703.  Similar problems arose when Theranos used modified third-party devices to test finger-stick samples.  *See* 10/6/21 Tr. at 2810 (Dr. Rosendorff testifying that the Theranos modifications to third-party devices made them less

accurate).

Erika Cheung and Dr. Rosendorff were not alone in their concerns about the reliability of Theranos technology. Surekha Gangakhedkar was a senior scientist who resigned from Theranos upon learning of the company's plan to use its Edison 3.0 and 3.5 devices to conduct clinical testing for patients. 9/17/21 Tr. at 1149-50. She explained that she knew of "reliability issues" with those devices that were not fully resolved, affecting their ability to return consistent results. *Id.* at 1186-87.

Given the dim view that Theranos' own scientists took of its technology, it is no surprise that a number of Theranos patients received results that were suspicious or demonstrably incorrect. For example, Dr. Mark Burnes testified at trial about a patient named Mehrl Ellsworth, who sought PSA (prostate specific antigen) testing from Theranos in advance of an international trip. 11/18/21 Tr. at 6836. Theranos reported Dr. Ellsworth's PSA levels to be extremely elevated compared to his previous results—a change that could have indicated of prostate cancer if accurate. TX 4938, 4415; 11/18/21 Tr. at 6882. Dr. Ellsworth's next test from Theranos, however, showed normal PSA levels. TX 4938, 4415; 11/18/21 Tr. at 6842-6856. The third test from Theranos was once again dramatically elevated, but subsequent testing returned normal results. *Id.* It turned out that the two unexpectedly elevated PSA results from Theranos had something in common: they were both run on a Theranos proprietary system, whereas the normal results had been generated by traditional, FDA-approved methods. *Id.* Dr. Burnes was able to conclude that the elevated PSA levels indicated by the Theranos-specific tests were not valid. 11/18/21 Tr. at 6858. Theranos' repeated failure to return an accurate PSA test result after multiple attempts using its proprietary equipment speaks volumes about the reliability of Theranos technology.

Theranos patients also experienced problems with the company's PT/INR test, which relates to blood clotting. Patient "AT" suffered from atrial fibrillation (AFib) and her doctor instructed her to obtain a PT/INR test from Theranos. PSR ¶ 55. Although her PT/INR level was normally between two and three, Theranos returned an unusually low level of 0.08. *Id.* "AT's" doctor did not believe the Theranos results could be accurate, and sent her to a traditional lab for confirmatory testing, which yielded a result of 2.8—in her typical range for that assay. *Id.* "AT" told government investigators that, had she adjusted her medication in response to the erroneously low Theranos PT/INR value, she would

have been at risk for internal bleeding, a common complication of AFib.  *Id.*  Theranos' own employees were not immune from questionable results.  "EG" was a Theranos phlebotomist who had been on blood-thinning medication for years due to a history of blood clots.  *Id.* at 56.  When she went to Theranos for a PT/INR test, her results came back markedly different from her usual levels, and her doctor adjusted her medication in response.  *Id.*  Due to skepticism over the validity of the Theranos results, "EG" had confirmatory testing performed at a traditional lab and received results matching her usual values, showing that the adjustment to her medication had been unnecessary.  *Id.*

Several Theranos patients received erroneous HCG tests providing inaccurate information about the status of their pregnancies.  Brittany Gould and her treating nurse practitioner, Dr. Audra Zachman, testified at trial about multiple dubious HCG results provided by Theranos in October 2014.  *See* TX 5410, 2044, 4242, 3305, 5411.  Ms. Gould, who had suffered multiple miscarriages in the past, obtained a series of HCG values from Theranos and traditional lab Quest Diagnostics over the course of a week.  The Theranos results—which included a dramatic drop in HCG value—strongly indicated that Ms. Gould was having another miscarriage, but confirmatory testing by Quest indicated a viable pregnancy, and Ms. Gould went on to deliver a healthy baby.  9/21/21 Tr. at 1396-1403.  Dr. Zachman testified that she doubted the accuracy of both Theranos test results received by Ms. Gould, and stated that she had never had accuracy issues with HCG tests from other labs the way she did with the results for Ms. Gould.  *Id.*  Unfortunately, Ms Gould's experience with Theranos' HCG test was not unique.  In May 2014, a physician had called Theranos about HCG results that turned out to be unexpectedly low and would have suggested a miscarriage if accurate, prompting the company to collect another sample and rerun the test.  TX 4145.  Five months later, a provider contacted Theranos to complain about Theranos HCG tests that had suggested that a pregnant patient was miscarrying.  TX 4222.  In response to that Theranos test value, the patient's doctor had her discontinue pregnancy medications and get ready for her next cycle.  *Id.*  When the patient was tested again for HCG, however, her value was over 2000 and a subsequent scan detected a fetal heartbeat.  *Id.*  When Holmes learned about this erroneous test result, she asked Balwani, "How did that happen?"—a strange question from someone who had been aware of problems with Theranos' HCG test for months.

/ /

It is impossible to know exactly how many times frightening scenarios like these played out in the lives of patients who trusted their blood testing to Theranos.  The government's investigation of Theranos did not reveal a centralized, comprehensive log of customer complaints.  Instead, that information was apparently stored in multiple places and compiled as needed.  *See* Balwani TX 4520. (complaint log selections provided to Balwani in connection with Adam Rosendorff).  Equally alarming is the high likelihood that numerous patients relied on inaccurate blood test results from Theranos without ever realizing that they were unreliable.  It is likely that some portion of Theranos patients experienced harm to their health as a result of invalid Theranos test results without ever realizing the cause.

The evidence available paints a bleak picture of Theranos' ability to return valid results using its TSPU analyzer.  Internal quality control checks at Theranos provided a valuable objective measure of how accurate the analyzer was.  Analyzing standardized samples, with known concentrations of the substance being tested, the Theranos machines would either pass or fail daily checks of individual assays.  In March of 2014, records indicate that nearly 26% of quality control checks on the TSPU resulted in failures, i.e., inaccurate results.  TX 1633.  Some of the individual assays performed even worse.  Theranos' PSA test failed quality control nearly 30% of the time, and the company's test for triiodothyronine failed more than 50% of the time.  *Id.*  Because there is no guaranteed way to identify inaccurate patient test results, Theranos' poor QC numbers are the best available method to estimate how frequently Theranos was sending incorrect values to patients.  *See* 9/15/21 Tr. at 967.

When Centers for Medicare and Medicaid Services (CMS) inspected Theranos in the late summer and fall of 2015, the agency found systemic issues with quality control for the Theranos miniature analyzer or TSPU.  PSR ¶ 58.  In particular, CMS put Theranos on notice of "multiple and recurrent time periods (across all analytes tested) of abrupt shifts in [quality control] means, high rates of 1-2s QC rule failures, and QC CVs far exceeding limits for a stable testing process."  *Id.*  In other words, Theranos' own quality control data revealed severe reliability problems with its testing systems, just as employees had warned Defendants years earlier.  Faced with CMS's findings, Theranos itself admitted that there had been "a global and long-term failure of the quality control program for this instrument," and further concluded that "there is a possible patient impact for every test reported from

the laboratory's TPS 3.5 instruments." *Id.* Based on the scale of the problems highlighted by CMS, Theranos voided every patient test result ever run on its Edison device in the clinical lab. Of course, this step did nothing to mitigate the harm patients would already have suffered due to their reliance on inaccurate medical test information.

### C. The Cover Up

In April 2015, Holmes learned that a *Wall Street Journal* reporter was working on a negative story about Theranos. *See* TX 5387D at 50 ("Wsj guy might show up tomorrow"). She and Balwani scrambled to have the Phoenix store prepared to perform only fingerstick tests rather than vein draws – hoping to avoid the possible impression Theranos was doing ordinary blood testing. *Id.* (SB: "We need tomorrow to test and then the team can push production tomorrow night. . . . So Wednesday it will trigger fs for gc18 [general chemistry] . . . [s]o if he comes it may be 3 fs."). Ultimately, Balwani told Holmes "[t]he team is not confident about pushing out fingerstick tonite . . . we don't want to rush this. We went thru hell." *Id.* at 52. Unable to dupe the reporter, they then hired David Boies to try to get him to drop the story. Tr. at 7998. When that failed, Holmes personally appealed to the owner of *The Wall Street Journal*, who also was a significant investor in Theranos, to quash the story. Tr. at 7999; TX 5704.

