No. 22-10312

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ELIZABETH A. HOLMES

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 5:18-CR-00258
Hon. Edward J. Davila

---

## EXCERPTS OF RECORD
## VOL. V of LVII | ER-1100 to ER-1377

---

JOHN D. CLINE
LAW OFFICE OF JOHN D. CLINE
  600 Stewart Street
  Suite 400
  Seattle, WA 98101
  (360) 320-6435

KEVIN M. DOWNEY
LANCE A. WADE
AMY MASON SAHARIA
KATHERINE A. TREFZ
WILLIAMS & CONNOLLY LLP
  680 Maine Ave. S.W.
  Washington, D.C. 200024
  (202) 434-5000
  asaharia@wc.com

present day.  These discussions always centered around how Elizabeth could create a vehicle to pay back her investors, from licensing back her own technology to starting new companies with novel ideas she had. I told Elizabeth that these investors were sophisticated, knew that there was risk involved in their investments, and that she should move on.  Nonetheless, notwithstanding my counsel, Elizabeth insisted that she needed to create the means to return every last penny to her investors. Despite the allegations levied against her at the time, both in the media and otherwise, Elizabeth's focus was on making those initial supporters whole.

I have also read and heard suggestions from others that Elizabeth was dictatorial in her management style, intimidating to employees and not open to criticism; my experience was that nothing could be further from the truth. As a member of the TAB, I found that Elizabeth received advice openly and was constantly looking to fix things she recognized had been done incorrectly. When I was acting Senior Vice-President at Theranos, I personally witnessed Elizabeth working with her team on a daily basis, and despite the enormous amount of pressure she was under, she was always empathetic, understanding, and open to new ideas.

A jury has decided that Elizabeth owes a debt to society, and for the moment, this finding is irreversible. It must be noted, though, that society will also suffer with the incarceration of Elizabeth Holmes, as the stifling of her creativity and inventiveness will inevitably cause lives *not* to be saved. While I fully comprehend that there must be some sentence, I humbly urge you to consider the ultimate effect of restraining her brilliance.

Sincerely,

Dr. John E. Moalli

Hon. Edward J. Davila
San Jose Courthouse, Courtroom 4 – 5th Floor
280 South 1st Street
San Jose, CA 95113


Alex Moore
Austin, TX. 78704


Dear Sir/Madam,

My name is Alex Moore. I am 39 years old. I am a graduate of Stanford University
Undergraduate School where I got a degree in Economics. Liz Holmes was a classmate of mine. I
knew Liz both in school and also for a great deal of time after I graduated. Liz was known as a
dreamer, a thinker and an entrepreneur at Stanford. Someone who had big ideas and
ambitions. This type of thinking was encouraged at Stanford; the home of Hewlett-Parkard,
Google, Yahoo and hundreds of other great technology companies. It was a bastion of huge
ideas and huge world-changing projects. It remains to this day. Everything about the
construction of the school, the network of people around it, the professors and the tap water is
designed to house this and this is the backdrop under which we went to school from 2001-
2005.

For further context, I was also an ambitious young person at Stanford like Liz Holmes. I was a
disciple (so to speak) of the philosophy of Steve Jobs who encouraged us to be bold and that
"ordinary people could come together to do extraordinary things". Steve Jobs was not an
abstract concept to us. In fact, Steve Jobs spoke at my Stanford graduation in 2005'. He lived in
a house literally on Stanford campus and I ran into him at various times walking around
campus. He was famous for taking 3 hour walks around the campus to think and solve problems
in his head. I remember telling my friends I had sighted him a few times. He drove a Mercedes
car with no dealer plates (no numbers or letters) and would show up at Starbucks or at the
Apple store to critique the staff and layout of products. He spoke in classes, was a real
presence, also often times would be considered a ghost-like figure. Everyone told stories about
him. Legend.

I arrived at school on Sept 20, 2001. This was one week after 9-11 where 3,000 Americans died
and it put a scar on our hearts coming in happy young 18 year olds. I think it truly stained
everyone in that year. With the stock market crash of 2000 and 9-11 I think the students that
entered Stanford in those particular years wanted to do things to help rebuild society, to make
things better. I'm sure Liz also had this sentiment as she made her way through the University
as well as others. We were so tired of seeing destruction and wanted to fix things.

Knowing Liz very well over the past 20 years, I can say she fits clearly inside of my vein in terms
of worldview, values and understanding. I think she is a person who cares deeply about society
and making impact and that her company was genuinely attempting to fix large problems in
health care the way that we all wanted to see the world fixed. Liz's company was not able to

get to where they wanted, but this is a reality of technology limitations and lifecycles. Things sometimes work and sometimes they do not. I don't believe Liz was intentionally leading the company astray or making intentional movements in a dishonest way against shareholders or the like. This would be entirely inconsistent with her character and the person who I have known for 20 years and doesn't align with the large mission she had laid out.

Instead I think the machinery of legal/media has exaggerated what is common place in Silicon Valley. Having large dreams, raising money, hiring people, these are the building blocks of what we do and actually 90% of the time everything goes to nothing – despite the optimism of the founders and creators of the vision. This process can be painful, but is certainly not crime. Instead this is the poetry of innovation. This is part of the process of creation. I believe Liz had good faith in her actions and simply had an unsuccessful attempt here. This happens.

In my new career as a venture capitalist I assign capital to new projects. Again, 90% of my "bets" (they are bets, nothing is certain) fail and go to 0. This is expected. I take great satisfaction and excitement every time I write that check. My firm has invested in fact $5 billion dollars over 10 years. This is a large scale, but in fact does not make us even in the top 20 firms in SV. We are considered a young promising group. We have a ways to go. The scale of these figures seem large, but they are not. Even one great investment can return the entire sum and so makes it worth it to have all the failures.

Failures are a part of the game in Silicon Valley. They are also part of the game in life. We can't punish our innovators in society or there will be no innovation. I believe society is best served by having Liz Holmes free to raise her family and start more companies. There are lessons to learn here for Liz, everyone, and industry – perhaps around communication, mgmt., etc. but the final analysis should not be punitive that will serve no one and will not encourage what's best for society.

Sincerely,

*Alex Moore*

Alex Moore

Hon. Edward J. Davila
San Jose Courthouse, Courtroom 4 – 5th Floor
280 South 1st Street
San Jose, CA 95113

Dear Judge Davila:


I have known Elizabeth Holmes as a friend for over seven years. I was also employed with Theranos as Security Supervisor for Arizona Operations.

In addition to our friendship, I was fortunate to travel with Elizabeth. This is where I got to know her character. Elizabeth worked extremely hard in developing transparent and affordable healthcare services for the world. On one of our international trips to Mexico, Elizabeth was on a mission to bring accessible and affordable services to the entire country. Elizabeth was also a mentor to many young female entrepreneurs from around the world. She hosted them in Palo Alto and provided free workshops and access to educational material. Elizabeth and our daughter exchanged letters over the years as she was an inspiration to our daughter.

Theranos was the best company I have ever worked for throughout my professional career. Our leadership under Elizabeth was second to none. During my time at Theranos, the company provided breakfast, lunch, and dinner to all of its employees. Excellent health care benefits, compensation, and retirement plans. Elizabeth has always been a beacon of light in the community. Elizabeth was there for every employee, especially when Theranos closed. Elizabeth made it a point to be there and show significant support during a sudden and arduous job search. Theranos provided every employee with a separation package, resume support services, and job placement before it closed its doors.

Despite her current situation, I still believe Elizabeth Holmes to be an honorable individual, a valuable member of the community, and a good human being.  It is my sincere hope that the court considers this letter and extends leniency to her.



Thank you,

Bienvenido Morel

August 30th, 2022
Hon. Edward J. Davila
San Jose Courthouse, Courtroom 4  - 5th Floor
280 South 1st Street
San Jose, CA 95113

**Character Reference for Elizabeth Holmes**

Dear Judge Davila,

My name is Ryan Gross and I am a friend of both the Holmes and Evans families. I'm writing given my close relationship with Elizabeth and my experience of her as a kind, genuine, and caring woman. I hope you take this letter into consideration as you deliberate her upcoming sentencing. Before I share my thoughts on Elizabeth's character, I'd like to first give context on the origins of our friendship.

I was fortunate to be introduced to Elizabeth in 2017, when she was first building a friendship with her now partner, Billy Evans—a life-long best friend who I've known since the age of 5. Billy and I were inseparable growing up (from first grade to graduation) given our shared hobbies and passion for volleyball. Billy lived much closer to our school than me and given our rigorous practice schedule, I ended up staying at his house ~3 nights a week for much of our childhood. Within a few seasons, I was an extended part of his family. After attending different colleges, our brotherhood continued to grow as roommates in San Francisco, and we lived together from 2014-2018. In August 2021, just weeks before the trial commenced, Billy was the best man at my wedding.

When I think about why Billy has remained my best friend after all these years, a few qualities stand out: his loyalty to family & those that he loves, his selfless commitment to helping his friends, his humble and honest approach, & his surrounding himself with a strong community with shared values. One must look no further than Billy's friends to see that they are mirrors of the qualities I have always found most admirable in him, and the last 5 years knowing Elizabeth has made it clear that she is no exception to this rule. While my list is not exhaustive, I'd like to highlight three areas that stand out based on my friendship with Elizabeth.

**Elizabeth's Commitment to Family**

I've had the opportunity to be with Elizabeth these past years on several occasions that involved my family, her family, and Billy's family. In all these scenarios, I have witnessed Elizabeth spend hours talking, laughing, crying and forging genuine bonds with family members. In almost every conversation that I witnessed, Elizabeth would make the conversation about the family member, exhibiting genuine curiosity and interest. Elizabeth would discuss her situation in detail when asked but she never put herself at the center of conversations. If I was in her shoes, I could have seen myself every so often turning the conversation towards the trial/Theranos, probably subconsciously seeking sympathy. Elizabeth's interest in others far surpassed the circumstances & stresses circling around herself; in subsequent conversations, she was amazing at recollecting memories and making her audience feel incredibly special.

I've been so fortunate that my mother, Monique Sanders, has also built a strong familial relationship with Elizabeth. Elizabeth has on at least 5 occasions in the past year brought her son, ███ , over to my mom's house so the three of them could spent quality time with one another. My mom has no grandchildren of her own yet but really considers ███ her first, primarily due to Elizabeth's willingness to always find time and invest it with my mom.

To recap a few other scenarios I have seen that reaffirm my perspective on Elizabeth's commitment to her family: daily mile+ long walks with ██, consulting Billy for hours on end on his professional endeavors, nightly dinners during the trial spent preparing dinner with her mom and cleaning up with her dad.

One of Liz's most important dreams beyond all professional endeavors has been to be a mother and I've been so grateful as a dear friend to see this dream come to fruition beautifully, despite the macro stresses going on around her.

**Elizabeth's Loyalty to Friends**

Having met Elizabeth towards the end of her experience at Theranos, in 2017, and working in technology myself, I was aware of Theranos, the media surrounding her, and the allegations involving her. Although I am a new friend from this decade, I've had the opportunity to meet friends from every part of Elizabeth's life. My husband and I have become good friends with many of Elizabeth's friends. Every friend speaks about Elizabeth in the same way that we recognize her character: humble, extremely curious about others, always willing to put her priorities second, a bit quiet and very gracious. It is also clear to us that these are not new qualities of Elizabeth, but qualities she has demonstrated her entire life.

When my husband and I got engaged in the summer of 2021, Billy, Elizabeth and another dear friend offered to help throw us an engagement party. They took it upon themselves to plan the most incredible, intimate celebration that we know took hours of preparation. Elizabeth met several new friends that day— people from my husband's and my life that came to celebrate. Several of these friends came up to us that day and shared how kind, empathetic & curious Elizabeth was. Many were expecting to meet someone with different characteristics based on the media they had consumed over the years. I bring this up, as it is these same qualities that every single person discusses about Elizabeth. Whether it be a new friend, a friend of a friend, or a best friend from childhood, there is always consistency in explaining the person Elizabeth is and how she treats & nurtures the friendships she holds.

**Elizabeth's Honesty and Self Reflection**

Over the years, I've asked a lot of questions to Elizabeth about Theranos and her self reflection on that decade of her life. Elizabeth was genuine with me when she discussed the mistakes she made that she wished she could have changed, just as she was throughout the trial. She wished she was a better people manager, that she waited longer to go-to-market and scale, and that she could have been able to create more separation between her professional and intimate personal life, to name a few examples.

I've always found Elizabeth to be a credible & honest voice in my 5 years of knowing her. If she makes a mistake, she takes full responsibility. She is constantly open to hearing feedback and is vulnerable with others about the parts of her life that she is focused on improving. She gives back to her community, her family and her friends constantly. I know that Elizabeth plans to stay this committed to her community and her loved ones with no end in sight.

Thank you,
Ryan Gross

*Ryan Gross*

**August 27, 2022**

Hon. Edward J. Davila
San Jose Courthouse, Courtroom 4 – 5th Floor
280 South 1st Street
San Jose, CA 95113

**Subject: Character Reference for Elizabeth ("Liz") Holmes**

Dear Judge Davila,

My name is Nicolas Newman and I am married to Ryan Gross, a close friend of William ("Billy")
Evans – Liz's partner. Through my relationship with Ryan, which started in 2017, and his
friendship with Billy, I have had the privilege to spend considerable time with Liz over the past
few years and build a friendship.

Liz is empathetic, gentle, inquisitive, and loyal. I've experienced these qualities personally and
have also observed her impart them on others (friends, family, strangers), all during a period of
great adversity & stress. These qualities have been consistently, broadly exhibited, and I believe
they are emblematic of who she is at her core.

Liz is a deeply devoted partner, community member, & mother. I've observed Liz support Billy
selflessly as he pursues his professional aspirations & prioritize his emotions before her own.
I've watched Liz wholeheartedly connect with Billy's parents, siblings, and extended network of
friends in the Bay Area and San Diego. I've seen Liz invest her limited time into the service of
women who have been abused. Liz's selflessness has been unwavering as she navigated the
difficult road leading up to, and now following, her trial. And now I have the joy of witnessing
these qualities bestowed upon ███, her new son. He is the center of her world. Liz is a
fantastic mother.

I had a unique opportunity to share a meal with Liz's immediate family this winter, during her
trial. It was a long day in the courtroom and Liz unfortunately couldn't make it back home in time
to eat. While I only knew Liz after her chapter at Theranos, this intimate meal – sitting across
from her mother and father – reaffirmed that the Liz I knew was the Liz they knew. The loving
friend, partner, and mother was also a loving daughter. During a dark time, it was a bright
moment to reflect & share memories about the woman they had raised and who I had come to
appreciate as a friend.

It is my hope that you take this letter into consideration at the time of sentencing. Despite the
outcome of the trial, I believe Liz to be an honorable woman and a good human being.

Sincerely,

Nicolas Newman

William Nicholson

███████████

August 16, 2022

Hon. Edward J. Davila
San Jose Courthouse, Courtroom 4—5th Floor
280 South 1st Street
San Jose, CA  95113

Dear Judge Davila:

  As a 60-year friend of Chris Holmes, I have kept up with his family to include Elizabeth since her birth.

  Chris and his wife, Noel, worked with Elizabeth to give her every advantage from an educational and experiential standpoint.  She thrived under their parental guidance and acquitted herself in a superior fashion, both academically and in terms of self-guided extracurricular activities.

  I was an investor in Theranos and believed in Elizabeth and her technology.  Undoubtedly, some missteps were taken, and she has paid an enormous price professionally and emotionally over the past several years.  Will additional punishment benefit her or her family?  I don't think so.  I would support a lenient sentence.

Respectfully,

William R. Nicholson

msb

**ER-1108**

Hon. Edward J. Davila
San Jose Courthouse, Courtroom 4 –
5th Floor 280 South 1st Street San Jose, CA 95113

 Dear Judge Davila

I am someone who heavily believes in my gut and first principle thinking. I met Liz in 2018 and
didn't put 2 and 2 together on who she was at first. I just met her as Liz. We met at a lunch and
my takeaway was "wow, she is really nice". She asked me questions about me and listened
intently. I only knew her as Liz, so I was shocked when I found out she was Elizabeth Holmes.

The media is extremely powerful. It was interesting to see the dichotomy between "Liz" and
Elizabeth Holmes. The "Liz" I knew was sweet, kind and caring. The Elizabeth Holmes I read
about was evil and dangerous.

I am really happy I met her as Liz. I don't think I would have been able to get over my bias,
whether it be conscious or unconscious, of Elizabeth Holmes.

I spent a lot of time with Liz over the next few years. Liz always put others before herself.
Countless times she patiently listened to my trivial stories because she genuinely cared about
me.

It's so interesting hearing her painted as a "money obsessed monster", or that her intentions
were always to "screw people over" to get money. To me Liz never cared much at all about
material things. Money was never a topic we talked about. I never thought of money being a
motivator at all to her.

She was so happy with a (cheap) homecooked meal.
She never cared about what car we were driving.
She valued people over things.

She cared about the same things I care about.
A genuine conversation.
A nice afternoon walk.
Playing with animals.
Sitting around a fireplace.

I always connected with Liz because we both care about humans. The ones we are around. The
ones we aren't around. We would talk about how to help people in need and how we can make
the world a better place. We never talked about how we can make money.

I don't know Elizabeth Holmes. In the thousand hours we spent together I never saw anything
that even resembled the Elizabeth Holmes I read about. I know Liz.

**ER-1109**

Liz is a caring mother.
A wonderful wife.
A genuine human.
A lifelong friend and a confidant I would trust with my life.

Liz is an amazing person who can and will make the world a better place.

The world is lucky to have Liz. Liz makes everyone around her better. Liz make the world better.

I truly hope the world can see past the fabricated invention of Elizabeth Holmes and see Liz.

I'm happy I did.

-   Taylor Offer
    *Taylor Offer*

**ER-1110**

Kelly O'Neill



Hon. Edward J. Davila
San Jose Courthouse, Courtroom 4 - 5th Floor
280 South 1st Street
San Jose, CA 95113

Dear Judge Davila,

I have closely observed the case of the United States v. Elizabeth Holmes, both understanding and respecting the decisions that you and the jury have made thus far. I can only imagine how much of your time has been put into it beyond the courtroom, and I appreciate the opportunity to personally address you. With that said, I will do my best to keep this brief and to the point! Although, I could speak endlessly about my world being a brighter place with Elizabeth in it. It is not my intent to "shed some light" on all the great things about Elizabeth. My goal is rather to collect all the light in existence and shine it on her potential to change our world for the better.

I first met Elizabeth during my introduction to the Evans family – only a week into dating Rex, the younger brother of Elizabeth's partner Billy. It had been several months since Rex had been willing to spend time with his family, which made me undoubtedly anxious, scared, and uncertain of the dynamic I was about to walk into. I wasn't exactly sure of the reason for Rex to distance himself – but the moment we arrived at their home; my fear disappeared. Everyone was beaming with excitement; eager to welcome me into their family with open arms. Given the circumstances, I had assumed Rex would be glued to my hip and ready to leave at a moment's notice – but that wasn't the case. Throughout our visit, he and Elizabeth were deeply invested in conversation. Out of everybody there – his parents, sister, and brother and I – Elizabeth was the one person who could put him at ease, providing a sense of comfort through her gentle, yet divine compassion. Upon my very first time meeting her, I knew Elizabeth to be a kind, loving person; incredibly passionate about helping others.

A year later, Rex and I started a business together providing premium beach bonfire experiences in San Diego. After a tiresome but successful launch in 2021, we hosted a celebration with close family and friends for Elizabeth, the soon-to-be-mom of adorable baby ▮▮▮. Again, the pressure was on; this time, we were hopeful to impress and share what we had worked tirelessly at perfecting. While we received several compliments on the overall experience, it was only Elizabeth who noticed and took the time to ask about the small things; the parts that most overlooked, but what we had spent never-ending sleepless nights to create. Even in a setting with friends she hadn't seen in ages, Elizabeth remained attentive to the finer details of our new business; genuinely curious of how they came to be. Beyond that, she went the extra mile to have meaningful interactions with every person around her that night. She expressed her selfless gratitude to everyone that attended. For me, as a young, female entrepreneur, it felt incredible to have another hardworking woman like Elizabeth notice and commend the work I had put in. Knowing how intelligent and honest of a person she is, it meant the world to hear that she was proud of what we had achieved.

Fast forward to baby ▮▮▮ arrival, I was concerned about the trial and her difficult road ahead. Elizabeth would have to juggle the mental, emotional, and physical toll of revisiting the past, spending long hours away from her newborn baby, still nursing, and all in the public's eye. But she did it; and with such grace. I admire how she faced adversity and pessimism but chose optimism, every single day. I truly have not once heard her complain. She is the most positive, humble, resilient, and brave person I have had of getting to know.

While over the last two years I have greatly benefitted from building a relationship with Elizabeth, our world was simultaneously confronted with abundant change. Adapting to new normals, we as humans have learned, listened, and implemented innovation for the better – as we rebuild, now is the time for our society to continue experiencing growth. As entrepreneurs, we are the ones responsible for taking that initiative. We are the risk takers who believe in what we are doing and must have the confidence it takes to bring our solutions to life. Elizabeth was ahead of her time, embodying this quality at such a young age. Now, years later in life, she too has learned, listened, and will implement change for the better. She is the type of woman who holds the key to drive

214

**ER-1111**

the changes our society needs. Her passion for benefitting humankind is rare, and hard to find. It's the kind that deserves the freedom to create solutions that will change our world for the better.

Thank you for taking the time to read my letter, Judge Davila. I hope you will consider my close experiences and understanding of who Elizabeth is as a person and member of our society when making your decision on the outcome of the trial.

Respectfully,

Kelly O'Neill

**James C. Orr**



July 5, 2022

Hon. Edward J. Davila
San Jose Courthouse, Courtroom 4 – 5th Floor
280 South 1st Street
San Jose, CA 95113

Dear Judge Davila:

I am writing to provide a different perspective on Elizabeth Holmes in the hope it might help lead to a modicum of leniency in her sentencing. I am both a close family friend and an early investor in her company. Additionally, I am also a veteran of a failed, high-tech start-up.

Elizabeth's father, Chris, was my college roommate and has been my closest friend for 50 years. From close at hand I observed Elizabeth's upbringing from birth into adulthood. Her parents were and are loving and attentive. They challenged their children to work hard and think big. I have often remarked to others that Chris and Noel Holmes are probably the best parents I have known.

Elizabeth herself wanted to help people from an early age. She was particularly caring and supportive of her younger brother and other young children. When she was in middle school I saw her rush to the side of a child who was crying about a minor injury. While other children paid little attention, Elizabeth comforted the girl and offered to sit with her until the parents arrived. As recently as a couple of months ago when I stayed with her when attending her trial, I watched adult Elizabeth interact with her young son ▇▇▇▇▇ I was struck with what a loving and devoted mother she had become, mirroring her own mother and her mother's mother, as well.

In her youth Elizabeth was single-minded in pursuit of what she deemed important. She was a top student throughout school and at least once served as class president. Outside of school she undertook the daunting commitment to learn Mandarin Chinese with help from a private tutor. She spent a summer in Asia interning at the Genome Institute of Singapore working in a high-tech medical lab. It was in Singapore, in fact, that she conceived of the idea that blood assays could be performed with a micro blood draw and that results could be provided instantly.

After reading her first prospectus I asked if I could make an investment. She agreed even though she was pursuing large investors, not small ones like me. I do remember having concerns on two scores: whether the technological problems could be overcome, and whether her youth and lack of any business experience could become issues. She was a very young and seemingly vulnerable female wading into a ruthless, male-dominated industry.

No one who has known Elizabeth could doubt her seriousness of purpose. She was hell-bent on developing this breakthrough technology that would improve people's lives by reducing costs and delays in medical testing and giving more control to individuals. You have heard testimony about how hard she worked at this and how she struggled to overcome the technical problems as they inevitably developed.

In retrospect it is clear she lacked an experienced hand in business to guide her along the way.  Sunny Balwani had no manufacturing or medical industry background, and he took advantage of her in more ways than one.  Uber-attorney David Boies failed to provide either good legal and ethical guidance to her, and then he ran for cover at the first sign of trouble.  Her star-quality board of directors, although all household names, looked great on paper, but most had no business or medical industry experience.

Despite widespread assertions on social media, this was never about greed or personal enrichment.  She lived quite modestly until moving in with Sunny.  Because she believed in the company and its future, she took most of her compensation in the form of company stock.  Then, as the company was imploding, she voluntary donated her $30 million D&O insurance settlement back to Theranos, buying the company some more time as they tried to succeed.  My understanding is that she largely depleted what funds she had in efforts to save the company.

From personal experience I can state that raising money to maintain a start-up is a constant struggle.  It also involves a delicate balance.  One the one hand the entrepreneur must present an upbeat story to potential investors about all the great accomplishments that are to come.  At the same time the entrepreneur must describe accurately where things stand at the moment and be candid about potential difficulties in the path.

As an investor I kept a close watch on the company, and importantly, to this day I do not feel I was misled.  I sat in the courtroom through two weeks of the trial.  Her jury ultimately believed she crossed the line, blurring the difference between her aspirations and the company's current capabilities.  In my view, however, it was never her intention to defraud.

In the press and social media, she is portrayed as a schemer who created a criminal enterprise in order to bilk investors.  This is a completely false narrative.  The company in fact had made tremendous progress toward its goals; although it was unable to deliver everything they hoped and promised before it ultimately collapsed.  And Theranos did in fact achieve some remarkable breakthroughs in medical technology.  Its patents, once valued at over a billion dollars, were ultimately sold for $100 million in a fire sale.

Anyone who sat through the trial will have seen that she is not the evil, calculating schemer that the government has alleged. At worst she is a young woman who made serious mistakes in her zeal to succeed.

Thank you for reading this.

Respectfully,

James C. Orr

Carlos Perez-Rubio



Hon. Edward J. Davila
San Jose Courthouse, Courtroom 4 – 5th Floor
280 South 1st Street
San Jose, CA 95113

Dear Judge Davila:

I write this letter in behalf Elizabeth Holmes. I have known her since she was a baby. I went to boarding school with her father Chris Holmes, whom I have known since 1962.

Throughout the years, I have been in touch with Chris and Elizabeth. I understand that she is in a big predicament, has been convicted, and is now awaiting sentencing.

I have found Elizabeth to be an honorable and honest person. She has always told me that she wanted to do things that would make the world a better place. I found that quite impressive from a young teen. She highlighted the need to improve the human condition. When I asked her in what field, she replied that healthcare and life science was of particular interest to her.

Her tenacity and curiously about complex issues led to the beginnings of her business.    Her intelligence and "out of the box" thinking helped her business development acumen that one doesn't learn in school.

She has made mistakes in the past, I know that it was not premeditated. I am also sure she is deeply saddened and very repentant with her past actions. She told me so personally as I have seen her on several occasions while I was in the United States.

I have the highest regard for her. I know that she will bounce back and proceed with her life. I also hope that she will use her intellect and values productively as she has moves on with the path of a new life.

The reason for this letter is I beg for your indulgence and leniency when you render a sentence.

With my warmest regards,

Carlos Perez-Rubio

Vanessa Perez-Rubio Maffia

August 6, 2022

Hon. Edward J. Davila
San Jose Courthouse, Courtroom 4 – 5th Floor
280 South 1st Street
San Jose, CA 95113

Dear Judge Davila:

My name is Vanessa Perez-Rubio Maffia and I write this letter on behalf of Elizabeth Holmes who I have known since I was a little girl. Our fathers met as teenagers in boarding school and have remained best friends ever since.

I've always loved the Holmes family. I watched Elizabeth grow up and remember a girl who always had drive and a vision. I was wowed by her commitment to learning Mandarin at such a young age and thrilled when she received her acceptance to Stanford University. I remember one evening in particular, not long after she began her freshman year, when she joined my family for dinner. I had just graduated from college and was beginning my own career in education at a local school. I listened with awe and admiration as she shared her vision for finding a more efficient way to detect diabetes. Even as a college teenager, she spoke with such purpose and eloquence.

Throughout Elizabeth's high profile endeavors, I have never felt intimidated by her. She is and has always been just Elizabeth - down to earth, grounded, and sincere. Our connection grew once Elizabeth became a mother. We have taken many walks and shared many dinners together. She's an active listener, an engaging conversationalist, and entertaining companion. I have often sensed a bit of sadness and regret over missing out on a "normal" life during her Theranos years and her longing to re-capture it with her now growing family.

I know that her life is anything but normal and never will be. I struggle to comprehend how the Elizabeth that's portrayed in the media is the same, sweet Elizabeth I know and am proud to call my friend. She is someone who, in spite of her circumstances, continues to show up to support to her friends and family. Just days before her indictment, she attended a launch event for my sister's clothing company. Under what I could only assume to be an unfathomable amount of stress after those grueling weeks in court, there she was showing enthusiasm and encouragement for my little sister's work. Last year, Elizabeth offered to virtually meet with my 10 year old niece who declared that she wanted to start her own business. I'm told they spoke for over 30 minutes. I thought to myself how amazing it was that she maintains such optimism and excitement for female entrepreneurship in all forms.

I will conclude with a fond memory I have of a four year old Elizabeth clutching a doll she called Vanessa. My ten-year-old self was beyond delighted to hear that she named her doll after me. Elizabeth and I like to chuckle about these simple times from a lifetime ago. So much has happened since then.

As I reflect on her journey with Theranos, the mistakes made, and the sentence that awaits her, I continue to believe that Elizabeth has so much to offer as a champion and mentor for future female entrepreneurs and leaders. I hope she has the opportunity to do that and ask that leniency is considered in her sentence.

With my warmest regards,

Vanessa Perez-Rubio Maffia

STANFORD GRADUATE SCHOOL OF BUSINESS, STANFORD UNIVERSITY
655 KNIGHT WAY, STANFORD, CALIFORNIA 94305-7298  USA

JEFFREY PFEFFER
THOMAS D. DEE II PROFESSOR OF
ORGANIZATIONAL BEHAVIOR

August 22, 2022

Hon. Edward J. Davila
San Jose Courthouse, Courtroom 4—5th Floor
280 South First Street
San Jose, CA  95113

RE:  Sentencing of Elizabeth Holmes

Dear Judge Davila:

I went to a private boys' high school with Chris Holmes, the father of Elizabeth.  When she
started her company, she came to see me for advice.  I know nothing about blood chemistry but I
did tell her that many start-up founders lose their positions so she needed to be careful about that.

I then saw her at our fiftieth high school reunion, which she attended because her father won an
award from the school on whose board he had served.  But most of my contact with Elizabeth
Holmes occurred during the time of her trial, mostly by chance. ██████████████████████
████████████████████████████████████
███████████████████████████████ Chris and his wife,
were in the area at that time for the trial.  Chris and Noel, were a huge comfort during my
grieving and I would go to meals at the house where Elizabeth and her partner, William Evans,
lived with Chris and Noel.  After the Holmes' parents went back to Washington, I went to
several meals with Elizabeth and Billie—and others—accompanied by the Stanford medical
school physician I was dating at the time.  During this time I experienced the care and concern of
Elizabeth and Billie and saw her with her family, with her partner, and with her child.

I offer some observations based on my first-hand experience with Elizabeth and my thoughts
about the public image she has developed.

First, my experience with Elizabeth in her home is that of a loving, caring, emotionally mature
person.  Her interactions with her family, her partner's family, and with me, were always sweet
and tender.  She is clearly a devoted mother and is very committed to and loving of her son.  Her
obvious love and concern for all of us—me following the death of my wife of 35 years, her

TEL: +1.650.723.2915     E-MAIL: pfeff@stanford.edu

**ER-1117**

parents, and her baby, was sincere. I believe Elizabeth to be a caring mother, devoted daughter and sister, a wonderful partner, and a loving friend.

Second, there is a public image of Elizabeth Holmes that portrays her as a liar and fraud that is inconsistent with what I observed. Cognition is often motivated and people see and believe what they want to see and believe. Statements repeated frequently come to be apprehended as truth by observers and by those who make the statements. My sense from talking to Elizabeth is that her intentions were always sincere and that she believed what she said.

Third, my colleague Robert Sutton and I some years ago wrote a book on evidence-based management. We then wound up working with a consulting company retained by the DOJ to work on evidence-based criminology and sentencing. I came to know that sentencing has two objectives: first, to keep people who may be likely to repeat harm to others locked up so that they cannot do additional harm, and second, to, through the example of sentencing, deter their criminal behavior from being exhibited by others.

As should be clear, the odds of Elizabeth Holmes repeating her behavior is close to zero. And as numerous Silicon Valley examples—including the recent funding of WeWork's Adam Neumann make clear, at least in the case of white men, it is not clear that the trial of Holmes has sent a signal to many people about appropriate contrasted with inappropriate or possibly even illegal behavior. Therefore, it is far from clear to me that a jail term, and particularly a long jail term, for Elizabeth Holmes serves any useful social purpose. On the contrary, it will put a talented person behind bars, separating her from her child and her family.

I therefore both hope for leniency from the court in the case of Elizabeth Holmes, for reasons that I hope the forgoing make clear.

Respectfully submitted,

Jeffrey Pfeffer

Hon. Edward J. Davila
San Jose Courthouse, Courtroom 4 – 5th Floor
280 South 1st Street
San Jose, CA 95113
September 18, 2022

Judge Davila,

My name is Shize (Daniel) Qi.  I am writing this letter to support Ms Elizabeth Holmes in her case.

I worked for Theranos from September, 2005 to November 2006 as a Sr. Scientist.  I first met Elizabeth when I went to Theranos for the job interview.   I had a chance to speak to her at the end of the process.  I was impressed when she told me how she started her company when she was only nineteen years old two years ago.  She talked about her vision and her enthusiasm about Theranos technologies and products. That was the first time I learned that a medical device could perform a test at the point of care and the result could be transferred to the doctor's office through mobile communication.  Elizabeth is one of those pioneers who brought these concepts to the tech world.  I was excited to join Theranos team and wanted to really make a difference to improve human health.

During my time with Theranos, I had meetings with Elizabeth regularly.  I also had chances to listen to her speech during company conferences.  I could feel that she dedicated herself to the technology.  She worked very hard to get ahead of everything.  Many coworkers of mine, including myself, had the experiences when we sent her an email even at night such as 2 am, she often responded right away.  She seemed to be on a 24/7 schedule.  I still remember that she carried our prototype equipment all by herself traveling to Europe to do demos to our investors. I also remember we traveled together to a manufacturer in China.  She arrived early that day and got to the plant meeting with manufacturing managers and took a tour in the cleanroom to make sure it was up to production.  She then left for her next flight in the evening. Considering she is a vegetarian, I don't understand where her energy was from.

I also noticed that she did not have much experience of management.  Her first real job was a startup CEO.  She had to rely on other managers to oversee the daily operations.   Some of the managers were not from the biotech industry. Their understanding of the development process and timeline might not really make too much sense. They often forced deadlines and Elizabeth was sold easily all the time and overly optimistic about the development progress.  There were many problems that were overlooked. It was a systematic management problem due to her inexperience.  That is why I was not surprised many years later when I heard that things went wrong with Theranos.

I am really sad that Theranos did not achieve the goals it meant from the beginning.  I believe Elizabeth is a good person with all the good intentions. She is an ambitious and fearless leader.  I wish Elizabeth well. I am hoping she will come back someday to the tech world to make her dream of changing people's life come true.

Yours sincerely,

Daniel Qi

Honorable Judge Edward J. Davila

San Jose Courthouse, Courtroom 4 – 5th Floor

280 South 1st Street

San Jose, Ca. 95113

Dear Judge Davila:

My wife and I have had the pleasure of knowing Elizabeth Holmes for the last four years. During this time, we have been impressed with her genuine and kind nature. We have observed her in social settings with my family and others and she has always been very accepting and kind in all circumstances. When we first met Elizabeth, she was dating Billy Evans. She did not have a child at that time, but we were impressed as she would interact and play with our three children and get to know them. Our children have grown to love Elizabeth and her kind nature. They like to talk, play games, and enjoy time together. My wife and I have had similar experiences and we too appreciate Elizabeth. She has been very kind and welcoming. We have celebrated holidays, birthdays, etc. and we have thoroughly enjoyed all events together.

As life has progressed on, we have seen the joy experienced from Elizabeth and Billy welcoming their baby ███ into their life. We have personally seen the growth and joy that has entered their life when they became parents. ███ is truly loved, and they pour their heart and soul into being parents while trying to balance life. Elizabeth is an amazing mother. We have noticed the joy and focus she brings to making motherhood a priority in her life. She understands the importance of raising her son and the significant impact that will make on his life. It is truly special to see her love for him and the joy she has being a mother.

I share these thoughts because we truly care for Elizabeth. Based on knowing and interacting with someone for four years you get to know their true nature. You see them in various setting, challenges, celebrations, etc. I have never observed any negative behavior from Elizabeth. However, I continue to be pleasantly surprised at the kind gestures and genuine approach to friendship and care that Elizabeth has for our family. We appreciate you taking the time to read this letter. Please feel free to call or email with any questions, thank you and we wish you the best.

Sincerely,

Bryce Raleigh, Tara Raleigh, E███ (13), B███ (12), and K███ (7)

███████████
███████████

223

**ER-1120**

To: Hon. Edward J. Davila
San Jose Courthouse, Courtroom 4 - 5th Floor
280 South 1st Street
San Jose, CA 95113

August 17, 2022

Dear Judge Davila,

My name is Debbie Raleigh,  I am the  Aunt of Billy Evans — Elizabeth Holmes partner and
Wills Father.  I have enjoyed working in the field of Property Management and Real Estate sales
in San Diego County for the past 34 years.  My family is my greatest joy, as well as, my
testimony of a Loving Heavenly Father and His Beloved Son, Jesus Christ.

I've enjoyed getting to know Elizabeth over the last four years.  We've enjoyed holidays
together, specifically Christmas and Independence Day with our family.  Baby ███ was the
highlight of our holidays.  Elizabeth is a patient loving mother.  She's always sensitive to ████
needs.  Elizabeth has always been a caring, helpful, kind niece.  She puts others needs first
instead of her own.  When someone wants to share a few thoughts with Liz she always has a
listening ear.  Elizabeth is a spiritual individual.  She has shared her thoughts about God
and her feelings of His Love for her and all people.  I only know the kind hearted, nurturing
woman Elizabeth has been to me and our family.  I wanted to share a picture of
Elizabeth and ████ during our Christmas Eve family celebration.

Thank you Judge Davila for your time,

*Debbie Raleigh* Aug.18, 2022

Debbie Raleigh



Dear Judge Davila,

My name is Julia and the first time I met Liz was at my wedding, when she attended with my cousin Billy, on August fourth two thousand and eighteen, as of tomorrow I will have had the pleasure of having her in my life for four years. Immediately upon meeting Liz she was kind and gracious to my husband and I as she congratulated us and introduced herself. I remember watching her and Billy together that day and having the distinct thought that they cared for each other very deeply. Over the time she has spent with our family and been in our lives she has brought joy, laughter and happiness and I truly feel we are blessed to have her. I remember getting to see Liz and Billy at a Christmas party just a few months after our wedding and she took the time to talk with my husband and I, genuinely listening to us, asking about what did for work and where went to school, how we'd met. I realized then what a great listener she was and I appreciated that she took the time to truly get to know us better. When Liz made the effort to come spend my grandmothers eightieth birthday with our family, I knew she was someone special. She came to the house and was so sweet spending time catching up with everyone,  she talked with me one on one and told me about her family, where her and Billy were living at the time and how she liked it. She asked about how my husband and I were doing and what was new with us and I just remember feeling grateful for her openness and vulnerability as she talked with me and how thoughtful she consistently was, every time we got together, in asking about our lives and being genuinely interested in who we were.  We're big on tradition in our family and every Christmas Eve we spend at my grandmothers home. Last year when Billy and Liz came with their sweet baby ██, it was the first time I got to meet the new baby and the first time I had the pleasure of meeting Liz's parents, who were kind and wonderful people to be around. That was such a special evening spending time with all of them and getting to see how our family had grown and the vital part that Liz played in that growth. Immediately when she came into the house that Christmas Eve she was so excited to introduce everyone to baby ██. She doted on him and was so proud to be a new mother, it truly beautiful to see. My husband and I had gotten ██ a little gift, nothing big, just a simple book and little toy but by the way Liz's eyes lit up when we told her we had something for him, even before he'd opened the gift, she was so kind and grateful that we had included her son, you'd have thought we'd lassoed the

moon for him. I could see how much she loved him and how much it meant to her that we cared about him. She was incredibly gracious with us and made us feel appreciated. Liz thanked us multiple times and showed off the gifts we'd given to ████ and that made us feel so special. She even took the time to call me a few days later, I didn't have my phone on me so she left a voicemail with Billy and ████, the message was so thoughtful and spoken with such genuine kindness that I kept it and still have it on my phone today. I'm the kind of person who keeps birthday, holiday cards and notes and that's what the message from Liz felt like, a personal note of gratitude and love. Just this last Easter, when we got to see Liz, Billy and ████, she sat with me at the kitchen table chatting and talking about how fast ████ was growing up and then we tried to help teach ████ to say my name but the best part was that she told him my name was Auntie Julia, which was a really tender moment that made me feel so important and included in their lives. Liz is a part of our family and I just love her, my cousin Billy and their beautiful son so much. There's something so special about how when a family grows and your love extends to new members,  because of the memories and special moments you share together, that you can't picture what it was like before they were a part of that family unit. That's how it is with Liz she's added so much to our family and I feel truly blessed to have Elizabeth in my life. There is no person that could love my cousin Billy better than her and for that I am so grateful.

Sincerely,

Julia Raleigh

08/03/2022

To:  Hon. Edward J. Davila
     San Jose Courthouse, Courtroom 4 - 5th Floor
     280 South 1st Street
     San Jose, CA 95113

August 18, 2022

Dear Judge Davila,

I am writing regarding my personal relationship/experience with my niece Liz Holmes.

My name is Michael Raleigh,  Billy Evans and Liz  are my nephew and niece.  I live in

San Diego area with my wife Debbie who is Billy's Aunt.  We have five children and five

grandchildren who thank goodness happen to all live in San Diego County. We feel fortunate.

I am a Realtor for the past 30 years and am actively involved in my church.

Just a quick note on Billy.  I've watched him grow into the man he is and have witnessed the

wise choices and quality associations he has kept over the years and know he is devoted to Liz

and they're little son ███ wholeheartedly.  Billy has a large capacity for compassion and

interest in others and He & Liz are similar in that way.

I've known Liz for the past 4 years and because of family gatherings at the beach, home and

Christmas,  we've been able to spend time together in informal settings.  The only

Elizabeth Holmes I know is happy, positive, and overall genuinely values relationships above

everything else.  In my conversations with her I'd have to say aside from her relevant questions

to me,  she's fairly reserved and listens more than she talks.  She is pretty mellow most of the

time trying to keep up with little ███ needs and "Life."  I know she's intelligent because she's

witty!  You have to be smart to have wit.

We've celebrated together at our daughter's wedding, Bar BQ's, beach walks, dog walks,

holidays etc..

I'll give a brief capsulated firsthand experience that sums up my take on Elizabeth Holmes.

Last Christmas Eve will go down as an Epic Family gathering at Grandma Genny's —my Mother in-law— house with all the family including Billy, Liz & ▓ and Liz's parents Chris & Noel.  Watching Liz during our white elephant gift exchange laugh and take some ribbing and dish some back was a relief knowing her and Billy and her parents were facing a very difficult storm in their lives. It was the first Christmas Eve we have been able to spend together and was very special!  I say Epic having been to the previous 39 annual Christmas Eves in that house.  Lots of love, singing Christmas Carols, reading from Luke -The Christmas Story together with Billy's Booming voice. Food etc..  I was happy for the occasion of the Holiday but also that Liz and Billy and her parents could be around people who know them best.  A place of refuge from the noisy world of public opinion. A time to cherish what we have and hold most dear.  They were with those who had no preconceived notions having no reason to judge them because there's nothing to judge.  Just decent regular old family.

Liz was actually quite good about letting our three daughters and granddaughters hold ▓ once in a while during our evening together.  I did see that "First Baby" look from Mama Liz more than a few times trying to keep track of where he was.   Liz has openly mentioned her faith a few times over last few years and how relevant it is in her life.  I was personally glad to hear that from her.  Her parents have been very genuine and friendly with us. Thoughtful to send flowers for different occasions.  Noel seems like a sweetheart.

Last thought:  I felt the true Spirit of Christmas on that evening together with Family.  In the back of my mind I knew there was a trial going on but you couldn't tell by looking around the room.  A number of times I saw Liz smile at me and others throughout the evening. It was calming, it was relaxed not forced. There was a warmth and peace from her that was sincere. I saw happiness in her face that was coming from inside out.  You can't fake what I saw and felt. It was genuine. At a time of personal trial for her, I saw Liz reaching out to me and other family members through a glowing smile and a few soft spoken words of love and cheer.  Seeing and talking with her, watching her move forward with grace and dignity under extremely stressful

2

and troubling circumstances.  Watching her put ███ needs before her own is humbling and inspiring.  But that's who she is and who I have come to know.

I can only express what I have experienced personally with Liz.  She's a smart girl no doubt, but she's no mastermind.  She wants good things for others.  She put herself out there in the game to make a difference instead of sitting on the sidelines.  What she was involved with professionally was big girl big boy stuff and you have to be accountable, however, IF she did error,  it was on the side of an overall intent to improve lives and quality of life.

Thank you your Honor, for taking the time to read my personal insights and experience with Liz.

Take Care

Mike Raleigh

*3*

Justin Randolph





September 7, 2022

Hon. Edward J. Davila
San Jose Courthouse, Courtroom 4 – 5th Floor
280 South 1st Street
San Jose, CA 95113

Dear Judge Davila:

I have known Elizabeth since childhood — she and I attended middle school and
high school together in Houston, and we since established a deeper friendship
after I moved to the Bay Area in 2010.

I respect that a jury has found Elizabeth guilty of four of the charges brought
against her. I am writing to offer a more complete picture of who she is, given
my interactions with her for more than 25 years, in hopes that you will find
Elizabeth's character warranting of a lower sentence.

I first witnessed her quiet determination to learn and contribute to something
greater than herself while in the classroom. Specifically, we were in the same
organic chemistry class in 10th grade, and I remember well how it was typical of
her to remain in the science lab long after class was over — meticulously
documenting her lab experiments and diligently focusing on her studies. While
working together in classroom teams, she was eager to help and to contribute
to the rest of the of team without any need to take personal credit or attention.
While it was clear she was intellectually-gifted and highly-intelligent, I never
observed any sense of arrogance, egotism or entitlement common of others
with such talents.

As a friend, she has exhibited similar care and attentiveness. She has remained
readily-willing to lend support — even in the midst of her own legal challenges
— as I struggled over the last few years through a difficult relationship and

breakup with my ex-partner. Whenever I have asked for guidance, she has selflessly made herself available for a walk or a dinner — listening intently and eager to offer care, guidance, and advice.

I realize the Federal Sentencing Guidelines, although not mandatory, provide the court with recommendations, and I realize how significant the possible sentence could be. I hope that you will find Elizabeth's life and work to warrant a low sentence. I have no doubt she has learned deeply from her own challenges, and I'm confident she remains eager to contribute positively to those around her in the future in the years to come.

Sincerely,

Justin Randolph

August 15, 2022

Hon. Edward J. Davila
San Jose Courthouse, Courtroom 4 – 5th Floor
280 South 1st Street
San Jose, CA  95113

Dear Judge Davila,

I write in reference to the forthcoming decision you will soon make regarding
Elizabeth Holmes. My connection with her began at the time of her encounter
with the Justice system, though I have a long and warm history with her father
and mother.  Her father Christopher was my Chief Financial Officer when I
was U.S. EPA Administrator in the administration of President George H. W.
Bush, and we have remained close over the years since then.

Early in the preparations for her trial her father, knowing that I was then living
a few blocks from her apartment in San Francisco, asked me if I would check
in on her, do what I could to improve her outlook, and remind her that she was
not without friends. I invited her to lunch where we talked about her life and
activities, her reacquainting with Stanford classmates, sailing on the Bay, her
sudden exposure to free time and non-working afternoons, a life she had
never allowed herself from the age of nineteen. Her father had indicated that
she was very down, which she tried hard not to give in to. My immediate
impression was how young she was, which I should have known.

I am a practicing Catholic and, knowing of her own childhood faith brought up
the importance of maintaining a spiritual perspective and trusting the
consolations of her religion. She responded enthusiastically to my suggestion
that she speak with a wise and charismatic Dominican priest. I alerted him to
her situation and to my sense of her emotional and spiritual needs. He was
open to helping her but made clear that the request had to come from her.
She initiated a series of conversations with him which she has said she found
inspiring and uplifting.

A year or more later I invited Elizabeth and her fiancé to come to lunch at our
home in          . I was struck by her mature and accepting objectivity
regarding her situation, not apparently angry or resentful, not despairing,
taking life day by day. She seemed to have grown since our first encounter.

Her fiancé and later her baby appeared to be a steadying focus and even to introduce a measure of humor, and domestic happiness, and other people to be concerned about. Elizabeth made clear during our luncheon conversation that she retains her sense of mission to help humanity.

I pray that you and she will find a constructive path for her to lead a productive future.

Respectfully,

William K. Reilly

**ER-1131**

September 21, 2022

Hon. Edward J. Davila
San Jose Courthouse, Courtroom 4 – 5th Floor
280 South 1st Street
San Jose, CA 95113

Dear Judge Davila,

This letter is written on behalf of Elizabeth Holmes. I have known Elizabeth since our Freshman year in college. When we first met, we shared a love for changing the world and pushing ourselves to make an impact in healthcare for the people that we love. I remember how hard we both worked in college on weekends to achieve our dreams - Elizabeth and I would spend our weekends in research laboratories in hopes of discovering or creating something that could better the lives of the people we saw suffering around us.  We were inspired by the endless possibilities of innovation to help others.  I understand how Elizabeth has been portrayed in the media, but the person I know had dreams that were rooted in the best intentions, who believed that the best way to achieve our dreams were to work hard and be honest.

Elizabeth was and continues to be a truly caring and kind friend, a compassionate individual, and loving mother. In my journey as a young professional woman facing challenges in the business world of healthcare, Elizabeth always extended a hand to motivate me to take small steps while thoughtfully dreaming big. I have memories of specific conversations about the inequities of healthcare and how much potential there is to create a healthcare system for all that is equitable, accessible, and above all, based in empathy. These conversations were never about monetary gains or how famous one could be, but grounded in the impact we could have on healthcare and, ultimately, the betterment of people's lives. This dedication was for the good of humanity, and potential for new discoveries in science, a sentiment I know she carried with her throughout her work.

I, and many of Elizabeth's friends and colleagues, know her to be a human being with a great heart. In my friendship with Elizabeth, I have never once doubted her character, decision-making, or intentions.

Kind Regards,

*Sonia Samagh, M.D.*

Dr. Sonia Samagh, MD, MBA

Hon. Edward J. Davila
San Jose Courthouse, Courtroom 4 - 5th Floor
280 South 1st Street
San Jose, CA 95113

August 10, 2022

Dear Judge Davila:

Over the last five years, the Elizabeth Holmes I have gotten to know is a kind, contrite and humble, loyal and sincere, intelligent and engaged, woman and mother.

Elizabeth has spent over 200+ hours volunteering on a statewide ▮▮▮ sexual abuse hotline... offering support and consolation for those in dire need. Something she was not able to resource in her own time of vulnerability and need. Her plan is to spend 12-48 hours every week volunteering and being available for others. I have spoken to her at length about this time in her life, and I came away with a clear understanding of her true conviction to service and support of those up against sexual abuse. This is a time of putting aside her own needs and if she can help just one young person not be abused, or not be swayed and manipulated into an untenable or uncomfortable situation, she feels her time has been well spent.

Five years ago, I had the privilege of meeting a kind, quiet, yet subdued Elizabeth at my son's apartment in San Francisco, on Mother's Day. The importance of this day seemed irrelevant then. But now as I look back, none of us knew that both myself and this gathering of friends would witness the incredible maturation and evolution of this young woman. She has gone from a disguised subject of tabloid fodder, to acquaintance, to loyal friend, to valued member of their inner circle, to loving partner to Billy, and now, to devoted Mother to ▮▮▮. The transformation has been immense. Elizabeth has fiercely refocused her life and is dedicated to teaching and nurturing her son to the best of her ability. Wholesome family life and the simple pleasures of raising ▮▮▮ give her the greatest joy.

May Elizabeth be judged on the full scope and entirety of her life to date, and not just one snippet of her vulnerable and impressionable time at Theranos, where her reality was full of insurmountable physical and emotional distress. She has spent equal parts of her life riding the Theranos Roller Coaster, as she has spent fighting for her life post Theranos. She should be given credit for her evolution and growth, maturity and contrition at trial, and evaluated for the woman she is now.

Kindly,

Monique Sanders

236

**ER-1133**

Honorable Edward J. Davila
San Jose Courthouse, Courtroom 4 – 5th Floor
280 South 1st Street
San Jose, CA 95113

August 2, 2022

Dear Judge Davila,

My name is Breanne Smith. I was first introduced to Elizabeth (Liz) Holmes through our significant others; they have known each other since childhood. The day I met Liz, I was largely unaware of her story and her prominence, therefore I was able to get to know her in an unbiased way, sans any preconceived notions influenced by media reports. Liz is loving, loyal and ambitiously benevolent.

The night I met her, my fiancé and I had been invited over to our mutual friend's home for dinner. As soon as I arrived, Liz introduced herself with the warmest smile and, unlike many first interactions I have experienced, she truly took time to get to know me, share stories and form a friendship. My first impression of her was warm, genuine, and kind, which holds true to this day; we quickly became friends as a result.

Liz is the friend I can always count on to listen and encourage me. Throughout the years she has been there for me when I faced a headwind in my own career and her own strength has inspired and motivated me to persevere and pursue my ambitions and dreams. She is also one of the most thoughtful people I know- she sends handwritten cards and will thoughtfully care or call just to check in on me and let me know she cares. When I moved up to San Francisco last year, I knew no one. With this in mind, Liz introduced me to all of her friends and ensured I would have the support of her community. You can tell a lot about someone through the people around them, and I haven't met a friend of hers that I didn't like or did not trust.

God blessed Liz with a child last year and seeing her as a mom has validated how I've always felt about her - patient, loving, and kind.We have had long talks about how we were raised and how we would want to raise our children. Liz told me she wants her child to be surrounded with love, to have strength, and to find his passions. Motherhood isn't for everyone, but Liz was born to be a mother, she nurtures and loves her baby so much. Despite everything going on, her being a new mother, she still shows up for me. I think her strength and resilience is admirable.

I am shocked and saddened to see Liz who I know to be so kind, selfless and benevolent, in the position she is today. It is painful for me to see her portrayed so differently in the media, to the world, versus who I know her as. Her sole purpose in building this company was to help others. That is who she is to her core. As a friend Liz has shown selflessness in her hardship, genuine care and love for me and all others around her. She is a good human, loving mom, and a valuable friend. It is my sincere hope that you take this letter into consideration when determining her future.

Sincerely,

*Breanne Smith*
Breanne Smith

**DAVID L. SOKOL**

███████████████

August 11, 2022

The Honorable Edward J. Davila
San Jose Courthouse, Courtroom 4, 5ᵗʰ Floor
280 South 1ˢᵗ Street
San Joes, CA 95113

Re:  United States v. Elizabeth Holmes, case no. 18-cr-253

Dear Judge Davila,

Thank you very much for the opportunity to submit this letter in regard to your consideration of appropriate sentencing outcomes for Elizabeth Holmes.  Over my 44-year business career, I have been Chairman and Chief Executive Officer ("CEO") of three public companies. In late 1999 I sold 81% of MidAmerican Energy Holdings Company to Berkshire Hathaway and I remained as Chairman until March 2011. While at Berkshire Hathaway I was also Chairman of Johns Manville Company and NetJets. Since leaving Berkshire Hathaway I have been a private investor and I am currently Chairman of Atlas Corp. a NYSE listed company.  My first CEO appointment was in 1983.  Over this 44-year period, I have been intimately exposed to the laws and regulations which govern both private and public companies as well as investing in public securities, private securities and venture capital.  I humbly suggest that my perspective, stemming from both my business experience and my knowledge of Ms. Holmes' character, may be useful for this Court to consider as it contemplates her sentencing.  I very strongly urge leniency.

How I Met Ms. Elizabeth Holmes
I have no historic family or business relationship with Elizabeth Holmes.  As discussed below, I met Ms. Holmes in the spring of 2015.

In the fall of 2014, I was an executive committee member and Chairman of the Horatio Alger Association of Distinguished Americans, an organization which celebrates the American dream and provides scholarships for thousands of young men and women who have overcome extraordinary adversity to attend college or trade schools.  To date, the Association has in excess of 30,000 alumni scholar recipients and we have distributed over $225 million in scholarships which are funded exclusively through Member contributions.

1

During the fall of 2014, the Association had its normal board of directors meeting at which it annually selects approximately 10 individuals who will receive the Horatio Alger Award at the following awards ceremony which is held in Washington, DC in early April. The Award honors individuals who have demonstrated unusual purpose and perseverance in their professional or personal lives, often overcoming significant adversity. As such, they serve as role models for our scholarship recipients. I was Chairman of the selection committee that year and at the conclusion of the meeting and having selected our nominees, one of our newer members, Byron Trott, made an unusual request. Mr. Trott recommended that we add Ms. Elizabeth Holmes to the nomination list which we had just approved after two hours of discussion. This request was unusual in that we were provided no prior information on Ms. Holmes. Mr. Trott made an impassioned plea for us to break protocol and select Ms. Holmes based upon his personal due diligence and confirmation that she is "the real deal" and that she would make an ideal role model for our young female scholars. Only a few of our board members had even heard of Ms. Holmes and there were several objections to Mr. Trott's request due to a lack of familiarity with Ms. Holmes and the last-minute request. Ultimately, the board approved Mr. Trott's recommendation and Ms. Holmes received the Horatio Alger Award in April, 2015.

My first personal introduction to Ms. Holmes was during the Thursday awards event in Washington, DC that spring of 2015. During an extended question and answer period with our scholarship recipients, she was very thoughtful, encouraging and inspirational. Following the awards ceremony, I was very favorably impressed by Ms. Holmes' kindness and openness when mingling with myself and others at the after party. She expressed excitement at being able to mentor and communicate with our scholars and seemed genuinely humbled by the honor of the award.

I additionally enjoyed meeting Ms. Holmes' parents who quickly conveyed a very genuine love of their daughter and deep pride about her dreams of improving blood testing costs and availability. They were unpretentious, caring parents and seemed very grounded.

My wife and I have closely followed Ms. Holmes' career and this prosecution. Throughout this period, we have only increased our belief in Ms. Holmes' honesty, kindness and intellect.

What is Venture Capital Investing?
Over my 44-year business career, I have had the pleasure of building multiple businesses and I have taken three companies public. Through my career, I have invested in venture capital transactions which have been failures and successes. I believe it is important to explain as simply as possible the difference between venture capital investing and investing in existing proven businesses whether private or public.

When investing in existing, proven businesses you have the opportunity to review the past performance of the company and its financial results; its future plans; the quality of the management team; the company's competitors and then how the company compares. Also, you will be capable of comparing the value proposition of this investment versus this company's competitors. You would evaluate the price to earnings ratio, profit margin and the soundness of the companies' balance sheet to weather future economic changes as well as their ability to invest in expanding the business. You would be able to create a projection of possible future profitability based upon past performance.

By contrast, when investing in venture capital, you have virtually no historic information to evaluate. Your investment will predominantly be based upon an estimate of the value of the business "if" the venture is successful as well as the management team's ability to hopefully make it successful. Venture capital is inherently very risky investing and often only 1 out of 10 such investments prove successful. The reason is obvious in that most venture capital ideas are attempting to do something never before tried or achieved.

In my own case, my biggest investment blunder was losing $300 million in what appeared to be a very high probability technical extension of one of our existing businesses. I provide below the details of this experience as I believe the Court may find it instructive as it considers Ms. Holmes' conduct and appropriate sentencing.

2

My Zinc Venture Capital Experience

One of MidAmerican Energy Holding Company subsidiaries was a geothermal energy company which has developed and commercialized multiple geothermal power plants which sold their power to Southern California Edison for resale to their various customers. At the time, we were considered the leader in geothermal power development and generation worldwide.

Several of our geothermal power plants in Southern California utilized a deep geothermal reservoir to extract super-heated brine in order to utilize heat exchangers to create steam which then drove electric generators.

In essence, the super-heated brine was utilized to boil clean water in a heat exchanger (think tea pot) and the steam produced expanded in a turbine which is connected to an electric generator.

We had extensive experience over a decade with this very successful technology. The reason we utilized the heat exchanger to create steam was that the super-heated brine was a very complicated compound of various minerals and chemical compounds which are formed in nature and heated by molten magma in the earth's crust. Due to these complexities, the brine was extracted from deep in the earth's crust, passed through the heat exchanger, and reinserted into the underground reservoir at a somewhat lower temperature.

Years before while designing the metallurgy for the heat exchangers so that they could resist the corrosive nature of the super-heated brine we analyzed many samples of the various constituents held in the brine. Consistently, we discovered commercial amounts of zinc and magnesium as well as smaller amounts of gold and silver.

Beginning in the late 1990s, one of our geothermal chemistry experts developed a theory that we could create a device which would be filled with a specialty designed resin which could attract particles of zinc or other specific elements. The device would operate much like a sand filter utilized to keep swimming pools clean except it would utilize specially designed resins to attract specific elements from the brine.

I was initially skeptical of the idea given that such a device had never been developed or utilized on such complicated liquids as super-heated brine. However, the enthusiasm of our team and the extraordinary economic model which showed outstanding financial potential if this device could be proven to work convinced me to explore this potential further.

After requiring my team to develop a detailed proposal to prove this concept at a bench scale, I and our Board of Directors approved a $15 million expenditure.

The results of the 12-month bench scale research project proved very successful. While the results demonstrated that such a technology could be ultimately worth several billion dollars, it also identified multiple technical challenges which would have to be overcome in perfecting the process.

As a result of this study, we again agreed to expend approximately $100 million to build a single full-scale unit which would be designed to overcome the various technological challenges identified by the first study.

After approximately an additional six months of design and construction on this first full-sized unit, our team of engineers and operators were confident that they identified solutions to the technical challenges. Further, they completed a forward-looking model which indicated that this proposed full-scale zinc extraction facility would be worth approximately $1.5 billion. The bad news was that the final full-scale facility would in total cost $250 million and take 18 more months to complete.

3

**ER-1137**

Following extensive challenging of the team's solutions we determined that the risk/reward analysis warranted us expending this further amount given that return on our total investment of $275 million would be $1.5 billion or nearly a 5.5 to 1 return. Our team's predicted probability of success was 80% at this point.

Sadly, when the facility was fully completed 18 months later, testing results consistently showed inadequate recovery percentages of zinc. After three months of continued testing, modifications and analysis it was determined that an unanticipated chemical reaction between the actual brine and the resin, essentially blinded the resin and substantially reduced the recovery percentages.

We spent additional sums thoroughly analyzing what had occurred to be certain we had not missed something. Unfortunately, the final result was that a potentially revolutionary technology was proven not to work. We had to immediately write off a loss of $300 million in investment which included tearing down the facility. The only final recovery was the scrap metal.

While this was the biggest mistake of my career, it was made in good faith in an attempt to find a far more cost-effective method of extracting zinc from the earth in an environmentally benign fashion requiring no mining. Importantly, while I accept responsibility as CEO for the decision to proceed, I like Ms. Holmes based my decisions upon the technical expertise of our scientists and experts. Our scientists did their best to develop this technology and we fully understood the risks involved. The financial projections were not falsified as they were based upon the assumption that our technology would work. However, it did not!

I relay this story because my failed zinc project was a classic example of venture capital investing. I am by no means proud of this result; however, under similar circumstances, I would make the same decisions. It is through this high risk and high reward investing that great human progress has been achieved.

The Securities and Exchange Commission Investigation

Your Honor, I have followed Ms. Holmes' prosecution closely and I have read hundreds of pages of testimony and witnessed several days of testimony in the court room. The prosecutors have followed essentially the script of the multiple articles from the Wall Street Journal, and the subsequent book and movie based thereon. That story paints Ms. Holmes as a villain in the long tradition of journalistic zeal to find, and sell, scandal. That story is based largely upon conjecture and unverified assumptions. However, at the same time, the Securities and Exchange Commission ("SEC") conducted a nearly 18-month investigation of Theranos and Ms. Holmes. As you are aware, the SEC is the agency of the United States government specifically responsible for reviewing and regulating our financial markets, punishing insider trading and identifying financial fraud. Additionally, the SEC fully understands the risk acceptance which "Qualified Investors" make when investing in such risky ventures.

The SEC made no finding of guilt on behalf of Ms. Holmes and accepted a settlement of five-hundred thousand dollars. Signifcantly, as you know, the SEC applies a lower standard of proof than in the criminal case, and still made no finding of Ms. Holmes' culpability. Certainly, the SEC's technical knowledge and expertise far surpasses that of a jury of typical Americans, particularly in such a complicated venture capital undertaking.

Ms. Holmes had the opportunity to sell hundreds of millions of dollars of stock – but did not!

In the 2015 timeframe, Ms. Holmes was offered the opportunity to sell hundreds of millions of dollars in her stock holdings in Theranos. She turned down that opportunity because she felt that she should not profit until all of her investors had returned their investment profitably.

It is beyond reasonable judgement that someone intending to commit fraud would decline an opportunity to cash in hundreds of millions of dollars from an investor anxiously wanting to invest in Theranos.

Not only did Ms. Holmes not accept such an opportunity, she has been rendered bankrupt by this criminal litigation and will have a legal fee repayment obligation in the many millions. Additionally, she has been essentially in purgatory during the three-year period of these indictments.

The Ms. Elizabeth Holmes I have known for seven years is not a criminal

Over the period that my wife and I have know Ms. Holmes, there has not been a single moment where she has exhibited anything but kindness, intelligence and determination to find better and more cost-effective health care solutions for everyone.

Having interfaced quite often with Ms. Holmes while she was being attacked, she never attempted to mislead us in any way or to avoid accepting responsibility for her business decisions. Her greatest frustration that she has shared with me was the extraordinary amount of time and money Theranos was having to spend defending itself from one attack after another from various sources. I understood her frustration given that as a private company such attacks are unusual at best.

Frankly, in my opinion, had those dollars been utilized to complete the technology Ms. Holmes was trying to finish, we might very well have lowered the cost of blood testing significantly by now.

This was not, and is not, a House of Cards

The prosecution took every opportunity to paint the picture that Theranos was a fraud, a house of cards and that Ms. Holmes was the cause. If their picture was correct, why did an unrelated financial institution pay in excess of $100 million to purchase the numerous patents which Ms. Holmes and her team created? In my $300 million zinc loss, there were no valuable assets remaining. The firm which purchased Ms. Holmes' patents had expressed a view that they may be worth over $1 billion dollars. That is not a house of cards.

Conclusion and Thoughts for Your Honor

In over 40 years in business, I have experienced a great deal. I have had the privilege of developing and growing three companies which we took public on the New York Stock Exchange. I lost $300 million in a zinc venture. I have made numerous successful investments and I have made my share of mistakes in business.

Additionally, I am a true believer in America's capitalistic meritocracy and our system of justice. As such, I accept the jury's decision in Ms. Holmes' trial. However, I also believe that such a trial revolves around extremely complex business realities which would be complicated for an experienced business person let alone someone not trained in such things as venture capital investing, accounting, proforma projections and related legal concepts and laws. As a knowledgeable investor, I can say with certainty that I would not have found Ms. Holmes guilty on any of the wire fraud charges. Many business mistakes were made, which is not unusual in such a venture by such a young person, but I find no fraud. Just as Ms. Holmes' decisions were not all flawless, neither is the jury system flawless.

I would respectfully ask your Honor to consider the following points as you consider sentencing:

1. Ms. Holmes is a very good person. Kind, smart and a positive contributor to society. She will do far better for society if she is able to continue her inventing ways. There is nothing to be gained by incarcerating her. She is a danger to no one. She has already suffered immeasurably.

2. Theranos was not, and is not, the house of cards the prosecution painted it to be. An unrelated financial institution has paid in excess of $100 million to purchase the numerous patents which Ms. Holmes and her team created and and expressed a view that they may be worth over $1 billion dollars. That is not a house of cards.

ER-1139

3. The focus the prosecution made to the jury that the forecasted profitability of Theranos was never achieved and therefore must have been fraud was perhaps overly impactful on the jury as they did not understand the difference between venture capital and lower risk investing. The proformas for venture capital investments necessarily assume that the technology "will" work. The fact that the Theranos technology was only proven to work for a portion of the many tests hoped for would necessarily mean that the forecast would be missed.

   In my opinion, it appears that the jury did not understand this reality.

4. Ms. Holmes, is in my experience and opinion, a person of high integrity and she at no time intended to commit fraud. To the contrary, Ms. Holmes wanted to change the world by creating a better and less intrusive blood testing device. She still believes in the technology, as do those who bought the patents.

   She has paid an enormous price for her failure to achieve success at Theranos but failure is not a crime.

   I am thankful that we live in a country where striving to invent new and better solutions to historic problems is praised. Failure, while unfortunate, is understood and recognized as part of the innovative process. Failure is often the precursor to success. Demonizing and criminalizing failure will stifle people's willingness to try. Thomas Edison failed over 1,000 times by his own estimate. He was not a criminal. Neither is Ms. Holmes.

5. Lastly, no public good will be served by incarcerating Ms. Holmes. She poses no danger to anyone. She openly acknowledges her business mistakes and she did not benefit in any material way notwithstanding the opportunity to do so. Her suffering, including among other things extreme public ignominy, financial bankruptcy and the terrifying prospect of incarceration while the mother of a new baby, provides more than ample deterrence to others.

I urge the court to understand the extraordinary circumstances of this situation. A very complicated research and development business venture. Years of an uninformed journalistic narrative and movie. Nearly three years from indictment to conclusion of the trial.

Elizabeth is bankrupt from this process and will spend the rest of her life attempting to repay legal costs. Let her utilize her intellect and compassion to better the world.

I appreciate your Honor's patience in accepting the length of this letter. I would be happy to answer any questions which this letter many create as you grapple with your sentencing obligation. Your Honor, justice fairly administered, is the hallmark of our self-governing society. This Court's compassion and understanding are required to find fairness out of the complexity.

Sincerely yours,

David Sokol
Chairman, Teton Capital, LLC

6

ER-1140

**August 27, 2022**

Hon. Edward J. Davila
San Jose Courthouse, Courtroom 4 – 5th Floor
280 South 1st Street
San Jose, CA 95113

**Dear Judge Davila:**

I am writing you this letter in support of my dear friend, Elizabeth Holmes. My path with Elizabeth first crossed at Stanford University in 2003, but it wasn't until New Year's Day 2019 that we were introduced, and a beautiful friendship blossomed. Your Honor, I feel it is important for you to know that my introduction to Elizabeth was unlike most people who met her in 2019: I didn't know who she was. As I was getting ready to leave for brunch with a mutual friend, my boyfriend at the time told me I should google her. I told him no; I wasn't interested in reading the media's take on who she was or about what she may or may not have done. So off to brunch I went. Over the course of our two-hour meal, we talked about Stanford, what our mutual friends were up to, and I shared with her a bit about me. At the end of our meal, my assessment of the woman I'd met was that she was kind, warm, thoughtful, sensitive, and above all else: genuine. I arrived home later that day and decided to google her. Your Honor, the picture painted of "Elizabeth Holmes" by the mainstream media and internet at-large was nothing like the person I'd spent time with. And in the three years since then, Elizabeth has stayed true to the warm, kind, and genuine person I met. Our friendship was solidified as forever and always status in 2020 when we learned that we share an unfortunate and unbreakable bond, and since then I've come to know her well beyond surface level. She cares deeply for those in her inner circle and is truly a wonderful friend. Her selfless and giving nature shines through every time I speak to her. She's always asking how I'm doing, how I'm feeling, and what's going on in my life? It never ceases to impress me that someone who is going through what's she's going through has the capacity to make space to inquire about others. That's just Elizabeth.

Your Honor I'd also like you to know that she comes from a loving family. During the Trial, I stayed with her a couple of nights and got to meet her parents. After a home cooked dinner

one evening and at the end of a very long Trial Day (I'm sure you remember), Elizabeth's Mother announced she was ready for bed. As Mrs. Holmes' said her goodnights, she walked around and kissed each of us on top of our heads. It'd been 30 years since I'd had a friend's mother do that to me and in that very moment, I was brought back to the first time I'd met Elizabeth, on that cold New Year's Day back in New York and how I'd found her to be so warm, genuine, and kind. Mrs. Holmes' small gesture of love and appreciation validated everything I know to be true about Elizabeth, and offered me a window into the loving, supportive home she was raised in.

At her core, Elizabeth is a selfless person with a big heart. She does not have a single bone in her body that would willfully or intentionally harm another. The woman who sits in front of you is humble, thoughtful, and a committed citizen of this country who truly and passionately wants to make the world a better place.

Your Honor, Elizabeth is not a danger to society. If afforded the opportunity, I'm confident she will give back as a contributing member to our community and spend her life helping others. It is with so much humility and grace that I ask you to please consider these facts as they support the Elizabeth I know and love as you weigh the options for her future.

With deepest appreciation for your consideration,

Erica Sorgi

2

June 30, 2022

Hon. Edward J. Davila
San Jose Courthouse, Courtroom 4 – 5th Floor
280 South 1st Street
San Jose, CA 95113

Dear Judge Davila:

My name is Lauren Stat. I advise companies on their business strategies and sit on several boards. I am proud and humbled to call Elizabeth (Liz) one of my closest friends.

Liz has always inspired me to do the right thing. From the first day we met at Stanford to now, her bright enthusiasm to learn and to make the world a better place continues to give me hope and pushes me to take the right path in my own personal journey, even if it is the harder one.

It was during the first week of classes at Stanford in the fall quarter of 2002 when we first met. After just one Chemical Engineering 101 lecture, we became fast friends, both delighted and surprised to find a twin flame within the walls of the Stanford chemical engineering department. I was a sophomore and she was a freshman. I was quick to explain that most of the learning in STEM classes was done through extensive problem sets, which was homework to be done within the week. Completing these problem sets without the help of a teacher's assistant or a group of peers was considered virtually impossible. Should you be lucky enough to be invited into a study group, you would have access to problem set solutions that were treated as treasured relics and handed down from the older students to the younger students.

Liz appreciated and understood the "lore of the problem sets" but hesitated when I declared that we must find ourselves a great study group. She had full confidence that we could learn everything and complete all of the work on our own, just the two of us. There was no need to rely on those relics of dubious morality. And so with her leadership, we proceeded to learn the right way, the hard way.

I remember one week during which we modeled the function of a kidney in Matlab, a task which was considered to be one of the hardest problem sets in the course. Everyone else I knew had relied on guidance from teaching assistants and answer keys to get it right. Instead, Liz and I stayed up all night together, glued to our computers and

the equations dancing across the screen, while our friends did what many students do on a Thursday night in college.

I learned so much with Liz.

After her rape, she was both broken and resolute, using her anger and hurt as an impetus to make the changes she so strongly believed in. My heart was broken when she left Stanford to start Theranos; I was devastated to lose my friend and study partner, and missed the spark and inspiration to learn the hard way.

We lost touch after Stanford, as we both immersed ourselves in work and she became involved in an abusive relationship. Fortunately, we were able to rekindle our friendship as our careers shifted and her stifling relationship came to an end. We have spent so much time together that I can say with full confidence that she has the same heart and moral compass that she did when we were back at Stanford.

She seeks to do the right thing, always. She trusts in her advisors, mentors and friends. She continues to trust, even though many have failed her and have not stood by her. She learns the hard way, and challenges those around her to continue to grow and learn as well. She is an incredible mother, and I could not wish for a better friend.

Respectfully,

Lauren Stat

Hon. Edward J. Davila                                        August 10, 2022
San Jose Courthouse, Courtroom 4 - 5th Floor
280 South 1st Street
San Jose, CA 95113

Dear Judge Davila:

My name is Debbie, and I am a friend of Elizabeth Holmes. We've known each other for about 15 years; first meeting as undergraduates at Stanford, then both venturing into entrepreneurship as young female founders, and nowadays, spending time together as new moms with our little kids in tow.

First, a little about me: I am an engineer, inventor, and entrepreneur. For the past 10 years, I have been working as the Founder and CEO of a children's media and toy company whose mission is to get kids excited about science, technology, engineering, and math. I live in Los Angeles with my husband and two young sons.

I'm writing to you because I feel compelled to share my insights into Liz's character as both her friend and as a fellow female entrepreneur. I hope this letter helps give you a fuller picture of a person whose future rests in your hands.

People who only know of Liz through the media assume the worst of her, which is such a shame because if they knew the true Liz the way I know her, they would see that she is a loving mom, a loyal friend, and a well-meaning person who wants to make the world a better place.

As a new mother, Liz brims with joy over her son, ██. She is a wonderful, caring parent who is always doting over her son. Motherhood comes easily and naturally to her. On our long walks with side-by-side strollers, we compare notes on breastfeeding, developmental milestones, sleep training, and all sorts of other parenting topics. The mere thought of ever being separated from my children makes me feel physically ill, and I know this thought weighs on Liz every day as her sentencing draws near. Liz once told me that ██ has brought her a whole new sense of meaning and purpose in life. ██ is thriving under Liz's loving care, and he is the light that has helped lift her up during such an incredibly challenging time.

Liz is a thoughtful and loyal friend – the kind of person who calls you on your birthday, who remembers when you have a big pitch meeting and checks in to see how it went. She's a great listener who always gives you her full and undivided attention. She's made the effort to show up

to important events in my life, and it was never lost on me that each time she came, she was risking negative publicity from being out at a social gathering. She's never asked me for anything – in fact, she didn't even ask me to write this letter, and perhaps that is partly why I am writing it. I know she'd do the same for me.

Liz is a socially minded person who strives to make a positive impact on the world. I firmly believe she started Theranos because of her genuine desire to help humanity. During her Theranos years, she gave up her entire social life because she was so passionate about this greater purpose. She wasn't in it for the money or the fame, she was driven by the prospect of changing people's lives for the better by giving them more affordable, easier access to data on their health. Even now, after everything that has happened, she still looks for ways she can positively contribute to society. She recently told me that she has been undergoing training and doing volunteer crisis hotline work to help other domestic abuse victims.

I vividly remember the first time I felt an inkling that Liz had been abused by Sunny. It was in March of 2018. We were having breakfast and she was describing her experience working with him. She confided in me that for many years she had idolized him as the smartest businessman she'd ever known. She confessed how difficult it was for her to build up the courage and self-esteem to finally break up with him and fire him from the company. She described this moment feeling like she had "broken free of a spell". The way she described it at the time felt troubling to me, and I knew something was wrong, but I didn't know how to articulate it.

Over the past few years, I've done quite a bit of research on abuse and I've learned that victims and their close confidantes often don't know how to recognize abuse, especially as it is unfolding. As a result, the abuse continues behind closed doors as victims cede control and decision-making to their abusers. This leads to isolation from friends and family, poor decision-making, and a loss of autonomy. Years later, when Liz finally built up the courage to voice to her friends and family that Sunny had abused her, I thought back to that breakfast. I thought back to her monk-like behavior, her lack of friends while she was at Theranos, and the sheer isolation she must have felt at that time. It all made so much sense.

Liz was under crippling pressure at such a young age - a time in life when most of our peers were just deciding what college courses to take, Liz took on the weight of solving a global public health problem while appeasing dozens of investors 20+ years her senior. From my own experience as a young startup CEO, I can empathize with how much pressure there is to keep your lead investors happy and follow their guidance on big company decisions. In Liz's case, Sunny was a lead investor, with a successful startup already under his belt, so it makes sense she would have followed his lead.

Liz and I attended some of the same entrepreneurship events in Silicon Valley while she was at Theranos. These events often featured panels and fireside chats, where prominent people in business would make the case that a key reason less than 2% of venture capital goes to women is because female founders don't present bold enough visions. The advice at these conferences was to picture what massive success would look like in 5 or 10 years, and sell *that* vision, because *that's* what male founders were doing, and *that's* what venture capitalists expect to see. When I think back to my younger days as a CEO, I was frequently told that my financial projections were too conservative. I know Liz experienced immense pressure as a young, inexperienced, and impressionable new entrepreneur, and I think it's important to consider the unique challenges she faced as a first-time female founder and an abuse victim.

I've spent a fair amount of time with Liz over the past few years and in all my interactions with her, she's seemed deeply remorseful about what has happened, the mistakes she's made and the people whose lives were negatively impacted. She has suffered from the loss of her dream, her job, her status, her livelihood, and her reputation. She will never be able to go out in public or apply for a job without the barrage of negative media forever following her.  Through this difficult time, her deep and undying love for her baby boy has helped lift her from the deepest pits of depression and help her find purpose and meaning in life. I've witnessed her journey as she tries to learn how to love herself again and re-ignite that passion within her to make a positive impact on her family, her community, and the world.

Sincerely,

Debbie Sterling Glasband

8/10/22



CARL W. STERN

August 31, 2022

Hon. Edward J. Davila
San Jose Courthouse, Courtroom 4 – 5th Floor
280 South 1st Street
San Jose, California 95113

Dear Judge Davila:

First of all, thank you for your kind attention. I imagine that the circumstances of this case must present unique challenges, and I very much appreciate the care that I know you are taking to make perfectly balanced decisions. In that spirit, I am grateful for the opportunity to add some context, and I very much appreciate you taking the time to read this note.

I have known Elizabeth Holmes' father (an extraordinary public servant) for almost seventy years, and I have known Elizabeth since she was a teenager. I am no stranger to business: I spent 37 years with Boston Consulting Group (six as CEO and the ensuing eight as Chairman). I spoke with Elizabeth from time to time over the course of the Theranos saga; so, I heard her side of the story firsthand as it unfolded: quite different from the point of view purveyed by the news media.

There are a few points that I would like to register by way of context as you contemplate what an appropriate sentence might be. My contention is that society would be best served by leniency.

The first point I'd like you to consider deals with Elizabeth's motivation. My guess is that most cases involving financial fraud involve rather blatant grasping for personal profit. That pattern would not apply here. Elizabeth's motivation centered right from the start on making a central component of healthcare affordable for all (including governments, which could certainly use some relief!). That this was her main motivation – indeed her only one, in my opinion – is clear from the fact that she never sold shares on the secondary market, as she was personally consumed in her belief that she could make her invention work right until the bitter end. Totally focused on her mission, she squirreled away no funds to build a personal nest egg for herself or her family, leaving her with nothing. She was (and is) a bit of a social zealot – and society is the poorer for her failure.

Not so everyone, however. Had she been successful, she would have collapsed a rather large profit pool enjoyed by the lab testing duopoly. Her conviction spares some very sophisticated investors and their advisors embarrassment over their failure to perform adequate due diligence (actually, as an investor in ventures myself, their complaints strike me as rather disingenuous).

There has been a lot written about making an example of Elizabeth *pour encourager les autres,* the guardians of the Silicon Valley "bro" culture that urges fledgling entrepreneurs to "fake it 'til you make it." If that's the objective, focusing on a woman who didn't cash out seems an odd choice. Except that the copious publicity (some of it admittedly her own fault for putting herself out there too early) must have made her a tempting target, I suppose. Still, when I see so many doing so much worse with seeming impunity – and profiting handsomely – it leaves me with a bit of a sour aftertaste.

The final point I'd like to make is that society is best served by Elizabeth being out there, free to invent. The fire in her belly burns unabated. She feels her purpose is to serve humankind. She may have failed in her first shot, but so have many others. She is an immense talent with so much to offer. Every day she spends off-mission will leave the world the poorer for it.

Thank you once again for your consideration, Judge Davila.

Respectfully,

Carl W. Stern

Hon. Edward J. Davila
San Jose Courthouse, Courtroom 4 – 5th Floor
280 South 1st Street
San Jose, CA 95113

August 16th, 2022

Dear Judge Davila,

I have known Elizabeth for nearly five years. She and I met soon after she met her Partner Billy Evans, who has been a close friend of mine since we both moved to San Francisco in 2015. I have had the opportunity to watch her relationship with my close friend grow into a strong and committed partnership in which she shows unwavering love and support. I have been there to witness her growth as a mother to her son ███. Our time together has also I also given me the opportunity to witness her passion and enthusiasm for science. In particular, scientific endeavors that could help others. It is for those reasons I have composed this letter and am submitting it on her behalf, today.

If I have learned anything from my own relationship with my partner, it is that the true nature of an individual is grown and influenced by those with which they chose to spend time. As Billy and Elizabeth's relationship grew and they spent more time together, it became clear the positive impact that Elizabeth was having on him as a person. For example, I recall when Elizabeth and Billy returned from a months long camping trip across the western United States, he displayed a new level of compassion in his demeanor, a strong sense of intention with his actions, and a heightened desire to listen to and look at others with purpose. I attribute these changes, at least in part, to Elizabeth's ability to have a positive impact on those around her.

Fast forward to this past year, I have also had the ability to witness Elizabeth and Billy grow their family to include their son, ███. Unsurprisingly, the attention she gives her son demonstrates a clear, passionate, and unwavering approach to motherhood. I recall at a birthday celebration at Elizabeth and Billy's home, listening Elizabeth speak about their son, ███. Yes, the stories contained the bragging and doting that is expected to be on display when any new parent is speaking about their child. But what I remember most was that the time we spent with Elizabeth and ███ that day was mostly spent listening to Elizabeth talk about the excitement she felt about the future ███ had in front of him, and how excited she was to teach, learn from, and impact her son, much in that same way she had done with her partner and my close friend.

Beyond Elizabeth's commitment to family, I have also witnessed her enthusiasm for science and helping others. It is easy for me to fall into scientific conversations that revolve around the theoretical. But when diving into various scientific topics with Elizabeth, which would happen often during the various moments we have spent in conversation, the focus always remained objective – what impact could this have on the lives on others, how can it help them? This makes for stimulating conversation, yes, but more so, and more importantly for that matter, this clear resolve and focus on helping others through her passion for science makes those around her begin to share that some focus and objective.

Sincerely,

Jordan Stern

THE **Webb**
SCHOOLS



September 5, 2022

Hon. Edward J. Davila
San Jose Courthouse, Courtroom 4 – 5th Floor
280 South 1st Street
San Jose, CA 95113

Dear Judge Davila,

I write this letter in support of Elizabeth Holmes, someone I have known since she was in middle school. In my role as Head of The Webb Schools, a boarding prep school in Claremont CA, I have the wonderful opportunity to meet many of the school's alumni. One such person is Elizabeth's father, Chris Holmes, Webb School Class of 1964. Chris' son Christian also is a Webb graduate. When visiting Chris and his wife Noel at their home in Houston many years ago, I met Elizabeth and was impressed with how mature she was for her age. She had a mission of making the world a better place and was very clear about that. We had a wonderful dinner table conversation, and I was beyond impressed.

We have not communicated a great deal since that visit, but Elizabeth did come to the Webb campus in 2014 when her father won a prestigious Webb alumni award. At that time, Theranos was thriving, and I had a meaningful conversation with Elizabeth. She was so incredibly proud of her father and spoke about how he instilled values in her and Christian that will last a lifetime. She also said she was convinced that the Theranos product would change the world, not just for those of us civilians in the U.S. but also for our brave military men and women and millions of people all over the world. She was sincere and genuine, and it was actually quite moving.

I have also spent a great deal of time with Chris and Noel and know through them what Elizabeth has been going through as this episode plays out so publicly. I am writing to let you know that I continue to believe that Elizabeth is a sincere person who still stands to make the world a better place. She has already endured an unfathomably difficult passage of time in all she and her family have been going through. This is my perspective on it, and I am happy to have a follow up conversation at your convenience.

Thank you and most sincerely,

Taylor B. Stockdale
Head of Schools

254

**ER-1151**

Alice Warnecke Sutro

September 1, 2022

Hon. Edward J. Davila
San Jose Courthouse, Courtroom 4 – 5th Floor
280 South 1st Street
San Jose, CA 95113

Dear Judge Davila,

I know Elizabeth from Stanford. We were in the same freshman dorm. We were best friends that year and the next until she dropped out. I really wish she had not quit school. I have missed her since then and writing a letter like this nearly makes me cry. I remember talking to her about the decision. She said that entering the professional world immediately, with the opportunities presented to her thanks to her research and her skillset, was the best way she could be of service to society. That has always been her goal and the driving force behind her work. To serve people and make the world a better place.

What I miss is her genuine love, her compassion, her support, and her creativity. I miss my friend. She dedicated herself so completely to her project that we did not see each other for years except periodically. During those visits and phone calls we would return to our favorite topics from freshman year. We would share about the books we'd read that always had overlapping themes. She read and studied religion, Buddhism, art and the pursuit of self-actualization and happiness. The goal always in our personal reading lists was how to be more kind, compassionate and dedicated to our respective passions. For me, that is art. For Elizabeth, it is science. She deeply believed in modelling dedication and passion to inspire others. She is loyal and dedicated to her friends, just like she was to her business.

Her creativity also makes her who she is. She can dream, and she can step into others' shoes to feel what they feel. Scientists and artists are alike in these ways. They are also generous with themselves, always giving to society, to make the innovations and artworks that lift us all up in spirit. I think this part of Elizabeth has also been a driving force in her life.

To convey the depth of her goodness, I can illustrate with an anecdote. Freshman year our friend hid her bicycle to pretend that it had been stolen. Elizabeth didn't get it, she was very upset, she didn't understand how you could joke in a mean way like that, pulling people's beliefs into discomfort and distress. That was not in her nature. She was very straightforward and engaged with people with a high level of integrity. At that moment, she showed a type of innocent belief in the essential goodness of people that you can only truly believe in when that is how you yourself inhabit the world. That's Elizabeth and how I know her to be.

Thank you for your time,

A. Sutro

Alice Warnecke Sutro

Hon. Edward J. Dávila
San José Courthouse - Countroom 4 - 5th Floor
280 South 1st Street
San José, Cd 95113                          Agosto - 9 - 2022

Honorable Juez Edward J. Dávila

Por medio de la presente, hago de su
conocimiento mi amistad con Elizabeth Holmes,
a quien conozco hace 30 años.

La puedo describir como una persona muy
especial; estudiosa, responsable, disciplinada y
con mucha determinación en todo lo que se
propone hacer. Siempre manifestando su educación
y los valores con los cuales ha sido creada.

Elizabeth es muy especial para mí, desde que
la conozco nunca ha cambiado; noble,
generosa; disfruta mucho a su familia en
los cumpleaños, Thanksgiving y
Christmas.

Atentamente
María E. Autry M.

256

**ER-1153**

Hon. Edward J. Davila
San Jose Courthouse, Courtroom 4 – 5th Floor
280 South 1st Street
San Jose, CA 95113
July 31, 2022

Dear Judge Davila,

    I am writing on behalf of Elizabeth Holmes, my friend of 25 years, to tell you about her character: generous, earnest, resilient, and kind. Elizabeth and I met in seventh grade at St.

 John's School in Houston, Texas. She was new to the school and I immediately adopted her as my best friend. She traveled with my family and was always game for an adventure, like getting a golf-cart license or learning a cheerleading routine to the "Space Jam" soundtrack. My parents liked Elizabeth because she was a good influence and never a whiner. If she spent the night at my house on a Friday, she had to be back at her house by 8am every Saturday for Chinese lessons. We were dorky and energetic, big fans of costumes and themed dinners. She had a "Clueless"  themed birthday party where I won "best costume." Elizabeth was my date to every school dance. We were attached at the hip. In 1999, I went away to another school and we temporarily lost touch, though I heard through the grapevine that she became very studious without me there to distract her.

    In Summer 2014, by coincidence Elizabeth and I attended the same academic conference (at the time I was a PhD candidate of English at the University of Texas) and we crossed paths on the lawn before my panel. I remember blurting out, "You got your braces off!" and we both giggled like kids. She had a packed schedule, but she made time to meet me for breakfast. I noticed that she seemed muted, intense, and tired.  She wouldn't order off the menu, but ate

 carrots out of a box and told me ingesting chlorophyl gave her enough energy to sleep only four hours a night. I laughed at this, but she was serious. She asked about my dad, whom she had loved, and I told her he had recently died in part due to the nebulousness of medicine. Elizabeth reached out to hold my hand. She looked into my eyes and said, "Preventing that is the reason we're doing what we do." Then she missed her flight in order to catch up with me.

    From that day forward, we were back to being close friends.  Elizabeth would call me in the middle of the night from her lab to ask questions about my classes, my students, my husband, my brothers. She seemingly had no personal life, could only speak freely to me if we spoke at odd hours, and sometimes asked me strange questions, such as "why did you leave me?" I explained that I had gone to a different high school for carpool reasons, and that she had done nothing wrong to drive me away. She seemed so lonely, and I worried about her. When I was in Oakland to visit a friend, Elizabeth drove two hours each way in order to see me at a perfect stranger's house. She was in the middle of a public firestorm, but she repeatedly made the time to call me, to visit me, to see my mom, to meet my husband and my friends.

Then Elizabeth called me to tell me about Billy. She was, as my dad would say, "kicked in the butt by love." Billy loved her for the same reasons I loved her. He saw the person she was in her



heart: affectionate, unselfish, and tenacious. Elizabeth and Billy traveled cross-country together in a stinky truck with their giant dog in order to meet my first baby. Dogs were not allowed in our house, so they chose to sleep in the truck with him. I could see immediately that the lightness of my old friend was back. Elizabeth's hair was wild, she wore comfortable clothes, and she laughed openly and made fun of herself. She held my baby and was eating normal food again—no more regimented, pre-packed vegetable boxes. Billy is irreverent and level-headed, with a supportive family and a generous spirit to match Elizabeth's. We should all be so lucky to witness a partnership like theirs.

When Elizabeth became a mother, she called me from the delivery room, joyful and smitten. She sends me videos of Baby ██ eating blueberries (which she cuts individually), giggling on walks, and playing with/ riding their dog. On Christmas, she FaceTimed me to show off their matching family plaid pajamas. ██ is one month older than my second son, ██, and we finally got the babies together for



their first birthdays this summer. They looked like twins! Elizabeth is a hands-on, loving, attentive mother. When she walked across the room, ██ waddled after her like a baby satellite. He got upset when she left the room for a moment. I began to feel panicked, imagining him spending extended time away from her were she to be incarcerated. They are utterly bonded, and it is unfathomable to me as a mom myself with a baby the same age to comprehend the cruel pain they would both endure were they to be separated.



Back in December 2021, I flew down to California to attend one day of Elizabeth's trial. I had just had Baby ██, so Elizabeth and Billy helped arrange my travel and brought me a cooler full of ice packs to the courtroom to store expressed milk. Elizabeth was pumping too at the time, sometimes even while she was on the stand. During breaks in court, Elizabeth checked in on me to make sure I had snacks, drinks, and a comfy cushion. She brought me candy and showed me her pump and its parts, encouraging me to upgrade my four year old machine. Amid absolute chaos, Elizabeth was focused on the needs of others. I got coffee with Elizabeth's mom, Noelle, and chatted with her group of girlfriends who had all come to show support. There are so many people who genuinely know and love Elizabeth, who is a real person with a resilience I have never seen in anyone else. We want her son to be able have his mother present in his formative years. I want my friend of 25 years to have the opportunity to finally, freely live her life, to have a shot at normalcy, to watch her son grow daily and make his first, hopefully lifelong, friends.

Sincerely,

Maley Thompson, PhD

Hon. Edward J. Davila
San Jose Courthouse, Courtroom 4 – 5th Floor
280 South 1st Street
San Jose, CA 95113


Dear Judge Davila,
I admire and love Elizabeth Holmes. She has been a part of my family inner circle for over 20 years. She is still a close and loyal friend to my daughter Maley. They met at St John's School in Houston and I got to know her mom Noelle and her brother Christian. Elizabeth spent many nights at our home and traveled with us on family trips. I hated having to get up early on Saturdays to get her ready to be picked up for her early Mandarin lessons at Rice University. She always strove for excellence.
Even at a young age, Elizabeth was driven and focused and brilliant. She could interact well with adults, but I liked her best when she and Maley were just being young silly girls. She was also there with supportive words for me personally at a difficult time. She is a giving, not a taking, person.
Elizabeth is honest and true. She believed in Theranos and was not business sophisticate enough to swim in the deep waters of the tech world. I believe she was vulnerable to the bullying personality of an older man who was happy to use her genuine sincerity. I am crushed at the idea of Elizabeth being separated from her sweet baby and loving partner for any amount of time. She is still an inspiration to me and the people who really know her. She tried to change the world for the better.


With deepest regards,
Mary Holmes Thompson


Retired Attorney

## ALEXIS TOBIN

The Honorable Judge Edwad Davila
United States District Court, Northern California
San Jose Courthouse, Courtroom 4 (5th Floor)
280 South 1st Street
San Jose, California 95113                                    August 26, 2022

Your Honor,

My name is Alexis Tobin. I am writing this letter of support on behalf of Elizabeth
Holmes.  Though Elizabeth and I grew up very close to one another
geographically, it was not until we were a bit older that I really got to know
Elizabeth.  I say this because although we are technically family, I know her very
much as a peer and a friend, therefore my perspective is as such.  In the time I
have spent with her over the better part of the last fifteen or so years, I have
always known her to be incredibly kind and forthright even to a fault.  I remember
one of our first conversations as "adults" at my family Christmas party and
thinking, "Wow, I can't wait to spend time with her, and I can't believe how great
that conversation was".  In the years since then I have always thought of Elizabeth
not only as being far smarter than I, but more importantly, truly as someone with
the utmost integrity.  She is kind, honest, and a wonderful woman who I very
much respect both as a friend and as my family.  I hope you will take into account
the opinions of those that have really known her character and good intentions,
as opposed to the conclusions drawn by those whose interests are served by
scandal, not by the relatively boring truth.

Thank you very much for your consideration.

Alexis D. Tobin

260

**ER-1157**

Donald L. Tschirhart, MD

Hon Edward J. Davila
San Jose Courthouse
Courtroom 4, 5th floor
280 South First Street
San Jose, CA 95113

Dear Judge Davila:

It is my pleasure to submit this letter of support for Elizabeth Holmes, who is now under your consideration. I worked for Theranos from March, 2016 until June of 2017 and Elizabeth was my immediate supervisor.

In late 2015 my very good career as laboratory director at one of Los Angeles' finest hospitals was headed for a brick wall. Our hospital had gone through its first bankruptcy sale and was headed for a second. Hopes of successful reorganization or even finding a friendly buyer were melting like a discarded ice cream cone on the asphalt. Just to prove the situation can always get worse, I was diagnosed with metastatic carcinoma. That is when I met Elizabeth Holmes.

I was more than a little surprised to find out that Elizabeth wanted to personally interview me. Although it was true that my position would directly report to her as CEO, I did not expect that kind of direct involvement. This is the first lesson about Elizabeth; she was a dedicated and hard-working person who wanted to be personally involved in her company. In all my time with her, she worked tirelessly late into the evening almost every day. She would call me sometimes late at night with some burning technical question.

It is appropriate to ask why I would take on such a job, after all by the time I got there in March of 2016 we were already in negotiations with the CLIA regulators trying to save our license. The answer is because I am one of the few laboratory directors that had experience with this type of "negative" CLIA inspection. In 2000 our hospital brought in a new leadership team which could only be described as a disaster. In desperation our own employees made complaints to the CLIA regulators, which resulted in a "negative" inspection. I was able to identify the real problems and negotiate a successful outcome for us. I learned from that experience that these types of inspections always stem from complaints filed, which must be multiple. In the case of Theranos, we know those complaints were filed by the same people that created a storm of negative publicity, because they proudly admitted it. The CLIA inspector after evaluating the complaints moves to shut down the offending laboratory by conducting a relentless "negative" inspection. They do not expect a laboratory to survive such an inspection, and indeed most do not. It is a bit like going to court after a grand jury indictment; the odds are not good.

One much-discussed aspect of Theranos is the technology.  While the Theranos machine never had the through-put rate to completely replace conventional analyzers in a laboratory, it did have many excellent uses that I found quite exciting. Near the end, we had an independent third party consultant evaluate the business case for the machine as it actually was and they concluded it would generate a billion dollars in revenue in the first ten years. None the less, the investors decided to force bankruptcy; it was clear that

factors other than profitability played a role in their decision.

Although Elizabeth Holmes was not able to bring to market a finished product, the accomplishments of Theranos are still significant and will change the laboratory world forever. As one of the few people who experienced having my blood drawn at a Theranos site, I now dread the dreary and humiliating experience of normal phlebotomy. Elizabeth revised the process from the ground up, and it was fabulous. Theranos also developed, tested and manufactured a system for micro blood draws, including transportation and loading of the specimens; this research is infinitely valuable to our future. I have heard people who have been misinformed compare Edison to a countertop chemistry analyzer; indeed there are many such systems on the market. Edison was a hundred times more than that, it was an entire laboratory in a package that could literally be put in a suitcase. The technology was brilliant. Additionally, the information system aspects were ground-breaking. We are just now starting to get some of that sophistication in the regular lab through so-called middleware systems. Edision was digitally monitored at every step from the front end to the back end. It could be remotely monitored from anywhere in the world, allowing anyone to have a true state of the art laboratory tests wherever they were, be that your own bedroom or a third world clinic. The potential uses were mind-blowing.

If this sounds impersonal, it is because I only knew Elizabeth as my boss. I can tell you that she was a workaholic and had little personal life. She was never a flashy person and contrary to her detractors I never saw any evidence that she was infatuated with money. She did not wear expensive clothes or jewelry and I never once heard her talk about buying any expensive personal item. She had a black SUV and a driver/security officer that she used and rightly so at that point; to my knowledge she did not own a personal car.  Near the end she volunteered even to give up her ownership of the company in hopes of saving it. My only real glimpse into her true personal life was meeting her parents when Elizabeth courageously gave her famous lecture to the American Society of Clinical Chemists in Philadelphia. Her parents were very real, very down-to-earth people and they spoke of her like any proud parent speaks of their child. I never saw anything in Elizabeth that would lead me to believe that she was anything other than what she claimed to be. Everyone at Theranos liked her; she was strong, she fought for us and she treated us well until the last moments.

In the end we have an intelligent, fearless woman who took on a huge project that should have changed the world and nearly succeeded. I am not personally aware of any wrongdoing on her part, and to the contrary, I found her unbelievably dedicated to her work and accomplishing what she set out to do. There are hundreds of failed Silicon Valley CEO's out there and I have never heard of any of them facing this outcome. Elizabeth and the world have lost a great dream, it is just that the world is too ignorant to understand what they have lost.

As a judge, you must faithfully serve the law, I expect no less. I only ask that you also consider the immense contributions that she has made to the field of laboratory medicine and to humanity, even if at this point, they don't understand what they have been given. I hope in some way that you can find her redemption in these good deeds.

Sincerely,

Donald L. Tschirhart, MD

Former Laboratory Director
Theranos, Scottsdale

# CHASE UNTERMEYER

Honorable Edward J. Davila,
United States District Judge
San Jose Courthouse
280 South First Street
San Jose, California 95113

Dear Judge Davila:

We write seeking leniency in
the sentencing of Elizabeth Holmes.

We have Known Elizabeth since
she was a little girl, first in
washington and then in Houston.
Her parents, our close friends,
are godparents to our daughter
Elly, making Elizabeth her "god-
sister". She always had time to
play with Elly when we were all
together for lunches and dinners.
Times spent with the Holmes
family were loving and happy, so
we are sure Elizabeth will provide
the same environment for her son
███████.

Elizabeth was a dedicated and
diligent student here in Houston.
At an early age she chose to study
Mandarin — independently, in
addition to a heavy academic load —
out of a very far-sighted recognition

that knowing the language would be highly important in the world she would enter as an adult. She told Elly all about Stanford, which Elly eventually attended and loved.

It was abundantly clear to us that Elizabeth, while in high school and in college, was dedicated to helping her community, with big dreams about making the world a better place. She undoubtedly founded Theranos with this goal.

We therefore hope that with this factor in mind you will grant her leniency.

Thank you, Your Honor, for considering our earnest request.

Sincerely,

Chang Anthyay r

Diana C. K. Untey

Martin G. VanTrieste



August 15, 2022
San Jose Courthouse, Courtroom 4 – 5th Floor
280 South 1st Street
San Jose, CA 95113

Dear Judge Davila:

My name is Martin VanTrieste, and I am a  pharmacist with 39 years of
experience in the pharmaceutical and medical device industries working in
R&D, Manufacturing, Quality and the founder of two non-profit organizations,
Rx-360 and Civica Rx.  Most recently, I retired as the Founder and CEO of
Civica Rx, a non-profit generic drug company that is working on eliminating
drug shortages that hospitals face daily and significantly lowering the cost of
medications to consumers, such as insulin and cancer treatments.

I was asked to help Theranos in 2017 by Fabrizio Bonanni, a Theranos Board
member and previous colleague of mine from Amgen, to serve on the
Theranos Board Compliance Committee. The purpose of my role was to
provide expert guidance on FDA (U.S. Food and Drug Administration)
regulations, expectations, and current Good Manufacturing Practices. I
specifically provided guidance and oversight on how to comply with these
FDA requirements.

My engagement began as a result of Theranos' difficulties with the FDA and
other regulatory bodies. During my committee involvement, Ms. Elizabeth
Holmes was thoroughly engaged, wanted to learn and make improvements
at Theranos. She embraced our recommendations, worked hard to
implement the recommendations, and understood what went wrong
previously. I felt her openness to continuous improvement was adopted
within the company and was extremely helpful in making rapid changes and
continuous improvements.

Please let me know if you have any questions.

Sincerely,

Martin  G. VanTrieste

1

July 13th, 2022

Dear Judge Davila,

My name is Hung Vu and I was a Production Manager at Theranos for three years. I am touched and thankful for the opportunity to tell you what I know about Elizabeth Holmes. In 2014, I was in need of a job after being laid off for a while, ███████████████████████████ ███████████ That time period was not only rough for me, but also a great number of workers in California. I was very grateful, and still am today, for the opportunity to have worked for Theranos. A great burden had been lifted when I got the job offer, and I will never forget how much it meant to me at the time.

I had gradually gotten to know Elizabeth Holmes as I worked for Theranos and I wanted to share my thoughts about her with you. I believe that her vision to revolutionize blood testing was only a means to help provide a solution to a great problem our society faces. From her passion, I gathered that she is a very intelligent, kind, and caring person. During my first few years, I did not have direct interactions with her, but I witnessed her actions to help me formulate my own opinions. One thing I had noticed was that she cares so much about the employees and their families. When planning for company events, she would ensure that the quality of the setups and foods offered reflected the hard work of the employees. She also reached out, to her best ability, to thank the employees for their dedication to the company. When engaging during company meetings, she built a sense of community and informed us about the products.

During one of the many company meetings, she was in tears when she had to announce that the company would shut down. I could never forget to see how heartbroken and emotional she was to have her vision and dream come to an end. It was so sad to see her so worn out from the mess of the state of the company. As the company was nearing its end, I had a chance to get to know her better, not as a founder of the company, but more so as a person. During that time, she worked with the employees more closely and became aware of what their opinions of the news was.

Before I departed, Elizabeth gave me a picture frame of a tiger resting on a Buddha's head. Buddha's peaceful and calm nature has tamed a big ferocious tiger. This was my interpretation of her telling me that for a person to reach enlightenment, they need to be humble and kind. Whenever I look at that picture, it gives me a sense of serenity, a feeling so powerful that I would not want to do anything evil-natured. I cherished it because it carries a powerful meaning and I know that she believes in Buddha's teachings to become a genuine and kind person.

**ER-1163**

Now that Elizabeth Holmes has a child, I am sure she will be more careful in her decision-making process. Becoming a mother will help her become stronger in setting a good example for her son. For someone to have been through such a disastrous event in her life, I know she will continue to learn and grow to be the best mother and person she can be. She is the type of person that would do everything in her power to teach and provide for her son no matter the circumstances. Her resiliency throughout everything she has experienced should attest to why she should still have the opportunity to prove herself. I really appreciate being given the opportunity to tell you my own thoughts about the person who I looked up to and still admire.

Regards,

Hung Vu

*Hung Vu*

July 13th, 2022

Case: 22-10312, 04/17/2023, ID: 12696875, DktEntry: 22-6, Page 66 of 278



# JIMMY WALKER, LTD.
BUSINESS | SPORTS | ENTERTAINMENT

August 1, 2022

Hon. Edward J. Davila
San Jose Courthouse, Courtroom 4 – 5th Floor
280 South 1st Street
San Jose, CA 95113

Dear Judge Davilla,

I understand Mrs. Holmes has been convicted of 4 counts of wire fraud and conspiracy to commit wire fraud. This letter is to share my personal experience with Elizbeth Holmes, and to ask for leniency with her case.

I met Elizabeth 7 years ago, when she was awarded the 2015 Horatio Alger Award of the Horatio Alger Association of Distinguished Americans in Washington D.C. Since then, we have talked many times and I now consider her a personal friend.

Throughout the time I have known Elizabeth, I have seen her as a good person; someone who is intelligent, generous and kind. She is also hard-working and trust-worthy. In fact, I know she has worked with the homeless at St. Vincent De Paul in San Francisco. I also have observed her being an excellent mother to her son, ███, and she is a good wife to her husband, Billy Holmes.

Perhaps most importantly, I have had conversations with Elizabeth since the trial, and I know she feels deep regret about anything she has done wrong. Her contrition is real and appreciable, and I ask this court to observe it, as I do, and to be as lenient as the law permits in dealing with her. I know she is truly a good person and deserving of a second chance as so many good people are entitled.

Sincerely,

*Jimmy Walker*

Jimmy Walker

████████████████████

October 2, 2022

Hon. Edward J. Davila
San Jose Courthouse, Courtroom 4 – 5th Floor
280 South 1st Street
San Jose, CA 95113

Reference:  Elizabeth Holmes

Dear Judge Davila,

My name is Dan Warmenhoven.  For 15 years I served as the CEO of NetApp, Inc. (NASDAQ:NTAP), and I have also served on numerous public and private company boards.  I joined the Board of Directors of Theranos, Inc. in November 2016 well after the issues that you are familiar with took place.  ████████████████████████████████████████████
███████████████████████████████████████  My goal was to finish the product, get it into the marketplace, and try to salvage the company.  I stayed on the board until the company ceased operations in October, 2018. I did not receive any compensation for my board duties.

The purpose of my letter is to request leniency in the sentencing of Elizabeth Holmes.

Elizabeth left Stanford at age 19 to pursue a dream and founded Theranos.  She was very creative and technically brilliant, but she was also very naive and had no business experience, no financial management experience, and no operational management experience. She was dependent on advice from others and more specifically her Board.  But the board was full of luminaries such as George Schultz, Henry Kissinger, General James Mattis and others with similar backgrounds. None had any business experience. Because of their lack of business experience they were unable to advise her, especially regarding how to present the company and how to interact with shareholders. The board acted more like cheerleaders than helping keep the organization focused on achievable progress.

Elizabeth is an idealist who wants to make the world a better place.  Her passion was to revolutionize medical systems by making blood testing fast and inexpensive.  She is a genuinely good person with a good heart who relied on others for advice and guidance, but she often received very bad guidance which I believe is the root cause of the issues you are familiar with. She always put the interests of the company ahead of her own.  She took a meager salary and never sold a share of her stock.  For all her efforts, after 15 years at Theranos she was virtually penniless.

My request is that you take these factors into consideration in your sentencing decision.  She made mistakes, but I believe many of her mistakes were the result of bad advice, and were not motivated by any desire on her part to deceive or defraud anyone.

Thank you for your consideration.

*Daniel J Warmenhoven*

Daniel J. Warmenhoven

Hon. Edward J. Davila                                    July 31, 2022
San Jose Courthouse, Courtroom 4 - 5th Floor
280 South 1st Street
San Jose, CA 95113

Dear Judge Davila,

I am writing to share my personal views of Elizabeth Holmes' character. We first met about a decade ago while I was serving as President Obama's Assistant Secretary of Defense for Nuclear, Chemical and Biological Defense Programs. I visited her in Palo Alto at the suggestion of two of my mentors, former Secretary of Defense William J. Perry and former Senator Sam Nunn, and have kept in touch with her ever since.

During our first conversation it became clear that we had a shared passion for reducing infectious disease and biological weapons threats. We envisioned a world where individuals would have in-home access to diagnostic tests, and the data would be shared into a global "weather map" for forecasting and isolating epidemics. Indeed, she helped accelerate a revolution in distributed diagnostics which every American is now experiencing with in-home Covid tests. Soon parents will be able to run tests to know immediately and precisely what is causing a fever in their child, and to treat them accordingly.

I believe the reason Elizabeth has so much passion about promoting this vision is her deep sense of humanitarian purpose. She cares deeply about making the world a healthier and better place for future generations. Now as the young mother of a baby boy named ███████ she is driven even harder to make a better world. This is apparent in her volunteer work with rape trauma victims, and in her everyday life.

As you do your duty in sentencing Elizabeth, please take these aspects of her altruistic character and loving parenting into consideration.

Sincerely,

Hon. Andy C. Weber

Hon. Edward J. Davila
San Jose Courthouse, Courtroom 4 – 5th Floor
280 South 1st Street
San Jose, CA 95113

Dear Judge Davila:

Liz and I met in the fall of 2018 through mutual friends. About a month into our friendship, we had a heart to heart that is still fresh in my memory … We were sitting on a tiny white sofa by the window in my San Francisco bedroom and Liz's eyes were filled with tears. She made so many mistakes at Theranos and was deeply sorry for its outcome, she told me. If she could do it all over again, she would have made very different business decisions and trusted different people, she confided. I could see the regret in her tears and hear it in her voice. Liz showed more introspection and remorse than what I'd personally witnessed in any other failed founder, and I had seen many in my decade of investing.

I'm an investor in early-stage companies. A few of my first-time founders made it; most did not. Despite losing a tremendous amount of money in some situations (high 8 digits), I've actually never faulted anyone except myself. Even with the best of intentions, all can go wrong. Sometimes it takes as little as one innocent misstep. Most first-time founders are visionary but naïve about how to build a business and how long it takes to build a business (this second point is especially true). Thus, when working with a first-time founder I believe it's me, the more experienced board member, who must ensure that the business plan is actionable, the financial projections sensible, and the product works. For example, recently one of my companies gave me a set of financial projections to review before a fundraising. I cut the numbers by over 50% because I see operational hiccups that the first time CEO doesn't yet have the foresight to see.

With this context, on leaving this conversation with Liz, I asked myself to let go what I had heard and read about her to discover who she is on my own. This is what I have concluded – Liz is one of the best people I know, and our friendship has been the most surprising and beautiful thing that's happened to me in the last few years of my life.

Extremely genuine, giving, and selfless, Liz is unlike anyone else I've met in Silicon Valley. For example, small as they may be compared to hers, my life's needs and challenges have often taken center stage in our friendship. She took time away from her trial preparations to help me recruit advisors to support my career (with incredible insights as a function of her own experience on who can truly be valuable versus who I might perceive to be valuable) and she has helped me emotionally navigate several difficult personal situations. Irrespective of what has happened in her own life (conviction, skin cancer, Covid), she has continued to call, write, and be there for me in a way that no one else has. She has been the best friend that one can ask for. So much so that I've often felt like a lesser person before her.



Four years later, I'm drafting this letter that I never imagined to be writing with many tears in my own eyes. The imminent possibility of losing her is crushing. I ask that you please consider the possibility that perhaps the world has misread Elizabeth Holmes and that you give it another opportunity to get to know her the way that I have. I also hope that you can give her the opportunity to do right for the people around her and for the world, as she so desperately wants to.

Sincerely,

Yinne
Yu
Yinne Yu
August 28, 2022

Aug 28, 2022

Hon. Edward J. Davila
San Jose Courthouse, Courtroom 4- 5th Floor
280 South 1st Street
San Jose, CA 95113

Dear Judge Davila,

Based on our 27 years of friendship, I believe Liz is an idealist who only had positive intentions when starting and building Theranos. She doggedly pursued Theranos not to maximize personal gain, but because she genuinely wanted to make the world a better place.

Even in high school, her idealism and drive to help people stood out. During sophomore year, Liz led efforts to help victims of the Kosovo War—a world away from Houston. I interviewed her for our school newspaper (see attached pics at end of letter): *One SJS student, Elizabeth Holmes ('02), is trying to make a difference. After studying independently about the events in Kosovo, Holmes was appalled by the situation. She said, "We come from a society where everything is wonderful. Most of us cannot even begin to imagine the extent of the atrocities in Kosovo."… Holmes felt so sorry for the victims in Kosovo that she decided to do something to help them. She researched various Kosovo relief organizations; and she finally decided to raise money for "Save the Children", an organization which provides supplies (such as food and vaccines) to the tortured refugees and also gives them the means to become educated so they can begin a new life. So far students and faculty have donated more than $1,000… In the upcoming weeks, Holmes plans to do even more to help the people in Kosovo. She will collect money for "Save the Children" at Kinkaid and Episcopal High Schools, give a presentation to the SJS middle schoolers to educate them about Kosovo, and start raising money for the Houston division of UNICEF. Holmes believes, "We have the potential to reform and to prevent the horrors of this world if we simply learn and act." (The Review, May 26, 1999).*

Liz and I attended middle and high school together in Houston, Texas. We became close in high school when we were the only two women in our Computer Science AP class. We bonded not only over C++ homework assignments, but also watching "Legally Blond" at slumber parties and making gingerbread houses together at Christmas time. Liz and I lost touch after high school, as we attended different colleges. While she was busy with Theranos (sacrificing fun and friendships for her mission to help others), I was across the country doing medical school and then neurosurgery residency. We reconnected again in 2019 when we were both back in the Bay Area, and it was like we had never been apart. I found the same kindness and caring in Liz in her 30s that I had known as a teenager raising money for the children in Kosovo.  Liz and Billy have become two of my closest friends over the last several years, and my partner and I have spent countless evenings sharing meals with them and their families.

Despite all the challenges Liz has faced over the last few years, she has put her friends and family first. I have seen first-hand her love for Billy and her family and witnessed the amazing partner and daughter that she is, and the amazing mother that she has become to little ████ .

She has also been a wonderful and staunchly loyal, caring friend to me. My work as a neurosurgeon is time-consuming and stressful, and Liz has always been there to listen to me and let me vent my frustrations, to cheer me on, and sometimes just to let me cry. I still remember her dropping everything, leaving a dinner in the city to drive 40 minutes to come over to my house to comfort me after a particularly grueling day at work. As I was crying and sharing my frustrations, I couldn't help but appreciate how much less severe my issue was than what Liz has been facing. Nevertheless, Liz did not minimize my problem. She listened patiently, hugged me, and made me feel supported—the best thing a friend can do.

I have also witnessed first-hand the profoundly negative effects of this case on her, Billy, and their parents. Her punishment has already been severe, and I humbly request you consider and acknowledge the extraordinary reputational and emotional suffering she has endured in the last seven years. Not only has she lost her company and everything she worked for for over a decade, but she has become a pariah in our community. I have many friends who, although they have never met her, do not want to spend time with Liz. I cannot invite her to dinner or events with most of our friends, and I cannot speak about my friendship with Liz to most people, as I am judged merely by my association with her. I cannot overemphasize the degree to which Liz is ostracized by people who do not know her and the degree to which this social isolation has affected Liz, Billy, and their families. Despite this, Liz has kept her head up and remained a staunchly loyal, kind friend, daughter, partner, and mother.

Liz still has an opportunity to have a positive impact on society through her family, friends, and future good works. As her friend spanning nearly three decades, I hope you will give her that chance.


Sincerely,

Corinna Zygourakis
Assistant Professor of Neurosurgery
Stanford University School of Medicine





**May 26, 1999**

# Kosovo Relief

■ by Corinna Zygourakis ('02)

Many people around the world believe that the massacre in Kosovo is the greatest horror and wrongdoing since World War II. Thousands of people are being brutally murdered. Hundreds of thousands of people are being forced out of their homes in Kosovo by the Serbs and relocated to crowded and insufficiently supplied refugee camps in Albania and surrounding countries.

But one SJS student, Elizabeth Holmes ('02), is trying to make a difference. After studying independently about the events in Kosovo, Holmes was appalled at the situation. She said, "We come from a society where everything is wonderful. Most of us cannot even begin to imagine the extent of the atrocities in Kosovo. In fact, most Americans don't understand that these massacres are on the same level as the Holocaust. Milosovich [the Serbian leader] is practically a Hitler reincarnated."

Holmes felt so sorry for the victims in Kosovo that she decided to do something to help them. She researched various Kosovo relief organizations; and she finally decided to raise money for "Save the Children," an organization which provides supplies (such as food and vaccines) to the tortured refugees and also gives them the means to become educated so that they can begin a new life. So far students and faculty have donated more than $1000.

Next, Holmes—together with Shivani Gupta ('99) and Zoe Stewart ('01)—posted signs all over the Upper School campus, urging people to contribute to "Save the Children." These posters had pictures of people being tortured and killed; the

Elizabeth Holmes heard Picts's poignant story. At least two students were crying as Picts took them on a journey through Kosovo and described the horrible atrocities he had witnessed. Holmes said, "What Picts described defies the imagination. The Kosovo children have been exposed to inconceivable horrors. When Picts and his fellow officers from "Save the Children" gave the kids some crayons, all of the kids drew pictures of their parents being killed, their houses being set on fire, or people being tortured. When Picts asked the kids what they wanted the most, the children said that, first, they wanted to see their families; second, they wanted to go home; third, they wanted to go back to school; and fourth, they wanted their pets. The kids also said that they missed playing games like soccer; so the "Save the Children" organization brought more than a hundred soccer balls to the children, allowing them to play and temporarily forget their problems. Picts described terrifying scenes of women and children being forced out of their homes, men being shot and slain, little girls being raped, and families being separated. He described his visits to the freezing cold refugee camps with no food, water, or supplies. The refugees had not taken showers in weeks and had nothing except the clothes on their backs."

Nelson added, " Picts's speech was heartbreaking. One of his most moving stories was his account of a visit to one refugee camp. He entered a little room and found a mother with her two daughters and two men. The men were just informing the woman that her husband and her father had been murdered by the Serbs. The kids



ful. Most of us cannot even begin to imagine the extent of the atrocities in Kosovo. In fact, most Americans don't understand that these massacres are on the same level as the Holocaust. Milosovich [the Serbian leader] is practically a Hitler reincarnated."

Holmes felt so sorry for the victims in Kosovo that she decided to do something to help them. She researched various Kosovo relief organizations; and she finally decided to raise money for "Save the Children," an organization which provides supplies (such as food and vaccines) to the tortured refugees and also gives them the means to become educated so that they can begin a new life. So far students and faculty have donated more than $1000.

Next, Holmes—together with Shivani Gupta ('99) and Zoe Stewart ('01)—posted signs all over the Upper School campus, urging people to contribute to "Save the Children." These posters had pictures of people being tortured and killed; the signs had messages such as: "Your parents are murdered in front of you. Your classmates are dying of starvation. " Then Holmes distributed envelopes to every advisory to collect donations for "Save the Children." Holmes said, "The response to the relief fund has been great at SJS. Even before I gave envelopes to the advisories, students were coming up to me and contributing twenty and sometimes fifty dollars for the relief fund. Perhaps students don't realize how big of a difference they can make. Every dollar counts. With only twenty dollars, an entire family in Kosovo can be sustained for a week. So with the amount of money that SJS has contributed, fifty families can survive for a week."

Then, Holmes attempted to educate SJS students about the situation in Kosovo by arranging a conference call with Tim Picts, an official of "Save the Children" who had just returned from Kosovo. Mary Catherine Blanton ('02); Caroline Gaston ('02); Stephanie Nelson ('02);

they wanted to go back to school; and fourth, they wanted their pets. The kids also said that they missed playing games like soccer; so the "Save the Children" organization brought more than a hundred soccer balls to the children, allowing them to play and temporarily forget their problems. Picts described terrifying scenes of women and children being forced out of their homes, men being shot and slain, little girls being raped, and families being separated. He described his visits to the freezing cold refugee camps with no food, water, or supplies. The refugees had not taken showers in weeks and had nothing except the clothes on their backs."

Nelson added, " Picts's speech was heartbreaking. One of his most moving stories was his account of a visit to one refugee camp. He entered a little room and found a mother with her two daughters and two men. The men were just informing the woman that her husband and her father had been murdered by the Serbs. The kids were too little to understand what was going on. But the mother was sobbing. Picts held the woman's hand and watched her cry."

Holmes narrated yet another touching story: "A Serbian soldier entered the home of some Kosovo inhabitants. He held a gun to the mother's head and threatened to kill her daughter if she did not turn over all of their valuables. So the mother handed over all their possessions to the Serb. Then the soldier slit the throat of the father and forced the mother and children out of their home."

In the upcoming weeks, Holmes plans to do even more to help the people in Kosovo. She will collect money for "Save the Children" at Kinkaid and Episcopal High Schools, give a presentation to the SJS middle schoolers to educate them about Kosovo, and start raising money for the Houston division of UNICEF. Holmes believes "we have the potential to reform and prevent the horrors of this world if we simply learn and act."

September 28, 2022

The Honorable Edward J. Davila
San Jose Courthouse, Courtroom 4 – 5th Floor
280 South 1st Street
San Jose, CA 95113

Dear Judge Davila:

I write with a personal reflection about Elizabeth Holmes, as I have known her during my lifetime. I met Elizabeth shortly after she was born, as her parents are close friends of my parents, and her parents are my chosen godparents. As such, I have spent time with their family over the years, including together with their children when they were young, and at Christmas, Easter, and other family gathering times. During that time, I got to know the family very well, and I consider them to be without equal in terms of their integrity, caring, and commitment to public service. That is the environment in which Elizabeth grew up.

I have had more limited connection with Elizabeth than her family over the years, given our geographies and the fact that she grew up mostly in Houston and then moved to California. Nevertheless, I have always found her to be kind, caring and genuine, as well as driven. I believe her drive to succeed is deeply motivated by the desire to help others, a cornerstone of her family's approach to life.

Thank you for the opportunity to share these reflections about a close family friend.

Sincerely,

Lisel Loy





Joan F. Tobin

The Honorable Judge Edward Davila
United States District Court, Northern California
San Jose Courthouse, Courtroom 4 (5th Floor)
280 South 1st Street
San Jose, California 95113                                    November 9, 2022

Dear Judge Davila,

I am writing to you because you hold the future of a good woman in your hands. I have had long years and a great deal of experience with Elizabeth, as a relative, as a friend, as a business woman and occasional mentor; and can attest that she is a woman who is not and never has been the self-serving, manipulative Svengali-like person that she has been portrayed to be. She is, in fact, an extremely nice person who is loving and kind, a wonderful mother and a well -intentioned, thoughtful person who is ethical, honest and hard-working. It is not in her nature to conspire to defraud. She is simply not that sort of person - by nature or upbringing, or any other reason.

I am not saying that she might not have made mistakes - I know of no businesspeople - in fact of no people at all - who have not made decisions that they would do differently; but Elizabeth is not a person who would deliberately conspire to advance her ends by dishonest means. She just wouldn't. It is not in her.

I know Elizabeth's story from many years with her and her family. It is that of a young person who wanted to do something good - and who was untutored in the myriad realities of business and very naive in personal relationships, an awkward young person with little experience and a big commitment to do good. Elizabeth does not run away from her responsibility for herself, but she has already been made into a public pariah, lost her reputation, lost everything she had, been punished severely by the SEC and been used as the vehicle from which journalists and filmmakers have made a great deal of money selling their own versions of her. Please, Judge Davila, I hope you will agree that enough is enough. She has a beautiful and happy baby son, and is pregnant with a second child. She is a wonderful, thoughtful and caring mother which I know from being with her and her son for days on end. He is beyond important to her, and her next child will be as well. Please do not send her to jail. She has paid and paid already in so many ways for whatever mis-judgments she made. They were not ones of ill intent. With every ounce of experience in my 78 years, on public corporate boards, as a successful owner of a medium sized business, as one who has been through some difficult business experiences, and as a close family friend and older friend of Elizabeth's, I know she is a good person, and not what she has been painted to be. Please, please use your power and judgement to let her stay with her son, have her next child in freedom and peace, and fade from intense public view.

Thank you very much for your consideration.

Sincerely, (signature on next page)

P9.1

Joan F. Tobin

Pg. 2

**ER-1177**

DocuSign Envelope ID: CA5EF6C8-8BDC-4F42-809A-95F708F7BD6E

## To whom it may concern:

I have known Liz Holmes for 20 years at this point, from when we were freshmen in college at Stanford in 2002. She came in with the reputation as the Mandarin-speaking protégé of freshman class. She was well liked that year, but it always seemed that as if she was interested in doing something more than just learning. We knew each other socially and were friendly having friends in common. In sophomore year when I learned Liz had left Stanford to pursue a startup, it was not surprising. We didn't stay in touch since the last time I saw her on campus at a frat party until 12 years later I saw her on the cover of Forbes, and I was quite surprised having myself become on entrepreneur in the biomedical industry.

Since that time, we reconnected at our 10th year reunion in 2016 at Stanford and have stayed in touch, occasionally grabbing sushi when I visited Palo Alto. She remained very friendly as I remembered her from the college days, with a very strong focus on helping people – which she wholeheartedly believed she was doing at Theranos. Even when she was extremely busy, she found some to discuss key questions, or think 'big ideas' on how healthcare delivery in America needed to be reformed.

I believe Ms. Holmes is a good person, who was extremely caring about everything she took part in. She tried to extend a helping hand to everyone around her while at Stanford and always had a great sense of humor. I am hopeful that she will not be punished too harshly.

DocuSigned by:

*Gerald Commissiong*

294C473BD7394A8...

Sincerely,

Gerald Commissiong

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ELIZABETH A. HOLMES,<br><br>Defendant. | Case No.   5:18-cr-00258-EJD-1<br><br>**ORDER DENYING MOTIONS FOR NEW TRIAL**<br><br>Re: Dkt. Nos. 1574, 1576, 1577 |

Defendant Elizabeth A. Holmes brings three motions for a new trial, each based on a different set of newly discovered evidence. The first motion arises from post-trial statements that purportedly implied government misconduct (Dkt. No. 1574); the second relates to statements made during the government's closing argument at co-Defendant Ramesh "Sunny" Balwani's trial (Dkt. No. 1576); and the third motion focuses on allegedly suppressed *Brady* evidence regarding the loss of Theranos's Laboratory Information System ("LIS") database (Dkt. No. 1577).

This Order follows full briefing on all three motions, a limited evidentiary hearing examining the government witness whose statements are the basis for Ms. Holmes' first motion, and the parties' post-hearing briefs. For the reasons discussed below, the Court DENIES all of Defendant's motions for new trial.

**I.      BACKGROUND**

On July 28, 2020, the government filed the Third Superseding Indictment, charging Defendants Elizabeth A. Holmes ("Defendant") and Ramesh "Sunny" Balwani ("Co-Defendant") with ten counts of wire fraud (Counts 3-12) and two counts of conspiracy to commit wire fraud (Counts 1-2). Dkt. No. 469. Although Holmes and Balwani were initially named as co-

defendants, their individual cases were severed in March 2020.  Dkt. No. 362.

Homes' trial began in August 2021.  Throughout both pre-trial and the four-month trial, the government and Holmes clashed on multiple issues regarding, *inter alia*, key government witness and former Theranos laboratory director Dr. Adam Rosendorff, the roles and relationship between Holmes and Balwani in managing Theranos, and the decommissioning of the LIS database containing Theranos' testing and quality control data.  *See* Dkt. Nos. 1574, 1576, 1577.  On January 3, 2022, the jury found Holmes guilty of Counts 1, 6, 7, and 8, relating to fraud against Theranos investors.  Dkt. No. 1235.  The jury acquitted her of Counts 2, 10, 11, and 12, which related to fraud against patients, and the Court declared a mistrial as to Counts 3 through 5, on which the jury did not reach a unanimous verdict.  *Id.*

Balwani's separate trial began in March 2022 on the same twelve counts.  Following a comparably lengthy trial, the jury found Balwani guilty of all twelve counts.  Dkt. No. 1507.

## II.      DISCUSSION

Because Defendant did not file a motion for new trial within the stipulated time period, Dkt. No. 1252, Rule 33(b)(2) acts as a mandatory claim-processing rule to bar any new trial motions unless they are based on newly discovered evidence.  Fed. R. Crim. P. 33(b)(2); *Eberhart v. United States*, 546 U.S. 12 (2005).  Accordingly, each of the instant three motions must arise from newly discovered evidence.

### A.      Legal Standard

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  The burden of justifying a new trial rests with the defendant.  *See United States v. Shaffer*, 789 F.2d 682, 687 (9th Cir. 1986).  The decision to grant a new trial is within the sound discretion of the trial court.  *See United States v. Love*, 535 F.2d 1152, 1157 (9th Cir. 1976).

Where a new trial is requested on the basis of newly discovered evidence, the movant must satisfy a five-part test: "(1) the evidence must be newly discovered; (2) the failure to discover the evidence sooner must not be the result of a lack of diligence on the defendant's part; (3) the

evidence must be material to the issues at trial; (4) the evidence must be neither cumulative nor merely impeaching; and (5) the evidence must indicate that a new trial would probably result in acquittal." *United States v. Harrington*, 410 F.3d 598, 601 (9th Cir. 2005). "[T]he trial judge has broad discretion in deciding whether new evidence is credible." *United States v. Panza*, 612 F.2d 432, 441 (9th Cir. 1979).

      **B.**     **Dr. Rosendorff's Post-Trial Statements (Dkt. No. 1574)**

Dr. Adam Rosendorff was clinical lab director at Theranos from April 2013 to November 2014, which provided him with insight into the development of the company's blood testing operation. At Defendant's trial, he testified for two days of direct examination and four days of cross examination.

On August 8, 2022, about eight months after Defendant's trial, Dr. Rosendorff arrived at Defendant's residence, where he encountered her partner, William Evans, and requested to speak with Defendant. Evans Decl., Ex. A, Dkt. No. 1574-2. In the ten-minute encounter, Dr. Rosendorff had two short conversations with Mr. Evans. 10/17/22 Hr'g Tr. 13:21-24. Per Mr. Evans' recollection, Dr. Rosendorff appeared distressed and made comments regarding a variety of topics, including his experiences at trial. Dkt. No. 1574-2. In particular, Dr. Rosendorff remarked that he "tried to answer the questions honestly [at trial] but that the prosecutors tried to make everybody look bad," "the government made things sound worse than they were," and he "felt like he had done something wrong." *Id.*

Defendant initially moved for a new trial based on the newly discovered statements that Dr. Rosendorff communicated to Mr. Evans. Dkt. No. 1574, at 6. The Court granted a limited evidentiary hearing to explore whether Dr. Rosendorff's comments implicated government misconduct or affected the veracity of his trial testimony. Dkt. No. 1593. However, following the evidentiary hearing, Defendant appears to have shifted to focus primarily on the government's misconduct implied by Dr. Rosendorff's statements. Dkt. No. 1618, at 5. The Court addresses each argument in turn under their respective frameworks.

### 1.    "Newly Discovered" Evidence

In her opening motion, Defendant sought a new trial based on statements that Dr. Rosendorff made to Mr. Evans in front of her residence.  Dkt. No. 1574.  Defendant emphasizes that, at his evidentiary hearing, Dr. Rosendorff did not deny making those statements.  Dkt. No. 1618, at 2-3.  Defendant also relies on Dr. Rosendorff's assent to defense counsel's questions that "sometimes [he was not] given the opportunity to tell the full story with respect to a particular event at Theranos during [his] direct examination" and "with respect to some of that testimony, there was only a limited amount of information that came out during the direct examination." 10/17/22 Hr'g Tr. 23:24-24:6.  Defendant posits that these post-trial statements made by the government's star witness would have supported her defense theme that the government had cherry-picked evidence to present at her trial.  Dkt. No. 1574, at 8.

After reviewing Defendant's submissions and Dr. Rosendorff's testimony under oath, the Court finds that Dr. Rosendorff's statements do not meet the third and fourth *Harrington* requirements for a new trial, specifically that the evidence be material to the issues at trial and neither cumulative nor merely impeaching.

As an initial matter, Defendant acknowledges that Dr. Rosendorff's statements to Mr. Evans are unclear as to their precise meanings, thereby necessitating an evidentiary hearing to provide further context and elaboration.  Dkt. No. 1574, at 7 (listing four potential meanings of Dr. Rosendorff's remarks).  Although Defendant urges the Court to interpret these statements as acknowledgement that the government presented an incomplete picture to the jury, Dkt. No. 1618, at 1, Dr. Rosendorff's testimony at his evidentiary hearing refutes both interpretations.  On at least three different occasions, Dr. Rosendorff testified that he did *not* believe the government was making things sound worse than they were at trial.  10/17/22 Hr'g Tr. 21:12-18, 26:1-7; 54:3-14. He also testified that he believed the government was "comprehensive" and not "cherry picking or being selective" when presenting exhibits during his direct examination.[1]  *Id.* at 22:19-24.  The

---

[1] Defendant asks the Court to disregard Dr. Rosendorff's professed beliefs as irrelevant to the government's intentions in presenting its case.  Dkt. No. 1618, at 10 (quoting 10/17/22 Hr'g Tr. 22:22-23).  Although Dr. Rosendorff cannot testify as to the government's subjective intentions,

Court finds Dr. Rosendorff's statements under oath to be credible, which would declaw most, if not all, of the negative implications that Defendant would attribute to them.

Even if Dr. Rosendorff's statements carried the implications proposed by Defendant, they would nonetheless be either immaterial to the issues or cumulative of evidence already presented at trial. Defendant argues that Dr. Rosendorff's statements (1) gravely damaged the reliability of the government's investigation; (2) supported the defense's theme of cherry-picking; and (3) and undermined the government's showing of Defendant's intent to defraud. Dkt. No. 1574, at 8-9.

*First*, although evidence relating to the thoroughness of the government's investigation would be material, *see U.S. v. Howell*, 231 F.3d 615, 625 (9th Cir. 2000), Dr. Rosendorff's statements simply do not implicate the government's investigation, as his statements only related to the *presentation* of evidence at trial. *See* Dkt. No. 1574, at 7 (listing potential interpretations without any reference to government's investigation).

*Second*, even with regards to trial presentation, the vagueness of Dr. Rosendorff's comments would defy any efforts to construe a specific instance where the government had misrepresented evidence, and Dr. Rosendorff did not recall any such instance during his hearing. *See generally* 10/17/22 Hr'g Tr. To the extent Dr. Rosendorff's statements could be interpreted as broadly suggesting the government had cherry-picked evidence to present as a general matter, they would be substantially cumulative of arguments the defense already presented—most notably in the first fifteen minutes of the defense's closing arguments, Dkt. No. 1574, at 8 (citing 12/16/21 Tr. 9031:19-9041:10)—and that the jury would have considered.

And *third*, Dr. Rosendorff's statements that "everyone was working so hard to do something good and meaningful" do not bear upon Defendant's intent to defraud, as Dr. Rosendorff expressly indicated at his hearing that he "did not intend to include Ms. Holmes and Mr. Balwani in that statement." 10/17/22 Hr'g Tr. 17:7-10. In any event, the notion that Theranos employees were working hard to do something good would be cumulative of other statements

he is nonetheless aware of the universe of *his* knowledge and can testify as to whether a fair and complete version of *those* facts came out during his direct examination.

from Dr. Rosendorff and other witnesses.  *See* Dkt. No. 1587, at 7-9 (identifying other statements).

In sum, the Court finds that the statements Dr. Rosendorff made to Mr. Evans do not stand for any of the proposed meanings that Defendant would want and, even if they did, they would not be material to the issues at trial or otherwise non-cumulative.  Accordingly, a new trial is not warranted based on the "newly discovered" evidence of Dr. Rosendorff's statements to Mr. Evans.  However, in her post-hearing brief, Defendant appears to argue under the framework for a due process violation based on government misconduct, which the Court turns to next.

### 2.    Government Misconduct

After Dr. Rosendorff's evidentiary hearing, Defendant submitted briefing asserting that Dr. Rosendorff's testimony proved that the government presented a misleading and incomplete picture to the jury.  Dkt. No. 1618, at 1.  Her argument primarily relies on two points: (1) Dr. Rosendorff did not directly deny any of the statements attributed to him by Mr. Evans and (2) Dr. Rosendorff had assented to defense counsel's questions that there were instances where he did not have the opportunity to tell the "full story" of certain events where only a "limited amount of information" would come out on direct examination.  *Id.* at 2-3.  Defendant's brief then segues into a montage of trial highlights where defense counsel on cross-examination either impeached Dr. Rosendorff or provided further context for evidence the government had introduced on direct.  *Id.* at 5-8.

The Court first notes that, to the extent Defendant seeks a new trial based solely on impressions the government had made on direct that defense counsel later rebutted on cross, such a motion would be time barred by Rule 33(b)(2).  Fed. R. Crim. P. 33(b)(2) ("Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty."); *see also United States v. Fekrat*, 450 F. App'x 615 (9th Cir. 2011) (unpublished) (affirming district court's denial of Rule 33 motion based solely on government's presentation at trial).  The Court thereby will focus only on whether Dr. Rosendorff's "newly discovered" statements implicate any government misconduct.

To establish a due process violation for government misconduct under *Napue v. Illinois*, 360 U.S. 264 (1959), Defendant must show: "(1) that the testimony was actually false, (2) that the

government knew or should have known that it was false, and (3) that the testimony was material, meaning there is a 'reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *United States v. Renzi*, 769 F.3d 731, 751 (9th Cir. 2014). Here, the Court finds that Dr. Rosendorff's statements do not identify any trial testimony as being either false or misleading nor would those statements be likely to affect the jury's judgment.

With respect to the falsehood requirement, Dr. Rosendorff's post-trial statements are too vague and general to imply that any specific testimony was actually false or misleading. First, as noted above, Dr. Rosendorff clarified in his evidentiary hearing that he does *not* in fact believe that the government had "made things seem worse than they were," a position that he repeated on three different occasions. *See supra* at Section II(B)(1). Second, even if Dr. Rosenberg at times did not have an opportunity on direct to tell the "full story" where only a "limited amount of information" was presented, that does not *ipso facto* mean the government presented false or even misleading testimony.[2] Such broad and general remarks as to a well-known feature of the adversarial system would fall significantly below the falsehood threshold demanded by *Napue*. *See United States v. Houston*, 648 F.3d 806, 814 (9th Cir. 2011) (finding no falsity where allegations "at most point to evidence creating an inference of falsity" and the "inconsistencies were fully explored and argued to the jury"); *Hein v. Sullivan*, 601 F.3d 897, 909 (9th Cir. 2010) ("[A]lthough a few of [witness's] statements at trial were incomplete, . . . *Napue* imposed no duty on [prosecutor] to clarify [witness's] answers to open-ended questions about his willingness to be a witness or to specifically question him about the July 10 letter."); *Shadid v. Schriro*, 2005 WL 8161001, at *6 (D. Ariz. July 13, 2005) ("[A]n ambiguous or incomplete statement does not rise to the level of false testimony."). As a result, Defendant's *Napue* claim stumbles at the first step.

Even if Dr. Rosendorff's statements could somehow satisfy *Napue* "actually false" requirement, Defendant has not shown that those statements are likely to affect the jury's

---

[2] This point is exemplified by Defendant's bold proposition that, if government witnesses on direct testify to anything less than every point discussed in their pre-trial meetings with prosecutors, the government should "be forced to disclose to the jury that . . . it presented an incomplete picture of the documents and the testimony when [the witness] took the stand." Dkt. No. 1618, at 10.

judgment—here, Defendant's convictions on the investor fraud counts.  To the extent the
government set up a particular impression based on Dr. Rosendorff's direct examination, that
impression would have then been subjected to four days of cross examination where Defendant
had the opportunity to change that impression.  In fact, for every instance where the government
created an allegedly misleading impression on direct, Defendant explains how that impression was
later clarified in cross examination, which would have ultimately provided the complete picture to
the jury.  Dkt. No. 1618, at 6-7 (citing instances where Dr. Rosendorff's testimony was clarified or
impeached); *see also United States v. Houston*, 648 F.3d 806, 814 (9th Cir. 2011) (finding that
"there is not a 'reasonable likelihood' that [witness's] statement 'affected the judgment of the
jury'" where "[d]efense counsel effectively attacked [the witness's] credibility").  Additionally,
Dr. Rosendorff's post-trial statements only pertained to the *internal* operations at Theranos and,
therefore, are unlikely to affect the Defendant's convictions for investor fraud that featured
Defendant's representations of Theranos's *external* partnerships.  *See* Dkt. No. 469 ¶ 12.
Accordingly, Defendant cannot show that Dr. Rosendorff's statements would have been material.

Based on the foregoing, the Court finds that Dr. Rosendorff's post-trial statements to Mr.
Evans do not satisfy either the *Harrington* test to warrant a new trial for newly discovered
evidence or the *Napue* test to establish government misconduct.  The Court therefore DENIES
Defendant's motion for new trial based on evidence regarding Dr. Rosendorff (Dkt. No. 1574).

## C.      Government's Closing Arguments in Mr. Balwani's Trial (Dkt. No. 1576)

Defendant also moves for a new trial based on the government's statements in its closing
arguments at Co-Defendant Balwani's trial.  Dkt. No. 1576.  Specifically, the government had
mentioned in its closing rebuttal arguments at Balwani's trial that he had "a lot of influence over
[Defendant]" in their relationship, thereby undermining Defendant's knowledge and intent with
respect to her representations to investors, so the argument goes.  *Id.* at 6.  The Court finds that
Defendant's motion for a new trial—arising from a few sentences made during the government's
closing rebuttal arguments—do not warrant a new trial under the *Harrington* test because they are
not "newly discovered," not material, and not likely to result in acquittal.

### 1. "Newly Discovered" Evidence

First, the inference that Balwani's experience and close relationship with Defendant "would have given him a lot of influence over her" cannot be considered "newly discovered" evidence, because all those facts were known to the Defendant when the jury returned her verdict. It is well-established that evidence is not "newly discovered" if the substance of the evidence was "already known to the defendant or introduced in another form." *United States v. Kramer*, 2020 WL 5408165, at *3 (N.D. Cal. Sept. 9, 2020); *United States v. Hinkson*, 585 F.3d 1247, 1264 (9th Cir. 2009) (affirming district court determination that affidavits were not new because "while newly written, [they] did not provide any new *information* that was not already considered") (emphasis in original); *accord United States v. Caballero*, 745 F. App'x 32, 33 (9th Cir. 2018).

Defendant responds that the "newly discovered" information is the government's opinion and not the facts that the opinion is based on. Dkt. No. 1591, at 2. This is a semantically dubious distinction, as the sentences at issue do not express an opinion so much as they propose inferences that the jury can draw from said facts. *See* 7/19/22 Hr'g Tr. 7652:9-17 ("*[Y]ou can also infer* that his close relationship with Ms. Holmes would have given him a lot of influence over her. . . . *it would be no surprise* that his advise [sic], his input would carry a lot of weight with her.").

In any event, the government's rebuttal argument in Balwani's trial did not take a new or inconsistent position from that presented at Defendant's trial. The government argued, in both trials, that both defendants helmed Theranos together as partners. *Compare* 9/8/21 Hr'g Tr. 553:3-5 *with* 3/22/22 Hr'g Tr. 1041:25-1042:4. The government also argued that each defendant was receptive to and could be influenced by the other's opinions. *Compare* 12/17/21 Hr'g Tr. 9310:1-4 (noting that Balwani deferred decisions on inventions and devices to Holmes) *with* 6/24/22 Hr'g Tr. 7652:14-17 ("[It]t would be no surprise that his advise [*sic*], his input would carry a lot of weight with her."). Contrary to Defendant's characterization, the closing remarks in question do not profess a "newly discovered" or changed government opinion but instead present the same (albeit complex) relationship from different perspectives. Defendant's motion for new trial can be denied for her inability to meet this first step.

### 2. Material

Even if the government's statements at Balwani's trial can be considered "newly discovered evidence," those statements are not material to the issues in Defendant's trial. Defendant argues that Balwani's influence in their relationship is material to Defendant's knowledge and intent with respect to investor representations, as well as whether she entered into a conspiracy with Balwani. Dkt. No. 1576, at 6; Dkt. No. 1591, at 6-7. This argument, however, commits the same error that Defendant accuses the government of making: it focuses on the relationship itself instead of the government's opinion of the relationship. Defendant provides no support for the proposition that opinions or characterizations from government attorneys—who have no contemporary personal knowledge of the co-Defendants' relationship—would carry any evidentiary weight as to the actual relationship that existed during the relevant time. And insofar as Defendant's focus is on the relationship itself, those facts are clearly not "newly discovered." *See supra* at Section II(C)(1). Accordingly, the government's post-trial opinion of co-Defendants' relationship is not material to any of the issues in Defendant's trial.

### 3. Likelihood of Acquittal

Finally, the government's closing arguments in Balwani's trial are unlikely to result in an acquittal for Defendant. Contrary to Defendant's characterization of these statements as "an express position from the government in the record that Mr. Balwani exercise unique influence over Ms. Holmes," Dkt. No. 1591, at 9, the Court does not read the statements as inconsistent with those the government made in Defendant's trial. *See supra* at Section II(C)(1). Furthermore, any opinion of Defendant's relationship from the government is not likely to tilt the scales on the verdicts when compared to statements Defendant made herself. Specifically, she had testified that Balwani did not force her to make any of the statements to investors or journalists, *see* 11/29/21 Hr'g Tr. 7878:22-7879:4, and that she made all the decisions at Theranos jointly with Balwani. *See* 11/30/21 Hr'g Tr. 8063:15-21. Given the existence of direct personal testimony on Co-Defendants' relationship, the Court cannot say that the government's remarks or suggestions as to that relationship would "probably result in acquittal."

The Court finds that the government's closing arguments in Balwani's trial are not "newly discovered" evidence, not material to the issues in Defendant's trial, and are not likely to result in acquittal if they were included in a new trial. Accordingly, Defendant has not met the five-part *Harrington* test, and the Court DENIES her motion for new trial based on evidence from Balwani's trial (Dkt. No. 1576).

### D. Evidence Regarding LIS Database (Dkt. No. 1577)

Finally, Defendant moves for a new trial on the basis that the government committed a *Brady* violation by refusing to produce certain emails relating to the government's efforts to recover the LIS database. Dkt. No. 1577, at 1.

On October 29, 2020, the government provided a 24-page letter disclosing potential *Brady*, *Giglio*, and *Jencks* information, including the government's attempts to access and recover the LIS database from two hard drives it received. Dkt. No. 732-2 (the "*Brady* Letter"). The *Brady* Letter provided a detailed chronology of the government's interactions with the LIS database, including as follows: how the LIS hard drives came into the government's possession, the support staff's efforts to open and decrypt the hard drives, the various recovery options presented to the government, the government's selection and pursuit of those options, and conversations regarding the LIS database's encryption and decommissioning. Dkt. No. 732-2 ¶¶ 39-51. Defendant subsequently requested and moved to compel production of the documents underlying the letter, which the Court denied as speculative and irrelevant to her defenses but left the door open to future document production if either party put the issue in dispute at trial. Dkt. No. 887, at 17-18. During her trial, Defendant did not pursue a defense blaming the government for failing to gather and preserve the LIS database. *See* Volkar Decl., Ex. 1, Dkt. No. 1586-2.

During Co-Defendant Balwani's trial, he also moved to compel documents relating to the LIS database. Dkt. No. 1156. Because Balwani had articulated a specific defense relating to the government's investigation and efforts to obtain the LIS database, the Court ordered production of communications sufficient to show the government's recovery efforts referenced in the *Brady* Letter. Dkt. No. 1464. The government subsequently produced eleven emails ("LIS Emails") to

both Defendants on June 2, 2022.  Dkt. No. 1577-2.  The instant motion for new trial claims that the government violated *Brady* by not producing these emails to Defendant earlier.

When motions for a new trial include newly discovered evidence along with alleged *Brady* violations, the violations have been evaluated according to their own respective standard rather than the five-part *Harrington* test.  *See United States v. Brosnan*, 2013 WL 4427258, at *2 (N.D. Cal. Aug. 15, 2013) (citing *United States v. Jernigan*, 492 F.3d 1050 (9th Cir. 2007)).  To prove a *Brady* violation, a defendant must meet three elements: "(1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued."  *United States v. Kohring*, 637 F.3d 895, 901 (9th Cir. 2011). Evidence is prejudicial if, in the context of the entire record, it "undermines confidence in the outcome of the trial," resulting in a "reasonable probability . . . the result of the proceeding would have been different."  *Karis v. Calderon*, 283 F.3d 1117, 1128 (9th Cir. 2002).

Here, the Court finds that Defendant has failed to show that the government suppressed the LIS Emails and, even if they had been disclosed, there is not a reasonable probability that Defendant's trial would have turned out any differently.

### 1.      Government Suppression

To the extent that the LIS Emails contain or reflect information that was already disclosed in the government's *Brady* Letter, that information was not suppressed by the government. "When . . . a defendant has enough information to be able to ascertain the supposed *Brady* material on his own, there is no suppression by the government."  *United States v. Aichele*, 941 F.2d 761, 764 (9th Cir. 1991); *see also United States v. Bond*, 552 F.3d 1092, 1097 (9th Cir. 2009) (finding no suppression where the government "provided [defendant] with the information needed to acquire all trial testimony, and provided him with the essential factual data to determine whether the witness' testimony might be helpful").  There can be little argument that the chronology and facts contained in the *Brady* Letter would have enabled Defendant to pursue a defense at trial challenging the government's recovery efforts, a tactic that her Co-Defendant did indeed pursue

and resulted in the production of the LIS Emails.[3]

Regardless of her trial strategy, Defendant cannot, as a matter of law, claim that the government suppressed any information or fact that it had previously disclosed in its *Brady* Letter. *See Aichele*, 941 F.3d at 764; *Bond*, 552 F.3d at 1097.  Defendant cites *United States v. Liew* for the proposition that the government may be required to produce the source material for *Brady* information that had already been disclosed.  856 F.3d 585, 604 (9th Cir. 2017).  However, *Liew* is distinguishable because it involved a declaration attesting to specific and relevant differences between the disclosed FBI interview report and the actual witness interview, suggesting that the rough interview notes may contain exculpatory information.  *Id.* at 595.  By contrast, the only "missing" information Defendant cited in her one-paragraph request to compel the LIS Emails were the identities of the anonymous government individuals referenced in the *Brady* Letter.  Dkt. No. 810, at 8.  In the absence of a reason why the LIS Emails or identities would have been relevant, this Court rejected Defendant's request as an attempt to "use *Brady* simply to search for *Brady* materials."  Dkt. No. 997, at 17.  Similarly, in the absence of any sign that the information in the *Brady* Letter was incomplete, the Court rejects Defendant's suggestion that the government should have supplemented its *Brady* disclosures with every document referenced therein.

Accordingly, the Court finds that, to the extent the LIS Emails reflected information that was disclosed in the government's *Brady* Letter, that information was not suppressed by the government.  Any potential *Brady* violation in the instant motion would have to arise from new information in the LIS Emails that were not included the *Brady* Letter.

### 2.    Prejudice

Recognizing perhaps that information previously disclosed in the *Brady* Letter would not suffice to establish a *Brady* violation, Defendant points to new information that the LIS Emails contained.  Most notably, the LIS Emails revealed (1) the identities of the previously unnamed

---

[3] Indeed, there may have been some strategic benefit for Defendant to avoid blaming the government for the loss of the LIS database.  *See* Volkar Decl., Ex. 1, Dkt. No. 1586-2 ("Because the defense has not opened the door, the government cannot introduce evidence concerning the loss of the LIS database.").

"government attorneys" and (2) that the *Brady* Letter had implied only Balwani could decrypt the LIS database when there may have been one other unidentified person who could have done so. Dkt. No. 1577, at 5-6.  Although these items were not included in the government's *Brady* Letter, the Court finds that their non-disclosure does not undermine confidence in the outcome of the trial, nor would it have been reasonably likely to change the result.

First, the Court cannot conclude that identifying the specific attorneys on the LIS Emails would have changed the result of the trial.  To be clear, the information at issue here is not the decisions or actions the government took to recover the LIS database (which had been disclosed in the *Brady* Letter); rather, the allegedly suppressed information is the identities of the government attorneys on those emails.  Accordingly, Defendant's winding counterfactuals of how differently trial would have gone if only she had presented evidence of the government's poor-quality investigation all miss the mark, because they do not explain why the *attorneys' identities* would have changed the course of trial.  Dkt. No. 1577, at 7-11.  In any event, Defendant appeared to have had some idea of who the unnamed individuals were—she acknowledges that Mr. Bostic, Mr. Leach, and Mr. Schenk were likely witnesses to the government's efforts to capture the LIS database, Dkt. No. 1592, at 7, and she had even added them to her witness list.  Dkt. No. 1003.  It would strain credulity to conclude that—but for the LIS Emails' revelation of the government attorneys' identities—Defendant would have been entirely in the dark as to who these unnamed individuals were and foiled in her efforts to attack the government's LIS preservation efforts. Given the *de minimis* relevance, if any, the missing identities would have had on the issues at trial, the Court finds that the government's non-disclosure of the individuals' identities do not undermine confidence in the outcome of the trial nor would their disclosure have been reasonably likely to change the outcome.

Second, Defendant presents no argument as to how the trial result would have been different if she had known there was one individual other than Balwani who could have decrypted the LIS database.  She appears to primarily argue that, as a general matter, the LIS Emails would have enabled her to show the inadequacy of the government's investigation, which would have

adjusted the light in which the jury viewed the entire trial.  Dkt. No. 1577, at 9-11; Dkt. No. 1592, at 9-11.  However, as noted above, the government had previously disclosed the factual bases and its decisions surrounding the LIS database and, therefore, such information could not have been suppressed.[4]  More specifically, the LIS Email in question only contained a rather qualified remark regarding the individuals who could decrypt the LIS database: "we don't have the code, maybe two former employees know how to unravel it, Sonny [sic] Balwani was one, Tom – do you recall the other."  Saharia Decl., Ex. 9, Dkt. No. 1577-10.  Defendant does not explain—and the Court struggles to envision—how the theoretical existence of an anonymous individual who could have decrypted the LIS database would have changed the course of trial.

Because the government's *Brady* Letter had already disclosed the substance and factual bases of its efforts to preserve the LIS database, Defendant cannot show that the government suppressed the information contained in the LIS Emails.  Additionally, having reviewed the alleged "new" information in the LIS Emails, the Court finds that they are largely peripheral details, none of which rise to the level of prejudice required.  Accordingly, the Court DENIES Defendant's motion for new trial based on evidence relating to the LIS database.  Dkt. No. 1577.

## III.   CONCLUSION

Based on the foregoing, the Court DENIES Defendant's motions for new trial based on Dr. Rosendorff's post-trial statements, the disclosure of the LIS Emails, and the government's statements made in closing arguments at Balwani's trial.

**IT IS SO ORDERED.**

Dated: November 7, 2022

EDWARD J. DAVILA
United States District Judge

---

[4] For the same reason, the other instances of purportedly new information in the LIS Emails are not likely to have changed the result at trial nor would their non-disclosure undermine confidence in the jury's verdict.  Dkt. No. 1577, at 5-6; Dkt. No. 1592, at 5-6. These "discrepancies" amount to little more than criticism of the level of granularity of the government's *Brady* Letter.

1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | CR-18-00258-EJD |
| PLAINTIFF, | ) | |
| | ) | SAN JOSE, CALIFORNIA |
| VS. | ) | |
| | ) | OCTOBER 17, 2022 |
| ELIZABETH A. HOLMES, | ) | |
| | ) | PAGES 1 – 60 |
| DEFENDANT. | ) | |
| _____ | ) | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE EDWARD J. DAVILA
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                      BY:  JOHN C. BOSTIC
                           JEFFREY B. SCHENK
                      150 ALMADEN BOULEVARD, SUITE 900
                      SAN JOSE, CALIFORNIA 95113

                      BY:  ROBERT S. LEACH
                           KELLY VOLKAR
                      1301 CLAY STREET, SUITE 340S
                      OAKLAND, CALIFORNIA 94612

         (APPEARANCES CONTINUED ON THE NEXT PAGE.)


OFFICIAL COURT REPORTER:
                          IRENE L. RODRIGUEZ, CSR, RMR, CRR
                          CERTIFICATE NUMBER 8074


      PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
           TRANSCRIPT PRODUCED WITH COMPUTER

2

```
 1        A P P E A R A N C E S: (CONT'D)

 2

 3     FOR DEFENDANT HOLMES:   WILLIAMS & CONNOLLY LLP
                                BY:  KEVIN M. DOWNEY
 4                                   LANCE A. WADE
                                     KATHERINE TREFZ
 5                                   J.R. FLEURMONT
                                725 TWELFTH STREET, N.W.
 6                              WASHINGTON, D.C. 20005

 7

       FOR DR. ROSENDORFF      QUINN EMANUEL URQUHART & SULLIVAN, LLP
 8                              BY:  DANIEL KOFFMANN
                                51 MADISON AVENUE, 22ND FLOOR
 9                              NEW YORK, NEW YORK 10010

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2                        INDEX OF PROCEEDINGS

3

**ADAM ROSENDORFF**
4        DIRECT EXAM BY MR. WADE              P. 10
         CROSS-EXAM BY MR. BOSTIC             P. 47
5        REDIRECT EXAM BY MR. WADE            P. 54

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

```
         1    SAN JOSE, CALIFORNIA                    OCTOBER 17, 2022

         2                    P R O C E E D I N G S

09:04AM  3         (COURT CONVENED AT 9:04 A.M.)

09:04AM  4             THE COURT:  WE ARE ON THE RECORD IN 18-258,

09:04AM  5    UNITED STATES VERSUS ELIZABETH HOLMES.  THIS IS A SPECIAL

09:04AM  6    HEARING SET.

09:04AM  7         LET ME FIRST CAPTURE THE APPEARANCE OF THE PARTIES,

09:04AM  8    PLEASE.

09:04AM  9         WHO APPEARS FOR THE GOVERNMENT?

09:04AM 10             MR. BOSTIC:  GOOD MORNING, YOUR HONOR.

09:04AM 11         JOHN BOSTIC FOR THE UNITED STATES ALONG WITH ROBERT LEACH,

09:04AM 12    JEFF SCHENK, AND KELLY VOLKAR.

09:04AM 13             THE COURT:  THANK YOU.  GOOD MORNING.

09:04AM 14         AND FOR THE DEFENDANT?

09:04AM 15             MR. WADE:  GOOD MORNING, YOUR HONOR.

09:04AM 16         LANCE WADE ON BEHALF OF MS. HOLMES.

09:04AM 17         WITH ME TODAY ARE MR. DOWNEY, MS. TREFZ, MS. SAHARIA, AND

09:04AM 18    MR. FLEURMONT.

09:04AM 19         MS. HOLMES IS ALSO PRESENT.

09:04AM 20             THE COURT:  GOOD MORNING.  IT'S NICE TO SEE EVERYONE

09:04AM 21    AGAIN.

09:04AM 22         I DO WANT TO INQUIRE, IS MR. KOFFMANN PRESENT?

09:04AM 23             MR. KOFFMANN:  GOOD MORNING, YOUR HONOR.

09:04AM 24             THE COURT:  GOOD MORNING, MR. KOFFMANN.

09:04AM 25         YOU REPRESENT, I BELIEVE, DR. ROSENDORFF?
```

5

09:04AM  1          MR. KOFFMANN:  THAT IS CORRECT, WHO IS HERE IN COURT

09:05AM  2     AS WELL.

09:05AM  3          THE COURT:  THANK YOU VERY MUCH.  THANK YOU.

09:05AM  4       YOU CAN BE SEATED.

09:05AM  5       I JUST WANTED TO INDICATE THAT WE SET THIS HEARING TODAY

09:05AM  6     IN REGARDS TO SOME CONVERSATIONS THAT DR. ROSENDORFF HAD WITH

09:05AM  7     MS. HOLMES'S PARTNER.  WE HAD DISCUSSIONS ABOUT THAT.

09:05AM  8     MS. HOLMES HAD FILED MOTIONS IN THIS MATTER RELATED TO THAT AND

09:05AM  9     A COUPLE OF OTHER ISSUES.

09:05AM 10       THE COURT DECIDED TO SET AN EVIDENTIARY HEARING TO FOLLOW

09:05AM 11     UP ON SOME STATEMENTS THAT DR. ROSENDORFF ALLEGEDLY MADE AT

09:05AM 12     THIS HEARING.

09:05AM 13       AS I SAID PREVIOUSLY, THIS -- I DON'T ANTICIPATE THIS TO

09:05AM 14     BE A LENGTHY HEARING THIS MORNING.  THIS IS AN OPPORTUNITY FOR

09:05AM 15     THE COURT TO MAKE INQUIRY OF THE DOCTOR REGARDING STATEMENTS.

09:05AM 16       AGAIN, THIS IS RELATED TO THE CIRCUMSTANCES THAT RESULTED

09:06AM 17     IN DR. ROSENDORFF'S DECLARATION THAT'S FOUND IN DOCKET 1587-1.

09:06AM 18     THE ISSUES HERE ARE LIMITED.

09:06AM 19       INITIALLY, LET ME INDICATE THAT I HAVE -- I WILL CALL

09:06AM 20     DR. ROSENDORFF IN JUST A MOMENT TO SPEAK.  I HAVE INDICATED TO

09:06AM 21     COUNSEL THAT DR. ROSENDORFF WILL BE ABLE TO CONSULT WITH HIS

09:06AM 22     ATTORNEY IF HE FEELS HE NEEDS TO DO THAT, AND I'LL INFORM

09:06AM 23     DR. ROSENDORFF ABOUT THAT IN JUST A MOMENT.

09:06AM 24       ARE YOU COMFORTABLE SITTING THERE, MR. KOFFMANN?

09:06AM 25          MR. KOFFMANN:  SURE.  THAT'S FINE.  THANK YOU AGAIN.

6

| | | |
|---|---|---|
| 09:06AM | 1 | THE COURT: SURE. SURE. |
| 09:06AM | 2 | LET ME ALSO INDICATE THAT I HAVE -- THIS IS IN REFERENCE |
| 09:06AM | 3 | TO DOCKETS 1574, 1587, AND 1590. THOSE ARE THE RESPECTIVE |
| 09:07AM | 4 | DOCKETS RELATED TO THIS PARTICULAR ONE OF MS. HOLMES'S MOTIONS. |
| 09:07AM | 5 | SO LET'S CALL DR. ROSENDORFF NOW, PLEASE. |
| 09:07AM | 6 | SIR, IF YOU WOULD COME FORWARD. |
| 09:07AM | 7 | THE WITNESS: YES, YOUR HONOR. |
| 09:07AM | 8 | THE COURT: IF YOU WOULD STAND OVER HERE AGAIN BY |
| 09:07AM | 9 | THE WITNESS STAND AND RAISE YOUR RIGHT HAND, OUR COURTROOM |
| 09:07AM | 10 | DEPUTY HAS A QUESTION FOR YOU. |
| 09:07AM | 11 | **(GOVERNMENT'S WITNESS, ADAM ROSENDORFF, WAS SWORN.)** |
| 09:07AM | 12 | THE WITNESS: YES, I DO. |
| 09:07AM | 13 | THE COURT: HAVE A SEAT AND MAKE YOURSELF |
| 09:07AM | 14 | COMFORTABLE. ADJUST THE CHAIR AND MICROPHONE AS YOU NEED. |
| 09:07AM | 15 | THERE'S WATER THERE TO REFRESH YOU SHOULD YOU NEED IT. |
| 09:07AM | 16 | WHEN YOU ARE COMFORTABLE, SIR, WOULD YOU PLEASE STATE YOUR |
| 09:07AM | 17 | NAME AND THEN SPELL IT. |
| 09:07AM | 18 | THE WITNESS: MY NAME IS ADAM ROSENDORFF. A-D-A-M, |
| 09:07AM | 19 | R-O-S-E-N-D-O-R-F-F. |
| 09:07AM | 20 | THE COURT: THANK YOU. |
| 09:08AM | 21 | AND, DR. ROSENDORFF, I WANT TO REITERATE AGAIN THAT I HAVE |
| 09:08AM | 22 | INDICATED TO THE LAWYERS HERE THAT YOU MAY SPEAK WITH YOUR |
| 09:08AM | 23 | COUNSEL, MR. KOFFMANN, AT ANY TIME IF YOU FEEL THE DESIRE TO DO |
| 09:08AM | 24 | SO. IF THAT'S THE CASE, JUST LET ME KNOW, AND I'LL PERMIT YOU |
| 09:08AM | 25 | TO SPEAK WITH HIM. |

09:08AM 1      I ALSO HAVE INDICATED TO THE PARTIES THAT I WILL PERMIT

09:08AM 2  YOUR LAWYER, MR. KOFFMANN, TO LODGE ANY OBJECTION OR STATEMENT

09:08AM 3  IF HE FEELS A LEGAL ISSUE HAS COME UP TO ANY QUESTION.

09:08AM 4      MR. KOFFMANN, YOU SHOULD JUST FEEL FREE TO STAND AND LET

09:08AM 5  ME KNOW OF THAT, AND WE CAN HAVE A DISCUSSION ABOUT THAT ISSUE.

09:08AM 6      SO IF YOUR COUNSEL DOES OBJECT, DR. ROSENDORFF, YOU SHOULD

09:08AM 7  WAIT ON YOUR ANSWER UNTIL FURTHER INSTRUCTED.

09:08AM 8      DO YOU UNDERSTAND THAT?

09:08AM 9          THE WITNESS:  YES, YOUR HONOR.

09:08AM 10         THE COURT:  ALSO, SIR, IF AT ANY TIME YOU DO NOT

09:08AM 11 UNDERSTAND A QUESTION OR YOU WOULD LIKE FURTHER EXPLANATION OR

09:08AM 12 YOU'D LIKE A QUESTION REPEATED, PLEASE JUST LET THE PARTIES

09:08AM 13 KNOW AND WE'LL DO THAT, ALL RIGHT, SIR?

09:09AM 14         THE WITNESS:  OKAY.

09:09AM 15         THE COURT:  ANYTHING FURTHER FROM THE GOVERNMENT

09:09AM 16 BEFORE WE BEGIN?

09:09AM 17         MR. BOSTIC:  NO, YOUR HONOR.

09:09AM 18         THE COURT:  MR. WADE?

09:09AM 19         MR. WADE:  NO, YOUR HONOR.

09:09AM 20         THE COURT:  MR. KOFFMANN?

09:09AM 21         MR. KOFFMANN:  NO, YOUR HONOR.

09:09AM 22         THE COURT:  ALL RIGHT.  THANK YOU.

09:09AM 23     DR. ROSENDORFF, I THINK YOU'VE DISCUSSED WITH YOUR LAWYER

09:09AM 24 WHY YOU'RE HERE.  I'M NOT GOING TO ASK YOU ABOUT THAT

09:09AM 25 CONVERSATION.

8

09:09AM 1    IT WAS BROUGHT TO ALL OF OUR ATTENTION THAT YOU PAID A

09:09AM 2    VISIT TO MS. HOLMES'S RESIDENCE. I'VE READ DECLARATIONS IN

09:09AM 3    REGARDS TO THOSE, TO THAT VISIT, THOSE CONVERSATIONS.

09:09AM 4    I JUST HAVE SOME QUESTIONS FOR YOU, SIR.

09:09AM 5    THE FIRST QUESTION I HAVE FOR YOU, SIR, IS REGARDING YOUR

09:09AM 6    TESTIMONY AT MS. HOLMES'S TRIAL AS WELL AS YOUR TESTIMONY AT

09:09AM 7    MR. BALWANI'S TRIAL.

09:09AM 8    AND MY QUESTION TO YOU, SIR, IS WHEN YOU TESTIFIED AT BOTH

09:09AM 9    OF THOSE TRIALS, DID YOU TESTIFY HONESTLY?

09:10AM 10    THE WITNESS: YES, YOUR HONOR, AT ALL TIMES I

09:10AM 11    TESTIFIED TRUTHFULLY AND HONESTLY TO THE BEST OF MY

09:10AM 12    RECOLLECTION.

09:10AM 13    THE COURT: SIR, IN REGARDS TO YOUR TESTIMONY, DID

09:10AM 14    YOU INTENTIONALLY GIVE ANY FALSE TESTIMONY?

09:10AM 15    THE WITNESS: NO, I DID NOT.

09:10AM 16    THE COURT: DO YOU FEEL, SIR, IN REGARDS TO YOUR

09:10AM 17    TESTIMONY, THAT YOU WERE MANIPULATED OR PRESSURED IN ANY WAY BY

09:10AM 18    THE GOVERNMENT IN REGARDS TO YOUR TESTIMONY?

09:10AM 19    THE WITNESS: NO, SIR, I DO NOT FEEL THAT WAY. I

09:10AM 20    DID NOT FEEL THAT WAY THEN AND I DON'T FEEL THAT WAY NOW.

09:10AM 21    AT ALL TIMES THE GOVERNMENT ENCOURAGED ME TO TELL THE

09:10AM 22    TRUTH AND ONLY THE TRUTH, AND MR. LEACH REPEATEDLY TOLD ME THAT

09:10AM 23    ALL HE WANTED TO KNOW IS WHAT HAPPENED AT THERANOS.

09:10AM 24    THE COURT: DID THE GOVERNMENT, IN REGARDS TO YOUR

09:10AM 25    TESTIMONY, SIR, EVER THREATEN YOU OR OFFER YOU ANY INDUCEMENT

9

09:11AM 1    FOR YOUR TESTIMONY?

09:11AM 2            THE WITNESS:  NO, THEY DID NOT.  ON THE CONTRARY, I

09:11AM 3    INCURRED SIGNIFICANT FINANCIAL AND EMOTIONAL EXPENSES IN THE

09:11AM 4    PROCESS.

09:11AM 5            THE COURT:  DID THE GOVERNMENT EVER TELL YOU HOW YOU

09:11AM 6    SHOULD TESTIFY OR HOW THEY, THE GOVERNMENT, WISHED YOU TO

09:11AM 7    TESTIFY?

09:11AM 8            THE WITNESS:  NO, THEY DID NOT.

09:11AM 9            THE COURT:  DID THE GOVERNMENT EVER, AFTER YOUR

09:11AM 10   TESTIMONY, OFFER CRITIQUE TO YOU ABOUT YOUR TESTIMONY OR

09:11AM 11   CRITICIZE YOU IN ANY WAY REGARDING ANY OF YOUR TESTIMONY?

09:11AM 12           THE WITNESS:  NO.  THEY WERE NOT PERMITTED TO SPEAK

09:11AM 13   TO ME DURING THE COURSE OF MY TESTIMONY, AND I WAS NOT

09:11AM 14   PERMITTED TO SPEAK TO THEM.

09:11AM 15           THE COURT:  ALL RIGHT.  THANK YOU.

09:11AM 16        DID THE GOVERNMENT EVER MISREPRESENT SOMETHING THAT YOU

09:11AM 17   SAID TO THEM?

09:11AM 18           THE WITNESS:  NO, THEY DID NOT.

09:11AM 19           THE COURT:  ALL RIGHT.  THANK YOU.

09:11AM 20        I DON'T HAVE ANY FURTHER QUESTIONS.

09:11AM 21        MR. WADE.

09:12AM 22           MR. WADE:  ONE MOMENT, YOUR HONOR.

09:12AM 23   ///

09:12AM 24   ///

09:12AM 25   ///

ROSENDORFF DIRECT BY MR. WADE                                    10

| | | |
|---|---|---|
| 09:12AM | 1 | **DIRECT EXAMINATION** |
| 09:12AM | 2 | BY MR. WADE: |
| 09:12AM | 3 | Q.   GOOD MORNING, DR. ROSENDORFF. |
| 09:12AM | 4 | A.   GOOD MORNING. |
| 09:12AM | 5 | Q.   I UNDERSTAND THAT ON AUGUST 8TH OF THIS YEAR YOU HAD AN |
| 09:12AM | 6 | OCCASION TO GO TO PALO ALTO; IS THAT CORRECT? |
| 09:12AM | 7 | A.   CORRECT. |
| 09:12AM | 8 | Q.   AND WHAT PROMPTED YOU TO GO TO PALO ALTO? |
| 09:13AM | 9 | A.   IN THE WEEKS AND MONTHS FOLLOWING ELIZABETH HOLMES'S |
| 09:13AM | 10 | CONVICTION, I STARTED TO FEEL INCREASINGLY DISTRESSED AND |
| 09:13AM | 11 | UNCOMFORTABLE AT THE PROSPECT THAT HER YOUNG CHILD, HER INFANT |
| 09:13AM | 12 | CHILD WOULD SPEND THE FORMATIVE YEARS OF THEIR LIFE WITHOUT |
| 09:13AM | 13 | THEIR MOTHER PRESENT IN THEIR LIFE.  AND IT'S MY UNDERSTANDING |
| 09:13AM | 14 | THAT MS. HOLMES MAY BE PREGNANT AGAIN. |
| 09:13AM | 15 | Q.   AND THAT PROMPTED YOU TO GO TO PALO ALTO? |
| 09:13AM | 16 | A.   I ALSO WENT DOWN THERE TO VISIT MY OLD STOMPING GROUNDS. |
| 09:13AM | 17 | THE LAST WEEK I WAS AT THERANOS, I TRIED TO MAKE CONTACT WITH |
| 09:13AM | 18 | ELIZABETH TO DISCUSS MALFEASANCE AND WRONGDOING AT THE COMPANY |
| 09:13AM | 19 | IN THE WAKE OF ELIZABETH'S INTENTION TO TEST FOR EBOLA, AND SHE |
| 09:13AM | 20 | DID NOT RESPOND TO ME AT ALL.  I THOUGHT THAT BY TALKING TO |
| 09:13AM | 21 | HER, I MIGHT BE ABLE TO FORGIVE HER, NOT SO MUCH FOR HER BUT |
| 09:13AM | 22 | FOR MYSELF SO THAT I COULD FINALLY PUT THE SAGA BEHIND ME AND |
| 09:14AM | 23 | MOVE ON WITH MY LIFE. |
| 09:14AM | 24 | Q.   AND ON THIS DAY WHEN YOU WENT TO PALO ALTO, YOU |
| 09:14AM | 25 | SUBSEQUENTLY WENT TO THE WOODSIDE; IS THAT CORRECT? |

ROSENDORFF DIRECT BY MR. WADE                                    11

09:14AM   1    A.   CORRECT.

09:14AM   2    Q.   AND WERE YOU EMOTIONALLY STRUGGLING DURING THAT TIME?

09:14AM   3    A.   NOT THAT DAY, NO.

09:14AM   4    Q.   OKAY.  BUT YOU HAVE IN THE PAST WITH RESPECT TO THE

09:14AM   5    EVENTS?

09:14AM   6    A.   SIR, I THINK WE'VE ALL HAD OUR EMOTIONAL STRUGGLES.

09:14AM   7    Q.   TO BE SURE, YES.

09:14AM   8    A.   YES.

09:14AM   9    Q.   AND ON THAT DAY, YOU CALLED ME IN MY OFFICE.

09:14AM   10        DO YOU RECALL THAT?

09:14AM   11   A.   YES.

09:14AM   12   Q.   AND WHAT PROMPTED YOU TO CALL ME?

09:14AM   13   A.   I WANTED TO SEE IF I COULD MAKE CONTACT WITH YOU TO BROKER

09:14AM   14   A MEETING WITH MS. HOLMES.

09:14AM   15   Q.   OKAY.  AND HOW LONG HAD YOU BEEN IN PALO ALTO BEFORE YOU

09:14AM   16   DECIDED THAT YOU WOULD TRY TO REACH OUT TO MS. HOLMES?

09:14AM   17   A.   I ARRIVED IN PALO ALTO AT 2:00 O'CLOCK.  I THINK I WAS

09:14AM   18   THERE FOR MAYBE THREE OR FOUR HOURS.

09:14AM   19   Q.   OKAY.  AND WHEN YOU TRAVELLED TO PALO ALTO, WAS IT WITH

09:15AM   20   THE INTENTION TO TRY TO GO TO SEE MS. HOLMES?

09:15AM   21   A.   YES.

09:15AM   22   Q.   OKAY.  AND DO YOU RECALL WHAT YOU SAID IN YOUR VOICEMAIL

09:15AM   23   THAT YOU LEFT FOR ME?

09:15AM   24   A.   I BELIEVE THE GIST OF IT WAS THAT I WANTED TO SPEAK TO

09:15AM   25   MS. HOLMES.

ROSENDORFF DIRECT BY MR. WADE                                    12

09:15AM   1    Q.   DO YOU RECALL SAYING THAT YOU THOUGHT IT WOULD BE HEALING

09:15AM   2    FOR YOURSELF AND FOR MS. HOLMES?

09:15AM   3    A.   YES.

09:15AM   4    Q.   AND YOU BELIEVED THAT?

09:15AM   5    A.   YES.

09:15AM   6    Q.   OKAY.  AND THAT WAS THE GENESIS OF --

09:15AM   7    A.   I DON'T KNOW IF IT'S GOING TO BE HEALING FOR MS. HOLMES OR

09:15AM   8    NOT.  I DON'T HAVE INSIGHT INTO HER PSYCHE.

09:15AM   9    Q.   OKAY.  YOU THOUGHT IT WOULD BE HEALING FOR YOURSELF?

09:15AM  10    A.   YES.

09:15AM  11    Q.   AND I WAS -- I DID NOT RESPOND PROMPTLY.  I WAS NOT IN THE

09:15AM  12    OFFICE ON THAT MONDAY; CORRECT?

09:15AM  13    A.   I DON'T KNOW.  I DON'T KNOW.

09:15AM  14    Q.   AND YOU DECIDED TO GO UP TO MS. HOLMES'S RESIDENCE IN ANY

09:15AM  15    EVENT; IS THAT RIGHT?

09:15AM  16    A.   I -- SINCE I WAS IN PALO ALTO, I WAS LOOKING AT THE

09:15AM  17    PHYSICAL ENVIRONMENT AROUND THE OLD THERANOS BUILDING WHICH HAD

09:16AM  18    BEEN DEMOLISHED IN 2016, I BELIEVE, AND IT WAS UNRECOGNIZABLE.

09:16AM  19    EVERYTHING HAD BEEN REARRANGED.  THE STREET NAMES WERE THE

09:16AM  20    SAME, BUT THE NUMBERS WERE DIFFERENT, AND I WASN'T GETTING ANY

09:16AM  21    KIND OF SOLACE OR CLOSURE FROM THAT.  AND SINCE I WAS ALREADY

09:16AM  22    IN PALO ALTO, I THOUGHT WHY NOT GO UP THERE.  I HAD NOTHING TO

09:16AM  23    LOSE.

09:16AM  24    Q.   HOW WAS IT -- PLEASE, WITHOUT IDENTIFYING ANY SPECIFIC

09:16AM  25    GEOGRAPHIC INFORMATION, HOW WAS IT THAT YOU FOUND HER

ROSENDORFF DIRECT BY MR. WADE                                    13

09:16AM   1    RESIDENCE?

09:16AM   2    A.   WELL, HER GENERAL LOCATION IS PUBLIC KNOWLEDGE.  AND THEN

09:16AM   3    WHEN I WAS IN THE ESTATE, I ASKED A PASSERBY WHICH HOUSE

09:16AM   4    BELONGED TO ELIZABETH.

09:16AM   5    Q.   OKAY.  HAD YOU BEEN TO HER HOUSE BEFORE?

09:16AM   6    A.   NO, SIR.

09:16AM   7    Q.   OKAY.  HAD YOU BEEN IN THAT AREA BEFORE?

09:16AM   8    A.   CAN YOU BE MORE SPECIFIC.

09:16AM   9    Q.   HAD YOU BEEN IN THAT ESTATE?

09:16AM  10    A.   NO, I HAD NOT.

09:17AM  11    Q.   AND WHEN YOU WENT THERE, YOU KNOCKED ON THE DOOR; IS THAT

09:17AM  12    RIGHT?

09:17AM  13    A.   I RANG THE DOORBELL.

09:17AM  14    Q.   OKAY.  AND WHAT HAPPENED NEXT?

09:17AM  15    A.   MR. EVANS CAME OUT AND ASKED ME TO IDENTIFY MYSELF.  I

09:17AM  16    TOLD HIM WHO I WAS, AND HE ASKED ME TO LEAVE, AND I TURNED

09:17AM  17    AROUND AND GOT IN MY CAR AND PREPARED TO LEAVE.

09:17AM  18    Q.   OKAY.  AND DID YOU -- I BELIEVE YOU PUT IN YOUR

09:17AM  19    DECLARATION THAT YOU HAD A COUPLE OF LIMITED INTERACTIONS WITH

09:17AM  20    MR. EVANS DURING THAT PERIOD; IS THAT RIGHT?

09:17AM  21    A.   NO, NOT -- SO AFTER HE ASKED ME TO LEAVE, I WAS PULLING

09:17AM  22    OUT OF HIS DRIVEWAY TO LEAVE, AND HE APPROACHED ME AND GESTURED

09:17AM  23    FOR ME TO ROLL DOWN MY WINDOW, AND WE HAD ABOUT A TEN MINUTE

09:17AM  24    CONVERSATION.  IT COULD HAVE BEEN MORE OR LESS.

09:17AM  25    Q.   OKAY.  AND WHEN YOU APPROACHED THE DOOR INITIALLY BEFORE

ROSENDORFF DIRECT BY MR. WADE                                        14

09:17AM   1    YOU DEPARTED, YOU HAD YOUR, YOUR IPHONE IN YOUR HAND; IS THAT

09:17AM   2    RIGHT?

09:17AM   3    A.   YES.

09:17AM   4    Q.   AND WERE YOU RECORDING THE CONVERSATION?

09:17AM   5    A.   I DON'T RECALL.  I DON'T RECALL.

09:17AM   6    Q.   DO YOU HAVE YOUR IPHONE WITH YOU?

09:18AM   7    A.   YES.

09:18AM   8    Q.   WOULD YOU BE ABLE TO CHECK AND SEE IF YOU HAD A RECORDING

09:18AM   9    OF THE CONVERSATION?

09:18AM   10   A.   I DON'T THINK I'M REQUIRED TO DO THAT, SIR, IN TERMS OF

09:18AM   11   THE SUBPOENA THAT WAS QUASHED.

09:18AM   12   Q.   OKAY.

09:18AM   13          THE WITNESS:  IS THAT ACCURATE, YOUR HONOR?

09:18AM   14          THE COURT:  JUST LISTEN TO HIS QUESTIONS, AND YOU

09:18AM   15   CAN ANSWER HIS QUESTION.

09:18AM   16          THE WITNESS:  OKAY.

09:18AM   17   BY MR. WADE:

09:18AM   18   Q.   OKAY.  YOU DON'T RECALL WHETHER YOU WERE RECORDING THE

09:18AM   19   CONVERSATION OR NOT?

09:18AM   20   A.   I HAVE A PHOTOGRAPH OF MY FEET ON MY PHONE.

09:18AM   21   Q.   OKAY.  SO YOU MAYBE TOOK A VISUAL.

09:18AM   22        DO YOU KNOW WHETHER YOU TOOK ANY AUDIO RECORDING?

09:18AM   23   A.   I DON'T RECALL.

09:18AM   24   Q.   OKAY.  HAVE YOU -- DO YOU -- HAVE YOU EVER USED THE AUDIO

09:18AM   25   RECORDER ON YOUR PHONE?

ROSENDORFF DIRECT BY MR. WADE                                    15

09:18AM  1     A.   YES.  I THINK WE ALL HAVE.

09:18AM  2     Q.   BUT YOU HAVE?

09:18AM  3     A.   YES.

09:18AM  4     Q.   OKAY.  AND YOU DON'T RECALL WHETHER THERE WAS AN AUDIO

09:18AM  5     REGARDING OF THAT INTERACTION?

09:18AM  6     A.   NO.

09:18AM  7     Q.   OKAY.

09:18AM  8     A.   ARE YOU TALKING ABOUT THE FIRST INTERACTION OR THE SECOND

09:18AM  9     ONE?

09:18AM  10    Q.   EITHER INTERACTION.

09:19AM  11    A.   I DON'T RECALL FOR EITHER.

09:19AM  12    Q.   YOU DON'T RECALL WHETHER THERE WAS AN AUDIO REGARDING?

09:19AM  13    A.   NO.

09:19AM  14    Q.   OKAY.  DO YOU RECALL OBSERVING WHETHER MR. EVANS WAS

09:19AM  15    RECORDING THE CONVERSATION IN ANY WAY?

09:19AM  16    A.   HE HAD HIS PHONE IN HIS HAND AND HE PRESSED A BUTTON.  I

09:19AM  17    DON'T KNOW WHAT THE PURPOSE OF THAT WAS.

09:19AM  18    Q.   OKAY.  AND DO YOU KNOW -- YOU DON'T KNOW WHETHER HE WAS

09:19AM  19    RECORDING THAT CONVERSATION?

09:19AM  20    A.   NO.

09:19AM  21    Q.   OKAY.  AND DID YOU OBSERVE ANY SECURITY CAMERAS OR

09:19AM  22    ANYTHING THAT MIGHT HAVE BEEN RECORDING THE CONVERSATION?

09:19AM  23    A.   ON THE FRONT DOOR THERE WAS A -- SOME KIND OF CAMERA NEXT

09:19AM  24    TO THE DOORBELL.

09:19AM  25    Q.   OKAY.  AND DURING THE -- HOW LONG DO YOU RECALL YOUR

ROSENDORFF DIRECT BY MR. WADE                                    16

09:19AM   1    INTERACTION AT THE DOOR WAS WITH MR. EVANS APPROXIMATELY?

09:19AM   2    A.   20 SECONDS.

09:19AM   3    Q.   20 SECONDS.

09:19AM   4         AND THE GIST OF THAT WAS THAT HE ASKED YOU TO LEAVE?

09:19AM   5    A.   CORRECT.

09:19AM   6    Q.   AND YOU LEFT?

09:19AM   7    A.   CORRECT.

09:19AM   8    Q.   AND NO SUBSTANTIVE COMMUNICATIONS?

09:19AM   9    A.   NO.

09:19AM  10    Q.   OKAY.  AND THEN YOU WENT AND GOT INTO YOUR CAR; CORRECT?

09:20AM  11    A.   CORRECT.

09:20AM  12    Q.   AND STARTED TO DRIVE AWAY?

09:20AM  13    A.   CORRECT.

09:20AM  14    Q.   AND MR. EVANS CAME OUT; IS THAT RIGHT?

09:20AM  15    A.   CORRECT.

09:20AM  16    Q.   AND THAT WAS BECAUSE YOU WERE HEADING IN THE WRONG

09:20AM  17    DIRECTION AND HE WAS TRYING TO HELP YOU GET TURNED AROUND?

09:20AM  18    A.   NO, I DON'T BELIEVE THAT'S THE CASE, NO.

09:20AM  19    Q.   OKAY.

09:20AM  20    A.   I THINK I HAVE A PRETTY GOOD SENSE OF DIRECTION.

09:20AM  21    Q.   OKAY.  IN ANY EVENT, YOU ROLLED DOWN THE WINDOW; IS THAT

09:20AM  22    RIGHT?

09:20AM  23    A.   CORRECT.

09:20AM  24    Q.   AND YOU SAID YOU HAD ABOUT A TEN MINUTE CONVERSATION?

09:20AM  25    A.   CORRECT.

ROSENDORFF DIRECT BY MR. WADE                                    17

09:20AM  1    Q.   WHAT DO YOU RECALL ABOUT THAT CONVERSATION?

09:20AM  2    A.   UM, I WAS A LITTLE -- I WAS PRETTY NERVOUS.  MUCH OF IT

09:20AM  3    WAS A BLUR.

09:20AM  4         I REMEMBER SPEAKING TO MR. EVANS ABOUT THE FACT THAT WE

09:20AM  5    BOTH HAD YOUNG KIDS AND THE SADNESS THAT I FELT THAT HIS KID

09:20AM  6    WOULD GROW UP WITHOUT A MOM.

09:20AM  7         I EXPRESSED SYMPATHY FOR THE RANK AND FILE EMPLOYEES AT

09:21AM  8    THERANOS WHOSE CAREERS AND LIVES HAVE BEEN SO SEVERELY IMPACTED

09:21AM  9    BY THE SCANDAL.  I DID NOT INTEND TO INCLUDE MS. HOLMES AND

09:21AM 10    MR. BALWANI IN THAT STATEMENT.

09:21AM 11    Q.   OKAY.  IS THERE ANYTHING ELSE THAT YOU REMEMBER ABOUT THE

09:21AM 12    TEN MINUTE CONVERSATION?

09:21AM 13    A.   THERE WAS SOMETHING ABOUT ME ACKNOWLEDGING THAT MR. EVANS

09:21AM 14    HAD SOME HOTELS IN THE AREA, IN SAN DIEGO AREA.

09:21AM 15    Q.   YOU HAD ACTUALLY, YOU HAD DISCUSSED ABOUT THE FACT THAT HE

09:21AM 16    WAS GOING TO BE -- YOU WERE GOING TO BE VISITING SAN DIEGO FOR

09:21AM 17    A CONFERENCE OR SOMETHING?

09:21AM 18    A.   NOT A CONFERENCE, BUT I -- YES, I THINK SO.

09:21AM 19    Q.   AND YOU THOUGHT MAYBE YOU WERE STAYING AT ONE OF HIS

09:21AM 20    FAMILY'S HOTELS; IS THAT RIGHT?

09:21AM 21    A.   NO, NO.

09:21AM 22    Q.   OKAY.  IS THERE ANYTHING ELSE THAT YOU REMEMBER ABOUT THE

09:21AM 23    CONVERSATION?

09:21AM 24    A.   THAT'S ABOUT IT.

09:21AM 25    Q.   OKAY.  DO YOU RECALL TELLING HIM THAT YOU THOUGHT IF YOU

ROSENDORFF DIRECT BY MR. WADE                                    18

09:21AM  1    COULD COMMUNICATE WITH MS. HOLMES, THAT IT WOULD BE HEALING FOR

09:21AM  2    YOURSELF?

09:21AM  3    A.   YES, YES.

09:21AM  4    Q.   DO YOU RECALL TELLING HIM THAT YOU WERE STRUGGLING A BIT?

09:22AM  5    A.   I DON'T RECALL.

09:22AM  6    Q.   WERE YOU STRUGGLING A BIT?

09:22AM  7    A.   NO.  AS I'VE TESTIFIED, I WAS -- MY MENTAL STATE WAS SOLID

09:22AM  8    THAT DAY.

09:22AM  9    Q.   OKAY.  AND WE'VE, WE'VE TALKED A LITTLE BIT ABOUT HOW

09:22AM  10   WE'VE ALL HAD STRUGGLES AS A RESULT OF THIS; RIGHT?

09:22AM  11   A.   YES.

09:22AM  12   Q.   JUST A FEW MOMENTS AGO?

09:22AM  13   A.   YES.

09:22AM  14   Q.   AND YOU'VE HAD SOME STRUGGLES.  I BELIEVE YOU'VE TALKED

09:22AM  15   PUBLICALLY RECENTLY ABOUT HAVING A BREAKDOWN AND NEEDING TO BE

09:22AM  16   HOSPITALIZED?

09:22AM  17   A.   I'M NOT SURE WHAT YOU'RE REFERRING TO, AND THAT'S

09:22AM  18   PROTECTED HEALTH CARE INFORMATION.

09:22AM  19   Q.   OKAY.  DO YOU RECALL SPEAKING TO THE "SOUTH AFRICAN JEWISH

09:22AM  20   TIMES" ABOUT YOUR EXPERIENCE WITH THERANOS?

09:22AM  21   A.   YES.

09:22AM  22   Q.   AND DO YOU RECALL TALKING TO THEM ABOUT THE DIFFICULTIES

09:22AM  23   OF BEING A WHISTLEBLOWER?

09:22AM  24   A.   YES.

09:22AM  25   Q.   AND DO YOU RECALL TELLING THEM THAT YOU HAD HAD A

ROSENDORFF DIRECT BY MR. WADE                    19

09:22AM   1    BREAKDOWN?

09:23AM   2    A.   I DON'T RECALL.

09:23AM   3    Q.   DO YOU RECALL TELLING THEM THAT YOU NEEDED MEDICATION AND

09:23AM   4    HOSPITALIZATION?

09:23AM   5    A.   I DON'T RECALL.

09:23AM   6    Q.   AND THAT IT WAS JUST BEFORE TRIAL THAT YOU WERE ABLE TO

09:23AM   7    COME OFF THE MEDICATION?

09:23AM   8    A.   SIR, I'M FINDING THIS LINE OF QUESTIONING TO BE INVASIVE

09:23AM   9    AND INAPPROPRIATE.

09:23AM  10    Q.   AND IT WAS JUST BEFORE TRIAL THAT YOU WERE -- YOU CAME OFF

09:23AM  11    THE MEDICATION; IS THAT RIGHT?

09:23AM  12    A.   AGAIN --

09:23AM  13         MR. BOSTIC:   YOUR HONOR, THE GOVERNMENT WOULD OBJECT

09:23AM  14    TO THIS LINE OF QUESTIONING AS BEYOND THE SCOPE OF THE HEARING.

09:23AM  15         THE COURT:   SUSTAINED.

09:23AM  16         MR. WADE:   OKAY.

09:23AM  17         THE COURT:   THANK YOU, MR. WADE.

09:23AM  18    BY MR. WADE:

09:23AM  19    Q.   WHEN YOU WENT TO MS. HOLMES'S HOUSE THAT DAY, WERE YOU

09:23AM  20    TAKING ANY MEDICATION OR HAVING ANY --

09:23AM  21    A.   AGAIN, I'M NOT PREPARED TO DISCUSS MY MEDICAL HISTORY WITH

09:23AM  22    YOU.

09:24AM  23    Q.   LET ME TRY TO ASK A SLIGHTLY MORE PRECISE QUESTION.

09:24AM  24         WERE YOU TAKING ANY MEDICATION THAT MIGHT HAVE AFFECTED

09:24AM  25    YOUR MEMORY OR YOUR PERCEPTION OF WHAT HAPPENED?

ROSENDORFF DIRECT BY MR. WADE                    20

09:24AM   1      A.   NO, ABSOLUTELY NOT.

09:24AM   2      Q.   DID YOU TELL MR. EVANS THAT IT HAD BEEN ABOUT TEN YEARS

09:24AM   3   SINCE YOU TALKED TO MS. HOLMES?

09:24AM   4      A.   YES.

09:24AM   5      Q.   AND THAT YOU HAD PREVIOUSLY BEEN FRIENDS WITH HER?

09:24AM   6      A.   I DON'T RECALL.  I MEAN, I WOULDN'T DESCRIBE MY

09:24AM   7   RELATIONSHIP WITH MS. HOLMES AS A FRIENDSHIP.  SHE WAS SOMEBODY

09:24AM   8   THAT I REPORTED TO.

09:24AM   9      Q.   OKAY.  YOU DON'T BELIEVE THAT YOU TALKED TO HIM ABOUT

09:24AM  10   BEING FRIENDS?

09:24AM  11      A.   I DON'T RECALL.

09:24AM  12      Q.   OKAY.  DID YOU TALK WITH HIM ABOUT GOING TO HER BIRTHDAY

09:25AM  13   PARTY AND HALLOWEEN PARTIES AND VISITING WITH HER?

09:25AM  14      A.   I DON'T KNOW.  I DON'T RECALL, SIR.

09:25AM  15      Q.   YOU DON'T RECALL HAVING THAT CONVERSATION?

09:25AM  16      A.   NO.

09:25AM  17      Q.   OKAY.  DO YOU RECALL SAYING THAT ELIZABETH HAD BEEN KIND

09:25AM  18   TO YOU?

09:25AM  19      A.   I DON'T RECALL.

09:25AM  20      Q.   DO YOU RECALL TELLING MR. EVANS THAT WHEN YOU WERE CALLED

09:25AM  21   AS A WITNESS, THAT YOU TRIED TO ANSWER THE QUESTIONS HONESTLY

09:25AM  22   BUT THAT THE PROSECUTORS TRIED TO MAKE EVERYONE LOOK BAD?

09:25AM  23      A.   I THINK I DID SAY SOMETHING TO THAT EFFECT, BUT I CAN

09:25AM  24   EXPLAIN WHAT I MEAN, WHICH IS THAT --

09:25AM  25      Q.   LET ME -- IF I COULD START --

ROSENDORFF DIRECT BY MR. WADE                                    21

09:25AM   1        A.   -- THE PROSECUTION WASN'T TRYING TO --

09:25AM   2                  THE COURT:  SIR, LET HIM ASK.

09:25AM   3        BY MR. WADE:

09:25AM   4        Q.   IF I COULD JUST START WITH DO YOU RECALL SAYING SOMETHING

09:25AM   5        TO THAT EFFECT?

09:25AM   6        A.   SOMETHING TO THAT EFFECT.

09:25AM   7        Q.   OKAY.  AND WHY DON'T YOU TELL US WHAT YOU MEANT BY THAT

09:26AM   8        STATEMENT.

09:26AM   9        A.   THE PROSECUTION WAS TRYING TO PAINT AN ACCURATE PICTURE OF

09:26AM  10        ELIZABETH HOLMES.  TO THE EXTENT THAT OTHER PEOPLE LOOKED BAD,

09:26AM  11        IT WAS BECAUSE OF THEIR ASSOCIATION WITH ELIZABETH.

09:26AM  12        Q.   OKAY.  THE PART OF THAT STATEMENT, "THE PROSECUTORS TRIED

09:26AM  13        TO MAKE EVERYONE LOOK BAD," DO YOU BELIEVE THAT THERE WERE

09:26AM  14        TIMES THAT THE GOVERNMENT WERE TRYING TO MAKE THINGS SEEM WORSE

09:26AM  15        THAN THEY WERE?

09:26AM  16        A.   NOT AT ALL.

09:26AM  17        Q.   NOT AT ALL?

09:26AM  18        A.   NO.

09:26AM  19        Q.   AND JUST SO WE'RE CLEAR, YOU TOOK THE OATH HERE TODAY;

09:26AM  20        RIGHT?

09:26AM  21        A.   YES.

09:26AM  22        Q.   AND YOU'VE TAKEN THAT OATH MANY TIMES IN CONNECTION WITH

09:26AM  23        YOUR TESTIMONY?

09:26AM  24        A.   YES.

09:26AM  25        Q.   AND YOU HAVE EVERY INTENTION OF BEING TRUTHFUL TO THE BEST

ROSENDORFF DIRECT BY MR. WADE                                    22

09:26AM  1    OF YOUR RECOLLECTION; RIGHT?

09:26AM  2    A.   OF COURSE.

09:26AM  3    Q.   AND THE BEST OF YOUR ABILITY; RIGHT?

09:26AM  4    A.   OF COURSE.

09:26AM  5    Q.   BUT THERE ARE ONLY CERTAIN THINGS THAT ARE IN YOUR CONTROL

09:27AM  6    AS A WITNESS; RIGHT?

09:27AM  7    A.   RIGHT.

09:27AM  8    Q.   YOU DON'T FRAME THE QUESTIONS; RIGHT?

09:27AM  9    A.   RIGHT.

09:27AM  10   Q.   YOU DON'T CHOOSE THE EXHIBITS; RIGHT?

09:27AM  11   A.   THERE ARE NONE IN THIS TRIAL, IN THIS HEARING.

09:27AM  12   Q.   THERE MAY BE.  WE'LL SEE.

09:27AM  13        BUT WHEN YOU WERE TESTIFYING PREVIOUSLY, YOU DIDN'T CHOOSE

09:27AM  14   THE EXHIBITS --

09:27AM  15   A.   NO.

09:27AM  16   Q.   -- OR THE PORTION OF EXHIBITS THAT YOU WERE ASKED TO SPEAK

09:27AM  17   ABOUT; RIGHT?

09:27AM  18   A.   NO.

09:27AM  19   Q.   AND DO YOU RECALL DURING THE TRIAL THAT THERE WERE VERY

09:27AM  20   SELECTIVE PORTIONS OF THE EXHIBITS THAT THE GOVERNMENT WAS

09:27AM  21   USING IN YOUR TESTIMONY?

09:27AM  22   A.   I DON'T BELIEVE THEY WERE CHERRY PICKING OR BEING

09:27AM  23   SELECTIVE.

09:27AM  24        I THOUGHT THAT THEY WERE COMPREHENSIVE.

09:27AM  25   Q.   WELL, DO YOU RECALL TESTIFYING DURING THE TRIAL THAT THEY

UNITED STATES COURT REPORTERS

ROSENDORFF DIRECT BY MR. WADE                           23

09:27AM  1    WERE JUMPING ALL OVER THE PLACE IN THE DOCUMENTS?

09:27AM  2    A.   THAT WAS YOUR STATEMENT.

09:27AM  3    Q.   WHICH YOU AGREED WITH.  DO YOU RECALL THAT?

09:27AM  4    A.   I DON'T RECALL.

09:27AM  5    Q.   YOU DON'T REMEMBER THAT?

09:27AM  6    A.   NO.

09:27AM  7    Q.   OKAY.  DO YOU RECALL THERE WERE TIMES WHERE THE GOVERNMENT

09:28AM  8    ELICITED TESTIMONY THAT YOU CONCEDE ON CROSS-EXAMINATION WAS

09:28AM  9    NOT ACCURATE?

09:28AM 10    A.   I DON'T RECALL.

09:28AM 11    Q.   YOU DON'T RECALL THAT.  OKAY.

09:28AM 12    A.   I CAN GO FURTHER IF YOU WOULD LIKE.

09:28AM 13    Q.   SURE.

09:28AM 14    A.   SO TO THE EXTENT THAT YOU TRIED TO MAKE ME OUT TO BE A

09:28AM 15    LIAR OR INCONSISTENT, MY STATEMENTS HAVE ALWAYS BEEN GEARED

09:28AM 16    TOWARDS THE TRUTH AND REFLECTIVE OF THE TRUTH, AND I'M ALLOWED

09:28AM 17    TO EXPAND AND FURTHER ADD FLESH TO THE BONES OF THE TRUTH, AND

09:28AM 18    THAT DOESN'T MEAN THAT I'M CHANGING MY TESTIMONY OR FLIP

09:28AM 19    FLOPPING AT ALL.

09:28AM 20    Q.   OKAY.  I WASN'T SUGGESTING THAT YOU WERE FLIP FLOPPING.

09:28AM 21         YOU WERE TRYING TO TELL THE TRUTH AS BEST YOU COULD;

09:28AM 22    RIGHT?

09:28AM 23    A.   CORRECT.

09:28AM 24    Q.   BUT SOMETIMES YOU WEREN'T GIVEN THE OPPORTUNITY TO TELL

09:28AM 25    THE FULL STORY WITH RESPECT TO A PARTICULAR EVENT AT THERANOS

ROSENDORFF DIRECT BY MR. WADE                                    24

09:29AM   1     DURING YOUR DIRECT EXAMINATION; RIGHT?

09:29AM   2     A.   CORRECT.

09:29AM   3     Q.   AND WITH RESPECT TO SOME OF THAT TESTIMONY, THERE WAS ONLY

09:29AM   4     A LIMITED AMOUNT OF INFORMATION THAT CAME OUT DURING THE DIRECT

09:29AM   5     EXAMINATION?

09:29AM   6     A.   CORRECT.

09:29AM   7     Q.   AND SOME OF THAT WAS INFORMATION THAT WAS FOCUSSED ON A

09:29AM   8     PARTICULAR NEGATIVE INCIDENT; CORRECT?

09:29AM   9     A.   WHICH INCIDENT ARE YOU REFERRING TO?

09:29AM   10    Q.   WELL, THE GOVERNMENT FOR THE MOST PART WAS, I BELIEVE YOU

09:29AM   11    SAID, TRYING TO MAKE MS. HOLMES LOOK BAD; RIGHT?

09:29AM   12    A.   THE GOVERNMENT WAS TRYING TO GET AT THE TRUTH OF WHAT

09:29AM   13    HAPPENED AND WHAT MS. HOLMES DID, PERIOD.

09:29AM   14    Q.   RIGHT.  RIGHT.

09:29AM   15         BUT SOME OF THE PARTICULAR INCIDENT THAT YOU WERE ASKED

09:29AM   16    ABOUT DURING YOUR TRIAL TESTIMONY WAS FOCUSSED ON NEGATIVE

09:29AM   17    INCIDENTS AS OPPOSED TO POSITIVE INCIDENTS; IS THAT FAIR?

09:29AM   18            MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OBJECTS TO

09:29AM   19    THIS AS VAGUE AND THE KIND OF RECROSS THAT THE COURT CAUTIONED

09:29AM   20    AGAINST IN SETTING THIS HEARING.

09:29AM   21            THE COURT:  MR. WADE, ARE YOU TAKING US DOWN A ROAD

09:30AM   22    OF CRIMINAL PROCEDURE AND WHAT PROSECUTION DOES VIS-À-VIS

09:30AM   23    DEFENSE?

09:30AM   24         I THINK WE ALL KNOW THAT PROSECUTION TYPICALLY WILL PUT ON

09:30AM   25    EVIDENCE THAT IS CONTRARY TO A DEFENDANT'S INTEREST, AND THE

UNITED STATES COURT REPORTERS

**ER-1217**

ROSENDORFF DIRECT BY MR. WADE                          25

09:30AM 1    DEFENSE WILL RESPOND WITH OTHER EVIDENCE THAT IS IN THE DEFENSE

09:30AM 2    FAVOR.

09:30AM 3         IS THAT WHERE YOU'RE GOING HERE?

09:30AM 4              MR. WADE:  NO, YOUR HONOR, THAT'S NOT WHERE I WAS

09:30AM 5    GOING.

09:30AM 6         WHERE I WAS GOING IS TRYING TO EXPLORE THE CONTEXT OF THE

09:30AM 7    STATEMENT THAT DR. ROSENDORFF MADE AND THEN HAS EXPLAINED.

09:30AM 8              THE COURT:  THE STATEMENT AT THE RESIDENCE?

09:30AM 9              MR. WADE:  YES.

09:30AM 10             THE COURT:  YES.  WHY DON'T WE CONTINUE WITH THAT.

09:30AM 11   SURE.  GO AHEAD.

09:30AM 12   BY MR. WADE:

09:30AM 13   Q.   DO YOU RECALL TELLING MR. EVANS THAT THE GOVERNMENT MADE

09:30AM 14   THINGS SOUND WORSE THAN THEY WERE WHEN YOU WERE UP ON THE STAND

09:30AM 15   DURING YOUR TESTIMONY?

09:30AM 16   A.   I DON'T RECALL.

09:30AM 17   Q.   OKAY.  YOU DON'T DENY SAYING THAT TO MR. EVANS?

09:30AM 18   A.   NO, I DON'T DENY.  I NEITHER DENY NOR AFFIRM.

09:31AM 19   Q.   AND ISN'T IT TRUE THAT AT TIMES THE GOVERNMENT DID MAKE

09:31AM 20   THINGS SOUND WORSE THAN THEY WERE WHEN YOU WERE ON THE WITNESS

09:31AM 21   STAND DURING THE TESTIMONY?

09:31AM 22   A.   MY UNDERSTANDING IS THAT THE GOVERNMENT'S JOB IS TO SECURE

09:31AM 23   A CONVICTION BECAUSE THERE'S SUFFICIENT EVIDENCE TO SUPPORT

09:31AM 24   ONE.  THAT'S THEIR JOB.  IT'S SIMPLE.

09:31AM 25   Q.   I UNDERSTAND YOUR VIEW OF THEIR JOB.

ROSENDORFF DIRECT BY MR. WADE                                    26

09:31AM    1          BUT, AGAIN, DR. ROSENDORFF, I'M JUST ASKING ABOUT THIS

09:31AM    2    STATEMENT AND THE FACT THAT YOU DO BELIEVE THAT AT TIMES THE

09:31AM    3    GOVERNMENT MADE THINGS SOUND WORSE THAN THEY WERE WHEN YOU WERE

09:31AM    4    TESTIFYING?

09:31AM    5    A.   NO, I DON'T BELIEVE THAT AT ALL, NO.

09:31AM    6    Q.   YOU DON'T BELIEVE THAT?

09:31AM    7    A.   NO, NO.

09:31AM    8    Q.   OKAY.  BUT YOU DON'T DENY SAYING THAT TO MR. EVANS?

09:31AM    9    A.   I DON'T RECALL.

09:31AM   10    Q.   OKAY.  HAVE YOU SAID ANYTHING LIKE THAT TO ANYONE ELSE IN

09:31AM   11    WRITING OR ORALLY?

09:31AM   12    A.   NO.  I DON'T DISCUSS THE DETAILS OF MY TESTIMONY WITH

09:32AM   13    FRIENDS AND FAMILY.

09:32AM   14    Q.   DID YOU HAVE IN THIS TIME PERIOD ANY ANGER AT THE

09:32AM   15    GOVERNMENT WITH RESPONSE TO ANYTHING THAT WAS MOTIVATING THAT

09:32AM   16    COMMENT PERHAPS?

09:32AM   17    A.   I WASN'T ANGRY AT THE GOVERNMENT.  IT WAS OBVIOUSLY

09:32AM   18    PAINFUL AND INCONVENIENT TO ME TO HAVE TO FLY AND TRAVEL TO

09:32AM   19    TESTIFY, BUT I WAS JUST DOING MY CIVIC DUTY.

09:32AM   20    Q.   OKAY.  THERE HAD BEEN A MESSAGE THAT YOU HAD LEFT FOR

09:32AM   21    MR. BOSTIC THAT WENT UNRETURNED.

09:32AM   22          WERE YOU UPSET ABOUT THAT?

09:32AM   23    A.   THE FACT THAT MR. BOSTIC DID NOT RETURN THE MESSAGE?

09:32AM   24    Q.   YES.

09:32AM   25    A.   NO, NOT AT ALL.

ROSENDORFF DIRECT BY MR. WADE                                27

09:32AM   1    Q.   OKAY.  WAS THERE ANYTHING ELSE ABOUT YOUR INTERACTIONS OR

09:32AM   2    YOUR JOB STATUS THAT CAUSED YOU TO BE UPSET AT THE GOVERNMENT

09:32AM   3    IN AUGUST OF 2022?

09:32AM   4    A.   NO.

09:32AM   5    Q.   DO YOU RECALL TELLING MR. EVANS THAT YOU FELT THAT YOU HAD

09:33AM   6    DONE SOMETHING WRONG?

09:33AM   7    A.   NO, I DO NOT RECALL.

09:33AM   8    Q.   OKAY.  DO YOU DENY SAYING THAT, SIR?

09:33AM   9    A.   NO, I DON'T DENY IT.

09:33AM   10   Q.   DO YOU RECALL TELLING MR. EVANS THAT THIS -- THINGS HAVE

09:33AM   11   BEEN WEIGHING ON YOU PERSONALLY?

09:33AM   12   A.   YES.

09:33AM   13   Q.   YOU DID TELL HIM THAT?

09:33AM   14   A.   YES.

09:33AM   15   Q.   AND THAT YOU WERE HAVING TROUBLE SLEEPING?

09:33AM   16   A.   I DON'T RECALL.

09:33AM   17   Q.   WHAT WAS WEIGHING ON YOU, SIR?

09:33AM   18   A.   SIR, AS I MENTIONED IN THE BEGINNING OF MY TESTIMONY, THAT

09:33AM   19   ELIZABETH'S CHILDREN WOULD GROW UP WITHOUT A MOTHER TO RAISE

09:33AM   20   THEM.

09:33AM   21   Q.   OKAY.  ANYTHING ELSE THAT WAS WEIGHING ON YOU, SIR?

09:33AM   22   A.   WELL, OF COURSE.  I HAVE MY OWN FIVE-YEAR-OLD CHILD.

09:33AM   23   Q.   ANYTHING ELSE THAT WAS WEIGHING ON YOU THAT DAY, SIR?

09:33AM   24   A.   NO.

09:33AM   25   Q.   DO YOU RECALL TELLING THEM THAT YOU WANTED TO HELP HER?

ROSENDORFF DIRECT BY MR. WADE                                    28

09:34AM 1      A.   I DON'T RECALL.

09:34AM 2      Q.   DO YOU DENY SAYING THAT?

09:34AM 3      A.   NO COMMENT.  NO COMMENT.

09:34AM 4      Q.   I THINK --

09:34AM 5           THE COURT:  CAN YOU ANSWER HIS QUESTION?  DO YOU

09:34AM 6      WANT HIM TO REPEAT IT?

09:34AM 7           THE WITNESS:  I DON'T WANT TO HELP MS. HOLMES.

09:34AM 8      SHE'S NOT SOMEBODY WHO SHOULD BE HELPED.  THE ONLY PERSON THAT

09:34AM 9      COULD HELP HER IS HERSELF.

09:34AM 10          AT THIS POINT SHE NEEDS TO PAY HER DEBT TO SOCIETY.

09:34AM 11     BY MR. WADE:

09:34AM 12     Q.   OKAY.  SO DO YOU DENY THAT YOU SAID THAT YOU WANTED TO

09:34AM 13     HELP HER?

09:34AM 14     A.   I DON'T RECALL.

09:34AM 15     Q.   OKAY.

09:34AM 16     A.   YOU UNDERSTAND I WAS NERVOUS SO I DON'T HAVE A CLEAR

09:34AM 17     RECOLLECTION OF ALL OF THESE STATEMENTS.

09:34AM 18     Q.   OKAY.  AND DO YOU RECALL TELLING MR. EVANS THAT WHEN YOU

09:34AM 19     WERE AT THERANOS, IT WAS EARLY IN YOUR CAREER AND THAT YOU HAD

09:35AM 20     JUST FINISHED YOUR RESIDENCY?

09:35AM 21     A.   YES.  YES.

09:35AM 22     Q.   AND WHY DID YOU MENTION THAT?

09:35AM 23     A.   I WAS RECRUITED TO THERANOS PRETTY AGGRESSIVELY BY

09:35AM 24     MONA RAMAMURTHY AND OTHER RECRUITERS, AND BY SUNNY AND

09:35AM 25     ELIZABETH THEMSELVES, AND I LEFT A CAREER AT THE UNIVERSITY OF

09:35AM  1    PITTSBURGH IN ACADEMIA.

09:35AM  2         MY BROTHER AND FATHER ARE VERY SUCCESSFUL ACADEMICS.  MY

09:35AM  3    FATHER IS RETIRED NOW, AND HE HAD A VERY DISTINGUISHED CAREER.

09:35AM  4         AND IT WAS WITH GREAT DIFFICULTY THAT I DECIDED TO LEAVE A

09:35AM  5    CAREER IN ACADEMIA AND COME TO SILICON VALLEY.  AND I WAS

09:35AM  6    EXTREMELY HOPEFUL AT THAT TIME THAT THERANOS WOULD BE ABLE TO

09:35AM  7    TRANSFORM HEALTH CARE.

09:35AM  8    Q.   AND DO YOU RECALL TELLING MR. EVANS THAT EVERYONE AT THE

09:35AM  9    COMPANY WAS WORKING SO HARD TO DO SOMETHING GOOD AND

09:35AM  10   MEANINGFUL, OR SOMETHING TO THAT EFFECT?

09:35AM  11   A.   SOMETHING LIKE THAT.

09:35AM  12   Q.   AND YOU DO RECALL SAYING THAT?

09:35AM  13   A.   YES.  AGAIN, I WASN'T REFERENCING ELIZABETH OR SUNNY IN

09:36AM  14   THAT STATEMENT.

09:36AM  15   Q.   OKAY.  I WAS.

09:36AM  16        AND YOU SAID THAT EVERYONE WAS JUST DOING THE BEST THAT

09:36AM  17   THEY COULD?

09:36AM  18   A.   CORRECT.

09:36AM  19   Q.   OKAY.  AND YOU TALKED ABOUT BEING WITH ELIZABETH AND

09:36AM  20   TALKING WITH HER AT HER 30TH BIRTHDAY PARTY, THE COMPANY

09:36AM  21   HOLIDAY PARTIES, AND THE HALLOWEEN PARTY?

09:36AM  22   A.   SIR, IF I MAY, I THINK YOU'RE TRYING TO PAINT A MORE

09:36AM  23   INTIMATE PICTURE OF MY RELATIONSHIP WITH ELIZABETH THAN WHAT

09:36AM  24   REALLY EXISTED AT THE TIME.

09:36AM  25   Q.   I'M JUST ASKING YOU WHETHER YOU SAID THAT TO MR. EVANS?

ROSENDORFF DIRECT BY MR. WADE                           30

09:36AM 1      A.   I DON'T RECALL.

09:36AM 2      Q.   OKAY.  AND YOU DON'T BELIEVE THAT YOU TOLD MR. EVANS THAT

09:36AM 3      YOU WERE FRIENDS WITH ELIZABETH?

09:36AM 4      A.   I DON'T KNOW.

09:36AM 5      Q.   YOU DON'T DENY IT?

09:36AM 6      A.   I DON'T DENY IT, AND I DON'T AFFIRM IT.

09:36AM 7      Q.   OKAY.  DO YOU RECALL SAYING THAT EVERYONE HAD MADE SO MUCH

09:36AM 8      MONEY OFF OF HER AND THIS STORY THEY CREATED, BUT SHE DIDN'T

09:37AM 9      MAKE ANY MONEY?

09:37AM 10     A.   MANY PEOPLE HAVE MADE A LOT OF MONEY FROM THE SCANDAL.  I

09:37AM 11     DON'T KNOW HOW MUCH ELIZABETH HAS MADE.  I CERTAINLY HAVEN'T

09:37AM 12     MADE A PENNY.

09:37AM 13     Q.   BUT DO YOU RECALL TELLING HIM THAT NEITHER YOU NOR ANYONE

09:37AM 14     ELSE WHO WAS WORKING AT THE COMPANY HAD MADE MONEY OFF OF THEM?

09:37AM 15     A.   I'M SORRY, SAY AGAIN.

09:37AM 16     Q.   DO YOU RECALL TELLING MR. EVANS THAT THE PEOPLE WHO HAD

09:37AM 17     ACTUALLY WORKED AT THERANOS, INCLUDING MS. HOLMES, HADN'T MADE

09:37AM 18     ANY MONEY OFF OF?

09:37AM 19     A.   I DON'T RECALL THAT STATEMENT AT ALL.  I DON'T KNOW WHO

09:37AM 20     MADE HOW MUCH MONEY AND WHEN.

09:37AM 21     Q.   DO YOU RECALL TELLING MR. EVANS THAT ELIZABETH WAS KIND TO

09:37AM 22     YOU?

09:37AM 23     A.   I DON'T RECALL.  I WILL SAY THAT THE ISSUE HERE IS PATIENT

09:38AM 24     CARE AND THE HIPPOCRATIC OATH.  IT'S NOT AN ISSUE OF MONEY.

09:38AM 25     Q.   DO YOU RECALL REFERENCING THE AMERICAN WAY OF TAKING

09:38AM 1   PEOPLE DOWN?

09:38AM 2   A.   I DON'T RECALL.

09:38AM 3   Q.   DO YOU RECALL REFERENCING HOW THAT'S WHAT THEY HAD DONE TO

09:38AM 4   MICHAEL JACKSON?

09:38AM 5   A.   I DON'T RECALL.

09:38AM 6   Q.   HAVING GONE THROUGH SOME OF THESE STATEMENTS, IS THERE

09:38AM 7   ANYTHING ELSE THAT YOU RECALL ABOUT -- HAS THIS REFRESHED YOUR

09:39AM 8   RECOLLECTION ABOUT ANYTHING IN ANY WAY ABOUT YOUR CONVERSATIONS

09:39AM 9   WITH MR. EVANS?

09:39AM 10  A.   AFTER I FINISHED TALKING TO HIM, I DROVE HOME, STRAIGHT

09:39AM 11  HOME TO WALNUT CREEK.  I DID NOT SEEK CONTACT WITH EITHER

09:39AM 12  MS. HOLMES OR MR. BALWANI SINCE.

09:39AM 13  Q.   AND HOW FAR IS IT FROM WOODSIDE TO WALNUT CREEK?

09:39AM 14  A.   AN HOUR.

09:39AM 15  Q.   ABOUT AN HOUR.

09:39AM 16       AND THE NEXT DAY I RESPONDED TO YOUR MESSAGE BY CONTACTING

09:39AM 17  YOUR LAWYER.  HAVE YOU COME TO LEARN THAT?

09:39AM 18  A.   YES.

09:39AM 19  Q.   AND YOU UNDERSTAND THAT I WAS ETHICALLY OBLIGATED TO

09:39AM 20  CONTACT YOUR LAWYER AND NOT CONTACT YOU PERSONALLY?

09:39AM 21  A.   YES.

09:39AM 22  Q.   YEAH.  I MEANT NO OFFENSE BY NOT RESPONDING TO YOU

09:39AM 23  DIRECTLY.

09:39AM 24  A.   OF COURSE.

09:39AM 25  Q.   OKAY.  BUT BY THAT POINT YOU DIDN'T HAVE ANY FURTHER

ROSENDORFF DIRECT BY MR. WADE                                    32

| | | |
|---|---|---|
| 09:39AM | 1 | INTEREST IN TALKING WITH ME? |
| 09:39AM | 2 | A.  NO. |
| 09:39AM | 3 | Q.  LATER THAT SAME DAY YOU CONTACTED THE GOVERNMENT ABOUT |
| 09:40AM | 4 | REIMBURSEMENT OF EXPENSES THAT WERE OUTSTANDING FOR FOUR |
| 09:40AM | 5 | MONTHS. |
| 09:40AM | 6 | DO YOU RECALL THAT? |
| 09:40AM | 7 | A.  I BELIEVE SO. |
| 09:40AM | 8 | Q.  WAS THERE SOMETHING ABOUT MY INTERACTION THAT PROMPTED YOU |
| 09:40AM | 9 | TO CONTACT THE GOVERNMENT THAT DAY? |
| 09:40AM | 10 | A.  NO. |
| 09:40AM | 11 | Q.  OKAY. |
| 09:40AM | 12 | A.  I CONTACTED THE WITNESS COORDINATOR, I BELIEVE. |
| 09:40AM | 13 | Q.  I'M SORRY? |
| 09:40AM | 14 | A.  I CONTACTED THE WITNESS COORDINATOR, COORDINATOR. |
| 09:40AM | 15 | Q.  WHY WAS IT THAT YOU DIDN'T WANT TO SPEAK TO ME ANYMORE |
| 09:40AM | 16 | AFTER THAT INTERACTION? |
| 09:40AM | 17 | IN OTHER WORDS, WHY -- YOU LEFT THE MESSAGE TO TRY TO |
| 09:40AM | 18 | ARRANGE FOR A MEETING, BUT THEN THE NEXT DAY IT WASN'T -- YOU |
| 09:40AM | 19 | DECIDED NOT TO GO FURTHER.  WHY WAS THAT? |
| 09:40AM | 20 | A.  NOTHING MORE WOULD HAVE BEEN ACHIEVED.  IT WAS CLEAR FROM |
| 09:40AM | 21 | MR. EVANS'S INTERACTION, AND PARTICULARLY THE COUNSEL OF MY |
| 09:41AM | 22 | LAWYER, THAT NOTHING COULD BE ACHIEVED FROM SUCH A |
| 09:41AM | 23 | CONVERSATION. |
| 09:41AM | 24 | Q.  OKAY.  DID YOU UNDERSTAND THAT ACTUALLY THERE COULD BE |
| 09:41AM | 25 | SOME RISKS TO YOU? |

ROSENDORFF DIRECT BY MR. WADE                              33

09:41AM  1    A.   YES.

09:41AM  2    Q.   AND THAT BASED ON SOME OF YOUR STATEMENTS, DEPENDING UPON

09:41AM  3    HOW THEY CAME OUT, THAT THAT COULD CREATE SOME LEGAL RISK FOR

09:41AM  4    YOU?

09:41AM  5    A.   YES.

09:41AM  6    Q.   DO YOU KNOW -- DID YOU, AFTER YOU VISITED MR. EVANS, DID

09:41AM  7    YOU MAKE ANY CONTACT WITH THE GOVERNMENT DIRECTLY OR THROUGH

09:41AM  8    COUNSEL?

09:41AM  9    A.   I DON'T BELIEVE SO, NO.

09:41AM  10        WELL, I MEAN, MY COUNSEL WROTE A MOTION.  I MEAN, I DON'T

09:41AM  11   KNOW WHAT YOU MEAN.  I'M CONFUSED.

09:42AM  12   Q.   OKAY.  LET ME BREAK IT DOWN A LITTLE BIT.

09:42AM  13        YOU UNDERSTAND THAT AT SOME POINT MS. HOLMES FILED A

09:42AM  14   MOTION RELATING TO YOUR VISIT?

09:42AM  15   A.   SHE FILED MULTIPLE MOTIONS.

09:42AM  16   Q.   RIGHT.  YOU UNDERSTAND THAT ONE RELATED TO YOUR VISIT TO

09:42AM  17   HER HOUSE THAT DAY?

09:42AM  18   A.   YES, YES.

09:42AM  19   Q.   AND IN BETWEEN THE VISIT TO MS. HOLMES'S HOME AND THE

09:42AM  20   FILING OF THAT MOTION, DO YOU KNOW WHETHER THERE WAS ANY

09:42AM  21   INTERACTION WITH THE GOVERNMENT ABOUT YOUR VISIT?

09:42AM  22        MR. BOSTIC:  YOUR HONOR, I WOULD OBJECT TO THAT AS

09:42AM  23   CALLING FOR PRIVILEGED COMMUNICATIONS, ALSO BEYOND THE SCOPE OF

09:42AM  24   THIS HEARING.

09:42AM  25        THE COURT:  SUSTAINED.

ROSENDORFF DIRECT BY MR. WADE                                          34

09:42AM   1    BY MR. WADE:

09:42AM   2    Q.   DID YOU TALK WITH ANYONE OTHER THAN YOUR COUNSEL ABOUT THE

09:42AM   3    MOTION THAT WAS FILED?

09:42AM   4              MR. BOSTIC:   YOUR HONOR, SAME OBJECTION AS BEYOND

09:42AM   5    THE SCOPE.

09:42AM   6              THE COURT:   CAN YOU BE MORE SPECIFIC.

09:42AM   7    BY MR. WADE:

09:42AM   8    Q.   YOU UNDERSTOOD THAT THE MOTION RELATED TO STATEMENTS THAT

09:42AM   9    MR. EVANS RECALLED YOU MAKING THE DAY OF YOUR VISIT?

09:43AM  10    A.   YES.

09:43AM  11    Q.   AND DID YOU UNDERSTAND THAT MR. EVANS DOCUMENTED THOSE

09:43AM  12    STATEMENTS THAT NIGHT --

09:43AM  13    A.   YES.

09:43AM  14    Q.   -- AND SENT THEM TO US?

09:43AM  15    A.   YES.

09:43AM  16    Q.   AND THAT THERE WERE GOING TO BE PERHAPS QUESTIONS RAISED

09:43AM  17    ABOUT THE STATEMENTS THAT WERE MADE BY YOU TO MR. EVANS?

09:43AM  18              THE WITNESS:   YOUR HONOR, AT THIS TIME I WOULD LIKE

09:43AM  19    TO CONFER WITH MY COUNSEL.

09:43AM  20              THE COURT:   ALL RIGHT.   YOU CAN DO THAT.

09:43AM  21        (CONVERSATION WITH THE WITNESS AND HIS COUNSEL OFF THE

09:43AM  22    RECORD.)

09:44AM  23              THE COURT:   ALL RIGHT.   THANK YOU.

09:44AM  24        DR. ROSENDORFF, YOU HAVE RETURNED TO THE STAND.

09:44AM  25        HAVE YOU HAD AN OPPORTUNITY TO SPEAK WITH YOUR COUNSEL?

ROSENDORFF DIRECT BY MR. WADE                                        35

09:44AM  1              THE WITNESS:  YES.

09:44AM  2              THE COURT:  ALL RIGHT.  THANK YOU.

09:45AM  3         YOU CAN ASK YOUR NEXT QUESTION.

09:45AM  4              MR. WADE:  I APOLOGIZE.

09:45AM  5         THERE WAS A QUESTION PENDING, I THINK.  COULD WE READ THAT

09:45AM  6    BACK?

09:45AM  7              THE COURT:  MADAM REPORTER, COULD YOU READ THE LAST

09:45AM  8    QUESTION OF MR. WADE.

09:45AM  9         (RECORD READ BY COURT REPORTER.)

09:45AM 10              THE WITNESS:  I RECALL YOUR QUESTIONS ABOUT WHETHER

09:45AM 11    I HAD SPOKEN TO ANYBODY ABOUT MY INTERACTIONS WITH MR. EVANS OR

09:45AM 12    ABOUT THE MOTION THAT HE FILED; IS THAT CORRECT?

09:45AM 13    BY MR. WADE:

09:45AM 14    Q.   I DID ASK A QUESTION ABOUT THAT.  I WAS LAYING SOME

09:45AM 15    FOUNDATION.

09:45AM 16         DID YOU SPEAK WITH ANYONE?

09:45AM 17    A.   I DID.  I SPEAK TO MY THERAPIST, THAT'S PRIVILEGED; MY

09:45AM 18    BROTHER, HE'S BEEN A MENTOR TO ME.

09:45AM 19    Q.   OKAY.

09:45AM 20    A.   MY GIRLFRIEND.

09:45AM 21    Q.   OKAY.  DID YOU EXPRESS -- DID YOU READ THE STATEMENT AS

09:45AM 22    OUTLINED BY MR. EVANS IN THE MOTION?  DID YOU GET A COPY OF THE

09:46AM 23    MOTION?

09:46AM 24    A.   YES, MY COUNSEL SENT IT TO ME.

09:46AM 25    Q.   OKAY.  AND SO -- DID YOU GET IT SHORTLY AFTER IT WAS

ROSENDORFF DIRECT BY MR. WADE                                    36

09:46AM  1    FILED?

09:46AM  2    A.   YES.

09:46AM  3    Q.   OKAY.

09:46AM  4    A.   THE NEXT MORNING, I BELIEVE.

09:46AM  5    Q.   OKAY.  AND IN BETWEEN THE TIME THAT YOU GOT IT AND NOW,

09:46AM  6    DID YOU EVER DENY MAKING THOSE STATEMENTS?

09:46AM  7    A.   WHICH STATEMENTS?

09:46AM  8    Q.   THE STATEMENT THAT MR. EVANS RECOUNTED, DID YOU EVER

09:46AM  9    INDICATE TO ANYONE THAT YOU DID NOT --

09:46AM 10    A.   I DIDN'T DISCUSS MR. EVANS'S STATEMENTS WITH ANYBODY ELSE

09:46AM 11    BESIDES MY GIRLFRIEND, MY THERAPIST, AND MY COUNSEL.

09:46AM 12    Q.   OKAY.

09:46AM 13    A.   AND MY BROTHER, OF COURSE.

09:46AM 14    Q.   YOU UNDERSTAND THAT THE GOVERNMENT FILED AN OPPOSITION TO

09:47AM 15    OUR MOTION RELATING TO A NEW TRIAL?

09:47AM 16    A.   YES, YES.

09:47AM 17    Q.   OKAY.  AND BY THAT I MEAN AN OPPOSITION TO THE MOTION THAT

09:47AM 18    RELATED TO YOUR, YOUR VISIT TO HER HOME?

09:47AM 19    A.   YES.

09:47AM 20    Q.   OKAY.  AND AT SOME POINT DID THE GOVERNMENT SEEK YOUR

09:47AM 21    ASSISTANCE IN CONNECTION WITH THAT OPPOSITION?

09:47AM 22    A.   NO.

09:47AM 23    Q.   WELL, YOU RECALL THAT --

09:47AM 24    A.   THEY MAY HAVE SPOKEN TO MY COUNSEL.  I DON'T KNOW.

09:47AM 25    Q.   OKAY.  YOU DIDN'T, YOU DIDN'T COMMUNICATE WITH THE

UNITED STATES COURT REPORTERS

ROSENDORFF DIRECT BY MR. WADE                                    37

09:47AM   1    GOVERNMENT?

09:47AM   2    A.   NO.

09:47AM   3    Q.   OKAY.  HAVE YOU EVER COMMUNICATED WITH THE GOVERNMENT

09:47AM   4    ABOUT THIS DIRECTLY?

09:47AM   5    A.   NO, I HAVE NOT.

09:47AM   6    Q.   AND ONLY THROUGH COUNSEL?

09:47AM   7    A.   CORRECT.

09:47AM   8    Q.   OKAY.  AND AT SOME POINT DID YOU COME TO LEARN THAT THE

09:47AM   9    GOVERNMENT WAS SEEKING YOUR ASSISTANCE IN OPPOSING THE MOTION?

09:47AM  10         MR. BOSTIC:  I OBJECT TO THAT AS VAGUE AND CALLING

09:47AM  11    FOR PRIVILEGED COMMUNICATIONS, YOUR HONOR.

09:47AM  12         MR. WADE:  I DON'T THINK IT'S PRIVILEGED IF IT

09:48AM  13    RELATES TO COMMUNICATIONS BETWEEN THE GOVERNMENT.

09:48AM  14         THE COURT:  ARE YOU ASKING HIM ABOUT THE

09:48AM  15    DECLARATION?

09:48AM  16         MR. WADE:  THAT'S WHERE I'M GOING.

09:48AM  17         THE COURT:  WELL, WHY DON'T WE GET THERE.

09:48AM  18         MR. WADE:  ALL RIGHT.

09:48AM  19    Q.   YOU FILED A DECLARATION IN CONNECTION WITH THE

09:48AM  20    GOVERNMENT'S OPPOSITION?

09:48AM  21    A.   CORRECT.  CORRECT.

09:48AM  22    Q.   OKAY.  AND DID THE GOVERNMENT REQUEST THAT YOU PREPARE

09:48AM  23    THAT DECLARATION?

09:48AM  24    A.   YES.

09:48AM  25    Q.   AND WHO DRAFTED THE DECLARATION?

ROSENDORFF DIRECT BY MR. WADE                    38

09:48AM  1        MR. KOFFMANN:  YOUR HONOR, I'M GOING TO OBJECT ON

09:48AM  2   PRIVILEGE GROUNDS.

09:48AM  3        THE COURT:  SUSTAINED.

09:48AM  4        MR. WADE:  THE DECLARATION HAS BEEN SUBMITTED TO

09:48AM  5   COURT.  I THINK WE CAN ASK WHO DRAFTED IT.  THAT'S NOT

09:48AM  6   PRIVILEGED.

09:48AM  7        THE COURT:  WELL, I'M GOING TO GRANT AND SUSTAIN THE

09:48AM  8   OBJECTION WITHOUT FURTHER FOUNDATION ON THAT.  SO YOU CAN ASK

09:48AM  9   ANOTHER QUESTION.

09:48AM  10        MR. WADE:  OKAY.

09:48AM  11   Q.   DID YOU DRAFT A DECLARATION?

09:48AM  12   A.   MY LAWYER AND I COOPERATED TO DRAFT A DECLARATION.

09:48AM  13   Q.   OKAY.

09:48AM  14   A.   AND OBVIOUSLY I APPROVED IT.  IT WOULDN'T HAVE BEEN

09:48AM  15   SUBMITTED WITHOUT MY APPROVAL.

09:49AM  16   Q.   WERE THERE MULTIPLE DRAFTS OF THE DECLARATION?

09:49AM  17   A.   I DON'T RECALL HOW MANY THERE WERE.

09:49AM  18   Q.   OKAY.  DO YOU KNOW WHETHER THE CONTENT OF THE DECLARATION

09:49AM  19   WAS RUN BY THE GOVERNMENT BEFORE IT WAS FINALIZED?

09:49AM  20   A.   I HAVE NO IDEA, I'M SORRY.  I THINK -- I HAVE NO IDEA.

09:49AM  21   Q.   IN YOUR TESTIMONY TODAY AND IN YOUR DECLARATION I BELIEVE

09:50AM  22   YOU SAID THE ONLY INSTRUCTION THAT YOU GOT FROM THE GOVERNMENT

09:50AM  23   IN THIS CASE WAS TO TELL THE TRUTH ABOUT THE EVENTS THAT

09:50AM  24   HAPPENED; IS THAT RIGHT?

09:50AM  25   A.   CORRECT.

ROSENDORFF DIRECT BY MR. WADE                                    39

09:50AM   1    Q.   AND I JUST WANT TO JUST TEST THAT BRIEFLY IF I CAN.

09:50AM   2         THEY'VE NEVER TALKED TO YOU IN ANY WAY ABOUT HOW TESTIMONY

09:50AM   3    WOULD HAPPEN IN COURT?

09:50AM   4    A.   OF COURSE.  PROCEDURALLY THEY DESCRIBED WHAT WOULD HAPPEN

09:50AM   5    AND WHAT THE COURTROOM LOOKED LIKE, YES.

09:50AM   6    Q.   AND WHAT THE PROCESS WOULD BE LIKE WHEN THEY WERE

09:50AM   7    CONDUCTING DIRECT EXAMINATION?

09:50AM   8    A.   YES, YES.

09:50AM   9    Q.   AND YOU HAD MEETINGS WITH THEM PREPARING FOR THE DIRECT

09:50AM   10   TESTIMONY; RIGHT?

09:50AM   11   A.   CORRECT.

09:50AM   12   Q.   AND DURING THAT, THEY EXPLAINED TO YOU THAT THERE WOULD BE

09:50AM   13   EXHIBITS THAT YOU WOULD BE ASKED ABOUT; RIGHT?

09:50AM   14   A.   CORRECT.

09:50AM   15   Q.   AND THAT YOU WOULD BE ASKED QUESTIONS?

09:50AM   16   A.   CORRECT.

09:50AM   17   Q.   AND THEY WENT THROUGH THE QUESTIONS THAT THEY WERE GOING

09:51AM   18   TO ASK YOU; RIGHT?

09:51AM   19   A.   NO, NOT DIRECTLY.  AND THEY DIDN'T RUN THE LIST OF

09:51AM   20   QUESTIONS BY ME.  THEY PRODUCED EMAILS THAT WE DISCUSSED.

09:51AM   21        I DIDN'T -- I HAD NO IDEA OF THE FINAL LIST OF QUESTIONS

09:51AM   22   OR ORDER OF THE QUESTIONS THAT WOULD BE ASKED.

09:51AM   23   Q.   BUT WHAT I'M TRYING TO EXPLORE, DR. ROSENDORFF, IS THEY

09:51AM   24   GAVE YOU -- THEY WENT THROUGH THE TOPICS THAT THEY WERE GOING

09:51AM   25   TO PRESENT TO YOU ON DIRECT TESTIMONY; CORRECT?

ROSENDORFF DIRECT BY MR. WADE                                        40

09:51AM   1    A.   SOME OF THEM, BUT IT WASN'T AN EXCLUSIVE LIST.   I MEAN,

09:51AM   2    THERE WERE SOME THINGS DISCUSSED IN TRIAL THAT WE HAD NOT

09:51AM   3    DISCUSSED BEFORE.

09:51AM   4    Q.   OKAY.  DID THEY PREPARE YOU AT ALL FOR CROSS-EXAMINATION?

09:51AM   5    A.   IN A VERY LIMITED SENSE.  THEY SPOKE ABOUT THE KINDS OF

09:52AM   6    THINGS THAT YOU MIGHT BE ASKING ME.

09:52AM   7    Q.   AND WHAT DID THEY, WHAT DID THEY SAY ABOUT

09:52AM   8    CROSS-EXAMINATION?

09:52AM   9            MR. BOSTIC:  YOUR HONOR, I WOULD OBJECT TO THIS AS

09:52AM  10    BEYOND THE SCOPE OF THE HEARING, ESPECIALLY GIVEN THIS

09:52AM  11    WITNESS'S PRIOR ANSWERS.

09:52AM  12            THE COURT:  WELL, I'LL ALLOW THIS.  THIS IS ONE OF

09:52AM  13    THE QUESTIONS I'VE ALREADY ASKED AND I RECEIVED AN ANSWER TO,

09:52AM  14    BUT I'LL ALLOW YOU TO PROBE AND YOU CAN ANSWER THIS.

09:52AM  15       DO YOU REMEMBER THE QUESTION?

09:52AM  16       LET'S HAVE HIM ASK IT AGAIN JUST SO THE RECORD IS CLEAR.

09:52AM  17    BY MR. WADE:

09:52AM  18    Q.   YOU WERE TALKING ABOUT SOME PREPARATION FOR

09:52AM  19    CROSS-EXAMINATION?

09:52AM  20    A.   YES.

09:52AM  21    Q.   AND TELL US WHAT THE GOVERNMENT TOLD YOU ABOUT WHAT TO

09:52AM  22    EXPECT ON CROSS-EXAMINATION?

09:52AM  23    A.   I BELIEVE IT WAS SOMETHING TO THE EFFECT THAT YOU WOULD

09:52AM  24    TRY TO IMPEACH ME OR PAINT ME AS A LIAR AND TRY TO POINT OUT

09:52AM  25    INCONSISTENCIES IN MY TESTIMONY.

ROSENDORFF DIRECT BY MR. WADE                                    41

09:52AM 1        I DON'T REALLY RECALL ANYTHING MORE THAN THAT.

09:52AM 2     Q.   OKAY.  DID THEY TALK TO YOU -- ANYTHING ELSE THAT YOU

09:53AM 3     RECALL?

09:53AM 4     A.   OH, YEAH.  WELL, THEY TOLD ME WHAT THE COURTROOM LOOKED

09:53AM 5     LIKE.  I MEAN --

09:53AM 6     Q.   OKAY.  AND DID THEY TALK TO YOU AT ALL ABOUT HOW YOU

09:53AM 7     ANSWERED THE QUESTIONS?

09:53AM 8     A.   SO THE ONLY THING ALONG THOSE LINES THAT I CAN RECALL IS A

09:53AM 9     MEETING SOON BEFORE ELIZABETH'S TRIAL WHERE I STARTED TALKING

09:53AM 10    ABOUT CLIA VIOLATIONS COMMITTED BY ELIZABETH, AND MR. LEACH

09:53AM 11    SAID THAT HE WASN'T GOING TO MAKE IT AN ISSUE OF CLIA

09:53AM 12    VIOLATIONS, THAT IT WASN'T GOING TO BE CLIA BUT --

09:53AM 13    Q.   OKAY.  ANYTHING ELSE WHERE THERE WAS A DISCUSSION ABOUT

09:53AM 14    EITHER WHAT THEY WANTED YOU TO FOCUS ON AT TRIAL OR WHAT THEY

09:53AM 15    DIDN'T WANT YOU TO FOCUS ON AT TRIAL?

09:53AM 16    A.   I BELIEVE I HAVE ALREADY ANSWERED YOUR QUESTIONS

09:53AM 17    SATISFACTORILY ALONG THOSE LINES.

09:53AM 18    Q.   OKAY.  AND IS THAT -- THERE'S NOTHING ELSE THAT YOU

09:54AM 19    RECALL?

09:54AM 20    A.   I CAN'T RECALL.

09:54AM 21    Q.   OKAY.  IN YOUR DECLARATION AND I THINK IN YOUR TESTIMONY

09:54AM 22    HERE TODAY YOU TESTIFIED THAT YOU ANSWERED EVERYTHING

09:54AM 23    COMPLETELY, ACCURATELY, AND TRUTHFUL TO THE BEST OF YOUR

09:54AM 24    ABILITY?

09:54AM 25    A.   YES.

ROSENDORFF DIRECT BY MR. WADE                                    42

09:54AM   1     Q.   OKAY.  AND YOU UNDERSTAND THAT -- DO YOU RECALL THAT THERE

09:54AM   2     WERE, THERE WERE TIMES DURING THE TRIAL WHERE YOU TESTIFIED

09:54AM   3     THAT ACTUALLY YOU -- THE TESTIMONY THAT CAME OUT ON DIRECT WAS

09:54AM   4     INCOMPLETE?

09:54AM   5          MR. BOSTIC:  OBJECT TO THIS IS VAGUE AND RECROSS

09:54AM   6     ALONG THE LINES THE COURT CAUTIONED AGAINST.

09:54AM   7          MR. WADE:  JUST PROBING HIS DECLARATION AND HIS

09:54AM   8     TESTIMONY TODAY, THIS MORNING.

09:55AM   9          THE COURT:  YOU'RE REFERRING TO DURING THE TRIAL ON

09:55AM  10     CROSS-EXAMINATION YOU REFRESHED THE WITNESS'S RECOLLECTION

09:55AM  11     SEVERAL TIMES, AND I THINK AT ONE POINT THE TRANSCRIPT REVEALS

09:55AM  12     YOUR COLLOQUY WITH THIS WITNESS WAS THAT, WELL, NOW THAT I'VE

09:55AM  13     SHOWN YOU THIS DOCUMENT, DOES THAT CHANGE YOUR TESTIMONY.

09:55AM  14          AND I THINK AT ONE POINT THIS WITNESS SAID, YES, IT DOES.

09:55AM  15          IS THAT WHAT YOU'RE REFERRING TO, ONE OF THOSE INSTANCES?

09:55AM  16          MR. WADE:  YEAH.  I BELIEVE THERE MAY HAVE BEEN TEN

09:55AM  17     OF THOSE INSTANCES, BUT I WAS REFERRING TO THE CONCEPT

09:55AM  18     GENERALLY, NOT NECESSARILY OF REFRESHING RECOLLECTION, BUT

09:55AM  19     TESTIMONY WHERE THE GOVERNMENT DREW OUT TESTIMONY.

09:55AM  20     Q.   AND ON CROSS-EXAMINATION YOU CORRECTED OR CLARIFIED THE

09:55AM  21     TESTIMONY AS HAVING BEEN INCOMPLETE OR INACCURATE?

09:55AM  22     A.   I DON'T BELIEVE THE GOVERNMENT LED ME OR MISLED ME OR

09:56AM  23     ENCOURAGED ME TO LIE.

09:56AM  24     Q.   SO YOU DON'T RECALL WHAT I -- YOU DON'T RECALL THOSE

09:56AM  25     INSTANCES?

ROSENDORFF DIRECT BY MR. WADE                                          43

09:56AM  1    A.   I, I -- IN GENERAL TERMS, YES, I DO RECALL THEM, BUT I

09:56AM  2    NEVER REVERSED MYSELF.  IT WAS CLARIFICATION.  I WAS

09:56AM  3    CLARIFYING.

09:56AM  4    Q.   RIGHT.  BUT YOU UNDERSTAND THAT THERE CAN BE INFORMATION

09:56AM  5    THAT CAN BE MISLEADING BECAUSE IT'S INCOMPLETE; RIGHT?

09:56AM  6    A.   YES.

09:56AM  7    Q.   AND THAT THERE WERE TIMES WHERE YOU PROVIDED MORE COMPLETE

09:56AM  8    INFORMATION ON CROSS-EXAMINATION TO CLARIFY THINGS; RIGHT?

09:56AM  9    A.   YES, YES.

09:56AM  10   Q.   AND THAT WAS BECAUSE SOME OF WHAT CAME OUT DURING YOUR

09:56AM  11   DIRECT EXAMINATION WAS NOT COMPLETE?

09:56AM  12            MR. BOSTIC:  YOUR HONOR, I OBJECT.  ASKED AND

09:56AM  13   ANSWERED.  ALSO ARGUMENTATIVE.

09:56AM  14            THE COURT:  I THINK WE'RE GETTING -- I HAVE THE

09:56AM  15   TRANSCRIPTS IN FRONT OF ME THAT I'VE REVIEWED, AS DO YOU I'M

09:56AM  16   SURE, COUNSEL.

09:56AM  17            MR. WADE:  YES.

09:56AM  18            THE COURT:  SO I THINK I UNDERSTAND WHERE YOU'RE

09:57AM  19   GOING.

09:57AM  20      IF YOU WOULD LIKE TO REPHRASE THE QUESTION.  IF YOU'RE

09:57AM  21   ASKING THIS WITNESS ABOUT CROSS-EXAMINATION AND YOUR ABILITY TO

09:57AM  22   SHOW DOCUMENTS THAT THE GOVERNMENT DIDN'T SHOW THAT THEN

09:57AM  23   CHANGED HIS TESTIMONY, IS THAT WHERE YOU'RE GOING?  IS THAT

09:57AM  24   WHAT THIS IS GOING TO?

09:57AM  25            MR. WADE:  YES.

ROSENDORFF DIRECT BY MR. WADE                                          44

09:57AM   1     Q.   I'M QUESTIONING.  YOU SAY THAT YOU DON'T BELIEVE THAT THE

09:57AM   2     GOVERNMENT EVER OFFERED ANY MISLEADING INFORMATION OR ANY

09:57AM   3     MISLEADING TESTIMONY?

09:57AM   4     A.   CORRECT, I DON'T BELIEVE THAT.

09:57AM   5     Q.   RIGHT.  AND THAT YOU ALWAYS -- YOU TESTIFIED COMPLETELY.

09:57AM   6          IS THAT TRUE ON DIRECT EXAMINATION, YOU THOUGHT EVERYTHING

09:57AM   7     WAS COMPLETE?

09:57AM   8     A.   I WAS CONSISTENT IN MY TESTIMONY.

09:57AM   9     Q.   BUT WERE YOU -- ON JUST YOUR DIRECT TESTIMONY, UNDER JUST

09:57AM  10     YOUR DIRECT TESTIMONY, WERE YOU COMPLETE?

09:57AM  11          MR. BOSTIC:  YOUR HONOR, I OBJECT TO THAT QUESTION

09:57AM  12     AS VAGUE.  I'M NOT SURE WHAT COUNSEL IS ASKING.

09:57AM  13          THE COURT:  SUSTAINED.

09:57AM  14          DO YOU WANT TO NARROW IT DOWN TO AN ISSUE?

09:57AM  15          MR. WADE:  WELL, THE DECLARATION COVERS ALL OF THIS

09:58AM  16     TESTIMONY.

09:58AM  17     Q.   SO MY QUESTION IS ON YOUR DIRECT TESTIMONY, WAS YOUR

09:58AM  18     TESTIMONY COMPLETE?

09:58AM  19     A.   YES.

09:58AM  20     Q.   YES.  AND YOU DON'T BELIEVE, AS YOU TESTIFY HERE TODAY,

09:58AM  21     THAT YOUR DIRECT TESTIMONY WAS MISLEADING IN ANY WAY?

09:58AM  22     A.   NO, IT WAS NOT MISLEADING.

09:58AM  23     Q.   IN YOUR DECLARATION IN PARAGRAPH 4 -- AND I CAN PROVIDE A

09:58AM  24     COPY IF IT'S USEFUL.  THIS IS NOT A MEMORY TEST -- BUT YOU MADE

09:58AM  25     THIS STATEMENT, "I HAVE NO REASON TO BELIEVE THAT THE

ROSENDORFF DIRECT BY MR. WADE                                    45

09:59AM  1    GOVERNMENT MISREPRESENTED OR OTHERWISE CREATED A MISIMPRESSION

09:59AM  2    ABOUT MS. HOLMES'S OR MR. BALWANI'S CONDUCT AT THERANOS"?

09:59AM  3    A.   CORRECT.   CORRECT.

09:59AM  4    Q.   YOU DID NOT SAY, "I HAVE NO REASON TO BELIEVE THAT THE

09:59AM  5    GOVERNMENT MISREPRESENTED OR OTHERWISE CREATED A

09:59AM  6    MISREPRESENTATION ABOUT ANYTHING AT THERANOS"?

09:59AM  7    A.   I DON'T HAVE THE DECLARATION IN FRONT OF ME, BUT I'M --

09:59AM  8            THE COURT:  I'LL HAND YOU ONE.  IT'S 1587-1, PAGE 2

09:59AM  9    OF 3?  IS THAT THE CORRECT DOCUMENT?

09:59AM 10            MR. WADE:  1587-1, YES, CORRECT.

09:59AM 11            THE COURT:  AND MAY I HAND HIM A COPY JUST FOR

09:59AM 12    EFFICIENCY?

09:59AM 13            MR. WADE:  SURE.  THANK YOU, YOUR HONOR.

10:00AM 14            THE COURT:  AND THERE'S THE SIGNATURE PAGE.  THAT'S

10:00AM 15    THE SIGNATURE PAGE.

10:00AM 16        (HANDING.)

10:00AM 17            THE WITNESS:  SO WHICH ITEM ARE WE DISCUSSING?

10:00AM 18            MR. WADE:  PARAGRAPH 4, THE SECOND SENTENCE.

10:00AM 19            THE WITNESS:  YES, THE SECOND SENTENCE IS WHAT I

10:00AM 20    SIGNED TO, YES.

10:00AM 21    BY MR. WADE:

10:00AM 22    Q.   YES.  AND YOU DISCUSSED THAT THERE WERE NO REPRESENTATIONS

10:00AM 23    OR MISREPRESENTATIONS RELATING TO MS. HOLMES'S OR MR. BALWANI'S

10:00AM 24    CONDUCT AT THERANOS?

10:00AM 25    A.   YES.

ROSENDORFF DIRECT BY MR. WADE                                    46

10:00AM   1    Q.   OKAY.  BUT THERE WERE MISREPRESENTATIONS OR MISIMPRESSIONS

10:00AM   2    ABOUT OTHER ASPECTS OF WHAT HAPPENED AT THERANOS?

10:00AM   3    A.   NO, I DON'T THINK SO.

10:00AM   4    Q.   WAS THERE A REASON THAT YOU LIMITED IT TO JUST MS. HOLMES

10:00AM   5    AND MR. BALWANI?

10:00AM   6         MR. BOSTIC:  OBJECTION, YOUR HONOR.  THAT COULD BE

10:00AM   7    PRIVILEGED COMMUNICATIONS.

10:00AM   8         THE COURT:  THIS IS THE DECLARATION THAT HE --

10:00AM   9         MR. WADE:  -- THAT HE SUBMITTED TO THE COURT, YEAH.

10:00AM  10         THE COURT:  THAT WAS PREPARED BY HE AND HIS COUNSEL?

10:01AM  11         MR. WADE:  WELL, HE SUBMITTED IT TO THE COURT, SO

10:01AM  12    YEAH.

10:01AM  13         THE COURT:  ALL RIGHT.  I'M GOING TO SUSTAIN THE

10:01AM  14    OBJECTION.

10:01AM  15         MR. WADE:  I CAN'T ASK HIM ABOUT THE CONTENT OF IT

10:01AM  16    BECAUSE HE PREPARED IT WITH HIS COUNSEL, YOUR HONOR?

10:01AM  17         THE COURT:  YOU CAN ASK ANOTHER QUESTION.

10:01AM  18         MR. WADE:  OKAY.

10:01AM  19    Q.   THIS IS A DECLARATION THAT YOU SIGNED; CORRECT?

10:01AM  20    A.   CORRECT.

10:01AM  21    Q.   AND YOU AGREE THAT IT WAS TRUTHFUL AND ACCURATE?

10:01AM  22    A.   CORRECT.

10:01AM  23    Q.   OKAY.  IS THERE ANY REASON THAT YOU LIMITED THE LANGUAGE

10:01AM  24    IN PARAGRAPH 4 TO ONLY REFER TO MR. BALWANI AND MS. HOLMES?

10:01AM  25         MR. BOSTIC:  YOUR HONOR, SAME OBJECTION.  THIS IS

10:01AM  1    ASKING ABOUT THE DELIBERATIVE PROCESS OF CRAFTING THIS

10:01AM  2    DECLARATION WHICH I THINK GOES TO PRIVILEGED COMMUNICATIONS.

10:01AM  3            THE COURT:  LET ME -- MR. KOFFMANN?

10:01AM  4            MR. KOFFMANN:  I WOULD JOIN IN THE OBJECTION.

10:01AM  5            THE COURT:  ALL RIGHT.  THANK YOU.  SUSTAINED.

10:01AM  6            MR. WADE:  OKAY.  THE COURT'S INDULGENCE FOR A

10:02AM  7    MOMENT?

10:02AM  8        (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

10:03AM  9            MR. WADE:  NOTHING FURTHER, DR. ROSENDORFF.

10:03AM  10    THANK YOU, YOUR HONOR.

10:03AM  11            THE COURT:  MR. BOSTIC?

10:03AM  12            MR. BOSTIC:  YES.  THANK YOU, YOUR HONOR.

10:03AM  13                    **CROSS-EXAMINATION**

10:03AM  14    BY MR. BOSTIC:

10:03AM  15    Q.  GOOD MORNING, DR. ROSENDORFF.

10:03AM  16    A.  GOOD MORNING, MR. BOSTIC.

10:03AM  17    Q.  I'D LIKE TO ASK YOU A FEW QUESTIONS JUST FOLLOWING UP ON

10:03AM  18    THE TOPICS THAT WE HAVE BEEN TALKING ABOUT HERE TODAY.

10:03AM  19        FIRST, LET'S TALK A LITTLE BIT ABOUT YOUR MEETINGS WITH

10:03AM  20    THE GOVERNMENT PRIOR TO YOUR TRIAL TESTIMONY.  OKAY?

10:03AM  21    A.  UH-HUH.

10:03AM  22    Q.  YOU MET WITH THE GOVERNMENT A NUMBER OF TIMES BEFORE

10:03AM  23    TESTIFYING IN THE ELIZABETH HOLMES TRIAL; IS THAT RIGHT?

10:03AM  24    A.  YES.  I BELIEVE IT WAS FIVE OR SIX TIMES.

10:03AM  25    Q.  WERE YOU REPRESENTED BY YOUR OWN LAWYER THROUGHOUT THAT

ROSENDORFF CROSS BY MR. BOSTIC                                    48

10:03AM   1    TIME PERIOD WHEN YOU WERE MEETING WITH THE GOVERNMENT?

10:03AM   2    A.   YES, I WAS.

10:03AM   3    Q.   AND DID YOUR COUNSEL ATTEND MOST, IF NOT ALL, OF THE

10:03AM   4    MEETINGS THAT YOU HAD WITH THE GOVERNMENT?

10:03AM   5    A.   YES.

10:03AM   6    Q.   WHEN YOU TESTIFIED AT THE TWO TRIALS IN THIS CASE, YOU

10:04AM   7    WERE REQUIRED TO APPEAR BY SUBPOENA; IS THAT RIGHT?

10:04AM   8    A.   YES.

10:04AM   9    Q.   AND WHEN YOU MET WITH THE GOVERNMENT, THOUGH, WERE YOU

10:04AM  10    REQUIRED TO HAVE THOSE MEETINGS OR WERE THEY VOLUNTARY?

10:04AM  11    A.   I BELIEVE THEY WERE VOLUNTARY.

10:04AM  12    Q.   WHY THEN DID YOU MAKE THE CHOICE TO MEET WITH THE

10:04AM  13    GOVERNMENT IN CONNECTION WITH THIS INVESTIGATION?

10:04AM  14    A.   TO FULLY COOPERATE WITH THE UNITED STATES GOVERNMENT IN

10:04AM  15    THE INTEREST OF JUSTICE.

10:04AM  16    Q.   AND DO YOU REMEMBER DURING THOSE MEETINGS GOVERNMENT

10:04AM  17    INVESTIGATORS TELLING YOU THAT IT WAS IMPORTANT TO BE HONEST

10:04AM  18    DURING THOSE MEETINGS?

10:04AM  19    A.   YES, I DO RECALL THAT.

10:04AM  20    Q.   SO, IN OTHER WORDS, IT WASN'T ONLY IN CONNECTION WITH YOUR

10:04AM  21    TRIAL TESTIMONY THAT THE GOVERNMENT ASKED YOU TO BE HONEST, BUT

10:04AM  22    IT WAS ALSO IN THOSE OUT-OF-COURT DISCUSSIONS WITH THE

10:04AM  23    GOVERNMENT TEAM; IS THAT RIGHT?

10:04AM  24    A.   YES.

10:04AM  25    Q.   AND IN THE INTERVIEWS THAT YOU HAD WITH THE GOVERNMENT

ROSENDORFF CROSS BY MR. BOSTIC                                    49

10:04AM   1    TEAM, WERE YOU TRUTHFUL AND HONEST TO THE BEST OF YOUR ABILITY?

10:04AM   2    A.   YES, I WAS.

10:04AM   3    Q.   YOU TESTIFIED WHEN YOU SPOKE TO MR. WADE JUST NOW ABOUT

10:05AM   4    SOME CONVERSATIONS THAT YOU MIGHT HAVE HAD WITH THE GOVERNMENT

10:05AM   5    ABOUT WHAT TO EXPECT AT TRIAL.

10:05AM   6         DO YOU REMEMBER THAT QUESTIONING BY MR. WADE?

10:05AM   7    A.   YES, YES.

10:05AM   8    Q.   AND WHEN YOU TALKED ABOUT THOSE CONVERSATIONS WITH THE

10:05AM   9    GOVERNMENT, SITTING HERE TODAY, DO YOU HAVE A MEMORY OF THE

10:05AM  10    SPECIFIC RECORDS THAT WERE USED AND THE STATEMENTS THAT THE

10:05AM  11    GOVERNMENT TEAM MIGHT HAVE MADE TO YOU?

10:05AM  12    A.   NO, NOT AT ALL.

10:05AM  13    Q.   SO WHEN YOU SAID, FOR EXAMPLE, THAT THE GOVERNMENT MIGHT

10:05AM  14    HAVE TOLD YOU THAT THE DEFENSE LAWYERS MIGHT TRY TO PAINT YOU

10:05AM  15    AS A LIAR, WAS THAT A QUOTE FROM THE GOVERNMENT TEAM FROM YOUR

10:05AM  16    MEMORY?

10:05AM  17    A.   NO, NO.  IT COULD HAVE BEEN SOMETHING THAT MY OWN COUNSEL

10:05AM  18    SAID.

10:05AM  19    Q.   MOVING ON TO YOUR TESTIMONY AT THE TRIAL.

10:05AM  20         YOU UNDERSTOOD THAT EVERY TIME THAT YOU WERE SITTING ON

10:05AM  21    THAT STAND TESTIFYING IN MS. HOLMES'S TRIAL OR MR. BALWANI'S

10:05AM  22    TRIAL, YOU WERE UNDER OATH?

10:05AM  23         DID YOU UNDERSTAND THAT?

10:05AM  24    A.   YES.

10:05AM  25    Q.   AND THROUGHOUT THOSE DAYS THAT YOU SPENT ON THE STAND, DID

ROSENDORFF CROSS BY MR. BOSTIC                                    50

10:05AM   1    YOU KEEP THAT OATH IN MIND?  WERE YOU ALWAYS AWARE THAT YOU

10:06AM   2    WERE UNDER OATH TO TELL THE TRUTH?

10:06AM   3    A.   YES, IT WAS ALWAYS FOREFRONT.

10:06AM   4    Q.   SITTING HERE TODAY THINKING BACK ON THE WHOLE OF YOUR

10:06AM   5    TESTIMONY IN BOTH TRIALS FOR MS. HOLMES AND MR. BALWANI, DO YOU

10:06AM   6    STILL STAND BY YOUR TESTIMONY IN EVERY RESPECT?

10:06AM   7    A.   ABSOLUTELY, I DO.

10:06AM   8    Q.   DO YOU BELIEVE THAT YOUR TESTIMONY CAN BE RELIED UPON TO

10:06AM   9    ACCURATELY REPRESENT YOUR EXPERIENCE WITH THERANOS?

10:06AM  10    A.   YES.

10:06AM  11    Q.   SO YOU'VE TOLD US THAT YOU TOLD THE TRUTH, BUT DESPITE

10:06AM  12    THAT, DO YOU HAVE ANY REASON TO BELIEVE THAT THE GOVERNMENT

10:06AM  13    CREATED A FALSE IMPRESSION ABOUT THE DEFENDANTS OR ABOUT

10:06AM  14    THERANOS IN ANY WAY IN CONNECTION WITH YOUR TRIAL TESTIMONY?

10:06AM  15         MR. WADE:  OBJECTION, YOUR HONOR.  I DON'T THINK

10:06AM  16    COUNSEL WOULD WANT ME TO GO INTO THOSE ISSUES ON REDIRECT.

10:06AM  17         THE COURT:  I HAVE HIS DECLARATION.  WE HAVE THE

10:06AM  18    DECLARATIONS.  I'M GOING TO SUSTAIN THE OBJECTION.

10:07AM  19    BY MR. BOSTIC:

10:07AM  20    Q.   DR. ROSENDORFF, ARE YOU FAMILIAR WITH THE CONTENT OF THE

10:07AM  21    DECLARATION THAT YOU SIGNED IN CONNECTION WITH THESE ISSUES?

10:07AM  22    A.   YES.

10:07AM  23    Q.   AND DO YOU STAND BY THE CONTENT OF THAT DECLARATION

10:07AM  24    SITTING HERE TODAY?

10:07AM  25    A.   YES, I DO.

ROSENDORFF CROSS BY MR. BOSTIC                                  51

10:07AM   1      Q.   THINKING ABOUT YOUR TESTIMONY AND WHAT YOU SAW AT THE

10:07AM   2      TRIAL, WAS THERE ANY CONDUCT BY THE GOVERNMENT THAT YOU VIEWED

10:07AM   3      AS MISLEADING OR IMPROPER IN ANY WAY?

10:07AM   4      A.   NO.

10:07AM   5      Q.   OKAY.  LET'S TALK ABOUT THE TIME PERIOD AFTER YOUR

10:07AM   6      TESTIMONY IN THE HOLMES TRIAL.

10:07AM   7           AFTER TESTIFYING AT MS. HOLMES'S TRIAL, DID YOU HAVE TIME

10:07AM   8      AND OPPORTUNITY TO THINK BACK ON YOUR TESTIMONY?

10:07AM   9      A.   YES.

10:07AM  10      Q.   A FEW MONTHS AFTER TESTIFYING IN MS. HOLMES'S TRIAL, YOU

10:07AM  11      TESTIFIED IN MR. BALWANI'S TRIAL; IS THAT RIGHT?

10:08AM  12      A.   CORRECT.

10:08AM  13      Q.   AND GENERALLY SPEAKING, WAS IT YOUR INTENT TO GIVE ANSWERS

10:08AM  14      IN THAT SECOND TRIAL THAT WERE CONSISTENT WITH YOUR ANSWERS IN

10:08AM  15      THE FIRST?

10:08AM  16      A.   YES.

10:08AM  17      Q.   AND IS THAT BECAUSE AT THE TIME OF THE SECOND TRIAL, YOU

10:08AM  18      REMAINED COMFORTABLE THAT YOU HAD TESTIFIED ACCURATELY IN THAT

10:08AM  19      FIRST TRIAL?

10:08AM  20      A.   YES.

10:08AM  21      Q.   YOU TESTIFIED EARLIER THAT WHEN YOU TRIED TO MAKE CONTACT

10:08AM  22      WITH MS. HOLMES, YOU WERE MOTIVATED BY A DESIRE TO ACHIEVE SOME

10:08AM  23      KIND OF A HEALING OR FORGIVENESS; IS THAT ACCURATE?

10:08AM  24      A.   YES.

10:08AM  25      Q.   AND WAS THAT YOUR GOAL WHEN YOU TESTIFIED AT THE TWO

ROSENDORFF CROSS BY MR. BOSTIC                                          52

10:08AM  1    TRIALS, TO ACHIEVE HEALING OR FORGIVENESS?

10:08AM  2    A.   NO.

10:08AM  3    Q.   AND WHAT GOAL DID YOU HAVE OR WHAT WERE YOUR GOALS WHEN

10:08AM  4    YOU WERE SITTING ON THAT STAND AND TESTIFYING AT TRIAL?

10:08AM  5    A.   TO BE THE BEST WITNESS I COULD.

10:08AM  6    Q.   AND WHAT CONSTITUTES BEING THE BEST WITNESS THAT YOU

10:08AM  7    COULD?

10:08AM  8    A.   RECALLING EVENTS, DEALINGS, CONVERSATIONS TO THE BEST OF

10:09AM  9    MY RECOLLECTION AND BEING TRUTHFUL.

10:09AM  10   Q.   AND DOES BEING THE BEST WITNESS THAT YOU COULD MEAN GIVING

10:09AM  11   ANSWERS THAT WERE THE MOST HELPFUL TO THE GOVERNMENT

10:09AM  12   NECESSARILY?

10:09AM  13   A.   NO.

10:09AM  14   Q.   SO IF SOMEONE WANTED TO KNOW FROM YOU THE TRUTH ABOUT WHAT

10:09AM  15   HAPPENED AT THERANOS, WHAT THE DEFENDANTS DID IN THIS CASE,

10:09AM  16   SHOULD THEY RELY ON STATEMENTS THAT YOU MIGHT HAVE MADE TO

10:09AM  17   MR. EVANS DURING YOUR CONVERSATION OR SHOULD THEY RELY ON YOUR

10:09AM  18   SWORN TESTIMONY AT TRIAL?

10:09AM  19   A.   THEY SHOULD RELY ON MY SWORN TESTIMONY.

10:09AM  20   Q.   SITTING HERE TODAY -- WELL, LET ME ASK, MR. WADE ASKED

10:09AM  21   YOU, WHEN HE WAS QUESTIONING YOU, ABOUT A STATEMENT THAT YOU

10:09AM  22   MIGHT HAVE MADE TO THE EFFECT THAT YOU HAD DONE SOMETHING

10:09AM  23   WRONG.

10:09AM  24       AND I BELIEVE YOU TESTIFIED THAT YOU DIDN'T RECALL MAKING

10:09AM  25   THAT STATEMENT; IS THAT RIGHT?

ROSENDORFF CROSS BY MR. BOSTIC                                      53

10:09AM  1      A.   CORRECT, CORRECT.

10:09AM  2      Q.   SITTING HERE TODAY, DO YOU FEEL THAT YOU DID SOMETHING

10:10AM  3      WRONG OR UNETHICAL IN CONNECTION WITH THIS CASE?

10:10AM  4      A.   NO, NO, I DO NOT FEEL THAT WAY.

10:10AM  5      Q.   WAS YOUR VISIT TO MS. HOLMES'S HOUSE OR YOUR ATTEMPT TO

10:10AM  6      CONTACT HER MOTIVATED IN ANY WAY BY A FEELING THAT THE TRIAL IN

10:10AM  7      THIS CASE HAD BEEN UNFAIR?

10:10AM  8      A.   NO.

10:10AM  9      Q.   WHEN MR. WADE WAS QUESTIONING YOU, HE ASKED YOU ABOUT YOUR

10:10AM  10     UNDERSTANDING OF SOME LEGAL RISK THAT MIGHT ARISE AS A RESULT

10:10AM  11     OF THESE EVENTS.

10:10AM  12          DO YOU RECALL THAT TESTIMONY GENERALLY?

10:10AM  13     A.   YES.

10:10AM  14     Q.   MY QUESTION NOW IS, ARE THE POSITIONS THAT YOU ARE TAKING

10:10AM  15     TODAY DRIVEN AT ALL BY THAT LEGAL RISK?

10:10AM  16     A.   NO.

10:10AM  17     Q.   IN OTHER WORDS --

10:11AM  18     A.   NOT AT ALL.

10:11AM  19     Q.   LET ME ASK IT A DIFFERENT WAY ALSO.

10:11AM  20          THE STATEMENTS THAT YOU'RE MAKING ABOUT YOUR TRIAL

10:11AM  21     TESTIMONY AND THE TRUTH OF YOUR DECLARATION, ARE THOSE

10:11AM  22     STATEMENTS TRUE OR ARE THEY MOTIVATED BY A DESIRE TO AVOID SOME

10:11AM  23     KIND OF A LEGAL RISK?

10:11AM  24     A.   THEY ARE TRUE.

10:11AM  25            MR. BOSTIC:  MAY I HAVE A MOMENT, YOUR HONOR?

ROSENDORFF REDIRECT BY MR. WADE                                54

10:11AM   1              (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

10:11AM   2        BY MR. BOSTIC:

10:11AM   3        Q.   DR. ROSENDORFF, I WANT TO CIRCLE BACK TO ONE STATEMENT

10:11AM   4        THAT MR. EVANS REPORTED THAT YOU MADE TO THE EFFECT THAT THE

10:11AM   5        GOVERNMENT AT TRIAL MADE THINGS SOUND WORSE THAN THEY WERE.

10:11AM   6              DO YOU RECALL THAT DISCUSSION?

10:11AM   7        A.   YES.

10:11AM   8              WITH MR. EVANS?

10:12AM   9        Q.   DO YOU RECALL THAT DISCUSSION AT THIS HEARING?

10:12AM  10        A.   YES.

10:12AM  11        Q.   IS THAT WHAT YOU BELIEVE?  DO YOU BELIEVE THAT THE

10:12AM  12        GOVERNMENT MADE THINGS AT THERANOS SOUND WORSE THAN THEY REALLY

10:12AM  13        WERE DURING TRIAL?

10:12AM  14        A.   NO, NO.

10:12AM  15        Q.   THANK YOU.

10:12AM  16              NO FURTHER QUESTIONS.

10:12AM  17                   THE COURT:  MR. WADE.

10:12AM  18                        **REDIRECT EXAMINATION**

10:12AM  19        BY MR. WADE:

10:12AM  20        Q.   LET ME COME BACK TO THE LEGAL RISK POINT THAT MR. BOSTIC

10:12AM  21        WAS JUST ASKING YOU ABOUT.

10:12AM  22              YOU UNDERSTAND THAT IF YOU MADE STATEMENTS TO THE EFFECT

10:12AM  23        THAT YOUR TRIAL TESTIMONY WAS INACCURATE, THAT THAT COULD

10:12AM  24        CREATE CRIMINAL LEGAL RISK FOR YOU; CORRECT?

10:12AM  25        A.   CORRECT.

ROSENDORFF REDIRECT BY MR. WADE                          55

10:12AM   1    Q.   AND YOU UNDERSTAND THAT IF -- DO YOU UNDERSTAND THAT IF

10:13AM   2    THE STATEMENTS ABOUT MISREPRESENTATIONS OR MISIMPRESSIONS WERE

10:13AM   3    AFFIRMED, THAT THAT COULD POTENTIALLY REQUIRE A NEW TRIAL?  ARE

10:13AM   4    YOU AWARE OF THAT?

10:13AM   5    A.   I DON'T KNOW WHAT WOULD RISE TO THE LEVEL OF A NEW TRIAL.

10:13AM   6    I JUST DON'T KNOW.

10:13AM   7    Q.   OKAY.  BUT ARE YOU AWARE THAT THAT COULD CAST DOUBT AS TO

10:13AM   8    THE VERDICT IN MS. HOLMES'S TRIAL?

10:13AM   9    A.   YES.

10:13AM  10    Q.   OKAY.  DO YOU WANT THERE TO BE ANOTHER TRIAL, SIR?

10:13AM  11    A.   NO.

10:13AM  12    Q.   WE TALKED BRIEFLY ABOUT THE HEALTH ISSUES.  I DON'T WANT

10:13AM  13    TO GO INTO THOSE IN DETAIL, BUT IS THERE ANYTHING ABOUT THOSE

10:13AM  14    HEALTH ISSUES -- FIRST OF ALL, YOU DISCLOSED THOSE HEALTH

10:13AM  15    ISSUES TO THE GOVERNMENT?

10:13AM  16    A.   THE GOVERNMENT IS AWARE THAT I TOOK A LEAVE OF ABSENCE IN

10:14AM  17    2016.

10:14AM  18    Q.   OKAY.  AND YOU DISCLOSED TO THEM YOUR HEALTH ISSUES THAT

10:14AM  19    YOU STRUGGLED WITH; IS THAT RIGHT?

10:14AM  20              MR. BOSTIC:  OBJECTION.  VAGUE.

10:14AM  21              THE COURT:  CAN YOU -- I'M CONCERNED ABOUT GOING

10:14AM  22    INTO SOME PRIVATE MATTERS HERE.

10:14AM  23              MR. WADE:  I DON'T WANT TO ASK ANYTHING ABOUT THE

10:14AM  24    SUBSTANCE.  I JUST WANT TO ASK IF HE CONVEYED.  THAT'S WHY I'M

10:14AM  25    TRYING TO KEEP IT GENERAL.

ROSENDORFF REDIRECT BY MR. WADE                                        56

10:14AM   1              THE COURT:  SURE.  MAYBE YOU COULD MAKE IT MORE

10:14AM   2     GENERAL.

10:14AM   3     BY MR. WADE:

10:14AM   4     Q.   WE TALKED ABOUT SOME OF THE HEALTH ISSUES THAT YOU

10:14AM   5     REFERRED TO IN AN INTERVIEW THAT YOU DID.

10:14AM   6          DO YOU RECALL THAT?

10:14AM   7     A.   I'M GOING TO OBJECT ON THE GROUNDS OF HIPAA AND PROTECTED

10:14AM   8     HIPAA INFORMATION.

10:14AM   9              MR. WADE:  I NEVER HAD A WITNESS OBJECT TO MY

10:14AM  10     QUESTION.

10:14AM  11              THE COURT:  OH, NO, THAT HAPPENED DURING THE TRIAL.

10:14AM  12          (LAUGHTER.)

10:14AM  13              MR. WADE:  YOUR HONOR, I THINK I RECALL THAT NOW.

10:15AM  14     Q.   I'M SEEKING NOT TO GO INTO THAT.  I'M JUST ASKING YOU

10:15AM  15     ABOUT THE INFORMATION THAT YOU DISCLOSED TO A REPORTER -- I'M

10:15AM  16     TRYING SPECIFICALLY NOT TO GO INTO YOUR PERSONAL HEALTH

10:15AM  17     INFORMATION.  I'M TRYING TO LIMIT IT TO WHAT YOU DISCLOSED TO

10:15AM  18     THE REPORTER.

10:15AM  19              MR. BOSTIC:  SO, YOUR HONOR, APOLOGIES.  THIS IS

10:15AM  20     BEYOND THE SCOPE OF THE HEARING, BEYOND THE SCOPE OF THE

10:15AM  21     GOVERNMENT'S EXAMINATION, AND --

10:15AM  22              THE COURT:  IT IS BEYOND THE SCOPE, MR. WADE.

10:15AM  23          IF YOU -- I'M NOT SURE WHAT THE RELEVANCE OF THAT IS TO

10:15AM  24     THE PURPOSE OF THIS HEARING.  MAYBE YOU COULD LAY A BETTER

10:15AM  25     FOUNDATION FOR IT.

ROSENDORFF REDIRECT BY MR. WADE                                    57

10:15AM  1    BY MR. WADE:

10:15AM  2    Q.   DO YOU BELIEVE THAT THOSE HEALTH ISSUES WERE PRESENT

10:15AM  3    DURING YOUR INTERACTIONS WITH THE GOVERNMENT?

10:15AM  4    A.   AGAIN, I'M GOING TO OBJECT ON THE GROUNDS OF HIPAA.

10:15AM  5         I DON'T BELIEVE THOSE -- ANY HEALTH ISSUES INFLUENCED THE

10:15AM  6    TRUTHFULNESS OF MY INTERACTIONS WITH THE GOVERNMENT.

10:16AM  7    Q.   BUT THE GOVERNMENT WAS AWARE OF THOSE HEALTH ISSUES,

10:16AM  8    THAT'S ALL I'M ASKING?

10:16AM  9         MR. BOSTIC:  YOUR HONOR, THIS IS A VAGUE QUESTION.

10:16AM  10   WITHOUT DEFINING WHAT HEALTH ISSUES WE'RE TALKING ABOUT, IT'S A

10:16AM  11   VAGUE QUESTION, AND WE CAN'T DEFINE THOSE ISSUES DUE TO

10:16AM  12   DR. ROSENDORFF'S PRIVACY.

10:16AM  13        THE COURT:  I THINK THE RECORD IS CLEAR ABOUT WHAT

10:16AM  14   IT IS, WHETHER HE TALKED ABOUT HIS HEALTH CONDITIONS.

10:16AM  15        AND YOU'RE PROBING WHETHER OR NOT THE GOVERNMENT KNEW HIS

10:16AM  16   HEALTH CONDITIONS, IS THAT WHAT YOU'RE PROBING?

10:16AM  17        MR. WADE:  MR. BOSTIC ASKED HIM ABOUT THE

10:16AM  18   INTERACTIONS HE HAD WITH THE GOVERNMENT.

10:16AM  19        THE COURT:  SURE.

10:16AM  20        MR. WADE:  AND THAT'S THE PIECE THAT I'M ASKING.

10:16AM  21        THE COURT:  AND I THINK HE ANSWERED THAT QUESTION.

10:16AM  22   HE SAID, I DON'T BELIEVE ANY HEALTH ISSUES INFLUENCED THE

10:16AM  23   TRUTHFULNESS OF MY INTERACTIONS WITH THE GOVERNMENT.

10:16AM  24        MR. WADE:  WELL, I UNDERSTAND THAT'S HIS BELIEF.

10:16AM  25   I'M JUST WONDERING IF THE GOVERNMENT KNEW ABOUT THOSE.

ROSENDORFF REDIRECT BY MR. WADE                          58

10:16AM   1              THE COURT:  I'M GOING TO SUSTAIN THE OBJECTION.

10:16AM   2              MR. WADE:  ALL RIGHT.  NO FURTHER QUESTIONS,

10:16AM   3    YOUR HONOR.

10:16AM   4              MR. BOSTIC:  NOTHING FURTHER, YOUR HONOR.

10:16AM   5              THE COURT:  ALL RIGHT.  THANK YOU.

10:16AM   6          MAY THIS WITNESS BE EXCUSED, MR. WADE?

10:16AM   7              MR. WADE:  HE MAY, YOUR HONOR.

10:17AM   8              MR. BOSTIC:  YES, YOUR HONOR.

10:17AM   9              THE COURT:  ALL RIGHT.

10:17AM  10              THE WITNESS:  YOUR HONOR, MAY I HAND BACK --

10:17AM  11              THE COURT:  YES.

10:17AM  12              THE WITNESS:  (HANDING.)

10:17AM  13          THANK YOU, YOUR HONOR.

10:17AM  14              THE COURT:  THANK YOU VERY MUCH.

10:17AM  15          THANK YOU, MR. KOFFMANN.

10:17AM  16          THANK YOU, DR. ROSENDORFF.

10:17AM  17          THAT CONCLUDES THE TESTIMONIAL PORTION OF THIS HEARING.

10:17AM  18    THIS IS WHAT THE COURT WANTED TO HEAR FROM DR. ROSENDORFF ABOUT

10:17AM  19    THE ISSUES THAT WERE RAISED IN MS. HOLMES'S MOTION.  BOTH SIDES

10:17AM  20    HAVE ASKED QUESTIONS PROBING THAT -- THOSE ISSUES, AND THEY'VE

10:17AM  21    BEEN HELPFUL TO THE COURT.

10:17AM  22          I'LL HEAR ANY COMMENTS.  DO YOU WANT TO MAKE A COMMENT,

10:17AM  23    MR. WADE?

10:17AM  24              MR. WADE:  I THINK, YOUR HONOR, IN THE STATUS

10:17AM  25    CONFERENCE IN ADVANCE OF THIS HEARING YOUR HONOR SUGGESTED THAT

10:18AM 1    WITHIN A PERIOD OF TIME, THAT I DON'T NOW RECALL BUT I KNOW

10:18AM 2    IT'S IN AN ORDER, THAT WE WOULD SUBMIT ANY FURTHER BRIEFING ON

10:18AM 3    THIS SO THE COURT HAS THE BENEFIT OF THAT.

10:18AM 4          MR. BOSTIC:  I BELIEVE THE COURT PROVIDED ONE WEEK

10:18AM 5    FOR THAT, YOUR HONOR.  WE'RE HAPPY TO RESERVE OUR COMMENTS

10:18AM 6    UNTIL THEN.

10:18AM 7          MR. WADE:  WE'RE HAPPY TO MAKE THAT IN WRITING WITH

10:18AM 8    THE BENEFIT OF THE TRANSCRIPT, AND THEN WE'LL REST ON THE

10:18AM 9    PAPERS.

10:18AM 10         THE COURT:  OKAY.  THANK YOU.  I JUST WANTED TO MAKE

10:18AM 11   AN OPPORTUNITY FOR EITHER SIDE TO MAKE ANY COMMENT HERE WHILE

10:18AM 12   I'M ON THE BENCH.

10:18AM 13       IF NOT, IF YOU WANT TO RESERVE THAT, THAT'S FINE.

10:18AM 14         MR. WADE:  I THINK WE'LL RESERVE THAT.

10:18AM 15         THE COURT:  YES, THERE'S NO QUALITY DIFFERENCE

10:18AM 16   BETWEEN THOSE.

10:18AM 17         MR. WADE:  YES.

10:18AM 18         THE COURT:  OKAY.  THANK YOU.  ANY FURTHER EVIDENCE

10:18AM 19   OR TESTIMONY TO BE OFFERED AT THIS HEARING?

10:18AM 20         MR. BOSTIC:  NOT FROM THE GOVERNMENT, YOUR HONOR.

10:18AM 21         MR. WADE:  NO, YOUR HONOR.

10:18AM 22         THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

10:18AM 23       I'LL WAIT TO HEAR YOUR SUBMISSIONS, RECEIVE YOUR

10:18AM 24   SUBMISSIONS, AND I WISH EVERYONE WELL.  THANK YOU.

10:18AM 25         THE COURT:  THANK YOU.

10:18AM   1                    MR. WADE:   THANK YOU, YOUR HONOR.

10:18AM   2                    THE CLERK:   COURT IS CONCLUDED.

10:18AM   3             (COURT CONCLUDED AT 10:18 A.M.)

          4

          5

          6

          7

          8

          9

          10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

1

2

3                         CERTIFICATE OF REPORTER

4

5

6

7        I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8    STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9    280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10   CERTIFY:

11       THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16       IRENE RODRIGUEZ, CSR, RMR, CRR
         CERTIFICATE NUMBER 8074
17

18
         DATED:  OCTOBER 17, 2022
19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| USA,<br><br>        Plaintiff,<br><br>   v.<br><br>ELIZABETH A. HOLMES,<br><br>        Defendant. | Case No.  5:18-cr-00258-EJD-1<br><br>**ORDER GRANTING MOTION TO QUASH SUBPOENA *DUCES TECUM***<br><br>Re: Dkt. No. 1602 |

Non-Party Dr. Adam Rosendorff moves to quash a subpoena *duces tecum* issued by Defendant Elizabeth Holmes.  ECF No. 1602.  The subpoena sought documents and communications in advance of the limited October 17 evidentiary hearing to examine Dr. Rosendorff on certain discrete issues.  ECF No. 1602-2.  After considering the arguments presented in Dr. Rosendorff's and Defendant's briefs and oral arguments, the Court GRANTS Dr. Rosendorff's motion.

Rule 17 of the Federal Rules of Criminal Procedure permits a court to quash a subpoena if compliance would be "unreasonable or oppressive."  Fed. R. Crim. P. 17(c)(2).  In so reviewing, a court must consider whether the subpoena "clear[s] three hurdles: (1) relevancy; (2) admissibility; (3) specificity."  *United States v. Nixon*, 418 U.S. 683, 700 (1974).  Here, Defendant requests Dr. Rosendorff produce non-privileged "emails or communications regarding [his] trial testimony [and] emails or communications regarding the prosecution team (including its agents) and its work on, or interactions with [him], in this matter" from September 24, 2021 to the present.  ECF No. 1602-2, at 4.

Given the evidentiary hearing's discrete scope and purpose, Defendant's subpoena requests

are unreasonable.  As articulated by the Court on October 3, the limited purpose of the evidentiary hearing is to clarify Dr. Rosendorff's visit to Defendant's residence and his subsequent colloquy with Defendant's partner, specifically whether they implicate government misconduct or otherwise alter the veracity or character of Dr. Rosendorff's trial testimony.  *See* Hr'g Tr. 32:13-34:6 (Oct. 3, 2022).  Defendant's subpoena requests, however, are couched in broad and unrestrained terms—communications "regarding" Dr. Rosendorff's trial testimony and "regarding" the prosecution team—without any indicia of the discrete concerns voiced by the Court.  These requests more closely resemble the broad discovery permitted in civil proceedings, but "Rule 17(c) was not intended as a discovery device, or to allow a blind fishing expedition seeking unknown evidence."  *United States v. Reed*, 726 F.2d 570, 577 (9th Cir. 1984) (internal quotation marks omitted).  Under these unique circumstances that gave rise to a limited evidentiary hearing, Defendant's subpoena extends beyond the limited scope set for the October 17 hearing and is unreasonable.

Accordingly, Dr. Rosendorff's motion to quash is GRANTED.  The subpoena *duces tecum* issued to Dr. Rosendorff purporting to require production of certain materials by October 17, 2022, at 9:00 a.m. is QUASHED.

**IT IS SO ORDERED.**

Dated: October 14, 2022

EDWARD J. DAVILA
United States District Judge

1

```
 1                    UNITED STATES DISTRICT COURT

 2                   NORTHERN DISTRICT OF CALIFORNIA

 3                        SAN JOSE DIVISION

 4
      UNITED STATES OF AMERICA,       )
 5                                    )  CR-18-00258-EJD
                     PLAINTIFF,       )
 6                                    )  SAN JOSE, CALIFORNIA
                VS.                   )
 7                                    )  OCTOBER 14, 2022
      ELIZABETH A. HOLMES,            )
 8                                    )  PAGES 1 - 26
                     DEFENDANT.       )
 9    _____)

10

11                 TRANSCRIPT OF ZOOM PROCEEDINGS
              BEFORE THE HONORABLE EDWARD J. DAVILA
12                 UNITED STATES DISTRICT JUDGE

13    A P P E A R A N C E S:

14    FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                            BY:  JOHN C. BOSTIC
15                          150 ALMADEN BOULEVARD, SUITE 900
                            SAN JOSE, CALIFORNIA 95113
16
                            BY:  ROBERT S. LEACH
17                               KELLY VOLKAR
                            1301 CLAY STREET, SUITE 340S
18                          OAKLAND, CALIFORNIA 94612

19          (APPEARANCES CONTINUED ON THE NEXT PAGE.)

20
      OFFICIAL COURT REPORTER:
21                          IRENE L. RODRIGUEZ, CSR, RMR, CRR
                            CERTIFICATE NUMBER 8074
22

23       PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
             TRANSCRIPT PRODUCED WITH COMPUTER
24

25
```

2

A P P E A R A N C E S: (CONT'D)


FOR DEFENDANT HOLMES:   WILLIAMS & CONNOLLY LLP
                        BY:  LANCE A. WADE
                             KATHERINE TREFZ
                             J.R. FLEURMONT
                             AMY SAHARIA
                        725 TWELFTH STREET, N.W.
                        WASHINGTON, D.C. 20005


FOR DR. ROSENDORFF:    QUINN EMANUEL URQUHART & SULLIVAN, LLP
                       BY:  DANIEL KOFFMANN
                       51 MADISON AVENUE, 22ND FLOOR
                       NEW YORK, NEW YORK 10010

**ER-1258**

3

```
        1    SAN JOSE, CALIFORNIA                    OCTOBER 14, 2022

        2                    P R O C E E D I N G S
01:04PM
01:04PM  3        (COURT CONVENED AT 1:04 P.M.)

01:04PM  4             THE COURT:  THANK YOU.  GOOD AFTERNOON EVERYONE.

01:04PM  5        LET'S CALL THIS MATTER 18-258, UNITED STATES VERSUS

01:04PM  6    ELIZABETH HOLMES.  THIS IS A SPECIAL HEARING THAT IS SET IN

01:04PM  7    REGARDS TO A COUPLE OF MOTIONS FILED.

01:04PM  8        BUT FIRST LET ME CAPTURE THE APPEARANCE OF THE PARTIES,

01:04PM  9    PLEASE.

01:04PM 10        WHO APPEARS -- LET ME START WITH THE DEFENDANT,

01:04PM 11    MS. HOLMES.

01:04PM 12             WHO APPEARS AND WHO WILL BE SPEAKING?

01:04PM 13             MR. WADE:  GOOD AFTERNOON, YOUR HONOR.

01:04PM 14        LANCE WADE WITH MS. HOLMES.

01:04PM 15        WITH ME TODAY ARE MY COLLEAGUES:  AMY SAHARIA,

01:04PM 16    KATHERINE TREFZ, AND J.R. FLEURMONT.

01:04PM 17        AND MS. HOLMES IS ALSO PRESENT HERE TODAY.

01:04PM 18        I SHOULD NOTE FOR THE RECORD THAT WE HAVE -- WE CONSENT TO

01:05PM 19    APPEARING VIA THE VIDEO MEANS AS WE HAVE IN THE PAST AND THAT

01:05PM 20    WE'VE MADE ARRANGEMENTS WITH MS. HOLMES TO COMMUNICATE WITH HER

01:05PM 21    SEPARATELY IF THAT BECOMES NECESSARY DURING THE COURSE OF THE

01:05PM 22    HEARING.

01:05PM 23             THE COURT:  GREAT.  THANK YOU VERY MUCH, MR. WADE.

01:05PM 24    I APPRECIATE THAT.  IT'S NICE TO SEE EVERYONE ON YOUR TEAM

01:05PM 25    AGAIN AND MS. HOLMES.
```

4

```
01:05PM   1        AND LET ME ASK, WHO APPEARS FOR THE MOVING PARTY IN THIS
01:05PM   2   MATTER?
01:05PM   3            MR. KOFFMANN:  GOOD AFTERNOON, YOUR HONOR.
01:05PM   4        DANIEL KOFFMANN FROM QUINN EMANUEL URQUHART & SULLIVAN
01:05PM   5   APPEARING ON BEHALF OF DR. ROSENDORFF.
01:05PM   6            THE COURT:  THANK YOU.  AND YOUR CLIENT IS NOT
01:05PM   7   PARTICIPATING IN THIS HEARING; IS THAT CORRECT?
01:05PM   8            MR. KOFFMANN:  THAT'S CORRECT, YOUR HONOR.
01:05PM   9            THE COURT:  ALL RIGHT.  THANK YOU.
01:05PM  10        AND I NOTE WE HAVE GOVERNMENT ATTORNEYS PRESENT ALSO.  WHY
01:05PM  11   DON'T WE HAVE THEM IDENTIFY THEMSELVES.
01:05PM  12        MR. BOSTIC.
01:05PM  13            MR. BOSTIC:  GOOD AFTERNOON, YOUR HONOR.
01:05PM  14        JOHN BOSTIC FOR THE UNITED STATES, ALONG WITH
01:06PM  15   ROBERT LEACH AND KELLY VOLKAR.
01:06PM  16            THE COURT:  GOOD AFTERNOON.  IT'S NICE TO SEE
01:06PM  17   EVERYONE.
01:06PM  18        FIRST OF ALL, LET ME THANK YOU ALL FOR AGREEING TO HEAR
01:06PM  19   THIS MATTER THIS AFTERNOON.  I KNOW IT'S LATE AFTERNOON ON THE
01:06PM  20   EAST COAST.
01:06PM  21        I APPRECIATE, MR. WADE, YOU AND YOUR TEAM'S ATTENTION TO
01:06PM  22   THIS AS WELL AS MR. KOFFMANN, I THINK YOU'RE ON THE EAST COAST
01:06PM  23   AS WELL, SO I APPRECIATE THE OPPORTUNITY TO HAVE THIS MATTER
01:06PM  24   ADVANCED AND HEARD IN ADVANCE OF OUR MONDAY HEARING.
01:06PM  25        SO THANK YOU FOR THAT.
```

5

| | | |
|---|---|---|
| 01:06PM | 1 | WHAT BRINGS US HERE IS THE MOTION AT 1602, IT'S |
| 01:06PM | 2 | DR. ROSENDORFF'S MOTION TO QUASH THE SUBPOENA ISSUED, AND 1604 |
| 01:06PM | 3 | IS MS. HOLMES'S OPPOSITION TO THE MOTION TO QUASH. |
| 01:06PM | 4 | ARE THERE ANY OTHER FILED DOCUMENTS THAT THE PARTIES WISH |
| 01:06PM | 5 | TO DRAW TO MY ATTENTION THAT I HAVEN'T MENTIONED? |
| 01:07PM | 6 | MR. KOFFMANN: NOT FROM MY PERSPECTIVE, YOUR HONOR. |
| 01:07PM | 7 | THE COURT: OKAY. |
| 01:07PM | 8 | MR. WADE: NONE FOR THE DEFENSE, YOUR HONOR. |
| 01:07PM | 9 | THE COURT: OKAY. THANK YOU. |
| 01:07PM | 10 | WELL, MR. KOFFMANN, WHY DON'T I HEAR FROM YOU, SIR. |
| 01:07PM | 11 | YOU'RE THE MOVING PARTY ON THIS MOTION TO QUASH. WHAT WOULD |
| 01:07PM | 12 | YOU LIKE ME TO KNOW, SIR? |
| 01:07PM | 13 | MR. KOFFMANN: YES. SO THANK YOU, YOUR HONOR. |
| 01:07PM | 14 | THANK YOU FOR MAKING YOURSELF AVAILABLE. I KNOW THAT THIS IS |
| 01:07PM | 15 | ALL MOVING VERY QUICKLY. |
| 01:07PM | 16 | SO -- AND I KNOW THAT YOU'VE READ OUR PAPERS AND YOU'RE |
| 01:07PM | 17 | FAMILIAR WITH THEM. BUT THERE ARE, I THINK, TWO POINTS THAT I |
| 01:07PM | 18 | WOULD SUGGEST TO THE COURT MAY BE USEFUL IN YOUR ANALYSIS. |
| 01:07PM | 19 | AND THE FIRST IS THAT THE SUBPOENA FAILS UNDER NIXON. |
| 01:07PM | 20 | IT'S REALLY NOT EVEN CLOSE. IT'S OVERBROAD. IT DOESN'T SEEK |
| 01:07PM | 21 | SUBSTANTIVE EVIDENCE. |
| 01:07PM | 22 | AND ON THE SPECIFICITY ELEMENTS, THE THIRD ELEMENT UNDER |
| 01:07PM | 23 | THE NIXON TEST, WHAT I THOUGHT WAS INTERESTING FROM THE |
| 01:07PM | 24 | DEFENDANT'S RESPONSE THAT THEY, THAT THE DEFENSE FILED TODAY IS |
| 01:08PM | 25 | THEY CONFIRM WHAT I THINK WE DIDN'T KNOW BEFORE, BUT THEY |

6

01:08PM 1    CONFIRMED THAT THEY HAVE NO BASIS TO BELIEVE THAT ANY OF THE

01:08PM 2    DOCUMENTS THAT THEY SEEK ACTUALLY EXIST.

01:08PM 3        THE WHOLE BASIS FOR THEIR SUBPOENA IS SPECULATION.  AND

01:08PM 4    THEY SAY ON PAGE 4 OF THEIR OPPOSITION, THIS IS LINE 7 TO 10,

01:08PM 5    IT WOULD BE SURPRISING IF DR. ROSENDORFF WERE COMMUNICATING

01:08PM 6    EXTENSIVELY IN WRITING ABOUT HIS TRIAL TESTIMONY, BUT

01:08PM 7    ESSENTIALLY THAT POSSIBILITY CANNOT BE DISCOUNTED.

01:08PM 8        AND EFFECTIVELY THIS IS ALL THEIR HOPE THAT THEY WILL FIND

01:08PM 9    SOME DOCUMENTS THAT THEY CAN USE AT THIS HEARING.  AND IT

01:08PM 10   REMINDED ME OF THE AGUILAR DECISION FROM JUDGE ARMSTRONG, A

01:08PM 11   2008 DECISION TO WHICH WE CITED IN OUR PAPERS, WHERE

01:08PM 12   JUDGE ARMSTRONG SAID THAT A MERE HOPE THAT THE SUBPOENA WILL

01:08PM 13   OBTAIN FAVORABLE DOCUMENTS IS NOT ENOUGH UNDER NIXON.

01:09PM 14       AND THEN, OF COURSE, EVEN IF THE DOCUMENTS EXIST, AND

01:09PM 15   MOVING ON TO THE ADMISSIBILITY ELEMENT OF THE NIXON TEST, EVEN

01:09PM 16   IF THOSE DOCUMENTS EXIST, THEIR ONLY USE IS AS IMPEACHMENT, AND

01:09PM 17   THEY -- IN THEIR RESPONSE THEY DON'T ARTICULATE ANY

01:09PM 18   NON-IMPEACHMENT USE FOR THESE DOCUMENTS, AND THAT DOESN'T APPLY

01:09PM 19   UNDER NIXON.

01:09PM 20       AND WE CITED TO THE FIELDS DECISION, THE FIELDS ORDER FROM

01:09PM 21   THE NINTH CIRCUIT WHERE THE COURT FOUND IT WAS ABUSE OF

01:09PM 22   DISCRETION FOR THE DISTRICT COURT TO DENY A MOTION TO QUASH

01:09PM 23   WHERE THE ONLY ARTICULATED BASIS FOR THE MATERIALS SOUGHT WAS

01:09PM 24   IMPEACHMENT.

01:09PM 25       SO THAT'S KIND OF THE FIRST POINT THAT I WOULD OFFER TO

7

01:09PM 1    YOUR HONOR THAT IT FAILS UNDER NIXON.

01:09PM 2        NOW, DEFENDANT ARGUES THAT NIXON DOESN'T APPLY BECAUSE THE

01:09PM 3    MATERIALS ARE NOT BEING SOUGHT PRIOR TO THE PROCEEDING.  THAT'S

01:09PM 4    CLEARLY WRONG.  THEY DO NOT CITE TO ANY AUTHORITY THAT HOLDS

01:10PM 5    THAT.

01:10PM 6        AS NEAR AS I CAN TELL, THE DECISIONS THAT THEY CITE TO

01:10PM 7    APPLY NIXON TO THE SITUATION WHERE DOCUMENTS ARE SOUGHT PRIOR

01:10PM 8    TO THE PROCEEDING, BUT THAT'S VERY DIFFERENT FROM SAYING THAT

01:10PM 9    NIXON DOES NOT APPLY WHERE THE SUBPOENA SEEKS DOCUMENTS TO BE

01:10PM 10   BROUGHT TO TRIAL OR TO THE RELEVANT PROCEEDING.

01:10PM 11       AND THEY DON'T OFFER ANY REASONS WHY A DIFFERENT

01:10PM 12   STANDARD -- WHY NIXON SHOULD NOT APPLY IN THE LATTER SCENARIO.

01:10PM 13   SO IT FAILS UNDER NIXON.

01:10PM 14       BUT, YOU KNOW, THE SECOND POINT OF WHAT I THINK MAY BE

01:10PM 15   MORE CONCERNING TO THE COURT IS WHETHER ANY SUBPOENAS ARE

01:10PM 16   APPROPRIATE IN THIS CONTEXT OR CONSISTENT WITH THE SCOPE THAT

01:10PM 17   THE COURT SET FOR THE HEARING.

01:10PM 18       I THINK WE ALL AGREE THAT THE COURT HAS TO CONSIDER THE

01:10PM 19   CONTEXT WHEN PERFORMING THE NIXON ANALYSIS.

01:10PM 20       SO THE CONTEXT HERE, AS YOUR HONOR KNOWS, IS WE HAVE A

01:11PM 21   TRIAL WITNESS, DR. ROSENDORFF, WHO MADE ALLEGED STATEMENTS THAT

01:11PM 22   THE DEFENSE HAS ARGUED, YOU KNOW, HAS SOUGHT TO DRAW AN

01:11PM 23   INSINUATION FROM THOSE STATEMENTS THAT HE MAY HAVE A DESIRE TO

01:11PM 24   RECANT HIS TESTIMONY.

01:11PM 25       AND DR. ROSENDORFF HAS SUBMITTED HIS DECLARATION, WHICH HE

01:11PM 1    REAFFIRMED HIS TESTIMONY, HE REPUDIATED ANY POTENTIAL

01:11PM 2    RECANTATION THAT MIGHT HAVE OCCURRED DURING HIS VISIT TO

01:11PM 3    MS. HOLMES'S HOUSE.

01:11PM 4        AND I THINK, YOU KNOW, THE CASE LAW IS CLEAR THAT THAT

01:11PM 5    DECLARATION WAS SUFFICIENT TO DEFEAT THE NEW TRIAL MOTION.

01:11PM 6    NEVERTHELESS, THE COURT HAS OPTED TO HOLD A HEARING.

01:11PM 7        AND AS I UNDERSTOOD THE COURT AT THE STATUS CONFERENCE,

01:11PM 8    WHAT I UNDERSTOOD THE COURT TO BE SAYING EFFECTIVELY IS THAT WE

01:12PM 9    OUGHT TO SORT OF EYEBALL DR. ROSENDORFF, GET HIM IN COURT AND

01:12PM 10   SEE -- AND I'M QUOTING HERE FROM THE TRANSCRIPT ON PAGE 33 FROM

01:12PM 11   THE OCTOBER 3RD HEARING.  THE COURT SAID, "SO PERHAPS THIS WILL

01:12PM 12   EITHER BE AN OPPORTUNITY TO REAFFIRM THAT," REFERRING TO

01:12PM 13   DR. ROSENDORFF'S DECLARATION, "OR TO EXPLAIN WHY HE PARTS

01:12PM 14   COMPANY WITH THAT.  SO THAT'S WHY I SAY I DON'T THINK THIS WILL

01:12PM 15   BE A LENGTHY PROCESS."

01:12PM 16       THE COURT SAID THIS WOULD NOT BE RECROSS OR REDIRECT.  IT

01:12PM 17   WOULD BE A LIMITED, LIMITED, LIMITED HEARING, AND IT WOULD NOT

01:12PM 18   BE A FISHING EXPEDITION.

01:12PM 19       AND EFFECTIVELY IT IS SORT OF MY PARAPHRASING OF WHAT THE

01:12PM 20   COURT SAID IS THAT WE SHOULD LAY EYES ON DR. ROSENDORFF AND SEE

01:12PM 21   IF HE STANDS BY HIS TESTIMONY IN HIS DECLARATION OR I SUPPOSE,

01:12PM 22   YOU KNOW, AS THIS DECLARATION WAS SOMETHING THAT WAS KIND OF

01:13PM 23   FORCED ON HIM BY THE GOVERNMENT.

01:13PM 24       NOW, I'LL SAY OBVIOUSLY, YOUR HONOR, AS HIS LAWYER, I CAN

01:13PM 25   TELL YOU WHAT HIS ANSWERS ARE GOING TO BE TO THAT, AND I THINK

9

01:13PM 1    THE MOTION TO QUASH, YOU KNOW, HOPEFULLY PROVIDED SOME CLARITY

01:13PM 2    ON THAT ABOUT WHAT HIS ANSWER WOULD BE.

01:13PM 3       BUT MY POINT HERE IS THAT THIS CONTEXT, A SORT OF

01:13PM 4    POTENTIAL INSINUATION OF A DESIRE TO RECANT FOLLOWED BY A

01:13PM 5    REPUDIATION OF THAT INSINUATION SIMPLY IS NOT CONSISTENT WITH

01:13PM 6    THE DEFENDANT IN A LIMITED, LIMITED HEARING TO PROBE THAT

01:13PM 7    DECLARATION.  THAT IS JUST NOT CONSISTENT WITH THE DEFENDANT

01:13PM 8    ISSUING SUBPOENAS, SEEKING IMPEACHMENT MATERIALS, AND AS FAR AS

01:13PM 9    I CAN TELL NOT SEEKING THE COURT'S GUIDANCE BEFOREHAND ABOUT

01:13PM 10    WHETHER THAT WOULD BE WITHIN THE SCOPE OF WHAT THE COURT SET

01:13PM 11    FOR THE HEARING.

01:13PM 12       SO I THINK IT'S SUFFICIENT FOR THIS SUBPOENA TO SAY THAT

01:14PM 13    IT FAILS UNDER NIXON QUASHED, BUT I RAISE THE SECOND POINT ONLY

01:14PM 14    BECAUSE, YOUR HONOR, I DON'T KNOW WHAT ELSE IS OUT THERE.  I

01:14PM 15    DON'T KNOW WHETHER THE DEFENDANT HAS SUBPOENAED OTHER PEOPLE

01:14PM 16    SEEKING INFORMATION ABOUT DR. ROSENDORFF, AND I DON'T THINK

01:14PM 17    THAT THAT WOULD BE CONSISTENT WITH THE COURT'S EXPECTATIONS FOR

01:14PM 18    THIS HEARING, AND I DON'T THINK IT WOULD BE APPROPRIATE GIVEN

01:14PM 19    THE POSTURE OF THE CASE.

01:14PM 20       SO IN THAT RESPECT I WOULD OFFER JUST ONE FINAL POINT TO

01:14PM 21    YOUR HONOR THAT I THINK IS IMPORTANT FOR THE CONTEXT HERE THAT

01:14PM 22    IT'S RELEVANT TO CONSIDER SORT OF WHAT DR. ROSENDORFF HAS BEEN

01:14PM 23    THROUGH.  THIS IS A MAN WHO CAME FORWARD AT TREMENDOUS

01:14PM 24    PROFESSIONAL, LEGAL, PERSONAL RISK TO BLOW THE WHISTLE ON

01:15PM 25    CONDUCT THAT TWO JURIES HAVE NOW FOUND MOUNTED TO FEDERAL

01:15PM 1    FELONIES.

01:15PM 2        AND IN RETURN HE HAS GOTTEN NOTHING BUT HEARTACHE.  HE'S

01:15PM 3    BEEN CAST INTO THE PUBLIC EYE, HE'S HAD EVERY ASPECT OF HIS

01:15PM 4    LIFE PULLED OVER AND MUCH OF IT AIRED IN COURT AND IN PUBLIC.

01:15PM 5    I THINK AT SOME POINT IN THESE PROCEEDINGS SOMEBODY REFERRED TO

01:15PM 6    HIM AS THE TYPHOID MARY OF THE LAB INDUSTRY.  THIS HAS ALL COME

01:15PM 7    AT GREAT EMOTIONAL EXPENSE.  I WANT TO BE CLEAR ABOUT THAT.

01:15PM 8        I COMMEND MR. WADE, THE ENTIRE DEFENSE TEAM FOR, YOU KNOW,

01:15PM 9    THE ZEALOUS ADVOCACY THAT THEY PROVIDED TO THEIR CLIENTS.  AND

01:15PM 10   DR. ROSENDORFF, YOU KNOW, HE DID WHAT HE HAD TO DO ACCORDING TO

01:15PM 11   HIS MORALS AND ETHICS ABOUT WHAT HE SAW AT THERANOS, BUT I DO

01:16PM 12   THINK IT'S IMPORTANT TO KEEP IN MIND THAT HE DIDN'T SEEK OUT

01:16PM 13   WORKING AT A FRAUDULENT COMPANY SO THAT HE COULD BECOME A

01:16PM 14   WHISTLEBLOWER AND HAVE HIS LIFE UPENDED.  THAT ROLE WAS HOISTED

01:16PM 15   ON HIM BY THE DEFENDANTS IN THIS CASE.  AND I THINK HE'S

01:16PM 16   ENTITLED TO SOME RELIEF.

01:16PM 17       NOW, OF COURSE, HE'LL OBEY THE COURT'S ORDERS AS HE ALWAYS

01:16PM 18   HAS, BUT I WOULD ASK THE COURT TO FACTOR INTO THE ANALYSIS THAT

01:16PM 19   DR. ROSENDORFF HAS BEEN THROUGH A LOT, AND I THINK HE DESERVES

01:16PM 20   TO BE LEFT ALONE.

01:16PM 21       SO WITH THAT, YOUR HONOR, I'M HAPPY TO ADDRESS ANY

01:16PM 22   PARTICULAR POINTS ABOUT THE MOTION THAT YOUR HONOR MAY WANT TO

01:16PM 23   ASK ABOUT, AND OTHERWISE I WOULD REST ON THE PAPERS.

01:16PM 24           THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH,

01:16PM 25   MR. KOFFMANN.  I APPRECIATE THAT.

01:16PM 1      MS. SAHARIA, ARE YOU SPEAKING?  IS MR. WADE SPEAKING?

01:16PM 2              MR. WADE:  I GET THE PLEASURE OF SPEAKING.

01:16PM 3              MS. SAHARIA:  MR. WADE IS.

01:16PM 4              THE COURT:  ALL RIGHT.  MR. WADE, WHAT WOULD YOU

01:17PM 5      LIKE ME TO KNOW, SIR?

01:17PM 6              MR. WADE:  THANK YOU, YOUR HONOR.

01:17PM 7          LET ME TRY TO ADDRESS A FEW OF THE POINTS SUCCINCTLY.

01:17PM 8      FIRST OF ALL, THIS IS THE ONLY SUBPOENA WE HAVE ISSUED IN

01:17PM 9      CONNECTION WITH THE HEARING, AND SO TO THE EXTENT THERE ARE ANY

01:17PM 10     QUESTIONS ABOUT THAT, I CAN CLARIFY THAT FOR COUNSEL AND FOR

01:17PM 11     THE COURT.

01:17PM 12         AS THE COURT KNOWS UNDER RULE 17, THERE'S NOT PERMISSION

01:17PM 13     NEEDED FROM THE COURT TO ISSUE A SUBPOENA IN CONNECTION WITH AN

01:17PM 14     EVIDENTIARY HEARING.

01:17PM 15         I BELIEVE -- I WOULD HAVE TO CHECK MY RECORDS, BUT I

01:17PM 16     BELIEVE EVERY EVIDENTIARY HEARING THAT I HAVE EVER PARTICIPATED

01:17PM 17     IN WHERE I'VE SUBPOENAED WITNESSES TO TESTIFY, I OFTEN INCLUDE

01:17PM 18     DOCUMENT SUBPOENAS, AND THIS IS A TESTIMONY SUBPOENA THAT

01:17PM 19     INCLUDES DOCUMENTS, SO I DON'T THINK THERE'S ANYTHING

01:17PM 20     EXTRAORDINARY ABOUT THIS.

01:17PM 21         WE SOUGHT TO SPECIFICALLY AND NARROWLY TAILOR THE REQUEST

01:17PM 22     TO THE ISSUES THAT ARE RELEVANT TO THE HEARING AND

01:17PM 23     COMMUNICATIONS THAT ARE RELEVANT TO THE TWO SUBJECTS OF

01:17PM 24     INQUIRY.

01:17PM 25         WE BELIEVE THERE ARE DOCUMENTS THAT RELATE TO THAT, AND I

01:18PM 1    THINK IMPLICITLY COUNSEL IN HIS SUBMISSION HAS CONFIRMED THAT

01:18PM 2    THERE ARE DOCUMENTS AND THAT IT POTENTIALLY BE BURDENSOME TO

01:18PM 3    LOOK FOR THEM.

01:18PM 4        WE WOULD HAVE BEEN HAPPY TO MEET AND CONFER.  IF IT IS

01:18PM 5    BURDENSOME, WE WOULD BE HAPPY TO ADJOURN THE HEARING FOR A

01:18PM 6    SHORT PERIOD OF TIME TO MEET ANY BURDEN.

01:18PM 7        WE DIDN'T THINK THIS WAS A BURDENSOME SUBPOENA BECAUSE,

01:18PM 8    FRANKLY, WE DIDN'T THINK THERE WOULD BE VOLUMINOUS INQUIRIES.

01:18PM 9        WE ONLY SEEK THE COMMENTS OF DR. ROSENDORFF FROM THE TWO

01:18PM 10   TOPICS THAT ARE SUBJECT OF INQUIRY.  I THINK THOSE TWO TOPICS,

01:18PM 11   TO THE EXTENT THAT THERE ARE EMAILS OR COMMUNICATIONS THAT

01:18PM 12   ADDRESS THEM, THEY'RE HIGHLY PERTINENT TO WHAT IS GOING TO --

01:18PM 13   THE ISSUES THAT WE'RE GOING TO EXPLORE IN THE SPECIFIC CONTEXT

01:18PM 14   OF THIS HEARING, WHICH IS WHAT IS APPROPRIATE UNDER NIXON.

01:18PM 15       WE CAN ENGAGE IN AN ESOTERIC DEBATE OF THE APPLICATION OF

01:19PM 16   NIXON HERE.  I KNOW THE JUDICIAL CONFERENCE IS CURRENTLY

01:19PM 17   CONSIDERING THE AMENDED RULE 17 BECAUSE OF SOME UNCERTAINTY

01:19PM 18   THAT EXISTS OUT THERE WITH RESPECT TO NIXON, BUT WHETHER IT

01:19PM 19   APPLIES IN THIS CONTEXT OR NOT, EVEN COUNSEL ADMITS THAT YOU

01:19PM 20   HAVE TO LOOK AT THE SPECIFIC CONTEXT.

01:19PM 21       THE SPECIFIC CONTEXT HERE IS A HEARING ON TWO ISSUES THAT

01:19PM 22   ARE THE TWO ISSUES THAT ARE IDENTIFIED IN THE REQUESTS AND

01:19PM 23   THEIR COMMUNICATIONS FROM DR. ROSENDORFF ABOUT THOSE ISSUES.

01:19PM 24   THAT'S WHAT WE SEEK.

01:19PM 25       I THINK IT WOULD BE HARD TO SUGGEST THAT THAT'S NOT

13

01:19PM 1    RELEVANT TO THE INQUIRY IF, FOR EXAMPLE, DR. ROSENDORFF SENT AN

01:19PM 2    EMAIL TO A FRIEND OR A REPORTER OR SOMEONE ELSE IN A

01:19PM 3    NON-PRIVILEGED CONTEXT WHERE HE RAISED AN ISSUE ABOUT THE

01:19PM 4    GOVERNMENT'S CONDUCT OR HE RAISED AN ISSUE ABOUT HIS TRIAL

01:19PM 5    TESTIMONY BEING MISLEADING.

01:19PM 6        I THINK IT WOULD BE HARD TO SAY THAT THAT'S NOT RELEVANT

01:20PM 7    TO THE INQUIRY GIVEN THAT IT APPEARS THERE MAY BE SOME DISPUTE

01:20PM 8    AS TO THE SIGNIFICANCE OF THE STATEMENTS THAT HE MADE TO

01:20PM 9    MR. EVANS.

01:20PM 10       I'M SYMPATHETIC TO DR. ROSENDORFF TO THE EXTENT THAT WE

01:20PM 11   UNDERSTAND THAT, YOU KNOW, I'M SURE A LAWYER OF MR. KOFFMAN'S

01:20PM 12   QUALITY DOESN'T COME CHEAP.  IT'S A BURDEN, IT'S AN EXPENSE,

01:20PM 13   AND WE ARE SYMPATHETIC TO THAT.

01:20PM 14       OF COURSE, YOUR HONOR, MY CLIENT DID NOT GO TO

01:20PM 15   DR. ROSENDORFF'S HOUSE.  DR. ROSENDORFF CAME TO MY CLIENT'S

01:20PM 16   HOUSE IN THE MOST EXTRAORDINARY OF CIRCUMSTANCES, AND WE'RE

01:20PM 17   JUST WITHIN THE RULES MEETING OUR OBLIGATIONS, IDENTIFYING

01:20PM 18   DISCRETE CATEGORIES OF DOCUMENTS, AND TRYING TO FIND A

01:20PM 19   REASONABLE WAY TO ADDRESS THESE MATTERS.

01:20PM 20       SO I'LL REST WITH THAT.  I'M HAPPY TO ADDRESS ANY

01:20PM 21   QUESTIONS THAT THE COURT MAY HAVE.

01:20PM 22       AS I'VE SAID, WE'RE HAPPY TO, CONSISTENT WITH THE COURT'S

01:21PM 23   DESIRES AND SCHEDULE, TO GIVE DR. ROSENDORFF SOME FLEXIBILITY

01:21PM 24   TO GO THROUGH THE COMMUNICATIONS, BUT WE THINK THE

01:21PM 25   COMMUNICATIONS ARE JUSTIFIED AND APPROPRIATE UNDER THE FEDERAL

01:21PM 1    RULES.

01:21PM 2            THE COURT:  ALL RIGHT.  THANK YOU.  THANK YOU.

01:21PM 3        MR. KOFFMANN, DID YOU WANT TO RESPOND?

01:21PM 4            MR. KOFFMANN:  YES, JUST BRIEFLY, YOUR HONOR.

01:21PM 5        I HEARD MR. WADE SAY THAT THE DEFENSE BELIEVES THAT THERE

01:21PM 6    MAY BE DOCUMENTS THAT ARE RELATED TO THESE TWO TOPICS LISTED IN

01:21PM 7    THE SUBPOENA.  I THINK HE SAID THAT IF DR. ROSENDORFF

01:21PM 8    COMMUNICATED IN WRITING ABOUT THESE THINGS, THAT WOULD BE

01:21PM 9    RELEVANT, AND I THINK THAT CONFIRMS THAT THIS IS A DISCOVERY

01:21PM 10   EFFORT.

01:21PM 11       AND PUTTING ASIDE WHETHER IT'S GOOD POLICY FOR RULE 17 TO

01:21PM 12   PROHIBIT DISCOVERY, IF I WERE IN MR. WADE'S SHOES I WOULD BE

01:21PM 13   ARGUING THAT IT DOES NOT, BUT THAT IS THE RULE.  THIS IS A

01:21PM 14   DISCOVERY REQUEST.  THIS IS NOT A REQUEST FOR SURVEILLANCE

01:22PM 15   FOOTAGE DURING A PARTICULAR TIME, THIS IS NOT A REQUEST FOR THE

01:22PM 16   SECURITY LOG BOOK AT A BUILDING OR A GENERAL LEDGER.  THAT'S

01:22PM 17   WHAT RULE 17 IS ABOUT.  IT'S NOT A BROAD DOCUMENT REQUEST

01:22PM 18   SEEKING INFORMATION THAT IF IT EXISTS MIGHT BE RELEVANT.  AND

01:22PM 19   THAT'S SORT OF THE -- THERE ARE TOO MANY DECISIONS TO CITE THEM

01:22PM 20   ALL THAT REJECT THE RULE 17 SUBPOENA FOR THOSE KINDS OF

01:22PM 21   MATERIALS.

01:22PM 22           THE COURT:  ALL RIGHT.  THANK YOU.

01:22PM 23       WELL, LET ME INDICATE THAT MS. HOLMES SEEKS, THROUGH HER

01:22PM 24   LAWYERS, NON-PRIVILEGED EMAILS OR COMMUNICATIONS REGARDING YOUR

01:22PM 25   TRIAL TESTIMONY, THAT IS, DR. ROSENDORFF'S TRIAL TESTIMONY,

01:22PM  1    FROM SEPTEMBER 24, 2021 TO THE PRESENT.  THAT'S THE FIRST ITEM,

01:22PM  2    I BELIEVE, THAT'S ON THE SUBPOENA.

01:22PM  3        THE SECOND IS NON-PRIVILEGED EMAILS OR COMMUNICATIONS

01:23PM  4    REGARDING THE PROSECUTION TEAM, PARENTHETICALLY, INCLUDING ITS

01:23PM  5    AGENTS, AND ITS WORK ON OR INTERACTIONS WITH YOU IN THIS MATTER

01:23PM  6    FROM SEPTEMBER 24, 2021 TO THE PRESENT.

01:23PM  7        AND INITIALLY WHEN I SAW THAT, IT DOES SEEM TO BE -- I

01:23PM  8    KNOW THAT MR. WADE SUGGESTS THAT YOU'VE NARROWED IT DOWN,

01:23PM  9    YOU'VE NARROWED THE TIMEFRAMES, AND I APPRECIATE THAT.

01:23PM 10        BUT THE WORDING, THE LANGUAGE OF THE, OF THE REQUESTS SEEM

01:23PM 11    TO BE BROAD, THEY SEEM TO BE BROAD, AND TO ME, AT FIRST BLUSH I

01:23PM 12    LOOK AT IT, AND THEN I LOOK AT, AS MR. KOFFMANN SUGGESTED AND I

01:23PM 13    THINK YOU ALLUDED TO, MR. WADE, THE PURPOSES OF RULE 17 AND THE

01:23PM 14    ISSUANCE OF A SUBPOENA IN ADVANCE OF TRIAL, OR IN THIS CASE A

01:23PM 15    HEARING, AND WHAT IS THE PURPOSE TO BE SERVED.

01:24PM 16        WE HAD DISCUSSION.  MR. KOFFMANN WAS NOT PRESENT I DON'T

01:24PM 17    BELIEVE, BUT WE HAD DISCUSSION IN REGARDS TO MS. HOLMES'S THREE

01:24PM 18    MOTIONS, AND THE COURT FOUND IT WOULD BE APPROPRIATE AT LEAST

01:24PM 19    FOR THE COURT'S PURPOSE OF EVALUATING THE ISSUES RAISED BY THE

01:24PM 20    DEFENSE IN REGARDS TO THE VISITS TO MS. HOLMES'S RESIDENCE BY

01:24PM 21    THIS WITNESS, DR. ROSENDORFF.

01:24PM 22        THERE WERE QUESTIONS RAISED ABOUT THE COMMENTS, THE

01:24PM 23    COLLOQUY THAT ENSUED BETWEEN THOSE TWO INDIVIDUALS WHICH THEN

01:24PM 24    SUGGESTED TO THE DEFENSE OTHER AREAS OF INQUIRY THAT SHOULD BE

01:24PM 25    LOOKED INTO BECAUSE OF CONCERNS ABOUT DR. ROSENDORFF'S

01:24PM 1    TESTIMONY, THE CONTINUED VERACITY OF THAT, AND OTHER ISSUES

01:24PM 2    SUCH THAT, AS THE PARTIES OUTLINED, I SAID AND FOUND THAT IT

01:25PM 3    WOULD BE APPROPRIATE TO HAVE A LIMITED, A LIMITED HEARING FOR

01:25PM 4    THE PURPOSE OF THE COURT, THE FACT FINDER HERE FOR THIS

01:25PM 5    HEARING, TO DETERMINE WHAT IMPACT, IF ANY, AND EFFECT, IF ANY,

01:25PM 6    THIS COLLOQUY HAD ON DR. ROSENDORFF'S TESTIMONY AND ALSO THE

01:25PM 7    SUGGESTION THAT THERE MAY HAVE BEEN MISCONDUCT BY THE

01:25PM 8    GOVERNMENT.

01:25PM 9         AND YOU ALL RECALL I SAID THIS WAS GOING TO BE A LIMITED

01:25PM 10   HEARING.  I USED THE PHRASE -- IT WAS RAISED IN I THINK YOUR

01:25PM 11   PLEADING -- IT IS NOT A FISHING EXPEDITION.  AND I MENTIONED

01:25PM 12   THAT IN THE CONTEXT OF THE NIXON CASE AND ITS PROGENY.  WE ALL

01:25PM 13   KNOW ABOUT THOSE CASES.

01:25PM 14        THEY ARE -- THANK YOU, MR. KOFFMANN, FOR NOT RECITING THEM

01:25PM 15   -- THEY'RE LEGION.  EXPERIENCED COUNSEL KNOW WHERE THEY TAKE US

01:25PM 16   AND THE LIMITATIONS THAT ARE PUT ON RULE 17 AND REQUESTS.

01:26PM 17        RULE 17 EXISTS FOR A PARTICULAR REASON, AND IT AFFORDS THE

01:26PM 18   PARTIES AN OPPORTUNITY TO EXPLORE OTHER EVIDENCE, BUT THERE ARE

01:26PM 19   PARAMETERS TO IT.

01:26PM 20        THE HEARING THAT WE HAD, THAT WE WILL HAVE MONDAY WAS A

01:26PM 21   LIMITED ONE, AS I'VE SAID, AND THE COURT WAS CONCERNED ABOUT

01:26PM 22   THE VISITS AND THE COLLOQUY THAT ENSUED, AND WHAT, AS I SAID,

01:26PM 23   WHAT EFFECTS THAT MAY HAVE HAD ON THE TESTIMONY.

01:26PM 24        THE OPPORTUNITY TO EXPLORE THIS -- AND, MR. WADE, YOU

01:26PM 25   EXAMINED DR. ROSENDORFF AT LENGTH FOR SEVERAL -- A FEW DAYS,

01:26PM 1    AND THERE WAS AN OPPORTUNITY TO EXPLORE SOME OF THESE ISSUES

01:26PM 2    WITH HIM.  I HAVE ABOUT 20 PAGES OF TRANSCRIPTS HERE THAT I

01:26PM 3    REREAD IN PREPARATION FOR THIS HEARING AS WELL AS CITATIONS TO

01:27PM 4    OTHERS WHERE YOU ASKED DR. ROSENDORFF REGARDING THE ITEM 2 ON

01:27PM 5    THE SUBPOENA, THAT IS, COMMUNICATIONS OF PROSECUTION AND WHAT

01:27PM 6    THOSE WERE BOTH ON SEPTEMBER 28TH, SEPTEMBER 29TH.  IT'S A LOT

01:27PM 7    OF COLLOQUY ABOUT THAT.  I DON'T WANT TO GET AHEAD OF OURSELVES

01:27PM 8    FOR MONDAY'S HEARING, BUT I DO NOTE THAT THAT -- THOSE MANY

01:27PM 9    PAGES INFORM THE COURT AND THE PARTIES AS TO THOSE

01:27PM 10   COMMUNICATIONS.

01:27PM 11        THERE WAS AN OPPORTUNITY TO EXPLORE DR. ROSENDORFF UNDER

01:27PM 12   OATH ABOUT HIS COMMUNICATIONS WITH THE GOVERNMENT SPECIFICALLY

01:27PM 13   ASKING ON SEVERAL OCCASIONS DISCUSSION WITH THE GOVERNMENT

01:27PM 14   ABOUT CONCERNS AND WHO WAS INTERVIEWED AND DID THINGS DIFFER,

01:27PM 15   ET CETERA.

01:27PM 16        CUTTING TO THE CHASE HERE ABOUT -- THE PURPOSE OF THE

01:28PM 17   HEARING WAS VERY LIMITED, AS I TOLD YOU THAT.  THE CONTEXT AS

01:28PM 18   YOU SUGGEST, YOU AND MR. KOFFMANN SUGGEST AND RECOGNIZE, AND I

01:28PM 19   APPRECIATE THAT, IS A LIMITED ONE.

01:28PM 20        AND I DO FIND THAT THE SUBPOENA, WHILE I WILL FIND THAT IT

01:28PM 21   IS IN GOOD FAITH, MR. WADE.  I THINK YOUR TEAM IS, AS

01:28PM 22   MR. KOFFMANN RECOGNIZES, HE LAUDS YOU AND YOUR TEAM'S EFFORT

01:28PM 23   FOR YOUR CLIENT, I'M NOT SUGGESTING THAT IT IS IN BAD FAITH AT

01:28PM 24   ALL, BUT I DO THINK THAT IT IS OVERBROAD.  I DO FIND THAT UNDER

01:28PM 25   RULE 17, OF COURSE, YOU KNOW THE COURT CAN QUASH THE SUBPOENA

01:28PM 1    IF THE COURT FINDS IT'S UNREASONABLE OR OPPRESSIVE.

01:28PM 2        LOOKING AT THE TOTALITY OF THE REQUEST AS WELL AS

01:28PM 3    COMPARING THE DECLARATION OF DR. ROSENDORFF AND THE PURPOSE,

01:29PM 4    THE LIMITED FOCUS OF OUR HEARING MONDAY, I DO FIND THAT THE

01:29PM 5    SUBPOENA IS UNREASONABLE GIVEN THE LIMITED NATURE AND THE SCOPE

01:29PM 6    OF THE HEARING AS I ARTICULATED.

01:29PM 7        I DON'T BELIEVE THAT THE REQUESTS OF THE SUBPOENA WILL IN

01:29PM 8    ANY WAY ADVANCE THE PURPOSE OF THAT HEARING AND ARE REALLY

01:29PM 9    OUTSIDE THE NARROW AND LIMITED SCOPE OF THAT HEARING AS I

01:29PM 10   INDICATED PREVIOUSLY.  THIS WAS NOT INTENDED TO BE A FISHING

01:29PM 11   EXPEDITION THAT WOULD ALLOW FOR EVIDENTIARY DISCOVERY, IF YOU

01:29PM 12   WILL.

01:29PM 13       SO I JUST DON'T FIND THAT EVEN DOING A NIXON ANALYSIS, I

01:29PM 14   DON'T FIND THAT THE REQUESTED INFORMATION IS NECESSARILY

01:29PM 15   RELEVANT FOR THE PURPOSE OF THE LIMITED SCOPE OF THE HEARING,

01:29PM 16   AND I'M GOING TO GRANT THE MOTION TO QUASH THE SUBPOENA AS I DO

01:30PM 17   FIND THAT IT IS UNREASONABLE AND EXERCISING THE COURT'S

01:30PM 18   DISCRETION AS I LOOK AT THE TOTALITY OF THE CIRCUMSTANCES FOR

01:30PM 19   THAT HEARING, I DO FIND THAT IT IS EXCESSIVE AND OTHERWISE

01:30PM 20   UNREASONABLE, AND I'M GOING TO GRANT THE MOTION TO QUASH THAT

01:30PM 21   SUBPOENA.

01:30PM 22       THAT DOES NOT, OF COURSE, TAKE THE HEARING OFF THE TABLE.

01:30PM 23   WE STILL WILL HAVE THE HEARING, AND I TOLD YOU WHAT I WAS

01:30PM 24   INTERESTED IN BOTH THE LAST TIME THAT WE WERE TOGETHER AND I

01:30PM 25   THINK I'VE TOUCHED ON THAT TODAY.

01:30PM 1      I DON'T KNOW IF YOU WANT TO HAVE ANY OTHER QUESTIONS ABOUT

01:30PM 2    THAT, MR. WADE, FROM YOUR TEAM OR NOT.  I'M HAPPY TO DISCUSS

01:30PM 3    THAT NOW, BUT WE CAN JUST WAIT UNTIL MONDAY AND SEE WHERE WE

01:30PM 4    GO.

01:30PM 5      MR. WADE:  NO.  I THINK WE'VE GOTTEN DIRECTION FROM

01:30PM 6    THE COURT.  OBVIOUSLY, AS THE COURT NOTED, WE MADE AN EFFORT TO

01:31PM 7    TRY TO NARROW THE SUBPOENA AS FRAMED, BUT WE ACCEPT THE COURT'S

01:31PM 8    ORDER AS IT RELATES TO THIS SUBPOENA, AND WE'LL PROCEED WITH

01:31PM 9    THE DIRECTION THE COURT HAS GIVEN US ON MONDAY AND BEFORE

01:31PM 10   SEEING THE COURT ON MONDAY.

01:31PM 11      THE COURT:  GREAT.  ALL RIGHT.  THANK YOU VERY MUCH.

01:31PM 12     ANYTHING FURTHER FROM ANY -- MR. KOFFMANN, ANYTHING

01:31PM 13   FURTHER, SIR?

01:31PM 14      MR. KOFFMANN:  YES.  IF I COULD, YOUR HONOR.

01:31PM 15     YOU KNOW, SO I GUESS I HAVE ONE THOUGHT THAT I WOULD OFFER

01:31PM 16   TO THE COURT AND TO THE PARTIES AND ONE REQUEST.  I'LL START

01:31PM 17   WITH MY THOUGHT ON SORT OF THE SCOPE OF THE HEARING.  YOU KNOW,

01:31PM 18   GIVEN WHAT YOUR HONOR SAID AT THE STATUS CONFERENCE AND WHAT

01:31PM 19   YOU JUST SAID NOW ABOUT SORT OF THE SCOPE OF THE HEARING, I

01:31PM 20   WONDER IF -- AS I HEAR THE COURT TO BE SAYING, IT'S ESSENTIALLY

01:31PM 21   LIMITED TO WHETHER DR. ROSENDORFF IS GOING TO STAND BY HIS

01:31PM 22   DECLARATION, AND IF HE DOES, IT SEEMS TO ME THAT THAT OUGHT TO

01:32PM 23   BE IT, THAT OUGHT TO END THE SORT OF INQUIRY.

01:32PM 24     AND IF THE ANSWER IS NO, THEN, YOU KNOW, WE'LL SEE WHERE

01:32PM 25   IT GOES.

01:32PM 1       BUT IF I'M RIGHT THAT THAT IS ESSENTIALLY THE SCOPE, THEN

01:32PM 2   I WONDER IF THAT'S NOT MOST EFFICIENTLY DONE BY HAVING THE

01:32PM 3   COURT CONDUCT THE QUESTIONING.

01:32PM 4       AS YOU SAID, YOUR HONOR, YOU'RE THE FACT FINDER HERE, AND

01:32PM 5   YOU KNOW BETTER THAN ANYBODY WHAT ISSUES ARE GOING TO BE USEFUL

01:32PM 6   FOR YOU TO DECIDE THIS MOTION.  SO I WOULD OFFER THAT THOUGHT

01:32PM 7   THAT MAYBE IT'S MOST EFFICIENT TO HAVE THE COURT CONDUCT THE

01:32PM 8   QUESTIONING.

01:32PM 9       AND THEN MY REQUEST, YOUR HONOR, IS I THINK REGARDLESS OF

01:32PM 10  WHO CONDUCTS THE QUESTIONING, THERE ARE LIKELY TO BE SOME

01:32PM 11  POTENTIALLY THORNY PRIVILEGE ISSUES THAT COME UP GIVEN THE

01:32PM 12  NATURE OF THE INQUIRY.  YOU KNOW, OBVIOUSLY I SPENT A LOT OF

01:32PM 13  TIME WITH DR. ROSENDORFF DURING HIS TESTIMONY PREPARING FOR HIS

01:33PM 14  TESTIMONY, AND SO I WOULD MAKE A REQUEST TO THE COURT THAT I BE

01:33PM 15  PERMITTED TO APPEAR AT THE HEARING AND BE ABLE TO LODGE

01:33PM 16  OBJECTIONS BECAUSE I THINK I'M PROBABLY IN THE BEST POSITION OF

01:33PM 17  ANYBODY TO SORT OF KNOW WHERE WE'RE GETTING INTO POTENTIALLY

01:33PM 18  THORNY TERRITORY.

01:33PM 19          THE COURT:  WELL, THANK YOU FOR THOSE OBSERVATIONS.

01:33PM 20  LET ME INDICATE, IT WOULD BE MY INTENT TO PUT QUESTIONS BEFORE

01:33PM 21  DR. ROSENDORFF.  AS YOU POINT OUT, I'M THE ONE WHO SET THE

01:33PM 22  HEARING, AND IT IS NOT A HEARING TO REENGAGE CROSS-EXAMINATION,

01:33PM 23  TRIAL CROSS-EXAMINATION.  THE DEFENSE HAS RAISED SOME ISSUES.

01:33PM 24      CANDIDLY, AS MR. WADE POINTS OUT, AND I'M NOT BEING

01:33PM 25  ACCUSATORY HERE, DON'T GET ME WRONG ABOUT THAT, BUT

21

01:33PM 1     DR. ROSENDORFF, HIS CONDUCT IN VISITING, OF COURSE, IS THE

01:33PM 2     GENESIS OF ALL OF THIS.

01:33PM 3         AND IT, IT -- I FOUND AND I STILL BELIEVE THAT IT DOES

01:34PM 4     DESERVE SOME SCRUTINY, AND THAT'S WHY I SET THE HEARING.  SO I

01:34PM 5     HEARD THE DEFENSE AND THEIR COLLOQUY, THEIR COMMENTS REGARDING

01:34PM 6     THE THREE MOTIONS.  AS INDICATED, THERE ARE A COUPLE OF PIECES

01:34PM 7     THAT RESONATED WITH ME, AND THAT'S WHAT I'D LIKE TO FLUSH OUT.

01:34PM 8         BUT I DO NOT, AND I'VE SAID BEFORE, I'VE SET ASIDE A FULL

01:34PM 9     DAY, AND I DID THAT JUST TO CLEAR OUR DOCKET, CANDIDLY.  THIS

01:34PM 10    WILL NOT BE A LENGTHY, A LENGTHY DISCUSSION OR EXAMINATION.

01:34PM 11    IT'S VERY LIMITED AND FOCUSSED ON THOSE ISSUES.

01:34PM 12        MR. WADE, DO YOU WANT TO BE HEARD AS TO PROTOCOL OF

01:34PM 13    EXAMINATION?

01:34PM 14            MR. WADE:  OBVIOUSLY, YOUR HONOR, IT WOULDN'T

01:34PM 15    SURPRISE ME IF THE COURT HAD INQUIRY.  WE MADE THE MOTION.  IT

01:35PM 16    AFFECTS OUR CLIENT, AND WE OBVIOUSLY BELIEVE THAT WE SHOULD

01:35PM 17    HAVE THE RIGHT TO CONDUCT THE EXAMINATION SINCE WE'RE THE

01:35PM 18    MOVING PARTY.  I THINK ORDINARILY WE WOULD, YOU KNOW, WE WOULD

01:35PM 19    BEGIN THE EXAMINATION.

01:35PM 20        I DON'T, I DON'T -- THIS IS A, THIS IS A MATTER BETWEEN

01:35PM 21    THE UNITED STATES AND MS. HOLMES.  I DON'T THINK IT'S

01:35PM 22    APPROPRIATE FOR COUNSEL FOR A WITNESS TO APPEAR AND LODGE

01:35PM 23    OBJECTIONS.  I MEAN, I DON'T -- OBVIOUSLY TO THE EXTENT THAT

01:35PM 24    DR. ROSENDORFF SEES A PRIVILEGE ISSUE, WE HAVE NO, NO CONCERN

01:35PM 25    ABOUT HIM CONSULTING WITH COUNSEL.  WE HAVE NO INTENTION TO TRY

22

01:35PM 1    AND GO INTO HIS PRIVILEGED COMMUNICATIONS, BUT I DON'T THINK

01:35PM 2    COUNSEL FOR A WITNESS IN THESE TYPES OF MATTERS WOULD

01:35PM 3    ORDINARILY SIT AT COUNSEL TABLE, AND I DON'T THINK THAT'S

01:35PM 4    NECESSARY HERE.

01:35PM 5           THE COURT:  WELL, THANK YOU.

01:35PM 6        MR. WADE, IT IS -- THEY WERE YOUR MOTIONS, THE THREE

01:35PM 7    MOTIONS.  THIS IS THE ONE THAT WE'RE HAVING SOME EVIDENCE ON.

01:36PM 8    SO IT WOULD BE MY INTENT AND IT WAS MY INTENT TO ALLOW YOU TO

01:36PM 9    DO SOME LIMITED EXAMINATION, SIR, BUT I'M PAUSING HERE BECAUSE,

01:36PM 10   YOU KNOW, I DON'T WANT TO EVER DENY A DEFENDANT AN OPPORTUNITY

01:36PM 11   TO FULLY TO EXPLORE ISSUES THAT ARE APPROPRIATE AND WITHIN

01:36PM 12   EVIDENTIARY BOUNDARIES.

01:36PM 13       ON THE OTHER HAND, THIS -- I JUST WANT TO REITERATE, THIS

01:36PM 14   IS A VERY LIMITED HEARING.  IT IS.  AND I THINK YOU UNDERSTAND.

01:36PM 15   THAT.  I'VE SAID IT SEVERAL TIMES.  THE PARTIES HAVE REPEATED

01:36PM 16   IT, SO I THINK THERE IS COMMON KNOWLEDGE ABOUT WHAT THIS

01:36PM 17   HEARING IS ALL ABOUT AND WHAT IT IS NOT ABOUT.

01:36PM 18       I HAVE SOME SPECIFIC QUESTIONS.

01:36PM 19       MR. KOFFMANN SUGGESTS, JUDGE, IF WE JUST PUT THE WITNESS

01:36PM 20   ON AND HE SAYS, YES, I RE-AFFIRM THE DECLARATION, THAT'S THE

01:36PM 21   END OF HIS STORY AND I THINK FROM HIS POSITION HE'S PROBABLY

01:36PM 22   RIGHT, THAT'S IT.

01:36PM 23       BUT OBVIOUSLY I READ HIS DECLARATION, AND I FELT THAT

01:36PM 24   THERE WAS A LITTLE BIT MORE THAT I WOULD LIKE TO HEAR, A LITTLE

01:37PM 25   BIT MORE.

23

01:37PM  1        SO I AM GOING TO -- MR. KOFFMANN, I WILL PERMIT MR. WADE

01:37PM  2   TO ENGAGE IN EXAMINATION, AND I'LL LODGE THE COURT'S OWN

01:37PM  3   OBJECTIONS IF I FEEL IT'S OUTSIDE THE PURVIEW OF WHAT THE COURT

01:37PM  4   INTENDS, MR. WADE, JUST TO LET YOU KNOW THAT.

01:37PM  5        MR. WADE, YOU'VE PROBABLY BEEN IN HEARINGS, AS COUNSEL

01:37PM  6   HERE, WHERE A WITNESS'S LAWYER HAS SAT NEXT TO THE WITNESS ON

01:37PM  7   THE WITNESS STAND.  THAT HAPPENS SOMETIMES IN COURT, OR STANDS

01:37PM  8   NEXT TO THEM.  IT'S UNWIELDY, AND IT'S PROBABLY A LITTLE MORE

01:37PM  9   UNWIELDY IN FRONT OF A JURY, BUT THIS IS POST-TRIAL.  SO I

01:37PM 10   DON'T THINK THOSE CONCERNS ARE NECESSARILY BEFORE US.

01:37PM 11        AND I DO THINK THE ISSUE OF PRIVILEGE IS ONE THAT A LAWYER

01:37PM 12   HAS MORE KNOWLEDGE OF THAN HIS OR HER CLIENT TYPICALLY.  SO I

01:38PM 13   DON'T HAVE ANY OBJECTIONS TO MR. KOFFMANN, MR. KOFFMANN BEING

01:38PM 14   PRESENT.

01:38PM 15        AND IF THERE IS SOMETHING THAT IS PRIVILEGED THAT HE

01:38PM 16   BELIEVES FROM HIS LEGAL OPINION MIGHT TOUCH ON PRIVILEGE, I'M

01:38PM 17   NOT GOING TO DENY HIM THE OPPORTUNITY TO LODGE THAT OBJECTION

01:38PM 18   WITH THE COURT ON BEHALF OF HIS CLIENT.  I DON'T THINK IT'S

01:38PM 19   APPROPRIATE TO ASK A LAYPERSON, EVEN THOUGH HE'S A DOCTOR, A

01:38PM 20   DOCTOR OF MEDICINE, BUT FOR HIM TO UNDERSTAND THE NUANCES OF

01:38PM 21   THE FEDERAL RULES OF EVIDENCE, INCLUDING PRIVILEGES.

01:38PM 22        SO, MR. KOFFMANN, I WOULD ALLOW YOU TO BE PRESENT.  WE'LL

01:38PM 23   FIGURE OUT THE PROTOCOL.  I DON'T THINK YOU WANT TO SIT NEXT TO

01:38PM 24   YOUR CLIENT IN THE WITNESS BOX OR STAND.

01:38PM 25        MR. KOFFMANN:  NOT ESPECIALLY, JUDGE, NO.

24

| | | |
|---|---|---|
| 01:38PM | 1 | THE COURT: BUT WE'LL FIGURE OUT A PROTOCOL FOR THAT |
| 01:38PM | 2 | THAT WE ALL CAN AGREE ON MONDAY MORNING. |
| 01:38PM | 3 | MR. KOFFMANN: VERY WELL. THANK YOU, YOUR HONOR. |
| 01:38PM | 4 | THE COURT: YOU'RE WELCOME. |
| 01:38PM | 5 | AND I WILL, AS I SAY, MR. WADE, AND TO THE GOVERNMENT AS |
| 01:39PM | 6 | WELL, I INTEND TO ASK SOME QUESTIONS UNLESS MY QUESTIONS ARE |
| 01:39PM | 7 | ANSWERED THROUGH YOUR QUESTIONING, MR. WADE, AND OTHERS. |
| 01:39PM | 8 | BUT, AGAIN, THE HEARING IS INTENDED TO BE BRIEF. THERE |
| 01:39PM | 9 | ARE DISCRETE ISSUES. YOU'VE RAISED THEM. YOUR TEAM HAS RAISED |
| 01:39PM | 10 | THEM, MR. WADE. I THOUGHT THEY WERE APPROPRIATE TO HAVE |
| 01:39PM | 11 | FURTHER DISCUSSION ON, AND MY SENSE IS THAT WE CAN GET TO IT. |
| 01:39PM | 12 | AND YOU'RE GOING TO CONTINUE WITH THE PROFESSIONALISM |
| 01:39PM | 13 | THAT ALL PARTIES HAVE DISPLAYED IN THIS TRIAL, AND I EXPECT |
| 01:39PM | 14 | THAT'S GOING TO RESOLVE THE ISSUE WITHOUT UNDUE TIME |
| 01:39PM | 15 | CONSTRAINTS. |
| 01:39PM | 16 | OKAY. ANY OTHER QUESTIONS BEFORE WE SIGN OFF? |
| 01:39PM | 17 | MR. BOSTIC: YOUR HONOR, I APOLOGIZE. JUST BRIEFLY |
| 01:39PM | 18 | IF I MIGHT? |
| 01:39PM | 19 | THE COURT: YES. |
| 01:39PM | 20 | MR. BOSTIC: I THINK THE COURT MIGHT HAVE JUST |
| 01:39PM | 21 | ANSWERED MY QUESTION, BUT I WAS WONDERING IF THE COURT HAD |
| 01:39PM | 22 | THOUGHTS OR PREFERENCES ON THE SEQUENCE OF KIND OF OPERATIONS |
| 01:39PM | 23 | FOR MONDAY'S HEARING, WHETHER THE COURT WOULD INTEND OR |
| 01:40PM | 24 | CONSIDER ASKING THE QUESTIONS THAT IT HAS OF DR. ROSENDORFF |
| 01:40PM | 25 | FIRST TO KIND OF SET THE TONE AND THE SCOPE OF THE HEARING. |

01:40PM 1          THE COURT: YES.

01:40PM 2          MR. BOSTIC: I CAN SEE THE BENEFIT OF THAT.

01:40PM 3       SECONDARILY, I WONDER IF THE DEFENSE IS PROCEEDING FIRST,

01:40PM 4 IF THE COURT WOULD INTEND TO LIMIT THE DEFENSE TO DIRECT STYLE

01:40PM 5 QUESTIONS, THAT IS, NON-LEADING QUESTIONS IN MONDAY'S HEARING.

01:40PM 6         THE COURT: WELL, I HAD THOUGHT ABOUT, MR. BOSTIC,

01:40PM 7 ABOUT WHAT IS THE PROCEDURE.

01:40PM 8      AS I SAID EARLIER, I SET THE HEARING BECAUSE I THOUGHT I

01:40PM 9 NEEDED MORE INFORMATION, AND I SAID I'M A FACT FINDER, AND

01:40PM 10 THERE ARE SOME SPECIFIC QUESTIONS THAT I WANT ANSWERED, I'D

01:40PM 11 LIKE TO HAVE ANSWERED. IT'S MY INTENT TO ASK THOSE QUESTIONS.

01:40PM 12      IT MIGHT BE BEST FOR ME TO JUST ASK MY QUESTIONS AND THEN

01:40PM 13 HAVE BOTH OF YOU, IF YOU WISH, THAT IS, MR. WADE, MR. BOSTIC,

01:40PM 14 WHOEVER YOUR TEAM DESIGNATES, TO ASK FOLLOW-UP QUESTIONS.

01:41PM 15      BUT MY QUESTIONS ARE GOING TO BE BRIEF. BUT I'M NOT GOING

01:41PM 16 TO -- I DON'T WANT TO DENY EITHER PARTY AN OPPORTUNITY TO

01:41PM 17 EXPLORE THOSE. BUT I'M NOT GOING TO LIMIT -- YOU KNOW, AS THE

01:41PM 18 FACT FINDER HERE, I THINK I UNDERSTAND THE DISTINCTION BETWEEN

01:41PM 19 THE LEADING QUESTION AND A DIRECT QUESTION AND THE WEIGHT TO BE

01:41PM 20 GIVEN TO EITHER OF THOSE AND THE ANSWERS TO THOSE TYPES OF

01:41PM 21 QUESTIONS AND THE ABILITY TO FOLLOW UP, I THINK I'LL BE ABLE TO

01:41PM 22 GAIN CLARITY FOR MYSELF AS TO THOSE PROCEEDINGS, WHICH IS TO

01:41PM 23 SAY, MR. BOSTIC, IF YOU OR MR. WADE WANT TO ASK DIRECT

01:41PM 24 QUESTIONS, THAT'S FINE. IF YOU WANT TO ASK A LEADING QUESTION,

01:41PM 25 YOU KNOW, LET'S SEE WHERE THAT TAKES US. I'M NOT GOING TO DENY

26

01:41PM 1  THAT OPPORTUNITY, BUT I THINK I'VE JUST TOLD YOU HOW THE COURT

01:42PM 2  MIGHT VIEW THAT TYPE OF EVIDENCE AND THE KIND OF WEIGHT IT

01:42PM 3  WOULD GIVE TO IT.

01:42PM 4          MR. BOSTIC:  THAT'S HELPFUL.  THANK YOU, YOUR HONOR.

01:42PM 5          THE COURT:  MR. WADE?

01:42PM 6          MR. WADE:  THAT'S HELPFUL GUIDANCE, YOUR HONOR.

01:42PM 7  THANK YOU.

01:42PM 8          THE COURT:  OKAY.

01:42PM 9          MR. WADE:  AS YOUR HONOR KNOWS, THERE'S A LOT OF

01:42PM 10  DISCRETION IN AN EVIDENTIARY HEARING.  THERE'S THE ABILITY TO

01:42PM 11  FOLLOW UP AS WELL.  SO WE'LL TRY TO DO IT IN A WAY THAT IS MOST

01:42PM 12  EFFICIENT FOR EVERYONE.

01:42PM 13          THE COURT:  THANK YOU, MR. WADE, FOR GETTING THAT

01:42PM 14  IN.  I APPRECIATE IT OF COURSE.

01:42PM 15      WELL, I LOOK FORWARD TO MONDAY'S HEARING.  THANK YOU.

01:42PM 16      ANYTHING FURTHER THEN, MR. WADE?  MR. KOFFMANN?  ANY OF

01:42PM 17  YOUR TEAMS?  MR. BOSTIC?

01:42PM 18          MR. KOFFMANN:  NOT FOR DR. ROSENDORFF.  THANK YOU,

01:42PM 19  YOUR HONOR.

01:42PM 20          THE COURT:  OKAY.  SAFE TRAVELS.  WE'LL SEE YOU IN

01:42PM 21  CALIFORNIA MONDAY THE 17TH.  THANKS.

01:42PM 22          MR. WADE:  THANK YOU, YOUR HONOR.  HAVE A GOOD

01:42PM 23  WEEKEND.

01:42PM 24          THE COURT:  YOU AS WELL.  THANKS.

01:43PM 25      (COURT CONCLUDED AT 1:43 P.M.)

1

2

3                           CERTIFICATE OF REPORTER

4

5

6

7          I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8     STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9     280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10    CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16                         _____
                           IRENE RODRIGUEZ, CSR, RMR, CRR
17                         CERTIFICATE NUMBER 8074

18
                                   DATED:  OCTOBER 16, 2022
19

20

21

22

23

24

25

1

2               UNITED STATES DISTRICT COURT

3              NORTHERN DISTRICT OF CALIFORNIA

4                   SAN JOSE DIVISION

5

    UNITED STATES OF AMERICA,          )
6                                      )  CR-18-00258-EJD
                   PLAINTIFF,          )
7                                      )  SAN JOSE, CALIFORNIA
              VS.                      )
8                                      )  OCTOBER 3, 2022
    ELIZABETH A. HOLMES,               )
9                                      )  PAGES 1 - 37
                   DEFENDANT.          )
10   _____  )

11

12              TRANSCRIPT OF ZOOM PROCEEDINGS
            BEFORE THE HONORABLE EDWARD J. DAVILA
13              UNITED STATES DISTRICT JUDGE

14   A P P E A R A N C E S:

15   FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                            BY:  JOHN C. BOSTIC
16                          150 ALMADEN BOULEVARD, SUITE 900
                            SAN JOSE, CALIFORNIA 95113

17                          BY:  ROBERT S. LEACH
                            1301 CLAY STREET, SUITE 340S
18                          OAKLAND, CALIFORNIA 94612

19        (APPEARANCES CONTINUED ON THE NEXT PAGE.)

20

    OFFICIAL COURT REPORTER:
21                          IRENE L. RODRIGUEZ, CSR, RMR, CRR
                            CERTIFICATE NUMBER 8074
22

23      PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
            TRANSCRIPT PRODUCED WITH COMPUTER
24

25

2

1     A P P E A R A N C E S: (CONT'D)

2

3     FOR DEFENDANT HOLMES:   WILLIAMS & CONNOLLY LLP
                              BY:  KEVIN M. DOWNEY
4                                  LANCE A. WADE
                                   AMY SAHARIA
5                                  ANDREW LEMENS
                              725 TWELFTH STREET, N.W.
6                             WASHINGTON, D.C. 20005

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**ER-1285**

|  |  |  |
|--|--|--|
| | 1 | SAN JOSE, CALIFORNIA                    OCTOBER 3, 2022 |
| | 2 | P R O C E E D I N G S |
| 10:02AM | 3 | (COURT CONVENED AT 10:02 A.M.) |
| 10:02AM | 4 | THE COURT:  GOOD MORNING EVERYONE. |
| 10:02AM | 5 | LET'S GO ON THE RECORD IN THIS MORNING'S MATTER.  THIS IS |
| 10:02AM | 6 | 18-258, UNITED STATES VERSUS ELIZABETH HOLMES. |
| 10:02AM | 7 | LET ME FIRST CAPTURE THE APPEARANCE OF THE PARTIES. |
| 10:02AM | 8 | THIS IS A REMOTE HEARING.  BUT WHO APPEARS FOR THE |
| 10:02AM | 9 | GOVERNMENT? |
| 10:02AM | 10 | MR. BOSTIC:  JOHN BOSTIC AND BOB LEACH FOR THE |
| 10:02AM | 11 | UNITED STATES. |
| 10:02AM | 12 | GOOD MORNING, YOUR HONOR. |
| 10:02AM | 13 | THE COURT:  THANK YOU.  GOOD MORNING. |
| 10:02AM | 14 | AND FOR THE DEFENSE?  WE'RE HAVING SOME ISSUES.  LET ME |
| 10:03AM | 15 | ASK WHO APPEARS FOR THE DEFENDANTS? |
| 10:03AM | 16 | MR. DOWNEY:  YOUR HONOR, ARE YOU ABLE TO HEAR ME? |
| 10:03AM | 17 | THE COURT:  YES, I CAN HEAR YOU, MR. DOWNEY.  YOU'RE |
| 10:03AM | 18 | KIND OF -- THE LIGHTING IS POOR.  I CAN'T SEE YOUR FACE THERE, |
| 10:03AM | 19 | BUT I HEAR YOUR VOICE. |
| 10:03AM | 20 | MR. DOWNEY:  YES, I WILL TRY SORT OF -- AFTER I DO |
| 10:03AM | 21 | THE APPEARANCE, I'LL TRY TO MAKE MYSELF MORE VISIBLE. |
| 10:03AM | 22 | BUT IT'S KEVIN DOWNEY FOR MS. HOLMES, ALONG WITH |
| 10:03AM | 23 | AMY SAHARIA, LANCE WADE, AND ANDREW LEMENS. |
| 10:03AM | 24 | AND MS. HOLMES IS PRESENT ON THE VIDEO LINK AS WELL. |
| 10:03AM | 25 | THE COURT:  OKAY.  THANK YOU VERY MUCH.  I SEE |

4

10:03AM 1     EVERYONE HERE.  NICE TO SEE EVERYONE AGAIN.

10:03AM 2          MR. LEMENS, NICE TO SEE YOU AGAIN, SIR.

10:03AM 3          THIS IS A REMOTE HEARING.

10:04AM 4          FIRST OF ALL, THIS WAS TO BE AN IN-PERSON HEARING

10:04AM 5     REGARDING THE VARIOUS MOTIONS, 1574, 1576, AND 1577, THAT IS,

10:04AM 6     THE DEFENSE MOTIONS FOR NEW TRIAL.

10:04AM 7          AS YOU KNOW, THE COURT SCHEDULED THIS AS A STATUS

10:04AM 8     CONFERENCE.  I DO WANT TO TALK A LITTLE ABOUT THIS, BUT FOR

10:04AM 9     PURPOSES OF THIS STATUS CONFERENCE, MR. WADE, AND MR. LEMENS,

10:04AM 10    AND MR. DOWNEY, DO YOU CONSENT TO THIS PROCEEDING BEING A

10:04AM 11    REMOTE PROCEEDING AND DO YOU HAVE YOUR CLIENT'S PERMISSION TO

10:04AM 12    DO SO?

10:04AM 13          MR. DOWNEY:  YES, YOUR HONOR.  AND WE ALSO HAVE THE

10:04AM 14    ABILITY TO ENGAGE WITH OUR CLIENT FOR PURPOSES OF COUNSELLING

10:04AM 15    IF ANY ISSUES ARISE DURING THE HEARING THAT NECESSITATE THAT.

10:04AM 16          THE COURT:  ALL RIGHT.  THANK YOU.

10:04AM 17          AND I NEGLECTED TO MENTION MS. SAHARIA IN THAT.

10:05AM 18          MS. SAHARIA, THANK YOU.  YOU'RE IN THE UPPER RIGHT-HAND

10:05AM 19    CORNER OF MY SCREEN, SO IT FADES OUT, AND SO I APOLOGIZE FOR

10:05AM 20    THAT.  NO OFFENSE WAS INTENDED.

10:05AM 21          MS. SAHARIA:  NO OFFENSE WAS TAKEN, YOUR HONOR.

10:05AM 22          THE COURT:  THANK YOU.

10:05AM 23          AND THANK YOU FOR AGREEING TO MEET WITH ME ON A REMOTE

10:05AM 24    STATUS THIS MORNING AND FOR STATUS AS OPPOSED TO THE HEARINGS.

10:05AM 25          I'VE READ THE PLEADINGS AND THE RESPONSES, AND THE

5

10:05AM 1    OPERATIVE, AGAIN DOCKETS ARE 1574, 1567, AND 1577.

10:05AM 2        I'VE READ THOSE MOTIONS BY MS. HOLMES AS WELL AS THE

10:05AM 3    GOVERNMENT'S OPPOSITION TO THOSE MOTIONS.

10:05AM 4        I WANT TO TALK ABOUT 1574.  LET ME SAY I DON'T REQUIRE ANY

10:05AM 5    ADDITIONAL HELP FROM THE PARTIES REGARDING 1576 AND 1577, AND

10:05AM 6    THE COURT WILL BE ABLE TO MAKE ANY DECISION AS TO THOSE MOTIONS

10:06AM 7    ON THE PLEADINGS THAT YOU'VE SUBMITTED.

10:06AM 8        AS TO 1574 AND THE RELIEF THAT IS REQUESTED IN THAT

10:06AM 9    MATTER, I READ THE PLEADINGS AND I UNDERSTAND, I BELIEVE --

10:06AM 10   MS. SAHARIA, WILL YOU BE SPEAKING TO THIS?

10:06AM 11           MS. SAHARIA:  NO, YOUR HONOR.  MR. WADE WILL BE

10:06AM 12   SPEAKING TO THIS.

10:06AM 13           THE COURT:  OKAY.  THANK YOU.

10:06AM 14       I UNDERSTAND THEN THAT ONE OF THE PRIMARY, IF NOT THE

10:06AM 15   PRIMARY BASIS, FOR THIS REQUEST, MR. WADE, IS THE VISIT THAT

10:06AM 16   OCCURRED BY DR. ROSENDORFF, A WITNESS IN THIS CASE, TO YOUR

10:06AM 17   CLIENT'S RESIDENCE, AND DR. ROSENDORFF DID NOT SPEAK WITH YOUR

10:06AM 18   CLIENT.  I BELIEVE HE SPOKE WITH HER PARTNER.  I'VE READ THE

10:06AM 19   DECLARATIONS OF ALL PARTIES IN THAT REGARD.

10:06AM 20       I JUST HAD A COUPLE OF QUESTIONS ABOUT THIS, IF I MAY.

10:07AM 21   AND THE FIRST QUESTION I HAVE THAT WOULD HELP ME UNDERSTAND

10:07AM 22   THINGS, IS THE DEFENSE GOING TO ARGUE THAT THE GOVERNMENT

10:07AM 23   KNOWINGLY PUT ON FALSE TESTIMONY?  IS THAT PART OF YOUR

10:07AM 24   ARGUMENT OR IS THAT THE ARGUMENT AS TO THIS ISSUE?

10:07AM 25           MR. WADE:  WELL, YOUR HONOR, I THINK THERE ARE

6

10:07AM 1    CERTAINLY CERTAIN COMMENTS THAT WERE MADE BY DR. ROSENDORFF

10:07AM 2    THAT COULD SUGGEST THAT, IN THE SENSE THAT THEY COULD SUGGEST

10:07AM 3    THAT THERE WAS AT LEAST MISLEADING INFORMATION THAT CAME ABOUT

10:07AM 4    SETTING ASIDE WHETHER IT WAS INTENTIONAL OR NOT.

10:07AM 5        I DON'T THINK WE HAVE ENOUGH INFORMATION FROM THE

10:07AM 6    INFORMATION PROVIDED BY DR. ROSENDORFF AT THIS POINT, BUT I

10:07AM 7    THINK THERE ARE SERIOUS QUESTIONS THAT ARE RAISED BY THAT,

10:07AM 8    THOSE STATEMENTS, AND I THINK QUESTIONS THAT WOULD WARRANT, YOU

10:07AM 9    KNOW, AT A MINIMUM, A HEARING ON THIS MATTER TO EXPLORE THOSE

10:08AM 10   ISSUES.

10:08AM 11       THE COURT:  THANK YOU.  YOU INDICATE THAT YOU'RE NOT

10:08AM 12   ACCUSING THE GOVERNMENT OF MISCONDUCT AT THIS TIME, AND WHICH

10:08AM 13   CAUSED ME TO QUESTION, WELL, IS THIS A -- AND I'LL USE THE

10:08AM 14   PEJORATIVE TERM -- IS THIS A FISHING EXPEDITION, IS THAT WHAT

10:08AM 15   THIS IS?

10:08AM 16       IF THERE'S NO EVIDENCE AND THEN JUST SUSPICION, DOESN'T

10:08AM 17   DR. ROSENDORFF'S DECLARATION THAT HE SUBSEQUENTLY FILED,

10:08AM 18   DOESN'T THAT RESOLVE THIS?

10:08AM 19       MR. WADE:  WE DON'T BELIEVE IT DOES, YOUR HONOR, FOR

10:08AM 20   THE REASONS SET FORTH IN OUR REPLY MEMORANDUM WHICH WAS

10:08AM 21   SUBMITTED TO THE COURT AFTER THE GOVERNMENT'S OPPOSITION.

10:08AM 22       WE THINK THAT THE DECLARATION THAT HE PROVIDED WAS VERY

10:08AM 23   CAREFULLY CRAFTED.  IT DOES NOT SPECIFICALLY ADDRESS THE ISSUES

10:08AM 24   THAT WERE RAISED IN HERE AND RAISED BY MR. EVANS'S DECLARATION.

10:08AM 25       AND IN MANY RESPECTS, IT SORT OF SPECIFICALLY AVOIDS THOSE

7

| 10:08AM | 1 | ISSUES TO THE EXTENT THAT THEY FOCUS ON SPECIFIC COMMENTS OF |

10:08AM 1    ISSUES TO THE EXTENT THAT THEY FOCUS ON SPECIFIC COMMENTS OF

10:09AM 2    THE GOVERNMENT, BUT THEY DON'T FOCUS ON THE CONDUCT OF THE

10:09AM 3    GOVERNMENT.

10:09AM 4        AND DR. ROSENDORFF DIDN'T SAY THE GOVERNMENT INSTRUCTED

10:09AM 5    ME X.  DR. ROSENDORFF SAID THE IMPLICATION OF THE GOVERNMENT'S

10:09AM 6    ACTIONS WAS TO CREATE A MISIMPRESSION.  SO HE DIDN'T ANSWER

10:09AM 7    THOSE INQUIRIES.  HE FOCUSSED VERY SPECIFICALLY ON THINGS THAT

10:09AM 8    WERE SAID.  HE FOCUSSED ON THE TRUTHFULNESS OF HIS TESTIMONY TO

10:09AM 9    THE BEST OF HIS RECOLLECTION, BUT THE DECLARATION CREATES THE

10:09AM 10   POSSIBILITY, WE THINK, FRANKLY, A STRONG INFERENCE, THAT THERE

10:09AM 11   WAS CONDUCT BY THE GOVERNMENT THAT DR. ROSENDORFF BELIEVED TO

10:09AM 12   BE MISLEADING, AND I THINK THAT IS WHAT WE THINK NEEDS TO BE

10:09AM 13   ADDRESSED IN THE HEARING.

10:09AM 14       I THINK A NEW TRIAL COULD BE GRANTED BASED UPON THAT

10:09AM 15   WITHOUT MORE, BUT WE COULD CERTAINLY UNDERSTAND IN LIGHT OF THE

10:10AM 16   DECLARATION THE NEED TO AT LEAST HAVE A DESIRE FROM THE COURT

10:10AM 17   TO EXPLORE THAT VIA AN EVIDENTIARY ISSUING AS AN INITIAL

10:10AM 18   MATTER.

10:10AM 19           THE COURT:  SO ARE YOU SAYING -- HE SAID, AND I

10:10AM 20   THINK THE QUOTE IS, "HE FELT HE HAD DONE SOMETHING WRONG," END

10:10AM 21   QUOTE.

10:10AM 22       ARE YOU ALLEGING THAT HE LIED DURING HIS TESTIMONY?  IS

10:10AM 23   THAT THE ALLEGATION HERE?

10:10AM 24           MR. WADE:  WELL, IT'S UNQUESTIONABLE THAT

10:10AM 25   DR. ROSENDORFF LIED DURING IN HIS TESTIMONY.  HE ACTUALLY

8

10:10AM 1   ADMITTED AS MUCH HIS DURING CROSS-EXAMINATION.  THAT'S WHY

10:10AM 2   THERE'S A DEGREE TO WHICH HIS DECLARATION HAS LIMITED PROBATIVE

10:10AM 3   VALUE.

10:10AM 4        I THINK PEOPLE CAN, PEOPLE CAN OFFER EVIDENCE THAT IS

10:10AM 5   MISLEADING, HOWEVER, WITHOUT IT EVEN BEING INTENTIONALLY A LIE.

10:10AM 6        AND IF THE BELIEF THAT DR. ROSENDORFF HAS IS THAT THE WAY

10:10AM 7   IN WHICH TRUTHFUL INFORMATION WAS PRESENTED WAS AFFIRMATIVELY

10:11AM 8   MISLEADING, WITHOUT IT BEING A LIE, IT COULD BE PROBATIVE OF

10:11AM 9   MISCONDUCT.

10:11AM 10       YOU KNOW, AS THE COURT NOTES -- KNOWS BECAUSE OBVIOUSLY

10:11AM 11  YOU WERE THERE, WE DID RAISE AN NAPUE ISSUE AT TRIAL, AND WE

10:11AM 12  WERE VERY CONCERNED ABOUT THE WAY IN WHICH DR. ROSENDORFF'S

10:11AM 13  TESTIMONY WAS PRESENTED AND WAYS IN WHICH IT SEEMED THAT

10:11AM 14  EVIDENCE WAS ELICITED THAT WAS FALSE.

10:11AM 15       THE COURT:  WELL, AS YOU SAY, AS YOU INDICATE, YOU

10:11AM 16  SAID JUST A MOMENT AGO IT'S UNQUESTIONABLE, YOUR OPINION

10:11AM 17  UNQUESTIONABLE THAT HE LIED, HE ADMITTED SO ON

10:11AM 18  CROSS-EXAMINATION.

10:11AM 19       THAT WOULD SUGGEST THAT YOU HAVE ALREADY HAD A FULSOME

10:11AM 20  OPPORTUNITY TO EXAMINE HIM.  AND YOU HAD THE OPPORTUNITY TO

10:11AM 21  EXAMINE HIM.  I BELIEVE HE WAS ON THE STAND FOR FOUR DAYS ON

10:11AM 22  CROSS-EXAMINATION.

10:11AM 23       DOESN'T THAT SUGGEST THAT YOU'VE HAD THE OPPORTUNITY TO

10:11AM 24  EXPLORE THIS?

10:11AM 25       MR. WADE:  BUT NOT ON THESE ISSUES, NOT ON THESE

10:12AM 1    ISSUES, YOUR HONOR.

10:12AM 2       HE RAISES NEW ISSUES WITH RESPECT TO THE PRESENTATION OF

10:12AM 3    EVIDENCE THAT DID NOT COME OUT ON DIRECT OR ON

10:12AM 4    CROSS-EXAMINATION.

10:12AM 5       HE WAS, HE WAS CROSS-EXAMINED, BUT HE DID NOT OFFER THAT

10:12AM 6    HE FELT THAT THE GOVERNMENT WAS AFFIRMATIVELY MISLEADING.  HE

10:12AM 7    DIDN'T OFFER THAT THE GOVERNMENT MADE IT SEEM LIKE HE DID

10:12AM 8    SOMETHING WRONG WHEN HE CLEARLY BELIEVES THAT HE DOESN'T.

10:12AM 9       SO CLEARLY THERE'S A BELIEF THERE AS TO THE EFFECT OF THE

10:12AM 10   GOVERNMENT'S CONDUCT THAT WARRANTS A HEARING ON THIS IN ORDER

10:12AM 11   FOR US TO EXPLORE.

10:12AM 12          THE COURT:  THANK YOU.

10:12AM 13      HIS STATEMENT I THINK YOU FOCUS ON, WAS WORKING HARD,

10:12AM 14   EVERYONE DOING THE BEST THAT THEY COULD, WORKING SO HARD TO DO

10:12AM 15   SOMETHING GOOD AND MEANINGFUL.

10:12AM 16      AND I THINK YOUR PAPERS SUGGEST THAT THIS IS SOMETHING

10:12AM 17   THAT WAS NOT PRESENTED TO THE JURY AND THAT COULD CHANGE THE

10:13AM 18   JURY'S REFLECTION ON THIS ISSUE.

10:13AM 19      BUT I RECALL ERIKA CHEUNG TESTIFIED TO THIS.  SHE MAY HAVE

10:13AM 20   BEEN -- WAS SHE THE FIRST OR SECOND WITNESS WHO TESTIFIED?  AND

10:13AM 21   SHE TESTIFIED WHY THEY TOOK THE JOB.  SHE WAS EXCITED TO BE

10:13AM 22   INVOLVED WITH A VISIONARY COMPANY THAT WOULD BENEFIT SOCIETY

10:13AM 23   WITH THE INNOVATION AND CREATE BETTER HEALTH CARE FOR SOCIETY,

10:13AM 24   AND SHE TALKED ABOUT THE WONDERFUL OPPORTUNITY TO WORK WITH

10:13AM 25   SUCH A VISIONARY WOMAN WHO AS A LEADER IN THE TECHNOLOGY AT

10:13AM  1    THIS TIME.

10:13AM  2        I THINK DAN EDLIN TESTIFIED TO SIMILAR GROUNDS, HIS

10:13AM  3    EXCITEMENT AND ENTHUSIASM IN WORKING WITH A COMPANY THAT WAS

10:13AM  4    GOING TO CREATE NEW TECHNOLOGY TO BENEFIT SOCIETY.

10:13AM  5        OF COURSE, DR. ROSENDORFF EXPRESSED SIMILAR THOUGHTS.

10:13AM  6        SO IT SEEMS LIKE THAT WAS -- THAT'S BEFORE THE JURY AS

10:14AM  7    WELL.  THE JURY KNEW ABOUT THAT.  I SUPPOSE THIS GOES TO THE

10:14AM  8    QUESTION OF WHETHER OR NOT THAT TYPE OF EVIDENCE IS CUMULATIVE

10:14AM  9    OR WHETHER IT'S REALLY NEEDED OR JUST IMPEACHMENT.

10:14AM  10       THE OTHER ISSUE THAT YOU RAISE IS THE CHERRY PICKING.  AND

10:14AM  11   I THINK YOU SAID THAT ONE OF THE ISSUES WAS -- MIGHT BE THAT

10:14AM  12   THE GOVERNMENT CHERRY PICKED EVIDENCE.  AND THIS IS IN REGARDS,

10:14AM  13   I SUPPOSE, TO SUPPORT ANY ALLEGED MISCONDUCT AND THEY CHERRY

10:14AM  14   PICKED TESTIMONY.

10:14AM  15       I APPRECIATE THAT.  AND I JUST WANT TO ASK YOU, WHAT --

10:14AM  16   HOW IS THAT DIFFERENT THAN NORMAL TRIAL PRACTICE I GUESS?  IN

10:14AM  17   TRIAL, AS YOU KNOW, EACH SIDE MEASURES THE EVIDENCE AND

10:14AM  18   INCLUDING EXHIBITS AND WITNESS TESTIMONIES AND THOSE THINGS,

10:14AM  19   THEY DECIDE, EACH SIDE DECIDES WHAT THEY THINK WOULD BE BEST

10:15AM  20   FOR THEIR CASE TO ADVANCE WITNESSES AND EXHIBITS AND WHAT

10:15AM  21   QUESTIONS TO ASK AND PERHAPS STRATEGICALLY ASKING QUESTIONS

10:15AM  22   THAT ADVANCE OR ARE IMPORTANT TO THEIR CASE, AND NOT ASKING

10:15AM  23   OTHER QUESTIONS THAT THEY FEEL MIGHT CREATE ISSUES FOR THEM.

10:15AM  24       AND, OF COURSE, WHEN LAWYERS PREPARE TRIALS, THEY

10:15AM  25   RECOGNIZE THAT THEY CALL A WITNESS, THEY EXPOSE THAT WITNESS TO

| | | |
|---|---|---|
| 10:15AM | 1 | CROSS-EXAMINATION OPPORTUNITIES FROM SKILLED COUNSEL, AND |
| 10:15AM | 2 | THAT'S FOR THE OPPORTUNITY THAT THE OTHER SIDE WILL PROVIDE A |
| 10:15AM | 3 | FULSOME, A FULSOME EXPLORATION OF TESTIMONY AND ISSUES THAT THE |
| 10:15AM | 4 | JURY COULD USE.  THAT'S HOW TRIALS WORK. |
| 10:15AM | 5 | SO I GUESS THE CHERRY PICKING, THAT TYPE OF EVIDENCE |
| 10:15AM | 6 | HARVESTING IS KIND OF WHAT HAPPENS IN TRIAL, ISN'T IT? |
| 10:15AM | 7 | MR. WADE:  WELL, YOUR HONOR, I DON'T THINK THE COURT |
| 10:15AM | 8 | OR THE GOVERNMENT WOULD SUGGEST THAT IT WOULD BE APPROPRIATE |
| 10:16AM | 9 | FOR THE GOVERNMENT IN A CRIMINAL CASE TO PRESENT EVIDENCE IN A |
| 10:16AM | 10 | MANNER THAT IS AFFIRMATIVELY MISLEADING TO A JURY, AND I DON'T |
| 10:16AM | 11 | THINK THE COURT IS SUGGESTING THAT BY REFERENCING CHERRY |
| 10:16AM | 12 | PICKING. |
| 10:16AM | 13 | TO BE SURE, THERE'S A MOUNTAIN OF EVIDENCE AND YOU PICK A |
| 10:16AM | 14 | FEW ROCKS, BUT THERE'S A DIFFERENCE BETWEEN SELECTING YOUR |
| 10:16AM | 15 | ROCKS AND SETTING THE ROCKS UP IN A WAY THAT ARE TOTALLY |
| 10:16AM | 16 | MISLEADING TO THE JURY. |
| 10:16AM | 17 | AND THE STATEMENTS OF DR. ROSENDORFF THAT WE FOCUS ON MORE |
| 10:16AM | 18 | ARE NOT ACTUALLY THE ONES THAT THE COURT WAS JUST FOCUSSED ON |
| 10:16AM | 19 | BUT RATHER THE ONES THAT SUGGESTED THAT THE GOVERNMENT MADE |
| 10:16AM | 20 | THINGS SOUND WORSE THAN THEY WERE WHEN HE WAS UP ON THE STAND |
| 10:16AM | 21 | DURING HIS TESTIMONY THAT SUGGEST THAT THAT AFFIRMATIVELY -- |
| 10:16AM | 22 | THE COURT:  THAT WAS HIS STATEMENT. |
| 10:16AM | 23 | MR. WADE:  THAT WAS HIS STATEMENT. |
| 10:16AM | 24 | THE COURT:  RIGHT. |
| 10:16AM | 25 | MR. WADE:  THAT HE HAD DONE SOMETHING WRONG WHEN HE |

12

10:16AM 1    IMPLICITLY AND CLEARLY DIDN'T THINK THAT HE HAD.

10:16AM 2        AND SO THE SUGGESTION FROM THE WITNESS -- ALL, MIND YOU,

10:17AM 3    IN A BACKDROP OF A RATHER EXTRAORDINARY, I THINK WE CAN ALL

10:17AM 4    AGREE, A RATHER EXTRAORDINARY SET OF CIRCUMSTANCES WHERE THE

10:17AM 5    LEAD GOVERNMENT WITNESS, AFTER BEING CROSS-EXAMINED AS

10:17AM 6    EXTENSIVELY AS THE COURT NOTED HE WAS, GETS INTO HIS -- FINDS

10:17AM 7    THE DEFENDANT'S HOME RESIDENCE, GETS INTO A CAR, AND WITHOUT

10:17AM 8    CONSULTING HIS COUNSEL, DRIVES UNANNOUNCED AND APPEARS AT THE

10:17AM 9    DEFENDANT'S RESIDENCE.  I MEAN, IT'S AN EXTRAORDINARY SET OF

10:17AM 10   CIRCUMSTANCES, AND IT SUGGESTS THAT THERE IS MORE THERE.

10:17AM 11       IT SUGGESTS, IN LIGHT OF THOSE STATEMENTS, WHICH WERE NOT

10:17AM 12   ADDRESSED BY THE DECLARATION DIRECTLY, IT SUGGESTS THAT THERE'S

10:17AM 13   MORE THERE THAT SHOULD BE EXPLORED IN AN EVIDENTIARY HEARING.

10:17AM 14       WE, OF COURSE, TRIED TO ADDRESS THIS OUTSIDE OF AN

10:17AM 15   EVIDENTIARY HEARING, AND APPROPRIATELY, I BELIEVE, AND

10:18AM 16   ETHICALLY WITH HIS COUNSEL RATHER THAN CONTACTING

10:18AM 17   DR. ROSENDORFF DIRECTLY, EVEN THOUGH HE CONTACTED ME DIRECTLY.

10:18AM 18   AND SO WE WANT TO DO THIS APPROPRIATELY, YOUR HONOR.

10:18AM 19       BUT WE DO THINK IT'S NECESSARY TO EXPLORE THESE ISSUES,

10:18AM 20   THAT THEY'RE NOT TO REST BY A LAWYER CAREFULLY CRAFTED

10:18AM 21   DECLARATION THAT DOESN'T ACTUALLY SQUARELY ADDRESS THE ISSUES.

10:18AM 22           THE COURT:  WELL, THANK YOU.

10:18AM 23       SO HE SAYS HE FEELS BAD ABOUT WHAT HAS HAPPENED.  HIS

10:18AM 24   DECLARATION SPEAKS ABOUT FEELING BAD FOR THE FAMILIES INVOLVED,

10:18AM 25   BUT HE DOESN'T RECANT.  ARE YOU CALLING THIS A RECANTATION?

10:18AM 1   ARE YOU SAYING THAT HE RECANTED HIS TESTIMONY?

10:18AM 2        MR. DOWNEY:  WELL, THE SUGGESTION IS THAT THE

10:18AM 3   TESTIMONY THAT WAS OFFERED WAS MISLEADING.  THAT'S THE

10:18AM 4   SUGGESTION.  AND THEN HE DIDN'T RECANT THAT.

10:18AM 5        THAT WAS THE SUGGESTION IN HIS STATEMENT TO MR. EVANS,

10:18AM 6   WHICH MR. EVANS ATTESTED TO UNDER OATH, AND IN HIS DECLARATION

10:18AM 7   HE DOES NOT RECANT THAT.

10:18AM 8        THE COURT:  I SEE.

10:19AM 9        MR. WADE:  AND SO HE DIDN'T -- WE HAVEN'T

10:19AM 10  SPECIFICALLY ASKED WHETHER HE RECANTS ANY ASPECTS OF HIS

10:19AM 11  TESTIMONY.

10:19AM 12       BUT HE DID SAY HE INTENDS TO BE TRUTHFUL TO THE BEST OF

10:19AM 13  HIS KNOWLEDGE.  FOR ALL WE KNOW THE ANSWER COULD BE -- OR TO

10:19AM 14  THE BEST OF MY ABILITY, BUT I DIDN'T END UP BEING TRUTHFUL

10:19AM 15  BECAUSE I DIDN'T FEEL LIKE THE INFORMATION CAME OUT FAIRLY.  HE

10:19AM 16  DOESN'T ADDRESS THAT.  ALL HE --

10:19AM 17       THE COURT:  WHAT IS THE RELEVANCE OF HIS OPINION OF

10:19AM 18  EVIDENCE, HIS OPINION ON EVIDENTIARY OBJECTIONS, WHETHER

10:19AM 19  EVIDENCE COMES IN FAIRLY OR NOT?  IS THAT RELEVANT?

10:19AM 20       MR. WADE:  WELL, THE WITNESS CLEARLY BELIEVES --

10:19AM 21  YOUR HONOR, THERE WAS AN NAPUE ISSUE IN THIS CASE AS IT WAS.

10:19AM 22  WE RAISED THAT ISSUE AT TRIAL.

10:19AM 23       WE THOUGHT THE GOVERNMENT WAS INTENTIONALLY PRESENTING

10:19AM 24  INFORMATION THROUGH DR. ROSENDORFF THAT WAS FALSE AND

10:19AM 25  MISLEADING.  WE DID.  WE MADE A RECORD OF IT, AND WE DID OUR

10:19AM 1    BEST TO ADDRESS THAT IN CROSS-EXAMINATION.

10:19AM 2        BUT AS THE COURT KNOWS, THIS WAS STILL POWERFUL EVIDENCE.

10:20AM 3    IT'S BEEN ADDRESSED BY THE GOVERNMENT IN ITS CLOSING, AND IT'S

10:20AM 4    BEEN ADDRESSED IN POST-TRIAL LITIGATION.

10:20AM 5        AND SO IN LIGHT OF THAT BACKDROP, THE FACT THAT YOU HAVE

10:20AM 6    THE WITNESS HIMSELF COMING FORWARD AND ESSENTIALLY SAYING,

10:20AM 7    WELL, HE SAID AT TRIAL IS SIGNIFICANT, BECAUSE WE DON'T KNOW

10:20AM 8    THE FULL CONTEXT OF THOSE STATEMENTS.

10:20AM 9        WE DON'T KNOW EXACTLY WHY IT IS THAT HE FEELS COMPELLED TO

10:20AM 10   GET INTO HIS CAR AND DRIVE TO MS. HOLMES'S RESIDENCE IN ORDER

10:20AM 11   TO TRY AND ADDRESS THESE ISSUES.

10:20AM 12       WE'RE SPECULATING AS TO HIS MOTIVE IN THAT BECAUSE HE

10:20AM 13   FEELS SORRY FOR THE FAMILY AND THE LIKE.

10:20AM 14              THE COURT:  SURE.

10:20AM 15              MR. WADE:  WE'RE SPECULATING, BUT WE DON'T REALLY

10:20AM 16   KNOW BECAUSE HE DIDN'T ADDRESS THOSE IN HIS DECLARATION, AND WE

10:20AM 17   HAVEN'T HAD HIM UNDER OATH.

10:20AM 18              THE COURT:  WELL, THAT'S WHAT HE TOLD MS. HOLMES'S

10:20AM 19   PARTNER, THAT HE FEELS BAD.  DIDN'T HE SAY THAT?  OR HE FELT

10:20AM 20   BAD AND HE WANTED TO CLEANSE OR CLEAR THE AIR OR SOMETHING LIKE

10:20AM 21   THAT?

10:20AM 22       IT ALMOST SEEMS LIKE IT WAS HIS OWN PERSONAL SORROW OF WHO

10:20AM 23   KNOWS WHAT, BEING INVOLVED IN THE CASE AND WHATEVER.

10:21AM 24       I TAKE YOUR POINT FROM YOUR LENS AS TO HOW IT MIGHT BE

10:21AM 25   INTERPRETED, AND I UNDERSTAND WHAT YOU'RE SAYING ABOUT

10:21AM 1 DECLARATIONS.  ARE THEY PREPARED BY LAWYERS OR NOT?

10:21AM 2  I WAS LOOKING AT THE DECLARATIONS HERE, AND I LOOKED AT

10:21AM 3 1574-2, WHICH IS MR. EVANS'S EMAIL, AND THEN I COMPARE THAT

10:21AM 4 WITH 1574-5.  YOU KNOW, IF YOU LOOK AT THE FONTS, THE FONTS ARE

10:21AM 5 A LITTLE DIFFERENT THERE.  I DON'T KNOW IF THAT'S AN ISSUE OR

10:21AM 6 NOT.

10:21AM 7  BUT IF YOU LOOK AT MR. EVANS, YOU KNOW, HIS FIRST

10:21AM 8 PARAGRAPH HE SAYS THIS IS WHAT HAPPENED.

10:21AM 9  AND THEN BELOW THAT THERE'S MULTIPLE PARAGRAPHS IN A

10:21AM 10 DIFFERENT FONT OF WHAT HAPPENED.

10:21AM 11  AND THEN I LOOK OVER AT 1574-5, AND THAT FONT IS THE FONT

10:21AM 12 THAT WAS USED BY TWO LAWYERS IN THE CASE, HIS LAWYER AND THEN

10:21AM 13 MS. HOLMES'S LAWYER.

10:22AM 14  I DON'T THINK THAT -- I DON'T KNOW IF THAT MEANS ANYTHING.

10:22AM 15 IT'S PROBABLY JUST THE WAY TECHNOLOGY WORKS, I SUPPOSE.  I

10:22AM 16 DON'T KNOW.

10:22AM 17  BUT MAYBE, AS YOU SUGGEST, AN EVIDENTIARY HEARING WOULD

10:22AM 18 ALSO HELP THAT ISSUE.

10:22AM 19  LET ME ASK THIS OTHER QUESTION, THOUGH, AND I SUPPOSE IT'S

10:22AM 20 REGARDING MATERIALITY.

10:22AM 21  LOOKING AT THE CASE, MR. WADE, AS A RESULT OF THE FULSOME

10:22AM 22 CROSS-EXAMINATION AND YOUR TEAM'S TREATMENT OF THE EVIDENCE,

10:22AM 23 INCLUDING OPENINGS, CLOSINGS, EVIDENCE THAT WAS SUBMITTED,

10:22AM 24 EXHIBITS, AND YOUR EXAMINATION, YOU WERE VICTORIOUS ON THE

10:22AM 25 PATIENT COUNTS.  SO YOU WON THOSE COUNTS, AND THOSE WERE THE

16

10:22AM 1    COUNTS THAT WERE, I SUPPOSE, MOST INTIMATE TO DR. ROSENDORFF'S

10:22AM 2    LAB TESTIMONY.  THE COUNTS THAT YOUR CLIENT SUFFERED

10:22AM 3    CONVICTIONS OF ARE SOMEWHAT REMOVED FROM THOSE, THE INVESTOR

10:23AM 4    COUNTS, THAT RELIED MORE ON FINANCIAL TESTIMONY AND OTHER

10:23AM 5    DIRECT AND INDIRECT REPRESENTATIONS OF FINANCIAL CONDITION,

10:23AM 6    REPRESENTATIONS ABOUT THE INTEGRITY OF THE TECHNOLOGY AND THOSE

10:23AM 7    TYPES OF THINGS.

10:23AM 8        SO IT SEEMS LIKE DR. ROSENDORFF'S CONNECTION, INTIMACY

10:23AM 9    WITH THE INVESTMENT COUNTS IS SOMEWHAT LIMITED.

10:23AM 10           MR. WADE:  RESPECTFULLY, WE DISAGREE, YOUR HONOR.

10:23AM 11       I THINK WE DID PREVAIL ON THE PATIENT COUNTS, AND

10:23AM 12   CERTAINLY DR. ROSENDORFF'S TESTIMONY WAS RELEVANT TO THAT.  BUT

10:23AM 13   THERE ARE REPRESENTATIONS WITHIN PARAGRAPH 12 THAT GO TO THE

10:23AM 14   TECHNOLOGY AS WELL AND THE ABILITIES OF THE TECHNOLOGY, AND

10:23AM 15   DR. ROSENDORFF WAS A PRINCIPAL WITNESS WITH RESPECT TO THAT FOR

10:23AM 16   THE GOVERNMENT IN THIS CASE.  SO HIS, HIS EVIDENCE WAS NOT

10:24AM 17   LIMITED TO JUST THOSE COUNTS.

10:24AM 18       AND TO BE SURE, THERE WAS OTHER ALLEGED FALSE STATEMENTS

10:24AM 19   IN CONNECTION WITH THE PARAGRAPH 12, WITH THE PARAGRAPH 12

10:24AM 20   STATEMENTS, BUT WE -- BUT CLEARLY HIS -- THE GOVERNMENT ARGUED

10:24AM 21   THAT HIS STATEMENTS WERE RELEVANT TO THOSE COUNTS.  I BELIEVE

10:24AM 22   IT'S ARGUED IN POST-TRIAL LITIGATION AS WELL THAT THE

10:24AM 23   STATEMENTS THAT EVIDENCE OFFERED BY DR. ROSENDORFF IS RELEVANT

10:24AM 24   TO THOSE COUNTS, AND THERE ISN'T A LOT OF IT.

10:24AM 25       A LOT OF EVIDENCE WITH RESPECT TO THE PERFORMANCE OF

10:24AM 1    CERTAIN OF THAT TECHNOLOGY, IT WAS NOT A STRENGTH OF THE

10:24AM 2    GOVERNMENT'S OFFERING.  SO THE FACT THAT DR. ROSENDORFF OFFERED

10:24AM 3    THAT IS PARTICULARLY SIGNIFICANT, AND IT MAKES IT PARTICULARLY

10:24AM 4    MATERIAL IN THIS CASE.

10:24AM 5         TO SAY NOTHING OF THE FACT THAT, YOU KNOW, IF THERE ARE

10:25AM 6    ISSUES WITH RESPECT TO THE GOVERNMENT'S CONDUCT IN THE CASE,

10:25AM 7    THAT'S A SEPARATE AND DIFFERENT ISSUE, WHICH COULD BE PUT

10:25AM 8    BEFORE THE JURY AS WELL, AND WE'RE ENTITLED TO DO THAT AS PART

10:25AM 9    OF OUR DEFENSE.

10:25AM 10        THE COURT:  OKAY.  ANYTHING ELSE, MR. WADE, YOU

10:25AM 11   WOULD LIKE ME TO KNOW BEFORE I TURN TO MR. BOSTIC AND MR. LEACH

10:25AM 12   FOR HIS COMMENTS?

10:25AM 13        MR. WADE:  I JUST WANTED TO SAY BRIEFLY BECAUSE I

10:25AM 14   DON'T THINK I HAD A CHANCE TO ADDRESS THE FONT ISSUE.

10:25AM 15        I WILL CONFESS TO THE COURT THAT THAT'S AN ISSUE THAT

10:25AM 16   WE'RE COMFORTABLE FULLY EXPLORING.  WE CERTAINLY HAVE NOTHING

10:25AM 17   TO HIDE THERE.  I DON'T KNOW WHAT DEVICES THESE THINGS WERE

10:25AM 18   CREATED OR WHAT APPLICATIONS THINGS ARE CUT AND PASTED, AND I'M

10:25AM 19   CONFIDENT THERE'S AN INNOCENT EXPLANATION OF THAT THAT INVOLVES

10:25AM 20   ANYONE ON THIS CONFERENCE.

10:25AM 21        THE COURT:  OKAY.  THANK YOU.

10:25AM 22        AND I RAISE IT, JUST AS I SAID, I WAS LOOKING AT AND

10:25AM 23   GIVING GREAT SCRUTINY TO EVERYTHING THAT YOU PRESENTED TO THE

10:26AM 24   COURT AND THAT'S SOMETHING THAT I NOTICE WAS DIFFERENT.  IT

10:26AM 25   MIGHT NOT MEAN ANYTHING, BUT I JUST THOUGHT I WOULD GIVE YOU AN

10:26AM 1     OPPORTUNITY TO TALK ABOUT IT.

10:26AM 2         MR. LEACH, MR. BOSTIC, WHO IS GOING TO SPEAK FROM YOUR

10:26AM 3     TEAM?

10:26AM 4             MR. BOSTIC:  I'LL SPEAK TO THIS.  THANK YOU,

10:26AM 5     YOUR HONOR.

10:26AM 6         SO I THINK WE SHOULD START WITH THE LEGAL STANDARD FOR

10:26AM 7     WHEN AN EVIDENTIARY HEARING IS NECESSARY OR WARRANTED, AND

10:26AM 8     THOSE CASES ARE COLLECTED AND SUMMARIZED IN THE GOVERNMENT'S

10:26AM 9     OPPOSITION BRIEF, WHICH I'M SURE THE COURT HAS HAD A CHANCE TO

10:26AM 10    REVIEW.  BUT IN SUM, THE LEGAL STANDARD DOES NOT FAVOR THE

10:26AM 11    HOLDING OF AN EVIDENTIARY HEARING ON FACTS LIKE THESE.

10:26AM 12        THE CASES THAT WE'VE CITED ARE CLEAR THAT IN GENERAL, NEW

10:26AM 13    TRIAL MOTIONS CAN BE RESOLVED ON THE PAPERS.  THEY CAN BE

10:26AM 14    RESOLVED BASED ON DECLARATIONS AND AFFIDAVITS FROM THE RELEVANT

10:26AM 15    WITNESSES AND PARTIES.  THAT'S WHAT IS REGULARLY DONE.

10:26AM 16        HOLDING AN EVIDENTIARY HEARING IS THE EXCEPTION RATHER

10:26AM 17    THAN THE RULE, AND, OF COURSE, THE DECISION WHETHER TO HAVE AN

10:27AM 18    EVIDENTIARY HEARING OR NOT IS WITHIN THE SOUND DISCRETION OF

10:27AM 19    THE TRIAL COURT.

10:27AM 20        SO HOW SHOULD THE TRIAL COURT EXERCISE THAT DISCRETION?

10:27AM 21    WELL, THE CASES ANSWER THAT FOR US ALSO.  THEY SAY THAT THE

10:27AM 22    COURT SHOULD ENGAGE IN A COMMON SENSE PRACTICAL EXAMINATION OF

10:27AM 23    THE ISSUES, AND THE QUESTION THERE IS WHETHER THE DEFENSE IN

10:27AM 24    BRINGING THE MOTION HAS MADE A THRESHOLD SHOWING THAT ACTUALLY

10:27AM 25    WARRANTS A HEARING.

10:27AM 1       AND IN THIS CASE THE DEFENSE HASN'T BEEN ABLE TO DO THAT.

10:27AM 2    I SHOULD POINT OUT AGAIN THAT THIS IS ALL BASED ON AN ACCOUNT

10:27AM 3    OF WHAT DR. ROSENDORFF REPORTEDLY SAID TO MS. HOLMES'S PARTNER,

10:27AM 4    BUT THAT CONVERSATION WAS NOT RECORDED, SO WE DON'T KNOW THE

10:27AM 5    EXACT WORDS THAT WERE USED, YOU KNOW, MEMORIES FAIL, AND WE

10:27AM 6    DON'T HAVE A TRANSCRIPT OF THAT EXACT CONVERSATION, SO WHILE

10:27AM 7    IT'S TRUE THAT THE DECLARATION FROM DR. ROSENDORFF DOESN'T

10:27AM 8    CORRECT ANY OF THE STATEMENTS THAT WERE ATTRIBUTED TO HIM, IT

10:28AM 9    DOESN'T DISPUTE THAT THOSE STATEMENTS WERE MADE, I DON'T THINK

10:28AM 10    THAT SHOULD BE TAKEN AS A CONCESSION THAT MR. EVANS'S ACCOUNT

10:28AM 11    OF THINGS IS ACCURATE.

10:28AM 12       I THINK INSTEAD THAT MIGHT HAVE BEEN A DELIBERATE DECISION

10:28AM 13    BY DR. ROSENDORFF TO AVOID CREATING WHAT WOULD BE AN

10:28AM 14    UNNECESSARY FACTUAL DISPUTE IN THIS CASE.

10:28AM 15       AND THE REASON WHY THAT FACTUAL DISPUTE WOULD BE

10:28AM 16    UNNECESSARY IS BECAUSE IT ACTUALLY DOESN'T MATTER EXACTLY WHAT

10:28AM 17    DR. ROSENDORFF SAID, THE WORDS THAT HE USED BECAUSE THE

10:28AM 18    DECLARATION, HIS SWORN DECLARATION RULES OUT THE POSSIBILITIES

10:28AM 19    THAT THE DEFENSE RAISES THAT COULD CONCEIVABLY WARRANT A NEW

10:28AM 20    TRIAL.

10:28AM 21       BUT, IN FACT, IT PROBABLY WOULDN'T EVEN IF THESE WERE THE

10:28AM 22    THINGS THAT THE DEFENSE PORTRAYS THEM AS.

10:28AM 23       DR. ROSENDORFF'S DECLARATION MAKES CLEAR THAT HE IS NOT

10:28AM 24    RECANTING ANY OF HIS TESTIMONY.

10:28AM 25       AS A SIDE NOTE, THOUGH, AS THE COURT HAS SEEN FROM THE

10:28AM 1    CASE LAW, EVEN IF DR. ROSENDORFF HAD RECANTED HIS TESTIMONY IN

10:29AM 2    HIS CONVERSATION WITH MR. EVANS, HIS SUBSEQUENT DECLARATION

10:29AM 3    WOULD ACT AS A REPUDIATION OF THAT RECANTATION, AND WE WOULD

10:29AM 4    STILL END UP IN THIS PLACE WHERE A NEW TRIAL IS NOT WARRANTED.

10:29AM 5        SO EVEN TAKING DR. ROSENDORFF'S PURPORTED STATEMENTS IN A

10:29AM 6    WAY THAT IS AS ADVANTAGEOUS TO THE DEFENSE AS POSSIBLE, HIS

10:29AM 7    DECLARATION WOULD STILL DEFEAT THEIR MOTION FOR A NEW TRIAL,

10:29AM 8    AND THAT'S UNDER SEVERAL CASES THAT WE HAVE CITED, INCLUDED

10:29AM 9    NINTH CIRCUIT AUTHORITY.

10:29AM 10       BUT HIS DECLARATION SHOWS THAT IN FACT THAT WAS NOT A

10:29AM 11   RECANTATION.

10:29AM 12       AND WHEN MR. WADE WAS TALKING JUST NOW AND CHARACTERIZING

10:29AM 13   THE DECLARATION OF WHAT IT DID AND WHAT IT DIDN'T DO, I NEEDED

10:29AM 14   TO GO BACK AND LOOK AT THE DECLARATION BECAUSE IT MADE ME THINK

10:29AM 15   THAT I HAD MISREMEMBERED IT, BUT I DIDN'T.

10:29AM 16       THE DECLARATION DOES ADDRESS THE CONCERNS THAT MR. WADE

10:29AM 17   RAISES.  HE SAYS IN THAT DECLARATION HE ANSWERED EVERY QUESTION

10:30AM 18   PUT TO HIM COMPLETELY, ACCURATELY, AND TRUTHFULLY TO THE BEST

10:30AM 19   OF HIS ABILITY, AND NOTHING HE HAS LEARNED SINCE GIVING HIS

10:30AM 20   TESTIMONY HAS CHANGED HIS RECOLLECTION OF THE EVENTS THAT HE

10:30AM 21   HAD WITNESSED AT THERANOS.  AND HE SAYS IMPORTANTLY, I STAND BY

10:30AM 22   MY TESTIMONY AT MS. HOLMES'S AND MR. BALWANI'S TRIAL IN EVERY

10:30AM 23   RESPECT AND HIS TESTIMONY WAS CONSISTENT IN THOSE TWO TRIALS.

10:30AM 24       WHEN IT COMES TO CREATING A MISIMPRESSION, AND THAT'S WHAT

10:30AM 25   MR. WADE WAS FOCUSSED ON, THE ALLEGATION OR THE POSSIBILITY

21

10:30AM 1   THAT WHILE DR. ROSENDORFF'S TESTIMONY WAS ACCURATE AND

10:30AM 2   TRUTHFUL, THE GOVERNMENT NONETHELESS USED IT TO CREATE A

10:30AM 3   MISIMPRESSION, HE ADDRESSES THAT AS WELL.  HE SAID EVEN NOW, IN

10:30AM 4   RETROSPECT, CONSIDERING ALL OF THE TESTIMONY, THE DECLARATION

10:30AM 5   SAYS, I HAVE NO REASON TO BELIEVE THAT THE GOVERNMENT

10:30AM 6   MISREPRESENTED OR OTHERWISE CREATED A MISIMPRESSION ABOUT

10:30AM 7   MS. HOLMES'S OR MR. BALWANI'S CONDUCT AT THERANOS.

10:30AM 8       SO I HEAR THE DEFENSE SAYING THAT WE NEED AN EVIDENTIARY

10:30AM 9   HEARING TO DETERMINE WHAT DR. ROSENDORFF MEANT WHEN HE MADE

10:31AM 10  THESE STATEMENTS THAT HE PURPORTEDLY MADE, BUT HE'S TELLING US

10:31AM 11  WHAT HE DIDN'T MEAN.  HE'S TELLING US THAT HE DID NOT MEAN TO

10:31AM 12  WITHDRAW OR CALL INTO QUESTION ANY OF HIS TESTIMONY, THAT HE

10:31AM 13  DID NOT MEAN TO SUGGEST OR ALLEGE THAT THE GOVERNMENT USED THAT

10:31AM 14  TESTIMONY TO CREATE A MISIMPRESSION ABOUT THE FACTS IN THIS

10:31AM 15  CASE.

10:31AM 16      SO THAT SEEMS TO BE RULING OUT THE POSSIBILITIES THAT THE

10:31AM 17  DEFENSE IS REFERRING TO.  SO FOR THOSE REASONS I THINK IT'S

10:31AM 18  IMPOSSIBLE FOR THE DEFENSE TO MEET ITS BURDEN TO SHOW AS A

10:31AM 19  THRESHOLD MATTER THAT AN EVIDENTIARY HEARING IS NECESSARY HERE.

10:31AM 20      WHEN IT COMES TO DR. ROSENDORFF'S MOTIVATIONS, THE REASONS

10:31AM 21  WHY HE APPARENTLY MADE THAT VISIT TO MS. HOLMES'S HOUSE, I

10:31AM 22  DON'T THINK THAT'S RELEVANT UNDER THE NEW TRIAL STANDARD, BUT I

10:31AM 23  THINK TO THE EXTENT THAT THE COURT MIGHT HAVE QUESTIONS ABOUT

10:31AM 24  WHY DR. ROSENDORFF WANTED TO HAVE THAT CONVERSATION, I THINK WE

10:32AM 25  HAVE THE ANSWER TO THAT AS WELL.

22

10:32AM 1    I THINK MR. WADE REFERRED TO SPECULATION, BUT I DON'T

10:32AM 2    THINK WE NEED TO SPECULATE.  THE DECLARATION TALKS ABOUT THE

10:32AM 3    COMPASSION THAT HE FEELS, THAT DR. ROSENDORFF FEELS FOR

10:32AM 4    MS. HOLMES AND MR. BALWANI AND THEIR FAMILIES IN LIGHT OF THE

10:32AM 5    SITUATION THAT THEY'RE IN.  I THINK THAT'S UNDERSTANDABLE.

10:32AM 6    I THINK THE WEIGHT OF THIS SITUATION, THE FACT THAT PEOPLE

10:32AM 7    HAVE BEEN CONVICTED OF FEDERAL FELONIES, I THINK THAT IS A

10:32AM 8    WEIGHT THAT IS FELT BY MANY PARTICIPANTS IN THE CRIMINAL

10:32AM 9    JUSTICE SYSTEM, AND I THINK ESPECIALLY FOR DR. ROSENDORFF WHO

10:32AM 10   WORKED WITH THESE PEOPLE WHO HAD, AS HE APPARENTLY SAID, YOU

10:32AM 11   KNOW, SOME POSITIVE INTERACTIONS WITH HIM AS WELL, IS

10:32AM 12   UNDERSTANDABLE THAT HE WOULD BE FEELING THAT WAY AFTER

10:32AM 13   TESTIFYING AGAINST THEM AT TRIAL.

10:32AM 14   THAT DOES NOT MEAN THAT HIS TESTIMONY WAS FALSE OR

10:32AM 15   MISLEADING, IT DOES NOT MEAN THAT ANYTHING UNFAIR HAPPENED IN

10:32AM 16   CONNECTION WITH THE TRIAL, AND IT DOES NOT MEAN THAT A NEW

10:33AM 17   TRIAL IS WARRANTED.

10:33AM 18   THE COURT:  THANK YOU.  THANK YOU, MR. BOSTIC.

10:33AM 19   AND I DO NOTE PARAGRAPHS 4 AND 5 OF MR. ROSENDORFF'S

10:33AM 20   DECLARATION OF 1587-1 SPEAK TO THOSE TWO TOPICS THAT YOU'VE

10:33AM 21   JUST RAISED.  AND THOSE ARE WHAT I HAD IN MIND WHEN I WAS

10:33AM 22   QUESTIONING MR. WADE.

10:33AM 23   MR. WADE, ANYTHING ELSE YOU WOULD LIKE ME TO KNOW, SIR?

10:33AM 24   MR. WADE:  YEAH, JUST BRIEFLY, YOUR HONOR, IF I

10:33AM 25   MIGHT.

23

10:33AM 1    WHAT THE GOVERNMENT IS ESSENTIALLY ARGUING IS IF YOU TAKE

10:33AM 2    THESE FACTS AND CONSTRUE THEM IN THE LIGHT MOST FAVORABLE TO

10:33AM 3    THE GOVERNMENT, YOU CAN FIND AN INTERPRETATION THAT DOESN'T

10:33AM 4    REQUIRE A NEW TRIAL.

10:33AM 5    CONVERSELY, IF YOU TAKE THE FACTS AND CONSTRUE THEM IN THE

10:33AM 6    LIGHT MOST FAVORABLE TO MS. HOLMES, A NEW TRIAL IS REQUIRED,

10:33AM 7    AND SO IF IT'S AMBIGUOUS AT BEST, WE SHOULD HAVE A HEARING, BUT

10:33AM 8    THE READING OF PARAGRAPHS 4 AND 5 IS A VERY CAREFUL READING

10:33AM 9    WHICH DOES NOT DIRECTLY ADDRESS THE STATEMENTS THAT WERE MADE

10:33AM 10   BY DR. ROSENDORFF.

10:34AM 11   WE UNDERSTAND HE FEELS, HE FEELS UPSET ABOUT THE

10:34AM 12   CONSEQUENCES OF HIS ACTIONS, BUT THAT DOESN'T MEAN THAT'S WHY

10:34AM 13   HE WAS THERE.  HE MAY FEEL UPSET BECAUSE HE FEELS LIKE HIS --

10:34AM 14   THE EVIDENCE WAS MISPORTRAYED BY THE GOVERNMENT, AND NOW THE

10:34AM 15   RESULT IS REALLY BAD.

10:34AM 16   WE HAVE TO LOOK AT THE STATEMENTS IN TOTAL AND FOCUS ON

10:34AM 17   THE TOTAL IMPLICATIONS OF THEM IN THIS TRIAL.

10:34AM 18   THE COURT:  MR. WADE, IS IT -- IS THE REASON FOR AN

10:34AM 19   EVIDENTIARY HEARING, YOUR REQUEST FOR AN EVIDENTIARY HEARING,

10:34AM 20   TO TEST WHETHER OR NOT DR. ROSENDORFF FEELS THAT THE EVIDENCE

10:34AM 21   WAS ADMITTED FAIRLY OR AS TO -- FROM THE GOVERNMENT, OR IS THE

10:34AM 22   ISSUE REALLY, DR. ROSENDORFF, DO YOU FEEL THAT THE

10:34AM 23   GOVERNMENT -- DID THE GOVERNMENT DO ANYTHING TO YOU THAT COULD

10:34AM 24   BE CONSIDERED MISCONDUCT IN THE WAY THAT THEY PRESENTED THEIR

10:34AM 25   EVIDENCE?  HE DOESN'T GET -- HE'S NOT THE TRIAL ATTORNEY, OF

24

10:35AM 1    COURSE. HE'S NOT AN ATTORNEY. AND I DON'T THINK YOU'RE -- IF

10:35AM 2    THERE IS AN EVIDENTIARY HEARING, YOU DON'T INTEND TO ASK HIS

10:35AM 3    CRITIQUE OF THE GOVERNMENT'S PRESENTATION. THAT'S NOT THE

10:35AM 4    ISSUE FOR HIM.

10:35AM 5        ISN'T THE ISSUE REALLY DID THE GOVERNMENT IN ANY WAY TELL

10:35AM 6    YOU TO TESTIFY ABOUT THINGS IN A FALSE WAY, OR DID THEY ASK YOU

10:35AM 7    TO LIE ABOUT TESTIMONY? DID THEY ASK YOU TO DO ANYTHING THAT

10:35AM 8    WOULD HAVE BEEN VIOLATED OF THE TRIAL PROCESS IN A FAIR TRIAL?

10:35AM 9    ISN'T THAT WHAT THE ISSUE IS?

10:35AM 10        MR. WADE: YEAH. IT GOES TO WHETHER THE

10:35AM 11   QUESTIONS -- YOU DID YOUR BEST, BUT NOTWITHSTANDING YOUR BEST,

10:35AM 12   DID THE GOVERNMENT ELICIT A FALSE NARRATIVE AS TO WHAT HAPPENED

10:35AM 13   WITH RESPECT TO YOUR CONDUCT OR OTHER CONDUCT OF THE COMPANY

10:35AM 14   BECAUSE OF HOW IT PRESENTED THE EVIDENCE?

10:35AM 15        THAT SEEMS TO BE WHAT HE'S, THAT SEEMS TO BE WHAT HE'S

10:35AM 16   FOCUSSED ON, YOUR HONOR. AND I THINK WE'RE SAYING THE SAME

10:36AM 17   THING.

10:36AM 18        IT'S NOT, WAS THIS PARTICULAR -- WHAT DID HE MEAN BY SOME

10:36AM 19   OF THESE STATEMENTS? HE COULD, HE COULD TRY HIS BEST TO ANSWER

10:36AM 20   INFORMATION TRUTHFULLY, BUT IF THE WAY IN WHICH IT WAS

10:36AM 21   PRESENTED AFFIRMATIVELY CREATES A MISIMPRESSION, THAT'S AS BAD

10:36AM 22   AS PRESENTING A LIE.

10:36AM 23        THE COURT: WELL, SO IF HE SAYS AT AN EVIDENTIARY

10:36AM 24   HEARING, GEE, I WISH THE GOVERNMENT HAD -- I DON'T LIKE WHAT

10:36AM 25   HAPPENED, BECAUSE MY FRIENDS, OR WHATEVER, WERE CONVICTED OR IT

25

10:36AM 1  MADE THEM LOOK BAD, HE COULD ALSO SAY, GEE, I WISH THE DEFENSE

10:36AM 2  HAD BEEN A LITTLE BETTER BECAUSE THEY COULD HAVE CHALLENGED

10:36AM 3  THIS MORE AND THERE WOULDN'T HAVE BEEN A CONVICTION IF THEY

10:36AM 4  WERE ONLY BETTER.

10:36AM 5  AND I'M NOT SAYING ANYTHING AGAINST YOUR TEAM, MR. WADE.

10:36AM 6  I USE THAT AS AN EXAMPLE TO SAY, WHAT IS THE RELEVANCE OF HIS,

10:36AM 7  OF HIS DECIDING WHICH LAWYERS IN HIS OPINION PUT ON A BETTER

10:37AM 8  CASE OR A STRONGER CASE?  THAT'S NOT THE PURPOSE OF AN

10:37AM 9  EVIDENTIARY HEARING.

10:37AM 10  REALLY, THE PURPOSE IS WERE YOU MANIPULATED BY THE

10:37AM 11  GOVERNMENT?

10:37AM 12  MR. WADE:  THAT'S RIGHT.  THAT'S RIGHT.

10:37AM 13  THE COURT:  THAT'S IT.  THAT'S IT.

10:37AM 14  AND IT'S NOT HIS OPINION AS TO WHETHER, WELL, I THINK THE

10:37AM 15  GOVERNMENT -- GEE, I WISH THEY HADN'T ARGUED AS STRONGLY OR I

10:37AM 16  WISH, MR. WADE, YOU WOULD HAVE ARGUED MORE, WHATEVER.

10:37AM 17  HIS CRITIQUE OF THE TRIAL IS NOT, IS NOT THE BASIS FOR A

10:37AM 18  NEW TRIAL.  YOU WOULD AGREE WITH THAT?

10:37AM 19  MR. WADE:  I THINK WE'RE SAYING THE SAME THING,

10:37AM 20  YOUR HONOR.

10:37AM 21  I DON'T THINK -- I CERTAINLY DON'T WANT HIM TO CRITIQUE MY

10:37AM 22  OWN PERFORMANCE TO BE SURE, AND I DOUBT THAT HE WOULD ASK THAT

10:37AM 23  -- WISH I HAD DONE MORE AT THE TRIAL.

10:37AM 24  THAT'S NOT THE GOAL.  THE GOAL IS TO EXPLORE WHAT HE MEANS

10:37AM 25  BY THESE STATEMENTS AND WHETHER IT SUGGESTS THAT THERE WAS SOME

10:37AM 1    ACT BY THE GOVERNMENT THAT CREATED A MISIMPRESSION THROUGH HIS

10:37AM 2    TESTIMONY.

10:37AM 3        IT'S NOT A CRITIQUE.  IT'S WHETHER THERE WERE ACTIONS THAT

10:38AM 4    WERE TAKEN THAT, THAT CREATE A MISIMPRESSION AND SUCH THAT HIS

10:38AM 5    TESTIMONY WOULD NOT BE ACCURATE AND SHOULD NOT BE RELIED UPON.

10:38AM 6        THESE ARE HIS STATEMENTS.  THAT'S WHAT WE WANT TO EXPLORE.

10:38AM 7            THE COURT:  SURE.

10:38AM 8            MR. WADE:  THE GOVERNMENT WANTS TO MATCH UP

10:38AM 9    STATEMENTS FROM HIS DECLARATION THAT ARE KIND OF GENERAL AND

10:38AM 10   DON'T EVEN DIRECTLY CONFRONT THE ISSUES PRESENTED BY WHAT HE

10:38AM 11   SAID TO MR. EVANS AND SUGGESTS, WELL, THIS KIND OF GENERALLY

10:38AM 12   WASHES OVER IT, BUT IT ACTUALLY DOESN'T SPECIFICALLY ADDRESS

10:38AM 13   THE CORE CONCERNS THAT ARE PRESENTED BY THE DECLARATION, AND

10:38AM 14   THAT'S WHAT WE WANT TO EXPLORE HERE.

10:38AM 15           THE COURT:  AND NOT, NOT AN EVALUATION OF WHAT

10:38AM 16   MR. EVANS'S RECOLLECTION IS OF WHAT MR. ROSENDORFF SAID.  THAT

10:38AM 17   DOESN'T SEEM TO HAVE RELEVANCE TO THIS.

10:38AM 18           MR. WADE:  I, I, I DON'T THINK IT DOES, YOUR HONOR.

10:39AM 19       I THINK THAT --

10:39AM 20           THE COURT:  IT'S NOT WHO DO YOU BELIEVE, MR. EVANS'S

10:39AM 21   RECOLLECTION OF WHAT WAS SAID OR DR. ROSENDORFF'S.  WHAT IS AT

10:39AM 22   ISSUE HERE, ACCORDING TO WHAT I HEAR FROM YOU SAYING, IS THAT

10:39AM 23   THIS RAISES THE QUESTION OF WHETHER OR NOT THIS WITNESS WAS IN

10:39AM 24   SOME WAY, AND I'LL USE THE WORD MANIPULATED, OR IN SOME WAY,

10:39AM 25   SOMEHOW TESTIFIED IN AN UNTOWARD WAY AT THE GOVERNMENT'S HAND.

27

| | | |
|---|---|---|
| 10:39AM | 1 | THAT'S THE ISSUE THAT YOU'RE RAISING HERE. |
| 10:39AM | 2 | MR. WADE: YEAH, I THINK TO THE EXTENT THAT -- IN |
| 10:39AM | 3 | ESSENCE, I THINK, YES, YOUR HONOR. TO THE EXTENT THAT THE |
| 10:39AM | 4 | STATEMENTS TO MR. EVANS ARE RELEVANT IS IT REFLECTS AT LEAST A |
| 10:39AM | 5 | BELIEF ABOUT HIM AT THE TIME THAT THERE MAY BE AN ISSUE WITH |
| 10:39AM | 6 | RESPECT TO THAT. SO YOU CAN IMAGINE ASKING, YOU KNOW, DID YOU |
| 10:39AM | 7 | SAY THIS OR SOMETHING SIMILAR TO THIS AND WHAT DID YOU MEAN BY |
| 10:39AM | 8 | THAT. |
| 10:39AM | 9 | THE COURT: OKAY. THANK YOU. |
| 10:39AM | 10 | MR. BOSTIC, ANYTHING IN CLOSING, SIR? |
| 10:39AM | 11 | MR. BOSTIC: THANK YOU, YOUR HONOR. JUST A FEW |
| 10:39AM | 12 | POINTS IN RESPONSE. |
| 10:40AM | 13 | SO I THINK BEFORE CONSIDERING AN EVIDENTIARY HEARING, |
| 10:40AM | 14 | CERTAINLY BEFORE ORDERING AN EVIDENTIARY HEARING, I WOULD ASK |
| 10:40AM | 15 | THE COURT FOR SOME GUIDANCE ON WHAT QUESTIONS WE'RE ACTUALLY |
| 10:40AM | 16 | TRYING TO ANSWER BY HAVING THAT HEARING, AND I WOULD SUBMIT |
| 10:40AM | 17 | THAT THERE ARE NO MATERIAL QUESTIONS THAT NEED ANSWERING SUCH |
| 10:40AM | 18 | THAT A HEARING WOULD BE WARRANTED. |
| 10:40AM | 19 | AND IN THE COURT'S DISCUSSION JUST NOW WITH MR. WADE, I |
| 10:40AM | 20 | HEARD QUESTIONS RAISED ABOUT WHETHER THIS WITNESS WAS |
| 10:40AM | 21 | MANIPULATED BY THE GOVERNMENT, WHETHER THROUGH THIS WITNESS THE |
| 10:40AM | 22 | GOVERNMENT TOOK ACTION THAT CREATED A MISIMPRESSION, AND |
| 10:40AM | 23 | MR. WADE CONTINUES TO CONTEND THAT THE DECLARATION DOES NOT |
| 10:40AM | 24 | ADDRESS THOSE POINTS, BUT IT DOES. |
| 10:40AM | 25 | DR. ROSENDORFF IN HIS DECLARATION SAYS THAT HE STANDS BY |

28

10:40AM 1    HIS TESTIMONY IN EVERY RESPECT, AND HE SAYS THAT THE ONLY

10:41AM 2    INSTRUCTION THAT THE GOVERNMENT HAS GIVEN HIM IN CONNECTION

10:41AM 3    WITH THAT CASE IS TO TELL THE TRUTH ABOUT THE EVENTS HE

10:41AM 4    WITNESSED, AND HE SAYS IN TERMS OF WHETHER THE GOVERNMENT

10:41AM 5    CREATED A MISIMPRESSION, THAT HE HAS NO REASON TO BELIEVE, THIS

10:41AM 6    IS A QUOTE, HE HAS NO REASON TO BELIEVE THAT THE GOVERNMENT

10:41AM 7    MISREPRESENTED OR OTHERWISE CREATED A MISIMPRESSION ABOUT

10:41AM 8    MS. HOLMES OR MR. BALWANI'S CONDUCT AT THERANOS.

10:41AM 9        AREN'T THOSE THE ANSWERS TO THE QUESTIONS THAT THE DEFENSE

10:41AM 10   IS CONTENDING ARE STILL OPEN?  AND IF THAT'S THE CASE, WHY DO

10:41AM 11   WE NEED AN EVIDENTIARY HEARING?

10:41AM 12       IN TERMS OF GOVERNMENT MISCONDUCT, AS THE COURT NOTED, THE

10:41AM 13   DEFENSE IS NOT MAKING THAT ALLEGATION AT THIS TIME.  THERE'S NO

10:41AM 14   EVIDENCE TO SUPPORT THAT ALLEGATION.  SO HOLDING AN EVIDENTIARY

10:41AM 15   HEARING WOULD BE SIMPLY ENABLING A FISHING EXPEDITION BY THE

10:41AM 16   DEFENSE TO SEE IF IT COULD POSSIBLY UNCOVER THAT EVIDENCE.

10:41AM 17       I'LL TELL THE COURT NOW, THERE WAS NO SUCH MISCONDUCT, SO

10:41AM 18   THAT EVIDENCE WILL NOT BE FOUND.  BUT WITHOUT MORE OF A

10:42AM 19   THRESHOLD SHOWING AT THIS POINT, THERE'S NO REASON TO EVEN

10:42AM 20   ALLOW OR DEVOTE THE RESOURCES TO THAT KIND OF FISHING

10:42AM 21   EXPEDITION.

10:42AM 22       AND BECAUSE THIS IS ALL IN THE CONTEXT OF A RULE 33 MOTION

10:42AM 23   FOR A NEW TRIAL, WE DO NEED TO KEEP IN MIND THAT THE STANDARDS

10:42AM 24   THAT REQUIRE THAT THE NEW EVIDENCE ACTUALLY HAVE A LIKELIHOOD

10:42AM 25   OF RESULTING IN AN ACQUITTAL, IN A HYPOTHETICAL NEW TRIAL, AND

10:42AM 1    I THINK THE GOVERNMENT -- I'M SORRY, THE COURT MADE A GOOD

10:42AM 2    POINT WHEN IT FOCUSSED ON THE NATURE OF DR. ROSENDORFF'S

10:42AM 3    TESTIMONY AND HOW IT FIT INTO THE ACTUAL CONVICTIONS IN THIS

10:42AM 4    CASE.

10:42AM 5        THE FACT IS THAT HIS TESTIMONY ABOUT OPERATIONS IN THE

10:42AM 6    CLINICAL LAB WHERE THERANOS RENDERED SERVICES TO PATIENTS, THE

10:42AM 7    VICTIMS OF THE ALLEGED PATIENT FRAUD, THAT TESTIMONY IS MOST

10:42AM 8    RELEVANT TO THE PATIENT SIDE OF THE CASE WHERE MS. HOLMES WAS

10:42AM 9    ACQUITTED.

10:42AM 10   THE FACT THAT SHE WAS CONVICTED ON COUNTS RELATING TO

10:43AM 11   INVESTOR FRAUD MAKES IT VERY DIFFICULT TO SEE HOW IMPEACHING

10:43AM 12   DR. ROSENDORFF'S TESTIMONY OR CALLING IT INTO QUESTION IN ANY

10:43AM 13   WAY WOULD HAVE CHANGED THE RESULT AT TRIAL.

10:43AM 14       AND THAT LEADS ME TO MY FINAL POINT, WHICH IS THAT EVEN

10:43AM 15   TAKING THIS IN A LIGHT MOST FAVORABLE TO THE DEFENSE,

10:43AM 16   DR. ROSENDORFF'S PURPORTED STATEMENTS WERE MERELY IMPEACHING

10:43AM 17   BECAUSE THEY DID NOT AFFECT THE TRUTHFULNESS OF HIS TESTIMONY

10:43AM 18   OR THE GOVERNMENT'S PRESENTATION OF EVIDENCE, AND WE KNOW THAT

10:43AM 19   FROM HIS DECLARATION.

10:43AM 20       THE FACT THAT HE MAY HAVE SAID THESE THINGS GOES ONLY TO

10:43AM 21   THE POSSIBILITY OF IMPEACHING HIM, AND THE CASES TELL US

10:43AM 22   REPEATEDLY VERY CLEARLY THAT THAT'S NOT SUFFICIENT FOR A

10:43AM 23   TRIAL.

10:43AM 24       WHAT THE DEFENSE IS REALLY ASKING FOR WHEN THEY'RE ASKING

10:43AM 25   FOR AN EVIDENTIARY HEARING IS, THEY'RE ASKING FOR HOURS 20

10:43AM 1    THROUGH 22 OF THE DR. ROSENDORFF CROSS.  THAT'S NOT SOMETHING

10:43AM 2    THAT THEY'RE ENTITLED TO.  IT'S NOT A GOOD USE OF THE COURT'S

10:43AM 3    RESOURCES.  AND THE CASES CITED BY THE GOVERNMENT WARN AGAINST

10:43AM 4    THE CHAOS, I THINK THAT'S THE WORD USED BY THE GLANTZ CASE, THE

10:44AM 5    CHAOS THAT WOULD ENSUE IF THE DEFENDANTS WERE ABLE TO

10:44AM 6    REPEATEDLY HAVE ADDITIONAL BITES AT THE APPLE WHEN IT COMES TO

10:44AM 7    CROSS-EXAMINING WITNESSES LIKE THIS.

10:44AM 8            THE COURT:  THANK YOU, MR. BOSTIC.

10:44AM 9        MR. WADE, ANYTHING FURTHER?

10:44AM 10            MR. WADE:  YOUR HONOR, THIS IS NOT A CASE WHERE

10:44AM 11   WE'RE SEEKING SERIAL CROSS-EXAMINATION.  IT'S AN EXTRAORDINARY

10:44AM 12   CIRCUMSTANCE WHERE A LEAD WITNESS SHOWS UP AT A DEFENDANT'S

10:44AM 13   HOUSE AND MAKES EXTRAORDINARY STATEMENTS.  IT WARRANTS A

10:44AM 14   HEARING AND OUR REPLY BRIEF ADDRESSES THE GOVERNMENT'S CASES,

10:44AM 15   AND I'LL POINT THE COURT TO THAT TO ADDRESS WHY WE THINK THE

10:44AM 16   GOVERNMENT IS MISREADING MANY OF THE STANDARDS THAT THEY'RE

10:44AM 17   RELYING UPON TO SAY THAT A HEARING SHOULD NOT OCCUR HERE.

10:44AM 18       SO WE OTHERWISE DEFER TO THE COURT AND ARE HAPPY TO ANSWER

10:44AM 19   ANY OTHER QUESTIONS THAT YOU MAY HAVE.

10:44AM 20            THE COURT:  THANK YOU, MR. WADE.

10:44AM 21       IT SOUNDS LIKE, MR. WADE, THIS IS A CASE OF FIRST

10:44AM 22   IMPRESSION IN YOUR EXPERIENCE, THAT IS, A WITNESS GOING TO

10:45AM 23   SPEAK WITH A CONVICTED DEFENDANT AFTER TRIAL.  IT SOUNDS LIKE

10:45AM 24   YOU HAVEN'T HAD THIS EXPERIENCE BEFORE, EITHER.

10:45AM 25            MR. WADE:  WE THINK THIS IS PRETTY EXTRAORDINARY,

10:45AM 1    YOUR HONOR, AND IN LIGHT OF THE STATEMENTS AND IF THEY'RE

10:45AM 2    FAVORABLY CONSTRUED, THEY WOULD WARRANT A NEW TRIAL.  I TAKE

10:45AM 3    THE COURT'S COMMENTS ON HOW IT COULD BE INTERPRETED ANOTHER

10:45AM 4    WAY, BUT AT A MINIMUM, WE SHOULD ADDRESS THIS --

10:45AM 5          THE COURT:  ALL RIGHT.

10:45AM 6          MR. WADE:  -- AND NOT LEAVE UNCERTAINTY GIVEN THE

10:45AM 7    SIGNIFICANCE OF DR. ROSENDORFF'S TESTIMONY.

10:45AM 8          THE COURT:  ALL RIGHT.  WELL, THANK YOU VERY MUCH.

10:45AM 9      THANK YOU FOR THE DISCUSSION THIS MORNING.  IT'S BEEN

10:45AM 10   HELPFUL.  I ASKED MR. WADE IF IT'S A CASE OF FIRST IMPRESSION

10:45AM 11   WITH HIM, AND I'M NOT CERTAIN HE ANSWERED THAT QUESTION, BUT I

10:45AM 12   WILL SAY I HAVE NOT SEEN A CASE WHERE THIS HAS HAPPENED BEFORE.

10:45AM 13     THE ISSUES RAISED BY THE DEFENSE ARE SERIOUS, LIMITED BUT

10:45AM 14   SERIOUS, LET ME PUT IT THAT WAY.  THE ALLEGATION IS, AND IT'S

10:46AM 15   QUOTE, "THE POSSIBILITY THAT THE GOVERNMENT MAY HAVE ENGAGED IN

10:46AM 16   MISCONDUCT," THAT'S AT DOCUMENT 1574, PAGE 10, LINES 12 THROUGH

10:46AM 17   14 I THINK IS WHERE THAT'S EXPRESSED IN THE PLEADINGS, AND THE

10:46AM 18   COURT TAKES THAT SERIOUSLY.

10:46AM 19     I LOOK AT THE FACTS HERE, THAT IS, DR. ROSENDORFF

10:46AM 20   APPEARING AT THE HOME OF THE DEFENDANT WHO WAS CONVICTED,

10:46AM 21   EXPRESSING A DESIRE TO SPEAK TO CLEAR THE AIR, I THINK HE SAID,

10:46AM 22   OR IT WOULD BE A CLEANSING FOR BOTH PARTIES, SOMETHING LIKE

10:46AM 23   THAT, ARE INFORMATIVE AS IS HIS SUBSEQUENT DECLARATION WHICH,

10:46AM 24   AS MR. BOSTIC POINTS OUT, DOES ADD CLARITY TO NOT NECESSARILY

10:46AM 25   SPECIFICALLY TO HIS STATEMENTS BUT PERHAPS MORE IMPORTANTLY TO

32

| | | |
|---|---|---|
| 10:46AM | 1 | HIS TESTIMONY AT THE TRIAL, WHICH IS REALLY THE ISSUE THAT THE |
| 10:47AM | 2 | COURT IS CONCERNED ABOUT, AND I THINK THAT ALL COUNSEL ARE |
| 10:47AM | 3 | CONCERNED ABOUT. |
| 10:47AM | 4 | MR. WADE TALKS ABOUT AND TELLS US THAT HE NEEDS TO KNOW A |
| 10:47AM | 5 | LITTLE BIT MORE ABOUT WHAT DOES THE DECLARATION MEAN, AND I |
| 10:47AM | 6 | HAVE SUGGESTED THAT THIS IS -- IF THERE IS AN EVIDENTIARY |
| 10:47AM | 7 | HEARING OR WERE TO BE ONE, IT WOULD NOT BE AN EVIDENTIARY |
| 10:47AM | 8 | HEARING THAT WOULD INVOLVE BALANCING THE RECOLLECTION OF |
| 10:47AM | 9 | MS. HOLMES'S PARTNERS VERSUS MR. OR DR. ROSENDORFF'S |
| 10:47AM | 10 | RECOLLECTION OF WHAT WAS SAID AND WHERE THE CAR DROVE AND HOW |
| 10:47AM | 11 | SOMEONE LOOKED AND ALL OF THOSE THINGS.  IT'S REALLY ABOUT HIS |
| 10:47AM | 12 | COURT TESTIMONY. |
| 10:47AM | 13 | AND RECOGNIZING THAT, AND PERHAPS TO GET FINALITY ON THIS |
| 10:47AM | 14 | PARTICULAR ISSUE, I AM GOING TO HAVE A LIMITED, LIMITED |
| 10:47AM | 15 | EVIDENTIARY HEARING, AND IT WOULD BE LIMITED SOLELY TO THE |
| 10:47AM | 16 | ISSUES RAISED IN THAT CITATION I JUST READ, THAT IS, THE |
| 10:48AM | 17 | POSSIBILITY THAT THE GOVERNMENT MAY HAVE ENGAGED IN MISCONDUCT, |
| 10:48AM | 18 | AND THOSE RELATE TO THE DECLARATION OF DR. ROSENDORFF AS HE'S |
| 10:48AM | 19 | TALKED ABOUT IN PARAGRAPHS 3 AND 4 AND PERHAPS PARAGRAPH 1 |
| 10:48AM | 20 | SPECIFICALLY. |
| 10:48AM | 21 | THIS IS NOT GOING TO BE A FISHING EXPEDITION, MR. WADE. |
| 10:48AM | 22 | I'M GOING TO LIMIT IT TO ONE DAY, AND I DON'T THINK WE NEED ONE |
| 10:48AM | 23 | DAY, BUT I'M GOING TO SET ASIDE A FULL DAY FOR THIS. |
| 10:48AM | 24 | WE HAVE OCTOBER 17TH CURRENTLY SET FOR THE SENTENCING OF |
| 10:48AM | 25 | MS. HOLMES, AND BECAUSE WE'RE ALL READY FOR THAT DATE, I'LL SET |

33

10:48AM   1    THAT DATE FOR THE EVIDENTIARY HEARING.  THAT WILL BE AT 9:00

10:48AM   2    A.M. IN MY COURTROOM.

10:48AM   3        WHAT I'M GOING TO ASK THE PARTIES TO DO, AND AS I SAID,

10:48AM   4    THIS IS -- I'M DEVOTING THE DAY TO THAT.  I DON'T BELIEVE AND I

10:48AM   5    DON'T EXPECT THAT WE WILL NEED A FULL DAY.

10:48AM   6        THIS IS NOT GOING TO BE, MR. WADE AND MR. BOSTIC, A

10:49AM   7    RECROSS-EXAMINATION OF HIM OR A REDIRECT OF DR. ROSENDORFF.

10:49AM   8    THE ISSUES ARE LIMITED, LIMITED TO HIS DECLARATION, AS MR. WADE

10:49AM   9    PUT IT, WHAT DID YOU MEAN?

10:49AM  10        AND WHAT THE COURT WANTS TO KNOW IS, DR. ROSENDORFF, DO

10:49AM  11    YOU FEEL THAT THE GOVERNMENT MANIPULATED YOU IN THEIR

10:49AM  12    PREPARATION OR IN ANY WAY IN REGARDS TO THEIR TESTIMONY,

10:49AM  13    NOTWITHSTANDING THE OUTCOME OF THE CASE, ANY OF THAT,

10:49AM  14    NOTWITHSTANDING HIS -- I'M NOT INTERESTED IN HIS CRITIQUE OF

10:49AM  15    WHAT HAPPENED OR HIS OPINION ABOUT QUESTIONS THAT COULD HAVE,

10:49AM  16    SHOULD HAVE BEEN ASKED.  HE'S NOT A LAWYER.  HIS PARTICIPATION

10:49AM  17    IN THIS CASE WAS MERELY AS A WITNESS.  HE TOOK AN OATH TO TELL

10:49AM  18    THE TRUTH, AND REALLY WHAT I WANT TO KNOW IS DID YOU TELL THE

10:49AM  19    TRUTH?

10:50AM  20        THAT'S REALLY THE QUESTION THAT I THINK, MR. WADE, YOU

10:50AM  21    WOULD LIKE TO HAVE ANSWERED.

10:50AM  22        FROM THE GOVERNMENT'S PERSPECTIVE, MR. BOSTIC, HE TELLS US

10:50AM  23    HE ALREADY TOLD US THAT.

10:50AM  24        AND SO PERHAPS THIS WILL EITHER BE AN OPPORTUNITY TO

10:50AM  25    REAFFIRM THAT OR TO EXPLAIN WHY HE PARTS COMPANY WITH THAT.

34

10:50AM 1      SO THAT'S WHY I SAY I DON'T BELIEVE THAT THIS WILL BE A

10:50AM 2  LENGTHY PROCESS.

10:50AM 3      WE'LL SET OCTOBER 17TH, OCTOBER 17TH AT 9:00 A.M. FOR THAT

10:50AM 4  TO OCCUR, AND THAT I WILL BE AN IN-PERSON HEARING.  AND I'LL

10:50AM 5  LEAVE IT TO THE PARTIES TO OBTAIN DR. ROSENDORFF'S APPEARANCE

10:50AM 6  FOR THAT HEARING.

10:50AM 7      I'M GOING TO THEN REQUEST THAT THE PARTIES FILE ONE FILING

10:50AM 8  EACH, AND YOU'LL FILE THAT BY CLOSE OF BUSINESS OCTOBER 24TH,

10:50AM 9  AND THAT WILL BE YOUR, YOUR POSITION AS TO THE HEARING.

10:50AM 10      THE COURT WOULD HOPE THAT I WOULD GET AN ORDER OUT SHORTLY

10:50AM 11  THEREAFTER, HOPEFULLY IN A WEEK, TEN DAYS, SOMETHING LIKE THAT.

10:51AM 12      OF COURSE, WHAT I'VE JUST DONE IS I'VE MOVED THE

10:51AM 13  SENTENCING.  SO LET'S LOOK AT THAT, AND LET ME SUGGEST DATES

10:51AM 14  FOR SENTENCING SHOULD SENTENCING BE NEEDED.  I JUST WANT TO

10:51AM 15  SECURE DATES.  I'M NOT SUGGESTING IN ANY WAY THAT THE COURT HAS

10:51AM 16  MADE A DECISION ON THIS MOTION, BUT I DO WANT FOR CALENDAR

10:51AM 17  MANAGEMENT TO SET DATES SHOULD THEY BE NECESSARY.

10:51AM 18      IF THE COURT, AFTER THE HEARING, THE COURT FINDS THAT A

10:51AM 19  SENTENCING IS NOT NECESSARY, OF COURSE WE'LL VACATE ANY DATE

10:51AM 20  THAT IS SET, BUT I DO, FOR COURT MANAGEMENT AND YOUR CALENDAR

10:51AM 21  MANAGEMENT, WISH TO SET A SENTENCING DATE ANEW.

10:51AM 22      NOW, LET ME SUGGEST SOME DATES FOR ALL OF YOU WHILE YOU

10:51AM 23  HAVE YOUR CALENDARS OPEN.

10:51AM 24      THESE ARE DATES THAT ARE AVAILABLE FOR US:  NOVEMBER 16TH

10:51AM 25  OR 18; DECEMBER 5TH; DECEMBER 6TH; DECEMBER 12TH; JANUARY 12TH;

| | | |
|---|---|---|
| 10:52AM | 1 | JANUARY 17TH OF 2023. |
| 10:52AM | 2 | MR. WADE:  SORRY TO INTERRUPT, YOUR HONOR.  MIGHT I |
| 10:52AM | 3 | SUGGEST GIVEN THE NUMBER OF SCHEDULES INVOLVED AND TO NOT |
| 10:52AM | 4 | BURDEN THE COURT, WE CONFER ON OUR SIDE, CONFER WITH COUNSEL |
| 10:52AM | 5 | AND REPORT BACK HERE, YOUR DEPUTY AS TO THE BEST OF THOSE |
| 10:52AM | 6 | DATES? |
| 10:52AM | 7 | THE COURT:  I'M HAPPY TO DO THAT IF THE GOVERNMENT |
| 10:52AM | 8 | IS -- WISHES TO PROCEED THAT WAY. |
| 10:52AM | 9 | IF YOU CAN'T AGREE ON A PARTICULAR DATE, MR. WADE, THEN |
| 10:52AM | 10 | WHAT I'M GOING TO ASK TO DO, MR. BOSTIC, IS YOU GIVE ME DATES |
| 10:52AM | 11 | THAT YOU -- THAT AT LEAST YOU HAVE CLOSE PARITY WITH, AND I'LL |
| 10:52AM | 12 | LOOK AT THOSE. |
| 10:52AM | 13 | MR. BOSTIC? |
| 10:52AM | 14 | MR. BOSTIC:  SO, YOUR HONOR, I HEAR THE DEFENSE |
| 10:52AM | 15 | SAYING HE WOULD LIKE A CHANCE TO CONFER AND MEET WITH THE |
| 10:53AM | 16 | GOVERNMENT TO TALK ABOUT WHAT DATES MIGHT BE AVAILABLE FOR BOTH |
| 10:53AM | 17 | SIDES.  WE'RE HAPPY TO TAKE THAT APPROACH. |
| 10:53AM | 18 | I'LL TELL THE COURT THAT I THINK THE MAJORITY OF THOSE |
| 10:53AM | 19 | DATES WOULD BE FINE FOR THE GOVERNMENT, AND THAT, OF COURSE, |
| 10:53AM | 20 | THE GOVERNMENT, AS THE COURT KNOWS, RECOGNIZES THE PUBLIC |
| 10:53AM | 21 | INTEREST IN PROCEEDING WITH THE SENTENCING AS SOON AS POSSIBLE. |
| 10:53AM | 22 | SO WITH THAT SAID, YES, WE'RE HAPPY TO MEET AND CONFER |
| 10:53AM | 23 | WITH THE DEFENSE IF THE COURT WOULD LIKE US TO. |
| 10:53AM | 24 | THE COURT:  OKAY.  THANK YOU.  I APPRECIATE THAT, |
| 10:53AM | 25 | MR. WADE. |

36

10:53AM 1          I APPRECIATE YOUR CONTINUED COOPERATION IN SETTING THESE

10:53AM 2     DATES AND ALSO IN YOUR BRIEFING SCHEDULES, THAT'S HELPFUL, TOO.

10:53AM 3          THE OTHER MOTIONS, 1576 AND 1577, THE COURT WILL TAKE

10:53AM 4     THOSE UNDER SUBMISSION.  AS I SAID, I DON'T NEED ANY ADDITIONAL

10:53AM 5     INFORMATION FROM EITHER SIDE AS TO THOSE MOTIONS AND THE

10:53AM 6     PLEADINGS SPEAK FOR THEMSELVES, AND I CAN MAKE DECISIONS ON

10:53AM 7     THAT, ON THOSE TWO MOTIONS.

10:53AM 8          BUT WE'LL SET THE EVIDENTIARY HEARING, AS I'VE INDICATED.

10:53AM 9          ANYTHING FURTHER, MR. WADE?

10:54AM 10              MR. WADE:  NO, YOUR HONOR.

10:54AM 11              THE COURT:  MS. SAHARIA, MR. DOWNEY, MR. LEMENS,

10:54AM 12     ANYTHING FURTHER?

10:54AM 13              MS. SAHARIA:  NO, YOUR HONOR.

10:54AM 14              MR. DOWNEY:  NO, YOUR HONOR.  THANK YOU, YOUR HONOR.

10:54AM 15              THE COURT:  ALL RIGHT.  THANK YOU.

10:54AM 16          MR. BOSTIC, MR. LEACH, ANYTHING FURTHER?

10:54AM 17              MR. BOSTIC:  NOTHING FURTHER, YOUR HONOR.  THANK

10:54AM 18     YOU.

10:54AM 19              MR. LEACH:  NO, YOUR HONOR.  THANK YOU.

10:54AM 20              THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.  I LOOK

10:54AM 21     FORWARD TO HEARING FROM YOU.

10:54AM 22          ALSO, YOU SHOULD INFORM ME WHEN YOU GET BACK WITH THE

10:54AM 23     DATES ABOUT THE WITNESS'S AVAILABILITY AND HOW THAT IS GOING TO

10:54AM 24     BE.  I'LL LEAVE THAT TO YOU ALSO TO DISCUSS HOW YOU'RE GOING TO

10:54AM 25     GET HIM HEAR AND THOSE TYPES OF LOGISTICS.

10:54AM   1            ALL RIGHT.  THANK YOU VERY MUCH.

10:54AM   2                 MS. SAHARIA:  THANK YOU.

10:54AM   3                 THE COURT:  THANK YOU.

10:54AM   4                 THE CLERK:  COURT IS CONCLUDED.

10:54AM   5         (COURT CONCLUDED AT 10:54 A.M.)

          6

          7

          8

          9

         10

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

1

2

3                        CERTIFICATE OF REPORTER

4

5

6

7        I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8    STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9    280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10   CERTIFY:

11       THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16   IRENE RODRIGUEZ, CSR, RMR, CRR
     CERTIFICATE NUMBER 8074
17

18
                    DATED:  OCTOBER 3, 2022
19

20

21

22

23

24

25

# Exhibit 8

**Cleary, Rich**

| | |
|---|---|
| **From:** | Holliman, Lakisha (USACAN) |
| **Sent:** | Thursday, October 4, 2018 8:54 PM |
| **To:** | Peirce, Sutton (USACAN) |
| **Cc:** | Schenk, Jeffrey (USACAN); Bostic, John (USACAN); Leach, Robert (USACAN); Lam, Mimi (USACAN) |
| **Subject:** | FW: Theranos Discovery |
| **Attachments:** | Theranos Seagate Drive.pdf |

Hi Sutton:

I will be out of the office from 10/5- 10/19.  I wanted to know if you were able to find the program that would allow us to view the hard drive.

I am cc'ing the AUSAs so they can know the status while I am on vacation.

FYI- The AUSAs have a status conference on 10/15/18 and will need to let the Judge know the status of all discovery.

FYI- Mimi Lam is my back-up while I am out of the office.

Thanks in advance.

Lakisha

---

**From:** Peirce, Sutton (USACAN)
**Sent:** Tuesday, September 18, 2018 5:36 PM
**To:** Holliman, Lakisha (USACAN) <LHolliman@usa.doj.gov>
**Cc:** Kingwell, Tim (USACAN) <TKingwell@usa.doj.gov>
**Subject:** RE: Theranos Discovery

Hi Lakisha,

It looks like Tim's diagnosis was correct; we couldn't see the contents of the drive because it's a VeraCrypt volume (a drive which has been encrypted using VeraCrypt).
Using the password you provided I was able to open it on the standalone, but now I just have further questions!

The contents of the drive *do not* appear to be load ready files, or natives, or any kind of forensic viewer. Rather, It looks like a set of backup copies of something, probably a database (the format is .bak).
Without knowing what sort of database these are from (or if they indeed are database backups) it's very hard to figure out how we might extract the data (or even if it's possible for us to do so).
It also raised the question that perhaps these are simply backup copies of material that has already been provided to our office.

Was there any documentation provided when the drive was delivered?
If you could send along any additional info you have about this drive that would be great; I'm also happy to speak with an agent if you have a point of contact for this material.

I've included a screenshot of the contents in case it helps shed some light.

1

Thanks,
Sutton



**From:** Holliman, Lakisha (USACAN)
**Sent:** Saturday, September 15, 2018 1:31 PM
**To:** Peirce, Sutton (USACAN) <SPeirce@usa.doj.gov>
**Cc:** Dao, Henry (USACAN) <HDao@usa.doj.gov>; Kingwell, Tim (USACAN) <TKingwell@usa.doj.gov>
**Subject:** RE: Theranos Discovery

Hi Sutton:

I digged deep in my email and found that the hard drive is password protected.

The password is below:

7Dh$fsB!dgs&6Fes!

Thanks

Lakisha

**From:** Peirce, Sutton (USACAN)
**Sent:** Friday, September 14, 2018 4:01 PM
**To:** Holliman, Lakisha (USACAN) <LHolliman@usa.doj.gov>
**Cc:** Dao, Henry (USACAN) <HDao@usa.doj.gov>; Kingwell, Tim (USACAN) <TKingwell@usa.doj.gov>
**Subject:** RE: Theranos Discovery

Hi Lakisha,

I received the drive this afternoon but I'm afraid it's not playing nice with me either. The message I receive, both on my workstation and the standalone, is "*You need to format the disk in drive \*: before you can use it*"



My first guess was that it might be formatted for a Mac or simply corrupted, but after discussing it with Brian and Tim I think Tim has the most likely suspicion: He's wondering if the entire drive might be encrypted as a VeraCrypt (or TrueCrypt) volume? If that's the case we'll need a password to unlock it.

Did the originator of this drive provide any documentation as to the contents and/or a password? If you find any info for this guy please pass it along. I'm attaching a scan of the drive label in case it's helpful in tracking down a password.

Thanks!
Sutton

---

**From:** Holliman, Lakisha (USACAN)
**Sent:** Wednesday, September 12, 2018 2:56 PM
**To:** Peirce, Sutton (USACAN) <SPeirce@usa.doj.gov>
**Cc:** Dao, Henry (USACAN) <HDao@usa.doj.gov>
**Subject:** RE: Theranos Discovery

Hi Sutton:

Henry from IT just called me in re:  HD and I  let him that I will send the drive to ALS directly since the plan was for ALS to process discovery for me.  I told Henry if you have any issues with opening up the drive you would forward the drive to IT.

Thanks

Lakisha

---

**From:** Peirce, Sutton (USACAN)
**Sent:** Wednesday, September 12, 2018 1:23 PM
**To:** Holliman, Lakisha (USACAN) <LHolliman@usa.doj.gov>
**Subject:** RE: Theranos Discovery

Sounds like a plan, thanks!
…and feel free to let IT know that I'm happy to have a look at that drive as well—we all have our little tricks to try and coax hard drives to play nice ☺

---

**From:** Holliman, Lakisha (USACAN)
**Sent:** Wednesday, September 12, 2018 1:19 PM
**To:** Peirce, Sutton (USACAN) <SPeirce@usa.doj.gov>
**Subject:** Theranos Discovery

**ER-1325**

Hi Sutton:

I have 2 hard drives in my possession and I am waiting for the agent to send me a 3rd drive.  I took a look at the two hard drives and one hard drive is only 12 GB, so I will process that on  my own because I will be using various prefixes.  The hard drive that I wanted to send you is (1TB DRIVE but I am not sure what the DATA size is) and my computer is not detecting it.

I plan on Fedex'ing the Hard drive to IT to take a look at it and if they are able to fix I will have them give it to you.

If they are able to fix it, I will fill out the ALS request form to give you more details on what specifically I want done.

I will keep you posted.

Thanks

Lakisha



Grand Jury Subpoena
Investigation #2016R00024

August 27, 2018

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

**ER-1327**



Case 5:18-cr-00258-EJD   Document 1577-9   Filed 09/07/22   Page 7 of 8

Computer ▸ Local Disk (M:) ▸ LIS ▸ LatestprodDBBackups ▸

Organize ▾     Include in library ▾     Share with ▾     Burn     New folder

| Name | Date modified | Type | Size |
|---|---|---|---|
| AllKeys_Certs | 8/8/2018 11:58 PM | File folder | |
| AuthDB_backup_2017_01_10_172346_1022605.bak | 1/10/2017 5:23 PM | BAK File | 259,850 KB |
| DashboardDB_backup_2017_01_10_172346_1803934.bak | 1/10/2017 5:24 PM | BAK File | 66,792 KB |
| DataAnalyticsDB_backup_2017_01_10_172348_9775557.bak | 1/10/2017 9:11 PM | BAK File | 2,991,930 KB |
| eLabsDB_backup_2017_01_10_172346_2272736.bak | 1/10/2017 6:27 PM | BAK File | 391,362,474 KB |
| FinDB_backup_2017_01_10_172346_2585262.bak | 1/10/2017 7:04 PM | BAK File | 42,996 KB |
| LogDB_backup_2017_01_10_172347_6649194.bak | 1/10/2017 8:22 PM | BAK File | 1,833,218 KB |
| ResultsDB_backup_2017_01_10_172346_3054059.bak | 1/10/2017 7:12 PM | BAK File | 48,673,750 KB |
| SM2Core_backup_2017_01_10_172348_1805946.bak | 1/10/2017 8:54 PM | BAK File | 174,850,734 KB |
| SurveyDB_backup_2017_01_10_172346_3835398.bak | 1/10/2017 7:16 PM | BAK File | 788 KB |
| TVADB_backup_2017_01_10_172346_6023107.bak | 1/10/2017 7:58 PM | BAK File | 209,449,448 KB |
| XifinDB_backup_2017_01_10_172349_8057597.bak | 1/10/2017 9:26 PM | BAK File | 327,783 KB |

12 items

**ER-1328**

**PLACE HOLDER**

FileName:          FW Theranos Discovery.msg
FilePath:          D:\027\FW Theranos Discovery.msg
Create Date:       6/1/2022 02:56 PM
Modified Date:     6/1/2022 02:56 PM
File Attributes:   Archive
File Size:         609kb
File Type:         Microsoft Outlook Message File

US1-001841

# Exhibit 4

| | |
|---|---|
| **From:** | Holliman, Lakisha (USACAN) |
| **To:** | Peirce, Sutton (USACAN); Schenk, Jeffrey (USACAN); Leach, Robert (USACAN); Bostic, John (USACAN) |
| **Cc:** | Wickett, Brian (USACAN) |
| **Subject:** | RE: Theranos 1 TB drive |
| **Date:** | Tuesday, October 30, 2018 4:54:56 PM |

Hi Sutton:

Thank you so much for looking into this very complex hard drive issue for us.

I had a meeting with the AUSAs on the case regarding our options and we all decided to do the following:

**Possible Routes Forward**
- Push back on defense and see if they can be persuaded to produce this in a manner that can be viewed and processed in a standard way rather than in an unspecified archive format that we can't access
- Check with the FBI (or other agencies) to see if they have a resource that can process large SQL database archives

You can send the hard drive back to me whenever you get a chance.

Thanks

Lakisha

**From:** Peirce, Sutton (USACAN)
**Sent:** Friday, October 5, 2018 4:58 PM
**To:** Schenk, Jeffrey (USACAN) <JSchenk@usa.doj.gov>; Leach, Robert (USACAN)
<RLeach@usa.doj.gov>; Bostic, John (USACAN) <jbostic@usa.doj.gov>
**Cc:** Holliman, Lakisha (USACAN) <LHolliman@usa.doj.gov>; Wickett, Brian (USACAN)
<BWickett@usa.doj.gov>
**Subject:** Theranos 1 TB drive

Hello Team,

I'm writing to outline the issues surrounding this drive and to propose some possible paths toward resolution. I've been in discussion with Lakisha, my unit, IT, and the LTSC/LTHD. Sadly, this drive does not contain material which can processed in-house or by the LTSC. Further, it's my suspicion that this material probably isn't accurately responsive to the subpoena (I'd need a copy of the subpoena to be sure).

**What the Drive Contains:**
*12 BAK* files, totaling approximately *830 Gigabytes* (screenshot of contents attached)
- In this circumstance it's most likely that the .bak extension indicates that these are backup

files for a **Microsoft SQL database**.
- If that's correct these files would be used to restore database backups on a Microsoft SQL Server.
- However, .bak is a common extension for a myriad of backup files; without documentation of what the drive was meant to contain we can only make an educated guess that these are SQL database backups
- Because these are archive files the size of the data could increase significantly when restored

**Why We Can't Process it in-house**
- This material was not provided to our office in a format that can extracted, viewed or processed by any of the software available to us
- We don't have a MS SQL Database server upon which to restore these backup files for review
- The LTSC's EDD software can only ingest SQL .bak files if they are under 300 mb

**Possible Routes Forward**
- Push back on defense and see if they can be persuaded to produce this in a manner that can be viewed and processed in a standard way rather than in an unspecified archive format that we can't access
  - If they can't figure out how to produce the contents of their database in a legitimate manner perhaps they'll consider handing over their physical SQL server and we can set it up in a workroom?
- Check with the FBI (or other agencies) to see if they have a resource that can process large SQL database archives
- Identify a vendor who could process the material
  - The defense would need to be notified based on the sensitivity and confidentiality of this material ("contains Confidential Protected Health Information")
  - Considering the data size and labor involved the cost could be staggering

Let me know if you'd like to set up a meeting or teleconference to discuss this further, and of course feel free to call or email with any questions.

Thanks,
Sutton

# PLACE HOLDER

FileName:          RE Theranos 1 TB drive.msg
FilePath:          D:\027\RE Theranos 1 TB drive.msg
Create Date:       6/1/2022 02:56 PM
Modified Date:     6/1/2022 02:56 PM
File Attributes:   Archive
File Size:         70kb
File Type:         Microsoft Outlook Message File

# Exhibit 2

| | |
|---|---|
| **From:** | Peirce, Sutton (USACAN) |
| **Sent:** | Friday, October 5, 2018 7:58 PM |
| **To:** | Schenk, Jeffrey (USACAN); Leach, Robert (USACAN); Bostic, John (USACAN) |
| **Cc:** | Holliman, Lakisha (USACAN); Wickett, Brian (USACAN) |
| **Subject:** | Theranos 1 TB drive |
| **Attachments:** | Theranos Seagate Drive.pdf |

Hello Team,

I'm writing to outline the issues surrounding this drive and to propose some possible paths toward resolution. I've been in discussion with Lakisha, my unit, IT, and the LTSC/LTHD. Sadly, this drive does not contain material which can processed in-house or by the LTSC. Further, it's my suspicion that this material probably isn't accurately responsive to the subpoena (I'd need a copy of the subpoena to be sure).

**What the Drive Contains:**
*12 BAK* files, totaling approximately ***830 Gigabytes*** (screenshot of contents attached)
- In this circumstance it's most likely that the .bak extension indicates that these are backup files for a **Microsoft SQL database**.
- If that's correct these files would be used to restore database backups on a Microsoft SQL Server.
- However, .bak is a common extension for a myriad of backup files; without documentation of what the drive was meant to contain we can only make an educated guess that these are SQL database backups
- Because these are archive files the size of the data could increase significantly when restored

**Why We Can't Process it in-house**
- This material was not provided to our office in a format that can extracted, viewed or processed by any of the software available to us
- We don't have a MS SQL Database server upon which to restore these backup files for review
- The LTSC's EDD software can only ingest SQL .bak files if they are under 300 mb

**Possible Routes Forward**
- Push back on defense and see if they can be persuaded to produce this in a manner that can be viewed and processed in a standard way rather than in an unspecified archive format that we can't access
  - If they can't figure out how to produce the contents of their database in a legitimate manner perhaps they'll consider handing over their physical SQL server and we can set it up in a workroom?
- Check with the FBI (or other agencies) to see if they have a resource that can process large SQL database archives
- Identify a vendor who could process the material
  - The defense would need to be notified based on the sensitivity and confidentiality of this material ("contains Confidential Protected Health Information")
  - Considering the data size and labor involved the cost could be staggering

Let me know if you'd like to set up a meeting or teleconference to discuss this further, and of course feel free to call or email with any questions.

Thanks,
Sutton

1



Grand Jury Subpoena
Investigation #2016R00024

August 27, 2018

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

Trial Exh. 20832 Page 003



**Trial Exh. 20832 Page 004**

1 | JOHN D. CLINE (CA State Bar No. 237759)
600 Stewart Street, Suite 400
2 | Seattle, WA 98101
Telephone: (360) 320-6435
3 | Email: cline@johndclinelaw.com

4 | KEVIN M. DOWNEY (Admitted Pro Hac Vice)
LANCE A. WADE (Admitted Pro Hac Vice)
5 | AMY MASON SAHARIA (Admitted Pro Hac Vice)
KATHERINE TREFZ (CA State Bar No. 262770)
6 | WILLIAMS & CONNOLLY LLP
680 Maine Avenue, S.W.
7 | Washington, DC 20024
Telephone: (202) 434-5000 │ Facsimile: (202) 434-5029
8 | Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

9 | Attorneys for Defendant ELIZABETH A. HOLMES

10

11 UNITED STATES DISTRICT COURT

12 NORTHERN DISTRICT OF CALIFORNIA

13 SAN JOSE DIVISION

14

| 15 | UNITED STATES OF AMERICA, | ) | Case No. CR-18-00258-EJD |
|---|---|---|---|
| | | ) | |
| 16 | Plaintiff, | ) | **DECLARATION OF AMY MASON SAHARIA** |
| | | ) | **IN SUPPORT OF MS. HOLMES' MOTION FOR** |
| 17 | v. | ) | **NEW TRIAL BASED ON NEWLY** |
| | | ) | **DISCOVERED EVIDENCE RELATING TO** |
| 18 | ELIZABETH HOLMES, | ) | **THE LIS DATABASE** |
| | | ) | |
| 19 | Defendant. | ) | Hon. Edward J. Davila |
| | | ) | |
| 20 | | ) | |

21

22

23

24

25

26

27

28

DECLARATION OF AMY MASON SAHARIA
CR-18-00258 EJD

1

I, AMY MASON SAHARIA, declare as follows:

1.     I represent Defendant Elizabeth Holmes in the above-captioned matter and have been admitted to practice *pro hac vice* in this matter.  Pursuant to Criminal Local Rule 47-2(b) and Civil Local Rule 7-5, I submit this declaration in support of Ms. Holmes' Motion for New Trial Relating to the LIS Database ("Motion").

2.     I am providing the following exhibits in support of Ms. Holmes' Motion.

A.     Ex. 1 is a true and correct copy of a June 2, 2022 letter from John Bostic to Lance Wade and Jeffrey Coopersmith, relating to a document production.

B.     Ex. 2 is a true and correct copy of TX 20832, as admitted in *United States v. Balwani*, 18-cr-258-2.

C.     Ex. 3 is a true and correct copy of TX 5917 (Bates-stamped US1-001848), as admitted in *United States v. Balwani*, 18-cr-258-2.

D.     Ex. 4 is a true and correct copy of TX 5943 (Bates-stamped US1-001847), as admitted in *United States v. Balwani*, 18-cr-258-2.

E.     Ex. 5 is a true and correct copy of a July 5, 2022 letter from Lance Wade to the government.

F.     Ex. 6 is a true and correct copy of a July 21, 2022 email from Richard Cleary to the government.

G.     Ex. 7 is a true and correct copy of a July 28, 2022 email from Robert Leach to Richard Cleary.

H.     Ex. 8 is a true and correct copy of an email thread from September and October 2018 involving Jeffrey Schenk, Robert Leach, John Bostic, Sutton Peirce, Lakisha Holliman, Mimi Lam, and/or Tim Kingman, and an attachment, Bates-stamped US1-001841.

I.     Ex. 9 is a true and correct copy of an email thread dated October 15, 2018 between John Bostic and Stephen O'Neill, Bates-stamped US1-001857.

J.     Ex. 10 is a true and correct copy of an email thread between October 9-11, 2018 involving Jeffrey Schenk, John Bostic, Kevin Downey, Lance Wade, Seema Mittal Roper,

DECLARATION OF AMY MASON SAHARIA
CR-18-00258 EJD

2

1  Michelle Chen, Jeffrey Coopersmith, Mark Bartlett, and others.

2          K.      Ex. 11 is a true and correct copy of a January 2019 email thread involving

3  Jeffrey Schenk, Robert Leach, John Bostic, and Lakisha Holliman, Bates-stamped US1-001846.

4          L.      Ex. 12 is a true and correct copy of a memorandum of interview dated

5  June 7, 2021 of Dr. Kingshuk Das, Bates-stamped US-REPORTS-0026721.

6          I declare under penalty of perjury under the laws of the United States that the foregoing is true

7  and correct to the best of my knowledge.

8

9          Executed this 7th day of September, 2022 in Chevy Chase, MD.

10

11

12                                                  AMY MASON SAHARIA
                                                    Attorney for Elizabeth Holmes
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF AMY MASON SAHARIA
CR-18-00258 EJD
                                  3

**ER-1340**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ELIZABETH A. HOLMES,<br><br>Defendant. | Case No.  5:18-cr-00258-EJD-1<br><br>**ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL**<br><br>Re: Dkt. No. 1291 |

Defendant Elizabeth Holmes was indicted on ten counts of wire fraud in violation of 18 U.S.C. § 1343 (Counts 3–12), and two counts of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 (Counts 1–2).  Following a four-month long trial, the jury reached a partial verdict.  The jury unanimously found Defendant guilty of four counts, Counts 1, 6, 7, and 8, which charged conspiracy to commit wire fraud and wire fraud against Theranos investors.  *See* Third Superseding Indictment ("TSI"), Dkt. No. 469.  The jury did not reach a unanimous verdict as to Counts 3, 4, and 5, and the Court declared a mistrial as to those counts.  The jury acquitted Defendant of Counts 2, 10, 11, and 12, which charged conspiracy to commit wire fraud and wire fraud as to paying patients.

Defendant moves for a judgment of acquittal as to Counts 1, 6, 7, and 8.  The Government opposes this motion, arguing that the overwhelming weight of the evidence admitted at trial supports the jury's conviction of Defendant as to each and every element of Counts 1, 6, 7, and 8. Having reviewed the Parties' papers, the relevant case law, and having had the benefit of oral argument on September 1, 2022, the Court **DENIES** Defendant's motion for judgment of acquittal.

Federal Rule of Criminal Procedure 29 permits a court to set aside a jury's guilty verdict and enter a judgment of acquittal only if "the evidence is insufficient to sustain a conviction." Under this standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Riggins*, 40 F.3d 1055, 1057 (9th Cir. 1994) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Courts accord great deference to a jury's determination. *See Jackson*, 443 U.S. at 318–19. "The hurdle to overturn a jury's conviction based on a sufficiency of the evidence challenge is high." *United States v. Rocha*, 598 F.3d 1144, 1153 (9th Cir. 2010). The Court must find that under 18 U.S.C. § 1343 and 18 U.S.C. § 1349 no rational jury could have convicted Defendant of conspiracy to commit wire fraud and wire fraud against Theranos investors. That is, the Court must conclude that, viewing the facts in the light most favorable to the government, "the government's proof was insufficient as a matter of law." *Id.*; *see also United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc). Pursuant to this standard, the Court holds that is sufficient evidence to convict Defendant of Counts 1, 6, 7, and 8.

1. To prove a conspiracy to commit wire fraud under § 1349, the government had to prove (1) that Defendant and co-defendant Sunny Balwani agreed to commit wire fraud and (2) that Defendant became a member of the alleged conspiracy knowing one of its objects and intending to help accomplish it. The evidence showed, and a reasonable juror could find, that Defendant and Mr. Balwani conspired with each other to commit wire fraud to "save" Theranos from financial ruin. Through the trial, evidence was presented about Theranos's financial status, including evidence about Theranos's financial position in 2009, prior to the indictment period. Importantly, at trial, the evidence showed that in 2009, Theranos received a loan to save the company from financial collapse. *See* 09/08/21 Tr. at 633–35. The evidence further showed that following this loan, Theranos turned its attention away from pharmaceutical companies and toward retail companies, like Walgreens and Safeway, because the money from pharmaceutical companies was not sufficient to sustain the company. The evidence also showed that in November 2013,

Theranos was down to $15 million, with a burn rate of one to two million per week.  Walgreens declined to give a further investment without seeing more progress.  Defendant and Mr. Balwani then pursued private investors and used Theranos's relationships with Walgreens and Safeway as proof of Theranos's success, despite knowing that Theranos's relationships with retail companies were stagnating.

Text messages and emails between Defendant and Mr. Balwani during this time support the jury's conclusion that the co-defendants conspired to commit wire fraud.  In November 2014, Dr. Rosendorff resigned from Theranos, citing concerns about being forced to vouch for results that he did not trust.  Around the same time, Defendant texts Mr. Balwani that they "need to stop fighting fires by not creating them."  Shortly after that, Mr. Balwani texts Defendant about the state of the CLIA lab, writing that the "Normandy lab is an [expletive] disaster zone."  In that same time frame, Defendant texts Mr. Balwani about securing a $150 million investment from the Walton family and about securing an investment from Mr. Murdoch.  Less than two weeks after that, Defendant texts Mr. Balwani about what to include in the Murdoch investment binder.  The materials admitted at trial demonstrate that concerns about the lab, concerns about "fires" at Theranos, and concerns from Theranos's own lab director were not included in the investment binder.  A rational juror, viewing the evidence in the light most favorable to the prosecution, could have concluded that Defendant and Mr. Balwani conspired to commit wire fraud knowing at least one of the conspiracy's objects—to obtain money from investors—and worked together to accomplish the goal of the conspiracy.  The evidence supports a conclusion that Defendant and Mr. Balwani lied to investors about the capabilities, and financial security, of Theranos to obtain investments to keep Theranos afloat.

The close personal relationship between the co-defendants further supports the determination.  *See United States v. Sanders*, 952 F.3d 263, 275 n.10 (5th Cir. 2020) (citing *United States v. Willett*, 751 F.3d 335, 340 (5th Cir. 2014) (characterizing as circumstantial evidence the existence of a family relationship and the defendant's position of authority within the organization); *United States v. Cherniavsky*, 732 F. App'x 601, 602 (9th Cir. 2018).  Likewise, the

co-defendants' response to John Carreyrou, first in trying to ensure he received a fingerstick test rather than the typical veinous draw, and later in trying to figure out which former employees served as his sources, is circumstantial evidence of knowledge.  Further, after the Wall Street Journal article that exposed Theranos was published, Mr. Balwani texted Defendant that "Walgreens [was] freaking out" due to the lack of transparency.  Defendant responded that they needed to respond that they had not decided to shut off the fingerstick testing.  Mr. Balwani then responded that this was a "bad idea" because "they know" so it is better to "be transparent."  This, in conjunction with the other evidence of financial troubles and a scaled approach to fundraising, is more than sufficient for a reasonable juror to conclude that Defendant conspired with Mr. Balwani to defraud investors.  Indeed, "[a] tacit agreement may be inferred from the conspirators' conduct as well as other circumstantial evidence," such as "a common motive, joint action in pursuit of a common objective, and a coordinated cover-up."  *Untied States v. Gonzalez*, 906 F.3d 784, 792 (9th Cir. 2018).

2. The elements of wire fraud are: (1) the existence of a scheme to defraud; (2) the use of wire, radio, or television to further the scheme, and (3) specific intent to defraud.[1]  There is sufficient evidence to convict Defendant on Counts 6–8.  Defendant represented to investors, like Brian Grossman, that Theranos used its own proprietary technology to run assays, when in fact Theranos used third-party devices.  For example, when Brian Grossman got a blood draw, it was a vein draw rather than a fingerstick draw.  He followed up with Defendant and was repeatedly assured that the vein draw was only because of the test he ordered.  He was never told that his test was going to be run on a non-Theranos device.  In fact, he was under the impression that his test was run on a Theranos device, when it was actually run on an unmodified third-party device. Defendant spends great time arguing that she did not disclose the use of third-party devices based

---

[1] Defendant brings constructive amendment and variance arguments, which the government argues are the subject of a Rule 33 motion, rather than a Rule 29 motion.  The Court need not resolve this dispute.  There is sufficient evidence to support Counts 6–8 outside the identified constructive amendment and variance grounds (*i.e.*, statements about the department of defense and the pharmaceutical companies).

on trade secret protection.  But Defendant presented this argument at trial and the jury rejected it. The evidence at trial also demonstrated that Defendant made false representations to investors regarding Theranos's relationship with Walgreens.  For example, Defendant told investors that Walgreens planned to expand with Theranos to 900 stores, when in fact she knew that only 200 stores were predicted.  A rational juror could find that the totality of the evidence, including evidence regarding Theranos's precarious financial position, showed that Defendant lied to investors about Theranos's technology, growth, and potential to secure funding.  Viewing the evidence in the light most favorable to the prosecution, there is sufficient evidence that a rational trier of fact could have found the essential elements of wire fraud beyond a reasonable doubt.

Finally, while not a specific directive for Rule 29, the Court notes this history of this case as further support of the jury's rational decision making.  The jury deliberated for eight days and returned a split verdict.  This history reflects that the jury carefully considered the evidence, the arguments of counsel, and the court's instructions as to each of the counts alleged.

For these reasons, the Court **DENIES** Defendant's motion for judgment of acquittal.

**IT IS SO ORDERED.**

Dated: September 6, 2022

EDWARD J. DAVILA
United States District Judge

# EXHIBIT 2

| | |
|---|---|
| **From:** | Daniel Koffmann |
| **To:** | Wade, Lance |
| **Subject:** | RE: Dr. Rosendorff |
| **Date:** | Tuesday, August 9, 2022 3:19:47 PM |

Hi Lance – thanks for the heads-up. I've spoken to Dr. Rosendorff and there's no need for you to return the call.

Best

Dan

**Daniel Koffmann**
*Partner*
Quinn Emanuel Urquhart & Sullivan, LLP

51 Madison Avenue, 22nd Floor
New York, NY 10010
+1 212-849-7617 Direct
███████████ Mobile
+1 212-849-7000 Main Office Number
danielkoffmann@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

-----Original Message-----
From: Wade, Lance <LWade@wc.com>
Sent: Tuesday, August 9, 2022 10:37 AM
To: Daniel Koffmann <danielkoffmann@quinnemanuel.com>
Subject: Dr. Rosendorff
[EXTERNAL EMAIL from lwade@wc.com]

Dan,

I got a voice message from Dr. Rosendorff last evening. I am more than happy to return his call, but wanted to confirm that you are comfortable with me doing so. Please advise.

Many thanks.

—Lance Wade

_____

This message and any attachments are intended only for the addressee and may contain information that is privileged and confidential. If you have received this message in error, please do not read, use, copy, distribute, or disclose the contents of the message and any attachments. Instead, please delete the message and any attachments and notify the sender immediately. Thank you.

# EXHIBIT 1

| From: | webex_comm@webex.com |
|---|---|
| To: | Wade, Lance |
| Subject: | Incoming Voice Mail from ADAM ROSENDORFF ███████ |
| Date: | Monday, August 8, 2022 7:50:35 PM |



# You have a new voicemail

| **Time:** | Monday, August 08, 2022 07:50 PM Eastern Daylight Time |
|---|---|
| **From:** | ADAM ROSENDORFF ███████ |
| **To:** | 611 L Wade 5755 |
| **Duration:** | 00:31 |

The Webex Team
Need help? Go to Help center

© 2022 Cisco and/or its affiliates. All rights reserved. Privacy Statement | Terms of Service



JOHN D. CLINE (CA State Bar No. 237759)
600 Stewart Street, Suite 400
Seattle, WA 98101
Telephone: (360) 320-6435
Email: cline@johndclinelaw.com

KEVIN M. DOWNEY (Admitted Pro Hac Vice)
LANCE A. WADE (Admitted Pro Hac Vice)
AMY MASON SAHARIA (Admitted Pro Hac Vice)
KATHERINE TREFZ (CA State Bar No. 262770)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, S.W.
Washington, DC 20024
Telephone: (202) 434-5000 │Facsimile: (202) 434-5029
Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

Attorneys for Defendant ELIZABETH A. HOLMES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>ELIZABETH HOLMES,<br><br>　　　　Defendant. | ) Case No. CR-18-00258-EJD<br>)<br>) **DECLARATION OF LANCE WADE IN**<br>) **SUPPORT OF MS. HOLMES' MOTION FOR**<br>) **NEW TRIAL BASED ON NEWLY**<br>) **DISCOVERED EVIDENCE REGARDING**<br>) **ADAM ROSENDORFF OR IN THE**<br>) **ALTERNATIVE FOR AN EVIDENTIARY**<br>) **HEARING**<br>)<br>) Hon. Edward J. Davila |

1   I, LANCE WADE, declare as follows:

2       1.    I represent Defendant Elizabeth Holmes in the above-captioned matter and have been

3   admitted to practice *pro hac vice* in this matter.  Pursuant to Criminal Local Rule 47-2(b) and Civil

4   Local Rule 7-5, I submit this declaration in support of Ms. Holmes' Motion for New Trial Based on

5   Newly Discovered Evidence Regarding Adam Rosendorff or in the Alternative for an Evidentiary

6   Hearing ("Motion").

7       2.    On August 8, 2022 at 7:51pm ET (4:51pm PT) I received a WebEx email notification of

8   a voice message left on my work voicemail by Dr. Adam Rosendorff.

9       3.    I listened to the message at approximately 9:35 p.m. ET.

10      4.    I recognized Dr. Rosendorff's voice in the recorded message.

11      5.    In the message Dr. Rosendorff stated, "I want to try to visit Elizabeth at [her residence].

12  I'd like to see her again.  I think it would be quite healing for her and for me.  Would it be possible for

13  you to arrange a meeting between Elizabeth and myself at [her property]?"

14      6.    I have preserved the message and can furnish the recording to the Court upon request.

15      7.    The next day I emailed Dr. Rosendorff's counsel, Daniel Koffmann, and explained that

16  Dr. Rosendorff had left me a voice message.  I asked if it was okay for me to return Dr. Rosendorff's

17  call.  Dr. Rosendorff's counsel stated that he had "spoken to Dr. Rosendorff and there's no need for you

18  to return the call."

19      7.    I am providing the following exhibits in support of Ms. Holmes' Motion.

20      A.    Ex. 1 is a true and accurate copy of the WebEx email notification of Dr.

21  Rosendorff's voice message, redacted to protect personal identifying information.

22      B.    Ex. 2 is a true and accurate copy of an August 9, 2022 email exchange

23  between myself and Dr. Rosendorff's counsel, redacted to protect personal identifying information.

24      I declare under penalty of perjury under the laws of the United States that the foregoing is true

25  and correct to the best of my knowledge.

26

27

28

DECLARATION OF LANCE WADE
CR-18-00258 EJD         2

1

2      Executed this 6 day of September, 2022 in Washington, D.C.

3

4

5

6                                          LANCE WADE
7                                          Attorney for Elizabeth Holmes

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF LANCE WADE
CR-18-00258 EJD                    3

# EXHIBIT A

**From:**      William Evans
**To:**         Downey, Kevin; Trefz, Katherine; John Cline
**Subject:**   My interaction with Adam Rosendorff
**Date:**      Monday, August 8, 2022 11:08:27 PM

Today around 6pm Adam Rosendorff knocked on our door asking to speak to Elizabeth. We had a brief conversation after asking him to please leave. I have recorded that interaction to the best of my ability. You are of course welcome to call me any time if you have any specific questions about the interaction. ████████

Adam Rosendorff showed up at my home around 6:05 pm tonight. He came to the front door and rang the doorbell. I did not recognize him. He is a big guy and my first thought was he was lost, he looked disheveled. His shirt was untucked, his hair was messy, his voice slightly trembled. His phone was open to his camera, but his video was not on. At first I thought he was trying to record an interaction but then I saw how disheveled he was and it looked like he had just pressed the camera button on his phone by accident. I don't believe it was recording anything and I did not see him taking any pictures.

He said he needs to talk to Elizabeth. I told him that he could not be here and that he needed to leave. He kept saying he needed to talk to her. I told him he knows Elizabeth can't talk to anyone and told him he needs to go. He turned to leave.

He got in his car and started going into the cul-de-sac by our home so I told him he needed to go the other way.

He said he thought it would be healing for both himself and Elizabeth to talk. He said it has been 10 years since he talked to her. He said he feels guilty, it seemed like he was hurting. He said when he was called as a witness he tried to answer the questions honestly but that the prosecutors tried to make everybody look bad (in the company). He said that the government made things sound worse than they were when he was up on the stand during his testimony. He said he felt like he had done something wrong. And that this was weighing on him, He said he was having trouble sleeping. He felt desperate to talk to Elizabeth.

He said he wants to help her. He said he is hurting. He said Theranos was early in his and her career, that he had just finished residency, and that everyone was working so hard to do something good and meaningful.  He said that everyone was just doing the best they could. He talked about being with Elizabeth and talking with her at her thirtieth birthday party and about company holiday parties, including the Halloween party. He talked about how they were friends. He said Elizabeth was kind to him. He said that everyone has made so much money off of her and this story they created but that she didn't make any money. and neither did he or anyone who worked at the business, but that everyone else has off of the story of it. I remarked that it is easier to break things than to build them. He said that breaking things is the nature of America. He said that is what they did to Michael Jackson. They build things up

only to tear them down.

He asked how I was and how our child is (referred to as she).  I said we are blessed to have a happy and healthy son who just turned 1 year old. He said he has a five year old and he asked about W█. He said he would be in San Diego next week for a conference and was going to stay at one of the hotels my family owns. The hotel was the Hotel Del Coronado and I told him that we do not own that hotel and that we are just a small family business.

It appears he does not live here but has been thinking about this for a long time and wants to find Elizabeth. (The car seemed like a rental.) I told him I am sorry that he is hurting and having such a hard time. I told him that truth will prevail. I wished him good luck and said goodbye, he said the same.


--

**William B. Evans**

████████████ █████████

1    JOHN D. CLINE (CA State Bar No. 237759)
     600 Stewart Street, Suite 400
2    Seattle, WA 98101
     Telephone: (360) 320-6435
3    Email: cline@johndclinelaw.com

4    KEVIN M. DOWNEY (Admitted Pro Hac Vice)
     LANCE A. WADE (Admitted Pro Hac Vice)
5    AMY MASON SAHARIA (Admitted Pro Hac Vice)
     KATHERINE TREFZ (CA State Bar No. 262770)
6    WILLIAMS & CONNOLLY LLP
     680 Maine Avenue, S.W.
7    Washington, DC 20024
     Telephone: (202) 434-5000 │ Facsimile: (202) 434-5029
8    Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

9    Attorneys for Defendant ELIZABETH A. HOLMES

10

11                          UNITED STATES DISTRICT COURT

12                       NORTHERN DISTRICT OF CALIFORNIA

13                                SAN JOSE DIVISION

14

15   UNITED STATES OF AMERICA,          )   Case No. CR-18-00258-EJD
                                        )
16           Plaintiff,                 )   **DECLARATION OF WILLIAM B. EVANS**
                                        )
17       v.                             )
                                        )   Hon. Edward J. Davila
18   ELIZABETH HOLMES,                  )
                                        )
19                                      )
             Defendant.                 )
20   _____)

21

22

23

24

25

26

27

28

DECLARATION OF WILLIAM B. EVANS
CR-18-00258 EJD

## <u>DECLARATION OF WILLIAM B. EVANS</u>

I, William B. Evans, declare as follows:

1.      I am the partner of Elizabeth Holmes.  I rent a home on a property in ▮▮▮▮▮▮ California, where I reside with Elizabeth and our son.  The property has a private driveway with several roads that provide access to seven homes on the same property, including the one I rent.

2.      On Monday August 8, 2022, at approximately 6:05pm, I was in the living room of the home, with a view of the front door, which is surrounded on both sides by large windows. Elizabeth and a friend were in another part of the home bathing our son.  I noticed a man approaching our door and went to answer it.

3.      The visitor identified himself as Adam Rosendorff.  Although I did not immediately recognize him, I recognized him after he introduced himself to me because I was in the courtroom during his trial testimony.  As described in Exhibit A, Dr. Rosendorff asked to speak with Elizabeth and made various other statements.  I asked him to leave.  When I noticed him attempting to leave the property in the wrong direction, I stopped him to correct his course.

4.      I had two conversations with Dr. Rosendorff.  The first was outside my front door when Dr. Rosendorff first approached.  The second was when I stopped him to point him in the direction of the exit.  That second conversation took place at the top of my driveway, with Dr. Rosendorff in his car and me outside of the car on the driver's side.  The substance of both conversations is captured to the best of my recollection in Exhibit A.

5.      My main focus during both conversations was to ensure Dr. Rosendorff quickly and safely left the property without interacting with Elizabeth and to do so in a courteous and respectful manner.   For this reason, I did not follow up on many of Dr. Rosendorff's statements.

6.      Shortly after he left, I memorialized the conversations I had with Dr. Rosendorff in an email that I sent to Elizabeth's counsel around 8:08pm.  A true and correct copy of that email is attached as Exhibit A to this declaration.

7.      Exhibit A contains my recollections of what Dr. Rosendorff told me but is not a word-for-word description of my encounter with Dr. Rosendorff.  For example, Dr. Rosendorff repeated many

DECLARATION OF WILLIAM B. EVANS
CR-18-00258 EJD

1

1    of the statements in Exhibit A throughout both conversations, but I did not separately memorialize each

2    instance of the statements in my email.

3         I declare under penalty of perjury under the laws of the United States that the foregoing is true

4    and correct to the best of my knowledge.

5

6         Executed this ___ day of August, 2022 in ▮▮▮▮ CA.

7

8

9                                                    _____

10                                                   WILLIAM B. EVANS

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
DECLARATION OF WILLIAM B. EVANS
CR-18-00258 EJD

2

1  JOHN D. CLINE (CA State Bar No. 237759)
   600 Stewart Street, Suite 400
2  Seattle, WA 98101
   Telephone: (360) 320-6435
3  Email: cline@johndclinelaw.com

4
   KEVIN M. DOWNEY (Admitted Pro Hac Vice)
5  LANCE A. WADE (Admitted Pro Hac Vice)
   AMY MASON SAHARIA (Admitted Pro Hac Vice)
6  KATHERINE TREFZ (CA State Bar No. 262770)
   WILLIAMS & CONNOLLY LLP
7  680 Maine Avenue, S.W.
   Washington, DC 20024
8  Telephone: (202) 434-5000 │ Facsimile: (202) 434-5029
9  Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

10 Attorneys for Defendant ELIZABETH A. HOLMES

11

12

13                          UNITED STATES DISTRICT COURT

14                       NORTHERN DISTRICT OF CALIFORNIA

15                                SAN JOSE DIVISION

16

17 UNITED STATES OF AMERICA,          )  Case No. CR-18-00258-EJD
                                      )
18         Plaintiff,                 )  **MS. HOLMES' MOTION FOR A NEW TRIAL**
                                      )  **BASED ON NEWLY DISCOVERED EVIDENCE**
19     v.                             )  **REGARDING ADAM ROSENDORFF OR IN**
                                      )  **THE ALTERNATIVE AN EVIDENTIARY**
20 ELIZABETH HOLMES and               )  **HEARING**
   RAMESH "SUNNY" BALWANI,            )
21                                    )
           Defendants.                )  Date:      October 3, 2022
22                                    )  Time:      1:30 PM
                                      )  CTRM:      4, 5th Floor
23                                    )
24                                    )  Hon. Edward J. Davila
                                      )
25 ───────────────────────────────────

26

27

28 MS. HOLMES' MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE
   REGARDING ADAM ROSENDORFF OR IN THE ALTERNATIVE AN EVIDENTIARY HEARING
   CR-18-00258 EJD

## MOTION FOR A NEW TRIAL OR IN THE ALTERNATIVE

## AN EVIDENTIARY HEARING

PLEASE TAKE NOTICE that on October 3, 2022 at 1:30 pm or on such other date and time as the Court may order, in Courtroom 4 of the above-captioned Court, 280 South 1st Street, San Jose, CA 95113, before the Honorable Edward J. Davila, Defendant Elizabeth Holmes will and hereby does respectfully move the Court for a new trial or, alternatively, an evidentiary hearing based on newly discovered evidence.  Ms. Holmes makes this motion pursuant to Federal Rule of Criminal Procedure 33.  The Motion is based on the below Memorandum of Points and Authorities, the record in this case, and any other matters that the Court deems appropriate.


DATED: September 6, 2022


                                          /s/ Amy Mason Saharia
                                          KEVIN DOWNEY
                                          LANCE WADE
                                          AMY MASON SAHARIA
                                          KATHERINE TREFZ
                                          Attorneys for Elizabeth Holmes

MS. HOLMES' MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE REGARDING ADAM ROSENDORFF OR IN THE ALTERNATIVE AN EVIDENTIARY HEARING
CR-18-00258 EJD

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

Page

BACKGROUND ...................................................................................................1

    A.    Dr. Rosendorff's Trial Testimony...........................................................1

    B.    Dr. Rosendorff's Encounter at Ms. Holmes' Home ...........................4

LEGAL STANDARD.............................................................................................5

ARGUMENT .........................................................................................................6

I.    The Newly Discovered Evidence Warrants a New Trial................................6

II.    At a Minimum, the Court Should Order an Evidentiary Hearing.................11

CONCLUSION.....................................................................................................12

MS. HOLMES' MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE
REGARDING ADAM ROSENDORFF OR IN THE ALTERNATIVE AN EVIDENTIARY HEARING
CR-18-00258 EJD

i

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Balestreri v. United States*, 224 F.2d 915 (9th Cir. 1955) ........................................................ 10

*Hayes v. Brown*, 399 F.3d 972 (9th Cir. 2005) ......................................................................... 2

*Kyles v. Whitley*, 514 U.S. 419 (1995) ....................................................................................... 8

*Napue v. Illinois*, 360 U.S. 264 (1959) ..................................................................................... 2

*United States v. A. Lanoy Alston, D.M.D., P.C.*, 974 F.2d 1206 (9th Cir. 1992) ...................... 5

*United States v. Butler*, 567 F.2d 885 (9th Cir. 1978) .............................................................. 8

*United States v. Davis*, 960 F.2d 820 (9th Cir. 1992) ............................................................. 10

*United States v. Fulcher*, 250 F.3d 244 (4th Cir. 2001) ...................................................... 7, 11

*United States v. Harrington*, 410 F.3d 598 (9th Cir. 2005) ................................................ 5, 10

*United States v. Hernandez-Rodriguez*, 443 F.3d 138 (1st Cir. 2006) .................................. 11

*United States v. Howell*, 231 F.3d 615 (9th Cir. 2000) ............................................................ 8

*United States v. Krasny*, 607 F.2d 840 (9th Cir. 1979) .......................................................... 10

*United States v. McKinney*, 952 F.2d 333 (9th Cir. 1991) ....................................................... 6

*United States v. Mendez*, 619 F. App'x 644 (9th Cir. 2015) ............................................... 6, 10

*United States v. Navarro-Garcia*, 926 F.2d 818 (9th Cir. 1991) ....................................... 11, 12

*United States v. Vozzella*, 124 F.3d 389 (2d Cir. 1997) ........................................................... 7

*United States v. Walgren*, 885 F.2d 1417 (9th Cir. 1989) .................................................. 6, 10

*United States v. Walker*, 546 F. Supp. 805 (D. Haw. 1982) ..................................................... 7

*United States v. Wallach*, 935 F.2d 445 (2d Cir. 1991) ......................................................... 10

## RULES

Cal. R. Prof'l Conduct 4.2(a) ..................................................................................................... 5

Fed. R. Crim. P. 33 ......................................................................................................... 1, 5, 11

## OTHER AUTHORITIES

1 Weinstein's Evidence ¶ 401[07] (1985) .................................................................................. 9

MS. HOLMES' MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE
REGARDING ADAM ROSENDORFF OR IN THE ALTERNATIVE AN EVIDENTIARY HEARING
CR-18-00258 EJD

ii

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2 On August 8, 2022, at 4:51pm PT, Dr. Adam Rosendorff left a voicemail for Ms. Holmes'

3 counsel asking if he could set up a meeting between Ms. Holmes and Dr. Rosendorff.  An hour and 15

4 minutes later, without hearing back, Dr. Rosendorff appeared at Ms. Holmes' residence.  Ms. Holmes'

5 partner, William Evans, answered the door.  In the course of two short conversations described in more

6 detail below, Dr. Rosendorff stated, among other things:  (1) he tried to answer the questions honestly at

7 Ms. Holmes' trial, but the government tried to make everyone look bad; (2) the government made things

8 seem worse than they were; (3) everyone at Theranos was working hard to do something good and

9 meaningful; (4) he felt that he had done something wrong, apparently in connection with Ms. Holmes'

10 trial; (5) he wanted to talk to Ms. Holmes; (6) he thought a conversation with Ms. Holmes would be

11 healing for both of them; (7) both she and he were young at the time of the events; and (8) these

12 concerns were weighing on him to the point where he had difficulty sleeping.

13 As the Court knows, Dr. Rosendorff was an important witness; indeed, the government viewed

14 him as a star witness.  The government mentioned him more than any other government witness in both

15 opening and closing statements, and Dr. Rosendorff testified longer than any other government witness.

16 Due to the ethical restrictions on lawyers' communications with represented parties, Ms.

17 Holmes' counsel are unable to return Dr. Rosendorff's call to probe the precise meaning of his

18 statements.  Under any interpretation of his statements, the statements warrant a new trial under Rule 33.

19 But, at a minimum, and to the extent the Court has any doubt about whether a new trial is required, the

20 Court should order an evidentiary hearing and permit Ms. Holmes to subpoena Dr. Rosendorff to testify

21 about his concerns.

22

**BACKGROUND**

23

**A. Dr. Rosendorff's Trial Testimony**

24 The Court is familiar with Dr. Rosendorff.  He was Theranos' laboratory director from April

25 2013 to November 2014.  Holmes 9/24/21 Tr. 1702:19-1703:1.  Even before Ms. Holmes' trial

26 commenced, Dr. Rosendorff was a major focus of the government's case.  The government met with Dr.

27

28 MS. HOLMES' MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE
REGARDING ADAM ROSENDORFF OR IN THE ALTERNATIVE AN EVIDENTIARY HEARING
CR-18-00258 EJD

1

Rosendorff at least eight times, and noticed him as an expert as early as March 2020.  Holmes 9/28/21 Tr. 1963:20-1967:16; Dkt. 580-3 at 7-8 (Gov't 3/6/2020 Notice of Expert Disclosure).

During trial, the government featured Dr. Rosendorff repeatedly in its opening statement as a witness who would testify as to issues related to technology, the state of the clinical laboratory, and intent.  Holmes 9/8/21 Tr. 547-556.  The government mentioned Dr. Rosendorff more than any other government witness during its opening statement.

After deciding not to produce its retained hematology expert for a *Daubert* hearing, and lacking any statistically significant evidence concerning the accuracy and reliability of Theranos technology, the government was forced to rely heavily on Dr. Rosendorff's testimony during Ms. Holmes' trial.  The government's examination of Dr. Rosendorff led to a host of misleading statements that Ms. Holmes' counsel was forced to correct on cross-examination.  *See, e.g.*, Holmes 9/28/21 Tr. 1974:15-1975:25, 1977:9-25 (Dr. Rosendorff's reasons for leaving the company); 2011:16-2014:16 (date and nature of Theranos' launch); 1981:25-1983:8 (Dr. Rosendorff confirming that the government failed to show him any policy documents or validation reports); 2256:18-2257:22 (correcting the government's implication that proficiency testing was not performed); 2476:17-2477:7 (establishing that all of Dr. Rosendorff's concerns regarding proficiency testing were addressed).  Indeed, Ms. Holmes counsel alerted the Court that "the breadth of the [cross-]examination" was driven in part by "substantial concerns about what was [elicited] in direct under *Napue* [*v. Illinois*]" and its progeny, which compelled Ms. Holmes to "clarify the record."  Holmes 10/5/21 Tr. 2714:3-8[1] (citing *Napue v. Illinois*, 360 U.S. 264 (1959)).[2]  Due to the misleading nature of the government's presentation, throughout the cross-examination Ms. Holmes'

---

[1] Ms. Holmes later informed the Court that the government's questioning of Dr. Rosendorff also improperly implied facts not in the record concerning the propriety of Theranos' scientific data.  Holmes 10/15/21 Tr. 3838:4-3839:2.

[2] In *Napue*, the Supreme Court held "that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." 360 U.S. at 269.  "[I]f it is established that the government knowingly permitted the introduction of false testimony reversal is 'virtually automatic.'" *Hayes v. Brown*, 399 F.3d 972, 978 (9th Cir. 2005).

MS. HOLMES' MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE REGARDING ADAM ROSENDORFF OR IN THE ALTERNATIVE AN EVIDENTIARY HEARING
CR-18-00258 EJD

2

1  counsel asked Dr. Rosendorff to confirm that he was being truthful in his testimony.  *See, e.g.*, Holmes
2  9/28/21 Tr. 1973:8-1974:7.

3          Significant issues also arose concerning Dr. Rosendorff's bias.  Holmes 10/5/21 Tr. 2548:22-
4  2576:17, 2705:5-2720:25.  Ms. Holmes informed the Court of the serious potential for Dr. Rosendorff to
5  provide biased testimony in favor of the government due to the pending government investigations into
6  the three positions that he held post-Theranos—Perkin Elmer, Invitae, and uBiome.  *Id.*  The post-
7  employment issues concerned Dr. Rosendorff's competence as a lab director, as well as his motivation
8  to shift the blame for any Theranos issues to others including Ms. Holmes.

9          The Court permitted limited questioning about Dr. Rosendorff's employment at PerkinElmer on
10  the ground that it was relevant "to potential issue[s] of bias." Holmes 10/5/21 Tr. 2709:14-2710:19,
11  2717:5-2720:25.  The Court forbade questioning regarding "the nature of any investigation, the quality
12  of the investigation, [or] [Dr. Rosendorff's] specific role in it."  *Id.* at 2710:11-22.  The Court excluded
13  examination about Invitae as "inappropriate character evidence" under Rule 404(a)(1).  *Id.* at 2709:5-13.
14  And it excluded examination about uBiome under Rule 403 because the Court understood that a federal
15  investigation into that lab "did not have anything to do with the operation of the lab per se." *Id.* at
16  2708:2-2709:4.  Soon after the Court's ruling, the government opened the door by asking Dr. Rosendorff
17  to compare his experience at Theranos with his experience at other laboratories.  *Id.* at 2866:8-23.  Ms.
18  Holmes again requested to question Dr. Rosendorff about his post-employment issues as well as his
19  bias.  *See id.* at 2867:15-2888:11.  The Court declined and, recognizing that the government opened the
20  door to the issue, instructed the jury to disregard the government's questions and Dr. Rosendorff's
21  answer.  *Id.* at 2889:23-2890:10.

22          The government featured Dr. Rosendorff repeatedly in its closing arguments, again mentioning
23  Dr. Rosendorff more than any other witness.  *See* Holmes 12/16/21 and 12/17/22 Tr. (collectively
24  referencing Dr. Rosendorff *over 50 times*).  Recently, in the government's Opposition to Ms. Holmes'
25  Rule 29 motion, the government repeatedly emphasized Dr. Rosendorff's interactions with Ms. Holmes.
26
27
28  MS. HOLMES' MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE
    REGARDING ADAM ROSENDORFF OR IN THE ALTERNATIVE AN EVIDENTIARY HEARING
    CR-18-00258 EJD

                                              3

1  Dkt. 1395 at 11. During the hearing on that motion, the government cited to Dr. Rosendorff's testimony

2  in support of its argument.  9/1/22 Hr'g Tr. 24:8-25:3.

3      **B.**    **Dr. Rosendorff's Encounter at Ms. Holmes' Home**

4      On August 8, 2022, at approximately 6:05pm, Dr. Rosendorff arrived at Ms. Holmes' home.

5  Declaration of William B. Evans ("Evans Decl.") ¶ 1; *see also* Evans Decl., Ex. A.  As Dr. Rosendorff

6  approached the home, her partner, William Evans, noticed Dr. Rosendorff walking towards the front

7  door and went to answer it.  Evans Decl. ¶ 2.  Mr. Evans did not immediately recognize Dr. Rosendorff,

8  but did so after Dr. Rosendorff introduced himself.  *Id.* ¶ 3.  Dr. Rosendorff seemed to be in distress and

9  his voice was trembling.  Ex. A at 1.  His cellphone was open to his camera, although it did not appear

10 that he was recording.  *Id.*  During this brief interaction outside the front door, Dr. Rosendorff repeatedly

11 stated that he needed to talk to Ms. Holmes.  *Id.*  Mr. Evans explained that Ms. Holmes could not talk to

12 anyone and that Dr. Rosendorff needed to leave.  *Id.*

13     Dr. Rosendorff attempted to leave the property but was driving the wrong way.  *Id.*  Mr. Evans

14 approached Dr. Rosendorff in his vehicle at the top of the driveway in order to direct Dr. Rosendorff in

15 the right direction.  *Id.*  A second conversation then occurred at the top of the driveway, with Mr. Evans

16 outside the car at the window and Dr. Rosendorff in the driver's seat.  Evans Decl. ¶ 4  Dr. Rosendorff

17 explained that he wanted to speak to Ms. Holmes because it would be "healing for both himself and

18 Elizabeth to talk."  Ex. A at 1.  He stated that "when he was called as a witness he tried to answer the

19 questions honestly but that the prosecutors tried to make everyone look bad" and that "the government

20 made things sound worse than they were when he was up on the stand during his testimony." *Id.*  Dr.

21 Rosendorff stated that "Theranos was early in his and [Ms. Holmes'] career," that "everyone was just

22 doing the best they could," and "everyone was working so hard to do something good and meaningful."

23 *Id.* He stated that "he fe[lt] guilty" and that he "felt like he had done something wrong," apparently in

24 connection with his testimony in Ms. Holmes' case.  *Id.*  He stated that these issues were "weighing on

25 him" and that "he was having trouble sleeping.  *Id.*

26

27

28 MS. HOLMES' MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE
REGARDING ADAM ROSENDORFF OR IN THE ALTERNATIVE AN EVIDENTIARY HEARING
CR-18-00258 EJD

                4

Shortly before Dr. Rosendorff went to Ms. Holmes' home, he left a voicemail for Ms. Holmes' counsel Lance Wade.  Decl. of Lance A. Wade ("Wade Decl.") ¶ 1 & Ex. 1.  Mr. Wade received that voicemail at 7:51pm ET (4:51pm PT), and it lasted approximately thirty seconds. Wade Decl., Ex. 1.  In the voicemail, Dr. Rosendorff identified himself and explained that he was calling because "he want[s] to try to visit Elizabeth at [her residence]; [he would] like to see her again" and that he thought "it would be quite healing for her and for [him]."  Wade Decl. ¶ 5.  Dr. Rosendorff asked if it was possible for Mr. Wade to arrange a visit between Dr. Rosendorff and Ms. Holmes at her residence.  *Id.*  Mr. Wade did not respond directly to Dr. Rosendorff given the ethical restrictions on communicating with represented parties.  *See* Cal. R. Prof'l Conduct 4.2(a) ("a lawyer shall not communicate directly or indirectly about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer").  The next day, Mr. Wade instead contacted the attorney who had appeared at Ms. Holmes' trial with Dr. Rosendorff.  Wade Decl., Ex. 2. The attorney responded that there was no need for Mr. Wade to return the call.  *Id.*

**LEGAL STANDARD**

Under Federal Rule of Criminal Procedure 33, "[u]pon a defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  "A district court's power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal."  *United States v. A. Lanoy Alston, D.M.D., P.C.*, 974 F.2d 1206, 1211 (9th Cir. 1992). Ordinarily, a new trial should be ordered under Rule 33 on the basis of newly discovered evidence where a defendant shows the following: (1) the evidence is newly discovered; (2) the defendant was diligent in seeking the evidence; (3) the evidence is material to the issues at trial; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence indicates the defendant would probably be acquitted in a new trial.  *See United States v. Harrington*, 410 F.3d 598, 601 (9th Cir. 2005).

However, "when the motion implicates governmental misconduct," a defendant is not required to demonstrate that the newly discovered evidence would have probably resulted in an acquittal in a new trial, but needs to show only that there was a reasonable probability that the result would have been

MS. HOLMES' MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE REGARDING ADAM ROSENDORFF OR IN THE ALTERNATIVE AN EVIDENTIARY HEARING CR-18-00258 EJD

5

1    different if the evidence was available to the defense.  *United States v. Walgren*, 885 F.2d 1417, 1427-28

2    (9th Cir. 1989).

3                                      **ARGUMENT**

4            Dr. Rosendorff's statements reflecting his concerns with the government's presentation of his

5    trial testimony, along with his comments that bear on Ms. Holmes' intent, put the integrity of the jury

6    verdict against Ms. Holmes in grave doubt.  The Court should grant a new trial or, at the very least,

7    order an evidentiary hearing.

8    **I.       The Newly Discovered Evidence Warrants a New Trial**

9            Dr. Rosendorff's statements satisfy each requirement for a new trial:

10           ***Newly Discovered.***  Dr. Rosendorff's statements on August 8, 2022 occurred seven months after

11   the conclusion of Ms. Holmes' trial.  The information he revealed—including his belief that everyone at

12   Theranos was "working so hard to do something good and meaningful" and his concern about how the

13   government presented his testimony—is newly discovered evidence.  *United States v. Mendez*, 619 F.

14   App'x 644, 646 (9th Cir. 2015) (reversing and remanding after district court erroneously denied Rule 33

15   motion and stating that police report was newly discovered when the defendant and his attorneys "did

16   not have access to [the evidence] prior to trial"); *see also United States v. McKinney*, 952 F.2d 333, 335

17   (9th Cir. 1991) (evidence is newly discovered under Rule 33 when discovered after the verdict was

18   received).

19           ***Diligence in Discovery.***  Similarly, Ms. Holmes' lack of access to this evidence was not the

20   result of a failure to act with diligence.  To the contrary, Ms. Holmes' counsel tried to elicit this

21   evidence when asking Dr. Rosendorff at trial whether he testified truthfully.  Holmes 9/28/21

22   Tr. 1973:8-1974:7.  Despite this questioning, Dr. Rosendorff did not indicate while on the stand that "he

23   tried to answer questions honestly" but that the government "made things sound worse than they were

24   when he was up on the stand during his testimony."  *Compare* Evans Decl., Ex. A., *with* Holmes 9/28/21

25   Tr. 1973:8-1974:7. Because this information was not revealed to Ms. Holmes despite her efforts at trial

26   to probe what she viewed as the misleading nature of the government's presentation, the due diligence

27

28   MS. HOLMES' MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE
     REGARDING ADAM ROSENDORFF OR IN THE ALTERNATIVE AN EVIDENTIARY HEARING
     CR-18-00258 EJD

                                              6

1   prong is satisfied. *See United States v. Fulcher*, 250 F.3d 244, 250 (4th Cir. 2001) (diligence prong is

2   satisfied when "there is simply no indication from the record that a more probing cross-examination

3   would have elicited any of the facts that came to light following the trial"); *United States v. Walker*, 546

4   F. Supp. 805, 811 (D. Haw. 1982) ("Due diligence means ordinary, rather than extraordinary,

5   diligence.").

6      ***Material to Issues at Trial.***  Dr. Rosendorff's statements are material.  To be sure, the exact

7   meaning of Dr. Rosendorff's statements is unclear.  Potential meanings include the following:

8      1.  He "*tried* to answer the questions honestly," Evans Decl., Ex. A at 1 (emphasis added), but

9          his attempt to be honest was not always successful, meaning that he provided untruthful

10         testimony to the jury.  This interpretation would explain why he said he "felt like he had done

11         something wrong." *Id.*

12     2.  He answered the government's questions honestly, but nonetheless the resulting presentation

13         of evidence was misleading, raising potential concerns under *Napue*, discussed above.  *See,*

14         *e.g.*, *United States v. Vozzella*, 124 F.3d 389, 390 (2d Cir. 1997) (recognizing that *Napue*

15         applied to "the use of evidence that was in part false and otherwise so misleading as to

16         amount to falsity").

17     3.  He answered the government's inculpatory questions honestly, but the government did not

18         ask him about exculpatory information he had provided to the government (that the

19         government did not disclose to the defense).

20     4.  He answered the questions honestly, but the government's cherry-picked questioning and

21         exhibits and his resulting testimony presented an incomplete picture to the jury and made

22         things seem "worse than they were"—for example, by failing to present to the jury a

23         complete, accurate picture of his time at Theranos, his many positive interactions with Ms.

24         Holmes, and his view that "everyone was just doing the best they could" and was "working

25         so hard to do something good and meaningful." Evans Decl., Ex. A at 1.

26      Under any interpretation of Dr. Rosendorff's statements, the statements are material to the case.

27

28  MS. HOLMES' MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE
    REGARDING ADAM ROSENDORFF OR IN THE ALTERNATIVE AN EVIDENTIARY HEARING
    CR-18-00258 EJD

    7

1    Even assuming he meant version 4, which is the most conservative interpretation of his statements, that

2    statement would have fundamentally changed the jury's perception of the case.

3          For starters, testimony from a government star witness that the government cherry-picked

4    evidence and/or testimony to make things seem worse than they were would have gravely damaged the

5    reliability of the government's investigation and presentation of evidence and bolstered Ms. Holmes'

6    defense.  Evidence undermining the reliability of the government's investigation is necessarily material.

7    *See Kyles v. Whitley*, 514 U.S. 419, 446 (1995) (evidence was material because it could have been used

8    to attack the reliability of the government's investigation); *United States v. Howell*, 231 F.3d 615, 625

9    (9th Cir. 2000) ("[I]nformation which might 'have raised opportunities to attack . . . the thoroughness

10   and even good faith of the investigation . . .' constitutes exculpatory, material evidence.").  And this

11   testimony almost certainly would have diminished the weight the jury would have ascribed to Dr.

12   Rosendorff's testimony, which the government used to support key elements of its case.  *See United*

13   *States v. Butler*, 567 F.2d 885, 890–91 (9th Cir. 1978) ("Both by casting doubt on the prosecution case

14   and by increasing the scope of the closing defense arguments, disclosure of the exact nature of the

15   prosecution's dealings with its key witness would certainly have affected the weight given his testimony

16   by the jury.").

17         Ms. Holmes specifically argued to the jury that the government's cherry-picked evidence

18   "obscured the full picture" and that the government was incorrectly viewing the evidence through a

19   "dirty lens."  *See* Holmes 12/16/21 Tr. 9031:19-9041:10.  Notably, Ms. Holmes attempted to

20   demonstrate the government's cherry-picking of evidence through Dr. Rosendorff's cross-examination.

21   *See* Holmes 9/29/21 Tr. 2139:15-2146:22 (showing government did not introduce on direct examination

22   full email chain related to inspection of CLIA lab that showed transparency in dealing with inspectors);

23   Holmes 10/5/21 Tr. at 2651:5-2657:25 (showing government raised issues with bicarbonate assay on

24   direct examination, but did not introduce emails that showed the issue was investigated and addressed

25   within 24 hours).  This argument was central to Ms. Holmes' defense:  it was the very first argument

26   that defense counsel made in closing argument.  Dr. Rosendorff's statements would have powerfully

27

28   MS. HOLMES' MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE
     REGARDING ADAM ROSENDORFF OR IN THE ALTERNATIVE AN EVIDENTIARY HEARING
     CR-18-00258 EJD

8

1    corroborated this defense.

2         Dr. Rosendorff's statements also are material to Ms. Holmes' alleged intent to defraud.  To

3    secure a conviction on the investor counts the government had to show, *inter alia*, that Ms. Holmes

4    knowingly made material misrepresentations with intent to deceive.  The government relied on Dr.

5    Rosendorff in its closing argument when discussing the requisite knowledge and falsity elements of wire

6    fraud.  *See, e.g.*, Holmes 12/16/21 Tr. 8975:6-10 ("Dr. Rosendorff said that in the middle of 2014 he had

7    conversations with Ms. Holmes about QC control . . . again, more knowledge evidence.").  Dr.

8    Rosendorff's statements that "everyone at Theranos" was doing their "best" and "working so hard to do

9    something good and meaningful" would have directly undermined the government's intent arguments.

10   No doubt exists that Ms. Holmes would have featured these statements prominently in her closing.

11   Especially coming from a star government witness, these statements would have been material to intent.

12        ***Not Cumulative or Merely Impeaching.***  The evidence is not cumulative.  "Evidence is

13   cumulative if repetitive, *and* if the small increment of probability it adds may not warrant the time spent

14   in introducing it." 1 Weinstein's Evidence ¶ 401[07] (1985).  Dr. Rosendorff did not testify at trial that

15   the government's questioning obscured an accurate depiction of his tenure at Theranos, despite Ms.

16   Holmes' counsel's repeated questioning about the government's tactics.

17        Nor is this evidence merely impeaching.  Dr. Rosendorff's statement that everyone at Theranos

18   "was just doing the best they could" that "everyone was working so hard to do something good and

19   meaningful" is affirmative evidence of Ms. Holmes' intent.  Evans Decl., Ex. A.  And his statement that

20   the government's presentation was an attempt "to make everybody look bad" and that the government

21   "made things sound worse than they were" is affirmative evidence negating the quality of the

22   government's investigation and trial presentation.  *Id.*

23        Even if the evidence could be considered impeachment in part, that fact does not defeat the

24   motion.  Although "[o]rdinarily, evidence impeaching a witness will not be material . . . [i]n some

25   situations, however, the newly-discovered impeachment evidence may be so powerful that, if it were to

26   be believed by the trier of fact, it could render the witness's testimony totally incredible." *United States*

27

28   MS. HOLMES' MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE
     REGARDING ADAM ROSENDORFF OR IN THE ALTERNATIVE AN EVIDENTIARY HEARING
     CR-18-00258 EJD

                                              9

1  *v. Davis*, 960 F.2d 820, 825 (9th Cir. 1992); *see also United States v. Wallach*, 935 F.2d 445, 458 (2d

2  Cir. 1991) (concluding that new evidence impeaching the government's central witness was sufficiently

3  powerful to require a new trial); *Balestreri v. United States*, 224 F.2d 915, 917 (9th Cir. 1955) ("To deny

4  in every case a motion for a new trial on the ground of newly discovered evidence for the sole reason

5  that the evidence was 'merely impeachment' might often lead to injustice.").  Dr. Rosendorff was an

6  important witness and his new statements materially undermine his testimony.

7      ***Likelihood of Acquittal.***  The final element overlaps considerably with the materiality element

8  discussed above.  *See United States v. Krasny*, 607 F.2d 840, 845 n.3 (9th Cir. 1979) (citing favorably

9  the reasoning that "two of the traditional prerequisites for prevailing on a motion for a new trial based

10  upon newly discovered evidence, *i.e.*, that the newly discovered evidence be material and that it

11  probably would produce an acquittal on retrial, are really two means of measuring the same thing").

12      As an initial matter, Dr. Rosendorff's statements raise the possibility that the government may

13  have engaged in misconduct.  Dr. Rosendorff's statements to Mr. Evans are not sufficiently precise for

14  Ms. Holmes to accuse the government of misconduct at this time.  But if misconduct occurred, Ms.

15  Holmes need not demonstrate that the evidence would probably lead to an acquittal.  *Walgren*, 885 F.2d

16  at 1428.  Rather, the applicable standard would be whether there is a reasonable probability that the

17  result would have been different if the evidence had been available at trial.  *Id.*  At a minimum, the

18  Court should order an evidentiary hearing to determine whether misconduct occurred.

19      Even under the more stringent standard, the last factor is met because the new evidence indicates

20  that "a new trial would probably result in acquittal." *Harrington*, 410 F.3d at 601.  For all the reasons

21  already stated, and even ascribing the most conservative meaning to Dr. Rosendorff's statements, if the

22  jury had heard from Dr. Rosendorff that the government cherry-picked evidence to make things seem

23  worse than they were and that everyone was doing their best and working hard to do something good

24  and meaningful, the jury would have viewed this case very differently.  Dr. Rosendorff's statements

25  would have "significantly bolstered [Ms. Holmes'] defense and directly rebutted the government's

26  primary response." *Mendez*, 619 F. App'x at 646 (reversing denial of new trial motion after holding that

27

28  MS. HOLMES' MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE
REGARDING ADAM ROSENDORFF OR IN THE ALTERNATIVE AN EVIDENTIARY HEARING
CR-18-00258 EJD

10

1   "[a] new trial, with the benefit of [newly discovered records], would probably result in acquittal"); *see*

2   *also Fulcher*, 250 F.3d at 251, 255 (affirming district court findings that new evidence "would paint a

3   'significantly more persuasive picture than the one presented to the jury at trial,'" and would "certainly

4   create a record more favorable for [the defendants]"); *United States v. Hernandez-Rodriguez*, 443 F.3d

5   138, 146 (1st Cir. 2006) (reversing denial of new trial motion where "district judge failed to consider the

6   full import of the defendant's new evidence"). Even without this new testimony, this was a close case,

7   as evidenced by the split verdict. Had Dr. Rosendorff provided these statements to the jury, Ms. Holmes

8   probably would have been acquitted.

9   **II.     At a Minimum, the Court Should Order an Evidentiary Hearing**

10          At a minimum, the Court should hold an evidentiary hearing both to determine the meaning of

11  Dr. Rosendorff's statements and to determine whether any government misconduct occurred. As

12  discussed above, Ms. Holmes' counsel are unable to return Dr. Rosendorff's phone call to ascertain the

13  meaning of his statements. If the Court has any doubts about whether Dr. Rosendorff's statements

14  warrant a new trial, an evidentiary hearing will provide the Court the facts necessary to decide the

15  motion.

16          An evidentiary hearing must be held on a motion for a new trial "[u]less the court is able to

17  determine without a hearing that the allegations are without credibility or that the allegations if true

18  would not warrant a new trial." *United States v. Navarro-Garcia*, 926 F.2d 818, 822 (9th Cir. 1991). In

19  determining whether to grant a hearing, "the district court must be guided 'by the content of the

20  allegations, including the seriousness of the alleged misconduct or bias, and the credibility of the

21  source.'" *Id.*

22          The "content of the allegations" here weighs in favor of a granting a hearing. Dr. Rosendorff's

23  statements suggest that the government's presentation of evidence may have misled the jury, whether

24  intentionally or not. His statements suggest that there is strong reason to doubt the credibility of a key

25  government witness. And his statements at least raise the possibility of government misconduct. As

26  already discussed, if government misconduct occurred, that would alter the applicable standard for

27

28  MS. HOLMES' MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE
    REGARDING ADAM ROSENDORFF OR IN THE ALTERNATIVE AN EVIDENTIARY HEARING
    CR-18-00258 EJD

                                                        11

1  obtaining a new trial.  Thus, to the extent the Court has any doubt that a new trial is required under the

2  normal Rule 33 standard, at a minimum, it should conduct a hearing to determine whether misconduct

3  occurred.

4        Second, there is no reason to doubt the credibility of Dr. Rosendorff's statements or that Mr.

5  Evans has accurately conveyed those statements.  Dr. Rosendorff's recorded voicemail for Ms. Holmes'

6  counsel is consistent with Mr. Evans' account of his interactions with Dr. Rosendorff and Dr.

7  Rosendorff's statements.  *Compare* Evans Decl., Ex. A at 1; *with* Wade Decl. ¶ 5.  Nothing in the

8  current record refutes Dr. Rosendorff's recent statements.  *See Navarro-Garcia*, 926 F.2d at 823 ("The

9  district court made no finding that the affidavit lacked credibility.  Moreover, there is nothing in the

10  record that would support such a conclusion.").

11        The Court should hear directly from Dr. Rosendorff at an evidentiary hearing.

12                                   **CONCLUSION**

13        For the foregoing reasons, the Court should grant Ms. Holmes' motion for a new trial or, at a

14  minimum, order an evidentiary hearing.

15

16  DATED: September 6, 2022

17                                        /s/ Amy Mason Saharia
                                         _____
18                                        KEVIN DOWNEY
                                         LANCE WADE
19                                        AMY MASON SAHARIA
                                         KATHERINE TREFZ
20                                        Attorneys for Elizabeth Holmes

21

22

23

24

25

26

27

28  MS. HOLMES' MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE
    REGARDING ADAM ROSENDORFF OR IN THE ALTERNATIVE AN EVIDENTIARY HEARING
    CR-18-00258 EJD
                                         12

**CERTIFICATE OF SERVICE**

I hereby certify that on September 6, 2022 a copy of this filing was delivered via ECF on all counsel of record.

/s/ Amy Mason Saharia
AMY MASON SAHARIA
Attorney for Elizabeth Holmes

MS. HOLMES' MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE, REGARDING ADAM ROSENDORFF OR IN THE ALTERNATIVE AN EVIDENTIARY HEARING
CR-18-00258 EJD

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 17, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Amy Mason Saharia*
AMY MASON SAHARIA

April 17, 2023