No. 22-10312

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ELIZABETH A. HOLMES

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 5:18-CR-00258
Hon. Edward J. Davila

---

## EXCERPTS OF RECORD
## VOL. VI of LVII | ER-1378 to ER-1643

---

JOHN D. CLINE
LAW OFFICE OF JOHN D. CLINE
600 Stewart Street
Suite 400
Seattle, WA 98101
(360) 320-6435

KEVIN M. DOWNEY
LANCE A. WADE
AMY MASON SAHARIA
KATHERINE A. TREFZ
WILLIAMS & CONNOLLY LLP
680 Maine Ave. S.W.
Washington, D.C. 200024
(202) 434-5000
asaharia@wc.com

1

1

2                    UNITED STATES DISTRICT COURT

3                  NORTHERN DISTRICT OF CALIFORNIA

4                        SAN JOSE DIVISION

5

6    UNITED STATES OF AMERICA,        )
                                      )  CR-18-00258-EJD
7                   PLAINTIFF,        )
                                      )  SAN JOSE, CALIFORNIA
8         VS.                         )
                                      )  SEPTEMBER 1, 2022
9    ELIZABETH A. HOLMES,             )
                                      )  PAGES 1 - 61
10                  DEFENDANT.        )
     _____ )
                                      )

11

12                    TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE EDWARD J. DAVILA
13                  UNITED STATES DISTRICT JUDGE

14   A P P E A R A N C E S:

15   FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                           BY:  JOHN C. BOSTIC
16                              JEFFREY B. SCHENK
                           150 ALMADEN BOULEVARD, SUITE 900
17                         SAN JOSE, CALIFORNIA 95113

18                         BY:  ROBERT S. LEACH
                                KELLY VOLKAR
19                         1301 CLAY STREET, SUITE 340S
                           OAKLAND, CALIFORNIA 94612

20       (APPEARANCES CONTINUED ON THE NEXT PAGE.)

21

22   OFFICIAL COURT REPORTERS:
                             IRENE L. RODRIGUEZ, CSR, RMR, CRR
23                           CERTIFICATE NUMBER 8074
                             LEE-ANNE SHORTRIDGE, CSR, CRR
24                           CERTIFICATE NUMBER 9595
         PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25              TRANSCRIPT PRODUCED WITH COMPUTER

```
1      A P P E A R A N C E S: (CONT'D)

2

3      FOR DEFENDANT HOLMES:    WILLIAMS & CONNOLLY LLP
                                BY:  KEVIN M. DOWNEY
4                                    AMY SAHARIA
                                     KATHERINE TREFZ
5                                    J.R. FLEURMONT
                                725 TWELFTH STREET, N.W.
6                               WASHINGTON, D.C. 20005

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | SAN JOSE, CALIFORNIA                    SEPTEMBER 1, 2022            |
| 10:33AM | 2  | P R O C E E D I N G S                                               |
| 10:33AM | 3  | (COURT CONVENED AT 10:33 A.M.)                                      |
| 10:33AM | 4  | THE COURT:  WE HAD ANOTHER MATTER.  THE JURY IS OUT                 |
| 10:33AM | 5  | IN ANOTHER MATTER.  I HOPE THAT DOESN'T INTERRUPT THIS MATTER.      |
| 10:33AM | 6  | LET'S CALL THIS MATTER.  THIS IS 18-258, UNITED STATES             |
| 10:33AM | 7  | VERSUS ELIZABETH HOLMES.                                            |
| 10:33AM | 8  | LET ME FIRST CAPTURE THE APPEARANCE OF THE PARTIES,               |
| 10:33AM | 9  | PLEASE.                                                             |
| 10:33AM | 10 | WHO APPEARS FOR THE GOVERNMENT?                                     |
| 10:33AM | 11 | MS. VOLKAR:  GOOD MORNING, YOUR HONOR.                             |
| 10:33AM | 12 | WONDERFUL TO BE BACK BEFORE YOU.                                    |
| 10:34AM | 13 | THE COURT:  THANK YOU.                                              |
| 10:34AM | 14 | MS. VOLKAR:  KELLY VOLKAR ON BEHALF OF THE UNITED                  |
| 10:34AM | 15 | STATES, AND I'M JOINED BY MY COLLEAGUES, ROBERT LEACH,             |
| 10:34AM | 16 | JOHN BOSTIC, AND JEFFREY SCHENK.                                    |
| 10:34AM | 17 | AND IF IT'S ALL RIGHT WITH THE COURT, I WOULD LIKE TO              |
| 10:34AM | 18 | REMOVE MY MASK.                                                     |
| 10:34AM | 19 | THE COURT:  PLEASE.  GO RIGHT AHEAD.  THANK YOU FOR                |
| 10:34AM | 20 | THAT.  IT'S NICE TO SEE EVERYONE.                                   |
| 10:34AM | 21 | MS. VOLKAR:  THANK YOU.                                             |
| 10:34AM | 22 | THE COURT:  AND FOR THE DEFENSE?                                    |
| 10:34AM | 23 | MS. SAHARIA:  GOOD MORNING, YOUR HONOR.                            |
| 10:34AM | 24 | ON BEHALF OF THE DEFENSE, AMY SAHARIA.  WITH ME AT COUNSEL         |
| 10:34AM | 25 | TABLE IS KEVIN DOWNEY, KATHERINE TREFZ AND J.R. FLEURMONT, AND     |

4

10:34AM 1     MS. HOLMES IS PRESENT.

10:34AM 2        THE COURT:  GOOD MORNING.  IT'S NICE TO SEE

10:34AM 3     EVERYONE.

10:34AM 4        MS. SAHARIA:  GOOD MORNING.

10:34AM 5        THE COURT:  THIS IS MS. HOLMES'S RULE 29 MOTION

10:34AM 6     HEARING.  I'VE RECEIVED PLEADINGS FROM THE PARTIES, THANK YOU

10:34AM 7     FOR THAT.

10:34AM 8     I'VE READ AND REVIEWED THOSE, AS WELL AS REVIEWED THE

10:34AM 9     RECORD AND THE ITEMS MENTIONED IN YOUR PLEADINGS.

10:34AM 10     I'M HAPPY TO HEAR FROM YOU IF YOU WOULD LIKE TO BE HEARD

10:34AM 11     AS TO ANY AUGMENTATION OF THE PLEADINGS, ANYTHING ELSE YOU

10:35AM 12     WOULD LIKE ME TO KNOW.

10:35AM 13     MS. SAHARIA, IT'S YOUR MOTION.  WHY DON'T WE HEAR FROM YOU

10:35AM 14     FIRST?

10:35AM 15        MS. SAHARIA:  SURE.  THANK YOU, YOUR HONOR.  I WILL

10:35AM 16     TRY TO BE BRIEF, BUT I'D LIKE TO COVER A FEW POINTS.

10:35AM 17        THE COURT:  SURE.

10:35AM 18        MS. SAHARIA:  LET ME START WITH FIVE LEGAL

10:35AM 19     PRINCIPLES THAT I THINK INFORM THE COURT'S RESOLUTION OF THIS

10:35AM 20     MOTION BEFORE I TURN TO THE SUBSTANTIVE COUNTS.

10:35AM 21     THE FIRST IS THAT BECAUSE THE COURT RESERVED RULING ON

10:35AM 22     MS. HOLMES'S MOTION AT THE END OF GOVERNMENT'S CASE, THE RECORD

10:35AM 23     ON THIS MOTION IS LIMITED TO THE RECORD AS IT EXISTED AT THAT

10:35AM 24     TIME.  I THINK THE PARTIES ARE IN AGREEMENT ON THAT.  THAT IS

10:35AM 25     GOVERNED BY RULE 20(B).

10:35AM 1    THE SECOND RELATES TO THE HUNG COUNTS.  SO AS THE COURT

10:35AM 2  KNOWS, THE JURY HUNG ON THREE COUNTS.  THOSE ARE COUNTS THREE

10:35AM 3  THROUGH FIVE, WHICH ARE SUBSTANTIVE WIRE FRAUD COUNTS.

10:35AM 4    AND MS. HOLMES DID MOVE ON THOSE COUNTS AT THE END OF THE

10:35AM 5  GOVERNMENT'S CASE.  UNDER RULE 29(B), THE COURT MAY RULE ON THE

10:35AM 6  MOTION FOR JUDGMENT OF ACQUITTAL AT THIS TIME ON THOSE COUNTS

10:35AM 7  AS WELL.

10:35AM 8    IF THE COURT WERE TO DENY THE MOTION FOR JUDGMENT OF

10:35AM 9  ACQUITTAL ON THOSE COUNTS, WE WOULD URGE THE COURT TO GRANT THE

10:36AM 10  GOVERNMENT'S PENDING MOTION TO DISMISS THOSE COUNTS, WHICH FOR

10:36AM 11  THE RECORD IS ECF 1255.  THAT DISMISSAL DOES REQUIRE LEAVE OF

10:36AM 12  COURT UNDER RULE 48(A).

10:36AM 13    THE THIRD IS A POINT THAT GOES BACK TO THE JURY

10:36AM 14  INSTRUCTIONS AND THE CHARGE CONFERENCE IN THIS CASE.

10:36AM 15    THE COURT MIGHT RECALL, ALTHOUGH IT'S NOW BEEN A WHILE,

10:36AM 16  THAT AT THE LAST MINUTE --

10:36AM 17    AM I ECHOING TOO MUCH?

10:36AM 18      THE COURT:  NO.

10:36AM 19      MS. SAHARIA:  -- THAT THE GOVERNMENT DROPPED AT THE

10:36AM 20  LAST MINUTE AN OMISSION THEORY IN THIS CASE.

10:36AM 21    SO THERE'S NO CLAIM IN THIS CASE THAT MS. HOLMES OWED A

10:36AM 22  DUTY OF DISCLOSURE TO INVESTORS.

10:36AM 23    THE GOVERNMENT CAN'T PREMISE A CONVICTION ON ARGUMENTS

10:36AM 24  THAT SHE SHOULD HAVE DISCLOSED INFORMATION, THAT SHE CONCEALED

10:36AM 25  INFORMATION, THAT SHE HID INFORMATION.

6

10:36AM 1      THE GOVERNMENT NEEDS TO POINT TO AFFIRMATIVE STATEMENTS

10:36AM 2  THAT WERE EITHER FALSE OR MISLEADING HALF-TRUTHS TO SUSTAIN THE

10:37AM 3  CONVICTION IN THIS CASE.

10:37AM 4      THE FOURTH AND FIFTH POINT RELATE TO TWO POINTS THE

10:37AM 5  GOVERNMENT MADE IN ITS SURREPLY THAT I WANT TO MAKE SURE THAT I

10:37AM 6  ADDRESS.

10:37AM 7      THE FIRST IS THE GOVERNMENT'S CLAIM THAT MS. HOLMES ONLY

10:37AM 8  CHALLENGED ONE ELEMENT OF WIRE FRAUD.  THEY MADE THIS POINT AT

10:37AM 9  PAGE 1 OF THE SURREPLY.

10:37AM 10     THAT'S NOT CORRECT.

10:37AM 11     OUR ARGUMENTS RELATE BOTH TO WHETHER MISREPRESENTATIONS

10:37AM 12 WERE MADE AS PART OF THE SCHEME TO DEFRAUD, BUT ALSO WHETHER

10:37AM 13 THERE WAS INTENT TO DEFRAUD, WHICH IS AN ADDITIONAL ELEMENT OF

10:37AM 14 WIRE FRAUD.

10:37AM 15     WE EXPRESSLY ARGUED IN OUR BRIEF THAT MS. HOLMES DID NOT

10:37AM 16 MAKE MISREPRESENTATIONS, AND THAT SHE DIDN'T KNOW SHE WAS

10:37AM 17 MAKING MISREPRESENTATIONS.  AND, OF COURSE, IF SHE DIDN'T KNOW

10:37AM 18 SHE WAS MAKING MISREPRESENTATIONS, SHE DIDN'T HAVE THE INTENT

10:37AM 19 TO DEFRAUD INVESTORS.

10:37AM 20     I WOULD POINT THE COURT, JUST FOR SOME EXAMPLES, TO

10:37AM 21 PAGES 9, 11, 12, AND 18 OF OUR BRIEF FOR SOME EXAMPLES OF THOSE

10:37AM 22 KINDS OF ARGUMENTS.  SO I JUST WANTED TO MAKE THAT POINT CLEAR.

10:38AM 23     THE FIFTH POINT RELATES TO THE PARTIES' DISCUSSION OF THE

10:38AM 24 PRINCIPLES OF CONSTRUCTIVE AMENDMENT AND VARIANCE IN OUR BRIEF.

10:38AM 25     THE GOVERNMENT IS WRONG TO ARGUE THAT WE ARE BRINGING AN

10:38AM 1    UNTIMELY RULE 33 MOTION.  WE HAVE NOT FILED A RULE 33 MOTION.

10:38AM 2    WE ARE NOT ASKING THE COURT FOR A NEW TRIAL ON THESE GROUNDS.

10:38AM 3         OUR ARGUMENT IS SIMPLY THAT THE GOVERNMENT HAS NOT PROVEN

10:38AM 4    THE ALLEGATIONS IN THE INDICTMENT, THAT IS ITS BURDEN, AND THE

10:38AM 5    GOVERNMENT CAN'T COME INTO COURT AND TRY TO SAVE A FAULTY

10:38AM 6    VERDICT WITH AN ARGUMENT THAT IT PROVED SOMETHING ELSE.

10:38AM 7         WHETHER THAT SOMETHING ELSE AMENDS THE INDICTMENT OR

10:38AM 8    WHETHER IT VARIES THE INDICTMENT, THAT IS NOT A VALID DEFENSE

10:38AM 9    TO A RULE 29 MOTION.

10:38AM 10             THE COURT:  SO YOUR POSITION -- I'M SORRY TO

10:38AM 11   INTERRUPT YOU.

10:38AM 12             MS. SAHARIA:  YES.

10:38AM 13             THE COURT:  YOUR POSITION ON THIS IS THAT IT'S A

10:38AM 14   FAILURE OF PROOF --

10:38AM 15             MS. SAHARIA:  EXACTLY, YOUR HONOR.

10:38AM 16             THE COURT:  -- AS OPPOSED TO A MOTION THAT SPEAKS TO

10:38AM 17   THE EVIDENCE THAT WAS MORE PROPERLY RAISED IN A RULE 33

10:38AM 18   CONCEPT.

10:39AM 19             MS. SAHARIA:  EXACTLY, YOUR HONOR.

10:39AM 20        AND IF THE COURT HAD ANY DOUBT ABOUT THAT, I WOULD POINT

10:39AM 21   THE COURT TO THE FIFTH CIRCUIT'S DECISION IN CHAMBERS WHICH WE

10:39AM 22   CITED IN OUR BRIEF, IT'S 408 F.3D 237, IT'S A 2005 DECISION BY

10:39AM 23   THE FIFTH CIRCUIT, AND IN THAT CASE THE COURT IN FOOTNOTE 6

10:39AM 24   EXPRESSLY ADDRESSES THE DISTINCTION BETWEEN A RULE 29 MOTION

10:39AM 25   FOR JUDGMENT OF ACQUITTAL ON THE GROUND THAT THE GOVERNMENT

8

10:39AM 1    PROVE SOMETHING OTHER THAN THE INDICTMENT ALLEGATIONS IN A

10:39AM 2    RULE 33 MOTION, AND OUR ARGUMENTS ARE PREMISED SQUARELY IN

10:39AM 3    ACQUITTAL.

10:39AM 4        ANOTHER CASE FOR THAT PROPOSITION IS THE NINTH CIRCUIT'S

10:39AM 5    DECISION IN TSINHNAHIJINNIE, WHICH I'M SURE TO BUTCHER, I'LL

10:39AM 6    SPELL IT, IT'S T-S-I-N-H-N-A-H-I-J-I-N-N-I-E, AND THAT'S A CASE

10:39AM 7    WHERE THE NINTH CIRCUIT HELD THAT THE DEFENDANT WAS ENTITLED TO

10:39AM 8    JUDGMENT OF ACQUITTAL BECAUSE THE GOVERNMENT DIDN'T PROVE THE

10:39AM 9    INDICTMENT ALLEGATIONS EVEN THOUGH IT PROVED SOMETHING ELSE.

10:39AM 10       SO WITH THOSE LEGAL PRINCIPLES AND THE BACKGROUND, LET ME

10:40AM 11   BRIEFLY ADDRESS THE RELEVANT COUNTS.  I'LL START WITH

10:40AM 12   CONSPIRACY.

10:40AM 13       AS THE COURT KNOWS, THE TWO ELEMENTS OF CONSPIRACY --

10:40AM 14           THE COURT:  COULD I ASK YOU FOR TO PAUSE FOR JUST A

10:40AM 15   SECOND.  I APOLOGIZE TO YOU.

10:40AM 16       I THINK I TOLD YOU WE HAVE A JURY OUT.

10:40AM 17           MS. SAHARIA:  YES.

10:40AM 18           THE COURT:  AND I'VE JUST BEEN HANDED THREE

10:40AM 19   QUESTIONS.

10:40AM 20           MS. SAHARIA:  UH OH.

10:40AM 21       IT'S A VERY INQUISITIVE JURY, YOUR HONOR.

10:40AM 22       (PAUSE IN PROCEEDINGS.)

10:41AM 23           THE COURT:  YOU KNOW, I THINK -- I DO BEG YOUR

10:41AM 24   PARDON, BUT I THINK I SHOULD TAKE THESE QUESTIONS UP TO GET THE

10:41AM 25   JURY THE INFORMATION THAT THEY NEED, AND I WANT TO JUST STOP

10:41AM 1    YOU, MS. SAHARIA, BEFORE YOU BEGIN THE ARGUMENT.  I THINK IT'S

10:41AM 2    BETTER TO STOP THERE RATHER THAN IN MID-ARGUMENT.

10:41AM 3              MS. SAHARIA:  I APOLOGIZE.

10:41AM 4              THE COURT:  SO LET'S TAKE A BREAK IN THIS CASE.

10:41AM 5              MS. SAHARIA:  UH-HUH, SURE.

10:41AM 6              THE COURT:  WE'LL TURN OUR ATTENTION TO THE TRIAL,

10:41AM 7    AND WE'LL TRY TO ANSWER THESE QUESTIONS THAT THEY HAVE.

10:41AM 8         YOU MAY WANT TO REMAIN THERE.

10:41AM 9              MS. SAHARIA:  OF COURSE, YOUR HONOR.  WE'LL SIT IN

10:41AM 10   THE GALLERY.

10:41AM 11             MS. VOLKAR:  THANK YOU, YOUR HONOR.

10:41AM 12        (RECESS FROM 10:41 A.M. UNTIL 11:29 A.M.)

11:29AM 13             THE COURT:  THANK YOU.  WE'RE BACK ON THE RECORD IN

11:29AM 14   THE HOLMES MATTER.  ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT

11:29AM 15   ONCE AGAIN.

11:29AM 16        THANK YOU FOR YOUR PATIENCE.

11:29AM 17        MS. SAHARIA, DO YOU WANT TO COME FORWARD?

11:29AM 18             MS. SAHARIA:  THANK YOU, YOUR HONOR.

11:29AM 19        I THINK WHEN WE BROKE I WAS JUST ABOUT TO TURN TO

11:29AM 20   CONSPIRACY, WHICH IS COUNT ONE OF THE INDICTMENT.

11:29AM 21        AS THE COURT KNOWS, THERE'S TWO ELEMENTS OF CONSPIRACY:

11:29AM 22   FIRST, AN AGREEMENT BETWEEN MS. HOLMES AND MR. BALWANI TO

11:29AM 23   COMMIT WIRE FRAUD AGAINST INVESTORS; AND THE SECOND THAT

11:29AM 24   MS. HOLMES BECAME A MEMBER OF THE CONSPIRACY BY PARTICIPATING

11:29AM 25   IN A PLAN TO COMMIT WIRE FRAUD.

11:29AM 1          IN THIS CASE THOSE TWO ELEMENTS, I THINK, COLLAPSE INTO

11:29AM 2     THE SAME GENERAL POINT.  OUR POINT IS THAT THE GOVERNMENT

11:29AM 3     DIDN'T PROVE EITHER ELEMENT FOR ESSENTIALLY THE SAME REASON.

11:29AM 4     THERE IS SIMPLY NO EVIDENCE OF AN AGREEMENT OR A MEETING OF THE

11:29AM 5     MINDS BETWEEN MS. HOLMES AND MR. BALWANI.

11:30AM 6          THE EVIDENCE YOU TYPICALLY SEE IN A CONSPIRACY CASE IS

11:30AM 7     ABSENT HERE.  THERE'S NO COOPERATOR WHO TESTIFIED TO BEING PART

11:30AM 8     OF THE CONSPIRACY.  THERE'S NO RECORDINGS BETWEEN MS. HOLMES

11:30AM 9     AND MR. BALWANI.

11:30AM 10         THE GOVERNMENT HAD ACCESS TO MS. HOLMES'S AND

11:30AM 11    MR. BALWANI'S EMAILS FROM THERANOS.  THEY DON'T REALLY CITE ANY

11:30AM 12    EMAIL THAT THEY CLAIM SHOWS A CONSPIRACY TO DEFRAUD INVESTORS.

11:30AM 13         THEY RELY EXCLUSIVELY, ALMOST EXCLUSIVELY, I BELIEVE, ON

11:30AM 14    TEXT MESSAGES.

11:30AM 15         THE GOVERNMENT HAD ACCESS TO YEARS UPON YEARS OF PRIVATE,

11:30AM 16    CANDID TEXT MESSAGES BETWEEN MS. HOLMES AND MR. BALWANI.

11:30AM 17         AS THE COURT KNOWS, THERE WAS QUITE A LOT OF LITIGATION

11:30AM 18    AROUND THOSE TEXT MESSAGES.  THERE ARE THOUSANDS OF TEXT

11:30AM 19    MESSAGES SPANNING THOUSANDS OF PAGES.

11:30AM 20         THERE'S NO EVIDENCE IN THOSE TEXT MESSAGES OF AN AGREEMENT

11:30AM 21    BETWEEN MS. HOLMES OR MR. BALWANI TO DEFRAUD INVESTORS.

11:30AM 22    THERE'S NO MESSAGES DISCUSSING LYING TO INVESTORS.  THERE'S NO

11:30AM 23    MESSAGES DISCUSSING DEFRAUDING INVESTORS.

11:31AM 24         IN FACT, THE TEXT MESSAGES SHOW THE VERY OPPOSITE.  THEY

11:31AM 25    SHOW TWO PEOPLE WHO BELIEVED IN THE COMPANY'S TECHNOLOGY, WHO

UNITED STATES COURT REPORTERS

11:31AM  1    BELIEVED IN THE COMPANY AND BELIEVED THAT THEY WERE ENGAGED IN

11:31AM  2    A MISSION TO DO GOOD, TO IMPROVE ACCESS TO HEALTH CARE.

11:31AM  3        AND THEY SHOW THAT WHEN "THE WALL STREET JOURNAL" SURFACED

11:31AM  4    ALLEGATIONS REGARDING THERANOS IN 2015, THEY WEREN'T PANICKED

11:31AM  5    THAT THOSE ALLEGATIONS WOULD UNCOVER A FRAUD.  THEY WERE

11:31AM  6    LEGITIMATELY CONCERNED THAT THE REPORTING WAS WRONG, AND THAT'S

11:31AM  7    WHAT THOSE TEXT MESSAGES SHOW.

11:31AM  8        I WOULD POINT THE COURT, FOR EXAMPLE, TO 5387D, PAGE 78

11:31AM  9    WHERE THEY SAY "THE CD CALCULATIONS WE ACTUALLY HAVE NOW

11:31AM  10   SUBMITTED TO FDA.  SO THAT'S ANOTHER LEG CHOPPED OFF CARREYROU,

11:31AM  11   'THE WALL STREET JOURNAL REPORTER.'"

11:31AM  12       THESE MESSAGES SHOW THAT MS. HOLMES AND MR. BALWANI SHOWED

11:31AM  13   THAT THEIR DATA VALIDATED THE TECHNOLOGY AND THAT THAT WOULD

11:32AM  14   SHOW "THE WALL STREET JOURNAL" TO BE WRONG.

11:32AM  15       SO IN ITS BRIEFING, THE GOVERNMENT TRIES TO FILL THIS HOLE

11:32AM  16   IN THE EVIDENCE WITH RESPECT TO AN AGREEMENT IN TWO WAYS.  THE

11:32AM  17   FIRST IS TO POINT TO EVIDENCE THAT MS. HOLMES AND MR. BALWANI

11:32AM  18   COMANAGED THE COMPANY AND COMMUNICATED ABOUT THE COMPANY'S

11:32AM  19   OPERATIONS.

11:32AM  20       OF COURSE, THAT IN AND OF ITSELF CANNOT BE EVIDENCE OF A

11:32AM  21   CRIME.  THEY WERE, AFTER ALL, CEO AND COO, AND OF COURSE THEY

11:32AM  22   COMMUNICATED ALL OF THE TIME ABOUT THE COMPANY.

11:32AM  23       THE GOVERNMENT POINTS TO THE TEXT MESSAGES TO SHOW THAT

11:32AM  24   THE TWO OF THEM WERE COMMUNICATING ABOUT VARIOUS ASPECTS OF THE

11:32AM  25   COMPANY'S OPERATIONS, BUT ONLY ONE OF THOSE BUCKETS OF

12

11:32AM 1   COMMUNICATIONS RELATES TO ACTUAL COMMUNICATIONS TO INVESTORS,

11:32AM 2   AND THIS IS THE BUCKET THE GOVERNMENT CALLS COMMUNICATIONS

11:32AM 3   REGARDING POTENTIAL INVESTORS.

11:32AM 4      NEARLY ALL OF THE MESSAGES THAT THEY CITE ONLY DISCUSS

11:33AM 5   DETAILS SUCH AS THE AMOUNT OF INVESTMENTS.  THEY ONLY CITE ONE

11:33AM 6   EXAMPLE OF A TEXT MESSAGE THAT RELATES TO THE CONTENT OF ANY

11:33AM 7   COMMUNICATIONS TO INVESTORS.

11:33AM 8      THAT'S AT EXHIBIT 5387D AT PAGE 32.  THE TEXT MESSAGE

11:33AM 9   SAYS, "ARE THERE ANY MATERIALS IN THE BINDERS THAT YOU THINK

11:33AM 10  SHOULD BE REMOVED FROM MURDOCH NEWS CORP?"

11:33AM 11     THAT'S IT.  THAT'S THE ONLY EXAMPLE THAT THEY HAVE.

11:33AM 12     WE SAID IN OUR BRIEF THAT WAS THE ONLY EXAMPLE THEY HAVE,

11:33AM 13  AND THEY DIDN'T COME BACK WITH ANY MORE.

11:33AM 14     AND THEIR SURREPLY -- AND NO ONE WOULD REASONABLY INFER

11:33AM 15  FROM THAT MUNDANE TEXT MESSAGE AN AGREEMENT TO DEFRAUD

11:33AM 16  MR. MURDOCH OR ANY OTHER INVESTOR.

11:33AM 17     THE OTHER WAY THE GOVERNMENT TRIES TO FILL THIS HOLE WITH

11:33AM 18  RESPECT TO LACK OF AN AGREEMENT IS TO POINT TO WHAT THEY CALL

11:33AM 19  "MOTIVE EVIDENCE," AND THEY SAY THAT MS. HOLMES AND MR. BALWANI

11:33AM 20  HAD A MOTIVE TO GET INVESTMENTS TO KEEP THE COMPANY AFLOAT.

11:33AM 21     WE CITED TO THE COURT THE GOYAL CASE FROM THE

11:34AM 22  NINTH CIRCUIT, THAT'S U.S. V. GOYAL, 629 F.3D 912.  WE THINK

11:34AM 23  THAT CASE IS RIGHT ON POINT.  THERE THE NINTH CIRCUIT REVERSED

11:34AM 24  A CONVICTION AND REJECTED THE GOVERNMENT'S ARGUMENT THAT THE

11:34AM 25  JURY COULD INFER FRAUDULENT INTENT FROM THE DEFENDANT'S DESIRE

11:34AM 1    TO MEET REVENUE TARGETS.  THEY POINTED OUT THAT'S WHAT ALL GOOD

11:34AM 2    CORPORATE EXECUTIVES WOULD DO.

11:34AM 3        SO TO HEAR THAT MS. HOLMES AND MR. BALWANI OF COURSE

11:34AM 4    WANTED TO INCREASE THE COMPANY'S REVENUE AND KEEP THE COMPANY

11:34AM 5    AFLOAT, AND THAT FACT IN AND OF ITSELF CAN'T SUBSTITUTE FOR THE

11:34AM 6    LACK OF AN AGREEMENT.

11:34AM 7        THE MOTIVE EVIDENCE ALSO FAILS ON ITS FACTS, AND I'LL JUST

11:34AM 8    MAKE TWO POINTS BASED ON THE GOVERNMENT'S ARGUMENTS IN ITS

11:34AM 9    SURREPLY.

11:34AM 10        FIRST, THE GOVERNMENT HIGHLIGHTS THE FACT THAT THE COMPANY

11:34AM 11    WAS SHORT ON CASH IN 2009.  THAT'S BEFORE THE CONSPIRACY

11:34AM 12    PERIOD, AND SO YOU CAN'T PROVE AN AGREEMENT TO DEFRAUD

11:35AM 13    INVESTORS DURING THE CONSPIRACY PERIOD WHICH STARTED IN 2010.

11:35AM 14        IN THEIR SURREPLY AT PAGE 4, THE GOVERNMENT MAKES THE

11:35AM 15    ARGUMENT FOR THE FIRST TIME THAT BECAUSE MR. BALWANI GUARANTEED

11:35AM 16    A LINE OF CREDIT FOR THE COMPANY IN 2009, THE JURY COULD INFER

11:35AM 17    IN 2010 THAT THE TWO OF THEM WERE ENGAGED IN A CONSPIRACY TO

11:35AM 18    GET MONEY TO PAY BACK THE LINE OF CREDIT THAT MR. BALWANI HAD

11:35AM 19    SECURED OR GUARANTEED.

11:35AM 20        THERE'S NO EVIDENCE OF THAT.  THEY DIDN'T EVEN ARGUE THAT

11:35AM 21    THEORY TO THE JURY IN THIS CASE.

11:35AM 22        THE SECOND IS THAT THE GOVERNMENT POINTS -- THIS IS ALSO

11:35AM 23    AT PAGE 4 OF THE SURREPLY -- TO THE EVIDENCE THAT THERANOS WAS

11:35AM 24    DOWN TO 15 MILLION IN CASH IN NOVEMBER OF 2013.

11:35AM 25        BUT NO EVIDENCE TIES THAT FACT TO ANY REPRESENTATIONS TO

14

11:35AM 1     INVESTORS, TO ANY DECISION TO LAUNCH A ROUND OF FUNDRAISING IN

11:35AM 2     2013.

11:35AM 3         IN FACT, THE EVIDENCE SHOWS THAT THE COMPANY WAS EXPECTING

11:35AM 4     PAYMENTS FROM WALGREENS DURING THAT SAME TIME PERIOD.  THAT

11:36AM 5     WOULD ALLEVIATE THAT CONCERN.

11:36AM 6         SO WE DON'T THINK THE MOTIVE EVIDENCE STANDS ON ITS FACTS,

11:36AM 7     BUT MORE FUNDAMENTALLY, THAT CAN'T SUBSTITUTE FOR LACK OF

11:36AM 8     ACTUAL EVIDENCE OF AN AGREEMENT TO DEFRAUD INVESTORS BETWEEN

11:36AM 9     MS. HOLMES AND MR. BALWANI.

11:36AM 10         UNLESS THE COURT HAS QUESTIONS ABOUT CONSPIRACY, I CAN

11:36AM 11     TURN TO WIRE FRAUD.

11:36AM 12           THE COURT:  YES, PLEASE.  THANK YOU.

11:36AM 13           MS. SAHARIA:  GREAT.

11:36AM 14         SO AS I MENTIONED BEFORE, THE ARGUMENTS THAT WE PRESENTED

11:36AM 15     TO THE COURT ON WIRE FRAUD GO BOTH TO WHETHER THERE WERE

11:36AM 16     MISREPRESENTATIONS MADE AS PART OF A SCHEME TO DEFRAUD, AND

11:36AM 17     ALSO WHETHER MS. HOLMES HAD THE INTENT TO DEFRAUD, AND WE DON'T

11:36AM 18     THINK THE GOVERNMENT HAS PROVED EITHER OF THOSE.

11:36AM 19         I WANT TO FOCUS MY REMARKS IN THE INTEREST OF TIME ON THE

11:36AM 20     CORE ALLEGATION IN THIS CASE, WHICH IS THAT MS. HOLMES

11:36AM 21     MISREPRESENTED THE CAPACITY AND ACCURACY OF THERANOS'S

11:36AM 22     TECHNOLOGY.

11:37AM 23         THE GOVERNMENT CALLED THIS IN CLOSING THE UNDERLYING FALSE

11:37AM 24     STATEMENT IN THE CASE.  THAT'S AT TRANSCRIPT 8958.

11:37AM 25         AND THIS IS REALLY THE ALLEGATION IN PARAGRAPH 12 OF THE

15

11:37AM  1      INDICTMENT THAT TIES ALL OF THE OTHER ALLEGATIONS TOGETHER.

11:37AM  2          FOR EXAMPLE, SOME OF THE INVESTORS TESTIFIED THAT WHEN

11:37AM  3      THEY HEARD REPRESENTATIONS ABOUT THE DEPARTMENT OF DEFENSE OR

11:37AM  4      PHARMACEUTICAL COMPANIES, THAT WAS IMPORTANT TO THEM BECAUSE

11:37AM  5      THAT WAS EVIDENCE OF THE CAPACITY OF THE TECHNOLOGY.

11:37AM  6          AND SO THIS IS REALLY THE ALLEGATION THAT UNDERLIES ALL OF

11:37AM  7      THE OTHER ONES.

11:37AM  8          AS TO THAT ALLEGATION, THE GOVERNMENT'S CLAIM REALLY RESTS

11:37AM  9      ON A FATAL MISMATCH.

11:37AM  10         THERANOS WAS DOING TWO THINGS DURING THE RELEVANT TIME

11:37AM  11     PERIOD.  IT WAS, ON THE ONE HAND, DEVELOPING, REFINING, AND

11:37AM  12     IMPORTANTLY, SUBMITTING TO THE FDA FOR A REGULATORY APPROVAL

11:37AM  13     ITS SERIES 4 ANALYZER CALLED THE MINILAB, AND THAT ANALYZER

11:37AM  14     COULD CONDUCT ALL FOUR KINDS OF ASSAYS ON FINGERSTICK BLOOD.

11:38AM  15         AT THE SAME TIME, IT WAS ALSO RUNNING A CLIA LABORATORY.

11:38AM  16     AS WE ALL KNOW THAT NOW FROM THE TRIAL, THE CLIA LABORATORY

11:38AM  17     DEPLOYED VARIOUS KINDS OF TECHNOLOGY.  IT DEPLOYED AN EARLIER

11:38AM  18     VERSION OF THE THERANOS ANALYZER, IT DEPLOYED FDA APPROVED

11:38AM  19     MACHINES FROM OTHER COMPANIES, AND IT DEPLOYED OTHER SMALL

11:38AM  20     SAMPLE TECHNOLOGY THAT THERANOS HAD DEVELOPED ON OTHER

11:38AM  21     MACHINES.

11:38AM  22         THE GOVERNMENT'S CASE RESTS ON THE FUNDAMENTAL MISMATCH ON

11:38AM  23     THE PREMISE THAT WHEN MS. HOLMES WAS SPEAKING ABOUT THERANOS'S

11:38AM  24     TECHNOLOGY, THE TECHNOLOGY IT WAS SUBMITTING TO THE FDA BEING

11:38AM  25     THE MINILAB, THAT SHE WAS TALKING ABOUT THE CLIA LAB.

11:38AM 1      AND THE PROBLEM IS THAT THE GOVERNMENT DIDN'T BRING ANY

11:38AM 2 WITNESS OR ANY EVIDENCE WHO COULD TELL THE JURY ABOUT THE

11:38AM 3 CAPACITY OF THE MINILAB.

11:38AM 4      IT DIDN'T BRING ANYONE FROM THE R&D PIECE OF THERANOS WHO

11:39AM 5 WAS WORKING ON DEVELOPING THE MINILAB.  FOR EXAMPLE,

11:39AM 6 DANIEL YOUNG, THE HEAD OF R&D, DID NOT TESTIFY, NOR DID ANYONE

11:39AM 7 ELSE UNDER HIM WHO WORKED ON DEVELOPING THE MINILAB.

11:39AM 8      IN ITS SURREPLY, THE GOVERNMENT CITES DR. DAS FOR THE

11:39AM 9 PROPOSITION THAT THE MINILAB STILL COULD NOT RUN PATIENT

11:39AM 10 SAMPLES.

11:39AM 11      THAT'S NOT WHAT HE SAID.  HE SAID ONLY THAT THERANOS

11:39AM 12 DIDN'T USE IT TO RUN PATIENT SAMPLES.

11:39AM 13      THERE IS SIMPLY NO, NO WITNESS WHO TOLD THE JURY THAT THE

11:39AM 14 MINILAB COULDN'T DO WHAT MS. HOLMES WAS TELLING INVESTORS IT

11:39AM 15 COULD DO.

11:39AM 16      AND EVEN MORE IMPORTANTLY, I THINK, NO WITNESS OR DOCUMENT

11:39AM 17 COULD SHOW THE JURY THAT MS. HOLMES DIDN'T BELIEVE THE TRUTH OF

11:39AM 18 HER REPRESENTATIONS ABOUT THE MINILAB AND WHAT IT COULD DO.

11:39AM 19      ALL EVIDENCE IS TO THE CONTRARY.

11:39AM 20      AND IN PARTICULAR, THE FACT THAT MS. HOLMES SUBMITTED TO

11:39AM 21 THE FDA THE MINILAB FOR REGULATORY APPROVAL AND THAT THE FDA

11:40AM 22 APPROVED THE 4 SERIES DEVICE FOR USE WITH THE HSB1 ASSAY, WHICH

11:40AM 23 IS AT TX 13988, IS POWERFUL EVIDENCE THAT SHE BELIEVED WHAT SHE

11:40AM 24 WAS SAYING ABOUT THERANOS'S TECHNOLOGY.

11:40AM 25      FINALLY, ON THIS PARTICULAR POINT, THE GOVERNMENT DIDN'T

11:40AM 1    PROVE THAT MS. HOLMES MISREPRESENTED THAT THE CLIA LAB WAS

11:40AM 2    USING THAT MINILAB TECHNOLOGY AS OPPOSED TO AN ASSORTMENT OF

11:40AM 3    DIFFERENT TECHNOLOGIES, SOME OF WHICH WAS THERANOS'S

11:40AM 4    TECHNOLOGY.

11:40AM 5        THERANOS WAS QUITE TRANSPARENT ABOUT THE FACT THAT IT WAS

11:40AM 6    DOING SOME VENOUS TESTING AS OPPOSED TO SMALL SAMPLE

11:40AM 7    FINGERSTICK TESTING.  WE CITED THAT EVIDENCE AT ECF 1467,

11:40AM 8    PAGES 16 AND 17.

11:40AM 9        THE GOVERNMENT POINTS IN ITS SURREPLY TO SLIDE DECKS THAT

11:40AM 10   WERE GIVEN TO INVESTORS THAT TALK BOTH ABOUT CLIA LAB

11:40AM 11   OPERATIONS AND THAT TALK ABOUT THERANOS'S TECHNOLOGY AS

11:41AM 12   EVIDENCE OF FRAUDULENT MISREPRESENTATIONS, BUT OF COURSE THOSE

11:41AM 13   SLIDE DECKS TALKED ABOUT VARIOUS ASPECTS OF THERANOS'S

11:41AM 14   TECHNOLOGY.  IT TALKED ABOUT THE TECHNOLOGY THAT WAS THEN BEING

11:41AM 15   PERFECTED IN SUBMITTING TO THE FDA, IT TALKED ABOUT THE CLIA

11:41AM 16   LAB, IT TALKED ABOUT WALGREENS, IT TALKED ABOUT ALL -- MANY

11:41AM 17   DIFFERENT ASPECTS OF THERANOS'S TECHNOLOGY AND OPERATIONS, AND

11:41AM 18   THAT'S NORMAL AND TO BE EXPECTED AND NOT ITSELF EVIDENCE OF

11:41AM 19   FRAUD.

11:41AM 20       SO ON THIS CORE POINT, THE CAPACITY OF THE TECHNOLOGY, THE

11:41AM 21   GOVERNMENT DIDN'T PROVE THAT MS. HOLMES MADE MISREPRESENTATIONS

11:41AM 22   ABOUT WHAT THE MINILAB COULD DO, AND IT CERTAINLY DIDN'T PROVE

11:41AM 23   THAT SHE DIDN'T BELIEVE HER REPRESENTATIONS.

11:41AM 24       I DON'T WANT TO TAKE THE COURT'S TIME TO WALK THROUGH ALL

11:41AM 25   OF THE REMAINING PARAGRAPH 12 ALLEGATIONS.  THE ARGUMENTS ARE

18

11:41AM 1    SET FORTH IN THE PARTIES' PAPERS.

11:41AM 2        I WOULD JUST MAKE A FEW HIGH LEVEL POINTS WITH RESPECT TO

11:41AM 3    ALL OF THOSE.

11:41AM 4        THE FIRST IS THAT IT'S CRITICAL THAT THE COURT LOOK TO THE

11:41AM 5    ACTUAL LANGUAGE OF THE INDICTMENT WITH RESPECT TO THOSE

11:42AM 6    ALLEGATIONS, BECAUSE IN MANY CASES, THE GOVERNMENT NOW IS

11:42AM 7    ARGUING THAT IT PROVED SOMETHING OTHER THAN WHAT IS IN THE

11:42AM 8    INDICTMENT.

11:42AM 9        AND THE SECOND IS THAT I DON'T THINK THAT THE COURT CAN

11:42AM 10   LOOK AT THOSE -- EACH OF THOSE PARAGRAPH 12 ALLEGATIONS IN A

11:42AM 11   VACUUM.  AS I INDICATED, THE GOVERNMENT ITSELF INDICATED IN

11:42AM 12   CLOSING THAT THE ALLEGATIONS ABOUT THE TECHNOLOGY WERE THE

11:42AM 13   UNDERLYING REPRESENTATIONS IN THIS CASE.

11:42AM 14       THE OTHER ALLEGATIONS ON PARAGRAPH 12 REALLY TIE BACK TO

11:42AM 15   THAT ONE.  THEY, THEY INTERACT WITH EACH OTHER.  THEY TIE TO

11:42AM 16   EACH OTHER.

11:42AM 17       AND NOT EVERY INVESTOR HEARD ALL OF THOSE REPRESENTATIONS,

11:42AM 18   WHEREAS THE INVESTORS, OF COURSE, ALL HEARD REPRESENTATIONS

11:42AM 19   ABOUT THE TECHNOLOGY.

11:42AM 20       SO I DON'T THINK IT'S NECESSARY TO WALK THROUGH ALL OF

11:42AM 21   THOSE, AND THAT WOULD TAKE TOO MUCH TIME, BUT IF THE COURT HAS

11:42AM 22   ANY QUESTIONS ABOUT THOSE, I'M HAPPY TO ANSWER THAT.

11:42AM 23         THE COURT:  NO.  THANK YOU.  I THINK YOU'VE

11:42AM 24   INDICATED SUCH IN YOUR BRIEFING.

11:42AM 25         MS. SAHARIA:  YES.

19

11:42AM 1          THE COURT:  I DON'T HAVE ANY QUESTIONS ABOUT THAT.

11:42AM 2          MS. SAHARIA:  THANK YOU.

11:42AM 3          THE COURT:  YOU'RE WELCOME.  THANK YOU.

11:43AM 4      MS. VOLKAR.

11:43AM 5          MS. VOLKAR:  YES, YOUR HONOR.  I WOULD JUST LIKE TO

11:43AM 6   RESPOND TO A COUPLE OF POINTS MS. SAHARIA MADE.

11:43AM 7       I WOULD LIKE TO START WITH THE LEGAL PRINCIPLES THAT

11:43AM 8   MS. SAHARIA DISCUSSED SHORTLY BEFORE OUR BREAK, AND I REALLY

11:43AM 9   WANT TO FOCUS ON I THINK ONE CRITICAL DISAGREEMENT BETWEEN THE

11:43AM 10  PARTIES, WHICH IS THE PROPER ROLE OF CONSTRUCTIVE AMENDMENT AND

11:43AM 11  VARIANCE ARGUMENTS.

11:43AM 12      THE LAW IN THE NINTH CIRCUIT IS CLEAR THAT CONSTRUCTIVE

11:43AM 13  AMENDMENT AND VARIANCE, THOSE ARGUMENTS ARE LEGAL ARGUMENTS.

11:43AM 14  IT IS AN ARGUMENT THAT A DEFENDANT CAN MAKE TO SAY THAT WHAT

11:43AM 15  WAS ALLEGED IN THE INDICTMENT NO LONGER MATCHES EITHER THE JURY

11:43AM 16  INSTRUCTIONS OR THE PROOF AT TRIAL.

11:43AM 17      THAT IS REALLY WHEN THE FOCUS OF THE INDICTMENT, IN

11:43AM 18  WALKING THROUGH ALL OF THE PARAGRAPHS OF THE INDICTMENT, COMES

11:43AM 19  INTO PLAY.

11:43AM 20      THAT'S A LEGAL ARGUMENT.  THE TSINHNAHIJINNIE CASE FROM

11:43AM 21  THE NINTH CIRCUIT THAT WE CITED IN OUR BRIEFS IS THE ONE THAT

11:43AM 22  REALLY CLEARLY SHOWS THIS DISTINCTION.  THERE'S THE LEGAL

11:44AM 23  QUESTION ABOUT WHETHER OR NOT WHAT WAS ALLEGED IN THE

11:44AM 24  INDICTMENT GAVE THE DEFENDANT SUFFICIENT NOTICE FOR WHAT SHE

11:44AM 25  WAS ACTUALLY TRIED WITH, AND THEN THERE'S THE FACTUAL QUESTION

11:44AM 1    OF WHETHER OR NOT SUFFICIENT EVIDENCE WAS PUT BEFORE THE JURY

11:44AM 2    TO MATCH THE ESSENTIAL ELEMENTS OF THE CRIME.

11:44AM 3         THE COURT:  AND THAT'S A RULE 29.

11:44AM 4         MS. VOLKAR:  CORRECT.  THE LATTER IS THE RULE 29.

11:44AM 5         THE COURT:  YES.

11:44AM 6         MS. VOLKAR:  WHICH IS WHAT WE'RE OF COURSE HERE TO

11:44AM 7    DISCUSS.

11:44AM 8         ONE CASE I DID NOT CITE IN MY BRIEF OR MY SURREPLY FOR

11:44AM 9    SPACE PURPOSES, BUT REALLY CALLS INTO RELIEF THIS POINT IS

11:44AM 10   UNITED STATES VERSUS RENZI, 769 F.3D 731, PIN CITE 756 TO 757,

11:44AM 11   AND THAT'S A NINTH CIRCUIT CASE FROM 2014 THAT TALKS

11:44AM 12   SPECIFICALLY ABOUT A CONSTRUCTIVE AMENDMENT IN A WIRE FRAUD

11:44AM 13   CASE WHERE THE DEFENDANT IS SAYING THAT THE GOVERNMENT DID NOT

11:45AM 14   PROVE THIS WORD "MISAPPROPRIATION."

11:45AM 15        BUT THE NINTH CIRCUIT LOOKS AT IT AND LOOKS AT THE

11:45AM 16   ELEMENTS OF WIRE FRAUD AND SAYS MISAPPROPRIATION IS NOT IN THE

11:45AM 17   ELEMENTS OF WIRE FRAUD AND, THEREFORE, THAT IS SURPLUSAGE

11:45AM 18   LANGUAGE IN THE INDICTMENT THAT THE GOVERNMENT DID NOT HAVE TO

11:45AM 19   PROVE IN ORDER TO MEET, FOR SUFFICIENCY OF THE EVIDENCE

11:45AM 20   PURPOSES, THE ESSENTIAL ELEMENTS OF THE CRIME.

11:45AM 21        NOW, I REALLY WANT TO FOCUS ON WHAT DOES THAT MEAN HERE

11:45AM 22   TODAY FOR THE COURT'S PURPOSES?

11:45AM 23        THE GOVERNMENT DOES NOT BELIEVE THERE'S A CONSTRUCTIVE

11:45AM 24   AMENDMENT OR VARIANCE FROM THE INDICTMENT.

11:45AM 25        IT'S SIMPLY NOT AN ARGUMENT THAT SHOULD BE MADE OR SHOULD

21

11:45AM 1    BE DEBATED IN THIS FORUM WHEN WE'RE TALKING ABOUT A RULE 29

11:45AM 2    MOTION.

11:45AM 3        THE QUESTION BEFORE THE COURT IS WHETHER SUFFICIENT

11:45AM 4    EVIDENCE SUPPORTS EVERY ELEMENT OF THE CRIME, AND I BELIEVE I

11:45AM 5    HEARD MY COLLEAGUE CONCEDE THAT THEY'RE NOT CHALLENGING TWO OF

11:45AM 6    THOSE ELEMENTS, MATERIALITY AND THE INTERSTATE WIRE.

11:45AM 7        SO IN PRACTICAL TERMS WHAT THAT MEANS IS THAT EVEN IF

11:46AM 8    HYPOTHETICALLY THE DEFENDANT WAS RIGHT AND THERE WAS A

11:46AM 9    CONSTRUCTIVE AMENDMENT OR THERE WAS A VARIANCE, WHICH WE DON'T

11:46AM 10   AGREE WITH, BUT EVEN IF THE DEFENDANT WAS RIGHT, THE GOVERNMENT

11:46AM 11   CAN STILL PREVAIL ON THIS RULE 29 MOTION BECAUSE THERE ARE

11:46AM 12   ALTERNATIVE MEANS OF PROVING ONE ELEMENT.

11:46AM 13       THE CONSTRUCTIVE AMENDMENT AND VARIANCE ARGUMENTS RELATE

11:46AM 14   TO THE STATEMENTS ABOUT THE DEPARTMENT OF DEFENSE AND THE

11:46AM 15   PHARMACEUTICAL COMPANIES.

11:46AM 16       THERE ARE MANY OTHER FALSE MISREPRESENTATIONS AND

11:46AM 17   STATEMENTS THAT THE DEFENDANT MADE TO INVESTORS THAT ARE SET

11:46AM 18   OUT IN THE GOVERNMENT'S BRIEFS.

11:46AM 19       AND SO EVEN IF THEY WERE RIGHT, EVEN IF DEFENSE WAS RIGHT

11:46AM 20   ON THOSE TWO CATEGORIES OF MISREPRESENTATIONS -- AND AGAIN, WE

11:46AM 21   DO NOT THINK THAT THEY ARE -- IT WOULDN'T MATTER FOR RULE 29

11:46AM 22   PURPOSES BECAUSE THERE ARE ALTERNATIVE MEANS FOR PROVING AND

11:46AM 23   FOR THE JURY TO HAVE FOUND THAT SAME ELEMENT.

11:46AM 24       NOW I WANT TO TURN TO MY COLLEAGUE'S ARGUMENTS ON THE

11:47AM 25   COUNTS THEMSELVES, AND I WILL ALSO SIMILARLY TRY TO BE BRIEF.

22

11:47AM 1       I THINK THE MOST IMPORTANT STARTING PLACE HERE IS ALSO THE

11:47AM 2   LEGAL STANDARD, WHICH IS, WHAT IS THE STANDARD OF A RULE 29

11:47AM 3   MOTION?  IT IS TO VIEW THE EVIDENCE IN THE LIGHT MOST FAVORABLE

11:47AM 4   TO THE PROSECUTION.

11:47AM 5       MS. SAHARIA WALKED THROUGH THE EVIDENCE AS I THINK THE

11:47AM 6   DEFENSE CONTINUES TO SEE IT.  THEY ARGUED THAT IN THEIR CLOSING

11:47AM 7   ARGUMENT.  THEY'RE ENTITLED TO VIEW THE EVIDENCE THAT WAY.

11:47AM 8       BUT THAT IS NOT HOW THE COURT IS ENTITLED TO VIEW THE

11:47AM 9   EVIDENCE FOR PURPOSES OF RULING ON THIS MOTION.  THE COURT MUST

11:47AM 10  VIEW THE EVIDENCE IN THE LIGHT MOST FAVORABLE TO THE

11:47AM 11  PROSECUTION, ASSUME THAT THE JURY RESOLVED EVIDENTIARY

11:47AM 12  CONFLICTS IN FAVOR OF THE VERDICT, AND ASSUME THAT THE JURY

11:47AM 13  MADE REASONABLE INFERENCES ALSO IN SUPPORT OF THAT VERDICT.

11:47AM 14      ON THE CONSPIRACY COUNT, MY COLLEAGUE REFERENCES THAT --

11:47AM 15  OR ESSENTIALLY TRIES TO POINT TO A HOLE IN THE EVIDENCE, BUT I

11:48AM 16  WOULD GO BACK TO, FOR A CONSPIRACY COUNT, THE CASE LAW IS CLEAR

11:48AM 17  THAT IF DEFENDANTS ACT IN A CONCERTED ACTION, THAT IS

11:48AM 18  SUFFICIENT TO FIND SUFFICIENT EVIDENCE FOR A CONSPIRACY COUNT

11:48AM 19  AND CIRCUMSTANTIAL EVIDENCE CAN PROVE THAT.  THERE IS NO

11:48AM 20  REQUIREMENT THAT AN EXPLICIT OR EVEN FORMAL OR EVEN SPOKEN

11:48AM 21  AGREEMENT EXISTS IN ORDER TO FIND SUFFICIENT EVIDENCE FOR A

11:48AM 22  CONSPIRACY COUNT.

11:48AM 23      AND ALTHOUGH OBVIOUSLY RULE 29 IS QUINTESSENTIALLY A

11:48AM 24  FACTUAL DETERMINATION, I WOULD LIKE TO PROVIDE TWO CASES THAT I

11:48AM 25  FOUND PREPARING FOR TODAY THAT I THINK REALLY HELP ILLUMINATE

11:48AM 1    THE POINT THAT THE GOVERNMENT IS TRYING TO MAKE.

11:48AM 2        IT'S NOT JUST THAT MR. BALWANI AND MS. HOLMES WERE THE TWO

11:48AM 3    MOST SENIOR EXECUTIVES IN THE COMPANY.  IT'S NOT JUST THAT THEY

11:48AM 4    HAD MORE THAN A DECADE LONG ROMANTIC RELATIONSHIP.  IT'S NOT

11:49AM 5    JUST THAT THEY WERE IN CONSTANT COMMUNICATION.

11:49AM 6        IT'S ALSO THAT WHAT THEY WERE DISCUSSING AND WHAT THEY

11:49AM 7    WERE TALKING ABOUT SHOWED THAT THEY KNEW INFORMATION THAT THEY

11:49AM 8    DIDN'T SHARE WITH THE INVESTORS, AND IT'S ALL OF THAT TOGETHER

11:49AM 9    THAT IS SUFFICIENT EVIDENCE.

11:49AM 10       AND WITH THAT, WITH THE COURT'S PERMISSION, I'D LIKE TO

11:49AM 11   READ TWO CASE CITES THAT I THINK ARE AT LEAST INSTRUCTIVE WHERE

11:49AM 12   THERE WERE ROMANTIC PARTNERS WHO WERE ALSO BUSINESS EXECUTIVES

11:49AM 13   WHO COMMITTED IN THOSE CASES HEALTH CARE FRAUD AND CONSPIRACY

11:49AM 14   TO COMMIT HEALTH CARE FRAUD, AND THESE CIRCUIT COURTS FOUND

11:49AM 15   SUFFICIENT EVIDENCE BECAUSE OF THE ADDITIONAL EVIDENCE IN

11:49AM 16   ADDITION TO THE RELATIONSHIP PIECE.

11:49AM 17       THE FIRST CASE IS UNITED STATES VERSUS SANDERS,

11:49AM 18   952 F.3D 263, 274 -- I'M SORRY, PIN CITE 274 TO 276.  THAT ONE

11:50AM 19   IS A FIFTH CIRCUIT CASE FROM 2020, BUT IT HAS A MORE DETAILED

11:50AM 20   EXPLANATION.

11:50AM 21       THE NINTH CIRCUIT CASE IS UNITED STATES V. CHERNIAVSKY,

11:50AM 22   732 FEDERAL APPENDIX 601, AND THAT'S A NINTH CIRCUIT CASE FROM

11:50AM 23   2018.

11:50AM 24       THE FACT IT HELPS TO GO BACK TO THE DISTRICT COURT

11:50AM 25   OPINIONS TO GET A LITTLE MORE OF THE FACTS AND BACKGROUND IN

24

11:50AM  1  THAT CASE, BUT THEY'RE BOTH CONSPIRACY TO COMMIT HEALTH CARE

11:50AM  2  FRAUD, WHICH IS THE HEIGHTENED MENS REA STANDARD, AND THEY SHOW

11:50AM  3  THAT YOU CAN CONSIDER THE RELATIONSHIPS, THE BUSINESS AND THE

11:50AM  4  ROMANTIC RELATIONSHIP AND THE ADDITIONAL EVIDENCE TO THAT.

11:50AM  5      AND ALTHOUGH I HAVE SEVERAL EXAMPLES IN THE GOVERNMENT'S

11:50AM  6  SUBMISSIONS THAT SHOW THIS, I'LL TAKE THE COURT'S TIME JUST TO

11:50AM  7  POINT TO ONE.

11:50AM  8      IN NOVEMBER OF 2014 AND EARLY 2015, BUT STARTING IN

11:51AM  9  NOVEMBER OF 2014, DR. ROSENDORFF RESIGNS AND SENDS AN EMAIL

11:51AM 10  DIRECTLY TO MS. HOLMES SAYING THAT HE IS -- HE IS RESIGNING

11:51AM 11  BECAUSE HE FEELS UNCOMFORTABLE AND HE'S BEING FORCED TO VOUCH

11:51AM 12  FOR RESULTS THAT HE CAN NO LONGER HAVE CONFIDENCE IN.

11:51AM 13      AROUND THE SAME TIME, MS. HOLMES TEXTS MR. BALWANI, "WE

11:51AM 14  NEED TO STOP FIGHTING FIRES BY NOT CREATING THEM," AND IN THE

11:51AM 15  CONTEXT OF THE DISCUSSION, I THINK IT'S REASONABLE TO ASSUME

11:51AM 16  AND TO READ THAT THEY ARE TALKING ABOUT THE STATE OF THE LAB.

11:51AM 17      SHORTLY AFTER THAT, MR. BALWANI TEXTS, THE TEXT WE'RE ALL

11:51AM 18  FAMILIAR WITH, "NORMANDY IS AN" EXPLETIVE "DISASTER ZONE."

11:51AM 19      IN THAT SAME TIMEFRAME IS WHEN MS. HOLMES TEXTS

11:51AM 20  MR. BALWANI ABOUT SECURING $150 MILLION INVESTMENT FROM THE

11:51AM 21  WALTON FAMILY AND SECURING AN INVESTMENT FROM MR. MURDOCH.

11:51AM 22      LESS THAN TWO WEEKS AFTER THAT, MS. HOLMES TEXTS

11:52AM 23  MR. BALWANI ABOUT WHAT TO INCLUDE IN THE MURDOCH BINDER.

11:52AM 24      NOW, THAT MAY NOT BE AN EXPLICIT AGREEMENT TO COMMIT WIRE

11:52AM 25  FRAUD, BUT WE KNOW WHAT THOSE MATERIALS THAT WERE ADMITTED

25

11:52AM 1    THROUGH MR. EDLIN, WE KNOW WHAT THOSE MATERIALS CONTAIN, AND

11:52AM 2    THEY DON'T CONTAIN DR. ROSENDORFF'S CONCERN.  THEY DON'T

11:52AM 3    CONTAIN MS. HOLMES'S LET'S STOP FIGHTING FIRES BY NOT CREATING

11:52AM 4    THEM.  THEY DON'T CONTAIN NORMANDY IS A DISASTER ZONE.

11:52AM 5        AND WHEN YOU'RE VIEWING THE EVIDENCE IN THE LIGHT MOST

11:52AM 6    FAVORABLE TO THE GOVERNMENT, THAT'S A CONSPIRACY.  THAT'S TWO

11:52AM 7    PEOPLE WHO ARE LYING TO AN INVESTOR ABOUT THE STATE OF THEIR

11:52AM 8    LAB, THE STATE OF THEIR TECHNOLOGY IN ORDER TO GET MONEY.

11:52AM 9        LAST, ON THE SUBSTANTIVE -- AND, OF COURSE, I'M HAPPY TO

11:52AM 10   ANSWER THE COURT'S QUESTIONS ON ANY OTHER POINTS, BUT I DO WANT

11:52AM 11   TO TRY TO BE AS BRIEF AS I CAN.

11:52AM 12       ON THE SUBSTANTIVE WIRE FRAUD COUNTS, THIS IS ANOTHER AREA

11:53AM 13   WHERE I FEEL MS. SAHARIA GAVE THE DEFENDANT'S VERSION OF

11:53AM 14   EVENTS, BUT, OF COURSE, THE EVIDENCE MUST BE VIEWED IN THE

11:53AM 15   LIGHT MOST FAVORABLE TO THE GOVERNMENT.

11:53AM 16       I BELIEVE THERE WAS A BIT OF DISCUSSION ABOUT THE

11:53AM 17   MISMATCH, THE 4 SERIES VERSUS THE 3 SERIES.  WE'RE ALL FAMILIAR

11:53AM 18   WITH THIS BY NOW.

11:53AM 19       THE PROBLEM IS THAT MR. GROSSMAN, BRIAN GROSSMAN TESTIFIED

11:53AM 20   THAT MS. HOLMES TOLD HIM THAT THE 4 SERIES, THE MINILAB, WAS

11:53AM 21   BEING USED TO TEST PATIENTS IN THE LAB.

11:53AM 22       UNDER THE RULE 29 STANDARD, WE MUST ASSUME THAT THE JURY

11:53AM 23   GAVE CREDIT TO THAT AND NOT TO MS. HOLMES'S VERSION OF EVENTS.

11:53AM 24   WE MUST VIEW THE EVIDENCE IN THE LIGHT MOST FAVORABLE TO THE

11:53AM 25   VERDICT, AND THAT MEANS THAT THAT SINGLE STATEMENT UNDERCUTS

26

11:53AM 1   THE ENTIRE ARGUMENT ABOUT THE 4 SERIES AND THE 3 SERIES AND

11:53AM 2   THERE WAS NO DECEPTION HERE.

11:53AM 3     I ALSO GO BACK TO, AND I KNOW THIS IS IN MY BRIEFS SO I

11:54AM 4   WON'T BELABOR IT, THE WRITTEN MATERIALS THEMSELVES, ACCORDING

11:54AM 5   TO THE DEFENDANT'S PERSPECTIVE, BOUNCE BACK AND FORTH BETWEEN

11:54AM 6   THE 4 SERIES AND THE 3 SERIES WITH NO DELINEATION, NOTHING THAT

11:54AM 7   WOULD INDICATE TO THE INVESTORS THAT THEY'RE TALKING ABOUT TWO

11:54AM 8   ENTIRELY DIFFERENT DEVICES WITH DIFFERENT CAPABILITIES, AND I

11:54AM 9   WOULD ARGUE THAT THAT IS IN AND OF ITSELF AN EXAMPLE OF THE

11:54AM 10   DECEPTIVENESS TO INVESTORS.

11:54AM 11     AND THEN -- OH.  AND THEN I ALSO WANT TO SAY THERE REALLY

11:54AM 12   IS NO ANSWER BY THE DEFENDANT TO THE FACT THAT EVERY INVESTOR

11:54AM 13   WHO IS A SUBSTANTIVE COUNT THAT SHE WAS FOUND GUILTY OF, AND

11:54AM 14   ADDITIONAL INVESTORS TESTIFIED THAT THEY WERE NOT AWARE

11:54AM 15   THERANOS WAS USING THIRD PARTY DEVICES, OR IN THE CASE OF

11:54AM 16   WADE MIQUELON ON BEHALF OF WALGREENS, HE TESTIFIED THAT HE

11:55AM 17   UNDERSTOOD THEY USED IT VERY RARELY FOR ESOTERIC TESTS.

11:55AM 18     THE ONLY DEFENSE THAT THEY HAVE TO THAT, EVEN VIEWING IT

11:55AM 19   IN THE LIGHT MOST FAVORABLE TO THE DEFENDANT, IS THAT, WELL,

11:55AM 20   THEY KNEW WE DID VEIN DRAWS.  BRIAN GROSSMAN WENT INTO A

11:55AM 21   WALGREENS AND HE GOT A VEIN DRAW.

11:55AM 22     I WOULD ARGUE THAT HE TESTIFIED THAT WHEN HE GOT THE VEIN

11:55AM 23   DRAW, HE FOLLOWED UP WITH THE DEFENDANTS TO FIGURE OUT WHY THAT

11:55AM 24   WAS, AND HE REPEATEDLY RECEIVED ASSURANCES THAT THE VEIN DRAW

11:55AM 25   WAS BECAUSE OF A TEST HE ORDERED, ET CETERA, ET CETERA.

27

11:55AM 1          BUT HE WAS NEVER TOLD THAT THAT WAS NOT GOING TO BE RUN ON

11:55AM 2     A THERANOS DEVICE.

11:55AM 3          THAT ENTIRE TIME, EVEN WITH A DIFFERENT SOURCE OF BLOOD

11:55AM 4     DRAW, HE STILL WAS UNDER THE IMPRESSION THAT THERANOS WAS USING

11:55AM 5     ITS PROPRIETARY TECHNOLOGY WHEN, IN FACT, WE KNOW FROM A

11:55AM 6     DOCUMENT THAT WAS ADMITTED THROUGH DR. ROSENDORFF,

11:55AM 7     MR. GROSSMAN'S TESTS WAS RUN ON AN UNMODIFIED THIRD PARTY

11:55AM 8     MACHINE THAT COULD NOT BE CATEGORIZED AS THERANOS PROPRIETARY

11:55AM 9     TECHNOLOGY.

11:55AM 10          SO I GO BACK TO THERE ARE VERY CLEAR UNANSWERABLE

11:56AM 11     CATEGORIES OF FALSE MISREPRESENTATIONS IN THIS CASE, AND

11:56AM 12     THERE'S A LOT MORE THAN THAT, OF COURSE, THAT ARE LAID OUT IN

11:56AM 13     THE GOVERNMENT'S SUBMISSIONS, EVEN MORE THAN THAT THAT WERE

11:56AM 14     ADMITTED AT TRIAL.

11:56AM 15          AND I HAVE MORE EXAMPLES PREPARED, BUT I'M GOING TO MOVE

11:56AM 16     ON.

11:56AM 17          SO THE VERY LAST THING I WANT TO SAY IS ON THE LAST POINT

11:56AM 18     MY COLLEAGUE MADE, WHICH IS, THERE ARE OF COURSE OTHER

11:56AM 19     CATEGORIES OF MISREPRESENTATIONS, AND WE COULD BE HERE MUCH

11:56AM 20     LONGER TO DEBATE THEM.  THE PARTIES HAVE ALREADY IN THEIR

11:56AM 21     BRIEFING.

11:56AM 22          BUT MY COLLEAGUE POINTED TO THE FACT THAT THE GOVERNMENT

11:56AM 23     WAS NOT GOING BACK TO THE ACTUAL LANGUAGE OF THE INDICTMENT AND

11:56AM 24     DOING THIS HYPERTECHNICAL PAIRING UP OF THE EVIDENCE TO THE

11:56AM 25     CHARGES IN THE INDICTMENT.

28

11:56AM 1    AND I WILL ADMIT THAT I DID NOT DO THAT IN THE BRIEFS ON

11:56AM 2 PURPOSE, BECAUSE WHERE WE ARE IN THE RULE 29 STAGE IS, DID THE

11:56AM 3 GOVERNMENT MEET THE ESSENTIAL ELEMENTS OF WIRE FRAUD?

11:56AM 4    I SUBMIT TO YOU, AS WE DID THROUGH THE SUBMISSIONS, THE

11:57AM 5 GOVERNMENT HAS.

11:57AM 6    I SAY THAT WITHOUT -- I BELIEVE WE ARE ALSO IN LINE WITH

11:57AM 7 THE INDICTMENT.

11:57AM 8    BUT WE'RE NOT AT A STAGE WHERE WHAT WE SHOULD BE DOING IS

11:57AM 9 PARSING THE LANGUAGE OF THE INDICTMENT VERY FINELY AGAINST THE

11:57AM 10 EVIDENCE.  THAT'S JUST NOT WHAT A RULE 29 MOTION IS MEANT TO

11:57AM 11 DO.

11:57AM 12    SO I WILL ACCEPT THAT AS MY COLLEAGUE'S CRITICISM, BUT I

11:57AM 13 WILL ALSO SAY IT WAS DONE WITH A PURPOSE, WHICH IS THAT WE ARE

11:57AM 14 PAIRING UP THE EVIDENCE TO THE ELEMENTS AS IS REQUIRED.

11:57AM 15    I ALSO THINK THAT BECAUSE THERE ARE ALL OF THE ALTERNATIVE

11:57AM 16 MEANS FOR SHOWING THE FALSE MISREPRESENTATIONS AND THERE ARE

11:57AM 17 ALL OF THESE SEVERAL DIFFERENT CATEGORIES, I WANT TO DRAW THE

11:57AM 18 COURT'S ATTENTION TO THE FACT THAT THIS IS A SCHEME TO DEFRAUD.

11:57AM 19    AND AS MY COLLEAGUE POINTED OUT, NOT EVERY INVESTOR HEARD

11:57AM 20 EVERY LIE, BUT THAT'S WHERE IT COMES BACK TO THE POINT IS THAT

11:57AM 21 IT WAS A SCHEME TO DEFRAUD, AND MR. BALWANI AND MS. HOLMES

11:57AM 22 EXECUTED A SCHEME TO DEFRAUD INVESTORS, AND THAT IS WHY THE

11:58AM 23 VERDICT SHOULD BE UPHELD AND THE COURT SHOULD DENY MS. HOLMES'S

11:58AM 24 RULE 29 MOTION.

11:58AM 25    THANK YOU.

| | | |
|---|---|---|
| 11:58AM | 1 | THE COURT: THANK YOU, MS. VOLKAR. |
| 11:58AM | 2 | MS. SAHARIA: LET ME JUST TOUCH ON WHAT I THINK ARE |
| 11:58AM | 3 | THE THREE CATEGORIES OF MS. VOLKAR'S COMMENTS. |
| 11:58AM | 4 | FIRST, THE ISSUE OF CONSTRUCTIVE AMENDMENT AND VARIANCE, |
| 11:58AM | 5 | AND THEN CONSPIRACY, AND THEN BRIEFLY WIRE FRAUD. |
| 11:58AM | 6 | OF COURSE, IT'S HARD TO CITE AND RESPOND TO CASES THAT |
| 11:58AM | 7 | WERE NOT CITED UNTIL TODAY, SO I'M NOT GOING TO BE ABLE TO DO |
| 11:58AM | 8 | THAT ON THE FLY. |
| 11:58AM | 9 | BUT THE TSINHNAHIJINNIE CASE THAT WAS CITED THAT MS. |
| 11:58AM | 10 | VOLKAR MENTIONED DOESN'T SAY ANYTHING ABOUT A RULE 29 MOTION |
| 11:58AM | 11 | BECAUSE THAT CASE AROSE IN THE CONTEXT OF A RULE 33 MOTION. |
| 11:58AM | 12 | I STILL DIDN'T HEAR ANY RESPONSE TO THE TSINHNAHIJINNIE |
| 11:58AM | 13 | FROM THE NINTH CIRCUIT, WHICH IS A RULE 29 CASE, AND THE COURT |
| 11:58AM | 14 | IN THAT CASE HELD THAT THE DEFENDANT WAS ENTITLED TO A JUDGMENT |
| 11:58AM | 15 | OF ACQUITTAL EVEN THOUGH THE GOVERNMENT PROVED AN OFFENSE, |
| 11:58AM | 16 | PROVED THE ESSENTIAL ELEMENTS OF THE OFFENSE, BUT DIDN'T PROVE |
| 11:59AM | 17 | IT PURSUANT TO THE INDICTMENT ALLEGATIONS. |
| 11:59AM | 18 | IN THAT CASE THE ISSUE WAS THE DATE OF THE OFFENSE, AND |
| 11:59AM | 19 | THE GOVERNMENT -- EXCUSE ME, THE COURT SAID, WELL, THE |
| 11:59AM | 20 | GOVERNMENT PROVED THE SUBSTANCE OF THE OFFENSE, BUT IT PROVED |
| 11:59AM | 21 | IT OCCURRED TWO YEARS LATER AND NOT ON THE DATE OR NEAR THE |
| 11:59AM | 22 | DATE THAT WAS ALLEGED IN THE INDICTMENT. AND BECAUSE OF THAT |
| 11:59AM | 23 | FATAL VARIANCE, THE COURT USED THE WORD "VARIANCE," BECAUSE OF |
| 11:59AM | 24 | THAT VARIANCE, THE DEFENDANT WAS ENTITLED TO JUDGMENT OF |
| 11:59AM | 25 | ACQUITTAL. |

11:59AM 1      THIS IS ABSOLUTELY A PROPER ACQUITTAL ARGUMENT.

11:59AM 2      THE ARGUMENT IS SIMPLY THAT THE GOVERNMENT DIDN'T PROVE

11:59AM 3   THE ALLEGATIONS IN THE INDICTMENT.

11:59AM 4      AND I STILL HAVEN'T HEARD ANY CASE FROM THE GOVERNMENT

11:59AM 5   THAT SAYS THAT THIS IS NOT A PROPER RULE 29 ARGUMENT.

11:59AM 6           THE COURT:  SO ACQUITTAL, NOT A NEW TRIAL.

11:59AM 7           MS. SAHARIA:  EXACTLY, YOUR HONOR.

11:59AM 8      AND IF THE COURT HAS ANY QUESTION ABOUT WHETHER THIS

11:59AM 9   PARTICULAR KIND OF -- WHETHER THIS KIND OF MISMATCH BETWEEN THE

11:59AM 10  INDICTMENT AND THE PROOF AT TRIAL CAN BE A FATAL VARIANCE, FOR

11:59AM 11  INSTANCE, I WOULD POINT THE COURT TO THE ADAMSON CASE THAT WE

12:00PM 12  CITED.

12:00PM 13     THAT WAS A WIRE FRAUD CASE, AND THE ISSUE IN THAT CASE WAS

12:00PM 14  THAT THE INDICTMENT ALLEGED ONE SPECIFIC MISREPRESENTATION AND

12:00PM 15  THE GOVERNMENT PROVED A DIFFERENT ONE AT TRIAL, AND THE

12:00PM 16  NINTH CIRCUIT SAID, OF COURSE THAT KIND OF VARIANCE IS

12:00PM 17  PREJUDICIAL TO A DEFENDANT.

12:00PM 18     WITH RESPECT TO THE ISSUE OF WHICH PARTICULAR PARAGRAPH 12

12:00PM 19  ALLEGATIONS THE GOVERNMENT HAS TRIED TO AMEND, IT IS TRUE THAT

12:00PM 20  IN OUR BRIEF WE FOCUSSED ON -- EXCUSE ME, ON THE PHARMACEUTICAL

12:00PM 21  ALLEGATIONS AN THE DEPARTMENT OF DEFENSE ALLEGATIONS.

12:00PM 22     THE GOVERNMENT AGAIN TRIES TO AMEND THE ALLEGATIONS WITH

12:00PM 23  RESPECT TO WALGREENS AND FINANCES IN ITS SURREPLY, SO I'M --

12:00PM 24  BECAUSE MS. VOLKAR MADE THE SPECIFIC POINT, I'LL JUST BRIEFLY

12:00PM 25  ADDRESS THOSE.

12:00PM 1        WHEN IT COMES TO WALGREENS, THE GOVERNMENT IN ITS

12:00PM 2    SURREPLY -- THE GOVERNMENT IN THE INDICTMENT SAID THAT

12:01PM 3    MS. HOLMES MADE MISREPRESENTATIONS THAT THE WALGREENS

12:01PM 4    PARTNERSHIP WAS PRESENTLY EXPANDING WHEN, IN FACT, IT HAD

12:01PM 5    STALLED.

12:01PM 6        AS WE POINT OUT IN OUR PAPERS, THE RELATIONSHIP WAS

12:01PM 7    EXPANDING AND IT HAD NOT STALLED.  WALGREENS AND THERANOS

12:01PM 8    STILL, AS OF DECEMBER 2014, ENVISIONED EXPANDING TO 200 STORES.

12:01PM 9        SO IN ITS SURREPLY THE GOVERNMENT SAYS, WELL, SHE DIDN'T

12:01PM 10   TELL INVESTORS THAT IT WASN'T 900 STORES AND ONLY 200 STORES.

12:01PM 11       THAT'S NOT THE ALLEGATION.

12:01PM 12       THERE'S NO EVIDENCE, BY THE WAY, THAT SHE KNEW OF THAT

12:01PM 13   MODIFIED NUMBER OF STORES.

12:01PM 14       BUT MORE FUNDAMENTALLY, THAT'S JUST NOT THE INDICTMENT

12:01PM 15   ALLEGATION.

12:01PM 16       THE SAME WITH FINANCES.  THE -- AS WE POINT OUT IN OUR

12:01PM 17   BRIEF, WHEN IT COMES TO 2014 REVENUE, THE COMPANY DID HAVE MORE

12:01PM 18   THAN $100,000 -- EXCUSE ME, $100 MILLION IN REVENUE, WHICH WAS

12:01PM 19   RECORDED AS DEFERRED REVENUE.

12:01PM 20       THE INDICTMENT ALLEGATION WAS THAT SHE MISREPRESENTED THAT

12:02PM 21   THERE WOULD BE MORE THAN $100 MILLION IN REVENUE.

12:02PM 22       SO THE GOVERNMENT IN ITS SURREPLY SAYS THAT SHE

12:02PM 23   MISREPRESENTED THE CATEGORIES OF THAT REVENUE.  THAT'S ALSO NOT

12:02PM 24   THE INDICTMENT ALLEGATION.

12:02PM 25       SO ENOUGH ABOUT THE AMENDMENT AND VARIANCE POINT.

32

12:02PM 1          WITH RESPECT TO CONSPIRACY, LET ME MAKE TWO OR THREE

12:02PM 2      POINTS.

12:02PM 3          FIRST, IT IS CLEAR FROM THE CASE LAW THAT EVEN KNOWLEDGE

12:02PM 4      AND ACQUIESCENCE IN SOMEONE ELSE'S CRIME IS NOT ENOUGH.

12:02PM 5          SO EVEN TAKING THE GOVERNMENT'S ALLEGATION THAT THE TEXT

12:02PM 6      MESSAGES SHOW THAT MS. HOLMES AND MR. BALWANI MAY HAVE KNOWN --

12:02PM 7      AND WE DISAGREE WITH THIS -- BUT MAY HAVE KNOWN THAT CERTAIN

12:02PM 8      REPRESENTATIONS THAT EACH OTHER MIGHT HAVE BEEN MAKING TO

12:02PM 9      INVESTORS WERE FALSE, KNOWING THAT SOMEONE ELSE IS MAKING THE

12:02PM 10     FALSE REPRESENTATION, OR EVEN ACQUIESCING IN IT, IS NOT

12:02PM 11     CONSPIRACY UNLESS THERE IS A MEETING OF THE MINDS.

12:03PM 12         MS. VOLKAR REPEATEDLY SAID THAT THESE TEXT MESSAGES SHOW

12:03PM 13     THAT MS. HOLMES AND MR. BALWANI KNEW INFORMATION THAT THEY

12:03PM 14     DIDN'T SHARE WITH INVESTORS, THE MATERIALS THAT THEY PROVIDED

12:03PM 15     TO INVESTORS DIDN'T CONTAIN THAT INFORMATION.

12:03PM 16         THOSE ARE ALL OMISSION TYPE ARGUMENTS, WHICH ARE NO LONGER

12:03PM 17     VALID IN THIS CASE.

12:03PM 18         AGAIN, THERE NEEDS TO BE AN AFFIRMATIVE MISREPRESENTATION

12:03PM 19     TO AN INVESTOR, AND THIS OMISSION TYPE DID NOT CONTAIN, DID NOT

12:03PM 20     DISCLOSE THEORY JUST DOESN'T WORK GIVEN THAT THE GOVERNMENT

12:03PM 21     FORECLOSED AN OMISSION THEORY.

12:03PM 22             THE COURT:  I APPRECIATE THAT.

12:03PM 23         ONE PIECE OF EVIDENCE THAT SEEMED TO HAVE SOME

12:03PM 24     SIGNIFICANCE WAS THE LETTER WITH THE LOGOS AND HOW THAT WAS

12:03PM 25     PREPARED AND HOW IT WAS ALLEGEDLY USED, OR THE JURY PERHAPS

33

| 12:03PM | 1 | FOUND WAS USED WHEN IT WAS DELIVERED BY YOUR CLIENT TO OTHER |
|---|---|---|
| 12:04PM | 2 | POTENTIAL INVESTORS. |
| 12:04PM | 3 | DO YOU WANT TO -- IS THAT A PIECE OF AN AFFIRMATIVE |
| 12:04PM | 4 | EVIDENCE? |
| 12:04PM | 5 | MS. SAHARIA:  SURE.  I'M HAPPY TO SPEAK TO THAT. |
| 12:04PM | 6 | I DON'T THINK THAT ACTUALLY GOES TO THE CONSPIRACY COUNT |
| 12:04PM | 7 | BECAUSE I DON'T RECALL THERE BEING ANY EVIDENCE THAT |
| 12:04PM | 8 | MR. BALWANI HAD ANY KNOWLEDGE OF WHO OR WHEN THOSE LOGOS WERE |
| 12:04PM | 9 | AFFIXED TO THOSE DOCUMENTS. |
| 12:04PM | 10 | THE COURT:  WE HAD SOME DISCUSSION ABOUT THAT, |
| 12:04PM | 11 | RIGHT.  THERE WAS SOME DISCUSSION, I THINK, SOME -- |
| 12:04PM | 12 | MS. SAHARIA:  YEAH. |
| 12:04PM | 13 | I DON'T KNOW WHAT CAME OUT AT MR. BALWANI'S TRIAL, OF |
| 12:04PM | 14 | COURSE. |
| 12:04PM | 15 | BUT AS I RECALL, SOME OF THOSE PHARMACEUTICAL ENDEAVORS |
| 12:04PM | 16 | OCCURRED EVEN BEFORE HE JOINED THE COMPANY. |
| 12:04PM | 17 | SO I'M NOT AWARE THAT THERE WAS ANY EVIDENCE OF THAT IN |
| 12:04PM | 18 | OUR CASE, THAT MR. BALWANI HAD THAT KNOWLEDGE SUCH THAT HE OR |
| 12:04PM | 19 | MS. HOLMES -- AND MS. HOLMES COULD HAVE AGREED TO MAKE THAT |
| 12:04PM | 20 | PARTICULAR MISREPRESENTATION. |
| 12:04PM | 21 | BUT LET ME ADDRESS THAT DOCUMENT AND THOSE REPORTS AS IT |
| 12:04PM | 22 | GOES TO THE SUBSTANTIVE WIRE FRAUD COUNT. |
| 12:04PM | 23 | THE COURT:  RIGHT. |
| 12:04PM | 24 | MS. SAHARIA:  BECAUSE I DO THINK IT'S RELEVANT |
| 12:05PM | 25 | THERE. |

34

12:05PM  1        ON THAT POINT, FIRST OF ALL, I THINK IT'S CRITICAL THAT

12:05PM  2    THE COURT, AGAIN, LOOK AT THE INDICTMENT LANGUAGE WHEN IT COMES

12:05PM  3    TO PHARMACEUTICAL COMPANIES.

12:05PM  4        THE INDICTMENT ALLEGES THAT MS. HOLMES MISREPRESENTED THAT

12:05PM  5    SEVERAL PHARMACEUTICAL COMPANIES AND RESEARCH INSTITUTIONS HAD

12:05PM  6    USED, EXAMINED, AND VALIDATED THERANOS'S TECHNOLOGY.

12:05PM  7        THE GOVERNMENT CERTAINLY DIDN'T PROVE THAT TO BE FALSE AND

12:05PM  8    CERTAINLY DIDN'T PROVE THAT MS. HOLMES KNEW THAT TO BE FALSE.

12:05PM  9        THE FACT IS THAT TEN PHARMACEUTICAL COMPANIES DID USE,

12:05PM 10    EXAMINE, AND VALIDATE MS. HOLMES OR THERANOS'S TECHNOLOGY.

12:05PM 11        THE GOVERNMENT BROUGHT THREE PHARMACEUTICAL WITNESSES TO

12:05PM 12    TRIAL WHO TESTIFIED ABOUT CONCERNS THAT THEY HAD ABOUT THE

12:05PM 13    TECHNOLOGY, NONE OF WHICH WERE SHARED IN REAL TIME WITH

12:05PM 14    MS. HOLMES OR WITH THERANOS AND THE EVIDENCE SHOWED THAT.

12:05PM 15        AND THE EVIDENCE FROM THE GOVERNMENT'S CASE ABOUT WHAT

12:06PM 16    THERANOS THOUGHT OF ITS PARTNERSHIPS WITH THOSE COMPANIES CAME

12:06PM 17    FROM MS. GANGAKHEDKAR, AND MS. GANGAKHEDKAR, WHO WORKED ON SOME

12:06PM 18    OF THOSE PARTNERSHIP, SAID THAT SHE VIEWED -- SHE WAS TALKING

12:06PM 19    IN THAT CONTEXT ABOUT THE GSK PARTNERSHIP -- THAT SHE DID, IN

12:06PM 20    FACT, VIEW THAT AS VALIDATING THERANOS'S TECHNOLOGY.

12:06PM 21        SO THERE'S NO EVIDENCE THAT MS. HOLMES DID NOT BELIEVE

12:06PM 22    THAT THOSE COMPANIES -- AND AGAIN, SHE WORKED WITH TEN

12:06PM 23    COMPANIES -- THAT THOSE COMPANIES HAD VALIDATED THERANOS'S

12:06PM 24    TECHNOLOGY.

12:06PM 25        SO WHEN IT --

35

| | | |
|---|---|---|
| 12:06PM | 1 | THE COURT: I'M SORRY. GO AHEAD AND FINISH. |
| 12:06PM | 2 | MS. SAHARIA: NO, YOUR HONOR. |
| 12:06PM | 3 | THE COURT: I'M CURIOUS, THROUGH A RULE 29 LENS -- |
| 12:06PM | 4 | AND I APPRECIATE YOUR ARGUMENT -- BUT ARE WE LOOKING AT THIS |
| 12:06PM | 5 | THROUGH THE LENS OF, WELL, THE JURY DID LOOK, CONSIDER THIS, |
| 12:06PM | 6 | BUT THEY HAD A DIFFERENT VIEW THAN WHAT YOU'RE ARTICULATING. |
| 12:06PM | 7 | AND ARE YOU -- IS THE SEARCH HERE TO FIND THAT ACTUALLY, |
| 12:07PM | 8 | JUDGE, THERE WAS NO WAY THAT A RATIONAL JUROR COULD HAVE MADE |
| 12:07PM | 9 | THE DECISION THAT THEY DID? IS THAT THE QUESTION THAT GETS |
| 12:07PM | 10 | ASKED? |
| 12:07PM | 11 | MS. SAHARIA: OF COURSE THAT'S THE QUESTION, AND OUR |
| 12:07PM | 12 | POSITION IS THAT A RATIONAL JUROR COULD NOT HAVE CONCLUDED THAT |
| 12:07PM | 13 | THE GOVERNMENT FAILED TO PROVE WHAT IT ALLEGED IN THE |
| 12:07PM | 14 | INDICTMENT, WHICH WAS THAT SEVERAL PHARMACEUTICAL COMPANIES AND |
| 12:07PM | 15 | RESEARCH INSTITUTIONS USED, EXAMINED, AND VALIDATED THERANOS'S |
| 12:07PM | 16 | TECHNOLOGY. THAT DID HAPPEN. |
| 12:07PM | 17 | THE COURT: SO THEIR DECISION WAS IRRATIONAL. |
| 12:07PM | 18 | MS. SAHARIA: THAT'S OUR POSITION. |
| 12:07PM | 19 | THE COURT: RIGHT. |
| 12:07PM | 20 | MS. SAHARIA: AND OF COURSE THAT'S WHY RULE 29 |
| 12:07PM | 21 | EXISTS. |
| 12:07PM | 22 | THE COURT: RIGHT. |
| 12:07PM | 23 | MS. SAHARIA: IT'S THE SAFETY VALVE BECAUSE |
| 12:07PM | 24 | SOMETIMES JURORS DO MAKE IRRATIONAL DECISIONS. |
| 12:07PM | 25 | THE COURT: OKAY. |

**ER-1413**

36

| | | |
|---|---|---|
| 12:07PM | 1 | MS. SAHARIA: SO I THINK THAT COVERS WHAT I WANTED |
| 12:07PM | 2 | TO TALK ABOUT WITH RESPECT TO CONSPIRACY. |
| 12:07PM | 3 | MS. VOLKAR POINTED, ON THAT POINT, TO A SERIES OF |
| 12:07PM | 4 | COMMUNICATIONS BETWEEN MS. HOLMES AND MR. BALWANI IN THE SAME |
| 12:07PM | 5 | GENERAL TIME PERIOD THAT THEY WERE CORRESPONDING WITH |
| 12:08PM | 6 | MR. MURDOCH. |
| 12:08PM | 7 | I DO ENCOURAGE THE COURT TO ALWAYS GO BACK AND LOOK AT THE |
| 12:08PM | 8 | EVIDENCE THAT THE GOVERNMENT CITES. |
| 12:08PM | 9 | IF YOU LOOK AT 5387D, PAGE 24 AND 29, WHICH IS THE |
| 12:08PM | 10 | LANGUAGE THAT MS. VOLKAR CITED ABOUT FIGHTING FIRES AND |
| 12:08PM | 11 | NORMANDY BEING A DISASTER ZONE, IF YOU ACTUALLY LOOK AT THOSE |
| 12:08PM | 12 | COMMUNICATIONS, THE TWO PARTIES, MS. HOLMES AND MR. BALWANI, |
| 12:08PM | 13 | ARE TALKING ABOUT PERSONNEL IN THOSE -- THE PERSONNEL WHO ARE |
| 12:08PM | 14 | WORKING IN THE LAB. THEY'RE TALKING ABOUT THEIR CALL CENTER |
| 12:08PM | 15 | OPERATIONS NOT WORKING RIGHT AND NEEDING TO FIX THAT, NEEDING |
| 12:08PM | 16 | TO REPLACE CERTAIN PEOPLE IN THE LAB WHO THEY DIDN'T THINK WERE |
| 12:08PM | 17 | DOING A GOOD JOB. |
| 12:08PM | 18 | YES, IT IS TRUE THAT THEY DIDN'T TELL MR. MURDOCH IN THE |
| 12:08PM | 19 | INVESTOR MATERIALS THAT THEY WERE DISSATISFIED WITH TINA IN THE |
| 12:08PM | 20 | LAB. THAT THAT'S ONE OF THE EXAMPLES. OF COURSE NOT. NO |
| 12:08PM | 21 | COMPANY DOES THAT. |
| 12:08PM | 22 | AND SHE DIDN'T OWE A DUTY OF DISCLOSURE TO MR. MURDOCH TO |
| 12:09PM | 23 | TELL HIM EVERY PIECE OF INFORMATION ABOUT THE OPERATIONS OF THE |
| 12:09PM | 24 | LABORATORY. |
| 12:09PM | 25 | AND THE GOVERNMENT DOESN'T ARGUE THAT MS. HOLMES OR |

12:09PM 1    MR. BALWANI MADE AN AFFIRMATIVE MISREPRESENTATION TO

12:09PM 2    MR. MURDOCH ABOUT THE SUBJECT MATTER OF THOSE TEXT MESSAGES.

12:09PM 3         THE COURT:  COULD THE JURY, IN HEARING ALL OF THE

12:09PM 4    EVIDENCE -- AND THERE WAS EVIDENCE ABOUT THE TEXTS AND THE

12:09PM 5    CONDITION OF THE LABORATORY.  THERE WAS EVIDENCE ABOUT -- I'LL

12:09PM 6    USE THE WORD SECRECY, I DON'T KNOW IF THAT CAME UP, BUT THE

12:09PM 7    CONCERN FOR PRIVACY AND SECURITY IN THE LAB AND THE TOTALITY OF

12:09PM 8    ALL OF THAT EVIDENCE THAT WITNESSES TESTIFIED ABOUT.

12:09PM 9     WOULD THAT, COULD A RATIONAL JUROR CONSIDER THAT WHEN IT

12:09PM 10   LOOKS AT THESE EXCHANGES ABOUT THE CONDITION OF THE LABORATORY,

12:09PM 11   AND WOULD THAT THEN INFORM AND GUIDE THEM IN A RATIONAL WAY AS

12:09PM 12   TO THE DECISION THAT THEY MADE?

12:09PM 13        MS. SAHARIA:  I DON'T THINK SO, YOUR HONOR.  I DON'T

12:10PM 14   SEE A CONNECTION BETWEEN THESE TEXT MESSAGES AND THE STEPS THAT

12:10PM 15   THERANOS TOOK TO PROTECT TRADE SECRETS, FOR INSTANCE, OR

12:10PM 16   PROTECT ORIGINALLY THE LAB, OF COURSE, IS A SENSITIVE PLACE

12:10PM 17   WHERE PATIENT INFORMATION IS MAINTAINED, AND THE COMPANY HAD

12:10PM 18   CERTAIN OBLIGATIONS WITH RESPECT TO THAT AS WELL.

12:10PM 19    I DON'T RECALL THERE BEING ANY TESTIMONY OR EVIDENCE FROM

12:10PM 20   WHICH A RATIONAL JUROR COULD CONCLUDE, RATIONALLY CONCLUDE THAT

12:10PM 21   THOSE STEPS WERE SOME SORT OF MECHANISM TO HIDE PROBLEMS IN THE

12:10PM 22   LABORATORY AS OPPOSED TO GENERAL, YOU KNOW, SECURITIES MEASURES

12:10PM 23   THAT ALL COMPANIES TAKE.

12:10PM 24        THE COURT:  THERE WAS SOME TESTIMONY ABOUT, OR TEXT

12:10PM 25   MESSAGES, I THINK IT WAS, ABOUT THE CONCERN, ABOUT THE CONCERN

12:10PM  1    OF LEAKS, I'LL USE THAT, LEAKS IN THE LAB AND IDENTIFYING WHO

12:10PM  2    THE PERSONS OR INDIVIDUALS WERE AND WHO WERE THE SOURCE OF

12:11PM  3    SUPPOSED LEAKS, AND WOULD THAT HAVE GIVEN A RATIONAL JUROR

12:11PM  4    CONSIDERATION ABOUT COULD THEY THEN INFER THAT THERE WAS REASON

12:11PM  5    OR CONCERN ABOUT A LEAK BECAUSE THE TRUTH MIGHT OWN OUT SO TO

12:11PM  6    SPEAK, THAT TYPE OF THING?

12:11PM  7        MS. SAHARIA:  I DON'T THINK SO BECAUSE A JUROR, TO

12:11PM  8    MAKE THESE KIND OF INFERENCES, NEEDS TO HAVE SOME BASIS TO DRAW

12:11PM  9    THAT UP-FRONT.

12:11PM  10       I THINK THE LANGUAGE THAT THE NINTH CIRCUIT USES, IT NEEDS

12:11PM  11   TO BE AN INFERENCE THAT IS BASED ON LOGICAL EVIDENCE THAT IS

12:11PM  12   GROUNDED -- A LOGICAL CONNECTION THAT IS GROUNDED IN THE ACTUAL

12:11PM  13   EVIDENCE.

12:11PM  14       AND THOSE TEXT MESSAGES AROSE IN THE CONTEXT OF "THE

12:11PM  15   WALL STREET JOURNAL" REPORTING.  IT IS CLEAR AS DAY FROM THE

12:11PM  16   TEXT MESSAGES THAT MS. HOLMES AND MR. BALWANI WERE CONCERNED

12:11PM  17   THAT THOSE EMPLOYEES HAD DISCLOSED THERANOS TRADE SECRETS.

12:11PM  18   IT'S WRITTEN ALL THROUGHOUT THE TEXT MESSAGES THAT THAT WAS

12:11PM  19   THEIR CONCERN.

12:11PM  20       SO I DON'T KNOW HOW A RATIONAL JUROR COULD CONCLUDE THAT

12:12PM  21   THERE WAS SOME OTHER NEFARIOUS MOTIVATION FROM THOSE ACTIONS

12:12PM  22   WHEN THERE'S NO EVIDENCE TO SUPPORT THAT INFERENCE.  ALL OF THE

12:12PM  23   EVIDENCE IS TO THE CONTRARY.

12:12PM  24           THE COURT:  OKAY.  I WAS THINKING ABOUT THAT IN A

12:12PM  25   WAY JUST AS A JUROR MIGHT LOOK AT IT, MIGHT A RATIONAL JUROR

12:12PM 1    LOOK AT THIS AND SAY, WELL, THERE WAS CERTAINLY EVIDENCE FROM

12:12PM 2    ROSENDORFF AND OTHERS ABOUT THE QUALITY AND THE NATURE AND THE

12:12PM 3    CONDITION OF THE LAB, AND WOULD THIS EVIDENCE GIVE A RATIONAL

12:12PM 4    JUROR CAUSE TO THINK, WELL, THAT'S WHAT THEY WERE TRYING TO

12:12PM 5    HIDE IS THE DISABILITIES, THE INABILITY OF THE LAB TO FUNCTION

12:12PM 6    AS REPRESENTED TO THE PUBLIC AND OTHERS?  NO?

12:12PM 7         MS. SAHARIA:  I DON'T SEE ANY EVIDENCE FROM WHICH A

12:12PM 8    JUROR COULD CONNECT THOSE TWO THINGS, PARTICULARLY WHEN ONE

12:12PM 9    OCCURRED I THINK MORE THAN, YOU KNOW, AT LEAST A YEAR AFTER THE

12:12PM 10   OTHER, THE TEXT MESSAGES ABOUT THE LEAKS TO MR. CARREYROU

12:13PM 11   OCCURRING LATE -- OR AT SOME POINT IN 2015, AND DR. ROSENDORFF

12:13PM 12   LEAVING IN 2014.

12:13PM 13        AND WHEN IT COMES TO WHAT DR. ROSENDORFF DID OR DID NOT

12:13PM 14   COMMUNICATE TO MS. HOLMES ABOUT THE CONDITION OF THE

12:13PM 15   LABORATORY, IN THE END, HE TESTIFIED CLEAR AS DAY TO THE JURY

12:13PM 16   THAT HE APPROVED EVERY TEST THAT WAS APPROVED IN THE

12:13PM 17   LABORATORY, HE DID -- HE NEVER OFFERED A TEST HE DIDN'T BELIEVE

12:13PM 18   WAS ACCURATE AND RELIABLE.  HE NEVER RELEASED ANY TEST RESULTS

12:13PM 19   TO PATIENTS HE DIDN'T BELIEVE WERE ACCURATE AND RELIABLE, AND

12:13PM 20   MS. HOLMES NEVER ORDERED HIM TO DO THAT, EITHER.

12:13PM 21        SO IT'S HARD FOR ME TO SEE HOW A JUROR COULD CONCLUDE FROM

12:13PM 22   SOMETHING THAT HAPPENED A YEAR LATER A CONNECTION BACK TO

12:13PM 23   DR. ROSENDORFF.

12:13PM 24             THE COURT:  THANK YOU.

12:13PM 25             MS. SAHARIA:  LET ME JUST BRIEFLY TURN TO WIRE

| | | |
|---|---|---|
| 12:13PM | 1 | FRAUD. |
| 12:13PM | 2 | MS. VOLKAR FOCUSSED ON ONE PARTICULAR POINT, WHICH WAS |
| 12:14PM | 3 | DOCTOR -- MR. GROSSMAN'S TESTIMONY ABOUT WHAT MS. HOLMES |
| 12:14PM | 4 | SUPPOSEDLY TOLD HIM. |
| 12:14PM | 5 | I WOULD AGAIN ENCOURAGE THE COURT TO LOOK AT THE CITED |
| 12:14PM | 6 | TESTIMONY. HE DID NOT SAY THAT MS. HOLMES TOLD HIM THAT THE |
| 12:14PM | 7 | MINILABS WERE BEING USED IN THE CLIA LAB. |
| 12:14PM | 8 | HIS EXACT WORDS WERE THAT MS. HOLMES HELD OUT, WHATEVER |
| 12:14PM | 9 | THAT MEANS. I DON'T KNOW WHAT THAT MEANS. |
| 12:14PM | 10 | THE COURT: COULD A RATIONAL JUROR FIND THAT THAT |
| 12:14PM | 11 | MEANS HE TOLD ME? |
| 12:14PM | 12 | MS. SAHARIA: I DON'T THINK SO, BECAUSE IF YOU LOOK |
| 12:14PM | 13 | AT THE REST OF THE SAME PORTION OF HIS TESTIMONY, HE TALKS |
| 12:14PM | 14 | ABOUT GOING TO THE CLIA LAB, AND HE SAID, AND I SAW THE |
| 12:14PM | 15 | MINILABS IN THE CLIA LAB. |
| 12:14PM | 16 | WE ALL KNOW THAT THE MINILAB WAS NEVER IN THE CLIA LAB. |
| 12:14PM | 17 | THERE'S NO EVIDENCE THAT IT EVER WAS. |
| 12:14PM | 18 | AND SO IT'S CLEAR THAT MR. GROSSMAN, IN THIS PORTION OF |
| 12:14PM | 19 | HIS TESTIMONY, IS CONFLATING THE MINILAB, THE EDISON. HE'S |
| 12:14PM | 20 | USING THIS ONE WORD FOR ALL OF THERANOS'S ANALYZERS, AND I |
| 12:15PM | 21 | DON'T THINK A JUROR COULD CONCLUDE FROM THAT CONGLOMERATION OF |
| 12:15PM | 22 | HIS TESTIMONY THAT HE WAS SAYING THAT MS. HOLMES TOLD HIM THE |
| 12:15PM | 23 | MINILAB ITSELF, THE 4.0 SERIES, AND NOT THE EDISON, THE 3.5 |
| 12:15PM | 24 | SERIES, BECAUSE HE'S CONFLATING THE TWO, WAS BEING USED IN THE |
| 12:15PM | 25 | CLIA LABORATORY. |

41

12:15PM 1       OF COURSE THE 3.5 DEVICE WAS BEING USED IN THE CLIA

12:15PM 2    LABORATORY.  THAT'S UNDOUBTEDLY WHAT HE SAW WHEN HE WAS IN THE

12:15PM 3    CLIA LABORATORY AND HE CALLED IT THE MINILAB, AND SO WE CANNOT

12:15PM 4    DRAW ANY CONCLUSIONS FROM THAT TESTIMONY.

12:15PM 5       THE COURT:  CAN AND WOULD A RATIONAL JUROR, SITTING

12:15PM 6    BACK AND LISTENING TO ALL OF THE EVIDENCE -- AND THERE WAS

12:15PM 7    EVIDENCE THAT THE GOVERNMENT PUT ON THAT SUGGESTED THAT YOUR

12:15PM 8    CLIENT WAS LESS THAN FULSOME, LET ME PUT IT THAT WAY, IN MANY

12:15PM 9    OF THE RESPONSES THAT SHE MADE, IN THE INTERVIEWS, IN

12:15PM 10   PUBLICATIONS, IN CONVERSATIONS WITH INVESTORS AND OTHERS.

12:15PM 11      AND COULD A JUROR, HEARING ALL OF THAT EVIDENCE, COULD A

12:16PM 12   RATIONAL JUROR SAY, WELL, AS YOU POINT OUT, SHE NEVER SAID

12:16PM 13   THIS, OR GROSSMAN FELT THIS.

12:16PM 14      BUT THE TOTALITY OF THE HALF-TRUTHS, I'LL JUST CALL THEM

12:16PM 15   THAT -- AND I DON'T MEAN ANYTHING PEJORATIVE -- BUT THE

12:16PM 16   TOTALITY OF ALL OF THOSE STATEMENTS, MISSTATEMENTS, COULD A

12:16PM 17   RATIONAL JUROR LOOK AT THIS AND SAY, THERE ARE SO MANY OF THOSE

12:16PM 18   THAT THAT SEEMS TO BE PART OF A SCHEME OR PART OF THE PLAN AND

12:16PM 19   IT FITS IN?  IS THAT IRRATIONAL FOR A JUROR TO THINK ABOUT ALL

12:16PM 20   OF THAT?

12:16PM 21          MS. SAHARIA:  WE SUBMIT THAT IT IS.

12:16PM 22          THE COURT:  OKAY.

12:16PM 23          MS. SAHARIA:  MEANING, I DON'T THINK --

12:16PM 24          THE COURT:  THAT WASN'T A SOFT BALL QUESTION, BUT I

12:16PM 25   SUPPOSE IT WAS.

12:16PM 1         MS. SAHARIA:  I UNDERSTAND THAT, YOUR HONOR.

12:16PM 2     WE DON'T BELIEVE THAT THE EVIDENCE SHOWS THAT MS. HOLMES

12:16PM 3 MADE MISREPRESENTATIONS OR HALF-TRUTHS.

12:16PM 4         THE COURT: SURE.  SURE.

12:16PM 5         MS. SAHARIA:  AGAIN, GOING BACK TO THIS POINT ABOUT

12:17PM 6 OMISSIONS, IT'S NOT ENOUGH THAT SHE WAS LESS THAN FULSOME.

12:17PM 7     THERE NEEDS TO BE AFFIRMATIVE MISREPRESENTATIONS OR

12:17PM 8 HALF-TRUTHS OR ESSENTIALLY A REPRESENTATION THAT IS MISLEADING,

12:17PM 9 EVEN IF NOT AFFIRMATIVELY FALSE.

12:17PM 10     AGAIN, WE DON'T SEE THAT THE GOVERNMENT PROVED THOSE

12:17PM 11 MISREPRESENTATIONS WERE HALF-TRUTHS.

12:17PM 12     MOST OF WHAT THEY POINT YOU TO ARE MS. HOLMES TALKING

12:17PM 13 ABOUT THERANOS'S TECHNOLOGY, WHICH AT THAT POINT DURING THE

12:17PM 14 RELEVANT PERIOD WAS THE MINILAB.  THAT IS A TECHNOLOGY THAT IT

12:17PM 15 WAS SUBMITTING TO THE FDA FOR APPROVAL.  IT'S THE TECHNOLOGY

12:17PM 16 THAT CONDUCTED ALL FOUR KINDS OF TESTS.  THE GOVERNMENT DIDN'T

12:17PM 17 PROVE THAT IT COULDN'T CONDUCT ALL FOUR KINDS OF TESTS.

12:17PM 18     SO WHEN SHE WAS TALKING ABOUT THAT TECHNOLOGY, I DON'T

12:17PM 19 THINK A RATIONAL JUROR COULD CONCLUDE FROM THAT THAT SHE WAS

12:17PM 20 INTENDING TO MISLEAD INVESTORS ABOUT WHAT WAS BEING USED IN THE

12:17PM 21 CLIA LAB, THAT BEING THE 3.5 DEVICE.

12:17PM 22         THE COURT:  THANK YOU.

12:18PM 23         MS. SAHARIA:  WITH THAT, I THINK THAT COVERS

12:18PM 24 EVERYTHING THAT I WANTED TO COVER.

12:18PM 25         THE COURT:  OKAY.  THANK YOU.

43

12:18PM 1          MS. VOLKAR IS EAGER TO JUST ASK ME FOR TWO MINUTES, I

12:18PM 2     THINK.

12:18PM 3          IS THAT RIGHT, MS. VOLKAR?

12:18PM 4          MS. VOLKAR:  YOUR HONOR, I'LL BE GUIDED BY THE

12:18PM 5     COURT.

12:18PM 6          THE COURT:  I'M HAPPY TO HEAR FROM YOU, AND THEN

12:18PM 7     I'LL HEAR FINALLY FROM THE DEFENSE IF YOU WANT TO RESPOND TO

12:18PM 8     SOMETHING.

12:18PM 9          MS. VOLKAR:  SURE, I WILL RESPOND.

12:18PM 10         I FEAR THAT WE'LL BE HERE ALL DAY AS WE UNRAVEL EACH

12:18PM 11    CATEGORY OF MISREPRESENTATION ONE BY ONE, SO I HAVE SOME

12:18PM 12    CONCERNS ABOUT THAT.

12:18PM 13         BUT I WILL TRY TO BE BRIEF AND RESPOND TO JUST A COUPLE OF

12:18PM 14    POINTS.

12:18PM 15         FIRST, I THINK THE COURT HAS A GOOD SENSE OF WHAT A

12:18PM 16    RATIONAL JUROR IS, AND I THINK MS. SAHARIA FIGHTS THE STANDARD

12:18PM 17    THAT IS VERY UNFAVORABLE TO DEFENDANTS ON A RULE 29 MOTION.  IT

12:18PM 18    IS A VERY HIGH BAR.  THE NINTH CIRCUIT SAYS OVER AND OVER AGAIN

12:19PM 19    THAT THIS IS A HIGH THRESHOLD TO MEET.

12:19PM 20         IN CASE THERE IS ANY DOUBT, THE FIFTH CIRCUIT CASE I

12:19PM 21    POINTED TO EARLIER, SANDERS, USES "BLACK'S LAW DICTIONARY" TO

12:19PM 22    DEFINE RATIONAL AS NOT ABSURD, NOT PREPOSTEROUS, NOT FOOLISH,

12:19PM 23    OR NOT FANCIFUL.

12:19PM 24         ON THE CONSPIRACY POINT, I WILL START WITH SOMETHING THAT

12:19PM 25    ALSO WRAPS INTO THE PHARMACEUTICAL POINT.

12:19PM 1     MS. SAHARIA SAID THERE WAS NO EVIDENCE OF MEETING OF THE

12:19PM 2  MINDS AND SAID THAT THE EVIDENCE THAT THE GOVERNMENT POINTED TO

12:19PM 3  IN 2009 IS IRRELEVANT.

12:19PM 4     AS YOUR HONOR HEARD US ARGUE IN THE BALWANI CASE, OF

12:19PM 5  COURSE IT'S NOT IRRELEVANT.  EVERYTHING IS RELEVANT EVEN IF

12:19PM 6  IT'S NOT DURING THE CONSPIRACY PERIOD.

12:19PM 7     WHY IT'S RELEVANT HERE TO THE CONSPIRACY COUNT IN

12:19PM 8  PARTICULAR IS THAT IN 2009 THERANOS WAS SO UNDERWATER THAT THEY

12:20PM 9  WERE STRUGGLING TO MAKE PAYROLL.  THE COURT HEARD THAT FROM

12:20PM 10  MS. YAM.

12:20PM 11     THE ONLY REASON IT WAS ABLE TO CONTINUE AS A COMPANY TO

12:20PM 12  2010 WAS BECAUSE OF MR. BALWANI'S LOAN, OR, I'M SORRY, THE LOAN

12:20PM 13  THAT MR. BALWANI PERSONALLY GUARANTEED.  THAT INFORMATION ALSO

12:20PM 14  CAME IN THROUGH MS. YAM.

12:20PM 15     AND THEN THERE IS A SWITCH IN FOCUS FROM THE

12:20PM 16  PHARMACEUTICAL COMPANIES -- WHICH AT THIS POINT IN TIME A

12:20PM 17  REASONABLE INFERENCE A RATIONAL JUROR COULD MAKE IS THAT BOTH

12:20PM 18  MS. HOLMES AND MR. BALWANI KNEW THE PHARMACEUTICAL COMPANIES

12:20PM 19  WERE NOT PROVIDING SUFFICIENT REVENUE BECAUSE THE COMPANY WAS

12:20PM 20  ABOUT TO GO UNDER BUT FOR THE LOAN.

12:20PM 21     THEY SWITCHED FOCUS TO RETAIL, AND THEN WHAT DO WE SEE?

12:20PM 22  WE SEE IN APRIL 2010 MS. HOLMES ADDING THE LOGOS TO THE

12:20PM 23  PHARMACEUTICAL REPORTS, THE PFIZER REPORT, THE SCHERING-PLOUGH

12:20PM 24  REPORT, AND THE GSK REPORT, AND SENDING THEM TO WALGREENS AND

12:20PM 25  SAFEWAY.

45

12:21PM  1          WHAT DO WE ALSO SEE?  WE HAVE STEVE BYRD WHO TESTIFIED

12:21PM  2     THAT IN 2010 MS. HOLMES TOLD HIM THAT THERANOS WAS CASH FLOW

12:21PM  3     NEUTRAL.  THAT'S A DIRECT LIE.

12:21PM  4          AND I KNOW MS. SAHARIA IS GOING TO COME BACK AND SAY IT'S

12:21PM  5     NOT IN THE INDICTMENT.

12:21PM  6          IT GOES TO KNOWLEDGE.  THESE ARE RELEVANT FACTS TO

12:21PM  7     MS. HOLMES'S KNOWLEDGE, WHAT SHE KNEW ABOUT THE COMPANY, AND

12:21PM  8     WHAT SHE WAS PRESENTING TO INVESTORS.

12:21PM  9          AND BECAUSE MS. SAHARIA SAID THERE WERE NO HALF-TRUTHS,

12:21PM 10     AND WE'RE ON THE TOPIC OF PHARMACEUTICAL COMPANIES, I'LL POINT

12:21PM 11     THE COURT TO TX -- I'M SORRY, TRIAL EXHIBIT 291.  THAT'S THE

12:21PM 12     EMAIL WHERE MS. HOLMES SENT THESE FALSIFIED OR DOCTORED

12:21PM 13     PHARMACEUTICAL REPORTS TO WALGREENS AND REFERS TO THEM IN THE

12:21PM 14     EMAIL AS THREE INDEPENDENT DUE DILIGENCE REPORTS FROM GSK,

12:21PM 15     PFIZER, AND SCHERING-PLOUGH AFTER THEIR OWN TECHNICAL

12:21PM 16     VALIDATION.

12:21PM 17          SHE KNOWS EVERY SINGLE ONE OF THOSE STATEMENTS IS FALSE

12:22PM 18     BECAUSE THERANOS AUTHORED THE REPORTS.  WE SAW THE EVIDENCE

12:22PM 19     WHERE SHE SENT THEM TO THE PHARMACEUTICAL COMPANIES, AND WE SAW

12:22PM 20     THE EVIDENCE FROM SHANE WEBER, WHO TESTIFIED THAT HE TALKED TO

12:22PM 21     THE DEFENDANT ON THE PHONE AND SAID THAT PFIZER DID NOT HAVE A

12:22PM 22     FORESEEABLE USE FOR THERANOS'S DEVICE, AND THAT WAS ALSO

12:22PM 23     MEMORIALIZED INTERNALLY AT TRIAL EXHIBIT 174.

12:22PM 24          THAT CONVERSATION BETWEEN SHANE WEBER AND MS. HOLMES,

12:22PM 25     WHICH THE COURT HAS TO CREDIT THAT THE JURY BELIEVED TO BE TRUE

12:22PM 1    UNDER A RULE 29 STANDARD, THAT CONVERSATION OCCURRED AFTER

12:22PM 2    DEFENDANT SENT THE ORIGINAL DRAFT REPORT IN TRIAL EXHIBIT 143

12:22PM 3    THAT DID NOT HAVE THE LOGO.

12:22PM 4        SO LET'S LOOK AT THE TIMELINE.  MS. HOLMES SENDS A REPORT

12:22PM 5    WRITTEN BY THERANOS TO PFIZER.  MS. HOLMES HAD A CONVERSATION

12:22PM 6    WITH SHANE WEBER WHERE SHANE WEBER SAYS PFIZER HAS NO

12:22PM 7    FORESEEABLE USE FOR YOUR TECHNOLOGY.

12:22PM 8        THE COMPANY IS SO LOW ON FUNDS, THEY NEED A LOAN TO

12:22PM 9    SURVIVE.

12:22PM 10       AND THEN IN 2010, THE START OF THE CONSPIRACY PERIOD,

12:23PM 11   MS. HOLMES ALTERS THOSE PHARMACEUTICAL REPORTS AND PRESENTS

12:23PM 12   THEM TO WALGREENS AS VALIDATION OF THE TECHNOLOGY.

12:23PM 13       AND THAT'S WHY I DON'T THINK IT'S A CONSTRUCTIVE AMENDMENT

12:23PM 14   OR A VARIANCE, BECAUSE THE ENTIRE POINT OF SENDING THESE

12:23PM 15   DOCTORED REPORTS IS TO SAY OTHER COMPANIES THAT DO THIS ALL THE

12:23PM 16   TIME HAVE LOOKED AT THIS MACHINE AND DECLARED THAT IT WORKS,

12:23PM 17   LOOK AT THESE WONDERFUL CONCLUSIONS.

12:23PM 18       IN THE CASE OF SCHERING-PLOUGH, MS. HOLMES EVEN EDITED THE

12:23PM 19   CONCLUSIONS TO MAKE THEM MORE FAVORABLE.

12:23PM 20       FROM ALL OF THAT, A RATIONAL JUROR COULD CONCLUDE -- A

12:23PM 21   REASONABLE INFERENCE FROM ALL OF THAT IS NOT ONLY THAT

12:23PM 22   MS. HOLMES MADE FALSE STATEMENTS TO WALGREENS WITH RESPECT TO

12:23PM 23   THE RELATIONSHIPS WITH PHARMACEUTICAL COMPANIES, BUT ALSO THAT

12:23PM 24   MS. HOLMES AND MR. BALWANI ACTED IN TANDEM, AS MR. BALWANI WAS

12:23PM 25   INCLUDED ON THOSE REPORTS, IN DUPING WALGREENS AND LATER

| | | |
|---|---|---|
| 12:23PM | 1 | SAFEWAY. |
| 12:24PM | 2 | AND THEN THE LAST POINT THAT I WANT TO MAKE IS THE |
| 12:24PM | 3 | RETALIATION POINT, BECAUSE I AGREE WITH YOUR HONOR, AND THE TWO |
| 12:24PM | 4 | CASES THAT I CITED EARLIER ON THE CONSPIRACY POINT BOTH TALK |
| 12:24PM | 5 | ABOUT HOW THE DEFENDANTS ACT WHEN THE TRUTH MIGHT COME TO LIGHT |
| 12:24PM | 6 | OR DOES COME TO LIGHT. |
| 12:24PM | 7 | AND THAT'S CLEAR EVIDENCE WE HAVE IN THIS CASE, TOO. |
| 12:24PM | 8 | WE HAVE TWO INSTANCES. WE HAVE BEFORE THE NEGATIVE |
| 12:24PM | 9 | "WALL STREET JOURNAL" ARTICLE WHEN WE SEE WITH RESPECT TO -- |
| 12:24PM | 10 | WELL, I'LL JUST TAKE THAT TIME PERIOD FIRST. |
| 12:24PM | 11 | WE GET TO SEE MS. HOLMES AND HER TREATMENT OF MEDIA |
| 12:24PM | 12 | SOURCES THAT ARE POSITIVE TO HER, SUCH AS ROGER PARLOFF OR THE |
| 12:24PM | 13 | JOE RAGO ARTICLE, AND WE GET TO SEE HER ENGAGING WITH THEM, IN |
| 12:24PM | 14 | SOME INSTANCES REVIEWING DRAFTS OF THEIR ARTICLES BEFORE |
| 12:24PM | 15 | THEY'RE SENT OUT. WE SEE HER SENDING COPIES OF THOSE ARTICLES |
| 12:24PM | 16 | TO INVESTORS. |
| 12:24PM | 17 | AND THEN WE SEE HOW SHE TREATS MR. CARREYROU WHEN SHE |
| 12:24PM | 18 | BELIEVES HE'S GOING TO WRITE SOMETHING NEGATIVE. |
| 12:24PM | 19 | AND CLEARLY THE GOVERNMENT DISAGREES WITH MS. SAHARIA |
| 12:25PM | 20 | ABOUT WHETHER OR NOT THEY WERE WORRIED ABOUT THE TRUTH OF THOSE |
| 12:25PM | 21 | ALLEGATIONS. |
| 12:25PM | 22 | THERE IS -- I CAN FIND THE PIN CITE IN A MOMENT IF IT'S |
| 12:25PM | 23 | NECESSARY, BUT THERE'S THE APRIL 2015 TEXT MESSAGE WHERE THEY |
| 12:25PM | 24 | SAY, LET'S MAKE HE GETS A FINGERSTICK. I THINK HE'S LOOKING TO |
| 12:25PM | 25 | WRITE SOMETHING NEGATIVE. |

12:25PM  1     THEY WANT TO ALTER MR. CARREYROU'S EXPERIENCE IN THE

12:25PM  2  WALGREENS TO TRY TO PREVENT HIM FROM WRITING SOMETHING

12:25PM  3  NEGATIVE.

12:25PM  4     AND THEN WE CAN ALSO SEE HOW MS. HOLMES AND MR. BALWANI

12:25PM  5  TREATED EMPLOYEES WHO THEY WERE AFRAID WOULD LET THE TRUTH GET

12:25PM  6  OUT ABOUT THE CAPABILITY OF THE DEVICE AND THE USE OF THIRD

12:25PM  7  PARTY MACHINES.

12:25PM  8     WE HEARD MS. CHEUNG TESTIFY ABOUT HOW THEY SENT

12:25PM  9  DAVID BOIES AFTER HER, AND WE ALSO HEARD THAT TYLER SHULTZ

12:25PM 10  UNDERWENT SIMILAR TREATMENT.

12:25PM 11     FINALLY, THERE'S THE OTHER PERIOD OF TIME, WHICH IS AFTER

12:25PM 12  THE OCTOBER 2015 "WALL STREET JOURNAL" ARTICLE COMES OUT, AND

12:25PM 13  THEIR TEXT MESSAGES ARE REVEALING THERE AS WELL.  THERE'S AN

12:26PM 14  EXCHANGE -- AND THIS ONE I DO HAVE THE CITES AT MY FINGERTIPS

12:26PM 15  FOR.  THERE'S AN EXCHANGE AT 5387D, 116.

12:26PM 16     BALWANI SAYS WALGREENS FREAKING OUT, OR WAG FREAKING OUT,

12:26PM 17  LACK OF TRANSPARENCY.

12:26PM 18     DOWN THE PAGE, MS. HOLMES SAYS, WE'LL HAVE TO PRESENT WELL

12:26PM 19  THAT WE HADN'T DECIDED TO SHUT OFF THE FINGERSTICK TESTING.

12:26PM 20     AND MR. BALWANI RESPONDS, BAD IDEA.  AT THIS POINT THEY

12:26PM 21  KNOW SO NEED TO BE TRANSPARENT.

12:26PM 22     THE ONLY THING THAT CHANGED FROM WALGREENS'S PERSPECTIVE

12:26PM 23  WAS LEARNING ABOUT HOW THERANOS WAS CONDUCTING ITS TESTS

12:26PM 24  THROUGH A MEDIA ARTICLE AND NOT FROM THE DEFENDANTS.

12:26PM 25     SO, AGAIN, WE COULD STAND UP HERE ALL DAY AND HAVE A

12:26PM 1    REPEAT OF THE PARTIES' CLOSING ARGUMENTS AND HOW BOTH SIDES

12:26PM 2    VIEW THE EVIDENCE, BUT I REALLY JUST WANT TO END ON THE HIGH

12:26PM 3    THRESHOLD OF A RULE 29, THAT ALL OF THE EVIDENCE MUST BE VIEWED

12:26PM 4    IN THE LIGHT MOST FAVORABLE TO THE PROSECUTION, TESTIMONY FROM

12:27PM 5    ONE SINGLE WITNESS IS SUFFICIENT.

12:27PM 6        ALL THREE INVESTOR VICTIMS TESTIFIED, AND OF COURSE EVEN

12:27PM 7    MORE INVESTORS THAN THAT TESTIFIED, AND THE GOVERNMENT'S

12:27PM 8    POSITION IS THAT THE SCHEME TO DEFRAUD IS MORE THAN SUPPORTED

12:27PM 9    BY SEVERAL DIFFERENT CATEGORIES OF FALSE MISREPRESENTATIONS

12:27PM 10   THAT ALSO CLEARLY DEMONSTRATE MS. HOLMES'S KNOWLEDGE AND INTENT

12:27PM 11   TO DECEIVE AND CHEAT, AND FOR THOSE REASONS WE THINK THE COURT

12:27PM 12   SHOULD DENY.

12:27PM 13       THANK YOU.

12:27PM 14           THE COURT:  THANK YOU.

12:27PM 15       MS. SAHARIA, THE FINAL, FINAL WORD.

12:27PM 16           MS. SAHARIA:  THANK YOU.

12:27PM 17       I'LL JUST CLOSE WITH THE PHARMACEUTICAL REPORTS SINCE

12:27PM 18   THAT'S WHERE MS. VOLKAR SPENT MOST OF HER TIME.

12:27PM 19       FIRST OF ALL, I STILL DIDN'T HEAR ANY EVIDENCE FROM OUR

12:27PM 20   TRIAL THAT MR. BALWANI KNEW HOW THE CONTENT OF THOSE REPORTS

12:27PM 21   WERE GENERATED, OR KNEW ANYTHING ABOUT THE LOGOS FROM THOSE

12:27PM 22   REPORTS, SO I STILL DON'T SEE HOW THAT FACT HAS ANYTHING TO DO

12:27PM 23   WITH A CONSPIRACY WHEN IT COMES TO THE CONTENT OF THOSE

12:27PM 24   REPORTS.

12:27PM 25       SECOND, SHE HIGHLIGHTED REPEATEDLY MR. WEBER'S, OR

12:28PM 1    DR. WEBER'S CALL WITH MS. HOLMES WHERE HE SAID THAT PFIZER HAD

12:28PM 2    NO NEED TO USE THE TECHNOLOGY IN THE FUTURE.

12:28PM 3        THERE'S A WORLD OF DIFFERENCE BETWEEN A COMPANY SAYING WE

12:28PM 4    DON'T HAVE A NEED FOR YOUR TECHNOLOGY AND YOUR TECHNOLOGY

12:28PM 5    DOESN'T WORK OR WE DON'T THINK YOU VALIDATED YOUR TECHNOLOGY,

12:28PM 6    OR YOUR TECHNOLOGY IS BAD.

12:28PM 7        HE DIDN'T SAY ANY OF THAT TO HER.

12:28PM 8        AND THERE'S NO EVIDENCE IN THE RECORD FROM WHICH A JURY

12:28PM 9    COULD CONCLUDE THAT MS. HOLMES DID NOT PERSONALLY BELIEVE THAT

12:28PM 10    HER WORK WITH TEN PHARMACEUTICAL COMPANIES, MORE THAN THE THREE

12:28PM 11    THAT THE GOVERNMENT BROUGHT IN TO TESTIFY, THAT THAT DID NOT

12:28PM 12    VALIDATE THERANOS'S TECHNOLOGY.  THAT IS THE INDICTMENT

12:28PM 13    ALLEGATION, AND THERE'S JUST NO EVIDENCE FROM WHICH A JURY

12:28PM 14    COULD CONCLUDE THAT.

12:28PM 15        AS TO THE LOGOS AND THE EMAIL TO WALGREENS, AGAIN, THERE'S

12:28PM 16    NO EVIDENCE THAT MS. HOLMES THOUGHT SHE WAS DOING SOMETHING

12:29PM 17    WRONG, THAT SHE WAS INTENDING TO DEFRAUD AS OPPOSED TO SIMPLY

12:29PM 18    IDENTIFYING WITH A PICTURE WHICH COMPANY WAS INVOLVED IN THE

12:29PM 19    PARTNERSHIP.  THE REPORTS SHOWED BOTH THE THERANOS LOGO AND THE

12:29PM 20    LOGO OF THE COMPANY.

12:29PM 21        IN THE CASE OF THE PFIZER REPORT, THAT IS CLEAR AS DAY THE

12:29PM 22    REPORT WAS WRITTEN BY THERANOS BECAUSE IT'S ON THERANOS

12:29PM 23    LETTERHEAD WITH THE THERANOS ADDRESS ON THE REPORT ITSELF.

12:29PM 24        AND IT'S ALSO -- THERE'S ALSO NO EVIDENCE THAT MS. HOLMES

12:29PM 25    DIDN'T REASONABLY VIEW THE REPORTS AS BEING FROM THOSE

12:29PM 1    COMPANIES.  GSK ITSELF WROTE THE REPORT.  BOTH OF THEM WERE

12:29PM 2    SUBMITTED TO THOSE COMPANIES.

12:29PM 3        THE PFIZER REPORT -- CONTRACT REQUIRED THERANOS TO DRAFT

12:29PM 4    THE REPORT THAT RESULTED FROM THEIR JOINT PARTNERSHIP.

12:29PM 5        AND SCHERING-PLOUGH ASKED THERANOS TO DRAFT THAT REPORT AS

12:29PM 6    PART OF A JOINT PARTNERSHIP.

12:29PM 7        COULD THE EMAIL TO WALGREENS HAVE BEEN MORE PRECISE?

12:30PM 8    SURE.  WE ALL WRITE IMPRECISE EMAILS EVERY DAY.  GOD HELP US

12:30PM 9    ALL IF THEY'RE EVIDENCE OF A CRIME.

12:30PM 10        THERE'S NO EVIDENCE THAT SHE WAS INTENDING TO DEFRAUD

12:30PM 11    WALGREENS IN THAT EMAIL.

12:30PM 12            THE COURT:  THANK YOU VERY MUCH.

12:30PM 13            MS. SAHARIA:  WITH THAT, I'LL REST.

12:30PM 14            THE COURT:  THANK YOU.

12:30PM 15        I APPRECIATE THE COMMENTS AND THE PLEADINGS HERE.  I'M

12:30PM 16    GOING TO LOOK AT THE CASES YOU CITE, AS WELL AS SOME OF THE

12:30PM 17    TRANSCRIPT CITES THAT YOU MENTION.

12:30PM 18        BUT I DO JUST WANT TO STATE FOR THE RECORD PERHAPS A

12:30PM 19    PRELIMINARY FINDING OF THE COURT AT THIS POINT BASED ON YOUR

12:30PM 20    PLEADINGS AND THE COMMENTS THAT YOU'VE MADE, AND I APPRECIATE

12:30PM 21    THOSE.

12:30PM 22        AND OF COURSE, AS WE KNOW, AND AS YOU'VE RECOGNIZED, BOTH

12:30PM 23    SIDES HAVE RECOGNIZED THIS MORNING THAT FOR RULE 29, THE

12:30PM 24    EVIDENCE MUST BE VIEWED IN THE LIGHT MOST FAVORABLE TO THE

12:30PM 25    PROSECUTION AND TO THE JURY'S FINDING AND THE JURY'S VERDICT IN

| | | |
|---|---|---|
| 12:30PM | 1 | THIS CASE. |
| 12:30PM | 2 | AND OUR CASES TELL US ABOUT THE DESIRE TO MAINTAIN AND |
| 12:31PM | 3 | RESPECT THE INTEGRITY OF JURORS' FINDINGS.  WE KNOW THAT. |
| 12:31PM | 4 | RULE 29 EXISTS, AS MS. SAHARIA TELLS US, AS A SAFETY |
| 12:31PM | 5 | VALVE, TO HAVE JUDICIAL CHECK AND HAVE THE PARTIES LOOK AT THE |
| 12:31PM | 6 | FINDINGS OF A JURY TO DETERMINE WHETHER OR NOT, LOOKING AT IT |
| 12:31PM | 7 | IN THE LENS MOST FAVORABLE TO THE PROSECUTION, WHETHER OR NOT |
| 12:31PM | 8 | THE EVIDENCE IS ADEQUATE SUCH THAT TO ALLOW ANY RATIONAL TRIER |
| 12:31PM | 9 | OF FACT TO FIND THE ESSENTIAL ELEMENTS OF THE OFFENSE BEYOND A |
| 12:31PM | 10 | REASONABLE DOUBT, AND THAT'S WHAT OUR CONVERSATION HAS BEEN |
| 12:31PM | 11 | ABOUT THIS MORNING, AND YOU'VE INDICATED THAT IN YOUR PLEADING. |
| 12:31PM | 12 | SO THE QUESTION REALLY IS, IN VIEWING THE EVIDENCE IN THE |
| 12:31PM | 13 | LIGHT MOST FAVORABLE TO THE PROSECUTION, COULD ANY RATIONAL |
| 12:31PM | 14 | TRIER OF FACT HAVE MADE THE FINDINGS OF GUILT THAT THEY DID IN |
| 12:31PM | 15 | THIS CASE BASED ON THE EVIDENCE THAT WE ALL HEARD AND THAT WAS |
| 12:32PM | 16 | PRESENTED TO THE JURY? |
| 12:32PM | 17 | AND WE KNOW THAT MS. HOLMES WAS INDICTED ON TEN COUNTS OF |
| 12:32PM | 18 | WIRE FRAUD AND TWO COUNTS OF CONSPIRACY TO COMMIT WIRE FRAUD. |
| 12:32PM | 19 | THE THIRD SUPERSEDING INDICTMENT INFORMS US OF THAT. |
| 12:32PM | 20 | THE TRIAL IN THIS CASE WAS APPROXIMATELY FOUR MONTHS, IF I |
| 12:32PM | 21 | RECALL, AND THE JURY REACHED PARTIAL VERDICTS AS WE ALL KNOW IN |
| 12:32PM | 22 | THAT CASE. |
| 12:32PM | 23 | THERE WAS UNANIMOUS FINDINGS OF GUILT ON THE FOUR COUNTS |
| 12:32PM | 24 | THAT WE'RE TALKING ABOUT, AND THE JURY FOUND OTHERWISE ON THE |
| 12:32PM | 25 | REMAINING SEVEN COUNTS. |

12:32PM 1    THE COURT -- I'VE LISTENED TO THIS AND TO YOUR COMMENTS,

12:32PM 2    AND I'M PARTICULARLY INTERESTED IN THE RULE 33 AND RULE 29

12:32PM 3    DISCUSSION, WHETHER OR NOT THOSE INVADE THE PROVINCE OF ONE

12:32PM 4    ANOTHER.

12:32PM 5    THE COURT IS GOING TO CONSIDER THIS MOTION PROPERLY BEFORE

12:32PM 6    THE COURT AS A RULE 29 MOTION, AND THAT IS TO SET ASIDE THE

12:32PM 7    JURY VERDICT AND ENTER AN ACQUITTAL ON THE COUNTS REQUESTED.

12:33PM 8    I KNOW MS. HOLMES HAS, ALSO IN YOUR PLEADINGS, YOU RESERVE

12:33PM 9    ARGUMENTS MADE PREVIOUSLY ON THIS ISSUE.

12:33PM 10    MS. SAHARIA:  CORRECT, YOUR HONOR.

12:33PM 11    THE COURT:  AND I'LL NOTE THAT, AND YOU'VE INDICATED

12:33PM 12    SUCH IN YOUR PLEADINGS.  THAT'S ON THE MOTION TO DISMISS THAT

12:33PM 13    THE COURT HEARD SOME TIME AGO.

12:33PM 14    MS. SAHARIA:  AS TO THE STATUTE OF LIMITATIONS.

12:33PM 15    THE COURT:  CORRECT, CORRECT.

12:33PM 16    WE HEARD THAT, AND THE COURT HAS RULED ON THAT, AND OF

12:33PM 17    COURSE YOU'VE PRESERVED YOUR ARGUMENTS ON THAT.

12:33PM 18    BUT THE COURT IS GOING TO LOOK AT THIS MOTION UNDER THE

12:33PM 19    RULE 29 LENS AND CONSIDER YOUR BRIEFING AND CONSIDER YOUR

12:33PM 20    COMMENTS MADE TODAY UNDER THE RULE 29 RUBRIC.

12:33PM 21    LET ME STATE THAT AT THIS POINT, AND THIS IS A PRELIMINARY

12:33PM 22    DECISION, MY INTENT IS THAT -- I'M GOING TO MAKE SOME COMMENTS,

12:33PM 23    BRIEF, THIS MORNING, AND I'LL FOLLOW UP WITH A BRIEF ORDER AS

12:33PM 24    WELL AFTER I'VE REVIEWED WHAT YOU'VE SAID.  SO THIS IS JUST

12:33PM 25    PRELIMINARY.

54

12:33PM  1      BUT OVERALL THE COURT FINDS THAT, LOOKING AT THIS THROUGH

12:34PM  2  THE LENS MOST FAVORABLE TO THE PROSECUTION, THAT THE EVIDENCE

12:34PM  3  DOES SUPPORT, SUPPORT THE JURORS' FINDINGS IN THIS CASE.

12:34PM  4      THE EVIDENCE SHOWED, AND A REASONABLE JUROR COULD FIND,

12:34PM  5  THAT MS. HOLMES AND MR. BALWANI CONSPIRED WITH EACH OTHER,

12:34PM  6  KNOWING ABOUT THE COMPANY'S FINANCIAL SITUATIONS, THEIR DESIRE

12:34PM  7  TO KEEP THE COMPANY GOING, THEIR DESIRE TO MARSHAL FORWARD WITH

12:34PM  8  THEIR IDEAS, AND THE NEED FOR FINANCES TO ACCOMPLISH THAT.

12:34PM  9      WE HEARD, AND THE JURY HEARD RATHER, DIFFERENT WITNESSES

12:34PM 10  TALK ABOUT DIFFERENT TIME PERIODS AND THE FUNDING THAT THE

12:34PM 11  COMPANY HAD AT DIFFERENT TIME PERIODS DURING ITS HISTORY,

12:34PM 12  INCLUDING PRIOR TO THE INDICTMENT PERIOD, AND POST-INDICTMENT

12:34PM 13  PERIOD, TOO.

12:34PM 14      WE HEARD EVIDENCE, AND THE JURY HEARD EVIDENCE OF THE LAB

12:34PM 15  OPERATIONS, BOTH ITS ABILITIES, AND I'LL USE THE WORD

12:35PM 16  "DEFICIENCIES" DURING THE TIMEFRAME, AND THE EVIDENCE -- THERE

12:35PM 17  WAS EVIDENCE OF CONTINUED COMMUNICATIONS BETWEEN MS. HOLMES AND

12:35PM 18  MR. BALWANI.  THOSE ARE EVIDENCED THROUGH THE TEXT MESSAGES

12:35PM 19  THAT WE HEARD ABOUT.  THERE WAS EMAIL.  THERE WERE EMAILS ALSO

12:35PM 20  THAT THE JURY HAD.

12:35PM 21      THESE EMAILS AND TEXTS, MOSTLY EMAILS, TOUCHED ON ISSUES

12:35PM 22  ABOUT REGULATORS AND INTERNAL ISSUES REGARDING THE STATUS AND

12:35PM 23  THE ABILITY OF THE LAB TO PROCESS AND ACCURATELY TEST SAMPLES

12:35PM 24  ON ITS DEVICES AT EACH TIME PERIOD, AS REPRESENTED AT EACH TIME

12:35PM 25  PERIOD.

12:35PM 1       AND THOSE EMAILS, THOSE TEXTS REVEALED TO THE JURY AT

12:35PM 2    LEAST THAT EVIDENCE THAT THEY HEARD AND WE PRESUME THEY

12:35PM 3    DISCUSSED WHEN THEY REACHED THE VERDICTS THEY DID.

12:35PM 4       THE EVIDENCE, THE COURT FINDS, AGAIN PRELIMINARILY, THAT A

12:36PM 5    REASONABLE JUROR COULD FIND THAT THERE WAS EVIDENCE OF

12:36PM 6    MISREPRESENTATIONS TO INVESTORS THAT SUPPORTS THE FINDING OF

12:36PM 7    GUILT AS TO THOSE COUNTS INVOLVING THEM.

12:36PM 8       THERE WAS EVIDENCE ABOUT THE BINDERS THAT WERE PREPARED

12:36PM 9    AND ISSUES THAT THE JURY COULD FIND CONTAINED

12:36PM 10    MISREPRESENTATIONS TO INVESTORS, AND THAT A RATIONAL JUROR

12:36PM 11    COULD FIND THAT MS. HOLMES APPROVED OF THE INFORMATION THAT WAS

12:36PM 12    SUBMITTED INTO EACH OF THOSE BINDERS.  WE HEARD TESTIMONY FROM

12:36PM 13    WITNESSES WHO SUGGESTED THAT.

12:36PM 14       THE LOGOS -- I ASKED YOU SOME QUESTIONS ABOUT THE LOGOS.

12:36PM 15    I WAS CURIOUS ABOUT YOUR THOUGHTS, MS. SAHARIA, ABOUT RATIONAL

12:36PM 16    JURORS, ABOUT HOW THEY SHOULD AND WOULD INTERPRET THAT

12:36PM 17    EVIDENCE, THE PFIZER, THE SCHERING-PLOUGH LOGOS AFFIXED TO

12:37PM 18    DOCUMENTS.

12:37PM 19       THE EVIDENCE WOULD SUPPORT, AND THE COURT WOULD FIND THAT

12:37PM 20    A RATIONAL AND REASONABLE JUROR COULD LOOK AT THAT EVIDENCE AND

12:37PM 21    RECOGNIZE THAT IT PURPORTED TO VALIDATE OR GIVE THE IMPRIMATUR

12:37PM 22    OF THOSE TWO COMPANIES TO THERANOS'S TECHNOLOGY THAT IT

12:37PM 23    OTHERWISE DID NOT DESERVE.

12:37PM 24       AND THAT'S NOT AN OMISSION.  THAT'S RATHER AFFIRMATIVE

12:37PM 25    CONDUCT THAT WAS TAKEN.

12:37PM 1      A RATIONAL JUROR COULD FIND THAT THIS WAS IMPORTANT

12:37PM 2   OBVIOUSLY TO THE COMPANY, TO THERANOS, TO CONTINUE TO PURSUE

12:37PM 3   ITS BUSINESS OPERATIONS, INCLUDING CONTACT WITH WALGREENS AND

12:37PM 4   OTHERS, SAFEWAY.  WE KNOW SAFEWAY WAS INVOLVED AS WELL.

12:37PM 5      THERE WERE -- A RATIONAL JUROR COULD FIND THAT

12:37PM 6   REPRESENTATIONS MADE TO SAFEWAY AND TO WALGREENS DURING THE

12:37PM 7   TIME THAT THE COMPANY WAS INVOLVED IN THOSE NEGOTIATIONS, AND

12:38PM 8   SPECIFICALLY RELATED TO MS. HOLMES, AND I THINK THERE WAS

12:38PM 9   TESTIMONY FROM THE SAFEWAY CEO ABOUT THE NEGOTIATIONS OF THAT

12:38PM 10  CONTRACT.  HE FOUND IT VERY UNIQUE, I RECALL, THAT MS. HOLMES

12:38PM 11  WAS CONDUCTING THOSE NEGOTIATIONS ALONE WITHOUT BENEFIT OF

12:38PM 12  COUNSEL.

12:38PM 13     NOW, I SUPPOSE THERE'S A COUPLE OF WAYS OF LOOKING AT

12:38PM 14  THAT.  ONE WAY IS YOU COULD SAY IT WAS VERY PROVINCIAL OF HIM

12:38PM 15  TO SHE THAT A SMART YOUNG WOMAN COULD NOT HANDLE HERSELF IN

12:38PM 16  THOSE NEGOTIATIONS, AND PERHAPS THAT'S ONE WAY OF LOOKING AT

12:38PM 17  IT.

12:38PM 18     ANOTHER WAY FROM A BUSINESS, AT LEAST A BUSINESS THAT HE

12:38PM 19  WAS FAMILIAR WITH WAS THAT IT'S USUALLY, IN THESE TYPES OF

12:38PM 20  LARGE NEGOTIATIONS, PRUDENT AND ENCOURAGED TO HAVE COUNSEL, AT

12:38PM 21  LEAST COUNSEL PRESENT TO ASSIST WITH ANY QUESTIONS THAT MIGHT

12:38PM 22  COME UP.

12:38PM 23     BUT THE EVIDENCE SHOWED THAT OF COURSE YOUR CLIENT ENGAGED

12:39PM 24  WITH THE CEO IN THOSE NEGOTIATIONS BY HERSELF, MADE

12:39PM 25  REPRESENTATIONS, AND A REASONABLE JUROR COULD FIND THAT IF

12:39PM 1    THERE WERE MISREPRESENTATIONS MADE, THEY WERE MATERIAL AND THAT

12:39PM 2    MS. HOLMES WAS THE SOURCE OF THAT INFORMATION.

12:39PM 3         THE JURY HEARD EVIDENCE THAT MS. HOLMES SHARED MEDIA

12:39PM 4    INFORMATION WITH INVESTORS, AND A RATIONAL JUROR COULD FIND

12:39PM 5    THAT SHE KNEW THIS EVIDENCE TO BE AND THAT INFORMATION THAT WAS

12:39PM 6    SHARED WAS FALSE OR INACCURATE AT A MINIMUM, AND THIS WAS DONE

12:39PM 7    TO FURTHER, TO FURTHER THE EFFORTS OF THE COMPANY THROUGH

12:39PM 8    MS. HOLMES TO GAIN NEW INVESTORS.

12:39PM 9         THE THIRD PARTY LAB MACHINES, THERE WAS A LOT OF EVIDENCE

12:39PM 10   ABOUT WHERE THOSE WERE USED OR NOT USED AND IN WHAT CONTEXT,

12:39PM 11   WHETHER OR NOT THERE WERE REPRESENTATIONS OF THIRD PARTY

12:39PM 12   MACHINES BEING USED SINGULARLY OR IN CONNECTION WITH OR

12:40PM 13   MODIFIED WITH TECHNOLOGY.

12:40PM 14        THE JURORS HEARD DIFFERENT STORIES ABOUT THAT, INCLUDING

12:40PM 15   REPRESENTATIONS MADE THAT AT LEAST ONE WITNESS, MAYBE MORE,

12:40PM 16   TESTIFIED THAT THE INFORMATION THAT CAME FROM THERANOS THROUGH

12:40PM 17   MS. HOLMES WAS THAT THESE TESTS WERE RUN ON A SPECIFIC MACHINE

12:40PM 18   WHEN IT WASN'T ACTUALLY TRUE.  A RATIONAL JUROR COULD FIND THAT

12:40PM 19   THAT -- THAT THOSE REPRESENTATIONS WERE MADE.

12:40PM 20        A RATIONAL JUROR COULD FIND THAT THE TOTALITY OF THE

12:40PM 21   EVIDENCE REGARDING THERANOS'S BUSINESS DEALINGS WITH WALGREENS

12:40PM 22   AND SAFEWAY SHOWED THAT, AGAIN, THAT MS. HOLMES PROVIDED FALSE

12:40PM 23   AND MISLEADING INFORMATION REGARDING THE TRUE FINANCIAL

12:40PM 24   CONDITION OF THE COMPANY AND ITS ACTUAL ABILITY TO PROVIDE

12:40PM 25   FUNCTIONING MACHINES THAT COULD TEST, PROPRIETARY DEVICES THAT

58

12:40PM 1    COULD TEST AS REPRESENTED.

12:41PM 2        A RATIONAL JUROR COULD FIND, BASED ON THE EVIDENCE

12:41PM 3    SUBMITTED, THAT FALSE STATEMENTS AND REPRESENTATIONS WERE MADE

12:41PM 4    TO INVESTORS THAT WERE MATERIAL TO INVESTMENT DECISIONS.

12:41PM 5        HERE IN THIS CASE, AS WE KNOW, THIS JURY DELIBERATED

12:41PM 6    APPROXIMATELY EIGHT DAYS, I THINK IT WAS ABOUT EIGHT DAYS, AND

12:41PM 7    THEY RETURNED A SPLIT VERDICT.

12:41PM 8        THE JURY FOUND MS. HOLMES NOT GUILTY ON COUNTS TWO, TEN,

12:41PM 9    ELEVEN, AND TWELVE.

12:41PM 10       THIS JURY REACHED NO VERDICT, THAT IS TO SAY, THEY WERE

12:41PM 11   UNABLE TO AGREE UNANIMOUSLY AS TO THE ISSUE OF GUILT ON COUNTS

12:41PM 12   THREE, FOUR, AND FIVE.

12:41PM 13       THIS JURY FOUND MS. HOLMES GUILTY ON COUNTS ONE, SIX,

12:41PM 14   SEVEN, AND EIGHT.

12:41PM 15       AND WHILE NOT PERHAPS SPECIFICALLY DIRECTIVE FOR RULE 29

12:41PM 16   PURPOSES, THE JURY'S DELIBERATIONS, AT LEAST THIS HISTORY AND

12:41PM 17   THIS RETURN OF THEIR VERDICT AND FINDINGS, REFLECT THAT THEY

12:42PM 18   TOOK THEIR TASKS SERIOUSLY AND CAREFULLY CONSIDERED ALL OF THE

12:42PM 19   EVIDENCE, THE ARGUMENTS OF COUNSEL, AND THE COURT'S

12:42PM 20   INSTRUCTIONS AS TO EACH OF THE COUNTS ALLEGED, AND THEY

12:42PM 21   ULTIMATELY RETURNED VERDICTS THAT FOUND GUILTY ON ONLY FOUR OF

12:42PM 22   THE ELEVEN CHARGES THAT WERE FILED.

12:42PM 23       THIS SUGGESTS THAT THEY CONDUCTED A THOROUGH AND RATIONAL

12:42PM 24   MAKING DECISION PROCESS IN THEIR FINDINGS.

12:42PM 25       AS I SAID, I'VE READ THE BRIEFINGS AND I'VE HEARD YOUR

59

12:42PM 1    ARGUMENTS AND THEY'VE BEEN VERY HELPFUL.  AND FOR REASONS

12:42PM 2    STATED, AS I SAID, I AM GOING TO READ AND REVIEW THE ITEMS THAT

12:42PM 3    YOU'VE TAKEN AND SUGGESTED THAT THE COURT TAKE REVIEW OF.

12:42PM 4        AT THIS POINT, AS I SAID, THIS IS JUST A PRELIMINARY

12:42PM 5    RULING, BUT AT THIS POINT THE COURT IS GOING TO RESPECTFULLY

12:42PM 6    DENY MS. HOLMES'S RULE 29 MOTION TO SET ASIDE THE JURORS'

12:42PM 7    VERDICT.

12:42PM 8        THE COURT FINDS, AGAIN, THAT LOOKING THROUGH THE LENS THAT

12:43PM 9    THE COURT MUST IN A RULE 29 MOTION, THAT VIEWED IN THE LIGHT

12:43PM 10   MOST FAVORABLE TO THE PROSECUTION, THE COURT FINDS THAT A

12:43PM 11   RATIONAL JUROR COULD FIND AS THEY DID AS TO THE FOUR COUNTS

12:43PM 12   THAT THEY DID AND I'M GOING TO AT THIS TIME RESPECTFULLY DENY

12:43PM 13   THE MOTION.

12:43PM 14       HOWEVER, AS I SAID, THIS IS A PRELIMINARY DECISION.  I'M

12:43PM 15   GOING TO REVIEW YOUR BRIEFING, CANDIDLY, AND THE CASES THAT YOU

12:43PM 16   REFERRED ME TO TODAY, AND I'LL ISSUE A FORMAL WRITTEN ORDER AS

12:43PM 17   QUICKLY AS I CAN.

12:43PM 18       MS. SAHARIA:  YOUR HONOR, WE'LL LOOK AT THE CASES

12:43PM 19   THAT MS. VOLKAR CITED FOR THE FIRST TIME TODAY.  WE'LL SUBMIT

12:43PM 20   SOMETHING, I THINK, ONLY IF THEY MATERIALLY CHANGE ANYTHING.  I

12:43PM 21   DON'T KNOW RIGHT NOW WHETHER THEY DO OR DO NOT.

12:43PM 22       THE COURT:  SURE.  OF COURSE.  OF COURSE.

12:43PM 23       AND I'M NOT GOING TO DENY YOU THAT OPPORTUNITY SHOULD YOU

12:43PM 24   WISH.

12:43PM 25       MS. SAHARIA:  THANK YOU, YOUR HONOR.

UNITED STATES COURT REPORTERS

12:43PM 1          THE COURT:  ALL RIGHT.  ANYTHING ON THIS THEN BEFORE

12:43PM 2   WE --

12:43PM 3          MS. VOLKAR:  NO, THANK YOU, YOUR HONOR.

12:44PM 4          MS. SAHARIA:  YOUR HONOR, I DID JUST WANT TO NOTIFY

12:44PM 5   THE COURT THAT WE DO ANTICIPATE FILING SEVERAL -- ONE OR

12:44PM 6   SEVERAL RULE 33 MOTIONS BASED ON NEWLY DISCOVERED EVIDENCE.

12:44PM 7          THE COURT:  OKAY.

12:44PM 8          MS. SAHARIA:  I EXPECT THAT WE'LL BE FILING THOSE

12:44PM 9   FAIRLY SOON.

12:44PM 10         THE COURT:  OKAY.  THANK YOU FOR THAT INFORMATION.

12:44PM 11  I APPRECIATE THAT.

12:44PM 12         MS. VOLKAR:  YOUR HONOR, IF I MAY BE HEARD ON THAT?

12:44PM 13         THE COURT:  YES.

12:44PM 14         MS. VOLKAR:  IF THEY ARE PLANNING TO FILE SUCH

12:44PM 15  MOTIONS, OF COURSE I THINK I CAN SAY AT THE OUTSET THAT THE

12:44PM 16  GOVERNMENT IS GOING TO OBJECT THAT THEY ARE UNTIMELY, AND IF IT

12:44PM 17  WOULD BE HELPFUL TO THE COURT TO HAVE BRIEFING ON THAT, I DON'T

12:44PM 18  WANT TO UNDULY DELAY PROCEEDINGS.  THIS IS THE FIRST I'M

12:44PM 19  HEARING OF A RULE 33 MOTION.

12:44PM 20         MS. SAHARIA:  WELL, THE DEADLINE FOR MOTIONS BASED

12:44PM 21  ON NEWLY DISCOVERED EVIDENCE HAS NOT YET PASSED, SO I'M NOT

12:44PM 22  SURE WHAT THERE WOULD BE TO BRIEF ON THAT.

12:44PM 23    BUT OF COURSE IF THE GOVERNMENT WANTS TO ARGUE THAT IN

12:44PM 24  RESPONSE TO THE MOTION, IT SHOULD DO THAT.

12:44PM 25         THE COURT:  WELL, I'M NOT GOING TO PRECLUDE ANYONE

| | | |
|---|---|---|
| 12:44PM | 1 | FROM FILING ANYTHING IF YOU WANT TO FILE IT. |
| 12:44PM | 2 | I APPRECIATE THE NOTICE OF THIS. |
| 12:44PM | 3 | MS. SAHARIA:  THANK YOU. |
| 12:44PM | 4 | THE COURT:  AND WE'LL SEE WHAT IS FORTHCOMING AND -- |
| 12:45PM | 5 | MS. SAHARIA:  THANK YOU. |
| 12:45PM | 6 | THE COURT:  -- AND MOVE FORWARD ACCORDINGLY.  SO |
| 12:45PM | 7 | THANK YOU. |
| 12:45PM | 8 | GIVE ME JUST A MOMENT. |
| 12:45PM | 9 | (DISCUSSION OFF THE RECORD.) |
| 12:45PM | 10 | THE COURT:  I HAVE INSTRUCTED OUR COURTROOM DEPUTY |
| 12:45PM | 11 | TO PROVIDE YOU WITH A LETTER THAT WE RECEIVED TO EACH SIDE, AND |
| 12:45PM | 12 | SHE'LL GIVE YOU A COPY OF THIS BEFORE YOU LEAVE TODAY. |
| 12:45PM | 13 | MS. SAHARIA:  THANK YOU. |
| 12:45PM | 14 | MS. VOLKAR:  THANK YOU. |
| 12:45PM | 15 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 12:45PM | 16 | ANYTHING FURTHER? |
| 12:45PM | 17 | MS. VOLKAR:  NO, YOUR HONOR. |
| 12:45PM | 18 | MS. SAHARIA:  NO, YOUR HONOR. |
| 12:45PM | 19 | THE COURT:  THANK YOU.  BE SAFE.  IT'S GOOD SEEING |
| 12:45PM | 20 | EVERYONE AGAIN. |
| 12:45PM | 21 | MS. VOLKAR:  THANK YOU, YOUR HONOR. |
| 12:45PM | 22 | THE CLERK:  COURT IS CONCLUDED. |
| 12:46PM | 23 | (COURT CONCLUDED AT 12:46 P.M.) |
| | 24 | |
| | 25 | |

UNITED STATES COURT REPORTERS

1

2

3                    CERTIFICATE OF REPORTER

4

5

6

7          I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8     STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9     280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10    CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16    _____
      IRENE RODRIGUEZ, CSR, RMR, CRR
17    CERTIFICATE NUMBER 8074

18
               DATED:  SEPTEMBER 1, 2022
19

20

21

22

23

24

25

STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS S. COLTHURST (CABN 99493)
Chief, Criminal Division

JEFFREY B. SCHENK (CABN 234355)
JOHN C. BOSTIC (CABN 264367)
ROBERT S. LEACH (CABN 196191)
KELLY I. VOLKAR (CABN 301377)
Assistant United States Attorneys

    150 Almaden Boulevard, Suite 900
    San Jose, California 95113
    Telephone: (408) 535-5061
    Fax: (408) 535-5066
    Kelly.Volkar@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 18-CR-00258 EJD |
| Plaintiff, | DECLARATION OF KELLY I. VOLKAR IN SUPPORT OF UNITED STATES' OPPOSITION TO DEFENDANT'S ORAL MOTION FOR ACQUITTAL PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 29 |
| v. | |
| ELIZABETH HOLMES, | |
| Defendant. | Court:  Hon. Edward J. Davila |

I, Kelly I. Volkar, declare:

1.     I am an Assistant United States Attorney (AUSA) representing the United States of America, the plaintiff in this case.

2.     Attached hereto as Exhibit 1 is a transcript of audio-only recordings admitted as Trial Exhibits 1647A, 1657A, 1719A, 5473A, 5473B2, 5473C, 5473D2, 5474AB2, 5475A, 5477A, 5478A2, 5480A, 5481A, 5481B, 5481C, 5481D and played for the jury during the testimony of government witness Roger Parloff in *United States v. Holmes*, No. 18-CR-00258, on November 18, 2021; the transcript was produced in discovery to Defendant Holmes starting with Bates TR-002409.

3.     Attached hereto as Exhibit 2 is a transcript of a video recording admitted as Trial Exhibit 2851 and played for the jury during the testimony of government witness Lisa Peterson in *United States v. Holmes*, No. 18-CR-00258, on October 26, 2021; the transcript was produced in discovery to Defendant Holmes starting with Bates TR-000297.

4.     Attached hereto as Exhibit 3 is a transcript of a video recording admitted as Trial Exhibit 3152 and played for the jury during the testimony of government witness Lisa Peterson in *United States v. Holmes*, No. 18-CR-00258, on October 26, 2021; the transcript was produced in discovery to Defendant Holmes starting with Bates TR-000480.

5.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Walnut Creek, California, on April 8, 2022.


DATED: April 8, 2022


*/s/ Kelly I. Volkar*
KELLY I. VOLKAR
Assistant United States Attorney

STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS S. COLTHURST (CABN 99493)
Chief, Criminal Division

JEFFREY B. SCHENK (CABN 234355)
JOHN C. BOSTIC (CABN 264367)
ROBERT S. LEACH (CABN 196191)
KELLY I. VOLKAR (CABN 301377)
Assistant United States Attorneys

      150 Almaden Boulevard, Suite 900
      San Jose, California 95113
      Telephone: (408) 535-5061
      Fax: (408) 535-5066
      Kelly.Volkar@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 18-CR-00258 EJD |
| | ) | |
|     Plaintiff, | ) | UNITED STATES' OPPOSITION TO |
| | ) | DEFENDANT ELIZABETH HOLMES' ORAL |
|     v. | ) | MOTION FOR ACQUITTAL PURSUANT TO |
| | ) | FEDERAL RULE OF CRIMINAL PROCEDURE 29 |
| ELIZABETH HOLMES, | ) | |
| | ) | |
|     Defendant. | ) | |
| | ) | Court:  Hon. Edward J. Davila |
| | ) | |
| | ) | |
| | ) | |

**TABLE OF CONTENTS**

INTRODUCTION……………………………………………………………………...1

BACKGROUND……………………………………………………………………….1

ARGUMENT…………………………………………………………………………...2

A. The Legal Standard Under Federal Rule of Criminal Procedure 29………………………………2

B. The Evidence at Trial Was Sufficient to Support the Jury's Verdict Convicting Defendant of Count 1—Conspiracy to Defraud Theranos Investors…………………………………………………4

C. The Evidence at Trial Was Sufficient to Support the Jury's Verdict Convicting Defendant Holmes of Counts 6, 7, and 8—Wire Fraud Against Theranos Investors………………………6

  1. Defendant Knowingly Participated in a Scheme to Defraud Investors………………………8

    (i)    Misrepresentations Regarding Validation by Pharmaceutical Companies…………...8

    (ii)   Misrepresentations Regarding Theranos' Work with the Department of Defense…..10

    (iii)  Misrepresentations Regarding the Use of Modified and Unmodified Third-Party Devices for the September 2013 Launch of Theranos Tests Available for Patients at Walgreens Stores…………………………………………………………10

  2. Defendant Intended to Defraud—That Is, to Deceive and Cheat—Investors………………14

    (i)    Misrepresentations Regarding the Capabilities of Theranos' Proprietary Analyzer...14

    (ii)   Misrepresentations Regarding the Walgreens Partnership Expanding………………20

    (iii)  Misrepresentations Regarding Theranos' Financial Stability……………………..21

  3. Defendant's False Misrepresentations Were Material…………………………………..…22

  4. Defendant's Scheme to Defraud Involved Interstate Wire Communications………………22

CONCLUSION……………………………………………………………………...…23

## TABLE OF AUTHORITIES

### Cases

*Jackson v. Virginia*,
  443 U.S. 307 (1979)............................................................................... 3
*United States v. Bunker*,
  532 F.2d 1262 (9th Cir. 1976) ............................................................. 3
*United States v. Del Toro-Barboza*,
  673 F.3d 1136 (9th Cir. 2012) ............................................................. 3
*United States v. Gudino*,
  432 F.2d 433 (9th Cir. 1970) ............................................................... 3
*United States v. Jinian*,
  725 F.3d 954 (9th Cir. 2013) ...................................................... 6, 7, 9
*United States v. Lindsey*,
  850 F.3d 1009 (9th Cir. 2017) .................................................. 6, 7, 22
*United States v. Miller*,
  953 F.3d 1095 (9th Cir. 2020) ............................................................. 6
*United States v. Nevils*,
  598 F.3d 1158 (9th Cir. 2010) ............................................................. 3
*United States v. Rocha*,
  598 F.3d 1144 (9th Cir. 2010) ............................................................. 3
*United States v. Stapleton*,
  293 F.3d 1111 (9th Cir. 2002) ............................................................. 2
*United States v. Woods*,
  335 F.3d 993 (9th Cir. 2003) ............................................................... 7
*United States v. Yossunthorn*,
  167 F.3d 1267 (9th Cir. 1999) ............................................................. 3

### Statutes

18 U.S.C. § 1343 .................................................................................... 2
18 U.S.C. § 1349.................................................................................... 2

### Rules

Fed. R. Crim. P. 29.......................................................................1, 2, 3
Fed. R. Crim. P. 29(a)........................................................................... 3
Fed. R. Crim. P. 29(b)........................................................................... 1
.

## INTRODUCTION

The government opposes Defendant Elizabeth Holmes's Motion for Acquittal pursuant to Federal Rule of Criminal Procedure 29 ("Rule 29 Motion").  The government respectfully submits the Court should deny her Rule 29 Motion because the evidence at trial overwhelmingly supports the jury's conviction of Defendant Holmes on Counts 1, 6, 7, and 8.

## BACKGROUND

On August 31, 2021, jury selection began for the trial against Defendant Holmes on twelve counts of conspiring to commit and committing wire fraud against investors in, and paying patients of, the company she founded—Theranos.  *See* ECF Nos. 469 (Third Superseding Indictment), 993 (minute order), 1256 (official trial transcript).  The trial spanned four months and more than 50-trial-related transcripts, covering 36 days of witness testimony and over 900 admitted exhibits.  *See generally United States v. Holmes*, ECF Nos. 1256–1306, 1324.[1]  The government presented testimony from 29 witnesses during its case-in-chief.  *See* ECF No. 1152.  Defendant chose to present a case-in-chief with three witnesses and to testify herself.  *See generally* 11/19/21, 11/22/21, 11/23/21, 11/29/21, 11/30/21, 12/07/21, 12/08/21 Tr.  The relevant facts as presented to the jury at trial will be discussed within the argument section below.

At the close of the government's case-in-chief, Defendant orally made a Rule 29 Motion without any accompanying argument.  *See* 11/19/21 Tr. at 7084:7–25, 7104:17–7105:11.  Defendant simply asserted that "the evidence presented by the government is insufficient on every element of every count[.]"  *Id.* at 7104:19–20.  At the close of all evidence, Defendant timely renewed her Rule 29 Motion orally and offered to file a written submission supporting her argument.  *See* 12/08/21 Tr. at 8646:13–8648:9.  At the Court's suggestion for purposes of trial efficiency, the parties both agreed to file written arguments regarding Defendant's Rule 29 Motion after the jury's verdict.  *Id.* at 8647:22–8648:7.  On both occasions, the Court reserved ruling on Defendant's Rule 29 Motion and took it under submission.  *See id.*; 11/19/21 Tr. at 7105:2–9; *see also* Fed. R. Crim. P. 29(b).

---

[1] Throughout this opposition, the government will refer to the trial transcript using the day of testimony and relevant page and line numbers from the official transcript, all of which are available at ECF Nos. 1256–1306.  The government will refer to admitted Trial Exhibits as "TX" and they are all briefly described at ECF No. 1324.

On January 3, 2022, the jury reached a partial verdict. ECF No. 1235. The jury unanimously found Defendant Holmes guilty of four counts, Counts 1, 6, 7, and 8 of the Third Superseding Indictment ("TSI"), charging conspiracy to commit wire fraud and wire fraud against investors in Theranos, in violation of 18 U.S.C. §§ 1343, 1349. *Id.* The jury did not reach a unanimous verdict with respect to Counts 3, 4, and 5; accordingly, the Court declared a mistrial as to those counts. *Id.*; 01/03/22 Tr. at 9429:11–24.[2] The jury acquitted Defendant Holmes of Counts 2, 10, 11, and 12, charging conspiracy to commit wire fraud and wire fraud against Theranos paying patients. ECF No. 1235.

On January 12, 2022, the Court adopted an extended briefing schedule, stipulated to by the parties, allowing Defendant until March 4, 2022, to file her written Rule 29 Motion, as well as other potential post-verdict motions. ECF No. 1252. Defendant did not file any post-verdict motions by the Court-ordered deadline of March 4, 2022, and the government now responds solely to the pending oral Rule 29 Motion made by Defendant at the close of evidence. *See* 11/19/21 Tr. at 7084:7–25, 7104:17–7105:11; 12/08/21 Tr. at 8646:13–8648:9.

## ARGUMENT

The overwhelming weight of the evidence admitted at trial supports the jury's conviction of Defendant Holmes as to each and every element of Counts 1, 6, 7, and 8 of the TSI, namely conspiracy to commit wire fraud and wire fraud against Theranos investors. A sampling of that evidence is summarized below. While the government uses subheadings for convenience, the government maintains that all evidence included in this opposition as well as additional evidence admitted at trial may support more than one element and/or more than one conviction count. Indeed, the Ninth Circuit has noted that certain essential elements overlap between a conspiracy and substantive scheme to defraud. *See*, *e.g.*, *United States v. Stapleton*, 293 F.3d 1111, 1116–17 (9th Cir. 2002) (internal citation omitted).

### A.    The Legal Standard Under Federal Rule of Criminal Procedure 29

Federal Rule of Criminal Procedure 29 ("Rule 29") permits a court to set aside a jury's guilty verdict and enter a judgment of acquittal only if "the evidence is insufficient to sustain a conviction."

---

[2] The government subsequently dismissed without prejudice all the charges that resulted in a mistrial. ECF No. 1255. The government also dismissed Count 9 with respect to Defendant Holmes at the close of its case-in-chief. ECF No. 1152.

Fed. R. Crim. P. 29(a).  Where a jury has returned a verdict, however, courts must accord great deference to the jury's determination.  *See Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979).  Indeed, "[t]he hurdle to overturn a jury's conviction based on a sufficiency of the evidence challenge is high." *United States v. Rocha*, 598 F.3d 1144, 1153 (9th Cir. 2010).

The Ninth Circuit employs "a two-step inquiry for considering a challenge to a conviction based on sufficiency of the evidence." *United States v. Nevils*, 598 F.3d 1158, 1163–65 (9th Cir. 2010) (en banc) (citing *Jackson*).  First, the evidence as presented at trial must be viewed "in the light most favorable to the prosecution." *Id.* at 1164.  This "standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.  As such, the Court "must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Nevils*, 598 F.3d at 1164 (quoting *Jackson*, 443 U.S. at 326).  Second, the Court must "determine whether this evidence, so viewed, is adequate to allow '*any* rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Jackson*, 443 U.S. at 319) (emphasis in original).  "At this second step, however, a reviewing court may not 'ask itself whether *it* believes that the evidence at the trial established guilt[,]' . . . only whether '*any*' rational trier of fact could have made that finding[.]" *Id.* (quoting *Jackson*, 443 U.S. at 318–19); *see also United States v. Del Toro-Barboza*, 673 F.3d 1136, 1143–46 (9th Cir. 2012).

With respect to the weight of the evidence, the Ninth Circuit has held that the testimony of only a single witness can be sufficient when reviewing a Rule 29 motion for acquittal.  "The testimony of the one witness, if believed, was sufficient to support the conviction, and the resolution of any question as to his credibility was properly entrusted to the jury." *United States v. Gudino*, 432 F.2d 433, 434 (9th Cir. 1970); *see also United States v. Yossunthorn*, 167 F.3d 1267, 1270 (9th Cir. 1999), *as amended* (Mar. 31, 1999) (holding that "uncorroborated testimony of an accomplice is enough to sustain a conviction unless the testimony is incredible or unsubstantial on its face" (quotation omitted)); *United States v. Bunker*, 532 F.2d 1262, 1264 (9th Cir. 1976) ("Credibility is exclusively within the jury's province.").

**B.      The Evidence at Trial Was Sufficient to Support the Jury's Verdict Convicting Defendant of Count 1—Conspiracy to Defraud Theranos Investors**

The evidence admitted at trial unquestionably proved beyond a reasonable doubt that Defendant Holmes knowingly entered an agreement with numerous individuals—including co-Defendant Ramesh "Sunny" Balwani and others—to commit wire fraud by misleading investors in Theranos during the period 2010 to 2015 regarding several topics related to the maturity of the company, its main product, and its prior business relationships.  *See* ECF No. 1206 at 17 (final jury instructions defining elements of conspiracy charge).  The evidence demonstrated that Defendant became a member of a conspiracy with at least co-Defendant Balwani knowing that Theranos needed financial support in order to continue operating as a company and used many different types of knowingly false misrepresentations or half-truths to obtain investments, some of which are summarized in the next section.

The record is replete with examples of Defendant Holmes and co-Defendant Balwani working together and conspiring to effectuate a scheme to defraud investors.  Defendants were constantly in communication via email, text message, and in-person meetings regarding, *inter alia*, the state of the lab and patient testing, Theranos' financials, the Walgreens relationship, progress with investors, and visits to Theranos by state and federal regulators.  *See, e.g.*, TX 1287; TX 1828; TX 2228; TX 4145; TX 4181; TX 4189; TX 4222; TX 4292; TX 4840; TX 5663; 10/19/21 Tr. at 3927:4–23, 4056:12–4059:22 (Daniel Edlin observed Defendants working together and in personal settings and described how Defendants always had next-door offices with a door between, often ate lunch together "and were in discussion with one another"); *see also* 09/22/21 Tr. at 1555:1–19; 09/24/21 Tr. at 1725:6–17, 1732:8–1733:3, 1818:7–1819:9; 09/28/21 Tr. at 1883:6–14, 1912:19–1913:18; 10/06/21 Tr. at 2858:5–2861:1, 2978:22–2981:16; 10/12/21 Tr. at 3167:10–23, 3196:11–22; 11/30/21 Tr. at 7987:10–7991:13 (Defendant commenting on co-Defendant Balwani's response—before it was sent—to Tyler Shultz's concerns regarding testing on Edison devices in spring 2014); *see generally* TX 5387D.

The private and contemporaneous messages between Defendants during the charged period, alone, are strong evidence that they communicated regularly and openly about, among other topics: (i) the financial health of the company, *see* TX 5387D at 3, 7, 10 (discussing in May 2012 "later in [the] year once we get revenue flowing in"), 17 (Defendant said in November 2013 she will "get [ ]

comfortable" with financial models to present to investors while Balwani was in India), 18, 20 ("We are at $15m as of today / Free cash" in late November 2013), 34–35, 54, 68;

(ii) potential investors, including what materials to send them and the amounts they might invest, *see id.* at 16, 26–28 (Defendant sharing that Waltons and Rupert Murdoch intend to invest more than $100 million each), 31–32, 34–35;

(iii) the status of the CLIA laboratory and Theranos' devices' capabilities or lack thereof, *see id.* at 12 (stating in April 2013 "once we get our device perfected"), 14–15, 22 (Defendant asking whether certain tests are available on fingerstick ("fs") in November 2014, showing knowledge that not all tests are available on fingerstick), 23–26 ("Everyone complaining" in November 2014, Defendant said "fundamentally we need to stop fighting fires by not creating them" and co-Defendant said need to "operationalize Normandy"), 29 (co-Defendant said "Normandy lab is a fucking disaster zone"), 30 (discussing how to describe automation), 38, 42, 45–48 (describing fingerstick as "risky" in April 2015), 52, 54 ("I am worried about over exposure without solid substance which is lacking right now."), 56–60 ("Got to succeed in fs [fingerstick]"), 64, 78 ("For a long time to come we will have hybrid solutions" in May 2015), 83, 86, 117 (after negative *Wall Street Journal* article in October 2015, co-Defendant said to Defendant "[w]orried about your 'all fingersticks on our technology' comment");

(iv) the Walgreens relationship, *see id.* at 24–26 ("we can't scale with wag"), 37, 39–42, 65, 73–75, 91, 114, 116 (in October 2015 "WAG freaking out. Lack of transparency");

(v) how to prevent a reporter from writing a negative story and which former employees may be confidential sources, *see id.* at 50–51, 53, 60–61, 63, 76–79 (discussing legal action against Carreyrou's sources, co-Defendant said "I am narrowing this down in CLIA.  Down to 5 people. Will nail this mother fucker" and then "[i]t is Tyler Erika and Adam"), 82, 84–86, 110–113;  and

(vi) how poorly fall 2015 visits from regulators were going, *see id.* at 93–105 (during August 2015 surprise FDA inspection, Defendant said "[r]emember tspu [Theranos sample processing unit] not listed or in use"), 106–108 (during September 2015 CMS inspection co-Defendant said "[v]ery hostile so far" and "[g]oing bad so far. Pray" and Defendant responded "[p]raying continually"), 118–119 (during November 2015 CMS follow up inspection).

In their private messages, Defendants described joint ownership of decisions at Theranos:  in May 2012, co-Defendant Balwani said "no on[e] but you and I can build this business together" and Defendant Holmes responded "I know"; in December 2014, Defendant Holmes said "We together decide what sounds best"; and in July 2015, co-Defendant Balwani admitted "I am responsible for everything at Theranos.  All have been my decisions too."  *See id.* at 7, 30, 33, 36, 87–89, 109.

By 2015, the end of the conspiracy period, Defendants' private messages show that they knew the entire time that their technology was not what they claimed externally:  co-Defendant Balwani said he was "worried about over exposure without solid substance which is lacking right now" and later suggested that they "should think about sharing we have a large reference lab" because "[t]his will shock people"; Defendant Holmes said in April 2015 "***when*** we have FS [fingerstick] live" (emphasis added) and a few months later "[w]e need explicit plan and timeline to being 100% tech" rather than in the CLIA lab; and co-Defendant Balwani said in September 2015 while discussing issues with the FDA inspection "people will talk about our fingerstick[ w]ithout us talking about it[.]"  *See id.* at 46–47, 54, 60, 83, 102.

In sum, the evidence referenced above and the evidence in below sections support the jury's verdict convicting Defendant Holmes of conspiracy to commit wire fraud against Theranos investors.

### C.   The Evidence at Trial Was Sufficient to Support the Jury's Verdict Convicting Defendant Holmes of Counts 6, 7, and 8—Wire Fraud Against Theranos Investors

The evidence at trial overwhelmingly proved beyond a reasonable doubt that Defendant Holmes committed wire fraud against Theranos investors as charged in Counts 6 (re: PFM Health Sciences), 7 (re: RDV Corporation), and 8 (re: Daniel Mosley) of the TSI.  *See* ECF No. 1235.  The elements of wire fraud are: (1) the existence of a scheme to defraud, (2) material false statements, misrepresentations, or half-truths, (3) an intent to defraud, meaning an intent to deceive and cheat, and (4) the use of an interstate wire communication to further the scheme.  *See* ECF No. 1206 at 23–25 (final jury instructions defining elements of wire fraud); *United States v. Lindsey*, 850 F.3d 1009, 1013–14 (9th Cir. 2017); *United States v. Jinian*, 725 F.3d 954, 960 (9th Cir. 2013).  A scheme to defraud is a deceptive scheme or plan to "obtain money or property by means of false or fraudulent pretenses, representations, or promises."  *United States v. Miller*, 953 F.3d 1095, 1103 (9th Cir. 2020) (internal

quotation omitted).  "The element of materiality is evaluated under an objective test," examining "the intrinsic capabilities of the false statement itself" and "the propensity or capacity to influence or affect a lender's decision[,]" rather than "actual reliance upon the defendant's misrepresentations[.]"  *Lindsey*, 850 F.3d at 1014 (internal quotations and citations omitted).  However, the government is not required "to prove a specific material false statement on which the jury unanimously agreed" so long as the evidence shows that the scheme as a whole was "reasonably calculated to deceive."  *United States v. Woods*, 335 F.3d 993, 998 (9th Cir. 2003).  Finally, the wire communication itself "need not be an essential element of the scheme, just a step in the plot[.]"  *Jinian*, 725 F.3d at 960 (quotation omitted).

Defendant Holmes secured dozens of investors in Theranos over several years by falsely claiming that Theranos had manufactured one single, proprietary blood analyzer device that could run any blood test that was run by conventional labs, all from a blood sample drawn via a fingerstick rather than the traditional draw from a vein, with higher accuracy and less variability than traditional methods, due in part to its more automated process that reduced human error inherent in running blood tests in a laboratory.  To support her bold claims, Defendant repeatedly told potential investors that Theranos' technology had been comprehensively validated by multiple major pharmaceutical companies and was being used in the battlefield by the Department of Defense to treat wounded soldiers.  Defendant also asserted that Theranos was a profitable company and had a healthy ongoing relationship with retail pharmacy company Walgreens, through which it provided blood tests to patients beginning in September 2013.

As described below, these statements were made to Theranos investors, including PFM Health Care, RDV Corporation, and Daniel Mosley whose investments form the basis for Counts 6, 7, and 8 of the TSI, respectively, in addition to other investors or potential investors during the same time periods. Indeed, many of these false statements as described in more detail below were also included in written materials that were provided to investors, and a former Theranos employee testified that Defendant Holmes approved the material for binders sent to investors.  *See*, *e.g.*, TX 3387; TX 4077; TX 4858; 10/19/21 Tr. at 3993:15–4001:25.

In truth, Theranos' proprietary device could never complete more than 12 types of blood tests, often with less accuracy, less automation, and more variability than traditional "predicate" machines

manufactured by third-party companies, such as Siemens AG.  Because of these shortcomings, pharmaceutical companies did very little work with Theranos and did not validate its technology, and the Department of Defense never used Theranos' analyzer to clinically treat soldiers.  Theranos had zero revenue in 2012 and 2013 and desperately needed new sources of cash.  Defendants hid the shortcomings of Theranos' proprietary device by using—without telling potential investors—modified and unmodified third-party machines to fulfill the remainder of Theranos' available blood test menu to patients at Walgreens stores.  As a result, Theranos' relationship with Walgreens was faltering because the percentage of traditional venous draws was too high.  But none of this information was shared with PFM Health Care, RDV Corporation, and Daniel Mosley, or other investors.

The government presented a plethora of trial testimony and exhibits demonstrating Defendant Holmes knowingly made false or misleading statements or misrepresentations to investor-victims with the intent to deceive and cheat Theranos investors.  A small sampling of the evidence introduced at trial demonstrating these facts is summarized below by juxtaposing what insiders at Theranos knew—and were telling Defendant—with what Defendant was saying externally to investors at certain key times.

### 1.    Defendant Knowingly Participated in a Scheme to Defraud Investors

Below is a non-exhaustive list of select examples from a few categories of misrepresentations showing that Defendant Holmes knowingly participated in, devised, or intended to devise a scheme or plan to defraud investors, for the purpose of obtaining money or property through deceptive means.  As previously stated, the government includes subheadings for convenience, but the excerpts of evidence frequently support more than one element and more than one count.

### (i)    Misrepresentations Regarding Validation by Pharmaceutical Companies

Theranos did some limited work for a handful of pharmaceutical companies but, by 2010, the work and resulting revenue was drying up.  *See* TX 7753.  In January 2009, Shane Weber spoke telephonically with Defendant to inform her that "Pfizer did not have at this time a foreseeable use for the Theranos immunoassay device" and Mr. Weber was "polite, clear, crisp and patiently firm as she pushed back."  TX 0174.  Also in early 2009, Theranos was having difficulty paying vendors and at one point struggled to make payroll.  09/08/21 Tr. at 633:2–635:8.  Co-Defendant Balwani personally

guaranteed a loan to help keep the company afloat. *See id.*; *but see* TX 5387D (co-Defendant Balwani in June 2011 said "we will get a [private] plane for these short journeys after C2" fundraising).

Theranos prepared purported validation reports of its work for Pfizer and Schering Plough, but neither pharmaceutical company endorsed the conclusions in those reports or authorized Theranos to affix the company's logo to the reports. 10/22/21 Tr. at 4396:12–4402:25; 11/02/21 Tr. at 5039:14–5048:3; *see also* 09/29/21 Tr. at 2336:19–2340:7 (discussing TX 3893).

Nevertheless, in April 2010, Defendant Holmes emailed representatives of Walgreens—attaching the same reports Theranos sent to pharmaceutical companies but now altered to include Pfizer's and Schering Plough's logo and with enhanced conclusions—and referred to the reports as "three independent due diligence reports on Theranos systems." TX 0291; 10/22/21 Tr. at 4396:12–4402:25; 11/02/21 Tr. at 5039:14–5048:3. *Compare* TX 0143, *and* TX 0259, *with* TX 0291. Defendant further described the reports as "*from* GlaxoSmithKline, Pfizer, and Schering Plough after their own technical validation and experience with Theranos Systems in the field[,]" TX 0291 (emphasis added), and the Walgreens executive who received these reports understood that to mean either that Pfizer authored the report or approved what was written. 10/12/21 Tr. at 3186:6–3190:6.[3]

Years later, in 2013 and 2014, Defendant continued to share these altered reports—including the Pfizer-related report—with other investors, such as RDV Corporation and Mr. Mosley, who testified at trial that they had believed Pfizer authored the report, not Theranos, and that added credibility to Defendant's claims about Theranos' technology. *See, e.g.*, 10/26/21 Tr. at 4681:11-4683:20, 4667:3–12; 11/02/21 Tr. at 5108:4–5110:2, 5126:12–5128:14; *see also* TX 5387D at 16 (Defendant texting co-Defendant that she is planning to include the Pfizer report to send to investors).

This evidence, along with additional evidence presented at trial, was sufficient to show that Defendant Holmes knowingly participated in a scheme to defraud investors—including Walgreens, PFM Health Care, RDV Corporation, and Daniel Mosley—by falsely suggesting that Pfizer, Schering Plough, and other pharmaceutical companies comprehensively validated Theranos' technology when, in truth, they had not.

---

[3] During her testimony, Defendant Holmes admitted to adding the logos to these reports and altering the conclusions shortly before sending to Walgreens in April 2010. 11/23/21 Tr. at 7478:15–23.

(ii)     **Misrepresentations Regarding Theranos' Work with the Department of Defense**

Defendant also lied to investors about use of the Theranos analyzer by the Department of Defense on medevac helicopters, "in the battlefield[,]" or to treat soldiers in Afghanistan or Iraq. 11/16/21 Tr. at 6379:12–22, 6382:25–6383:11, 6383:22–6384:6; *see, e.g.*, 10/06/21 Tr. at 2995:18–2998:7; 10/26/21 Tr. at 4658:9–4659:4; 11/04/21 Tr. at 5441:13–5442:10; 11/18/21 Tr. at 6930:1–6933:19 (discussing audio recording in TX 5478A2).[4]  In truth, Defendant knew that Theranos' proprietary analyzer was never used by the Department of Defense to clinically treat patients or for anything other than minimal studies with predetermined outcomes.  *See* 09/22/21 Tr. at 1542:3–1543:8; 10/19/21 Tr. at 4018:17–4019:18, 4053:1–4054:3, 10/20/21 Tr. at 4267:4–16; *see also* TX 0588.

(iii)    **Misrepresentations Regarding the Use of Modified and Unmodified Third-Party Devices for the September 2013 Launch of Theranos Tests Available for Patients at Walgreens Stores**

From 2010 to 2013, Walgreens and Safeway worked with Defendant in an attempt to get Theranos' miniaturized blood testing device in their respective stores.  Former Walgreens executive Wade Miquelon testified that, as of June 2012, he understood that Theranos would be using its own analyzer to test patient blood samples—not modified third party devices—and it would use unmodified third-party machines for esoteric tests at most, but "the vast majority of tests would be done on a Theranos machine."  10/13/21 Tr. at 3399:11–3400:8.  Steve Burd, former CEO of Safeway, who also partnered with Theranos beginning in 2010, testified that modified third-party machines would not be as interesting because the device "has to be sufficiently different from everybody else in the market."  10/06/21 Tr. at 2977:12–2978:13.  By May 2013, Theranos' partnership with Safeway was waning as Defendant did not deliver the device she promised and thus Safeway did not make its final payment.  *See, e.g.*, 10/12/21 Tr. at 3046:5–3047:15.  Defendant promised Walgreens that Theranos would be ready to launch by September 2013.  *See* 09/17/21 Tr. at 1215:1–1216:12.

---

[4] While transcripts of Mr. Parloff's recordings were not provided to the jury, the official transcript does not capture the audio discussion, and thus the government submits them for the Court's convenience. *See* Declaration of Kelly I. Volkar in support of United States' Opposition to Defendant's Motion for Acquittal, Exhibit 1 at 17 (Bates TR-002425).

Throughout the summer of 2013, insiders at Theranos reported consistent problems with the various iterations of Theranos' device. Former Theranos scientist Surekha Gangakhedkar testified that, in July 2013, the research and development team was focused on preparing Theranos' 4.0 device for clinical use but there was not any imminent plan to launch the device for use on patients. 09/17/21 Tr. at 1184:3–1185:24; *see also* TX 0860. However, when Ms. Gangakhedkar returned from a vacation on August 17, 2013, she learned Defendant changed the plan, Theranos would modify third-party devices, and Theranos was going to launch tests for use on patients, using an older version, Edison 3.0 and 3.5, which was a "stopgap method" until the 4.0 device was ready. 09/17/21 Tr. at 1184:24–1187:14; *see also* TX 1020 (communicating Defendant's priority in August 2013 to validate 61 assays on the 3.x (Edison) and 27 on the Siemens Advia). Defendant pressured and rushed the scientists to quickly validate assays for clinical use on these older devices. 09/17/21 Tr. at 1187:15–1188:12; 09/24/21 Tr. at 1722:6–1725:17 (discussing TX 3231).

On August 29, 2013, Theranos' then-CLIA laboratory director, Dr. Adam Rosendorff, raised concerns to Defendant Holmes about the timing of the launch. 09/24/21 Tr. at 1726:1–1733:3; TX 1049. He testified at trial that, in response, Defendant Holmes "was very nervous" and "not her usual composed self. She was trembling a little bit, her knee was tapping, her voice was breaking up. She was clearly upset. . . . She didn't seem surprised to me. She just seemed nervous and upset." 09/24/21 Tr. at 1726:1–1733:3. Ms. Gangakhedkar also consistently raised issues with testing on Theranos devices to Defendant throughout the end of August and early September 2013. *See* 09/17/21 Tr. at 1184:24–1187:14; TX 0972.

However, also in August 2013, Theranos was running out of money and sought to receive an advanced payment from Walgreens, but the Walgreens payment was contingent on a consumer launch. 10/13/21 Tr. at 3402:2–3406:3 (discussing TX 0971), 3397:6–3400:22 (discussing TX 0617); 09/14/21 Tr. at 717:2–720:22 (discussing TX 5172). That month, Defendant and other Theranos employees provided a demonstration to Walgreens representatives with a Theranos device present, and one of those representatives, Nimesh Jhaveri, testified that he understood the demonstration to represent "the experience that potentially a patient would" have; in reality, the Walgreens representatives' samples

were run on a third-party machine.  10/14/21 Tr. at 3694:24–3696:1; 10/19/21 Tr. at 3933:2–3938:11 (discussing TX 0957 and TX 0966).

By September 2013, Defendant Holmes had promised investor-victim Walgreens that Theranos would be ready to start providing blood tests to Walgreens' customers in certain stores, but Theranos had not validated a single assay for clinical (patient) use on any version of its proprietary blood analyzer device (the Edison, 3.0, 3.5, 4.0, TSPU, etc.).  09/24/21 Tr. at 1722:6–1725:17; *see, e.g.*, TX 3959 (no assays validated on Theranos system for clinical use as of August 31, 2013); TX 3231; TX 4533. Instead, without telling Walgreens, Theranos began using third party machines—modified and unmodified—to run the vast majority of tests received from patients at Walgreens.  *See, e.g.*, 09/24/21 Tr. at 1774:4–1776:13; TX 3959 (Defendant asking for number of assays validated on Siemens Advia and "other platforms"); *cf.* 10/14/21 Tr. at 3694:24–3696:1.

On September 5, 2013, Ms. Gangakhedkar resigned because of her concerns with the reliability of running patient tests on Theranos' 3.0 and 3.5 devices, and when she expressed these concerns to Defendant, Holmes responded that "she has a promise to deliver to the customer [Walgreens], she doesn't have much of a choice but to go ahead with the launch."  09/17/21 Tr. at 1215:1–1216:12, 1219:12–24.  Ms. Gangakhedkar also "felt that it was not the right thing to do" to launch when Theranos was not ready to provide fingerstick testing to patients because she "believed that the launch was based on using the nanotainers [collecting from a fingerstick] instead of using samples drawn by venous blood."  *Id.* at 1216:13–1218:10.  The same day Ms. Gangakhedkar resigned due to accuracy concerns, Defendant also received feedback from lawyers on changes to the website, including "[r]eplace highest levels of accuracy with high levels of accuracy[,]" "remove references to 'all' tests and replace with statements such as 'multiple' or 'several' [i]t is highly unlikely that the laboratory can perform every conceivable test[,]" and "[e]nsure substantiation for claim '1/1000 the size of' typical blood draw[.]" TX 3981.  *But see* TX 3387; TX 4077; TX 4858 (PowerPoints later provided to investors still contain these statements).

On September 8, 2013, the *Wall Street Journal* published a piece about Theranos that claimed that Theranos "devices [ ] automate and miniaturize more than 1,000 laboratory tests" and that "Theranos's processes are faster, cheaper and more accurate than the conventional methods and require

only microscopic blood volumes, not vial after vial of the stuff." TX 1106. Defendant Holmes had the opportunity to review and edit the substance of the article in the days prior to its release. TX 1090. The next day, Theranos and Walgreens issued a joint press release stating that samples would be "taken from a tiny finger stick or micro-sample taken from traditional methods, eliminating the need for larger needles and numerous vials of blood required for most diagnostic lab testing." TX 1113. At the time, Theranos had not validated a single assay for clinical use on its devices. *See* TX 4533; 09/24/21 Tr. at 1722:6–1725:17. Nevertheless, Defendant shared the *Wall Street Journal* article and Walgreens press release with potential investors. *See* TX 1102; 11/02/21 Tr. at 5085:2–7, 5114:20–5116:4 (shared with investor-victim Daniel Mosley); 11/16/21 Tr. at 6417:4–6418:23 (shared with investor-victim PFM and representative Brian Grossman testified it was "critical" because "[i]t represented a transition for this business from being a risky early stage company to being a commercial business, and it changed the nature of the investment and the risks of the investment"); *see also* 09/14/21 Tr. at 717:2–720:22 (describing incoming investments in late September 2013 and in February 2014); TX 1770 (sharing June 2014 *Fortune* article with investors).

When former Theranos employees attempted to expose the truth to John Carreyrou, a reporter from the *Wall Street Journal*, Defendants retaliated by threatening expensive lawsuits against the former employees and attempted to shield the truth from Mr. Carreyrou while he was investigating the claims. *See*, *e.g.*, 09/15/21 Tr. at 981:19–986:5; TX 5387D at 50–51, 60–61, 63, 76–79 (discussing legal action against Carreyrou's sources, co-Defendant said "I am narrowing this down in CLIA. Down to 5 people. Will nail this mother fucker" and then "[i]t is Tyler Erika and Adam"), 82, 84–86 (discussing sending lawyer's letter to Erika Cheung and "Adam 100% the source to JC").

The evidence described above, and throughout this opposition, demonstrates that Defendant Holmes knew Theranos' proprietary device could not do what she claimed externally to investors, and she hid that fact by using modified and unmodified third-party devices to perform patient tests without telling Walgreens or other investors. Indeed, Defendant went to great lengths to prevent former employees from telling the public that Theranos used third-party machines. Thus, the jury's conclusion that Defendant knowingly devised or participated in a scheme to defraud investors was well-supported.

### 2. Defendant Intended to Defraud—That Is, to Deceive and Cheat—Investors

In addition to the evidence described above, the government presented ample additional evidence to demonstrate that Defendant intentionally defrauded individual investors PFM Health Care (Count 6), RDV Corporation (Count 7), Daniel Mosley (Count 8), and others, by lying about, among other things, the capabilities of Theranos' proprietary analyzer, the status of Theranos' relationship with Walgreens, and Theranos' financial state. Externally, to investors, the public, and the press, Defendant Holmes falsely claimed that Theranos had manufactured one single, proprietary blood analyzer device that could run any blood test that was run by conventional labs, all from a blood sample drawn via a fingerstick rather than the traditional draw from a vein, with higher accuracy and less variability than traditional methods, due in part to its more automated process that reduced human error inherent in running blood tests in a laboratory. Internally, scientists and lab employees kept both Defendants informed that Theranos' proprietary device could never complete more than 12 types of blood tests, often with less accuracy, less automation, and more variability than traditional "predicate" machines manufactured by third-party companies, such as Siemens AG. In turn, these shortcomings increasingly negatively impacted Theranos' relationship with Walgreens. Below are select examples of Defendant's intent to defraud individual investors.

### (i) Misrepresentations Regarding the Capabilities of Theranos' Proprietary Analyzer

The problems that former Theranos scientists identified for Defendant prior to the Walgreens launch, and beginning patient testing, continued throughout the winter of 2013 and spring of 2014. But Theranos was running out of money again—Defendants discussed via text message how they had only $15 million in cash remaining in late November 2013. TX 5387D at 20; *see also* 09/14/21 Tr. at 719:15–720:2 (describing burn rate of $1–2 million per week in fall 2013).

Erika Cheung, a lab associate at Theranos from October 2013 until April 2014 who regularly ran tests on the Edison 3.0 or 3.5 device first in research and development and then for live patient samples, testified at trial how quality control or QC was important to know whether a device was working—but QC constantly failed on Theranos' Edison device. 09/14/21 Tr. at 789:15–791:4, 841:7–845:4; 09/15/21 Tr. at 910:8–918:14, 920:17–925:3, 957:19–971:19; 09/17/21 Tr. at 1134:14–1135:22; *see also* TX 4943

(patient impact assessment re QC failures). Defendant Holmes knew of these problems and recommended switching to using "traditional methods" as a solution. *See, e.g.*, TX 1287; 09/14/21 Tr. at 845:17–847:3; 09/15/21 Tr. at 973:1–981:18 (discussing TX 1660). Indeed, Defendant hid the issues in the lab from government regulators by directing them on a path that included FDA-approved machines and did not include Theranos' proprietary devices. *See* TX 4047; 10/15/21 Tr. at 3866:2–8; *see also* TX 1295; 09/15/21 Tr. at 944:11–946:12, 953:7–23.

Ms. Cheung testified that Theranos used its proprietary analyzer for no more than seven assays while she worked at Theranos, used modified third-party machines for several more tests, but used unmodified third-party machines for the bulk of its testing. 09/14/21 Tr. at 810:15–814:21 (discussing TX 3741A, Theranos' menu of tests); *see also* 09/15/21 Tr. at 901:7–904:16, 938:19–939:25, 944:11–946:12, 955:1–11; 09/17/21 Tr. at 1081:21–1083:22; TX 4533; *cf.* 11/16/21 Tr. at 6416:7–6417:1, 6426:23–6427:10 (references to hundreds of tests on Theranos' menu that investor was led to believe were all run on Theranos' minilab). Ms. Cheung described the 4.0, also known as the minilab, "which was essentially a device that was meant to be able to process all of the different types of tests" but "it was still in development [and] didn't have that capacity while [Ms. Cheung] was working for the company." 09/14/21 Tr. at 804:21–806:7; 09/17/21 Tr. at 1181:12–14; *cf.* 11/16/21 Tr. at 6396:2–23 (investor testifying that Defendant held out the minilab as the device that was being used to test patient samples). Ms. Cheung testified that the unmodified third-party machines were more automated than Theranos' proprietary device, which always required the use of a non-Theranos manufactured machine called the Tecan. 09/14/21 Tr. at 800:2–810:14; 09/15/21 Tr. at 901:7–907:1, 929:22-932:9; 09/17/21 Tr. at 1140:3–19; *cf.* 11/16/21 Tr. at 6432:17–20, 6434:1–5 (Defendant told investor that Theranos was "vertically integrated").

Ms. Cheung also testified that the Edison had greater variability than the third-party machines and discussed two specific examples of Vitamin D and HDL. 09/14/21 Tr. at 817:5–818:11, 836:21–837:9, 844:8–850:10; 09/15/21 Tr. at 926:5–929:5, 949:10–951:11, 954:2–955:21, 964:15–965:6, 975:8–978:24; *see also* 09/17/21 Tr. at 1131:8–1134:20, 1195:18–1196:24; 09/24/21 Tr. at 1810:6–1819:6; TX 1543; TX 1555; TX 1432; *cf.* 11/16/21 Tr. at 6380:19–25, 6419:13–6421:13 (Defendant told investor that coefficient of variation for Vitamin D and HDL was 25-30% higher on conventional

equipment).  Theranos employed a practice of removing two out of six results—deemed "outliers"—in an attempt to reduce this variability.  *See* 09/14/21 Tr. at 849:9–850:10; 09/15/21 Tr. at 911:24–914:8, 933:25–935:21; 09/17/21 Tr. at 1141:13–1142:3; 09/24/21 Tr. at 1751:3–1753:15.

That's not what Defendant Holmes told Brian Grossman, the managing partner and chief investment officer at PFM Health Sciences ("PFM"), a regulated investment entity, who had over twenty years of experience covering the BioTech sector as an analyst or investor.  *See* 11/16/21 Tr. at 6374:10–6376:12.  Mr. Grossman, on behalf of PFM, met with Defendant Holmes and co-Defendant Balwani for approximately an hour in December 2013, and again in early January 2014 after Mr. Grossman sent more than two pages of due diligence questions to discuss as PFM considered investing in Theranos.  *Id.* at 6377:5–6385:23, 6391:22–6392:9, 6400:23–6404:18; TX 1404.  Mr. Grossman testified that Defendant did most of the talking during the December 2013 meeting and they mostly discussed Theranos' technology.  11/16/21 Tr. at 6378:22–6379:11, 6385:1–5.  Specifically, Defendant told PFM that Theranos "could do all – over a thousand CPT codes with their technology," that Theranos' "technology was actually better than conventional laboratory equipment, which suffered from a huge amount of variability . . . due to humans" processing the samples, and Theranos' automation "eliminated the human aspect of that, and as a result it had dramatically less variability from test to test, from machine to machine[,]" and that Theranos' analyzer was a comprehensive "laboratory shrunk down into a [small] box" named the minilab.  11/16/21 Tr. at 6379:8–11, 6380:9–18, 6381:1–6382:24, 6384:7–25, 6396:20–6398:9.  Defendant also told PFM that Theranos was "vertically integrated"—"meaning that they made their own analyzers as opposed to using third parties"—"which was unusual for companies in the diagnostic space[.]"  11/16/21 Tr. at 6432:17–20, 6434:1–5.

Similar statements were repeated to Mr. Grossman and other PFM representatives during their January 10, 2014, meeting with Defendant after asking due diligence questions that PFM intended to ensure "there was no ambiguity" and "no confusion about what the technology was capable of doing"—Mr. Grossman testified that "[t]he answer was that there were no limitations."  11/16/21 Tr. at 6394:19–6395:13, 6405:19–6406:14, 6407:17–6408:18; *see also* TX 1404.  Defendant Holmes told PFM that Theranos "had waited this long to launch a retail product [because] they wanted to make sure that they had complete coverage, 100 percent coverage of what Quest and LabCorp could offer" and the company

had accomplished that by this meeting in January 2014. 11/16/21 Tr. at 6404:19–6405:25; *see also id.* at 6381:5–24. Mr. Grossman testified that Defendant held out the minilab as Theranos' proprietary device that was running patient samples collected at Walgreens (*id.* at 6396:20–23), and Defendant never told PFM that its analyzer was only being used to run a handful of tests in the CLIA lab, never told PFM that Theranos was using modified third-party machines, and never told PFM that Siemens or other third-party machines were used to do the blood testing. 11/16/21 Tr. at 6395:22–6396:23, 6400:23–6403:1, 6413:5–9, 6414:7–6415:23, 6442:18–6443:15, 6448:1–10.

Indeed, Mr. Grossman had his blood tested at a Walgreens offering Theranos' services, received a venous draw rather than fingerstick, and was never told that some of the tests he ordered were run on a third-party machine—Immulite—rather than a Theranos analyzer. *See* 11/16/21 Tr. at 6455:12–6457:14; TX 1491; *see also* 09/24/21 Tr. at 1739:3–1741:5. Finally, Mr. Grossman received written materials from Defendants that repeated the same misrepresentations they told him orally during their first two meetings: "Theranos runs any test available in central laboratories, and processes all sample types"; references 800+ test menu; "all 1,000 plus currently run tests/CPT codes are available through Theranos"; and "the unprecedented lack of variation from system to system yields higher integrity data." 11/16/21 Tr. at 6408:19–6429:5; TX 4077. PFM invested in Theranos in early February 2014. *Id.* at 6460:1–6461:24; TX 1506. There was thus ample evidence from which the jury could infer that Defendant intended to deceive and cheat PFM out of something valuable.

Problems within Theranos' lab—including trying to run patient samples on Theranos' proprietary device and modified third-party devices—continued throughout 2014. *See*, *e.g.*, 09/24/21 Tr. at 1765:6–1766:22, 1790:1–14, 1825:10–1828:24 (discussing TX 4189); TX 1717; TX 2228; TX 4124; TX 4145; TX 4181; TX 4189; TX 4222; TX 4292; TX 5413; *see also* TX 3070.

By September 2014, Defendant's brother, Christian Holmes who also worked at Theranos, wanted to have "a candid conversation" with Defendant because "it's pretty obvious we have issues with calcium, potassium and sodium specifically" and asked for Defendant's thoughts on "considering to stop reporting these tests" until resolved. TX 1953. Dr. Adam Rosendorff, the lab director at the time, expressed increasing concerns and dismay at the "number and severity of issues" and "high frequency of doctor complaints." 09/28/21 Tr. at 1939:4–24. Dr. Rosendorff escalated his concerns to management,

including Defendant, but he felt "management was paying lip service to this issue[.]"  *Id.* at 1913:4–18.
Theranos could perform no more than 12 tests on its own device.  TX 4533.  Defendant even asked then-
member of Theranos' Board of Directors, General James Mattis, not to discuss "on the record" with a
reporter from *The New Yorker* "that there is a single device that does all tests" (TX 4196), which
General Mattis testified "was rather strange because I thought we had been kind of out front that there's
a single device and why would we want to hide that."  09/22/21 Tr. at 1575:11–1578:5.

But Defendant told a different story externally to investors throughout fall 2014.  *See*, *e.g.*,
TX 2223 (early investor Alan Eisenman emailed Defendants in early October 2014 about claims that
Theranos' tests are being processed in a central lab and are less reliable, co-Defendant responds "sounds
like an uninformed consultant").  Daniel Mosley, then a trusts and estates partner at Cravath, Swaine,
and Moore LLP, learned of Theranos in summer 2014 through one of his long-time clients, Dr. Henry
Kissinger, who was on the Board of Directors of Theranos.  11/02/21 Tr. at 5071:11–5073:22.  On
August 18, 2014, Defendant Holmes sent Mr. Mosley a cover letter and binder of materials about
Theranos, which Mr. Mosley reviewed at Dr. Kissinger's request to evaluate the company as an
investment opportunity.  *Id.* at 5078:8–5083:22, 5092:10–5116:13, 5119:10–5120:5; TX 4173;
TX 3387; TX 4197.  Mr. Mosley understood from Defendant and the written materials that Theranos'
technology could currently run "comprehensive blood tests" from a finger stick "without having to use a
large needle" with the exception of tests that might require a throat swab or other bodily fluids besides
blood.  11/02/21 Tr. at 5097:10–5100:9, 5102:4–5104:1; 11/03/21 Tr. at 5375:6–5379:13.  Mr. Mosley
did not know that Theranos used third party machines to run the majority of its tests.  *Id.* at 5097:10–
5100:9, 5104:2–19.  In October 2014, Mr. Mosley met with Defendant Holmes in person and "had a
long conversation about Theranos and the technology" during which everything he learned was
consistent with what he had read in the materials she provided to him earlier, in August 2014.  *Id.* Tr. at
5141:7–5142:17.  Mr. Mosley personally invested in Theranos on October 31, 2014.  TX 4845.

Mr. Mosley introduced Defendant to other potential investors, including RDV Corporation
("RDV").[5]  10/26/21 Tr. at 4644:5–10; 11/02/21 Tr. at 5120:6–5122:21.  In fall 2014, both members of

---

[5] RDV Corporation is the family office for the DeVos family and an investment advisor.  10/26/21 Tr. at
4634:16–25.

RDV and Daniel Mosley received copies of a *Fortune* cover article about Defendant Holmes and Theranos, which asserted that Theranos did not use third party machines.  TX 1776; TX 1944; 10/26/21 Tr. at 4640:1–4643:4, 4680:21–4681:5; 11/02/21 Tr. at 5104:20–5107:8, 5116:5–13.  Roger Parloff, the author of that *Fortune* article, testified that the source of that information was Defendant, herself. 11/18/21 Tr. at 6944:1–6947:10, 6953:20–6956:8.

On October 3 and 14, 2014, representatives of RDV, including Lisa Peterson who works in the investment group, participated first in a phone call with Defendant Holmes and then flew out to Theranos' headquarters in person to discuss potentially investing in Theranos.  *See* 10/26/21 Tr. at 4634:16–25, 4645:11–4650:25, 4660:7–4662:22, 4668:2–25.  Ms. Peterson testified that she learned from Defendant Holmes and the materials she provided that Theranos could run hundreds of tests from "a pinprick and a drop of blood," those tests were purportedly more accurate and "100 percent automated, no manual handling of the sample," and that "Theranos uses their own analyzer equipment[.]" 10/26/21 Tr. at 4653:11–4658:25.  Ms. Peterson testified that Defendant told RDV multiple times that Theranos could perform hundreds of tests from a fingerstick and showed RDV representatives the Theranos analyzer when they were in person at Theranos.  10/26/21 Tr. at 4660:7–4662:22, 4668:2–25.  RDV was given written materials that repeated similar claims.  *See* TX 4858; TX 1853; 10/26/21 Tr. at 4663:11–4670:17, 4678:11–4689:14.  From this information, RDV understood Theranos was a "game changer for health care." 10/26/21 Tr. at 4654:10–17.  Defendant Holmes never told RDV that Theranos used third party machines for testing and never told RDV that Theranos' analyzer could not run more than 12 assays.  10/26/21 Tr. at 4693:14–4697:6.  RDV invested in Theranos on October 31, 2014.  10/26/21 Tr. at 4697:7–4698:20; TX 4845.

Indeed, the pattern continued in November 2014.  Dr. Rosendorff, Theranos' lab director, resigned because, as he told Defendant, he felt "really uncomfortable with the [sic] what is happening right now in this company. . . .  I am feeling pressured to vouch for results that I cannot be confident in[.]" TX 4330; *see also* 09/24/21 Tr. at 1703:2–9; 09/28/21 Tr. at 1948:13–1958:17.  Nevertheless, on November 27, 2014, Defendant Holmes and co-Defendant Balwani sent texts to each other about securing a $150 million investment from the Walton family, who own Walmart, and Rupert Murdoch

for over $100 million.  TX 5387D at 28.  The next day, co-Defendant Balwani texted Defendant Holmes "Normandy lab is a fucking disaster zone[.]"  TX 5387D at 29; *see also id.* at 22–26.

In sum, the above evidence amply supports the jury's conclusion that Defendant Holmes intended to defraud—that is to deceive and cheat—Theranos investors by misrepresenting the capabilities of Theranos' proprietary technology and hiding the use of third-party machines.

### (ii)   Misrepresentations Regarding the Walgreens Partnership Expanding

By August 2014, Walgreens decreased the goal for 2015 from opening 500 stores with Theranos testing services available to only 200 such stores, in part because Theranos was not meeting Walgreens' goal of having less than 10% of patients receive venous draws; indeed, approximately 40% of patients were still receiving venous draws rather than fingerstick tests.  10/14/21 Tr. at 3588:3–3591:10 (describing plan to decrease percentage of vein draws, which was 43% in February 2014, to less than 10% by August 2014 but Theranos did not meet that goal), 3600:15–3609:13 (discussing TX 1884), 3610:3–3615:2 (discussing TX 1896), 3620:11–21; TX 5663.  Former Walgreens representative Nimesh Jhaveri testified that Walgreens was focused on the percentage of vein draw tests versus fingerstick tests because the latter was the "innovation" of getting lab tests done from "a few drops of blood with a fingerstick" and run on the Theranos device that Defendant Holmes and co-Defendant Balwani had shown to Walgreens representatives back in August 2013 before the consumer launch.  10/14/21 Tr. at 3598:4–20, 3694:24–3696:1 (describing initial demonstration); *see also* TX 5387D at 24–26 (in November 2014 co-Defendant said "we can't scale with wag"), 40–42, 116.

Yet, approximately one month later, Defendant Holmes was painting a different picture for investors.  Ms. Peterson participated in a phone call with Defendant Holmes during which Defendant discussed projections based on Theranos providing testing at 900 Walgreens locations and described the risk as "execution" not any issue with the technology or its capabilities.  10/26/21 Tr. at 4634:16–25, 4645:11–4650:25 (discussing TX 2015).  Defendant Holmes never told RDV that Walgreens was scaling back the number of stores it would have Theranos operate within.  10/26/21 Tr. at 4680:4–19.  This is further evidence supporting the jury's verdict necessarily finding that Defendant Holmes intended to defraud investors, including RDV.

###### (iii)    Misrepresentations Regarding Theranos' Financial Stability

The evidence presented to the jury at trial demonstrated that Defendant made additional misrepresentations to investors beyond those captured herein.  As but a few parting examples, among others, Defendant consistently misrepresented the financial health of Theranos to investors, *e.g.*:

- In 2010, Defendant Holmes told Steve Burd, then-CEO of Safeway, that Theranos was cash flow neutral and projected revenue for 2011 of $223 million.  10/06/21 Tr. at 2938:21–2939:18, 2953:8–2955:15, 2963:6–2964:17; TX 0370.  In truth, Theranos' revenue was steadily declining as work with the pharmaceutical companies dried up—from approximately $2,800,000 in 2009 to less than $600,000 in 2011—at the same time the company's accumulated deficit rose dramatically.  09/08/21 Tr. at 623:15–626:8, 640:4–9; 09/14/21 Tr. at 687:4–689:5; *see also* TX 5387D at 7, 10 (discussing in May 2012 need to work on revenue and get "revenue flowing in").  Thus, there was no basis for the projections Defendant provided to Safeway to induce them to invest in Theranos.

- In January 2014, Defendants told investor-victim PFM that Theranos had historically earned over $200 million in revenue, primarily from the company's work with the Department of Defense, when, in reality, Theranos had only ever earned approximately $290 *thousand* from a short study with the American Burn Association.  *Compare* 11/16/21 Tr. at 6383:22–6384:6, *with* 09/14/21 Tr. at 716:1–17.  In truth, Theranos earned *zero* revenue in 2012 and 2013, and only ever received approximately $9.6 million from pharmaceutical companies.  09/14/21 Tr. at 692:8–693:3, 696:3–14; TX 7753 (second attachment); *see also* TX 5387D at 7, 10, 17–18 (Defendant will get comfortable with financial model), 20.

- Investor-victim Daniel Mosley testified that he would have been surprised if Theranos had had very little revenue by August 2014 given three-quarters of the fiscal year had passed and Defendant provided financial projections that projected $140 million of revenue for Theranos by December 31, 2014.  11/02/21 Tr. at 5092:10–5095:11, 5111:8–5114:18 (discussing TX 3387 at pg. 512), 5118:9–5119:9; *see also* 10/26/21 Tr. at 4683:21–4687:18; TX 1853 (Lisa Peterson testifying similarly as of October 2014); 11/02/21 Tr. at 4978:13–24, 4984:6–4985:16.  In truth,

Theranos' revenue in 2014 was $150 *thousand*—nowhere near the projections that Defendant provided investors in the third fiscal quarter of that same year. *See* 09/14/21 Tr. at 705:6–19.

In sum, the evidence at trial, including the excerpts described above, overwhelmingly supports the jury's conclusion that Defendant Holmes intentionally defrauded Theranos investors, including PFM, RDV, and Mr. Mosley, by intentionally deceiving them with respect to the capabilities of Theranos' proprietary blood testing analyzer, the status of Theranos' relationship with Walgreens, the extent of the historical relationships Theranos had with pharmaceutical companies and the Department of Defense, and Theranos' financial status, among other categories, and thereby intentionally cheated and deprived those investors of their money through deceptive means.

### 3.    Defendant's False Misrepresentations Were Material

Representatives of the investor-victims repeatedly testified that the statements referenced above were important or material to them. *See*, *e.g.*, 10/14/21 Tr. at 3696:22–3697:5, 3600:15–3601:2; 10/26/21 Tr. at 4642:2–10, 4656:14–4659:4; 11/02/21 Tr. at 5108:4–5110:2, 5126:12–5128:14; 11/16/21 Tr. at 6382:7–6383:11, 6409:23–6411:13, 6426:14–22; *see also* TX 3387; TX 4077; TX 4858.  From an objective perspective, viewing the excerpts of evidence included above in the light most favorable to the prosecution—in addition to the rest of evidence introduced at trial—a rational juror could find beyond a reasonable doubt that the Defendant's misrepresentations were material.  *See Lindsey*, 850 F.3d at 1014.

### 4.    Defendant's Scheme to Defraud Involved Interstate Wire Communications

The evidence also clearly demonstrated the use of interstate wire communications to further the scheme.  On February 6, 2014, three legal entities managed by PFM, representing different groups of investors, invested a total of over $96.1 million in Theranos.  11/16/21 Tr. at 6460:1–6461:24; TX 1506.  One entity, PFM Healthcare Master Fund L.P., alone invested $38,336,632 in Theranos and represents Count 6 of the TSI.  *See id.*; TX 4845; ECF No. 469.  On October 31, 2014, a legal entity on behalf of RDV invested $99,999,984 in Theranos.  10/26/21 Tr. at 4697:7–4698:20; TX 4845.  That same day, a legal entity on behalf of Daniel Mosley invested $5,999,997 in Theranos.  11/02/21 Tr. at 5152:14–5153:8; TX 4845.  The investments by RDV and Mr. Mosley represent Counts 7 and 8 of the TSI, respectively.  *See* ECF Nos. 469, 1235.

At trial, an employee of Fedwire testified that all wire transfers of money in 2013 and 2014 necessarily crossed state lines to Texas and New Jersey—regardless of where the wire transfers originated. *See* 10/13/21 Tr. at 3523:16–3526:4; 10/14/21 Tr. at 3562:5–3563:18, 3565:18–3567:18 (discussing TX 4845). Thus, PFM's, RDV's, and Mr. Mosley's wire transfers necessarily crossed state lines when they made their respective investments in Theranos. *See id.*

\*\*\*

In sum, the evidence referenced above and otherwise admitted at trial overwhelmingly supports the jury's verdict convicting Defendant Holmes of conspiracy to commit wire fraud—Count 1—and three substantive wire fraud counts—Counts 6 (re: PFM), 7 (re: RDV), and 8 (re: Mr. Mosley)—against Theranos investors.

## CONCLUSION

For the reasons stated above, the government respectfully requests that the Court deny Defendant Holmes' Rule 29 Motion and reaffirm the jury's proper verdict.

DATED:  April 8, 2022                                          Respectfully submitted,

                                                              STEPHANIE M. HINDS
                                                              United States Attorney


                                                               */s/ Kelly I. Volkar*
                                                              JEFFREY B. SCHENK
                                                              JOHN C. BOSTIC
                                                              ROBERT S. LEACH
                                                              KELLY I. VOLKAR
                                                              Assistant United States Attorneys

STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

JEFF SCHENK (CABN 234355)
JOHN C. BOSTIC (CABN 264367)
ROBERT S. LEACH (CABN 196191)
KELLY I. VOLKAR (CABN 301377)
Assistant United States Attorneys

    150 Almaden Boulevard, Suite 900
    San Jose, California 95113
    Telephone: (408) 535-5061
    Fax: (408) 535-5066
    john.bostic@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NO.  18-CR-00258 EJD |
| | ) | |
| Plaintiff, | ) | NOTICE OF DISMISSAL OF COUNTS |
| | ) | |
| v. | ) | |
| | ) | |
| ELIZABETH HOLMES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

With leave of the Court, the United States Attorney for the Northern District of California
dismisses without prejudice Counts Three, Four, and Five of the Third Superseding Indictment in the
above case as to Defendant Holmes only.

DATED:  January 14, 2022

                           Respectfully submitted,

                           STEPHANIE M. HINDS
                           United States Attorney

                           *Thomas A. Colthurst*
                           THOMAS A. COLTHURST
                           Chief, Criminal Division

Leave is granted to the government to dismiss Counts Three, Four, and Five of the Third Superseding Indictment without prejudice as to Defendant Holmes only.

Date: _____

_____
HON. EDWARD J. DAVILA
United States District Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

ELIZABETH A. HOLMES,

Defendant.

Case No.  5:18-cr-00258-EJD-1

**FINAL VERDICT FORM**

We, the members of the Jury in the above-entitled case, unanimously find the defendant,
Elizabeth Holmes:

1.  _____Guilty_____ [GUILTY / NOT GUILTY] of the
charge of Conspiracy to Commit Wire Fraud against Theranos investors in violation of 18 U.S.C.
§ 1349, as charged in Count One of the indictment.

2.  _____Not Guilty_____ [GUILTY / NOT GUILTY] of the
charge of Conspiracy to Commit Wire Fraud against Theranos paying patients in violation of 18
U.S.C. § 1349, as charged in Count Two of the indictment.

3.  _____ [GUILTY / NOT GUILTY] of the
charge of Wire Fraud against Theranos investors, in violation of 18 U.S.C. § 1343, in connection
with a wire transfer of $99,990 on or about December 30, 2013, as charged in Count Three of the
indictment.

Case No.: 5:18-cr-00258-EJD-1
FINAL VERDICT FORM

1

4.    _____ [GUILTY / NOT GUILTY] of the charge of Wire Fraud against Theranos investors, in violation of 18 U.S.C. § 1343, in connection with a wire transfer of $5,349,900 on or about December 31, 2013, as charged in Count Four of the indictment.

5.    _____ [GUILTY / NOT GUILTY] of the charge of Wire Fraud against Theranos investors, in violation of 18 U.S.C. § 1343, in connection with a wire transfer of $4,875,000 on or about December 31, 2013, as charged in Count Five of the indictment.

6.    _____Guilty_____ [GUILTY / NOT GUILTY] of the charge of Wire Fraud against Theranos investors, in violation of 18 U.S.C. § 1343, in connection with a wire transfer of $38,336,632 on or about February 6, 2014, as charged in Count Six of the indictment.

7.    _____Guilty_____ [GUILTY / NOT GUILTY] of the charge of Wire Fraud against Theranos investors, in violation of 18 U.S.C. § 1343, in connection with a wire transfer of $99,999,984 on or about October 31, 2014, as charged in Count Seven of the indictment.

8.    _____Guilty_____ [GUILTY / NOT GUILTY] of the charge of Wire Fraud against Theranos investors, in violation of 18 U.S.C. § 1343, in connection with a wire transfer of $5,999,997 on or about October 31, 2014, as charged in Count Eight of the indictment.

10.    _____Not Guilty_____ [GUILTY / NOT GUILTY] of the charge of Wire Fraud against Theranos paying patients, in violation of 18 U.S.C. § 1343, in connection with a wire transmission of Patient E.T.'s laboratory blood test results on or about May 11, 2015, as charged in Count Ten of the indictment.

11.    _____Not Guilty_____ [GUILTY / NOT GUILTY] of the charge of Wire Fraud against Theranos paying patients, in violation of 18 U.S.C. § 1343, in connection with a wire transmission of Patient M.E.'s laboratory blood test results on or about

Case No.: 5:18-cr-00258-EJD-1
FINAL VERDICT FORM

2

United States District Court
Northern District of California

1   May 16, 2015, as charged in Count Eleven of the indictment.

2        12.    _____Not   Guilty_____ [GUILTY / NOT GUILTY] of the

3   charge of Wire Fraud against Theranos paying patients, in violation of 18 U.S.C. § 1343, in

4   connection with a wire transfer of $1,126,661 on or about August 3, 2015, as charged in Count

5   Twelve of the indictment.

6   Dated: 1/3/22

7                                                _____

8                                                Jury Foreperson

Case No.: 5:18-cr-00258-EJD-1
FINAL VERDICT FORM

3

**ER-1473**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

UNITED STATES OF AMERICA,

                    Plaintiff,

        v.

ELIZABETH A. HOLMES,

                    Defendant.

Case No.   5:18-cr-00258-EJD-1

**FINAL JURY INSTRUCTIONS**

Dated: December 17, 2021

EDWARD J. DAVILA
United States District Judge

**JURY INSTRUCTION NO. 1**

**DUTIES OF JURY TO FIND FACTS AND FOLLOW LAW**

Members of the jury, now that you have heard all the evidence, it is my duty to instruct you on the law that applies to this case.  A copy of these instructions will be available in the jury room for you to consult.

It is your duty to weigh and to evaluate all the evidence received in the case and, in that process, to decide the facts.  It is also your duty to apply the law as I give it to you to the facts as you find them, whether you agree with the law or not.  You must decide the case solely on the evidence and the law.  Do not allow personal likes or dislikes, sympathy, prejudice, fear, or public opinion to influence you.   You should also not be influenced by any person's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, profession, celebrity, economic circumstances, or position in life or in the community.  Also, do not allow yourself to be influenced by personal likes or dislikes, sympathy, prejudice, fear, public opinion, or biases, including unconscious biases.  Unconscious biases are stereotypes, attitudes, or preferences that people may consciously reject but may be expressed without conscious awareness, control, or intention.  You will recall that you took an oath promising to do so at the beginning of the case.

You must follow all these instructions and not single out some and ignore others; they are all important.  Please do not read into these instructions or into anything I may have said or done any suggestion as to what verdict you should return—that is a matter entirely up to you.

**JURY INSTRUCTION NO. 2**

**CHARGE AGAINST MS. HOLMES NOT EVIDENCE—PRESUMPTION OF INNOCENCE—BURDEN OF PROOF**

The indictment is not evidence.  Ms. Holmes, the defendant, has pleaded not guilty to the charges.  Ms. Holmes is presumed to be innocent unless and until the government proves her guilty beyond a reasonable doubt.  In addition, Ms. Holmes does not have to testify or present any evidence.  Ms. Holmes does not have to prove innocence; the government has the burden of proving every element of the charges beyond a reasonable doubt.

**JURY INSTRUCTION NO. 3**

**ABSENCE OF CO-DEFENDANT**

For reasons that do not concern you, the case against Ms. Holmes' codefendant, Mr. Ramesh "Sunny" Balwani, is not before you.  Do not speculate why.  This fact should not influence your verdict with reference to Ms. Holmes, and you must base your verdict solely on the evidence against Ms. Holmes.

**JURY INSTRUCTION NO. 4**

**MS. HOLMES' DECISION TO TESTIFY**

Ms. Holmes has testified.  You should treat this testimony just as you would the testimony of any other witness.

**JURY INSTRUCTION NO. 5**

**REASONABLE DOUBT—DEFINED**

Proof beyond a reasonable doubt is proof that leaves you firmly convinced Ms. Holmes is guilty.  It is not required that the government prove guilt beyond all possible doubt.

A reasonable doubt is a doubt based upon reason and common sense and is not based purely on speculation.  It may arise from a careful and impartial consideration of all the evidence, or from lack of evidence.

If after a careful and impartial consideration of all the evidence, you are not convinced beyond a reasonable doubt that Ms. Holmes is guilty, it is your duty to find Ms. Holmes not guilty.  On the other hand, if after a careful and impartial consideration of all the evidence, you are convinced beyond a reasonable doubt that Ms. Holmes is guilty, it is your duty to find Ms. Holmes guilty.

**JURY INSTRUCTION NO. 6**

**WHAT IS EVIDENCE**

The evidence you are to consider in deciding what the facts consist of:

(1) the sworn testimony of any witness; and

(2) the exhibits that are received in evidence.

**JURY INSTRUCTION NO. 7**

**WHAT IS NOT EVIDENCE**

In reaching your verdict you may consider only the testimony and exhibits received in evidence.  The following things are not evidence and you may not consider them in deciding what the facts are:

1) Questions, statements, objections, and arguments by the lawyers are not evidence.  The lawyers are not witnesses.  Although you must consider a lawyer's questions to understand the answers of a witness, the lawyer's questions are not evidence.  Similarly, what the lawyers have said in their opening statements, closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence.  If the facts as you remember them differ from the way the lawyers state them, your memory of them controls.

2) Any testimony that I have excluded, stricken, or instructed you to disregard is not evidence.  In addition, some evidence was received only for a limited purpose; when I have instructed you to consider certain evidence in a limited way, you must do so.

3) Anything you may have seen or heard when the court was not in session is not evidence.  You are to decide the case solely on the evidence received at the trial.

**JURY INSTRUCTION NO. 8**

**DIRECT AND CIRCUMSTANTIAL EVIDENCE**

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did.  Circumstantial evidence is indirect evidence, that is, it is proof of one or more facts from which one can find another fact.

You are to consider both direct and circumstantial evidence.  Either can be used to prove any fact.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give to any evidence.

By way of example, if you wake up in the morning and see that the sidewalk is wet, you may find from that fact that it rained during the night.  However, other evidence, such as a turned-on garden hose, may provide an explanation for the water on the sidewalk.  Therefore, before you decide that a fact has been proved by circumstantial evidence, you must consider all the evidence in the light of reason, experience, and common sense.

## JURY INSTRUCTION NO. 9

## CREDIBILITY OF WITNESSES

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

(1) the witness's opportunity and ability to see or hear or know the things testified to;

(2) the witness's memory;

(3) the witness's manner while testifying;

(4) the witness's interest in the outcome of the case, if any;

(5) the witness's bias or prejudice, if any;

(6) whether other evidence contradicted the witness's testimony;

(7) the reasonableness of the witness's testimony in light of all the evidence; and

(8) any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said.  Sometimes different witnesses will give different versions of what happened.  People often forget things or make mistakes in what they remember.  Also, two people may see the same event but remember it differently.  You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said.  On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about it.  What is important is how believable the witnesses are, and how much weight you think their testimony deserves.

**JURY INSTRUCTION NO. 10**

**ACTIVITIES NOT CHARGED**

You are here only to determine whether Ms. Holmes is guilty or not guilty of the charges in the indictment.  Ms. Holmes is not on trial for any conduct or offense not charged in the indictment.

**JURY INSTRUCTION NO. 11**

**SEPARATE CONSIDERATION OF MULTIPLE COUNTS—SINGLE DEFENDANT**

A separate crime is charged against Ms. Holmes in each count.  You must decide each count separately.  Your verdict on one count should not control your verdict on any other count.

**JURY INSTRUCTION NO. 12**

**ON OR ABOUT—DEFINED**

The indictment charges that the offenses alleged in Counts One through Eight and Ten through Twelve were committed "on or about" a certain date.

Although it is necessary for the government to prove beyond a reasonable doubt that the offenses were committed on a date reasonably near the date alleged in the indictment, it is not necessary for the government to prove that the offenses were committed precisely on the date charged.

**JURY INSTRUCTION NO. 13**

**DUAL ROLE TESTIMONY**

You have heard testimony from Dr. Audra Zachman and Dr. Mark Burnes, who testified to both facts and opinions and the reasons for their opinions.

Fact testimony is based on what the witness saw, heard, or did.  Opinion testimony is based on the education or experience of the witness.

As to the testimony about facts, it is your job to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says, or part of it, or none of it.  You may take into account the factors discussed earlier in these instructions that were provided to assist you in weighing the credibility of witnesses.

As to the testimony about the witness's opinions, this opinion testimony is allowed because of the education or experience of this witness.  Opinion testimony should be judged like any other testimony.  You may accept all of it, part of it, or none of it.  You should give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

**JURY INSTRUCTION NO. 14**

**CHARTS AND SUMMARIES NOT ADMITTED INTO EVIDENCE**

During the trial, certain charts and summaries were shown to you in order to help explain the evidence in the case.  These charts and summaries were not admitted into evidence and will not go into the jury room with you.  They are not themselves evidence or proof of any facts.  If they do not correctly reflect the facts or figures shown by the evidence in the case, you should disregard these charts and summaries and determine the facts from the underlying evidence.

**JURY INSTRUCTION NO. 15**

**CHARTS AND SUMMARIES ADMITTED INTO EVIDENCE**

Certain charts and summaries have been admitted into evidence.  Charts and summaries are only as good as the underlying supporting material.  You should, therefore, give them only such weight as you think the underlying material deserves.

**JURY INSTRUCTION NO. 16**

**CONSPIRACY—ELEMENTS**

Ms. Holmes is charged in Counts One and Two of the indictment with conspiring to commit wire fraud in violation of Section 1349 of Title 18 of the United States Code.

Ms. Holmes is charged in Count One of the indictment with conspiring to commit wire fraud against investors in Theranos during the period 2010 to 2015.

Ms. Holmes is charged in Count Two of the indictment with conspiring to commit wire fraud against patients who paid for Theranos's blood testing services during the period 2013 to 2016.

I will define wire fraud later in these instructions.

In order for Ms. Holmes to be found guilty of either count, you must all unanimously agree with respect to each Count that the government has proved each of the following elements beyond a reasonable doubt:

First, that there was an agreement between two or more persons to commit wire fraud as charged in the indictment; and

Second, that Ms. Holmes became a member of the alleged conspiracy knowing of at least one of its objects and intending to help accomplish it.

A conspiracy is a kind of criminal partnership—an agreement of two or more persons to commit one or more crimes.  The crime of conspiracy is the agreement to do something unlawful; it does not matter whether the crime agreed upon was committed.

For a conspiracy to have existed, it is not necessary that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy.  It is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another.  Nor is it enough, standing alone, that they had a business or romantic relationship.  You must find that there was a plan to commit wire fraud as alleged in the indictment as an object of the conspiracy with all of you agreeing as to the particular crime which the conspirators agreed to commit.

One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even though the person does not have full knowledge of all the details of the conspiracy.  Furthermore, one who willfully joins an existing conspiracy is as responsible for it as the originators.  On the other hand, one who has no knowledge of a conspiracy, but happens to act in a way which furthers some object or purpose of the conspiracy, does not thereby become a conspirator.  Similarly, a person does not become a conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing that a conspiracy exists.

**JURY INSTRUCTION NO. 17**

**DEFINITION OF "WILLFULLY"**

"Willfully" means to act with knowledge that one's conduct is unlawful and with the intent to do something the law forbids.

**JURY INSTRUCTION NO. 18**

**CONSPIRACY—KNOWLEDGE OF AND ASSOCIATION WITH OTHER CONSPIRATORS**

A conspiracy may continue for a long period of time and may include the performance of many transactions.  It is not necessary that all members of a conspiracy join it at the same time, and one may become a member of a conspiracy without full knowledge of all the details of the unlawful scheme or the names, identities, or locations of all of the other members.

Even if Ms. Holmes did not directly conspire with other conspirators in the overall scheme, Ms. Holmes has, in effect, agreed to participate in an alleged conspiracy if the government proves each of the following beyond a reasonable doubt:

(1) First, that Ms. Holmes directly conspired with one or more conspirators to carry out at least one of the objects of the conspiracy;

(2) Second, that Ms. Holmes knew or had reason to know that other conspirators were involved with those with whom Ms. Holmes directly conspired; and

(3) Third, that Ms. Holmes had reason to believe that whatever benefits Ms. Holmes might get from the alleged conspiracy were probably dependent upon the success of the entire venture.

It is not a defense that a person's participation in a conspiracy was minor or for a short period of time.

## JURY INSTRUCTION NO. 19

## CONSPIRACY—LIABILITY FOR SUBSTANTIVE OFFENSE COMMITTED BY CO-CONSPIRATOR

Each member of a conspiracy is responsible for the reasonably foreseeable actions of the other conspirators performed during the course and in furtherance of the conspiracy.  If one member of a conspiracy commits a crime in furtherance of a conspiracy, the other members have also, under the law, committed that crime.

Therefore, you may find Ms. Holmes guilty of wire fraud against investors in Theranos as charged in Counts Three through Eight of the indictment if the government has proved each of the following elements beyond a reasonable doubt:

First, a co-conspirator committed the crime of wire fraud as alleged in that count;

Second, the co-conspirator was a member of the conspiracy charged in Count One of the indictment;

Third, the co-conspirator committed the crime of wire fraud in furtherance of the conspiracy;

Fourth, Ms. Holmes was a member of the same conspiracy at the time the offense charged in Counts Three through Eight was committed by the co-conspirator; and

Fifth, the offense fell within the scope of the unlawful agreement and could reasonably have been foreseen by Ms. Holmes to be a necessary or natural consequence of the unlawful agreement.

You may find Ms. Holmes guilty of wire fraud against patients who paid for Theranos' blood testing services as charged in Counts Ten through Twelve of the indictment if the government has proved each of the following elements beyond a reasonable doubt:

First, a co-conspirator committed the crime of wire fraud as alleged in that count;

Second, the co-conspirator was a member of the conspiracy charged in Count Two of the indictment;

**ER-1494**

Third, the co-conspirator committed the crime of wire fraud in furtherance of the conspiracy;

Fourth, Ms. Holmes was a member of the same conspiracy at the time the offense charged in Counts Ten through Twelve was committed by the co-conspirator; and

Fifth, the offense fell within the scope of the unlawful agreement and could reasonably have been foreseen by Ms. Holmes to be a necessary or natural consequence of the unlawful agreement.

# JURY INSTRUCTION NO. 20

## WIRE FRAUD (18 U.S.C. § 1343)

Ms. Holmes is charged in Counts Three, Four, Five, Six, Seven, Eight, Ten, Eleven, and Twelve of the indictment with wire fraud in violation of Section 1343 of Title 18 of the United States Code.

Ms. Holmes is charged in Counts Three through Eight of the indictment with wire fraud against investors in Theranos.  In particular:

Ms. Holmes is charged in Count Three with wire fraud in connection with a wire transfer of $99,990 on or about December 30, 2013.

Ms. Holmes is charged in Count Four with wire fraud in connection with a wire transfer of $5,349,900 on or about December 31, 2013.

Ms. Holmes is charged in Count Five with wire fraud in connection with a wire transfer of $4,875,000 on or about December 31, 2013.

Ms. Holmes is charged in Count Six with wire fraud in connection with a wire transfer of $38,336,632 on or about February 6, 2014.

Ms. Holmes is charged in Count Seven with wire fraud in connection with a wire transfer of $99,999,984 on or about October 31, 2014.

Ms. Holmes is charged in Count Eight with wire fraud in connection with a wire transfer of $5,999,997 on or about October 31, 2014.

Ms. Holmes is charged in Counts Ten through Twelve of the indictment with wire fraud against patients who paid for Theranos' blood testing services.  In particular:

Ms. Holmes is charged in Count Ten with wire fraud in connection with a wire transmission of Patient E.T.'s laboratory blood test results on or about May 11, 2015.

Ms. Holmes is charged in Count Eleven with wire fraud in connection with a wire transmission of Patient M.E.'s laboratory blood test results on or about May 16, 2015.

Ms. Holmes is charged in Count Twelve with wire fraud in connection with a wire transfer of $1,126,661 on or about August 3, 2015.

In order for Ms. Holmes to be found guilty of each count of wire fraud, you must all unanimously agree with respect to each count that the government has proved each of the following elements beyond a reasonable doubt:

First, Ms. Holmes knowingly participated in, devised, or intended to devise a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.  A scheme to defraud is a deceptive scheme to deprive a person of money or property.  Deceitful statements of half-truths may constitute false or fraudulent representations;

Second, the statements made as part of the scheme were material.  Statements are material if they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

Third, Ms. Holmes acted with the intent to defraud, that is, the intent to deceive and cheat. The intent to deceive and cheat is the intent to deprive someone of money or property by means of deception; and

Fourth, Ms. Holmes used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential part of the scheme.  The wire itself need not be false or misleading.

In determining whether a scheme to defraud exists, you may consider not only Ms. Holmes' words and statements, but also the circumstances in which they are used as a whole.

A wiring is caused when one knows that a wire will be used in the ordinary course of business or when one can reasonably foresee such use.

It need not have been reasonably foreseeable to Ms. Holmes that the wire communication would be interstate in nature.  Rather, it must have been reasonably foreseeable to Ms. Holmes that some wire communication would occur in furtherance of the scheme, and an interstate wire communication must have actually occurred in furtherance of the scheme.

**JURY INSTRUCTION NO. 21**

**INTENT TO DEFRAUD—DEFINED**

An intent to defraud is an intent to deceive and cheat, that is, to deprive someone of money or property by means of deception.

**JURY INSTRUCTION NO. 22**

**GOOD FAITH**

You may consider whether Ms. Holmes had an honest, good faith belief in the truth of the specific misrepresentations alleged in the indictment in determining whether or not she acted with intent to defraud.

**JURY INSTRUCTION NO. 23**

**KNOWINGLY—DEFINED**

    An act is done knowingly if Ms. Holmes is aware of the act and does not act through ignorance, mistake, or accident.  The government is not required to prove that Ms. Holmes knew that her acts were unlawful.  You may consider evidence of Ms. Holmes' words, acts, or omissions, along with all the other evidence, in deciding whether Ms. Holmes acted knowingly.

    To find that Ms. Holmes acted knowingly, you must find that she herself had knowledge of the fact at issue.

**JURY INSTRUCTION NO. 24**

**AIDING AND ABETTING**

Ms. Holmes may be found guilty of wire fraud as charged in Counts Three through Eight and Ten through Twelve of the indictment, even if Ms. Holmes personally did not commit the act or acts constituting the crime but aided and abetted in its commission.  To "aid and abet" means intentionally to help someone else commit a crime.  To prove Ms. Holmes guilty of wire fraud by aiding and abetting, the government must prove each of the following beyond a reasonable doubt:

First, someone else committed the conduct charged in Counts Three through Eight and Ten through Twelve of the indictment**;**

Second, Ms. Holmes aided, counseled, commanded, induced, or procured that person with respect to at least one element of wire fraud as charged in Counts Three through Eight and Ten through Twelve of the indictment**;**

Third, Ms. Holmes acted with the intent to facilitate wire fraud as charged in Counts Three through Eight and Ten through Twelve of the indictment**;** and

Fourth, Ms. Holmes acted before the crime was completed.

It is not enough that Ms. Holmes merely associated with the person committing the crime, or unknowingly or unintentionally did things that were helpful to that person, or was present at the scene of the crime.  The evidence must show beyond a reasonable doubt that Ms. Holmes acted with the knowledge and intention of helping that person commit wire fraud as charged in Counts Three through Eight and Ten through Twelve of the indictment**.**

A defendant acts with the intent to facilitate the crime when the defendant actively participates in a criminal venture with advance knowledge of the crime and having acquired that knowledge when the defendant still had a realistic opportunity to withdraw from the crime.

The government is not required to prove precisely which person actually committed the crime and which person aided and abetted.

**JURY INSTRUCTION NO. 25**

**SCHEME TO DEFRAUD—VICARIOUS LIABILITY (18 U.S.C. § 1343)**

If you find that Ms. Holmes was a member of the scheme to defraud investors in Theranos charged in Counts Three through Eight and that Ms. Holmes had the intent to defraud investors in Theranos, Ms. Holmes may be responsible for other co-schemers' actions during the course of and in furtherance of the alleged scheme, even if Ms. Holmes did not know what they said or did.

For Ms. Holmes to be guilty of an offense committed by a co-schemer in furtherance of the scheme, the government must prove each of the following elements beyond a reasonable doubt:

First, the co-schemer was a member of the scheme to defraud investors charged in Counts Three through Eight of the indictment;

Second, the co-schemer committed the offense in furtherance of the scheme to defraud Theranos investors;

Third, Ms. Holmes was a member of the same scheme to defraud, and possessed the intent to defraud Theranos investors; and

Fourth, the offense committed by the co-schemer fell within the scope of the scheme to defraud and was one that Ms. Holmes could reasonably foresee as a necessary and natural consequence of the scheme to defraud.

If you find that Ms. Holmes was a member of the scheme to defraud patients who paid for Theranos' blood testing services charged in Counts Ten through Twelve and that Ms. Holmes had the intent to defraud Theranos paying patients, Ms. Holmes may be responsible for other co-schemers' actions during the course of and in furtherance of the alleged scheme, even if Ms. Holmes did not know what they said or did.

For Ms. Holmes to be guilty of an offense committed by a co-schemer in furtherance of the scheme, the government must prove each of the following elements beyond a reasonable doubt:

First, the co-schemer was a member of the scheme to defraud patients who paid for Theranos' blood testing services charged in Counts Ten through Twelve of the indictment;

Second, the co-schemer committed the offense in furtherance of the scheme to defraud

Theranos paying patients;

Third, Ms. Holmes was a member of the same scheme to defraud, and possessed the intent to defraud Theranos paying patients; and

Fourth, the offense committed by the co-schemer fell within the scope of the scheme to defraud and was one that Ms. Holmes could reasonably foresee as a necessary and natural consequence of the scheme to defraud.

**JURY INSTRUCTION NO. 26**

**WIRE FRAUD—ALLEGED VICTIM'S CONDUCT**

An alleged victim's negligence is not a defense to wire fraud.  You have heard evidence regarding investors' process for deciding whether to invest money in Theranos.  You are to consider this evidence to the extent that it helps you determine whether Ms. Holmes made false or fraudulent pretenses, representations, or promises as part of a scheme or plan to defraud (see prior Wire Fraud instruction).  You may also consider this evidence to the extent that it helps you determine whether the statements made as part of the alleged scheme were material; that is, whether they had a natural tendency to influence, or were capable of influencing, a person to part with money or property (see prior Wire Fraud instruction).

**JURY INSTRUCTION NO. 27**

**SUCCESS OF A WIRE FRAUD SCHEME**

Success of a scheme to defraud is not necessary for purposes of determining whether wire fraud occurred.  For Counts Three through Eight and Ten through Twelve, it is not necessary that Ms. Holmes made a profit or that anyone actually suffered a loss.

**JURY INSTRUCTION NO. 28**

**ALLEGED VIOLATIONS OF REGULATIONS AND INDUSTRY STANDARDS**

You have heard evidence regarding alleged violations of regulations and industry standards. Ms. Holmes is not liable for any of the offenses alleged in the indictment merely because she or Theranos may have violated federal or state regulations or because Ms. Holmes or Theranos may have engaged in negligent practices or violated industry standards related to laboratory testing or medical devices. However, you may consider such evidence, along with other evidence, limited to any purposes for which such evidence was admitted, in assessing whether the government has proved each of the counts charged in the indictment.

**JURY INSTRUCTION NO. 29**

**DUTY TO DELIBERATE**

When you begin your deliberations, elect one member of the jury as your foreperson who will preside over the deliberations and speak for you here in court.

You will then discuss the case with your fellow jurors to reach agreement if you can do so. Your verdict, whether guilty or not guilty, must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Do not be afraid to change your opinion if the discussion persuades you that you should. But do not come to a decision simply because other jurors think it is right.

It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision. Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

Perform these duties fairly and impartially. Do not allow personal likes or dislikes, sympathy, prejudice, fear, or public opinion to influence you. You should also not be influenced by any person's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, profession, celebrity, economic circumstances, or position in life or in the community. Also, do not allow yourself to be influenced by personal likes or dislikes, sympathy, prejudice, fear, public opinion, or biases, including unconscious biases. Unconscious biases are stereotypes, attitudes, or preferences that people may consciously reject but may be expressed without conscious awareness, control, or intention.

It is your duty as jurors to consult with one another and to deliberate with one another with a view towards reaching an agreement if you can do so. During your deliberations, you should not hesitate to reexamine your own views and change your opinion if you become persuaded that it is wrong.

### JURY INSTRUCTION NO. 30

### CONSIDERATION OF EVIDENCE—CONDUCT OF THE JURY

Because you must base your verdict only on the evidence received in the case and on these instructions, I remind you that you must not be exposed to any other information about the case or to the issues it involves.  Except for discussing the case with your fellow jurors during your deliberations:

Do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it.  This restriction includes discussing the case in person, in writing, by phone, tablet, computer, or any other means, via email, text messaging, or any Internet chat room, blog, website or other forms of social media.  This restriction applies to communicating with your family members, your employer, the media or press, and the people involved in the trial.  If you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and to report the contact to the court.

Do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it; do not do any research, such as consulting dictionaries, searching the Internet (through Google or otherwise) or using other reference materials; and do not make any investigation or in any other way try to learn about the case on your own.

The law requires these restrictions to ensure the parties have a fair trial based on the same evidence that each party has had an opportunity to address.  A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire trial process to start over.  If any juror is exposed to any outside information, please notify the court immediately.

**JURY INSTRUCTION NO. 31**

**USE OF NOTES**

Some of you have taken notes during the trial.  Whether or not you took notes, you should rely on your own memory of what was said.  Notes are only to assist your memory.  You should not be overly influenced by your notes or those of your fellow jurors.

**JURY INSTRUCTION NO. 32**

**JURY CONSIDERATION OF PUNISHMENT**

The punishment provided by law for the alleged offenses is for the court to decide.  You may not consider punishment in deciding whether the government has proved its case against Ms. Holmes beyond a reasonable doubt.

**JURY INSTRUCTION NO. 33**

**VERDICT FORM**

A verdict form has been prepared for you.  After you have reached unanimous agreement on a verdict, your foreperson should complete the verdict form according to your deliberations, sign, and date it, and advise the clerk that you are ready to return to the courtroom.

**JURY INSTRUCTION NO. 34**

**COMMUNICATION WITH COURT**

If it becomes necessary during your deliberations to communicate with me, you may send a note through the clerk, signed by any one or more of you.  No member of the jury should ever attempt to communicate with me except by a signed writing, and I will respond to the jury concerning the case only in writing or here in open court.  If you send out a question, I will consult with the lawyers before answering it, which may take some time.  You may continue your deliberations while waiting for the answer to any question.  Remember that you are not to tell anyone—including me—how the jury stands, numerically or otherwise, on any question submitted to you, including the question of the guilt of Ms. Holmes, until after you have reached a unanimous verdict or have been discharged.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| USA,<br><br>              Plaintiff,<br><br>       v.<br><br>ELIZABETH A. HOLMES,<br><br>              Defendant. | Case No.  5:18-cr-00258-EJD-1<br><br>**ORDER RE DEFENDANT'S MOTION<br>TO STRIKE THE CMS REPORT** |

     The Court has reviewed the transcript, see Transcript at 7084–7090, and requests the Parties' views regarding the admissibility of Government's Exhibit 4621A & B ("the 2016 CMS Report") with respect to the charging period.  This is in relation to today's discussion regarding Jury Instruction 31.  The Parties are instructed to file written briefing by noon on 12/12/2021 and are ordered to appear for a hearing on 12/13/2021 at 9:00 a.m.  The Parties' briefs shall not exceed ten pages.

     **IT IS SO ORDERED.**

Dated: December 10, 2021

EDWARD J. DAVILA
United States District Judge

# Exhibit K



*United States Attorney*
*Northern District of California*

*150 Almaden Boulevard, Suite 900*          *(408) 535-5061*
*San Jose, California 95113*          *FAX: (408) 535-5066*

September 6, 2017

Theranos, Inc.
Custodian of Records

      Re:  Grand Jury Subpoena (Investigation # 2016R00024)

Dear Madam or Sir:

      You have received a grand jury subpoena <u>duces tecum</u> in connection with the above-numbered grand jury investigation.  The subpoena has been issued in furtherance of that investigation.

      This letter is written to advise you that disclosure of the subpoena and your response to it to any of your clients or any third parties may impede or obstruct the investigation. Therefore, we ask you not to disclose the existence of the subpoena or the nature of your response to it to any client or person not employed by you for the indefinite future.

      If you have any questions about this request, please feel free to contact me at (408)535-2695.

                Very truly yours,

                BRIAN J. STRETCH
                United States Attorney

                JEFF SCHENK
                Assistant United States Attorney

JS:lw
Enclosures
GJ 16-1 (SJ)
2016R00024

**2016R00024 - 048**

AO 110  (Rev. 06/09) Subpoena to Testify Before a Grand Jury

# UNITED STATES DISTRICT COURT
### for the
Northern District of California

## SUBPOENA TO TESTIFY BEFORE A GRAND JURY

To:  Theranos, Inc.
Custodian of Records

**YOU ARE COMMANDED** to appear in this United States district court at the time, date, and place shown below to testify before the court's grand jury.  When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place: United States District Courthouse - San Jose<br>280 S. First Street<br>Room 2115, 2nd Floor<br>San Jose, CA 95113 | Date and Time:<br><br>10/05/2017 9:00 am |
|---|---|

You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:
SEE ATTACHMENT. Provide all records in electronic format only.

Voluntary compliance with this federal grand jury subpoena will be deemed satisfactory when the information requested is provided to the agent listed below and no appearance will be necessary.

MAIL DOCUMENTS TO:
Special Agent Mario C. Scussel
Federal Bureau of Investigation
450 Golden Gate Ave, 13th Floor
San Francisco, CA 94102
Email: mcscussel@fbi.gov

Date:    September 6, 2017

*CLERK OF COURT*

Susan Y. Soong

*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the United States attorney, or assistant United States attorney, who requests this subpoena, are:
Jeffrey B. Schenk,  AUSA
150 Almaden Blvd., Suite 900
San Jose,  CA  95113
jeffrey.b.schenk@usdoj.gov    (408) 535-5061
S/A Mario C. Scussel - FBI    (415) 553-7564

## SUBPOENA ATTACHMENT

Custodian of Records
Theranos, Inc.

### I.    DEFINITIONS

As used herein:

A.    "Document" means the **original** of all written, recorded, or graphic material and all electronic data of every kind, whether prepared by your company or by any other person, that is in your company's possession, custody, or control, including but not limited to: memoranda, reports, letters, telegrams, and other communications recorded in any form or medium; notes, minutes, and transcripts of conferences, meetings and telephone or other communications; contracts and other agreements; checks, check registers, statements, ledgers, and other records of financial matters or commercial transactions; appointment books, calendars, notebooks, and diaries, including data in PDAs; maps, diagrams, graphs, and charts; plans and specifications; publications; photographs; photocopies, microfilm, and other copies or reproductions; computer printouts; tallies, tabulations, and summaries of sales or bids; and all file folders, file tabs, folder tabs, mailing envelopes, facsimile transmission cover sheets, and any other proof or indicia of mailing (if applicable) associated with each original. The term "document" includes spreadsheets, as well as underlying cell formulae and other codes. The term "document" also includes electronic mail messages and other documents and data stored in, or accessible through, computer or other information retrieval systems, such as personal computers, portable computers, workstations, minicomputers, personal data assistants, archival voice storage systems, group and collaborative tools, electronic messaging devices, portable or removable storage media, mainframes, servers, backup disks and tapes, archive disks and tapes, and other forms of online or offline storage, whether on or off company premises. The term "document" includes all drafts of a document and all duplicates of a document (whether or not identical) in the files of or in the files maintained on behalf of all directors, officers, managers, or other supervisory employees, duplicates of documents in all other files that are not identical duplicates of the originals (including copies that differ in any way, such as through notations, underlining, or other markings), and  duplicates of documents the originals of which are not in the possession, custody, or control of your company. The term "document" includes all data (including metadata, embedded, hidden and other bibliographic or historical data describing or relating to documents created, revised, or distributed on computer systems) stored in electronic form or accessible through computer or other

1

information retrieval systems, together with instructions and all other materials necessary to use or interpret this data. Unless otherwise specified, the term "document" excludes non-electronic forms of invoices, bills of lading, purchase orders, customs declarations, and other similar documents of a purely transactional nature.

B.   "Identify" means to state and "identity" means a statement of:

   1) In the case of a person other than a natural person, its name, the address of its principal place of business, its telephone number, and the name of its chief executive officer;

   2) In the case of a natural person, his or her full name (including full middle name), date and place of birth and social security number, passport number and country of issuance, last known home telephone number and home address, last known business telephone number (including extensions) and business address, last known cellular or mobile telephone numbers, the positions held by each individual and dates of service in each position, and the name and position of each such person's immediate supervisors in each position; and

   3) In the case of a communication, its date, its type *(e.g.,* telephone conversation, letter, electronic mail, or meeting), the place where it occurred, the identity of the persons who made it, the identity of the persons who received it or who were present when it was made, and the subject matter discussed.

C.   "Person" means any natural person, association, cooperative, public or private corporation, joint venture, partnership, sole proprietorship, governmental entity, or other form of business or legal entity.

D.   "Relating to" or "relate to" or "regarding" means directly or indirectly refer or pertain to, discuss, describe, reflect, contain, examine, analyze, study, report on, comment on, evidence, constitute, show, consider, recommend, concern, record, or set forth, in whole or in part.

E.   "Telephone number" includes any general telephone numbers, private line numbers, telephone extension numbers, cellular or mobile telephone numbers, and facsimile transmission numbers.

F.   "You" or "your company" means the person to which this subpoena is addressed; any parent, predecessor, successor, division, affiliate, or subsidiary (whether wholly owned or not) of that person; any joint venture to which any such person is or was a party; and each officer, director, manager, partner, employee, attorney, agent,

2

representative, consultant, affiliated person, or other person acting on behalf of any of them.

## II.    INSTRUCTIONS

A.   Unless otherwise specifically provided herein, the documents that must be produced in response to this subpoena include all responsive documents prepared, sent, dated, received, used, or in effect at any time during the period of **January 1, 2003** through **the date of this subpoena** ("the subpoena period"). The "date of this subpoena" is its date of service.

B.   All documents produced must be **originals,** unless otherwise indicated.  Photocopies will be accepted only after your company demonstrates that the originals are unavailable.

C.   This subpoena and schedule of documents call for the production of all responsive documents in the possession, custody, or control of your company without regard to the physical location of the documents and without regard to whether the documents were prepared by or for your company.

D.   Use of the singular or the plural in this subpoena should not be deemed a limitation, and the use ofthe singular should be construed to include, where appropriate, the plural. The conjunctive form "and" and the disjunctive form "or" are mutually interchangeable and encompass each other. The terms "any" and "all" are mutually interchangeable and encompass each other.

E.   Any documents that are withheld in whole or in part from production based on a claim of privilege shall be assigned document control numbers (with unique consecutive numbers for each page of each document); for purposes of this instruction, each attachment to a document shall be treated as a separate document and separately logged, if withheld, and cross referenced, if produced. Your company shall also provide a statement of the claim of privilege and all facts relied upon in support of the decision to withhold each document, in the form of a log that conforms with the requirements set forth below. Your company is encouraged to propose categorical limitations to exclude certain classes of privileged documents from its log.

a.  For each document identified on your company's privilege log, state:

i.  the document's control numbers;
ii.  all authors of the document;
iii.  all addressees of the document;
iv.  all recipients of the document or of any copies of the document, to the extent not included among the document's addressees;
v.  the date of the document;

3

      vi.   a description of the subject matter of the document;

     vii.   the nature or type of the privilege that your company is asserting for the document (*e.g,* "attorney-client privilege");

   viii.   the specifications of this schedule to which the document is responsive;

     ix.   the document control numbers of any attachments to the document, regardless of whether any privilege is being asserted for such attachments; and

      x.   whether the document has been produced in redacted form.

b.  Your company's privilege log shall also conform with all of the following requirements:

      i.   Provide a separate legend containing the full name, title, and employer or company affiliation of each author, addressee, and recipient identified on your company's privilege log.

     ii.   All attorneys acting in a legal capacity with respect to the withheld document or communication, and only such attorneys, shall be identified on the privilege log with an asterisk.

    iii.   The description of the subject matter of each document shall describe the nature of the document in a manner that, though not revealing information that is itself privileged, provides sufficiently detailed information to enable the Department to assess the applicability of the privilege claimed.

    iv.   For each document withheld under a claim that it constitutes or contains attorney work product, also state whether your company asserts that the document was prepared in anticipation of litigation or for trial and, if so, identify the anticipated litigation or trial upon which the assertion is based.

     v.   Produce all nonprivileged portions of any responsive document (including nonprivileged or redactable attachments) for which a claim of privilege is asserted, except where the only nonprivileged information in the document has already been produced. Note where any redactions in the document have been made.

    vi.   The privilege log shall be produced in both hard-copy and electronic form, the electronic form of which shall be both searchable and sortable.

c.  Documents sent solely between counsel for your company, including in-house counsel acting solely in a legal capacity, and documents authored by your company's outside counsel that were not directly or indirectly furnished to any third party, such as internal law firm memoranda, may be omitted from the privilege log. However, any attachments to such documents must be included on

4

the privilege log (if a privilege is applicable to such materials), unless such attachments are addressed and sent solely to counsel.

d. If any portion of any document is responsive to any paragraph or subparagraph in Section III below, then the entire document must be produced, including all supporting, underlying, or explanatory documents and all attached, annexed, or appended documents (this includes file attachments to electronic communications). Documents should be submitted as found in your company's files *(e .g.,* documents that in their original condition were stapled, clipped, or otherwise fastened together, or maintained in separate file folders, shall be produced in such form). Documents should also be produced in the order in which they appear in your company's files and should not be shuffled or otherwise rearranged. If a document contains privileged material, the entire document must be produced, with the privileged material redacted and documented as set forth in Paragraph II.E., above.

e. If you intend to utilize any de-duplication software or services when collecting or reviewing information that is stored in your company's computer systems or electronic storage media in response to this schedule of documents to be produced, or if your company's computer systems contain or utilize such software, you must contact the attorneys for the government to determine, with the assistance of the appropriate government technical staff, whether and in what manner your company may use such software or services.

f. Mark each page of each document submitted- whether in hard-copy or electronic format- with corporate identification and consecutive document control numbers. Place all documents produced in hard-copy format in file folders. Mark each file folder with your company's corporate identification, the name of the person whose documents are in the folder, and how the original file was labeled. If your company submits hard copies of electronic documents that have been printed from a common electronic source, such as a central e-mail or document server or a backup disk, such documents must be submitted in file folders that are marked with (1) a description of the enclosed documents' electronic source (e.g., "Documents from Backup Tape No.3 for Email Server XYZ, 3/1 /06 - 3/31 /06"); and (2) the name of each natural person whose electronic documents are contained in that file folder. Where a document is responsive to more than one paragraph or subparagraph of Section III below, your company shall produce it only once. Hard-copy documents shall be submitted in sturdy boxes not larger than 1.5 cubic feet. Number each box and mark each box with corporate identification and the names of the individuals whose files are contained in that box.

5

g. Provide a master list showing: (1) the name of each individual from whom responsive documents are submitted; and (2) the corresponding consecutive document control numbers used to identify that person's documents. If the master list exists in electronic form, provide the master list both as a printed hard copy and in electronic form (provided the master list can be produced in a format that allows the Department to use it). The Department representatives will provide a sample master list upon request.

h. The definition of "document" used in this schedule includes data stored in any electronic form. Your company is required to review such data and determine whether it contains material responsive to this subpoena. In addition, your company should **immediately** take the following steps to ensure that it preserves all types of electronic data from the subpoena period that may be responsive:

   i. Electronic Data to be Preserved. The following (subparagraphs a.-g.) types of electronic data should be preserved, in accordance with the steps set forth in Paragraphs II.J.2. through 7., below:

      1. All electronic mail, information about electronic mail (including but not limited to information on message contents, header information, and logs of electronic mail system usage), any attachments, and any other electronic communications, including any data from Instant Messaging programs, Internet Relay Chat systems, or any voicemail programs, containing information responsive to the subpoena;

      2. All files that contain information from electronic calendars or scheduling programs responsive to the subpoena;

      3. All user-created files (including but not limited to word processing files, spreadsheets and slide presentations) that contain information responsive to the subpoena;

      4. All databases (including all records and fields and structural information in such databases) or other data files that contain any information (such as sales, pricing, customer, financial, accounting, and billing information) responsive to the subpoena;

      5. All logs of activity on computer systems that may have been used to process or to store electronic data containing information responsive to the subpoena;

      6. All electronic data files created or used by spreadsheet programs that contain information responsive to the subpoena; and

6

7.  All other electronic data containing information that is responsive to the subpoena.

ii.  <u>Online Data Storage: Servers/Mainframes</u>. With regard to your company's servers, mainframes, and any other electronic data storage devices, *do not modify or delete* any electronic data existing as of the date of the subpoena that contain information that meets any of the criteria set forth in Paragraph II.J.l . above, unless a true and correct copy of each such electronic data file has been made and steps have been taken to ensure that this copy will be preserved and accessible for purposes of this grand jury investigation.

iii.  <u>Off-Line Data Storage: Backups, Archives, and Other Removable Media</u>. With regard to all electronic media used for off-line storage, including but not limited to magnetic tapes and cartridges and other media that, at the date of service of this subpoena, contain any electronic data meeting the criteria listed in Paragraph II.J.l., *immediately stop any activity* that may result in the loss of such electronic data, including rotation, destruction, overwriting; or erasure of such media in whole or in part. This request is intended to cover all removable electronic media used for data storage in connection with your company's computer system, including magnetic tapes and cartridges, magneto-optical disks, floppy diskettes, CDs, DVDs, USB thumb drives, and all other media, whether used with personal computers, mainframes, other computers, or other electronic data storage devices, and whether containing  active data, backup data, archived data, or any other electronic data, for your company's computer systems.

iv.  <u>Replacement of Data Storage Devices</u>. Do not dispose of any electronic data storage devices or media that may be replaced due to failure, upgrade, or other reasons if such devices or media may contain electronic data meeting the criteria listed in Paragraph II.J.l above.

v.  <u>Local-User Hard Drives on Personal Computers, Hand-Held Devices</u>. With regard to electronic data meeting the criteria listed in Paragraph II.J.l. above that existed on stand-alone computers (including desktops, laptops, and home computers used to conduct your company's business) and handheld devices (including BlackBerrys and Palm Pilots) as of the date of this subpoena, *do not alter or erase* this electronic data, and do not perform other procedures (such as data compression, disk

7

defragmentation, optimization routines, or reassignment of hard drives) that may affect this data, unless a true and correct copy has been made of these active files, copies have been made of all directory listings (including system files) for all directories and subdirectories containing those files, and arrangements have been made to preserve the copies during the pendency of this grand jury investigation.

    vi.   <u>Custom Designed Programs and Utilities</u>. Preserve copies of all application programs and utilities that are used to process electronic data responsive to this subpoena.

    vii.  <u>Log of System Modifications</u>. Maintain an activity log to document modifications made to any electronic data processing system that may affect the system's capability to process any electronic data meeting the criteria listed in Paragraph II.J.l., regardless of whether these modifications were made by employees, contractors, vendors, or any other third parties.

i.    Unless otherwise requested by a Department representative, electronic documents *(e.g.,* email) and data shall be produced in electronic form only. Electronic documents and data shall be produced in a format that allows the Department to access and use them, together with instructions and all other materials necessary to use or interpret the data, including record layouts and data dictionaries. For data submitted electronically, submit a description of the data's source.

j.    Before you prepare documents or information for production in electronic form (for example, before you attempt to copy, for your response to this schedule, documents or information from an electronically ·stored source onto a disk or other electronic storage medium), you must contact a Department representative to arrange a meeting or conference call with your company's personnel who are familiar with the electronic files in which the documents or information are stored, to explain to Department representatives the manner in which the documents or information are stored, and the types of information that are available on the electronic source. Department representatives must approve the format and production method for electronic data in advance of the submission by your company of its response to this schedule of documents.

8

k.  This subpoena requires your company to:

   i.   Appear before the grand jury through an authorized, knowledgeable
        representative at the time and place set;
   ii.  Produce before the grand jury all documents described in this schedule of
        documents; and
   iii. Identify and authenticate all documents so produced.

l.  The representative who appears before the grand jury for your company will be
    questioned under oath regarding methods of compliance and whether all
    documents described in this schedule of documents have been produced. The
    representative making the appearance should be prepared to explain what was
    done, how, where, when, and by whom, to comply with the demands set forth in
    this schedule of documents.

m.  Your company, at its sole election, may also comply with the subpoena, in lieu of
    producing documents before the grand jury, by producing all responsive
    documents via certified or registered mail, or via equivalent delivery, to the
    address listed in Paragraph II.Q. below, provided that each of the following
    prerequisites is met:

   i.   All subpoenaed documents reach the United States on or before the date
        your company, through its representative, is scheduled to appear before
        the grand jury (or on or before such other date agreed upon in writing by
        your company and attorneys for the United States); and
   ii.  The official of your company responsible for complying with this
        subpoena submits with the subpoenaed documents a sworn statement that:

      1.  States the name and position of each person assisting in the search
          for the documents;
      2.  Describes all locations searched, including your company's
          computer system and all removable media;
      3.  Identifies the documents produced by number; and
      4.  Certifies that the documents produced fully comply with the
          demands of the subpoena, and that your company has withheld no
          documents, except on grounds of privilege in accordance with
          Paragraph II.E., above.

n.  Regardless of which production method your company chooses, the grand jury
    reserves the right to require the official of your company responsible for

9

compliance with this subpoena or any other employee involved in the search to testify about your company's efforts to comply with the subpoena.

o. No agreement or stipulation by the United States or its representatives, purporting to modify, limit, defer, or otherwise vary this subpoena or schedule of documents will be valid or binding on the United States unless confirmed or acknowledged in writing by the United States, or made of record in open court, by a duly authorized representative thereof.

p. All communications or inquiries regarding this subpoena and schedule of documents should be addressed to:

Bob Leach, Assistant U.S. Attorney
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone number: (415) 436-7200

Jeff Schenk, Assistant U.S. Attorney
150 Almaden Blvd.
San Jose, CA 95126
Telephone number: (408) 535-5061

## III.   DOCUMENTS TO BE PRODUCED

A.   All documents regarding the financial health, financial status, financial stability, income, debt, or projected income or debt of Theranos, including any final reports, narratives, drafts, edits, comments, or revisions.

B.   All documents regarding fraud, fraudulent reporting, inaccuracies, inconsistencies, or falsification with respect to Theranos blood testing results, including tests for patients, demonstrations, or tests performed for research and development purposes.

C.   All documents regarding assay development reports (in un-redacted form).

D.   All documents known as or created in conjunction with validation reports, including validation reports generating during assay development.

E.   All documents regarding Theranos device capabilities, device-specific assay menus, and the date(s) specific assays were validated and/or operational for Theranos-developed devices.

F.   All documents regarding the purchase or modification of third party blood testing devices, including whether any such modifications should or should not be disclosed to the manufactures of or to service technicians working on third party blood testing devices.

10

G. All documents regarding personal expenses incurred by Theranos on behalf of or for the benefit of Elizabeth Holmes or Ramesh "Sunny" Balwani.

H. All documents regarding the removal of outliers or outlier data during blood testing.

I. All signed and unsigned versions of contracts or agreements between Theranos and the following entities or institutions:

    a. United Health

    b. Johns Hopkins University

    c. GSK

    d. Pfizer

    e. UCSF

    f. Cleveland Clinic

    g. GlaxcoSmithKline

    h. Schering-Plough

    i. Centocor

    j. Celegene

    k. Novartis

    l. Bristol-Meyers Squibb

    m. Merck & Co.

    n. AstraZeneca

    o. Mayo Clinic

    p. Stanford University

    q. Daiichi Sankyo

    r. Janssen Biotech

    s. Children's Hospital of Philadelphia

    t. Cedars-Sinai

    u. Hospital Corporation of America

    v. Hospital for Special Surgery

    w. Select Medical

J. All documents identifying devices that Theranos used to conduct research for the entities listed in Subpart III I. a. – w.

K. All documents regarding study design, study protocol, and results related to the research Theranos conducted for the entities listed in Subpart III I. a. – w.

L. All institutional review board submissions and approvals Theranos submitted or obtained (or submitted or obtained on Theranos's behalf) for the entities listed in Subpart III I. a. – w.

M. In a July 11, 2017 letter from Wilmer to the DOJ, Mr. Davies stated that, "Accordingly, beginning in 2007, the Company partnered with a number of well-known pharmaceutical companies and research institutions on studies the Company believed would assess the viability of its technology." Please provide all documents supporting this statement, including agreements establishing the "partnership," and

**ER-1527**

documents produced by the pharmaceutical company or research institution regarding the viability of Theranos technology.

N.   All emails to, from, or including Elizabeth Holmes or Sunny Balwani concerning:

    a.   Any topic referenced in Subpart III A. to III L. above;

    b.   assays;

    c.   Theranos devices, including Edison, MiniLab, and any other Theranos-created blood testing or analyzing device.

O.   All text or SMS messages sent or received by cellular phones owned or paid for by Theranos, and used by either Elizabeth Holmes or Sunny Balwani.

P.   All communications, including purchase orders, invoices, and receipts, between Theranos and the following entities:

    a.   Siemens Corporation;

    b.   Beckman Coulter;

    c.   Becton Dickinson;

    d.   BioRad Laboratories;

    e.   DiaSorin Inc.;

    f.   Tosoh USA; and

    g.   EldonCard d/b/a Eldon Biologicals.

## IV.   NOTICE CONCERNING DOCUMENT DESTRUCTION AND OBSTRUCTION OF JUSTICE

Any person who withholds, alters, deletes, or destroys documents – including electronic documents - demanded by this subpoena, or who removes or transfers such documents to outside the jurisdiction of the United States, may be subject to criminal prosecution for obstruction of justice, contempt of court, or other federal criminal violations. Conviction of any of these offenses .may be punishable by substantial fine or imprisonment, or both.

12

2016R00024 - 048

## DECLARATION OF CUSTODIAN OF RECORDS

Pursuant to 28 U.S.C. § 1746, I, the undersigned, hereby declare:

My name is _____.
          (Name of Declarant)

I am a United States citizen, and I am over eighteen years of age. I am the custodian of records of the business named below, or I am otherwise qualified as a result of my position with the business named below to make this declaration.

I am in receipt of a United States District Court Grand Jury Subpoena for the Northern District of California, signed by Assistant U.S. Attorney _____, requesting specified records of the business named below. Attached hereto are records responsive to the subpoena. Pursuant to Federal Rule of Evidence 902(11) and Federal Rule of Evidence 803(6), I hereby certify that the records attached hereto:

(1) were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;

(2) were kept in the course of the regularly conducted business activity; and

(3) were made by the regularly conducted business activity as a regular practice.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____.

_____
(signature of declarant)

_____
(name of declarant)

_____
(name of business/firm)

_____
(business address)

_____

_____

2016R00024 - 048

AO 110 (Rev. 06/09) Subpoena to Testify Before Grand Jury (Page 2)

## PROOF OF SERVICE

This subpoena for *(name of individual or organization)*   Theranos, Inc.

was received by me on *(date)*                     .

❑   I served the subpoena by delivering a copy to the named person as follows:

_____   on *(date)* _____ ; or

❑   I returned the subpoena unexecuted because: _____

_____  .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# Exhibit  J



*United States Attorney*
*Northern District of California*

---

*11th Floor, Federal Building*
*450 Golden Gate Ave., Box 36055*
*San Francisco, CA 94102-3495*

*(415)436-7200*
*FAX: (415) 436-7234*

November 30, 2016

Custodian of Records
Theranos, Inc.
c/o Thomas L. Strickland
Wilmerhale
1875 Pennsylvania Avenue, NW
Washington, D.C.  20006
Fax:  (202) 663-6363

**Re: Grand Jury Subpoena, Investigation #2016R00024-15**

To Whom It May Concern:

You have received a grand jury subpoena duces tecum in connection with the above-numbered grand jury investigation.  The subpoena has been issued in furtherance of that investigation.

This letter is written to advise you that disclosure of the subpoena and your response to it to any third parties may impede or obstruct the investigation.  Therefore, we ask you not to disclose the existence of the subpoena or the nature of your response to it to any person for the indefinite future.

If you have any questions about this request, please telephone me at (415) 436-7534.

Very truly yours,

ALEX TSE
Attorney of the United States
Acting Under Authority Conferred by 28 U.S.C. § 515

ROBERT S. LEACH
Assistant United States Attorney

RSL:bk
cc:  Cameron Purves, Special Agent (via e-mail w/enclosures)

AO 110 (Rev. 06/09) Subpoena to Testify Before a Grand Jury                    USAO NO. 2016R00024-15    GJ 16-1

# UNITED STATES DISTRICT COURT
for the

Northern District of California

## SUBPOENA TO TESTIFY BEFORE A GRAND JURY

To: Custodian of Records
Theranos, Inc.
c/o Thomas L. Strickland - Wilmerhale, 1875 Pennsylvania Avenue, NW, Washington, D.C.  20006

   **YOU ARE COMMANDED** to appear in this United States district court at the time, date, and place shown below to testify before the court's grand jury.  When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place: United States District Court<br>Grand Jury Room A, 17th Floor<br>450 Golden Gate Avenue<br>San Francisco, CA  94102 | Date and Time:<br><br>12/22/2016 9:30 am |
|---|---|

   You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

### **PLEASE SEE ATTACHED**
All records must be provided in electronic format unless otherwise specified.  Voluntary compliance with this federal grand jury subpoena will be deemed satisfactory and no appearance will be necessary, if the information requested is sent to the agent listed below on or before the date listed above.

Cameron Purves, Special Agent
Federal Bureau of Investigation
450 Golden Gate Ave, 13th Floor
San Francisco, CA  94102
Phone: (415) 553-7658; Fax:  (415) 575-5005
E-mail: Cameron.Purves@ic.fbi.gov

Date:  _____11/30/2016_____

*CLERK OF COURT*

_____
*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the United States attorney, or assistant United States attorney, who requests this subpoena, are:
Robert S. Leach, Assistant United States Attorney
U.S. Attorney's Office - 450 Golden Gate Avenue, 11th Floor, San Francisco, CA  94102, Ph: (415) 436-7534

This subpoena is issued on application of the United States of America.
ALEX TSE
ATTORNEY FOR THE UNITED STATES, ACTING UNDER AUTHORITY CONFERRED BY 28 U.S.C. § 515

**Attachment A**

Custodian of Records
Theranos, Inc.
c/o Thomas L. Strickland
Wilmerhale
1875 Pennsylvania Avenue, NW
Washington, D.C.  20006
Fax:  (202) 663-6363

1.  All documents relating to the United States Food and Drug Administration (US FDA), including, but not limited to, all applications, notes, and communications both internal and external, with or regarding the US FDA.
2.  All documents relating to the Clinical Laboratory Improvement Amendments (CLIA) certification, including, but not limited to, all applications, notes, and communications both internal and external, with or regarding the CLIA certification.
3.  Employee records of all current and former employees of Theranos, Inc. and any of its subsidiaries including but not limited to, name, position at Theranos, Inc., dates of employment, any known addresses, any known telephone numbers, and any known email addresses.

<u>CONTACT INFORMATION</u>

If you wish to comply voluntarily rather than appear before the Grand Jury, please produce the responsive documents on or before the return date of the subpoena by emailing or delivering the documents to the federal agent at the address below:

Special Agent Cameron Purves
450 Golden Gate Avenue, 13th Floor
San Francisco, CA  94102
Phone:  (415) 553-7400
Cameron.purves@ic.fbi.gov

## DECLARATION OF CUSTODIAN OF RECORDS

Pursuant to 28 U.S.C. § 1746, I, the undersigned, hereby declare:

My name is _____ .
                            (name of declarant)

I am a United States citizen, and I am over eighteen years of age.  I am the custodian of records of the business named below, or I am otherwise qualified as a result of my position with the business named below to make this declaration.

I am in receipt of a United States District Court Grand Jury Subpoena for the Northern District of California, signed by **Assistant U.S. Attorney Robert S. Leach** requesting specified records of the business named below.  Attached hereto are records responsive to the subpoena. Pursuant to Federal Rule of Evidence 902(11) and Federal Rule of Evidence 803(6), I hereby certify that the records attached hereto:

(1) were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;

(2) were kept in the course of the regularly conducted business activity; and

(3) were made by the regularly conducted business activity as a regular practice.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on _____ .


_____
(signature of declarant)

_____
(name of declarant)

_____
(name of business/firm)

_____
(business address)

_____

_____

**ER-1535**

# Exhibit  I



*United States Attorney*
*Northern District of California*

*11ᵗʰ Floor, Federal Building*
*450 Golden Gate Ave., Box 36055*
*San Francisco, CA 94102-3495*

*(415)436-7200*
*FAX: (415) 436-7234*

January 11, 2016

Custodian of Records
Theranos, Inc.
c/o Peter Skinner, Esq.
Boies, Schiller & Flexner LLP
575 Lexington Avenue, 7th Floor
New York, NY 10022
Fax:  (212) 446-2350

**Re: Grand Jury Subpoena Investigation #2016R00024-1**

Dear Sir or Madam:

　　You have received a grand jury subpoena duces tecum in connection with the above-numbered grand jury investigation.  The subpoena has been issued in furtherance of that investigation.

　　This letter is written to advise you that disclosure of the subpoena and your response to it to any third parties may impede or obstruct the investigation.  Therefore, we ask you not to disclose the existence of the subpoena or the nature of your response to it to any person for the indefinite future.

　　If you have any questions about this request, please telephone me at (415) 436-7534.

Very truly yours,

BRIAN J. STRETCH
Acting United States Attorney

ROBERT S. LEACH
Assistant United States Attorney

RSL:bk
Enclosures

**ER-1537**

AO 110  (Rev. 06/09) Subpoena to Testify Before a Grand Jury                      USAO NO. 2016R00024-1      GJ 14-3

# UNITED STATES DISTRICT COURT

for the

Northern District of California

### SUBPOENA TO TESTIFY BEFORE A GRAND JURY

To:  Custodian of Records
Theranos, Inc.
c/o Peter Skinner, Esq. - Bois, Schiller & Flexner LLP, 575 Lexington Avenue, 7th Floor, New York, NY  10022

**YOU ARE COMMANDED** to appear in this United States district court at the time, date, and place shown below to testify before the court's grand jury.  When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place: | United States District Court<br>Federal Building & Courthouse, Grand Jury Room A, 17<br>450 Golden Gate Avenue<br>San Francisco, CA  94102 | Date and Time:<br><br>01/28/2016 9:30 am |
|---|---|---|

You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

**\*\*PLEASE SEE ATTACHED\*\***

Date:     01/11/2016                                                    *CLERK OF COURT*

                                                                        Susan Y. Soong
                                                                        *Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the United States attorney, or assistant United States attorney, who requests this subpoena, are:
Robert S. Leach, AUSA
U.S. Attorney's Office
450 Golden Gate Avenuen, 11th Floor, San Francisco, CA  94102, Ph:  (415) 436-7534
This subpoena is issued on application of the United States of America.
BRIAN J. STRETCH
ACTING UNITED STATES ATTORNEY



**U.S. Department of Justice**

*United States Attorney*
*Northern District of California*

---

*11th Floor, Federal Building*          *(415)436-7200*
*450 Golden Gate Ave., Box 36055*        *FAX: (415) 436-7234*
*San Francisco, CA 94102-3495*

**ADVICE OF RIGHTS**

In accordance with Department of Justice regulations, this form is attached to all federal grand jury subpoenas, regardless of the status, culpability, or involvement of the person who receives a subpoena.

1.     The grand jury is conducting an investigation of possible violations of federal criminal law involving securities fraud, wire fraud, mail fraud, false statements, the Federal Food, Drug, and Cosmetic Act, and other offenses.

2.     A witness before the grand jury may refuse to answer any questions if a truthful answer to the question would tend to incriminate the witness.

3.     Anything said by a witness before the grand jury may be used against the witness by a grand jury or in a subsequent legal proceeding.

4.     If a witness has retained counsel, the grand jury will permit the witness a reasonable opportunity to step outside the grand jury to consult with counsel if the witness so desires.

**ATTACHMENT A**

Custodian of Records
Theranos, Inc.
c/o Peter Skinner, Esq.
Boies, Schiller & Flexner LLP
575 Lexington Avenue, 7th Floor
New York, NY 10022
Fax:  (212) 446-2350

1.   Documents sufficient to identify all shareholders of Theranos.
2.   Documents sufficient to identify any bank accounts or lines of credit of Theranos.
3.   Documents sufficient to identify all securities offerings by Theranos.
4.   With respect to any securities offering, a copy of the prospectus and any other offering materials used.
5.   All documents relating to any business arrangement between Theranos and Walgreens, including, without limitation, all agreements with Walgreens, all communications with Walgreens relating to any business arrangement, and all documents relating to Theranos' performance under any agreement.
6.   All documents relating to any business arrangement between Theranos and Safeway, including, without limitation, all agreements with Safeway, all communications with Safeway relating to any business arrangement, and all documents relating to Theranos' performance under any agreement.
7.   All documents relating to any communications between Theranos and Novartis AG, including, but not limited to, notes or e-mails summarizing or describing meetings with Novartis.
8.   All documents relating to any communications between Theranos and the Cleveland Clinic.

| TRANSPORTATION EXPENSE | | | | |
|---|---|---|---|---|
| Name:<br>(Please Print) | | | | |
| Home Address: | | | | |
| City: | | State: | | Zip Code: |
| Social Security #: | | Telephone #:   Home. (     )<br>                      Bus.  (     )<br>(Must include area code) | | |

| (Local Witnesses) Travel by Privately Owned Vehicle | | | | |
|---|---|---|---|---|
| Mileage from residence to court (roundtrip): _____ | | | **MUST BE ANSWERED BY ALL WITNESS** | |
| Toll Information | | | TESTIMONY DATES | |
| Date | Name of Bridge(s) | Amount | Grand Jury | |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

| Parking Fees: (Copy of Claim Ticket(s) Required) | | | | | |
|---|---|---|---|---|---|
| Date | Amount | Date | Amount | Date | Amount |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

Bart Travelers: (Copy of BART Ticket Required)

Name of attorney who subpoenaed you: _____

| Out of State Witnesses |
|---|
| Note: Receipts required for all transactions (parking, taxi, and/or subway) |
| Mode of Travel from residence to airport (roundtrip): ☐ Taxi (Cost:_____)<br>☐ Subway (Cost:_____)<br>☐ Privately Owned Vehicle (Mileage:_____) |
| Mode of travel from airport to Court House / Hotel (roundtrip): ☐ Taxi (Cost:_____)<br>☐ Subway (Cost:_____)<br>☐ Privately Owned Vehicle (Mileage:_____) |

| Arrival Date: | Departure Date: |
|---|---|
| ☐ I am not a Federal employee<br>☐ I am a Federal employee | ☐ I am a citizen of the United States<br>☐ I am not a citizen of the United States<br>(if not a citizen, present your Alien Registration Record for copying) |

PLEASE SIGN _____   DATE _____
                      (Signature)

Revised: Nov-15

**U.S. DEPARTMENT OF JUSTICE**

INSTRUCTIONS FOR FACT WITNESSES APPEARING ON
BEHALF OF THE UNITED STATES GOVERNMENT
(Not Applicable to Federal Employees)



**San Francisco**

---

**READ THE INFORMATION CONTAINED ON THIS FORM BEFORE YOUR COURT APPEARANCE.  PLEASE CALL THE INDIVIDUAL(S) LISTED BELOW FOR INFORMATION REGARDING TRAVEL ARRANGEMENTS AND SPECIFIC ENTITLEMENTS.  IF YOU HAVE A MEDICAL CONDITION OR FAMILY SITUATION THAT REQUIRES SPECIAL CONSIDERATION, PLEASE ADVISE THE INDIVIDUAL LISTED BELOW AS SOON AS POSSIBLE.**

---

**CONTACT PERSON(S):**   BETTY VANTREE
Grand Jury Coordinator

**TELEPHONE NUMBER:**  (415) 436-7236

**- VERIFY YOUR ATTENDANCE -**

On the last business day BEFORE you travel to court, call the above number to verify that your attendance is required.   This may prevent a wasted trip in the event the trial date is changed.

**- APPEARANCE IN ANOTHER CITY -**

If you are required to travel to another city to appear in court, immediately contact the individual listed above and request instructions.  Any amount advanced to you will be deducted from your fees and allowances.

**- REIMBURSEMENT OF EXPENSES AND ATTENDANCE FEES -**

A.    **ATTENDANCE FEE:** You will be paid a fee of $40 per day, including travel days.

B.    **TRANSPORTATION:** Call the individual listed above to obtain information on transportation.  Reimbursement will be made for travel by the least expensive method reasonably available to you.  The following rules apply to transportation expenses:

1. **Local Travel:** The recommended method of travel in the local area of court is transit bus/subway.

2. **Privately Owned Vehicles (POV):** You will be reimbursed the following amounts:

Motorcycle .535  per mile    Automobile .575  per mile    Airplane $1.33 per mile

In addition to the above mileage allowance, necessary tolls, parking and other fees may be reimbursed.  You must keep a record of your odometer readings if you travel by motorcycle or automobile.  If two or more witnesses travel in the same vehicle, only one reimbursement for mileage can be made.

**IF POV EXPENSES, INCLUDING MILEAGE, TOLLS, PARKING AND OTHER ASSOCIATED COSTS, ARE GREATER THAN THE GOVERNMENT AIRFARE, YOU WILL BE RESPONSIBLE FOR THE DIFFERENCE.**

3. **Common Carrier:** If you are located outside the local court area, **CALL THE INDIVIDUAL LISTED ABOVE FOR INSTRUCTIONS.** Train, bus or airfare will be reimbursed at the Government rate.  Reimbursement **WILL NOT** be made for First Class accommodations, "Frequent Flyer" tickets, or charter service.  **DO NOT** purchase non-refundable tickets.  If your appearance date changes or is cancelled, you **WILL NOT** be reimbursed for non-refundable tickets.  If you have any questions concerning transportation arrangements, please contact the individual(s) listed above.

C.    **MEALS:** If it is necessary for you to remain away from home overnight, you will receive the following daily meal allowances:

$ 37.00    for each travel day    PLUS    $ 74.00    for each full day at court

D.    **LODGING:** If it is necessary for you to remain away from home overnight, you will be reimbursed for the **ACTUAL COST** of  your hotel/motel room, which may be not exceed  $ 250.00  per night, including tax.

**- YOU MUST RETAIN RECEIPTS -**

**ALL CLAIMS FOR PARKING MUST BE SUPPORTED BY A RECEIPT.  OTHER EXPENSES EQUAL TO $25 OR MORE MUST BE SUP-PORTED BY A RECEIPT, WITH THE EXCEPTION OF MEALS AND MILEAGE.**

**- DISMISSAL -**

When you are advised that your attendance is no longer required, you should request information regarding the payment of the fees and allowances outlined above.  The individual requiring your attendance will provide you with a Fact Witness Voucher.  You will be required to list your expenses on this Voucher.  The Voucher will be submitted to the U.S. Marshals Service for payment.  The U.S. Marshals Service will process the voucher and MAIL the payment to you.  If you require funds to return home, you must bring this fact to the attention of the individual requiring your attendance, who will notify the U.S. Marshals Service.

---

This form was electronically produced by Elite Federal Forms, Inc.

Form OBD-2

AO 110  (Rev. 06/09)  Subpoena to Testify Before Grand Jury (Page 2)

## PROOF OF SERVICE

This subpoena for *(name of individual or organization)* _____
was received by me on *(date)* _____ .

❐   I served the subpoena by delivering a copy to the named person as follows: _____
_____ on *(date)* _____ ; or

❐   I returned the subpoena unexecuted because: _____
_____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# **Exhibit  H**



### UNITED STATES
### SECURITIES AND EXCHANGE COMMISSION
San Francisco Regional Office
44 Montgomery Street, Suite 2800
San Francisco, CA 94104

**DIVISION OF ENFORCEMENT**

Jessica W. Chan
Counsel
(415) 705-2451

May 27, 2016

**VIA UPS AND EMAIL**

Theranos, Inc.
c/o Peter M. Skinner, Esq. and Andrew Z. Michaelson, Esq.
Boies, Schiller & Flexner
575 Lexington Avenue, 7th Floor
New York, NY 10022
pskinner@bsfllp.com
amichaelson@bsllp.com

Re:     **In the Matter of Theranos, Inc. (SF-4030)**

Dear Pete and Andrew:

The enclosed subpoena has been issued pursuant to a formal order entered by the United States Securities and Exchange Commission.  The subpoena requires your client, Theranos, Inc., to produce documents.

**Producing Documents**

*What materials do I have to produce?*

The subpoena requires production of the documents described in the attachment to the subpoena.  The attachment defines some terms (such as "document") before listing what must be produced.  The documents must be produced to the Commission no later than **June 10, 2016.**

Please note that if copies of a document differ in any way, they are considered separate documents and each one must be produced.  For example, if there are two copies of the same letter, but only one of them has handwritten notes on it, both the clean copy and the one with notes must be produced.

If you prefer, photocopies of the originals may be produced.  The Commission cannot reimburse copying costs.  The copies must be identical to the originals, including even faint marks or print.  If you choose to send copies, the originals must be kept in a safe place.  We will accept the copies for now, but may require production of the originals later.

If photocopies are produced, please put an identifying notation on each page of each document to indicate that you produced it, and number the pages of all the documents submitted. Please make sure the notation and number do not conceal any writing or marking on the document.  If originals are produced, please do not add any identifying notations.

*Do I need to send anything else?*

You should enclose a list briefly describing each item produced.  The list should state to which category number(s) in the subpoena attachment each item responds.

You also should include a cover letter stating whether you believe you have met your obligations under the subpoena by searching carefully and thoroughly for everything called for by the subpoena, and producing it all to us.

*What if I do not produce everything described in the attachment to the subpoena?*

The subpoena requires production of all the materials described in it.  If, for any reason – including a claim of attorney-client privilege – you do not produce something called for by the subpoena, you should submit a list of what is not being produced.  The list should describe each item separately, noting:

- its author(s);

- its date;

- its subject matter;

- the name of the person who has the item now, or the last person known to have it;

- the names of everyone who ever had the item or a copy of it, and the names of everyone who was told the item's contents; and

- the reason the item was not produced.

If you withhold anything on the basis of a claim of attorney-client privilege or attorney work product protection, you should also identify the attorney and client involved.

*Where should I send the materials?*

Please send the materials to:

ENF-CPU
U.S. Securities and Exchange Commission
100 F St., N.E., Mailstop 5973
Washington, DC 20549-5973

For smaller electronic productions under 10MB in size, the materials may be emailed to the following email address:  ENF-CPU@sec.gov.

We ask that you send a copy of the cover letter to your response and a courtesy copy of the production by mail, fax, or email to:

Jessica W. Chan, Staff Attorney
U.S. Securities and Exchange Commission
San Francisco Regional Office
44 Montgomery Street, Suite 2800
San Francisco, California 94104
Telephone:  (415) 705-2451
Fax:  (415) 705-2501
Email:  chanjes@sec.gov

**Other Important Information**

*What will the Commission do with the materials I send and the testimony I provide?*

The enclosed SEC Form 1662 includes a List of Routine Uses of information provided to the Commission.  This form has other important information for you.  Please read it carefully.

*Has the Commission determined that anyone has done anything wrong?*

This investigation is a non-public, fact-finding inquiry.  We are trying to determine whether there have been any violations of the federal securities laws.  The investigation and the subpoena do not mean that we have concluded that you or anyone else has broken the law.  Also, the investigation does not mean that we have a negative opinion of any person, entity or security.

*Important Policy Concerning Settlements*

Please note that, in any matter in which enforcement action is ultimately deemed to be warranted, the Division of Enforcement will not recommend any settlement to the Commission unless the party wishing to settle certifies, under penalty of perjury, that all documents responsive to Commission subpoenas and formal and informal document requests in this matter have been produced.

*I have read this letter, the subpoena, and the SEC Form 1662, but I still have questions.  What should I do?*

If you have any questions concerning this matter, you may call me at (415) 705-2451.

Very truly yours,

Jessica W. Chan
Counsel, Division of Enforcement

Enclosures:    Subpoena Duces Tecum (with attachment)
                SEC Form 1662
                SEC Data Delivery Standards



## SUBPOENA

# UNITED STATES OF AMERICA
### SECURITIES AND EXCHANGE COMMISSION

**In the Matter of Theranos, Inc. (SF-4030)**

To:     Theranos, Inc.
        c/o Peter M. Skinner, Esq. and Andrew Z. Michaelson, Esq.
        Boies, Schiller & Flexner LLP
        575 Lexington Avenue, 7th Floor
        New York, NY 10022

☒      **YOU MUST PRODUCE** everything specified in the Attachment to this subpoena to
        officers of the Securities and Exchange Commission at the place, and no later than the date
        and time, specified below.

        ENF-CPU
        U.S. Securities and Exchange Commission
        100 F St., N.E., Mailstop 5973
        Washington, DC 20549-5973
        Date/Time:  June 10, 2016

☐      **YOU MUST TESTIFY** before officers of the Securities and Exchange Commission, at the
place, date and time specified below:

        **FEDERAL LAW REQUIRES YOU TO COMPLY WITH THIS SUBPOENA**.
                Failure to comply may subject you to a fine and/or imprisonment.

By:     _____   Date:   May 27, 2016
        Jessica W. Chan
        U.S. Securities and Exchange Commission, San Francisco Regional Office
        44 Montgomery Street, Suite 2800, San Francisco, CA 94104; Telephone (415) 705-2451
I am an officer of the Securities and Exchange Commission authorized to issue subpoenas in this
matter.  The Securities and Exchange Commission has issued a Formal Order authorizing this
investigation under Section 20(a) of the Securities Act of 1933 and Section 21(a) of the Securities
Exchange Act of 1934.

## ATTACHMENT

**Subpoena to Theranos, Inc.**
**In the Matter of Theranos, Inc. (SF-4030)**
**May 27, 2016**

## INSTRUCTIONS

This subpoena requires the production of certain documents, as specified in the section entitled "Production" below. The required documents should be produced in accordance with the following requirements:

A.    You must submit all documents required to be produced by the subpoena that are in your possession, custody, or control, regardless of whether the documents are in your possession.

B.    If you claim attorney-client privilege, or any other privilege or protection from production, provide a list of the documents that you claim are privileged or protected, indicating the date prepared, authors, all recipients, the subject matters of the document, and the privilege or protection claimed, sufficiently identifying the documents to permit the staff to determine whether to request an in camera inspection by a federal district court judge.

C.    Produce the entirety of each and every document described below, without alteration, deletion, redaction, or obliteration of any information contained therein, even though such information is not specifically requested.

D.    The following rules of construction apply to this subpoena and attachment: (1) the connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the attachment all responses that might otherwise be construed to be outside of its scope; and (2) the use of the singular form of any word includes the plural and vice versa.

## DEFINITIONS

A.    "COMMUNICATIONS" means and includes, but is not limited to, any correspondence, memoranda, notes, electronic mail, telephone conversations, instant message statements, and any other conversations, conferences, or meetings.

B.    "CONCERNING" means and includes, but is not limited to, referring to, pertaining to, relating to, alluding to, bearing upon, commenting upon, touching upon, regarding, concerning, recording, evidencing, constituting, substantiating, supporting, contradicting, discussing, mentioning, including or otherwise affecting (directly or indirectly).

C.    "DOCUMENT" and "DOCUMENTS" mean and include, but are not limited to, any and all records in your possession, custody or control, whether drafts or final versions, originals or annotated or non-identical copies, however and by whomever created, produced or stored (manually, mechanically, electronically or otherwise), including,

without limitation, books, papers, files, notes, account statements, confirmations, reports, correspondence, electronic files, e-mail, instant messages, text messages, Internet sites, World Wide Web pages, memoranda, ledger sheets, reports, telegrams, telexes, telephone bills, messages or logs, notes or minutes of conversations or meetings, contracts, agreements, calendars, datebooks, diaries, computer programs, records of billings, checks, receipts, wire transfers, drafts for money, records of payment, magnetic tape, tape recordings, disks, diskettes, diskpacks or other electronic media, microfilm, microfiche and other storage devices.  "DOCUMENT" and "DOCUMENTS" shall also include all "writings," "recordings" and "photographs" as defined by Rule 1001 of the Federal Rules of Evidence and all "electronically stored information" as the term is used in Rules 26 and 34 of the Federal Rules of Civil Procedure.

D.      "PEER VENTURES GROUP IV" means PEER Ventures Group IV, LP, the entities and their divisions, groups, subsidiaries, predecessors, successors and affiliates, as well as current and former officers, directors, members, general and limited partners, employees, attorneys, accountants, agents, representatives, and any person acting on behalf of PEER Ventures Group IV, LP with express, implied or apparent authority to do so or under its direction or control.

E.      "PEER VENTURE PARTNERS" means PEER Venture Partners, the entities and their divisions, groups, subsidiaries, predecessors, successors and affiliates, as well as current and former officers, directors, members, general and limited partners, employees, attorneys, accountants, agents, representatives, and any person acting on behalf of PEER Venture Partners with express, implied or apparent authority to do so or under its direction or control.

F.      "THERANOS" means Theranos, Inc., the entities and their divisions, groups, subsidiaries, predecessors, successors and affiliates, as well as current and former officers, directors, members, general and limited partners, employees, attorneys, accountants, agents, representatives, and any person acting on behalf of Theranos, Inc. with express, implied or apparent authority to do so or under its direction or control.

## PRODUCTION

1.      DOCUMENTS sufficient to identify all former THERANOS employees since the date of THERANOS' formation, including (1) their period of employment; (2) their positions or titles at the company at the time they departed; and (3) their contact information, including their addresses, phone numbers, and email addresses.

2.      DOCUMENTS sufficient to identify all divisions within THERANOS, the responsibility of each division, and reporting lines since the date of THERANOS' formation, including, but not limited to, historical organizational charts.

3.      For the individuals shown on TS-0000001, DOCUMENTS sufficient to describe their roles and responsibilities at THERANOS.

4.    DOCUMENTS sufficient to identify all THERANOS employees involved in research and development of THERANOS' proprietary technology since THERANOS' formation, including these employees' titles or positions and, if they are still currently employed by the company, who in TS-0000001 is their top-line supervisor.

5.    DOCUMENTS sufficient to show how much money has been spent by THERANOS on research and development for each fiscal year since THERANOS's formation.

6.    From January 1, 2010 to the date of production, all monthly or other periodic statements for any bank or brokerage accounts in the name of or for the benefit of THERANOS.

7.    From January 1, 2010 to the date of production, all (a) accounting records including general ledgers and subsidiary ledgers; (b) DOCUMENTS sufficient to understand the accounting systems or software utilized by THERANOS; and (c) income tax returns filed by THERANOS.

8.    From January 1, 2010 to the date of production, all DOCUMENTS CONCERNING any bank or cash account reconciliation performed by THERANOS.

9.    The THERANOS human resources or employee file for any current or former employee who has been the subject of any enforcement, or threatened enforcement, by THERANOS of any confidentiality provision as a result of communicating with any party outside of THERANOS.

10.   All DOCUMENTS that were provided by THERANOS to the Centers for Medicare and Medicaid Services ("CMS") during any of CMS's onsite surveys of THERANOS or any meetings between CMS and THERANOS, including, but not limited to, (a) a September 23, 2015 letter that was provided to CMS surveyors during the onsite survey that took place from September 22-23, 2015; (b) DOCUMENTS titled, "Theranos Background" that contain a summary of Phase I: Current Model and Phase II: Proposed model after 510(k) clearance; and (c) DOCUMENTS titled, "Overview of Sample Processing Workflow Prepared for FDA: Phase I and Phase II of Theranos Business Operations."

11.   All DOCUMENTS that were provided by THERANOS to the U.S. Food and Drug Administration ("FDA") during any of FDA's onsite inspections of THERANOS or any meetings between FDA and THERANOS.

12.   All COMMUNICATIONS CONCERNING CMS, including, but not limited to, COMMUNICATIONS CONCERNING the proficiency testing results submitted to the CMS in 2014.

13.   All COMMUNICATIONS CONCERNING the FDA.

14. All COMMUNICATIONS CONCERNING the Arizona Department of Health Services.

15. All COMMUNICATIONS CONCERNING or with the New York State Department of Health.

16. All COMMUNICATIONS CONCERNING or with the California Department of Public Health.

17. All DOCUMENTS CONCERNING any validation work performed on THERNANOS's proprietary technology by an outside party.

18. All DOCUMENTS provided by THERANOS to Walgreens, Safeway, United Health Group, or Blue Cross Blue Shield Association.

19. All signed agreements between THERANOS and United Health Group.

20. All signed agreements between THERANOS and Blue Cross Blue Shield Association.

21. From January 1, 2013 to the date of production, all COMMUNICATIONS CONCERNING or with United Health Group.

22. From January 1, 2013 to the date of production, all COMMUNICATIONS CONCERNING or with Blue Cross Blue Shield Association.

23. Since THERANOS' formation, all COMMUNICATIONS CONCERNING or with the U.S. Department of Defense, including, but not limited to, the U.S. Military or U.S. Navy.

24. All signed agreements with the U.S. Department of Defense, including, but not limited to, the U.S. Military or U.S. Navy.

25. Since THERANOS' formation, DOCUMENTS sufficient to show all revenues generated by work performed for the U.S. Department of Defense, including, but not limited to, the U.S. Military or U.S. Navy. Such DOCUMENTS may include, but not be limited to, invoices and payment confirmations.

26. From January 1, 2013 to the date of production, all DOCUMENTS and/or COMMUNICATIONS CONCERNING or with PEER VENTURES GROUP IV and/or PEER VENTURE PARTNERS.

27. From January 1, 2013 to the date of production, all DOCUMENTS provided by THERANOS to PEER VENTURES GROUP IV and/or PEER VENTURE PARTNERS.

**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**Supplemental Information for Persons Requested to Supply**
**Information Voluntarily or Directed to Supply Information**
**Pursuant to a Commission Subpoena**

**A. False Statements and Documents**

Section 1001 of Title 18 of the United States Code provides as follows:

> [W]hoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully--
>
> (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
> (2) makes any materially false, fictitious, or fraudulent statement or representation; or
> (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;
>
> shall be fined under this title, imprisoned not more than 5 years . . . or both.

**B. Testimony**

If your testimony is taken, you should be aware of the following:

1.  *Record.* Your testimony will be transcribed by a reporter. If you desire to go off the record, please indicate this to the Commission employee taking your testimony, who will determine whether to grant your request. The reporter will not go off the record at your, or your counsel's, direction.

2.  *Counsel.* You have the right to be accompanied, represented and advised by counsel of your choice. Your counsel may advise you before, during and after your testimony; question you briefly at the conclusion of your testimony to clarify any of the answers you give during testimony; and make summary notes during your testimony solely for your use. If you are accompanied by counsel, you may consult privately.

If you are not accompanied by counsel, please advise the Commission employee taking your testimony if, during the testimony, you desire to be accompanied, represented and advised by counsel. Your testimony will be adjourned once to afford you the opportunity to arrange to be so accompanied, represented or advised.

You may be represented by counsel who also represents other persons involved in the Commission's investigation. This multiple representation, however, presents a potential conflict of interest if one client's interests are or may be adverse to another's. If you are represented by counsel who also represents other persons involved in the investigation, the Commission will assume that you and counsel have discussed and resolved all issues concerning possible conflicts of interest. The choice of counsel, and the responsibility for that choice, is yours.

3.  *Transcript Availability.* Rule 6 of the Commission's Rules Relating to Investigations, 17 CFR 203.6, states:

> A person who has submitted documentary evidence or testimony in a formal investigative proceeding shall be entitled, upon written request, to procure a copy of his documentary evidence or a transcript of his testimony on payment of the appropriate fees: *Provided, however*, That in a nonpublic formal investigative proceeding the Commission may for good cause deny such request. In any event, any witness, upon proper identification, shall have the right to inspect the official transcript of the witness' own testimony.

If you wish to purchase a copy of the transcript of your testimony, the reporter will provide you with a copy of the appropriate form. Persons requested to supply information voluntarily will be allowed the rights provided by this rule.

4.  *Perjury.* Section 1621 of Title 18 of the United States Code provides as follows:

> Whoever--
> (1) having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true; or

(2) in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true;

is guilty of perjury and shall, except as otherwise expressly provided by law, be fined under this title or imprisoned not more than five years, or both.

5.   *Fifth Amendment and Voluntary Testimony.* Information you give may be used against you in any federal, state, local or foreign administrative, civil or criminal proceeding brought by the Commission or any other agency.

You may refuse, in accordance with the rights guaranteed to you by the Fifth Amendment to the Constitution of the United States, to give any information that may tend to incriminate you.

If your testimony is not pursuant to subpoena, your appearance to testify is voluntary, you need not answer any question, and you may leave whenever you wish. Your cooperation is, however, appreciated.

6.   *Formal Order Availability.* If the Commission has issued a formal order of investigation, it will be shown to you during your testimony, at your request. If you desire a copy of the formal order, please make your request in writing.

**C.  Submissions and Settlements**

Rule 5(c) of the Commission's Rules on Informal and Other Procedures, 17 CFR 202.5(c), states:

> Persons who become involved in . . . investigations may, on their own initiative, submit a written statement to the Commission setting forth their interests and position in regard to the subject matter of the investigation. Upon request, the staff, in its discretion, may advise such persons of the general nature of the investigation, including the indicated violations as they pertain to them, and the amount of time that may be available for preparing and submitting a statement prior to the presentation of a staff recommendation to the Commission for the commencement of an administrative or injunction proceeding. Submissions by interested persons should be forwarded to the appropriate Division Director or Regional Director with a copy to the staff members conducting the investigation and should be clearly referenced to the specific investigation to which they relate. In the event a recommendation for the commencement of an enforcement proceeding is presented by the staff, any submissions by interested persons will be forwarded to the Commission in conjunction with the staff memorandum.

The staff of the Commission routinely seeks to introduce submissions made pursuant to Rule 5(c) as evidence in Commission enforcement proceedings, when the staff deems appropriate.

Rule 5(f) of the Commission's Rules on Informal and Other Procedures, 17 CFR 202.5(f), states:

> In the course of the Commission's investigations, civil lawsuits, and administrative proceedings, the staff, with appropriate authorization, may discuss with persons involved the disposition of such matters by consent, by settlement, or in some other manner. It is the policy of the Commission, however, that the disposition of any such matter may not, expressly or impliedly, extend to any criminal charges that have been, or may be, brought against any such person or any recommendation with respect thereto. Accordingly, any person involved in an enforcement matter before the Commission who consents, or agrees to consent, to any judgment or order does so solely for the purpose of resolving the claims against him in that investigative, civil, or administrative matter and not for the purpose of resolving any criminal charges that have been, or might be, brought against him. This policy reflects the fact that neither the Commission nor its staff has the authority or responsibility for instituting, conducting, settling, or otherwise disposing of criminal proceedings. That authority and responsibility are vested in the Attorney General and representatives of the Department of Justice.

**D.  Freedom of Information Act**

The Freedom of Information Act, 5 U.S.C. 552 (the "FOIA"), generally provides for disclosure of information to the public. Rule 83 of the Commission's Rules on Information and Requests, 17 CFR 200.83, provides a procedure by which a person can make a written request that information submitted to the Commission not be disclosed under the FOIA. That rule states that no determination as to the validity of such a request will be made until a request for disclosure of the information under the FOIA is received. Accordingly, no response to a request that information not be disclosed under the FOIA is necessary or will be given until a request for disclosure under the FOIA is received. If you desire an acknowledgment of receipt of your written request that information not be disclosed under the FOIA, please provide a duplicate request, together with a stamped, self-addressed envelope.

**E.  Authority for Solicitation of Information**

*Persons Directed to Supply Information Pursuant to Subpoena.* The authority for requiring production of information is set forth in the subpoena. Disclosure of the information to the Commission is mandatory, subject to the valid assertion of any legal right or privilege you might have.

*Persons Requested to Supply Information Voluntarily.* One or more of the following provisions authorizes the Commission to solicit the information requested: Sections 19 and/or 20 of the Securities Act of 1933; Section 21 of the Securities Exchange Act of 1934; Section 321 of the Trust Indenture Act of 1939; Section 42 of the Investment Company Act of 1940; Section 209 of the Investment Advisers Act of 1940; and 17 CFR 202.5. Disclosure of the requested information to the Commission is voluntary on your part.

**F.  Effect of Not Supplying Information**

*Persons Directed to Supply Information Pursuant to Subpoena.* If you fail to comply with the subpoena, the Commission may seek a court order requiring you to do so. If such an order is obtained and you thereafter fail to supply the information, you may be subject to civil and/or criminal sanctions for contempt of court. In addition, if the subpoena was issued pursuant to the Securities Exchange Act of 1934, the Investment Company Act of 1940, and/or the Investment Advisers Act of 1940, and if you, without just cause, fail or refuse to attend and testify, or to answer any lawful inquiry, or to produce books, papers, correspondence, memoranda, and other records in compliance with the subpoena, you may be found guilty of a misdemeanor and fined not more than $1,000 or imprisoned for a term of not more than one year, or both.

*Persons Requested to Supply Information Voluntarily.* There are no direct sanctions and thus no direct effects for failing to provide all or any part of the requested information.

**G.  Principal Uses of Information**

The Commission's principal purpose in soliciting the information is to gather facts in order to determine whether any person has violated, is violating, or is about to violate any provision of the federal securities laws or rules for which the Commission has enforcement authority, such as rules of securities exchanges and the rules of the Municipal Securities Rulemaking Board. Facts developed may, however, constitute violations of other laws or rules. Information provided may be used in Commission and other agency enforcement proceedings. Unless the Commission or its staff explicitly agrees to the contrary in writing, you should not assume that the Commission or its staff acquiesces in, accedes to, or concurs or agrees with, any position, condition, request, reservation of right, understanding, or any other statement that purports, or may be deemed, to be or to reflect a limitation upon the Commission's receipt, use, disposition, transfer, or retention, in accordance with applicable law, of information provided.

**H.  Routine Uses of Information**

The Commission often makes its files available to other governmental agencies, particularly United States Attorneys and state prosecutors. There is a likelihood that information supplied by you will be made available to such agencies where appropriate. Whether or not the Commission makes its files available to other governmental agencies is, in general, a confidential matter between the Commission and such other governmental agencies.

Set forth below is a list of the routine uses which may be made of the information furnished.

1.  To appropriate agencies, entities, and persons when (a) it is suspected or confirmed that the security or confidentiality of information in the system of records has been compromised; (b) the SEC has determined that, as a result of the suspected or confirmed compromise, there is a risk of harm to economic or property interests, identity theft or fraud, or harm to the security or integrity of this system or other systems or programs (whether maintained by the SEC or another agency or entity) that rely upon the compromised information; and (c) the disclosure made to such agencies, entities, and persons is reasonably necessary to assist in connection with the SEC's efforts to respond to the suspected or confirmed compromise and prevent, minimize, or remedy such harm.

2.  To other federal, state, local, or foreign law enforcement agencies; securities self-regulatory organizations; and foreign financial regulatory authorities to assist in or coordinate regulatory or law enforcement activities with the SEC.

3.  To national securities exchanges and national securities associations that are registered with the SEC, the Municipal Securities Rulemaking Board; the Securities Investor Protection Corporation; the Public Company Accounting Oversight Board; the federal banking authorities, including, but not limited to, the Board of Governors of the Federal Reserve System, the Comptroller of the Currency, and the Federal Deposit Insurance Corporation; state securities regulatory agencies or organizations; or regulatory authorities of a foreign government in connection with their regulatory or enforcement responsibilities.

4.  By SEC personnel for purposes of investigating possible violations of, or to conduct investigations authorized by, the federal securities laws.

5.  In any proceeding where the federal securities laws are in issue or in which the Commission, or past or present members of its staff, is a party or otherwise involved in an official capacity.

6.  In connection with proceedings by the Commission pursuant to Rule 102(e) of its Rules of Practice, 17 CFR 201.102(e).

7.  To a bar association, state accountancy board, or other federal, state, local, or foreign licensing or oversight authority; or professional association or self-regulatory authority to the extent that it performs similar functions (including the Public Company Accounting Oversight Board) for investigations or possible disciplinary action.

8.  To a federal, state, local, tribal, foreign, or international agency, if necessary to obtain information relevant to the SEC's decision concerning the hiring or retention of an employee; the issuance of a security clearance; the letting of a contract; or the issuance of a license, grant, or other benefit.

9.  To a federal, state, local, tribal, foreign, or international agency in response to its request for information concerning the hiring or retention of an employee; the issuance of a security clearance; the reporting of an investigation of an employee; the letting of a contract; or the issuance of a license, grant, or other benefit by the requesting agency, to the extent that the information is relevant and necessary to the requesting agency's decision on the matter.

10.  To produce summary descriptive statistics and analytical studies, as a data source for management information, in support of the function for which the records are collected and maintained or for related personnel management functions or manpower studies; may also be used to respond to general requests for statistical information (without personal identification of individuals) under the Freedom of Information Act.

11.  To any trustee, receiver, master, special counsel, or other individual or entity that is appointed by a court of competent jurisdiction, or as a result of an agreement between the parties in connection with litigation or administrative proceedings involving allegations of violations of the federal securities laws (as defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)) or pursuant to the Commission's Rules of Practice, 17 CFR 201.100 – 900 or the Commission's Rules of Fair Fund and Disgorgement Plans, 17 CFR 201.1100-1106, or otherwise, where such trustee, receiver, master, special counsel, or other individual or entity is specifically designated to perform particular functions with respect to, or as a result of, the pending action or proceeding or in connection with the administration and enforcement by the Commission of the federal securities laws or the Commission's Rules of Practice or the Rules of Fair Fund and Disgorgement Plans.

12.  To any persons during the course of any inquiry, examination, or investigation conducted by the SEC's staff, or in connection with civil litigation, if the staff has reason to believe that the person to whom the record is disclosed may have further information about the matters related therein, and those matters appeared to be relevant at the time to the subject matter of the inquiry.

13.  To interns, grantees, experts, contractors, and others who have been engaged by the Commission to assist in the performance of a service related to this system of records and who need access to the records for the purpose of assisting the Commission in the efficient administration of its programs, including by performing clerical, stenographic, or data analysis functions, or by reproduction of records by electronic or other means. Recipients of these records shall be required to comply with the requirements of the Privacy Act of 1974, as amended, 5 U.S.C. 552a.

14.  In reports published by the Commission pursuant to authority granted in the federal securities laws (as such term is defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)), which authority shall include, but not be limited to, section 21(a) of the Securities Exchange Act of 1934, 15 U.S.C. 78u(a)).

15.  To members of advisory committees that are created by the Commission or by Congress to render advice and recommendations to the Commission or to Congress, to be used solely in connection with their official designated functions.

16.  To any person who is or has agreed to be subject to the Commission's Rules of Conduct, 17 CFR 200.735-1 to 200.735-18, and who assists in the investigation by the Commission of possible violations of the federal securities laws (as such term is defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)), in the preparation or conduct of enforcement actions brought by the Commission for such violations, or otherwise in connection with the Commission's enforcement or regulatory functions under the federal securities laws.

17.  To a Congressional office from the record of an individual in response to an inquiry from the Congressional office made at the request of that individual.

18.  To members of Congress, the press, and the public in response to inquiries relating to particular Registrants and their activities, and other matters under the Commission's jurisdiction.

19.  To prepare and publish information relating to violations of the federal securities laws as provided in 15 U.S.C. 78c(a)(47)), as amended.

20.  To respond to subpoenas in any litigation or other proceeding.

21.  To a trustee in bankruptcy.

22.  To any governmental agency, governmental or private collection agent, consumer reporting agency or commercial reporting agency, governmental or private employer of a debtor, or any other person, for collection, including collection by administrative offset, federal salary offset, tax refund offset, or administrative wage garnishment, of amounts owed as a result of Commission civil or administrative proceedings.

\* \* \* \* \*

*Small Business Owners*: The SEC always welcomes comments on how it can better assist small businesses. If you would like more information, or have questions or comments about federal securities regulations as they affect small businesses, please contact the Office of Small Business Policy, in the SEC's Division of Corporation Finance, at 202-551-3460. If you would prefer to comment to someone outside of the SEC, you can contact the Small Business Regulatory Enforcement Ombudsman at http://www.sba.gov/ombudsman or toll free at 888-REG-FAIR. The Ombudsman's office receives comments from small businesses and annually evaluates federal agency enforcement activities for their responsiveness to the special needs of small business.



# U.S. Securities and Exchange Commission

# Data Delivery Standards

This document describes the technical requirements for paper and electronic document productions to the U.S. Securities and Exchange Commission (SEC).  **Any proposed file formats other than those described below must be discussed with the legal and technical staff of the SEC Division of Enforcement prior to submission.**

General Instructions .......................................................................................................................... 1

Delivery Formats .............................................................................................................................. 2

   I.   *Concordance®* Imaged Productions ............................................................................................ 2

      1.  Images ............................................................................................................................... 2

      2.  *Concordance Image®* or Opticon Cross-Reference File ................................................. 2

      3.  *Concordance®* Data File .................................................................................................. 2

      4.  Text ................................................................................................................................... 3

      5.  Linked Native Files .......................................................................................................... 3

  II.  Native File Productions without loadfiles ................................................................................ 3

 III.  Adobe PDF File Productions ................................................................................................... 3

 IV.  Audio Files ............................................................................................................................. 4

  V.  Video Files ............................................................................................................................. 4

 VI.  Electronic Trade and Bank Records ........................................................................................ 4

VII.  Electronic Phone Records ....................................................................................................... 4

## General Instructions

Electronic files must be produced in their native format, i.e., the format in which they are ordinarily used and maintained during the normal course of business. For example, an MS Excel file must be produced as an MS Excel file rather than an image of a spreadsheet. *(Note: An Adobe PDF file is not considered a native file unless the document was initially created as a PDF.)*

In the event produced files require the use of proprietary software not commonly found in the workplace, the SEC will explore other format options with the producing party.

The proposed use of file de-duplication methodologies or *computer-assisted review* or *technology-assisted review* (TAR) during the processing of documents must be discussed with and approved by the legal and technical staff of the Division of Enforcement (ENF). If your production will be de-duplicated it is vital that you 1) preserve any unique metadata associated with the duplicate files, for example, custodian name, and, 2) make that unique metadata part of your production to the SEC.

ER-1559

U.S. Securities and Exchange Commission
Data Delivery Standards

General requirements for **ALL** document productions are:

1. A cover letter should be included with each production and include the following:
   a. A list of each piece of media included in the production with its unique production volume number
   b. A list of custodians, identifying the Bates range for each custodian.
   c. The time zone in which the emails were standardized during conversion.
2. Data can be produced on CD, DVD, thumb drive, etc., using the media requiring the least number of deliverables and labeled with the following:
   a. Case number
   b. Production date
   c. Producing party
   d. Bates range
3. All submissions must be organized by **custodian** unless otherwise instructed.
4. All document family groups, i.e. email attachments, embedded files, etc., should be produced together and children files should follow parent files sequentially in the Bates numbering.
5. All load-ready collections should include only one data load file and one image pointer file.
6. All load-ready text must be produced as separate text files.
7. All load-ready collections should account for custodians in the custodian field.
8. Audio files should be separated from data files if both are included in the production.
9. Only alphanumeric characters and the underscore character are permitted in file names and **folder names**. Special  characters are not permitted.
10. All data productions must be produced using industry standard self-extracting encryption software.
11. Passwords for documents, files, compressed archives and encrypted media must be provided separately either via email or in a separate cover letter from the media.
12. All productions should be produced free of computer viruses.
13. Additional technical descriptions can be found in the addendum to this document.

   *Please note that productions that come via United States Postal Service are subject to Mail Irradiation, as a result electronic productions may be damaged.*

**Delivery Formats**

**I.** *Concordance® Imaged Productions*
   The SEC prefers that all documents and data be produced in a structured format prepared for Concordance. All scanned paper electronic file collections should be converted to TIFF files, Bates numbered, and include fully searchable text files.

   **1. Images**
      a. Black and white images must be 300 DPI Group IV single-page TIFF files.
      b. Color images must be produced in JPEG format.
      c. File names cannot contain embedded spaces or special characters (including the comma).
      c. Folder names cannot contain embedded spaces or special characters (including the comma).
      d. All TIFF image files must have a unique file name, i.e. Bates number.
      e. Images must be endorsed with sequential Bates numbers in the lower right corner of each image.
      f. The number of TIFF files per folder should not exceed 500 files.
      g. Excel spreadsheets should have a placeholder image named by the Bates number of the file.
      h. AUTOCAD/photograph files should be produced as a single page JPEG file.

Rev 10/2014

**ER-1560**

U.S. Securities and Exchange Commission
Data Delivery Standards

---

**2.    Concordance Image® OR Opticon  Cross-Reference File**
The image cross-reference file to link the images to the database should be a comma- delimited file consisting of seven fields per line with a line in the cross-reference file for every image in the database with the following format:

*ImageID,VolumeLabel,ImageFilePath,DocumentBreak,FolderBreak,BoxBreak,Pag*

**3.    *Concordance*® Data File**
The data file (.DAT) contains all of the fielded information that will be loaded into the *Concordance*® database.

a.   The first line of the .DAT file must be a header row identifying the field names.
b.   The .DAT file must use the following *Concordance*® default delimiters:
     Comma ¶ ASCII character (020)
     Quote þ ASCII character (254)
c.   Date fields should be provided in the format:  mm/dd/yyyy
d.   Date and time fields must be two separate fields.
e.   If the production includes imaged emails and attachments, the attachment fields must be included to preserve the parent/child relationship between an email and its attachments.
f.   An OCRPATH field must be included to provide the file path and name of the extracted text file on the produced storage media.  The text file must be named after the FIRSTBATES.  Do not include the text in the .DAT file.
g.   For production with native files, a NATIVELINK field must be included to provide the file path and name of the native file on the produced storage media.
h.   BEGATT and ENDATT fields must be two separate fields.
i.   A complete list of metadata fields is available in **Addendum A** to this document.

**4.    Text**
Text must be produced as separate text files, not as fields within the .DAT file. The full path to the text file (OCRPATH) should be included in the .DAT file.  We require document level ANSI text files, named per the FIRSTBATES/Image Key. (Please note in the cover letter if any non-ANSI text files are included in the production.)  Extracted text must be in a separate folder, one text file per document.  The number of files per folder should not exceed 500 files. There should be no special characters (including commas in the folder names). For redacted documents, provide the full text for the redacted version.

**5.    Linked Native Files**
Copies of original email and native file documents/attachments must be included for all electronic productions.
a.   Native file documents must be named per the FIRSTBATES number.
b.   The full path of the native file must be provided in the .DAT file for the LINK field.
c.   The number of native files per folder should not exceed 500 files.

**II.    Native File Production without Loadfiles**
With prior approval, native files may be produced without loadfiles.  The files must be produced as they are maintained in the normal course of business and organized by custodian-named file folders. When approved, Outlook (.PST) and Lotus Notes (.NSF) email files may be produced in native file format.  A separate folder should be provided for each custodian.

**III.    Adobe PDF File Production**
With prior approval, Adobe PDF files may be produced in native file format.
1.   PDF files should be produced in separate folders named by the custodian. The folders should not contain any special characters (including commas).
2.   All PDFs must be unitized at the document level, i.e., each PDF should represent a discrete document.
3.   All PDF files must contain embedded text that includes all discernible words within the document, not selected text or image only. This requires all layers of the PDF to be flattened first.
4.   If PDF files are Bates endorsed, the PDF files must be named by the Bates range.

3

Rev 10/2014

U.S. Securities and Exchange Commission
Data Delivery Standards

**IV.** **Audio Files**

Audio files from telephone recording systems must be produced in a format that is playable using Microsoft Windows Media Player™. Additionally, the call information (metadata) related to each audio recording MUST be provided. The metadata file must be produced in a delimited text format. Field names must be included in the first row of the text file. The metadata must include, at a minimum, the following fields:

| | | |
|---|---|---|
| 1) | Caller Name: | Caller's name or account/identification number |
| 2) | Originating Number: | Caller's phone number |
| 3) | Called Party Name: | Called party's name |
| 4) | Terminating Number: | Called party's phone number |
| 5) | Date: | Date of call |
| 6) | Time: | Time of call |
| 7) | Filename: | Filename of audio file |

**V.** **Video Files**

Video files must be produced in a format that is playable using Microsoft Windows Media Player™.

**VI.** **Electronic Trade and Bank Records**

When producing electronic trade and bank records, provide the files in one of the following formats:

1. MS Excel spreadsheet with header information detailing the field structure. If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details.

2. Delimited text file with header information detailing the field structure. The preferred delimiter is a vertical bar "|". If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details.

**VII. Electronic Phone Records**

When producing electronic phone records, provide the files in the following format:

1. MS Excel spreadsheet with header information detailing the field structure. If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details.  Data must be formatted in its native format (i.e. dates in a date format, numbers in an appropriate numerical format, and numbers with leading zeroes as text).

   a. The metadata that must be included is outline in **Addendum B** of this document. Each field of data must be loaded into a separate column.  For example, Date and Start_Time must be produced in separate columns and not combined into a single column containing both pieces of information.  Any fields of data that are provided in addition to those listed in **Addendum B** must also be loaded into separate columns.

4

Rev 10/2014

U.S. Securities and Exchange Commission
Data Delivery Standards

## ADDENDUM A

The metadata of electronic document collections should be extracted and provided in a .DAT file using the field definition and formatting described below:

| Field Name | Sample Data | Description |
|---|---|---|
| FIRSTBATES | EDC0000001 | First Bates number of native file document/email |
| LASTBATES | EDC0000001 | Last Bates number of native file document/email **The LASTBATES field should be populated for single page documents/emails. |
| ATTACHRANGE | EDC0000001 - EDC0000015 | Bates number of the first page of the parent document to the Bates number of the last page of the last attachment "child" document |
| BEGATTACH | EDC0000001 | First Bates number of attachment range |
| ENDATTACH | EDC0000015 | Last Bates number of attachment range |
| PARENT_BATES | EDC0000001 | First Bates number of parent document/Email **This PARENT_BATES field should be populated in each record representing an attachment "child" document |
| CHILD_BATES | EDC0000002; EDC0000014 | First Bates number of "child" attachment(s); can be more than one Bates number listed depending on the number of attachments **The CHILD_BATES field should be populated in each record representing a "parent" document |
| CUSTODIAN | Smith, John | Email:  mailbox where the email resided Native: Individual from whom the document originated |
| FROM | John Smith | Email:  Sender Native: Author(s) of document **semi-colon should be used to separate multiple entries |
| TO | Coffman, Janice; LeeW [mailto:LeeW@MSN.com] | Recipient(s) **semi-colon should be used to separate multiple entries |
| CC | Frank Thompson [mailto: frank_Thompson@cdt.com] | Carbon copy recipient(s) **semi-colon should be used to separate multiple entries |
| BCC | John Cain | Blind carbon copy recipient(s) **semi-colon should be used to separate multiple entries |
| SUBJECT | Board Meeting Minutes | Email: Subject line of the email Native: Title of document (if available) |
| DATE_SENT | 10/12/2010 | Email:  Date the email was sent Native: (empty) |
| TIME_SENT/TIME_ZONE | 07:05 PM GMT | Email: Time the email was sent/ Time zone in which the emails were standardized during conversion. Native: (empty) **This data must be a separate field and cannot be combined with the DATE_SENT field; |
| TIME_ZONE | GMT | The time zone in which the emails were standardized during conversion. Email: Time zone Native: (empty) |

5

Rev 10/2014

U.S. Securities and Exchange Commission
Data Delivery Standards

| LINK | D:\001\EDC0000001.msg | Hyperlink to the email or native file document<br>**The linked file must be named per the FIRSTBATES number |
| MIME_TYPE | MSG | The content type of an Email or native file document as identified/extracted from the header |
| FILE_EXTEN | MSG | The file type extension representing the Email or native file document; will vary depending on the email format |
| AUTHOR | John Smith | Email: (empty)<br>Native: Author of the document |
| DATE_CREATED | 10/10/2010 | Email: (empty)<br>Native: Date the document was created |
| TIME_CREATED | 10:25 AM | Email: (empty)<br>Native: Time the document was created<br>**This data must be a separate field and cannot be combined with the DATE_CREATED field |
| DATE_MOD | 10/12/2010 | Email: (empty)<br>Native: Date the document was last modified |
| TIME_MOD | 07:00 PM | Email: (empty)<br>Native: Time the document was last modified<br>**This data must be a separate field and cannot be combined with the DATE_MOD field |
| DATE_ACCESSD | 10/12/2010 | Email: (empty)<br>Native: Date the document was last accessed |
| TIME_ACCESSD | 07:00 PM | Email: (empty)<br>Native: Time the document was last accessed<br>**This data must be a separate field and cannot be combined with the DATE_ACCESSD field |
| PRINTED_DATE | 10/12/2010 | Email: (empty)<br>Native: Date the document was last printed |
| FILE_SIZE | 5,952 | Size of native file document/email in KB |
| PGCOUNT | 1 | Number of pages in native file document/email |
| PATH | J:\Shared\SmithJ\October Agenda.doc | Email: (empty)<br>Native: Path where native file document was stored including original file name. |
| INTFILEPATH | Personal Folders\Deleted Items\Board Meeting Minutes.msg | Email: original location of email including original file name.<br>Native: (empty) |
| INTMSGID | <000805c2c71b$75977050$cb8306d1@MSN> | Email: Unique Message ID<br>Native: (empty) |
| MD5HASH | d131dd02c5e6eec4693d9a0698aff95c 2fcab58712467eab4004583eb8fb7f89 | MD5 Hash value of the document. |
| OCRPATH | TEXT/001/EDC0000001.txt | Path to extracted text of the native file |

Sample Image Loadfile:

```
IMG0000001,,E:\001\IMG0000001.TIF,Y,,,
IMG0000002,,E:\001\IMG0000002.TIF,,,,
IMG0000003,,E:\001\IMG0000003.TIF,,,,
IMG0000004,,E:\001\IMG0000003.TIF,,,,
IMG0000005,,E:\001\IMG0000003.TIF,Y,,,
IMG0000006,,E:\001\IMG0000003.TIF,,,,
```

Rev 10/2014

**ER-1564**

# **ADDENDUM B**

For Electronic Phone Records, include the following fields in separate columns:

For Calls:

1) Account Number
2) Connection Date – Date the call was received or made
3) Connection Time – Time call was received or made
4) Seizure Time – Time it took for the call to be placed in seconds
5) Originating Number – Phone that placed the call
6) Terminating Number – Phone that received the call
7) Elapsed Time – The length of time the call lasted, preferably in seconds
8) End Time – The time the call ended
9) Number Dialed – Actual number dialed
10) IMEI Originating – Unique id to phone used to make call
11) IMEI Terminating– Unique id to phone used to receive call
12) IMSI Originating – Unique id to phone used to make call
13) IMSI Terminating- Unique id to phone used to receive call
14) Call Codes – Identify call direction or other routing information
15) Time Zone – Time Zone in which the call was received or placed, if applicable


For Text messages:

1) Account Number
2) Connection Date – Date the text was received or made
3) Connection Time – Time text was received or made
4) Originating Number – Who placed the text
5) Terminating Number – Who received the text
6) IMEI Originating – Unique id to phone used to make text
7) IMEI Terminating– Unique id to phone used to receive text
8) IMSI Originating - Unique id to phone used to make text
9) IMSI Terminating- Unique id to phone used to receive text
10) Text Code – Identify text direction, or other text routing information
11) Text Type Code – Type of text message (sent SMS, MMS, or other)
12) Time Zone – Time Zone in which the call was received or placed, if applicable


For Mobile Data Usage:

1) Account Number
2) Connection Date – Date the data was received or made
3) Connection Time – Time data was received or made
4) Originating number – Number that used data
5) IMEI Originating – Unique id of phone that used data
6) IMSI Originating - Unique id of phone that used data
7) Data or Data codes – Identify data direction, or other data routing information
8) Time Zone – Time Zone in which the call was received or placed, if applicable

Rev 10/2014

# Exhibit  G



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
San Francisco Regional Office
44 Montgomery Street, Suite 2800
San Francisco, CA 94104

**DIVISION OF ENFORCEMENT**                           Jessica W. Chan
Counsel
(415) 705-2451


February 16, 2016


**VIA UPS AND EMAIL**

Theranos, Inc.
c/o Peter M. Skinner, Esq. and Andrew Z. Michaelson, Esq.
Boies, Schiller & Flexner
575 Lexington Avenue
7th Floor
New York, NY 10022
pskinner@bsfllp.com
amichaelson@bsllp.com

Re:      **In the Matter of Theranos, Inc. (SF-4030)**

Dear Pete and Andrew:

The enclosed subpoena has been issued pursuant to a formal order entered by the United States Securities and Exchange Commission.  The subpoena requires your client, Theranos, Inc., to produce documents.

**Producing Documents**

*What materials do I have to produce?*

The subpoena requires production of the documents described in the attachment to the subpoena.  The attachment defines some terms (such as "document") before listing what must be produced.  The documents must be produced to the Commission no later than **March 1, 2016.**

Please note that if copies of a document differ in any way, they are considered separate documents and each one must be produced.  For example, if there are two copies of the same letter, but only one of them has handwritten notes on it, both the clean copy and the one with notes must be produced.

If you prefer, photocopies of the originals may be produced.  The Commission cannot reimburse copying costs.  The copies must be identical to the originals, including even faint

marks or print.  If you choose to send copies, the originals must be kept in a safe place.  We will accept the copies for now, but may require production of the originals later.

If photocopies are produced, please put an identifying notation on each page of each document to indicate that you produced it, and number the pages of all the documents submitted. Please make sure the notation and number do not conceal any writing or marking on the document.  If originals are produced, please do not add any identifying notations.

*Do I need to send anything else?*

You should enclose a list briefly describing each item produced.  The list should state to which category number(s) in the subpoena attachment each item responds.

You also should include a cover letter stating whether you believe you have met your obligations under the subpoena by searching carefully and thoroughly for everything called for by the subpoena, and producing it all to us.

*What if I do not produce everything described in the attachment to the subpoena?*

The subpoena requires production of all the materials described in it.  If, for any reason – including a claim of attorney-client privilege – you do not produce something called for by the subpoena, you should submit a list of what is not being produced.  The list should describe each item separately, noting:

- its author(s);
- its date;
- its subject matter;
- the name of the person who has the item now, or the last person known to have it;
- the names of everyone who ever had the item or a copy of it, and the names of everyone who was told the item's contents; and
- the reason the item was not produced.

If you withhold anything on the basis of a claim of attorney-client privilege or attorney work product protection, you should also identify the attorney and client involved.

*Where should I send the materials?*

Please send the materials to:

ENF-CPU
U.S. Securities and Exchange Commission
100 F St., N.E., Mailstop 5973
Washington, DC 20549-5973

For smaller electronic productions under 10MB in size, the materials may be emailed to the following email address:  ENF-CPU@sec.gov.

We ask that you send a copy of the cover letter to your response and a courtesy copy of the production by mail, fax, or email to:

Jessica W. Chan, Staff Attorney
U.S. Securities and Exchange Commission
San Francisco Regional Office
44 Montgomery Street, Suite 2800
San Francisco, California 94104
Telephone:  (415) 705-2451
Fax:  (415) 705-2501
Email:  chanjes@sec.gov

**Other Important Information**

*What will the Commission do with the materials I send and the testimony I provide?*

The enclosed SEC Form 1662 includes a List of Routine Uses of information provided to the Commission.  This form has other important information for you.  Please read it carefully.

*Has the Commission determined that anyone has done anything wrong?*

This investigation is a non-public, fact-finding inquiry.  We are trying to determine whether there have been any violations of the federal securities laws.  The investigation and the subpoena do not mean that we have concluded that you or anyone else has broken the law.  Also, the investigation does not mean that we have a negative opinion of any person, entity or security.

*Important Policy Concerning Settlements*

Please note that, in any matter in which enforcement action is ultimately deemed to be warranted, the Division of Enforcement will not recommend any settlement to the Commission unless the party wishing to settle certifies, under penalty of perjury, that all documents responsive to Commission subpoenas and formal and informal document requests in this matter have been produced.

*I have read this letter, the subpoena, and the SEC Form 1662, but I still have questions.  What should I do?*

If you have any questions concerning this matter, you may call me at (415) 705-2451.

Very truly yours,

Jessica W. Chan
Counsel, Division of Enforcement

Enclosures:     Subpoena Duces Tecum (with attachment)
                SEC Form 1662
                SEC Data Delivery Standards



## SUBPOENA

# UNITED STATES OF AMERICA
## SECURITIES AND EXCHANGE COMMISSION

### In the Matter of Theranos, Inc. (SF-4030)

To:     Theranos, Inc.
c/o Peter M. Skinner, Esq. and Andrew Z. Michaelson, Esq.
Boies, Schiller & Flexner
575 Lexington Avenue
7th Floor
New York, NY 10022

☒     **YOU MUST PRODUCE** everything specified in the Attachment to this subpoena to officers of the Securities and Exchange Commission at the place, and no later than the date and time, specified below.

ENF-CPU
U.S. Securities and Exchange Commission
100 F St., N.E., Mailstop 5973
Washington, DC 20549-5973
Date/Time:  March 1, 2016

☐     **YOU MUST TESTIFY** before officers of the Securities and Exchange Commission, at the place, date and time specified below:

**FEDERAL LAW REQUIRES YOU TO COMPLY WITH THIS SUBPOENA**.
Failure to comply may subject you to a fine and/or imprisonment.

By:  _____   Date:   February 16, 2016
Jessica W. Chan
U.S. Securities and Exchange Commission, San Francisco Regional Office
44 Montgomery Street, Suite 2800, San Francisco, CA 94104; Telephone (415) 705-2451
I am an officer of the Securities and Exchange Commission authorized to issue subpoenas in this matter.  The Securities and Exchange Commission has issued a Formal Order authorizing this investigation under Section 20(a) of the Securities Act of 1933 and Section 21(a) of the Securities Exchange Act of 1934.

**ATTACHMENT**

**Subpoena to Theranos, Inc.**
**In the Matter of Theranos, Inc. (SF-4030)**
**February 16, 2016**

**INSTRUCTIONS**

This subpoena requires the production of certain documents, as specified in the section entitled "Production" below.  The required documents should be produced in accordance with the following requirements:

A.      You must submit all documents required to be produced by the subpoena that are in your possession, custody, or control, regardless of whether the documents are in your possession.

B.      If you claim attorney-client privilege, or any other privilege or protection from production, provide a list of the documents that you claim are privileged or protected, indicating the date prepared, authors, all recipients, the subject matters of the document, and the privilege or protection claimed, sufficiently identifying the documents to permit the staff to determine whether to request an in camera inspection by a federal district court judge.

C.      Produce the entirety of each and every document described below, without alteration, deletion, redaction, or obliteration of any information contained therein, even though such information is not specifically requested.

D.      The following rules of construction apply to this subpoena and attachment: (1) the connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the attachment all responses that might otherwise be construed to be outside of its scope; and (2) the use of the singular form of any word includes the plural and vice versa.

**DEFINITIONS**

A.      "COMMUNICATIONS" means and includes, but is not limited to, any correspondence, memoranda, notes, electronic mail, telephone conversations, instant message statements, and any other conversations, conferences, or meetings.

B.      "CONCERNING" means and includes, but is not limited to, referring to, pertaining to, relating to, alluding to, bearing upon, commenting upon, touching upon, regarding, concerning, recording, evidencing, constituting, substantiating, supporting, contradicting, discussing, mentioning, including or otherwise affecting (directly or indirectly).

C.      "DOCUMENT" and "DOCUMENTS" mean and include, but are not limited to, any and all records in your possession, custody or control, whether drafts or final versions,

**ER-1572**

originals or annotated or non-identical copies, however and by whomever created, produced or stored (manually, mechanically, electronically or otherwise), including, without limitation, books, papers, files, notes, account statements, confirmations, reports, correspondence, electronic files, e-mail, instant messages, text messages, Internet sites, World Wide Web pages, memoranda, ledger sheets, reports, telegrams, telexes, telephone bills, messages or logs, notes or minutes of conversations or meetings, contracts, agreements, calendars, datebooks, diaries, computer programs, records of billings, checks, receipts, wire transfers, drafts for money, records of payment, magnetic tape, tape recordings, disks, diskettes, diskpacks or other electronic media, microfilm, microfiche and other storage devices.  "DOCUMENT" and "DOCUMENTS" shall also include all "writings," "recordings" and "photographs" as defined by Rule 1001 of the Federal Rules of Evidence and all "electronically stored information" as the term is used in Rules 26 and 34 of the Federal Rules of Civil Procedure.

D.     "THERANOS" means Theranos, Inc., the entities and their divisions, groups, subsidiaries, predecessors, successors and affiliates, as well as current and former officers, directors, members, general and limited partners, employees, attorneys, accountants, agents, representatives, and any person acting on behalf of Theranos, Inc. with express, implied or apparent authority to do so or under its direction or control.

E.     Unless otherwise specified, the time period for all requests is January 1, 2010 to the date of production.

## **PRODUCTION**

1.     From January 1, 2013 to the date of production, all DOCUMENTS provided to THERANOS' board of directors, any sub-committee of the board of directors, THERANOS' governing board, and/or THERANOS' board of counselors, including, but not limited to, meeting minutes and agendas of meetings and any DOCUMENTS provided by THERANOS at any of these meetings.

2.     From January 1, 2013 to the date of production, all COMMUNICATIONS with any THERANOS director, member of THERANOS' board of governors, and/or member of THERANOS' board of counselors to which Elizabeth Holmes and/or Sunny Balwani is a party.

3.     From January 1, 2013 to the date of production, all COMMUNICATIONS CONCERNING THERANOS' board of directors, THERANOS' board of governors, and/or THERANOS' board of counselors to which Elizabeth Holmes and/or Sunny Balwani is a party.

4.     All DOCUMENTS reflecting any enforcement, or threatened enforcement, by THERANOS of any confidentiality provision as a result of communicating with any party outside of THERANOS, including the press.

5.     From June 1, 2012 to the present, all COMMUNICATIONS CONCERNING Tyler Shultz to which Elizabeth Holmes and/or Sunny Balwani is a party.

6.      From June 1, 2012 to the present, all COMMUNICATIONS with Tyler Shultz to which Elizabeth Holmes and/or Sunny Balwani is a party.

7.      Tyler Shultz's THERANOS human resources or employee file, including, but not limited to, any DOCUMENTS CONCERNING his employment and/or the performance of his job duties at THERANOS.

8.      Audited financial statements for THERANOS for the fiscal years 2013, 2014, and 2015.

9.      If financial statements have not been audited, then unaudited financial statements for THERANOS for the fiscal years 2013, 2014, and 2015.

# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

### Supplemental Information for Persons Requested to Supply
### Information Voluntarily or Directed to Supply Information
### Pursuant to a Commission Subpoena

**A. False Statements and Documents**

Section 1001 of Title 18 of the United States Code provides as follows:

> [W]hoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully--
> (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
> (2) makes any materially false, fictitious, or fraudulent statement or representation; or
> (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;
> shall be fined under this title, imprisoned not more than 5 years . . . or both.

**B. Testimony**

If your testimony is taken, you should be aware of the following:

1. *Record.* Your testimony will be transcribed by a reporter. If you desire to go off the record, please indicate this to the Commission employee taking your testimony, who will determine whether to grant your request. The reporter will not go off the record at your, or your counsel's, direction.

2. *Counsel.* You have the right to be accompanied, represented and advised by counsel of your choice. Your counsel may advise you before, during and after your testimony; question you briefly at the conclusion of your testimony to clarify any of the answers you give during testimony; and make summary notes during your testimony solely for your use. If you are accompanied by counsel, you may consult privately.

If you are not accompanied by counsel, please advise the Commission employee taking your testimony if, during the testimony, you desire to be accompanied, represented and advised by counsel. Your testimony will be adjourned once to afford you the opportunity to arrange to be so accompanied, represented or advised.

You may be represented by counsel who also represents other persons involved in the Commission's investigation. This multiple representation, however, presents a potential conflict of interest if one client's interests are or may be adverse to another's. If you are represented by counsel who also represents other persons involved in the investigation, the Commission will assume that you and counsel have discussed and resolved all issues concerning possible conflicts of interest. The choice of counsel, and the responsibility for that choice, is yours.

3. *Transcript Availability.* Rule 6 of the Commission's Rules Relating to Investigations, 17 CFR 203.6, states:

> A person who has submitted documentary evidence or testimony in a formal investigative proceeding shall be entitled, upon written request, to procure a copy of his documentary evidence or a transcript of his testimony on payment of the appropriate fees: *Provided, however,* That in a nonpublic formal investigative proceeding the Commission may for good cause deny such request. In any event, any witness, upon proper identification, shall have the right to inspect the official transcript of the witness' own testimony.

If you wish to purchase a copy of the transcript of your testimony, the reporter will provide you with a copy of the appropriate form. Persons requested to supply information voluntarily will be allowed the rights provided by this rule.

4. *Perjury.* Section 1621 of Title 18 of the United States Code provides as follows:

> Whoever--
> (1) having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true; or

(2) in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true;

is guilty of perjury and shall, except as otherwise expressly provided by law, be fined under this title or imprisoned not more than five years, or both.

5.   *Fifth Amendment and Voluntary Testimony.* Information you give may be used against you in any federal, state, local or foreign administrative, civil or criminal proceeding brought by the Commission or any other agency.

You may refuse, in accordance with the rights guaranteed to you by the Fifth Amendment to the Constitution of the United States, to give any information that may tend to incriminate you.

If your testimony is not pursuant to subpoena, your appearance to testify is voluntary, you need not answer any question, and you may leave whenever you wish. Your cooperation is, however, appreciated.

6.   *Formal Order Availability.* If the Commission has issued a formal order of investigation, it will be shown to you during your testimony, at your request. If you desire a copy of the formal order, please make your request in writing.

## C.  Submissions and Settlements

Rule 5(c) of the Commission's Rules on Informal and Other Procedures, 17 CFR 202.5(c), states:

> Persons who become involved in . . . investigations may, on their own initiative, submit a written statement to the Commission setting forth their interests and position in regard to the subject matter of the investigation. Upon request, the staff, in its discretion, may advise such persons of the general nature of the investigation, including the indicated violations as they pertain to them, and the amount of time that may be available for preparing and submitting a statement prior to the presentation of a staff recommendation to the Commission for the commencement of an administrative or injunction proceeding. Submissions by interested persons should be forwarded to the appropriate Division Director or Regional Director with a copy to the staff members conducting the investigation and should be clearly referenced to the specific investigation to which they relate. In the event a recommendation for the commencement of an enforcement proceeding is presented by the staff, any submissions by interested persons will be forwarded to the Commission in conjunction with the staff memorandum.

The staff of the Commission routinely seeks to introduce submissions made pursuant to Rule 5(c) as evidence in Commission enforcement proceedings, when the staff deems appropriate.

Rule 5(f) of the Commission's Rules on Informal and Other Procedures, 17 CFR 202.5(f), states:

> In the course of the Commission's investigations, civil lawsuits, and administrative proceedings, the staff, with appropriate authorization, may discuss with persons involved the disposition of such matters by consent, by settlement, or in some other manner. It is the policy of the Commission, however, that the disposition of any such matter may not, expressly or impliedly, extend to any criminal charges that have been, or may be, brought against any such person or any recommendation with respect thereto. Accordingly, any person involved in an enforcement matter before the Commission who consents, or agrees to consent, to any judgment or order does so solely for the purpose of resolving the claims against him in that investigative, civil, or administrative matter and not for the purpose of resolving any criminal charges that have been, or might be, brought against him. This policy reflects the fact that neither the Commission nor its staff has the authority or responsibility for instituting, conducting, settling, or otherwise disposing of criminal proceedings. That authority and responsibility are vested in the Attorney General and representatives of the Department of Justice.

## D.  Freedom of Information Act

The Freedom of Information Act, 5 U.S.C. 552 (the "FOIA"), generally provides for disclosure of information to the public. Rule 83 of the Commission's Rules on Information and Requests, 17 CFR 200.83, provides a procedure by which a person can make a written request that information submitted to the Commission not be disclosed under the FOIA. That rule states that no determination as to the validity of such a request will be made until a request for disclosure of the information under the FOIA is received. Accordingly, no response to a request that information not be disclosed under the FOIA is necessary or will be given until a request for disclosure under the FOIA is received. If you desire an acknowledgment of receipt of your written request that information not be disclosed under the FOIA, please provide a duplicate request, together with a stamped, self-addressed envelope.

**E.  Authority for Solicitation of Information**

*Persons Directed to Supply Information Pursuant to Subpoena.* The authority for requiring production of information is set forth in the subpoena. Disclosure of the information to the Commission is mandatory, subject to the valid assertion of any legal right or privilege you might have.

*Persons Requested to Supply Information Voluntarily.* One or more of the following provisions authorizes the Commission to solicit the information requested: Sections 19 and/or 20 of the Securities Act of 1933; Section 21 of the Securities Exchange Act of 1934; Section 321 of the Trust Indenture Act of 1939; Section 42 of the Investment Company Act of 1940; Section 209 of the Investment Advisers Act of 1940; and 17 CFR 202.5. Disclosure of the requested information to the Commission is voluntary on your part.

**F.  Effect of Not Supplying Information**

*Persons Directed to Supply Information Pursuant to Subpoena.* If you fail to comply with the subpoena, the Commission may seek a court order requiring you to do so. If such an order is obtained and you thereafter fail to supply the information, you may be subject to civil and/or criminal sanctions for contempt of court. In addition, if the subpoena was issued pursuant to the Securities Exchange Act of 1934, the Investment Company Act of 1940, and/or the Investment Advisers Act of 1940, and if you, without just cause, fail or refuse to attend and testify, or to answer any lawful inquiry, or to produce books, papers, correspondence, memoranda, and other records in compliance with the subpoena, you may be found guilty of a misdemeanor and fined not more than $1,000 or imprisoned for a term of not more than one year, or both.

*Persons Requested to Supply Information Voluntarily.* There are no direct sanctions and thus no direct effects for failing to provide all or any part of the requested information.

**G.  Principal Uses of Information**

The Commission's principal purpose in soliciting the information is to gather facts in order to determine whether any person has violated, is violating, or is about to violate any provision of the federal securities laws or rules for which the Commission has enforcement authority, such as rules of securities exchanges and the rules of the Municipal Securities Rulemaking Board. Facts developed may, however, constitute violations of other laws or rules. Information provided may be used in Commission and other agency enforcement proceedings. Unless the Commission or its staff explicitly agrees to the contrary in writing, you should not assume that the Commission or its staff acquiesces in, accedes to, or concurs or agrees with, any position, condition, request, reservation of right, understanding, or any other statement that purports, or may be deemed, to be or to reflect a limitation upon the Commission's receipt, use, disposition, transfer, or retention, in accordance with applicable law, of information provided.

**H.  Routine Uses of Information**

The Commission often makes its files available to other governmental agencies, particularly United States Attorneys and state prosecutors. There is a likelihood that information supplied by you will be made available to such agencies where appropriate. Whether or not the Commission makes its files available to other governmental agencies is, in general, a confidential matter between the Commission and such other governmental agencies.

Set forth below is a list of the routine uses which may be made of the information furnished.

1.  To appropriate agencies, entities, and persons when (a) it is suspected or confirmed that the security or confidentiality of information in the system of records has been compromised; (b) the SEC has determined that, as a result of the suspected or confirmed compromise, there is a risk of harm to economic or property interests, identity theft or fraud, or harm to the security or integrity of this system or other systems or programs (whether maintained by the SEC or another agency or entity) that rely upon the compromised information; and (c) the disclosure made to such agencies, entities, and persons is reasonably necessary to assist in connection with the SEC's efforts to respond to the suspected or confirmed compromise and prevent, minimize, or remedy such harm.

2.  To other federal, state, local, or foreign law enforcement agencies; securities self-regulatory organizations; and foreign financial regulatory authorities to assist in or coordinate regulatory or law enforcement activities with the SEC.

3.  To national securities exchanges and national securities associations that are registered with the SEC; the Municipal Securities Rulemaking Board; the Securities Investor Protection Corporation; the Public Company Accounting Oversight Board; the federal banking authorities, including, but not limited to, the Board of Governors of the Federal Reserve System, the Comptroller of the Currency, and the Federal Deposit Insurance Corporation; state securities regulatory agencies or organizations; or regulatory authorities of a foreign government in connection with their regulatory or enforcement responsibilities.

4.  By SEC personnel for purposes of investigating possible violations of, or to conduct investigations authorized by, the federal securities laws.

5.  In any proceeding where the federal securities laws are in issue or in which the Commission, or past or present members of its staff, is a party or otherwise involved in an official capacity.

6.  In connection with proceedings by the Commission pursuant to Rule 102(e) of its Rules of Practice, 17 CFR 201.102(e).

7.  To a bar association, state accountancy board, or other federal, state, local, or foreign licensing or oversight authority; or professional association or self-regulatory authority to the extent that it performs similar functions (including the Public Company Accounting Oversight Board) for investigations or possible disciplinary action.

8.  To a federal, state, local, tribal, foreign, or international agency, if necessary to obtain information relevant to the SEC's decision concerning the hiring or retention of an employee; the issuance of a security clearance; the letting of a contract; or the issuance of a license, grant, or other benefit.

9.  To a federal, state, local, tribal, foreign, or international agency in response to its request for information concerning the hiring or retention of an employee; the issuance of a security clearance; the reporting of an investigation of an employee; the letting of a contract; or the issuance of a license, grant, or other benefit by the requesting agency, to the extent that the information is relevant and necessary to the requesting agency's decision on the matter.

10.  To produce summary descriptive statistics and analytical studies, as a data source for management information, in support of the function for which the records are collected and maintained or for related personnel management functions or manpower studies; may also be used to respond to general requests for statistical information (without personal identification of individuals) under the Freedom of Information Act.

11.  To any trustee, receiver, master, special counsel, or other individual or entity that is appointed by a court of competent jurisdiction, or as a result of an agreement between the parties in connection with litigation or administrative proceedings involving allegations of violations of the federal securities laws (as defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)) or pursuant to the Commission's Rules of Practice, 17 CFR 201.100 – 900 or the Commission's Rules of Fair Fund and Disgorgement Plans, 17 CFR 201.1100-1106, or otherwise, where such trustee, receiver, master, special counsel, or other individual or entity is specifically designated to perform particular functions with respect to, or as a result of, the pending action or proceeding or in connection with the administration and enforcement by the Commission of the federal securities laws or the Commission's Rules of Practice or the Rules of Fair Fund and Disgorgement Plans.

12.  To any persons during the course of any inquiry, examination, or investigation conducted by the SEC's staff, or in connection with civil litigation, if the staff has reason to believe that the person to whom the record is disclosed may have further information about the matters related therein, and those matters appeared to be relevant at the time to the subject matter of the inquiry.

13.  To interns, grantees, experts, contractors, and others who have been engaged by the Commission to assist in the performance of a service related to this system of records and who need access to the records for the purpose of assisting the Commission in the efficient administration of its programs, including by performing clerical, stenographic, or data analysis functions, or by reproduction of records by electronic or other means. Recipients of these records shall be required to comply with the requirements of the Privacy Act of 1974, as amended, 5 U.S.C. 552a.

14.  In reports published by the Commission pursuant to authority granted in the federal securities laws (as such term is defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)), which authority shall include, but not be limited to, section 21(a) of the Securities Exchange Act of 1934, 15 U.S.C. 78u(a)).

15.  To members of advisory committees that are created by the Commission or by Congress to render advice and recommendations to the Commission or to Congress, to be used solely in connection with their official designated functions.

16.  To any person who is or has agreed to be subject to the Commission's Rules of Conduct, 17 CFR 200.735-1 to 200.735-18, and who assists in the investigation by the Commission of possible violations of the federal securities laws (as such term is defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)), in the preparation or conduct of enforcement actions brought by the Commission for such violations, or otherwise in connection with the Commission's enforcement or regulatory functions under the federal securities laws.

17.  To a Congressional office from the record of an individual in response to an inquiry from the Congressional office made at the request of that individual.

18.  To members of Congress, the press, and the public in response to inquiries relating to particular Registrants and their activities, and other matters under the Commission's jurisdiction.

19.  To prepare and publish information relating to violations of the federal securities laws as provided in 15 U.S.C. 78c(a)(47)), as amended.

20.  To respond to subpoenas in any litigation or other proceeding.

21.  To a trustee in bankruptcy.

22.  To any governmental agency, governmental or private collection agent, consumer reporting agency or commercial reporting agency, governmental or private employer of a debtor, or any other person, for collection, including collection by administrative offset, federal salary offset, tax refund offset, or administrative wage garnishment, of amounts owed as a result of Commission civil or administrative proceedings.

* * * * *

*Small Business Owners*: The SEC always welcomes comments on how it can better assist small businesses. If you would like more information, or have questions or comments about federal securities regulations as they affect small businesses, please contact the Office of Small Business Policy, in the SEC's Division of Corporation Finance, at 202-551-3460. If you would prefer to comment to someone outside of the SEC, you can contact the Small Business Regulatory Enforcement Ombudsman at http://www.sba.gov/ombudsman or toll free at 888-REG-FAIR. The Ombudsman's office receives comments from small businesses and annually evaluates federal agency enforcement activities for their responsiveness to the special needs of small business.

 **U.S. Securities and Exchange Commission**

**<u>Data Delivery Standards</u>**

This document describes the technical requirements for paper and electronic document productions to the U.S. Securities and Exchange Commission (SEC).   ***\*\*Any proposed file formats other than those described below must be discussed with the legal and technical staff of the SEC Division of Enforcement prior to submission.\*\****

General Instructions ........................................................................................................................................1

Delivery Formats............................................................................................................................................2

    I.   *Concordance*® Imaged Productions..........................................................................................................2

       1.  Images ...................................................................................................................................2

       2.  *Concordance Image*®  or Opticon Cross-Reference File ...................................................2

       3.  *Concordance*® Data File..................................................................................................3

       4.  Text .....................................................................................................................................3

       5.  Linked Native Files .............................................................................................................3

    II.  Native File Productions without loadfiles.................................................................................3

    III.   Adobe PDF File Productions…………..................................................................................3

    IV.   Audio Files .................................................................................................................................4

    V.   Video Files...................................................................................................................................4

    VI.   Electronic Trade and Bank Records ......................................................................................4

    VII.   Electronic Phone Records.......................................................................................................4

**General Instructions**

Electronic files must be produced in their native format, i.e., the format in which they are ordinarily used and maintained during the normal course of business.  For example, an MS Excel file must be produced as an MS Excel file rather than an image of a spreadsheet*. (Note:  An Adobe PDF file is <u>not</u> considered a native file unless the document was initially created as a PDF.)*

In the event produced files require the use of proprietary software not commonly found in the workplace, the SEC will explore other format options with the producing party.

The proposed use of file de-duplication methodologies or *computer-assisted review* or *technology-assisted review* (TAR) during the processing of documents must be discussed with and approved by the legal and technical staff of the Division of Enforcement (ENF).  If your production will be de-duplicated it is vital that you 1) preserve any unique metadata associated with the duplicate files, for example, custodian name, and, 2) make that unique metadata part of your production to the SEC.

Rev 10/2014

U.S. Securities and Exchange Commission
Data Delivery Standards

General requirements for **ALL** document productions are:

1. A cover letter should be included with each production and include the following:
   a. A list of each piece of media included in the production with its unique production volume number
   b. A list of custodians, identifying the Bates range for each custodian.
   c. The time zone in which the emails were standardized during conversion.
2. Data can be produced on CD, DVD, thumb drive, etc., using the media requiring the least number of deliverables and labeled with the following:
   a. Case number
   b. Production date
   c. Producing party
   d. Bates range
3. All submissions must be organized by **custodian** unless otherwise instructed.
4. All document family groups, i.e. email attachments, embedded files, etc., should be produced together and children files should follow parent files sequentially in the Bates numbering.
5. All load-ready collections should include only one data load file and one image pointer file.
6. All load-ready text must be produced as separate text files.
7. All load-ready collections should account for custodians in the custodian field.
8. Audio files should be separated from data files if both are included in the production.
9. Only alphanumeric characters and the underscore character are permitted in file names and **folder names**. Special characters are not permitted.
10. All data productions must be produced using industry standard self-extracting encryption software.
11. Passwords for documents, files, compressed archives and encrypted media must be provided separately either via email or in a separate cover letter from the media.
12. All productions should be produced free of computer viruses.
13. Additional technical descriptions can be found in the addendum to this document.

   *Please note that productions that come via United States Postal Service are subject to Mail Irradiation, as a result electronic productions may be damaged.*

**Delivery Formats**

**I.** ***Concordance® Imaged Productions***
   The SEC prefers that all documents and data be produced in a structured format prepared for Concordance. All scanned paper electronic file collections should be converted to TIFF files, Bates numbered, and include fully searchable text files.

   **1. Images**
      a. Black and white images must be 300 DPI Group IV single-page TIFF files.
      b. Color images must be produced in JPEG format.
      c. File names cannot contain embedded spaces or special characters (including the comma).
      c. Folder names cannot contain embedded spaces or special characters (including the comma).
      d. All TIFF image files must have a unique file name, i.e. Bates number.
      e. Images must be endorsed with sequential Bates numbers in the lower right corner of each image.
      f. The number of TIFF files per folder should not exceed 500 files.
      g. Excel spreadsheets should have a placeholder image named by the Bates number of the file.
      h. AUTOCAD/photograph files should be produced as a single page JPEG file.

Rev 10/2014

**ER-1581**

U.S. Securities and Exchange Commission
Data Delivery Standards

---

2. **Concordance Image® OR Opticon  Cross-Reference File**
   The image cross-reference file to link the images to the database should be a comma- delimited file consisting of seven fields per line with a line in the cross-reference file for every image in the database with the following format:

   *ImageID,VolumeLabel,ImageFilePath,DocumentBreak,FolderBreak,BoxBreak,Pag*

3. ***Concordance*® Data File**
   The data file (.DAT) contains all of the fielded information that will be loaded into the *Concordance*® database.

   a. The first line of the .DAT file must be a header row identifying the field names.
   b. The .DAT file must use the following *Concordance*® default delimiters:
      Comma ¶ ASCII character (020)
      Quote þ ASCII character (254)
   c. Date fields should be provided in the format:  mm/dd/yyyy
   d. Date and time fields must be two separate fields.
   e. If the production includes imaged emails and attachments, the attachment fields must be included to preserve the parent/child relationship between an email and its attachments.
   f. An OCRPATH field must be included to provide the file path and name of the extracted text file on the produced storage media.  The text file must be named after the FIRSTBATES.  Do not include the text in the .DAT file.
   g. For production with native files, a NATIVELINK field must be included to provide the file path and name of the native file on the produced storage media.
   h. BEGATT and ENDATT fields must be two separate fields.
   i. A complete list of metadata fields is available in **Addendum A** to this document.

4. **Text**
   Text must be produced as separate text files, not as fields within the .DAT file. The full path to the text file (OCRPATH) should be included in the .DAT file.  We require document level ANSI text files, named per the FIRSTBATES/Image Key. (Please note in the cover letter if any non-ANSI text files are included in the production.)  Extracted text must be in a separate folder, one text file per document.  The number of files per folder should not exceed 500 files. There should be no special characters (including commas in the folder names). For redacted documents, provide the full text for the redacted version.

5. **Linked Native Files**
   Copies of original email and native file documents/attachments must be included for all electronic productions.
   a. Native file documents must be named per the FIRSTBATES number.
   b. The full path of the native file must be provided in the .DAT file for the LINK field.
   c. The number of native files per folder should not exceed 500 files.

II. **Native File Production without Loadfiles**
   With prior approval, native files may be produced without loadfiles.  The files must be produced as they are maintained in the normal course of business and organized by custodian-named file folders. When approved, Outlook (.PST) and Lotus Notes (.NSF) email files may be produced in native file format.   A separate folder should be provided for each custodian.

III. **Adobe PDF File Production**
   With prior approval, Adobe PDF files may be produced in native file format.
   1. PDF files should be produced in separate folders named by the custodian. The folders should not contain any special characters (including commas).
   2. All PDFs must be unitized at the document level, i.e., each PDF should represent a discrete document.
   3. All PDF files must contain embedded text that includes all discernible words within the document, not selected text or image only. This requires all layers of the PDF to be flattened first.
   4. If PDF files are Bates endorsed, the PDF files must be named by the Bates range.

Rev 10/2014

**ER-1582**

U.S. Securities and Exchange Commission
Data Delivery Standards

**IV.   Audio Files**

Audio files from telephone recording systems must be produced in a format that is playable using Microsoft Windows Media Player™. Additionally, the call information (metadata) related to each audio recording MUST be provided. The metadata file must be produced in a delimited text format. Field names must be included in the first row of the text file. The metadata must include, at a minimum, the following fields:

| | | |
|---|---|---|
| 1) | Caller Name: | Caller's name or account/identification number |
| 2) | Originating Number: | Caller's phone number |
| 3) | Called Party Name: | Called party's name |
| 4) | Terminating Number: | Called party's phone number |
| 5) | Date: | Date of call |
| 6) | Time: | Time of call |
| 7) | Filename: | Filename of audio file |

**V.   Video Files**

Video files must be produced in a format that is playable using Microsoft Windows Media Player™.

**VI.   Electronic Trade and Bank Records**

When producing electronic trade and bank records, provide the files in one of the following formats:

1.   MS Excel spreadsheet with header information detailing the field structure. If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details.

2.   Delimited text file with header information detailing the field structure. The preferred delimiter is a vertical bar "|". If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details.

**VII.   Electronic Phone Records**

When producing electronic phone records, provide the files in the following format:

1.   MS Excel spreadsheet with header information detailing the field structure. If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details.  Data must be formatted in its native format (i.e. dates in a date format, numbers in an appropriate numerical format, and numbers with leading zeroes as text).

    a.   The metadata that must be included is outline in **Addendum B** of this document. Each field of data must be loaded into a separate column.  For example, Date and Start_Time must be produced in separate columns and not combined into a single column containing both pieces of information.  Any fields of data that are provided in addition to those listed in **Addendum B** must also be loaded into separate columns.

Rev 10/2014

U.S. Securities and Exchange Commission
Data Delivery Standards

## ADDENDUM A

The metadata of electronic document collections should be extracted and provided in a .DAT file using the field definition and formatting described below:

| Field Name | Sample Data | Description |
|---|---|---|
| FIRSTBATES | EDC0000001 | First Bates number of native file document/email |
| LASTBATES | EDC0000001 | Last Bates number of native file document/email<br>**The LASTBATES field should be populated for single page documents/emails. |
| ATTACHRANGE | EDC0000001 - EDC0000015 | Bates number of the first page of the parent document to the Bates number of the last page of the last attachment "child" document |
| BEGATTACH | EDC0000001 | First Bates number of attachment range |
| ENDATTACH | EDC0000015 | Last Bates number of attachment range |
| PARENT_BATES | EDC0000001 | First Bates number of parent document/Email<br>**This PARENT_BATES field should be populated in each record representing an attachment "child" document |
| CHILD_BATES | EDC0000002; EDC0000014 | First Bates number of "child" attachment(s); can be more than one Bates number listed depending on the number of attachments<br>**The CHILD_BATES field should be populated in each record representing a "parent" document |
| CUSTODIAN | Smith, John | Email:  mailbox where the email resided<br>Native: Individual from whom the document originated |
| FROM | John Smith | Email:  Sender<br>Native: Author(s) of document<br>**semi-colon should be used to separate multiple entries |
| TO | Coffman, Janice; LeeW [mailto:LeeW@MSN.com] | Recipient(s)<br>**semi-colon should be used to separate multiple entries |
| CC | Frank Thompson [mailto: frank_Thompson@cdt.com] | Carbon copy recipient(s)<br>**semi-colon should be used to separate multiple entries |
| BCC | John Cain | Blind carbon copy recipient(s)<br>**semi-colon should be used to separate multiple entries |
| SUBJECT | Board Meeting Minutes | Email: Subject line of the email<br>Native: Title of document (if available) |
| DATE_SENT | 10/12/2010 | Email:  Date the email was sent<br>Native: (empty) |
| TIME_SENT/TIME_ZONE | 07:05 PM GMT | Email: Time the email was sent/ Time zone in which the emails were standardized during conversion.<br>Native: (empty)<br>**This data must be a separate field and cannot be combined with the DATE_SENT field; |
| TIME_ZONE | GMT | The time zone in which the emails were standardized during conversion.<br>Email: Time zone<br>Native: (empty) |

5

Rev 10/2014

| LINK | D:\001\EDC0000001.msg | Hyperlink to the email or native file document **The linked file must be named per the FIRSTBATES number |
| MIME_TYPE | MSG | The content type of an Email or native file document as identified/extracted from the header |
| FILE_EXTEN | MSG | The file type extension representing the Email or native file document; will vary depending on the email format |
| AUTHOR | John Smith | Email: (empty) Native: Author of the document |
| DATE_CREATED | 10/10/2010 | Email: (empty) Native: Date the document was created |
| TIME_CREATED | 10:25 AM | Email: (empty) Native: Time the document was created **This data must be a separate field and cannot be combined with the DATE_CREATED field |
| DATE_MOD | 10/12/2010 | Email: (empty) Native: Date the document was last modified |
| TIME_MOD | 07:00 PM | Email: (empty) Native: Time the document was last modified **This data must be a separate field and cannot be combined with the DATE_MOD field |
| DATE_ACCESSD | 10/12/2010 | Email: (empty) Native: Date the document was last accessed |
| TIME_ACCESSD | 07:00 PM | Email: (empty) Native: Time the document was last accessed **This data must be a separate field and cannot be combined with the DATE_ACCESSD field |
| PRINTED_DATE | 10/12/2010 | Email: (empty) Native: Date the document was last printed |
| FILE_SIZE | 5,952 | Size of native file document/email in KB |
| PGCOUNT | 1 | Number of pages in native file document/email |
| PATH | J:\Shared\SmithJ\October Agenda.doc | Email: (empty) Native: Path where native file document was stored including original file name. |
| INTFILEPATH | Personal Folders\Deleted Items\Board Meeting Minutes.msg | Email: original location of email including original file name. Native: (empty) |
| INTMSGID | <000805c2c71b$75977050$cb 8306d1@MSN> | Email: Unique Message ID Native: (empty) |
| MD5HASH | d131dd02c5e6eec4693d9a069 8aff95c 2fcab58712467eab4004583eb 8fb7f89 | MD5 Hash value of the document. |
| OCRPATH | TEXT/001/EDC0000001.txt | Path to extracted text of the native file |

Sample Image Loadfile:

```
IMG0000001,,E:\001\IMG0000001.TIF,Y,,,
IMG0000002,,E:\001\IMG0000002.TIF,,,,
IMG0000003,,E:\001\IMG0000003.TIF,,,,
IMG0000004,,E:\001\IMG0000003.TIF,,,,
IMG0000005,,E:\001\IMG0000003.TIF,Y,,,
IMG0000006,,E:\001\IMG0000003.TIF,,,,
```

Rev 10/2014

**ER-1585**

## ADDENDUM B

For Electronic Phone Records, include the following fields in separate columns:

For Calls:

1) Account Number
2) Connection Date – Date the call was received or made
3) Connection Time – Time call was received or made
4) Seizure Time – Time it took for the call to be placed in seconds
5) Originating Number – Phone that placed the call
6) Terminating Number – Phone that received the call
7) Elapsed Time – The length of time the call lasted, preferably in seconds
8) End Time – The time the call ended
9) Number Dialed – Actual number dialed
10) IMEI Originating – Unique id to phone used to make call
11) IMEI Terminating– Unique id to phone used to receive call
12) IMSI Originating – Unique id to phone used to make call
13) IMSI Terminating- Unique id to phone used to receive call
14) Call Codes – Identify call direction or other routing information
15) Time Zone – Time Zone in which the call was received or placed, if applicable

For Text messages:

1) Account Number
2) Connection Date – Date the text was received or made
3) Connection Time – Time text was received or made
4) Originating Number – Who placed the text
5) Terminating Number – Who received the text
6) IMEI Originating – Unique id to phone used to make text
7) IMEI Terminating– Unique id to phone used to receive text
8) IMSI Originating - Unique id to phone used to make text
9) IMSI Terminating- Unique id to phone used to receive text
10) Text Code – Identify text direction, or other text routing information
11) Text Type Code – Type of text message (sent SMS, MMS, or other)
12) Time Zone – Time Zone in which the call was received or placed, if applicable

For Mobile Data Usage:

1) Account Number
2) Connection Date – Date the data was received or made
3) Connection Time – Time data was received or made
4) Originating number – Number that used data
5) IMEI Originating – Unique id of phone that used data
6) IMSI Originating - Unique id of phone that used data
7) Data or Data codes – Identify data direction, or other data routing information
8) Time Zone – Time Zone in which the call was received or placed, if applicable

Rev 10/2014

# Exhibit  F



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
San Francisco Regional Office
44 Montgomery Street, Suite 2800
San Francisco, CA 94104

**DIVISION OF ENFORCEMENT**

Jessica W. Chan
Counsel
(415) 705-2451

December 8, 2015

**VIA UPS AND EMAIL (heather.king@theranos.com)**

Heather King, Esq.
General Counsel
Theranos, Inc.
1701 Page Mill Road
Palo Alto, CA 94304

Re:      **In the Matter of Theranos, Inc. (SF-4030)**

Dear Ms. King:

The enclosed subpoena has been issued pursuant to a formal order entered by the United States Securities and Exchange Commission.  The subpoena requires Theranos, Inc. to produce documents.

**Producing Documents**

*What materials do I have to produce?*

The subpoena requires production of the documents described in the attachment to the subpoena.  The attachment defines some terms (such as "document") before listing what must be produced.  The documents must be produced to the Commission no later than **December 22, 2015.**

Please note that if copies of a document differ in any way, they are considered separate documents and each one must be produced.  For example, if there are two copies of the same letter, but only one of them has handwritten notes on it, both the clean copy and the one with notes must be produced.

If you prefer, photocopies of the originals may be produced.  The Commission cannot reimburse copying costs.  The copies must be identical to the originals, including even faint marks or print.  If you choose to send copies, the originals must be kept in a safe place.  We will accept the copies for now, but may require production of the originals later.

If photocopies are produced, please put an identifying notation on each page of each document to indicate that you produced it, and number the pages of all the documents submitted. Please make sure the notation and number do not conceal any writing or marking on the document.  If originals are produced, please do not add any identifying notations.

*Do I need to send anything else?*

You should enclose a list briefly describing each item produced.  The list should state to which category number(s) in the subpoena attachment each item responds.

You also should include a cover letter stating whether you believe you have met your obligations under the subpoena by searching carefully and thoroughly for everything called for by the subpoena, and producing it all to us.

*What if I do not produce everything described in the attachment to the subpoena?*

The subpoena requires production of all the materials described in it.  If, for any reason – including a claim of attorney-client privilege – you do not produce something called for by the subpoena, you should submit a list of what is not being produced.  The list should describe each item separately, noting:

- its author(s);
- its date;
- its subject matter;
- the name of the person who has the item now, or the last person known to have it;
- the names of everyone who ever had the item or a copy of it, and the names of everyone who was told the item's contents; and
- the reason the item was not produced.

If you withhold anything on the basis of a claim of attorney-client privilege or attorney work product protection, you should also identify the attorney and client involved.

*Where should I send the materials?*

Please send the materials to:

ENF-CPU
U.S. Securities and Exchange Commission
100 F St., N.E., Mailstop 5973
Washington, DC 20549-5973

For smaller electronic productions under 10MB in size, the materials may be emailed to the following email address:  ENF-CPU@sec.gov.

We ask that you send a copy of the cover letter to your response and a courtesy copy of the production by mail, fax, or email to:

> Jessica W. Chan, Staff Attorney
> U.S. Securities and Exchange Commission
> San Francisco Regional Office
> 44 Montgomery Street, Suite 2800
> San Francisco, California 94104
> Telephone: (415) 705-2451
> Fax: (415) 705-2501
> Email: chanjes@sec.gov

## Other Important Information

*What will the Commission do with the materials I send and the testimony I provide?*

The enclosed SEC Form 1662 includes a List of Routine Uses of information provided to the Commission. This form has other important information for you. Please read it carefully.

*Has the Commission determined that anyone has done anything wrong?*

This investigation is a non-public, fact-finding inquiry. We are trying to determine whether there have been any violations of the federal securities laws. The investigation and the subpoena do not mean that we have concluded that you or anyone else has broken the law. Also, the investigation does not mean that we have a negative opinion of any person, entity or security.

*Important Policy Concerning Settlements*

Please note that, in any matter in which enforcement action is ultimately deemed to be warranted, the Division of Enforcement will not recommend any settlement to the Commission unless the party wishing to settle certifies, under penalty of perjury, that all documents responsive to Commission subpoenas and formal and informal document requests in this matter have been produced.

*I have read this letter, the subpoena, and the SEC Form 1662, but I still have questions. What should I do?*

If you have any questions concerning this matter, you may call me at (415) 705-2451.

Very truly yours,

Jessica W. Chan
Counsel, Division of Enforcement

Enclosures:    Subpoena Duces Tecum (with attachment)
               SEC Form 1662
               SEC Data Delivery Standards



## SUBPOENA

# UNITED STATES OF AMERICA
## SECURITIES AND EXCHANGE COMMISSION

### In the Matter of Theranos, Inc. (SF-4030)

To:    Heather King, Esq.
General Counsel
Theranos, Inc.
1701 Page Mill Road
Palo Alto, CA 94304

☒    **YOU MUST PRODUCE** everything specified in the Attachment to this subpoena to officers of the Securities and Exchange Commission at the place, and no later than the date and time, specified below.

ENF-CPU
U.S. Securities and Exchange Commission
100 F St., N.E., Mailstop 5973
Washington, DC 20549-5973
Date/Time:  December 22, 2015

☐    **YOU MUST TESTIFY** before officers of the Securities and Exchange Commission, at the place, date and time specified below:

**FEDERAL LAW REQUIRES YOU TO COMPLY WITH THIS SUBPOENA**.
        Failure to comply may subject you to a fine and/or imprisonment.

By:   _____   Date:   <u>December 8, 2015</u>
Jessica W. Chan
U.S. Securities and Exchange Commission, San Francisco Regional Office
44 Montgomery Street, Suite 2800, San Francisco, CA 94104; Telephone (415) 705-2451

I am an officer of the Securities and Exchange Commission authorized to issue subpoenas in this matter.  The Securities and Exchange Commission has issued a Formal Order authorizing this investigation under Section 20(a) of the Securities Act of 1933 and Section 21(a) of the Securities Exchange Act of 1934.

## ATTACHMENT

**Subpoena to Theranos, Inc.**
**In the Matter of Theranos, Inc. (SF-4030)**
**December 8, 2015**

## INSTRUCTIONS

This subpoena requires the production of certain documents, as specified in the section entitled "Production" below.  The required documents should be produced in accordance with the following requirements:

A.    You must submit all documents required to be produced by the subpoena that are in your possession, custody, or control, regardless of whether the documents are in your possession.

B.    If you claim attorney-client privilege, or any other privilege or protection from production, provide a list of the documents that you claim are privileged or protected, indicating the date prepared, authors, all recipients, the subject matters of the document, and the privilege or protection claimed, sufficiently identifying the documents to permit the staff to determine whether to request an in camera inspection by a federal district court judge.

C.    Produce the entirety of each and every document described below, without alteration, deletion, redaction, or obliteration of any information contained therein, even though such information is not specifically requested.

D.    The following rules of construction apply to this subpoena and attachment: (1) the connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the attachment all responses that might otherwise be construed to be outside of its scope; and (2) the use of the singular form of any word includes the plural and vice versa.

## DEFINITIONS

A.    "COMMUNICATIONS" means and includes, but is not limited to, any correspondence, memoranda, notes, electronic mail, telephone conversations, instant message statements, and any other conversations, conferences, or meetings.

B.    "CONCERNING" means and includes, but is not limited to, referring to, pertaining to, relating to, alluding to, bearing upon, commenting upon, touching upon, regarding, concerning, recording, evidencing, constituting, substantiating, supporting, contradicting, discussing, mentioning, including or otherwise affecting (directly or indirectly).

C.    "DOCUMENT" and "DOCUMENTS" mean and include, but are not limited to, any and all records in your possession, custody or control, whether drafts or final versions, originals or annotated or non-identical copies, however and by whomever created, produced or stored (manually, mechanically, electronically or otherwise), including,

without limitation, books, papers, files, notes, account statements, confirmations, reports, correspondence, electronic files, e-mail, instant messages, text messages, Internet sites, World Wide Web pages, memoranda, ledger sheets, reports, telegrams, telexes, telephone bills, messages or logs, notes or minutes of conversations or meetings, contracts, agreements, calendars, datebooks, diaries, computer programs, records of billings, checks, receipts, wire transfers, drafts for money, records of payment, magnetic tape, tape recordings, disks, diskettes, diskpacks or other electronic media, microfilm, microfiche and other storage devices.  "DOCUMENT" and "DOCUMENTS" shall also include all "writings," "recordings" and "photographs" as defined by Rule 1001 of the Federal Rules of Evidence and all "electronically stored information" as the term is used in Rules 26 and 34 of the Federal Rules of Civil Procedure.

D.      "THERANOS" means Theranos, Inc., the entities and their divisions, groups, subsidiaries, predecessors, successors and affiliates, as well as current and former officers, directors, members, general and limited partners, employees, attorneys, accountants, agents, representatives, and any person acting on behalf of Theranos, Inc. with express, implied or apparent authority to do so or under its direction or control.

E.      Unless otherwise specified, the time period for all requests is January 1, 2010 to the date of production.

## PRODUCTION

1.      All U.S. Food and Drug Administration inspection records, including, but not limited to, announcements of inspections, Form 483s, warning letters, and THERANOS' responses.

2.      All COMMUNICATIONS with the U.S. Food and Drug Administration besides applications for device approvals.

3.      All Centers for Medicare and Medicaid Services inspection records, including, but not limited to, announcements of inspections, observations, and THERANOS' responses.

4.      All COMMUNICATIONS with the Centers for Medicare and Medicaid Services.

5.      All Arizona Department of Health Services inspection records, including, but not limited to, announcements of inspections, observations, and THERANOS' responses.

6.      All COMMUNICATIONS with Arizona Department of Health Services.

7.      All email correspondence referenced in the December 2, 2015 Washington Post article titled, "E-mails reveal concerns about Theranos's FDA compliance date back years."

8.      From January 1, 2013 to the date of production, all complaints received by
        THERANOS from THERANOS employees regarding the accuracy of
        THERANOS' blood testing diagnostic results.

# Exhibit  E



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
San Francisco Regional Office
44 Montgomery Street, Suite 2800
San Francisco, CA 94104

**DIVISION OF ENFORCEMENT**

Jessica W. Chan
Counsel
(415) 705-2451

November 23, 2015

**VIA UPS AND EMAIL (heather.king@theranos.com)**

Heather King, Esq.
General Counsel
Theranos, Inc.
1701 Page Mill Road
Palo Alto, CA 94304

Re:   **In the Matter of Theranos, Inc. (SF-4030)**

Dear Ms. King:

The enclosed subpoena has been issued pursuant to a formal order entered by the United States Securities and Exchange Commission. The subpoena requires Theranos, Inc. to produce documents.

**Producing Documents**

*What materials do I have to produce?*

The subpoena requires production of the documents described in the attachment to the subpoena. The attachment defines some terms (such as "document") before listing what must be produced. The documents must be produced to the Commission no later than **December 7, 2015.**

Please note that if copies of a document differ in any way, they are considered separate documents and each one must be produced. For example, if there are two copies of the same letter, but only one of them has handwritten notes on it, both the clean copy and the one with notes must be produced.

If you prefer, photocopies of the originals may be produced. The Commission cannot reimburse copying costs. The copies must be identical to the originals, including even faint marks or print. If you choose to send copies, the originals must be kept in a safe place. We will accept the copies for now, but may require production of the originals later.

If photocopies are produced, please put an identifying notation on each page of each document to indicate that you produced it, and number the pages of all the documents submitted. Please make sure the notation and number do not conceal any writing or marking on the document.  If originals are produced, please do not add any identifying notations.

*Do I need to send anything else?*

You should enclose a list briefly describing each item produced.  The list should state to which category number(s) in the subpoena attachment each item responds.

You also should include a cover letter stating whether you believe you have met your obligations under the subpoena by searching carefully and thoroughly for everything called for by the subpoena, and producing it all to us.

*What if I do not produce everything described in the attachment to the subpoena?*

The subpoena requires production of all the materials described in it.  If, for any reason – including a claim of attorney-client privilege – you do not produce something called for by the subpoena, you should submit a list of what is not being produced.  The list should describe each item separately, noting:

- its author(s);

- its date;

- its subject matter;

- the name of the person who has the item now, or the last person known to have it;

- the names of everyone who ever had the item or a copy of it, and the names of everyone who was told the item's contents; and

- the reason the item was not produced.

If you withhold anything on the basis of a claim of attorney-client privilege or attorney work product protection, you should also identify the attorney and client involved.

*Where should I send the materials?*

Please send the materials to:

ENF-CPU
U.S. Securities and Exchange Commission
100 F St., N.E., Mailstop 5973
Washington, DC 20549-5973

For smaller electronic productions under 10MB in size, the materials may be emailed to the following email address:  ENF-CPU@sec.gov.

We ask that you send a copy of the cover letter to your response and a courtesy copy of the production by mail, fax, or email to:

> Jessica W. Chan, Staff Attorney
> U.S. Securities and Exchange Commission
> San Francisco Regional Office
> 44 Montgomery Street, Suite 2800
> San Francisco, California 94104
> Telephone:  (415) 705-2451
> Fax:  (415) 705-2501
> Email:  chanjes@sec.gov

## **Other Important Information**

*What will the Commission do with the materials I send and the testimony I provide?*

The enclosed SEC Form 1662 includes a List of Routine Uses of information provided to the Commission.  This form has other important information for you.  Please read it carefully.

*Has the Commission determined that anyone has done anything wrong?*

This investigation is a non-public, fact-finding inquiry.  We are trying to determine whether there have been any violations of the federal securities laws.  The investigation and the subpoena do not mean that we have concluded that you or anyone else has broken the law.  Also, the investigation does not mean that we have a negative opinion of any person, entity or security.

*Important Policy Concerning Settlements*

Please note that, in any matter in which enforcement action is ultimately deemed to be warranted, the Division of Enforcement will not recommend any settlement to the Commission unless the party wishing to settle certifies, under penalty of perjury, that all documents responsive to Commission subpoenas and formal and informal document requests in this matter have been produced.

*I have read this letter, the subpoena, and the SEC Form 1662, but I still have questions.  What should I do?*

If you have any questions concerning this matter, you may call me at (415) 705-2451.

Very truly yours,

Jessica W. Chan

Jessica W. Chan
Counsel, Division of Enforcement

Enclosures:     Subpoena Duces Tecum (with attachment)
                SEC Form 1662
                SEC Data Delivery Standards



**SUBPOENA**

# UNITED STATES OF AMERICA
## SECURITIES AND EXCHANGE COMMISSION

**In the Matter of Theranos, Inc. (SF-4030)**

To:    Heather King, Esq.
       General Counsel
       Theranos, Inc.
       1701 Page Mill Road
       Palo Alto, CA 94304

☒     **YOU MUST PRODUCE** everything specified in the Attachment to this subpoena to
      officers of the Securities and Exchange Commission at the place, and no later than the date
      and time, specified below.

      ENF-CPU
      U.S. Securities and Exchange Commission
      100 F St., N.E., Mailstop 5973
      Washington, DC 20549-5973
      Date/Time:  December 7, 2015

☐     **YOU MUST TESTIFY** before officers of the Securities and Exchange Commission, at the
place, date and time specified below:

       **FEDERAL LAW REQUIRES YOU TO COMPLY WITH THIS SUBPOENA**.
              Failure to comply may subject you to a fine and/or imprisonment.

By:   _____  Date:   November 23, 2015
      Jessica W. Chan
      U.S. Securities and Exchange Commission, San Francisco Regional Office
      44 Montgomery Street, Suite 2800, San Francisco, CA 94104; Telephone (415) 705-2451

I am an officer of the Securities and Exchange Commission authorized to issue subpoenas in this
matter.  The Securities and Exchange Commission has issued a Formal Order authorizing this
investigation under Section 20(a) of the Securities Act of 1933 and Section 21(a) of the Securities
Exchange Act of 1934.

## ATTACHMENT

**Subpoena to Theranos, Inc.**
**In the Matter of Theranos, Inc. (SF-4030)**
**November 23, 2015**

### INSTRUCTIONS

This subpoena requires the production of certain documents, as specified in the section entitled "Production" below.  The required documents should be produced in accordance with the following requirements:

A.      You must submit all documents required to be produced by the subpoena that are in your possession, custody, or control, regardless of whether the documents are in your possession.

B.      If you claim attorney-client privilege, or any other privilege or protection from production, provide a list of the documents that you claim are privileged or protected, indicating the date prepared, authors, all recipients, the subject matters of the document, and the privilege or protection claimed, sufficiently identifying the documents to permit the staff to determine whether to request an in camera inspection by a federal district court judge.

C.      Produce the entirety of each and every document described below, without alteration, deletion, redaction, or obliteration of any information contained therein, even though such information is not specifically requested.

D.      The following rules of construction apply to this subpoena and attachment: (1) the connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the attachment all responses that might otherwise be construed to be outside of its scope; and (2) the use of the singular form of any word includes the plural and vice versa.

### DEFINITIONS

A.      "COMMUNICATIONS" means and includes, but is not limited to, any correspondence, memoranda, notes, electronic mail, telephone conversations, instant message statements, and any other conversations, conferences, or meetings.

B.      "CONCERNING" means and includes, but is not limited to, referring to, pertaining to, relating to, alluding to, bearing upon, commenting upon, touching upon, regarding, concerning, recording, evidencing, constituting, substantiating, supporting, contradicting, discussing, mentioning, including or otherwise affecting (directly or indirectly).

C.      "DOCUMENT" and "DOCUMENTS" mean and include, but are not limited to, any and all records in your possession, custody or control, whether drafts or final versions, originals or annotated or non-identical copies, however and by whomever created, produced or stored (manually, mechanically, electronically or otherwise), including,

without limitation, books, papers, files, notes, account statements, confirmations, reports, correspondence, electronic files, e-mail, instant messages, text messages, Internet sites, World Wide Web pages, memoranda, ledger sheets, reports, telegrams, telexes, telephone bills, messages or logs, notes or minutes of conversations or meetings, contracts, agreements, calendars, datebooks, diaries, computer programs, records of billings, checks, receipts, wire transfers, drafts for money, records of payment, magnetic tape, tape recordings, disks, diskettes, diskpacks or other electronic media, microfilm, microfiche and other storage devices.  "DOCUMENT" and "DOCUMENTS" shall also include all "writings," "recordings" and "photographs" as defined by Rule 1001 of the Federal Rules of Evidence and all "electronically stored information" as the term is used in Rules 26 and 34 of the Federal Rules of Civil Procedure.

D.    "THERANOS" means Theranos, Inc., the entities and their divisions, groups, subsidiaries, predecessors, successors and affiliates, as well as current and former officers, directors, members, general and limited partners, employees, attorneys, accountants, agents, representatives, and any person acting on behalf of Theranos, Inc. with express, implied or apparent authority to do so or under its direction or control.

## PRODUCTION

1.    From October 15, 2015 to the time of production, all COMMUNICATIONS with THERANOS Series C-2 investors.

2.    The identity and contact information (including physical address, phone number, and email address) of all customers quoted on TS-000450-452 of THERANOS' document production on November 4, 2015.

3.    The contact information (including physical address, phone number, and email address) of all physicians quoted on TS-000453-455 of THERANOS' document production on November 4, 2015.

4.    All signed contracts with the ten major pharmaceutical companies Theranos represented are its current and past clients on TS-000399 of Theranos' document production on November 4, 2015.

5.    The contact information (including physical address, phone number, and email address) of the individuals listed under "Johns Hopkins Medicine Participants" on TS-000639 of THERANOS' document production on November 4, 2015.

6.    All signed contracts between THERANOS and Walgreens.

7.    All signed contracts between THERANOS and Safeway.

8.    All signed contracts between THERANOS and UnitedHealthcare.

9.    All signed contracts between THERANOS and Blue Cross and Blue Shield Association.

10. From January 1, 2013 to the date of production, all COMMUNICATIONS CONCERNING Safeway to which Elizabeth Holmes and/or Sunny Balwani is a party or between Elizabeth Holmes and/or Sunny Balwani on the one hand and Safeway on the other.

11. From October 15, 2015 to the time of production, all COMMUNICATIONS CONCERNING Walgreens to which Elizabeth Holmes and/or Sunny Balwani is a party or between Elizabeth Homes and/or Sunny Balwani on the one hand and Walgreens on the other.

12. DOCUMENTS sufficient to show the percentage of projected revenues and net income (as shown on TS-000605 of THERANOS' document production on November 4, 2015) derived from THERANOS' contracts with Walgreens and Safeway.

13. DOCUMENTS sufficient to show the dates of THERANOS' purchases of blood-testing and diagnostic equipment from third parties, including, but not limited to, purchase orders, invoices, and receipts.

14. DOCUMENTS sufficient to show the number of tests performed by THERANOS' proprietary technology and the number of tests performed by equipment developed by third parties as of the following dates:  January 1, 2013, January 1, 2014, December 4, 2014, and the date of production.

15. DOCUMENTS sufficient to show the number of types of diagnostic tests that THERANOS' proprietary technology was capable of performing as of the following dates: January 1, 2013, January 1, 2014, December 4, 2014, and the date of production.

16. DOCUMENTS sufficient to show when THERANOS began to perform only one test, for herpes, using its proprietary technology.

17. Since January 1, 2013 to the date of production, all DOCUMENTS showing comparisons of proficiency testing results from THERANOS' proprietary technology versus results from equipment developed by third-parties.

18. The emails referenced in the October 15, 2015 Wall Street Journal article, entitled, "Hot Startup Theranos Has Struggled With Its Blood-Test Technology," between Sunny Balwani and THERANOS employees CONCERNING proficiency testing in early 2014.

19. All COMMUNICATIONS between Sunny Balwani and Elizabeth Holmes regarding the proficiency testing results submitted to the Centers for Medicare and Medicaid Services in 2014.

20. From January 1, 2013 to the date of production, all complaints received by THERANOS from physicians or customers regarding the accuracy of THERANOS' blood testing diagnostic results.

21.    All COMMUNICATIONS with Rochelle Gibbons CONCERNING her interactions with John Carreyrou, the Wall Street Journal reporter and author of "Hot Startup Theranos Has Struggled With Its Blood-Test Technology."

22.    All COMMUNICATIONS with individuals interviewed by John Carreyrou, the Wall Street Journal reporter and author of "Hot Startup Theranos Has Struggled With Its Blood-Test Technology," CONCERNING their conversations with Mr. Carreyrou.

# Exhibit  D

Ramesh "Sunny" Balwani
10/11/2019

---

1  UNITED STATES DISTRICT COURT
2  NORTHERN DISTRICT OF CALIFORNIA
3  SAN JOSE DIVISION
4
5  SECURITIES AND EXCHANGE )
   COMMISSION,            )
6                         )
      Plaintiff,          )
7                         )
      vs.                 ) Case No. 5:18-cv-01603-EJD
8                         )
   RAMESH "SUNNY" BALWANI, )
9                         )
      Defendant.          )
10 _____)
11
12
13
14      VIDEOTAPED DEPOSITION OF
15      RAMESH "SUNNY" BALWANI
16        Friday, October 11, 2019
17
18
19
20
21
22
23
   Stenographically Reported By:
24 KATHRYN S. SWANK, Certified Shorthand Reporter
   License No. 13061, RPR
25 JOB No. 191011CRT

1

---

1        APPEARANCES
2  FOR THE PLAINTIFF:
3     SECURITIES AND EXCHANGE COMMISSION
      BY: MARC D. KATZ,
4        ANDREW J. HEFTY
         SUSAN LaMARCA
5        ATTORNEYS AT LAW
      44 Montgomery Street, Suite 2800
6     San Francisco, California 94104
      (415) 705-8121
7     katzma@sec.gov
8
   FOR THE DEFENDANT:
9
      ORRICK, HERRINGTON & SUTCLIFFE LLP
10    BY: JEFFREY B. COOPERSMITH,
          ATTORNEY AT LAW
11    701 5th Avenue, Suite 5600
      Seattle, Washington 98104
12    (206) 839-4339
      Coopersmith@orrick.com
13
14 THE VIDEOGRAPHER:
15    GRADILLAS COURT REPORTERS
      BY: MARCUS MAJERS, VIDEOGRAPHER
16    (424) 239-2800
17
18
19
20
21
22
23
24
25

2

---

1        INDEX OF EXAMINATIONS
2  EXAMINATION            PAGE
3  Mr. Katz               6
4        ---oOo---
5        EXHIBIT INDEX
6     (EXHIBITS BOUND SEPARATELY)
7  EXHIBIT NO.    DESCRIPTION    PAGE
8  Exhibit 1    Notice of Deposition of    5
               Defendant Ramesh "Sunny" Balwani
9
   Exhibit 2    Ramesh Balwani's Amended    15
10             Supplemental Objections and
               Responses to SEC's First Set of
11             Interrogatories
12 Exhibit 3    E-mail dated December 22nd, 2013,    32
               from Pat Mendenhall to David
13             Harris
14 Exhibit 4    E-mail dated January 17th, 2014,    58
               from Ramesh Balwani to Brian
15             Grossman
16 Exhibit 5    "Theranos" slide deck    58
17 Exhibit 5A   Enlarged shelf blade    68
18 Exhibit 5B   Enlarged shelf blade    72
19 Exhibit 6    E-mail dated October 13, 2014,    96
               from Sunny Balwani to John Dills,
20             Genevieve Hovde, Jim Berry, and
               cc'ing Byron Trott, Elizabeth
21             Holmes, and Rob Verigan
22 Exhibit 7    "Theranos Confidential Overview"    131
               slide deck
23
   Exhibit 8    E-mail dated October 24, 2014,    149
24             from Sunny Balwani to Scott
               Earthy, cc'ing Alan Dachs and
25             Elizabeth Holmes

3

---

1      EXHIBIT INDEX CONTINUED
2  EXHIBIT NO.    DESCRIPTION    PAGE
3  Exhibit 9    "Theranos Confidential    170
               Overview" slide deck
4
   Exhibit 10   "Theranos Confidential, Summary    176
5              Capitalization" spreadsheet
6  Exhibit 11   Text messages    191
7        ---oOo---
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

4

---

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

**ER-1607**

Ramesh "Sunny" Balwani
10/11/2019

| | |
|---|---|
| 1   BE IT REMEMBERED that on Friday, October 11, | 1   **A**   Sure.  Ramesh, R-A-M-E-S-H.  Last name is |
| 2   2019, commencing at the hour of 9:04 a.m., thereof, | 2   Balwani, B-A-L-W-A-N-I. |
| 3   at Securities and Exchange Commission, 44 Montgomery | 3   **Q**   Okay. |
| 4   Street, Suite 2800, San Francisco, California, | 4   **A**   And I also go by "Sunny," S-U-N-N-Y. |
| 5   before me, Kathryn S. Swank, a Certified Shorthand | 5   **Q**   Where do you currently reside? |
| 6   Reporter in the State of California, empowered to | 6   **A**   227 Park Lane in Atherton, California. |
| 7   administer oaths, there personally appeared | 7   **Q**   Okay.  And as you know, I'm Marc Katz, one |
| 8        RAMESH "SUNNY" BALWANI, | 8   of the attorneys with the plaintiff, Securities and |
| 9   called as a witness, who was examined and | 9   Exchange Commission.  And you saw and met my |
| 10  interrogated as hereinafter set forth. | 10  colleagues, Mr. Hefty and Susan LaMarca. |
| 11       ---o0o--- | 11       I'm going to start by marking the first |
| 12  (Exhibit 1 was marked for | 12  exhibit.  I believe it's been marked already. |
| 13       identification.) | 13       What you are being handed is Plaintiff |
| 14       ---o0o--- | 14  Exhibit 1, and that is -- Plaintiff's Exhibit 1 is |
| 15       THE VIDEOGRAPHER:  Good morning.  Here | 15  the Notice of Deposition of Defendant Ramesh Sunny |
| 16  begins volume number 1 in the deposition of Ramesh | 16  Balwani. |
| 17  Sunny Balwani, in the matter of Securities and | 17       Do you see that? |
| 18  Exchange Commission versus Ramesh Sunny Balwani, in | 18  **A**   Yes. |
| 19  the United States District Court, Northern District | 19  **Q**   Did you receive that -- see that before |
| 20  of California, San Jose Division.  The case number | 20  today? |
| 21  is 5:18-cv-01603-EJD. | 21  **A**   Yes. |
| 22       Today's date is October 11th, 2019.  The | 22       MR. COOPERSMITH:  Okay.  Go ahead. |
| 23  time on the video monitor is 9:05 a.m.  My name is | 23  Proceed. |
| 24  Marcus Majers, the video operator today, contracted | 24  BY MR. KATZ: |
| 25  by Gradillas Court Reporters. | 25  **Q**   And as you know, from this procedure and |
| 5 | 7 |
| 1        This video deposition is taking place at | 1   having attended some of these, you can give an |
| 2   44 Montgomery Street, Suite 2800, San Francisco, | 2   opportunity to let Counsel object if there are |
| 3   California. | 3   objections to have -- we'll give a pause in between. |
| 4        The court reporter today is Kathy Swank of | 4        MR. COOPERSMITH:  That would be helpful. |
| 5   Gradillas Court Reporters. | 5        MR. KATZ:  Okay. |
| 6        Will all counsel present please identify | 6   **Q**   I know you have been to some depositions in |
| 7   themselves and state whom they represent. | 7   this case, but I'm still going to give you some of |
| 8        MR. KATZ:  Good morning.  Marc Katz for the | 8   the ground rules, just a handful of them. |
| 9   plaintiff, Securities and Exchange Commission. | 9        You have been placed under oath, and the |
| 10       MR. HEFTY:  Andrew Hefty for the Securities | 10  oath you took to tell the truth is the same oath |
| 11  and Exchange Commission. | 11  that's used in court.  The testimony you give today |
| 12       MS. LaMARCA:  Susan LaMarca with the SEC. | 12  may be submitted as evidence in this matter, subject |
| 13       MR. COOPERSMITH:  Jeff Coopersmith, | 13  to specific rules. |
| 14  representing Mr. Balwani. | 14       Do you understand that? |
| 15       THE VIDEOGRAPHER:  Thank you. | 15  **A**   Yes. |
| 16       Will the court reporter please swear in the | 16  **Q**   Okay.  If you need to take a break, this |
| 17  witness. | 17  isn't an endurance test, just let me know. |
| 18       (Witness placed under oath.)_ | 18       But I'd prefer that you answer the question |
| 19       ---o0o--- | 19  pending before we take a break.  Okay? |
| 20       EXAMINATION | 20  **A**   Okay. |
| 21  BY MR. KATZ: | 21  **Q**   If you don't understand a question that I |
| 22  **Q**   Good morning, Mr. Balwani. | 22  ask, just let me know, and I will rephrase it. |
| 23  **A**   Morning. | 23       And if you do answer the question, I will |
| 24  **Q**   Would you please state and spell your name | 24  assume that you understood it.  Okay? |
| 25  for the record. | 25  **A**   Okay. |
| 6 | 8 |

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

Ramesh "Sunny" Balwani
10/11/2019

1   **Q**   Have you taken any medication or is there
2   any other reason that might impair your ability to
3   give truthful testimony today?
4         MR. COOPERSMITH:  As Mr. Balwani's counsel,
5   I instruct him, at this time, not to answer the
6   question based on his rights under the
7   Fifth Amendment to the United States Constitution.
8         Mr. Balwani is willing to testify in this
9   litigation at an appropriate time.  I also will say,
10  for the record, that in my e-mail to Ms. LaMarca,
11  when she first told me about this deposition, I
12  offered to agree with the SEC to -- to have the
13  deposition later, after an acquittal in the criminal
14  case.  That was rejected.
15        I also pointed out that this deposition is
16  unnecessary based on the three days of testimony the
17  SEC took during the investigation.
18        So I will -- just want to state for the
19  record that we think this SEC deposition today is
20  pretextual and just designed to create, you know, an
21  advantaged trial that's not warranted.
22        I won't make that speech every time,
23  Mr. Katz, but I wanted to say that for the record.
24        MR. KATZ:  Okay.
25    **Q**   So given that Counsel, on your behalf, has

9

1   say it more succinctly and just say "Fifth" or
2   "Fifth Amendment," whatever you prefer.
3     **A**   Okay.
4     **Q**   If you want to consult with Counsel on how
5   you want to do that in response to the questions.
6     **A**   Is it okay for --
7     **Q**   Do you want to take a break, or do you want
8   to --
9         MR. COOPERSMITH:  I'm sorry.  Did you want
10  to talk to me or --
11        THE WITNESS:  Oh, sorry.
12        MR. KATZ:  It's fine if you want to take a
13  break and -- and decide how you want to handle that.
14  When I ask the questions going forward, if he wants
15  to just say "Fifth" or "Five" or "Fifth Amendment,"
16  any of that is fine with us.
17        MR. COOPERSMITH:  Okay.  Why don't we just
18  proceed, and I think we know how we're going to
19  handle this.
20        THE WITNESS:  Okay.  Sure.
21        MR. COOPERSMITH:  And if you just, as
22  Mr. Katz said, give me at least a moment to -- to
23  speak before you say anything, that would be
24  helpful.
25        THE WITNESS:  I will do that.

11

1   just invoked the Fifth Amendment, I have an
2   admonishment that I will give you about the Fifth
3   Amendment, and then we can proceed.
4         Given, again, your counsel's represented
5   that you will be asserting your Fifth Amendment
6   privilege today, I wanted to let you know a few
7   things:
8         I'm not authorized to compel you to give
9   evidence or testimony as to which you assert your
10  privilege against self-incrimination, and I have no
11  intention of doing so.
12        In addition, I do not have the authority to
13  grant you immunity from prosecution.  Any question
14  that I ask you hereafter will be with the
15  understanding that if you wish to assert your
16  privilege, all you need to do is say so.  Okay?
17        If you refuse to answer a question based on
18  the Fifth Amendment privilege, a judge or jury may
19  be permitted to infer that your answer to the
20  question would incriminate you.
21        Do you understand that?
22    **A**   Yes.
23    **Q**   Okay.  As we go forward, notwithstanding
24  your counsel's speech there, whichever you prefer --
25  if you want to elaborate, you can, or if you want to

10

1   BY MR. KATZ:
2     **Q**   Mr. Balwani, you joined Theranos in 2009?
3         MR. COOPERSMITH:  I instruct Mr. Balwani
4   not to answer based on his Fifth Amendment rights.
5   BY MR. KATZ:
6     **Q**   At the time you joined Theranos -- at the
7   time you joined Theranos, Theranos was on the verge
8   of running out of money, correct?
9         MR. COOPERSMITH:  I instruct Mr. Balwani
10  not to answer based on his Fifth Amendment rights.
11        MS. LaMARCA:  Let's take a break, Marc.
12        MR. COOPERSMITH:  Yeah, let's take a break.
13        MR. KATZ:  We'll go off the record for just
14  a minute.
15        THE VIDEOGRAPHER:  This marks the end of
16  media file labeled number one.  Off the record at
17  9:11 a.m.
18        (Break taken in proceedings.)
19        THE VIDEOGRAPHER:  This marks the beginning
20  of media file number 2.  Back on the record at
21  9:14 a.m.
22  BY MR. KATZ:
23    **Q**   Mr. Balwani, you became president and COO
24  of Theranos in 2009, correct?
25        MR. COOPERSMITH:  I instruct Mr. Balwani

12

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

# Exhibit  C

RECEIVED

SEP 1 2 2017

SEC San Francisco

Page 769

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:            )
                             )
THERANOS, INC.               )   File No. SF-04030-A

WITNESS:   Ramesh "Sunny" Balwani
PAGES:     769 through 957
PLACE:     44 Montgomery Street, Suite 2800
           San Francisco, California
DATE:      Thursday, September 7, 2017

    The above-entitled matter came on for hearing,
pursuant to notice, at 12:28 p.m.

 COPY

        Diversified Reporting Services, Inc.
              (202) 467-9200

HIGHLY CONFIDENTIAL - ATTORNEYS EYE'S ONLY        SBCOLMAN003246_Jigsaw

Page 811

```
 9        Q    I also want to clarify a couple of points in
10   your understanding of -- of CLIA's -- of Theranos's CLIA
11   lab operations.
12        A    Okay.
13        Q    Who at Theranos made the determination of what
14   device to use for patient testing in the CLIA lab?
15        A    It's evolved over time.  Initially in 2010,
16   2011 -- it was, I think -- I was not involved.  It was
17   the lab.  We had one lab director with three or four
18   individuals.  They did some research on what to pick,
19   what to use.  And they had picked the original devices.
20             And then after 2011, from a product dev
21   perspective, I got involved, understand how the, you
22   know, other companies use it.  And then I started
23   playing more and more active role.
24             But even there my participation was from a
25   business perspective.  The technical decisions were
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYE'S ONLY          SBCOLMAN003288_Jigsaw

Page 812

1    being made by the CLIA lab directors and the scientists

2    and engineers in the company.

3        Q    So, you know, just using a hypothetical of a

4    test that can be run on any of the three models --

5        A    Sure.

6        Q    -- you know, the TSPU, the modified or the

7    unmodified, who would have the final say about which

8    machine Theranos should use to test CLIA samples in the

9    lab?

10       A    Well, the final say is always the lab director.

11   So lab director, if they don't sign up, that's the end

12   of it.

13       Q    Okay.

14       A    But --

15       Q    Was that true throughout your time at Theranos?

16       A    Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS EYE'S ONLY                    SBCOLMAN003289_Jigsaw

# Exhibit  B

Page 395

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:              )
                               ) File No. SF-04030-A
THERANOS, INC.                 ) Amended: 9/7/2017


WITNESS:   Ramesh "Sunny" Balwani
PAGES:     395 through 768
PLACE:     Securities and Exchange Commission
           44 Montgomery Street
           Suite 2800
           San Francisco, CA
DATE:      Thursday, August 10, 2017


        The above-entitled matter came on for hearing,
pursuant to notice, at 9:05 a.m.




           Diversified Reporting Services, Inc.
                  (202) 467-9200

HIGHLY CONFIDENTIAL - ATTORNEYS EYE'S ONLY          SBCOLMAN002874_Jigsaw

Page 493

```
2          BY MS. CHAN:
3      Q    Who was working with you on the financial
4   model?
5      A    Well, the model actually had a long history.
6   I created the first version of that working with, I
7   believe, Safeway first and then Walgreens separately.
8   And then as we started evaluating the business --
9   because obviously in 2010, we didn't know much about
10  the business, the lab testing and -- and other details.
11         So Mr. Steve Burd at Safeway actually spent a
12  lot of time educating us on the lab industry, and then
13  so did Walgreens.  When we had met both of the
14  companies, they knew a lot about the lab industry.
15  They clearly was -- were looking at it.
16         And Walgreens actually had told us during
17  those early modeling exercises that they had spoken
18  with dozens of companies.  They also had partnered with
19  LabCorp at one point.  So they had been interested in
20  this market.  So they had a lot of data.  So the early
21  models came from my work with Walgreens and Safeway.
22         Around 2010, I started -- and 2011, I started
23  doing my own research to educate myself on the
24  industry. Some of assumptions in the model, as you
25  probably noticed, came from the CDC's website.  For
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYE'S ONLY            SBCOLMAN002972_Jigsaw

Page 494

1  example, how many EMR visits in the U.S. and how many

2  ICU beds.  So I got that data from there.

3        And -- and over time, it was raw data coming

4  from the field as I learned, you know, how much -- how

5  much dollars per requisition we were making from the

6  field.  So as I -- over time, I think it was more input

7  from a lot of people.  As the information came into me,

8  I would, you know, update the model and keep it

9  updated.

10      Q   So you mentioned that either maybe you or

11  somebody else that was working on it would put

12  "projections" on the top.  So I was just wondering who

13  at Theranos was working on the model with you.

14      A   Well, Danise Yam had provided me -- she used

15  to provide me balance sheets because balance sheets,

16  she just drew out from the QAD system.  So there were

17  some headers that she had provided me, and I had copied

18  and pasted those headers across all three -- or two

19  other tabs at some point.

20        And then, like I said, I had given that model

21  to the consultants at BDT, and they made a bunch of

22  changes to clean the model up.  Formatting.  I had a

23  lot of typos.  I also had a lot of acronyms, like

24  Normandy and other things in the model.  I remember in

25  one meeting, I had a word called "killer software

HIGHLY CONFIDENTIAL - ATTORNEYS EYE'S ONLY        SBCOLMAN002973_Jigsaw

Page 495

1    engineers." And the board -- some people in the board
2    thought I really meant killer software, like in killer
3    software.  And "killer software" means really good
4    software engineers.
5           So I had to -- these guys came and cleaned up
6    a lot of the model.  So they changed the headers and
7    changed other things in the model.
8       Q    Was there anyone else from Theranos who was
9    working on the model while you were working on it?
10      A    I don't think so.
11      Q    Did --
12      A    Like -- sorry.  Nobody with direct access to
13   the model.  I don't think anybody else modified it.
14           BY MR. KOLHATKAR:

Page 554

1    that -- let me rephrase that.

2              To your knowledge, Elizabeth Holmes

3    understood that you maintained a financial model for

4    the company; right?

5         A    Correct.

6         Q    And that -- that model was based on certain

7    assumptions based on -- in terms of the business and

8    its R&D; is that fair?

9         A    And a bunch of other inputs.  But, yes,

10   that's fair.

11        Q    And she was generally familiar with the kinds

12   of inputs that went into the financial model?

13        A    She may have been at some point, but I was

14   revving the model and adding so many assumptions that

15   she may not be familiar with all of them or even most

16   of them.  So I -- I wouldn't necessarily make that --

17   that blanket statement.

18              BY MS. CHAN:

19        Q    Did she ever edit the model?

20        A    To the best of my knowledge, no.  And there

21   was one time I actually had a couple of questions for

22   her, and I had put a model with her name on it so she

23   could  edit, but I don't think she ever did because I

24   continued with my assumptions and I never even looked

25   at that model.  So my -- I think my answer is:  No.

HIGHLY CONFIDENTIAL - ATTORNEYS EYE'S ONLY          SBCOLMAN003033_Jigsaw

# Exhibit  A

RECEIVED

AUG 16 2017

SEC San Francisco

Page 1

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

COPY

In the Matter of:                    )
                                     ) File No. SF-04030-A
THERANOS, INC.                       )


WITNESS:  Ramesh "Sunny" Balwani
PAGES:    1 through 394
PLACE:    Securities and Exchange Commission
          44 Montgomery Street
          Suite 2800
          San Francisco, CA
DATE:     Wednesday, August 9, 2017


     The above-entitled matter came on for hearing,
pursuant to notice, at 9:03 a.m.




          Diversified Reporting Services, Inc.
               (202) 467-9200

Page 46

4      Q     And so you -- you mentioned that over time,
5  sort of your responsibilities grew.  Can you -- can you
6  briefly explain how that --
7      A     Yeah.
8      Q     -- what got added to your portfolio?
9      A     Sure.  So after I was doing this project, we
10 started also spending -- I started spending more time
11 on the hardware side to understand the supply chain,
12 you know.  Because the machine had a CPU and a
13 motherboard, I wanted to see what are the decisions
14 being made there. By "machine," I mean the TSPU, sorry,
15 3.0.
16           So I spent a lot of time on hardware and
17 learned how the hardware works, the supply chain for
18 the hardware, supply chain for the reagents.  I learned
19 that there are many, many chemistries for which there's
20 just one supplier, some guy in Ireland who found a way
21 to grow some antibodies using his sheep.  Seriously.
22 And -- and then you need to secure the supply chain.
23 Right?
24           So I spent -- I learned that part of the
25 business.  And then 2010 March, February time frame, I

HIGHLY CONFIDENTIAL - ATTORNEYS EYE'S ONLY          SBCOLMAN002525_Jigsaw

Page 47

1    was also spending time on the road, me and Elizabeth
2    Holmes, meeting with the retail pharmacy businesses,
3    and as that evolved, I took the leadership role there
4    in negotiations and contracts.  So -- and then after
5    that -- I mean, I can -- there was a lot of other
6    things that happened after that.
7         Q    Sure.  I guess by "retail pharmacies," do you
8    mean Walgreens --
9         A    Walgreens.
10        Q    -- primarily?
11        A    Yes.
12        Q    What about the Safeway?
13        A    Yes.  Yeah.  Same thing on Safeway.  I
14   spent -- I, you know, spent time with Safeway.  Even
15   though initially, I would say, the first year, year and
16   a half, Elizabeth spent a lot more time on Safeway
17   because she had developed a close relationship with
18   Steve Burd, the CEO of Safeway at that time.  He was
19   obsessed with this project, with Theranos' project,
20   building a lab inside Safeway.
21             His reason was that Safeway one day is going
22   to be a healthcare company, not a grocery.  Because he
23   saw that giant in Seattle, Amazon, entering this space,
24   so he said, "We've got to be in the healthcare
25   business." And he was very clear that Safeway wants to

Page 48

1  be a healthcare company, and a diagnostics lab testing

2  has to be a key part of that.

3       So she spent a lot of time on Safeway

4  initially, but ultimately, I took that over also.

5       Q    Do you -- I mean, I guess -- so would you say

6  you took over responsibility for the Safeway

7  relationship more so after Mr. Burd left --

8       A    Yeah.

9       Q    -- Safeway?

10      A    Yes.  Pretty much right after that.

11      Q    And Walgreens, was it sort of similar, both

12  you and Ms. Holmes were involved in the start and then

13  you took more of a lead after --

14      A    Yes, it was similar.  However, in Walgreens'

15  case, I was deep into Walgreens from the start.  So

16  unlike Safeway where she was spending more time at

17  Safeway, with Walgreens, I was spending at least as

18  much time as her on Walgreens from the start.

Page 50

2      Q    What were your responsibilities with respect

3   to the company's financials when you -- early on in

4   that president and COO role?

5      A    At that time we had a controller in the

6   company.  Her name was Danise Yam.  So she was in

7   charge of all the financials.  Initially, I didn't

8   spend any time on financials.  There was too much to do

9   and there's not much finance -- finances.  I had loaned

10   the -- the money to the company, so I knew about the

11   finances.

12          So I didn't spend too much time there.  Even

13   over time, I would -- I used to get updates from Yam

14   about what's the cash position?  I mean, that's kind of

15   where my eyes were, how much cash we had.  But I didn't

16   spend much time in financials until then.

17          Around 2010 when we started engaging with the

18   retail pharmacies, Safeway and Walgreens, I started

19   building a financial model with the help initially from

20   Safeway and Walgreens that I owned and -- until I left

21   the company.

22      Q    By saying you owned, you mean you were the

23   person responsible for the company's financial

24   projections as you just described?

25      A    Financial model.

HIGHLY CONFIDENTIAL - ATTORNEYS EYE'S ONLY          SBCOLMAN002529_Jigsaw

Page 51

1      Q     Financial model.

2      A     Yes.

3      Q     And I -- what was the distinction in your --

4   in your mind?

5      A     Well, I can tell you what I thought about the

6   financial model.  It was a planning tool that I was

7   using to see the potential of the business.  And also,

8   it was -- it was basically a spreadsheet, Excel

9   spreadsheet literally, and that included a lot of the

10  learnings that I was doing from -- about the industry.

11  You know, how many patients typically come at Quest

12  Diagnostics.  That's another lab company in the field.

13  Or LabCorp, what's going to be the R&D burn expenses,

14  and how many patients you can get in a ceratin

15  location, how many sites you can have.

16          So as those assumptions came in, I would just

17  put all those data into this model and see how it

18  changes the model over time.  So I was using this as a

19  planning tool, and some of the tabs in the model would

20  spit out as the end result of, you know, changing any

21  assumptions in the model.

22      Q     When you started with the company in that

23  sort of early, you know, say, 2010 to 2012 time period,

24  did you share financial documents with the board at all

25  or --

HIGHLY CONFIDENTIAL - ATTORNEYS EYE'S ONLY          SBCOLMAN002530_Jigsaw

Page 52

```
1        A    I mean, I -- I think 2010 to '12, we would
2    show the balance sheet and -- but it was part of the
3    model. So I would often show the model to the board
4    pretty much almost every board meeting just to show
5    them how it is evolving.  And so that was always almost
6    every part of a board meeting.  So I would say yes.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYE'S ONLY                SBCOLMAN002531_Jigsaw

Page 97

2                 BY MR. KOLHATKAR:

3        Q    So you mentioned, I guess, the -- the -- sort

4    of the -- the throughput issue.  Did -- did you

5    supervise Theranos's CLIA lab?

6        A    Well, there are lab directors.  There are

7    legal requirements on the word "supervision." So the

8    lab directors are responsible for all the medical

9    decision stuff.  So I cannot make any medical decisions

10   in the CLIA lab.  However, all labs report ultimately

11   to business, so -- not all, but most, I should say.

12   Independent labs for sure.

13            And so there's recruiting to be done in the

14   lab, decisions to be made on how to negotiate contract

15   with the vendors, scheduling employees because overtime

16   is a big issue in the lab.  Because of how the machines

17   work, you have to design the employee schedules around

18   machines.

19            So all of that came to me -- reported to me,

20   but there were other people managing it, but they did

21   report under me.

HIGHLY CONFIDENTIAL - ATTORNEYS EYE'S ONLY                SBCOLMAN002576_Jigsaw

Page 226



```
13        Q     Did you ever discuss the null protocol with
14   Ms. Holmes?
15        A     No.  This is a deep software concept.  And I
16   don't think most in the company besides the programmers
17   or the people who are working on it would refer to it
18   as null protocol.  Everybody --
19        Q     But --
20        A     Sorry.
21        Q     Please.
22        A     Everybody else would probably call it the
23   demo app or "I'm not going to run the test.  I will
24   only demo the app device," something more user
25   friendly.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYE'S ONLY          SBCOLMAN002705_Jigsaw

1  JOHN D. CLINE (CA State Bar No. 237759)
   50 California Street, Suite 1500
2  San Francisco, CA 94111
   Telephone: (415) 662-2260 │ Facsimile: (415) 662-2263
3  Email: cline@johndclinelaw.com

4  KEVIN M. DOWNEY (Admitted Pro Hac Vice)
   LANCE A. WADE (Admitted Pro Hac Vice)
5  AMY MASON SAHARIA (Admitted Pro Hac Vice)
   KATHERINE TREFZ (CA State Bar No. 262770)
6  WILLIAMS & CONNOLLY LLP
   725 Twelfth Street, NW
7  Washington, DC 20005
   Telephone: (202) 434-5000 │ Facsimile: (202) 434-5029
8  Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

9  Attorneys for Defendant ELIZABETH A. HOLMES

10

11              UNITED STATES DISTRICT COURT

12             NORTHERN DISTRICT OF CALIFORNIA

13                  SAN JOSE DIVISION

14

15 UNITED STATES OF AMERICA,          ) Case No. CR-18-00258-EJD
                                      )
16        Plaintiff,                  ) **DECLARATION OF AMY MASON SAHARIA**
                                      ) **IN SUPPORT OF MS. HOLMES' MOTION TO**
17    v.                              ) **ADMIT PRIOR TESTIMONY OF RAMESH**
                                      ) **"SUNNY" BALWANI**
18 ELIZABETH HOLMES and              )
   RAMESH "SUNNY" BALWANI,           )
19                                    ) Hon. Edward J. Davila
          Defendants.                )
20                                    )
                                      )
21 _____ )

22

23

24

25

26

27

28
   DECLARATION OF AMY MASON SAHARIA IN SUPPORT OF MS. HOLMES' MOTION TO
   ADMIT PRIOR TESTIMONY OF RAMESH "SUNNY" BALWANI
   CR-18-00258 EJD

1    I, AMY MASON SAHARIA, declare as follows:

2       1.    I represent Defendant Elizabeth Holmes and have been admitted to practice *pro hac vice*

3    in the above-captioned matter.  I submit this declaration in support of Ms. Holmes' Motion to Admit

4    Prior Testimony of Ramesh "Sunny" Balwani.  I attest to the following facts upon which the Motion

5    relies.

6       2.    Attached to this declaration are 11 exhibits.  The contents of the exhibits are as follows:

7          a.    Exhibit A is a true and correct copy of excerpts of the August 9, 2017 United

8    States Securities and Exchange Commission ("SEC") deposition of Mr. Balwani.

9          b.    Exhibit B is a true and correct copy of excerpts of the August 10, 2017 SEC

10   deposition of Mr. Balwani.

11         c.    Exhibit C is a true and correct copy of excerpts of the September 7, 2017 SEC

12   deposition of Mr. Balwani.

13         d.    Exhibit D is a true and correct copy of excerpts of the October 11, 2019 SEC

14   deposition of Mr. Balwani.

15         e.    Exhibit E is a true and correct copy of a November 23, 2015 subpoena issued by

16   the SEC to Theranos, Inc.

17         f.    Exhibit F is a true and correct copy of a December 8, 2015 subpoena issued by the

18   SEC to Theranos, Inc.

19         g.    Exhibit G is a true and correct copy of a February 16, 2016 subpoena issued by

20   the SEC to Theranos, Inc.

21         h.    Exhibit H is a true and correct copy of a May 27, 2016 subpoena issued by the

22   SEC to Theranos, Inc.

23         i.    Exhibit I is a true and correct copy of a January 11, 2016 subpoena issued by a

24   grand jury to Theranos, Inc.

25         j.    Exhibit J is a true and correct copy of a November 30, 2016 subpoena issued by a

26   grand jury to Theranos, Inc.

27         k.    Exhibit K is a true and correct copy of a September 6, 2017 subpoena issued by a

28   DECLARATION OF AMY MASON SAHARIA IN SUPPORT OF MS. HOLMES' MOTION TO
ADMIT PRIOR TESTIMONY OF RAMESH "SUNNY" BALWANI
CR-18-00258 EJD

1

1    grand jury to Theranos, Inc.

2          I declare under penalty of perjury under the laws of the United States that the foregoing is true

3    and correct to the best of my knowledge.

4          Executed this 24th day of November 2021 in Rockville Centre, NY.

5

6                                              _____

7                                              AMY MASON SAHARIA
                                               Attorney for Elizabeth Holmes
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28    DECLARATION OF AMY MASON SAHARIA IN SUPPORT OF MS. HOLMES' MOTION TO
      ADMIT PRIOR TESTIMONY OF RAMESH "SUNNY" BALWANI
      CR-18-00258 EJD
                                              2

1  JOHN D. CLINE (CA State Bar No. 237759)
   50 California Street, Suite 1500
2  San Francisco, CA 94111
   Telephone: (415) 662-2260 │Facsimile: (415) 662-2263
3  Email: cline@johndclinelaw.com

4  KEVIN M. DOWNEY (Admitted Pro Hac Vice)
   LANCE A. WADE (Admitted Pro Hac Vice)
5  AMY MASON SAHARIA (Admitted Pro Hac Vice)
   KATHERINE TREFZ (CA State Bar No. 262770)
6  WILLIAMS & CONNOLLY LLP
   725 Twelfth Street, NW
7  Washington, DC 20005
   Telephone: (202) 434-5000 │Facsimile: (202) 434-5029
8  Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

9  Attorneys for Defendant ELIZABETH A. HOLMES

10

11                    UNITED STATES DISTRICT COURT

12                  NORTHERN DISTRICT OF CALIFORNIA

13                         SAN JOSE DIVISION

14

15  UNITED STATES OF AMERICA,          )  Case No. CR-18-00258-EJD
                                       )
16          Plaintiff,                 )  **MS. HOLMES' MOTION TO ADMIT PRIOR**
                                       )  **TESTIMONY OF RAMESH "SUNNY"**
17     v.                              )  **BALWANI**
                                       )
18  ELIZABETH HOLMES and               )  Date:      November 29, 2021
    RAMESH "SUNNY" BALWANI,            )  Time:      9:00 a.m.
19                                     )  CTRM:  4, 5th Floor
            Defendants.                )
20                                     )  Hon. Edward J. Davila
                                       )
21                                     )
                                       )
22  _____   )

23

24

25

26

27

28

    MS. HOLMES' MOTION TO ADMIT PRIOR TESTIMONY OF RAMESH "SUNNY" BALWANI
    CR-18-00258 EJD

## MOTION TO ADMIT PRIOR TESTIMONY OF

## RAMESH "SUNNY" BALWANI

PLEASE TAKE NOTICE that on November 29, 2021 at 9:00 a.m., or on such other date and time as the Court may order, in Courtroom 4 of the above-captioned Court, 280 South 1st Street, San Jose, CA 95113, before the Honorable Edward J. Davila, Defendant Elizabeth Holmes will and hereby does respectfully move the Court to admit certain prior testimony of Ramesh "Sunny" Balwani. Ms. Holmes makes this motion pursuant to Federal Rule of Evidence 804. The Motion is based on the below Memorandum of Points and Authorities, the record in this case, and any other matters that the Court deems appropriate.

DATED: November 24, 2021

/s/ Amy Mason Saharia
KEVIN DOWNEY
LANCE WADE
AMY MASON SAHARIA
KATHERINE TREFZ
Attorneys for Elizabeth Holmes

## MEMORANDUM OF POINTS AND AUTHORITIES

Ms. Holmes moves to admit certain prior deposition testimony of her co-defendant Ramesh "Sunny" Balwani concerning Mr. Balwani's management of certain aspects of Theranos' operations (identified on Exhibits A-C to the Declaration of Amy Mason Saharia)[1]. Through counsel, Mr. Balwani has represented that, if called as a witness in the defense case, he would invoke his Fifth Amendment privilege not to testify in response to any relevant question. Mr. Balwani is therefore unavailable for purposes of Federal Rule of Evidence 804. His prior testimony is admissible as either (1) a statement against interest, Fed. R. Evid. 804(b)(3), or (2) prior testimony offered against a party (the government) that had an opportunity and similar motive to develop it, Fed. R. Evid. 804(b)(1).

## ARGUMENT

### I.     Mr. Balwani Is Unavailable.

Under Rule 804(a)(1), a declarant is unavailable if he is "exempted from testifying about the subject matter of the declarant's statement because the court rules that a privilege applies." This exemption includes the Fifth Amendment privilege against self-incrimination. *United States v. Wyatt*, 804 Fed. Appx. 530, 532 (9th Cir. 2020). Rule 804(a)(1) requires a court ruling that the Fifth Amendment privilege applies. *See* Fed. R. Evid. 804 adv. comm. notes.

In cases "where the trial judge has some special or extensive knowledge of the case that allows evaluation of the claimed fifth amendment privilege even in the absence of specific questions to the witness," a judge may "recognize a blanket privilege against self-incrimination"—*i.e.*, "conclude that the witness could legitimately refuse to answer essentially all relevant questions." *United States v. Shayota*, 2016 WL 8732803, at *3 (N.D. Cal. Oct. 21, 2016) (quoting *United States v. Moore*, 682 F.2d 853, 856 (9th Cir. 1982)). In such cases, a proffer by the witness's attorney that the witness would invoke the Fifth Amendment suffices to allow the court to rule that the privilege applies. *See, e.g.*, *United States v. Sapp*, 721 Fed. Appx. 698, 699 (9th Cir. 2018). The Ninth Circuit has repeatedly upheld district court rulings recognizing a blanket assertion of the privilege in such circumstances. *See,*

---

[1] For clarity, Ms. Holmes has redacted in Exhibits A-C portions of the SEC deposition she does not seek to admit.

MS. HOLMES' MOTION TO ADMIT PRIOR TESTIMONY OF RAMESH "SUNNY" BALWANI
CR-18-00258 EJD

1

1   *e.g.*, *United States v. James*, --- Fed. Appx. ---, 2021 WL 4027812, at *4 (9th Cir. Sept. 3, 2021)

2   (blanket invocation of privilege where court had "unique familiarity with the facts surrounding [the

3   witness's] potential criminal liability"); *Sapp*, 721 Fed. Appx. at 699 (blanket assertion of privilege by

4   witness's attorney in response to list of proposed questions by the defense); *United States v. Tsui*, 646

5   F.2d 365, 367-68 (9th Cir. 1981) (blanket invocation of privilege where the witness "was up to his neck

6   in criminal investigations" and the district court knew that "any response to all possible questions would

7   tend to incriminate the witness").

8       Ms. Holmes desires to call Mr. Balwani as a witness in her defense case to testify to his

9   management of certain aspects of Theranos' operations put at issue in the government's case in chief,

10  including the CLIA laboratory operations, the Walgreens and Safeway relationships, the company's

11  financial model, and a software protocol used in certain technology demonstrations.  In response to an

12  inquiry from undersigned counsel about Mr. Balwani's availability, Mr. Balwani's attorney, Jeffrey

13  Coopersmith, recently proffered that Mr. Balwani would invoke his Fifth Amendment right not to testify

14  in response to all relevant questions if called by Ms. Holmes. *See* Decl. of L. Wade. ¶¶ 2-3.  That

15  approach is consistent with Mr. Balwani's prior invocation of his Fifth Amendment privilege in

16  response to all questions in an SEC deposition that post-dated the indictment in this case.  *See* Decl. of

17  Amy Mason Saharia, Ex. D at 3-4.[2]

18      This Court's familiarity with this case[3] enables it to rule that Mr. Balwani properly could invoke

19  the Fifth Amendment privilege in response to each question identified on Exhibits A-C.  Mr. Balwani

20  has already been indicted, and is awaiting trial, on charges related to his role at Theranos.  Each of the

21  questions that Ms. Holmes desires to ask Mr. Balwani tends to establish his responsibility for managing

22  certain aspects of Theranos' operations that the government has put at issue in the indictment.  *See* Third

23  Superseding Indictment, ECF 469, ¶ 12(B) (company's financial projections), ¶ 12(C) (null protocol for

24  demonstrations), ¶ 12(D) (Walgreens relationship), ¶ 16 (Theranos' ability to consistently produce

25  accurate and reliable test results in its CLIA laboratory).  Testimony that he managed these aspects of

26  _____

27      [2] Mr. Balwani had previously given three days of deposition testimony to the SEC before the indictment in this case.

28      [3] This Court presided over the SEC action and is therefore familiar with that case as well.

MS. HOLMES' MOTION TO ADMIT PRIOR TESTIMONY OF RAMESH "SUNNY" BALWANI
CR-18-00258 EJD

2

1  Theranos' operations would "furnish a link in the chain of evidence needed to prosecute" Mr. Balwani

2  "or lead to evidence having a tendency to incriminate him." *See Tsui*, 646 F.2d at 367. The Court thus

3  should rule that Mr. Balwani is unavailable due to his invocation of his Fifth Amendment privilege.

4  **II.   Mr. Balwani's Prior Testimony Is Admissible under Rule 804(b)(3).**

5       Mr. Balwani's unavailability gives rise to two separate grounds for admitting his prior SEC

6  testimony. First, each of the statements that Ms. Holmes seeks to admit is a "statement against

7  interest"—*i.e.*, a statement that "a reasonable person in [Mr. Balwani's] position would have made only

8  if [he] believed it to be true because, when made, it . . . had so great a tendency . . . to expose the

9  declarant to civil or criminal liability." Fed. R. Evid. 804(b)(3)(A).

10       Mr. Balwani made the statements in Exhibits A-C in August-September 2017, when he knew

11  that both the SEC and the U.S. Attorney's Office were investigating Theranos and his conduct in

12  particular. The SEC first issued a subpoena to Theranos nearly two years earlier, in November 2015.

13  *See* Ex. E. That subpoena specifically targeted Mr. Balwani's communications, and put at issue in

14  particular the Walgreens and Safeway relationships, Theranos' financial projections, and laboratory

15  operations. *See id.* (Requests 6-7, 10-12, 16-20). Later SEC subpoenas further probed these issues.

16  *See, e.g.*, Ex. F (Dec. 8, 2015 subpoena), Ex. G (Feb. 16, 2016 subpoena), Ex. H (May 27, 2016

17  subpoena). So too, the U.S. Attorney's Office was investigating Theranos throughout 2016 and 2017.

18  *See, e.g.*, Ex. I (Jan. 11, 2016 subpoena), Ex. J (Nov. 30, 2016 subpoena), Ex. K (Sept. 6, 2017

19  subpoena).

20       "Whether a statement is in fact against interest must be determined from the circumstances of

21  each case, and can only be determined by viewing it in context." *United Stated v. Paguio*, 114 F.3d 928,

22  933 (9th Cir. 1997) (citation omitted). Rule 804(b)(3)'s use of the phrase "tending to" "broadens the

23  phrase, so that the statement need not be a plain confession making the difference between guilty and

24  not guilty." *Id.* Thus, for example, statements admitting a "leadership" role in allegedly fraudulent

25  conduct may well be against a declarant's interest. *See id.* ("leading others into wrongdoing has always

26  been seen as especially bad"); *see also, e.g.*, *United States v. Persico*, 645 F.3d 85, 102 (2d Cir. 2011)

27

28

MS. HOLMES' MOTION TO ADMIT PRIOR TESTIMONY OF RAMESH "SUNNY" BALWANI
CR-18-00258 EJD

3

1    (statement need not "be[] sufficient, standing alone, to convict" so long as it "would have been probative

2    in a criminal trial").

3          Here, in context, Mr. Balwani's statements taking responsibility for various aspects of the

4    company's operations that were then under investigation by both the SEC and the U.S. Attorney's office

5    tended to expose him to both civil and criminal liability.  Indeed, the SEC complaint against Mr.

6    Balwani, filed just months after his depositions, specifically put at issue these aspects of the company's

7    operations.  *See* Compl., Case No. 18-1603, Dkt. 1, ¶¶ 25-36, 46, 66-72, 77-84 (N.D. Cal. Mar. 14,

8    2018).  Given the ongoing investigations, Mr. Balwani would not have accepted responsibility unless his

9    statements were true.  *See Williamson v. United States*, 512 U.S. 594, 599 (1994) ("Rule 804(b)(3) is

10   founded on the commonsense notion that reasonable people, even reasonable people who are not

11   especially honest, tend not to make self-inculpatory statements unless they believe them to be true.").

12         Additionally, "corroborating circumstances . . . clearly indicate [the] trustworthiness" of Mr.

13   Balwani's statements. Fed. R. Evid. 804(b)(3)(B).  In particular the evidence at trial has corroborated

14   the following:

15        • Mr. Balwani's prior testimony that he was responsible for the management of the CLIA

16            lab.  9/28/21 Tr. 2000:22-2001:2 (Rosendorff); 10/15/21 Tr. 3799:6-11 (Dhawan);

17            11/10/21 Tr. 5913:19-23 (Das).[4]

18        • Mr. Balwani's prior testimony that he was responsible for the company's financial

19            modeling.  9/22/21 Tr. 1619:21-1620:19 (Mattis).

20        • Mr. Balwani's prior testimony that he had responsibility for managing the Walgreens'

21            relationship.  10/14/21 Tr. 3580:17-20 (Jhaveri).

22        • Mr. Balwani's prior testimony about his role in the Safeway relationship.  10/6/21 Tr.

23            2978:24-2979:1 (Burd).

24        • Mr. Balwani's prior testimony concerning the null protocol. 10/20/21 Tr. 4173:3-15

25            (Edlin).

26

27   _____

       [4] The government's recently filed motion *in limine* in *United States v. Balwani* also pointed out
28   that "Balwani was the direct report of the Laboratory Director, to whom several senior lab employees
     reported."  Dkt. 1155 at 18 (citing TX4528).

     MS. HOLMES' MOTION TO ADMIT PRIOR TESTIMONY OF RAMESH "SUNNY" BALWANI
     CR-18-00258 EJD
                                            4

1   For these reasons, the Court should admit Mr. Balwani's prior testimony at Exhibits A-C under

2   Rule 804(b)(3).

3   **III.    In the Alternative, Mr. Balwani's Prior Testimony Is Admissible under Rule 804(b)(1).**

4   Alternatively, Mr. Balwani's prior testimony is admissible under Rule 804(b)(1).  Rule 804(b)(1)

5   authorizes admission of testimony from an unavailable witness if (A) given "at a trial, hearing, or lawful

6   deposition," and (B) offered against a party who had "an opportunity and similar motive to develop it by

7   direct, cross-, or redirect examination."  Both prongs are satisfied here:  (A) Mr. Balwani gave the

8   testimony at a lawful deposition, and (b) the government had an opportunity and similar motive to

9   develop his testimony by cross-examination.

10   To be sure, the government entity that examined Mr. Balwani at the deposition was the SEC, not

11   the Department of Justice (DOJ).  But in both cases, the federal government was the relevant party.  The

12   SEC and DOJ investigated this case jointly.  In many cases, the SEC and DOJ jointly interviewed

13   witnesses; as of early 2019, the SEC and DOJ had disclosed to the defense interview memoranda for at

14   least 57 joint interviews, and more have followed since then.  DOJ requested and received access to "the

15   investigative and non-public files of the [SEC] related to Theranos."  Dkt. 67-19 (Correspondence

16   between government investigators and SEC).   The government also produced millions of pages of SEC

17   documents as discovery in this case.  And, as the Ninth Circuit has explained, "Congress has expressly

18   authorized the SEC to share information with the Department of Justice to facilitate the investigation

19   and prosecution of crimes," *United States v. Stringer*, 535 F.3d 929, 939 (9th Cir. 2008), since the SEC

20   itself lacks criminal enforcement authority.

21   Thus, as a general matter, the SEC and DOJ "play closely coordinated roles on behalf of the

22   United States in the overall enforcement of a single statutory scheme."  *United States v. Sklena*, 692

23   F.3d 725, 732 (7th Cir. 2012) (holding that CFTC and DOJ qualified as the same "party" for purposes of

24   Rule 804(b)(1) even though DOJ did not have litigating authority for the CFTC).  And, on the specific

25   facts of this case, the two agencies closely coordinated their investigations at the time of Mr. Balwani's

26   deposition testimony.  There can be no question on these facts that DOJ had the opportunity to shape the

27   questions posed by SEC attorneys to Mr. Balwani at a time when the two agencies were jointly

28

MS. HOLMES' MOTION TO ADMIT PRIOR TESTIMONY OF RAMESH "SUNNY" BALWANI
CR-18-00258 EJD

1   investigating Mr. Balwani.  *See id.* at 731 ("[H]ad the Department wished, it could have ensured that the

2   CFTC lawyers included questions of interest to the United States when they deposed [the witness].").

3       Other cases declining to apply Rule 804(b)(1) in the context of SEC deposition testimony are

4   easily distinguishable.  In *United States v. Baker*, 923 F.3d 390 (5th Cir. 2019), the two agencies did not

5   participate in joint interviews, the SEC "limited the information it provided to the DOJ," and the SEC

6   had been "uncooperative" with DOJ.  *Id.* at 400-01.  In that context, the Fifth Circuit held that the two

7   agencies were not the same "party" for purposes of Rule 804(b)(1).[5]  The very opposite was true here:

8   the two agencies cooperated extensively.  *United States v. Martoma*, 2014 WL 5361977 (S.D.N.Y. Jan.

9   8, 2014) is also distinguishable.  There, the DOJ prosecutor assigned to the case submitted a declaration

10  disclaiming any involvement in preparing or even advance knowledge of the topics of the at-issue

11  deposition.  *Id.* at *3.  And the decision identifies no joint investigative efforts of the type apparent on

12  the record here.  *See id.*  On this record, DOJ and the SEC are fairly considered the same party for

13  purposes of Rule 804(b)(1).

14      The government also had a similar "motive" to cross-examine Mr. Balwani at the time of his

15  prior depositions.  This is "'inherently a factual inquiry' based on 'the similarity of the underlying issues

16  and on the context of the . . . questioning.'"  *United States v. Duenas*, 691 F.3d 1070, 1089 (9th Cir.

17  2012) (quoting *United States v. Salerno*, 505 U.S. 317, 326 (1992) (Blackmun, J., concurring)).

18  Identical motivation is not required, *id.* at 1088, nor does it matter that the incentive to elicit

19  incriminating evidence at the prior proceeding was "likely not as intense as it would have been at trial,"

20  *id.* at 1089 (citation omitted).

21      Here, the government's motivation in deposing Mr. Balwani was similar to its motivation to

22  examine him at trial:  to develop incriminating evidence against both him and Ms. Holmes.  By 2017,

23  both Mr. Balwani and Ms. Holmes were targets of the SEC and DOJ joint investigation.  The

24  government had already been investigating for nearly two years.  Notably, the SEC frequently used

25

26  _____
         [5] The Fifth Circuit also reasoned that the two agencies need not "cooperate to enforce the same
27  statutory scheme" and that "[t]he SEC is an independent agency with its own litigating authority."  923
    F.3d at 401.  Those observations are materially incomplete:  the DOJ and SEC jointly enforce the
28  securities scheme because the SEC lacks "litigating authority" in criminal matters.

MS. HOLMES' MOTION TO ADMIT PRIOR TESTIMONY OF RAMESH "SUNNY" BALWANI
CR-18-00258 EJD

1  leading questions in the deposition.  *See, e.g.*, Ex. B (SEC attorney stating as a question "[Ms. Holmes]

2  was generally familiar with the kinds of inputs that went into the financial model?").  And the fact that

3  both were "investigating the same underlying conduct with an eye to take enforcement action" further

4  supports the conclusion that the SEC and DOJ had similar motives to develop Mr. Balwani's testimony.

5  *Sklena*, 692 F.3d at 732 (finding a similar motive when "the [CFTC] and [DOJ] alleged and needed to

6  prove the same allegations, as a comparison of the CFTC's civil complaint and the indictment

7  demonstrate[d]").  The SEC complaint alleges near identical conduct as the indictment in this case

8  including, as relevant to this motion, alleged misrepresentations regarding Theranos technology,

9  "stalled" relationships with retailers, and alleged misrepresentations concerning financial numbers.

10  *Compare* Compl., Case No. 18-1603, Dkt. 1 *with* TSI Dkt. 469.  On these facts, the government cannot

11  credibly argue, as it has done in other cases, that its deposition of Mr. Balwani was an exploratory,

12  information-gathering deposition "during an early investigation."  *SEC v. Jasper*, 678 F.3d 1116, 1128

13  (9th Cir. 2012).  The government's deposition of Mr. Balwani was undoubtedly an "adverse witness

14  deposition, when battle lines have already been drawn."  *Id.* at 1128-29.  In sum, the government had a

15  similar incentive to probe his statements taking ownership of certain aspects of the company's

16  operations then as it has now.

17       For all these reasons, the Court should admit Mr. Balwani's prior SEC testimony excerpted at

18  Exhibits A-C.

19                                    **CONCLUSION**

20       For the foregoing reasons, Court should grant Ms. Holmes' Motion and admit the testimony

21  identified in Exhibits A-C.

22

23  DATED:  November 24, 2021                    Respectfully submitted,

24                                    /s/ Amy Mason Saharia
                                      KEVIN DOWNEY
25                                    LANCE WADE
                                      AMY MASON SAHARIA
26                                    KATHERINE TREFZ
                                      Attorneys for Elizabeth Holmes
27

28

MS. HOLMES' MOTION TO ADMIT PRIOR TESTIMONY OF RAMESH "SUNNY" BALWANI
CR-18-00258 EJD

7

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on November 24, 2021 a copy of this filing was delivered via ECF on all counsel of record.

/s/ Amy Mason Saharia
AMY MASON SAHARIA
Attorney for Elizabeth Holmes

MS. HOLMES' MOTION TO ADMIT PRIOR TESTIMONY OF RAMESH "SUNNY" BALWANI
CR-18-00258 EJD

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 17, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Amy Mason Saharia
AMY MASON SAHARIA

April 17, 2023