No. 22-10312

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ELIZABETH A. HOLMES

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 5:18-CR-00258
Hon. Edward J. Davila

---

## EXCERPTS OF RECORD
## VOL. VII of LVII | ER-1644 to ER-1942

---

JOHN D. CLINE
LAW OFFICE OF JOHN D. CLINE
  600 Stewart Street
  Suite 400
  Seattle, WA 98101
  (360) 320-6435

KEVIN M. DOWNEY
LANCE A. WADE
AMY MASON SAHARIA
KATHERINE A. TREFZ
WILLIAMS & CONNOLLY LLP
  680 Maine Ave. S.W.
  Washington, D.C. 200024
  (202) 434-5000
  asaharia@wc.com

# EXHIBIT 5

**theranos**

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

April 1, 2016

**BY MESSENGER**

Ms. Karen Fuller
State Oversight and CLIA Branch
Division of Survey and Certification
Centers for Medicare and Medicaid Services
90 Seventh Street, Suite 5-300 (5W)
San Francisco, CA 94103-6707

**Re:    Updated Response of Theranos, Inc. to the March 18, 2016 Letter From Karen
Fuller To Dr. Sunil Dhawan, Elizabeth Holmes, and Sunny Balwani (CLIA Number
05D2025714)**

Dear Ms. Fuller,

This letter provides Theranos, Inc.'s response to your letter of March 18, 2016.  We respond to
each of the reasons why CMS found that our response to a specific deficiency was insufficient by
providing additional information and supporting documentation, which we believe demonstrate
that our Newark, California laboratory has come into Condition-level compliance and abated the
immediate jeopardy.

Based on the productive discussions we have had with Sarah Bennett and Gary Yamamoto about
your March 18 letter, this response aims to ensure that there are not any miscommunications
about important issues that we have learned were unclear to CMS from our initial submission.  In
addition, this response reflects work that the laboratory, under the direction of its new leadership,
has done to address CMS's feedback, including, for example, performing thorough re-review of
data and further revising procedures.

As set forth in this detailed response and through the enclosed supporting documentation:

1.  The laboratory has put in place new leadership, including a new full-time lab director and
    a new full-time clinical consultant, who is a co-director under California's regulations.
    The new laboratory director, Dr. Kingshuk Das, has been on-site full-time as of March
    14, 2016.  He has extensive clinical laboratory experience, including as an Associate
    Medical Director of UCLA's Clinical Laboratories between August 2013 and March
    2016.  The new clinical consultant, Dr. Don Tschirhart, has been on-site full-time as of
    March 14, 2016.  He has over 15 years of experience as a hospital lab director.

2.  The laboratory's new leadership firmly believes that the laboratory will be able to ensure
    the deficient practices will not recur through its robust new quality systems and through
    the intense oversight being provided by the laboratory's new quality monitoring and
    improvement program and new audit procedures.  Indeed, the laboratory's new audit

1
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                              THER-0534700
Fed. R. Crim. P. 6(e) material

**ER-1646**



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

procedures require both monthly tracer audits of pre-analytic, analytic and post-analytic processes and quarterly audits of the laboratory's quality systems.  The results of these audits are then scrutinized at the laboratory's monthly QMPI Program meetings.

3. Many of the issues raised in your March 18 letter appear to be premised on CMS's belief that the laboratory is running a number of tests that it actually stopped running either before or during the survey, and has not run since. We have clarified this issue below.

4. The laboratory has undertaken aggressive corrective actions.  For example, out of an extreme abundance of caution and based on its dissatisfaction with prior QA oversight, the laboratory voided all results reported for the assays run on the Theranos Proprietary System 3.5 (TPS) in 2014 and 2015 and all reported PT/INR tests run on the Siemens Advia BCS XP instrument that went into use in October 2014 through September of 2015.[1]

We believe that these considerable actions, when viewed together with the other information and documentation provided herein and in our initial submission, should leave no doubt that the Newark laboratory has come into Condition-level compliance and abated immediate jeopardy. For that reason, we submit that CMS should approve the laboratory's submission, and thereafter perform a revisit at which CMS will see that the laboratory's new leadership has implemented, enforced, and monitored the corrective actions.

We welcome further engagement with CMS on any of the information we have submitted to date, including the opportunity to address any questions or concerns CMS may have in real-time, in order to avoid any unnecessary delay or work for CMS and pursuant to our efforts to respond comprehensively to all issues raised by CMS.

Please note that these materials contain confidential commercial information and trade secrets that are statutorily exempt from disclosure under the Freedom of Information Act, 5 U.S.C. § 552(b)(4).  We are providing this highly sensitive information to CMS in order to fully respond to the agency's inquiries.  However, this is information that Theranos closely protects from public disclosure, and any disclosure by the agency of this information is likely to cause the company irreparable harm.  As a result, in providing this information, we respectfully request the opportunity to provide redactions should you decide to disclose any of the documents to any member of the public for any reason, under FOIA procedures or otherwise.  In addition, if the agency incorporates the substance of any of this information into correspondence or other agency-generated documents that may be publicly disclosed, we request the opportunity to redact the information from those documents as well.  We also ask that you take steps to protect these documents from unauthorized disclosure

---

[1] A list of all accessions for which corrected reports have been issued is enclosed herein in Exhibit MM.

2
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos          THER-0534701
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

## D2094

**D2094 – March 18 Letter Statement 1:** *"Some documents pertaining to this deficiency referenced in the submission were not included.  Specifically, the submission references 'Ex. A, Tab 4, § 7.1.2.2.d.2.'  We found no such reference contained in the materials provided to CMS.  In addition, Exhibit (Ex.) O, Tab 2 states:  'The QC data are presented here: <Exhibit D Tab 7, Tab 8>.'  We found no 'Tab 7' or 'Tab 8' in Ex. D."*

**Theranos Response to Statement 1 in D2094:**  The citation reference to Ex. A, Tab 4, § 7.1.2.2.d.2 was an inadvertent transcription.  The citation reference Ex. D, Tabs 7 and 8 were also inadvertent transcription errors, but the QC data were included in the initial submission in Exhibit O.  We have enclosed another copy of that QC data for ALP with this letter at Ex. JJ, Tab 3B.

**D2094 – March 18 Letter Statement 2:**  *"Although the laboratory's submitted protocol indicates that ungraded proficiency testing (PT) results will be evaluated, the submitted protocol does not explain how an investigation is performed and who must sign an investigation of ungraded PT samples."*

**Theranos Response to Statement 2 in D2094:**  The lab has revised its proficiency testing procedure (i) to indicate the protocol used to evaluate ungraded proficiency testing (PT); (ii) to explain how an investigation of ungraded PT is performed; and (iii) to explain who must sign an investigation of ungraded PT samples. (Ex. BB, Tab 3).  The revised procedure requires the laboratory to use its Proficiency Testing Investigation and Corrective Action form to investigate ungraded PT, which must be approved by the lab director.  (Ex. BB, Tab 3§ 9.4, F-1).  Training on this revised SOP has occurred.  (Ex. BB, Tabs 3B-3C).

**D2094 – March 18 Letter Statement 3:** *"In the submission, the laboratory concludes:*

- *'Not enough patient data available for meaningful analysis'*
- *'No evidence of systemic errors'*
- *'No patient impact expected'*

*However, no information as to how the laboratory came to these conclusions related to patient outcomes was submitted.  Documentation contained in in Ex. O, Tab 2 also compares the 'Range of Means' with no explanation as to what this refers to or how it correlates to the laboratory's ungraded results.  The submission merely indicates that 'the lab has investigated this ungraded PT event for ALP [alkaline phosphatase] and has documented its investigation and conclusion."*

**Theranos Response to Statement 3 in D2094:**  Pursuant to its revised proficiency testing procedure, the lab has documented its investigation of the ungraded ALP event for the 3rd event of 2014 using the Proficiency Testing Investigation and Corrective Action form.  (Ex. JJ, Tab 3A).  That documentation explains how the laboratory came to its conclusions related

3
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534702



1701 Page Mill Road     P 650.838.9292     theranos.com
Palo Alto, CA 94304     F 650.838.9165

to patient outcomes.  (Ex. JJ, Tab 3A).  Additionally, the laboratory has revised and clarified its analysis, including by removing the phrase "Range of Means."  (Ex. AA, Tab 13).

**D2094 – March 18 Letter Statement 4:**   *"Furthermore, a Quality Monitoring and Processing Improvement (QMPI), Program Meeting Agenda, CL FRM-00045-F1, that was submitted as part of Ex. A, Tab 13 and only includes PT for Alternative Proficiency Assessment (APA). Based on information included in the submitted agenda, all PT issues were not addressed as required in CL QOP-00045, Revision A (Ex. A, Tab 12) in Section 7.2.2.6 and 7.2.2.7."*

> **Theranos Response to Statement 4 in D2094:**  The lab has revised the QMPI Program procedures and meeting agenda to make clear that the agenda includes all PT issues as required in CL QOP-00045. (Ex. BB, Tab 7 § 7.5.2).[2]

**D2094 – March 18 Letter Statement 5:**   *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program.  However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted.  In the submission, the laboratory indicates that a 'tracer audit* **may** [emphasis added] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

> **Theranos Response to Statement 5 in D2094:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8 § 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7§ 7.5).[3]  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

---

[2] Note, the prior version of the QMPI QOP that was included with the submission stated that QMPI Meetings would include a review of the "schedule" and "results" for "Proficiency Tests". (Ex. A, Tab 12, § 7.2.2.5).

[3] Note, the prior version of the QMPI Meeting Agenda that was included with the submission required a review of audit "Findings."  (Ex. A, Tab 12, § 9.)

4
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534703

**theranos**

<table>
<tr><td>1701 Page Mill Road</td><td>P 650.838.9292</td><td>theranos.com</td></tr>
<tr><td>Palo Alto, CA 94304</td><td>F 650.838.9165</td><td></td></tr>
</table>

**<u>D2128</u>**

**D2128 – March 18 Letter Statement 1:** *"The submission references 'Ex. A, Tab 4, § 7.1.2.2.d.2.' We found no such reference contained in the materials provided to CMS."*

> **Theranos Response to Statement 1 in D2128:** The citation reference to Ex. A, Tab 4, § 7.1.2.2.d.2 was an inadvertent transcription error and should not have been included.

**D2128 – March 18 Letter Statement 2** *"Although the laboratory's submitted protocol indicates that unsatisfactory PT results would be investigated using CL FRM-00006-F1, the laboratory provided no documentation showing that the required form was used to investigate the unsatisfactory PT result. The laboratory also states that the 'lab has investigated the one unacceptable challenge and documented its investigation and conclusions'; however, CL FRM-00006-F1 documenting the investigation was not submitted per the laboratory's protocol."*

> **Theranos Response to Statement 2 in D2128:** We note that there was not an "unsatisfactory PT result" reported by the American Proficiency Institute for the "Blood Cell ID (Educational)" 2nd event of 2014, because this educational event was "Not Graded." (Ex. JJ, Tab 2). Pursuant to its revised proficiency testing procedure, the laboratory has documented its investigation of this "Blood Cell ID (Educational)" 2nd event of 2014 that was "Not Graded" using the Proficiency Testing Investigation and Corrective Action form. (Ex. JJ, Tab 2).
>
> Likewise, pursuant to its revised proficiency testing procedure, the laboratory has documented its investigation of the one unacceptable challenge for the "Blood Cell Identification" 2nd event of 2014 using the Proficiency Testing Investigation and Corrective Action form. (Ex. JJ, Tab 2A).

**D2128 – March 18 Letter Statement 3:** *"In the submission, the laboratory concludes:*

- *'Not enough patient data available for meaningful analysis'*
- *'No evidence of systemic errors'*
- *'No patient impact expected'*

*However, no information as to how the laboratory came to these conclusions related to patient outcomes was submitted. Documentation contained in Ex O, Tab 3 shows that the laboratory received a passing score of 80% for blood cell identification." While this is true, the CLIA regulations require that all unacceptable results have remedial action taken and that such remedial action be documented. The submission does not contain evidence of remedial action."*

> **Theranos Response to Statement 3 in D2128:** Pursuant to its revised proficiency testing procedure, the laboratory has documented its investigation of the "Blood Cell ID (Educational)" 2nd event of 2014 that was "Not Graded" using the Proficiency Testing Investigation and Corrective Action form. (Ex. JJ, Tab 2). That documentation explains how the laboratory came to its conclusions related to patient outcomes. (Ex. JJ, Tab 2).

5
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534704



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

Pursuant to its revised proficiency testing procedure, the laboratory has documented its investigation of the one unacceptable challenge for "Blood Cell Identification" 2nd event of 2014 using the Proficiency Testing Investigation and Corrective Action form. (Ex. JJ, Tab 2A). That documentation explains how the laboratory came to its conclusions related to patient outcomes. (Ex. JJ, Tab 2A).

**D2128 – March 18 Letter Statement 4:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In the submission, the laboratory indicates that a 'tracer audit may [emphasis added [in the letter]] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 4 in D2128:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8 § 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab 7B-7C).

**D5024**:

The March 18 Letter states: *"See our reviews of D5403, D5437, D5447, D5469, D5481, D5779, and D5801."* Accordingly, we refer you to our responses to those reviews.

**D5217**

**D5217 – March 18 Letter Statement 1:** *"Some documents pertaining to this deficiency referenced in the submission were not included. Specifically, the submission references 'Ex. A, Tab 4, § 7.1.2.2.d.2.' We found no such reference contained in the materials provided to CMS. In addition, Exhibit (Ex.) O, Tab 2 states: 'The QC data are presented here: <Exhibit D Tab 7, Tab 8>.' We found no 'Tab 7' or 'Tab 8' in Ex. D."*

**Theranos Response to Statement 1 – D5217:** The citation reference to Ex. A, Tab 4, § 7.1.2.2.d.2 was an inadvertent transcription error and should not have been included. The citation reference Ex. D, Tabs 7 and 8 were also inadvertent transcription errors, but the QC data were included in the submission in Exhibit O. We have enclosed another copy of the QC data for Troponin with this letter at Ex. JJ, Tab 1B.

6
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534705



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

**D5217 – March 18 Letter Statement 2:**   *"In the submission, the laboratory concludes:*

- *'Not enough patient data available for meaningful analysis'*
- *'No evidence of systemic errors'*
- *'No patient impact expected'*

*However, no information as to how the laboratory came to these conclusions related to patient outcomes was submitted.*

**Theranos Response to Statement 2 – D5217:**  The lab has revised its conclusions for the ungraded Troponin 2nd event of 2014; those conclusions are consistent with CMS's review in response to D5217 Statement 3 below.  Pursuant to its revised proficiency testing procedure, the laboratory has documented its investigation and conclusion of the ungraded Troponin 2nd event of 2014 using the Proficiency Testing Investigation and Corrective Action form.  (Ex. JJ, Tab 1A).  That documentation explains how the laboratory came to its conclusions related to patient outcomes. (Ex. JJ, Tabs 1A-1B).

**D5217 – March 18 Letter Statement 3:**   *"The laboratory states in Ex. O, Tab 1 that no peer data was available for the Siemens Immulite 2000.  Based on lack of a peer group, the laboratory should compare its results to 'All Participants' values for troponin.  Review of the laboratory's values versus the 'All Participants' values shows that four of five of the laboratory's troponin values for the second proficiency testing event of 2014 were unacceptable when compared to the 'All Participants' acceptable ranges.  It appears the laboratory reviewed all of the mean values for all peer, instrument and method groups in order to determine an inappropriate acceptable range for its samples based on data not related to the 'All Participants' values."*

**Theranos Response to Statement 3 – D5217:**  Pursuant to its revised proficiency testing procedure, the laboratory has documented its investigation and conclusion of the ungraded Troponin 2nd event of 2014 using the Proficiency Testing Investigation and Corrective Action form.  (Ex. JJ, Tab 1A). That documentation reflects the laboratory's revised investigation, analysis, and conclusions.  (Ex. JJ, Tabs 1A-1B).  Based on its investigation, the laboratory has concluded that its values versus the "All Participants" values show that four of five of the laboratory's troponin values for the second proficiency testing event of 2014 did not constitute passing values for this PT event.  (Ex. JJ, Tabs 1A-1B).  The enclosed documentation describes the investigation and remedial action taken to address the unacceptable values.  (Ex. JJ, Tabs 1A-1B).  As explained in that documentation, the laboratory has, out of an abundance of caution, issued corrected reports voiding all affected Troponin results.  (Ex. JJ, Tab 1A).  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5217 – March 18 Letter Statement 4:**   *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program.  However, the laboratory did not*

7

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534706



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

*establish the procedure by which these quarterly audits are to be conducted. In the submission, the laboratory indicates that a 'tracer audit may [emphasis added [in the letter]] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 4 – D5217:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

<u>D5311</u>

**D5311 – March 18 Letter Statement 1:** *"The submission references 'Ex. A, Tab 4, 7.1.2.2.d.2.' We found no such reference contained in the materials provided to CMS."*

**Theranos Response to Statement 1 – D5311:** The citation reference to Ex. A, Tab 4, § 7.1.2.2.d.2 was an inadvertent transcription error and should not have been included.

**D5311 – March 18 Letter Statement 2:** *"The laboratory concluded that 'this issue is not likely to affect patients' because its mislabel error rate is comparable to published industry mislabel error rates. No other information related to possible patient outcomes was provided. Even though the laboratory's error rate may be comparable, the laboratory must still pursue any corrective action(s) for patients that may have been affected by this deficient practice."*

**Theranos Response to Statement 2 – D5311:** The laboratory has revised its patient impact assessment analysis and conclusions to address CMS's review. (Ex. AA, Tab 1). Among other things, the revised assessment shows that laboratory took corrective action in 2014 and 2015 for patients that may have been affected by offering a redraw and retest at no charge. (Ex. AA, Tab 1; Ex. HH, Tab 10).

**D5311 – March 18 Letter Statement 3:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In the submission, the laboratory indicates that a 'tracer audit may [emphasis added [in the letter]] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would*

8
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534707



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

*be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 3 – D5311:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB Tab 7§ 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tab7B-C).

**D5391**

Finding #1

**D5391 Finding #1 – March 18 Letter Statement 1:**  *"The submission references 'Ex. A, Tab 4.'  We found no such reference contained in the materials provided to CMS."*

**Theranos Response to Statement 1 – D5391 Finding #1:**  The citation reference to Ex. A, Tab 4, § 7.1.2.2.d.2 was an inadvertent transcription error and should not have been included.

**D5391 Finding #1 – March 18 Letter Statement 2:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program.  However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted.  In the submission, the laboratory indicates that a 'tracer audit may [emphasis added [in the letter]] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5391 Finding #1:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on

9
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534708

 theran⬡s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

findings and analysis" during the QMPI Program meetings.  (Ex. BB Tab 7§ 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tab7B-C).

Finding #2

**D5391 Finding #2 – March 18 Letter Statement 1:**  *"The submission references 'Ex. A, Tab 18, § 3.7.1,' and 'Ex. A, Tab 23, §§ 7.14, 7.15, 8.6.1, 8.6.4, 8.6.5.'  We found no such reference contained in the materials provided to CMS."*

**Theranos Response to Statement 1 –  D5391 Finding #2:**  The citation references to Ex. A, Tab 4, § 3.7.1 and Ex. A, Tab 23, §§ 7.14, 7.15, 8.6.1, 8.6.4, 8.6.5 were inadvertent transcription errors and should not have been included.

**D5391 Finding #2 – March 18 Letter Statement 2:**  *"At the time of the onsite survey, the laboratory failed to establish a written protocol for the daily review of patient specimens referred to other laboratories for testing to ensure timely receipt and reporting of test results performed by other laboratories.  The laboratory did not provide such a protocol with its submission."*

**Theranos Response to Statement 2 – D5391 Finding #2:**  The lab has implemented revised written procedures for referral testing, which includes the protocol for daily review of patient specimens referred to other laboratories for testing to ensure timely receipt and reporting of test results performed by other laboratories.  (Ex. BB, Tab 10 § 8.7).  The revised procedure requires written documentation of this daily review.  Training on that SOP has occurred.  (Ex. BB, Tabs 10B-10C).  The revised QMPI Program procedures require a review of referral testing and turnaround time.  (Ex. BB, Tab 7 §§ 7.5.3, 7.5.4).

**D5391 Finding #2 – March 18 Letter Statement 3:**  *"In addition, it is unclear how the laboratory's QMPI Program would ensure the establishment of written protocols for all the laboratory's processes."*

**Theranos Response to Statement 3 – D5391 Finding #2:**  The laboratory's improved document control procedures, SOP on SOPs, audit procedures, and QMPI Program ensure the laboratory has written protocols for all of the laboratory's processes.  (Ex. BB, Tabs 1-2, 7-8). The document control procedures identify levels and categories of procedures (Ex. BB, Tab 1 §§ 3.11, 6.1); the SOP on SOPs includes procedures and templates to ensure that there are written protocols for all processes that should be covered by an SOP (Ex. BB, Tab 2); the revised audit procedures include monthly tracer audits that would identify any instance where a written protocol did not exist for a process (Ex. BB, Tab 8 § 8.1); and the QMPI Program requires review of tracer audit results and of written procedures that are new, revised or in process.  (Ex. BB, Tab 7§§ 7.1, 7.5).  Training on these procedures has occurred.  (Ex. BB, Tabs 1B-1C, 2B-2C, 7B-7C, 8B-8C).

10
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                    THER-0534709
Fed. R. Crim. P. 6(e) material

**theran⬡s**

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

<u>**D5393**</u>

**D5393 – March 18 Letter Statement 1:** *"The submission references 'Ex. A, Tab 23, §§ 7.14, 7.15, 8.6.1, 8.6.4, 8.6.5.' We found no such reference contained in the materials provided to CMS."*

> **Theranos Response to Statement 1 – D5393:** The citation references to Ex. A, Tab 23, §§ 7.14, 7.15, 8.6.1, 8.6.4, 8.6.5 was an inadvertent transcription error and should not have been included.

**D5393 – March 18 Letter Statement 2:** *"At the time of the onsite survey, the laboratory failed to establish a written protocol for the daily review of patient specimens referred to other laboratories for testing to ensure timely receipt and reporting of test results performed by other laboratories. The laboratory did not provide such a protocol with its submission."*

> **Theranos Response to Statement 2 – D5393** The lab has implemented revised written procedures for referral testing, which includes the protocol for daily review of patient specimens referred to other laboratories for testing to ensure timely receipt and reporting of test results performed by other laboratories. (Ex. BB, Tab 10 § 8.7). The revised procedure requires written documentation of this daily review. (Ex. BB, Tab 10 § 8.7, F-1). Training on that SOP has occurred. (Ex. BB, Tabs 10B-10C). The revised QMPI Program procedures require a review of referral testing and turnaround time. (Ex. BB, Tab 7 §§ 7.5.3, 7.5.4).

**D5393 – March 18 Letter Statement 3:** *"In addition, it is unclear how the laboratory's QMPI Program would ensure the establishment of written protocols for all of the laboratory's processes."*

> **Theranos Response to Statement 3 – D5393:** The laboratory's improved document control procedures, SOP on SOPs, audit procedures, and QMPI Program ensure the laboratory has written protocols for all of the laboratory's processes. (Ex. BB, Tabs 1-2, 7-8). The document control procedures identify levels and categories of procedures (Ex. BB, Tab 1 §§ 3.11; 6.1); the SOP on SOPs includes procedures and templates to ensure that there are written protocols for all processes that should be covered by an SOP (Ex. BB, Tab 2); the revised audit procedures include monthly tracer audits that would identify any instance where a written protocol did not exist for a process (Ex. BB, Tab 8 § 8.1); and the QMPI Program requires review of tracer audit results and of written procedures that are new, revised or in process. (Ex. BB, Tab 7§§ 7.1, 7.5). Training on these procedures has occurred. (Ex. BB, Tabs 1B-1C, 2B-2C, 7B-7C, 8B-8C).

**D5393 – March 18 Letter Statement 4:** *"In addition, without daily written documentation, it is unclear as to how the laboratory's QMPI Program would ensure this quality assessment activity has been completed."*

> **Theranos Response to Statement 4 – D5393:** The laboratory's revised written procedures for referral testing require written documentation of the daily review of referral testing. (Ex. BB, Tab 10 § 8.7, F-1). Training on the revised referral testing procedures has occurred.

11
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534710

**ER-1656**

**theran⬤s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

(Ex. BB, Tabs 10B-10C). The revised QMPI procedures require a review of referral testing and turnaround time.  (Ex. BB, Tab 7 §§ 7.5.3, 7.5.4).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

**D5400**

The March 18 Letter states "*See our reviews of D5403, D5407, D5413, D5421, D5423, D5429, D5437, D5447, D5449, D5469, D5477, D5481, D5775, D5779, D5787, D5791, and D5793.*" Accordingly, we refer you to our responses to those reviews.

**D5403**

Finding #1

**D5403 Finding #1 – March 18 Letter Statement 1:**  "*Although the laboratory addressed the inclusion in its procedure manual of corrective actions to be taken when calibration or quality control (QC) results failed to meet the laboratory's criteria for acceptability when using the Siemens Advia 2120i instrument, in its submission the laboratory failed to address how it will ensure its procedure manuals include applicable components as required by 42 C.F.R. 493.1251(b).*"

> **Theranos Response to Statement 1 – D5403 Finding #1:**  The lab's revised SOP on SOPs includes written protocols and SOP templates, which sets forth protocols for preparing procedure manuals that are consistent with 42 C.F.R. § 493.1251(b).  (Ex. BB, Tab 2).  The laboratory's revised document control policies further ensure that procedure manuals are consistent with 42 C.F.R. § 493.1251(b).  (Ex. BB, Tab 1 §§ 6.1, 6.2, 6.3).  The lab will monitor compliance with these procedures and 42 C.F.R. § 493.1251(b) through its monthly QMPI meetings, which include a review of written procedure manuals that are new, revised or in process.  (Ex. BB Tab 7, §§ 7.1, 7.5.6).  The lab will also ensure compliance through its revised audit procedures of pre-analytic, analytic, and post-analytic practices.  (Ex. BB, Tab 8, §§ 8.1, 8.2).  Training on these revised procedures has occurred.  (Ex. BB, Tabs 1B-1C; 2B-2C; 7B-7C; 8B-8C).

**D5403 Finding #1 – March 18 Letter Statement 2:**  "*To ensure appropriate and required calibration or QC corrective actions were taken, the laboratory indicated that quarterly audits will be performed and suggested that the audit results would be reviewed within the laboratory's QMPI Program.  However, the laboratory did not establish the procedure by which these quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program.  However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted.  In the submission, the laboratory indicates that a 'tracer audit* **may** *[emphasis added] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program.*"

> **Theranos Response to Statement 2 – D5403 Finding #1:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex BB,

12
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                          THER-0534711
Fed. R. Crim. P. 6(e) material



theranos                                          1701 Page Mill Road    P 650.838.9292   theranos.com
                                                  Palo Alto, CA 94304    F 650.838.9165

Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised
procedures establish that tracer audits must occur monthly; provide the protocol for a tracer
audit; and require that tracer audits be documented using the tracer audit form, CL FRM
00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a
quarterly audit to cover the quality management systems; provide the protocol for quarterly
audits; and require that quarterly audits are documented using the audit record form, CL QOP
00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear
that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on
findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training
on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

<u>Finding #2</u>:

**D5403 Finding #2 – March 18 Letter Statement 1:**  *"The laboratory was cited for not having
a QC procedure for the 'Edison 3.5 Theranos System' prior to 5/15/14.  The laboratory's
submission states that it performed QC before and after 5/15/14; however, it did not address the
citation.  While the data submitted did show that QC was run prior to 5/15/14, the laboratory
provided no information regarding any investigation as what procedure the laboratory was
using to determine number, type, frequency, and acceptability criteria."*

> **Theranos Response to Statement 1 – D5403 Finding #2:**  D5403 Finding #2 relates to the
> Theranos Proprietary System 3.5 ("TPS") The laboratory has performed a review to
> determine number, type, frequency, and acceptability criteria for QC on the TPS 3.5 prior to
> May 15, 2014.  Prior to May 15, 2014, the laboratory (i) used the same type of QC material
> as used after May 15, 2014; (ii) the laboratory ran at least two levels of QC prior to May 15,
> 2014; (iii) the laboratory was required to pass at least two levels of QC at least 24 hours
> before reporting a patient result; and (iv) the laboratory used the Westgard rules for the
> acceptance criteria.  (Ex. FF, Tab 13).

**D5403 Finding #2 – March 18 Letter Statement 2:**  *"The laboratory indicated that systemic
errors using QC and patient test distribution over time as well as random errors were used to
evaluate patient impact.  Specifically, the laboratory indicated that 'QC data was reviewed to
identify >2SD failure and periods of elevated CV.  Namely, batches of 10 consecutive QC data
points were analyzed and the CV was calculated for each QC level during this period.  If the CV
was >30%, then all patient results run during that time period will be voided.'  Ex. E, Tab 1.
That laboratory did not indicate how 'periods of elevated CV' were identified or what time
periods were reviewed."*

> **Theranos Response to Statement 2 – D5403 Finding #2:**  This deficiency concerns the
> TPS 3.5, which was one of the Theranos proprietary technologies in use in 2014 and
> 2015.  The laboratory began phasing out the TPS 3.5 in December 2014, and it was **fully
> retired** in early-August 2015.

The laboratory values CMS's feedback, and takes it very seriously.  The laboratory has
conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January
1, 2014 until the TPS 3.5 was fully retired in early-August 2015.  As explained further in the

13
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                    THER-0534712
Fed. R. Crim. P. 6(e) material

**ER-1658**



|  | 1701 Page Mill Road | P 650.838.9292 | theranos.com |
|--|--|--|--|
|  | Palo Alto, CA 94304 | F 650.838.9165 | |

attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5.  (Ex. AA, Tab 3).  The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures.  Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015.  As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015.  (Ex. AA, Tab 3).  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5403 Finding #2 – March 18 Letter Statement 3:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program.  However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted.  In the submission, the laboratory indicates that a 'tracer audit **may** [emphasis added [in the letter]] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

    **Theranos Response to Statement 3 – D5403 Finding #2:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB Tab 7§ 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tab7B-C).

<u>D5407</u>

**D5407 – March 18 Letter Statement 1:**  *"Although the laboratory's submitted protocol (provided at Ex. A, Tab 1 § 4.13) indicates that the laboratory director must sign all procedures prior to use, the response does not include an explanation as to why the cited procedures were not signed by the laboratory director prior to use as required by the laboratory's protocol available at the time of the onsite."*

    **Theranos Response to Statement 1 – D5407:**  D5407 states that the following procedures showed an effective date in December 2014, but were signed by the lab director on

14
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material
THER-0534713



| | |
|---|---|
| | 1701 Page Mill Road    P 650.838.9292    theranos.com |
| | Palo Alto, CA 94304    F 650.838.9165 |

September 19, 2015: CL SOP-09102 (ALP),[4] CL SOP-09161, Revision A (APO), CL SOP-09118 (Glucose),[5] CL SOP-09111 (CO2), CL SOP-10001, Revision B (Measuring Prothrombin Time-Innovin (PT)), and CL SOP-15036, Revision A (Edison 3.5 Theranos System Daily QC Procedure).

D5407 also states that CL SOP-06060, Revision A (SensoScientific Monitor) showed an effective date of June 23, 2015, but was not signed by the lab director until September 22, 2015.

Lastly, D5407 states that CL PLN-14003, Revision A (Master Validation Plan for Routine Chemistry Assays on Theranos Devices) showed an effective date of November 4, 2011, but was not signed by the lab director under September 19, 2015.  To ensure that the record is correct with respect to this document, we note that CL PLN-14003, Revision A (Master Validation Plan for Routine Chemistry Assays on Theranos Devices), was authored and signed by the laboratory's then-lab director, Dr. Arnold Gelb, on November 4, 2011.  (Ex. HH, Tab 12).  Dr. Gelb remained the Lab Director until January 27, 2013.  (Ex. HH, Tab 4C).  Although Dr. Gelb signed CL PLN-14003, the subsequent lab directors did not sign and date CL PLN-14003 until Dr. Sunil Dhawan signed it on September 19, 2015.  We recognize that those prior lab directors should have reviewed, dated and signed CL PLN-14003 before that date.

As reflected by the Lab Director deficiencies identified by CMS, the prior lab directors did not provide sufficient oversight over the documents cited in D5407.  This appears to be one of the reasons why these documents were not timely reviewed and signed by the prior lab directors.  In addition, the laboratory has found that its quality assurance oversight over these documents, including document control oversight, was not sufficient.  The laboratory has hired a new lab director, who has approved enhanced document control policies and procedures to address this issue.  (Ex. BB, Tab 1 §§ 5.1, 5.2, 5.3, 6.1, 6.2, 6.3).  Training on those procedures has occurred.  (Ex. BB, Tabs 1B-1C).  The laboratory has also hired a Document Control Manager whose responsibilities include tracking new and revised policies and procedures to ensure that they are reviewed and approved by the lab director before they become effective.  (Ex. HH, Tab 7C).  In addition, the laboratory's revised QMPI Program procedures and agenda require review of procedures that are new, revised, or in process at monthly QMPI Program meetings.  (Ex. BB, Tab 7 §§ 7.1, 7.5.6).

---

[4] D5407, Paragraph h, states that the Alkaline Phosphatase SOP that was made effective in December 2014 was "CL SOP-81102."  This reference appears to be a typographical error because the Alkaline Phosphatase (ALP) SOP that was made effective in December 2014 was "CL SOP-09102."

[5] As another point of clarification only, we note that D5407, Paragraph h, states that the glucose procedure (CL SOP-09118) was not signed by the LD.  That procedure was signed by the lab director, but not until September 19, 2015.  We recognize that this signature date is still deficient under D5407, and provide this information only to clarify the record.

15
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534714



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

**D5407 – March 18 Letter Statement 2:**   *"In Ex. L, Tab 26 the submission states: "The lab's overarching review of its systems and primary instruments has identified the patients affected or having the potential to be affected by this issue." The laboratory did not define the criteria used to make this determination or provide documentation as to how they came to this conclusion."*

**Theranos Response to Statement 2 – D5407:**   D5407 cites certain documents that were not timely signed and approved by the former lab director.

D5407 cites the follows SOPs for certain assays run on the Siemens Advia XPT because they had an effective date in December 2014, but were not signed by the former lab director until September 2015: (i) CL SOP-09161, Revision A (Apolipoprotein); (ii) CL SOP-09118 (Glucose); [6] (iii) CL SOP-09111 (CO2); and (iv) CL SOP-09102 (Alkaline Phophatase). [7] The laboratory and its new leadership do not approve of the fact these SOPs were given an effective date before Dr. Dhawan signed them.  However, there is no potential for these untimely signatures by Dr. Dhawan to have affected patients because Dr. Dhawan ultimately approved the SOPs without making any modifications or revisions to them.  To address other deficiencies identified by CMS, the laboratory's initial submission included a broader analysis of QC, proficiency testing results, and patient population distribution data for APO, Glucose, CO2, and ALP tests run on the Siemens Advia XPT for the entire period during which these SOPs were effective.  In response to CMS's review of D5793 Finding #8, the laboratory has extended this analysis to evaluate global quality control indicators.  (Ex. AA, Tab 11).  Based on these analyses, the laboratory has issued corrected reports.  (Ex. AA, Tab 11).  The laboratory **stopped** using the Siemens Advia XPT instrument on November 17, 2015, and **has not used it since then**.

D5407 also cites CL SOP-10001, Revision B (Measuring Prothrombin Time-Innovin (PT)), because it was made effective in December 2014, but was not signed by the former lab director until September 2015.  This SOP concerns PT/INR tests on the BCS XP.  Again, the laboratory and its new leadership do not approve of the fact this SOP was given an effective date before Dr. Dhawan signed the SOP.  However, there is no potential for this untimely

---

[6] As a point of clarification only, we note that D5407, Paragraph h, states that the glucose procedure (CL SOP-09118) was not signed by the LD.  That procedure was signed by the lab director, but not until September 19, 2015.  We recognize that this signature date is still deficient under D5407, and provide this information only to clarify the record.

[7] D5407, Paragraph h, states that the Alkaline Phosphatase SOP that was made effective in December 2014 was "CL SOP-81102."  This reference appears to be a typographical error because the Alkaline Phosphatase (ALP) SOP that was made effective in December 2014 was "CL SOP-09102."

16
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534715



1701 Page Mill Road     P 650.838.9292     theranos.com
Palo Alto, CA 94304     F 650.838.9165

signature to have affected patients because Dr. Dhawan ultimately approved the SOP without making any modifications or revisions to it. To address other deficiencies identified by CMS, the laboratory has performed a broader analysis of all PT/INR tests run on this BCS XP instrument, which was **first put into use in October 2014.** Based on this analysis, which included a review of INR calculations, QC data, proficiency testing, and patient population distribution data, the laboratory issued corrected reports voiding PT/INR test results reported for the period October 2014 through September 2015. (Ex. AA, Tab 7). The laboratory **stopped** using the BCS XP instrument on September 17, 2015, and **has not used it since then**.

D5407 also cites CL SOP-15036, Revision A (Edison 3.5 Theranos System Daily QC Procedure), because it was made effective in December 2014, but was not signed by the former lab director until September 2015. This SOP concerns the Theranos Proprietary System (TPS), which was being phased-out beginning in December 2014 and was fully **retired** in mid-August 2015. Again, the laboratory and its new leadership do not approve of the fact this SOP was given an effective date before Dr. Dhawan signed the SOP to indicate his approval of it. However, there is no potential for this untimely signature to have affected patients because Dr. Dhawan ultimately approved the SOP without making any modifications or revisions to it. To address other deficiencies identified by CMS, the laboratory has performed a broad re-analysis of all QC related to tests run on the TPS 3.5 in 2014 and 2015. That analysis is discussed below and is enclosed with this letter at Tab AA, Ex. 3. Based on that analysis, the laboratory has, out of an extreme abundance of caution, voided all tests run on the TPS 3.5 in 2014 and 2015. Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

D5407 also cites CL SOP-06060, Revision A (SensoScientific Monitor) because it was made effective on June 23, 2015, but was not signed by the former lab director until September 2015. Again, the laboratory and its new leadership do not approve of the fact this SOP was given an effective date before Dr. Dhawan signed the SOP to indicate his approval of it. However, there is no potential for this untimely signature to have affected patients because Dr. Dhawan ultimately approved the SOP without making any modifications or revisions to it.

Finally, D5407 cites CL PLN-14003, Revision A (Master Validation Plan for Chemistry Assays on Theranos Devices). The plan is consistent with 42 C.F.R. § 493.1253(b). CL PLN-14003 was authored, approved, signed and dated by Dr. Arnold Gelb. Dr. Gelb was the

17
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534716

theran♦s

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

Laboratory Director when he approved CL PLN-14003.[8]  (Ex. HH, Tabs 4B, 4C, & 12).
Although Dr. Dhawan should have reviewed the plan sooner, he ultimately approved of it.
Because Dr. Dhawan approved of the plan without making any changes to it, no patients
have the potential to have been affected by the finding in D5407, Paragraph g.

### D5413

Finding #1

**D5413 Finding #1 – March 18 Letter Statement 1:**  *"Although the laboratory's submitted
protocol indicates that the allowable temperature should be posted on the unit (see Ex. A, Tab
29), the response does not address the incorrect labeling for acceptable temperatures on the
freezer doors. Documentation contained in Ex. A, Tab 29, § 4.5 indicated that the laboratory
supervisor or designee was responsible for monitoring and recording temperatures. However,
we could not determine if the new procedure had been effectuated as no documentation was
submitted to show that the freezer units had been labeled appropriately."*

   **Theranos Response to Statement 1 – D5413 Finding #1:**  The new procedure has been
   effectuated as reflected in the enclosed documentation showing that the freezer units have
   been labeled appropriately.  (Ex. II, Tab 2).

**D5413 Finding #1 – March 18 Letter Statement 2:**  *"In addition, the laboratory states that
training had occurred subsequent to the survey, but it is not clear who should be trained as
'laboratory supervisor or designee' was not defined."*

   **Theranos Response to Statement 2 – D5413 Finding #1:**  The laboratory has revised this
   procedure to define who should be trained.  The revised procedure is enclosed at Ex. BB, Tab
   13.

**D5413 Finding #1 – March 18 Letter Statement 3:**  *"Training records provided in Ex. A, Tab
30 included only training documents for one general supervisor."*

   **Theranos Response to Statement 3 – D5413:**  The laboratory has enclosed with this letter a
   complete set of training records on this SOP, which shows that the relevant laboratory
   personnel have been trained.  (Ex. BB, Tabs 13B-13C).

**D5413 Finding #1 – March 18 Letter Statement 4:**  *"Several freezers were identified as "not
used in patient testing" (see Ex. N, Tab A); however, based on interviews during the onsite visit,*

---

[8] At the time that Dr. Gelb authored this plan, his qualifications included, among other things, a
Master of Science in Materials Science and Engineering (Biomedical); a Fellowship in MIT's
Medical Engineering Graduate Program; a Doctor of Medicine from Stanford University; an
internship in Internal Medicine at the University of Chicago Hospitals; a Fellowship in
Immunodiagnosis and Surgical Pathology at Stanford University; and a Fellowship in
Hematopathology at the University of California San Francisco.  (Ex. HH, Tab 4A).

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                                      THER-0534717
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*these freezers were identified as being used for CLIA activities.  The submission did not include a response or data related to the freezers identified as 'not used in patient testing.'"*

**Theranos Response to Statement 4 – D5413 Finding #1:**  D5413 identifies six -20C freezers and four -80C freezers.  In the lab's submission, we explain that five of those freezers did not contain materials that would be used in the future for clinical patient testing.  Rather, they only contained material that might be used in the future for research and development.

Based on CMS's March 18 letter, it appears that there was a miscommunication when the CMS surveyors were onsite.  D5413, Paragraph f, states that CMS had a discussion about these freezers with the "Director of Assay Systems and technical supervisor at 11/19/15 at approximately 11 am."  The Director of Assay Systems did not have any regular involvement with those freezers at that time and did not have knowledge of their contents.  The "technical supervisor" in attendance on November 19, 2015 joined the company on October 26, 2015; he also did not have regular involvement with those freezers at the time and did not have knowledge of their contents.  (Ex. HH, Tab 8).  To the extent CMS understood either of these individuals to be confirming the contents of these freezers or whether these freezers were used in clinical patient testing, there was a miscommunication.

The laboratory has looked into this issue further, and has reconfirmed that the statements in the laboratory's submission are accurate.  As reflected in the enclosed documentation:

- On November 19, 2015, there were four -20 C freezers in the microbiology or BUGS laboratory.  7061 BUGS -20 C Freezer 4 did **not** contain any materials for future use in clinical patient testing.  (Ex. II, Tab 3B).

- On November 19, 2015, there was one -20 C freezer in the Normandy laboratory.  Clinical patient testing in the Normandy laboratory **stopped** on September 20, 2015, and there has **not** been any clinical patient testing in the Normandy laboratory since then.  The 1 Normandy -20 C freezer did **not** contain any materials for future use in patient testing.  (Ex. II, Tab 3C).

- On November 19, 2015, there were four -80 C freezers.  7098 -80 C Freezer 1 Nuair, 7111 -80 C Freezer 2 Thermo, and 7113 -80 C Freezer 2 CLIA Lab did not contain any materials for future use in clinical patient testing.  While named 7113 -80 2 CLIA Lab, it was only used to store old specimens that were not for use in clinical patient testing.  (Ex. II, Tab 3A).

**D5413 Finding #1 – March 18 Letter Statement 5:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program.  However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted.  In the submission, the laboratory indicates that a 'tracer audit **may** [emphasis added [in the letter]] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a*

19
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                    THER-0534718
Fed. R. Crim. P. 6(e) material



theranos                                   1701 Page Mill Road    P 650.838.9292    theranos.com
                                            Palo Alto, CA 94304     F 650.838.9165

*'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the
information reviewed by the QMPI Program."*

**Theranos Response to Statement 5 – D5413 Finding #1:** The laboratory has revised its
audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB,
Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised
procedures establish that tracer audits must occur monthly; provide the protocol for a tracer
audit; and require that tracer audits be documented using the tracer audit form, CL FRM
00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a
quarterly audit to cover the quality management systems; provide the protocol for quarterly
audits; and require that quarterly audits are documented using the audit record form, CL QOP
00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear
that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on
findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training
on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

Finding #2

**D5413 Finding #2 – March 18 Letter Statement 1:** *"The submission references 'Ex. I, Tabs 2-
6.' We located these tabs, but found no documentation in Tabs 2, 5, and 6."*

**Theranos Response to Statement 1 – D5413 Finding #2:** There was an inadvertent
copying error for Exhibit I to the initial submission. The laboratory has enclosed the
applicable documents with this letter, as well as additional documents related to the
laboratory's broader analysis of the PT/INR test over the entire time it was run on this
Siemens BCS XP instrument. (Ex. GG).

**D5413 Finding #2 – March 18 Letter Statement 2:** *"Although the laboratory's submitted
protocol indicates that the laboratory was required to check manufacturer package inserts prior
to use (see Ex. A, Tab 31, §8.1.2), which was also stated in the laboratory's written procedure
available prior to the onsite survey, the laboratory provided no documentation showing that this
protocol has been effectuated and no indication that package inserts for new lot numbers have
been checked."*

**Theranos Response to Statement 2 – D5413 Finding #2:** D5413 concerns the laboratory's
failure to follow the manufacturer's instructions for the expiration date of one lot of Innovin
(thromboplastin) used for Prothrombin Time/International Normalized Ratio (PT/INR)
testing on the Siemens BCS XP. The laboratory **stopped** running tests on Siemens BCS XP
on September 17, 2015, and has **not** run any tests on the Siemens BCS XP since then.

Although the laboratory is not running PT/INR tests on the Siemens BCS XP, we have
enclosed documentation related to a different test that is in use, which shows that the
laboratory has effectuated its protocol to check manufacturer's instructions for the expiration
date. This documentation includes a photograph of the manufacturer's package insert for
IRISpec and a photograph of the bottles showing a handwritten open date and expiration date
that is consistent with the 15-day "open stability" specification contained in the package

20
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                              THER-0534719
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

insert .  (Ex. HH, Tabs 11A-11B).  As these photographs show, the laboratory effectuated its protocol by reviewing the manufacturer's instructions, initialed the material, and wrote the correct expiration date on the bottle.  (Ex. HH, Tab 11A).

**D5413 Finding #2 – March 18 Letter Statement 3***:  "In addition, the submission states that "the lab has conducted training on those procedures;" however, the training documents submitted in Ex. A, Tab 32 do not include any training specific to the cited deficiency. We were unable to verify that training occurred as stated."*

**Theranos Response to Statement 3 – D5413 Finding #2:**  D5413 Finding #2 states that the laboratory "failed to follow the manufacturer instructions for expiration date of Innovin (thromboplastin) used for Prothrombin Time/International Normalized Mean Ratio (PT/INR) testing."  The laboratory's submission included records for training on the revised reagent qualification and management procedures.  (Ex. BB, Tab 14B).  The training addressed review of manufacturer specification and package inserts.  (Ex. BB, Tab 14).  The laboratory has performed supplemental training that specifically focuses on reviewing and following manufacturer instructions for expiration dates.  (Ex. BB, Tab 14D).  That training used this deficiency about Innovin (thromboplastin) as a case study.  (Ex. BB, Tab 14D).

**D5413 Finding #2 – March 18 Letter Statement 4***:  "In Ex. I, Tab 1, the laboratory provided lists of patient specimen accession numbers for which the laboratory issued corrected reports; however, the laboratory did not provide copies of the corrected reports."*

**Theranos Response to Statement 4 – D5413 Finding #2:**  To address this and other deficiencies related to PT/INR, the laboratory conducted a further patient assessment analysis that covers the entire period during which this Siemens BCS XP instrument was in use in the lab. (Ex. AA, Tab 7).  As a result of that analysis, the laboratory has voided all results for PT/INR from October 2014 through September 2015. (Ex. AA, Tab 7).  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK; Ex. GG, Tab 7).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

<u>**D5421**</u>

<u>Finding #1</u>

**D5421 Finding #1– March 18 Letter Statement 1***: The submission references "Ex. A, Tab 9, §7.2.4.4 and Ex. B, Tabs 46-50, 52-56, 57-61."  We found no such references contained in the materials provided to CMS."*

**Theranos Response to Statement 1 – D5421 Finding #1:**  There was an inadvertent copying error for Exhibit I to the initial submission.  The laboratory has enclosed the applicable documents with this letter, as well as additional documents related to the

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                    THER-0534720
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

laboratory's broader analysis of the PT/INR test over the entire time it was run on this Siemens BCS XP instrument. (Ex. GG).

**D5421 Finding #1– March 18 Letter Statement 2**: *"The laboratory's submitted protocol (Ex. A, Tab 9, § 4.2) states: 'If the verification is performed by the vendor, the laboratory is involved in all aspects of the verification and the final verification documentation is reviewed and signed off by the Laboratory Director.' We were unable to determine what specific aspects of the method verification the laboratory would be performing or if vendors would continue to perform method verifications."*

**Theranos Response to Statement 2 – D5421 Finding #1:** The laboratory has further revised its method verification SOP to clarify that the procedure requires the laboratory to perform method verifications. To be clear, the vendor will not continue to perform method verifications. (Ex. BB, Tab 5 § 4.1.2).

**D5421 Finding #1– March 18 Letter Statement 2:** *"The submitted protocol included form CL FRM-00022-F1, Verification Results (Ex. A, Tab 9), which appears to be pre-signed by the laboratory director. We were unable to determine if the laboratory director will "review and sign off" on each method verification."*

**Theranos Response to Statement 2 – D5421 Finding #1:** The copy of CL FRM-00022-F1 included with the submission was not a pre-signed form. Rather, the laboratory director signed the version of the form attached to the revised method verification SOP simply to indicate that he approved of it as a new form that could be used. To eliminate any confusion or potential confusion caused by this way of approving forms, we have revised the lab's document control policy to make clear that forms attached to an SOP are part of the SOP, and therefore are approved when the lab director approves the SOP. (Ex. BB, Tab 1). Consistent with this revision, the enclosed copy of CL FRM-00022-F1 no longer has any signatures on it. (Ex. BB, Tab 5 F1).

**D5421 Finding #1– March 18 Letter Statement 3:** *"We note that in the laboratory's submission related to test performance specifications for the Advia XPT instrument, it was the laboratory's policy to accept %CV values that were up to 1.5 times the %CV values stated by the instrument manufacturer for any given chemistry analyte. In the submission, we found no explanation as to why 1.5 times the manufacturer's %CV was acceptable to the laboratory. We also note that the submitted re-verification of test performance specifications did not follow the submitted protocol for test verification; therefore, we could not determine if the re-verifications were adequate or how the laboratory determined if patients were affected or potentially affected."*

**Theranos Response to Statement 3 – D5421 Finding #1:** Prior to the survey, the laboratory did not employ a policy to accept %CV values that were up to 1.5 times the %CV values stated by the manufacturer, and the verification reports that CMS reviewed did not use 1.5 times the %CV stated by the manufacturer. Likewise, the laboratory's revised method

22
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534721



| | 1701 Page Mill Road | P 650.838.9292 | theranos.com |
| --- | --- | --- | --- |
| | Palo Alto, CA 94304 | F 650.838.9165 | |

verification procedure does not include a 1.5 times %CV policy. (Ex. BB, Tab 5).[9]  Rather, it requires that the laboratory verify the manufacturer's imprecision claim. (Ex. BB, Tab 5 § 8.2).  Training on the revised procedure has occurred. (Ex. BB, Tabs 5B-5C).  Additionally, there appears to have been a miscommunication because the laboratory **stopped** running tests on the Siemens Advia XPT on November 17, 2015, and has **not** run any tests on the instrument since then.  Accordingly, the laboratory has not re-verified any assay on the Siemens Advia XPT.  References to method verification data in documents enclosed with the submission are to verification reports prepared **before** the survey began and before the laboratory's revised procedures were made effective (those reports were either reviewed by CMS or available to CMS during the survey), which were referenced for context.

Finding #2

**D5421 Finding #2– March 18 Letter Statement 1:**  *"Although the laboratory's submitted protocol (Ex. A, Tab 9) included a method verification procedure which addressed verification of accuracy, precision, and reportable range, the laboratory provided no documentation showing that this protocol had been followed to re-verify performance specifications.  The submission also stated:  Before the lab resumes any test on the Advia XPT, the lab will ensure that the test has been re-verified pursuant to the lab's improved method verification procedures that have been approved by the laboratory director." The completion date for the correction of this deficiency was indicated on the submitted Allegation of Compliance as February 12, 2016, which, in order to determine correction, should include the re-verification documentation for the Advia XPT. However, the laboratory provided no documentation that the re-verification had been performed.  We note that in the laboratory's submission related to test performance specifications for the Advia XPT instrument it was the laboratory's policy to accept %CV values that were up to 1.5 times the %CV values stated by the instrument manufacturer for any given chemistry analyte. In the submission, we found no explanation as to why 1.5 times the manufacturer's %CV was acceptable to the laboratory.*

**Theranos Response to Statement 1 – D5421 Finding #2:**  Prior to the survey, the laboratory did not employ a policy to accept %CV values that were up to 1.5 times the %CV values stated by the manufacturer, and the verification reports that CMS reviewed did not use 1.5 times the %CV stated by the manufacturer.  Likewise, the laboratory's revised method verification procedure does not include a 1.5 times %CV policy. (Ex. BB, Tab 5).[10]  Rather, it requires that the laboratory verify the manufacturer's imprecision claim. (Ex. BB, Tab 5 §

---

[9] The laboratory referred to a 1.5 times %CV in its response based upon Bio-Rad's coefficient of variation rate.  (http://www.qcnet.com/Portals/50/PDFs/QCWorkbook2008_Jun08.pdf). Upon further review, the laboratory does not believe that Bio-Rad's coefficient of variation rate is applicable here.

[10] The laboratory referred to a 1.5 times %CV in its response based upon Bio-Rad's coefficient of variation rate.  (http://www.qcnet.com/Portals/50/PDFs/QCWorkbook2008_Jun08.pdf). Upon further review, the laboratory does not believe that Bio-Rad's coefficient of variation rate is applicable here.

23

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534722



<table>
<tr><td></td><td>1701 Page Mill Road</td><td>P 650.838.9292</td><td>theranos.com</td></tr>
<tr><td></td><td>Palo Alto, CA 94304</td><td>F 650.838.9165</td><td></td></tr>
</table>

8.2).   Training on the revised procedure has occurred.  (Ex. BB, Tabs 5B-5C).  Additionally, there appears to have been a miscommunication because the laboratory **stopped** running tests on the Siemens Advia XPT on November 17, 2015, and has **not** run any tests on the instrument since then.  Accordingly, the laboratory has not re-verified any assay on the Siemens Advia XPT.  References to method verification data in documents enclosed with the submission are to verification reports prepared **before** the survey began and before the laboratory's revised procedures were made effective (those reports were either reviewed by CMS or available to CMS during the survey), which were referenced for context.

**D5421 Finding #2– March 18 Letter Statement 2:**   *"We also found no explanation as how "normal patient distribution" related to determining if patients were affected or potentially affected."*

    **Theranos Response to Statement 2 – D5421 Finding #2:**  The laboratory has enclosed a revised analysis to clarify its examination of these patient test result distributions, which should eliminate the confusion created by the phrase "normal patient distribution."  (Ex. AA, Tab 5).

**D5421 Finding #2– March 18 Letter Statement 3:**   *"In addition, the laboratory's submission (Ex. B, various analyte tabs) states: "Matrix comparisons done by the manufacturer between serum and plasma showed correlation." No documentation was submitted supporting this statement."*

    **Theranos Response to Statement 3 – D5421 Finding #2:**  The laboratory has enclosed with this letter documentation supporting that matrix comparisons done by the manufacturer between serum and plasma showed correlation.  (Ex. HH, Tab 13).

**D5421 Finding #2– March 18 Letter Statement 4:**   *"The submission also states that "the lab has conducted training on these procedures to ensure that the practice is consistent with them," but the laboratory did not include complete training documentation to support this assertion."*

    **Theranos Response to Statement 4 – D5421 Finding #2:**  The laboratory's submission included training documentation for seven laboratory personnel. The laboratory has enclosed with this letter additional training documentation for the lab's method verification procedures. (Ex. BB, Tabs 5B-5C).

**D5421 Finding #2– March 18 Letter Statement 5:**   *"Because the laboratory has not shown whether it can follow its own validation protocols, it was uncertain whether the laboratory's quality assessment mechanisms could monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

    **Theranos Response to Statement 5 – D5421 Finding #2:**  As stated above, there appears to have been a miscommunication because the laboratory **stopped** running tests on the Siemens

24
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534723

theran⬡s

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

Advia XPT on November 17, 2015, and has **not** run any tests on the instrument since then. Accordingly, the laboratory has not re-verified any assay on the Siemens Advia XPT.

The laboratory is capable of ensuring that the deficient practice in D5421 does not recur. Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures. The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016. Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory. In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant. Dr. Tschirhart has over fifteen years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team. The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

## D5423

**D5423 – March 18 Letter Statement 1:** *"Although the laboratory's submitted protocol (Ex. A, Tab 9) included a method verification procedure which addressed verification of accuracy, precision, and reportable range, the laboratory provided no documentation showing that this protocol had been followed to re-verify performance specifications. The submission also stated: Before the lab resumes any test on the Advia XPT, the lab will ensure that the test has been re-verified pursuant to the lab's improved method verification procedures that have been approved by the laboratory director." The completion date for the correction of this deficiency was indicated on the submitted Allegation of Compliance as February 12, 2016, which, in order to determine correction, should include the re-verification documentation for the Advia XPT. However, the laboratory provided no documentation that the re-verification had been performed. We note that in the laboratory's submission related to test performance specifications for the Advia XPT instrument, it was the laboratory's policy to accept %CV values that were up to 1.5 times the %CV values stated by the instrument manufacturer for any given chemistry analyte. In the submission, we found no explanation as to why 1.5 times the manufacturer's %CV was acceptable to the laboratory."*

**Theranos Response to Statement 1 – D5423:** Prior to the survey, the laboratory did not employ a policy to accept %CV values that were up to 1.5 times the %CV values stated by the manufacturer, and the verification reports that CMS reviewed did not use 1.5 times the %CV stated by the manufacturer. Likewise, the laboratory's revised method verification procedure does not include a 1.5 times %CV policy. (Ex. BB, Tab 5).[11] Rather, it requires

---

[11] The laboratory referred to a 1.5 times %CV in its response based upon Bio-Rad's coefficient of variation rate. (http://www.qcnet.com/Portals/50/PDFs/QCWorkbook2008_Jun08.pdf). Upon

25
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534724



theran🔴s

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304    F 650.838.9165

that the laboratory verify the manufacturer's imprecision claim. (Ex. BB, Tab 5 § 8.2). Training on the revised procedure has occurred.  (Ex. BB, Tabs 5B-5C).  Additionally, there appears to have been a miscommunication because the laboratory **stopped** running tests on the Siemens Advia XPT on November 17, 2015, and has **not** run any tests on the instrument since then.  Accordingly, the laboratory has not re-verified any assay on the Siemens Advia XPT.  References to method verification data in documents enclosed with the submission are to verification reports prepared **before** the survey began and before the laboratory's revised procedures were made effective (those reports were either reviewed by CMS or available to CMS during the survey), which were referenced for context.

**D5423 – March 18 Letter Statement 2:**  *"We also found no explanation as how "normal patient distribution" relates to determining if patients were affected or potentially affected."*

**Theranos Response to Statement 2 – D5423:**  The laboratory has enclosed a revised analysis to clarify its examination of these patient test result distributions, which should eliminate the confusion created by the phrase "normal patient distribution."  (Ex. AA, Tab 5).

**D5423 – March 18 Letter Statement 3:**  *"The laboratory's procedure as well as the method verification for alkaline phosphatase was reviewed at the onsite survey and the reportable range was documented as 0 - 1100 IU/L thus modifying the test. At the time of survey, the laboratory stated that the reportable range was 10 - 1100 IU/L per the manufacturer, and that the reportable range of 0 - 1100 IU/L was an error. The laboratory confirmed that the lowest reportable value established by the manufacturer was 10 IU/L. The Patient Impact Analysis submitted by the laboratory at Ex. B, Tab 6 now indicates that the reportable range should be 5 - 1100 IU/L which is still lower than the range established by the manufacturer; however, the laboratory did not submit any documentation to support this new reportable range."*

**Theranos Response to Statement 2 – D5423:**  The "Patient Impact Analysis" submitted by the laboratory at Ex. B, Tab 6 of its submission included a typographical error.  As reflected in the revised patient assessment enclosed with this letter, the reportable range should be 12 – 909 U/L.  (Ex. AA, Tab 6).

**D5423 – March 18 Letter Statement 4:**  *"The Patient Impact Analysis also indicates that review of the PT showed a negative bias for PT samples CAP C-A 2015 and CAP-B 2015, but the laboratory determined that no corrected were needed. The submission also states: "There were no significant trends or bias in patient population data." The laboratory provided no explanations for these assertions."*

---

further review, the laboratory does not believe that Bio-Rad's coefficient of variation rate is applicable here.

26
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534725



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

**Theranos Response to Statement 4 – D5423:**  The laboratory's patient assessment analysis appears to have included an inadvertent copy and paste mistake.  The laboratory has enclosed its revised analysis.  (Ex. AA, Tab 2).

**D5423 – March 18 Letter Statement 5:**  *"In addition, the laboratory's submission states at Ex. B, Tab 6: "Matrix comparisons done by the manufacturer between serum and plasma showed correlation." The laboratory submitted no documentation supporting this statement."*

**Theranos Response to Statement 5 – D5423:**  The laboratory has enclosed with this letter documentation supporting that matrix comparisons done by the manufacturer between serum and plasma showed correlation.  (Ex. HH, Tab 13).

**D5423 – March 18 Letter Statement 6:**  *"The submission also states that "the lab has conducted training on these procedures to ensure that the practice is consistent with them," but did not include complete training documentation."*

**Theranos Response to Statement 6 – D5423:**  The laboratory's submission included training documentation on the method verification procedures for seven laboratory personnel.  The laboratory has enclosed with this letter additional training documentation for the lab's method verification procedures. (Ex. BB, Tabs 5B-5C).

**D5423 – March 18 Letter Statement 7:**  *"Because the laboratory has not shown whether it can follow its own validation protocols, it is uncertain whether the laboratory's quality assessment mechanisms could monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

**Theranos Response to Statement 7 – D5423:**  As stated above, there appears to have been a miscommunication because the laboratory **stopped** running tests on the Siemens Advia XPT on November 17, 2015, and has **not** run any tests on the instrument since then.  Accordingly, the laboratory has not re-verified any assay on the Siemens Advia XPT.

The laboratory is capable of ensuring that the deficient practice in D5423 does not recur. Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures. The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016.  Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory.  In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant.  Dr. Tschirhart has over fifteen years of experience as a clinical laboratory director, and is a valuable part of the

27
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                                    THER-0534726
Fed. R. Crim. P. 6(e) material

**theran⬡s**

1701 Page Mill Road    P 650.838.9292    theranos.com<br>Palo Alto, CA 94304    F 650.838.9165

laboratory's new leadership and oversight team.  The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

**D5429**

**D5429 – March 18 Letter Statement:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program.  However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted.  In the submission, the laboratory indicates that a 'tracer audit **may** [emphasis added [in the letter]] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

    **Theranos Response to Statement – D5429:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB Tab 7§ 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tab7B-C).

**D5437**

Findings #1 & #2

**D5437 Findings #1 & #2 – March 18 Letter Statement 1:** *"At the time of the onsite survey, the laboratory failed to maintain calibration documentation for the complete blood count (CBC) instruments. In the submission, we found no evidence the laboratory has re-established its calibration documentation for the CBC instruments."*

    **Theranos Response to Statement 1 – D5437 Findings #1 & #2:**  There appears to have been a miscommunication.  The laboratory **stopped** using its Siemens Advia 2120i instruments for clinical patient testing on November 17, 2015, and has **not** used them since then.  The two Drew-3 instruments were retired before the survey began on September 22, 2015 and before the laboratory's revised procedures were made effective.  Because the

28<br>TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION<br>EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                        THER-0534727<br>Fed. R. Crim. P. 6(e) material



1701 Page Mill Road     P 650.838.9292     theranos.com
Palo Alto, CA 94304     F 650.838.9165

laboratory's "CBC instruments" are not in use, the laboratory has not "re-established" calibration documentation for those instruments.

**D5437 Findings #1 & #2 – March 18 Letter Statement 2:**  *"In Ex. F, the laboratory provided lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports; however, the laboratory provided no documentation to indicate corrected reports were generated and issued."*

**Theranos Response to Statement 2 – D5437 Findings #1 & #2:**  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5437 Findings #1 & #2 – March 18 Letter Statement 3:**  *"To ensure appropriate and required calibration or QC corrective actions were taken, the laboratory indicated that quarterly audits will be performed and suggested that the audit results would be reviewed within the laboratory's QMPI Program.  However, the laboratory did not establish the procedure by which these quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program.  However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted.  In the submission, the laboratory indicates that a 'tracer audit **may** [emphasis added] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 3 – D5437 Finding #1 & #2:**

The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB Tab 7§ 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tab7B-C).

**D5437 Findings #1 & #2 – March 18 Letter Statement 4:**  *"In addition, we note that in the laboratory's re-verification of test performance specifications for the CBC instruments, it was the laboratory's policy to accept %CV values that were up to 1.5 times the %CV values stated by*

29

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION<br>EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                        THER-0534728
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*the instrument manufacturer for any given CBC analyte. In the submission, we find no explanation as to why 1.5 times the manufacturer's %CV is acceptable to the laboratory."*

**Theranos Response to Statement 4 – D5437 Finding #1 & #2:** Prior to the survey, the laboratory did not employ a policy to accept %CV values that were up to 1.5 times the %CV values stated by the manufacturer, and the verification reports that CMS reviewed did not use 1.5 times the %CV stated by the manufacturer.  Likewise, the laboratory's revised method verification procedure does not include a 1.5 times %CV policy.  (Ex. BB, Tab 5).[12]  Rather, it requires that the laboratory verify the manufacturer's imprecision claim. (Ex. BB, Tab 5 § 8.2).  Training on the revised procedure has occurred.  (Ex. BB, Tabs 5B-5C).  Additionally, there appears to have been a miscommunication because the laboratory stopped running tests on the Siemens Advia 2120i instruments on November 17, 2015, and has not run any tests on the instruments since then.  The laboratory has retired its two Drew-3 instruments.  Accordingly, the laboratory has not re-verified any assay on "the CBC instruments."  References to method verification data in documents enclosed with the submission are to verification reports prepared **before** the survey began and before the laboratory's revised procedures were made effective (those reports were either reviewed by CMS or available to CMS during the survey), which were referenced for context.

### D5447

**D5447 – March 18 Letter Statement 1:**  *"Although the laboratory's submitted protocol indicates that a two-level QC slide review is now required every day of patient testing when using the Cellavision, the laboratory provided no documentation of or information about the QC materials used, how the statistical parameters of the QC materials would be determined, how QC test results will be documented, and whether laboratory staff has been trained on this new protocol."*

**Theranos Response to Statement 1 – D5447:**  The laboratory has revised the Cellavision SOP to include information about the QC materials used, how the statistical parameters of the QC materials would be determined, and how QC test results will be documented.  (Ex. BB, Tab 15 ).  However, this SOP is not presently in use, because the laboratory stopped using the Cellavision on November 17, 2015, and has not used the Cellavision since then.  Because the Cellavision is not in use, the laboratory has not conducted a training on this revised (but inactive) SOP.

---

[12] The laboratory referred to a 1.5 times %CV in its response based upon Bio-Rad's coefficient of variation rate.  (http://www.qcnet.com/Portals/50/PDFs/QCWorkbook2008_Jun08.pdf). Upon further review, the laboratory does not believe that Bio-Rad's coefficient of variation rate is applicable here.

30
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534729

**theran⬡s**

1701 Page Mill Road     P 650.838.9292     theranos.com
Palo Alto, CA 94304     F 650.838.9165

**D5447 – March 18 Letter Statement 2:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program.  However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted.  In the submission, the laboratory indicates that a 'tracer audit **may** [emphasis added [in the letter]] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

    **Theranos Response to Statement 2 – D5447:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB Tab 7§ 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tab7B-C).

**<u>D5449</u>**

**D5449 – March 18 Letter Statement 1:**  *"Although the laboratory's submitted protocol indicates that an external positive QC material would be included in each run of patient Chlamydia trachomatis/Neisseria gonorrhoeae (CT /NG) testing, the laboratory provided no documentation of the positive QC material used, how the statistical parameters of the positive QC material would be determined, how the positive QC test result will be documented, and whether laboratory staff has been trained on this new protocol."*

    **Theranos Response to Statement 1 – D5449:**  The laboratory has revised the CT/NG SOP to include information about the positive QC materials used, how the statistical parameters of the QC materials would be determined, and how QC test results will be documented.  (Ex. BB, Tab 16 § 9.1.5).  The relevant laboratory personnel have been trained on this protocol.  (Ex. BB, Tabs 16B-16C).

**D5449 – March 18 Letter Statement 2:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program.  However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted.  In the submission, the laboratory indicates that a 'tracer audit **may** [emphasis added [in the letter]] be used, but*

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534730



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would
be documented, and whether the results of a 'tracer audit' would be the information reviewed by
the QMPI Program."*

**Theranos Response to Statement 2 – D5449:**  The laboratory has revised its audit
procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).
Training on these procedures has occurred.  (Ex. BB, Tabs 8B-C).  The revised procedures
establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and
require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.
(Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to
cover the quality management systems; provide the protocol for quarterly audits; and require
that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex.
BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth
tracer and quarterly audits are reviewed, analyzed and presented based on findings and
analysis" during the QMPI Program meetings.  (Ex. BB Tab 7§ 7.5).  Training on the revised
QMPI procedures has occurred.  (Ex. BB, Tab7B-C).

<u>**D5469**</u>

<u>Finding #1</u>

**D5469 Finding #1 – March 18 Letter Statement 1:**  *"Although the laboratory's submitted
protocol indicates that the stated values of new commercially assayed CBC QC materials were
to be verified through parallel testing against QC materials in use, the laboratory provided no
documentation indicating that this protocol had been effectuated, no information as to how the
results of the parallel testing will be documented, and no information as to whether laboratory
staff has been trained on this new protocol."*

**Theranos Response to Statement 2 – D5469 Finding #1:**  D5469 Finding #1 relates to the
laboratory's "two Drew 3 instruments."  The laboratory's two Drew-3 instruments were
retired before the survey began on September 22, 2015.  Since the survey, there has not yet
been a need to perform parallel testing against QC materials in use because the laboratory has
not approached a QC lot change for the tests that are in use.  To ensure that there will not be
an issue with documentation of such parallel testing in the future, the laboratory has further
revised its procedures as to how the results of the parallel testing against QC materials in use
must be documented.  (Ex. BB, Tab 14 § 9).  The laboratory staff has been trained on this
documentation procedure.  (Ex. BB, Tabs 14B-C).

To ensure that there is not any confusion, we note that the Advia 2120i CBC SOP is inactive
(and is not in use) because the laboratory stopped using those instruments on November 17,
2015, and has not used them since then.

32
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                                                THER-0534731
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

**D5469 Finding #1 – March 18 Letter Statement 2:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

    **Theranos Response to Statement 2 – D5469 Finding #1:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB Tab 7§ 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tab7B-C).

<u>Finding #2</u>

**D5469 Finding #2 – March 18 Letter Statement 1:**  *"Although the laboratory's submitted protocol indicates that the stated values of new commercially assayed chemistry QC materials were to be verified through parallel testing against QC materials in use, the laboratory provided no documentation indicating that this protocol had been effectuated, no information as to how the results of the parallel testing will be documented, and no information as to whether laboratory staff has been trained on this new protocol."*

    **Theranos Response to Statement 1 – D5469 Finding #2:**  D5469 Finding #2 relates to the chemistry assays on the Siemens Advia 1800 and Siemens Advia XPT instruments.  The laboratory stopped using the Siemens Advia 1800 instruments before the survey began on September 22, 2015, and has not used them since then.  The laboratory stopped using the Siemens Advia XPT instrument on November 17, 2015, and has not used it since then.  Since the survey, there has not yet been a need to perform parallel testing against QC materials in use because the laboratory has not approached a QC lot change for the tests that are in use.  To ensure that there will not be an issue with documentation of such parallel testing in the future, the laboratory has further revised its procedures as to how the results of the parallel

33<br>TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION<br>EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534732



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

testing against QC materials in use must be documented.  (Ex. BB, Tab 14).  The current procedures include worksheets for how to document parallel testing. (Ex. BB, Tab 14 F1-F4). The laboratory staff has been trained on this documentation procedure.  (Ex. BB, Tabs 14B-14C).

**D5469 Finding #2 – March 18 Letter Statement 2:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

> **Theranos Response to Statement 2 – D5469 Finding #1:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB Tab 7§ 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tab7B-C).

## D5477

**D5477 – March 18 Letter Statement 1:**  *"The laboratory submitted no written procedure for the bacteriology media QC protocol, and no information as to whether laboratory staff has been trained on this new protocol."*

> **Theranos Response to Statement 1 – D5477:**  The laboratory has enclosed with this letter its written procedure for the bacteriology media QC protocol and documentation showing that the relevant personnel have been trained on it.  (Ex. BB, Tabs 4-4C).

**D5477 – March 18 Letter Statement 2:**  *"In Ex. L, Tab 8, the submission included a completed form titled 'Blood Agar 5% Quality Control Log sheet.'  We note that the entry for the media received on 1/18/16 indicates that QC testing of this bacteriology media was completed on 1/14/16, which is before the date the media was received by the laboratory. Yet, as documented*

34
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534733



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*on the form, the completed form was reviewed on 2/11/16 without any indication this entry had been reviewed. We question the accuracy of this entry as well as the effectiveness of the laboratory's oversight mechanism."*

**Theranos Response to Statement 2 – D5477:**  CMS appears to have had difficulty reading the handwriting on the Blood Agar 5% Quality Control Log Sheet, confusing a handwritten "3" with an "8".  The "Blood Agar 5% Quality Control Log Sheet" states that the media was received on 1/13/16.  ((Ex. HH, Tabs 5A-5B). Therefore, there is no reason to question that accuracy of this entry because the log shows that the media was received the day before QC testing of this bacteriology media was completed.  For the same reason, the February 11, 2016 review of the completed form was performed correctly, and there is no reason to question the effectiveness of the laboratory's oversight mechanism.

**D5469 Finding #2 – March 18 Letter Statement 3:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 3 – D5469 Finding #2:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB Tab 7§ 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tab7B-C).

## D5481

### Finding #1

**D5481 Finding #1 – March 18 Letter Statement 1:**  *"The submission references 'Ex. I, Tabs 2-6.' We located these tabs, but found no documentation in Tabs 2, 5, and 6."*

35
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                      THER-0534734
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

**Theranos Response to Statement 1 – D5481 Finding #2:** There was an inadvertent copying error for Exhibit I to the initial submission. The laboratory has enclosed the applicable documents with this letter, as well as additional documents related to the laboratory's broader analysis of the PT/INR test over the entire time it was run on this Siemens BCS XP instrument. (Ex. GG).

**D5481 Finding #1 – March 18 Letter Statement 2:** *"Although the laboratory's submitted protocol requires that QC values be acceptable prior to reporting patient results, the submission states: 'Theranos reviewed all quality control (QC) data for PT/INR [Prothombin Time/International Normalized Ratio] for the time period that this lot of Dade Innovin was in use.' The laboratory provided no documentation of this review other than stating it was performed.*

**Theranos Response to Statement 2 – D5481 Finding #1:** The laboratory has revised its patient assessment analysis for PT/INR, which is enclosed with this letter at Ex. AA, Tab 7. The revised assessment references supporting documentation identifying the time period that this lot of Dade Innovin was in use, as well as the QC data for that period. (Ex. AA, Tab 7; Ex. GG). That supporting documentation is also enclosed with this letter. (Ex. GG).

**D5481 Finding #1 – March 18 Letter Statement 3:** *We also found no documentation to indicate that the revised standard operating procedures (SOPS) have been effectuated. That is, we found no documentation of PT/INR QC failure investigations and corrective actions taken based on the revised SOPS."*

**Theranos Response to Statement 3 – D5481 Finding #1:** There appears to have been a miscommunication because the laboratory stopped running tests on the Siemens BCS XP, including PT/INR, on September 17, 2015, and has not run any tests on the instrument since then. Therefore, there have been no new QC failures for PT/INR to investigate or address through corrective action. The revised SOPs were implemented only after CMS identified the QC failures for PT/INR. The "review" discussed in the submission was simply intended to refer to the analysis conducted to address the deficiency identified by CMS. The issue addressed by the "review" — i.e., failing to document corrective action for QC fails for PT/INR — is the same issue identified by CMS in its deficiency, and thus did not constitute a new issue or occurrence.

**D5481 Finding #1 – March 18 Letter Statement 4:** *"In Ex. I, the laboratory provided lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were issued. We also note that the Patient Impact Assessment (Ex. I, Tab 1) states that "remedial action was taken on 9/25/15," but "corrected reports were issued beginning on 11/10/15 and completed on*

36
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534735



1701 Page Mill Road     P 650.838.9292     theranos.com
Palo Alto, CA 94304     F 650.838.9165

*11/12/15." There was no explanation as to why there was such a long period of time between the remedial action and issuing corrected reports.*

**Theranos Response to Statement 4 – D5481 Finding #1:**  All of these corrected reports for PT/INR, along with documentation confirming that they were sent, are enclosed with this letter.  (Ex. GG, Tab 7).  On September 22 or 23, CMS identified a number of issues related to PT/INR tests during the period April to September 2015.  The laboratory undertook a thorough investigation.  Given the number of issues to review, the investigation took time to complete properly.  Timeliness for proper completion of the investigation and associated corrective actions were also affected by the absence of a full-time, on-site laboratory director.  The laboratory subsequently hired its new lab director, Dr. Kingshuk Das, who is highly qualified and has extensive clinical laboratory experience.  As of March 14, 2016, Dr. Das joined Theranos on-site full-time at the Newark, California laboratory.  Additionally, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant.  Dr. Tschirhart has over fifteen years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team.

**D5481 Finding #1 – March 18 Letter Statement 5:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 5 – D5481 Finding #1:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB Tab 7§ 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tab7B-C).

37
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                                                THER-0534736
Fed. R. Crim. P. 6(e) material

**ER-1682**



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

Finding #2

**D5481 Finding #2 – March 18 Letter Statement 1:**  *"Although the laboratory submitted a QC protocol (Ex. A, Tab 9), the laboratory's submission did not include an updated protocol for QC specific to the Theranos Proprietary Devices."*

> **Theranos Response to Statement 1 – D5481 Finding #2:**  This aspect of the review appears to be based on a miscommunication because Theranos **retired** the TPS 3.5 in early-August 2015.

**D5481 Finding #2 – March 18 Letter Statement 2:**  *"The reference protocol states at §§ 8.1.9-8.1.10:*

> *'No instrument or test method can be used for the purpose of performing a test to report a result to a patient prior to having passed all required QC procedures at least once for the day on which the test is to be performed. It is the responsibility of all testing personnel to ensure this does not occur. Testing personnel must immediately take the appropriate action for all failed QC runs, refer to section 8.4.'*

*In addition, the laboratory's submission states:*

> *'To perform this analysis, systematic error was investigated using quality control (QC) data and patient distribution over time. The QC data was reviewed in Levey-Jennings plots and evaluated for bias trends. The patient data was summarized by plotting monthly means, monthly medians and monthly means ("average of normal" or AON) calculated from central 95% of values. In addition, random errors were evaluated by analysis of QC data. Namely, QC data was reviewed to identify >2SD failures and period of elevated CV. Namely, batches of 10 consecutive QC data points were analyzed and the CV was calculated for each QC level during this period. If the CV was >30%, then all patient results run during that time period will be voided. (Ex. E, Tab 1).'*

*The laboratory's response does not include an evaluation of unacceptable QC results or patients affected or potentially affected by the cited QC failures. It is not clear how evaluating aggregate patient (i.e., monthly means and medians) and QC (i.e., bias trends, >2SD, CV) data addressed specific days that the QC was unacceptable and patient results were reported.*

*The summary (Ex. E, Tab 1) included analytes tested on the Theranos Proprietary Device. We note that general statements such as, but not limited to, were included:*

- *'Monthly patient distribution variance were noted, but they could not be further substantiated by QC trends'*
- *'Patient results following a QC failure and during periods of high CV are being voided'*

38
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                            THER-0534737
Fed. R. Crim. P. 6(e) material

**theranos**

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

- *'Patient distribution and QC trends did not reveal significant trends.'*
- *'Potential biases observed in patient distributions were found to be insignificant relative to the normal reference intervals'*

*The laboratory's submission did not provide any explanation or documentation to support these statements."*

**Theranos Response to Statement 2 – D5481 Finding #2:**  This deficiency concerns the TPS 3.5, which was one of the Theranos proprietary technologies in use in 2014 and 2015.  The laboratory began phasing out the TPS 3.5 in December 2014, and it was **fully retired** in early-August 2015.

The laboratory values CMS's feedback, and takes it very seriously.  The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was fully retired in early-August 2015.  As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5.  The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures.  Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015.  As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015.  (Ex. AA, Tab 3).  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5481 Finding #2 – March 18 Letter Statement 3:**  *"The submission (Ex. E) includes a list of patient specimen accession numbers for which the laboratory "identified reports," but does not specify or include documentation to indicate whether corrected reports were generated and issued."*

**Theranos Response to Statement 3 – D5481 Finding #2:**  As indicated above, the laboratory has revised and broadened its analysis of this deficiency.  Based on that analysis, which is described above and in the attached documentation, the laboratory has, out of an extreme abundance of caution, voided all results reported for assays run on the TPS 3.5 in 2014 and 2015.  (Ex. AA, Tab 3).  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5775**

Finding #1

39
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534738



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

**D5775 Finding #1 – March 18 Letter Statement 1:**  *"In the submitted protocol, the laboratory states: 'To ensure all manual differentials performed are comparable, ... manual differentials will be compared annually amongst the competent staff....'  The laboratory provided no written procedure as to how "manual differentials will be compared annually.'  In addition, the regulation requires the laboratory to conduct such evaluations twice a year, not annually."*

    **Theranos Response to Statement 1 – D5775:**  The laboratory has revised the Cellavision SOP to include procedures for how manual differential will be compared and to require that the laboratory perform such evaluations twice a year.  (Ex. BB, Tab 15 § 9.1.4.2).  Please note, however, that this SOP is inactive because the laboratory stopped using the Cellavision on November 17, 2015, and has not used it since then.

**D5775 Finding #1 – March 18 Letter Statement 2:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

    **Theranos Response to Statement 2 – D5775 Finding #1:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB Tab 7§ 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tab7B-C).

<u>Finding #2</u>

**D5775 Finding #2 – March 18 Letter Statement 1:**  *"Although the laboratory submitted a method/instrument comparison protocol (Ex. A, Tab 28), we were unable to determine if the protocol was effectuated. In its submission, the laboratory states: 'The lab's technical supervisors and the quality system director will be responsible for ensuring that these*

40
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534739



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*procedures are followed.' However, the laboratory's submission did not include any
documentation to indicate that the technical supervisors or the quality systems director had been
trained on the method/instrumentation comparison protocols."*

**Theranos Response to Statement 1 – D5775 Finding #2:**  This deficiency concerns method
comparison for the TPS 3.5.  As indicated above, the TPS 3.5 was fully **retired** in early-
August 2015.  Before the survey began, the laboratory had **stopped** running the same test
using different methodologies or instruments, and the laboratory has **not** run the same test
using different methodologies or instruments since then.  As a result, the laboratory has had
no reason to use the method verification protocol that it included with the submission.
Although the laboratory does not have a need to use the revised method comparison protocol
at this time, it has trained its technical supervisors and quality director on it. (Ex. BB, Tabs
12-12C).

**D5775 Finding #2 – March 18 Letter Statement 2:**  *"The laboratory's submission also
includes the following statement:*

> *Because TPS's [Theranos Proprietary Devices] were factory calibrated by Theranos,
> the laboratory did not perform additional method correlation studies. As part of this
> investigation, Theranos examined the correlation of different TPS to evaluate their
> concordance. Namely, for SHGB, TT3, Vitamin B12 and Vitamin D, patient
> distributions were compared across representative TPS's in use during the same
> period (Exhibit E Tab 12-A; Tab 24-A, Tab 33-A). These data showed similar patient
> distributions across the different devices. In addition, comparison of assay results
> across different assay levels and different TPS's demonstrates that the instruments
> were well correlated to each other (Exhibit E, Tab 12-A; Tab 24-A, Tab 33-A).
> Namely, the median result for each TPS was within the total allowable error thereby
> demonstrating that the same assay reference ranges were appropriate for TPS.*

*The laboratory's response indicates that not all TPS would be included in the correlation studies
rather 'across representative TPS in use during the same period.' The laboratory submitted
correlation studies for Sex Hormone Binding Globulin (SHBG) and Vitamin D (VitD) only (Ex E,
Tabs 12-A, 24-A and 33-A, respectively).  However, these studies did not include a date on either
the summary or raw data, so we were unable to determine when the correlation studies
occurred.  The submission for SHBG also included information on one document with box plots
that included three devices and another document that included box plots of six devices, so we
were unable to determine what devices were actually used for SHBG testing.*

*The laboratory's submission offered no response to correlation studies for Vitamin B12 and no
explanation for the disparity between the devices used for QC and the devices used for patient*

41
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                                              THER-0534740
Fed. R. Crim. P. 6(e) material

**ER-1686**



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

*testing. We also noted that there was no explanation as to where the total allowable error (TAE)
of 24% on the raw data documentation came from or if any TAE was calculated for the submitted
data. The laboratory used the median result for each proprietary device to determine if TAE was
acceptable, but did not provide an explanation why the median results were used."*

**Theranos Response to Statement 2 – D5775 Finding #2:**  This portion of CMS's March 18
letter concerns aspects of the patient assessment analysis for tests run on the TPS 3.5.  The
laboratory began phasing out the TPS 3.5 in December 2014, and it was **fully retired** in
early-August 2015.

As reflected in its submission, the laboratory believes oversight, implementation and
structure of its prior method comparison procedures were not satisfactory, which is why it
has developed the improved method comparison procedures that were included with the
submission.  The laboratory has further revised those procedures in response to other
feedback contained in CMS's March 18 letter.  (Ex. BB, Tab 12).  Training on these
procedures has occurred. (Ex. BB, Tabs 12B-12C).

The laboratory values CMS's feedback, and takes it very seriously.  The laboratory has
conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January
1, 2014 until the TPS 3.5 was **fully retired** in early-August 2015.  As explained further in the
attached patient assessment analysis, the laboratory is not satisfied with its old quality
assessment program's ability to effectively flag and promptly address QC imprecision, QC
failures, and QC trends on the TPS 3.5.  (Ex. AA, Tab 3).  The laboratory has new leadership
and a new QMPI Program with robust quality monitoring and program improvement
procedures.  Based on its re-review of QC data for the TPS 3.5, the laboratory has
determined that its prior QA program failed to satisfactorily address these types of QC issues
for assays run on the TPS 3.5 in 2014 and 2015.  As corrective action, the laboratory has, out
of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in
2014 and 2015.  (Ex. AA, Tab 3).  Many corrected reports have been transmitted, and the
remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31,
2016.  The remainder of the transmittals and confirmations of receipt will be provided to
CMS under separate cover.

**D5775 Finding #2 – March 18 Letter Statement 3:**  *"To ensure the deficient practice does not
recur, the laboratory indicated that quarterly audits will be performed and suggested that the
audits results would be reviewed within the laboratory's QMPI Program. However, the
laboratory did not establish the procedure by which these quarterly audits are to be conducted.
In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used,"
but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would*

42
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                             THER-0534741
Fed. R. Crim. P. 6(e) material



theranos

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

*be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5775 Finding #1:** audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

<u>**D5779**</u>

**D5779 – March 18 Letter Statement 1**: *"In Ex. F, the laboratory provided lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were issued."*

**Theranos Response to Statement 1 – D5779:** Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5779 – March 18 Letter Statement 2:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5779:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to

43
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                           THER-0534742
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road     P 650.838.9292     theranos.com
Palo Alto, CA 94304     F 650.838.9165

cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB Tab 7§ 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tab7B-C).

### D5787

**D5787 – March 18 Letter Statement 1:**  *"The laboratory submitted no written procedure for the documentation of the lot of bacteriology media used to test any given patient specimen, and no information as to whether laboratory staff has been trained on this new protocol."*

> **Theranos Response to Statement 1 – D5787:**  The laboratory has enclosed with this letter its written procedure for the documentation of bacteriology media QC protocol.  (Ex. BB, Tab 4 § 8.2).  The relevant laboratory personnel have been trained on that procedure, as reflected in the documentation enclosed at Ex. BB, Tabs 4B-4C.

**D5787 – March 18 Letter Statement 2:**  *"In its submission, the laboratory references Ex. L, Tab 6 which states: "When [media quality control] testing is completed the results are logged into an excel sheet with lot number and expiration date for each patient (see attached report)." We find no "attached report" in the submission and, therefore, no documentation indicating the laboratory's corrective action has been effectuated."*

> **Theranos Response to Statement 2 – D5787:**  The laboratory has effectuated its written bacteriology media QC protocol by logging each patient result into a separate excel worksheet that includes the lot number and expiration date for the bacteriology media lot used for that patient test.  We have enclosed examples of these excel spreadsheets, which show that the laboratory's corrective action has been effectuated.  (Ex. HH, Tab 6).

**D5787 – March 18 Letter Statement 3:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

> **Theranos Response to Statement 3 – D5787:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).

44

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534743



1701 Page Mill Road     P 650.838.9292     theranos.com
Palo Alto, CA 94304     F 650.838.9165

Training on these procedures has occurred.  (Ex. BB, Tabs 8B-C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB Tab 7§ 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tab7B-C).

**D5791**

Finding #1

**D5791 Finding #1 – March 18 Letter Statement 1:**  *"The laboratory submitted a protocol for the SensoScientific Monitoring in Ex. A, Tab 24. The response does not specifically address the days that the freezers did not meet acceptable temperatures as documented in the SensoScientific Monitoring Audit Node Log. We could not determine if the new procedure has been effectuated as no documentation was submitted to show that the unacceptable freezer temperatures were addressed.*

**Theranos Response to Statement 1 – D5791 Finding #1:**  The laboratory has effectuated its revised procedures for the SensoScientific Monitoring that were included with our initial submission.  Two examples of the current system monitoring are enclosed with this letter.  (Ex. II, Tabs 1A-1B).  First, on March 18, 2016, at about 11:00 a.m., the laboratory's Wi-Fi became temporarily inoperable.  All monitors went into failure mode and a down-time paper recording was initiated.  The Wi-Fi was brought back up and the system was restored by 6:00 p.m.  Data was reclaimed from the monitors for the period in question, and this failure was documented in the enclosed Alarm History and Corrective Action (Ex. II, Tab 1A) and the enclosed Occurrence Report Form.  (Ex. II, Tab 1B).  Second, on March 19, 2016, freezer 7063 failed a temperature check.  The low magnitude and brevity of the failure was below the alarm threshold.  (Ex. II, Tab 4).  The failure was detected and evaluated on a weekly review.  (Ex. II, Tab 4).  As it had corrected itself less than 30 minutes after it occurred, there was no need for further action.  (Ex. II, Tab 4).  This demonstrates that the procedure is being followed and temperatures are being adequately monitored.  In addition, as stated in above regarding D5413, the laboratory has also posted signs on the freezers pursuant to the new procedures, as reflected in the attached documentation.  (Ex. II, Tab 2).

45
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material                                                            THER-0534744



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

**D5791 Finding #1 – March 18 Letter Statement 2:** *In addition, the laboratory states that training has occurred, but it was not clear who should be trained as 'laboratory supervisor or designee' was not defined."*

> **Theranos Response to Statement 2 – D5791 Finding #1:** The laboratory has revised this procedure to clarify that "[i]t is the daily responsibility of the laboratory supervisor to monitor and record the temperatures of refrigerators and freezers and the temperature and humidity of each lab room and ambient storage space." (Ex. BB, Tab 13 § 4.5). The revised procedure is enclosed at Ex. BB, Tab. 13.

**D5791 Finding #1 – March 18 Letter Statement 3:** *"Training records provided in Ex. A, Tab 30 included only training documents for one general supervisor."*

> **Theranos Response to Statement 3 – D5791 Finding #1:** The laboratory has enclosed with this letter a complete set of training records on this SOP, which show that the relevant laboratory personnel have been trained. (Ex. BB, Tabs 13B-13C).

**D5791 Finding #1 – March 18 Letter Statement 4:** *"Several freezers were identified as 'not used in patient testing' (see Ex. N, Tab A); however, based on interviews during the onsite visit, these freezers were identified as being used for CLIA activities. The submission did not include a response or data related to the freezers identified as 'not used in patient testing.'"*

> **Theranos Response to Statement 4 – D5791 Finding #1:** D5791 #1 identifies the same six -20 C freezers and four -80 freezers as D5413. In the laboratory's submission, we explain that five of those freezers did not contain materials that would be used in the future for clinical patient testing. Rather, they only contained material that might be used in the future for research and development.

Based on CMS's March 18 letter, it appears that there was a miscommunication when the CMS surveyors were onsite. D5413, Paragraph f, states that CMS had a discussion about these freezers with the "Director of Assay Systems and technical supervisor at 11/19/15 at approximately 11 am." The Director of Assay Systems did not have any regular involvement with those freezers at that time and did not have knowledge of their contents. The "technical supervisor" in attendance on November 19, 2015 joined the company on October 26, 2015 (Ex. HH, Tab 8); he also did not have regular involvement with those freezers at the time and did not have knowledge of their contents. To the extent CMS understood either of these individuals to be confirming the contents of these freezers or whether these freezers were used in clinical patient testing, there was a miscommunication.

The laboratory has looked into this issue further, and has reconfirmed that the statements in the laboratory's submission are accurate. As reflected in the enclosed documentation:

- On November 19, 2015, there were four -20 C freezers in the microbiology or BUGS laboratory. 7061 BUGS -20 C Freezer 4 did **not** contain any materials for future use in clinical patient testing. (Ex. II, Tab 3B).

46
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                                    THER-0534745
Fed. R. Crim. P. 6(e) material

**theranos**

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

- On November 19, 2015, there was one -20 C freezer in the capillary laboratory. Clinical patient testing in the Normandy laboratory **stopped** on September 20, 2015, and there has **not** been any clinical patient testing in the Normandy laboratory since then. The 1 Normandy -20 C freezer 7066 did **not** contain any materials for future use in patient testing. (Ex. II, Tab 3C).

- On November 19, 2015, there were four -80 C freezers. 7098 -80 C Freezer 1 Nuair, 7111 -80 C Freezer 2 Thermo, and 7113 -80 2 CLIA Lab did not contain any materials for future use in clinical patient testing. While the last of those three freezers was named 7113 -80 2 CLIA Lab, it was only used to store old specimens that were not for future use in clinical patient testing. (Ex. II, Tab 3A)

**D5791 Finding #1 – March 18 Letter Statement 5:** *"The laboratory submitted an article for the use of Mean Kinetic Temperatures (MKT) (Ex. N, Tab 1). This article relates to the handling, storage, and distribution of temperature sensitive pharmaceuticals, not clinical laboratory specimens, reagents, reference materials, etc. We are unclear as to how this article applies to this deficient practice, and note that the written procedure submitted by the laboratory at Ex. A, Tab 24 does not incorporate monitoring temperature by MKT."*

**Theranos Response to Statement 5 – D5791 Finding #1:** Although the article is not critical to our analysis, it is relevant because it provides a specific rationale for understanding the chemical effects of brief increases (or decreases) in temperature on pharmaceuticals, and by extrapolation, on chemical controls. The conclusion of the article is that brief periods of temperature elevation have little effect on the rate of chemical degradation on the product being stored. While we do not recommend storing chemical control material in an unstable environment, the article gives reassurance that chemical control materials subjected to a short period of increased temperature by mistake are unlikely to be chemically degraded.

**D5791 Finding #1 – March 18 Letter Statement 6:** *"The laboratory also submitted an article related to the storage of bacterial samples for optimal viability (Ex. N, Tab 22). We note that the submitted written procedure relates to determining acceptable temperature viability of bacterial samples does not include any references to this article. We are unclear as to how this article applied to this deficient practice."*

**Theranos Response to Statement 6 – D5791 Finding #1:** This article is cited in the laboratory's revised patient assessment for this deficiency, which is enclosed with this letter. (Ex. AA, Tab 4). This article is relevant because it shows that bacterial samples will remain viable for 10 years at -80C and for 1-3 years at -20C.

**D5791 Finding #1 – March 18 Letter Statement 7:** *"The laboratory submitted no evidence to support the following conclusion for the Sanyo JP Lab 7059 -20 freezer: '[The laboratory]*

47
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534746



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*determined that higher storage temperature had no effect on the calibrators or controls stored in this freezer. There is no patient impact from the change in temperature during the time period.'"*

**Theranos Response to Statement 7 – D5791 Finding #1:**  The laboratory has revised its patient assessment analysis to provide more detail and documentation about its review of the effect this issue may have had on the Immulite controls stored in this freezer.  (Ex. AA, Tab 4).  Based on that review, the laboratory has voided certain test results.  (Ex. AA, Tab 4). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5791 Finding #1 – March 18 Letter Statement 8:**  *In addition, the laboratory stated for another freezer (1 BUGS 7120 -80 freezer) that the 'MKT remained between -70 and -86 C for the entire date range.' However, the laboratory indicated that "a small number of bacterial cultures ... labeled to be stored at -80C or colder" were stored in this freezer. It was unclear as to why it was appropriate to store 'bacterial cultures ... labeled to be stored at -80C or colder' to be stored at temperatures of -70C to -79C."*

**Theranos Response to Statement 8 – D5791 Finding #1:**  The temperature at which these bacterial cultures are stored is not determined by a manufacturer.  While the laboratory recognizes that it should have followed its procedures for maintaining the temperature of this freezer at -80C or colder, storage of these bacterial cultures at temperatures of -70C to -79C did not have the potential to affect patients receiving tests in 2014 and 2015.  Most importantly, these bacterial cultures can only be used in patient testing after there is growth, which occurs **after** the bacterial culture is removed from the freezer.  If there is no growth after the bacterial culture is removed from the freezer, then the culture is not viable and cannot be used in patient testing.  Therefore, the higher temperature of this freezer did not have any potential to affect patients, even if even it had caused a bacterial culture to be unviable.

It is also worth noting that the temperature of -70C to -79C should not have had an impact on the viability of these bacterial cultures, which were put in these freezers after the laboratory moved to the Newark facility in October 2014.  The laboratory labels bacterial cultures for storage at -80C or colder only because that allows for the longest period of viability, which is 10 years.  (Ex. II, Tab 26). However, bacterial cultures remain viable for 1-3 years when stored at -20C.  (Ex. II, Tab 26).

**D5791 Finding #1 – March 18 Letter Statement 9:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the*

48
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534747



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 9 – D5791 Finding #1:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

<u>Finding #2</u>

**D5791 Finding #2 – March 18 Letter Statement 1:**  *"The laboratory submitted a protocol for a Master Validation Plan (Ex. E, Tab 30B) which required the %CV of replicates to be not more than 20% (25% at the lower and upper limits of detection). The submitted protocol was different than the protocol presented to the surveyor at the time of the onsite survey which required the %CV of replicates to be not more than 15% (20% at the lower and upper limits of detection). The %CV in the protocol presented to the surveyor at the time of the onsite survey matched the %CV of the predicate devices. It is unclear as to why the TPS, which is covered by the Master Validation Plan, can now have %CV's for replicates greater than the predicate devices; no explanation was submitted. In addition, we note that the %CV's (18.7% - 63.8%) included in the submission does not appear to have been evaluated using this new protocol nor was it addressed in the laboratory's response provided at Ex. E, Tab 1."*

**Theranos Response to Statement 1 – D5791 Finding #2:**  This deficiency concerns the TPS 3.5.  As noted above, the TPS 3.5 was **fully retired** in early-August 2015.

With respect to these validation plans, there appears to have been a miscommunication. During the September 22-23, 2015 on-site visit, the laboratory understood that CMS had requested the validation plan for proprietary chemistry assays run on other Theranos technologies.  The laboratory did not realize that CMS believed this plan was also the

49
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                                THER-0534748
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

validation plan that applied to ELISA assays run on the TPS 3.5. After reviewing the Form 2567, we realized that there had been a miscommunication, which is why our submission included the ELISA Master Validation Plan.

As detailed above, the laboratory values CMS's feedback, and takes it very seriously. [13] The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was **fully retired** in early-August 2015. As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5. (Ex. AA, Tab 3). The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures. Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015. As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015. (Ex. AA, Tab 3). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5791 Finding #2 – March 18 Letter Statement 2:** *"The submission (Ex. E) includes a list of patient specimen accession numbers for which the laboratory "identified reports," but does not specify or include documentation to indicate whether corrected reports were generated and issued."*

**Theranos Response to Statement 2 – D5791 Finding #2:** As indicated above, the laboratory has revised and broadened its analysis of this deficiency and associated corrective actions. Based on that analysis, which is described above and in the attached documentation, the laboratory has, out of an extreme abundance of caution, voided all results reported for assays run on the TPS 3.5 in 2014 and 2015. (Ex. AA, Tab 3). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be

---

[13] In discussing establishment of precision for an LDT, the March 18 letter references a comparison of %CVs between an LDT and "predicate devices." We note, however, that CLIA regulations do not contain any regulation requiring that there be any correlation or equivalence of %CV between LDTs and predicate devices. Rather, the regulations require only that the precision for the test must be established for the LDT itself. 42 C.F.R. § 493.1253(b)(2). It also is generally accepted that accuracy is the only required performance specification that typically requires a correlation study. 42 C.F.R. § 493.1253(b)(2).

50
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534749



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

Finding #3

**D5791 Finding #3 – March 18 Letter Statement 1:**  *"The laboratory's review of the QC found in Ex. E, Tab 1 did not specify what period of QC the laboratory reviewed."*

**Theranos Response to Statement 1 – D5791 Finding #3:**  As indicated above, the laboratory's analysis covers the entire period in which each assay run on the TPS 3.5 was in use in 2014 and 2015.  (Ex. AA, Tab 3).

**D5791 Finding #3 – March 18 Letter Statement 2:**  *"The quality assessment (QA) documentation related to QC data from the survey in July 2014, October 2014, and February through June 2015. The laboratory's investigation did not indicate that the review had identified the cited issues related to QC."*

**Theranos Response to Statement 2 – D5791 Finding #3:**  The revised analysis enclosed with this letter makes clear that the laboratory identified the cited issues related to QC.  (Ex. AA, Tab 3).  The laboratory's review of QC in connection with the submission, as well as the re-review reflected in the enclosed revised analysis, included a review of imprecision, QC trends, and QC failures, including failures occurring where one of the two levels of control had a value of 2SD or greater.

**D5791 Finding #3 – March 18 Letter Statement 3:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 3 – D5791 Finding #3:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on

51
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534750



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

Finding #4

**D5791 Finding #4 – March 18 Letter Statement 1:**  *"Although the laboratory's submitted protocol included information about quarterly audits and agenda items for the laboratory's QMPI Program, the submission does not provide specific actions to take when problems are identified, specifically related to clotted specimens. The laboratory states in Ex. L, Tab 35 that "[p]atient specimens that did not meet the lab's acceptance criteria were rejected ... " However, the issue was not that the clotted specimens were rejected, rather that the laboratory's QA program did not identify the high number of clotted specimens over a period of three quarters. The submission does not include any documentation showing that the issue was identified and corrected. We note that Ex. A, Tab 12, §7.2.1.6 indicates that the QMPI Program agenda included specimen rejection rate partitioned by rejection criteria, but does not require that any action be taken based on this agenda item. In addition, we note that in Ex. A, Tab 12, §7.1, the laboratory provided the frequency of the QMPI Program meetings, but does not indicate any action should be taken in the event it is determined that the quality metrics were not met."*

**Theranos Response to Statement 1 – D5791 Finding #4:**  The laboratory has further revised its QMPI Program procedures to ensure that the QMPI Program identifies specimen rejection issues promptly.  (Ex. BB, Tab 7 § 7.2.3.1). The procedure requires that when analyzing specimen rejection and redraws, the QMPI team will "[i]dentify any corrective action to take based on data such as retraining or a procedure change." (Ex. BB, Tab 7 § 7.2.3.1.e)

**D5791 Finding #4 – March 18 Letter Statement 2:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5791 Finding #4:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tab 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a

52
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534751

**ER-1697**



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

<u>D5793</u>

<u>Finding #1</u>

The March 18 Letter states: *"See our reviews of D5403, D5437, D5469, and D5779."* Accordingly, we refer you to our responses to those reviews.

<u>Finding #2</u>

**D5793 Finding #2 – March 18 Letter Statement 1:** *In the submission, the laboratory states:*

> *Based on comprehensive review, multiple examples of failed QC without the appropriate documentation with no investigation or corrective action was identified which is now addressed with revised SOPS and training. Additional competency is on-going to ensure CLS demonstrate the required proficiency with quality control and the appropriate investigation, corrective action and notification.*

*We find no documentation to indicate that the 'revised SOPS' have been effectuated. That is, we find no documentation of cytometry QC failure investigations and corrective actions taken based on the 'revised SOPS' as discovered while conducting the 'comprehensive review.'"*

**Theranos Response to Statement 1 – D5793 Finding #2:** There appears to have been a miscommunication here because the laboratory **stopped** running tests on the flow cytometer before the survey began on September 22, 2015, and **has** not run any tests on the instrument since then. Because the flow cytometer is not in use, and has not been in use since the survey began, there has not been any new QC failures that required investigation or corrective action under the laboratory's new procedures. The "review" discussed in the submission was simply intended to refer to the analysis conducted to address the deficiency identified by CMS. The issue addressed by the "review" — i.e., failing to document corrective action for QC fails for the Fortessa and Canto — is the same issue identified by CMS in its deficiency, and thus did not constitute a new issue or occurrence.

**D5793 Finding #2 – March 18 Letter Statement 2:** *In Ex. J, the laboratory provided lists of patient specimen accession numbers for which the laboratory intended to issue corrected test*

53<br>TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION<br>EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                    THER-0534752
Fed. R. Crim. P. 6(e) material



| | |
|---|---|
| | 1701 Page Mill Road   P 650.838.9292   theranos.com |
| | Palo Alto, CA 94304   F 650.838.9165 |

*reports. The laboratory provided no documentation to indicate corrected reports were generated and issued.*

**Theranos Response to Statement 2 – D5793 Finding #2:** Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5793 Finding #2 – March 18 Letter Statement 3:** *"To ensure the deficient practice did not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 3 – D5793 Finding #2:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

Finding #3

**D5793 Finding #3 – March 18 Letter Statement 1:** *"In the submission, the laboratory states:*

- *'07/16/2015: Level 3 QC outside manufacturer's recommended range, and not repeated, therefore level 3 QC was out of control for the day'*
- *'09/01/2015 to 09/13/2015: all level 3 control results are outside the manufacturer's recommended range (negative bias)'*
- *'10/01/2015 - 10/31/2015: all level 3 control results are outside the manufacturer's recommended range (negative bias)'*
- *'All 3 levels of QC were not run on 11/04/2015, 11/05/2015, 11/07/2015, 11/08/2015, 11/09/2015, 11/10/2015, 11/12/2015, 11/14/2015, and 11/15/2015' [The laboratory*

54
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534753



| | 1701 Page Mill Road | P 650.838.9292 | theranos.com |
| | Palo Alto, CA 94304 | F 650.838.9165 | |

*provided no information as to whether patient HCG specimens were tested on the November dates listed.]*

*Yet, the laboratory concluded: 'Results for urine HCG are quantitative with a cut off of 30 mUI/ml. Because of the nature of this assay no correct reports are required.'*

*Since QC failures may indicate possible test system problems and it is unknown as to how the HCG (human chronic gonadotropin) test results were used and interpreted, we question the laboratory's conclusion and the accuracy and reliability of any patient HCG test results reported on the July, September, October, and November dates listed."*

**Theranos Response to Statement 1 – D5793 Finding #3:**  The laboratory has conducted a further review of this data and has revised its patient assessment analysis, as reflected in the enclosed documentation.  (Ex. AA, Tab 8).

**D5793 Finding #3 – March 18 Letter Statement 2:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5793 Finding #3:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

<u>Finding #4</u>

**D5793 Finding #4 – March 18 Letter Statement 1:**  *"In the submission, the laboratory states:*

- *'Anti-HBs is a qualitative assay with a positive cutoff of 11 so no corrected reports are*

55<br>
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION<br>
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534754

**theranos**

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

*required.'*
- *'Qualitative assay will not require corrected reports to be issued'*

*We are unclear as to how the laboratory came to these conclusions and the submission does not contain any documentation to support these statements."*

**Theranos Response to Statement 1 – D5793 Finding #4:**  The laboratory has conducted a further review of this data and has revised its patient assessment analysis, as reflected in the enclosed documentation.  (Ex. AA, Ex. 9).

**D5793 Finding #4 – March 18 Letter Statement 2:**  *"Nevertheless, to ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5793 Finding #4:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

Finding #5

**D5793 Finding #5 – March 18 Letter Statement 1:**  *"In the submission, the laboratory states: 'Corrected [LH] reports to be sent for patient samples analyzed for the following time period: 7/1/2015-7/8/2015; all patient samples analyzed in 8/2015 and 9/2015.' However, later in the submission, the laboratory concluded that '[b]ased on this review, 0 corrected reports are being issued.' From these conflicting statements, it is unclear whether the laboratory addressed patient outcomes. The laboratory provided no documentation to indicate that corrected LH (luteinizing hormone) patient reports were issued."*

56
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                              THER-0534755
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

**Theranos Response to Statement 1 – D5793 Finding #5:**  The laboratory's patient assessment analysis for this finding appears to have included an inadvertent copy and paste mistake.  The laboratory has enclosed its revised analysis, which explains why it has issued corrected reports for certain patients having the potential to be affected.  (Ex. AA, Tab 10). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5793 Finding #5 – March 18 Letter Statement 2:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5793 Finding #5:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

Finding #6

**D5793 Finding #6 – March 18 Letter Statement 1:**  *"In the submission, the laboratory states:*

-   *"All patient results reported> 472 U/ml will need corrected reports."*
-   *"Based on this review, 122 corrected [CA-125] reports are being issued to reflect the verified reportable range."*

*The laboratory provided no documentation to indicate corrected reports were generated and issued.*

57
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                                    THER-0534756
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road     P 650.838.9292     theranos.com
Palo Alto, CA 94304     F 650.838.9165

**Theranos Response to Statement 1 – D5793 Finding #6:**  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5793 Finding #6 – March 18 Letter Statement 2:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5793 Finding #6:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

Finding #7

**D5793 Finding #7 – March 18 Letter Statement 1:**  *"The submission references "Ex. H, Tabs 1, 2 – 5, 16, 17 – 20, 21, 22 – 25, 26, 27 – 30, 36, 37 – 40,46, 47 – 50, 56, and 57 – 60." We found no such references in the materials provided to CMS."*

**Theranos Response to Statement 1 – D5793 Finding #7:**  The citation references to Ex. H, Tabs 1, 2 – 5, 16, 17 – 20, 21, 22 – 25, 26, 27 – 30, 36, 37 – 40,46, 47 – 50, 56, and 57 – 60 were inadvertent transcription errors, and the inclusion of these blank tabs in the materials was an inadvertent copying error.

**D5793 Finding #7 – March 18 Letter Statement 2:**  *"Throughout Ex. H, the submission includes lists of patient specimen accession numbers for which the laboratory intended to issue*

58
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534757



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*corrected test reports. The laboratory provided no documentation to indicate corrected reports were generated and issued."*

**Theranos Response to Statement 2 – D5793 Finding #7:**  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5793 Finding #7 – March 18 Letter Statement 3:**  *"We found no information addressing how the laboratory will ensure the timely review of the effectiveness of any actions taken. Although the laboratory indicated that quarterly audits will be performed to ensure compliance with this deficient practice, it is unclear how quarterly audits will timely address the issues cited under this deficiency.  Nevertheless, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 3 – D5793 Finding #7:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

<u>Finding #8</u>

**D5793 Finding #8 – March 18 Letter Statement 1:**  *"The submission references 'Ex. B, Tabs 51 and 53-55, and Ex. H, Tabs 1,2 - 5, 17 - 20, 26, 27 -30, 36, 37 - 40, 46, 47 - 50, 56, and 57 - 60.' We found no such references in the materials provided to CMS."*

**Theranos Response to Statement 1 – D5793 Finding #8:**  The citation references to Ex. B, Tabs 51 and 53-55, and Ex. H, Tabs 1,2 - 5, 17 - 20, 26, 27 -30, 36, 37 - 40, 46, 47 - 50, 56, and 57 - 60 were inadvertent transcription errors, and the inclusion of these blank tabs in the materials was an inadvertent copying error.

59

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                      THER-0534758
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

**D5793 Finding #8 – March 18 Letter Statement 2:**  *"The laboratory submitted a new QC procedure (Ex. A, Tab 1) which requires QC Pass/Fail Criteria. Specifically, Section 8.2.1.1.a - c. provides that QC must meet certain criteria as well as '... the required Westgard rule pass criteria.' Westgard rules included a "10x" rule for rejecting QC when 10 consecutive control measurements fall on one side of the mean. We note that on page 17 of 19 (Ex. A, Tab 6) in the updated protocol that the "10x" rule was included as part of the Westgard rules which the lab must follow. The lab provided no documentation indicating that the "10x" rule was evaluated as part of its review ...  Because the laboratory has not shown whether it can follow its own QC protocols, it is unclear whether the laboratory's quality assessment mechanisms can monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

> **Theranos Response to Statement 2 – D5793 Finding #8:**  The laboratory has extended this analysis to evaluate global quality control indicators, as reflected in the attached documentation.  (Ex. AA, Tab 11).  As a result of that analysis, the laboratory has voided additional results for certain chemistry assays.  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

The laboratory is capable of ensuring that the deficient practice in D5793 Finding #8 does not recur. Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures.  The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016.  Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory.  In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant.  Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team.  The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

**D5793 Finding #8 – March 18 Letter Statement 3:**  *"In Ex. B and Ex. H, the submission includes lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were generated and issued."*

> **Theranos Response to Statement 3 – D5793 Finding #8:**  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

60
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534759



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

Finding #9

**D5793 Finding #9 – March 18 Letter Statement 1:** *"The laboratory did not submit any documentation in the referenced exhibits related to an updated protocol for Alternative Assessment Procedures (AAP); therefore, we have concluded that the current protocol applies. The laboratory's submission did not include any documentation to explain why the laboratory did not follow its AAP protocol for the Theranos Proprietary System. Because the laboratory has not shown whether it can follow its own AAP protocols, it is unclear whether the laboratory's quality assessment mechanisms can monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

**Theranos Response to Statement 1 – D5793 Finding #9:**  There appears to have been a miscommunication.  The TPS 3.5 was **fully retired** in early-August 2015.  In addition, the laboratory **stopped** using its other LDTs, and does not have plans to resume using them as it transitions to compliance with FDA quality systems requirements for its LDTs and introduces next generation technologies.  Accordingly, the AAP protocol that was used for tests run on these instruments in 2014 and 2015 is not in use.

Furthermore, although alternative proficiency testing is not required for any test that is in use in the lab, the laboratory's revised proficiency testing procedure includes new procedures for alternative proficiency assessment. (Ex. BB, Tab 3 § 9.2.4).  These alternative proficiency assessment procedures were in the version of the proficiency testing procedure included with our submission, and are also in the revised proficiency testing procedure enclosed with this letter.  (Ex. BB, Tab 3).  Training on the revised proficiency testing procedure has occurred. (Ex. BB, Tabs 3B-3C). The QMPI procedures state that the "meeting standing agenda" includes a discussion of analytical quality metrics including proficiency testing results and overall performance. (Ex. BB, Tab 7 § 7.5.2.5).

The laboratory is capable of ensuring that the deficient practice in D5793 Finding #9 does not recur. Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures.  The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016.  Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory.  In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant.  Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team.  The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

61
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534760



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

<u>Finding #10</u>

**D5793 Finding #10 – March 18 Letter Statement 1:** *Ex. A, Tab 9 of the submission contains the protocol "Method Validation." Section 8.4 of this protocol, "Reference Intervals," states:*

> *The reference intervals are established from a selected reference population. Typically, when both decreased and increased levels are clinically significant, it is defined as the interval between and including the lower and upper reference limits of the studies population. This is calculated as the central 95 percentile of the population distribution where the lower and upper reference limits are demarcated as the 2.5th and 97.5th percentiles of the underlying distribution of values ... The reference intervals are used to establish expected level in health "normal" individuals. Values outside the reference range are considered "abnormal" or "high" or "low."*

*In Ex. E, Tab 1, the laboratory states:*

> *[The] laboratory director decided to use medical decision limits based on national consensus. Accordingly, the following decision limits were displayed on all lab reports for Vitamin D. As noted in CLSI EP28-A3, "when decision limits determined by national or worldwide consensus exist, these limits, rather than reference intervals should be reported.*

*In Ex. E of the submission, the laboratory provided the following "medical decision limits:"*

| | |
|---|---|
| *Deficiency:* | *<20.0 ng/mL* |
| *Insufficiency:* | *20.0 - 29.0 ng/mL* |
| *Sufficiency:* | *30.0 - 100.0 ng/mL* |
| *Possible Toxicity:* | *>100.0 ng/mL* |

*We were unclear as to the laboratory's definition of "medical decision limits." No definition of this phrase was found in Section 3 - Definitions of the "Method Validation" protocol. In addition, no reference to CLSI EP28-A3 was found in the submitted protocol. We also note that the submitted protocol does not include a reference to "medical decision limits" as a criterion for determining reference range.*

**Theranos Response to Statement 1 – D5793 Finding #10:** D5793 Finding #10 relates to the TPS 3.5. The TPS 3.5 was **fully retired** in early-August 2015. The laboratory's revised method verification procedure references a "medical decision level," which is defined in the procedure as "[t]he concentration of analyte in blood or bodily fluid sample being analyzed at which some medical action is indicated for proper patient care. There may be several medical decision limits for a given analyte." (Ex. BB, Tab 5 § 3.9). In addition, this revised

62
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534761



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

procedure references CLSI EP28-A3 (Ex. BB, Tab 5 § 10.6), which states:  "for some analytes, reference intervals have been replaced by ***decision limits [emphasis in original]***, established by national (or international) consensus.  As examples, consider cholesterol and glycated hemoglobin."  Training on the laboratory's revised method verification procedure has occurred.  (Ex. BB, Tabs 5B-5C).

**D5793 Finding #10 – March 18 Letter Statement 2:** *Since the laboratory provided no definition of "critical medical decision level," no information regarding the laboratory's disparity between the reference range (9.3 - 47.9 ng/mL) in the validation documentation and raw data reports, and no explanation as to how a Vitamin D level could be both normal and deficient or insufficient, it is unclear as to whether the laboratory has followed its own "Method Validation" protocol set forth at Section 8.4....  Because the laboratory has not shown whether it could follow its own validation protocols, it is unclear whether the laboratory's quality assessment mechanisms can monitor the laboratory's corrective actions and ensure this deficient practice does not recur.*

**Theranos Response to Statement 2 – D5793 Finding #10:**  D5793 Finding #10 concerns the TPS 3.5.  There appears to have been a miscommunication because the TPS 3.5 was **fully retired** in early-August 2015.  Accordingly, the laboratory has not re-validated any assay on the TPS 3.5.  References to validation data in documents enclosed with the submission are to validation reports prepared **before** the survey began and **before** the laboratory's revised procedures were made effective (those reports were either reviewed by CMS or available to CMS during the survey).

Because there is a national consensus for the decision levels for Vitamin D, the laboratory was correct in using the national consensus instead of a reference interval established through a validation study.  CLSI EP28-A3 states:  "for some analytes, reference intervals have been replaced by ***decision limits [emphasis in original]***, established by national (or international) consensus.  As examples, consider cholesterol and glycated hemoglobin."

The laboratory's revised method verification procedure references a "medical decision level," which is defined in the procedure as "[t]he concentration of analyte in blood or bodily fluid sample being analyzed at which some medical action is indicated for proper patient care. There may be several medical decision limits for a given analyte."  (Ex. BB, Tab 5 § 3.9).  In addition, this revised procedure references CLSI EP28-A3.  (Ex. BB, Tab 5 § 10.6).  Training on the laboratory's revised method verification procedure has occurred.  (Ex. BB, Tabs 5B-5C).

Additionally, the laboratory is capable of ensuring that the deficient practice in D5793#10 does not recur. Significantly, the laboratory has brought in an entirely new leadership team

63
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                    THER-0534762
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road  P 650.838.9292  theranos.com<br>Palo Alto, CA 94304  F 650.838.9165

that is directly involved with implementing and monitoring the laboratory's new procedures. The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016. Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory. In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant. Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team. The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

**D5793 Finding #10 – March 18 Letter Statement 3:** *"Throughout Ex. E, the laboratory provided a list of patient specimen accession numbers for which the laboratory 'identified reports,' but did not specify or submit documentation to indicate whether corrected reports were generated and issued."*

**Theranos Response to Statement 2 – D5793 Finding #10:** This deficiency concerns the TPS 3.5, which was one of the Theranos proprietary technologies in use in 2014 and 2015. The laboratory began phasing out the TPS 3.5 in December 2014, and it was **fully retired** in early-August 2015.

The laboratory values CMS's feedback, and takes it very seriously. The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was fully retired in early-August 2015. As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5. (Ex. AA, Tab 3). The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures. Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015. As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015. (Ex. AA, Tab 3). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

<u>**D5801**</u>

**D5801 – March 18 Letter Statement 1:** *"The submission references "Ex. I, Tabs 2-6." We located these tabs, but found no documentation in Tabs 2, 5 and 6."*

64<br>TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION<br>EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos          THER-0534763
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

**Theranos Response to Statement 1 – D5801:**  There was an inadvertent copying error for Exhibit I to the initial submission.  The laboratory has enclosed the applicable documents with this letter, as well as additional documents related to the laboratory's broader analysis of the PT/INR test over the entire time it was run on this Siemens BCS XP instrument.  (Ex. GG).

**D5801 – March 18 Letter Statement 2:**  *"In the submission, the laboratory states:*

> *Before PT/INR testing resumes, the lab will also prepare a revised assay-specific procedure for PT/INR to reinforce that the International Normalized Ratio (INR) must be calculated accurately prior to reporting patient test results. The relevant testing personnel will be required to demonstrate competency to ensure the practice is consistent with these procedures.*

*We note that the laboratory provided no documentation to indicate that the inaccurate calculations were reviewed or that INR calculation using different lot numbers of Dade Innovin were reviewed for accuracy. In addition, we found that the laboratory did not provide documentation to ensure that PT/INR results reported from calculations were, and would continue to be, accurate."*

**Theranos Response to Statement 2 – D5801:**  As noted above, the laboratory **stopped** running PT/INR tests on the Siemens BCS XP on September 17, 2015, and has **not** run any PT/INR tests since then.  The laboratory has reviewed the inaccurate calculation and has reviewed the INR calculations for different lot numbers of Dade Innovin that were used with this Siemens BCS XP instrument from the time it was put in use in October 2014.  As a result of this review, the laboratory has determined that certain INR calculations for prior lots were not accurate because the laboratory did not use the correct MNPT and ISI figures for those calculations.  Based on this finding and other findings in the revised PT/INR patient assessment that is enclosed with this letter, the laboratory has voided all PT/INR results reported from October 2014 through September 2015.  (Ex. AA, Tab 7).  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

The laboratory is capable of ensuring that the deficient practice in D5801 does not recur. Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures.  The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016.  Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory.  In addition, the laboratory has hired

65
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                    THER-0534764
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant.  Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team.  The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

**D5801 – March 18 Letter Statement 2:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5801:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

**<u>D5805</u>**

**D5805 – March 18 Letter Statement 1:**  *"The submission references "Ex. I, Tabs 2-6." We located these tabs, but found no documentation in Tabs 2, 5 and 6."*

**Theranos Response to Statement 1 – D5805:**  There was an inadvertent copying error for Exhibit I to the initial submission.  The laboratory has enclosed the applicable documents with this letter, as well as additional documents related to the laboratory's broader analysis of the PT/INR test over the entire time it was run on this Siemens BCS XP instrument.  (Ex. GG).

**D5805 – March 18 Letter Statement 2:**  *In its submission, the laboratory states: 'The lab revised its patient reports during the survey so that the interpretive note appears only under the*

66
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534765



|  | 1701 Page Mill Road   P 650.838.9292   theranos.com |
|  | Palo Alto, CA 94304   F 650.838.9165 |

*heading for patients with therapy.' However, no updated forms were shown to the surveyor during the survey and the laboratory's submission does not include documentation of the updated reports.*

**D5805 – March 18 Letter Statement 2:**  As indicated above, the laboratory performed a patient assessment for PT/INR tests run on this BCS XP instrument with reagent lots that were used prior to the reagent lot identified in CMS's Form 2567.  Based on that review, the laboratory has voided all PT/INR results from the time this BCS XP instrument was put in use in October 2014.  (Ex. AA, Tab 7).  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5805 – March 18 Letter Statement 3:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 3 – D5805:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

<u>**D5821**</u>

**D5821 – March 18 Letter Statement 1:**  *"The submission references "Ex. I, Tabs 2-6." We located these tabs, but found no documentation in Tabs 2, 5 and 6."*

67
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                                                      THER-0534766
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

**Theranos Response to Statement 1 – D5821:**  There was an inadvertent copying error for Exhibit I to the initial submission.  The laboratory has enclosed the applicable documents with this letter, as well as additional documents related to the laboratory's broader analysis of the PT/INR test over the entire time it was run on this Siemens BCS XP instrument.  (Ex. GG).

**D5821 – March 18 Letter Statement 2:**  *"In Ex. I, the laboratory provided lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were issued. "We also note that the Patient Impact Assessment (Ex. I, Tab 1) states that 'remedial action was taken on 9/25/15,' but 'corrected reports were issued beginning on 11/10/15 and completed on 11/12/15.' There was no explanation as to why there was such a long period of time between the remedial action and issuing corrected reports."*

**Theranos Response to Statement 2 – D5821:**  All of these corrected reports for PT/INR, along with documentation confirming that they were sent, are enclosed with this letter.  (Ex. GG, Tab 7).  On September 22 or 23, CMS identified a number of issues related to PT/INR tests during the period April to September 2015.  The laboratory undertook a thorough investigation.  Given the number of issues to review, the investigation took time to complete. Completion of the investigation was also hindered by the absence of a highly qualified, full-time laboratory director.  The laboratory subsequently hired its new lab director, Dr. Kingshuk Das, who is highly qualified and has extensive clinical laboratory experience.  As of March 14, 2016, Dr. Das joined Theranos full-time at the Newark, California laboratory.

**D5821 – March 18 Letter Statement 3:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5821:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8). Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require

68
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534767



| | |
|---|---|
| | 1701 Page Mill Road   P 650.838.9292   theranos.com |
| | Palo Alto, CA 94304   F 650.838.9165 |

that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

### D6076

The March 18 Letter states: *"See our reviews of D6083, D6085, D6086, D6093, D6094, D6098, and D6102."*  Accordingly, we refer you to our responses to those reviews.

### D6079

The March 18 Letter states that "[b]ased on the laboratory's submission, this requirement is met."

### D6083

The March 18 Letter states: *"See our reviews of D5413 and D5791."*  Accordingly, we refer you to our responses to those reviews.

### D6085

The March 18 Letter states: *"See our review of D6115."*  Accordingly, we refer you to our responses to your review of D6115.

### D6086

**D6086 Finding #1—March 18 Letter Statement 1:** *"The submission references 'Ex. A, Tab 9, F-1' and "Ex. A, Tab 10, F-1.' We found no such references in the materials provided to CMS."*

> **Theranos Response to Statement 1 in D6086 Finding #1:** The citation references to Ex. A, Tab 9, F-1 and Ex. A, Tab 10, F-1 were inadvertent transcription errors and should not have been included.

**D6086 Finding #1 – March 18 Letter Statement 2:** "*Throughout Ex. E, Tab 1, the laboratory provided lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were generated and issued.*"

> **Theranos Response to Statement 2 in D6086 Finding #1:** This deficiency concerns the TPS 3.5, which was one of the Theranos proprietary technologies in use in 2014 and 2015.  The laboratory began phasing out the TPS 3.5 in December 2014, and it was **fully retired** in early-August 2015.

69
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534768



| | |
|---|---|
| | 1701 Page Mill Road    P 650.838.9292    theranos.com |
| | Palo Alto, CA 94304    F 650.838.9165 |

The laboratory values CMS's feedback, and takes it very seriously. The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was fully retired in early-August 2015. As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5. (Ex. AA, Tab 3). The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures. Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015. As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015. (Ex. AA, Tab 3). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D6086 Finding #1 – March 18 Letter Statement 3:** *We found no information addressing how the laboratory will ensure the accurate review of test method validation documentation, the issue cited in the deficiency.*

    **Theranos Response to Statement 3 in D6086 Finding #1:** The TPS 3.5 was **fully retired** early-August 2015, and the laboratory is **not** using any LDTs.

    The laboratory has revised its method verification procedure to show how it will ensure the accurate review of test method verification documentation. (Ex. BB, Tab 5). As set forth in the revised procedures, the laboratory director is responsible for reviewing both the verification plan and the verification report. (Ex. BB, Tab 5 § 4.1). "The method verification procedure requires multiple reviews to include Quality to ensure protocols are followed." (Ex. BB, Tab 7 § 7.1.3.3).

    <u>Finding #2</u>

**D6086 Finding #2—March 18 Letter Statement 1:** *"The submission references 'Ex. H, Tabs 1, 2-5, 16, 17 - 20, 21, 22 - 25, 26, 27 - 30, 36, 37 - 40, 46, 47 - 50, 56, and 57 - 60.' We found no such references in the materials provided to CMS."*

    **Theranos Response to Statement 1 in D6086 Finding #2:** The citation references to Ex. H, Tabs 1, 2-5, 16, 17 - 20, 21, 22 - 25, 26, 27 - 30, 36, 37 - 40, 46, 47 - 50, 56, and 57-60 were inadvertent.

70

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos        THER-0534769
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road      P 650.838.9292    theranos.com
Palo Alto, CA 94304      F 650.838.9165

**D6086 Finding #2—March 18 Letter Statement 2:** *"Ex. H contains lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were generated and issued."*

**Theranos Response to Statement 2 in D6086 Finding #2:**  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK)  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D6086 Finding #2—March 18 Letter Statement 3:** *"At the time of the onsite survey, the laboratory's protocol 'Master Validation Plan for Routine Chemistry Assays on Theranos Devices,' stated: '... for establishing the trueness or comparability to two procedures. . .at least 50% of samples should be outside the reference interval.' For five validation documents (ALT, BUN, calcium, glucose, and sodium testing using the Advia 1800), a review of the test results used by the laboratory to establish 'the trueness or comparability of two procedures' showed that the laboratory did not follow its established protocol and use "at least 50% of samples ... outside the reference interval.  The submission includes the protocol 'Method Validation,' at Ex. A, Tab 9, Section 8.1.1.1 ('A method comparison and bias estimation design'), which states: 'If the analyte has a critical medical decision level, at least 50% of the specimens must have analyte levels below this value and the remaining 50% above.' We are unclear as to the laboratory's definition of 'critical medical decision level.' No definition of this phrase was found in Section 3 - Definitions of the "Method Validation" protocol or in Ex. H."*

**Theranos Response to Statement 3 in D6086 Finding #2:**  D6086 Finding #2 relates to the chemistry assays on the Siemens Advia 1800 instruments.  The laboratory **stopped** using the Siemens Advia 1800 instruments before the survey began on September 22, 2015, and has **not** used them since then.

The laboratory's revised method verification procedure references a "medical decision level," which is defined in the procedure as "[t]he concentration of analyte in blood or bodily fluid sample being analyzed at which some medical action is indicated for proper patient care." There may be several medical decision limits for a given analyte."  (Ex. BB, Tab 5 § 3.9).  In addition, this revised procedure references CLSI EP28-A3 (Ex. BB, Tab 5 § 10.6), which states:  "for some analytes, reference intervals have been replaced by *decision limits [emphasis in original]*, established by national (or international) consensus.  As examples, consider cholesterol and glycated hemoglobin." Training on the laboratory's revised method verification procedure has occurred.  (Ex. BB, Tabs 5B-5C).

**D6086 Finding #2—March 18 Letter Statement 4:** *"In Ex. H of the submission, the laboratory provided the following 'assay validation' summary:*

71
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                          THER-0534770
Fed. R. Crim. P. 6(e) material

**theranos**

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

| Analyte | Number of Specimens Used | Specimen Value Range |
|---------|--------------------------|----------------------|
| ALT | 128 | 12-62 |
| BUN | 128 | 9-21 |
| Calcium | 128 | 9.2 -10.2 |
| Glucose | 128 | 65 - 142 |
| Sodium | 128 | 134 -142 |

*Since the laboratory provided no definition of 'critical medical decision level' and no information regarding the laboratory's panic or alert values for ALT, BUN, calcium, glucose, and sodium testing, it is unclear as to whether the laboratory has followed its own "Method Validation" protocol at Section 8.1.1.1. Because the laboratory has not shown whether it can follow its own validation protocols, it is unclear whether the laboratory's quality assessment mechanisms can monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

**Theranos Response to Statement 4 in D6086 Finding #2:** There appears to have been a miscommunication. The laboratory **stopped** using its Siemens Advia 1800 instruments for clinical patient testing before the survey began on September 22, 2015 and before the revised method verification procedures were effective, and has **not** used them since then. Accordingly, the laboratory has not re-validated any assay on the Siemens Advia 1800.

The laboratory's revised method verification procedure references a "medical decision level," which is defined in the procedure as "[t]he concentration of analyte in blood or bodily fluid sample being analyzed at which some medical action is indicated for proper patient care. There may be several medical decision limits for a given analyte." (Ex. BB, Tab 5 § 3.9). In addition, this revised procedure references CLSI EP28-A3 (Ex. BB, Tab 5 § 10.6), which states: "for some analytes, reference intervals have been replaced by *decision limits [emphasis in original]*, established by national (or international) consensus. As examples, consider cholesterol and glycated hemoglobin." Training on the laboratory's revised method verification procedure has occurred. (Ex. BB, Tabs 5B-5C).

The laboratory is capable of ensuring that the deficient practice in D6086 Finding #2 does not recur. Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures. The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016. Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory. In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant. Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team. The laboratory's new leadership team has installed an entirely redesigned QMPI

72

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534771



theranos

1701 Page Mill Road     P 650.838.9292     theranos.com
Palo Alto, CA 94304     F 650.838.9165

Program, as well as robust audit procedures that required monthly and quarterly audits. With respect to method verification, the procedure now includes appropriate criteria for accuracy, precision, and other pertinent performance characteristics, and requires the lab director to review both the verification plan and verification report to ensure adherence to the criteria in the procedure. (Ex. BB, Tab 5 §§ 7.7, 8).

Finding #3

**D6086 Finding #3—March 18 Letter Statement 1:** *"Ex. H contains lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were generated and issued."*

> **Theranos Response to Statement 1 in D6086 Finding #3:** Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D6086 Finding #3—March 18 Letter Statement 2:** *"At the time of the onsite survey, for five validation documents reviewed (ALT, BUN, calcium, glucose, and sodium testing using the Advia 1800), laboratory summary information indicated that the laboratory obtained coefficient of variation (CV) results greater than CV's established by the instrument manufacturer. That is, ALT, BUN, calcium, glucose, and sodium test results obtained by the laboratory were statistically less precise than what would be expected using the Advia 1800. The laboratory provided no explanation for and no information pertaining to any investigation as to why the laboratory's test results were less precise. These validation documents were approved by the laboratory director as evidenced by his signature.  In Ex. H of the submission, the laboratory provided summary data for ALT, BUN, calcium, glucose, and sodium similar to the CV data reviewed at the time of the onsite survey. Again, the laboratory provided no explanation for and/or information pertaining to any investigation as to why the laboratory's test results were less precise. Because the laboratory has not shown whether its assay verification procedures are adequate to determine assay precision characteristics, we question whether the laboratory's quality assessment mechanisms can monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

> **Theranos Response to Statement 2 in D6086 Finding #3:**  D6086 Finding #3 concerns the laboratory's method for using capillary specimens to test for ALT, BUN, calcium, glucose and sodium using Advia 1800 instruments that the laboratory modified.  There appears to have been a miscommunication. The laboratory **stopped** using its Siemens Advia 1800 instruments for clinical patient testing before the survey began on September 22, 2015 and before the revised method verification procedures were effective, and has **not** used them

73
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534772



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

since then.  Accordingly, the laboratory has not re-validated any assay on the Siemens Advia 1800.

Additionally, the CV figures from the manufacturer's package insert are **not** relevant.  Under 42 C.F.R. § 1253(b)(1), a laboratory that "modifies an FDA-cleared or approved test system … must, before reporting patient results, establish for each test system the performance specifications for the following performance characteristics: (i) Accuracy, (ii) Precision, (iii) Analytical sensitivity, (iv) Analytical specificity to include interfering substances, (v) Reportable range of test results for the test system, (vi) Reference intervals (normal values), (vii) Any other performance characteristic required for test performance."  Under this regulation, the precision of an LDT is established solely by the laboratory.  These regulations do **not** require a laboratory to compare the CV it establishes for an LDT — including an LDT that is based on a modification to an FDA-cleared or approved test system — with the %CV of "the predicate device."  Likewise, there is nothing in 42 C.F.R. §1253(b)(1) that requires a laboratory to document why the CV that it has established for an LDT is different from the CV for "a predicate device."

Finding #4

**D6086 Finding #4—March 18 Letter Statement 1:** "*Ex. H contains lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were generated and issued.*"

> **Theranos Response to Statement 1 in D6086 Finding #4:** Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D6086 Finding #4—March 18 Letter Statement 2:** "*At the time of the onsite survey, for four validation documents reviewed (ALT, BUN, calcium, and glucose testing using the Advia 1800), laboratory summary information indicated that the reference range determined by the laboratory's testing differed from the reference range on the laboratory's test reports. The following was noted:*

| Analyte | Validation Document Reference Range | Test Report Reference Range |
|---|---|---|
| ALT | | 8-41 U/L |
| BUN | 0- 52 UIL | 6 - 24 mg/dL |
| Calcium | 5.3 - 22.5 mg/dL | 8.3 - 10.6 mg/dL |
| Glucose | 8.18 -10.3 mg/dL | 73 - 99 mg/dL |
| | 64.0 - 112.3 mg/dL | |

74
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534773



theranos
1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*In Ex. H of the submission, the laboratory provided the following reference ranges, some of which were still different than what appeared on the laboratory's test reports:*

| Analyte | Reference Range |
|---------|-----------------|
| ALT | 8-41 U/L |
| BUN | 6.2 - 22 mg/dL |
| Calcium | 8.2 - 10.3 mg/dL |
| Glucose | 64 - 112 mg/dL |

*Since the laboratory did not provide copies of any updated test reports in its submission, we are unable to determine whether the laboratory has corrected this deficient practice. Because the laboratory has not shown whether it had corrected this deficient practice, we are also unable to determine whether the laboratory's quality assessment mechanisms can monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

**Theranos Response to Statement 2 in D6086 Finding #4:** As CMS observed in the Form 2567, the validation reports for these assays were dated in April 2015. These validated assays went live on April 22, 2015. The laboratory has issued corrected reports updating the reference ranges for ALT, Calcium, and BUN tests run on the Siemens Advia 1800 on or after April 2015. Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover. As noted above, the laboratory **stopped** running these tests on the Siemens Advia 1800 before the survey began on September, and has **not** run them since then.

The laboratory has not issued corrected reports for Glucose because the reference range used in patient reports was consistent with the national consensus, which was the correct range to use. As noted above, the revised method verification procedures enclosed with this letter references CLSI EP28-A3, which provides that when decision limits determined by national or worldwide consensus exist, these limits, rather than reference intervals should be reported. (Ex. BB, Tab 5 § 10.6).

The laboratory is capable of ensuring that the deficient practice in D6086 Finding #4 does not recur. Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures. The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016. Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory. In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant. Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight

75

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                    THER-0534774
Fed. R. Crim. P. 6(e) material

 theran⬤s

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

team.  The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

Finding #5

**D6086 Finding #5 – March 18 Letter Statement 1**:  *"The submission references 'Ex. G, Tabs 31, 34, 36, 39, 41, 44, 46, 49, 51, 54, 56, 61, 64, 66, and 69.' We found no documents within these tabs."*

**Theranos Response to Statement 1 in D6086 Finding #5:**  The citation reference to Ex. G, Tabs 31, 34, 36, 39, 41, 44, 46, 49, 51, 54, 56, 61, 64, 66, and 69 was an inadvertent transcription error, and the inclusion of these blank tabs in the materials was an inadvertent copying error.

**D6086 Finding #5 – March 18 Letter Statement 2:**  *"At the time of the onsite survey, the laboratory maintained no documentation showing that the validation documents for two Siemens Advia 2120i instruments had been reviewed and approved by the laboratory director.  In Ex. G of the submission, we again found no information to indicate the Siemens Advia 2120i validation documents have been reviewed and approved by the director. Because the laboratory has not shown whether it has corrected this deficient practice, we are also unable to determine whether the laboratory's QA mechanisms can monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

**Theranos Response to Statement 2 in D6086 Finding #5:**  There appears to be a miscommunication.  The laboratory **stopped** using its Siemens Advia 2120i instruments for clinical patient testing on November 17, 2015, and has **not** used them since then.  The laboratory does not intend to rely on those verifications to perform any tests on the Siemens Advia 2120i instruments in the future.  As described above, the laboratory has put in place mechanisms that will effectively monitor its corrective action and ensure that deficient practices do not recur.  With respect to method verification, the current procedures require the lab director to approve both the verification plan prior to the verification and the verification report.   (Ex. BB, Tab 5 § 7.7). "The method verification procedure requires multiple reviews to include Quality to ensure protocols are followed."  (Ex. BB, Tab 7 § 7.1.3.3).

The laboratory is capable of ensuring that the deficient practice in D6086 Finding #5 does not recur. Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures.  The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016.  Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory.  In addition, the laboratory has hired

76
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                          THER-0534775
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road     P 650.838.9292    theranos.com
Palo Alto, CA 94304     F 650.838.9165

Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant. Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team. The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

Finding #6

**D6086 Finding #6 – March 18 Letter Statement 1:** *"The submission references 'Ex. I, Tabs 2-6.' We located these tabs, but found no documentation in Tabs 2, 5, and 6."*

**Theranos Response to Statement 1 – D6086 Finding #6:** There was an inadvertent copying error for Exhibit I to the initial submission. The laboratory has enclosed the applicable documents with this letter, as well as additional documents related to the laboratory's broader analysis of the PT/INR test over the entire time it was run on this Siemens BCS XP instrument. (Ex. GG).

**D6086 Finding #6 – March 18 Letter Statement 2:** *"See our review of D5413."*

**Theranos Response to Statement 2 – D6086 Finding #6:** See the laboratory's response to your review of D5413.

**D6086 Finding #6 – March 18 Letter Statement 3:** *"Although the submitted protocol (Ex. A, Tab 31, § 8.1.2) included the requirement to review all new manufacturer package inserts and vendor notifications, the laboratory did not provide a response to the citation other than to state: 'Theranos did not have the documentation for the MNPT calculation done for lot #539280 in 3/2015 before it was put in use for patient testing.' It is unclear what investigation was performed to determine how the Mean Normal Prothrombin Time (MNPT) for Dade Innovin lot number 539280 was defined and entered into the Siemens BCS-XP."*

**Theranos Response to Statement 3 – D6086 Finding #6:** The lab personnel responsible for MNPT for PT/INR tests run on the Siemens BCS XP at the time that this Dade Innovin lot was put in use are no longer with the laboratory, which has limited the laboratory's ability to determine precisely what occurred. Based on the laboratory's investigation, it appears that the laboratory would determine the MNPT with the assistance of Siemens. Siemens would then send the laboratory a letter containing both the MNPT and the ISI for the lot. The laboratory would then be responsible for entering the MNPT and ISI numbers for the lot into the BCS XP. The laboratory appears to have not properly entered the MNPT and ISI numbers for this lot and the laboratory failed to have sufficient oversight to identify the problem when it occurred.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                                                THER-0534776
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

As noted above, the laboratory **stopped** running PT/INR tests on September 17, 2015, and has **not** run any PT/INR tests since then.  The laboratory is capable of ensuring that the deficient practice in D6086 Finding #6 does not recur.  Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures.  The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016.  Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory.  In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant.  Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team.  The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

**D6086 Finding #6 – March 18 Letter Statement 4:**  *"In its submission the laboratory states "training has occurred," however, training documentation provided in Ex. A Tab 32 did not include all testing personnel listed on the CMS-209 (Ex. L, Tab 1 )."*

**Theranos Response to Statement 4 – D6086 Finding #6:**  The training records for this SOP provided with the submission included all testing personnel listed on the CMS-209 who run tests in the laboratory.  Please note that Chi Nguyen is no longer a member of the CLIA laboratory (we will update our Form 209 accordingly), which is why she does not appear on any of the training documentation.  The enclosed training records reflect that all testing personnel listed on the CMS-209 have been trained on the laboratory's enhanced protocol requiring review of all new manufacturer package inserts and vendor notifications.  (Ex. BB, Tabs 14B-14D).

**D6086 Finding #6 – March 18 Letter Statement 5:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 5 – D6086 Finding #6:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer

78
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534777



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C)

### D6093

Finding #1

The March 18 Letter states: *"See our reviews of D5447, D5449, D5461, D5481, and D5779."*  Accordingly, we refer you to our responses to those reviews.

Finding #2

**D6093 Finding #2 – March 18 Letter Statement 1:**  The March 18 Letter states: *"See our reviews of D5481."*

> **Theranos Response to Statement 1 – D6093 Finding #2:**  We refer you to our response to your review of D5481.

**D6093 Finding #2 – March 18 Letter Statement 2:**  *"The submission references 'Ex. I, Tabs 2-6.' We located these tabs, but found no documentation in Tabs 2, 5, and 6."*

> **Theranos Response to Statement 2 – D6093 Finding #2:**  There was an inadvertent copying error for Exhibit I to the initial submission.  The laboratory has enclosed the applicable documents with this letter, as well as additional documents related to the laboratory's broader analysis of the PT/INR test over the entire time it was run on this Siemens BCS XP instrument.  (Ex. GG).

**D6093 Finding #2 – March 18 Letter Statement 3:**  *"The laboratory's submission did not include an explanation or documentation of an investigation regarding the adjustment of QC ranges."*

> **Theranos Response to Statement 3 – D6093 Finding #2:**  D6093#2, Paragraph k, states that "[o]n approximately 9/16/15, the laboratory adjusted the acceptable range for Citrol 3 to match the data" and that the "change was implemented without any investigation as to the reason for the shift in control values."  The laboratory **stopped** running PT/INR tests on September 17, 2015.  The laboratory's review of this issue has come to the same ultimate conclusion.  Under the laboratory's prior leadership and its old QA Program, the laboratory

79
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534778



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

changed the control values for PT/INR on September 16, 2015 without documenting a proper investigation, and in contrast to what is required by the laboratory's new procedures.  The laboratory's new leadership and new QMPI Program do **not** ascribe to this type of practice, as changes to QC values should not occur unless a full and documented investigation shows that the change is warranted.  The laboratory **stopped** PT/INR testing on September 17, 2015, thus limiting the potential effect that this change to control values could have.  The laboratory has not performed any PT/INR tests since September 17, 2015.  As indicated above, the laboratory has broadened its investigation of PT/INR tests to encompass the entire period during which this BCS XP instrument was in use, which was October 2014 through September 2015.  Based on that investigation, the laboratory has voided all PT/INR results reported during that period. (Ex. AA, Tab 7)  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK)  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D6093 Finding #2 – March 18 Letter Statement 4:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 4 – D6093 Finding #2:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8)  Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C)  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1)  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2)  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5)  Training on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C)

<u>D6094</u>

<u>Finding #1</u>

80
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                                          THER-0534779
Fed. R. Crim. P. 6(e) material

**theran⬡s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

The March 18 Letter states: *"See our reviews of D5391, D5393, D5791, and D5793."*
Accordingly, we refer you to our responses to those reviews.

Finding #2

The March 18 Letter states: *"See our reviews of D5413, D5481, D5801, D5805, and 5821."*
Accordingly, we refer you to our responses to those reviews.

**D6098**

The March 18 Letter states: *"See our review of D5805."*  Accordingly, we refer you to our
response to your review of D5805.

**D6102**

**D6102 – March 18 Letter Statement 1:**  *"The laboratory submitted protocols relating to testing
personnel training (Ex. A, Tab 16, §§ 4.5.3 and 6.4) which state the following:*

- *§ 4.5.3 'Testing personnel/trainee are responsible to ensure that training is properly
  documented using CL-FRM-03016-F4, Training Attendance Form, approved by the
  designated trainer and stored in the relevant binder.'*
- *§ 6.4 '… It is the responsibility of the trainee and trainer to ensure the SOP is accurate.'*

*However, the regulations require that the laboratory director, not the testing personnel, is
responsible for ensuring that prior to testing patient specimens, all personnel have the
appropriate training and have demonstrated that they can perform all testing operations to
provide and report accurate results."*

**Theranos Response to Statement 1 in D6102:**  The laboratory has revised its training and
competency procedures to clarify that the laboratory director has the responsibility to ensure
adherence to the Quality Management System, including the training and competency
procedures.  (Ex. BB, Tab 9 §§ 4.1, 4.7.6, 6.9.9.1).  Training on these procedures has
occurred.  (Ex. BB, Tabs 9B-9C).

**D6102 – March 18 Letter Statement 2:**  *"Training documentation submitted in Ex. A, Tab 11
only includes training on protocols related to testing personnel qualification requirements and
delegation of responsibilities, as well as job descriptions. The laboratory provided no
documentation or plan to train or retrain testing personnel on the Theranos Proprietary
Device."*

**Theranos Response to Statement 2 in D6102:**  There appears to have been a
miscommunication because the TPS 3.5 was **fully retired** before the survey began on
September 22, 2015.  Because the TPS 3.5 is not being used, and will not be used in the

81
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534780



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

future, the laboratory is not required to train or re-train personnel on tests that used to be run on that retired instrument.

**D6102 – March 18 Letter Statement 3:**  *"Training documents submitted in Ex. A, Tab 17 only addressed review of the document control and training and competency protocols, but did not include training or retraining documentation for personnel performing testing in the venipuncture lab nor did it include an investigation if patient were affected or potentially affected when untrained or partially trained testing personnel were performing patent testing."*

**Theranos Response to Statement 3 in D6102:**  The laboratory previously submitted training and competency documentation for all testing personnel as part of its response to D6124.  The laboratory has updated that documentation.  A list showing which testing personnel operate each instrument currently in use is enclosed.  (Ex. HH, Tab 9A).[14]  Current training and competency documentation for those testing personnel and those instruments is also enclosed.  (Ex. HH, Tab 9B).

D6102, paragraph a, concerns the personnel training documentation for the TPS 3.5.  The TPS 3.5 was **fully retired** in early-August 2015.  The laboratory values CMS's feedback, and takes it very seriously.  The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was fully retired in early-August 2015.  As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5.  (Ex. AA, Tab 3).  The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures.  Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015.  As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015.  (Ex. AA, Tab 3).  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

---

[14] Please note that Chi Nguyen, who is listed on the Form 209, is no longer a member of the CLIA laboratory (we will update our Form 209 accordingly), which is why she does not appear on any of the training documentation.

82
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                                    THER-0534781
Fed. R. Crim. P. 6(e) material

**theran⬤s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

As set forth in the attached analysis, the laboratory has enclosed training documentation for Testing Person #6 (TP6); Testing Person #11 (TP11); and Testing Person #31 (TP31).  (Ex. HH, Tabs 14, 15, 16).  The analysis of these training records is set forth in Ex. AA, Tab 12.

**D6102 – March 18 Letter Statement 4:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit **may** [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

> **Theranos Response to Statement 4 – D6102:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

**D6108**

The March 18 Letter states: *"See our review of D6115."*  Accordingly, we refer you to our response to your review of D6115.

**D6111**

The March 18 Letter states:  "Based on the laboratory's submission, this requirement is met."

**D6115**

**D6115 – March 18 Letter Statement 1:**  *"The laboratory submitted a protocol for a Master Validation Plan at Ex. E, Tab 30B which was a different protocol than presented to the surveyor. In Ex. E, Tab 1, under the Accuracy section, the submission indicates that 'some of the immunoassays on the TSP [Theranos Proprietary System] were 'calibrated' or 'corrected' to*

83
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534782



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

*remove systemic bias between the two methods.' It is not clear what specific biases were used for each analyte which used a corrected results or if the corrected or uncorrected results was reported.*

**Theranos Response to Statement 1 – D6115:** This deficiency concerns the TPS 3.5, which was one of the Theranos proprietary technologies in use in 2014 and 2015. The laboratory began phasing out the TPS 3.5 in December 2014, and it was **fully retired** in early-August 2015.

The laboratory values CMS's feedback, and takes it very seriously. The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was fully retired in early-August 2015. As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5. (Ex. AA, Tab 3). The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures. Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015. As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015. (Ex. AA, Tab 3). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D6115 – March 18 Letter Statement 2:** *In addition, the Accuracy section described that the "samples spanned the medical decision levels (MDL)". We are unclear as to the laboratory's definition of "medical decision limits." No definition of this phrase was found in Section 3 - Definitions of the "Method Validation" protocol or in Ex. E. We also note that the submitted protocol does not include a reference to "medical decision limits" as a criterion for determining accuracy.*

**Theranos Response to Statement 2 – D6115:** D6115 concerns the TPS 3.5. The TPS 3.5 was **fully retired** before in early-August 2015. References to method validation data in documents enclosed with the submission are to validation reports prepared **before** the survey began and before the laboratory's revised procedures were made effective (those reports were either reviewed by CMS or available to CMS during the survey), which were referenced for context. In addition, the laboratory has further revised its method verification procedure, which now has no reference to "critical medical decision limits." (Ex. BB, Tab 5).

84
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534783



theranos                                    1701 Page Mill Road    P 650.838.9292    theranos.com
                                            Palo Alto, CA 94304    F 650.838.9165

The laboratory's revised method verification procedure references a "medical decision level," which is defined in the procedure as "[t]he concentration of analyte in blood or bodily fluid sample being analyzed at which some medical action is indicated for proper patient care. There may be several medical decision limits for a given analyte." (Ex. BB, Tab 5 § 3.9). In addition, this revised procedure references CLSI EP28-A3 (Ex. BB, Tab 5 § 10.6), which states: "for some analytes, reference intervals have been replaced by *decision limits [emphasis in original]*, established by national (or international) consensus. As examples, consider cholesterol and glycated hemoglobin." Training on the laboratory's revised method verification procedure has occurred. (Ex. BB, Tabs 5B-5C).

**D6115 – March 18 Letter Statement 3:** *"We also note that the laboratory's submission provided no indication why the validation report for SHBG had an effective date of 7/14/14, but was not approved by the laboratory director until 9/19/15, even though patient testing began 7/28/14."*

**Theranos Response to Statement 3 – D6115:** This issue is similar to the issue addressed in the discussion above regarding D5407. As reflected by the Lab Director deficiencies identified by CMS, the prior lab directors did not provide sufficient oversight over the documents cited in D5407 and D6115. This appears to be one of the reasons why these documents were not timely reviewed and signed by the prior lab directors. In addition, the laboratory has found that its quality assurance oversight over these documents, including document control oversight, was not sufficient. The laboratory has hired a new lab director, who has approved enhanced document control policies and procedures to address this issue. (Ex. BB, Tab 1 §§ 5.1, 5.2, 5.3, 6.1, 6.2, 6.3). Training on those procedures has occurred. (Ex. BB, Tabs 1B-1C). The laboratory has also hired a Document Control Manager whose responsibilities include tracking new and revised policies and procedures to ensure that they are reviewed and approved by the lab director before they become effective. (Ex. HH, Tab 7C). In addition, the laboratory's revised QMPI Program procedures and agenda require review of procedures that are new, revised, or in process at monthly QMPI Program meetings. (Ex. BB, Tab 7 §§ 7.1, 7.5.6).

**D6115 – March 18 Letter Statement 4:** *The laboratory's submission in Ex. E, Tab 1 states:*

*The procedure and acceptance criteria outlined in the "Guidance for Industry: Bioanalytical Method Validation, 2001" document from FDA was followed to establish the analytical measurement range (AMR) (reportable range) for these immunoassays run on the TPS. Theranos did not follow the validation plan for immunoassays (ELISAs) as outlined in Master Validation Plan for ELISA Assays on Theranos Devices.*

85
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                THER-0534784
Fed. R. Crim. P. 6(e) material

**ER-1730**



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*The laboratory's response does not include a copy of the FDA protocol, and does not state in the submitted master validation protocol, CL PLN-14002, Rev. A, that the FDA protocol should be used to determine AMR.*

*The laboratory submitted a protocol for a Master Validation Plan at Ex. E, Tab 30B which requires the %CV of replicates to be not more than 20% (25% at the lower and upper limits of detection). The submitted protocol was different than the protocol presented to the surveyor at the time of the onsite survey which required the %CV of replicates to be not more than 15% (20% at the lower and upper limits of detection). The %CV in the protocol presented to the surveyor at the time of the onsite survey matched the %CV of the predicate devices. Based on the protocol submitted in the submission, it is unclear as to why the TPS, which is covered by the Master Validation Plan, can now have %CV's for replicates greater than the predicate devices. No explanation for the change in %CV was submitted. In addition, we noted that the information submitted in Ex. E, Tab 1 did not include a 20-day precision study as required by the submitted protocol.*

*The laboratory's submitted protocol requires that 120 samples be used to determine Reference Intervals (see Ex. E, Tab 30B), Ex. E, Tab 1 states:*

> *However, the validation plan noted that the reference range would be established with 120 samples per partition. However, the study followed CLSI procedure for transferring a reference range - the process by which one adapts a previously established reference range to a new analytical method. Furthermore, the transferred reference range was verified following CLSI guidelines - namely "the process by which one ensures, with reasonable confidence, using a relative small number of reference individuals (eg, n=20), that a reference interval established elsewhere, or transferred from another study, can be used locally.*

*We question the laboratory's procedure for "transferring a reference range" since the laboratory provided no reference document to support "transferring a reference range." We note that the submitted protocol does not state in Section 18, Reference Range, that the laboratory can "transfer" a reference range. It is unclear as to how the laboratory determined that the predicate method's reference range could be adapted or "transferred" to the Theranos Proprietary Devices, which used different methodology than the predicate method.*

**Theranos Response to Statement 4 – D6115:** D6115 concerns the TPS 3.5. The TPS 3.5 was **fully retired** in early-August 2015. In addition, the laboratory **stopped** using its other LDTs, and does not have plans to resume using them as it transitions to compliance with FDA quality systems requirements for its LDTs and introduces next generation technologies. Accordingly, neither the master validation plan for ELISA assays nor "*Guidance for*

86
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                    THER-0534785
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*Industry: Bioanalytical Method Validation, 2001"* are being used by the laboratory. The laboratory does not plan to use either of those documents, plans or procedures in the future.

The laboratory will ensure that all future validation plans are documented and supported in accordance with the laboratory's new quality systems and procedures. Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures. The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016. Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory. In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant. Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team. The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

The laboratory values CMS's feedback, and takes it very seriously. The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was **fully retired** in early-August 2015. As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5. (Ex. AA, Tab 3). The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures. Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015. As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015. (Ex. AA, Tab 3). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.[15]

---

[15] In discussing establishment of precision for an LDT, the March 18 letter references a comparison of %CVs between an LDT and "predicate devices." We note, however, that CLIA regulations do not contain any regulation requiring that there be any correlation or equivalence of %CV between LDTs and predicate devices. Rather, the regulations require only that the precision for the test must be established for the LDT itself. 42 C.F.R. § 493.1253(b)(2). It also is generally accepted that accuracy is the only required performance specification that typically requires a correlation study. 42 C.F.R. § 493.1253(b)(2).

87
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                                    THER-0534786
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road     P 650.838.9292     theranos.com
Palo Alto, CA 94304     F 650.838.9165

**D6115 – March 18 Letter Statement 5:**  *"The laboratory's submission does not indicate that the % Recovery and Allowable Bias citations had been addressed…. Because the laboratory has not shown that it can follow its own validation protocols, it is unclear whether the laboratory's quality assessment mechanisms could monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

**Theranos Response to Statement 5 – D6115:**  D6115 concerns the TPS 3.5.  The TPS 3.5 was **fully retired** in early-August 2015.  In addition, neither the master validation plan for ELISA assays nor the master validation plan for chemistry assays are being used by the laboratory.  The laboratory does not plan to use either of those documents, plans or procedures in connection with clinical testing in the future.

The laboratory values CMS's feedback, and takes it very seriously.  The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was fully retired in early-August 2015.  As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5.  (Ex. AA, Tab 3).  The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures.  Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015.  As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015.  (Ex. AA, Tab 3).  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

The laboratory is capable of ensuring that the deficient practice in D6115 does not recur.  Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures.  The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016.  Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory.  In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant.  Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team.  The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits. For

88
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534787



theranos                                     1701 Page Mill Road    P 650.838.9292    theranos.com
                                             Palo Alto, CA 94304     F 650.838.9165

example, § 8.1.1.3 of the method verification procedure lays out the requirements for a recovery design as part of an IVD verification.  (Ex. BB, Tab 5 § 8.1.1.3).

**D6115 – March 18 Letter Statement 6:**  *"Ex. E contains a list of patient specimen accession numbers for which the laboratory 'identified reports', but did not specify, or submit documentation to show that corrected reports were generated and issued."*

> **Theranos Response to Statement 6 – D6115:**  As described above, the laboratory has revised its patient assessment analysis based upon a thorough re-review of QC data for the TPS 3.5.  Based on that analysis, the laboratory has, out of an extreme abundance of caution, voided all results reported for assays run on the TPS 3.5 in 2014 and 2015.  (Ex. AA, Tab 3). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**<u>D6124</u>**

**D6124 – March 18 Letter Statement 1:**  *"Ex. A, Tab 16, § 7.3 of the submission contains a competency assessment protocol, Annual Competency. However, the protocol does not address the cited deficiency that direct observation was required for instrument maintenance and function checks. The protocol at § 1.1.7 (page 12) allows for a choice of validation method of which direct observation is one choice. The submitted laboratory protocol also requires the use of CL FRM 03016-F3 for annual competency. This form also allows the assessor to choose the validation method for competency assessment. Neither the submitted protocol nor the form to document competency assessment indicate that the six required procedures for CLIA competency assessment are required."*

> **Theranos Response to Statement 1 in D6124:**  The laboratory has revised its training and competency procedures to clarify that the performance of maintenance and function checks <u>must</u> be directly observed (Ex. BB, Tab 9 §§ 6.9.4.4, 9.1), and to expressly require each of the procedures required by 42 CFR § 493.1451(b)(8)(iv).  (Ex. BB, Tab 9 §§ 6.9.4).  Training on these procedures has occurred.  (Ex. BB, Tabs 9B-9C).

**D6124 – March 18 Letter Statement 2:**  *"Ex. L, Tab 4 of the submission states: 'All testing personnel currently performing tests have completed competency testing with direct observation of, among other things, maintenance and function checks for the tests they are performing.' We are unable to determine if the documentation is complete as there is no information submitted about which testing personnel were performing testing on which instrument(s). Because the laboratory has not shown that it has corrected this deficient practice, we are also unable to determine whether the laboratory's quality assessment mechanisms can monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

89
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                THER-0534788
Fed. R. Crim. P. 6(e) material



theranos                                                1701 Page Mill Road   P 650.838.9292   theranos.com
                                                        Palo Alto, CA 94304   F 650.838.9165

**Theranos Response to Statement 2 in D6124:**  The laboratory's submission included training and competency documentation for all testing personnel on the instruments they were operating at that time.  The laboratory subsequently made some minor staffing changes. A list showing which testing personnel operate each instrument currently in use is enclosed. (Ex. HH, Tab 9A).  Current training and competency documentation for those testing personnel and those instruments is also enclosed.  (Ex. HH, Tab 9B).  That documentation shows that all testing personnel have completed competency testing for the tests they are performing.  (Ex. HH, Tabs 9A-9B).

The laboratory is capable of ensuring that the deficient practice in D6124 does not recur. Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures.  The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016.  Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory.  In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant.  Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team.  The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

**D6170**

**D6170 – March 18 Letter Statement 1:**  *"Ex. J, Tab 46 contains lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were generated and issued."*

> **Theranos Response to Statement 1 in D6170:**  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D6170 – March 18 Letter Statement 2:**  *"The submission further states:*

- *"Based on comprehensive review, multiple examples of failed QC [quality control] without the appropriate documentation with no investigation or corrective action was identified which is now addressed with revised SOPS and training."*
- *"… the review identified multiple examples where technical service provided PM and that service was not documented in addition to failed QC run as part of the service which is now addressed with revised SOPs and training."*

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                    THER-0534789
Fed. R. Crim. P. 6(e) material



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*The laboratory provided no documentation of investigation or corrective action for these QC failures and lack of maintenance documentation."*

**Theranos Response to Statement 2 in D6170:** There appears to have been a miscommunication here because the laboratory **stopped** running tests on the Fortessa and Canto before the survey began on September 22, 2015, and has **not** run any tests on the instruments since then. Because the Fortessa and Canto instruments are not in use, and have not been in use since the survey began, there have not been any new QC failures or maintenance issues that required investigation or corrective action under the laboratory's new procedures. The "review" discussed in the submission was simply intended to refer to the analysis conducted to address the deficiency identified by CMS. The issue addressed by the "review" — i.e., failing to document corrective action for QC fails for the Fortessa and Canto — is the same issue identified by CMS in its deficiency, and thus did not constitute a new issue or occurrence.

**D6170 – March 18 Letter Statement 3:** *"Ex. A, Tab 10, § 5.10 states: 'Unlicensed laboratory personnel are responsible for performing the activities listed below, under direct and constant supervision by licensed test personnel, with strict adherence to regulatory requirements ...' California. The laboratory relied on its written policies and procedures to ensure that appropriately licensed testing personnel were performing and reporting patient test results. However, if the laboratory's policies and procedures are inconsistent with state requirements, we question whether this mechanism would prevent the deficient practice from recurring, and question the laboratory's document control system to ensure accurately written policies and procedures."*

**Theranos Response to Statement 3 in D6170:** The laboratory's policy does not permit unlicensed personnel to run patient tests, and the laboratory did not intend to imply otherwise. To eliminate any confusion or potential for confusion, however, the laboratory has revised this procedure to remove the language identified by CMS. (Ex. BB, Tab 6 § 5.10).

<u>**D6171**</u>

**D6170 – March 18 Letter Statement 1:** *"Ex. L, Tab 3 of the submission states: 'TP14 has been retrained to ensure that TP14 only performs activities within the scope of TP14's job description as a clinical laboratory associate, under the supervision of testing personnel. Because TP 14 is not testing personnel, the high complexity personnel educational requirements do not apply.' The CLIA job responsibilities in the job description provided at Ex. L, Tab 3 does include CLIA regulatory responsibilities for testing personnel, and as such TP14 was required to meet the educational requirements. The laboratory's submission does not provide any additional*

91
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534790



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*documentation that establishes that TP14 was qualified to perform high complexity testing. TP14 remains unqualified to perform high complexity testing.*

**Theranos Response to Statement 1 in D6170:**  The job description for TP14 has been revised to be consistent with the job description of a Clinical Laboratory Associate in the laboratory's revised personnel procedures.  (Ex. HH, Tab 7B).  The laboratory has confirmed that TP14 has not performed any test analyses between November 2015 and his execution of this revised job description.  (Ex. HH, Tab 7A).

**<u>D6178</u>**

**D6178 – March 18 Letter Statement 1:**  *"Ex. F contains lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were generated and issued."*

**Theranos Response to Statement 1 in D6178:**  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D6178 – March 18 Letter Statement 2:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit **may** [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D6178:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

92
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION<br>EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534791

theran⬤s

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

Sincerely,

Dr. Kingshuk Das
Laboratory Director
Theranos, Newark California Laboratory

93
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534792

# EXHIBIT 4

# Exhibit AA
# Response Letter, Patient Impact Summaries

# *March 28, 2016*

CMS2-164369

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

Case 5:18-cr-00258-EJD  Document 1134-5  Filed 11/08/21  Page 3 of 92

**theran⚙s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

March 28, 2016

**BY MESSENGER**

Ms. Karen Fuller
State Oversight and CLIA Branch
Division of Survey and Certification
Centers for Medicare and Medicaid Services
90 Seventh Street, Suite 5-300 (5W)
San Francisco, CA 94103-6707

Re:    **Response of Theranos, Inc. to the March 18, 2016 Letter From Karen Fuller To Dr.
Sunil Dhawan, Elizabeth Holmes, and Sunny Balwani (CLIA Number 05D2025714)**

Dear Ms. Fuller,

This letter provides Theranos, Inc.'s response to your letter of March 18, 2016. We respond to
each of the reasons why CMS found that our response to a specific deficiency was insufficient by
providing additional information and supporting documentation, which we believe demonstrate
that our Newark, California laboratory has come into Condition-level compliance and abated the
immediate jeopardy.

Based on the productive discussions we have had with Sarah Bennett and Gary Yamamoto about
your March 18 letter, this response aims to ensure that there are not any miscommunications
about important issues that we have learned were unclear to CMS from our initial submission. In
addition, this response reflects work that the laboratory, under the direction of its new leadership,
has done to address CMS's feedback, including, for example, performing thorough re-review of
data and further revising procedures.

As set forth in this detailed response and through the enclosed supporting documentation:

1. The laboratory has put in place new leadership, including a new full-time lab director and
   a new full-time clinical consultant, who is a co-director under California's regulations.
   The new laboratory director, Dr. Kingshuk Das, has been on-site full-time as of March
   14, 2016. He has extensive clinical laboratory experience, including as an Associate
   Medical Director of UCLA's Clinical Laboratories between August 2013 and March
   2016. The new clinical consultant, Dr. Don Tschirhart, has been on-site full-time as of
   March 14, 2016. He has over 15 years of experience as a hospital lab director.

2. The laboratory's new leadership firmly believes that the laboratory will be able to ensure
   the deficient practices will not recur through its robust new quality systems and through
   the intense oversight being provided by the laboratory's new quality monitoring and
   improvement program and new audit procedures. Indeed, the laboratory's new audit
   procedures require both monthly tracer audits of pre-analytic, analytic and post-analytic

1

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164370

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

Case 5:18-cr-00258-EJD   Document 1134-5   Filed 11/08/21   Page 4 of 92

# theran⊛s

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

processes and quarterly audits of the laboratory's quality systems. The results of these audits are then scrutinized at the laboratory's monthly QMPI Program meetings.

3. Many of the issues raised in your March 18 letter appear to be premised on CMS's belief that the laboratory is running a number of tests that it actually stopped running either before or during the survey, and has not run since. We have clarified this issue below, and have enclosed an instrument list indicating which instruments are in use.

4. The laboratory has undertaken aggressive corrective actions. For example, out of an extreme abundance of caution and based on its dissatisfaction with prior QA oversight, the laboratory voided all results reported for the assays run on the Theranos Proprietary System 3.5 (TPS) in 2014 and 2015 and all reported PT/INR tests run on the Siemens Advia BCS XP instrument that went into use in October 2014 through September of 2015.[1]

We believe that these considerable actions, when viewed together with the other information and documentation provided herein and in our initial submission, should leave no doubt that the Newark laboratory has come into Condition-level compliance and abated immediate jeopardy. For that reason, we submit that CMS should approve the laboratory's submission, and thereafter perform a revisit at which CMS will see that the laboratory's new leadership has implemented, enforced, and monitored the corrective actions.

We welcome further engagement with CMS on any of the information we have submitted to date, including the opportunity to address any questions or concerns CMS may have in real-time, in order to avoid any unnecessary delay or work for CMS and pursuant to our efforts to respond comprehensively to all issues raised by CMS.

## D2094

**D2094 – March 18 Letter Statement 1:** *"Some documents pertaining to this deficiency referenced in the submission were not included. Specifically, the submission references 'Ex. A, Tab 4, § 7.1.2.2.d.2.' We found no such reference contained in the materials provided to CMS. In addition, Exhibit (Ex.) O, Tab 2 states: 'The QC data are presented here: <Exhibit D Tab 7, Tab 8>.' We found no 'Tab 7' or 'Tab 8' in Ex. D."*

**Theranos Response to Statement 1 in D2094:** The citation reference to Ex. A, Tab 4, § 7.1.2.2.d.2 was an inadvertent transcription. The citation reference Ex. D, Tabs 7 and 8 were also inadvertent transcription errors, but the QC data were included in the initial submission in Exhibit O. We have enclosed another copy of that QC data for ALP with this letter at Ex. JJ, Tab 3B.

**D2094 – March 18 Letter Statement 2:** *"Although the laboratory's submitted protocol indicates that ungraded proficiency testing (PT) results will be evaluated, the submitted protocol*

---

[1] A list of all accessions for which corrected reports have been issued is enclosed herein in Exhibit MM.

2

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

Case 5:18-cr-00258-EJD Document 1134-5 Filed 11/08/21 Page 5 of 92

**theran☉s**

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9166

*does not explain how an investigation is performed and who must sign an investigation of ungraded PT samples."*

**Theranos Response to Statement 2 in D2094:** The lab has revised its proficiency testing procedure (i) to indicate the protocol used to evaluate ungraded proficiency testing (PT); (ii) to explain how an investigation of ungraded PT is performed; and (iii) to explain who must sign an investigation of ungraded PT samples. (Ex. BB, Tab 3). The revised procedure requires the laboratory to use its Proficiency Testing Investigation and Corrective Action form to investigate ungraded PT, which must be approved by the lab director . (Ex. BB, Tab 3§ 9.4, F-1). Training on this revised SOP has occurred. (Ex. BB, Tabs 3B-3C).

**D2094 – March 18 Letter Statement 3:** *"In the submission, the laboratory concludes:*

- *'Not enough patient data available for meaningful analysis'*
- *'No evidence of systemic errors'*
- *'No patient impact expected'*

*However, no information as to how the laboratory came to these conclusions related to patient outcomes was submitted. Documentation contained in in Ex. O, Tab 2 also compares the 'Range of Means' with no explanation as to what this refers to or how it correlates to the laboratory's ungraded results. The submission merely indicates that 'the lab has investigated this ungraded PT event for ALP [alkaline phosphatase] and has documented its investigation and conclusion."*

**Theranos Response to Statement 3 in D2094:** Pursuant to its revised proficiency testing procedure, the lab has documented its investigation of the ungraded ALP event for the 3rd event of 2014 using the Proficiency Testing Investigation and Corrective Action form. (Ex. JJ, Tab 3A). That documentation explains how the laboratory came to its conclusions related to patient outcomes. (Ex. JJ, Tab 3A). Additionally, the laboratory has revised and clarified its analysis, including by removing the phrase "Reference of Means." (Ex. JJ, Tab 3A).

**D2094 – March 18 Letter Statement 4:** *"Furthermore, a Quality Monitoring and Processing Improvement (QMPI), Program Meeting Agenda, CL FRM-00045-F1, that was submitted as part of Ex. A, Tab 13 and only includes PT for Alternative Proficiency Assessment (APA). Based on information included in the submitted agenda, all PT issues were not addressed as required in CL QOP-00045, Revision A (Ex. A, Tab 12) in Section 7.2.2.6 and 7.2.2.7."*

**Theranos Response to Statement 4 in D2094:** The lab has revised the QMPI Program procedures and meeting agenda to make clear that the agenda includes all PT issues as required in CL QOP-00045. (Ex. BB, Tab 7 § 7.5.2).[2]

**D2094 – March 18 Letter Statement 5:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not*

---

[2] Note, the prior version of the QMPI QOP that was included with the submission stated that QMPI Meetings would include a review of the "schedule" and "results" for "Proficiency Tests". (Ex. A, Tab 12, § 7.2.2.5).

3

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164372

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

theran⬡s

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

*establish the procedure by which these quarterly audits are to be conducted.  In the submission, the laboratory indicates that a 'tracer audit **may** [emphasis added] be used, but did not provided [sic] a protocol for a 'tracer audit.' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

> **Theranos Response to Statement 5 in D2094:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8 § 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 _ § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7§ 7.5).[3]  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

### D2128

**D2128 – March 18 Letter Statement 1:**  *"The submission references 'Ex. A, Tab 4, § 7.1.2.2.d.2.'  We found no such reference contained in the materials provided to CMS."*

> **Theranos Response to Statement 1 in D2128:**  The citation reference to Ex. A, Tab 4, § 7.1.2.2.d.2 was an inadvertent transcription error and should not have been included.

**D2128 – March 18 Letter Statement 2**  *"Although the laboratory's submitted protocol indicates that unsatisfactory PT results would be investigated using CL FRM-00006-F1, the laboratory provided no documentation showing that the required form was used to investigate the unsatisfactory PT result. The laboratory also states that the 'lab has investigated the one unacceptable challenge and documented its investigation and conclusions'; however, CL FRM-00006-F1 documenting the investigation was not submitted per the laboratory's protocol."*

> **Theranos Response to Statement 2 in D2128:**  We note that there was not an "unsatisfactory PT result" reported by the American Proficiency Institute for the "Blood Cell ID (Educational)" 2nd event of 2014, because this educational event was "Not Graded." (Ex. JJ, Tab 2).  Pursuant to its revised proficiency testing procedure, the laboratory has documented its investigation of this "Blood Cell ID (Educational)" 2nd event of 2014 that was "Not Graded" using the Proficiency Testing Investigation and Corrective Action form. (Ex. JJ, Tab 2).

---

[3] Note, the prior version of the QMPI Meeting Agenda that was included with the submission required a review of audit "Findings."  (Ex. A, Tab 12, § 9.)

4

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164373

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

# theran⊛s

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9185

Likewise, pursuant to its revised proficiency testing procedure, the laboratory has
documented its investigation of the one unacceptable challenge for the "Blood Cell ID
(Educational)" 2nd event of 2014 that was "Not Graded" using the Proficiency Testing
Investigation and Corrective Action form. (Ex. JJ, Tab 2A.)

**D2128 – March 18 Letter Statement 3:** *"In the submission, the laboratory concludes:*

- *'Not enough patient data available for meaningful analysis'*
- *'No evidence of systemic errors'*
- *'No patient impact expected'*

*However, no information as to how the laboratory came to these conclusions related to patient
outcomes was submitted. Documentation contained in Ex O, Tab 3 shows that the laboratory
received a passing score of 80% for blood cell identification." While this is true, the CLIA
regulations require that all unacceptable results have remedial action taken and that such
remedial action be documented. The submission does not contain evidence of remedial action."*

**Theranos Response to Statement 3 in D2128:** Pursuant to its revised proficiency testing
procedure, the laboratory has documented its investigation of the "Blood Cell ID
(Educational)" 2nd event of 2014 that was "Not Graded" using the Proficiency Testing
Investigation and Corrective Action form. (Ex. JJ, Tab 2). That documentation explains how
the laboratory came to its conclusions related to patient outcomes. (Ex. JJ, Tab 2).

Pursuant to its revised proficiency testing procedure, the laboratory has documented its
investigation of the one unacceptable challenge for "Blood Cell Identification" 2nd event of
2014 using the Proficiency Testing Investigation and Corrective Action form. (Ex. JJ, Tab
2A). That documentation explains how the laboratory came to its conclusions related to
patient outcomes. (Ex. JJ, Tab 2A).

**D2128 – March 18 Letter Statement 4:** *"To ensure the deficient practice does not recur, the
laboratory indicated that quarterly audits will be performed and suggested that the audits results
would be reviewed within the laboratory's QMPI Program. However, the laboratory did not
establish the procedure by which these quarterly audits are to be conducted. In the submission,
the laboratory indicates that a 'tracer audit may [emphasis added [in the letter]] be used, but
did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would
be documented, and whether the results of a 'tracer audit' would be the information reviewed by
the QMPI Program."*

**Theranos Response to Statement 4 in D2128:** The laboratory has revised its audit
procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8 §
8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised
procedures establish that tracer audits must occur monthly; provide the protocol for a tracer
audit; and require that tracer audits be documented using the tracer audit form, CL FRM
00046 F2. ( Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a
quarterly audit to cover the quality management systems; provide the protocol for quarterly
audits; and require that quarterly audits are documented using the audit record form, CL QOP
00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear

5

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164374

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

Case 5:18-cr-00258-EJD   Document 1134-5   Filed 11/08/21   Page 8 of 92

**theran☺s**

1701 Page Mill Road  P 650.838.9292  theranos.com
Palo Alto, CA 94304  F 650.838.9165

that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab 7B-7C).

### D5024:

The March 18 Letter states: *"See our reviews of D5403, D5437, D5447, D5469, D5481, D5779, and D5801."* Accordingly, we refer you to our responses to those reviews.

### D5217

**D5217 – March 18 Letter Statement 1:** *"Some documents pertaining to this deficiency referenced in the submission were not included. Specifically, the submission references 'Ex. A, Tab 4, § 7.1.2.2.d.2.' We found no such reference contained in the materials provided to CMS. In addition, Exhibit (Ex.) O, Tab 2 states: 'The QC data are presented here: <Exhibit D Tab 7, Tab 8>.' We found no 'Tab 7' or 'Tab 8' in Ex. D."*

> **Theranos Response to Statement 1 – D5217:** The citation reference to Ex. A, Tab 4, § 7.1.2.2.d.2 was an inadvertent transcription error and should not have been included. The citation reference Ex. D, Tabs 7 and 8 were also inadvertent transcription errors, but the QC data were included in the submission in Exhibit O. We have enclosed another copy of the QC data for Troponin with this letter at Ex. JJ, Tab 1C.

**D5217 – March 18 Letter Statement 2:** *"In the submission, the laboratory concludes:*

- *'Not enough patient data available for meaningful analysis'*
- *'No evidence of systemic errors'*
- *'No patient impact expected'*

*However, no information as to how the laboratory came to these conclusions related to patient outcomes was submitted.*

> **Theranos Response to Statement 2 – D5217:** The lab has revised its conclusions for the ungraded Troponin 2nd event of 2014; those conclusions are consistent with CMS's review in response to D5217 Statement 3 below. Pursuant to its revised proficiency testing procedure, the laboratory has documented its investigation and conclusion of the ungraded Troponin 2nd event of 2014 using the Proficiency Testing Investigation and Corrective Action form. Ex. JJ, Tab 1B). That documentation explains how the laboratory came to its conclusions related to patient outcomes. (Ex. JJ, Tabs 1A-1C).

**D5217 – March 18 Letter Statement 3:** *"The laboratory states in Ex. O, Tab 1 that no peer data was available for the Siemens Immulite 2000. Based on lack of a peer group, the laboratory should compare its results to 'All Participants' values for troponin. Review of the laboratory's values versus the 'All Participants' values shows that four of five of the laboratory's troponin values for the second proficiency testing event of 2014 were unacceptable when compared to the 'All Participants' acceptable ranges. It appears the laboratory reviewed all of the mean values for all peer, instrument and method groups in order to determine an*

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164375

CONFIDENTIAL Case 5:18-cr-00258-EJD Document 1134-5 Filed 11/08/21 Page 9 of 92 INFORMATION ACT

**theranos**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*inappropriate acceptable range for its samples based on data not related to the 'All Participants' values."*

**Theranos Response to Statement 3 – D5217:** Pursuant to its revised proficiency testing procedure, the laboratory has documented its investigation and conclusion of the ungraded Troponin 2nd event of 2014 using the Proficiency Testing Investigation and Corrective Action form. (Ex. JJ, Tab 1B). That documentation reflects the laboratory's revised investigation, analysis, and conclusions. (Ex. JJ, Tabs 1A-1C). Based on its investigation, the laboratory has concluded that its values versus the "All Participants" values show that four of five of the laboratory's troponin values for the second proficiency testing event of 2014 did not constitute passing values for this PT event. (Ex. JJ, Tabs 1A-1C). The enclosed documentation describes the investigation and remedial action taken to address the unacceptable values. (Ex. JJ, Tabs 1A-1C). As explained in that documentation, the laboratory has, out of an abundance of caution, issued corrected reports voiding all affected Troponin results. (Ex. JJ, Tab 1A). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5217 – March 18 Letter Statement 4:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In the submission, the laboratory indicates that a 'tracer audit **may** [emphasis added [in the letter]] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 4 – D5217:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

## D5311

**D5311 – March 18 Letter Statement 1:** *"The submission references 'Ex. A, Tab 4, 7.1.2.2.d.2.' We found no such reference contained in the materials provided to CMS."*

CONFIDENTIAL INFORMATION, COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164376

**ER-1747**

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

theran⊕s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

**Theranos Response to Statement 1 – D5311:** The citation reference to Ex. A, Tab 4, § 7.1.2.2.d.2 was an inadvertent transcription error and should not have been included.

**D5311 – March 18 Letter Statement 2:** *"The laboratory concluded that 'this issue is not likely to affect patients' because its mislabel error rate is comparable to published industry mislabel error rates. No other information related to possible patient outcomes was provided. Even though the laboratory's error rate may be comparable, the laboratory must still pursue any corrective action(s) for patients that may have been affected by this deficient practice."*

**Theranos Response to Statement 2 – D5311:** The laboratory has revised its patient impact assessment analysis and conclusions to address CMS's review. (Ex. AA, Tab 1). Among other things, the revised assessment shows that laboratory took corrective action in 2014 and 2015 for patients that may have been affected by offering a redraw and retest at no charge. (Ex. AA, Tab 1; Ex. HH, Tab 10).

**D5311 – March 18 Letter Statement 3:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In the submission, the laboratory indicates that a 'tracer audit **may** [emphasis added [in the letter]] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 3 – D5311:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

### D5391

Finding #1

**D5391 Finding #1 – March 18 Letter Statement 1:** *"The submission references 'Ex. A, Tab 4.' We found no such reference contained in the materials provided to CMS."*

**Theranos Response to Statement 1 – D5391 Finding #1:** The citation reference to Ex. A, Tab 4, § 7.1.2.2.d.2 was an inadvertent transcription error and should not have been included.

8

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164377

CONFIDENTIAL Case 5:18-cr-00258-EJD Document 1134-5 Filed 11/08/21 Page 11 of 92 ATION ACT

theran⌀s

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

**D5391 Finding #1 – March 18 Letter Statement 2:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In the submission, the laboratory indicates that a 'tracer audit **may** [emphasis added [in the letter]] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be reviewed by the QMPI Program."*

    **Theranos Response to Statement 2 – D5391 Finding #1:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

Finding #2

**D5391 Finding #2 – March 18 Letter Statement 1:** *"The submission references 'Ex. A, Tab 18, § 3.7.1,' and 'Ex. A, Tab 23, §§ 7.14, 7.15, 8.6.1, 8.6.4, 8.6.5.' We found no such reference contained in the materials provided to CMS."*

    **Theranos Response to Statement 1 – D5391 Finding #2:** The citation references to Ex. A, Tab 4, § 3.7.1 and Ex. A, Tab 23, §§ 7.14, 7.15, 8.6.1, 8.6.4, 8.6.5 were inadvertent transcription errors and should not have been included.

**D5391 Finding #2 – March 18 Letter Statement 2:** *"At the time of the onsite survey, the laboratory failed to establish a written protocol for the daily review of patient specimens referred to other laboratories for testing to ensure timely receipt and reporting of test results performed by other laboratories. The laboratory did not provide such a protocol with its submission."*

    **Theranos Response to Statement 2 – D5391 Finding #2:** The lab has implemented revised written procedures for referral testing, which includes the protocol for daily review of patient specimens referred to other laboratories for testing to ensure timely receipt and reporting of test results performed by other laboratories. (Ex. BB, Tab 10 § 8.7). The revised procedure requires written documentation of this daily review. Training on that SOP has occurred. (Ex. BB, Tabs 10B-10C). The revised QMPI Program procedures require a review of referral testing and turnaround time. (Ex. BB, Tab 7 §§ 7.53, 7.54).

9

CONFIDENTIAL, COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

CMS2-164378

CONFIDENTIAL Case 5:18-cr-00258-EJD Document 1134-5 Filed 11/08/21 Page 12 of 92 TION ACT

theran⊕s

1701 Page Mill Road     P 650.838.9292   theranos.com
Palo Alto, CA 94304     F 650.838.9165

**D5391 Finding #2 – March 18 Letter Statement 3:**  *"In addition, it is unclear how the laboratory's QMPI Program would ensure the establishment of written protocols for all the laboratory's processes."*

**Theranos Response to Statement 3 – D5391 Finding #2:** The laboratory's improved document control procedures, SOP on SOPs, audit procedures, and QMPI Program ensure the laboratory has written protocols for all of the laboratory's processes. (Ex. AA, Tabs 1-2, 7-8). The document control procedures identify levels and categories of procedures (Ex. BB, Tab 1 §§ 3.11; 6.1); the SOP on SOPs includes procedures and templates to ensure that there are written protocols for all processes that should be covered by an SOP (Ex. BB, Tab 2); the revised audit procedures include monthly tracer audits that would identify any instance where a written protocol did not exist for a process (Ex. BB, Tab 8 § 8.1); and the QMPI Program requires review of tracer audit results and of written procedures that are new, revised or in process. (Ex. BB, Tab 7§§ 7.1, 7.5). Training on these procedures has occurred. (Ex. BB, Tabs 1B-1C, 2B-2C, 7B-7C, 8B-8C).

### D5393

**D5393 – March 18 Letter Statement 1:**  *"The submission references 'Ex. A, Tab 23, §§ 7.14, 7.15, 8.6.1, 8.6.4, 8.6.5.'  We found no such reference contained in the materials provided to CMS."*

**Theranos Response to Statement 1 – D5393:** The citation references to Ex. A, Tab 23, §§ 7.14, 7.15, 8.6.1, 8.6.4, 8.6.5 was an inadvertent transcription error and should not have been included.

**D5393 – March 18 Letter Statement 2:**  *"At the time of the onsite survey, the laboratory failed to establish a written protocol for the daily review of patient specimens referred to other laboratories for testing to ensure timely receipt and reporting of test results performed by other laboratories.  The laboratory did not provide such a protocol with its submission."*

**Theranos Response to Statement 2 – D5393** The lab has implemented revised written procedures for referral testing, which includes the protocol for daily review of patient specimens referred to other laboratories for testing to ensure timely receipt and reporting of test results performed by other laboratories. (Ex. BB, Tab 10 § 8.7). The revised procedure requires written documentation of this daily review. Training on that SOP has occurred. (Ex. BB, Tabs 10B-10C). The revised QMPI Program procedures require a review of referral testing and turnaround time. (Ex. BB, Tab 7 §§ 7.53, 7.54).

**D5393 – March 18 Letter Statement 3:**  *"In addition, it is unclear how the laboratory's QMPI Program would ensure the establishment of written protocols for all of the laboratory's processes."*

**Theranos Response to Statement 3 – D5393:** The laboratory's improved document control procedures, SOP on SOPs, audit procedures, and QMPI Program ensure the laboratory has written protocols for all of the laboratory's processes. (Ex. AA, Tabs 1-2, 7-8). The document control procedures identify levels and categories of procedures (Ex. BB, Tab 1 §§

10

CONFIDENTIAL COMMERICIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER — EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

Case 5:18-cr-00258-EJD Document 1364-5 Filed 01/08/21 Page 13 of 192

theran⌖s

1701 Page Mill Road    P 650.838.9292   theranos.com
Palo Alto, CA 94304    F 650.838.9165

3.11; 6.1); the SOP on SOPs includes procedures and templates to ensure that there are written protocols for all processes that should be covered by an SOP (Ex. BB, Tab 2); the revised audit procedures include monthly tracer audits that would identify any instance where a written protocol did not exist for a process (Ex. BB, Tab 8 § 8.1); and the QMPI Program requires review of tracer audit results and of written procedures that are new, revised or in process. (Ex. BB, Tab 7§§ 7.1, 7.5). Training on these procedures has occurred. (Ex. BB, Tabs 1B-1C, 2B-2C, 7B-7C, 8B-8C).

**D5393 – March 18 Letter Statement 4:** *"In addition, without daily written documentation, it is unclear as to how the laboratory's QMPI Program would ensure this quality assessment activity has been completed."*

**Theranos Response to Statement 4 – D5393:** The laboratory's revised written procedures for referral testing require written documentation of the daily review of referral testing. . (Ex. BB, Tab 10 § 8.7, F-1). Training on the revised referral testing procedures has occurred. (Ex. BB, Tabs 10B-10C). The revised QMPI procedures require a review of referral testing and turnaround time. (Ex. BB, Tab 7 §§ 7.5.3, 7.5.4). Training on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

#### D5400

The March 18 Letter states *"See our reviews of D5403, D5407, D5413, D5421, D5423, D5429, D5437, D5447, D5449, D5469, D5477, D5481, D5775, D5779, D5787, D5791, and D5793."* Accordingly, we refer you to our responses to those reviews.

#### D5403

Finding #1

**D5403 Finding #1 – March 18 Letter Statement 1:** *"Although the laboratory addressed the inclusion in its procedure manual of corrective actions to be taken when calibration or quality control (QC) results failed to meet the laboratory's criteria for acceptability when using the Siemens Advia 2120i instrument, in its submission the laboratory failed to address how it will ensure its procedure manuals include applicable components as required by 42 C.F.R. 493.1251(b)."*

**Theranos Response to Statement 1 – D5403 Finding #1:** The lab's revised SOP on SOP includes written protocols and SOP templates, which sets forth protocols for preparing procedure manuals that are consistent 42 C.F.R. § 493.1251(b). (Ex. AA, Tab 2 § 11). The laboratory's revised document control policies further ensure that procedure manuals are consistent with 42 C.F.R. § 493.1251(b). (Ex. BB, Tab 1 §§ 6.1, 6.2, 6.3). The lab will monitor compliance with these procedures and 42 C.F.R. § 493.1251(b) through its monthly QMPI meetings, which include a review of written procedure manuals that are new, revised or in process. (Ex. BB Tab 7, §§ 7.1, 7.5.6). The lab will also ensure compliance through its revised audit procedures of pre-analytic, analytic, and post-analytic practices. (Ex. BB, Tab 8, §§ 8.1, 8.2). Training on these revised procedures has occurred. (Ex. BB, Tabs 2B-2C; 7B-7C; 8B-8C).

11

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

CMS2-164380

CONFIDENTIAL Case 5:18-cr-00258-EJD Document 1134-5 Filed 11/08/21 Page 14 of 92 ATION ACT

**theranos**

1701 Page Mill Road    P 650.838.9292   theranos.com
Palo Alto, CA 94304    F 650.838.9165

**D5403 Finding #1 – March 18 Letter Statement 2:** *"To ensure appropriate and required calibration or QC corrective actions were taken, the laboratory indicated that quarterly audits will be performed and suggested that the audit results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In the submission, the laboratory indicates that a 'tracer audit **may** [emphasis added] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

   **Theranos Response to Statement 2 – D5403 Finding #1:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex BB, Tab 8). Training on these procedures has occurred. (Ex. AA, Tabs 8B-8C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

Finding #2:

**D5403 Finding #2 – March 18 Letter Statement 1:** *"The laboratory was cited for not having a QC procedure for the 'Edison 3.5 Theranos System' prior to 5/15/14. The laboratory's submission states that it performed QC before and after 5/15/14; however, it did not address the citation. While the data submitted did show that QC was run prior to 5/15/14, the laboratory provided no information regarding any investigation as what procedure the laboratory was using to determine number, type, frequency, and acceptability criteria."*

   **Theranos Response to Statement 1 – D5403 Finding #2:** D5403 Finding #2 relates to the Theranos Proprietary System ("TPS") The laboratory has performed a review to determine number, type, frequency, and acceptability criteria for QC on the TPS prior to May 15, 2014. Prior to May 15, 2014, the laboratory (i) used the same type of QC material as used after May 15, 2014; (ii) the laboratory ran at least two levels of QC prior to May 15, 2014; (iii) the laboratory was required to pass at least two levels of QC at least 24 hours before reporting a patient result; and (iv) the laboratory used the Westgard rules for the acceptance criteria. (Ex. FF, Tab 13).

**D5403 Finding #2 – March 18 Letter Statement 2:** *"The laboratory indicated that systemic errors using QC and patient test distribution over time as well as random errors were used to evaluate patient impact. Specifically, the laboratory indicated that 'QC data was reviewed to identify >2SD failure and periods of elevated CV. Namely, batches of 10 consecutive QC data*

12

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CONFIDENTIAL Case 5:18-cr-00258-EJD Document 1134-5 Filed 11/08/21 Page 15 of 92 ATION ACT

**theran�she⚶s**

1701 Page Mill Road    P 650.838.9292   theranos.com
Palo Alto, CA 94304    F 650.838.9165

*points were analyzed and the CV was calculated for each QC level during this period. If the CV was >30%, then all patient results run during that time period will be voided.' Ex. E, Tab 1. That laboratory did not indicate how 'periods of elevated CV' were identified or what time periods were reviewed."*

**Theranos Response to Statement 2 – D5403 Finding #2:** This deficiency concerns the TPS 3.5, which was one of the Theranos proprietary technologies in use in 2014 and 2015. The laboratory began phasing out the TPS 3.5 in December 2014, and it was **fully retired** in early-August 2015.

The laboratory values CMS's feedback, and takes it very seriously. The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was fully retired in early-August 2015. As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5. (Ex. AA, Tab 3). The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures. Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015. As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015. (Ex. AA, Tab 3). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5403 Finding #2 – March 18 Letter Statement 3:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In the submission, the laboratory indicates that a 'tracer audit **may** [emphasis added [in the letter]] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 3 – D5403 Finding #2:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on

13

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164382

CONFIDENTIAL Case 5:18-cr-00258-EJD Document 1345-5 Filed 11/08/21 Page 16 of 92 INFORMATION ACT

**theran☰s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

### D5407

**D5407 – March 18 Letter Statement 1:** *"Although the laboratory's submitted protocol (provided at Ex. A, Tab 1 § 4.13) indicates that the laboratory director must sign all procedures prior to use, the response does not include an explanation as to why the cited procedures were not signed by the laboratory director prior to use as required by the laboratory's protocol available at the time of the onsite."*

**Theranos Response to Statement 1 – D5407:** D5403 states that the following procedures showed an effective date in December 2014, but signed by the lab director on September 19, 2015: CL SOP-09102 (ALP),[4] CL SOP-09161, Revision A (APO), CL SOP-09118 (Glucose),[5] CL SOP-09111 (CO2), CL SOP-10001, Revision B (Measuring Prothrombin Time-Innovin (PT)), and CL SOP-15036, Revision A (Edison 3.5 Theranos System Daily QC Procedure).

D5403 also states that CL SOP-06060, Revision A (SensoScientific Monitor) showed an effective date of June 23, 2015, but was not signed by the lab director until September 22, 2015.

Lastly, D5403 states that CL PLN-14003, Revision A (Master Validation Plan for Routine Chemistry Assays on Theranos Devices) showed an effective date of November 4, 2011, but was not signed by the lab director under September 19, 2015. To ensure that the record is correct with respect to this document, we note that CL PLN-14003, Revision A (Master Validation Plan for Routine Chemistry Assays on Theranos Devices), was authored and signed by the laboratory's then-lab director, Dr. Arnold Gelb, on November 4, 2011. (Ex. HH, Tab 12). Dr. Gelb remained the Lab Director until January 27, 2013. (Ex. HH, Tab 4C). Although Dr. Gelb signed CL PLN-14003, the subsequent lab directors did not sign and date CL PLN-14003 until Dr. Sunil Dhawan signed it on September 19, 2015. We recognize that those prior lab directors should have reviewed, dated and signed CL PLN-14003 before that date.

As reflected by the Lab Director deficiencies identified by CMS, the lab director did not provide sufficient oversight over the documents cited in D5403. This appears to be one of the reasons why these documents were not timely reviewed and signed by the prior lab directors. In addition, the laboratory has found that its quality assurance oversight over these

---

[4] D5407, Paragraph h, states that the Alkaline Phosphatase SOP that was made effective in December 2014 was "CL SOP-81102." This reference appears to be a typographical error because the Alkaline Phosphatase (ALP) SOP that was made effective in December 2014 was "CL SOP-09102."

[5] As another point of clarification only, we note that D5407, Paragraph h, states that the glucose procedure (CL SOP-09118) was not signed by the LD. That procedure was signed by the lab director, but not until September 19, 2015. We recognize that this signature date is still deficient under D5407, and provide this information only to clarify the record.

14

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164383

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

**theranos**

1701 Page Mill Road    P 650.838.9292   theranos.com
Palo Alto, CA 94304    F 650.838.9165

documents, including document control oversight, was not sufficient. The laboratory has hired a new lab director, who has approved enhanced document control policies and procedures to address this issue. (Ex. BB, Tab 1 §§ 5.1, 5.2, 5.3, 6.1, 6.2, 6.3). Training on those procedures has occurred. (Ex. BB, Tabs 1B-1C). The laboratory has also hired a Document Control Manager whose responsibilities include tracking new and revised policies and procedure to ensure that they are reviewed and approved by the lab director before they become effective. (Ex. HH, Tab 7C). In addition, the laboratory's revised QMPI Program procedures and agenda require review of procedures that are new, revised, or in process at monthly QMPI Program meetings. (Ex. BB, Tab 7 §§ 7.1, 7.5.6).

**D5407 -- March 18 Letter Statement 2:** *"In Ex. L, Tab 26 the submission states: "The lab's overarching review of its systems and primary instruments has identified the patients affected or having the potential to be affected by this issue." The laboratory did not define the criteria used to make this determination or provide documentation as to how they came to this conclusion."*

> **Theranos Response to Statement 2 -- D5407:** D5407 cites certain documents that were not timely signed and approved by the former lab director.
>
> D5407 cites the follows SOPs for certain assays run on the Siemens Advia XPT because they had an effective date in December 2014, but were not signed by the former lab director until September 2015: (i) CL SOP-09161, Revision A (Apolipoprotein); (ii) CL SOP-09118 (Glucose); [6] (iii) CL SOP-09111 (CO2); and (iv) CL SOP-09102 (Alkaline Phophatase).[7] The laboratory and its new leadership do not approve of the fact these SOPs were given an effective date before Dr. Dhawan's signed them. However, there is no potential for this untimely signature to have affected patients because Dr. Dhawan ultimately approved the SOP without making any modifications or revisions to it. To address other deficiencies identified by CMS, the laboratory's initial submission included a broader analysis of QC, proficiency testing results, and patient population distribution data for APO, Glucose, CO2, and ALP tests run on the Siemens Advia XPT for the entire period during which these SOPs were effective. In response to CMS's review of D5793 Finding #8, the laboratory has extended this analysis to evaluate global quality control indicators. (Ex. AA, 11). Based on these analyses, the laboratory has issued corrected reports. (Ex. KK). The laboratory

---

[6] As a point of clarification only, we note that D5407, Paragraph h, states that the glucose procedure (CL SOP-09118) was not signed by the LD. That procedure was signed by the lab director, but not until September 19, 2015. We recognize that this signature date is still deficient under D5407, and provide this information only to clarify the record.

[7] D5407, Paragraph h, states that the Alkaline Phosphatase SOP that was made effective in December 2014 was "CL SOP-81102." This reference appears to be a typographical error because the Alkaline Phosphatase (ALP) SOP that was made effective in December 2014 was "CL SOP-09102."

15

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

**theranos**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

**stopped** using the Siemens Advia XPT instrument on November 17, 2015, and **has not used it since then.**

D5407 also cites CL SOP-10001, Revision B (Measuring Prothrombin Time-Innovin (PT)), because it was made effective in December 2014, but was not signed by the former lab director until September 2015. This SOP concerns PT/INR tests on the BCS XP. Again, the laboratory and its new leadership do not approve of the fact this SOP was given an effective date before Dr. Dhawan's signed the SOP. However, there is no potential for this untimely signature to have affected patients because Dr. Dhawan ultimately approved the SOP without making any modifications or revisions to it. To address other deficiencies identified by CMS, the laboratory has performed a broader analysis of all PT/INR tests run on this BCS XP instrument, which was **first put into use in October 2014.** Based on this analysis, which included a review of INR calculations, QC data, proficiency testing, and patient population distribution data, the laboratory issued corrected reports voiding PT/INR test results reported for the period October 2014 through September 2015. (Ex. AA, Tab 7). The laboratory **stopped** using the BCS XP instrument on September 17, 2015, and **has not used it since then.**

D5407 also cites CL SOP-15036, Revision A (Edison 3.5 Theranos System Daily QC Procedure), because it was made effective in December 2014, but was not signed by the former lab director until September 2015. This SOP concerns the Theranos Proprietary System (TPS), which was begin phased-out beginning in December 2014 and was fully **retired** in mid-August 2015. Again, the laboratory and its new leadership do not approve of the fact this SOP was given an effective date before Dr. Dhawan's signed the SOP to indicate his approval of it. However, there is no potential for this untimely signature to have affected patients because Dr. Dhawan ultimately approved the SOP without making any modifications or revisions to it. To address other deficiencies identified by CMS, the laboratory has performed a broad re-analysis of all QC related to tests run on the TPS in 2014 and 2015. That analysis is discussed below and is enclosed with this letter at Tab AA, Ex. 3. Based on that analysis, the laboratory has, out of an extreme abundance of caution, voided tests run on the TPS in 2014 and 2015. Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

D5407 also cites CL SOP-06060, Revision A (SensoScientific Monitor) because it was made effective on June 23, 2015, but was not signed by the former lab director until September 2015. Again, the laboratory and its new leadership do not approve of the fact this SOP was given an effective date before Dr. Dhawan's signed the SOP to indicate his approval of it. However, there is no potential for this untimely signature to have affected patients because

16

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

CMS2-164385

CONFIDENTIAL Case 5:18-cr-00258-EJD Document 1384-5 Filed 11/08/21 Page 19 of 92 ATION ACT

theran⚬s
1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9195

Dr. Dhawan ultimately approved the SOP without making any modifications or revisions to
it.

Finally, D5407 cites CL PLN-14003, Revision A (Master Validation Plan for Chemistry
Assays on Theranos Devices). The plan is consistent with 42 C.F.R. § 493.1253(b). CL
PLN-14003 was authored, approved, signed and dated by Dr. Arnold Gelb. Dr. Gelb was the
Laboratory Director when he approved CL PLN-14003.[8] Ex. HH, Tab 12). Although Dr.
Dhawan should have reviewed the plan sooner, he ultimately approved of it. Because Dr.
Dhawan approved of the plan without making any changes to it, no patients have the
potential to have been affected by the finding in D5407, Paragraph g.

## D5413

Finding #1

**D5413 Finding #1 – March 18 Letter Statement 1:** *"Although the laboratory's submitted
protocol indicates that the allowable temperature should be posted on the unit (see Ex. A, Tab
29), the response does not address the incorrect labeling for acceptable temperatures on the
freezer doors. Documentation contained in Ex. A. Tab 29, § 4.5 indicated that the laboratory
supervisor or designee was responsible for monitoring and recording temperatures. However,
we could not determine if the new procedure had been effectuated as no documentation was
submitted to show that the freezer units had been labeled appropriately."*

  **Theranos Response to Statement 1 – D5413 Finding #1:** The new procedure has been
  effectuated as reflected in the enclosed documentation showing that the freezer units have
  been labeled appropriately. (Ex. BB, Tab 13).

**D5413 Finding #1 – March 18 Letter Statement 2:** *"In addition, the laboratory states that
training had occurred subsequent to the survey, but it is not clear who should be trained as
'laboratory supervisor or designee' was not defined."*

  **Theranos Response to Statement 2 – D5413 Finding #1:** The laboratory has revised this
  procedure to define who should be trained. The revised procedure is enclosed at Ex. BB, Tab
  13.

**D5413 Finding #1 – March 18 Letter Statement 3:** *"Training records provided in Ex. A, Tab
30 included only training documents for one general supervisor."*

---

[8] At the time that Dr. Gelb authored this plan, his qualifications included, among other things, a
Master of Science in Materials Science and Engineering (Biomedical); a Fellowship in MIT's
Medical Engineering Graduate Program; a Doctor of Medicine from Stanford University; an
internship in Internal Medicine at the University of Chicago Hospitals; a Fellowship in
Immunodiagnosis and Surgical Pathology at Stanford University; and a Fellowship in
Hematopathology at the University of California San Francisco. (Ex. HH, Tab 4A).

17

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164386

CONFIDENTIAL Case 5:18-cr-00258-EJD Document 1184-5 Filed 11/08/21 Page 20 of 92 ATION ACT

theran●s

1701 Page Mill Road   P 650.838.9292  theranos.com
Palo Alto, CA 94304   F 650.838.9165

**Theranos Response to Statement 3 – D5413:** The laboratory has enclosed with this letter a complete set of training records on this SOP, which shows that the relevant laboratory personnel have been trained. (Ex. BB, Tabs 13B-13C).

**D5413 Finding #1 – March 18 Letter Statement 4:** *"Several freezers were identified as "not used in patient testing" (see Ex. N, Tab A); however, based on interviews during the onsite visit, these freezers were identified as being used for CLIA activities. The submission did not include a response or data related to the freezers identified as 'not used in patient testing.'"*

**Theranos Response to Statement 4 – D5413 Finding #1:** D5413 identifies six -20C freezers and four -80C freezers. In the lab's submission, we explain that five of those freezers did not contain materials that would be used in the future for clinical patient testing. Rather, they only contained material that might be used in the future for research and development.

Based on CMS's March 18 letter, it appears that there was a miscommunication when the CMS surveyors were onsite. D5413, Paragraph f, states that CMS had a discussion about these freezers with the "Director of Assay Systems and technical supervisor at 11/19/15 at approximately 11 am." The Director of Assay Systems did not have any regular involvement with those freezers at that time and did not have knowledge of their contents. The "technical supervisor" in attendance on November 19, 2015 joined the company on October 26, 2015; he also did not have regular involvement with those freezers at the time and did not have knowledge of their contents. (Ex. HH, Tab 8). To the extent CMS understood either of these individuals to be confirming the contents of these freezers or whether these freezers were used in clinical patient testing, there was a miscommunication.

The laboratory has looked into this issue further, and has reconfirmed that the statements in the laboratory's submission are accurate. As reflected in the enclosed documentation:

- On November 19, 2015, there were four -20 C freezers in the microbiology or BUGS laboratory. 7061 BUGS -20 C Freezer 4 did **not** contain any materials for future use in clinical patient testing. (Ex. II, Tabs 3A-3C).
  1.
- On November 19, 2015, there was one -20 C freezer in the Normandy laboratory. Clinical patient testing in the Normandy laboratory **stopped** on September 20, 2015, and there has **not** been any clinical patient testing in the Normandy laboratory since then. The 1 Normandy -20 C freezer did **not** contain any materials for future use in patient testing. (Ex. II, Tabs 3A-3C).

2.
- On November 19, 2015, there were four -80 C freezers. 7098 -80 C Freezer 1 Nuair, 7111 -80 C Freezer 2 Thermo, and 7113 -80 2 CLIA Lab did not contain any materials for future use in clinical patient testing. While named 7113 -80 2 CLIA Lab, it was only used to store old specimens that were not for use in clinical patient testing. (Ex. II, Tabs 3A-3C)

18

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164387

CONFIDENTIAL Case 5:18-cr-00258-EJD Document 1134-5 Filed 11/08/21 Page 21 of 92 ATION ACT

**theran⦾s**

1701 Page Mill Road    P 650.838.9292  theranos.com
Palo Alto, CA 94304    F 650 838 9165

**D5413 Finding #1 – March 18 Letter Statement 5:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In the submission, the laboratory indicates that a 'tracer audit **may** [emphasis added [in the letter]] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

> **Theranos Response to Statement 5 – D5413 Finding #1:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

Finding #2

**D5413 Finding #2 – March 18 Letter Statement 1:** *"The submission references 'Ex. 1, Tabs 2-6.' We located these tabs, but found no documentation in Tabs 2, 5, and 6."*

> **Theranos Response to Statement 1 – D5413 Finding #2:** There was an inadvertent copying error for Exhibit I to the initial submission. The laboratory has enclosed the applicable documents with this letter, as well as additional documents related to the laboratory's broader analysis of the PT/INR test over the entire time it was run on this Siemens BCS XP instrument. (Ex. GG).

**D5413 Finding #2 – March 18 Letter Statement 2:** *"Although the laboratory's submitted protocol indicates that the laboratory was required to check manufacturer package inserts prior to use (see Ex. A, Tab 31, §8.1.2), which was also stated in the laboratory's written procedure available prior to the onsite survey, the laboratory provided no documentation showing that this protocol has been effectuated and no indication that package inserts for new lot numbers have been checked."*

> **Theranos Response to Statement 2 – D5413 Finding #2:** D5413 concerns the laboratory's failure to follow the manufacturer's instructions for the expiration date of one lot of Innovin (thromboplastin) used for Prothrombin Time/International Normalized Ratio (PT/INR) testing on the Siemens BCS XP. The laboratory **stopped** running tests on Siemens BCS XP on September 17, 2015, and has **not** run any tests on the Siemens BCS XP since then.

19

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

CMS2-164388

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

**theran✪s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

Although the laboratory is not running PT/INR tests on the Siemens BCS XP, we have enclosed documentation related to a different test that is in use, which shows that the laboratory has effectuated its protocol to check manufacturer's instructions for the expiration date. This documentation includes a photograph of the manufacturer's package insert for IRISpec and a photograph of the bottles showing a handwritten open date and expiration date that is consistent with the 15-day "open stability" specification contained in the package insert. (Ex. HH, Tabs 11A-11B). As these photographs show, the laboratory effectuated its protocol by reviewing the manufacturer's instructions, initialed the material, and wrote the correct expiration date on the cartridge. (Ex. HH, Tab 11A).

**D5413 Finding #2 – March 18 Letter Statement 3**: *"In addition, the submission states that "the lab has conducted training on those procedures;" however, the training documents submitted in Ex. A, Tab 32 do not include any training specific to the cited deficiency. We were unable to verify that training occurred as stated."*

> **Theranos Response to Statement 3 – D5413 Finding #2:** D5413 Finding #2 states that the laboratory "failed to follow the manufacturer instructions for expiration date of Innovin (thromboplastin) used for Prothrombin Time/International Normalized Mean Ratio (PT/INR) testing." The laboratory's submission included training records for training on the revised reagent qualification and management procedures. (Ex. BB, Tab 14B). The training addressed review of manufacturer specification and package inserts. (Ex. BB, Tab 14). The laboratory has performed supplemental training that specifically focuses on reviewing and following manufacturer instructions for expiration dates. (Ex. BB, Tab 14D). That training used this deficiency about Innovin (thromboplastin) as a case study." (Ex. BB, Tab 14D).

**D5413 Finding #2 – March 18 Letter Statement 4**: *"In Ex. I, Tab 1, the laboratory provided lists of patient specimen accession numbers for which the laboratory issued corrected reports; however, the laboratory did not provide copies of the corrected reports."*

> **Theranos Response to Statement 4 – D5413 Finding #2:** To address this and other deficiencies related to PT/INR, the laboratory conducted a further patient assessment analysis that covers the entire period during which this Siemens BCS XP instrument was in use in the lab. (Ex. AA, Tab 7). As a result of that analysis, the laboratory has voided all results for PT/INR from October 2014 through September 2015. (Ex. AA, Tab 7). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

### D5421

Finding #1

**D5421 Finding #1– March 18 Letter Statement 1**: *The submission references "Ex. A, Tab 9, §7.2.4.4 and Ex. B, Tabs 46-50, 52-56, 57-61." We found no such references contained in the materials provided to CMS."*

20

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164389

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

Case 5:18-cr-00258-EJD Document 1134-5 Filed 11/08/21 Page 23 of 92

**theran😊s**

1701 Page Mill Road    P 650.838.9292   theranos.com
Palo Alto, CA 94304    F 650.838.9165

**Theranos Response to Statement 1 -- D5421 Finding #1:** There was an inadvertent copying error for Exhibit I to the initial submission. The laboratory has enclosed the applicable documents with this letter, as well as additional documents related to the laboratory's broader analysis of the PT/INR test over the entire time it was run on this Siemens BCS XP instrument. (Ex. GG).

**D5421 Finding #1-- March 18 Letter Statement 2:** *"The laboratory's submitted protocol (Ex. A, Tab 9, § 4.2) states: 'If the verification is performed by the vendor, the laboratory is involved in all aspects of the verification and the final verification documentation is reviewed and signed off by the Laboratory Director.' We were unable to determine what specific aspects of the method verification the laboratory would be performing or if vendors would continue to perform method verifications."*

**Theranos Response to Statement 2 -- D5421 Finding #1:** The laboratory has further revised its method verification SOP to clarify that the procedure requires the laboratory to perform method verifications. To be clear, the vendor will not continue to perform method verifications. (Ex. BB, Tab 5 § 4.1.2).

**D5421 Finding #1-- March 18 Letter Statement 2:** *"The submitted protocol included form CL FRM-00022-F1, Verification Results (Ex. A, Tab 9), which appears to be pre-signed by the laboratory director. We were unable to determine if the laboratory director will "review and sign off" on each method verification."*

**Theranos Response to Statement 2 -- D5421 Finding #1:** The copy of CL FRM-00022-F1 included with the submission was not a pre-signed form. Rather, the laboratory director signed the version of the form attached to the revised method verification SOP simply to indicate that he approved of it as a new form that could be used. To eliminate any confusion or potential confusion caused by this way of approving forms, we have revised the lab's document control policy to make clear that forms attached to an SOP are part of the SOP, and therefore are approved when the lab director approves the SOP. (Ex. BB, Tab 1). Consistent with this revision, the enclosed copy of CL FRM-00022-F1 no longer has any signatures on it. (Ex. BB, Tab 5 F1).

**D5421 Finding #1-- March 18 Letter Statement 3:** *"We note that in the laboratory's submission related to test performance specifications for the Advia XPT instrument, it was the laboratory's policy to accept %CV values that were up to 1.5 times the %CV values stated by the instrument manufacturer for any given chemistry analyte. In the submission, we found no explanation as to why 1.5 times the manufacturer's %CV was acceptable to the laboratory. We also note that the submitted re-verification of test performance specifications did not follow the submitted protocol for test verification; therefore, we could not determine if the re-verifications were adequate or how the laboratory determined if patients were affected or potentially affected."*

**Theranos Response to Statement 3 -- D5421 Finding #1:** Prior to the survey, the laboratory did not employ a policy to accept %CV values that were up to 1.5 times the %CV

21

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

**theran⦾s**                                    1701 Page Mill Road   P 650.838.9292   theranos.com
                                                Palo Alto, CA 94304   F 650.838.9165

values, and the verification reports that CMS reviewed did not use 1.5 times %CV.
Likewise, the laboratory's revised method verification procedure does not include a 1.5 times
%CV policy. (Ex. BB, Tab 5).[9] Rather, it requires that the laboratory verify the
manufacturer's imprecision claim. (Ex. BB, Tab 5 § 8.2). Training on the revised procedure
has occurred. (Ex. BB, Tabs 5B-5C). Additionally, there appears to have been a
miscommunication because the laboratory **stopped** running tests on the Siemens Advia XPT
on November 17, 2015, and has **not** run any tests on the instrument since then. Accordingly,
the laboratory has not re-verified any assay on the Siemens Advia XPT. References to
method verification data in documents enclosed with the submission are to verification
reports prepared **before** the survey began and before the laboratory's revised procedures
were made effective (those reports were either reviewed by CMS or available to CMS during
the survey), which were referenced for context.

Finding #2

**D5421 Finding #2– March 18 Letter Statement 1:** *"Although the laboratory's submitted*
*protocol (Ex. A, Tab 9) included a method verification procedure which addressed verification of*
*accuracy, precision, and reportable range, the laboratory provided no documentation showing*
*that this protocol had been followed to re-verify performance specifications. The submission*
*also stated: Before the lab resumes any test on the Advia XPT, the lab will ensure that the test*
*has been re-verified pursuant to the lab's improved method verification procedures that have*
*been approved by the laboratory director." The completion date for the correction of this*
*deficiency was indicated on the submitted Allegation of Compliance as February 12, 2016,*
*which, in order to determine correction, should include the re-verification documentation for the*
*Advia XPT. However, the laboratory provided no documentation that the re-verification had*
*been performed. We note that in the laboratory's submission related to test performance*
*specifications for the Advia XPT instrument it was the laboratory's policy to accept %CV values*
*that were up to 1.5 times the %CV values stated by the instrument manufacturer for any given*
*chemistry analyte. In the submission, we found no explanation as to why 1.5 times the*
*manufacturer's %CV was acceptable to the laboratory.*

   **Theranos Response to Statement 1 – D5421 Finding #2:** Prior to the survey, the
   laboratory did not employ a policy to accept %CV values that were up to 1.5 times the %CV
   values, and the verification reports that CMS reviewed did not use 1.5 times %CV.
   Likewise, the laboratory did not employ a policy to accept %CV values that were up to 1.5
   times the %CV values prior to the survey. The laboratory's revised method verification
   procedure does not include a 1.5 times %CV policy. (Ex. BB, Tab 5).[10] Rather, it requires

---

[9] The laboratory referred to a 1.5 times %CV in its response based upon Bio-Rad's coefficient of
variation rate. (http://www.qcnet.com/Portals/50/PDFs/QCWorkbook2008_Jun08.pdf). Upon
further review, the laboratory does not believe that Bio-Rad's coefficient of variation rate is
applicable here.

[10] The laboratory referred to a 1.5 times %CV in its response based upon Bio-Rad's coefficient
of variation rate. (http://www.qcnet.com/Portals/50/PDFs/QCWorkbook2008_Jun08.pdf). Upon
further review, the laboratory does not believe that Bio-Rad's coefficient of variation rate is
applicable here.

22

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

**theran⬤s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

that the laboratory verify the manufacturer's imprecision claim. (Ex. BB, Tab 5 § 8.2). Training on the revised procedure has occurred. (Ex. BB, Tabs 5B-5C). Additionally, there appears to have been a miscommunication because the laboratory **stopped** running tests on the Siemens Advia XPT on November 17, 2015, and has **not** run any tests on the instrument since then. Accordingly, the laboratory has not re-verified any assay on the Siemens Advia XPT. References to method verification data in documents enclosed with the submission are to verification reports prepared **before** the survey began and before the laboratory's revised procedures were made effective (those reports were either reviewed by CMS or available to CMS during the survey), which were referenced for context.

**D5421 Finding #2– March 18 Letter Statement 2:** *"We also found no explanation as how "normal patient distribution" related to determining if patients were affected or potentially affected."*

    **Theranos Response to Statement 2 – D5421 Finding #2:** The laboratory has enclosed a revised analysis to clarify its examination of these patient test result distributions, which should eliminate the confusion created by the phrase "normal patient distribution." (Ex. AA, Tab 5).

**D5421 Finding #2– March 18 Letter Statement 3:** *"In addition, the laboratory's submission (Ex. B, various analyte tabs) states: "Matrix comparisons done by the manufacturer between serum and plasma showed correlation." No documentation was submitted supporting this statement."*

    **Theranos Response to Statement 3 – D5421 Finding #2:** The laboratory has enclosed with this letter documentation supporting that matrix comparisons done by the manufacturer between serum and plasma showed correlation. (Ex. HH, Tab 13).

**D5421 Finding #2– March 18 Letter Statement 4:** *"The submission also states that "the lab has conducted training on these procedures to ensure that the practice is consistent with them," but the laboratory did not include complete training documentation to support this assertion."*

    **Theranos Response to Statement 4 – D5421 Finding #2:** The laboratory's submission included training documentation for seven laboratory personnel. The laboratory has enclosed with this letter additional training documentation for the lab's method verification procedures. (Ex. BB, Tabs 5B-5C).

**D5421 Finding #2– March 18 Letter Statement 5:** *"Because the laboratory has not shown whether it can follow its own validation protocols, it was uncertain whether the laboratory's quality assessment mechanisms could monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

    **Theranos Response to Statement 5 – D5421 Finding #2:** As stated above, there appears to have been a miscommunication because the laboratory **stopped** running tests on the Siemens

23

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

theranos

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

Advia XPT on November 17, 2015, and has **not** run any tests on the instrument since then. Accordingly, the laboratory has not re-verified any assay on the Siemens Advia XPT.

The laboratory is capable of ensuring that the deficient practice in D5421 does not recur. Significantly, the laboratory's has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures. The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016. Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory. In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant. Dr. Tschirhart has over fifteen years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team. The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

### D5423

**D5423 – March 18 Letter Statement 1:** *"Although the laboratory's submitted protocol (Ex. A, Tab 9) included a method verification procedure which addressed verification of accuracy, precision, and reportable range, the laboratory provided no documentation showing that this protocol had been followed to re-verify performance specifications. The submission also stated: Before the lab resumes any test on the Advia XPT, the lab will ensure that the test has been re-verified pursuant to the lab's improved method verification procedures that have been approved by the laboratory director." The completion date for the correction of this deficiency was indicated on the submitted Allegation of Compliance as February 12, 2016, which, in order to determine correction, should include the re-verification documentation for the Advia XPT. However, the laboratory provided no documentation that the re-verification had been performed. We note that in the laboratory's submission related to test performance specifications for the Advia XPT instrument, it was the laboratory's policy to accept %CV values that were up to 1.5 times the %CV values stated by the instrument manufacturer for any given chemistry analyte. In the submission, we found no explanation as to why 1.5 times the manufacturer's %CV was acceptable to the laboratory."*

> **Theranos Response to Statement 1 – D5423:** Prior to the survey, the laboratory did not employ a policy to accept %CV values that were up to 1.5 times the %CV values, and the verification reports that CMS reviewed did not use 1.5 times %CV. Likewise, the laboratory's revised method verification procedure does not include a 1.5 times %CV policy. (Ex. BB, Tab 5).[11] Rather, it requires that the laboratory verify the manufacturer's imprecision claim. (Ex. BB, Tab 5 § 8.2). ). Training on the revised procedure has occurred.

---

[11] The laboratory referred to a 1.5 times %CV in its response based upon Bio-Rad's coefficient of variation rate. (http://www.qcnet.com/Portals/50/PDFs/QCWorkbook2008_Jun08.pdf). Upon further review, the laboratory does not believe that Bio-Rad's coefficient of variation rate is applicable here.

24

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CONFIDENTIAL Case 5:18-cr-00258-EJD Document 1184-5 Filed 11/08/21 Page 27 of 92 ATION ACT

theran�</s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

(Ex. BB, Tabs 5B-5C). Additionally, there appears to have been a miscommunication because the laboratory **stopped** running tests on the Siemens Advia XPT on November 17, 2015, and has **not** run any tests on the instrument since then. Accordingly, the laboratory has not re-verified any assay on the Siemens Advia XPT. References to method verification data in documents enclosed with the submission are to verification reports prepared **before** the survey began and before the laboratory's revised procedures were made effective (those reports were either reviewed by CMS or available to CMS during the survey), which were referenced for context.

**D5423 – March 18 Letter Statement 2:** *"We also found no explanation as how "normal patient distribution" relates to determining if patients were affected or potentially affected."*

    **Theranos Response to Statement 2 – D5423:** The laboratory has enclosed a revised analysis to clarify its examination of these patient test result distributions, which should eliminate the confusion created by the phrase "normal patient distribution." (Ex. AA, Tab 5).

**D5423 – March 18 Letter Statement 3:** *"The laboratory's procedure as well as the method verification for alkaline phosphatase was reviewed at the onsite survey and the reportable range was documented as 0 - 1100 IU/L thus modifying the test. At the time of survey, the laboratory stated that the reportable range was 10 - 1100 IU/L per the manufacturer, and that the reportable range of 0 - 1100 IU/L was an error. The laboratory confirmed that the lowest reportable value established by the manufacturer was 10 IU/L. The Patient Impact Analysis submitted by the laboratory at Ex. B, Tab 6 now indicates that the reportable range should be 5 - 1100 IU/L which is still lower than the range established by the manufacturer; however, the laboratory did not submit any documentation to support this new reportable range."*

    **Theranos Response to Statement 2 – D5423:** The "Patient Impact Analysis" submitted by the laboratory at Ex. B, Tab 6 of its submission included a typographical error. As reflected in the revised patient assessment enclosed with this letter, the reportable range should be 12 – 909 U/L. (Ex. AA, Tab 6).

**D5423 – March 18 Letter Statement 4:** *"The Patient Impact Analysis also indicates that review of the PT showed a negative bias for PT samples CAP C-A 2015 and CAP-B 2015, but the laboratory determined that no corrected were needed. The submission also states: "There were no significant trends or bias in patient population data." The laboratory provided no explanations for these assertions."*

    **Theranos Response to Statement 4 – D5423:** The laboratory's patient assessment analysis appears to have included an inadvertent copy and paste mistake. The laboratory has enclosed its revised analysis. (Ex. AA, Tab 2).

25

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

**ER-1765**

CONFIDENTIAL — COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

Case 5:18-cr-00258-EJD Document 1134-5 Filed 11/08/21 Page 28 of 92

**theran⬣s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

**D5423 – March 18 Letter Statement 5:** *"In addition, the laboratory's submission states at Ex. B, Tab 6: "Matrix comparisons done by the manufacturer between serum and plasma showed correlation." The laboratory submitted no documentation supporting this statement."*

> **Theranos Response to Statement 5 – D5423:** The laboratory has enclosed with this letter documentation supporting that matrix comparisons done by the manufacturer between serum and plasma showed correlation. (Ex. HH, Tab 13).

**D5423 – March 18 Letter Statement 6:** *"The submission also states that "the lab has conducted training on these procedures to ensure that the practice is consistent with them," but did not include complete training documentation."*

> **Theranos Response to Statement 6 – D5423:** The laboratory's submission included training documentation on the method verification procedures for seven laboratory personnel. The laboratory has enclosed with this letter additional training documentation for the lab's method verification procedures. (Ex. BB, Tabs 5B-5C).

**D5423 – March 18 Letter Statement 7:** *"Because the laboratory has not shown whether it can follow its own validation protocols, it is uncertain whether the laboratory's quality assessment mechanisms could monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

> **Theranos Response to Statement 7 – D5423:** As stated above, there appears to have been a miscommunication because the laboratory **stopped** running tests on the Siemens Advia XPT on November 17, 2015, and has **not** run any tests on the instrument since then. Accordingly, the laboratory has not re-verified any assay on the Siemens Advia XPT.
>
> The laboratory is capable of ensuring that the deficient practice in D5423 does not recur. Significantly, the laboratory's has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures. The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016. Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory. In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant. Dr. Tschirhart has over fifteen years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team. The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

26

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

**ER-1766**

CONFIDENTIAL Case 5:18-cr-00258-EJD Document 1134-5 Filed 11/08/21 Page 29 of 92 CONFIDENTIAL INFORMATION ACT

**theranos**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

#### D5429

**D5429 – March 18 Letter Statement:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In the submission, the laboratory indicates that a 'tracer audit may [emphasis added [in the letter]] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

> **Theranos Response to Statement – D5429:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

#### D5437

Findings #1 & #2

**D5437 Findings #1 & #2 – March 18 Letter Statement 1:** *"At the time of the onsite survey, the laboratory failed to maintain calibration documentation for the complete blood count (CBC) instruments. In the submission, we found no evidence the laboratory has re-established its calibration documentation for the CBC instruments."*

> **Theranos Response to Statement 1 – D5437 Findings #1 & #2:** There appears to have been a miscommunication. The laboratory **stopped** using its Siemens Advia 2120i instruments for clinical patient testing on November 17, 2015, and has **not** used them since then. The two Drew-3 instruments were retired before the survey began on September 22, 2015 and before the laboratory's revised procedures were made effective. Because the laboratory's "CBC instruments" are not in use, the laboratory has not "re-established" calibration documentation for those instruments.

**D5437 Findings #1 & #2 – March 18 Letter Statement 2:** *"In Ex. F, the laboratory provided lists of patient specimen accession numbers for which the laboratory intended to issue corrected*

27

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164396

# theran⊛s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.8165

*test reports; however, the laboratory provided no documentation to indicate corrected reports were generated and issued."*

**Theranos Response to Statement 2 – D5437 Findings #1 & #2:** Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5437 Findings #1 & #2 – March 18 Letter Statement 3:** *"To ensure appropriate and required calibration or QC corrective actions were taken, the laboratory indicated that quarterly audits will be performed and suggested that the audit results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In the submission, the laboratory indicates that a 'tracer audit **may** [emphasis added] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

### Theranos Response to Statement 3 – D5437 Finding #1 & #2:

The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

**D5437 Findings #1 & #2 – March 18 Letter Statement 4:** *"In addition, we note that in the laboratory's re-verification of test performance specifications for the CBC instruments, it was the laboratory's policy to accept %CV values that were up to 1.5 times the %CV values stated by the instrument manufacturer for any given CBC analyte. In the submission, we find no explanation as to why 1.5 times the manufacturer's %CV is acceptable to the laboratory."*

**Theranos Response to Statement 4 – D5437 Finding #1 & #2:** Prior to the survey, the laboratory did not employ a policy to accept %CV values that were up to 1.5 times the %CV values, and the verification reports that CMS reviewed did not use 1.5 times %CV.

28

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CONFIDENTIAL Case 5:18-cr-00258-EJD Document 1134-5 Filed 11/08/21 Page 31 of 92 ATION ACT

# theran🇴s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9166

Likewise, the laboratory's revised method verification procedure does not include a 1.5 times %CV policy. (Ex. BB, Tab 5).[12] Rather, it requires that the laboratory verify the manufacturer's imprecision claim. (Ex. BB, Tab 5 § 8.2). Training on the revised procedure has occurred. (Ex. BB, Tabs 5B-5C). Additionally, there appears to have been a miscommunication because the laboratory stopped running tests on the Siemens Advia 2120i instruments on November 17, 2015, and has not run any tests on the instrument since then. The laboratory has retired its two Drew-3 instruments. Accordingly, the laboratory has not re-verified any assay on "the CBC instruments." References to method verification data in documents enclosed with the submission are to verification reports prepared **before** the survey began and before the laboratory's revised procedures were made effective (those reports were either reviewed by CMS or available to CMS during the survey), which were referenced for context.

### D5447

**D5447 – March 18 Letter Statement 1:** *"Although the laboratory's submitted protocol indicates that a two-level QC slide review is now required every day of patient testing when using the Cellavision, the laboratory provided no documentation of or information about the QC materials used, how the statistical parameters of the QC materials would be determined, how QC test results will be documented, and whether laboratory staff has been trained on this new protocol."*

> **Theranos Response to Statement 1 – D5447:** The laboratory has revised the Cellavision SOP to include information about the QC materials used, how the statistical parameters of the QC materials would be determined, and how QC test results will be documented. (Ex. BB, Tab 15 ). However, this SOP is not presently in use, because the laboratory stopped using the Cellavision on November 17, 2015, and has not used the Cellavision since then. Because the Cellavision is not in use, the laboratory has not conducted a training on this revised (but inactive) SOP.

**D5447 – March 18 Letter Statement 2:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In the submission, the laboratory indicates that a 'tracer audit **may** [emphasis added [in the letter]] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

---

[12] The laboratory referred to a 1.5 times %CV in its response based upon Bio-Rad's coefficient of variation rate. (http://www.qcnet.com/Portals/50/PDFs/QCWorkbook2008_Jun08.pdf). Upon further review, the laboratory does not believe that Bio-Rad's coefficient of variation rate is applicable here.

29

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164398

CONFIDENTIAL — Case 5:18-cr-00258-EJD Document 1184-5 Filed 11/08/21 Page 82 of 92 — INFORMATION ACT

theran�066s

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

**Theranos Response to Statement 2 – D5447:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

### D5449

**D5449 — March 18 Letter Statement 1:** *"Although the laboratory's submitted protocol indicates that an external positive QC material would be included in each run of patient Chlamydia trachomatis/Neisseria gonorrhoeae (CT/NG) testing, the laboratory provided no documentation of the positive QC material used, how the statistical parameters of the positive QC material would be determined, how the positive QC test result will be documented, and whether laboratory staff has been trained on this new protocol."*

**Theranos Response to Statement 1 – D5449:** The laboratory has revised the CT/NG SOP to include information about the positive QC materials used, how the statistical parameters of the QC materials would be determined, and how QC test results will be documented. (Ex. BB, Tab 16 § 9.1.5). The relevant laboratory personnel have been trained on this protocol. (Ex. BB, Tabs 16B-16C).

**D5449 – March 18 Letter Statement 2:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In the submission, the laboratory indicates that a 'tracer audit **may** [emphasis added [in the letter]] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5449:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.

30

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

CMS2-164399

CONFIDENTIAL — Case 5:18-cr-00258-EJD Document 1134-5 Filed 11/08/21 Page 83 of 92 — INFORMATION ACT

theran⊛s

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9166

(Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

### D5469

Finding #1

**D5469 Finding #1 – March 18 Letter Statement 1:** *"Although the laboratory's submitted protocol indicates that the stated values of new commercially assayed CBC QC materials were to be verified through parallel testing against QC materials in use, the laboratory provided no documentation indicating that this protocol had been effectuated, no information as to how the results of the parallel testing will be documented, and no information as to whether laboratory staff has been trained on this new protocol."*

**Theranos Response to Statement 2 – D5469 Finding #1:** D5469 Finding #1 relates to the laboratory's "two Drew 3 instruments." The laboratory's two Drew-3 instruments were retired before the survey began on September 22, 2015. Since the survey, there has not yet been a need to perform parallel testing against QC materials in use because the laboratory has not approached a QC lot change for the tests that are in use. To ensure that there will not be an issue with documentation of such parallel testing in the future, the laboratory has further revised its procedures as to how the results of the parallel testing against QC materials in use must be documented. (Ex. BB, Tab 14 § 9). The laboratory staff has been trained on this documentation procedure. (Ex. BB, Tabs 14B-C).

To ensure that there is not any confusion, we note that the Advia 2120i CBC SOP is inactive (and is not in use) because the laboratory stopped using those instruments on November 17, 2015, and has not used them since then.

**D5469 Finding #1 – March 18 Letter Statement 2:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

31

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

CMS2-164400

CONFIDENTIAL Case 5:18-cr-00258-EJD Document 1384-5 SUBJECT TO FREEDOM 11/08/21 Page 34 of 92 ATION ACT

**theran⦿s**

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

**Theranos Response to Statement 2 – D5469 Finding #1:** The laboratory has revised its
audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB,
Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised
procedures establish that tracer audits must occur monthly; provide the protocol for a tracer
audit; and require that tracer audits be documented using the tracer audit form, CL FRM
00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a
quarterly audit to cover the quality management systems; provide the protocol for quarterly
audits; and require that quarterly audits are documented using the audit record form, CL QOP
00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear
that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on
findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training
on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

Finding #2

**D5469 Finding #2 – March 18 Letter Statement 1:** *"Although the laboratory's submitted
protocol indicates that the stated values of new commercially assayed chemistry QC materials
were to be verified through parallel testing against QC materials in use, the laboratory provided
no documentation indicating that this protocol had been effectuated, no information as to how
the results of the parallel testing will be documented, and no information as to whether
laboratory staff has been trained on this new protocol."*

**Theranos Response to Statement 1 – D5469 Finding #2:** D5469 Finding #2 relates to the
chemistry assays on the Siemens Advia 1800 and Siemens Advia XPT instruments. The
laboratory stopped using the Siemens Advia 1800 instruments before the survey began on
September 22, 2015, and has not used them since then. The laboratory stopped using the
Siemens Advia XPT instrument on November 17, 2015, and has not used it since then. Since
the survey, there has not yet been a need to perform parallel testing against QC materials in
use because the laboratory has not approached a QC lot change for the tests that are in use.
To ensure that there will not be an issue with documentation of such parallel testing in the
future, the laboratory has further revised its procedures as to how the results of the parallel
testing against QC materials in use must be documented. (Ex. BB, Tab 14). The current
procedures include worksheets for how to document parallel testing. (Ex. BB, Tab 14 F1-F4).
The laboratory staff has been trained on this documentation procedure. (Ex. BB, Tabs 14B-
14C).

**D5469 Finding #2 – March 18 Letter Statement 2:** *"To ensure the deficient practice does not
recur, the laboratory indicated that quarterly audits will be performed and suggested that the
audits results would be reviewed within the laboratory's QMPI Program. However, the
laboratory did not establish the procedure by which these quarterly audits are to be conducted.
In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used."*

32

CONFIDENTIAL-COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

# theran♦s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5469 Finding #1:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

## D5477

**D5477 – March 18 Letter Statement 1:** *"The laboratory submitted no written procedure for the bacteriology media QC protocol, and no information as to whether laboratory staff has been trained on this new protocol."*

**Theranos Response to Statement 1 – D5477:** The laboratory has enclosed with this letter its written procedure for the bacteriology media QC protocol and documentation showing that the relevant personnel have been trained on it. (Ex. BB, Tabs 4-4C).

**D5477 – March 18 Letter Statement 2:** *"In Ex. L, Tab 8, the submission included a completed form titled 'Blood Agar 5% Quality Control Log sheet.' We note that the entry for the media received on 1/18/16 indicates that QC testing of this bacteriology media was completed on 1/14/16, which is before the date the media was received by the laboratory. Yet, as documented on the form, the completed form was reviewed on 2/11/16 without any indication this entry had been reviewed. We question the accuracy of this entry as well as the effectiveness of the laboratory's oversight mechanism."*

**Theranos Response to Statement 2 – D5477:** CMS appears to have had difficulty reading the handwriting on the Blood Agar 5% Quality Control Log Sheet, confusing a handwritten "3" with an "8". The "Blood Agar 5% Quality Control Log Sheet" states that the media was received on 1/13/16. ((Ex. HH, Tabs 5A-5B). Therefore, there is no reason to question that accuracy of this entry because the log shows that the media was received the day before QC testing of this bacteriology media was completed. For the same reason, the February 11,

33

CMS2-164402

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

**theranos**

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9166

2016 review of the completed form was performed correctly, and there is no reason to question the effectiveness of the laboratory's oversight mechanism.

**D5469 Finding #2 – March 18 Letter Statement 3:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 3 – D5469 Finding #2:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

**D5481**

Finding #1

**D5481 Finding #1 – March 18 Letter Statement 1:** *"The submission references 'Ex. I, Tabs 2-6.' We located these tabs, but found no documentation in Tabs 2, 5, and 6."*

**Theranos Response to Statement 1 – D5481 Finding #2:** There was an inadvertent copying error for Exhibit I to the initial submission. The laboratory has enclosed the applicable documents with this letter, as well as additional documents related to the laboratory's broader analysis of the PT/INR test over the entire time it was run on this Siemens BCS XP instrument. (Ex. GG).

**D5481 Finding #1 – March 18 Letter Statement 2:** *"Although the laboratory's submitted protocol requires that QC values be acceptable prior to reporting patient results, the submission states: 'Theranos reviewed all quality control (QC) data for PT/INR [Prothombin Time/International Normalized Ratio] for the time period that this lot of Dade Innovin was in*

34

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

CMS2-164403

**ER-1774**

CONFIDENTIAL Case 5:18-cr-00258-EJD Document 1184-5 Filed 11/08/21 Page 37 of 92 ATION ACT

**theranos**

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

*use.' The laboratory provided no documentation of this review other than stating it was performed.*

**Theranos Response to Statement 2 – D5481 Finding #1:** The laboratory has revised its patient assessment analysis for PT/INR, which is enclosed with this letter at Ex. AA, Tab 7. The revised assessment references supporting documentation identifying the time period that this lot of Dade Innovin was in use, as well as the QC data for that period. (Ex. AA, Tab 7; Ex. GG). That supporting documentation is also enclosed with this letter. (Ex. GG).

**D5481 Finding #1 – March 18 Letter Statement 3:** *We also found no documentation to indicate that the revised standard operating procedures (SOPS) have been effectuated. That is, we found no documentation of PT/INR QC failure investigations and corrective actions taken based on the revised SOPS."*

**Theranos Response to Statement 3 – D5481 Finding #1:** There appears to have been a miscommunication because the laboratory stopped running tests on the Siemens BCS XP, including PT/INR, on September 17, 2015, and has not run any tests on the instrument since then. Therefore, there have been no new QC failures for PT/INR to investigate or address through corrective action. The revised SOPs were implemented only after CMS identified the QC failures for PT/INR. The "review" discussed in the submission was simply intended to refer to the analysis conducted to address the deficiency identified by CMS. The issue addressed by the "review" — i.e., failing to document corrective action for QC fails for PT/INR — is the same issue identified by CMS in its deficiency, and thus did not constitute a new issue or occurrence.

**D5481 Finding #1 – March 18 Letter Statement 4:** *"In Ex. I, the laboratory provided lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were issued. We also note that the Patient Impact Assessment (Ex. I, Tab 1) states that "remedial action was taken on 9/25/15," but "corrected reports were issued beginning on 11/10/15 and completed on 11/12/15." There was no explanation as to why there was such a long period of time between the remedial action and issuing corrected reports.*

**Theranos Response to Statement 4 – D5481 Finding #1:** All of these corrected reports for PT/INR, along with documentation confirming that they were sent, are enclosed with this letter. (Ex. GG, Tab 7). On September 22 or 23, CMS identified a number of issues related to PT/INR tests during the period April to September 2015. The laboratory undertook a thorough investigation. Given the number of issues to review, the investigation took time to complete properly. Timeliness for proper completion of the investigation and associated corrective actions were also affected by the absence of a full-time, on-site laboratory director. The laboratory subsequently hired its new lab director, Dr. Kingshuk Das, who is highly

35

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CONFIDENTIAL Case 5:18-cr-00258-EJD Document 1034-5 Filed 01/08/21 Page 88 of 92 ATION ACT

**theranos**

1701 Page Mill Road  P 650.838.9292  theranos.com
Palo Alto, CA 94304  F 650.838.9165

qualified and has extensive clinical laboratory experience. As of March 14, 2016, Dr. Das joined Theranos on-site full-time at the Newark, California laboratory. Additionally, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant. Dr. Tschirhart has over fifteen years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team.

**D5481 Finding #1 – March 18 Letter Statement 5:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 5 – D5481 Finding #1:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

Finding #2

**D5481 Finding #2 – March 18 Letter Statement 1:** *"Although the laboratory submitted a QC protocol (Ex. A, Tab 9), the laboratory's submission did not include an updated protocol for QC specific to the Theranos Proprietary Devices."*

**Theranos Response to Statement 1 – D5481 Finding #2:** This aspect of the review appears to be based on a miscommunication because Theranos **retired** the TPS in early-August 2015.

**D5481 Finding #2 – March 18 Letter Statement 2:** *"The reference protocol states at §§ 8.1.9-8.1.10:*

36

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

CMS2-164405

CONFIDENTIAL — Case 5:18-cr-00258-EJD Document 1384-5 Filed 11/08/21 Page 39 of 92 ATION ACT

theran*s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

> 'No instrument or test method can be used for the purpose of performing a test to report
> a result to a patient prior to having passed all required QC procedures at least once for
> the day on which the test is to be performed. It is the responsibility of all testing
> personnel to ensure this does not occur. Testing personnel must immediately take the
> appropriate action for all failed QC runs, refer to section 8.4.'

In addition, the laboratory's submission states:

> 'To perform this analysis, systematic error was investigated using quality control (QC)
> data and patient distribution over time. The QC data was reviewed in Levey-Jennings
> plots and evaluated for bias trends. The patient data was summarized by plotting monthly
> means, monthly medians and monthly means ("average of normal" or AON) calculated
> from central 95% of values. In addition, random errors were evaluated by analysis of QC
> data. Namely, QC data was reviewed to identify >2SD failures and period of elevated
> CV. Namely, batches of 10 consecutive QC data points were analyzed and the CV was
> calculated for each QC level during this period. If the CV was >30%, then all patient
> results run during that time period will be voided. (Ex. E, Tab 1).'

The laboratory's response does not include an evaluation of unacceptable QC results or patients
affected or potentially affected by the cited QC failures. It is not clear how evaluating aggregate
patient (i.e., monthly means and medians) and QC (i.e., bias trends, >2SD, CV) data addressed
specific days that the QC was unacceptable and patient results were reported.

The summary (Ex. E, Tab 1) included analytes tested on the Theranos Proprietary Device. We
note that general statements such as, but not limited to, were included:

- 'Monthly patient distribution variance were noted, but they could not be further
  substantiated by QC trends'
- 'Patient results following a QC failure and during periods of high CV are being voided'
- 'Patient distribution and QC trends did not reveal significant trends.'
- 'Potential biases observed in patient distributions were found to be insignificant relative
  to the normal reference intervals'

The laboratory's submission did not provide any explanation or documentation to support these
statements."

**Theranos Response to Statement 2 – D5481 Finding #2:** This deficiency concerns the
TPS 3.5, which was one of the Theranos proprietary technologies in use in 2014 and
2015. The laboratory began phasing out the TPS 3.5 in December 2014, and it was **fully
retired** in early-August 2015.

The laboratory values CMS's feedback, and takes it very seriously. The laboratory has
conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January
1, 2014 until the TPS 3.5 was fully retired in early-August 2015. As explained further in the

37

CMS2-164406

**ER-1777**

CONFIDENTIAL Case 5:18-cr-00258-EJD Document 1345-5 Filed 11/08/21 Page 40 of 92 INFORMATION ACT

theran⬤s

1701 Page Mill Road    P 650.838.9292   theranos.com
Palo Alto, CA 94304    F 650.838.9165

attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5. (Ex. AA, Tab 3). The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures. Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015. As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015. (Ex. AA, Tab 3). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5481 Finding #2 – March 18 Letter Statement 3:** *"The submission (Ex. E) includes a list of patient specimen accession numbers for which the laboratory "identified reports," but does not specify or include documentation to indicate whether corrected reports were generated and issued."*

**Theranos Response to Statement 3 – D5481 Finding #2:** As indicated above, the laboratory has revised and broadened its analysis of this deficiency. Based on that analysis, which is described above and in the attached documentation, the laboratory has, out of an extreme abundance of caution, voided all results reported for assays run on the TPS 3.5 in 2014 and 2015. (Ex. AA, Tab 3). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

## D5775

### Finding #1

**D5775 Finding #1 – March 18 Letter Statement 1:** *"In the submitted protocol, the laboratory states: 'To ensure all manual differentials performed are comparable, ... manual differentials will be compared annually amongst the competent staff....' The laboratory provided no written procedure as to how "manual differentials will be compared annually.' In addition, the regulation requires the laboratory to conduct such evaluations twice a year, not annually."*

**Theranos Response to Statement 1 – D5775:** The laboratory has revised the Cellavision SOP to include procedures for how manual differential will be compared and to require that the laboratory perform such evaluations twice a year. (Ex. BB, Tab 15 § 9.1.4.2). Please note, however, that this SOP is inactive because the laboratory stopped using the Cellavision on November 17, 2015, and has not used it since then.

**D5775 Finding #1 – March 18 Letter Statement 2:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the*

38

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

CMS2-164407

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

Case 5:18-cr-00258-EJD Document 1134-5 Filed 11/08/21 Page 41 of 92

**theran&s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9105

*audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5775 Finding #1:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

Finding #2

**D5775 Finding #2 – March 18 Letter Statement 1:** *"Although the laboratory submitted a method/instrument comparison protocol (Ex. A, Tab 28), we were unable to determine if the protocol was effectuated. In its submission, the laboratory states: 'The lab's technical supervisors and the quality system director will be responsible for ensuring that these procedures are followed.' However, the laboratory's submission did not include any documentation to indicate that the technical supervisors or the quality systems director had been trained on the method/instrumentation comparison protocols."*

**Theranos Response to Statement 1 – D5775 Finding #2:** This deficiency concerns method comparison for the TPS 3.5. As indicated above, the TPS 3.5 was fully **retired** in early-August 2015. Before the survey began, the laboratory had **stopped** running the same test using different methodologies or instruments, and the laboratory has **not** run the same test using different methodologies or instruments since then. As a result, the laboratory has had no reason to use the method verification protocol that it included with the submission. Although the laboratory does not have a need to use the revised method comparison protocol at this time, it has trained its technical supervisors and quality director on it. (Ex. BB, Tabs 12-12C).

39

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164408

CONFIDENTIAL—COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

**theran☯s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

**D5775 Finding #2 – March 18 Letter Statement 2:** *"The laboratory's submission also includes the following statement:*

> *Because TPS's [Theranos Proprietary Devices] were factory calibrated by Theranos, the laboratory did not perform additional method correlation studies. As part of this investigation, Theranos examined the correlation of different TPS to evaluate their concordance. Namely, for SHGB, TT3, Vitamin B12 and Vitamin D, patient distributions were compared across representative TPS's in use during the same period (Exhibit E Tab 12-A; Tab 24-A, Tab 33-A). These data showed similar patient distributions across the different devices. In addition, comparison of assay results across different assay levels and different TPS's demonstrates that the instruments were well correlated to each other (Exhibit E, Tab 12-A; Tab 24-A, Tab 33-A). Namely, the median result for each TPS was within the total allowable error thereby demonstrating that the same assay reference ranges were appropriate for TPS.*

*The laboratory's response indicates that not all TPS would be included in the correlation studies rather 'across representative TPS in use during the same period.' The laboratory submitted correlation studies for Sex Hormone Binding Globulin (SHBG) and Vitamin D (VitD) only (Ex E, Tabs 12-A, 24-A and 33-A, respectively). However, these studies did not include a date on either the summary or raw data, so we were unable to determine when the correlation studies occurred. The submission for SHBG also included information on one document with box plots that included three devices and another document that included box plots of six devices, so we were unable to determine what devices were actually used for SHBG testing.*

*The laboratory's submission offered no response to correlation studies for Vitamin B12 and no explanation for the disparity between the devices used for QC and the devices used for patient testing. We also noted that there was no explanation as to where the total allowable error (TAE) of 24% on the raw data documentation came from or if any TAE was calculated for the submitted data. The laboratory used the median result for each proprietary device to determine if TAE was acceptable, but did not provide an explanation why the median results were used."*

**Theranos Response to Statement 2 – D5775 Finding #2:** This portion of CMS's March 18 letter concerns aspects of the patient assessment analysis for tests run on the TPS 3.5. The laboratory began phasing out the TPS 3.5 in December 2014, and it was **fully retired** in early-August 2015.

As reflected in its submission, the laboratory believes oversight, implementation and structure of its prior method comparison procedures were not satisfactory, which is why it has developed the improved method comparison procedures that were included with the submission. The laboratory has further revised those procedures in response to other

40

CONFIDENTIAL, COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

CMS2-164409

CONFIDENTIAL — Case 5:18-cr-00258-EJD Document 1184-5 Filed 11/08/21 Page 43 of 92 — SUBJECT TO PROTECTIVE ORDER EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

theran☉s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9166

feedback contained in CMS's March 18 letter. (Ex. BB, Tab 12). Training on these procedures has occurred. (Ex. BB, Tabs 12B-12C).

The laboratory values CMS's feedback, and takes it very seriously. The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was **fully retired** in early-August 2015. As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5. (Ex. AA, Tab 3). The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures. Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015. As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015. (Ex. AA, Tab 3). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5775 Finding #2 – March 18 Letter Statement 3:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5775 Finding #1:** audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

D5779

41

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

CONFIDENTIAL Case 5:18-cr-00258-EJD Document 1345-5 Filed 11/08/21 Page 44 of 92 ATION ACT

**theranos**

1701 Page Mill Road  P 650.838.9292  theranos.com
Palo Alto, CA 94304  F 650.838.9165

**D5779 – March 18 Letter Statement 1**: *"In Ex. F, the laboratory provided lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were issued."*

    **Theranos Response to Statement 1 – D5779:** Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5779 – March 18 Letter Statement 2:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

    **Theranos Response to Statement 2 – D5779:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-D). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

## D5787

**D5787 – March 18 Letter Statement 1:** *"The laboratory submitted no written procedure for the documentation of the lot of bacteriology media used to test any given patient specimen, and no information as to whether laboratory staff has been trained on this new protocol."*

    **Theranos Response to Statement 1 – D5787:** The laboratory has enclosed with this letter its written procedure for the documentation of bacteriology media QC protocol. (Ex. BB, Tab 4 § 8.2). The relevant laboratory personnel have been trained on that procedure, as reflected in the documentation enclosed at Ex. BB, Tabs 4B-4C.

42

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

CONFIDENTIAL Case 5:18-cv-00256-EJD Document 1134-5 Filed 11/08/21 Page 45 of 92 ATION ACT

**theran⬤s**

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

**D5787 – March 18 Letter Statement 1:** *"In its submission, the laboratory references Ex. L, Tab 6 which states: "When [media quality control] testing is completed the results are logged into an excel sheet with lot number and expiration date for each patient (see attached report)." We find no "attached report" in the submission and, therefore, no documentation indicating the laboratory's corrective action has been effectuated."*

> **Theranos Response to Statement 1 – D5787:** The laboratory has effectuated its written bacteriology media QC protocol by logging each patient result into a separate excel worksheet that includes the lot number and expiration date for the bacteriology media lot use for that patient test. We have enclosed examples of these excel spreadsheets, which show that the laboratory's corrective action has been effectuated. (Ex. HH, Tab 6).

**D5787 – March 18 Letter Statement 2:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

> **Theranos Response to Statement 2 – D5787:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

## D5791

### Finding #1

**D5791 Finding #1 – March 18 Letter Statement 1:** *"The laboratory submitted a protocol for the SensoScientific Monitoring in Ex. A, Tab 24. The response does not specifically address the days that the freezers did not meet acceptable temperatures as documented in the SensoScientific Monitoring Audit Node Log. We could not determine if the new procedure has been effectuated*

43

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

Case 5:18-cr-00258-EJD Document 1134-5 Filed 11/08/21 Page 46 of 92

**theran⬩s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*as no documentation was submitted to show that the unacceptable freezer temperatures were addressed.*

**Theranos Response to Statement 1 – D5791 Finding #1:** The laboratory has effectuated its revised procedures for the SensoScientific Monitoring that were included with our initial submission. Two examples of the current system monitoring are enclosed with this letter. (Ex. II, Tabs 1A-1B). First, on March 18, 2016, at about 11:00 a.m., the laboratory's Wi-Fi became temporarily inoperable. All monitors went into failure mode and a down-time paper recording was initiated. The Wi-Fi was brought back up and the system was restored by 6:00 p.m. Data was reclaimed from the monitors for the period in question, and this failure was documented in the enclosed Alarm History and Corrective Action (Ex. II, Tab 1A) and the enclosed Occurrence Report Form. (Ex. II, Tab 1B). Second, on March 19, 2016, freezer 7063 failed a temperature check. The low magnitude and brevity of the failure was below the alarm threshold. (Ex. II, Tab 4). The failure was detected and evaluated on a weekly review. (Ex. II, Tab 4). As it had corrected itself less than 30 minutes after it occurred, there was no need for further action. (Ex. II, Tab 4). This demonstrates that the procedure is being followed and temperatures are being adequately monitored. In addition, as stated in above regarding D5413, the laboratory has also posted signs on the freezers pursuant to the new procedures, as reflected in the attached documentation. (Ex. II, Tab 2).

**D5791 Finding #1 – March 18 Letter Statement 2:** *In addition, the laboratory states that training has occurred, but it was not clear who should be trained as 'laboratory supervisor or designee' was not defined."*

**Theranos Response to Statement 2 – D5791 Finding #1:** The laboratory has revised this procedure to clarify that "[i]t is the daily responsibility of the laboratory supervisor to monitor and record the temperatures of refrigerators and freezers and the temperature and humidity of each lab room and ambient storage space." (Ex. BB, Tab 13 § 4.5). The revised procedure is enclosed at Ex. BB, Tab. 13.

**D5791 Finding #1 – March 18 Letter Statement 3:** *"Training records provided in Ex. A, Tab 30 included only training documents for one general supervisor."*

**Theranos Response to Statement 3 – D5791 Finding #1:** The laboratory has enclosed with this letter a complete set of training records on this SOP, which show that the relevant laboratory personnel have been trained. (Ex. BB, Tabs 13B-13C).

**D5791 Finding #1 – March 18 Letter Statement 4:** *"Several freezers were identified as 'not used in patient testing' (see Ex. N, Tab A); however, based on interviews during the onsite visit, these freezers were identified as being used for CLIA activities. The submission did not include a response or data related to the freezers identified as 'not used in patient testing.'"*

44

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

**ER-1784**

CONFIDENTIAL Case 5:18-cr-00258-EJD Document 1034-5 Filed 11/08/21 Page 47 of 92 ATION ACT

**theranos**

1701 Page Mill Road    P 650.838.9292   theranos.com
Palo Alto, CA 94304    F 650.838.9165

**Theranos Response to Statement 4 – D5791 Finding #1:** D5791 #1 identifies the same six -20 C freezers and four -80 freezers as D5413. In the laboratory's submission, we explain that five of those freezers did not contain materials that would be used in the future for clinical patient testing. Rather, they only contained material that might be used in the future for research and development.

Based on CMS's March 18 letter, it appears that there was a miscommunication when the CMS surveyors were onsite. D5413, Paragraph f, states that CMS had a discussion about these freezers with the "Director of Assay Systems and technical supervisor at 11/19/15 at approximately 11 am." The Director of Assay Systems did not have any regular involvement with those freezers at that time and did not have knowledge of their contents. The "technical supervisor" in attendance on November 19, 2015 joined the company on October 26, 2015 (Ex. HH, Tab 8); he also did not have regular involvement with those freezers at the time and did not have knowledge of their contents. To the extent CMS understood either of these individuals to be confirming the contents of these freezers or whether these freezers were used in clinical patient testing, there was a miscommunication.

The laboratory has looked into this issue further, and has reconfirmed that the statements in the laboratory's submission are accurate. As reflected in the enclosed documentation:

- On November 19, 2015, there were four -20 C freezers in the microbiology or BUGS laboratory. 7061 BUGS -20 C Freezer 4 did **not** contain any materials for future use in clinical patient testing. (Ex. II, Tab 3B).
  3.
- On November 19, 2015, there was one -20 C freezer in the capillary laboratory. Clinical patient testing in the Normandy laboratory **stopped** on September 20, 2015, and there has **not** been any clinical patient testing in the Normandy laboratory since then. The 1 Normandy -20 C freezer 7066 did **not** contain any materials for future use in patient testing. (Ex. II, Tab 3C).

4.

- On November 19, 2015, there were four -80 C freezers. 7098 -80 C Freezer 1 Nuair, 7111 -80 C Freezer 2 Thermo, and 7113 -80 2 CLIA Lab did not contain any materials for future use in clinical patient testing. While the last of those three freezers was named 7113 -80 2 CLIA Lab, it was only used to store old specimens that were not for future use in clinical patient testing. (Ex. II, Tab 3A)

**D5791 Finding #1 – March 18 Letter Statement 5:** *"The laboratory submitted an article for the use of Mean Kinetic Temperatures (MKT) (Ex. N, Tab 1). This article relates to the handling, storage, and distribution of temperature sensitive pharmaceuticals, not clinical laboratory specimens, reagents, reference materials, etc. We are unclear as to how this article applies to this deficient practice, and note that the written procedure submitted by the laboratory at Ex. A, Tab 24 does not incorporate monitoring temperature by MKT."*

**Theranos Response to Statement 5 – D5791 Finding #1:** Although the article is not critical to our analysis, it is relevant because it provides a specific rationale for understanding

45

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

CMS2-164414

CONFIDENTIAL — COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

**theran⚬s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9185

the chemical effects of brief increases (or decreases) in temperature on pharmaceuticals, and by extrapolation, on chemical controls. The conclusion of the article is that brief periods of temperature elevation have little effect on the rate of chemical degradation on the product being stored. While we do not recommend storing chemical control material in an unstable environment, the article gives reassurance that chemical control material subject short period of increased temperature by mistake are unlikely to be chemically degraded.

**D5791 Finding #1 – March 18 Letter Statement 6:** *"The laboratory also submitted an article related to the storage of bacterial samples for optimal viability (Ex. N, Tab 22). We note that the submitted written procedure relates to determining acceptable temperature viability of bacterial samples does not include any references to this article. We are unclear as to how this article applied to this deficient practice."*

**Theranos Response to Statement 6 – D5791 Finding #1:** This article is cited in the laboratory's revised patient assessment for this deficiency, which is enclosed with this letter. (Ex. AA, Tab 4). This article is relevant because it shows that bacteriology will remain viable for 10 years at -80C and for 1-3 years at -20C.

**D5791 Finding #1 – March 18 Letter Statement 7:** *"The laboratory submitted no evidence to support the following conclusion for the Sanyo JP Lab 7059 -20 freezer: '[The laboratory] determined that higher storage temperature had no effect on the calibrators or controls stored in this freezer. There is no patient impact from the change in temperature during the time period.'"*

**Theranos Response to Statement 7 – D5791 Finding #1:** The laboratory has revised its patient assessment analysis to provide more detail and documentation about its review of the effect this issue may have had on the Immulite controls stored in this freezer. (Ex. AA, Tab 4). Based on that review, the laboratory has voided certain test results. (Ex. AA, Tab 4). All of these voided reports, along with documentation confirming that they were sent, are enclosed with this letter. (Ex. KK).

**D5791 Finding #1 – March 18 Letter Statement 8:** *In addition, the laboratory stated for another freezer (1 BUGS 7120 -80 freezer) that the 'MKT remained between -70 and -86 C for the entire date range.' However, the laboratory indicated that "a small number of bacterial cultures ... labeled to be stored at -80C or colder" were stored in this freezer. It was unclear as to why it was appropriate to store 'bacterial cultures ... labeled to be stored at -80C or colder' to be stored at temperatures of -70C to -79C."*

**Theranos Response to Statement 8 – D5791 Finding #1:** The temperature at which these bacterial cultures are stored is not determined by a manufacturer. While the laboratory recognizes that it should have followed its procedures for maintaining the temperature of this freezer at -80C or colder, storage of these bacterial cultures at temperatures of -70C to -79C did not have the potential to affect patients receiving tests in 2014 and 2015. Most

46

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

CMS2-164415

CONFIDENTIAL Case 5:18-cr-00258-EJD Document 1134-5 Filed 11/08/21 Page 49 of 92 ATION ACT

theran⊛s

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9185

importantly, these bacterial cultures can only be used in patient testing after there is growth, which occurs **after** the bacterial culture is removed from the freezer. If there is no growth after the bacterial culture is removed from the freezer, then the culture is not viable and cannot be used in patient testing. Therefore, the higher temperature of this freezer did not have any potential to affect patients, even if even it had caused a bacterial culture to be unviable.

It is also worth noting that the temperature of -70C to -79C should not have had an impact on the viability of these bacterial cultures, which were put in these freezers after the laboratory moved to the Newark facility in October 2014. The laboratory labels bacterial cultures for storage at -80C or colder only because that allows for the longest period of viability, which is 10 years. (Ex. II, Tab 26).However, bacterial cultures remain viable for 1-3 years when stored at -20C. (Ex. II, Tab 26).

**D5791 Finding #1 – March 18 Letter Statement 9:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 9 – D5791 Finding #1:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

Finding #2

**D5791 Finding #2 – March 18 Letter Statement 1:** *"The laboratory submitted a protocol for a Master Validation Plan (Ex. E, Tab 30B) which required the %CV of replicates to be not more than 20% (25% at the lower and upper limits of detection). The submitted protocol was different*

47

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

**ER-1787**

CONFIDENTIAL Case 5:18-cr-00258-EJD Document 1134-5 Filed 11/08/21 Page 50 of 92 ATION ACT

**theran⊛s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*than the protocol presented to the surveyor at the time of the onsite survey which required the %CV of replicates to be not more than 15% (20% at the lower and upper limits of detection). The %CV in the protocol presented to the surveyor at the time of the onsite survey matched the %CV of the predicate devices. It is unclear as to why the TPS, which is covered by the Master Validation Plan, can now have %CV's for replicates greater than the predicate devices; no explanation was submitted. In addition, we note that the %CV's (18.7% - 63.8%) included in the submission does not appear to have been evaluated using this new protocol nor was it addressed in the laboratory's response provided at Ex. E, Tab 1."*

**Theranos Response to Statement 1 – D5791 Finding #2:** This deficiency concerns the TPS 3.5. As noted above, the TPS 3.5 was **fully retired** in early-August 2015.

With respect to these validation plans, there appears to have been a miscommunication. During the September 22-23, 2015 on-site visit, the laboratory understood that CMS had requested the validation plan for proprietary chemistry assays run on other Theranos technologies. The laboratory did not realize that CMS believed this plan was also the validation plan that applied to ELISA assays run on the TPS 3.5. After reviewing the Form 2567, we realized that there had been a miscommunication, which is why our submission included the ELISA Master Validation Plan.

As detailed above, the laboratory values CMS's feedback, and takes it very seriously. [13] The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was **fully retired** in early-August 2015. As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5. (Ex. AA, Tab 3). The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures. Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015. As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015. (Ex. AA, Tab 3). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March

---

[13] In discussing establishment of precision for an LDT, the March 18 letter references a comparison of %CVs between an LDT and "predicate devices." We note, however, that CLIA regulations do not contain any regulation requiring that there be any correlation or equivalence of %CV between LDTs and predicate devices. Rather, the regulations require only that the precision for the test must be established for the LDT itself. 42 C.F.R. § 493.1253(b)(2). It also is generally accepted that accuracy is the only required performance specification that typically requires a correlation study. 42 C.F.R. § 493.1253(b)(2).

48

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

CMS2-164417

CONFIDENTIAL Case 5:18-cr-00258-EJD Document 1184-5 Filed 11/08/21 Page 51 of 92 ATION ACT

**theran�s**

1701 Page Mill Road　　P 650.838.9292　theranos.com
Palo Alto, CA 94304　　F 650.838.9165

31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5791 Finding #2 – March 18 Letter Statement 2:** *"The submission (Ex. E) includes a list of patient specimen accession numbers for which the laboratory "identified reports," but does not specify or include documentation to indicate whether corrected reports were generated and issued."*

**Theranos Response to Statement 2 – D5791 Finding #2:** As indicated above, the laboratory has revised and broadened its analysis of this deficiency and associated corrective actions. Based on that analysis, which is described above and in the attached documentation, the laboratory has, out of an extreme abundance of caution, voided all results reported for assays run on the TPS 3.5 in 2014 and 2015. (Ex. AA, Tab 3). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

Finding #3

**D5791 Finding #3 – March 18 Letter Statement 1:** *"The laboratory's review of the QC found in Ex. E, Tab 1 did not specify what period of QC the laboratory reviewed."*

**Theranos Response to Statement 1 – D5791 Finding #3:** As indicated above, the laboratory's analysis covers the entire period in which each assay run on the TPS 3.5 was in use in 2014 and 2015. (Ex. AA, Tab 3).

**D5791 Finding #3 – March 18 Letter Statement 2:** *"The quality assessment (QA) documentation related to QC data from the survey in July 2014, October 2014, and February through June 2015. The laboratory's investigation did not indicate that the review had identified the cited issues related to QC."*

**Theranos Response to Statement 2 – D5791 Finding #3:** The revised analysis enclosed with this letter makes clear that the laboratory identified the cited issues related to QC. (Ex. AA, Tab 3). The laboratory's review of QC in connection with the submission, as well as the re-review reflected in the enclosed revised analysis, included a review of imprecision, QC trends, and QC failures, including failures occurring where one of the two levels of control had a value of 2SD or greater.

**D5791 Finding #3 – March 18 Letter Statement 3:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would*

49

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

**theranos**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*be documented, and whether the results of a "tracer audit" would be the information reviewed*
*by the QMPI Program."*

**Theranos Response to Statement 3 – D5791 Finding #3:** The laboratory has revised its
audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB,
Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised
procedures establish that tracer audits must occur monthly; provide the protocol for a tracer
audit; and require that tracer audits are documented using the tracer audit form, CL FRM
00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a
quarterly audit to cover the quality management systems; provide the protocol for quarterly
audits; and require that quarterly audits are documented using the audit record form, CL QOP
00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear
that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on
findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training
on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

Finding #4

**D5791 Finding #4 – March 18 Letter Statement 1:** *"Although the laboratory's submitted*
*protocol included information about quarterly audits and agenda items for the laboratory's*
*QMPI Program, the submission does not provide specific actions to take when problems are*
*identified, specifically related to clotted specimens. The laboratory states in Ex. L, Tab 35 that*
*"[p]atient specimens that did not meet the lab's acceptance criteria were rejected ... " However,*
*the issue was not that the clotted specimens were rejected, rather that the laboratory's QA*
*program did not identify the high number of clotted specimens over a period of three quarters.*
*The submission does not include any documentation showing that the issue was identified and*
*corrected. We note that Ex. A, Tab 12, §7.2.1.6 indicates that the QMPI Program agenda*
*included specimen rejection rate partitioned by rejection criteria, but does not require that any*
*action be taken based on this agenda item. In addition, we note that in Ex. A, Tab 12, §7.1, the*
*laboratory provided the frequency of the QMPI Program meetings, but does not indicate any*
*action should be taken in the event it is determined that the quality metrics were not met."*

**Theranos Response to Statement 1 – D5791 Finding #4:** The laboratory has further
revised its QMPI Program procedures to ensure that the QMPI Program identifies specimen
rejection issues promptly. (Ex. BB, Tab 7 § 7.2.3.1). The procedure requires that when
analyzing specimen rejection and redraws, the QMPI team will "[i]dentify any corrective
action to take based on data such as retraining or a procedure change." (Ex. BB, Tab 7 §
7.2.3.1.e)

**D5791 Finding #4 – March 18 Letter Statement 2:** *"To ensure the deficient practice does not*
*recur, the laboratory indicated that quarterly audits will be performed and suggested that the*
*audits results would be reviewed within the laboratory's QMPI Program. However, the*
*laboratory did not establish the procedure by which these quarterly audits are to be conducted.*

50

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

CMS2-164419

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

**theran⊛s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used,"*
*but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would*
*be documented, and whether the results of a "tracer audit" would be the information reviewed*
*by the QMPI Program."*

> **Theranos Response to Statement 2 – D5791 Finding #4:** The laboratory has revised its
> audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB,
> Tab 8). Training on these procedures has occurred. (Ex. BB, Tab 8B-8C). The revised
> procedures establish that tracer audits must occur monthly; provide the protocol for a tracer
> audit; and require that tracer audits be documented using the tracer audit form, CL FRM
> 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a
> quarterly audit to cover the quality management systems; provide the protocol for quarterly
> audits; and require that quarterly audits are documented using the audit record form, CL QOP
> 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear
> that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on
> findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training
> on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

## D5793

### Finding #1

The March 18 Letter states: *"See our reviews of D5403, D5437, D5469, and D5779."*
Accordingly, we refer you to our responses to those reviews.

### Finding #2

**D5793 Finding #2 – March 18 Letter Statement 1:** *In the submission, the laboratory states:*

> *Based on comprehensive review, multiple examples of failed QC without the appropriate*
> *documentation with no investigation or corrective action was identified which is now*
> *addressed with revised SOPS and training. Additional competency is on-going to ensure*
> *CLS demonstrate the required proficiency with quality control and the appropriate*
> *investigation, corrective action and notification.*

*We find no documentation to indicate that the 'revised SOPS' have been effectuated. That is, we*
*find no documentation of cytometry QC failure investigations and corrective actions taken based*
*on the 'revised SOPS' as discovered while conducting the 'comprehensive review.'"*

> **Theranos Response to Statement 1 – D5793 Finding #2:** There appears to have been a
> miscommunication here because the laboratory **stopped** running tests on the flow cytometer
> before the survey began on September 22, 2015, and **has** not run any tests on the instrument
> since then. Because the flow cytometer is not in use, and has not been in use since the survey

51

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

**ER-1791**

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

theran⬡s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

began, there has not been any new QC failures that required investigation or corrective action under the laboratory's new procedures. The "review" discussed in the submission was simply intended to refer to the analysis conducted to address the deficiency identified by CMS. The issue addressed by the "review" — i.e., failing to document corrective action for QC fails for the Fortessa and Canto — is the same issue identified by CMS in its deficiency, and thus did not constitute a new issue or occurrence.

**D5793 Finding #2 – March 18 Letter Statement 2:** *In Ex. J, the laboratory provided lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were generated and issued.*

    **Theranos Response to Statement 2 – D5793 Finding #2:** Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5793 Finding #2 – March 18 Letter Statement 3:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

    **Theranos Response to Statement 3 – D5793 Finding #2:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

Finding #3

**D5793 Finding #3 – March 18 Letter Statement 1:** *"In the submission, the laboratory states:*

52

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

CMS2-164421

**theran⬤s**

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

- *'07/16/2015: Level 3 QC outside manufacturer's recommended range, and not repeated,*
  *5.    therefore level 3 QC was out of control for the day'*
- *'09/01/2015 to 09/13/2015: all level 3 control results are outside the manufacturer's*
  *6.    recommended range (negative bias)'*
- *'10/01/2015 - 10/31/2015: all level 3 control results are outside the manufacturer's*
  *recommended range (negative bias)'*
- *'All 3 levels of QC were not run on 11/04/2015, 11/05/2015, 11/07/2015, 11/08/2015,*
  *11/09/2015, 11/10/2015, 11/12/2015, 11/14/2015, and 11/15/2015' [The laboratory*
  *provided no information as to whether patient HCG specimens were tested on the*
  *November dates listed.]*

*Yet, the laboratory concluded: 'Results for urine HCG are quantitative with a cut off of 30*
*mUI/ml. Because of the nature of this assay no correct reports are required.'*

*Since QC failures may indicate possible test system problems and it is unknown as to how the*
*HCG (human chronic gonadotropin) test results were used and interpreted, we question the*
*laboratory's conclusion and the accuracy and reliability of any patient HCG test results*
*reported on the July, September, October, and November dates listed."*

> **Theranos Response to Statement 1 – D5793 Finding #3:** The laboratory has conducted a
> further review of this data and has revised its patient assessment analysis, as reflected in the
> enclosed documentation. (Ex. AA, Tab 8). The laboratory has concluded patient results
> were unaffected by this deficiency.

**D5793 Finding #3 – March 18 Letter Statement 2:** *"To ensure the deficient practice does not*
*recur, the laboratory indicated that quarterly audits will be performed and suggested that the*
*audits results would be reviewed within the laboratory's QMPI Program. However, the*
*laboratory did not establish the procedure by which these quarterly audits are to be conducted.*
*In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used,"*
*but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would*
*be documented, and whether the results of a "tracer audit" would be the information reviewed*
*by the QMPI Program."*

> **Theranos Response to Statement 2 – D5793 Finding #3:** The laboratory has revised its
> audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB,
> Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised
> procedures establish that tracer audits must occur monthly; provide the protocol for a tracer
> audit; and require that tracer audits be documented using the tracer audit form, CL FRM
> 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a
> quarterly audit to cover the quality management systems; provide the protocol for quarterly
> audits; and require that quarterly audits are documented using the audit record form, CL QOP
> 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear
> that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on

53

CMS2-164422

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

Case 5:18-cr-00258-EJD Document 1134-5 Filed 11/08/21 Page 56 of 92

**theran☉s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training
on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

Finding #4

**D5793 Finding #4 – March 18 Letter Statement 1:** *"In the submission, the laboratory states:*

- *'Anti-HBs is a qualitative assay with a positive cutoff of 11 so no corrected reports are*
  *7. required.'*
- *'Qualitative assay will not require corrected reports to be issued'*

*We are unclear as to how the laboratory came to these conclusions and the submission does not
contain any documentation to support these statements."*

    **Theranos Response to Statement 1 – D5793 Finding #4:** The laboratory has conducted a
further review of this data and has revised its patient assessment analysis, as reflected in the
enclosed documentation. (Ex. AA, Ex. 9).

**D5793 Finding #4 – March 18 Letter Statement 2:** *"Nevertheless, to ensure the deficient
practice does not recur, the laboratory indicated that quarterly audits will be performed and
suggested that the audits results would be reviewed within the laboratory's QMPI Program.
However, the laboratory did not establish the procedure by which these quarterly audits are to
be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis
added] be used," but did not provided a protocol for a "tracer audit," the means by which a
"tracer audit" would be documented, and whether the results of a "tracer audit" would be the
information reviewed by the QMPI Program."*

    **Theranos Response to Statement 2 – D5793 Finding #4:** The laboratory has revised its
audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB,
Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised
procedures establish that tracer audits must occur monthly; provide the protocol for a tracer
audit; and require that tracer audits be documented using the tracer audit form, CL FRM
00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a
quarterly audit to cover the quality management systems; provide the protocol for quarterly
audits; and require that quarterly audits are documented using the audit record form, CL QOP
00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear
that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on
findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training
on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

Finding #5

54

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164423

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

**theran✺s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

**D5793 Finding #5 -- March 18 Letter Statement 1:** *"In the submission, the laboratory states: 'Corrected [LH] reports to be sent for patient samples analyzed for the following time period: 7/1/2015-7/8/2015; all patient samples analyzed in 8/2015 and 9/2015.' However, later in the submission, the laboratory concluded that '[b]ased on this review, 0 corrected reports are being issued.' From these conflicting statements, it is unclear whether the laboratory addressed patient outcomes. The laboratory provided no documentation to indicate that corrected LH (luteinizing hormone) patient reports were issued."*

    **Theranos Response to Statement 1 -- D5793 Finding #5:** The laboratory's patient assessment analysis for this finding appears to have included an inadvertent copy and paste mistake. The laboratory has enclosed its revised analysis, which explains why it has issued corrected reports for certain patients having the potential to be affected. (Ex. AA, Tab 10). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5793 Finding #5 -- March 18 Letter Statement 2:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

    **Theranos Response to Statement 2 -- D5793 Finding #5:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

Finding #6

**D5793 Finding #6 -- March 18 Letter Statement 1:** *"In the submission, the laboratory states:*

55

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164424

**ER-1795**

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

Case 5:18-cr-00258-EJD Document 1134-5 Filed 11/08/21 Page 58 of 92

## theran⊛s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

- "All patient results reported> 472 U/ml will need corrected reports."
- "Based on this review, 122 corrected [CA-125] reports are being issued to reflect the verified reportable range."

*The laboratory provided no documentation to indicate corrected reports were generated and issued.*

**Theranos Response to Statement 1 -- D5793 Finding #6:** Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5793 Finding #6 -- March 18 Letter Statement 2:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 -- D5793 Finding #6:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

### Finding #7

**D5793 Finding #7 -- March 18 Letter Statement 1:** *"The submission references "Ex. H, Tabs 1, 2 - 5, 16, 17 - 20, 21, 22 - 25, 26, 27 - 30, 36, 37 - 40,46, 47 - 50, 56, and 57 - 60." We found no such references in the materials provided to CMS."*

**Theranos Response to Statement 1 -- D5793 Finding #7:** The citation references to Ex. H, Tabs 1, 2 - 5, 16, 17 - 20, 21, 22 - 25, 26, 27 - 30, 36, 37 - 40,46, 47 - 50, 56, and 57 – 60

56

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164425

CONFIDENTIAL Case 5:18-cr-00258-EJD Document 1034-5 Filed 08/21 Page 59 of 92 ATION ACT

**theranos**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

were inadvertent transcription errors, and the inclusion of these blank tabs in the materials was an inadvertent copying error.

**D5793 Finding #7 – March 18 Letter Statement 2:** *"Throughout Ex. H, the submission includes lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were generated and issued."*

> **Theranos Response to Statement 2 – D5793 Finding #7:** Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5793 Finding #7 – March 18 Letter Statement 3:** *"We found no information addressing how the laboratory will ensure the timely review of the effectiveness of any actions taken. Although the laboratory indicated that quarterly audits will be performed to ensure compliance with this deficient practice, it is unclear how quarterly audits will timely address the issues cited under this deficiency. Nevertheless, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

> **Theranos Response to Statement 3 – D5793 Finding #7:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

Finding #8

**D5793 Finding #8 – March 18 Letter Statement 1:** *"The submission references 'Ex. B, Tabs 51 and 53-55, and Ex. H, Tabs 1,2 - 5, 17 - 20, 26, 27 -30, 36, 37 - 40, 46, 47 - 50, 56, and 57 - 60.' We found no such references in the materials provided to CMS."*

57

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164426

CONFIDENTIAL Case 5:18-cr-00258-EJD Document 1134-5 Filed 11/08/21 Page 60 of 92 INFORMATION ACT

**theranos**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

**Theranos Response to Statement 1 – D5793 Finding #8:** The citation references to Ex. B, Tabs 51 and 53-55, and Ex. H, Tabs 1,2 - 5, 17 - 20, 26, 27 -30, 36, 37 - 40, 46, 47 - 50, 56, and 57 - 60 were inadvertent transcription errors, and the inclusion of these blank tabs in the materials was an inadvertent copying error.

**D5793 Finding #8 – March 18 Letter Statement 2:** *"The laboratory submitted a new QC procedure (Ex. A, Tab 1) which requires QC Pass/Fail Criteria. Specifically, Section 8.2.1.1.a - c. provides that QC must meet certain criteria as well as '... the required Westgard rule pass criteria.' Westgard rules included a "10x" rule for rejecting QC when 10 consecutive control measurements fall on one side of the mean. We note that on page 17 of 19 (Ex. A, Tab 6) in the updated protocol that the "10x" rule was included as part of the Westgard rules which the lab must follow. The lab provided no documentation indicating that the "10x" rule was evaluated as part of its review... Because the laboratory has not shown whether it can follow its own QC protocols, it is unclear whether the laboratory's quality assessment mechanisms can monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

**Theranos Response to Statement 2 – D5793 Finding #8:** The laboratory has extended this analysis to evaluate global quality control indicators, as reflected in the attached documentation. (Ex. AA, 11). As a result of that analysis, the laboratory has voided additional results for certain chemistry assays. Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

The laboratory is capable of ensuring that the deficient practice in D5793 Finding #8 does not recur. Significantly, the laboratory's has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures. The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016. Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory. In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant. Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team. The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

**D5793 Finding #8 – March 18 Letter Statement 3:** *"In Ex. B and Ex. H, the submission includes lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were generated and issued."*

58

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

CMS2-164427

theran♥s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

**Theranos Response to Statement 3 – D5793 Finding #8:** Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

Finding #9

**D5793 Finding #9 – March 18 Letter Statement 1:** *"The laboratory did not submit any documentation in the referenced exhibits related to an updated protocol for Alternative Assessment Procedures (AAP); therefore, we have concluded that the current protocol applies. The laboratory's submission did not include any documentation to explain why the laboratory did not follow its AAP protocol for the Theranos Proprietary System. Because the laboratory has not shown whether it can follow its own AAP protocols, it is unclear whether the laboratory's quality assessment mechanisms can monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

**Theranos Response to Statement 1 – D5793 Finding #9:** There appears to have been a miscommunication. The TPS 3.5 was **fully retired** in early-August 2015. In addition, the laboratory **stopped** using its other LDTs, and does not have plans to resume using them as it transitions to compliance with FDA quality systems requirements for its LDTs and introduces next generation technologies. Accordingly, the AAP protocol that was used for tests run on these instruments in 2014 and 2015 is not in use.

Furthermore, although alternative proficiency testing is not required for any test that is in use in the lab, the laboratory's revised proficiency testing procedure includes new procedures for alternative proficiency assessment. (Ex. BB, Tab 3 § 9.2.4). These alternative proficiency assessment procedures were in the version of the proficiency testing procedure included with our submission, and are also in the revised proficiency testing procedure enclosed with this letter. (Ex. BB, Tab 3). Training on the revised proficiency testing procedure has occurred. (Ex. BB, Tabs 3B-3C). The QMPI procedures state that the "meeting standing agenda" includes a discussion of analytical quality metrics including proficiency testing results and overall performance. (Ex. BB, Tab 7 § 7.5.2.5).

The laboratory is capable of ensuring that the deficient practice in D5793 Finding #9 does not recur. Significantly, the laboratory's has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures. The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016. Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory. In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant. Dr. Tschirhart has over 15 years of experience as a clinical

59

CMS2-164428

**ER-1799**

CONFIDENTIAL — Case 5:18-cr-00258-EJD Document 1134-5 Filed 11/08/21 Page 62 of 92 — REDACTED UNDER FREEDOM OF INFORMATION ACT

**theran⌀s**

1701 Page Mill Road    P 650.838.9292   theranos.com
Palo Alto, CA 94304    F 650.838.9185

laboratory director, and is a valuable part of the laboratory's new leadership and oversight team. The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

Finding #10

**D5793 Finding #10 – March 18 Letter Statement 1:** *Ex. A, Tab 9 of the submission contains the protocol "Method Validation." Section 8.4 of this protocol, "Reference Intervals," states:*

> *The reference intervals are established from a selected reference population. Typically, when both decreased and increased levels are clinically significant, it is defined as the interval between and including the lower and upper reference limits of the studies population. This is calculated as the central 95 percentile of the population distribution where the lower and upper reference limits are demarcated as the 2.5th and 97.5th percentiles of the underlying distribution of values ... The reference intervals are used to establish expected level in health "normal" individuals. Values outside the reference range are considered "abnormal" or "high" or "low."*

*In Ex. E, Tab 1, the laboratory states:*

> *[The] laboratory director decided to use medical decision limits based on national consensus. Accordingly, the following decision limits were displayed on all lab reports for Vitamin D. As noted in CLSI EP28-A3, "when decision limits determined by national or worldwide consensus exist, these limits, rather than reference intervals should be reported.*

*In Ex. E of the submission, the laboratory provided the following "medical decision limits:"*

| | |
|---|---|
| *Deficiency:* | *<20.0 ng/mL* |
| *Insufficiency:* | *20.0 - 29.0 ng/mL* |
| *Sufficiency:* | *30.0 - 100.0 ng/mL* |
| *Possible Toxicity:* | *>100.0 ng/mL* |

*We were unclear as to the laboratory's definition of "medical decision limits." No definition of this phrase was found in Section 3 - Definitions of the "Method Validation" protocol. In addition, no reference to CLSI EP28-A3 was found in the submitted protocol. We also note that the submitted protocol does not include a reference to "medical decision limits" as a criterion for determining reference range.*

**Theranos Response to Statement 1 – D5793 Finding #10:** D5793 Finding #10 relates to the TPS 3.5. The TPS 3.5 was **fully retired** in early-August 2015. The laboratory's revised method verification procedure references a "medical decision level," which is defined in the

60

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

**ER-1800**

CONFIDENTIAL Case 5:18-cr-00258-EJD Document 1184-5 Filed 11/08/21 Page 63 of 92 FORMATION ACT

**theran⦵s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

procedure as "[t]he concentration of analyte in blood or bodily fluid sample being analyzed at which some medical action is indicated for proper patient care. There may be several medical decision limits for a given analyte." (Ex. BB, Tab 5 § 3.9). In addition, this revised procedure references CLSI EP28-A3 (Ex. BB, Tab 5 § 10.6), which states: "for some analytes, reference intervals have been replaced by *decision limits [emphasis in original]*, established by national (or international) consensus. As examples, consider cholesterol and glycated hemoglobin." Training on the laboratory's revised method verification procedure has occurred. (Ex. BB, Tabs 5B-5C).

**D5793 Finding #10 – March 18 Letter Statement 2:** *Since the laboratory provided no definition of "critical medical decision level," no information regarding the laboratory's disparity between the reference range (9.3 - 47.9 ng/mL) in the validation documentation and raw data reports, and no explanation as to how a Vitamin D level could be both normal and deficient or insufficient, it is unclear as to whether the laboratory has followed its own "Method Validation" protocol set forth at Section 8.4.... Because the laboratory has not shown whether it could follow its own validation protocols, it is unclear whether the laboratory's quality assessment mechanisms can monitor the laboratory's corrective actions and ensure this deficient practice does not recur.*

**Theranos Response to Statement 2 – D5793 Finding #10:** D5793 Finding #10 concerns the TPS 3.5. There appears to have been a miscommunication because the TPS 3.5 was **fully retired** in early-August 2015. Accordingly, the laboratory has not re-validated any assay on the TPS 3.5. References to validation data in documents enclosed with the submission are to validation reports prepared **before** the survey began and **before** the laboratory's revised procedures were made effective (those reports were either reviewed by CMS or available to CMS during the survey).

Because there is a national consensus for the decision levels for Vitamin D, the laboratory was correct in using the national consensus instead of a reference interval established through a validation study. CLSI EP28-A3 states: "for some analytes, reference intervals have been replaced by *decision limits [emphasis in original]*, established by national (or international) consensus. As examples, consider cholesterol and glycated hemoglobin. For such analytes, there is no need to establish *de novo*, or even to verify the reference intervals."

The laboratory's revised method verification procedure references a "medical decision level," which is defined in the procedure as "[t]he concentration of analyte in blood or bodily fluid sample being analyzed at which some medical action is indicated for proper patient care. There may be several medical decision limits for a given analyte." (Ex. BB, Tab 5 § 3.9). In addition, this revised procedure references CLSI EP28-A3. (Ex. BB, Tab 5 § 10.6). Training on the laboratory's revised method verification procedure has occurred. (Ex. BB, Tabs 5B-5C).

61

CONFIDENTIAL, COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

CMS2-164430

**ER-1801**

CONFIDENTIAL CaSeMERCIALcv-0025FORMED-EJDN DoscumentM1A34-5suRfiledNRO8/21REFEPage 64 of 92ATION ACT

**theran⊕s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

Additionally, the laboratory is capable of ensuring that the deficient practice in D5793#10 does not recur. Significantly, the laboratory's has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures. The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016. Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory. In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant. Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team. The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

**D5793 Finding #10 – March 18 Letter Statement 3:** *"Throughout Ex. E, the laboratory provided a list of patient specimen accession numbers for which the laboratory 'identified reports,' but did not specify or submit documentation to indicate whether corrected reports were generated and issued."*

**Theranos Response to Statement 2 – D5793 Finding #10:** This deficiency concerns the TPS 3.5, which was one of the Theranos proprietary technologies in use in 2014 and 2015. The laboratory began phasing out the TPS 3.5 in December 2014, and it was **fully retired** in early-August 2015.

The laboratory values CMS's feedback, and takes it very seriously. The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was fully retired in early-August 2015. As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5. (Ex. AA, Tab 3). The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures. Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015. As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015. (Ex. AA, Tab 3). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

### D5801

**D5801 – March 18 Letter Statement 1:** *"The submission references "Ex. I, Tabs 2-6." We located these tabs, but found no documentation in Tabs 2, 5 and 6."*

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

CMS2-164431

CONFIDENTIAL — COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

**theran✺s**

1701 Page Mill Road     P 650.838.9292   theranos.com
Palo Alto, CA 94304     F 650.838.9165

**Theranos Response to Statement 1 – D5801:** There was an inadvertent copying error for Exhibit I to the initial submission. The laboratory has enclosed the applicable documents with this letter, as well as additional documents related to the laboratory's broader analysis of the PT/INR test over the entire time it was run on this Siemens BCS XP instrument. (Ex. GG).

**D5801 – March 18 Letter Statement 2:** *"In the submission, the laboratory states:*

> *Before PT/INR testing resumes, the lab will also prepare a revised assay-specific procedure for PT/INR to reinforce that the International Normalized Ratio (INR) must be calculated accurately prior to reporting patient test results. The relevant testing personnel will be required to demonstrate competency to ensure the practice is consistent with these procedures.*

*We note that the laboratory provided no documentation to indicate that the inaccurate calculations were reviewed or that INR calculation using different lot numbers of Dade Innovin were reviewed for accuracy. In addition, we found that the laboratory did not provide documentation to ensure that PT/INR results reported from calculations were, and would continue to be, accurate."*

**Theranos Response to Statement 2 – D5801:** As noted above, the laboratory **stopped** running PT/INR tests on the Siemens BCS XP on September 17, 2015, and has **not** run any PT/INR tests since then. The laboratory has reviewed the inaccurate calculation and has reviewed the INR calculations for different lot number of Dade Innovin that were used with this Siemens BCS XP instrument from the time it was put in use in October 2014. As a result of this review, the laboratory has determined that certain INR calculations for prior lots were not accurate because the laboratory did not use the correct MNPT and ISI figures for those calculations. Based on this finding and other findings in the revised PT/INR patient assessment that is enclosed with this letter, the laboratory has voided all PT/INR results reported from October 2014 through September 2015. (Ex. AA, Tab 7). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

The laboratory is capable of ensuring that the deficient practice in D5801 does not recur. Significantly, the laboratory's has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures. The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016. Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory. In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a

63

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

theran⬤s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9166

full-time clinical consultant. Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team. The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

**D5801 – March 18 Letter Statement 2:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

> **Theranos Response to Statement 2 – D5801:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

### D5805

**D5805 – March 18 Letter Statement 1:** *"The submission references "Ex. I, Tabs 2-6." We located these tabs, but found no documentation in Tabs 2, 5 and 6."*

> **Theranos Response to Statement 1 – D5805:** There was an inadvertent copying error for Exhibit I to the initial submission. The laboratory has enclosed the applicable documents with this letter, as well as additional documents related to the laboratory's broader analysis of the PT/INR test over the entire time it was run on this Siemens BCS XP instrument. (Ex. GG).

**D5805 – March 18 Letter Statement 2:** *In its submission, the laboratory states: 'The lab revised its patient reports during the survey so that the interpretive note appears only under the heading for patients with therapy.' However, no updated forms were shown to the surveyor*

64

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

CONFIDENTIAL Case 5:18-cr-00258-EJD Document 1134-5 Filed 11/08/21 Page 67 of 92 ATION ACT

theran⦾s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*during the survey and the laboratory's submission does not include documentation of the*
*updated reports.*

> **D5805 – March 18 Letter Statement 2:** As indicated above, the laboratory performed a
> patient assessment for PT/INR tests run on this BCS XP instrument with reagent lots that
> were used prior to the reagent lot identified in CMS's Form 2567. Based on that review, the
> laboratory has voided all PT/INR results from the time this BCS XP instrument was put in
> use in October 2014. (Ex. AA, Tab 7). Many corrected reports have been transmitted, and
> the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31,
> 2016. The remainder of the transmittals and confirmations of receipt will be provided to
> CMS under separate cover.

**D5805 – March 18 Letter Statement 3:** *"To ensure the deficient practice does not recur, the*
*laboratory indicated that quarterly audits will be performed and suggested that the audits results*
*would be reviewed within the laboratory's QMPI Program. However, the laboratory did not*
*establish the procedure by which these quarterly audits are to be conducted. In its submission,*
*the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not*
*provided a protocol for a "tracer audit," the means by which a "tracer audit" would be*
*documented, and whether the results of a "tracer audit" would be the information reviewed by*
*the QMPI Program."*

> **Theranos Response to Statement 3 – D5805:** The laboratory has revised its audit
> procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8).
> Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised procedures
> establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and
> require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.
> (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to
> cover the quality management systems; provide the protocol for quarterly audits; and require
> that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex.
> BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth
> tracer and quarterly audits are reviewed, analyzed and presented based on findings and
> analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training on the
> revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

### D5821

**D5821 – March 18 Letter Statement 1:** *"The submission references "Ex. I, Tabs 2-6." We*
*located these tabs, but found no documentation in Tabs 2, 5 and 6."*

> **Theranos Response to Statement 1 – D5821:** There was an inadvertent copying error for
> Exhibit I to the initial submission. The laboratory has enclosed the applicable documents
> with this letter, as well as additional documents related to the laboratory's broader analysis of

65

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

**ER-1805**

CONFIDENTIAL Case 5:18-cr-00258-EJD Document 1034-5 Filed 08/11/08/21 Page 68 of 92ATION ACT

theran⚬s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

the PT/INR test over the entire time it was run on this Siemens BCS XP instrument. (Ex. GG).

**D5821 – March 18 Letter Statement 2:** *"In Ex. I, the laboratory provided lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were issued. "We also note that the Patient Impact Assessment (Ex. I, Tab 1) states that 'remedial action was taken on 9/25/15,' but 'corrected reports were issued beginning on 11/10/15 and completed on 11/12/15.' There was no explanation as to why there was such a long period of time between the remedial action and issuing corrected reports."*

**Theranos Response to Statement 2 – D5821:** All of these corrected reports for PT/INR, along with documentation confirming that they were sent, are enclosed with this letter. (Ex. GG, Tab 7). On September 22 or 23, CMS identified a number of issues related to PT/INR tests during the period April to September 2015. The laboratory undertook a thorough investigation. Given the number of issues to review, the investigation took time to complete. Completion of the investigation was also hindered by the absence of a highly qualified, full-time laboratory director. The laboratory subsequently hired its new lab director, Dr. Kingshuk Das, who is highly qualified and has extensive clinical laboratory experience. As of March 14, 2016, Dr. Das joined Theranos full-time at the Newark, California laboratory.

**D5821 – March 18 Letter Statement 3:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5821:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and

66

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

CMS2-164435

CONFIDENTIAL Case 5:18-cr-00258-EJD Document 1134-5 Filed 11/08/21 Page 69 of 92 ATION ACT

theran⊛s

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9195

analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

### D6076

The March 18 Letter states: *"See our reviews of D6083, D6085, D6086, D6093, D6094, D6098, and D6102."* Accordingly, we refer you to our responses to those reviews.

### D6079

The March 18 Letter states that "[b]ased on the laboratory's submission, this requirement is met."

### D6083

The March 18 Letter states: *"See our reviews of D5413 and D5791."* Accordingly, we refer you to our responses to those reviews.

### D6085

The March 18 Letter states: *"See our review of D6115."* Accordingly, we refer you to our responses to your review of D6115.

### D6086

**D6086 Finding #1—March 18 Letter Statement 1:** *"The submission references 'Ex. A, Tab 9, F-1" and "Ex. A, Tab 10, F-1.' We found no such references in the materials provided to CMS."*

**Theranos Response to Statement 1 in D6086 Finding #1:** The citation references to Ex. A, Tab 9, F-1 and Ex. A, Tab 10, F-1 were inadvertent transcription errors and should not have been included.

**D6086 Finding #1 – March 18 Letter Statement 2:** *"Throughout Ex. E, Tab 1, the laboratory provided lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were generated and issued."*

**Theranos Response to Statement 2 in D6086 Finding #1:** This deficiency concerns the TPS 3.5, which was one of the Theranos proprietary technologies in use in 2014 and 2015. The laboratory began phasing out the TPS 3.5 in December 2014, and it was **fully retired** in early-August 2015.

The laboratory values CMS's feedback, and takes it very seriously. The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was fully retired in early-August 2015. As explained further in the

67

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

Case 5:18-cr-00258-EJD Document 1384-5 Filed 11/08/21 Page 70 of 82

## theran⌀s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5. (Ex. AA, Tab 3). The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures. Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015. As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015. (Ex. AA, Tab 3). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D6086 Finding #1 – March 18 Letter Statement 3:** *We found no information addressing how the laboratory will ensure the accurate review of test method validation documentation, the issue cited in the deficiency.*

> **Theranos Response to Statement 3 in D6086 Finding #1:** The TPS 3.5 was **fully retired** early-August 2015, and the laboratory is **not** using any LDTs.
>
> The laboratory has revised its method verification procedure to show how it will ensure the accurate review of test method verification documentation. (Ex. BB, Tab 5). As set forth in the revised procedures, the laboratory director is responsible for reviewing both the verification plan and the verification report. (Ex. BB, Tab 5 § 4.1). "The method verification procedure requires multiple reviews to include Quality to ensure protocols are followed." (Ex. BB, Tab 7 § 7.1.3.3).

Finding #2

**D6086 Finding #2—March 18 Letter Statement 1:** *"The submission references 'Ex. H, Tabs 1, 2-5, 16, 17 - 20, 21, 22 - 25, 26, 27 - 30, 36, 37 - 40, 46, 47 - 50, 56, and 57 - 60.' We found no such references in the materials provided to CMS."*

> **Theranos Response to Statement 1 in D6086 Finding #2:** The citation references to Ex. H, Tabs 1, 2-5, 16, 17 - 20, 21, 22 - 25, 26, 27 - 30, 36, 37 - 40, 46, 47 - 50, 56, and 57-60 were inadvertent.

**D6086 Finding #2—March 18 Letter Statement 2:** *"Ex. H contains lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were generated and issued."*

68

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

CONFIDENTIAL — Case 5:18-cr-00258-EJD Document 1134-5 Filed 11/08/21 Page 71 of 92 INFORMATION ACT

theran☺s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304     F 650.838.9165

**Theranos Response to Statement 2 in D6086 Finding #2:**  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D6086 Finding #2—March 18 Letter Statement 3:**  *"At the time of the onsite survey, the laboratory's protocol 'Master Validation Plan for Routine Chemistry Assays on Theranos Devices,' stated: '... for establishing the trueness or comparability to two procedures. . .at least 50% of samples should be outside the reference interval.' For five validation documents (ALT, BUN, calcium, glucose, and sodium testing using the Advia 1800), a review of the test results used by the laboratory to establish 'the trueness or comparability of two procedures' showed that the laboratory did not follow its established protocol and use "at least 50% of samples ... outside the reference interval. The submission includes the protocol 'Method Validation,' at Ex. A, Tab 9, Section 8.1.1.1 ('A method comparison and bias estimation design'), which states: 'If the analyte has a critical medical decision level, at least 50% of the specimens must have analyte levels below this value and the remaining 50% above.' We are unclear as to the laboratory's definition of 'critical medical decision level.' No definition of this phrase was found in Section 3 - Definitions of the "Method Validation" protocol or in Ex. H.""*

**Theranos Response to Statement 3 in D6086 Finding #2:**  D6086 Finding #2 relates to the chemistry assays on the Siemens Advia 1800 instruments. The laboratory **stopped** using the Siemens Advia 1800 instruments before the survey began on September 22, 2015, and has **not** used them since then.

The laboratory's revised method verification procedure references a "medical decision level," which is defined in the procedure as "[t]he concentration of analyte in blood or bodily fluid sample being analyzed at which some medical action is indicated for proper patient care. There may be several medical decision limits for a given analyte." (Ex. BB, Tab 5 § 3.9). In addition, this revised procedure references CLSI EP28-A3 (Ex. BB, Tab 5 § 10.6), which states: "for some analytes, reference intervals have been replaced by ***decision limits [emphasis in original]***, established by national (or international) consensus. As examples, consider cholesterol and glycated hemoglobin. For such analytes, there is no need to establish *de novo*, or even to verify the reference intervals." Training on the laboratory's revised method verification procedure has occurred. (Ex. BB, Tabs 5B-5C).

**D6086 Finding #2—March 18 Letter Statement 4:**  *"In Ex. H of the submission, the laboratory provided the following 'assay validation' summary:*

| Analyte | Number of Specimens Used | Specimen Value Range |
|---------|--------------------------|----------------------|
| ALT | 128 | 12-62 |
| BUN | 128 | 9-21 |
| Calcium | 128 | 9.2 -10.2 |

69

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

CMS2-164438

**theran⚬s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

| | | |
|---|---|---|
| *Glucose* | *128* | *65 - 142* |
| *Sodium* | *128* | *134 -142* |

*Since the laboratory provided no definition of 'critical medical decision level' and no information regarding the laboratory's panic or alert values for ALT, BUN, calcium, glucose, and sodium testing, it is unclear as to whether the laboratory has followed its own "Method Validation" protocol at Section 8.1.1.1. Because the laboratory has not shown whether it can follow its own validation protocols, it is unclear whether the laboratory's quality assessment mechanisms can monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

**Theranos Response to Statement 4 in D6086 Finding #2:** There appears to have been a miscommunication. The laboratory **stopped** using its Siemens Advia 1800 instruments for clinical patient testing before the survey began on September 22, 2015 and before the revised method verification procedures were effective, and has **not** used them since then. Accordingly, the laboratory has not re-validated any assay on the Siemens Advia 1800.

The laboratory's revised method verification procedure references a "medical decision level," which is defined in the procedure as "[t]he concentration of analyte in blood or bodily fluid sample being analyzed at which some medical action is indicated for proper patient care. There may be several medical decision limits for a given analyte." (Ex. BB, Tab 5 § 3.9). In addition, this revised procedure references CLSI EP28-A3 (Ex. BB, Tab 5 § 10.6), which states: "for some analytes, reference intervals have been replaced by *decision limits [emphasis in original]*, established by national (or international) consensus. As examples, consider cholesterol and glycated hemoglobin. For such analytes, there is no need to establish *de novo*, or even to verify the reference intervals." Training on the laboratory's revised method verification procedure has occurred. (Ex. BB, Tabs 5B-5C).

The laboratory is capable of ensuring that the deficient practice in D6086 Finding #2 does not recur. Significantly, the laboratory's has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures. The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016. Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory. In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant. Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team. The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits. With respect to method verification, the procedure now includes appropriate criteria for accuracy, precision, and other pertinent performance characteristics, and requires the lab director to

70

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

CMS2-164439

CONFIDENTIAL Case 5:18-cr-00258-EJD Document 1134-5 Filed 11/08/21 Page 73 of 92 ATION ACT

theran∞s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9185

review both the verification plan and verification report to ensure adherence to the criteria in
the procedure. (Ex. BB, Tab 5 §§ 7.7, 8).

Finding #3

**D6086 Finding #3—March 18 Letter Statement 1:** *"Ex. H contains lists of patient specimen
accession numbers for which the laboratory intended to issue corrected test reports. The
laboratory provided no documentation to indicate corrected reports were generated and issued."*

> **Theranos Response to Statement 1 in D6086 Finding #3:** Many corrected reports have
> been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be
> complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt
> will be provided to CMS under separate cover.

**D6086 Finding #3—March 18 Letter Statement 2:** *"At the time of the onsite survey, for five
validation documents reviewed (ALT, BUN, calcium, glucose, and sodium testing using the Advia
1800), laboratory summary information indicated that the laboratory obtained coefficient of
variation (CV) results greater than CV's established by the instrument manufacturer. That is,
ALT, BUN, calcium, glucose, and sodium test results obtained by the laboratory were
statistically less precise than what would be expected using the Advia 1800. The laboratory
provided no explanation for and no information pertaining to any investigation as to why the
laboratory's test results were less precise. These validation documents were approved by the
laboratory director as evidenced by his signature. In Ex. H of the submission, the laboratory
provided summary data for ALT, BUN, calcium, glucose, and sodium similar to the CV data
reviewed at the time of the onsite survey. Again, the laboratory provided no explanation for
and/or information pertaining to any investigation as to why the laboratory's test results were
less precise. Because the laboratory has not shown whether its assay verification procedures are
adequate to determine assay precision characteristics, we question whether the laboratory's
quality assessment mechanisms can monitor the laboratory's corrective actions and ensure this
deficient practice does not recur."*

> **Theranos Response to Statement 2 in D6086 Finding #3:** D6086 Finding #3 concerns the
> laboratory's method for using capillary specimens to test for ALT, BUN, calcium, glucose
> and sodium using Advia 1800 instruments that the laboratory modified. There appears to
> have been a miscommunication. The laboratory **stopped** using its Siemens Advia 1800
> instruments for clinical patient testing before the survey began on September 22, 2015 and
> before the revised method verification procedures were effective, and has **not** used them
> since then. Accordingly, the laboratory has not re-validated any assay on the Siemens Advia
> 1800.

71

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

CMS2-164440

CONFIDENTIAL — Case 5:18-cr-00258-EJD Document 1344-5 Filed 11/08/21 Page 74 of 92 — CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

# theranos

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

Additionally, the CV figures from the manufacturer's package insert are **not** relevant. Under 42 C.F.R. § 1253(b)(1), a laboratory that "modifies an FDA-cleared or approved test system … must, before reporting patient results, establish for each test system the performance specifications for the following performance characteristics: (i) Accuracy, (ii) Precision, (iii) Analytical sensitivity, (iv) Analytical specificity to include interfering substances, (v) Reportable range of test results for the test system, (vi) Reference intervals (normal values), (vii) Any other performance characteristic required for test performance." Under this regulation, the precision of an LDT is established solely by the laboratory. These regulations do **not** require a laboratory to compare the CV it establishes for an LDT ---- including an LDT that is based on a modification to an FDA-cleared or approved test system — with the %CV of "the predicate device." Likewise, there is nothing in 42 C.F.R. §1253(b)(1) that requires a laboratory to document why the CV that it has established for an LDT is different from the CV for "a predicate device."

Finding #4

**D6086 Finding #4---March 18 Letter Statement 1:** *"Ex. H contains lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were generated and issued."*

> **Theranos Response to Statement 1 in D6086 Finding #4:** Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D6086 Finding #4----March 18 Letter Statement 2: "***At the time of the onsite survey, for four validation documents reviewed (ALT, BUN, calcium, and glucose testing using the Advia 1800), laboratory summary information indicated that the reference range determined by the laboratory's testing differed from the reference range on the laboratory's test reports. The following was noted:*

| Analyte | Validation Document Reference Range | Test Report Reference Range |
|---------|-------------------------------------|------------------------------|
| ALT | 0- 52 U/L | 8-41 U/L |
| BUN | 5.3 - 22.5 mg/dL | 6 - 24 mg/dL |
| Calcium | 8.18 -10.3 mg/dL | 8.3 - 10.6 mg/dL |
| Glucose | 64.0 - 112.3 mg/dL | 73 - 99 mg/dL |

*In Ex. H of the submission, the laboratory provided the following reference ranges, some of which were still different than what appeared on the laboratory's test reports:*

| Analyte | Reference Range |
|---------|-----------------|
| ALT | 8-41 U/L |
| BUN | 6.2 - 22 mg/dL |
| Calcium | 8.2 - 10.3 mg/dL |

72

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

**ER-1812**

CONFIDENTIAL — COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

**theran⊕s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*Glucose*            *64 - 112 mg/dL*

*Since the laboratory did not provide copies of any updated test reports in its submission, we are unable to determine whether the laboratory has corrected this deficient practice. Because the laboratory has not shown whether it had corrected this deficient practice, we are also unable to determine whether the laboratory's quality assessment mechanisms can monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

**Theranos Response to Statement 2 in D6086 Finding #4:** As CMS observed in the Form 2567, the validation reports for these assays were dated in April 2015. These validated assays went live on April 22, 2015. The laboratory has issued corrected reports updating the reference ranges for ALT, Calcium, and BUN tests run on the Siemens Advia 1800 on or after April 2015. Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover. As noted above, the laboratory **stopped** running these tests on the Siemens Advia 1800 before the survey began on September, and has **not** run them since then.

The laboratory has not issued corrected reports for Glucose because the reference ranged used in patient reports was consistent with the national consensus, which was the correct range to use. [insert explanation from LDs] As noted above, the revised method verification procedures enclosed with this letter references CLSI EP28-A3, which provides that when decision limits determined by national or worldwide consensus exist, these limits, rather than reference intervals should be reported. (Ex. BB, Tab 5 § 10.6).

The laboratory is capable of ensuring that the deficient practice in D6086 Finding #4 does not recur. Significantly, the laboratory's has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures. The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016. Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory. In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant. Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team. The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

Finding #5

**D6086 Finding #5 – March 18 Letter Statement 1:** *"The submission references 'Ex. G, Tabs 31, 34, 36, 39, 41, 44, 46, 49, 51, 54, 56, 61, 64, 66, and 69.' We found no documents within these tabs."*

73

CONFIDENTIAL — COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

**ER-1813**

theran⊛s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

**Theranos Response to Statement 1 in D6086 Finding #5:** The citation reference to Ex. G, Tabs 31, 34, 36, 39, 41, 44, 46, 49, 51, 54, 56, 61, 64, 66, and 69 was an inadvertent transcription error, and the inclusion of these blank tabs in the materials was an inadvertent copying error.

**D6086 Finding #5 – March 18 Letter Statement 2:** *"At the time of the onsite survey, the laboratory maintained no documentation showing that the validation documents for two Siemens Advia 2120i instruments had been reviewed and approved by the laboratory director. In Ex. G of the submission, we again found no information to indicate the Siemens Advia 2120i validation documents have been reviewed and approved by the director. Because the laboratory has not shown whether it has corrected this deficient practice, we are also unable to determine whether the laboratory's QA mechanisms can monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

**Theranos Response to Statement 2 in D6086 Finding #5:** There appears to be a miscommunication. The laboratory **stopped** using its Siemens Advia 2120i instruments for clinical patient testing on November 17, 2015, and has **not** used them since then. The laboratory does not intend to rely on those verifications to perform any tests on the Siemens Advia 2120i instruments in the future. As described above, the laboratory has put in place mechanisms that will effectively monitor its corrective action and ensure that deficient practices do not recur. With respect to method verification, the current procedures require the lab director to approve both the validation plan prior to the validation and the verification report. (Ex. BB, Tab 5 § 7.7). "The method verification procedure requires multiple reviews to include Quality to ensure protocols are followed." (Ex. BB, Tab 7 § 7.1.3.3).

The laboratory is capable of ensuring that the deficient practice in D6086 Finding #5 does not recur. Significantly, the laboratory's has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures. The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016. Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory. In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant. Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team. The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

Finding #6

**D6086 Finding #6 – March 18 Letter Statement 1:** *"The submission references 'Ex. I, Tabs 2-6.' We located these tabs, but found no documentation in Tabs 2, 5, and 6."*

74

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

CMS2-164443

CONFIDENTIAL Case 5:18-cr-00258-EJD Document 1184-6 SUBJECT TO PROTECTIVE ORDER EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

theran✺s

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

**Theranos Response to Statement 1 – D6086 Finding #6:** There was an inadvertent copying error for Exhibit I to the initial submission. The laboratory has enclosed the applicable documents with this letter, as well as additional documents related to the laboratory's broader analysis of the PT/INR test over the entire time it was run on this Siemens BCS XP instrument. (Ex. GG).

**D6086 Finding #6 – March 18 Letter Statement 2:** *"See our review of D5413."*

**Theranos Response to Statement 2 – D6086 Finding #6:** See the laboratory's response to your review of D5413.

**D6086 Finding #6 – March 18 Letter Statement 3:** *"Although the submitted protocol (Ex. A, Tab 31, § 8.1.2) included the requirement to review all new manufacturer package inserts and vendor notifications, the laboratory did not provide a response to the citation other than to state: 'Theranos did not have the documentation for the MNPT calculation done for lot #539280 in 3/2015 before it was put in use for patient testing.' It is unclear what investigation was performed to determine how the Mean Normal Prothrombin Time (MNPT) for Dade Innovin lot number 539280 was defined and entered into the Siemens BCS-XP."*

**Theranos Response to Statement 3 – D6086 Finding #6:** The lab personnel responsible for MNPT for PT/INR tests run on the Siemens BCS XP at the time that this Dade Innovin lot was put in use are no longer with the laboratory, which has limited the laboratory's ability to determine precisely what occurred. Based on the laboratory's investigation, it appears that the laboratory would determine the MNPT with the assistance of Siemens. Siemens would then send the laboratory a letter containing both the MNPT and the ISI for the lot. The laboratory would then be responsible for entering the MNPT and ISI numbers for the lot into the BCS XP. The laboratory appears to have not properly entered the MNPT and ISI numbers for this lot and the laboratory failed to have sufficient oversight to identify the problem when it occurred.

As noted above, the laboratory **stopped** running PT/INR tests on September 17, 2015, and has **not** run any PT/INR tests since then. The laboratory is capable of ensuring that the deficient practice in D6086 Finding #6 does not recur. Significantly, the laboratory's has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures. The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016. Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory. In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant. Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team. The laboratory's new leadership team has

75

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

**ER-1815**

**theran✸s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

installed an entirely redesigned QMPI Program, as well as robust audit procedures that
required monthly and quarterly audits.

**D6086 Finding #6 -- March 18 Letter Statement 4:** *"In its submission the laboratory states
"training has occurred," however, training documentation provided in Ex. A Tab 32 did not
include all testing personnel listed on the CMS-209 (Ex. L, Tab 1 )."*

> **Theranos Response to Statement 4 – D6086 Finding #6:** The training records for this SOP
> provided with the submission included all testing personnel listed on the CMS-209 who run
> tests in the laboratory. Please note that Chi Nguyen is no longer a member of the CLIA
> laboratory (we will update our Form 209 accordingly), which is why she does not appear on
> any of the training documentation. The enclosed training records reflect that all testing
> personnel listed on the CMS-209 have been trained on the laboratory's enhanced protocol
> requiring review of all new manufacturer package inserts and vendor notifications. (Ex. BB,
> Tabs 14B-14D).

**D6086 Finding #6 -- March 18 Letter Statement 5:** *"To ensure the deficient practice does not
recur, the laboratory indicated that quarterly audits will be performed and suggested that the
audits results would be reviewed within the laboratory's QMPI Program. However, the
laboratory did not establish the procedure by which these quarterly audits are to be conducted.
In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used,"
but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would
be documented, and whether the results of a "tracer audit" would be the information reviewed
by the QMPI Program."*

> **Theranos Response to Statement 5 – D6086 Finding #6:** The laboratory has revised its
> audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB,
> Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised
> procedures establish that tracer audits must occur monthly; provide the protocol for a tracer
> audit; and require that tracer audits be documented using the tracer audit form, CL FRM
> 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a
> quarterly audit to cover the quality management systems; provide the protocol for quarterly
> audits; and require that quarterly audits are documented using the audit record form, CL QOP
> 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear
> that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on
> findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training
> on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

### D6093

Finding #1

76

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164445

CONFIDENTIAL Case 5:18-cr-00258-EJD Document 1184-5 SUBJECT TO 11/08/21 Page 79 of 92ATION ACT

theran⚫s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

The March 18 Letter states: *"See our reviews of D5447, D5449, D5461, D5481, and D5779."* Accordingly, we refer you to our responses to those reviews.

Finding #2

**D6093 Finding #2 – March 18 Letter Statement 1:** The March 18 Letter states: *"See our reviews of D5481."*

 **Theranos Response to Statement 1 – D6093 Finding #2:** We refer you to our response to your review of D5481.

**D6093 Finding #2 – March 18 Letter Statement 2:** *"The submission references 'Ex. I, Tabs 2-6.' We located these tabs, but found no documentation in Tabs 2, 5, and 6."*

 **Theranos Response to Statement 2 – D6093 Finding #2:** There was an inadvertent copying error for Exhibit I to the initial submission. The laboratory has enclosed the applicable documents with this letter, as well as additional documents related to the laboratory's broader analysis of the PT/INR test over the entire time it was run on this Siemens BCS XP instrument. (Ex. GG).

**D6093 Finding #2 – March 18 Letter Statement 3:** *"The laboratory's submission did not include an explanation or documentation of an investigation regarding the adjustment of QC ranges."*

 **Theranos Response to Statement 3 – D6093 Finding #2:** D6093#2, Paragraph k, states that "[o]n approximately 9/16/15, the laboratory adjusted the acceptable range for Citrol 3 to match the data" and that the "change was implemented without any investigation as to the reason for the shift in control values." The laboratory **stopped** running PT/INR tests on September 16, 2015. The laboratory's review of this issue has come to the same ultimate conclusion. Under the laboratory's prior leadership and its old QA Program, the laboratory changed the control values for PT/INR on September 16, 2015 without documenting a proper investigation, and in contrast to what is required by the laboratory's new procedures. The laboratory's new leadership and new QMPI Program do **not** ascribe to this type of practice, as changes to QC values should not occur unless a full and documented investigation shows that the change is warranted. The laboratory **stopped** PT/INR testing on September 17, 2015, thus limiting the potential effect that this change to control values could have. The laboratory has not performed any PT/INR tests since September 17, 2015. As indicated above, the laboratory has broadened its investigation of PT/INR tests to encompass the entire period during which this BCS XP instrument was in use, which was October 2014 through September 2015. Based on that investigation, the laboratory has voided all PT/INR results reported during that period. (Ex. AA, Tab 7). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March

77

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

**ER-1817**

**theranos**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D6093 Finding #2 – March 18 Letter Statement 4:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 4 – D6093 Finding #2:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

### D6094

#### Finding #1

The March 18 Letter states: *"See our reviews of D5391, D5393, D5791, and D5793."* Accordingly, we refer you to our responses to those reviews.

#### Finding #2

The March 18 Letter states: *"See our reviews of D5413, D5481, D5801, D5805, and 5821."* Accordingly, we refer you to our responses to those reviews.

### D6098

The March 18 Letter states: *"See our review of D5805."* Accordingly, we refer you to our response to your review of D5805.

### D6102

78

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164447

CONFIDENTIAL Case 5:18-cr-00258-EJD Document 1134-5 Filed 11/08/21 Page 81 of 92 INFORMATION ACT

theran⦿s

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

**D6102 – March 18 Letter Statement 1:** *"The laboratory submitted protocols relating to testing personnel training (Ex. A, Tab 16, §§ 4.5.3 and 6.4) which state the following:*

- *§ 4.5.3 'Testing personnel/trainee are responsible to ensure that training is properly documented using CL-FRM-03016-F4, Training Attendance Form, approved by the designated trainer and stored in the relevant binder.'*
- *§ 6.4 '... It is the responsibility of the trainee and trainer to ensure the SOP is accurate.'*

*However, the regulations require that the laboratory director, not the testing personnel, is responsible for ensuring that prior to testing patient specimens, all personnel have the appropriate training and have demonstrated that they can perform all testing operations to provide and report accurate results."*

> **Theranos Response to Statement 1 in D6102:** The laboratory has revised its training and competency procedures to clarify that the responsibility to ensure that training is properly documented and approved by a designated trainer; instead the laboratory director has the responsibility to ensure adherence to the Quality Management System, including the training and competency procedures. (Ex. BB, Tab 9 §§ 4.1, 4.7.6, 6.9.9.1). Training on these procedures has occurred. (Ex. BB, Tabs 9B-9C).

**D6102 – March 18 Letter Statement 2:** *"Training documentation submitted in Ex. A, Tab 11 only includes training on protocols related to testing personnel qualification requirements and delegation of responsibilities, as well as job descriptions. The laboratory provided no documentation or plan to train or retrain testing personnel on the Theranos Proprietary Device."*

> **Theranos Response to Statement 2 in D6102:** There appears to have been a miscommunication because the TPS 3.5 was **fully retired** before the survey began on September 22, 2015. Because the TPS 3.5 is not being used, and will not be used in the future, the laboratory is not required to train or re-train personnel on tests that used to be run on that retired instrument.

**D6102 – March 18 Letter Statement 3:** *"Training documents submitted in Ex. A, Tab 17 only addressed review of the document control and training and competency protocols, but did not include training or retraining documentation for personnel performing testing in the venipuncture lab nor did it include an investigation if patient were affected or potentially affected when untrained or partially trained testing personnel were performing patent testing."*

> **Theranos Response to Statement 3 in D6102:** The laboratory previously submitted training and competency documentation for all testing personnel as part of its response to D6124. The laboratory has updated that documentation. A list showing which testing

79

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CONFIDENTIAL — Case 5:18-cr-00258-EJD Document 1354-5 Filed 11/08/21 Page 82 of 192 ATION ACT

theran☮s

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304    F 650.838.9165

personnel operate each instrument currently in use is enclosed. (Ex. HH, Tab 9A).[14]  Current
training and competency documentation for those testing personnel and those instruments is
also enclosed. (Ex. HH, Tab 9B).

D6102, paragraph a, concerns the personnel training documentation for the TPS 3.5. The
TPS 3.5 was **fully retired** in early-August 2015. The laboratory values CMS's feedback,
and takes it very seriously. The laboratory has conducted a thorough re-review of QC data
for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was fully retired in
early-August 2015. As explained further in the attached patient assessment analysis, the
laboratory is not satisfied with its old quality assessment program's ability to effectively flag
and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5. (Ex. AA,
Tab 3). The laboratory has new leadership and a new QMPI Program with robust quality
monitoring and program improvement procedures. Based on its re-review of QC data for the
TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily
address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015. As
corrective action, the laboratory has, out of an extreme abundance of caution, voided results
reported for assays run on the TPS 3.5 in 2014 and 2015. (Ex. AA, Tab 3). Many corrected
reports have been transmitted, and the remainder are being transmitted. (Ex.
KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals
and confirmations of receipt will be provided to CMS under separate cover.

As set forth in the attached analysis, the laboratory has enclosed training documentation for
Testing Person #6 (TP6); Testing Person #11 (TP11); and Testing Person #31 (TP31). (Ex.
HH, Tabs 14, 15, 16). The analysis of these training records is set forth in Ex. AA, Tab 12.

**D6102 – March 18 Letter Statement 4:**  *"To ensure the deficient practice does not recur, the
laboratory indicated that quarterly audits will be performed and suggested that the audits results
would be reviewed within the laboratory's QMPI Program. However, the laboratory did not
establish the procedure by which these quarterly audits are to be conducted. In its submission,
the laboratory indicates that a "tracer audit **may** [emphasis added] be used," but did not
provided a protocol for a "tracer audit," the means by which a "tracer audit" would be
documented, and whether the results of a "tracer audit" would be the information reviewed by
the QMPI Program."*

**Theranos Response to Statement 4 – D6102:** The laboratory has revised its audit
procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8).
Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised procedures

---

[14] Please note that Chi Nguyen, who is listed on the Form 209, is no longer a member of the
CLIA laboratory (we will update our Form 209 accordingly), which is why she does not appear
on any of the training documentation.

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164449

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

## theran⦿s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

### D6108

The March 18 Letter states: *"See our review of D6115."* Accordingly, we refer you to our response to your review of D6115.

### D6111

The March 18 Letter states: "Based on the laboratory's submission, this requirement is met."

### D6115

**D6115 – March 18 Letter Statement 1:** *"The laboratory submitted a protocol for a Master Validation Plan at Ex. E, Tab 30B which was a different protocol than presented to the surveyor. In Ex. E, Tab 1, under the Accuracy section, the submission indicates that 'some of the immunoassays on the TSP [Theranos Proprietary System] were 'calibrated' or 'corrected' to remove systemic bias between the two methods.' It is not clear what specific biases were used for each analyte which used a corrected results or if the corrected or uncorrected results was reported.*

> **Theranos Response to Statement 1 – D6115:** This deficiency concerns the TPS 3.5, which was one of the Theranos proprietary technologies in use in 2014 and 2015. The laboratory began phasing out the TPS 3.5 in December 2014, and it was **fully retired** in early-August 2015.
>
> The laboratory values CMS's feedback, and takes it very seriously. The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was fully retired in early-August 2015. As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5. (Ex. AA, Tab 3). The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures. Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues

81

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

CMS2-164450

theranos

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

for assays run on the TPS 3.5 in 2014 and 2015. As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015. (Ex. AA, Tab 3). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D6115 – March 18 Letter Statement 2:** *In addition, the Accuracy section described that the "samples spanned the medical decision levels (MDL)". We are unclear as to the laboratory's definition of "medical decision limits." No definition of this phrase was found in Section 3 - Definitions of the "Method Validation" protocol or in Ex. E. We also note that the submitted protocol does not include a reference to "medical decision limits" as a criterion for determining accuracy.*

**Theranos Response to Statement 2 – D6115:** D6115 concerns the TPS 3.5. The TPS 3.5 was **fully retired** before in early-August 2015. References to method validation data in documents enclosed with the submission are to validation reports prepared **before** the survey began and before the laboratory's revised procedures were made effective (those reports were either reviewed by CMS or available to CMS during the survey), which were referenced for context. In addition, the laboratory has further revised its method verification procedure, which now has no reference to "critical medical decision limits." (Ex. BB, Tab 5).

The laboratory's revised method verification procedure references a "medical decision level," which is defined in the procedure as "[t]he concentration of analyte in blood or bodily fluid sample being analyzed at which some medical action is indicated for proper patient care. There may be several medical decision limits for a given analyte." (Ex. BB, Tab 5 § 3.9). In addition, this revised procedure references CLSI EP28-A3 (Ex. BB, Tab 5 § 10.6), which states: "for some analytes, reference intervals have been replaced by *decision limits [emphasis in original]*, established by national (or international) consensus. As examples, consider cholesterol and glycated hemoglobin. For such analytes, there is no need to establish *de novo*, or even to verify the reference intervals." Training on the laboratory's revised method verification procedure has occurred. (Ex. BB, Tabs 5B-5C).

**D6115 – March 18 Letter Statement 3:** *"We also note that the laboratory's submission provided no indication why the validation report for SHBG had an effective date of 7/14/14, but was not approved by the laboratory director until 9/19/15, even though patient testing began 7/28/14."*

**Theranos Response to Statement 3 – D6115:** [need to review report and then respond]

**D6115 – March 18 Letter Statement 4:** *The laboratory's submission in Ex. E, Tab 1 states:*

82

CONFIDENTIAL, COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

**ER-1822**

theran⊗s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*The procedure and acceptance criteria outlined in the "Guidance for Industry:*
*Bioanalytical Method Validation, 2001" document from FDA was followed to establish*
*the analytical measurement range (AMR) (reportable range) for these immunoassays run*
*on the TPS. Theranos did not follow the validation plan for immunoassays (ELISAs) as*
*outlined in Master Validation Plan for ELISA Assays on Theranos Devices.*

*The laboratory's response does not include a copy of the FDA protocol, and does not state in the*
*submitted master validation protocol, CL PLN-14002, Rev. A, that the FDA protocol should be*
*used to determine AMR.*

*The laboratory submitted a protocol for a Master Validation Plan at Ex. E, Tab 30B which*
*requires the %CV of replicates to be not more than 20% (25% at the lower and upper limits of*
*detection). The submitted protocol was different than the protocol presented to the surveyor at*
*the time of the onsite survey which required the %CV of replicates to be not more than 15%*
*(20% at the lower and upper limits of detection). The %CV in the protocol presented to the*
*surveyor at the time of the onsite survey matched the %CV of the predicate devices. Based on the*
*protocol submitted in the submission, it is unclear as to why the TPS, which is covered by the*
*Master Validation Plan, can now have %CV's for replicates greater than the predicate devices.*
*No explanation for the change in %CV was submitted. In addition, we noted that the information*
*submitted in Ex. E, Tab 1 did not include a 20-day precision study as required by the submitted*
*protocol.*

*The laboratory's submitted protocol requires that 120 samples be used to determine Reference*
*Intervals (see Ex. E, Tab 30B), Ex. E, Tab 1 states:*

> *However, the validation plan noted that the reference range would be established with*
> *120 samples per partition. However, the study followed CLSI procedure for transferring*
> *a reference range - the process by which one adapts a previously established reference*
> *range to a new analytical method. Furthermore, the transferred reference range was*
> *verified following CLSI guidelines - namely "the process by which one ensures, with*
> *reasonable confidence, using a relative small number of reference individuals (eg,*
> *n=20), that a reference interval established elsewhere, or transferred from another study,*
> *can be used locally.*

*We question the laboratory's procedure for "transferring a reference range" since the*
*laboratory provided no reference document to support "transferring a reference range." We*
*note that the submitted protocol does not state in Section 18, Reference Range, that the*
*laboratory can "transfer" a reference range. It is unclear as to how the laboratory determined*
*that the predicate method's reference range could be adapted or "transferred" to the Theranos*
*Proprietary Devices, which used different methodology than the predicate method.*

83

CMS2-164452

**ER-1823**

theran⊛s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9195

**Theranos Response to Statement 4 – D6115:** D6115 concerns the TPS 3.5. The TPS 3.5 was **fully retired** in early-August 2015. In addition, the laboratory **stopped** using its other LDTs, and does not have plans to resume using them as it transitions to compliance with FDA quality systems requirements for its LDTs and introduces next generation technologies. Accordingly, neither the master validation plan for ELISA assays nor "*Guidance for Industry: Bioanalytical Method Validation, 2001*" are being used by the laboratory. The laboratory does not plan to use either of those documents, plans or procedures in the future.

The laboratory will ensure that all future validation plans are documented and supported in accordance with the laboratory's new quality systems and procedures. Significantly, the laboratory's has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures. The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016. Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory. In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant. Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team. The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

The laboratory values CMS's feedback, and takes it very seriously. The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was **fully retired** in early-August 2015. As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5. (Ex. AA, Tab 3). The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures. Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015. As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015. (Ex. AA, Tab 3). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.[15]

---

[15] In discussing establishment of precision for an LDT, the March 18 letter references a comparison of %CVs between an LDT and "predicate devices." We note, however, that CLIA regulations do not contain any regulation requiring that there be any correlation or equivalence of

84

CMS2-164453

**ER-1824**

theran**s

1701 Page Mill Road    P 650.838.9292   theranos.com
Palo Alto, CA 94304    F 650.838.9165

**D6115 – March 18 Letter Statement 5:** *"The laboratory's submission does not indicate that the % Recovery and Allowable Bias citations had been addressed…. Because the laboratory has not shown that it can follow its own validation protocols, it is unclear whether the laboratory's quality assessment mechanisms could monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

**Theranos Response to Statement 5 – D6115:** D6115 concerns the TPS 3.5. The TPS 3.5 was **fully retired** in early-August 2015. In addition, neither the master validation plan for ELISA assays nor the master validation plan for chemistry assays are being used by the laboratory. The laboratory does not plan to use either of those documents, plans or procedures in connection with clinical testing in the future.

The laboratory values CMS's feedback, and takes it very seriously. The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was fully retired in early-August 2015. As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5. (Ex. AA, Tab 3). The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures. Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015. As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015. (Ex. AA, Tab 3). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

The laboratory is capable of ensuring that the deficient practice in D6115 does not recur. Significantly, the laboratory's has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures. The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016. Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory. In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant. Dr. Tschirhart has over 15 years of experience as a clinical

---

%CV between LDTs and predicate devices. Rather, the regulations require only that the precision for the test must be established for the LDT itself. 42 C.F.R. § 493.1253(b)(2). It also is generally accepted that accuracy is the only required performance specification that typically requires a correlation study. 42 C.F.R. § 493.1253(b)(2).

85

CMS2-164454

theran☺s

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

laboratory director, and is a valuable part of the laboratory's new leadership and oversight team. The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits. For example, § 8.1.1.3 of the method verification procedure lays out the requirements for a recovery design as part of an IVD verification.

**D6115 – March 18 Letter Statement 6:** *"Ex. E contains a list of patient specimen accession numbers for which the laboratory 'identified reports', but did not specify, or submit documentation to show that corrected reports were generated and issued."*

> **Theranos Response to Statement 6 – D6115:** As described above, the laboratory has revised its patient assessment analysis based upon a thorough re-review of QC data for the TPS 3.5. Based on that analysis, the laboratory has, out of an extreme abundance of caution, voided all results reported for assays run on the TPS 3.5 in 2014 and 2015. (Ex. AA, Tab 3). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

### D6124

**D6124 – March 18 Letter Statement 1:** *"Ex. A, Tab 16, § 7.3 of the submission contains a competency assessment protocol, Annual Competency. However, the protocol does not address the cited deficiency that direct observation was required for instrument maintenance and function checks. The protocol at § 1.1.7 (page 12) allows for a choice of validation method of which direct observation is one choice. The submitted laboratory protocol also requires the use of CL FRM 03016-F3 for annual competency. This form also allows the assessor to choose the validation method for competency assessment. Neither the submitted protocol nor the form to document competency assessment indicate that the six required procedures for CLIA competency assessment are required."*

> **Theranos Response to Statement 1 in D6124:** The laboratory has revised its training and competency procedures to clarify that the performance of maintenance and function checks must be directly observed (Ex. BB, Tab 9 §§ 6.9.4.4, 9.1), and to expressly require each of the procedures required by 42 CFR § 493.1451(b)(8)(iv). (Ex. BB, Tab 9 §§ 6.9.4). Training on these procedures has occurred. (Ex. BB, Tabs 9B-9C).

**D6124 – March 18 Letter Statement 2:** *"Ex. L, Tab 4 of the submission states: 'All testing personnel currently performing tests have completed competency testing with direct observation of, among other things, maintenance and function checks for the tests they are performing.' We are unable to determine if the documentation is complete as there is no information submitted about which testing personnel were performing testing on which instrument(s). Because the laboratory has not shown that it has corrected this deficient practice, we are also unable to*

86

CMS2-164455

**ER-1826**

theranos

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*determine whether the laboratory's quality assessment mechanisms can monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

**Theranos Response to Statement 2 in D6124:** The laboratory's submission included training and competency documentation for all testing personnel on the instruments they were operating at that time. The laboratory subsequently made some minor staffing changes. A list showing which testing personnel operate each instrument currently in use is enclosed. (Ex. HH, Tab 9A). Current training and competency documentation for those testing personnel and those instruments is also enclosed. (Ex. HH, Tab 9B). That documentation shows that all testing personnel have completed competency testing for the tests they are performing. (Ex. HH, Tabs 9A-9B).

The laboratory is capable of ensuring that the deficient practice in D6124 does not recur. Significantly, the laboratory's has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures. The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016. Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory. In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant. Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team. The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

## D6170

**D6170 – March 18 Letter Statement 1:** *"Ex. J, Tab 46 contains lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were generated and issued."*

**Theranos Response to Statement 1 in D6170:** Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D6170 – March 18 Letter Statement 2:** *"The submission further states:*

- *"Based on comprehensive review, multiple examples of failed QC [quality control] without the appropriate documentation with no investigation or corrective action was identified which is now addressed with revised SOPS and training."*
- *" ... the review identified multiple examples where technical service provided PM and that service was not documented in addition to failed QC run as part of the service which is now addressed with revised SOPs and training."*

87

CMS2-164456

theran⚬s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*The laboratory provided no documentation of investigation or corrective action for these QC failures and lack of maintenance documentation."*

**Theranos Response to Statement 2 in D6170:** There appears to have been a miscommunication here because the laboratory **stopped** running tests on the Fortessa and Canto before the survey began on September 22, 2015, and **has** not run any tests on the instruments since then. Because the Fortessa and Canto instruments are not in use, and have not been in use since the survey began, there have not been any new QC failures or maintenance issues that required investigation or corrective action under the laboratory's new procedures. The "review" discussed in the submission was simply intended to refer to the analysis conducted to address the deficiency identified by CMS. The issue addressed by the "review" — i.e., failing to document corrective action for QC fails for the Fortessa and Canto — is the same issue identified by CMS in its deficiency, and thus did not constitute a new issue or occurrence.

**D6170 – March 18 Letter Statement 3:** *"Ex. A, Tab 10, § 5.10 states: 'Unlicensed laboratory personnel are responsible for performing the activities listed below, under direct and constant supervision by licensed test personnel, with strict adherence to regulatory requirements ...' California. The laboratory relied on its written policies and procedures to ensure that appropriately licensed testing personnel were performing and reporting patient test results. However, if the laboratory's policies and procedures are inconsistent with state requirements, we question whether this mechanism would prevent the deficient practice from recurring, and question the laboratory's document control system to ensure accurately written policies and procedures."*

**Theranos Response to Statement 3 in D6170:** The laboratory's policy does not permit unlicensed personnel to run patient tests, and the laboratory did not intend to imply otherwise. To eliminate any confusion or potential for confusion, however, the laboratory has revised this procedure to remove the language identified by CMS. (Ex. BB, Tab 6 § 5.10).

### D6171

**D6170 – March 18 Letter Statement 1:** *"Ex. L, Tab 3 of the submission states: 'TP14 has been retrained to ensure that TP14 only performs activities within the scope of TP14's job description as a clinical laboratory associate, under the supervision of testing personnel. Because TP 14 is not testing personnel, the high complexity personnel educational requirements do not apply.' The CLIA job responsibilities in the job description provided at Ex. L, Tab 3 does include CLIA regulatory responsibilities for testing personnel, and as such TP14 was required to meet the educational requirements. The laboratory's submission does not provide any additional*

88

theran⊛s

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

*documentation that establishes that TP14 was qualified to perform high complexity testing. TP14 remains unqualified to perform high complexity testing.*

> **Theranos Response to Statement 1 in D6170:** The job description for TP14 has been revised to be consistent with the job description of a Clinical Laboratory Associate in the laboratory's revised personnel procedures. (Ex. HH, Tab 7B). The laboratory has confirmed that TP14 has not performed any test analyses between November 2015 and his execution of this revised job description. (Ex. HH, Tab 7A).

### D6178

**D6178 – March 18 Letter Statement 1:** *"Ex. F contains lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were generated and issued."*

> **Theranos Response to Statement 1 in D6178:** Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D6178 – March 18 Letter Statement 2:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit **may** [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

> **Theranos Response to Statement 2 – D6178:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

89

CMS2-164458

theranos

1701 Page Mill Road      P 650.838.9292    theranos.com
Palo Alto, CA 94304      F 650.838.9165

Sincerely,

Dr. Kingshuk Das
Laboratory Director
Theranos, Newark California Laboratory

90

CMS2-164459

**ER-1830**

# EXHIBIT 3

**theran⊕s**

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

February 12, 2016

**BY MESSENGER**

Ms. Karen Fuller
State Oversight and CLIA Branch
Division of Survey and Certification
Centers for Medicare and Medicaid Services
90 7th Street, Suite 5-300 (5W)
San Francisco, CA 94103-6707

> **Re:   Allegation of Compliance and Evidence of Correction, Form CMS-2567 (CLIA Number 05D2025714)**

Dear Ms. Fuller:

I write to provide you with Theranos, Inc.'s allegation of compliance and evidence of correction in response to the Statement of Deficiencies ("Plan of Correction"), Form CMS-2567, received by Theranos on January 26, 2016.

Please note that the Plan of Correction, like the Statement of Deficiencies, contains highly sensitive trade secret and confidential commercial information that Theranos has submitted and is submitting to CMS solely in connection with its survey. Public release of this information would irreparably harm Theranos' proprietary and business interests. As such, this information is exempt from disclosure under the Freedom of Information Act ("FOIA")[1] and CMS regulations.[2]

We respectfully request that you refrain from producing any copies of Theranos' Plan of Correction, the Statement of Deficiencies, or any exhibits or documents related thereto, redacted or otherwise, to any member of the public at this time. We are preparing a request for certain redactions to the Plan of Correction, which we will provide to you in the coming days. These redactions will supplement our requested redactions to the Statement of Deficiencies, which I submitted to you on February 4, 2016.

In addition, I hereby request sufficient advance notice prior to public disclosure of any of these documents.

---

[1] *See* 5 U.S.C. § 552(b)(4) (exempting "trade secrets and commercial or financial information obtained from a person and privileged or confidential" from public disclosure).

[2] *See* 42 C.F.R. § 401.116 ("CMS will, upon request made in accordance with this subpart, make identified records available to any person, unless they are exempt from disclosure under the provisions of section 552(b) of title 5."); *id.* § 401.126(a) ("Pursuant to paragraph (b) of 5 U.S.C. 552, certain classes of records are exempt from disclosure. For some examples of the kinds of materials which are exempt, see subpart F of the public information regulation of the Department of Health and Human Services (45 CFR part 5) and the appendix to that regulation."); *see also* 45 C.F.R. part 5, subpart F, § 5.65 ("We will withhold trade secrets and commercial or financial information that is obtained from a person and is privileged or confidential.").

1

Confidential

THPFM0004755071

theran●s

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

Finally, if CMS determines to transfer any of Theranos' confidential material to another federal agency, please forward a copy of this letter to that agency along with any confidential material and indicate that Theranos has requested confidential treatment of the material.

I am available to address any questions and look forward to continuing our work together.

Sincerely,

Heather King
General Counsel

cc:   Gary Yamamoto
      Sarah Bennett

*Enclosures*

2

CONFIDENTIAL Case 5:18-cr-00258-EJD Document 1434-4 Filed 11/08/21 Page 4 of 150 OF INFORMATION ACT

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|---|
| | **05D2025714** | A. BUILDING _____ | B. WING _____ | **11/20/2015** |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| **THERANOS INC** | 7333 GATEWAY BLVD<br>NEWARK, CA 94560 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D2094 | 493.841(e) ROUTINE CHEMISTRY<br><br>(1) For any unsatisfactory analyte or test performance or testing event for reasons other than a failure to participate, the laboratory must undertake appropriate training and employ the technical assistance necessary to correct problems associated with a proficiency testing failure.<br>(2) For any unacceptable analyte or testing event score, remedial action must be taken and documented, and the documentation must be maintained by the laboratory for two years from the date of participation in the proficiency testing event.<br>This STANDARD is not met as evidenced by:<br>Based on review of proficiency testing (PT) documentation and interview with the General Supervisor (GS), the laboratory failed to investigate and document the investation of ungraded alkaline phosphatase (ALP) PT results for the 3rd event of 2014. Findings include:<br><br>a. The laboratory was enrolled with the College of American Pathologists (CAP) PT program for ALP for the 3rd event 2014.<br><br>b. The CAP results showed that five of five samples (CHM-06 through CHM-10) were ungraded with a code [20].<br><br>c. There was no documenation that the ungraded ALP results had been investigated.<br><br>d. The general supervisor stated that the Quality Control/Quality Assurance (QC/QA) Manager was responsible for investigating ungraded PT results.<br><br>e. The QC/QA Manger confirmed on 11/18/15 that an investigation was not done or | D2094 | D2094<br>The lab has investigated this ungraded PT event for ALP and has documented its investigation and conclusions.<br><br>The new lab director has approved enhanced procedures for proficiency testing, which reinforce the lab's systems for the investigation of ungraded PT results. The lab's technical supervisors will be responsible for ensuring that these procedures are implemented and followed.<br><br>The lab will provide oversight through monthly QA meetings by reviewing investigations and corrective action for ungraded proficiency tests with outcomes of less than 100%. In addition, the lab will monitor compliance through its improved occurrence management, and audit procedures. | 2/12/16 |

| LABORATORY DIRECTOR'S OR PROVIDER/SUPPLIER REPRESENTATIVE'S SIGNATURE | TITLE | (X6) DATE |
|---|---|---|
| Kingshuk Das  Digitally signed by Kingshuk Das Date: 2016.02.12 10:18:05 -08'00' | Lab Director | 2/12/16 |

Any deficiency statement ending with an asterisk (*) denotes a deficiency which the institution may be excused from correcting providing it is determined that other safeguards provide sufficient protection to the patients. (See instructions.) Except for nursing homes, the findings stated above are disclosable 90 days following the date of survey whether or not a plan of correction is provided. For nursing homes, the findings and plans of correction are disclosable 14 days following the date these documents are made available to the facility. If deficiencies are cited, an approved plan of correction is requisite to continued program participation.

| FORM CMS-2567(02-99) Previous Versions Obsolete | Event ID: W34211 | Facility ID: CA22046272 | If continuation sheet Page 1 of 121 |
|---|---|---|---|

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

Confidential

THPFM0004755073

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  05D2025714 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE  7333 GATEWAY BLVD  NEWARK, CA  94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D2094  D2128 | Continued From page 1 documented.  493.851(e) HEMATOLOGY  (1) For any unsatisfactory analyte or test performance or testing event for reasons other than a failure to participate, the laboratory must undertake appropriate training and employ the technical assistance necessary to correct problems associated with a proficiency testing failure.  (2) For any unacceptable analyte or testing event score, remedial action must be taken and documented, and the documentation must be maintained by the laboratory for two years from the date of participation in the proficiency testing event.  This STANDARD is not met as evidenced by:  Based on review of proficiency testing (PT) documentation and interview with the General Supervisor (GS), the laboratory failed to investigate and document the investigation of ungraded blood cell identification PT results and failed to investigate and document the investigation of an unsatisfactory blood cell identification PT result for the 2nd event of 2014. Findings include:  a.   The laboratory was enrolled with the American Proficiency Institute (API) PT program for blood cell identification for the 2nd event 2014.  b.   The API results showed that two of five samples (BCI-13, BCI-14) were ungraded.  c.   The API results showed that BCI-11 was graded as "unacceptable."  d.   There was no documenation that the | D2094  D2128 | D2128  Two out of two challenges for "Blood Cell ID (Educational)" were "Not Graded" for the second API event of 2014.  The lab has investigated this ungraded PT event and documented its investigation and conclusions.  Four out of five challenges for "Blood Cell Identification" were acceptable for the second API event of 2014, meaning that the PT event received a passing grade.  The lab has investigated the one unacceptable challenge and documented its investigation and conclusions.  The new lab director has approved enhanced procedures for proficiency testing, which reinforce the lab's systems for investigation of ungraded PT results and any challenges that receive an unacceptable grade. The lab's technical supervisors are responsible for ensuring that these procedures are implemented and followed.  The lab will provide oversight through monthly QA meetings by reviewing investigations and corrective action | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page 2 of 121

Confidential

Trial Exh. 5257 Page 0004

**ER-1835**

THPFM0004755074

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|
| | **05D2025714** | A. BUILDING _____ <br> B. WING _____ | **11/20/2015** |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| **THERANOS INC** | **7333 GATEWAY BLVD** <br> **NEWARK, CA  94560** |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D2128 | Continued From page 2 <br> ungraded and unsatisfactory results had been investigated. <br><br> e.   The general supervisor stated that the Quality Control/Quality Assurance (QC/QA) Manager was responsible for investigating ungraded PT results. <br><br> f.   The QC/QA Manger confirmed on 11/18/15 that an investigation was not done or documented. | D2128 | D2128 (continued) <br> for proficiency tests with outcomes of less than 100% or challenges that are ungraded.  In addition, the lab will monitor compliance through its improved occurrence management and audit procedures. | |
| D5024 | 493.1215 HEMATOLOGY <br><br> If the laboratory provides services in the specialty of Hematology, the laboratory must meet the requirements specified in §§493.1230 through 493.1256, §493.1269, and §§493.1281 through 493.1299. <br><br> This CONDITION  is not met as evidenced by: Based on the number and severity of the deficiencies cited herein, the Condition: Hematology was not met.  The laboratory failed to have a procedure manual which included the corrective action to take when complete blood counts (CBC) calibration and quality control (QC) results failed to meet the laboratory's criteria for acceptability (see D5403); document CBC calibrations (see D5437); include two QC materials with differing white blood cell (WBC) patterns each day of testing (see D5447); verify stated values of commercially assayed CBC controls (see D5469); ensure QC for PT/INR was acceptable prior to reporting patient test results (see D5481); follow corrective action policies and procedures as necessary to maintain the laboratory operation for testing patient CBC specimens in a manner that ensured accurate | D5024 | D5024 <br> The laboratory has completed assessments to identify any patients affected or having the potential to be affected by the issues identified in this observation, and has taken corrective and preventative action. Among other things, the lab has hired a new lab director and established improved quality systems and procedures addressing the issues identified in this observation.  (D5403, D5437, D5447, D5469, D5481, D5779, D5801). | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  3 of 121

THPFM0004755075

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  05D2025714 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE  7333 GATEWAY BLVD  NEWARK, CA  94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5024 | Continued From page 3  and reliable patient test results and reports (see D5779); have an analytic systems quality assessment mechanism that included a review of the effectiveness of the laboratory's CBC processes and flow cytometer corrective actions taken to resolve problems (see D5779); and ensure that the calculated International Normalized Ratio (INR) results were accurate prior to reporting final patient results (see D5801). | D5024 | | |
| D5217 | 493.1236(c)(1) EVALUATION OF PROFICIENCY TESTING PERFORMANCE  At least twice annually, the laboratory must verify the accuracy of any test or procedure it performs that is not included in subpart I of this part.  This STANDARD  is not met as evidenced by:  Based on review of proficiency testing records and interview with the General Supervisor, the laboratory failed to investigate and document an investigation of ungraded troponin proficiency testing (PT) results from the 2nd event 2014. Findings include:  a.   The laboratory was enrolled in proficiency testing for troponin with the American Proficiency Institute (API) for the 2nd event 2014.  b.   Troponin results for five of five specimens (CM-06 through CM-10) were ungraded by API.  c.   There was no documentation that the ungraded results had been investigated or reviewed by the laboratory personnel.  d.   The general supervisor stated that the Quality Control/Quality Assurance (QC/QA) Manager was responsible for investigating ungraded PT results. | D5217 | D5217  Troponin I results for the second event of 2014 were "Not Graded" due to "No Consensus" for all challenges. The lab has investigated this ungraded PT event and documented its investigation and conclusions.  The new lab director has approved enhanced procedures for proficiency testing, which reinforce the lab's systems for investigation of ungraded PT results.  The lab's technical supervisors are responsible for ensuring that these procedures are implemented and followed.  The lab will provide oversight through monthly QA meetings by reviewing investigations and corrective action for ungraded proficiency tests.  In addition, the lab will monitor compliance through its improved | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  4 of 121

Confidential

THPFM0004755076

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE<br>7333 GATEWAY BLVD<br>NEWARK, CA  94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5217 | Continued From page 4<br><br>e.   The QC/QA Manger confirmed on 11/18/15 that an investigation was not done or documented. | D5217 | D5217 (continued)<br>occurrence management and audit procedures. | |
| D5311<br><br>110H<br>120H<br>140H<br>210B<br>220B<br>310B<br>320M<br>330B<br>340B<br>400B<br>510M | 493.1242(a) SPECIMEN SUBMISSION, HANDLING, AND REFERRAL<br><br>The laboratory must establish and follow written policies and procedures for each of the following, if applicable:<br>(1) Patient preparation.<br>(2) Specimen collection.<br>(3) Specimen labeling, including patient name or unique patient identifier and, when appropriate, specimen source.<br>(4) Specimen storage and preservation.<br>(5) Conditions for specimen transportation.<br>(6) Specimen processing.<br>(7) Specimen acceptability and rejection.<br>(8) Specimen referral.<br>This STANDARD  is not met as evidenced by:<br> Based on laboratory personnel interviews and pre-analytic policies and procedures record review on September 23, 2015, the laboratory failed to establish written policies and procedures for patient specimen labeling.  Findings included:<br><br>a.   It was the practice of the laboratory to require that all patient specimens received be labeled with laboratory generated bar codes that were issued at the point of specimen collection.<br><br>b.   The laboratory maintained no written policies and procedures detailing this patient specimen labeling policy and procedure.<br><br>c.   According to laboratory records, the laboratory performed approximately 890,000 patient tests annually. | D5311 | D5311<br>As noted in the findings, it was the practice of the lab to label all patient specimens with lab-generated bar codes issued at the point of collection. Those bar codes and related software properly tracked patient specimens.<br><br>The new lab director has approved written policies and procedures addressing patient specimen labeling. The lab's supervisors, quality systems director, and lab director will be responsible for ensuring that these procedures are implemented and followed.<br><br>The lab will provide oversight of accessioning through monthly QA meetings. In addition, the lab will monitor compliance through its improved occurrence management, and audit procedures, both of which address preanalytic activities. | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete     Event ID: W34211     Facility ID: CA22046272     If continuation sheet Page  5 of 121

Confidential

THPFM0004755077

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 05D2025714 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED 11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| THERANOS INC | 7333 GATEWAY BLVD NEWARK, CA 94560 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5391 110H 120H 140H 210B 220B 310B 320M 330B 340B 400B 510M | 493.1249(a) PREANALYTIC SYSTEMS QUALITY ASSESSMENT<br><br>The laboratory must establish and follow written policies and procedures for an ongoing mechanism to monitor, assess, and when indicated, correct problems identified in the preanalytic systems specified at §§493.1241 through 493.1242.<br><br>This STANDARD is not met as evidenced by:<br><br>1. Based on laboratory personnel interviews and pre-analytic remedial action record review on September 23, 2015, the laboratory failed to establish written policies and procedures for an ongoing mechanism to monitor, assess, and when indicated, correct problems identified in the laboratory's preanalytic systems when received patient specimens did not meet the laboratory's criteria for acceptability. Findings included:<br><br>a. According to laboratory personnel, during the accessioning of patient specimens, if a patient specimen was received that did not meet the laboratory's criteria for acceptability, a description as to why the specimen did not meet the laboratory's criteria for acceptability would be electronically noted, applicable laboratory personnel would be notified, appropriate corrective actions would be taken and electronically noted, and the incident would be captured for quality assessment review.<br><br>b. The laboratory maintained no written policies and procedures detailing this quality assessment process.<br><br>c. According to laboratory records, the laboratory performed approximately 890,000 | D5391 | D5391 #1<br>As noted in the findings, if a patient specimen did not meet the lab's acceptance criteria, the lab's practice was to describe the issue in its electronic system, to notify relevant lab personnel, and to take, and electronically note, appropriate corrective action. Patient specimens that did not meet the lab's acceptance criteria were not used for testing.<br><br>The new lab director has approved enhanced specimen rejection procedures, which require the relevant lab personnel to further monitor and assess received patient specimens and to correct problems as needed. These procedures also require a supervisor to review and approve daily a list of requested redraws. The lab has conducted training on these procedures.<br><br>During monthly QA meetings, the lab will review, among other things, specimen rejection rates and any associated issues. In addition, the lab will monitor compliance through its improved occurrence management, and audit procedures, both of which address preanalytic activities.<br><br>The new lab director is responsible for | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete    Event ID: W34211    Facility ID: CA22046272    If continuation sheet Page 6 of 121

Confidential

THPFM0004755078

Trial Exh. 5257 Page 0008

**ER-1839**

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE<br>7333 GATEWAY BLVD<br>NEWARK, CA  94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5391 | Continued From page 6<br>patient tests annually.<br><br>2.   Based on laboratory personnel interviews and patient specimen referral policies and procedures record review on September 23, 2015, the laboratory failed to establish written policies and procedures for an ongoing mechanism to monitor, assess, and when indicated, correct problems identified in the laboratory's preanalytic systems for patient specimens referred to other laboratories for testing.  Findings included:<br><br>a.   According to laboratory personnel, a log of patient specimens referred to other laboratories for testing was reviewed daily to ensure the timely receipt and reporting of the test results performed by the other laboratories.<br><br>b.   The laboratory maintained no written policies and procedures detailing this quality assessment process. | D5391 | D5391 #1 (continued)<br>the lab's QA program, and has also appointed a Quality Director who will provide additional oversight.<br><br>D5391 #2<br>As noted in the findings, the lab's practice was to review its log of patient specimens referred to other labs to ensure the timely receipt and reporting of the test results performed by the other labs.<br><br>The new lab director has approved enhanced procedures for referral testing, which require, among other things, the lab to document its review of pending orders and results for referral tests, including the lab's log of patient specimens referred to other labs. | 2/12/16 |
| D5393<br>110H<br>120H<br>140H<br>210B<br>220B<br>310B<br>320M<br>330B<br>340B<br>400B<br>510M | 493.1249(b)(c) PREANALYTIC SYSTEMS QUALITY ASSESSMENT<br><br>The preanalytic systems assessment must include a review of the effectiveness of corrective actions taken to resolve problems, revision of policies and procedures necessary to prevent recurrence of problems, and discussion of preanalytic systems quality assessment reviews with appropriate staff.  The laboratory must document all preanalytic systems quality assessment activities.<br><br>This STANDARD  is not met as evidenced by:<br> Based on laboratory personnel interviews and patient specimen referral policies and procedures record review on September 23, 2015, the | D5393 | The lab's management, including the lab director and quality systems director, is responsible for monitoring and assessing compliance with these procedures, and ensuring that corrective action is taken as needed. The lab also requires monitoring of turnaround times for reference labs and related issues during monthly QA meetings, through regular audits, and through its improved occurrence management. | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  7 of 121

Confidential

THPFM0004755079

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|
| | 05D2025714 | A. BUILDING _____ B. WING _____ | 11/20/2015 |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| THERANOS INC | 7333 GATEWAY BLVD NEWARK, CA 94560 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5391 | Continued From page 6 patient tests annually.

2.   Based on laboratory personnel interviews and patient specimen referral policies and procedures record review on September 23, 2015, the laboratory failed to establish written policies and procedures for an ongoing mechanism to monitor, assess, and when indicated, correct problems identified in the laboratory's preanalytic systems for patient specimens referred to other laboratories for testing.  Findings included:

a.   According to laboratory personnel, a log of patient specimens referred to other laboratories for testing was reviewed daily to ensure the timely receipt and reporting of the test results performed by the other laboratories.

b.   The laboratory maintained no written policies and procedures detailing this quality assessment process. | D5391 | (Continued) | |
| D5393 110H 120H 140H 210B 220B 310B 320M 330B 340B 400B 510M | 493.1249(b)(c) PREANALYTIC SYSTEMS QUALITY ASSESSMENT

The preanalytic systems assessment must include a review of the effectiveness of corrective actions taken to resolve problems, revision of policies and procedures necessary to prevent recurrence of problems, and discussion of preanalytic systems quality assessment reviews with appropriate staff.  The laboratory must document all preanalytic systems quality assessment activities.

This STANDARD  is not met as evidenced by:  Based on laboratory personnel interviews and patient specimen referral policies and procedures record review on September 23, 2015, the | D5393 | D5393 As noted in the findings, the lab's practice was to review its log of patient specimens referred to other labs to ensure the timely receipt and reporting of the test results performed by other labs.

The new lab director has approved enhanced procedures for referral testing, which require, among other things, that review of referral testing logs will be documented. | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete        Event ID: W34211        Facility ID: CA22046272        If continuation sheet Page  7 of 121

Confidential

THPFM0004755080

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE<br>7333 GATEWAY BLVD<br>NEWARK, CA 94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5393 | Continued From page 7<br>laboratory failed to document all preanalytic systems quality assessment activities, specifically for patient specimens referred to other laboratories for testing.  Findings included:<br><br>a.   According to laboratory personnel, a log of patient specimens referred to other laboratories for testing was reviewed daily to ensure the timely receipt and reporting of the test results performed by the other laboratories.<br><br>b.   The laboratory maintained no documentation indicating that the patient specimen referral log was reviewed daily. | D5393 | D5393 (continued)<br>The lab's management, including the lab director and quality systems director, is responsible for overseeing compliance with these procedures. The lab also requires monitoring of turnaround times for reference labs and related issues during monthly QA meetings, through regular audits, and through its improved occurrence management. | |
| D5400 | 493.1250 ANALYTIC SYSTEMS<br><br>Each laboratory that performs nonwaived testing must meet the applicable analytic systems requirements in §§493.1251 through 493.1283, unless HHS approves a procedure, specified in Appendix C of the State Operations Manual (CMS Pub.7), that provides equivalent quality testing. The laboratory must monitor and evaluate the overall quality of the analytic systems and correct identified problems as specified in §493.1289 for each specialty and subspecialty of testing performed.<br><br>This CONDITION  is not met as evidenced by:  Based on the number and severity of the deficiencies cited herein, the Condition: Analytic Systems was not met.  The laboratory failed to have a procedure manual that included corrective action for chemistry quality control (QC) (see D5403); failed to have procedures signed, dated, and approved by the laboratory director prior to use (see D5407); failed to have freezer temperature consistent with manufacturer | D5400 | D5400<br>The laboratory has completed assessments to identify any patients affected or having the potential to be affected by the issues identified in this observation, and has taken corrective and preventative action.  Among other things, the lab has hired a new lab director and established improved quality systems and procedures addressing the issues identified in this observation.  (D5403, D5407, D5413, D5421, D5423, D5429, D5437, D5447, D5449, D5469, D5477, D5481, D5775, D5779, D5787, D5791, D5793). | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete       Event ID: W34211       Facility ID: CA22046272       If continuation sheet Page  8 of 121

Confidential

THPFM0004755081

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|---|
| | 05D2025714 | A. BUILDING _____ B. WING _____ | | 11/20/2015 |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| THERANOS INC | 7333 GATEWAY BLVD NEWARK, CA  94560 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5400 | Continued From page 8<br><br>requirements (see D5413); failed to verify performance specifications on the Advia XPT (see D5421); failed to establish performance specification when the alkaline phosphatase test system was modified (see D5423); failed to perform weekly maintenance on the Evolis (see D5429); failed to document hematology calibration (see D5437); failed to include two quality control materials at least once each day WBC differentials were performed (see D5447); failed to include positive quality control materials each day patient specimens were assayed (see D5449); failed to verify the criteria for acceptability of quality control materials for hematology and chemistry (see D5469); failed to check blood agar plates for its ability to support growth (see D5477); failed to ensure that QC test results met the laboratory's criteria for acceptability for Prothrombin Time/International Normalized Ratio and the Theranos Proprietary System (TPS) prior to reporting patient test results (see D5481); failed to have a system that twice per year evaluated and defined the relationship for WBC differentials and the TPS (see D5775); failed to follow hematology corrective action policies and procedures (see D5779); failed to have a record system that documented the lot number of media used to test patient bacteriology specimens (see D5787); failed to follow quality assessment (QA) policies and procedures (see D5791); and failed to monitor the effectiveness of corrective actions and revise policies and procedures to prevent recurrence of problems (see D5793). | D5400 | | |
| D5403<br><br>400M | 493.1251(b) PROCEDURE MANUAL<br><br>The procedure manual must include the following when applicable to the test procedure: | D5403 | D5403 #1:<br>The laboratory proactively paused testing on the Advia 2120i during the survey.  The lab has completed an | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  9 of 121

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br><br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE<br>7333 GATEWAY BLVD<br>NEWARK, CA  94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5403 | Continued From page 9<br>(1) Requirements for patient preparation; specimen collection, labeling, storage, preservation, transportation, processing, and referral; and criteria for specimen acceptability and rejection as described in §493.1242.<br>(2) Microscopic examination, including the detection of inadequately prepared slides.<br>(3) Step-by-step performance of the procedure, including test calculations and interpretation of results.<br>(4) Preparation of slides, solutions, calibrators, controls, reagents, stains, and other materials used in testing.<br>(5) Calibration and calibration verification procedures.<br>(6) The reportable range for test results for the test system as established or verified in §493.1253.<br>(7) Control procedures.<br>(8) Corrective action to take when calibration or control results fail to meet the laboratory's criteria for acceptability.<br>(9) Limitations in the test methodology, including interfering substances.<br>(10) Reference intervals (normal values).<br>(11) Imminently life-threatening test results, or panic or alert values.<br>(12) Pertinent literature references.<br>(13) The laboratory's system for entering results in the patient record and reporting patient results including, when appropriate, the protocol for reporting imminently life threatening results, or panic, or alert values.<br>(14) Description of the course of action to take if a test system becomes inoperable.<br><br>This STANDARD  is not met as evidenced by:<br>1.  Based on laboratory personnel interviews and the laboratory's hematology Advia 2120i | D5403 | D5403 #1 (continued)<br>assessment to identify any patients affected or having the potential to be affected by this issue.<br><br>The new lab director has approved enhanced QC procedures that address the corrective actions to take when QC fails to meet the lab's acceptability criteria, and the lab has conducted training on those procedures.  The new lab director has also approved an enhanced SOP for CBC on the Siemens Advia 2120i that addresses the corrective actions to take when calibration or QC fail to meet the lab's acceptability criteria<br><br>Before the lab resumes any tests on the Siemens Advia 2120i, it will conduct training on those procedures. In addition, lab staff will be required to demonstrate competency to ensure that practice is consistent with these procedures. In addition, prior to resuming any test on this instrument, the lab will re-verified the test in accordance with its improved method verification procedures.<br><br>Lab management, including the lab director, technical supervisors, and quality director, is responsible for compliance with these procedures. | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID:W34211          Facility ID: CA22046272          If continuation sheet Page  10 of 121

Confidential

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>**THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE<br>**7333 GATEWAY BLVD**<br>**NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5403 | Continued From page 10<br>procedure record review on November 19, 2015, the laboratory failed to have a procedure manual that included the corrective action to take when calibration or quality control results failed to meet the laboratory's criteria for acceptability.  Findings included:<br><br>a.   It was the practice of the laboratory to test patient venous complete blood counts (CBC) specimens using a Siemens Advia 2120i instrument.<br><br>b.   In the laboratory's procedure titled "SOP Advia 2120i Operation and Maintenance," there was no written protocol for the corrective action to be taken when calibration or quality control results failed to meet the laboratory's criteria for acceptability.<br><br>c.   Between February 2015 and September 21, 2015, the laboratory performed and reported 2,395 patient CBC test results using the Advia 2120i.<br><br>2.   Based on review of the quality control (QC) procedure for the Edison 3.5 Theranos System and documentation provided by the laboratory, the laboratory failed to have a procedure for QC prior to 5/15/2014.  Findings include:<br><br>a.   CL SOP-15026 Revision A, "Edison 3.5 Theranos System Daily QC Procedure" revealed an effective date of 5/15/2014.<br><br>b.   A chart provided by the laboratory indicated that eight of twelve analytes run on the above system were put into use for patient testing prior to 5/15/2014. The initial use dates of the eight analytes ranged from 11/6/2013 through | D5403 | D5403 #1 (continued)<br>The lab will provide oversight through monthly QA meetings, and will monitor compliance through its improved occurrence management, and audit procedures.<br><br><br><br>D5403 #2<br>The lab performed QC for the Theranos Sample Processing Unit 3.5 ("TSPU 3.5") both before and after May 15, 2014.  The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue.<br><br>The new lab director has approved enhanced QC procedures that address the corrective actions to take when QC | <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA2046272          If continuation sheet Page  11 of 121

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br>**THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE<br>**7333 GATEWAY BLVD**<br>**NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5403<br><br>D5407 | Continued From page 11<br>5/9/2014.<br>493.1251(d) PROCEDURE MANUAL<br><br>Procedures and changes in procedures must be approved, signed, and dated by the current laboratory director before use.<br>This STANDARD is not met as evidenced by:<br> Based on review of procedures and interview with the technical supervisor, the current laboratory director (LD) failed to sign, date and approve procedures prior to use.  Findings include:<br><br>a.   The current LD start date was 2/10/2015.<br><br>b.   Eight procedures were reviewed.  Seven of seven procedures did not include a LD signature prior to putting into use and one of one was not signed by the current LD.<br><br>c.   CL SOP-09161, Revision A (Apolipoprotein) showed an effective date of 12/5/2014, but was not signed by the LD until 9/19/2015.  It was signed by a technical supervisors "for the LD."  The procedure was not signed, dated and approved by any LD prior to 9/19/2015.<br><br>d.   CL SOP-10001, Revision B  (Measuring Prothrombin Time-Innovin (PT) on the Siemens BCS XP Instrument) showed an effective date of 12/5/2014, but was not signed by the LD until 9/19/2015.  The procedure was not signed, dated and approved by any LD prior to 9/19/2015.<br><br>e.   CL SOP-06060, Revision A (SensoScientific Monitor) showed an effective date of 6/23/2015, but was not signed by the LD until 9/22/2015. | D5403<br><br>D5407 | D5403 #2 (continued)<br>fails to meet the lab's acceptability criteria, and the lab has conducted training on those procedures.<br><br>Lab management, including technical supervisors, the lab director, and the quality director, will be responsible for ensuring compliance with these procedures.  The lab will provide oversight through monthly QA meetings, and will monitor compliance through its improved occurrence management, and audit procedures. | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  12 of 121

Confidential

THPFM0004755085

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  05D2025714 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE  7333 GATEWAY BLVD  NEWARK, CA  94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5403  D5407 | Continued From page 11  5/9/2014.  493.1251(d) PROCEDURE MANUAL  Procedures and changes in procedures must be approved, signed, and dated by the current laboratory director before use.  This STANDARD is not met as evidenced by:  Based on review of procedures and interview with the technical supervisor, the current laboratory director (LD) failed to sign, date and approve procedures prior to use.  Findings include:  a.   The current LD start date was 2/10/2015.  b.   Eight procedures were reviewed.  Seven of seven procedures did not include a LD signature prior to putting into use and one of one was not signed by the current LD.  c.   CL SOP-09161, Revision A (Apolipoprotein) showed an effective date of 12/5/2014, but was not signed by the LD until 9/19/2015.  It was signed by a technical supervisors "for the LD." The procedure was not signed, dated and approved by any LD prior to 9/19/2015.  d.   CL SOP-10001, Revision B  (Measuring Prothrombin Time-Innovin (PT) on the Siemens BCS XP Instrument) showed an effective date of 12/5/2014, but was not signed by the LD until 9/19/2015.  The procedure was not signed, dated and approved by any LD prior to 9/19/2015.  e.   CL SOP-06060, Revision A (SensoScientific Monitor) showed an effective date of 6/23/2015, but was not signed by the LD until 9/22/2015. | D5403  D5407 | D5407  The lab directors during the period covered by the survey no longer hold any position with the lab.  The new lab director was hired after the on-site survey had been completed.  The new lab director has approved enhanced document control policies and procedures to ensure that the relevant personnel approve new or revised documents before they become effective.  The lab has conducted training on those procedures.  All active SOPs relevant to testing currently being performed have been approved by the new lab director.  The lab has appointed a Document Control Manager whose responsibilities include tracking new and revised policies and procedures to ensure they are reviewed, approved, and signed by the lab director before they become effective.  The lab will provide oversight of document control through monthly | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  12 of 121

Confidential

THPFM0004755086

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 05D2025714 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED 11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE 7333 GATEWAY BLVD NEWARK, CA 94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5407 | Continued From page 12<br><br>f.   CL SOP-15036, Revision A (Edison 3.5 Theranos System Daily QC Procedure) showed an effective date of 12/5/2014, but was not signed by the LD until 9/19/2015.  The procedure was not signed, dated and approved by any LD prior to 9/19/2015.<br><br>g.   CL PLN-14003, Revision A (Master Validation Chemistry Assays on Theranos Devices) showed an effective date of 11/4/2011, but was not signed by the LD until 9/19/2015.  The procedure was not signed, dated and approved by any LD prior to 9/19/2015.<br><br>h.   Three of three procedures for the Advia Chemistry System (Glucose/CL SOP-09118, Carbon Dioxide (CO2)/CL SOP-09111, Alkaline Phosphatase/CL SOP-81102) were put into use in December 2014. The CO2 and alkaline phosphatase procedures were not signed, dated and approved by the LD until 9/19/2015.  The glucose procedure was not signed, dated and approved by the LD. | D5407 | D5407 (continued)<br>QA meetings, and will monitor compliance through its new audit procedures. | |
| D5413 | 493.1252(b) TEST SYSTEMS, EQUIPMENT, INSTRUMENTS, REAGENT<br><br>The laboratory must define criteria for those conditions that are essential for proper storage of reagents and specimens, accurate and reliable test system operation, and test result reporting. The criteria must be consistent with the manufacturer's instructions, if provided.  These conditions must be monitored and documented and, if applicable, include the following:<br>(1) Water quality.<br>(2) Temperature.<br>(3) Humidity.<br>(4) Protection of equipment and instruments from | D5413 | D5413 #1<br>A review of hourly data demonstrated that average hourly temperature for nearly all of the freezers at issue met the manufacturer temperature requirements for the materials stored. The lab has identified and discarded any materials that had the potential to have been affected. The lab has also completed an assessment to identify any patients affected or having the potential to be affected by this issue. | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  13 of 121

Confidential

THPFM0004755087

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 05D2025714 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED 11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE 7333 GATEWAY BLVD NEWARK, CA  94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5413 | Continued From page 13 fluctuations and interruptions in electrical current that adversely affect patient test results and test reports. This STANDARD  is not met as evidenced by: 1.  Based on observation and document review, the laboratory failed to define freezer temperature ranges that were consistent with the manufacturer's instructions for freezers which stored reference materials and patient specimens.  Findings include: a.  A tour of the laboratory where the freezers were kept showed that the freezer doors were labeled with the laboratory's acceptable temperature ranges. b.  Four of four -80 C freezers were marked with a temperature range of -60 to -90 C. c.  Six of six -20 C freezers were marked with a temperature range of -17 to -25 C. d.  Review of two manufacturer instructions for samples stored in the -80 freezers required that the samples be kept at "at least -80 C." e.  Review of 3 manufacturer instructions for samples stored in the -20 freezers required that the samples be kept at "at least -20 C." f.  The Director of Assay Systems and technical supervisor confirmed at 11/19/15 at approximately 11 am that the freezers were labeled with the above ranges and that the ranges did not meet the manufacturers instructions. 2.  Based on review of the procedure, manufacturer package insert (PI) and | D5413 | D5413 #1 (continued) The new lab director has approved enhanced temperature management procedures to reinforce monitoring of temperature and environmental conditions and storage of materials according to the manufacturer's temperature range. The lab has conducted training on those procedures. The lab's management, including the new lab director and quality systems director, will ensure compliance with these procedures, including by making sure that supervisors perform their respective duties effectively. The lab will also provide oversight through monthly QA meetings, and will monitor compliance through its improved occurrence management, and audit procedures. | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  14 of 121

THPFM0004755088

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 05D2025714 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED 11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE 7333 GATEWAY BLVD NEWARK, CA 94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5413 | Continued From page 14 observation, the laboratory failed to follow the manufacturer instructions for expiration date of Innovin (thromboplastin) used for Prothrombin Time/International Normalized Ratio (PT/INR) testing. Findings include:<br><br>a.   Dade Innovin (thromboplastin) lot number 539280 was put into use by the laboratory at the end of March 2015.<br><br>b.   The general supervisor stated that the package inserts were usually white.<br><br>c.   The package insert for lot number 539280 was pink which indicated that the manufacturer had included special instructions for the specific lot number of Innovin.<br><br>d.   Review of the PI revealed an "important note" that this specific lot number was only stable for 2 days instead of 10 days after reconstitution when stored at 2-8 C.<br><br>e.   The current vial of Innovin reagent was observed in the 2-8 C refrigerator with a 5 day expiration date.<br><br>f.   CL SOP-10001 Revision A, "Measuring Prothrombin Time..." stated on page 10, section 12.1 that "the package insert for a new lot must be reviewed for any changes before use."<br><br>g.   The general supervisor confirmed on 9/23/15 that the change in storage and stability of the Innovin reagent had not been identified from March 2015 through September 2015. | D5413 | D5413 #2<br>This PT/INR issue related to one lot. The lab paused testing on the Siemens BCS XP, including PT/INR, during the survey.  The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue.<br><br>The new lab director has approved enhanced reagent qualification and management procedures that reinforce the lab's practice of ensuring that manufacturer inserts and notifications are reviewed and followed.  The lab has conducted training on those procedures.<br><br>Before the lab resumes PT/INR testing, the lab will reinforce with relevant testing personnel the importance of reviewing and following instructions on manufacturer inserts and notifications, including instructions concerning expiration dates.  The same type of training will occur for personnel conducting other tests.  These trainings, along with competency testing, will ensure that practice is consistent with these procedures.<br><br>Lab management, including the new lab director, technical supervisors, and | 2/12/16 |
| D5421 | 493.1253(b)(1) ESTABLISHMENT AND VERIFICATION OF PERFORMANCE | D5421 | | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  15 of 121

Confidential

THPFM0004755089

ER-1850

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 05D2025714 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED 11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE 7333 GATEWAY BLVD NEWARK, CA 94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5413 | Continued From page 14 observation, the laboratory failed to follow the manufacturer instructions for expiration date of Innovin (thromboplastin) used for Prothrombin Time/International Normalized Ratio (PT/INR) testing. Findings include:<br><br>a.   Dade Innovin (thromboplastin) lot number 539280 was put into use by the laboratory at the end of March 2015.<br><br>b.   The general supervisor stated that the package inserts were usually white.<br><br>c.   The package insert for lot number 539280 was pink which indicated that the manufacturer had included special instructions for the specific lot number of Innovin.<br><br>d.   Review of the PI revealed an "important note" that this specific lot number was only stable for 2 days instead of 10 days after reconstitution when stored at 2-8 C.<br><br>e.   The current vial of Innovin reagent was observed in the 2-8 C refrigerator with a 5 day expiration date.<br><br>f.   CL SOP-10001 Revision A, "Measuring Prothrombin Time..." stated on page 10, section 12.1 that "the package insert for a new lot must be reviewed for any changes before use."<br><br>g.   The general supervisor confirmed on 9/23/15 that the change in storage and stability of the Innovin reagent had not been identified from March 2015 through September 2015. | D5413 | D5413 #2 (continued) quality director, is responsible for ensuring that these procedures are followed.  The lab will provide oversight through monthly QA meetings, and will monitor compliance through its improved occurrence management, and audit procedures. | |
| D5421 | 493.1253(b)(1) ESTABLISHMENT AND VERIFICATION OF PERFORMANCE | D5421 | | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page 15 of 121

Confidential

THPFM0004755090

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 05D2025714 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED 11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| THERANOS INC | 7333 GATEWAY BLVD NEWARK, CA  94560 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5421 | Continued From page 15<br><br>Each laboratory that introduces an unmodified, FDA-cleared or approved test system must do the following before reporting patient test results:<br>(1)(i) Demonstrate that it can obtain performance specifications comparable to those established by the manufacturer for the following performance characteristics:<br>(1)(i)(A) Accuracy.<br>(1)(i)(B) Precision.<br>(1)(i)(C) Reportable range of test results for the test system.<br>(1)(ii) Verify that the manufacturer's reference intervals (normal values) are appropriate for the laboratory's patient population.<br>This STANDARD  is not met as evidenced by:<br>1.  Based on review of the performance specification verification documentation and interview with the general supervisor and technical supervisor, the laboratory failed to maintain any documentation that the laboratory had participated in conducting the verification of the performance specifications on the Advia XPT. Findings include:<br><br>a.  The general supervisor and techincal supervisor stated that the manufacturer performed all of the performance specification verification activities on the Advia XPT.<br><br>b.  They further stated that the laboratory staff were available to prepare quality control material and gathering patient samples for the manufacturer representative to perform the verification.<br><br>c.  The Director of Assays confirmed that the manufacturer had performed the verification of performance specifications on the Advia XPT. | D5421 | D5421 #1:<br>The lab proactively paused testing on the Advia XPT during the survey.<br>The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue.<br><br>Before the lab resumes any test on the Advia XPT, the lab will ensure that the test has been re-verified pursuant to the lab's improved method verification procedures that have been approved by the new lab director. These improved procedures reinforce that the lab's testing personnel are required to actively participate in method verification and document their participation.<br><br>Before any verification studies are performed, these improved procedures require the lab director's review and approval of a detailed method verification plan containing defined acceptance criteria. The lab director must also review and approve the verification report before any patient testing begins.<br><br>The lab has conducted training on these procedures to ensure that practice is consistent with them. | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete        Event ID: W34211        Facility ID: CA22046272        If continuation sheet Page  16 of 121

Confidential

THPFM0004755091

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|
| | 05D2025714 | A. BUILDING _____<br>B. WING _____ | 11/20/2015 |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| THERANOS INC | 7333 GATEWAY BLVD<br>NEWARK, CA  94560 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5421 | Continued From page 15<br><br>Each laboratory that introduces an unmodified, FDA-cleared or approved test system must do the following before reporting patient test results:<br>(1)(i) Demonstrate that it can obtain performance specifications comparable to those established by the manufacturer for the following performance characteristics:<br>(1)(i)(A) Accuracy.<br>(1)(i)(B) Precision.<br>(1)(i)(C) Reportable range of test results for the test system.<br>(1)(ii) Verify that the manufacturer's reference intervals (normal values) are appropriate for the laboratory's patient population.<br>This STANDARD  is not met as evidenced by:<br>1. Based on review of the performance specification verification documentation and interview with the general supervisor and technical supervisor, the laboratory failed to maintain any documentation that the laboratory had participated in conducting the verification of the performance specifications on the Advia XPT. Findings include:<br><br>a.   The general supervisor and techincal supervisor stated that the manufacturer performed all of the performance specification verification activities on the Advia XPT.<br><br>b.   They further stated that the laboratory staff were available to prepare quality control material and gathering patient samples for the manufacturer representative to perform the verification.<br><br>c.   The Director of Assays confirmed that the manufacturer had performed the verification of performance specifications on the Advia XPT. | D5421 | D5421 #1 (continued)<br>Lab management, including the new lab director, technical supervisors, and quality systems director, is responsible for ensuring compliance with these procedures. The lab will provide oversight through monthly QA meetings, and will monitor compliance through its improved occurrence management and audit procedures. | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  16 of 121

Confidential

THPFM0004755092

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  05D2025714 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE  7333 GATEWAY BLVD  NEWARK, CA 94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5421 | Continued From page 16  2.  Based on review of verification procedures, verification documentation and interview with general supervisor and technical supervisor, the laboratory failed to verify accuracy, precision, and/or reportable range for calcium, albumin, apolipoprotein, triglyceride, carbon dioxide, and glucose.  In addition, the laboratory failed to verify the reference interval (normal range) for carbon dioxide.  Findings include:  a.  CL QOP-00022, "Verification of Procedures Revision A", effective 8/12/14, stated in Section V.B.1.a. in order to determine accuracy "at least 20 samples of various reactivity should be compared between the method and the old method...if a second method is not available onsite, compare 20 samples tested by a different method used by a different laboratory."  The procdures also stated that the validation plan should determine what percentage of accuracy is acceptable.  b.  CL QOP-00022, "Verification of Procedures Revision A", effective 8/12/14, stated in Section V.B.1.b. that "a replication experiment" is used to determine precision.  The procedure further stated that "at least 20 samples of various reactivity's are run 2 or 3 times and results compared. Duplicate runs may be on different days or by different microbiologists..."  The procedure also required that the percentage of precision for acceptability must be determined.  c.  CL QOP-00022, "Verification of Procedures Revision A", effective 8/12/14, stated in Section V.B.1.c. that the reportable range "is the range of test results from the lowest to the highest that are reliable and therefore reportable." | D5421 | D5421 #2  The lab proactively paused testing on the Advia XPT during the survey. The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue.  Before the lab resumes any test on the Advia XPT, the lab will ensure that the test has been re-verified pursuant to the lab's improved method verification procedures that have been approved by the new lab director. These enhanced procedures reinforce the required steps and acceptance criteria that must be followed to verify accuracy, precision, reportable range, and reference intervals before a test is put into use.  Before any verification studies are performed, these improved procedures require the lab director's review and approval of a detailed method verification plan containing defined acceptance criteria. The lab director must also review and approve the verification report before any patient testing begins.  The lab has conducted training on | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page 17 of 121

Confidential

THPFM0004755093

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X2) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>**11/20/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>**THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE<br>**7333 GATEWAY BLVD**<br>**NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5421 | Continued From page 17<br><br>d.  CL QOP-00022, "Verification of Procedures Revision A," effective 8/12/14, stated in Section V.B.1.d. required that the validation plan be approved by the laboratory director "before testing begins."<br><br>e.  The general supervisor and techinical supervisor stated that the Advia XPT was put into use 12/18/14.<br><br>Calcium<br><br>i.  Standard Operating Procedure (SOP) CL SOP-09107, "Calcium (CA, CA_2) in serum, plasma or urine on the Siemens Advia Chemistry Systems indicated that the reportable range for serum and plasma samples was 1.0-16.0 mg/dL.<br><br>ii.  The manufacturer performed the verification of performance specifications for serum on 10/23/14.  There was no documentation that the performance specifications had been verified for plasma samples.<br><br>iii.  The accuracy study included samples which ranged from 4.58-15.8 mg/dL.<br><br>iv.  The accuracy study did not include samples across the entire reportable range.<br><br>v.  The accuracy study did not include a comparison study as required by the laboratory's procedure.<br><br>vi.  The accuracy study did not indicate an acceptable percentage for accuracy.<br><br>vii.  The precision study included samples which | D5421 | D5421 #2 (continued)<br>these procedures to ensure that practice is consistent with them.<br><br>The laboratory's management, including the new lab director, technical supervisors, and quality systems director, is responsible for ensuring compliance with these procedures. The lab will provide oversight through monthly QA meetings, and will monitor compliance through its improved occurrence management and audit procedures. | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  18 of 121

Confidential

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br><br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE<br>7333 GATEWAY BLVD<br>NEWARK, CA  94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5421 | Continued From page 18<br>ranged from 4.58-12.93 mg/dL.<br><br>viii.  The precision study did not include samples across the entire reportable range.<br><br>ix.   The precision study only included within run precision and did not include day-to-day, run-to-run, or different operators.<br><br>x.   The summary report from the manufacturer showed that the reportable range for serum calcium was 0.5-16.0 mg/dL which differed from the calcium SOP.<br><br>xi.   The reportable range data showed included samples from 1.0-13.4 mg/dL which did not cover the entire reportable range stated in the SOP.<br><br>Albumin<br><br>i.   Standard Operating Procedure (SOP) CL SOP-09186 Revision A, "Albumin BCP (ALP) in serum or plasma Advia Chemistry Systems indicated that the reportable range for serum and plasma samples was 0.6-8.0 g/dL. The SOP was effective 7/31/15.<br><br>ii.   The manufacturer performed the verification of performance specifications for serum on 10/23/14.  There was no documentation that the performance specifications had been verified for plasma samples.<br><br>iii.   The accuracy study included samples which ranged from 2.0-4.4 g/dL.<br><br>iv.   The accuracy study did not include samples across the entire reportable range. | D5421 | (Continued; see above) | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  19 of 121

Confidential

THPFM0004755095

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br>**THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE<br>**7333 GATEWAY BLVD**<br>**NEWARK, CA 94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5421 | Continued From page 19<br><br>v.   The accuracy study did not include a comparison study as required by the laboratory's procedure.<br><br>vi.   The accuracy study did not indicate an acceptable percentage for accuracy.<br><br>vii.   The precision study included samples which ranged from 0.5-5.5 g/dL.<br><br>viii.   The precision study did not include samples across the entire reportable range.<br><br>ix.   The SOP stated that for precision each sample 2 times per run, 2 runs per day, for at least 20 days.<br><br>x.   The precision study only included within run precision and did not include 2 times per run, 2 runs per day, for at least 20 days.<br><br>xi.   The summary report from the manufacturer showed that the reportable range for serum albumin was 0.8-8.0 g/dL which differed from the SOP.<br><br>xii.   The reportable range data showed included samples from 0.4-6.9 g/dL which did not cover the entire reportable range stated in the SOP.<br><br>Apolipoprotein<br><br>i.   Standard Operating Procedure (SOP) CL SOP-09161 Revision A, "Apolipoprotein A-1 in serum or plasma Chemistry Systems indicated that the reportable range for serum and plasma samples was 15-(200-260) mg/dL. The SOP stated that the reference interval (normal range) for males was 79-169 mg/dL and females was 76 | D5421 | (Continued; see above) | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  20 of 121

THPFM0004755096

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>**11/20/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>**THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE<br><br>**7333 GATEWAY BLVD**<br>**NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5421 | Continued From page 20<br>-214 mg/dL.<br><br>ii.   The manufacturer performed the verification of performance specifications for serum on 11/6/14.  There was no documentation that the performance specifications had been verified for plasma samples.<br><br>iii.   The accuracy study included samples which ranged from 88.6-412.0mg/dL.<br><br>iv.   The accuracy study did not include samples across the entire reportable range.<br><br>v.   The accuracy study did not include a comparison study as required by the laboratory's procedure.<br><br>vi.   The accuracy study did not indicate an acceptable percentage for accuracy.<br><br>vii.   The precision study included samples which ranged from 100.9-314.7 mg/dL.<br><br>viii.   The precision study did not include samples across the entire reportable range.<br><br>ix.   The precision study only included within run precision and did not include day-to-day, run-to-run, or different operators.<br><br>x.   The summary report from the manufacturer showed that the reportable range for serum  was "15-  " mg/dL which differed from the SOP.<br><br>Triglyceride<br><br>i.   The manufacturer performed the verification of performance specifications on 10/23/14.  The | D5421 | (Continued; see above) | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  21 of 121

Confidential

THPFM0004755097

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>**11/20/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>**THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE<br>**7333 GATEWAY BLVD**<br>**NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5421 | Continued From page 21<br><br>manufacturer summary report showed that the reportable range was 0-500 mg/dL. The manufacturer summary report revealed reference interval (normal range) was 0-300 mg/dL.<br><br>ii.   The accuracy study included samples which ranged from 62.7-259 mg/dL.<br><br>iii.   The accuracy study did not include samples across the entire reportable range.<br><br>iv.   The acuracy study did not include a comparison study as required by the laboratory's procedure.<br><br>v.   The accuracy study did not indicate an acceptable percentage for accuracy.<br><br>vi.   The precision study included samples which ranged from 77.6-237.3 mg/dL.<br><br>vii.   The precision study did not include samples across the entire reportable range.<br><br>viii.   The precision study only included within run precision and did not include day-to-day, run-to-run, or different operators.<br><br>ix.   The reportable range data included samples from 74.0-447.0 mg/dL which did not cover the entire reportable range stated in the SOP.<br><br>x.   The laboratory director did not sign and approve the verification of performance specifications. Patient testing began 12/18/14.<br><br>Glucose<br><br>i.   Standard Operating Procedure (SOP) CL | D5421 | (Continued; see above) | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  22 of 121

Confidential

THPFM0004755098

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br><br>**11/20/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>**THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE<br>**7333 GATEWAY BLVD**<br>**NEWARK, CA 94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5421 | Continued From page 22<br>SOP-09118 Revision A, "Glucose in serum, plasma, urine or CSF on the Advia Chemistry Systems" indicated that the reportable range for serum and plasma samples was 4-700 mg/dL.<br><br>ii.   The manufacturer performed the verification of performance specifications for serum on 10/23/14.  There was no documentation that the performance specifications had been verified for plasma samples.<br><br>iii.   The accuracy study included samples which ranged from 47.2-384.0 mg/dL.<br><br>iv.   The accuracy study did not include samples across the entire reportable range.<br><br>v.   The accuracy study did not include a comparison study as required by the laboratory's procedure.<br><br>vi.   The accuracy study did not indicate an acceptable percentage for accuracy.<br><br>vii.   The precision study included samples which ranged from 57.9-356.2 mg/dL.<br><br>viii.   The precision study did not include samples across the entire reportable range.<br><br>ix.   The precision study only included within run precision and did not include 2 times per run, 2 runs per day, for at least 20 days.<br><br>x.   The reportable range data showed included samples from 10.6-557.27 mg/dLwhich did not cover the entire reportable range stated in the SOP. | D5421 | (Continued; see above) | |

FORM CMS-2567(02-99) Previous Versions Obsolete       Event ID: W34211       Facility ID: CA22046272       If continuation sheet Page  23 of 121

Confidential

THPFM0004755099

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|---|
| | 05D2025714 | A. BUILDING _____ <br> B. WING _____ | | 11/20/2015 |

NAME OF PROVIDER OR SUPPLIER

**THERANOS INC**

STREET ADDRESS, CITY, STATE, ZIP CODE
**7333 GATEWAY BLVD**
**NEWARK, CA  94560**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5421 | Continued From page 23 <br> Carbon Dioxide (CO2) <br><br> i.    Standard Operating Procedure (SOP) CL SOP-09111 Revision B, "CO2 in serum or plasma on the Advia Chemistry Systems" indicated that the reportable range for serum or plasma was 10-40 mEq/L. . <br><br> ii.    The manufacturer performed the verification of performance specifications for serum on 10/23/14. There was no documentation that the performance specifications had been verified for plasma samples. <br><br> iii.    The accuracy study included samples which ranged from 12.9-34.3 mEq/L. <br><br> iv.    The accuracy study did not include samples across the entire reportable range. <br><br> v.    The accuracy study did not include a comparison study as required by the laboratory's procedure. <br><br> vi.    The accuracy study did not indicate an acceptable percentage for accuracy. <br><br> vii.    The precision study included samples which ranged from 14.3-23.0 mEq/L. <br><br> viii.    The precision study did not include samples across the entire reportable range. <br><br> ix.    The precision study only included within run precision and did not include 2 times per run, 2 runs per day, for at least 20 days. <br><br> x.    The manufacturer summary report indicated that the verification of the reference interval did | D5421 | (Continued; see above) | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  24 of 121

Confidential

THPFM0004755100

Trial Exh. 5257 Page 0030

**ER-1861**

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| THERANOS INC | 7333 GATEWAY BLVD<br>NEWARK, CA 94560 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5421 | Continued From page 24<br>not pass.<br><br>xi.   No further documentation verifying the reference interval was presented to the surveyor.<br><br>xii.   The laboratory director approved the verification study on 11/18/14.  Patient testing began on 12/18/14. | D5421 | (Continued; see above) | |
| D5423 | 493.1253(b)(2) ESTABLISHMENT AND VERIFICATION OF PERFORMANCE<br><br>Each laboratory that modifies an FDA-cleared or approved test system, or introduces a test system not subject to FDA clearance or approval (including methods developed in-house and standardized methods such as text book procedures), or uses a test system in which performance specifications are not provided by the manufacturer must, before reporting patient test results, establish for each test system the performance specifications for the following performance characteristics, as applicable:<br>(2)(i) Accuracy.<br>(2)(ii) Precision.<br>(2)(iii) Analytical sensitivity.<br>(2)(iv) Analytical specificity to include interfering substances.<br>(2)(v) Reportable range of test results for the test system.<br>(2)(vi) Reference intervals (normal values).<br>(2)(vii) Any other performance characteristic required for test performance.<br>This STANDARD  is not met as evidenced by:<br> Based on review of the alkaline phosphatase procedure, manufacturer verification report and interview with the Director of Assays, the laboratory failed to establish performance specifications when the laboratory modified the | D5423 | D5423<br>The lab proactively paused testing on the Advia XPT during the survey. The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue.<br><br>Before the lab resumes any test on that instrument, the lab will ensure that the test has been re-verified pursuant to the lab's improved method verification procedures that have been approved by the new lab director. These enhanced procedures reinforce the required steps and acceptance criteria that must be followed to verify accuracy, precision, reportable range, and reference intervals before a test is put into use.<br><br>Before any verification studies are performed, these improved procedures | 2/12/16 |

Confidential

Trial Exh. 5257 Page 0031

THPFM0004755101

**ER-1862**

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:

05D2025714 | (X2) MULTIPLE CONSTRUCTION
A. BUILDING _____
B. WING _____ | (X3) DATE SURVEY COMPLETED

**11/20/2015** |

NAME OF PROVIDER OR SUPPLIER

**THERANOS INC**

STREET ADDRESS, CITY, STATE, ZIP CODE

**7333 GATEWAY BLVD**
**NEWARK, CA  94560**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5423 | Continued From page 25 reportable range for alkaline phosphatase. Findings include:

a.    Standard Operating Procedure (SOP) CL SOP-09102 Revision B, "Alkaline Phosphatase (ALP) in serum or plasma on the Advia Chemistry Systems" indicated that the reportable range for serum and plasma samples was 0-1100 IU/L.

b.    The Director of Assays stated that the reportable range was 10-1100 IU/L and that the SOP was incorrect.

c.    The manufacturer performed the verification of performance specifications for serum on 10/23/14. There was no documentation that the performance specifications had been verified for plasma samples.

d.    The accuracy study included samples which ranged from 23.70-423.0 IU/L.

e.    The accuracy study did not include samples across the entire reportable range.

f.    The accuracy study did not include a comparison study as required by the laboratory's procedure.

g.    The accuracy study did not indicate an acceptable percentage for accuracy.

h.    The precision study included samples which ranged from 30.9-359.0 IU/L.

i.    The precision study did not include samples across the entire reportable range.

j.    The precision study included within run | D5423 | D5423 (continued) require the lab director's review and approval of a detailed method verification plan containing defined acceptance criteria. The lab director must also review and approve the verification report before any patient testing begins.

The lab has conducted training on these procedures to ensure that practice is consistent with them.

The lab's management, including the new lab director, technical supervisors, and quality systems director, is responsible for ensuring compliance with these procedures. The lab will provide oversight through monthly QA meetings, and will monitor compliance through its improved occurrence management and audit procedures. | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  26 of 121

Confidential

Trial Exh. 5257 Page 0032

**ER-1863**

THPFM0004755102

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 05D2025714 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED 11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| THERANOS INC | 7333 GATEWAY BLVD NEWARK, CA  94560 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5423 | Continued From page 26 precision, but did not include day-to-day, run-to-run, or different operators.

k.   The summary report from the manufacturer showed that the reportable range for serum ALP was 0-1100 IU/L.

l.   The reportable range data showed included samples from 12-914 IU/L which did not cover the entire reportable range.

m.  The Director of Assays stated that analytic sensitivity and analytic specificity was not established for the modified ALP assay. | D5423 | | |
| D5429 220M | 493.1254(a)(1) MAINTENANCE AND FUNCTION CHECKS

For unmodified manufacturer's equipment, instruments, or test systems, the laboratory must perform and document maintenance as defined by the manufacturer and with at least the frequency specified by the manufacturer. This STANDARD  is not met as evidenced by: Based on technical supervisor interviews and Evolis maintenance log record review on November 17, 2015, the laboratory failed to perform weekly Evolis maintenance as defined by the manufacturer.  Findings included:

a.   In general immunology, it was the practice of the laboratory to test patient ANA, HIV Ag/Ab, and quantiferon using the Bio-Rad Evolis system.

b.   In August 2015, for 2 (weeks 1 and 3) of 4 weeks in which patient specimens were tested, the laboratory maintained no documentation to indicate that weekly manufacturer required maintenance had been performed. | D5429 | D5429 The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue.  Following the survey, weekly maintenance on the Evolis has been performed. The new lab director has approved enhanced procedures addressing equipment maintenance, which reinforce the lab's systems for performing and documenting all required maintenance.  The lab has conducted training on those procedures to ensure that practice is consistent with them.

Lab management, including new lab director, technical supervisors, and quality director, is responsible for ensuring that these procedures are | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  27 of 121

THPFM0004755103

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>**11/20/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>**THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE<br>**7333 GATEWAY BLVD**<br>**NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5429<br><br>D5437<br>400M | Continued From page 27<br><br>c.   In August 2015, the laboratory performed and reported 844 patient HIV Ag/Ab test results using the Evolis system.<br>493.1255(a) CALIBRATION AND CALIBRATION VERIFICATION<br><br>Unless otherwise specified in this subpart, for each applicable test system the laboratory must perform and document calibration procedures--<br>(1) Following the manufacturer's test system instructions, using calibration materials provided or specified, and with at least the frequency recommended by the manufacturer;<br>(2) Using the criteria verified or established by the laboratory as specified in §493.1253(b)(3)--<br>(2)(i) Using calibration materials appropriate for the test system and, if possible, traceable to a reference method or reference material of known value; and<br>(2)(ii) Including the number, type, and concentration of calibration materials, as well as acceptable limits for and the frequency of calibration; and<br>(3) Whenever calibration verification fails to meet the laboratory's acceptable limits for calibration verification.<br><br>This STANDARD  is not met as evidenced by:<br>1.   Based on laboratory personnel interviews and complete blood counts (CBC) calibration documentation record reviews on September 23, 2015, the laboratory failed to document all CBC instrument calibrations performed using the Drew 3 instruments.  Findings included:<br><br>a.   It was the practice of the laboratory to test | D5429<br><br><br><br>D5437 | D5429 (continued)<br>followed.  The lab will provide oversight of required maintenance through monthly QA meetings, and will monitor compliance through its improved occurrence management and audit procedures.<br><br><br><br><br><br><br><br><br><br>(D5437#1 begins on next page) | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  28 of 121

Confidential

THPFM0004755104

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br><br>**11/20/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>**THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE<br>**7333 GATEWAY BLVD**<br>**NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5429 | Continued From page 27 | D5429 | | |
| | c.   In August 2015, the laboratory performed and reported 844 patient HIV Ag/Ab test results using the Evolis system. | | | |
| D5437<br><br>400M | 493.1255(a) CALIBRATION AND CALIBRATION VERIFICATION<br><br>Unless otherwise specified in this subpart, for each applicable test system the laboratory must perform and document calibration procedures--<br>(1) Following the manufacturer's test system instructions, using calibration materials provided or specified, and with at least the frequency recommended by the manufacturer;<br>(2) Using the criteria verified or established by the laboratory as specified in §493.1253(b)(3)--<br>(2)(i) Using calibration materials appropriate for the test system and, if possible, traceable to a reference method or reference material of known value; and<br>(2)(ii) Including the number, type, and concentration of calibration materials, as well as acceptable limits for and the frequency of calibration; and<br>(3) Whenever calibration verification fails to meet the laboratory's acceptable limits for calibration verification.<br><br>This STANDARD  is not met as evidenced by:<br>1.   Based on laboratory personnel interviews and complete blood counts (CBC) calibration documentation record reviews on September 23, 2015, the laboratory failed to document all CBC instrument calibrations performed using the Drew 3 instruments. Findings included:<br><br>a.   It was the practice of the laboratory to test | D5437 | D5437 #1<br>The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue.<br><br>The new lab director has approved enhanced procedures addressing equipment systems, reinforcing that calibration documentation must be organized and maintained. The lab has conducted training on those procedures to ensure that practice and documentation is consistent with them.  Assay-specific SOPs will identify the specific procedures used for each platform or instrument.<br><br>Lab management, including new lab director, technical supervisors, and quality director, is responsible for ensuring that these procedures are followed.  The lab will provide | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete        Event ID: W34211        Facility ID: CA22046272        If continuation sheet Page  28 of 121

Confidential

THPFM0004755105

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  05D2025714 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE  7333 GATEWAY BLVD  NEWARK, CA  94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5437 | Continued From page 28<br>patient capillary CBC specimens using two Drew 3 instruments the laboratory designated as "Drew #2" and "Drew #3." On September 23, 2015, information recorded on "Drew #2" indicated that the "Drew #2" was calibrated on August 24, 2015, and information recorded on "Drew #3" indicated that the "Drew #3" was calibrated on August 31, 2015.<br><br>b.   The laboratory maintained no documentation of the August 24, 2015 and August 31, 2015 calibrations of the laboratory's two Drew 3 CBC instruments.<br><br>c.   According to laboratory personnel, between August 24, 2015 and September 23, 2015, the laboratory performed and reported 864 patient CBC specimens using the two Drew 3 instruments.<br><br>2.   Based on laboratory personnel interviews and complete blood counts (CBC) calibration documentation record reviews on November 19, 2015, the laboratory failed to document all CBC instrument calibrations performed using a Advia 2120i instrument.  Findings included:<br><br>a.   It was the practice of the laboratory to test patient venous CBC specimens using two Siemens Advia 2120i instruments, designated as #1 and #2.<br><br>b.   For Advia 2120i #1, the laboratory maintained no documentation of any calibrations prior to September 21, 2015.  For Advia 2120I #2, the laboratory maintained no documentation of any calibrations performed.<br><br>c.   Between February 2015 and September 21, | D5437 | D5437 #1 (continued)<br>oversight through monthly QA meetings, and will monitor compliance through its improved occurrence management, and audit procedures.<br><br><br><br>D5437 #2<br>The laboratory proactively paused testing on the Advia 2120i during the survey.  The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue.<br><br>The new lab director has approved enhanced procedures addressing equipment systems, reinforcing that calibration documentation must be organized and maintained. The lab has conducted training on those procedures. | <br><br><br><br><br><br><br><br><br><br><br>2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  29 of 121

Confidential

THPFM0004755106

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br><br>**11/20/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>**THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE<br>**7333 GATEWAY BLVD**<br>**NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5437 | Continued From page 29<br>2015, the laboratory performed and reported 2,395 patient CBC test results using the Advia 2120i #1.  From November 6, 2015 to November 19, 2015, the laboratory performed and reported 67 patient CBC test results using the Advia 2120I #2. | D5437 | D5437 #2 (continued)<br>The new lab director has also approved specific calibration procedures for CBC on the Advia 2120i. Before the lab resumes any tests on the Advia 2120i, it will conduct training on those procedures. In addition, testing personnel will be required to demonstrate competency to ensure that practice is consistent with those procedures. | |
| D5447<br><br>400H | 493.1256(d)(3)(i)(g) CONTROL PROCEDURES<br><br>Unless CMS Approves a procedure, specified in Appendix C of the State Operations Manual (CMS Pub. 7), that provides equivalent quality testing, the laboratory must--<br><br>At least once a day patient specimens are assayed or examined perform the following for--<br><br>Each quantitative procedure, include two control materials of different concentrations;<br><br>(g) The laboratory must document all control procedures performed.<br>This STANDARD  is not met as evidenced by:<br> Based on laboratory personnel interviews and WBC differential quality control record review on November 19, 2015, the laboratory failed to include two quality control materials with differing WBC differential patterns at least once each day patient WBC differential specimens were examined using the Cellavision instrument. Findings included:<br><br>a.   It was the practice of the laboratory to use the Cellavision instrument to aid in the examination and reporting of patient WBC differentials performed from stained slides.<br><br>b.   According to laboratory personnel, although the laboratory performed a function check (cell | D5447 | Lab management, including the new lab director, technical supervisors, and quality director, is responsible for ensuring that these procedures are followed.  The lab will provide oversight through monthly QA meetings, and will monitor compliance through its improved occurrence management and audit procedures. | |

FORM CMS-2567(02-99) Previous Versions Obsolete      Event ID: W34211      Facility ID: CA22046272      If continuation sheet Page  30 of 121

Confidential

THPFM0004755107

Trial Exh. 5257 Page 0037

**ER-1868**

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  05D2025714 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  **11/20/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  **THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE  **7333 GATEWAY BLVD**  **NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5437 | Continued From page 29  2015, the laboratory performed and reported 2,395 patient CBC test results using the Advia 2120i #1.  From November 6, 2015 to November 19, 2015, the laboratory performed and reported 67 patient CBC test results using the Advia 2120I #2. | D5437 | | |
| D5447  400H | 493.1256(d)(3)(I)(g) CONTROL PROCEDURES  Unless CMS Approves a procedure, specified in Appendix C of the State Operations Manual (CMS Pub. 7), that provides equivalent quality testing, the laboratory must--  At least once a day patient specimens are assayed or examined perform the following for--  Each quantitative procedure, include two control materials of different concentrations;  (g) The laboratory must document all control procedures performed.  This STANDARD  is not met as evidenced by:  Based on laboratory personnel interviews and WBC differential quality control record review on November 19, 2015, the laboratory failed to include two quality control materials with differing WBC differential patterns at least once each day patient WBC differential specimens were examined using the Cellavision instrument.  Findings included:  a.   It was the practice of the laboratory to use the Cellavision instrument to aid in the examination and reporting of patient WBC differentials performed from stained slides.  b.   According to laboratory personnel, although the laboratory performed a function check (cell | D5447 | D5447  The lab proactively paused testing on the Cellavision during the survey.  The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue.  The new lab director has approved enhanced QC procedures that reinforce the need to perform QC with at least two levels of control, unless otherwise specified, and the lab has conducted training on those procedures.  The new lab director has also approved enhanced procedures for the Cellavision instrument to reinforce that the daily WBC differential must include two QC materials with differing WBC patterns. Before the lab resumes any tests on the Cellavision, it will conduct training and competency testing on those procedures to ensure that practice is consistent with them. | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  30 of 121

Confidential

THPFM0004755108

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>**THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE<br>**7333 GATEWAY BLVD**<br>**NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5447 | Continued From page 30<br>locator) each day the Cellavision was used to examine patient stained slides, the laboratory did not examine two quality control materials with differing WBC differential patterns each day the Cellavision was used to examine patient stained slides.  Laboratory personnel also stated that all Cellavision examinations were reviewed by testing personnel and revised, if necessary, before the examination was release for reporting. However, the Cellavision did perform the primary WBC differential screening of patient stained slides.<br><br>c.   According to laboratory personnel, since February 2015, the laboratory examined and reported 225 patient WBC differentials using the Cellavision. | D5447 | D5447 (continued)<br>Lab management, including technical supervisors, will be responsible for ensuring that these procedures are followed.  The lab will provide oversight through monthly QA meetings, and will monitor compliance through its improved occurrence management, and audit procedures. | |
| D5449<br><br>110H<br>220H | 493.1256(d)(3)(ii)(g) CONTROL PROCEDURES<br><br>Unless CMS Approves a procedure, specified in Appendix C of the State Operations Manual (CMS Pub. 7), that provides equivalent quality testing, the laboratory must--<br><br>At least once a day patient specimens are assayed or examined perform the following for--<br><br>Each qualitative procedure, include a negative and positive control material;<br><br>(g) The laboratory must document all control procedures performed.<br>This STANDARD  is not met as evidenced by:<br> Based on technical supervisor interview and CT/NG quality control record review on November 17, 2015, at least once a day patient specimens were assayed, the laboratory failed to include a positive CT/NG quality control material. | D5449 | D5449<br>Prior to the survey, the lab followed the procedures for QC identified in the manufacturer's package insert for this FDA cleared device.<br><br>The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue.<br><br>The new lab director has approved enhanced QC procedures that reinforce the need to perform QC with at least two levels of control, unless otherwise specified, and the lab has conducted training on those procedures. | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  31 of 121

Confidential

THPFM0004755109

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 05D2025714 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED 11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE 7333 GATEWAY BLVD NEWARK, CA  94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5449 | Continued From page 31<br>Findings included:<br><br>a.   It was the practice of the laboratory to perform and report patient CT/NG testing using a PCR method.<br><br>b.   Laboratory records indicated that on November 13, 2015 the laboratory performed patient CT/NG testing without including a positive CT/NG quality control material in the assay. Although the laboratory included samples the manufacturer labeled as a "positive" CT/NG quality control material in the assay, the test results of this "positive" CT/NG quality control material were used to calculate the assay cutoff which determines whether patient test results tested as positive or negative for CT/NG.  As a result, the manufacturer's "positive" CT/NG quality control material was considered a calibrator and not quality control material.  The laboratory assayed no other positive CT/NG quality control materials.<br><br>c.   On November 13, 2015, the laboratory tested 41 patient CT/NG specimens.<br><br>d.   Pursuant to 42 C.F.R. 493.1256(d)(9), when using calibration material as control material, the laboratory must at least use calibration material from a different lot than that used to establish a cut-off value. | D5449 | D5449 (continued)<br>The new lab director has also approved enhanced procedures for CT/NG to require the use of a positive CT/NG control material that is not also used as a calibrator.<br><br>Lab management, including technical supervisors, will be responsible for ensuring that these procedures are followed.  The lab will provide oversight through monthly QA meetings, and will monitor compliance through its improved occurrence management and audit procedures. | |
| D5469<br><br>400H | 493.1256(d)(10)(g) CONTROL PROCEDURES<br><br>Unless CMS Approves a procedure, specified in Appendix C of the State Operations Manual (CMS Pub. 7), that provides equivalent quality testing, the laboratory must-- | D5469 | (D5469 #1 begins on next page) | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete        Event ID: W34211        Facility ID: CA22046272        If continuation sheet Page 32 of 121

Confidential

THPFM0004755110

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>**11/20/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>**THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE<br><br>**7333 GATEWAY BLVD**<br>**NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5469 | Continued From page 32<br>Establish or verify the criteria for acceptability of all control materials.<br><br>(i) When control materials providing quantitative results are used, statistical parameters (for example, mean and standard deviation) for each batch and lot number of control materials must be defined and available.<br>(ii) The laboratory may use the stated value of a commercially assayed control material provided the stated value is for the methodology and instrumentation employed by the laboratory and is verified by the laboratory.<br>(iii) Statistical parameters for unassayed control materials must be established over time by the laboratory through concurrent testing of control materials having previously determined statistical parameters.<br><br>(g) The laboratory must document all control procedures performed.<br>This STANDARD  is not met as evidenced by:<br>1.  Based on laboratory personnel interviews and complete blood counts (CBC) quality control record review on September 23, 2015, the laboratory failed to verify the stated values of the commercially assayed CBC quality control materials in use at the time of the survey. Findings included:<br><br>a.  It was the practice of the laboratory to use commercially assayed CBC quality control materials to monitor patient CBC testing using two Drew 3 instruments..<br><br>b.  Laboratory CBC quality control records indicated that on June 27, 2015 the laboratory changed the lot of quality control material from lot number EX045 to EX075. | D5469 | D5469 #1<br>The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue.<br><br>The new lab director has approved enhanced procedures to reinforce the practice of parallel testing each new lot of control material with the lot of control material in use, and establishing a range based on the manufacturer's range.  The lab has conducted training on those procedures.<br><br>Lab management, including technical supervisors and the quality director, will be responsible for ensuring that these procedures are followed.  The lab will provide oversight through monthly QA meetings, and will monitor compliance through its improved occurrence management and audit procedures. | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  33 of 121

Confidential

Trial Exh. 5257 Page 0041

THPFM0004755111

**ER-1872**

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  05D2025714 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  **THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE  **7333 GATEWAY BLVD**  **NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5469 | Continued From page 33 | D5469 | | |
| | c.   The laboratory maintained no documentation to indicate that the stated values of CBC quality control material lot number EX075 had been verified by the laboratory. | | | |
| | d.   According to laboratory personnel, between June 27, 2015 and September 24, 2015, the laboratory used one of the Drew 3 instruments on 30 different days to perform and report patient CBC specimens, and used the other Drew 3 instrument on 87 different days to perform and report patient CBC specimens. | | | |
| | 2.   Based on interview with the general supervisor and chemistry quality control (QC) records on November 17, 2015, the laboratory failed to verify the stated values of the commercially assayed QC material.  Findings include: | | D5469 #2 The lab has completed assessments to identify any patients affected or having the potential to be affected by this issue. | 2/12/16 |
| | a.   The general supervior stated that when a new lot number of QC was started, the QC ranges were entered into the chemistry analyzers (Advia 1800 and Advia XPT) from the manufacturer's package insert just prior to use. | | The new lab director has approved enhanced procedures to reinforce the practice of parallel testing each new lot of control material with the lot of control material in use, and establishing a range based on the manufacturer's range.  The lab has conducted training on those procedures. | |
| | b.   The general supervisor further stated that the new lot number of QC was run one time prior to patient testing. | | | |
| | c.   QC records show that MultiQual lot number 45660 was put into use in 2014 and discontinued in August 2015. | | Lab management, including technical supervisors and quality systems director, will be responsible for ensuring that these procedures are followed.  The lab will provide | |
| | d.   The general supervisor and Director of Assays confirmed on 11/17/15 at 9:40 am that manufacturer's QC ranges for new lot numbers of chemistry controls were not verified. | | | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  34 of 121

Confidential

Trial Exh. 5257 Page 0042

**ER-1873**

THPFM0004755112

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>**11/20/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>**THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE<br>**7333 GATEWAY BLVD**<br>**NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5469 | Continued From page 33<br><br>c.   The laboratory maintained no documentation to indicate that the stated values of CBC quality control material lot number EX075 had been verified by the laboratory.<br><br>d.   According to laboratory personnel, between June 27, 2015 and September 24, 2015, the laboratory used one of the Drew 3 instruments on 30 different days to perform and report patient CBC specimens, and used the other Drew 3 instrument on 87 different days to perform and report patient CBC specimens.<br><br>2.   Based on interview with the general supervisor and chemistry quality control (QC) records on November 17, 2015, the laboratory failed to verify the stated values of the commercially assayed QC material.  Findings include:<br><br>a.   The general supervior stated that when a new lot number of QC was started, the QC ranges were entered into the chemistry analyzers (Advia 1800 and Advia XPT) from the manufacturer's package insert just prior to use.<br><br>b.   The general supervisor further stated that the new lot number of QC was run one time prior to patient testing.<br><br>c.   QC records show that MultiQual lot number 45660 was put into use in 2014 and discontinued in August 2015.<br><br>d.   The general supervisor and Director of Assays confirmed on 11/17/15 at 9:40 am that manufacturer's QC ranges for new lot numbers of chemistry controls were not verified. | D5469 | D5469 #2 (continued)<br>oversight through monthly QA meetings, and will monitor compliance through its improved occurrence management and audit procedures. | |

FORM CMS-2567(02-99) Previous Versions Obsolete        Event ID: W34211        Facility ID: CA22046272        If continuation sheet Page  34 of 121

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br>THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE<br>7333 GATEWAY BLVD<br>NEWARK, CA 94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5477<br><br>110H | 493.1256(e)(4)(g) CONTROL PROCEDURES<br><br>(e) For reagent, media, and supply checks, the laboratory must do the following:<br><br>(e)(4) Before, or concurrent with the initial use--<br>(e)(4)(i) Check each batch of media for sterility if sterility is required for testing;<br>(e)(4)(ii) Check each batch of media for its ability to support growth and, as appropriate, select or inhibit specific organisms or produce a biochemical response; and<br>(e)(4)(iii) Document the physical characteristics of the media when compromised and report any deterioration in the media to the manufacturer.<br><br>(g) The laboratory must document all control procedures performed.<br>This STANDARD is not met as evidenced by:<br>Based on technical supervisor interview and bacteriology media quality control record review on November 18, 2015, the laboratory failed to check each batch of media for its ability to support growth before or concurrent with initial use. Findings included:<br><br>a. From November 15, 2015 to November 18, 2015, the laboratory performed patient bacteriology testing using Hardy blood agar plates (BAP), lot number 15300, expiration date 01/25/2016.<br><br>b. For this lot of BAP, the laboratory relied on manufacturer's documentation that the manufacturer performed quality control procedures on the BAP. The laboratory did not, before or concurrent with initial use, performed any quality control procedures to check whether this lot of BAP supported organism growth. | D5477 | D5477<br>The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue.<br><br>The new lab director has approved enhanced QC procedures for microbiology.<br><br>Lab management, including technical supervisors, will be responsible for ensuring that these procedures are followed. The lab will provide oversight through monthly QA meetings, and will monitor compliance through its improved occurrence management and audit procedures. | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete         Event ID: W34211         Facility ID: CA22046272         If continuation sheet Page 35 of 121

Confidential                                                                                                    THPFM0004755114

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  05D2025714 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE  7333 GATEWAY BLVD  NEWARK, CA 94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5477 | Continued From page 35<br>c.   From November 15, 2015 to November 18, 2015, the laboratory performed 12 patient specimen cultures using Hardy BAP, lot number 15300, expiration date 01/25/2016. | D5477 | | |
| D5481 | 493.1256(f)(g) CONTROL PROCEDURES<br><br>(f) Results of control materials must meet the laboratory's and, as applicable, the manufacturer's test system criteria for acceptability before reporting patient test results.<br><br>(g) The laboratory must document all control procedures performed.<br>This STANDARD  is not met as evidenced by:<br>1.   Based on review of the prothrombin time/international normalized ratio (PT/INR) procedure, quality control (QC) records, patient results and interview with the general supervisor, the laboratory failed to ensure that the QC for PT/INR was acceptable prior to reporting patient results from April 2015 through September 2015. Findings include:<br><br>a.   CL SOP-10001 Revision A, "Measuring Prothrombin Time-Innovin (PT on the Siemens BCS XP Instrument" stated on page 6, section 8.6 that if control values are outside of the determined range, the controls, reagents and instrument performance should be checked and that identification and correction of the problem shoud be documented prior to reporting patient results.<br><br>b.   QC records for Citrol 3 (Lot number 548425) were reviewed from 4/1/15 through 9/23/15.<br><br>c.   The general supervisor stated that QC was acceptable if the values were +/- 2 SD from the | D5481 | D5481 #1<br>The laboratory paused testing on the Siemens BCS XP, including PT/INR, during the survey.  The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue.<br><br>The new lab director has approved enhanced QC procedures, which reinforce and detail the required investigation and corrective action that must occur to address QC issues before patient tests are performed and clarify which employees are responsible for performing and documenting these activities. The lab has conducted training and competency on those procedures to ensure that practice is consistent with them.<br><br>Lab management, including technical supervisors and the quality systems director, is responsible for ensuring compliance with these procedures. The lab will also provide oversight | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete      Event ID: W34211      Facility ID: CA22046272      If continuation sheet Page  36 of 121

Confidential

THPFM0004755115

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|---|
| | 05D2025714 | A. BUILDING _____ B. WING _____ | | 11/20/2015 |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| THERANOS INC | 7333 GATEWAY BLVD NEWARK, CA 94560 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5481 | Continued From page 36 mean.<br><br>d.   On 9/7/15, Citrol 3 was run seven times without obtaining an acceptable QC value.<br><br>e.   On 9/8/15, Citrol 3 was run twelve times without obtaining an acceptable QC value.<br><br>f.   On 25 of 32 days, Citrol 3 was not rerun when the QC value was greater than - 2 SD.<br><br>g.   On 5/15/15, 8/13/15, 8/21/15 and 9/10/15, Citrol 3 was run twice.  All QC results were unacceptable.<br><br>h.   The Rule Check report revealed that 13 of 13 QC values in April 2015, 2 of 17 in May 2015, 7 of 7 in June 2015, 13 of 13 in July 2015, 16 of 16 in August, and 24 of 24 during September 1-16, 2015 showed rule violation messages related to Citrol 3.<br><br>i.   81 patients were reported from 4/1/15 through 9/16/15.<br><br>2.   Based on review of the quality control (QC) procedure, QC records, and raw data from patient test runs and interview with the general supervisor, the laboratory failed to ensure that the QC was acceptable for the Theranos Proprietary System (TPS) prior to reporting patient test results:  Findings include:<br><br>a.   CL SOP-15026 Revision A, "Edison 3.5 Theranos System Daily QC Procedures", stated the following in section 10.1.1: "...For any single Edison instrument, reject QC if either level is greater than 2 SD or if either level falls on the same side of the mean for 10 consecutive days." | D5481 | D5481 #1 (continued) through monthly QA meetings, and will monitor compliance through its improved occurrence management and audit procedures.<br><br><br><br>D5481 #2 The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue.<br><br>The new lab director has approved enhanced QC procedures, which reinforce that QC results must be acceptable before patient tests are performed, and detail the steps to take | <br><br><br><br>2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete        Event ID: W34211        Facility ID: CA22046272        If continuation sheet Page 37 of 121

Confidential

THPFM0004755116

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|---|
| | 05D2025714 | A. BUILDING _____ <br> B. WING _____ | | 11/20/2015 |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| THERANOS INC | 7333 GATEWAY BLVD <br> NEWARK, CA  94560 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5481 | Continued From page 37 <br><br> b.   Section 11.1.1 of  CL SOP-15026 Revision A further stated that "Daily QC automatically expires 24 hours after use." <br><br> c.   The general supervisor stated that when the QC was unacceptable, the TPS device locked out patient testing for 24 hours or until the QC was acceptable and if the QC was unacceptable another device would be used for testing. <br><br> d.   QC records for Sex Hormone Binding Globulin (SHBG) showed that on Device E001025 QC Level 2's (QC2) 24 hour expiration was on 8/14/14 at 18:54 and was not run again until 8/15/14 at 00:05.  Patient data showed that patient Accession #94389 was run on 8/14/14 at 19:09. <br><br> e.   QC records for SHBG showed that on Device E001025 QC Level 1's (QC1) 24 hour expiration was on 8/20/14 at 17:43 and was not run again until 8/21/14 at 17:50. Patient data showed that patient Accession #95403 was run on 8/20/14 at 19:08. <br><br> f.   QC records for SHBG showed that on Device E001036 QC1 was not run again until 11/1/14 at 22:15.  Patient data showed that patient Accession #112807 was run on 11/1/14 at 00:02. <br><br> g.   QC records for Vitamin B12 (VB12) showed that on Device E000027 QC1 was run on 8/16/14 at 06:16 and failed. QC1 was next run 8/17/14 at 09:10 and passed.  QC2 was not run on 8/15/14 or 8/16/14. Patient data showed that patient Accession #94598 was run on 8/16/14 at 00:48. <br><br> h.   QC records for VB12 showed that on Device | D5481 | D5481 #2 (continued) <br> when QC results are not acceptable. The lab has conducted training and competency on those procedures to ensure that practice is consistent with them. <br><br> Lab management, including technical supervisors and the quality systems director, is responsible for ensuring that these procedures are followed. The lab will also provide oversight through monthly QA meetings, and will monitor compliance through its improved occurrence management and audit procedures. | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  38 of 121

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|---|
| | | A. BUILDING _____ | | |
| | **05D2025714** | B. WING _____ | | **11/20/2015** |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| **THERANOS INC** | **7333 GATEWAY BLVD** <br> **NEWARK, CA  94560** |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5481 | Continued From page 38 <br> E000027 QC1 was run on 8/16/14 at 06:16 and failed. QC1 was next run 8/17/14 at 09:10 and passed.  QC2 was not run on 8/15/14 or 8/16/14. Patient data showed that patient Accession #94598 was run on 8/16/14 at 00:48. <br><br> i.    QC records for VB12 showed that on Device E000027 QC2 24 hour expiration was on 8/19/14 at 08:00 and was not run again until 8/20/14 at 21:05. Patient data showed that 3 patients (Accession #s 95411, 95462, 95543) were run on 8/20/14 between 12:33 and 17:52. <br><br> j.    QC records for VB12 showed that on Device E000027 QC2 24 hour expiration was on 8/22/14 at 17:38 and was not run again until 8/23/14 at 21:05. Patient data showed that 2 patients (Accession #s 95984, 96106) were run on 8/22/14 at 18:56 and 21:21. <br><br> k.    QC records for VB12 showed that on Device E000027 QC1's 24 hour expiration was on 8/24/14 at 16:43 and was not run again until 8/25/14 at 07:59. QC2 24 hour expiration was on 8/24/14 at 21:05 and was not run again until 8/25/14 at 12:23. Patient data showed that 3 patients (Accession #s 96327, 96250, 96371) were run on 8/24/14 between 17:15 and 21:36. <br><br> l.    QC records for VB12 showed that on Device E000037 QC1 had a "10x warning" message in the QC Pass/Fail Status column on 2/25/15 at 20:29 and again on 2/26/15 at 20:22. QC2  had a "10x warning" message in the QC Pass/Fail Status column on 2/25/15 at 22:11 and again on 2/26/15 at 22:04.  QC1 passed on 2/27/15 at 22:54 and QC2 was run and passed on 2/28/15 at 00:27. Patient data showed that 7 patients (Accession #s 146275, 146391, 146651, 146852, | D5481 | | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID:W34211          Facility ID: CA22046272          If continuation sheet Page  39 of 121

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>**05D2025714** | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>**11/20/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>**THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE<br>**7333 GATEWAY BLVD**<br>**NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5481 | Continued From page 39<br>147149, 146596, 146898) were run between 2/26/15 and 2/27/15 during the time the laboratory had a 10x warning.<br><br>m.  QC records for VB12 showed that on Device E001000 QC1's 24 hour expiration was on 1/25/15 at 21:58 and was not run again until 1/28/15 at 2140. QC2 24 hour expiration was on 1/26/15 at 02:22 and was not run again until 1/28/15 at 23:19. Patient data showed that 5 patients (Accession #s 136351, 136139,136386, 136897, 135548) were run between 1/27/15 at 1359 and 1/28/15 at 11:50.<br><br>n.  QC records for Vitamin D, 25-OH (VitD) showed that on Device E001059 QC1's 24 hour expiration was on 7/6/14 at 14:11 and was not run again until 7/7/15 at 08:04. Patient data showed that Accession #88699 was run on 7/6/14 at 14:31.<br><br>o.  Levey-Jennings charts revealed that SHBG Device E000026 QC1 had 13 consecutive days and QC2 had 15 consecutive days that the results were at least 2 standard deviations (SDs) below the mean from 9/30/14 through 10/29/14.<br><br>p.  Levey-Jennings charts revealed that SHBG Device E001007 QC1 had 19 consecutive days that the results were at least 2 SDs below the mean from 3/31/15 through 4/29/15.<br><br>q.  Levey-Jennings charts revealed that VitD Device E001059 QC1 had 15 consecutive days that the results were at least 2 SDs above the mean from 6/30/15 through 7/25/14.<br><br>r.  Levey-Jennings charts revealed that Total T3 (TT3) Device E000195 QC1 had 11 consecutive | D5481 | | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  40 of 121

Confidential

THPFM0004755119

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 05D2025714 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED 11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| THERANOS INC | 7333 GATEWAY BLVD NEWARK, CA  94560 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5481 | Continued From page 40 days that the results were at least 2 SDs above the mean from 1/3/15 through 1/29/15.<br><br>s.   Levey-Jennings charts revealed that TT3 Device E001032 QC1 had 113 consecutive days and QC2 had 12 consecutive days that the results were at least 2 SDs above the mean from 7/9/14 through 7/25/14.<br><br>t.   Levey-Jennings charts revealed that VB12 Device E000187 QC1 had 14 consecutive days and QC2 had 12 consecutive days that the results were at least 2 SDs above the mean from 2/10/14 through 2/27/14. | D5481 | | |
| D5775<br><br>400B | 493.1281(a)(c) COMPARISON OF TEST RESULTS<br><br>(a) If a laboratory performs the same test using different methodologies or instruments, or performs the same test at multiple testing sites, the laboratory must have a system that twice a year evaluates and defines the relationship between test results using the different methodologies, instruments, or testing sites.<br>(c) The laboratory must document all test result comparison activities.<br>This STANDARD  is not met as evidenced by:<br>1.   Based on laboratory personnel interview and manual WBC differential record review on November 19, 2015, the laboratory failed to have a system that twice a year evaluated and defined the relationship between WBC differential test results examined by multiple testing personnel. Findings included:<br><br>a.   It was the practice of the laboratory for multiple testing personnel to examine and report patient WBC differentials from stained slides. | D5775 | D5775 #1<br>The lab proactively paused testing on the Cellavision during the survey. The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue.<br><br>The new lab director has approved enhanced method comparison procedures, which reinforce that the lab will compare the results of any instruments running the same test(s) at least twice each year to ensure that their results are comparable and within defined acceptance criteria. The lab has conducted training on those procedures.<br><br>The new lab director has also | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  41 of 121

Confidential

THPFM0004755120

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>**11/20/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>**THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE<br>**7333 GATEWAY BLVD**<br>**NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5775 | Continued From page 41<br><br>b.   The laboratory had no system that twice a year evaluated and defined the relationship between WBC differential test results examined by multiple testing personnel.  Other than through the distribution of proficiency testing samples, the laboratory had no documentation to indicate whether testing personnel were examining patient stained slides and reporting patient manual WBC differential similarly, accurately, and reliably.<br><br>2.   Based on review of documentation, the laboratory failed to have a system that twice a year evaluated and defined the relationship between the Theranos Proprietary System (TPS) to a predicate instrument. Findings include:'<br><br>a.   Undated documentation provided by the laboratory revealed a comparison study between the Theranos Proprietary System (TPS) (i.e., Edison) and a predicate device (Immulite, Centaur, or Liaison) for Sex Hormone Binding Globulin (SHBG), Total T3 (TT3), Vitamin D (VitD) and Vitamin B12 (VB12).<br><br>b.   The method comparison documentation showed that the following devices (i.e., readers) E000026, E001025 and E001036 were used for SHBG comparison testing.  SHBG testing occurred from 7/28/14 through 6/25/15.<br><br>c.   Quality control (QC) monthly reports revealed that seven devices were used for SHBG from February 2015 through June 2015 but only three devices were included in the comparison study.<br><br>d.   QC and patient result documentation for SHBG also revealed that devices E000040, E001007 and E001035 were used for patient | D5775 | D5775 #1 (continued)<br>approved enhanced procedures for the Cellavision instrument to ensure that the lab evaluates and defines the relationship between WBC differential test results examined by multiple testing personnel at least twice each year.  Before the lab resumes any tests on the Cellavision, it will conduct training and competency testing on those procedures to ensure that practice is consistent with them.<br><br>The lab's technical supervisors and the quality systems director will be responsible for ensuring that these procedures are followed. The lab will provide oversight through monthly QA meetings, and will monitor compliance through its improved occurrence management, and audit procedures. | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  42 of 121

Confidential

THPFM0004755121

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  05D2025714 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  **11/20/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  **THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE  **7333 GATEWAY BLVD**  **NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5775 | Continued From page 41 | D5775 | | |
| | b.   The laboratory had no system that twice a year evaluated and defined the relationship between WBC differential test results examined by multiple testing personnel.  Other than through the distribution of proficiency testing samples, the laboratory had no documentation to indicate whether testing personnel were examining patient stained slides and reporting patient manual WBC differential similarly, accurately, and reliably. | | | |
| | 2.   Based on review of documentation, the laboratory failed to have a system that twice a year evaluated and defined the relationship between the Theranos Proprietary System (TPS) to a predicate instrument. Findings include:' | | D5775 #2 The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue. | 2/12/16 |
| | a.   Undated documentation provided by the laboratory revealed a comparison study between the Theranos Proprietary System (TPS) (i.e., Edison) and a predicate device (Immulite, Centaur, or Liaison) for Sex Hormone Binding Globulin (SHBG), Total T3 (TT3), Vitamin D (VitD) and Vitamin B12 (VB12). | | The new lab director has approved enhanced method comparison procedures, which reinforce that the lab will compare the results of any instruments running the same test(s) at least twice each year, to ensure that their results are comparable and within defined acceptance criteria.   The lab has conducted training on those procedures. | |
| | b.   The method comparison documentation showed that the following devices (i.e., readers) E000026, E001025 and E001036 were used for SHBG comparison testing.  SHBG testing occurred from 7/28/14 through 6/25/15. | | | |
| | c.   Quality control (QC) monthly reports revealed that seven devices were used for SHBG from February 2015 through June 2015 but only three devices were included in the comparison study. | | The lab's technical supervisors and the quality systems director will be responsible for ensuring that these procedures are followed.   The lab will provide oversight through monthly QA meetings, and will monitor | |
| | d.   QC and patient result documentation for SHBG also revealed that devices E000040, E001007 and E001035 were used for patient | | | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  42 of 121

Confidential

THPFM0004755122

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>**11/20/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>**THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE<br>**7333 GATEWAY BLVD**<br>**NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5775 | Continued From page 42<br><br>testing and were not included in the comparison study.<br><br>e.   The method comparison documentation showed that the following devices E000162, E000187, E000195, E001011, E001032, and E001049 were used for TT3 testing.  TT3 testing occurred from 2/2/14 through 2/4/15.<br><br>f.   The method comparison documentation showed that the following devices E000053, E000072, E00101, E0001157, E001007, E001043, and E001059 were used for VitD testing.  VitD testing occurred from 11/6/13 through 3/10/15.<br><br>g.   Quality control (QC) monthly reports revealed that twelve devices were used for VitD in February 2015 and eighteen devices were used from March 2015 through April 2015 but only seven devices were included in the comparison study.<br><br>h.   QC and patient result documentation for VitD also revealed that device E001059 was used for patient testing and was not included in the comparison study.<br><br>i.   The method comparison documentation showed that the following devices E000053, E000072, E00101, E0001157, E001007, E001043, and E001059 were used for VB12 testing.  VB12 testing occurred from 8/12/14 through 3/6/15.<br><br>j.   Quality control (QC) monthly reports revealed that twelve devices were used for VB12 in October 2014 and February 2015 through April 2015 but only eleven devices were included in the | D5775 | D5775 #2 (continued)<br>compliance through its improved occurrence management, and audit procedures. | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  43 of 121

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>**THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE<br>**7333 GATEWAY BLVD**<br>**NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5775<br><br>D5779<br><br>400B | Continued From page 43<br>comparison study.<br><br>493.1282(a) CORRECTIVE ACTIONS<br><br>Corrective action policies and procedures must be available and followed as necessary to maintain the laboratory's operation for testing patient specimens in a manner that ensures accurate and reliable patient test results and reports.<br><br>This STANDARD  is not met as evidenced by:<br> Based on laboratory personnel interviews and complete blood counts (CBC) quality control record review on September 23, 2015, the laboratory failed to follow corrective action policies and procedures as necessary to maintain the laboratory's operation for testing patient CBC specimens in a manner that ensure accurate and reliable patient test results and reports when the laboratory's criteria for acceptability of CBC quality control material test results were not met. Findings included:<br><br>a.  It was the practice of the laboratory to test three levels (low, normal, and high) of quality control materials each day of patient testing and to use the stated values of commercially assayed quality control materials to monitor patient CBC testing using the Drew 3 instruments.  In the event any CBC quality control material test results did not fall within the stated assay values, laboratory personnel were to follow the procedure detailed in the protocol titled "Quality Control (document number CL QOP-00013, revision F)."<br><br>i.   "Step 1" of the procedure was to "rerun the controls." | D5775<br><br>D5779 | D5779<br>The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue.<br><br>The new lab director has approved enhanced QC procedures, which reinforce and detail the required investigation and corrective action that must occur to address QC issues before patient tests are performed. In addition, the procedures clarify which employees are responsible for performing and documenting these activities, and require regular technical supervisor review and analysis of QC results.  The lab has conducted training and competency testing on those procedures to ensure that practice is consistent with them.<br><br>Lab management, including technical supervisors and the quality systems director, is responsible for ensuring | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  44 of 121

Confidential

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE<br>7333 GATEWAY BLVD<br>NEWARK, CA  94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5779 | Continued From page 44<br><br>ii.   "Step 2" of the procedure was to "repeat with fresh controls" "if the rerun of controls failed."<br><br>iii.   "Step 3" of the procedure was to "check the operation of the instrument" "if the rerun of [fresh] controls failed."<br><br>iv.   "Step 4" of the procedure was to "repeat using a new reagent kit" and "recalibrate" if quality control test results continued to fall outside the laboratory's criteria for acceptability.<br><br>v.   "Step 5" of the procedure was to "call instrument support and inform [the] supervisor" if quality control test results continued to fall outside the laboratory's criteria for acceptability.<br><br>b.   Laboratory records for the Drew 3 instrument the laboratory designated as "Drew #2" indicated that on July 11, 12, 14, and 16, 2015 CBC quality control material test results failed to meet stated assay values.  The laboratory's documentation of these quality control failures indicated that the laboratory's "Quality Control" protocol was not followed.<br><br>i.   On July 12, 2015, laboratory records indicated that the high quality control material failed to meet the laboratory's criteria for acceptability (specific CBC analyte not designated).  Testing of the high quality control material was repeated three times before being acceptable using a "new QC tube."  "Step 1" was repeated three times before the laboratory followed "Step 2."<br><br>ii.   On July 16, 2015, laboratory records indicated that the high quality control material failed to meet the laboratory's criteria for | D5779 | D5779 (continued)<br>compliance with these procedures. The lab will also provide oversight through monthly QA meetings, and will monitor compliance through its improved occurrence management and audit procedures. | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  45 of 121

Confidential

THPFM0004755125

Trial Exh. 5257 Page 0055

ER-1886

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br>**11/20/2015** |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER

**THERANOS INC**

STREET ADDRESS, CITY, STATE, ZIP CODE

**7333 GATEWAY BLVD**
**NEWARK, CA  94560**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5779 | Continued From page 45<br>acceptability (specific CBC analyte not designated).  Testing of the high quality control material was repeated two times before being acceptable on a third repeat.  "Step 1" was repeated two times without following "Step 2."<br><br>iii.   On July 17, 2015, laboratory records indicated that the high quality control material failed to meet the laboratory's criteria for acceptability (specific CBC analyte not designated).  Testing of the high quality control material was repeated two times before being acceptable on a third repeat.  "Step 1" was repeated two times without following "Step 2."<br><br>[NOTE: On July 11 and 14, 2015, laboratory records also indicated that the high quality control material failed to meet the laboratory's criteria for acceptability (specific CBC analyte not designated).  Testing was repeated and was acceptable.  "Step 1" was followed.]<br><br>[NOTE: On July 14, 2015, laboratory records also indicated that the normal quality control material failed to meet the laboratory's criteria for acceptability (specific CBC analyte not designated).  Testing was repeated and was acceptable.  "Step 1" was followed.]<br><br>c.   Laboratory records indicated that the Drew 3 instrument the laboratory designated as "Drew #2" was used to test and report 36 patient CBC specimens on July 11, 2015, 12 patient CBC specimens on July 12, 2015, 36 patient CBC specimens on July 14, 2015, and 45 patient CBC specimens on July 16, 2015.  It is unknown how many patient CBC specimens were tested using "Drew #2" on July 17, 2015. | D5779 | | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  46 of 121

Confidential

THPFM0004755126

DEPARTMENT OF HEALTH AND HUMAN SERVICES

CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>**11/20/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>**THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE<br>**7333 GATEWAY BLVD<br>NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5787<br>D5787<br><br>110H | Continued From page 46<br>493.1283(a) TEST RECORDS<br><br>The laboratory must maintain an information or record system that includes the following:<br>(a)(1) The positive identification of the specimen.<br>(a)(2) The date and time of specimen receipt into the laboratory.<br>(a)(3) The condition and disposition of specimens that do not meet the laboratory's criteria for specimen acceptability.<br>(a)(4) The records and dates of all specimen testing, including the identity of the personnel who performed the test(s).<br>This STANDARD  is not met as evidenced by:<br> Based on technical supervisor interview and bacteriology media quality control record review on November 18, 2015, the laboratory failed to have an information or record system that included the records of all bacteriology patient specimen testing.  Findings included:<br><br>Although the laboratory maintained documentation to indicate that all lots of bacteriology media used to test patient bacteriology specimens had been quality controlled by the manufacturer or laboratory, the laboratory maintained no documentation of the lot of media used to test any given patient bacteriology specimen.  The laboratory maintained no such information or record system. | D5787<br>D5787 | D5787<br>The lab is keeping records that track the media used to test any given bacteriology patient specimen.<br><br>The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue.<br><br>The new lab director has approved enhanced procedures regarding documentation of the bacteriology media used to test patient specimens.<br><br>The lab will ensure these procedures are followed through audits performed pursuant to the lab's new audit procedures, and through oversight during the monthly QA meetings. | 2/12/16 |
| D5791 | 493.1289(a)(c) ANALYTIC SYSTEMS QUALITY ASSESSMENT<br><br>(a) The laboratory must establish and follow written policies and procedures for an ongoing mechanism to monitor, assess, and when indicated, correct problems identified in the analytic systems specified in | D5791 | D5791 #1<br>A review of hourly data demonstrated that average hourly temperature for nearly all of the freezers at issue met the manufacturer temperature requirements for the materials stored. | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  47 of 121

Confidential

THPFM0004755127

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>**11/20/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>**THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE<br>**7333 GATEWAY BLVD**<br>**NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5791 | Continued From page 47<br>§§493.1251 through 493.1283.<br>(c) The laboratory must document all analytic systems assessment activities.<br><br>This STANDARD  is not met as evidenced by:<br>1.  Based on the SensoScientific Monitoring Audit Node Report and intervew, the laboratory failed to identify and perform corrective action when ten of ten freezer temperatures did not meet the manufacturer temperature requirements. Findings include:<br><br>a.   The Audit Node Reports for July 2015 and September 2015 were reviewed.<br><br>b.   Six -20 C freezers were identified: 7059 -20 Freezer Sanyo JP lab, 7061 BUGS -20 Freezer 4, 7063 -20 Freezer Accessioning, 7066 -20 Freezer 1 Normandy, 7075 -20 Freezer 2 JP, and 7077 -20 Freezer 3JP.<br><br>c.   Four -80 C freezers were identified: 7098 -80 Freezer 1 Nuair, 7111 -80 Freezer 2 Thermo, 7113 -80 Freezer 2 CLIA Lab, and 7120 -80 Freezer 1 BUGS.<br><br>d.   The Audit Node Report for 7/6/15 through 7/31/15 revealed the following number of days that the freezers did not meet the required acceptable temperature range of greater than or equal to -20 C or greater that or equal to -80 C:<br><br>7059 -20 Freezer Sanyo JP Lab 25/26 days<br>7098 -80 Freezer 1 Nuair        7/26 days<br>7111 -80 Freezer 2 Thermo      18/26 days<br>7113 -80 Freezer 2 CLIA Lab    14/26 days<br>7120 -80 Freezer 1 BUGS        25/26 days<br><br>e.   The Audit Node Report for 9/1/15 through | D5791 | D5791 #1 (continued)<br>The lab has identified and discarded any materials that had the potential to have been affected. The lab has also completed an assessment to identify any patients affected or having the potential to be affected by this issue.<br><br>The new lab director has approved enhanced temperature management procedures to reinforce monitoring of temperature and environmental conditions and storage of materials according to the manufacturer's temperature range. The lab has conducted training on those procedures.<br><br>The lab's management, including the new lab director and quality systems director, will ensure compliance with these procedures, including by making sure that supervisors perform their respective duties effectively. The lab will also provide oversight through monthly QA meetings, and will monitor compliance through its improved occurrence management and audit procedures. | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  48 of 121

Confidential

THPFM0004755128

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 05D2025714 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED 11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE 7333 GATEWAY BLVD NEWARK, CA 94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5791 | Continued From page 48 9/24/15 revealed the following number of days that the freezers did not meet the required acceptable temperature range of greater than or equal to -20 C or greater that or equal to -80 C: | D5791 | | |

7059 -20 Freezer Sanyo JP Lab 12/24 days
7061 BUGS -20 Freezer 4        12/24 days
7063 -20 Freezer Accessioning   11/24 days
7066 -20 Freezer 1 Normandy    9/24 days
7075 -20 Freezer 2 JP          6/24 days
7077 -20 Freezer 3JP           5/24 days
7098 -80 Freezer 1 Nuair       11/24 days
7111 -80 Freezer 2 Thermo      3/24 days
7113 -80 Freezer 2 CLIA Lab    10/24 days
7120 -80 Freezer 1 BUGS        18/24 days

f.    The Quality Assurance Quality Control Manager signed and dated the Audit Node Reports.  The Quality Assurance Quality Control Manager could not explain if any corrective action was taken.

g.    There was no documenation that the laboratory identified the days that the freezers did not meet the acceptable temperature ranges and did not take any corrective action for those days.

h.    Refer to D5413.

2.    Based on review of Quality Control (QC) data and Monthly QC Reports, the laboratory failed to have a quality assessment (QA) procedure to identify and correct problem with the QC values for the Theranos Proprietary System (TPS) when precision did not meet the laboratory's requirement for precision.  Findings include:

a.    CL PLN-14003 Revision A, "Master Validation Plan for Routine Chemistry Assays on Theranos

**D5791 #2**
The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue.

The new lab director is responsible for the lab's QA program and has

2/12/16

FORM CMS-2567(02-99) Previous Versions Obsolete    Event ID: W34211    Facility ID: CA22046272    If continuation sheet Page 49 of 121

Confidential

THPFM0004755129

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  05D2025714 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  **THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE  **7333 GATEWAY BLVD  NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5791 | Continued From page 49  Devices" in section 13.4.5 requires the %CV of replicates to be not more than 15% (20% at the lower and upper limits of detection).  b.   QC results were reviewed from June 2014 through November 2014 and January through February 2015 for Vitamin B12 (VB12), Vitamin D (VitD), and Sex Hormone Binding Globulin (SHBG) which were used for patient testing on the TPS devices.  c.   VB12 QC Level 1 and Level 3 (QC1 and QC3) on Device E000110 revealed the following %CV (coefficient of variation): 34.3% and 48.5%, respectively, from 1/5/15 through 1/30/15.  d.   VB12 QC1 and QC3 on Device E001085 revealed the following %CVs: 52.5% and 35.2%, respectively, from 1/5/15 through 1/30/15.  e.   VB12 QC1 and QC3 on Device E001102 revealed the following %CVs: 39.0% and 20.0%, respectively, from 2/10/15 through 2/27/15.  f.   VB12 QC1 and QC3 on Device E001000 revealed the following %CVs: 34.7% and 39.9%, respectively, from 1/2/15 through 1/31/15.  g.   VB12 QC1 and QC3 on Device E001102 revealed the following %CVs: 39.0% and 20.0%, respectively, from 2/10/15 through 2/27/15.  h.   VitD QC Level 1 and Level 2 (QC1 and QC2) on Device E000053 revealed the following %CVs: 63.8% and 26.4%, respectively, from 8/21/14 through 8/30/14.  i.   VitD QC1 and QC2 on Device E001059 revealed the following %CVs: 18.7% and 18.7%, | D5791 | D5791 #2 (continued)  approved enhanced quality systems and related procedures. The lab has also appointed a Quality Director who will provide additional oversight.  These improved systems include QC procedures to reinforce that QC is effectively reviewed to identify precision that is inconsistent with the lab's CV requirements and that documented investigations and corrective action occur. In addition, the procedures clarify which employees are responsible for performing and documenting these activities, and require regular technical supervisor review and analysis of QC results. The lab has conducted training and competency testing on those procedures to ensure that practice is consistent with them.  Lab management, including technical supervisors and the quality director, are responsible for compliance with these procedures.  The lab will also provide oversight through monthly QA meetings, and will monitor compliance through its improved occurrence management and audit procedures. | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  50 of 121

Confidential

THPFM0004755130

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| THERANOS INC | 7333 GATEWAY BLVD<br>NEWARK, CA  94560 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5791 | Continued From page 50<br>respectively, from 6/29/14 through 7/24/14.<br><br>j.   VitD QC1 and QC2 on Device E001043 revealed the following %CVs: 25.2% and 31.9%, respectively, from 6/29/14 through 7/25/14.<br><br>k.   SHBG QC1 on Device E001026 revealed the following %CV: 18.9% from 9/30/14 through 11/5/14.<br><br>l.   SHBG QC1 on Device E001025 revealed the following %CV: 21.2% from 7/31/14 through 8/28/14.<br><br>3.   Based on review of Quality Assessment (QA) documentation and QA procedures, the laboratory failed to have a quality assessment (QA) procedure established to identify and correct problems with the Quality Control (QC) program for the Theranos Proprietary System (TPS) . Findings include:<br><br>a.   Monthly QC reports were reviewed for July 2014, October 2014, and February through June 2015.<br><br>b.   All reports were signed by the laboratory director (LD) on 9/19/15, except the March 2015 report was signed by the LD on 11/19/15.<br><br>c.   The total percentage of QC values greater than 2 standard deviations (SDs) was reviewed by the surveyor.<br><br>d.   The July 2014 report indicated in the summary that 2179 controls had been run on the "Edison**" devices; however, the specific report on the "Edison**" device showed that only 1618 were run on all tests and all devices. | D5791 | D5791 #3<br>The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue.<br><br>The new lab director is responsible for the lab's QA program and has approved enhanced quality systems and related procedures. The lab has also appointed a Quality Director who will provide additional oversight.<br><br>These improved systems include enhanced QC procedures, which reinforce and detail the required investigation and corrective action that must occur to address QC issues before patient tests are performed. In addition, they clarify which employees are responsible for performing | 2//12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete        Event ID: W34211        Facility ID: CA22046272        If continuation sheet Page  51 of 121

Confidential

THPFM0004755131

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>**05D2025714** | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br><br>**11/20/2015** |
| --- | --- | --- | --- |

| NAME OF PROVIDER OR SUPPLIER<br><br>**THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE<br><br>**7333 GATEWAY BLVD**<br>**NEWARK, CA  94560** |
| --- | --- |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
| --- | --- | --- | --- | --- |
| D5791 | Continued From page 51<br><br>e.   In July 2014, the data revealed the following tests showed percentage of QC samples with more than 15% of values greater than 2 SD: Testosterone (TST) (28%), Total T4 (TT4) (21%), VitD (28%).  Overall 16% of QC samples on all tests on all devices had values greater than 2 SDs.<br><br>f.   In October 2014, the data revealed the following tests showed percentage of QC samples with more than 15% of values greater than 2 SD:  Estradiol (EST) (33%), Free T4 (FT4) (19%), Prolactin (PRLN) (47%), SHBG (45%), Thyroid Stimulating Hormone (TSH) (26%), TST (45%), Total T3 (TT3) (32%), TT4 (28%), VitD (19%), VB12 (46%).  Overall 29% of QC samples on all tests on all devices had values greater than 2 SDs.<br><br>g.   In February 2015, the data revealed the following tests showed percentage of QC samples with more than 15% of values greater than 2 SD:  FT4 (26%), SHBG (87%), TT3 (33%), VitD (24%), VB12 (20%).  Overall 24% of QC samples on all tests on all devices had values greater than 2 SDs.<br><br>h.   In March 2015, the data revealed the following tests showed percentage of QC samples with more than 15% of values greater than 2 SD:  SHBG (42%), TSH (20%). Overall 20% of QC samples on all tests on all devices had values greater than 2 SDs.<br><br>i.   In April 2015, the data revealed the following tests showed percentage of QC samples with more than 15% of values greater than 2 SD: SHBG (16%), total Prostate Specific Antigen | D5791 | D5791 #3 (continued)<br>and documenting these activities, and require regular technical supervisor review and analysis of QC results. The lab has conducted training and competency testing on those procedures to ensure that practice is consistent with them.<br><br>Lab management, including technical supervisors and the quality director, is responsible for compliance with these procedures. The lab will also provide oversight through monthly QA meetings, and will monitor compliance through its improved occurrence management and audit procedures. | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  52 of 121

Confidential

THPFM0004755132

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>**THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE<br>**7333 GATEWAY BLVD**<br>**NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5791 | Continued From page 52<br>(tPSA) (22%), VB12 (60%).  Overall 21% of QC samples on all tests on all devices had values greater than 2 SDs.<br><br>j.    In May 2015, the data revealed the following tests showed percentage of QC samples with more than 15% of values greater than 2 SD: SHBG (34%), tPSA (22%).  Overall 26% of QC samples on all tests on all devices had values greater than 2 SDs.<br><br>k.    In June 2015, the data revealed the following tests showed percentage of QC samples with more than 15% of values greater than 2 SD: SHBG (23%). Overall 14% of QC samples on all tests on all devices had values greater than 2 SDs.<br><br>4.    Based on review of the quarterly Quality Assessment (QA) Power Points and interview with the QA/Quality Control (QC) Manager, the laboratory failed to identify and correct problems with drawing patient specimens. Findings include:<br><br>a.    The QA/AC Manager stated that a Power Point presentation was prepared and presented to specific staff each quarter and that no minutes or corrective actions were documented.<br><br>b.    The QA presentation from the 3rd quarter 2014 showed that the number 1 reason that patient specimens had to be redrawn was clots (293).<br><br>c.    The QA presentation from the 1st quarter 2015 showed that the number 1 reason that patient specimens had to be redrawn was clots (246). | D5791 | D5791 #4<br>As noted by CMS above, if a patient specimen did not meet the lab's acceptance criteria, the lab's practice was to describe the issue in its electronic system, to notify relevant lab personnel, and to take, and electronically note, appropriate corrective action. Patient specimens that did not meet the lab's acceptance criteria were not used for testing.<br><br>The new lab director is responsible for the lab's QA program and has approved enhanced quality systems and related procedures. The lab has also appointed a Quality Director who will provide additional oversight. | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  53 of 121

Confidential                                                                                                                                      THPFM0004755133

Trial Exh. 5257 Page 0063

**ER-1894**

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>**THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE<br><br>**7333 GATEWAY BLVD**<br>**NEWARK, CA 94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5791 | Continued From page 53<br>d.   The QA presentation from the 2nd quarter 2015 showed that the number 1 reason that patient specimens had to be redrawn was clots (116).<br><br>e.   There was no documentation which showed that the lab had identified the large number of redraws due to clots or that any action had been taken to correct the number of redraws due to clots. | D5791 | D5791 #4 (continued)<br>The new lab director has approved enhanced specimen rejection procedures, which require the relevant lab personnel to further monitor and assess received patient specimens and to correct problem as needed.<br><br>During monthly QA meetings, the lab will review, among other things, specimen rejection rates and any associated issues. In addition, the lab will monitor compliance through its improved occurrence management and audit procedures, both of which address preanalytic activities. | |
| D5793<br><br>400B | 493.1289(b)(c) ANALYTIC SYSTEMS QUALITY ASSESSMENT<br><br>(b) The analytic systems quality assessment must include a review of the effectiveness of corrective actions taken to resolve problems, revision of policies and procedures necessary to prevent recurrence of problems, and discussion of analytic systems quality assessment reviews with appropriate staff.<br>(c) The laboratory must document all analytic systems assessment activities.<br>This STANDARD  is not met as evidenced by:<br>1.   Based on laboratory personnel interviews and complete blood counts (CBC) quality control and calibration record review on September 23, 2015, the laboratory failed to have an analytic systems quality assessment mechanism that included a review of the effectiveness of the laboratory's CBC processes.  Finding included:<br><br>a.   The laboratory's Siemens Advia 2120i procedure failed to include the corrective actions to be taken when calibration or quality control results failed to meet the laboratory's criteria for acceptability.  See D5403.<br><br>b.   The laboratory's quality assessment | D5793 | | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  54 of 121

Confidential

THPFM0004755134

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 05D2025714 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED 11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| THERANOS INC | 7333 GATEWAY BLVD NEWARK, CA 94560 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5791 | Continued From page 53<br><br>d. The QA presentation from the 2nd quarter 2015 showed that the number 1 reason that patient specimens had to be redrawn was clots (116).<br><br>e. There was no documentation which showed that the lab had identified the large number of redraws due to clots or that any action had been taken to correct the number of redraws due to clots. | D5791 | | |
| D5793<br><br>400B | 493.1289(b)(c) ANALYTIC SYSTEMS QUALITY ASSESSMENT<br><br>(b) The analytic systems quality assessment must include a review of the effectiveness of corrective actions taken to resolve problems, revision of policies and procedures necessary to prevent recurrence of problems, and discussion of analytic systems quality assessment reviews with appropriate staff.<br>(c) The laboratory must document all analytic systems assessment activities.<br>This STANDARD is not met as evidenced by:<br>1. Based on laboratory personnel interviews and complete blood counts (CBC) quality control and calibration record review on September 23, 2015, the laboratory failed to have an analytic systems quality assessment mechanism that included a review of the effectiveness of the laboratory's CBC processes. Finding included:<br><br>a. The laboratory's Siemens Advia 2120i procedure failed to include the corrective actions to be taken when calibration or quality control results failed to meet the laboratory's criteria for acceptability. See D5403.<br><br>b. The laboratory's quality assessment | D5793 | D5793 #1<br>The laboratory proactively paused testing on the Advia 2120i during the survey. The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue.<br><br>The new lab director is responsible for the lab's QA program and has approved enhanced quality systems and related procedures. The lab has also appointed a Quality Director who will provide additional oversight.<br><br>The new lab director has approved enhanced QC procedures that address, among other things, parallel testing to verify QC values; review of QC data, including regular review by technical supervisors; and investigation and correction action to take when QC fails to meet the lab's criteria for | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page 54 of 121

Confidential

THPFM0004755135

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  05D2025714 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  **THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE  **7333 GATEWAY BLVD**  **NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5793 | Continued From page 54 mechanism failed to ensure that all CBC calibration documentation was maintained.  See D5437.  c.   The laboratory's quality assessment mechanism failed to ensure that the stated values of commercially assayed CBC quality control materials were verified.  See D5469.  d.   The laboratory's quality assessment mechanism failed to ensure that laboratory personnel followed the established corrective action protocol when CBC quality control test results failed to meet the laboratory's criteria for acceptability even though the laboratory maintained documentation to indicate that the documented CBC quality control corrective actions had been reviewed during a quality assessment audit on August 6, 2015.  In addition, the laboratory maintained no documentation it had recognized and investigated possible problems with the high quality control material being used as it had failed to meet the laboratory's criteria for acceptability upon initial testing for 5 of 7 days of patient specimen testing from July 11, 2015 to July 17, 2015.  See D5779.  2.   Based on laboratory personnel interviews and WBC differential flow cytometer performance report record review on November 17, 2015, the laboratory failed to have an analytic systems quality assessment mechanism that included a review of the effectiveness of flow cytometer corrective actions taken to resolve problems. Findings included:  a.   For patient capillary specimens, it was the practice of the laboratory to use flow cytometry instrumentation to perform and report patient | D5793 | D5793 #1 (continued) acceptability. The lab has conducted training on those procedures.  The new lab director has also approved enhanced procedures addressing equipment systems and reinforcing that calibration documentation must be organized and maintained. The lab has conducted training on those procedures.  The new lab director has also approved an enhanced SOP for CBC on the Advia 2120i that addresses the corrective actions to take when calibration or QC fail to meet the lab's criteria for acceptability.  Before the lab resumes any tests on the Advia 2120i, it will conduct training on those procedures. In addition, lab staff will be required to demonstrate competency to ensure that practice is consistent with these procedures.  Lab management, including technical supervisors and the quality director, is responsible for compliance with these procedures. The lab will provide oversight through monthly QA meetings, and will monitor compliance through its improved occurrence management, and audit procedures. | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  55 of 121

Confidential

THPFM0004755136

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>**THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE<br>**7333 GATEWAY BLVD**<br>**NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5793 | Continued From page 54<br>mechanism failed to ensure that all CBC calibration documentation was maintained.  See D5437.<br><br>c.   The laboratory's quality assessment mechanism failed to ensure that the stated values of commercially assayed CBC quality control materials were verified.  See D5469.<br><br>d.   The laboratory's quality assessment mechanism failed to ensure that laboratory personnel followed the established corrective action protocol when CBC quality control test results failed to meet the laboratory's criteria for acceptability even though the laboratory maintained documentation to indicate that the documented CBC quality control corrective actions had been reviewed during a quality assessment audit on August 6, 2015.  In addition, the laboratory maintained no documentation it had recognized and investigated possible problems with the high quality control material being used as it had failed to meet the laboratory's criteria for acceptability upon initial testing for 5 of 7 days of patient specimen testing from July 11, 2015 to July 17, 2015.  See D5779.<br><br>2.   Based on laboratory personnel interviews and WBC differential flow cytometer performance report record review on November 17, 2015, the laboratory failed to have an analytic systems quality assessment mechanism that included a review of the effectiveness of flow cytometer corrective actions taken to resolve problems.  Findings included:<br><br>a.   For patient capillary specimens, it was the practice of the laboratory to use flow cytometry instrumentation to perform and report patient | D5793 | D5793 #2<br>The lab proactively paused testing on the flow cytometer during the survey.<br><br>The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue. | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete      Event ID: W34211      Facility ID: CA22046272      If continuation sheet Page  55 of 121

Confidential

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| THERANOS INC | 7333 GATEWAY BLVD<br>NEWARK, CA 94560 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5793 | Continued From page 55<br>WBC differentials.<br><br>b.   On August 23, 2015, in which the flow cytometer was used to perform and report patient WBC differentials, laboratory "Cytometer Performance Reports" indicated that at 09:30 the flow cytometer performance check failed.  The performance check was repeated and again failed at 10:18.  At 12:49, laboratory documentation indicated that the flow cytometer performance check passed.<br><br>c.   The laboratory maintained no documentation to indicate that the actions taken on August 23, 2015 to "pass" the flow cytometer performance check had been reviewed for the effectiveness of the actions under the laboratory's quality assessment mechanism.<br><br>3.   Based on technical supervisor interviews and human chorionic gonadotropin (HCG) quality control record review on November 19, 2015, the laboratory failed to have an analytic systems quality assessment mechanism that included a review of the effectiveness of HCG quality control corrective actions taken to resolve problems. Findings included:<br><br>a.   It was the practice of the laboratory to use the Immulite 2000 XPi instrument to perform and report patient quantitative HCG test results.  It was also the practice of the laboratory to use three levels of assayed quality control materials and the stated values of the commercially assayed quality control materials as the laboratory's criteria for acceptability to monitor patient quantitative HCG testing.<br><br>b.   A review of the criteria for acceptability for the | D5793 | D5793 #2 (continued)<br>The new lab director is responsible for the lab's QA program and has approved enhanced quality systems and related procedures. The lab has also appointed a Quality Director who will provide additional oversight.<br><br>The new lab director has approved enhanced procedures to reinforce the practice of addressing a performance check fail through documented investigations and corrective action. The lab has conducted training on those procedures.<br><br>Lab management, including technical supervisors and the quality director, are responsible for compliance with these procedures. The lab will provide oversight through monthly QA meetings, and will monitor compliance through its improved occurrence management, and audit procedures. | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID:W34211          Facility ID: CA22046272          If continuation sheet Page  56 of 121

Confidential

THPFM0004755138

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>**11/20/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>**THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE<br>**7333 GATEWAY BLVD**<br>**NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5793 | Continued From page 55<br>WBC differentials.<br><br>b.   On August 23, 2015, in which the flow cytometer was used to perform and report patient WBC differentials, laboratory "Cytometer Performance Reports" indicated that at 09:30 the flow cytometer performance check failed.  The performance check was repeated and again failed at 10:18.  At 12:49, laboratory documentation indicated that the flow cytometer performance check passed.<br><br>c.   The laboratory maintained no documentation to indicate that the actions taken on August 23, 2015 to "pass" the flow cytometer performance check had been reviewed for the effectiveness of the actions under the laboratory's quality assessment mechanism.<br><br>3.   Based on technical supervisor interviews and human chorionic gonadotropin (HCG) quality control record review on November 19, 2015, the laboratory failed to have an analytic systems quality assessment mechanism that included a review of the effectiveness of HCG quality control corrective actions taken to resolve problems. Findings included:<br><br>a.   It was the practice of the laboratory to use the Immulite 2000 XPi instrument to perform and report patient quantitative HCG test results.  It was also the practice of the laboratory to use three levels of assayed quality control materials and the stated values of the commercially assayed quality control materials as the laboratory's criteria for acceptability to monitor patient quantitative HCG testing.<br><br>b.   A review of the criteria for acceptability for the | D5793 | D5793 #3<br>The lab proactively paused testing on the Siemens Immulite 2000 XPi during the survey.<br><br>The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue.<br><br>The new lab director is responsible for the lab's QA program and has approved enhanced quality systems and related procedures. The lab has also appointed a Quality Director who will provide additional oversight. | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID:W34211          Facility ID:CA22046272          If continuation sheet Page  56 of 121

Confidential

THPFM0004755139

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 05D2025714 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED 11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| THERANOS INC | 7333 GATEWAY BLVD NEWARK, CA  94560 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5793 | Continued From page 56 three quality control materials (Bio-Rad, lot number 40310, expiration date 12/31/2017)  in use on November 19, 2015 indicated that for the level 1 quality control material the criteria for acceptability used to monitor patient HCG testing was 9.38 - 14.4 mIU/mL, the level 2 quality control material's criteria for acceptability used to monitor patient HCG testing was 20.6 - 32.4 mIU/mL, and the level 3 quality control material's criteria for acceptability used to monitor patient HCG testing was 264 - 376.

c.   According to the manufacturer's package insert, the assayed values of the three quality control materials in use on November 19, 2015 to monitor patient HCG testing was 8.66 - 18.2 mIU/mL for level 1, 21.6 - 40.6 mIU/mL for level 2, and 306 - 460 mIU/mL for level 3.

d.   According to laboratory records, the criteria for acceptability for the three quality control materials in use on November 19, 2015 to monitor patient HCG testing was changed on September 11, 2015 to the criteria for acceptability that was used until November 19, 2015.  According to laboratory personnel, the change to the criteria for acceptability was made on September 11, 2015 because there was an apparent "shift" in the laboratory's quality control materials test results.  The laboratory conducted no further investigation or review prior to changing the criteria for acceptability for the three quality control materials.

e.   The laboratory's change of the criteria for acceptability for the two of the three HCG quality control materials resulted in criteria for acceptability outside the criteria established by the manufacturer.  The laboratory maintained no | D5793 | D5793 #3 (continued) These new procedures reinforce the need to document investigations and the reasons for corrective action when QC fails to meet the lab's criteria for acceptability, including the reasons for any changes to QC parameters. The lab has conducted training on those procedures.

These procedures require the technical supervisors to regularly review QC and to initiate investigations and corrective action when QC fails to meet the lab's acceptability criteria. In addition, oversight of QC reviews, investigations and corrective action occurs through monthly QA meetings. The lab will also monitor compliance through its improved occurrence management, and audit procedures.

Before the lab resumes any test on the Siemens Immulite 2000 XPi, the lab will ensure that the test has been re-verified pursuant to the lab's improved method verification procedures that have been approved by the new lab director. The lab will also ensure that testing personnel have been trained and demonstrated competency to ensure that practice is consistent with these procedures and the other procedures for that test. | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  57 of 121

Confidential                                                                                                    THPFM0004755140

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>**THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE<br>**7333 GATEWAY BLVD**<br>**NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5793 | Continued From page 57<br>mechanism to assess the effectiveness of this corrective action.<br><br>f.   From September 11, 2015 to November 19, 2015, the laboratory performed and reported 19 patient  quantitative HCG tests.<br><br>4.   Based on technical supervisor interviews and hepatitis B survey antibody (HBsAb) quality control record review on November 19, 2015, the laboratory failed to have an analytic systems quality assessment mechanism that included a review of the effectiveness of HBsAb quality control corrective actions taken to resolve problems.  Findings included:<br><br>a.   It was the practice of the laboratory to use the Immulite 2000 XPi instrument to perform and report patient HBsAb test results.  It was also the practice of the laboratory to use three levels of assayed quality control materials and the stated values of the commercially assayed quality control materials as the laboratory's criteria for acceptability to monitor patient HBsAb testing.<br><br>b.   A review of the criteria for acceptability for the three quality control materials (Siemens, lot number 0134, expiration date 11/2016)  in use on November 19, 2015 indicated that for the negative quality control material the criteria for acceptability used to monitor patient HBsAb testing was 0.0 - 4.0, the low positive quality control material's criteria for acceptability used to monitor patient HBsAb testing was 10.3 - 19.6, and the positive quality control material's criteria for acceptability used to monitor patient HBsAb testing was 234 - 345.<br><br>c.   According to the manufacturer's package | D5793 | D5793 #4<br>The lab proactively paused testing on the Siemens Immulite 2000 XPi during the survey. The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue.<br><br>The new lab director is responsible for the lab's QA program and has approved enhanced quality systems and related procedures. The lab has also appointed a Quality Director who will provide additional oversight.<br><br>The new lab director has approved enhanced QC procedures to reinforce the need to document investigations and the reasons for corrective action when QC fails to meet the lab's acceptability criteria, including the reasons for any changes to QC parameters. The lab has conducted training on those procedures.<br><br>These procedures require the technical | 2/12/16 |

| FORM CMS-2567(02-99) Previous Versions Obsolete | Event ID: W34211 | Facility ID: CA22046272 | If continuation sheet Page  58 of 121 |
|---|---|---|---|

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|---|
| | 05D2025714 | A. BUILDING _____<br>B. WING _____ | | 11/20/2015 |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| THERANOS INC | 7333 GATEWAY BLVD<br>NEWARK, CA  94560 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5793 | Continued From page 58<br>insert, the assayed values of the three quality control materials in use on November 19, 2015 to monitor patient HBsAb testing was 0.0 - 4.0 for the negative quality control material, 11 - 21 for the low positive quality control material, and 226 - 340 for the positive quality control material.<br><br>d.   According to laboratory records, the criteria for acceptability for two of the three quality control materials in use on November 19, 2015 to monitor patient HBsAb testing was changed on September 11, 2015 to the criteria for acceptability that was used until November 19, 2015.  According to laboratory personnel, the change to the criteria for acceptability was made on September 11, 2015 because there was an apparent "shift" in the laboratory's quality control materials test results.  The laboratory conducted no further investigation or review prior to changing the criteria for acceptability for the three quality control materials.<br><br>e.   The laboratory's change of the criteria for acceptability for the two of the three HBsAb quality control materials resulted in criteria for acceptability outside the criteria established by the manufacturer.  The laboratory maintained no mechanism to assess the effectiveness of this corrective action.<br><br>f.   From September 11, 2015 to November 19, 2015, the laboratory performed and reported 16 patient HBsAb tests.<br><br>5.   Based on technical supervisor interviews and luteinizing hormone (LH) quality control record review on November 19, 2015, the laboratory failed to have an analytic systems quality assessment mechanism that included a review of | D5793 | D5793 #4 (continued)<br>supervisors to regularly review QC and to initiate investigations and corrective action when QC fails to meet the lab's acceptability criteria. In addition, oversight of QC reviews, investigations and corrective action occurs through monthly QA meetings. The lab will also monitor compliance through its improved occurrence management, and audit procedures. | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  59 of 121

Confidential          Trial Exh. 5257 Page 0072          THPFM0004755142

**ER-1903**

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  05D2025714 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE  7333 GATEWAY BLVD  NEWARK, CA  94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5793 | Continued From page 59  the effectiveness of LH quality control corrective actions taken to resolve problems.  Findings included:  a.   It was the practice of the laboratory to use the Siemens Advia Centaur XP Immunoassay System instrument to perform and report patient LH test results.  It was also the practice of the laboratory to use three levels of assayed quality control materials and the stated values of the commercially assayed quality control materials as the laboratory's criteria for acceptability to monitor patient LH testing.  b.   A review of the criteria for acceptability for the three quality control materials (Bio-Rad, lot number 50980, expiration date 11/30/2016)  in use on November 19, 2015 indicated that for the level 1 quality control material the criteria for acceptability used to monitor patient LH testing was 2.86 - 4.18 mIU/mL, the level 2 quality control material's criteria for acceptability used to monitor patient LH testing was 16.98 - 25.48 mIU/mL, and the level 3 quality control material's criteria for acceptability used to monitor patient LH testing was 57.6 - 84.8 mIU/mL.  c.   According to the manufacturer's package insert, the assayed values of the three quality control materials in use on November 19, 2015 to monitor patient LH testing was 2.86 - 4.18 mIU/mL for level 1, 16.6 - 23.9 mIU/mL for level 2, and 57.6 - 84.8 mIU/mL for level 3.  d.   According to laboratory records, the criteria for acceptability for one of the three quality control materials in use on November 19, 2015 to monitor patient LH testing was changed on July 9, 2015 to the criteria for acceptability that was used | D5793 | D5793 #5  The lab proactively paused testing on the Siemens Advia Centaur XP Immunoassay System during the survey.  The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue.  The new lab director is responsible for the lab's QA program and has approved enhanced quality systems and related procedures. The lab has also appointed a Quality Director who will provide additional oversight.  These new procedure reinforce the need to document investigations and the reasons for corrective action when QC fails to meet the lab's acceptability criteria, including the reasons for any changes to QC parameters. The lab has conducted training on those procedures.  These procedures require the technical supervisors to regularly review QC and to initiate investigations and corrective action when QC fails to meet the lab's criteria for acceptability. In addition, oversight of QC reviews, investigations and corrective action occurs through | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  60 of 121

Confidential

THPFM0004755143

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| DEPARTMENT OF HEALTH AND HUMAN SERVICES CENTERS FOR MEDICARE & MEDICAID SERVICES | | | |
|---|---|---|---|
| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>11/20/2015 |

| NAME OF PROVIDER OR SUPPLIER<br><br>**THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE<br>**7333 GATEWAY BLVD**<br>**NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5793 | Continued From page 60<br>until November 19, 2015.  According to laboratory personnel, the change to the criteria for acceptability was made on July 9, 2015 because there was an apparent "shift" in the laboratory's quality control materials test results.  The laboratory conducted no further investigation or review prior to changing the criteria for acceptability for the three quality control materials.<br><br>e.   The laboratory's change of the criteria for acceptability for the one of the three LH quality control materials resulted in criteria for acceptability outside the criteria established by the manufacturer.  The laboratory maintained no mechanism to assess the effectiveness of this corrective action.<br><br>f.    From July 9, 2015 to November 19, 2015, the laboratory performed and reported 132 patient LH tests.<br><br>6.    Based on technical supervisor interviews and CA-125 quality control record review on November 19, 2015, the laboratory failed to have an analytic systems quality assessment mechanism that included a review of the effectiveness of CA-125 quality control corrective actions taken to resolve problems.  Findings included:<br><br>a.    It was the practice of the laboratory to use the Immulite 2000 XPi instrument to perform and report patient CA-125 test results.  It was also the practice of the laboratory to use three levels of assayed quality control materials and the stated values of the commercially assayed quality control materials as the laboratory's criteria for acceptability to monitor patient CA-125 testing. | D5793 | D5793 #5<br>monthly QA meetings. The lab will also monitor compliance through its improved occurrence management and audit procedures.<br><br><br><br>D5783 #6<br>This finding appears to have a typographical error because CA-125 was tested on the Siemens Advia Centaur XP Immunoassay System during this period, not the Siemens Immulite 2000 XPi.<br><br>The lab proactively paused testing on the Siemens Advia Centaur XP Immunoassay System during the survey.<br><br>The lab has completed an assessment | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  61 of 121

Confidential

THPFM0004755144

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>**11/20/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>**THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE<br>**7333 GATEWAY BLVD**<br>**NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5793 | Continued From page 61<br><br>b.   A review of the criteria for acceptability for the three quality control materials (Bio-Rad, lot number 19980, expiration date 09/30/2016)  in use on November 19, 2015 indicated that for the level 1 quality control material the criteria for acceptability used to monitor patient CA-125 testing was 18.6 - 28.7 U/mL, the level 2 quality control material's criteria for acceptability used to monitor patient CA-125 testing was 53.5 - 82.2 U/mL, and the level 3 quality control material's criteria for acceptability used to monitor patient CA-125 testing was 92.5 - 141 U/mL.<br><br>c.   According to the manufacturer's package insert for quality control materials Bio-Rad, lot number 19980, there were no assayed values for the three quality control materials in use on November 19, 2015 to monitor patient CA-125. According to laboratory personnel, the quality control material's manufacturer could not publish the criteria for acceptability at the time the quality control material was received by the laboratory, and was told by the manufacturer to use the criteria for acceptability from the previous lot of quality control materials.  The laboratory maintained no documentation to support the manufacturer's instructions for the use of the criteria for acceptability from the previous lot of quality control materials.<br><br>d.   A review of the manufacturer's criteria for acceptability from the previous lot of CA-125 quality control materials revealed that the criteria for acceptability for the quality control materials used by the laboratory on November 19, 2015 to monitor patient CA-125 testing did not match the criteria for acceptability from the previous lot of CA-125 quality control materials. | D5793 | D5793 #6 (continued)<br>to identify any patients affected or having the potential to be affected by this issue.<br><br>The new lab director is responsible for the lab's QA program and has approved enhanced quality systems and related procedures. The lab has also appointed a Quality Director who will provide additional oversight.<br><br>The new lab director has approved enhanced QC procedures to reinforce the need to document investigations and the reasons for corrective action when QC fails to meet the lab's acceptability criteria, including the reasons for any changes to QC parameters. The lab has conducted training on those procedures.<br><br>These procedures require the technical supervisors to regularly review QC and to initiate investigations and corrective action when QC fails to meet the lab's criteria for acceptability. In addition, oversight of QC reviews, investigations and corrective action occurs through monthly QA meetings. The lab will also monitor compliance through its improved occurrence management, and audit procedures. | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA2046272          If continuation sheet Page  62 of 121

Confidential

THPFM0004755145

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 05D2025714 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED 11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE 7333 GATEWAY BLVD NEWARK, CA 94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5793 | Continued From page 62 | D5793 | | |
| | e. Upon further review, it was discovered that the criteria for acceptability for the quality control materials used by the laboratory on November 19, 2015 to monitor patient CA-125 testing was the criteria for acceptability established by the manufacturer for Bio-Rad, lot number 19980, for use on a different instrument and not the Siemens Advia Centaur XP Immunoassay System instrument. | | | |
| | f. From the date quality control materials Bio-Rad, lot number 19980 to November 19, 2015, the laboratory performed and reported 46 patient CA-125 tests. | | | |
| | 7. Based on laboratory personnel interviews and the laboratory's "Alternative Assessment Program" (AAP) record review on November 20, 2015, the laboratory failed to have an analytic systems quality assessment mechanism that included the timely review of the effectiveness of actions taken. Findings included: | | D5793 #7 The lab directors during the period covered by the survey no longer hold any position with the lab. The new lab director was hired after the on-site survey had been completed. | 2/12/16 |
| | a. To comply with the CLIA requirement at 42 C.F.R. 493.1281(a), the laboratory maintained a protocol titled "Proficiency Testing for Theranos Lab-Developed Tests" that included a laboratory process called AAP in which tests performed using the Advia 1800 would be evaluated and defined in relationship to the Advia XPT. | | The new lab director is responsible for the lab's QA program and has approved enhanced quality systems and related procedures. The lab has also appointed a Quality Director who will provide additional oversight. | |
| | b. A review of laboratory documents indicated that for the following AAP events, the laboratory's evaluation was not timely and, therefore, ineffective: | | The new lab director has approved enhanced procedures requiring that alternative assessments must be subject to timely review and | |
| | i. On April 1, 2014, the laboratory completed testing for 18 routine chemistry analytes using the | | | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page 63 of 121

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE<br>7333 GATEWAY BLVD<br>NEWARK, CA  94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5793 | Continued From page 63<br>Advia 1800 and compared these test results to test results on the same samples using the Advia XPT.  Laboratory records indicated that the review of this AAP was not completed until November 16, 2015 by appropriate laboratory personnel and was not reviewed by the laboratory director as required by laboratory protocol.<br><br>ii.    On May 15, 2014, the laboratory completed testing for 14 routine chemistry analytes using the Advia 1800 and compared these test results to test results on the same samples using the Advia XPT.  Laboratory records indicated that the review of this AAP was not completed until November 15, 2015 by appropriate laboratory personnel.<br><br>iii.    On July 31, 2014, the laboratory completed testing for 18 routine chemistry analytes using the Advia 1800 and compared these test results to test results on the same samples using the Advia XPT.  Laboratory records indicated that the review of this AAP was not completed until November 16, 2015 by appropriate laboratory personnel and was not reviewed by the laboratory director as required by laboratory protocol.<br><br>iv.    On November 20, 2014, the laboratory completed testing for 14 routine chemistry analytes using the Advia 1800 and compared these test results to test results on the same samples using the Advia XPT.  Laboratory records indicated that the review of this AAP was not completed until November 15, 2015 by appropriate laboratory personnel.<br><br>8.    Based on review of the quality control (QC) procedure, Levey-Jennings reports for the Advia 1800 and Advia XPT, proficiency testing (PT) | D5793 | D5793 #7 (continued)<br>evaluation by the lab director and/or a technical supervisor.<br><br>The lab will provide oversight through monthly QA meetings, and will also monitor compliance through its improved occurrence management and audit procedures. | <br><br>2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  64 of 121

Confidential

THPFM0004755147

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>**THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE<br><br>**7333 GATEWAY BLVD<br>NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5793 | Continued From page 64<br>results and quality assessment (QA) documentation the laboratory failed to take corrective actions when chemistry QC in the venipuncture laboratory was observed ten consecutive times on the same side of the mean. Findings include:<br><br>a,  CL QOP-00013 Revision D, "Quality Control in Chemistry", stated in section 6.3.1.7.2 that QC is deemed to have passed when...Westgard rules hae not been violated (see following monthly QC section 6.3.2)."<br><br>b.  CL QOP-00013 Revision D also stated in section 6.3.2.5 that ten consecutive observations on the same side of the mean should be monitored.<br><br>c.  The Advia XPT was put into use for chemistry testing on 12/18/14. Prior to 12/18/14, the Advia 1800 was used for chemistry testing.<br><br>Albumin<br><br>i.  Review of the PT results for albumin for the 1st and 2nd events of 2015 revealed that the submitted results showed a negative bias ranging from -3.3 to -4.9 and -1.8 to -3.5, respectively.<br><br>ii.  Review of Levey-Jenning reports from April 2014 and September 2014, revealed that MultiQual Level 1 (MQ1) and Multi Qual Level 2 (MQ2) had at least 10 consecutive results below the mean but within 2 standard deviations (SD).<br><br>iii.  Review of Levey-Jenning reports for January 2015 through April 2015 revealed MQ1 (Lot number 45661) had 10 consecutive results below the mean, MQ2 (Lot number 45662) had 10 | D5793 | D5793 #8<br>The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue.<br><br>The new lab director is responsible for the lab's QA program and has approved enhanced quality systems and related procedures. The lab has also appointed a Quality Director who will provide additional oversight.<br><br>The new lab director has approved enhanced QC procedures to reinforce that regular review of QC data is required and that investigations and corrective actions must be taken when QC fails to meet the lab's criteria for acceptability. The lab has conducted training on those procedures to ensure that practice is consistent with them.<br><br>These procedures require the technical supervisors to regularly review QC and to initiate investigations and corrective action when QC fails to meet the lab's criteria for acceptability. In addition, oversight of QC reviews, investigations and corrective action occurs through monthly QA meetings. The lab will also monitor compliance through its improved occurrence management, and audit procedures. | |

FORM CMS-2567(02-99) Previous Versions Obsolete        Event ID:W34211        Facility ID: CA22046272        If continuation sheet Page 65 of 121

Confidential

THPFM0004755148

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE<br>7333 GATEWAY BLVD<br>NEWARK, CA  94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5793 | Continued From page 65<br>consecutive results below the mean and MultiQual Level3 (MQ3, Lot number 45663) had 10 consecutive results below the mean but within 2 SDs for all four months.<br><br>iv.   MQ1 data revealed 125 of 125 below the mean for January 2015 through April 2015 but within 2 SDs.<br><br>v.   MQ2 data revealed 126 of 126 below the mean for January 2015 through April 2015 but within 2 SDs.<br><br>vi.   MQ3 data revealed 123 of 125 below the mean for January 2015 through April 2015 but within 2 SDs.<br><br>vii.   Review of Levey-Jenning reports from May 2015 revealed that MQ1, MQ2 and MQ3 were below the mean for 21 of 31 days.<br><br>viii. The mean for all three levels was adjusted on 5/22/15 to fit the data without investigation or documentation of an investigation.  After 5/22/15 all 3 levels of QC were above the mean.<br><br>ix.   The manufacturer ranges for MQ1 (Lot number 45661) was 2.03-3.04 g/dL; MQ2 (Lot number 45662) was 3.04-4.56 g/dL; MQ3 (Lot number 45663) was 3.26-4.89 g/dL.<br><br>x.   After adjusting the acceptable ranges on 5/22/15, the laboratory's ranges fell outside the manufacturer's assayed ranges and were as follows:  MQ1 (1.77-2.665 g/dL); MQ2 (2.5-3.74 g/dL; MQ3 (3.02-4.52 g/dL).<br><br>xi.   Quarterly Quality Assessment PowerPoint presentations from the 3rd quarter of 2014 | D5793 | (continued; see above) | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  66 of 121

Confidential

THPFM0004755149

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|---|
| | 05D2025714 | A. BUILDING _____ B. WING _____ | | 11/20/2015 |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| THERANOS INC | 7333 GATEWAY BLVD NEWARK, CA 94560 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5793 | Continued From page 66<br><br>through the 2nd quarter of 2015 did not identify the negative bias for albumin or the 10 consecutive QC values above or below the mean.<br><br>xii.  8293 albumins were reported from January 2015 through June 2015.<br><br>Calcium<br><br>i.    Review of the PT results for calcium for the 2nd events of 2015 revealed that the submitted results showed a negative bias ranging from -3.9 to -5.1.<br><br>ii.    Review of Levey-Jenning reports from April 2014 and May 2015 revealed 27 of 27 and 25 of 25 QC consecutive results below the mean but within 2 SDs.<br><br>iii.    7719 calciums were reported from January 2015 through June 2015.<br><br>Other Chemistries<br><br>Review of Levey-Jenning reports from April 2014, September 2014, and January 2014 revealed that Creatinine, Glucose, High density lipoprotein (HDL), Low density lipoprotein (LDL), Total Bilirubin, Chloride, Potassium, Triglycerides, Cholesterol, Alkaline Phosphatase, and Alanine Transaminase had at least one event of 10 consecutive QC results above or below the mean but within 2 SDs for one to 3 levels of QC.<br><br>9.    Based on review of the alternative assessment procedure (AAP) and results of AAP from August 2014 through March 2015, the laboratory failed to identify through the quality assessment (QA) activities that the AAP for the | D5793 | (continued; see above) | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  67 of 121

Confidential

THPFM0004755150

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br>THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE<br>7333 GATEWAY BLVD<br>NEWARK, CA 94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5793 | Continued From page 67<br>Theranos Propietary System (TPS) was not performed every 6 months and was not reviewed and reviewed and approved by the laboratory (LD) in a timely manner as required by the laboratory's procedures, and therefore, ineffective. Findings include:<br><br>a.  CL SOP-00020 Revision B, "Proficiency testing for Theranos Lab-Developed Tests (Immunoassays)", effective 1/1/2014, stated in section 3.1 that the technical supervisor (TS) was responsible for ensuring that the AAP was conducted every 6 months for all analytes.<br><br>b.   Section 3.3.2 of the procedures stated that the TS was reponsible for evaluating testing samples results and section 3.4 stated that the LD was responsible for reviewing and approving each testing event documentation.<br><br>c.   Review of the AAP result forms (CL FRM-00022-F3) revealed that the AAP was performed on 8/18/14, 10/21/14, and 3/13/15.<br><br>d.   All three result forms did not include a documented evaluation  by the TS.<br><br>e.   The result documents from 8/18/14 and 3/15/15 were not signed by the LD until 11/15/15 and the result form from 10/12/14 was not signed by the LD.<br><br>f.   Four tests (Vitamin D, Thyroid Stimulating Hormone, Free T4, and Total Prostate Specific Antigen) were initially implemented in November 2013.<br><br>10. Based on review of patient raw data reports and the validation report for Vitamin D (VitD), the | D5793 | D5793 #9<br>The lab directors during the period covered by the survey no longer hold any position with the lab. The new lab director was hired after the on-site survey had been completed.<br><br>The new lab director is responsible for the lab's QA program. The lab has also appointed a Quality Director who will provide additional oversight.<br><br>The new lab director has approved enhanced quality systems to ensure that the lab's procedures are followed. Among other things, the lab's management, including the new lab director and new quality systems director, will provide oversight over proficiency testing and AAP through monthly QA meetings. The lab will also monitor compliance through its improved occurrence management, and audit procedures.<br><br>Before the survey, the lab proactively paused testing on its laboratory developed tests. It is not currently performing AAP testing. | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  68 of 121

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  05D2025714 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  **THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE  **7333 GATEWAY BLVD**  **NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5793 | Continued From page 68  laboratory failed to have a quality assessement mechanism to identify that the laboratory's reference ranges established from the validation study were accurately reflected on the patient raw data reports.  Findings include:  a.   The validation report for VitD stated that the reference range was 9.3-47.9 ng/mL.  b.   The patient raw data reports revealed that the reference range was "30-100."  c.   Patient raw data reports were reviewed from 6/15/14 through 8/31/14 and from 2/1/15 through 2/17/15.  d.   Thirty (30) of ninety-four (94) patient results were flagged as "Insufficiency" on the patient raw data report when the result was normal according to the laboratory's reference range.  e.   Twenty seven (27) of ninety four (94) patient results were flagged as normal on the patient raw data report when the result was above the normal range according to the laboratory's reference range. | D5793 | | |
| D5801 | 493.1291(a) TEST REPORT  The laboratory must have an adequate manual or electronic system(s) in place to ensure test results and other patient-specific data are accurately and reliably sent from the point of data entry (whether interfaced or entered manually) to final report destination, in a timely manner.  This includes the following:  (a)(1) Results reported from calculated data.  (a)(2) Results and patient-specific data electronically reported to network or interfaced | D5801 | D5801  The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue.  The new lab director is responsible for the lab's QA program and has approved enhanced quality systems and related procedures. The lab has | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete       Event ID: W34211       Facility ID: CA22046272       If continuation sheet Page  69 of 121

Confidential                                                                                    THPFM0004755152

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|---|
| | 05D2025714 | A. BUILDING _____<br>B. WING _____ | | 11/20/2015 |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| THERANOS INC | 7333 GATEWAY BLVD<br>NEWARK, CA  94560 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5793 | Continued From page 68<br>laboratory failed to have a quality assessement mechanism to identify that the laboratory's reference ranges established from the validation study were accurately reflected on the patient raw data reports.  Findings include:<br><br>a.   The validation report for VitD stated that the reference range was 9.3-47.9 ng/mL.<br><br>b.   The patient raw data reports revealed that the reference range was "30-100."<br><br>c.   Patient raw data reports were reviewed from 6/15/14 through 8/31/14 and from 2/1/15 through 2/17/15.<br><br>d.   Thirty (30) of ninety-four (94) patient results were flagged as "Insufficiency" on the patient raw data report when the result was normal according to the laboratory's reference range.<br><br>e.   Twenty seven (27) of ninety four (94) patient results were flagged as normal on the patient raw data report when the result was above the normal range according to the laboratory's reference range. | D5793 | D5801 (continued):<br>also appointed a Quality Director who will provide additional oversight.<br><br>The new lab director has approved enhanced procedures for reagent qualification and management that include procedures to ensure manufacturer inserts are reviewed. Training on these procedures has occurred.<br><br>Before PT/INR testing resumes, the lab will also prepare a revised assay-specific procedure for PT/INR to reinforce that the International Normalized Ratio (INR) must be calculated accurately prior to reporting patient test results.  The relevant testing personnel will be required to demonstrate competency to ensure that practice is consistent with these procedures.<br><br>The lab will provide oversight through monthly QA meetings, and will also monitor compliance through its improved occurrence management, and audit procedures. | |
| D5801 | 493.1291(a) TEST REPORT<br><br>The laboratory must have an adequate manual or electronic system(s) in place to ensure test results and other patient-specific data are accurately and reliably sent from the point of data entry (whether interfaced or entered manually) to final report destination, in a timely manner.  This includes the following:<br>(a)(1) Results reported from calculated data.<br>(a)(2) Results and patient-specific data electronically reported to network or interfaced | D5801 | | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  69 of 121

Confidential

THPFM0004755153

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br>**THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE<br>**7333 GATEWAY BLVD**<br>**NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5801 | Continued From page 69<br>systems.<br>(a)(3) Manually transcribed or electronically transmitted results and patient-specific information reported directly or upon receipt from outside referral laboratories, satellite or point-of-care testing locations.<br>This STANDARD  is not met as evidenced by:<br> Based on review of the patient results, manufacturer International Sensitivity Index (ISI) number, and the laboratory's mean normal prothrombin time (MNPT), the laboratory failed to ensure that the reported International Normalized Ratio (INR) was calculated accurately prior to reporting final patient test results. Findings include:<br><br>a.    Laboratory quality control records revealed that Dade Innovin (thromboplastin) lot number 539280 was put into use in March 2015.  The MNPT for this lot number was determined to be 8.0 seconds and the manufacturer stated that the ISI was 0.89.<br><br>b.    A review of the INR results from 4/3/15 through 9/21/15 revealed that 81 of 81 reported final patient results were not accurate when the patient prothrombin time (PT) was used with the above MNPT and ISI numbers to calculate the INR.<br><br>c.    The final reported results varied from the true results by 0.1-0.5 units. | D5801 | | |
| D5805 | 493.1291(c) TEST REPORT<br><br>The test report must indicate the following:<br>(c)(1) For positive patient identification, either the patient's name and identification number, or a unique patient identifier and identification number. | D5805 | D5805:<br>The lab revised its patient reports for PT/INR during the survey so that the interpretive note appears only under the heading for patients with therapy. | 2/12/16 |

Confidential

Trial Exh. 5257 Page 0084

THPFM0004755154

**ER-1915**

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>**11/20/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>**THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE<br>**7333 GATEWAY BLVD**<br>**NEWARK, CA 94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5805 | Continued From page 70<br>(c)(2) The name and address of the laboratory location where the test was performed.<br>(c)(3) The test report date.<br>(c)(4) The test performed.<br>(c)(5) Specimen source, when appropriate.<br>(c)(6) The test result and, if applicable, the units of measurement or interpretation, or both.<br>(c)(7) Any information regarding the condition and disposition of specimens that do not meet the laboratory's criteria for acceptability.<br>This STANDARD is not met as evidenced by:<br>Based on review of final reports and interview with the Senior Vice President, the laboratory failed to differentiate the intrepretive data for Warfarin therapy vs. Non-Warfarin Therapy. Findings include:<br><br>a.  Thirteen of thirteen final patient test reports reviewed indicated that the International Normalized Ratio (INR) interpretive data on the final report was identical for Warfarin therapy and non-Warfarin therapy.<br><br>b.  The Senior Vice President confirmed the above finding on 9/22/15 at approximately 4:45 pm. | D5805 | D5805 (continued):<br>The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue.<br><br>The new lab director has approved enhanced reporting procedures that require the technical supervisor to verify that interpretive information is accurate and to obtain approval from the lab director or clinical consultant before any updates are implemented.<br><br>The lab will provide oversight through monthly QA meetings, and will also monitor compliance through its improved occurrence management, and audit procedures. | |
| D5821 | 493.1291(k) TEST REPORT<br><br>When errors in the reported patient test results are detected, the laboratory must do the following:<br>(k)(1) Promptly notify the authorized person ordering the test and, if applicable, the individual using the test results of reporting errors.<br>(k)(2) Issue corrected reports promptly to the authorized person ordering the test and, if applicable, the individual using the test results.<br>(k)(3) Maintain duplicates of the original report, as | D5821 | D5821:<br>The new lab director has approved enhanced procedures to address correcting potential errors in patient reports.  These procedures require that the person ordering the test is promptly notified after the lab determines that a correction is required. | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  71 of 121

Confidential

THPFM0004755155

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  05D2025714 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  **THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE  **7333 GATEWAY BLVD**  **NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5821 | Continued From page 71 well as the corrected report. This STANDARD is not met as evidenced by: Based on review of patient test reports and interview with the technical supervisor, the laboratory failed to notify the authorized person for approximately seven weeks after the surveyor identified a quality control problem with Prothrombin Time/International Normalized Ratio (PT/INR). Findings include:  a.  Refer to D6093.  b.  Five of thirteen final patient reports reviewed showed corrected reports were faxed between 11/11/15 and 11/15/15.  c.  Eight of thirteen final patient reports reviewed did not show documentation that the authroized person was notified when an error in patient test results was detected.  d.  81 PT/INR patient test results were reported from 4/1/15 through 9/16/15.  e.  The technical supervisor stated that all authorized persons were notified of the error in PT/INR results, including those without documentation. | D5821 | D5821 (continued): The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue.  The lab will provide oversight through monthly QA meetings, and will also monitor compliance through its improved occurrence management and audit procedures. | |
| D6076 | 493.1441 LABORATORY DIRECTOR  The laboratory must have a director who meets the qualification requirements of §493.1443 of this subpart and provides overall management and direction in accordance with §493.1445 of this subpart.  This CONDITION is not met as evidenced by: Based on the number and severity of the | D6076 | D6076: The laboratory has completed assessments to identify any patients affected or having the potential to be affected by the issues identified in this observation, and has taken corrective and preventative action. Among other things, the lab has hired a new lab | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page 72 of 121

Confidential

Trial Exh. 5257 Page 0086

THPFM0004755156

**ER-1917**

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  05D2025714 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE  7333 GATEWAY BLVD  NEWARK, CA  94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6076 | Continued From page 72<br><br>deficiencies cited herein, the Condition: Laboratories performing high complexity testing; laboratory director was not met.  The laboratory director failed to ensure that appropriate personnel were responsible for the quality control (QC) and quality assessment (QA) programs (see D6079); failed to ensure that the freezer temperatures were appropriate for storage of specimens and reference materials (see D6083); failed to ensure the methodologies selected provided quality results (see D6085); failed to ensure the verification procedures were adequate (see D6086); failed to ensure that the QC programs (see D6093) and QA programs (see D6094) are established and maintained; failed to ensure that the final patient test reports included appropriate interpretation information for PT/INR (see D6098); and failed to ensure that all personnel were appropriately trained (see D6102). | D6076 | D6076 (continued)<br>director and established improved quality systems and related procedures addressing the issues identified in this observation.  (D6079, D6083, D6085, D6086, D6093, D6094, D6102). | |
| D6079 | 493.1445(a)(b) LABORATORY DIRECTOR RESPONSIBILITIES<br><br>The laboratory director is responsible for the overall operation and administration of the laboratory, including the employment of personnel who are competent to perform test procedures, record and report test results promptly, accurately and proficiently, and for assuring compliance with the applicable regulations.<br>(a) The laboratory director, if qualified, may perform the duties of the technical supervisor, clinical consultant, general supervisor, and testing personnel, or delegate these responsibilities to personnel meeting the qualifications under 493.1447, 493.1453, 493.1459, and 493.1487 respectively.<br>(b) If the laboratory director reapportions | D6079 | D6079<br>The lab directors during the period covered by the survey no longer hold any position with the lab.  The new lab director was hired after the on-site survey had been completed.<br><br>The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue.<br><br>The new lab director is responsible for the lab's QA program and has approved enhanced quality systems and related procedures, including | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete        Event ID: W34211        Facility ID: CA22046272        If continuation sheet Page  73 of 121

THPFM0004755157

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 05D2025714 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED 11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| THERANOS INC | 7333 GATEWAY BLVD NEWARK, CA 94560 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6079 | Continued From page 73<br><br>performance of his or her responsibilities, he or she remains responsible for ensuring that all duties are properly performed.<br>This STANDARD is not met as evidenced by:<br>Based on the Plan of Correction (POC) from the 12/3/2013 recertification survey and review of quality control (QC) and quality assessment (QA) documentation and the Laboratory Personnel Report (CMS-209), the laboratory director (LD) failed to ensure that the laboratory's QC and QA programs were delegated to a qualified technical supervisor (TS). Findings include:<br><br>a.   The POC from the laboratory's 12/3/2013 recertification survey stated that a QA/QC Manager was hired and began employment on 12/10/13.<br><br>b.   The QA/QC Manager stated on 9/23/15 and again on 11/19/15 that evaluating and monitoring the QA and QC programs was solely the QA/QC Manager's responsibility.<br><br>c.   The QA/QC Manager was not listed on the CMS-209 forms dated 9/19/15, 9/23/15, or 11/15/15 in any capacity.<br><br>d.   The QA/QC Manager was not qualified to oversee and maintain the QC and QA programs. | D6079 | D6079 (continued)<br>revised QC procedures to ensure the appropriate supervisors are involved in review of quality metrics. The lab has conducted training on those procedures. The new lab director is the technical supervisor for chemistry, hematology, and immunohematology. During the survey, CMS determined that Technical Supervisor #3 was qualified in bacteriology, mycology, virology, and diagnostic immunology. These technical supervisors are now responsible for QC assessments in their respective specialties.<br><br>The lab will ensure that the new lab director is effective in overseeing compliance with these procedures through audits performed pursuant to the lab's new audit procedures, through oversight during monthly QA meetings, and through use of a new on-site visit log that records the lab director's time spent physically in the lab. | |
| D6083 | 493.1445(e)(2) LABORATORY DIRECTOR RESPONSIBILITIES<br><br>The laboratory director must ensure that the physical plant and environmental conditions of the laboratory are appropriate for the testing performed.<br>This STANDARD is not met as evidenced by:<br>Based on review of temperature documentation | D6083 | D6083<br>The lab directors during the period covered by the survey no longer hold any position with the lab. The new lab director was hired after the on-site survey had been completed. | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page 74 of 121

Confidential                                                                                              THPFM0004755158

Trial Exh. 5257 Page 0088

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br><br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>**THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE<br>**7333 GATEWAY BLVD**<br>**NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6083<br><br><br><br><br>D6085 | Continued From page 74<br>and interview with the Director of Assay Systems, the laboratory director failed to ensure that the freezer temperatures were appropriate for storage of reference materials and patient specimens.  Refer to D5413 and D5791.<br>493.1445(e)(3) LABORATORY DIRECTOR RESPONSIBILITIES<br><br>The laboratory director must ensure that the test methodologies selected have the capability of providing the quality of results required for patient care.<br>This STANDARD  is not met as evidenced by:<br> Based on review of validation documents on the Theranos Proprietary System (TPS), the laboratory director failed to ensure that the quality of results on the TPS; failed to ensure the establishment of performance specifications followed the laboratory's procedures to establish accuracy, precision, reportable range, and/or reference range. Findings include:<br><br>a.   Validations Reports for Vitamin D (VitD), Total T3 (TT3), Human Chorionic Gonadotropin (HCG), and Sex Hormone Binding Globulin (SHBG) were reviewed.<br><br>b.   The laboratory presented the procedure, CL PLN-14003 Revision A, "Master Validation Plan for Routine Chemistry Assays on Theranos Devices", when the surveyor requested their procedure for establishing performance specifications.<br><br>c.   VitD, HCG, and SHBG validation reports included "Theranos-corrected" results without an explanation as to how the "Theranos Result" was corrected or which result was reported. | D6083<br><br><br><br><br>D6085 | D6083 (continued)<br>A review of hourly data demonstrated that average hourly temperature for nearly all of the freezers at issue met the manufacturer temperature requirements for the materials stored. The lab has identified and discarded any materials that had the potential to have been affected. The lab has also completed an assessment to identify any patients affected or having the potential to be affected by this issue.<br><br>The lab will ensure that the new lab director effectively implements and monitors lab procedures, including temperature management procedures, through oversight during monthly QA meetings, through audits performed pursuant to the lab's new audit procedures, and through use of a new on-site visit log that records the lab director's time spent physically in the lab.<br><br>This improved oversight will ensure that the new lab director implements the lab's enhanced temperature management procedures, which reinforce the proper monitoring of temperature and environmental conditions and the storage of materials according to the manufacturer's temperature range. | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  75 of 121

Confidential                                                                    THPFM0004755159

Trial Exh. 5257 Page 0089

**ER-1920**

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br><br>**11/20/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>**THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE<br>**7333 GATEWAY BLVD**<br>**NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6083<br><br><br><br><br><br>D6085 | Continued From page 74<br>and interview with the Director of Assay Systems, the laboratory director failed to ensure that the freezer temperatures were appropriate for storage of reference materials and patient specimens.  Refer to D5413 and D5791.<br>493.1445(e)(3) LABORATORY DIRECTOR RESPONSIBILITIES<br><br>The laboratory director must ensure that the test methodologies selected have the capability of providing the quality of results required for patient care.<br>This STANDARD  is not met as evidenced by:<br> Based on review of validation documents on the Theranos Proprietary System (TPS), the laboratory director failed to ensure that the quality of results on the TPS; failed to ensure the establishment of performance specifications followed the laboratory's procedures to establish accuracy, precision, reportable range, and/or reference range. Findings include:<br><br>a.   Validations Reports for Vitamin D (VitD), Total T3 (TT3), Human Chorionic Gonadotropin (HCG), and Sex Hormone Binding Globulin (SHBG) were reviewed.<br><br>b.   The laboratory presented the procedure, CL PLN-14003 Revision A, "Master Validation Plan for Routine Chemistry Assays on Theranos Devices", when the surveyor requested their procedure for establishing performance specifications.<br><br>c.   VitD, HCG, and SHBG validation reports included "Theranos-corrected" results without an explanation as to how the "Theranos Result" was corrected or which result was reported. | D6083<br><br><br><br><br>D6085 | D6083 (continued)<br>The lab has conducted training on those procedures<br><br><br>D6085<br>The lab directors during the period covered by the survey no longer hold any position with the lab. The new lab director was hired after the on-site survey had been completed.<br><br>The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue.<br><br>The lab will ensure that the new lab director effectively implements and monitors lab procedures, including verification and validation procedures, through oversight during monthly QA meetings, through audits performed pursuant to the lab's new audit procedures, and through use of a new on-site visit log that records the lab director's time spent physically in the lab.<br><br>This improved oversight will ensure that the new lab director implements the lab's enhanced procedures for method verification. Before any | <br><br><br><br>2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete        Event ID: W34211        Facility ID: CA22046272        If continuation sheet Page  75 of 121

Confidential        THPFM0004755160

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:

05D2025714 | (X2) MULTIPLE CONSTRUCTION
A. BUILDING _____
B. WING _____ | (X3) DATE SURVEY COMPLETED

11/20/2015 |

| NAME OF PROVIDER OR SUPPLIER

**THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE

**7333 GATEWAY BLVD**
**NEWARK, CA  94560** |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6085 | Continued From page 75

d.   Accuracy for VitD, TT3, HCG, and SHBG was not determined following CL PLN-14003.

e.   Precision for VitD, TT3, and SHBG was not determined following CL PLN-14003.

f.   Reportable range data for VitD, TT3, and SHBG was not determined following CL PLN-14003.

g.   Percent (%) Recovery did not meet the laboratory's accetable criteria for VitD, TT3, and SHBG.

h.   Allowable Bias did not meet the laboratory's acceptable criteria for VitD, TT3, and SHBG.

i.   Refer to D6115. | D6085 | D6085 (continued)
verification studies are performed, these improved procedures require the lab director's review and approval of a detailed method verification plan containing defined acceptance criteria. The lab director must also review and approve the verification report before any patient testing begins. The lab has conducted training on those procedures.

The lab will ensure that the new lab director also implements enhanced validation procedures, which will include review processes and acceptance criteria similar to the improved method verification procedures, along with other required procedures. Relevant lab personnel will receive training and competency on those procedures to ensure that practice is consistent with them. | |
| D6086 | 493.1445(e)(3)(ii) LABORATORY DIRECTOR RESPONSIBILITIES

The laboratory director must ensure that verification procedures used are adequate to determine the accuracy, precision, and other pertinent performance characteristics of the method.
This STANDARD  is not met as evidenced by:
1.  Based on laboratory personnel interview and establishment of vitamin B12 performance specifications record review on September 22, 2015, the laboratory director failed to ensure that verification procedures used were adequate to determine pertinent performance characteristics for the laboratory's vitamin B12 testing methods.
Findings included:

a.   A review of the laboratory's vitamin B12 | D6086 | | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  76 of 121

Confidential

THPFM0004755161

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE<br>7333 GATEWAY BLVD<br>NEWARK, CA 94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6085 | Continued From page 75<br><br>d.   Accuracy for VitD, TT3, HCG, and SHBG was not determined following CL PLN-14003.<br><br>e.   Precision for VitD, TT3, and SHBG was not determined following CL PLN-14003.<br><br>f.    Reportable range data for VitD, TT3, and SHBG was not determined following CL PLN-14003.<br><br>g.   Percent (%) Recovery did not meet the laboratory's accetable criteria for VitD, TT3, and SHBG.<br><br>h.   Allowable Bias did not meet the laboratory's acceptable criteria for VitD, TT3, and SHBG.<br><br>i.    Refer to D6115. | D6085 | (continued; see above) | |
| D6086 | 493.1445(e)(3)(ii) LABORATORY DIRECTOR RESPONSIBILITIES<br><br>The laboratory director must ensure that verification procedures used are adequate to determine the accuracy, precision, and other pertinent performance characteristics of the method.<br>This STANDARD  is not met as evidenced by:<br>1.  Based on laboratory personnel interview and establishment of vitamin B12 performance specifications record review on September 22, 2015, the laboratory director failed to ensure that verification procedures used were adequate to determine pertinent performance characteristics for the laboratory's vitamin B12 testing methods. Findings included:<br><br>a.   A review of the laboratory's vitamin B12 | D6086 | D6086 #1<br>The lab directors during the period covered by the survey no longer hold any position with the lab.  The new lab director was hired after the on-site survey had been completed.<br><br>The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue. | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page 76 of 121

Confidential

THPFM0004755162

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  05D2025714 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE  7333 GATEWAY BLVD  NEWARK, CA  94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6086 | Continued From page 76  establishment of performance specifications document  indicated that the laboratory obtained an allowable bias greater than the laboratory's criteria for acceptability.  When asked to explain this discrepant result, upon close examination, laboratory personnel indicated that there was an error in the written information provided and reviewed.  The laboratory was able to provided corrected data and appropriate supporting documents.  b.   In spite of the erroneous information included in the vitamin B12 establishment of performance specifications document provided during this survey for review on September 22, 2015, laboratory records indicated that eleven people from the laboratory's staff approved this document between August 5, 2014 and September 19, 2015 without recognizing the document error.  2.   Based on laboratory personnel interviews and establishment of performance specifications policies and procedures record review on September 22, 2015, the laboratory director failed to ensure that verification procedures used are adequate to determine the accuracy, precision, and other pertinent performance characteristics of the laboratory's Advia 1800 testing methods. Findings included:  a.   It was the practice of the laboratory to use the Siemens Advia 1800 to perform and report patient routine chemistry serum testing.  Examples of analytes the laboratory tested using the Advia 1800 included ALT, BUN, calcium, glucose, and sodium.  b.   According to the laboratory's protocol titled | D6086 | D6086 #1 (continued)  The lab will ensure that the new lab director effectively implements and monitors lab procedures, including verification and validation procedures, through oversight during monthly QA meetings, through audits performed pursuant to the lab's new audit procedures, and through use of a new on-site visit log that records the lab director's time spent physically in the lab.  This improved oversight will ensure that the new lab director implements the lab's enhanced procedures for method verification. Before any verification studies are performed, these improved procedures require the lab director's review and approval of a detailed method verification plan containing defined acceptance criteria. The lab director must also review and approve the verification report before any patient testing begins. The lab has conducted training on those procedures.  The lab will ensure that the new lab director also implements enhanced validation procedures, which will include review processes and acceptance criteria similar to the improved method verification | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  77 of 121

Confidential

THPFM0004755163

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>**11/20/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>**THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE<br><br>**7333 GATEWAY BLVD**<br>**NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6086 | Continued From page 76<br>establishment of performance specifications document  indicated that the laboratory obtained an allowable bias greater than the laboratory's criteria for acceptability.  When asked to explain this discrepant result, upon close examination, laboratory personnel indicated that there was an error in the written information provided and reviewed.  The laboratory was able to provided corrected data and appropriate supporting documents.<br><br>b.   In spite of the erroneous information included in the vitamin B12 establishment of performance specifications document provided during this survey for review on September 22, 2015, laboratory records indicated that eleven people from the laboratory's staff approved this document between August 5, 2014 and September 19, 2015 without recognizing the document error.<br><br>2.   Based on laboratory personnel interviews and establishment of performance specifications policies and procedures record review on September 22, 2015, the laboratory director failed to ensure that verification procedures used are adequate to determine the accuracy, precision, and other pertinent performance characteristics of the laboratory's Advia 1800 testing methods. Findings included:<br><br>a.   It was the practice of the laboratory to use the Siemens Advia 1800 to perform and report patient routine chemistry serum testing.  Examples of analytes the laboratory tested using the Advia 1800 included ALT, BUN, calcium, glucose, and sodium.<br><br>b.   According to the laboratory's protocol titled | D6086 | D6086 #1 (continued)<br>procedures, along with the other required procedures. Relevant lab personnel will receive training and competency on those procedures to ensure that practice is consistent with them.<br><br><br><br><br><br>D6086 #2<br>The lab directors during the period covered by the survey no longer hold any position with the lab.  The new lab director was hired after the on-site survey had been completed.<br><br>The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue.<br><br>The lab will ensure that the new lab | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  77 of 121

Confidential                                                        THPFM0004755164

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  05D2025714 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE  7333 GATEWAY BLVD  NEWARK, CA  94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6086 | Continued From page 77 "Master Validation Plan for Routine Chemistry Assays on Theranos Devices," "for establishing the trueness or comparability of two procedures. . .at least 50% of samples should be outside the reference interval."  c.   A review of the test results used by the laboratory to establish "the trueness or comparability of two procedures" for ALT, BUN, calcium, glucose, and sodium testing using the Advia 1800 showed that the laboratory did not follow its established protocol and use "at least 50% of samples. . .outside the reference interval."  i.    For a validation document dated April 2, 2015, ALT test results used to establish "the trueness or comparability of two procedures" for tests performed using the Advia 1800, 6 of 110 ALT test results used were outside the laboratory's reference interval.  ii.    For a validation document dated April 21, 2015, BUN test results used to establish "the trueness or comparability of two procedures" for tests performed using the Advia 1800, 1 of 109 BUN test result used was outside the laboratory's reference interval.  iii.    For a validation document dated April 21, 2015, calcium test results used to establish "the trueness or comparability of two procedures" for tests performed using the Advia 1800, 1 of 110 calcium test result used was outside the laboratory's reference interval.  iv.    For a validation document dated April 21, 2015, glucose test results used to establish "the trueness or comparability of two procedures" for tests performed using the Advia 1800, 6 of 110 | D6086 | D6086 #2 (continued) director effectively implements and monitors lab procedures, including verification and validation procedures, through oversight during monthly QA meetings, through audits performed pursuant to the lab's new audit procedures, and through use of a new on-site visit log that records the lab director's time spent physically in the lab.  This improved oversight will ensure that the new lab director implements the lab's enhanced procedures for method verification. Before any verification studies are performed, these improved procedures require the lab director's review and approval of a detailed method verification plan containing defined acceptance criteria. The lab director must also review and approve the verification report before any patient testing begins. The lab has conducted training on those procedures.  The lab will ensure that the new lab director also implements enhanced validation procedures, which will nclude review processes and acceptance criteria similar to the improved method verification | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page 78 of 121

Confidential

THPFM0004755165

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE<br>7333 GATEWAY BLVD<br>NEWARK, CA  94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6086 | Continued From page 78<br>glucose test results used were outside the laboratory's reference interval.<br><br>v.   For a validation document dated April 1, 2015, sodium test results used to establish "the trueness or comparability of two procedures" for tests performed using the Advia 1800, 1 of 113 sodium test result used was outside the laboratory's reference interval.<br><br>3.   Based on laboratory personnel interviews and establishment of performance specifications record review on November 17, 2015, the laboratory director failed to ensure that ALT, BUN, calcium, glucose, and sodium verification procedures used were adequate to determine the precision of the laboratory's Advia 1800 testing methods.  Findings included:<br><br>a.   It was the practice of the laboratory to use the Siemens Advia 1800 to perform and report patient routine chemistry serum testing.  Examples of analytes the laboratory tested using the Advia 1800 included ALT, BUN, calcium, glucose, and sodium.<br><br>b.   A review of laboratory documents establishing performance specifications for ALT, BUN, calcium, glucose, and sodium performed using the Advia 1800 indicated that the coefficient of variation (CV) determined by the laboratory's testing differed from the CV established by the manufacturer.<br><br>i.   For ALT, based on a laboratory document dated April 2, 2015, the laboratory determined ALT Advia 1800 CV's between 2.0 - 5.5.  The manufacturer's established ALT CV's were between 1.6 - 3.1. | D6086 | D6086 #2 (continued)<br>procedures, along with the other required procedures. Relevant lab personnel will receive training and competency on those procedures to ensure that practice is consistent with them.<br><br>D6086 #3<br>The lab directors during the period covered by the survey no longer hold any position with the lab.  The new lab director was hired after the on-site survey had been completed.<br><br>The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue.<br><br>The lab will ensure that the new lab director effectively implements and monitors lab procedures, including verification and validation procedures, through oversight during monthly QA meetings, through audits performed pursuant to the lab's new audit procedures, and through use of a new on-site visit log that records the lab director's time spent physically in the lab.<br><br>This improved oversight will ensure | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete                Event ID: W34211                Facility ID: CA22046272                If continuation sheet Page  79 of 121

Confidential

THPFM0004755166

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|
| | **05D2025714** | A. BUILDING _____<br>B. WING _____ | **11/20/2015** |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| **THERANOS INC** | **7333 GATEWAY BLVD**<br>**NEWARK, CA  94560** |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6086 | Continued From page 79<br><br>ii.   For BUN, based on a laboratory document dated April 21, 2015, the laboratory determined BUN Advia 1800 CV's between 2.1 - 2.7.  The manufacturer's established BUN CV's were between 1.7 - 2.4.<br><br>iii.   For calcium, based on a laboratory document dated April 21, 2015, the laboratory determined calcium Advia 1800 CV's between 2.0 - 3.6.  The manufacturer's established calcium CV's were between 0.8 - 2.1.<br><br>iv.   For glucose, based on a laboratory document dated April 21, 2015, the laboratory determined glucose Advia 1800 CV's between 1.5 - 2.2.  The manufacturer's established glucose CV's were between 0.7 - 0.9.<br><br>v.   For sodium, based on a laboratory document dated April 1, 2015, the laboratory determined sodium Advia 1800 CV's between 1.2 - 1.3.  The manufacturer's established sodium CV's were between 0.6 - 1.1.<br><br>c.   The laboratory provided no written explanation/investigation as to why the laboratory obtained CV's for ALT, BUN, calcium, glucose, and sodium using the Advia 1800 that were greater than the CV's established by the manufacturer.  Laboratory records indicated that these laboratory documents were approved by the laboratory director on September 19, 2015.<br><br>4.   Based on laboratory personnel interviews and establishment of performance specifications record review on November 17, 2015, the laboratory director failed to ensure that ALT, BUN, calcium, and glucose verification procedures | D6086 | D6086 #3 (continued)<br>that the new lab director implements the lab's enhanced procedures for method verification.  Before any verification studies are performed, these improved procedures require the lab director's review and approval of a detailed method verification plan containing defined acceptance criteria. The lab director must also review and approve the verification report before any patient testing begins. The lab has conducted training on those procedures.<br><br>The lab will ensure that the new lab director also implements enhanced validation procedures, which will include review processes and acceptance criteria similar to the improved method verification procedures, along with the other required procedures. Relevant lab personnel will receive training and competency on those procedures to ensure that practice is consistent with them.<br><br>D6086 #4<br>The lab directors during the period covered by the survey no longer hold any position with the lab.  The new | 2/12/16 |

Confidential

THPFM0004755167

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE<br>7333 GATEWAY BLVD<br>NEWARK, CA  94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6086 | Continued From page 80<br><br>used were adequate to determine pertinent performance characteristics, such as reference range, of the laboratory's Advia 1800 testing methods.  Findings included:<br><br>a.   It was the practice of the laboratory to use the Siemens Advia 1800 to perform and report patient routine chemistry serum testing.  Examples of analytes the laboratory tested using the Advia 1800 included ALT, BUN, calcium, and glucose.<br><br>b.   A review of laboratory documents establishing performance specifications for ALT, BUN, calcium, and glucose performed using the Advia 1800 indicated that the reference range determined by the laboratory's testing differed from the reference range on the laboratory's test reports.<br><br>i.    For ALT, based on a laboratory document dated April 2, 2015, the laboratory determined the ALT Advia 1800 reference range as 0 - 52 U/L. However, the laboratory's reference range on the test reports was 8 - 41 U/L.<br><br>ii.   For BUN, based on a laboratory document dated April 21, 2015, the laboratory determined the BUN Advia 1800 reference range as 5.3 - 22.5 mg/dL.  However, the laboratory's reference range on the test reports was 6 - 24 mg/dL.<br><br>iii.  For calcium, based on a laboratory document dated April 21, 2015, the laboratory determined the calcium Advia 1800 reference range as 8.18 - 10.3 mg/dL.  However, the laboratory's reference range on the test reports was 8.3 - 10.6 mg/dL.<br><br>iv.   For glucose, based on a laboratory document dated April 21, 2015, the laboratory determined | D6086 | D6068 #4 (continued)<br>lab director was hired after the on-site survey had been completed.<br><br>The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue.<br><br>The lab will ensure that the new lab director effectively implements and monitors lab procedures, including verification and validation procedures, through oversight during monthly QA meetings, through audits performed pursuant to the lab's new audit procedures, and through use of a new on-site visit log that records the lab director's time spent physically in the lab.<br><br>This improved oversight will ensure that the new lab director implements the lab's enhanced procedures for method verification. Before any verification studies are performed, these improved procedures require the lab director's review and approval of a detailed method verification plan containing defined acceptance criteria. | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  81 of 121

Confidential

THPFM0004755168

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  05D2025714 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  **THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE  **7333 GATEWAY BLVD**  **NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6086 | Continued From page 81  the glucose Advia 1800 reference range as 64.0 - 112.3 mg/dL.  However, the laboratory's reference range on the test reports was 73 - 99 mg/dL.  c.   The laboratory provided no written explanation/investigation as to why the laboratory obtained reference ranges for ALT, BUN, calcium, and glucose were different than than the reference ranges indicated on the test reports.. Laboratory records indicated that these laboratory documents were approved by the laboratory director on September 19, 2015.  5.   Based on laboratory personnel interviews and complete blood counts (CBC) verification of method specifications record review on November 19, 2015, the laboratory director failed to ensure that verification procedures used were adequate to determine the accuracy, precision, and other pertinent performance characteristics for the two Siemens Advia 2120i instruments. Findings included:  a.   It was the practice of the laboratory to test patient venous CBC specimens using two Siemens Advia 2120i instruments, designated as #1 and #2.  b.   Although the laboratory maintained verification of test performance specifications documents for the two Advia 2120i instruments, the laboratory maintained no documentation to indicate that verification results for the two instruments were acceptable to the laboratory, no evidence that the laboratory director had reviewed and approved the verification documents, and no date the verification documents were reviewed and approved. | D6086 | D6068 #4 (continued)  The lab director must also review and approve the verification report before any patient testing begins. The lab has conducted training on those procedures.  Any update to a reference range is reviewed and approved by the lab director or a clinical consultant, and the lab has procedures to ensure that data on patient reports are consistent with established reference ranges. In addition, the lab will ensure that the new lab director also implements enhanced validation procedures, which will include review processes and acceptance criteria similar to the improved method verification procedures, along with the other required procedures. Relevant lab personnel will receive training and competency on those procedures to ensure that practice is consistent with them. | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  82 of 121

Confidential

THPFM0004755169

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE<br>7333 GATEWAY BLVD<br>NEWARK, CA  94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6086 | Continued From page 81<br>the glucose Advia 1800 reference range as 64.0 - 112.3 mg/dL. However, the laboratory's reference range on the test reports was 73 - 99 mg/dL.<br><br>c.   The laboratory provided no written explanation/investigation as to why the laboratory obtained reference ranges for ALT, BUN, calcium, and glucose were different than than the reference ranges indicated on the test reports.. Laboratory records indicated that these laboratory documents were approved by the laboratory director on September 19, 2015.<br><br>5.   Based on laboratory personnel interviews and complete blood counts (CBC) verification of method specifications record review on November 19, 2015, the laboratory director failed to ensure that verification procedures used were adequate to determine the accuracy, precision, and other pertinent performance characteristics for the two Siemens Advia 2120i instruments. Findings included:<br><br>a.   It was the practice of the laboratory to test patient venous CBC specimens using two Siemens Advia 2120i instruments, designated as #1 and #2.<br><br>b.   Although the laboratory maintained verification of test performance specifications documents for the two Advia 2120i instruments, the laboratory maintained no documentation to indicate that verification results for the two instruments were acceptable to the laboratory, no evidence that the laboratory director had reviewed and approved the verification documents, and no date the verification documents were reviewed and approved. | D6086 | D6086 #5<br>The lab directors during the period covered by the survey no longer hold any position with the lab.  The new lab director was hired after the on-site survey had been completed.<br><br>The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue.<br><br>The lab will ensure that the new lab director effectively implements and monitors lab procedures, including verification procedures, through oversight during monthly QA meetings, through audits performed pursuant to the lab's new audit | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  82 of 121

Confidential                                                                                                   THPFM0004755170

Trial Exh. 5257 Page 0100

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>**11/20/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>**THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE<br>**7333 GATEWAY BLVD**<br>**NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6086 | Continued From page 82<br><br>c.   Between February 2015 and September 21, 2015, the laboratory performed and reported 2,395 patient CBC test results using the Advia 2120i #1.  From November 6, 2015 to November 19, 2015, the laboratory performed and reported 67 patient CBC test results using the Advia 2120i #2.<br><br>6.   Based on review of documentation, lack of documentation, observation and interview with the general supervisor, the laboratory director failed to ensure that the laboratory determined the mean normal prothrombin time (MNPT) prior to implementing a new lot number of Innovin (thromboplastin) on the Siemens BCS XP. Findings include:<br><br>a.   Dade Innovin (thromboplastin) lot number 539280 was put into use in March 2015.<br><br>b.   The test system required that the MNPT (in seconds) be calculated for each new lot number of Innovin.<br><br>c.   The MNPT specific to the lot number of Innovin was to be entered into the BCS XP.<br><br>d.   The MNPT was observed on 9/23/15 at approximately 3:25 pm revealed the correct MNPT was entered into the BCS XP.<br><br>e.   Review of the MNPT data revealed that the MNPT data was performed on 9/18/15.<br><br>f.   The general supervisor stated that there should be date from March 2015; however, the documentation could not be located. | D6086 | D6068 #5 (continued) procedures, and through use of a new on-site visit log that records the lab director's time spent physically in the lab.<br><br>This improved oversight will ensure that the new lab director implements the lab's enhanced procedures for method verification.  Before any verification studies are performed, these improved procedures require the lab director's review and approval of a detailed method verification plan containing defined acceptance criteria. The lab director must also review and approve the verification report before any patient testing begins. The lab has conducted training on those procedures. | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  83 of 121

Confidential

Trial Exh. 5257 Page 0101

THPFM0004755171

**ER-1932**

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|
| | 05D2025714 | A. BUILDING _____ <br> B. WING _____ | 11/20/2015 |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| THERANOS INC | 7333 GATEWAY BLVD <br> NEWARK, CA  94560 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6086 | Continued From page 82 <br><br> c.   Between February 2015 and September 21, 2015, the laboratory performed and reported 2,395 patient CBC test results using the Advia 2120i #1.  From November 6, 2015 to November 19, 2015, the laboratory performed and reported 67 patient CBC test results using the Advia 2120i #2. <br><br> 6.   Based on review of documentation, lack of documentation, observation and interview with the general supervisor, the laboratory director failed to ensure that the laboratory determined the mean normal prothrombin time (MNPT) prior to implementing a new lot number of Innovin (thromboplastin) on the Siemens BCS XP. Findings include: <br><br> a.   Dade Innovin (thromboplastin) lot number 539280 was put into use in March 2015. <br><br> b.   The test system required that the MNPT (in seconds) be calculated for each new lot number of Innovin. <br><br> c.   The MNPT specific to the lot number of Innovin was to be entered into the BCS XP. <br><br> d.   The MNPT was observed on 9/23/15 at approximately 3:25 pm revealed the correct MNPT was entered into the BCS XP. <br><br> e.   Review of the MNPT data revealed that the MNPT data was performed on 9/18/15. <br><br> f.   The general supervisor stated that there should be date from March 2015; however, the documentation could not be located. | D6086 | D6068 #6: <br> The lab directors during the period covered by the survey no longer hold any position with the lab. The new lab director was hired after the on-site survey had been completed. <br><br> This PT/INR issue related to one reagent lot. The lab paused testing on the Siemens BCS XP, including PT/INR, during the survey. The lab has also completed an assessment to identify any patients affected or having the potential to be affected by this issue. <br><br> The lab will ensure that the new lab director effectively implements and monitors lab procedures, including reagent qualification and management procedures, through oversight during monthly QA meetings, through audits performed pursuant to the lab's new audit procedures, and through use | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  83 of 121

Confidential

THPFM0004755172

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>**11/20/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>**THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE<br>**7333 GATEWAY BLVD**<br>**NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6093<br>D6093 | Continued From page 83<br>493.1445(e)(5) LABORATORY DIRECTOR RESPONSIBILITIES<br><br>The laboratory director must ensure that the quality control programs are  established and maintained to assure the quality of laboratory services provided and to identify failures in quality as they occur.<br>This STANDARD  is not met as evidenced by:<br>1.   Based on laboratory personnel interviews, direct observations, and quality control document reviews, the laboratory director failed to ensure that quality control programs were established and maintained to assure the quality of laboratory services provided and to identify failures in quality as they occur.  The laboratory director failed to ensure that the laboratory included two quality control materials at least once each day patient specimens were examined (see D5447), the laboratory included a positive control material at least once each day patient specimens were assayed (see D5449), stated values of commercially assayed quality control materials were verified (see D5469), each batch of media was checked for its ability to support growth (see D5477), results of quality control materials met the laboratory's criteria for acceptability (see D5481), and the laboratory followed established quality control corrective action protocols (see D5779).<br><br>2.   Based on review of the prothrombin time/international normalized ratio (PT/INR) procedure, quality control (QC) records and interview with the general supervisor, the laboratory director failed to ensure that the QC for PT/INR was acceptable prior to reporting patient results and failed to identify that the QC data revealed a shift greater than 2 standard | D6093<br>D6093 | D6086 #6 (continued)<br>of a new on-site visit log that records the lab director's time spent physically in the lab.<br><br>The lab's enhanced procedures for reagent qualification and management include procedures to ensure manufacturer inserts are reviewed. Training on these procedures has occurred.<br><br>Before PT/INR testing resumes, the lab will also ensure that the new lab director prepares and implements a revised assay-specific procedure for PT/INR to reinforce that the Mean Normal Prothrombin Time (MNPT) must be calculated for each new lot number of Innovin.  The relevant testing personnel will be required to demonstrate competency to ensure that practice is consistent with these procedures. | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  84 of 121

Confidential

THPFM0004755173

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  05D2025714 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE  7333 GATEWAY BLVD  NEWARK, CA  94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6093 D6093 | Continued From page 83  493.1445(e)(5) LABORATORY DIRECTOR RESPONSIBILITIES  The laboratory director must ensure that the quality control programs are  established and maintained to assure the quality of laboratory services provided and to identify failures in quality as they occur.  This STANDARD  is not met as evidenced by:  1.   Based on laboratory personnel interviews, direct observations, and quality control document reviews, the laboratory director failed to ensure that quality control programs were established and maintained to assure the quality of laboratory services provided and to identify failures in quality as they occur.  The laboratory director failed to ensure that the laboratory included two quality control materials at least once each day patient specimens were examined (see D5447), the laboratory included a positive control material at least once each day patient specimens were assayed (see D5449), stated values of commercially assayed quality control materials were verified (see D5469), each batch of media was checked for its ability to support growth (see D5477), results of quality control materials met the laboratory's criteria for acceptability (see D5481), and the laboratory followed established quality control corrective action protocols (see D5779).  2.   Based on review of the prothrombin time/international normalized ratio (PT/INR) procedure, quality control (QC) records and interview with the general supervisor, the laboratory director failed to ensure that the QC for PT/INR was acceptable prior to reporting patient results and failed to identify that the QC data revealed a shift greater than 2 standard | D6093 D6093 | D6093 #1  The lab directors during the period covered by the survey no longer hold any position with the lab. The new lab director was hired after the on-site survey had been completed.  The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue.  The lab will ensure that the new lab director effectively implements and monitors lab procedures, including the lab's improved quality systems and related procedures, through oversight during monthly QA meetings, through audits performed pursuant to the lab's new audit procedures, and through use of a new on-site visit log that records the lab director's time spent physically in the lab.  D6093 #2  The lab directors during the period covered by the survey no longer hold any position with the lab. The new lab director was hired after the on-site survey had been completed. | 2/12/16  2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page 84 of 121

Confidential

THPFM0004755174

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>**THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE<br>**7333 GATEWAY BLVD**<br>**NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6093 | Continued From page 84<br>deviations (SD) from April 2015 through September 2015. Findings include:<br><br>a.  CL SOP-10001 Revision A, "Measuring Prothrombin Time-Innovin (PT on the Siemens BCS XP Instrument" stated on page 6, section 8.6 that if control values are outside of the determined range, the controls, reagents and instrument performance should be checked and that identification and correction of the problem shoud be documented prior to reporting patient results.<br><br>b.  QC records for Citrol 3 (Lot number 548425) were reviewed from 4/1/15 through 9/23/15.<br><br>c.  The general supervisor stated that QC was acceptable if the values were +/- 2 SD from the mean.<br><br>d.  From April 1, 2015 through September 16, 2015, 32 of 69 days showed Citrol 3 QC values were greater than 2 SD (- 2 SD) below the mean.<br><br>e.  On 4/7/15, Citrol 3 was run six times before an acceptable QC value was obtained.<br><br>f.  On 9/7/15, Citrol 3 was run seven times without obtaining an acceptable QC value.<br><br>g.  On 9/8/15, Citrol 3 was run twelve times without obtaining an acceptable QC value.<br><br>h.  On 25 of 32 days, Citrol 3 was not retrun when the QC value was greater than - 2 SD.<br><br>i.  On 5/15/15, 8/13/15, 8/21/15 and 9/10/15, Citrol 3 was run twice. All QC results were unacceptable. | D6093 | D6093 #2 (continued)<br>In addition, the lab paused testing on the Siemens BCS XP, including PT/INR, during the survey. The lab has also completed an assessment to identify any patients affected or having the potential to be affected by this issue.<br><br>The lab will ensure that the new lab director effectively implements and monitors lab procedures, including QC procedures, through oversight during monthly QA meetings, through audits performed pursuant to the lab's new audit procedures, and through use of a new on-site visit log that records the lab director's time spent physically in the lab.<br><br>This improved oversight will ensure that the new lab director implements the lab's enhanced QC procedures, which reinforce and detail the required investigation and corrective action that must occur to address QC issues before patient tests are performed and clarify which employees are responsible for performing and documenting these activities. The lab has conducted training and competency testing on those procedures to ensure that practice is consistent with them. | |

Confidential

Trial Exh. 5257 Page 0105

THPFM0004755175

**ER-1936**

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  05D2025714 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  **11/20/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  **THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE  **7333 GATEWAY BLVD**  **NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6093 | Continued From page 85  j.   TheRule Check report revealed that 13 of 13 QC values in April 2015, 2 of 17 in May 2015, 7 of 7 in June 2015; 13 of 13 in July 2015, 16 of 16 in August and 24 of 24 9/1-9/16 2015 showed rule violation messages related to Citrol 3.  k.   On approximately 9/16/15, the labortory adjusted the acceptable range for Citrol 3 to match the data.  This change was implemented without any investigation as to the reason for the shift in control values.  l.   81 patients were reported from 4/1/15 through 9/16/15. | D6093 | | |
| D6094 | 493.1445(e)(5) LABORATORY DIRECTOR RESPONSIBILITIES  The laboratory director must ensure that the quality assessment programs are established and maintained to assure the quality of laboratory services provided and to identify failures in quality as they occur.  This STANDARD  is not met as evidenced by:  1.  Based on laboratory personnel interviews, direct observations, and quality control document reviews, the laboratory director failed to ensure that quality assessment programs were established and maintained to assure the quality of laboratory services provided and to identify failures in quality as they occur.  The laboratory director failed to ensure that preanalytic (see D5391 and D5393) and analytic (see D5791 and D5793) systems quality assessment programs were established, followed, and effective.  2.   Based on review of documentation and lack of documentation, the laboratory director failed to | D6094 | D6094 #1:  The lab directors during the period covered by the survey no longer hold any position with the lab. The new lab director was hired after the on-site survey had been completed.  The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue.  The new lab director is responsible for the lab's QA program and has approved enhanced quality systems and related procedures concerning pre-analytic, analytic, and post-analytic issues (see D5391, D5393, D5791, and D5793). | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  86 of 121

Confidential

THPFM0004755176

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br>**THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE<br>**7333 GATEWAY BLVD**<br>**NEWARK, CA 94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6093 | Continued From page 85<br><br>j.   TheRule Check report revealed that 13 of 13 QC values in April 2015, 2 of 17 in May 2015, 7 of 7 in June 2015; 13 of 13 in July 2015, 16 of 16 in August and 24 of 24 9/1-9/16 2015 showed rule violation messages related to Citrol 3.<br><br>k.   On approximately 9/16/15, the labortory adjusted the acceptable range for Citrol 3 to match the data.  This change was implemented without any investigation as to the reason for the shift in control values.<br><br>l.   81 patients were reported from 4/1/15 through 9/16/15. | D6093 | D6094 #1 (continued)<br>The lab will ensure that the new lab director effectively implements and monitors these procedures through audits performed pursuant to the lab's new audit procedures, through oversight during monthly QA meetings, and through use of a new on-site visit log that records the lab director's time spent physically in the lab. | |
| D6094 | 493.1445(e)(5) LABORATORY DIRECTOR RESPONSIBILITIES<br><br>The laboratory director must ensure that the quality assessment programs are established and maintained to assure the quality of laboratory services provided and to identify failures in quality as they occur.<br>This STANDARD  is not met as evidenced by:<br> 1.  Based on laboratory personnel interviews, direct observations, and quality control document reviews, the laboratory director failed to ensure that quality assessment programs were established and maintained to assure the quality of laboratory services provided and to identify failures in quality as they occur.  The laboratory director failed to ensure that preanalytic (see D5391 and D5393) and analytic (see D5791 and D5793) systems quality assessment programs were established, followed, and effective.<br><br> 2.   Based on review of documentation and lack of documentation, the laboratory director failed to | D6094 | D 6094 #2:<br>The lab directors during the period covered by the survey no longer | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete        Event ID: W34211        Facility ID: CA22046272        If continuation sheet Page  86 of 121

Confidential

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|---|
| | 05D2025714 | A. BUILDING _____<br>B. WING _____ | | 11/20/2015 |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| THERANOS INC | 7333 GATEWAY BLVD<br>NEWARK, CA 94560 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6094 | Continued From page 86<br>identify failures in Prothrombin Time/International Normalized Ratio (PT/INR) testing which affected the quality of the PT/INR patient results. Findings include:<br><br>a.   The Dada Innovin (thromboplastin) reagent was used past the expiration date. Refer to D5413.<br><br>b.   The quality control data from 4/1/2015 through 9/16/15 revealed that patient results above normal were biased low (i.e., reported value was lower than it should have been reported).<br><br>c.   The target INR value for patients on Warfarin therapy was 2-3.<br><br>d.   81 patients were reported from 4/1/15 through 9/21/15.<br><br>e.   44 of 81 patients had INRs greater than or equal to 2 reported and of the 44, 16 of the 44 had INR greater than or equal to 3 reported.<br><br>f.   There was no quality assessment (QA) or other documentation to indicate that the PT/INR failure had been identified and corrected. | D6094 | D6094 #2 (continued)<br>hold any position with the lab. The new lab director was hired after the on-site survey had been completed.<br><br>In addition, the lab paused testing on the Siemens BCS XP, including PT/INR, during the survey. The lab has also completed an assessment to identify any patients affected or having the potential to be affected by this issue.<br><br>The lab will ensure that the new lab director effectively implements and monitors lab procedures, including QC procedures, through oversight during monthly QA meetings, through audits performed pursuant to the lab's new audit procedures,  and through use of a new on-site visit log that records the lab director's time spent physically in the lab. | |
| D6098 | 493.1445(e)(8) LABORATORY DIRECTOR RESPONSIBILITIES<br><br>The laboratory director must ensure that reports of test results include pertinent information required for interpretation.<br>This STANDARD  is not met as evidenced by:<br> Based on review of final test reports and interview with the Senior Vice President, the laboratory director failed to ensure that the | D6098 | This improved oversight will ensure that the new lab director implements the lab's enhanced QC procedures, which reinforce and detail the required investigation and corrective action that must occur to address QC issues before  patient tests are performed, and clarify which employees are responsible for performing and | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  87 of 121

Confidential

THPFM0004755178

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 05D2025714 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED 11/20/2015 |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER

**THERANOS INC**

STREET ADDRESS, CITY, STATE, ZIP CODE

**7333 GATEWAY BLVD
NEWARK, CA 94560**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6094 | Continued From page 86 identify failures in Prothrombin Time/International Normalized Ratio (PT/INR) testing which affected the quality of the PT/INR patient results. Findings include: a. The Dada Innovin (thromboplastin) reagent was used past the expiration date. Refer to D5413. b. The quality control data from 4/1/2015 through 9/16/15 revealed that patient results above normal were biased low (i.e., reported value was lower than it should have been reported). c. The target INR value for patients on Warfarin therapy was 2-3. d. 81 patients were reported from 4/1/15 through 9/21/15. e. 44 of 81 patients had INRs greater than or equal to 2 reported and of the 44, 16 of the 44 had INR greater than or equal to 3 reported. f. There was no quality assessment (QA) or other documentation to indicate that the PT/INR failure had been identified and corrected. | D6094 | D6094 #2 (continued) documenting these activities. The lab has conducted training and competency testing on those procedures to ensure that practice is consistent with them. | |
| D6098 | 493.1445(e)(8) LABORATORY DIRECTOR RESPONSIBILITIES The laboratory director must ensure that reports of test results include pertinent information required for interpretation. This STANDARD is not met as evidenced by: Based on review of final test reports and interview with the Senior Vice President, the laboratory director failed to ensure that the | D6098 | D6098 The lab directors during the period covered by the survey no longer hold any position with the lab. The new lab director was hired after the on-site survey had been completed. The lab revised its patient reports for PT/INR during the survey so that the | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete     Event ID: W34211     Facility ID: CA22046272     If continuation sheet Page 87 of 121

Confidential

Trial Exh. 5257 Page 0109

**ER-1940**

THPFM0004755179

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>**11/20/2015** |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>**THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE<br><br>**7333 GATEWAY BLVD<br>NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6098<br><br><br><br><br><br>D6102 | Continued From page 87<br>interpretive data on the Prothrombin Time/International Normalized Ratio (PT/INR) final reports was clear to differentiate between Warfarin therapy and non-Warfarin therapy. Refer to D5805.<br>493.1445(e)(12) LABORATORY DIRECTOR RESPONSIBILITIES<br><br>The laboratory director must ensure that prior to testing patients' specimens, all personnel have the appropriate education and experience, receive the appropriate training for the type and complexity of the services offered, and have demonstrated that they can perform all testing operations reliably to provide and report accurate results.<br>This STANDARD  is not met as evidenced by:<br> Based on review of training documents and interview with the QA/QC (Quality Assurance/Quality Control) Manager, technical supervisor and testing personnel, the laboratory failed to document training of testing personnel on the Theranos Proprietary System (TPS) prior to patient testing and failed to document training in the vacutainer laboratory of testing personnel prior to patient testing. Findings include:<br><br>a.   Theranos Proprietary System (TSP)<br><br>i.   The QA/QC Manager and technical supervisor stated that all training documentation was kept in each testing person's employee file.<br><br>ii.   Eleven testing personnel files were reviewed.<br><br>iii.   Eight of eleven personnel files did not include any documentation of training on the TPS prior to running and reporting patient test results. | D6098<br><br><br><br><br><br>D6102 | D6098 (continued)<br>interpretive note appears only under the heading for patients under therapy. The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue.<br><br>The new lab director has approved revised reporting procedures that require the technical supervisor to verify that interpretive information is accurate and to obtain approval from the lab director or clinical consultant before any updates are implemented.<br><br>The lab will ensure that the new lab director effectively implements and monitors these procedures through audits performed pursuant to the lab's new audit procedures, through oversight during monthly QA meetings, and through use of a new on-site visit log that records the lab director's time spent physically in the lab.<br><br>(D6102 begins on next page) | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  88 of 121

Confidential

THPFM0004755180

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 17, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Amy Mason Saharia
AMY MASON SAHARIA

April 17, 2023