No. 22-10312

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ELIZABETH A. HOLMES

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 5:18-CR-00258
Hon. Edward J. Davila

## EXCERPTS OF RECORD
### VOL. VIII of LVII | ER-1943 to ER-2234

JOHN D. CLINE
LAW OFFICE OF JOHN D. CLINE
  600 Stewart Street
  Suite 400
  Seattle, WA 98101
  (360) 320-6435

KEVIN M. DOWNEY
LANCE A. WADE
AMY MASON SAHARIA
KATHERINE A. TREFZ
WILLIAMS & CONNOLLY LLP
  680 Maine Ave. S.W.
  Washington, D.C. 200024
  (202) 434-5000
  asaharia@wc.com

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|---|
| | 05D2025714 | A. BUILDING _____ <br> B. WING _____ | | 11/20/2015 |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| THERANOS INC | 7333 GATEWAY BLVD <br> NEWARK, CA  94560 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6098 | Continued From page 87 <br><br> interpretive data on the Prothrombin Time/International Normalized Ratio (PT/INR) final reports was clear to differentiate between Warfarin therapy and non-Warfarin therapy. Refer to D5805. | D6098 | | |
| D6102 | 493.1445(e)(12) LABORATORY DIRECTOR RESPONSIBILITIES <br><br> The laboratory director must ensure that prior to testing patients' specimens, all personnel have the appropriate education and experience, receive the appropriate training for the type and complexity of the services offered, and have demonstrated that they can perform all testing operations reliably to provide and report accurate results. <br> This STANDARD  is not met as evidenced by: <br> Based on review of training documents and interview with the QA/QC (Quality Assurance/Quality Control) Manager, technical supervisor and testing personnel, the laboratory failed to document training of testing personnel on the Theranos Proprietary System (TPS) prior to patient testing and failed to document training in the vacutainer laboratory of testing personnel prior to patient testing. Findings include: <br><br> a.   Theranos Proprietary System (TSP) <br><br> i.   The QA/QC Manager and technical supervisor stated that all training documentation was kept in each testing person's employee file. <br><br> ii.   Eleven testing personnel files were reviewed. <br><br> iii.   Eight of eleven personnel files did not include any documentation of training on the TPS prior to running and reporting patient test results. | D6102 | D6102 <br> The lab directors during the period covered by the survey no longer hold any position with the lab. The new lab director was hired after the on-site survey had been completed. <br><br> The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue. <br><br> The new lab director has approved enhanced procedures to ensure that testing personnel are qualified, have received training, and are competent before performing any test on any instrument, and to ensure that those qualifications, training, and competency are documented. Training on these procedures has occurred to ensure the practice is consistent with them. <br><br> The lab will ensure that the new lab director effectively implements and monitors lab procedures, including personnel procedures, through audits performed pursuant to the lab's new | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete        Event ID: W34211        Facility ID: CA22046272        If continuation sheet Page  88 of 121

Confidential

THPFM0004755181

Trial Exh. 5257 Page 0111

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|---|
| | 05D2025714 | A. BUILDING _____<br>B. WING _____ | | 11/20/2015 |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| THERANOS INC | 7333 GATEWAY BLVD<br>NEWARK, CA  94560 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6102 | Continued From page 88<br><br>b.   Venipuncture Laboratory<br><br>a.   The QA/QC Manager and technical supervisor stated that all training documentation was kept in each testing person's employee file.<br><br>b.   Three testing personnel files were reviewed.<br><br>c.   Testing Person #6 (TP6) training records did not include documentation for the Siemens XPT, Advia 2120i, Eldon Card, and were incomplete for the Centaur, IRIS, BC SXP and Cellavision.<br><br>d.   TP6 stated that training had not been completed as of 9/23/15; however PT6 had been running and reporting patient test results since April 2015.  TP6 also stated that activities listed on the training documentation which were not signed off were performed by TP6, but training had not occurred.<br><br>e.   TP6 confirmed the above findings on 9/23/15 at approximately 3:30 pm.<br><br>f.   Testing Person #11 (TP11) training records did not include documentation for the Advia, Immulite, BC SXP, Advia 2120i, Centaur, MacroVu RPR, Multispot HIV, and Diasorin Liaison.<br><br>g.   TP6 stated that TP11 ran and reported patient test results from these systems.<br><br>h.   Testing Person #31 (TP31)'s training documentation included documents on critical values and critical values logsheets.  No other training documentation was found. | D6102 | D6102 (continued)<br>audit procedures, through oversight during monthly QA meetings, and through use of a new on-site visit log that records the lab director's time spent physically in the lab. | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  89 of 121

Confidential

THPFM0004755182

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 05D2025714 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| THERANOS INC | 7333 GATEWAY BLVD  NEWARK, CA  94560 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6102 | Continued From page 89  i.    The general supervisor stated that TP31 had been running and releasing patient test results.  j.    The general supervisor confirmed that the training documents were missing or incomplete for three of three testing personnel on 11/19/15 at 11:40 am. | D6102 | | |
| D6108 | 493.1447 LABORATORY TECHNICAL SUPERVISOR  The laboratory must have a technical supervisor who meets the qualification requirements of §493.1449 of this subpart and provides technical supervision in accordance with §493.1451 of this subpart.  This CONDITION  is not met as evidenced by:  Based on the number and severity of the deficiencies cited herein, the Condition: Laboratories performing high complexity testing; technical supervisor was not met.  Two of three technical supervisors failed to meet the training or experience requirement in one or more specialties/subspecialties (see D6111), and the technical supervisors failed to ensure the establishment of performance specifications for the Theranos Proprietary System (TPS) were complete and followed the laboratory's procedure (see D6115). | D6108 | D6108  The lab has corrected this issue by ensuring that all of its technical supervisors meet the training and experience requirements.  The new lab director is the technical supervisor for chemistry, hematology, and immunohematology. CMS already qualified the lab's other technical supervisor for microbiology and diagnostic immunology.  TS1 and TS2 are no longer technical supervisors for the lab.  It is worth noting, however, that CMS qualified TS1 as a technical supervisor for chemistry and found that TS1 was just months away from qualifying for hematology and immunology.  In addition, TS2 is still endeavoring to obtain documents from TS2's former employers to show the requisite experience.  The lab has completed an assessment to identify any patients affected or | 2/12/16 |
| D6111 | 493.1449 TECHNICAL SUPERVISOR QUALIFICATIONS  (a) The technical supervisor must possess a current license issued by the State in which the laboratory is located, if such licensing is required; and  (b) The laboratory may perform anatomic and clinical laboratory procedures and tests in all | D6111 | | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  90 of 121

Confidential

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  05D2025714 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE  7333 GATEWAY BLVD  NEWARK, CA  94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6102 | Continued From page 89  i.    The general supervisor stated that TP31 had been running and releasing patient test results.  j.    The general supervisor confirmed that the training documents were missing or incomplete for three of three testing personnel on 11/19/15 at 11:40 am. | D6102 | D6108 (continued) having the potential to be affected by this issue (see 06111, 06115). | |
| D6108 | 493.1447 LABORATORY TECHNICAL SUPERVISOR  The laboratory must have a technical supervisor who meets the qualification requirements of §493.1449 of this subpart and provides technical supervision in accordance with §493.1451 of this subpart.  This CONDITION  is not met as evidenced by: Based on the number and severity of the deficiencies cited herein, the Condition: Laboratories performing high complexity testing; technical supervisor was not met.  Two of three technical supervisors failed to meet the training or experience requirement in one or more specialties/subspecialties (see D6111), and the technical supervisors failed to ensure the establishment of performance specifications for the Theranos Proprietary System (TPS) were complete and followed the laboratory's procedure (see D6115). | D6108 | The new lab director has approved enhanced policies and procedures governing personnel qualification and defining, among other things, the education and experience requirements for a technical supervisor (see 06111).  The new lab director has also approved enhanced procedures related to the establishment of performance specifications (see 06115).  The lab has conducted training on these procedures to ensure that its practice is consistent with them (see 06111 and 06115).  In addition, the lab has improved its quality systems and procedures— including quality assurance review, monitoring, and audits—to prevent recurrence (see 06111 and 06115). | |
| D6111 | 493.1449 TECHNICAL SUPERVISOR QUALIFICATIONS  (a) The technical supervisor must possess a current license issued by the State in which the laboratory is located, if such licensing is required; and (b) The laboratory may perform anatomic and clinical laboratory procedures and tests in all | D6111 | (D6111 begins on next page) | |

FORM CMS-2567(02-99) Previous Versions Obsolete       Event ID: W34211       Facility ID: CA22046272       If continuation sheet Page  90 of 121

Confidential

THPFM0004755184

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br>THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE<br>7333 GATEWAY BLVD<br>NEWARK, CA 94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6102 | Continued From page 89<br><br>i.   The general supervisor stated that TP31 had been running and releasing patient test results.<br><br>j.   The general supervisor confirmed that the training documents were missing or incomplete for three of three testing personnel on 11/19/15 at 11:40 am. | D6102 | | |
| D6108 | 493.1447 LABORATORY TECHNICAL SUPERVISOR<br><br>The laboratory must have a technical supervisor who meets the qualification requirements of §493.1449 of this subpart and provides technical supervision in accordance with §493.1451 of this subpart.<br><br>This CONDITION  is not met as evidenced by:  Based on the number and severity of the deficiencies cited herein, the Condition: Laboratories performing high complexity testing; technical supervisor was not met.  Two of three technical supervisors failed to meet the training or experience requirement in one or more specialties/subspecialties (see D6111), and the technical supervisors failed to ensure the establishment of performance specifications for the Theranos Proprietary System (TPS) were complete and followed the laboratory's procedure (see D6115). | D6108 | | |
| D6111 | 493.1449 TECHNICAL SUPERVISOR QUALIFICATIONS<br><br>(a) The technical supervisor must possess a current license issued by the State in which the laboratory is located, if such licensing is required; and<br>(b) The laboratory may perform anatomic and clinical laboratory procedures and tests in all | D6111 | D6111<br> The lab has corrected this issue by ensuring that all of its technical supervisors meet the training and experience requirements. The new lab director is the technical supervisor for chemistry, hematology, and | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  90 of 121

Confidential

THPFM0004755185

ER-1948

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  05D2025714 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE  7333 GATEWAY BLVD  NEWARK, CA  94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6111 | Continued From page 90  specialties and subspecialties of services except histocompatibility and clinical cytogenetics services provided the individual functioning as the technical supervisor--  (b)(1) Is a doctor of medicine or doctor of osteopathy licensed to practice medicine or osteopathy in the State in which the laboratory is located; and  (b)(2) Is certified in both anatomic and clinical pathology by the American Board of Pathology or the American Osteopathic Board of Pathology or Possesses qualifications that are equivalent to those required for such certification.  (c) If the requirements of paragraph (b) of this section are not met and the laboratory performs tests in the subspecialty of bacteriology, the individual functioning as the technical supervisor must--  (c)(1)(i) Be a doctor of medicine or doctor of osteopathy licensed to practice medicine or osteopathy in the State in which the laboratory is located; and  (c)(1)(ii) Be certified in clinical pathology by the American Board of Pathology or the American Osteopathic Board of Pathology or possess qualifications that are equivalent to those required for such certification; or  (c)(2)(i) Be a doctor of medicine, doctor of osteopathy, or doctor of podiatric medicine licensed to practice medicine, osteopathy, or podiatry in the State in which the laboratory is located; and  (c)(2)(ii) Have at least one year of laboratory training or experience, or both, in high complexity testing within the specialty of microbiology with a minimum of 6 months experience in high complexity testing within the subspecialty of bacteriology; or | D6111 | D6111 (continued) immunohematology. CMS already qualified the lab's other technical supervisor for microbiology and diagnostic immunology.  TS1 and TS2 are no longer technical supervisors for the lab. It is worth noting, however, that CMS qualified TS1 as a technical supervisor for chemistry and found that she was just months away from qualifying for hematology and immunology. In addition, TS2 is still endeavoring to obtain documents from his former employers to show that he has the requisite experience (see 06111).  The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue (see 06111, 06115).  The new lab director has approved enhanced policies and procedures governing personnel qualification and defining, among other things, the education and experience requirements for a technical supervisor (see 06111). The new lab director has also approved enhanced procedures related to the | |

FORM CMS-2567(02-99) Previous Versions Obsolete        Event ID: W34211        Facility ID: CA22046272        If continuation sheet Page  91 of 121

Confidential

THPFM0004755186

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|
| | 05D2025714 | A. BUILDING _____  B. WING _____ | 11/20/2015 |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| THERANOS INC | 7333 GATEWAY BLVD  NEWARK, CA  94560 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6111 | Continued From page 91  (c)(3)(i) Have an earned doctoral degree in a chemical, physical, biological or clinical laboratory science from an accredited institution; and  (c)(3)(ii) Have at least 1 year of laboratory training or experience, or both, in high complexity testing within the specialty of microbiology with a minimum of 6 months experience in high complexity testing within the subspecialty of bacteriology; or  (c)(4)(i) Have earned a master's degree in a chemical, physical, biological or clinical laboratory science or medical technology from an accredited institution; and  (c)(4)(ii) Have at least 2 years of laboratory training or experience, or both, in high complexity testing within the specialty of microbiology with a minimum of 6 months experience in high complexity testing within the subspecialty of bacteriology; or  (c)(5)(i) Have earned a bachelor's degree in a chemical, physical, or biological science or medical technology from an accredited institution; and  (c)(5)(ii) Have at least 4 years of laboratory training or experience, or both, in high complexity testing within the specialty of microbiology with a minimum of 6 months experience in high complexity testing within the subspecialty of bacteriology.  (d) If the requirements of paragraph (b) of this section are not met and the laboratory performs tests in the subspecialty of mycobacteriology, the individual functioning as the technical supervisor must--  (d)(1)(i) Be a doctor of medicine or doctor of osteopathy licensed to practice medicine or osteopathy in the State in which the laboratory is located; and | D6111 | D6111 (continued) establishment of performance specifications (see 06115).  The lab has conducted training on these procedures to ensure that its practice is consistent with them (see 06111 and 06115).  In addition, the lab has improved its quality systems and procedures— including quality assurance review, monitoring, and audits—to prevent recurrence (see 06111 and 06115). | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page 92 of 121

Confidential

THPFM0004755187

Trial Exh. 5257 Page 0117

**ER-1950**

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE<br>7333 GATEWAY BLVD<br>NEWARK, CA  94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6111 | Continued From page 92<br><br>(d)(1)(ii) Be certified in clinical pathology by the American Board of Pathology or the American Osteopathic Board of Pathology or possess qualifications that are equivalent to those required for such certification; or<br>(d)(2)(i) Be a doctor of medicine, doctor of osteopathy, or doctor or podiatric medicine licensed to practice medicine, osteopathy, or podiatry in the State in which the laboratory is located; and<br>(d)(2)(ii) Have at least 1 year of laboratory training or experience, or both, in high complexity testing within the specialty of microbiology with a minimum of 6 months experience in high complexity testing within the subspecialty of mycobacteriology; or<br>(d)(3)(i) Have an earned doctoral degree in a chemical, physical, biological or clinical laboratory science from an accredited institution; and<br>(d)(3)(ii) Have at least 1 year of laboratory training or experience, or both, in high complexity testing within the specialty of microbiology with a minimum of 6 months experience in high complexity testing within the subspecialty of mycobacteriology; or<br>(d)(4)(i) Have earned a master's degree in a chemical, physical, biological or clinical laboratory science or medical technology from an accredited institution; and<br>(d)(4)(ii) Have at least 2 years of laboratory training or experience, or both, in high complexity testing within the specialty of microbiology with a minimum of 6 months experience in high complexity testing within the subspecialty of mycobacteriology; or<br>(d)(5)(i) Have earned a bachelor's degree in a chemical, physical or biological science or medical technology from an accredited institution; | D6111 | (continued; see above) | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  93 of 121

Confidential

THPFM0004755188

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|
| | 05D2025714 | A. BUILDING _____<br>B. WING _____ | 11/20/2015 |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| THERANOS INC | 7333 GATEWAY BLVD<br>NEWARK, CA 94560 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6111 | Continued From page 93<br>and<br>(d)(5)(ii) Have at least 4 years of laboratory training or experience, or both, in high complexity testing within the specialty of microbiology with a minimum of 6 months experience in high complexity testing within the subspecialty of mycobacteriology.<br>(e) If the requirements of paragraph (b) of this section are not met and the laboratory performs tests in the subspecialty of mycology, the individual functioning as the technical supervisor must--<br>(e)(1)(i) Be a doctor of medicine or doctor of osteopathy licensed to practice medicine or osteopathy in the State in which the laboratory is located; and<br>(e)(1)(ii) Be certified in clinical pathology by the American Board of Pathology or the American Osteopathic Board of Pathology or possess qualifications that are equivalent to those required for such certification; or<br>(e)(2)(i) Be a doctor of medicine, doctor of osteopathy, or doctor of podiatric medicine licensed to practice medicine, osteopathy, or podiatry in the State in which the laboratory is located; and<br>(e)(2)(ii) Have at least 1 year of laboratory training or experience, or both, in high complexity testing within the specialty of microbiology with a minimum of 6 months experience in high complexity testing within the subspecialty of mycology; or<br>(e)(3)(i) Have an earned doctoral degree in a chemical, physical, biological or clinical laboratory science from an accredited institution; and<br>(e)(3)(ii) Have at least 1 year of laboratory training or experience, or both in high complexity testing within the specialty of microbiology with a | D6111 | (continued; see above) | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page 94 of 121

Confidential          THPFM0004755189

Trial Exh. 5257 Page 0119

**ER-1952**

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE<br>7333 GATEWAY BLVD<br>NEWARK, CA  94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6111 | Continued From page 94<br>minimum of 6 months experience in high complexity testing within the subspecialty of mycology; or<br>(e)(4)(i) Have earned a master's degree in a chemical, physical, biological or clinical laboratory science or medical technology from an accredited institution; and<br>(e)(4)(ii) Have at least 2 years of laboratory training or experience, or both, in high complexity testing within the specialty of microbiology with a minimum of 6 months experience in high complexity testing within the subspecialty of mycology; or<br>(e)(5)(i) Have earned a bachelor's degree in a chemical, physical or biological science or medical technology from an accredited institution; and<br>(e)(5)(ii) Have at least 4 years of laboratory training or experience, or both, in high complexity testing within the specialty of microbiology with a minimum of 6 months experience in high complexity testing within the subspecialty of mycology.<br>(f) If the requirements of paragraph (b) of this section are not met and the laboratory performs tests in the subspecialty of parasitology, the individual functioning as the technical supervisor must--<br>(f)(1)(i) Be a doctor of medicine or a doctor of osteopathy licensed to practice medicine or osteopathy in the State in which the laboratory is located; and<br>(f)(1)(ii) Be certified in clinical pathology by the American Board of Pathology or the American Osteopathic Board of Pathology or possess qualifications that are equivalent to those required for such certification; or<br>(f)(2)(i) Be a doctor of medicine, doctor of | D6111 | (continued; see above) | |

FORM CMS-2567(02-99) Previous Versions Obsolete       Event ID: W34211       Facility ID: CA22046272       If continuation sheet Page  95 of 121

Confidential

THPFM0004755190

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br><br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE<br>7333 GATEWAY BLVD<br>NEWARK, CA  94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6111 | Continued From page 95<br>osteopathy, or doctor of podiatric medicine licensed to practice medicine, osteopathy, or podiatry in the State in which the laboratory is located; and<br>(f)(2)(ii) Have at least one year of laboratory training or experience, or both, in high complexity testing within the specialty of microbiology with a minimum of 6 months experience in high complexity testing within the subspecialty of parasitology;<br>(f)(3)(i) Have an earned doctoral degree in a chemical, physical, biological or clinical laboratory science from an accredited institution; and<br>(f)(3)(ii) Have at least 1 year of laboratory training or experience, or both, in high complexity testing within the specialty of microbiology with a minimum of 6 months experience in high complexity testing within the subspecialty of parasitology; or<br>(f)(4)(i) Have earned a master's degree in a chemical, physical, biological or clinical laboratory science or medical technology from an accredited institution; and<br>(f)(4)(ii) Have at least 2 years of laboratory training or experience, or both, in high complexity testing within the specialty of microbiology with a minimum of 6 months experience in high complexity testing within the subspecialty of parasitology; or<br>(f)(5)(i) Have earned a bachelor's degree in a chemical, physical or biological science or medical technology from an accredited institution; and<br>(f)(5)(ii) Have at least 4 years of laboratory training or experience, or both, in high complexity testing within the specialty of microbiology with a minimum of 6 months experience in high complexity testing within the subspecialty of | D6111 | (continued; see above) | |

| FORM CMS-2567(02-99) Previous Versions Obsolete | Event ID: W34211 | Facility ID: CA22046272 | If continuation sheet Page  96 of 121 |
|---|---|---|---|

Confidential

THPFM0004755191

ER-1954

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|---|
| | | A. BUILDING _____ | | |
| | 05D2025714 | B. WING _____ | | 11/20/2015 |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| THERANOS INC | 7333 GATEWAY BLVD NEWARK, CA 94560 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6111 | Continued From page 96 parasitology. (g) If the requirements of paragraph (b) of this section are not met and the laboratory performs tests in the subspecialty of virology, the individual functioning as the technical supervisor must-- (g)(1)(i) Be a doctor of medicine or doctor of osteopathy licensed to practice medicine or osteopathy in the State in which the laboratory is located; and (g)(1)(ii) Be certified in clinical pathology by the American Board of Pathology or the American Osteopathic Board of Pathology or possess qualifications that are equivalent to those required for such certification; or (g)(2)(i) Be a doctor of medicine, doctor of osteopathy, or doctor of podiatric medicine licensed to practice medicine, osteopathy, or podiatry in the State in which the laboratory is located; and (g)(2)(ii) Have at least 1 year of laboratory training or experience, or both, in high complexity testing within the specialty of microbiology with a minimum of 6 months experience in high complexity testing within the subspecialty of virology; or (g)(3)(i) Have an earned doctoral degree in a chemical, physical, biological or clinical laboratory science from an accredited institution; and (g)(3)(ii) Have at least 1 year of laboratory training or experience, or both, in high complexity testing within the specialty of microbiology with a minimum of 6 months experience in high complexity testing within the subspecialty of virology; or (g)(4)(i) Have earned a master's degree in a chemical, physical, biological or clinical laboratory science or medical technology from an accredited institution; and | D6111 | (continued; see above) | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page 97 of 121

Confidential

THPFM0004755192

Trial Exh. 5257 Page 0122

**ER-1955**

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  05D2025714 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE  7333 GATEWAY BLVD  NEWARK, CA  94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6111 | Continued From page 97<br><br>(g)(4)(ii) Have at least 2 years of laboratory training or experience, or both, in high complexity testing within the specialty of microbiology with a minimum of 6 months experience in high complexity testing within the subspecialty of virology; or<br>(g)(5)(i) Have earned a bachelor's degree in a chemical, physical or biological science or medical technology from an accredited institution; and<br>(g)(5)(ii) Have at least 4 years of laboratory training or experience, or both, in high complexity testing within the specialty of microbiology with a minimum of 6 months experience in high complexity testing within the subspecialty of virology.<br>(h) If the requirements of paragraph (b) of this section are not met and the laboratory performs tests in the specialty of diagnostic immunology, the individual functioning as the technical supervisor must-<br>(h)(1)(i) Be a doctor of medicine or a doctor of osteopathy licensed to practice medicine or osteopathy in the State in which the laboratory is located; and<br>(h)(1)(ii) Be certified in clinical pathology by the American Board of Pathology or the American Osteopathic Board of Pathology or possess qualifications that are equivalent to those required for such certification; or<br>(h)(2)(i) Be a doctor of medicine, doctor of osteopathy, or doctor of podiatric medicine licensed to practice medicine, osteopathy, or podiatry in the State in which the laboratory is located; and<br>(h)(2)(ii) Have at least 1 year of laboratory training or experience, or both, in high complexity testing for the specialty of diagnostic immunology; or | D6111 | (continued; see above) | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page 98 of 121

Confidential

THPFM0004755193

Trial Exh. 5257 Page 0123

**ER-1956**

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE<br>7333 GATEWAY BLVD<br>NEWARK, CA  94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6111 | Continued From page 98<br><br>(h)(3)(i) Have an earned doctoral degree in a chemical, physical, biological or clinical laboratory science from an accredited institution; and<br>(h)(3)(ii) Have at least 1 year of laboratory training or experience, or both, in high complexity testing within the specialty of diagnostic immunology; or<br>(h)(4)(i) Have earned a master's degree in a chemical, physical, biological or clinical laboratory science or medical technology from an accredited institution; and<br>(h)(4)(ii) Have at least 2 years of laboratory training or experience, or both, in high complexity testing for the specialty of diagnostic immunology; or<br>(h)(5)(i) Have earned a bachelor's degree in a chemical, physical or biological science or medical technology from an accredited institution; and<br>(h)(5)(ii) Have at least 4 years of laboratory training or experience, or both, in high complexity testing for the specialty of diagnostic immunology.<br>(i) If the requirements of paragraph (b) of this section are not met and the laboratory performs tests in the specialty of chemistry, the individual functioning as the technical supervisor must--<br>(i)(1)(i) Be a doctor of medicine or doctor of osteopathy licensed to practice medicine or osteopathy in the State in which the laboratory is located; and<br>(i)(1)(ii) Be certified in clinical pathology by the American Board of Pathology or the American Osteopathic Board of Pathology or possess qualifications that are equivalent to those required for such certification; or<br>(i)(2)(i) Be a doctor of medicine, doctor of osteopathy, or doctor of podiatric medicine licensed to practice medicine, osteopathy, or podiatry in the State in which the laboratory is | D6111 | (continued; see below) | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  99 of 121

Confidential

THPFM0004755194

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE<br>7333 GATEWAY BLVD<br>NEWARK, CA  94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6111 | Continued From page 99<br>located; and<br>(i)(2)(ii) Have at least 1 year of laboratory training or experience, or both, in high complexity testing for the specialty of chemistry; or<br>(i)(3)(i) Have an earned doctoral degree in a chemical, physical, biological or clinical laboratory science from an accredited institution; and<br>(i)(3)(ii) Have at least 1 year of laboratory training or experience, or both, in high complexity testing within the specialty of chemistry; or<br>(i)(4)(i) Have earned a master's degree in a chemical, physical, biological or clinical laboratory science or medical technology from an accredited institution; and<br>(i)(4)(ii) Have at least 2 years of laboratory training or experience, or both, in high complexity testing for the specialty of chemistry; or<br>(i)(5)(i) Have earned a bachelor's degree in a chemical, physical or biological science or medical technology from an accredited institution; and<br>(i)(5)(ii) Have at least 4 years of laboratory training or experience, or both, in high complexity testing for the specialty of chemistry.<br>(j) If the requirements of paragraph (b) of this section are not met and the laboratory performs tests in the specialty of hematology, the individual functioning as the technical supervisor must--<br>(j)(1)(i) Be a doctor of medicine or a doctor of osteopathy licensed to practice medicine or osteopathy in the State in which the laboratory is located; and<br>(j)(1)(ii) Be certified in clinical pathology by the American Board of Pathology or the American Osteopathic Board of Pathology or possess qualifications that are equivalent to those required for such certification; or<br>(j)(2)(i) Be a doctor of medicine, doctor of | D6111 | (continued; see above) | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  100 of 121

Confidential

THPFM0004755195

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  05D2025714 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE  7333 GATEWAY BLVD  NEWARK, CA 94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6111 | Continued From page 100  osteopathy, or doctor of podiatric medicine licensed to practice medicine, osteopathy, or podiatry in the State in which the laboratory is located; and  (j)(2)(ii) Have at least one year of laboratory training or experience, or both, in high complexity testing for the specialty of hematology (for example, physicians certified either in hematology or hematology and medical oncology by the American Board of Internal Medicine); or  (j)(3)(i) Have an earned doctoral degree in a chemical, physical, biological or clinical laboratory science from an accredited institution; and  (j)(3)(ii) Have at least 1 year of laboratory training or experience, or both, in high complexity testing within the specialty of hematology; or  (j)(4)(i) Have earned a master's degree in a chemical, physical, biological or clinical laboratory science or medical technology from an accredited institution; and  (j)(4)(ii) Have at least 2 years of laboratory training or experience, or both, in high complexity testing for the specialty of hematology; or  (j)(5)(i) Have earned a bachelor's degree in a chemical, physical or biological science or medical technology from an accredited institution; and  (j)(5)(ii) Have at least 4 years of laboratory training or experience, or both, in high complexity testing for the specialty of hematology.  (k)(1) If the requirements of paragraph (b) of this section are not met and the laboratory performs tests in the subspecialty of cytology, the individual functioning as the technical supervisor must--  (k)(1)(i) Be a doctor of medicine or a doctor of osteopathy licensed to practice medicine or osteopathy in the State in which the laboratory is located; and | D6111 | (continued; see above) | |

FORM CMS-2567(02-99) Previous Versions Obsolete        Event ID: W34211        Facility ID: CA22046272        If continuation sheet Page 101 of 121

Confidential

THPFM0004755196

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  05D2025714 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE  7333 GATEWAY BLVD  NEWARK, CA  94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6111 | Continued From page 101<br><br>(k)(1)(ii) Meet one of the following requirements--<br>(k)(1)(ii)(A) Be certified in anatomic pathology by the American Board of Pathology or the American Osteopathic Board of Pathology or possess qualifications that are equivalent to those required for such certification; or<br>(k)(1)(ii)(B) Be certified by the American Society of Cytology to practice cytopathology or possess qualifications that are equivalent to those required for such certification;<br>(l) If the requirements of paragraph (b) of this section are not met and the laboratory performs tests in the subspecialty of histopathology, the individual functioning as the technical supervisor must--<br>(l)(1) Meet one of the following requirements:<br>(l)(1)(i)(A) Be a doctor of medicine or a doctor of osteopathy licensed to practice medicine or osteopathy in the State in which the laboratory is located; and<br>(l)(1)(i)(B) Be certified in anatomic pathology by the American Board of Pathology or the American Osteopathic Board of Pathology or possess qualifications that are equivalent to those required for such certification;<br>(l)(1)(ii) An individual qualified under §493.1449(b) or paragraph (l)(1) of this section may delegate to an individual who is a resident in a training program leading to certification specified in paragraph (b) or (l)(1)(i)(B) of this section, the responsibility for examination and interpretation of histopathology specimens.<br>(l)(2) For tests in dermatopathology, meet one of the following requirements:<br>(l)(2)(i)(A) Be a doctor of medicine or doctor of osteopathy licensed to practice medicine or osteopathy in the State in which the laboratory is | D6111 | (continued; see above) | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page 102 of 121

Confidential

THPFM0004755197

| | | | | PRINTED: 01/25/2016 FORM APPROVED OMB NO. 0938-0391 |
|---|---|---|---|---|

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|
| | 05D2025714 | A. BUILDING _____ <br> B. WING _____ | 11/20/2015 |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| THERANOS INC | 7333 GATEWAY BLVD <br> NEWARK, CA 94560 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6111 | Continued From page 102 <br> located and-- <br> (l)(2)(i)(B) Meet one of the following requirements: <br> (l)(2)(i)(B)(1) Be certified in anatomic pathology by the American Board of Pathology or the American Osteopathic Board of Pathology or possess qualifications that are equivalent to those required for such certification; or <br> (l)(2)(i)(B)(2) Be certified in dermatopathology by the American Board of Dermatology and the American Board of Pathology or possess qualifications that are equivalent to those required for such certification; or <br> (l)(2)(i)(B)(3) Be certified in dermatology by the American Board of Dermatology or possess qualifications that are equivalent to those required for such certification; or <br> (l)(2)(ii) An individual qualified under §493.1449(b) or paragraph (l)(2)(i) of this section may delegate to an individual who is a resident in a training program leading to certification specified in paragraphs (b) or (l)(2)(i)(B) of this section, the responsibility for examination and interpretation of dermatopathology specimens. <br> (l)(3) For tests in ophthalmic pathology, meet one of the following requirements: <br> (l)(3)(i)(A) Be a doctor of medicine or doctor of osteopathy licensed to practice medicine or osteopathy in the State in which the laboratory is located and-- <br> (l)(3)(i)(B) Must meet one of the following requirements: <br> (l)(3)(i)(B)(1) Be certified in anatomic pathology by the American Board of Pathology or the American Osteopathic Board of Pathology or possess qualifications that are equivalent to those required for such certification; or <br> (l)(3)(i)(B)(2) Be certified by the American Board | D6111 | (continued; see above) | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page 103 of 121

Confidential

THPFM0004755198

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE<br>7333 GATEWAY BLVD<br>NEWARK, CA 94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6111 | Continued From page 103<br>of Ophthalmology or possess qualifications that are equivalent to those required for such certification and have successfully completed at least 1 year of formal post-residency fellowship training in ophthalmic pathology; or<br>(l)(3)(ii) An individual qualified under §493.1449(b) or paragraph (l)(3)(i) of this section may delegate to an individual who is a resident in a training program leading to certification specified in paragraphs (b) or (l)(3)(i)(B) of this section, the responsibility for examination and interpretation of ophthalmic specimens; or<br>(m) If the requirements of paragraph (b) of this section are not met and the laboratory performs tests in the subspecialty of oral pathology, the individual functioning as the technical supervisor must meet one of the following requirements:<br>(m)(1)(i) Be a doctor of medicine or a doctor of osteopathy licensed to practice medicine or osteopathy in the State in which the laboratory is located and--<br>(m)(1)(ii) Be certified in anatomic pathology by the American Board of Pathology or the American Osteopathic Board of Pathology or possess qualifications that are equivalent to those required for such certification; or<br>(m)(2) Be certified in oral pathology by the American Board of Oral Pathology or possess qualifications for such certification; or<br>(m)(3) An individual qualified under §493.1449(b) or paragraph (m)(1) or (2) of this section may delegate to an individual who is a resident in a training program leading to certification specified in paragraphs (b) or (m)(1) or (2) of this section, the responsibility for examination and interpretation of oral pathology specimens.<br>(n) If the requirements of paragraph (b) of this section are not met and the laboratory performs | D6111 | (continued; see above) | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page 104 of 121

Confidential

THPFM0004755199

Trial Exh. 5257 Page 0129

ER-1962

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  05D2025714 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  11/20/2015 |
| --- | --- | --- | --- |

| NAME OF PROVIDER OR SUPPLIER  THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE  7333 GATEWAY BLVD  NEWARK, CA  94560 |
| --- | --- |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
| --- | --- | --- | --- | --- |
| D6111 | Continued From page 104<br><br>tests in the specialty of radiobioassay, the individual functioning as the technical supervisor must--<br>(n)(1)(i) Be a doctor of medicine or a doctor of osteopathy licensed to practice medicine or osteopathy in the State in which the laboratory is located; and<br>(n)(1)(ii) Be certified in clinical pathology by the American Board of Pathology or the American Osteopathic Board of Pathology or possess qualifications that are equivalent to those required for such certification; or<br>(n)(2)(i) Be a doctor of medicine, doctor of osteopathy, or doctor of podiatric medicine licensed to practice medicine, osteopathy, or podiatry in the State in which the laboratory is located; and<br>(n)(2)(ii) Have at least 1 year of laboratory training or experience, or both, in high complexity testing for the specialty of radiobioassay; or<br>(n)(3)(i) Have an earned doctoral degree in a chemical, physical, biological or clinical laboratory science from an accredited institution; and<br>(n)(3)(ii) Have at least 1 year of laboratory training or experience, or both, in high complexity testing within the specialty of radiobioassay; or<br>(n)(4)(i) Have earned a master's degree in a chemical, physical, biological or clinical laboratory science or medical technology from an accredited institution; and<br>(n)(4)(ii) Have at least 2 years of laboratory training or experience, or both, in high complexity testing for the specialty of radiobioassay; or<br>(n)(5)(i) Have earned a bachelor's degree in a chemical, physical or biological science or medical technology from an accredited institution; and<br>(n)(5)(ii) Have at least 4 years of laboratory | D6111 | (continued; see above) | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  105 of 121

Confidential                                                                              THPFM0004755200

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 05D2025714 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED 11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE 7333 GATEWAY BLVD NEWARK, CA 94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6111 | Continued From page 105 training or experience, or both, in high complexity testing for the specialty of radiobioassay. (o) If the laboratory performs tests in the specialty of histocompatibility, the individual functioning as the technical supervisor must either-- (o)(1)(i) Be a doctor of medicine, doctor of osteopathy, or doctor of podiatric medicine licensed to practice medicine, osteopathy, or podiatry in the State in which the laboratory is located; and (o)(1)(ii) Have training or experience that meets one of the following requirements: (o)(1)(ii)(A) Have 4 years of laboratory training or experience, or both, within the specialty of histocompatibility; or (o)(1)(ii)(B)(1) Have 2 years of laboratory training or experience, or both, in the specialty of general immunology; and (o)(1)(ii)(B)(2) Have 2 years of laboratory training or experience, or both, in the specialty of histocompatibility; or (o)(2)(i) Have an earned doctoral degree in a biological or clinical laboratory science from an accredited institution; and (o)(2)(ii) Have training or experience that meets one of the following requirements: (o)(2)(ii)(A) Have 4 years of laboratory training or experience, or both, within the specialty of histocompatibility; or (o)(2)(ii)(B)(1) Have 2 years of laboratory training or experience, or both, in the specialty of general immunology; and (o)(2)(ii)(B)(2) Have 2 years of laboratory training or experience, or both, in the specialty of histocompatibility. (p) If the laboratory performs tests in the specialty of clinical cytogenetics, the individual functioning as the technical supervisor must-- | D6111 | (continued; see above) | |

| FORM CMS-2567(02-99) Previous Versions Obsolete | Event ID: W34211 | Facility ID: CA22046272 | If continuation sheet Page 106 of 121 |
|---|---|---|---|

Confidential

THPFM0004755201

ER-1964

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  05D2025714 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE  7333 GATEWAY BLVD  NEWARK, CA  94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6111 | Continued From page 106  (p)(1)(i) Be a doctor of medicine, doctor of osteopathy, or doctor of podiatric medicine licensed to practice medicine, osteopathy, or podiatry in the State in which the laboratory is located; and  (p)(1)(ii) Have 4 years of training or experience, or both, in genetics, 2 of which have been in clinical cytogenetics; or  (p)(2)(i) Hold an earned doctoral degree in a biological science, including biochemistry, or clinical laboratory science from an accredited institution; and  (p)(2)(ii) Have 4 years of training or experience, or both, in genetics, 2 of which have been in clinical cytogenetics.  (q) If the requirements of paragraph (b) of this section are not met and the laboratory performs tests in the specialty of immunohematology, the individual functioning as the technical supervisor must--  (q)(1)(i) Be a doctor of medicine or a doctor of osteopathy licensed to practice medicine or osteopathy in the State in which the laboratory is located; and  (q)(1)(ii) Be certified in clinical pathology by the American Board of Pathology or the American Osteopathic Board of Pathology or possess qualifications that are equivalent to those required for such certification; or  Note: The technical supervisor requirements for "laboratory training or experience, or both" in each specialty or subspecialty may be acquired concurrently in more than one of the specialties or subspecialties of service. For example, an individual, who has a doctoral degree in chemistry and additionally has documentation of 1 year of laboratory experience working concurrently in | D6111 | (continued; see above) | |

FORM CMS-2567(02-99) Previous Versions Obsolete      Event ID: W34211      Facility ID: CA22046272      If continuation sheet Page 107 of 121

Confidential

THPFM0004755202

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE<br>7333 GATEWAY BLVD<br>NEWARK, CA  94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6111 | Continued From page 107<br>high complexity testing in the specialties of microbiology and chemistry and 6 months of that work experience included high complexity testing in bacteriology, mycology, and mycobacteriology, would qualify as the technical supervisor for the specialty of chemistry and the subspecialties of bacteriology, mycology, and mycobacteriology.<br><br>This STANDARD  is not met as evidenced by:<br>Based on review of training documentation, two of three technical supervisors failed to have the required 4 years of training or experience, or both, in a specialty or subspecialty as required to qualify as a technical supervisor.  Findings include:<br><br>a.   Training documents from the personnel file for three technical supervisors were reviewed.<br><br>b.   Technical Supervisor #1 (TS1) and the QA/QC Manager stated that all training documentation was kept in the personnel file for each employee.<br><br>c.   TS1 was unable to provided documentation which showed 4 years of training and/or experience in high complexity testing for hematology or immunology.<br><br>d.   Technical Supervisor #2 (TS2) was unable to provided documentation which showed 4 years of training and/or experience in high complexity testing for hematology, chemistry or immunology.<br><br>e.   TS1 confirmed on 9/23/2015 at 10:30 am that the documentation did not show the required training or experience in immunology and hematology for TS1. | D6111 | (continued; see above) | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  108 of 121

Confidential

THPFM0004755203

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 05D2025714 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED 11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| THERANOS INC | 7333 GATEWAY BLVD NEWARK, CA 94560 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6111 | Continued From page 108 | D6111 | | |
| | f.    TS2 confirmed on 11/18/2015 at approximately 9:50 am that the documentation did not show the required training or experience in hematology, chemistry or immunology for TS2. | | | |
| D6115 | 493.1451(b)(2) TECHNICAL SUPERVISOR RESPONSIBILITIES | D6115 | D6115 The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue. | 2/12/16 |
| | The technical supervisor is responsible for verification of the test procedures performed and establishment of the laboratory's test performance characteristics, including the precision and accuracy of each test and test system. This STANDARD  is not met as evidenced by:  Based on review of validation documents on the Theranos Proprietary System (TPS), the technical supervisor failed to ensure that the validation procedures performed on the TPS established performance specifications for accuracy, precision, reportable range, and/or reference range and failed to ensure establishment of the performance specifications followed the laboratory's procedures.  Findings include: | | The lab's management, including the new lab director and newly appointed quality director, is responsible for ensuring that technical supervisors are effective in supervising method verification and validation procedures. The lab will further ensure that these procedures are effective through oversight during monthly QA meetings.  In addition, the lab will monitor the implementation of these procedures through audits performed pursuant to the lab's new audit procedures. | |
| | a.   Validations Reports for Vitamin D (VitD), Total T3 (TT3), Human Chorionic Gonadotropin (HCG), and Sex Hormone Binding Globulin (SHBG) were reviewed. | | | |
| | b.   The laboratory presented the procedure, CL PLN-14003 Revision A, "Master Validation Plan for Routine Chemistry Assays on Theranos Devices," when the surveyor requested their procedure for establishing performance specifications. | | | |
| | c.   VitD, HCG, and SHBG validation reports | | | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  109 of 121

Confidential

THPFM0004755204

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  05D2025714 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER  THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE  7333 GATEWAY BLVD  NEWARK, CA  94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6115 | Continued From page 109

included "Theranos-corrected" results without an explanation as to how the "Theranos Result" was corrected or which result was reported.

d.   The procedure requires in Section 4.1 that the laboratory director (LD) ensures that the chemistry assays are qualified and validated according to the procedure.

e.   The validation report for SHBG had an effective date of 7/14/14 but was not signed by the LD until 9/19/15.  SHBG testing was performed on the TPS from 7/28/14 through 6/24/15.

Accuracy

a.   The procedure required in Section 16 that the samples used to calculate accuracy were to cover the entire reportable range, samples were to be run in at least 2 replicates, and 50% of samples were to be outside the reference range.

b.   VitD, TT3, HCG, and SHBG reports all indicated that the predicate method was performed in duplicate, but did not indicate if TPS samples were run in duplicate.

c.   TT3 had a reportable range of 47.6-1420 ng/dL however the accuracy data only covered the range of 42.8-350 ng/dL.

d.   The laboratory used a total of 148 specimens to perform the accuracy study for SHBG.  Of the 148 specimens only six (4%) were outside the reference range.  50% of the specimens were not outside the reference range as required.

Precision | D6115 | (continued; see above) | |

FORM CMS-2567(02-99) Previous Versions Obsolete     Event ID:W34211     Facility ID: CA22046272     If continuation sheet Page  110 of 121

Confidential

THPFM0004755205

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE<br><br>7333 GATEWAY BLVD<br>NEWARK, CA 94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6115 | Continued From page 110<br><br>a.   The procedure required in Section 13 that the samples used to calculate precision were to cover the entire reportable range, include data from the familiarization study, include at least 1 quality control sample, have study performed over 20 operating days, and have a CV% less than or equal to 15% (less than or equal to 20% at the lower and upper level of detection).<br><br>b.   VitD, TT3, HCG, and SHBG reports revealed that none of the precision studies covered 20 operating days.<br><br>c.   VitD and TT3 reports revealed that the precision study did not cover the entire reportable range.<br><br>d.   VitD, TT3, HCG, and SHBG reports did not document that the familiarization data was used in the validation report and did not document 1 level of quality control was included in the study.<br><br>e.   VitD precision data showed that two of three levels (15, 33.5 ng/mL) used showed a CV% greater than 20% and 15% respectively.<br><br>f.   TT3 precision data showed that two of three levels (85, 109 ng/dL) used showed a CV% greater than 15%.<br><br>g.   SHBG precision revealed that 47 of 96 samples had %CV greater than 20%.<br><br>Reportable Range<br><br>a.   The procedure required in Section 17 that the samples used to calculate reportable range were to cover the entire reportable range. | D6115 | (continued; see above) | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page 111 of 121

Confidential

THPFM0004755206

| DEPARTMENT OF HEALTH AND HUMAN SERVICES<br>CENTERS FOR MEDICARE & MEDICAID SERVICES | | | PRINTED: 01/25/2016<br>FORM APPROVED<br>OMB NO. 0938-0391 |
|---|---|---|---|
| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>**11/20/2015** |

| NAME OF PROVIDER OR SUPPLIER<br><br>**THERANOS INC** | STREET ADDRESS, CITY, STATE, ZIP CODE<br>**7333 GATEWAY BLVD**<br>**NEWARK, CA  94560** |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6115 | Continued From page 111<br><br>b.   The validation report for VitD stated that the reportable range was 10-150 ng/mL.  Samples tested covered a range of 14.17-108.25 ng/mL.<br><br>c.   The validation report for TT3 stated that the reportable range was 47.6-1420 ng/dL.  Samples tested covered a range of less than 40-266 ng/dL.<br><br>d.   The validation report for SHBG stated that the reportable range was 2.5-200 nM.  Samples tested covered a range of 2.4-106 nM.<br><br>e.   The validtion report for SHBG also stated that the R2 value for the dilution linearity should be equal to or greater than 0.95.  However, the valuation report states on page 46 that "Two of the seven samples did not meet the optimal percent recovery and show slightly higher % recovery than the upper desired limit, however the R2 value of 0.92 seems very compariable to the 0.95 acceptance value."<br><br>Reference Range<br><br>a.   The procedure required in Section 18 that the reference range data should include "...a minimum of 120 samples for each partition.  For instance, if a reference  interval needs partitions for gender, then samples from 120 men and 120 women will be needed."<br><br>b.   Reference range data for VitD, TT3, and HCG included 20 samples.<br><br>c.   Reference range data for SHBG included 14 samples from females and 10 samples from males. | D6115 | (continued; see above) | |

FORM CMS-2567(02-99) Previous Versions Obsolete       Event ID: W34211       Facility ID: CA22046272       If continuation sheet Page  112 of 121

Confidential

THPFM0004755207

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE<br><br>7333 GATEWAY BLVD<br>NEWARK, CA  94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6115 | Continued From page 112<br>Percent (%) Recovery<br><br>a.   The laboratory validation reports required a Recovery Rate of 100 +/- 20% (100 +/- 25% at the upper limit and lower limit of reportable range) for VitD, TT3, and SHBG.<br><br>b.   The "Clinical Correlation (Historical)" table, Table 7, for VitD revealed that twelve (12) of twenty nine (29) samples showed a % Recovery greater than +/- 20%.  Ten (10) of the 12 samples had a % Recovery greater than +/- 25%.  Of these 10 samples, eight of ten were not at the upper or lower limit of the reportable range.<br><br>c.   The "Clinical Correlation (Historical)" table, Table 8, for VitD revealed that twenty eight (28) of eighty one (81) samples showed a % Recovery greater than +/- 20%.  Twenty (20) of the 28 samples had a % Recovery greater than +/- 25%.  Of these 28 samples, seventeen (17) of twenty eight (28) were not at the upper or lower limit of the reportable range.<br><br>d.   The "Clinical Correlation and Bias Correction" table, Table 6, for TT3 revealed that thirty six (36) of  one hundred and seven (107) samples showed a % Recovery greater than +/- 20%.  Twenty four (24) of the 36 samples had a % Recovery greater than +/- 25%.  Of these 36 samples, 23 of 36 were not at the upper or lower limit of the reportable range.<br><br>e.   The "Dilution Linearity" table, Table 21, for SHBG revealed that the 1:2 dilution (nominal value = 53.4 nM) had a % Recovery of 131% and the 1:64 dilution (nominal value 2.4 nM) had a % Recovery of 150%.  The laboratory's reportable range for SHBG was 2.5-200 nM. | D6115 | (continued; see above) | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  113 of 121

Confidential

THPFM0004755208

Trial Exh. 5257 Page 0138

**ER-1971**

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE<br>7333 GATEWAY BLVD<br>NEWARK, CA 94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6115 | Continued From page 113 | D6115 | (continued; see above) | |

f.    The "Summary of normal patient samples for Reference Range" table, Table 24, for SHBG revealed that ten (10) of fourteen (14) samples for females and nine (9) of ten (10) samples for males showed a % Recovery greater than +/- 20%. Fourteen (14) of the twenty four (24) total samples had a % Recovery greater than +/- 25%. Of these 24 samples, 24 of 24 were not at the upper or lower limit of the reportable range.

Allowable Bias

a.    The Alternative Assessment Program procedure stated that allowable bias between a predicate method and the Theranos Proprietary System (TPS) was equal to or less than 20%.

b.    The terms Total Allowable Error and Allowable Bias seemed to be used interchangably.

c.    The formula used to determine allowable bias was: Laboratory value minus the Predicate value divided by Predicate value (Laboratory value - Predicate value/Predicate value).

d.    Nine random samples (01, 20, 30, 41, 91, 32, 74, H2, H58) were reviewed from the VitD clinical correlation studies (Table 7 and 8) from the validation report.  The allowable bias calculation for these nine samples ranged from 21-130%. The reference ranges for both the Predicate method and the TPS were the same for VitD.

e.    Nine random samples (2, 60, 62, 18, 57, 43, 68, 73, 92) were reviewed from the TT3 clinical correlation study (Table 6) from the validation report.  The allowable bias calculation for these

| FORM CMS-2567(02-99) Previous Versions Obsolete | Event ID: W34211 | Facility ID: CA22046272 | If continuation sheet Page 114 of 121 |
|---|---|---|---|

Confidential

THPFM0004755209

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE<br>7333 GATEWAY BLVD<br>NEWARK, CA  94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6115 | Continued From page 114<br>nine samples ranged from 21-39%. The reference ranges for both the Predicate method and the TPS were the same for TT3.<br><br>f.     Nine random samples (5, 8, 25, 36, 54, 74, 76, 131, 145) were reviewed from the SHBG clinical correlation study (Table 20) from the validation report.  The allowable bias calculation for these nine samples ranged from 22-146%. The reference ranges for both the Predicate method and the TPS were the same for SHBG. | D6115 | | |
| D6124 | 493.1451(b)(8)(iv) TECHNICAL SUPERVISOR RESPONSIBILITIES<br><br>The procedures for evaluation of the competency of the staff must include, but are not limited to direct observation of performance of instrument maintenance and function checks.<br>This STANDARD  is not met as evidenced by:<br>  Based on review of the 2015 competency assessment form and interview, the technical supervisor failed to include direct observations of performance of instrument maintenance and function checks in competency assessment. Findings include:<br><br>a.   Competency Assessment form, CL FRM-0316-F59, stated the following: "Review documentation of assigned instrument maintenance and function checks as applicable."<br><br>b.   Testing personnel and the technical supervisor stated on 9/23/15 at approximately 1:30 pm that instrument maintenance and function check documention was reviewed as part of annual competency assessment and that direct obervation of these activities was not performed. | D6124 | D6124<br>All testing personnel currently performing tests have completed competency testing with direct observation of, among other things, maintenance and function checks for the tests they are performing.<br><br>The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue.<br><br>The laboratory management, including the new lab director and newly appointed quality director, will ensure that technical supervisors follow required procedures, including personnel procedures.  The lab will further assure the adequacy and competency of staff during monthly QA meetings.  In addition, the lab will | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  115 of 121

Confidential

THPFM0004755210

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 05D2025714 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED 11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| THERANOS INC | 7333 GATEWAY BLVD NEWARK, CA 94560 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6168 | 493.1487 TESTING PERSONNEL<br><br>The laboratory has a sufficient number of individuals who meet the qualification requirements of §493.1489 of this subpart to perform the functions specified in §493.1495 of this subpart for the volume and complexity of testing performed.<br><br>This CONDITION is not met as evidenced by: Based on the number and severity of the deficiencies cited herein, the Condition: Laboratories performing high complexity testing; testing personnel was not met. The laboratory failed to have qualified testing personnel performing high complexity testing. Refer to D6170 and D6171. | D6168 | D6124 (continued) monitor the implementation of these procedures through audits performed pursuant to the lab's new audit procedures.<br><br>This improved oversight will ensure that technical supervisors implement and monitor the lab's enhanced training and competency procedures. These procedures require, among other things, direct observation of instrument maintenance and function checks in competency assessments. The lab has conducted training on these procedures to ensure that practice is consistent with them. | |
| D6170 | 493.1489(a) TESTING PERSONNEL QUALIFICATIONS<br><br>Each individual performing high complexity testing must possess a current license issued by the State in which the laboratory is located, if such licensing is required.<br>This STANDARD is not met as evidenced by: Based on laboratory personnel interviews and WBC differential record review on November 17, 2015, each individual performing high complexity WBC differential testing failed to possess a current license issued by the State of California. Findings included:<br><br>a. For patient capillary specimens, it was the practice of the laboratory to use flow cytometry instrumentation to perform and report patient WBC differentials.<br><br>b. Between June 1, 2015 and September 21, 2015, California unlicensed testing personnel reviewed and released patient flow cytometry | D6170 | | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page 116 of 121

Confidential

THPFM0004755211

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|---|
| | 05D2025714 | A. BUILDING _____<br>B. WING _____ | | 11/20/2015 |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| THERANOS INC | 7333 GATEWAY BLVD<br>NEWARK, CA  94560 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6168 | 493.1487 TESTING PERSONNEL<br><br>The laboratory has a sufficient number of individuals who meet the qualification requirements of §493.1489 of this subpart to perform the functions specified in §493.1495 of this subpart for the volume and complexity of testing performed.<br><br>This CONDITION  is not met as evidenced by:  Based on the number and severity of the deficiencies cited herein, the Condition: Laboratories performing high complexity testing; testing personnel was not met.  The laboratory failed to have qualified testing personnel performing high complexity testing.  Refer to D6170 and D6171. | D6168 | D6168:<br>The lab has corrected this issue by ensuring that all of its testing personnel who perform high complexity testing are qualified, with strict adherence to the regulatory requirements (see D6170, D6171).<br><br>The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue (see D6170, D6171). | 2/12/16 |
| D6170 | 493.1489(a) TESTING PERSONNEL QUALIFICATIONS<br><br>Each individual performing high complexity testing must possess a current license issued by the State in which the laboratory is located, if such licensing is required.<br>This STANDARD  is not met as evidenced by:  Based on laboratory personnel interviews and WBC differential record review on November 17, 2015, each individual performing high complexity WBC differential testing failed to possess a current license issued by the State of California. Findings included:<br><br>a.   For patient capillary specimens, it was the practice of the laboratory to use flow cytometry instrumentation to perform and report patient WBC differentials.<br><br>b.   Between June 1, 2015 and September 21, 2015, California unlicensed testing personnel reviewed and released patient flow cytometry | D6170 | The new lab director has approved enhanced policies and procedures governing personnel qualification and defining, among other things, the responsibilities of licensed and unlicensed personnel, respectively. The lab has conducted training on these procedures to ensure that its practice is consistent with them (see 06170 and 06171).<br><br>In addition, the lab has improved its quality systems and procedures—including quality assurance review, monitoring, and audits—to prevent recurrence (see 06170 and 06171). | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  116 of 121

Confidential

THPFM0004755212

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>05D2025714 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE<br>7333 GATEWAY BLVD<br>NEWARK, CA  94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6168 | 493.1487 TESTING PERSONNEL<br><br>The laboratory has a sufficient number of individuals who meet the qualification requirements of §493.1489 of this subpart to perform the functions specified in §493.1495 of this subpart for the volume and complexity of testing performed.<br><br>This CONDITION is not met as evidenced by: Based on the number and severity of the deficiencies cited herein, the Condition: Laboratories performing high complexity testing; testing personnel was not met.  The laboratory failed to have qualified testing personnel performing high complexity testing.  Refer to D6170 and D6171. | D6168 | | |
| D6170 | 493.1489(a) TESTING PERSONNEL QUALIFICATIONS<br><br>Each individual performing high complexity testing must possess a current license issued by the State in which the laboratory is located, if such licensing is required.<br>This STANDARD is not met as evidenced by: Based on laboratory personnel interviews and WBC differential record review on November 17, 2015, each individual performing high complexity WBC differential testing failed to possess a current license issued by the State of California. Findings included:<br><br>a.   For patient capillary specimens, it was the practice of the laboratory to use flow cytometry instrumentation to perform and report patient WBC differentials.<br><br>b.   Between June 1, 2015 and September 21, 2015, California unlicensed testing personnel reviewed and released patient flow cytometry | D6170 | D6170:<br>The lab has reviewed its personnel files to ensure testing personnel satisfy the educational and experiential requirements.<br><br>The lab proactively paused WBC tests, including manual differentials.<br><br>The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue.<br><br>The new lab director has approved enhanced procedures to ensure that all testing personnel satisfy the qualification requirements, including the required license and education. | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page 116 of 121

Confidential

THPFM0004755213

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 05D2025714 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED 11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| THERANOS INC | 7333 GATEWAY BLVD NEWARK, CA 94560 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6170 | Continued From page 116 WBC differential scatter plots. The scatter plots were released by California unlicensed testing personnel without any further review by a California licensed testing person. | D6170 | D6170 (continued) These procedures also define, among other things, the responsibilities of licensed and unlicensed personnel, respectively. The responsibilities and approved activities of unlicensed personnel are limited, with strict adherence to regulatory requirements, and may only be performed under the direct supervision of licensed personnel. The lab has conducted training on these procedures to ensure that its practice is consistent with them. | |
| | c.   Between June 1, 2015 and September 21, 2015, the laboratory reported 2,112 patient WBC differential performed using the flow cytometry instrumentation. | | | |
| D6171 | 493.1489(b) TESTING PERSONNEL QUALIFICATIONS (b) Meet one of the following requirements: (b)(1) Be a doctor of medicine, doctor of osteopathy, or doctor of podiatric medicine licensed to practice medicine, osteopathy, or podiatry in the State in which the laboratory is located or have earned a doctoral, master's or bachelor's degree in a chemical, physical, biological or clinical laboratory science, or medical technology from an accredited institution; (b)(2)(i) Have earned an associate degree in a laboratory science, or medical laboratory technology from an accredited institution or-- (b)(2)(ii) Have education and training equivalent to that specified in paragraph (b)(2)(i) of this section that includes-- (b)(2)(ii)(A) At least 60 semester hours, or equivalent, from an accredited institution that, at a minimum, include either-- (b)(2)(ii)(A)(1) 24 semester hours of medical laboratory technology courses; or (b)(2)(ii)(A)(2) 24 semester hours of science courses that include-- (b)(2)(ii)(A)(2)(i) Six semester hours of chemistry; (b)(2)(ii)(A)(2)(ii) Six semester hours of biology; and | D6171 | The laboratory management, including the new lab director and newly appointed quality director, is responsible for ensuring that practice is consistent with these procedures. The lab will further assure the adequacy and competency of staff during monthly QA meetings. In addition, the lab will monitor the implementation of these procedures through audits performed pursuant to the lab's new audit procedures. | |

FORM CMS-2567(02-99) Previous Versions Obsolete        Event ID: W34211        Facility ID: CA22046272        If continuation sheet Page  117 of 121

Confidential

THPFM0004755214

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|---|
| | **05D2025714** | A. BUILDING _____ | | |
| | | B. WING _____ | | **11/20/2015** |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| **THERANOS INC** | **7333 GATEWAY BLVD**<br>**NEWARK, CA  94560** |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6170 | Continued From page 116<br>WBC differential scatter plots.  The scatter plots were released by California unlicensed testing personnel without any further review by a California licensed testing person.<br><br>c.    Between June 1, 2015 and September 21, 2015, the laboratory reported 2,112 patient WBC differential performed using the flow cytometry instrumentation. | D6170 | | |
| D6171 | 493.1489(b) TESTING PERSONNEL QUALIFICATIONS<br><br>(b) Meet one of the following requirements:<br>(b)(1) Be a doctor of medicine, doctor of osteopathy, or doctor of podiatric medicine licensed to practice medicine, osteopathy, or podiatry in the State in which the laboratory is located or have earned a doctoral, master's or bachelor's degree in a chemical, physical, biological or clinical laboratory science, or medical technology from an accredited institution;<br>(b)(2)(i) Have earned an associate degree in a laboratory science, or medical laboratory technology from an accredited institution or--<br>(b)(2)(ii) Have education and training equivalent to that specified in paragraph (b)(2)(i) of this section that includes--<br>(b)(2)(ii)(A) At least 60 semester hours, or equivalent, from an accredited institution that, at a minimum, include either--<br>          (b)(2)(ii)(A)(1) 24 semester hours of medical laboratory technology courses; or<br>          (b)(2)(ii)(A)(2) 24 semester hours of science courses that include--<br>              (b)(2)(ii)(A)(2)(i) Six semester hours of chemistry;<br>              (b)(2)(ii)(A)(2)(ii) Six semester hours of biology; and | D6171 | D6171:<br>TP14 has been retrained to ensure that TP14 only performs activities within the scope of TP14's job description as a clinical laboratory associate, under the supervision of testing personnel. Because TP14 is not testing personnel, the high complexity personnel educational requirements do not apply.<br><br>The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue.<br><br>The new lab director has approved enhanced procedures to ensure that testing personnel meet the requisite educational qualifications.  These procedures also define, among other things, the responsibilities of licensed and unlicensed personnel, respectively.  The responsibilities and approved activities of unlicensed | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  117 of 121

Confidential

THPFM0004755215

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 05D2025714 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED 11/20/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE 7333 GATEWAY BLVD NEWARK, CA 94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6171 | Continued From page 117<br>            (b)(2)(ii)(A)(2)(iii) Twelve semester hours of chemistry, biology, or medical laboratory technology in any combination; and<br>            (b)(2)(ii)(B) Have laboratory training that includes either of the following:<br>(b)(2)(ii)(B)(1) Completion of a clinical laboratory training program approved or accredited by the ABHES, the CAHEA, or other organization approved by HHS. (This training may be included in the 60 semester hours listed in paragraph (b)(2)(ii)(A) of this section.)<br>(b)(2)(ii)(B)(2) At least 3 months documented laboratory training in each specialty in which the individual performs high complexity testing.<br>(b)(3) Have previously qualified or could have qualified as a technologist under §493.1491 on or before February 28, 1992;<br>(b)(4) On or before April 24, 1995 be a high school graduate or equivalent and have either--<br>(b)(4)(i) Graduated from a medical laboratory or clinical laboratory training program approved or accredited by ABHES, CAHEA, or other organization approved by HHS; or<br>(b)(4)(ii) Successfully completed an official U.S. military medical laboratory procedures training course of at least 50 weeks duration and have held the military enlisted occupational specialty of Medical Laboratory Specialist (Laboratory Technician);<br>(b)(5)(i) Until September 1, 1997--<br>            (b)(5)(i)(A) Have earned a high school diploma or equivalent; and<br>(b)(5)(i)(B) Have documentation of training appropriate for the testing performed before analyzing patient specimens. Such training must ensure that the individual has--<br>(b)(5)(i)(B)(1) The skills required for proper specimen collection, including patient preparation, | D6171 | D6171 (continued)<br>personnel are limited, with strict adherence to regulatory requirements, and may only be performed under the direct supervision of licensed personnel. The lab has conducted training on these procedures to ensure that its practice is consistent with them.<br><br>The laboratory management, including the new lab director and newly appointed quality director, is responsible for ensuring that practice is consistent with these procedures. The lab will further assure the adequacy and competency of staff during monthly QA meetings. In addition, the lab will monitor the implementation of these procedures through audits performed pursuant to the lab's new audit procedures. | |

FORM CMS-2567(02-99) Previous Versions Obsolete        Event ID: W34211        Facility ID: CA22046272        If continuation sheet Page  118 of 121

Confidential

THPFM0004755216

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 05D2025714 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED 11/20/2015 |
|---|---|---|---|

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| NAME OF PROVIDER OR SUPPLIER THERANOS INC | STREET ADDRESS, CITY, STATE, ZIP CODE 7333 GATEWAY BLVD NEWARK, CA 94560 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6171 | Continued From page 118 | D6171 | | |

if applicable, labeling, handling, preservation or fixation, processing or preparation, transportation and storage of specimens;
(b)(5)(i)(B)(2) The skills required for implementing all standard laboratory procedures;
(b)(5)(i)(B)(3) The skills required for performing each test method and for proper instrument use;
(b)(5)(i)(B)(4) The skills required for performing preventive maintenance, troubleshooting, and calibration procedures related to each test performed;
(b)(5)(i)(B)(5) A working knowledge of reagent stability and storage;
(b)(5)(i)(B)(6) The skills required to implement the quality control policies and procedures of the laboratory;
(b)(5)(i)(B)(7) An awareness of the factors that influence test results; and
(b)(5)(i)(B)(8) The skills required to assess and verify the validity of patient test results through the evaluation of quality control values before reporting patient test results; and
(b)(5)(i)(B)(8)(ii) As of September 1, 1997, be qualified under §493.1489(b)(1), (b)(2), or (b)(4), except for those individuals qualified under paragraph (b)(5)(i) of this section who were performing high complexity testing on or before April 24, 1995;
(b)(6) For blood gas analysis--
  (b)(6)(i) Be qualified under §493.1489(b)(1), (b)(2), (b)(3), (b)(4), or (b)(5);
(b)(6)(ii) Have earned a bachelor's degree in respiratory therapy or cardiovascular technology from an accredited institution; or
(b)(6)(iii) Have earned an associate degree related to pulmonary function from an accredited institution; or
(b)(7) For histopathology, meet the qualifications

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  119 of 121

Confidential

THPFM0004755217

Trial Exh. 5257 Page 0147

**ER-1980**

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|
| | 05D2025714 | A. BUILDING _____<br>B. WING _____ | 11/20/2015 |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| THERANOS INC | 7333 GATEWAY BLVD<br>NEWARK, CA  94560 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6171 | Continued From page 119<br><br>of §493.1449 (b) or (l) to perform tissue examinations.<br><br>This STANDARD is not met as evidenced by:  Based on review of personnel documentation and interview, one of thirty five testing personnel (TP14)failed to meet the high complexity personnel educational qualifications.  Findings include:<br><br>a.   Review of TP14's personnel records revealed a bachelors degree in Liberal Studies.<br><br>b.   The general supervisor and technical consultant stated that all personnel documents were kept in the personnel records.<br><br>c.   No further records were identified which showed a bachelor's degree in a chemical, physical, biological, clinical laboratory science or medical technology. | D6171 | | |
| D6178 | 493.1495(b)(4) TESTING PERSONNEL RESPONSIBILITIES<br><br>Each individual performing high complexity testing must follow the laboratory's established policies and procedures whenever test systems are not within the laboratory's established acceptable levels of performance.<br>This STANDARD is not met as evidenced by:  Based on laboratory personnel interviews and complete blood counts (CBC) quality control corrective action record review on September 23, 2015, the testing personnel, high complexity testing, failed to follow the laboratory's established policies and procedures whenever CBC test systems were not with the laboratory's established acceptable levels of performance. | D6178 | D6178:<br>The lab has completed an assessment to identify any patients affected or having the potential to be affected by this issue.<br><br>The new lab director has approved revised QC procedures to ensure that QC is acceptable before patient results are reported.  Lab personnel have been trained on these procedures.<br><br>The laboratory management, including | 2/12/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  120 of 121

Confidential

THPFM0004755218

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 05D2025714 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED 11/20/2015 |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
| THERANOS INC | 7333 GATEWAY BLVD NEWARK, CA  94560 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6178 | Continued From page 120<br>Findings included:<br><br>a.   It was the practice of the laboratory to use the stated values of commercially assayed quality control materials to monitor patient CBC testing using the Drew 3 instrument.  In the event any CBC quality control material test results did not fall within the stated assay values, laboratory personnel were to follow the procedure detailed in the protocol titled "Quality Control (document number CL QOP-00013, revision F)."<br><br>b.   Laboratory records for the Drew 3 instrument the laboratory designated as "Drew #2" indicated that on July 11, 12, 14, and 16, 2015 CBC quality control material test results failed to meet stated assay values.  The laboratory's documentation of these quality control failures indicated that the laboratory's "Quality Control" protocol was not followed.<br><br>c.   Laboratory records indicated that the Drew 3 instrument the laboratory designated as "Drew #2" was used to test and report 36 patient CBC specimens on July 11, 2015, 12 patient CBC specimens on July 12, 2015, 36 patient CBC specimens on July 14, 2015, and 45 patient CBC specimens on July 16, 2015. | D6178 | D6178 (continued) the new lab director and newly appointed quality director, is responsible for ensuring that practice is consistent with these procedures.  In addition, the lab will monitor the implementation of these procedures through audits performed pursuant to the lab's new audit procedures. | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: W34211          Facility ID: CA22046272          If continuation sheet Page  121 of 121

Confidential

THPFM0004755219

Trial Exh. 5257 Page 0149

ER-1982

# EXHIBIT 2

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT
Theranos Internal Only

## Table of Contents

| Binder Letter | Volume Number | Tab | Summary |
|---|---|---|---|
| AA | 1 | 1 | D5311: Specimen Labeling |
| AA | 1 | 2 | D5400 and D5423: ALP Negative PT Bias 2015 |
| AA | 1 | 3 | D5403, D5481 Finding #2, D5791 Finding #2, D5791 Finding #3, D6102, and D5145: TPS 3.5 (Edition) |
| AA | 1 | 4 | D5413 Finding #1 and D5791 Finding #1: Freezer Temperature |
| AA | 1 | 5 | D5421 Finding #2 and D5423: Clarifying "normal patient distribution" |
| AA | 1 | 6 | D5423: AMR for ALP |
| AA | 1 | 7 | D5481 Finding #1, D5801, D6093 Finding #2: PT/INR on BCS XP |
| AA | 1 | 8 | D5791 Finding #1 and D5793 Finding #3: hCG on Immulite |
| AA | 1 | 9 | D5791 Finding #1 and D5793 Finding #4: Anti-HBs on Immulite |
| AA | 1 | 10 | D5793 Finding #5: LH Assessment |
| AA | 1 | 11 | D5793 Finding #8: 10x Rule |
| AA | 1 | 12 | D6102: Personnel Training and Competency Files (TP6, TP11, TP31) |
| AA | 1 | 13 | D2094: Alkaline Phosphatase on Siemens Advia 1800 |

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164332

Trial Exh. 4943 Page 0001

CMS2-164333

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

**Patient Impact Assessment: Specimen Labeling**

<u>**DEFICIENCY:**</u> D5311

<u>**INVESTIGATION:**</u>

In its initial submission, the laboratory did not provide sufficient detail explaining how it determined that this deficient practice was not likely to affect patients. To clarify, if a specimen was not labeled or was mislabeled, it was the laboratory's practice in 2014 and 2015 to offer a redraw at no charge. (Ex. HH, Ex. 10).

<u>**PATIENT IMPACT:**</u>

The laboratory took corrective action to address mislabeling by [redacted] and practices at no charge. Accordingly, the lab believes this issue is not likely to affect patients. The lab is not aware of any instances where this issue has affected patients.



CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164334

2

CMS2-164335

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

**Patient Impact Assessment: Alkaline Phosphatase on Siemens Advia XPT**

**DEFICIENCY:**

D5400, D5423

**INVESTIGATION:**

The laboratory investigated both of the CAP proficiency testing surveys cited in its initial patient impact assessment. A negative bias was noted on CAP survey C-A 2015 (3/16/2015) with all SDIs negative, all >1.5 SD, and SDIs ranging from -1.6 to -4.2. For the CAP survey C-B 2015 (6/1/2015), a negative bias was noted once again, with all SDIs negative, three >1.5 SD, and SDIs ranging from -0.7 to -1.8. The subsequent CAP survey C-C 2015 (10/5/2015) showed the previously negative biases were no longer present, and actually demonstrated a slight positive bias, with all SDIs positive, and SDIs ranging from 0.3 to 0.5 (none exceeding 1SD). (Ex. CC, Tab 4).

To determine if the negative biases detected in the C-A and C-B surveys affected patient results, all QC values were examined from 3/2015 through 10/2015 (Ex. CC, Tab 3), and the following biases were noted:

May 2015: a slight positive bias for QC level 3 (approx. 0.5 SD; target mean = 308, SD = 14.26), with no observed bias for QC levels 1 or 2

July 2015: a slight positive bias for QC level 3 from 7/16/2015-7/31/2015 (approx. 0.5 SD; target mean = 307.5, SD = 14.26); a slight positive bias for QC level 2 from 7/16/2015-7/31/2015 (approx. 1 SD; target mean = 166, SD = 12.46); no observed bias for QC level 1

August 2015: slight positive bias across 2 lots each of QC levels 2 and 3 [0.5 SD for all 4 lots; QC level 2 target means (SD) = 166 (12.46), 152.5 (3.33); QC level 3 target means (SD) = 307.5 (14.26), 295 (5.71)], with no bias trends for QC level 1

The negative bias demonstrated in the CAP C-A and CAP C-B surveys was not observed in this review of QC records.

As QC material does not necessarily reflect patient material due to possible differences in matrices, patient test result distributions were examined over this period to ascertain the presence of any bias, which would reflect preanalytical as well as analytical biases. The laboratory's examination of patient test result distributions over this period demonstrated means and medians approximating the middle of adult reference range, as expected, because the vast majority of patients tested are expected to be unaffected adults. No monthly medians or means of these

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164336

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

patient test result distributions showed significant negative or positive biases in comparison to the expected means and medians.

## PATIENT IMPACT:

The potential bias detected in the PT results discussed above was not substantiated in the laboratory's subsequent review of QC data and patient test result distribution analyses.

However, QC data review uncovered other possible biases.  With the caveat that biases detected via QC analysis may not accurately reflect effects on patient testing, the slight positive bias detected in May 2015 would be expected to result in minimal (7 U/L) increases in test results already well above the adult reference interval (target QC mean = 308; upper limit of adult reference range approximately 115 in males; 744 U/L in females). Likewise, the slight positive bias identified in the July 2015 QC data review would be expected to result in minimal increases (12 U/L, 7 U/L) in values already significantly above the adult reference interval (target means 166 and 307.5, respectively, for QC levels 2 and 3). In reviewing the August 2015 QC results, again, the biases identified would be expected to result in minimal increases (6, 1.5, 7, and 3 U/L) to values already significantly above the adult reference interval (target means 166 and 152.5, and 307.5 and 295, respectively, for QC levels 2 and 3).

In adults, alkaline phosphatase testing is indicated and offers clinical utility for diagnostic and monitoring purposes for a limited number of disease entities including extra- or intrahepatic biliary obstruction, or diseases affecting the skeletal system such as Paget disease, rickets, and primary/secondary bone tumors.  In all such cases the level of alkaline phosphatase elevation is significant, often ranging from 3-12 fold the upper limit of reference interval with biliary obstruction, 10-25 fold in Paget disease, 2-4 fold with rickets, and even higher levels present in patients with bone tumors depending on tumor type, grade, and stage. The quantitative testing results themselves are of no clinical significance, with only gross degrees of elevation serving clinical utility.  Therefore, the minimal biases detected in the above analyses, when applied to any of these clinical scenarios, would have no clinical significance.

In children, significantly elevated alkaline phosphatase levels (up to 5 fold above the upper limit of adult reference intervals) are reflective of expected accelerated bone growth.  As with adults, quantitative values are of no clinical significance; reference intervals are extremely broad, and gross degrees of elevation only note the expected physiologic growth of bones during those age ranges.  Therefore, again, the bias identified in the above analyses, applied to such cases, would have no clinical significance.

In summary, the bias detected via the above analyses is expected to have no patient impact.

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164337

Trial Exh. 4943 Page 0006



CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

**CORRECTIVE ACTION:**

There is no patient impact expected. Therefore, no corrected or voided reports were generated.

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164338

3

CMS2-164339

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

**Patient Impact Assessment: TPS 3.5**

**DEFICIENCIES:**

D5403 Finding #2, D5481 Finding #2, D5791 Finding #2, D5791 Finding #3, D6102, D6115

**INVESTIGATION:**

The laboratory agrees that its descriptions of prior analyses were lacking sufficient detail to explain the conclusions submitted in its original response.

Upon a review of that response, including the entirety of the prior analysis of TPS 3.5 QC data and patient test result distributions for all analytes during the time period examined, the laboratory made note of poor QC performance throughout. Therefore, the laboratory conducted an expanded retrospective analysis for 2014 and 2015 QC data. This data is presented at Ex. FF, Tabs 1-12. The laboratory noted multiple and recurrent time periods (across all analytes tested) of abrupt shifts in QC target means, high rates of 1-2s QC rule failures, and QC CVs far exceeding limits for a stable testing process.

**PATIENT IMPACT:**

Although the magnitude of QC deviations from target means does not necessarily reflect the exact nature and magnitude of bias on patient results because of differences in matrices, the QC failures identified by this comprehensive retrospective analysis reflect a global and long-term failure of the quality control program for this instrument, as well as failures of related quality assurance procedures that should have alerted the laboratory to correct such an unstable process. Therefore, the laboratory has concluded that there is a possible patient impact for every test reported from the laboratory's TPS 3.5 instruments.

**CORRECTIVE ACTION:**

The fraction of patient results truly impacted, and the nature and magnitude of any effect, are unknown. Out of an abundance of caution, the laboratory has voided all patient test results reported from the TPS 3.5 instruments. Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164340

CMS2-164341

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

**Patient Impact Assessment: Temperature Control**

**DEFICIENCIES:**

D5791 Finding #1, D5413 Finding #1

**INVESTIGATION AND PATIENT IMPACT:**

As the laboratory explained in its initial submission, five of the freezers identified by the surveyors did not contain any materials that were being stored for future use in connection with clinical testing:

- 7061 BUGS -20 C Freezer 4 did **not** contain any materials for future use in clinical testing. (Ex. II, Tab 3B).

- The I Normandy -20 C Freezer did **not** contain any materials for future use in clinical testing. (Ex. II, Tab 3C).

- 7098 -80 C Freezer 1 Nuair did **not** contain any materials for future use in clinical testing. (Ex. II, Tab 3A).

- 7111 -80 C Freezer 2 Thermo did **not** contain any materials for future use in clinical testing. (Ex. II, Tab 3A).

- 7113 -80 2 CLIA Lab did **not** contain any materials for future use in clinical testing. (Ex. II, Tab 3A). While it was named 7113 -80 2 CLIA Lab, it was only used to store old specimens that were not for future use in clinical testing. (Ex. II, Tab 3A).

**Sanyo JP Lab 7059 -20 C Freezer**: This freezer contained control materials and calibrators for certain tests run on the Siemens Immulite 2000. Of the Immulite control materials and calibrators that may have been stored in this freezer, the manufacturer required storage at -20 C or colder for the following tests: Anti-HBs, HCG, SHBG, ABC, AC3, HFG, IG1, RUM, SYP, and THG.

The laboratory **stopped** running all tests on the Immulite on November 17, 2015, and has **not** run any tests on the instrument since then. Between July 2015 and September 2015, however, the Sanyo JP Lab 7059 -20 C freezer had an inconsistency that led to temperature variations from - 12.2 C to -25.6 C. The temperature was consistently -20 C from 8/24/15 to 8/30/15, but warmer than -20 C at all other points reviewed (07/01/15 to 08/23/15 and 08/31/15 to 10/31/15). (Ex. II, Tab 9).

To determine whether any of the control materials or calibrators stored in these freezers were affected, the laboratory reviewed QC for each of these tests on the Immulite for the period July 2015 through November 2015. Overall, a review of QC data from April 2015 through October 2015 showed no evidence of a progressive bias that might indicate material degradation.

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164342

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

In mid- to late-July 2015 and mid-September 2015, there was a slight downward drift for SHBG QC values, however these periodic QC drifts are not consistent with material degradation. For HCG and Anti-HBs there are more random QC fluctuations that are not clearly the result of degradation but are addressed under DS793 #3 and DS793 #4.

**1 BUGS 7120 -80 C Freezer:** The 1 BUGS 7120 -80 C Freezer included certain bacterial cultures. The laboratory affixed labels to these cultures indicating that they should be stored at -80 C or colder. CMS found that this freezer was between -70C and -79 C, and thus higher than -80 C.

While the laboratory recognizes that it should have followed its procedures for maintaining the temperature of this freezer at -80C or colder, storage of these bacterial cultures at temperatures of -70 C to -79 C did not have the potential to affect patients receiving tests in 2014 and 2015. Most importantly, these bacterial cultures can only be used in patient testing after there is growth, which occurs after the bacterial culture is removed from the freezer. If there is no growth after the bacterial culture is removed from the freezer, then the culture is not viable and cannot be used in patient testing. Therefore, the higher temperature of this freezer did not have any potential to affect patients, even if even it had caused a bacterial culture to be non-viable.

It is also worth noting that the temperature of -70 C to -79 C does not appear to have had an impact on the viability of these bacterial cultures, which were put in these freezer's after the laboratory moved to the Newark facility on October 24, 2014. The laboratory labels bacterial cultures for storage at -80C or colder only because that allows for the longest period of viability, which is 10 years. (Ex. II, Tab 26). However, bacterial cultures remain viable for 1 to 3 years when stored at -20C. (Ex. II, Tab 26 (this article is now cited in the laboratory's SOP)).

**CORRECTIVE ACTION:**

The laboratory has already voided certain results for HCG, as set forth in the laboratory's patient impact assessment for DS791. Although the pattern of SHBG QC drift was not suggestive of material degradation, out of an abundance of caution the laboratory is voiding all SHBG results from July and September 2015. Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164343

CMS2-164344

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

**Patient Impact Assessment: Patient Test Result Distribution Analysis**

**DEFICIENCIES:**

D5421 Finding #2, D5423

**INVESTIGATION:**

The laboratory provided an inadequate explanation of its patient test result distribution analysis in its initial response. To clarify, in that analysis, the laboratory examined patient test result distributions for the following analytes tested on the Siemens Advia XPT instrument: albumin, alkaline phosphatase, ALT, ApoA1, total bilirubin, BUN, calcium, chloride, cholesterol, $CO_2$, glucose, HDL, LDL, an triglycerides. For each analyte, the laboratory identified the mean, median, mode, and bounds of the central 95% of results, as well as the percentage of abnormal results. The mean and median of the distributions are particularly helpful in identifying analytical and preanalytical (because patient samples encounter the entire testing process, in contrast to QC material) biases in the methods because the vast majority of analytes tested in clinical laboratories have an expected range of values in healthy populations. The middle of that range of values is relatively constant, and is actually fairly unaffected by abnormal values, because the weighted effect of the expected small number of abnormal results is very low and fairly constant. Furthermore, imprecision does not affect the means/medians, as long as there is no concurrent additional bias, because the added scatter of results will distribute across both sides of the mean/median. Therefore, these studies are very useful in detecting biases. However, they require relatively large numbers of patient results for utility, so as to avoid false interpretations due to the skewing of small data sets by outliers.

Monthly patient test result distribution statistics were analyzed for the analytes listed above on the Siemens Advia XPT for 2014 and 2015, and the following biases were detected:

**Albumin:** February 2015, positive bias detected; April 2015, negative bias detected.

**Alkaline phosphatase:** No significant bias detected.

**ALT:** No significant bias detected.

**APOA1:** Data points were too few to yield useful mean/median evaluations due to susceptibility to skewing by outliers or random error affecting limited numbers of results.

**Total Bilirubin:** February 2015, positive bias detected.

**BUN:** No significant bias detected.

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164345

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

**Calcium:** December 2014, negative bias detected; May 2015, negative bias detected.

**Chloride:** No significant bias detected.

**Total cholesterol:** No significant bias detected.

**CO2:** May 2015 through November 2015, positive bias detected.

**Creatinine:** No significant bias detected.

**Glucose:** No significant bias detected. Please note that monthly means for December 2014-March 2015 appear to exhibit positive biases; however, those months also contain relatively large numbers of large magnitude high glucose outlier results. These results are skewing the mean calculations for those months, as evidenced by stable monthly median data across the entire period examined, and therefore no significant bias is detected from this data set.

**HDL:** No significant bias detected.

**LDL:** No significant bias detected.

**Triglycerides:** No biases detected.

**PATIENT IMPACT:**

Biases detected in this fashion are unpredictable in nature and magnitude because individual patient specimens may be affected to differing degrees based on matrix effects and patient-specific preanalytical factors. Therefore, bias corrections cannot be applied directly to groups of patient results identified in this fashion.

However, it is probable that at least some fraction of patients were affected by the biases identified above. They may have been affected to a degree that would impact clinical management of these affected patients.

**CORRECTIVE ACTION:**

Out of an abundance of caution, the laboratory has voided all patient results from the above-mentioned months where the laboratory observed evidence of bias. Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164346

CMS2-164347

CONFIDENTIAL, COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

**Patient Impact Assessment: AMR for Alkaline Phosphatase**

**DEFICIENCY:** D5423

**INVESTIGATION:**

The surveyors correctly noted the failure of the laboratory to properly implement the correct analytical measurement range (AMR) for the alkaline phosphatase assay on the Siemens Advia XPT instrument. According to the manufacturer's package insert, the AMR is 12-1180 U/L. (Ex. CC, Tab 33). However, upon review of the applicable method verification report, the laboratory only verified an AMR from 12 to 909.33 U/L.

**PATIENT IMPACT:**

The laboratory reported some quantitative alkaline phosphatase values outside its verified AMR. These quantitative values are invalid.

**CORRECTIVE ACTION:**

All patient results for alkaline phosphatase reporting less than 12 U/L or greater than 909 U/L have been amended to correct the reported values to "<12 U/L" and ">909 U/L," respectively. Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

CONFIDENTIAL, COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164348

CMS2-164349

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

### Patient Impact Assessment: PT/INR testing on Siemens BCS XP

**DEFICIENCIES:**

DS801, DS481 Finding #1, D6093 Finding #2

**INVESTIGATION:**

To investigate the potential patient impact of the above deficiencies:

1. The laboratory examined the accuracy of PT/INR calculations across the entire lifetime of this test offering (10/2014-9/2015). For every patient report, the laboratory examined the accuracy of INR calculations by tabulating: (a) the reported result; (b) the correct calculated result (based on instrument PT value, mean normal PT (MNPT) provided by Siemens analysis of Theranos data, and ISI values for respective lots of Dade Innovin materials); and (c) the absolute difference between values (a) and (b). This data is presented at Ex. GG. As presented, there are significant differences between the correct calculated results and the respective reported results across the entire time period (ranging from -0.5 to 0.6 INR units). The laboratory has ascertained that these differences are due to rounding errors. PT values, MNPT values, and ISI values were all verified to be correct; however, prior to INR calculations PT values and PT/MNPT ratios were inappropriately rounded up or down. In many cases based on an inconsistent number of significant figures. After the ISI exponential factor was applied, these small rounding errors were magnified, and resulted in the observed significant differences between correct calculated and reported INR values.

2. The laboratory examined all QC data over the entire lifetime of this test offering (10/2014-9/2015) to determine the quality of the analytical performance of the Siemens BCS XP method over time. This data is presented at Ex. GG. The October 2014 QC data demonstrated a positive bias up to approximately 0.75 SD affecting the "normal" level 1 QC, a negative bias up to approximately 1 SD affecting the "high" level 3 QC, and an inappropriately adjusted QC target mean for level 1 QC from 10/18/2014 to 10/24/2014. In November 2014, level 1 QC demonstrated a positive bias up to 2 SD, and level 3 QC demonstrated no appreciable bias but had 4 values outside 2 SD limits. For the months December 2014 through March 2015, level 1 QC was showing running above the target mean. The magnitude of this positive bias was less than 1 SD. Level 3 QC showed an acceptable level of fluctuation around the target value during December 2014 until January 2015. However, in February and March 2015, level 3 QC showed a downward trend that was between 1 SD and 2 SD.

CMS2-164350

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

3.  The laboratory reviewed proficiency testing results to ascertain an external quality assessment. Proficiency testing results for prothrombin time were satisfactory during this time period (CAP Survey kits 10/25/2014, 01/26/2015, and 5/11/2015). This data is available at Ex. GG.

4.  The laboratory reviewed several months (12/2014-03/2015) of patient test result distributions to ascertain the presence of any biases that might not be evident from QC data (which does not accurately reflect patient matrix effects, nor the entire testing process including preanalytical variables) or proficiency testing (which only provides a small number of data points for analysis). Patient test result distributions can also support findings of bias based on other sources of information, including QC data review and proficiency testing results. This data is available at Ex. GG. A summary of the laboratory's review is set forth below.

**Prothrombin Time (PT):** As seen below, PT demonstrated dramatic differences in the distribution of values of the tested population from month to month, suggesting that the assay had issues that may have impacted patient results during this time (as reflected in the QC data review).

| Date Range Start | Date Range End | Low (% of tested population) | Normal (% of tested population) | High (% of tested population) | Critical High (% of tested population) | High + Critical High (% of tested population) |
|---|---|---|---|---|---|---|
| 5-Dec-14 | 29-Dec-14 | 9.0 | 19.2 | 63.1 | 8.6 | 71.8 |
| 1-Jan-15 | 31-Jan-15 | 4.2 | 27.4 | 61.2 | 7.2 | 68.4 |
| 1-Feb-15 | 28-Feb-15 | 6.4 | 20.4 | 66.8 | 6.4 | 73.2 |
| 1-Mar-15 | 22-Mar-15 | 2.8 | 25.0 | 69.4 | 2.8 | 72.2 |

Most results were "high or critical high" (~70%) each month. The "normal" percentage ranged from ~20% to 27% of the population. The percentage "low" changed from 9% to 2.8% from December 2014 to March 2015. The percentage "critical high" ranged from 8.6% to 2.8% in the same time frame. Such fluctuations in percentages of "critical high" and "low" patients in the distribution are not expected, again suggesting that the assay experienced biases that may have impacted patient results during this time.

The laboratory also evaluated the distribution of patient result values by month. This data is available at Ex. GG. Among abnormal values (i.e. those above the "normal" range), the laboratory observed an approximately normal distribution centered around the mean/median (~22 sec). However, during each month, there were fluctuations on either ends of those

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164351

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

distributions. This fluctuation is observed for every month, suggesting that a systematic error is present in this test method that may have affected at least a fraction of patient samples during the time periods evaluated.

**International Normalized Ratio (INR):** INR demonstrates issues similar to those seen for prothrombin time. Of note, there appears to be a redistribution of patient results, with a relatively greater proportion within the therapeutic INR range (2.0-3.0), which may reflect migration of high INRs (greater than 3.0) and/or those below 2.0.

PATIENT IMPACT:

As detailed above, multiple errors and potential biases were detected over the entire time period of this test offering. This includes errors in the calculation of reported INR values, and positive and negative QC biases detected at multiple levels over multiple time periods—which may or may not reflect the exact nature or magnitude of test result biases due to matrix effect differences between patient and control materials, and is further complicated by concurrent positive and negative biases at both QC levels, as in October 2014. Furthermore, additional biases were suggested via examination of changes in patient test result distributions, which also identified the possibility of both negative and positive biases.

The laboratory therefore believes these multiple errors and possible biases call into question the analytical validity of all PT/INR tests resulted, and because the exact nature and magnitude of these errors cannot be determined for any given patient due to the dependence on QC and patient test result distribution review to uncover them, the analytical and clinical validity of these results are uncertain. Because PT/INR results inform diagnostic algorithms for defects in blood coagulation and therapeutic dosage of warfarin, and due to the limitations of this retrospective analysis, which cannot identify specific patient results impacted by these deviations, the laboratory believes there is a possibility of patient impact for all PT/INR tests resulted.

CORRECTIVE ACTION:

All PT/INR test results have been voided. Corrected reports are being generated. Many have been transmitted, and the remainder are being transmitted (Ex. KKK). Transmission will be complete by 3/31/16. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164352

8

CMS2-164353

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

**Patient Impact Assessment: HCG on the Siemens Immulite**

**DEFICIENCY:**

D5793 Finding #3, D5791 Finding #1

**INVESTIGATION:**

The laboratory has reviewed QC data for HCG measurement on the Siemens Immulite, from July 2015 through October 2015. (Ex. EH, Tab 1). The Immulite was last used to test patient samples for HCG in October 2015.

Based on that review, the laboratory substantially confirmed the QC deficiencies identified by the surveyors. The laboratory also identified QC deficiencies on 7/9/2015, 7/10/2015, 7/15-18/2015, 7/29/2015, 8/30-9/14/2015, and 10/12-30/2015.

**PATIENT IMPACT:**

Because the probability of an unstable testing process cannot be determined without QC, and an unstable testing process is likely when QC fails, all patients tested in runs with QC failures may be impacted.

**CORRECTIVE ACTION:**

The laboratory voided test results for all patients tested in runs with QC failures. Corrected reports are being generated. Many have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by 3/31/16. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

CMS2-164354

CMS2-164355

CONFIDENTIAL-COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

Patient Impact Assessment: Anti-HBs on the Siemens Immulite

**DEFICIENCY:**

D5793 #4, D5791 Finding #1

**INVESTIGATION:**

As the surveyors noted, on September 11, 2015, the laboratory changed the criteria for acceptability for Anti-HBs level 2 and level 3 QC. There was no documented explanation for those changes.

The laboratory has reviewed September 2015 Anti-HBs QC data under the criteria for acceptability that were in effect both prior to and after the September 11 change. (Ex. EE, Tab 4). The laboratory has determined that there were no QC results that would have been "acceptable" under the pre-September 11 criteria and unacceptable under the post-September 11 criteria, or vice versa. To determine if these practices were more widespread for Anti-HBs testing, the laboratory examined QC data from 5/2015-9/2015. All QC values failing outside manufacturer's recommended ranges (listed on package insert) were noted.

**PATIENT IMPACT:**

The QC review revealed no examples of progressive bias that might be expected with degeneration of a reagent or control although there are examples of sustained bias that exist before and during the time period of the freezer failure, particularly in the level one control. Occasional failures of QC before freezer control are also noted both before and during the time period of freezer failure. These are corrected. In all, the QC patterns before and after the period of freezer failure are similar. There is no progressive bias demonstrated that might indicate a degradation of reagents or controls. Therefore, the impact of the freezer failure on the anti-HBs test is insignificant. There is no patient impact.

CMS2-164356

10

CMS2-164357

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

**Patient Impact Assessment-LH**

**DEFICIENCY:** D5793 #5

**INVESTIGATION:**

The surveyors correctly identified a discrepancy in the laboratory's initial patient impact assessment: the body of the assessment indicated that corrected reports would be sent for patient samples analyzed from 7/1/2015 through 7/8/2015, and all patient samples analyzed in August and September 2015; however, the assessment's conclusion erroneously stated that "0 corrected reports [were] being issued."

**PATIENT IMPACT:**

Patient impact is possible for patients who received LH testing during the following time periods: 7/1/2015 through 7/8/2015, and the entire months of August and September 2015.

**CORRECTIVE ACTION:**

Corrected reports are being generated. Many have been transmitted, and the remainder are being transmitted. (Ex. KK) Transmission will be complete by 3/31/16. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

CMS2-164358

CMS2-164359

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

**Patient Impact Assessment: 10x Rule in QC Review**

**DEFICIENCY:** D5793 #8

**INVESTIGATION:**

The surveyors correctly identify the 10x rule as part of the laboratory's new QC procedure.

The laboratory stopped running tests on the Siemens Advia XPT on November 17, 2015, and has not run any tests on the instrument since then. The laboratory stopped running tests on the Advia 1800 before the survey began on September 22, 2015, and has not used them since then. As a result, the laboratory's new QC procedures have not been applied to these instruments.

The laboratory has retroactively examined Siemens Advia XPT QC data from (12/2013 through 11/17/2015) for the following analytes as part of its review. ALB, ALP, ALT, APO A1, BUN, Calcium, Chloride, Cholesterol, CO2, Creatinine, Glucose, HDL, LDL, Total Bilirubin, TP, Triglyceride. (Ex. CC). The laboratory has retroactively examined Siemens Advia 1800 QC data from (1/2014 through 9/22/2015) for the following analytes as part of its review. ALT, Bicarbonate, BUN, Calcium, Glucose, Sodium, and Total Protein. (Ex. LL).

For both the Siemens Advia XPT and the Siemens Advia 1800, the laboratory initially applied the 10x rule as part of the retroactive analysis of QC data, but noted that the QC target means themselves, upon which the 10x rule would be applied, had at times been incorrectly manipulated. (The rationale for these manipulations was unclear. In fact, in some instances the manipulated target means and/or ranges fell well outside the QC manufacturer's acceptable ranges—therefore, rather than apply the 10x rule to erroneous QC target means - especially means that may have already represented QC failures according to the manufacturer's recommendations—the laboratory opted to retroactively apply QC manufacturer target means and ranges across the entire period assessed. Every QC result that fell outside the acceptance range defined by the manufacturer's target mean and range was noted.

**PATIENT IMPACT:**

The magnitude of QC deviation from the target mean does not necessarily reflect the exact nature and magnitude of bias on patient results, but the QC failures ascertained in this fashion do reflect deviation from QC manufacturer recommendations, the laboratory has deemed possible patient impact for every test result identified in this manner.

In short, the laboratory has determined that there may be a patient impact for all results generated on the Siemens Advia XPT and Siemens Advia 1800 during QC failures.

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164360

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

**CORRECTIVE ACTION:**

Although the fraction of patient results truly impacted, and the nature and magnitude of any effect are unknown, out of an abundance of caution all patient test results identified by the above analysis have been voided. Corrected reports are being generated. Many have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by 3/31/16. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.



CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164361

Trial Exh. 4943 Page 0030

12

CMS2-164362

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

Patient Impact Assessment: Training Records

DEFICIENCY: D6102

INVESTIGATION:

TP6 is a CLS with 20 years of experience, who started working in the laboratory in March 2015. A review of her file shows that she has training documentation for the Siemens Advia 2120i, Siemens Advia Autoslide, Eldon Card, Iris, BCS XP, and Cellavision. (Ex. HH, Tab 16). She also has a record of initial competency training for the Siemens Advia 2120i, Siemens Autoslide, BCS XP, Iris, Contaur XP, Cellavision, Siemens Advia XPT, and Eldon Card. (Ex. HH, Tab 16). TP6 has current training and competency on all instruments she now operates. (Ex. HH, Tabs 9A-9B). The competency documents are complete, and the training documents are largely complete.

TP11 is a CLS who worked in the laboratory from June 2014 through March 2016. A review of her personnel file shows that she has training and competency documentation for the Advia XPT, Cellavision, Eldon Card, Advia Centaur XP, Siemens BCS, Siemens Immulite Xoi, Beckman Coulter Iris, Siemens DCA, Leadbno 2, Bio-Rad Tango, Macrovue-RPR, Cellavision, Siemens Advia 2120, DiaSorin Liaison, Bio-Rad Multispot HIV-1/2 Rapid Assay, LabDaq, Occult Blood, and ABO. (Ex. HH, Tab 15).

TP31 is a CLS who worked at Theranos in the Clinical Laboratory between February 18, 2014 and June 5, 2014. During that time she released tests from the Ruby hematology analyzer, IRIS urinalysis analyzer, Immunlite Immunoassay analyzer, Liaison Chemistry analyzer, Advia 1800 Chemistry analyzer, BCS XP Hemostasis analyzer, and DCA Vantage point-of-care testing device. The file contains no documentation of training for these instruments. Because TP31 is no longer employed with the company, the lab telephoned her on March 22, 2016 in order to assess what training, if any, TP31 had to perform these tests. TP31 was asked about her work on each of the referenced analyzers and stated that she was informally trained to perform tests on each of these analyzers. TP31 stated she received a combination of verbal and hands-on training for each analyzer. Additionally, TP31 stated that she had been trained on the firmware to another laboratory prior to working at Theranos. When asked if she thought this training was adequate, she stated it was, and that she felt competent to do the work that she was doing. TP31 signed an attestation to this. (Ex. HH, Tab 14).

PATIENT IMPACT:

The records for TP6 and TP11 show they received training on each instrument they operated even if their records did not comply with all components of the training and competency.

CMS2-164363

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

procedures. In addition, the laboratory's personnel files for TP6 and TP11 contain records of their competency to operate all of the instruments identified in D6102. Because the laboratory's documentation reflects that TP6 and TP11 were competent to operate those instruments, there is no potential patient impact from this deficiency related to TP6 and TP11.

Instrument training and competency records for TP31 were not contained in her personnel file. However, her attestation that she receiving training and was competent to operate those instruments demonstrate that there is no potential patient impact as a result of this deficiency as it relates to TP31.

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164364

Trial Exh. 4943 Page 0033

13

CMS2-164365

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

**Patient Impact Assessment: Alkaline Phosphatase on Siemens Advia 1800**

**DEFICIENCY:** D2094

**INVESTIGATION:**

The laboratory did not adequately explain its patient impact assessment for its investigation of an ungraded PT event for the testing of alkaline phosphatase on the Siemens Advia 1800 (CAP survey 2014 C-C).

The grading criteria for alkaline phosphatase in this PT event was peer group ± 30%. The laboratory received a grade of Code 20 ("no appropriate target/response, cannot be graded"). The CAP Participant Summary for Code 20 explains that "there must be at least 10 laboratories in the peer group...if fewer than 10 laboratories have reported results, a peer group may not be established." In this survey only nine laboratories, including Theranos' Newark laboratory, reported using this method: as a result, the CAP survey was unable to determine the laboratory's proficiency. (Ex. 3I, Tab 3B).

Because the laboratory failed to conduct an investigation to determine proficiency at that time, a retrospective investigation was conducted using the current proficiency testing investigation and corrective action format.  (Ex. 3I, Tab 3B; Ex. 3I8, Tab 3 3 9.4.3). The result of the investigation uncovered that the laboratory submitted the wrong method code when completing the original survey, and therefore was not assigned to its proper peer group (Siemens Chem Sys). Upon repeat analysis of the survey results, using the proper peer group and CAP-prescribed acceptance criteria, the results demonstrated acceptable performance for all five challenges:

| Specimen | Theranos Siemens Advia 1800 | Peer Group Mean (SD) | Limits of Acceptability Lower-Upper (± 30%) | SDI | Self-Evaluation Grade |
|---|---|---|---|---|---|
| CHM-11 | 128 | 133.4 (5.8) | 93.4-173.4 | -0.93 | Acceptable |
| CHM-12 | 188 | 195.6 (8.0) | 136.9-254.3 | -0.95 | Acceptable |
| CHM-13 | 398 | 411.3 (17.2) | 287.9-534.7 | -0.77 | Acceptable |
| CHM-14 | 193 | 196.8 (7.6) | 137.8-255.8 | -0.50 | Acceptable |
| CHM-15 | 151 | 155.0 (6.2) | 108.5-201.5 | -0.65 | Acceptable |

However, it is notable that a slight negative bias existed across all five specimens, ranging from -0.50 to -0.95.

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164366

Trial Exh. 4943 Page 0035

**ER-2018**

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

To further investigate the possibility of bias, the laboratory examined QC results from all 3 levels for five months, encompassing the date of this CAP PT survey (8/1/2014-12/31/2014). (Ex. J1, Tab 3C). Level 1 QC did not reveal any significant bias trends; results were clustered around the mean, and the vast majority of results were within ± 1SD. Level 2 and 3 QC did, however, demonstrate a slight negative bias, with the majority of results around -1SD. This bias is consistent with the results of the laboratory's retroactive PT analysis, and the target values evaluated by the survey (ranging from 128 U/L to 398 U/L) are within the analytical measurement ranges tested by level 2 and 3 QC.

The laboratory assessed the possible clinical impact of the bias observed in the PT survey and its analysis of QC data. (Although it is difficult to directly apply any bias of QC material to patient material due to matrix differences, in this case the bias was also observed in PT survey samples).

Note that the documentation initially submitted for this deficiency referred to an analysis of a "range of means." That analysis was referenced in error, and has no bearing on the investigation of this particular deficiency. Please disregard that reference.

**PATIENT IMPACT:**

In adults, alkaline phosphatase testing is indicated and offers clinical utility for diagnostic and monitoring purposes for a limited number of disease entities including extra- or intrahepatic biliary obstruction, or diseases affecting the skeletal system such as Paget disease, rickets, and primary/secondary bone tumors. In all such cases the level of alkaline phosphatase elevation is significant, often ranging from 3-12 fold the upper limit of reference interval with biliary obstruction, 10-25 fold in Paget disease, 2-4 fold with rickets, and even higher levels present in patients with bone tumors depending on tumor type, grade, and stage. The quantitative testing results themselves are of no clinical significance, with only gross degrees of elevation serving clinical utility. Therefore, any minimal negative bias, such as that identified in this case, when applied to any of these clinical scenarios, would have no clinical significance.

In children, significantly elevated alkaline phosphatase levels (up to 5 fold above the upper limit of adult reference intervals) are reflective of expected accelerated bone growth. As with adults, quantitative values are of no clinical significance, reference intervals are extremely broad, and gross degrees of elevation only note the expected physiologic growth of bones during those age ranges. Therefore, again, the bias identified in the above analysis, applied to such cases, would have no clinical significance.

In summary, the bias detected via the above analysis is expected to have no patient impact.

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164367

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

**CORRECTIVE ACTION:**

The retroactive PT investigation has been properly documented according to the laboratory SOP CL QOP-0006. (Ex. B3, Tab 3). As there is no patient impact expected, no corrected or voided reports have been generated. In addition, noting the root cause of this error was submission of the wrong method code, SOP CL QOP-00006 has been revised to now require a second review prior to submission of PT results to ensure correct code use. (Ex. B3, Tab 3 § 9.3).

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-164368

# EXHIBIT 1



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

April 1, 2016

**BY MESSENGER**

Ms. Karen Fuller
State Oversight and CLIA Branch
Division of Survey and Certification
Centers for Medicare and Medicaid Services
90 Seventh Street, Suite 5-300 (5W)
San Francisco, CA 94103-6707

**Re:    Updated Response of Theranos, Inc. to the March 18, 2016 Letter From Karen
Fuller To Dr. Sunil Dhawan, Elizabeth Holmes, and Sunny Balwani (CLIA Number
05D2025714)**

Dear Ms. Fuller,

This letter provides Theranos, Inc.'s response to your letter of March 18, 2016.  We respond to
each of the reasons why CMS found that our response to a specific deficiency was insufficient by
providing additional information and supporting documentation, which we believe demonstrate
that our Newark, California laboratory has come into Condition-level compliance and abated the
immediate jeopardy.

Based on the productive discussions we have had with Sarah Bennett and Gary Yamamoto about
your March 18 letter, this response aims to ensure that there are not any miscommunications
about important issues that we have learned were unclear to CMS from our initial submission.  In
addition, this response reflects work that the laboratory, under the direction of its new leadership,
has done to address CMS's feedback, including, for example, performing thorough re-review of
data and further revising procedures.

As set forth in this detailed response and through the enclosed supporting documentation:

1. The laboratory has put in place new leadership, including a new full-time lab director and
   a new full-time clinical consultant, who is a co-director under California's regulations.
   The new laboratory director, Dr. Kingshuk Das, has been on-site full-time as of March
   14, 2016.  He has extensive clinical laboratory experience, including as an Associate
   Medical Director of UCLA's Clinical Laboratories between August 2013 and March
   2016.  The new clinical consultant, Dr. Don Tschirhart, has been on-site full-time as of
   March 14, 2016.  He has over 15 years of experience as a hospital lab director.

2. The laboratory's new leadership firmly believes that the laboratory will be able to ensure
   the deficient practices will not recur through its robust new quality systems and through
   the intense oversight being provided by the laboratory's new quality monitoring and
   improvement program and new audit procedures.  Indeed, the laboratory's new audit

1
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                                                                                                          THPFM0003765147



1701 Page Mill Road     P 650.838.9292    theranos.com
Palo Alto, CA 94304     F 650.838.9165

procedures require both monthly tracer audits of pre-analytic, analytic and post-analytic processes and quarterly audits of the laboratory's quality systems.  The results of these audits are then scrutinized at the laboratory's monthly QMPI Program meetings.

3. Many of the issues raised in your March 18 letter appear to be premised on CMS's belief that the laboratory is running a number of tests that it actually stopped running either before or during the survey, and has not run since. We have clarified this issue below.

4. The laboratory has undertaken aggressive corrective actions.  For example, out of an extreme abundance of caution and based on its dissatisfaction with prior QA oversight, the laboratory voided all results reported for the assays run on the Theranos Proprietary System 3.5 (TPS) in 2014 and 2015 and all reported PT/INR tests run on the Siemens Advia BCS XP instrument that went into use in October 2014 through September of 2015.[1]

We believe that these considerable actions, when viewed together with the other information and documentation provided herein and in our initial submission, should leave no doubt that the Newark laboratory has come into Condition-level compliance and abated immediate jeopardy. For that reason, we submit that CMS should approve the laboratory's submission, and thereafter perform a revisit at which CMS will see that the laboratory's new leadership has implemented, enforced, and monitored the corrective actions.

We welcome further engagement with CMS on any of the information we have submitted to date, including the opportunity to address any questions or concerns CMS may have in real-time, in order to avoid any unnecessary delay or work for CMS and pursuant to our efforts to respond comprehensively to all issues raised by CMS.

Please note that these materials contain confidential commercial information and trade secrets that are statutorily exempt from disclosure under the Freedom of Information Act, 5 U.S.C. § 552(b)(4).  We are providing this highly sensitive information to CMS in order to fully respond to the agency's inquiries.  However, this is information that Theranos closely protects from public disclosure, and any disclosure by the agency of this information is likely to cause the company irreparable harm.  As a result, in providing this information, we respectfully request the opportunity to provide redactions should you decide to disclose any of the documents to any member of the public for any reason, under FOIA procedures or otherwise.  In addition, if the agency incorporates the substance of any of this information into correspondence or other agency-generated documents that may be publicly disclosed, we request the opportunity to redact the information from those documents as well.  We also ask that you take steps to protect these documents from unauthorized disclosure

---

[1] A list of all accessions for which corrected reports have been issued is enclosed herein in Exhibit MM.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                                                                          THPFM0003765148



1701 Page Mill Road    P 650.838.9292   theranos.com
Palo Alto, CA 94304    F 650.838.9165

### D2094

**D2094 – March 18 Letter Statement 1:** *"Some documents pertaining to this deficiency referenced in the submission were not included.  Specifically, the submission references 'Ex. A, Tab 4, § 7.1.2.2.d.2.'  We found no such reference contained in the materials provided to CMS.  In addition, Exhibit (Ex.) O, Tab 2 states:  'The QC data are presented here: <Exhibit D Tab 7, Tab 8>.'  We found no 'Tab 7' or 'Tab 8' in Ex. D."*

    **Theranos Response to Statement 1 in D2094:**  The citation reference to Ex. A, Tab 4, § 7.1.2.2.d.2 was an inadvertent transcription.  The citation reference Ex. D, Tabs 7 and 8 were also inadvertent transcription errors, but the QC data were included in the initial submission in Exhibit O.  We have enclosed another copy of that QC data for ALP with this letter at Ex. JJ, Tab 3B.

**D2094 – March 18 Letter Statement 2:**   *"Although the laboratory's submitted protocol indicates that ungraded proficiency testing (PT) results will be evaluated, the submitted protocol does not explain how an investigation is performed and who must sign an investigation of ungraded PT samples."*

    **Theranos Response to Statement 2 in D2094:**  The lab has revised its proficiency testing procedure (i) to indicate the protocol used to evaluate ungraded proficiency testing (PT); (ii) to explain how an investigation of ungraded PT is performed; and (iii) to explain who must sign an investigation of ungraded PT samples. (Ex. BB, Tab 3).  The revised procedure requires the laboratory to use its Proficiency Testing Investigation and Corrective Action form to investigate ungraded PT, which must be approved by the lab director. (Ex. BB, Tab 3§ 9.4, F-1).  Training on this revised SOP has occurred. (Ex. BB, Tabs 3B-3C).

**D2094 – March 18 Letter Statement 3:** *"In the submission, the laboratory concludes:*

-   *'Not enough patient data available for meaningful analysis'*
-   *'No evidence of systemic errors'*
-   *'No patient impact expected'*

*However, no information as to how the laboratory came to these conclusions related to patient outcomes was submitted.  Documentation contained in in Ex. O, Tab 2 also compares the 'Range of Means' with no explanation as to what this refers to or how it correlates to the laboratory's ungraded results.  The submission merely indicates that 'the lab has investigated this ungraded PT event for ALP [alkaline phosphatase] and has documented its investigation and conclusion."*

    **Theranos Response to Statement 3 in D2094:**  Pursuant to its revised proficiency testing procedure, the lab has documented its investigation of the ungraded ALP event for the 3rd event of 2014 using the Proficiency Testing Investigation and Corrective Action form.  (Ex. JJ, Tab 3A).  That documentation explains how the laboratory came to its conclusions related

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential
THPFM0003765149



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

to patient outcomes.  (Ex. JJ, Tab 3A).  Additionally, the laboratory has revised and clarified its analysis, including by removing the phrase "Range of Means."  (Ex. AA, Tab 13).

**D2094 – March 18 Letter Statement 4:**   *"Furthermore, a Quality Monitoring and Processing Improvement (QMPI), Program Meeting Agenda, CL FRM-00045-F1, that was submitted as part of Ex. A, Tab 13 and only includes PT for Alternative Proficiency Assessment (APA). Based on information included in the submitted agenda, all PT issues were not addressed as required in CL QOP-00045, Revision A (Ex. A, Tab 12) in Section 7.2.2.6 and 7.2.2.7."*

> **Theranos Response to Statement 4 in D2094:**  The lab has revised the QMPI Program procedures and meeting agenda to make clear that the agenda includes all PT issues as required in CL QOP-00045. (Ex. BB, Tab 7 § 7.5.2).[2]

**D2094 – March 18 Letter Statement 5:**   *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program.  However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted.  In the submission, the laboratory indicates that a 'tracer audit **may** [emphasis added] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

> **Theranos Response to Statement 5 in D2094:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8 § 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7§ 7.5).[3]  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

---

[2] Note, the prior version of the QMPI QOP that was included with the submission stated that QMPI Meetings would include a review of the "schedule" and "results" for "Proficiency Tests". (Ex. A, Tab 12, § 7.2.2.5).

[3] Note, the prior version of the QMPI Meeting Agenda that was included with the submission required a review of audit "Findings." (Ex. A, Tab 12, § 9.)

4
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

**D2128**

**D2128 – March 18 Letter Statement 1:** *"The submission references 'Ex. A, Tab 4, § 7.1.2.2.d.2.' We found no such reference contained in the materials provided to CMS."*

**Theranos Response to Statement 1 in D2128:** The citation reference to Ex. A, Tab 4, § 7.1.2.2.d.2 was an inadvertent transcription error and should not have been included.

**D2128 – March 18 Letter Statement 2** *"Although the laboratory's submitted protocol indicates that unsatisfactory PT results would be investigated using CL FRM-00006-F1, the laboratory provided no documentation showing that the required form was used to investigate the unsatisfactory PT result. The laboratory also states that the 'lab has investigated the one unacceptable challenge and documented its investigation and conclusions'; however, CL FRM-00006-F1 documenting the investigation was not submitted per the laboratory's protocol."*

**Theranos Response to Statement 2 in D2128:** We note that there was not an "unsatisfactory PT result" reported by the American Proficiency Institute for the "Blood Cell ID (Educational)" 2nd event of 2014, because this educational event was "Not Graded." (Ex. JJ, Tab 2). Pursuant to its revised proficiency testing procedure, the laboratory has documented its investigation of this "Blood Cell ID (Educational)" 2nd event of 2014 that was "Not Graded" using the Proficiency Testing Investigation and Corrective Action form. (Ex. JJ, Tab 2).

Likewise, pursuant to its revised proficiency testing procedure, the laboratory has documented its investigation of the one unacceptable challenge for the "Blood Cell Identification" 2nd event of 2014 using the Proficiency Testing Investigation and Corrective Action form. (Ex. JJ, Tab 2A).

**D2128 – March 18 Letter Statement 3:** *"In the submission, the laboratory concludes:*

- *'Not enough patient data available for meaningful analysis'*
- *'No evidence of systemic errors'*
- *'No patient impact expected'*

*However, no information as to how the laboratory came to these conclusions related to patient outcomes was submitted. Documentation contained in Ex O, Tab 3 shows that the laboratory received a passing score of 80% for blood cell identification."* While this is true, the CLIA regulations require that all unacceptable results have remedial action taken and that such remedial action be documented. The submission does not contain evidence of remedial action."*

**Theranos Response to Statement 3 in D2128:** Pursuant to its revised proficiency testing procedure, the laboratory has documented its investigation of the "Blood Cell ID (Educational)" 2nd event of 2014 that was "Not Graded" using the Proficiency Testing Investigation and Corrective Action form. (Ex. JJ, Tab 2). That documentation explains how the laboratory came to its conclusions related to patient outcomes. (Ex. JJ, Tab 2).

5
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential

THPFM0003765151



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

Pursuant to its revised proficiency testing procedure, the laboratory has documented its investigation of the one unacceptable challenge for "Blood Cell Identification" 2nd event of 2014 using the Proficiency Testing Investigation and Corrective Action form. (Ex. JJ, Tab 2A). That documentation explains how the laboratory came to its conclusions related to patient outcomes. (Ex. JJ, Tab 2A).

**D2128 – March 18 Letter Statement 4:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In the submission, the laboratory indicates that a 'tracer audit **may** [emphasis added [in the letter]] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

   **Theranos Response to Statement 4 in D2128:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8 § 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab 7B-7C).

<u>D5024</u>:

The March 18 Letter states: *"See our reviews of D5403, D5437, D5447, D5469, D5481, D5779, and D5801."* Accordingly, we refer you to our responses to those reviews.

<u>D5217</u>

**D5217 – March 18 Letter Statement 1:** *"Some documents pertaining to this deficiency referenced in the submission were not included. Specifically, the submission references 'Ex. A, Tab 4, § 7.1.2.2.d.2.' We found no such reference contained in the materials provided to CMS. In addition, Exhibit (Ex.) O, Tab 2 states: 'The QC data are presented here: <Exhibit D Tab 7, Tab 8>.' We found no 'Tab 7' or 'Tab 8' in Ex. D."*

   **Theranos Response to Statement 1 – D5217:** The citation reference to Ex. A, Tab 4, § 7.1.2.2.d.2 was an inadvertent transcription error and should not have been included. The citation reference Ex. D, Tabs 7 and 8 were also inadvertent transcription errors, but the QC data were included in the submission in Exhibit O. We have enclosed another copy of the QC data for Troponin with this letter at Ex. JJ, Tab 1B.

6
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                                        THPFM0003765152



theranos

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

**D5217 – March 18 Letter Statement 2:**  *"In the submission, the laboratory concludes:*

- *'Not enough patient data available for meaningful analysis'*
- *'No evidence of systemic errors'*
- *'No patient impact expected'*

*However, no information as to how the laboratory came to these conclusions related to patient outcomes was submitted.*

**Theranos Response to Statement 2 – D5217:**  The lab has revised its conclusions for the ungraded Troponin 2nd event of 2014; those conclusions are consistent with CMS's review in response to D5217 Statement 3 below.  Pursuant to its revised proficiency testing procedure, the laboratory has documented its investigation and conclusion of the ungraded Troponin 2nd event of 2014 using the Proficiency Testing Investigation and Corrective Action form.  (Ex. JJ, Tab 1A).  That documentation explains how the laboratory came to its conclusions related to patient outcomes. (Ex. JJ, Tabs 1A-1B).

**D5217 – March 18 Letter Statement 3:**  *"The laboratory states in Ex. O, Tab 1 that no peer data was available for the Siemens Immulite 2000.  Based on lack of a peer group, the laboratory should compare its results to 'All Participants' values for troponin.  Review of the laboratory's values versus the 'All Participants' values shows that four of five of the laboratory's troponin values for the second proficiency testing event of 2014 were unacceptable when compared to the 'All Participants' acceptable ranges.  It appears the laboratory reviewed all of the mean values for all peer, instrument and method groups in order to determine an inappropriate acceptable range for its samples based on data not related to the 'All Participants' values."*

**Theranos Response to Statement 3 – D5217:**  Pursuant to its revised proficiency testing procedure, the laboratory has documented its investigation and conclusion of the ungraded Troponin 2nd event of 2014 using the Proficiency Testing Investigation and Corrective Action form.  (Ex. JJ, Tab 1A). That documentation reflects the laboratory's revised investigation, analysis, and conclusions. (Ex. JJ, Tabs 1A-1B).  Based on its investigation, the laboratory has concluded that its values versus the "All Participants" values show that four of five of the laboratory's troponin values for the second proficiency testing event of 2014 did not constitute passing values for this PT event. (Ex. JJ, Tabs 1A-1B).  The enclosed documentation describes the investigation and remedial action taken to address the unacceptable values. (Ex. JJ, Tabs 1A-1B).  As explained in that documentation, the laboratory has, out of an abundance of caution, issued corrected reports voiding all affected Troponin results. (Ex. JJ, Tab 1A).  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5217 – March 18 Letter Statement 4:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program.  However, the laboratory did not*

7

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential

THPFM0003765153



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*establish the procedure by which these quarterly audits are to be conducted. In the submission, the laboratory indicates that a 'tracer audit **may** [emphasis added [in the letter]] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 4 – D5217:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

<u>**D5311**</u>

**D5311 – March 18 Letter Statement 1:** *"The submission references 'Ex. A, Tab 4, 7.1.2.2.d.2.' We found no such reference contained in the materials provided to CMS."*

**Theranos Response to Statement 1 – D5311:** The citation reference to Ex. A, Tab 4, § 7.1.2.2.d.2 was an inadvertent transcription error and should not have been included.

**D5311 – March 18 Letter Statement 2:** *"The laboratory concluded that 'this issue is not likely to affect patients' because its mislabel error rate is comparable to published industry mislabel error rates. No other information related to possible patient outcomes was provided. Even though the laboratory's error rate may be comparable, the laboratory must still pursue any corrective action(s) for patients that may have been affected by this deficient practice."*

**Theranos Response to Statement 2 – D5311:** The laboratory has revised its patient impact assessment analysis and conclusions to address CMS's review. (Ex. AA, Tab 1). Among other things, the revised assessment shows that laboratory took corrective action in 2014 and 2015 for patients that may have been affected by offering a redraw and retest at no charge. (Ex. AA, Tab 1; Ex. HH, Tab 10).

**D5311 – March 18 Letter Statement 3:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In the submission, the laboratory indicates that a 'tracer audit **may** [emphasis added [in the letter]] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would*

8
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential

THPFM0003765154



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 3 – D5311:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

<u>D5391</u>

<u>Finding #1</u>

**D5391 Finding #1 – March 18 Letter Statement 1:** *"The submission references 'Ex. A, Tab 4.' We found no such reference contained in the materials provided to CMS."*

**Theranos Response to Statement 1 – D5391 Finding #1:** The citation reference to Ex. A, Tab 4, § 7.1.2.2.d.2 was an inadvertent transcription error and should not have been included.

**D5391 Finding #1 – March 18 Letter Statement 2:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In the submission, the laboratory indicates that a 'tracer audit* **may** *[emphasis added [in the letter]] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5391 Finding #1:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on

9<br>TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION<br>EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

findings and analysis" during the QMPI Program meetings.  (Ex. BB Tab 7§ 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tab7B-C).

Finding #2

**D5391 Finding #2 – March 18 Letter Statement 1:**  *"The submission references 'Ex. A, Tab 18, § 3.7.1,' and 'Ex. A, Tab 23, §§ 7.14, 7.15, 8.6.1, 8.6.4, 8.6.5.'  We found no such reference contained in the materials provided to CMS."*

   **Theranos Response to Statement 1 –  D5391 Finding #2:**  The citation references to Ex. A, Tab 4, § 3.7.1 and Ex. A, Tab 23, §§ 7.14, 7.15, 8.6.1, 8.6.4, 8.6.5 were inadvertent transcription errors and should not have been included.

**D5391 Finding #2 – March 18 Letter Statement 2:**  *"At the time of the onsite survey, the laboratory failed to establish a written protocol for the daily review of patient specimens referred to other laboratories for testing to ensure timely receipt and reporting of test results performed by other laboratories.  The laboratory did not provide such a protocol with its submission."*

   **Theranos Response to Statement 2 – D5391 Finding #2:**  The lab has implemented revised written procedures for referral testing, which includes the protocol for daily review of patient specimens referred to other laboratories for testing to ensure timely receipt and reporting of test results performed by other laboratories.  (Ex. BB, Tab 10 § 8.7).  The revised procedure requires written documentation of this daily review.  Training on that SOP has occurred.  (Ex. BB, Tabs 10B-10C).  The revised QMPI Program procedures require a review of referral testing and turnaround time.  (Ex. BB, Tab 7 §§ 7.5.3, 7.5.4).

**D5391 Finding #2 – March 18 Letter Statement 3:**  *"In addition, it is unclear how the laboratory's QMPI Program would ensure the establishment of written protocols for all the laboratory's processes."*

   **Theranos Response to Statement 3 – D5391 Finding #2:**  The laboratory's improved document control procedures, SOP on SOPs, audit procedures, and QMPI Program ensure the laboratory has written protocols for all of the laboratory's processes.  (Ex. BB, Tabs 1-2, 7-8). The document control procedures identify levels and categories of procedures (Ex. BB, Tab 1 §§ 3.11, 6.1); the SOP on SOPs includes procedures and templates to ensure that there are written protocols for all processes that should be covered by an SOP (Ex. BB, Tab 2); the revised audit procedures include monthly tracer audits that would identify any instance where a written protocol did not exist for a process (Ex. BB, Tab 8 § 8.1); and the QMPI Program requires review of tracer audit results and of written procedures that are new, revised or in process.  (Ex. BB, Tab 7§§ 7.1, 7.5).  Training on these procedures has occurred.  (Ex. BB, Tabs 1B-1C, 2B-2C, 7B-7C, 8B-8C).

10
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                                                                      THPFM0003765156

**theran⬡s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

**D5393**

**D5393 – March 18 Letter Statement 1:** *"The submission references 'Ex. A, Tab 23, §§ 7.14, 7.15, 8.6.1, 8.6.4, 8.6.5.' We found no such reference contained in the materials provided to CMS."*

**Theranos Response to Statement 1 – D5393:** The citation references to Ex. A, Tab 23, §§ 7.14, 7.15, 8.6.1, 8.6.4, 8.6.5 was an inadvertent transcription error and should not have been included.

**D5393 – March 18 Letter Statement 2:** *"At the time of the onsite survey, the laboratory failed to establish a written protocol for the daily review of patient specimens referred to other laboratories for testing to ensure timely receipt and reporting of test results performed by other laboratories. The laboratory did not provide such a protocol with its submission."*

**Theranos Response to Statement 2 – D5393** The lab has implemented revised written procedures for referral testing, which includes the protocol for daily review of patient specimens referred to other laboratories for testing to ensure timely receipt and reporting of test results performed by other laboratories. (Ex. BB, Tab 10 § 8.7). The revised procedure requires written documentation of this daily review. (Ex. BB, Tab 10 § 8.7, F-1). Training on that SOP has occurred. (Ex. BB, Tabs 10B-10C). The revised QMPI Program procedures require a review of referral testing and turnaround time. (Ex. BB, Tab 7 §§ 7.5.3, 7.5.4).

**D5393 – March 18 Letter Statement 3:** *"In addition, it is unclear how the laboratory's QMPI Program would ensure the establishment of written protocols for all of the laboratory's processes."*

**Theranos Response to Statement 3 – D5393:** The laboratory's improved document control procedures, SOP on SOPs, audit procedures, and QMPI Program ensure the laboratory has written protocols for all of the laboratory's processes. (Ex. BB, Tabs 1-2, 7-8). The document control procedures identify levels and categories of procedures (Ex. BB, Tab 1 §§ 3.11; 6.1); the SOP on SOPs includes procedures and templates to ensure that there are written protocols for all processes that should be covered by an SOP (Ex. BB, Tab 2); the revised audit procedures include monthly tracer audits that would identify any instance where a written protocol did not exist for a process (Ex. BB, Tab 8 § 8.1); and the QMPI Program requires review of tracer audit results and of written procedures that are new, revised or in process. (Ex. BB, Tab 7§§ 7.1, 7.5). Training on these procedures has occurred. (Ex. BB, Tabs 1B-1C, 2B-2C, 7B-7C, 8B-8C).

**D5393 – March 18 Letter Statement 4:** *"In addition, without daily written documentation, it is unclear as to how the laboratory's QMPI Program would ensure this quality assessment activity has been completed."*

**Theranos Response to Statement 4 – D5393:** The laboratory's revised written procedures for referral testing require written documentation of the daily review of referral testing. (Ex. BB, Tab 10 § 8.7, F-1). Training on the revised referral testing procedures has occurred.

11
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential

THPFM0003765157



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

(Ex. BB, Tabs 10B-10C). The revised QMPI procedures require a review of referral testing and turnaround time. (Ex. BB, Tab 7 §§ 7.5.3, 7.5.4). Training on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

**D5400**

The March 18 Letter states "*See our reviews of D5403, D5407, D5413, D5421, D5423, D5429, D5437, D5447, D5449, D5469, D5477, D5481, D5775, D5779, D5787, D5791, and D5793.*" Accordingly, we refer you to our responses to those reviews.

**D5403**

Finding #1

**D5403 Finding #1 – March 18 Letter Statement 1:** "*Although the laboratory addressed the inclusion in its procedure manual of corrective actions to be taken when calibration or quality control (QC) results failed to meet the laboratory's criteria for acceptability when using the Siemens Advia 2120i instrument, in its submission the laboratory failed to address how it will ensure its procedure manuals include applicable components as required by 42 C.F.R. 493.1251(b).*"

> **Theranos Response to Statement 1 – D5403 Finding #1:** The lab's revised SOP on SOPs includes written protocols and SOP templates, which sets forth protocols for preparing procedure manuals that are consistent with 42 C.F.R. § 493.1251(b). (Ex. BB, Tab 2). The laboratory's revised document control policies further ensure that procedure manuals are consistent with 42 C.F.R. § 493.1251(b). (Ex. BB, Tab 1 §§ 6.1, 6.2, 6.3). The lab will monitor compliance with these procedures and 42 C.F.R. § 493.1251(b) through its monthly QMPI meetings, which include a review of written procedure manuals that are new, revised or in process. (Ex. BB Tab 7, §§ 7.1, 7.5.6). The lab will also ensure compliance through its revised audit procedures of pre-analytic, analytic, and post-analytic practices. (Ex. BB, Tab 8, §§ 8.1, 8.2). Training on these revised procedures has occurred. (Ex. BB, Tabs 1B-1C; 2B-2C; 7B-7C; 8B-8C).

**D5403 Finding #1 – March 18 Letter Statement 2:** "*To ensure appropriate and required calibration or QC corrective actions were taken, the laboratory indicated that quarterly audits will be performed and suggested that the audit results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In the submission, the laboratory indicates that a 'tracer audit **may** [emphasis added] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program.*"

> **Theranos Response to Statement 2 – D5403 Finding #1:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex BB,

12
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

Finding #2:

**D5403 Finding #2 – March 18 Letter Statement 1:**  *"The laboratory was cited for not having a QC procedure for the 'Edison 3.5 Theranos System' prior to 5/15/14.  The laboratory's submission states that it performed QC before and after 5/15/14; however, it did not address the citation.  While the data submitted did show that QC was run prior to 5/15/14, the laboratory provided no information regarding any investigation as what procedure the laboratory was using to determine number, type, frequency, and acceptability criteria."*

> **Theranos Response to Statement 1 – D5403 Finding #2:**  D5403 Finding #2 relates to the Theranos Proprietary System 3.5 ("TPS")  The laboratory has performed a review to determine number, type, frequency, and acceptability criteria for QC on the TPS 3.5 prior to May 15, 2014.  Prior to May 15, 2014, the laboratory (i) used the same type of QC material as used after May 15, 2014; (ii) the laboratory ran at least two levels of QC prior to May 15, 2014; (iii) the laboratory was required to pass at least two levels of QC at least 24 hours before reporting a patient result; and (iv) the laboratory used the Westgard rules for the acceptance criteria.  (Ex. FF, Tab 13).

**D5403 Finding #2 – March 18 Letter Statement 2:**  *"The laboratory indicated that systemic errors using QC and patient test distribution over time as well as random errors were used to evaluate patient impact.  Specifically, the laboratory indicated that 'QC data was reviewed to identify >2SD failure and periods of elevated CV.  Namely, batches of 10 consecutive QC data points were analyzed and the CV was calculated for each QC level during this period.  If the CV was >30%, then all patient results run during that time period will be voided.' Ex. E, Tab 1. That laboratory did not indicate how 'periods of elevated CV' were identified or what time periods were reviewed."*

> **Theranos Response to Statement 2 – D5403 Finding #2:**  This deficiency concerns the TPS 3.5, which was one of the Theranos proprietary technologies in use in 2014 and 2015.  The laboratory began phasing out the TPS 3.5 in December 2014, and it was **fully retired** in early-August 2015.
>
> The laboratory values CMS's feedback, and takes it very seriously.  The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was fully retired in early-August 2015.  As explained further in the

13
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential

THPFM0003765159



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5. (Ex. AA, Tab 3). The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures. Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015. As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015. (Ex. AA, Tab 3). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5403 Finding #2 – March 18 Letter Statement 3:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In the submission, the laboratory indicates that a 'tracer audit **may** [emphasis added [in the letter]] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

    **Theranos Response to Statement 3 – D5403 Finding #2:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

**D5407**

**D5407 – March 18 Letter Statement 1:** *"Although the laboratory's submitted protocol (provided at Ex. A, Tab 1 § 4.13) indicates that the laboratory director must sign all procedures prior to use, the response does not include an explanation as to why the cited procedures were not signed by the laboratory director prior to use as required by the laboratory's protocol available at the time of the onsite."*

    **Theranos Response to Statement 1 – D5407:** D5407 states that the following procedures showed an effective date in December 2014, but were signed by the lab director on

14
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential

THPFM0003765160

**ER-2035**



1701 Page Mill Road      P 650.838.9292    theranos.com
Palo Alto, CA 94304      F 650.838.9165

September 19, 2015: CL SOP-09102 (ALP),[4] CL SOP-09161, Revision A (APO), CL SOP-09118 (Glucose),[5] CL SOP-09111 (CO2), CL SOP-10001, Revision B (Measuring Prothrombin Time-Innovin (PT)), and CL SOP-15036, Revision A (Edison 3.5 Theranos System Daily QC Procedure).

D5407 also states that CL SOP-06060, Revision A (SensoScientific Monitor) showed an effective date of June 23, 2015, but was not signed by the lab director until September 22, 2015.

Lastly, D5407 states that CL PLN-14003, Revision A (Master Validation Plan for Routine Chemistry Assays on Theranos Devices) showed an effective date of November 4, 2011, but was not signed by the lab director under September 19, 2015.  To ensure that the record is correct with respect to this document, we note that CL PLN-14003, Revision A (Master Validation Plan for Routine Chemistry Assays on Theranos Devices), was authored and signed by the laboratory's then-lab director, Dr. Arnold Gelb, on November 4, 2011.  (Ex. HH, Tab 12).  Dr. Gelb remained the Lab Director until January 27, 2013.  (Ex. HH, Tab 4C).  Although Dr. Gelb signed CL PLN-14003, the subsequent lab directors did not sign and date CL PLN-14003 until Dr. Sunil Dhawan signed it on September 19, 2015.  We recognize that those prior lab directors should have reviewed, dated and signed CL PLN-14003 before that date.

As reflected by the Lab Director deficiencies identified by CMS, the prior lab directors did not provide sufficient oversight over the documents cited in D5407.  This appears to be one of the reasons why these documents were not timely reviewed and signed by the prior lab directors.  In addition, the laboratory has found that its quality assurance oversight over these documents, including document control oversight, was not sufficient.  The laboratory has hired a new lab director, who has approved enhanced document control policies and procedures to address this issue.  (Ex. BB, Tab 1 §§ 5.1, 5.2, 5.3, 6.1, 6.2, 6.3).  Training on those procedures has occurred.  (Ex. BB, Tabs 1B-1C).  The laboratory has also hired a Document Control Manager whose responsibilities include tracking new and revised policies and procedures to ensure that they are reviewed and approved by the lab director before they become effective.  (Ex. HH, Tab 7C).  In addition, the laboratory's revised QMPI Program procedures and agenda require review of procedures that are new, revised, or in process at monthly QMPI Program meetings.  (Ex. BB, Tab 7 §§ 7.1, 7.5.6).

---

[4] D5407, Paragraph h, states that the Alkaline Phosphatase SOP that was made effective in December 2014 was "CL SOP-81102."  This reference appears to be a typographical error because the Alkaline Phosphatase (ALP) SOP that was made effective in December 2014 was "CL SOP-09102."

[5] As another point of clarification only, we note that D5407, Paragraph h, states that the glucose procedure (CL SOP-09118) was not signed by the LD.  That procedure was signed by the lab director, but not until September 19, 2015.  We recognize that this signature date is still deficient under D5407, and provide this information only to clarify the record.

15

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304     F 650.838.9165

**D5407 – March 18 Letter Statement 2:**   *"In Ex. L, Tab 26 the submission states: "The lab's overarching review of its systems and primary instruments has identified the patients affected or having the potential to be affected by this issue." The laboratory did not define the criteria used to make this determination or provide documentation as to how they came to this conclusion."*

**Theranos Response to Statement 2 – D5407:**  D5407 cites certain documents that were not timely signed and approved by the former lab director.

D5407 cites the follows SOPs for certain assays run on the Siemens Advia XPT because they had an effective date in December 2014, but were not signed by the former lab director until September 2015: (i) CL SOP-09161, Revision A (Apolipoprotein); (ii) CL SOP-09118 (Glucose); [6] (iii) CL SOP-09111 (CO2); and (iv) CL SOP-09102 (Alkaline Phophatase). [7] The laboratory and its new leadership do not approve of the fact these SOPs were given an effective date before Dr. Dhawan signed them.  However, there is no potential for these untimely signatures by Dr. Dhawan to have affected patients because Dr. Dhawan ultimately approved the SOPs without making any modifications or revisions to them.  To address other deficiencies identified by CMS, the laboratory's initial submission included a broader analysis of QC, proficiency testing results, and patient population distribution data for APO, Glucose, CO2, and ALP tests run on the Siemens Advia XPT for the entire period during which these SOPs were effective.  In response to CMS's review of D5793 Finding #8, the laboratory has extended this analysis to evaluate global quality control indicators.  (Ex. AA, Tab 11).  Based on these analyses, the laboratory has issued corrected reports.  (Ex. AA, Tab 11).  The laboratory **stopped** using the Siemens Advia XPT instrument on November 17, 2015, and **has not used it since then**.

D5407 also cites CL SOP-10001, Revision B (Measuring Prothrombin Time-Innovin (PT)), because it was made effective in December 2014, but was not signed by the former lab director until September 2015.  This SOP concerns PT/INR tests on the BCS XP.  Again, the laboratory and its new leadership do not approve of the fact this SOP was given an effective date before Dr. Dhawan signed the SOP.  However, there is no potential for this untimely

---

[6] As a point of clarification only, we note that D5407, Paragraph h, states that the glucose procedure (CL SOP-09118) was not signed by the LD.  That procedure was signed by the lab director, but not until September 19, 2015.  We recognize that this signature date is still deficient under D5407, and provide this information only to clarify the record.

[7] D5407, Paragraph h, states that the Alkaline Phosphatase SOP that was made effective in December 2014 was "CL SOP-81102."  This reference appears to be a typographical error because the Alkaline Phosphatase (ALP) SOP that was made effective in December 2014 was "CL SOP-09102."

16
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential

THPFM0003765162



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

signature to have affected patients because Dr. Dhawan ultimately approved the SOP without making any modifications or revisions to it. To address other deficiencies identified by CMS, the laboratory has performed a broader analysis of all PT/INR tests run on this BCS XP instrument, which was **first put into use in October 2014.** Based on this analysis, which included a review of INR calculations, QC data, proficiency testing, and patient population distribution data, the laboratory issued corrected reports voiding PT/INR test results reported for the period October 2014 through September 2015. (Ex. AA, Tab 7). The laboratory **stopped** using the BCS XP instrument on September 17, 2015, and **has not used it since then**.

D5407 also cites CL SOP-15036, Revision A (Edison 3.5 Theranos System Daily QC Procedure), because it was made effective in December 2014, but was not signed by the former lab director until September 2015. This SOP concerns the Theranos Proprietary System (TPS), which was being phased-out beginning in December 2014 and was fully **retired** in mid-August 2015. Again, the laboratory and its new leadership do not approve of the fact this SOP was given an effective date before Dr. Dhawan signed the SOP to indicate his approval of it. However, there is no potential for this untimely signature to have affected patients because Dr. Dhawan ultimately approved the SOP without making any modifications or revisions to it. To address other deficiencies identified by CMS, the laboratory has performed a broad re-analysis of all QC related to tests run on the TPS 3.5 in 2014 and 2015. That analysis is discussed below and is enclosed with this letter at Tab AA, Ex. 3. Based on that analysis, the laboratory has, out of an extreme abundance of caution, voided all tests run on the TPS 3.5 in 2014 and 2015. Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

D5407 also cites CL SOP-06060, Revision A (SensoScientific Monitor) because it was made effective on June 23, 2015, but was not signed by the former lab director until September 2015. Again, the laboratory and its new leadership do not approve of the fact this SOP was given an effective date before Dr. Dhawan signed the SOP to indicate his approval of it. However, there is no potential for this untimely signature to have affected patients because Dr. Dhawan ultimately approved the SOP without making any modifications or revisions to it.

Finally, D5407 cites CL PLN-14003, Revision A (Master Validation Plan for Chemistry Assays on Theranos Devices). The plan is consistent with 42 C.F.R. § 493.1253(b). CL PLN-14003 was authored, approved, signed and dated by Dr. Arnold Gelb. Dr. Gelb was the

17
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential

THPFM0003765163



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

Laboratory Director when he approved CL PLN-14003.[8]  (Ex. HH, Tabs 4B, 4C, & 12).
Although Dr. Dhawan should have reviewed the plan sooner, he ultimately approved of it.
Because Dr. Dhawan approved of the plan without making any changes to it, no patients
have the potential to have been affected by the finding in D5407, Paragraph g.

**D5413**

Finding #1

**D5413 Finding #1 – March 18 Letter Statement 1:**  *"Although the laboratory's submitted
protocol indicates that the allowable temperature should be posted on the unit (see Ex. A, Tab
29), the response does not address the incorrect labeling for acceptable temperatures on the
freezer doors. Documentation contained in Ex. A, Tab 29, § 4.5 indicated that the laboratory
supervisor or designee was responsible for monitoring and recording temperatures. However,
we could not determine if the new procedure had been effectuated as no documentation was
submitted to show that the freezer units had been labeled appropriately."*

    **Theranos Response to Statement 1 – D5413 Finding #1:**  The new procedure has been
effectuated as reflected in the enclosed documentation showing that the freezer units have
been labeled appropriately.  (Ex. II, Tab 2).

**D5413 Finding #1 – March 18 Letter Statement 2:**  *"In addition, the laboratory states that
training had occurred subsequent to the survey, but it is not clear who should be trained as
'laboratory supervisor or designee' was not defined."*

    **Theranos Response to Statement 2 – D5413 Finding #1:**  The laboratory has revised this
procedure to define who should be trained.  The revised procedure is enclosed at Ex. BB, Tab
13.

**D5413 Finding #1 – March 18 Letter Statement 3:**  *"Training records provided in Ex. A, Tab
30 included only training documents for one general supervisor."*

    **Theranos Response to Statement 3 – D5413:**  The laboratory has enclosed with this letter a
complete set of training records on this SOP, which shows that the relevant laboratory
personnel have been trained.  (Ex. BB, Tabs 13B-13C).

**D5413 Finding #1 – March 18 Letter Statement 4:**  *"Several freezers were identified as "not
used in patient testing" (see Ex. N, Tab A); however, based on interviews during the onsite visit,*

---

[8] At the time that Dr. Gelb authored this plan, his qualifications included, among other things, a
Master of Science in Materials Science and Engineering (Biomedical); a Fellowship in MIT's
Medical Engineering Graduate Program; a Doctor of Medicine from Stanford University; an
internship in Internal Medicine at the University of Chicago Hospitals; a Fellowship in
Immunodiagnosis and Surgical Pathology at Stanford University; and a Fellowship in
Hematopathology at the University of California San Francisco.  (Ex. HH, Tab 4A).

18

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential

THPFM0003765164



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

*these freezers were identified as being used for CLIA activities.  The submission did not include
a response or data related to the freezers identified as 'not used in patient testing.'"*

**Theranos Response to Statement 4 – D5413 Finding #1:**  D5413 identifies six -20C
freezers and four -80C freezers.  In the lab's submission, we explain that five of those
freezers did not contain materials that would be used in the future for clinical patient testing.
Rather, they only contained material that might be used in the future for research and
development.

Based on CMS's March 18 letter, it appears that there was a miscommunication when the
CMS surveyors were onsite.  D5413, Paragraph f, states that CMS had a discussion about
these freezers with the "Director of Assay Systems and technical supervisor at 11/19/15 at
approximately 11 am."  The Director of Assay Systems did not have any regular involvement
with those freezers at that time and did not have knowledge of their contents.  The "technical
supervisor" in attendance on November 19, 2015 joined the company on October 26, 2015;
he also did not have regular involvement with those freezers at the time and did not have
knowledge of their contents.  (Ex. HH, Tab 8).  To the extent CMS understood either of these
individuals to be confirming the contents of these freezers or whether these freezers were
used in clinical patient testing, there was a miscommunication.

The laboratory has looked into this issue further, and has reconfirmed that the statements in
the laboratory's submission are accurate.  As reflected in the enclosed documentation:

- On November 19, 2015, there were four -20 C freezers in the microbiology or BUGS
  laboratory.  7061 BUGS -20 C Freezer 4 did **not** contain any materials for future use
  in clinical patient testing.  (Ex. II, Tab 3B).

- On November 19, 2015, there was one -20 C freezer in the Normandy laboratory.
  Clinical patient testing in the Normandy laboratory **stopped** on September 20, 2015,
  and there has **not** been any clinical patient testing in the Normandy laboratory since
  then.  The 1 Normandy -20 C freezer did **not** contain any materials for future use in
  patient testing.  (Ex. II, Tab 3C).

- On November 19, 2015, there were four -80 C freezers.  7098 -80 C Freezer 1 Nuair,
  7111 -80 C Freezer 2 Thermo, and 7113 -80 2 CLIA Lab did not contain any
  materials for future use in clinical patient testing.  While named 7113 -80 2 CLIA
  Lab, it was only used to store old specimens that were not for use in clinical patient
  testing.  (Ex. II, Tab 3A).

**D5413 Finding #1 – March 18 Letter Statement 5:**  *"To ensure the deficient practice did not
recur, the laboratory indicated that quarterly audits will be performed and suggested that the
audits results would be reviewed within the laboratory's QMPI Program.  However, the
laboratory did not establish the procedure by which these quarterly audits are to be conducted.
In the submission, the laboratory indicates that a 'tracer audit **may** [emphasis added [in the
letter]] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a*

19
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                                                                                    THPFM0003765165



| | 1701 Page Mill Road | P 650.838.9292 | theranos.com |
| | Palo Alto, CA 94304 | F 650.838.9165 | |

*'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 5 – D5413 Finding #1:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

Finding #2

**D5413 Finding #2 – March 18 Letter Statement 1:** *"The submission references 'Ex. I, Tabs 2-6.' We located these tabs, but found no documentation in Tabs 2, 5, and 6."*

**Theranos Response to Statement 1 – D5413 Finding #2:** There was an inadvertent copying error for Exhibit I to the initial submission. The laboratory has enclosed the applicable documents with this letter, as well as additional documents related to the laboratory's broader analysis of the PT/INR test over the entire time it was run on this Siemens BCS XP instrument. (Ex. GG).

**D5413 Finding #2 – March 18 Letter Statement 2:** *"Although the laboratory's submitted protocol indicates that the laboratory was required to check manufacturer package inserts prior to use (see Ex. A, Tab 31, §8.1.2), which was also stated in the laboratory's written procedure available prior to the onsite survey, the laboratory provided no documentation showing that this protocol has been effectuated and no indication that package inserts for new lot numbers have been checked."*

**Theranos Response to Statement 2 – D5413 Finding #2:** D5413 concerns the laboratory's failure to follow the manufacturer's instructions for the expiration date of one lot of Innovin (thromboplastin) used for Prothrombin Time/International Normalized Ratio (PT/INR) testing on the Siemens BCS XP. The laboratory **stopped** running tests on Siemens BCS XP on September 17, 2015, and has **not** run any tests on the Siemens BCS XP since then.

Although the laboratory is not running PT/INR tests on the Siemens BCS XP, we have enclosed documentation related to a different test that is in use, which shows that the laboratory has effectuated its protocol to check manufacturer's instructions for the expiration date. This documentation includes a photograph of the manufacturer's package insert for IRISpec and a photograph of the bottles showing a handwritten open date and expiration date that is consistent with the 15-day "open stability" specification contained in the package

20
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential

THPFM0003765166



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

insert .  (Ex. HH, Tabs 11A-11B).  As these photographs show, the laboratory effectuated its protocol by reviewing the manufacturer's instructions, initialed the material, and wrote the correct expiration date on the bottle.  (Ex. HH, Tab 11A).

**D5413 Finding #2 – March 18 Letter Statement 3**:  *"In addition, the submission states that "the lab has conducted training on those procedures;" however, the training documents submitted in Ex. A, Tab 32 do not include any training specific to the cited deficiency. We were unable to verify that training occurred as stated."*

**Theranos Response to Statement 3 – D5413 Finding #2:** D5413 Finding #2 states that the laboratory "failed to follow the manufacturer instructions for expiration date of Innovin (thromboplastin) used for Prothrombin Time/International Normalized Mean Ratio (PT/INR) testing."  The laboratory's submission included records for training on the revised reagent qualification and management procedures.  (Ex. BB, Tab 14B).  The training addressed review of manufacturer specification and package inserts.  (Ex. BB, Tab 14).  The laboratory has performed supplemental training that specifically focuses on reviewing and following manufacturer instructions for expiration dates.  (Ex. BB, Tab 14D).  That training used this deficiency about Innovin (thromboplastin) as a case study.  (Ex. BB, Tab 14D).

**D5413 Finding #2 – March 18 Letter Statement 4**:  *"In Ex. I, Tab 1, the laboratory provided lists of patient specimen accession numbers for which the laboratory issued corrected reports; however, the laboratory did not provide copies of the corrected reports."*

**Theranos Response to Statement 4 – D5413 Finding #2:**  To address this and other deficiencies related to PT/INR, the laboratory conducted a further patient assessment analysis that covers the entire period during which this Siemens BCS XP instrument was in use in the lab. (Ex. AA, Tab 7).  As a result of that analysis, the laboratory has voided all results for PT/INR from October 2014 through September 2015. (Ex. AA, Tab 7).  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK; Ex. GG, Tab 7).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

<u>**D5421**</u>

<u>Finding #1</u>

**D5421 Finding #1– March 18 Letter Statement 1**: *The submission references "Ex. A, Tab 9, §7.2.4.4 and Ex. B, Tabs 46-50, 52-56, 57-61."  We found no such references contained in the materials provided to CMS."*

**Theranos Response to Statement 1 – D5421 Finding #1:**  There was an inadvertent copying error for Exhibit I to the initial submission.  The laboratory has enclosed the applicable documents with this letter, as well as additional documents related to the

21
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

laboratory's broader analysis of the PT/INR test over the entire time it was run on this Siemens BCS XP instrument.  (Ex. GG).

**D5421 Finding #1– March 18 Letter Statement 2:**  *"The laboratory's submitted protocol (Ex. A, Tab 9, § 4.2) states: 'If the verification is performed by the vendor, the laboratory is involved in all aspects of the verification and the final verification documentation is reviewed and signed off by the Laboratory Director.' We were unable to determine what specific aspects of the method verification the laboratory would be performing or if vendors would continue to perform method verifications."*

**Theranos Response to Statement 2 – D5421 Finding #1:**  The laboratory has further revised its method verification SOP to clarify that the procedure requires the laboratory to perform method verifications.  To be clear, the vendor will not continue to perform method verifications. (Ex. BB, Tab 5 § 4.1.2).

**D5421 Finding #1– March 18 Letter Statement 2:**  *"The submitted protocol included form CL FRM-00022-F1, Verification Results (Ex. A, Tab 9), which appears to be pre-signed by the laboratory director. We were unable to determine if the laboratory director will "review and sign off" on each method verification."*

**Theranos Response to Statement 2 – D5421 Finding #1:**  The copy of CL FRM-00022-F1 included with the submission was not a pre-signed form.  Rather, the laboratory director signed the version of the form attached to the revised method verification SOP simply to indicate that he approved of it as a new form that could be used. To eliminate any confusion or potential confusion caused by this way of approving forms, we have revised the lab's document control policy to make clear that forms attached to an SOP are part of the SOP, and therefore are approved when the lab director approves the SOP.  (Ex. BB, Tab 1). Consistent with this revision, the enclosed copy of CL FRM-00022-F1 no longer has any signatures on it.  (Ex. BB, Tab 5 F1).

**D5421 Finding #1– March 18 Letter Statement 3:**  *"We note that in the laboratory's submission related to test performance specifications for the Advia XPT instrument, it was the laboratory's policy to accept %CV values that were up to 1.5 times the %CV values stated by the instrument manufacturer for any given chemistry analyte.  In the submission, we found no explanation as to why 1.5 times the manufacturer's %CV was acceptable to the laboratory. We also note that the submitted re-verification of test performance specifications did not follow the submitted protocol for test verification; therefore, we could not determine if the re-verifications were adequate or how the laboratory determined if patients were affected or potentially affected."*

**Theranos Response to Statement 3 – D5421 Finding #1:**  Prior to the survey, the laboratory did not employ a policy to accept %CV values that were up to 1.5 times the %CV values stated by the manufacturer, and the verification reports that CMS reviewed did not use 1.5 times the %CV stated by the manufacturer.  Likewise, the laboratory's revised method

22
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential

THPFM0003765168



theran⦿s

1701 Page Mill Road     P 650.838.9292     theranos.com
Palo Alto, CA 94304     F 650.838.9165

verification procedure does not include a 1.5 times %CV policy.  (Ex. BB, Tab 5).[9]  Rather, it requires that the laboratory verify the manufacturer's imprecision claim. (Ex. BB, Tab 5 § 8.2).  Training on the revised procedure has occurred.  (Ex. BB, Tabs 5B-5C).  Additionally, there appears to have been a miscommunication because the laboratory **stopped** running tests on the Siemens Advia XPT on November 17, 2015, and has **not** run any tests on the instrument since then.  Accordingly, the laboratory has not re-verified any assay on the Siemens Advia XPT.  References to method verification data in documents enclosed with the submission are to verification reports prepared **before** the survey began and before the laboratory's revised procedures were made effective (those reports were either reviewed by CMS or available to CMS during the survey), which were referenced for context.

Finding #2

**D5421 Finding #2– March 18 Letter Statement 1:**   *"Although the laboratory's submitted protocol (Ex. A, Tab 9) included a method verification procedure which addressed verification of accuracy, precision, and reportable range, the laboratory provided no documentation showing that this protocol had been followed to re-verify performance specifications.  The submission also stated:  Before the lab resumes any test on the Advia XPT, the lab will ensure that the test has been re-verified pursuant to the lab's improved method verification procedures that have been approved by the laboratory director." The completion date for the correction of this deficiency was indicated on the submitted Allegation of Compliance as February 12, 2016, which, in order to determine correction, should include the re-verification documentation for the Advia XPT. However, the laboratory provided no documentation that the re-verification had been performed.  We note that in the laboratory's submission related to test performance specifications for the Advia XPT instrument it was the laboratory's policy to accept %CV values that were up to 1.5 times the %CV values stated by the instrument manufacturer for any given chemistry analyte. In the submission, we found no explanation as to why 1.5 times the manufacturer's %CV was acceptable to the laboratory.*

**Theranos Response to Statement 1 – D5421 Finding #2:**  Prior to the survey, the laboratory did not employ a policy to accept %CV values that were up to 1.5 times the %CV values stated by the manufacturer, and the verification reports that CMS reviewed did not use 1.5 times the %CV stated by the manufacturer.  Likewise, the laboratory's revised method verification procedure does not include a 1.5 times %CV policy.  (Ex. BB, Tab 5).[10]  Rather, it requires that the laboratory verify the manufacturer's imprecision claim. (Ex. BB, Tab 5 §

---

[9] The laboratory referred to a 1.5 times %CV in its response based upon Bio-Rad's coefficient of variation rate.  (http://www.qcnet.com/Portals/50/PDFs/QCWorkbook2008_Jun08.pdf). Upon further review, the laboratory does not believe that Bio-Rad's coefficient of variation rate is applicable here.

[10] The laboratory referred to a 1.5 times %CV in its response based upon Bio-Rad's coefficient of variation rate.  (http://www.qcnet.com/Portals/50/PDFs/QCWorkbook2008_Jun08.pdf). Upon further review, the laboratory does not believe that Bio-Rad's coefficient of variation rate is applicable here.

23

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential

THPFM0003765169

theran●s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

8.2).  Training on the revised procedure has occurred.  (Ex. BB, Tabs 5B-5C).  Additionally, there appears to have been a miscommunication because the laboratory **stopped** running tests on the Siemens Advia XPT on November 17, 2015, and has **not** run any tests on the instrument since then.  Accordingly, the laboratory has not re-verified any assay on the Siemens Advia XPT.  References to method verification data in documents enclosed with the submission are to verification reports prepared **before** the survey began and before the laboratory's revised procedures were made effective (those reports were either reviewed by CMS or available to CMS during the survey), which were referenced for context.

**D5421 Finding #2– March 18 Letter Statement 2:**  *"We also found no explanation as how "normal patient distribution" related to determining if patients were affected or potentially affected."*

   **Theranos Response to Statement 2 – D5421 Finding #2:**  The laboratory has enclosed a revised analysis to clarify its examination of these patient test result distributions, which should eliminate the confusion created by the phrase "normal patient distribution."  (Ex. AA, Tab 5).

**D5421 Finding #2– March 18 Letter Statement 3:**  *"In addition, the laboratory's submission (Ex. B, various analyte tabs) states: "Matrix comparisons done by the manufacturer between serum and plasma showed correlation." No documentation was submitted supporting this statement."*

   **Theranos Response to Statement 3 – D5421 Finding #2:**  The laboratory has enclosed with this letter documentation supporting that matrix comparisons done by the manufacturer between serum and plasma showed correlation.  (Ex. HH, Tab 13).

**D5421 Finding #2– March 18 Letter Statement 4:**  *"The submission also states that "the lab has conducted training on these procedures to ensure that the practice is consistent with them," but the laboratory did not include complete training documentation to support this assertion."*

   **Theranos Response to Statement 4 – D5421 Finding #2:**  The laboratory's submission included training documentation for seven laboratory personnel. The laboratory has enclosed with this letter additional training documentation for the lab's method verification procedures. (Ex. BB, Tabs 5B-5C).

**D5421 Finding #2– March 18 Letter Statement 5:**  *"Because the laboratory has not shown whether it can follow its own validation protocols, it was uncertain whether the laboratory's quality assessment mechanisms could monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

   **Theranos Response to Statement 5 – D5421 Finding #2:**  As stated above, there appears to have been a miscommunication because the laboratory **stopped** running tests on the Siemens

24
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                                                      THPFM0003765170



theran*s

1701 Page Mill Road    P 650.838.9292   theranos.com
Palo Alto, CA 94304    F 650.838.9165

Advia XPT on November 17, 2015, and has **not** run any tests on the instrument since then. Accordingly, the laboratory has not re-verified any assay on the Siemens Advia XPT.

The laboratory is capable of ensuring that the deficient practice in D5421 does not recur. Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures. The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016. Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory. In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant. Dr. Tschirhart has over fifteen years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team. The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

### D5423

**D5423 – March 18 Letter Statement 1:**   *"Although the laboratory's submitted protocol (Ex. A, Tab 9) included a method verification procedure which addressed verification of accuracy, precision, and reportable range, the laboratory provided no documentation showing that this protocol had been followed to re-verify performance specifications. The submission also stated: Before the lab resumes any test on the Advia XPT, the lab will ensure that the test has been re-verified pursuant to the lab's improved method verification procedures that have been approved by the laboratory director." The completion date for the correction of this deficiency was indicated on the submitted Allegation of Compliance as February 12, 2016, which, in order to determine correction, should include the re-verification documentation for the Advia XPT. However, the laboratory provided no documentation that the re-verification had been performed. We note that in the laboratory's submission related to test performance specifications for the Advia XPT instrument, it was the laboratory's policy to accept %CV values that were up to 1.5 times the %CV values stated by the instrument manufacturer for any given chemistry analyte. In the submission, we found no explanation as to why 1.5 times the manufacturer's %CV was acceptable to the laboratory."*

   **Theranos Response to Statement 1 – D5423:**  Prior to the survey, the laboratory did not employ a policy to accept %CV values that were up to 1.5 times the %CV values stated by the manufacturer, and the verification reports that CMS reviewed did not use 1.5 times the %CV stated by the manufacturer. Likewise, the laboratory's revised method verification procedure does not include a 1.5 times %CV policy. (Ex. BB, Tab 5).[11] Rather, it requires

---

[11] The laboratory referred to a 1.5 times %CV in its response based upon Bio-Rad's coefficient of variation rate. (http://www.qcnet.com/Portals/50/PDFs/QCWorkbook2008_Jun08.pdf). Upon

25
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                                                THPFM0003765171



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

that the laboratory verify the manufacturer's imprecision claim. (Ex. BB, Tab 5 § 8.2).
Training on the revised procedure has occurred. (Ex. BB, Tabs 5B-5C). Additionally, there
appears to have been a miscommunication because the laboratory **stopped** running tests on
the Siemens Advia XPT on November 17, 2015, and has **not** run any tests on the instrument
since then. Accordingly, the laboratory has not re-verified any assay on the Siemens Advia
XPT. References to method verification data in documents enclosed with the submission are
to verification reports prepared **before** the survey began and before the laboratory's revised
procedures were made effective (those reports were either reviewed by CMS or available to
CMS during the survey), which were referenced for context.

**D5423 – March 18 Letter Statement 2:** *"We also found no explanation as how "normal
patient distribution" relates to determining if patients were affected or potentially affected."*

    **Theranos Response to Statement 2 – D5423:** The laboratory has enclosed a revised
analysis to clarify its examination of these patient test result distributions, which should
eliminate the confusion created by the phrase "normal patient distribution." (Ex. AA, Tab 5).

**D5423 – March 18 Letter Statement 3:** *"The laboratory's procedure as well as the method
verification for alkaline phosphatase was reviewed at the onsite survey and the reportable range
was documented as 0 - 1100 IU/L thus modifying the test. At the time of survey, the laboratory
stated that the reportable range was 10 - 1100 IU/L per the manufacturer, and that the
reportable range of 0 - 1100 IU/L was an error. The laboratory confirmed that the lowest
reportable value established by the manufacturer was 10 IU/L. The Patient Impact Analysis
submitted by the laboratory at Ex. B, Tab 6 now indicates that the reportable range should be 5 -
1100 IU/L which is still lower than the range established by the manufacturer; however, the
laboratory did not submit any documentation to support this new reportable range."*

    **Theranos Response to Statement 2 – D5423:** The "Patient Impact Analysis" submitted by
the laboratory at Ex. B, Tab 6 of its submission included a typographical error. As reflected
in the revised patient assessment enclosed with this letter, the reportable range should be 12 –
909 U/L. (Ex. AA, Tab 6).

**D5423 – March 18 Letter Statement 4:** *"The Patient Impact Analysis also indicates that
review of the PT showed a negative bias for PT samples CAP C-A 2015 and CAP-B 2015, but
the laboratory determined that no corrected were needed. The submission also states: "There
were no significant trends or bias in patient population data." The laboratory provided no
explanations for these assertions."*

---

further review, the laboratory does not believe that Bio-Rad's coefficient of variation rate is
applicable here.

26
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential

THPFM0003765172



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

**Theranos Response to Statement 4 – D5423:** The laboratory's patient assessment analysis appears to have included an inadvertent copy and paste mistake. The laboratory has enclosed its revised analysis. (Ex. AA, Tab 2).

**D5423 – March 18 Letter Statement 5:** *"In addition, the laboratory's submission states at Ex. B, Tab 6: "Matrix comparisons done by the manufacturer between serum and plasma showed correlation." The laboratory submitted no documentation supporting this statement."*

**Theranos Response to Statement 5 – D5423:** The laboratory has enclosed with this letter documentation supporting that matrix comparisons done by the manufacturer between serum and plasma showed correlation. (Ex. HH, Tab 13).

**D5423 – March 18 Letter Statement 6:** *"The submission also states that "the lab has conducted training on these procedures to ensure that the practice is consistent with them," but did not include complete training documentation."*

**Theranos Response to Statement 6 – D5423:** The laboratory's submission included training documentation on the method verification procedures for seven laboratory personnel. The laboratory has enclosed with this letter additional training documentation for the lab's method verification procedures. (Ex. BB, Tabs 5B-5C).

**D5423 – March 18 Letter Statement 7:** *"Because the laboratory has not shown whether it can follow its own validation protocols, it is uncertain whether the laboratory's quality assessment mechanisms could monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

**Theranos Response to Statement 7 – D5423:** As stated above, there appears to have been a miscommunication because the laboratory **stopped** running tests on the Siemens Advia XPT on November 17, 2015, and has **not** run any tests on the instrument since then. Accordingly, the laboratory has not re-verified any assay on the Siemens Advia XPT.

The laboratory is capable of ensuring that the deficient practice in D5423 does not recur. Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures. The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016. Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory. In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant. Dr. Tschirhart has over fifteen years of experience as a clinical laboratory director, and is a valuable part of the

27
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential

THPFM0003765173



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

laboratory's new leadership and oversight team.  The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

**D5429**

**D5429 – March 18 Letter Statement:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program.  However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted.  In the submission, the laboratory indicates that a 'tracer audit **may** [emphasis added [in the letter]] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

   **Theranos Response to Statement – D5429:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB Tab 7§ 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tab7B-C).

**D5437**

Findings #1 & #2

**D5437 Findings #1 & #2 – March 18 Letter Statement 1:** *"At the time of the onsite survey, the laboratory failed to maintain calibration documentation for the complete blood count (CBC) instruments. In the submission, we found no evidence the laboratory has re-established its calibration documentation for the CBC instruments."*

   **Theranos Response to Statement 1 – D5437 Findings #1 & #2:**  There appears to have been a miscommunication.  The laboratory **stopped** using its Siemens Advia 2120i instruments for clinical patient testing on November 17, 2015, and has **not** used them since then.  The two Drew-3 instruments were retired before the survey began on September 22, 2015 and before the laboratory's revised procedures were made effective.  Because the

28
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                                                                                THPFM0003765174



1701 Page Mill Road     P 650.838.9292   theranos.com
Palo Alto, CA 94304     F 650.838.9165

laboratory's "CBC instruments" are not in use, the laboratory has not "re-established" calibration documentation for those instruments.

**D5437 Findings #1 & #2 – March 18 Letter Statement 2:**  *"In Ex. F, the laboratory provided lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports; however, the laboratory provided no documentation to indicate corrected reports were generated and issued."*

> **Theranos Response to Statement 2 – D5437 Findings #1 & #2:**  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5437 Findings #1 & #2 – March 18 Letter Statement 3:**  *"To ensure appropriate and required calibration or QC corrective actions were taken, the laboratory indicated that quarterly audits will be performed and suggested that the audit results would be reviewed within the laboratory's QMPI Program.  However, the laboratory did not establish the procedure by which these quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program.  However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted.  In the submission, the laboratory indicates that a 'tracer audit **may** [emphasis added] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

> **Theranos Response to Statement 3 – D5437 Finding #1 & #2:**
>
> The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB Tab 7§ 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tab7B-C).

**D5437 Findings #1 & #2 – March 18 Letter Statement 4:**  *"In addition, we note that in the laboratory's re-verification of test performance specifications for the CBC instruments, it was the laboratory's policy to accept %CV values that were up to 1.5 times the %CV values stated by*

29
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                                                    THPFM0003765175

**ER-2050**



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*the instrument manufacturer for any given CBC analyte. In the submission, we find no*
*explanation as to why 1.5 times the manufacturer's %CV is acceptable to the laboratory."*

**Theranos Response to Statement 4 – D5437 Finding #1 & #2:** Prior to the survey, the
laboratory did not employ a policy to accept %CV values that were up to 1.5 times the %CV
values stated by the manufacturer, and the verification reports that CMS reviewed did not use
1.5 times the %CV stated by the manufacturer. Likewise, the laboratory's revised method
verification procedure does not include a 1.5 times %CV policy. (Ex. BB, Tab 5).[12] Rather,
it requires that the laboratory verify the manufacturer's imprecision claim. (Ex. BB, Tab 5 §
8.2). Training on the revised procedure has occurred. (Ex. BB, Tabs 5B-5C). Additionally,
there appears to have been a miscommunication because the laboratory stopped running tests
on the Siemens Advia 2120i instruments on November 17, 2015, and has not run any tests on
the instruments since then. The laboratory has retired its two Drew-3 instruments.
Accordingly, the laboratory has not re-verified any assay on "the CBC instruments."
References to method verification data in documents enclosed with the submission are to
verification reports prepared **before** the survey began and before the laboratory's revised
procedures were made effective (those reports were either reviewed by CMS or available to
CMS during the survey), which were referenced for context.

<u>**D5447**</u>

**D5447 – March 18 Letter Statement 1:**   *"Although the laboratory's submitted protocol*
*indicates that a two-level QC slide review is now required every day of patient testing when*
*using the Cellavision, the laboratory provided no documentation of or information about the QC*
*materials used, how the statistical parameters of the QC materials would be determined, how*
*QC test results will be documented, and whether laboratory staff has been trained on this new*
*protocol."*

**Theranos Response to Statement 1 – D5447:** The laboratory has revised the Cellavision
SOP to include information about the QC materials used, how the statistical parameters of
the QC materials would be determined, and how QC test results will be documented. (Ex.
BB, Tab 15 ). However, this SOP is not presently in use, because the laboratory stopped
using the Cellavision on November 17, 2015, and has not used the Cellavision since then.
Because the Cellavision is not in use, the laboratory has not conducted a training on this
revised (but inactive) SOP.

---

[12] The laboratory referred to a 1.5 times %CV in its response based upon Bio-Rad's coefficient
of variation rate. (http://www.qcnet.com/Portals/50/PDFs/QCWorkbook2008_Jun08.pdf). Upon
further review, the laboratory does not believe that Bio-Rad's coefficient of variation rate is
applicable here.

30
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                                                                      THPFM0003765176

theran☺s

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

**D5447 – March 18 Letter Statement 2:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In the submission, the laboratory indicates that a 'tracer audit **may** [emphasis added [in the letter]] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5447:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

<u>D5449</u>

**D5449 – March 18 Letter Statement 1:** *"Although the laboratory's submitted protocol indicates that an external positive QC material would be included in each run of patient Chlamydia trachomatis/Neisseria gonorrhoeae (CT/NG) testing, the laboratory provided no documentation of the positive QC material used, how the statistical parameters of the positive QC material would be determined, how the positive QC test result will be documented, and whether laboratory staff has been trained on this new protocol."*

**Theranos Response to Statement 1 – D5449:** The laboratory has revised the CT/NG SOP to include information about the positive QC materials used, how the statistical parameters of the QC materials would be determined, and how QC test results will be documented. (Ex. BB, Tab 16 § 9.1.5). The relevant laboratory personnel have been trained on this protocol. (Ex. BB, Tabs 16B-16C).

**D5449 – March 18 Letter Statement 2:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In the submission, the laboratory indicates that a 'tracer audit **may** [emphasis added [in the letter]] be used, but*

31
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential

THPFM0003765177



1701 Page Mill Road      P 650.838.9292    theranos.com
Palo Alto, CA 94304      F 650.838.9165

*did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5449:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8). Training on these procedures has occurred.  (Ex. BB, Tabs 8B-C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB Tab 7§ 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tab7B-C).

## D5469

### Finding #1

**D5469 Finding #1 – March 18 Letter Statement 1:**  *"Although the laboratory's submitted protocol indicates that the stated values of new commercially assayed CBC QC materials were to be verified through parallel testing against QC materials in use, the laboratory provided no documentation indicating that this protocol had been effectuated, no information as to how the results of the parallel testing will be documented, and no information as to whether laboratory staff has been trained on this new protocol."*

**Theranos Response to Statement 2 – D5469 Finding #1:**  D5469 Finding #1 relates to the laboratory's "two Drew 3 instruments."  The laboratory's two Drew-3 instruments were retired before the survey began on September 22, 2015.  Since the survey, there has not yet been a need to perform parallel testing against QC materials in use because the laboratory has not approached a QC lot change for the tests that are in use.  To ensure that there will not be an issue with documentation of such parallel testing in the future, the laboratory has further revised its procedures as to how the results of the parallel testing against QC materials in use must be documented.  (Ex. BB, Tab 14 § 9).  The laboratory staff has been trained on this documentation procedure.  (Ex. BB, Tabs 14B-C).

To ensure that there is not any confusion, we note that the Advia 2120i CBC SOP is inactive (and is not in use) because the laboratory stopped using those instruments on November 17, 2015, and has not used them since then.

32
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION<br/>EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential

THPFM0003765178



1701 Page Mill Road    P 650.838.9292   theranos.com
Palo Alto, CA 94304    F 650.838.9165

**D5469 Finding #1 – March 18 Letter Statement 2:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

> **Theranos Response to Statement 2 – D5469 Finding #1:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB Tab 7§ 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tab7B-C).

<u>Finding #2</u>

**D5469 Finding #2 – March 18 Letter Statement 1:**  *"Although the laboratory's submitted protocol indicates that the stated values of new commercially assayed chemistry QC materials were to be verified through parallel testing against QC materials in use, the laboratory provided no documentation indicating that this protocol had been effectuated, no information as to how the results of the parallel testing will be documented, and no information as to whether laboratory staff has been trained on this new protocol."*

> **Theranos Response to Statement 1 – D5469 Finding #2:**  D5469 Finding #2 relates to the chemistry assays on the Siemens Advia 1800 and Siemens Advia XPT instruments.  The laboratory stopped using the Siemens Advia 1800 instruments before the survey began on September 22, 2015, and has not used them since then.  The laboratory stopped using the Siemens Advia XPT instrument on November 17, 2015, and has not used it since then.  Since the survey, there has not yet been a need to perform parallel testing against QC materials in use because the laboratory has not approached a QC lot change for the tests that are in use.  To ensure that there will not be an issue with documentation of such parallel testing in the future, the laboratory has further revised its procedures as to how the results of the parallel

33
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                                      THPFM0003765179



1701 Page Mill Road    P 650.838.9292   theranos.com
Palo Alto, CA 94304    F 650.838.9165

testing against QC materials in use must be documented.  (Ex. BB, Tab 14).  The current
procedures include worksheets for how to document parallel testing. (Ex. BB, Tab 14 F1-F4).
The laboratory staff has been trained on this documentation procedure.  (Ex. BB, Tabs 14B-
14C).

**D5469 Finding #2 – March 18 Letter Statement 2:**  *"To ensure the deficient practice does not
recur, the laboratory indicated that quarterly audits will be performed and suggested that the
audits results would be reviewed within the laboratory's QMPI Program. However, the
laboratory did not establish the procedure by which these quarterly audits are to be conducted.
In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used,"
but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would
be documented, and whether the results of a "tracer audit" would be the information reviewed
by the QMPI Program."*

> **Theranos Response to Statement 2 – D5469 Finding #1:**  The laboratory has revised its
> audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB,
> Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-C).  The revised
> procedures establish that tracer audits must occur monthly; provide the protocol for a tracer
> audit; and require that tracer audits be documented using the tracer audit form, CL FRM
> 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a
> quarterly audit to cover the quality management systems; provide the protocol for quarterly
> audits; and require that quarterly audits are documented using the audit record form, CL QOP
> 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear
> that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on
> findings and analysis" during the QMPI Program meetings.  (Ex. BB Tab 7§ 7.5).  Training
> on the revised QMPI procedures has occurred.  (Ex. BB, Tab7B-C).

<u>D5477</u>

**D5477 – March 18 Letter Statement 1:**  *"The laboratory submitted no written procedure for the
bacteriology media QC protocol, and no information as to whether laboratory staff has been
trained on this new protocol."*

> **Theranos Response to Statement 1 – D5477:**  The laboratory has enclosed with this letter
> its written procedure for the bacteriology media QC protocol and documentation showing
> that the relevant personnel have been trained on it.  (Ex. BB, Tabs 4-4C).

**D5477 – March 18 Letter Statement 2:**  *"In Ex. L, Tab 8, the submission included a completed
form titled 'Blood Agar 5% Quality Control Log sheet.'  We note that the entry for the media
received on 1/18/16 indicates that QC testing of this bacteriology media was completed on
1/14/16, which is before the date the media was received by the laboratory. Yet, as documented*

34
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential

THPFM0003765180

**ER-2055**



1701 Page Mill Road     P 650.838.9292     theranos.com
Palo Alto, CA 94304     F 650.838.9165

*on the form, the completed form was reviewed on 2/11/16 without any indication this entry had been reviewed. We question the accuracy of this entry as well as the effectiveness of the laboratory's oversight mechanism."*

**Theranos Response to Statement 2 – D5477:** CMS appears to have had difficulty reading the handwriting on the Blood Agar 5% Quality Control Log Sheet, confusing a handwritten "3" with an "8". The "Blood Agar 5% Quality Control Log Sheet" states that the media was received on 1/13/16. ((Ex. HH, Tabs 5A-5B). Therefore, there is no reason to question that accuracy of this entry because the log shows that the media was received the day before QC testing of this bacteriology media was completed. For the same reason, the February 11, 2016 review of the completed form was performed correctly, and there is no reason to question the effectiveness of the laboratory's oversight mechanism.

**D5469 Finding #2 – March 18 Letter Statement 3:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 3 – D5469 Finding #2:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

## D5481

### Finding #1

**D5481 Finding #1 – March 18 Letter Statement 1:** *"The submission references 'Ex. I, Tabs 2-6.' We located these tabs, but found no documentation in Tabs 2, 5, and 6."*

35
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                                                    THPFM0003765181



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

**Theranos Response to Statement 1 – D5481 Finding #2:** There was an inadvertent copying error for Exhibit I to the initial submission.  The laboratory has enclosed the applicable documents with this letter, as well as additional documents related to the laboratory's broader analysis of the PT/INR test over the entire time it was run on this Siemens BCS XP instrument.  (Ex. GG).

**D5481 Finding #1 – March 18 Letter Statement 2:**   *"Although the laboratory's submitted protocol requires that QC values be acceptable prior to reporting patient results, the submission states: 'Theranos reviewed all quality control (QC) data for PT/INR [Prothrombin Time/International Normalized Ratio] for the time period that this lot of Dade Innovin was in use.' The laboratory provided no documentation of this review other than stating it was performed.*

**Theranos Response to Statement 2 – D5481 Finding #1:**  The laboratory has revised its patient assessment analysis for PT/INR, which is enclosed with this letter at Ex. AA, Tab 7.  The revised assessment references supporting documentation identifying the time period that this lot of Dade Innovin was in use, as well as the QC data for that period.  (Ex. AA, Tab 7; Ex. GG).  That supporting documentation is also enclosed with this letter.  (Ex. GG).

**D5481 Finding #1 – March 18 Letter Statement 3:**  *We also found no documentation to indicate that the revised standard operating procedures (SOPS) have been effectuated. That is, we found no documentation of PT/INR QC failure investigations and corrective actions taken based on the revised SOPS."*

**Theranos Response to Statement 3 – D5481 Finding #1:**  There appears to have been a miscommunication because the laboratory stopped running tests on the Siemens BCS XP, including PT/INR, on September 17, 2015, and has not run any tests on the instrument since then.  Therefore, there have been no new QC failures for PT/INR to investigate or address through corrective action.  The revised SOPs were implemented only after CMS identified the QC failures for PT/INR.  The "review" discussed in the submission was simply intended to refer to the analysis conducted to address the deficiency identified by CMS.  The issue addressed by the "review" — i.e., failing to document corrective action for QC fails for PT/INR — is the same issue identified by CMS in its deficiency, and thus did not constitute a new issue or occurrence.

**D5481 Finding #1 – March 18 Letter Statement 4:**  *"In Ex. I, the laboratory provided lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were issued. We also note that the Patient Impact Assessment (Ex. I, Tab 1) states that "remedial action was taken on 9/25/15," but "corrected reports were issued beginning on 11/10/15 and completed on*

36
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential   THPFM0003765182



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*11/12/15." There was no explanation as to why there was such a long period of time between the
remedial action and issuing corrected reports.*

**Theranos Response to Statement 4 – D5481 Finding #1:** All of these corrected reports for
PT/INR, along with documentation confirming that they were sent, are enclosed with this
letter. (Ex. GG, Tab 7). On September 22 or 23, CMS identified a number of issues related
to PT/INR tests during the period April to September 2015. The laboratory undertook a
thorough investigation. Given the number of issues to review, the investigation took time to
complete properly. Timeliness for proper completion of the investigation and associated
corrective actions were also affected by the absence of a full-time, on-site laboratory director.
The laboratory subsequently hired its new lab director, Dr. Kingshuk Das, who is highly
qualified and has extensive clinical laboratory experience. As of March 14, 2016, Dr. Das
joined Theranos on-site full-time at the Newark, California laboratory. Additionally, the
laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California
regulations) and a full-time clinical consultant. Dr. Tschirhart has over fifteen years of
experience as a clinical laboratory director, and is a valuable part of the laboratory's new
leadership and oversight team.

**D5481 Finding #1 – March 18 Letter Statement 5:** *"To ensure the deficient practice does not
recur, the laboratory indicated that quarterly audits will be performed and suggested that the
audits results would be reviewed within the laboratory's QMPI Program. However, the
laboratory did not establish the procedure by which these quarterly audits are to be conducted.
In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used,"
but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would
be documented, and whether the results of a "tracer audit" would be the information reviewed
by the QMPI Program."*

**Theranos Response to Statement 5 – D5481 Finding #1:** The laboratory has revised its
audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB,
Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised
procedures establish that tracer audits must occur monthly; provide the protocol for a tracer
audit; and require that tracer audits be documented using the tracer audit form, CL FRM
00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a
quarterly audit to cover the quality management systems; provide the protocol for quarterly
audits; and require that quarterly audits are documented using the audit record form, CL QOP
00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear
that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on
findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training
on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

37
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                                                                              THPFM0003765183



theranos                                    1701 Page Mill Road    P 650.838.9292   theranos.com
                                            Palo Alto, CA 94304    F 650.838.9165

<u>Finding #2</u>

**D5481 Finding #2 – March 18 Letter Statement 1:**  *"Although the laboratory submitted a QC protocol (Ex. A, Tab 9), the laboratory's submission did not include an updated protocol for QC specific to the Theranos Proprietary Devices."*

> **Theranos Response to Statement 1 – D5481 Finding #2:**  This aspect of the review appears to be based on a miscommunication because Theranos **retired** the TPS 3.5 in early-August 2015.

**D5481 Finding #2 – March 18 Letter Statement 2:**  *"The reference protocol states at §§ 8.1.9-8.1.10:*

> *'No instrument or test method can be used for the purpose of performing a test to report a result to a patient prior to having passed all required QC procedures at least once for the day on which the test is to be performed. It is the responsibility of all testing personnel to ensure this does not occur. Testing personnel must immediately take the appropriate action for all failed QC runs, refer to section 8.4.'*

*In addition, the laboratory's submission states:*

> *'To perform this analysis, systematic error was investigated using quality control (QC) data and patient distribution over time. The QC data was reviewed in Levey-Jennings plots and evaluated for bias trends. The patient data was summarized by plotting monthly means, monthly medians and monthly means ("average of normal" or AON) calculated from central 95% of values. In addition, random errors were evaluated by analysis of QC data. Namely, QC data was reviewed to identify >2SD failures and period of elevated CV. Namely, batches of 10 consecutive QC data points were analyzed and the CV was calculated for each QC level during this period. If the CV was >30%, then all patient results run during that time period will be voided. (Ex. E, Tab 1).'*

*The laboratory's response does not include an evaluation of unacceptable QC results or patients affected or potentially affected by the cited QC failures. It is not clear how evaluating aggregate patient (i.e., monthly means and medians) and QC (i.e., bias trends, >2SD, CV) data addressed specific days that the QC was unacceptable and patient results were reported.*

*The summary (Ex. E, Tab 1) included analytes tested on the Theranos Proprietary Device. We note that general statements such as, but not limited to, were included:*

- *'Monthly patient distribution variance were noted, but they could not be further substantiated by QC trends'*
- *'Patient results following a QC failure and during periods of high CV are being voided'*

38

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                                                    THPFM0003765184

**theran⬤s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

-   *'Patient distribution and QC trends did not reveal significant trends.'*
-   *'Potential biases observed in patient distributions were found to be insignificant relative to the normal reference intervals'*

*The laboratory's submission did not provide any explanation or documentation to support these statements."*

**Theranos Response to Statement 2 – D5481 Finding #2:**  This deficiency concerns the TPS 3.5, which was one of the Theranos proprietary technologies in use in 2014 and 2015.  The laboratory began phasing out the TPS 3.5 in December 2014, and it was **fully retired** in early-August 2015.

The laboratory values CMS's feedback, and takes it very seriously.  The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was fully retired in early-August 2015.  As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5.  (Ex. AA, Tab 3).  The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures.  Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015.  As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015.  (Ex. AA, Tab 3).  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5481 Finding #2 – March 18 Letter Statement 3:**  *"The submission (Ex. E) includes a list of patient specimen accession numbers for which the laboratory "identified reports," but does not specify or include documentation to indicate whether corrected reports were generated and issued."*

**Theranos Response to Statement 3 – D5481 Finding #2:**  As indicated above, the laboratory has revised and broadened its analysis of this deficiency.  Based on that analysis, which is described above and in the attached documentation, the laboratory has, out of an extreme abundance of caution, voided all results reported for assays run on the TPS 3.5 in 2014 and 2015.  (Ex. AA, Tab 3).  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

<u>D5775</u>

<u>Finding #1</u>

39
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                                                                    THPFM0003765185



1701 Page Mill Road     P 650.838.9292     theranos.com
Palo Alto, CA 94304     F 650.838.9165

**D5775 Finding #1 – March 18 Letter Statement 1:** *"In the submitted protocol, the laboratory states: 'To ensure all manual differentials performed are comparable, ... manual differentials will be compared annually amongst the competent staff....' The laboratory provided no written procedure as to how "manual differentials will be compared annually.' In addition, the regulation requires the laboratory to conduct such evaluations twice a year, not annually."*

    **Theranos Response to Statement 1 – D5775:** The laboratory has revised the Cellavision SOP to include procedures for how manual differential will be compared and to require that the laboratory perform such evaluations twice a year. (Ex. BB, Tab 15 § 9.1.4.2). Please note, however, that this SOP is inactive because the laboratory stopped using the Cellavision on November 17, 2015, and has not used it since then.

**D5775 Finding #1 – March 18 Letter Statement 2:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

    **Theranos Response to Statement 2 – D5775 Finding #1:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

<u>Finding #2</u>

**D5775 Finding #2 – March 18 Letter Statement 1:** *"Although the laboratory submitted a method/instrument comparison protocol (Ex. A, Tab 28), we were unable to determine if the protocol was effectuated. In its submission, the laboratory states: 'The lab's technical supervisors and the quality system director will be responsible for ensuring that these*

40

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential

THPFM0003765186



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304     F 650.838.9165

*procedures are followed.' However, the laboratory's submission did not include any documentation to indicate that the technical supervisors or the quality systems director had been trained on the method/instrumentation comparison protocols."*

**Theranos Response to Statement 1 – D5775 Finding #2:**  This deficiency concerns method comparison for the TPS 3.5.  As indicated above, the TPS 3.5 was fully **retired** in early-August 2015.  Before the survey began, the laboratory had **stopped** running the same test using different methodologies or instruments, and the laboratory has **not** run the same test using different methodologies or instruments since then.  As a result, the laboratory has had no reason to use the method verification protocol that it included with the submission.  Although the laboratory does not have a need to use the revised method comparison protocol at this time, it has trained its technical supervisors and quality director on it. (Ex. BB, Tabs 12-12C).

**D5775 Finding #2 – March 18 Letter Statement 2:**  *"The laboratory's submission also includes the following statement:*

> *Because TPS's [Theranos Proprietary Devices] were factory calibrated by Theranos, the laboratory did not perform additional method correlation studies. As part of this investigation, Theranos examined the correlation of different TPS to evaluate their concordance. Namely, for SHGB, TT3, Vitamin B12 and Vitamin D, patient distributions were compared across representative TPS's in use during the same period (Exhibit E Tab 12-A; Tab 24-A, Tab 33-A). These data showed similar patient distributions across the different devices. In addition, comparison of assay results across different assay levels and different TPS's demonstrates that the instruments were well correlated to each other (Exhibit E, Tab 12-A; Tab 24-A, Tab 33-A). Namely, the median result for each TPS was within the total allowable error thereby demonstrating that the same assay reference ranges were appropriate for TPS.*

*The laboratory's response indicates that not all TPS would be included in the correlation studies rather 'across representative TPS in use during the same period.' The laboratory submitted correlation studies for Sex Hormone Binding Globulin (SHBG) and Vitamin D (VitD) only (Ex E, Tabs 12-A, 24-A and 33-A, respectively).  However, these studies did not include a date on either the summary or raw data, so we were unable to determine when the correlation studies occurred.  The submission for SHGB also included information on one document with box plots that included three devices and another document that included box plots of six devices, so we were unable to determine what devices were actually used for SHBG testing.*

*The laboratory's submission offered no response to correlation studies for Vitamin B12 and no explanation for the disparity between the devices used for QC and the devices used for patient*

41
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                                                                                    THPFM0003765187



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*testing. We also noted that there was no explanation as to where the total allowable error (TAE)*
*of 24% on the raw data documentation came from or if any TAE was calculated for the submitted*
*data. The laboratory used the median result for each proprietary device to determine if TAE was*
*acceptable, but did not provide an explanation why the median results were used."*

**Theranos Response to Statement 2 – D5775 Finding #2:** This portion of CMS's March 18
letter concerns aspects of the patient assessment analysis for tests run on the TPS 3.5. The
laboratory began phasing out the TPS 3.5 in December 2014, and it was **fully retired** in
early-August 2015.

As reflected in its submission, the laboratory believes oversight, implementation and
structure of its prior method comparison procedures were not satisfactory, which is why it
has developed the improved method comparison procedures that were included with the
submission. The laboratory has further revised those procedures in response to other
feedback contained in CMS's March 18 letter. (Ex. BB, Tab 12). Training on these
procedures has occurred. (Ex. BB, Tabs 12B-12C).

The laboratory values CMS's feedback, and takes it very seriously. The laboratory has
conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January
1, 2014 until the TPS 3.5 was **fully retired** in early-August 2015. As explained further in the
attached patient assessment analysis, the laboratory is not satisfied with its old quality
assessment program's ability to effectively flag and promptly address QC imprecision, QC
failures, and QC trends on the TPS 3.5. (Ex. AA, Tab 3). The laboratory has new leadership
and a new QMPI Program with robust quality monitoring and program improvement
procedures. Based on its re-review of QC data for the TPS 3.5, the laboratory has
determined that its prior QA program failed to satisfactorily address these types of QC issues
for assays run on the TPS 3.5 in 2014 and 2015. As corrective action, the laboratory has, out
of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in
2014 and 2015. (Ex. AA, Tab 3). Many corrected reports have been transmitted, and the
remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31,
2016. The remainder of the transmittals and confirmations of receipt will be provided to
CMS under separate cover.

**D5775 Finding #2 – March 18 Letter Statement 3:** *"To ensure the deficient practice does not*
*recur, the laboratory indicated that quarterly audits will be performed and suggested that the*
*audits results would be reviewed within the laboratory's QMPI Program. However, the*
*laboratory did not establish the procedure by which these quarterly audits are to be conducted.*
*In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used,"*
*but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would*

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                                                    THPFM0003765188

Trial Exh. 3144 Page 0042

**ER-2063**



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5775 Finding #1:** audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB Tab 7§ 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tab7B-C).

<u>D5779</u>

**D5779 – March 18 Letter Statement 1**: *"In Ex. F, the laboratory provided lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were issued."*

**Theranos Response to Statement 1 – D5779:**  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5779 – March 18 Letter Statement 2:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5779:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to

43
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential

THPFM0003765189



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304     F 650.838.9165

cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB Tab 7§ 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tab7B-C).

### D5787

**D5787 – March 18 Letter Statement 1:**  *"The laboratory submitted no written procedure for the documentation of the lot of bacteriology media used to test any given patient specimen, and no information as to whether laboratory staff has been trained on this new protocol."*

   **Theranos Response to Statement 1 – D5787:**  The laboratory has enclosed with this letter its written procedure for the documentation of bacteriology media QC protocol.  (Ex. BB, Tab 4 § 8.2).  The relevant laboratory personnel have been trained on that procedure, as reflected in the documentation enclosed at Ex. BB, Tabs 4B-4C.

**D5787 – March 18 Letter Statement 2:**  *"In its submission, the laboratory references Ex. L, Tab 6 which states: "When [media quality control] testing is completed the results are logged into an excel sheet with lot number and expiration date for each patient (see attached report)." We find no "attached report" in the submission and, therefore, no documentation indicating the laboratory's corrective action has been effectuated."*

   **Theranos Response to Statement 2 – D5787:**  The laboratory has effectuated its written bacteriology media QC protocol by logging each patient result into a separate excel worksheet that includes the lot number and expiration date for the bacteriology media lot used for that patient test.  We have enclosed examples of these excel spreadsheets, which show that the laboratory's corrective action has been effectuated.  (Ex. HH, Tab 6).

**D5787 – March 18 Letter Statement 3:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

   **Theranos Response to Statement 3 – D5787:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).

44
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

theran●s                                1701 Page Mill Road    P 650.838.9292    theranos.com
                                        Palo Alto, CA 94304    F 650.838.9165

Training on these procedures has occurred.  (Ex. BB, Tabs 8B-C).  The revised procedures
establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and
require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.
(Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to
cover the quality management systems; provide the protocol for quarterly audits; and require
that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex.
BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth
tracer and quarterly audits are reviewed, analyzed and presented based on findings and
analysis" during the QMPI Program meetings.  (Ex. BB Tab 7§ 7.5).  Training on the revised
QMPI procedures has occurred.  (Ex. BB, Tab7B-C).

<u>D5791</u>

<u>Finding #1</u>

**D5791 Finding #1 – March 18 Letter Statement 1:**  *"The laboratory submitted a protocol for
the SensoScientific Monitoring in Ex. A, Tab 24. The response does not specifically address the
days that the freezers did not meet acceptable temperatures as documented in the SensoScientific
Monitoring Audit Node Log. We could not determine if the new procedure has been effectuated
as no documentation was submitted to show that the unacceptable freezer temperatures were
addressed.*

 **Theranos Response to Statement 1 – D5791 Finding #1:**  The laboratory has effectuated its
revised procedures for the SensoScientific Monitoring that were included with our initial
submission.  Two examples of the current system monitoring are enclosed with this letter.
(Ex. II, Tabs 1A-1B).  First, on March 18, 2016, at about 11:00 a.m., the laboratory's Wi-Fi
became temporarily inoperable.  All monitors went into failure mode and a down-time paper
recording was initiated.  The Wi-Fi was brought back up and the system was restored by 6:00
p.m.  Data was reclaimed from the monitors for the period in question, and this failure was
documented in the enclosed Alarm History and Corrective Action (Ex. II, Tab 1A) and the
enclosed Occurrence Report Form.  (Ex. II, Tab 1B).  Second, on March 19, 2016, freezer
7063 failed a temperature check.  The low magnitude and brevity of the failure was below
the alarm threshold.  (Ex. II, Tab 4).  The failure was detected and evaluated on a weekly
review.  (Ex. II, Tab 4).  As it had corrected itself less than 30 minutes after it occurred, there
was no need for further action.  (Ex. II, Tab 4).  This demonstrates that the procedure is being
followed and temperatures are being adequately monitored.  In addition, as stated in above
regarding D5413, the laboratory has also posted signs on the freezers pursuant to the new
procedures, as reflected in the attached documentation.  (Ex. II, Tab 2).

45

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                                                    THPFM0003765191



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

**D5791 Finding #1 – March 18 Letter Statement 2:** *In addition, the laboratory states that training has occurred, but it was not clear who should be trained as 'laboratory supervisor or designee' was not defined."*

> **Theranos Response to Statement 2 – D5791 Finding #1:** The laboratory has revised this procedure to clarify that "[i]t is the daily responsibility of the laboratory supervisor to monitor and record the temperatures of refrigerators and freezers and the temperature and humidity of each lab room and ambient storage space." (Ex. BB, Tab 13 § 4.5). The revised procedure is enclosed at Ex. BB, Tab. 13.

**D5791 Finding #1 – March 18 Letter Statement 3:** *"Training records provided in Ex. A, Tab 30 included only training documents for one general supervisor."*

> **Theranos Response to Statement 3 – D5791 Finding #1:** The laboratory has enclosed with this letter a complete set of training records on this SOP, which show that the relevant laboratory personnel have been trained. (Ex. BB, Tabs 13B-13C).

**D5791 Finding #1 – March 18 Letter Statement 4:** *"Several freezers were identified as 'not used in patient testing' (see Ex. N, Tab A); however, based on interviews during the onsite visit, these freezers were identified as being used for CLIA activities. The submission did not include a response or data related to the freezers identified as 'not used in patient testing.'"*

> **Theranos Response to Statement 4 – D5791 Finding #1:** D5791 #1 identifies the same six -20 C freezers and four -80 freezers as D5413. In the laboratory's submission, we explain that five of those freezers did not contain materials that would be used in the future for clinical patient testing. Rather, they only contained material that might be used in the future for research and development.

Based on CMS's March 18 letter, it appears that there was a miscommunication when the CMS surveyors were onsite. D5413, Paragraph f, states that CMS had a discussion about these freezers with the "Director of Assay Systems and technical supervisor at 11/19/15 at approximately 11 am." The Director of Assay Systems did not have any regular involvement with those freezers at that time and did not have knowledge of their contents. The "technical supervisor" in attendance on November 19, 2015 joined the company on October 26, 2015 (Ex. HH, Tab 8); he also did not have regular involvement with those freezers at the time and did not have knowledge of their contents. To the extent CMS understood either of these individuals to be confirming the contents of these freezers or whether these freezers were used in clinical patient testing, there was a miscommunication.

The laboratory has looked into this issue further, and has reconfirmed that the statements in the laboratory's submission are accurate. As reflected in the enclosed documentation:

- On November 19, 2015, there were four -20 C freezers in the microbiology or BUGS laboratory. 7061 BUGS -20 C Freezer 4 did **not** contain any materials for future use in clinical patient testing. (Ex. II, Tab 3B).

46
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential

**theranos**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

- On November 19, 2015, there was one -20 C freezer in the capillary laboratory. Clinical patient testing in the Normandy laboratory **stopped** on September 20, 2015, and there has **not** been any clinical patient testing in the Normandy laboratory since then. The 1 Normandy -20 C freezer 7066 did **not** contain any materials for future use in patient testing. (Ex. II, Tab 3C).

- On November 19, 2015, there were four -80 C freezers. 7098 -80 C Freezer 1 Nuair, 7111 -80 C Freezer 2 Thermo, and 7113 -80 2 CLIA Lab did not contain any materials for future use in clinical patient testing. While the last of those three freezers was named 7113 -80 2 CLIA Lab, it was only used to store old specimens that were not for future use in clinical patient testing. (Ex. II, Tab 3A)

**D5791 Finding #1 – March 18 Letter Statement 5:**   *The laboratory submitted an article for the use of Mean Kinetic Temperatures (MKT) (Ex. N, Tab 1). This article relates to the handling, storage, and distribution of temperature sensitive pharmaceuticals, not clinical laboratory specimens, reagents, reference materials, etc. We are unclear as to how this article applies to this deficient practice, and note that the written procedure submitted by the laboratory at Ex. A, Tab 24 does not incorporate monitoring temperature by MKT."*

   **Theranos Response to Statement 5 – D5791 Finding #1:** Although the article is not critical to our analysis, it is relevant because it provides a specific rationale for understanding the chemical effects of brief increases (or decreases) in temperature on pharmaceuticals, and by extrapolation, on chemical controls. The conclusion of the article is that brief periods of temperature elevation have little effect on the rate of chemical degradation on the product being stored. While we do not recommend storing chemical control material in an unstable environment, the article gives reassurance that chemical control materials subjected to a short period of increased temperature by mistake are unlikely to be chemically degraded.

**D5791 Finding #1 – March 18 Letter Statement 6:**   *The laboratory also submitted an article related to the storage of bacterial samples for optimal viability (Ex. N, Tab 22). We note that the submitted written procedure relates to determining acceptable temperature viability of bacterial samples does not include any references to this article. We are unclear as to how this article applied to this deficient practice."*

   **Theranos Response to Statement 6 – D5791 Finding #1:** This article is cited in the laboratory's revised patient assessment for this deficiency, which is enclosed with this letter. (Ex. AA, Tab 4). This article is relevant because it shows that bacterial samples will remain viable for 10 years at -80C and for 1-3 years at -20C.

**D5791 Finding #1 – March 18 Letter Statement 7:**   *The laboratory submitted no evidence to support the following conclusion for the Sanyo JP Lab 7059 -20 freezer: '[The laboratory]*

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                                                    THPFM0003765193



theran**s**

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

*determined that higher storage temperature had no effect on the calibrators or controls stored in this freezer. There is no patient impact from the change in temperature during the time period.'"*

**Theranos Response to Statement 7 – D5791 Finding #1:** The laboratory has revised its patient assessment analysis to provide more detail and documentation about its review of the effect this issue may have had on the Immulite controls stored in this freezer. (Ex. AA, Tab 4). Based on that review, the laboratory has voided certain test results. (Ex. AA, Tab 4). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5791 Finding #1 – March 18 Letter Statement 8:** *In addition, the laboratory stated for another freezer (1 BUGS 7120 -80 freezer) that the 'MKT remained between -70 and -86 C for the entire date range.' However, the laboratory indicated that "a small number of bacterial cultures ... labeled to be stored at -80C or colder" were stored in this freezer. It was unclear as to why it was appropriate to store 'bacterial cultures ... labeled to be stored at -80C or colder' to be stored at temperatures of -70C to -79C."*

**Theranos Response to Statement 8 – D5791 Finding #1:** The temperature at which these bacterial cultures are stored is not determined by a manufacturer. While the laboratory recognizes that it should have followed its procedures for maintaining the temperature of this freezer at -80C or colder, storage of these bacterial cultures at temperatures of -70C to -79C did not have the potential to affect patients receiving tests in 2014 and 2015. Most importantly, these bacterial cultures can only be used in patient testing after there is growth, which occurs **after** the bacterial culture is removed from the freezer. If there is no growth after the bacterial culture is removed from the freezer, then the culture is not viable and cannot be used in patient testing. Therefore, the higher temperature of this freezer did not have any potential to affect patients, even if even it had caused a bacterial culture to be unviable.

It is also worth noting that the temperature of -70C to -79C should not have had an impact on the viability of these bacterial cultures, which were put in these freezers after the laboratory moved to the Newark facility in October 2014. The laboratory labels bacterial cultures for storage at -80C or colder only because that allows for the longest period of viability, which is 10 years. (Ex. II, Tab 26). However, bacterial cultures remain viable for 1-3 years when stored at -20C. (Ex. II, Tab 26).

**D5791 Finding #1 – March 18 Letter Statement 9:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the*

48
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential

THPFM0003765194

**theran⬢s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 9 – D5791 Finding #1:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

Finding #2

**D5791 Finding #2 – March 18 Letter Statement 1:** *"The laboratory submitted a protocol for a Master Validation Plan (Ex. E, Tab 30B) which required the %CV of replicates to be not more than 20% (25% at the lower and upper limits of detection). The submitted protocol was different than the protocol presented to the surveyor at the time of the onsite survey which required the %CV of replicates to be not more than 15% (20% at the lower and upper limits of detection). The %CV in the protocol presented to the surveyor at the time of the onsite survey matched the %CV of the predicate devices. It is unclear as to why the TPS, which is covered by the Master Validation Plan, can now have %CV's for replicates greater than the predicate devices; no explanation was submitted. In addition, we note that the %CV's (18.7% - 63.8%) included in the submission does not appear to have been evaluated using this new protocol nor was it addressed in the laboratory's response provided at Ex. E, Tab 1."*

**Theranos Response to Statement 1 – D5791 Finding #2:** This deficiency concerns the TPS 3.5. As noted above, the TPS 3.5 was **fully retired** in early-August 2015.

With respect to these validation plans, there appears to have been a miscommunication. During the September 22-23, 2015 on-site visit, the laboratory understood that CMS had requested the validation plan for proprietary chemistry assays run on other Theranos technologies. The laboratory did not realize that CMS believed this plan was also the

49
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT



theran⬤s                          1701 Page Mill Road    P 650.838.9292   theranos.com
                                  Palo Alto, CA 94304    F 650.838.9165

validation plan that applied to ELISA assays run on the TPS 3.5.  After reviewing the Form 2567, we realized that there had been a miscommunication, which is why our submission included the ELISA Master Validation Plan.

As detailed above, the laboratory values CMS's feedback, and takes it very seriously. [13]  The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was **fully retired** in early-August 2015.  As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5.  (Ex. AA, Tab 3).  The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures.  Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015.  As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015.  (Ex. AA, Tab 3).  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5791 Finding #2 – March 18 Letter Statement 2:**  *"The submission (Ex. E) includes a list of patient specimen accession numbers for which the laboratory "identified reports," but does not specify or include documentation to indicate whether corrected reports were generated and issued."*

**Theranos Response to Statement 2 – D5791 Finding #2:**  As indicated above, the laboratory has revised and broadened its analysis of this deficiency and associated corrective actions.  Based on that analysis, which is described above and in the attached documentation, the laboratory has, out of an extreme abundance of caution, voided all results reported for assays run on the TPS 3.5 in 2014 and 2015.  (Ex. AA, Tab 3).  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be

---

[13] In discussing establishment of precision for an LDT, the March 18 letter references a comparison of %CVs between an LDT and "predicate devices."  We note, however, that CLIA regulations do not contain any regulation requiring that there be any correlation or equivalence of %CV between LDTs and predicate devices.  Rather, the regulations require only that the precision for the test must be established for the LDT itself.  42 C.F.R. § 493.1253(b)(2).  It also is generally accepted that accuracy is the only required performance specification that typically requires a correlation study.  42 C.F.R. § 493.1253(b)(2).

50
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                                    THPFM0003765196



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

Finding #3

**D5791 Finding #3 – March 18 Letter Statement 1:**  *"The laboratory's review of the QC found in Ex. E, Tab 1 did not specify what period of QC the laboratory reviewed."*

**Theranos Response to Statement 1 – D5791 Finding #3:**  As indicated above, the laboratory's analysis covers the entire period in which each assay run on the TPS 3.5 was in use in 2014 and 2015.  (Ex. AA, Tab 3).

**D5791 Finding #3 – March 18 Letter Statement 2:**  *"The quality assessment (QA) documentation related to QC data from the survey in July 2014, October 2014, and February through June 2015. The laboratory's investigation did not indicate that the review had identified the cited issues related to QC."*

**Theranos Response to Statement 2 – D5791 Finding #3:**  The revised analysis enclosed with this letter makes clear that the laboratory identified the cited issues related to QC.  (Ex. AA, Tab 3).  The laboratory's review of QC in connection with the submission, as well as the re-review reflected in the enclosed revised analysis, included a review of imprecision, QC trends, and QC failures, including failures occurring where one of the two levels of control had a value of 2SD or greater.

**D5791 Finding #3 – March 18 Letter Statement 3:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 3 – D5791 Finding #3:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on

51
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                                              THPFM0003765197



1701 Page Mill Road    P 650.838.9292   theranos.com
Palo Alto, CA 94304    F 650.838.9165

findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

<u>Finding #4</u>

**D5791 Finding #4 – March 18 Letter Statement 1:**  *"Although the laboratory's submitted protocol included information about quarterly audits and agenda items for the laboratory's QMPI Program, the submission does not provide specific actions to take when problems are identified, specifically related to clotted specimens. The laboratory states in Ex. L, Tab 35 that "[p]atient specimens that did not meet the lab's acceptance criteria were rejected ... " However, the issue was not that the clotted specimens were rejected, rather that the laboratory's QA program did not identify the high number of clotted specimens over a period of three quarters. The submission does not include any documentation showing that the issue was identified and corrected. We note that Ex. A, Tab 12, §7.2.1.6 indicates that the QMPI Program agenda included specimen rejection rate partitioned by rejection criteria, but does not require that any action be taken based on this agenda item. In addition, we note that in Ex. A, Tab 12, §7.1, the laboratory provided the frequency of the QMPI Program meetings, but does not indicate any action should be taken in the event it is determined that the quality metrics were not met."*

**Theranos Response to Statement 1 – D5791 Finding #4:**  The laboratory has further revised its QMPI Program procedures to ensure that the QMPI Program identifies specimen rejection issues promptly.  (Ex. BB, Tab 7 § 7.2.3.1). The procedure requires that when analyzing specimen rejection and redraws, the QMPI team will "[i]dentify any corrective action to take based on data such as retraining or a procedure change." (Ex. BB, Tab 7 § 7.2.3.1.e)

**D5791 Finding #4 – March 18 Letter Statement 2:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5791 Finding #4:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tab 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a

52
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                      THPFM0003765198



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

**D5793**

Finding #1

The March 18 Letter states: *"See our reviews of D5403, D5437, D5469, and D5779."* Accordingly, we refer you to our responses to those reviews.

Finding #2

**D5793 Finding #2 – March 18 Letter Statement 1:**  *In the submission, the laboratory states:*

> *Based on comprehensive review, multiple examples of failed QC without the appropriate documentation with no investigation or corrective action was identified which is now addressed with revised SOPS and training. Additional competency is on-going to ensure CLS demonstrate the required proficiency with quality control and the appropriate investigation, corrective action and notification.*

*We find no documentation to indicate that the 'revised SOPS' have been effectuated. That is, we find no documentation of cytometry QC failure investigations and corrective actions taken based on the 'revised SOPS' as discovered while conducting the 'comprehensive review.'"*

**Theranos Response to Statement 1 – D5793 Finding #2:**  There appears to have been a miscommunication here because the laboratory **stopped** running tests on the flow cytometer before the survey began on September 22, 2015, and **has** not run any tests on the instrument since then.  Because the flow cytometer is not in use, and has not been in use since the survey began, there has not been any new QC failures that required investigation or corrective action under the laboratory's new procedures.  The "review" discussed in the submission was simply intended to refer to the analysis conducted to address the deficiency identified by CMS.  The issue addressed by the "review" — i.e., failing to document corrective action for QC fails for the Fortessa and Canto — is the same issue identified by CMS in its deficiency, and thus did not constitute a new issue or occurrence.

**D5793 Finding #2 – March 18 Letter Statement 2:**  *In Ex. J, the laboratory provided lists of patient specimen accession numbers for which the laboratory intended to issue corrected test*

53
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential

THPFM0003765199



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*reports. The laboratory provided no documentation to indicate corrected reports were generated and issued.*

**Theranos Response to Statement 2 – D5793 Finding #2:**  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK)  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5793 Finding #2 – March 18 Letter Statement 3:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 3 – D5793 Finding #2:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

Finding #3

**D5793 Finding #3 – March 18 Letter Statement 1:**  *"In the submission, the laboratory states:*

- *'07/16/2015: Level 3 QC outside manufacturer's recommended range, and not repeated, therefore level 3 QC was out of control for the day'*
- *'09/01/2015 to 09/13/2015: all level 3 control results are outside the manufacturer's recommended range (negative bias)'*
- *'10/01/2015 - 10/31/2015: all level 3 control results are outside the manufacturer's recommended range (negative bias)'*
- *'All 3 levels of QC were not run on 11/04/2015, 11/05/2015, 11/07/2015, 11/08/2015, 11/09/2015, 11/10/2015, 11/12/2015, 11/14/2015, and 11/15/2015' [The laboratory*

54
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                                                                    THPFM0003765200



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*provided no information as to whether patient HCG specimens were tested on the November dates listed.]*

*Yet, the laboratory concluded: 'Results for urine HCG are quantitative with a cut off of 30 mUI/ml. Because of the nature of this assay no correct reports are required.'*

*Since QC failures may indicate possible test system problems and it is unknown as to how the HCG (human chronic gonadotropin) test results were used and interpreted, we question the laboratory's conclusion and the accuracy and reliability of any patient HCG test results reported on the July, September, October, and November dates listed."*

**Theranos Response to Statement 1 – D5793 Finding #3:** The laboratory has conducted a further review of its data and has revised its patient assessment analysis, as reflected in the enclosed documentation.  (Ex. AA, Tab 8).

**D5793 Finding #3 – March 18 Letter Statement 2:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5793 Finding #3:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

Finding #4

**D5793 Finding #4 – March 18 Letter Statement 1:**  *"In the submission, the laboratory states:*

- *'Anti-HBs is a qualitative assay with a positive cutoff of 11 so no corrected reports are*

55
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential

THPFM0003765201

**theranos**

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

*required.'*
- *'Qualitative assay will not require corrected reports to be issued'*

*We are unclear as to how the laboratory came to these conclusions and the submission does not contain any documentation to support these statements."*

**Theranos Response to Statement 1 – D5793 Finding #4:** The laboratory has conducted a further review of this data and has revised its patient assessment analysis, as reflected in the enclosed documentation. (Ex. AA, Ex. 9).

**D5793 Finding #4 – March 18 Letter Statement 2:** *"Nevertheless, to ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5793 Finding #4:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

<u>Finding #5</u>

**D5793 Finding #5 – March 18 Letter Statement 1:** *"In the submission, the laboratory states: 'Corrected [LH] reports to be sent for patient samples analyzed for the following time period: 7/1/2015-7/8/2015; all patient samples analyzed in 8/2015 and 9/2015.' However, later in the submission, the laboratory concluded that '[b]ased on this review, 0 corrected reports are being issued.' From these conflicting statements, it is unclear whether the laboratory addressed patient outcomes. The laboratory provided no documentation to indicate that corrected LH (luteinizing hormone) patient reports were issued."*

56
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                          THPFM0003765202



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

**Theranos Response to Statement 1 – D5793 Finding #5:**  The laboratory's patient assessment analysis for this finding appears to have included an inadvertent copy and paste mistake.  The laboratory has enclosed its revised analysis, which explains why it has issued corrected reports for certain patients having the potential to be affected.  (Ex. AA, Tab 10).  Many corrected reports have been transmitted, and the remainder are being transmitted.  (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5793 Finding #5 – March 18 Letter Statement 2:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5793 Finding #5:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

Finding #6

**D5793 Finding #6 – March 18 Letter Statement 1:**  *"In the submission, the laboratory states:*

-   *"All patient results reported> 472 U/ml will need corrected reports."*
-   *"Based on this review, 122 corrected [CA-125] reports are being issued to reflect the verified reportable range."*

*The laboratory provided no documentation to indicate corrected reports were generated and issued.*

57
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                                                                                    THPFM0003765203



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

**Theranos Response to Statement 1 – D5793 Finding #6:**  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5793 Finding #6 – March 18 Letter Statement 2:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5793 Finding #6:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

Finding #7

**D5793 Finding #7 – March 18 Letter Statement 1:**  *"The submission references "Ex. H, Tabs 1, 2 - 5, 16, 17 - 20, 21, 22 - 25, 26, 27 - 30, 36, 37 - 40,46, 47 - 50, 56, and 57 - 60." We found no such references in the materials provided to CMS."*

**Theranos Response to Statement 1 – D5793 Finding #7:**  The citation references to Ex. H, Tabs 1, 2 - 5, 16, 17 - 20, 21, 22 - 25, 26, 27 - 30, 36, 37 - 40,46, 47 - 50, 56, and 57 – 60 were inadvertent transcription errors, and the inclusion of these blank tabs in the materials was an inadvertent copying error.

**D5793 Finding #7 – March 18 Letter Statement 2:**  *"Throughout Ex. H, the submission includes lists of patient specimen accession numbers for which the laboratory intended to issue*

58

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential

THPFM0003765204



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*corrected test reports. The laboratory provided no documentation to indicate corrected reports were generated and issued."*

**Theranos Response to Statement 2 – D5793 Finding #7:**  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5793 Finding #7 – March 18 Letter Statement 3:**  *"We found no information addressing how the laboratory will ensure the timely review of the effectiveness of any actions taken. Although the laboratory indicated that quarterly audits will be performed to ensure compliance with this deficient practice, it is unclear how quarterly audits will timely address the issues cited under this deficiency.  Nevertheless, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 3 – D5793 Finding #7:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

Finding #8

**D5793 Finding #8 – March 18 Letter Statement 1:**  *"The submission references 'Ex. B, Tabs 51 and 53-55, and Ex. H, Tabs 1,2 - 5, 17 - 20, 26, 27 -30, 36, 37 - 40, 46, 47 - 50, 56, and 57 - 60.' We found no such references in the materials provided to CMS."*

**Theranos Response to Statement 1 – D5793 Finding #8:**  The citation references to Ex. B, Tabs 51 and 53-55, and Ex. H, Tabs 1,2 - 5, 17 - 20, 26, 27 -30, 36, 37 - 40, 46, 47 - 50, 56, and 57 - 60 were inadvertent transcription errors, and the inclusion of these blank tabs in the materials was an inadvertent copying error.

59

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                                    THPFM0003765205

**theran⬡s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

**D5793 Finding #8 – March 18 Letter Statement 2:**   *"The laboratory submitted a new QC procedure (Ex. A, Tab 1) which requires QC Pass/Fail Criteria. Specifically, Section 8.2.1.1.a - c. provides that QC must meet certain criteria as well as '... the required Westgard rule pass criteria.' Westgard rules included a "10x" rule for rejecting QC when 10 consecutive control measurements fall on one side of the mean. We note that on page 17 of 19 (Ex. A, Tab 6) in the updated protocol that the "10x" rule was included as part of the Westgard rules which the lab must follow. The lab provided no documentation indicating that the "10x" rule was evaluated as part of its review ... Because the laboratory has not shown whether it can follow its own QC protocols, it is unclear whether the laboratory's quality assessment mechanisms can monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

> **Theranos Response to Statement 2 – D5793 Finding #8:**  The laboratory has extended this analysis to evaluate global quality control indicators, as reflected in the attached documentation.  (Ex. AA, Tab 11).  As a result of that analysis, the laboratory has voided additional results for certain chemistry assays.  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.
>
> The laboratory is capable of ensuring that the deficient practice in D5793 Finding #8 does not recur. Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures.  The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016.  Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory.  In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant.  Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team.  The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

**D5793 Finding #8 – March 18 Letter Statement 3:**   *"In Ex. B and Ex. H, the submission includes lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were generated and issued."*

> **Theranos Response to Statement 3 – D5793 Finding #8:**  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

60
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                                                                THPFM0003765206



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

Finding #9

**D5793 Finding #9 – March 18 Letter Statement 1:** *"The laboratory did not submit any documentation in the referenced exhibits related to an updated protocol for Alternative Assessment Procedures (AAP); therefore, we have concluded that the current protocol applies. The laboratory's submission did not include any documentation to explain why the laboratory did not follow its AAP protocol for the Theranos Proprietary System. Because the laboratory has not shown whether it can follow its own AAP protocols, it is unclear whether the laboratory's quality assessment mechanisms can monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

**Theranos Response to Statement 1 – D5793 Finding #9:**  There appears to have been a miscommunication.  The TPS 3.5 was **fully retired** in early-August 2015.  In addition, the laboratory **stopped** using its other LDTs, and does not have plans to resume using them as it transitions to compliance with FDA quality systems requirements for its LDTs and introduces next generation technologies.  Accordingly, the AAP protocol that was used for tests run on these instruments in 2014 and 2015 is not in use.

Furthermore, although alternative proficiency testing is not required for any test that is in use in the lab, the laboratory's revised proficiency testing procedure includes new procedures for alternative proficiency assessment. (Ex. BB, Tab 3 § 9.2.4).  These alternative proficiency assessment procedures were in the version of the proficiency testing procedure included with our submission, and are also in the revised proficiency testing procedure enclosed with this letter.  (Ex. BB, Tab 3).  Training on the revised proficiency testing procedure has occurred. (Ex. BB, Tabs 3B-3C). The QMPI procedures state that the "meeting standing agenda" includes a discussion of analytical quality metrics including proficiency testing results and overall performance. (Ex. BB, Tab 7 § 7.5.2.5).

The laboratory is capable of ensuring that the deficient practice in D5793 Finding #9 does not recur. Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures.  The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016.  Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory.  In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant.  Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team.  The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

61
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

<u>Finding #10</u>

**D5793 Finding #10 – March 18 Letter Statement 1:** *Ex. A, Tab 9 of the submission contains the protocol "Method Validation." Section 8.4 of this protocol, "Reference Intervals," states:*

> *The reference intervals are established from a selected reference population. Typically, when both decreased and increased levels are clinically significant, it is defined as the interval between and including the lower and upper reference limits of the studies population. This is calculated as the central 95 percentile of the population distribution where the lower and upper reference limits are demarcated as the 2.5th and 97.5th percentiles of the underlying distribution of values ... The reference intervals are used to establish expected level in health "normal" individuals. Values outside the reference range are considered "abnormal" or "high" or "low."*

*In Ex. E, Tab 1, the laboratory states:*

> *[The] laboratory director decided to use medical decision limits based on national consensus. Accordingly, the following decision limits were displayed on all lab reports for Vitamin D. As noted in CLSI EP28-A3, "when decision limits determined by national or worldwide consensus exist, these limits, rather than reference intervals should be reported.*

*In Ex. E of the submission, the laboratory provided the following "medical decision limits:"*

| | |
|---|---|
| *Deficiency:* | *<20.0 ng/mL* |
| *Insufficiency:* | *20.0 - 29.0 ng/mL* |
| *Sufficiency:* | *30.0 - 100.0 ng/mL* |
| *Possible Toxicity:* | *>100.0 ng/mL* |

*We were unclear as to the laboratory's definition of "medical decision limits." No definition of this phrase was found in Section 3 - Definitions of the "Method Validation" protocol. In addition, no reference to CLSI EP28-A3 was found in the submitted protocol. We also note that the submitted protocol does not include a reference to "medical decision limits" as a criterion for determining reference range.*

**Theranos Response to Statement 1 – D5793 Finding #10:**  D5793 Finding #10 relates to the TPS 3.5.  The TPS 3.5 was **fully retired** in early-August 2015.  The laboratory's revised method verification procedure references a "medical decision level," which is defined in the procedure as "[t]he concentration of analyte in blood or bodily fluid sample being analyzed at which some medical action is indicated for proper patient care. There may be several medical decision limits for a given analyte."  (Ex. BB, Tab 5 § 3.9).  In addition, this revised

62

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential

THPFM0003765208



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

procedure references CLSI EP28-A3 (Ex. BB, Tab 5 § 10.6), which states: "for some analytes, reference intervals have been replaced by *decision limits [emphasis in original]*, established by national (or international) consensus.  As examples, consider cholesterol and glycated hemoglobin."  Training on the laboratory's revised method verification procedure has occurred.  (Ex. BB, Tabs 5B-5C).

**D5793 Finding #10 – March 18 Letter Statement 2:** *Since the laboratory provided no definition of "critical medical decision level," no information regarding the laboratory's disparity between the reference range (9.3 - 47.9 ng/mL) in the validation documentation and raw data reports, and no explanation as to how a Vitamin D level could be both normal and deficient or insufficient, it is unclear as to whether the laboratory has followed its own "Method Validation" protocol set forth at Section 8.4....  Because the laboratory has not shown whether it could follow its own validation protocols, it is unclear whether the laboratory's quality assessment mechanisms can monitor the laboratory's corrective actions and ensure this deficient practice does not recur.*

**Theranos Response to Statement 2 – D5793 Finding #10:**  D5793 Finding #10 concerns the TPS 3.5.  There appears to have been a miscommunication because the TPS 3.5 was **fully retired** in early-August 2015.  Accordingly, the laboratory has not re-validated any assay on the TPS 3.5.  References to validation data in documents enclosed with the submission are to validation reports prepared **before** the survey began and **before** the laboratory's revised procedures were made effective (those reports were either reviewed by CMS or available to CMS during the survey).

Because there is a national consensus for the decision levels for Vitamin D, the laboratory was correct in using the national consensus instead of a reference interval established through a validation study.  CLSI EP28-A3 states:  "for some analytes, reference intervals have been replaced by *decision limits [emphasis in original]*, established by national (or international) consensus.  As examples, consider cholesterol and glycated hemoglobin."

The laboratory's revised method verification procedure references a "medical decision level," which is defined in the procedure as "[t]he concentration of analyte in blood or bodily fluid sample being analyzed at which some medical action is indicated for proper patient care. There may be several medical decision limits for a given analyte."  (Ex. BB, Tab 5 § 3.9).  In addition, this revised procedure references CLSI EP28-A3.  (Ex. BB, Tab 5 § 10.6).  Training on the laboratory's revised method verification procedure has occurred.  (Ex. BB, Tabs 5B-5C).

Additionally, the laboratory is capable of ensuring that the deficient practice in D5793#10 does not recur. Significantly, the laboratory has brought in an entirely new leadership team

63
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

that is directly involved with implementing and monitoring the laboratory's new procedures. The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016. Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory. In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant. Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team. The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

**D5793 Finding #10 – March 18 Letter Statement 3:** *"Throughout Ex. E, the laboratory provided a list of patient specimen accession numbers for which the laboratory 'identified reports,' but did not specify or submit documentation to indicate whether corrected reports were generated and issued."*

**Theranos Response to Statement 2 – D5793 Finding #10:** This deficiency concerns the TPS 3.5, which was one of the Theranos proprietary technologies in use in 2014 and 2015. The laboratory began phasing out the TPS 3.5 in December 2014, and it was **fully retired** in early-August 2015.

The laboratory values CMS's feedback, and takes it very seriously. The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was fully retired in early-August 2015. As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5. (Ex. AA, Tab 3). The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures. Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015. As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015. (Ex. AA, Tab 3). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5801**

**D5801 – March 18 Letter Statement 1:** *"The submission references "Ex. I, Tabs 2-6." We located these tabs, but found no documentation in Tabs 2, 5 and 6."*

64
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                                                                    THPFM0003765210



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

**Theranos Response to Statement 1 – D5801:** There was an inadvertent copying error for Exhibit I to the initial submission.  The laboratory has enclosed the applicable documents with this letter, as well as additional documents related to the laboratory's broader analysis of the PT/INR test over the entire time it was run on this Siemens BCS XP instrument.  (Ex. GG).

**D5801 – March 18 Letter Statement 2:**  *"In the submission, the laboratory states:*

> *Before PT/INR testing resumes, the lab will also prepare a revised assay-specific procedure for PT/INR to reinforce that the International Normalized Ratio (INR) must be calculated accurately prior to reporting patient test results. The relevant testing personnel will be required to demonstrate competency to ensure the practice is consistent with these procedures.*

*We note that the laboratory provided no documentation to indicate that the inaccurate calculations were reviewed or that INR calculation using different lot numbers of Dade Innovin were reviewed for accuracy. In addition, we found that the laboratory did not provide documentation to ensure that PT/INR results reported from calculations were, and would continue to be, accurate."*

**Theranos Response to Statement 2 – D5801:**  As noted above, the laboratory **stopped** running PT/INR tests on the Siemens BCS XP on September 17, 2015, and has **not** run any PT/INR tests since then.  The laboratory has reviewed the inaccurate calculation and has reviewed the INR calculations for different lot numbers of Dade Innovin that were used with this Siemens BCS XP instrument from the time it was put in use in October 2014.  As a result of this review, the laboratory has determined that certain INR calculations for prior lots were not accurate because the laboratory did not use the correct MNPT and ISI figures for those calculations.  Based on this finding and other findings in the revised PT/INR patient assessment that is enclosed with this letter, the laboratory has voided all PT/INR results reported from October 2014 through September 2015.  (Ex. AA, Tab 7).  Many corrected reports have been transmitted, and the remainder are being transmitted.  (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

The laboratory is capable of ensuring that the deficient practice in D5801 does not recur. Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures.  The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016.  Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory.  In addition, the laboratory has hired

65
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                                                 THPFM0003765211



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant.  Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team.  The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

**D5801 – March 18 Letter Statement 2:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

> **Theranos Response to Statement 2 – D5801:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

<u>D5805</u>

**D5805 – March 18 Letter Statement 1:**  *"The submission references "Ex. I, Tabs 2-6." We located these tabs, but found no documentation in Tabs 2, 5 and 6."*

> **Theranos Response to Statement 1 – D5805:**  There was an inadvertent copying error for Exhibit I to the initial submission.  The laboratory has enclosed the applicable documents with this letter, as well as additional documents related to the laboratory's broader analysis of the PT/INR test over the entire time it was run on this Siemens BCS XP instrument.  (Ex. GG).

**D5805 – March 18 Letter Statement 2:**  *In its submission, the laboratory states: 'The lab revised its patient reports during the survey so that the interpretive note appears only under the*

66

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                                                      THPFM0003765212



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

*heading for patients with therapy.' However, no updated forms were shown to the surveyor during the survey and the laboratory's submission does not include documentation of the updated reports.*

**D5805 – March 18 Letter Statement 2:**  As indicated above, the laboratory performed a patient assessment for PT/INR tests run on this BCS XP instrument with reagent lots that were used prior to the reagent lot identified in CMS's Form 2567.  Based on that review, the laboratory has voided all PT/INR results from the time this BCS XP instrument was put in use in October 2014.  (Ex. AA, Tab 7).  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5805 – March 18 Letter Statement 3:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 3 – D5805:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8). Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

**D5821**

**D5821 – March 18 Letter Statement 1:**  *"The submission references "Ex. I, Tabs 2-6." We located these tabs, but found no documentation in Tabs 2, 5 and 6."*

67

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                                                                                   THPFM0003765213



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

**Theranos Response to Statement 1 – D5821:**  There was an inadvertent copying error for Exhibit I to the initial submission.  The laboratory has enclosed the applicable documents with this letter, as well as additional documents related to the laboratory's broader analysis of the PT/INR test over the entire time it was run on this Siemens BCS XP instrument.  (Ex. GG).

**D5821 – March 18 Letter Statement 2:**  *"In Ex. I, the laboratory provided lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were issued. "We also note that the Patient Impact Assessment (Ex. I, Tab 1) states that 'remedial action was taken on 9/25/15,' but 'corrected reports were issued beginning on 11/10/15 and completed on 11/12/15.' There was no explanation as to why there was such a long period of time between the remedial action and issuing corrected reports."*

**Theranos Response to Statement 2 – D5821:**  All of these corrected reports for PT/INR, along with documentation confirming that they were sent, are enclosed with this letter.  (Ex. GG, Tab 7).  On September 22 or 23, CMS identified a number of issues related to PT/INR tests during the period April to September 2015.  The laboratory undertook a thorough investigation.  Given the number of issues to review, the investigation took time to complete.  Completion of the investigation was also hindered by the absence of a highly qualified, full-time laboratory director.  The laboratory subsequently hired its new lab director, Dr. Kingshuk Das, who is highly qualified and has extensive clinical laboratory experience.  As of March 14, 2016, Dr. Das joined Theranos full-time at the Newark, California laboratory.

**D5821 – March 18 Letter Statement 3:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5821:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require

68
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential

THPFM0003765214



theranos                                    1701 Page Mill Road   P 650.838.9292   theranos.com
                                            Palo Alto, CA 94304   F 650.838.9165

that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

### D6076

The March 18 Letter states:  *"See our reviews of D6083, D6085, D6086, D6093, D6094, D6098, and D6102."*  Accordingly, we refer you to our responses to those reviews.

### D6079

The March 18 Letter states that "[b]ased on the laboratory's submission, this requirement is met."

### D6083

The March 18 Letter states:  *"See our reviews of D5413 and D5791."*  Accordingly, we refer you to our responses to those reviews.

### D6085

The March 18 Letter states:  *"See our review of D6115."*  Accordingly, we refer you to our responses to your review of D6115.

### D6086

**D6086 Finding #1—March 18 Letter Statement 1:** *"The submission references 'Ex. A, Tab 9, F-1' and "Ex. A, Tab 10, F-1.' We found no such references in the materials provided to CMS."*

    **Theranos Response to Statement 1 in D6086 Finding #1:** The citation references to Ex. A, Tab 9, F-1 and Ex. A, Tab 10, F-1 were inadvertent transcription errors and should not have been included.

**D6086 Finding #1 – March 18 Letter Statement 2:** *"Throughout Ex. E, Tab 1, the laboratory provided lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were generated and issued."*

    **Theranos Response to Statement 2 in D6086 Finding #1:** This deficiency concerns the TPS 3.5, which was one of the Theranos proprietary technologies in use in 2014 and 2015.  The laboratory began phasing out the TPS 3.5 in December 2014, and it was **fully retired** in early-August 2015.

69
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                    THPFM0003765215



theran⚫s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

The laboratory values CMS's feedback, and takes it very seriously.  The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was fully retired in early-August 2015.  As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5.  (Ex. AA, Tab 3).  The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures.  Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015.  As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015.  (Ex. AA, Tab 3).  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D6086 Finding #1 – March 18 Letter Statement 3:** *We found no information addressing how the laboratory will ensure the accurate review of test method validation documentation, the issue cited in the deficiency.*

**Theranos Response to Statement 3 in D6086 Finding #1:** The TPS 3.5 was **fully retired** early-August 2015, and the laboratory is **not** using any LDTs.

The laboratory has revised its method verification procedure to show how it will ensure the accurate review of test method verification documentation.  (Ex. BB, Tab 5).  As set forth in the revised procedures, the laboratory director is responsible for reviewing both the verification plan and the verification report.  (Ex. BB, Tab 5 § 4.1). "The method verification procedure requires multiple reviews to include Quality to ensure protocols are followed." (Ex. BB, Tab 7 § 7.1.3.3).

Finding #2

**D6086 Finding #2—March 18 Letter Statement 1:** *"The submission references 'Ex. H, Tabs 1, 2-5, 16, 17 - 20, 21, 22 - 25, 26, 27 - 30, 36, 37 - 40, 46, 47 - 50, 56, and 57 - 60.' We found no such references in the materials provided to CMS."*

**Theranos Response to Statement 1 in D6086 Finding #2:** The citation references to Ex. H, Tabs 1, 2-5, 16, 17 - 20, 21, 22 - 25, 26, 27 - 30, 36, 37 - 40, 46, 47 - 50, 56, and 57-60 were inadvertent.

70
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                                                                    THPFM0003765216



<table>
1701 Page Mill Road | P 650.838.9292 | theranos.com
Palo Alto, CA 94304 | F 650.838.9165
</table>

**D6086 Finding #2—March 18 Letter Statement 2:** *"Ex. H contains lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were generated and issued."*

**Theranos Response to Statement 2 in D6086 Finding #2:**  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK)  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D6086 Finding #2—March 18 Letter Statement 3:** *"At the time of the onsite survey, the laboratory's protocol 'Master Validation Plan for Routine Chemistry Assays on Theranos Devices,' stated: '... for establishing the trueness or comparability to two procedures. . .at least 50% of samples should be outside the reference interval.' For five validation documents (ALT, BUN, calcium, glucose, and sodium testing using the Advia 1800), a review of the test results used by the laboratory to establish 'the trueness or comparability of two procedures' showed that the laboratory did not follow its established protocol and use "at least 50% of samples ... outside the reference interval.  The submission includes the protocol 'Method Validation,' at Ex. A, Tab 9, Section 8.1.1.1 ('A method comparison and bias estimation design'), which states: 'If the analyte has a critical medical decision level, at least 50% of the specimens must have analyte levels below this value and the remaining 50% above.' We are unclear as to the laboratory's definition of 'critical medical decision level.' No definition of this phrase was found in Section 3 - Definitions of the "Method Validation" protocol or in Ex. H."'*

**Theranos Response to Statement 3 in D6086 Finding #2:**  D6086 Finding #2 relates to the chemistry assays on the Siemens Advia 1800 instruments.  The laboratory **stopped** using the Siemens Advia 1800 instruments before the survey began on September 22, 2015, and has **not** used them since then.

The laboratory's revised method verification procedure references a "medical decision level," which is defined in the procedure as "[t]he concentration of analyte in blood or bodily fluid sample being analyzed at which some medical action is indicated for proper patient care. There may be several medical decision limits for a given analyte."  (Ex. BB, Tab 5 § 3.9).  In addition, this revised procedure references CLSI EP28-A3 (Ex. BB, Tab 5 § 10.6), which states:  "for some analytes, reference intervals have been replaced by *decision limits [emphasis in original]*, established by national (or international) consensus.  As examples, consider cholesterol and glycated hemoglobin." Training on the laboratory's revised method verification procedure has occurred.  (Ex. BB, Tabs 5B-5C).

**D6086 Finding #2—March 18 Letter Statement 4:** *"In Ex. H of the submission, the laboratory provided the following 'assay validation' summary:*

71

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential

**theran⬡s**

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

| Analyte | Number of Specimens Used | Specimen Value Range |
|---------|--------------------------|----------------------|
| ALT | 128 | 12-62 |
| BUN | 128 | 9-21 |
| Calcium | 128 | 9.2 -10.2 |
| Glucose | 128 | 65 - 142 |
| Sodium | 128 | 134 -142 |

*Since the laboratory provided no definition of 'critical medical decision level' and no information regarding the laboratory's panic or alert values for ALT, BUN, calcium, glucose, and sodium testing, it is unclear as to whether the laboratory has followed its own "Method Validation" protocol at Section 8.1.1.1.  Because the laboratory has not shown whether it can follow its own validation protocols, it is unclear whether the laboratory's quality assessment mechanisms can monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

**Theranos Response to Statement 4 in D6086 Finding #2:** There appears to have been a miscommunication. The laboratory **stopped** using its Siemens Advia 1800 instruments for clinical patient testing before the survey began on September 22, 2015 and before the revised method verification procedures were effective, and has **not** used them since then. Accordingly, the laboratory has not re-validated any assay on the Siemens Advia 1800.

The laboratory's revised method verification procedure references a "medical decision level," which is defined in the procedure as "[t]he concentration of analyte in blood or bodily fluid sample being analyzed at which some medical action is indicated for proper patient care. There may be several medical decision limits for a given analyte."  (Ex. BB, Tab 5 § 3.9).  In addition, this revised procedure references CLSI EP28-A3 (Ex. BB, Tab 5 § 10.6), which states:  "for some analytes, reference intervals have been replaced by *decision limits [emphasis in original]*, established by national (or international) consensus.  As examples, consider cholesterol and glycated hemoglobin."  Training on the laboratory's revised method verification procedure has occurred.  (Ex. BB, Tabs 5B-5C).

The laboratory is capable of ensuring that the deficient practice in D6086 Finding #2 does not recur. Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures.  The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016.  Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory.  In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant.  Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team.  The laboratory's new leadership team has installed an entirely redesigned QMPI

72

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

Program, as well as robust audit procedures that required monthly and quarterly audits. With respect to method verification, the procedure now includes appropriate criteria for accuracy, precision, and other pertinent performance characteristics, and requires the lab director to review both the verification plan and verification report to ensure adherence to the criteria in the procedure. (Ex. BB, Tab 5 §§ 7.7, 8).

Finding #3

**D6086 Finding #3—March 18 Letter Statement 1:** *"Ex. H contains lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were generated and issued."*

**Theranos Response to Statement 1 in D6086 Finding #3:** Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D6086 Finding #3—March 18 Letter Statement 2:** *"At the time of the onsite survey, for five validation documents reviewed (ALT, BUN, calcium, glucose, and sodium testing using the Advia 1800), laboratory summary information indicated that the laboratory obtained coefficient of variation (CV) results greater than CV's established by the instrument manufacturer. That is, ALT, BUN, calcium, glucose, and sodium test results obtained by the laboratory were statistically less precise than what would be expected using the Advia 1800. The laboratory provided no explanation for and no information pertaining to any investigation as to why the laboratory's test results were less precise. These validation documents were approved by the laboratory director as evidenced by his signature. In Ex. H of the submission, the laboratory provided summary data for ALT, BUN, calcium, glucose, and sodium similar to the CV data reviewed at the time of the onsite survey. Again, the laboratory provided no explanation for and/or information pertaining to any investigation as to why the laboratory's test results were less precise. Because the laboratory has not shown whether its assay verification procedures are adequate to determine assay precision characteristics, we question whether the laboratory's quality assessment mechanisms can monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

**Theranos Response to Statement 2 in D6086 Finding #3:** D6086 Finding #3 concerns the laboratory's method for using capillary specimens to test for ALT, BUN, calcium, glucose and sodium using Advia 1800 instruments that the laboratory modified. There appears to have been a miscommunication. The laboratory **stopped** using its Siemens Advia 1800 instruments for clinical patient testing before the survey began on September 22, 2015 and before the revised method verification procedures were effective, and has **not** used them

73
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential

THPFM0003765219



theranos                                    1701 Page Mill Road    P 650.838.9292   theranos.com
                                            Palo Alto, CA 94304     F 650.838.9165

since then.  Accordingly, the laboratory has not re-validated any assay on the Siemens Advia 1800.

Additionally, the CV figures from the manufacturer's package insert are **not** relevant.  Under 42 C.F.R. § 1253(b)(1), a laboratory that "modifies an FDA-cleared or approved test system … must, before reporting patient results, establish for each test system the performance specifications for the following performance characteristics: (i) Accuracy, (ii) Precision, (iii) Analytical sensitivity, (iv) Analytical specificity to include interfering substances, (v) Reportable range of test results for the test system, (vi) Reference intervals (normal values), (vii) Any other performance characteristic required for test performance."  Under this regulation, the precision of an LDT is established solely by the laboratory.  These regulations do **not** require a laboratory to compare the CV it establishes for an LDT — including an LDT that is based on a modification to an FDA-cleared or approved test system — with the %CV of "the predicate device."  Likewise, there is nothing in 42 C.F.R. §1253(b)(1) that requires a laboratory to document why the CV that it has established for an LDT is different from the CV for "a predicate device."

Finding #4

**D6086 Finding #4—March 18 Letter Statement 1:** *"Ex. H contains lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were generated and issued."*

**Theranos Response to Statement 1 in D6086 Finding #4:** Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D6086 Finding #4—March 18 Letter Statement 2: "***At the time of the onsite survey, for four validation documents reviewed (ALT, BUN, calcium, and glucose testing using the Advia 1800), laboratory summary information indicated that the reference range determined by the laboratory's testing differed from the reference range on the laboratory's test reports. The following was noted:*

| Analyte | Validation Document Reference Range | Test Report Reference Range |
|---------|--------------------------------------|------------------------------|
| ALT | | 8-41 U/L |
| BUN | 0- 52 U/L | 6 - 24 mg/dL |
| Calcium | 5.3 - 22.5 mg/dL | 8.3 - 10.6 mg/dL |
| Glucose | 8.18 -10.3 mg/dL | 73 - 99 mg/dL |
| | 64.0 - 112.3 mg/dL | |

74
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                                                    THPFM0003765220



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*In Ex. H of the submission, the laboratory provided the following reference ranges, some of which were still different than what appeared on the laboratory's test reports:*

| Analyte | Reference Range |
|---------|-----------------|
| *ALT* | *8-41 U/L* |
| *BUN* | *6.2 - 22 mg/dL* |
| *Calcium* | *8.2 - 10.3 mg/dL* |
| *Glucose* | *64 - 112 mg/dL* |

*Since the laboratory did not provide copies of any updated test reports in its submission, we are unable to determine whether the laboratory has corrected this deficient practice. Because the laboratory has not shown whether it had corrected this deficient practice, we are also unable to determine whether the laboratory's quality assessment mechanisms can monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

**Theranos Response to Statement 2 in D6086 Finding #4:** As CMS observed in the Form 2567, the validation reports for these assays were dated in April 2015. These validated assays went live on April 22, 2015. The laboratory has issued corrected reports updating the reference ranges for ALT, Calcium, and BUN tests run on the Siemens Advia 1800 on or after April 2015. Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover. As noted above, the laboratory **stopped** running these tests on the Siemens Advia 1800 before the survey began on September, and has **not** run them since then.

The laboratory has not issued corrected reports for Glucose because the reference range used in patient reports was consistent with the national consensus, which was the correct range to use. As noted above, the revised method verification procedures enclosed with this letter references CLSI EP28-A3, which provides that when decision limits determined by national or worldwide consensus exist, these limits, rather than reference intervals should be reported. (Ex. BB, Tab 5 § 10.6).

The laboratory is capable of ensuring that the deficient practice in D6086 Finding #4 does not recur. Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures. The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016. Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory. In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant. Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight

75
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential

THPFM0003765221

**ER-2096**



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

team.  The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

Finding #5

**D6086 Finding #5 – March 18 Letter Statement 1**:  *"The submission references 'Ex. G, Tabs 31, 34, 36, 39, 41, 44, 46, 49, 51, 54, 56, 61, 64, 66, and 69.' We found no documents within these tabs."*

> **Theranos Response to Statement 1 in D6086 Finding #5:**  The citation reference to Ex. G, Tabs 31, 34, 36, 39, 41, 44, 46, 49, 51, 54, 56, 61, 64, 66, and 69 was an inadvertent transcription error, and the inclusion of these blank tabs in the materials was an inadvertent copying error.

**D6086 Finding #5 – March 18 Letter Statement 2:**  *"At the time of the onsite survey, the laboratory maintained no documentation showing that the validation documents for two Siemens Advia 2120i instruments had been reviewed and approved by the laboratory director.  In Ex. G of the submission, we again found no information to indicate the Siemens Advia 2120i validation documents have been reviewed and approved by the director. Because the laboratory has not shown whether it has corrected this deficient practice, we are also unable to determine whether the laboratory's QA mechanisms can monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

> **Theranos Response to Statement 2 in D6086 Finding #5:**  There appears to be a miscommunication.  The laboratory **stopped** using its Siemens Advia 2120i instruments for clinical patient testing on November 17, 2015, and has **not** used them since then.  The laboratory does not intend to rely on those verifications to perform any tests on the Siemens Advia 2120i instruments in the future.  As described above, the laboratory has put in place mechanisms that will effectively monitor its corrective action and ensure that deficient practices do not recur.  With respect to method verification, the current procedures require the lab director to approve both the verification plan prior to the verification and the verification report.   (Ex. BB, Tab 5 § 7.7). "The method verification procedure requires multiple reviews to include Quality to ensure protocols are followed."  (Ex. BB, Tab 7 § 7.1.3.3).

The laboratory is capable of ensuring that the deficient practice in D6086 Finding #5 does not recur. Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures.  The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016.  Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory.  In addition, the laboratory has hired

76
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential

THPFM0003765222



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304    F 650.838.9165

Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant. Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team. The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

Finding #6

**D6086 Finding #6 – March 18 Letter Statement 1:** *"The submission references 'Ex. I, Tabs 2-6.' We located these tabs, but found no documentation in Tabs 2, 5, and 6."*

**Theranos Response to Statement 1 – D6086 Finding #6:** There was an inadvertent copying error for Exhibit I to the initial submission. The laboratory has enclosed the applicable documents with this letter, as well as additional documents related to the laboratory's broader analysis of the PT/INR test over the entire time it was run on this Siemens BCS XP instrument. (Ex. GG).

**D6086 Finding #6 – March 18 Letter Statement 2:** *"See our review of D5413."*

**Theranos Response to Statement 2 – D6086 Finding #6:** See the laboratory's response to your review of D5413.

**D6086 Finding #6 – March 18 Letter Statement 3:** *"Although the submitted protocol (Ex. A, Tab 31, § 8.1.2) included the requirement to review all new manufacturer package inserts and vendor notifications, the laboratory did not provide a response to the citation other than to state: 'Theranos did not have the documentation for the MNPT calculation done for lot #539280 in 3/2015 before it was put in use for patient testing.' It is unclear what investigation was performed to determine how the Mean Normal Prothrombin Time (MNPT) for Dade Innovin lot number 539280 was defined and entered into the Siemens BCS-XP."*

**Theranos Response to Statement 3 – D6086 Finding #6:** The lab personnel responsible for MNPT for PT/INR tests run on the Siemens BCS XP at the time that this Dade Innovin lot was put in use are no longer with the laboratory, which has limited the laboratory's ability to determine precisely what occurred. Based on the laboratory's investigation, it appears that the laboratory would determine the MNPT with the assistance of Siemens. Siemens would then send the laboratory a letter containing both the MNPT and the ISI for the lot. The laboratory would then be responsible for entering the MNPT and ISI numbers for the lot into the BCS XP. The laboratory appears to have not properly entered the MNPT and ISI numbers for this lot and the laboratory failed to have sufficient oversight to identify the problem when it occurred.

77
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential

THPFM0003765223



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

As noted above, the laboratory **stopped** running PT/INR tests on September 17, 2015, and has **not** run any PT/INR tests since then.  The laboratory is capable of ensuring that the deficient practice in D6086 Finding #6 does not recur.  Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures.  The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016.  Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory.  In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant.  Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team.  The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

**D6086 Finding #6 – March 18 Letter Statement 4:**   *"In its submission the laboratory states "training has occurred," however, training documentation provided in Ex. A Tab 32 did not include all testing personnel listed on the CMS-209 (Ex. L, Tab 1 )."*

   **Theranos Response to Statement 4 – D6086 Finding #6:**  The training records for this SOP provided with the submission included all testing personnel listed on the CMS-209 who run tests in the laboratory.  Please note that Chi Nguyen is no longer a member of the CLIA laboratory (we will update our Form 209 accordingly), which is why she does not appear on any of the training documentation.  The enclosed training records reflect that all testing personnel listed on the CMS-209 have been trained on the laboratory's enhanced protocol requiring review of all new manufacturer package inserts and vendor notifications.  (Ex. BB, Tabs 14B-14D).

**D6086 Finding #6 – March 18 Letter Statement 5:**   *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

   **Theranos Response to Statement 5 – D6086 Finding #6:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer

78
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential

THPFM0003765224



theranos                              1701 Page Mill Road      P 650.838.9292    theranos.com
                                      Palo Alto, CA 94304      F 650.838.9165

audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

<u>D6093</u>

<u>Finding #1</u>

The March 18 Letter states: *"See our reviews of D5447, D5449, D5461, D5481, and D5779."*  Accordingly, we refer you to our responses to those reviews.

<u>Finding #2</u>

**D6093 Finding #2 – March 18 Letter Statement 1:**  The March 18 Letter states: *"See our reviews of D5481."*

   **Theranos Response to Statement 1 – D6093 Finding #2:**  We refer you to our response to your review of D5481.

**D6093 Finding #2 – March 18 Letter Statement 2:**  *"The submission references 'Ex. I, Tabs 2-6.' We located these tabs, but found no documentation in Tabs 2, 5, and 6."*

   **Theranos Response to Statement 2 – D6093 Finding #2:**  There was an inadvertent copying error for Exhibit I to the initial submission.  The laboratory has enclosed the applicable documents with this letter, as well as additional documents related to the laboratory's broader analysis of the PT/INR test over the entire time it was run on this Siemens BCS XP instrument.  (Ex. GG).

**D6093 Finding #2 – March 18 Letter Statement 3:**  *"The laboratory's submission did not include an explanation or documentation of an investigation regarding the adjustment of QC ranges."*

   **Theranos Response to Statement 3 – D6093 Finding #2:**  D6093#2, Paragraph k, states that "[o]n approximately 9/16/15, the laboratory adjusted the acceptable range for Citrol 3 to match the data" and that the "change was implemented without any investigation as to the reason for the shift in control values."  The laboratory **stopped** running PT/INR tests on September 17, 2015.  The laboratory's review of this issue has come to the same ultimate conclusion.  Under the laboratory's prior leadership and its old QA Program, the laboratory

79
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                                                                    THPFM0003765225



1701 Page Mill Road  P 650.838.9292  theranos.com
Palo Alto, CA 94304  F 650.838.9165

changed the control values for PT/INR on September 16, 2015 without documenting a proper investigation, and in contrast to what is required by the laboratory's new procedures. The laboratory's new leadership and new QMPI Program do **not** ascribe to this type of practice, as changes to QC values should not occur unless a full and documented investigation shows that the change is warranted. The laboratory **stopped** PT/INR testing on September 17, 2015, thus limiting the potential effect that this change to control values could have. The laboratory has not performed any PT/INR tests since September 17, 2015. As indicated above, the laboratory has broadened its investigation of PT/INR tests to encompass the entire period during which this BCS XP instrument was in use, which was October 2014 through September 2015. Based on that investigation, the laboratory has voided all PT/INR results reported during that period. (Ex. AA, Tab 7). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D6093 Finding #2 – March 18 Letter Statement 4:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 4 – D6093 Finding #2:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

<u>**D6094**</u>

<u>Finding #1</u>

80

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

The March 18 Letter states: *"See our reviews of D5391, D5393, D5791, and D5793."* Accordingly, we refer you to our responses to those reviews.

<u>Finding #2</u>

The March 18 Letter states: *"See our reviews of D5413, D5481, D5801, D5805, and 5821."* Accordingly, we refer you to our responses to those reviews.

**<u>D6098</u>**

The March 18 Letter states: *"See our review of D5805."*  Accordingly, we refer you to our response to your review of D5805.

**<u>D6102</u>**

**D6102 – March 18 Letter Statement 1:**   *"The laboratory submitted protocols relating to testing personnel training (Ex. A, Tab 16, §§ 4.5.3 and 6.4) which state the following:*

- *§ 4.5.3 'Testing personnel/trainee are responsible to ensure that training is properly documented using CL-FRM-03016-F4, Training Attendance Form, approved by the designated trainer and stored in the relevant binder.'*
- *§ 6.4 '... It is the responsibility of the trainee and trainer to ensure the SOP is accurate.'*

*However, the regulations require that the laboratory director, not the testing personnel, is responsible for ensuring that prior to testing patient specimens, all personnel have the appropriate training and have demonstrated that they can perform all testing operations to provide and report accurate results."*

**Theranos Response to Statement 1 in D6102:**  The laboratory has revised its training and competency procedures to clarify that the laboratory director has the responsibility to ensure adherence to the Quality Management System, including the training and competency procedures.  (Ex. BB, Tab 9 §§ 4.1, 4.7.6, 6.9.9.1).  Training on these procedures has occurred.  (Ex. BB, Tabs 9B-9C).

**D6102 – March 18 Letter Statement 2:**  *"Training documentation submitted in Ex. A, Tab 11 only includes training on protocols related to testing personnel qualification requirements and delegation of responsibilities, as well as job descriptions. The laboratory provided no documentation or plan to train or retrain testing personnel on the Theranos Proprietary Device."*

**Theranos Response to Statement 2 in D6102:**  There appears to have been a miscommunication because the TPS 3.5 was **fully retired** before the survey began on September 22, 2015.  Because the TPS 3.5 is not being used, and will not be used in the

81
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential

THPFM0003765227



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

future, the laboratory is not required to train or re-train personnel on tests that used to be run on that retired instrument.

**D6102 – March 18 Letter Statement 3:** "*Training documents submitted in Ex. A, Tab 17 only addressed review of the document control and training and competency protocols, but did not include training or retraining documentation for personnel performing testing in the venipuncture lab nor did it include an investigation if patient were affected or potentially affected when untrained or partially trained testing personnel were performing patent testing.*"

**Theranos Response to Statement 3 in D6102:**  The laboratory previously submitted training and competency documentation for all testing personnel as part of its response to D6124.  The laboratory has updated that documentation.  A list showing which testing personnel operate each instrument currently in use is enclosed.  (Ex. HH, Tab 9A).[14]  Current training and competency documentation for those testing personnel and those instruments is also enclosed.  (Ex. HH, Tab 9B).

D6102, paragraph a, concerns the personnel training documentation for the TPS 3.5.  The TPS 3.5 was **fully retired** in early-August 2015.  The laboratory values CMS's feedback, and takes it very seriously.  The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was fully retired in early-August 2015.  As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5.  (Ex. AA, Tab 3).  The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures.  Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015.  As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015.  (Ex. AA, Tab 3).  Many corrected reports have been transmitted, and the remainder are being transmitted.  (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

---

[14] Please note that Chi Nguyen, who is listed on the Form 209, is no longer a member of the CLIA laboratory (we will update our Form 209 accordingly), which is why she does not appear on any of the training documentation.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                                                              THPFM0003765228



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

As set forth in the attached analysis, the laboratory has enclosed training documentation for Testing Person #6 (TP6); Testing Person #11 (TP11); and Testing Person #31 (TP31).  (Ex. HH, Tabs 14, 15, 16).  The analysis of these training records is set forth in Ex. AA, Tab 12.

**D6102 – March 18 Letter Statement 4:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit **may** [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 4 – D6102:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

<u>**D6108**</u>

The March 18 Letter states: *"See our review of D6115."*  Accordingly, we refer you to our response to your review of D6115.

<u>**D6111**</u>

The March 18 Letter states:  "Based on the laboratory's submission, this requirement is met."

<u>**D6115**</u>

**D6115 – March 18 Letter Statement 1:**  *"The laboratory submitted a protocol for a Master Validation Plan at Ex. E, Tab 30B which was a different protocol than presented to the surveyor. In Ex. E, Tab 1, under the Accuracy section, the submission indicates that 'some of the immunoassays on the TSP [Theranos Proprietary System] were 'calibrated' or 'corrected' to*

83
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                                                                    THPFM0003765229



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304     F 650.838.9165

*remove systemic bias between the two methods.' It is not clear what specific biases were used for each analyte which used a corrected results or if the corrected or uncorrected results was reported.*

**Theranos Response to Statement 1 – D6115:**  This deficiency concerns the TPS 3.5, which was one of the Theranos proprietary technologies in use in 2014 and 2015.  The laboratory began phasing out the TPS 3.5 in December 2014, and it was **fully retired** in early-August 2015.

The laboratory values CMS's feedback, and takes it very seriously.  The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was fully retired in early-August 2015.  As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5.  (Ex. AA, Tab 3).  The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures.  Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015.  As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015.  (Ex. AA, Tab 3).  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D6115 – March 18 Letter Statement 2:**  *In addition, the Accuracy section described that the "samples spanned the medical decision levels (MDL)".  We are unclear as to the laboratory's definition of "medical decision limits." No definition of this phrase was found in Section 3 - Definitions of the "Method Validation" protocol or in Ex. E. We also note that the submitted protocol does not include a reference to "medical decision limits" as a criterion for determining accuracy.*

**Theranos Response to Statement 2 – D6115:**  D6115 concerns the TPS 3.5.  The TPS 3.5 was **fully retired** before in early-August 2015.  References to method validation data in documents enclosed with the submission are to validation reports prepared **before** the survey began and before the laboratory's revised procedures were made effective (those reports were either reviewed by CMS or available to CMS during the survey), which were referenced for context.  In addition, the laboratory has further revised its method verification procedure, which now has no reference to "critical medical decision limits."  (Ex. BB, Tab 5).

84
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                                                                  THPFM0003765230



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

The laboratory's revised method verification procedure references a "medical decision level," which is defined in the procedure as "[t]he concentration of analyte in blood or bodily fluid sample being analyzed at which some medical action is indicated for proper patient care. There may be several medical decision limits for a given analyte." (Ex. BB, Tab 5 § 3.9). In addition, this revised procedure references CLSI EP28-A3 (Ex. BB, Tab 5 § 10.6), which states: "for some analytes, reference intervals have been replaced by **decision limits** *[emphasis in original]*, established by national (or international) consensus. As examples, consider cholesterol and glycated hemoglobin." Training on the laboratory's revised method verification procedure has occurred. (Ex. BB, Tabs 5B-5C).

**D6115 – March 18 Letter Statement 3:** *"We also note that the laboratory's submission provided no indication why the validation report for SHBG had an effective date of 7/14/14, but was not approved by the laboratory director until 9/19/15, even though patient testing began 7/28/14."*

**Theranos Response to Statement 3 – D6115:** This issue is similar to the issue addressed in the discussion above regarding D5407. As reflected by the Lab Director deficiencies identified by CMS, the prior lab directors did not provide sufficient oversight over the documents cited in D5407 and D6115. This appears to be one of the reasons why these documents were not timely reviewed and signed by the prior lab directors. In addition, the laboratory has found that its quality assurance oversight over these documents, including document control oversight, was not sufficient. The laboratory has hired a new lab director, who has approved enhanced document control policies and procedures to address this issue. (Ex. BB, Tab 1 §§ 5.1, 5.2, 5.3, 6.1, 6.2, 6.3). Training on those procedures has occurred. (Ex. BB, Tabs 1B-1C). The laboratory has also hired a Document Control Manager whose responsibilities include tracking new and revised policies and procedures to ensure that they are reviewed and approved by the lab director before they become effective. (Ex. HH, Tab 7C). In addition, the laboratory's revised QMPI Program procedures and agenda require review of procedures that are new, revised, or in process at monthly QMPI Program meetings. (Ex. BB, Tab 7 §§ 7.1, 7.5.6).

**D6115 – March 18 Letter Statement 4:** *The laboratory's submission in Ex. E, Tab 1 states:*

*The procedure and acceptance criteria outlined in the "Guidance for Industry: Bioanalytical Method Validation, 2001" document from FDA was followed to establish the analytical measurement range (AMR) (reportable range) for these immunoassays run on the TPS. Theranos did not follow the validation plan for immunoassays (ELISAs) as outlined in Master Validation Plan for ELISA Assays on Theranos Devices.*

85
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                                        THPFM0003765231



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

*The laboratory's response does not include a copy of the FDA protocol, and does not state in the submitted master validation protocol, CL PLN-14002, Rev. A, that the FDA protocol should be used to determine AMR.*

*The laboratory submitted a protocol for a Master Validation Plan at Ex. E, Tab 30B which requires the %CV of replicates to be not more than 20% (25% at the lower and upper limits of detection). The submitted protocol was different than the protocol presented to the surveyor at the time of the onsite survey which required the %CV of replicates to be not more than 15% (20% at the lower and upper limits of detection). The %CV in the protocol presented to the surveyor at the time of the onsite survey matched the %CV of the predicate devices. Based on the protocol submitted in the submission, it is unclear as to why the TPS, which is covered by the Master Validation Plan, can now have %CV's for replicates greater than the predicate devices. No explanation for the change in %CV was submitted. In addition, we noted that the information submitted in Ex. E, Tab 1 did not include a 20-day precision study as required by the submitted protocol.*

*The laboratory's submitted protocol requires that 120 samples be used to determine Reference Intervals (see Ex. E, Tab 30B), Ex. E, Tab 1 states:*

> *However, the validation plan noted that the reference range would be established with 120 samples per partition. However, the study followed CLSI procedure for transferring a reference range - the process by which one adapts a previously established reference range to a new analytical method. Furthermore, the transferred reference range was verified following CLSI guidelines - namely "the process by which one ensures, with reasonable confidence, using a relative small number of reference individuals (eg, n=20), that a reference interval established elsewhere, or transferred from another study, can be used locally.*

*We question the laboratory's procedure for "transferring a reference range" since the laboratory provided no reference document to support "transferring a reference range." We note that the submitted protocol does not state in Section 18, Reference Range, that the laboratory can "transfer" a reference range. It is unclear as to how the laboratory determined that the predicate method's reference range could be adapted or "transferred" to the Theranos Proprietary Devices, which used different methodology than the predicate method.*

**Theranos Response to Statement 4 – D6115:**  D6115 concerns the TPS 3.5.  The TPS 3.5 was **fully retired** in early-August 2015.  In addition, the laboratory **stopped** using its other LDTs, and does not have plans to resume using them as it transitions to compliance with FDA quality systems requirements for its LDTs and introduces next generation technologies. Accordingly, neither the master validation plan for ELISA assays nor "*Guidance for*

86
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                                                                    THPFM0003765232



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

*Industry: Bioanalytical Method Validation, 2001"* are being used by the laboratory. The laboratory does not plan to use either of those documents, plans or procedures in the future.

The laboratory will ensure that all future validation plans are documented and supported in accordance with the laboratory's new quality systems and procedures. Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures. The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016. Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory. In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant. Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team. The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

The laboratory values CMS's feedback, and takes it very seriously. The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was **fully retired** in early-August 2015. As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5. (Ex. AA, Tab 3). The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures. Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015. As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015. (Ex. AA, Tab 3). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.[15]

---

[15] In discussing establishment of precision for an LDT, the March 18 letter references a comparison of %CVs between an LDT and "predicate devices." We note, however, that CLIA regulations do not contain any regulation requiring that there be any correlation or equivalence of %CV between LDTs and predicate devices. Rather, the regulations require only that the precision for the test must be established for the LDT itself. 42 C.F.R. § 493.1253(b)(2). It also is generally accepted that accuracy is the only required performance specification that typically requires a correlation study. 42 C.F.R. § 493.1253(b)(2).

87
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential

THPFM0003765233



1701 Page Mill Road      P 650.838.9292    theranos.com
Palo Alto, CA 94304      F 650.838.9165

**D6115 – March 18 Letter Statement 5:**  *"The laboratory's submission does not indicate that the % Recovery and Allowable Bias citations had been addressed…. Because the laboratory has not shown that it can follow its own validation protocols, it is unclear whether the laboratory's quality assessment mechanisms could monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

**Theranos Response to Statement 5 – D6115:**  D6115 concerns the TPS 3.5.  The TPS 3.5 was **fully retired** in early-August 2015.  In addition, neither the master validation plan for ELISA assays nor the master validation plan for chemistry assays are being used by the laboratory.  The laboratory does not plan to use either of those documents, plans or procedures in connection with clinical testing in the future.

The laboratory values CMS's feedback, and takes it very seriously.  The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was fully retired in early-August 2015.  As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5.  (Ex. AA, Tab 3).  The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures.  Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015.  As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015.  (Ex. AA, Tab 3).  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

The laboratory is capable of ensuring that the deficient practice in D6115 does not recur.  Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures.  The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016.  Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory.  In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant.  Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team.  The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.  For

88

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

example, § 8.1.1.3 of the method verification procedure lays out the requirements for a recovery design as part of an IVD verification.  (Ex. BB, Tab 5 § 8.1.1.3).

**D6115 – March 18 Letter Statement 6:**  *"Ex. E contains a list of patient specimen accession numbers for which the laboratory 'identified reports', but did not specify, or submit documentation to show that corrected reports were generated and issued."*

> **Theranos Response to Statement 6 – D6115:**  As described above, the laboratory has revised its patient assessment analysis based upon a thorough re-review of QC data for the TPS 3.5.  Based on that analysis, the laboratory has, out of an extreme abundance of caution, voided all results reported for assays run on the TPS 3.5 in 2014 and 2015.  (Ex. AA, Tab 3).  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**<u>D6124</u>**

**D6124 – March 18 Letter Statement 1:**  *"Ex. A, Tab 16, § 7.3 of the submission contains a competency assessment protocol, Annual Competency. However, the protocol does not address the cited deficiency that direct observation was required for instrument maintenance and function checks. The protocol at § 1.1.7 (page 12) allows for a choice of validation method of which direct observation is one choice. The submitted laboratory protocol also requires the use of CL FRM 03016-F3 for annual competency. This form also allows the assessor to choose the validation method for competency assessment. Neither the submitted protocol nor the form to document competency assessment indicate that the six required procedures for CLIA competency assessment are required."*

> **Theranos Response to Statement 1 in D6124:**  The laboratory has revised its training and competency procedures to clarify that the performance of maintenance and function checks <u>must</u> be directly observed (Ex. BB, Tab 9 §§ 6.9.4.4, 9.1), and to expressly require each of the procedures required by 42 CFR § 493.1451(b)(8)(iv).  (Ex. BB, Tab 9 §§ 6.9.4).  Training on these procedures has occurred.  (Ex. BB, Tabs 9B-9C).

**D6124 – March 18 Letter Statement 2:**  *"Ex. L, Tab 4 of the submission states: 'All testing personnel currently performing tests have completed competency testing with direct observation of, among other things, maintenance and function checks for the tests they are performing.' We are unable to determine if the documentation is complete as there is no information submitted about which testing personnel were performing testing on which instrument(s). Because the laboratory has not shown that it has corrected this deficient practice, we are also unable to determine whether the laboratory's quality assessment mechanisms can monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

89<br>
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION<br>
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

**Theranos Response to Statement 2 in D6124:**  The laboratory's submission included training and competency documentation for all testing personnel on the instruments they were operating at that time.  The laboratory subsequently made some minor staffing changes. A list showing which testing personnel operate each instrument currently in use is enclosed. (Ex. HH, Tab 9A).  Current training and competency documentation for those testing personnel and those instruments is also enclosed.  (Ex. HH, Tab 9B).  That documentation shows that all testing personnel have completed competency testing for the tests they are performing.  (Ex. HH, Tabs 9A-9B).

The laboratory is capable of ensuring that the deficient practice in D6124 does not recur. Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures.  The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016.  Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory.  In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant.  Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team.  The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

<u>**D6170**</u>

**D6170 – March 18 Letter Statement 1:**  *"Ex. J, Tab 46 contains lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were generated and issued."*

> **Theranos Response to Statement 1 in D6170:**  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D6170 – March 18 Letter Statement 2:**  *"The submission further states:*

- *"Based on comprehensive review, multiple examples of failed QC [quality control] without the appropriate documentation with no investigation or corrective action was identified which is now addressed with revised SOPS and training."*
- *"... the review identified multiple examples where technical service provided PM and that service was not documented in addition to failed QC run as part of the service which is now addressed with revised SOPs and training."*

90
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

*The laboratory provided no documentation of investigation or corrective action for these QC failures and lack of maintenance documentation."*

**Theranos Response to Statement 2 in D6170:**  There appears to have been a miscommunication here because the laboratory **stopped** running tests on the Fortessa and Canto before the survey began on September 22, 2015, and has **not** run any tests on the instruments since then.  Because the Fortessa and Canto instruments are not in use, and have not been in use since the survey began, there have not been any new QC failures or maintenance issues that required investigation or corrective action under the laboratory's new procedures.  The "review" discussed in the submission was simply intended to refer to the analysis conducted to address the deficiency identified by CMS.  The issue addressed by the "review" — i.e., failing to document corrective action for QC fails for the Fortessa and Canto — is the same issue identified by CMS in its deficiency, and thus did not constitute a new issue or occurrence.

**D6170 – March 18 Letter Statement 3:**  *"Ex. A, Tab 10, § 5.10 states: 'Unlicensed laboratory personnel are responsible for performing the activities listed below, under direct and constant supervision by licensed test personnel, with strict adherence to regulatory requirements ...' California. The laboratory relied on its written policies and procedures to ensure that appropriately licensed testing personnel were performing and reporting patient test results. However, if the laboratory's policies and procedures are inconsistent with state requirements, we question whether this mechanism would prevent the deficient practice from recurring, and question the laboratory's document control system to ensure accurately written policies and procedures."*

**Theranos Response to Statement 3 in D6170:**  The laboratory's policy does not permit unlicensed personnel to run patient tests, and the laboratory did not intend to imply otherwise. To eliminate any confusion or potential for confusion, however, the laboratory has revised this procedure to remove the language identified by CMS.  (Ex. BB, Tab 6 § 5.10).

**D6171**

**D6170 – March 18 Letter Statement 1:**  *"Ex. L, Tab 3 of the submission states: 'TP14 has been retrained to ensure that TP14 only performs activities within the scope of TP14's job description as a clinical laboratory associate, under the supervision of testing personnel. Because TP 14 is not testing personnel, the high complexity personnel educational requirements do not apply.' The CLIA job responsibilities in the job description provided at Ex. L, Tab 3 does include CLIA regulatory responsibilities for testing personnel, and as such TP14 was required to meet the educational requirements. The laboratory's submission does not provide any additional*

91
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential

THPFM0003765237



1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*documentation that establishes that TP14 was qualified to perform high complexity testing. TP14 remains unqualified to perform high complexity testing.*

**Theranos Response to Statement 1 in D6170:**  The job description for TP14 has been revised to be consistent with the job description of a Clinical Laboratory Associate in the laboratory's revised personnel procedures.  (Ex. HH, Tab 7B).  The laboratory has confirmed that TP14 has not performed any test analyses between November 2015 and his execution of this revised job description.  (Ex. HH, Tab 7A).

<u>**D6178**</u>

**D6178 – March 18 Letter Statement 1:**  *"Ex. F contains lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were generated and issued."*

**Theranos Response to Statement 1 in D6178:**  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D6178 – March 18 Letter Statement 2:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit **may** [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D6178:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

92

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

Confidential                                                                                          THPFM0003765238

**theranos**

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

Sincerely,

Dr. Kingshuk Das
Laboratory Director
Theranos, Newark California Laboratory

93
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

1 | JOHN D. CLINE (CA State Bar No. 237759)
50 California Street, Suite 1500
2 | San Francisco, CA 94111
Telephone: (415) 662-2260 │Facsimile: (415) 662-2263
3 | Email: cline@johndclinelaw.com

4 | KEVIN M. DOWNEY (Admitted Pro Hac Vice)
LANCE A. WADE (Admitted Pro Hac Vice)
5 | AMY MASON SAHARIA (Admitted Pro Hac Vice)
KATHERINE TREFZ (CA State Bar No. 262770)
6 | WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
7 | Washington, DC 20005
Telephone: (202) 434-5000 │Facsimile: (202) 434-5029
8 | Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

9 | Attorneys for Defendant ELIZABETH A. HOLMES

10

11 | UNITED STATES DISTRICT COURT

12 | NORTHERN DISTRICT OF CALIFORNIA

13 | SAN JOSE DIVISION

14

15 | UNITED STATES OF AMERICA,                      ) Case No. CR-18-00258-EJD
                                                   )
16 |            Plaintiff,                          ) **DECLARATION OF LANCE A. WADE IN**
                                                   ) **SUPPORT OF MS. HOLMES' SUBMISSON**
17 |    v.                                          ) **REGARDING TESTIMONY OF DR.**
                                                   ) **KINGSHUK DAS**
18 | ELIZABETH HOLMES and                           )
RAMESH "SUNNY" BALWANI,                             )
19 |                                                ) Hon. Edward J. Davila
            Defendants.                             )
20 |                                                )
                                                   )
21 | _____ )

22

23

24

25

26

27

28

DECLARATION OF LANCE A. WADE IN SUPPORT OF MS. HOLMES'
SUBMISSON REGARDING TESTIMONY OF DR. KINGSHUK DAS
CR-18-00258 EJD

1    I, LANCE A. WADE, declare as follows:

2    1.    I represent Defendant Elizabeth Holmes and have been admitted to practice *pro hac vice*

3    in the above-captioned matter.  I submit this declaration in support of Ms. Holmes' Notice of Filing.  I

4    attest to the following facts upon which the Notice relies.

5    2.    Attached to this declaration are five exhibits.

6    3.    The contents of the exhibits are as follows:

7    a.    Exhibit 1 is a true and correct copy of government exhibit TX 3144.

8    b.    Exhibit 2 is a true and correct copy of government exhibit TX 4943.

9    c.    Exhibit 3 is a true and correct copy of government exhibit TX 5257.

10    d.    Exhibit 4 is a true and correct copy of government exhibit TX 5260.

11    e.    Exhibit 5 is a true and correct copy of government exhibit TX 5471.

12    I declare under penalty of perjury under the laws of the United States that the foregoing is true

13    and correct to the best of my knowledge.

14    Executed this 8th day of November 2021 in San Jose, CA.

15

16    _____

17    LANCE A. WADE
      Attorney for Elizabeth Holmes

18

19

20

21

22

23

24

25

26

27

28    DECLARATION OF LANCE A. WADE IN SUPPORT OF MS. HOLMES'
      SUBMISSON REGARDING TESTIMONY OF DR. KINGSHUK DAS
      CR-18-00258 EJD

                                        1

1   JOHN D. CLINE (CA State Bar No. 237759)
    50 California Street, Suite 1500
2   San Francisco, CA 94111
    Telephone: (415) 662-2260 │Facsimile: (415) 662-2263
3   Email: cline@johndclinelaw.com

4   KEVIN M. DOWNEY (Admitted Pro Hac Vice)
    LANCE A. WADE (Admitted Pro Hac Vice)
5   AMY MASON SAHARIA (Admitted Pro Hac Vice)
    KATHERINE TREFZ (CA State Bar No. 262770)
6   WILLIAMS & CONNOLLY LLP
    725 Twelfth Street, NW
7   Washington, DC 20005
    Telephone: (202) 434-5000 │Facsimile: (202) 434-5029
8   Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

9   Attorneys for Defendant ELIZABETH A. HOLMES

10

11                          UNITED STATES DISTRICT COURT

12                       NORTHERN DISTRICT OF CALIFORNIA

13                              SAN JOSE DIVISION

14
    UNITED STATES OF AMERICA,            )   Case No. CR-18-00258-EJD
15                                       )
            Plaintiff,                   )   **MS. HOLMES' SUBMISSON REGARDING**
16                                       )   **TESTIMONY OF DR. KINGSHUK DAS**
        v.                               )
17                                       )   Date:      November 9, 2021
    ELIZABETH HOLMES and                 )   Time:      8:00 a.m.
18  RAMESH "SUNNY" BALWANI,              )   CTRM: 4, 5th Floor
                                         )
19          Defendants.                  )   Hon. Edward J. Davila
                                         )
20                                       )
                                         )
21                                       )
                                         )
22  _____  )

23

24

25

26

27

28

    MS. HOLMES' SUBMISSION RE: TESTIMONY OF DR. KINGSHUK DAS
    CR-18-00258 EJD

### SUBMISSION RE: TESTIMONY OF DR. KINGSHUK DAS

Ms. Holmes respectfully submits the following statement of issues concerning the testimony of Dr. Kingshuk Das that she may seek to address with the Court prior to Dr. Das' testimony.  For the Court's convenience, Ms. Holmes references below any filings or Court orders, or portions thereof, that are relevant to the issues.

## I.    CMS REPORT

**Issue: Admissibility of Report Through Dr. Das.**  Ms. Holmes maintains that the January 25, 2016 Form CMS-2567 ("CMS Report") and Cover Letter may only be admitted during the testimony of one of the Report's authors, Sarah Bennett or Gary Yamamoto.

| Relevant Docket Entries | | |
|---|---|---|
| **Dkt.** | **Document** | **Description/Excerpts** |
| 574 | Def. MIL | Motion to Exclude CMS report under Rules 401, 403 and 802. |
| 675 | Gov't Opp | Gov't Opp'n to Mot. to Exclude CMS Report, in particular:<br><br>Explaining CMS surveyors will lay foundation for CMS Report:[1]<br>• "Its primary authors, CMS surveyors Sarah Bennett and Gary Yamamoto, are expected to testify to its content and will be subject to cross-examination." Dkt. 675 at 2.<br>• "Sarah Bennett, is expected to testify that 'CMS is responsible for the implementation of the CLIA regulations, which are *designed to ensure the accuracy and reliability of laboratory testing*.'" *Id.* at 4; *see also id.* (explaining expected testimony of Sarah Bennett).<br><br>Arguing that admission of the report is not prejudicial partly because Ms. Holmes can cross-examine CMS witnesses:<br>• "[Ms. Holmes] remains free to cross-examine CMS witnesses and attempt to undercut their observations." *Id.* at 8<br>• "More fundamentally, evidence is not excludable because it is 'subjective'; the remedy is cross-examination." *Id.* at 8-9 |
| 798 | MIL Order | Court's Order on admissibility of CMS Report, in particular:<br><br>Granting motion to admit but acknowledging "the possibility for further side bar discussions on this matter, should parties wish to specify certain exhibits within this collection of evidence and make new arguments as to why these particular exhibits should still be excluded." Dkt. 798 at 20.<br><br>Deferring on hearsay within hearsay issue concerning statements of unnamed employees cited in CMS report.  Dkt. 798 at 20 n.6. |

---

[1] The government has only noticed one CMS surveyor, Sarah Bennett, as a potential trial witness.  And the government has refused to confirm that it will indeed call Ms. Bennett, even if the CMS report is admitted through Dr. Das.

MS. HOLMES' SUBMISSION RE: TESTIMONY OF DR. KINGSHUK DAS
CR-18-00258 EJD

**Issue: Admissibility of Certain Portions of Report.**  Ms. Holmes maintains that the government has not met its burden under the Court's August 30, 2021 Order on Pre-Trial Motions with respect to certain portions of the CMS Report that Ms. Holmes proposed be redacted prior to admission because they are double-hearsay statements from Theranos employees and/or because they relate exclusively to tests not at issue in the case.

| Relevant Docket Entries | | |
|---|---|---|
| Dkt. | Document | Description/Excerpts |
| 798 | MIL Order | Ruling on evidence concerning tests not identified in the Bill of Particulars.  *See* Dkt. 798 at 80.<br><br>Ruling on out-of-court statements by Theranos and Theranos employees.  *See* Dkt. 798 at 97. |
| 897 | Mot. to Redact | Motion to redact tests not in BOP, layered hearsay, and irrelevant portions of CMS Report. |
| 989 | Order on Mot. to. Redact. | "Nevertheless, rather than deny the motion outright, the Court DEFERS ruling on the proposed redactions until the Government seeks to introduce the cover letter and Form CMS-2567 at trial. The government shall provide Ms. Holmes and the Court with advance notice of the portions of the cover letter and Form CMS-2567 it intends to offer."  Dkt. 989 at 7-8. |

## II.   EXPERT TESTIMONY

**Issue: Scope of Dr. Das' Testimony.**  Ms. Holmes maintains that, under the Court's August 30, 2021 Order on Pre-Trial Motions, the government may not elicit expert testimony from Dr. Das.

| Relevant Docket Entries | | |
|---|---|---|
| Dkt. | Document | Description/Excerpts |
| 892 | Holmes Mot. to Strike | Motion to strike supplemental expert report under Rules 16 and 702. |
| 893-1 | Gov't Suppl. Disclosure | July 29, 2021 email disclosing Dr. Das as expert citing THPFM00004005199 (TX5274). |
| 893-4 | TX 5274 | Bases for Das' Expert Opinion. *See* Dkt. 893-1 |
| 906 | Gov't Opp'n | Gov't Opp'n arguing that Dr. Das is solely a percipient witness. |
| 989 | Order on Pretrial Motions | Court's Order on Motion to Strike:<br><br>"At the hearing, the Government provided further clarification on the testimony it intends to elicit from Dr. Das. Based on those representations, the Court is persuaded that Dr. Das may proceed as a percipient witness. However, the parties are on notice that specific details of particular scientific procedures or analyses that would require specialized knowledge to understand and interpret—including the Six Sigma analysis—would move Dr. Das's testimony from percipient to expert. If expert testimony is introduced, Holmes may object at that time. A Daubert hearing will be sufficient to address any prejudice to Holmes, particularly in light of the fact that the parties intend to conduct a Daubert hearing mid-trial for the Government's expert witness, Dr. Stephen Master." Dkt. 989 at 4. |

MS. HOLMES' SUBMISSION RE: TESTIMONY OF DR. KINGSHUK DAS
CR-18-00258 EJD

2

III.     **SEPTEMBER 2016 DRAFT LETTER (TX 5274)**

**Issue: Admissibility of TX 5274.**  Ms. Holmes objects to the admission of Exhibit 5274, which is a September 2016 email to Dr. Das attaching a portion of a draft letter to CMS that was never finalized or submitted.

| Relevant Docket Entries | | |
|---|---|---|
| Dkt. | Document | Description/Excerpts |
| 892 | Holmes Mot. to Strike | Motion to strike supplemental expert report under Rules 16 and 702. Dkt 892 at 7 (explaining inadmissibility of draft letter). |
| 893-1 | Email from Gov't re Disclosure | Email from government identifying draft letter at TX 5274 as basis for Dr. Das' expert testimony. |
| 893-4 | Portion of TX 5274 | Attachment to September 2016 email from Dr. Helfand to Dr. Das that has since been marked as TX 5274. |

IV.     **VOIDING OF TEST RESULTS**

**Issue: Admissibility of Evidence and Testimony Concerning Subsequent Remedial Measures.**  Ms. Holmes maintains the government has not met its burden under the Court's May 22, 2021 Order on Motions in Limine for admission of evidence concerning the voiding of certain Theranos lab test results.  Moreover, because the government's proffer of Dr. Das' likely testimony on this issue is inconsistent with the memoranda of interview it has produced to date, Ms. Holmes respectfully requests the opportunity to voir dire the witness outside the presence of the jury on this issue.  *Compare* 11/4/21 Tr. at 5585:20-22 (government stating that "Dr. Das has said on multiple occasions . . . that he was legally required to void the tests") *with* Dkt. 893-2 (2/1/21 Memoranda of Interview); 893-3 (6/7/21 Memorandum of Interview).

| Relevant Docket Entries | | |
|---|---|---|
| Dkt. | Document | Description |
| 572 | Holmes' MIL | Motion to Exclude Subsequent Remedial Measures under Rule 401, 403, and 407. |
| 673 | Gov't Opp'n | Gov't Opposition to Motion. |
| 715 | Holmes' Reply | Ms. Holmes' Reply In Support of Motion to Exclude Subsequent Remedial Measures. |
| 798 | MIL Order | Court's Order on Motion in Limine re Voiding: "Holmes's most persuasive argument is that admitting evidence of Theranos' decision to void tests would be unfairly prejudicial because that decision was not made until 2016 and therefore is not probative of her intent during 2010-2015—the years that are the subject of the indictment. The Court shares Holmes's concern that the jury could convict her for failing to uncover laboratory issues, a negligence standard, rather than for knowingly misrepresenting false, material information during the charged conspiracy." Dkt. 798 at 37. |

MS. HOLMES' SUBMISSION RE: TESTIMONY OF DR. KINGSHUK DAS
CR-18-00258 EJD

3

| | | | |
|---|---|---|---|
| | | | Moreover, Holmes raises other legitimate concerns about admitting Theranos' decision to void test results, including (a) confusion of the issues because Theranos' lab practices were not placed at issue in the indictment, and (b) undue consumption of time because it would require Holmes to present extensive evidence about the decision to void the tests, including the regulatory backdrop for CMS's actions.<br><br>Accordingly, the Court defers ruling on the admissibility of Theranos' decision to void test results until the Government makes a proffer of evidence that clearly ties the events in 2016 to the charged conduct, as well as presents a factual basis for its assertion that Theranos' decision was involuntary for purposes of Rule 407."<br><br>Dkt. 798 at 37-38. |
| | 893-2 | 2/1/21 MOI | Memorandum of February 1, 2021 government interview of Dr. Das. |
| | 893-3 | 6/7/21 MOI | Memorandum of June 7, 2021 government interview of Dr. Das. |

**V.    CMS CORRESPONDENCE AND SUBMISSIONS (TX 3144, 4943, 5257, 5260, 5471)**

**Issue: Admissibility of Exhibits Reflecting 2016 Correspondence with CMS.**  Ms. Holmes maintains that several government exhibits reflecting Theranos' substantive responses to certain findings in the January 2016 CMS Report, and CMS' evaluation of those responses, are inadmissible in whole or in part.  Ms. Holmes attaches the relevant exhibits to this notice.  Decl. of Lance A. Wade, Exs. 1-5.

DATED: November 8, 2021

                                        /s/ Lance Wade
                                        KEVIN DOWNEY
                                        LANCE WADE
                                        AMY MASON SAHARIA
                                        KATHERINE TREFZ
                                        Attorneys for Elizabeth Holmes

MS. HOLMES' SUBMISSION RE: TESTIMONY OF DR. KINGSHUK DAS
CR-18-00258 EJD
                                        4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 8, 2021 a copy of this filing was delivered via ECF on all counsel of record.

/s/ Lance Wade
LANCE WADE
Attorney for Elizabeth Holmes

MS. HOLMES' SUBMISSION RE: TESTIMONY OF DR. KINGSHUK DAS
CR-18-00258 EJD

STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

JEFFREY B. SCHENK (CABN 234355)
JOHN C. BOSTIC (CABN 264367)
ROBERT S. LEACH (CABN 196191)
KELLY I. VOLKAR (CABN 301377)
Assistant United States Attorneys

> 150 Almaden Boulevard, Suite 900
> San Jose, California 95113
> Telephone: (408) 535-5061
> Fax: (408) 535-5066
> Kelly.Volkar@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. 18-CR-00258 EJD |
| | ) |
| Plaintiff, | ) UNITED STATES' SUPPLEMENTAL BRIEF |
| | ) REGARDING ADMISSION OF CMS REPORT |
| v. | ) (TRIAL EXHIBIT 4621), TESTIMONY OF DR. |
| | ) KINGSHUK DAS, AND EVIDENCE REGARDING |
| ELIZABETH HOLMES, | ) VOIDING OF THERANOS TEST RESULTS |
| | ) |
| Defendant. | ) Date:  November 9, 2021 |
| | ) Time:  8:00 a.m. |
| | ) Court: Hon. Edward J. Davila |

The government seeks admission of certain evidence and testimony all of which have been the subject of prior motions practice and oral argument before the Court, namely: (1) admitting the entirety of the Centers for Medicare and Medicaid Services' ("CMS") January 25, 2016 letter to Theranos's former lab director, Dr. Sunil Dhawan, and the attached Form CMS-2567, Statement of Deficiencies, for the Theranos Newark clinical laboratory (collectively, "January 2016 CMS Report"), as captured in Trial Exhibit 4621 (*available at* ECF No. 898-3); (2) admitting percipient testimony of Dr. Kingshuk Das, as previously discussed; and (3) admitting evidence regarding Theranos's ultimate voiding of all tests run on its proprietary blood analyzer device in or about March 2016 (during the alleged conspiracy to defraud patients, as alleged in Count Two). The government has read the relevant orders by the Court and asserts these three evidentiary topics are admissible pursuant to those orders. *See* ECF Nos. 798 (Order re: Motions *in Limine* ("MIL Order")), 989 (Order re: Pre-trial Motions ("MIL 2 Order")).

## BACKGROUND

The Third Superseding Indictment ("TSI") alleges that Defendant Elizabeth Holmes and co-Defendant Ramesh "Sunny" Balwani devised a scheme to defraud patients between approximately 2013—when Theranos began providing lab testing services to patients through certain Walgreens stores in Palo Alto and Arizona—and 2016—when Theranos elected to shutter its lab following interactions with CMS. ECF No. 469 ¶¶ 14–18. Specifically, the TSI alleges that from 2013 to 2016, the entire time Theranos was providing testing services to patients, Theranos represented to doctors and patients that Theranos could provide accurate, fast, reliable, and cheap blood tests and test results at the same time that Defendants knew that Theranos was not, in fact, capable of consistently producing accurate and reliable results. *Id.* Based on an order from the Court, the government provided a Bill of Particulars and ultimately incorporated those 25 assays into the TSI for the patient-related counts. *Id.* ¶ 16.

The evidence and testimony the government seeks to admit explains why Theranos's clinical testing of patients ceased in 2016—it was not a voluntary decision by Defendant as she would like the jury to believe. Beginning in September 2015, CMS conducted an in-person inspection of Theranos's Newark, California laboratory and observed that Theranos's blood analyzer repeatedly failed quality control checks and repeatedly produced values outside of ranges *Theranos* deemed acceptable—yet Theranos continued to report patient results. *See* ECF No. 875 at 5–10. These findings were ultimately

memorialized in the January 2016 CMS Report.  *Id.*  In response to these negative CMS findings, Defendants hired Dr. Kingshuk Das around December 2015 as Theranos's Newark Lab Director, in part to respond to questions from CMS and realign the lab with relevant regulations.  *See* ECF No. 727-2 (memorandum of interview of Dr. Das on February 1, 2021).  Dr. Das was hired to investigate and report on CMS's findings—presumably with the hope of finding a path forward—but, by spring 2016, Dr. Das "concluded [CMS inspectors] were '100%' correct with their deficiency findings."  ECF No. 846-2 (memorandum of interview of Dr. Das on June 7, 2021).  Dr. Das told Defendant that Theranos was required by CLIA regulations to void all of the test results produced by Theranos's blood analyzer due to accuracy and reliability concerns—but Defendant "push[ed] back" and told Dr. Das this was "not a device issue[.]"  *See* ECF Nos. 727-2, 846-2.  Dr. Das is expected to testify that he had regular meetings with Defendant to inform her of the issues with Theranos's blood analyzer, but the "conversations did not go well."  ECF No. 727-2.  Ultimately, Dr. Das prevailed; Theranos in March 2016 voided all patient test results on its proprietary analyzer from 2014 and 2015 (within the charged period) and, later that year in October 2016, Defendant Holmes shuttered Theranos's Newark lab altogether.  ECF Nos. 588 at 16, 588-6, 673 at 5.  Thus, the evidence the government seeks to admit is directly connected to the allegations in the TSI.

In addition, the evidence and testimony the government seeks to admit is an appropriate response given that Defendant has repeatedly put her actions and state of mind in 2016 at issue during the trial thus far.  In the first few minutes of her opening statement, Defendant vividly described her packing her car in 2018 and leaving the Newark laboratory on her last day—suggesting a guilty person would not have stuck it out.  09/8/2021 Hearing Transcript ("9/8 Tr.") at 560:1–23.  Despite Defendant texting her co-Defendant Balwani at the time of the CMS inspection that she was "praying continually" as he informed her that the inspection was "going bad so far" (10/14/2021 Hearing Transcript ("10/14 Tr.") at 3738:5–3739:15), Defendant's counsel pointed to her conduct in 2016 after receiving the final CMS findings during opening statements.  *See* 9/8 Tr. at 609:10–613:6.  Defendant has since sought to admit—and admitted occasionally over the government's objections—evidence during this 2016 timeframe to show her state of mind following the January 2016 CMS Report and the critical October 2015 *Wall Street Journal* article.  *See*, *e.g.*, 09/22/2021 Hearing Transcript ("9/22 Tr.") at 1648:4–

1655:10 (admitting Exhibits 10512 and 7653 (attached to this filing as Exhibits 1 and 2, respectively) over objection relating to positive feedback Defendant received in 2016).  Indeed, Defendant has repeatedly introduced evidence of her discussion of Theranos's technology during the American Association of Clinical Chemistry ("AACC") conference in August 2016, which the government should be permitted to rebut with Defendant's voiding of all tests run on Theranos's proprietary analyzer just a few months before and Defendant's shuttering of the lab approximately two months later.  *See* 9/22 Tr. at 1645:15–1646:5 (questioning General Mattis about Defendant's statements during the AACC conference); 10/26/2021 Hearing Transcript ("10/26 Tr.") at 4828:4–4831:23 (questioning Lisa Peterson about Defendant's presentation at the AACC conference); *see also id.* at 4592:8–4593:20 (arguing AACC video where Defendant defends Theranos's technology is admissible to show her state of mind in August 2016); 09/21/2021 Hearing Transcript at 1426:5–1427:19 (questioning Dr. Audra Zachman about the number of hCG tests Theranos performed for Dr. Zachman's clinic from October 2015 through October 2016—which unbeknownst to the witness would have occurred after Theranos ceased using the Edison for hCG testing).

Defendant has also questioned multiple witnesses on cross examination regarding events occurring after the CMS inspection and Report throughout 2016—purportedly to demonstrate Defendant's state of mind with respect to Theranos's technology in 2016.  *See, e.g.*, 10/26 Tr. at 4829:10–4831:23 (asking Lisa Peterson about attending AACC conference in August 2016 almost two years after RDV Corporation invested in Theranos); 10/13/2021 Hearing Transcript at 3505:2–3508:19 (asking Wade Miquelon, former CFO of Walgreens, about encouraging and positive emails he sent to Defendant in 2016 when he was no longer employed by Walgreens); 09/17/2021 Hearing Transcript at 1117:4–1120:2 (questioning Erika Cheung about a Theranos patent application from 2016 that the witness noted was filed after she left the company).  Defendant has even introduced evidence beyond the charged conspiracy period for the patient counts by questioning witnesses about events in December 2016 and even late 2017, well after Theranos ceased providing blood testing services to patients.  *See* 9/22 Tr. at 1646:6–1648:3 (questioning General Mattis about Theranos participating in a comparative study with UCSF in late 2017); 10/20/2021 Hearing Transcript at 4263:22–4266:1 (questioning Edlin regarding Dr. Robertson and whether Theranos created a technology advisory board in December 2016).

In sum, Defendant has repeatedly introduced evidence of her 2016 conduct under the theory that convening a scientific board, presenting at a scientific conference, or submitting herself to questioning by investors and the public undercuts an intent to deceive regarding the accuracy and reliability of Theranos's tests.

## ARGUMENT

The government submits that the evidence and testimony it seeks to admit is directly relevant to prove allegations against Defendant in the TSI—specifically with respect to the conspiracy to defraud Theranos's patients from 2013 to 2016—and is necessary to rebut the presently misleading impression Defendant has introduced at trial that her state of mind in 2016 was solely that the technology worked when she was being told a different story internally by Dr. Das and through the January 2016 CMS Report and subsequent interactions with CMS. Indeed, Theranos's decision in March 2016 to void all test results on its proprietary device from 2014 and 2015 as a result of the CMS Report and findings, and Dr. Das's internal review of those findings, demonstrates Defendant's knowledge of the severity of the inaccuracy and unreliability problems with Theranos's blood analyzer during the charged period.

## I.      CMS Findings

The government hereby provides notice to the Court and Defendant that it intends to seek admission of the entirety of the January 2016 CMS Report (and letter) as explicitly permitted by the Court's MIL Order. MIL Order, ECF No. 798 at 16–20. As the Court recently observed with respect to an issue raised by Defendant that the Court had granted in its MIL Order, to reverse course now in the midst of trial would "do violence to the Court's order in the MIL motion." 11/03/2021 Hearing Transcript at 5211:8–12.

The January 2016 CMS Report has been the subject of several filings to date. ECF Nos. 574, 588, 659, 675, 717, 726, 798, 897, 906, 989, 1086. The government initially moved *in limine* to seek admission of the January 2016 CMS Report, and Defendant moved *in limine* to blanketly exclude "Evidence of CMS Survey Findings and Sanctions," which included the January 2016 CMS Report (and letter). ECF Nos. 574, 588 at 15–17, 659, 675, 717, 726. The Court denied Defendant's motion and granted the government's motion, finding the CMS survey findings and sanctions relevant, "more probative than prejudicial," and not hearsay. ECF No. 798 at 16–20. The Court noted that Defendant

took particular issue with references to "CMS's finding of 'immediate jeopardy'" but held the phrase did not raise unfair prejudice concerns. *Id.* at 19.  Nevertheless, a few weeks before trial began, Defendant moved the Court to reconsider its finding on the January 2016 CMS Report—based again on relevance and hearsay grounds—and asserted that the Court's prior ruling did not encompass the CMS letter accompanying Form CMS-2567.  ECF Nos. 897, 906.  The Court disagreed, holding that "no new arguments have been presented to justify the breadth of the redactions requested" by Defendant and "reject[ing] Holmes's assertions that the cover letter is 'new' and not covered in the MIL Order."  MIL 2 Order, ECF No. 898 at 7–8 & n.1.  When the government provided notice of its intent to seek admission of a different CMS-related document, Defendant again submitted a filing stating her intent to object on the same grounds of relevance, unfair prejudice, and hearsay.  ECF No. 1086.

The government hereby provides advance notice of its intent to seek admission of the January 2016 CMS Report (and accompanying letter) and asserts that the Court has considered and rejected Defendant's arguments numerous times and there is thus no barrier to admission of Trial Exhibit 4621.  The development of evidence at trial thus far underscores the relevance of the January 2016 CMS Report.  For example, several of defense counsel's cross examinations of former Theranos employee witnesses have focused on Theranos's CLIA certification, policies in place within the lab (a.k.a. "SOPs"), and assay validation reports.  *See, e.g.*, 09/28/2021 Hearing Transcript, 09/29/2021 Hearing Transcript, 10/01/2021 Hearing Transcript, 10/05/2021 Hearing Transcript (cross examination of Dr. Adam Rosendorff).  And co-Defendant Balwani asked then-lab director Dr. Sunil Dhawan to sign approximately 300 SOPs the week before the CMS inspection in September 2015.  10/14 Tr. at 3727:21–3732:2.  But the CMS Report found the lab deficient and lacking documentation or instituted policies in many of these same areas.  Based on the survey, CMS found Theranos failed to comply with five conditions required for CLIA certification, as well as numerous CLIA standards.  And, among other things, in the Form CMS-2567, CMS found Theranos failed to ensure that quality control ("QC") was acceptable for the Theranos blood analyzer (TPS or Edison 3.0/3.5) *before* using the analyzer for reporting patient test results, failed to verify accuracy, precision, and/or reportable reference range for numerous assays, and failed to verify the performance specifications and conduct of a third-party device it was using.  *See* ECF No. 588 at 15–16 & 898-3.

While Defendant claimed at the motion *in limine* stage that the CMS Report was irrelevant because it did not demonstrate she was aware of these problems at the time of patient testing (*see* MIL Order, ECF No. 798 at 18–19), the trial testimony of former Theranos employees to date has shown otherwise. *See*, *e.g.*, 09/24/2021 Hearing Transcript at 1725:8–1732:14 (Dr. Adam Rosendorff testifying that he described issues in lab to Defendant leading up to Walgreens launch and admitting Exhibit 1049); 09/15/2021 Hearing Transcript at 973:1–980:25 (Erika Cheung testifying about Defendant's knowledge of issues in the lab and admitting Exhibit 1660 for notice to Defendant). In addition, Defendant objected at the motion *in limine* stage to the "immediate jeopardy" language in the CMS Letter, but she has since acquiesced to the introduction of such evidence through her own rule of completeness arguments to the "Today Show" video clip in April 2016 (Exhibit 3152). 10/26 Tr. at 4584:2–4596:24, 4702:4–4708:24 (admitting the entirety of Exhibit 3152 as requested by Defendant, and Exhibit 3152 recounts CMS's finding of "immediate jeopardy" against Theranos). Thus, as the Court previously found, the January 2016 CMS Report is more probative than prejudicial because it shows "Holmes's state of mind, knowledge, and intent regarding her representations to investors regarding the accuracy and reliability of Theranos' technology." *Id.*

Based on evidence introduced thus far in the trial, the Court should also reject any assertions by Defendant that the January 2016 CMS Report contains inadmissible hearsay within hearsay merely because CMS inspectors incorporated information conveyed by Theranos laboratory employees. *Cf.* ECF No. 897 at 8. The Court previously indicated that admission of such portions would depend on whether the government demonstrated a sufficient agency relationship between the Theranos employee and Defendant Holmes. ECF No. 798 at 20 n.6, 94–97. The government produced the email attached as Exhibit 3 (Bates CMS-USAO-001391) to Defendant, identifying which Theranos employees the CMS inspectors interviewed in connection with its report. Specifically, CMS inspectors interviewed Theranos's two General Supervisors (Hoda Alamdar and Gurbir Sidhu), Technical Supervisor (Godfried Masinde), Quality Assurance and Quality Control Manager (Langley Gee), Director of Assay Systems (Dr. Suraj Saksena), and Theranos's Senior Vice President (Dr. Daniel Young). *See* Exhibit 3. These were all employees listed—along with their qualifications—in the introductory presentation that Theranos presented to CMS when they arrived for their inspection. *See* Exhibit 4 (Admitted Trial

Exhibit 4528 at PowerPoint slide pages 8, 12–18).  The testimony of Dr. Sunil Dhawan demonstrated that these individuals held senior positions in Theranos's lab, and these were the individuals Dr. Dhawan relied upon when he signed documents on behalf of Theranos as Lab Director in Fall 2015.  *See*, *e.g.*, 10/14/2021 Hearing Transcript ("10/14 Tr.") at 3735:11–3739:15; 10/15/2021 Hearing Transcript ("10/15 Tr.") at 3795:10–3797:25, 3806:3–3809:13, 3820:9–3825:1.  In addition, text messages between Defendant Holmes and co-Defendant Balwani at the time of the CMS inspection demonstrate that both Defendants were focused on the CMS inspection and supports the inference that they chose these Theranos employees to speak with authority on behalf of them and the company.  *See* 10/15 Tr. at 3736:25–3739:15; *see also* ECF No. 798 at 25–27 (finding Defendant Holmes sufficiently connected to Theranos's September 2015 communications with CMS).  Thus, any information communicated to CMS by these senior lab employees was within the scope of their relationship while it existed and non-hearsay under Federal Rule of Evidence 801(d)(2)(D).

The government submits the entirety of the CMS Report (Exhibit 4621) is admissible, as the Court found several months ago in its MIL Order.

## II.     Testimony of Dr. Kingshuk Das

For similar reasons, Dr. Das should be permitted to testify based on his percipient knowledge of completing the tasks that Defendant hired him to do, pursuant to the limitations the Court outlined in the weeks leading up to trial.  *See* MIL 2 Order, ECF No. 989 at 3–4.

As with the CMS Report, the parties and the Court extensively discussed pretrial Dr. Das's expected testimony.  *See* ECF Nos. 892, 906, 912, 926, 989.  Defendant argued that a substantial portion of Dr. Das's testimony would qualify as expert testimony—as it had at the MIL stage with respect to Dr. Adam Rosendorff—and the government asserted that the majority (if not all) of Dr. Das's expected testimony would be percipient testimony.  *See id.*  The Court largely agreed with the government that, based on the government's representations at the August 20, 2021 hearing, "the Court is persuaded that Dr. Das may proceed as a percipient witness."  MIL 2 Order, ECF No. 989 at 4.  The Court warned, however, that discussion of "the Six Sigma analysis [ ] would move Dr. Das's testimony from percipient to expert."  *Id.*  The Court's ruling in its MIL 2 Order matches the discussion at the hearing, where the Court expressed reservation about the Six Sigma analysis, but noted it was possible for the witness to

testify in a percipient manner and not get into those specifics, providing the following hypothetical:
"This is my job, this is what I do, I get the results, I look at the results, . . . I compare it to whatever it is,
and that's not my opinion, it's the results, and I'm reporting the results [to my boss]."  08/20/2021
Hearing Transcript at 64:18–80:25 (attached as Exhibit 5).  Defendant expressed her view that only 20%
of Dr. Das's testimony would qualify as percipient testimony, but the Court disagreed.  *Id.*  The Court
also noted that it provided its thoughts on what testimony—in particular the Six Sigma analysis—would
cross the line into expert testimony and the government would proceed into such topics at its own peril.
*Id.* at 79:19–80:18.

The government understands the limitations the Court has expressed for Dr. Das's testimony and
has crafted its direct examination accordingly.  The government has read the Court's relevant MIL 2
Order and the related portions of the transcript and intends to abide by the Court's directions.  Thus, the
government should be permitted to call Dr. Das to testify about his job, what he was hired by Defendant
to do, what he discovered in performing the tasks the Defendant asked him to do (namely, investigate
CMS's findings and concerns), and his perspective of the resulting discussion of what he discovered
with Defendant.  Each of those topics are squarely within his percipient knowledge.

**III.     Voiding Test Results**

The government also submits that the evidence admitted at trial thus far has provided sufficient
foundation to address the prerequisites the Court stated in its MIL Order with respect to Theranos's
voiding of the test results in March 2016, and any remaining concerns will be addressed by Dr. Das's
expected testimony.  Defendant moved to exclude evidence relating to Theranos voiding its tests and
subsequent settlements the company entered into and, as relevant here, the Court deferred with respect
to the evidence relating to voiding of the tests.  MIL Order, ECF No. 798 at 30–39.  Specifically, the
Court found the evidence relevant but "defer[ed] ruling on the admissibility of Theranos' decision to
void test results until the Government makes a proffer of evidence that clearly ties the events in 2016 to
the charged conduct, as well as presents a factual basis for its assertion that Theranos' decision was
involuntary for purposes of Rule 407."  *Id.* at 34–38.  The government submits it has met those two
requirements.

As stated above, Defendant has repeatedly placed events in 2016 at issue in the case and, of course, the charged conspiracy to defraud patients extends until the Newark lab closed down in October 2016.  Defendant claimed at the MIL stage a similar defense she has presented to the jury—that she took CMS's findings seriously and wanted to respond to skepticism stemming from the *Wall Street Journal* article including by attending the AACC.  *See id.* at 37; 10/26 Tr. at 4828:4–4831:23.  But Lisa Peterson on behalf of investor-victim RDV Corporation has already testified that she heard a different version of events from Defendant in a meeting with Thernaos investors in April 2016, specifically that Defendant "very much downplayed what had been happening in the press" and told Peterson that "CMS was questioning the process, not the accuracy of the tests[.]"  10/26 Tr. at 4709:6–24.  The government submits it has sufficiently tied Defendant's decision to void the tests in March 2016 with the charged conduct because it relates both to keeping the investors in the dark regarding how serious the CMS findings were and to the inaccuracy and unreliability of tests Theranos offered to patients in 2014 and 2015.  To the extent there remains any doubt, Dr. Das is expected to testify that he received push back from Defendant when he informed her that Theranos was required to void the test results, and to pass the issue off as a quality control systems issue—not an issue with Theranos's proprietary device.  *See* ECF No. 893-2 at 3.  Similarly, Dr. Das is expected to testify that he was obligated—under the same CLIA regulations that Defendant admitted into evidence during the testimony of Dr. Rosendorff (Trial Exhibit 7603)—to void the tests on behalf of Theranos.  *Id.*  That Defendant had to be persuaded to this course of action goes directly to the core of Defendant's intent and knowledge.  Voiding the tests in March 2016 is tied to the charged conduct and was completely involuntary, and thus the Court should admit related testimony.

And, of course, even if the Court were to find Theranos's voiding of the tests to be a voluntary remedial measure under Rule 407, such a ruling would not preclude any evidence of Theranos's internal analysis leading to voiding of the tests.  As the Court noted, "statements by Theranos and Holmes to . . . CMS in the course of its survey and subsequent proceedings are not subject to exclusion[.]"  MIL Order, ECF No. 798 at 39; ECF No. 673 at 8–9.  As the government argued at the MIL stage, Rule 407 prohibits evidence of voluntary subsequent *measures*, not evidence of a party's *analysis* of its product, even when prompted by regulators.  *See*, *e.g.*, *Aguilar v. City of Los Angeles*, 853 F. App'x 92, 95

(9th Cir. 2021) (finding legal error in district court excluding LAPD's internal in-custody death investigation under Rule 407 because they were "retrospective, not remedial"); *Rocky Mountain Helicopters, Inc. v. Bell Helicopters Textron, a Div. of Textron, Inc.*, 805 F.2d 907, 918 (10th Cir. 1986) ("It would strain the spirit of the remedial measure prohibition in Rule 407 to extend its shield to evidence contained in post-event tests or reports.").

In addition, given the Defendant's repeated arguments and suggestions that her actions in 2016 and beyond (convening an advisory board, soliciting input from scientists, attending AACC, etc.) demonstrate a lack of intent to defraud, it would be unfair to deny the government an opportunity to show through her other statements and actions a complete picture of her state of mind in 2016. The government should be permitted to provide the whole picture to the jury and explain why the conspiracy with respect to the scheme to defraud patients ended in 2016 with Defendant voiding all of the tests (as a consequence of CMS's findings in the Report) and shuttering the lab later that year.

## CONCLUSION

For these reasons and those stated in the government's prior filings on this topic, the government requests the Court admit Trial Exhibit 4621 in its entirety—over any relevance, Rule 403, or hearsay objections by Defendant—when offered by the government at trial. The government further requests that Dr. Das be permitted to testify as a percipient witness within the guardrails the Court outlined during pre-trial motion practice. Finally, the government requests the Court admit evidence and testimony regarding voiding of tests in March 2016 as it has met the court's prerequisites.

DATED:  November 8, 2021                              Respectfully submitted,

                                                      STEPHANIE M. HINDS
                                                      Acting United States Attorney


                                                       */s/ Kelly I. Volkar*                              
                                                      JEFFREY B. SCHENK
                                                      JOHN C. BOSTIC
                                                      ROBERT S. LEACH
                                                      KELLY I. VOLKAR
                                                      Assistant United States Attorneys

# EXHIBIT 9

**Date:**   Tue, 6 Jul 2021 9:34:23 PM (UTC)

**Sent:**   Tue, 6 Jul 2021 9:34:22 PM (UTC)

**Subject:**   RE: [External] CDPH Branch Laboratory, Valencia, CA (CLIA Number 05D2197416)

**From:**   Fuller, Karen M. (CMS/CCSQ) <Karen.Fuller@cms.hhs.gov>

**To:**   Yamamoto, Gary K. (CMS/CCSQ) <Gary.Yamamoto@cms.hhs.gov>; Cohen, Joshua (CMS/CCSQ) <Joshua.Cohen@cms.hhs.gov>;

Thank you for the update. Karen

**From:** Yamamoto, Gary K. (CMS/CCSQ)
**Sent:** Tuesday, July 6, 2021 12:43 PM
**To:** Fuller, Karen M. (CMS/CCSQ) <Karen.Fuller@cms.hhs.gov>; Cohen, Joshua (CMS/CCSQ) <Joshua.Cohen@cms.hhs.gov>
**Subject:** FW: [External] CDPH Branch Laboratory, Valencia, CA (CLIA Number 05D2197416)

Karen and Josh,

FYI. I also received a call from Dr. Rosendorff, who had some questions about the letter. His questions mainly dealt with possible implications for him if CMS imposed the sanctions. He asked whether the prohibition would affect his ability to practice medicine. If the revocation became final, I told him the prohibition would only affect his ability to own and direct laboratories, not his ability to practice medicine. He asked whether the prohibition would affect PerkinElmer. As far as we knew, PerkinElmer is not an owner of the laboratory and would therefore not be affected by a prohibition. He then realized that CA would be affected and asked what it might mean for CA. I told him that CA would be affected by any prohibition but explained that an option for CMS would be to suspend and not revoke. A suspension does not have the same prohibition implications. He asked whether CMS has decided on which sanctions to impose. I told him that CMS would decide which sanctions to impose if and when CMS chooses to impose the sanctions.

Gary

**From:** Rosendorff, Adam <Adam.Rosendorff@PERKINELMER.COM>
**Sent:** Tuesday, July 6, 2021 11:08 AM
**To:** Yamamoto, Gary K. (CMS/CCSQ) <Gary.Yamamoto@cms.hhs.gov>
**Cc:** Cohen, Joshua (CMS/CCSQ) <Joshua.Cohen@cms.hhs.gov>
**Subject:** Re: [External] CDPH Branch Laboratory, Valencia, CA (CLIA Number 05D2197416)

Hi Gary

Received.

Thank you,

Adam

Adam Rosendorff, MD
Laboratory Director, CDPH Branch Laboratory, Valencia
Medical Director, PerkinElmer Genomics
Mobile: ▮▮▮▮▮▮▮
E-mail: adam.rosendorff@perkinelmer.com

**From:** "Yamamoto, Gary K. (CMS/CCSQ)" <Gary.Yamamoto@cms.hhs.gov>
**Date:** Tuesday, July 6, 2021 at 10:08 AM
**To:** "Rosendorff, Adam" <Adam.Rosendorff@PERKINELMER.COM>
**Cc:** "Cohen, Joshua (CMS/CCSQ)" <Joshua.Cohen@cms.hhs.gov>

**Subject:** [External] CDPH Branch Laboratory, Valencia, CA (CLIA Number 05D2197416)

Use caution when opening links or attachments.

Dr. Rosendorff,

CMS faxed the attached letter to the laboratory today.  I am emailing you a courtesy copy.

Gary

# EXHIBIT 8

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
Division of Clinical Laboratory Improvement & Quality (DCLIQ)
Western and Central Operations Branch - San Francisco Office
(Denver, Kansas City, San Francisco, and Seattle)
90 7th Street, Suite 5-300 (5W)
San Francisco, CA  94103-6707



Refer to:  DCLIQ - GKY

## IMPORTANT NOTICE – PLEASE READ CAREFULLY

Via facsimile to (661) 402-6485.
*(Confirmation of successful facsimile transmission constitutes proof of receipt.)*

July 6, 2021

Adam Rosendorff, M.D., Director
CDPH Branch Laboratory
28454 Livingston Avenue
Valencia, CA  91355

CLIA Number: 05D2197416

**RE:   NOTICE OF PROPOSED SANCTIONS – CONDITIONS NOT MET –
IMMEDIATE JEOPARDY. IMPOSITION NOTICE TO FOLLOW IF PROPOSED
SANCTIONS ARE IMPOSED.**

Dear Dr. Rosendorff:

**This letter provides notice of sanctions the Centers for Medicare & Medicaid Services
(CMS) proposes to impose against the laboratory's Clinical Laboratory Improvement
Amendments of 1988 (CLIA) certificate. This letter also provides notice of the laboratory's
opportunity to submit in writing any evidence or information as to why the proposed
sanctions should not be imposed. If the sanctions are imposed, we will provide the
laboratory with a separate notice setting forth hearing rights and explaining the
administrative appeals process.**

For a laboratory to perform testing under CLIA, Public Law 100-578, it must comply with all
CLIA requirements. These requirements are found in section 353 of the Public Health Service
Act (42 U.S.C. § 263a) and Title 42 of the Code of Federal Regulations, Part 493 (42 C.F.R. Part
493). Laboratories are required to be in compliance with the applicable regulations. Compliance
with these regulations is a condition of certification for the CLIA program.

CMS conducted a CLIA initial certification and complaint survey at CDPH Branch Laboratory
("the laboratory") completed on May 6, 2021. Based on this survey, the laboratory was found to
be out of compliance with the following two CLIA Condition-level requirements:

| | |
|---|---|
| D5400: 42 C.F.R. § 493.1250 | Condition: Analytic systems; and, |
| D6076: 42 C.F.R. § 493.1441 | Condition: Laboratories performing high complexity testing; laboratory director. |

In addition, CMS determined that various CLIA Standard-level requirements were not met.

Because of the serious nature of the deficiencies, the survey determined there was immediate jeopardy to health and safety. We notified CDPH Branch Laboratory by letter dated May 6, 2021, that conditions within the laboratory pose an immediate jeopardy situation. Immediate jeopardy is a situation in which immediate corrective action is necessary because the laboratory's non-compliance with one or more Condition level requirements has already caused, is causing, or is likely to cause, at any time, serious injury or harm, or death, to individuals served by the laboratory or to the health or safety of the general public. This term is synonymous with imminent and serious risk to human health and significant hazard to public health. *See* 42 C.F.R. § 493.2.

We provided the laboratory a listing of all deficiencies identified during the survey on Form CMS-2567, Statement of Deficiencies, sent as an enclosure to our May 6, 2021 letter. In the May 6, 2021 letter, we notified the laboratory to take immediate action to remove jeopardy and bring any unmet Condition-level requirement into compliance. CMS gave the laboratory ten calendar days from the date of receipt of the May 6, 2021 letter to submit a credible allegation of compliance and acceptable evidence of correction for the cited deficiencies. CMS received a submission from the laboratory in response to the May 6, 2021 letter on May 16, 2021.

After careful review, we have determined that the laboratory's submission does not constitute a credible allegation of compliance and acceptable evidence of correction for the deficiencies cited during the CLIA initial certification and complaint survey completed on May 6, 2021. In addition, the submission does not demonstrate that the laboratory has come into Condition-level compliance and abated immediate jeopardy. In general, we find that the statements made in the allegation of compliance and evidence of correction: 1) failed to adequately address the deficient practice cited; 2) are incomplete and failed to meet the criteria of acceptable evidence of correction; 3) do not ensure sustained compliance; and 4) show a lack of understanding of the CLIA requirements.

As we advised the laboratory in our May 6, 2021 letter, a credible allegation of compliance, as defined by regulation (42 C.F.R. § 493.2), is a statement or document that is:

1) Made by a representative of a laboratory with a history of having maintained a commitment to compliance and taking corrective action when required;

2) Realistic in terms of the possibility of the corrective action being accomplished between the date of the survey and the date of the allegation; and

3) Indicates resolution of the problem.

It is important to note that the allegation of compliance must be complete and address each of the deficiencies cited in the Statement of Deficiencies to be credible. For each deficiency, the allegation of compliance must include a corrective action date that is realistic in terms of the action being accomplished between the date of the survey and the planned date of completion.

2

As we also advised the laboratory in our May 6, 2021 letter, the laboratory's allegation of compliance must be substantiated by acceptable evidence of correction, which must include:

1) Documentation showing what corrective action(s) have been taken for patients found to have been affected by the deficient practice;

2) How the laboratory has identified other patients having the potential to be affected by the same deficient practice and what corrective action(s) have been taken;

3) What measure has been put into place or what systemic changes the laboratory has made to ensure that the deficient practice does not recur; and

4) How the corrective action(s) is being monitored to ensure the deficient practice does not recur.

The following explanation details why the laboratory's May 16, 2021 submission does not constitute a credible allegation of compliance and acceptable evidence of correction:

D5209
**The laboratory's allegation of compliance is not credible, and evidence of correction is not acceptable.**

In the submission, the laboratory stated: "No staff were due for 6-month or 12-month competency assessment because the laboratory had been open less than 6 months [as of the onsite March 2021 CLIA survey/investigation]." However, we note that records titled "Training and Competency Record" were provided, which indicated that testing personnel were determined to be competent before March 2021. In addition, since these records were all dated before the March 2021 CLIA survey/investigation, the laboratory did not explain why these records were not available at the time of the onsite survey/investigation.

We also note that the laboratory has been operational for more than six months as of the submission date. Yet, the laboratory provided no documents indicating that the laboratory had effectuated its six-month laboratory staff competency assessment.

The laboratory failed to adequately address this deficiency and provide acceptable evidence of correction consisting of the required documentation and information set forth above and in our May 6, 2021 letter.

D5400
**The laboratory's allegation of compliance is not credible, and evidence of correction is not acceptable.**

See our reviews of D5423, D5429, D5481, D5789, and D5791.

D5423

**The laboratory's allegation of compliance is not credible, and evidence of correction is not acceptable.**

Based on "CLIA 42 CFR [§] 493.1253 and FDA [Food and Drug Administration] guidance [Policy for Coronavirus Disease – 2019 Tests During the Public Health Emergency (Revised), May 2020]," the laboratory's May 16, 2021 cover letter and May 15, 2021 allegation of compliance assert that its SARS-CoV-2 test "is a fully validated LDT [laboratory developed test]." The laboratory makes additional references in the cover letter and allegation of compliance to "the FDA permitted right to reference," the laboratory's ability to "leverage studies for interfering substances from the EUA [Emergency Use Authorization]," and "bridge studies as per FDA guidance."

The laboratory's assertions imply that it has met the CLIA requirement at 42 C.F.R. § 493.1253(b)(2) by following the cited FDA guidance and applying certain data submitted to the FDA for another test system that the FDA approved under the FDA's EUA.

The CLIA requirement at 42 C.F.R. § 493.1253(b)(2) has not been waived or in any way modified by the cited FDA guidance and remains in full force and effect. Under that requirement, "[e]ach laboratory that modifies an FDA-cleared or approved test system, or introduces a test system not subject to FDA clearance or approval (including methods developed in-house and standardized methods such as test book procedures), or uses a test system in which performance specifications are not provide by the manufacturer *must,* before reporting patient test results, *establish for each test system the performance specifications*" (emphasis added) as further specified in the regulation. The actions described by the laboratory do not meet this requirement, and the laboratory has not otherwise demonstrated that it had established performance specifications for its SARS-CoV-2 test as required.

We also note that in the submission, the laboratory:
- Referenced the following but provided no supporting documentation for:
  o Viral transport media (PrimeSource MTM (molecular transport medium)) validation;
  o The establishment of cycle threshold (CT) cutoff values for patient test result reporting; and,
  o "Attached White paper" for high CT values.

- Did not explain:
  o Why test results recorded in "Table 1a," "Table 1b," "Table 1c," "Table 1d," "Table 1e," and "Table 1f" differed between specimens that were heat activated and heat inactivated; and,
  o Why the laboratory's "validation report" was dated effective 11/23/2020; however, patient specimen testing began on 11/2/2020.

The laboratory failed to adequately address this deficiency and provide acceptable evidence of correction consisting of the required documentation and information set forth above and in our May 6, 2021 letter.

4

D5429

**The laboratory's allegation of compliance is not credible, and evidence of correction is not acceptable.**

In the submission, the laboratory referenced the following but provided no supporting documents for:
- Maintenance quality assessment monthly audits;
- The "laboratory's continuous improvement and correction action process;" and,
- Retrospective review.

We note that in its submission, the laboratory stated that its ". . .retrospective analysis is ongoing." This statement clearly indicates that the laboratory had not completed its corrective actions for this deficient practice.

The laboratory failed to adequately address this deficiency and provide acceptable evidence of correction consisting of the required documentation and information set forth above and in our May 6, 2021 letter.

D5481

**The laboratory's allegation of compliance is not credible, and evidence of correction is not acceptable.**

In the submission, the laboratory referenced the following but provided no supporting documents for:
- Repeated patient test run; and,
- "Draft [mock inspection] SOP" and training.

The laboratory failed to adequately address this deficiency and provide acceptable evidence of correction consisting of the required documentation and information set forth above and in our May 6, 2021 letter.

D5789

**The laboratory's allegation of compliance is not credible, and evidence of correction is not acceptable.**

The laboratory's response is not credible because modifications made to various portions of their electronic results pathway do not translate from one portion to another over time. These modifications then create situations with inadequate tracking of patient information to ensure accurate and reliable patient test reports.

In the submission, the laboratory referenced the following but provided no supporting documentation of:

- A written procedure detailing how audits or routine review of historical data is to be performed indicating that there was no impact on patient test results.
- The laboratory effectuating these audits/reviews.

5

- Patient reports showing that the historical modifications of CT values and corresponding result interpretations in laboratory data records did not impact patient test results displayed on patient reports.
- A written procedure detailing the "monthly end-to-end tracer" audit and evidence that it has been effectuated.

The laboratory failed to adequately address this deficiency and provide acceptable evidence of correction consisting of the required documentation and information set forth above and in our May 6, 2021 letter.

D5791

**The laboratory's allegation of compliance is not credible, and evidence of correction is not acceptable.**

In its submission, the laboratory stated the following:

- "Prior to the inspection on March 10, 2021, the laboratory had self-identified, in mid-December, that not all maintenance records were completed, and some were missing supervisor review and/or supervisor dated review. This deviation from written procedure and regulation entered the laboratory's continuous improvement and correction action process."
- "The laboratory has taken corrective action; however retrospective analysis is ongoing."

The laboratory provided no documentation supporting these statements and clearly indicates that the laboratory's corrective actions for this deficient practice had not been completed.

The laboratory failed to adequately address this deficiency and provide acceptable evidence of correction consisting of the required documentation and information set forth above and in our May 6, 2021 letter.

D6076

**The laboratory's allegation of compliance is not credible, and evidence of correction is not acceptable.**

See our review of D6085, D6094, D6097, and D6102.

D6085

**The laboratory's allegation of compliance is not credible, and evidence of correction is not acceptable.**

See our review of D5423.

D6094

**The laboratory's allegation of compliance is not credible, and evidence of correction is not acceptable.**

6

See our review of D5791.

D6097
**The laboratory's allegation of compliance is not credible, and evidence of correction is not acceptable.**

See our review of D5481.

D6102
**The laboratory's allegation of compliance is not credible, and evidence of correction is not acceptable.**

While the laboratory provided a substantial amount of records indicating various laboratory training requirements and tracking mechanisms to monitor those requirements, the presentation of the material did not appear comprehensive to cover all staff in a manner that would indicate completion of training according to laboratory policies and procedures. For example, there was no master list showing which staff performed what tasks, no list of what trainings were required for specific tasks, and no list of when those trainings were assigned, and completion was documented.

The laboratory failed to adequately address this deficiency and provide acceptable evidence of correction consisting of the required documentation and information set forth above and in our May 6, 2021 letter.

**Proposed Sanctions**

Accordingly, pursuant to 42 C.F.R. §§ 493.1806, 493.1814, and 493.1840(a)(3), **based on the finding of immediate jeopardy and the laboratory's failure to meet all CLIA Condition-level requirements, and based on the failure by the owners and director of the laboratory to comply with certificate requirements and performance standards as evidenced by the deficiencies cited during the CLIA recertification and complaint survey completed on March 10, 2021**, CMS is proposing the following sanctions against the CLIA certificate of CDPH Branch Laboratory:

- 42 U.S.C. § 263a(i), and 42 C.F.R. §§ 493.1806, 493.1840(a)(3), and 493.1840(e) – Principal Sanction: **Revocation** of the laboratory's CLIA certificate effective **60 calendar days from the notice of imposition**. If imposed, the laboratory has 60 calendar days to appeal the determination to revoke the laboratory's CLIA certificate. If a timely hearing request is received, revocation of the laboratory's CLIA certificate will become effective following the administrative hearing decision if our determination of non-compliance is upheld.

- 42 C.F.R. §§ 493.1806, 493.1812, 493.1840(a)(3), and 493.1840(d)(2)(i) – Principal Sanction: **Suspension** of the laboratory's CLIA certificate effective **eight calendar days from the notice of imposition** based on the finding of immediate jeopardy. The limitation will take effect regardless of whether a hearing request is filed and will remain in effect until the laboratory's CLIA certificate is revoked.

7

- 42 C.R.R. §§ 493.1806(c)(3), 493.1810(c)(2)(ii), 493.1810(d), and 493.1834 - Alternative Sanction: **Civil Money Penalty (CMP)** of $21,410 per day for each day of non-compliance effective **five calendar days from the notice of imposition**. If the laboratory requests a hearing, the CMP will not be collected until after the hearing decision is rendered. However, the $21,410 per day will begin to accrue five (5) days from the notice of imposition and will continue to accrue until it can be verified that all the cited deficiencies have been corrected and the laboratory is in compliance with all Condition-level requirements, or the laboratory's CLIA certificate is suspended.

In determining the amount of the penalty, CMS has taken into account the following factors: (1) the laboratory was found to be out of compliance with two CLIA Condition-level requirements as well as numerous Standard-level CLIA requirements during the survey completed on May 6, 2021; (2) the deficiencies cited during the survey were so serious as to result in the determination of immediate jeopardy to patient health and safety; (3) the laboratory failed to remove the jeopardy after being provided an opportunity to do so; (4) the laboratory failed to come into Condition-level compliance after being provided ample opportunity to do so; (5) the laboratory failed to meet all analytic system requirements specified in 42 C.F.R. §§ 493.1251 through 493.1283; (6) the laboratory failed to meet all requirements for a laboratory director of a laboratory performing high complexity testing, specified in 42 C.F.R. §§ 493.1443 and 493.1445; and (7) the laboratory has expressed no rational reasons for its failure to achieve compliance with all applicable Condition-level CLIA requirements.

Pursuant to 42 C.F.R. § 493.1834(e)(2)(iii), if the laboratory waives its right to a hearing[1], the amount of the CMP may be reduced by 35 percent (35%). If you would like to waive your right to a hearing regarding the imposition of any CMP, you must do so by submitting your written notice of waiver to the following address within sixty (60) calendar days from the date of receipt of the imposition notice:

> Karen Fuller, Manager
> Division of Clinical Laboratory Improvement & Quality (DCLIQ)
> Western and Central Operations Branch – San Francisco Office
> Centers for Medicare & Medicaid Services
> 90 7th Street, Suite S-300 (5W)
> San Francisco, CA  94103-6707

- 42 C.F.R. §§ 493.1806(c)(1), 493.1832(b)(2), 493.1844(d)(1), and 493.1844(g)(1) – Alternative Sanction: **Directed Portion of a Plan of Correction** effective **five calendar days from the notice of imposition**. The laboratory will be directed to submit to this office within ten calendar days from the date of the notice of imposition of sanctions a list of the names and addresses of all physicians and other clients who have used some or all of the laboratory's services from November 2020 to the present date. CMS may use this list to

---

[1] *See* 42 C.F.R. § 493.1834(e)(2) for hearing rights regarding proposed CMPs. You will be provided another opportunity to appeal or claim the 35% reduction in a subsequent letter if CMS decides to impose any sanctions, including a CMP.

8

advise the laboratory's clients of its non-compliance and the nature and effective date of any sanctions imposed against the laboratory. The effective date of this sanction will not be delayed due to the filing of a hearing request.

- 42 C.F.R. §§ 493.1804(b)(1)(ii), 493.1804(b)(2), 493.1807(b), 493.1808(b), 493.1826, 493.1844(d)(1), and 493.1844(h)(2) – Medicare Principal Sanction: **Suspension of the laboratory's approval to receive Medicare payments** for any services performed on or after **eight calendar days from the notice of imposition**.

As a consequence of the suspension of the approval to receive Medicare for services performed, under Section 1902(a)(9)(C) of the Social Security Act and 42 C.F.R. § 440.30(c), payment under the Medicaid program, Title XIX of the Social Security Act, will no longer be available to the laboratory for all laboratory services performed effective **eight calendar days from the notice of imposition.**

- 42 C.F.R. §§ 493.1807(a), 493.1808(a), 493.1842, and 493.1844(d)(3) – Principal Sanction: **Cancellation of the laboratory's approval to receive Medicare payments** for all laboratory services effective **60 calendar days from the notice of imposition**. This sanction will be effectuated even if the laboratory files a timely appeal.

Moreover, in accordance with Section 1902(a)(9)(C) of the Social Security Act and 42 C.F.R. § 440.30(c) and 493.1809, payment under the Medicaid program, Title XIX of the Social Security Act, will no longer be available to the laboratory for all laboratory services effective **60 calendar days from the notice of imposition**. See 42 C.F.R. § 440.2(b).

The laboratory is advised that the above sanctions cannot be avoided by the closure, discontinuation of testing, voluntary withdrawal from the CLIA program, or changes in the certificate to a lower level of testing. CMS will not change a laboratory's CLIA certificate type while an enforcement action is pending. In addition, a laboratory's CLIA certificate will remain active while an enforcement action is pending.

**When the laboratory's CLIA certificate is revoked, the laboratory will not be permitted to perform any testing, including waived testing and provider performed microscopy procedures, regardless of whether or not the laboratory charges for the testing.[2] When the laboratory's CLIA certificate is limited for the specialty of hematology, the laboratory will not be permitted to perform any hematology testing, including waived testing and provider performed microscopy procedures, regardless of whether or not the laboratory charges for the testing[3].** Also, upon revocation of a laboratory's CLIA certificate 42 U.S.C. § 263a(i)(3) and 42 C.F.R. § 493.1840(a)(8) prohibit the owners or operator(s) (including the laboratory director – see 42 C.F.R. § 493.2) from owning or operating (or directing) a laboratory for at least two years

---

[2] The laboratory may continue to perform parallel testing on patient specimens if needed to implement corrective actions. However, the laboratory may not report any patient test results during the period when its CLIA certificate is revoked.
[3] The laboratory may continue to perform parallel testing on patient hematology specimens if needed to implement corrective actions. However, the laboratory may not report any patient hematology test results during the period when its CLIA certificate is limited for the specialty of hematology.

9

from the date of the revocation. This prohibition applies to the owner, operator, and laboratory director at the time the deficiencies which led to the proposal of sanctions were identified by CMS.

Please note that in accordance with 42 U.S.C. § 263a(i)(2), CMS is authorized to suspend the CLIA certificate of a laboratory before holding a hearing where the failure to comply with CLIA requirements presents an imminent and serious risk to human health, as has been determined in the case of CDPH Branch Laboratory. As further provided under this section of the statute, if the laboratory requests a hearing, it is entitled to have the hearing commence within 60 days of the effective date of the suspension. The laboratory must specify in any request for a hearing to challenge the suspension of its CLIA certificate whether it wishes the hearing to commence within 60 days.

Please be advised that the determination that a laboratory's deficiencies pose immediate jeopardy is not subject to appeal. Please also be advised that the determination of which alternative sanction or sanctions to impose, including the amount of a Civil Money Penalty to impose per day or violation, is not subject to appeal. *See* 42 C.F.R. § 493.1844(c)(4) and (c)(6).

Please note that pursuant to 42 C.F.R. § 493.1840(a)(7), failure to comply with an alternative sanction, such as a CMP or a Directed Plan of Correction, is a separate and distinct basis for limitation, suspension, or revocation of any CLIA certificate.

**Instructions for Sending in Your Response**

**The laboratory has ten calendar days from the date of this notice, or until July 16, 2021 to submit in writing any evidence or information as to why the sanctions detailed above should not be imposed.** If a response is not made, is untimely, or does not successfully rebut the bases for the proposed sanctions, we will notify the laboratory in writing that we will proceed to impose the above-referenced sanctions. We will provide information regarding the laboratory's hearing rights and a description of the appeals process at that time.

All responses, as well as any future correspondence about this survey, should be sent to:

Karen Fuller, Manager
Division of Clinical Laboratory Improvement & Quality (DCLIQ)
Western and Central Operations Branch – San Francisco Office
Centers for Medicare & Medicaid Services
90 7th Street, Suite S-300 (5W)
San Francisco, CA  94103-6707

If the sanctions become effective as referenced above, in accordance with 42 C.F.R. § 493.1850(a)(2), information regarding the actions against the laboratory's CLIA certificate will appear in the Laboratory Registry for the calendar year in which the actions are imposed. In addition, pursuant to 42 C.F.R. § 493.1844(g)(1), we will notify the general public by posting the information on the Survey & Certification website at

10

https://www.cms.gov/Medicare/Provider-Enrollment-and-
Certification/SurveyCertificationGenInfo/Termination-Notices.html.

Please contact Gary Yamamoto by telephone at ▮▮▮▮▮▮ or by e-mail at
gary.yamamoto@cms.hhs.gov or Josh Cohen by telephone at ▮▮▮▮▮▮ or by e-mail at
joshua.cohen@cms.hhs.gov with any questions concerning this letter.

Sincerely,

Karen M.      Digitally signed by Karen
              M. Fuller -S
Fuller -S     Date: 2021.07.06
              06:36:43 -07'00'

Karen Fuller, Manager
Division of Clinical Laboratory
        Improvement & Quality (DCLIQ)
Western and Central Operations Branch
(Denver, Kansas City, San Francisco, and
        Seattle)

cc:      California Department of Public Health, Laboratory Field Services

11

# EXHIBIT 7

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
Division of Clinical Laboratory Improvement & Quality (DCLIQ)
Western and Central Operations Branch - San Francisco Location
(Denver, Kansas City, San Francisco, and Seattle)
90 7th Street, Suite 5-300 (5W)
San Francisco, CA  94103–6707



Refer to:  DCLIQ - GKY

**IMPORTANT NOTICE – PLEASE READ CAREFULLY**

Sent via facsimile to (661) 402-6485 and first class mail.
*(Confirmation of successful facsimile transmission or e-mail constitutes proof of receipt.)*

May 6, 2021

Adam Rosendorff, M.D., Director
CDPH Branch Laboratory
28454 Livingston Avenue
Valencia, CA  91355

CLIA Number: 05D2197416

RE:    **NOTICE OF CONDITION-LEVEL DEFICIENCIES – IMMEDIATE JEOPARDY**

**REQUEST FOR ALLEGATION OF COMPLIANCE AND EVIDENCE OF CORRECTION**

Dear Dr. Rosendorff:

In order for a laboratory to perform testing under the Clinical Laboratory Improvement Amendments of 1988 (CLIA), Public Law 100-578, it must comply with all CLIA requirements.  These requirements are found in section 353 of the Public Health Service Act (42 U.S.C. § 263a) and Title 42 of the Code of Federal Regulations, Part 493 (42 C.F.R. § 493). Laboratories are required to be in compliance with the applicable regulations. Compliance with these regulations is a condition of certification for the CLIA program.

Representatives from the Centers for Medicare & Medicaid Services (CMS) San Francisco Location conducted an initial certification and complaint survey of your laboratory that was completed on May 6, 2021. As a result of the survey, it was determined that your facility is not in compliance with all of the Conditions required for certification in the CLIA program. In addition, based on the Condition-level requirements at 42 C.F.R. § 493.1250, Analytic Systems and 42 C.F.R. § 493.1441, Laboratories Performing High Complexity Testing; Laboratory Director, it was determined that the deficient practices of the laboratory pose immediate jeopardy to patient health and safety. (Immediate jeopardy is defined by the CLIA regulations as a situation in which immediate corrective action is necessary because the laboratory's non-compliance with one or more Condition-level requirements has already caused, is causing, or is likely to cause, at any time, serious injury or harm, or death, to individuals served by the laboratory or to the health and safety of the general public.) Specifically, the following Conditions were not met:

Page **1** of **3**

D5400 - 42 C.F.R. § 493.1250 Condition: Analytic Systems; and,
D6076 - 42 C.F.R. § 493.1441 Condition: Laboratories performing high complexity
testing; laboratory director

In addition, the laboratory was not in compliance with various CLIA Standards. Enclosed is Form CMS-2567, Statement of Deficiencies, listing all the deficiencies found during the survey.

When a laboratory's deficiencies pose immediate jeopardy, CMS requires the laboratory to take immediate action to remove the jeopardy and come into Condition-level compliance. Laboratories that do not meet the Condition-level requirements of CLIA may not be certified to perform laboratory testing under the CLIA program. You must take steps to bring any unmet Conditions and associated Standards into compliance immediately.

Please be advised that sanctions and/or enforcement actions can be rescinded only when compliance is verified.

You are required to respond WITHIN 10 CALENDAR DAYS OF RECEIPT of this notice. You are directed to document your credible allegation of compliance using the enclosed Form CMS-2567, Statement of Deficiencies, or in a separate document attachment. If using the Form CMS-2567 for each finding, complete the columns labeled "Provider Plan of Correction" and "Completion Date" located on the right side of the form, keying your responses to the deficiencies on the left. The laboratory director must sign, date and return the completed Form CMS-2567 or separate document containing your documentation of a credible allegation of compliance to our office WITHIN 10 CALENDAR DAYS from the date of this notice. You must also submit documented evidence verifying the laboratory has made all corrections noted in the credible allegation of compliance. Your allegation of compliance will be included in the public record of the inspection. We may conduct a follow-up, onsite survey to verify the corrections.

A credible allegation of compliance is a statement or documentation that is:

1) Made by a representative of a laboratory with a history of having maintained a commitment to compliance and taking corrective action when required;

2) Realistic in terms of the possibility of the corrective action being accomplished between the date of the survey and the date of the allegation; and,

3) Indicates resolution of the problems.

For your information, acceptable evidence of correction must include:

1) Documentation showing what corrective action(s) have been taken for patients found to have been affected by the deficient practice;

2) How the laboratory has identified other patients having the potential to be affected by the same deficient practice and what corrective action(s) has been taken;

3) What measure has been put into place or what systemic changes you have made to ensure that the deficient practice does not recur; and,

4) How the corrective action(s) are being monitored to ensure the deficient practice does not recur.

Page 2 of 3

If you do not submit a credible allegation of compliance and acceptable evidence of correction, or if you submit an allegation of compliance that is determined to be credible and are found to be out of compliance with any CLIA Condition-level requirements at the time of the follow-up visit, we may impose sanctions. These may include alternative sanctions (Civil Money Penalty per 42 C.F.R. § 493.1834, Directed Plan of Correction per 42 C.F.R. § 493.1832, State Onsite Monitoring per 42 C.F.R. § 493.1836) and principal sanctions (suspension, limitation and/or revocation of your laboratory's CLIA certificate per 42 C.F.R. § 493.1840, and cancellation of your laboratory's approval for Medicare payments per 42 C.F.R. § 493.1814).

Please note that surveys take an overview of the laboratory, often through random sampling. By its nature, a survey may not find every violation that the laboratory may have committed. It remains the responsibility of the laboratory and its director to ensure that the laboratory is at all times following all CLIA requirements, to identify any problems in the laboratory and take corrective action specific to the problems, and to institute appropriate quality assessment measures to ensure that the deficient practices do not recur.

In addition to the routine CLIA certification surveys, announced or unannounced investigations/surveys may be conducted by CMS or its agent at any time to address complaints or other non-compliance issues. These investigations/surveys may well identify violations that may not have surfaced during a routine survey using random sampling, but for which the laboratory and its director will still be held responsible.

All responses as well as any future correspondence pertaining to this survey should be sent to:

> Karen Fuller, Manager
> Division of Clinical Laboratory Improvement & Quality (DCLIQ)
> Western and Central Operations Branch – San Francisco Office
> Centers for Medicare & Medicaid Services
> 90 7th Street, Suite S-300 (5W)
> San Francisco, CA  94103-6707

Please contact Gary Yamamoto by telephone at ▓▓▓▓▓▓▓ or by e-mail at gary.yamamoto@cms.hhs.gov, or Josh Cohen by telephone at ▓▓▓▓▓▓▓ or by e-mail at joshua.cohen@cms.hhs.gov with any questions concerning this letter.

> Sincerely,
>
> Karen M. Fuller -S   Digitally signed by Karen M.
>                       Fuller -S
>                       Date: 2021.05.06 12:24:45 -07'00'
>
> Karen Fuller, Manager
> Division of Clinical Laboratory Improvement & Quality (DCLIQ)
> Western and Central Operations Branch
> (Denver, Kansas City, San Francisco, and Seattle)

Enclosure:     CMS-2567, Statement of Deficiencies

cc:            California Department of Public Health, Laboratory Field Services

Date/Time IJ Template provided to entity:      **May 6, 2021 12:00PM**

| IJ Component | Yes/No | Preliminary fact analysis which demonstrates when key component exists. |
|---|---|---|
| **Noncompliance:** Has the entity failed to meet one or more federal health, safety, and/or quality regulations?<br><br>If yes, in the blank space, identify the tag and briefly summarize the issues that lead to the determination that the entity is in noncompliance with the identified requirement. This includes the action(s), error(s), or lack of action, and the extent of the noncompliance (for example, number of cases). Use one IJ template for each tag being considered at IJ level. | Yes | D6076 – Laboratory Director, High Complexity Testing<br><br>The Laboratory Director failed to ensure that:<br>- Testing systems developed for its SARS-CoV-2 test provided quality laboratory results for all aspects of the testing performed;<br>- Quality Assessment (QA) programs are maintained;<br>- Test systems are functioning properly; and,<br>- Personnel received appropriate training prior to results reporting. |
| | **AND** | |
| **Serious injury, serious harm, serious impairment or death:** Is there evidence that a serious adverse outcome occurred, or a serious adverse outcome is likely as a result of the identified noncompliance?<br><br>If Yes, in the blank space, briefly summarize the serious adverse outcome, or likely serious adverse outcome to the recipient. | Yes | A serious adverse outcome could occur if inaccurate and unreliable patient test results are reported as a result of non-compliance with 42 C.F.R. § 493.1441 Laboratories Performing High Complexity Testing; Laboratory Director (deficiency tag: D6076). |
| | **AND** | |
| **Need for Immediate Action:** Does the entity need to take immediate action to correct noncompliance that has caused or is likely to cause serious injury, serious harm, serious impairment, or death?<br><br>If yes, in the blank space, briefly explain why. | Yes | The laboratory must immediately:<br>- Establish test performance specifications for its SARS-CoV-2 test system;<br>- Maintain QA protocols;<br>- Follow maintenance protocols;<br>- Maintain an accurate test records system; and,<br>- Ensure employee training and competency. |

**Disclaimer: The findings on this IJ Template are preliminary and do not represent an official finding against a Medicare provider or supplier. Form CMS-2567 is the only form that contains official survey finding.**

Date/Time IJ Template provided to entity:   __May 6, 2021 12:00PM__

| IJ Component | Yes/No | Preliminary fact analysis which demonstrates when key component exists. |
|---|---|---|
| **Noncompliance:** Has the entity failed to meet one or more federal health, safety, and/or quality regulations?<br><br>If yes, in the blank space, identify the tag and briefly summarize the issues that lead to the determination that the entity is in noncompliance with the identified requirement. This includes the action(s), error(s), or lack of action, and the extent of the noncompliance (for example, number of cases). Use one IJ template for each tag being considered at IJ level. | Yes | D5400 ANALYTIC SYSTEMS<br>The laboratory failed to:<br>- Establish test performance specifications for its SARS-CoV-2 test system;<br>- Ensure quality control materials meet laboratory criteria for acceptability before reporting a patient SARS-CoV-2 test result;<br>- Ensure employee training and competency;<br>- Follow maintenance protocols;<br>- Maintain an accurate test records system; and,<br>- Maintain Quality Assurance (QA) protocols. |
| | A | |
| **Serious injury, serious harm, serious impairment or death:** Is there evidence that a serious adverse outcome occurred, or a serious adverse outcome is likely as a result of the identified noncompliance?<br><br>If Yes, in the blank space, briefly summarize the serious adverse outcome, or likely serious adverse outcome to the recipient. | Yes | A serious adverse outcome could occur if inaccurate and unreliable patient test results are reported as a result of non-compliance with 42 C.F.R. § 493.1250 Condition: Analytic Systems (deficiency tag: D5400). |
| | A | |
| **Need for Immediate Action:** Does the entity need to take immediate action to correct noncompliance that has caused or is likely to cause serious injury, serious harm, serious impairment, or death?<br><br>If yes, in the blank space, briefly explain why. | Yes | The laboratory must immediately:<br>- Establish test performance specifications for its SARS-CoV-2 test system;<br>- Ensure quality control materials meet laboratory criteria for acceptability before reporting a patient SARS-CoV-2 test result;<br>- Ensure employee training and competency;<br>- Follow maintenance protocols;<br>- Maintain an accurate test records system; and,<br>- Maintain QA protocols. |

**Disclaimer: The findings on this IJ Template are preliminary and do not represent an official finding against a Medicare provider or supplier. Form CMS-2567 is the only form that contains official survey finding.**

# EXHIBIT 5



State of California—Health and Human Services Agency
# California Department of Public Health



**TOMÁS J. ARAGÓN, M.D., Dr.P.H**
*Director and State Public Health Officer*

**GAVIN NEWSOM**
*Governor*

### IMPORTANT NOTICE – ACTION NECESSARY

*(Confirmation of successful transmission by email constitutes proof of receipt of this letter)*

February 19, 2021

Adam Rosendorff, MD
CLIA Laboratory Director
CDPH Branch Laboratory
28454 Livingston Ave
Valencia, CA 91355

Timothy Bow
Emergency Procurement Officer, Owner Representative
California Department of Public Health
850 Marina Bay Parkway, Bldg. P
Richmond, CA 94804

STATE: CPH889339
CLIA: 05D2197416

### PUBLIC HEALTH LABORATORY STATE INSPECTION-CONDITION LEVEL DEFICIENCIES – IMMEDIATE JEOPARDY

Dear Laboratory Director/Owner(s):

An inspection of your laboratory was conducted on December 8, 2020, and December 9, 2020, and on December 16, 2020, by Elsa Eleco, Examiner III , Elaine Flores, Examiner II, Catherine Tolentino, Examiner II, and Jinong Feng, Examiner I, representatives of the California Department of Public Health (the Department), Laboratory Field Services. This routine inspection concluded on February 17, 2021.

As a result of that inspection, Department examiners determined that your laboratory is **not** in compliance with the requirements specified in the Health and Safety Code (HSC) section 101160 and/or California Code of Regulations (CCR), title 17, sections 1078 and 1083.

---

Laboratory Field Services ● 320 West 4th Street, Suite 890 ● Los Angeles, CA 90013
(213) 620-6160 ● (213) 620-6565 FAX
LFS Website (www.cdph.ca.gov/LFS)

CMS-CDPH-BL-000607

CDPH Branch Laboratory
February 19, 2021
Page 2

In order for a public health laboratory to perform testing under the Health and Safety Code subsections 101160 (a) – (b), it must comply with all federal CLIA requirements. These requirements are found in section 353 of the Public Health Service Act (42 U.S.C. 263a) and 42 Code of Federal Regulations, Part 493 (42 CFR 493). Compliance with these regulations is a condition of certification for the State Public Health Laboratory Certification program.

As a result of that inspection, Department examiners determined that your laboratory is **not** in compliance with all of the Conditions required for certification in the State Public Health Laboratory Certification program. In addition, the examiners determined that the deficient practices of your laboratory pose immediate jeopardy to patient health and safety. (Immediate jeopardy is defined in the California Code of Regulations (CCR) as a situation in which immediate corrective action is necessary because the laboratory's non-compliance with one or more Condition-level requirements has already caused, is causing, or is likely to cause, at any time, serious injury or harm, or death, to individuals served by the laboratory or to the health and safety of the general public.) Specifically, the laboratory did not meet the following Conditions:

D3000 - 42 CFR 493.1100  Condition: Facility administration
D5300 - 42 CFR 493.1240  Condition: Preanalytic systems
D5400 - 42 CFR 493.1250  Condition: Analytic systems
D5800 - 42 CFR 493.1290  Condition: Postanalytic systems
D6076 - 42 CFR 493.1441  Condition: Laboratories performing high complexity
  testing; laboratory director

In addition, other standards were also found to be not met. Enclosed is Form 2567, Statement of Deficiencies, listing all the deficiencies found during the survey.

Because of the seriousness of these deficiencies, your laboratory no longer meets the requirements to perform testing under the Health and Safety Code. Based on the finding of immediate jeopardy, this office has contacted the Centers for Medicare & Medicaid Services (CMS), and has notified them of our determination of non-compliance.

When a laboratory's deficiencies pose immediate jeopardy, the Department requires the laboratory to take immediate action to remove the jeopardy and come into Condition-level compliance.

Failure to meet Condition-level requirements and/or failure to return the allegation of compliance and accompanying evidence within the stated time period may result in sanctions against the public health laboratory's certificate, laboratory director, and owners, suspension from the Medi-Cal and/or Medicaid program in addition to civil money penalties, and recovery of costs associated with the investigation:

1. Civil money penalties for each day of noncompliance or per violation for a condition level deficiency that poses immediate jeopardy, to the extent permitted by law.

CMS-CDPH-BL-000608

CDPH Branch Laboratory
February 19, 2021
Page 3

2. Exclusion from Ownership or Operation (Title 17 CCR § 1065.5)

3. Revocation and/or suspension of the public health certificate (Title 17 CCR § 1065.5)

Please be advised that sanctions and/or enforcement actions can be rescinded only when compliance is verified. Please also be advised that due to the potential significant hazard to the public health and safety posed by the deficiencies identified, sanctions may become effective 21 calendar days from the date of this letter.

You have 10 CALENDAR DAYS from the date of this notice to provide this office (at the address shown at the end of this notice), with a credible allegation of compliance and acceptable evidence documenting that the immediate jeopardy has been removed and that action has been taken to correct all of the Condition-level deficiencies in question.

You are directed to document your allegation of compliance using the enclosed State Form 2567, Statement of Deficiencies, in the columns labeled "Provider Plan of Correction" and "Completion Date" located on the right side of the form, keying your responses to the deficiencies on the left. The laboratory director must sign, date, and return the completed State Form 2567 documented with a credible allegation of compliance to our office WITHIN 10 CALENDAR DAYS from the date of this notice. You must also submit documented evidence that verifies that the corrections were made.

For your information, a credible allegation of compliance is a statement or documentation that is:

1. Made by a representative of a laboratory with a history of having maintained a commitment to compliance and taking corrective action when required;

2. Realistic in terms of the possibility of the corrective action being accomplished between the date of the survey and the date of the allegation; and

3. Indicates resolution of the problems.

In addition, acceptable evidence of correction must include:

1. Documentation showing what corrective action(s) have been taken for patients found to have been affected by the deficient practice;

2. How the laboratory has identified other patients having the potential to be affected by the same deficient practice and what corrective action(s) has been taken;

3. What measure has been put into place or what systemic changes you have made to ensure that the deficient practice does not recur; and

4. How the corrective action(s) are being monitored to ensure the deficient practice does not recur.

CMS-CDPH-BL-000609

CDPH Branch Laboratory
February 19, 2021
Page 4

If you submit a credible allegation of compliance and acceptable evidence that your
laboratory has removed jeopardy and come into Condition-level compliance,
postmarked by March 1, 2021, and we are able to verify compliance with all CLIA
requirements through a follow-up survey, sanctions will not be imposed. If your
laboratory does not submit a credible allegation of compliance and acceptable evidence
of correction, we will not conduct a follow-up survey. (Your allegation of compliance will
be included in the public record of the inspection.) Electronic submission is acceptable.

Please send all correspondence to the following address:

> CDPH-Laboratory Field Services
> 320 West 4th Street, Suite 890
> Los Angeles, CA 90013
> Attention: Catherine Tolentino, Examiner II

If you have any questions regarding this letter, you may contact me at 213-422-5703 or
via email at Catherine.Tolentino@cdph.ca.gov.

Sincerely,

*Robert J. Thomas for*
*Catherine Tolentino*

Catherine Tolentino
Examiner II

Enclosure

cc:   Robert J. Thomas
      Branch Chief

      Elsa Eleco
      Section Chief, On-Site Licensing Inspections

CMS-CDPH-BL-000610

# EXHIBIT 4

**DX 13427**

7/22/2021      50,000 Patients to Retest After Invitae Finds Errors | The Dark Intelligence Group







SUBSCRIBER? LOG IN

# 50,000 PATIENTS TO RETEST AFTER INVITAE FINDS ERRORS

### *Company acknowledges that, for 11 months, it failed to test for the MSH2 Boland Inversion*

By Robert Michel| From the Volume XXIV No. 12 - August 28, 2017 Issue



← Big Payers Want to Bring Order to Genetic Testing

Estimating Total Costs When Genetic Tests Must Be Retested →

*CEO SUMMARY: In recent weeks, a client notified Invitae of discordant results on a patient. The notification caused the genetic testing company to discover it had a systemic error that failed to test for a specific rare mutation associated with inherited cancer. Company officials believe only 2 to 15 patients received a false negative test result due to this error, yet because the error went undetected for 11 months, the company will retest 50,000 patients.*

ONE OF THE NATION'S LARGER GENETIC TESTING COMPANIES is dealing with a significant problem that may have long-term consequences for how genetic testing labs are regulated at the federal and state level.

Last week, THE DARK REPORT was first to break the news that **Invitae Corporation** reported inaccurate genetic test results for what it said could be is as many as 50,000 patients over 11 months, starting in September 2016 and ending in July 2017.

**ER-2161**

The company admitted it failed to test for a specific rare mutation associated with hereditary cancer. In recent weeks, Invitae became aware of the problem and began contacting clinicians to notify them of the error in the genetic test results it reported for certain patients and to arrange to retest those patients. Invitae would not say exactly when it discovered the problem beyond saying, "in recent weeks."

In a statement to THE DARK REPORT, Invitae said, "For the past several weeks, Invitae has been working with clinicians to address an issue related to our analysis of a rare genetic variant in the MSH2 gene associated with Lynch syndrome (0.007% of inherited cancer tests), also known as the Boland inversion, which we believe could have led to a false negative report for a small number of patients (estimated 2-15 patients impacted).

"Because of the unique characteristics of how we were testing for the MSH2 Boland inversion, our quality control checks did not catch omission of the components of the assay," the statement continued. "As soon as the omission was recognized and relevant components returned to the assay, it once again performed properly. We have added two separate quality controls to ensure this issue will not reoccur."

For two reasons, this failure may have significant repercussions—not just for genetic testing companies, but also for the entire clinical laboratory industry. First, Invitae determined that the genetic tests for 50,000 patients were subject to this systemic testing error, a number that is likely a record high for such an error. Second, these assays are laboratory-developed tests (LDTs), which the FDA said in 2014 should be subject to regulation.

## ☐ Similar Vulnerabilities

Additional factors that make this a significant event for the clinical laboratory profession include the following. Pathologists who are medical directors of genetic laboratories will recognize how these events demonstrate vulnerabilities that exist in their own labs. This episode also highlights the limitations of the current state of technologies and systems used in genetic testing.

In its statements to THE DARK REPORT and in interviews with reporter Turna Ray at Genomeweb.com, Invitae acknowledged the following:

- When it developed a new assay version in 2016, Invitae did not recognize that the probes for the Boland inversion mutation were not included.
- This error occurred in September 2016 and from that time, in normal daily testing operations, Invitae's internal quality controls did not detect this problem.

- In July 2017, 11 months after it launched the new assay, a clinician notified Invitae of discordant results on a patient who had been tested twice, once by Invitae and once by another genetic testing lab company.

- After being alerted to the discordant results, Invitae confirmed the systemic error and began notifying clinicians of the error and arranging retesting for those patients.

- Invitae said it will retest 50,000 patients and it has notified the **College of American Pathologists**, its CLIA accreditor, of the genetic testing error.

## ☐ Story has Two Dimensions

This story will unfold in two dimensions: among investors and among clinicians. Clinicians include physicians and genetic counselors who use genetic tests, and pathologists and laboratory scientists who perform genetic tests.

News reports and financial analyst commentary will die down quickly after investors decide this episode won't affect Invitae's ability to pursue its growth plans. In this dimension, the problem at Invitae will be deemed as not material to the company's future profitability. Wall Street and the news media may dismiss Invitae's characterization that the errors should affect only 2 to 15 patients (out of 50,000 genetic tests) as not material and continue to cover the company as usual.

## ☐ How Will Clinicians React?

Among clinicians, Invitae's current woes may have consequences over many years. Some physicians, genetic counselors, and other clinicians will consider Invitae's omission of the MSH2 Boland inversion mutation to be minor—a hiccup in a field that advances through trial and error. But there will be some clinicians who distrust Invitae enough to refer their tests to other lab companies.

The next question is how lab regulators will react. Lab regulators have a history of being tough when such errors come to light. When they learn of these failures, government regulators conduct rigorous inspections in an effort to uncover any problems that might otherwise go undetected.

Federal and state inspectors recognize that it is extraordinary for any laboratory to have performed inaccurate tests on 50,000 patients over 11 months and never detect the systemic error through its quality control program.

Also, government lab regulators understand the significance of a systemic error involving such a large number of patients and the extent of the potential harm such an error can cause, even if only a few patients are affected.

Pathologists and lab administrators will watch closely to see if officials inspect the Invitae lab in San Francisco, what deficiencies they identify, and what enforcement actions they take. Any regulatory action may set new precedents in how genetic testing laboratories are inspected.

For lab directors, the lessons to gain from this episode will include what they can learn to improve their own lab's quality control programs, what deficiencies federal and state regulators identify, and how to eliminate those deficiencies in their own labs through improved quality control procedures.

In important ways, this problem at Invitae has the potential to cause the entire genetic testing industry to undergo more regulatory scrutiny and tougher inspections of their laboratories. New and tougher regulations may result and the FDA will have this episode to support its efforts to gain congressional approval to regulate laboratory-developed tests.

## ☐ *Finding the 1 patient in 1,000,000 with Rare Mutation Is the Main Goal of Every Genetic Testing Lab*

*IN THEIR PUBLIC COMMENTS about the systemic error in the genetic tests performed for 50,000 patients, executives at Invitae Corporation emphasize that they estimate that only 2 to 15 patients received a false negative report.*

*If their message to the media and investors is that this is not a systemic error that should cause concern about the integrity of the company's genetic testing activities and, if the small number of patients who got false negative results for a rare mutation associated with inherited cancers supports that conclusion, there are others in the genetic testing industry who disagree with that view.*

*Several medical directors at genetic testing laboratories expressed their personal opinion to THE DARK REPORT that the problem represents an important failure of the genetic testing company and should be taken seriously.*

*One lab industry executive says that the primary service every genetic testing laboratory provides to physicians and patients is its ability to accurately and*

**ER-2164**

consistently identify rare mutations that would be clinically-relevant for the individual patient.

"Think of it in this way," stated Richard Faherty, formerly Executive VP, Administration, for **BioReference Laboratories, Inc.** and its **GeneDx** subsidiary. "The essential product of a genetic testing laboratory that says it detects rare mutations for inherited genetic disease is the ability to always find that one mutation in a million for the patient. After all, isn't that why the referring physician and the patient ask a genetic testing lab to identify whether any such mutations are present?

"Thus, for any lab like Invitae to tell its physicians that the genetic test performed for 'only a few patients' may have reported a false negative result betrays the quality and accuracy that all physicians, patients, and their families expect of our labs," explained Faherty. "Remember that what physicians and patients do with these results is very drastic because it determines how therapies such as surgery, radiation, and cancer drugs will be used.

"This is why I consider it a massive failure anytime a genetic lab—whether large or small—misses rare mutations in even a small number of patients because of a failure at the bench," added Faherty.

Tags: cancer tests, clia, clinical lab, Clinical Laboratory, clinical laboratory industry, dark report, genetic test, genetic testing, genetic testing companies, genetic testing lab, genetic testing labs, genetic tests, impac, invitae corp, invitae corporation, invitae lab, lab administrator, lab industry, laboratories, laboratory industry, laboratory scientists, ldt, pathologists, quality control, reference laboratories, testing laboratories, testing laboratory, the clinical laboratory, the dark report

← **Big Payers Want to Bring Order to Genetic Testing**

**Estimating Total Costs When Genetic Tests Must Be Retested →**



*Volume XXIV No. 12 – August 28, 2017*

## TABLE OF CONTENTS

### COMMENTARY & OPINION BY R. LEWIS DARK

Big Payers Want to Bring Order to Genetic Testing

### ARTICLES

50,000 Patients to Retest After Invitae Finds Errors

Estimating Total Costs When Genetic Tests Must Be Retested

Invitae Investing Heavily To Expand Market Share

Two Largest Payers Start Lab Test Pre-Authorization

UnitedHealth to Start Gene Test Pre-Approval

Anthem/AIM Responds to Queries About Its Pre-Approval Program

Labs Report Problems with Anthem's Pre-Approval

### INTELLIGENCE

August 28, 2017 Intelligence: Late Breaking Lab News

### Need A Group Membership? Company Discounts are Available!

Get More Information Now!

•Home •The Dark Report •Issues Archive •TDR Library •Live Events •TDR Insider •Subscribe

•Authors •Sign In •Manage Account •About •Contact Us •Privacy Policy



Copyright 2020 © The Dark Report. All rights reserved.
The Dark Report • 21806 Briarcliff Dr • Spicewood, TX 78669
Phone: 512-264-7103 • Toll Free Number: 800-560-6363
Email: customerservice@darkintelligencegroup.com

;

ER-2167

# EXHIBIT 2

**DX 11006**

## MEMORANDUM OF INTERVIEW

| | | |
|---|---|---|
| CASE NUMBER | : | 2204323-MF |
| PERSON INTERVIEWED | : | Adam Rosendorff |
| PLACE OF INTERVIEW | : | Telephonic |
| DATE OF INTERVIEW | : | September 25, 2020 |
| TIME OF INTERVIEW | : | 10:15 A.M. |

On September 25, 2020, Adam Rosendorff (ROSENDORFF) was interviewed telephonically by Assistant United States Attorney John Bostic and me. The purpose of the interview was to learn about ROSENDORFF's professional experience as the director of a clinical laboratory. Rees Morgan was present as ROSENDORFF's counsel. The following is a summary of the statements made during the interview.

ROSENDORFF is currently Medical Director and CLIA [Clinical Laboratory Improvement Amendments] Laboratory Director of record at Millennium. Millennium is a clinical toxicology laboratory that also conducts genetic analyses. As medical director, ROSENDORFF is responsible for ensuring testing is accurate and precise, reviewing quality control (QC) and quality assurance (QA), conducting proficiency testing through the College of American Pathologists (CAP), examining test result trends to determine if QC is meeting specifications, and interpreting urine and drug testing reports as necessary. ROSENDORFF is not involved with Millennium's genetic analyses.

Prior to Millennium, ROSENDORFF was Laboratory Director for Invitae, a CAP accredited clinical laboratory that conducted genetic analyses for cancers and other hereditary conditions. ROSENDORFF's responsibilities at Invitae were the same as with Millennium, with the exception that he also was signatory on patient reports. Invitae was a CAP deemed organization and reported its lab findings to CLIA. CAP had higher standards than CLIA and had an area checklist that laboratories had to abide by. While at Invitae, ROSENDORFF was also part time lab director for Precision Diagnostics, a COLA accredited laboratory. CAP and COLA were functionally the same. As laboratory director, he did not personally document individual lab reports. ROSENDORFF reported to CEO Miguel Gallego.

ROSENDORFF was Laboratory Director for Children's Hospital-University of Pittsburgh before his employment at Theranos, and reported to pathologists Alan Wells and Miguel Reyes.

ROSENDORFF is board certified in laboratory medicine/clinical pathology. He has taken continuing education courses to maintain his medical license, and regularly reviews articles in the *New England Journal of Medicine* and other toxicology based publications. ROSENDORFF has attended very few professional conferences.

ROSENDORFF treated patients as part of his medical residency, but not since that time and not in a clinical setting. His conclusions and opinions are based on his education and training, residency, and laboratory experience. While at Children's Hospital, he often interacted with clinical physicians and came to understand the use of patient clinical lab testing.

Page 1 of 6

US-REPORTS-0018851

As lab director for Children's Hospital, ROSENDORFF was responsible for reviewing and approving validation reports. Any assay that is going to be used for patient care needs to be validated to CLIA performance standards of accuracy, precision, linearity, upper limit of detection, lower limit of detection, and sensitivity. A validation report must be approved and signed before the assay can be used clinically. Validation must be done for all assays, but not for an assay that is run on multiple devices if those devices are comparable with each other. Proficiency testing post-validation continues to ensure the assay is meeting performance specifications, while quality control is used on a daily or shift-basis to determine if a device is "drifting." QC standards are determined by CAP checklist and the Clinical & Laboratory Standards Institute (CLSI) for any lab operating under good lab practices.

Laboratory directors must be familiar with the laws that govern laboratory operations which are outlined in CLIA regulations and the Code of Federal Regulations. Some states have state-specific laws. For example, New York State requires labs to meet specific regulations in order to run samples from patients that reside in New York. The lab director may delegate responsibility for maintaining compliance with state regulation to a QA manager. Lab directors oversee lab staff, but may delegate staffing duties and other logistic responsibilities to a lab manager and operations vice president. Ultimately, the laboratory director has the highest authority in the lab.

Theranos' QA manager was Langley Gee.

ROSENDORFF estimated that while acting as lab director, the clinical laboratories he directed ran hundreds of thousands of assays. In his professional capacity, ROSENDORFF estimated he has personally reviewed thousands of lab results covering a wide variety of tests, including some of the most common tests run in clinical chemistry, toxicology, genetics, and immunology. As lab director, his ultimate goals were to run the lab smoothly, generate results that were of clinical use, ensure device calibrations were set, ensure QC was in range, review critical values to ensure no pre-analytic issues caused the result, and ensure that results are accurate and precise.

Dilution of samples was disadvantageous because the Theranos process diluted samples below the Siemens device's lower level of quantitation (LLOQ). LLOQ was the value where the device could reliably measure while limit of detection (LOD) was the value at which the device produced a signal. These measurements are different. ROSENDORFF explained the Siemens instrument was qualified to measure values per the manufacturer. The manufacturer calculated the device's LLOQ by using samples of known concentrations that were diluted and run in an assay. Results were measured and error was calculated. Chemistry, hardware, and reagents were all integrated into the process of producing a result. Theranos processes were "breaking the system" to measure values lower than the LLOQ. ROSENDORFF said it was well known in the clinical lab community that, "The lower the value, the greater the error." Dilution made assays less effective.

Dilution issues can also be exacerbated by device bias, and ROSENDORFF identified ion selective electrode (ISE) and lipids as assays that suffered from this. ROSENDORFF stated a device could be validated to run assays which returned results lower than the device's standard LLOQ. Theranos struggled to revalidate ISE assays as the results kept dropping below the analytic measurement range. ROSENDORFF observed this while at Theranos but had no explanation for these observations. Theranos lipid assays run on different devices, including the modified Advia, returned different results.

US-REPORTS-0018852

CMP, CBC, Vitamin D, HbA1c, TSH, PSA, and bicarbonate are assays that are commonly run as part of normal metabolic panels. These are not esoteric tests.

Proficiency testing was a method to measure the ability of a lab to return an accurate result. The process relied on peers running the same analyte on the same type of analyzers. Success was measured by returning a measurement that was within two standard deviations from the results of the lab's peer group. Proficiency testing was conducted on an ongoing basis three times per year. An unsatisfactory grade required the lab to conduct a review to determine the cause of the error. Two failures required the lab to discontinue patient testing for that test. Ungraded results required the lab to conduct an alternate assessment of proficiency (AAP). ROSENDORFF believed that CLIA and CAP regulations, as well as industry standard practice, guided proficiency testing schedules and consequences for failures. ROSENDORFF's knowledge of proficiency testing is based on his work in the industry, discussions with coworkers and experienced laboratory supervisors, and review of related publications.

Proficiency testing samples, including those sent by CAP, are artificial samples containing a certain concentration of the analyte to be measured. The concentration is known to CAP, but unknown to the lab that is supposed to conduct the analysis. These samples are shipped to a lab and its peer group at the same time and are supposed to be measured in the same manner as a regular patient sample. Labs cannot discuss results with each other—that can result in a lab shutdown. The samples are run and results submitted to CAP for grading. Labs cannot self-judge their ability to measure a proficiency testing sample. Most of ROSENDORFF's experience with proficiency testing was with CAP, which has been the testing entity for Children's Hospital, Precision Diagnostics, Invitae, and Millennium. There are other companies and entities, such as the State of New York, that conduct proficiency testing.

ROSENDORFF said CAP samples are designed to be stable and are reliable and consistent when analyzed on FDA devices in the manner they were designed to be run. Theranos laboratory developed tests [LDT's] may not have been an appropriate manner to run CAP samples and may have required alternate proficiency testing. ROSENDORFF was asked to recall an incident where Sunny Balwani (BALWANI) suggested CAP samples sent to Theranos had degraded or were bad. ROSENDORFF stated it was possible the samples had degraded, but unlikely, and that he did not share BALWANI's conclusion. CAP samples can go bad if they are not stored correctly, and ROSENDORFF had a general recollection of a CAP sample going bad in his prior work experience. However, a lab can request a new sample to run. Regarding the incident at Theranos, ROSENDORFF remembered agreeing with Daniel Young's (YOUNG) assessment that there were matrix effects that affected Theranos ability to run the CAP sample and that an alternate proficiency assessment was appropriate.

Proficiency testing for LDT's would have involved using patient or QC samples of known concentrations. The samples would have been run using regular methods to determine a measurement, and then diluted and provided to laboratory staff for analysis. ROSENDORFF defined a challenge as a sample with a known concentration. To successfully pass proficiency testing, Theranos would have had to pass four of five challenges where the result was within 20% of the actual value. ROSENDORFF described Theranos' proficiency testing as shoddy and inconsistent, and he said AAP was long overdue. ROSENDORFF believed that if AAP had been implemented at Theranos, he would have been more confident with the results the lab generated. He could not say whether Theranos would have performed better or worse. The reason

Page 3 of 6

US-REPORTS-0018853

ROSENDORFF resigned was because proficiency testing was not conducted at the required frequencies.

CLIA dictates proficiency testing should be done using the most common method performed at the lab, which for Theranos, was fingerstick blood samples. Theranos tested venous blood on predicate devices.

ROSENDORFF thought resistance to proficiency testing was because BALWANI did not believe it was important and did not devote resources to the complete it. ROSENDORFF also thought BALWANI did not understand the difference between QC and proficiency testing. QC is performed either daily or by shift to determine if the instrument is performing to specifications. Proficiency testing is done three times per year.

Theranos conducted quality control before patient samples were run using commercial QC material purchased from BioRad. QC was run every day on every analyzer, including the Edison devices. Sometimes Edison and predicate devices failed QC, and would either need to be recalibrated or removed from service. A device that failed QC for one analyte, but passed for another, could still be used for that analyte that passed. Once devices were serviced, and passed QC, they could be used to run patient samples. ROSENDORFF observed the Edison devices failed QC at significantly higher rates, ranging from 5% for some assays to 20% for others. In comparison, the Advia failed QC, for any given assay for which it was operated correctly, 1% of the time. His observations and conclusions were based on his prior work experience.

ROSENDORFF did not know how Theranos devices that failed QC and were removed from service were identified.

Quality assurance was a more broad concept that put quality systems in place and monitored test performance over time. Quality control was a daily measurement.

Critical results are supposed to be reported by the laboratory director or a trained clinical laboratory scientist (CLS). These positions met the legal requirements and had the necessary lab training to complete the task. BALWANI, whose background was in software, was not qualified to review critical values. ROSENDORFF said he was less concerned about YOUNG's involvement in reviewing critical values because YOUNG was involved with the data analyses. Critical results should not be voided as potential erroneous results because that process may hide truly critical values. These results must be interpreted with a physician or patient harm may result. ROSENDORFF said patients may have been harmed by Theranos, but his concern was tempered because the typical Theranos patient walked into a Walgreens to have their blood tested and were probably healthy overall. These patients were not from hospitals.

ROSENDORFF stated the lab director has ultimate responsibility to ensure lab results are accurate, reliable, and appropriate for patient care. The lab director is also responsible for operating a lab as prescribed by CLIA regulation. To do that, the lab director must delegate certain functions to laboratory supervisors, and may seek the advice from lab employees in certain discrete areas where that person may have more specific knowledge. A lab director cannot review every result and must trust that the other lab personnel make decisions based on their best judgement and that the systems are working. A lab director can trust lower level employees because the director must also make sure lab personnel are qualified for their positions. The lab director's authority or decisions, regarding medical issues, cannot be overruled, especially by a superior that lacks a medical background. ROSENDORFF said it

Page 4 of 6

US-REPORTS-0018854

would be inappropriate for a "business person," such as a CEO, to overrule a lab director's decision. He believed that authority is derived from CLIA regulation. A laboratory director's decisions are made based on their medical education and training, and their experience running a clinical lab.

ROSENDORFF said a clinical lab must be transparent about their testing, to include what devices are used. This information would have been important for a physician to understand a result. ROSENDORFF also said a lack of transparency could have created problems for patients that are tracking their historical test results. HbA1c was notorious for returning different results based on what device is used to conduct the assay.

ROSENDORFF said that voiding results, such as for abnormal bicarbonate results, could have masked actual abnormal patient results. A lab director must assess the pre-analytic conditions of a sample to determine if some outside force effected the sample. For bicarbonate, ROSENDORFF said Theranos samples were exposed to $CO_2$ which changed the assay result. ROSENDORFF said the Theranos bicarbonate assay was not useful and they never solved the issue.

ROSENDORFF said there was pressure at Theranos to view fingerstick blood and venous blood as equivalent, but he did not. These samples required collection specific reference ranges. Capillary blood may have more glucose, whereas glucose in venous blood tended to be metabolized. Cell lysis also presented problems for blood collected by fingerstick, but did not affect reference ranges. Cell lysis compromised the sample and ROSENDORFF said there was no way to compensate for a sample contaminated with $K^+$. LDL levels were also affected by cell lysis as there was more LDL in red blood cells than serum. Edema or excess interstitial fluid on a person's fingertips could have also affected the results derived from fingerstick blood.

Reference ranges described the range of results plus or minus two standard deviations from the mean in a healthy population. ROSENDORFF reiterated his belief that Theranos should have used separate reference ranges for each sample type. He spoke with Elizabeth Holmes about his concerns but felt she did not care. Ultimately, Theranos created new reference ranges based on their testing results.

ROSENDORFF said BALWANI wanted capillary drawn blood treated the same way as venous blood when run on fingerstick assays. ROSENDORFF said you cannot assume the samples are the same.

Running a proficiency sample multiple times was not permitted. The samples must be run as they would have been normally processed. Only those samples that produced critical values could be re-run. It was not good laboratory practice to run a sample multiple times.

ROSENDORFF stated Theranos' six tip design ran assays in parallel and returned the average result. This design and device operation was distinct from running a sample multiple times. Theranos had to develop rules to address outliers for tip specific results. He said the process was "not ideal." ROSENDORFF did not object to parallel testing, but after the fact stated it would have been better to run a sample only once. This conclusion was based on his opinion, and not a CLIA regulation.

ROSENDORFF stated that any single date followed by a "-" on his C.V. indicated that he was involved with that item for only that particular year.

US-REPORTS-0018855

The interview ended at 12:00 P.M.

Christopher McCollow                                    September 29, 2020

U.S. Postal Inspector                                            Date

Attachments:

- CV of Adam Rosendorff

US-REPORTS-0018856

# Adam Rosendorff, MD

### *EDUCATION AND TRAINING*

| | |
|---|---|
| 1988-1993 | **BA, BA Hons** University of the Witwatersrand, Johannesburg, South Africa |
| 1995-2000 | **MD** Mount Sinai School of Medicine, New York, NY |
| 2000-2005 | Brigham and Women's Hospital and Harvard University, Boston MA Postdoctoral fellowship in infectious diseases |
| 2005-2008 | **Resident in Clinical Pathology**, Brigham and Women's Hospital, Boston, MA |

### *APPOINTMENTS AND POSITIONS*

| | |
|---|---|
| 3/2020- | Part time laboratory director, COVID-19 lab, Color Genomics, Burlingame, CA |
| 12/2017- | Medical Director, Millennium Health, San Diego, CA |
| 1/2015-8/2017 | Laboratory Director, Invitae, San Francisco, CA |
| 1/2015-6/2016 | Laboratory Director, Precision Diagnostics, San Diego, CA (part-time) |
| 4/2013-12/2014 | Laboratory Director, Theranos Inc., Palo Alto, CA |
| 8/2008-4/2013 | Assistant Professor of Pathology, Department of Pathology, University of Pittsburgh, Laboratory Medical Director, Clinical Laboratories, Children's Hospital of Pittsburgh of UPMC, Pittsburgh, PA<br>Founder and Director, Hemoglobin Diagnostics Service, UPMC. |

### PROFESSIONAL CERTIFICATION AND LICENSURE

| | |
|---|---|
| 2013- | California Medical License (C5591) |
| 2008- | Board Certification, Clinical Pathology (08-425) |
| 2013 | State of Arizona Medical License (Inactive) |
| 2008 | Pennsylvania Medical License (MD435621) (Inactive) |
| 2008 | Commonwealth of Massachusetts Medical License (Inactive) |

### MEMBERSHIPS IN PROFESSIONAL SOCIETIES

| | |
|---|---|
| 2015- | Association of Molecular Pathology |
| 2008- | American Society for Clinical Pathology (ASCP) |
| 2008- | College of American Pathologists (CAP) |
| 2008- | Society for Pediatric Pathology |
| 2007- | Academy of Clinical Laboratory and Physician Scientists (ACLPS) |

### *PRIZES AND AWARDS*

| | |
|---|---|
| 2009-2013 | Howard Hughes Medical Institute Physician-Scientist Early Career Award |
| 2002-2005 | Leukemia and Lymphoma Society (LLS), Grant Awardee (Fellow), |

US-REPORTS-0018857

# Adam  Rosendorff, MD

| 2000 | Morris B Bender Family Prize for Clinical Neurology, |
| 1998-1999 | Howard Hughes Medical Institute Research Training Fellowship |
| 1992- | Faculty of Arts Gold Medal, University of the Witwatersrand |
| 1988- | University Council Entrance Scholarship |

## INVITED REVIEWER ACTIVITY

| 2012- | Ad-Hoc Reviewer, Current Microbiology |
| 2012- | Ad-Hoc Reviewer, Cellular Physiology and Biochemistry (Karger) |
| 2011- | European Journal of Immunology |
| 2009- | Ad-Hoc Reviewer, Journal of Pediatric Pathology |
| 2008- | Reviewer, CDC Evaluation of Genomic Applications in Practice and Prevention (EGAPP™) grants, Atlanta, GA. |

## COMPLIANCE AND REGULATORY ACTIVITIES

| 2016- | Prepared Medicare/Palmetto Molecular Diagnostics Technical Assessment |
| 2015- | FDA presentation at invitation of E Mansfield, Gaithersburg, MD: NGS testing at Invitae. |
| 2015- | Successful NYS, CLIA inspections, granting of NYS and CLIA licensure for Invitae. |

## UNIVERSITY ACTIVITIES

| 2012- | Chair, Clinical Laboratory Standards Committee (CHP) |
| 2010- | Clinical Pathology Rotation Director:Pathology Residency (Junior Lab Director Program) and Pediatric Pathology Fellowship |
| 2009- | Physician representative, Executive Patient-Safety Committee (CHP) |
| 2008- | Member: Molecular Virology Program, UPCI |
| 2008- | Lecturer: Molecular Virology graduate course (Tumor Virology), UPCI and Hillman Cancer Center |
| 2001-2005 | Tutor, Infectious Diseases and Immunology course, Harvard Medical School |

## MEETINGS AND ABSTRACTS (2012)

2016-  European Society of Human Genetics, May 21st-24th, Barcelona, Spain McCalmon et.al. "SMRTer Confirmation": Scalable Clinical Read-through Variant Confirmation Using Pacific Biosciences' SMRT Sequencing Platform."

2015-  American Society of Human Genetics (ASHG) (forthcoming) October 6-10, Baltimore, MD Lincoln et. Al. "To confirm or not confirm, That is the Question: A rigorous approach to evaluating the importance of Sanger confirmation of NGS findings"

2

US-REPORTS-0018858

# Adam  Rosendorff, MD

2015-  NIST/ Genome in a Bottle (GIAB) Consortium Working Group, August 27-28[th] (participant)

2015-  ACMG Annual Clinical Genetics Meeting, Salt Lake City, Utah, March 25-28[th] (attendee).

2012-  International Conference on Oncogenic Herpesviruses and Associated Diseases, Philadelphia, PA, August 1-4, 2012) Epstein-Barr virus  (EBV) ZTA interacts with histone modifying proteins MLL2 and JMJD2C to create an epigenetic footprint favoring lytic replication Taylor GM and **Rosendorff A**

2012-  *Proteomics, Interactomes*. May 7-May 12, 2012, Stockholm, Sweden (Keystone Conferences) Epstein-Barr virus  (EBV) ZTA interacts with histone modifying proteins MLL2 and JMJD2C to create an epigenetic footprint favoring lytic replication Taylor GM and **Rosendorff A**

2012-  AACR "Mass Spectrometry in the Clinical Lab: Best Practices and Current Applications" September 6-7, Chicago, IL.

### GRANT FUNDING

2008-2014 Howard Hughes Medical Institute, Physician-Scientist Early Career Award

2002-2005 Leukemia and Lymphoma Society Early Career Award

### PUBLICATIONS

(1)  Ami P. Shah, M.D., M.P.H; Benjamin T. Cobb; Darla R. Lower, MT(ASCP); Nader Shaikh, M.D.; Jayne Rassmusen, MPM, MT(ASCP);  Alejandro Hoberman, M.D.; Ellen R. Wald, M.D.; **Adam Rosendorff, M.D.**; Robert W. Hickey, M.D. Enhanced vs. Automated Urinalysis for screening of Urinary Tract Infections in Children in the Emergency Department. (submitted *NEJM*)

(2)  **Adam Rosendorff,**  Comparison of CEDIA FK506 assay with HPLC/MS/MS in a large cohort of pediatric patients  (Am J Clin Pathol. 2013 Jun;139(6):788-92)

(3)  Maurer S, **Rosendorff A**  Hemoglobin Pittsburgh: Spurious hypoxemia by pulse oximetry due to a novel alpha-chain hemoglobin variant in a 12 year-old boy (submitted, *American Journal of Clinical Pathology*)

(4)  Activated Partial Thromboplastin Time is a Better Trending Tool in Pediatric ECMO Timothy M. Maul TM, Wolff EL, **Rosendorff A**, Morell VO and Wearden PD, Pediatr Crit Care Med. 2012 Nov;13(6):e363-71. doi: 10.1097/PCC.0b013e31825b582e.

(5)  Taylor GM, Raghuwanshi SK, Wadowsky R, Rowe DT **Rosendorff, A** Endoplasmic Reticulum Stress Causes EBV lytic replication Blood August 17, 2011

(6)  Davies ML, Xu S, Lyons-Weiler J, **Rosendorff A**, Webber SA, Wasil LR, Metes D, Rowe DT. (2010) Cellular factors associated with latency and spontaneous Epstein-Barr virus reactivation in B-lymphoblastoid cell lines. Virology. 400:53-67

US-REPORTS-0018859

# Adam  Rosendorff, MD

(7)     Garrido J, Maruo S, Takada K, **Rosendorff A** EBNA3C interacts with Gadd34  and counteracts the unfolded protein response. Virol J. 2009 Dec 29;6(1):231.

(8)     **Rosendorff, A** and Dorfman, DD Factor $V_{Leiden}$: a review Arch Pathol Lab Med. 2007 Jun;131(6):866-71.

(9)     Portal D, **Rosendorff A,** Kieff E Epstein-Barr nuclear antigen leader protein co-activates transcription through interaction with histone deacetylase 4. Proc Natl Acad Sci USA 2006 103(51): 19278-83.

(10)    **Rosendorff A**, Sakakibara S, Lu S, Kieff E, Xuan Y, DiBacco A, Shi Y, Shi Y and Gill G  NXP-2 association with SUMO-2 depends on lysines required for transcriptional repression. Proc Natl Acad Sci U S A. 2006 Apr 4;103(14):5308-13.

(11)    **Rosendorff A,** David G, Lin J, Kieff E and Johannsen E. EBNA3C coactivation with EBNA2 requires a SUMO homology domain. J Virol. 2004 Jan;78(1):367-77.

(12)    **Rosendorff A**, Ebersole BJ, Sealfon S. Conserved helix 7 tyrosine functions as an activation relay in the serotonin $5HT_{2C}$ receptor Brain Res Mol Brain Res. 2000 Dec 8;84(1-2):90-6.

(13)    Chu JL, Ramos P, **Rosendorff A**, Nikolic-Zugic J, Lacy E, Matsuzawa A, Elkon KB. "Massive upregulation of Fas ligand in lpr and gld mice: implications for Fas regulation and the graft-versus-host disease-like wasting syndrome." J. Exp. Med. 1995;181:393-398.

<u>**REFERENCES:**</u>

Available upon request

US-REPORTS-0018860

# EXHIBIT 1

**From:** Wade, Lance <LWade@wc.com>
**Date:** Monday, Oct 04, 2021, 5:08 PM
**To:** Bostic, John (USACAN) <John.Bostic@usdoj.gov>, Adriana Kratzmann
███████████████████████████ CRD EJD <EJDCRD@cand.uscourts.gov>
**Cc:** Schenk, Jeffrey (USACAN) <Jeffrey.B.Schenk@usdoj.gov>, Leach, Robert (USACAN)
<Robert.Leach@usdoj.gov>, Volkar, Kelly (USACAN) <Kelly.Volkar@usdoj.gov>, Downey, Kevin
<KDowney@wc.com>, Trefz, Katherine <KTrefz@wc.com>
**Subject:** RE: U.S. v. Holmes, 18cr258 - request for brief hearing tomorrow

Ms. Kratzmann,

The following documents are relevant background materials for the testimony we may seek to elicit
relating to Dr. Rosendorff's post-Theranos employment.  We will likely <u>not</u> seek to offer many of these
documents into evidence.

- TX 11006 (Yellow Binder, Vol. 2)
- TX 11007 (Yellow Binder, Vol. 2)
- Attached exhibits:
    - 13930
    - 13427
    - 13731
    - 13941
    - 13942
    - 13943

We will address tomorrow why we think this testimony is admissible under 401, 608(b), and for
bias.  **For planning purposes, we can avoid addressing these issues until after the lunch break, if that
makes matters easier for the Court.**

Respectfully,

Lance Wade

**Lance Wade**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029
lwade@wc.com  |  www.wc.com/lwade

**From:** Bostic, John (USACAN) <John.Bostic@usdoj.gov>
**Sent:** Monday, October 4, 2021 4:47 PM
**To:** Adriana Kratzmann ███████████████████████████ CRD EJD
<EJDCRD@cand.uscourts.gov>
**Cc:** Schenk, Jeffrey (USACAN) <Jeffrey.B.Schenk@usdoj.gov>; Leach, Robert (USACAN)
<Robert.Leach@usdoj.gov>; Volkar, Kelly (USACAN) <Kelly.Volkar@usdoj.gov>; Downey, Kevin
<KDowney@wc.com>; Wade, Lance <LWade@wc.com>; Trefz, Katherine <KTrefz@wc.com>
**Subject:** U.S. v. Holmes, 18cr258 - request for brief hearing tomorrow

Good afternoon Ms. Kratzmann,

The parties have met and conferred regarding some topics the defense may cover in the remainder of its cross-examination of Dr. Rosendorff, and have been unable to reach agreement.  In particular, the parties disagree regarding the admissibility of certain details regarding Dr. Rosendorff's employment post-Theranos.  If the Court is amenable, we would appreciate the chance to be heard on this issue before the defense raises these topics with Dr. Rosendorff.  The parties are available at 8:00 a.m. tomorrow to address the matter, or at any time convenient for the Court.

I understand defense counsel may follow up to transmit or cite specific exhibits it is considering introducing so that the Court can have that context.

Regards,
John

JOHN C. BOSTIC
Assistant United States Attorney
Northern District of California
150 Almaden Blvd. | San Jose, CA 95113
█████████████ | Fax:  (408) 535-5066
Email:  john.bostic@usdoj.gov

1  JOHN D. CLINE (CA State Bar No. 237759)
    50 California Street, Suite 1500
2  San Francisco, CA 94111
    Telephone: (415) 662-2260 │ Facsimile: (415) 662-2263
3  Email: cline@johndclinelaw.com

4  KEVIN M. DOWNEY (Admitted Pro Hac Vice)
    LANCE A. WADE (Admitted Pro Hac Vice)
5  AMY MASON SAHARIA (Admitted Pro Hac Vice)
    KATHERINE TREFZ (CA State Bar No. 262770)
6  WILLIAMS & CONNOLLY LLP
    725 Twelfth Street, NW
7  Washington, DC 20005
    Telephone: (202) 434-5000 │ Facsimile: (202) 434-5029
8  Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

9  Attorneys for Defendant ELIZABETH A. HOLMES

10

11                 UNITED STATES DISTRICT COURT

12              NORTHERN DISTRICT OF CALIFORNIA

13                    SAN JOSE DIVISION

14

15  UNITED STATES OF AMERICA,    )  Case No. CR-18-00258-EJD
                      )
16        Plaintiff,        )  **DECLARATION OF LANCE A. WADE IN**
                      )  **SUPPORT OF MS. HOLMES' NOTICE OF**
17    v.              )  **FILING**
                      )
18  ELIZABETH HOLMES and     )
    RAMESH "SUNNY" BALWANI,  )  Hon. Edward J. Davila
                      )
19       Defendants.      )
                      )
20                      )
    _____)

21

22

23

24

25

26

27

28

DECLARATION OF LANCE A. WADE IN SUPPORT OF MS. HOLMES' NOTICE OF FILING
CR-18-00258 EJD

I, LANCE A. WADE, declare as follows:

1. I represent Defendant Elizabeth Holmes and have been admitted to practice *pro hac vice* in the above-captioned matter. I submit this declaration in support of Ms. Holmes' Notice of Filing. I attest to the following facts upon which the Notice relies.

2. Attached to this declaration are nine exhibits.

3. The contents of the exhibits are as follows:

a. Exhibit 1 is a true and correct copy of an October 4, 2021 email from Lance Wade to the Court concerning the cross-examination of Dr. Adam Rosendorff, copying government counsel, redacted to protect non-public information.

b. Exhibit 2 is a true and correct copy of the September 25, 2020 Memorandum of Interview of Dr. Adam Rosendorff, Bates-Stamped US-REPORTS-0018851, redacted to protect confidential information.

c. Exhibit 3 is a true and correct copy of a December 16, 2020 Memorandum of Interview of Dr. Adam Rosendorff, Bates-Stamped US-REPORTS-0025225, filed under seal pursuant to this Court's Protective Order. Dkt. 879.

d. Exhibit 4 is a true and correct copy of Defense Exhibit 13427, an August 28, 2017 article entitled "50,000 Patients to Retest After Invitae Finds Errors."

e. Exhibit 5 is a true and correct copy of Defense Exhibit 13731, a February 19, 2021 "Public Health Laboratory State Inspection-Condition Level Deficiencies-Immediate Jeopardy" letter to Adam Rosendorff from the California Department of Public Health.

f. Exhibit 6 is a true and correct copy of Defense Exhibit 13930, an October 27, 2016 email from Dr. Adam Rosendorff, filed under seal pursuant to this Court's Protective Order. Dkt. 879.

g. Exhibit 7 is a true and correct copy of Defense Exhibit 13931, a May 6, 2021 "Notice of Condition-Level Deficiencies Immediate Jeopardy" letter to Dr. Adam Rosendorff from the Centers of Medicare & Medicaid Services ("CMS"), redacted to protect confidential information.

h. Exhibit 8 is a true and correct copy of Defense Exhibit 13942, a July 6, 2021

DECLARATION OF LANCE A. WADE IN SUPPORT OF MS. HOLMES' NOTICE OF FILING
CR-18-00258 EJD

1

"Notice of Proposed Sanctions" to Dr. Adam Rosendorff from CMS, redacted to protect confidential information.

      i.     Exhibit 9 is a true and correct copy of Defense Exhibit 13943, a July 6, 2021 email from Karen Fuller to Gary Yamamoto, redacted to protect confidential information.

    4.    Exhibits 2 and 3 were provided to the Court and government counsel in hard copy on September 28, 2021.

    5.    Exhibits 4 through 9 were attached to defense counsel's October 4, 2021 email to the Court, copying government counsel.

    I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

    Executed this 11th day of October 2021 in San Jose, CA.


_____
LANCE A. WADE
Attorney for Elizabeth Holmes

DECLARATION OF LANCE A. WADE IN SUPPORT OF MS. HOLMES' NOTICE OF FILING
CR-18-00258 EJD

2



1  JOHN D. CLINE (CA State Bar No. 237759)
   50 California Street, Suite 1500
2  San Francisco, CA 94111
   Telephone: (415) 662-2260 | Facsimile: (415) 662-2263
3  Email: cline@johndclinelaw.com

4  KEVIN M. DOWNEY (Admitted Pro Hac Vice)
   LANCE A. WADE (Admitted Pro Hac Vice)
5  AMY MASON SAHARIA (Admitted Pro Hac Vice)
   WILLIAMS & CONNOLLY LLP
6  725 Twelfth Street, NW
   Washington, DC 20005
7  Telephone: (202) 434-5000 | Facsimile: (202) 434-5029
   Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com
8

9
   Attorneys for Defendant ELIZABETH A. HOLMES
10

11                          UNITED STATES DISTRICT COURT

12                        NORTHERN DISTRICT OF CALIFORNIA

13                                 SAN JOSE DIVISION

14

15  UNITED STATES OF AMERICA,          )  Case No. CR-18-00258-EJD
                                       )
16          Plaintiff,                 )  **DEFENDANT ELI  A  ETH HOLMES' NOTICE**
                                       )  **OF FILING**
17      v.                             )
                                       )
18  ELIZABETH HOLMES and               )  Hon. Edward J. Davila
    RAMESH "SUNNY" BALWANI,            )
19                                     )
           Defendants.                 )
20                                     )
                                       )
21                                     )
    _____   )
22

23

24

25

26

27

28

   DEFENDANT'S NOTICE OF FILING
   CR-18-00258 EJD

1      PLEASE TAKE NOTICE that Defendant Elizabeth Holmes hereby files the documents attached

2  to and referenced in her counsel's October 4, 2021 email to the Court regarding the cross-examination of

3  Dr. Adam Rosendorff.  The documents and email are attached as Exhibits 1 through 9 to the Declaration

4  of Lance A. Wade filed contemporaneously with this notice. Exhibits 2 and 3 were provided to the Court

5  and government counsel in hard copy on September 28, 2021.  Exhibits 4 through 9 were attached to the

6  October 4, 2021 email copying government counsel.  The email itself is attached as Exhibit 1.

7

8  DATED: October 11, 2021

9

10

11                               s  Lance Wade

12                              KEVIN DOWNEY
                              LANCE WADE

13                              AMY MASON SAHARIA
                              KATHERINE TREFZ

14                              Attorneys for Elizabeth Holmes

15

16

17

18

19

20

21

22

23

24

25

26

27

28
DEFENDANT'S NOTICE OF FILING
CR-18-00258 EJD

2

1    <u>**CERTIFICATE OF SER   ICE**</u>

2        I hereby certify that on October 11, 2021 a copy of this filing was delivered via ECF on all

3    counsel of record.

4

5                                               s  Lance Wade
                                                KEVIN DOWNEY
6                                               LANCE WADE
                                                AMY MASON SAHARIA
7                                               KATHERINE TREFZ
                                                Attorneys for Elizabeth Holmes
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S NOTICE OF FILING
CR-18-00258 EJD

Case: 22-10312, 04/17/2023, ID: 12696875, DktEntry: 22-9, Page 246 of 292

1  JOHN D. CLINE (CA State Bar No. 237759)
   50 California Street, Suite 1500
2  San Francisco, CA 94111
   Telephone: (415) 662-2260 │ Facsimile: (415) 662-2263
3  Email: cline@johndclinelaw.com

4  KEVIN M. DOWNEY (Admitted Pro Hac Vice)
   LANCE A. WADE (Admitted Pro Hac Vice)
5  AMY MASON SAHARIA (Admitted Pro Hac Vice)
   KATHERINE TREFZ (CA State Bar No. 262770)
6  WILLIAMS & CONNOLLY LLP
   725 Twelfth Street, NW
7  Washington, DC 20005
   Telephone: (202) 434-5000 │ Facsimile: (202) 434-5029
8  Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

9  Attorneys for Defendant ELIZABETH A. HOLMES

10

11                    UNITED STATES DISTRICT COURT

12                  NORTHERN DISTRICT OF CALIFORNIA

13                        SAN JOSE DIVISION

14  UNITED STATES OF AMERICA,          )  Case No. CR-18-00258-EJD
                                       )
15          Plaintiff,                 )  **JOINT STIPULATION REGARDING TRIAL**
                                       )  **EVIDENCE**
16      v.                             )
                                       )
17  ELIZABETH HOLMES and               )  Hon. Edward J. Davila
    RAMESH "SUNNY" BALWANI,            )
18                                     )
            Defendants.                )
19                                     )
                                       )
20                                     )
                                       )
21                                     )
                                       )
22  _____)

23

24

25

26

27

28

JOINT STIPULATION REGARDING TRIAL EVIDENCE
CR-18-00258 EJD

Case: 22-10312, 04/17/2023, ID: 12696875, DktEntry: 22-9, Page 247 of 292

1    The Parties stipulate and agree to the admission of the following exhibits into evidence: 9000;

2  9003; 9011; 9019; 9029; 9030; 9034; 9035; 9036; 9037; 9038; 9039; 9040; 9041; 9045; 9056; 9075;

3  9092; 9108; 9119; 9120; 9121; 9128; 9131; 9136; 9140; 9141; 9142; 9143; 9144; 9145; 9146; 9152;

4  9157; 9160; 9164; 9169; 9170; 9174; 9175; 9176; 9177; 9193; 9194; 9195; 9204; 9205; 9208; 9209;

5  9211; 9216; 9219; 9221; 9227; 9229; 9233; 9234; 9235; 9236; 9237; 9238; 9239; 9242; 9247; 9250;

6  9281; 9282; 9287; 9289; 9298; 9305; 9306; 9308; 9318; 9321; 9322; 9332; 9334; 9335; 9339; 9340;

7  9346; 9357; 9361; 9362; 9363; 9364; 9365; 9367; 9371; 9379; 9386; 9389; 9398; 9399; 9406; 9407;

8  9408; 9414; 9415; 10504.

9

10  DATE: __10/5/21__                              Respectfully Submitted,

11

12

13                                                KEVIN DOWNEY
                                                 LANCE WADE
14                                                AMY MASON SAHARIA
                                                 KATHERINE TREFZ
15                                                Attorneys for Elizabeth Holmes

16                                                STEPHANIE M. HINDS
                                                 Acting United States Attorney
17

18                                                JEFF SCHENK
19                                                JOHN C. BOSTIC
                                                 ROBERT S. LEACH
20                                                KELLY I. VOLKAR
                                                 Assistant United States Attorneys
21

22

23

24

25

26

27

28

JOINT STIPULATION REGARDING TRIAL EVIDENCE
CR-18-00258 EJD

1   STEPHANIE M. HINDS (CABN 154284)
    Acting United States Attorney
2
    HALLIE HOFFMAN (CABN 210020)
3   Chief, Criminal Division

4   JEFF SCHENK (CABN 234355)
    JOHN C. BOSTIC (CABN 264367)
5   ROBERT S. LEACH (CABN 196191)
    KELLY I. VOLKAR (CABN 301377)
6   Assistant United States Attorneys

7        150 Almaden Boulevard, Suite 900
         San Jose, California 95113
8        Telephone: (408) 535-5061
         Fax: (408) 535-5066
9        Robert.Leach@usdoj.gov

10  Attorneys for United States of America

11                    UNITED STATES DISTRICT COURT

12                 NORTHERN DISTRICT OF CALIFORNIA

13                          SAN JOSE DIVISION

14
    UNITED STATES OF AMERICA,          )   Case No. 18-CR-00258 EJD
15                                      )
             Plaintiff,                 )   JOINT STIPULATIONS REGARDING
16                                      )   TRIAL EVIDENCE
         v.                             )
17                                      )
    ELIZABETH HOLMES,                   )
18                                      )
             Defendant.                 )
19                                      )
                                        )
20  _____

21       The United States and Defendant Elizabeth Holmes hereby stipulate and agree as follows:

22       1.      Emails to or from email addresses with the domain @theranos.com that were sent or

23  received by Theranos personnel and bear the bates prefixes HOLMES, THER-, THERDOJ-, THPFM-,

24  THER-AZ-, TS-, and TS2- are true and correct copies of emails stored, collected, and/or produced by

25  Theranos.  Such documents are authentic for the purposes of Federal Rules of Evidence 901 and 902 and

26  are admissible over any objections as to authenticity or best evidence.

27       2.      The following exhibits are true and correct copies of public records and websites:  DX

28  9500-9698; DX 7051; DX 7054; DX 7056; DX 7057; DX 7094; DX 7308; DX 7333; DX 7339; DX

    JOINT TRIAL STIPULATIONS
    CASE NO. 18-258 EJD                          1

1   7457; DX 7468; DX 7478; DX 7480; DX 7509; DX 7545; DX 7603; DX 7660; DX 7668; DX 7670; DX

2   7694; DX 7695; DX 7707; DX 7711; DX 7718; DX 7719; DX 7721; DX 7722; DX 7725; DX 7726; DX

3   7727; DX 7728; DX 7729; DX 7730; and DX 10386-10443.  Such documents are authentic for the

4   purposes of Federal Rules of Evidence 901 and 902 and are admissible over any objections as to

5   authenticity or best evidence.

6          3.       Exhibits 4845 and 3314 are true and correct copies of wire transfer records obtained from

7   the Federal Reserve Bank of New York, and are authentic for the purposes of Federal Rules of Evidence

8   901 and 902 and admissible as business records.

9          4.       The following video exhibits are authentic for the purposes of Federal Rules of Evidence

10  901 and 902 and are admissible over any objections as to authenticity or best evidence:

11             a)      Exhibit 1221 is a true and correct copy of a video interview of Elizabeth Holmes

12  on or about November 6, 2013, by Caitlin Roper of Wired Magazine.

13             b)      Exhibit 1253 is a true and correct copy of a video interview of Elizabeth Holmes

14  on or about October 30, 2013, by Eric Topol of Medscape.

15             c)      Exhibit 1616 is a true and correct copy of a video of proceedings before the

16  Arizona Senate Health and Human Services Committee, including statements by Ramesh

17  Balwani, on or about March 12, 2014.

18             d)      Exhibit 3727 is a true and correct copy of a TEDMED talk by Elizabeth Holmes

19  on or about September 20, 2014.

20             e)      Exhibit 2274  is a true and correct copy of a video interview of Elizabeth Holmes

21  on or about December 2, 2014, by Pattie Sellers of Fortune.

22             f)       Exhibit 2283 is a true and correct copy of a video interview of Ken Auletta on or

23  about December 12, 2014, by CNBC.

24             g)      Exhibit 2431 is a true and correct copy of a video interview of Elizabeth Holmes

25  and Toby Cosgrove on or about March 9, 2015, by Maria Bartiromo of Fox Business.

26             h)      Exhibit 2476 is a true and correct copy of a news report aired on CBS on or about

27  April 16, 2015, including statements by Elizabeth Holmes.

28             i)       Exhibit 2851 is a true and correct copy of a video interview of Elizabeth Holmes

JOINT TRIAL STIPULATIONS
CASE NO. 18-258 EJD                              2

1    on or about October 15, 2015, by Jim Cramer of CNBC.

2          j)      Exhibit 2889 is a true and correct copy of a video interview of Elizabeth Holmes

3    on or about October 21, 2015, by Jonathan Krim of The Wall Street Journal.

4          k)      Exhibit 3716 is a true and correct copy of a video interview of Elizabeth Holmes

5    on or about October 26, 2015, by Toby Cosgrove.

6          l)      Exhibit 2949 is a true and correct copy of a video interview of Elizabeth Holmes

7    on or about November 2, 2015, by Alan Murray of Fortune.

8          m)      Exhibit 3152 is a true and correct copy of a news report aired on NBC on or about

9    April 18, 2016, including statements by Elizabeth Holmes.

10          n)      Exhibit 3717 is a true and correct copy of a video interview of Elizabeth Holmes

11    on or about August 1, 2016, at the American Association of Clinical Chemistry.

12          o)      Exhibit 3224 is a true and correct copy of a video interview of Elizabeth Holmes

13    on or about August 1, 2016, by Dr. Sanjay Gupta of CNN.

14

15    DATED:   9/8/2021                        Respectfully submitted,

16                                            STEPHANIE M. HINDS
17                                            Acting United States Attorney

18
19                                            JEFF SCHENK
                                             JOHN C. BOSTIC
20                                            ROBERT S. LEACH
                                             KELLY I. VOLKAR
21                                            Assistant United States Attorneys

22

23
24    DATED:   9/9/2021

25                                            KEVIN DOWNEY
                                             LANCE WADE
26                                            KATHERINE TREFZ
                                             Attorneys for Defendant Elizabeth Holmes
27

28

JOINT TRIAL STIPULATIONS
CASE NO. 18-258 EJD                    3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| USA,<br><br>        Plaintiff,<br><br>    v.<br><br>ELIZABETH A. HOLMES,<br><br>        Defendant. | Case No.  5:18-cr-00258-EJD-1<br><br>**ORDER DEFERRING RULING ON DEFENDANT'S MOTION TO EXCLUDE CERTAIN TESTIMONY OF ERIKA CHEUNG, DANIEL EDLIN, AND SO HAN SPIVEY (A.K.A. DANISE YAM)**<br><br>Re: Dkt. No. 1000 |

Defendant Elizabeth Holmes ("Holmes") has moved to exclude certain testimony of Erika Cheung, Daniel Edlin, and So Han Spivey (a.k.a. Danise Yan) pursuant to Rules 401–404, 602, 702 and 801 of the Federal Rules of Evidence, Rule 16 of the Federal Rules of Criminal Procedure, Criminal Local Rule 16-1(c)(3), and this Court's Order re: Motions in Limine, Dkt. 798.  *See* Ms. Holmes's Mot. to Exclude Testimony of Erika Cheung, Daniel Edlin, and So Han Spivey (a.k.a. Danise Yam), Dkt. No. 1000.  The Court has reviewed Holmes's motion and her arguments for why certain testimony should be excluded, as well as the Government's opposition to the motion.  *See* U.S. Opp'n to Def.'s Mot. to Exclude Testimony of Trial Week of Sept. 6, 2021 Witnesses, Dkt. No. 1004.

The Court finds that it would be premature to make a ruling on Holmes's evidentiary challenges to certain testimony at this time without the benefit of hearing the questions posed by the Government or consideration of any potential foundation testimony elicited during trial.

**CASE NO.: 5:18-cr-00258-EJD-1**
**ORDER DEFERRING RULING ON DEFENDANT'S MOTION TO EXCLUDE CERTAIN TESTIMONY OF ERIKA CHEUNG, DANIEL EDLIN, AND SO HAN SPIVEY (A.K.A. DANISE YAM)**

Further, the Court does not know for certain what testimony the Government intends to elicit during trial.  As such, the Court **DEFERS** ruling on Holmes's evidentiary challenges until and unless the Government seeks to elicit such testimony.  At which point, Holmes's counsel will have the opportunity to object before potentially inadmissible evidence is elicited or to ask the Court to strike objectionable testimony if an objection is sustained.

**IT IS SO ORDERED.**

Dated: September 7, 2021

EDWARD J. DAVILA
United States District Judge

STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

JEFF SCHENK (CABN 234355)
JOHN C. BOSTIC (CABN 264367)
ROBERT S. LEACH (CABN 196191)
KELLY I. VOLKAR (CABN 301377)
Assistant United States Attorneys

    150 Almaden Boulevard, Suite 900
    San Jose, California 95113
    Telephone: (408) 535-5061
    FAX: (408) 535-5066
    john.bostic@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 18-CR-258 EJD |
| Plaintiff, | UNITED STATES' SECOND AMENDED WITNESS LIST |
| v. | |
| ELIZABETH HOLMES, | |
| Defendant. | |

The United States may call the following witnesses during its case in chief:

1.    S.A.

2.    Robert Amenta

3.    Peter Anderson

4.    Samartha Anekal

5.    Brad Arington

6.    Gerald Asin

7.      Carolyn Balkenhol

8.      Sarah Bennett

9.      B.B.

10.     Jeff Blickman

11.     David Boies

12.     Jessica Bramstedt

13.     Brooke Buchanan

14.     Steve Burd

15.     Howard Burris

16.     Sarah Cabayan

17.     Eric Caddenhead

18.     Xiao-Yan Cai

19.     Marc Campbell

20.     Nianhang Chen

21.     Erika Cheung

22.     Kevin Chung

23.     Michael Chung

24.     William Clarke

25.     Dustin Cook

26.     Toby Cosgrove

27.     John Couvaras

28.     Michael Craig

29.     Constance Cullen

30.     Andrea Cuppoletti

31.     Sunil Dhawan

32.     Susan DiGiaimo

33.     Michael Dixon

34.     Bruce Doll

35.    Matt Downs

36.    Dan Doyle

37.    Martin Drake

38.    Diana Dupuy

39.    Lisa Durkin

40.    Scott Earthy

41.    Erin Edgar

42.    Dan Edlin

43.    Joel Ehrenkranz

44.    ███ A.E. ███

45.    Kerry Elenatinoba-Johnson

46.    ███ M.E. ███

47.    JoEllen Embry

48.    Raymond Embry

49.    Phyllis Gardner

50.    ███ K.F. ███

51.    Richard Fernandez

52.    Stan Fiorito

53.    Season Flores

54.    Max Fosque

55.    Gary Frenzel

56.    Peter Fritsch

57.    Surekha Gangakhedkar

58.    Arnold Gelb

59.    Rochelle Gibbons

60.    ███ R.G. ███

61.    Melissa Givens

62.    ███ M.G. ███

63.   Xinwei Sam Gong

64.   Robert Gordon

65.   ████ B.G. ████

66.   Cass Grandone

67.   ████ W.G. ████

68.   Brian Grossman

69.   Craig Hall

70.   Kevin Hagen

71.   Kevin Hunter

72.   George Hamilton

73.   Christian Holmes

74.   Stefan Hristu

75.   Jared Hutchings

76.   Nimesh Jhaveri

77.   Thomas Kickler

78.   Heather King

79.   Henry Kissinger

80.   ████ Y.K. ████

81.   ████ E.L. ████

82.   Courtney Lias

83.   Tina Lin

84.   Steven Linnerson

85.   Craig Lipset

86.   Chris Lucas

87.   Clarissa Lui

88.   ████ A.M. ████

89.   Stephen Master

90.   James Mattis

91.   Seth Michelson

92.   Wade Miquelon

93.   Dan Mosley

94.   Rupert Murdoch

95.   Matthew Nathan

96.   Eileen Norkin

97.   Anthony Nugent

98.   Sam Nunn

99.   Justin Offen

100.  Noam Ohana

101.  Patrick O'Neill

102.  Curtis Page

103.  Mark Pandori

104.  Chinmay Pangarkar

105.  Roger Parloff

106.  J.P.

107.  William Perry

108.  M.P.

109.  Lisa Peterson

110.  Meredith Potter

111.  Mona Ramamurthy

112.  Natalie Ravitz

113.  Larree Renda

114.  Kim Romanski

115.  Jay Rosan

116.  Channing Robertson

117.  David Rogers

118.  Callie Rosendin

119.   Adam Rosendorff

120.   Gary Roughhead

121.   David Rusnak

122.   Suraj Saksena

123.   David Shoemaker

124.   Robert Shapiro

125.   Tyler Shultz

126.   Kyle Sims

127.   Sharada Sivaraman

128.   Dee Anna Smith

129.   Adrienne Stewart

130.   █████ S.S. █████

131.   Nicole Sundene

132.   Victoria Sung

133.   Todd Surdey

134.   Edward Szmuc

135.   Brian Tolbert

136.   █████ E.T. █████

137.   Eric Topol

138.   █████ A.T. █████

139.   Jerry Tubergen

140.   Shane Weber

141.   Kate Wolff

142.   Mike Yagi

143.   Danise Yam

144.   Gary Yamamoto

145.   Daniel Young

146.   Audra Zachman

147.    David Nathan Zalatan

148.    Lisa Zuckerman

149.    Kingshuk Das

150.    Bruce Pixley

151.    Mark Burnes

152.    Sean O'Malley

153.    Nicholas Haase

154.    Govind Acharya

155.    Laree Renda

156.    Cassie Hughes

157.    Antii Korhonen

158.    Craig Josephson

159.    Alexander White

160.    David Satchell

161.    Mike Wei

162.    David Taylor

163.    Katie Moran

164.    Matthew Benedetto

165.    Michael Romeo

166.    Chris Davies

167.    Shekar Chandrasekaran

168.    Sekhar Variam

169.    John McChesney

170.    Jim Topinka

171.    Zubin Gautam

172.    Adelaida Hernandez

173.    Ian Pilcher

174.    E.G.

175.  Paige Williams

176.  Swapna Joshi

177.  Gurbir Sidhu

178.  Langley Gee

179.  Jan Reed

180.  Jarod Wada

181.  Carrie Brodmerkel

182.  Custodians of Records

    a.  American Express

    b.  Celgene

    c.  Comerica

    d.  Dignity Health

    e.  Hall Black Diamond

    f.  Federal Reserve Board

    g.  GSK

    h.  Iconiq

    i.  Intermountain

    j.  Johns Hopkins

    k.  Peer Ventures

    l.  Pfizer

    m.  PFM

    n.  PricewaterhouseCoopers LLP

    o.  RDV Corporation

    p.  Safeway

    q.  Schering-Plough

    r.  Securities and Exchange Commission

    s.  Sherwood Partners

    t.  Siemens

u.  Sutter Health

v.  Theranos Inc.

w.  Theranos (assignment for the benefit of creditors), LLC

x.  Walgreens

The government may seek to supplement this list as trial preparations progress, and will notify the defendant and the Court of any changes to its Witness List.

DATED:  September 2, 2021                     Respectfully submitted,

                                              STEPHANIE M. HINDS
                                              Acting United States Attorney

                                              ___/s/_____
                                              ROBERT S. LEACH
                                              JEFF SCHENK
                                              JOHN C. BOSTIC
                                              KELLY I. VOLKAR
                                              Assistant United States Attorneys

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ELIZABETH A. HOLMES,<br><br>Defendant. | Case No.   5:18-cr-00258-EJD-1<br><br>**ORDER RE PRE-TRIAL MOTIONS**<br><br>Re: Dkt. Nos. 892, 895, 897, 899 |

On July 28, 2020, a federal grand jury returned a Third Superseding Indictment, charging Defendants Elizabeth Holmes and Ramesh "Sunny" Balwani with ten counts of wire fraud ("Counts 3 through 12"), in violation of 18 U.S.C. § 1343, and two counts of conspiracy to commit wire fraud ("Counts 1 through 2"), in violation of 18 U.S.C. § 1349.  Third Superseding Indictment ("TSI"), Dkt. No. 469.  Defendants were charged with making deceptive representations about their company, Theranos, and its technology. In anticipation of trial, Holmes and the Government each filed motions in limine ("MIL"), which the Court ruled on.  Mots. in Limine, Dkt. Nos. 560-578, 588; Order re: Mots. in Limine ("MIL Order"), Dkt. No. 798.

Holmes filed additional pre-trial motions now before the Court.  Dkt. Nos. 892, 895, 897, 899.  The Court heard oral argument on the motions on August 20, 2021.  Dkt. No. 926.  Having considered the parties' arguments, the relevant law, and the record in this case, the Court DENIES and DEFERS the following pre-trial motions, as set forth below.

**I.      BACKGROUND**

The background of the case is set forth in the MIL Order and will not be recited herein.  In

brief, Holmes is charged with conspiring to commit and committing fraud.  Holmes allegedly made several misrepresentations to investors regarding (1) Theranos's proprietary analyzer (the TSPU, Edison, or minilab), (2) approval from government agencies, and (3) Theranos's financial condition.

## II.    LEGAL STANDARD

Motions in limine are a "procedural mechanism to limit in advance testimony or evidence in a particular area." *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009).  Like other pretrial motions, motions in limine are "useful tools to resolve issues which would otherwise clutter up the trial." *City of Pomona v. SQM N. Am. Corp.*, 866 F.3d 1060, 1070 (9th Cir. 2017).  Accordingly, "a ruling on a motion in limine is essentially a preliminary opinion that falls entirely within the discretion of the district court." *Id.*; *see Luce v. United States*, 469 U.S. 38, 41 n.4 (1984) (explaining that a court may rule in limine "pursuant to the district court's inherent authority to manage the course of trials").

In many instances, however, rulings "should be deferred until trial, so that questions of foundation, relevancy, and potential prejudice may be resolved in proper context." *United States v. Pac. Gas & Elec. Co.* ("*PG&E*"), 178 F. Supp. 3d 927, 941 (N.D. Cal. 2016).  For example, in order to exclude evidence on a motion in limine, "the evidence must be inadmissible on all potential grounds." *McConnell v. Wal-Mart Stores, Inc.*, 995 F. Supp. 2d 1164, 1167 (D. Nev. 2014).  Thus, denial of a motion in limine to exclude certain evidence does not mean that all evidence contemplated by the motion will be admitted, only that the court is unable to make a comprehensive ruling in advance of trial.  *Id.* at 1168.  Moreover, even if a district court does rule in limine, the court may "change its ruling at trial because testimony may bring facts to the district court's attention that it did not anticipate at the time of its initial ruling."  *City of Pomona*, 866 F.3d at 1070; *see also Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000) ("[I]n limine rulings are not binding on the trial judge, and the judge may always change his mind during the course of a trial.").

III.   **DISCUSSION**

   A.   **Holmes's Motion to Strike Improper and Untimely Expert Disclosure and to Preclude Expert Opinion Testimony of Dr. Kingshuk Das (Dkt. No. 892)**

In November 2019, pursuant to the parties' agreement, the Court entered an order requiring the Government to serve a summary for each expert witness it intended to call under Federal Rule of Criminal Procedure 16 by March 6, 2020.  Dkt. No. 170 at 13; Dkt. No. 171.  At that time, jury selection was scheduled to begin July 28, 2020 with the first day of trial to take place on August 4, 2020.  Dkt. No. 170-6; Dkt. No. 171.  The Government served its Rule 16 disclosures on March 6, 2020.

Jury selection has since been continued to August 31, 2021, owing in part to the ongoing COVID-19 pandemic.  Dkt. No 484; Dkt. No. 650; Dkt. No. 756.  In February and June 2021, the Government interviewed Dr. Kingshuk Das, former lab director of Theranos, and disclosed interview memoranda for him to Holmes after each interview.  Ms. Holmes's Mot. to Strike Improper and Untimely Expert Disclosure and to Preclude Expert Opinion Testimony of Dr. Kingshuk Das ("892 Mot."), Dkt. No. 892, at 3; U.S.'s Omnibus Resp. to Def. Holmes' Mots. To Reconsider or Clarify the Court's Order on Mots. In Limine ("Opp'n"), Dkt. No. 906, at 11.  On July 29, 2021, the Government informed Holmes that it intended to call Dr. Das as a witness in an email as follows:

> Further, although we submit it is not necessary, we are supplementing our Rule 16(a)(1)(G) disclosure to advise you the government intends to offer testimony from Dr. Kings[h]uk Das. A summary of his anticipated testimony is set forth in the memoranda of interview that have previously been produced to you. The bases for his opinions, to the extent they constitute expert opinion testimony, are set forth in those memoranda of interview, THPFM00004005199[1], and the list of documents at ECF 842-1 pp.10-15.

892 Mot. at 2.  Holmes now moves to strike the Government's July 29, 2021 supplemental disclosure and to preclude the Government from eliciting any expert opinion from Dr. Das at trial.  *Id.* at 1.

The parties' fundamental disagreement concerns Dr. Das's status as a witness.  The Government asserts that it has always believed Dr. Das to be a percipient witness, that it does not

intend to elicit any expert opinion or testimony from him, and that it made its supplemental disclosure out of an abundance of caution once it realized that Holmes perceived him to be an expert witness.  Opp'n at 11–16.  Holmes argues that Dr. Das's testimony will be based at last in part on scientific, technical, or other specialized knowledge that renders him an expert witness subject to Rule 16 and Federal Rule of Evidence 702.  892 Mot. at 3–4.  In particular, Holmes focuses on Dr. Das's "Six Sigma" analysis of Edison data and his resulting conclusion that Edison devices did not perform well and did not meet the necessary accuracy and precision requirements. *Id.*

At the hearing, the Government provided further clarification on the testimony it intends to elicit from Dr. Das.  Based on those representations, the Court is persuaded that Dr. Das may proceed as a percipient witness.  However, the parties are on notice that specific details of particular scientific procedures or analyses that would require specialized knowledge to understand and interpret—including the Six Sigma analysis—would move Dr. Das's testimony from percipient to expert.  If expert testimony is introduced, Holmes may object at that time.  A *Daubert* hearing will be sufficient to address any prejudice to Holmes, particularly in light of the fact that the parties intend to conduct a *Daubert* hearing mid-trial for the Government's expert witness, Dr. Stephen Master.

Accordingly, the Court DEFERS ruling on Holmes's motion unless and until Dr. Das offers expert witness testimony at trial.

### B.    Holmes's Renewed Motion to Exclude Certain News Articles (Dkt. No. 895)

In her renewed motion, Holmes moves to exclude seven news articles not previously submitted to the Court with her original motion in limine.  Ms. Holmes' Renewed Mot. to Exclude Certain News Articles, Dkt. No 895 ("895 Mot.").  The Government, however, calls the present motion premature and potentially unnecessary given presentation of evidence has not begun, and the Court agrees.  Opp'n at 3–4; Aug. 20, 2021 Hr'g Tr. ("8/20/2021 Tr."), Dkt. No. 939, at 7:21 – 8:2, 13:15–14:1.

In its opposition and at the August 20, 2021 hearing on this motion, the Government

committed to not referencing these articles, or any information contained in them, in its opening statement.  Opp'n at 3; 8/20/2021 Tr. at 10:9-21.  The Government also maintained it would provide advance notice and lay foundation for admissibility if it subsequently intends to introduce any of the seven articles.  *Id*.  The Court takes the Government at its word and thus DEFERS ruling on the motion unless and until the Government seeks introduction of any of the seven articles at trial.

### C.   Holmes's Motion to Partially Redact Government Agency Reports (Dkt. No. 897)

In its MIL Order, the Court deferred ruling on Holmes's Motion to Exclude FDA Inspection Evidence.  MIL Order at 16.  The Court held that "evidence arising out of the FDA inspection" was relevant, more probative than prejudicial, and not excludable under Rule 404(b).  *Id*. at 11–13.  Regarding the two FDA inspection reports (referred to as Form FDA-483s), the Court held they were admissible under Federal Rule of Evidence 803(8)(A)(ii) because they "consist[] largely of observations" comparable to those made by "government employees such as city building inspectors, medical examiners, and prison case managers."  *Id*. at 14 (citing cases).  The Court noted that there were portions of the report that go beyond mere observations.  The Court expressed its openness to continued discussions regarding the issue should Holmes wish to raise arguments as to certain specific pieces of evidence within the FDA inspection evidence that involve such a high degree of observer analysis that they might not be admissible under Rule 803(A)(ii).  *Id*.

Also, in the MIL Order, the Court denied Holmes's Motion to Exclude Evidence of CMS Survey Findings and granted the Government's corresponding motion to admit the Form CMS-2567.  *Id*. at 20.  The Court held that "evidence of CMS survey findings and sanctions" was relevant to questions about Holmes's state of mind, intent, and knowledge regarding the alleged misrepresentations about the accuracy and reliability of Theranos' blood tests."  *Id*. at 18.  The Court rejected Holmes's hearsay argument for the same reasons it rejected the argument as to the FDA inspection reports.  *Id*. at 20.  The Court, however, acknowledged "the possibility for further

side bar discussions on this matter, should [the] parties wish to specify certain exhibits within this collection of evidence and make new arguments as to why these particular exhibits should still be excluded." *Id.*

Without waiving her objections, Holmes moves to redact three of the Government's exhibits: a Form FDA-483 for Theranos's Palo Alto facility, a form FDA-483 for the Newark facility, and a Form CMS-2567, as well as the cover letter accompanying the Form CMS-2567. Ms. Holmes' Mot. to Partially Redact Gov't Agency Reports ("897 Mot.), Dkt. No. 896; *see* Decl. of Amy Mason Saharia in Supp. of Ms. Holmes' Mot. to Partially Redact Gov't Agency Reports, Dkt. No. 898, Exs. 4-6. Specifically, Holmes proposes redacting (1) what she perceives as high-level subjective conclusions of the reports' authors such that only the factual observations of the authors will be admitted at trial; (2) purported double-hearsay; and (3) tests not identified in the Bill of Particulars.

### 1.   Form FDA-483 Palo Alto Facility (Exhibit 4)

The Court finds that the proposed redactions to Exhibit 4, Form FDA-483 for the Palo Alto Facility, consist of observations that fall within Rule 803(8)(A)(ii), and therefore are admissible. The Form FDA-483, which was issued to Holmes, recites that "[t]his document lists observations made by the FDA representative(s) during the inspection of your facility"; that they are "inspectional observations" and do not represent a final Agency determination regarding compliance. Dkt. No. 898-4 at 2. Holmes proposes redactions to four sentences summarizing observations regarding lack of documentation. For example, the proposed redaction for "Observation 1" merely summarizes the FDA representative's observation that the documents reviewed by the representative did not address certain assays and that there was an absence of documentation regarding investigation for other assays. *Id.* Similarly, the proposed redaction for "Observation 2" summarizes the FDA representative's observation that the design validation plan lacks information such as the TSCD lot numbers used. These sentences do not reflect such a high degree of observer analysis that they fall outside the purview of Rule 803(A)(ii).

Accordingly, the Court DENIES Holmes's motion as to Exhibit 4.

### 2.    Form FDA-483 Newark Facility (Exhibit 5)

Most of the observations set forth in the Form FDA-483 for the Newark Facility are similar in kind and character to those described above.  One exception is the proposed redactions under the "Observation 1" heading.  These proposed redactions are provisionally approved because at present, the redacted portions lack foundation.  If a proper foundation is laid, the Government may seek reconsideration of the Court's ruling.

Holmes also requests redaction of the five-step procedure under the "Observation 2" heading, asserting that it is hearsay.  The hearsay objection is overruled; the five-step procedure is not an out-of-court statement being offered to prove the truth of the matter asserted.

The Court DENIES Holmes's motion as to Exhibit 5, except that the Court provisionally approves the proposed redactions under the "Observation 1" heading.

### 3.    Cover Letter and Form CMS-2567 (Exhibit 6)

Holmes proposes extensive redactions to the cover letter and Form CMS-2567.  The Court previously held that both are more probative than prejudicial and not hearsay.  MIL Order at 12.[1]  The Court agrees with the Government that Holmes's present motion is essentially a motion for reconsideration for which no new arguments have been presented to justify the breadth of the redactions requested.

Nevertheless, rather than deny the motion outright, the Court DEFERS ruling on the proposed redactions until the Government seeks to introduce the cover letter and Form CMS-2567 at trial.  The Government shall provide Holmes and the Court with advance notice of the portions

---

[1] The Court rejects Holmes's assertions that the cover letter is "new" and not covered in the MIL Order.  Holmes previously sought to "exclude evidence relating to the findings of surveys of Theranos' clinical laboratories conducted by the Centers for Medicare & Medicaid Services' ("CMS") in 2015 and 2016, including the survey reports and sanctions imposed by CMS."  Dkt. No. 574 at 1.  In that motion in limine, Holmes referred to the cover letter and the Form 2567 collectively as the "January 2016 CMS Report."  *Id*. at 3.  According to Holmes, in the January 2016 CMS Report, "CMS asserted Theranos's California lab was in violation of various CLIA requirements and warned that if Theranos did not remediate these deficiencies within 10 days, CMS would impose sanctions."  *Id*.  Holmes argued that the "findings that Theranos had violated CLIA regulations are irrelevant."  *Id*. at 3.  Therefore, the Court construed Holmes's motion in limine as seeking exclusion of both the cover letter and the Form 2567.

of the cover letter and Form CMS-2567 it intends to offer.

**D.     Holmes's Renewed Motion to Exclude Certain Doctor Testimony (Dkt. No. 899)**

Next, Holmes renews her motion to exclude certain doctor testimony.  Holmes's Renewed Mot. to Exclude Certain Doctor Testimony ("899 Mot."), Dkt. No. 899.  Previously, Holmes sought to exclude expert testimony from nine medical professionals whose patients received allegedly inaccurate Theranos tests results during the period of the charged conspiracy.  *See* Holmes's Mot. in Limine to Exclude Expert Opinion Testimony of Fact/Percipient Witnesses Under Rules 401-403 and 702, Dkt. No. 561.  Holmes argued in part that for a number of these doctors, the Government had failed to disclose the test results and customers on which their opinions would be based.  *Id.* at 10–12.  In its ruling on Holmes's motion, the Court "agree[d] with Holmes that the disclosures [were] lacking in information necessary for her to adequately prepare for trial," but, based on the Government's representation that it would provide an updated disclosure, denied the motion to exclude "without prejudice, subject to renewal should the Government fail to provide updated disclosures in advance of trial."  MIL Order at 55–56.

Following the Court's ruling, Holmes met and conferred with the Government regarding a due date for updated disclosures.  The parties agreed that the Government would "provide an amended set of disclosures for all physician witnesses" by July 30, 2021.  Decl. of Amy Saharia in Supp. of Holmes's Renewed Mot. to Exclude Expert Testimony, Dkt. No. 900, Ex. B at 1.  On July 30, 2021, the Government provided its amended disclosure.  *See id.*, Ex. D.  The disclosure identified the seven physicians who would testify as well as the number of customers and which assays the physicians would discuss.  *Id.*, Ex. D at 2–10.  Additionally, the Government stated that its July 30, 2021 disclosure "supersedes" its prior disclosures.  *Id.*, Ex. D at 1.

Still, Holmes now asks the Court for an order excluding any doctor testimony not disclosed in the Government's July 30, 2021 amended disclosure.  The Court, however, afforded Holmes the opportunity to renew her motion to exclude expert testimony of physician witnesses if the Government failed to provide updated disclosures in advance of trial.  Given the Government's

July 30, 2021 amended disclosure, the Court sees no reason to depart from its previous MIL Order and finds that a further order is unnecessary at this time.

Accordingly, the Court DENIES Holmes's renewed motion to exclude certain doctor testimony.

**IT IS SO ORDERED.**

Dated:  August 30, 2021

EDWARD J. DAVILA
United States District Judge

# Exhibit D

D5403

<u>Finding #2</u>

**D5403 – July 7 Letter Statement 1. Finding #2.** *The laboratory failed to submit documentation of any quality control (QC) procedure prior to May 15, 2014. Rather, the laboratory's submission includes an attestation (Ex. FF, Tab 13) from an employee who, based on documentation and interview at the time of the onsite survey, only performed dilutions on the TECAN, but did not perform quality control or patient testing. Both the attestation and the laboratory's written submission state what the employee recalls as to the laboratory's QC procedure. Again, however, the laboratory did not provide any documented evidence that a QC procedure existed or was in use prior to May 15, 2014. We also note that the attestation states that the employee's duties included running QC, which is contrary to the information given to the surveyor at the time of the onsite survey, but did not indicate if he/she had responsibility for evaluating QC prior to releasing patient test results.*

> Comment [MC1]: Q1

> Comment [MC2]: Q2

> Comment [MC3]: The testing dates and for the assay are before

> Comment [MC4]: Q#

*The second submission states the following in Ex.AA, Tab 3:*

> *Upon review of that response, including the entirety of the prior analysis of TPS [Theranos Propriety System] 3.5 QC data and patient test results distribution for all analytes during the time period examined, the laboratory made note of poor QC performance throughout. Therefore, the laboratory conducted an expanded retrospective analysis for 2014 and 2015.*

THPFM0004005199

This data is presented in Ex. FF, Tabs 1-12. The laboratory noted multiple and recurrent time periods (across all analytes tested) of abrupt shifts in QC target means, high rates of 1-2s QC rule failures, and QC CV's [Coefficients of Variation] far exceeding limits for a stable testing process. (See Investigation section)

Although the magnitude of QC deviations from target means does not necessarily reflect the exact nature and magnitude of bias on patient results because of differences in matrices, the QC failures identified by this comprehensive retrospective analysis reflect a global and long-term failure of the quality control program for this instrument, as well as failures of related quality assurance procedures that should have alerted the laboratory to correct such an unstable process. Therefore, the laboratory has concluded that there is a possible patient impact for every test reported from the laboratory's TPS 3.5 instruments. (See Patient Impact section)

The fraction of patient results truly impacted, and the nature and magnitude of any effect, are unknown. Out of an abundance of caution, the laboratory has voided all patient test results reported from the TPS 3.5 instruments. Many corrected reports have been transmitted. (See Corrective Action section)

**Theranos Response to Statement 1, Finding #2 in D5403.**
**The laboratory fully agrees with criticisms of the previously-submitted employee attestation to QC procedures prior to May 14, 2014. Not only does the attestation conflict with data gathered by surveyors, an attestation certainly does not constitute proper or formal documentation of a QC SOP. Upon further investigation, the laboratory has located a QC procedure prior to May 14, 2015 Ex XXX, which would have been applicable to TPS 3.5 testing. However, upon review of TPS 3.5 QC data (see analysis below), from start of testing October 11, 2013 through May 14, 2014, we find no evidence of this SOP being enacted for TPS 3.5 instrument. Therefore, we conclude that no formal QC SOP was implemented in practice by the laboratory for the TPS 3.5 instruments from October 11, 2013 through May 14, 2014.**

**D5403 - July 7 Letter Statement 2. Finding #2.** *Review of documents in Ex. FF, Tabs 1-12 revealed that only QC data was submitted. There was no documentation in Ex. FF, Tabs 1-12 related to a "comprehensive retrospective review." In addition, there was no documentation submitted related to "multiple and recurrent time periods (across all analytes tested) of abrupt shifts in QC target means, high rates of 1-2s QC rule failures, and QC CV's far exceeding limits for a stable testing process" that the laboratory noted. We also note that no documentation was submitted in Ex. AA, Tab 3 or Ex. FF, Tabs 1-12 that indicated what the investigation into QC issues found as the root cause for the QC failures.*

| Comment [MC5]: #1 |
| Comment [MC6]: #2 |

*Based on the laboratory's submission at Ex. AA, Tab 3, the expanded retrospective analysis*

THPFM0004005200

*for 2014 and 2015 centered on QC issues, but failed to include 2013 in the expanded analysis. Four tests (Vitamin D, TSH, Free T4, and Total PSA) were put into use for patient testing in 2013. It is unclear why the 2013 QC data was not included, especially since the laboratory concluded that "there is a possible patient for every test reported from the laboratory's TPS 3.5 instruments." We also note that the QC data submitted for the above four tests did not begin until various dates in March 2014. We are unclear as to whether QC was performed from November 2013 through various dates in March 2014.*

Comment [MC7]: #3

Comment [MC8]: #4

Comment [MC9]: Dr DAS

**Theranos Response to Statement 2, Finding #2 in D5403.**
**The laboratory agrees fully with the above criticisms and certainly failed to provide supporting documentation for its claims.  It is correct that clinical testing on TPS 3.5 instruments began in 2013.  In fact, clinical testing for Vitamin D (vitD), Thyroid Stimulating Hormone (TSH), Free Thyroxine (fT4), and Total Prostate Specific Antigen (tPSA) on the TPS 3.5 started in October, 2013 (10/11/2013 for vitD, 10/17/2013 for TSH, 10/22/2013 for fT4, and 10/25/2013 for tPSA).  In review of this discrepancy noted by CMS, it was uncovered that the laboratory limited its review to 2014-2015, citing the scope of the current CMS audit versus previous. However, the laboratory failed to recognize that proper investigation of patients affected or having the potential to be affected by a deficient practice has no such limitations on scope.   Therefore a proper investigation of deficiencies related to TPS 3.5 clinical testing should have included 2013, as noted by CMS.  In addition, the laboratory failed to include any documentation of its analysis of 2014-2015 TPS 3.5 QC data previously submitted, in addition to failing to provide or analyze the 2013 data.  The 2013 data has now been included and analyzed alongside the 2014-2015 data (Ex. XX). This updated analysis includes retrospective evaluation of QC data according to SOP's that should have been implemented during the respective time periods (Ex. XX, QC SOP 00013 for October 2013 through May 14, 2014; and Ex. XX QC SOP 15026 and related TPS assay-specific SOPs for May 14, 2014 through June 25, 2015, the result upload date for the final "live" TPS 3.5 assay: i.e., PSA).  As the surveyors noted, when QC rules were applied (1-2s trigger, followed by 1-3s, 2-2s, R-4s, 4-1s, and 10x as necessary, prior to May 14, 2014; and 1-2s and 10x rules from May 14, 2014 onward), the findings indicated an unexpectedly high QC failure rate of 20.8% overall (15.7% overall were 1-2s rule violations) for all QC's performed across all time periods for all 12 analytes assayed on the TPS 3.5 (Ex. XX). Overall QC failure rates varied by assay from 14.7 to 33.3% (11.1 to 22% for 1-2s violations, Ex. XX). Although it is obvious by visual discrimination that such rates are inconsistent with adequate analytical performance, the laboratory has supported this assertion by analyzing observed versus expected 1-2s QC failure rates via Chi-squared statistical analysis (Ex. XX).  As expected, this analysis returned very large Chi-squared values, 5678 for 1-2s failures overall, and varied from 67 to 1636 depending on the assay.  Each of those values equated to P values less than 0.0001 (any value <0.05 would be alarming), meaning there is less than a 0.01% chance that such large discrepancies would be observed between the expected and observed QC failure rates of the**

TPS 3.5. With such obviously poor quality control metrics, the laboratory initiated a root cause analysis. First, the analytical performance of the methods was examined by using the available method validation data sets (Ex. XX). These findings were then corroborated using the available "live" testing data, in the form of patient test result distributions (Ex. XX) and proficiency testing results (Ex. XX).

Analysis of the validation data for the TPS 3.5 assays revealed that all 12 demonstrated analytical performance characteristics were unsuitable for clinical purposes (Ex. XX, with summary attached). It is immediately apparent that the bias and imprecision of these assays could not support quality clinical testing results. When the laboratory performed the method validations, it referenced very lenient total allowable error (TEa) criteria, often citing proficiency testing acceptance criteria which are liberal enough to allow assessment of specific methods operating in many different laboratories under many different conditions and operators, which result in large ranges in analytical performance. Nonetheless, these TEa criteria were used to judge the analytical performance of the 12 TPS 3.5 methods by calculating sigma metrics at each level evaluated. The average sigma metric calculated across all levels of all 12 methods was 1.00, ranging from -0.84 (negative due to hCG mean bias exceeding TEa for 2 levels) to 3.5. We note that using a very lenient sigma metric cut-off of 1.65 allows 5% of test results to exceed the TEa. Assuming stable method performance, 86.1% (31/36) of calculated sigma metrics failed to meet these criteria, with 0 out of 12 methods meeting criteria at all 3 levels. Not being able to meet such lenient analytical performance criteria, while also assuming continued stable method performance, is certainly unacceptable for clinical assays. The attached summary document (Ex. XX) details other gross and notable failures in all 12 method validations. It was also discovered that only a fraction of the total number of TPS instruments employed clinically had documented method validations. Based on a comparison of instrument identifiers for those that were used clinically for each method versus the number of identifiers of those validated for each method, it appears that only a maximum of 12 of 249 (4.8%) instruments used for clinical purposes were fully validated (Ex. XX). In addition, although TPS instruments were calibrated versus predicate devices, if bias between TPS instruments for any given method was investigated, as required by CLIA (cite rule for q6 month method comparison for same analyte multiple methods, same analyte multiple instruments/same method), no documentation was made of these studies.

To assess the impact of inadequate TPS 3.5 performance, including the impact of those instruments whose analytical performance was not documented properly by method validations, patient test result distributions were examined from all 12 TPS 3.5 methods. Calculations of the observed test result distribution means and SDs were made for each month of testing, for each analyte. Standard errors of those observed means were calculated (referencing the number of patients tested per month) to obtain a gross estimate of the 95% confidence interval of those means. These observed intervals were

Confidential

compared to the respective expected patient test result means (calculated from >1000 patients, per mean), generated from predicate devices operating in Theranos Arizona clinical laboratory during the same time period, to best approximate the reference population distribution.   Under these circumstances, because 95% intervals were calculated, it is highly unlikely that an expected result mean would lie outside the observed TPS 3.5 interval by chance, whereas it would be very likely that finding represents gross bias affecting the TPS 3.5 for the respective time intervals.   Note that only gross, long-term biases are likely to be detected by this analysis since a large (95%) interval is used for comparison to expected results, and the data is compiled into monthly intervals.   Nonetheless, the analysis revealed that 58% (ranging from 35 to 88%, per assay, Ex. XX) of monthly intervals across all 12 assays demonstrate such evidence of gross bias.  Of those, 63% (ranging from 0 to 100%, per assay) of monthly interval biases identified correlated with the direction (i.e., negative vs. positive) of mean biases detected during the respective method validations, which further supports validity of the mean analytical biases detected via method comparison studies.   However, the lack of 100% correlation in this case suggests additional presence of gross preanalytical biases and/or method instability.   Further controlled studies would be necessary to investigate these possibilities; however, from this crude initial evaluation it is certain that significant gross biases affected patient testing across the majority of monthly testing periods for all 12 analytes tested on the TPS 3.5.

The last set of analytical performance data evaluated was the Alternative Assessment Procedures (AAP) for the TPS 3.5.  If implemented properly, such quality assessments, whether external or alternative, can detect changes in method performance at prescribed points in time, when present.  Unfortunately, in the case of the TPS 3.5, the AAP program was not implemented or monitored in a manner conducive to prompt error detection, investigation, and correction.  A total of 18 assessments were performed from August 2014 through March 2015, covering all 12 analytes tested on these instruments (Ex XX, including summary Excel sheet).  Of the 18 surveys, 12 (67%) were performed in a timely manner (on the q6 month schedule).  Since no limits had been set by the laboratory for timeliness, we have chosen one month to represent a reasonable time limit, since all assessments are performed and analyzed within Theranos Laboratories.  Notably, 0 of the 18 surveys were actually evaluated within these time limits: data analysis was delayed until August 2015 (signed by the then-current Laboratory Director on 9/19/2015) for some surveys and November 2015 (signed by the then-current Laboratory Director on 11/15/2015) for others.  This delay in analysis would not have allowed timely identification of method error, if present.  When examining the survey analyses, it was also noted that acceptance criteria were uniformly set at ± 20% TEa, citing CLIA criteria; however, these criteria were found to be true for only one analyte (Total T4).  For the remaining 11 analytes, we applied TEa acceptance criteria quoted from the respective method validations, which allowed more consistent evaluation of these methods in this review.  Also of note, the range of analyte examined via AAP for these 12 methods was very limited for 10 of the methods, but acceptable for the remaining 2 (fT4 and Testosterone).  Limiting the analyte ranges tested even further hinders error detection via AAP because error modes

Confidential

THPFM0004005203

affecting only certain intervals of the AMR may not be detected.  In fact, the initial AAP SOP (Ex. XX, CL SOP-0020 Rev A) required testing of specimens across the AMR (with contrived specimens, as necessary) per 12-month AAP cycle; however, this requirement was eliminated in both subsequent revisions (CL SOP-0020 Rev B and C, Ex. XX) for unknown reasons.  Regardless, while acknowledging these limitations, a retrospective grading of all 18 surveys yielded passing grades for 17 of 18, with only the Testosterone survey failing 3 of 5 specimens (acceptance criteria allow one specimen failure out of 5, or 20%, see Ex. XX for SOP's).  Since the criteria applied by the laboratory at the time of analysis deemed this a passing event, no investigation was performed or documented; however, these results clearly violate the required analytical method performance metrics as set forth in the validation study (See Ex. XX).  This method continued in clinical use from the date of this failed survey on 10/20/2014 through the last recorded result upload date of 3/10/2015, presumably operating at increased risk of error.

After root cause analysis of QC failures on the TPS 3.5 identified that the analytical performance was unsuitable for clinical use, including inadequate method validation metrics for all 12 methods and further substantiated by biases in patient testing results across the majority of testing periods for all methods, all results reported by these methods were voided.  Note that the voided results were updated to include those reported in 2013 (vitamin D, TSH, fT4, and PSA), which were inadvertently not included in the initial analysis.  Voided reports and receipt confirmations are available in Ex. XX.  It is evident that the laboratory failed to properly execute and analyze method evaluations and validations for the TPS 3.5.  Even a cursory evaluation of accuracy and precision should have noted unsatisfactory metrics and prompted remedial action by the research and development team.  It appears the laboratory lacked the proper procedures and oversight to execute these critical studies.  To avoid such issues with LDT's in the future, the organization has determined to pursue the more prudent route of developing these technologies through the FDA QSR framework, ultimately targeting LDT offerings in the clinical laboratory under FDA regulation and, eventually, IVD's through 510k/PMA routes [need clarity here, vs. revising method validation SOPs and checklists].  In addition to the failure to properly vet and establish analytical performance characteristics of LDT's prior to launch, the laboratory lacked the trained and licensed testing personnel and laboratory director oversight to perform these necessary quality control and quality assessment procedures.  This is underscored by satisfactory QC SOP's with completely unsatisfactory QC performance and corrective actions.  However, quality assessment procedures did not appear to be instituted effectively, evidenced by lack of patient test result documentation and monitoring over time and an inadequate AAP.  QC and QA systems have been revised and updated, including monthly QC and QMPI meetings (Ex. XX).  [This entire last paragraph is likely addressed by Bryan's document + other Dtag write-ups]

D5403 - July 7 Letter Statement 3.  Finding #2.  *Based on documentation supplied by the laboratory at the time of the survey, the TPS was not used for patient testing after June 25, 2015.  However, the laboratory's submission states that the TPS 3.5 was "fully retired in early-August 2015." Patient testing was "retired" later than when the laboratory previously indicated. We note that no explanation was submitted regarding the*

Comment [MC10]: #2

Confidential

THPFM0004005204

*disparity between the end dates provided at the time of the survey and the portion of the second submission dated April 1, 2016.*

| Comment [MC11]: #2 |
|---|

**Theranos Response to Statement 3, Finding #2 in D5403.**

| Comment [MC12]: |
|---|

**The laboratory has reviewed the history of clinical test results from the 12 TPS 3.5 assays, which confirms the initial information provided to surveyors. The final result upload from the last assay being performed clinically on the TPS 3.5 (PSA) was dated 6/25/2015. No clinical results were released from TPS 3.5 instruments after this date, therefore the mention of "early-August 2015" either references non-clinical activity on the TPS 3.5 or was referenced erroneously.**

Confidential

THPFM0004005205

# Exhibit C

## MEMORANDUM OF INTERVIEW

| | | |
|---|---|---|
| CASE NUMBER | : | 2204323-MF |
| PERSON INTERVIEWED | : | Dr. Kingshuk Das |
| PLACE OF INTERVIEW | : | Videoconference Call |
| DATE OF INTERVIEW | : | June 7, 2021 |
| TIME OF INTERVIEW | : | 7:00 P.M. (Eastern) |

On June 7, 2021, Dr. Kingshuk Das (DAS) was interviewed by videoconference call regarding his knowledge of Theranos. Assistant United States Attorneys Robert Leach and John Bostic, and Food and Drug Administration-Office of Criminal Investigation Special Agent George Scavdis were present for the interview. Prior to the start of the interview, DAS was instructed to be mindful of any communications he had with attorneys which may be privileged. The following is a summary of the statements made during the interview.

DAS believed quality control (QC) data should have been sent by Theranos employees other than himself to CMS [Centers for Medicare and Medicaid Services] to respond to the Form 2567. Based on his experience, this data would have included summaries and all QC charts relevant to the identified deficiencies. This information resided in Theranos' LIS [Laboratory Information System] database and would have been requested through Daniel Young (YOUNG), Tina Lin (LIN), or Max Fosque.

DAS reviewed document CMS-009171 to CMS-009274. Page two of the document was titled "PATIENT IMPACT ASSESSMENT" and DAS recognized the general format as a part of a document that would have been sent to CMS. He said this was a standard format for this type of document, and he would have given high-level supervision to the creation of this type of document. DAS believed this specific patient impact assessment was sent as part of Theranos' first response to CMS. At the time, DAS was working part time at UCLA while simultaneously working for Theranos. He may have seen some documents like this, but DAS did not believe that he nor his associates Lisa Helfend or Donald Tschirhart (TSCHIRHART) drafted this particular patient impact assessment. The patient impact assessments he believed they drafted were formatted slightly differently.

On page two of the same document, under the subheading of "Accuracy/Trueness/Comparability," DAS identified "CL-RPT-14077" as a cited assay validation document. An $R^2$ value is an accuracy plot of a Theranos assay versus an assay from another source. An $R^2$ of 1.0 is perfect and an $R^2$ of at least 0.9 is preferred and would be seen of assays used in most clinical laboratories. Theranos' $R^2$ for this particular sodium assay, 0.58, was "poor."

DAS said it was sometimes difficult to get data, because his requests had to go through multiple layers of people to be fulfilled.

DAS stated it was necessary for him to invalidate all TSPU assay results because the assays themselves were unacceptable for clinical testing, even gauged against what he described as the

Page 1 of 4

US-REPORTS-0026721

"lowest bar." The data he used to draw this conclusion was documented in "D-tag" files he and TSCHIRHART shared with each other by email. DAS did not believe any of the data that supported his conclusion went to CMS. This information was included in Theranos' draft third response which was not sent. DAS and TSCHIRHART told Elizabeth Holmes (HOLMES) Theranos' first response to CMS was not reflective of the true work Theranos had conducted.

Typically, laboratory directors and other lab staff are the people who engaged with regulators. This was not the case at Theranos.

DAS said HOLMES freed them to do the work they felt was required to respond to CMS. He and his team audited all documents, a task the CMS inspectors simply did not have the time to do, and concluded regulators were "100%" correct with their deficiency findings. The first two responses to CMS from Theranos did not convey the depth and breadth of issues DAS identified.

On page two of the same documents, DAS reviewed the sodium assay precision validation levels and said they were unusual. These sodium levels were so low, they were not relevant to clinical testing. A normal, healthy adult would have had sodium levels of 135 to 145 mM, or possibly higher or lower if they were ill. DAS said he would need to review the specific validation document to draw any further conclusions about the assay's precision.

DAS reviewed page eleven of the same document and defined the following:

- "Level"-The levels 1, 2, and 3 most likely referred to low, medium and high and were standard for chemistry assays.
- "Lot"-A QC based identifier, most likely sourced from BioRad. DAS did not know what "pre" nor what "post" [see page eighteen] meant. He said it was possible this could have described some sort of dilution of the QC material, but the typical Theranos nomenclature for dilution was "_P," and a lack of that tag indicated to him the sample was not diluted. Page two of the document stated, "Theranos Method of Siemens Advia 1800" and DAS said this could have been another nomenclature method to indicate dilution.
- "Start" and "end" referred to the start and end dates of the QC data.
- "Target mean" and "target SD" were typically used to identify the values of the mean and standard deviation from the in-house assay. However, the inclusion of "calc mean" and "calc SD" led DAS to believe the target values were sourced from BioRad.

TSPU assays was a term interchangeable with Edison immunoassays.

DAS reviewed document THPFM0005602170 to THPFM000562655 and identified it as QC data for a specific Edison device. All Edison/TSPU devices had an "E" number, and there were hundreds of these devices. The QC data was indicative of Edison devices; it was bad and caused by poor performance.

DAS reviewed document SEC2-USAO-EPROD-000790659 to SEC2-USAO-EPROD-000790750 and identified it as an assay-by-assay report for the TSPU. "CL-PLN-14002" was a validation document and DAS said he and whomever authored the document greatly disagreed in their conclusions. For example, there are numerous tables throughout the document with column heading "Is Bias within Acceptable Limits?". The author answered "yes," but the data is unacceptable for clinical purposes, and DAS would have answered "no." DAS explained the general theory of sigma metrics and said they were typically used by clinical chemists. Excellent assays score sigma metrics of 5.0, good assays score a sigma metric of 4.0, and marginal assays

US-REPORTS-0026722

score a sigma metric of 3.0.  DAS had calculated the sigma metric for thirteen TSPU assays and said almost all did not score better that 1.65, which was already an unacceptably low bar.

Sigma values were calculated as such:  The absolute value of the mean bias was divided by the concentration.  The returned value was then subtracted from the total allowable error and then divided by the precision CV.  The result was the sigma value.  DAS used the table values for the Vitamin B12 assay on page three of the document and calculated a sigma of approximately 1.42.  DAS said the total allowable error of 30% for the Vitamin B12 assay is "pretty large," even after having accounted for the fact that immunoassays typically have larger error margins.  Higher sigma values are better, and those calculated for the TSPU assays meant the devices had no room for any error.  Most lab directors would not have used the devices.

DAS did not prepare patient impact assessments and did not remember having any communication with HOLMES about the documents.  Around the time of Theranos' second response to CMS, a meeting was held where he had a conversation with HOLMES about the sigma metrics he had calculated and why the patient results from those assays needed to be invalidated.  DAS said he believed the sigma metric, which was calculated using the assay validation documents, was the easiest way to convey his message.  The same conclusions could have also been drawn from the Edison QC data, but DAS said the QC data was never good.

DAS told HOLMES he did not think Theranos' second response to CMS was valid.

DAS said assay validation was akin to "having to jump through all of the hoops."  The assay calculations were not done correctly, and the assays themselves did not meet Theranos' own acceptance criteria, and were not performing to specification.

Page three of document SEC2-USAO-EPROD-000790659 stated, "Note the total allowable error (35%) was based on CLIA proficiency testing criteria for acceptable analytical performance, as printed in the Federal Register…"  DAS said CLIA [Clinical Laboratory Improvement Amendments] set proficiency testing boundaries for all clinical labs, and a total allowable error of 35% was a "ridiculously low bar."  It was inappropriate for Theranos to use this CLIA regulation for an individual clinical lab.

Page six of the same document discussed reference ranges which were intervals of values normally returned for an assay.  Theranos incorrectly adopted CLSI guidelines for their TSPU assays.  DAS said to adopt the reference ranges from another specific assay, the TSPU assays would have needed the same preanalytical criteria, such as patient population, storage, transportation, and storage temperature, as well as the same analytic performance and methods.  The TSPU did not do this.

LIN resigned from Theranos shortly after she returned from personal leave.  DAS did not know the exact reason why LIN resigned.

DAS said he would further review documents the government had provided to him for his impressions.

During the interview, we took a break from 7:47 P.M. to 7:50 P.M.

The interview ended at 8:07 P.M.

Page 3 of 4

US-REPORTS-0026723

*Christopher McCollow*

Christopher McCollow                                June 9, 2021
                                                  _____
U.S. Postal Inspector                                      Date

Attachments:

- CMS-009171 to CMS-009274
- THPFM0005602170 to THPFM000562655
- SEC2-USAO-EPROD-000790659 to SEC2-USAO-EPROD-000790750

US-REPORTS-0026724

# Exhibit B

## MEMORANDUM OF INTERVIEW

| | | |
|---|---|---|
| CASE NUMBER | : | 2204323-MF |
| PERSON INTERVIEWED | : | Dr. Kingshuk Das |
| PLACE OF INTERVIEW | : | Videoconference Call |
| DATE OF INTERVIEW | : | February 1, 2021 |
| TIME OF INTERVIEW | : | 3:35 P.M. |

On February 1, 2021, Dr. Kingshuk Das (DAS) was interviewed by videoconference call regarding his knowledge of and employment with Theranos. Assistant United States Attorney Robert Leach, Food and Drug Administration-Office of Criminal Investigation Special Agent George Scavdis, and I participated in the interview. DAS was instructed during the interview that he should not reveal any communications he had with attorneys as they may be protected by attorney/client privilege. The following is a summary of the statements made during the interview.

DAS works remotely for Invitae and currently resides in Minnesota. He worked at UCLA before his employment with Theranos.

DAS first learned about Theranos from a job advertisement. He applied for the position of laboratory director and was interviewed by Elizabeth Holmes (HOLMES), Sunny Balwani (BALWANI), Daniel Young, (YOUNG), and possibly one other person. During the interview, DAS learned the position would be as lab director for Theranos' Newark facility. He was told to anticipate "a few weeks of paperwork," which he later learned was responding to the CMS Form 2567. HOLMES and BALWANI told to DAS CMS had conducted an audit, and that a few irregularities had been identified, but specifics were not discussed. DAS described the interview overall as pleasant, and HOLMES and BALWANI as charismatic. DAS started with Theranos as a contractor in December 2015, and commuted one day per week to the San Francisco Bay Area while continuing to work at UCLA. DAS became a full time Theranos employee in March 2016 and was employed with Theranos until he was laid off in June 2018. DAS worked for Theranos, and was paid a yearly salary by Theranos.

Theranos had a full legal team in place, and DAS interacted with that team often. This was unusual for him.

Theranos' lab as well equipped, and the staff was good but "needed seasoning." Some of the laboratory staff included Gurbir Sidhu, Hoda Alamdar, and Calvin Leung. Theranos' microbiology lab was in operation when DAS started at Theranos, and he believed the Arizona lab was fully operational. Theranos' proprietary testing had been shut down and DAS did not think any Edison or modified devices were operational. Edison devices were never used in the CLIA laboratory during DAS' tenure at Theranos. Some clinical samples were sent to either ARUP or Mayo for processing.

DAS identified Tina Lin as the person most familiar with the Edison data, and YOUNG as having the most knowledge of the Edison device overall. YOUNG, Chinmay Pangarkar

US-REPORTS-0024149

(PANGARKAR), and "Shelia" prepared a high-level PowerPoint document which analyzed Edison test accuracy and precision. This document was presented as part of the CMS audit investigation. DAS received a copy of this document and reviewed it. DAS conducted a Six Sigma analysis of the Edison data and concluded the Edison devices did not perform well, and the accuracy and precision did not meet the level needed for clinical testing. He said that even using a fairly low bar, none of the Edison tests passed an acceptable level. DAS thought YOUNG and PANGARKAR believed the Edison analysis demonstrated the device performed adequately.

DAS' Six Sigma analysis led to an uncomfortable meeting setup by Boies Shiller Flexner (BSF) attorneys with HOLMES, BALWANI, and YOUNG. He believed this meeting took place sometime after the first response to the CMS 2567, but before the second response. DAS presented at this meeting, which took place in the conference rooms where BSF was setup.

DAS said HOLMES was always with the BSF lawyers.

DAS concluded the Edison devices never performed at the level of accuracy and precision required, and could not have generated any results which had clinical value. DAS said there was some push back, but this conclusion was based on Six Sigma metrics. Theranos management suggested this was not a device issue, but rather a quality systems issue. DAS disagreed with that assessment and decided to void all Edison tests. DAS said it was his obligation as the director of record to conduct a patient impact assessment to determine if any harm came from a laboratory error.

PT/INR results were also voided because the assay, which used a BCS-XP device, was run improperly. The calculations associated with the test were done incorrectly, and quality control was poor. DAS said there was no way to salvage any of the test results. DAS believed he documented his work at this information should be contained in the contents of his Theranos computer hard drive. He also communicated these results to counsel, and to Brian Lipszin (LIPSZIN), a contractor who helped craft Theranos' final response to CMS. DAS did not know who hired LIPSZIN.

Theranos did not provide much Edison accuracy or precision data to CMS when responding to the Form 2567, and instead focused on laboratory remediation instead of directly responding to the issues. DAS said it was not his responsibility to consider business implications.

DAS knew Sunil Dhawan, [Adam] Rosendorff, and [Arnold] Gelb were former Theranos laboratory directors. He never spoke to them.

DAS had private meeting with HOLMES he described as general meetings where they would check-in with each other. DAS mentioned his finding to HOLMES, and said these conversations did not go well. HOLMES was not a laboratorian, and he needed to discuss certain topics at her level. He specifically remembered telling HOLMES that approximately one dozen female patients had PSA [prostate-specific antigen] results reported. He said HOLMES seemed perplexed by the issue, and to prove her point, identified an abstract which said females could have PSA in their blood. DAS said that while it was in the realm of possibility that a woman could have PSA in her blood, it was unlikely that twelve women had a reportable result.

There was an effort to rebuild the Theranos CLIA lab by bringing up one test at a time. DAS believed the first test they worked on was the CBC [complete blood count] run on an Advia 2120

US-REPORTS-0024150

with blood drawn by venipuncture.  DAS did not think this process concluded due to the settlement with CMS.

After the CLIA lab closed, DAS continued his internal investigations until those were shut down by Theranos' general counsel in late 2017 or early 2018.  DAS said addressing the deficiencies identified in the CMS 2567 was just the "tip of the iceberg," and his investigations continued to "follow the thread" into other areas.  DAS believed he finished his investigation of Theranos' proprietary testing by the time he was shut down.  DAS provided periodic updates to David Taylor, and WilmerHale attorneys Mugmon and Davies.

During his last six months, DAS worked on a non-clinical Zika assay that was going to be submitted to the U.S. Food and Drug Administration (FDA).

DAS did not work on the minilab device, but saw some data that was going to be used for HOLMES' AACC [American Association for Clinical Chemistry] presentation.  He and Phoenix lab director Don Tschirhart (TSCHIRHART) were initially going to attend the AACC conference and participate in a roundtable discussion, but were politely uninvited by Daniel Edlin.  DAS was told they were not needed and their spots would be used for someone else.

DAS believed he only had two direct interactions with BALWANI before he left Theranos because his mother fell ill.  DAS heard gossip about BALWANI's role in the company similar to what was published in John Carreyrou's (CARREYROU) book and in other new articles.

DAS has not been deposed in relation to any Theranos litigation.  He provided Zika information on the condition of anonymity to CARREYROU for an upcoming podcast.  He did not speak with any other journalists.

DAS reviewed document THER-0534700 to THER-0534792 and said that he drafted, reviewed, and signed the document.  Most of the content, however, was the work of Theranos attorneys.  He did not know what role HOLMES played in drafting this document, but would have been surprised if she had not reviewed it.  Most of his CMS interactions were with local inspector Gary Yamamoto (YAMAMOTO) with whom he exchanged periodic emails regarding sending data.  DAS, HOLMES, TSCHIRHART, and Heather King attended a meeting in Washington, D.C. at CMS with Karen Fuller's supervisor.  YAMAMOTO and Sarah Bennett attended by telephone.

DAS' Edison review data was stored on Theranos' share drives and labelled with D-tag numbers corresponding to the CMS 2567.  There were also LIS [laboratory information system] data dumps on his computer.

The interview ended at 4:35 P.M.

*Christopher McCollow*

Christopher McCollow

U.S. Postal Inspector

February 15, 2021
_____
Date

Attachments:

- THER-0534700 to THER-0534792

Page 3 of 3

US-REPORTS-0024151

# Exhibit A

| | |
|---|---|
| **From:** | Leach, Robert (USACAN) <Robert.Leach@usdoj.gov> |
| **Sent:** | Thursday, July 29, 2021 9:28 PM |
| **To:** | Downey, Kevin; Wade, Lance; Saharia, Amy; Trefz, Katherine |
| **Cc:** | Schenk, Jeffrey (USACAN); Bostic, John (USACAN); Volkar, Kelly (USACAN) |
| **Subject:** | US v. Holmes:  Supplemental Disclosure |

Dear Counsel,

We write to advise you that, In response to the Court's ruling on the motions in limine, we are amending our witness list to add Justin Offen, Dave Rogers, and a custodian of records from PricewaterhouseCoopers, LLP.

Further, although we submit it is not necessary, we are supplementing our Rule 16(a)(1)(G) disclosure to advise you the government intends to offer testimony from Dr. Kingsuk Das.  A summary of his anticipated testimony is set forth in the memoranda of interview that have previously been produced to you.  The bases for his opinions, to the extent they constitute expert opinion testimony, are set forth in those memoranda of interview, THPFM00004005199, and the list of documents at ECF 842-1 pp.10-15.

Best regards,
Bob

*******************************
Robert S. Leach
Assistant United States Attorney
United States Attorney's Office,
  Northern District of California
1301 Clay Street, Suite 340S
Oakland, California 94612-5217
(510) 637-3918
(415) 793-2945 - Cell

1

**ER-2231**

JOHN D. CLINE (CA State Bar No. 237759)
50 California Street, Suite 1500
San Francisco, CA 94111
Telephone: (415) 662-2260 │Facsimile: (415) 662-2263
Email: cline@johndclinelaw.com

KEVIN M. DOWNEY (Admitted Pro Hac Vice)
LANCE A. WADE (Admitted Pro Hac Vice)
AMY MASON SAHARIA (Admitted Pro Hac Vice)
KATHERINE TREFZ (CA State Bar No. 262770)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC 20005
Telephone: (202) 434-5000 │Facsimile: (202) 434-5029
Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

Attorneys for Defendant ELIZABETH A. HOLMES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR-18-00258-EJD |
| Plaintiff, | **DECLARATION OF AMY MASON SAHARIA IN SUPPORT OF MS. HOLMES' MOTION TO STRIKE IMPROPER AND UNTIMELY EXPERT DISCLOSURE AND TO PRECLUDE EXPERT OPINION TESTIMONY OF DR. KINGSHUK DAS** |
| v. | |
| ELIZABETH HOLMES and RAMESH "SUNNY" BALWANI, | |
| Defendants. | Hon. Edward J. Davila |

I, AMY MASON SAHARIA, declare as follows:

1.      I represent Defendant Elizabeth Holmes and have been admitted to practice *pro hac vice* in the above-captioned matter.  I submit this declaration in support of Ms. Holmes' Motion to Strike Improper and Untimely Expert Disclosure and to Preclude Expert Opinion Testimony of Dr. Kingshuk

DECLARATION OF AMY MASON SAHARIA IN SUPPORT OF MS. HOLMES' MOTION TO STRIKE IMPROPER AND UNTIMELY EXPERT DISCLOSURE AND TO PRECLUDE EXPERT OPINION TESTIMONY OF DR. KINGSHUK DAS
CR-18-00258 EJD

1

1   Das ("Motion").  I attest to the following facts upon which the Motion relies.

2       2.      Attached to the Motion are four exhibits.  The content of the exhibits are as follows:

3           a.      Exhibit A is a true and correct copy of a July 29, 2021 email from Assistant

4   United States Attorney Robert Leach to defense counsel.

5           b.      Exhibit B is a true and correct copy of a February 1, 2021 FBI Form 302

6   summary of an interview of Dr. Kingshuk Das, Bates-stamped US-REPORTS-0024149.

7           c.      Exhibit C is a true and correct copy of June 7, 2021 FBI Form 302 summary of an

8   interview of Dr. Kingshuk Das, Bates-stamped US-REPORTS-0026721.

9           d.      Exhibit D is a true and correct copy of the document referenced in the

10  government's July 29, 2021 email (Ex. A), Bates-stamped THPFM0004005199.

11      I declare under penalty of perjury under the laws of the United States that the foregoing is true

12  and correct to the best of my knowledge.

13

14      Executed this 5th day of August, 2021 in Chevy Chase, MD.

15

16

17      AMY MASON SAHARIA
        Attorney for Elizabeth Holmes

18

19

20

21

22

23

24

25

26

27

28  DECLARATION OF AMY MASON SAHARIA IN SUPPORT OF MS. HOLMES' MOTION TO
    STRIKE IMPROPER AND UNTIMELY EXPERT DISCLOSURE AND TO PRECLUDE EXPERT
    OPINION TESTIMONY OF DR. KINGSHUK DAS
    CR-18-00258 EJD
                                    2

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 17, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Amy Mason Saharia*

AMY MASON SAHARIA

April 17, 2023