No. 22-10312

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ELIZABETH A. HOLMES

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 5:18-CR-00258
Hon. Edward J. Davila

---

## EXCERPTS OF RECORD
### VOL. IX of LVII | ER-2235 to ER-2534

---

JOHN D. CLINE
LAW OFFICE OF JOHN D. CLINE
 600 Stewart Street
 Suite 400
 Seattle, WA 98101
 (360) 320-6435

KEVIN M. DOWNEY
LANCE A. WADE
AMY MASON SAHARIA
KATHERINE A. TREFZ
WILLIAMS & CONNOLLY LLP
 680 Maine Ave. S.W.
 Washington, D.C. 200024
 (202) 434-5000
 asaharia@wc.com

JOHN D. CLINE (CA State Bar No. 237759)
50 California Street, Suite 1500
San Francisco, CA 94111
Telephone: (415) 662-2260 │ Facsimile: (415) 662-2263
Email: cline@johndclinelaw.com

KEVIN M. DOWNEY (Admitted Pro Hac Vice)
LANCE A. WADE (Admitted Pro Hac Vice)
AMY MASON SAHARIA (Admitted Pro Hac Vice)
KATHERINE TREFZ (CA State Bar No. 262770)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC 20005
Telephone: (202) 434-5000 │ Facsimile: (202) 434-5029
Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

Attorneys for Defendant ELIZABETH A. HOLMES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. CR-18-00258-EJD |
| Plaintiff, | ) |
| | ) **MS. HOLMES' MOTION TO STRIKE** |
| v. | ) **IMPROPER AND UNTIMELY EXPERT** |
| | ) **DISCLOSURE AND TO PRECLUDE EXPERT** |
| | ) **OPINION TESTIMONY OF DR. KINGSHUK** |
| ELIZABETH HOLMES and | ) **DAS** |
| RAMESH "SUNNY" BALWANI, | ) |
| | ) Date: August 20, 2021 |
| Defendants. | ) Time: 10:00 AM |
| | ) CTRM: 4, 5th Floor |
| | ) |
| | ) Hon. Edward J. Davila |
| | ) |

MS. HOLMES' MOTION TO STRIKE IMPROPER AND UNTIMELY EXPERT DISCLOSURE
AND TO PRECLUDE EXPERT OPINION TESTIMONY OF DR. KINGSHUK DAS
CR-18-00258-EJD

**<u>MS. HOLMES' MOTION TO STRIKE IMPROPER AND UNTIMELY EXPERT DISCLOSURE
AND TO PRECLUDE EXPERT OPINION TESTIMONY OF DR. KINGSHUK DAS</u>**

PLEASE TAKE NOTICE that on August 20 at 10:00 a.m., or on such other date and time as the Court may order, in Courtroom 4 of the above-captioned Court, 280 South 1st Street, San Jose, CA 95113, before the Honorable Edward J. Davila, Defendant Elizabeth Homes will and hereby does respectfully move the Court pursuant to Rule 16 of the Federal Rules of Criminal Procedure and Rule 702 of the Federal Rules of Evidence for an order striking the government's expert disclosure for Dr. Kingshuk Das and excluding any expert opinion testimony from the witness.  The Motion is based on the below Memorandum of Points and Authorities, the Declaration of Amy Saharia and accompanying exhibits, the record in this case, and any other matters that the Court deems appropriate.

DATED: August 5, 2021

<u>/s/ Amy Mason Saharia</u>
KEVIN DOWNEY
LANCE WADE
AMY MASON SAHARIA
KATHERINE TREFZ
Attorneys for Elizabeth Holmes

MS. HOLMES' MOTION TO STRIKE IMPROPER AND UNTIMELY EXPERT DISCLOSURE
AND TO PRECLUDE EXPERT OPINION TESTIMONY OF DR. KINGSHUK DAS
CR-18-00258-EJD                                        i

1

2                                 **TABLE OF CONTENTS**

3                                                                                              **Page**

4    MEMORANDUM OF POINTS AND AUTHORITIES ............................................................1

5    BACKGROUND ..............................................................................................................1

6    ARGUMENT ....................................................................................................................3

7    I.      The Court Should Strike the Government's "Supplemental Disclosure."......................3

8            A.      Dr. Das' Opinions Are Subject to Rule 702 and Rule 16. ................................3

9            B.      The Government's Disclosure Is Untimely and Insufficient. ............................4

10   II.     Dr. Das' Opinions Are Inadmissible under Rule 702. ....................................7

11   CONCLUSION..................................................................................................................9

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   MS. HOLMES' MOTION TO STRIKE IMPROPER AND UNTIMELY EXPERT DISCLOSURE
     AND TO PRECLUDE EXPERT OPINION TESTIMONY OF DR. KINGSHUK DAS
     CR-18-00258-EJD                              ii

**MEMORANDUM OF POINTS AND AUTHORITIES**

On July 29, 2021, nearly a year and a half past the Court-ordered expert disclosure deadline and one month before trial, the government disclosed for the first time its intent to call Dr. Kingshuk Das, a former Theranos lab director, as an expert in this case. It did so in a four-sentence email, entitled "Supplemental Disclosure." The email states that the government is "supplementing [its] Rule 16(a)(1)(G) disclosure" to include Dr. Das, and that his anticipated testimony as well as the "bases for his opinions" are set forth in two recently disclosed FBI interview memoranda and in the over 1000 pages of cited material in the supplemental expert report of Dr. Stephen Master.

The government's "Supplemental Disclosure" is untimely and insufficient. The purpose of Rule 16 is "to allow counsel to frame a *Daubert* motion (or other motion *in limine*) [and] to prepare for cross-examination," *United States v. Cerna*, 2010 WL 2347406, at *1 (N.D. Cal. June 8, 2010), as well as to "minimize surprise that often results from unexpected expert testimony, [to] reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." Fed. R. Crim. P. 16 advisory committee's note to 1993 amendment. If a contentless email on the eve of trial and over a year and a half after the disclosure deadline could satisfy Rule 16, that Rule would be meaningless. The Court should strike this untimely and insufficient disclosure and exclude any expert opinion testimony from Dr. Das.

**BACKGROUND**

The Court is generally familiar with the myriad issues concerning the government's Rule 16 disclosures. The following is an abridged summary relevant to this motion.

In November 2019, the Court ordered the government to "serve a summary under Rule 16" for its expert witnesses by March 6, 2020, which was then nearly five months before the scheduled August 4, 2020 trial date. ECF 171 (adopting schedule in Exhibit F to Status Report, ECF 170-6). The government served its Rule 16 disclosures on that date and, after the trial was continued to March 2021, served a supplement to those disclosures on September 28, 2020. *See* ECF 580-3 (Mar. 2020 Disclosure), 580-4 (Sept. 2020 Disclosure). The government's initial disclosure included hybrid fact/expert witnesses who worked at Theranos. *See* ECF 580-3 at 6-7. The supplemental disclosure

MS. HOLMES' MOTION TO STRIKE IMPROPER AND UNTIMELY EXPERT DISCLOSURE
AND TO PRECLUDE EXPERT OPINION TESTIMONY OF DR. KINGSHUK DAS
CR-18-00258-EJD                                          1

disclosed two new expert witnesses and significantly expanded the summary of the proposed expert testimony of Dr. Adam Rosendorff, a former Theranos lab director.  ECF 580-4.   The government did not identify Dr. Das in either of those disclosures.

Since the government's initial disclosure on March 6, 2020, Ms. Holmes had repeatedly requested that the government serve disclosures that complied with Rule 16.  *See, e.g.*, Ms. Holmes' Mot. To Exclude Expert Opinion Testimony of Fact/Percipient Witnesses, ECF 561, at 10-12 (detailing numerous requests for adequate disclosures).  These Rule 16 issues have been the subject of two motions and significant correspondence.  *Id.*

Despite the attention on this issue for over a year and a half, the government first disclosed Dr. Kingshuk Das as an expert on July 29, 2021—one month before trial.  It did so in a four-sentence "Supplemental Disclosure" email stating in full:

> Dear Counsel,
>
> We write to advise you that, [i]n response to the Court's ruling on the motions in limine, we are amending our witness list to add Justin Offen, Dave Rogers, and a custodian of records from PricewaterhouseCoopers, LLP.
>
> Further, although we submit it is not necessary, we are supplementing our Rule 16(a)(1)(G) disclosure to advise you the government intends to offer testimony from Dr. Kings[h]uk Das. A summary of his anticipated testimony is set forth in the memoranda of interview that have previously been produced to you. The bases for his opinions, to the extent they constitute expert opinion testimony, are set forth in those memoranda of interview, THPFM00004005199[1], and the list of documents at ECF 842-1 pp.10-15.
>
> Best regards,
>
> Bob

Ex. A.

The government did not newly discover Dr. Das' identity; it has known about him for years.  He was hired at Theranos in December 2015 as a contractor, working one day a week until March 2016 when he began working full time at the company as its lab director.  Ex. B at 1 (Feb. 2021 MOI).  Dr. Das left the company in 2018, and his employment at Theranos was a matter of public record.

---

[1] The government inadvertently included the wrong Bates number for this document in its email.  The correct number is THPFM0004005199.  Ex. D.

MS. HOLMES' MOTION TO STRIKE IMPROPER AND UNTIMELY EXPERT DISCLOSURE AND TO PRECLUDE EXPERT OPINION TESTIMONY OF DR. KINGSHUK DAS
CR-18-00258-EJD                                    2

1    It appears that the government first interviewed Dr. Das in February 2021 and then again in June

2    2021. *Id.*; Ex. C (Jun. 2021 MOI). In other words, the government first interviewed Dr. Das nearly a

3    year after its expert disclosure deadline and half a year after it told the Court in July 2020 that it was trial

4    ready. 7/20/2020 Hr'g Tr. 60:14-18. Although the government disclosed those interview memoranda to

5    Ms. Holmes in February and June 2021, it did not disclose until July 29 that it had any intent to elicit the

6    expert opinions contained in those interview memoranda. As far as Ms. Holmes knew, the government

7    intended to elicit relevant expert opinions only from its retained expert Dr. Master, as well as from two

8    other former Theranos laboratory directors, Drs. Rosendorff and Young, whom it disclosed as experts in

9    March 2020.

10                                                **ARGUMENT**

11   **I.    The Court Should Strike the Government's "Supplemental Disclosure."**

12          **A.    Dr. Das' Opinions Are Subject to Rule 702 and Rule 16.**

13          To the extent the government intends to elicit the full range of testimony contained in Dr. Das'

14   interview memoranda, that testimony undoubtedly includes expert opinions subject to Rules 16 and 702

15   because he offers opinions based on scientific expertise. That Dr. Das may also be a percipient witness

16   to factual events relevant to this case does not relieve the government of its obligations under these

17   Rules. As the Ninth Circuit has held, "[t]he mere percipience of a witness to the facts on which he

18   wishes to tender an opinion does not trump Rule 702." *United States v. Figueroa-Lopez*, 125 F.3d 1241,

19   1246 (9th Cir. 1997). In *Figueroa-Lopez*, the court rejected a government argument that percipient

20   witnesses' expert opinions are not subject to the same requirements as retained expert witnesses. 125

21   F.3d at 1246. As the Ninth Circuit observed, that "argument simply blurs the distinction between

22   Federal Rules of Evidence 701 and 702," and "subverts the requirements of Federal Rule of Criminal

23   Procedure 16(a)(1)(E). . . [which] requires the Government to 'disclose to the defendant a written

24   summary of [expert] testimony the government intends to use . . . during its case in chief.'" *Id.*; *see also*

25   *Rodriguez v. Gen. Dynamics Armament & Tech. Prod.*, 510 Fed. App'x 675, 676 (9th Cir. 2013)

26   (reversing judgment when "district court incorrectly determined that '[a]ny witness can talk about his

27   job,'" because "in fact, 'any part of a witness' testimony that is based upon scientific, technical, or other

28   MS. HOLMES' MOTION TO STRIKE IMPROPER AND UNTIMELY EXPERT DISCLOSURE
     AND TO PRECLUDE EXPERT OPINION TESTIMONY OF DR. KINGSHUK DAS
     CR-18-00258-EJD                         3

1   specialized knowledge within the scope of Rule 702 is governed by the standards of Rule 702.").[2]  It is

2   for this reason that the government provided Rule 16 disclosures for Theranos' other lab directors whom

3   it intends to call as witnesses.

4        It appears clear from the government's email that it intends for Dr. Das to offer scientific

5   opinions.  For example, according to his interview memoranda, Dr. Das described for the government a

6   "six sigma" analysis he conducted in 2016 to assess the accuracy and reliability of certain of Theranos'

7   assays. Ex. B (Feb. 2021 MOI at 2).  After the government learned of this analysis this year, it

8   apparently asked its retained expert Dr. Master to conduct a similar analysis; Dr. Master even references

9   Dr. Das' interview memorandum and analysis in his supplemental expert report.  ECF 842-1 at 9

10  (referencing Dr. Das' analysis).   According to the government's disclosure email, the documents on

11  which Dr. Das relies as the bases of his opinions are the *same* documents cited in Dr. Master's

12  supplemental report. Ex. A.   It is obvious that testimony about this analysis and other similar testimony

13  qualifies as expert opinion.

14      **B.**    **The Government's Disclosure Is Untimely and Insufficient.**

15       Under Rule 16(a)(1)(G), the government is required to provide "a written summary of any

16  testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of

17  Evidence during its case-in-chief at trial."  The summary must "describe the witness's opinions, the

18  bases and reasons for those opinions, and the witness's qualifications." *Id.*  This requirement "is

19  intended to minimize surprise that often results from unexpected expert testimony, [to] reduce the need

20  for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's

21  testimony through focused cross-examination." Fed. R. Crim. P. 16 advisory committee's note to 1993

22  amendment.  Expert disclosures must be made "in a timely fashion." Fed. R. Crim. P. 16 advisory

23  committee note.  Here, the Court-ordered deadline for the government's disclosures was March 6, 2020.

24       The government's disclosure of Dr. Das is clearly untimely.  The government has provided no

25  justification for its delay in disclosing Dr. Das as an expert.  Nor could it.  Dr. Das has been identified in

26  _____

27  [2] This is not new ground. This issue has already been litigated in the context of the government's doctor
witnesses.

28  MS. HOLMES' MOTION TO STRIKE IMPROPER AND UNTIMELY EXPERT DISCLOSURE
AND TO PRECLUDE EXPERT OPINION TESTIMONY OF DR. KINGSHUK DAS
CR-18-00258-EJD         4

1   documents in the government's possession since well before the indictment.  And, of course, it was no

2   secret that Dr. Das served as Theranos' lab director in 2016.  The government's only explanation for this

3   late disclosure appears to be that it believed that a disclosure "is not necessary." Ex. A.  As courts in this

4   district have recognized, the claimed failure to understand that a witness's testimony is governed by

5   Rule 702 is no excuse for not providing a timely disclosure.  *See United States v. Yagi,* 2013 WL

6   10570994*,* at *16 (N.D. Cal. Oct. 17, 2013) (excluding government expert opinion proffered "less than

7   one month before the start of trial" notwithstanding government's argument that "it believed the

8   witnesses in question could testify as lay witnesses"); *see also United States v. Valdez,* 2019 WL

9   539074, at *3 (N.D. Cal. Feb. 11, 2019) (excluding government DNA expert when the government

10  provided an insufficient summary shortly before the trial date).  The same result should follow here.

11      The government's four-sentence email likewise violates Rule 16's requirement to summarize the

12  opinions and provide the bases and reasons for those opinions.  The email isn't even a summary:  it just

13  refers defense counsel to FBI interview memoranda and the voluminous documents identified in the

14  attachment to Dr. Master's supplemental report. Ex. A.  Although discovery may provide *context* for a

15  Rule 16 summary, "the production of additional documents cannot satisfy a rule that requires a

16  'summary' that "describe[s] . . . the bases and reasons for [the expert witness's] opinions." *Valdez*, 2019

17  WL 539074, at *3.  The government was required to provide an actual summary of Dr. Das' opinions

18  and the bases and reasons for those opinions.

19      Dr. Das' interview memoranda (collectively 6 pages of information) are no substitute for an

20  adequate disclosure.  First, it is unclear what particular assays Dr. Das will opine on and the data on

21  which he is basing his opinions.  The two interview memoranda collectively reference three assays

22  (Sodium, Vitamin B12, and PT/INR) out of the 23 assays identified in the Indictment.  Two of these,

23  PT/INR and Vitamin B12, are not part of the ten assays that are the subject of Dr. Master's original

24  report.  From the cited documents, Ms. Holmes does not know which other assays Dr. Das will opine on

25  or what methodology (or methodologies) he will apply.  The number of assays and methodologies the

26  government seeks to put at issue in this case through expert testimony has been, and continues to be, a

27  moving target.  *See* ECF 847, Ms. Holmes' Response to Gov't Supp. Expert Report.  It is unfair to Ms.

28  MS. HOLMES' MOTION TO STRIKE IMPROPER AND UNTIMELY EXPERT DISCLOSURE
    AND TO PRECLUDE EXPERT OPINION TESTIMONY OF DR. KINGSHUK DAS
    CR-18-00258-EJD                     5

1   Holmes to require her to develop a response to new expert opinions on new assays on the eve of trial.

2           Second, the cited documents do not explain the source of the data on which Dr. Das relies for his

3   opinions.  In his February 2021 interview memorandum, he references an analysis of unsourced "Edison

4   data," and implies that these data were contained in a "high-level" PowerPoint document by two named

5   Theranos employees and a third person referred to as "Shelia." Ex. B (Feb. 2021 MOI at 1-2).  It does

6   not appear that the government has produced the PowerPoint referenced in the interview; at a minimum,

7   it is not among the materials the government cited as the bases for Dr. Das' opinions.  We do not know

8   what underlying data was subject to this analysis, how many tests the data represented, or if the data

9   covered the entire span of the relevant devices.  In his June 2021 interview memorandum, Dr. Das refers

10  to having used summary information in validation reports to conduct an analysis, but does not identify

11  which reports he reviewed or explain why he did not use all the data available to him, apart from the

12  unexplained statement that using summary information in the validation reports was "the easiest way to

13  convey his message."  Ex. C (Jun. 2021 MOI at 3).

14          Likewise, Dr. Das explained in his interview that he continued his "internal investigations" until

15  late 2017 or early 2018 and that he "'followed the thread' into other areas," but said nothing about what

16  his methods were, what assays he investigated, what his findings or conclusions were after he

17  investigated "other areas" or even what the other areas were.  Ex. B (Feb. 2021 MOI at 3).  The

18  memoranda raise more questions than answers.  An adequate summary, at a minimum, would list each

19  assay Dr. Das planned to opine on, the opinion for each assay, and the bases and reason for each

20  particular opinion (including the data and methodology for each).  The government's cited documents

21  fall well short of these basic requirements.

22          The government's email assertion that Dr. Das' opinions are based on the materials that Dr.

23  Master cited in his supplemental report is also inadequate (and cannot possibly be correct).  It is clear

24  from Dr. Das' interview memoranda that he is unfamiliar with many of those documents.  For example,

25  Dr. Master relied on patient impact assessments, but the degree to which Dr. Das was involved with the

26  patient impact assessment process is unclear from the documents disclosed by the government.  *See* Ex.

27  C (Jun. 2021 MOI at 3) (stating he "did not prepare patient impact assessments."); *see also* ECF 842-1 at

28  MS. HOLMES' MOTION TO STRIKE IMPROPER AND UNTIMELY EXPERT DISCLOSURE
AND TO PRECLUDE EXPERT OPINION TESTIMONY OF DR. KINGSHUK DAS
CR-18-00258-EJD                                    6

11.  Dr. Das also explained that he did not know what some of the terms in documents cited in Dr. Master's supplement mean.  *Id.* at 2.  The government provided several of Dr. Master's cited documents to Dr. Das in his interview, and he stated that although "he *may* have seen documents like" those documents, neither he or his team drafted those particular documents.  *Id.* at 1 (emphasis added).  Ms. Holmes has no idea what documents Dr. Das is relying on or whether the government even gave him all of the documents on which Dr. Master relied, and she should not have to guess which documents support his amorphous opinions.

The government also cites in its email a document that purports to be a draft letter to CMS that was never sent.  Ex. A (citing THPFM0004005199); *see also* Ex. C (Jun. 2021 MOI at 2).  Dr. Das stated in his interview that the "data he used to draw [his] conclusion [in this draft letter] was documented in 'D-tag' Files he and [another employee] shared with each other by email," Ex. C (Jun. 2021 MOI at 2), but to Ms. Holmes' knowledge the government has never produced these data and certainly did not identify the data in its disclosures.  The draft letter has numerous citations that appear to be placeholders for documents that the government has not identified or disclosed as the data underlying Dr. Das' opinions.  *See* Ex. D (including several highlighted citations for "Ex. XX").[3] Critically, Dr. Das has explained that he no longer has access to any of this data, which would have been either on "Theranos' share drives" or in the "LIS [,]laboratory information system[,] data dumps on his computer." Ex. B (Feb. 2021 MOI at 3).  The government cannot adequately disclose the bases and reasons for Dr. Das' opinions if those bases no longer exist, nor can Ms. Holmes fairly probe the opinions without access to the underlying data.

**II.    Dr. Das' Opinions Are Inadmissible under Rule 702.**

Although Ms. Holmes can only guess as to what Dr. Das' opinions will actually be, the interview memoranda disclosed to date make clear that Dr. Das' opinions cannot survive Rule 702.  Ms. Holmes reserves the right to file a *Daubert* motion and to request a *Daubert* hearing if the Court permits these untimely opinions.  For now, she offers the following preliminary observations:

---

[3] Moreover, the document is littered with comments in the margins, and it is unclear if this is the final version of this draft document.

MS. HOLMES' MOTION TO STRIKE IMPROPER AND UNTIMELY EXPERT DISCLOSURE AND TO PRECLUDE EXPERT OPINION TESTIMONY OF DR. KINGSHUK DAS
CR-18-00258-EJD                    7

1    First, the opinions do not appear to be based on reliable information and/or data.  Dr. Das cannot

2  vouch for the reliability of the data summary contained in the unidentified "high-level PowerPoint"

3  document or validation reports on which he apparently relied.  There are serious questions regarding the

4  reliability of relying on summary data, as opposed to actual data, to draw conclusions about accuracy

5  and reliability.  To the extent he relied on unidentified LIS data "dumps," his interview memoranda do

6  not establish the reliability of the methods by which those data dumps occurred, and he cannot prove

7  their reliability now since he no longer has access to the data.  Ex. B (Feb. 2021 MOI at 3).  If Dr. Das is

8  relying on the calculations of other Theranos scientists, their methodology needs to be explained as part

9  of his disclosure.   The government has not explained how it intends to establish the reliability of the

10  inputs used in Dr. Das' calculations, as it has not disclosed any other expert testimony from Theranos

11  scientists on this subject.

12    Second, the government has not established the reliability of Dr. Das' methodology.  He stated in

13  his interview that he employed a sigma metrics analysis to determine the accuracy of some assays, but

14  none of the cited documents shows that the use of such metrics is generally accepted in the field to

15  determine the accuracy and reliability of clinical assays.  Ex. C (Jun. 2021 MOI at 3).  Similarly, Dr.

16  Das admitted to using summary information and not the actual data drawn from Theranos devices

17  without any explanation as to whether that methodology was accepted in his field.  *Id.*

18    These points illustrate the *Daubert* issues that plague Dr. Das' ambiguous opinions.  If the Court

19  permits these untimely, inadequate opinions, a *Daubert* hearing will be required to understand the

20  opinions and to allow Ms. Holmes to formulate a *Daubert* challenge.  But requiring Ms. Holmes to

21  litigate these issues on the eve of, or during, trial would be extremely prejudicial.  Rule 16 required an

22  adequate disclosure sufficiently in advance of trial, to allow an orderly resolution of *Daubert* issues.

23  Indeed, the deadline for Ms. Holmes to file *Daubert* motions was in November 2020.  The government's

24  failure to comply with Rule 16 requires excluding Dr. Das' expert opinions.  Absent such relief, Ms.

25  Holmes will be forced to move for a continuance to attempt to mitigate the prejudice resulting from this

26  untimely disclosure.

27

28  MS. HOLMES' MOTION TO STRIKE IMPROPER AND UNTIMELY EXPERT DISCLOSURE
AND TO PRECLUDE EXPERT OPINION TESTIMONY OF DR. KINGSHUK DAS
CR-18-00258-EJD                                8

1

**CONCLUSION**

2    For these reasons, the Court should strike the supplemental disclosure of the expert testimony of

3    Dr. Kingshuk Das and preclude the government from eliciting expert opinions from Dr. Das at trial.

4    DATED: August 5, 2021

5                                    /s/ Amy Mason Saharia
                                     KEVIN DOWNEY
6                                    LANCE WADE
                                     AMY MASON SAHARIA
7                                    KATHERINE TREFZ
                                     Attorneys for Elizabeth Holmes
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28    MS. HOLMES' MOTION TO STRIKE IMPROPER AND UNTIMELY EXPERT DISCLOSURE
      AND TO PRECLUDE EXPERT OPINION TESTIMONY OF DR. KINGSHUK DAS
      CR-18-00258-EJD                          9

1

**CERTIFICATE OF SERVICE**

2        I hereby certify that on August 5, 2021, a copy of this filing was delivered via ECF on all

3    counsel of record.

4

5                                                              /s/ Amy Mason Saharia
                                                               AMY MASON SAHARIA
6                                                              Attorney for Elizabeth Holmes

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28    MS. HOLMES' MOTION TO STRIKE IMPROPER AND UNTIMELY EXPERT DISCLOSURE
      AND TO PRECLUDE EXPERT OPINION TESTIMONY OF DR. KINGSHUK DAS
      CR-18-00258 EJD

**Pages 1 - 22**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward J. Davila, Judge

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               )
   VS.                         )     **NO. CR 18-00258 EJD**
                               )
ELIZABETH A. HOLMES,           )
                               )
          Defendant.           )
_____)

San Jose, California
Monday, June 28, 2021

**TRANSCRIPT OF REMOTE ZOOM VIDEO CONFERENCE PROCEEDINGS**

**APPEARANCES VIA ZOOM:**

For Plaintiff:

                    STEPHANIE M. HINDS
                    ACTING UNITED STATES ATTORNEY
                    450 Golden Gate Avenue, 11th Floor
                    San Francisco, California  94102
          BY:  **ROBERT S. LEACH**
               **ASSISTANT UNITED STATES ATTORNEY**

                    STEPHANIE M. HINDS
                    ACTING UNITED STATES ATTORNEY
                    150 Almaden Boulevard, Suite 900
                    San Jose, California  95113
          BY:  **JOHN C. BOSTIC**
               **JEFFREY B. SCHENK**
               **ASSISTANT UNITED STATES ATTORNEYS**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported Remotely By:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
                       CSR No. 7445, Official U.S. Reporter

```
 1   APPEARANCES VIA ZOOM:   (CONTINUED)

 2   For Plaintiff:
                         STEPHANIE M. HINDS
 3                       ACTING UNITED STATES ATTORNEY
                         450 Golden Gate Avenue, 11th Floor
 4                       San Francisco, California  94102
                  BY:  KELLY I. VOLKAR
 5                       ASSISTANT UNITED STATES ATTORNEY

 6

 7   For Defendant:
                         WILLIAMS & CONNOLLY LLP
 8                       725 Twelfth Street, NW
                         Washington, D.C. 20005
 9                  BY:  LANCE A. WADE, ATTORNEY AT LAW
                         AMY SAHARIA, ATTORNEY AT LAW
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | <u>**Monday - June 28, 2021**</u>        <u>**3:12 p.m.**</u> |
| 2 | **P R O C E E D I N G S** |
| 3 | ---o0o--- |
| 4 | (Defendant present via Zoom, out of custody.) |
| 5 | **THE CLERK:** Court is now in session. The Honorable Edward |
| 6 | J. Davila presiding. |
| 7 | **THE COURT:** All right. Thank you. |
| 8 | Let's call 18-258, United States versus Elizabeth Holmes. |
| 9 | This is a remote status hearing that was set by the Court |
| 10 | for the parties. This is a hearing where parties were asked to |
| 11 | phone in. |
| 12 | And let me first capture appearance of the parties, |
| 13 | starting with the Government. |
| 14 | Who appears for the Government? |
| 15 | **MR. LEACH:** Good afternoon, Your Honor. Robert Leach on |
| 16 | behalf of the United States, and I'm joined by John Bostic, |
| 17 | Jeff Schenk, and Kelly Volkar. |
| 18 | **THE COURT:** Thank you. |
| 19 | Good afternoon, everyone. Thank you for being available |
| 20 | for this. |
| 21 | And let me ask from the defense side, who appears? |
| 22 | **MR. WADE:** Good morning. I guess good afternoon, |
| 23 | Your Honor. It's Lance Wade on behalf of Ms. Holmes. With me |
| 24 | is Ms. Saharia. |
| 25 | Ms. Holmes is also present telephonically and is listening |

1   in.  We have conferred with her, as we usually do, and are able

2   to reach her if we need to consult with her during the hearing.

3       **THE COURT:**  All right.  Thank you.

4       And she otherwise consents to participate in this remote

5   hearing for this status purpose?

6       **MR. WADE:**  She does consent to proceeding in this manner,

7   Your Honor.  Thank you.

8       **THE COURT:**  All right.  Thank you.

9       And I'm going to ask -- Ms. Holmes, I see that it appears

10  from my screen that you're muted.  If you could just unmute

11  yourself and just state your name.  I'm then going to ask your

12  lawyers whether or not they recognize that voice as being their

13  client.

14      So, Ms. Holmes, if you could unmute and just state your

15  name, please.

16      **THE DEFENDANT:**  Yes.  Good afternoon.  My name is

17  Elizabeth Holmes.

18      **THE COURT:**  Thank you very much.

19      And, Mr. Wade, that question is to you, sir, now.  Do you

20  recognize that voice as that of your client?

21      **MR. WADE:**  I do, Your Honor.

22      **THE COURT:**  All right.  Thank you very much.  We've got

23  that out of the way.  Ms. Holmes can mute herself again, if she

24  wishes, unless she's called upon to speak.

25      Well, thank you.  I set this today because, as everyone

1   knows, we had a *Daubert* hearing calendared for this Wednesday

2   in regards to some of the issues involving Dr. Masters.  And we

3   had scheduled that.  There was to be, I think, a trial run, a

4   dry run of the technology regarding that hearing and how it was

5   going to be conducted remotely from Philadelphia, San Jose.

6        I received an e-mail Friday -- I think it was Friday late

7   afternoon -- from Ms. Kratzmann indicating that there were some

8   issues regarding -- it sounded like there were some issues from

9   Mr. Wade about the Government's supplemental submissions and

10   the defense feeling that it was not possible to do the hearing

11   remotely as originally planned; therefore, that dry run would

12   not be necessary.

13        I received copies of your communications with

14   Ms. Kratzmann, both Mr. Wade's as well as the Government's

15   response from Mr. Leach suggesting that the hearing could go

16   forward, in the Government's view, and that if it could not for

17   whatever reason, that they suggested a date perhaps closer in

18   time to the trial date, which would allow for convenience of

19   witnesses and parties.

20        So I wanted to just touch base now.  I have not vacated

21   the date yet, the Wednesday date, although I do think it's

22   doubtful that that will occur, just to let you know.

23        But what I do want to know is what -- I suppose, Mr. Wade,

24   you can inform the Court about the issues that you think might

25   present problems with the original plan, how we can repair

1    those issues, solve the issues such that we could go forward,

2    and also, to gain your insight, both sides, as to a new date

3    that we can -- an appropriate date that we can schedule this

4    *Daubert* hearing.

5         So let's start with you, Mr. Wade, please.

6         **MR. WADE:**  Thank you, Your Honor.

7         And I think as the Court knows, there was an issue with

8    respect to the witness, really, in the *Daubert* hearing that the

9    parties have been meeting and conferring on to try to reach an

10   accommodation to see if there was a way in which we could

11   squeeze this *Daubert* hearing in before our client became

12   unavailable.  It was obviously our preference to try to do

13   that, but there were some travel restrictions, I think, as

14   the Court knows.

15        We believed that we might be able to accomplish that via

16   remote proceeding, technologically, based on the information

17   that we had available to us at the time and what we thought

18   would be the subject of the hearing.

19        As the Court knows, the Government last week provided a

20   new report that provides substantial new -- points to

21   substantial new evidence upon which Dr. Master relies, provides

22   new opinions upon which Dr. Master relies.  We obviously have

23   concerns about the timeliness of that, which are addressed in

24   the papers.

25        The issues with respect to the practical matter before

1    the Court and whether the hearing can proceed in a virtual
2    manner is really a logistical one or a practical one, which is,
3    many of the documents that are at issue are very small, have
4    very small font; they have a lot of data; they have very narrow
5    lines of data.  And going through them and going through what
6    was technologically possible with the court in Philadelphia, we
7    just didn't think it would be possible to have a hearing that
8    would be effective to convey that information through to the
9    courtroom remotely.
10        I say that notwithstanding the great efforts that
11   the Court and its staff went to to try to accommodate that and
12   to try to make this work, and we're obviously very appreciative
13   of those efforts by the Court.  And one of the reasons we
14   raised it so quickly, frankly, is everyone had gone to so much
15   effort to try to facilitate that, we didn't want to burden them
16   further, given all the effort and our belief that it wouldn't
17   technologically be possible with the type of exhibits that we
18   would have to use in the hearing.
19        We did meet and confer with the Government.  Our solution
20   to going forward in a remote setting is not one I think would
21   necessarily -- is, we think, the appropriate solution, but not
22   necessarily one we think the Government would accept, which is,
23   they could -- the Court could strike the supplemental report
24   and the materials in it, and we'd be prepared to go forward on
25   the prior report that was filed with respect to Dr. Master.

1    And if the Court were to do that, we would be prepared to go

2    forward on Thursday and comfortable using the evidence that we

3    were aware of prior to the supplemental report.

4        In the event that that is not possible and although it's

5    not our preference, given unavailability issues that I know

6    the Court is aware of, I think we would probably have no choice

7    but to wait until closer to the hearing and to have the *Daubert*

8    hearing, you know, at a time closer to the hearing, when the

9    witness would be available.  And we've conveyed that to

10    the Government as well.

11        It wouldn't be our preference.  Our preference would be to

12    go sooner.  But obviously, we're not going to require anyone to

13    drive across the country or do anything extraordinary for this.

14    We think we can wait if that's what's required.

15        **THE COURT:**  All right.  Thank you.

16        And when you say "the hearing," are you referencing the

17    start of trial sometime in August?

18        **MR. WADE:**  Yes.  I think the Government had suggested that

19    in some communications with the Court.  I think we had raised

20    with the Court previously our preference to go -- to go sooner.

21    Obviously, there are some practical limitations that stand

22    between our ability to move forward.  And we recognize reality,

23    and we're not going to impose on the witness some unreasonable

24    burden.  We don't think that's reasonable, and we'll wait.

25        **THE COURT:**  Okay.  Thank you.

1    And the reality is, we're a little compressed for time

2 because of your client's situation, of course, and we all want

3 to respect that and the Court does respect that.  And I'm not

4 going to -- and neither is the Government, as they've said

5 before.  They're not wishing to impose any type of difficulties

6 on your client.  I appreciate the reciprocity as to any witness

7 issue from the Government.

8    Mr. Leach, do you want to be heard?

9    **MR. LEACH:**  I do, Your Honor.  Thank you very much, and

10 thank you for taking the time.

11    Since the Court's order on the motion in limine respecting

12 Dr. Master, we've been coordinating and communicating with the

13 defense to try to accommodate two issues:  one, a health

14 condition relating to the Government's witness; and, two, the

15 defense's stated need to have any *Daubert* hearing completed by

16 July 1st.  And it was in that spirit with which we agreed to

17 the 30th and proposed the remote hearing.

18    I don't think there's anything in the supplemental report

19 from a substantive or a technological reason that really

20 changes the playing field.  But I take counsel at their word

21 that they feel constrained by the format the Government was

22 prepared to show exhibits.

23    I mean, we were prepared to have the technology

24 demonstration today to see exactly how we would be doing it;

25 and in the event we weren't able to show them on the screen, we

1  were prepared to go forward with hard-copy exhibits, as we did

2  before the technological revolution.  And we think that's a

3  perfectly fine way to go about it, particularly given our view

4  of what the scope of the hearing should be.

5      But I take the defense at their word that they feel

6  constrained by that, and want to make sure all sides are able

7  to present their arguments and information in an effective way.

8      We -- the Government sees -- will make itself available at

9  any time convenient to the Court and the parties.

10      We obviously object to striking the supplemental report.

11  We think it's perfectly appropriate.  The defense challenged

12  the bases and the quantum of information that Dr. Master

13  considered.  He now has considered some additional information

14  which was produced in discovery a long time ago.  We don't see

15  any basis to strike the report.  We'd want to be heard on that

16  substantive point.

17      But from a technological standpoint, we hear what the

18  defense is saying and will be available whenever the Court and

19  the defense are prepared to proceed.

20      We've raised some issues with -- about our ability to have

21  a live hearing because of some medical issues and want to be as

22  respectful as we can of those.  I do think the closer we get to

23  trial, the more those will be resolved or we'll have clarity on

24  how to navigate those.

25      And so the Government would be fine scheduling a hearing

11

1   closer to trial, or even during trial, for that matter.  But we

2   don't see that technology is an impediment.  And we'll be

3   available whenever the Court and counsel are ready.

4       **THE COURT:**  Thank you, Mr. Leach.  Thank you.  I

5   appreciate the parties looking at this.

6       It sounds like, Mr. Wade, your concern was, during the

7   *Daubert* hearing, your ability to effectively communicate

8   regarding some of the information you've received.  It sounds

9   like a formatting-type issue with some of these graphs.  I've

10  not seen them.  I'm not sure what it is exactly you're talking

11  about.  But it sounds like your e-mail suggested some of these

12  things are difficult to read and comprehend.

13      And I saw that and I was curious whether or not, if all

14  parties had, as Mr. Leach said, hard copies, whether or not

15  that would facilitate a better, more facile operation, where we

16  could all look at it and hold hard copy and, nonetheless,

17  reference it remotely.  That was the first thing that came to

18  my mind.  Mr. Leach said "old school."  You're too young to be

19  old school, Mr. Wade.  But that's something that perhaps we

20  could do.

21      But, again, I don't want to -- I want to respect

22  everybody's, both sides, any time constraints that you have

23  regarding compressing a hearing.  If we need to go closer to

24  the trial date to accommodate, that would give the parties more

25  time to perhaps create larger slides, whatever it is you need

1    to do, that's fine as well.

2       I believe when the Court set this hearing, I think I

3    allowed a supplemental report to be filed.  I think I did that

4    as long as supplemental reports were filed -- wasn't it

5    ten days before the hearing?  I think that's what I said.

6       **MR. LEACH:**  Yes, Your Honor.

7       **THE COURT:**  So the filing on -- what was it? -- the 18th,

8    I think, I think that falls 12 days before the hearing date

9    perhaps.  So I don't think there's a timeliness issue,

10   Mr. Wade, respectively, about that.

11      But I'm happy to do -- we were looking at our calendar

12   because, of course, my calendar has to be adjusted for what's

13   available for us.  And I'll tell you, we're having some

14   staffing issues as we start to reopen, my colleagues.  And so

15   we do have some staffing issues that present challenges for us.

16   They can be overcome.  They're challenges, but they can,

17   nonetheless, be overcome.

18      We were looking at perhaps having a hearing on the 9th as

19   probably the last possible day we could have a hearing prior

20   to -- at least that's probably the last day I would like to do

21   something, given Ms. Holmes' situation.  I don't think going

22   any closer or any deeper into July would be appropriate.

23      And thank you both for meeting and conferring.

24      I'm also happy to allow the *Daubert* hearing to occur

25   sometime in August as well, if the parties want to look to an

1   August date that might look convenient that is before the trial

2   starts, recognizing we have some other work to do, of course,

3   before that trial date.

4      We're going to be looking through -- and I just received

5   some responses regarding questionnaires. And, of course, that

6   questionnaire is still a work in progress, isn't it? It's not

7   in the record. It's still being worked on by the parties and

8   by the Court, and we still have some work to do before that

9   questionnaire actually goes out to the public; that is, the

10   public jurors who are going to receive that and fill it out.

11      So we still have that to do sometime in perhaps August,

12   late July, I just want to remind you. And I don't think I have

13   to remind you of all the work that's necessary in the case.

14      But we can certainly do something in August. I know we

15   can find a date to have this hearing in August.

16      I think Mr. Leach suggested -- I think you said even

17   during the trial. And it's not unusual to have *Daubert*

18   hearings during the trial as well. I know that's not counsel's

19   preference. Counsel prefers to have all issues resolved -- as

20   many issues resolved as possible prior to the beginning of

21   evidence. I recognize that. But we all know that that

22   sometimes happens, and we'll deal with it as needed.

23      Should I -- well, let me ask you. Should we have this

24   hearing in August sometime and allow you to meet and confer and

25   pick a date in August that sounds reasonable for both of your

1  concerns, availability of parties?

2      **MR. WADE:**  Your Honor, I do think that's probably most

3  sensible, and we certainly -- I would like to do that.

4      I appreciate that the Court is, in part, accommodating our

5  client and her unavailability, as the Government has been

6  during our dialogue.  So I do want to state for the record my

7  appreciation of that.

8      I do think -- I feel constrained about talking about

9  technology via this technology.  But if this gives the Court

10  any sense for some of the difficulties, some of the -- drawing

11  differences between some of these lines and doing it with a

12  witness while the Court follows along and there are multiple

13  parties within a Zoom call, I hope the Court understands

14  that -- maybe it's the fact that I am old school that makes me

15  slightly afraid to be able to do that effectively via this

16  manner.

17      So I think proceeding in August is sensible.  I think we

18  could meet and confer with the Government and find -- find a

19  time that works with the witness and to accommodate the

20  witness's concerns.

21      I would like to note, Your Honor, just to make sure that

22  our position on this is not lost amidst our accommodating each

23  other here, Your Honor did permit a supplemental report,

24  supplemental materials in support of Dr. Master's exhibit to

25  explain the methodology that he used in his prior report.

1     That's not what we got on the docket a little over a week

2   ago.  We got a completely different methodology that supported

3   many of the tests, and we -- and they doubled the tests.  So

4   they went from nine tests that were supposed to be at issue in

5   the *Daubert* hearing, and instead, now Dr. Master has provided

6   an opinion with respect to ten additional tests that were not a

7   part of his prior report and were never previously disclosed.

8   They did that based upon information that's been available to

9   the Government for years, and they did it just a short time

10  before trial.

11     So this is -- in our view, this is not contemplated by

12  the Court.  This is well beyond the *Daubert* order.  This is

13  just a completely new opinion with respect -- that doubles the

14  number of tests that are at issue in the case.  And so we do

15  think that report should be stricken.

16     I think the Court may know -- I know you mentioned before,

17  Your Honor, you've been on a well-earned vacation, and so it's

18  possible you haven't gotten through some of the papers yet.

19  But we did note in our papers that if this is to be permitted,

20  we would be forced to seek a continuance on this issue because

21  they've substantially, and at a late date, doubled the tests

22  that their expert's going to opine on.

23     And so I don't want that to get lost amidst the issue of

24  the *Daubert* hearing with respect to the nine tests that were

25  the subject of the Court's order.  That's -- there's more than

1   that that's really at issue with respect to Dr. Master.

2      **THE COURT:** Well, thank you. I'll ask Mr. Leach to

3   comment.

4      But I want to draw everyone's attention to Document 797,

5   page 11 of 12, ECF page 11 and 12, and lines 16 through 18.

6   I think that speaks to the -- if you look at that order -- and

7   I know you all have -- that's what the *Daubert* hearing is

8   about, and I think we're all aware of that.

9      (Reading):

10        "The Court concludes that a *Daubert* hearing is

11        appropriate to assess the reliability of Dr. Master's

12        methodology, which he employed to provide testimony

13        and opinions about chloride, potassium, bicarbonate,

14        HIV, HbA1c, hCG, cholesterol, calcium, and sodium."

15      So I don't think it's in dispute that that's what

16   the Court's interested in, and anything else beyond what

17   the Court order said would be not relevant to the Court's

18   order.

19      Mr. Leach, I think you understand that.

20      **MR. LEACH:** I do, Your Honor. And I don't agree with the

21   characterization that defense counsel is attributing to the

22   supplemental report or to Dr. Master.

23      What Dr. Master has done is he's described in more fulsome

24   detail his methodology. He also notes that he's reviewed

25   additional documents with respect to the assays listed in the

1   report and come to the conclusion that those additional

2   documents further support what he opined in the initial report.

3       In addition, he's looked at -- and I think the Court will

4   see this on page 6 and 7 of his supplemental report, that the

5   new documents that he's reviewed are directly relevant to his

6   conclusion in the initial report that there's systemic problems

7   with Edison 3.5 testing.  And based on what he'll explain are

8   signal values for the tests that he's looked at, as well as

9   other tests, those additional assays reinforce his opinions on

10  the ones listed in the Court order.

11      And so I don't think we've gone beyond what the Court has

12  ordered for the hearing.

13      Even if we were and these were new assays and new

14  opinions, I think it's perfectly appropriate for an expert to

15  supplement his opinion as new information comes along.  There

16  are often times when an expert learns of information in the

17  trial and wants to incorporate that into his opinion.

18      So I don't share the view that this dramatically expands

19  what he's saying.  It's perfectly appropriate, when a defendant

20  or any party brings a motion challenging the bases for an

21  expert for that expert to look to see if there are additional

22  facts supporting his bases and methodologies.

23      So I don't think we've gone beyond what the Court has

24  ordered, and certainly, it's perfectly appropriate for an

25  expert to supplement his opinion.

1    **THE COURT:** All right. Thank you.

2    Well, the Court indicated in its order, as I read it to

3    you -- and you all have it in that filing -- I said that there

4    should be a *Daubert* hearing. It would be appropriate to have a

5    *Daubert* hearing in regards to the doctor's opinions of those

6    assays that I mentioned. And I think Mr. Wade's accurate;

7    there's nine of them.

8    If he's going to talk about assays that the Court's not

9    interested in, then the Court won't consider those.

10   What I think I hear you saying, Mr. Leach, is that in

11   regards to -- and I'm not trying to put words in your mouth.

12   I'm telling you what I think I heard you say -- that in regards

13   to the Court's inquiry about and curiosity about methodology,

14   this expert will -- and I think I saw that in Document 842 and

15   various pages; that's your supplemental -- this doctor will

16   talk about his methodology in regards to his findings on those

17   nine categories, but he will explain that that methodology can

18   also be used and was used in examining other types of assays.

19   And he'll talk about why that -- for example, the TEA,

20   I think -- is that trial and error? -- those types of things

21   and why that is permitted in the science. He talks about two

22   ways: total allowable errors and some other ratios. So I

23   expect there might be some explanation about that from the

24   doctor.

25   Mr. Leach?

1        **MR. LEACH:**  That's very fair, Your Honor.

2        And I anticipate Dr. Master will say:  My calculation --

3   or my -- the information about total allowable error, as it

4   applies to these particular assays, one of the reasons why I'm

5   confident that these assays were not accurate and reliable

6   based on the Cigna metrics calculated using that total

7   allowable error hold true for these assays is it also holds

8   true for other assays.  So these are not outliers.  These are

9   not, you know, simply cherrypicked assays.  But it's a metric

10  that applies equally to other Edison tests.

11       And so I -- those, at a high level, are the concepts laid

12  out in the supplemental report.

13       **THE COURT:**  Okay.  Thank you for that.  And of course --

14       **MR. LEACH:**  I'm sorry, Your Honor.

15       Also, I wanted to respond to the Court's initial question,

16  which is, a date in August would be fine and we're happy to

17  confer with the defense about that.

18       **THE COURT:**  All right.  Thank you.

19       So, Mr. Wade, the *Daubert* hearing is an opportunity for

20  whoever the proffering party is to answer the Court's

21  questions, the Court's curiosity, the Court's doubts as

22  expressed in this Court's order.  And I think the supplemental

23  report suggests that.

24       I don't look at it this way, Mr. Wade, as an entirely new

25  report that requires a continuance so you can retain yet

1  another expert to come in and do various things.  I don't see

2  it quite that way.

3      I see it as Dr. Master rising to the Court's challenge and

4  offering his additional information on methodology and how he

5  came to his opinions, and that's appropriate.

6      And certainly, you and your team, I expect, will continue

7  to test his theories and his bases.

8      And I appreciate your consideration of the Court.  You

9  held up a paper that had some drawings on it.  I couldn't tell

10  if it was a batting order, a recipe for lasagna, or what it

11  was.  But I understand -- thank you.  I understand why now you

12  think it would be best for us to have an in-person hearing or

13  at least that the remote would not work and it would be a

14  challenge when we look at different grids that have notations,

15  certainly with scientific notations on them.  And I appreciate

16  that.  We want to have as clear a record as we can for the

17  parties.

18      So those are my observations, Mr. Wade, in response to

19  yours about a new report, entirely new report.  It's a

20  different report.  It's additional information.  I expect that

21  you will vigorously challenge it when the time comes for the

22  hearing.

23      Let's do this.  Let's then vacate the hearing that's set,

24  Ms. Kratzmann, for this Thursday, the 30th.  We'll vacate that.

25      And thank you very much, Counsel.  Rather than have you

1    sit and discuss that here on the Zoom hearing, I think it would

2    probably be more efficient and effective for us to end our

3    hearing now, with the understanding that the parties will

4    continue to meet and confer and will consult Ms. Kratzmann

5    regarding a date, an appropriate date for the *Daubert* hearing

6    that was ordered pursuant to the Court's order in Docket 797,

7    7-9-7.  And you can select a date that is convenient for all

8    parties.

9        I'm not going to disturb -- I believe we'll see each other

10   next week sometime.  I think it's July 7.  Don't we have a

11   hearing regarding a motion to dismiss?

12       **MR. WADE:**  That's correct, Your Honor.

13       **THE COURT:**  Right.

14       **MR. WADE:**  A suppression motion.  Suppression motion.

15       **THE COURT:**  Yes, a suppression motion.  Thank you.

16       I'm not going to disturb that date.  That will remain in

17   place.  As I understand, the parties wish to proceed on that;

18   so we'll do that.

19       All right.  Any questions about today or anything we're

20   going to do regarding the *Daubert* or Dr. Master?

21       **MR. LEACH:**  Not from the Government, Your Honor, no.

22       **THE CLERK:**  Your Honor, just to confirm that date, it

23   would be scheduled for a half-day session; correct?

24       **THE COURT:**  Well, that's what I have indicated.  I think

25   we can get this done in a half a day, owing to I know how

```
 1  efficient counsel are and the issues that they'd like to take
 2  care of.  So that's what we'll schedule it for.  And hope
 3  springs eternal, Ms. Kratzmann.  So we'll schedule it for half
 4  a day.
 5       And then you can meet and confer, Counsel, and get back to
 6  Ms. Kratzmann with a date.
 7       We'll check our calendars and move forward.  Okay?
 8       MR. WADE:  Thank you, Your Honor.
 9       MR. LEACH:  Thank you, Your Honor.
10       THE COURT:  Anything further?  If not, we'll conclude this
11  hearing.  And I look forward to seeing everyone on the 7th.
12       Thank you very much.  Thanks for accommodating this.
13  Thank you.  I appreciate it.
14       MR. LEACH:  Thank you, Your Honor.
15       MR. WADE:  Thank you, Your Honor.
16       THE CLERK:  Court is adjourned.  This webinar shall
17  terminate.
18                 (Proceedings adjourned at 3:42 p.m.)
19                           ---oOo---
20
21
22
23
24
25
```

1

2  **CERTIFICATE OF REPORTER**

3       I certify that the foregoing is a correct transcript

4  from the record of proceedings in the above-entitled matter.

5

6  DATE:  Tuesday, August 24, 2021

7

8  _____

9  Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
            Official United States Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   JOHN D. CLINE (CA State Bar No. 237759)
    50 California Street, Suite 1500
2   San Francisco, CA 94111
    Telephone: (415) 662-2260 │Facsimile: (415) 662-2263
3   Email: cline@johndclinelaw.com

4   KEVIN M. DOWNEY (Admitted Pro Hac Vice)
    LANCE A. WADE (Admitted Pro Hac Vice)
5   AMY MASON SAHARIA (Admitted Pro Hac Vice)
    KATHERINE TREFZ (CA State Bar No. 262770)
6   WILLIAMS & CONNOLLY LLP
    725 Twelfth Street, NW
7   Washington, DC 20005
    Telephone: (202) 434-5000 │Facsimile: (202) 434-5029
8   Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

9   Attorneys for Defendant ELIZABETH A. HOLMES

10

11                      UNITED STATES DISTRICT COURT

12                   NORTHERN DISTRICT OF CALIFORNIA

13                          SAN JOSE DIVISION

14
    UNITED STATES OF AMERICA,          )   Case No. CR-18-00258-EJD
15                                     )
              Plaintiff,               )   **MS. HOLMES' REPLY IN SUPPORT OF**
16                                     )   **MOTION TO SUPPRESS EVIDENCE OF**
         v.                            )   **CUSTOMER COMPLAINTS AND TESTING**
17                                     )   **RESULTS AS WELL AS FINDINGS IN CMS**
    ELIZABETH HOLMES and               )   **REPORT**
18   RAMESH "SUNNY" BALWANI,           )
                                       )   Date:    July 7, 2021
19            Defendants.              )   Time:    10:00 a.m.
                                       )   CTRM:  4, 5th Floor
20                                     )
                                       )
21                                     )   Hon. Edward J. Davila
                                       )
22   _____  )

23

24

25

26

27

28

    MS. HOLMES' REPLY IN SUPPORT OF MOTION TO SUPPRESS
    CR-18-00258 EJD

# TABLE OF CONTENTS

Page

I.      *Flyer* Does Not Require Bad Faith for Suppression. .........................................2

II.     The Loss of Potentially Useful Evidence Can Constitute a Due Process
        Violation Under *Youngblood*. ...............................................................................5

        A.      The Government Misstates the Legal Standard Under *Youngblood*.......................5

        B.      The Parties Dispute Whether the *Youngblood* Elements Have Been
                Satisfied..............................................................................................................6

III.    An Evidentiary Hearing Is Necessary to Resolve Specific Factual Disputes. ....................8

        A.      The Pleadings Have Identified Specific Contested and Unresolved
                Issues of Fact.....................................................................................................9

        B.      Testimony Is Necessary to Resolve Contested or Open Issues of Fact. ...............11

        C.      The Government Has Conceded Specific Issues of Fact. ....................................13

IV.     Ms. Holmes Is Entitled to Evidence Identified in the Government's *Brady*
        Letter. .......................................................................................................................14

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO SUPPRESS
CR-18-00258 EJD

i

1

## TABLE OF AUTHORITIES

2

### CASES

3    *Arizona v. Youngblood*, 488 U.S. 51 (1988)………………………………………..*passim*

4    *Brady v. Maryland*, 373 U.S. 83 (1963) ....................................................................14

5    *California v. Trombetta*, 467 U.S. 479 (1984)…………………………………………4

6    *Cunningham v. City of Wenatchee*, 345 F.3d 802 (9th Cir. 2003)...............................4

7    *Giglio v. United States*, 405 U.S. 150 (1972) ...........................................................14

8    *Illinois v. Fisher*, 540 U.S. 544 (2004) .......................................................................5

9    *Mellen v. Winn*, 900 F.3d 1085 (9th Cir. 2018) ........................................................15

10   *United States v. Booth*, 309 F.3d 566 (9th Cir. 2002)..................................................4

11   *United States v. Brown*, 2018 WL 451556 (D. Nev. Jan. 16, 2018)...........................3

12   *United States v. Drake*, 543 F.3d 1080 (9th Cir. 2008) ..............................................8

13   *United States v. Flyer*, 633 F.3d 911 (9th Cir. 2011)........................................ *passim*

14   *United States v. Garcia*, 37 F.3d 1359 (9th Cir. 1994)...............................................4

15   *United States v. Hinkson*, 2004 WL 7333646 (D. Idaho Dec. 22, 2004)....................4

16   *United States v. Holman*, 2013 WL 12204324 (D. Nev. Sept. 20, 2013) ...................3

17   *United States v. Howell*, 231 F.3d 615 (9th Cir. 2000)................................................8

18   *United States v. Loud Hawk*, 628 F.2d 1139 (9th Cir. 1979)............................... *passim*

19   *United States v. Montes De Oca*, 656 F. App'x 831 (9th Cir. 2016)..........................15

20   *United States v. Patrick*, 2016 WL 6610983 (E.D. Mich. Nov. 9, 2016) ...................4

21   *United States v. Sinek*, 2016 WL 11687630 (N.D.N.Y. Aug. 18, 2016) .....................4

22   *United States v. Stevers*, 603 F.3d 747 (9th Cir. 2010)..............................................15

23   *United States v. White*, 850 F.3d 667 (4th Cir. 2017)................................................15

24   *United States v. Zaragoza-Moreira*, 780 F.3d 971 (9th Cir. 2015) ...................... *passim*

27

28

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO SUPPRESS
CR-18-00258 EJD

1

**RULES**

2    Fed. R. Crim. P. 12 ................................................................................15

3    Fed. R. Crim. P. 16 ...........................................................................14, 15

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    This Court should hold an evidentiary hearing, and, after that hearing, suppress the categories of

2    customer complaints, testing results, and CMS Report findings identified in Ms. Holmes' motion.

3    Ms. Holmes is entitled to relief under the governing legal standards.  First, and contrary to the

4    government's assertion, suppression does not require a finding of bad faith.  *See United States v. Flyer*,

5    633 F.3d 911 (9th Cir. 2011).  Instead, the Ninth Circuit requires consideration and balancing of

6    multiple factors.  *See id.* at 916 (citing *United States v. Loud Hawk*, 628 F.2d 1139, 1152 (9th Cir. 1979)

7    (Kennedy, J., concurring)).  Under this doctrine, suppression may be appropriate even when bad faith is

8    absent.

9    Second, the Ninth Circuit has held that the loss of "potentially useful" evidence—evidence that

10   *might* have been exculpatory—constitutes a due process violation when the government acts in bad

11   faith.  *See United States v. Zaragoza-Moreira*, 780 F.3d 971, 978 (9th Cir. 2015) (applying *Arizona v.*

12   *Youngblood*, 488 U.S. 51 (1988)).  The government suggests that the loss of such evidence cannot form

13   the basis of a due process violation.  That is incorrect, and there is no question that the evidence residing

14   in the LIS was potentially useful to Ms. Holmes' defense.

15   The government's opposition makes clear that a suppression hearing is required.  The

16   government does not contest that this Court's Order on the motions *in limine* endorsed the relevance of

17   its anecdotal evidence.  Dkt. 798 at 48-49.  That Order ripened Ms. Holmes' due process concern.  The

18   government also agrees that a suppression hearing is necessary when the movant identifies contested

19   issues of fact.  And while the government has conceded important factual issues, such as the

20   involvement of members of the prosecution team in the events at issue, numerous factual disputes

21   remain.  *See infra* pp. 11-13.

22   Ms. Holmes is also entitled to the identities of the government personnel discussed in the

23   government's October 29, 2020 *Brady* letter, as well as the documents on which that letter relies.  Dkt.

24   732-2.  This evidence is necessary for both this motion and the preparation of her defense as a whole.

25   A final point before turning to the merits.  The government continues to insinuate vaguely that

26   Ms. Holmes had a role in the loss of the LIS.  *See* Opp'n, Dkt. 846 at 1-2, 7; *see also* Dkt. 682 at 1, 9-10;

27   Dkt. 580, 580-1, 580-2; 7/20/2020 H'rg Tr. 56:15-18; 5/4/2021 Hr'g Tr. 82:14-17, 83:17-21.  That is

28

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO SUPPRESS
CR-18-00258 EJD

1    false.  In an "independent" grand jury investigation relating to the LIS, members of the prosecution team

2    have collected dozens of witness statements and proffers and hundreds of thousands of pages of

3    documents.  They have not found one scintilla of evidence connecting Ms. Holmes to the loss of this

4    database—because there is none.  Counsel's persistence in insinuating without evidence that Ms.

5    Holmes is responsible for the loss of this evidence needs to stop, particularly in light of this Court's

6    ruling foreclosing such argument because of the government's lack of evidence.  Dkt. 798 at 57.

7        **I.    *Flyer* Does Not Require Bad Faith for Suppression.**

8            Bad faith on the part of the government is required to dismiss an indictment under the Due

9    Process Clause, but not for lesser sanctions such as suppression.  In *Flyer*, the Ninth Circuit explained

10   that "[t]he government's failure to preserve potentially exculpatory evidence rises to the level of a due

11   process violation if a defendant can show that the government acted in bad faith."  633 F.3d at 916.

12   "Bad faith," the Ninth Circuit continued, "requires more than mere negligence or recklessness."  *Id.*

13   However, "[i]f the government destroys evidence under circumstances that do not violate a defendant's

14   constitutional rights," *e.g.*, which do not involve bad faith, "the court may still impose sanctions

15   including suppression of secondary evidence."  *Id.* (citing *Loud Hawk,* 628 F.2d at 1152 (Kennedy, J.,

16   concurring)).  In determining whether such sanctions are appropriate, "the court must balance 'the

17   quality of the Government's conduct and the degree of prejudice to the accused.'"  *Id.* (quoting *Loud*

18   *Hawk,* 628 F.2d at 1152 (Kennedy, J., concurring)).  Although the defendant bears the burden of

19   showing the government's bad faith to establish a constitutional violation, the government has the

20   burden of justifying its conduct under *Flyer*, where lesser sanctions are at stake.  633 F.3d at 916.

21           The government's assertion that the Ninth Circuit inflexibly requires bad faith for the

22   suppression of evidence, Dkt. 846 at 9, 11-12, is wrong.  The government bases this assertion on Judge

23   Trask's opinion in *Loud Hawk*, Dkt. 846 at 1-2, 9-10, but in *Flyer* the Ninth Circuit adopted then-Judge

24   Kennedy's controlling opinion in that case, not Judge Trask's.  Judge Kennedy's opinion is

25   unmistakably clear: "[i]n cases of severe prejudice, suppression or other sanctions would be appropriate

26   without regard to the good faith or culpability of the Government."  628 F.2d at 1152.

27           The Ninth Circuit's opinion in *United States v. Zuniga-Garcia* illustrates the showing required

28
     MS. HOLMES' REPLY IN SUPPORT OF MOTION TO SUPPRESS
     CR-18-00258 EJD
                                                2

for sanctions under *Flyer*.  472 F. App'x 498, 499 (9th Cir. 2012).  In a prosecution for importing narcotics, the defendant claimed that he was unaware of the marijuana found in his car's gas tank.  At trial, the government sought to establish *mens rea* by pointing to the facts that the defendant had a bolt in his pocket when arrested, and that the bolt fit the retaining clip connecting the gas tank to the vehicle.  *See id*. at 500 (Callahan, J., dissenting).

For his part, the defendant argued that the bolt "was for one of the many construction-related tools in his truck."  *Id*. at 499.  At some point before trial, however, the government lost all those construction tools, preventing the defendant from showing that the bolt matched one of the tools.  *Id*.  Applying *Flyer*, the Ninth Circuit did not ask the defendant to prove that the bolt, in fact, fit those construction tools, nor did the court assess whether the government acted in bad faith.  In reversing the conviction and instructing the district court to provide the requested sanction, the Court's reasoning was simple enough: "The destruction of this evidence left the defendant without any means of refuting an important part of the prosecution's case."  *Id*

The government's principal response is to suggest that it tried, but failed, to obtain a working copy of the LIS.  Dkt. 846 at 9-10, 14.  Under *Flyer*, whether the government had custody of evidence is just one factor to consider—it is not dispositive.  *See Loud Hawk*, 628 F.2d at 1152 (Kennedy, J., concurring).[1]  The adequacy of the government's efforts to gather, access, and preserve a working copy remains in dispute.  The government received a copy of the LIS on August 27, 2018, Dkt. 732-2 ¶ 34 (Oct. 29, 2020 Letter from R. Leach to L. Wade ("*Brady* Letter")); Dkt. 681-35, but its efforts to access that copy were lackluster at best, *see, e.g., Brady* Letter ¶¶ 46-49; Dkt. 730 at 13-16.  The government also claims that the LIS was "inaccessible" from late August 2018 onward, Dkt. 846 at 7, but that

---

[1] In *United States v. Brown*, 2018 WL 451556, *4 (D. Nev. Jan. 16, 2018), the district court summarily declined to apply *Flyer* balancing because the government's failure to collect evidence was negligent, rather than in bad faith.  That holding is irreconcilable with Judge Kennedy's controlling opinion in *Loud Hawk*, which makes clear that government custody is just one factor to consider, and that the loss of evidence may require suppression "without regard to the good faith or culpability of the government" in cases of severe prejudice.  628 F.2d at 1152.  And in *United States v. Holman*, 2013 WL 12204324 (D. Nev. Sept. 20, 2013), after holding an evidentiary hearing, the court declined to give a loss of evidence instruction because, by the time the government began its investigation, the email "server contained no emails to collect or preserve" due to the company's document-destruction policy, and there was no question that the government had acted diligently in initiating the investigation.  *Id*. at *2-*4.

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO SUPPRESS
CR-18-00258 EJD

3

1   assertion conflicts with the statements of multiple witnesses who understood that the LIS could be

2   reconstituted on hardware in the possession of the Theranos Assignee.  *See infra* p. 8.  And that is to say

3   nothing of the government's inexplicable delay in taking possession of the database from which it had

4   been receiving productions for years, as the company was closing.  *See* Dkt. 730 at 12-14.

5       The government cites a flurry of cases, but most involve constitutional claims and thus apply a

6   legal standard more onerous than the *Flyer* standard.[2]  The government cites only three opinions that

7   balance the quality of the government's conduct against the prejudice to the defense.  Those are readily

8   distinguishable.  In *United States v. Robertson,* the court declined to impose sanctions when a separate

9   government agency "not involved in the case" automatically recorded over a videotape because, *inter*

10  *alia*, prosecutors were not involved in the loss of evidence; it was unclear whether the video had an

11  unobstructed view of the events in question (or even could confirm the identity of the individuals

12  involved); the video was "not central to the case" because it concerned only a small subset of the

13  allegations; and the jury was informed of the government's loss of the videotape.  895 F.3d 1206, 1213-

14  14 (9th Cir. 2018).  In *United States v. Gibson*, the Court did not impose sanctions because the officer

15  who failed to collect evidence followed crime-scene protocol; had no reason to believe the uncollected

16  evidence was exculpatory; was not negligent; and the lost evidence would not have exculpated the

17  defendant.  2012 WL 1123057, at *4 (N.D. Cal. 2012).  In *United States v. Hendrix*, the court was

18  "somewhat troubled" by the quality of the government's conduct, but ultimately declined to impose

19  sanctions because no prosecutors were involved in the loss of evidence; the loss was not deliberate; the

20  government conformed to standard practices; and the lost evidence was not "crucial or exculpatory."

21  2019 WL 6683509, at *6 (W.D. Wash. Dec. 6, 2019).

22      By contrast, here, members of the prosecution team were involved in the loss of evidence, acted

23  in disregard of Ms. Holmes' rights by failing to preserve the LIS, bucked the advice of federal personnel

24

25      [2] *See Cunningham v. City of Wenatchee*, 345 F.3d 802, 812 (9th Cir. 2003) (applying
    *Youngblood* and *Trombetta*); *United States v. Booth*, 309 F.3d 566, 574 (9th Cir. 2002) (applying
26  *Trombetta*); *United States v. Garcia*, 37 F.3d 1359, 1366 (9th Cir. 1994) (applying *Youngblood*); *United
    States v. Sinek*, 2016 WL 11687630, at *3-*4 (N.D.N.Y. Aug. 18, 2016) (applying *Youngblood* and
27  *Trombetta*); *United States v. Patrick*, 2016 WL 6610983, at *1 (E.D. Mich. Nov. 9, 2016) (applying
    *Trombetta*); *United States v. Hinkson*, 2004 WL 7333646, at *13-*14 (D. Idaho Dec. 22, 2004)
28  (applying *Youngblood* and *Trombetta*).

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO SUPPRESS
CR-18-00258 EJD

4

1  regarding the handling of the LIS, and then (years later) sought to cast the blame on others for the loss of

2  this evidence. *See* Dkt. 810 at 5-6; Dkt. 730 at 10-20. In addition, Ms. Holmes is severely prejudiced by

3  the loss of the LIS, for the reasons previously explained to the Court. *See* Dkt. 810 at 6-7; Dkt. 730 at

4  10-12; *see also* 5/4/2021 Hr'g Tr. 46:15-49:3.

5      The government also suggests that the case law forecloses relief when the exculpatory potential

6  of the evidence is "purely speculative." Dkt. 846 at 2. But lost evidence need only be "potentially

7  useful" to warrant sanctions. *See infra* pp. 5-6. There is no question that the LIS contained significant

8  exculpatory evidence, *see infra* pp. 9-10 n. 8, 9, or that the government appreciated the significance of

9  the database before its loss, Dkt. 846 at 5-6 (describing government subpoenas for data contained in

10  LIS).

11      **II.    The Loss of Potentially Useful Evidence Can Constitute a Due Process Violation
        Under *Youngblood*.**

12

13      **A.    The Government Misstates the Legal Standard Under *Youngblood*.**

14      The government maintains that the loss of evidence that could have either exculpated or

15  inculpated a defendant cannot form the basis of a due process violation. Dkt. 846 at 7-8, 12-13. That is

16  an incorrect statement of the law. *Youngblood* makes clear that the loss of even "potentially exculpatory

17  evidence" can violate the Due Process Clause. 488 U.S. at 57-58. In assessing whether the government

18  has acted in bad faith, the key question is whether the government had "knowledge of the *potential*

19  usefulness of the evidence" at the time that evidence was lost or destroyed. *Zaragoza-Moreira*, 780

20  F.3d at 977 (emphasis added).[3]

21      The Ninth Circuit's opinion in *Zaragoza-Moreira* is on point. *Id*. In that case, the Ninth Circuit

22  found a due process violation when the government destroyed a videotape that could have "corroborated

23  or disproved" the defendant's statements supporting her duress defense. *Id*. at 980. The defendant was

24

25      [3] The Supreme Court does not require a finding of bad faith "when the [government] suppresses
        or fails to disclose material exculpatory evidence." *Illinois v. Fisher*, 540 U.S. 544, 547 (2004). In that
26      circumstance, "the good or bad faith of the prosecution is irrelevant: a due process violation occurs
        whenever such evidence is withheld." *Id*. The bad-faith requirement applies only when the government
27      has failed "to preserve evidentiary material of which no more can be said than that it could have been
        subjected to tests, the results of which might have exonerated the defendant." *Id*. (quoting *Youngblood*,
28      488 U.S. at 57).

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO SUPPRESS
CR-18-00258 EJD

5

1  apprehended at a port of entry with narcotics.  *Id.* at 975.  At an interview, the defendant informed a

2  government agent of facts supporting a duress defense—namely, that she had tried to get the attention of

3  authorities while in the port-of-entry line, and that she had been accompanied in line by a woman named

4  "Karen" who had pressured her to transport the drugs.  *Id.*  The agent was independently aware that a

5  videotape existed that might have substantiated those statements, but "made no attempt to view or

6  preserve the . . . video before it was destroyed."  *Id.* at 980.  The Ninth Circuit held that the government

7  agent was aware of the videotape's "apparent value," despite the fact that no one had actually viewed the

8  videotape.  *Id.*  That knowledge, coupled with the agent's knowledge that "Karen" had passed through

9  that port-of-entry (which partially corroborated the defendant's account), and the agent's omission of

10  statements of the defendant from some (but not all) post-interview documents, established bad faith and

11  required dismissal of the indictment.[4]  *Id.* at 980-81.

12        **B.**       **The Parties Dispute Whether the *Youngblood* Elements Have Been Satisfied.**

13        *Youngblood* and its progeny set out three elements for a due process violation resulting from the

14  loss of evidence.  As applied to this motion, those are:

15      • Whether the evidence residing on the LIS was potentially useful to Ms. Holmes' defense;

16      • Whether the government failed to access and preserve the LIS while knowing that evidence

17          was potentially useful to Ms. Holmes, and its conduct is sufficient to show "a conscious

18          effort to suppress exculpatory evidence," i.e., bad faith;

19      • Whether Ms. Holmes can obtain comparable evidence by other reasonably available means.

20  *Zaragoza*, 780 F.3d at 977, 980.

21        The parties agree on some facts relevant to the three-part test and dispute others.  As to the first

22  element, the government does not contest that the LIS contained some exculpatory evidence.  For

23  example, the government accepts that the LIS contained substantial data concerning millions of testing

24  results (including potentially millions of accurate test results), contained vast quantities of QC data, and

25

26           [4] The government notes that, in *Zarogoza-Moreira*, the prosecutor "failed to notify the agency of

27  the defendant's explicit request to preserve the video evidence."  Dkt. 846 at 11.  But the Ninth Circuit
made clear that it was not relying on the conduct of the prosecutor for its finding of bad faith—the

28  conduct of the federal agent was sufficient.  *See* 780 F.3d at 981.

1   could be used to query and access those results and data. Dkt. 846 at 3-4. Ms. Holmes has described the

2   ways in which this information could be used to assess accuracy of particular testing results. *See* Dkt.

3   730 at 10-11; 5/4/2021 Hr'g Tr. 46:15-49:3. Nor does the government dispute that, under this Court's

4   ruling, accurate results in the LIS would be exculpatory. Dkt. 810 at 6 (quoting Dkt. 798 at 48-49). The

5   parties dispute the degree of prejudice associated with the loss of the LIS. *Compare* Dkt. 846 at 12-13,

6   *with* Dkt. 810 at 4, 6-7. For example, the government now describes the LIS as "secondary evidence."

7   Dkt. 846 at 13. That is incorrect, as Theranos' specific lab testing results and QC data were stored in the

8   LIS, as the government has elsewhere acknowledged, *see* Dkt. 846 at 4-5, Dkt. 682 at 1-3. The

9   government's second- and third-hand anecdotes about testing results and QC data all trace to the LIS.

10       As to the second element (whether the government acted in bad faith), the government refuses to

11   accept that it bears any responsibility for the loss of the LIS evidence, arguing instead that Theranos

12   "destroyed the [LIS] evidence." Dkt. 846 at 11-12; 5/4/2021 Hr'g Tr. 81:17-18. This position conflicts

13   with the statements of witnesses who understood that, even after the closure of Theranos' facility in

14   August 2018, the LIS could be reconstituted on its original hardware. *See* Dkt. 736-7 (filed under seal);

15   Ex. 10 (US-REPORTS-0025513); *cf.* Dkt. 735-4 (describing November 2018 attempt by former

16   Theranos contractor to access LIS that "suggest[ed] that the database servers *may* still be running").

17   Other witnesses with IT expertise have stated that it would have been technically possible to reconstitute

18   the LIS on its original hardware. Ex. 11 (US-REPORTS-0024258) (IT expert "did not think it would be

19   difficult to reconstruct the servers to make them work because they had given them instruction on how

20   to rebuild them and it was a standard Microsoft procedure on how to rebuild it."); Ex. 13 (US-

21   REPORTS-0019711) (although "very difficult," LIS could be reconstructed if the hard drives were

22   placed in the proper order).

23       In addition, unanswered questions remain (due to the government's inadequate disclosures) as to

24   why government attorneys refused to follow the advice of government personnel regarding ways to

25   access the LIS following the assignment. *See Brady* Letter ¶¶ 46-49. The government's course of

26   conduct after taking possession of the LIS copy (including its massive, years-later expenditure of

27   resources to pin the fault elsewhere) bears directly on the question of bad faith, as does the decision to

28

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO SUPPRESS
CR-18-00258 EJD

7

1   seek the return of an indictment before consulting the company's comprehensive database to assess

2   accuracy and reliability.  *See* Dkt. 730 at 8; *Zaragoza-Moreira*, 780 F.3d at 980.

3         As to the third element, the government's opposition does not contest that Ms. Holmes is unable

4   "to obtain comparable evidence by other reasonably available means." *Zaragoza-Moreira*, 780 F.3d at

5   977, 981 (rejecting cross-examination as a comparable substitute).  The government has acknowledged

6   that the LIS was a unique repository of critical evidence in this case.  *See* Dkt. 682 at 1-3, 9-10.

7         The government's principal response to all this is to suggest that it never had a working copy of

8   the LIS.  Dkt. 846 at 9-10.  But, as the government concedes, the government's failure even to collect

9   potentially exculpatory evidence violates due process if done in bad faith, *id*. at 8.  And, as already

10  discussed, the facts surrounding this issue are very much in dispute.  *See supra* pp. 3-4.  An evidentiary

11  hearing is required to resolve the parties' factual dispute concerning the government's conduct.  *See*

12  *Zaragoza-Moreira* 780 F.3d at 977, 980.[5]

13  **III.    An Evidentiary Hearing Is Necessary to Resolve Specific Factual Disputes.**

14        Both parties agree that an evidentiary hearing is necessary "when the moving papers allege facts

15  with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested

16  issues of fact exist." *United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000); *see* Dkt. 846 at 18.

17  The government has already recognized a factual dispute relating to its handling of this evidence.

18  5/4/2021 Hr'g Tr. 81:17-18 (Government: "When it comes to blame for the loss of the LIS. As the Court

19  can tell, this is a very hotly debated factual dispute."); *see also id*. at 82:5-7, 83:17-23.  In addition, the

20  parties dispute specific facts associated with the question of prejudice, including whether the LIS data

21

22

23         [5] The government's cases do not warrant a different result.  In *United States v. Martinez-
24  Martinez*, the Ninth Circuit acknowledged that the loss of potentially exculpatory evidence may violate
    due process, but concluded that "it was not readily apparent that [the evidence at issue] might have
25  proven exculpatory."  369 F.3d 1076, 1087 (9th Cir. 2004).  By contrast, in this case, the government
    "undoubtedly appreciated the significance" of the LIS database.  *Zaragoza-Moreira*, 780 F.3d at 979.
26  The government also relies on *United States v. Drake*, 543 F.3d 1080, 1090 (9th Cir. 2008), which
    misstates the *Youngblood* standard.  To the extent that *Drake* stands for the idea that the loss of
27  potentially exculpatory evidence cannot violate due process, even when bad faith is present, it is
    inconsistent with *Youngblood* and has been abrogated by subsequent Ninth Circuit case law.  *See*
28  *Zaragoza-Moreira*, 780 F.3d at 977.

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO SUPPRESS
CR-18-00258 EJD

8

could "corroborate[] or disprove[]" the government's assertions about accuracy and reliability.

*Zaragoza-Moreira*, 780 F.3d at 980.

**A.      The Pleadings Have Identified Specific Contested and Unresolved Issues of Fact.**

Among others, the following contested and/or unresolved issues of fact exist:

***The quality of the government's conduct***

- Whether the government could have accessed the LIS through legacy Theranos servers after the closure of Theranos' facility (before their return to the lessor), as multiple witnesses have indicated;[6]

- Whether, had the government followed the advice of its litigation support professionals, it could have accessed and preserved the copy of the LIS in its possession;[7]

- Whether the government could have obtained the password to access the produced copy of the LIS if it had timely sought the password, *see supra* p. 9 n. 6;

- The extent of government notice about the existence of accurate testing results in the LIS;[8]

---

[6] According to evidence generated by the government's "independent" grand jury investigation, there were at least two possible ways to access the LIS following the closure of Theranos' facility in late August 2018. First, the government might have accessed the copy of the LIS produced to it on August 27, 2018. The government states that this copy was "inaccessible" because the government lacked the appropriate password (although the government did not timely request the password). Dkt. at 846 at 6, 18. But a number of witnesses have stated that there was a *second* possible way to access the LIS: the LIS could have been reconstituted on the sophisticated hardware retained by Theranos and subsequently by the Assignee. The government has repeatedly ignored the availability of this second possible pathway for accessing and preserving the LIS. *Compare, e.g.,* Dkt. 846 at 5, 18 (asserting that the copy of the LIS that it received was "inaccessible"); 5/4/2021 Hr'g Tr. 83:17-21 (government argument: describing copy of LIS in government's possession as "inaccessible"), *id.* at 83:6-16 (government argument: stating that government attempts to access LIS after closure of Theranos facility "may have been doomed from the start"), *id.* at 83:3-5 (government argument: it was "likely impossible" to access the LIS); *with supra* p. 8 (witness statements that it was understood that LIS could be reconstituted after the closure of Theranos facility).

[7] *Compare* Dkt. 846 at 5; 5/4/2021 Hr'g Tr. 83:17-21, *with Brady* Letter ¶¶ 46-49.

[8] Before August 2018, the government knew that accurate test results resided in the LIS. *See, e.g.,* Ex. 14 (US-REPORTS-0008569) (February 28, 2018 interview with member of prosecution team and doctor, who stated that "Theranos was his favorite laboratory" and "all his clients' test results from Theranos were clinically relevant"); Ex. 15 (US-REPORTS-0007225) (February 2, 2018 interview in which doctor said that out of "40 or 50" patients sent to Theranos only "[a] couple of those results were 'weird'" but "[w]eird laboratory results aren't out of the ordinary"); Ex. 16 (US-REPORTS-0008710) (February 27, 2018 interview including member of prosecution team in which doctor, when shown test result, stated that he "did not have a concern about the accuracy of the test" and, when shown another, "did not find anything concerning in the lab results"); Ex. 17 (US-REPORTS-0002771) (investor's Theranos blood test results "seemed consistent with other tests he has received").

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO SUPPRESS
CR-18-00258 EJD

9

- The extent to which the LIS contained exculpatory evidence in the form of accurate test results;[9]

- The extent of government notice about the technical complications associated with accessing and preserving the LIS, Dkt. 732-3, 732-4, 736-7 (under seal);

- The reason why government attorneys did not take steps recommended by government personnel to gather and/or access and preserve the LIS, *Brady* Letter ¶¶ 46-49;

- The reason why the government did not acquire the software needed to access the LIS, as recommended by Theranos counsel, *Brady* Letter ¶ 32; Dkt. 734, 734-1;

- The reason why the government did not "go the search warrant route," Dkt. 734-1, or seek to take possession of the physical servers (as it did for specific devices), Dkt. 734-2; *Brady* Letter ¶ 33;

- The extent of involvement of members of the prosecution team in these events, Dkt. 732-3, 732-4, 734, 734-1, 734-2, 736-7 (under seal); *cf., e.g., Brady* letter ¶¶ 46-49 (describing actions of unnamed government attorneys).

### *Degree of prejudice to the accused*

- Whether the data in the LIS could have been used to rebut the government's assertions of accuracy and reliability;[10]

- Whether (as Dr. Master states in his supplemental report) an individual test result tends to prove or disprove accuracy and reliability of the underlying technology, Dkt. 842-1 at 2;

- Whether the rich array of data in the LIS (both patient testing data and QC data) could been used to verify or rebut anecdotal assertions, including from Kingshuk Das, Adam Rosendorff, and doctors and customers;[11]

---

[9] *Compare* Dkt. 846 at 2 ("purely speculative" that LIS possessed actual exculpatory evidence), *with supra* p. 9 n. 8 (detailing exculpatory evidence in LIS).

[10] *Compare* Dkt. 846 at 3; 5/4/2021 Hr'g Tr. 79:10-15, *with* Dkt. 730 at 2, 9-12; Dkt. 810 at 6-7; 5/4/2021 Hr'g Tr. 46:15-49:3.

[11] *Compare* Dkt. 846 at 3; 5/4/2021 Hr'g Tr. 79:10-15, *with* Dkt. 730 at 2, 9-12; Dkt. 810 at 6-7; 5/4/2021 Hr'g Tr. 46:15-49:3.

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO SUPPRESS
CR-18-00258 EJD

10

- The "probative value and reliability of the secondary or substitute evidence" intended to be used by the government at trial;[12]

- The "nature and probable weight of factual inferences or other demonstrations and kinds of proof lost" to Ms. Holmes as a result of the loss of the LIS data.[13]

These factual issues are directly relevant to the question whether to suppress the evidence identified in Ms. Holmes' motion.[14]

**B.    Testimony Is Necessary to Resolve Contested or Open Issues of Fact.**

Resolving these factual disputes requires testimony from the individuals involved, and the production and review of relevant documents.  For example, the parties will need to elicit testimony from the following individuals on the following subjects.

- USAO Automated Litigation Support (ALS) Staff
  - What options for accessing the LIS the ALS Unit, government paralegal(s), and government attorneys discussed in fall 2018, *Brady* Letter ¶¶ 39-43, 45-47;
  - The reasons for the ALS Unit's recommendations for accessing the LIS, *id*. ¶ 46;
  - How the ALS ordinarily accesses and preserves sensitive data, *cf. id*. ¶¶ 37-54.
- USAO Paralegal(s)
  - Whether the paralegal received any instructions from government attorneys upon receipt of the hard drive containing the LIS copy;[15]
  - Why the paralegal delayed approximately two weeks before sending the hard drive to the Automated Litigation Support supervisor, *Brady* Letter ¶¶ 36, 39;
  - Whether anyone contacted the paralegal between October 30, 2018 and May 2020 regarding the LIS copy in her possession, *id*. ¶¶ 47, 49, 53;

---

[12] *Compare* Dkt. 846 at 13, *with* Dkt. 810 at 6.

[13] *Compare* Dkt. 810 at 6-7; Dkt. 730 at 10-11; 5/4/2021 Hr'g Tr. 46:15-49:3, *with* Dkt. 846 at 13.

[14] To be clear, Ms. Holmes does not concede that the LIS at the Theranos facility was the "only accessible version of the database," or that the LIS was inaccessible after the closure of that facility. Dkt. 846 at 18.  Ms. Holmes also does not concede that the government lacked "notice" of Theranos' closure and, with it, the movement of the LIS servers from the Theranos facility.  *Id*.

[15] *See id*. ¶ 36; *see* Exs. 18 (USAO-8511), 19 (USAO-8512).

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO SUPPRESS
CR-18-00258 EJD

11

1   o   Why the paralegal re-initiated contact twice in January 2019 with government attorneys
2       to remind them of potential ways to access the LIS, *id*. ¶ 49;
3   o   Whether the government attorneys responded to this January 2019 outreach, *id*.
4   •   Government attorneys
5   o   Why the government sought productions of data from the LIS from 2015 to 2018.[16]
6   o   Whether government attorneys were informed that there would be technical difficulties
7       associated with accessing the LIS database, Dkt. 732-3, 732-4, 736-7 (under seal);
8   o   How government attorneys responded to notice of those technical difficulties, *id*.;
9   o   Why the government did not acquire the software identified in the July 2018 email from
10      Theranos counsel to the prosecution team as necessary to restore and run the LIS, *Brady*
11      Letter ¶ 32; Dkt. 734, 734-1;
12  o   Whether the fact that the LIS copy was intended for a SQL database was communicated
13      to the paralegal and the ALS unit, *Brady* Letter ¶ 46;
14  o   Why the government waited until June 4, 2018 to subpoena the LIS, Dkt. 733;
15  o   The identities of the unnamed government attorneys described in the *Brady* letter, and
16      why did they not follow the advice of ALS staff and the USAO paralegal outlined in the
17      *Brady* letter, *Brady* Letter ¶¶ 46, 49;
18  o   Whether the government asked the FBI or any other agency with appropriate expertise to
19      try to access the LIS database, *id*. ¶¶ 46-47;
20  o   Whether government attorneys responded to the paralegal's proposals for accessing the
21      LIS in January 2019, *id*. ¶ 49;
22  o   Whether the government took steps to contact any Theranos IT personnel for assistance
23      with accessing the LIS in fall 2018, *cf. id*. ¶ 18;

---

[16] Dkt. 846 at 5-6; Dkt. 846-7, 846-8; *cf. Zaragoza*, 780 F.3d at 979 (questions about duress defense showed government notice of potentially exculpatory nature of evidence).

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO SUPPRESS
CR-18-00258 EJD

12

1   o   Whether government counsel (as they have previously represented) spoke with Theranos
2       counsel over the phone regarding access to the LIS database shortly after receiving the
3       copy of the LIS, Dkt. 730 at 15 n. 9; Dkt. 735-2.
4   o   Whether government counsel contacted a particular former Theranos executive, as a
5       member of the prosecution team indicated they might, Dkt. 736-1;
6   • Theranos counsel
7   o   What specifically Theranos counsel told government attorneys regarding technical
8       difficulties associated with accessing the LIS database, Dkt. 732-3, 732-4, 736-7 (under
9       seal);
10  o   When Theranos counsel did so, *id.*;
11  o   Whether Theranos counsel informed the government of the closing of the Theranos
12      facility and/or the disassembly of the LIS.[17]
13  At the requested evidentiary hearing, Ms. Holmes also would call one or more witnesses to establish the
14  capabilities and functionality of the LIS, and how it included vast amounts of information that are
15  directly relevant to the government's allegations.[18]
16  **C.    The Government Has Conceded Specific Issues of Fact.**
17  The government has conceded certain factual issues relevant under *Flyer*.
18  ***Quality of government conduct***
19  • The government was on notice as early as 2015 of the LIS and its contents, Dkt. 846 at 5-6,
20    Dkt. 732-1;
21  • The government sought and received productions of data derived from the LIS between 2015
22    and 2018, *id.*; Dkt. 732-1; *Brady* Letter p. 12, ¶ 19;
23  • Theranos counsel produced what they represented to be a copy of the LIS to the government,
24    *Brady* Letter ¶ 36; Dkt. 681-35;
25
26
27    [17] Dkt. 846 at 11, 18.
28    [18] *See* Dkt. 682 at 1-3; Dkt. 810 at 6-7; Dkt. 730 at 10-11; 5/4/2021 Hr'g Tr. 46:15-49:3.
    MS. HOLMES' REPLY IN SUPPORT OF MOTION TO SUPPRESS
    CR-18-00258 EJD
                                    13

- The government took custody of that copy, *Brady* Letter ¶ 36; Exs. 18 (USAO-8511), 19 (USAO-8512);

- Government attorneys did not follow the advice of litigation support professionals after receipt of that copy, *Brady* Letter ¶¶ 46-49;

- Members of the prosecution team were involved in the events at issue, Dkt. 732-3, 732-4, 734, 734-1, 734-2, 736-7 (under seal).

***Prejudice to Ms. Holmes***

- The data the LIS contained (including data relating to each testing result and all the QC data) and the specific functionality of the database (including the ability to query and sort data);[19]

- That the LIS contained potentially millions of accurate test results;[20]

- The probable effect on the jury of loss of evidence, *i.e.*, faulting Ms. Holmes for the loss of the evidence, *see supra* pp. 1-2, and shifting the burden to her to disprove the government's accuracy-and-reliability allegations, *cf.* Dkt. 846 at 3-4.

The government also concedes the legal proposition that, under this Court's motion *in limine* ruling, an accurate test result is exculpatory.  Dkt. 810 at 6.

**IV.     Ms. Holmes Is Entitled to Evidence Identified in the Government's *Brady* Letter.**

Contrary to the government's assertion, *see* Dkt. 846 at 19, Ms. Holmes is not attempting to "search for information" within government files—she requests the particular evidence relied on or contained in the government's October 29, 2020 *Brady* letter.  This evidence is essential for the Court to make an informed decision under *Youngblood* and *Flyer*, and Ms. Holmes is entitled to it under *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and Rule 16.  The *Brady* letter plainly quotes from documents not yet produced to Ms. Holmes,[21] and describes conduct of unnamed government personnel that is squarely at issue in this motion.  *See, e.g., Brady* Letter ¶¶ 37-52;

---

[19] *See* Dkt. 846 at 4-5; Dkt. 682 at 1-3.

[20] The government does not contest this assertion in its opposition.  *See* Dkt. 810 at 6.

[21] *See, e.g., Brady* Letter ¶¶ 3-4 (quoting "Notes by a postal inspector"); ¶¶ 5, 11 (quoting "Government notes"); ¶ 6 (quoting "Notes by an SEC attorney"); ¶ 7 (quoting "Notes by an SEC attorney"); ¶¶ 8-10, 13-22, 29 (quoting "Notes by an SEC attorney"); ¶ 41 (screenshot of computer message); ¶ 43 (apparent block quote and screenshot of computer message).

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO SUPPRESS
CR-18-00258 EJD

14

1   *Mellen v. Winn*, 900 F.3d 1085, 1097-98 (9th Cir. 2018) ("[T]he government cannot satisfy

2   its *Brady* obligation to disclose exculpatory evidence by making some evidence available and claiming

3   the rest would be cumulative.").  The government's refusal to produce this evidence is troubling, as the

4   government bears the burden of justifying its conduct under *Flyer.  See supra* p. 2.

5          This evidence also is material to Ms. Holmes' defense at trial.  The government has noticed

6   numerous LIS-related witnesses.  In light of this Court's ruling on the motions *in limine*, some of those

7   witnesses appear unlikely to testify, although Ms. Holmes notes that the government added many of

8   these witnesses to its list *after* that ruling.  Dkt. 798 at 57-58.  If the Court revisits its ruling, Ms. Holmes

9   will need to know who the individuals identified are, and what documents the *Brady* letter cites, quotes,

10  and relies upon, in order to examine the noticed government witnesses and develop her own witness

11  list.[22]  *See* Fed. R. Crim. P. 16(a)(1)(E)(i) (requiring government to disclose all "documents . . . within

12  the government's possession, custody, or control [that are] material to preparing the defense"); *see also*

13  *United States v. Stevers*, 603 F.3d 747, 753-54 (9th Cir. 2010) (finding Rule 16 violation when

14  government withheld relevant evidence).

15                                      **CONCLUSION**

16          For the foregoing reasons, and those stated in Ms. Holmes' motion, this Court should order an

17  evidentiary hearing and, thereafter, grant Ms. Holmes' motion.

18

19  _____

20  [22] Ms. Holmes' motion is timely.  For two reasons, the motion was not "reasonably available" before this Court's August 2020 deadline for Rule 12 motions, and Ms. Holmes has "good cause" to bring this motion now.  Fed. R. Crim. P. 12(b)(3), (c)(3).  First, the government did not provide its

21  *Brady* disclosures relating to the loss of the LIS evidence until after the Court's Rule 12 deadline.  The government has made key productions on this issue well after the Court's motion *in limine* deadlines.

22  As relevant here, the government produced audio recordings, FD-302s, agent notes, and other documents relating to the LIS weeks after Ms. Holmes filed her February 23, 2021 Reply in Support of

23  Motion to Exclude Anecdotal Test Results, Dkt. 730, despite having had much of this evidence in its possession for months.  The government continues to resist disclosure of evidence relevant to this

24  motion.  *See supra* pp. 14-15.  Courts routinely deem Rule 12(b) motions timely in such circumstances. *See United States v. White*, 850 F.3d 667, 673 (4th Cir. 2017) (mid-trial motion for a *Franks* hearing

25  timely because it was based on trial testimony); *United States v. Montes De Oca*, 656 F. App'x 831, 833 n. 1 (9th Cir. 2016) (post-trial motion to dismiss timely because government had disclosed relevant

26  evidence after trial); *see also* Fed. R. Crim. P. 12 Advisory Committee Notes – 2012 Amendments ("The 'then reasonably available' language is intended to ensure that a claim a party could not have raised on

27  time [due to lack of information] is not subject to the [good cause] limitation on review imposed by Rule 12(c)(3).").  Second, this Court had not endorsed the relevance of the government's anecdotal evidence

28  until its motion *in limine* rulings.  *See* Dkt. 810 at 1; Dkt. 798 at 49-50.

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO SUPPRESS
CR-18-00258 EJD
                                        15

1    DATED:  June 28, 2021                    Respectfully submitted,

2

3

4                                            KEVIN DOWNEY
                                             LANCE WADE
5                                            AMY MASON SAHARIA
                                             KATHERINE TREFZ
6                                            Attorneys for Elizabeth Holmes

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO SUPPRESS
CR-18-00258 EJD
                                    16

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 28, 2021 a copy of this filing was delivered via ECF on all counsel of record.

_____

LANCE WADE
Attorney for Elizabeth Holmes

MS. HOLMES' REPLY IN SUPPORT OF MOTION TO SUPPRESS
CR-18-00258 EJD

JOHN D. CLINE (CA State Bar No. 237759)
50 California Street, Suite 1500
San Francisco, CA 94111
Telephone: (415) 662-2260 │Facsimile: (415) 662-2263
Email: cline@johndclinelaw.com

KEVIN M. DOWNEY (Admitted Pro Hac Vice)
LANCE A. WADE (Admitted Pro Hac Vice)
AMY MASON SAHARIA (Admitted Pro Hac Vice)
KATHERINE TREFZ (CA State Bar No. 262770)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC 20005
Telephone: (202) 434-5000 │Facsimile: (202) 434-5029
Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

Attorneys for Defendant ELIZABETH A. HOLMES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR-18-00258-EJD |
| Plaintiff, | **MS. HOLMES' RESPONSE TO GOVERNMENT'S SUPPLEMENTAL EXPERT REPORT** |
| v. | |
| ELIZABETH HOLMES and RAMESH "SUNNY" BALWANI, | Hon. Edward J. Davila |
| Defendants. | |

MS. HOLMES' RESPONSE TO GOVERNMENT'S SUPPLEMENTAL EXPERT REPORT
18-CR-00258-EJD

1

**<u>TABLE OF CONTENTS</u>**

2

<u>Page</u>

3

I.      The Court Should Strike Dr. Master's Untimely New Expert Report. ........................................... 1

4

II.     The Court Should Exclude Dr. Master's New Opinions under Rule 702 and *Daubert* .................. 4

5

III.    The Court Should Exclude Dr. Master's Original Opinions on HIV, HbA1c, Calcium, and
        Chloride .......................................................................................................................................... 7

6

7       Conclusion ....................................................................................................................................... 7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MS. HOLMES' RESPONSE TO GOVERNMENT'S SUPPLEMENTAL EXPERT REPORT
CR-18-00258-EJD

i

1   The Court ordered a *Daubert* hearing to "assess the reliability of Dr. Master's methodology,

2   which he employed to provide testimony and opinions about chloride, potassium, bicarbonate, HIV,

3   HbA1c, hCG, cholesterol, calcium, and sodium" in his March 2020 expert disclosure.  Dkt. 797 at 11;

4   *see also* 5/5/2021 Hr'g Tr. at 17:21-22 (stating that Court would order a "*Daubert* hearing, for those

5   particular topics").  In aid of that determination, the Court ordered the government to file "[a]ny

6   supplemental material the Government plans to rely on at the hearing" by June 18, 2021.  Dkt. 797 at 11.

7   The government apparently finds itself unable to defend the anecdotal methodology that Dr.

8   Master employed in his expert disclosure that is the subject of the ordered *Daubert* hearing; indeed, Dr.

9   Master has disavowed some of his earlier opinions and has failed to supplement others.  The government

10   did not file on June 18 "supplemental material" supporting Dr. Master's disclosed methodology.

11   Instead, it filed a new expert report employing new methodologies that were not discussed in Dr.

12   Master's initial disclosure and introducing new opinions on ten additional Theranos assays.

13   Supplemental Report (Supp. Rpt.), Dkt 842-1, at 1-9.  The government's disclosure of brand-new expert

14   opinions on the eve of the planned *Daubert* hearing[1] and trial violates the scheduling order and the

15   Court's *Daubert* order.  The government cannot establish good cause for its delay.  The Court should

16   strike the new report.[2]

17   **I.      The Court Should Strike Dr. Master's Untimely New Expert Report.**

18   Dr. Master's "supplemental" report is no mere supplement.  It contains brand-new opinions.  The

19   report purports to employ new "sigma metrics" and/or "linear correlation coefficient" methodologies to

20   three of the nine assays at issue in the Court's *Daubert* order (bicarbonate, hCG, and sodium).[3]  Dr.

21   Master did not discuss or even mention those methodologies in his original report, nor did the

22

23   [1] Given the complexity of the evidence that the defense will need to use at the *Daubert* hearing in

24   light of Dr. Master's new opinions, the defense now believes that a remote hearing conducted by videoconference will not be possible.  The parties are meeting and conferring about dates for an in-person hearing and will be in touch with the Court.

25   [2] Dr. Master's new opinions also fail Rule 702 and *Daubert* on their merits, although Ms.

26   Holmes has not yet had sufficient time to prepare a *Daubert* motion.  Ms. Holmes previews those arguments in Part II below.

27   [3] Ms. Holmes attaches as Appendix A a chart showing which new methodologies do or do not

28   relate to the at-issue assays.

MS. HOLMES' RESPONSE TO GOVERNMENT'S SUPPLEMENTAL EXPERT REPORT
CR-18-00258-EJD

1

1   government discuss them in response to Ms. Holmes' *Daubert* motion.  Applying the new

2   methodologies, Dr. Master also adds new opinions for ten assays absent from his original disclosure

3   (Vitamin B12, Estradiol, TSH, TT3, TT4, fT4, TST, Prolactin, SHBG, and tPSA).  Supp. Rpt. at 8.  The

4   new report violates the scheduling order, Rule 16, and this Court's *Daubert* order and should be

5   stricken.  If Dr. Master is permitted to offer his untimely opinions, Ms. Holmes will have no choice but

6   to move for a two-month continuance.

7        *The scheduling order and Rule 16*.  Under the scheduling order negotiated by the parties and

8   entered by the Court, the government's Rule 16 expert disclosure was due on March 6, 2020, which was

9   then five months before the scheduled August 4, 2020 trial date.  *See* Dkt. 171 (adopting schedule in

10  Exhibit F to Status Report, Dkt 170-6); Dkt. 83.  That deadline implemented the requirement that expert

11  disclosures be provided "in a timely fashion" to avoid surprise and mitigate the need for continuances.

12  Fed. R. Crim. P. 16 advisory committee note.

13       The government's new disclosure for Dr. Master is more than one year late.  It comes less than

14  two weeks before the court-ordered *Daubert* hearing, and only two months before trial.  Ms. Holmes

15  negotiated the pre-trial schedule to provide sufficient time to respond to expert opinions in this complex

16  case.  The introduction of untimely new expert opinions on the eve of trial will prejudice her defense.  It

17  is unrealistic to expect Ms. Holmes to cross-examine Dr. Master on his new opinions at trial in two

18  months.  Defense counsel have already diverted precious trial preparation time to understanding the new

19  opinions and reviewing the 1,000 pages of cited material.  That diversion of resources will continue;

20  counsel will need to prepare a new *Daubert* motion targeting the new opinions.  Ms. Holmes will need

21  to re-consider whether to disclose her own responsive expert.  And all this will need to occur during a

22  time when counsel will lack ready access to their client.

23       The only appropriate remedy for the government's violation of the scheduling order is to strike

24  the new report.  *See United States v. Grace*, 526 F.3d 499, 516 (9th Cir. 2008) ("[T]he court has inherent

25  authority to enforce its specific discovery order, which the government would violate if it were to call

26  undisclosed nonexpert witnesses."); Fed. R. Crim. P.16 (d)(2) (providing that when a party fails to

27  comply with Rule 16, including a court order, the court may, as relevant here, "(B) grant a continuance;

28  MS. HOLMES' RESPONSE TO GOVERNMENT'S SUPPLEMENTAL EXPERT REPORT
CR-18-00258-EJD

2

1  (C) prohibit that party from introducing the undisclosed evidence; or (D) enter any other order that is

2  just under the circumstances").  In determining which sanction to employ in cases of untimely

3  government disclosures, "the Court should typically consider three factors: '(1) the reason for the

4  government's delay in production; (2) the extent of prejudice to the defendant as a result of the delay;

5  and (3) the feasibility of curing the prejudice with a continuance.'" *United States v. Yagi*, 2013 WL

6  10570994, at *16 (N.D. Cal. Oct. 17, 2013) (excluding expert testimony when government failed to

7  serve timely disclosures).

8      Each factor favors striking the report.  The government offered no reason for its delay, and none

9  exists.  Nearly every document on which Dr. Master bases his new opinions has been in the

10  government's possession for years.  The government apparently provided the documents to Dr. Master

11  on May 26, 2021, Declaration of Amy Mason Saharia (Saharia Decl.), Ex. A. (5/26/2021 Email from Dr.

12  Master to R. Leach), following the Court's *Daubert* order and at a time when the government was

13  resisting the defense's efforts to schedule a prompt *Daubert* hearing, Saharia Decl. Ex. B (6/5/2021

14  Email from R. Leach to L. Wade).

15      Nor does Dr. Master provide any reason for his failure to identify his new methodology in his

16  initial disclosure.  Dr. Master states that sigma statistics "were first introduced into laboratory medicine

17  in the early 1970s in a paper by Dr. James Westgard" and "thus, they have a long and well-established

18  role in laboratory medicine analytics."  Supp. Rpt. at 2.  If that is so, there is no excuse for Dr. Master's

19  failure to apply this methodology in his first report.  The same is true for his new linear correlation

20  coefficient analysis.  Dr. Master explains that he applied this analysis using Theranos' validation reports,

21  Supp. Rpt. at 1, but, contrary to Dr. Master's assertion, those are not "newly available" documents, *id*. at

22  4.  The government has long had these documents.  And, in the Appendix to his original report, Dr.

23  Master cited several validation reports including US-FDA-0024744 (chloride), US-FDA-0024797

24  (potassium), and US-FDA-0024827 (sodium).  Initial Dr. Master Rpt., Dkt. 580-5, at 49 (Mar. 6, 2020);

25  *see also* Saharia Decl., Ex. C (USAO-006934), but nonetheless did not mention this methodology in his

26  initial disclosure.

27      As already explained, the government's untimely disclosure, if permitted, will prejudice Ms.

28

MS. HOLMES' RESPONSE TO GOVERNMENT'S SUPPLEMENTAL EXPERT REPORT
CR-18-00258-EJD

3

1  Holmes.  But a continuance also would prejudice Ms. Holmes.  Ms. Holmes has been diligently

2  preparing for trial based on the current trial date, and delaying the trial by two months would push the

3  trial into the holiday period and likely reduce the number of available jurors.  The only appropriate

4  remedy is to strike the report and exclude all opinions therein.  *See United States v. Valdez*, 2019 WL

5  539074, at *2 (N.D. Cal. Feb. 11, 2019) ("The plain purpose of Rule 16 is to prevent exactly the

6  situation threatened here— a defendant facing imminent trial without an adequate opportunity to prepare

7  for evidence that the government intends to use against him.").  As referenced above, absent such relief,

8  Ms. Holmes will be forced to move for a two-month continuance to attempt to mitigate the resulting

9  prejudice.  *See United States v. Kloehn*, 620 F.3d 1122, 1127-29 (9th Cir. 2010) (explaining four-factor

10  inquiry for continuance).

11       *The Court's Daubert ruling.*  The new report also violates the Court's *Daubert* ruling and should

12  be stricken for that additional reason.  The Court ordered a *Daubert* hearing to "assess the reliability of

13  Dr. Master's methodology, which he employed to provide testimony and opinions about chloride,

14  potassium, bicarbonate, HIV, HbA1c, hCG, cholesterol, calcium, and sodium" in his March 2020

15  disclosure. Dkt. 797 at 11.  Dr. Master's new report does not identify supplemental material supporting

16  the methodology (if any) that he employed in the disclosure that is the subject of the pending *Daubert*

17  motion.  As already discussed, it instead discloses brand-new methodologies and new opinions on ten

18  different assays.  No reasonable interpretation of the Court's order permits the government to disclose

19  brand-new methodologies and opinions.

20  **II.    The Court Should Exclude Dr. Master's New Opinions under Rule 702 and *Daubert*.**

21       Ms. Holmes has not had sufficient time to prepare a *Daubert* motion targeting Dr. Master's new

22  opinions.  Nonetheless, Ms. Holmes expects that the evidence at the *Daubert* hearing will reveal

23  substantial flaws in Dr. Master's new opinions that preclude their admission.  Ms. Holmes offers the

24  following preliminary thoughts:

25       1.    Although Dr. Master focuses his new report on "sigma metrics" and/or "linear correlation

26  coefficient" methodologies, he does not appear to actually apply those methodologies to most of the nine

27  assays at issue in the Court's *Daubert* order.  He applies those methodologies only to three of the nine

28

MS. HOLMES' RESPONSE TO GOVERNMENT'S SUPPLEMENTAL EXPERT REPORT
CR-18-00258-EJD

4

1   assays.  *See* App. A.  He provides no justification for his failure to apply these methodologies to the

2   remaining six assays.

3          2.     Dr. Master does not establish the validity of the metrics on which he is basing his

4   calculations.  He appears to have plucked metrics out of Theranos documents and input them into his

5   calculations without explaining how he chose which metrics to use.  For example, he identifies various

6   $R^2$ values that he found in Theranos documents in his report, but does not explain why he chose these $R^2$

7   values instead of others, or why he used values calculated on one date but not on other dates.

8          3.     Dr. Master's claim that sigma statistics "have a long and well-established role in

9   laboratory medicine analytics," Supp. Rpt. at 2, appears suspect, as we will develop at the hearing.

10         4.     Dr. Master's lack of access to the underlying data precludes him from establishing the

11  reliability of his calculations.  Dr. Master's new calculations rest on inputs that he did not calculate.  For

12  example, sigma calculations involve two levels of calculations.  First, one must calculate metrics such as

13  bias and imprecision from raw Theranos data.  Then, those calculated metrics are input into the sigma

14  calculation.  Dr. Master does not have the raw data.  As a result, as he acknowledges, he cannot

15  independently conduct the first level of calculations.  Supp. Rpt. at 4.  Instead, he conducted only the

16  second level of calculations using as inputs "the company's own stated TEa, bias, and imprecision."  *Id.*

17  In other words, he is relying on inputs calculated by Theranos scientists.  The government has not

18  explained how it intends to establish the reliability of the inputs into Dr. Master's calculations, as it has

19  not disclosed any other expert testimony from Theranos scientists on this subject.

20       Although an expert may "present the findings and conclusions of those whose work he or she

21  supervised and that he or she could personally replicate if necessary," an expert cannot simply

22  summarize another witness's data.  *In re M/V MSC FLAMINIA*, 2017 WL 3208598, at *22 (S.D.N.Y.

23  July 28, 2017).  Dr. Master did not supervise Theranos scientists, and he cannot replicate their analysis

24  because he does not have the raw data.  He is simply parroting their calculations.  *See Finjan, Inc. v.

25  Sophos, Inc.*, 2016 WL 4560071, at *12 (N.D. Cal. Aug. 22, 2016) ("Rule 703 . . . does not permit an

26  expert to simply parrot the opinions of another expert").

27       Anticipating this defect, Dr. Master states that he is "confident that [his] conclusions are not

28  MS. HOLMES' RESPONSE TO GOVERNMENT'S SUPPLEMENTAL EXPERT REPORT
CR-18-00258-EJD

1  hampered by a lack of access to adequate data" because his sigma calculations are "similar" to

2  calculations described by Dr. Kingshuk Das, Theranos' former laboratory director, in a government

3  interview on February 21, 2021. Ex. D (US-REPORTS-0024149).[4]   That observation misses the point.

4  Dr. Master cannot blindly input into his mathematical formula metrics calculated by others that rest on

5  data to which Dr. Master lacks access. Dr. Master does not know what the data is, how it was gathered,

6  and whether it was reliably calculated. A qualified expert needs to establish the reliability of the inputs

7  into Dr. Master's formulas. The government has disclosed no expert who can do that. Dr. Master's new

8  calculations are an unreliable and unsupported attempt to replicate Dr. Das' 2016 analysis.

9        5.     In his "Additional Remarks," Dr. Master provides yet additional new opinions. Supp.

10  Rpt. at 9. He remarks that "Theranos knew or should have known that results from fingerstick samples

11  obtained using the Theranos collection device were completely inappropriate for clinical use." *Id.*

12  Similarly, he remarks that based on review of data for the ten new assays he believes there was a

13  pervasive problem with the Edison 3.5 platform. *Id.* These opinions fail *Daubert* for the following

14  additional reasons.

15        First, Dr. Master fails to explain why his opinion is tied to the Theranos collection device. He

16  does not review any collection device data nor explain how any data shows that use of the collection

17  device—as opposed to other factors—caused any of supposed problems on which he opines. *Id.*

18  Relatedly, he does not disclose any methodology he applied to reach this opinion.

19        Second, Dr. Master's opinion about what Theranos "knew or should have known" is

20  impermissible because experts cannot permissibly express views as to someone else's knowledge, intent,

21  or purpose. *See, e.g.*, *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004)

22  ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony.");

23  *Lofton v. McNeil Consumer & Specialty Pharmaceuticals*, 2008 WL 4878066, at *6-7 (N.D. Tex. July

24  25, 2008) (opinions "regarding Defendants' ethical obligations, motive, state of mind, asserted

25  

26      [4] Dr. Das cannot testify to any opinions he reached based on this analysis because the
government has not noticed him as an expert. For a fact witness to testify about opinions based on their

27  expertise, the offering party must abide by the disclosure requirements of Fed. R. Crim. P. 16. *See* Fed.
R. Evid. 701 advisory committee's notes to the 2000 amendment.

28  MS. HOLMES' RESPONSE TO GOVERNMENT'S SUPPLEMENTAL EXPERT REPORT
CR-18-00258-EJD

1  knowledge, and alleged conduct" excluded as "personal opinions or legal conclusions based on
2  Defendants' alleged behavior").

3      Finally, Dr. Master's remark about "a pervasive problem" with the Edison 3.5 is outside the
4  scope of the Court's *Daubert* order because it rests on Dr. Master's opinions about the ten new assays.
5  Ms. Holmes moved to exclude Master's opinion regarding "problems with the Edison" in her *Daubert*
6  motion, Dkt. 560 at 17-19, 23-24, and the government failed to respond to that argument in its
7  opposition, Dkt. 668; *see also* Reply In Support of *Daubert* Motion, Dkt. 704 at 12, 14-15.  The
8  government cannot revive this waived opinion.

9  **III.    The Court Should Exclude Dr. Master's Original Opinions on HIV, HbA1c, Calcium, and
10        Chloride.**

11      For independent reasons, the Court should exclude Dr. Master's opinions on HIV, HbA1C,
12  calcium, and chloride.  Dr. Master has not provided any additional evidence or analysis to support his
13  opinions on HIV and HbA1C.  *See* Supp. Rpt. at 8 ("I have no additional information on Theranos HIV
14  or Hba1c testing, and nothing to add to my original report.").  What is more, he has disavowed his prior
15  opinions for calcium and chloride.  *See id.* (stating that the data for calcium and chloride show the assays
16  were, respectively, operating "reasonably consistent with other clinical assays with respect to precision
17  and stability" and in their "operational behavior").  The Court should exclude Dr. Master's (prior)
18  opinions on these four assays without a *Daubert* hearing.

19                              **CONCLUSION**

20      For the foregoing reasons, the Court should strike the Supplemental Report, exclude Dr. Master's
21  prior opinions on HIV, HbA1c, calcium and chloride, and proceed with a *Daubert* hearing on the
22  remainder of the topics referenced in the Court's Order.  Dkt. 797 at 11.

23

24

25

26

27

28

MS. HOLMES' RESPONSE TO GOVERNMENT'S SUPPLEMENTAL EXPERT REPORT
CR-18-00258-EJD
                              7

1  DATED: June 25, 2021                    Respectfully submitted,

2

3                                          /s/ Amy Mason Saharia
                                           KEVIN DOWNEY
4                                          LANCE WADE
                                           AMY MASON SAHARIA
5                                          KATHERINE TREFZ
                                           Attorneys for Elizabeth Holmes
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MS. HOLMES' RESPONSE TO GOVERNMENT'S SUPPLEMENTAL EXPERT REPORT
CR-18-00258-EJD
                                  8

**CERTIFICATE OF SERVICE**

I hereby certify that on June 25, 2021 a copy of this filing was delivered via ECF on all counsel of record.


/s/ Amy Mason Saharia
AMY MASON SAHARIA
Attorney for Elizabeth Holmes

MS. HOLMES' RESPONSE TO GOVERNMENT'S SUPPLEMENTAL EXPERT REPORT
18-CR-00258-EJD

*United States v. Elizabeth Holmes & Ramesh Balwani*, CR 18-258 EJD (N.D. Cal.),
Supplement to Expert Report of Stephen Master, MD, PhD, FCAP, FAACC

June 18, 2021

I. Overview and Summary

I have been retained by the United States Attorney's Office (USAO) to provide expert testimony in this matter.  On March 6, 2020, based on information that I received from the USAO and my knowledge and expertise in the fields of Clinical Laboratory Medicine, Clinical Chemistry, and Pathology, I provided an expert report addressing whether Theranos was market ready and able to produce accurate and reliable fingerstick results for a variety of tests. Based on a review of available data, I concluded that Theranos did not meet this standard for Vitamin D, chloride, potassium, bicarbonate, cholesterol and sodium; further, I indicated that there were substantial questions about their ability to provide patient-appropriate results for calcium, HIV, HbA1c, and hCG.  I based these conclusions on my review of data such as quality control information obtained by CMS, information regarding distributions of test results obtained from patient samples, Theranos validation documents, and customer complaints.  I reached my conclusions using the same analytical approaches that I would use in my own professional practice of Laboratory Medicine.  In reporting my conclusions, I also stated that I reserve the right to supplement or revise my initial report based on additional information received.

I have subsequently received access to significant additional information in the form of Theranos' responses to CMS (which included substantial quality control data—hereafter abbreviated "QC" data—that document the performance of their assays in clinical practice) and a set of Theranos validation documents that were provided to Walgreens[1].  These types of documents are exactly the types of reports and data that I review on a regular basis in my own professional practice and use to determine whether assays are appropriate for patient care.

I understand the Defendant has moved to exclude my testimony, and the Court seeks additional information about my methodology and conclusions.  In preparation for the Daubert hearing, I present this supplemental report to further clarify reasoning and methodology that I applied to reach my conclusions.  Additionally, I have provided information based on the additional data I have had the opportunity to review since my previous report.  Having reviewed these new data, I agree with the conclusions of my previous report, and in fact believe that I have even stronger evidence to support key claims of that initial report.  I conclude that a broad array of Theranos assays, including all assays run on the Theranos 3.5 platform, were unsuitable for clinical use.  I look forward to communicating this and answering questions during the Daubert hearing.

---

[1] See Attachment I

II. Methodology and reasoning

As I outlined in my initial report, accuracy and precision are key metrics which a clinical laboratorian uses to assess the quality of a test.  In my professional practice, where I am responsible for ensuring that our own tests are appropriate for patient care, I regularly review data exactly like the data contained in the CMS response and Theranos validation documents in order to determine if assays are appropriately accurate and reliable for patient care.  Even without physically seeing an instrument, such reports allow me to determine, in my own practice of laboratory medicine, whether an assay meets appropriate criteria.  In addition to accuracy and precision, concepts such as linear correlation (discussed below) and appropriate thresholds of error are the universally accepted concepts within my field for determining such appropriateness.

In my earlier report, I described the concept of total allowable error (TEa).  By combining the degree of inaccuracy (bias) and imprecision into a <u>single</u> number representing total analytical error, it is possible to determine whether that error lies within a boundary of acceptability (the TEa). There are two typical ways in which one can use TEa within a clinical laboratory.  First, since a result that is further away from the "true" value than the TEa counts as a failure of the assay/medical error, it is possible to enumerate how often such failures occur.  Such failure rates can be expressed as "sigma metrics", which express the degree to which a process is well-controlled.  Sigma statistics were first introduced into laboratory medicine in the early 1970s in a paper by Dr. James Westgard, the leading authority on laboratory quality control and creator of the "Westgard rules" (quality control rules that are widely used in lab medicine, including by Theranos); thus, they have a long and well-established role in laboratory medicine analytics (for a brief overview, see the article by Westgard and Westgard that is hosted on the web site of the American Association for Clinical Chemistry[2]). Although "six-sigma" performance is typically the desired goal, expert opinion within laboratory medicine designates a process **with** an initial sigma score >5 as "excellent", >4 as "good", and so on, with 2-3 being considered "poor" and <2 being considered "unacceptable"[3].  Sigma scores may be calculated using the accuracy and precision data from an assay.[4]

The second way in which one can use TEa within a clinical laboratory is to determine whether a given laboratory test will successfully pass the CLIA-mandated proficiency testing (PT), where a correct score of 80% is required and the TEa is set either by overall national performance by laboratories or, in some cases, by mandated maxima within CLIA itself.  It is worth noting that the CLIA-mandated limits, first established in 1992, are widely considered to

---

[2] https://www.aacc.org/cln/articles/2013/september/total-analytic-error.
[3] Westgard, S, *Clinics in Laboratory Medicine*, 2013 33(1), pp. 41-53.
[4] For an example applying sigma metrics to a commercial laboratory platform, see e.g. Westgard S *et al*, *Clinical Biochemistry*, 2017 50(18), pp. 1216-1221.

be excessively lenient targets that do not necessarily reflect current best practices in laboratory medicine.

An appropriate way to determine the relationship between TEa, accuracy, and precision has also been clearly laid out by Dr. Westgard, who recommends estimating error using a specific formula (Bias+2*CV) that ensures that a value only exceeds the TEa by chance 1 in every 20 times (i.e. a 95% pass rate)[5]. In this case, if the TEa is set using proficiency testing (PT) guidance boundaries, an assay should easily receive the mandated 80% passing score. Interestingly, however, Theranos consistently used a more lenient formula (Bias+CV) to assess the performance of their assays against their own self-declared total allowable error values. If Theranos ran, for example, 15 different assays that each performed at the limits of their criteria for acceptability, we would expect that (by chance) 2-3 of these assays would <u>fail</u> proficiency testing during each PT challenge (assuming that PT was appropriately performed at a stringency that is comparable to mandated testing criteria). This nonstandard assessment of acceptable assay performance appears throughout Theranos assay validation documents, as well as in their response to the CMS inspection.

Another concept relevant to my discussion is the linear correlation coefficient, which is expressed as a single number ("$R^2$"). Briefly, when $R^2 = 1$, this reflects a perfectly "straight-line" relationship between two methods (e.g. an accepted predicate method and a second method that is under investigation); conversely, when $R^2 = 0$, there is no (linear) relationship at all between results from the two methods. The higher the $R^2$ (correlation coefficient), the better. It is normal practice in the field of laboratory medicine to calculate this relationship for every quantitative method comparison, and only under special circumstances would one see an $R^2$ less than ~0.90 (in my experience, 0.98 or higher is more typical for chemistry analytes).

All of the metrics I have described (accuracy, precision, TAe, sigma value, and correlation coefficient) are uncontroversial, accepted ways to assess assay quality within the routine practice of laboratory medicine. I would note that other means of assessment (such as reliance on customer complaints) that I used in the original report but do not discuss in this supplement are part of my regular practice of laboratory medicine, and I am happy to elaborate on this point in the context of the upcoming hearing.


III. Assessments of Individual Assays

*Summary of methodology*

I have reviewed the documents provided to me using the same analytical approaches (described above) that are commonly used within my field. The issues that I raise in this report are precisely the types of issues that I would raise (if they existed), where appropriate, with assays in my own laboratory. I have divided this assessment into two sections: one relating to

---

[5] https://www.aacc.org/cln/articles/2013/september/total-analytic-error

assays discussed in my original report, and another in which I utilize the newly available documents in order to review additional assays performed on the Edison 3.5. This is an important addition, because I did not have access to these documents when I produced my original report. Further, these additions provide important additional evidence about systematic problems with Edison testing, which I concluded in my original report but which was called into question in the Defense motion to exclude my testimony.

In order to assess these assays in an unbiased manner using the criteria that Theranos themselves provided, I have calculated sigma performance values based on the company's own stated TEa, bias, and imprecision. Except where noted, I am not in this section making specific claims about the stringency (low or high) of the company's TEa with respect to medical appropriateness, but rather highlighting the performance of Theranos assays when assessed on their own terms. Also, in the interest of space, the following assessments summarize selected, notable points rather than describing all problems identified with the assays. I have omitted a number of additional details regarding problems that exist with respect to analyte stability and equivalence of plasma vs. serum.

<u>Opinions regarding assays discussed in the original report</u>
*hCG*

For this and other Edison 3.5 assays, I calculated a sigma value using the TEa, bias (accuracy), and %CV (precision) documented explicitly by Theranos in either the validation documents or in their response to CMS. I calculated the sigma value using the formula sigma=(%TEa − %bias)/%CV, which is the accepted formula for this calculation. Using the appropriate values from the Theranos hCG documentation, I determined that the sigma value at the low end of this assay is 1.00, and the signal value in the medium range of the assay is 1.77; both of these are in the "unacceptable" range[6]. Theranos also provided accuracy and precision data for an updated version of the cartridge; unfortunately, the sigma value at the low end was worse, with a value of 0.54 sigma.

*Vitamin D*

I have previously noted the lack of precision in the Theranos Vitamin D assay as identified by the CMS review of QC records. My own review of the provided QC shows that it exhibited excessive variability, and in some cases the "acceptable" range for QC spans a range from a value of zero all the way into the upper part of the vitamin D "normal" (not high) range.

Much of my prior critique of the Vitamin D assay performance focused on the extremely high (in some cases, >60%) CV. I have reviewed Theranos' response to CMS, in which they claim that their precision is better than what CMS identified and meets criteria for acceptability.

---

[6] As described earlier, I am taking this terminology regarding acceptability directly from commonly accepted sources, including Westgard, S, *Clinics in Laboratory Medicine*, 2013 33(1), pp. 41-53

However, even accepting their own numbers and TEa target (noting that, based on a review of the QC traces, I have not changed my opinion that the precision of this assay is inadequate), I calculate the sigma value for this assay as 1.47, which is in the "unacceptable" range.

*Potassium*

The Theranos validation report shows that the company failed to meet its own criteria for acceptable bias at medical decision points when comparing venous vs. capillary blood measurements.  Interestingly, a closer examination of these data show that greater than one out of every 20 samples (6.2%) that were measured within the normal range by the FDA-approved, predicate method on a venous sample were artifactually elevated in the fingerstick sample beyond a range that is considered a medically significant "critical value" (>6 mM). These comparison data provide conclusive additional support for the concerns that I raised in the first report based on distributions of patient data.  This result is also striking in light of the fact that concerns about the Theranos fingerstick potassium were discussed within the laboratory medicine community, and exactly this type of artifact was predicted.  The Theranos validation data confirm that this critique of their approach was well-founded.

*Bicarbonate*

A visual inspection of the Theranos data comparing an FDA-approved predicate method on venous blood to the Theranos fingerstick method, coupled with a reported $R^2$ of 0.07 (close to zero), shows that this method is completely unsuitable for clinical testing.  There is essentially no meaningful relationship between the established method, with its longstanding medical validation, and the Theranos fingerstick results.

*Cholesterol*

Cholesterol was discussed in more detail in my original report, so I will limit remarks in this supplement.  I note, after review of the QC documents provided to CMS and the validation documents provided to Walgreens, that--in actual practice--the operational QC was significantly (at least two-fold) less stringent than the performance described in the original validation report, and numerous significant shifts and biases are noted.

*Sodium*

The correlation coefficient when comparing the Theranos sodium assay to an FDA-approved commercial assay was 0.58.  This is poor correlation, particularly for a very well-characterized and commonly-measured electrolyte such as sodium.  However, since a correlation coefficient can occasionally look low based on a limited range of values relative to its error, I consulted a 2016 method comparison that my (then) laboratory performed between sodium assays from two well-established vendors (Beckman and Siemens); the $R^2$ was 0.84.

Using Theranos' own best-case validation data, the sigma score for this assay estimated using the high control is 2.4 (the "poor" range).

This poor performance is borne out by a review of the proficiency testing data provided to CMS.  For example, during the period including 4/24/15-4/30/15, the Theranos level 3 calibrator was operating with control ranges that were so wide that a value could exceed the allowable thresholds set by CLIA in 1992 and still be considered acceptable.  Despite this inappropriately large QC range, the assay still failed QC at two distinct times during that week.

Most significantly, a comparison of venous and capillary blood testing was performed by Theranos.  The correlation showed $R^2 = 0.41$, which is completely unsuitable for clinical testing and strikes at the heart of Theranos' claim that it could measure sodium levels from capillary samples in a clinically meaningful way.

*Calcium*

Without additional data I cannot draw strong conclusions about the behavior of the calcium assay and its relationship to patient complaints that I discussed in my initial report.  Notwithstanding some notable exceptions, my review of the calcium PT traces provided to CMS shows an assay that behaves in a manner that is reasonably consistent with other clinical assays with respect to precision and stability.  My only other note is in relation to the capillary vs. venous correlation, which yields $R^2$ ranging from 0.669 (Theranos vs. Advia 1800) to 0.129 (Theranos vs. Advia XPT).  Without access to more data it is not possible for me to draw strong conclusions about the cause of this discrepancy.

*Chloride*

Based on my review of additional documents, I have nothing notable to add beyond my comments in the original report.  QC data appear to show an assay that is reasonably consistent in its operational behavior.  However, a close examination of the venous vs. fingerstick data (notwithstanding the problematic negative numeric bias that I described in the first report) is instructive largely because it shows what a reasonable linear (albeit biased) relationship between venous and fingerstick data can look like.  In this case, by contrast, it highlights how thoroughly unacceptable the corresponding comparison is for potassium and bicarbonate.

*HIV* and *HbA1c*

I have no additional information on Theranos HIV or HbA1c testing, and nothing to add to my original report.

Opinions regarding other Edison 3.5 assays

As discussed above, these opinions based on newly available (to me) information are directly relevant to my conclusion in the initial report that there is a systemic problem with

Edison 3.5 testing.  Based on the uniformly bad sigma values for these tests, as well as the quality control traces across many assays, which are the worst that I have examined in my career, these data strongly support my earlier contention.

*Vitamin B12*

Using the Theranos assay validation data, the sigma value for this assay is 1.09, which is in the "unacceptable" range.  QC problems in data provided to CMS are also noted.

*Estradiol*

QC values provided to CMS are markedly variable and concerning, and they clearly demonstrate that—notwithstanding claims from the company—the actual %CV in practice was >>20%.  Even without adjusting the CV based on visual inspection, the assay still only achieves 1.12 sigma, which is in the "unacceptable" range.  Of note, the capillary to venous correlation was not a problem for this assay, demonstrating that it is possible in principle to make clinically meaningful estradiol measurements using capillary samples (but not with this assay).  Significant sample stability issues are noted.

*TSH*

Data from Theranos demonstrate a sigma value of 1.11, which is in the "unacceptable" range.  Review of QC shows that the actual %CV was profoundly worse than what was originally estimated during validation; this estimate can be reliably made from visual inspection based on counting the number of points that exceed the 2SD mark and comparing it to the number that would be statistically predicted.

*TT3*

The initial data show a sigma value of 1.61, which is in the "unacceptable" range.  With further correction and increasing the number of measurement tips from 2 to 6, Theranos was able to improve to achieve a sigma value of 2.14, which is in the "poor" range.  Notwithstanding this positive development, the QC data provided to CMS shows that the performance of the test and instrumentation in the clinical setting was much worse, with substantial bias and imprecision noted frequently.

*TT4*

Based on the Theranos summary of QC performance in response to CMS, the sigma value of this test is 1.58, which is in the "unacceptable" range.

*fT4*

At the low end of this assay, the sigma value is 1.49, which is in the "unacceptable" range.  At a higher range, this assay appears to be a notable exception to the rest, with a sigma value of 3.83 (in the "good" range).  Unfortunately, however, this sigma value is based on a 7.8%CV estimated during validation, and subsequent review of QC traces reported to CMS, which reflect the actual performance of this assay in clinical testing, shows that this level of precision was not achieved in practice.  Additionally, the QC traces show a number of extreme outliers that are far outside a normal distribution of error; this raises additional safety concerns, since QC practices are typically not well-formulated to prevent such outlier events from affecting patient results.

*TST*

Based on Theranos' own validation data and target TEa, this assay achieves a sigma value of 0.90, which is in the "unacceptable" range.  However, in order to give them the benefit of the doubt, I examined this assay more closely because Theranos had set a laudably stringent 10% TEa goal.  It would be more typical to set a higher TEa for total testosterone, and I note that, for example, New York State mandates +/- 25% for their proficiency testing[7].  If we grant Theranos this more lenient TEa goal, the sigma value moves to 2.8, which is in the "poor" range.  Unfortunately, QC review shows that they are not close to achieving their claimed 9% CV in practice, so this improved sigma value does not characterize the test as it was being applied to patient testing.

*Prolactin*

Using the Theranos data and target, the sigma value was found to be 2.49, which is in the "poor" range.  This is based on an estimated 12%CV, although QC traces provided to CMS show that the performance in practice was actually much worse than this.  I am unable to calculate true sigma in practice (which would be worse that 2.49), given lack of availability of full QC data.  Additionally, Theranos allowed themselves a TEa of 30% for this assay, and I note by way of comparison that the New York State Department of Health lists 25% as their target[8]; adopting the NYS target would further lower the sigma value.

*SHBG*

Using the Theranos data and target, the sigma value was found to be 1.79, which is in the "unacceptable" range.

*tPSA*

---

[7] https://wadsworth.org/sites/default/files/WebDoc/1120368889/CLEPGUIDE-March2015.pdf, p. 41.
[8] *Id.*

Using the Theranos validation data and target, the sigma value was found to be 1.01, which is in the "unacceptable" range.

IV. Additional Remarks

In addition to the Theranos validation documents and CMS response, I have also recently had the opportunity to review remarks drafted by Dr. Kingshuk Das as a response to CMS.  Dr. Das estimated sigma metrics for the 12 Edison 3.5 assays using all Theranos data available to him, and he reports a similar range of results to those described in my own calculations above.  Thus, I am confident that my conclusions are not hampered by a lack of access to adequate data.

It is also important, perhaps, to say something summative about my view of the QC traces that I have had an opportunity to review.  It should be noted, by way of contrast, that there are a few examples of assays that appear to have reasonable QC behavior (calcium is a notable example).  However, the overall performance—particularly of the assays from the Edison 3.5—is remarkably poor with respect to the expected parameters.  There is bias, drift, poor precision, and the presence of outlier values that—in my judgement as a laboratorian— render these assays unsuitable for clinical use.  I would not allow these instruments to be used in my laboratory, and I do not believe that they were suitable for clinical use in the time period for which I have been asked to comment.  Of the 18 assays that I have discussed in this supplement, I believe that only calcium and chloride (with modifications) could be acceptable for patient testing.  Further, I believe that the validation data for certain electrolytes, such as potassium and bicarbonate, show that Theranos knew or should have known that results from fingerstick samples obtained using the Theranos collection device were completely inappropriate for clinical use.  Finally, in my original report I argued that, in my opinion, the problems with multiple Edison 3.5 assays pointed to a pervasive problem with the platform and its assays.  With the opportunity to review additional data that I did not have access to in March 2020, I have been able to expand my analysis to a wider range of Edison assays and conclude that the new data support my earlier finding and opinion.

| Exhibit Date | Description | Beg Bates | End Bates | Control Number |
|---|---|---|---|---|
| 2016 | Patent Impact Assessment for Assay Bicarbonate | SEC2-USAO-EPROD-000790620 | SEC2-USAO-EPROD-000790624 | SEC2-USAO-EPROD-000790620 |
| 2016 | QC Data for Assay Bicarbonate | CMS2-161878 | CMS2-161920 | CMS2-161878 |
| 2016 | Patent Impact Assessment for Assay Calcium ADVIA XPT | SEC2-USAO-EPROD-000790757 | SEC2-USAO-EPROD-000790759 | SEC2-USAO-EPROD-000790757 |
| 2016 | Patent Impact Assessment for Assay Calcium ADVIA 1800 | SEC2-USAO-EPROD-000790784 | SEC2-USAO-EPROD-000790797 | SEC2-USAO-EPROD-000790784 |
| 2016 | QC Data for Assay Calcium | CMS-008902 | CMS-008921 | CMS-008902 |
| 2016 | Patent Impact Assessment for Assay Chloride | SEC2-USAO-EPROD-001453061 | SEC2-USAO-EPROD-001453085 | SEC2-USAO-EPROD-001453061 |
| 2016 | Patent Impact Assessment for Assay Chloride | SEC2-USAO-EPROD-000790522 | SEC2-USAO-EPROD-000790523 | SEC2-USAO-EPROD-000790522 |
| 2016 | Patent Impact Assessment for Assay Cholesterol | THPFM0000926861 | THPFM0000926863 | SEC-USAO-EPROD-005309742 |
| 2016 | QC Data for Assay Cholesterol | CMS-002247 | CMS-002247 | CMS-001658 |
| 2016 | Patent Impact Assessment for Assay Sodium | SEC2-USAO-EPROD-000790776 | SEC2-USAO-EPROD-000790783 | SEC2-USAO-EPROD-000790776 |
| 2016 | QC Data for Assay Sodium | CMS-009171 | CMS-009274 | CMS2-009171 |
| 2016 | Patent Impact Assessment for Theranos Proprietary System Assays | SEC2-USAO-EPROD-000790659 | SEC2-USAO-EPROD-000790750 | SEC2-USAO-EPROD-000790659 |
| 2016 | QC Data for Estradiol | THPFM0000604302 | THPFM0000604465 | THPFM0000604302 |
| 2016 | QC Data for hCG | THPFM0000602015 | THPFM0000602166 | THPFM0000602015 |
| 2016 | QC Data for Prolactin | SEC2-USAO-EPROD-001471818 | SEC2-USAO-EPROD-001471949 | SEC2-USAO-EPROD-001471818 |
| 2016 | QC Data for SHBG | SEC2-USAO-EPROD-001469715 | SEC2-USAO-EPROD-001469986 | SEC2-USAO-EPROD-001469715 |
| 2016 | QC Data for PSA | SEC2-USAO-EPROD-001471380 | SEC2-USAO-EPROD-001471384 | SEC2-USAO-EPROD-001471380 |
| 2016 | QC Data for TSH | SEC2-USAO-EPROD-001470928 | SEC2-USAO-EPROD-001471576 | SEC2-USAO-EPROD-001470928 |
| 2016 | QC Data for T3T | SEC2-USAO-EPROD-001470679 | SEC2-USAO-EPROD-001470924 | SEC2-USAO-EPROD-001470679 |
| 2016 | QC Data for TT3 | SEC2-USAO-EPROD-001469563 | SEC2-USAO-EPROD-001469714 | SEC2-USAO-EPROD-001469563 |
| 2016 | QC Data for TT4 | SEC2-USAO-EPROD-001470531 | SEC2-USAO-EPROD-001470678 | SEC2-USAO-EPROD-001470531 |
| 2016 | QC Data for Vitamin B12 | SEC2-USAO-EPROD-001455408 | SEC2-USAO-EPROD-001455728 | SEC2-USAO-EPROD-001455408 |
| 2016 | QC Data for Vitamin D | THPFM0000602170 | THPFM0000602055 | THPFM0000602170 |
| 2016 | QC Data for fT4 (Thyroxine, Free) | SEC2-USAO-EPROD-001471950 | SEC2-USAO-EPROD-001472170 | SEC2-USAO-EPROD-001471950 |
| 2016 | QC Spreadsheet for Siemens ADVIA 1800 | | | SEC2-USAO-EPROD-000790770 |

ER-2313

| Exhibit Date | Description | Beg Bates | End Bates | Control Number |
|---|---|---|---|---|
| 11/16/2015 | Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System | THPFM0003691928 | THPFM0003691992 | |
| 8/29/14 | Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System | THPFM0003615067 | THPFM0003615105 | |
| 11/16/2015 | Total Testosterone ELISA Assay Validation Report on Edison 3.5 Theranos System | THPFM0002706057 | THPFM0002706143 | |
| UNK | Total Testosterone ELISA Assay Validation Report on Edison 3.5 Theranos System | THPFM0000206870 | THPFM0000206917 | |
| 9/24/2013 | Validation Report for Modified Siemens Assay of Bicarbonate in Lithium Heparin Plasma | THPFM0001714852 | THPFM0001714866 | |
| 9/26/2013 | Validation Report for Modified Theranos Assay of Bicarbonate in Lithium Heparin Plasma | THPFM0003934623 | THPFM0003934638 | |
| 9/24/2013 | Validation Report for Modified Siemens Calcium Assay | THPFM0000024068 | THPFM0000024082 | |
| 9/23/2015 | Validation of Modified Theranos Calcium Assay | THPFM0001762862 | THPFM0001762875 | |
| 9/26/2013 | Validation of Modified Siemens Chloride Assay | TS-0010576 | TS-0010590 | |
| 9/25/2015 | Validation of Modified Theranos Chloride Assay | THPFM0004860485 | THPFM0004860599 | |
| 4/21/2015 | Validation of Modified Theranos Total Cholesterol Assay | THPFM0005457277 | THPFM0005457305 | |
| 9/25/2013 | Validation of Modified Siemens Total Cholesterol Assay | THPFM0000024095 | THPFM0000024107 | |
| 11/9/2015 | Validation of Modified Theranos Total Cholesterol Assay | THPFM0003692008 | THPFM0003692024 | |
| 1/15/2014 | Free T4 ELISA Assay Validation Report on Edison 3.5 Theranos System | THPFM0001709134 | THPFM0001709181 | |
| 11/16/2015 | Free T4 ELISA Assay Validation Report on Edison 3.5 Theranos System | THPFM0002706858 | THPFM0002706933 | |
| 11/6/2015 | hCG ELISA Assay Validation Report on Edison 3.5 Theranos System | THPFM0002705918 | THPFM0002705986 | |
| 3/9/2014 | hCG ELISA Assay Validation Report on Edison 3.5 Theranos System | THPFM0005774496 | THPFM0005774550 | |
| 9/26/2013 | Validation of Modified Siemens Potassium Assay | | | SEC-USAO-EPROD-00037566 |
| 11/9/2015 | Validation of Modified Theranos Potassium Assay | THPFM0002706424 | THPFM0002706438 | |
| 9/25/2015 | Validation of Modified Theranos Potassium Assay | THPFM0004860515 | THPFM0004860530 | |
| UNK | Prolactin ELISA Assay Validation Report on Edison 3.5 Theranos System | THPFM0001618751 | THPFM0001618794 | |
| 11/16/2015 | Prolactin ELISA Assay Validation Report on Edison 3.5 Theranos System | THPFM0002473893 | THPFM0002473959 | |
| UNK | SHBG ELISA Assay Validation Report on Edison 3.5 Theranos System | THPFM0001706974 | THPFM0001707044 | |
| 11/16/2015 | SHBG ELISA Assay Validation Report on Edison 3.5 Theranos System | THPFM0003692025 | THPFM0003692105 | |
| 9/26/2013 | Validation of Modified Siemens Sodium Assay | TS-0010561 | TS-0010575 | |
| 9/23/2015 | Validation of Modified Theranos Sodium Assay | THPFM0001762876 | THPFM0001762890 | |
| UNK | tPSA ELISA Assay Validation Report on Edison 3.X Theranos System | THPFM0001707628 | THPFM0001707684 | |
| 11/16/2015 | tPSA ELISA Assay Validation Report on Edison 3.5 Theranos System | THPFM0002706794 | THPFM0002706857 | |
| 11/16/2015 | TSH-ELISA Assay Validation Report on Edison 3.5 Theranos System | THPFM0000343159 | THPFM0000343232 | |
| UNK | TSH-ELISA Assay Validation Report on Edison 3.X Theranos System | THPFM0001699954 | THPFM0001700008 | |
| 1/10/2014 | Total Triiodothyronine ELISA Assay Validation Report on Edison 3.5 Theranos System | CMS2-001347 | CMS2-001519 | |
| 11/16/2015 | Total Triiodothyronine ELISA Assay Validation Report on Edison 3.5 Theranos System | THPFM0002706144 | THPFM0002706208 | |
| 1/10/2014 | Total T4 ELISA Assay Validation Report on Edison 3.5 Theranos System | THPFM0001704109 | THPFM0001704153 | |
| 11/16/2015 | Total T4 ELISA Assay Validation Report on Edison 3.5 Theranos System | THPFM0002705987 | THPFM0002706056 | |
| 8/5/2014 | Vitamin B12 ELISA Assay Validation Report on Edison 3.5 Theranos System | | | CMS2-001520 |
| 2/11/2016 | Vitamin B12 ELISA Assay Validation Report on Edison 3.5 Theranos System | THPFM0001627724 | THPFM0001627802 | |
| 11/16/2015 | Vitamin B12 ELISA Assay Validation Report on Edison 3.5 Theranos System | THPFM0002813396 | THPFM0002813483 | |
| 11/16/2015 | 25OH VitD Total ELISA Assay Validation Report on Edison 3.5 Theranos System | THPFM0005615046 | THPFM0005615112 | |
| UNK | 25OH VitD Total ELISA Assay Validation Report on Edison 3.X Theranos System | THPFM0001699906 | THPFM0001699953 | |

| Beg Bates | End Bates | Control Number |
|---|---|---|
| THER-4035017 | THER-4035027 | |
| THPFM0004795971 | THPFM0004795979 | |

| Exhibit Date | Description | Beg Bates | End Bates | Control Number |
|---|---|---|---|---|
| 9/2/2016 | Theranos draft response to CMS July 7 letter titled "DS403.KD" | THPFM0004005199 | THPFM0004005205 | |
| 9/2/2016 | E-mail from Kingshuk Das to Lisa Helfend subject "DS403.KD" | THPFM0004005198 | | |

| Exhibit Date | Description | Beg Bates | End Bates | Control Number |
|---|---|---|---|---|
| 12/7/2015 | Theranos Documents consisting of validation reports Binder 1 of 4 | WAG-TH-DOJ-00028976 | WAG-TH-DOJ-00029302 | |
| 12/7/2015 | Theranos Documents consisting of validation reports Binder 2 of 4 | WAG-TH-DOJ-00029267 | WAG-TH-DOJ-00030151 | |
| 12/7/2015 | Theranos Documents consisting of validation reports Binder 3 of 4 | WAG-TH-DOH-00030466-000001 | WAG-TH-DOJ-00030517 | |
| 12/7/2015 | Theranos Documents consisting of validation reports Binder 4 of 4 | WAG-TH-DOJ-00030518 | WAG-TH-DOJ-00030928 | |

Case 5:18-cr-00258-EJD   Document 842-1   Filed 06/18/21   Page 15 of 15

| Exhibit Date | Description | Beg Bates | End Bates | Control Number |
|---|---|---|---|---|
| 4/1/2016 | Theranos Response to Proposed Sanctions (updated version of letter sent March 28, 2016 | THPFM0004755265 | THPFM0004755357 | |
| 2/12/2016 | Theranos Plan of Correction in Response to CMS 2567 | THPFM0004755071 | THPFM0004755219 | |
| 2016 | TOC Exhibits A through O | Pending Bates Number | | |
| 3/28/2016 | Theranos Response to Proposed Sanctions March 28, 2016 | CMS2-164369 | CMS2-164417 | |
| 3/18/2016 | CMS Letter re Propose Sanctions | THPFM0004755220 | THPFM0004755264 | |
| | TOC Exhibits AA through MM, no KK(flashdrive) | Pending Bates Number | | |
| | TOC Exhibit G, Binder 2 | Pending Bates Number | | |
| 4/17/2016 | Theranos Letter re Supplemental Information | THPFM0004755360 | THPFM0004755367 | |
| 5/20/2016 | Theranos Letter to CMS re Advia 2120 | THPFM0004755393 | | |
| 1/25/2016 | CMS 2567 (Cover Letter) | THPFM0004755067 | THPFM0004755070 | |
| | CMS Plan of Correction Communication | THPFM0004755066 | | |
| 4/7/2016 | Cover Letter for Additional Corrected Reports April 7, 2016 | THPFM0004755358 | | |
| 4/18/2016 | Cover Letter for Additional Corrected Reports April 18, 2016 | THPFM0004755391 | | |
| 4/26/2016 | Cover Letter for Additional Corrected Reports April 26, 2016 | THPFM0004755392 | | |
| | Interview Reports of Dr. Kingshuk Das dated June 7, 2021, and February 1, 2021 | | | |

STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

JEFF SCHENK (CABN 234355)
JOHN C. BOSTIC (CABN 264367)
ROBERT S. LEACH (CABN 196191)
KELLY I. VOLKAR (CABN 301377)
Assistant United States Attorneys

     150 Almaden Boulevard, Suite 900
     San Jose, California 95113
     Telephone: (408) 535-5061
     Fax: (408) 535-5066
     Robert.Leach@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 18-CR-00258 EJD |
| | ) | |
|     Plaintiff, | ) | UNITED STATES' SUPPLEMENTAL |
| | ) | MATERIAL IN ADVANCE OF *DAUBERT* |
|   v. | ) | HEARING |
| | ) | |
| ELIZABETH HOLMES, | ) | Date:  June 30, 2021 |
| | ) | Time:  9:00 a.m. |
|     Defendant. | ) | Court:  Hon. Edward J. Davila |
| | ) | |
| | ) | |

On May 21, 2021, the Court issued an Order Re: Holmes' Motion to Exclude Expert Opinion Testimony of Dr. Stephen Master Under Rules 401-403 and 702.  The Court "conclude[d] that a Daubert hearing is appropriate to assess the reliability of Dr. Master's methodology, which he employed to provide testimony and opinions about chloride, potassium, bicarbonate, HIV, HbA1c, hCG, cholesterol, calcium, and sodium."  ECF No. 797 at 11.  The Court has scheduled the hearing for June 30, 2021, at 9:00 a.m.  The Court also has ordered that "[a]ny supplemental material the Government plans to rely on at the hearing shall be filed no later than ten business days before the hearing."  ECF No. 797 at 11.  In accordance with this direction, the government respectfully submits the attached Supplement to Expert Report of Stephen Master.

DATED:  June 18, 2021

Respectfully submitted,

STEPHANIE M. HINDS
Acting United States Attorney

*Robert S. Leach*

JEFF SCHENK
JOHN C. BOSTIC
ROBERT S. LEACH
KELLY I. VOLKAR
Assistant United States Attorneys

1

2   JOHN D. CLINE (CA State Bar No. 237759)
    50 California Street, Suite 1500
3   San Francisco, CA 94111
    Telephone: (415) 662-2260 │ Facsimile: (415) 662-2263
4   Email: cline@johndclinelaw.com

5   KEVIN M. DOWNEY (Admitted Pro Hac Vice)
    LANCE A. WADE (Admitted Pro Hac Vice)
6   AMY MASON SAHARIA (Admitted Pro Hac Vice)
    KATHERINE TREFZ (CA State Bar No. 262770)
7   WILLIAMS & CONNOLLY LLP
    725 Twelfth Street, NW
8   Washington, DC 20005
    Telephone: (202) 434-5000 │ Facsimile: (202) 434-5029
9   Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

10  Attorneys for Defendant ELIZABETH A. HOLMES

11

12                  UNITED STATES DISTRICT COURT

13                  NORTHERN DISTRICT OF CALIFORNIA

14                       SAN JOSE DIVISION

15
    UNITED STATES OF AMERICA,          )   Case No. CR-18-00258-EJD
16                                     )
              Plaintiff,               )   **MS. HOLMES' MOTION TO SUPPRESS**
17                                     )   **EVIDENCE OF CUSTOMER COMPLAINTS**
        v.                             )   **AND TESTING RESULTS AS WELL AS**
18                                     )   **FINDINGS IN CMS REPORT**
    ELIZABETH HOLMES and               )
19  RAMESH "SUNNY" BALWANI,            )
                                       )   Date: June 16, 2021
20            Defendants.              )   Time: 10:00 AM
                                       )   CTRM: 4, 5th Floor
21                                     )
                                       )   Hon. Edward J. Davila
22                                     )
                                       )
23  _____)

24

25

26

27

28  MS. HOLMES' MOTION TO SUPPRESS
    CR-18-00258 EJD
                                    i

**MS. HOLMES' MOTION TO SUPPRESS EVIDENCE OF CUSTOMER COMPLAINTS AND TESTING RESULTS AS WELL AS FINDINGS IN CMS REPORT**

PLEASE TAKE NOTICE that on June 16, 2021 at 10:00 a.m., or on such other date and time as the Court may order, in Courtroom 4 of the above-captioned Court, 280 South 1st Street, San Jose, CA 95113, before the Honorable Edward J. Davila, Defendant Elizabeth Holmes will and hereby does respectfully move the Court to suppress evidence of customer complaints and testing results, and the findings contained in the January 25, 2016 CMS Report.  The Motion is based on the below Memorandum of Points and Authorities, the Declaration of Lance Wade and accompanying exhibits, the record in this case, and any other matters that the Court deems appropriate.

DATED: June 2, 2021.

/s/ Lance Wade
KEVIN M. DOWNEY
LANCE A. WADE
AMY MASON SAHARIA
KATHERINE TREFZ
Attorneys for Elizabeth Holmes

MS. HOLMES' MOTION TO SUPPRESS
CR-18-00258 EJD

ii

1

## TABLE OF CONTENTS

2

**Page**

3    BACKGROUND ........................................................................................................2

4    LEGAL STANDARD...............................................................................................3

5    ARGUMENT ............................................................................................................5

6    I.    Evidence of Customer Complaints and Testing Results as well as Findings of the
      CMS Report Should Be Suppressed. ................................................................5

7

8    II.   An Evidentiary Hearing Is Necessary to Resolve Contested Issues of Fact Relating to
      the Government's Failure to Gather and Preserve the LIS Evidence and the Ensuing
      Prejudice to Ms. Holmes...................................................................................7

9

10   III.  The Court Should Direct the Government to Produce the Evidence Relating to its
      October 2020 *Brady* Letter That Ms. Holmes Requested More Than Six Months Ago. ................8

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   MS. HOLMES' MOTION TO SUPPRESS
     CR-18-00258 EJD
                                    i

## TABLE OF AUTHORITIES

### CASES

*Arizona v. Youngblood*, 488 U.S. 51 (1988) .................................................................3

*Brady v. Maryland*, 373 U.S. 83 (1963) .............................................................2, 7, 8

*Giglio v. United States*, 405 U.S. 150 (1972) ...........................................................8

*Miller v. Vazquez*, 868 F.2d 1116 (9th Cir. 1989) ...................................................3

*United States v. Flyer*, 633 F.3d 911 (9th Cir. 2011)........................................... passim

*United States v. Howell*, 231 F.3d 615 (9th Cir. 2000)...........................................4, 7

*United States v. Leal-Del Carmen*, 697 F.3d 964 (9th Cir. 2012) .................................3

*United States v. Loud Hawk*, 628 F.2d 1139 (9th Cir. 1979) (en banc)................4, 6, 7

*United States v. W.R. Grace*, 526 F.3d 499 (9th Cir. 2008) (en banc)…………………………4

*United States v. Zaragoza-Moreira*, 780 F.2d 971 (9th Cir. 2015) ................................3

*United States v. Zuniga-Garcia*, 472 F. App'x 498 (9th Cir. 2012).........................1, 6

### RULES

Fed. R. Evid. 401 .........................................................................................1

Fed. R. Evid. 402 .........................................................................................1

Fed. R. Evid. 403 .........................................................................................1

Fed. R. Crim. P. 16 ......................................................................................8

MS. HOLMES' MOTION TO SUPPRESS
CR-18-00258 EJD

ii

ER-2324

**MEMORANDUM OF POINTS AND AUTHORITIES**

Ms. Holmes respectfully moves to suppress evidence of customer complaints and testing results and the findings of the January 25, 2016 CMS Report ("CMS Report") under *United States v. Flyer*, 633 F.3d 911 (9th Cir. 2011), and for an evidentiary hearing on that motion.

In its May 22, 2021 Order, this Court denied Ms. Holmes' Motion to Exclude Anecdotal Test Results, Dkt. 563. Rejecting Ms. Holmes' arguments under Fed. R. Evid. 401-403, the Court ruled that "[e]ach time a Theranos customer allegedly paid for an accurate and reliable blood test based on Holmes's representations and did not receive such a test, that experience on its own is evidence of the fraud." Order re: Motions in Limine, Dkt. 798 at 49 ("Order"). By the terms of the Order, the government may now present at trial its anecdotal evidence, including customer complaints and testing results, as well as the findings contained in the CMS report. Order, Dkt. 798 at 20, 49-50 ("The Court finds that anecdotal evidence of test results is relevant and admissible.").[1]

This ruling ripens Ms. Holmes' previously stated concerns about the use of anecdotal evidence at trial. *See* Ms. Holmes' Reply in Support of Motion to Exclude Anecdotal Test Results, Dkt. 730 at 2, 9. Allowing the government to use customer complaints and testing results and the findings of the CMS Report as "evidence of the fraud" after the government failed to gather and preserve the Laboratory Information System database ("LIS") would violate Ms. Holmes' right to present a complete defense and to receive due process. Order at 49. That is because the LIS contained evidence that could have allowed Ms. Holmes to rebut the government's assertion that that anecdotal evidence tends to show that Theranos' technology was "in fact, not capable of consistently producing accurate and reliable results." Dkt. 469, ¶ 16. The government's failure to preserve the LIS has therefore "left [Ms. Holmes] without any means of [adequately] refuting an important part of the prosecution's case." *United States v. Zuniga-Garcia*, 472 F. App'x 498, 499 (9th Cir. 2012) (applying *Flyer*, 633 F.3d 911, to sanction government for loss of evidence). Suppression of this evidence is the appropriate remedy to safeguard

---

[1] With respect to the January 25, 2016 CMS Report, the Court held open the possibility of "further side bar discussions on this matter, should the parties wish to specify certain exhibits within this collection of evidence and make new arguments as to why [this] particular exhibit[] should be excluded." Order at 20.

MS. HOLMES' MOTION TO SUPPRESS
CR-18-00258 EJD

1

1   Ms. Holmes' constitutional rights.

2                                **BACKGROUND**

3        This Court is familiar with the LIS.[2]  The database has been the subject of extensive briefing and

4   argument, and the parties appear to agree on the contents and functionality of the LIS.  *See* Gov't

5   Corrected Opp'n to Ms. Holmes' Motion to Exclude Anecdotal Test Results, Dkt. 682 at 1-3; Ms.

6   Holmes' Reply in Support of Motion to Exclude Anecdotal Test Results, Dkt. 730 at 10-12; 5/4/2021

7   Hr'g Tr. 79:10-12 (government argument: "the defense has been helpful to a degree in explaining what

8   data specifically was in that LIS"); *id*. at 79:20-21 (government argument: "[The LIS] certainly would

9   have been a powerful tool to use in the government's investigation.").

10       The government's failure to gather and preserve the LIS database has also been the subject of

11  briefing and argument.  *See* Ms. Holmes' Reply in Support of Motion to Exclude Anecdotal Test

12  Results, Dkt. 730 at 1-2, 7-9, 12-16; 5/4/2021 Hr'g Tr. 50:9-13, 53:24-54:16, 55:17-57:8.  There is a live

13  factual dispute as to the degree of the government's culpability in the loss of the LIS evidence.  5/4/2021

14  Hr'g Tr. 51:23-25; *see also id*. at 83:17-18, 22-23.

15       The government's failure to gather and preserve the LIS is the subject of a 24-page letter

16  prepared by the government in response to Ms. Holmes' repeated demands for exculpatory material

17  pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963).  *See* Dkt. 732-2 (October 29, 2020 Letter from R.

18  Leach to L. Wade ("*Brady* Letter")); *see also* Declaration of Lance Wade in Support of Motion to

19  Suppress Customer Complaints and Testing Results as well as Findings of CMS Report ("Wade Decl.")

20  Exs. 1-9 (correspondence between undersigned counsel and government seeking *Brady* material relating

21  to LIS); *infra* pp. 7-8.  The *Brady* letter summarizes (among other things) the extent of the government's

22  notice regarding Theranos' dire financial condition; government interactions with Theranos' defense

23  counsel regarding the production of data contained in the LIS and the software necessary to access the

24  LIS; the government's receipt of a copy of the LIS; the period of time it took the government to ask for

25

26       [2] Ms. Holmes will not repeat the facts set forth in her prior pleading.  Instead, she incorporates
    by reference her recitation of the facts from Ms. Holmes' Reply in Support of Motion to Exclude
27  Anecdotal Test Results, Dkt. 730, at 1-2, 7-16.

28  MS. HOLMES' MOTION TO SUPPRESS
    CR-18-00258 EJD
                                        2

1    and attempt to access that copy; and the advice given (and ignored) by government personnel to

2    government attorneys relating to accessing the LIS.  The events recounted in the letter begin in 2016 and

3    continue through 2020.

4                                  **LEGAL STANDARD**

5          The Supreme Court has held that the government's failure to preserve evidence may violate a

6    defendant's rights to receive due process and to present a complete defense.  *See Arizona v. Youngblood*,

7    488 U.S. 51 (1988); *California v. Trombetta*, 467 U.S. 479 (1984).  Under *Trombetta*, the government's

8    loss of evidence whose "exculpatory value . . . was apparent before the evidence was destroyed," and

9    was "of such a nature that the defendant would be unable to obtain comparable evidence by other

10   reasonably available means" violates the due process of a criminal defendant.  467 U.S. at 488-89.

11   Under *Youngblood*, the failure to preserve even potentially exculpatory evidence violates due process

12   when the government acts in bad faith.  488 U.S. at 57-58 (describing "potentially exculpatory

13   evidence" as "evidentiary material of which no more can be said than that it could have been subject to

14   tests, the results of which might have exonerated the defendant").  The government's failure to gather

15   potentially exculpatory evidence—even if the government never takes possession of that evidence—

16   violates due process if done in bad faith.  *Miller v. Vazquez*, 868 F.2d 1116, 1120 (9th Cir. 1989).[3]

17   Applying *Youngblood*, the Ninth Circuit has explained that "[t]he presence or absence of bad faith turns

18   on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost

19   or destroyed."  *United States v. Zaragoza-Moreira*, 780 F.3d 971, 977 (9th Cir. 2015).

20          Even if a constitutional violation is not established, the government's failure to preserve

21   evidence may still require sanctions, including the suppression of evidence.  *See Flyer*, 633 F.3d at 916.[4]

22   In determining whether suppression is appropriate, courts must "balance 'the quality of the

23   government's conduct and the degree of prejudice to the accused.'"  *Id*. (quoting *United States v. Loud*

24           _____

25         [3] Ms. Holmes does not currently move to dismiss the counts of the indictment that rely on
evidence that could have been rebutted through the lost LIS evidence.  Ms. Holmes reserves the right to
move for dismissal based on the evidence adduced at the requested evidentiary hearing.

26         [4] The Ninth Circuit has not confronted the question whether the government's failure to gather

27   potentially exculpatory evidence (as opposed to the failure to preserve such evidence already in its
possession) requires suppression in the absence of a constitutional violation.

28   MS. HOLMES' MOTION TO SUPPRESS
CR-18-00258 EJD

3

1    *Hawk*, 628 F.2d 1139, 1152 (9th Cir. 1979) (en banc) (Kennedy, J., concurring), overruled on other

2    grounds, *United States v. W.R. Grace*, 526 F.3d 499 (9th Cir. 2008) (en banc)).  In this inquiry, "[t]he

3    government bears the burden of justifying its conduct, and the defendant bears the burden of

4    demonstrating prejudice."  *Id.*  The Ninth Circuit has identified certain non-exclusive factors for Courts

5    to consider:

6    **Reasonableness of government's conduct**

7    - "whether the evidence was lost or destroyed while in [the government's] custody";

8    - "whether the government acted in disregard for the interests of the accused";

9    - "whether [the government] was negligent in failing to adhere to established and

10   reasonable standards of care for police and prosecutorial functions";

11   - "if the acts were deliberate, whether they were taken in good faith or with reasonable

12   justification";

13   - "the nature and degree of federal [officers'] participation";

14   - "whether the government attorneys prosecuting the case have participated in the events

15   leading to loss or destruction of the evidence, for prosecutorial action may bear upon

16   existence of a motive to harm the accused."

17   **Degree of prejudice to the Defendant**

18   - "the centrality of the evidence to the case and its importance in establishing the elements

19   of the crime or the motive or intent of the defendant";

20   - "the probative value and reliability of the secondary or substitute evidence";

21   - "the nature and probable weight of factual inferences or other demonstrations and kinds

22   of proof allegedly lost to the accused";

23   - "the probable effect on the jury from absence of the evidence, including dangers of

24   unfounded speculation and bias that might result to the defendant if adequate presentation

25   of the case requires explanation about the missing evidence."

26   *Loud Hawk*, 628 F.2d at 1152 (Kennedy, J., concurring).

27

28   MS. HOLMES' MOTION TO SUPPRESS
     CR-18-00258 EJD

                                            4

The Ninth Circuit has held that an evidentiary hearing on a motion to suppress is necessary "when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist." *United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000).

**ARGUMENT**

**I.     Evidence of Customer Complaints and Testing Results as well as Findings of the CMS Report Should Be Suppressed.**

Evidence of customer complaints and customer testing results, as well as the findings of the CMS report, should be suppressed.[5]  Under *Flyer*, the quality of the government's conduct was poor, and the prejudice to Ms. Holmes' defense is severe:

*Reasonableness of the government's conduct*

- The government did not gather and preserve the LIS despite notice that the database was important, that the company was closing down, and that there would be technical complications associated with preserving and accessing the database;

- The government acted in disregard for Ms. Holmes' rights by failing to preserve evidence that could have addressed the government's accuracy-and-reliability allegations;

- The government failed to observe relevant standards of care because (among other things) government attorneys delayed attempting to access the LIS, then disregarded the advice of an internal litigation support professional regarding ways to access and preserve the evidence, and failed to engage experienced forensic professionals to access the LIS;[6]

---

[5] The evidence falling within these categories includes: testimony and exhibits offered by customers relating to their specific testing results; testimony and exhibits offered by doctors relating to customers' specific testing results; any aspect of Dr. Master's opinions that relates to specific testing results or quality control results; the CMS report's discussion of quality control results and other data that was maintained in the LIS; customer feedback spreadsheets; any other customer complaints or testing results offered by fact witnesses (by testimony or exhibit) other than doctors and customers; and any other testimony or exhibits relating to quality control data or any other data residing in the LIS offered by fact witnesses.

[6] Ms. Holmes notes that the government bears the burden in justifying its conduct, and that it may need to notice an expert in order to establish the relevant standard of care for gathering and preserving evidence.

MS. HOLMES' MOTION TO SUPPRESS
CR-18-00258 EJD

5

- The government failed to preserve the LIS despite knowing about the potentially exculpatory value of the LIS for nearly two years prior to the company's closing;

- Members of the prosecution team and other federal personnel were involved in these events.[7]

***Degree of prejudice to Ms. Holmes***

- As the Court has recognized, the LIS is "very important for this particular trial";[8]

- The LIS contained critical evidence with respect to each and every one of millions of testing results that it housed, as well as QC data and the response to QC data (i.e., whether/when a result was released). This evidence is central to the full and fair assessment of whether any individual testing result proffered by the government was accurate, and what the cause of any particular error might have been;

- The government's substitute evidence is not comparable to the LIS, because of the sheer number of results in the LIS, the richness of information about each testing result, and the database's ability to sift, sort, and query that information;

- Ms. Holmes has lost the opportunity to refute adequately the government's assertions with respect to customer complaints and testing results and the CMS finding reports;[9]

- If "[e]vidence of even one inaccurate result tends to show that Theranos was producing inaccurate results," it follows that evidence of accurate results tends to prove the opposite, and is exculpatory. Order at 48-49. Evidence of the potentially millions of accurate testing results that resided on the LIS is therefore central to the case and is now missing;

- There is a serious risk that jurors would wrongly fault Ms. Holmes for the loss of the LIS,

---

[7] *See* Ms. Holmes' Reply in Support of Motion to Exclude Anecdotal Test Results, Dkt. 730, at 1-2, 7-9, 12-16; 5/4/2021 Hr'g Tr. 53:25-54:16, 55:11-16, 55:17-57:8, 94:14-95:1.

[8] 5/4/2021 Hr'g Tr. 52:3-7.

[9] *See* Ms. Holmes' Reply in Support of Motion to Exclude Anecdotal Test Results, Dkt. 730 at 10-12.

MS. HOLMES' MOTION TO SUPPRESS
CR-18-00258 EJD

6

1    despite her lack of involvement;[10]

2    • Without the evidence contained in the LIS, there is a serious risk that jurors will wrongly

3    shift the burden of disproving the government's accuracy-and-reliability allegations to

4    Ms. Holmes.[11]

5 *See Loud Hawk*, 628 F.2d at 1152 (Kennedy, J., concurring).  The balance of these factors clearly favors

6 Ms. Holmes, and requires suppression in order to protect her constitutional rights.[12]

7 **II.** **An Evidentiary Hearing Is Necessary to Resolve Contested Issues of Fact Relating to the Government's Failure to Gather and Preserve the LIS Evidence and the Ensuing Prejudice to Ms. Holmes.**

8

9    The Ninth Circuit has held that an evidentiary hearing in support of a motion to suppress is

10 necessary "when the moving papers allege facts with sufficient definiteness, clarity, and specificity to

11 enable the trial court to conclude that contested issues of fact exist."  *Howell*, 231 F.3d at 620.  Here, the

12 Court has recognized the existence of a "factual dispute" about fault for the loss of this evidence, as has

13 the government.  5/4/2021 Hr'g Tr. 51:23-25; *see also id*. at 83:17-18, 22-23 (government argument:

14 "[T]here is a factual dispute. The government recognizes that.").  In addition, the 24-page *Brady* letter

15 raises questions about the government's conduct in this case that need to be explored.  *See supra* pp. 2-3;

16 *infra* pp. 7-8.  And while the government and Ms. Holmes appear to agree, as a factual matter, about the

17 contents and functionality of the LIS, *see supra* p. 2, there is a dispute as to the degree of prejudice

18 associated with the government's failure to collect and preserve the LIS, *compare* 5/4/2021 Hr'g Tr. at

19 47:20-48:23, with *id*. at 79:16-19.

20

21

22

23     [10] 5/4/2021 Hr'g Tr. 82:14-17 (erroneously insinuating, without evidence, that Ms. Holmes was

24 involved in the loss of the LIS).

    [11] 5/4/2021 Hr'g Tr. 62:19-22, 63:3-13, 87:20-88:11, 90:9-10.

25     [12] Indeed, even if this Court determines after hearing all the evidence at a suppression hearing

26 that no constitutional violation occurred, the poor quality of the government's conduct and the severe prejudice to Ms. Holmes still require suppression.  *See Zuniga-Garcia*, 472 F. App'x at 499 (balance of

27 government conduct and prejudice to defendant required sanction, regardless of whether a constitutional violation occurred).

28 MS. HOLMES' MOTION TO SUPPRESS
CR-18-00258 EJD

7

**III.    The Court Should Direct the Government to Produce the Evidence Relating to its October 2020 *Brady* Letter That Ms. Holmes Requested More Than Six Months Ago.**

Because *Flyer/Loud Hawk* balancing requires an assessment by this Court of the quality of the government's conduct (including the degree of involvement of the prosecution team), Ms. Holmes asks the Court to direct the government to produce certain information relating to its October 2020 *Brady* Letter, which purports to catalogue the government's steps to collect and preserve the evidence residing in the LIS.  *See Brady* Letter; *see also* 5/4/2021 Hr'g Tr. 55:17-25.  That document does not identify by name numerous government attorneys, paralegals, and litigation support staff directly involved in the events at issue.  On November 18, 2020, undersigned counsel requested that information, as well as the documents identified in the *Brady* letter (some of which appear to be quoted in the letter).  *See* Wade Decl., Exs. 1-4.  The government has refused to produce that evidence, despite repeated requests over the past six-plus months.  *See id.*  Because *Flyer* requires this Court to assess the quality of the government's conduct in failing to preserve the LIS, Ms. Holmes requires this evidence in order to prepare for the requested hearing.[13]

\*       \*       \*

For the foregoing reasons, Ms. Holmes respectfully moves to suppress evidence of customer complaints and testing results and the CMS report findings, and seeks an evidentiary hearing in support of this motion.


DATED: June 2, 2021

/s/ Lance Wade
KEVIN DOWNEY
LANCE WADE
AMY MASON SAHARIA
KATHERINE TREFZ
Attorneys for Elizabeth Holmes

---

[13] Independently of the requested hearing on her Motion to Suppress, Ms. Holmes is entitled to this evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and Fed. R. Crim. P. 16.

MS. HOLMES' MOTION TO SUPPRESS
CR-18-00258 EJD

8

1

**CERTIFICATE OF SERVICE**

2          I hereby certify that on June 2, 2021, a copy of this filing was delivered via ECF on all counsel

3    of record.

4

5

6                                                                    /s/ Lance Wade
                                                                     LANCE WADE
7                                                                    Attorney for Elizabeth Holmes

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
     MS. HOLMES' MOTION TO SUPPRESS
     CR-18-00258 EJD

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ELIZABETH A. HOLMES,<br><br>Defendant. | Case No.  5:18-cr-00258-EJD-1<br><br>**ORDER RE: HOLMES' MOTION TO EXCLUDE EXPERT OPINION TESTIMONY OF DR. STEPHEN MASTER UNDER RULES 401-403 AND 702** |

Defendants Elizabeth Holmes ("Holmes") and Ramesh "Sunny" Balwani ("Balwani") are charged with wire fraud, in violation of 18 U.S.C. § 1343, and conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349.  The charges stem from Defendants' allegedly deceptive representations about their company, Theranos, and its technology.  Pending before the Court is Holmes' motion to exclude expert opinion testimony of Dr. Stephen Master under Federal Rules of Evidence 401-403 and 701.  ("Mot."), Dkt. No. 560.  Having had the benefit of oral argument and having considered the parties' papers, the Court **DENIES IN PART** and **DEFERS IN PART** Holmes' motion to exclude Dr. Master's expert opinion testimony.  Specifically, the Court will not exclude Dr. Master's opinions regarding industry standards and the Vitamin D assay, and will defer ruling on the balance of Holmes' motion to exclude pending a *Daubert* hearing.

I.      **BACKGROUND**

A.      **DR. STEPHEN MASTER**

In support of its case, the Government offers Dr. Stephen Master as an expert in clinical

pathology and chemistry.  Specifically, Dr. Master was retained to provide opinions on whether Theranos was market ready and able to produce accurate and reliable fingerstick results for tests such as Vitamin D, chloride, potassium, bicarbonate, HIV, HbA1c, hCG, cholesterol, calcium, and sodium.  *See* Declaration. of Amy Mason Saharia In Support Of Ms. Holmes' Motions In Limine And Daubert Motions To Exclude Expert Testimony ("Saharia Decl.") Ex. 6 (Expert Report of Stephen Master, MD, PhD, FCAP, FAACC ("Master Report")), Dkt. No. 580-5 at 2-3.

Dr. Master is the Chief of Clinical Chemistry Laboratory Services at Weil Cornell Medicine and New York Presbyterian Hospital.  Master Report at 1.  He also currently serves as Chief of the Division of Laboratory Medicine and Medical Director of the Michael Palmieri Laboratory for Metabolic and Advanced Diagnostics at the Children's Hospital of Philadelphia, and as an Associate Professor of Pathology and Laboratory Medicine at the Perelman School of Medicine, University of Pennsylvania.  *Id*.  He is a Fellow of the College of American Pathologists and President-Elect of the Board of Directors of the American Association for Clinical Chemistry.  Dr. Master holds both an MD and a PhD (in cell and molecular biology) from the University of Pennsylvania School of Medicine.

### B.    THE MASTER REPORT

Dr. Master's twenty-page report sets forth two primary opinions regarding (1) Theranos' adherence to industry standards and (2) the accuracy and reliability of specific Theranos blood tests.

### i.    Industry Standards

First, Dr. Master sets forth general background principles regarding how blood tests are performed, how the performance of a laboratory test is measured, and the regulatory framework in which laboratories operate.  Master Report at 3-11.  Specifically, Dr. Master explains that there are two basic concepts that characterize the performance of a laboratory test: accuracy and precision. Accuracy refers to "how close the result comes to the 'true' amount of the analyte"—*i.e.*, the substance being tested— "in a blood sample."  *Id*. at 6.  Precision, according to Dr. Master, refers

to the degree to which a test produces the same result when it measures the same sample multiple times.  *Id*. at 6-7.  In other words, "in order to produce accurate and reliable results, a clinical assay must typically agree with the accepted results from a gold standard (accuracy), and it also must be able to do this reproducibly (reliab[ility])."  *Id*. at 12.  Because Dr. Master was retained to opine only on Theranos' fingerstick tests, he expressly disclaims offering any opinions on the many tests that Theranos performed on "traditional venous samples on FDA-approved or cleared instruments from third-party vendors."  *Id*. at 11.

Dr. Master then gives an overview of the regulatory framework that applies to clinical laboratories.  *Id*. at 8-11.  He explains that "clinical testing is regulated by the Clinical Laboratory Improvements Amendments ("CLIA"), which specifies the legal requirements for engaging in medical testing and is broadly administered under the Center for Medicare and Medicaid Services ("CMS").  He notes that CLIA requires laboratories to perform certain experiments to ensure their tests are suitable for clinical use, including proficiency testing, quality control checks, establishing and verifying reference ranges, and other validations of accuracy and precision.  *Id*. at 8-10.

Based on "publicly available information, scholarly research, and materials produced in discovery in this case," Dr. Master concludes that "Theranos did not adhere to normal industry standards for clinical laboratory testing from 2013-2015."  *Id*. at 17.  He stated that "[r]unning patient samples when QC is giving values out of the acceptable range directly impacts the accuracy and reliability of the results that are returned to the patient or clinician."  *Id*.  He opined further that "Theranos did not appropriately engage in proficiency testing," and that this had the potential to adversely affect the accuracy of its results.  *Id*. at 18.

### ii.    Theranos Blood Tests

Second, Dr. Master opines about Theranos blood tests.  To form his opinions, he reviewed materials provided in discovery in this case, including the Center for Medicare and Medicaid Services survey report ("CMS Report"), which included data from three Theranos devices, covering quality control data for approximately 30 days in 2014, the Icahn School of Medicine

Report ("Icahn Report"), "frequent complaints from customers according to internal Theranos emails," and other internal Theranos emails and documents. *Id*. at 15-16.

Based on those documents, Dr. Master concludes "Theranos was not market ready and able to produce accurate and reliable fingerstick results for tests such as Vitamin D, chloride, potassium, bicarbonate, cholesterol, and sodium." Master Report at 12. He opines further "there are substantial questions about the ability of their laboratory to provide patient-appropriate results for calcium, HIV, HbA1c, and hCG," but notes that "there are insufficient additional details in the material I have reviewed to determine the cause of these issues, the relationship to either the sample type or Theranos technology, or the resolution of the problems." *Id*. at 12, 15.

## II.    LEGAL STANDARD

Under Rule 702, expert testimony is admissible only when it (1) "will help the trier of fact to understand the evidence or to determine a fact in issue"; (2) "is based on sufficient facts or data"; (3) "is the product of reliable principles and methods"; and (4) the expert has "reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702; *see Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-90 (1993). An expert witness may be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. To be considered reliable, scientific opinions must be based on scientifically valid principles. *Daubert*, 509 U.S. at 589. The proponent of expert testimony has the burden of proving admissibility in accordance with Rule 702.

Under *Daubert*, the Court exercises a gatekeeping function to ensure an expert's proffered testimony is relevant and reliable. *United States v. Valencia-Lopez*, 971 F.3d 891, 897-98 (9th Cir. 2020). "[T]he case law—particularly Ninth Circuit case law—emphasizes that a trial judge should not exclude an expert opinion merely because he thinks it's shaky, or because he thinks the jury will have cause to question the expert's credibility. So long as an opinion is premised on reliable scientific principles, it should not be excluded by the trial judge." *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, No. 5:16-CV-06370-EJD, 2019 WL 4780183, at *1 (N.D. Cal. Sept. 30,

2019) (citing *In re Roundup Prods. Liab. Litig.*, 2018 WL 3368534 (N.D. Cal. July 20, 2018).

"Rule 702 and *Daubert* are not 'guarantees of correctness;' rather, they are safeguards against unreliable or irrelevant expert opinions." *NetFuel, Inc. v. Cisco Sys. Inc.*, No. 5:18-CV-02352-EJD, 2020 WL 1274985, at *2 (N.D. Cal. Mar. 17, 2020) (quoting *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 855 (Fed. Cir. 2010)).

## III.   DISCUSSION

Holmes argues that Dr. Master's opinions about the reliability and accuracy of Theranos blood tests, as well as his opinions about Theranos' compliance with industry standards, should be excluded.  Holmes also argues that Dr. Master is unqualified to opine on fingerstick technology.

### A.   QUALIFICATIONS

The parties agree that Dr. Master is qualified to opine about laboratory practices and clinical pathology generally, and the Court agrees.  Holmes argues, however, that Dr. Master is not qualified to provide opinions on "the accuracy or reliability of fingerstick testing on Theranos devices" specifically.  Mot. at 24.  While Holmes acknowledges Dr. Master's significant training and experience in clinical pathology and chemistry, she argues that he "does not identify any relevant experience with fingerstick blood testing" and "does not claim to have any knowledge of Theranos' proprietary technology."  Mot. at 24.

"Experts are not required to have previous experience with the product at issue." *In Re: Macbook Keyboard Litigation*, No. 5:18-CV-02813-EJD, 2021 WL 1250378, at *6 (N.D. Cal. Apr. 5, 2021) (quoting *Czuchaj v. Conair Corp.*, No. 313CV01901BENRBB, 2016 WL 4414673, at *3 (S.D. Cal. Aug. 19, 2016)); *see also Abaxis, Inc. v. Cepheid*, No. 10-CV-02840-LHK, 2012 WL 2979019, at *3 (N.D. Cal. July 19, 2012) ("Rule 702 imposes no requirement that experts have personal experience in an area to offer admissible testimony relating to that area").  Dr. Master is board certified in Clinical Pathology by the American Board of Pathology, and fingerstick blood testing falls within the discipline of Clinical Pathology.  His responsibilities as Laboratory Director and Chief of Clinical Laboratory Services at multiple hospitals over more

than a decade undoubtedly included oversight of fingerstick testing. The Court finds that Dr. Master need not have extensive personal knowledge in fingerstick testing, nor in Theranos' technology specifically, to offer a helpful and reliable opinion about the accuracy and reliability of such testing.

### B.     INDUSTRY STANDARDS

Holmes seeks to exclude Dr. Master's testimony and opinions about Theranos' laboratory practices. Specifically, Dr. Master opines "Theranos did not adhere to normal industry standards for clinical laboratory testing from 2013-2015," and that "this lack of adherence had the potential to adversely impact test accuracy and reliability." Master Report at 17. Holmes argues that these opinions should be excluded because they constitute impermissible legal opinions and because they will not be helpful to the jury.

First, Holmes argues that Dr. Master's opinions about Theranos' compliance with industry standards rest on his interpretation of federal law and its application to Theranos. Dr. Master indeed explains the "legal requirements" for clinical testing under CLIA and relevant U.S. Food and Drug Administration ("FDA") regulations as part of the background necessary to understand how and why laboratories operate the way they do. He concludes that Theranos did not adhere to normal industry standards for laboratory testing because (1) it did not prevent patient samples from being run on devices where the quality control indicated that the device was operating improperly, (2) it did not appropriately engage in any proficiency testing, and (3) it did not add a disclaimer to its laboratory developed tests—a designation that encompasses all Theranos tests—indicating that the test was not FDA approved or cleared.

Holmes argues that Dr. Master's "subjective, non-lawyer interpretation of what federal law requires and how it applies to Theranos are 'inappropriate subjects for expert testimony.'" Mot. at 19 (quoting *Aguilar v. Int'l Longshoremen's Union Local No. 10*, 966 F.2d 443, 447 (9th Cir. 1992)). Holmes maintains that, because Dr. Master is not a lawyer, he is not qualified to provide a legal opinion about what Theranos was or was not legally obligated to do under CLIA and FDA

regulations.  And even if he was so qualified, Holmes argues that it is not permissible for expert testimony to "prescribe legal standards to apply to the facts of the case" or to opine on "legal compliance in the language of 'industry practice.'"  Mot. at 20 (citing *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d at 558 ("testimony encompassing an ultimate legal conclusion based upon the facts of the case is not [admissible] and may not be made so simply because it is presented in terms of industry practice")).

The Government argues that Dr. Master is not prohibited from testifying about industry standards, of which he has extensive knowledge, merely because federal regulations form part of those standards.  The Ninth Circuit has permitted experts to testify about industry standards even where the testimony "relie[s] in part on [the expert's] understanding of the requirements of . . . law."  *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) ("'[A] witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible.  Indeed, a witness may properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms'") (quoting *Specht v. Jensen*, 853 F.2d 805, 809 (10th Cir. 1988)); *see also King v. GEICO Indem. Co.*, 712 Fed. Appx. 649 (9th Cir. 2017) ("Although it is well established that experts may not give opinions as to legal conclusions, experts may testify about industry standards").

The Court agrees with the Government that Dr. Master should not be precluded from testifying about industry standards in clinical laboratories simply because that industry happens to be heavily regulated.  Cases where courts have excluded expert witness testimony on these grounds have generally focused on preventing the expert from opining on an "ultimate legal conclusion" in the case.  *See e.g.*, *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d at 558 ("expert testimony must be circumscribed carefully to ensure that 'the expert does not usurp either the role of the trial judge in instructing the jury as to the applicable law and the role of the jury in applying that law to the facts before it.'"); *Aguilar v. Int'l Longshoremen's Union Loc. No. 10*, 966 F.2d at 447 (affirming the exclusion of expert testimony as to the reasonableness and foreseeability of

plaintiffs' reliance on an employer's promise in a promissory estoppel claim). The applicable law in this case will not include the CLIA and FDA regulations about which Dr. Master testifies. Nor will the jury be asked to decide whether Theranos or Holmes violated any such regulation. Thus, there is little risk in this case that Dr. Master's testimony about applicable regulations will unduly influence the jury as to any ultimate legal issue in the case.

Moreover, Dr. Master's focus will be on whether Theranos adhered to industry standards, not whether Theranos violated applicable regulations. While certain conduct may implicate regulations, the Court anticipates that any confusion or unfair prejudice resulting from testimony about regulatory violations can be mitigated by careful examination and thoughtful language. For example, while Dr. Master may be precluded from testifying that Theranos violated CLIA regulations by failing to perform sufficient proficiency testing, he may testify that it is typical to perform proficiency testing in the industry and that Theranos did not do so. *See, e.g., Sands v. Integon Nat'l Ins. Co.*, 2020 WL 7027442, at *4 (D. Colo. Nov. 30, 2020) ("[The expert] may not opine whether defendants met their duties under applicable caselaw or violated various statutes, but may testify whether, in his opinion, defendants' conduct conformed with specific insurance industry standards, including ones identified in those statutes").

Finally, Holmes argues that Dr. Master's opinions about industry standards will be unhelpful to and mislead the jury. Dr. Master opines that Theranos' lack of adherence to industry standards "had the potential to adversely impact test accuracy and reliability." Master Report at 17. According to Holmes, "[t]o be helpful to [the] jury's assessment of accuracy and reliability, Dr. Master's testimony would need to show that Theranos' supposed deviations from industry practice affected the integrity of its tests to such a degree that it would be materially false for someone with knowledge of the deviations to represent that Theranos' tests were accurate and reliable." Mot. at 22-23.

The Government argues that the Master Report adequately ties Theranos' practices to the accuracy and reliability of their blood tests, such that Dr. Master's testimony will be helpful to the

jury.  For example, Dr. Master explains that the failure to abide by industry-wide quality control standards can impact testing: "[r]unning patient samples when QC is giving values out of the acceptable range [as the CMS report described] directly impacts the accuracy and reliability of the results that are returned to the patient or clinician."  Master Report at 17.  The Government also points out that the Holmes herself recognized the connection between laboratory compliance practices and accuracy, touting Theranos' 100% proficiency testing score in investor PowerPoints as an indicator of accuracy.  Gov't Mots. in Limine, Ex. A, Dkt. No. 588-2 at ECF pg. 8.

The Court disagrees with Holmes' characterization of what evidence may be helpful to the jury.  Dr. Master's testimony need not provide complete or even direct evidence of Holmes' guilt to be helpful to the jury.  *United States v. Christian*, 749 F.3d 806, 811 (9th Cir. 2014) ("a district court deciding whether to admit expert testimony should evaluate whether that *testimony* 'will assist the trier of fact in drawing its own conclusion as to a fact in issue' and should not limit its consideration to 'the existence or strength of an expert's *opinion*'"), *overruled on other grounds by United States v. Bacon*, 979 F.3d 766 (9th Cir. 2020) (emphasis in original).  Although Dr. Master does not specifically conclude that Theranos' failure to abide by industry standards actually affected test results, his testimony about the purpose and effect of industry standards is nonetheless helpful.

Thus, the Court finds Dr. Master's opinions about industry standards relevant to determining whether Theranos tests were consistently accurate and reliable, and helpful to the jury in assessing whether Holmes' statements were misleading.  Accordingly, Holmes' motion is **DENIED** as to these opinions.

### C.    THERANOS BLOOD TESTS

Holmes challenges Dr. Master's opinions about the reliability and accuracy of particular Theranos blood tests on three grounds.

First, for four of the assays Dr. Master was asked to consider (HIV, HbA1c, hCG, and Calcium), he concluded that "there are substantial questions about the ability of [the] laboratory to provide patient-appropriate results" but that he lacks sufficient data to reach a more definitive

opinion.  Master Report at 12, 15.  Holmes argues "[t]hat nonopinion will not help the jury" and is unreliable.  Mot. at 8.

To assess whether proffered expert testimony would help the jury in a given case, courts "must look to the governing substantive standard."  *Daubert II*, 43 F.3d at 1320.  In this case, the substantive charge is wire fraud. The Government argues that "[g]iven the certitude and breadth with which Defendant spoke – the highest levels of accuracy for virtually every test – Dr. Master's opinion will assist the jury in assessing if that was true" for these four tests.  Opp'n, Dkt. No. 668 at 8.  The Court agrees, in principle, that Dr. Master's testimony about these four tests and his conclusion that there are "substantial questions" about their accuracy could be helpful to the jury *if* that conclusion is based on sufficient facts or data to be reliable.  The Court has concerns, however, about Dr. Master's representations that the materials he had access to were insufficient. *See, e.g.*, Master Report at 15 ("there are insufficient additional details in the material I have reviewed to determine the cause of these issues, the relationship to either the sample type or Theranos technology, or the resolution of the problems"); *id.* at 16 ("in many cases I have not been able to identify a clear paper trail demonstrating the root of these inaccuracies").

Second, Holmes argues Dr. Master's testimony about all ten tests is unreliable because he does not apply the scientific methodology that he himself outlines for determining whether a given test is suitable for clinical practice; rather, he bases his opinions on "anecdotes or snippets of data, none of which reliably support his opinions."  Mot. at 8.  More specifically, Dr. Master reported that he relied on the CMS Report for his opinion as to Vitamin D, the Icahn Report for his opinion as to cholesterol, and "frequent complaints from customers" derived from internal Theranos emails or "Theranos internal investigations" for his opinions as to all other tests.  The Government maintains that these bases are sufficiently reliable, and that Holmes' objection goes to the weight of the testimony rather than its admissibility.  Opp'n at 7-8.

In determining admissibility under Rule 702, the Court must "assess whether 'the reasoning or methodology underlying the testimony is scientifically valid' and 'properly can be applied to the facts in issue,' with the goal of ensuring that the expert 'employs in the courtroom

the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188 (9th Cir. 2019) (quoting *Daubert*, 509 U.S. at 592-93 and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

The Court is satisfied that Dr. Master's reliance on the CMS Report is scientifically sound. The CMS Report contains a significant amount of quality control data from Theranos assays, which is precisely the type of data that Dr. Master asserts is necessary to assess the accuracy of a given blood test. Thus, the Court finds Dr. Master's testimony and opinion as to the Vitamin D assay to be reliable.

As to Dr. Master's testimony and opinions about all other assays, Dr. Master does not provide sufficient information—about his underlying reasoning or methodology—in his report for the Court to assess the reliability of his opinion. Where a party "raises a material dispute as to the admissibility of expert scientific evidence, the district court must hold an *in limine* hearing (a so-called *Daubert* hearing) to consider the conflicting evidence and make findings about the soundness and reliability of the methodology employed by the scientific experts." *Daubert II*, 43 F.3d at 1319 n.10 (citing Fed. R. Evid. 104(a)). The Court concludes that a Daubert hearing is appropriate to assess the reliability of Dr. Master's methodology, which he employed to provide testimony and opinions about chloride, potassium, bicarbonate, HIV, HbA1c, hCG, cholesterol, calcium, and sodium.

## IV.   CONCLUSION

For the reasons stated, the Court **DENIES** the motion to exclude Dr. Master's opinions regarding industry standards and the Vitamin D assay. The Court will defer ruling on the balance of Holmes' motion to exclude pending a *Daubert* hearing. The Government shall determine Dr. Master's availability for a *Daubert* hearing, meet and confer with Holmes' counsel regarding scheduling, and shall notify the deputy clerk of the parties' proposed date for a *Daubert* hearing. Any supplemental material the Government plans to rely on at the hearing shall be filed no later than ten business days before the hearing. Holmes may file a responsive brief no later than five

business days before the hearing.

**IT IS SO ORDERED.**

Dated: May 21, 2021

_____

EDWARD J. DAVILA
United States District Judge

1

```
 1

 2                      UNITED STATES DISTRICT COURT

 3                    NORTHERN DISTRICT OF CALIFORNIA

 4                          SAN JOSE DIVISION

 5

      UNITED STATES OF AMERICA,          )
 6                                       )  CR-18-00258-EJD
                          PLAINTIFF,     )
 7                                       )  SAN JOSE, CALIFORNIA
                   VS.                   )
 8                                       )  MAY 6, 2021
      ELIZABETH A. HOLMES,               )
 9                                       )  PAGES 1 - 161
                          DEFENDANT.     )
10    _____    )  SEALED PAGES 152 - 161
                                         )
11

12                    TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE EDWARD J. DAVILA
13                   UNITED STATES DISTRICT JUDGE

14      A P P E A R A N C E S:

15
      FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
16                           BY:   JOHN C. BOSTIC
                                   JEFFREY B. SCHENK
17                           150 ALMADEN BOULEVARD, SUITE 900
                             SAN JOSE, CALIFORNIA 95113
18
                             BY:   ROBERT S. LEACH
19                                 KELLY VOLKAR
                             1301 CLAY STREET, SUITE 340S
20                           OAKLAND, CALIFORNIA 94612

21          (APPEARANCES CONTINUED ON THE NEXT PAGE.)

22    OFFICIAL COURT REPORTERS:
                             IRENE L. RODRIGUEZ, CSR, RMR, CRR
23                           CERTIFICATE NUMBER 8074
                             LEE-ANNE SHORTRIDGE, CSR, CRR
24                           CERTIFICATE NUMBER 9595

25          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                 TRANSCRIPT PRODUCED WITH COMPUTER
```

2

1     A P P E A R A N C E S: (CONT'D)

2

3     FOR DEFENDANT HOLMES:   WILLIAMS & CONNOLLY LLP
                              BY:  KEVIN M. DOWNEY
4                                  LANCE A. WADE
                                   PATRICK LOOBY
5                                  KATHERINE TREFZ
                                   AMY SAHARIA
6                                  ANDREW LEMENS
                                   J.R. FLEURMONT
7                                  SEEMA ROPER
                              725 TWELFTH STREET, N.W.
8                              WASHINGTON, D.C. 20005

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

|  | 1 | SAN JOSE, CALIFORNIA                                    MAY 6, 2021 |

```
         1    SAN JOSE, CALIFORNIA                      MAY 6, 2021

12:52PM  2                    P R O C E E D I N G S

12:52PM  3         (COURT CONVENED AT 1:03 P.M.)

01:04PM  4             THE COURT:  LET'S GO ON THE RECORD IN 18-258,

01:04PM  5    UNITED STATES VERSUS ELIZABETH HOLMES.

01:04PM  6         I SEE ALL COUNSEL PRESENT AGAIN.  GOOD AFTERNOON.

01:04PM  7    MS. HOLMES IS PRESENT.  AND WE'RE READY TO FINISH OUR

01:04PM  8    DISCUSSION, OR CONTINUE OUR DISCUSSIONS I SHOULD SAY, ON THE

01:04PM  9    PENDING IN LIMINE MOTIONS.

01:04PM 10         WHAT I'D LIKE TO DO, MS. SAHARIA, I'D LIKE TO GIVE

01:04PM 11    IN LIMINE MOTION, GOVERNMENT'S NUMBER 9 ONE MORE TRY.

01:04PM 12             MS. SAHARIA:  YES.  I WOULD AS WELL, YOUR HONOR.

01:04PM 13             THE COURT:  LET'S CALL THIS OUT OF ORDER.  THIS IS

01:04PM 14    GOVERNMENT'S MOTION NUMBER 9 TO EXCLUDE SELF-SERVING HEARSAY

01:04PM 15    STATEMENTS MADE AND OFFERED BY THE DEFENDANT.

01:05PM 16         YESTERDAY I WAS TALKING ABOUT RECOGNIZING THAT THE ORTEGA

01:05PM 17    CASE, 203 FED. 3D CONTROLS THIS ISSUE AND THAT THE COURT WOULD

01:05PM 18    BE INCLINED TO FOLLOW NINTH CIRCUIT LAW ON THIS ISSUE.

01:05PM 19         I THINK YOU WERE TALKING ABOUT, WELL, THERE MAY BE OTHER

01:05PM 20    CIRCUMSTANCES WHERE OTHER STATEMENTS OF THE DEFENDANT MIGHT,

01:05PM 21    MIGHT BE ADMISSIBLE.

01:05PM 22         I THINK YOUR CONCERN WAS THAT THE COURT WOULD ISSUE A

01:05PM 23    RULING, A BLANKET RULING PROHIBITING YOU FROM EVEN ATTEMPTING

01:05PM 24    TO GET THOSE TYPES OF STATEMENTS IN.

01:05PM 25             MS. SAHARIA:  THAT'S RIGHT.
```

4

01:05PM 1          THE COURT:  IF THAT WAS -- YOU CAN COME TO THE

01:05PM 2  LECTERN IF YOU WOULD LIKE.  THANK YOU.

01:05PM 3     AND IF THAT WAS THE IMPRESSION THAT I LEFT YOU WITH, THAT

01:05PM 4  WAS MY MISTAKE.  I DID NOT MEAN TO INDICATE THAT.

01:05PM 5     I THINK IT IS -- I DON'T KNOW WHOSE MOTION THIS IS.

01:05PM 6     YES.  THANK YOU.  MS. VOLKAR, COME ON UP.

01:05PM 7       MS. VOLKAR:  THANK YOU, YOUR HONOR.

01:05PM 8     THE COURT:  I DIDN'T MEAN TO INDICATE THAT I WAS

01:05PM 9  GOING TO GRANT THE MOTION AND THEREBY PRECLUDE YOUR TEAM FROM

01:06PM 10  INTRODUCING OR AT LEAST ATTEMPTING TO INTRODUCE STATEMENTS THAT

01:06PM 11  YOU FELT COULD BE ADMISSIBLE FOR SOME OTHER PURPOSE OTHER THAN

01:06PM 12  WHAT ORTEGA AND THE PROGENY.

01:06PM 13       MS. SAHARIA:  THAT WAS MY CONCERN, YOUR HONOR.  I'M

01:06PM 14  PREPARED TO ADDRESS THAT IF HELPFUL, BUT I THINK WE AGREE WITH

01:06PM 15  YOUR HONOR THAT ORTEGA IMPLEMENTS RULE 801 WHICH PROHIBITS US

01:06PM 16  FROM INTRODUCING MS. HOLMES'S STATEMENTS IF THEY ARE HEARSAY.

01:06PM 17  AND THE HOLDING OF ORTEGA WAS, QUOTE, "THE DISTRICT COURT DID

01:06PM 18  NOT ABUSE ITS DISCRETION WHEN IT LIMITED ORTEGA'S ABILITY TO

01:06PM 19  ELICIT HIS EXCULPATORY HEARSAY STATEMENTS ON

01:06PM 20  CROSS-EXAMINATION."

01:06PM 21     THERE ARE MULTIPLE DECISIONS OF THIS COURT THAT THEN GO ON

01:06PM 22  TO EXPLAIN THAT THERE MAY BE CIRCUMSTANCES IN WHICH A

01:06PM 23  DEFENDANT'S OUT-OF-COURT STATEMENT IS ADMISSIBLE FOR SOME OTHER

01:06PM 24  NONHEARSAY PURPOSE, FOR INSTANCE, THE YAGI CASE BY JUDGE CHEN

01:06PM 25  AND THE YANG CASE BY JUDGE KOH.

5

| | | |
|---|---|---|
| 01:06PM | 1 | SO WE WOULD JUST -- OF COURSE, WE INTEND TO COMPLY WITH |
| 01:07PM | 2 | ORTEGA.  WE WILL NOT INTRODUCE MS. HOLMES'S STATEMENTS FOR THE |
| 01:07PM | 3 | TRUTH, BUT THERE MAY BE OTHER PURPOSES SUCH AS STATE OF MIND OR |
| 01:07PM | 4 | OTHER NONHEARSAY PURPOSES TO WHICH THEY COULD BE ADMISSIBLE. |
| 01:07PM | 5 | THAT'S ALL THAT I WAS INTENDING, PERHAPS INARTICULATELY, |
| 01:07PM | 6 | TO EXPLAIN. |
| 01:07PM | 7 | THE COURT:  NO, NO.  AND I DIDN'T MEAN TO SUGGEST |
| 01:07PM | 8 | THAT THERE WOULD BE A BLANKET PRECLUSION FROM EVEN THAT |
| 01:07PM | 9 | ATTEMPT. |
| 01:07PM | 10 | DO YOU WISH TO BE HEARD? |
| 01:07PM | 11 | MS. VOLKAR:  I WOULD, YOUR HONOR. |
| 01:07PM | 12 | THIS IS, AS YOU MENTIONED YESTERDAY, A STRAIGHTFORWARD |
| 01:07PM | 13 | APPLICATION OF ORTEGA, AND IF THE COURT WISHES TO LOOK TO WHAT |
| 01:07PM | 14 | THE GOVERNMENT IS SEEKING, IF THE COURT WOULD LOOK -- IF THE |
| 01:07PM | 15 | GOVERNMENT WOULD POINT THE COURT TO A RECENT DECISION IN THIS |
| 01:07PM | 16 | COURT BY JUDGE ILLSTON IN THE DASHNER CASE FROM JUST A FEW |
| 01:07PM | 17 | YEARS AGO. |
| 01:07PM | 18 | THE REASON WHY WE POINT TO THAT IS BECAUSE THERE ARE A LOT |
| 01:07PM | 19 | OF STATEMENTS IN THIS CASE BY THE DEFENDANT TO THE MEDIA |
| 01:07PM | 20 | THROUGHOUT THE LAST SEVERAL YEARS AND THAT THE DEFENDANT COULD |
| 01:07PM | 21 | USE, FOR EXAMPLE, ON CROSS-EXAMINATION OF GOVERNMENT WITNESSES |
| 01:07PM | 22 | OR NOT THROUGH THE DEFENDANT'S OWN TESTIMONY THAT WOULD |
| 01:08PM | 23 | ESSENTIALLY, AS THE ORTEGA CASE SAYS, BE A BACKDOOR BRINGING IN |
| 01:08PM | 24 | THE SELF-SERVING AND STATEMENTS ABOUT SORT OF ALTRUISTIC MOTIVE |
| 01:08PM | 25 | BEHIND THE COMPANY WITHOUT ALLOWING THE GOVERNMENT THE CHANCE |

6

01:08PM  1    FOR CROSS-EXAMINATION.

01:08PM  2        AND, OF COURSE, A DEFENDANT HAS THE RIGHT TO TESTIFY.

01:08PM  3    THAT IS HER RIGHT.  BUT IF SHE CHOOSES NOT TO TESTIFY, THEN THE

01:08PM  4    GOVERNMENT WOULD BE LEFT WITHOUT RECOURSE TO CHALLENGE OR TO

01:08PM  5    VET THESE STATEMENTS, AND THAT IS THE GOVERNMENT'S ULTIMATE

01:08PM  6    CONCERNS.  AND JUDGE ILLSTON SAW THAT IN THE DASHNER CASE.

01:08PM  7        I WOULD ALSO LIKE TO SPECIFICALLY RESPOND TO YANG AND

01:08PM  8    YAGI.  THE YANG CASE WAS BEFORE JUDGE KOH IN THIS DISTRICT, AND

01:08PM  9    THERE THE DEFENDANT SPECIFICALLY STATED THAT THEY WOULD NOT BE

01:08PM  10   INTRODUCING ANY HEARSAY STATEMENTS OF THE DEFENDANT.

01:08PM  11       WE HAVE NOT RECEIVED A SIMILAR STATEMENT IN THIS CASE SO I

01:08PM  12   BELIEVE THAT DISTINGUISHES YANG FROM THE FACTS BEFORE THE

01:08PM  13   COURT.

01:08PM  14       AND THE YAGI CASE FOCUSSED MOSTLY ON THE STATE OF MIND

01:09PM  15   EXCEPTION, WHICH AT LEAST IN THE DEFENDANT'S OPPOSITION HAS NOT

01:09PM  16   SPECIFICALLY BEEN RAISED, ALTHOUGH I BELIEVE MS. SAHARIA

01:09PM  17   REFERENCED IT YESTERDAY.

01:09PM  18       I WOULD POINT AGAIN TO JUDGE ILLSTON'S DECISION IN

01:09PM  19   DASHNER, WHICH POINTS TO A NINTH CIRCUIT CASE, COLLICOTT FROM

01:09PM  20   2013, THAT REALLY TALKS ABOUT HOW LIMITED THE STATE OF MIND

01:09PM  21   EXCEPTION IS, AND IT TALKS ABOUT THE FACT THAT IF YOU'RE TRYING

01:09PM  22   TO BRING IN HEARSAY STATEMENTS THROUGH ANOTHER WITNESS

01:09PM  23   TESTIFYING, IT IS OFTEN INADMISSIBLE UNDER THIS BASIC BLANKET

01:09PM  24   BLACK LETTER LAW RULE, AND IF IT'S SORT OF A MEMORY OR BELIEF

01:09PM  25   OF WHAT THE DEFENDANT SAID COMING IN THROUGH ANOTHER WITNESS,

7

01:09PM 1    THEN IT'S IRRELEVANT HEARSAY.

01:09PM 2        AGAIN, I THINK I WOULD POINT TO ALTHOUGH THERE ARE THESE

01:09PM 3    TWO DISTRICT COURT CASES OUT THERE, THEY REALLY HAVE LIMITED

01:09PM 4    APPLICATION AND THE NINTH CIRCUIT IS VERY CLEAR.  WE'RE JUST

01:09PM 5    LOOKING FOR A RULE AGAIN IN YOUR ORDER SIMILAR TO WHAT

01:09PM 6    JUDGE ILLSTON DID, WHICH IS JUST REMINDING OF THOSE GUARDRAILS

01:10PM 7    AS WE HEAD INTO TRIAL.

01:10PM 8        THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

01:10PM 9    I THINK OUR CONVERSATION HAS REMINDED US OF THE

01:10PM 10   GUARDRAILS, AND I'M NOT CERTAIN I NEED TO MAKE A SPECIFIC

01:10PM 11   MOTION.  I HAVE NOT HEARD MS. SAHARIA ADVANCE A STATEMENT THAT

01:10PM 12   SHE THINKS IS APPROPRIATE NOW.  WE HAVEN'T STARTED TRIAL YET.

01:10PM 13       MS. SAHARIA:  CORRECT.  WE DON'T EVEN KNOW WHAT

01:10PM 14   STATEMENTS THEY'RE ATTEMPTING TO EXCLUDE BECAUSE THEY HAVE NOT

01:10PM 15   IDENTIFIED THEM WHICH IS WHY THE COURT IN YAGI AND YANG

01:10PM 16   DEFERRED RULING ON THE MOTION.

01:10PM 17       THE COURT:  AND I THINK WE KNOW TRIALS ARE VERY

01:10PM 18   FLUID, THEY CHANGE, THINGS CAN HAPPEN, AND I THINK IT WOULD BE

01:10PM 19   PREMATURE FOR THE COURT TO MAKE ANY KIND OF A RULING NOW BASED

01:10PM 20   ON WHAT WE KNOW THE LAW IS, BUT I DON'T HAVE THE TEXTUAL

01:10PM 21   INFORMATION IN FRONT OF ME TO ACTUALLY RULE ON A MOTION, DO I?

01:10PM 22   OTHER THAN TO RECOGNIZE AND BE GRATEFUL THAT EVERYBODY

01:10PM 23   RECOGNIZES WHAT THE LAW IS IN THE CIRCUIT AND THE STATEMENT

01:10PM 24   THAT THE COURT INTENDS TO FOLLOW AND I WILL NOTE THAT ALL

01:10PM 25   COUNSEL DO AS WELL.

8

01:10PM 1          MS. SAHARIA:  I AGREE, YOUR HONOR.

01:10PM 2          THE COURT:  ALL RIGHT.  THANK YOU.

01:10PM 3          MS. VOLKAR:  THANK YOU.

01:10PM 4          THE COURT:  I'LL DEFER THE MOTION.  THANK YOU.

01:11PM 5      ALL RIGHT.  LET'S TURN OUR ATTENTION BACK TO THE FIRST

01:11PM 6  MOTION THAT THE PARTIES HAVE INDICATED THAT THEY WOULD LIKE TO

01:11PM 7  DISCUSS.

01:11PM 8      IT'S DOCKET 567, AND THIS IS MS. HOLMES'S MOTION TO

01:11PM 9  EXCLUDE EVIDENCE CONCERNING WEALTH, SPENDING, AND LIFESTYLE.

01:11PM 10         MR. DOWNEY:  GOOD AFTERNOON, YOUR HONOR.

01:11PM 11         THE COURT:  GOOD AFTERNOON, MR. DOWNEY.

01:11PM 12         MR. DOWNEY:  KEVIN DOWNEY FOR MS. HOLMES.

01:12PM 13     AS THE COURT NOTED, I'LL BE ADDRESSING THE MOTION IN

01:12PM 14  LIMINE THAT RELATES TO WEALTH, WHICH IS AT DOCKET 567.

01:12PM 15     I MAY ALSO REFER DURING THE COURSE OF THE ARGUMENT TO WHAT

01:12PM 16  WE CALL THE SAHARIA AFFIDAVIT, WHICH IS TEXT IN THE DOCKET AS

01:12PM 17  579 AND PRINCIPALLY ANY REFERENCE I MAKE WOULD BE TO EXHIBIT 3

01:12PM 18  OF THAT DOCUMENT.

01:12PM 19     OF COURSE, I'M ALWAYS HAPPY TO HEAR WHATEVER THOUGHTS THE

01:12PM 20  COURT HAS AS TO THE ISSUES THAT HAVE DRAWN ITS FOCUS IN

01:12PM 21  REVIEWING THE BRIEFS.

01:12PM 22     BUT I THOUGHT THAT WHAT MIGHT BE HELPFUL FOR THE COURT AND

01:12PM 23  PROBABLY MOST HELPFUL WOULD BE TO FOCUS ON WHAT I THINK ARE THE

01:12PM 24  BINDING NINTH CIRCUIT CASES TO TALK ABOUT THE EVIDENCE THAT WE

01:12PM 25  KNOW SURELY WILL COME IN DURING THE COURSE OF THE TRIAL, THE

9

01:12PM 1    EVIDENCE THAT MOST CERTAINLY SHOULD NOT COME IN DURING THE

01:12PM 2    TRIAL.  AND ALSO, YOUR HONOR, I'D LIKE TO SAY IN THE LAST

01:13PM 3    PORTION OF MY COMMENTS, I WOULD LIKE TO TALK ABOUT WHAT COULD

01:13PM 4    BE COMMENTED ON DURING OPENING, AND I THINK IT'S A LITTLE

01:13PM 5    PREMATURE TO TALK ABOUT WHAT WILL BE SAID IN CLOSING, BUT MUCH

01:13PM 6    OF WHAT I WOULD SAY WOULD APPLY THERE AS WELL.

01:13PM 7         SO LET ME TALK ABOUT THE EVIDENCE FIRST THAT WILL COME IN

01:13PM 8    IN LIGHT OF REYES AND MITCHELL.  I THINK I SHOULD SAY FOR THE

01:13PM 9    COURT REPORTER THAT THE REYES CASE IS R-E-Y-E-S.

01:13PM 10   I KNOW THE COURT IS VERY FAMILIAR WITH THE FACTS OF THOSE

01:13PM 11   CASES, BUT I THOUGHT IT MIGHT BE USEFUL TO ENGAGE IN SOME

01:13PM 12   DISCUSSION OF THE PARTICULARS OF THE FACTS OF THOSE CASES TO

01:13PM 13   ANALOGIZE THEM TO WHAT I ANTICIPATE WE'LL SEE AT TRIAL.

01:13PM 14        WITH REGARD TO THE REYES CASE, AS THE COURT WELL KNOWS IT

01:13PM 15   WAS AN OPTIONS BACKDATING CASE.  THE EVIDENCE THAT WAS ADMITTED

01:13PM 16   THERE EFFECTIVELY ENDED UP BEING THE AMOUNT OF PROFIT REALIZED

01:13PM 17   BY THE DEFENDANT, WHICH ENDED UP BEING ABOUT $2 MILLION.  AT

01:13PM 18   ONE POINT IT HAD A NOTIONAL VALUE OF $130 MILLION.

01:14PM 19        THE COURT EFFECTIVELY HELD THAT BECAUSE THAT WAS SO

01:14PM 20   INTEGRAL TO THE OFFENSE AND BECAUSE IT SHOWED THAT THERE WOULD

01:14PM 21   BE A FINANCIAL GAIN, THAT IT WAS NOT INAPPROPRIATE TO ADMIT

01:14PM 22   THAT EVIDENCE.

01:14PM 23        I MUST SAY IT WAS UNDER A CLEARLY ERRONEOUS STANDARD OF

01:14PM 24   REVIEW, BUT IT DOESN'T STRIKE ME THAT IF THE STANDARD OF REVIEW

01:14PM 25   HAD BEEN DIFFERENT, WE WOULD HAVE LIKELY SEEN A DIFFERENT

UNITED STATES COURT REPORTERS

**ER-2354**

01:14PM 1    RESULT.

01:14PM 2        LET ME TAKE THOSE FACTS AND APPLY THEM TO WHAT I

01:14PM 3    ANTICIPATE WE'LL SEE HERE.  THERE ARE REALLY TWO DIFFERENT

01:14PM 4    KINDS OF FINANCIAL TRANSACTIONS THAT WE'LL BE TALKING ABOUT IN

01:14PM 5    THIS CASE.  ONE IS VERY SIMPLE, AND ONE IS A LITTLE MORE

01:14PM 6    COMPLEX.

01:14PM 7        OBVIOUSLY AS THE COURT WELL KNOWS AND THE DISCUSSION OVER

01:14PM 8    THE PAST FEW DAYS HAS PRESAGED, WE WILL SEE DISCUSSION OF

01:14PM 9    PATIENTS ENGAGING IN TRANSACTIONS TO BUY BLOOD TESTS.  THAT

01:14PM 10   REALLY IS NOT FOR THE MOST PART RELEVANT TO THIS ISSUE.

01:14PM 11       WE EXPECT THAT THE AMOUNTS PAID FOR THOSE TESTS WILL COME

01:14PM 12   INTO THE CASE, AND THAT'S OBVIOUSLY OF NO CONCERN WITH RESPECT

01:15PM 13   TO THIS.

01:15PM 14       THE ISSUE THAT TOUCHES ON THE ISSUE THAT WE'RE CONCERNED

01:15PM 15   ABOUT, BUT WHICH WILL LEAD TO ADMISSIBLE EVIDENCE, IS THE

01:15PM 16   FINANCIAL TRANSACTIONS BY WHICH INVESTORS MADE INVESTMENTS

01:15PM 17   WITHIN THERANOS.

01:15PM 18       OBVIOUSLY THE AMOUNTS OF THOSE INVESTMENTS WILL BE

01:15PM 19   REFLECTED IN EXHIBITS WHICH ARE ADMITTED AT TRIAL.  THERE WILL

01:15PM 20   BE TESTIMONY ABOUT THE AMOUNTS THAT INVESTORS EXHIBITED -- THAT

01:15PM 21   INVESTORS INVESTED WITHIN THERANOS.

01:15PM 22       AT THE SAME TIME THE JURY WILL LEARN THROUGH MULTIPLE

01:15PM 23   EXHIBITS HOW MUCH THAT INVESTMENT CONSTITUTES AS A PERCENTAGE

01:15PM 24   OF THE COMPANY, THE PERCENTAGE OF THE COMPANY THAT MS. HOLMES

01:15PM 25   OWNED, AND FROM THAT THE JURY WILL OBVIOUSLY BE ABLE TO AT

01:15PM 1    LEAST ON A SNAPSHOT BASIS OVER TIME GET A SENSE OF WHAT THE

01:15PM 2    NOTIONAL VALUE OF MS. HOLMES'S WEALTH IN THE COMPANY WAS AT

01:15PM 3    THAT POINT.

01:15PM 4        I DON'T THINK THERE'S ANY WAY TO AVOID THAT IN THIS CASE,

01:15PM 5    AND I DON'T SEEK TO AVOID IT BY THIS MOTION.  I THINK IF I DID

01:16PM 6    SEEK TO AVOID IT, THE REYES CASE WOULD PROBABLY SAY I SHOULD

01:16PM 7    LOSE THAT ARGUMENT.

01:16PM 8        THIS MOTION ISN'T ABOUT THOSE ISSUES.  THIS MOTION IS

01:16PM 9    ABOUT WHAT IS IN THE GOVERNMENT'S 404(B) NOTICE AND

01:16PM 10   SPECIFICALLY WHAT IS IN EXHIBIT 3 TO THE SAHARIA AFFIDAVIT.

01:16PM 11       WHAT THE GOVERNMENT WANTS TO DO IN THIS CASE AND WHAT MOST

01:16PM 12   CERTAINLY SHOULD NOT BE ADMITTED, AND ACTUALLY TO MY KNOWLEDGE

01:16PM 13   I'VE STRUGGLED TO FIND A CASE WHERE IT'S EVER BEEN ADMITTED, IS

01:16PM 14   TO TAKE EVIDENCE WHICH IS UNRELATED TO THE CRIME, WHICH IS HOW

01:16PM 15   WEALTH, WHICH IS IN THE GOVERNMENT'S VIEW DERIVED AT LEAST IN

01:16PM 16   PART FOR FRAUDULENT ACTIVITY, TO LOOK AT THAT AND TO ASK HOW

01:16PM 17   WAS THAT MONEY SPENT.  AND THAT IS CLEARLY PROHIBITED UNDER

01:16PM 18   NINTH CIRCUIT LAW.

01:16PM 19       THE ONLY ELEMENT OF WEALTH THAT IS RELEVANT IS THE ELEMENT

01:16PM 20   OF DEMONSTRATING THAT THERE WAS A FINANCIAL GAIN OR AN

01:17PM 21   ANTICIPATED FINANCIAL GAIN TO A DEFENDANT IN CONNECTION WITH

01:17PM 22   THE TRANSACTION.

01:17PM 23       SO WHAT ARE WE SPECIFICALLY TALKING ABOUT HERE THAT I'M

01:17PM 24   CONCERNED ABOUT?  IT'S ALL OF THE EVIDENCE THAT THE GOVERNMENT

01:17PM 25   GAVE US IN CONNECTION WITH ITS DISCLOSURE CONCERNING THE

UNITED STATES COURT REPORTERS

12

01:17PM 1  ARGUMENTS IT WANTS TO MAKE ON WEALTH, THE REASON IT WANTS TO

01:17PM 2  MAKE THOSE ARGUMENTS, AND THE DOCUMENTS THAT IT WILL SEEK TO

01:17PM 3  EXIST.

01:17PM 4      WHAT ARE THEY?  I'M NOT SURE THAT'S ENTIRELY CLEAR FOR THE

01:17PM 5  COURT FROM THE PAPERS THAT WE SUBMITTED, SO I WANT TO MAKE SURE

01:17PM 6  THAT THE COURT UNDERSTANDS IT.

01:17PM 7      LARGELY THE EVIDENCE IS IN THE FORM OF EMAILS.  MANY OF

01:17PM 8  THE EMAILS ARE ESSENTIALLY DAILY TO-DO LISTS EITHER COMPLETED

01:17PM 9  OR ANTICIPATED FOR MS. HOLMES'S ASSISTANT.  THEY ARE, I WILL

01:17PM 10  SAY TO YOUR HONOR, A VAST SUBSECTION OF DAILY EMAILS, AND

01:17PM 11  THEY'VE BEEN TENDENTIOUSLY SELECTED BY THE GOVERNMENT FOR A

01:17PM 12  PARTICULAR PURPOSE.

01:18PM 13      WHAT IS THEIR PURPOSE?  THEY REFERENCE POTENTIALLY A

01:18PM 14  DINNER AT A RESTAURANT WHICH THE GOVERNMENT CHARACTERIZES, AND

01:18PM 15  PROBABLY APPROPRIATELY SO, AS A LUXURIOUS RESTAURANT.  THEY

01:18PM 16  MIGHT REFERENCE A PURCHASE OF CLOTHING, A PURCHASE OF JEWELRY,

01:18PM 17  ET CETERA.

01:18PM 18      I ANTICIPATE THAT MY FRIENDS WILL BE EAGER TO GIVE THE

01:18PM 19  COURT MORE DETAIL ON THAT, BUT I THINK IT'S SAFE TO SAY THAT

01:18PM 20  THEY ARE EMAILS DISCUSSING PURCHASES OF WHAT MS. HOLMES WORE,

01:18PM 21  HOW HER HAIR WAS DONE, WHAT SHOES SHE CHOSE TO WEAR, WHERE SHE

01:18PM 22  STAYED, HOW SHE FLEW, ET CETERA.

01:18PM 23      NOW, TAKE THAT EVIDENCE AND COMPARE IT TO THE REYES CASE.

01:18PM 24  WE HAVE NO IDEA WHAT THE CEO OF BROCADE, MR. REYES, WORE.  WE

01:18PM 25  HAVE NO IDEA WHERE HE STAYED, WE HAVE NO IDEA HOW HE TRAVELLED

01:18PM 1    BY FLIGHT.  NONE OF THAT EVIDENCE TO THE BEST THAT I CAN

01:18PM 2    REINSTRUCT DID THE GOVERNMENT EVEN SEEK TO INTRODUCE IN THAT

01:19PM 3    CASE.

01:19PM 4        AND WHY?  FOR THE OBVIOUS REASON THAT THE FOUNDATIONAL

01:19PM 5    PRINCIPLE AROUND THIS TYPE OF EVIDENCE IS THAT EVIDENCE WHICH

01:19PM 6    IS DESIGNED MERELY TO SHOW EITHER WEALTH ON THE PART OF THE

01:19PM 7    DEFENDANT IS PRECLUDED UNDER RULE 401 OR EVIDENCE WHICH IS

01:19PM 8    DESIGNED TO INFLAME THE JURY OR TO SUGGEST TO THE JURY THAT THE

01:19PM 9    DEFENDANT HAS THE LIFESTYLE OF A WEALTHY PERSON IS CONSIDERED

01:19PM 10   INADMISSIBLE UNDER 403.

01:19PM 11       THAT IS IN NO WAY UNDERMINED BY THE RULING IN REYES NOR BY

01:19PM 12   ANY OTHER CASE CITED BY THE GOVERNMENT.

01:19PM 13       NOW, I SAY WITH RESPECT TO ALL OF THIS, YOUR HONOR, I,

01:19PM 14   AGAIN, HAVE NO ISSUE WITH THE DETAILS OF THE TRANSACTIONS

01:19PM 15   COMING IN.  WE INTEND FULLY TO EXAMINE THE DETAILS OF THOSE

01:19PM 16   TRANSACTIONS.  WE INTEND TO EXAMINE TRANSACTIONS WHICH WERE

01:19PM 17   PROPOSED TO MS. HOLMES WHICH WOULD HAVE ALLOWED HER TO CONVERT

01:20PM 18   HER HOLDINGS IN THERANOS INTO SUBSTANTIAL FINANCIAL WEALTH

01:20PM 19   WHICH SHE REJECTED CONSISTENTLY OVER MANY YEARS.  ALL OF THAT

01:20PM 20   WILL BE PART OF THIS TRIAL.

01:20PM 21       BUT WHAT SHE WORE, WHERE SHE STAYED, HOW SHE FLEW, WHAT

01:20PM 22   SHE ATE HAS NOTHING TO DO WITH THIS TRIAL.  IF THAT COMES INTO

01:20PM 23   THIS TRIAL, WE WILL BE FORCED TO STAND IN THIS COURTROOM AND

01:20PM 24   INTRODUCE THE OTHER SEVERAL HUNDREDS OF EMAILS PREPARED BY HER

01:20PM 25   ASSISTANT SHOWING WHAT HER DAILY ACTIVITIES WERE TO

14

01:20PM 1    CONTEXTUALIZE THE IMPRESSIONS THAT THE GOVERNMENT WILL HAVE

01:20PM 2    SOUGHT TO CREATE.

01:20PM 3        SO THOSE ARE THE TWO CATEGORIES OF EVIDENCE THAT I THINK

01:20PM 4    ARE AT ISSUE HERE.

01:20PM 5        THE THIRD ISSUE IS WHAT SHOULD THE COURT'S CONCERNS BE

01:20PM 6    BEFORE WE GET TO THE EVIDENCE?  AND I WOULD ASK YOUR HONOR AS

01:20PM 7    YOU THINK ABOUT THESE MOTIONS, I THINK YOUR HONOR CAN RECOGNIZE

01:20PM 8    THAT WE'VE HAD WHAT I THINK HAS BEEN A FRUITFUL DISCUSSION OVER

01:20PM 9    A COUPLE OF DAYS ABOUT CORE ISSUES IN THE CASE.  WHAT IS THE

01:21PM 10   SCIENCE?  WHAT IS THE TECHNOLOGY?  DOES IT DO WHAT

01:21PM 11   REPRESENTATIONS SUGGEST THAT IT COULD DO, ET CETERA?

01:21PM 12       WE'RE NOW VERY FAR ON THE PERIPHERY, AND WE'RE IN THE AREA

01:21PM 13   THAT I THINK EXPERIENCE TEACHES US IS VERY DANGEROUS BECAUSE

01:21PM 14   COMMENT ON ISSUES SUCH AS WEALTH IS PRECISELY THE KIND OF THING

01:21PM 15   THAT HAPPENS IN A CASE THAT UNDERMINES ITS INTEGRITY.

01:21PM 16       SO I WOULD ASK YOUR HONOR NOT ONLY TO CONSIDER THE

01:21PM 17   EXCLUSION THAT WE'VE ASKED FOR OF THE EVIDENCE BUT TO DO WHAT I

01:21PM 18   KNOW YOUR HONOR ALWAYS DOES, WHICH IS TO POLICE COMMENT IN

01:21PM 19   OPENING ON THIS BECAUSE I THINK THIS IS THE KIND OF

01:21PM 20   INFLAMMATORY COMMENTARY THAT COULD DO GREAT DAMAGE TO THE

01:21PM 21   TRIAL.

01:21PM 22       MANY OF THE ISSUES THAT WE HAVE BEEN DISCUSSING HERETOFORE

01:21PM 23   ARE ISSUES THAT REALISTICALLY THEY PROBABLY ARE BEST DEFERRED

01:21PM 24   AT THIS POINT.

01:21PM 25       I THINK THIS ISSUE CRIES OUT FOR A LITTLE MORE SPECIFIC

01:22PM 1    COMMENTARY FROM THE COURT AND A LITTLE CLEARER PROHIBITION ON

01:22PM 2    WHAT MAY AND MAY NOT BE SAID IN OPENING.

01:22PM 3        AND I THINK, YOUR HONOR, THE CASES ARE ABUNDANTLY CLEAR

01:22PM 4    THAT COMMENTARY WHICH SUGGESTS EITHER THAT MS. HOLMES AND HER

01:22PM 5    SPENDING ARE MOTIVATIONS FOR A CRIME IS CLEARLY PROHIBITED AS

01:22PM 6    IS THE ARGUMENT THAT THE MERE DESIRE TO CREATE WEALTH IS

01:22PM 7    PROHIBITED BY CASES THAT THE NINTH CIRCUIT HAS CITED.

01:22PM 8        SO I'D BE HAPPY TO ANSWER ANY FURTHER ANY QUESTIONS THAT

01:22PM 9    THE COURT HAS, BUT THAT'S OUR POSITION ON THIS ISSUE.

01:22PM 10        THE COURT:  ALL RIGHT.  WHO STANDS TO RESPOND?

01:22PM 11        MR. BOSTIC.  THANK YOU.

01:22PM 12        MR. BOSTIC, THANK YOU.

01:22PM 13        WHAT I HEAR MR. DOWNEY SUGGESTING IS THAT HE DOES NOT WANT

01:22PM 14    THIS PROSECUTION TO BE ONE OF A LIFESTYLE OR CLASS PROSECUTION.

01:23PM 15    I THINK YOU PROBABLY HEARD HIM SAY THAT AS WELL.

01:23PM 16        IS THAT WHAT THE GOVERNMENT INTENDS?

01:23PM 17        MR. BOSTIC:  CERTAINLY NOT, YOUR HONOR.

01:23PM 18        THE GOVERNMENT DOES NOT INTEND TO PRESENT THE EVIDENCE IN

01:23PM 19    QUESTION FOR ANY IMPROPER PURPOSE.  THE GOVERNMENT IS AWARE OF

01:23PM 20    THE NINTH CIRCUIT LAW AND THE OTHER LAWS REGARDING THE

01:23PM 21    INTRODUCTION OF THIS KIND OF EVIDENCE.

01:23PM 22        BUT I HAVE TO SAY LISTENING TO MY COUNTERPART'S ARGUMENT,

01:23PM 23    I WAS STRUCK BY THE FACT THAT WHAT HE SEEMS TO BE ASKING FOR

01:23PM 24    TODAY FEELS MUCH NARROWER THAN WHAT THE MOTION COVERS AND WHAT

01:23PM 25    THE BRIEFING COVERS.

01:23PM 1    THE ARGUMENT TODAY WAS FOCUSSED ON A SPECIFIC SUBSET OF

01:23PM 2    EVIDENCE SPECIFYING OR SPECIFICALLY DEALING WITH EMAILS BETWEEN

01:23PM 3    THE DEFENDANT AND HER ASSISTANT REGARDING TASKS FOR THAT DAY.

01:23PM 4    THERE ARE SOME OF THOSE ITEMS ON THE GOVERNMENT'S EXHIBIT LIST.

01:24PM 5    I'LL ADDRESS THOSE SHORTLY, BUT I DIDN'T HEAR MY COUNTERPART

01:24PM 6    TALK ABOUT ITEMS LIKE THE DEFENDANT'S SALARY AT THERANOS, THE

01:24PM 7    OTHER TANGIBLE OR INTANGIBLE BENEFITS THAT SHE OBTAINED FROM

01:24PM 8    HER POSITION AT THERANOS WHEREAS READING THE BRIEFING IT SEEMS

01:24PM 9    LIKE THE DEFENSE WAS SEEKING TO EXCLUDE ALL OF THAT.

01:24PM 10    I AGREE WITH MR. DOWNEY THAT THE LAW ON THIS AREA IS QUITE

01:24PM 11    CLEAR AND THAT THE PARTIES ARE SIMPLY ON DIFFERENT PAGES WHEN

01:24PM 12    IT COMES TO WHAT EVIDENCE THE GOVERNMENT IS GOING TO INTRODUCE

01:24PM 13    AND FOR WHAT PURPOSE.  SO LET ME SEE IF I CAN UNTANGLE THAT FOR

01:24PM 14    THE COURT'S BENEFIT.

01:24PM 15    IT SHOULDN'T BE CONTROVERSIAL THAT IN A FRAUD CASE WHERE

01:24PM 16    THE OUTCOME TURNS ON THE DEFENDANT'S INTENT, THE PROSECUTION IS

01:24PM 17    GOING TO INTRODUCE EVIDENCE THAT WILL ALLOW THE JURY TO

01:24PM 18    UNDERSTAND NOT JUST WHAT THE DEFENDANT DID BUT WHY.

01:24PM 19    SO HERE IT WILL BE UP TO THE JURY TO DETERMINE WHETHER

01:25PM 20    THIS DEFENDANT ENGAGED IN SCHEMES TO DEFRAUD VICTIMS.  IN ORDER

01:25PM 21    FOR THE JURY TO PERFORM THAT FUNCTION, THEY'RE ENTITLED TO HEAR

01:25PM 22    FACTS REGARDING SPECIFIC ACTIONS THAT THE DEFENDANT TOOK AND

01:25PM 23    THE DEFENDANT'S MOTIVE AND INTENT.  AND WHEN IT COMES TO MOTIVE

01:25PM 24    AND INTENT, THAT NEEDS TO INCLUDE FACTS REGARDING THE BENEFITS

01:25PM 25    THAT DEFENDANT RECEIVED FROM CARRYING OUT THOSE FRAUDULENT

01:25PM 1    SCHEMES.

01:25PM 2        THIS IS VERY IMPORTANT EVIDENCE BECAUSE THE JURY WILL BE

01:25PM 3    ASKED TO JUDGE MENTAL STATE AT THE END OF THE TRIAL.  WHEN WE

01:25PM 4    ASK THEM TO MAKE FINDINGS ABOUT AN INDIVIDUAL'S MENTAL STATE,

01:25PM 5    IT MAKES SENSE FOR THEM TO EXAMINE THE RESULTS OF THE

01:25PM 6    DEFENDANT'S ACTIONS BECAUSE IT ONLY STANDS TO REASON THAT A

01:25PM 7    PERSON INTENDS THE RESULTS OF THEIR ACTIONS.

01:25PM 8        AND IN THIS CASE WHAT RESULTED FROM DEFENDANT'S FRAUDULENT

01:25PM 9    ACTIONS WERE THAT SHE OBTAINED A SIGNIFICANT AMOUNT OF WEALTH

01:25PM 10   AS WELL AS OTHER BENEFITS, BOTH TANGIBLE AND INTANGIBLE FROM

01:25PM 11   THAT FRAUD.

01:25PM 12       THE DEFENSE CITES CASES SAYING THAT THE GOVERNMENT IS NOT

01:25PM 13   REQUIRED TO PROVE THAT A DEFENDANT PERSONALLY BENEFITTED.  JUST

01:26PM 14   TO BE CLEAR, THOSE CASES ARE IN CONTEXT OF DEFENDANT'S

01:26PM 15   CHALLENGING CONVICTIONS FOR FAILURE TO PROVE AN INTENT TO

01:26PM 16   PERSONALLY BENEFIT OR THAT THE DEFENDANT PERSONALLY BENEFITTED.

01:26PM 17       THOSE CASES HAVE NOTHING TO DO WITH WHAT KIND OF EVIDENCE

01:26PM 18   IS PERMITTED AT TRIAL, WHAT KIND OF EVIDENCE IS RELEVANT.  AND

01:26PM 19   TO THE EXTENT THAT THE CASES ADDRESS THAT, THEY MAKE IT VERY

01:26PM 20   CLEAR THAT EVIDENCE OF A FRAUDSTER'S PERSONAL BENEFIT IS

01:26PM 21   SQUARELY WITHIN THE REALM OF WHAT IS RELEVANT AT TRIAL, WHAT IS

01:26PM 22   IMPORTANT FOR A JURY TO HEAR.

01:26PM 23       THERE'S ANOTHER LINE OF CASES BARRING INTRODUCTION OF

01:26PM 24   WEALTH EVIDENCE MERELY FOR THE PURPOSE OF SHOWING THAT A

01:26PM 25   DEFENDANT IS WEALTHY OR IMPOVERISHED.

01:26PM 1    THESE CASES, THOUGH, DEAL WITH A DEFENDANT'S FINANCIAL

01:26PM 2    SITUATION INDEPENDENT FROM THE CRIMINAL CONDUCT THAT IS

01:26PM 3    CHARGED.

01:26PM 4    SO LOOKING AT CASES LIKE HATFIELD AND MITCHELL, IT'S VERY

01:26PM 5    CLEAR THAT THOSE CASES INVOLVE WHETHER IT'S APPROPRIATE FOR THE

01:26PM 6    PROSECUTION TO BRING IN EVIDENCE OF WHETHER A DEFENDANT HAPPENS

01:27PM 7    TO BE RICH OR POOR SEPARATE FROM AND INDEPENDENT FROM THE

01:27PM 8    CHARGED CONDUCT IN THE CASE.

01:27PM 9    SO THE GOVERNMENT RECOGNIZES THAT, AND THERE'S NO

01:27PM 10   INTENTION BY THE GOVERNMENT HERE TO INTRODUCE EVIDENCE

01:27PM 11   REGARDING DEFENDANT'S FINANCIAL SITUATION INDEPENDENT FROM THE

01:27PM 12   FRAUD HERE.

01:27PM 13          THE COURT:  SO PARDON ME.

01:27PM 14          MR. BOSTIC:  YES.

01:27PM 15          THE COURT:  SO IS IT THE GOVERNMENT'S POSITION THAT

01:27PM 16   BECAUSE SHE HAD A POSITION AT THERANOS, SHE IS A SALARIED

01:27PM 17   EMPLOYEE, WHATEVER IT WAS, SHE RECEIVED COMPENSATION, AND THE

01:27PM 18   GOVERNMENT BELIEVES THAT SHE ENGAGED IN FRAUDULENT CONDUCT

01:27PM 19   WHILE SHE WAS IN THAT POSITION, HER SALARY SHOULD BE BROUGHT TO

01:27PM 20   THE JURY'S ATTENTION BECAUSE IT WAS ILL-GOTTEN GAIN?

01:27PM 21          MR. BOSTIC:  THAT'S CORRECT, YOUR HONOR.

01:27PM 22   AND THAT WOULD NOT BE TRUE FOR ANY CEO.  SO IF THE DEFENSE

01:27PM 23   COMPARES THE SITUATION TO OTHER HYPOTHETICAL AND ACTUAL CEO'S

01:28PM 24   OF SUCCESSFUL COMPANIES, AND CORRECTLY NOTES THAT CEO'S OF

01:28PM 25   SUCCESSFUL COMPANIES TEND TO LIVE VERY NICE LIFESTYLES.  THEY

01:28PM 1    EARN SIGNIFICANT AMOUNTS OF MONEY, THEY EXPERIENCE A VARIETY OF

01:28PM 2    DIFFERENT KINDS OF PERKS.  THERE'S NOTHING NECESSARILY

01:28PM 3    NEFARIOUS ABOUT THAT, AND THE GOVERNMENT DOESN'T INTEND TO

01:28PM 4    SUGGEST OTHERWISE.

01:28PM 5        BUT IN THIS CASE THE EVIDENCE WILL SHOW THAT THE FRAUD IN

01:28PM 6    THIS CASE WAS THE BUT-FOR CAUSE OF THE SUCCESS OF THERANOS.

01:28PM 7        SO THIS ISN'T A SITUATION WHERE THE COMPANY IS SUCCESSFUL

01:28PM 8    AND PROFITABLE ON ITS OWN, A FRAUD OCCURS, A DISCRETE FRAUD

01:28PM 9    OCCURS AT THAT COMPANY, AND THEN THE PROSECUTION SEEKS TO

01:28PM 10   INTRODUCE EVIDENCE OF THE FOUNDER'S WEALTH FROM THE COMPANY

01:28PM 11   OPERATIONS IN GENERAL.

01:28PM 12       THE COURT:  SO THE GOVERNMENT WOULD SAY OUR

01:28PM 13   ALLEGATION IS SHE SUBMITTED FRAUD, CONSPIRED TO DO SO, SHE WAS

01:28PM 14   WHATEVER HER POSITION WAS, AND IN THAT POSITION SHE EARNED THE

01:29PM 15   SALARY OF X, THAT'S WHAT HER POSITION IS, AND SHE WAS PAID

01:29PM 16   THAT, SHE EARNED THAT FROM THE COMPANY AND SHE WAS COMMITTING

01:29PM 17   FRAUD, AND SO YOU, JURY, CAN CONSIDER THAT AS MOTIVE FOR HER

01:29PM 18   CONTINUING TO DO A FRAUD BECAUSE SHE HAD A NICE SALARY AND THE

01:29PM 19   JOB SHE WAS DOING THERE WAS FRAUDULENT AND YOU CAN CONSIDER

01:29PM 20   THAT?

01:29PM 21       MR. BOSTIC:  I THINK IT'S PARTLY THAT, BUT IT'S LESS

01:29PM 22   ABOUT PRESERVING A SITUATION THAT DEFENDANT HAPPENED TO FIND

01:29PM 23   HERSELF IN, AND IT'S MORE ABOUT HOW SHE ENDED UP IN THAT

01:29PM 24   FAVORABLE POSITION TO BEGIN WITH.

01:29PM 25       SO IN THIS CASE --

01:29PM 1      THE COURT:  SO IS IT RELEVANT BEYOND -- I'M SORRY TO

01:29PM 2  INTERRUPT YOU.

01:29PM 3      BUT IS IT RELEVANT BEYOND THAT TO SAY THAT SHE DINNED AT

01:29PM 4  EXCLUSIVE RESTAURANTS, SHE SHOPPED AT FINE STORES, SHE HAD HER

01:30PM 5  HAIR DONE AT DIFFERENT PLACES, IS THAT ALL -- IT SEEMS LIKE

01:30PM 6  THAT'S DESIGNED TO ENGAGE A CLASS CONVERSATION AMONGST THE

01:30PM 7  JURORS, WHICH I THINK YOU WOULD AGREE WOULD BE A LITTLE

01:30PM 8  DANGEROUS.

01:30PM 9      MR. BOSTIC:  I UNDERSTAND THE DANGERS AROUND THAT

01:30PM 10 KIND OF EVIDENCE, YOUR HONOR, AND I THINK THE ANSWER DEPENDS.

01:30PM 11 THE ANSWER DEPENDS ON WHETHER THAT -- WHETHER THOSE ITEMS ARE

01:30PM 12 SIMPLY ARE, AS THE DEFENSE CHARACTERIZES THEM, EXPENSES, THE

01:30PM 13 WAY THAT THE DEFENDANT SPENT THE MONEY SHE EARNED THROUGH

01:30PM 14 COMPENSATION OR WHETHER THEY WERE ADDITIONAL PERKS THAT SHE

01:30PM 15 RECEIVED FROM THE COMPANY.  SO I THINK IT MAKES SENSE TO

01:30PM 16 SEPARATE THEM INTO THOSE TWO CATEGORIES.

01:30PM 17     TO THE EXTENT THAT THEY'RE SIMPLY ITEMS OF SPENDING,

01:30PM 18 THAT'S HOW THE DEFENDANT DECIDED TO SPEND THE COMPENSATION THAT

01:30PM 19 SHE RECEIVED, I THINK IT'S SUFFICIENT FOR THE PROSECUTION'S

01:30PM 20 PURPOSES SIMPLY TO INTRODUCE THE AMOUNT OF COMPENSATION SO THE

01:30PM 21 JURY UNDERSTANDS WHAT BENEFIT WAS ACTUALLY FLOWING FROM THE

01:30PM 22 FRAUD, AND I'LL GET BACK TO THAT IN A SECOND.

01:30PM 23     BUT AS TO OTHER ITEMS, FOR EXAMPLE, THE DEFENSE MOTION

01:31PM 24 REFERENCES TRAVEL AND LODGING, AND TO THE EXTENT THAT THE

01:31PM 25 DEFENDANT CHOSE TO SPEND HER COMPENSATION TAKING LUXURY TRIPS,

01:31PM 1    AGAIN, THAT CAN ALL FALL WITHIN THE AMOUNT OF THE COMPENSATION

01:31PM 2    ITSELF.  THERE'S NO NEED FOR THE GOVERNMENT TO INTRODUCE TO THE

01:31PM 3    JURY EVIDENCE OF HOW SHE SPENT HER MONEY.  THE GOVERNMENT

01:31PM 4    UNDERSTANDS THE CASE LAW ON THAT.  THAT'S NOT WHAT THIS IS

01:31PM 5    ABOUT.

01:31PM 6         TO THE EXTENT THAT THE COMPANY, HOWEVER, IN ADDITION TO

01:31PM 7    HER SALARY PROVIDED FOR HER LUXURIOUS TRAVEL ON PRIVATE JETS,

01:31PM 8    EXPENSIVE LODGING AND TRIPS, THESE OTHER TANGIBLE AND

01:31PM 9    INTANGIBLE BENEFITS AS A RESULT OF HER POSITION IN THE COMPANY

01:31PM 10   AND ULTIMATELY AS A RESULT OF THE SUCCESS OF THE COMPANY THAT

01:31PM 11   FLOWS FROM THE FRAUD, TO THE EXTENT THAT THAT'S THE CASE, THOSE

01:31PM 12   BENEFITS BELONG IN THE SAME CATEGORY AS THE COMPENSATION AND

01:31PM 13   THE JURY SHOULD --

01:31PM 14            THE COURT:  SHOULD WE KNOW THE DISTINCTION BETWEEN

01:31PM 15   THAT TREATMENT AT THERANOS AND THE TREATMENT OF ANY OTHER

01:32PM 16   SILICON VALLEY CEO IF WE DRIVE ON HIGHWAY 101 OR IF WE DRIVE

01:32PM 17   DOWN SANDHILL ROAD OR PAGE MILL ROAD, DO WE NEED TO PULL

01:32PM 18   COMPARATORS FROM ANY OF THESE GEOGRAPHIC REASONS TO SEE IF IT'S

01:32PM 19   DIFFERENT?

01:32PM 20            MR. BOSTIC:  NO, YOUR HONOR, BECAUSE THE POINT OF

01:32PM 21   THIS EVIDENCE IS NOT TO INVITE THAT COMPARISON OR TO MAKE ANY

01:32PM 22   POINT ABOUT HOW THE DEFENDANT'S COMPENSATION OR BENEFITS

01:32PM 23   STACKED UP AGAINST OTHER CEO'S OF SUCCESSFUL COMPANIES.

01:32PM 24       BUT, AGAIN, THE POINT HERE IS THAT THE SO-CALLED SUCCESS

01:32PM 25   OF THERANOS WAS ENTIRELY THE PRODUCT OF A FRAUD.  SO IT DOESN'T

01:32PM 1    MAKE SENSE TO COMPARE THIS TO OTHER COMPANIES THAT OPERATE

01:32PM 2    LEGITIMATELY AS FAR AS WE KNOW THAT PRODUCE PROFITS NOT AS A

01:32PM 3    RESULT OF FRAUD.

01:32PM 4         HERE, FOR EXAMPLE --

01:33PM 5              THE COURT:  WELL, WOULDN'T THAT CHANGE YOUR

01:33PM 6    ARGUMENT, THOUGH, IF ALL CEO'S ARE -- FLY FIRST CLASS AND THEIR

01:33PM 7    BOARDS ALLOW THEM TO STAY AT THE FOUR SEASONS, OR WHATEVER

01:33PM 8    EXCLUSIVE HOTEL WHEN THEY TRAVEL, THEY'RE GIVEN DIFFERENT

01:33PM 9    PRIVILEGES, TREATMENTS, BECAUSE THOSE BOARDS AND THOSE

01:33PM 10   COMPANIES FEEL THAT IT'S APPROPRIATE TO HAVE HIGH RECOGNITION

01:33PM 11   FOR THEIR COMPANY, IT PROVIDES PUBLIC CONFIDENCE IN THE

01:33PM 12   COMPANY, ALL OF THOSE TYPES OF THINGS?  DOESN'T THAT GO A

01:33PM 13   LITTLE TOO FAR?  IT'S SOMETHING THAT -- WE HAD A CONFERENCE

01:33PM 14   ABOUT THIS, I THINK ON DAY ONE, ABOUT COMPARING DIFFERENT

01:33PM 15   COMPANIES AND LIFESTYLES AND THINGS.

01:33PM 16        SO THAT'S MY CONCERN.

01:33PM 17             MR. BOSTIC:  SO, YOUR HONOR, THOSE KINDS OF PERKS

01:33PM 18   ARE CERTAINLY PROBABLY PART AND PARCEL OF BEING A CEO OF A

01:33PM 19   SUCCESSFUL MULTI BILLION DOLLAR COMPANY, AND FOR A TIME

01:33PM 20   THERANOS WAS VALUED AT $9 BILLION.  DURING THAT TIME PERIOD IT

01:33PM 21   CAN BE ARGUED THAT THE DEFENDANT ENJOYED THE PERKS THAT COME

01:34PM 22   WITH BEING A CEO OF A $9 BILLION COMPANY.

01:34PM 23        BUT THE QUESTION FOR THE CASE IS WHY WAS SHE THE CEO OF A

01:34PM 24   9 BILLION COMPANY?  WHY WAS THE COMPANY VALUED THAT HIGHLY?

01:34PM 25   WHY WAS IT SO SUCCESSFUL SUCH THAT SHE WAS ABLE TO ENJOY THESE

01:34PM 1    PERKS?

01:34PM 2         AND IT TURNS OUT THE REASON THE COMPANY WAS THAT

01:34PM 3    SUCCESSFUL WAS ENTIRELY THE RESULT OF THE FRAUD ITSELF.  AND

01:34PM 4    THAT'S NOT SPECULATION, BY THE WAY.

01:34PM 5         WE KNOW THAT WHEN THE TRUTH CAME OUT ABOUT THERANOS'S

01:34PM 6    LIMITATIONS, THE FALSE STATEMENTS THAT HAD BEEN GIVEN TO THE

01:34PM 7    PUBLIC EARLIER, THAT SUCCESS EVAPORATED, FRANKLY.  THE

01:34PM 8    COMPANY'S VALUE CRATERED, AND THOSE BENEFITS GRADUALLY WENT

01:34PM 9    AWAY, AND THE COMPANY SHUDDERED.

01:34PM 10        SO IT'S NOT SPECULATION TO SAY THAT THE SUCCESS OF THE

01:34PM 11   COMPANY, THE HYPE, THE EXCITEMENT THAT SURROUNDED THE COMPANY,

01:34PM 12   THE EASE OF WHICH IT ATTRACTED INVESTORS THAT ALLOWED IT TO

01:34PM 13   FUND AND PROVIDE THOSE BENEFITS TO THE DEFENDANT, THAT WAS ALL

01:34PM 14   A PRODUCT OF THE FRAUD.

01:35PM 15        SO IN CASES LIKE REYES IT'S SIMPLER.  IT'S SIMPLER TO

01:35PM 16   SEPARATE OUT THE DEFENDANT'S, LET'S SAY, LEGITIMATE INCOME JUST

01:35PM 17   BY VIRTUE OF BEING A CEO OF WHAT WOULD BE STILL BE A SUCCESSFUL

01:35PM 18   COMPANY EVEN WITHOUT THE BACKDATING OFFENSE IN THAT CASE, IT'S

01:35PM 19   EASY TO SEPARATE THAT FROM THE SPECIFIC BENEFITS AND THE PROFIT

01:35PM 20   THAT HAS BEEN OBTAINED BY THE DEFENDANT IN THAT CASE AS A

01:35PM 21   RESULT OF THE BACKDATING.

01:35PM 22             THE COURT:  RIGHT.  THAT'S A PERSONAL PROFIT TO THAT

01:35PM 23   DEFENDANT.

01:35PM 24             MR. BOSTIC:  EXACTLY.

01:35PM 25             THE COURT:  BY BACKDATING STOCK.  THAT WAS IMMEDIATE

01:35PM 1    MONEY INTO HIS BANK ACCOUNT, HIS POCKET.

01:35PM 2        MR. BOSTIC:  BUT THE SAME PRINCIPLE APPLIES HERE.

01:35PM 3    THE RESULT OF THE FRAUD IN THIS CASE WAS NOT THAT THE ENTIRE

01:35PM 4    LOSS AMOUNT WENT DIRECTLY TO THE DEFENDANT.

01:35PM 5        AS MR. DOWNEY ALLUDED TO, THE TRANSACTIONS IN THIS CASE

01:35PM 6    INVOLVE PATIENTS PAYING THERANOS FOR TEST RESULTS AND INVESTORS

01:35PM 7    WRITING CHECKS TO THERANOS SO THAT THEY COULD PURCHASE EQUITY

01:35PM 8    IN THE COMPANY.  NEITHER OF THOSE RESULTS IN MONEY FLOWING

01:36PM 9    DIRECTLY TO THE DEFENDANT.

01:36PM 10       SO WITHOUT ALLOWING THE JURY TO UNDERSTAND HOW THIS FRAUD

01:36PM 11   BENEFITTED THE DEFENDANT, THE JURY WILL BE LEFT WITH ONLY A

01:36PM 12   PARTIAL PICTURE OF HER INTENT IN THIS CASE.

01:36PM 13       THE FACT IS THAT THE EVIDENCE OF THE BENEFITS THAT FLOWED

01:36PM 14   TO MS. HOLMES FILL IN THE LAST PIECE IN THAT PUZZLE.  THEY MAKE

01:36PM 15   IT CLEAR TO THE JURY HOW THIS BENEFIT ACTUALLY -- EXCUSE ME,

01:36PM 16   HOW THIS FRAUD ACTUALLY DID BENEFIT THE DEFENDANT WHICH IN TURN

01:36PM 17   BECOMES ADMISSIBLE EVIDENCE OF HER INTENT.

01:36PM 18       THE COURT:  SO IS IT ENOUGH TO SAY THAT SHE MADE

01:36PM 19   WHATEVER, INSERT HER SALARY HERE?  WHY ISN'T THAT ENOUGH?

01:36PM 20       MR. BOSTIC:  SO, YOUR HONOR, I THINK THAT'S PART OF

01:36PM 21   IT.  COMPENSATION SHOULD CERTAINLY BE ADMISSIBLE.

01:36PM 22       AGAIN, THE FAIR INFERENCE FROM THE JURY IS THAT SHE WOULD

01:36PM 23   NOT HAVE RECEIVED THIS FAIRLY HIGH COMPENSATION IN LINE WITH

01:36PM 24   CEO'S OF OTHER MULTI BILLION DOLLAR COMPANIES, BUT SHE WOULD

01:36PM 25   NOT HAVE RECEIVED THIS HIGH COMPENSATION WERE IT NOT FOR THE

01:37PM  1    FRAUD THAT CREATED THAT SUCCESS IN THAT COMPANY.

01:37PM  2        SO COMPENSATION IS ONE CATEGORY.  HER OWNERSHIP OF STOCK

01:37PM  3    IN THE COMPANY IS ANOTHER AND THE VALUE OF THAT STOCK.

01:37PM  4        AS A DIRECT AND PREDICTABLE AND INTENDED RESULT OF THE

01:37PM  5    FRAUD, THE VALUE OF THE STOCK OF THERANOS SKYROCKETED AND AT

01:37PM  6    SOME POINT AT LEAST ON PAPER THE DEFENDANT WAS ONE OF THE

01:37PM  7    WEALTHIEST PEOPLE IN THE WORLD.  SHE WAS A BILLIONAIRE.  THE

01:37PM  8    JURY SHOULD BE ENTITLED TO KNOW ABOUT THAT.  THAT IS CERTAINLY

01:37PM  9    PART OF THE MOTIVE EVIDENCE IN THIS CASE, AND IT HELPS EXPLAIN

01:37PM  10   WHY THE DEFENDANT TOOK THE ACTIONS THAT SHE DID.

01:37PM  11       ANOTHER CATEGORY WE'VE ALREADY DISCUSSED:  COMPANY PERKS.

01:37PM  12   SO THAT INCLUDES TRAVEL PAID FOR BY THE COMPANY, LODGING, AND

01:37PM  13   USE OF AN ASSISTANT FALLS WITHIN THAT.

01:37PM  14       YOU HEARD MR. DOWNEY REFERENCE WHAT WE EXPECT TO BE A

01:37PM  15   PROMINENT FEATURE OF THE DEFENSE AT TRIAL WHICH IS EVIDENCE

01:37PM  16   TENDING TO SHOW THAT THE DEFENDANT WAS MOTIVATED BY EITHER

01:37PM  17   ALTRUISTIC REASONS OR AT LEAST REASONS INDEPENDENT OF

01:38PM  18   ACCUMULATING WEALTH.

01:38PM  19           THE COURT:  THIS IS A DIFFERENT POINT, AND THIS IS

01:38PM  20   SOMETHING THAT I HAVE INTEREST IN, AND I WAS GOING TO ASK.

01:38PM  21       MR. WADE WILL PROBABLY COME TO THE LECTERN BY INVITATION

01:38PM  22   IN JUST A MOMENT BECAUSE IT MIGHT CHANGE THINGS IF THERE IS

01:38PM  23   EVIDENCE WHERE MS. HOLMES EXPRESSED I'M IN THIS NOT FOR PROFIT,

01:38PM  24   I'M IN THIS BECAUSE I BELIEVE IN THE GOOD OF THE WORLD, I HAVE

01:38PM  25   ALTRUISTIC INTEREST IN DOING WHAT I'M DOING, AND I TAKE NO

01:38PM 1    PERSONAL PROFIT.

01:38PM 2         DOES THAT CHANGE THINGS, MR. WADE?

01:38PM 3         I'M SORRY, MR. BOSTIC, TO INTERRUPT YOU.  IT'S A GOOD TIME

01:38PM 4    TO HAVE THIS QUESTION ANSWERED.

01:38PM 5              MR. BOSTIC:  OF COURSE, YOUR HONOR.

01:38PM 6              MR. DOWNEY:  FIRST OF ALL, LET ME SAY THAT I

01:38PM 7    APPRECIATE YOUR TAKING TEN YEARS OFF OF MY LIFE, BUT I'M

01:38PM 8    MR. DOWNEY.

01:38PM 9              THE COURT:  I BEG YOUR PARDON.  I'M SORRY.

01:38PM 10             MR. DOWNEY:  YOUR HONOR, I THINK THE REASON I BEGAN

01:38PM 11   WITH THE STRUCTURE OF THE TRANSACTION IS THAT'S REALLY THE

01:38PM 12   BEGINNING AND THE END OF THIS INQUIRY.  AND WITH RESPECT TO

01:39PM 13   MR. BOSTIC, I THINK HIS ANALYSIS OF IT SLIGHTLY MISSES IT.

01:39PM 14        IN THIS CASE THE LOSS SUFFERED, PUTATIVE LOSS SUFFERED BY

01:39PM 15   THE GOVERNMENT'S ALLEGED VICTIMS IS THE AMOUNT OF MONEY THAT

01:39PM 16   THEY PAID FOR THEIR INTEREST IN THERANOS THAT EXCEEDED WHATEVER

01:39PM 17   THE FAIR MARKET VALUE OF THERANOS WAS AT THE TIME THAT THEY

01:39PM 18   BOUGHT THAT INTEREST.

01:39PM 19        THE GOVERNMENT SAYS THAT VALUE WAS SOMETHING LESS THAN

01:39PM 20   WHAT THEY PAID AND THEY SUFFERED THROUGH A FRAUD.

01:39PM 21        WHAT IS THE JURY ENTITLED TO KNOW FROM THAT?

01:39PM 22        THE JURY IS ENTITLED TO KNOW THAT A PERCENTAGE OF THAT

01:39PM 23   LOSS ACTUALLY FLOWED TO MS. HOLMES THROUGH HER OWNERSHIP OF A

01:39PM 24   SUBSTANTIAL PORTION OF THE EQUITY IN THERANOS.  THEY DON'T --

01:39PM 25   ACTUALLY THAT DOESN'T NEED TO REALLY BE ANALYZED FOR THEM.  I

01:39PM 1    THINK OUR JURORS ARE SMART, AND THEY WILL FIGURE THAT OUT.

01:39PM 2    THAT'S THE BEGINNING AND THE END OF HOW EVIDENCE AROUND THESE

01:40PM 3    WEALTH ISSUES IS RELEVANT IN THE GOVERNMENT'S CASE.

01:40PM 4        AS I LISTENED TO MR. BOSTIC, IT IS ALMOST FRIGHTFUL TO ME

01:40PM 5    WHAT HE THINKS CAN BE ADVERTISED TO THE JURY ABOUT THIS WHILE

01:40PM 6    BY PUSHING THE CART OUT OF THE BARN BEFORE THE HORSE, WHICH WE

01:40PM 7    HAVE HEARD ABOUT OVER THE PAST FEW DAYS.

01:40PM 8        HE'S NOT ENTITLED IN OPENING TO ASSUME THAT THERE'S A

01:40PM 9    FRAUD AND THAT HE COULD COMMENT ON THE EVIDENCE IN THIS WAY

01:40PM 10   EITHER BY FEATURING IT OR PROMISING THAT IT WILL DEMONSTRATE

01:40PM 11   SOMETHING WHICH IT CAN NEVER BE USED TO DEMONSTRATE.

01:40PM 12       SO REALLY PART OF MY EMPHASIS HERE IS I THINK WE HAVE TO

01:40PM 13   LOOK VERY CLOSELY AT THE CASES THAT ALL OF THE PARTIES

01:40PM 14   RECOGNIZE ARE THE RELEVANT CASES.

01:40PM 15       NOW, HE ANSWERED YOUR HONOR BY SAYING THAT MS. HOLMES'S

01:40PM 16   SALARY IS THE RELEVANT, OR HER COMPENSATION FROM THE COMPANY IS

01:40PM 17   THE RELEVANT METRIC OR INDICATOR OF HOW MUCH SHE PROFITED.

01:41PM 18       AT THE TIME THAT MOST OF THE TRANSACTIONS THAT WE'RE

01:41PM 19   TALKING ABOUT TOOK PLACE MS. HOLMES'S SALARY WAS A COUPLE

01:41PM 20   HUNDRED THOUSAND DOLLARS A YEAR, GENEROUS MONEY TO BE SURE, BUT

01:41PM 21   NOT SOMETHING WHICH IN THIS CONTEXT IS UNUSUAL.  AND, IN FACT,

01:41PM 22   IF ANYTHING, IT'S PROBABLY UNUSUAL IN BEING LESS THAN SOME OF

01:41PM 23   HER PEERS.

01:41PM 24       I THINK AFTER THE POINT IN TIME THAT MR. BOSTIC SUGGESTS

01:41PM 25   IS THE POINT IN TIME WHERE, QUOTE-UNQUOTE, "THE FRAUD WAS

01:41PM 1    DISCOVERED," THE BOARD OF DIRECTORS OF THERANOS VOTED TO

01:41PM 2    INCREASE MS. HOLMES'S SALARY, NOT TO DECREASE IT.

01:41PM 3        SO I THINK HIS SORT OF CAVALIER ASSUMPTION THAT WE SHOULD

01:41PM 4    BEGIN THIS CASE BY ASSUMING THERE WAS A FRAUD IS WHERE HE GOES

01:41PM 5    OFF TRACK IN MULTIPLE WAYS.

01:41PM 6        IF I MIGHT COMMENT ON A FEW OTHER THINGS HE SAID BUT

01:41PM 7    I'M HAPPY TO --

01:42PM 8            THE COURT:  WELL, YOU KNOW, MR. DOWNEY, I WANTED YOU

01:42PM 9    TO ANSWER MY QUESTION.

01:42PM 10            MR. DOWNEY:  YES.

01:42PM 11            THE COURT:  WHICH IS IF THERE WAS EVIDENCE THAT YOUR

01:42PM 12   CLIENT SAID THAT I'M IN THIS NOT JUST FOR PERSONAL GAIN, I'M

01:42PM 13   NOT IN IT AT ALL FOR THAT, IT'S PURELY ALTRUISTIC ON MY PART, I

01:42PM 14   INTEND TO BENEFIT THE WORLD -- THE BETTERMENT OF THE WORLD

01:42PM 15   THROUGH MY INVENTION IN WHAT OUR COMPANY DOES, DOES THAT THEN

01:42PM 16   OPEN THE DOOR TO THIS TYPE OF INFORMATION, WELL, ACTUALLY,

01:42PM 17   LADIES AND GENTLEMEN, SHE WASN'T BECAUSE SHE BENEFITTED

01:42PM 18   GREATLY?  SHE WENT TO X PLACES, SHE FLEW ON X AIRLINES, THOSE

01:42PM 19   TYPES OF THINGS.  WOULD THAT OPEN THE DOOR TO THAT?

01:42PM 20            MR. DOWNEY:  I THINK WHAT IT WOULD OPEN THE DOOR TO

01:42PM 21   IS WHAT I'VE ALREADY DESCRIBED.  I THINK WE HAVE TO RECOGNIZE

01:42PM 22   THAT WHEN AN INVESTOR DECIDED TO INVEST IN THERANOS, NOTIONALLY

01:42PM 23   THERE WAS SOME BENEFIT TO MS. HOLMES.

01:42PM 24        NOW, SHE MAY HAVE BEEN ASKING FOR THAT INVESTMENT BECAUSE

01:42PM 25   SHE WANTED TO GROW THIS COMPANY TO THE POINT WHERE IT WOULD

01:42PM 1   CHANGE THE WORLD. WE SUGGEST THE EVIDENCE MAY DEMONSTRATE

01:43PM 2   THAT.

01:43PM 3       NEVERTHELESS, AS A LEGAL MATTER, WHAT IS RELEVANT FOR A

01:43PM 4   FRAUD CLAIM IS, IS THERE SOME FINANCIAL LOSS TO THE INVESTOR

01:43PM 5   AND SOME FINANCIAL GAIN TO THE PERSON MAKING THE INVESTMENT?

01:43PM 6       I THINK, YOUR HONOR, THAT EVIDENCE IS RELEVANT TO STATE OF

01:43PM 7   MIND ISSUES, BUT IT'S ACTUALLY NOT RELEVANT TO THE ISSUE THAT

01:43PM 8   WE'RE DISCUSSING TODAY.

01:43PM 9       THE COURT:  ALL RIGHT.  AND I THINK IT SOUNDS LIKE

01:43PM 10  YOUR GRAVE CONCERN IS THAT THIS COMING IN AT OPENING.

01:43PM 11      MR. DOWNEY:  WELL, FOR SURE, YOUR HONOR, BECAUSE I

01:43PM 12  THINK AS THE TRIAL PROGRESSES, I THINK IT WILL BE A LITTLE BIT

01:43PM 13  EASIER TO POLICE THIS, BUT I DON'T WANT SOMETHING THAT --

01:43PM 14  PERHAPS I LEFT SOME CONFUSION IN THE COURT'S MIND AS I DID IN

01:43PM 15  MR. BOSTIC'S MIND.

01:43PM 16      WE'RE ASKING FOR THE EXCLUSION OF THE EVIDENCE THAT IS

01:43PM 17  IDENTIFIED IN ITEM 21 OF THEIR 404(B) NOTICE.  I WOULD

01:43PM 18  CERTAINLY BE HAPPY TO GO THROUGH THAT EVIDENCE IN MORE DETAIL,

01:44PM 19  BUT I DON'T THINK IT WOULD REALLY IMPROVE THE COURT'S

01:44PM 20  PERCEPTION OF THESE ISSUES OR YOUR ABILITY TO MAKE A DECISION.

01:44PM 21      THE COURT:  ALL RIGHT.  THANK YOU.  MR. BOSTIC,

01:44PM 22  THANK YOU.

01:44PM 23      MR. BOSTIC:  I HEARD ONE THING THAT MR. DOWNEY SAID

01:44PM 24  THAT I WOULD LIKE TO RESPOND TO FIRST.  HE SAID THAT WHAT

01:44PM 25  MATTERS IN A FRAUD CLAIM, AND I'M PARAPHRASING, IS THE LOSS TO

UNITED STATES COURT REPORTERS

01:44PM 1    THE VICTIM AND THE GAIN TO THE DEFENDANT.

01:44PM 2        THAT'S SIMPLY INCORRECT.  AND THE CASE LAW CITED BY THE

01:44PM 3    DEFENSE ESTABLISHES THAT IT'S INCORRECT.  IT'S NOT AN ELEMENT

01:44PM 4    OF A WIRE FRAUD CLAIM THAT THE GOVERNMENT PROVE LOSS TO THE

01:44PM 5    VICTIM OR PERSONAL GAIN BY THE DEFENDANT.

01:44PM 6        WHAT MATTERS IS THE DEFENDANT'S INTENT, AND MOTIVE IS

01:44PM 7    CLOSELY TIED INTO INTENT.

01:44PM 8        SO WHEN MR. DOWNEY SAYS THAT THE FOCUS NEED ONLY BE ON THE

01:44PM 9    TRANSACTIONS, WHAT CHECKS WERE WRITTEN BY WHICH INVESTORS AND

01:44PM 10   WHEN, AND THE MERE FACT THAT MS. HOLMES BENEFITTED FROM THAT BY

01:44PM 11   VIRTUE OF HER OWNERSHIP OF THE COMPANY, THAT MISSES THE POINT.

01:45PM 12   THIS IS NOT ABOUT ESTABLISHING LOSS TO THE VICTIMS.  THIS IS

01:45PM 13   ABOUT EXPLAINING AND PROVIDING THE JURY WITH THE FACTS THAT

01:45PM 14   EXPLAIN THE DEFENDANT'S MOTIVE TO ENGAGE IN THIS FRAUD.

01:45PM 15       AND IT'S THAT EXACT MISUNDERSTANDING THAT HIGHLIGHTS THE

01:45PM 16   DANGER HERE OF HIDING THAT EVIDENCE FROM THE JURY.  IF THE JURY

01:45PM 17   SEES ONLY THAT PEOPLE INVESTED IN THERANOS, IF THEY SEE ONLY

01:45PM 18   THAT THE DEFENDANT OWNED A PORTION OF THE COMPANY, IF THEY

01:45PM 19   HEAR, AS I'M SURE THE DEFENSE WILL WANT THEM TO KNOW, THAT

01:45PM 20   DEFENDANT NEVER CASHED OUT HER STOCK AND NEVER REAPED THE

01:45PM 21   WEALTH THAT SHE HAD ON PAPER, THE JURY COULD COME TO BELIEVE

01:45PM 22   THAT HER MOTIVATIONS FOR ENGAGING IN MISCONDUCT WERE SOMETHING

01:45PM 23   OTHER THAN PERSONAL ENRICHMENT, AND THAT'S SIMPLY NOT THE CASE

01:45PM 24   BECAUSE A FULL PICTURE OF THE BENEFITS THAT SHE OBTAINED BY

01:45PM 25   VIRTUE OF THE FRAUD SHOW THE OPPOSITE.

UNITED STATES COURT REPORTERS

01:45PM 1    SO THE JURY ABSOLUTELY WILL HEAR ABOUT THE MONEY THAT

01:45PM 2    FLOWED FROM THE VICTIMS TO THERANOS, BUT THEY ALSO NEED TO

01:46PM 3    UNDERSTAND HOW THE MONEY THAT CAME TO THERANOS ACTUALLY

01:46PM 4    BENEFITTED THIS DEFENDANT INDIVIDUALLY BECAUSE AT THE END OF

01:46PM 5    THE DAY THE FOCUS IS ON HER MENTAL STATE.  SO THAT'S WHY --

01:46PM 6    THE COURT:  I ANTICIPATE, JUST LOOKING AT SOME OF

01:46PM 7    THE PLEADINGS THAT HAVE BEEN PRESENTED, I ANTICIPATE THAT THERE

01:46PM 8    IS GOING TO BE AT LEAST AN ATTEMPT TO INTRODUCE EVIDENCE OF

01:46PM 9    MS. HOLMES TALKING ABOUT THE COMPANY.  AND I MIGHT SEE VIDEOS

01:46PM 10   OR SOMETHING, THOSE TYPES OF THINGS, WHERE SHE SPEAKS ABOUT

01:46PM 11   WHAT THIS TECHNOLOGY IS, THE ADVANTAGES OF IT, THE UNIQUENESS

01:46PM 12   OF IT, ET CETERA, ET CETERA, IN REGARDS TO THE MARKET.

01:46PM 13   AND I'M JUST CURIOUS IF THIS IS WHERE THIS IS GOING TO

01:46PM 14   COME IN, SHE WENT TO SO AND SO AND SHE TRAVELLED FIRST CLASS.

01:46PM 15   WE GET INTO THAT, MR. BOSTIC, AND I HAVE SOME CONCERNS

01:46PM 16   ABOUT DO WE REALLY NEED TO KNOW THE ITINERARY?  WHAT IS THE

01:47PM 17   VALUE OF DID SHE STAY AT A FOUR SEASONS VIS-A-VIS A MOTEL 6?  I

01:47PM 18   GUESS I HAVE SOME CONCERNS ABOUT THAT.

01:47PM 19   MR. BOSTIC:  UNDERSTOOD, YOUR HONOR.

01:47PM 20   I THINK THERE CERTAINLY IS A LINE THAT SHOULD NOT BE

01:47PM 21   CROSSED WHEN DISCUSSING THIS KIND OF EVIDENCE.  I THINK THERE'S

01:47PM 22   A POINT AT WHICH THE POINT HAS BEEN MADE AND THERE IS NOT NEED

01:47PM 23   TO HARP ON THESE DETAILS.  IT IS CERTAINLY NOT THE GOVERNMENT'S

01:47PM 24   INTENTION TO MAKE THIS THE FOCUS AT TRIAL.

01:47PM 25   BUT THE JURY DOES NEED TO UNDERSTAND WHY SOMEONE WOULD DO

01:47PM 1    THIS, AND THE JURY NEEDS TO UNDERSTAND THE MOTIVE FOR THE

01:47PM 2    CHARGED FRAUD.

01:47PM 3       AND I UNDERSTAND MY COUNTERPART DOESN'T WANT TO ASSUME

01:47PM 4    THAT THERE IS A FRAUD HERE, BUT WE'RE TALKING ABOUT THE

01:47PM 5    GOVERNMENT'S CASE-IN-CHIEF.

01:47PM 6          THE COURT:  WELL, IT HASN'T BEEN PROVEN YET.

01:47PM 7          MR. BOSTIC:  I AM SORRY, YOUR HONOR?

01:47PM 8          THE COURT:  SHE ENJOYS THE BENEFIT OF THE

01:47PM 9    PRESUMPTION OF INNOCENCE.  THERE IS THAT.

01:47PM 10         MR. BOSTIC:  EXACTLY, YOUR HONOR.

01:47PM 11    BUT THE GOVERNMENT IS ENTITLED TO PUT ON ITS CASE-IN-CHIEF

01:47PM 12    THAT WILL GIVE THE JURY THE EVIDENCE NECESSARY TO MAKE ITS OWN

01:47PM 13    DECISION, AND THAT'S WHAT TRIAL IS ALL ABOUT.

01:47PM 14         THE COURT:  OF COURSE.

01:47PM 15         MR. BOSTIC:  WITHOUT THAT EVIDENCE, THE JURY MIGHT

01:47PM 16    BE CONFUSED ABOUT WHY THE DEFENDANT ENGAGED IN MISCONDUCT, AND

01:48PM 17    THAT'S WHY I THINK IT'S IMPORTANT FOR THE JURY TO HAVE A FULL

01:48PM 18    PICTURE.

01:48PM 19       AND I WAS GOING THROUGH THE CATEGORIES BEFORE THAT THE

01:48PM 20    EVIDENCE THAT THE GOVERNMENT THINKS ARE RELEVANT HERE.  WE

01:48PM 21    TALKED ABOUT COMPENSATION, STOCK IN THE COMPANY, THE PERKS THAT

01:48PM 22    WE WERE TALKING ABOUT, NOT THE MOST IMPORTANT CATEGORY, BUT IT

01:48PM 23    ALSO -- THOSE ITEMS ARE RELEVANT TO THE DEFENDANT'S DECISION

01:48PM 24    NOT TO CASH IN HER STOCK AND ENRICH HERSELF FURTHER.  THE PERKS

01:48PM 25    SHE WAS ENJOYING AS A RESULT OF HER POSITION AT THIS COMPANY,

01:48PM 1     WHOSE SUCCESS HAD BEEN BOLSTERED BY THE FRAUD, THE PERKS THAT

01:48PM 2     SHE WAS ENJOYING GREATLY REDUCE THE PRESSURE ON HER TO CASH IN,

01:48PM 3     SELL STOCK, AND MAKE MORE MONEY.

01:48PM 4         SO THEY ALSO -- THESE DETAILS PROVIDE A RESPONSE TO

01:48PM 5     EVIDENCE THAT THE DEFENDANT CHOSE NOT TO CASH IN HER STOCK,

01:48PM 6     CHOSE NOT TO ASK FOR A GREATER SALARY.  SO, AGAIN, NECESSARY TO

01:48PM 7     GIVE THE JURY THE COMPLETE PICTURE.

01:48PM 8         THE FINAL CATEGORY THAT WE HAVEN'T TALKED ABOUT, BUT IT'S

01:49PM 9     MENTIONED IN THE DEFENDANT'S BRIEF, IS LIFESTYLE EVIDENCE FOR

01:49PM 10     LACK OF A BETTER WORD.

01:49PM 11         THE GOVERNMENT SHOULD BE ENTITLED TO PUT IN EVIDENCE OF

01:49PM 12     THE INTANGIBLE BENEFITS THAT THE DEFENDANT REAPED FROM THE

01:49PM 13     FRAUD.  SPECIFICALLY, THE INCREASED CACHET AND POPULARITY THAT

01:49PM 14     SHE OBTAINED FROM BEING CEO OF THE COMPANY WHO'S REPUTATION HAS

01:49PM 15     BEEN ARTIFICIALLY INFLATED BY THE MISREPRESENTATIONS IN THIS

01:49PM 16     CASE.  THAT DOES NOT HAVE TO DO WITH HOW SHE SPENT HER MONEY.

01:49PM 17     SO THIS IS NOT CONTRARY TO THE CASE LAW CITED BY THE DEFENDANT.

01:49PM 18         THE COURT:  THAT SEEMS A LITTLE INTANGIBLE, DOESN'T

01:49PM 19     IT, HOW POPULAR SHE WAS?  IS THIS A -- YOU KNOW, HOW DO YOU

01:49PM 20     GAUGE THAT?  HOW DOES THAT MEASURE?  WHAT ARE THE METRICS FOR

01:49PM 21     THAT?

01:49PM 22         MR. BOSTIC:  SO I DON'T KNOW IF THERE ARE NUMBERS

01:49PM 23     THAT COULD BE ATTACHED TO IT, YOUR HONOR.

01:49PM 24         BUT, FOR EXAMPLE, THE FACT THAT THE DEFENDANT WAS A

01:49PM 25     SUBJECT OF A MOUNTAIN OF FAVORABLE PUBLICITY IS A FACT THAT

01:50PM 1    SHOULD BE PUT IN FRONT OF THE JURY, AND WE'LL TALK ABOUT THAT.

01:50PM 2    NEWS ARTICLES TO A CERTAIN EXTENT.  BUT FAVORABLE PUBLICITY,

01:50PM 3    FAVORABLE REPUTATION.

01:50PM 4        TO THE EXTENT THAT THE DEFENDANT RECEIVED -- BECAME A

01:50PM 5    CELEBRITY IN SILICON VALLEY, TO THE EXTENT SHE MET DIGNITARIES,

01:50PM 6    POLITICIANS AND OTHER BUSINESS LEADERS AS A RESULT, THESE

01:50PM 7    THINGS WERE TRULY WERE BENEFITS, INTANGIBLE, BUT BENEFITS

01:50PM 8    NONETHELESS OF THE FRAUDULENT SCHEME.

01:50PM 9        SO IF THE JURY IS ENTITLED TO KNOW ABOUT EVIDENCE RELEVANT

01:50PM 10   TO INTENT, THE JURY SHOULD BE ENTITLED TO KNOW ABOUT THOSE

01:50PM 11   INTANGIBLE BENEFITS AS WELL THAT THE DEFENDANT REAPED FROM THE

01:50PM 12   FRAUD.

01:50PM 13           THE COURT:  OKAY.

01:50PM 14           MR. DOWNEY:  I MUST SAY MR. BOSTIC'S COMMENTS

01:50PM 15   CONCERN ME.  I ACTUALLY EXPECTED THAT WHEN I MADE CLEAR THAT WE

01:50PM 16   HAVE NO OBJECTIONS TO THE DETAILS OF THESE TRANSACTIONS BEING

01:50PM 17   ADMITTED THAT HE WOULD BE SATISFIED, BECAUSE AFTER ALL, HE HAS

01:50PM 18   AVAILABLE TO HIM THE ARGUMENT THAT SHE WOULD HAVE ACHIEVED

01:51PM 19   SUBSTANTIAL FINANCIAL GAIN FROM THESE INVESTMENTS.

01:51PM 20       LET ME TELL YOU WHERE WE ARE THAT CONCERNS ME ABOUT WHAT

01:51PM 21   MR. BOSTIC JUST SAID.  WE DON'T HAVE EVIDENCE IN THE RECORD

01:51PM 22   FROM THE GOVERNMENT AS TO WHO PAID FOR THE BENEFITS THAT

01:51PM 23   MR. BOSTIC IS DESCRIBING.  WE DON'T HAVE A QUANTIFICATION OF

01:51PM 24   FAME OR CELEBRITY OR OTHER TABLOID TYPE OF COMMENTARY.  NONE OF

01:51PM 25   THIS DO WE HAVE OTHER THAN EMAILS DISCUSSING LUXURY ITEMS,

01:51PM 1    WHICH DISCUSS A LOT OF OTHER THINGS AS WELL, AND IT'S BEING PUT

01:51PM 2    IN FRONT OF THE JURY AND THE GOVERNMENT'S PROPOSAL TO ESTABLISH

01:51PM 3    THAT SHE WAS ILL-MOTIVATED BY A DESIRE FOR LUXURY AND A DESIRE

01:51PM 4    FOR FAME.

01:51PM 5        I THINK IT'S A VERY DANGEROUS AREA AND PARTICULARLY ODD

01:51PM 6    ONE FOR THE GOVERNMENT TO ENTER WHEN THE ARGUMENTS THAT ARE

01:51PM 7    AVAILABLE TO IT UNDER CERTAIN SCENARIOS ARE THERE TO BE TAKEN.

01:51PM 8        MR. BOSTIC:  YOUR HONOR, JUST BRIEFLY ON ONE OF

01:52PM 9    THOSE POINTS.

01:52PM 10       IT'S NOT THE CASE THAT THERE IS NO EVIDENCE ABOUT WHO PAID

01:52PM 11   FOR THE BENEFITS THAT THE GOVERNMENT IS REFERENCING.  FOR

01:52PM 12   EXAMPLE, AS TO TRAVEL, WITNESSES HAVE INFORMED THE GOVERNMENT

01:52PM 13   THAT THE COMPANY PAID FOR HOLMES'S TRAVEL.

01:52PM 14       SO THE FACT THAT THIS DEFENDANT TRAVELLED ON PRIVATE JETS,

01:52PM 15   FOR EXAMPLE, THE GOVERNMENT'S UNDERSTANDING BASED ON WITNESS

01:52PM 16   STATEMENTS IS THAT THAT WAS NOT PAID FOR BY THE DEFENDANT

01:52PM 17   INDIVIDUALLY BUT PAID FOR BY THE COMPANY.  SO THAT SHOULD BE

01:52PM 18   VIEWED AS PART OF HER COMPENSATION, PART OF THE BENEFITS SHE

01:52PM 19   REAPED.

01:52PM 20       THE COURT:  IS THERE A 403 ANALYSIS THAT I SHOULD

01:52PM 21   LOOK AT HERE AS WELL, MR. BOSTIC?

01:52PM 22       MR. BOSTIC:  SO, YOUR HONOR, TWO POINTS THERE.

01:52PM 23       I THINK THE QUANTITY OF THE EVIDENCE MATTERS, OR

01:52PM 24   POTENTIALLY MATTERS FOR 403 PURPOSES, AND I STATED BEFORE THE

01:52PM 25   GOVERNMENT'S COMMITMENT NOT TO BELABOR THIS POINT.

36

01:52PM 1        MR. DOWNEY'S POINT THAT IN THE GRAND SCHEME OF THINGS THE

01:52PM 2    DEFENDANT'S SALARY WAS RELATIVELY MODEST OR CERTAINLY COULD

01:52PM 3    HAVE BEEN MORE ARGUABLY REDUCES THE RISK OF PREJUDICE IN THIS

01:53PM 4    CASE.

01:53PM 5        THE FACT THAT SHE DIDN'T CASH IN HER STOCK FROM THE

01:53PM 6    COMPANY ARGUABLY REDUCES THE PREJUDICE FROM THE JURY KNOWING

01:53PM 7    ABOUT THAT AMOUNT.

01:53PM 8        AND SO I THINK GIVEN THE PROBATIVE VALUE OF THIS EVIDENCE,

01:53PM 9    THE FACT THAT WITHOUT IT THE JURY TRULY WILL HAVE AN INCOMPLETE

01:53PM 10   PICTURE OF THE MOTIVE IN THIS CASE AND WHY SOMEONE WOULD HAVE

01:53PM 11   ENGAGED IN THIS CONDUCT.  GIVEN THAT PROBATIVE VALUE, I THINK

01:53PM 12   THE POTENTIAL PREJUDICIAL VALUE IS EASILY OUTWEIGHED.

01:53PM 13       THE COURT:  MR. DOWNEY, I KNOW YOUR POSITION IS

01:53PM 14   DON'T LET ANY OF IT IN, BUT IF THE COURT IS LOOKING AT THIS,

01:53PM 15   SHOULD I LOOK THROUGH A 403 LENS?

01:53PM 16       MR. DOWNEY:  YOUR HONOR, I THINK YOU SHOULD,

01:53PM 17   PARTICULARLY IN THE FORM OF WHICH IT'S PRESENTED.

01:53PM 18       TO THE EXTENT THAT EXPENSE INFORMATION INCURRED BY A

01:53PM 19   COMPANY HAS COME INTO A CASE, IT'S TYPICALLY COME IN, IN THE

01:53PM 20   FORM WHERE A LEDGER FROM THE COMPANY IS CONSULTED, THE AMOUNT

01:53PM 21   OF THE EXPENSE IS LOOKED AT.  YOU CAN VERIFY FROM THAT WHETHER

01:53PM 22   IT WAS A CORPORATE EXPENSE OR NOT AND THEN WHETHER IT WAS A

01:54PM 23   LEGITIMATE CORPORATE OFFENSE OR NOT CAN BE DEBATED.

01:54PM 24       THERE'S NO QUESTION THAT THE WITNESSES WHO MR. BOSTIC

01:54PM 25   REFERENCES WILL TELL THIS JURY THAT MS. HOLMES WAS TRAVELLING

01:54PM 1  ALMOST EXCLUSIVELY ON COMPANY BUSINESS MUCH OF WHICH WAS NOT

01:54PM 2  ONLY ENCOURAGED BY THE BOARD BUT ARRANGED BY THE BOARD OF

01:54PM 3  DIRECTORS OF THIS ENTITY.

01:54PM 4      FOR US TO HAVE TO REBUT ALL OF THAT IS NOT ONLY PUTTING IN

01:54PM 5  FRONT OF THE JURY HIGHLY PREJUDICIAL EVIDENCE, BUT IT'S PUTTING

01:54PM 6  EVIDENCE BEFORE THE JURY THAT IS HIGHLY WASTEFUL OF THE JURY

01:54PM 7  AND COURT'S TIME.  SO I THINK THERE ARE SEVERAL SEPARATE 403

01:54PM 8  ISSUES THAT I THINK YOU HAVE TO LOOK AT.

01:54PM 9      THE COURT:  ALL RIGHT.

01:54PM 10     MR. BOSTIC:  YOUR HONOR, JUST TO CLARIFY THERE

01:54PM 11 BRIEFLY.  I THINK THAT MISAPPREHENDS THE PURPOSE FOR WHICH THE

01:54PM 12 EVIDENCE IS INTRODUCED.  THERE'S NOT GOING TO BE ANY

01:54PM 13 INSINUATION BY THE GOVERNMENT THAT THESE TRIPS, FOR EXAMPLE,

01:54PM 14 WERE IMPROPER OR THAT THE BOARD DIDN'T AUTHORIZE THEM.  THAT'S

01:55PM 15 NOT WHAT THIS CASE IS ABOUT.

01:55PM 16     BUT TO SAY THAT TRAVEL ON A PRIVATE JET, STAYING AT LUXURY

01:55PM 17 HOTELS, RECEIVING FAVORABLE ATTENTION FROM DIGNITARIES AND

01:55PM 18 POLITICIANS AND OTHER PROMINENT INDIVIDUALS, TO SAY THAT THESE

01:55PM 19 THINGS ARE NOT BENEFITS AND TO SAY THAT THEY DIDN'T FLOW FROM

01:55PM 20 WHAT THE GOVERNMENT ALLEGES TO BE A FRAUD SIMPLY DOESN'T HOLD

01:55PM 21 WATER.

01:55PM 22     THE COURT:  OKAY.

01:55PM 23     MR. DOWNEY:  WHAT MR. BOSTIC JUST SAID DECIDES THIS

01:55PM 24 MOTION FOR YOU, YOUR HONOR.  THE HOLDING OF THE REYES CASE IS

01:55PM 25 THAT WEALTH WHICH IS LEGITIMATELY INCURRED, AUTHORIZED WEALTH,

01:55PM  1    CANNOT BE USED TO ARGUE THAT A DEFENDANT ENGAGED IN CRIMINAL

01:55PM  2    ACTIVITY.

01:55PM  3        WHAT HE JUST SAID IS ACCURATE, AND IT PLACES THIS CASE

01:55PM  4    SQUARELY WITHIN REYES AND MITCHELL.

01:55PM  5            MR. BOSTIC:  I'M HAPPY TO RESPOND, YOUR HONOR,

01:55PM  6    OTHERWISE SUBMITTED.

01:55PM  7            THE COURT:  THANK YOU BOTH.

01:55PM  8            MR. DOWNEY:  THANK YOU.

01:55PM  9            THE COURT:  THANK YOU VERY MUCH.  THIS WILL BE UNDER

01:55PM 10    SUBMISSION.  THANK YOU BOTH.  AN ORDER WILL COME OUT WITH THE

01:55PM 11    OTHER MOTIONS.

01:55PM 12        NEXT IS DOCKET 566 AND 576, AND I BELIEVE THESE ARE

01:56PM 13    MS. HOLMES'S MOTIONS TO EXCLUDE EVIDENCE OF THERANOS'S TRADE

01:56PM 14    SECRETS PRACTICES AND EVIDENCE REGARDING THIRD PARTY TESTING

01:56PM 15    PLATFORMS.

01:56PM 16        GOOD AFTERNOON.  ARE YOU ANDREW LEMENS?

01:56PM 17            MR. LEMENS:  I AM ANDREW LEMENS.

01:56PM 18            THE COURT:  I HAVE A POST-IT HERE THAT SOMEBODY GAVE

01:56PM 19    ME, AND I THINK THIS IS TO INTRODUCE YOU.  I GUESS THEY WERE

01:56PM 20    SAYING I NEED POST-ITS BECAUSE I WILL CONFUSE MR. DOWNEY AND

01:56PM 21    MR. WADE.

01:56PM 22            MR. LEMENS:  I'M NOT GOING TO COMMENT ON THAT,

01:56PM 23    YOUR HONOR.  IT'S VERY NICE TO SEE YOU IN PERSON.

01:56PM 24            THE COURT:  THANK YOU.  THAT'S A CONVERSATION FOR

01:56PM 25    THEM ON THE FLIGHT HOME.

01:56PM 1          MR. LEMENS:  YOUR HONOR, ANDREW LEMENS FOR

01:56PM 2   ELIZABETH HOLMES.

01:56PM 3          THE COURT:  THANK YOU.

01:56PM 4          MR. LEMENS:  I WILL BE ADDRESSING BOTH MOTIONS.  THE

01:56PM 5   MOTION TO EXCLUDE EVIDENCE OF THERANOS'S TRADE SECRETS

01:56PM 6   PRACTICES, WHICH IS DOCKET 566; AND MOTION TO EXCLUDE CERTAIN

01:56PM 7   EVIDENCE RELATING TO THE MODIFIED DEVICES, WHICH IS 576.

01:56PM 8       I WAS GOING TO PROPOSE, YOUR HONOR, THAT WE TAKE THESE

01:56PM 9   SEPARATELY.  THERE ARE SOME OVERLAPPING ISSUES, BUT I THINK

01:57PM 10  DEALING WITH THE TRADE SECRETS CASE FIRST AND TRY AND CLEAN UP

01:57PM 11  WITH THE DEVICES.

01:57PM 12         THE COURT:  WELL, LET'S TALK ABOUT THE TRADE SECRETS

01:57PM 13  FIRST.  WE'RE IN SILICON VALLEY HERE, AND THERE ARE LOTS OF

01:57PM 14  THEM HERE.

01:57PM 15         MR. LEMENS:  I WILL NOT PRESUME TO -- I UNDERSTAND

01:57PM 16  YOUR HONOR IS PROBABLY DEEPLY FAMILIAR WITH THESE ISSUES, AND I

01:57PM 17  DON'T KNOW IF YOU HAVE ANYTHING SPECIFIC THAT YOU WANTED TO GET

01:57PM 18  INTO, OTHERWISE I COULD PROVIDE SOME --

01:57PM 19         THE COURT:  I THINK THE GOVERNMENT -- MR. LEACH, ARE

01:57PM 20  YOU SPEAKING FOR THE GOVERNMENT?  OH, I AM SORRY.  MR. SCHENK.

01:57PM 21      I SUPPOSE WHEN I STARTED THIS, MR. SCHENK, I LOOKED AT THE

01:57PM 22  PLEADINGS AND I -- YES, MAYBE YOU BETTER COME UP.  THANK YOU.

01:57PM 23      I WAS LOOKING AT THIS AND I WAS THINKING WE KNOW ABOUT

01:57PM 24  TRADE SECRETS, ALL OF US DO.  WE ALL HAVE FAMILIARITY WITH

01:57PM 25  THEM.  I SUPPOSE I'M TRYING TO DISCERN WHAT ARE THE -- WHAT IS

01:57PM 1    DIFFERENT ABOUT WHAT THIS COMPANY DID TO GUARD AS THEY'RE

01:57PM 2    REQUIRED TO DO, THE LAW REQUIRES COMPANIES TO PROTECT THEIR

01:58PM 3    PROPRIETARY SECRETS, AND WHAT IS DIFFERENT FROM WHAT THERANOS

01:58PM 4    DID THAT OTHER COMPANIES ARE DOING?

01:58PM 5        AND I DON'T MEAN, MR. LEMENS, TO CUT YOU OFF.  IF YOU WANT

01:58PM 6    TO SAY SOME WORDS ON THIS, PLEASE DO.  BUT THIS IS THE AREA AT

01:58PM 7    LEAST INITIALLY WHERE I THOUGHT MY THOUGHTS AND CONVERSATION

01:58PM 8    WOULD BE HELPFUL.

01:58PM 9        BUT DO YOU WANT TO ADD SOMETHING TO THIS, MR. LEMENS?

01:58PM 10            MR. LEMENS:  NO.  I THINK YOUR HONOR IDENTIFIED THE

01:58PM 11   ISSUE THAT WE'RE CONCERNED ABOUT, AND THAT'S THAT THERE IS A

01:58PM 12   LARGE AMOUNT OF CONDUCT IN THE GOVERNMENT'S 404(B) NOTICE AS TO

01:58PM 13   THESE THREE CATEGORIES, WHICH ALL ARE ROOTED IN TRADE SECRETS

01:58PM 14   PRACTICES, THAT IS, THE INNOCUOUS OR INNOCENT CONDUCT THAT THE

01:58PM 15   NINTH CIRCUIT HAS WARNED NOT TO INTRODUCE INTO CRIMINAL CASES

01:58PM 16   IN THIS MANNER.

01:58PM 17       THE GOVERNMENT TO DATE HAS IGNORED A LARGE SEGMENT OF ITS

01:58PM 18   404(B) NOTICE IN BRIEFING THIS MOTION.  THEY'VE GONE FROM 30 OR

01:59PM 19   MORE VIGNETTES THAT THEY SOUGHT TO INTRODUCE AT TRIAL TO 3 THAT

01:59PM 20   ARE ADDRESSED IN THEIR BRIEF, AND I THINK THE GOVERNMENT SHOULD

01:59PM 21   BE LIMITED TO THOSE THREE IF THEY COME IN AT ALL.

01:59PM 22       I THINK OUR CONCERN, YOUR HONOR, IS NORMALLY IN THESE

01:59PM 23   CASES, AND I BELIEVE THIS IS TRUE UNDER THE CIVIL CONTEXT AND I

01:59PM 24   WOULD EXPECT THE SAME HERE, YOU WOULD EXPECT TO SEE SOMEONE

01:59PM 25   WITH EXPERTISE IN CORPORATE PRACTICES, IN THE INDUSTRY, IN

41

01:59PM 1    TRADE SECRETS TO COME DRAW THE LINE BETWEEN WHAT IS PROPER AND

01:59PM 2    IMPROPER CONDUCT.

01:59PM 3         AND WE DON'T HAVE THAT HERE.  THERE'S NO EVIDENCE OR NO

01:59PM 4    DISCLOSURE OF SOMEONE WHO WOULD HELP THE JURY UNDERSTAND IF AND

01:59PM 5    TO WHAT EXTENT THE COMPANY CROSSED A LINE OR WENT BEYOND WHAT

01:59PM 6    WOULD BE CONSIDERED REASONABLE MEASURES.

01:59PM 7         OUR CONCERN IS THAT WITHOUT THAT, IT'S UNCLEAR HOW THAT

01:59PM 8    COMES IN.  SO THAT'S ISSUE ONE.

01:59PM 9         ISSUE TWO, I THINK WHAT THE GOVERNMENT IS TRYING TO SET UP

01:59PM 10   HERE IS TO PUT MS. HOLMES WITH THE BURDEN OF MAKING THAT

02:00PM 11   DISTINCTION.  THE ONLY EVIDENCE THAT SHOULD COME IN IS TO THE

02:00PM 12   EXTENT THAT A PRACTICE OR CONDUCT WAS IMPROPER.

02:00PM 13        THE GOVERNMENT HAS INDICATED IT WANTS TO INTRODUCE

02:00PM 14   STATEMENTS THAT THE COMPANY WAS VERY SECRETIVE OR HAD A SILO

02:00PM 15   CULTURE OR WAS MORE SECRETIVE THAN WHAT A PARTICULAR WITNESS

02:00PM 16   WOULD THINK.  THAT'S NOT ENOUGH TO THEN LEAVE IT TO THE DEFENSE

02:00PM 17   TO FORCE US TO TAKE ON THE BURDEN OF DISTINGUISHING WHAT WAS

02:00PM 18   PROPER CONDUCT AND WHAT WAS NOT.  I THINK IT FALLS TO THE

02:00PM 19   GOVERNMENT, IF THEY WANT TO INTRODUCE THIS EVIDENCE, TO SHOW

02:00PM 20   THIS IS THE LEGITIMATE CONDUCT.  AND THIS IS WHERE WE THINK

02:00PM 21   THEY CROSS THE LINE.

02:00PM 22            THE COURT:  OKAY.  MR. SCHENK.  THANK YOU.

02:00PM 23            MR. SCHENK:  A FEW THOUGHTS.  FIRST, TO BEGIN BY

02:00PM 24   ANSWERING THE COURT'S QUESTION, WHICH AS I UNDERSTAND IT IS

02:00PM 25   THAT IF THIS IS NORMAL SILICON VALLEY TRADE SECRET PROTECTION

02:00PM 1    PRACTICES, THEN WHAT IS THE RELEVANCE OF THE EVIDENCE?  WHY

02:01PM 2    ALLOW THE JURY TO HEAR THAT?

02:01PM 3        AND THE ANSWER REALLY IS TWO THINGS:  FIRST, IT'S -- LET'S

02:01PM 4    ASSUME FOR A MOMENT THAT CATEGORIES 7, 8, AND 12, WHICH ARE THE

02:01PM 5    CATEGORIES AT ISSUE HERE, INCLUDE DISCUSSIONS OF WHAT THE

02:01PM 6    DEFENSE CALLS ROUTINE TRADE SECRET PROTECTION PRACTICES, THE

02:01PM 7    GOVERNMENT HAS A DIFFERENT VERSION OF THAT, TOO.

02:01PM 8        THE GOVERNMENT'S VERSION IS THERANOS'S USE OF THE

02:01PM 9    NONDISCLOSURE AGREEMENTS WAS VERY AGGRESSIVE.  THERANOS'S USE

02:01PM 10   OF SILOING INFORMATION WAS VERY AGGRESSIVE.  THERANOS'S USE OF

02:01PM 11   HIDING INFORMATION WITHIN THE FOUR WALLS OF THERANOS FROM

02:01PM 12   CERTAIN EMPLOYEES WAS DONE TO PROTECT THAT INFORMATION FROM

02:01PM 13   GETTING OUT.

02:01PM 14       AGAIN, THE GOVERNMENT'S THEORY IS THAT THIS COMPANY WAS

02:02PM 15   COMMITTING FRAUD AND AS A RESULT THEY HAD TO USE CERTAIN

02:02PM 16   TACTICS THAT THEY'RE NOW SAYING WERE TRADE SECRET PRACTICES BUT

02:02PM 17   WERE, IN FACT, DONE TO PREVENT THE DISCOVERY OF THE FRAUD, AND

02:02PM 18   I CAN GIVE A COUPLE OF EXAMPLES.

02:02PM 19       IN THE SILOING CONTEXT, IT'S IMPORTANT THAT WE TALK ABOUT

02:02PM 20   THE TIMING OF THAT.  THE GOVERNMENT HAS INTERVIEWED FORMER

02:02PM 21   EMPLOYEES WHO SAY DURING, WHAT IN SOME BRIEFING BEFORE THE

02:02PM 22   COURT HAS BEEN DESCRIBED AS THE STEALTH PHASE, WHEN THERANOS

02:02PM 23   WAS MUCH MORE SECRETIVE, LET'S SAY THE FIRST 10 YEARS OF ITS

02:02PM 24   EXISTENCE, THERE WAS MUCH MORE FREE FLOW OF INFORMATION BY THE

02:02PM 25   EMPLOYEES WHEN THERANOS -- WHICH IS COUNTERINTUITIVE.  THEY

02:02PM 1   WERE DEEMED SECRETIVE AND YET WITHIN THE COMPANY YOU COULD

02:02PM 2   DISCUSS WITH YOUR COLLEAGUES, YOUR KEY CARD COULD GIVE YOU

02:02PM 3   ACCESS TO LOTS OF DIFFERENT ROOMS.  WHEN THERANOS PIVOTED, WHEN

02:02PM 4   THERANOS BECAME MORE AGGRESSIVE IN SEEKING PUBLIC ATTENTION,

02:02PM 5   IT, IN FACT, IMPOSED MANY OF THESE SILOS.  IT PREVENTED CERTAIN

02:03PM 6   EMPLOYEES FROM TALKING TO OTHER EMPLOYEES.  IT PREVENTED

02:03PM 7   CERTAIN EMPLOYEES FROM GETTING ACCESS TO CERTAIN LABS IN THE

02:03PM 8   BUILDING.

02:03PM 9        AND THE REASON IT DID THAT IS BECAUSE WHAT THEY WERE

02:03PM 10  TELLING TO THE WORLD, WHAT THEY WERE TELLING TO THE PUBLIC WAS

02:03PM 11  DIFFERENT THAN THE TRUTH WITHIN THE COMPANY.

02:03PM 12        AND AT THE TIME THERANOS WAS HIDING BEHIND TRADE SECRET

02:03PM 13  PRACTICES.  WE CAN'T TELL YOU MORE INFORMATION ABOUT WHAT WE'RE

02:03PM 14  DOING BECAUSE IT'S TRADE SECRET.

02:03PM 15           THE COURT:  SO THIS IS -- I'M SORRY TO INTERRUPT

02:03PM 16  YOU, MR. SCHENK.  SO THIS WILL BE TIME STAMPED, THE PROSECUTION

02:03PM 17  WILL TIME STAMP THE BEHAVIOR WITH SOMETHING ELSE THAT

02:03PM 18  THERANOS -- PERHAPS THE INABILITY, FROM YOUR POSITION, THE

02:03PM 19  INABILITY FOR THEM TO CONTINUE TO PRODUCE ACCURATE TESTING.

02:03PM 20  AND AS THAT STARTED TO UNFOLD AS WE'VE KNOWN FROM THE

02:03PM 21  ALLEGATIONS IN THE BRIEFING HERE, THE GOVERNMENT'S POSITION

02:03PM 22  HERE IS THAT'S WHEN THE SECRECY BECAME TIGHTER, TIGHTER OR THE

02:04PM 23  WAGON CIRCLED CLOSER.

02:04PM 24           MR. SCHENK:  YES, YOUR HONOR.

02:04PM 25        WHEN EVIDENCE OF THIS NATURE COMES IN AT TRIAL, LARGELY

02:04PM 1    EITHER THROUGH WITNESS TESTIMONY OR EMAILS, INTERNAL COMPANY

02:04PM 2    EMAILS, IT WILL BE DISCUSSING A PRACTICE AT A PARTICULAR TIME

02:04PM 3    AT THERANOS IN THE SORT OF DEVELOPMENT OR EVOLUTION OF THE

02:04PM 4    BUSINESS.

02:04PM 5        AND YOU CAN'T SAY, AS THE DEFENSE WANTS TO RIGHT NOW, ALL

02:04PM 6    OF THE PRACTICES WERE TRADE SECRET PROTECTION PRACTICES, AND,

02:04PM 7    THEREFORE, INAPPROPRIATE FOR THE JURY TO HEAR BECAUSE THAT'S

02:04PM 8    SIMPLY NOT TRUE.  THAT'S THE EXACT ARGUMENT THAT THEY MADE AT

02:04PM 9    THE TIME TO HIDE INFORMATION FROM THE PUBLIC TO PREVENT THE

02:04PM 10   DISCOVERY OF THE FRAUD.  I'M SORRY, WE CAN'T TELL YOU ANYTHING

02:04PM 11   ABOUT THE USE OF THIRD PARTY DEVICES BECAUSE THAT'S TRADE

02:04PM 12   SECRET PRACTICES.

02:04PM 13       IN FACT, THEY USE THAT SAME ARGUMENT THAT THEY'RE

02:04PM 14   PRESENTING NOW TO THE COURT TO PREVENT INVESTORS FROM LEARNING

02:04PM 15   MORE ABOUT WHAT WAS ACTUALLY OCCURRING AT THERANOS.

02:05PM 16       THERE ARE STORIES THAT ARE CITED IN THE GOVERNMENT'S

02:05PM 17   BRIEFING TO THE COURT ABOUT INDIVIDUALS COMING TO THERANOS,

02:05PM 18   THEN-VICE PRESIDENT BIDEN, AND DURING A VISIT THERE WERE

02:05PM 19   THERANOS TSP'S, THE THERANOS BOXES SET UP TO MAKE IT APPEAR

02:05PM 20   THAT THAT'S WHAT THEY USED TO TEST THE BLOOD.

02:05PM 21       THERE'S A SIMILAR STORY THAT IS PRESENTED IN THE

02:05PM 22   GOVERNMENT'S BRIEFING REGARDING INTERACTIONS THAT MS. HOLMES

02:05PM 23   HAD WITH ROGER PARLOFF, A REPORTER, WHERE MR. PARLOFF ASKED TO

02:05PM 24   VIEW A LAB AND IS TOLD, "REMEMBER WHEN YOU SAW THE ROOM WITH

02:05PM 25   ALL OF THE THERANOS BOXES IN IT, YOU ESSENTIALLY SAW THEM."

45

02:05PM 1     SO TO NOW SAY IT WOULD BE UNFAIR FOR THE GOVERNMENT AT

02:05PM 2  TRIAL TO GET TO INTRODUCE EVIDENCE OF HIDING THE LAB, OF

02:05PM 3  KEEPING TIGHT REINS AROUND THE LAB IS, AGAIN, FEEDING THE SAME

02:05PM 4  KIND OF ARGUMENTS THAT WERE USED AT THE TIME TO PREVENT

02:06PM 5  DISCLOSURE OF WHAT WAS ACTUALLY GOING ON AT THERANOS.

02:06PM 6     AND IT IS REASONABLE FOR THE JURY TO GET TO MAKE THEIR OWN

02:06PM 7  DETERMINATION ON THIS FACT ISSUE.

02:06PM 8     IS IT ACTUALLY REASONABLE TRADE SECRET PRACTICES AS THE

02:06PM 9  DEFENSE WANTS TO SAY IT IS OR WERE THESE EFFORTS TAKEN TO

02:06PM 10 FURTHER THE FRAUD?  DO THEY DEMONSTRATE THE INTENT?  DO THEY

02:06PM 11 DEMONSTRATE KNOWLEDGE OF THE INTENT?

02:06PM 12     THE COURT:  SO, MR. LEMENS, IS THIS JUST FACT

02:06PM 13 EVIDENCE?

02:06PM 14     MR. LEMENS:  I THINK THAT'S AN ENTIRELY NEW ARGUMENT

02:06PM 15 FROM THE GOVERNMENT, YOUR HONOR.  SO BEAR WITH ME, AND I'LL TRY

02:06PM 16 TO SORT THROUGH THAT.  I DON'T THINK THIS IS SOMETHING THAT WE

02:06PM 17 HAVE HEARD BEFORE.

02:06PM 18     AS TO SPECIFIC EXAMPLES THAT MR. SCHENK NOTED, THE

02:06PM 19 GOVERNMENT HAS PREVIOUSLY INDICATED THAT IT WOULD NOT PURSUE

02:06PM 20 THE NARRATIVE THAT IT PREVIOUSLY DISCLOSED WITH RESPECT TO THEN

02:06PM 21 VICE PRESIDENT BIDEN.  IF THAT'S BACK ON THE TABLE, I DON'T

02:07PM 22 KNOW, BUT I THINK WE NEED SOME CLARITY AS TO WHAT THE EVIDENCE

02:07PM 23 IS.

02:07PM 24     WITH RESPECT TO MR. PARLOFF, THAT'S CERTAINLY SOMETHING

02:07PM 25 THAT THE GOVERNMENT COULD HAVE CONTESTED IN ITS BRIEF.  IT DID

02:07PM 1    NOT.

02:07PM 2        BUT MORE BROADLY, THIS IDEA THAT IT CHANGES OVER TIME,

02:07PM 3    THIS IDEA THAT THERE ARE IMPROPER USE OF TRADE SECRETS

02:07PM 4    PRACTICES CALLS FOR THE EXPERT TESTIMONY OF SOMEONE OF

02:07PM 5    KNOWLEDGE AND EXPERTISE IN THAT FIELD, AND THE GOVERNMENT

02:07PM 6    DOESN'T HAVE THAT.  AND HE HAS NO -- MY COLLEAGUE HAS NO

02:07PM 7    RESPONSE TO THAT.

02:07PM 8        AND I DON'T THINK IT'S FAIR TO SAY WE'LL JUST LET THE JURY

02:07PM 9    DETERMINE WHAT WAS A REASONABLE PRACTICE.

02:07PM 10       WE'RE LOOKING BACK IN TIME.  THESE PRACTICES CHANGE OVER

02:07PM 11   TIME.  I THINK -- I'LL NOTE WITH NONDISCLOSURE AGREEMENTS IN

02:07PM 12   THE LAST SEVERAL YEARS THERE'S BEEN A SEA CHANGE IN HOW THOSE

02:07PM 13   ARE USED.  SOMEONE SHOULD NEED TO CONTEXTUALIZE THAT.

02:08PM 14       IT'S DIFFERENT PERIODS IN THE COMPANY'S EXISTENCE, WHAT

02:08PM 15   MR. SCHENK REFERS TO AS STEALTH MODE VERSUS -- THE PUBLIC PHASE

02:08PM 16   OF THE COMPANY'S WORK.

02:08PM 17       HOW THE COMPANY GREW OVER TIME AND WHEN CERTAIN INTERNAL

02:08PM 18   RESTRICTIONS WOULD OR WOULD NOT BE APPROPRIATE.  ALL OF THAT

02:08PM 19   CALLS FOR EXPERT TESTIMONY AND THERE ISN'T ANYTHING.

02:08PM 20       SO I THINK WE'RE JUST -- WE'RE SETTING OURSELVES UP FOR AN

02:08PM 21   INCREDIBLY CONFUSING NARRATIVE THAT SWEEPS IN A LARGE SWATH OF

02:08PM 22   THIS INNOCUOUS CONDUCT.

02:08PM 23            MR. SCHENK:  A COUPLE OF THOUGHTS.

02:08PM 24       YOUR HONOR, THE GOVERNMENT WANTS TO OFFER THIS EVIDENCE TO

02:08PM 25   SAY THAT THESE WERE PRACTICES AT THERANOS TO PREVENT DISCOVERY

02:08PM 1    OF THE FRAUD.

02:08PM 2        THE DEFENSE IS THE ONE WHO WANTS TO SAY THERE'S AN

02:08PM 3    INNOCENT EXPLANATION FOR ALL OF THIS, JURY, IT'S TRADE SECRET

02:08PM 4    PRACTICES.

02:08PM 5        THAT THEN, IN THE GOVERNMENT'S ESTIMATION, BECOMES A

02:09PM 6    LEGITIMATE FACTUAL DISPUTE REGARDING CERTAIN PRACTICES,

02:09PM 7    THERANOS DID X, IT SILOED INFORMATION, IT DENIED KEY CARD

02:09PM 8    ACCESS TO CERTAIN EMPLOYEES FROM THIS LAB OR THAT LAB.

02:09PM 9        THE GOVERNMENT PUTS THESE FACTS BEFORE THE JURY AND FROM

02:09PM 10   THOSE FACTS ARGUES THESE STEPS WERE TAKEN BECAUSE THERANOS HAD

02:09PM 11   TO, OTHERWISE THE FRAUD WOULD HAVE BEEN DISCOVERED.  THEY HAD

02:09PM 12   TO IMPOSE SILOING.  THEY HAD TO RESTRICT ACCESS.

02:09PM 13          THE COURT:  SO, MR. LEMENS, WHY ISN'T THIS JUST FACT

02:09PM 14   EVIDENCE, THIS IS THE WAY THE COMPANY WAS RUN, AND THE

02:09PM 15   GOVERNMENT'S POSITION IS THAT IT IS SINISTER THE WAY IT WAS RUN

02:09PM 16   AND, LADIES AND GENTLEMEN OF THE JURY, YOU SHOULD VIEW IT AS

02:09PM 17   SUCH?

02:09PM 18       AND YOU'LL STAND UP AND SAY NO.  THIS IS HOW SILICON

02:09PM 19   VALLEY OPERATES.  YOU PROTECT YOUR TRADE SECRETS, AND THIS IS

02:09PM 20   THE WAY IT'S DONE.  THAT'S REALLY WHAT IT IS.  THERE'S NOTHING

02:09PM 21   UNTOWARD ABOUT IT.

02:10PM 22       ISN'T THAT A FACTUAL ISSUE?

02:10PM 23          MR. LEMENS:  I DON'T THINK SO, YOUR HONOR.  CLEARLY

02:10PM 24   THERE ARE FACTS, BUT I DON'T THINK IT'S A FACTUAL DISPUTE.

02:10PM 25       I THINK FOR THE GOVERNMENT TO PRESENT THAT EVIDENCE IT HAS

02:10PM 1    TO SPECIFICALLY DO IT THROUGH 404(B) WHEN WE ARE VERY FAR AWAY

02:10PM 2    FROM THE CORE ALLEGATIONS IN THE INDICTMENT.

02:10PM 3            THE COURT:  NO.  RIGHT.  I'M SUGGESTING IT IS NOT.

02:10PM 4    IT'S OUTSIDE OF THE 404(B) ARENA.  IT'S JUST PURE FACT EVIDENCE

02:10PM 5    AND FAIR COMMENT FROM BOTH SIDES ON THE EVIDENCE.

02:10PM 6            MR. LEMENS:  YEAH.  I THINK IF IT'S GOING TO DO

02:10PM 7    THAT, THE ONLY ALLEGATION IS WHEN IT WAS DONE IMPROPERLY.  AND

02:10PM 8    FOR IT TO BE IMPROPER, YOU HAVE TO GET BEYOND THE BOUNDS OF

02:10PM 9    WHAT ARE REASONABLE TRADE SECRETS MEASURES.  I DON'T

02:10PM 10   THINK ANYONE --

02:10PM 11           THE COURT:  WELL -- I'M SORRY.

02:10PM 12       ISN'T IT CIRCUMSTANTIAL EVIDENCE?  CAN'T THEY ARGUE, I'M

02:10PM 13   NOT SAYING IT IS, BUT WOULDN'T THEY BE ABLE TO ARGUE

02:10PM 14   CIRCUMSTANTIALLY THE WAGON IS NARROWED WHEN THE CART STARTED

02:11PM 15   FALLING.  PARDON ME, I'LL JUST PUT IT THAT WAY TO UNDERSTAND

02:11PM 16   WHAT WE'RE TALKING ABOUT.

02:11PM 17       CAN'T THEY ARGUE THAT IS CIRCUMSTANTIAL EVIDENCE, LADIES

02:11PM 18   AND GENTLEMEN, AND YOU SHOULD CONSIDER THAT THE WAGON CIRCLED

02:11PM 19   TIGHTER WHEN THIS HAPPENED, THAT THERE'S A UNIQUE TIME STAMP AS

02:11PM 20   TO THOSE TWO EVENTS?

02:11PM 21           MR. LEMENS:  I DON'T -- WE'RE TALKING.

02:11PM 22           THE COURT:  I'M TAKING YOU WAY OFF OF YOUR ARGUMENT

02:11PM 23   AND YOUR PRESENTATION, AND I DIDN'T MEAN TO DO THAT.

02:11PM 24           MR. LEMENS:  NO.  NO.  LET ME JUST KIND OF BRING IT

02:11PM 25   BACK TO SAY THAT THERE IS LEGITIMATE CONDUCT THROUGHOUT THE

02:11PM 1    COMPANY'S EXISTENCE.  I DON'T THINK THERE'S A DISPUTE THAT THEY

02:11PM 2    WERE DEVELOPING TECHNOLOGY, THAT THERE WAS A RESEARCH AND

02:11PM 3    DEVELOPMENT PRACTICE, THAT THERE WERE THINGS HAPPENING AT

02:11PM 4    THERANOS.

02:11PM 5        AND I DON'T KNOW HOW IT'S PERMISSIBLE TO SHIFT THAT BURDEN

02:11PM 6    TO US TO DEFEND THE LEGITIMATE CONDUCT BECAUSE I THINK THE

02:11PM 7    CONTEMPORANEOUS EVIDENCE SHOWS THAT THERE WERE TRADE SECRETS

02:11PM 8    CONCERNS, THERE WAS LITIGATION INSTITUTED BY THE COMPANY VERY

02:11PM 9    EARLY ON IN ITS EXISTENCE TO PROTECT ITS TRADE SECRETS FROM

02:12PM 10   DEPARTING EMPLOYEES.

02:12PM 11       SO WHEN THERE IS LEGITIMATE TRADE SECRET CONCERNS, AND THE

02:12PM 12   GOVERNMENT WANTS TO BLOW PAST THAT AND MAKE IT ALL SINISTER, I

02:12PM 13   THINK WE GET INTO, EVEN IF IT'S FACT EVIDENCE, EVEN IF WE'RE

02:12PM 14   OUTSIDE OF 404(B), WE HAVE GOT 403 CONCERNS THAT THE JURY IS

02:12PM 15   GOING TO SIT HERE HEARING THIS FRAMED IN A WAY BY THE

02:12PM 16   GOVERNMENT, AND WE'RE GOING TO INTRODUCE EVIDENCE OF LEGITIMATE

02:12PM 17   CONDUCT, BUT THAT SOUNDS, WHEN PRESENTED, UNFAIRLY PREJUDICIAL

02:12PM 18   AND WITH VERY LITTLE RELEVANCE TO THE REST OF THE CASE.

02:12PM 19           THE COURT:  MR. SCHENK.

02:12PM 20           MR. SCHENK:  THE COURT SHOULD ADMIT THIS EVIDENCE

02:12PM 21   BECAUSE IT IS INTEGRAL EVIDENCE AS TO HOW THERANOS WAS ABLE TO

02:12PM 22   COMMIT A FRAUD, HOW IT WAS ABLE TO SILO ITS EMPLOYEES, HOW IT

02:12PM 23   WAS ABLE TO DENY CERTAIN INFORMATION FROM ESCAPING THE FOUR

02:12PM 24   WALLS OF THERANOS.

02:12PM 25           SILOING, FOR INSTANCE, IS RELEVANT BECAUSE TWO PEOPLE WHO

02:13PM 1    FLEW ABOVE THE SILO WERE THE TWO CONSPIRATORS, MS. HOLMES AND

02:13PM 2    MR. BALWANI.

02:13PM 3       SO LOTS OF OTHER EMPLOYEES GOT SILOED BUT PEOPLE WHO HAD

02:13PM 4    THE OVERARCHING 36,000 FOOT VIEW WERE MS. HOLMES AND

02:13PM 5    MR. BALWANI, AND THE GOVERNMENT SHOULD BE ALLOWED TO PRESENT

02:13PM 6    THAT EVIDENCE TO THE JURY AND THEN ARGUE, AS THE COURT JUST

02:13PM 7    SAID, BEARING INFERENCES FROM THAT EVIDENCE.

02:13PM 8       AND I'M NOT FOLLOWING THE 403 ANALYSIS.  IT'S PREJUDICIAL

02:13PM 9    IN THAT IT'S RELEVANT, BUT IT'S NOT UNFAIRLY PREJUDICIAL.  IT'S

02:13PM 10    EVIDENCE FROM WHICH THE JURY CAN SEE HOW BUSINESS WAS CONDUCTED

02:13PM 11    AT THERANOS AND HOW IT WAS THAT THE FRAUD WAS ALLOWED TO EXIST,

02:13PM 12    HOW INFORMATION WAS KEPT WITHIN THE FOUR WALLS OF THERANOS AND

02:13PM 13    OTHERS WERE DENIED ACCESS TO THAT INFORMATION.

02:13PM 14          THE COURT:  MR. LEMENS, YOU WANT TO --

02:13PM 15          MR. LEMENS:  MAYBE GO BACKWARD ON THIS.

02:13PM 16          THE COURT:  YOU DO, YOU DO.  IT'S YOUR MOTION.

02:13PM 17          MR. LEMENS:  RIGHT.  AND I THINK MAYBE JUST, YOU

02:13PM 18    KNOW, WE'VE HEARD SOME NEW THEORIES TODAY, AND I WOULD REMIND

02:14PM 19    THE COURT WE HAVE BRIEFED THIS, THE GOVERNMENT HAS TAKEN ITS

02:14PM 20    POSITION, AND I THINK THE COURT SHOULD HOLD IT TO ITS PRIOR

02:14PM 21    REPRESENTATIONS.

02:14PM 22       I THINK THE ISSUES AND ESPECIALLY THE LEGITIMATE PRACTICES

02:14PM 23    ARE PROBLEMATIC WHEN INTRODUCED IN THE WAY THAT THE GOVERNMENT

02:14PM 24    IS SUGGESTING.

02:14PM 25       AND I DON'T SEE HOW A WITNESS CAN COME ON TO THE STAND AND

02:14PM 1    SAY I THOUGHT THE COMPANY WAS VERY SECRETIVE AND NOT TO BE

02:14PM 2    RELEVANT WITHOUT -- AND NOT TO BE INCREDIBLY PREJUDICIAL TO THE

02:14PM 3    DEFENSE WHEN WE THEN TAKE ON -- HAVE TO TAKE ON THE BURDEN OF

02:14PM 4    JUSTIFYING ALL OF THE PRACTICES. I THINK IT'S FOR THE

02:14PM 5    GOVERNMENT TO SORT OUT WHICH PIECE OF THAT IS THE VERY PART.

02:14PM 6         THE COURT: IF THE WITNESS SAYS I'VE WORKED IN

02:14PM 7    VARIOUS STARTUPS IN SILICON VALLEY AND I'VE NEVER, EVER

02:14PM 8    EXPERIENCED THE SHELTERING IN PLACE, THE SECRECY THAT I

02:14PM 9    EXPERIENCED DURING MY TENURE AT THIS COMPANY, IS THAT RELEVANT?

02:14PM 10        MR. LEMENS: I THINK IF THE GOVERNMENT WOULD WANT TO

02:15PM 11   PROFFER THAT PERSON AS AN EXPERT, WE COULD GO THROUGH THE

02:15PM 12   PROCESS OF TESTING THEIR OPINIONS.

02:15PM 13        I THINK WHERE I WAS GOING TO GO, AND MAYBE WE'RE ON THE

02:15PM 14   SAME PAGE HERE, IS IF THIS EVIDENCE WAS GOING TO COME IN

02:15PM 15   THROUGH A PARTICULAR WITNESS, MAYBE WE DO NEED TO DO THIS ON A

02:15PM 16   CASE-BY-CASE BASIS BEFORE THAT WITNESS TESTIFIES, UNDERSTANDING

02:15PM 17   WHAT THE GOVERNMENT IS PROFFERING ABOUT WHAT THEY'RE GOING TO

02:15PM 18   SAY ON THIS MATTER AND WHAT THE BURDEN LOOKS LIKE, WHAT THE

02:15PM 19   PREJUDICE LOOKS LIKE, WHETHER WE'RE GOING TO CROSS INTO

02:15PM 20   EXPERTISE ABOUT TRADE SECRET PRACTICES.

02:15PM 21        SO IF YOUR HONOR IS NOT INCLINED TO RULE CERTAINLY FOR US,

02:15PM 22   BUT THERE'S A NUMBER OF ISSUES HERE THAT PERHAPS WE SHOULD DEAL

02:15PM 23   WITH THIS AT TRIAL.

02:15PM 24        THE COURT: OKAY. THANK YOU.

02:15PM 25        THERE'S ANOTHER PORTION OF THIS MOTION, I THINK, THAT

02:15PM 1    RELATES TO SPECIFIC CONDUCT AND INVOLVING SOME INDIVIDUALS,

02:15PM 2    SHULTZ AND CHEUNG?

02:15PM 3            MR. LEMENS:  YES, AND ON THAT I THINK THOSE ARE

02:15PM 4    ARGUMENTS THAT THE GOVERNMENT HAS PRESENTED.  IT'S NOT OUT OF

02:15PM 5    THE ORDINARY FOR EMPLOYEE DEPARTURES TO BE LITIGIOUS OR

02:16PM 6    CONFRONTATIONAL.  THE GOVERNMENT PROSECUTES INDIVIDUALS WHEN

02:16PM 7    THEY LEAVE COMPANIES FOR THEFT OF TRADE SECRETS.  THIS CAN BE A

02:16PM 8    SERIOUS INCIDENT.

02:16PM 9        WE ARE STILL WITHOUT WHO IS GOING TO EXPLAIN WHEN THOSE

02:16PM 10   PRACTICES BECOME IMPERMISSIBLE.  THERE'S STILL NO EXPERT.

02:16PM 11       I DON'T THINK MR. SHULTZ OR MS. CHEUNG ARE QUALIFIED TO

02:16PM 12   OFFER THAT TESTIMONY WHEN THIS WAS THEIR FIRST JOB OUT OF

02:16PM 13   COLLEGE.  I DON'T KNOW WHAT EXPERTISE DR. ROSENDORFF WOULD HAVE

02:16PM 14   TO OFFER THAT TESTIMONY.

02:16PM 15       SO THERE'S STILL THE ISSUES ABOUT THE OTHERWISE INNOCUOUS

02:16PM 16   CONDUCT THAT WE'VE BEEN DISCUSSING.

02:16PM 17       I THINK THESE TWO -- WELL, ONE MORE.  WHAT IS THE

02:16PM 18   CONNECTION TO MS. HOLMES IS STILL A LIVE ISSUE.  THE GOVERNMENT

02:16PM 19   HAS MADE SOME ASSERTIONS.  I THINK MS. SAHARIA IS GOING TO

02:16PM 20   ADDRESS AGENCY ISSUES IN A SUBSEQUENT MOTION AND THAT PERHAPS

02:16PM 21   THESE TWO ARE WORTH DEFERRING ON UNTIL WE GET A BETTER SENSE OF

02:16PM 22   EXACTLY WHAT THE PROFFER IS FOR FOUNDATION TO ADMIT THIS IN

02:17PM 23   THIS TRIAL.

02:17PM 24           THE COURT:  MR. SCHENK.

02:17PM 25           MR. SCHENK:  YOUR HONOR, I'M HAPPY TO ADDRESS THE

02:17PM 1  RELEVANCE OF THOSE TWO STORIES.

02:17PM 2  AGAIN, IT'S RELEVANT BECAUSE THE JURY SHOULD GET TO HEAR

02:17PM 3  WHAT THERANOS DID WHEN WHISTLE BLOWERS TRIED TO COME FORWARD,

02:17PM 4  WHEN INDIVIDUALS TRIED SAY, WHEN EMPLOYEES TRIED TO SAY WE'RE

02:17PM 5  DOING SOMETHING WRONG AND IT BOTHERS US.  AND THE GOVERNMENT

02:17PM 6  PUTS THEIR STORIES BEFORE THE JURY.

02:17PM 7  IF THE DEFENSE WANTS TO RESPOND SOMETIMES EMPLOYEE

02:17PM 8  DEPARTURES GET HOSTILE, THEY CAN MAKE THAT ARGUMENT AND THE

02:17PM 9  JURY CAN DECIDE WHICH VERSION OF THE EVENTS DID I BELIEVE?  DID

02:17PM 10  THERANOS REALLY HAVE A REASON TO GET WORRIED OR TO GET SCARED

02:17PM 11  WHEN EMPLOYEES STARTED CONTACTING REGULATORS, WHEN EMPLOYEES

02:17PM 12  STARTED TO WORRY ABOUT THE ACCURACY OF TESTS, WHEN EMPLOYEES

02:17PM 13  STARTED TO RAISE RED FLAGS?

02:17PM 14  THE JURY GETS TO DECIDE WAS THERANOS'S RESPONSE NORMAL FOR

02:18PM 15  PEOPLE THAT LIVE IN THE WORLD, NORMAL EMPLOYMENT ACTIONS AFTER

02:18PM 16  AN EMPLOYEE LEAVES AND THE RELATIONSHIP IS HOSTILE OR WAS

02:18PM 17  THERANOS TREATING THIS EMPLOYEE THAT WAY BECAUSE OF THE THREAT

02:18PM 18  THAT EMPLOYEE POSED?

02:18PM 19  AND THOSE ARE RELEVANT PIECES OF EVIDENCE FOR THE JURY TO

02:18PM 20  GET TO DECIDE WHICH VERSION OF EVENTS THEY CHOOSE TO BELIEVE.

02:18PM 21  THE COURT:  IS THAT 404(B), MR. SCHENK?

02:18PM 22  MR. SCHENK:  I THINK IT IS, BUT I THINK THE CASE LAW

02:18PM 23  SUGGESTS THAT THREATS OR INTIMIDATION IS A PROPER BASIS TO

02:18PM 24  ADMIT IT.  LET ME BE MORE CLEAR.  I THINK THERE'S A 404(B)

02:18PM 25  BASIS TO ADMIT IT.

02:18PM 1      NOW, THIS CONDUCT OCCURRED AT THE TIME OF THE FRAUD.  IN

02:18PM 2  OTHER WORDS, CONSISTENT WITH OR OVERLAPPING WITH THE TIME WHEN

02:18PM 3  THERANOS WAS SAYING ONE THING TO INVESTORS ABOUT THE ABILITY OF

02:19PM 4  ITS TECHNOLOGY, BUT KNOWING SOMETHING DIFFERENT WITHIN THE FOUR

02:19PM 5  WALLS OF THERANOS.

02:19PM 6      SO TO THAT EXTENT, NO, THERE IS CERTAINLY RELEVANT

02:19PM 7  EVIDENCE THAT THESE WITNESSES HAVE TO PROVIDE TO THE COURT THAT

02:19PM 8  IS SIMPLY JUST FACT EVIDENCE.  I WAS WORRIED ABOUT THIS TEST.

02:19PM 9  I WAS WORRIED ABOUT OUR QC.  I WAS WORRIED ABOUT X.  AND WHEN

02:19PM 10 THERANOS DIDN'T DO ANYTHING ABOUT IT, I LEFT.  SO THERE ARE

02:19PM 11 CERTAINLY ELEMENTS TO IT THAT ARE --

02:19PM 12      THE COURT:  AND THE EVIDENCE IS, I THINK IT'S IN THE

02:19PM 13 RECORD HERE AND PLEASE STOP ME IF IT IS NOT, BUT I THINK WHAT I

02:19PM 14 READ WAS AS TO THESE TWO INDIVIDUALS THAT WE'VE TALKED ABOUT,

02:19PM 15 THE GOVERNMENT WISHES TO PRESENT TO THE JURY THEIR EXPERIENCES

02:19PM 16 POST LEAVING, POST REPORTING OR AT LEAST EXPRESSING CONCERNS

02:19PM 17 ABOUT THE COMPANY AND THE EXPERIENCES THAT THEY RECEIVED

02:19PM 18 SUBSEQUENT TO THAT INVOLVE, I'LL JUST PUT IT BLACK SUV'S, BLUE

02:19PM 19 SUITS, AND NDA'S, AT HOURS OF THE DAY THAT WERE AT LEAST

02:20PM 20 OTHERWISE UNUSUAL FOR THAT TYPE OF CONDUCT.

02:20PM 21      IS THAT --

02:20PM 22      MR. SCHENK:  YES, YOUR HONOR.  AND WHAT I WAS

02:20PM 23 ATTEMPTING TO DO WAS MAYBE DRAW A DISTINCTION BETWEEN THE TYPES

02:20PM 24 OF EVIDENCE THAT EACH WITNESS WOULD PROVIDE, SOME OF IT BEING

02:20PM 25 PURE FACT, AND THEN AS THE COURT JUST SUMMARIZED, I THINK THAT

02:20PM 1    PROBABLY DOES MORE PROPERLY FALL UNDER 404(B).

02:20PM 2         THE COURT:  AND I LOOKED AT THAT AND I THOUGHT IS

02:20PM 3    THAT, AND I'M LOOKING AT MR. LEMENS NOW, IS THAT CONDUCT,

02:20PM 4    ASSUMING IT COMES IN, DOES IT COME IN BECAUSE IT'S INEXTRICABLY

02:20PM 5    INTERTWINED WITH THE CONSPIRACY AND THE CONDUCT THAT IS ALLEGED

02:20PM 6    IN THE INDICTMENT, THAT IS, THAT IN ORDER TO -- THERE WAS A

02:20PM 7    FRAUD THAT WAS ENGAGED AND IN ORDER TO CONTINUE WITH THE FRAUD

02:20PM 8    THE DEFENDANT SOUGHT OUT -- AND HERE'S A BIG LINK THAT

02:20PM 9    MR. SCHENK IS GOING TO HAVE TO OVERCOME -- HOW DOES IT TRACE

02:21PM 10   BACK TO MS. HOLMES?  PARDON ME, I DON'T MEAN TO POINT.  BUT HOW

02:21PM 11   DOES IT TRACE BACK TO HER?

02:21PM 12        BUT ENGAGING THE FRAUD, PART OF THE CONCERN WAS TO KEEP IT

02:21PM 13   SECRET, TO KEEP PEOPLE FROM SPILLING THE BEANS, IF YOU WILL,

02:21PM 14   TALKING ABOUT WHAT IS REALLY HAPPENING AND TO DO THAT THIS

02:21PM 15   BEHAVIOR WITH SUV'S, NDA'S, AFTER HOURS, WE HEARD MS. CHEUNG

02:21PM 16   TALK ABOUT HOW DID THEY EVEN FIND ME?  NO ONE KNEW MY ADDRESS.

02:21PM 17   AND IT COULD BE PERCEIVED AS A THREAT, INTIMIDATION.  ISN'T

02:21PM 18   THAT INEXTRICABLY INTERTWINED WITH A SCHEME TO DEFRAUD AND TO

02:21PM 19   KEEP IT FROM BEING DISCOVERED?

02:21PM 20        THAT'S A LOT TO TALK ABOUT.

02:21PM 21        MR. LEMENS:  I'LL TRY TO TAKE IT IN A FEW PIECES.

02:21PM 22   I DON'T THINK ANYONE WOULD DISPUTE THAT THIS IS AN

02:21PM 23   INCREDIBLY INFLAMMATORY NARRATIVE AS THE GOVERNMENT DESCRIBED

02:21PM 24   IT, SO THERE'S A HIGH RISK OF PREJUDICE.

02:21PM 25        THE COURT:  AND WE'LL TALKING ABOUT THE 403 PART,

02:21PM 1    SURE.

02:21PM 2         MR. LEMENS:  THERE'S THE LINK WHICH YOUR HONOR

02:22PM 3    MENTIONED, THERE'S THE PRESENCE OF ATTORNEYS AND PRIVILEGED

02:22PM 4    RELATIONSHIPS WHICH MS. HOLMES HOLDS, AND, OF COURSE, IS NOT

02:22PM 5    REQUIRED TO DROP.  YOU'VE GOT ATTORNEYS HERE SO WE HAVE SOME

02:22PM 6    PRIVILEGE ISSUES THAT --

02:22PM 7         THE COURT:  WELL, I DON'T THINK THERE'S ANY

02:22PM 8    CONVERSATIONS.  THERE IS CERTAINLY NO ATTORNEY-CLIENT PRIVILEGE

02:22PM 9    WITH THE CONTACTEES.

02:22PM 10        MR. LEMENS:  BUT THERE'S AN ASSERTION FROM THE

02:22PM 11   GOVERNMENT THAT MS. HOLMES DIRECTED ATTORNEYS TO DO THAT.  SO

02:22PM 12   YOU'VE GOT LAWYERS.  I JUST WANT TO GET THE ISSUES OUT ON THE

02:22PM 13   TABLE.

02:22PM 14        THE COURT:  RIGHT.

02:22PM 15        MR. LEMENS:  YOU HAVE DEPARTING EMPLOYEES WHO I

02:22PM 16   DON'T THINK THERE'S A DISPUTE ARE VIOLATING THEIR

02:22PM 17   CONFIDENTIALITY OBLIGATIONS TO THE COMPANY.

02:22PM 18      SO YOU HAVE, I THINK, WHAT IS -- I DON'T THINK IT'S A

02:22PM 19   CONTESTED OBLIGATION.

02:22PM 20      SO AGAIN WE'RE BACK AND THE SAME QUESTION IS WAS -- DID

02:22PM 21   THE COMPANY HAVE A BASIS TO LITIGATE, RIGHT?  DID THE COMPANY

02:22PM 22   HAVE -- WAS THAT A REASONABLE MEASURE?

02:22PM 23      YOU WOULD EXPECT TO SEE AN EXPERT TO COME IN AND SAY, YOU

02:22PM 24   KNOW, HERE'S THIS PORTION OF IT, YES, WE WOULD AGREE WITH AND

02:23PM 25   THIS PORTION PERHAPS WE THINK IS IMPROPER AND WE COULD JOIN THE

57

02:23PM 1    ARGUMENT THERE AND HAVE THAT DEBATE.

02:23PM 2        BUT FOR THE GOVERNMENT TO SEEK TO BRING IN AT LEAST SOME

02:23PM 3    OF WHICH MUST BE LEGITIMATE CONDUCT TO PROTECT ITS TRADE

02:23PM 4    SECRETS, I THINK WE GET INTO THE SAME ISSUES WE HAVE BEEN

02:23PM 5    DISCUSSING.

02:23PM 6        THE COURT:  IS THAT FOR THE JURY -- IS THAT A FACT

02:23PM 7    QUESTION FOR THE JURY TO DECIDE THAT BLACK SUV'S AFTER HOURS,

02:23PM 8    BLUE SUITS COMING OUT WITH NDA'S DEMANDING TO SIGN IT, IS THAT

02:23PM 9    FOR THE JURY TO DECIDE?

02:23PM 10        MR. LEMENS:  IF IT IS A REASONABLE MEASURE THAT A

02:23PM 11    COMPANY WOULD TAKE, I THINK IT'S FOR AN EXPERT TO OPINE.  I

02:23PM 12    THINK IT'S BEYOND WHAT YOU COULD CONSIDER LAY TESTIMONY.

02:23PM 13        YOUR HONOR HAS NOW MENTIONED BLACK SUV'S SEVERAL TIMES.

02:23PM 14    I HAVE SEARCHED THE GOVERNMENT'S PRODUCTION TO FIND REFERENCE

02:23PM 15    TO IT.  I DON'T SEE IT.  I KNOW IT'S IN THEIR BELIEF.

02:23PM 16        THE COURT:  I THOUGHT I SAW IT.

02:23PM 17        MR. LEMENS:  WELL, IT'S IN THEIR BRIEF BUT THE BRIEF

02:23PM 18    ALSO DOESN'T CITE TO EVIDENCE.

02:23PM 19        THE COURT:  THAT'S WHY I'M SAYING IT.

02:23PM 20        MR. LEMENS:  RIGHT.  WELL, I WANT TO BE VERY CAREFUL

02:24PM 21    ABOUT WHAT HAS BEEN SAID HERE.  WE'LL NEED TO MAKE SURE THAT

02:24PM 22    THERE'S A BASIS FOR THAT.

02:24PM 23        BUT I DON'T THINK THAT -- IT'S CERTAINLY NOT FOR ME TO

02:24PM 24    MAKE THE ASSESSMENT OF WHAT WAS A REASONABLE MEASURE.  I THINK

02:24PM 25    IT'S FOR SOMEONE WITH EXPERTISE IN THE FIELD.  THE GOVERNMENT

UNITED STATES COURT REPORTERS

ER-2402

02:24PM 1    HAS NOT PROVIDED THAT PERSON.

02:24PM 2            THE COURT:  FAIR ENOUGH.  AND THIS IS WOULD BE, AS

02:24PM 3    WE HAVE TALKED ABOUT BEFORE, IF SOMEONE -- A WITNESS SAID I'VE

02:24PM 4    BEEN PRACTICING, I HAVE BEEN EMPLOYED, AND I KNOW ABOUT NDA'S,

02:24PM 5    I'VE SIGNED HUNDREDS OF THEM, I NEVER HAD AN EXPERIENCE LIKE

02:24PM 6    THIS BEFORE, THAT MIGHT BE A DIFFERENT THING?

02:24PM 7            MR. LEMENS:  RIGHT.  WE COULD THEN LITIGATE THE

02:24PM 8    BASIS AND THE METHOD AND THE RELIABILITY OF THAT OPINION.

02:24PM 9            THE COURT:  RIGHT.  OKAY.  I JUST WANT TO TURN TO

02:24PM 10   BOTH TEAMS HERE.

02:24PM 11       DOES ANYBODY NEED A BREAK?  ARE WE OKAY?

02:24PM 12           MS. SAHARIA:  WE'RE OKAY.

02:24PM 13           THE COURT:  YOUR TEAM IS OKAY?

02:24PM 14           MR. SCHENK:  YES, YOUR HONOR.  THANK YOU.

02:24PM 15           THE COURT:  ALL RIGHT.  GREAT.  THANK YOU.

02:24PM 16           MR. LEMENS:  I WOULD MOVE TO 576 IF THAT WORKS,

02:24PM 17   YOUR HONOR.

02:24PM 18           THE COURT:  ANYTHING FURTHER ON THIS?

02:24PM 19           MR. SCHENK:  NO, YOUR HONOR.

02:25PM 20           THE COURT:  OKAY.  THANK YOU.

02:25PM 21           MR. LEMENS:  SO HERE WE'RE TALKING ABOUT THE

02:25PM 22   COMPANY'S USE OF MODIFIED COMMERCIAL TESTING PLATFORMS AND I

02:25PM 23   WILL JUST QUICKLY TO REFRESH WHERE WE ARE.

02:25PM 24       MS. SAHARIA MENTIONED ON THE FIRST DAY THE COMPANY HAD

02:25PM 25   USED THREE DIFFERENT TYPES OF TECHNICAL HARDWARE IN ITS

02:25PM 1   CLINICAL LAB.  ONE WAS COMMERCIAL DEVICES WITHOUT ANY

02:25PM 2   MODIFICATION; THE SECOND WAS THE THERANOS DEVICE, THE TSPU;

02:25PM 3   AND, THE THIRD WERE COMMERCIAL DEVICES THAT THE COMPANY HAD

02:25PM 4   MODIFIED IN ORDER TO RUN A SMALL SAMPLE TEST.  AND SO THAT'S

02:25PM 5   WHAT WE'RE FOCUSSED ON HERE.

02:25PM 6       THAT -- IT'S HELPFUL TO KEEP IN MIND THAT THE COMPANY

02:25PM 7   SPENT YEARS DEVELOPING SMALL -- THE ABILITY TO RUN BLOOD TESTS

02:25PM 8   ON SMALL SAMPLES.  THAT SEPARATE AND APART FROM THE DEVICE WAS

02:25PM 9   THE FOCUS OF THEIR RESEARCH AND DEVELOPMENT EFFORTS.

02:25PM 10      AND THE CHEMISTRY IS I THINK THE TECHNICAL TERM, OR THE

02:26PM 11  RECIPE, FOR HOW YOU DO THIS IS NOT NECESSARILY UNIQUE TO THE

02:26PM 12  TSPU OR THE PROPRIETARY DEVICE.  IT COULD HAVE APPLICATION TO

02:26PM 13  OTHER PLATFORMS.

02:26PM 14      SO AT THIS POINT THE COMPANY GOES AND SAYS, WELL, CAN WE

02:26PM 15  DO THIS ON A DIFFERENT DEVICE?  COULD WE DO THIS AT A HIGHER

02:26PM 16  THROUGHPUT?  COULD WE DO THIS IN A MORE EFFICIENT WAY?

02:26PM 17      THEY ENGAGED A CROSS OR A DIVERSE TEAM OF HIGHLY QUALIFIED

02:26PM 18  SCIENTISTS.  YOU HAVE DR. YOUNG WHO IS A SENIOR LEADER AT THE

02:26PM 19  COMPANY, A PH.D. FROM M.I.T., PH.D. IN PHYSICS, PEOPLE WITH

02:26PM 20  EXPERIENCE IN THE LABORATORY WHO LOOK AT THESE DEVICES AND SAY

02:26PM 21  IS THERE SOMETHING THAT WE CAN DO WITH IT?

02:26PM 22      THEY LAND ON THE ADVIA, A-D-V-I-A, DEVICE, WHICH IS

02:26PM 23  MANUFACTURED BY SIEMENS.  IT HAS THE CAPACITY TO RUN UP TO 1800

02:26PM 24  TESTS PER HOUR.

02:26PM 25          THE COURT:  IS THIS THE MACHINE THAT IS

02:26PM 1    PROGRAMMABLE?

02:27PM 2          MR. LEMENS:  YES.  YES, YOUR HONOR.

02:27PM 3          THE COURT:  AND IT'S OPEN SOURCE TO A CERTAIN DEGREE

02:27PM 4    I BELIEVE.

02:27PM 5          MR. LEMENS:  YES, YOUR HONOR.  THERE'S AN ABILITY

02:27PM 6    FOR THE -- FOR I DON'T WANT TO CALL THEM CLIENTS BUT PEOPLE WHO

02:27PM 7    PURCHASE THAT DEVICE TO THEN ADD THEIR OWN ASSAYS, RIGHT, THEIR

02:27PM 8    LABORATORY DEVELOPED TESTS.  AND THAT'S WHAT THE COMPANY DID

02:27PM 9    HERE.

02:27PM 10     I THINK THERE'S SOME DISPUTE, BUT THE GOVERNMENT CERTAINLY

02:27PM 11    WANTS TO CHALLENGE THE NATURE OF THOSE MODIFICATIONS AND THE

02:27PM 12    SPECIFIC MODIFICATIONS, AND THEY WANT TO ALLEGE THAT THOSE

02:27PM 13    MODIFICATIONS WERE CONCEALED.

02:27PM 14          THE COURT:  WELL, THEY USE THE WORD "TAMPER" I

02:27PM 15    THINK.

02:27PM 16          MR. LEMENS:  THEY STARTED WITH TAMPER.  I THINK

02:27PM 17    THEY'VE BACKED OFF OF THAT.  THEN THEY WENT TO INDUSTRY --

02:27PM 18    INCONSISTENT WITH INDUSTRY STANDARDS OR MANUFACTURER

02:27PM 19    EXPECTATIONS, AND THEY'VE BACKED OFF FROM THAT AND THEY MADE

02:27PM 20    THE CONCESSION THAT THEY DON'T INTEND TO PRESENT EVIDENCE THAT

02:27PM 21    THESE MODIFICATIONS ARE INCONSISTENT WITH INDUSTRY STANDARDS OR

02:27PM 22    MANUFACTURER USE AGREEMENTS OR OTHERWISE IMPROPER.  I THINK

02:28PM 23    THAT'S -- HE'LL TELL ME IF I'VE GOT THE LANGUAGE WRONG.

02:28PM 24     BUT YOU SHOULD HOLD THEM TO THAT CONCESSION.

02:28PM 25     BUT THE BRIEF -- THEIR OPPOSITION, HOWEVER, AND THIS IS AT

02:28PM  1    DOCKET 666, THEN GOES ON TO SAY, WELL, THESE WERE NOT COMMON,

02:28PM  2    THESE WERE NONSTANDARD, UNUSUAL, UNKNOWN.  AND I THINK THE

02:28PM  3    IMPLICATION IS CLEAR THAT THEY WANT TO CONTINUE TO CAST DOUBT

02:28PM  4    ON THE MODIFICATIONS.

02:28PM  5        THE PROBLEM FROM OUR PERSPECTIVE IS THAT IS SCIENTIFIC AND

02:28PM  6    TECHNICAL KNOWLEDGE, AND THEY DON'T HAVE AN EXPERT WHO WILL DO

02:28PM  7    THAT.  DR. ROSENDORFF TALKS ABOUT THE RESULT THAT CAME OUT OF

02:28PM  8    THIS DEVICE, BUT HE NEVER ADDRESSES THE HARDWARE INSERT THAT

02:28PM  9    WAS DESIGNED AND SAYS THAT WAS IMPROPER OR THIS WAS

02:28PM 10    INCONSISTENT.  HE NEVER ADDRESSES THE SOFTWARE PROGRAMMING TO

02:29PM 11    SAY THE SAME.

02:29PM 12        SO I THINK WE'RE LOOKING FOR YOUR HONOR TO NOT ELIMINATE

02:29PM 13    BUT TO CONSTRAIN THE GOVERNMENT'S USE TO THE TESTIMONY IT HAS

02:29PM 14    DISCLOSED, AND CERTAINLY THERE'S NOTHING TO SUGGEST THAT THEY

02:29PM 15    CAN REFER TO THIS AS NONSTANDARD OR WE MAY SEE THEM ARGUE THE

02:29PM 16    IMPLICATION THAT THEY'RE SOMEHOW IMPROPER.

02:29PM 17            THE COURT:  OKAY.  SO, MR. SCHENK, AS I UNDERSTAND

02:29PM 18    IT, THE SIEMENS MACHINE WAS PURCHASED, IT WAS USED, IT HAS OPEN

02:29PM 19    SOURCE TO A CERTAIN POINT, DESIGNED TO ALLOW PURCHASERS,

02:29PM 20    CONSUMERS, CUSTOMERS TO BUY OR MODIFY THE MACHINE AS THEY

02:29PM 21    WANTED TO.  THAT WAS THE SALIENT FEATURES OF THE MACHINE, IT

02:29PM 22    WAS ATTRACTIVE TO VARIOUS LABORATORIES, CLIENTS.

02:29PM 23        AND HERE I THINK IT SOUNDS LIKE THE ARGUMENT IS AT SOME

02:29PM 24    POINT THE J CUP WAS USED OR INSTEAD OF THE T CUP, AND SOFTWARE

02:29PM 25    MODIFICATIONS WERE DONE, AND IT SOUNDS LIKE THE MACHINE WAS

02:30PM 1     DESIGNED TO ALLOW THOSE MODIFICATIONS SUCH THAT THE CONSUMER,

02:30PM 2     WHOEVER PURCHASED IT COULD CREATE THIS FOLK MACHINE FOR THEIR

02:30PM 3     NEEDS.

02:30PM 4          IS THERE SOMETHING UNTOWARD ABOUT THAT THAT YOU WANTED TO

02:30PM 5     RAISE?

02:30PM 6               MR. SCHENK:  YES.  A COUPLE OF THINGS.

02:30PM 7               THE COURT:  OKAY.

02:30PM 8               MR. SCHENK:  FIRST, THE FACT THAT THERANOS USED

02:30PM 9     MODIFIED SIEMENS MACHINES, I DON'T THINK EITHER SIDE IS

02:30PM 10    DISPUTING WILL COME, THAT FACT IS RELEVANT BECAUSE IF THE TSP

02:30PM 11    WORKED AS ADVERTISED, WHY THE NEED TO USE OR TO MODIFY?  THAT'S

02:30PM 12    A QUESTION THAT THE GOVERNMENT IS BARELY ALLOWED TO PRESENT AND

02:30PM 13    ARGUE FROM IN FRONT OF THE JURY.

02:30PM 14         THE QUESTION NOW -- LET ME TURN TO MODIFICATIONS OF THE

02:30PM 15    SIEMENS MACHINES.  AN EMPLOYEE, FORMER EMPLOYEE TOLD THE

02:30PM 16    GOVERNMENT THAT THE ONLY REASON THAT THERANOS WAS ALLOWED TO

02:30PM 17    MAKE THE MODIFICATIONS TO THE SIEMENS MACHINE THAT IT MENTIONED

02:30PM 18    WAS BECAUSE A SIEMENS TECH ACCIDENTALLY LEFT OPEN SOME OF THE

02:31PM 19    SOFTWARE.

02:31PM 20              THE COURT:  WELL, I SAW THAT IN SOME OF YOUR

02:31PM 21    PLEADINGS AND I WONDERED THAT'S WHAT YOU WANT TO GET IN AS FACT

02:31PM 22    EVIDENCE?

02:31PM 23              MR. SCHENK:  YES.

02:31PM 24              THE COURT:  CONTINUE.  I'M SORRY.

02:31PM 25              MR. SCHENK:  OKAY.  IT IS REASONABLE TO ARGUE, AND

UNITED STATES COURT REPORTERS

02:31PM 1    WE NOTICED DR. ROSENDORFF AS AN EXPERT ON SOME OF THE

02:31PM 2    DISADVANTAGES TO THE SPECIFIC MODIFICATIONS THAT THERANOS MADE

02:31PM 3    AND COMBINED THOSE TWO FACTS.

02:31PM 4        DR. ROSENDORFF, WHO WORKED AT THERANOS AND WAS A LAB

02:31PM 5    DIRECTOR SAYING WHEN YOU MAKE THESE KIND OF MODIFICATIONS, YOU

02:31PM 6    RUN INTO PROBLEMS CAUSED BY DILUTION.  IS THE MACHINE GOING TO

02:31PM 7    PICK UP THE CONCENTRATION IN THE SAMPLE IF IT IS DILUTED AS

02:31PM 8    MUCH AS IT IS, IS THE SAMPLE VALUE IS AS SMALL AS IT IS,

02:31PM 9    COMBINE THAT FACT WITH THE FACT THAT THIS MODIFICATION, OR

02:31PM 10   MODIFICATIONS TO THE SIEMENS MACHINE OCCURRED AFTER A BACK DOOR

02:31PM 11   IS LEFT OPEN, IT'S, OF COURSE, REASONABLE FOR THE JURY TO INFER

02:32PM 12   FROM THOSE FACTS THAT THE RISK OF CREATING ACCURATE AND

02:32PM 13   RELIABLE TEST RESULTS INCREASED, THAT THOSE TWO FACTS ARE FACTS

02:32PM 14   TO PUT IN FRONT OF THE JURY AND TO DRAW THOSE INFERENCES FROM.

02:32PM 15          MR. LEMENS:  SURE.  SO I THINK THE INDIVIDUAL THAT

02:32PM 16   THEY'RE REFERENCING ABOUT THE BACK DOOR, THIS BEING SOMEWHAT,

02:32PM 17   AGAIN, AN INFLAMMATORY ACCUSATION HAD NO ROLE WITHIN THE DESIGN

02:32PM 18   OR PROJECT RELATED TO THESE DEVICES.  PERHAPS WE NEED TO DO

02:32PM 19   THAT AT TRIAL.

02:32PM 20       BUT WITH DR. ROSENDORFF THE ISSUE IS HE DOESN'T CONNECT

02:32PM 21   THE SPECIFIC MODIFICATIONS TO THE RESULT THAT HE'S CONCERNED

02:32PM 22   ABOUT, WHICH IS EXCESS DILUTION, RIGHT?  HE TALKS ABOUT EXCESS

02:32PM 23   DILUTION, AND I THINK HIS DISCLOSURE FAIRLY READ SAYS DILUTION

02:33PM 24   ISSUES CAN EXACERBATE THE EFFECT OF DEVICE BIAS.

02:33PM 25       HE DOESN'T SAY THAT THEY DO.  HE DOESN'T SAY THAT THERE'S

64

02:33PM 1       ANY EVIDENCE THAT THERE WAS AN ACCURACY AND RELIABILITY ISSUE

02:33PM 2       WITH RESPECT TO THESE MODIFICATIONS.

02:33PM 3           IT'S UNCLEAR -- I KNOW HE EXPLAINS THE ISSUE BUT WHAT DATA

02:33PM 4       OR METHODOLOGY HE WAS RELYING ON HERE WHEN HE REACHED THIS

02:33PM 5       CONCLUSION.  I DON'T BELIEVE HE LOOKED AT THE TESTING DATA TO

02:33PM 6       SAY THAT I'VE LOOKED AT THE RESULTS OF THESE TESTS, AND I CAN

02:33PM 7       CONCLUDE BASED ON THAT REVIEW THAT THERE WAS AN ACCURACY AND

02:33PM 8       RELIABILITY ISSUE.

02:33PM 9           SO I THINK OUR CONCERN IS THAT YOU'VE GOT A SOMEWHAT

02:33PM 10      ISOLATED OPINION THAT IS NOT ON THE FRONT END CONNECTED TO THE

02:33PM 11      MODIFICATIONS AND IS NOT ON THE BACK END CONNECTED, THERE'S NOT

02:34PM 12      A LINK TO ACCURACY AND RELIABILITY.  IT'S KIND OF A

02:34PM 13      HYPOTHETICAL MAYBE.

02:34PM 14          SO THERE'S A CONCERN THERE THAT THEY'RE DRAWING A PRETTY

02:34PM 15      BIG INFERENCE FROM THOSE TWO PIECES OF EVIDENCE AND WHETHER

02:34PM 16      THEY SHOULD BE ALLOWED TO DO.

02:34PM 17              THE COURT:  OKAY.

02:34PM 18              MR. SCHENK:  YOUR HONOR, THAT LARGELY FEELS LIKE

02:34PM 19      WEIGHT ARGUMENTS TO ME.  THEY OBVIOUSLY ARE GOING TO

02:34PM 20      CROSS-EXAMINE DR. ROSENDORFF ON THOSE TOPICS.

02:34PM 21          THE MOTION SOUGHT, AS I STOOD AND READ IT, WAS TO EXCLUDE

02:34PM 22      THE PHRASE "TAMPER WITH" OR "CONCEAL."  AND I ONLY ENDEAVOR TO

02:34PM 23      PROVIDE THE COURT WITH A BASIS FOR THE GOVERNMENT'S EVIDENCE ON

02:34PM 24      THOSE TWO PHRASES.

02:34PM 25              THE COURT:  OKAY.  ANYTHING FURTHER, MR. LEMENS?

65

02:34PM 1             MR. LEMENS:  I WANT TO CLARIFY.

02:34PM 2         IF THE CONCESSION IS WE'RE NOT GOING TO COMPARE THIS TO

02:34PM 3  THE INDUSTRY, WE'RE NOT GOING TO SAY IT WAS UNCOMMON OR UNUSUAL

02:34PM 4  THAT THEY WERE TAMPERED WITH, THAT THEY WERE CONCEALED OR

02:34PM 5  ALTERED, I DON'T KNOW IF THAT'S WHAT I'M HEARING BUT I THINK

02:34PM 6  THAT WAS THE REASON FOR THE MOTION.

02:34PM 7           THE COURT:  I HEARD HIM SAY "TAMPER."  I DIDN'T HEAR

02:35PM 8  HIM SAY THE OTHER THINGS.

02:35PM 9           MR. SCHENK:  YES, WE DO WANT TO ARGUE TAMPER BUT FOR

02:35PM 10  CLARIFICATION PURPOSES, WE DO NOT PLAN TO ARGUE THAT THE

02:35PM 11  MODIFICATIONS WERE UNETHICAL OR VIOLATED SOME INDUSTRY

02:35PM 12  STANDARD.

02:35PM 13           THE COURT:  IS THAT HELPFUL?

02:35PM 14           MR. LEMENS:  WE'RE BACK TO THE BEGINNING WHICH IS I

02:35PM 15  DON'T THINK THEY JUSTIFY TAMPERING, BUT --

02:35PM 16           THE COURT:  I WAS JUST GOING TO SAY IT'S THE

02:35PM 17  NOMENCLATURE I THINK NOW THAT WE'RE AT WORD "TAMPER."

02:35PM 18         AND I WAS TRYING TO LOOK AT THAT AND SAY, WELL, HOW ELSE

02:35PM 19  CAN WE USE THAT OTHER THAN TAMPER?  AND THERE MIGHT BE OTHER

02:35PM 20  WORDS THAT THE GOVERNMENT CAN USE TO JUSTIFY, MODIFY,

02:35PM 21  REPROGRAMMED AND ALL OF THAT TYPE OF THING.  TAMPERING IS KIND

02:35PM 22  OF PEJORATIVE AND UNTIL AND UNLESS THAT'S BEEN PROVEN.

02:35PM 23         I SUPPOSE YOU CAN ARGUE THAT IN YOUR CLOSING ARGUMENT.

02:35PM 24  THE EVIDENCE AND THE GOVERNMENT'S BELIEF SHOWS THAT IT WASN'T

02:35PM 25  MODIFIED, IT WAS TAMPERED, AND THAT'S HOW YOU SHOULD LOOK AT

66

02:35PM  1    IT, ET CETERA.  SOMETHING LIKE THAT.

02:35PM  2         OKAY.  THANKS VERY MUCH.  THANK YOU.

02:35PM  3              MR. LEMENS:  THANK YOU, YOUR HONOR.

02:36PM  4              THE COURT:  I'D LIKE TO SKIP AROUND, IF WE MAY, FROM

02:36PM  5    THE ORDER.  I HOPE THAT'S -- I'D LIKE TO COVER A COUPLE THAT

02:36PM  6    I'M HOPING MIGHT NOT TAKE TOO MUCH TIME, BUT, OF COURSE,

02:36PM  7    WHATEVER TIME WE NEED WE'LL TAKE FOR IT.

02:36PM  8         IN THAT VEIN, I WONDER IF WE SHOULD TALK ABOUT NUMBER 6,

02:37PM  9    WHICH IS THE GOVERNMENT'S NUMBER 7 TO ADMIT TEXT MESSAGES.

02:37PM 10              MS. SAHARIA:  THAT'S FINE, YOUR HONOR.

02:37PM 11              THE COURT:  MR. LEACH, GOOD AFTERNOON.

02:37PM 12              MR. LEACH:  GOOD AFTERNOON.

02:37PM 13         THIS IS THE GOVERNMENT'S MOTION TO ADMIT EXCERPTS OF

02:37PM 14    CERTAIN SPREADSHEETS OF TEXT MESSAGES FROM THE DEFENDANT.

02:37PM 15         JUST TO GIVE SOME CONTEXT, IN A PARALLEL S.E.C.

02:37PM 16    INVESTIGATION AND IN THE UNDERLYING GRAND JURY INVESTIGATION

02:37PM 17    THE DEFENDANT THROUGH HER COMPANY PRODUCED TWO SPREADSHEETS IN

02:37PM 18    RESPONSE TO SUBPOENAS SEEKING HER COMMUNICATIONS WITH

02:37PM 19    MR. BALWANI AND TEXTS SENT ON PHONES PAID FOR BY THERANOS AND

02:37PM 20    USED BY HOLMES OR BALWANI.

02:37PM 21         HER ATTORNEYS HELD THEM OUT OR HELD ONE OF THEM OUT AS A

02:38PM 22    SPREADSHEET REFLECTING TEXT MESSAGES SENT TO AND FROM

02:38PM 23    MS. HOLMES AND MR. BALWANI AS COLLECTED FROM MS. HOLMES'S

02:38PM 24    COMPANY ISSUED DEVICES.

02:38PM 25         THROUGH OUR MOTION WE'RE SEEKING ADMISSION OF PORTIONS OF

67

02:38PM 1    THOSE SPREADSHEETS FROM SIX PARTICULAR DATES BETWEEN NOVEMBER

02:38PM 2    OF 2013 AND OCTOBER OF 2015.  THESE DATES CORRELATE TO EVENTS

02:38PM 3    LIKE DR. ROSENDORFF'S DEPARTURE FROM THERANOS, WHICH WE HAVE

02:38PM 4    BEEN TALKING A LOT ABOUT, THE CMS INSPECTION, WHICH WE'VE

02:38PM 5    TALKED ABOUT YESTERDAY, AND CERTAIN INTERVIEWS THAT MS. HOLMES

02:38PM 6    HAD WITH PUBLICATIONS.

02:38PM 7        AS I UNDERSTAND IT THERE ARE TWO OBJECTIONS TO THIS

02:38PM 8    EVIDENCE, AUTHENTICITY AND RELEVANCE.

02:38PM 9        WE LAY OUT THE REASONS WHY THESE DOCUMENTS ARE CLEARLY

02:38PM 10   AUTHENTIC IN OUR BRIEF.  I WANT TO HIGHLIGHT JUST ONE POINT,

02:38PM 11   WHICH IS WITH RESPECT TO THE S.E.C. SPREADSHEET, HER ATTORNEYS

02:38PM 12   PRODUCED IT TO THE S.E.C. ON JULY 7TH.  FIVE DAYS LATER WITH

02:39PM 13   SOME OF THOSE SAME ATTORNEYS SITTING NEXT TO HER, THE DEFENDANT

02:39PM 14   SWORE UNDER OATH THAT SHE HAD NO REASON TO DOUBT THOSE WERE

02:39PM 15   WHAT THEY WERE.  SHE WAS ASKED QUESTIONS ABOUT SOME OF THOSE

02:39PM 16   TEXTS AND ANSWERED THOSE QUESTIONS.

02:39PM 17       AND WITH RESPECT TO AUTHENTICITY THE BURDEN HERE IS

02:39PM 18   SLIGHT.  WE DON'T NEED TO PROVE BEYOND A REASONABLE DOUBT THAT

02:39PM 19   THESE SPREADSHEETS ARE AUTHENTIC.  THERE'S ZERO DOUBT THAT THEY

02:39PM 20   ARE WHAT THEY PURPORT TO BE.  IF THE DEFENSE WANTS TO ARGUE

02:39PM 21   THAT, THEY CAN TO THE JURY.

02:39PM 22       OUR BURDEN OF FLIGHT ON AUTHENTICITY IS, IS THERE SOME

02:39PM 23   EVIDENCE TO SUPPORT A FINDING?  AND WE THINK FOR THE REASONS

02:39PM 24   LAID OUT IN OUR BRIEF THERE'S ZERO DOUBT THAT THESE ARE WHAT

02:39PM 25   THEY PURPORT TO BE.

68

02:39PM 1       THE SECOND OBJECTION IS RELEVANCE, AND AGAIN, THIS IS A

02:39PM 2 LOW BURDEN FOR THE GOVERNMENT.  I THINK THE RELEVANCE IS

02:39PM 3 SELF-EVIDENT FROM SOME OF THE STATEMENTS BACK AND FORTH,

02:39PM 4 PARTICULARLY WHEN YOU CORRELATE THEM TO THE TIME.  THESE WERE

02:39PM 5 SIGNIFICANT EVENTS FROM THE COMPANY.  THESE REFLECT THE

02:40PM 6 CONTEMPORANEOUS BACK AND FORTH IN THEIR PRIVATE COMMUNICATIONS.

02:40PM 7 I THINK THE RELEVANCE IS EVIDENT FROM SOME OF THE WORDS USED

02:40PM 8 "OUR LAB IS A DISASTER, WE NEED TO REBUILD," PRAYING DURING THE

02:40PM 9 INSPECTION, AND I THINK THE INFERENCES ARE QUITE OBVIOUS.  I

02:40PM 10 DON'T HAVE ANYTHING FURTHER FROM THE GOVERNMENT UNLESS THE

02:40PM 11 COURT HAS QUESTIONS.

02:40PM 12       THE COURT:  MS. SAHARIA, ARE YOU RISING TO THIS?

02:40PM 13       MS. SAHARIA:  YES.  SO, YOUR HONOR, I HEARD

02:40PM 14 MR. LEACH SAY THAT THE DEFENDANT PRODUCED THESE SPREADSHEETS

02:40PM 15 AND THAT HER ATTORNEYS PRODUCED THEM.

02:40PM 16     I THINK THAT REFLECTS A MISUNDERSTANDING THAT WE SEE

02:40PM 17 ACTUALLY ACROSS A NUMBER OF THE GOVERNMENT MOTIONS THAT WE'RE

02:40PM 18 GOING TO DISCUSS TODAY ABOUT THE ROLE OF COMPANY COUNSEL.  IT'S

02:40PM 19 BLACK LETTER LAW UNDER THE FAMOUS SUPREME COURT CASE UPJOHN

02:40PM 20 THAT WHEN COMPANY COUNSEL REPRESENTS A COMPANY, THEY DO NOT

02:40PM 21 REPRESENT THE EMPLOYEES OF THAT COMPANY.  THAT'S WHY WHEN WE

02:40PM 22 REPRESENT COMPANIES, WE GIVE UPJOHN WARNINGS TO CORPORATE

02:41PM 23 EMPLOYEES.

02:41PM 24     WILMER HALE DID NOT REPRESENT MS. HOLMES.  WILMER HALE WAS

02:41PM 25 THERANOS'S COUNSEL, MONTHS MS. HOLMES'S COUNSEL.  SO THAT'S

UNITED STATES COURT REPORTERS

02:41PM 1      JUST TO CLARIFY THE RECORD.

02:41PM 2             THE COURT:  THANK YOU.  DID MS. HOLMES'S, DID YOUR

02:41PM 3      CLIENT RATIFY OR OTHERWISE ENDORSE THIS TRANSCRIPT, THIS

02:41PM 4      SPREADSHEET RATHER SUCH THAT THE AUTHENTICATION ISSUE IS NOT

02:41PM 5      BEFORE US?

02:41PM 6             MS. SAHARIA:  I DON'T BELIEVE SO.  SHE WAS PRESENTED

02:41PM 7      WITH HUNDREDS OF PAGES OF PRINTOUTS FROM THE SPREADSHEET DURING

02:41PM 8      HER DOING AND SHE SAID SHE HAD NEVER SEEN IT BEFORE.

02:41PM 9             SHE WAS THEN ASKED, DO YOU HAVE ANY REASON TO BELIEVE IT

02:41PM 10     IS NOT A COLLECTION OF TEXT MESSAGES?  AND SHE SAID NO, BUT, OF

02:41PM 11     COURSE, SHE HAD NO TIME TO COMPARE THAT DOCUMENT TO HER PHONE,

02:41PM 12     TO HER COMPUTER TO DETERMINE WHETHER IT WAS IN FACT AUTHENTIC.

02:41PM 13             AGAIN, I DON'T KNOW HOW YOU COULD EXPECT SOMEONE TO DO

02:41PM 14     THAT WITH MULTIPLE HUNDREDS OF PAGES OF SPREADSHEETS SITTING

02:42PM 15     THERE ON THE FLY SO --

02:42PM 16             THE COURT:  WOULD THE GOVERNMENT HAVE TO CALL

02:42PM 17     KATIE MORAN TO TESTIFY AS TO THE AUTHENTICITY?

02:42PM 18             MS. SAHARIA:  I THINK THEY MAY, YOUR HONOR, IF THEY

02:42PM 19     WANT TO PUT THIS INTO EVIDENCE BECAUSE IT'S NOT CLEAR AT ALL

02:42PM 20     HOW THIS WAS COMPILED.

02:42PM 21             KATIE MORAN SAYS AT -- THIS IS GOVERNMENT'S EXHIBIT I

02:42PM 22     WHICH IS 588-10.  SHE CERTIFIED THAT THIS DOCUMENT IS A

02:42PM 23     SPREADSHEET OF TEXT MESSAGES, IMESSAGES, AND SKYPE EXCHANGES

02:42PM 24     PULLED APPARENTLY FROM DIFFERENT DEVICES, DIFFERENT PHONES, A

02:42PM 25     COMPUTER, AND THEN KIND OF MADE INTO SOME HYBRID DOCUMENT OF

02:42PM 1    ALL OF THOSE DIFFERENT SOURCES.

02:42PM 2        WE DON'T KNOW HOW THEY ENSURED THEY COLLECTED ALL OF THEM.

02:42PM 3    WE DON'T KNOW HOW THEY INSURED THAT THEY COLLECTED ALL OF THE

02:42PM 4    ONES BETWEEN MS. HOLMES AND MR. BALWANI, MEANING SOME MIGHT BE

02:42PM 5    MISSING.

02:42PM 6        AND THIS DECLARATION FROM MS. MORAN, ALTHOUGH IT PURPORTS

02:43PM 7    TO BE A DECLARATION CERTIFYING RECORDS OF REGULARLY CONDUCTED

02:43PM 8    BUSINESS ACTIVITY, IT'S CLEARLY NOT A PROPER BUSINESS RECORD

02:43PM 9    CERTIFICATION UNDER RULE 803(6) A BUSINESS RECORD CERTIFICATION

02:43PM 10   MUST ESTABLISH THAT THE BUSINESS RECORD WAS MADE AT OR NEAR

02:43PM 11   THE TIME BY OR FROM INFORMATION TRANSMITTED BY SOMEONE WITH

02:43PM 12   KNOWLEDGE.  THE RECORD WAS KEPT IN THE COURSE OF REGULARLY

02:43PM 13   CONDUCTED ACTIVITY OF A BUSINESS, AND MAKING THE RECORD WAS A

02:43PM 14   REGULAR PRACTICE OF THAT BUSINESS.

02:43PM 15       HER CERTIFICATION ESTABLISHES NONE OF THOSE THINGS.  SHE'S

02:43PM 16   NOT SOMEONE THAT WOULD HAVE KNOWLEDGE OF THOSE BECAUSE SHE WAS

02:43PM 17   NOT A COMPANY EMPLOYEE.  AND WE KNOW THIS PARTICULAR DOCUMENT

02:43PM 18   WAS CREATED FOR LITIGATION THAT WAS, AS I MENTIONED, A

02:43PM 19   COMPILATION OF DIFFERENT THINGS PREPARED FOR THE S.E.C. AND

02:43PM 20   LITIGATION.

02:43PM 21       SO I DON'T THINK IT'S A BUSINESS RECORD.  SO I THINK IF

02:43PM 22   THE GOVERNMENT WANTS TO AUTHENTICATE IT, THEY'RE GOING TO HAVE

02:43PM 23   TO CALL SOMEONE TO ESTABLISH A CHAIN OF CUSTODY SO WE KNOW HOW

02:44PM 24   IT WAS MADE.

02:44PM 25       THAT'S AUTHENTICITY.  AS TO RELEVANCE, THE GOVERNMENT

02:44PM 1 PURPORTS TO BE ASKING IN ITS MOTION FOR A BLANKET RULING

02:44PM 2 ADMITTING THE TEXT MESSAGES THAT THEY IDENTIFY AND ALL SIMILAR

02:44PM 3 TEXT MESSAGES.

02:44PM 4  OF COURSE, WE DON'T DISPUTE THAT SOME COULD BE RELEVANT.

02:44PM 5 SOME MAY NOT BE RELEVANT.  SOME ARE RELEVANT IF THE GOVERNMENT

02:44PM 6 LAYS A FOUNDATION.  SOME DEPEND ON THE COURT'S RULINGS ON THE

02:44PM 7 MOTIONS IN LIMINE.

02:44PM 8  SO WE WOULD SUBMIT THAT IF THE GOVERNMENT CAN'T

02:44PM 9 AUTHENTICATE THOSE AT TRIAL, IT CAN THEN TRY TO LAY THE

02:44PM 10 FOUNDATION FOR THE TEXT MESSAGES THAT ARE RELEVANT, AND WE CAN

02:44PM 11 TAKE THEM UP IN TURN THROUGHOUT TRIAL.

02:44PM 12   THE COURT:  I DON'T THINK MR. LEACH, WHEN IT SAID

02:44PM 13 "ALL SIMILAR," HE WAS ASKING FOR A BLANKET WITHOUT PROPER

02:44PM 14 FOUNDATION.

02:44PM 15  WHAT I READ INTO THAT WAS ALL, BUT HAVE A PROPER

02:44PM 16 FOUNDATION THAT WE CAN PRESENT TO THE COURT.

02:44PM 17  WAS THAT -- WAS I CORRECT IN THAT?

02:44PM 18   MR. LEACH:  THAT'S FAIR, YOUR HONOR.  I THINK THE

02:44PM 19 POINT OF MY LANGUAGE THERE IS THAT WE'RE GOING TO WANT MORE OF

02:45PM 20 THE TEXT MESSAGES IN, BUT I WANTED TO GIVE THE COURT A FLAVOR

02:45PM 21 OF THE RELEVANCE AND THE SIGNIFICANCE OF THESE.

02:45PM 22  IF I COULD JUST RESPOND BRIEFLY TO MY FRIEND.

02:45PM 23   THE COURT:  YES.

02:45PM 24   MR. LEACH:  IT'S NOT ME WHO IS DRAWING THE

02:45PM 25 CONCLUSION.  WILMER HALE WAS REPRESENTING MS. HOLMES.  THIS IS

02:45PM 1    WHAT WILMER HALE SAID ON THE RECORD AT 588-9.  WHEN ASKED WHO

02:45PM 2    HE REPRESENTS, MR. DAVIES, THAT'S SOMEONE FROM WILMER HALE,

02:45PM 3    SAYS I REPRESENT THE COMPANY AND MS. HOLMES AS THE CEO.

02:45PM 4        MS. HOLMES WAS CEO AT THE TIME.  SHE HIRED WILMER HALE.

02:45PM 5    THE IDEA THAT SHE DID NOT RATIFY OR AUTHORIZE THESE PRODUCTIONS

02:45PM 6    TO THE S.E.C. IS, FRANKLY, IN THE GRAND JURY, IS, FRANKLY,

02:45PM 7    PREPOSTEROUS.

02:45PM 8        THESE WERE NOT PREPARED FOR LITIGATION.  THESE WERE

02:45PM 9    PREPARED IN RESPONSE TO SUBPOENAS FROM THE GOVERNMENT.  IT

02:45PM 10    WASN'T AT THE TIME THAT THERE WAS LITIGATION PENDING.  THIS WAS

02:45PM 11    SAYING GIVE US ALL OF THE TEXTS, AND THIS IS WHAT THEY GAVE US.

02:46PM 12    SO THIS WASN'T PREPARED FOR SOME LITIGATION PURPOSE.

02:46PM 13        AND WE'VE TALKED A LOT ABOUT MINI TRIALS.  I DON'T WANT TO

02:46PM 14    HAVE MINI TRIES OVER AUTHENTICATION.  AND PART OF THE REASON

02:46PM 15    FOR THE GOVERNMENT PRESENTING THIS IS WE REALLY WANT TO AVOID

02:46PM 16    WHAT I THINK IS OBVIOUS.  THIS IS WHAT IT PURPORTS TO BE.

02:46PM 17        WE'RE NOT OFFERING THIS AS A BUSINESS RECORD, YOUR HONOR.

02:46PM 18    SO MS. MORAN NOT MEETING ALL OF THE ELEMENTS OF THE BUSINESS

02:46PM 19    RECORDS EXCEPTION AND THE AUTHENTICATION DECLARATION IS NEITHER

02:46PM 20    HERE NOR THERE.  THESE ARE ADMISSIONS BY THE DEFENDANTS.  THESE

02:46PM 21    ARE STATEMENTS BY A COCONSPIRATOR.  SO I DON'T THINK WE NEED TO

02:46PM 22    ANALYZE THIS AS A BUSINESS RECORD OF THERANOS.  AND FOR THOSE

02:46PM 23    REASONS, WE URGE THE COURT TO GRANT THE MOTION.

02:46PM 24        THE COURT:  MS. SAHARIA.

02:46PM 25        MS. SAHARIA:  I WOULD JUST NOTE THAT IF THEY'RE NOT

02:46PM 1   USING THIS DECLARATION AS A BUSINESS RECORDS CERTIFICATION,

02:46PM 2   THEN IT'S HEARSAY JUST LIKE ALL OF THE OTHER LETTERS FROM

02:46PM 3   HEARSAY PURPORTING TO AUTHENTICATE THE TEXT MESSAGES.

02:46PM 4        THE COURT:  I THOUGHT ABOUT THAT.  AND WHAT ABOUT

02:46PM 5   THE COCONSPIRATOR EXCEPTION?  DOES THAT LIE IN HERE AT ALL?  DO

02:47PM 6   THEY COME IN FOR THAT?

02:47PM 7        MS. SAHARIA:  I DON'T THINK THAT HAS ANYTHING TO DO

02:47PM 8   WITH AUTHENTICITY, YOUR HONOR.  THAT POTENTIALLY COULD HAVE TO

02:47PM 9   DO WITH THE ADMISSIBILITY OF THE STATEMENTS FROM MR. BALWANI

02:47PM 10  THAT ARE CONTAINED WITHIN THE TEXT MESSAGES.

02:47PM 11     SO I DO THINK THAT THAT COULD GO TO WHETHER THEY'RE

02:47PM 12  ADMISSIBLE UNDER A HEARSAY EXCEPTION, BUT I DON'T THINK THAT

02:47PM 13  SOLVES THE AUTHENTICITY ISSUE.

02:47PM 14       THE COURT:  OKAY.  ONE THING IS WHEN I LOOKED

02:47PM 15  THROUGH THE SPREADSHEET, I THINK IT MIGHT BENEFIT WHEN WE GET

02:47PM 16  TO THAT POINT AT TRIAL TO -- IF THIS DOES COME IN AND SOME OF

02:47PM 17  THEM DO COME IN, IT MIGHT BENEFIT, AND I'M SURE YOU'LL WORK ON

02:47PM 18  THE FORMAT, THERE'S SOME TYPE OF TIME STAMPING AND I

02:47PM 19  UNDERSTAND -- I DON'T REALLY UNDERSTAND HOW TEXTS WORK, BUT I

02:47PM 20  UNDERSTAND THAT SOMETIMES THEY DON'T TIME STAMP SEQUENTIALLY.

02:47PM 21  THERE'S A BREAK OR SOMETHING.  SO IT MIGHT BENEFIT.

02:47PM 22       MR. LEACH:  WE'RE HAPPY TO WORK WITH THE OTHER SIDE

02:47PM 23  ON THAT, YOUR HONOR.  THANK YOU.

02:47PM 24       THE COURT:  OKAY.  THANK YOU.

02:47PM 25       MS. SAHARIA:  THANK YOU.

02:47PM 1          THE COURT:  GREAT.  THANK YOU.  THIS IS UNDER

02:48PM 2   SUBMISSION.

02:48PM 3      SHALL WE TRY 564 AND SEE WHAT WE CAN DO?  I KNOW WE ARE

02:48PM 4   GETTING CLOSE TO THE TOP OF THE HOUR, AND I WANT TO GIVE PEOPLE

02:48PM 5   A BREAK.  WE'VE BEEN GOING TWO HOURS IN ABOUT TEN MINUTES, BUT

02:48PM 6   MAYBE WE CAN START THIS.

02:48PM 7          MS. SAHARIA:  THAT'S FINE, YOUR HONOR.

02:48PM 8          THE COURT:  MR. LEMENS.

02:48PM 9          MR. LEMENS:  ANDREW LEMENS FOR MS. HOLMES.  THANK

02:48PM 10  YOU, YOUR HONOR.

02:48PM 11     WHAT WE'RE DEALING WITH HERE IS THREE CATEGORIES OF THE

02:48PM 12  GOVERNMENT'S 404(B) NOTICE THAT RELATE TO PRACTICES WITHIN

02:48PM 13  THERANOS'S CLINICAL LABORATORY.

02:48PM 14     FIRST, AND JUST BRIEFLY TO DESCRIBE THE PRACTICES, HOW

02:48PM 15  RESULTS WERE CALCULATED FROM THE TSPU.  SO THIS IS A DEVICE

02:49PM 16  THAT TAKES SIX MEASUREMENTS.  IT THEN -- THOSE MEASUREMENTS

02:49PM 17  WERE THEN RUN THROUGH A SERIES OF STATISTICAL TOOLS OR

02:49PM 18  ALGORITHMS.  THOSE ALGORITHMS WERE DESIGNED BY PEOPLE MUCH

02:49PM 19  SMARTER THAN ME AND PH.D.'S IN THE FIELD.  AND THEN THAT

02:49PM 20  RESULT, A SINGLE RESULT, THAT COULD BE REPORTED TO A PATIENT OR

02:49PM 21  A PHYSICIAN.

02:49PM 22     THAT PRACTICE WAS ENDORSED BY THE FDA IN 2015 WHEN IT

02:49PM 23  APPROVED THERANOS'S DEVICE TO RUN AN HSB1 ASSAY.  THAT

02:49PM 24  INFORMATION WAS PRESENT TO THE FDA IN THE APPLICATION AND THAT

02:49PM 25  IS AT DOCKET 725 AT PAGE 74.  THAT WAS THE BASIS FOR THE

UNITED STATES COURT REPORTERS

02:49PM 1    SUBSEQUENT APPROVAL.

02:49PM 2         THE SECOND PRACTICE WE'RE TALKING ABOUT IS HOW REFERENCE

02:49PM 3    RANGES FOR THERANOS'S TESTS WERE ESTABLISHED.  SO REFERENCE

02:49PM 4    RANGES BEING THE RANGE OF NORMAL RESULTS YOU WOULD EXPECT TO

02:49PM 5    SEE IN A HEALTHY PATIENT.  THAT IS INFORMATION THAT IS PROVIDED

02:50PM 6    AS CONTEXT FOR THE RESULTS WHEN IT WAS RECORDED.

02:50PM 7         THERE'S OBVIOUSLY A PROCESS BY WHICH YOU SET THOSE FOR A

02:50PM 8    PARTICULAR TEST ON A PARTICULAR DEVICE, AND THEN THEY ARE

02:50PM 9    ADJUSTED OVER TIME AS MORE DATA COMES IN FROM THE TESTING

02:50PM 10   PLACE.

02:50PM 11        THE THIRD PRACTICE BEING THE CONTENT OF THE REPORT THAT

02:50PM 12   WAS PROVIDED TO PATIENTS AND PHYSICIANS WITH TEST RESULTS.  I

02:50PM 13   ASSUME ALL OF US AT SOME POINT HAVE RECEIVED ONE OF THESE

02:50PM 14   REPORTS.  THERE'S OBVIOUSLY THE RESULTS FROM THE TESTING.  THE

02:50PM 15   QUESTION THAT I THINK THE GOVERNMENT RAISES IS WHAT ELSE SHOULD

02:50PM 16   HAVE, MUST HAVE, COULD HAVE BEEN INCLUDED?

02:50PM 17        THE GOVERNMENT, I THINK, CONTENDS THAT THESE ARE IMPROPER.

02:50PM 18   OUR SUBMISSION IS THAT THEY ARE CORE SCIENTIFIC TECHNICAL AND A

02:50PM 19   SPECIALIZED KNOWLEDGE.  THAT'S CONTEMPLATED BY RULE 702 AND

02:50PM 20   THAT THEIR DISCLOSURES TO DATE ARE INSUFFICIENT TO PRESENT THIS

02:51PM 21   EVIDENCE AT TRIAL.

02:51PM 22        THERE'S A LACK OF THE INDUSTRY STANDARD OR THE SCIENTIFIC

02:51PM 23   FIELD IN WHICH THESE OF PRACTICES EXIST IN THE DISCLOSURES.

02:51PM 24   HERE WE'RE TALKING AGAIN ABOUT DR. ROSENDORFF'S DISCLOSURES.

02:51PM 25   HE'S THE LABORATORY DIRECTOR.

02:51PM 1       THE GOVERNMENT CONCEDES IT WILL NOT TRY TO COMPARE THE

02:51PM 2    THIRD PRACTICE REGARDING REPORTING TEST RESULTS TO INDUSTRY

02:51PM 3    STANDARDS, AND I THINK THE COURT SHOULD HOLD THE GOVERNMENT TO

02:51PM 4    THAT CONCESSION IN AN ORDER.

02:51PM 5       AND AS TO THE OTHER TWO PRACTICES, YOU DON'T SEE THAT IN

02:51PM 6    THEIR DISCLOSURES TO DATE, BOTH IN DR. ROSENDORFF'S EXPERT

02:51PM 7    DISCLOSURES AND THE STATEMENTS HE HAS OTHERWISE GIVEN TO THE

02:51PM 8    GOVERNMENT.

02:51PM 9       THE SECOND AND I THINK THE BIGGER PROBLEM IS THAT THE

02:51PM 10   GOVERNMENT LACKS SUFFICIENT OPINIONS FOR THE DEFENSE TO TEST

02:51PM 11   THEM OR FOR THE COURT TO TEST THEM AS PART OF ITS GATEKEEPING

02:51PM 12   FUNCTION.

02:51PM 13      TAKE THE FIRST PRACTICE RELATED TO CALCULATING RESULTS ON

02:52PM 14   THE TSPU.  DR. ROSENDORFF, AND THIS IS AT 580-4 WHICH IS

02:52PM 15   DEFENSE EXHIBIT 5 AT PAGE 13, DR. ROSENDORFF'S OPINION IN

02:52PM 16   TOTAL, THIS PROCESS WAS NOT IDEAL BECAUSE IT MAY HAVE TENDED TO

02:52PM 17   INCREASE THE APPEARANCE OF PRECISION BEYOND THE LAB TEST'S TRUE

02:52PM 18   PERFORMANCE.  IT WOULD HAVE BEEN BETTER TO RUN A GIVEN ASSAY

02:52PM 19   ONLY ONCE USING A METHOD WITH MAXIMUM ACCURACY OF PRECISION.

02:52PM 20   THAT'S IT.

02:52PM 21      THERE'S NO METHODOLOGY FOR HOW HE REACHED THIS CONCLUSION,

02:52PM 22   THERE'S NO UNDERSTANDING WHAT DATA HE RELIED ON, AND IT'S AN

02:52PM 23   AFTER-THE-FACT ANALYSIS.

02:52PM 24      WE KNOW THIS COULD NOT HAVE BEEN BASED ON WHAT HE

02:52PM 25   EXPERIENCED AT THERANOS BECAUSE HE APPROVED OF THOSE PRACTICES

02:52PM 1     AT THE TIME WHEN HE WAS THE LABORATORY DIRECTOR.  HE TOLD THE

02:52PM 2     GOVERNMENT HE DIDN'T UNDERSTAND HOW THE ALGORITHM WORKED THAT

02:52PM 3     MADE THE STATISTICAL CALCULATION.

02:52PM 4         SO IT COMES LATER IN HINDSIGHT HIS OPINION CHANGES, BUT WE

02:53PM 5     HAVE NO BASIS TO UNDERSTAND WHAT HE'S RELYING ON THROUGH THIS

02:53PM 6     NEW -- HIS NEW THINKING.  THE DISCLOSURE IS INADEQUATE.

02:53PM 7     THERE'S NO CONNECTION TO WHAT HE DID.  AND THE GOVERNMENT

02:53PM 8     HASN'T -- YOU KNOW, HAS HAD THESE OPINIONS OUT THERE FOR SOME

02:53PM 9     TIME.  IT HAS NOT SUPPLEMENTED THEM.  IT HAS NOT SOUGHT TO

02:53PM 10    SUPPLEMENT THEM.

02:53PM 11        SO IF IT'S GOING TO COME IN AT TRIAL, IF DR. ROSENDORFF IS

02:53PM 12    GOING TO BE ALLOWED TO TESTIFY, WHICH WE DON'T THINK HE SHOULD

02:53PM 13    BE AS TO THESE PRACTICES, I THINK AT THE VERY LEAST WE NEED THE

02:53PM 14    OPPORTUNITY TO TEST THEM.

02:53PM 15        NOW, I NOTE THAT YOUR HONOR HAS SCHEDULED A DAUBERT

02:53PM 16    HEARING FOR DR. MASTER.  PERHAPS THAT'S AN OPPORTUNITY FOR US

02:53PM 17    TO ADDRESS THIS ISSUE AS WELL AND FURTHER FLESH OUT THE OPINION

02:53PM 18    AND -- THE BASIS AND METHODOLOGIES FOR HIS OPINIONS, BUT YOU

02:53PM 19    NEED SOMETHING MORE BEFORE THAT EVIDENCE CAN GO TO THE JURY.

02:54PM 20        THE GOVERNMENT HAS A NUMBER OF RESPONSES TO THIS ISSUE.

02:54PM 21    WE THINK THEY'RE UNAVAILING FOR THE REFERENCE RANGES IT CLAIMS

02:54PM 22    IT'S STILL INVESTIGATING THE ISSUE.  WE'RE PRETTY CLOSE TO

02:54PM 23    TRIAL, AND THIS, AGAIN, HAS BEEN OUT IN THE ETHER FOR SOME

02:54PM 24    TIME.  I THINK THAT RINGS A LITTLE HOLLOW.

02:54PM 25        THE GOVERNMENT TRIES TO CONVERT THESE COMPLEX AND

02:54PM 1    STATISTICAL CONCEPTS INTO WHAT IT CALLS A SIMPLE HYPOTHETICAL

02:54PM 2    ABOUT AN UNDISPUTABLE TRUTH, AND THIS IS AT DOCKET 661 AT

02:54PM 3    PAGE 3 TO 4 OF ITS OPPOSITION.  THAT'S A TWO-PAGE HYPOTHETICAL

02:54PM 4    WITHOUT ANY CITATION TO LITERATURE, SCIENTIFIC REFERENCES,

02:54PM 5    TESTIMONY.  I DON'T KNOW WHERE IT CAME FROM, BUT I HAVE

02:54PM 6    QUESTIONS ABOUT ITS PREMISE AND ABOUT THE ASSUMPTIONS THAT THE

02:54PM 7    GOVERNMENT IS MAKING.

02:54PM 8          AND I DON'T -- I THINK THE HYPOTHETICAL ITSELF

02:54PM 9    DEMONSTRATES THAT THIS IS CORE 702 OPINION TESTIMONY THAT NEEDS

02:55PM 10   AN EXPERT.

02:55PM 11         AND THEN FINALLY, I THINK THE GOVERNMENT SUGGESTS, WELL,

02:55PM 12   DR. ROSENDORFF CAN FILL IN THE GAPS AT TRIAL BASED ON HIS

02:55PM 13   EXPERIENCE.  WE KNOW THAT EXPERIENCE COULDN'T HAVE COME FROM

02:55PM 14   THERANOS BECAUSE HE APPROVED OF THESE PRACTICES AT THE TIME.

02:55PM 15         THE GOVERNMENT CITES THE ADAMS CASE WHICH IS 760 F.3D 1332

02:55PM 16   OUT OF THE ELEVENTH CIRCUIT TO SUGGEST THAT EXPERIENCE ALONE IS

02:55PM 17   ENOUGH.

02:55PM 18         BUT EVEN ON ITS FACTS, ADAMS LOOKED AT -- THE EXPERT AT

02:55PM 19   ISSUE IN ADAMS HAD A METHODOLOGY, A DATA THAT THEY HAD

02:55PM 20   REVIEWED, AND SO I THINK IT'S DISTINGUISHABLE HERE.  AND WE

02:55PM 21   DON'T HAVE THAT FOR DR. ROSENDORFF.

02:55PM 22              THE COURT:  I REFERENCED THIS IN A COUPLE OF OTHER

02:55PM 23   MOTIONS, MR. LEMENS, BUT IS THIS -- COULD THIS COME IN JUST AS

02:55PM 24   FACT EVIDENCE, OBSERVATIONS OF THE LAB DIRECTOR, THIS IS HOW WE

02:55PM 25   DID THINGS AND WHEN WE DID THINGS THIS WAY, THIS IS WHAT YOU

79

02:56PM 1    GET?  THIS IS THE SPREAD, THIS IS THE RESULT.  CAN HE TESTIFY

02:56PM 2    ABOUT THAT WITHOUT MERGING INTO OR CHANGING LANES INTO A 702

02:56PM 3    POSITION?

02:56PM 4          MR. LEMENS:  RIGHT.  AND I THINK THIS IS GOING TO BE

02:56PM 5    AN ISSUE CLEARLY FOR DR. ROSENDORFF WE'LL ADDRESS AT TRIAL, BUT

02:56PM 6    CERTAINLY WE ARE NOT CHALLENGING HIS PERCIPIENT TESTIMONY AT

02:56PM 7    THE TIME.  BUT THESE OPINION AND THIS TESTIMONY THAT THE

02:56PM 8    GOVERNMENT HAS PROFFERED WAS NOT FROM HIS TIME AT THERANOS.  IT

02:56PM 9    COMES AFTER THE FACT.

02:56PM 10         THE COURT:  THE EXPLANATIONS, RIGHT.

02:56PM 11         MR. LEMENS:  WELL, THE SUBSEQUENT, WELL, NOW

02:56PM 12   THINKING IN RETROSPECT I HAVE A DIFFERENT VIEW.  I DON'T THINK

02:56PM 13   THAT COMES IN WITHOUT A SUFFICIENT EXPERT BASIS.

02:56PM 14         IF HE WANTS TO DESCRIBE THE FACT AS HE UNDERSTOOD IT AT

02:56PM 15   THE TIME WHILE AT THE COMPANY, I DON'T THINK WE HAVE, YOU

02:56PM 16   KNOW -- WE, OF COURSE, MAY HAVE OTHER OBJECTIONS, BUT THAT'S

02:56PM 17   NOT THE ISSUE HERE.

02:56PM 18         IT'S THOSE AFTER-THE-FACT OPINIONS OR HIS ATTEMPT TO

02:57PM 19   TAKE HIS -- WITH ONE CAVEAT, THE GOVERNMENT SEEMS TO MAKE HIS

02:57PM 20   EMAILS CONTEMPORANEOUSLY AND MAYBE CONVERT THEM INTO EXPERT

02:57PM 21   TESTIMONY.  AND I THINK YOU NEED A LITTLE BIT MORE FOR HIM TO

02:57PM 22   ADOPT THAT STATEMENT TO SUGGEST, YES, THIS IS THE INDUSTRY

02:57PM 23   STANDARD, THIS IS THE BASIS, IN ORDER FOR US TO LOOK AT AN

02:57PM 24   EMAIL THAT HE SENT SEVERAL YEARS AGO AND ASSUME IT'S AN EXPERT

02:57PM 25   OPINION TODAY.

80

02:57PM 1          THE COURT:  WHO SPEAKS TO THIS?  MR. BOSTIC?

02:57PM 2          MR. BOSTIC:  YES, YOUR HONOR.  GOOD AFTERNOON AGAIN.

02:57PM 3     LET ME TAKE THESE TOPICS OR THESE SUBJECT AREAS ONE AT A

02:57PM 4     TIME IF I MAY.

02:57PM 5     THE GOVERNMENT'S OVERALL POINT HERE IS THAT FOR THE VAST

02:57PM 6     MAJORITY OF THIS, AS THE COURT NOTED, THIS SHOULD BE SIMPLE

02:57PM 7     FACT EVIDENCE.  TO THE EXTENT THAT EXPERT DISCLOSURE IS

02:57PM 8     NECESSARY, THAT DISCLOSURE HAS BEEN MADE, AND IT'S SUFFICIENT.

02:57PM 9     LET ME START WITH THE MULTIPLEXING TEST RESULTS METHOD

02:58PM 10    THAT THERANOS USED.  DR. ROSENDORFF HAS EXPERIENCE AS A LAB

02:58PM 11    DIRECTOR IN MULTIPLE LOCATIONS, HE'S WORKED WITH A VARIETY OF

02:58PM 12    DIFFERENT TYPES OF DEVICES.

02:58PM 13    THE DEVICES HE WORKED WITH AT THERANOS USED A METHOD BY

02:58PM 14    WHICH ASSAYS ARE RUN MULTIPLE TIMES, RESULTS ARE GENERATED ALL

02:58PM 15    IN PARALLEL, AND THEN THE AVERAGE OF THOSE RESULTS ARE TAKEN,

02:58PM 16    AND THEN OUR UNDERSTANDING IS CERTAIN OUTLIERS, RESULTS THAT

02:58PM 17    MIGHT BE FAR AFIELD FROM THE REST, ARE DISCARDED AND NOT

02:58PM 18    INCLUDED IN THE CALCULATION.

02:58PM 19    THE END RESULT OF THIS IS THAT A MACHINE OR AN ANALYZER

02:58PM 20    CAN PRODUCE A WIDESPREAD OF RESULTS FOR ONE TEST, FOR ONE

02:58PM 21    SAMPLE INDICATING A LACK OF CONSISTENCY BUT A LIKELY LACK OF

02:58PM 22    ACCURACY AND A LACK OF RELIABILITY.  IT CAN PRODUCE THOSE

02:58PM 23    VARIETY OF RESULTS BUT OUTPUT ONLY ONE.

02:58PM 24    THE METHOD OF RUNNING EACH ASSAY MULTIPLE TIMES BUT THEN

02:59PM 25    ONLY REPORTING THE AVERAGE RESULT WOULD TEND TO MASK THAT

UNITED STATES COURT REPORTERS

02:59PM 1    INACCURACY IN THE RESULTS.

02:59PM 2        SO THE COURT SHOULD NOTE THAT DR. ROSENDORFF IS NOT

02:59PM 3    ADVANCING ANY CONCLUSION FROM THIS PRACTICE THAT THERE WAS

02:59PM 4    INACCURACY IN THERANOS'S LAB TEST RESULTS.  THAT EVIDENCE IS

02:59PM 5    ELSEWHERE, AND THERE'S AMPLE EVIDENCE OF THE ACCURACY AND

02:59PM 6    RELIABILITY PROBLEMS THAT PLAGUED THERANOS'S TECHNOLOGY AND ITS

02:59PM 7    TESTS.

02:59PM 8        THIS FACT IS SIMPLY ABOUT A MANNER THAT WAS USED TO

02:59PM 9    CONTRIBUTE TO THE MASKING OR THE HIDING OF THE INACCURACY AND

02:59PM 10   THE VARIABILITY IN THERANOS'S TESTS, AND VARIABILITY IS A KEY

02:59PM 11   ISSUE IN THIS CASE.

02:59PM 12       COEFFICIENT OF VARIATION IS A STATISTIC OR A MEASURE OF

02:59PM 13   THE CONSISTENCY OF A LAB TEST RESULTS, AND DEFENDANT HERSELF

02:59PM 14   BOASTED ABOUT THERANOS'S REVOLUTIONARY LOW COEFFICIENT OF

03:00PM 15   VARIATION WHEN SOLICITING INVESTMENTS FROM VICTIMS IN THIS

03:00PM 16   CASE.  IT IS A RELEVANT FACT FOR THE JURY TO KNOW THAT THE

03:00PM 17   METHODS THAT THERANOS USED BY DEFINITION WOULD TEND TO MASK

03:00PM 18   HIGHER VARIABILITY IN THEIR LAB TEST RESULTS.

03:00PM 19       AS FAR AS METHODOLOGY FOR CONCLUDING THAT, THE OPINION

03:00PM 20   REALLY IS AS SIMPLE AS IT SEEMS.  IT DOES REQUIRE HYPOTHETICALS

03:00PM 21   POSSIBLY TO UNDERSTAND IT WELL, BUT IT SIMPLY IS A FACT OF HOW

03:00PM 22   THIS WOULD WORK.  IT DOESN'T REQUIRE DETAILED KNOWLEDGE OF THE

03:00PM 23   PRECISE ALGORITHM OR ANY KIND OF STUDY OF DATA TO BE CONDUCTED.

03:00PM 24   IT'S JUST A FACT THAT DR. ROSENDORFF CAN EXPLAIN THAT USING

03:00PM 25   THIS METHOD WOULD TEND TO CONCEAL VARIABILITY IN THESE LIVE

03:00PM 1    TEST RESULTS.

03:00PM 2         THE FACT THAT HE REACHED THIS OPINION AFTER LEAVING

03:00PM 3    THERANOS, I STRUGGLE TO SEE THE RELEVANCE OF THAT OR WHY THAT

03:00PM 4    IS A HINDRANCE TO ITS ADMISSIBILITY.

03:01PM 5         DR. ROSENDORFF IS WELL POSITIONED TO MAKE THAT CONCLUSION.

03:01PM 6    HE WAS THERE AT THERANOS WORKING WITH THESE ANALYZERS, AND SO

03:01PM 7    HE'S CERTAINLY QUALIFIED TO UNDERSTAND HOW THEY WORKED.

03:01PM 8         HIS GENERAL LAB DIRECTOR EXPERIENCE GIVES HIM A BASIS ON

03:01PM 9    WHICH TO OPINE ABOUT HOW THEY RELATED TO OTHER CONVENTIONAL

03:01PM 10   MACHINES AND THE FACT THAT HE NOW BELIEVES THAT THERANOS'S

03:01PM 11   APPROACH WAS, AS HE SAYS NOT IDEAL, THAT IT CREATED THIS RISK

03:01PM 12   OF HIDING INCONSISTENCY, THAT OPINION IS ADMISSIBLE BECAUSE

03:01PM 13   IT'S THE OPINION THAT HE HOLDS TODAY.  IT'S HIS CURRENT VIEW.

03:01PM 14   THERE'S NO REASON THAT HE SHOULD BE DISQUALIFIED FROM GIVING

03:01PM 15   THAT OPINION BECAUSE HE'S ONLY SAID IT RECENTLY.

03:01PM 16        THERE'S ALSO EVIDENCE THAT WHEN DR. ROSENDORFF WAS LAB

03:01PM 17   DIRECTOR AT THERANOS, HIS VIEWS WERE FREQUENTLY OVERRULED OR

03:01PM 18   OVERRIDDEN BY DEFENDANT AND MR. BALWANI IN PARTICULAR.

03:02PM 19        SO IT'S PROBLEMATIC FOR THE DEFENSE TO SAY THAT THE JURY

03:02PM 20   SHOULD NOT HEAR ANY CRITICISM OF THERANOS'S METHODS FROM

03:02PM 21   DR. ROSENDORFF BECAUSE HE APPROVED THEM AT THE TIME.

03:02PM 22        WELL, WHEN HE WAS THERE, HE RAISED CONCERNS, HE WAS SHOT

03:02PM 23   DOWN, AND EVENTUALLY HE WAS FORCED TO LEAVE THE COMPANY, AND AS

03:02PM 24   A RESULT IT'S NOT SURPRISING AT ALL THAT HE NOW, NOT IN

03:02PM 25   RETROSPECT BUT IN LIGHT OF HIS VIEWS AT THE TIME, HE WOULD HAVE

03:02PM 1    PROBLEMS WITH SEVERAL OF THERANOS'S APPROACHES.

03:02PM 2        SO UNLESS THE COURT HAS CONCERNS ABOUT THE FIRST TOPIC,

03:02PM 3    I'LL MOVE TO THE NEXT.

03:02PM 4            THE COURT:  NO.

03:02PM 5            MR. BOSTIC:  AS TO THE SECOND TOPIC REGARDING

03:02PM 6    REFERENCE RANGES, I SHOULD START BY JUST CLARIFYING WHAT THE

03:02PM 7    GOVERNMENT PRESENTLY INTENDS TO OFFER ON THAT TOPIC.

03:02PM 8        HERE REFERENCE RANGES ARE A RANGE OF NORMAL VALUES

03:02PM 9    ASSOCIATED WITH A PARTICULAR ASSAY.  SO WHEN A PATIENT RECEIVES

03:03PM 10   A RESULT, THE LAB ALSO WILL FIND A REFERENCE RANGE SO THAT THE

03:03PM 11   PATIENT CAN DETERMINE WHETHER THAT RESULT IS IN THE NORMAL

03:03PM 12   RANGE OR NOT.

03:03PM 13       AT TRIAL THERE WILL BE SUBSTANTIAL EVIDENCE ABOUT THE

03:03PM 14   EQUIVALENCE OR REALLY LACK OF EQUIVALENCE BETWEEN BLOOD SAMPLES

03:03PM 15   DRAWN FROM THE VEIN AND BLOOD SAMPLES TAKER FROM A FINGERSTICK.

03:03PM 16       THERE WAS AN ACTIVE AND ONGOING DISPUTE BETWEEN

03:03PM 17   DR. ROSENDORFF AND THE DEFENDANTS IN THIS CASE ABOUT WHETHER

03:03PM 18   THOSE TWO TYPES OF SAMPLES COULD BE TREATED EQUIVALENTLY, AND

03:03PM 19   THE COURT WILL HEAR THAT TESTIMONY, AND THE JURY WILL HEAR THAT

03:03PM 20   TESTIMONY.

03:03PM 21       IN PARTICULAR, DR. ROSENDORFF IS EXPECTED TO TESTIFY THAT

03:03PM 22   HE WOULD HAVE PREFERRED TO HAVE SEPARATE REFERENCE RANGES FOR

03:03PM 23   FINGERSTICK SAMPLES VERSUS VEIN DRAW SAMPLES.  AND HE CAN

03:03PM 24   EXPLAIN AND HAS EXPLAINED THE DIFFERENCES BETWEEN THOSE TWO

03:03PM 25   SAMPLES AND WHY THAT IS NECESSARY, WHY THE SAME REFERENCE RANGE

03:03PM 1    CANNOT BE USED FOR SAMPLES DRAWN FROM THOSE TWO DIFFERENT

03:03PM 2    METHODS.

03:03PM 3         THE DEFENDANTS DISAGREED, AND THE INFERENCE THAT THE JURY

03:04PM 4    CAN DRAW FROM THAT IS THAT THE DEFENDANTS WERE MORE CONCERNED

03:04PM 5    WITH CONCEALING THE USE AND RELIANCE ON THIRD PARTY DEVICES,

03:04PM 6    CONCEALING THEIR RELIANCE ON VEIN DRAWS, BUT THEY WERE MORE

03:04PM 7    CONCERNED WITH THAT THAN THEY WERE WITH PROVIDING PATIENTS AND

03:04PM 8    DOCTORS WITH THE INFORMATION THAT THEY NEEDED TO RELY ON THE

03:04PM 9    TEST RESULTS THAT THERANOS WAS PROVIDING.  SO THAT'S WHY THAT

03:04PM 10   IS RELEVANT.

03:04PM 11        IN ADDITION, IT'S SIMPLY FACT TESTIMONY IF DR. ROSENDORFF

03:04PM 12   TESTIFIES THAT HE FELT RUSHED LEADING UP TO THE LAUNCH, IF HE

03:04PM 13   FELT THERE WAS TIME PRESSURE ON HIM TO MOVE FORWARD WITHOUT

03:04PM 14   PUTTING AS MUCH WORK INTO THE REFERENCE RANGES AS HE WOULD HAVE

03:04PM 15   WANTED.  THAT HAS, I BELIEVE, BEEN DISCLOSED AS AN OPINION, OR

03:04PM 16   IF NOT, IT'S IN HIS MEMORANDA OF INTERVIEWS.  BUT THAT'S SIMPLY

03:04PM 17   FACT EVIDENCE.  IT'S NOT OPINION.  IT DOESN'T RELATE TO

03:04PM 18   INDUSTRY STANDARDS.  IT ALL GOES TO DEFENDANT'S INTENT AND HOW

03:05PM 19   DEFENDANTS PRIORITIZED THE ACCURACY OF THE TESTS VERSUS THE

03:05PM 20   REPUTATION OF THE COMPANY, WHICH IS A KEY ISSUE IN THIS CASE.

03:05PM 21        MOVING ON TO THE THIRD ISSUE.  WHEN IT COMES TO THE

03:05PM 22   INFORMATION THAT THERANOS COULD HAVE BUT DID NOT PROVIDE TO ITS

03:05PM 23   PATIENTS, THIS IS SIMPLE FACT EVIDENCE ABOUT INTENT, ABOUT

03:05PM 24   SCHEME TO DEFRAUD.  THIS HAS NOTHING TO DO, AGAIN, WITH

03:05PM 25   INDUSTRY STANDARDS OR CLIA COME COMPLIANCE.  THERE WILL BE

85

03:05PM 1    EVIDENCE IN A VARIETY OF FORMS THAT SHOWS THAT WHEN THERANOS

03:05PM 2    ENCOUNTERED PROBLEMS WITH ITS TESTS ESPECIALLY, IT TOOK GREAT

03:05PM 3    CARE IN CONCEALING SOME OF THE DETAIL SO THOSE PROBLEMS FROM

03:05PM 4    ITS CUSTOMERS.

03:05PM 5         THE EXAMPLES IN THE GOVERNMENT'S BRIEF AT DOCUMENT 661 ON

03:05PM 6    THE DOCKET MAKE IT CLEAR THAT AT VARIOUS INSTANCES THERANOS

03:06PM 7    COULD HAVE PROVIDED PATIENTS WITH INFORMATION THAT WOULD HAVE

03:06PM 8    BEEN BENEFICIAL FOR PATIENTS TO HAVE ABOUT WHY A RESULT MIGHT

03:06PM 9    DIFFER FROM ANOTHER RESULT, OR WHY A TEST MIGHT NOT BE

03:06PM 10   AVAILABLE, WHY A RESULT WAS VOIDED.

03:06PM 11        THERANOS WITHHELD THAT INFORMATION.  AND IT'S FAIR FOR THE

03:06PM 12   JURY TO INFER THAT THAT WAS IN FURTHERANCE OF THE FRAUD BECAUSE

03:06PM 13   HAD THAT INFORMATION BEEN DISCLOSED, HAD THOSE PATIENTS BEEN

03:06PM 14   TOLD THAT THERANOS WAS RUNNING THE SAME TESTS, FOR EXAMPLE, ON

03:06PM 15   MULTIPLE DIFFERENT TYPES OF DEVICES, THERANOS'S RELIANCE ON

03:06PM 16   THIRD PARTY DEVICES WOULD HAVE COME OUT.  AND THAT WAS A SECRET

03:06PM 17   THAT THERANOS WAS ACTIVELY WORKING TO PROTECT SO THAT PEOPLE

03:06PM 18   WOULD CONTINUE TO HAVE THE IMPRESSION THAT THERANOS HAD ONE

03:06PM 19   ANALYZER THAT COULD PERFORM ALL OF THE TESTS ON ITS MENU.

03:06PM 20        SO WHEN THERANOS MADE THE DECISION -- AND AGAIN, THESE

03:06PM 21   DECISIONS IN SEVERAL CASES CAN BE TRACED UP TO THE DEFENDANTS

03:06PM 22   IN THIS CASE.  WHEN THERANOS MADE THESE DECISIONS, OR WHEN

03:06PM 23   DEFENDANTS MADE THESE DECISIONS, IT WAS WITH THE INTENT TO

03:06PM 24   FURTHER THE FRAUD, TO CONCEAL THE TRUTH, AND THAT COMES IN AS

03:07PM 25   SIMPLE FACT EVIDENCE WITHOUT THE NEED FOR AN EXPERT OPINION.

UNITED STATES COURT REPORTERS

03:07PM 1          THE COURT:  ALL RIGHT.  MR. LEMENS.

03:07PM 2          MR. LEMENS:  YOUR HONOR, I'LL BE BRIEF KNOWING THAT

03:07PM 3   I'M THE ONLY THING STANDING BETWEEN ME AND A BREAK.

03:07PM 4          SO ON THE FIRST ISSUE, DR. ROSENDORFF'S OPINION HAS

03:07PM 5   CHANGED BETWEEN THE TIME HE WAS AT THE COMPANY AND THE TIME HE

03:07PM 6   LEFT, AND I THINK WE'RE ENTITLED TO UNDERSTAND THE BASIS AND

03:07PM 7   THE METHODOLOGY FOR THIS -- NEW BELIEFS AND NEW OPINION.

03:07PM 8          ON THE REFERENCE RANGES, WHAT HE UNDERSTOOD AT THE TIME,

03:07PM 9   PERCIPIENT KNOWLEDGE, CERTAINLY I THINK YOU AND I DISCUSSED,

03:07PM 10   AND THERE MAY BE OTHER OBJECTIONS BUT THAT'S NOT THE ISSUE, BUT

03:07PM 11   IF YOU TRY TO CLOAK THAT IN THE GUISE OF EXPERT TESTIMONY OR IF

03:07PM 12   HE OFFERS AN OPINION ABOUT -- WHAT HE DOES NOT OFFER AN OPINION

03:07PM 13   SO FAR AS I'M AWARE AS WHAT IMPACT THAT COULD HAVE HAD ON THE

03:07PM 14   ACCURACY AND THE RELIABILITY OF THE TECHNOLOGY OR HOW IT

03:08PM 15   RELATES TO THE ACCURACY AND RELIABILITY OF THE TECHNOLOGY.  IF

03:08PM 16   HE'S GOING TO GO TO THAT FAR, THEN AGAIN, WE NEED A BASIS AND

03:08PM 17   METHODOLOGY UNDER 702.

03:08PM 18          AND ON THE THIRD ISSUE, MR. BOSTIC SAID THAT THIS EVIDENCE

03:08PM 19   COMES IN BECAUSE IT SHOWS WHAT COULD HAVE BEEN BENEFICIAL TO

03:08PM 20   PATIENTS OR PHYSICIANS.  THAT IS SPECIALIZED TECHNICAL

03:08PM 21   KNOWLEDGE WITHIN A VERY PARTICULAR FIELD.

03:08PM 22          IT'S UNCLEAR HOW THAT CONNECTS TO ACCURACY AND RELIABILITY

03:08PM 23   ISSUES WITH THE TECHNOLOGY, BUT EVEN WHAT SHOULD HAVE BEEN

03:08PM 24   INCLUDED OR MUST HAVE BEEN INCLUDED, FOR THE JURY TO HEAR THAT,

03:08PM 25   I THINK THEY NEED THE CONTEXT OF WHAT SOMEONE IN THAT INDUSTRY

| | |
|---|---|
| 03:08PM | 1 |

03:08PM 1    OR SOMEONE IN THAT FIELD WOULD HAVE EXPECTED.

03:08PM 2        I DON'T THINK IT'S -- I THINK YOU START TO GET INTO 403

03:08PM 3    ISSUES IF THE GOVERNMENT IS SIMPLY GOING TO PUT FORWARD AND

03:08PM 4    SAY, WELL, COULD HE HAVE INCLUDED THAT?  OH, AND HE DIDN'T.

03:08PM 5    OKAY.  AND THEN DRAW AN IMPROPER INFERENCE.

03:08PM 6        IF THERE'S GOING TO BE A DISCUSSION OF WHAT SHOULD HAVE

03:08PM 7    BEEN INCLUDED IN THESE TEST REPORTS, IT SHOULD BE WITH A

03:08PM 8    COMPARATOR TO WHAT IS NORMALLY INCLUDED WITHIN THAT PARTICULAR

03:09PM 9    FIELD.

03:09PM 10           THE COURT:  WELL, MR. BOSTIC, ARE YOU SUGGESTING

03:09PM 11   THAT THE EVIDENCE WILL BE THAT THERANOS WILLFULLY WITHHELD

03:09PM 12   TESTING INFORMATION?

03:09PM 13           MR. BOSTIC:  YES, YOUR HONOR.

03:09PM 14       SO THIS ISN'T ABOUT WHAT COULD BE CHARACTERIZED AS A

03:09PM 15   NEGLIGENT OR WELL MEANING FAILURE TO INCLUDE ADDITIONAL DETAIL.

03:09PM 16       THIS IS ABOUT ACTIVELY WITHHOLDING INFORMATION FROM

03:09PM 17   PATIENTS AND DOCTORS WITH THE GOAL OF CONCEALING THE EXISTENCE

03:09PM 18   OF THE FRAUD.

03:09PM 19           MR. LEMENS:  WELL, IN A WORLD WHERE YOU'RE WORKING

03:09PM 20   IN A VERY SPECIALIZED FIELD, DO WE -- ARE WE REQUIRED TO REPORT

03:09PM 21   THIS, RIGHT?  IS THIS SOMETHING THAT SHOULD BE SHARED?

03:09PM 22       THE COMPANY IS CERTAINLY ENTITLED TO MAKE A DECISION, AND

03:09PM 23   THERE COULD BE INNOCENT EXPLANATIONS.  NO, WE DON'T WANT TO

03:09PM 24   CLUTTER UP OUR REPORTS.  WE WANT THESE TO BE SIMPLE AND

03:09PM 25   STRAIGHTFORWARD.  WE DON'T THINK THAT'S NECESSARY.  THERE NEEDS

88

03:09PM  1    TO BE SOME SORT OF EXPLANATION TO THE JURY TO PUT THIS IN

03:09PM  2    CONTEXT.

03:09PM  3            MR. BOSTIC:  IF I MAY PROVIDE AN EXAMPLE,

03:10PM  4    YOUR HONOR.

03:10PM  5        SO THIS IS IN THE GOVERNMENT'S BRIEF SO I WON'T BELABOR

03:10PM  6    THE POINT, BUT WHEN THERANOS WAS OFFERING HCG TESTS DESIGNED TO

03:10PM  7    PRIMARILY DETECT WHETHER A PATIENT IS PREGNANT OR NOT AND THE

03:10PM  8    HEALTH AND PROGRESS OF THE PREGNANCY, THERANOS ENCOUNTERED

03:10PM  9    REPEATED PROBLEMS WITH THE ACCURACY OF ITS HCG TESTS.

03:10PM 10        RATHER THAN TELL DOCTORS AND PATIENTS THAT IT WAS

03:10PM 11    EXPERIENCING PROBLEMS WITH THOSE TESTS, WHICH WOULD ALLOW

03:10PM 12    DOCTORS AND PATIENTS TO REEVALUATE RESULTS THAT THEY HAD GOTTEN

03:10PM 13    BEFORE, GO ELSEWHERE IF THEY NEEDED TESTING IN THE SHORT TERM,

03:10PM 14    THERANOS INSTEAD TOLD DOCTORS AND PATIENTS THAT THIS WAS A

03:10PM 15    TEMPORARY, QUOTE, "ROUTINE QUALITY CHECK RELATED TO THERANOS'S

03:10PM 16    EXPANDING PATIENT POPULATION."

03:10PM 17        SO THE JURY SHOULD KNOW ABOUT THAT BECAUSE THE JURY CAN

03:10PM 18    INFER FROM THAT, THAT THERANOS WAS WORKING ACTIVELY TO CONCEAL

03:10PM 19    THE PROBLEMS WITH ITS TESTS.

03:10PM 20        NOW, THIS ISN'T ABOUT WHETHER INDUSTRY STANDARD WOULD

03:10PM 21    REQUIRE THERANOS TO DISCLOSE THAT INFORMATION, AND IT'S NOT

03:11PM 22    LIKE THERE'S A REGULATION SOMEWHERE ON THE BOOK THAT REQUIRES

03:11PM 23    THAT.  THAT'S WHY THERE ISN'T THE TERRITORY OF EXPERT

03:11PM 24    TESTIMONY.  THIS ISN'T A REGULATORY ACTION.  THIS IS ABOUT THE

03:11PM 25    INTENT OF THE DEFENDANTS AND THEIR COCONSPIRATORS IN DECIDING

03:11PM 1    TO WITHHOLD THAT INFORMATION FROM PEOPLE WHO TURNED OUT TO BE

03:11PM 2    THE VICTIMS IN THIS CASE.

03:11PM 3            THE COURT:  SO, MR. LEMENS, THAT'S WHAT I WAS

03:11PM 4    REFERENCING BEFORE, THE FACT THAT THE CONDUCT THAT ACTUALLY WAS

03:11PM 5    TAKEN, AND, THAT IS, A DIFFERENT EXPLANATION WAS OFFERED I

03:11PM 6    SUPPOSE.

03:11PM 7            MR. LEMENS:  SURE.  I THINK IF THERE'S AN ALLEGATION

03:11PM 8    OF SOMETHING INCONSISTENT OR WITH THIS PARTICULAR EXAMPLE.

03:11PM 9        WHAT I DON'T HEAR IS THAT THEY WERE REQUIRED TO OR SHOULD

03:11PM 10   HAVE OR PUT ANY GUISE OF -- THAT THEY DID SOMETHING WRONG

03:11PM 11   COMPARED TO THE INDUSTRY, AND THAT'S I THINK WHERE OUR CONCERN

03:11PM 12   IS, IS THAT THEY'RE ASSUMING THAT YOU SHOULD HAVE DONE THIS BUT

03:11PM 13   YOU DIDN'T.

03:11PM 14       AND WHENEVER -- IF YOU'RE DEFINING WHAT AN IDEAL LAB

03:11PM 15   REPORT LOOKS LIKE OR WHAT INFORMATION SHOULD BE INCLUDED IN

03:11PM 16   THAT REPORT, THAT'S, I THINK, WHERE WE RUN INTO THIS ISSUE, AND

03:12PM 17   I THINK IT'S SOMETHING THAT WE'RE GOING TO NEED TO OR HOPEFULLY

03:12PM 18   YOUR HONOR WILL POLICE CAREFULLY AS WE PROCEED THROUGH THE

03:12PM 19   TRIAL GIVEN THE EXPERT ISSUES OF THE PREJUDICE.

03:12PM 20           THE COURT:  I THINK I CAPTURE YOUR POSITION.  THANK

03:12PM 21   YOU.

03:12PM 22           MR. BOSTIC:  YOUR HONOR, VERY BRIEFLY.

03:12PM 23       THIS IS NOT JUST ABOUT THE CONTENT OF THE LAB REPORTS.

03:12PM 24   THIS IS ALSO ABOUT THE COMMUNICATIONS BETWEEN THERANOS STAFF

03:12PM 25   AND DOCTORS AND PATIENTS AFTER THE FACT.

90

03:12PM 1          THE COURT:  OKAY.  ALL RIGHT.

03:12PM 2              WELL, LET'S TAKE OUR AFTERNOON BREAK NOW.  I THINK IT'S

03:12PM 3      TIME FOR THAT.  AND I KNOW I SAID 4:00 O'CLOCK.  I THOUGHT WE

03:12PM 4      WOULD RESUME MAYBE AT THE BOTTOM OF THE HOUR AND SEE WHAT WE

03:12PM 5      CAN DO.

03:12PM 6          I'M HOPEFUL THAT WE CAN GET THROUGH EVERYTHING THIS

03:12PM 7      AFTERNOON SUCH THAT WE DON'T HAVE TO CARRY OVER UNTIL TOMORROW.

03:12PM 8          DO WE THINK WE COULD DO THAT?

03:12PM 9              MS. SAHARIA:  I AM SORRY, YOUR HONOR.  DID YOU SAY

03:12PM 10     WE WOULD START AT 4:00 O'CLOCK?

03:12PM 11             THE COURT:  NO.  I SAID WE WOULD START AT THE BOTTOM

03:12PM 12     OF THE HOUR.  IS THAT 3:30?

03:12PM 13             MS. SAHARIA:  YEAH, FINE.  THAT'S FINE, YOUR HONOR.

03:12PM 14             THE COURT:  OKAY.

03:13PM 15         (RECESS FROM 3:13 P.M. UNTIL 3:36 P.M.)

03:36PM 16             THE COURT:  THANK YOU.  WE'RE BACK ON THE RECORD.

03:36PM 17     ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

03:36PM 18         WE'LL CONTINUE OUR DISCUSSION ON THE MOTIONS IN LIMINE.

03:37PM 19     LET'S TURN TO DOCKET 588.  THIS IS MS. HOLMES'S MOTION TO

03:37PM 20     EXCLUDE CERTAIN NEWS ARTICLES.

03:37PM 21             MR. LOOBY:  GOOD AFTERNOON, YOUR HONOR.

03:37PM 22         SO I'LL BE ADDRESSING THIS MOTION.  THIS MOTION CONCERNS

03:37PM 23     ABOUT 50 OR SO ARTICLES ON THE GOVERNMENT'S EXHIBIT LIST.

03:37PM 24             THE COURT:  OKAY.  LET ME GIVE YOU SOME CREDIT HERE.

03:37PM 25     THIS IS PATRICK LOOBY APPEARING FOR MS. HOLMES.

03:37PM 1           MR. LOOBY:  YES.  SO THESE ARE 50 OR SO EXHIBITS OF

03:37PM 2   NEWS ARTICLES ON THE GOVERNMENT'S EXHIBIT LIST WHOSE AUTHORS

03:37PM 3   ARE NOT EXPECTED TO TESTIFY AT TRIAL BECAUSE THEY HAVE NOT BEEN

03:37PM 4   DISCLOSED BY THE GOVERNMENT ON ITS WITNESS LIST.

03:37PM 5      AND I SHOULD NOTE AT THE OUTSET THAT THE TWO ARTICLES ON

03:38PM 6   THE GOVERNMENT'S WITNESS LISTS BY THE TWO JOURNALISTS WHO HAVE

03:38PM 7   BEEN DISCLOSED, MR. ROGER PARLOFF AND ERIC TOPEL.  THIS ONE

03:38PM 8   RESERVES THE RIGHT TO OBJECT TO THE INTRODUCTION OF THOSE

03:38PM 9   ARTICLES AT TRIAL BECAUSE THEY ALSO POSE RULE 403 AND SOMETIMES

03:38PM 10   DOUBLE HEARSAY PROBLEMS.

03:38PM 11      BUT THE REASON WE SET OUT THIS MOTION IN THIS WAY PRETRIAL

03:38PM 12   IS BECAUSE AS THE CASES TEACH IN THE LAREZ VERSUS LOS ANGELES

03:38PM 13   CASE OUT OF THE NINTH CIRCUIT TEACHES WHEN THE AUTHOR OF THE

03:38PM 14   NEWS ARTICLE IS NOT PRESENT TO TESTIFY AT TRIAL, THERE IS A

03:38PM 15   THRESHOLD HEARSAY PROBLEM WITH THE INTRODUCTION OF ANY

03:38PM 16   STATEMENTS CONTAINED WITHIN THE ARTICLE, ALONG THE LINES OF A

03:38PM 17   REPRESENTATION FROM THE AUTHOR THAT THE SOURCE THAT IS QUOTED

03:38PM 18   ACTUALLY SAID WHAT THEY SAID.

03:38PM 19      SO ALL OF THE ARTICLES THAT WE'VE MOVED TO EXCLUDE SUFFER

03:38PM 20   FROM THAT SAME FATAL FLAW, AND WE SUBMIT THAT THE MOTION IS

03:39PM 21   RIPE FOR A PRETRIAL RULING THERE.

03:39PM 22      NOW, THE GOVERNMENT AGREES THAT IT CANNOT OFFER THESE

03:39PM 23   ARTICLES FOR THE TRUTH OF THE MATTER ASSERTED WITHIN THEM.

03:39PM 24      IT HAS OFFERED A SERIES OF NONHEARSAY THEORIES, BUT NONE

03:39PM 25   OF THESE SAVE THE EVIDENCE.  I THINK THEY KIND OF CONFUSE THE

92

03:39PM 1      ISSUES A LITTLE BIT MATTER THAN THEY ILLUMINATE.

03:39PM 2          I'LL JUST TOUCH BRIEFLY UPON THEM, AND THEN I CAN

03:39PM 3      ENTERTAIN ANY QUESTIONS THAT YOUR HONOR HAS ABOUT THE HEARSAY

03:39PM 4      ISSUES.

03:39PM 5          AND THEN I WANT TO SPEAK BRIEFLY ABOUT SOME OF THE 403

03:39PM 6      ISSUES THAT THESE ARTICLES POSE FOR THE TRIAL AS WELL.

03:39PM 7          THE FIRST THEORY THAT THE GOVERNMENT POSITS IS WHAT

03:39PM 8      THEY'RE CALLING KIND OF LIKE A BACKGROUND INFORMATION ABOUT THE

03:39PM 9      COMPANY THEORY.  AND THE WAY I READ THE GOVERNMENT'S POSITION

03:39PM 10     IS THAT THIS IS SOMETHING AKIN TO A FRAUD ON THE MARKET THEORY.

03:39PM 11     IN FACT, THEY'RE CITING CASES THAT APPLY THE 10(B) CIVIL FRAUD

03:39PM 12     ENFORCEMENT STANDARD IN THE UNITED STATES SUPREME COURT

03:40PM 13     STANDARD FROM THE <u>BASIC</u> CASE.  THAT KIND OF PRESUMES THAT ALL

03:40PM 14     INFORMATION IS PERFECTLY DISTRIBUTED IN A MARKET IN THE CIVIL

03:40PM 15     CONTEXT.

03:40PM 16         AND I TAKE THIS TO MEAN IN THIS CASE THAT THE GOVERNMENT

03:40PM 17     BELIEVES IT CAN OFFER ANY NEWS ARTICLE ABOUT THERANOS EVEN IF

03:40PM 18     IT DOES NOT IDENTIFY ANY ALLEGED FALSEHOOD IN THE ARTICLE, EVEN

03:40PM 19     IF IT DOES NOT CONNECT ANY ALLEGED FALSEHOOD TO MS. HOLMES, AND

03:40PM 20     EVEN IF IT DOESN'T CONNECT A SINGLE INVESTOR OR PATIENT WHO

03:40PM 21     WILL COME IN AND SAY, YEAH, I READ THIS AT THE TIME ABOUT

03:40PM 22     THERANOS AND IT INFLUENCED ME IN SOME WAY.

03:40PM 23         THE GOVERNMENT HAS CITED NO CASES TO SUPPORT THE

03:40PM 24     IMPOSITION OF THIS IDEA OF THE KIND OF BACKGROUND INFORMATION

03:40PM 25     ABOUT THE COMPANY INTO THE CRIMINAL CONTEXT.

UNITED STATES COURT REPORTERS

03:40PM 1      AND ITS RELIANCE ON JUDICIAL NOTICE CASES, I SUBMIT, SHOWS

03:40PM 2    THAT IT'S KIND OF REACHING ON THIS NONHEARSAY THEORY.  THOSE

03:40PM 3    CASES HAVE NOTHING TO DO WITH THE EVIDENCE AT ISSUE HERE SO

03:41PM 4    THAT'S THE HELIOTROPE CASE AND THE VON SAHER VERSUS NORTON

03:41PM 5    SIMON MUSEUM OF ART CASE.

03:41PM 6      NOTABLY, BOTH THE COURTS IN BOTH OF THOSE DECISIONS THEY

03:41PM 7    NOTICED -- THEY WERE BOTH ARRIVED AT FOR MOTION FOR JUDGMENT ON

03:41PM 8    THE PLEADINGS IN A CIVIL MATTER OR A SIMILAR SUMMARY

03:41PM 9    ADJUDICATION.  AND THE COURTS BOTH NOTICED THAT THEY WERE

03:41PM 10   CONSTRAINED TO TAKE NOTICE OF FACTS UNDER RULE 201(B) OF THE

03:41PM 11   FEDERAL RULES OF EVIDENCE AND LIMITED IT TO NOTING FACTS THAT

03:41PM 12   ARE NOT SUBJECT TO DISPUTE.

03:41PM 13     THE GOVERNMENT'S THEORY KIND OF DOESN'T HAVE ANYTHING TO

03:41PM 14   DO WITH THOSE PRINCIPLES.  SO WE WOULD SUBMIT THAT THE COURT

03:41PM 15   NEED NOT ENTERTAIN THIS NONHEARSAY THEORY EITHER NOW OR IF THE

03:41PM 16   ARTICLES ARE OFFERED FOR THAT PURPOSE AT TRIAL.

03:41PM 17     THE SECOND NONHEARSAY PURPOSE THAT THE GOVERNMENT PUTS

03:41PM 18   FORWARD IS THAT, YOU KNOW, THE FACT OF THE COVERAGE IN THE

03:42PM 19   ARTICLES SHOULD BE ADMITTED BECAUSE THE NEWS COVERAGE ITSELF IS

03:42PM 20   A MOTIVE TO DEFRAUD.  THE KIND OF CORE PROBLEM WITH THIS THEORY

03:42PM 21   IS THAT IT DOESN'T SPEAK AT ALL TO THE CONTENT OF THE ARTICLES

03:42PM 22   AS OPPOSED TO THE FACT OF THE ARTICLES.

03:42PM 23     AND BECAUSE THE GOVERNMENT APPARENTLY DOES INTEND TO CALL

03:42PM 24   TWO JOURNALISTS AT TRIAL, AND BECAUSE IT DOES INTEND TO ASK

03:42PM 25   INVESTORS AND OTHERS ABOUT PARTICULAR NEWS ARTICLES THAT THEY

03:42PM 1    MAY HAVE ACTUALLY SEEN, THE JURY IS GOING TO BE AWARE THAT

03:42PM 2    THERE IS PRESS COVERAGE OF THERANOS AND BECAUSE OF THAT THERE'S

03:42PM 3    NO NEED TO ADMIT KIND OF THE STACKS OF NEWS ARTICLES FOR THIS

03:42PM 4    PURPOSE TO KIND OF CEMENT SOME IDEA THAT THERE'S A MOTIVE FOR

03:42PM 5    POSITIVE PRESS COVERAGE.

03:42PM 6        THE THIRD NONHEARSAY PURPOSE IS FOR EFFECT ON THE READER.

03:42PM 7    SO THE GOVERNMENT IS ARGUING HERE THAT IT NEEDS TO ADMIT THE

03:42PM 8    NEWS ARTICLE TO SHOW THEIR EFFECT ON INVESTORS, IN OTHER WORDS,

03:42PM 9    LIKE WHY THEY WERE MOTIVATED TO INVEST IN THERANOS.

03:43PM 10       AND THE GOVERNMENT PRESENTS THIS AS A NONHEARSAY PURPOSE,

03:43PM 11   BUT ACTUALLY IT DOESN'T SOLVE THE THRESHOLD HEARSAY ISSUE THAT

03:43PM 12   IS IDENTIFIED IN OUR BRIEF.

03:43PM 13       AND THE REASON FOR THAT, YOUR HONOR, IS BECAUSE TO THE

03:43PM 14   EXTENT THAT THE GOVERNMENT IS OFFERING TESTIMONY FROM INVESTORS

03:43PM 15   ABOUT THE IMPACT AN ARTICLE HAD ON THEIR DESIRE TO INVEST,

03:43PM 16   THEY'RE ACTUALLY JUST OFFERING SUBSTANTIVE EVIDENCE OF THE

03:43PM 17   ALLEGED FRAUD IN THE CASE, AND FOR THAT TO BE RELEVANT IT HAS

03:43PM 18   TO BE MATERIALLY MISLEADING AND ATTRIBUTABLE TO MS. HOLMES.

03:43PM 19       SO IF THAT'S THE CASE, THEN THERE NEEDS TO BE -- IT NEEDS

03:43PM 20   TO BE THE CASE THAT MS. HOLMES IS ACTUALLY RESPONSIBLE FOR THE

03:43PM 21   REPRESENTATIONS THAT ARE CONTAINED IN THE ARTICLE, WHICH IS A

03:43PM 22   FACTUAL ASSERTION IMPLICIT IN THE ARTICLE THAT THE AUTHOR WOULD

03:43PM 23   HAVE TO COME IN AND TESTIFY FOR.

03:43PM 24       SO A GOOD CITATION FOR THAT IS IN OUR BRIEFS, AND IT'S THE

03:43PM 25   ACLU OF NEVADA CASE VERSUS THE CITY OF LOS ANGELES, 13 F.SUPP.

UNITED STATES COURT REPORTERS

03:44PM 1    2D 1064.

03:44PM 2         AND THAT'S WHEN -- THAT MAKES THE HELPFUL POINT THAT EVEN

03:44PM 3    WHEN THE STATEMENT IN THE ARTICLE ON THE ONE LEVEL IS

03:44PM 4    NONHEARSAY OR OFFERED FOR A NONHEARSAY PURPOSE, IT'S THE

03:44PM 5    REPETITION OF THE STATEMENT IN THE NEWS ARTICLE THAT CAUSES THE

03:44PM 6    HEARSAY PROBLEM.

03:44PM 7         AND THEN FINALLY, THERE'S THE ENDORSEMENT OR CIRCULATION

03:44PM 8    THEORY.  WE SUBMIT THIS DOESN'T SOLVE THEIR HEARSAY PROBLEM,

03:44PM 9    EITHER.

03:44PM 10        AS AN INITIAL MATTER, THE GOVERNMENT PROVIDES NO CASE LAW

03:44PM 11   SUPPORTING ADMITTING NEWS ARTICLES AGAINST A CRIMINAL DEFENDANT

03:44PM 12   UNDER THIS THEORY.  I MEAN, REALLY NONE OF ITS CASES SPEAK TO

03:44PM 13   THAT, YOUR HONOR.

03:44PM 14        THE CASES THEY DO CITE, CICCONE, AND I DON'T KNOW IF I AM

03:44PM 15   PRONOUNCING THAT CORRECTLY, BUT IT'S C-I-C-C-O-N-E, AND THAT'S

03:44PM 16   AT 219 F.3D 1078.  AND THAT'S OBVIOUSLY NOT ON POINT AS WE

03:45PM 17   EXPLAINED IN OUR BRIEF.

03:45PM 18        SO THE GOVERNMENT HASN'T REALLY LAID THE CONTOURS OF THIS

03:45PM 19   KIND OF RATIFICATION OR ENDORSEMENT THEORY OUT, AND PERHAPS

03:45PM 20   IT'S BETTER LEFT TO SETTLE AT TRIAL IN CASE THERE ARE ANY

03:45PM 21   ARTICLES IN FACT OFFERED UNDER THIS THEORY.

03:45PM 22        BECAUSE EVEN IF YOU WERE TO ACCEPT THAT THIS THEORY IS

03:45PM 23   ACTUALLY TRULY GETTING OUT FROM UNDER THAT THRESHOLD HEARSAY

03:45PM 24   PROBLEM, IT REALLY COULD ONLY DO SO UNDER CERTAIN CIRCUMSTANCES

03:45PM 25   AND PROBABLY ONLY FOR A SMALL NUMBER OF ARTICLES, AND EVEN THEN

03:45PM 1    IT PROBABLY WOULDN'T JUSTIFY ADMITTING THE ENTIRETY OF THE

03:45PM 2    ARTICLES THEMSELVES.

03:45PM 3        SO I THINK A FRAMEWORK FOR THIS THEORY TO WORK, THE

03:45PM 4    GOVERNMENT WOULD PROBABLY HAVE TO SHOW THAT THE ARTICLE WAS

03:45PM 5    LIKE ACTUALLY SHARED WITH AN INVESTOR.  THE GOVERNMENT GIVES AN

03:45PM 6    EXAMPLE OF ONE IN ITS BRIEF, BUT IT HAS NOT KIND OF LAID OUT

03:46PM 7    EXACTLY WHICH SUBSET OF ARTICLES IT'S PROPOSING TO OFFER FOR

03:46PM 8    THIS PURPOSE.

03:46PM 9        AND THEN I THINK THEY WOULD HAVE TO SHOW THAT MS. HOLMES

03:46PM 10   ACTUALLY DID SHARE THE ARTICLE OR THAT SHE WAS RESPONSIBLE FOR

03:46PM 11   THE SHARING; AND I THINK THAT THEY WOULD HAVE TO SHOW THAT THE

03:46PM 12   ARTICLE CONTAINS AN ALLEGED MISREPRESENTATION; AND THAT

03:46PM 13   MS. HOLMES WAS AWARE THAT THERE WAS AN ALLEGED

03:46PM 14   MISREPRESENTATION IN THE ARTICLE FOR THIS TO BE A RELEVANT

03:46PM 15   BASIS FOR ADMISSION.

03:46PM 16       I THINK IT'S IMPORTANT FOR THE GOVERNMENT TO HAVE TO MAKE

03:46PM 17   THESE FOUNDATIONAL SHOWING IF IT INDEED IS OFFERING ARTICLES

03:46PM 18   UNDER THIS THEORY BECAUSE THEIR BRIEF TELEGRAPHS PERHAPS A MORE

03:46PM 19   EXPANSIVE VERSION OF THIS THEORY WHERE ANY ARTICLE THAT IS

03:46PM 20   EITHER BEING CIRCULATED IN THE NEWS ECOSYSTEM ABOUT THERANOS,

03:46PM 21   WHETHER IT'S BEING TWEETED BY THE THERANOS ACCOUNT, OR WHETHER

03:46PM 22   IT'S BEING SHARED BY OTHER THERANOS EMPLOYEES THAT MS. HOLMES

03:46PM 23   IS RESPONSIBLE FOR THE CONTENT OF THOSE ARTICLES AND FOR KIND

03:46PM 24   OF REVIEWING THEM AND ISSUING CORRECTIONS, AND IF THE

03:47PM 25   GOVERNMENT IS MAKING THAT KIND OF EXPANSIVE THEORY, I THINK

03:47PM 1     IT'S IMPORTANT TO NOTE AND KEEP IN MIND THAT'S GENERALLY NOT

03:47PM 2     THE RESPONSIBILITY OF THE CEO'S, AND IT'S NOT HOW THE CRIME OF

03:47PM 3     WIRE FRAUD HAS BEEN UNDERSTOOD TO WORK IN THE CASES.

03:47PM 4         SECOND, THE REQUIREMENT OF KNOWLEDGE AND ANY MISSTATEMENTS

03:47PM 5     IN AN ARTICLE WOULD KEEP THIS FROM TURNING INTO LIKE A

03:47PM 6     NEGLIGENCE THEORY OF ADMISSIBILITY FOR THESE ARTICLES.  DID YOU

03:47PM 7     READ THE ARTICLE CLOSELY ENOUGH SUCH THAT YOU, YOU KNOW, YOU

03:47PM 8     WOULD UNDERSTAND THAT SOMEBODY MIGHT READ IT THIS WAY?

03:47PM 9         SO I THINK THAT THIS THEORY, IF THE GOVERNMENT DOES END UP

03:47PM 10     OFFERING ARTICLES PURSUANT TO IT AT TRIAL, YOU KNOW, POSES A

03:47PM 11     COUPLE TRICKY ISSUES, AND WE WOULD BE PREPARED TO DEAL WITH

03:47PM 12     THOSE AT TRIAL.

03:47PM 13         THE COURT:  OKAY.

03:47PM 14         MR. LOOBY:  BEFORE I MOVE ON, I JUST WANT TO TOUCH

03:47PM 15     QUICKLY ON SOME OF THE RULE 403 ISSUES THAT THESE ARTICLES

03:47PM 16     POSE, AND INSTEAD OF JUST TALKING GENERALLY ABOUT THE 403

03:48PM 17     STANDARD, WHICH WE'VE BEEN OVER QUITE A BIT OVER THESE PAST

03:48PM 18     THREE DAYS, WE PROVIDED A COUPLE EXAMPLE ARTICLES TO OUR

03:48PM 19     MOTION, AND THAT'S AT DEFENSE EXHIBIT 48, ECF 586-2.

03:48PM 20         AND I THINK THE PREJUDICE THAT THESE ARTICLES POSE, THE

03:48PM 21     UNFAIR PREJUDICE POSE IS KIND OF SELF-EVIDENT, BUT RATHER THAN

03:48PM 22     HAVE YOUR HONOR AND HIS CLERKS KIND OF COMB THROUGH SOME OLD

03:48PM 23     ARTICLES ABOUT THERANOS, I JUST CALL YOUR ATTENTION TO A FEW.

03:48PM 24         THERE'S "THE WALL STREET JOURNAL" ARTICLE AT ECF PAGES 1

03:48PM 25     THROUGH 12 TITLED "CREATING GROWTH, WALGREENS DISMISSED ITS

98

03:48PM 1    DOUBTS ABOUT THERANOS."

03:48PM 2              THE COURT:  COULD YOU CITE THAT AGAIN.  IT'S AT?

03:48PM 3              MR. LOOBY:  IT'S AT ECF PAGES 1 THROUGH 12, SO IT'S

03:48PM 4    ECF 586-2.

03:49PM 5              THE COURT:  OKAY.  THANK YOU.

03:49PM 6              MR. LOOBY:  SO THIS IS THE FIRST ARTICLE IN OUR

03:49PM 7    COMPENDIUM OF EXEMPLAR ARTICLES FROM THE GOVERNMENT'S EXHIBIT

03:49PM 8    LIST.

03:49PM 9        SO THIS ASSERTS AS FACT THAT THERANOS HAD ACCURACY

03:49PM 10   PROBLEMS WITH ITS TESTS.  IT CONTAINS ANONYMOUS QUOTES FROM

03:49PM 11   WALGREENS EXECUTIVES SAYING THAT THEY WERE, UNNAMED WALGREENS

03:49PM 12   EXECUTIVES SAYING THAT THEY WERE AFRAID OF GETTING SUED BY

03:49PM 13   THERANOS.

03:49PM 14       IT TALKS ABOUT A CIVIL FRAUD CASE THAT WAS RECENTLY, AT

03:49PM 15   THE TIME IT RECENTLY HAD BEEN FILED BY A THERANOS PATIENT.

03:49PM 16       SO -- I WON'T TICK THROUGH THEM ALL, BUT THERE'S ALSO "A

03:49PM 17   NEW YORKER" ARTICLE, AND THIS IS BY A JOURNALIST NAMED

03:49PM 18   KEN AULETTA AND THE TITLE IS "BLOOD SIMPLER."  AND THIS IS A

03:49PM 19   2014 ARTICLE, AND THIS IS AT ECF PAGES 32 THROUGH 49.

03:49PM 20       I DRAWER YOUR ATTENTION TO THIS BECAUSE THE GOVERNMENT IN

03:49PM 21   ITS OPPOSITION KIND OF TRIES TO DRAW A DISTINCTION BETWEEN

03:49PM 22   NEGATIVE NEWS OF THERANOS AND WHAT IT CHARACTERIZES AS POSITIVE

03:50PM 23   NEWS COVERAGE THAT WOULD PREDATE THE MOMENT IN TIME WHEN THE

03:50PM 24   GOVERNMENT WOULD SAY THAT THE FRAUD WAS EXPOSED, QUOTE-UNQUOTE.

03:50PM 25       BUT THIS ARTICLE PREDATES THAT MOMENT IN TIME ON THE

03:50PM 1    GOVERNMENT'S TIMELINE.

03:50PM 2         BUT IT SAYS, QUOTE, "SOME OBSERVERS ARE TROUBLED BY

03:50PM 3    THERANOS'S SECRECY."

03:50PM 4         IT CONTAINS COMMENTARY FROM THE JOURNALISTS ABOUT HOW

03:50PM 5    MS. HOLMES PRESENTS BOTH IN HER PHYSICAL PRESENTATION AND HOW

03:50PM 6    SHE PRESENTS WHEN TALKING TO ROOMS FULL OF PEOPLE.

03:50PM 7         THOSE ARE HIS OWN SUBJECTIVE OPINIONS ABOUT HOW SHE

03:50PM 8    PRESENTS.

03:50PM 9         THERE ARE QUOTES FROM QUEST DIAGNOSTICS EXECUTIVES TAKING

03:50PM 10   ISSUE WITH SEVERAL OF THERANOS'S CLAIMS ABOUT ITS TECHNOLOGY

03:50PM 11   AND SAYING BROADLY THAT FINGERSTICK BLOOD TESTS AREN'T RELIABLE

03:51PM 12   FOR CLINICAL DIAGNOSTIC TESTS.

03:51PM 13        SO I THINK, YOUR HONOR, WHERE THIS LEAVES US IS THAT THE

03:51PM 14   GOVERNMENT HAS POSITED A SERIES OF KIND OF ROUGHLY SKETCHED OUT

03:51PM 15   NONHEARSAY PURPOSES TO MOVE IN A POTENTIALLY MASSIVE AMOUNT OF

03:51PM 16   UNFAIRLY PREJUDICIAL INFORMATION, AND THESE JOURNALISTS WOULD

03:51PM 17   NOT BE ON THE STAND FOR CROSS-EXAMINATION BECAUSE THE

03:51PM 18   GOVERNMENT DOES NOT INTEND TO CALL THEM.

03:51PM 19        THEIR SOURCES, MANY OF THEM ARE ANONYMOUS.  THESE SOUND

03:51PM 20   BITES WOULD BE PUT BEFORE THE JURY WITHOUT MS. HOLMES'S ABILITY

03:51PM 21   TO CROSS-EXAMINE THE SOURCES.

03:51PM 22        SOME OF THE PEOPLE WHO THE QUOTES ARE ATTRIBUTED TO,

03:51PM 23   EITHER ANONYMOUSLY OR ATTRIBUTED TO BY NAME, ARE GOING TO BE

03:51PM 24   TRIAL WITNESSES IN THE CASE, AND A LOT OF THE CONTENT OF THE

03:51PM 25   ARTICLES DISCUSS ISSUES THAT OVERLAP WITH THE GOVERNMENT'S

100

03:51PM 1    ALLEGATIONS, AND THAT WILL BE AT ISSUE IN THE CASE.

03:51PM 2        SO THESE ARTICLES KIND OF REALLY HAVE NO PLACE IN THE

03:51PM 3    EVIDENCE IN THIS CASE, AND SO WE SUBMIT THAT THE COURT SHOULD

03:51PM 4    EXCLUDE THEM.

03:51PM 5        THE COURT:  ALL RIGHT.  THANK YOU.

03:52PM 6    MR. BOSTIC.

03:52PM 7        MR. BOSTIC:  YES.  YOUR HONOR, GOOD AFTERNOON AGAIN.

03:52PM 8    I THINK IT'S IMPORTANT TO START WITH THE RELIEF SOUGHT BY

03:52PM 9    THE DEFENSE'S MOTION.  AND THIS IS THE DEFENSE'S MOTION BY THE

03:52PM 10   WAY.  I THINK THE DEFENSE MAKES STRATEGIC USE OF RAISING THE

03:52PM 11   SPECTER OF THE GOVERNMENT INTRODUCING A STACK OF NEWSPAPER

03:52PM 12   ARTICLES AS AN EXHIBIT IN THIS CASE, HANDING THEM TO THE JURY

03:52PM 13   AND SAYING "HAVE AT IT, YOU CAN RELY ON THESE ARTICLES FOR THE

03:52PM 14   TRUTH OF THE STATEMENTS THEREIN."

03:52PM 15   THAT'S NOT AT ALL THE GOVERNMENT'S PLAN.  THERE'S NO

03:52PM 16   REASON TO BELIEVE THAT THAT'S THE GOVERNMENT'S PLAN, BUT LET ME

03:52PM 17   JUST SAY IT SO THAT IT'S SAID.

03:52PM 18   THIS IS NOT BEFORE THE COURT ON THE GOVERNMENT'S MOTION TO

03:52PM 19   ADMIT ALL 50 OF THE NEWS ARTICLES.  THIS IS THE DEFENSE ASKING

03:52PM 20   THE COURT FOR ONE BLANKET ORDER THAT WOULD EXCLUDE ALL OF THOSE

03:52PM 21   MATERIALS FROM CONSIDERATION BY THE JURY IN THIS CASE.

03:52PM 22   THE GOVERNMENT'S MAIN POINT IN RESPONSE IS THAT THE

03:53PM 23   DEFENSE PAINTS WITH TOO FAR BROAD -- FAR TOO BROAD A BRUSH IN

03:53PM 24   MAKING THAT REQUEST FOR RELIEF.

03:53PM 25   THESE ARTICLES REALLY NEED TO BE VIEWED ON A CASE-BY-CASE

101

03:53PM 1   BASIS.  AND THE GOVERNMENT HAS PROFFERED TO THE COURT THEORIES

03:53PM 2   OF ADMISSIBILITY FOR THESE ARTICLES TO SHOW, TO DEMONSTRATE WHY

03:53PM 3   A BLANKET ORDER IS INAPPROPRIATE FOR THESE CASES.

03:53PM 4       THE AUTHORITY CITED BY THE DEFENSE IS QUITE NARROW IN ITS

03:53PM 5   HOLDING AND THE DEFENSE POINTS OUT THAT THE GOVERNMENT DOESN'T

03:53PM 6   HAVE CASE AUTHORITY SUPPORTING ITS SPECIFIC THEORIES OF

03:53PM 7   ADMISSIBILITY BUT NOR DOES THE DEFENSE HAVE CASES SUPPORTING

03:53PM 8   ITS ARGUMENT THAT THESE MATERIALS CANNOT COME IN FOR THESE

03:53PM 9   NONHEARSAY PURPOSES.

03:53PM 10      THE DEFENSE CASES ARE EASILY DISTINGUISHABLE.  THE LAREZ

03:53PM 11  CASE AND ACLU VERSUS LAS VEGAS ARE BOTH ABOUT OFFERING NEWS

03:53PM 12  ARTICLES FOR THE TRUTH AND THE ACCURACY OF STATEMENTS THAT WERE

03:53PM 13  MADE IN THOSE ARTICLES.

03:53PM 14      SO SOMEONE RELEVANT TO THE LITIGATION MADE A STATEMENT AND

03:54PM 15  WAS QUOTED IN THE ARTICLE, AND A PARTY SOUGHT TO INTRODUCE THE

03:54PM 16  ARTICLE NOT TO PROVE THAT THE ARTICLE EXISTED, NOT TO SHOW THE

03:54PM 17  EFFECT ON THE READER, BUT AS SUBSTANTIVE PROOF THAT THAT ACTUAL

03:54PM 18  STATEMENT WAS MADE.  THAT'S NOT HOW THE GOVERNMENT IS SEEKING

03:54PM 19  TO USE THE ARTICLES IN THIS CASE.

03:54PM 20      WHEN NECESSARY, IF THE GOVERNMENT NEEDS TO SHOW THAT THE

03:54PM 21  DEFENDANT ACTUALLY DID MAKE A STATEMENT QUOTED IN AN ARTICLE,

03:54PM 22  IT WILL DO SO VIA AN APPROPRIATE NONHEARSAY MECHANISM, EITHER

03:54PM 23  TESTIMONY BY THE PERSON WHO HEARD THAT STATEMENT FROM

03:54PM 24  MS. HOLMES AND IN SOME CASES THERE ARE RECORDINGS OF

03:54PM 25  DEFENDANT'S CONVERSATIONS WITH JOURNALISTS.

03:54PM 1    THESE ARE THE WAYS THAT A JURY WILL BE ABLE TO CONCLUDE

03:54PM 2  THAT STATEMENTS IN THE ARTICLES ARE ACTUALLY ACCURATE AND THAT

03:54PM 3  THE DEFENDANT ACTUALLY MADE THEM, OTHERWISE THE ARTICLES ARE

03:54PM 4  COMING IN FOR DIFFERENT AND PERMISSIBLE PURPOSES.

03:54PM 5    REMOVING NEWS ARTICLES FROM THE TRIAL HERE WOULD HIDE FROM

03:54PM 6  THE JURY AN IMPORTANT TOOL THAT THIS DEFENDANT USED TO

03:55PM 7  ACCOMPLISH THE FRAUD IN THIS CASE, AND THAT'S WHY THIS IS AN

03:55PM 8  IMPORTANT MOTION, AND THAT'S WHY IT'S IMPORTANT THAT THE COURT

03:55PM 9  NOT PAINT WITH TOO BROAD A BRUSH THE WAY THAT THE DEFENSE IS.

03:55PM 10    THE IMPORTANT CATEGORY OF FACTS THAT WE'RE TALKING ABOUT

03:55PM 11  HERE IS NOT, AGAIN, THE FACTS RECORDED IN THE ARTICLES.  THE

03:55PM 12  GOVERNMENT DOES NOT NEED TO PROVE ITS CASE BY NEWS ARTICLES IN

03:55PM 13  THIS CASE.

03:55PM 14    INSTEAD, THE ESSENTIAL FACTS INVOLVE HOW THE CONTENT OF

03:55PM 15  THOSE ARTICLES REFLECTED OVERALL PUBLIC OPINION ABOUT THERANOS,

03:55PM 16  WHICH IS RELEVANT IN THIS CASE, AND IN TURN SHAPED READER'S

03:55PM 17  VIEWS OF THE COMPANY AND THEIR UNDERSTANDING OF THE COMPANY'S

03:55PM 18  POTENTIAL.  NONE OF THIS IMPLICATES THE HEARSAY PROBLEMS RAISED

03:55PM 19  BY THE DEFENSE.

03:55PM 20    I'D LIKE TO GO THROUGH THE THREE PERMISSIBLE USES OF THESE

03:55PM 21  ARTICLES IF I MIGHT.

03:55PM 22    FIRST, AS TO SHOW -- AS TO THE USE OF SHOWING FAVORABLE

03:55PM 23  PRESS COVERAGE OF THERANOS.  THIS IS AN IMPORTANT PART OF THE

03:56PM 24  STORY HERE.  THE NEWS COVERAGE SERVES AS A USEFUL BAROMETER OF

03:56PM 25  PUBLIC OPINION WHEN IT CAME TO THERANOS.  IT'S NOT IMPORTANT

103

03:56PM  1      THAT THE JURY RELY ON THE TRUTH OF THE STATEMENTS IN THE

03:56PM  2      ARTICLES FOR THEM TO SERVE THAT PURPOSE.  INSTEAD, THE JURY

03:56PM  3      SHOULD BE ALLOWED TO LOOK AT ARTICLES GENERALLY AND UNDERSTAND

03:56PM  4      THAT DURING THIS PERIOD OF TIME THERE WAS A LOT OF EXCITEMENT

03:56PM  5      ABOUT THE COMPANY, THAT THERE WAS FAVORABLE PRESS COVERAGE,

03:56PM  6      THAT THERE WAS WIDESPREAD PRESS COVERAGE, AND THAT'S IMPORTANT

03:56PM  7      FOR A COUPLE OF REASONS.

03:56PM  8          FIRST, IT'S PART OF THE MODE OF EVIDENCE IN THIS CASE, AND

03:56PM  9      I KNOW THE DEFENSE TOUCHED ON THIS, BUT JUST BRIEFLY.  THIS WAS

03:56PM  10     NOT JUST THE EXISTENCE OF PRESS COVERAGE, BUT QUITE FAVORABLE

03:56PM  11     PRESS COVERAGE WITH THE DEFENDANT HERSELF BEING FEATURED ON A

03:56PM  12     VARIETY OF MAGAZINE COVERS, RECEIVING ADULATION FROM THE PRESS,

03:56PM  13     AGAIN, A LOT OF HYPE AND EXCITEMENT BUILDING UP AROUND THIS

03:56PM  14     COMPANY, ITS POTENTIAL, THAT WAS THE BENEFIT THAT THE DEFENDANT

03:57PM  15     OBTAINED BY VIRTUE OF THE FRAUD.

03:57PM  16          THE COURT:  IS THAT A PERSONAL BENEFIT OR A COMPANY

03:57PM  17     BENEFIT OR CAN YOU DISTINGUISH THOSE TWO?

03:57PM  18          MR. BOSTIC:  SO IT'S CERTAINLY BOTH, YOUR HONOR.

03:57PM  19     ARGUABLY, IT IS A BENEFIT TO THE COMPANY, BUT IT'S ABSOLUTELY A

03:57PM  20     PERSONAL BENEFIT AS WELL.

03:57PM  21          AND PEOPLE CAN DIFFER ON WHETHER THEY THINK THAT CELEBRITY

03:57PM  22     IS A BLESSING OR A CURSE.  BUT PEOPLE CERTAINLY SEEK IT OUT,

03:57PM  23     YOUR HONOR, AND THE JURY IS ENTITLED TO CONCLUDE THAT THE

03:57PM  24     DEFENDANT'S DESIRE TO BE FAMOUS, TO RECEIVE THIS PRAISE, THIS

03:57PM  25     ATTENTION WAS PART OF HER MOTIVE FOR ENGAGING IN THIS SCHEME TO

104

03:57PM 1     DEFRAUD.

03:57PM 2        AND THE EVIDENCE SHOWS THAT THE DEFENDANT WAS VERY AWARE

03:57PM 3     OF THE PRESS COVERAGE.  THE EVIDENCE WILL SHOW AT TRIAL THAT

03:57PM 4     THE DEFENDANT CLOSELY MONITORED PRESS CONCERNING HER AND THE

03:57PM 5     COMPANY, AND THAT WILL SUPPORT THE JURY'S INFERENCE THAT THIS

03:57PM 6     WAS PART OF THE MOTIVE IN THIS CASE.

03:57PM 7        SO, AGAIN, THIS ISN'T ABOUT ASKING THE JURY TO ASSUME THE

03:58PM 8     TRUTH OF ANY STATEMENTS IN THESE ARTICLES, BUT IT'S ALSO ABOUT

03:58PM 9     MORE THAN JUST THE EXISTENCE OF THE ARTICLES.  THE JURY NEEDS

03:58PM 10     TO UNDERSTAND THAT THIS WAS FAVORABLE COVERAGE THAT BENEFITTED

03:58PM 11     THE DEFENDANT.

03:58PM 12        THE COURT:  SO WHAT IS THE GOVERNMENT'S PLAN IN THAT

03:58PM 13     REGARD?  HOW MUCH DO YOU NEED TO PUT THIS ON?

03:58PM 14        AND PERHAPS THE DEFENSE WOULD STIPULATE, YES, THAT WE'LL

03:58PM 15     STIPULATE THAT THIS STARTUP WAS WELL PUBLICIZED FOR MANY YEARS.

03:58PM 16     IT WAS IN THE MEDIA, IT WAS IN THE MEDIA'S ATTENTION, AND IT

03:58PM 17     WAS IN THE PUBLIC EYE.

03:58PM 18        MR. BOSTIC:  SO, YOUR HONOR, SOMETIMES A PARTY IN

03:58PM 19     LITIGATION WILL AGREE TO STIPULATE TO SOMETHING BECAUSE THE

03:58PM 20     IMPACT OF THE EVIDENCE WILL ACTUALLY BE MORE UNFAVORABLE TO

03:58PM 21     THEIR CASE.  I SUSPECT THAT IF THEY WERE WILLING TO STIPULATE

03:58PM 22     TO THAT, THAT MIGHT BE THE REASON.

03:58PM 23        I THINK IT'S IMPORTANT FOR THE JURY TO SEE THE EXTENT OF

03:58PM 24     THIS COVERAGE.  I DON'T THINK IT REQUIRES A LARGE VOLUME OF

03:58PM 25     EVIDENCE.  I THINK A SAMPLING OF MAGAZINE COVERS AND SOME

105

03:58PM 1    SAMPLE LANGUAGE FROM THOSE ARTICLES SHOWING THAT THIS WAS

03:59PM 2    POSITIVE COVERAGE OVER THE RELEVANT PERIOD OF TIME WOULD BE

03:59PM 3    SUFFICIENT.

03:59PM 4        SO, AGAIN, I DON'T THINK WE'RE TALKING ABOUT A LARGE

03:59PM 5    VOLUME OF EVIDENCE, NOR IS THIS THE MOST IMPORTANT USE OF THESE

03:59PM 6    ARTICLES.

03:59PM 7        THE SECOND CATEGORY OF PERMISSIBLE USE GETS INTO SOMETHING

03:59PM 8    A LITTLE MORE IMPORTANT, AND, THAT IS, TO SHOW THE EFFECT ON

03:59PM 9    WITNESSES WHO READ THE ARTICLE AND HOW IT INFORMED THEIR

03:59PM 10   DECISIONMAKING.

03:59PM 11       SO THE EVIDENCE AT TRIAL WILL SHOW THAT THE CONTENT OF

03:59PM 12   NEWS ARTICLES INFLUENCED THE DECISIONMAKING OF WITNESSES IN

03:59PM 13   THIS CASE, AND THAT'S TRUE AS TO INVESTORS IN PARTICULAR.

03:59PM 14       THE COURT:  SO IF THERE WERE ARTICLES THAT WERE PUT

03:59PM 15   IN BINDERS, MARKETING BINDERS, PROSPECTUS, AND A POTENTIAL

03:59PM 16   INVESTOR HAD BENEFIT OF THAT, THAT'S A DIFFERENT STORY THAN

03:59PM 17   JUST A STANDALONE ARTICLE I GUESS.

03:59PM 18       MR. BOSTIC:  CORRECT.  AND THAT, YOUR HONOR, WE'LL

03:59PM 19   GET INTO THE THIRD CATEGORY WHERE THE THEORY AND THE ALLEGATION

03:59PM 20   IS THAT THE DEFENDANT ACTIVELY USED THESE ARTICLES AS A VEHICLE

03:59PM 21   TO PRESENT MISREPRESENTATIONS TO THE VICTIMS IN THIS CASE.  SO

03:59PM 22   THAT'S CATEGORY THREE.

04:00PM 23       CATEGORY TWO, THOUGH, EVEN AS TO ARTICLES THAT WEREN'T

04:00PM 24   SENT BY DEFENDANT TO POTENTIAL INVESTORS, DEFENDANT CERTAINLY

04:00PM 25   KNEW THAT THESE ARTICLES WERE OUT THERE, GENERALLY SPEAKING,

04:00PM 1    AND THEY'RE ADMISSIBLE FOR THE EFFECT THAT THEY HAD ON

04:00PM 2    INVESTORS WHO WERE DECIDING WHETHER TO PART WITH THEIR MONEY

04:00PM 3    AND PURCHASE SHARES IN THERANOS.

04:00PM 4            THE COURT:  BUT ISN'T THAT CATEGORY THREE?

04:00PM 5            MR. BOSTIC:  SO CATEGORY THREE WOULD INVOLVE AN

04:00PM 6    ACTIVE USE BY THE DEFENDANT WHERE THE DEFENDANT ACTUALLY HAD A

04:00PM 7    ROLE EITHER IN RATIFYING THE CONTENT OF THE ARTICLE OR

04:00PM 8    SPECIFICALLY DIRECTING THAT ARTICLE TOWARDS AN INDIVIDUAL

04:00PM 9    DEFENDANT OR, EXCUSE ME, AN INDIVIDUAL VICTIM OR AT LEAST

04:00PM 10   PUBLICIZING IT ON THE THERANOS WEBSITE.

04:00PM 11           THE COURT:  AND DOESN'T CATEGORY TWO, ISN'T THAT

04:00PM 12   SOMETHING THAT IS NOT WITHIN HER CONTROL?  THAT'S MEDIA

04:00PM 13   ATTENTION, AND THAT'S POLLING, AND THAT'S REALLY UP TO THE

04:00PM 14   WHIMS OF THE EDITORS AND EVERYBODY IS A JOURNALIST THESE DAYS

04:01PM 15   I'M TOLD.

04:01PM 16       SO IS THAT FAIR TO HOLD HER TO BE SOMEWHAT RESPONSIBLE

04:01PM 17   UNLESS YOUR THEORY IS SHE PURSUED THAT ATTENTION, SHE PURSUED

04:01PM 18   THAT CELEBRITY, AND MADE HERSELF AVAILABLE FOR X MAGAZINES.

04:01PM 19           MR. BOSTIC:  THAT'S CERTAINLY TRUE, YOUR HONOR, AND

04:01PM 20   THE JURY WOULD BE REASONABLE TO INFER THAT.  BUT THIS CATEGORY

04:01PM 21   IS LESS ABOUT ATTRIBUTING STATEMENTS TO DEFENDANT, LESS ABOUT

04:01PM 22   BLAMING HER FOR THE CONTENT OF THE ARTICLES, AND MORE ABOUT

04:01PM 23   SIMPLY RECOGNIZING HOW THESE ARTICLES AFFECTED INVESTORS

04:01PM 24   THOUGHT PROCESSES, FOR EXAMPLE.  AND THE WAY THAT HAPPENED IS

04:01PM 25   THE ARTICLES MADE IT A LOT EASIER FOR THESE VICTIMS TO BE

04:01PM 1    DEFRAUDED, TO PUT IT BLUNTLY.

04:01PM 2        THE EXISTENCE OF ALL OF THIS HYPE AND EXCITEMENT AND

04:01PM 3    FAVORABLE COVERAGE ABOUT THERANOS CREATED A SENSE OF URGENCY IN

04:01PM 4    INVESTORS, THEY DIDN'T WANT TO MISS OUT ON WHAT WAS GOING TO

04:02PM 5    BE, ACCORDING TO THE COVERAGE, A LUCRATIVE INVESTMENT

04:02PM 6    OPPORTUNITY.  THE ARTICLES PRESENTED A LOT OF FAVORABLE

04:02PM 7    INFORMATION ABOUT THERANOS AND WHAT ITS TECHNOLOGY COULD DO.

04:02PM 8        THE GOVERNMENT IS ENTITLED TO ARGUE THAT DEFENDANT

04:02PM 9    EXPLOITED THAT FAVORABLE COVERAGE AND THEN IT PAVED THE WAY FOR

04:02PM 10   THE FRAUD THAT SHE ENDED UP COMMITTING.

04:02PM 11       SO AGAIN, THIS IS NOT ABOUT CONVICTING THE DEFENDANT FOR

04:02PM 12   THE CONTENT OF THOSE PARTICULAR ARTICLES.

04:02PM 13       THE EVIDENCE WILL SHOW THAT THE DEFENDANT REPEATED THE

04:02PM 14   LIES IN THESE ARTICLES AND REPEATED THOSE FALSE STATEMENTS TO

04:02PM 15   THE INDIVIDUAL VICTIMS OR CAUSED THOSE FALSE STATEMENTS TO GO

04:02PM 16   TO THE VICTIMS.

04:02PM 17       BUT THE ARTICLES THEMSELVES PRIMED THE VICTIMS TO BE

04:02PM 18   RECEPTIVE TO THAT DECEPTION, AND THAT IS AN IMPORTANT ELEMENT

04:02PM 19   OF THE STORY THAT THE JURY SHOULD NOT MISS OUT ON.

04:02PM 20       I'LL JUST POINT OUT ALTHOUGH NEITHER SIDE CITES A CASE

04:02PM 21   INVOLVING THIS PARTICULAR FACT PATTERN, OF COURSE, THAT

04:02PM 22   NONHEARSAY USE, THE USE OF NEWS ARTICLES TO SHOW THE EFFECT ON

04:03PM 23   THE READER IS WELL ESTABLISHED, AND THERE'S NO REASON TO

04:03PM 24   DEVIATE FROM THAT STANDARD RULE IN THIS CASE.

04:03PM 25       FINALLY, THE THIRD CATEGORY, THE THIRD PERMITTED USE.

04:03PM 1　　THIS IS IMPORTANT BECAUSE ARTICLES ADMITTED UNDER THIS THEORY

04:03PM 2　　WILL DEMONSTRATE HOW THE DEFENDANT DIDN'T JUST BENEFIT FROM THE

04:03PM 3　　EXISTENCE OF THESE ARTICLES, BUT ACTIVELY COURTED ATTENTION

04:03PM 4　　FROM THE PRESS AND SPECIFICALLY INJECTED THESE FALSE STATEMENTS

04:03PM 5　　INTO THE NEWS MEDIA.

04:03PM 6　　　　SO HERE THERE WILL BE INSTANCES, OF COURSE, WHERE THE

04:03PM 7　　GOVERNMENT WILL USE TESTIMONY FROM JOURNALISTS OR RECORDINGS OF

04:03PM 8　　INTERVIEWS TO SHOW THAT, YES, THE DEFENDANT DID MAKE A

04:03PM 9　　PARTICULAR STATEMENT.

04:03PM 10　　　BUT AN ARTICLE SHOULD ALSO BE ADMISSIBLE IF THE EVIDENCE

04:03PM 11　　SHOWS THAT THE DEFENDANT WAS INTERVIEWED BY A JOURNALIST, SAW A

04:03PM 12　　COPY OF THE ARTICLE BEFORE IT WAS PUBLISHED, INCLUDING SPECIFIC

04:03PM 13　　STATEMENTS, HAD THE CHANCE TO CORRECT ANYTHING AND DIDN'T, AND

04:03PM 14　　LET THOSE FALSE STATEMENTS END UP IN THE ARTICLE.

04:04PM 15　　　THE ACT OF DECLINING TO TAKE THE OPPORTUNITY TO CORRECT

04:04PM 16　　SOMETHING, THE ACT OF APPROVING THAT ARTICLE BEFORE IT WAS

04:04PM 17　　PUBLISHED SHOULD COUNT HERE.  IT'S NOT THE SAME THING AS ASKING

04:04PM 18　　THE JURY TO BELIEVE THE STATEMENTS IN THE ARTICLE WITHOUT ANY

04:04PM 19　　EVIDENCE OF THE DEFENDANT'S STATEMENTS OR RATIFICATION.

04:04PM 20　　　SIMILARLY, THE JURY SHOULD BE ABLE TO HEAR ABOUT AT LEAST

04:04PM 21　　ONE INSTANCE WHERE THE DEFENDANT WAS CONFRONTED WITH FALSE

04:04PM 22　　STATEMENTS IN A NEWS ARTICLE FOLLOWING HER INTERVIEW AND

04:04PM 23　　DECIDED NOT TO DO ANYTHING ABOUT IT.

04:04PM 24　　　HERE AGAIN IT'S THE FACT OF THAT CONFRONTATION, IT'S THE

04:04PM 25　　DEFENDANT'S DECISION NOT TO DO ANYTHING TO CORRECT THE FALSE

04:04PM 1    STATEMENT IN THAT ARTICLE THAT IS THE RELEVANT FACT FOR THE

04:04PM 2    JURY.  AND THIS IS A CASE OUTLINED OR A SITUATION OUTLINED IN

04:04PM 3    THE GOVERNMENT'S BRIEFING WHERE AN IN-HOUSE THERANOS ATTORNEY

04:05PM 4    ACTUALLY BROUGHT TO THE DEFENDANT'S ATTENTION FALSE OR

04:05PM 5    MISLEADING STATEMENTS IN AN ARTICLE THAT RESULTED FROM HER

04:05PM 6    INTERVIEWS, AND SHE DID NOTHING TO REACH OUT TO THE JOURNALIST

04:05PM 7    OR CORRECT THAT FALSE INFORMATION.

04:05PM 8        WHY SHOULD THE JURY BE PRECLUDED FROM HEARING ABOUT THAT?

04:05PM 9        FINALLY, THE DEFENDANT SHOULD BE RESPONSIBLE FOR ARTICLES

04:05PM 10   THAT SHE CAUSED TO BE SENT TO INDIVIDUALS, WHETHER THOSE ARE

04:05PM 11   POTENTIAL INVESTORS, AND, THEREFORE, POTENTIAL VICTIMS IN THE

04:05PM 12   CASE OR THE PUBLIC AT LARGE.

04:05PM 13       THE EVIDENCE WILL SHOW THAT, AGAIN, THE DEFENDANT WAS VERY

04:05PM 14   INVOLVED IN MONITORING PRESS COVERAGE OF THERANOS AND HERSELF

04:05PM 15   AND VERY ACTIVE IN DECIDING WHAT ROLES, OR EXCUSE ME, IN

04:05PM 16   DECIDING WHAT ARTICLES WOULD BE SENT TO INVESTORS OR PUBLISHED

04:05PM 17   ON THERANOS'S WEBSITE OR ON SOCIAL MEDIA.

04:05PM 18       BY SENDING OUT THAT INFORMATION, THE DEFENDANT WAS

04:05PM 19   INVITING POTENTIAL VICTIMS TO RELY ON THAT INFORMATION AND

04:06PM 20   ADOPTING THE STATEMENTS THEREIN.

04:06PM 21       IT CANNOT BE THE CASE THAT A FRAUDSTER CAN HIDE BEHIND THE

04:06PM 22   SOURCE OF INFORMATION WHEN IT'S THE FRAUDSTER HERSELF WHO IS

04:06PM 23   ACTIVELY SENDING THAT INFORMATION AROUND AND CIRCULATING IT TO

04:06PM 24   VICTIMS.  THAT WOULD BE TOO GREAT A LOOPHOLE.

04:06PM 25       AS TO "THE WALL STREET JOURNAL" ARTICLE AND SOME OF THE

04:06PM 1     NEGATIVE PRESS COVERAGE, AGAIN, LET ME EMPHASIZE, THE

04:06PM 2     GOVERNMENT DOES NOT INTEND TO INTRODUCE ANY OF THAT FOR THE

04:06PM 3     TRUTH OF THE MATTERS ASSERTED IN THOSE ARTICLES.

04:06PM 4         FOR EXAMPLE, "THE WALL STREET JOURNAL ARTICLE" FROM

04:06PM 5     OCTOBER 2013 REVEALED THAT THERANOS WAS RELYING ON THIRD PARTY

04:06PM 6     MANUFACTURED DEVICES.  THAT WILL BE PROVEN THROUGH AN ABUNDANCE

04:06PM 7     OF OTHER EVIDENCE IN THE CASE.  WE WON'T BE ASKING THE JURY TO

04:06PM 8     BELIEVE THAT BECAUSE THE ARTICLE SAYS SO, BUT THAT

04:06PM 9     "WALL STREET JOURNAL" ARTICLE IS AN IMPORTANT LANDMARK IN THE

04:06PM 10     TIMELINE OF THIS CASE BECAUSE IT SHOWS WHEN KNOWLEDGE OF THE

04:06PM 11     ALLEGED FRAUD BECAME PUBLIC.

04:06PM 12         AND ESPECIALLY IMPORTANT THERE ARE DEFENDANT'S AND HER

04:07PM 13     COCONSPIRATOR'S REACTIONS TO THAT ARTICLE IN THE TIME PERIOD

04:07PM 14     FOLLOWING THE RELEASE OF THE ARTICLE WHERE IT WAS SEEN THAT

04:07PM 15     DEFENDANT AND OTHERS DOUBLE DOWNED ON THE PREVIOUS

04:07PM 16     REPRESENTATIONS.  THAT IS CERTAINLY RELEVANT TO INTENT TO

04:07PM 17     DEFRAUD, IT'S CERTAINLY RELEVANT TO KNOWLEDGE, AND IT SHOULD BE

04:07PM 18     ADMISSIBLE.

04:07PM 19         SO I'M HAPPY TO ANSWER ANY OTHER QUESTIONS THAT THE COURT

04:07PM 20     MIGHT HAVE ABOUT THOSE CATEGORIES.  OTHERWISE I'LL --

04:07PM 21           THE COURT:  I JUST HAVE ONE QUESTION.  THE ARTICLE

04:07PM 22     THAT WAS IDENTIFIED AS I THINK NUMBER 5, WAS THAT SHARED?  DO

04:07PM 23     YOU KNOW?  WAS THAT SHARED WITH INVESTORS OR WITH THE BOARD?  I

04:07PM 24     THINK IT'S NUMBER 5.

04:07PM 25         DO YOU HAVE ANY KNOWLEDGE OF THAT?

04:07PM 1    MR. BOSTIC:  YOU KNOW, I DON'T KNOW OFFHAND,

04:07PM 2    YOUR HONOR.  I APOLOGIZE.  I DO KNOW THAT A VARIETY OF ARTICLES

04:07PM 3    WERE ACTIVELY POSTED ON THE WEBSITE, TWEETED WITH MS. HOLMES'S

04:07PM 4    APPROVAL OR SHARED WITH THE BOARD OF INVESTORS.  I DON'T KNOW

04:07PM 5    FOR THAT ONE OFFHAND.

04:07PM 6    THE COURT:  ALL RIGHT.

04:07PM 7    MR. BOSTIC:  BUT THAT'S PART OF THE GOVERNMENT'S

04:08PM 8    POINT IS THAT TO EXCLUDE ALL OF THESE ARTICLES AT THIS TIME

04:08PM 9    WITHOUT ALLOWING THE GOVERNMENT TO MAKE THAT SHOWING AS TO WHY

04:08PM 10   INDIVIDUAL ARTICLES MIGHT MATTER IS PREMATURE.

04:08PM 11   THE COURT:  ALL RIGHT.  THANK YOU.

04:08PM 12   I GUESS MY FIRST QUESTION, MR. LOOBY, IS, IS IT PREMATURE

04:08PM 13   TO RULE ON THIS MOTION NOW?  AND SHOULD I DEFER THIS TO THE

04:08PM 14   TIME AND PLACE IF THE GOVERNMENT SEEKS TO INTRODUCE ANY

04:08PM 15   ARTICLES, AND THEN YOU'LL REMIND ME OF EVERYTHING THAT WE'VE

04:08PM 16   DISCUSSED THIS AFTERNOON?

04:08PM 17   MR. LOOBY:  YOUR HONOR, I THINK IT WOULD BE FAIR TO

04:08PM 18   DEFER IT IN PART.  I THINK WE STILL WOULD REQUEST AN ORDER.

04:08PM 19   YOU KNOW, THE GOVERNMENT DID CONCEDE THAT IT'S NOT OFFERING

04:08PM 20   THESE ARTICLES FOR THE TRUTH OF THE MATTER ASSERTED.  I THINK

04:08PM 21   THAT'S IMPORTANT.  THAT'S AN IMPORTANT CONCESSION.

04:08PM 22   I DIDN'T HEAR MUCH OF THE DEFENSE OF WHAT I WILL CALL THE,

04:08PM 23   LIKE, THE BACKGROUND INFORMATION.  I GOT A LITTLE CONFUSED

04:08PM 24   ABOUT WHICH CATEGORIES MR. BOSTIC, HOW HE WAS NUMBERING THEM,

04:09PM 25   BUT I'M NOT SURE THAT I HEARD A ROBUST DEFENSE OF THE THEORY OF

112

04:09PM 1    KIND OF WHAT BACKGROUND INFORMATION IS AVAILABLE TO THE -- TO

04:09PM 2    LIKE THE GENERAL PUBLIC.

04:09PM 3        AND I THINK THAT THE COURT COULD RULE THAT THAT'S NOT

04:09PM 4    REALLY AN APPLICABLE THEORY THAT WILL BE AVAILABLE TO THE

04:09PM 5    GOVERNMENT.  IT'S NOT PREMATURE TO RULE IN THAT MANNER NOW

04:09PM 6    BECAUSE, I MEAN, THESE EXHIBITS ARE ON THE GOVERNMENT'S EXHIBIT

04:09PM 7    LIST.  TRIAL IS APPROACHING.  THE SHEER VOLUME OF NEWS MEDIA

04:09PM 8    THAT THE GOVERNMENT HAS CHOSEN TO DISCLOSE AS EVIDENCE THAT IT

04:09PM 9    MIGHT SEEK TO ADMIT, IT POSES REAL TRIAL PREPARATION ISSUES

04:09PM 10   ABOUT KNOWING WHAT EVIDENCE IS OR ISN'T IN THE CASE.

04:09PM 11       BECAUSE WHEN MR. BOSTIC TALKS ABOUT ARTICLES THAT WERE

04:09PM 12   EITHER SHARED WITH INVESTORS OR ARTICLES HE SEEMED -- HIS

04:09PM 13   ARGUMENT SEEMED TO PRESUME THAT THE GOVERNMENT WOULD ACTUALLY

04:09PM 14   OFFER PROOF ON ALL OF THOSE FACTORS THAT I HAD PUT FORWARD AS

04:09PM 15   THEM NEEDING TO ME, WHICH WOULD BE THAT MS. HOLMES ACTUALLY

04:10PM 16   SHARED THE ARTICLE, THAT AN INVESTOR RECEIVED IT AND REVIEWED

04:10PM 17   IT, THAT IT CONTAINED A MISSTATEMENT THAT MS. HOLMES WAS AWARE

04:10PM 18   AND ALLEGED TO HAVE BEEN AWARE OF THE MISSTATEMENT.

04:10PM 19       THE GOVERNMENT'S EXPLANATION SOUNDS LIKE THEY PRESUME THAT

04:10PM 20   THEY'RE GOING TO DO HAVE TO DO ALL OF THAT, AND WE SUBMIT THAT

04:10PM 21   THAT'S GOING TO BE A VERY SMALL NUMBER OF ARTICLES PROBABLY

04:10PM 22   THAT WE'RE TALKING ABOUT.

04:10PM 23       BUT THE GOVERNMENT'S LIST HAS 50 ARTICLES ON IT, AND THEIR

04:10PM 24   THEORIES OF ADMISSIBILITY SUGGEST THAT BASICALLY ANY ARTICLE

04:10PM 25   ABOUT THERANOS IS FAIR GAME BECAUSE ALL OF THIS POSITIVE

113

04:10PM 1 PUBLICITY IS ILL-GOTTEN I SUPPOSE BECAUSE THEY'RE LABELLING IT

04:10PM 2 POSITIVE, BUT THEN MR. BOSTIC SAYS BUT SHE REPEATED THE

04:10PM 3 MISSTATEMENTS IN THEM DIRECTLY TO INVESTORS.

04:10PM 4 SO THAT KIND OF GIVES AWAY THE GAME. THEY'RE ACTUALLY

04:10PM 5 BEING OFFERED TO SHOW THAT THERE WAS MISSTATEMENTS MADE BY

04:10PM 6 MS. HOLMES IN WHICH CASE THERE'S THE THRESHOLD QUESTION OF,

04:11PM 7 WELL, DID MS. HOLMES MAKE THE STATEMENT? AND THE JOURNALIST IS

04:11PM 8 NOT GOING TO BE CALLED IN TO TESTIFY TO THAT TO BE

04:11PM 9 CROSS-EXAMINED TO THAT.

04:11PM 10 SO I THINK THAT THAT THRESHOLD ISSUE, HEARSAY ISSUE REALLY

04:11PM 11 PRECLUDES THAT ENTIRE FIRST BUCKET OF, I WOULD SAY, JUST LIKE

04:11PM 12 INFORMATION ECOSYSTEM.

04:11PM 13 AND I THINK, YOUR HONOR, YOU KIND OF HIT THE NAIL ON THE

04:11PM 14 HEAD WHEN YOU ASKED ABOUT THE DEGREE OF CONTROL OF MS. HOLMES

04:11PM 15 MIGHT HAVE ABOUT KIND OF HOW STORIES SPIN OUT ABOUT A COMPANY.

04:11PM 16 I THINK THAT THAT'S ACTUALLY LIKE A GOOD POINT TO MAKE. I

04:11PM 17 MEAN, WHEN YOU SIT DOWN FOR AN INTERVIEW WITH A JOURNALIST, YOU

04:11PM 18 KNOW, YOU GIVE AN INTERVIEW AND IN CONTROL, EXCEPT IN INSTANCES

04:11PM 19 WHERE YOU ARE GIVEN KIND OF A PREVIEW OF WHAT THE ARTICLE WOULD

04:11PM 20 BE, WHICH IN THIS CASE IS GOING TO BE A VERY LIMITED SET OF

04:11PM 21 ARTICLES, THAT'S KIND OF THE END OF YOUR CONTROL OVER WHAT

04:11PM 22 HAPPENS.

04:11PM 23 AND SO THE IDEA THAT SOMEBODY WHO IS AT THE CENTER OF A

04:11PM 24 MEDIA KIND OF, I GUESS YOU COULD SAY JUST A MEDIA ECOSYSTEM,

04:12PM 25 THAT THEY'RE KIND OF IN CONTROL OF EVERY STATEMENT OR EVERY

114

04:12PM 1  CHARACTERIZATION OF THEIR OWN STATEMENTS AND KIND OF

04:12PM 2  PUPPETEERING THAT IS A LITTLE BIT OUTDATED, AND IT DOESN'T

04:12PM 3  REFLECT REALITY.

04:12PM 4      SO THE IDEA THAT THERE'S GOING TO BE ANY ARTICLE ABOUT

04:12PM 5  THERANOS IS SOMETHING THAT COULD HAVE INFLUENCED AN INVESTOR

04:12PM 6  BECAUSE THEY GOT CAUGHT UP INTO THE FRENZY, WHICH I'M ALSO A

04:12PM 7  LITTLE BIT SUSPICIOUS THAT AN INVESTOR IS GOING TO COME IN AND

04:12PM 8  SAY, YOU KNOW, I INVESTED BECAUSE I GOT CAUGHT UP IN A FRENZY

04:12PM 9  ALSO DOESN'T RING TRUE OF WHAT THE EVIDENCE AT TRIAL WILL SHOW.

04:12PM 10     AND THEN THE SECOND BUCKET I THINK IS ALSO RIPE FOR A

04:12PM 11 RULING NOW PRETRIAL IF YOUR HONOR IS SO PREDISPOSED, AND THAT'S

04:12PM 12 THE MOTIVE BUCKET, BECAUSE, AGAIN, THE GOVERNMENT DOESN'T WANT

04:12PM 13 TO STIPULATE TO THE FACT OF POSITIVE PRESS WHICH YOUR HONOR HAD

04:13PM 14 SUGGESTED.

04:13PM 15     THEY DON'T WANT THAT BECAUSE THEY WANT THESE ARTICLES IN

04:13PM 16 THAT HAVE THESE KIND OF SUBJECTIVE TAKES ON THE COMPANY AND

04:13PM 17 THAT REFLECT THE AUTHORIAL POINT OF VIEW.  AND SOMETIMES, EVEN

04:13PM 18 IN THE PERIOD OF TIME BEFORE, IN THE BUCKET THAT THE GOVERNMENT

04:13PM 19 MIGHT CHARACTERIZE AS POSITIVE, THERE ARE SKEPTICAL QUOTATIONS,

04:13PM 20 SOURCE OR TAKES ON THE EVIDENCE, AND THESE ARE FACTS AND PEOPLE

04:13PM 21 THAT THE JURY IS GOING TO MEET IN PERSON.

04:13PM 22     WE SUBMIT THAT THERE'S JUST NO REASON TO HAVE THESE

04:13PM 23 ARTICLES PUT IN KIND OF STACKING ON TOP OF EACH EITHER TO PROVE

04:13PM 24 A MOTIVE FOR PUBLICITY WHEN THEY POSE THOSE 403 RISKS.

04:13PM 25     I THINK FOR THE EFFECT ON THE READER AND FOR THE

UNITED STATES COURT REPORTERS

ER-2459

04:13PM 1    ENDORSEMENT CIRCULATION THEORIES, I THINK I KIND OF ALREADY

04:13PM 2    DISCUSSED THIS A LITTLE BIT IN MY REBUTTAL, BUT I THINK THAT

04:13PM 3    THERE ARE GOING TO BE SOME THRESHOLD FACTUAL SHOWING THAT THE

04:13PM 4    GOVERNMENT IS GOING TO HAVE TO MAKE TO BE ABLE TO CLEAR THE

04:13PM 5    HEARSAY ISSUE.

04:14PM 6        I STILL -- WE DON'T REALLY HAVE ANY AUTHORITY FROM THE

04:14PM 7    GOVERNMENT THAT THE HEARSAY ISSUES WILL BE SOLVED BY THAT, AND

04:14PM 8    AT THAT POINT IT'S GOING TO BE THEIR BURDEN TO ADMIT THE

04:14PM 9    EVIDENCE.  SO MAYBE THOSE ARE ISSUES UPON WHICH THE COURT COULD

04:14PM 10   DEFER RULING, BUT I THINK THAT THERE IS ROOM HERE FOR A

04:14PM 11   PRETRIAL RULING THAT WILL SET THE PARTIES' EXPECTATIONS KIND OF

04:14PM 12   ABOUT WHAT THE PLAYING FIELD IS.

04:14PM 13       AND THEN I FINALLY WANT TO SAY ONE LAST THING ABOUT KIND

04:14PM 14   OF THE NEGATIVE -- WHAT THE GOVERNMENT IS CALLING THE NEGATIVE

04:14PM 15   MEDIA COVERAGE.  SO I THINK "THE WALL STREET JOURNAL" ARTICLE,

04:14PM 16   THE OCTOBER 2015 ARTICLE BY JOHN CARREYROU THAT MR. BOSTIC

04:14PM 17   SPECIFICALLY MENTIONED.  THIS IS ALSO IN DEFENSE EXHIBIT 48,

04:14PM 18   ECF 586-2.  AND THE TITLE OF IT IS "HOT STARTUP THERANOS HAS

04:15PM 19   STRUGGLED WITH ITS BLOOD TESTING TECHNOLOGY."  AND THAT'S AT

04:15PM 20   ECF PAGES 12 TO 24.

04:15PM 21       AND THE GOVERNMENT SAYS, WELL, WE NEED TO PUT THIS IN

04:15PM 22   EVIDENCE TO KIND OF SHOW THE EFFECT, LIKE MS. HOLMES'S RESPONSE

04:15PM 23   TO IT OR THE COMPANY'S RESPONSE TO IT.

04:15PM 24       I WOULD SUBMIT THAT THE ARTICLE ITSELF DOES NOT NEED TO BE

04:15PM 25   ADMITTED FOR THOSE PURPOSES, AND THERE'S VERY SERIOUS CONCERNS

04:15PM 1    ABOUT ADMITTING IT FOR THOSE PURPOSES.

04:15PM 2        IT'S SOURCED FROM FORMER EMPLOYEES, MOST OF WHOM ARE

04:15PM 3    ANONYMOUS COMMENTING ON THERANOS'S BLOOD TESTING PROCEDURES.

04:15PM 4            THE COURT:  SO, MR. LOOBY, IS THE COURT GOING TO BE

04:15PM 5    PUT IN A POSITION OF EXECUTIVE EDITOR AND HAVE TO READ THE

04:15PM 6    ARTICLES AND THEN MAKE A DETERMINATION?

04:15PM 7        MR. BOSTIC, IS THAT ULTIMATELY WHAT IS GOING TO HAVE TO

04:15PM 8    HAPPEN TO DETERMINE ADMISSIBILITY IN SOME OF THESE ISSUES THAT

04:15PM 9    MR. LOOBY IS TALKING ABOUT?

04:15PM 10           MR. BOSTIC:  YOUR HONOR, I THINK NOT.

04:16PM 11       FOR ONE THING, IF THERE ARE CERTAIN LINES OR STATEMENTS IN

04:16PM 12   THE ARTICLES THAT CAUSE THE DEFENSE CONCERN, FOR EXAMPLE, I

04:16PM 13   KNOW THE DEFENSE HIGHLIGHTED FOR THE COURT A NUMBER OF NEGATIVE

04:16PM 14   OR UNFAVORABLE STATEMENTS IN THE ARTICLES, INCLUDING SOME OF

04:16PM 15   THE ARTICLES THAT ARE OVERALL POSITIVE.

04:16PM 16       THE GOVERNMENT IS WILLING TO WORK WITH THE DEFENSE TO

04:16PM 17   REDACT THOSE STATEMENTS, IF NECESSARY.  THAT COULD BE ONE

04:16PM 18   POSSIBLE SOLUTION.  I THINK THAT THE WAY THAT THESE ARTICLES

04:16PM 19   COME IN WILL MAKE A DIFFERENCE.

04:16PM 20       AS TO "THE WALL STREET JOURNAL ARTICLE," I DO THINK IT'S

04:16PM 21   NECESSARY FOR THE JURORS TO UNDERSTAND SOME OF THE CONTENT OF

04:16PM 22   THAT ARTICLE IN ORDER TO HAVE ANY UNDERSTANDING OF WHAT

04:16PM 23   MS. HOLMES AND THE COMPANY DO IN RESPONSE BOTH BEFORE AND AFTER

04:16PM 24   THAT ARTICLE COMES OUT WITHOUT THE SUBSTANCE OF THE ARTICLE NOT

04:16PM 25   INTRODUCED FOR THE TRUTH BUT AT LEAST AVAILABLE TO THE JURY,

04:16PM 1    THEY'LL HAVE NO WAY TO JUDGE OR UNDERSTAND WHAT AND WHY THE

04:16PM 2    DEFENDANT TAKES CERTAIN ACTIONS.

04:16PM 3            THE COURT:  OKAY.  THANK YOU.

04:16PM 4            MR. LOOBY:  YOUR HONOR, I WOULD SAY THE TITLE KIND

04:16PM 5    OF SAYS IT ALL AND WILL EXPLAIN IT ENOUGH, "HOT STARTUP

04:17PM 6    THERANOS HAS STRUGGLED WITH ITS BLOOD TESTING TECHNOLOGY."

04:17PM 7        THE ARTICLE ITSELF CONTAINS QUOTES FROM PHYSICIANS AND

04:17PM 8    NURSES AND PATIENTS, SOME OF WHOM THE JURY WILL MEET AS TRIAL

04:17PM 9    WITNESSES.  IT CONTAINS TRIPLE HEARSAY QUOTES FROM THE WIDOW OF

04:17PM 10   A DECEASED THERANOS EMPLOYEE RELAYING INFORMATION THAT HE

04:17PM 11   ALLEGEDLY CONVEYED TO HER ABOUT HIS TIME AT THERANOS.

04:17PM 12       IT CONTAINS ASSERTIONS SOURCED TO LAB EXPERTS, QUOTE, "LAB

04:17PM 13   EXPERTS UNNAMED ABOUT THERANOS'S LAB PRACTICES THAT SAY THAT

04:17PM 14   COULD LEAD TO ERRONEOUS RESULTS."

04:17PM 15       IT'S A GROSSLY PREJUDICIAL THING TO PUT BEFORE THE JURY

04:17PM 16   AND FOR THE LIMITED PURPOSE OF KIND OF EXPLAINING THE RESPONSE,

04:17PM 17   I DON'T THINK, WE SUBMIT, THAT WE DON'T THINK IT WILL BE

04:17PM 18   NECESSARY.

04:17PM 19           THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.  THANK

04:17PM 20   YOU.

04:17PM 21       ALL RIGHT.  WE'RE DOWN TO 565 THAT MIGHT BE CONCURRENT

04:18PM 22   WITH THE GOVERNMENT'S NUMBER 8, I BELIEVE.

04:18PM 23           MS. SAHARIA:  YES, YOUR HONOR, I'M GOING TO ADDRESS

04:18PM 24   THOSE.

04:18PM 25           THE COURT:  ALL RIGHT.  THANK YOU.  LET ME INDICATE,

04:18PM 1    TOO, WHILE YOU COME FORWARD, WHEN WE FINISH WITH OUR DISCUSSION

04:18PM 2    ON MILS, I DO WANT TO TALK TO COUNSEL ABOUT A SEALED MATTER.

04:18PM 3    SO WE'LL GO INTO A SEALED SESSION AT THE TIME, AND I'LL LET YOU

04:18PM 4    KNOW THAT, AND WE'LL TERMINATE THE PHONE CALL, AND WE'LL GO

04:19PM 5    INTO A SEALED SESSION.

04:19PM 6          MS. SAHARIA:  UNDERSTOOD, YOUR HONOR.  LET ME JUST

04:19PM 7    GRAB A PEN.

04:19PM 8          AMY SAHARIA FOR MS. HOLMES.

04:19PM 9          AS YOUR HONOR INDICATED, THESE ARE TWO RELATED MOTIONS.

04:19PM 10   THEY ARE DISTINCT, BUT THEY RELATE TO SIMILAR ISSUES.  THE

04:19PM 11   FIRST IS DEFENSE MOTION ECF 565, AND THE SECOND IS THE

04:19PM 12   GOVERNMENT'S MOTION NUMBER 8, ECF 588.

04:19PM 13         I CAN TAKE THEM HOWEVER YOUR HONOR WOULD LIKE.  I CAN

04:19PM 14   ADDRESS OURS AND THEN LET THE GOVERNMENT RESPOND OR I CAN

04:19PM 15   ADDRESS THEM ALL TOGETHER.  WHATEVER IS MOST CONVENIENCE.

04:19PM 16         THE COURT:  I LIKE EFFICIENT -- EFFICIENCY IS WHAT I

04:19PM 17   LIKE.

04:19PM 18         MS. SAHARIA:  ESPECIALLY AT THIS HOUR OF THE DAY.

04:19PM 19   SO I WILL TRY TO BE EFFICIENT.

04:19PM 20         JUST TO PUT THE TWO MOTIONS IN CONTEXT, OUR MOTION IS

04:19PM 21   BASED ON RELEVANCE, RULE 403 AND RULE 404(B) CONSIDERATIONS AS

04:19PM 22   IT RELATES TO CONDUCT AND STATEMENTS BY THERANOS EMPLOYEES.

04:20PM 23         THE GOVERNMENT'S MOTION, JUST TO BE CLEAR, IS NOT ABOUT

04:20PM 24   RELEVANCE.  IT'S A LIMITED MOTION ABOUT KIND OF BASIC HEARSAY

04:20PM 25   PRINCIPLES.  IT DOES NOT IDENTIFY THE PARTICULAR STATEMENTS IT

04:20PM 1    WISHES TO INTRODUCE. IT'S ASKING FOR A SORT OF ABSTRACT RULING

04:20PM 2    ON HOW THE HEARSAY PRINCIPLES APPLY TO STATEMENTS BY THERANOS

04:20PM 3    EMPLOYEES.

04:20PM 4         SO BOTH MOTIONS ARE ABOUT CONDUCT OR STATEMENTS BY

04:20PM 5    THERANOS EMPLOYEES, BUT THEY ADDRESS DIFFERENT LEGAL QUESTIONS.

04:20PM 6    SO IT'S A FUNDAMENTAL PRINCIPLE OF OUR CONSTITUTION THAT A

04:20PM 7    DEFENDANT IS CRIMINALLY LIABLE ONLY FOR HER OWN ACTS.

04:20PM 8         THERE ARE THREE WELL RECOGNIZED EXCEPTIONS TO THAT

04:20PM 9    PRINCIPLE. ONE IS FOR CONDUCT BY COCONSPIRATORS. THAT MAY BE

04:20PM 10   AN ISSUE FOR ANOTHER DAY IN THIS CASE, BUT THAT'S NOT THE

04:20PM 11   SUBJECT OF THIS PRESENT MOTION.

04:20PM 12        THE SECOND IS CONDUCT BY ACCOMPLICES. THAT'S ALSO NOT THE

04:20PM 13   SUBJECT OF THIS MOTION.

04:20PM 14        AND THE THIRD IS STRICT LIABILITY OFFENSES. WIRE FRAUD IS

04:20PM 15   NOT ONE OF THOSE OFFENSES.

04:21PM 16        ABSENT ONE OF THOSE EXCEPTIONS, THERE'S NO VICARIOUS

04:21PM 17   LIABILITY IN THE CRIMINAL LAW. MS. HOLMES IS NOT VICARIOUSLY

04:21PM 18   LIABLE FOR EVERYTHING THAT HAPPENED AT THERANOS JUST BECAUSE

04:21PM 19   SHE WAS CEO, NOR IS SHE VICARIOUSLY LIABLE BECAUSE SHE EXERTED

04:21PM 20   SOME SORT OF INFLUENCE AT THE COMPANY AS ALL CEO'S, OF COURSE,

04:21PM 21   DO.

04:21PM 22        THE GOVERNMENT'S RULE 404(B) NOTICE, VARIOUS ARGUMENTS AND

04:21PM 23   PLEADINGS THAT IT HAS MADE IN THIS CASE GAVE THE DEFENSE PAUSE

04:21PM 24   THAT THE GOVERNMENT INTENDS TO AT LEAST HINT AT VICARIOUS

04:21PM 25   LIABILITY TYPE ARGUMENTS TO THE JURY. IT HAS REPEATEDLY PUT AT

04:21PM 1    ISSUE IN VARIOUS ITERATIONS OF ITS 404(B) NOTICES CONDUCT BY

04:21PM 2    THERANOS AGENTS WITHOUT TYING THAT CONDUCT TO MS. HOLMES.  IT

04:21PM 3    HAS SAID THINGS LIKE "SHE IS ON THE HOOK FOR WHAT HAPPENED AT

04:21PM 4    THE COMPANY," AND THAT WAS THE IMPETUS FOR THIS PARTICULAR

04:22PM 5    MOTION.

04:22PM 6        LET ME START WITH THE PARTICULAR EVIDENCE IDENTIFIED IN

04:22PM 7    THE RULE 404(B) NOTICE, AND THEN I'LL TURN TO KIND OF THE

04:22PM 8    BROADER CONSIDERATIONS AT TRIAL.

04:22PM 9        THE GOVERNMENT PRODUCED A REVISED RULE 404(B) NOTICE IN

04:22PM 10   SEPTEMBER THAT CONTAINS VAGUE REFERENCES TO THERANOS EMPLOYEES

04:22PM 11   AND IN SOME CASES DOES NOT TIE THAT CONDUCT TO MS. HOLMES.

04:22PM 12       WE CATALOG THOSE AT PAGES 3 TO 5 OF OUR MOTION.  I DON'T

04:22PM 13   THINK IT'S NECESSARY FOR ME TO COVER THEM ALL HERE WITH THE

04:22PM 14   COURT, IN PARTICULAR BECAUSE THE GOVERNMENT DOESN'T RESPOND TO

04:22PM 15   THEM, BUT LET ME JUST HIGHLIGHT A FEW OF THOSE EXAMPLES.

04:22PM 16       THE FIRST IS THAT THE GOVERNMENT IDENTIFIES THE

04:22PM 17   EXPERIENCES OF VARIOUS PATIENTS AND SAYS THAT THOSE ARE

04:22PM 18   ADMISSIBLE TO PROVE NOTICE TO MS. HOLMES, BUT AS TO THREE OF

04:22PM 19   THOSE PATIENTS IT FAILS TO CONNECT THOSE IN IT'S 404(B) NOTICE

04:22PM 20   TO MS. HOLMES IN ANY WAY, WHICH GAVE US CONCERN THAT THE

04:23PM 21   GOVERNMENT INTENDS TO PURSUE SOME SORT OF IMPUTED KNOWLEDGE,

04:23PM 22   THEORY OR CONSTRUCTIVE NOTICE THEORY, AND THERE'S NO BASIS IN

04:23PM 23   THE CRIMINAL LAW FOR THAT KIND OF THEORY.  EITHER MS. HOLMES

04:23PM 24   HAD KNOWLEDGE OR SHE DIDN'T HAVE KNOWLEDGE.

04:23PM 25       THE SECOND IS THAT THE GOVERNMENT IDENTIFIES CONVERSATIONS

04:23PM 1    BETWEEN UNIDENTIFIED THERANOS REPRESENTATIVES SUCH AS CUSTOMER

04:23PM 2    SERVICE REPRESENTATIVES AND DOCTORS AND CLAIMS THAT THOSE

04:23PM 3    REPRESENTATIVES MADE FALSE STATEMENTS TO THE DOCTORS WITHOUT

04:23PM 4    ESTABLISHING ANY CAUSAL CONNECTION BETWEEN MS. HOLMES AND THOSE

04:23PM 5    CONVERSATIONS.

04:23PM 6         THAT MAKES THOSE ALLEGATIONS VERY DIFFERENT FROM THE

04:23PM 7    PRINCIPAL CASE THAT THE GOVERNMENT RELIES ON THAT I KNOW THE

04:23PM 8    COURT IS FAMILIAR WITH, WHICH IS THE CICCONE CASE, AS MR. LOOBY

04:23PM 9    CALLED IT, THAT'S C-I-C-C-O-N-E, FROM THE NINTH CIRCUIT.  IN

04:23PM 10   THAT CASE THE DEFENDANT ACTUALLY WROTE A SCRIPT FULL OF FALSE

04:24PM 11   STATEMENTS, GAVE THAT SCRIPT TO HIS EMPLOYEES, AND TOLD THE

04:24PM 12   EMPLOYEES WHO TO CALL WITH THAT SCRIPT.

04:24PM 13        THE COURT:  THOSE WERE CALL CENTER TYPE CONDUCT?

04:24PM 14        MS. SAHARIA:  EXACTLY.  THAT'S RIGHT.  HE WAS HELD

04:24PM 15   LIABLE FOR HIS OWN CONDUCT.  HIS CONDUCT WAS IN INSTRUCTING HIS

04:24PM 16   EMPLOYEES TO MAKE FALSE STATEMENTS.  AND, OF COURSE, WE'RE NOT

04:24PM 17   CHALLENGING THAT MS. HOLMES COULD BE LIABLE ON A THEORY THAT

04:24PM 18   SHE HERSELF DIRECTED PEOPLE TO DO SOMETHING.

04:24PM 19        OUR CONCERN HERE IS MORE ABOUT THESE BROADER THEORIES THAT

04:24PM 20   SHE'S LIABLE FOR THINGS HER EMPLOYEES DID EVEN IF SHE DIDN'T

04:24PM 21   DIRECT THOSE THINGS TO HAPPEN.  SO THAT'S CATEGORY TWO.

04:24PM 22        CATEGORY THREE, WHICH I WILL NOT DWELL ON, IS ONE THAT

04:24PM 23   YOUR HONOR TALKED ABOUT WITH MR. WADE, WHICH IS THE

04:24PM 24   GOVERNMENT'S ALLEGATIONS WITH RESPECT TO THE PRODUCTION OF THE

04:24PM 25   LIS DATABASE TO THE GOVERNMENT AND THE SUBSEQUENT DISASSEMBLY

122

04:24PM 1    OF THAT DATABASE.

04:24PM 2         THE GOVERNMENT ALLEGED IN ITS 404(B) NOTICE THAT THOSE

04:24PM 3    ACTIONS ARE RELEVANT TO MS. HOLMES'S INTENT.  THERE IS NOT ONE

04:25PM 4    SHRED OF EVIDENCE TYING THOSE ACTIONS TO MS. HOLMES.  WE DIDN'T

04:25PM 5    HEAR ANY SHRED OF EVIDENCE FROM THE GOVERNMENT THE OTHER DAY ON

04:25PM 6    THAT TOPIC.  ALL THEY SAID WAS THAT THEY CONTINUED TO

04:25PM 7    INVESTIGATE.  ONE WOULD HOPE THAT THEY WOULD HAVE INVESTIGATED

04:25PM 8    BEFORE MAKING THAT INFLAMMATORY STATEMENT AS TO MS. HOLMES.

04:25PM 9    I'M CONFIDENT NO SUCH EVIDENCE EXISTS.

04:25PM 10        I'M NOT GOING TO DWELL ON THAT SINCE THAT HAS BEEN COVERED

04:25PM 11   AT LENGTH.

04:25PM 12        THE FOURTH, AND THIS TOUCHES ON A POINT THAT WE WERE JUST

04:25PM 13   DISCUSSING, AND THIS IS THE ONLY ONE WE RESPOND TO IN THEIR

04:25PM 14   OPPOSITION BRIEF, IS THAT THEY POINT TO ACTS BY OUTSIDE COUNSEL

04:25PM 15   AND AT BOIES SCHILLER AS WELL AS THERANOS'S INSIDE GENERAL

04:25PM 16   COUNSEL WITH RESPECT TO "THE WALL STREET JOURNAL" WHICH THEY

04:25PM 17   CLAIM ARE EVIDENCE OF MS. HOLMES'S MENTAL STATE.  AGAIN, THEY

04:25PM 18   FAIL TO TIE THOSE ALLEGATIONS TO MS. HOLMES IN ANY WAY.

04:26PM 19        IN THEIR RESPONSE BRIEF THEY SIMPLY SAY IT'S IMPLAUSIBLE

04:26PM 20   THAT SHE DIDN'T DIRECT THOSE PARTICULAR ACTIONS.  I WOULD

04:26PM 21   SUBMIT THAT'S MERE SPECULATION.  THEY SHOULD COME FORWARD WITH

04:26PM 22   PROOF THAT SHE DIRECTED THESE ACTS AND THEY HAVE NOT DONE SO.

04:26PM 23   AND THIS IS A VERY DANGEROUS TERRITORY GIVEN THE ROLE OF

04:26PM 24   LAWYERS IN THESE PARTICULAR ACTIONS.

04:26PM 25        WE TOUCHED ON ONE OTHER CATEGORY THAT IS NOT SPECIFICALLY

123

04:26PM  1    MENTIONED HERE BUT WITH RESPECT TO THE CONDUCT OF THE COMPANY

04:26PM  2    VIS-A-VIS THE DEPARTURE OF CERTAIN EMPLOYEES AND WHAT HAPPENED

04:26PM  3    AFTER THEY LEFT THE COMPANY.

04:26PM  4         MY COLLEAGUE CHALLENGED THE GOVERNMENT JUST A FEW MINUTES

04:26PM  5    AGO TO ESTABLISH A CONNECTION TO MS. HOLMES, AND WE AGAIN HEARD

04:26PM  6    NO CONNECTION WHATSOEVER TO MS. HOLMES IN CONNECTION WITH THOSE

04:26PM  7    ACTIONS.

04:26PM  8         SO WE WOULD ASK THE COURT TO EXCLUDE ALL OF THE CATEGORIES

04:26PM  9    OR ALL OF THE EVIDENCE THAT WE HAVE IDENTIFIED AT PAGES 3 TO 5

04:26PM  10   OF OUR MOTION WHICH THE GOVERNMENT HAS NOT TIED TO MS. HOLMES.

04:26PM  11        THE SEPARATE QUESTION IS HOW DO WE DEAL WITH THIS ISSUE

04:27PM  12   MORE BROADLY AT TRIAL BECAUSE THERE ARE STATEMENTS IN THE

04:27PM  13   GOVERNMENT'S OPPOSITION BRIEF THAT GIVE US GREAT CONCERN THAT

04:27PM  14   THE GOVERNMENT DOESN'T KNOW WHERE TO DRAW THE LINE AND THAT

04:27PM  15   THEY MAY CONTINUE TO HINT AT THESE VICARIOUS LIABILITY KINDS OF

04:27PM  16   ARGUMENTS.

04:27PM  17        SO JUST AS A FEW EXAMPLES, AT OPPOSITION AT PAGE 6 THEY

04:27PM  18   SAY MS. HOLMES WAS WELL POSITIONED TO ENSURE THAT THE ACTIONS

04:27PM  19   OF THERANOS'S EMPLOYEES AND AGENTS FURTHERED DEFENDANT'S

04:27PM  20   SCHEMES WHENEVER POSSIBLE.

04:27PM  21        THEY SAY AGAIN AT OPPOSITION 6, HER WORDS AND ACTIONS HAD

04:27PM  22   A SIGNIFICANT EFFECT ON THE WAY THERANOS EMPLOYEES VIEWED THE

04:27PM  23   COMPANY.

04:27PM  24        THOSE KINDS OF GENERALITIES ABOUT SIGNIFICANT EFFECTS OR

04:27PM  25   INFLUENCE ARE NOT EVIDENCE.  THEY ARE NOT HER DIRECTING

UNITED STATES COURT REPORTERS

04:27PM 1    PARTICULAR ACTIONS TO OCCUR.

04:27PM 2        THE GOVERNMENT CITES NO CASE IMPUTING CRIMINAL LIABILITY

04:27PM 3    ON THOSE KINDS OF GENERALITIES.

04:27PM 4        SO WE WOULD ASK THE COURT TO ENTER AN ORDER LAYING GROUND

04:28PM 5    RULES TO GOVERN THIS TRIAL GOING FORWARD THAT WOULD REQUIRE

04:28PM 6    THAT THE GOVERNMENT TO PROVE THAT MS. HOLMES DIRECTED VARIOUS

04:28PM 7    ACTIONS TO OCCUR IF THEY ARE GOING TO PUT THESE BAD ACTS OR

04:28PM 8    ALLEGED BAD ACTS AND ALLEGEDLY FALSE STATEMENTS BY THERANOS'S

04:28PM 9    EMPLOYEES AT ISSUE IN THE CASE, THERE'S A VERY WELL ESTABLISHED

04:28PM 10   GROUND TO DO THAT.  IT IS RULE 104(B) OF THE RULES OF EVIDENCE.

04:28PM 11       UNDER RULE 104(B), WHEN THE RELEVANCE OF EVIDENCE DEPENDS

04:28PM 12   ON WHETHER A FACT EXISTS, PROOF MUST BE INTRODUCED SUFFICIENT

04:28PM 13   TO SUPPORT A FINDING THAT A FACT DOES EXIST.  THE COURT MAY

04:28PM 14   ADMIT THE PROPOSED EVIDENCE ON THE CONDITION THAT THE PROOF BE

04:28PM 15   INTRODUCED LATER.

04:28PM 16       SO IF THE GOVERNMENT IS GOING TO ATTEMPT TO PUT INTO

04:28PM 17   EVIDENCE ACTS BY THERANOS EMPLOYEES THAT IT ALLEGED TO BE BAD

04:28PM 18   ACTS OR FALSE STATEMENTS, IT SHOULD BE REQUIRED TO PROFFER AT

04:28PM 19   THAT TIME HOW IT INTENDS TO CONNECT THAT ACT TO MS. HOLMES SO

04:29PM 20   THAT WE DON'T END UP IN A SITUATION WHERE THEY PUT THAT INTO

04:29PM 21   EVIDENCE AND THEN THAT CONNECTION TO MS. HOLMES NEVER

04:29PM 22   MATERIALIZES.

04:29PM 23       SO I THINK WITH THAT MAYBE I'LL LET THE GOVERNMENT RESPOND

04:29PM 24   AND THEN WE CAN TURN TO THE GOVERNMENT'S MOTIONS, UNLESS YOU

04:29PM 25   PREFER FOR ME TO GO FORWARD WITH THIS.

125

04:29PM 1        THE COURT:  WELL, MR. BOSTIC, ARE YOU SPEAKING TO

04:29PM 2   THIS?

04:29PM 3        MR. BOSTIC:  YES, YOUR HONOR.  GOOD AFTERNOON.

04:29PM 4   ACTUALLY, BECAUSE THESE MOTIONS ARE SO INTERRELATED, I

04:29PM 5   WOULD SUGGEST THAT WE ADDRESS THEM SIMULTANEOUSLY IN PARALLEL.

04:29PM 6   I THINK PART OF THE GOVERNMENT'S POINT HERE WILL BE THAT

04:29PM 7   BECAUSE THE HEARSAY RULES EXPRESSLY PROVIDE AN EXCEPTION AND

04:29PM 8   PERMIT THE INTRODUCTION OF STATEMENTS BY AGENTS AND EMPLOYEES,

04:29PM 9   THAT THAT DOES ACTUALLY LAY THE GROUNDWORK FOR THE ADMISSION OF

04:29PM 10  THESE STATEMENTS AND INCLUDING THE INSTANCES THAT MS. SAHARIA

04:29PM 11  JUST MENTIONED.  SO I THINK IT DOES MAKE SENSE TO VIEW THEM IN

04:29PM 12  PARALLEL.

04:29PM 13       THE COURT:  ALL RIGHT.  THANK YOU.

04:29PM 14  ONE OF THE QUESTIONS I HAVE, AND I KNOW, MS. SAHARIA, WE

04:30PM 15  HAVE TO HAVE A DISCUSSION ABOUT AGENCY AND THE EXTENT OF AGENCY

04:30PM 16  AND WHETHER OR NOT THAT LIES HERE IN THE EVIDENCE AND FACTS IN

04:30PM 17  THIS CASE OR NOT, WHETHER OR NOT WE CAN TELL THAT NOW PRETRIAL

04:30PM 18  OR WHETHER THAT IS SOMETHING THAT, AS YOU AND OTHERS HAVE

04:30PM 19  SUGGESTED THIS IS SOMETHING THAT IS GOING TO, BECAUSE WE KNOW

04:30PM 20  TRIALS ARE FLUID, WHETHER OR NOT THIS IS SOMETHING THAT THE

04:30PM 21  COURT IS GOING TO HAVE TO ENTERTAIN AT THE TIME OF EITHER THE

04:30PM 22  ATTEMPT TO INTRODUCE OR THE MATTER COMES UP.

04:30PM 23       MS. SAHARIA:  SURE.  SO TWO RESPONSES TO THAT.

04:30PM 24  I THINK FOR SURE WHEN WE'RE TALKING ABOUT WHETHER AN

04:30PM 25  EMPLOYEE IS AN AGENT OF MS. HOLMES FOR THE PURPOSE OF THE

126

04:30PM 1   HEARSAY RULES, WE DO THINK THAT THAT IS NOT AN ISSUE THAT CAN

04:30PM 2   BE ADDRESSED NOW.  THE GOVERNMENT WOULD HAVE TO LAY THE PROPER

04:30PM 3   FOUNDATION AT TRIAL, AND I CAN TURN TO WHAT THAT FOUNDATION

04:30PM 4   WOULD LOOK LIKE.

04:30PM 5       BUT I DISAGREE WITH MR. BOSTIC THAT THESE TWO ISSUES MERGE

04:30PM 6   TOGETHER.  THEY'RE TWO DIFFERENT GROUNDS FOR EVIDENCE TO BE

04:31PM 7   ADMITTED, ONE OF WHICH IS HEARSAY AND ONE OF WHICH IS

04:31PM 8   RELEVANCE.  AND IT MAY CERTAINLY BE THE CASE THAT IF THE

04:31PM 9   GOVERNMENT CAN ESTABLISH UNDER THE FACTORS THAT I'LL DISCUSS

04:31PM 10  THAT A PARTICULAR EMPLOYEE SHOULD QUALIFY AS AN AGENT OF

04:31PM 11  MS. HOLMES SO THAT A STATEMENT CAN COME IN AS -- FOR THE TRUTH

04:31PM 12  OF THE MATTER ASSERTED UNDER THE HEARSAY RULES, THAT'S ONE

04:31PM 13  THING, BUT TO SAY THAT MS. HOLMES IS THEN CRIMINALLY LIABLE FOR

04:31PM 14  THE ACTS OF AN AGENT, THAT IS JUST SAYING THERE IS VICARIOUS

04:31PM 15  LIABILITY UNDER THE SUBSTANTIVE CRIMINAL LAW, AND THERE'S NO

04:31PM 16  AUTHORITY FOR THAT.

04:31PM 17      THE GOVERNMENT HAS NOT CITED ANY AUTHORITY, AND THAT WOULD

04:31PM 18  BE I THINK A FLAGRANT VIOLATION OF THE DUE PROCESS CLAUSE.

04:31PM 19      SO, AGAIN, THESE ARE TWO DIFFERENT ISSUES.  ONE, WHAT IS

04:31PM 20  SHE SUBSTANTIVELY LIABLE FOR?  AND THAT GOES INTO WHAT IS

04:31PM 21  RELEVANT, WHAT COMES INTO THE CASE.

04:31PM 22      A TOTALLY SEPARATE QUESTION, ALTHOUGH IT INVOLVES THE SAME

04:31PM 23  ISSUES, IS UNDER THE HEARSAY RULES WHAT STATEMENTS CAN COME IN

04:31PM 24  FOR THE TRUTH OF THE MATTER ASSERTED.

04:32PM 25      SO I'M HAPPY TO TURN TO THAT PARTICULAR HEARSAY QUESTION.

UNITED STATES COURT REPORTERS

127

04:32PM 1    AS I MENTIONED, THE GOVERNMENT IS ASKING THE COURT TO

04:32PM 2  ADMIT UNIDENTIFIED STATEMENTS.  I DON'T THINK THE COURT COULD

04:32PM 3  ADMIT ANY STATEMENTS AT THIS POINT.  IT'S REALLY KIND OF AN

04:32PM 4  ABSTRACT DISCUSSION ABOUT THE APPLICATION OF THE HEARSAY RULES.

04:32PM 5    AND WHAT THE GOVERNMENT IS ASKING FOR IN PARTICULAR IS A

04:32PM 6  BLANKET RULING THAT EVERY STATEMENT BY EVERY THERANOS EMPLOYEE

04:32PM 7  IS NONHEARSAY, AND THUS ADMISSIBLE FOR ITS TRUTH AS A STATEMENT

04:32PM 8  BY MS. HOLMES'S AGENT.

04:32PM 9    NOW, WE KNOW UNDER NINTH CIRCUIT LAW THAT WE LOOK TO

04:32PM 10  COMMON LAW AGENCY PRINCIPLES TO DECIDE WHO IS AN AGENT UNDER

04:32PM 11  RULE 801(D)(2)(D).  UNDER COMMON LAW AGENCY PRINCIPLES,

04:32PM 12  EMPLOYEES AT THERANOS WERE NOT MS. HOLMES'S AGENTS.  THEY WERE

04:32PM 13  AGENTS OF THERANOS, JUST LIKE SHE AS CEO WAS AN AGENT OF

04:32PM 14  THERANOS.

04:32PM 15    THE TWO -- MS. HOLMES AND EMPLOYEES OF THERANOS WERE

04:32PM 16  EFFECTIVELY COAGENTS OF THERANOS, AND WE CITED THE RESTATEMENT

04:33PM 17  OF AGENCY FOR THAT PRINCIPLE.

04:33PM 18    THE GOVERNMENT HASN'T IDENTIFIED ANY COMMON LAW AGENCY

04:33PM 19  PRINCIPALS THAT WOULD SUPPORT ITS INTERPRETATION.

04:33PM 20    NOW, UNDER THE GOVERNMENT'S RULE IT WANTS THE COURT TO

04:33PM 21  ADOPT THIS VERY BROAD NOVEL RULE THAT WOULD HOLD IN THE CASE OF

04:33PM 22  PRIVATE COMPANIES OWNED, AND CONTROLLED, AND MANAGED BY AN

04:33PM 23  INDIVIDUAL DEFENDANT, EVERY EMPLOYEE IS THE AGENT OF THE

04:33PM 24  DEFENDANT FOR PURPOSES OF RULE 801(D)(2)(D).  THEY CITE NO

04:33PM 25  COMMON LAW AGENCY PRINCIPLE IN SUPPORT OF THAT RULE, AND NO

04:33PM 1    CASE ADOPTING THAT RULE.

04:33PM 2         THERE IS, IN FACT, A VERY WELL ESTABLISHED BODY OF CASE

04:33PM 3    LAW ADDRESSING WHO IS AN AGENT OF A CORPORATE EXECUTIVE FOR

04:33PM 4    PURPOSES OF 801(D)(2)(D).  WE CITED THOSE CASES AT PAGES 15 TO

04:33PM 5    16 OF OUR OPPOSITION, AND IN THOSE CASES THE COURTS HAVE

04:33PM 6    UNIFORMLY REJECTED THE IDEA THAT ANY SUBORDINATE EMPLOYEE IS

04:33PM 7    ALWAYS CONSIDERED AN AGENT OF AN EXECUTIVE, AND THEY LOOK TO

04:34PM 8    THE DEGREE OF DAILY SUPERVISION BY THE DEFENDANT OVER A

04:34PM 9    DECLARANT.

04:34PM 10        SO THEY ASK QUESTIONS LIKE IS THE DECLARANT DIRECTLY

04:34PM 11   RESPONSIBLE TO THE DEFENDANT?  WAS THE DECLARANT HIRED DIRECTLY

04:34PM 12   BY THE DEFENDANT?  DID THE DECLARANT WORK ON MATTERS WHICH THE

04:34PM 13   DEFENDANT WAS ACTIVELY INVOLVED OR DID THE DEFENDANT DIRECT THE

04:34PM 14   DECLARANT'S WORK ON DAY-TO-DAY ON A CONTINUING BASIS?

04:34PM 15        SO WE CANNOT ANSWER THOSE QUESTIONS IN THE ABSTRACT.

04:34PM 16   THERE MIGHT BE SOME SMALL CATEGORY OF EMPLOYEES WHO COULD

04:34PM 17   QUALIFY UNDER THAT TEST, IF THAT IS A TEST THAT THE COURT WERE

04:34PM 18   TO APPLY, BUT THE GOVERNMENT HASN'T LAID ANY FOUNDATIONS FOR

04:34PM 19   THOSE FACTORS RIGHT NOW.

04:34PM 20        NOW, THE GOVERNMENT PRIMARILY RELIES ON TWO NINTH CIRCUIT

04:34PM 21   CASES, KIRK AND GIBSON.  I THINK AS YOUR HONOR PROBABLY KNOWS

04:34PM 22   FROM READING THEM, THEY CONTAIN VERY LITTLE ANALYSIS AND IN

04:34PM 23   BOTH CASES THE HOLDING WAS AN ALTERNATE HOLDING, BUT I THINK

04:34PM 24   THOSE CASES ARE PERFECTLY CONSISTENT WITH THE WELL ESTABLISHED

04:35PM 25   BODY OF CASE LAW THAT I JUST DESCRIBED BECAUSE IN BOTH OF THOSE

129

04:35PM 1    CASES THE DEFENDANT WAS SUPERVISING THE DECLARANTS ON A

04:35PM 2    DAY-TO-DAY BASIS.

04:35PM 3        IN KIRK THE NINTH CIRCUIT SAID EXPRESSLY IN DISCUSSING THE

04:35PM 4    FACTS OF THE CASE THAT THE DEFENDANT RAN THE DAY-TO-DAY

04:35PM 5    OPERATIONS THAT WERE AT ISSUE IN THAT CASE.  IT WAS A TIMESHARE

04:35PM 6    CLUB THAT WAS, YOU KNOW, FALSELY MAKING REPRESENTATIONS TO

04:35PM 7    CUSTOMERS.

04:35PM 8        AND THEN IN GIBSON, THIS IS ONE IS EVEN CLEARER, THE

04:35PM 9    DEFENDANT HIMSELF EXPRESSED OR INSTRUCTED THE SALESPEOPLE TO

04:35PM 10   CONVEY FALSE INFORMATION TO INVESTORS.  SO VERY MUCH LIKE THE

04:35PM 11   CICCONE CASE.  IT'S NOT SURPRISING THAT WHEN HE GAVE THOSE

04:35PM 12   DIRECT INSTRUCTIONS, THE COURT DEEMED THOSE EMPLOYEES TO BE

04:35PM 13   AGENTS.

04:35PM 14       SO WE THINK THAT THOSE CASES ARE CONSISTENT WITH THIS WELL

04:35PM 15   ESTABLISHED BODY OF CASE LAW THAT WE HAVE CITED AND THAT THE

04:35PM 16   COURT CAN'T DECIDE THIS ISSUE RIGHT NOW WITHOUT A FACTUAL

04:35PM 17   FOUNDATION FROM THE GOVERNMENT.

04:35PM 18           THE COURT:  OKAY.  THANK YOU.

04:35PM 19       MR. BOSTIC.

04:35PM 20           MR. BOSTIC:  THANK YOU, YOUR HONOR.

04:35PM 21       SO THE IMPORTANT ISSUE RAISED BY THESE MOTIONS RELATES TO

04:36PM 22   HOW THE COURT WILL DEAL WITH EVIDENCE OF STATEMENTS AND ACTIONS

04:36PM 23   BY INDIVIDUALS OTHER THAN THE DEFENDANT BUT WHERE THOSE

04:36PM 24   STATEMENTS AND ACTIONS ARE STILL CLEARLY IN FURTHERANCE OF THE

04:36PM 25   FRAUD THAT THIS DEFENDANT ORIGINATED AND THAT THIS DEFENDANT

04:36PM 1    WAS THE PRINCIPAL MOTIVATING FORCE FOR.

04:36PM 2        THE DEFENSE CITES CASES ADDRESSING THE RISK THAT A

04:36PM 3    DEFENDANT WILL BE IMPROPERLY CONVICTED FOR THE INDEPENDENT

04:36PM 4    CONDUCT OF OTHERS.  THAT'S THE LINE OF CASES CITED BY THE

04:36PM 5    DEFENSE IN ITS MOTION.

04:36PM 6        THAT RISK IS NONEXISTENT HERE.  THERE IS NO INDEPENDENT

04:36PM 7    FRAUD THAT TOOK PLACE AT THERANOS.

04:36PM 8        TO THE EXTENT THAT THERANOS AGENTS AND EMPLOYEES MADE

04:36PM 9    FALSE STATEMENTS IN FURTHERANCE OF THE FRAUD, IT WAS IN

04:36PM 10   FURTHERANCE OF THE SAME FRAUD THAT CONSTITUTES THE BASIS FOR

04:36PM 11   THE CHARGED CONDUCT IN THIS CASE.

04:36PM 12       AND EVEN WHERE INDIVIDUAL STATEMENTS CANNOT BE TRACED BACK

04:36PM 13   TO HOLMES, IN OTHER WORDS, EVEN WHERE THE DEFENDANT DID NOT SAY

04:36PM 14   HERE'S A SCRIPT, I WANT YOU TO GO SAVE THIS, IT STILL

04:37PM 15   NONETHELESS IS CLEAR FROM THE EVIDENCE AS A WHOLE THAT THOSE

04:37PM 16   STATEMENTS, THE ALLEGED BAD ACTS BY THERANOS AGENTS AND

04:37PM 17   EMPLOYEES ARE THE RESULT OF, THEY FLOW DIRECTLY FROM THE FRAUD

04:37PM 18   AND MISSTATEMENTS MADE BY THE DEFENDANT IN THIS CASE GIVEN HER

04:37PM 19   ESSENTIALLY COMPLETE CONTROL OVER THE OPERATIONS OF THE

04:37PM 20   COMPANY.

04:37PM 21       THE COURT:  SO I'M CURIOUS, HOW FAR DOES THAT

04:37PM 22   EXTEND, MR. BOSTIC?  HOW FAR DO WE EXTEND THAT?  DOES THAT GO

04:37PM 23   TO AN EMPLOYEE, A CUSTODIAN, SOMEBODY WHO IS IN CHARGE OF THE

04:37PM 24   PARKING LOT, SOMEBODY WHO IS IN CHARGE OF THE CAFETERIA AND

04:37PM 25   THEY MAKE A STATEMENT TO SOMEONE THAT THIS IS THE BEST COMPANY

04:37PM 1    THAT I HAVE EVER WORKED IN, AND I'VE NEVER BEEN TREATED BETTER

04:37PM 2    THAN THIS, THIS IS A SUCCESSFUL COMPANY, YOU SHOULD INVEST IN

04:37PM 3    THIS, IS SHE LIABLE FOR THAT?

04:37PM 4         MR. BOSTIC:  SO TWO POINTS IN RESPONSE, YOUR HONOR.

04:38PM 5         FIRST, WE'RE HERE TO TALK ABOUT ADMISSIBILITY AND NOT

04:38PM 6    NECESSARILY LIABILITY.

04:38PM 7         SO A FACT CAN BE ADMISSIBLE EVEN IF THAT FACT DOES NOT

04:38PM 8    STANDING ALONE SUPPORT A CONVICTION.  I HOPE THAT'S NOT A

04:38PM 9    CONTROVERSIAL POINT.

04:38PM 10        SO THE FALSE STATEMENT OR BAD ACT OF A THERANOS AGENT OR

04:38PM 11   EMPLOYEE CAN BE RELEVANT IN THIS CASE, IT CAN BE OKAY FOR THE

04:38PM 12   JURY TO HEAR ABOUT IT IF IT SHOWS THE EXISTENCE OF THE SCHEME

04:38PM 13   TO DEFRAUD, EVEN IF THAT STATEMENT ITSELF COULD NOT ON ITS OWN

04:38PM 14   SUPPORT THE CONVICTION OF THE DEFENDANT.

04:38PM 15        THE OTHER THING I WOULD SAY THERE IS THAT IT DOES MATTER

04:38PM 16   WHAT THE NATURE OF THE FALSE STATEMENT WAS.  HERE THE

04:38PM 17   INDICTMENT LAYS OUT SEVERAL CATEGORIES OF SPECIFIC TYPES OF

04:38PM 18   FALSE STATEMENTS THAT THIS DEFENDANT MADE ALONG WITH HER

04:38PM 19   COCONSPIRATOR.

04:38PM 20        WHEN THE DEFENDANT MAKES THOSE MISSTATEMENTS, THOSE

04:38PM 21   MISREPRESENTATIONS TO INVESTORS, TO OTHER EMPLOYEES OF THE

04:38PM 22   COMPANY, TO JOURNALISTS AS WE RECENTLY DISCUSSED, THOSE FALSE

04:39PM 23   STATEMENTS BEGIN TO PERMEATE THE ATMOSPHERE AT THERANOS.  IT'S

04:39PM 24   NO SURPRISE THAT HER AGENTS, HER EMPLOYEES THEN GO ON TO REPEAT

04:39PM 25   THOSE FALSE STATEMENTS THEREBY SPREADING THE FRAUD, SPREADING

04:39PM 1    THE MISUNDERSTANDING, SPREADING THAT FALSE INFORMATION.  THAT

04:39PM 2    CAN HAPPEN EITHER BECAUSE THOSE EMPLOYEES UNDERSTAND THAT WHILE

04:39PM 3    THIS IS NOT EXACTLY TRUE, BUT THIS IS WHAT WE'RE SAYING.  I

04:39PM 4    UNDERSTAND THIS BECAUSE I'VE GOTTEN DIRECTION FROM MY

04:39PM 5    SUPERIORS, INCLUDING THE DEFENDANTS IN THIS CASE, THAT THIS IS

04:39PM 6    HOW WE'RE GOING TO SPIN THIS ISSUE OR THIS IS HOW WE'RE GOING

04:39PM 7    TO REPRESENT WHAT IS HAPPENING HERE EVEN THOUGH IT MIGHT BE

04:39PM 8    MISLEADING.

04:39PM 9          THE COURT:  I THINK THAT'S THE DISTINCTION, ISN'T

04:39PM 10   IT, THAT IF THE EVIDENCE SHOWS THAT MS. HOLMES ACTUALLY

04:39PM 11   DIRECTED PEOPLE AND HAD REGULAR MEETINGS, AND THEY CAME IN AND

04:39PM 12   SHE SAID I WANT YOU TO SAY THIS, YOU MUST, AND HERE'S THE

04:39PM 13   SCRIPT, I'M NOT GOING TO GIVE YOU PAPER BECAUSE I DON'T WANT A

04:40PM 14   PAPER TRAIL, BUT HERE'S WHAT I WANT YOU TO SAY ABOUT OUR

04:40PM 15   COMPANY AND NOTHING ELSE?  THAT'S PRETTY EASY.  I THINK THAT'S

04:40PM 16   PRETTY STRAIGHTFORWARD.

04:40PM 17        BUT IF SHE -- IF THE GOVERNMENT ALLEGES THAT SHE MADE

04:40PM 18   FALSE STATEMENTS TO NEWSPAPERS, TO INVESTORS, AND OTHER FOLKS

04:40PM 19   BUT DIDN'T HAVE THOSE MEETINGS WHERE SHE TOLD PEOPLE TO SAY

04:40PM 20   CERTAIN THINGS, AND I THINK WHAT YOU'RE SAYING IS THE SUCCESS

04:40PM 21   OF THERANOS BASED ON MS. HOLMES'S EFFORTS, YOU ATTRIBUTE THE

04:40PM 22   SUCCESS TO HER EFFORTS IN RECRUITING INVESTORS, THAT CREATES A

04:40PM 23   CULTURE OF SUCCESS, BUT IT'S ALSO A CULTURE OF DECEIT BECAUSE

04:40PM 24   IT WAS DECEIT AT THE OUTSET AND THAT SHE SHOULD, THEREFORE --

04:40PM 25   BECAUSE SHE CREATED THAT WITH INVESTORS, SHE'S RESPONSIBLE FOR

04:40PM 1      THE NATURAL AND PROBABLE CONSEQUENCES OF THAT?

04:40PM 2          MR. BOSTIC:  I WOULD SAY IT'S SIMPLER AND MORE

04:41PM 3      CONCRETE THAN THAT, YOUR HONOR, WITH RESPECT.

04:41PM 4          I THINK INSTEAD I WOULD SAY WHERE A DEFENDANT WHO IS

04:41PM 5      PARTICIPATING IN A SCHEME TO DEFRAUD, WHO HAS DEVISED AND IS

04:41PM 6      ENGAGING IN A SCHEME TO DEFRAUD MAKES CERTAIN CATEGORIES OF

04:41PM 7      FALSE STATEMENTS REPEATEDLY OVER MONTHS AND OVER YEARS, MAKES

04:41PM 8      THOSE STATEMENTS PUBLICLY IN A WAY THAT ALLOWS HER EMPLOYEES

04:41PM 9      AND AGENTS TO BECOME AWARE THAT THIS IS WHAT MY SUPERIOR IS

04:41PM 10     SAYING, THE PERSON WHO IS DIRECTING THE WAY THAT I DO MY JOB IS

04:41PM 11     REPRESENTING THINGS TO THE WORLD IN THIS WAY, THAT WILL HAVE A

04:41PM 12     NATURAL AND UNAVOIDABLE EFFECT.

04:41PM 13         THE EFFECT WILL BE TO ENCOURAGE THOSE INDIVIDUALS, THOSE

04:41PM 14     SUBORDINATES, THOSE AGENTS TO MAKE SIMILAR STATEMENTS.  AND IF

04:41PM 15     THOSE STATEMENTS ARE FALSE, THEN THAT WILL RESULT IN A

04:41PM 16     PERPETUATION, A PROPAGATION OF THE FRAUD IN THIS CASE, AND

04:41PM 17     THAT'S WHAT HAPPENED.

04:41PM 18         SO THAT'S NOT A SURPRISE.

04:41PM 19         THE COURT:  MAY I ASK YOUR COLLEAGUE OPPOSITE HER

04:41PM 20     OPINION OF THAT?

04:41PM 21         MR. BOSTIC:  YOUR HONOR, OF COURSE.

04:41PM 22         MS. SAHARIA:  YES, YOUR HONOR.

04:41PM 23         THIS, TO ME, IS VERY DANGEROUS TERRITORY, AND THE REASON

04:42PM 24     FOR THAT IS THAT WITHOUT A DIRECTION BY MS. HOLMES OR SOME

04:42PM 25     ACTION BY HER THAT CONVEYS THAT SHE INTENDS FOR A FRAUDULENT

134

04:42PM 1    MISREPRESENTATION TO BE MADE, THE CRITICAL LINCHPIN ELEMENT OF

04:42PM 2    INTENT IS MISSING.  SHE WASN'T CHARGED WITH DECEIVING HER

04:42PM 3    EMPLOYEES.  SHE WAS CHARGED WITH DEFRAUDING INVESTORS AND

04:42PM 4    PAYING CUSTOMERS.

04:42PM 5        AND THE GOVERNMENT HAS TO ESTABLISH THAT SHE INTENDED FOR

04:42PM 6    FALSE REPRESENTATIONS TO BE MADE TO INVESTORS OR PAYING

04:42PM 7    CUSTOMERS FOR THE PURPOSE OF DEFRAUDING THEM.

04:42PM 8        AND TO SAY THAT, YOU KNOW, STATEMENTS SHE MADE PERMEATED

04:42PM 9    THE COMPANY, AND, THEREFORE, SHE MUST HAVE INTENDED FOR

04:42PM 10   PARTICULAR PEOPLE IN HER COMPANY TO MAKE PARTICULAR FALSE

04:42PM 11   REPRESENTATIONS TO PAYING CUSTOMERS OR INVESTORS, THIS IS --

04:42PM 12   IT'S VERY DANGEROUS.  THERE'S NO -- WE HAVEN'T DRAWN A DIRECT

04:43PM 13   CAUSAL LINK.  THERE'S NO CASES THAT HAVE ACKNOWLEDGED THIS KIND

04:43PM 14   OF CRIMINAL LIABILITY.

04:43PM 15       THE BEST CASE THAT WE HAVE WHERE THIS KIND OF THEORY, ANY

04:43PM 16   KIND OF THEORY LIKE THIS WORKED WAS THE CICCONE CASE WHERE

04:43PM 17   THERE WAS A DIRECTION FROM THE CEO.

04:43PM 18       AND I DON'T DISAGREE WITH YOUR HONOR THAT IF THERE WAS A

04:43PM 19   MEETING, OF COURSE, WHERE MS. HOLMES TOLD PEOPLE TO GO TELL THE

04:43PM 20   FOLLOWING MISREPRESENTATIONS, AND, OF COURSE, WE DON'T BELIEVE

04:43PM 21   THAT EVER HAPPENED, BUT OF COURSE IF THERE WAS THAT KIND OF

04:43PM 22   MEETING, WE'RE NOT DISPUTING THAT THAT SHOULD COME INTO

04:43PM 23   EVIDENCE.

04:43PM 24           THE COURT:  THANK YOU, MR. BOSTIC.

04:43PM 25           MR. BOSTIC:  SO, YOUR HONOR, HERE I THINK THE

04:43PM 1    DEFENSE WILL ACCUSE ME OF BLURRING THE ISSUES, BUT I THINK THAT

04:43PM 2    THE HEARSAY CASE LAW IS INSTRUCTIVE HERE BECAUSE WHEN WE GET TO

04:43PM 3    INTO THE CASE LAW DEALING WITH 801(B)(2) WE SEE THAT THE COURTS

04:43PM 4    ARE VERY COMFORTABLE ADMITTING STATEMENTS OF EMPLOYEES AND

04:43PM 5    AGENTS AS EVIDENCE OF AN ONGOING FRAUD, AND IT RELATES TO THE

04:44PM 6    RELATIONSHIP BETWEEN THE PRINCIPAL AND THE AGENT.  AND CONTRARY

04:44PM 7    TO THE DEFENSE'S ARGUMENTS, IT DOESN'T COME DOWN TO A HYPER

04:44PM 8    TECHNICAL READING OF AGENCY LAW AS IT MIGHT MATTER FOR SOME

04:44PM 9    CONTRACT OR CIVIL MATTERS.  INSTEAD, COURTS TAKE A MORE

04:44PM 10   FACT-SPECIFIC APPROACH, AND THEY LOOK AT THE DEGREE OF CONTROL

04:44PM 11   AND INFLUENCE EXERCISED BY THE PRINCIPLE.

04:44PM 12       AND HERE THOSE FACTS FAVOR THE ADMISSIBILITY OF THE

04:44PM 13   ACTIONS AND STATEMENTS OF THERANOS EMPLOYEES AS AGENTS.

04:44PM 14       THE GOVERNMENT CITES IN ITS BRIEF THE DEFENDANT'S OWN

04:44PM 15   STATEMENTS ABOUT HER DEGREE OF CONTROL AT THE COMPANY, HER

04:44PM 16   RESPONSIBILITY FOR THE OPERATIONS OF THE COMPANY.  ALL OF THE

04:44PM 17   EVIDENCE AT TRIAL WILL BEAR THAT OUT.

04:44PM 18       SHE WAS THE MAJORITY OWNER OF THE COMPANY.  SHE WAS THE

04:44PM 19   FOUNDER.  SHE WAS THE FACE OF THE COMPANY IN EVERY SENSE.  SHE

04:44PM 20   WAS INVOLVED IN ALL ASPECTS OF THE COMPANY'S OPERATION.

04:44PM 21       AND TO THE EXTENT THAT ANYONE HAD MORE CONTROL OVER A

04:45PM 22   CERTAIN ASPECT OF THE OPERATION, IT WAS HER COCONSPIRATOR AND

04:45PM 23   PARTNER, HER CODEFENDANT MR. BALWANI.

04:45PM 24       SO THERE'S NO WAY THAT THE DEFENSE FACTUALLY CAN ARGUE

04:45PM 25   THAT ANY EMPLOYEE'S ACTIVITIES WERE NOT ULTIMATELY UNDER THE

04:45PM 1    SUPERVISION AND CONTROL OF THE DEFENDANT HOLMES.

04:45PM 2        SHE ALSO WAS, OF COURSE, THE CEO.  AND THE FACT THAT THIS

04:45PM 3    FRAUD INVOLVED A CORPORATION, THE FACT THAT THE CORPORATION AND

04:45PM 4    ITS EMPLOYEES BECAME A TOOL FOR THE FRAUD IS NO REASON TO

04:45PM 5    SHIELD THE PRINCIPAL, TO SHIELD THE DEFENDANT FROM THE

04:45PM 6    RESPONSIBILITY FOR THE EFFECT OF THE FRAUD THAT SHE CREATED.

04:45PM 7        AND I THINK THE KIRK AND GIBSON CASES ARE DIRECTLY ON

04:45PM 8    POINT HERE WHEN IT COMES TO THE FACT THAT THESE KINDS OF

04:45PM 9    STATEMENTS, AS LONG AS THE PRINCIPAL DEFENDANT HAS SUFFICIENT

04:45PM 10   CONTROL OVER THE OPERATIONS, THESE STATEMENTS CAN COME IN TO

04:46PM 11   PROVE THAT MISREPRESENTATIONS WERE MADE.

04:46PM 12       AGAIN, THESE CASES DEAL WITH THE MISSTATEMENTS COMING

04:46PM 13   IN -- I'M SORRY, THE AGENT STATEMENTS COMING IN FOR THE TRUTH

04:46PM 14   OF THE MATTER AS A HEARSAY EXCEPTION, BUT THEY ALSO MAKE CLEAR

04:46PM 15   LIKE IN KIRK WHERE IT SAYS THAT STATEMENTS OF SALESPERSONS

04:46PM 16   MISREPRESENTING THE PROGRAM OF THAT PARTICULAR BUSINESS WERE

04:46PM 17   ADMISSIBLE TO PROVE THAT THE MISREPRESENTATIONS WERE MADE, NOT

04:46PM 18   NECESSARILY TO PROVE THE TRUTH OF WHAT THE SALESPERSON STATED.

04:46PM 19   THAT WAS THE GROUNDS FOR ADMISSIBILITY IN THAT CASE.  I THINK

04:46PM 20   THE SAME REASONING HOLDS TRUE HERE.

04:46PM 21       WHEN THE DEFENSE TALKS ABOUT THE TESTS FOR

04:46PM 22   ADMISSIBILITY -- EXCUSE ME, ADMISSIBILITY, AND TALKS ABOUT THE

04:46PM 23   DIFFERENT SCENARIOS UNDER WHICH AGENT STATEMENTS CAN COME IN

04:46PM 24   UNDER THIS THEORY, I THINK IT OVERSTATES THE RIGOR OF THOSE

04:46PM 25   SO-CALLED TESTS.

137

04:46PM 1    IN FACT, IF THE COURT LOOKS AT THE AGNE CASE, THAT'S THE

04:47PM 2    FIRST CIRCUIT, A-G-N-E, THAT'S A FIRST CIRCUIT CASE AT

04:47PM 3    214 F.3D 47. THAT COURT SIMILARLY SAID, "SO WHETHER THE

04:47PM 4    STATEMENTS OF A CORPORATE EMPLOYEE MAY BE ADMITTED AGAINST A

04:47PM 5    CORPORATE OFFICER, DEPENDS UPON THE RELATIONSHIP BETWEEN THE

04:47PM 6    EMPLOYEE AND THE OFFICER.

04:47PM 7    THAT COURT THEN GOES ON TO CITE OTHER CASES AND LISTS

04:47PM 8    OTHER SCENARIOS WHERE AN EMPLOYEE'S STATEMENT COULD BE VIEWED

04:47PM 9    AS AN AGENT ADMISSION OF THE PRINCIPAL, BUT THOSE ARE SIMPLY

04:47PM 10   EXAMPLES. IT'S NOT A MULTI FACTOR TEST I THINK AS THE DEFENSE

04:47PM 11   SUGGESTS. THESE ARE NOT THE ONLY SCENARIOS UNDER WHICH THIS

04:47PM 12   KIND OF THEORY APPLIES.

04:47PM 13   AND IF AN AGENT'S STATEMENT CAN COME IN AS AN ADMISSION

04:47PM 14   UNDER THE SAME RULE THAT GOVERNS THE DEFENDANT'S STATEMENTS,

04:47PM 15   THEN WHY OR HOW CAN IT BE SAID THAT IT'S NOT FAIR TO BRING IN

04:47PM 16   THAT SAME STATEMENT AS EVIDENCE THAT A SCHEME TO DEFRAUD WAS

04:47PM 17   OCCURRING AND THAT THIS WAS THE TOOL AND MECHANISM BY WHICH

04:48PM 18   VICTIMS WERE IN SOME CASES HEARING THESE FALSE STATEMENTS AND

04:48PM 19   BEING MISLED.

04:48PM 20         MS. SAHARIA:  BRIEFLY.

04:48PM 21   MR. BOSTIC IS CONFLATING HEARSAY AND RELEVANCE, BUT

04:48PM 22   PUTTING THAT ASIDE, EVERY CASE THAT HAS ADMITTED A STATEMENT BY

04:48PM 23   AN EMPLOYEE AS AN EXECUTIVE'S AGENT, THE EXECUTIVE DIRECTLY

04:48PM 24   SUPERVISED THAT EMPLOYEE.

04:48PM 25   THERE ARE CASES WHERE THE STATEMENTS OF THE CFO ARE

04:48PM 1    IMPUTED TO THE CEO BECAUSE THE CEO DIRECTLY SUPERVISED THE CFO

04:48PM 2    ON A DAY-TO-DAY BASIS.

04:48PM 3         THERE IS NO CASE THAT HAS HELD THAT A CEO -- THAT THE

04:48PM 4    STATEMENTS OF 400 EMPLOYEES IN A CORPORATION ARE ADMISSIBLE

04:48PM 5    AGAINST A CORPORATE CEO.

04:48PM 6         MS. HOLMES DID NOT SUPERVISE ALL 400 EMPLOYEES OF HER

04:48PM 7    COMPANY; SHE DID NOT OVERSEE THE DAY-TO-DAY OPERATIONS OF THE

04:48PM 8    SALESPEOPLE; SHE DID NOT OVERSEE THE DAY-TO-DAY OPERATIONS OF

04:48PM 9    THE LABORATORY TECHNICIANS.  THERE WERE MANY LAYERS BETWEEN HER

04:48PM 10   AND THOSE PEOPLE, AND NO CASE RECOGNIZES THAT KIND OF IMPUTING

04:49PM 11   UNDER THE HEARSAY RULES.

04:49PM 12        THE COURT:  HER STATEMENT -- I THINK I SAW SOMETHING

04:49PM 13   THAT SAID -- ATTRIBUTED TO HER, "I AM THERANOS," OR "I HAVE

04:49PM 14   CONTROL," OR "I HAVE COMPLETE CONTROL OVER THE COMPANY,"

04:49PM 15   SOMETHING LIKE THAT.  YOU PROBABLY KNOW WHAT I'M TALKING ABOUT.

04:49PM 16        MS. SAHARIA:  YEAH.  I THINK IT WAS "OF COURSE I'M

04:49PM 17   RESPONSIBLE FOR THE COMPANY."  I THINK ANY CEO OF ANY COMPANY

04:49PM 18   WOULD SAY THE BUCK STOPS WITH ME, I'M RESPONSIBLE FOR THIS

04:49PM 19   COMPANY.

04:49PM 20        THAT DOESN'T MAKE THEM RESPONSIBLE FOR THE STATEMENTS OF

04:49PM 21   ALL OF THE HUNDREDS OF EMPLOYEES IN THAT COMPANY.

04:49PM 22        THE COURT:  WHAT DOES IT DO?  WHAT DOES IT SAY?

04:49PM 23   IT'S DESIGNED TO TELL INVESTORS, THE PUBLIC, I'M THE PUBLIC

04:49PM 24   FACE OF THE COMPANY, YOU CAN TRUST ME, AND I'M IN CHARGE.  THE

04:49PM 25   BUCK STOPS WITH ME, SO TRUST.

139

04:49PM 1          MS. SAHARIA:  WELL, THIS WAS TESTIMONY THAT SHE GAVE

04:49PM 2     TO THE S.E.C. AFTER ALL OF THE EVENTS IN QUESTION.

04:49PM 3          BUT I THINK A STATEMENT THAT "I'M RESPONSIBLE FOR THE

04:49PM 4     COMPANY" IS A STATEMENT THAT EVERY CEO WOULD MAKE.  EVERY

04:49PM 5     CEO -- THAT'S THE PERSON WHO IS ULTIMATELY RESPONSIBLE.

04:50PM 6          THE COURT:  IT'S THEIR JOB DESCRIPTION.

04:50PM 7          MS. SAHARIA:  OF COURSE.  IT DOESN'T MEAN THAT THEY

04:50PM 8     SUPERVISE EVERY EMPLOYEE OF THAT COMPANY EVERY DAY.

04:50PM 9          THE COURT:  ALL RIGHT.  THANK YOU.

04:50PM 10         MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT IS NOT

04:50PM 11    ASKING THE COURT TO RULE THAT THE STATEMENTS OR THAT ANY

04:50PM 12    STATEMENTS OF ANY OF THE 400 EMPLOYEES OF THERANOS WOULD BE

04:50PM 13    ADMISSIBLE.

04:50PM 14         I THINK WHERE WE MIGHT BE HEADED IS WHAT THE COURT

04:50PM 15    OUTLINED AT THE BEGINNING, WHICH IS THAT THIS MIGHT BE A FACT

04:50PM 16    SPECIFIC OR EVIDENCE SPECIFIC INQUIRY TO BE DECIDED IN THE

04:50PM 17    CONTEXT OF ACTUAL EVIDENCE.

04:50PM 18         BUT I'LL JUST NOTE THAT PRIMARILY THE STATEMENTS THAT

04:50PM 19    WOULD BE AT ISSUE HERE WOULD BE STATEMENTS MADE BY THE OUTWARD

04:50PM 20    FACING EMPLOYEES AT THERANOS.  THOSE WOULD BE THE EMPLOYEES WHO

04:50PM 21    DEAL WITH THE MEDIA, THE EMPLOYEES WHO DEAL WITH DOCTORS AND

04:50PM 22    PATIENTS WHEN THERE ARE QUESTIONS OR PROBLEMS WITH TEST

04:50PM 23    RESULTS.

04:50PM 24         SO WE'RE NOT TALKING ABOUT THE ENTIRE SCOPE OF THE COMPANY

04:50PM 25    BY ANY MEASURE, CERTAINLY NOT CUSTODIANS.  GENERALLY NOT LAB

04:50PM 1    TECHNICIANS, EITHER, WHEN IT COMES TO FALSE STATEMENTS MADE TO

04:50PM 2    PEOPLE ON THE OUTSIDE.

04:50PM 3        THE EVIDENCE DOES SHOW THAT THE DEFENDANT WAS VERY

04:51PM 4    INVOLVED WITH THERANOS'S DEALINGS WITH THE MEDIA, HAD

04:51PM 5    SIGNIFICANT INFLUENCE IN HOW CUSTOMER FACING STAFF MESSAGED

04:51PM 6    PROBLEMS WITH THERANOS TESTS TO PATIENTS AND DOCTORS WHO CALLED

04:51PM 7    WITH PROBLEMS.

04:51PM 8        SO IT IS ABSOLUTELY FAIR AND ONLY LOGICAL TO ALLOW THE

04:51PM 9    STATEMENTS THAT PEOPLE UNDER HER DIRECTION MADE IN THE COURSE

04:51PM 10   OF THEIR EMPLOYMENT.  THOSE STATEMENTS ARE ADMISSIBLE UNDER THE

04:51PM 11   SUBSECTION OF 801(D)(2) DEALING WITH STATEMENTS MADE BY A

04:51PM 12   PARTY'S AGENT OR EMPLOYEE, AND THEY'RE ALSO ADMISSIBLE UNDER

04:51PM 13   SUBSECTION (C) BECAUSE THEY WERE MADE BY PEOPLE WHOM THE PARTY

04:51PM 14   AUTHORIZED TO MAKE A STATEMENT ON THE SUBJECT.

04:51PM 15       AGAIN, THESE ARE PEOPLE, THERANOS EMPLOYEES ACTING

04:51PM 16   SQUARELY WITHIN THE SCOPE OF THEIR EMPLOYMENT AND

04:51PM 17   COINCIDENTALLY BUT NOT COINCIDENTALLY FURTHERING THE FRAUD

04:51PM 18   PERPETRATED BY THEIR SUPERIOR.

04:51PM 19           THE COURT:  SHOULD I, SHOULD I EVEN ASK WHETHER OR

04:51PM 20   NOT THE CODEFENDANT'S STATEMENTS ARE GOING TO BE AN ISSUE?  IS

04:52PM 21   THAT SOMETHING THAT WE DON'T HAVE TO DISCUSS TODAY?

04:52PM 22           MS. SAHARIA:  I DON'T THINK WE HAVE TO DISCUSS THAT

04:52PM 23   TODAY, YOUR HONOR.

04:52PM 24           THE COURT:  OKAY.

04:52PM 25           MS. SAHARIA:  I WOULD JUST CONCLUDE WITH TWO POINTS.

04:52PM  1    IF THEY HAVE EVIDENCE THAT SHE DID CONTROL PARTICULAR

04:52PM  2    STATEMENTS MADE TO DOCTORS, THEN THEY CAN SUBMIT THAT EVIDENCE.

04:52PM  3    WE'RE NOT CONTESTING THAT.

04:52PM  4        WE'RE CONTESTING THAT THEY CAN INFER FROM PARTICULAR

04:52PM  5    INSTANCES OF THAT HAPPENING THAT SHE CONTROLLED EVERY MESSAGE

04:52PM  6    TO EVERY DOCTOR.

04:52PM  7        SECONDLY, WITH RESPECT TO LAB TECHNICIANS, IN OUR

04:52PM  8    DISCUSSIONS YESTERDAY ABOUT CMS AND FDA THE GOVERNMENT

04:52PM  9    REPEATEDLY SAID THAT ALL OF THE DOUBLE HEARSAY PROBLEMS AND THE

04:52PM  10   CMS AND FDA REPORTS ARE SOLVED BY THE FACT THAT THE LAB

04:52PM  11   TECHNICIANS ARE MS. HOLMES'S AGENTS.  SO THAT QUESTION IS

04:52PM  12   SQUARELY BEFORE THE COURT WITH RESPECT TO LAB PERSONNEL AS

04:52PM  13   WELL.

04:52PM  14           THE COURT:  OKAY.

04:52PM  15           MS. SAHARIA:  THERE IS ONE REMAINING ISSUE, WHICH IS

04:52PM  16   THE GOVERNMENT'S MOTION TO INTRODUCE INTERROGATORY RESPONSES BY

04:53PM  17   THERANOS.  SHOULD WE ADDRESS THAT, YOUR HONOR?

04:53PM  18           THE COURT:  WE MIGHT AS WELL SINCE WE HAVE SOME

04:53PM  19   TIME, YES.

04:53PM  20           MS. SAHARIA:  YES.  THIS IS A SEPARATE ISSUE FROM

04:53PM  21   THE ONE WE WERE JUST DISCUSSING.  THIS IS THE SECOND PART OF

04:53PM  22   THE GOVERNMENT'S MOTION NUMBER 8.

04:53PM  23       THE GOVERNMENT WANTS THE COURT TO ADMIT VARIOUS

04:53PM  24   INTERROGATORY RESPONSES THAT THERANOS, THE COMPANY, MADE IN

04:53PM  25   CIVIL LITIGATION.  THIS IS CLASSIC HEARSAY.  THE GOVERNMENT --

04:53PM 1    THEY'RE OUT-OF-COURT STATEMENTS BY A THIRD PARTY THAT THE

04:53PM 2    GOVERNMENT WANTS TO BE ADMITTED FOR THEIR TRUTH, AND SO THEY'VE

04:53PM 3    INVOKED TWO EXCEPTIONS.  THEY ARGUE THAT FIRST MS. HOLMES

04:53PM 4    AUTHORIZED THE STATEMENTS, AND, SECOND, THAT SHE ADOPTED THE

04:53PM 5    STATEMENTS.  THERE'S NO EVIDENCE OF EITHER.

04:53PM 6        JUST AS BACKGROUND, THESE RESPONSES WERE MADE IN CIVIL

04:53PM 7    LITIGATION IN LATE 2016 AND EARLY 2017.

04:53PM 8        THE THERANOS'S RESPONSES FOR THE RECORD ARE GOVERNMENT'S

04:54PM 9    EXHIBIT P, Q, AND R.

04:54PM 10       THE GOVERNMENT HAD ALREADY COMMENCED ITS GRAND JURY

04:54PM 11   INVESTIGATION BY THE TIME OF THESE INTERROGATORY RESPONSES, AND

04:54PM 12   FOR THAT REASON MS. HOLMES AND THERANOS ARE SEPARATE COUNSEL IN

04:54PM 13   THIS LITIGATION.

04:54PM 14       WILMER HALE REPRESENTED THERANOS AND COOLEY REPRESENTED

04:54PM 15   MS. HOLMES.

04:54PM 16       THE THERANOS INTERROGATORY RESPONSES WERE SIGNED BY

04:54PM 17   WILMER, NOT BY COOLEY, AND ALTHOUGH MULTIPLE THERANOS EMPLOYEES

04:54PM 18   VERIFIED THOSE RESPONSES AS IS NORMAL, MS. HOLMES WAS NOT ONE

04:54PM 19   OF THEM.  SHE DID NOT VERIFY THOSE RESPONSES.

04:54PM 20       THERE'S JUST NO EVIDENCE WHATSOEVER THAT MS. HOLMES

04:54PM 21   HERSELF AUTHORIZED THE CONTENT OF THOSE RESPONSES.

04:54PM 22       THE GOVERNMENT OFFERS A FEW ARGUMENTS IN ITS REPLY BRIEF,

04:54PM 23   WHICH I'LL ADDRESS.  THE FIRST IS THAT THE RESPONSES WERE

04:54PM 24   VERIFIED BY COMPANY EMPLOYEES, ONE OF WHICH WAS HER BROTHER WHO

04:55PM 25   WAS AN EMPLOYEE OF THE COMPANY.  THERE'S NO BROTHER EXCEPTION

143

04:55PM 1    TO THE HEARSAY RULES, AND IT'S NOT CLEAR TO ME THAT ANY OF

04:55PM 2    THOSE ARE STATEMENTS OF THOSE PARTICULAR EMPLOYEES.  AND THEN

04:55PM 3    THAT WOULD RAISE ALL OF THE SAME AGENT ISSUES THAT WE WERE JUST

04:55PM 4    DISCUSSING ANYWAY.

04:55PM 5         THE SECOND IS THAT THE WILMER HALE ATTORNEYS WHO

04:55PM 6    REPRESENTED THE COMPANY ALSO REPRESENTED HER AS CEO OF THE

04:55PM 7    COMPANY.  WE'VE DISCUSSED THAT EARLIER TODAY.  THERE'S NO

04:55PM 8    EVIDENCE THAT WILMER HALE WAS REPRESENTING HER IN HER PERSONAL

04:55PM 9    CAPACITY IN CONNECTION WITH THE CIVIL LITIGATION.  ALL OF THE

04:55PM 10   EVIDENCE IS TO THE CONTRARY.  SHE WAS REPRESENTED BY COOLEY.

04:55PM 11        THEY POINT OUT HER DEPOSITION TESTIMONY TO THE S.E.C.

04:55PM 12   WHERE SHE WAS PRESENTED WITH THESE INTERROGATORY RESPONSES.

04:55PM 13   AND SHE SAID -- SHE DIDN'T SAY SHE APPROVED THEM OR AUTHORIZED

04:55PM 14   THEM.  SHE DIDN'T KNOW IF SHE HAD SEEN THEM.  SHE DIDN'T RECALL

04:55PM 15   WHAT A RULE WAS RESPONDING TO THEM.  ALL SHE SAID WAS SHE

04:55PM 16   ENGAGED WITH AND WORKED WITH A LEGAL TEAM IN RESPONDING TO

04:56PM 17   THEM.

04:56PM 18        EVEN IF THAT'S THE CASE, EVEN IF SHE WORKED WITH THE

04:56PM 19   ATTORNEYS AND RESPONDING TO THEM, IT DOESN'T MEAN THAT SHE

04:56PM 20   APPROVED THE CONTENT OF EVERY SINGLE ONE OF THOSE INTERROGATORY

04:56PM 21   RESPONSES.

04:56PM 22        IF IT WERE OTHERWISE ANY EMPLOYEE WHO WORKED WITH ANY

04:56PM 23   ATTORNEY WOULD SOMEHOW BE DEEMED TO HAVE AUTHORIZED ALL OF THE

04:56PM 24   CONTENT OF THOSE RESPONSES.

04:56PM 25        SO FOR ALL OF THOSE REASONS THERE'S JUST NO EVIDENCE THAT

04:56PM 1  SHE AUTHORIZED THEM.

04:56PM 2  SO THE GOVERNMENT HAS A BACKUP ARGUMENT.  THE BACKUP

04:56PM 3  ARGUMENT IS THAT SHE SERVED HER OWN INTERROGATORY RESPONSES

04:56PM 4  SIGNED BY COOLEY AND THAT SHE ADOPTED THE THERANOS RESPONSES IN

04:56PM 5  HER OWN RESPONSES.

04:56PM 6  THERE'S A COUPLE OF PROBLEMS WITH THAT ONE.  THE FIRST IS

04:56PM 7  THAT THERE'S NO BASIS TO CONCLUDE THAT SHE ADOPTED ALL OF THE

04:56PM 8  THERANOS RESPONSES.

04:56PM 9  AT MOST THE GOVERNMENT POINTS TO PARTICULAR ANSWERS WHERE

04:56PM 10  SHE CROSS-REFERENCED OTHER ANSWERS, SO IT WOULD HAVE TO BE SOME

04:56PM 11  SORT OF PARTIAL INCORPORATION ARGUMENT.

04:57PM 12  JUST AS ONE EXAMPLE, THE GOVERNMENT SAYS IN ITS MOTION

04:57PM 13  THAT IT WANTS TO INTRODUCE THERANOS'S STATEMENT ABOUT THE

04:57PM 14  NUMBER OF TESTS THAT IT RAN ON ITS PROPRIETARY DEVICE IN ITS

04:57PM 15  CLINICAL LAB.  THAT WAS MADE BY THERANOS IN RESPONSE TO

04:57PM 16  EXHIBIT -- TO INTERROGATORY NUMBER 15, WHICH IS AT GOVERNMENT

04:57PM 17  EXHIBIT P.

04:57PM 18  BUT NONE OF MS. HOLMES'S RESPONSES CROSS-REFERENCE

04:57PM 19  THERANOS RESPONSE NUMBER 15.  THERE'S JUST NO BASIS TO CONCLUDE

04:57PM 20  THAT SHE ADOPTED THAT ONE AT ALL.

04:57PM 21  WITH RESPECT TO THE ONES THAT SHE DID CROSS-REFERENCE, SHE

04:57PM 22  DIDN'T ADOPT THEM.  SHE DIDN'T EXPRESS HER BELIEF THAT THEY

04:57PM 23  WERE TRUE.  SHE SIMPLY POINTED THE COUNTERPARTY TO THE THERANOS

04:57PM 24  ONE.

04:57PM 25  AS ONE EXAMPLE IN EXHIBIT V, THIS IS MS. HOLMES'S

UNITED STATES COURT REPORTERS

145

04:57PM 1    RESPONSES, IN RESPONSE TO NUMBER 45 SHE SAYS MS. HOLMES

04:57PM 2    RESPONDS THAT SHE WAS NOT PERSONALLY INVOLVED IN MODIFICATION

04:57PM 3    OF COMMERCIALLY AVAILABLE MACHINES, EQUIPMENT OR TECHNOLOGY

04:58PM 4    THAT THERANOS USED TO PROCESS BLOOD TESTS ON CAPILLARY BLOOD

04:58PM 5    SAMPLES OR MICRO SAMPLES.  THE SAME INTERROGATORY WAS DIRECTED

04:58PM 6    TO THE COMPANY, AND HOLMES REFERS PLAINTIFF TO THERANOS'S

04:58PM 7    RESPONSE INTERROGATORY NUMBER 64.

04:58PM 8        THAT WAS THE KIND OF LANGUAGE SHE WOULD USE TO REFER THE

04:58PM 9    COUNTERPARTY TO THE THERANOS RESPONSE, BUT NOTHING THERE ADOPTS

04:58PM 10   IT AS HER OWN.  IN FACT, SHE SAID SHE WAS NOT INVOLVED IN THAT

04:58PM 11   PARTICULAR ISSUE.

04:58PM 12       SO THE GOVERNMENT CITES NO CASE THAT HOLDS THIS KIND OF

04:58PM 13   MUTUAL LANGUAGE TO BE AN ADOPTION, AND WE SUBMIT THAT THERE'S

04:58PM 14   NO BASIS TO CONCLUDE THAT SHE EITHER AUTHORIZED OR ADOPTED

04:58PM 15   THOSE SEPARATE THERANOS'S RESPONSES.

04:58PM 16           THE COURT:  THANK YOU.  MR. BOSTIC.

04:58PM 17           MR. BOSTIC:  THANK YOU, YOUR HONOR.  JUST VERY

04:58PM 18   BRIEFLY.

04:58PM 19       THE EVIDENCE DISCUSSED BY THE DEFENSE IS ADMISSIBLE FOR

04:58PM 20   THE VERY REASONS DISCUSSED BY THE DEFENSE.

04:58PM 21       WHEN IT COMES TO WHETHER WILMER HALE REPRESENTED THE

04:58PM 22   DEFENDANT AT THAT TIME, I THINK THE DEFENSE SAID THERE'S NO

04:58PM 23   EVIDENCE THAT THAT'S THE CASE, BUT THAT'S FALSE.  THERE IS

04:59PM 24   EVIDENCE, AND IT'S CITED IN THE GOVERNMENT'S BRIEF.  THAT

04:59PM 25   EVIDENCE IS AT GOVERNMENT'S EXHIBIT U, PAGES 1 THROUGH 4 AND 13

146

04:59PM 1     WHERE IT IS CLEAR THAT WILMER HALE IS REPRESENTING MS. HOLMES

04:59PM 2     AS WELL AS THE COMPANY THERANOS ITSELF.

04:59PM 3         THE FACT THAT SHE MAY HAVE ALSO HAD HER OWN COUNSEL AT

04:59PM 4     COOLEY DOES NOT MEAN THAT THE WILMER HALE ATTORNEYS WERE NOT

04:59PM 5     ALSO REPRESENTING HER.

04:59PM 6         AND IN THE ABSENCE OF ANY EVIDENCE TO THE CONTRARY, THE

04:59PM 7     COURT SHOULD TAKE EXHIBIT U AT FACE VALUE.

04:59PM 8         WHEN IT COMES TO WHO ACTUALLY SIGNED THOSE INTERROGATORY

04:59PM 9     RESPONSES, I THINK THAT'S VERY IMPORTANT ALSO BECAUSE IT WAS

04:59PM 10    SIGNED BY SENIOR EMPLOYEES OF THE COMPANY, INCLUDING

04:59PM 11    MS. HOLMES'S BROTHER.  THAT DOES MATTER.

04:59PM 12        NO, THERE'S NOT A BROTHER EXCEPTION IN THE HEARSAY RULE,

04:59PM 13    BUT NOW WE'RE BACK UNDER 801(B)(2)(C), AND WE'RE TALKING ABOUT

04:59PM 14    SPECIFIC EMPLOYEES.  WE'RE NO LONGER IN THE ABSTRACT.

04:59PM 15        AND WHEN IT COMES TO THESE SPECIFIC EMPLOYEES, IT STRAINS

05:00PM 16    BELIEF TO ARGUE THAT THESE EMPLOYEES WERE NOT UNDER THE

05:00PM 17    SUPERVISION OF THE DEFENDANT AS CEO, IT STRAINS BELIEF TO ARGUE

05:00PM 18    THAT THEY WERE NOT AUTHORIZED TO MAKE THE STATEMENT OF SIGNING

05:00PM 19    AND VERIFYING THESE INTERROGATORY RESPONSES.

05:00PM 20        THE DEFENDANT AS CEO WOULD HAVE HAD THE PRIMARY

05:00PM 21    RESPONSIBILITY FOR DEALING WITH AND MANAGING THE COMPANY'S

05:00PM 22    LEGAL ISSUES, INCLUDING ITS RESPONSES TO LITIGATION.  OF COURSE

05:00PM 23    SHE WORKED WITH ATTORNEYS REPRESENTING THE COMPANY AND CREATING

05:00PM 24    AND APPROVING THESE INTERROGATORY RESPONSES AS HER STATEMENTS

05:00PM 25    TO THE CEO DURING HER SWORN DEPOSITION CONFIRM.

05:00PM 1        THE FACT THAT SHE DIDN'T SPECIFICALLY REMEMBER APPROVING

05:00PM 2   EACH ONE IS NO BARRIER TO THEIR ADMISSION UNDER 801(D)(2).

05:00PM 3        THE COURT:  ALL RIGHT.

05:00PM 4   MS. SAHARIA.

05:00PM 5        MS. SAHARIA:  THREE THINGS, YOUR HONOR.

05:00PM 6        EXHIBIT U, FIRST OF ALL, IS A DEPOSITION TRANSCRIPT FROM

05:01PM 7   THE S.E.C. PROCEEDINGS.  IT IS NOT THE CIVIL LITIGATION THAT

05:01PM 8   WE'RE TALKING ABOUT.  IT IS CRYSTAL CLEAR THAT MS. HOLMES HAD

05:01PM 9   SEPARATE COUNSEL IN THAT CIVIL LITIGATION.  SHE WAS NOT

05:01PM 10  REPRESENTED BY WILMER.

05:01PM 11       TO THE EXTENT THAT THE GOVERNMENT IS CLAIMING NOW THAT

05:01PM 12  WILMER ACTUALLY REPRESENTED MS. HOLMES IN HER PERSONAL CAPACITY

05:01PM 13  COMES AS A GREAT SURPRISE TO US GIVEN ALL OF THE MANY PRIVILEGE

05:01PM 14  ISSUES THAT WE'VE BEEN LITIGATING WITH THE GOVERNMENT AND WE

05:01PM 15  MAY NEED TO TAKE THAT UP SEPARATELY.

05:01PM 16       SECOND OF ALL, AGAIN, WE HEAR THIS LANGUAGE THAT WE HAVE

05:01PM 17  HEARD ALL THROUGHOUT THESE HEARINGS, IT STRAINS BELIEF.  THAT'S

05:01PM 18  JUST SPECULATION, THAT IS NOT EVIDENCE, AND IT DOES NOT STRAIN

05:01PM 19  BELIEF TO THINK THAT MS. HOLMES WAS NOT DIRECTLY SUPERVISING

05:01PM 20  THE WORK ON THESE INTERROGATORY RESPONSES FOR THE SIMPLE REASON

05:01PM 21  THAT I SAID, SHE HAD SEPARATE COUNSEL.  AND THE REASON SHE HAD

05:01PM 22  SEPARATE COUNSEL WAS BECAUSE THE GRAND JURY INVESTIGATION HAD

05:01PM 23  ALREADY COMMENCED, AND UNDER THOSE KIND OF CIRCUMSTANCES, WHAT

05:01PM 24  COMPANIES AND EMPLOYEES OFTEN DO IS TO HAVE THEIR OWN

05:02PM 25  LITIGATION COUNSEL BECAUSE OF THE DANGERS OF HAVING ONE, YOU

05:02PM 1      KNOW, THE SAME LAWYER REPRESENT THE COMPANY AND THE DEFENDANT.

05:02PM 2          IN THAT CASE SHE HAD HER OWN COUNSEL.  THERE'S NO

05:02PM 3      EVIDENCE THAT SHE SUPERVISED THE RESPONSES TO THESE

05:02PM 4      INTERROGATORIES.  THERE'S NO EVIDENCE THAT THESE EMPLOYEES

05:02PM 5      REPORTED TO HER WITH RESPECT TO THE CONTENT OF THE

05:02PM 6      INTERROGATORIES.

05:02PM 7          THE GOVERNMENT IS COMPLETELY SPECULATING.

05:02PM 8              THE COURT:  ALL RIGHT.

05:02PM 9              MR. BOSTIC:  YOUR HONOR, JUST VERY BRIEFLY ON THAT.

05:02PM 10             THE COURT:  YES, MR. BOSTIC.

05:02PM 11             MR. BOSTIC:  SO I JUST WANT TO POINT OUT THAT WHEN

05:02PM 12     IT COMES TO SPECIFIC INVOLVEMENT IN THESE INTERROGATORIES, IT

05:02PM 13     WOULD BE ONE THING IF THE DEFENSE WERE ARGUING THAT THERE HAD

05:02PM 14     BEEN A WALL PUT UP BETWEEN THE COMPANY'S REPRESENTATION AND THE

05:02PM 15     DEFENDANT'S REPRESENTATION INDIVIDUALLY AND THAT SHE HAD NO

05:02PM 16     INVOLVEMENT.

05:02PM 17         THEY'RE NOT ARGUING THAT.  THEY CAN'T ARGUE THAT IN LIGHT

05:02PM 18     OF HER STATEMENTS DURING THE DEPOSITION, BUT, YES, SHE BELIEVES

05:02PM 19     THAT SHE WAS INVOLVED IN THE PROCESS OF RESPONDING TO THESE

05:02PM 20     INTERROGATORY REQUESTS.

05:02PM 21         GIVEN THAT, IT IS SELF-EVIDENT THAT THE INDIVIDUALS AT

05:03PM 22     THERANOS WHO DID SIGN THESE INTERROGATORY REQUESTS WERE

05:03PM 23     AUTHORIZED TO DO SO BY THE DEFENDANT HERSELF AS CEO, THE PERSON

05:03PM 24     PRIMARILY RESPONSIBLE FOR THE COMPANY'S ACTIONS.

05:03PM 25             THE COURT:  OKAY.  THANK YOU.  THANK YOU VERY MUCH.

05:03PM 1      MS. SAHARIA:  THANK YOU.

05:03PM 2      YOUR HONOR, I CAN JUST REPORT TO THE COURT WITH RESPECT TO

05:03PM 3   THE VERY LAST MOTION FROM THE GOVERNMENT, WHICH WAS THE MOTION

05:03PM 4   TO COMPEL PRODUCTION OF RULE 26(2) MATERIAL THAT WE DID PRODUCE

05:03PM 5   THAT MATERIAL TO THE GOVERNMENT THIS MORNING.

05:03PM 6      THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.  I

05:03PM 7   NOTICED THAT THERE WASN'T ANY REAL REQUEST FOR AN ORDER.  SO

05:03PM 8   THANK YOU.  THANK YOU FOR THE UPDATE.

05:03PM 9      ANYTHING FURTHER ON ANY OF THESE MOTIONS THAT WE'VE

05:03PM 10  DISCUSSED?

05:03PM 11     MR. DOWNEY:  YOUR HONOR, I HAVE A VERY MINOR

05:03PM 12  REQUEST.

05:03PM 13     THE COURT:  YES.

05:03PM 14     MR. DOWNEY:  I KNOW THE COURT IS GOING TO BE

05:03PM 15  SCHEDULING A DAUBERT HEARING IN CONNECTION WITH DR. MASTER.

05:03PM 16     I WONDER IF IN THAT ORDER THE COURT MIGHT REQUEST THAT ANY

05:04PM 17  SUPPLEMENTAL INFORMATION THAT DR. MASTER REVIEWS BE PROVIDED TO

05:04PM 18  US AT SOME DATE CERTAIN IN ADVANCE OF THAT HEARING, AND PERHAPS

05:04PM 19  REQUIRE WHATEVER THE SUPPLEMENT TO HIS REPORT BE, THAT IT ALSO

05:04PM 20  BE FILED WITH SOME REASONABLE TIME FOR US TO REVIEW IT.

05:04PM 21     THE COURT:  ALL RIGHT.  MR. LEACH.

05:04PM 22     MR. LEACH:  I HAVE NO PROBLEM WITH THAT CONCEPT,

05:04PM 23  YOUR HONOR.

05:04PM 24     THE COURT:  ALL RIGHT.  THANK YOU.

05:04PM 25     I WAS THINKING ABOUT FOR A DAUBERT HEARING, JUST TIMING

150

| | | |
|---|---|---|
| 05:04PM | 1 | WISE, I HAVE NOT REALLY REACHED A DATE YET, BUT DOES SOME TIME |
| 05:04PM | 2 | IN JUNE SOUND GOOD?  IS THAT TOO LATE?  IS THAT TOO EARLY? |
| 05:04PM | 3 | WHAT DO YOU THINK, MR. LEACH?  IS JULY TOO LATE? |
| 05:04PM | 4 | MR. LEACH:  I DON'T THINK JULY IS TOO LATE, |
| 05:04PM | 5 | YOUR HONOR.  AND I NEED TO REPORT I HAVE -- GIVEN THE PACE OF |
| 05:04PM | 6 | OUR OTHER RESPONSIBILITIES, I HAVE NOT HAD A CHANCE TO CONNECT |
| 05:04PM | 7 | WITH THE EXPERT ABOUT HIS SCHEDULE.  SO I DID HEAR THE COURT'S |
| 05:04PM | 8 | COMMENT ABOUT DOING IT BEFORE THE PRETRIAL CONFERENCE, WHICH IS |
| 05:05PM | 9 | IN JUNE.  I THINK THAT'S -- WOULD PUT A LOT OF PRESSURE ON THE |
| 05:05PM | 10 | PARTIES, BUT WE'LL DO WHATEVER THE COURT WISHES.  I THINK JULY |
| 05:05PM | 11 | WOULD BE PERFECTLY FINE. |
| 05:05PM | 12 | THE COURT:  OKAY. |
| 05:05PM | 13 | MR. DOWNEY:  I WILL LEAVE IT TO YOUR HONOR.  OUR |
| 05:05PM | 14 | PREFERENCE WOULD BE STRONGLY TO THE CONTRARY.  I TAKE FROM THE |
| 05:05PM | 15 | AMOUNT OF MATERIAL THAT WE HAVE TO DEAL WITH, WE WOULD BE |
| 05:05PM | 16 | BETTER OFF TO KNOW WHAT IS GOING TO HAPPEN. |
| 05:05PM | 17 | THE COURT:  SURE. |
| 05:05PM | 18 | MR. DOWNEY:  AND WE'LL BE PREPARED TO DO IT AS SOON |
| 05:05PM | 19 | AS THE COURT IS, AND WE HOPE THAT WILL BE SOON. |
| 05:05PM | 20 | THE COURT:  ALL RIGHT.  THANK YOU.  THANK YOU VERY |
| 05:05PM | 21 | MUCH. |
| 05:05PM | 22 | MR. LEACH:  ALL RIGHT.  THANK YOU. |
| 05:05PM | 23 | THE COURT:  ANYTHING FURTHER FROM ANYONE ON THE |
| 05:05PM | 24 | TEAMS ABOUT ANYTHING BEFORE WE END THIS PUBLIC SESSION, |
| 05:05PM | 25 | MR. SCHENK? |

151

05:05PM 1          MR. SCHENK:  NO, YOUR HONOR.

05:05PM 2          MS. SAHARIA:  NO, YOUR HONOR.

05:05PM 3          THE COURT:  ALL RIGHT.  THANK YOU.  LET'S END THIS

05:05PM 4    PUBLIC SESSION THEN.

05:05PM 5       THE MOTIONS THAT THE COURT HAS NOT RULED ON ARE INDICATED

05:05PM 6    DEFERRED.  THE COURT WILL ISSUE AN ORDER ON THOSE.  THEY ARE

05:05PM 7    UNDER SUBMISSION, AND THE COURT WILL ISSUE ORDERS CONCURRENT

05:05PM 8    WITH THE OTHER ORDERS THAT HAVE BEEN MADE ON THE RECORD.  SO

05:05PM 9    THAT ENDS OUR SESSION NOW.

05:06PM 10      LET'S JUST TAKE A STANDING BREAK FOR A MINUTE WHILE

05:06PM 11   MS. KRATZMANN DOES WHAT SHE NEEDS TO DO.

05:06PM 12         THE CLERK:  YES, YOUR HONOR.

05:06PM 13   **(SEALED PROCEEDINGS PAGES 152 - 161.)**

05:06PM 14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                        CERTIFICATE OF REPORTER

4

5

6

7        I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8    STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9    280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10   CERTIFY:

11       THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16                        IRENE RODRIGUEZ, CSR, RMR, CRR
                          CERTIFICATE NUMBER 8074
17

18
                          DATED:  MAY 12, 2021
19

20

21

22

23

24

25

UNITED STATES COURT REPORTERS

1

1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3

4    SAN JOSE DIVISION

5

6    UNITED STATES OF AMERICA,          )
                                        )   CR-18-00258-EJD
7                    PLAINTIFF,         )
                                        )   SAN JOSE, CALIFORNIA
8    VS.                                )
                                        )   MAY 5, 2021
9    ELIZABETH A. HOLMES,               )
                                        )   PAGES 1 - 156
10                   DEFENDANT.         )
     _____     )
11                                      )

11              TRANSCRIPT OF PROCEEDINGS
12        BEFORE THE HONORABLE EDWARD J. DAVILA
               UNITED STATES DISTRICT JUDGE
13

14   A P P E A R A N C E S:

15   FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                           BY:  JOHN C. BOSTIC
16                              JEFFREY B. SCHENK
                           150 ALMADEN BOULEVARD, SUITE 900
17                         SAN JOSE, CALIFORNIA 95113

18                         BY:  ROBERT S. LEACH
                                KELLY VOLKAR
19                         1301 CLAY STREET, SUITE 340S
                           OAKLAND, CALIFORNIA 94612
20
           (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21
     OFFICIAL COURT REPORTERS:
22                         IRENE L. RODRIGUEZ, CSR, RMR, CRR
                           CERTIFICATE NUMBER 8074
23                         LEE-ANNE SHORTRIDGE, CSR, CRR
                           CERTIFICATE NUMBER 9595
24
         PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25           TRANSCRIPT PRODUCED WITH COMPUTER

UNITED STATES COURT REPORTERS

2

```
1        A P P E A R A N C E S: (CONT'D)
2
3     FOR DEFENDANT HOLMES:   WILLIAMS & CONNOLLY LLP
                               BY:  KEVIN M. DOWNEY
4                                   LANCE A. WADE
                                    PATRICK LOOBY
5                                   KATHERINE TREFZ
                                    AMY SAHARIA
6                                   J.R. FLEURMONT
                                    SEEMA ROPER
7                              725 TWELFTH STREET, N.W.
                               WASHINGTON, D.C. 20005
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

| | | |
|--|--|--|
| | 1 | SAN JOSE, CALIFORNIA                    MAY 5, 2021 |
| 08:48AM | 2 | P R O C E E D I N G S |
| 09:04AM | 3 | (COURT CONVENED AT 9:04 A.M.) |
| 09:04AM | 4 | THE COURT:  ALL RIGHT.  LET'S GO BACK ON THE RECORD |
| 09:04AM | 5 | IN 18-258, UNITED STATES VERSUS ELIZABETH HOLMES. |
| 09:04AM | 6 | I SEE ALL COUNSEL PRESENT.  MS. HOLMES IS PRESENT.  WE'RE |
| 09:04AM | 7 | READY TO PROCEED WITH OUR MOTIONS IN LIMINE. |
| 09:04AM | 8 | FOR WEDNESDAY I THINK OUR SCHEDULE SHOWS, OR THE SCHEDULE |
| 09:04AM | 9 | I HAVE SHOWS THE FIRST MOTION UP IS GOVERNMENT'S MOTION IN |
| 09:05AM | 10 | LIMINE NUMBER 4 REGARDING CHARGING DECISIONS.  I THINK THAT'S |
| 09:05AM | 11 | WHAT IS UP. |
| 09:05AM | 12 | BUT BEFORE WE TAKE THAT UP, ANYTHING EITHER COUNSEL WANTS |
| 09:05AM | 13 | TO INDICATE FOR THE RECORD BEFORE WE START? |
| 09:05AM | 14 | MR. SCHENK:  NOTHING FROM THE GOVERNMENT.  THANK |
| 09:05AM | 15 | YOU. |
| 09:05AM | 16 | MS. SAHARIA:  NOTHING, YOUR HONOR. |
| 09:05AM | 17 | I WOULD JUST NOTE WE HAVE A NEW MEMBER OF OUR TEAM HERE |
| 09:05AM | 18 | TODAY, PATRICK LOOBY, WHO YOU HAVE MET BY ZOOM BUT NOT IN |
| 09:05AM | 19 | PERSON. |
| 09:05AM | 20 | THE COURT:  GOOD MORNING.  NICE TO SEE YOU. |
| 09:05AM | 21 | MR. LOOBY:  GOOD MORNING. |
| 09:05AM | 22 | THE COURT:  ALBEIT THROUGH THE PLEXIGLASS.  IT'S |
| 09:05AM | 23 | NICE TO SEE YOU.  I'M SURE WE ALL LOOK VERY DIFFERENT ON THE |
| 09:05AM | 24 | OTHER SIDE OF THE PLEXIGLASS. |
| 09:05AM | 25 | LET'S SEE.  MR. SCHENK, ARE YOU RISING TO THIS MOTION? |

UNITED STATES COURT REPORTERS

09:05AM 1    MR. SCHENK:  YES.  THANK YOU, YOUR HONOR.

09:05AM 2   GOOD MORNING AGAIN.  JEFF SCHENK FOR THE UNITED STATES.

09:05AM 3   YOUR HONOR, I THINK THIS MOTION, THE GOVERNMENT'S 4TH

09:05AM 4 MOTION IN LIMINE, MAY FIT INTO THE CATEGORY OF THE ONES THAT WE

09:05AM 5 CAN DEAL WITH QUICKLY.

09:05AM 6   THE COURT WILL RECALL THAT IN THIS MOTION THE GOVERNMENT

09:05AM 7 IS SEEKING TO PRECLUDE ARGUMENTS FROM THE DEFENSE THAT ALLEGE

09:06AM 8 THAT THE CHARGING DECISIONS IN THIS CASE WERE BASED ON SOME

09:06AM 9 COORDINATION THAT, FRANKLY, DID NOT OCCUR BETWEEN THE

09:06AM 10 GOVERNMENT AND EITHER JOURNALISTS OR COMPETING LAB COMPANIES.

09:06AM 11   THE COURT KNOWS THAT DURING THE DOWNFALL OF THERANOS THERE

09:06AM 12 WERE STATEMENTS FROM MS. HOLMES AND OTHERS AT THERANOS THAT THE

09:06AM 13 RESPONSE TO THE MEDIA WAS BECAUSE OF MISGUIDED JOURNALISM OR

09:06AM 14 BECAUSE OF STORIES PLANTED BY COMPETING LAB COMPANIES.

09:06AM 15   SO THE GOVERNMENT IS EXPRESSING CONCERN WITH THOSE SAME

09:06AM 16 THEORIES.  THEY ARE GOING TO INFECT THIS TRIAL, AND THERE IS

09:06AM 17 JUST NO BASIS FOR.  THE U.S. ATTORNEY'S OFFICE, THE CRIMINAL

09:06AM 18 INVESTIGATORS DID NOT COORDINATE WITH JOURNALISTS, DID NOT

09:06AM 19 COORDINATE WITH LAB COMPANIES.  AND TO MAKE THOSE ARGUMENTS TO

09:06AM 20 THE JURY WOULD BE MAKING ARGUMENTS THAT SIMPLY ARE NOT TRUE.

09:06AM 21   THE DEFENSE IN RESPONSE SAYS THE LIMITS OF THE

09:06AM 22 GOVERNMENT'S STATEMENTS TO THE COURT ARE TELLING.  THAT IS, THE

09:07AM 23 GOVERNMENT'S STATEMENTS IN ITS MOTION WERE THAT THE PROSECUTION

09:07AM 24 AND THE CRIMINAL INVESTIGATORS DID NOT COORDINATE WITH LAB

09:07AM 25 COMPANIES OR WITH JOURNALISTS.

5

09:07AM 1       BUT IF YOU GO BACK FURTHER IN TIME, CMS SPOKE TO

09:07AM 2    JOURNALISTS, THERE WERE OTHER INTERVIEWS CONDUCTED OF LAB

09:07AM 3    COMPANIES, AND THAT THEY SHOULD BE ALLOWED TO MAKE THESE KIND

09:07AM 4    OF COORDINATION OR CHARGING DECISION-BASED ARGUMENTS.

09:07AM 5       I THINK AT FIRST IT WOULD BE HELPFUL FOR THE COURT TO JUST

09:07AM 6    KNOW IF THE DEFENSE PLANS TO MAKE THOSE ARGUMENTS.  IS IT,

09:07AM 7    HYPOTHETICALLY SPEAKING, WE SHOULD BE ALLOWED TO MAKE THEM:

09:07AM 8    OR, NO, JUDGE, YOU SHOULD DENY THE MOTION BECAUSE WE DO INTEND

09:07AM 9    TO AND THIS IS RIGHT.

09:07AM 10      I THINK THAT WOULD BE ILLUMINATING BECAUSE THERE MAY NOT

09:07AM 11    BE A CONTROVERSY FOR THE TO DECIDE IF THE DEFENSE DOES NOT

09:07AM 12    INTEND TO MAKE THOSE ARGUMENTS.

09:08AM 13      MOREOVER, IF THEY DO, THE COURT SHOULD PREVENT THEM.  THE

09:08AM 14    LINE OF CASES THAT THE DEFENSE CITES SUGGESTING THAT IT WOULD

09:08AM 15    BE APPROPRIATE TO MAKE THOSE ARGUMENTS ALL SPEAK TO IMPROPER

09:08AM 16    LIMITATIONS THAT THE COURT PLACED ON, FOR EXAMPLE,

09:08AM 17    CROSS-EXAMINATION OF AN AGENT ON THE STAND.

09:08AM 18      WHEN A DEFENSE ATTORNEY WANTED TO CALL INTO QUESTION THE

09:08AM 19    STRENGTH OF THE GOVERNMENT'S INVESTIGATION, A COURT INTERRUPTED

09:08AM 20    AND TOLD THE JURY, YOU'RE HERE TO GRADE THE PRODUCT OF THE

09:08AM 21    INVESTIGATION, THE EVIDENCE, NOT THE CONDUCT OF THE

09:08AM 22    INVESTIGATION, AND THE REVIEWING COURT SAID, NO, THAT'S NOT

09:08AM 23    APPROPRIATE, YOU CAN'T REALLY REVIEW ONE WITHOUT THE OTHER.

09:08AM 24      AND THAT ISN'T WHAT WOULD OCCUR HERE IF THE COURT

09:08AM 25    PRECLUDED THE DEFENSE FROM GOING INTO PRECRIMINAL INVESTIGATION

6

| | | |
|---|---|---|
| 09:08AM | 1 | ALLEGED COORDINATION, AND THAT'S AN IMPORTANT DISTINCTION |
| 09:08AM | 2 | BECAUSE THE GOVERNMENT'S CHARGING DECISIONS IN THIS CASE WERE |
| 09:08AM | 3 | NOT, AND THE DEFENSE DOES NOT ALLEGE WERE, INFLUENCED BY |
| 09:08AM | 4 | COORDINATION BETWEEN THE U.S. ATTORNEY'S OFFICE, THE |
| 09:08AM | 5 | PROSECUTORS IN THE CASE, THE CRIMINAL INVESTORS -- |
| 09:09AM | 6 | INVESTIGATORS IN THE CASE, AND THE LAB INDUSTRY AND THE |
| 09:09AM | 7 | JOURNALISTS, AND THAT'S AN IMPORTANT DISTINCTION BECAUSE THAT'S |
| 09:09AM | 8 | ONE THAT IS NOT ASSUMED WITHIN THE CASE LAW THAT SAYS BROAD |
| 09:09AM | 9 | DISCRETION TO ATTACK THE STRENGTH OF THE CRIMINAL |
| 09:09AM | 10 | INVESTIGATION. |
| 09:09AM | 11 | SO THE -- GRANTING THE MOTION WOULD NOT RUN AFOUL OF THOSE |
| 09:09AM | 12 | CASES, AND IT REALLY SUGGESTS IF THE DEFENSE MAKES THOSE |
| 09:09AM | 13 | ARGUMENTS THAT COORDINATION EXISTS WHERE IT REALLY DID NOT. |
| 09:09AM | 14 | AGAIN, THIS IS JUST SORT OF A MOTION BASED ON ARGUE WHAT |
| 09:09AM | 15 | THE FACTS ARE AND DON'T MISLEAD THE JURY. |
| 09:09AM | 16 | THANK YOU. |
| 09:09AM | 17 | THE COURT: OKAY. THANK YOU. |
| 09:09AM | 18 | MR. WADE. |
| 09:09AM | 19 | MR. WADE: GOOD MORNING, YOUR HONOR. LANCE WADE ON |
| 09:09AM | 20 | BEHALF OF MS. HOLMES. |
| 09:09AM | 21 | WE DO NOT INTEND TO ARGUE THAT THE GOVERNMENT CHARGING |
| 09:09AM | 22 | DECISION WAS EXECUTED IN COORDINATION WITH JOURNALISTS OR |
| 09:09AM | 23 | COMPETITORS, THAT IS TO SAY THAT THESE PROSECUTORS, YOU KNOW, |
| 09:09AM | 24 | GOT IN A ROOM AND REACHED SOME AGREEMENT. |
| 09:10AM | 25 | INTERACTIONS BETWEEN JOURNALISTS AND COMPETITORS AND OTHER |

7

09:10AM 1    GOVERNMENT REGULATORS COULD BE RELEVANT IN THE CASE.  I

09:10AM 2    RECOGNIZE MR. SCHENK'S INVITATION TO PREVIEW ALL OF THE

09:10AM 3    EVIDENCE THAT WE WANT TO OFFER IN OUR DEFENSE.

09:10AM 4          THE COURT:  DO YOU WANT TO ACCEPT THAT INVITATION?

09:10AM 5          MR. WADE:  I'LL DECLINE THE INVITATION.

09:10AM 6    BUT SUFFICE IT TO SAY THAT THERE ARE WAYS IN WHICH CMS

09:10AM 7    WITNESSES, FDA WITNESSES, AND OTHERS WERE IN CONTACT WITH

09:10AM 8    COMPETITORS AND JOURNALISTS DURING KEY TIME PERIODS THAT COULD

09:10AM 9    WELL GO -- BE APPROPRIATE CROSS-EXAMINATION OF WITNESSES WHO

09:10AM 10   ARE CALLED TO TESTIFY IN THE CASE.

09:10AM 11   THEORETICALLY THERE COULD BE CROSS-EXAMINATION OF

09:10AM 12   GOVERNMENT INVESTIGATING AGENTS IF THERE'S SOME INDICATION THAT

09:10AM 13   THE INVESTIGATING AGENT ONLY PURSUED CERTAIN INVESTIGATION

09:10AM 14   BECAUSE IT WAS WHAT WAS REPORTED IN THE MEDIA AND DIDN'T PURSUE

09:10AM 15   OTHER INVESTIGATION, FOR EXAMPLE.

09:11AM 16   BUT THIS IS ALL IN THE CATEGORY OF EVIDENCE-SPECIFIC

09:11AM 17   ISSUES THAT SHOULD BE DEFERRED AND DEALT WITH AS WE DEAL WITH

09:11AM 18   EVIDENCE AT TRIAL.  WE'VE POINTED TO THIS EVIDENCE AS EXAMPLES

09:11AM 19   WITHIN OUR BRIEFING.

09:11AM 20   MR. LOOBY WILL ARGUE THE CMS MOTION LATER TODAY.  I THINK

09:11AM 21   YOU'LL SEE IN THAT MOTION THAT THERE IS SOME INDICATION THAT

09:11AM 22   THE CMS ACTED DIFFERENTLY AS A RESULT OF INQUIRIES FROM

09:11AM 23   JOURNALISTS AND THEY IMPOSED DIFFERENT PROCEDURES.

09:11AM 24   EVIDENCE OF THAT KIND IS PERFECTLY RELEVANT IN THIS CASE

09:11AM 25   IN TERMS OF QUESTIONING THE WITNESS WHO TALKS ABOUT THE

UNITED STATES COURT REPORTERS

8

09:11AM 1    PROCEDURES THAT THEY DID DURING AN INSPECTION IF THAT EVIDENCE

09:11AM 2    COMES IN.  IT MAY NOT COME IN.  IT PROBABLY SHOULDN'T COME IN.

09:11AM 3        BUT IF IT DOES, THAT CROSS-EXAMINATION IS CLEARLY RELEVANT

09:11AM 4    AND --

09:11AM 5            THE COURT:  PARDON ME FOR INTERRUPTING YOU.

09:12AM 6        YOU'RE TALKING ABOUT, FOR EXAMPLE, THE CALIFORNIA

09:12AM 7    DEPARTMENT OF PUBLIC HEALTH TYPICALLY DOES A CERTAIN TYPE OF

09:12AM 8    INVESTIGATION, BUT IN THIS CASE ANOTHER FEDERAL AGENCY DECIDED

09:12AM 9    TO DO IT ON THEIR OWN AND YOU SHOULD BE ABLE TO, IF THAT

09:12AM 10   EVIDENCE IS PERMITTED, YOU SHOULD BE ABLE TO INQUIRE ABOUT WHY

09:12AM 11   THAT DISTINCTION WAS MADE.  IT'S -- IS THAT WHAT YOU'RE TALKING

09:12AM 12   ABOUT?

09:12AM 13           MR. WADE:  THAT IS AN EXAMPLE, YOUR HONOR.

09:12AM 14       AND THAT WITNESS HAS SAID ESSENTIALLY THAT IT WAS MADE

09:12AM 15   BECAUSE IT HAD A HEIGHTENED PROFILE, BECAUSE IT WAS IN THE

09:12AM 16   MEDIA AND THEY WERE GETTING INQUIRIES FROM JOURNALISTS IN THAT

09:12AM 17   TIME PERIOD.

09:12AM 18       THERE ARE OTHER WITNESSES WHO SUGGESTS THAT THERE WERE

09:12AM 19   DOCUMENTS FROM CMS THAT SUGGEST THAT MAYBE THERANOS WAS BEING

09:12AM 20   TREATED DIFFERENTLY BECAUSE OF THE SOME OF THE MEDIA INQUIRIES.

09:12AM 21       AGAIN, I DON'T --

09:12AM 22           THE COURT:  SO DO YOU HAVE -- IS THERE GOING TO BE

09:12AM 23   EVIDENCE, TO THE EXTENT THAT YOU CAN TELL ME NOW, IS THERE

09:12AM 24   EVIDENCE THAT THE GOVERNMENT COORDINATED WITH JOURNALISTS TO DO

09:13AM 25   THIS INVESTIGATION? -

9

09:13AM 1                MR. WADE:  BY "GOVERNMENT" YOU MEAN THE PROSECUTORS

09:13AM 2     WHO ARE INVOLVED IN THIS CASE, THE DEPARTMENT OF JUSTICE

09:13AM 3     PROSECUTORS?

09:13AM 4                THE COURT:  WELL, LET'S START THERE AND WORK OUR WAY

09:13AM 5     DOWN.

09:13AM 6                MR. WADE:  I HAVE NOT SEEN EVIDENCE THAT THEY HAVE

09:13AM 7     COORDINATED AND WOULD NOT INTEND TO ARGUE THAT THEY COORDINATED

09:13AM 8     AS SUCH.

09:13AM 9          AND TO THE EXTENT THAT YOU LOOK AT THE TITLE OF THE

09:13AM 10    GOVERNMENT'S MOTION, COORDINATION WITH RESPECT TO CHARGING

09:13AM 11    DECISIONS, WE CAN LIVE WITH AN ORDER ON THAT.

09:13AM 12         BUT THE BODY OF THEIR ARGUMENT TRIES TO CREEP A LITTLE BIT

09:13AM 13    MORE INTO CROSS-EXAMINATION THAT GOES TO MOTIVE FOR CERTAIN

09:13AM 14    ACTIONS AND THINGS THAT THE GOVERNMENT MAY CHOOSE TO BRING INTO

09:13AM 15    THIS CASE.  IF THEY CHOOSE TO BRING IT INTO THE CASE, WE GET TO

09:13AM 16    CROSS-EXAMINE THE WITNESSES.

09:13AM 17               THE COURT:  I THINK EVERYONE RECOGNIZES THAT THE

09:13AM 18    DEFENSE WILL HAVE AN OPPORTUNITY, AND SHOULD, TO CRITICIZE THE

09:13AM 19    DEFENSE -- OR CRITICIZE THE PROSECUTION.  YOU HAVE AN ABSOLUTE

09:13AM 20    RIGHT TO CRITICIZE THE EVIDENCE THAT IS PRESENTED OF AND TEST

09:13AM 21    THE EVIDENCE.  THAT'S THE JURY PROCESS.

09:14AM 22         YOU HAVE THE RIGHT TO DO THAT.

09:14AM 23         I THINK WHAT THIS MOTION SPEAKS TO IS YOU CAN'T CREATE

09:14AM 24    SOMETHING THAT DOESN'T EXIST, AND THE COORDINATION, I THINK,

09:14AM 25    THAT MR. SCHENK SPEAKS TO IS -- AND THIS IS PROPHYLACTIC, I

09:14AM 1    THINK, FROM THE GOVERNMENT'S PERSPECTIVE.  THERE'S FEAR THAT

09:14AM 2    PERHAPS THE DEFENSE MIGHT SAY THAT THE ONLY REASON THIS CASE

09:14AM 3    WAS PROSECUTED IN THE WAY THAT IT WAS IS BECAUSE CERTAIN

09:14AM 4    JOURNALISTS, CERTAIN NEWS ARTICLES, CERTAIN MEDIA DECIDED TO

09:14AM 5    GUIDE THE PROSECUTION AND BUT FOR THAT OR IN ANY OTHER CASE

09:14AM 6    THAT WOULDN'T HAVE HAPPENED.

09:14AM 7        IS THAT FAIR, MR. SCHENK?

09:14AM 8            MR. SCHENK:  YES.  PRECISELY.  THANK YOU.

09:14AM 9            MR. WADE:  WE CERTAINLY DON'T INTEND TO CREATE

09:14AM 10   EVIDENCE WHERE NONE EXISTS AND TO CREATE ARGUMENTS THAT ARE NOT

09:14AM 11   BASED ON EVIDENCE.  THAT WOULD BE IMPROPER AS THE COURT KNOWS

09:14AM 12   AND AS COUNSEL WELL KNOWS.

09:14AM 13       SO WE'RE MINDFUL OF THAT LINE AND DON'T INTEND TO CROSS

09:14AM 14   IT.  WE'LL SEE WHERE THE EVIDENCE GOES BASED ON WHAT THE

09:15AM 15   GOVERNMENT OFFERS AND BASED ON WHAT WE SEEK TO PUT ON, AND IF

09:15AM 16   MEDIA OR COMPETITORS OR INTERACTIONS ARE RELEVANT WITH

09:15AM 17   WITNESSES, WE'LL DRAW THAT EVIDENCE OUT AND WE'LL ARGUE IT AS

09:15AM 18   APPROPRIATE IN THE CASE.

09:15AM 19       BUT I THINK -- I UNDERSTAND THE CONCERN AND I UNDERSTAND

09:15AM 20   THAT THERE MAY BE SOME DESIRE TO AVOID THAT.  THE SPECIFIC

09:15AM 21   ISSUE THAT THE COURT HAS RAISED SHOULD NOT BE A CONCERN.

09:15AM 22           THE COURT:  GREAT.  OKAY.

09:15AM 23       MR. SCHENK, ANYTHING ELSE?

09:15AM 24           MR. SCHENK:  NOTHING FURTHER.

09:15AM 25           THE COURT:  GREAT.  I THINK IT'S IMPORTANT THAT WE

UNITED STATES COURT REPORTERS

09:15AM 1    HAVE THESE DISCUSSIONS NOW AT THIS HEARING AS BOTH SIDES

09:15AM 2    CONTINUE TO PREPARE YOUR CASES, AND THIS IS INFORMATIVE FOR THE

09:15AM 3    COURT ALSO TO RECOGNIZE IN MY NOTES WHAT WE MIGHT ANTICIPATE

09:15AM 4    AND THOSE ISSUES THAT WOULD COME UP.

09:15AM 5        SO THIS MOTION -- I THINK IN REGARDS TO THE MOTION I'LL

09:15AM 6    DEFER THE MOTION AND RECOGNIZING THE ISSUES THAT ARE PRESENTED,

09:16AM 7    THE STATEMENTS OF BOTH COUNSEL, AND SHOULD THIS COME UP, THE

09:16AM 8    COURT WILL RULE ON ANY SPECIFIC AREA AS NEEDED DURING THE

09:16AM 9    TRIAL.

09:16AM 10       ALL RIGHT.  THANK YOU.

09:16AM 11       NEXT I BELIEVE IS GOVERNMENT'S MOTION IN LIMINE NUMBER 5,

09:16AM 12   TO PRECLUDE THE DEFENDANT FROM PRESENTING AN IMPROPER

09:16AM 13   GOOD-FAITH DEFENSE.

09:16AM 14       MR. BOSTIC.

09:16AM 15        MR. BOSTIC:  YES, YOUR HONOR.  GOOD MORNING.

09:16AM 16   JOHN BOSTIC FOR THE UNITED STATES.

09:16AM 17       I BELIEVE THERE'S A SIGNIFICANT AMOUNT OF AGREEMENT ON

09:16AM 18   THIS MOTION ALSO BETWEEN THE PARTIES.  THERE SEEMS TO BE NO

09:16AM 19   DISPUTE THAT THE NINTH CIRCUIT HAS CLEARLY LAID OUT THE LAW,

09:16AM 20   THE RULE THAT A GOOD FAITH BELIEF THAT A FRAUD VICTIM WILL BE

09:16AM 21   REPAID IS NO DEFENSE TO A CHARGE OF FRAUD.

09:16AM 22       SO IN THIS CASE, OF COURSE, BASED ON THE ELEMENTS, THE

09:16AM 23   FOCUS OF THE JURY -- THE FOCUS OF THE EVIDENCE AT TRIAL WILL BE

09:16AM 24   ON THE DEFENDANT'S STATE OF MIND AND HER INTENT AT THE TIME THE

09:17AM 25   FRAUD WAS CARRIED OUT.

09:17AM 1    OF COURSE BOTH CATEGORIES OF FRAUD IN THE INDICTMENT ARE

09:17AM 2    BASED ON THE VICTIM SCHEMES TO DEFRAUD FIRST INVESTORS, AND

09:17AM 3    ALSO PATIENTS, AND TO SEPARATE THEM FROM THEIR MONEY BY

09:17AM 4    MISLEADING STATEMENTS.

09:17AM 5    THOSE DEFENSES CRIMINALIZE THE SCHEME TO DEFRAUD ITSELF.

09:17AM 6    SO, IN FACT, THE OFFENSES, ALONG WITH THE CONSPIRACY OFFENSES,

09:17AM 7    ARE COMPLETE BEFORE THE VICTIMS ARE EVEN SEPARATED FROM THEIR

09:17AM 8    MONEY.

09:17AM 9    THE PLANS DOWN THE ROAD OF A DEFENDANT TO RESTORE PROPERTY

09:17AM 10   OR MONEY TO VICTIMS HAVE NO IMPORT IN A TRIAL OF THIS KIND.

09:17AM 11   THEY HAVE NO EFFECT ON WHETHER FRAUD HAS BEEN COMMITTED.

09:17AM 12   EFFORTS TO RESTORE MONEY TO VICTIMS CANNOT UNDO A FRAUD OFFENSE

09:17AM 13   ONCE IT'S BEEN COMMITTED.

09:17AM 14   AND CRITICALLY FROM THE BENNY OPINION IN THE

09:18AM 15   NINTH CIRCUIT, THAT'S 786 F.2D 1410, THE DEFENDANT'S INTENT

09:18AM 16   THAT VICTIMS OF THE FRAUD ULTIMATELY BE REPAID OR HAVE THEIR

09:18AM 17   PROPERTY RESTORED IS NOT A PROPER DEFENSE TO ASSERT AT TRIAL.

09:18AM 18   SO THE GOVERNMENT IS SIMPLY SEEKING AN ORDER FROM THE

09:18AM 19   COURT ENFORCING THE RULE THAT BOTH PARTIES SEEM TO RECOGNIZE.

09:18AM 20   THE DEFENSE OBJECTS THAT THEY SHOULD BE PERMITTED,

09:18AM 21   HOWEVER, TO ARGUE THAT THE DEFENDANT HAD A GOOD FAITH BELIEF IN

09:18AM 22   THE TRUTH OF ANY REPRESENTATION THAT SHE MADE.

09:18AM 23   THE GOVERNMENT IS NOT SEEKING TO PRECLUDE THOSE ASSERTIONS

09:18AM 24   OR THAT ARGUMENT.  AND, IN FACT, THE GOVERNMENT ITSELF QUOTED

09:18AM 25   THE LANGUAGE IN BENNY THAT MAKES IT CLEAR THAT THAT IS A

UNITED STATES COURT REPORTERS

13

09:18AM 1    PERMISSIBLE TYPE OF GOOD FAITH DEFENSE.

09:18AM 2         THE GOVERNMENT'S MOTION IS SIMPLY SEEKING TO PRECLUDE AN

09:18AM 3    IMPROPER GOOD FAITH DEFENSE AND BELIEVES THE COURT IS CAPABLE

09:18AM 4    OF CRAFTING AN ORDER THAT WILL ENFORCE THAT RULE.

09:18AM 5         THE COURT:  THANK YOU.

09:18AM 6         MR. WADE, I THINK WHEN I LOOKED AT THIS, I THINK IT ASKED

09:19AM 7    US TO EITHER CONCUR OR NOT IN THE DECISION IN BENNY.

09:19AM 8         MR. WADE:  YOUR HONOR, I DON'T THINK WE NEED AN

09:19AM 9    ORDER THAT WE HAVE TO ADHERE TO THE LAW OF THE NINTH CIRCUIT.

09:19AM 10   I THINK THE NINTH CIRCUIT IS BINDING PRECEDENT AND WE HAVE TO

09:19AM 11   ADHERE TO IT.

09:19AM 12        BENNY IS A VERY LIMITED HOLDING.  A PROFFERED INSTRUCTION

09:19AM 13   THERE WAS A DEFENSE INSTRUCTION ON A GOOD FAITH INTENT TO

09:19AM 14   REPAY.  THAT INSTRUCTION WAS DENIED.

09:19AM 15        IT SHOULD BE DENIED HERE IF WE OFFER IT.  I SUGGEST WE

09:19AM 16   DON'T INTEND TO OFFER IT.  I THINK THE BRIEFING MAKES CLEAR

09:19AM 17   THAT WE KNOW WHERE THE LINES ARE ON GOOD FAITH AND I DON'T

09:19AM 18   THINK AN ORDER IS NEEDED HERE.

09:19AM 19        I THINK THIS ONE CAN BE EITHER DENIED OR DEFERRED AS THE

09:19AM 20   EVIDENCE IS CONSIDERED THROUGHOUT THE CASE.

09:19AM 21        I WOULD LIKE TO MAKE CLEAR, WE -- COUNSEL FOR THE

09:19AM 22   GOVERNMENT SORT OF BLENDED A LITTLE BIT BETWEEN STATE OF MIND

09:20AM 23   AND ACTUS REUS IN SOME OF THE DISCUSSIONS ABOUT EFFORTS TO DO

09:20AM 24   THINGS, AND THAT'S NOT IN THIS MOTION.

09:20AM 25        THIS MOTION RELATES TO GOOD FAITH INTENT.  THAT WILL

14

| | | |
|--|--|--|
| 09:20AM | 1 | UNDOUBTEDLY BE A PART OF THIS CASE. |
| 09:20AM | 2 | THE COURT:  SURE.  OKAY.  THANK YOU. |
| 09:20AM | 3 | MR. WADE:  THANK YOU. |
| 09:20AM | 4 | THE COURT:  THANK YOU VERY MUCH.  THANK YOU. |
| 09:20AM | 5 | WELL, LET ME SAY IN REGARDS TO THIS MOTION, THAT IS, |
| 09:20AM | 6 | GOVERNMENT'S MIL NUMBER 5, THE COURT WILL -- AS MR. WADE |
| 09:20AM | 7 | SUGGESTS AND RECOGNIZES, THE COURT WILL FOLLOW THE LAW OF THE |
| 09:20AM | 8 | NINTH CIRCUIT AND THAT, OF COURSE, INCLUDES A HOLDING IN THE |
| 09:20AM | 9 | DIRECTION THAT THE NINTH CIRCUIT PROVIDED US, UNITED STATES |
| 09:20AM | 10 | VERSUS BENNY -- EXCUSE ME -- 786 F.2D 1210, AND THE COURT |
| 09:20AM | 11 | INTENDS TO FOLLOW THE PRECEDENT IN THAT CASE, AND I APPRECIATE |
| 09:20AM | 12 | COUNSEL RECOGNIZING THAT AND AGREE TO FOLLOW IT AS WELL. |
| 09:20AM | 13 | CONCURRENT WITH THIS IS, PURSUANT TO MR. BOSTIC'S |
| 09:20AM | 14 | OBSERVATION, THIS DOES NOT PRECLUDE THE DEFENDANT OR THE |
| 09:21AM | 15 | DEFENSE FROM ARGUING A GOOD FAITH BELIEF AS A DEFENSE.  THAT'S |
| 09:21AM | 16 | THE SECOND PART THAT WAS IDENTIFIED IN BENNY THAT IS PRECLUDED |
| 09:21AM | 17 | IN THIS CASE. |
| 09:21AM | 18 | SO THANK YOU FOR THAT. |
| 09:21AM | 19 | NOW WE COME TO 560, WHICH IS MS. HOLMES'S MOTION REGARDING |
| 09:21AM | 20 | DR. MASTER. |
| 09:21AM | 21 | MS. SAHARIA:  GOOD MORNING, YOUR HONOR. |
| 09:21AM | 22 | THE COURT:  GOOD MORNING. |
| 09:21AM | 23 | MS. SAHARIA:  AMY SAHARIA FOR MS. HOLMES. |
| 09:21AM | 24 | THE COURT:  THANK YOU.  GOOD MORNING. |
| 09:21AM | 25 | MAY I MAKE SOME OBSERVATIONS THAT MIGHT BE HELPFUL HERE? |

UNITED STATES COURT REPORTERS

15

09:21AM 1    I HOPE THEY'RE HELPFUL.  I DON'T KNOW.

09:21AM 2            MS. SAHARIA:  YES, OF COURSE, YOUR HONOR.

09:21AM 3            THE COURT:  YOU CAN TELL ME IF THEY ARE OR NOT AND

09:21AM 4    I'M HAPPY TO RECEIVE THAT.

09:21AM 5      SO I READ THIS -- AND THIS IS A VERY INVOLVED AREA, OF

09:21AM 6    COURSE, WHENEVER WE'RE TALKING ABOUT THE EXPERT PIECE OF A

09:21AM 7    PROFFERED WITNESS HERE, AND HERE WE'RE SPEAKING -- THIS MOTION

09:22AM 8    SPEAKS TO DR. STEPHEN MASTER, THAT'S THE GOVERNMENT'S EXPERT

09:22AM 9    WHO HAS BEEN IDENTIFIED AS THE EXPERT HERE.

09:22AM 10      THERE ARE DIFFERENT AREAS AND TOPICS THAT THIS WITNESS

09:22AM 11    WOULD -- THAT THE GOVERNMENT SEEKS THIS WITNESS TO TESTIFY

09:22AM 12    ABOUT.  THERE'S A COUPLE OF ISSUES -- LET ME JUST TELL YOU, I

09:22AM 13    THINK I'LL INDICATE IT THIS WAY:  THE COURT CAN GIVE, I HOPE I

09:22AM 14    CAN GIVE YOU THIS FOR SOME BENEFIT TO YOU FOR YOUR DISCUSSION,

09:22AM 15    AND I DON'T KNOW WHO IS SPEAKING TO THIS.

09:22AM 16      MR. LEACH, ARE YOU TALKING?

09:22AM 17            MR. LEACH:  I WILL BE SPEAKING TO THIS, YES.

09:22AM 18            THE COURT:  OKAY.  GREAT.  THANK YOU.

09:22AM 19      SO IN READING YOUR PLEADINGS, AND AS THEY ALWAYS ARE IN

09:22AM 20    THIS CASE, THEY'RE VERY THOROUGH AND VERY HELPFUL, I LOOK AT

09:22AM 21    THE INDUSTRY STANDARDS AND THE QUESTION ABOUT WHETHER OR NOT

09:22AM 22    THIS WITNESS CAN TESTIFY ABOUT INDUSTRY STANDARDS.

09:22AM 23      AND I DO BELIEVE THAT THE WITNESS -- AND AGAIN, THIS IS MY

09:22AM 24    PRELIMINARY OBSERVATIONS -- THAT HE IS QUALIFIED TO TESTIFY

09:23AM 25    ABOUT INDUSTRY STANDARDS.  I THINK HE DOES HAVE, AND HIS

09:23AM 1    INFORMATION THAT I'VE RECEIVED SUGGESTS, THAT HE DOES HAVE THE

09:23AM 2    BACKGROUND, THE ABILITY, THE KNOWLEDGE TO TESTIFY ABOUT THIS,

09:23AM 3    INDUSTRY STANDARDS, AS LONG AS HE DOES NOT PROVIDE LEGAL

09:23AM 4    OPINIONS.  AND I WOULDN'T ALLOW HIM TO OPINE WITH ANY LEGAL

09:23AM 5    OPINIONS AS TO INDUSTRY STANDARDS.

09:23AM 6        AS TO FINGERSTICK, FINGERSTICK TECHNOLOGY, I DO THINK THAT

09:23AM 7    HE IS QUALIFIED, BASED ON HIS BACKGROUND AND HIS KNOWLEDGE, TO

09:23AM 8    OPINE ON FINGERSTICK BLOOD TESTING.  HE IS A CLINICAL

09:23AM 9    PATHOLOGIST AND HE HAS GREAT EXPERIENCE IN THAT BACKGROUND IN

09:23AM 10   THOSE AREAS, AND I DO THINK HE CAN TESTIFY AS TO THIS TESTING

09:23AM 11   AND OFFER AN OPINION ABOUT THAT.

09:23AM 12       NOTWITHSTANDING THE FACT -- AND I UNDERSTAND THE DEFENSE

09:23AM 13   IS CRITICAL OF HIM BECAUSE HE DOES NOT HAVE HANDS-ON, IF YOU

09:24AM 14   WILL, EXPERIENCE IN THAT REGARD.  BUT, AGAIN, I DO THINK THIS

09:24AM 15   IS A PRELIMINARY RULING.

09:24AM 16       GETTING INTO THE SPECIFIC TESTIMONY ABOUT THE DIFFERENT

09:24AM 17   ASSAYS, I DO HAVE SOME ISSUES ABOUT SOME OF THOSE.  LET ME JUST

09:24AM 18   INDICATE THAT I DO THINK THAT HIS OPINIONS ON VITAMIN D AND

09:24AM 19   CHOLESTEROL ARE PERMITTED.  HE WOULD BE PERMITTED TO TESTIFY ON

09:24AM 20   THOSE.

09:24AM 21       IT SEEMS FROM YOUR PLEADINGS THAT THE GOVERNMENT AND THE

09:24AM 22   DEFENSE, I THINK YOU BOTH RECOGNIZE THAT HIS OPINIONS ON

09:24AM 23   THOSE -- AS TO THOSE TWO SUBSTANCES, ASSAYS, DERIVED FROM THE

09:24AM 24   ICAHN, I-C-A-H-N, AND THE CMS REPORT, AND THOSE ARE PROPER

09:24AM 25   SOURCES FROM WHICH TO BASE AN OPINION.

09:24AM 1     I DO THINK THAT HIS OPINION ON THOSE ARE APPROPRIATELY

09:24AM 2    SUPPORTED AND HE WOULD BE PERMITTED TO TESTIFY HIS OPINIONS ON

09:24AM 3    THOSE ASSAYS.

09:25AM 4     THE POTASSIUM, CHLORIDE SODIUM, AND THE OTHERS, I THINK I

09:25AM 5    HAVE SOME PROBLEMS WITH.  I THINK THERE ARE SOME DEFICIENCIES

09:25AM 6    AS TO AT LEAST WHAT WE HAVE IN HIS 20-PAGE REPORT AND I DO FIND

09:25AM 7    SOME PROBLEMS.

09:25AM 8     THIS IS TO THE GOVERNMENT I SUPPOSE I'M SPEAKING.  I DO

09:25AM 9    HAVE SOME ISSUES WITH THOSE OPINIONS, AND IT WOULD BE THE

09:25AM 10   COURT'S INTENT TO SCHEDULE A DAUBERT HEARING AS TO THOSE

09:25AM 11   OPINIONS.  I THINK IT WOULD BE APPROPRIATE TO ALLOW THE

09:25AM 12   GOVERNMENT AND DR. MASTER TO PROVIDE ADDITIONAL INFORMATION

09:25AM 13   THAT WOULD ENABLE THE COURT TO DETERMINE WHETHER OR NOT THOSE

09:25AM 14   OPINIONS CAN BE SUPPORTED, SUBSTANTIATED FURTHER.

09:25AM 15    AND HE MAY BE ABLE TO PROVIDE ADDITIONAL INFORMATION

09:25AM 16   BEYOND HIS 20-PAGE REPORT.  I THINK 10 PAGES OF IT WERE TALKING

09:25AM 17   ABOUT BACKGROUND AND THE TESTING PROCEDURES, AND THEN THERE

09:26AM 18   WERE -- THE BALANCE I THINK DRILLED DOWN INTO THESE ISSUES.

09:26AM 19    I'M NOT BEING CRITICAL OF THE REPORT.  WHAT I'M SAYING IS

09:26AM 20   THAT I THINK I NEED MORE BEFORE I WOULD PERMIT HIM TO TESTIFY.

09:26AM 21    AND I'M GOING TO GIVE THE GOVERNMENT THAT OPPORTUNITY,

09:26AM 22   THROUGH A DAUBERT HEARING, FOR THOSE PARTICULAR TOPICS.

09:26AM 23     MS. SAHARIA:  THANK YOU, YOUR HONOR.  I THINK THAT'S

09:26AM 24   HELPFUL AND THAT WILL HELP STREAMLINE MY PRESENTATION

09:26AM 25   SIGNIFICANTLY.

09:26AM 1          SO I THINK MAYBE I CAN TAKE THIS IN MAYBE THREE BUCKETS.

09:26AM 2          LET ME START WITH THE ASSAYS, AND LET ME START WITH THE

09:26AM 3   EIGHT THAT YOUR HONOR INDICATED THAT YOU HAVE CONCERNS WITH,

09:26AM 4   WHICH WE, OF COURSE, SHARE.

09:26AM 5          THEN I'LL MOVE AND DISCUSS CHOLESTEROL AND VITAMIN D, AND

09:26AM 6   THEN I'LL CONCLUDE WITH INDUSTRY STANDARDS.

09:26AM 7          I DO THINK THAT IT WOULD BE IMPERMISSIBLE FOR THE COURT TO

09:27AM 8   ALLOW DR. MASTER TO OPINE AS TO THOSE EIGHT ASSAYS WITHOUT

09:27AM 9   AFFORDING THE DEFENSE A DAUBERT HEARING.  LET ME TRY TO

09:27AM 10  CONVINCE THE COURT WHY WE DON'T EVEN THINK THAT YOU SHOULD GET

09:27AM 11  TO A DAUBERT HEARING, BECAUSE HIS OPINIONS ON THOSE EIGHT

09:27AM 12  ASSAYS ARE SO DEFICIENT.

09:27AM 13         AND I THINK IT'S TELLING THAT YOUR HONOR POINTED OUT THAT

09:27AM 14  KIND OF A PAUCITY OF INFORMATION IN HIS REPORT ON THOSE ASSAYS.

09:27AM 15         I THINK WHAT IS ALSO TELLING IS THE PAUCITY OF THE

09:27AM 16  GOVERNMENT'S DEFENSE OF THOSE OF ASSAYS.  THEIR OPPOSITION

09:27AM 17  BRIEF IS ECF 668, AND THEY DEFEND HIS OPINIONS AS TO THE ASSAYS

09:27AM 18  ON PAGES 6 TO 9 OF THAT BRIEF.  AND THEY CITE NO CASE, THERE'S

09:27AM 19  NO CASE IN THEIR OPPOSITION DEFENDING DR. MASTER'S OPINIONS ON

09:27AM 20  THOSE ASSAYS.

09:27AM 21         THEY CITE KIND OF THE GENERIC DAUBERT PRINCIPLES IN THE

09:27AM 22  BEGINNING OF THEIR BRIEF, BUT WHEN IT COMES TO SHOWING THE

09:27AM 23  COURT ANOTHER CASE WHERE A COURT HAS ALLOWED AN EXPERT TO OFFER

09:28AM 24  SCIENTIFIC OPINIONS BASED ON EMAILS AND CUSTOMER COMPLAINTS.

09:28AM 25  THEY HAVE NO CASE, NO CASE THAT HAS SUBMITTED SIMILAR OPINIONS.

19

09:28AM 1     THEY CITE NO SCIENTIFIC LITERATURE THAT ESTABLISHES THAT

09:28AM 2     IS A SCIENTIFICALLY VALID WAY TO REACH THESE SCIENTIFIC

09:28AM 3     CONCLUSIONS, AND THAT'S BECAUSE IT IS NOT A SCIENTIFICALLY

09:28AM 4     VALID WAY TO REACH OPINIONS ON THE SCIENTIFICALLY COMPLEX ISSUE

09:28AM 5     OF ACCURACY AND RELIABILITY.

09:28AM 6     THAT SHOULD GIVE THE COURT GREAT PAUSE, AND WE WOULD

09:28AM 7     WELCOME A DAUBERT HEARING IF THAT'S WHAT THE COURT DECIDES TO

09:28AM 8     DO, BUT NO HEARING IS GOING TO SUPPLANT THAT -- IS GOING TO

09:28AM 9     PRODUCE MATERIAL THAT DOESN'T EXIST.  THE DATA DOESN'T EXIST.

09:28AM 10    WE KNOW WHY IT DOESN'T EXIST.  WE TALKED ABOUT THAT YESTERDAY,

09:28AM 11    AND THAT'S WHY DR. MASTER IS LEFT TO OFFER OPINIONS BASED ON

09:28AM 12    EMAILS AND CUSTOMER COMPLAINTS.

09:28AM 13    THE EIGHT ASSAYS THAT YOUR HONOR INDICATED, THEY FALL INTO

09:29AM 14    TWO BUCKETS.  AS I THINK YOU KNOW, FOUR OF THOSE, WHICH ARE --

09:29AM 15    CAN I JUST PUT UP THE ELMO?

09:29AM 16         MR. WADE:  YES.

09:29AM 17         MS. SAHARIA:  THANK YOU.

09:29AM 18    YOUR HONOR, THIS IS APPENDIX A TO OUR MOTION, AND THOSE

09:29AM 19    EIGHT ASSAYS FALL INTO TWO GROUPS.  THERE ARE FOUR WHICH ARE

09:29AM 20    CALCIUM, HBA1C, HCG, AND HIV, THESE ARE THE ASSAYS FOR WHICH

09:29AM 21    DR. MASTER WAS ASKED TO OFFER AN OPINION THAT THE ASSAYS ARE

09:29AM 22    ACCURATE AND RELIABLE, AND HE WAS UNABLE TO REACH THAT OPINION.

09:29AM 23    AT EXHIBIT 9 OF OUR EXHIBITS, HE EXPLAINED THAT TO FULLY

09:29AM 24    RENDER THE OPINION THAT THE GOVERNMENT WAS LOOKING FOR, HE WAS

09:29AM 25    LOOKING FOR DOCUMENTS THAT SPECIFICALLY RELATE TO THESE FOUR

09:30AM 1    ASSAYS, AND PRESUMABLY THE GOVERNMENT WAS UNABLE TO GIVE HIM

09:30AM 2    THOSE DOCUMENTS BECAUSE HE WAS UNABLE TO OFFER AN ACTUAL

09:30AM 3    OPINION ABOUT ACCURACY AND RELIABILITY.

09:30AM 4        HE ESSENTIALLY, AS TO THESE FOUR, OFFERS A NONOPINION.  HE

09:30AM 5    SAID, AND I QUOTE AT REPORT 15, "BASED ON CUSTOMER COMPLAINTS

09:30AM 6    ON THERANOS'S INTERNAL INVESTIGATIONS, THERE WERE SIGNIFICANT

09:30AM 7    ISSUES WITH CALCIUM, HBA1C, HCG, AND HIV DURING THE TIMES THAT

09:30AM 8    THESE WERE PERFORMED ON FINGERSTICK SAMPLES.  IN SOME CASES

09:30AM 9    THERE ARE INSUFFICIENT ADDITIONAL DETAILS OF THE MATERIAL I

09:30AM 10   HAVE REVIEWED TO DETERMINE THE CAUSE OF THESE ISSUES, THE

09:30AM 11   RELATIONSHIP TO ADDED EITHER THE SAMPLE TYPE OR THERANOS'S

09:30AM 12   TECHNOLOGY OR THE RESOLUTION OF THE PROBLEM."

09:30AM 13       WE DON'T KNOW WHAT HE MEANS BY "ISSUES," WE DON'T KNOW

09:30AM 14   WHAT CUSTOMER COMPLAINTS HE LOOKED AT, AND HE DOES NOT

09:30AM 15   ARTICULATE THAT THAT IS A VALID SCIENTIFIC METHODOLOGY TO REACH

09:30AM 16   AN OPINION, AND HE DOESN'T EVEN REACH AN OPINION.  HE DOESN'T

09:30AM 17   HAVE AN OPINION AS TO THESE FOUR.  THEY MIGHT BE INACCURATE,

09:31AM 18   THEY MIGHT NOT BE INACCURATE, AND THAT'S COMPLETELY UNHELPFUL

09:31AM 19   TO A JURY.

09:31AM 20       I THINK IN THAT REGARD HIS OPINION AS TO THESE FOUR ARE

09:31AM 21   JUST LIKE THE OPINIONS THAT THE NINTH CIRCUIT REJECTED IN

09:31AM 22   DAUBERT ON REMAND FROM THE SUPREME COURT WHERE THE EXPERT

09:31AM 23   ADVANCED THE OPINION THAT A MEDICATION COULD POSSIBLY HAVE

09:31AM 24   CAUSED INJURIES, AND THE NINTH CIRCUIT SAID THAT KIND OF

09:31AM 25   POSSIBLE CAUSE OPINION IS NOT HELPFUL TO A JURY AND IS

09:31AM 1    INADMISSIBLE.

09:31AM 2        AND THAT'S EFFECTIVELY WHAT DR. MASTER IS OFFERING AS TO

09:31AM 3    THESE FOUR.  THERE MIGHT BE PROBLEMS.  I DON'T KNOW WHAT THE

09:31AM 4    PROBLEMS ARE, I DON'T KNOW WHAT CAUSED THEM.  JURY, YOU FIGURE

09:31AM 5    THAT OUT.

09:31AM 6        THAT'S NOT A PROPER EXPERT OPINION.

09:31AM 7        AS TO THE REMAINING FOUR IN THIS FIRST BUCKET -- AND THOSE

09:31AM 8    ARE, JUST FOR THE RECORD, BICARBONATE, CHLORIDE, POTASSIUM, AND

09:32AM 9    SODIUM -- I THINK THE COURT CAN AT THIS STAGE EASILY EXCLUDE

09:32AM 10   HIS OPINION ON BICARBONATE.  HE OFFERS NO BASIS WHATSOEVER, AND

09:32AM 11   THE GOVERNMENT DIDN'T DEFEND THAT ONE IN ITS OPPOSITION.

09:32AM 12       AS TO CHLORIDE, SODIUM, AND POTASSIUM, AGAIN, DR. MASTER

09:32AM 13   BASES HIS OPINION ON UNIDENTIFIED CUSTOMER COMPLAINTS AND

09:32AM 14   INTERNAL EMAILS.

09:32AM 15       AND WHEN WE INDICATED IN OUR MOTION THAT THAT IS NOT A

09:32AM 16   PROPER METHODOLOGY, THE MOST THE GOVERNMENT COULD MUSTER IS

09:32AM 17   THAT THAT METHODOLOGY IS IMPLICIT IN HIS OPINION.

09:32AM 18       THAT CLEARLY IS A RED FLAG BECAUSE THE NINTH CIRCUIT

09:32AM 19   REQUIRES THAT AN EXPERT EXPRESSLY STATE HIS METHODOLOGY.

09:32AM 20       AGAIN, THE GOVERNMENT HAS CITED THE COURT TO ZERO CASES,

09:32AM 21   ZERO ACADEMIC LITERATURE ESTABLISHING THAT TO BE A VALID

09:32AM 22   METHODOLOGY FOR A SCIENTIST TO REACH SCIENTIFIC CONCLUSIONS.

09:33AM 23       SO UNLESS THE COURT HAS QUESTIONS ABOUT THOSE EIGHT, LET

09:33AM 24   ME MOVE TO CHOLESTEROL AND VITAMIN D.

09:33AM 25           THE COURT:  THAT'S FINE, THANK YOU.

09:33AM 1     MS. SAHARIA:  AS TO THE CHOLESTEROL OPINION, AS

09:33AM 2  YOUR HONOR INDICATED, DR. MASTER IS PRIMARILY BASING HIS

09:33AM 3  OPINION ON THE ICAHN STUDY.  THIS IS A STUDY OF 60 PATIENTS IN

09:33AM 4  WHICH THE STUDY AUTHORS ORDERED THE SAME TESTS FROM THOSE

09:33AM 5  PATIENTS FROM BOTH THERANOS AND FROM TWO OTHER LAB COMPANIES.

09:33AM 6     I THINK JUST TO EXPLAIN THE RESULTS OF THAT STUDY, IN

09:33AM 7  FACT, THE STUDY AUTHORS CONCLUDED THAT FOR VIRTUALLY ALL OF THE

09:33AM 8  TESTS, THE THERANOS RESULTS AGREED WITH THE RESULTS FROM THOSE

09:33AM 9  OTHER LABS WITH THE EXCEPTION OF WITH THE EXCEPTION OF THE

09:33AM 10  LIPID PANEL, AND THE LIPID PANEL IS A PANEL THAT INCLUDES

09:33AM 11  CHOLESTEROL ASSAYS.

09:33AM 12     TELLINGLY, NO ONE INVOLVED IN THAT STUDY OF THE IS ON THE

09:33AM 13  GOVERNMENT'S LIST, AND THAT'S BECAUSE THE STUDY AUTHORS DID NOT

09:33AM 14  REACH THE CONCLUSION THAT DR. MASTER REACHES.

09:33AM 15     THE STUDY AUTHORS DID NOT REACH OPINIONS ON ACCURACY AND

09:34AM 16  RELIABILITY.  THE STUDY WAS NOT AIMED AT MEASURING THAT.

09:34AM 17     INSTEAD IT WAS AIMED AT MEASURING WHETHER THERANOS RESULTS

09:34AM 18  WERE CONSISTENT WITH THE RESULTS FROM OTHER -- FROM THESE OTHER

09:34AM 19  COMPANIES.

09:34AM 20     NOW, DR. MASTER HIMSELF ACKNOWLEDGES IN HIS REPORT THAT

09:34AM 21  THERE ARE HARMONIZATION AND STANDARDIZATION ISSUES BETWEEN

09:34AM 22  COMPANIES AND THAT'S NORMAL AND EXPECTED AT PAGE 14 OF HIS

09:34AM 23  REPORT.

09:34AM 24     HE STATED AS A GENERAL PRINCIPLE THAT FOR MANY ANALYSTS,

09:34AM 25  THERE ARE ISSUES OF STANDARDIZATION AND HARMONIZATION BETWEEN

23

09:34AM 1    ASSAYS USED BY VARIOUS CLINICAL LABORATORIES.

09:34AM 2        AND THE PROBLEM WITH HIS CONCLUSION HERE IS THAT HE DIDN'T

09:34AM 3    ARTICULATE ANY METHODOLOGY BY WHICH HE CONCLUDED THAT THE

09:34AM 4    DIFFERENCES AS TO THE CHOLESTEROL ASSAY IN THIS CASE WERE

09:34AM 5    SIMPLY ISSUES OF STANDARDIZATION AND HARMONIZATION THAT WAS

09:34AM 6    EXPECTED, OR WHETHER THEY RESULTED FROM SOME MORE FUNDAMENTAL

09:35AM 7    PROBLEM WITH THE THERANOS CHOLESTEROL TEST.  HE DID NOT

09:35AM 8    ARTICULATE HOW HE REACHED THAT CONCLUSION.

09:35AM 9        NOW, AS YOUR HONOR INDICATED, IT IS APPROPRIATE FOR

09:35AM 10   EXPERTS TO BASE OPINIONS ON ACADEMIC ARTICLES, AND THAT'S THE

09:35AM 11   GOVERNMENT'S PRIMARY RESPONSE.  BUT THERE ARE MANY CASES,

09:35AM 12   INCLUDING THE SUPREME COURT DECISION IN GENERAL ELECTRIC VERSUS

09:35AM 13   JOINER, THAT SAY THAT EXPERTS CANNOT RELIABLY BASE AN OPINION

09:35AM 14   ON AN ACADEMIC ARTICLE WHEN THEY GO BEYOND THE CONCLUSIONS OF

09:35AM 15   THAT ACADEMIC ARTICLE ITSELF UNLESS THEY ARTICULATE SOME

09:35AM 16   METHODOLOGY BY WHICH THEY WERE ABLE TO EXTRACT A BROADER

09:35AM 17   OPINION THAN THE ARTICLE DID.

09:35AM 18       THAT'S EXACTLY WHAT WE HAVE HERE WITH DR. MASTER.

09:35AM 19       SO I WOULD SUBMIT THAT AT A MINIMUM, THE COURT SHOULD NOT

09:35AM 20   ADMIT THE OPINION AS TO CHOLESTEROL UNTIL WE HAVE A CHANCE TO

09:35AM 21   EXAMINE DR. MASTER AT A DAUBERT HEARING TO SEE WHETHER HE WAS

09:35AM 22   ABLE TO REACH AN OPINION THAT THE STUDY AUTHORS THEMSELVES DID

09:35AM 23   NOT REACH, ESPECIALLY WHEN HE HIMSELF RECOGNIZES THAT THERE ARE

09:36AM 24   THESE HARMONIZATION ISSUES ACROSS LABORATORIES.

09:36AM 25       WITH RESPECT TO VITAMIN D, DR. MASTER BASES HIS OPINION ON

09:36AM 1    THE CMS REPORT AND MY COLLEAGUE, MR. LOOBY IS GOING TO DISCUSS

09:36AM 2    THE CMS REPORT IN MORE DETAIL WITH THE CMS MOTION.

09:36AM 3        AS HE WILL EXPLAIN, CMS DID NOT ITSELF MEASURE ACCURACY

09:36AM 4    AND LIABILITY IN ASSAYS.  THERE'S NO FINDING BY CMS THAT

09:36AM 5    THERANOS, ITS VITAMIN D WAS INACCURATE OR UNRELIABLE.

09:36AM 6        AND DR. MASTER IN HIS REPORT SIMPLY PLUCKS OUT SOME DATA

09:36AM 7    IN THE CMS REPORT THAT RELATES TO ONLY THREE DEVICES, ONE FOR A

09:36AM 8    ONE WEEK PERIOD AND TWO FOR A ONE MONTH PERIOD.

09:36AM 9        AND HE DOESN'T EXPLAIN HOW HE WAS ABLE TO EXTRAPOLATE FROM

09:36AM 10   THAT VERY LIMITED SET OF DATA TO A GENERAL OPINION ABOUT THE

09:36AM 11   ACCURACY AND RELIABILITY OF THE VITAMIN D ASSAY OVER A THREE

09:37AM 12   YEAR PERIOD.

09:37AM 13       SO AGAIN, I WOULD SUBMIT THAT WE SHOULD BE ENTITLED TO

09:37AM 14   EXAMINE HIM IF THERE'S GOING TO BE A DAUBERT HEARING ABOUT HOW

09:37AM 15   HE WAS ABLE TO EXTRAPOLATE IN A SCIENTIFICALLY VALID MANNER

09:37AM 16   BECAUSE HE DOESN'T EXPLAIN THAT IN HIS REPORT.

09:37AM 17       UNLESS THE COURT HAS QUESTIONS ABOUT THOSE TWO, I'LL MOVE

09:37AM 18   TO INDUSTRY STANDARDS.

09:37AM 19           THE COURT:  PLEASE.

09:37AM 20           MS. SAHARIA:  OKAY.  SO I THINK THERE'S TWO PROBLEMS

09:37AM 21   WITH DR. MASTER'S OPINIONS ON INDUSTRY STANDARDS, AND I DON'T

09:37AM 22   QUIBBLE WITH HIS QUALIFICATIONS AS A GENERAL MATTER.  HE'S

09:37AM 23   OBVIOUSLY A QUALIFIED LABORATORY DIRECTOR.

09:37AM 24       THE FIRST IS THAT HIS OPINIONS DON'T FIT THE CASE, AND

09:37AM 25   THAT'S BECAUSE HE IS UNABLE TO OFFER AN OPINION THAT ANY

09:37AM 1     SUPPOSED VIOLATIONS OF INDUSTRY STANDARDS ACTUALLY CAUSED

09:37AM 2     ACCURACY OR LIABILITY PROBLEMS AT THERANOS.

09:37AM 3          HE, AGAIN, OFFERS ONLY THE OPINION THAT THEY POSSIBLY

09:37AM 4     CAUSED THOSE PROBLEMS.

09:37AM 5          AND THIS GETS TO THE ISSUE THAT WE WERE TALKING ABOUT

09:38AM 6     YESTERDAY SOMEWHAT WITH MY COLLEAGUE, MR. FLEURMONT, WHICH IS

09:38AM 7     THIS CASE IS NOT ABOUT WHETHER THERANOS VIOLATED CLIA.  IT'S

09:38AM 8     NOT ABOUT WHETHER THERANOS'S LAB OPERATED IN COMPLIANCE WITH

09:38AM 9     INDUSTRY STANDARDS.

09:38AM 10         IT'S ABOUT WHETHER MS. HOLMES MADE MISREPRESENTATIONS

09:38AM 11    RELATED TO THE ACCURACY AND RELIABILITY OF THERANOS'S TESTS.

09:38AM 12         AND IF HE'S NOT ABLE TO CONNECT THESE OPINIONS ABOUT

09:38AM 13    SUPPOSED VIOLATIONS OF INDUSTRY STANDARDS TO THE ACTUAL LEGAL

09:38AM 14    QUESTION IN THIS CASE, AND HE CONCEDES THAT THE COURT WAS

09:38AM 15    DISCUSSING WITH MR. FLEURMONT THAT HE CAN'T, THEN THERE'S --

09:38AM 16    THEN THAT LOGICAL CONNECTION THAT DAUBERT REQUIRES, THAT FIT,

09:38AM 17    IS SIMPLY MISSING FROM HIS OPINIONS.

09:38AM 18         AGAIN, THE OPINION IN THIS REGARD IS VERY MUCH LIKE THE

09:38AM 19    ONE THAT I MENTIONED IN THE DAUBERT OPINION ITSELF WHERE THE

09:38AM 20    OPINION WAS JUST THAT A CERTAIN DRUG COULD HAVE CAUSED

09:38AM 21    MEDICAL -- CERTAIN INJURIES.

09:38AM 22         HERE HE'S OPINING JUST THAT SUPPOSED VIOLATIONS OF

09:39AM 23    INDUSTRY STANDARDS COULD HAVE CAUSE ACCURACY PROBLEMS, BUT HE'S

09:39AM 24    NOT ABLE TO OPINE THAT IT ACTUALLY DID.

09:39AM 25         SO FOR THAT REASON WE THINK THIS DOES NOT FIT THE CASE.

09:39AM 1     NOW, ON THE ISSUE OF WHETHER HE IS OFFERING LEGAL

09:39AM 2   OPINIONS, I THINK IT IS CLEAR THAT HE DOES INTEND TO OFFER SOME

09:39AM 3   LEGAL OPINIONS, AND I'LL POINT THE COURT TO THE TWO MOST

09:39AM 4   OBVIOUS ONES.

09:39AM 5     AT PAGE 18 OF HIS REPORT, HE OPINES THAT THERANOS DID NOT

09:39AM 6   APPROPRIATELY ENGAGE IN PROFICIENCY TESTING.  PROFICIENCY

09:39AM 7   TESTING IS GOVERNED BY CLIA AND IT'S A PROCESS BY WHICH A

09:39AM 8   LABORATORY WILL TYPICALLY OBTAIN SAMPLES FROM A THIRD PARTY AND

09:39AM 9   TEST THOSE SAMPLES TO SEE IF THEY GET THE CORRECT RESULTS.

09:39AM 10     HE ACKNOWLEDGES THAT THIS TESTING IS GOVERNED BY CLIA AT

09:39AM 11  PAGE 10, AND HE ACKNOWLEDGES THAT THERE'S SOME CIRCUMSTANCES IN

09:39AM 12  WHICH, UNDER CLIA, A LABORATORY MAY ENGAGE IN WHAT'S CALLED

09:40AM 13  ALTERNATIVE METHODS OF PROFICIENCY TESTING.

09:40AM 14     AND HE CONCLUDES THAT -- HE ACKNOWLEDGES THAT THERANOS DID

09:40AM 15  THAT, THAT IT ENGAGED IN THIS ALTERNATIVE TESTING -- AGAIN,

09:40AM 16  WHICH IS PERMITTED UNDER SOME CIRCUMSTANCES UNDER CLIA -- AND

09:40AM 17  HE ACKNOWLEDGES THAT THERANOS DID THAT BASED ON ITS

09:40AM 18  INTERPRETATION OF CLIA, BUT HE DISAGREES WITH THAT

09:40AM 19  INTERPRETATION OF CLIA -- AGAIN, THIS IS ALL AT PAGE 18 -- IN

09:40AM 20  PART BASED ON HIS OPINIONS ON WHAT THE BURDENS OF PROOF ARE

09:40AM 21  UNDER CLIA.

09:40AM 22     THAT'S CLEARLY A LEGAL OPINION.

09:40AM 23       THE COURT:  SO IF HE'S PERMITTED TO TESTIFY, BUT HIS

09:40AM 24  TESTIMONY IS PARSED OUT, HE'S NOT PERMITTED TO OFFER HIS LEGAL

09:40AM 25  OPINION ABOUT WHY HE PARTS COMPANY WITH WHAT THERANOS DID OR

27

09:40AM 1     SOMETHING LIKE THAT, WOULD YOU STILL HAVE OBJECTIONS ABOUT HIS

09:40AM 2     TESTIMONY?

09:40AM 3         IN OTHER WORDS, CAN WE EXCISE, CAN WE SANITIZE THOSE

09:40AM 4     OPINIONS SUCH THAT THE BALANCE AND REMAINING OPINIONS WOULD BE

09:40AM 5     APPROPRIATE AND PROPER?

09:41AM 6         MS. SAHARIA:  SO OUR POSITION IS THAT HE SHOULD NOT

09:41AM 7     BE PERMITTED TO EVEN OFFER THE LEGAL OPINION AS TO WHAT CLIA

09:41AM 8     REQUIRES.

09:41AM 9         BUT EVEN MORE PROBLEMATIC WOULD BE HIS APPLICATION OF THAT

09:41AM 10    LAW TO THE FACTS HERE, AND IN PARTICULAR IN THE WAY HE DOES

09:41AM 11    THAT, WHICH IS TO ACKNOWLEDGE THAT THERANOS HAD ONE

09:41AM 12    INTERPRETATION AND TO SAY THAT HE DISAGREES WITH THAT

09:41AM 13    INTERPRETATION.

09:41AM 14        SO I WOULD SAY, NO, HE SHOULD NOT BE ABLE TO TALK ABOUT

09:41AM 15    CLIA AND FEDERAL LAW AT ALL.  THAT IS A LEGAL OPINION.

09:41AM 16        BUT THE MOST EGREGIOUS EXAMPLE OF THAT IS HIS DISCUSSION

09:41AM 17    OF HIS DISAGREEMENT WITH THE INTERPRETATION OF THERANOS.

09:41AM 18        THE COURT:  BECAUSE HE'S, HE'S -- HE HAS EXTENSIVE

09:41AM 19    BACKGROUND.  HE KNOWS ABOUT REGULATIONS.  MAYBE WE'RE IN THE

09:41AM 20    MARGINS HERE ABOUT IS A REGULATION A LEGAL OPINION OR IS IT

09:41AM 21    INTERPRETATION OF GUIDANCE FROM A FEDERAL AGENCY, AND DO THOSE

09:41AM 22    INTERSECT SOMEHOW SUCH THAT THEY CHANGE CHARACTERS?

09:42AM 23        MS. SAHARIA:  I DON'T THINK SO, YOUR HONOR.

09:42AM 24        A REGULATION IS BINDING LAW JUST IN THE WAY THAT A LAW IS.

09:42AM 25    IT WOULD BE ONE THING, I SUPPOSE, TO BE DISCUSSING NONBINDING

09:42AM 1   GUIDANCE THAT INFORMS HOW THE INDUSTRY OPERATES.  THAT MIGHT BE

09:42AM 2   DIFFERENT.

09:42AM 3        BUT A REGULATION IS A LEGALLY BINDING OBLIGATION IN THE

09:42AM 4   SAME WAY THAT A LAW IS.

09:42AM 5        SO I DON'T VIEW THERE BEING ANY DISTINCTION BETWEEN HIM

09:42AM 6   OPINING WHAT CLIA THE FEDERAL STATUTE REQUIRE AND WHAT THE

09:42AM 7   REGULATIONS ENFORCING CLIA REQUIRE.  I THINK THEY'RE THE SAME

09:42AM 8   THINGS.

09:42AM 9        I THINK WHAT IS IMPORTANT HERE -- AND I THINK IF ALL OF

09:42AM 10  THIS COMES OUT AT TRIAL RELATING TO CMS AND FDA, WHICH WE'RE

09:42AM 11  GOING TO DISCUSS THAT LATER TODAY -- BUT YOUR HONOR WILL HEAR

09:42AM 12  THAT THESE WERE TOPICS OF GREAT DEBATE AT THE TIME.

09:42AM 13       THERANOS HAD LEGAL COUNSEL ADVISING IT ON THESE VARIOUS

09:42AM 14  ISSUES, THEY WERE ENGAGED IN DISCUSSIONS WITH THE FEDERAL

09:42AM 15  AGENCIES ABOUT THESE TOPICS, AND TO ALLOW SOMEONE TO COME IN

09:43AM 16  AFTER THE FACT AND SAY, THE POSITION THAT YOU WERE TAKING WAS

09:43AM 17  INCORRECT IS I THINK HIGHLY PROBLEMATIC.

09:43AM 18       IT'S NOT ALLOWED UNDER DAUBERT, AND IT DOESN'T FALL INTO

09:43AM 19  THE BUCKET THAT WE WERE TALKING ABOUT YESTERDAY WHERE THERE WAS

09:43AM 20  SOMEONE IN REALTIME LIKE DR. ROSENDORFF, WHO THE GOVERNMENT

09:43AM 21  CLAIMS TOLD MS. HOLMES THAT HE BELIEVED THE COMPANY WAS NOT

09:43AM 22  COMPLYING WITH VARIOUS REGULATIONS AND THAT MIGHT GO TO HER

09:43AM 23  INTENT UNDER THE GOVERNMENT'S THEORY.

09:43AM 24       THIS DOESN'T FALL UNDER THAT CATEGORY OF ADMISSIBLE

09:43AM 25  EVIDENCE.

09:43AM 1          THE COURT:  THIS IS DIFFERENT.

09:43AM 2          MS. SAHARIA:  THIS IS VERY DIFFERENT.

09:43AM 3       SO I THINK THE SECOND REALLY GOOD EXAMPLE OF THAT -- THIS

09:43AM 4   IS AT PAGE 18 AND 19 -- WHERE HE DESCRIBES A LEGAL DISPUTE

09:43AM 5   BETWEEN THERANOS AND THE FDA REGARDING WHETHER THERANOS'S

09:43AM 6   COLLECTION DEVICE QUALIFIED AS A LABORATORY DEVELOPED TEST.

09:43AM 7         AND HE ACKNOWLEDGES AGAIN THAT THERANOS WAS ADVANCING ONE

09:43AM 8   LEGAL POSITION, AND THEN HE ARTICULATES THAT HE DISAGREES WITH

09:43AM 9   THAT LEGAL POSITION BECAUSE HE'S UNAWARE OF ANY LABORATORY THAT

09:44AM 10  HAS SIMILARLY ATTEMPTED TO ADVANCE THAT LEGAL POSITION.

09:44AM 11        I THINK THAT'S THE SAME KIND OF EXAMPLE WHERE IT WOULD BE

09:44AM 12  VERY IMPROPER TO ALLOW SOMEONE WHO IS NOT A LAWYER, EVEN THOUGH

09:44AM 13  HE IS QUALIFIED AS A LAB DIRECTOR, TO COME IN AFTER THE FACT

09:44AM 14  AND BASICALLY PUT HIS THUMB ON THE SCALE OF THE FDA'S POSITION

09:44AM 15  IN THIS LEGAL DISPUTE BETWEEN FDA AND THERANOS.

09:44AM 16        SO THOSE ARE THE VERY TWO CLEAR EXAMPLES WHERE I THINK

09:44AM 17  HE'S VERY CLEARLY ARTICULATING LEGAL OPINION.

09:44AM 18          THE COURT:  OKAY.  THANK YOU VERY MUCH.

09:44AM 19          MS. SAHARIA:  THANK YOU.

09:44AM 20          THE COURT:  MR. LEACH.

09:44AM 21          MR. LEACH:  THANK YOU, YOUR HONOR.  GOOD MORNING.

09:44AM 22      ROBERT LEACH ON BEHALF OF THE UNITED STATES.

09:44AM 23          THE COURT:  THANK YOU.  GOOD MORNING.

09:44AM 24          MR. LEACH:  LET ME START OFF WITH WHERE WE ENDED THE

09:44AM 25  CONVERSATION ABOUT WHETHER DR. MASTER'S OFFERING A LEGAL

UNITED STATES COURT REPORTERS

09:44AM 1    OPINION.  HE IS NOT.

09:45AM 2        I THINK A HELPFUL WAY TO THINK ABOUT THIS, YOUR HONOR, IS

09:45AM 3    IN A HIGHLY REGULATED INDUSTRY LIKE THIS, THERE ARE INDUSTRY

09:45AM 4    STANDARDS THAT COMPANIES ABIDE BY TO MAKE SURE THAT THEIR TESTS

09:45AM 5    ARE ACCURATE AND RELIABLE, BECAUSE THEY WANT THEM TO BE

09:45AM 6    ACCURATE AND RELIABLE.  PUTTING ASIDE ANY LAW, PUTTING ASIDE

09:45AM 7    ANY REGULATION, THERE ARE GENERALLY ACCEPTED LAB PRACTICES THAT

09:45AM 8    LABS FOLLOW IN ORDER TO ENSURE ACCURACY AND RELIABILITY, AND

09:45AM 9    ONE OF THEM IS PROFICIENCY TESTING.

09:45AM 10        NOW, IN A HIGHLY REGULATED AREA, THAT MAY GET CODIFIED

09:45AM 11   SOMEWHERE AS THE LAW THAT THEY MUST DO, AND WE DON'T INTEND TO

09:45AM 12   ELICIT FROM DR. MASTER THAT YOU MUST DO X.

09:45AM 13        BUT WE DO INTEND TO ELICIT THAT FIRST BUCKET, WHAT IS THE

09:45AM 14   INDUSTRY STANDARD?  WHAT DO MOST LAB DIRECTORS, WHAT DO MOST

09:45AM 15   PEOPLE WHO ARE TRYING TO RUN A SAFE, ACCURATE, RELIABLE LAB DO

09:45AM 16   IN ORDER TO ENSURE THIS?

09:46AM 17        AND ONE OF THOSE THINGS IS PROFICIENCY TESTING.  AND

09:46AM 18   DR. MASTER ESSENTIALLY CORROBORATES AND VALIDATES

09:46AM 19   DR. ROSENDORFF THAT THERANOS WAS DOING PROFICIENCY TESTING IN A

09:46AM 20   WAY THAT DID NOT ENSURE ACCURACY AND RELIABILITY.

09:46AM 21        THEY HAD THEIR EDISON DEVICE AND THEY DIDN'T DO ANY

09:46AM 22   PROFICIENCY TESTING ON THAT EDISON DEVICE.

09:46AM 23        THE PROFICIENCY TESTING THEY DID, ORDINARY FDA APPROVED

09:46AM 24   DEVICES AND ORDINARY FDA APPROVED TESTS, AND INTERNALLY THEY

09:46AM 25   COMPARED THOSE, AND THEY'RE SAYING THAT'S ENOUGH TO ENSURE

| | | |
|---|---|---|
| 09:46AM | 1 | ACCURACY AND RELIABLE RESULTS. |
| 09:46AM | 2 | DR. ROSENDORFF DISAGREED WITH THAT.  HE RAISED THAT |
| 09:46AM | 3 | REPEATEDLY. |
| 09:46AM | 4 | AND DR. MASTER'S OPINION IS ESSENTIALLY THAT THE INDUSTRY |
| 09:46AM | 5 | STANDARD IS CORROBORATIVE OF WHAT DR. ROSENDORFF IS SAYING. |
| 09:46AM | 6 | THE COURT:  I'M SORRY.  SO IS THAT WHAT YOU INTEND |
| 09:46AM | 7 | HIM TO SAY?  IS HE GOING TO GET ON THE STAND AND SAY, I'VE READ |
| 09:46AM | 8 | DR. ROSENDORFF'S REPORT, I AGREE WITH HIS FINDINGS? |
| 09:47AM | 9 | MR. LEACH:  I DON'T KNOW IF HE WOULD SAY THOSE EXACT |
| 09:47AM | 10 | WORDS, BUT HE WOULD SAY PROFICIENCY TESTING IS DESIGNED TO |
| 09:47AM | 11 | ENSURE ACCURACY AND RELIABILITY AND THE METHODS USED HERE DID |
| 09:47AM | 12 | NOT DO THAT. |
| 09:47AM | 13 | THE COURT:  AS FOUND AND AS STATED BY |
| 09:47AM | 14 | DR. ROSENDORFF? |
| 09:47AM | 15 | MR. LEACH:  YES, AND AS CONSISTENT WITH THE INDUSTRY |
| 09:47AM | 16 | STANDARD. |
| 09:47AM | 17 | THAT'S THE MOST IMPORTANT POINT.  IT'S NOT JUST |
| 09:47AM | 18 | DR. ROSENDORFF WHO THINKS THIS.  THIS IS -- IF YOU GO INTO MOST |
| 09:47AM | 19 | LABS, MOST PLACES, THIS WOULD NOT BE A WAY TO ENSURE ACCURACY |
| 09:47AM | 20 | AND RELIABILITY. |
| 09:47AM | 21 | SO I THINK IT'S -- A COMPANY DOES NOT GET A PASS FOR |
| 09:47AM | 22 | DEVIATING FROM THE INDUSTRY STANDARD SIMPLY BECAUSE THAT |
| 09:47AM | 23 | STANDARD GETS CODIFIED IN THE LAW. |
| 09:47AM | 24 | AN EXPERT WHO LIVES AND BREATHES THOSE STANDARDS AND WHO |
| 09:47AM | 25 | RUNS THE LAB AND HAS THE QUALIFICATIONS THAT DR. MASTER HAS |

09:47AM  1    SHOULD BE ABLE TO OFFER AN OPINION THAT I KNOW HOW TO RUN A LAB

09:47AM  2    AND I KNOW HOW TO DO IT TO MAKE TESTS ACCURATE AND RELIABLE,

09:47AM  3    AND DOING PROFICIENCY TESTING IN THIS METHOD THE WAY

09:48AM  4    DR. ROSENDORFF IS TALKING ABOUT DOESN'T FIT.

09:48AM  5         HE DOESN'T NEED TO TALK ABOUT THE CFR.  HE DOESN'T NEED TO

09:48AM  6    TALK ABOUT WHAT CMS MANDATES.

09:48AM  7         BUT THE INDUSTRY STANDARD, WHAT COMPANIES ABIDE BY AS A

09:48AM  8    MATTER OF GENERALLY APPLICABLE LAB PRACTICES ARE SOMETHING THAT

09:48AM  9    HE'S EMINENTLY QUALIFIED TO TALK ABOUT AND CAN DO IN A WAY THAT

09:48AM  10   DOES NOT GIVE AN IMPERMISSIBLE LEGAL OPINION.

09:48AM  11        MS. SAHARIA DIDN'T ADDRESS THE QUALIFICATIONS TO TALK

09:48AM  12   ABOUT FINGERSTICK TECHNOLOGY, AND UNLESS THE COURT HAS

09:48AM  13   QUESTIONS, I'LL SUBMIT IT ON THE BRIEFING ON THAT POINT.

09:48AM  14             THE COURT:  I THINK I'VE INDICATED MY REVIEW OF

09:48AM  15   THAT.  THANK YOU.

09:48AM  16             MR. LEACH:  WITH RESPECT TO THE OPINIONS ON

09:48AM  17   PARTICULAR ASSAYS, FIRST OF ALL, I DON'T THINK THE DEFENSE IS

09:48AM  18   BEING FAIR TO DR. MASTER'S OPINION ABOUT CALCIUM, HBA1C, HCG,

09:49AM  19   AND HIV.

09:49AM  20        THEY FAULT HIM FOR NOT COMING DOWN YES OR NO.  HIS OPINION

09:49AM  21   IS MORE NUANCED, AND THAT'S TO HIS CREDIT, NOT TO HIS DETRIMENT

09:49AM  22   ON THAT, AND HE'S ESSENTIALLY SAYING, BASED ON THE MATERIAL

09:49AM  23   THAT I'VE REVIEWED, THERE'S SUFFICIENT PROBLEMS WITH THESE

09:49AM  24   ASSAYS WHERE IT RAISES DOUBTS IN A LAB DIRECTOR'S MIND ABOUT

09:49AM  25   WHETHER WE SHOULD OR SHOULDN'T BE USING THESE TESTS.  IT'S

09:49AM 1    ESSENTIALLY, THERE ARE RED FLAGS HERE.

09:49AM 2        AND, REMEMBER, THIS IS A FRAUD CASE.  MS. HOLMES WENT OUT

09:49AM 3    AND TOLD THE WORLD -- NOT THE WORLD, BUT HER INVESTORS AND

09:49AM 4    OTHERS -- THAT WE HAVE TESTS OF THE HIGHEST ACCURACY, THAT CLIA

09:49AM 5    REGULATIONS ENSURE THAT WE HAVE ACCURATE AND RELIABLE TESTS.

09:49AM 6        AND DR. MASTER'S OPINION THERE, WHICH IS BASED ON INTERNAL

09:49AM 7    THERANOS DOCUMENTS, CORROBORATED -- OR PUTS THE LIE TO THAT

09:49AM 8    ESSENTIALLY.  THERE IS SUBSTANTIAL DOUBT ABOUT THESE.

09:49AM 9        AND THE FACT THAT IT'S NOT A YES OR NO IS TO HIS CREDIT,

09:50AM 10   NOT TO -- IT'S NOT A NONOPINION.  IT'S AN OPINION THAT THERE

09:50AM 11   ARE ISSUES HERE ESSENTIALLY.

09:50AM 12       SO I THINK THERE'S ENOUGH THERE EVEN WITHOUT A DAUBERT

09:50AM 13   HEARING.  WE INVITE THE ABILITY TO QUESTION DR. MASTER IN SUCH

09:50AM 14   A HEARING AND, TO THE EXTENT PERMITTED, SUPPLEMENT HIS VIEWS ON

09:50AM 15   THAT POINT.

09:50AM 16       WITH RESPECT TO SODIUM, CHLORIDE AND -- EXCUSE ME.  LET ME

09:50AM 17   GO TO MY LIST.

09:50AM 18       WITH RESPECT TO SODIUM AND CHLORIDE, THE BASIS OF HIS

09:50AM 19   OPINIONS ARE LAID OUT PRIMARILY ON PAGE 14 AND 15 OF THE

09:50AM 20   REPORT, AND THE THRUST OF THIS IS BASED ON THE NUMBER OF

09:50AM 21   COMPLAINTS THAT THERANOS IS SEEING ON THESE PARTICULAR ASSAYS,

09:51AM 22   THESE ARE CALLED ISE ASSAYS WHICH THE THERANOS METHODS WERE

09:51AM 23   PARTICULARLY HARD TO MANAGE.

09:51AM 24       THEY'RE ALSO BASED ON TESTIMONY AND STATEMENTS BY

09:51AM 25   DR. ROSENDORFF WHERE DR. ROSENDORFF, AT THE END OF HIS TENURE,

09:51AM 1    IS SAYING, I DON'T KNOW IF WE CAN SPOT CRITICAL VALUES ONE WAY

09:51AM 2    OR THE OTHER BASED ON THE INTERNAL DOCUMENTS THAT HE WAS

09:51AM 3    LOOKING AT.

09:51AM 4        AND THE DEFENSE'S POSITION IS ESSENTIALLY A LAB DIRECTOR

09:51AM 5    IN HIS POSITION CANNOT EXERCISE PROFESSIONAL JUDGMENT ABOUT

09:51AM 6    WHAT THESE INTERNAL MEMOS AND INTERNAL ISSUES MEAN, THAT YOU

09:51AM 7    NEED TO DO SOME TYPE OF STUDY.

09:51AM 8        I'M NOT SURE HOW WE WOULD GET THESE PATIENTS FROM 2014 OR

09:51AM 9    2015 TO COME BACK IN AND TAKE THEIR BLOOD NOW AND WHETHER OR

09:51AM 10   NOT WE WOULD BE ABLE TO COMPARE THOSE.

09:51AM 11       SO I THINK THEY'RE SETTING UP A STRAW MAN THAT HE DIDN'T

09:51AM 12   DO THIS, AND THEREFORE, THERE'S NO METHOD OR REASONING TO HIS

09:51AM 13   CONCLUSIONS HERE.

09:51AM 14       BUT I DO THINK THAT THERE'S A BASIS THERE.  WE'RE HAPPY TO

09:52AM 15   PRESENT MORE INFORMATION IN A DAUBERT HEARING.

09:52AM 16       AND WITH RESPECT TO VITAMIN D AND CHOLESTEROL, I THINK

09:52AM 17   THIS REALLY COMES DOWN TO WEIGHT ISSUES ABOUT HIS OPINION AND

09:52AM 18   THE APPROPRIATE INFERENCES THAT YOU CAN DRAW FROM THE CMS

09:52AM 19   REPORT AND THIS STUDY.

09:52AM 20       THE THRUST OF WHAT I ANTICIPATE FROM DR. MASTER IS THE

09:52AM 21   REFERENCE RANGES YOU SEE IN THE CMS FOR VITAMIN D, OVER THE

09:52AM 22   TIME PERIOD YOU SEE THEM, WHEN YOU COMPARE THEM TO OTHER

09:52AM 23   DEVICES THAT WERE HAVING SIMILAR ISSUES WITH DIFFERENT ASSAYS,

09:52AM 24   ARE JUST SO LONG AND SO PROFOUND THAT IT MUST BE AN INSTRUMENT

09:52AM 25   ISSUE, AND IT'S CERTAINLY AN ISSUE RUNNING THIS INSTRUMENT IN

09:52AM 1   THIS LAB.

09:52AM 2       I THINK THAT'S A FAIR CONCLUSION FROM THE CMS REPORT, AND

09:52AM 3   I THINK IT'S SOMETHING THAT A LAB DIRECTOR IS EMINENTLY

09:52AM 4   QUALIFIED TO EXTRAPOLATE FROM, AND THAT'S BOLSTERED BY THE

09:53AM 5   ICAHN STUDY, AND THERE'S A DEBATE ABOUT EXACTLY WHAT THIS MEANS

09:53AM 6   AND WHAT INFERENCES YOU CAN DRAW.  I THINK THAT'S FODDER FOR

09:53AM 7   CROSS-EXAMINATION AND I DON'T THINK THAT GOES TO THE

09:53AM 8   RELIABILITY OF HIS SCIENTIFIC OPINION.

09:53AM 9       FOR THAT REASON I AGREE WITH THE COURT'S TENTATIVE THAT

09:53AM 10  THERE'S NO NEED FOR A FURTHER DAUBERT ON THAT POINT.

09:53AM 11      UNLESS THE COURT HAS FURTHER QUESTIONS, I'LL SUBMIT IT.

09:53AM 12          THE COURT:  I WONDER IF YOU COULD SPEAK A LITTLE

09:53AM 13  BIT -- MS. SAHARIA WAS SUGGESTING THAT LEGAL OPINIONS, THAT

09:53AM 14  THIS WITNESS WOULD OFFER LEGAL OPINIONS.  I WAS ASKING HER

09:53AM 15  ABOUT, WELL, WEREN'T THEY JUST REGULATIONS AND DOES HE HAVE TO

09:53AM 16  GIVE A LEGAL OPINION ABOUT THAT?  YOU HEARD HER ANSWERS.

09:53AM 17      ANYTHING YOU WANT TO TELL ME ABOUT THAT?

09:53AM 18          MR. LEACH:  HE DOES NOT HAVE TO GIVE A LEGAL OPINION

09:53AM 19  TO SAY THERANOS WAS NOT ABIDING BY THE INDUSTRY STANDARD.

09:53AM 20      THE INDUSTRY STANDARD MIGHT BE THE SAME, IT MIGHT BE

09:53AM 21  GREATER, IT MIGHT BE LESSER THAN WHAT THE LAW REQUIRES.

09:54AM 22      HE CAN GIVE WHAT IS IN THAT FIRST BUCKET, THE INDUSTRY

09:54AM 23  STANDARD, WITHOUT SAYING THAT THEY VIOLATED THE LAW OR THEY

09:54AM 24  BREACHED THIS PARTICULAR CFR.

09:54AM 25          THE COURT:  SO YOUR VISION, OR WHAT I'M HEARING YOU

09:54AM 1    SAY, IS THAT HE WOULD TESTIFY ABOUT INDUSTRY STANDARDS AND TALK

09:54AM 2    ABOUT THAT, THE JURY WOULD BE INFORMED ABOUT WHAT THOSE ARE

09:54AM 3    FROM THIS WITNESS'S OPINION.

09:54AM 4        AND THEN THE QUESTION WOULD BE POSED:  DID THERANOS FOLLOW

09:54AM 5    THE INDUSTRY STANDARDS THAT YOU'VE JUST INDICATED?

09:54AM 6            MR. LEACH:  YES.

09:54AM 7            THE COURT:  AND HE WOULD SAY YES OR NO AS TO EACH

09:54AM 8    ONE OF THOSE STANDARDS.

09:54AM 9            MR. LEACH:  YES.

09:54AM 10           THE COURT:  AND THAT IS NOT A LEGAL OPINION?

09:54AM 11           MR. LEACH:  THAT IS NOT A LEGAL OPINION.

09:54AM 12           THE COURT:  OKAY.

09:54AM 13           MR. LEACH:  LET ME FRAME IT ONE MORE WAY THAT I

09:54AM 14   FOUND HELPFUL AFTER READING THE DEFENSE BRIEF.

09:54AM 15           THE COURT:  SURE.

09:54AM 16           MR. LEACH:  I ANTICIPATE IF WE WERE TO ASK

09:54AM 17   DR. MASTER, ASSUME THE CFR DIDN'T EXIST, ASSUME CMS WASN'T

09:55AM 18   HERE.  WOULD YOU STILL DO PROFICIENCY TESTING AS A LAB

09:55AM 19   DIRECTOR?  OF COURSE I WOULD DO PROFICIENCY TESTING.  THAT'S

09:55AM 20   HOW WE KNOW OUR DEVICE IS GENERATING THE RIGHT RESULT.  WE RUN

09:55AM 21   IT ON THIS AND WE SEND IT TO THE TESTING ENTITY AND THEY TELL

09:55AM 22   US IF WE GOT IT RIGHT.

09:55AM 23       SO IF CMS DOESN'T EXIST, IF THERE IS NO REGULATION, WOULD

09:55AM 24   YOU DO THESE THINGS?  OF COURSE YOU WOULD.  ANY LAB DIRECTOR

09:55AM 25   WOULD DO THOSE THINGS.

UNITED STATES COURT REPORTERS

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 17, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Amy Mason Saharia
AMY MASON SAHARIA

April 17, 2023