Holmes also attacked those she believed to be the reporter's sources. *See* Victim Impact Statement of Alex & Janel Shultz at 1 ("[S]he sure did her best to intimidate and silence the truth tellers."). In June 2015, she had a man sit all day outside of Erika Cheung's new workplace to serve a letter from Boies Schiller Flexner LLP threatening her with legal action. Tr. at 982-985, 7974-77; TX 2567; TX 5387D at 85 (SB: "I am ok sending letter to Erika as in [General Counsel] heather [King's] email"). After the reporter published a negative story, Holmes tried to dismiss Cheung as a low-level disgruntled employee. Tr. at 7978. She also had Boies Schiller lawyers surprise Tyler Shultz at his grandfather George Shultz's house to have him sign an affidavit identifying himself as a source for the reporter. Tr. at 7995-97; Leach Decl. Ex. L at 55-58; TX 5387D at 76 (EAH: "If Tyler thinking abt George fyi at right time"); *id.* at 82 (SB: "You not calling George back also sends a message that we are about to suit"). The incident enraged George Shultz, which he described as "one of the worst little things he had seen anybody try to do." Tr. at 7995-96; Leach Decl. Ex. L at 57; TX 5387D at 84

("George wants to know what Tyler has done. Would you ask David if I should say or tell him we'll let him know la[t]er and txt me back").  During this time period, Holmes and Balwani also discussed "nail[ing] this mother fucker" "in CLIA" who they believed to be spreading negative information, and at various times contemplated action against "Tyler [Schultz],", "Erika [Cheug]," "Adam [Rosendorff]," and "Rochelle [Gibbons]," the wife of a Theranos scientist who committed suicide in 2013.  TX 5387D at 76-78, 86; Tr. at 1468-71, 8474; Balwani Trial Transcript at 6531.

When the negative *Wall Street Journal* story broke, Holmes lied and dissembled.  On October 15, 2015, when confronted on Jim Cramer's *Mad Money* with the *Journal*'s claim that Edison could only do 15 out of 240 tests, Holmes falsely stated "every test that we offer in our laboratory can run on our proprietary devices."  TX 2851.  At the time, Theranos was not using Edison (or any future iteration of its device) for *any* tests, and had never used Edison for more than 12.  On October 21, 2015, she falsely stated at a public conference that Theranos "never used commercially available lab equipment for finger-stick based tests."  ECF No. 588 at 14; https://www.wsj.com/video/elizabeth-holmes-discusses-theranos-at-wsjdlive-2015/20CE68A0-CAEE-48E0-BAB4-FD6C47D283BE.html.  The comment so concerned Balwani that he texted: "Worried about your 'all fingersticks on our technology' comment."  TX 5387D at 117.

Months later, Holmes "continued to withhold information from [RDV] and other investors, which . . . made it impossible to make informed decisions about the status and value of our investment."  *See* Victim Impact Statement of RDV Corporation dated Aug. 26, 2022 at p.4.  She insisted the issues CMS identified were not major and downplayed their significance.  Tr. at 4709.

Holmes' coverup had lasting and devastating effects.  According to one victim impact statement, Holmes "intentionally lied to [George Shultz] about Tyler to discredit him to prevent [George Shultz] from learning the truth," creating a "permanent rift" within the family.  *See* Victim Impact Statement of Alex & Janel Shultz at p.2 (describing how Holmes "[took] a wrecking ball to [Shultz's] family" and stating "[t]he most heart breaking of all is to hear your son describe that he contemplated suicide because he felt abandoned, isolated, threatened and hopeless, for doing the right thing.").

/ /

## II.    PROCEDURAL HISTORY

On July 28, 2020, the government filed the Third Superseding Indictment, charging Holmes and Balwani with ten counts of wire fraud (Counts 3-12) and two counts of conspiracy to commit wire fraud (Counts 1-2).  ECF No. 469.  The Court severed the case in March 2020.  ECF No. 362.  Beginning on August 31, 2021, Holmes' trial spanned four months, during which over 900 exhibits were admitted and 32 witnesses testified.  *See* ECF No. 1395.  On January 3, 2022, the jury found Holmes guilty of four counts charging conspiracy to commit wire fraud during the period 2010 to 2015 and wire fraud against three specific investors in Theranos (Mosley, RDV, and PFM).  ECF No. 1235.  The jury did not reach a unanimous verdict with respect to the remaining investor-related counts and acquitted Holmes on the patient-related counts.  *Id.*  Balwani's separate trial began in March 2022 on the same twelve counts.  Following a comparably lengthy trial, the jury found Balwani guilty of all twelve counts.  ECF No. 1507.

### THE SENTENCING GUIDELINES CALCULATION

The government calculates the total offense level as follows:

| | | |
|---|---|---|
| a. | Base Offense Level, U.S.S.G. § 2B1.1(a)(1) | 7 |
| b. | Specific offense characteristics, U.S.S.G. § 2B1.1(b) | |
| | Loss more than $550,000,000, U.S.S.G. § 2B1.1(b)(1)(P) | +30 |
| | Offense involving 10 or more victims, U.S.S.G. § 2B1.1(b)(2)(A) | +2 |
| | Offense involving the conscious or reckless risk of death or serious bodily injury, U.S.S.G. § 2B1.1(b)(16) | +2 |
| c. | Adjustment for Role in the Offense, U.S.S.G. § 3B1.1(c) | +4 |
| d. | Total Offense Level | 43[1] |

Holmes falls within Criminal History Category I.  Thus, for Offense Level 43, the Guidelines recommend a sentence beyond the statutory maximum of 80 years.  The PSR omits the 2B1.1(b)(16) enhancement; the government objects to the omission.  The PSR recommends that the Court vary from Guidelines and impose a sentence of 108 months.  *See* PSR Sentencing Recommendation at p.1.

---

[1]    The Guidelines provide that "[a]n offense level of more than 43 is to be treated as an offense level of 43."  U.S.S.G. Ch. 5, Part A applic. note 2.

The government agrees with the Probation Office that the total offense level is 43.  Holmes objects to the application of certain adjustments.  The government thus addresses them in turn.

**I.      LOSS MORE THAN $550,000,000**

Under the Guidelines, loss "is the greater of actual or intended loss."  U.S.S.G. § 2B1.1(b) applic. note 3(A).  "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense."  *Id.* note 3(A)(i).  "'Intended loss' . . . [includes] the pecuniary harm that the defendant purposely sought to inflict."  *Id.* note 3(A)(ii).  "'[R]easonably foreseeable pecuniary harm' means pecuniary harm [i.e., harm that is monetary or otherwise readily measurably in money] that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense."  *Id.* notes 3(A)(iii & iv).

"The guidelines do not present a single universal method for loss calculation under § 2B1.1 . . . ."  *United States v. Zolp*, 479 F.3d 715, 718 (9th Cir. 2007).  The Court "need only make a reasonable estimate of the loss."  U.S.S.G. § 2B1.1(b) note 3(C).  Because the Court is in a unique position to assess the evidence and estimate the loss, its determination is entitled to appropriate deference.  *Id.*  In estimating loss, the Guidelines direct the Court to consider "the cost to the victim of replacing [the unlawfully taken] property," "[t]he approximate number of victims," and "reduction that resulted from the offense in the value of equity securities or other corporate assets."  *Id.*

In the context of public company securities, the Ninth Circuit has expressly rejected the need to show "loss causation."  *United States v. Berger*, 587 F.3d 1038, 1044-45 (9th Cir. 2009).  In the public company context, the Ninth Circuit has observed:

> Measurement of loss becomes considerably more complex, however, when the court confronts a "pump-and-dump" scheme involving an otherwise legitimate company.  In such a case, because the stock continues to have residual value after the fraudulent scheme is revealed, the court may not assume that the loss inflicted equals the full pre-disclosure value of the stock; rather, the court must disentangle the underlying value of the stock, inflation of that value due to the fraud, and either inflation or deflation of that value due to unrelated causes.

*Zolp*, 479 F.3d at 719 (citing cases involving public company securities and efficient markets); *United States v. Bakhit*, 218 F. Supp. 2d 1232, 1236-37 (C.D. Cal. 2012) (cited by *Zolp* with approval and

noting "after the fraud was fully disclosed and absorbed by the market, [the] stock continued to trade at around $5.00 per share.").

Conversely, the "pecuniary harm" to an investor induced to invest by fraud is the amount of the investment. *See*, *e.g.*, *United States v. Turk*, 626 F.3d 743, 750 (2d Cir. 2010) ("[T]he crux of [defendant's] offense is that she obtained loans by fraudulently leading unsecured creditors to believe that they were secured creditors. Without this deceit, she could not have obtained her victims' money."); *United States v. Bryson*, 101 F. Supp. 3d 147, 155 (D. Conn. 2015) ("[F]or those investors who were fraudulent induced to invest following the onset of the conspiracy, a reasonable estimate of the actual loss attributable to the offense conduct is the total value of their investment.") (citing *Turk*, 626 F.3d at 750). Where a defendant's victims are "left with nothing of value when the fraud was uncovered," a court may find "loss based on the victims' total . . . investment." *United States v. Byors*, 586 F.3d 222, 226 (2d Cir. 2009).

"Because [Holmes] was convicted of conspiracy, and because the losses were incurred because of that conspiracy, the 'preponderance of the evidence' standard applies." *See United States v. Laurienti*, 611 F.3d 530, 556 (9th Cir. 2010); *id.* at 557 (noting a court may infer in the conspiracy context all investors who purchased a particular security were duped by the conspiracy).

Here, Holmes was convicted of three counts of wire fraud relating to investments by Mosley, RDV, and PFM. Mosley and representatives of RDV testified at length in both trials about the misrepresentations and half-truths that induced their investments. Mosley invested $5,999,997 on October 31, 2014. PSR ¶ 47. He lost his entire investment. RDV invested $99,999,984 on October 31, 2014. *Id.* It also lost its entire investment. *See* Victim Impact Statement of RDV Corporation dated Aug. 26, 2022. PFM invested $96,139,998 in three separate wires on February 4, 2014. *See* Victim Impact Statement of PFM dated Sept. 6, 2022; PSR ¶ 46-47. Although $43,500,00 was returned on May 1, 2017, as settlement of a civil lawsuit, this does not offset the loss. *See* U.S.S.G. § 2B1.1 applic. Note (E)(i) ("Loss shall be reduced by . . . [t]he money returned . . . by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected."); *United States v. Bright*, 353 F.3d 1114, 1118 (9th Cir. 2004) (the defendant is only "entitled to credit for refunds paid prior to the

discovery of the offense").  The Mosley, RDV, and PFM investments *alone* account for $202,139,979 in loss.[2]

Holmes also was convicted of conspiracy to commit wire fraud against Theranos investors during the period 2010 to 2015.  ECF No. 1235 at 1; ECF No. 469.  Between September 2013, when Theranos publicly launched its partnership with Walgreens, and 2015, Holmes raised $730,840,309 from investors in the Series C round – Series C-1 and C-2 (including Mosley, RDV, and PFM).  According to Daniel Edlin, who reported to Holmes, he prepared binders to investors based on an approved checklist.  Tr. at 3993-94.  He authenticated a "typical investment related binder" that went to one specific investor.  *See* Tr. 3996 & TX 1940, 4869.  He explained that a confidential Theranos briefing "was included in all of the investment binders to my knowledge."  Tr. at 4001; *see also* Tr. 3997-4000.  The government also presented evidence of a recorded call between Holmes and a group of C-1 investors in advance of investments by Chris Lucas' and Bryan Tolbert's firms.  Because investors were generally provided similar information, and because they were exposed to similar public information (e.g., the September 2013 *Wall Street Journal* promotion, the September 2013 press release regarding Walgreens, the June 2014 Roger Parloff article), it is reasonable to conclude for sentencing purposes that they too are victims of the scheme to defraud the jury found.  But for settlements of lawsuits after the fraud was exposed, there is no evidence the C-1 or C-2 investors received any money or property or return on account of their investments.  They too lost the entirety of their investment when Theranos declared bankruptcy through an assignment for the benefit of creditors.

The trial also included evidence that Safeway and Walgreens invested $30 million and $40 million respectively on account of convertible promissory notes.  None of these investments yielded a return.  *See, e.g.*, ECF No. 517-1.

Holmes appears to suggest that the "loss" is somehow not the money investors actually lost.  She appears to argue that the loss is not reasonably estimable because Theranos was a real company with cash and patent rights at certain periods of time, and that the actual loss must be reduced by some hypothetical fair market value of Theranos when the fraud was discovered, or some other date.  This

---

[2]     The Guidelines provide for a 26-level increase for losses more than $150,000,000.  *See* U.S.S.G. § 2B1.1(b)(1)(N).

defies logic and is unsupported by Ninth Circuit authority. *Zolp* applies in the *public company* context, which makes sense: when a fraud is revealed in a public and efficient market, one can determine through the price change what the impact is to investors. Here, by contrast, there is no dispute: the C-1 and C-2 investors received nothing of value from their Theranos investment (save for some amounts returned through lawsuits after the fraud was revealed that cannot be a credit against loss). There were no sales of Theranos securities after the October 2015 *Wall Street Journal* article from which a fair market value could be derived; indeed, there was no market for Theranos shares at all. Holmes' victims were induced to invest in Theranos based on the premise that its technology was market ready and comparable to Quest and LabCorp; after the truth was revealed, they found themselves stuck in a market-less investment with nothing but a hope (never realized) that it would some day be market-ready.

The Ninth Circuit has said that "district courts should 'take a realistic, economic approach to determine what losses the defendant truly caused or intended to cause, rather than the use of some approach which does not reflect the monetary loss.'" *United States v. Martin*, 796 F.3d 1101, 1110 (9th Cir. 2015). Here, any realistic approach must recognize that, except for lawsuit settlements, the victim investors in this case have never received any monetary payment from Holmes or Theranos.

To the extent the Court nonetheless concludes that it is necessary to ascribe some hypothetical value to Theranos at the time victims invested or when the fraud revealed, the government has engaged and proffers the opinions of Carl Saba, a partner with the Forensic Consulting Group at Hemming Morse, LLP, and a Certified Valuation Analyst and Accredited Senior Appraiser with decades of experience in the valuation of businesses. Leach Decl. Ex. A. At the government's request, Mr. Saba attempted to estimate the fair market value of Theranos' equity on October 15, 2015 (when the fraud first started to come to light) and other valuation dates based on available information, and to calculate the loss to Theranos Series C-1 and C-2 investors based on those valuations. *Id.* ¶ 6. Mr. Saba was asked to define a minimum range of loss to investors and to apply assumptions that provide a favorable interpretation of the equity value of Theranos on October 15, 2015, and other valuation dates, including adoptions of optimistic management forecasts that assume Theranos' significant technology challenges would be resolved and Theranos would realize high revenue growth. *Id.* ¶¶ 7-8.

Applying widely accepted valuation methods, and based on assumptions favorable to Holmes, Mr. Saba determined that the loss to C-1 and C-2 investors – i.e. the loss measured by the difference between the price paid by the investors and his estimated value as of the valuation date of October 15, 2015 – to be between $237.323 million and $273.646 million, depending on the valuation method used. *Id.* ¶ 15 & Ex. A-1. Mr. Saba's report, which was provided to the defense and Probation in advance of the draft presentence report, demonstrates by any standard of proof that Holmes inflicted hundreds of millions of losses on her investors. *Id.*

For the reasons set forth above, the 30-point enhancement for a loss of more than $550 million is warranted. In no event is the loss less than $150 million.

## II.    OFFENSE INVOLVING 10 OR MORE VICTIMS

The PSR applies a two-point enhancement for the number of victims. This enhancement also is warranted.

The Guidelines provide for a two-level increase if the offense "involved 10 or more victims." U.S.S.G. § 2B1.1(b)(2)(A)(i). For purposes of Section 2B1.1, "victim" means "any person who sustained any part of the actual loss determined under subsection (b)(1)." U.S.S.G. § 2B1.1 applic. note 1. As with loss, estimating the number of victims does not require absolute precision, and the Court may make a reasonable estimate based on available information. *See United States v. George*, 949 F.3d 1181, 1186 (9th Cir. 2020) ("It [is] 'sufficient for the government to produce evidence for enough of the [victims] to allow the sentencing court reasonably to infer a pattern." (quoting *United States v. Pham*, 545 F.3d 712, 720 n.3 (9th Cir. 2008) (alteration in original))).

The PSR correctly finds that this enhancement applies. PSR ¶¶ 93, 107. More than 10 individuals and entities invested in Theranos in the C-1 and C-2 rounds subsequent to September 2013, when Theranos issued a press release announcing its launch and induced *The Wall Street Journal* to falsely tout Theranos' capabilities. Seven of those investors testified in the trials to the misrepresentations and half-truths they were told. An additional nine provided statements to the government or the SEC or submitted a victim impact statement. *See generally* Leach Decl. Exs. B-L. Representatives of Walgreens and Safeway also testified in the trial to how they were deceived into

investing in Theranos.  Under any measure, more than 10 individuals or entities sustained a loss as a result of Holmes' conspiracy and wire fraud offenses.

### III.   OFFENSE INVOLVING CONSCIOUS OR RECKLESS RISK OF DEATH OR SERIOUS BODILY INJURY

#### A.   Defendant's Conduct Created a Risk of Serious Harm to Theranos Patients

The Guidelines provide for a two-level increase in offense level if the conduct involved "the conscious or reckless risk of death or serious bodily injury."  U.S.S.G. § 2B1.1(b)(16)(A).  The evidence in this case establishes that this enhancement is warranted.  Holmes could have founded any kind of business when she dropped out of Stanford.  She chose to create a startup operating in the medical field, where the stakes are inevitably high.  As described above, Holmes caused Theranos to market and perform blood tests that were not sufficiently accurate or reliable for clinical use.  Despite knowing of the serious flaws in Theranos' testing, Holmes continued to promote and offer those tests to patients with the knowledge that those patients and their physicians would rely on the Theranos tests to make medical decisions.  Her conduct created a significant risk of death or serious injury as a result of misdiagnosis; an inaccurate test result could cause a patient to undergo an unnecessary treatment that could harm them, or to forego a necessary treatment that could save them.  As Dr. Rosendorff testified at trial, "Accuracy is critical.  Physicians and other health care providers depend on the accuracy of a test to make medical decisions, sometimes life and death medical decisions."  9/24/21 Tr. at 1706.

The obvious danger associated with inaccurate and unreliable medical tests is sufficient to warrant application of U.S.S.G. § 2B1.1(b)(16)(A), regardless of whether the government can show how much harm resulted.  Courts recognize that this two-level enhancement "focuses on the defendant's disregard of risk, rather than on the result."  *United States v. Henderson*, 893 F.3d 1338, 1351 (11th Cir. 2018) (quotation omitted).  In other words, the government "need not show actual injury to any particular victim."  *Id.*  Additionally, under Ninth Circuit law, a defendant cannot escape this enhancement by claiming ignorance of the risk created by his conduct.  *United States v. Johansson*, 249 F.3d 848, 859 (9th Cir. 2001) (interpreting similar provision in U.S.S.G. § 2F1.1, now consolidated with Section 2B1.1).  "[A] defendant does not have to subjectively know that his conduct created the risk."  *Id.*  Nor does the enhancement require that the defendant take some violent or direct action toward

victims.  Thus, in *Henderson*, it was enough that the government presented evidence that false entries in a computerized patient record system "could have delayed and influenced patient care."  *Henderson*, 893 F.3d at 1352.  In *United States v. Moran*, the enhancement was applied where defendants ran a healthcare facility and admitted elderly patients with dementia although the facility and staff were not equipped to meet those patients' needs.  *United States v. Moran*, 778 F.3d 942, 978 (11th Cir. 2015).  In *Popov*, the Ninth Circuit affirmed application of the standard where a doctor signed patient charts and Medicare reimbursement forms indicating he had supervised medical examinations when he had not.  *United States v. Popov*, 555 F. App'x 671, 676 (9th Cir. 2014).  The risk to Theranos patients created by Holmes' conduct is at least as serious and certain as the dangers posed by the criminal conduct in the above cases.

Moreover, the evidence shows that Holmes was fully conscious of the risks caused by Theranos' unreliable tests—starting years before the company launched its testing service and continuing through the point when they finally discontinued it.  As early as 2010, Holmes laughed off a dire warning she received from an outside consultant evaluating Theranos technology.  Kevin Hunter was hired by Walgreens in May or June 2010 as a laboratory consultant to advise Walgreens on its incipient partnership with Theranos.  *See* 12/6/21 Kevin Hunter 302 (Leach Decl. Ex. K).  Hunter participated in regular meetings with Holmes and Balwani, during which they told him that the Theranos Edison analyzer could perform approximately 193 tests.  *Id.*  Hunter's team wanted to perform comparison testing of Theranos against a lab at Stanford, but Holmes and Balwani would not agree.  *Id.*  Nor would Holmes allow Hunter to take a tour of the Theranos lab.  *Id.*  As Hunter asked more pointed questions, Holmes and Balwani began to take him out of the loop in conversations with Walgreens.  *Id.*  Eventually, Hunter's frustration with the lack of substantiation for Theranos' claims moved him to confront Holmes during a video teleconference.  *Id.*  He admonished her that her company was going to offer lab tests that people would use to make medical decisions, and warned her of the risk that she could be responsible for killing someone if the lab put out bad tests, and that she might go to jail as a result.  *Id.*  Holmes reportedly responded with something to the effect of, "They don't put pretty people like me in jail."  *Id.*  Hunter eventually separated from the Theranos-Walgreens project.  *Id.*

Holmes's lax attitude toward patient safety continued into 2013 and beyond.  Leading up to the launch of Theranos' testing services, Theranos' lab director spoke to Holmes personally in order to "raise alarm bells" about assays that he "didn't feel were ready for launch."  9/24/21 Tr. at 1725-1730; TX 1049.  During that time period, Holmes and Balwani had set a schedule for assay validation that Dr. Rosendorff viewed as "rushed."  *Id.*  In his communication to Holmes, Dr. Rosendorff suggested that Theranos might need to delay the launch and work on its calibrators or chemistry—essentially returning to the fundamentals to identify and solve "a basic problem" with the company's equipment.  *Id.*  Dr. Rosendorff testified that Holmes did not seem surprised to hear of problems with Theranos' tests, but that the conversation seemed to make her very nervous.  *Id.* at 1731-32.  Ultimately, she refused to delay the launch as he recommended, suggesting instead that certain tests could be performed on traditional equipment.  *Id.*

While Theranos' clinical lab was in operation, Holmes received reports of serious problems with the company's tests.  In April 2014, Balwani received an email from a senior scientist at Theranos reporting that the company's proprietary potassium results were running high as a result of sample hemolysis, forcing the lab to review images of all samples to determine whether to rerun—a practice Balwani told Holmes was "not scalable."  TX 4124.  Earlier in that email chain, Balwani had questioned the accuracy of the test "given this is an ISE," indicating awareness of preexisting accuracy problems with Theranos' ion-selective-electrode blood tests.  *Id.*  Also in April, employee Tyler Shultz sent Holmes a detailed email to alert her to several ways in which Theranos was overstating the accuracy of its tests and potentially masking problems.  TX 1660.  The points raised by Mr. Shultz gained no traction with Holmes.  In late May 2014, Dr. Rosendorff halted all testing of HCG (a pregnancy hormone) on Theranos analyzer in light of inaccurate results, and Balwani immediately passed along that news to Holmes.  TX 4147.  Dr. Rosendorff testified that the company resumed HCG testing on the Edison despite the fact that issues with that test persisted.

In August of that year, Dr. Rosendorff emailed Balwani to inform him that Theranos' bicarbonate test had lost all diagnostic value "and probably also reliability" due to the fact that the company voided all abnormal results in response to accuracy problems with this test.  TX 4189.  Balwani forwarded that notice to Holmes.  Around that same time, another email exchange

memorialized Balwani asking another Theranos scientist about the company's PT/INR test reporting inaccurately low numbers. TX4181. When the scientist provided a theoretical explanation and proposed an internal study to address the problem, Balwani emailed Holmes complaining, "Always another study after the fact." *Id.* In September 2014, Defendant's brother Christian Holmes sent her an individual email seeking a "candid conversation" because it was "pretty obvious" the company was having issues with the accuracy of its calcium, potassium, and sodium tests. TX 1953. In that message, Christian went so far as to suggest Theranos stop offering those tests until the problem was identified and solved. *Id.* By late November 2014, Defendants' collective faith in their lab still had not improved, with Balwani texting Holmes that the Normandy lab (where Theranos conducted its proprietary testing) was a "f___ing disaster zone." TX 5387D at 29. Despite ample notice of serious issues plaguing Theranos' technology, Holmes and Balwani stubbornly continued to send out clinical test results from their "disaster zone" of a laboratory, forcing Theranos' patients to unknowingly incur a risk of death or injury. Ultimately, they had to void every single Edison test following extremely negative CMS findings and their own assessment of possible patient impact.

### B.    Holmes' Treatment of Theranos Patients is Relevant Conduct

Holmes' acquittal on the counts relating to her scheme to defraud patients does not prevent this enhancement from applying. The Supreme Court has held that a sentencing court may consider facts underlying acquitted counts as relevant conduct for sentencing purposes as long as the conduct is proven by a preponderance of the evidence. *United States v. Watts*, 519 U.S. 148 (1997). In this case, it is impossible to know the precise reasons why the jury did not return guilty verdicts on the patient-focused counts, and the Court should disregard any speculation proffered by the defense on this question. The Court is well aware, though, of the evidence presented at trial demonstrating Holmes' role in the scheme to defraud Theranos patients. Even if the jury concluded that at least one element of those charged counts was not proven beyond a reasonable doubt, the Court should still conclude that Holmes' conduct toward patients has been proven by a preponderance. Indeed, the jury in the Balwani trial convicted on all counts based on substantially overlapping evidence, including Count 2 of the Third Superseding Indictment alleging a conspiracy between Holmes and Balwani to defraud patients. ECF No. 1507

Given that Holmes' actions toward patient victims have been shown by a preponderance of the evidence, they easily qualify as relevant conduct for sentencing purposes. Guidelines ranges are to be determined based on, in pertinent part, "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant," as well as certain acts of coconspirators, that "occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a)(1). The Guidelines go on to include as "relevant conduct" any such acts that were "part of the same course of conduct or common scheme or plan as the offense of conviction." *Id.* at § 1B1.3(a)(2).

Holmes' actions directed toward Theranos patients are undoubtedly part of the same course of conduct and scheme or plan as their fraud on investors. In order to attract investors and induce them to purchase Theranos stock, Holmes and Balwani sought to portray Theranos' technology as advanced, novel, and, critically, mature without any significant research and development remaining. As victims explained at trial, investing in a company whose key device was already market-ready carried significantly less risk than investing in an earlier-stage startup still working to develop its technology. 11/10/21 Tr. at 6081-83. With Theranos short on money in the second half of 2013, Defendants were motivated to show that their technology could actually be used for clinical patient testing—or at least to give the public that impression. With the commercial launch of Theranos testing services in September 2013, Holmes and Balwani sent a message to the world—and the pool of potential investors—that Theranos' technology could be trusted and there was nothing standing in the way of the company's expansion. Holmes made that message explicit in communications celebrating the launch. *See* TX 1113 (press release); TX 1334 (email to investors claiming Theranos is "rapidly scaling" following commercial launch). This method worked, igniting a wave of interest among investors that led to Theranos raising approximately $730 million between fall of 2013 and 2015. PSR ¶ 47. From 2013 on, the operation of Theranos' clinical lab furthered Defendant's goal of defrauding investors, constituting part of the same plan or scheme or course of conduct as the offenses of conviction.

Accordingly, a two-level increase is warranted under U.S.S.G. § 2B1.1(b)(16)(A), reflecting the fact that Holmes' conduct involved a conscious or reckless risk of death or serious bodily injury

imposed on Theranos patients.  Alternatively, the Court should account for Holmes' conduct toward

patients under U.S.S.G. § 1.4, which allows the Court to consider, "without limitation," any information

concerning the conduct of the defendant, in order to determine the sentence to impose within the

guideline range or whether to depart from the guidelines.

## IV.    ROLE IN THE OFFENSE

Holmes should also receive an additional enhancement due to her role as a manager and leader of

the extensive criminal activity that occurred in connection with the company she founded.  Under the

Guidelines, a four-level increase is warranted if a defendant was an "organizer or leader" of criminal

activity that either (1) involved five or more participants or (2) was otherwise extensive.  U.S.S.G.

§ 3B1.1(a).  The commentary for that section of the Guidelines defines "participant" as "a person who is

criminally responsible for the commission of the offense," although that person "need not have been

convicted."  *Id.* applic. note 1.  In this case, the Court need not determine whether the offense involved

five or more participants.  Section 3B1.1(a) applies because, regardless of the number of culpable

participants, the criminal activity here was "otherwise extensive."  The Guidelines commentary advises

that, in determining whether criminal activity was extensive under this provision, a court should

consider "all persons involved during the course of the entire offense."  *Id.* applic. note 3.  Even if a

fraud involves fewer than five participants, it still can qualify as extensive under section 3B1.1(a) if it

"used the unknowing services of many outsiders."  *Id.*  That language perfectly describes the way

Holmes and Balwani used the many employees of Theranos—along with Walgreens personnel,

marketing experts, journalists, and others—to carry out their scheme to defraud investors.

### A.    Holmes Was a Leader and Organizer

First, there can be no dispute that Holmes was an organizer and leader of the criminal activity

charged in this case, satisfying the first requirement for this four-level enhancement.  The Guidelines

instruct that, in identifying defendants with a leadership or organizational role, courts should consider

factors including "the exercise of decision making authority," "the claimed right to a larger share of the

fruits of the crime," "the degree of participation in planning or organizing the offense," and "the degree

of control and authority exercised over others."  U.S.S.G. § 3B1.1 applic. note 4.  Here, the evidence at

trial revealed the unsurpassed level of authority that Holmes wielded inside her company.  In terms of

reporting relationships at Theranos, Holmes acknowledged that all roads ultimately led to her as Chief Executive Officer.  11/30/21 Tr. at 8007.  Holmes' power at Theranos was enhanced by her role as President of the Board of Directors and the fact that she was by far the company's largest shareholder. And because she held far more Theranos stock than anyone else, she stood to gain the most from the inflated share price caused by her false and misleading statements about the company.

Holmes was a hands-on leader at Theranos, working long hours in the office.  10/15/21 Tr. at 3854.  Throughout the trial, documentary evidence and witness testimony highlighted Holmes' control over many of Theranos' business.  While Holmes restricted the flow of information among employees at Theranos, she and Balwani were unique in that they had access to all information about the company's activities.  *Id.* at 3855-57.  As CEO, Holmes had the authority to:  approve the training program for the personnel who would staff Theranos Wellness Centers at Walgreens stores (10/15/21 Tr. at 3862-63); give or withhold permission for an individual outside Theranos to receive a tour of specific areas inside company facilities (*id.* at 3865-66); order demonstrations of Theranos technology (*id.* at 3869); review and weigh in on the content of demo reports (TX 860); and control communications between Theranos and outside entities like pharmaceutical companies (TX 528), the U.S. military (10/19/21 Tr. at 4018-19), and potential investors (TX 1940; 10/19/21 Tr. at 3994), among many other things.  Holmes herself confirmed at trial that she was the founder and owned a majority of the company.  11/30/21 Tr. at 8005. She understood that her status gave her the power to terminate anyone at the company, including second-in-command Balwani, the lab directors, and even members of the board.  *Id.* at 8005-06.

Holmes was clearly a leader and organizer at Theranos.  When it came to carrying out the scheme to defraud investors, the evidence at trial showed that she stayed true to that role, as explained below.

### B.    Holmes' Fraud Was "Otherwise Extensive"

This case satisfies the second requirement for the four-point enhancement under section 3B1.1(a) because Holmes used her authority to direct many others in furtherance of the scheme to defraud Theranos' investors.  Therefore, her criminal activity was "otherwise extensive" as contemplated by the Guidelines.  The Ninth Circuit has made clear that this enhancement is not limited to cases where the defendant is aided by multiple people with criminal intent.  Instead, criminal activity can be "otherwise

extensive" where it involves the *unknowing* participation of people who were simply doing their jobs. *See United States v. Leung*, 35 F.3d 1402, 1406 (9th Cir. 1994) (affirming application of enhancement in case where defendant rented a warehouse to store drugs and hired shipping and transport companies to move the drugs). In the case of Theranos, Holmes' efforts to attract investors were supported by the hard work of hundreds of employees and outside partners who were doing their jobs in good faith: designing and manufacturing Theranos' analyzers, managing Theranos' finances, securing Theranos' intellectual property and other legal rights, and outfitting and maintaining Theranos' facilities. The fact that those individuals had no idea their efforts were furthering a fraudulent scheme is no barrier to this four-level enhancement. *See United States v. Booth*, 309 F.3d 566, 577 (9th Cir. 2002) (affirming four-level enhancement under Section 3B1.1(a) "because of the involvement, albeit unknowing, of more than ten employees and the geographical reach of the scheme").

The evidence at trial included additional specific examples of Holmes and Balwani's reliance on others' services within Theranos to further the fraud. For example, several groups of employees at Theranos were involved in setting up and running technology demonstrations for potential investors, including personal assistants, engineers, lab personnel, and phlebotomists. 10/15/21 Tr. at 3869-70. Those demonstrations directly furthered their scheme to defraud investors in that they left victims with an unrealistic image of the capabilities of Theranos' proprietary analyzer and the extent to which the company was using it for clinical testing. *See* TX 957; Balwani 4/19/22 Tr. at 2919-20 (testimony of Walgreens representative Nimesh Jhaveri that he was not aware the sample collected from him during a Theranos demo was tested on a third-party device). Similarly, multiple Theranos employees—along with outside consultants and contractors—were involved in creating and maintaining the Theranos company website. Holmes stayed involved and in charge, receiving input from several employees and outside lawyers regarding claims on the website that might be difficult to defend. *See, e.g.*, TX 3965, 3981, 5438. Holmes evidently decided to ignore much of that guidance, and the Theranos website ended up containing a number of materially misleading claims about Theranos technology. *See* Balwani TX 5805 (Theranos website pages). The work done by Holmes' agents on the Theranos website unwittingly furthered her scheme to defraud investors, as the website was an effective tool to spread misinformation that induced victims to invest.

Holmes and Balwani's scheme to defraud investors also relied on the use of members of the media. Journalists who obtained information from Holmes and Balwani and their agents unknowingly passed along false and misleading information about the company's achievements and abilities, embellishing Theranos' reputation and fueling investor excitement about the opportunity to buy a stake in the company. The evidence at trial included several articles repeating and amplifying Holmes' false statements, including articles published in *The Wall Street Journal* and *Fortune* magazine. TX 1106, 1776. In connection with the *Fortune* article, several Theranos employees answering to Holmes worked together to provide journalist Roger Parloff with requested information presenting a favorable image of Theranos. *See* TX 1753 (email including action item list with assigned employees).

As discussed in Section III above, Holmes and Balwani's scheme to defraud investors also depended on the successful operation of Theranos' blood testing business. Holmes had ultimate authority over that part of Theranos' operations just as she did for every other aspect of the company's activity. An org chart presented to CMS by Theranos displayed Holmes at the top of the CLIA lab operation, overseeing a group comprised of more than sixty Theranos employees including her coconspirator Ramesh Balwani. TX 4528 at 9.

The success of Holmes and Balwani's scheme turned on their ability to contain bad news about Theranos' accuracy problems. If word had gotten out about the poor reliability of Theranos' blood tests, prospective investors surely would have hesitated to part with the large sums that they did, and current investors would have asked questions Defendants did not want to answer. Defendants' efforts to suppress the truth depended on the participation of the Theranos employees who interacted with doctors and patients. Theranos' customer service group included more than twenty individuals who responded to questions about Theranos' test results. Complaint records document the ways in which Defendants used these employees to quell doubts about Theranos' test accuracy. For example, in connection with potentially erroneous results in April and August 2015, one Theranos customer representative assured a doctor that he believed the test results were accurate. TX 4520. In the log of that call, the employee noted, "When I talk to physicians or guests I try to offer them different variables or scenarios to consider when they question our results. *Of course none of them have to do with our testing methods*." *Id.* (emphasis added).

This use of other employees to appease doctors and patients troubled by dubious test results was an important part of Holmes and Balwani's plan. Indeed, when employees refused to spin Theranos' flawed test results as Defendants demanded, significant conflict arose. For example, Dr. Rosendorff, Theranos' lab director, testified that he felt pressured him to vouch for and explain away test results that he viewed as questionable, leading to heated internal exchanges over how to respond to inquiries from Theranos' customers. *See* 9/28/21 Tr. at 1940-1946; TX 4323, 4314. Ultimately, Dr. Rosendorff resigned partly out of unwillingness to keep "endorsing results that [he] essentially didn't have faith in." 10/5/21 Tr. at 2733; TX 4330. In addition to all the other ways Holmes' fraud depended on the work of numerous others, her exploitation of unknowing—and sometimes unwilling—employees to help cover up problems at Theranos certainly qualifies her for the offense level increase in Section 3B1.1(a).

Finally, even if this case did not involve the unknowing participation of so many people, the "otherwise extensive" requirement under Section 3B1.1(a) would still be satisfied. As the Ninth Circuit has instructed, "[w]hether criminal activity is 'otherwise extensive' depends on such factors as (i) the number of knowing participants and unwitting outsiders; (ii) the number of victims; and (iii) the amount of money fraudulently obtained or laundered." *United States v. Rose*, 20 F.3d 367, 374 (9th Cir.1994) (citations omitted); *see also United States v. Govan*, 152 F.3d 1088, 1096 (9th Cir.1998) (finding that a conspiracy was "clearly 'otherwise extensive'" because it "involved interstate travel, a large number of victims… as well as nearly $100,000 in robbery proceeds"). Here, the large number of investor victims, the fact that Theranos' activities stretched across state and national borders, and the nine-figure loss amount all weigh heavily in favor of a finding that Holmes organized a led criminal activity that was "otherwise extensive" under the Guidelines.

In sum, the facts of this case compel application of U.S.S.G. § 3B1.1(a).[3]

/ /

---

[3] Even if Section 3B1.1(a) were not satisfied, subsection (c) undoubtedly applies. *See* U.S.S.G. § 3B1.1(c) ("If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.").

## ARGUMENT

### I.     LEGAL STANDARD

The overarching goal of a sentencing court is to impose a sentence that is sufficient to "reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed education or vocational training, medical care, or other correctional treatment." *United States v. Ressam*, 679 F.3d 1069, 1088-89 (9th Cir. 2012) (*en banc*); *see United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); 18 U.S.C. § 3553(a).  The Court should begin the sentencing process by correctly calculating the applicable Guidelines range and must "remain cognizant of them throughout the sentencing process." *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007).  The Court should then consider the factors outlined in Section 3553(a) to determine the appropriate sentence.  *Ressam*, 679 F.3d at 1089.  If the Court determines that a sentence outside of the Guidelines range is warranted, it must ensure that the "justification is sufficiently compelling to support the degree of the variance." *Id.* (internal quotation omitted). "[A] major departure should be supported by a more significant justification than a minor one." *Gall*, 552 U.S. at 50

The Section 3553(a) factors are:

(1)     the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)     the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocations training, medical care, or other correctional treatment in the most effective manner;

(3)     the kinds of sentences available;

(4)     the kinds of sentence and the sentencing range established in the Guidelines;

(5)     any pertinent policy statement by the Sentencing Commission;

(6)     the need to avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)     the need to provide restitution to any victims.

*See* 18 U.S.C. § 3553(a)(1)-(7).

## II.     GOVERNMENT RECOMMENDATION

With these principles in mind, the government respectfully recommends a sentence of 180 months in custody.

The factors the Court should consider in determining the appropriate sentence include (i) the nature and circumstances of the offense and the history and characteristics of the defendant, (ii) the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment, (iii) the Sentencing Guidelines and related Sentencing Commission policy statements, (iv) the need to avoid unwarranted sentence disparities among similarly-situated defendants, and (v) the need to provide restitution to the victim of the crime.  18 U.S.C. § 3553(a).

As described above, Holmes' Total Offense Level (43) and Criminal History Category (I) yield a sentence within Zone D.  PSR ¶¶ 114, 118, and 176.  Zone D sentences shall be satisfied with a custodial sentence.  *Id.* and § 5C1.1(f)*.*  The applicable sentencing custodial range is capped at 960 months' imprisonment.  PSR ¶ 170.  This range assumes a sentence of 240 months' imprisonment (the statutory maximum) would be imposed for each of the four counts of conviction, run consecutively.  *Id.* Considering the extensiveness of Holmes' fraud, the sentencing factors support a sentence of 180 months' imprisonment, as it would reflect the seriousness of the offenses, promote respect for the law, provide for just punishment for the offenses, and deter Holmes and others.

### A.     The Nature and Circumstances of Holmes' Crimes (18 U.S.C. § 3553(a)(1))

Elizabeth Holmes' charged conduct was extremely serious.  The Indictment in this case lays out the key events in the story of Holmes' company Theranos, focusing on the fraudulent schemes that Holmes and Balwani devised and executed to benefit themselves and attract business and investment capital to Theranos.  PSR ¶¶ 10-84.  As detailed in the Indictment, one of Holmes' fraud schemes targeted investors in Theranos—individuals and entities who entrusted defendants with hundreds of millions of dollars based on representations made by Holmes and Balwani.  *Id.*  In a separate but closely related fraud, defendants targeted patients who paid for and relied upon Theranos' testing services to investigate and diagnose health conditions and make high-stakes decisions about medical care.  *Id.*  In

each of these fraudulent schemes, Holmes and Balwani misled victims regarding material facts about Theranos and the capabilities of its blood-testing technology. *Id.* The effects of Holmes and Balwani's fraudulent conduct were far-reaching and severe:  dozens of investors lost over $700 million and numerous patients received unreliable or wholly inaccurate medical information from Theranos' flawed tests, placing those patients' health at serious risk.  PSR ¶¶ 49, 106

Holmes was convicted at trial of four counts related to her scheme to defraud investors (Counts 1 and 6 through 8 of the Third Superseding Indictment, ECF. No. 469).  PSR ¶ 5.  Holmes was acquitted of the four counts related to her scheme to defraud patients (Counts 2, 10 through 12).  PSR ¶ 6. Nevertheless, the Court should consider Holmes' role in each scheme to defraud when evaluating the nature and circumstances of the offenses and to determine the appropriate sentence.  *See United States. v. Watts*, 519 U.S. 148 (1997) (Sentencing court may consider conduct of which defendant has been acquitted, so long as that conduct has been proved by a preponderance of the evidence).

As alleged in the Indictment and proven at trial, Theranos was founded by Holmes in approximately 2003, and drew little public attention for its first ten years.  PSR ¶¶ 10-84.  The company's stated goal was to develop innovative methods for testing tiny blood samples obtained from a fingertip with a small lancet without the need for traditional venous blood draws.  *Id.* In or around 2013, Theranos began to publicize its technology and tout its purported advantages, all while soliciting massive contributions from investors and gearing up toward the public launch of its testing services.  *Id.* Beginning in September 2013, Theranos offered blood testing to patients at its "Wellness Centers" in various locations in California and Arizona.  *Id.*

Unbeknownst to those outside the company, defendants were presenting investors with a deceptive picture of their company and its technology, overstating Theranos' achievements, promising unrealistically favorable developments on the horizon, and misrepresenting the abilities of its proprietary analyzer.  *Id.* In dealing with doctors and patients, defendants promoted the company's blood-testing services through explicit and implicit representations that Theranos' test results were reliable and accurate although they knew that was not the case.  *Id.*

The nature and circumstances of Holmes' crimes are aggravating factors for several reasons. First, Holmes' crimes were not isolated events.  They were not the result of poor choices on a single day.

They were not limited to her interactions with one investor or a single patient.  Instead, Holmes developed a complex scheme, and executed it over the course of many years.  Holmes presented a fake story about Theranos' technology day after day in meeting after meeting.  Holmes maintained this façade of accomplishments, after making the calculated decision that honesty would destroy her company.  She ignored innumerable opportunities to chose a lawful path.

Second, each investment in Theranos came with opportunity cost.  Money invested with Holmes' company was money not invested in legitimate, promising technology.  Holmes' scheme not only diverted valuable funding to her fraudulent purposes, but it also has the effect of discouraging investments generally in new technologies, as investors reasonably remain skeptical that the next investment pitch is too good to be true.  In short, Holmes' criminal activities were serious, extended, and extremely damaging.  The nature and circumstances of Holmes' criminal activity are significant aggravating factors in determining an appropriate sentence.

**B.**     **The History and Characteristics of Holmes (18 U.S.C. § 3553(a)(1))**

In addition to the nature of the offenses, Holmes' history and characteristics militate in favor of a significant custodial sentence.  Some defendants have difficult childhoods filled with obstacles that must be overcome.  Holmes did not.  PSR ¶¶ 122-125.  Some defendants have few formal educational opportunities, and instead are left to receive their educations informally, where they can find them.  Holmes had many educational opportunities.  PSR ¶¶ 122-126, 158-160.  Some defendants have no support networks, and instead must fend for themselves.  Holmes had and continues to have a substantial one.  PSR ¶¶ 144-148.  While some defendants certainly deserve consideration from a sentencing court for the obstacles they have overcome and the regrettable criminal motivations they adopt, Holmes does not.  Holmes, with strong family support, exceptional educational opportunities, and financial stability, chose to commit fraud, repeatedly.  Holmes' history and characteristics are aggravating factors that should lead this Court to impose a significant custodial sentence.  Similarly, the presence of these aggravating factors should discourage the Court from varying substantially from the applicable Guidelines range.

/ /

**C.     The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense (18 U.S.C. § 3553(a)(2)(A))**

This Court should send a clear message to the community that white collar crime is serious and deserving of significant punishment.  Through this sentencing proceeding, the public will observe the law, through this Court, treat fraudsters fairly for significant crimes.  Statements from victims in this prosecution provide additional support for the argument that a significant custodial sentence is needed to promote respect for the law.  In his statement, investor Craig Hall wrote, "…I urge you, first and foremost, to consider the broader and more significant impact this sentencing will have on our society moving forward.  Given the high-profile nature of this case, the sentencing will undoubtedly send a message to the community at large.  That messaging should, in my opinion, clearly and unequivocally communicate that there is no justification for or tolerance of fraud in the business world.  Deterring similar debacles is critical to avoid society's future loss of hundreds of millions of dollars, amounts which could otherwise be used to aid in the entrepreneurial efforts of hard-working, honest Americans, bolstering the economy and fostering the American Dream."  PSR ¶ 95; Craig Hall Letter, dated Sept. 6, 2022, at p. 1.  In Brent Bingham's victim impact statement, he wrote, "I feel sentencing should reflect a standard that medical related technology shouldn't be Beta tested by patients without consent.  Medical technology companies should receive a very clear message that placing finance and 1st to market considerations above engineering and science is not acceptable."  In Elizabeth R. Daoust's victim impact statement, she wrote, "Penalties for white collar crime seem too often to be slap[]s on the wrist.  People/companies perpetuating financial fraud often get light, if any, sentences in a minimum security prison and keep most of the stolen money.  This system of 'justice' has alienated a large swath of our citizens, weakened values, and turned more people against our government.  It is a serious problem that both the courts and legislatures need to remedy."  These, and many other, victim impact statements demonstrate the need for this sentence to reflect the seriousness of the offenses and promote respect for the law.

**D.     The Need to Afford Adequate Deterrence to Criminal Conduct (18 U.S.C. § 3553(a)(2)(B))**

A sentence of 180 months in custody will serve to deter others from committing or contemplating committing white collar crimes, especially those who might consider taking advantage of

investors or vulnerable patients.  General deterrence is of particular importance in white collar cases such as this one because would-be offenders need to be put on notice that there are severe consequences for engaging in this type of criminal conduct.  *See, e.g.*, *United States v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.") (citation and internal quotation omitted); *United States v. Goffer*, 721 F.3d 113, 132 (2nd Cir. 2013) (addressing the need for general deterrence for those who might otherwise feel that some white-collar crimes are "game[s] worth playing").

Holmes' criminal scheme was committed in Silicon Valley.  This region is known for innovation, where companies rely upon investments to fund ideas before they become profitable.  This investment relationship is built, at least in part, on trust.  The relationship between innovators and investors generates tremendous good far beyond this community.  Unfortunately, Holmes' crimes damaged the trust and integrity that are necessary for this community to thrive.  A significant custodial sentence will serve not only to deter future startup fraud schemes, but it will also serve to rebuild the trust investors must have when funding innovators.

### E.    The Need to Protect the Public From Future Crimes by Holmes (18 U.S.C. § 3553(a)(2)(C))

Specific deterrence, due to the brazenness of Holmes' conduct, coupled with the lack of any discernable economic need that might have motivated her, also counsels in favor of a sentence that is sufficiently punitive to deter Holmes from ever contemplating committing fraud again.  There is a need for this Court's sentence to deter Holmes from future criminal conduct.  First, Holmes has not accepted responsibility for her criminal conduct.  PSR ¶ 98.  Rather than acknowledge her role in this fraud, Holmes continues to view herself as one of Theranos' victims.  PSR ¶ 99.  Moreover, Holmes' experiences at Theranos apparently have not deterred her from similar employment.  Holmes continues to work on new patents involving chemistry within the health care space.  PSR ¶¶ 138-139.  Likewise, Holmes' settlement with the Securities and Exchange Commission allows her to return as an officer or director in the future.  *Securities and Exchange Commission v. Elizabeth Anne Holmes and Theranos Inc.*, 18-CV-01602-EJD, ECF. No. 9 at 3.

Finally, during her trial testimony, the following exchange occurred during her cross examination:

Q:    Okay.  And holding a patent does not necessarily mean the invention described in the patent works; correct?

A:    Yes.

Q:    For example, you don't have an ingestible pill that enables you to, to measure lipids in the blood, correct?

A:    **Not yet**.

12/7/21 Tr. at 8484. (emphasis added).  Approaching sentencing, this Court cannot be confident that Holmes has been deterred from future fraud.  Therefore, the Court must deter future criminal fraud, especially in the health care space, by Holmes through a significant custodial sentence.

### F.    The Properly Calculated Sentencing Guideline Range and Pertinent Policy Statements Provided by the Sentencing Commission (18 U.S.C. §§ 3553(a)(4) & 3553(a)(5))

Holmes' Total Offense Level (43) and Criminal History Category (I) yield a sentence within Zone D.  PSR ¶¶ 114, 118, and 176.  Zone D sentences shall be satisfied with a custodial sentence.  PSR ¶¶ 169, 170, and 176.  The applicable sentencing range is capped at 960 months' imprisonment.  PSR ¶ 70.  This range assumes a sentence of 240 months' imprisonment (the statutory maximum) would be imposed for each of the four counts of conviction, run consecutively.  *Id.*

The Sentencing Commission makes clear that the focus on loss amount in federal fraud sentencing hearings is reasonable and appropriate.  In particular, the Sentencing Commission states, "The Commission has determined that, ordinarily, the sentences of defendants convicted of federal offenses should reflect the nature of magnitude of the loss caused or intended by their crimes.  Accordingly, along with other relevant factors under the guidelines, loss serves as a measure of the seriousness of the offense and the defendant's relative culpability and is a principal factor in determining the offense level under this guideline."  *See* U.S. Sentencing Guidelines Manual, 2021, p. 102.

The government agrees with the Commission's assessment of the importance of loss amount as a measure of the gravity of a fraud conviction.  Here, Holmes' loss number is so high that a portion of it is not accounted for within the Section 2B1.1 table, as there is no additional increase for any loss amount

above $550 million.  This provides an additional basis to conclude that a sufficient sentence is 180 months' imprisonment.

### G.      The Need to Avoid Unwarranted Disparities (18 U.S.C. § 3553(a)(6))

The government recommends the Court impose a custodial sentence of 180 months' imprisonment.  This sentence would amount to a variance of 60 months from the statutory maximum sentence applicable to each count of conviction.  The basis for this five-year variance request is found in the 3553(a) factors.  First, this variance request acknowledges the gap that exists between the losses sustained by victim-investors and Holmes' realized financial gain through this fraud.  Through this variance request, the government also acknowledges that the Holmes' crimes were not motivated by a short-term desire for financial gain.  Second, this recommended sentence satisfies the "sufficient but not greater than necessary" standard found in 18 U.S.C. § 3553(a).  Finally, the Court will achieve the important sentencing goal of providing adequate deterrence to criminal conduct through a 15-year custodial sentence.

The United States Probation Office agrees that a variance is appropriate.  PSR Addendum.  Certain of Holmes' history and characteristics persuaded Probation to make this recommendation, including her family and social support, collateral punishments, and her experience with trauma.  *Id*.  While the government agrees that a variance is appropriate and agrees that her history and characteristics are relevant factors this Court should weigh at sentencing, a variance of eleven years from the statutory maximum sentence, and a significantly greater variance from the applicable Guideline range, is not justified.  Even more, a significant variance also fails to achieve important sentencing goals, such as general deterrence and promoting respect for the law.

The determination that a custodial sentence is or is not reasonable should not be based upon its absolute number alone, that is, their number of years.  Instead, custodial sentences are reasonable through the process that is followed to arrive at them.  And if the process includes too significant a variance, general deterrence and respect for the law suffer.  In the government's view, a nine-year custodial sentence would be the result of too significant a variance, especially when based upon factors such as the collateral consequences of Holmes' trial and conviction.  The Probation Office is correct that this case has garnered significant national media attention.  *Id*.  The Probation Office is also correct that

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 17, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Amy Mason Saharia
AMY MASON SAHARIA

April 17, 2023