No. 22-10312

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ELIZABETH A. HOLMES

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 5:18-CR-00258
Hon. Edward J. Davila

---

## EXCERPTS OF RECORD
## VOL. XI of LVII | ER-2835 to ER-3134

---

JOHN D. CLINE
LAW OFFICE OF JOHN D. CLINE
  600 Stewart Street
  Suite 400
  Seattle, WA 98101
  (360) 320-6435

KEVIN M. DOWNEY
LANCE A. WADE
AMY MASON SAHARIA
KATHERINE A. TREFZ
WILLIAMS & CONNOLLY LLP
  680 Maine Ave. S.W.
  Washington, D.C. 200024
  (202) 434-5000
  asaharia@wc.com

03:48PM 1    INSTRUCT THE JURY ON WHAT THE LAW IS.

03:48PM 2        AND TO THE EXTENT THAT THERE'S ANY DOUBT ABOUT THIS, THIS

03:48PM 3    CAN BE CURED WITH AN INSTRUCTION.  THE COURT CAN SAY SHE'S NOT

03:48PM 4    ACCUSED OF VIOLATING 42 CFR 1274 OR THIS.

03:48PM 5        THIS EVIDENCE IS OFFERED TO SHOW HER STATE OF MIND, HER

03:48PM 6    INTENT, HER KNOWLEDGE OF PROBLEMS WITHIN THE LAB, WHICH SHE

03:49PM 7    DOES NOT FIX.

03:49PM 8        AND THESE TWO ISOLATED EXAMPLES, YOUR HONOR, ARE IMPORTANT

03:49PM 9    BECAUSE THEY CULMINATE IN NOVEMBER OF 2014 WHEN DR. ROSENDORFF

03:49PM 10   GOES TO MS. HOLMES AGAIN AND SAYS, I AM NOT COMFORTABLE WITH

03:49PM 11   WHAT WE'RE DOING IN THE LAB.  I CAN NO LONGER STAND BY THESE

03:49PM 12   RESULTS.  YOU NEED TO FIND ANOTHER LAB DIRECTOR.

03:49PM 13       AND WHAT DO THEY DO?  THEY FORCE HIM OUT, AND THEN THEY

03:49PM 14   HARASS HIM WITH THREATS OF VIOLATING CONFIDENTIALITY.

03:49PM 15       ALL OF THIS, THIS ENTIRE ARC IS DEEPLY PROBATIVE OF HER

03:49PM 16   STATE OF MIND, HER INTENT, HER PLAN, AND HER MOTIVE.

03:49PM 17       AND I WOULD ALSO ADD, YOUR HONOR, THEY GO OUT OF THEIR

03:49PM 18   WAY -- AND WE CITED TWO CASES IN THE BRIEF, GRAPH AND MCCLAREN.

03:49PM 19   THESE STAND FOR THE OBVIOUS POSITION THAT IF SOMEONE IS RAISING

03:49PM 20   RED FLAGS ABOUT THE LAWFULNESS OF SOMEBODY'S CONDUCT DURING

03:49PM 21   THIS SCHEME, THAT OBVIOUSLY GOES TO THEIR INTENT AND THEIR

03:49PM 22   STATE OF MIND.

03:49PM 23       THE FACT THAT IT CAME FROM A LAB DIRECTOR INSTEAD OF A

03:50PM 24   LAWYER IS A DIFFERENCE WITHOUT A MEANING IN THIS PARTICULAR

03:50PM 25   INSTANCE, PARTICULARLY BECAUSE OF THE LAB DIRECTOR'S DUTIES.

03:50PM 1   THEY'RE ESSENTIALLY ARGUING FOR A RULE THAT SAYS IF

03:50PM 2 INSIDERS RAISE RED FLAGS ABOUT MISCONDUCT, UNLESS THEY HAVE A

03:50PM 3 LAW DEGREE, IT'S NOT ADMISSIBLE, AND THAT'S JUST NOT SUPPORTED

03:50PM 4 BY ANY OF THE CASES THAT THEY HAVE CITED OR COMMON SENSE.

03:50PM 5   IT WOULD, IT WOULD ESSENTIALLY IMMUNIZE EVIDENCE OF A

03:50PM 6 DEFENDANT'S KNOWLEDGE THAT HAPPENS TO COME COUCHED IN TERMS OF

03:50PM 7 A LEGAL OPINION.

03:50PM 8   THEY HAVE ALSO, UNDER THIS GUISE OF VIOLATING INDUSTRY

03:50PM 9 STANDARDS AND GOVERNMENT VIOLATIONS, MOVED TO EXCLUDE EVIDENCE

03:50PM 10 OF THERANOS'S REVELATION STUDIES, WHICH THEY DON'T EVEN MAKE

03:50PM 11 THE ARGUMENT IS ACTUALLY 404(B) EVIDENCE.  IT'S PART OF THE

03:50PM 12 SCHEME TO DEFRAUD.  IT'S PART OF THE UNDERLYING BASIS FOR WHAT

03:51PM 13 HAPPENED HERE.

03:51PM 14   THE GOVERNMENT'S POINT WITH THESE VALIDATION STUDIES,

03:51PM 15 YOUR HONOR, IS THAT IN 2013 THERANOS GOES VERY PUBLIC WITH ITS

03:51PM 16 TECHNOLOGY AND SAYS THAT WE HAVE A DEVICE THAT CAN RUN ALL OF

03:51PM 17 THE TESTS, AND WE'RE GOING TO BE COMPETING WITH LABCORP AND

03:51PM 18 QUEST AND ESSENTIALLY SAY WE'RE READY AND WE'RE NOW MAKING IT

03:51PM 19 AVAILABLE TO CONSUMERS.

03:51PM 20   WELL, IT TURNS OUT THERANOS INSIDERS, INCLUDING

03:51PM 21 DR. ROSENDORFF, INCLUDING SHEKAR CHANDRASEKARAN, INCLUDING

03:51PM 22 OTHERS WERE SAYING WE'RE NOT READY, MS. HOLMES, AND THESE

03:51PM 23 VALIDATION STUDIES ARE RUSHED AND YOU'RE PUTTING TOO MUCH

03:51PM 24 PRESSURE ON US, AND SOME OF THEM ARE NOT COMING BACK IN THE WAY

03:51PM 25 WE WANT.

03:51PM 1    AND THE THRUST OF THIS EVIDENCE IS THAT THEY ANNOUNCE THAT

03:51PM 2 THEY ARE READY WITHOUT HAVING DONE THE WORK AND WITHOUT HAVING

03:51PM 3 THE STUDIES TO BACK THEM UP.

03:51PM 4    I DON'T THINK THAT'S 404(B) EVIDENCE.  THAT WASN'T THE

03:51PM 5 BASIS FOR THE MOTION IN THE FIRST INSTANCE.  WE INCLUDE IT IN

03:52PM 6 THE NOTICE BECAUSE WE WANT TO BE TRANSPARENT ABOUT WHERE WE ARE

03:52PM 7 GOING AND WHAT WE'RE GOING TO OFFER.

03:52PM 8    BUT THESE ARE DEEPLY RELEVANT TO WHETHER OR NOT THERANOS

03:52PM 9 COULD REALLY DO WHAT IT SAID IT COULD DO WHEN IT ANNOUNCED ITS

03:52PM 10 TECHNOLOGY TO THE WORLD IN SEPTEMBER OF 2013.

03:52PM 11    SO I DON'T SEE A BASIS TO EXCLUDE THESE VALIDATION

03:52PM 12 STUDIES.

03:52PM 13    WITH RESPECT TO INDUSTRY STANDARDS, IT IS RELEVANT.  IT'S

03:52PM 14 RELEVANT BECAUSE MS. HOLMES HELD OUT TO THE WORLD HER

03:52PM 15 COMPLIANCE WITH CLIA AS PART OF THE WAY INVESTORS AND PATIENTS

03:52PM 16 COULD ENSURE THAT THE TESTS WERE ACCURATE AND RELIABLE.  SHE

03:52PM 17 PUT THAT IN A POWERPOINT TO HER BOARD MEMBERS.  SHE TOLD THAT

03:52PM 18 TO THE PRESS.

03:52PM 19    WHEN COMING UNDER SCRUTINY, SHE SAID, YOU DON'T NEED TO

03:52PM 20 WORRY ABOUT FDA REGULATION HERE.  I'M COMPLYING WITH CLIA.

03:53PM 21 THIS ENSURES THE ACCURACY AND RELIABILITY OF MY TESTING.

03:53PM 22    SO THE FACT THAT THEY ARE NOT COMPLYING WITH CLIA OR

03:53PM 23 INDUSTRY STANDARDS IS PART OF THE EVIDENCE THAT SHOWS THAT

03:53PM 24 THOSE TESTS WERE NOT ACCURATE AND RELIABLE.

03:53PM 25    IF YOU'RE NOT DOING THE THINGS THAT THE INDUSTRY HAS

03:53PM 1    AGREED ARE WHAT CONTRIBUTE TO THAT END PRODUCT, THAT'S A BRICK

03:53PM 2    IN THE WALL THAT HELPS SHOW THAT THE TESTS WERE, AT THE END OF

03:53PM 3    THE DAY, NOT ACCURATE AND NOT RELIABLE.

03:53PM 4         DR. MASTER IS EMINENTLY QUALIFIED TO TESTIFY ABOUT THESE

03:53PM 5    THINGS.  THE CMS WITNESSES ARE EMINENTLY QUALIFIED TO TALK

03:53PM 6    ABOUT THESE THINGS.

03:53PM 7         AND ALL OF THIS IS CURED WITH, TO THE EXTENT THAT THERE IS

03:53PM 8    ANY PREJUDICE -- AND I DON'T THINK THERE IS ANY PREJUDICE --

03:53PM 9    IT'S CURED WITH AN INSTRUCTION:  MS. HOLMES IS CHARGED WITH

03:53PM 10   VIOLATING THE WIRE FRAUD STATUTE.  ONE OF THE ELEMENTS IS HER

03:53PM 11   INTENT TO DECEIVE AND CHEAT.  YOU HAVE RECEIVED THIS EVIDENCE

03:53PM 12   PROFFERED BY THE GOVERNMENT AS PART OF THAT ELEMENT AND YOU'RE

03:53PM 13   NOT TO CONVICT BECAUSE OF A VIOLATION OF AN INDUSTRY STANDARD

03:54PM 14   OR SOME TYPE OF REGULATION.

03:54PM 15        THE COURT:  THIS GETS TO MY OBSERVATION THAT IT'S

03:54PM 16   IMPORTANT THAT THE JURY NOT CONVICT IN A CRIMINAL CASE WHERE A

03:54PM 17   CRIMINAL CHARGE BASED ON EVIDENCE OF CIVIL -- A VIOLATION OF A

03:54PM 18   CIVIL REGULATION, AND CERTAINLY THE GOVERNMENT WOULD NOT ARGUE

03:54PM 19   THAT TO A JURY.

03:54PM 20        MR. LEACH:  WE WOULD NOT ARGUE THAT, YOUR HONOR.  I

03:54PM 21   THINK THE COURT IS GETTING AT THE WOLF CASE AND SOME OF THE

03:54PM 22   OTHER CASES CITED BY THE DEFENDANT.

03:54PM 23        AND THERE WHERE I THINK THE GOVERNMENT WENT AWRY WAS THAT

03:54PM 24   IT WAS ARGUING THE DUTY TO DISCLOSE CAME FROM THIS CIVIL

03:54PM 25   REGULATION AND YOU COULD CONCLUDE THAT SHE MISREPRESENTED

03:54PM 1    SOMETHING TO THESE INVESTORS SIMPLY BY VIOLATING THAT

03:54PM 2    REGULATION.

03:54PM 3        THAT'S NOT WHAT WE'RE ARGUING HERE.  WE'RE ARGUING THAT

03:54PM 4    THE UNDERLYING FACTS, THE FACT THAT THEY WERE FAILING QUALITY

03:54PM 5    CONTROL SO MANY TIMES, THE FACT THAT THEY WERE RUNNING PATIENT

03:54PM 6    SAMPLES AFTER FAILING QUALITY CONTROL, THAT IS -- THAT FACTUAL

03:55PM 7    EVIDENCE IS EVIDENCE FROM WHICH A JURY COULD CONCLUDE THAT

03:55PM 8    THESE TESTS WERE NOT ACCURATE AND WERE NOT RELIABLE.

03:55PM 9        SO IT'S THE UNDERLYING FACTS, WHICH THE WITNESSES SHOULD

03:55PM 10   BE ABLE TO TALK ABOUT WHAT THEY SAW AND DID THERE, THAT THE

03:55PM 11   GOVERNMENT SEEKS TO ELICIT THAT SHE VIOLATED THIS PARTICULAR

03:55PM 12   CIVIL REGULATION AND, THEREFORE, CONVICT IS NOT AN ARGUMENT

03:55PM 13   THAT THE GOVERNMENT IS TRYING TO MAKE.

03:55PM 14           THE COURT:  THANK YOU VERY MUCH.  THANK YOU.

03:55PM 15           MR. LEACH:  THANK YOU, YOUR HONOR.

03:55PM 16           THE COURT:  SO A CURATIVE INSTRUCTION, IS THAT

03:55PM 17   SUFFICIENT?

03:55PM 18           MR. FLEURMONT:  NO, YOUR HONOR, IT'S NOT.

03:55PM 19       I'D LIKE TO PICK UP EXACTLY WHERE THE GOVERNMENT LEFT OFF.

03:55PM 20       SO THERE'S A DISTINCTION IN THE PROHIBITION OF

03:55PM 21   IMPERMISSIBLY INFECTING A TRIAL WITH CIVIL REGULATIONS IN THE

03:55PM 22   CASE LAW.

03:55PM 23       IN THE UNITED STATES VERSUS WOLF CASE, THE COURT STATED

03:55PM 24   THAT CREATING A SERIOUS RISK THAT THE JURY WOULD FIND THE

03:56PM 25   DEFENDANT GUILTY OF A REGULATION BECAUSE THEY FAILED TO COMPLY

03:56PM 1    WITH THAT REGULATION IN A CRIMINAL CASE IS GOING TO LEAD TO

03:56PM 2    REVERSIBLE ERROR.

03:56PM 3       THAT'S NOT ABOUT MAKING AN EXPLICIT STATEMENT ABOUT THE

03:56PM 4    REGULATION.  THAT'S NOT ABOUT MAKING A SPECIFIC ARGUMENT ABOUT

03:56PM 5    THE REGULATION.  THAT'S JUST ALLOWING THE REGULATION TO

03:56PM 6    IMPERMISSIBLY INFECT THE TRIAL.

03:56PM 7         THE COURT:  SO DOES THAT EVIDENCE EVER COME IN THEN?

03:56PM 8    AS MR. LEACH SUGGESTED, THE LAB DIRECTOR HAS A -- HE'S GOT AN

03:56PM 9    IMPORTANT POSITION AND PART OF THAT IS REPORTING UP THE CHAIN

03:56PM 10    OF COMMAND AND HE REPORTS DEFICIENCIES.

03:56PM 11       YOU'RE SUGGESTING THAT THAT'S NOT ADMISSIBLE.

03:56PM 12         MR. FLEURMONT:  NOT QUITE, YOUR HONOR.

03:56PM 13    I UNDERSTAND THE IMPORTANCE OF A LAB DIRECTOR,

03:56PM 14    PARTICULARLY IN THIS CASE, AND I UNDERSTAND THAT IT'S HIS DUTY

03:56PM 15    TO DO A VARIETY OF THINGS, AND ONE OF THOSE THINGS IS REPORTING

03:56PM 16    UP THE CHAIN.

03:56PM 17    WHERE WE'RE DRAWING THE LINE IS FOR A GOVERNMENT WITNESS,

03:57PM 18    LAB DIRECTOR OR NOT, ANY OF THEIR WITNESSES TO COME IN AND SAY

03:57PM 19    THIS IS THE LAW AND MY LEGAL CONCLUSION IS THAT THERANOS

03:57PM 20    VIOLATED THE LAW APPLYING THE FACTS AS THAT PERSON INTERPRETS

03:57PM 21    THEM TO THIS CASE.

03:57PM 22         THE COURT:  SO IF DR. ROSENDORFF, FOR EXAMPLE, IS

03:57PM 23    NOT PERMITTED TO SAY THAT, HE'S NOT PERMITTED TO SAY, IN MY

03:57PM 24    OPINION, THERANOS WAS VIOLATING THE LAW, BUT HE IS PERMITTED TO

03:57PM 25    TESTIFY THAT HE HAS KNOWLEDGE, BECAUSE OF HIS EDUCATION,

03:57PM 1     BACKGROUND, HE WAS HIRED AS LAB DIRECTOR, WHAT ARE THE DUTIES

03:57PM 2     AND RESPONSIBILITIES OF THAT CHAIN OF COMMAND REPORTING,

03:57PM 3     WHATEVER IT IS, AND HE SAYS, AS LAB DIRECTOR I'M FAMILIAR WITH

03:57PM 4     CLIA REGULATIONS.  AS LAB DIRECTOR I FELT THAT WE WEREN'T

03:57PM 5     FOLLOWING THOSE REGULATIONS, I REPORTED THAT.

03:58PM 6         CAN HE TESTIFY ABOUT THAT?  CAN HE SAY THAT?

03:58PM 7          MR. FLEURMONT:  YOUR HONOR, IT'S THAT MIDDLE PART

03:58PM 8     THAT I THINK IS PROHIBITED BY THE CASE LAW, THAT WE WEREN'T

03:58PM 9     FOLLOWING REGULATIONS, WE WERE IN VIOLATION OF A PARTICULAR

03:58PM 10    REGULATION.

03:58PM 11        THE COURT:  HE DOESN'T SAY VIOLATION.  HE SAID, WE

03:58PM 12    WERE NOT FOLLOWING THE REGULATIONS AS -- MAYBE HE SAYS, AS I

03:58PM 13    UNDERSTAND THEM TO BE BASED ON MY TRAINING AND EXPERIENCE AND

03:58PM 14    KNOWLEDGE AS A LAB DIRECTOR.  CAN HE SAY THAT?  CAN HE TESTIFY

03:58PM 15    AS TO -- NOT AS A LAWYER, NOT AS ANYONE WITH A LEGAL DEGREE,

03:58PM 16    BUT AS A LAB DIRECTOR, CAN HE SAY THAT?

03:58PM 17        AGAIN, PART OF HIS JOB DUTY IS TO REPORT, TO OBSERVE, TO

03:58PM 18    MAKE SURE THAT THE LAB IS IN COMPLIANCE, AND I GUESS I'M -- I

03:58PM 19    HOPE YOU CAN TELL I'M STRUGGLING A LITTLE BIT WITH WHY CAN'T

03:59PM 20    SOMEONE SAY, I WAS DOING MY JOB AND MY JOB IS TO REPORT WHAT I

03:59PM 21    BELIEVE ARE ERRORS IN THE FUNCTIONING AND THE OPERATION?

03:59PM 22        I'M NOT SAYING THAT WE'RE VIOLATING THE LAW -- OR LET ME

03:59PM 23    SAY THIS, HE WOULDN'T TESTIFY THAT, IN MY OPINION, WE WERE

03:59PM 24    VIOLATING THE LAW.  HE WOULDN'T BE PERMITTED TO SAY THAT.  HE

03:59PM 25    WOULDN'T HAVE THE BACKGROUND AS A LAWYER, AS YOU POINT OUT.

| | | |
|---|---|---|
| 03:59PM | 1 | BUT A QUESTION ABOUT, WERE YOU IN COMPLIANCE WITH THE |
| 03:59PM | 2 | REGULATIONS, CLIA REGULATIONS AS YOU KNEW IT? |
| 03:59PM | 3 | NO. |
| 03:59PM | 4 | WHY? |
| 03:59PM | 5 | WELL, THE REGULATIONS REQUIRE TESTING THREE TIMES A DAY AT |
| 03:59PM | 6 | X AMOUNT OF HOURS. |
| 03:59PM | 7 | WERE YOU DOING THAT? |
| 03:59PM | 8 | NO. |
| 03:59PM | 9 | IS THAT PERMITTED? |
| 03:59PM | 10 | MR. FLEURMONT:  WELL, YOUR HONOR, THE STRUGGLE I |
| 03:59PM | 11 | THINK WITH THIS QUESTION IS THAT AS THE GOVERNMENT POINTED TO |
| 03:59PM | 12 | EXHIBIT 24, I TOOK ANOTHER LOOK AT IT AND IN IT HE SAYS, AND I |
| 03:59PM | 13 | QUOTE, AS OF TODAY WE ARE IN VIOLATION OF THE STANDARD. |
| 03:59PM | 14 | THE COURT:  SURE. |
| 03:59PM | 15 | MR. FLEURMONT:  SO IT'S DIFFICULT TO WORK WITH THAT |
| 04:00PM | 16 | HYPOTHETICAL KNOWING THAT THE TESTIMONY THAT THEY SEEK TO ADMIT |
| 04:00PM | 17 | IS, AND I QUOTE, WE ARE IN VIOLATION OF THE STANDARD. |
| 04:00PM | 18 | BUT TO ANSWER THE COURT'S QUESTION, IT'S OUR POSITION THAT |
| 04:00PM | 19 | FOR ANY GOVERNMENT EXPERT, REGARDLESS IF IT'S DR. ROSENDORFF OR |
| 04:00PM | 20 | DR. MASTER OR ANY EXPERT, TO COME IN AND SAY, HERE'S THE LAW, |
| 04:00PM | 21 | HERE'S HOW THERANOS VIOLATED IT, AND THIS IS MY LEGAL |
| 04:00PM | 22 | CONCLUSION, IT'S CLEARLY IMPERMISSIBLE UNDER THE CASE LAW. |
| 04:00PM | 23 | NOW, EVEN IF THE COURT WERE TO DISAGREE, WE DO HAVE OUR |
| 04:00PM | 24 | RELEVANCE OBJECTIONS, AND AS I STATED BEFORE, THIS GOES BACK TO |
| 04:00PM | 25 | TWO OF THE GOVERNMENT WITNESSES EXPLICITLY STATING THAT -- ONE, |

04:00PM 1    THE FIRST BEING DR. MASTER, THAT THE VIOLATION OF INDUSTRY

04:00PM 2    STANDARDS COULD POTENTIALLY LEAD TO AN ISSUE WITH ACCURACY AND

04:00PM 3    RELIABILITY AND DOESN'T DRAW THAT CLEAR CONNECTION, AND THIS IS

04:00PM 4    THE GOVERNMENT'S RETAINED EXPERT.

04:00PM 5        AND NOW WE HAVE THE GOVERNMENT'S CMS WITNESS WHO SAYS THAT

04:01PM 6    IT'S NOT CMS'S JOB TO PASS ON THE ACCURACY AND RELIABILITY OF

04:01PM 7    THE TEST JUST TO SEE IF THERANOS IS FOLLOWING ITS OWN

04:01PM 8    STANDARDS.

04:01PM 9        THE COURT:  SO MAY I STOP YOU AND ASK MR. LEACH,

04:01PM 10   MR. LEACH, IS IT YOUR INTENT TO ASK DR. ROSENDORFF WHETHER OR

04:01PM 11   NOT, IN HIS OPINION, THE LAB WAS VIOLATING THE LAW AND HIM TO

04:01PM 12   SAY, THIS IS MY LEGAL CONCLUSION?

04:01PM 13       MR. LEACH:  I WOULDN'T ASK HIM IF THAT WAS HIS LEGAL

04:01PM 14   CONCLUSION, YOUR HONOR.

04:01PM 15       I WOULD ASK HIM, WAS THERANOS COMPLYING WITH THE STANDARD?

04:01PM 16   WAS THERANOS MEETING THE CONDITIONS THAT IT WAS OBLIGATED TO

04:01PM 17   MEET?

04:01PM 18       I CERTAINLY WOULDN'T FRAME IT IN TERMS OF VIOLATION OF THE

04:01PM 19   CRIMINAL CODE.

04:01PM 20       BUT I COME BACK TO THIS IDEA, YOUR HONOR, ALL OF THE CASES

04:01PM 21   THEY'RE TALKING ABOUT IN TERMS OF IMPERMISSIBLE LEGAL OPINION

04:01PM 22   ARE REALLY WHEN A RETAINED EXPERT COMES IN AND TRIES TO

04:01PM 23   ESSENTIALLY USURP YOUR HONOR'S ROLE IN TELLING THE JURY WHAT

04:02PM 24   THE LAW IS.

04:02PM 25       THIS EVIDENCE IS RELEVANT BECAUSE IT'S COMMUNICATED TO THE

04:02PM  1    DEFENDANT IN REAL TIME, AND IT'S HER REACTION TO THIS THAT

04:02PM  2    MATTERS.

04:02PM  3        DOES SHE SHOW DR. ROSENDORFF THE TEN REASONS WHY THEY

04:02PM  4    ACTUALLY WERE COMPLYING?  NO.  EVERYBODY AGREES THAT THEY

04:02PM  5    WEREN'T AND SHE SAYS, WE'RE GOING TO FIX THIS, WE'RE GOING TO

04:02PM  6    FIX THIS.

04:02PM  7        AND THEN IT COMES UP AGAIN IN MARCH OF 2014, AND WHAT DOES

04:02PM  8    SHE DO?  NOTHING.

04:02PM  9        AND THEN IT ULTIMATELY COMES TO A PEAK IN NOVEMBER OF

04:02PM 10    2015.

04:02PM 11        AND SO I CAN'T GLEAN FROM ANY OF THE CASES THAT THEY

04:02PM 12    CITED, PARTICULARLY IN LIGHT OF GRAPH AND MCCLAREN, THIS IDEA

04:02PM 13    THAT A LAY WITNESS, WHEN THEY'RE RAISING RED FLAGS -- IMAGINE

04:02PM 14    THE WHISTLEBLOWER WHO GOES TO THE CEO AND SAYS, WE'RE DOING

04:02PM 15    THESE 15 THINGS WRONG IN THE BANK.  I'M NOT A LAWYER, BUT I'VE

04:02PM 16    BEEN AT THE BANK FOR 20 YEARS AND THIS MAKES ME FEEL BAD.

04:02PM 17        NOBODY WOULD SUGGEST THAT THAT DOESN'T COME IN AS

04:03PM 18    KNOWLEDGE OF THE CEO'S INTENT.

04:03PM 19        THEY'RE REALLY CRAFTING A RULE THAT WOULD EXCLUDE ANY TYPE

04:03PM 20    OF RED FLAG EVIDENCE THAT IS COUCHED IN TERMS OF A LEGAL

04:03PM 21    OPINION, AND THERE IS OVERLAP IN THE RESPONSIBILITIES THAT

04:03PM 22    DR. ROSENDORFF HAS AS THE LAB DIRECTOR.  IT'S HIS JOB TO COMPLY

04:03PM 23    WITH THESE, YOU KNOW, IN ADDITION TO THE OWNER.

04:03PM 24        SO I THINK ALL OF THESE ISSUES ARE CURED WITH A GOOD JURY

04:03PM 25    INSTRUCTION AND CROSS-EXAMINATION.

04:03PM 1      YOU'RE NOT A LAWYER, ARE YOU, DR. ROSENDORFF?  YOU DON'T

04:03PM 2  KNOW HOW MANY LAWYERS MS. HOLMES TALKED TO, DO YOU,

04:03PM 3  DR. ROSENDORFF?

04:03PM 4      AND IT REALLY GOES TO THE WEIGHT OF WHAT HE'S SAYING, NOT

04:03PM 5  SOME CONTRAVENTION OF THE RULE THAT THIS IS IMPERMISSIBLE LEGAL

04:03PM 6  OPINION.  I JUST DON'T THINK THAT YOU CAN FIND THAT IN THE

04:03PM 7  CASES, AND THESE WERE THE WORDS THAT HE USED IN THE MOMENT TO

04:03PM 8  MR. BALWANI AND ULTIMATELY TO MS. HOLMES.

04:03PM 9        THE COURT:  RIGHT.  I APPRECIATE THAT.

04:03PM 10     I THINK, TO MR. FLEURMONT'S POINT, HIS CONCERN IS THAT THE

04:04PM 11  JURY MIGHT FIND, OR THE COURT WOULD ALLOW DR. ROSENDORFF, WHO

04:04PM 12  WE ARE TALKING ABOUT HERE, TO TESTIFY AS TO A LEGAL OPINION,

04:04PM 13  HIS LEGAL OPINION OF A VIOLATION OF THE LAW, AS OPPOSED TO

04:04PM 14  WHETHER THE LAB IS FOLLOWING THE REGULATIONS THAT THEY'RE

04:04PM 15  SUPPOSED TO FOLLOW.

04:04PM 16     I GUESS WHAT I'M SUGGESTING IS, ARE THOSE TWO DIFFERENT

04:04PM 17  THINGS, OR AREN'T THOSE THE SAME THINGS?

04:04PM 18       MR. FLEURMONT:  YOUR HONOR, WE SUBMIT THAT THOSE ARE

04:04PM 19  TWO VERY DIFFERENT THINGS.

04:04PM 20       THE COURT:  AND IF THE COURT WERE TO SAY YOUR

04:04PM 21  WITNESS IS NOT PERMITTED TO GIVE ANY LEGAL CONCLUSION?

04:04PM 22       MR. FLEURMONT:  YOUR HONOR, I DON'T THINK THAT'S

04:04PM 23  CLEAR ENOUGH GUIDANCE FOR THE WITNESS.  I THINK WE NEED TO

04:04PM 24  UNPACK THAT A LITTLE BIT, BECAUSE AS YOU CAN SEE IN THE

04:04PM 25  EXHIBITS, HE WANTS TO GIVE LEGAL CONCLUSIONS.  HE'S DONE IT

04:04PM  1    ALREADY.

04:04PM  2       AND I DID NOT HEAR MR. LEACH SAY THAT IT WOULD BE

04:04PM  3    IMPERMISSIBLE FOR HIM TO SAY, DR. ROSENDORFF, FOR HIM TO SAY

04:05PM  4    EXACTLY WHAT HE SAID IN THAT EXHIBIT, WHICH IS, WE ARE IN

04:05PM  5    VIOLATION OF THE STANDARD, WHICH I THINK UNDER THE CASE LAW IS

04:05PM  6    CLEARLY IMPERMISSIBLE.

04:05PM  7        THE COURT:  SO IF THE POINT IS, IN HIS OPINION AS

04:05PM  8    THE LAB DIRECTOR, THAT THE LAB WAS NOT FOLLOWING THE

04:05PM  9    REGULATIONS, OPERATIONAL, WE WERE NOT FOLLOWING THE

04:05PM 10    REGULATIONS.

04:05PM 11    WHY WEREN'T YOU?  WHAT DO THE REGULATIONS REQUIRE YOU TO

04:05PM 12    DO?

04:05PM 13       X, Y, Z, WHATEVER THEY ARE.

04:05PM 14    AND WERE YOU DOING THOSE THINGS?

04:05PM 15       NO, WE WEREN'T.  AND THAT'S CLIA.  I KNOW CLIA.  I'VE

04:05PM 16    LIVED WITH CLIA IN MY 30 YEARS OF EXPERIENCE, ET CETERA,

04:05PM 17    WHATEVER HE SAYS.

04:05PM 18    ISN'T THAT PERMISSIBLE?

04:05PM 19    AND THEN IF THE COURT WERE TO ADVISE THE JURY, THIS IS NOT

04:05PM 20    A LEGAL OPINION, THIS IS THE DIRECTOR'S OPINION ONLY AS TO

04:05PM 21    WHETHER THE LAB WAS FOLLOWING THE REGULATIONS AS HE UNDERSTOOD

04:05PM 22    THEM, AND THAT WOULD BE TESTED BY CROSS-EXAMINATION.

04:06PM 23    AND IF THE COURT WERE TO GIVE AN INSTRUCTION BOTH AT THE

04:06PM 24    TIME OF THE EVIDENCE, AS WELL AS IN A FINAL INSTRUCTION, THAT

04:06PM 25    THE JURY MAY NOT, THEY'RE NOT PERMITTED TO USE ANY ALLEGED

04:06PM 1    VIOLATIONS OF A REGULATION IN THEIR DELIBERATION OF A CRIMINAL

04:06PM 2    STATUTE, VIOLATION OF A CRIMINAL STATUTE, ISN'T THAT

04:06PM 3    PROPHYLACTIC ENOUGH TO PROVIDE THE JURY AND PROVIDE YOU SOME

04:06PM 4    ASSURANCE THAT THEY WON'T DO THAT?

04:06PM 5         MR. FLEURMONT:  SO, YOUR HONOR, I THINK WE'RE ALMOST

04:06PM 6    THERE.  BUT I THINK THERE ARE TWO ISSUES BAKED INTO THAT

04:06PM 7    HYPOTHETICAL, ONE THAT IS, I THINK, MOSTLY TAKEN CARE OF BY

04:06PM 8    THAT HYPOTHETICAL, AND ONE THAT IS NOT.

04:06PM 9      SO THE FIRST ONE IS THAT THE WAY YOU EXPLAINED, THE WAY HE

04:06PM 10    JUST WENT THROUGH THE REGULATIONS.  I THINK THAT THAT SOLVES

04:06PM 11    THE LEGAL CONCLUSION ISSUE, BUT IT DOES NOT SOLVE THE RELEVANCE

04:06PM 12    AND THE PREJUDICE ISSUE WHICH I THINK IS WHAT THE COURT WAS

04:06PM 13    TALKING ABOUT ON THE BACK END WITH THE CURATIVE INSTRUCTION.

04:06PM 14      YOUR HONOR, WE SUBMIT THAT THAT CURATIVE INSTRUCTION, I

04:07PM 15    GUESS IS WHERE I STARTED ON REBUTTAL, IS THAT IT'S NOT ENOUGH

04:07PM 16    BECAUSE, AS I WAS SAYING, THERE'S A DISTINCTION IN THE CASE

04:07PM 17    LAW.  ONE IS WHEN YOU IMPERMISSIBLY INFECT THE TRIAL WITH

04:07PM 18    GOVERNMENT REGULATIONS, AND THE OTHER IS WHEN YOU TRY TO TAKE

04:07PM 19    AN ELEMENT OF THE OFFENSE AND YOU SUBSTITUTE THAT WITH A

04:07PM 20    VIOLATION OF A REGULATION.

04:07PM 21      I THINK THAT IS WHAT MR. LEACH WAS GETTING AT WHEN HE WAS

04:07PM 22    TALKING ABOUT SOME OF THE CASES.

04:07PM 23      THAT, YOUR HONOR, IS NOT THE <u>WOLF</u> CASE WHICH TALKS ABOUT

04:07PM 24    THE FORMER.  THAT IS THE -- LET ME MAKE SURE AND GRAB THAT.  I

04:07PM 25    BELIEVE IT'S THE EAGLE WHITE CASE.  YEAH, THIS IS <u>UNITED STATES</u>

04:07PM 1    VERSUS -- I'M SORRY, NOT EAGLE WHITE, WHITE EAGLE, THAT'S

04:07PM 2    721 F.3D 1108.  IN THAT CASE, THE NINTH CIRCUIT MADE VERY CLEAR

04:07PM 3    THAT IT'S IMPERMISSIBLE TO USE VIOLATION OF A CIVIL STATUTE TO

04:07PM 4    IPSO FACTO SUPPLY A CRUCIAL ELEMENT OF A CRIMINAL OFFENSE,

04:07PM 5    WHICH IS DIFFERENT FROM REPEATEDLY REFERENCING CLIA REGULATIONS

04:07PM 6    OR CIVIL REGULATIONS AND HAVING THE JURY KIND OF INFER THAT

04:08PM 7    BECAUSE THESE REGULATIONS WERE VIOLATED, THERE WAS A VIOLATION

04:08PM 8    OF THE CRIMINAL OFFENSE FOR WHICH MS. HOLMES IS CHARGED.

04:08PM 9         SO OUR POSITION IS THAT A CURATIVE INSTRUCTION WOULD NOT

04:08PM 10   BE ENOUGH.

04:08PM 11        IF WE REACH A POINT THAT WE HAVE A CRITICAL MASS, IF YOU

04:08PM 12   WILL, A DISCUSSION OF CLIA REGULATIONS, BECAUSE AT THAT POINT

04:08PM 13   THERE'S A SERIOUS RISK THAT THE JURY WILL THINK, WELL, BECAUSE

04:08PM 14   THESE VIOLATIONS -- EXCUSE ME, BECAUSE THESE REGULATIONS WERE

04:08PM 15   VIOLATED, SHE MUST HAVE DONE SOMETHING WRONG AND SHE MUST HAVE

04:08PM 16   VIOLATED THE CHARGE FOR WHICH SHE'S CHARGED.

04:08PM 17             THE COURT:  SO SHOULD THE COURT BE CONCERNED ABOUT

04:08PM 18   WHETHER THAT IS THE ONLY EVIDENCE THAT THE GOVERNMENT HAS, AS

04:08PM 19   OPPOSED TO, IS THERE ADDITIONAL EVIDENCE THAT THE JURY COULD

04:08PM 20   USE IN THEIR CONSIDERATION?

04:08PM 21        IN OTHER WORDS, IF IT WAS JUST CIVIL REGULATIONS THAT WERE

04:08PM 22   VIOLATED AND THE GOVERNMENT SEEKS A CONVICTION BASED PRIMARILY

04:08PM 23   ON THAT, THAT WOULD BE ONE ISSUE.

04:08PM 24        BUT IF THE GOVERNMENT HAS OTHER EVIDENCE, AND MR. LEACH

04:08PM 25   WILL TELL US IN JUST A MOMENT WHETHER THEY DO HAVE OTHER

04:09PM 1    EVIDENCE, THAT IT WOULD BE FOR THE JURY TO CONSIDER AND TO

04:09PM 2    DELIBERATE IN ADDITION TO THIS PIECE OF EVIDENCE WHICH

04:09PM 3    MR. LEACH TELLS US IS REALLY FOR THE ISSUE OF PERHAPS

04:09PM 4    KNOWLEDGE, NOTICE, AND INTENT.

04:09PM 5        DOES THAT DELETE THAT ARGUMENT SOMEWHAT?

04:09PM 6            MR. FLEURMONT:  IT AFFECTS THE ARGUMENT, YOUR HONOR,

04:09PM 7    BUT IT'S NOT ENOUGH.

04:09PM 8        I THINK WHAT YOU REFERENCED IS TWO SITUATIONS, ONE NOT AS

04:09PM 9    BAD AS THE OTHER, BUT BOTH TERRIBLE IN A SENSE THAT IF IT'S THE

04:09PM 10   GOVERNMENT'S ONLY EVIDENCE THAT THERE IS VIOLATIONS OF CLIA

04:09PM 11   REGULATIONS TO SUPPORT ITS BROAD ALLEGATION THAT THERANOS --

04:09PM 12   SORRY, I UNDERSTAND I'M SPEAKING TOO FAST -- THAT THERANOS WAS

04:09PM 13   NOT ABLE TO CONSISTENTLY PRODUCE ACCURATE AND RELIABLE RESULTS,

04:09PM 14   THEN, OF COURSE, YOUR HONOR, WE WOULD FILE A RULE 29 MOTION AND

04:09PM 15   THAT WOULD BE THE FEATURE OF THE MOTION.

04:09PM 16       JUST BECAUSE THERE'S OTHER EVIDENCE DOES NOT REMOVE THE

04:09PM 17   TAINT OR THE INFECTION IN THE TRIAL.

04:09PM 18       IT'S NOT AS BAD AS THE FORMER, BUT THEY'RE BOTH -- WE

04:10PM 19   SUBMIT THAT BOTH WOULD BE A TERRIBLE RESULT AND LEAD TO ERROR

04:10PM 20   IN THIS TRIAL.

04:10PM 21           THE COURT:  IT'S PROBABLY DIFFICULT FOR A LAWYER TO

04:10PM 22   TALK ABOUT ERROR IN A CASE WHEN YOU'VE GOT A JUDGE IN FRONT OF

04:10PM 23   YOU.  YES, I REMEMBER THOSE AWKWARD CONVERSATIONS, AND NO

04:10PM 24   OFFENSE TAKEN.  I APPRECIATE THE CONVERSATION.

04:10PM 25           MR. FLEURMONT:  THANK YOU, YOUR HONOR.

04:10PM 1          THE COURT:  MR. LEACH.

04:10PM 2          MR. LEACH:  I LIKE THE HYPOTHETICAL THAT THE COURT

04:10PM 3  HAD BEEN CRAFTING, SO THAT'S MY POSITION ON THAT.

04:10PM 4          THE GOVERNMENT IS NOT ARGUING THAT BECAUSE MS. HOLMES

04:10PM 5  VIOLATED OR THERANOS VIOLATED 42 CFR, THAT YOU MAY CONVICT HER

04:10PM 6  OF WIRE FRAUD.

04:10PM 7          WHAT THE GOVERNMENT IS SAYING IS IF THERANOS WAS NOT

04:10PM 8  MEETING THE STANDARD SET FORTH IN THAT REGULATION AND THE CMS

04:10PM 9  INSPECTORS GO IN AND SEE THAT THERE'S THIS MANY NUMBER OF

04:10PM 10 QUALITY CONTROL FAILURES AND THIS MANY INSTANCES WHERE THEY'RE

04:11PM 11 REPORTING PATIENT RESULTS AFTER QUALITY CONTROL FAILURES, THAT

04:11PM 12 IS A PIECE OF EVIDENCE FROM WHICH A JURY COULD CONCLUDE

04:11PM 13 THERANOS'S TESTS WERE NOT ACCURATE AND RELIABLE.

04:11PM 14         IN ADDITION TO THE VOIDING, IN ADDITION TO THE ACCOUNTS OF

04:11PM 15 PATIENTS, IN ADDITION TO INNUMERABLE EMAILS TO MS. HOLMES

04:11PM 16 TELLING HER ABOUT PROBLEMS WITH THE TESTS, IN ADDITION TO

04:11PM 17 STATEMENTS FROM HER OWN INSIDERS THAT WE NEED TO STOP USING THE

04:11PM 18 EDISON DEVICE FOR CERTAIN TESTS, IN ADDITION TO EVIDENCE THAT

04:11PM 19 AT THE TIME THAT CMS HAD COME IN, THEY HAD COMPLETELY STOPPED

04:11PM 20 USING THE EDISON FOR ANYTHING, ALL OF THAT IS SUFFICIENT FOR A

04:11PM 21 JURY TO REACH A CONCLUSION.

04:11PM 22         BUT THE GOVERNMENT IS NOT SAYING MERE VIOLATION OF A CIVIL

04:11PM 23 REGULATORY SCHEME IS ENOUGH.  BUT IF YOU'RE TOLD ABOUT THESE

04:11PM 24 VIOLATIONS -- WHICH DON'T EXIST IN A VACUUM, THEY EXIST TO

04:11PM 25 ENSURE ACCURACY AND RELIABILITY -- AND YOU IGNORE THEM AND YOU

| | | |
|---|---|---|
| 04:12PM | 1 | FORCE OUT THE LAB DIRECTOR WHO WAS RAISING THOSE PROBLEMS, |
| 04:12PM | 2 | THAT'S SUGGESTIVE OF AN INTENT TO DEFRAUD. |
| 04:12PM | 3 | THAT'S WHAT THE GOVERNMENT IS ARGUING. |
| 04:12PM | 4 | THE COURT:  YOU GET THE LAST WORD.  IT'S YOUR |
| 04:12PM | 5 | MOTION, MR. FLEURMONT. |
| 04:12PM | 6 | MR. FLEURMONT:  I WON'T KEEP THE COURT ANY LONGER. |
| 04:12PM | 7 | THANK YOU, YOUR HONOR. |
| 04:12PM | 8 | THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.  THANK |
| 04:12PM | 9 | YOU. |
| 04:12PM | 10 | MR. LEACH:  THANK YOU, YOUR HONOR. |
| 04:12PM | 11 | THE COURT:  ALL RIGHT.  THIS ONE IS UNDER SUBMISSION |
| 04:12PM | 12 | AND, AS I SAID, I WISH TO GET WRITTEN ORDERS OUT TO YOU AFTER |
| 04:12PM | 13 | WE'VE FINISHED ALL OF THE MOTIONS. |
| 04:12PM | 14 | I THINK WE'RE FINISHED FOR THE DAY.  WE'RE ALMOST ON TIME. |
| 04:12PM | 15 | IT'S ABOUT QUARTER PAST THE HOUR. |
| 04:12PM | 16 | ANYTHING ELSE THAT EITHER SIDE WISHES TO RAISE TO THE |
| 04:12PM | 17 | COURT AT THIS TIME ON ANY ISSUE? |
| 04:12PM | 18 | MR. SCHENK:  NO, YOUR HONOR.  THANK YOU. |
| 04:12PM | 19 | MS. SAHARIA:  NOT FROM US. |
| 04:12PM | 20 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 04:12PM | 21 | MS. KRATZMANN, ARE WE MEETING AT 9:00 O'CLOCK TOMORROW |
| 04:12PM | 22 | MORNING? |
| 04:12PM | 23 | THE CLERK:  I BELIEVE SO, YOUR HONOR.  9:00 A.M. |
| 04:12PM | 24 | THE COURT:  DOES THAT WORK FOR EVERYONE'S SCHEDULE? |
| 04:13PM | 25 | MS. SAHARIA:  YES. |

04:13PM  1            THE COURT:  ALL RIGHT.  GREAT.  HAVE A GOOD EVENING.

04:13PM  2            MS. SAHARIA:  YOU, TOO.

04:13PM  3            THE COURT:  THANK YOU.

04:13PM  4            THE CLERK:  COURT IS ADJOURNED FOR THE DAY.

04:13PM  5        (COURT ADJOURNED AT 4:13 P.M.)

         6

         7

         8

         9

        10

        11

        12

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

1

2

3                    <u>CERTIFICATE OF REPORTERS</u>

4

5

6

7        WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11       THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16       _____
         IRENE RODRIGUEZ, CSR, CRR

17       CERTIFICATE NUMBER 8076

18       _____

19       LEE-ANNE SHORTRIDGE, CSR, CRR
         CERTIFICATE NUMBER 9595

20

21       DATED:  MAY 7, 2021

22

23

24

25

UNITED STATES COURT REPORTERS

# Exhibit 101



*United States Attorney*
*Northern District of California*

---

*1301 Clay Street, Suite 340S*       *(510) 637-3680*
*Oakland, California 94612*      *Fax: (510) 637-3724*

July 23, 2020

*By Email*

Katie Trefz, Esq.
Lance Wade, Esq.
Kevin Downey, Esq.
Amy Saharia, Esq.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, DC  20005

     Re:   *United States v. Holmes*, CR 18-258 EJD

Dear Counsel:

     I write in response to your July 7, 2020 letter.

     The government has completed its Rule 16 production.  If we receive additional documents responsive to Rule 16, we will produce them promptly.

     Tranche 9 includes documents gathered from local drives (e.g., "C drives"), network drives, and other drives of FDA custodians.  You can identify the custodians in the various subfolders.  We produced the documents as we have them; Rule 16 does not require otherwise.  We do not agree that we are required to process them on your behalf, but in any event, we are undertaking that.  We expect to have it ready for you by the end of this month.  Please return any hard drives you have so that we may load them for you.

     On August 2, 2019, the government disclosed to you at US-REPORTS-0010269 that Theranos produced a copy of what was purported to be the LIS database.  We also produced a copy of the production letter.  US-REPORTS-0010271.  With respect to your request for documents "describing the government's efforts, if any, to attempt to access the materials in the LIS database . . . and to locate other sources of the data that resided in that database," attached please find the June 4, 2018 subpoena for the information; a follow-up email with counsel to Theranos dated July 27, 2018; and two reports prepared by the FBI.  We have identified no additional reports prepared by the agents memorializing their efforts to access what was produced to the government.  We further advise you as follows:  After subpoenaing the LIS database from Theranos, government counsel corresponded with counsel representing the company and reiterated that the government required not just the database but also any software

needed to access and query it.  In late August 2018, Theranos produced a hard drive containing what purported to be a copy of the database, and provided a single alphanumeric encryption key.  Despite that key, the government was unable to access the data.  Shortly after receiving the hard drive, government counsel corresponded with Theranos counsel by telephone in an effort to gain access to the data.  During those calls, Theranos counsel confirmed that they were unaware of any additional information or software that would further facilitate government access to the data.  Following selection of an Assignee for Theranos, government counsel has had similar conversations with counsel for the Assignee concerning regaining access to the LIS database.  To date, Assignee counsel has confirmed that they do not have the LIS database in any other format and are unaware of any additional information that would facilitate access.

    With one exception (Dr. Melissa Pessin, who was interviewed by the government on July 15, 2020), the government has no agent notes, SEC deposition transcripts, and/or interview memoranda with respect to the individuals listed in bullets in Section II.  We are producing the interview memorandum for Dr. Pessin today, along with the agent's notes.  We will produce any memoranda of witness interviews we subsequently conduct, along with any agent notes.  To the best of my knowledge, the SEC did not prepare an interview memorandum for its interview of Mr. Anekal (and as you know the government did not attend).  The SEC has made its notes of the interview available to you.

    At this time, the government has no interview memoranda or agent notes with respect to Mr. Anderson, Mr. Cook, Mr. Gordon, Mr. Hamilton, or Ms. Ravitz.

    The government has produced to you its agent notes of attorney proffers.  Attached is a spreadsheet of SEC notes of attorney proffers.  The notes are work product of the SEC.  They are available for review at the USAO.  In light of restrictions in effect because of COVID-19, we are willing to send you a hard-copy set if you agree to treat them under the same conditions as the SEC interview notes.  Please let me know.

    We have no immunity agreements with witnesses.  We will produce all proffer agreements between the government and witnesses in this matter and any proffer agreements between the SEC and witnesses it has interviewed regarding Theranos.  We are producing today executed proffer agreements between the government and Jeff Blickman, Dan Edlin, Surekha Gangakhedkar, Christian Holmes, Suarj Saksena, and Daniel Young.  The government used the same form proffer agreement for Adam Rosendorff and will produce it in due course.  Callie Rosendin's proffer agreement was produced to you at US-REPORTS-0002371.

Very truly yours,

ADAM A. REEVES
Attorney for the United States,
Acting Under Authority Conferred
By 28 U.S.C. § 515

/s/
_____
ROBERT S. LEACH
JEFFREY SCHENK
JOHN C. BOSTIC
VANESSA BAEHR-JONES
Assistant United States Attorneys

cc      Jeff Coopersmith, Esq. (by email)

# Exhibit 100

# RE: Grand Jury Subpoena Investigation #2016R00024 - Theranos, Inc.

**From:** oneill.stephen@dorsey.com
**To:** "Bostic, John (USACAN)" <jbostic@usa.doj.gov>, ████████@wilmerhale.com, "Schenk, Jeffrey (USACAN)" <jschenk@usa.doj.gov>, "Leach, Robert (USACAN)" <rleach@usa.doj.gov>
**Cc:** marti.john@dorsey.com, hwang.thomas@dorsey.com, ████████@wilmerhale.com, ████████@wilmerhale.com
**Date:** Mon, 17 Sep 2018 12:44:20 -0700

10:00 am ( west coast ) on Friday works for us, do you want me to send out a conference line?

From: Bostic, John (USACAN) <John.Bostic@usdoj.gov>
Sent: Monday, September 17, 2018 11:22 AM
To: O'Neill, Stephen <oneill.stephen@dorsey.com>; ████████@wilmerhale.com; Schenk, Jeffrey (USACAN) <Jeffrey.B.Schenk@usdoj.gov>; Leach, Robert (USACAN) <Robert.Leach@usdoj.gov>
Cc: Marti, John <marti.john@dorsey.com>; Hwang, Thomas <hwang.thomas@dorsey.com>; ████████@wilmerhale.com; ████████@wilmerhale.com
Subject: RE: Grand Jury Subpoena Investigation #2016R00024 - Theranos, Inc.

Steve,

Thanks for contacting us. I agree it would be worthwhile to have a call this week to discuss the assignment. We have some availability Friday morning—could we speak at 9 or 10 that day? If not, let us know what times would work for you.

Best,
John

From: oneill.stephen@dorsey.com <oneill.stephen@dorsey.com>
Sent: Friday, September 14, 2018 4:08 PM
To: ████████@wilmerhale.com; Schenk, Jeffrey (USACAN) <JSchenk@usa.doj.gov>; Bostic, John (USACAN) <jbostic@usa.doj.gov>; Leach, Robert (USACAN) <RLeach@usa.doj.gov>
Cc: marti.john@dorsey.com; hwang.thomas@dorsey.com; ████████@wilmerhale.com; ████████@wilmerhale.com
Subject: RE: Grand Jury Subpoena Investigation #2016R00024 - Theranos, Inc.

Thanks ████ for the introduction

John, Jeff and Bob – nice to meet you via email. The assignment went live on Wednesday and so we are trying to get up to speed. We wanted to set up a call at the end of next week so we can answer any questions you may have about the assignment, please let us know if that works with your respective schedules.

Steve

From: ████████@wilmerhale.com>
Sent: Thursday, September 13, 2018 6:47 PM
To: Schenk, Jeffrey (USACAN) <Jeffrey.B.Schenk@usdoj.gov>; Bostic, John (USACAN) <John.Bostic@usdoj.gov>; Leach, Robert (USACAN) (Robert.Leach@usdoj.gov) <Robert.Leach@usdoj.gov>
Cc: O'Neill, Stephen <oneill.stephen@dorsey.com>; Marti, John <marti.john@dorsey.com>; Hwang, Thomas <hwang.thomas@dorsey.com>; ████████@wilmerhale.com>; <████████@wilmerhale.com>
Subject: Grand Jury Subpoena Investigation #2016R00024 - Theranos, Inc.

Hi John, Jeff and Bob,

As discussed earlier this week, Theranos' assets have been assigned to Sherwood Partners, and the certificate of dissolution has been filed. Copied here are Steve O'Neill, Thomas Hwang, and John Marti of Dorsey, counsel to Sherwood Partners.

USAO-008660



Please consider the environment before printing this email.

This email message and any attachments are being sent by Wilmer Cutler Pickering Hale and Dorr LLP, are confidential, and may be privileged. If you are not the intended recipient, please notify us immediately—by replying to this message or by sending an email to postmaster@wilmerhale.com—and destroy all copies of this message and any attachments. Thank you.

For more information about WilmerHale, please visit us at http://www.wilmerhale.com.

USAO-008661

# Exhibit 94

**2016R00024 - 103**

AO 110 (Rev. 06/09) Subpoena to Testify Before a Grand Jury

# UNITED STATES DISTRICT COURT

for the

Northern District of California

## SUBPOENA TO TESTIFY BEFORE A GRAND JURY

To: Theranos, Inc.
Custodian of Records

**YOU ARE COMMANDED** to appear in this United States district court at the time, date, and place shown below to testify before the court's grand jury. When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place: United States District Courthouse - San Jose<br>280 S. First Street<br>Room 2115, 2nd Floor<br>San Jose, CA 95113 | Date and Time:<br><br>06/14/2018 9:00 am |
| --- | --- |

You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

SEE ATTACHMENT. Provide all records in electronic format only.

Voluntary compliance with this federal grand jury subpoena will be deemed satisfactory when the information requested is provided to the agent listed below and no appearance will be necessary.

MAIL DOCUMENTS TO:
Jeff Schenk, Assistant U.S. Attorney  or  John Bostic, Assistant U.S. Attorney
150 Almaden Blvd. Suite 900                    150 Almaden Blvd. Suite 900
San Jose, CA 95126                                   San Jose, CA 95126
Telephone number: (408) 535-5061         Telephone number: (408) 535-5061

Date:     June 4, 2018

*CLERK OF COURT*

Susan y. Soong

*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the United States attorney, or assistant United States attorney, who requests this subpoena, are:
Jeffrey B. Schenk, AUSA
John C. Bostic, AUSA
150 Almaden Blvd., Suite 900  San Jose, CA 95113
jeffrey.b.schenk@usdoj.gov   (408) 535-5061
john.bostic@usdoj.gov

Custodian of Records
Theranos, Inc.

## SUBPOENA ATTACHMENT

### I.    DEFINITIONS

As used herein:

A.     "Document" means the **original** of all written, recorded, or graphic material and all
electronic data of every kind, whether prepared by your company or by any other
person, that is in your company's possession, custody, or control, including but not
limited to: memoranda, reports, letters, telegrams, and other communications
recorded in any form or medium; notes, minutes, and transcripts of conferences,
meetings and telephone or other communications; contracts and other agreements;
checks, check registers, statements, ledgers, and other records of financial matters or
commercial transactions; appointment books, calendars, notebooks, and diaries,
including data in PDAs; maps, diagrams, graphs, and charts; plans and specifications;
publications; photographs; photocopies, microfilm, and other copies or reproductions;
computer printouts; tallies, tabulations, and summaries of sales or bids; and all file
folders, file tabs, folder tabs, mailing envelopes, facsimile transmission cover sheets,
and any other proof or indicia of mailing (if applicable) associated with each original.
The term "document" includes spreadsheets, as well as underlying cell formulae and
other codes. The term "document" also includes electronic mail messages and other
documents and data stored in, or accessible through, computer or other information
retrieval systems, such as personal computers, portable computers, workstations,
minicomputers, personal data assistants, archival voice storage systems, group and
collaborative tools, electronic messaging devices, portable or removable storage
media, mainframes, servers, backup disks and tapes, archive disks and tapes, and
other forms of online or offline storage, whether on or off company premises. The
term "document" includes all drafts of a document and all duplicates of a document
(whether or not identical) in the files of or in the files maintained on behalf of all
directors, officers, managers, or other supervisory employees, duplicates of
documents in all other files that are not identical duplicates of the originals (including
copies that differ in any way, such as through notations, underlining, or other
markings), and  duplicates of documents the originals of which are not in the
possession, custody, or control of your company. The term "document" includes all
data (including metadata, embedded, hidden and other bibliographic or historical data
describing or relating to documents created, revised, or distributed on computer
systems) stored in electronic form or accessible through computer or other
information retrieval systems, together with instructions and all other materials
necessary to use or interpret this data. Unless otherwise specified, the term

1

"document" excludes non-electronic forms of invoices, bills of lading, purchase orders, customs declarations, and other similar documents of a purely transactional nature.

B.  "Identify" means to state and "identity" means a statement of:

1) In the case of a person other than a natural person, its name, the address of its principal place of business, its telephone number, and the name of its chief executive officer;

2) In the case of a natural person, his or her full name (including full middle name), date and place of birth and social security number, passport number and country of issuance, last known home telephone number and home address, last known business telephone number (including extensions) and business address, last known cellular or mobile telephone numbers, the positions held by each individual and dates of service in each position, and the name and position of each such person's immediate supervisors in each position; and

3) In the case of a communication, its date, its type *(e.g.,* telephone conversation, letter, electronic mail, or meeting), the place where it occurred, the identity of the persons who made it, the identity of the persons who received it or who were present when it was made, and the subject matter discussed.

C.  "Person" means any natural person, association, cooperative, public or private corporation, joint venture, partnership, sole proprietorship, governmental entity,or other form of business or legal entity.

D.  "Relating to" or "relate to" or "regarding" means directly or indirectly refer or pertain to, discuss, describe, reflect, contain, examine, analyze, study, report on, comment on, evidence, constitute, show, consider, recommend, concern, record, or set forth, in whole or in part.

E.  "Telephone number" includes any general telephone numbers, private line numbers, telephone extension numbers, cellular or mobile telephone numbers, and facsimile transmission numbers.

F.  "You" or "your company" means the person to which this subpoena is addressed; any parent, predecessor, successor, division, affiliate, or subsidiary (whether wholly owned or not) of that person; any joint venture to which any such person is or was a party; and each officer, director, manager, partner, employee, attorney, agent, representative, consultant, affiliated person, or other person acting on behalf of any of them.

2

## II.   INSTRUCTIONS

A.   Unless otherwise specifically provided herein, the documents that must be produced in response to this subpoena include all responsive documents prepared, sent, dated, received, used, or in effect at any time during the period of **2006** through **2016** ("the subpoena period").

B.   All documents produced must be **originals,** unless otherwise indicated.  Photocopies will be accepted only after your company demonstrates that the originals are unavailable.

C.   This subpoena and schedule of documents call for the production of all responsive documents in the possession, custody, or control of your company without regard to the physical location of the documents and without regard to whether the documents were prepared by or for your company.

D.   Use of the singular or the plural in this subpoena should not be deemed a limitation, and the use ofthe singular should be construed to include, where appropriate, the plural. The conjunctive form "and" and the disjunctive form "or" are mutually interchangeable and encompass each other. The terms "any" and "all" are mutually interchangeable and encompass each other.

E.   Any documents that are withheld in whole or in part from production based on a claim of privilege shall be assigned document control numbers (with unique consecutive numbers for each page of each document); for purposes of this instruction, each attachment to a document shall be treated as a separate document and separately logged, if withheld, and cross referenced, if produced. Your company shall also provide a statement of the claim of privilege and all facts relied upon in support of the decision to withhold each document, in the form of a log that conforms with the requirements set forth below. Your company is encouraged to propose categorical limitations to exclude certain classes of privileged documents from its log.

a.   For each document identified on your company's privilege log, state:

i.   the document's control numbers;
ii.   all authors of the document;
iii.   all addressees of the document;
iv.   all recipients of the document or of any copies of the document, to the extent not included among the document's addressees;
v.   the date of the document;
vi.   a description of the subject matter of the document;
vii.   the nature or type of the privilege that your company is asserting for the document *(e.g,* "attorney-client privilege");
viii.   the specifications of this schedule to which the document is responsive;

3

      ix.  the document control numbers of any attachments to the document, regardless of whether any privilege is being asserted for such attachments; and

      x.  whether the document has been produced in redacted form.

  b.  Your company's privilege log shall also conform with all of the following requirements:

      i.  Provide a separate legend containing the full name, title, and employer or company affiliation of each author, addressee, and recipient identified on your company's privilege log.

      ii.  All attorneys acting in a legal capacity with respect to the withheld document or communication, and only such attorneys, shall be identified on the privilege log with an asterisk.

      iii.  The description of the subject matter of each document shall describe the nature of the document in a manner that, though not revealing information that is itself privileged, provides sufficiently detailed information to enable the Department to assess the applicability of the privilege claimed.

      iv.  For each document withheld under a claim that it constitutes or contains attorney work product, also state whether your company asserts that the document was prepared in anticipation of litigation or for trial and, if so, identify the anticipated litigation or trial upon which the assertion is based.

      v.  Produce all nonprivileged portions of any responsive document (including nonprivileged or redactable attachments) for which a claim of privilege is asserted, except where the only nonprivileged information in the document has already been produced. Note where any redactions in the document have been made.

      vi.  The privilege log shall be produced in both hard-copy and electronic form, the electronic form of which shall be both searchable and sortable.

  c.  Documents sent solely between counsel for your company, including in-house counsel acting solely in a legal capacity, and documents authored by your company's outside counsel that were not directly or indirectly furnished to any third party, such as internal law firm memoranda, may be omitted from the privilege log. However, any attachments to such documents must be included on the privilege log (if a privilege is applicable to such materials), unless such attachments are addressed and sent solely to counsel.

  d.  If any portion of any document is responsive to any paragraph or subparagraph in Section III below, then the entire document must be produced, including all supporting, underlying, or explanatory documents and all attached, annexed, or appended documents (this includes file attachments to electronic

4

communications). Documents should be submitted as found in your company's files *(e .g.,* documents that in their original condition were stapled, clipped, or otherwise fastened together, or maintained in separate file folders, shall be produced in such form). Documents should also be produced in the order in which they appear in your company's files and should not be shuffled or otherwise rearranged. If a document contains privileged material, the entire document must be produced, with the privileged material redacted and documented as set forth in Paragraph II.E., above.

e. If you intend to utilize any de-duplication software or services when collecting or reviewing information that is stored in your company's computer systems or electronic storage media in response to this schedule of documents to be produced, or if your company's computer systems contain or utilize such software, you must contact the attorneys for the government to determine, with the assistance of the appropriate government technical staff, whether and in what manner your company may use such software or services.

f. Mark each page of each document submitted- whether in hard-copy or electronic format- with corporate identification and consecutive document control numbers. Place all documents produced in hard-copy format in file folders. Mark each file folder with your company's corporate identification, the name of the person whose documents are in the folder, and how the original file was labeled. If your company submits hard copies of electronic documents that have been printed from a common electronic source, such as a central e-mail or document server or a backup disk, such documents must be submitted in file folders that are marked with (1) a description of the enclosed documents' electronic source (e.g., "Documents from Backup Tape No.3 for Email Server XYZ, 3/1 /06 - 3/31 /06"); and (2) the name of each natural person whose electronic documents are contained in that file folder. Where a document is responsive to more than one paragraph or subparagraph of Section III below, your company shall produce it only once. Hard-copy documents shall be submitted in sturdy boxes not larger than 1.5 cubic feet. Number each box and mark each box with corporate identification and the names of the individuals whose files are contained in that box.

g. Provide a master list showing: (1) the name of each individual from whom responsive documents are submitted; and (2) the corresponding consecutive document control numbers used to identify that person's documents. If the master list exists in electronic form, provide the master list both as a printed hard copy and in electronic form (provided the master list can be produced in a format that

5

allows the Department to use it). The Department representatives will provide a sample master list upon request.

h. The definition of "document" used in this schedule includes data stored in any electronic form. Your company is required to review such data and determine whether it contains material responsive to this subpoena. In addition, your company should **immediately** take the following steps to ensure that it preserves all types of electronic data from the subpoena period that may be responsive:

    i. Electronic Data to be Preserved. The following (subparagraphs a.-g.) types of electronic data should be preserved, in accordance with the steps set forth in Paragraphs II.J.2. through 7., below:

        1. All electronic mail, information about electronic mail (including but not limited to information on message contents, header information, and logs of electronic mail system usage), any attachments, and any other electronic communications, including any data from Instant Messaging programs, Internet Relay Chat systems, or any voicemail programs, containing information responsive to the subpoena;

        2. All files that contain information from electronic calendars or scheduling programs responsive to the subpoena;

        3. All user-created files (including but not limited to word processing files, spreadsheets and slide presentations) that contain information responsive to the subpoena;

        4. All databases (including all records and fields and structural information in such databases) or other data files that contain any information (such as sales, pricing, customer, financial, accounting, and billing information) responsive to the subpoena;

        5. All logs of activity on computer systems that may have been used to process or to store electronic data containing information responsive to the subpoena;

        6. All electronic data files created or used by spreadsheet programs that contain information responsive to the subpoena; and

        7. All other electronic data containing information that is responsive to the subpoena.

    ii. Online Data Storage: Servers/Mainframes. With regard to your company's servers, mainframes, and any other electronic data storage devices, *do not modify or delete* any electronic data existing as of the date of the subpoena that contain information that meets any of the criteria set forth in

6

Paragraph II.J.1 . above, unless a true and correct copy of each such electronic data file has been made and steps have been taken to ensure that this copy will be preserved and accessible for purposes of this grand jury investigation.

iii.  Off-Line Data Storage: Backups, Archives, and Other Removable Media. With regard to all electronic media used for off-line storage, including but not limited to magnetic tapes and cartridges and other media that, at the date of service of this subpoena, contain any electronic data meeting the criteria listed in Paragraph II.J.1., *immediately stop any activity* that may result in the loss of such electronic data, including rotation, destruction, overwriting; or erasure of such media in whole or in part. This request is intended to cover all removable electronic media used for data storage in connection with your company's computer system, including magnetic tapes and cartridges, magneto-optical disks, floppy diskettes, CDs, DVDs, USB thumb drives, and all other media, whether used with personal computers, mainframes, other computers, or other electronic data storage devices, and whether containing  active data, backup data, archived data, or any other electronic data, for your company's computer systems.

iv.  Replacement of Data Storage Devices. Do not dispose of any electronic data storage devices or media that may be replaced due to failure, upgrade, or other reasons if such devices or media may contain electronic data meeting the criteria listed in Paragraph II.J.1 above.

v.  Local-User Hard Drives on Personal Computers, Hand-Held Devices. With regard to electronic data meeting the criteria listed in Paragraph II.J.1. above that existed on stand-alone computers (including desktops, laptops, and home computers used to conduct your company's business) and handheld devices (including BlackBerrys and Palm Pilots) as of the date of this subpoena, *do not alter or erase* this electronic data, and do not perform other procedures (such as data compression, disk defragmentation, optimization routines, or reassignment of hard drives) that may affect this data, unless a true and correct copy has been made of these active files, copies have been made of all directory listings (including system files) for all directories and subdirectories containing those files, and arrangements have been made to preserve the copies during the pendency of this grand jury investigation.

7

vi.  Custom Designed Programs and Utilities. Preserve copies of all application programs and utilities that are used to process electronic data responsive to this subpoena.

vii.  Log of System Modifications. Maintain an activity log to document modifications made to any electronic data processing system that may affect the system's capability to process any electronic data meeting the criteria listed in Paragraph II.J.l., regardless of whether these modifications were made by employees, contractors, vendors, or any other third parties.

i.  Unless otherwise requested by a Department representative, electronic documents *(e.g.,* email) and data shall be produced in electronic form only. Electronic documents and data shall be produced in a format that allows the Department to access and use them, together with instructions and all other materials necessary to use or interpret the data, including record layouts and data dictionaries. For data submitted electronically, submit a description of the data's source.

j.  Before you prepare documents or information for production in electronic form (for example, before you attempt to copy, for your response to this schedule, documents or information from an electronically ·stored source onto a disk or other electronic storage medium), you must contact a Department representative to arrange a meeting or conference call with your company's personnel who are familiar with the electronic files in which the documents or information are stored, to explain to Department representatives the manner in which the documents or information are stored, and the types of information that are available on the electronic source. Department representatives must approve the format and production method for electronic data in advance of the submission by your company of its response to this schedule of documents.

k.  This subpoena requires your company to:

i.  Appear before the grand jury through an authorized, knowledgeable representative at the time and place set;
ii.  Produce before the grand jury all documents described in this schedule of documents; and
iii.  Identify and authenticate all documents so produced.

l.  The representative who appears before the grand jury for your company will be questioned under oath regarding methods of compliance and whether all documents described in this schedule of documents have been produced. The

8

representative making the appearance should be prepared to explain what was done, how, where, when, and by whom, to comply with the demands set forth in this schedule of documents.

m. Your company, at its sole election, may also comply with the subpoena, in lieu of producing documents before the grand jury, by producing all responsive documents via certified or registered mail, or via equivalent delivery, to the address listed in Paragraph II.Q. below, provided that each of the following prerequisites is met:

    i. All subpoenaed documents reach the United States on or before the date your company, through its representative, is scheduled to appear before the grand jury (or on or before such other date agreed upon in writing by your company and attorneys for the United States); and

    ii. The official of your company responsible for complying with this subpoena submits with the subpoenaed documents a sworn statement that:

        1. States the name and position of each person assisting in the search for the documents;

        2. Describes all locations searched, including your company's computer system and all removable media;

        3. Identifies the documents produced by number; and

        4. Certifies that the documents produced fully comply with the demands of the subpoena, and that your company has withheld no documents, except on grounds of privilege in accordance with Paragraph II.E., above.

n. Regardless of which production method your company chooses, the grand jury reserves the right to require the official of your company responsible for compliance with this subpoena or any other employee involved in the search to testify about your company's efforts to comply with the subpoena.

o. No agreement or stipulation by the United States or its representatives, purporting to modify, limit, defer, or otherwise vary this subpoena or schedule of documents will be valid or binding on the United States unless confirmed or acknowledged in writing by the United States, or made of record in open court, by a duly authorized representative thereof.

9

**ER-2872**

p. All communications or inquiries regarding this subpoena and schedule of documents should be addressed to:

Jeff Schenk, Assistant U.S. Attorney
150 Almaden Blvd. Suite 900
San Jose, CA 95126
Telephone number: (408) 535-5061

John Bostic, Assistant U.S. Attorney
150 Almaden Blvd. Suite 900
San Jose, CA 95126
Telephone number: (408) 535-5061

III.   **DOCUMENTS TO BE PRODUCED**

**Lab Reports**

A.   The entirety of all blood test lab reports maintained in the L.I.S. database that Theranos provided to its patients.  Please produce these reports in the same format originally provided to such patients.

B.   A softcopy or proxy of the L.I.S. database, along with any other proprietary software required to access and search the database.

***Coleman* litigation**

C.   All deposition transcripts generated throughout the course of this litigation

IV.   **NOTICE CONCERNING DOCUMENT DESTRUCTION AND OBSTRUCTION OF JUSTICE**

**Any person who withholds, alters, deletes, or destroys documents – including electronic documents - demanded by this subpoena, or who removes or transfers such documents to outside the jurisdiction of the United States, may be subject to criminal prosecution for obstruction of justice, contempt of court, or other federal criminal violations. Conviction of any of these offenses may be punishable by substantial fine or imprisonment, or both.**

10

2016R00024 - 103

## DECLARATION OF CUSTODIAN OF RECORDS

Pursuant to 28 U.S.C. § 1746, I, the undersigned, hereby declare:

My name is _____.
          (Name of Declarant)

      I am a United States citizen, and I am over eighteen years of age. I am the custodian of records of the business named below, or I am otherwise qualified as a result of my position with the business named below to make this declaration.

      I am in receipt of a United States District Court Grand Jury Subpoena for the Northern District of California, signed by Assistant U.S. Attorney _____, requesting specified records of the business named below. Attached hereto are records responsive to the subpoena. Pursuant to Federal Rule of Evidence 902(11) and Federal Rule of Evidence 803(6), I hereby certify that the records attached hereto:

      (1) were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;

      (2) were kept in the course of the regularly conducted business activity; and

      (3) were made by the regularly conducted business activity as a regular practice.

      I declare under penalty of perjury that the foregoing is true and correct.

      Executed on _____.

                               _____
                               (signature of declarant)

                               _____
                               (name of declarant)

                               _____
                               (name of business/firm)

                               _____
                               (business address)

                               _____

                               _____

**2016R00024 - 103**

AO 110 (Rev. 06/09) Subpoena to Testify Before Grand Jury (Page 2)

## PROOF OF SERVICE

This subpoena for *(name of individual or organization)*   Theranos, Inc.

was received by me on *(date)*   .

&#9633;   I served the subpoena by delivering a copy to the named person as follows:

_____

_____   on *(date)* _____ ; or

&#9633;   I returned the subpoena unexecuted because: _____

_____

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# Exhibit 88



*United States Attorney*
*Northern District of California*

---

*1301 Clay Street, Suite 340S*                          *(510) 637-3680*
*Oakland, California 94612*                          *Fax  (510) 637-3724*

October 29, 2020

*By Email*

Lance Wade, Esq.
Kevin Downey, Esq.
Amy Saharia, Esq.
Katie Trefz, Esq.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, DC  20005

        Re:    *United States v. Holmes*, CR 18-258 EJD

Dear Counsel:

      Pursuant to your requests for discovery, we write to alert you to the following information, which you may view as potential *Brady*, *Giglio*, or *Jencks* information.  This supplements our letter to you dated July 9, 2019.  By making these disclosures, we do not necessarily agree that this information is responsive to Rule 16, *Brady*, *Giglio*, or *Jencks*, nor do we waive any applicable privilege or protection.

* * * * *

      1.    Government notes of a phone call with Pete Skinner on or about January 28, 2016, state in part:

> privately held
> few SHDs
>     sophisticated
>     employees
> no public offering
>
> tech
>     prop – h'ware, software, chem, protocol
> . . . .
> software enables TSPU and larger h'ware to hook up w/ cloud so machine can be used remotely & results viewed remotely
>     big data anal.

1

. . . .
co has not described to press – protocols and custom could be used by competitors
      4 min mile
      don't want other to reveal possibilities
can't disclose for competitive reasons
. . . .
co. did not keep control systems

    2.     On or about May 20, 2016, an AUSA, FBI agents, and a Postal Inspector met with attorneys from WilmerHale and Boies Schiller.  Notes of the meeting state in part:

2003-2013
      --pharmaceutical companies
      --small clinical lab
          --Safeway employees blood test
R&D lab vs. clinical lab
now – R&D and retail operation
      80 PhD employees

Theranos tech {      -collection process
                    -chemical process
                    -device
                    -software
. . . .
-200 tests/80 operational
-Arizona – moderately complex
      -not using proprietary machines
high throughput machine – runs many at [?]

Additional notes state in part:

2 clinical labs:  Newark, AZ
750 employees, 80 Phds
1000 patents

private co.
      85 investors
. . . .
barcode w patient name & test info
create shipping container
chemicals keep

automation to industry
. . . .
software
      apps for intake
      automate lab

2

>           allows to do for less cost

>       cloud software – can program the TSPUs remotely
>       big data implication & treat in a productive way

The additional notes also reflect statements made by Theranos' counsel about efforts the company was taking in response to the CMS review and other government inquires.

3.     Notes by a Postal Inspector of a call or meeting with Boies Schiller on or about June 30, 2016 state in part:

>       750 employees
>       85 shareholders
>       . . . .
>       software innovations – smaller needle & volume for venous draws
>       -Theranos using Edison for ELISA [?] (15 tests)
>       CLIA waiver for 35 machine for HSVI only

4.     Notes by a Postal Inspector of a meeting with WilmerHale, the SEC, the FBI, and others state in part:

>       Examined –   QC results,
>                    patient distribution
>                    proficiency testing
>       60,000 voided vs. 1.5 million total tests"

5.     Government notes of a meeting among the government, the SEC, WilmerHale, and David Taylor dated November 16, 2016 state in part:

>       SB loaned $$ to the co; EH never took out
>       . . . .
>       have resources at right team
>
>       Walgreens unraveling blew all of this up
>
>       clearly errors in the lab
>
>       emphasis on Edison, TSPU, + minilab = distortion
>       . . . .
>       2007-2010:  all resources into R&D
>               worked w/ #
>               established POC that the device worked
>               Testing more propel, more regularly would get better data
>       . . . .
>       fin record keeping not precise
>       . . . .
>       the CLIA lab misadventure

3

. . . .
8/2014 – Wag increases projections, 500-2500
3 stores in PHX
5/14 – 20
41 total by 9/2014
. . . .
DNK why roll out stalled
       CFO issues
       new management
       failed Express Scrips

    6.      Notes by an SEC attorney dated December 16, 2016 of a "Call with Wilmer" state in part:

Prosecution update
. . . .
Spreadsheet w/ LIS – response 14 &15 first stop
. . . .
LIS spreadsheet (12/9)
2 diff [?]

    7.      Notes by an SEC attorney dated December 2016 of a "Call with Wilmer Hale" state in part:

3.  Spreadsheet – LIS – proprietary / third party equipment
. . . .
LIS spreadsheet – this week's production
. . . .
4.  Investor meeting this week . . . shift in strategy, return to TSPU, focus on NICUS-development

    8.      Notes by an SEC attorney dated March 13, 2017 of a "Call with Winston Chan" state in part:

2/27:  Anti Kohrhonen

    9.      Notes by an SEC attorney dated March 16, 2017 of a "Call with Wilmer" state in part:

2 files for 2 lab [?]
Originally used LabDaq
At some point in early 2013; decision made to [?]
    --T LIS – Intell. Property
LabDaq continued in parallel of LIS from October 2013 thru middle June 2014
Past bridge from LabDaq to LIS
Only venous collections went into LabDaq
Any finger stick is in LIS

4

Data . . . out of LabDaq file is venous
After June 2014, LIS has every record – include . . . finger v. venous
No finger stick in LabDaq @ all
LabDaq had data from demos [?]
. . . .
Can't say @ what point every tech demo is recorded in LIS
. . . .
Can try provide data in native file

--compilation of test by device
. . . .
Device "unknown" on spreadsheet?

10.     Notes by an SEC attorney dated March 16, 2017 of a "Call with Wilmer Hale"
state in part:

4.  Do they have spreadsheets showing unique tests by device?

8.  Request 13 and 14 spreadsheet
Originally used commercially available LABDAQ available system
Early 2013 – decision made to develop proprietary system
LIS, which would house data
October 2013-June 2014 – developers created abridge all data in LABDAQ in LIS
Only venous collections went into LABDAQ
All fingerstick collection in LIS
LABDAQ included pre-commercial lab data prior to Walgreens launch.
There are results that signify was conducted for demo and not lab patient
Produced only commercial testing data

*will check that can put data in excel
*will check on fingersticks prior to bridge being created

11.     Government notes of a meeting with Wilmer Hale on or about May 18, 2017 state
in part:

voided 10% of the tests – QA wasn't in place
. . . .
AZ AG
        reimb -- $ to patients, mostly going to Walgreens
        we reimbursed everyone
        AZ published a complaint
. . . .
thought it could take 1 month to get assays into box(?)
        thought a mere step from R&D to clinical lab
        PFM knew that 20 samples not suff.

5

12.     Undated notes of a government call with WilmerHale attorneys state in part: "data re tests – more refined, next week, 13-15."

13.     Notes by an SEC attorney dated April 16, 2017 of a "Call with Wilmer Hale" state in part:

> "Live cycle documents – when will be produced?"
> . . . .
> Tender offer on hold.  . . .
>
> Notes by an SEC attorney dated May 1, 2017 of a "Call with Wilmer Hale" state in part:
>
> $43.5 payment made today
> . . . .
> •     Don't know about company's cash position
> Company will continue with tender offer and clock starts ticking once TRO has been lifted
> . . . .
> Unproduced texts . . . will review and produce only business related texts

14.     Notes by an SEC attorney dated May 17, 2017 of a "Meeting with Wilmer Hale" state in part:

> 2      Future plans
> Tender offer – Wilson Sonsini – fundraising method has changed
> . . . .
> $60mm cash in hand left as of April
> $10mm burn rate per month
>         --over half of burn rate is legal
> Trying to get advancement of legal fees $10-15mm
>         $30mm total
>
> Walgreens – want to settle
>
> Make submissions on 5.0 through 2018
>         --Need $100m to survive until 2018
> Existing investors – not sure if existing investors will put in more $
>
> --new investors
>         Banks
>         One-off investors –wealthy families
> --monetizing the IP
> . . . .
> IP Is valuable, not a lot of prior art
>         --exploring loans secured by IP
> . . . .

6

$550mm have accepted tender offer from C-1 and C-2

15.    Notes by an SEC attorney dated November 29, 2017 of a "Call with Rob Khuzami" state in part:

▓▓ : Fortress wants to make sure no misunderstanding regarding the financing of Theranos
--explain what the financing looks like
Don't want any surprises
. . . .
Not looking to get any blessing from the SEC

▓▓ : We cannot give blessing
We cannot disclose parts of investigation or where is headed
▓▓ : we can answer any questions about use of proceeds

▓▓ : Don't want clients to be shocked if we say nothing
Don't want to be position where Fortress asks why we didn't warn about the transaction

▓▓ : Fully understand that we will not get blessing.  Encourage us to ask questions – they want to be helpful.  Believe that ▓▓▓▓▓▓ will attend with Fortress.

▓▓ Feel free to reach out to Justice and we can coordinate
Noon looks fine for a meeting

16.    Notes by an SEC attorney dated June 23, 2017 of a "Call with Wilmer Hale" state in part:

(1)    Fundraising – whether secured by assets, underwriters assisting, what timing, who leading communications, term sheet, list of poss. Investors
. . . .
(6) Search terms – narrow date range
. . . .
(9)  Theranos considering a debt raise
Putting together term sheet
--seek funds from current investors, before going out
Need bridge capital
Convertible notes, not secured
. . . .
Offered to C-2 investors who participated in settlement.
. . . .
Holmes texts . . . did not include intensely personal nature may exclude personally embarrassing
There is a concern that she is a public figure
--included other private things – excluded

7

17.     Notes by an SEC attorney dated July 5, 2017 of a "Call with ████████ (Wilmer)" state in part:

> Elizabeth Holmes and David Taylor are interacting with investors.
> Company is at a critical juncture at now – will have a chilling impact on the company's survival

18.     Notes by an SEC attorney dated July 20, 2017 of a "Call with Wilmer Hale" state in part:

> (6) Fundraising . . . hoping to finalize Walgreens deal this week.

19.     Notes by an SEC attorney dated July 28, 2017 of a "Call with Wilmer Hale" state in part:

> Theranos has not received a commitment to invest
> --has not provided term sheet to others aside from list
> Have provided the term sheet to bank
> Applied Capital – TCP Advisory
> Provided IP to Perkins Coie – no update
>
> Company projected $43mm cash on hand
> --had heard burn rate of $10mm per month
>
> Walgreens settlement . . . . .
> Plaintiffs injunction to stop Theranos from paying out class certification.

20.     Notes by an SEC attorney dated August 12, 2017 of a "Call with Wilmer Hale" state in part:

> (7) Still hoping to raise more capital survive longer
> Involved in a study at UCSF regarding efficacy of assays on the TSPU
> --hoping they are on the right track
> "whatever you think of Elizabeth and company," technology is promising
> . . . .
> Trying to do what they can with $ they have

21.     Notes by an SEC attorney dated August 7, 2017 of a "Call with Wilmer Hale" state in part:

> (2)     $43.6mm cash position
> Plan is to raise money, IP investors – no commitments

22.     Notes by an SEC attorney dated November 17, 2017 of a "Wilmer Hale Mtg" state in part:

8

TS . . . believe a resolution around 17(a)(3) fits the facts
. . . .
10b-5 would be devastating even if EH [?] than company
. . . .
Cooley & DWT are in a better position
   --they believed they were saying when said it
   --case is largely circumstantial
. . . .
Sophisticated investors . . . w/o . . . diligence
   --inexperienced management is relevant to the state of mind
. . . .
Reality is the charges will be death . . . of the company
. . . .
DT . . . Fortress 100m debt facility
   Targets Thanksgiving; end of month
   Need to get certain shareholders [consent?]

23. Undated SEC notes state in part

  $100M debt facility with Fortress
    --up to date on what is going on with SEC
  Targeting Thanksgiving for close – end of month
  Most of largest shareholders have been told and are supportive
  Madrone, Devos, PEER – largest shareholders will need to vote
  Against the whole IP
    --SPV that holds IP, Fortress owns it
  Debt covenants are strong
    --terms of loan for 3-5 years

24. Notes by an SEC attorney dated November 29, 2017 of a "Meeting w/ John Dwyer & Steve Neal" state in part:

  If Fortress goes through; carries through end of 2018
  . . . .
  Current view is it makes company [secure?]

25. On numerous occasions, including on December 18, 2017, government attorneys had phone calls with lawyers at WilmerHale representing Theranos.  During these conversations, the parties discussed Wilmer's rolling document productions made in response to outstanding grand jury subpoenas.  The conversations addressed a variety of topics, including Wilmer's set of search terms, and the government's request to Wilmer to supplement its search terms.

26. Notes by an SEC attorney dated December 19, 2017 of a "Meeting with John and Steve" state in part:

  SN . . . If meet Fortress plan requirements, company would be ready for an IPO in ? years

9

JD . . . Board thinks EH should be at the helm today.  Whether she should stay on after IPO is a question, but don't want to take that off the table.

. . . .

If she cannot be the CEO of Theranos after IPO, that would be taking away the option – some value to shareholders

. . . .

The loan that company gave her to purchase the stock

    --no money changed hands

    No ill-gotten gain

The stock is going to be a significant issue

Believe the fraud, if any, would have started 2013 with the C-2 round

Believe that the investors were playing with play money and did not conduct adequate due diligence

November 2013-2015 during C2 round

. . . .

Her ability to pay is based on her salary – contingent on company going forward

She doesn't have a million dollars to give us now

█  Need a multiple of her salary – millions

27.    Notes by an SEC attorney dated February 14, 2018 of a "Call with Wilmer and Cooley" state in part:

█. The language is important to EH

. . . .

The staff isn't required to plead fraud or deceit

Haven't seen anything to support that

Written and oral communications

    --gap between what was said and what was heard

Inventors were talking about potential of invention, rather than current state

Risky and ambitious plan but investors understood risks.

What happened with FDA – not relevant

█ . . . communications with FDA don't have anything to do with investors.

█:  client was young and inexperienced

She relied on others for their experience and put in place knowledgeable advisors

There is a stumbling on execution of business plan

 and a lack of procedures in place for a company moving forward quickly.

    -EH can live with this

SEC can typically show self-dealing

    -no self-dealing

    Acknowledgment would go a long way

Process and procedures are getting better

    --would be helpful to see in a complaint

10

███ : We have the challenge of reconciling complaint with complaint against Balwani.

. . . .

███ : This is a unique case
Have not seen misstatements that can tie to particular individual.
Citing specific misstatements will be easier to get sign-off on

. . . .

███ : . . . What is important is this be described in a manner that reflects recklessness and not a scheme intended to defraud
This is not a case where principals are keeping separate set of books.
Ample evidence of lack of maturity, rather than desire to mislead people
There are explanations for what was said

. . . .

███ is finalizing a privilege log
     Trying to work with document certification to modify.
███ : In the process of getting tax returns and bank statements.

17.     Notes by an SEC attorney dated March 12, 2018 of a "Call with Wilmer and Cooley" state in part:

> Have proposed final edits to board
> Overreaching thematic point – complaint makes it seem like this was a Ponzi scheme
> . . . .
> Haven't tried to soften the language
> . . . .
> Draft of document at Wilmer's or Cooley's office
> . . . .
> Fraudulent scheme is stricken from the summary
> Read like no intent to develop a technology that was viable
>
> Theranos and Holmes were reckless in making these statements, often being unclear about status of technology nor did their descriptions of tech reflected current status of technology given developments to date
> . . . .
> Fortress warrant is not included in the 625 number

18.     Notes by an SEC attorney dated March 13, 2018 of a "Call with Cooley and Wilmer" state in part:

> (2) Para 3 – "virtually every aspect" "many" fine
> . . . .
> Knew there was substantial cash coming in   <u>no</u>
> Even if not revenue
>
> (7) Para 93 – delete 'defrauded' in front of investors.  <u>No</u>

11

19.     In advance of Wilmer's March 14, 2018 production to the government that was labeled THER-2609026 through THER-2627934, and included blood test lab reports generated via Theranos' LIS and LABDAQ systems, the government and attorneys at Wilmer discussed the fact that Wilmer would be withholding from its production certain test results, such as those that reference CD4+T-Cell test results.  These telephone conversations, between Wilmer and the government, occurred over the course of several dates, on dates unknown, but likely in or around February and March 2018.

20.     Notes by an SEC attorney dated March 22, 2018 of a "Call with Jeff and John" state in part:

> (2) Theranos has funding runway through the summer.  IEEE evaluated IP portfolio and one of the top 3 companies – ½ billion dollars
> Will start laying off people soon

21.     On or about April 8, 2018, the government hosted an in-person meeting at the USAO in San Jose with one or more lawyers from WilmerHale regarding Theranos. ███████ ██████ is believed to have been present for this meeting.  The government understands that WilmerHale asked for the meeting to update the government on developments at Theranos, including the purchase of some of its intellectual property by Fortress.  David Taylor was present for this meeting.  At this meeting, someone, believed to be David Taylor, stated in substance that Theranos's "runway" would last until July 2018.

22.     In or about April 2018, attorneys at WilmerHale asked to meet with government supervisors in the event the line prosecutors recommended charging the corporation.

23.     On or about April 26, 2018, ████████████████ of WilmerHale stated to the government:  "the Company will be producing all lab reports held in LIS from the commencement of retail patient testing to about September 19, 2015 (when the CTNs ceased being used), including unredacted HIV test results.  We will reproduce the lab reports from the period covered by the prior production to include these HIV test results."

24.     On or about May 4, 2018, counsel for Mr. Balwani wrote the government:

> Thank you again for meeting with us last Friday with your team.  We hope that you will agree with us that Sunny's liability for Theranos-related matters, if any, will and should be fully addressed by the civil actions, including the pending SEC enforcement case in San Jose, the Attorney General's action and pending class action lawsuit in Arizona, and the pending class action lawsuit in San Jose.  As we discussed, the burden of those cases is very substantial and will fall almost entirely on Sunny's shoulders.

> "If any event, I wanted to let you know that we had a discovery conference with SEC counsel yesterday, and agreed that we would receive the Commission's

12

initial disclosures on May 17, with the documents they obtained from third parties to follow within a reasonable time after that, subject, we are told, to the workload of their document processing department. We expect to receive this material and additional material we have requested within the next two months, or perhaps sooner. Although of course we understand that your office has conducted its own investigation, we assume that the Commission's case at least overlaps with the evidence relevant to the criminal investigation.

Whether we agree on the proper course of action in this matter, there is no question that the case is highly complex, involving a great many documents and witnesses, and thus if indicted would consume substantial time and resources on both sides. Before the government commits to that process -- which regardless of outcome would dramatically alter not only Sunny's life but also the lives of his family members who look to him for support and leadership -- we think that the government as well as Sunny would benefit from a discussion of more of the specific evidence that we will receive from the SEC, and perhaps from your office if you are willing to provide any pre-charge discovery in the form of a reverse proffer or otherwise. As we discussed last Friday, we believe that even the limited number of SEC transcripts we received only a week before our meeting cast substantial doubt on the investor fraud allegations in the Commission's case, particularly regarding Sunny's intent. For this reason, we believe that the government could only benefit from further dialogue that takes into account  additional evidence and such of the government's charging theories that you may be willing to share.

25. On or about May 10, 2108, counsel for Ms. Holmes wrote the Attorney for the Government stating, in substance, there were two factors why no prosecution was warranted: "virtually no evidence . . . to support a jury finding that Ms. Holmes acted with an intent to deceive" . . . and "your office has, to date, given insufficient weight to Ms. Holmes' settlement with the [SEC]."

26. On or about May 16, 2018, counsel for the government wrote WilmerHale as follows:

Hi Wilmer folks,

Can we have a call today or tomorrow to talk about a few outstanding items on the to-do list? So you can have the right people on the call, here are the topics we'd like to discuss:

• Timing of production of 2016 and 2017 documents, and Theranos's proposed privilege filter
• Production of additional items requested in subpoena served on April 20, i.e., lab data, exemplar devices, and materials re advertising / marketing
• Updates regarding Brad Arington's knowledge of a false statement made by Holmes to the FDA / CMS

13

Jeff and I are available toward the end of the day today and generally available tomorrow, so please let me know what times might work for you.

27.     On or about May 30, 2018, attorneys from WilmerHale stated to attorneys for the government: "Would you guys have time for a brief conversation today with ████ and me (and perhaps David Taylor as well).  We'd like to catch up with you on the status of the Company's sales efforts."

28.     Shortly before on or about June 1, 2018, the government had a call with several attorneys at Wilmer (representing the company) and the Theranos GC.  It was said that Theranos was in the process of looking for a buyer for its assets (mainly IP).  There were several upcoming dates that were allegedly important to the sale process.  Those dates were June 15, July 15, and August 15.  It was requested that the government not indict anything or anyone, but if it did, it was requested that the government delay indictment until after August 15.  If that was not doable, it was requested that the government consider delaying until after July 15, or even June 15.  It was said that each "fifteenth" that passed without additional negative publicity would make a sale more likely.  It was also claimed that a sale was the only way investors would see ROI.

29.     Notes by an SEC attorney dated June 18, 2018 of a "Call with ████████████" state in part:

> Joint defense agreements
> PFM depo videos
> Colman depo transcripts/videos
> Website captures
> QAD preservation
>
> Extremely low on cash and people
> QAD has been preserved / website preserved

30.     On or about July 23, 2018, an attorney of a law firm representing individuals interviewed by the government stated that the attorney "wanted . . . make sure you [i.e., the government] were aware of the . . . sales of Theranos assets."  The attorney noted "[w]e have heard rumors that this was done in a manner specifically to avoid the use of the Theranos name."  The attorney referred the government to the following website:

https://www.bidspotter.com/en-gb/auction-catalogues/bschilc/catalogue-id-bschilc10084

31.     On or about July 25, 2018, an AUSA wrote several attorneys at WilmerHale as follows:

> Wilmer team,
>
> Thanks again for taking the time to speak to me the other day.  I wanted to follow up on the topics we discussed to make sure we're on track to wrap everything up

14

in the next couple weeks.  In particular, I thought it would be helpful to set some compliance deadlines as laid out below.

**Production of Devices**

Thanks for providing the description of the devices in Theranos's possession.  If you'd like us to consider postponing our request for a given model on the grounds that the company only has one copy and needs access to it in the short term, please identify which models that applies to and briefly explain the need for the company to retain possession.  Please provide this information by Monday, July 30.  As to any unique devices we don't get in this round, the government would expect Theranos to maintain them in the company's possession without altering them or relinquishing custody to any other parties.  Speaking of which, I've looked into your question regarding the anticipated request from Holmes and Balwani for those same devices.  I've found no support for the proposition that a party is excused from complying with a grand jury subpoena on the basis of a competing request from a defendant—especially where the grand jury subpoena was served first and the Rule 17 subpoena has not been issued.  It's routine, of course, for the government to take possession of unique evidence items relevant to a criminal prosecution.  Defendants have a right to inspect such evidence seized by the government, but they don't have the power to deprive the government of that evidence by making competing requests.  Please let me know if you have any authority to the contrary.  Based on our understanding of the law, we don't think it would be appropriate for Theranos to delay production to the government based on a conversation it had with defense counsel.

The deadline for compliance with the request for devices is <u>August 8, 2018</u>.  Please deliver the requested devices to the FBI or have them ready for pickup by that date.  As a reminder, that subpoena request also included samples of other proprietary devices including the sample collection device and nanotainer.

**Remaining Documents & Privilege Filter Issues**

On the topic of 2016-2017 docs, we've received one production and understand you are preparing an additional production.  The additional production will include, among other things, communications with non-lawyer third parties that were withheld based on your initial privilege filter.  Please also include in that production any non-privileged documents to, from, or mentioning Heather King.  Given her expansive role at the company and her involvement in relevant events, we can't accept a production that simply excludes anything with her name on it.  We are fine, however, with Theranos keeping ████████ name on the privilege filter, based on your representations that his role was mainly limited to contracts and IP and the fact that any communications between him and non-lawyers outside of Theranos will be captured and produced as discussed above.

15

The deadline for compliance with this document request is <u>August 20, 2018</u>.  Please let us know by August 8 if Theranos won't comply so that we can determine next steps.

**LIS Database + Software**

I understand from our conversation that you've received the LIS database from Theranos and are preparing it for production to us next week.  To comply with the subpoena, please complete that production—including any software necessary to access and query the database—by <u>August 10, 2018</u>.

Please feel free to reach out by email or phone if you'd like to discuss any of the above.

32.     On or about July 30, 2018, an attorney with WilmerHale wrote the government:

Thank you for speaking with us, we very much appreciate your time.  Pursuant to our conversation last week, we wanted to circle back on the open items discussed on our call and in your email below.

**Production of Devices**

At this time, Theranos would appreciate postponing the requests for certain devices identified below.  Currently, only a single copy of each of these device versions exists, and the Company hopes to retain these unique devices so that it can demonstrate the evolution of its technologies to potential buyers or other potential partners.

- Theranos Bench Prototype
- Theranos Monolab
- Theranos Minilab 4.1-TC

Additionally, it appears that two miniLab 4.1 devices were incorrectly identified as the previous miniLab 4S versions.  As such, the Company will not be able to provide a version of the miniLab 4S, as most of these devices were disassembled and reused to build the miniLab 4.1 in 2015 and early 2016.  The Company is working to prepare its devices for transport and is happy to have these devices ready for pickup before August 8th (if possible, we believe scheduling a pickup for Monday, August 6th would work well on our end).  As we have discussed, we would appreciate it if this pickup could be handled with discretion.  We will provide you with a list of the devices we will have ready for pickup, and are of course happy to work with you and/or the FBI to arrange for the pickup of these devices.  Please don't hesitate to let us know if you have any other questions on this front.

**Remaining Documents & Privilege Filter Issues**

16

We are continuing to discuss this issue with our client and hope to get back to you shortly. We will circle back by August 8th to let you know our preferred option(s) on this front and to discuss next steps.

**LIS Database + Software**

We are working with the Company to prepare the LIS database for production. We have also been in touch regarding your request for additional information on any proprietary software necessary to query the LIS database, and are working with the Company to better understand this issue. Thus far, we have determined that the following software/operating system(s) will be necessary to restore and query the database:

- Microsoft SQL Server Enterprise License on Windows Server 2012R2
- SQL Server Management Studio 2014 Management Studio or any other standard software to query SQL Server database

Because the above software/operating system(s) are technically the property of third parties, we feel it is appropriate for you to obtain access via the relevant third parties. We are of course happy to work with you and provide any other information to assist you in this regard.

Thank you again for your time, and please don't hesitate to let us know if you have any questions or would like to discuss any of the above. We will of course circle back on these open items per your email below.

33.     On or about August 7, 2018, an attorney for WilmerHale wrote the government:

We are prepared to turn over the devices listed below. As we've discussed previously, these are the devices for which Theranos has more than one copy. I also included packaging dimensions and item weights so you can coordinate appropriate sized vehicle and resources for loading. There will be total of six (6) packages for pickup.

Please let us know when the agent or agents will be available to pick up the devices. We have a preference for 2pm on Wednesday, August 8th, but if that time does not work on your end we can find another time that works.

**Testing Devices**
- Edison 3.5 (only THE-manufactured device used in clinical lab) -> *Edison35_40-01006_06AUG2018.jpg (14"-W x 20"-L x 20"-H, Weight ~40lbs)*
- miniLab Tower -> *miniLab-Tower_40-01000_06AUG2018.jpg (Pallet 28"-W x 67"-L x 28"-H, Weight ~300lbs)*
- miniLab 4.1-Full -> *CASE_T41-C010_miniLab41-FULL_40-01016_06AUG2018.jpg (Case 28"-W x 32"-L x 26"-H, Weight ~130lbs)*

17

- miniLab 4.1-Lite (version used for UCSF study) -> **CASE_T41-C033_miniLab41-LITE_40-01019_06AUG2018.jpg (Case 28"-W x 32"-L x 26"-H, Weight ~110lbs)**
- miniLab 4.1-TC V2 (current version, used in R&D for Zika) -> **CASE-T41-C023_miniLab41-TCv2_40-01024_06AUG2018.jpg (Case 28"-W x 32"-L x 26"-H, Weight ~120lbs)**

**Collection Devices & Cartridges ->**
*Packed_TSCD&Cartridges_06AUG2018.jpg (small box, content pictures included for reference as described below)*
- TSCD -2 (LiHep) -> *TSCD2_50-00120_LiHEP_06AUG2018.jpg*
- TSCD -2 (EDTA)  -> *TSCD2_50-00121_EDTA_06AUG2018.jpg*
- Zika, fully assembled, with reagents (recent R&D use) -> *Cartridge_60-00186_06AUG2018.jpg*
- Training cartridges, fully assembled -> *Cartridge_60-00187_06AUG2018.jpg*

At this time, Theranos will not be providing the devices listed below because it only possesses one copy of each.  You will note the addition of two cartridges to this list.

- Theranos Bench Prototype
- Theranos Monolab
- Theranos Minilab 4.1-TC
- HSV-2 IgG Assay Cartridge
- Custom Potassium Cartridge

Please let me know if you would like to discuss or if there is a particular agent or agents with whom we should be coordinating.

The attorney attached photos of the referenced devices.

34.     On or about August 27, 2018, ████████ wrote government attorneys: "Attached please find the transmittal letter accompanying today's production of Theranos' LIS database.  The media will be delivered via courier today.  The encryption key is 7Dh$fsB!dgs&6Fes!."  On August 29, 2018, a government attorney replied:  "We've received that production—thank you.  Please provide a status update on Theranos's plans regarding the outstanding 2016-2017 documents at your earliest opportunity.  In order for us to determine appropriate next steps, it would be helpful for us to have a clear statement of the company's intentions with respect to complying with the subpoena.  Separately, we discussed obtaining the deposition transcripts from the Colman litigation.  I understand that under the protective order you needed to provide notice to certain parties.  Has that issue been resolved such that you can send us the transcripts today?"  On or about September 4, 2018, ████████ wrote attorneys for the government: "I understand that ████ has been in touch with you to advise you that Theranos intends to make a fully responsive production next week, upon consideration of John's email below. Am I correct that you nonetheless intend to file a motion to compel (which I assume would make clear that DOJ is seeking, among other things, non-privileged

18

communications from lawyer custodians), notwithstanding that (1) you will shortly be getting everything you asked for (and more); and (2) John's email made quite clear that we were to contact you before COB today if we wanted to avoid motion practice (which we do)? I'm not sure what would be the relief seek in your motion, if you do intend to file one. And I'd personally find it disappointing if you do intend to file a motion where we were given time to and did consider your position — and are giving you what you've requested. I assume that you would not be using this motion to cast the Company in a negative light to support your indictments.  I am taking time away from my vacation out of the country to respond to this, and I would hope that we could have your professional courtesy."

35.     On or about September 4, 2018, ████████████ wrote to attorneys for the government: "I now understand that it is Mr. Balwani's counsel that intends to file a motion to quash the subpoena. If that is not correct, please let us know. If, however, the below is right, we would like to continue meeting and conferring."  An attorney for the government replied: "Thanks for reaching out.  I think your first email was based on a misunderstanding and that you have things straight now.  The sole purpose of a motion to compel is to obtain the documents covered by the subpoena.  If Theranos is going to produce those documents pursuant to the subpoena and without the need for further court order, there's no need for any such motion.  I understand from speaking to ████ a few minutes ago that Theranos is processing the production now and that we'll get it as soon as it is ready next week.  I also understand that Theranos intends to produce those documents regardless of any motion that Mr. Balwani's lawyers might file in the criminal case.  If that's correct, I expect that the issue I raised in my September 1 email will be resolved with that production.  Please let me know if I'm misinformed about the company's plans.  Thanks again for taking the time to write.  I appreciate your attention to the matter and hope you enjoy the rest of your vacation."

36.     Shortly after receiving an encrypted hard drive with what was purported to be "a copy of Theranos' LIS database" on or about August 27, 2018, FBI Agent Scussel, at the direction of an attorney for the government, sent the encrypted drive by Federal Express to a paralegal in the USAO.

37.     On or about September 5, 2018, a USPIS representative not connected to the investigation forwarded to Chris McCollow a newspaper article to the effect that Theranos was shutting down.

38.     On or about September 12, 2018, ████████████ from WilmerHale stated to the government that the company was probably dissolving that day and that WilmerHale would not be able to act for the company after that.  ████ indicated WilmerHale was still planning to produce a final batch of documents to the government at the end of the week.  She also provided the name of the assignee and the law firm representing the assignee.

39.     On or about September 12, 2018, a paralegal in the USAO reported to an Automated Litigation Support (ALS) supervisor with the USAO that she had two hard drives in her possession.  The paralegal indicated she had wanted to send one of the hard drives to the ALS supervisor, that is was a 1 TB drive but that she was not sure what the data size was; her computer was not detecting the data size.  The paralegal planned on sending the hard drive to the IT department of the USAO to take a look.  If the IT department was able to fix it, the paralegal

19

planned to have the IT department give it to the ALS supervisor.  The paralegal indicated if the IT department was able to fix it, she would execute routine ALS forms to provide details on what the paralegal wanted done.

40.    Later on or about September 12, 2018, the ALS supervisor agreed to the paralegal's plan and offered to look at the drive as well, noting ALS had its little tricks to try and coax drives to play nice.  The paralegal advised that after a call with an IT department representative the paralegal decided to send the drive directly to ALS for processing.

41.    On or about September 14, 2018, the ALS supervisor advised the paralegal, an IT department representative, and a USAO employee in the ALS unit that she had received the drive that afternoon but it was not playing nice for her either.  She reported receiving the following message on both her workstation and a standalone computer:



The ALS supervisor initially guessed that that the drive might be formatted for a Mac or simply corrupted.  She discussed the matter with an IT department supervisor and the USAO employee in the ALS unit, who wondered whether the entire drive might be encrypted as a VeraCrypt (or TrueCrypt) volume.  The ALS supervisor noted that if that were the case, the ALS unit would need a password to unlock it.  She asked whether the originator of the drive provided any documentation as to the contents and/or a password?  She provided a scan of the drive label to assist in tracking down a password.

42.    On or about September 15, 2018, the paralegal reported to the ALS supervisor, the IT department representative, and the USAO employee in the ALS unit that she had found the hard drive is password protected and provided the following password: 7Dh$fsB!dgs&6Fes!

43.    On or about September 18, 2018, the ALS supervisor advised the paralegal and the USAO employee in the ALS unit as follows:

It looks like [the USAO employee in the ALS unit's] diagnosis was correct; we couldn't see the contents of the drive because it's a VeraCrypt volume (a drive which has been encrypted using VeraCrypt).

Using the password you provided I was able to open it on the standalone, but now I just have further questions!

The contents of the drive *do not* appear to be load ready files, or natives, or any kind of forensic viewer. Rather, It looks like a set of backup copies of something, probably a database (the format is .bak).

20

Without knowing what sort of database these are from (or if they indeed are database backups) it's very hard to figure out how we might extract the data (or even if it's possible for us to do so).

It also raised the question that perhaps these are simply backup copies of material that has already been provided to our office.

Was there any documentation provided when the drive was delivered?

If you could send along any additional info you have about this drive that would be great; I'm also happy to speak with an agent if you have a point of contact for this material.

The ALS supervisor also provided the following screenshot:



44.     On or about September 20, 2018, the government spoke with attorneys from Dorsey representing the Assignee.  The call participants discussed state law governing assignments for the benefit of creditors, the contract governing the assignment, board and shareholder approval, Fortress, and the Assignee's approach to privilege.

45.     On or about October 4, 2018, the government paralegal advised the ALS supervisor (and attorneys for the government) of an upcoming vacation through October 19, 2018, and inquired whether she was able to find the program that would enable the government to view the hard drive (described above).

46.     On or about October 5, 2018, the ALS supervisor advised attorneys for the government and the government paralegal about issues surrounding the hard drive. She noted she had discussions with her unit, the IT department, and the LTSC. She said the drive does not contain material which could be processed in house or by the LTSC. She said the drive contains 12 BAK files totaling about 830 gigabytes. She said the .bak extension indicates that the files were most likely backup files for a Microsoft SQL database. She said if that was correct such files would be used to restore database backups on a Microsoft SQL Server. She said .bak is a common extension and without documentation of what the drive was meant to contain she could only make an educated guess that these were database backups. She said because they were archive files the size of the data could increase when restored. She said the material was not provided to the USAO in a format that can be extracted, viewed, or processed by available software. She said the LTSC's EDD [electronic data discovery] software can only digest SQL.bak files if they are under 300 mb. She suggested a possible route forward of pushing the producing party to see if the party could be persuaded to produce in a manner that can be viewed and processed in a standard way rather than an unspecified archive format the government could not access. She suggested encouraging the producing party to consider handing over its physical SQL server and setting it up in a workroom. She suggested checking with the FBI or other agencies to see if they have resources that can process large SQL database archives. She suggested identifying a vendor who could process the material and noted the data size and labor cost could be staggering. She offered to set up a call or meeting to discuss the issues further.

47.     On or about October 30, 2018, the government paralegal advised the ALS supervisor she had met with attorneys for the government and the group decided to pursue the options of pushing the producing party to see if it could be persuaded to produce in a manner that can be viewed and processed in a standard way rather than an unspecified archive format the government could not access and checking with the FBI or other agencies to see if they have resources that can process large SQL database archives. The government paralegal also advised the ALS supervisor to return the hard drive when she had a chance. Around that time, the ALS supervisor did so. The hard drive remained in the possession of the government paralegal until around the spring of 2020.

48.     In approximately October and November of 2020, counsel for the government was in contact with counsel for the assignee at the Dorsey law firm on a variety of topics. During those discussions, government counsel noted that the government had been unable to access the copy of the LIS database produced by Theranos. Assignee counsel expressed a lack of surprise that the government was having difficulty accessing the database, and offered to investigate whether the assignee had the database in a different form that would facilitate the government's access. During a subsequent conversation, assignee counsel reported back to the government that it had been unable to locate an alternative version of the LIS database that would allow access. Assignee counsel also informed government counsel that the LIS database was encrypted and that the assignee lacked the means to decrypt it. Assignee counsel opined that Sunny Balwani would likely be able to decrypt the database, but could not identify anyone else who they thought could accomplish the task.

49.     On or about January 14, 2019, the government paralegal advised attorneys for the government that ALS had tried to process the hard drive but does not have the software to process the discovery and proposed possible options of producing a native version, involving the

22

FBI computer forensics team, involving a third party, and/or reaching out to the source.  On or about January 29, 2019, the government paralegal provided a similar update.

50.     In March of 2019, government counsel contacted assignee counsel to ask some follow-up questions about how the LIS database came to be encrypted and decommissioned.  On March 21, 2019, assignee counsel emailed an attorney for the government and conveyed the assignee's understanding that Sunny Balwani and Shekar Chandrasekaran encrypted the LIS database.  In that email, assignee counsel also quoted David Taylor, former Theranos president, as stating that the LIS database was "the most comprehensive (though still not fully comprehensive) company repository of clinical information -- patient contact info, doctor contact info, test dates and results, etc.  It has, however, been decommissioned, and before the company formally closed we were advised that it be a herculean undertaking to get it up and running again."  Assignee counsel promised to speak to the assignee to determine whether they had any additional information.

51.     On March 25, 2019, assignee counsel followed up with an attorney for the government and passed along information from Jarod Wada at the assignee entity.  Wada confirmed that the assignee did not know who decommissioned the LIS database.  Wada also conveyed that Eric Caddenhead, former IT manager of Theranos heard that Shakar Chandrasekaran had been involved with the LIS database, and that Caddenhead had stated that the LIS database was maintained by a group outside of Theranos, Inc.  That email also conveyed that David Taylor had told Wada on several occasions "that the LIS was decommissioned and that prior to ABC, Theranos, Inc. had been told that it could no longer be reconstructed with the existing resources."  The assignee also reported that a company called FTI Consulting had done some work via WilmerHale on behalf of Theranos, and relayed from a representative of that company that FTI had not decommissioned the database.

52.     In or about March or April of 2020, an attorney for the government called WilmerHale attorney ████████████ and/or ████████████.  The purpose of that call was to inquire as to whether WilmerHale was in possession of additional passwords or other information that would allow the government to access the purported copy of the LIS database that had previously been produced by WilmerHale when it represented Theranos.  During that call or a follow-on call, the attorney(s) from WilmerHale confirmed that they did not have any such additional information beyond what they had provided earlier.

53.     In or about May 2020, Special Agent Scussel retrieved an encrypted hard drive from the USAO and took it to the FBI's RCFL.

54.     In or about June 2020, Special Agent Scussel retrieved an encrypted hard drive from the RCFL, returned it the grand jury file, and provided four copies to the USAO.

23

Very truly yours,

STEPHANIE M. HINDS
Attorney for the United States,
Acting Under Authority Conferred
By 28 U.S.C. § 515

*/s Robert S. Leach*

ROBERT S. LEACH
JEFFREY SCHENK
JOHN C. BOSTIC
VANESSA BAEHR-JONES
Assistant United States Attorneys

cc      Jeff Coopersmith, Esq. (by email)

24

# Exhibit 87

FOIA CONFIDENTIAL TREATMENT REQUESTED
5 U.S.C. § 552
17 § C.F.R. 200.83

WILMERHALE

December 17, 2016

**FOIA CONFIDENTIAL TREATMENT REQUESTED**
**PURSUANT TO 17 C.F.R. § 200.83 AND 5 U.S.C. § 552**


@wilmerhale.com

**BY FEDERAL EXPRESS**

Robert S. Leach, AUSA
U.S. Department of Justice
450 Golden Gate Avenue, 11th Floor
San Francisco, CA  94102
Tel: (415) 436-7534

      Re:    Grand Jury Subpoena Investigation #2016R00024-15

Dear Mr. Leach:

      We write on behalf of Theranos, Inc. ("Theranos" or the "Company"), our client in the above referenced matter.  Please find enclosed at THER-0333352 to THER-0335495 documents responsive to: (1) the grand jury subpoena duces tecum issued on November 30, 2016 (the "Subpoena"); and (2) requests made by the U.S. Department of Justice ("DOJ") during our November 16, 2016 meeting (the "November 16 Meeting Requests").

      SUBPOENA REQUEST

      In response to Request 3 of the Subpoena, please find a document labeled THER-0333352.

      NOVEMBER 16 MEETING REQUESTS

      In response to the DOJ's request for copies of all Theranos contracts with military entities and documents sufficient to show revenue obtained therefrom, please find documents labeled THER-0333361 to THER-0333436.

      In response to the DOJ's request for all nondisclosure agreements between the Company and Partner Fund Management, L.P. ("PFM") and PFM's agents, please find documents labeled THER-0333353 to THER-0333360.

      In response to the DOJ's requests for a listing of all tests performed between 2013 and 2015 on Theranos Sample Processing Units ("TSPU"), modified-predicate devices, and predicate devices, please find a copy of documents simultaneously being produced to the U.S. Securities and Exchange Commission ("SEC") today labeled THER-0333437 to THER-0335495.  These documents are being produced to the SEC in response to Requests 14 and 15 of the SEC's November 23, 2015 subpoena and Requests 16 and 17 of the SEC's September 6, 2016 subpoena.

Wilmer Cutler Pickering Hale and Dorr LLP, 1875 Pennsylvania Avenue NW, Washington, DC 20006
Beijing   Berlin   Boston   Brussels   Denver   Frankfurt   London   Los Angeles   New York   Oxford   Palo Alto   Waltham   Washington

Theranos-DOJ TL000004

Robert S. Leach
December 17, 2016
Page 2

**WilmerHale**

The sources for the data are two Theranos laboratory information systems, the Laboratory Information System ("LIS") and LabDaq, that the Company maintained during the relevant period.  Each record represents one result and provides the following information requested by the SEC:

- Year and month of the patient visit;

- The accession number associated with the patient visit;

- A description of each test and result;

- Identification of whether the result was direct or calculated;

- Identification of the lab that produced the result;

- Identification of whether the result was produced using a proprietary calculation or method; and

- Identification of the device that produced the result.

Please note the following about the data as well:

- The data does not include results from before the Company's commercial launch on October 13, 2013.  The data includes results up to July 30, 2016.

- Where the data does not distinguish between the Company's Palo Alto and Newark labs, results performed by the Company are identified as "Theranos Inc. – CA."

- Where the data does not distinguish among reference labs, results performed by reference labs are identified as "Reference Lab" (LabDaq) or "UNKNOWN – REFERENCE LAB" (LIS).

- Where the data does not identify the specific performing lab, the lab is marked as "UNKNOWN."

- Where the data does not identify the device used to perform the test, the device designation was left blank (LabDaq) or marked "UNKNOWN" (LIS).

- Where the LIS data does not explicitly identify whether the result was produced using a proprietary calculation or method, and where assumptions could not be made as to whether such a calculation or method was used, the technology designation was marked as "UNKNOWN."

ActiveUS 160110327v.1

Theranos-DOJ TL000005

**ER-2903**

Robert S. Leach
December 17, 2016
Page 3

**WilmerHale**

- Because certain test results appeared simultaneously in both LabDaq and LIS, duplicative data was eliminated where possible from the LabDaq-sourced data. There may; however, remain some duplicative data where such overlap was not possible to confirm.

Theranos intends to provide a supplemental response to the request for a listing of all tests performed on various devices between 2013 and 2015 in its next production.

We are producing these documents on an encrypted disc. We will provide the password for the disc by email.

The enclosed materials are being produced pursuant to the above-referenced Subpoena and the November 16 Meeting Requests, and subject to Rule 6 of the Federal Rules of Criminal Procedure.

*        *        *        *

These materials are confidential and contain competitively sensitive information. Accordingly, we request confidential treatment of this letter and the enclosed materials and any information contained therein pursuant to 5 U.S.C. § 552 and 17 C.F.R. § 200.83 ("Confidential Material"). The materials are exempt from public disclosure under one or more provisions of FOIA and have been appropriately marked to reflect this status. *See, e.g.*, 5 U.S.C. § 552(b)(3) (protecting matters specifically exempted from disclosure by statute); § 552(b)(4) (protecting trade secrets and confidential and privileged financial and commercial information); § 552(b)(7) (protecting certain records or information compiled for law enforcement purposes); § 552(b)(8) (protecting certain records or information prepared for the use of an agency responsible for regulating or supervising financial institutions). Moreover, disclosure of the materials may be prohibited under 18 U.S.C. § 1905, and further protections may be available under the Privacy Act of 1974, 5 U.S.C. § 552a.

Should any third person request the opportunity to inspect or copy the Confidential Material pursuant to FOIA or otherwise, we request on behalf of Theranos that the undersigned immediately be notified of such request and be furnished with a copy of all written materials pertaining to such request (including but not limited to the request and any agency determination with respect to such request). Theranos expects that it will be given an opportunity to object to such disclosure. And, should the Department be inclined to grant any such request, it is Theranos' expectation that, pursuant to the procedures required by 28 C.F.R. § 16.8, and Exec. Order 12,600, 52 Fed. Reg. 23,781 (1987), we will be given reasonable advance notice of any such decision to enable our client to pursue any remedy that may be available to it. In such event, we request that you telephone the undersigned rather than rely upon the United States mail for such notice.

ActiveUS 160110327v.1

Theranos-DOJ TL000006

Robert S. Leach
December 17, 2016
Page 4

WILMERHALE

    The requests set forth in the preceding paragraphs also apply to any memoranda, notes, recordings, or other writings of any sort whatsoever which are made by, or at the request of, any employee of the Department (or any other government agency) and which (1) incorporate, include, or relate to any of the information contained in the Confidential Material; or (2) refer to any conference, meeting, telephone conversation, or interview between (a) our client's current or former employees, associates, representatives, agents, auditors, or counsel and (b) employees of the Department (or any other government agency).

    Provision of the enclosed materials is not intended to and does not waive any applicable privilege or other legal basis under which information may not be subject to production.  By the production of such documents, Theranos does not intend to and has not waived the attorney client privilege or any other protections.

    This Confidential Material remains the property of Theranos.  Accordingly, at the conclusion of this investigation, Theranos requests such material (and any copies thereof) be returned to the undersigned.

    Please do not hesitate to call me if you have any questions about these matters.

Very truly yours,

Enclosure

ActiveUS 160110327v.1

Theranos-DOJ TL000007

JOHN D. CLINE (CA State Bar No. 237759)
50 California Street, Suite 1500
San Francisco, CA 94111
Telephone: (415) 662-2260 │ Facsimile: (415) 662-2263
Email: cline@johndclinelaw.com

KEVIN M. DOWNEY (Admitted Pro Hac Vice)
LANCE A. WADE (Admitted Pro Hac Vice)
AMY MASON SAHARIA (Admitted Pro Hac Vice)
KATHERINE TREFZ (CA State Bar No. 262770)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC 20005
Telephone: (202) 434-5000 │ Facsimile: (202) 434-5029
Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

Attorneys for Defendant ELIZABETH A. HOLMES


UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. CR-18-00258-EJD |
| | ) |
| Plaintiff, | ) **DECLARATION OF AMY MASON SAHARIA** |
| | ) **IN SUPPORT OF MS. HOLMES' REPLY IN** |
| v. | ) **SUPPORT OF MOTION TO EXCLUDE** |
| | ) **ANECDOTAL TEST RESULTS** |
| ELIZABETH HOLMES and | ) |
| RAMESH "SUNNY" BALWANI, | ) Hon. Edward J. Davila |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |


I, AMY MASON SAHARIA, declare as follows:

1.      I represent Defendant Elizabeth Holmes and have been admitted to practice *pro hac vice*

in the above-captioned matter.  I submit this declaration in support of Ms. Holmes' Reply in Support of

Motion to Exclude Anecdotal Test Results.  Attached to this declaration are exhibits cited in Ms.

Holmes' Reply in Support of Motion to Exclude Anecdotal Test Results filed today, February 23, 2021,

in the above-captioned matter.  I attest to the following facts upon which the Reply relies.

2.     In support of her Motions *in Limine* and *Daubert* Motions to Exclude Expert Testimony, Ms. Holmes filed 64 exhibits.  *See* Saharia Decl., Dkt. 579; *see also* Dkt. 580-583; Ms. Holmes' Administrative Mot. for Leave to File Documents Under Seal.  Ms. Holmes' Replies in Support of Motions *in Limine* and *Daubert* Motions to Exclude Expert Testimony filed on February 16, 2013 were supported by an additional 11 exhibits.  *See* Saharia Decl., Dkt. 722.

3.     Ms. Holmes' Reply in Support of Motion to Exclude Anecdotal Test Results is supported by an additional 30 exhibits attached to this Declaration.  Three exhibits (Exhibits 113-115) have been filed as attachments to Ms. Holmes' Administrative Motion for Leave to File Reply in Support of Motion to Exclude Anecdotal Test Results and Certain Supporting Documents Under Seal (Administrative Motion) because they contain sensitive information.

4.     The contents of each exhibit are as follows:

a.     Exhibit 86 is a true and correct copy of an email sent by Don Dyk to Special Agent George Scavdis, Food and Drug Administration, dated March 11, 2020, Bates-stamped FDA-CORR-000548.  Certain personal identifying information has been redacted.

b.     Exhibit 87 is a true and correct copy of a letter sent by WilmerHale to Robert S. Leach, U.S. Department of Justice, dated December 17, 2016, Bates-stamped Theranos-DOJ TL0000004).  Certain personal identifying information has been redacted.

c.     Exhibit 88 is a true and correct copy of a letter sent by Robert S. Leach, U.S. Department of Justice, to L. Wade, dated Oct. 29, 2020 ("*Brady* letter").  Certain personal identifying information has been redacted.  An unredacted version is being filed under seal as Exhibit 113.

d.     Exhibit 89 is a true and correct copy of an email between WilmerHale attorneys and David Taylor, summarizing a conversation with Jeffrey Schenk and John Bostic, dated May 23, 2018, Bates-stamped WH000003121.  Certain personal identifying information has been redacted.

e.     Exhibit 90 is a true and correct copy of an email exchange between WilmerHale attorneys and the Government, dated June 4, 2018, and WilmerHale attorneys and David Taylor, dated June 5, 2018, Bates-stamped WH000002107.  Certain personal identifying information has been

redacted.

f.      Exhibit 91 is a true and correct copy of an email from Lance Wade to Robert Leach, U.S. Department of Justice, dated February 4, 2021.

g.      Exhibit 92 is a true and correct copy of a Memorandum of Interview of JoEllen Embry by Special Agent in Charge George Scavdis, dated December 20, 2020, Bates-stamped US-REPORTS-0023800.

h.      Exhibit 93 is a true and correct copy of an email exchange between WilmerHale attorneys, David Taylor, and Xan White in May and July 2018, Bates-stamped TheranosABC00042459. Certain personal identifying information has been redacted.

i.      Exhibit 94 is a true and correct copy of a grand jury subpoena to Theranos, Inc., Custodian of Records, dated June 4, 2018.

j.      Exhibit 95 is a true and correct copy of an article by John Carreyrou in *The Wall Street Journal*, entitled "Theranos Deepens Workforce Cuts," dated April 11, 2018 and Bates-stamped USAO-007265.

k.      Exhibit 96 is a true and correct copy of an email exchange between WilmerHale, John Bostic, and Jeffrey Schenk, dated July 25, July 30, and August 6, 2018, Bates-stamped USAO-00868.  Certain personal identifying information has been redacted.

l.      Exhibit 97 is a true and correct copy of an email exchange between WilmerHale attorneys in August 2018, Bates-stamped WH000005242.  Certain personal identifying information has been redacted.

m.      Exhibit 98 is a true and correct copy of an email exchange between WilmerHale attorneys, Theranos employees, and John Bostic, Mario C. Scussel, Adelaida Hernandez, dated August 10 and August 13, 2018, Bates-stamped WH00000052.  Certain personal identifying information has been redacted.

n.      Exhibit 99 is a true and correct copy of a letter from WilmerHale to Special Agent Mario C. Scussel, dated August 27, 2018, Bates-stamped USAO-008988.  Certain personal identifying information has been redacted.

   o. Exhibit 100 is a true and correct copy of an email exchange WilmerHale, the Government, and Dorsey, counsel for Assignee, dated September 13, 14, and 17, 2018, and Bates-stamped USAO-008660. Certain personal identifying information has been redacted.

   p. Exhibit 101 is a true and correct copy of a July 23, 2020 letter between the Government and counsel for Ms. Holmes.

   q. Exhibit 102 is a true and correct copy of an email exchange between the Government and counsel for Ms. Holmes, between December 2020 and February 2021.  Certain personal identifying information has been redacted.

   r. Exhibit 103 is a true and correct copy of an email exchange between Mike Wei, Jarod Wada, and counsel for Assignee in October and November 2018, Bates-stamped TheranosABC00001770.  Certain personal identifying information has been redacted.

   s. Exhibit 104 is a true and correct copy of an email exchange from Michael Chung to Jarod Wada, dated January 12, 2019 and Bates-stamped TheranosABC00000268.  Certain personal identifying information has been redacted.

   t. Exhibit 105 is a true and correct copy of an email exchange between Michael Chung, Jarod Wada, and Eric Caddenhead in December 2019 and January 2020, Bates-stamped NEETEK_000001_00005.  Certain personal identifying information has been redacted.

   u. Exhibit 106 is a true and correct copy of a March 2019 email exchange between the Government and Dorsey, counsel for the Assignee, Bates-stamped USAO-008626.

   v. Exhibit 107 is a true and correct copy of an email exchange dated March 7 and March 11, 2020 between Lance Wade and John Bostic, Department of Justice.

   w. Exhibit 108 is a true and correct copy of letter from Lance Wade to the Government, dated March 13, 2020.

   x. Exhibit 109 is a true and correct copy of a letter dated March 19, 2020 from the Government to Ms. Holmes' counsel.

   y. Exhibit 110 is a true and correct copy of a letter dated March 23, 2020 from Lance Wade to the Government.

z.      Exhibit 111 is a true and correct copy of an FD-302 relating to an April 17, 2020 interview of Eric Caddenhead.  Certain personal identifying information has been redacted.

aa.     Exhibit 112 is a true and correct copy of an email exchange between Xan White and WilmerHale, dated June 13 and June 14, 2018, and Bates-stamped WH000003133.  Certain personal identifying information has been redacted.

bb.     Exhibit 113 is a true and correct copy of a letter sent by Robert S. Leach, U.S. Department of Justice, to L. Wade, dated Oct. 29, 2020 ("*Brady* letter").  An unredacted copy has been tendered as an attachment to Ms. Holmes' Administrative Motion.  A redacted version has been filed on the docket as Exhibit 88.

cc.     Exhibit 114 is tendered as an attachment to Ms. Holmes' Declaration in Support of Administrative Motion.

dd.     Exhibit 115 is a true and correct, unredacted copy of an email exchange between WilmerHale attorneys and the Government, dated June 4, 2018, and WilmerHale attorneys and David Taylor, dated June 5, 2018, Bates-stamped WH000002107.  A redacted version of this document has been filed on the docket as Exhibit 90.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.


Executed this 23rd day of February, 2021 in Chevy Chase, MD.



AMY MASON SAHARIA
Attorney for Elizabeth Holmes

JOHN D. CLINE (CA State Bar No. 237759)
50 California Street, Suite 1500
San Francisco, CA 94111
Telephone: (415) 662-2260 │ Facsimile: (415) 662-2263
Email: cline@johndclinelaw.com

KEVIN M. DOWNEY (Admitted Pro Hac Vice)
LANCE A. WADE (Admitted Pro Hac Vice)
AMY MASON SAHARIA (Admitted Pro Hac Vice)
KATHERINE TREFZ (CA State Bar No. 262770)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC 20005
Telephone: (202) 434-5000 │ Facsimile: (202) 434-5029
Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

Attorneys for Defendant ELIZABETH A. HOLMES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. CR-18-00258-EJD |
| Plaintiff, | ) |
| | ) **MS. HOLMES' REPLY IN SUPPORT OF** |
| v. | ) **MOTION IN LIMINE TO EXCLUDE BAD** |
| | ) **ACTS AND FALSE OR MISLEADING** |
| ELIZABETH HOLMES and | ) **STATEMENTS OF THERANOS AGENTS AND** |
| RAMESH "SUNNY" BALWANI, | ) **EMPLOYEES** |
| | ) |
| Defendants. | ) Date:     March 23, 2021 |
| | ) Time:    9:00 AM |
| | ) CTRM:  4, 5th Floor |
| | ) |
| | ) Hon. Edward J. Davila |
| | ) |
| | ) |

## TABLE OF CONTENTS

**Page**

I.  The Government Cannot Connect Ms. Holmes to the Exemplar Allegations in the Motion...................................................................................................................1

II.  The Remainder of the Government's Arguments Lack Merit. ......................................................2

CONCLUSION.....................................................................................................................3

The government appears to misunderstand Ms. Holmes' Motion (Dkt. 565) to exclude alleged bad acts and false or misleading statements of Theranos agents and employees that lack the requisite connection to Ms. Holmes. Ms. Holmes' Motion is directed at such acts and statements that lack a legally valid connection to Ms. Holmes. Ms. Holmes provided several examples, drawn from the government's Rule 404(b) disclosures and interview memoranda, in her Motion. With one exception, the government does not address those examples. Instead, it spends the first part of its Opposition discussing actions that it alleges Ms. Holmes took herself. Govt' Opp'n, Dkt. 662, at 1-3. Those alleged actions are not the subject of this Motion. It then identifies two examples of actions by others that it claims it can connect directly to Ms. Holmes. *Id.* at 4. Those also are not the subject of this Motion. It then extrapolates from those examples to the sweeping proposition that Ms. Holmes is responsible for nearly everything that happened at Theranos. The government has no authority for that proposition, which is contrary to fundamental principles of due process. The Court should exclude evidence of alleged bad acts and false or misleading statements of Theranos agents and employees that lack the requisite connection to Ms. Holmes.

**I.      The Government Cannot Connect Ms. Holmes to the Exemplar Allegations in the Motion.**

In her Motion, Ms. Holmes identified specific examples of acts or statements by Theranos employees that the government has put at issue. *See* Def. Mot., Dkt. 565 at 2-5. With one exception discussed below, the government does not even attempt to tie them to Ms. Holmes in any way. It identifies *no* evidence that she knew of the three patients identified in the Motion; that she directed employees to make the various statements identified in the Motion; that she had any role in setting reference ranges; that she knew anything about responding to critical test results for chloride; or that she knew anything about what information was contained in HbA1C test reports. *Id*. at 2-4. All evidence of these acts and statements should be excluded.[1]

---

[1] Ms. Holmes' Motion also addressed the government's allegation that Theranos "senior managers" destroyed Theranos' database of patient data (the LIS database). Def. Mot., Dkt. 565 at 4. The government does not address that allegation in its Opposition to this Motion, but elsewhere in its Oppositions it recklessly insinuates the involvement of Ms. Holmes and her lawyers, with no evidentiary basis for doing so. Dkt. 682 at 9-10. To be clear, neither Ms. Holmes nor her lawyers had anything to

The only example that the government addresses is its claim that actions by David Boies, a lawyer for Theranos and Ms. Holmes, with respect to the *Wall Street Journal* are evidence of Ms. Holmes' mental state. *See* Def. Mot., Dkt. 565, at 5. (The government ignores entirely its allegation related to actions by Theranos' General Counsel Heather King.) The government surmises that "[i]t is implausible that Defendant did not play a significant role in influencing Boies's actions during that time period" and "it is reasonable to infer that he took significant direction from her as well." Gov't Opp'n, Dkt. 662 at 5. The government's supposition is no substitute for evidence. It cannot put on evidence of a third party's acts and ask the jury to infer, with no evidentiary basis, that Ms. Holmes directed the acts. The Court thus should exclude evidence of Mr. Boies' (and Ms. King's) actions vis-à-vis the *Wall Street Journal*.

## II.     The Remainder of the Government's Arguments Lack Merit.

The remainder of the government's Opposition is an improper attempt to hold Ms. Holmes liable for everything that happened at Theranos, a company with hundreds of employees. The government suggests in vague terms that Ms. Holmes exerted "influence" over Theranos' communications with the victims of the fraud; that she was "well positioned to ensure that the actions of Theranos' employees and agents furthered Defendants' schemes whenever possible"; that "her words and actions had a significant effect on the way Theranos employees viewed the company"; and that "causal chains of . . . false statements lead back to [Ms. Holmes]." Gov't Opp'n, Dkt. 662 at 4-7. But vague allegations of "influence," or claims that Theranos employees were "unwitting accomplices," do not make Ms. Holmes responsible for the acts or statements of Theranos employees. None of those arguments constitute viable theories of criminal liability, and the government cites no case whatsoever supporting them.

The only case the government cites for this "influence" theory is *United States v. Ciccone*, 219 F.3d 1078 (9th Cir. 2000), but the government seriously overstates that case's holding. In *Ciccone*, the defendant gave employees a list of victims of other telemarking schemes and wrote a misleading sales pitch for the employees to use to solicit money from victims. *Id.* at 1084. Unsurprisingly, the Ninth

do with the government's failure to preserve the LIS database. Ms. Holmes will respond more fully in her reply brief in support of her Motion to Exclude Evidence of Anecdotal Test Results (Dkt. 563).

Circuit held that the defendant was liable for his own acts taken "with the knowledge that the prohibited actions [by employees] will follow in the ordinary course of business or where the prohibited acts can reasonably be foreseen." *Id.* (citation omitted). That is a far cry from merely having "influence" over a company. All CEOs presumably have influence at the companies they lead, but it does not follow that they are liable for any misconduct that company employees undertake. Nor is the knowledge of company employees imputed to Ms. Holmes. *See Phillips v. United States,* 356 F.2d 297, 303 (9th Cir. 1965) (holding that "knowledge of a co-conspirator, agent of employee, has no tendency, circumstantially or otherwise, to prove criminal intent"). The government may attempt to hold Ms. Holmes liable for her own acts, as in *Ciccone*. But it cannot hold her liable for the acts of others simply on a theory that she, like all CEOs, "influenced" Theranos. Any other rule would effectively import vicarious liability principles into criminal law, in violation of the Due Process Clause. *See* Def. Mot., Dkt. 565 at 5.

*     *     *

To be clear, there may be situations in which the government has evidence that causally connects Ms. Holmes' acts with those of Theranos employees. It suggests that it has such evidence with respect to two alleged incidents it discusses in its Opposition. Gov't Opp'n, Dkt. 662, at 4. It apparently has none with respect to the allegations discussed in Ms. Holmes' Motion. The paucity of actual evidence cited by the government, and its frequent resort to vague claims of "influence," illustrate the need for a pre-trial ruling prohibiting evidence of bad acts or false or misleading statements of Theranos agents absent an advance proffer from the government of what evidence will connect such acts or statements to Ms. Holmes. Def. Mot., Dkt. 565 at 8-9; *see also* Fed. R. Evid. 104. Absent such a requirement, this trial will turn into a sprawling, unconstitutional mess of evidence about things that Theranos employees—but not Ms. Holmes—did or said.

**CONCLUSION**

For these reasons, and those set forth in Ms. Holmes' Motion, the Court should enter an order precluding the government from introducing evidence of bad acts or false or misleading statements of

Theranos agents or employees other than her alleged co-conspirators and alleged accomplices, at least absent a sufficient advance showing from the government pursuant to Rule 104.


DATED:  February 16, 2021                         Respectfully submitted,


                                                  /s/ Amy Mason Saharia
                                                  KEVIN DOWNEY
                                                  LANCE WADE
                                                  AMY MASON SAHARIA
                                                  KATHERINE TREFZ
                                                  Attorneys for Elizabeth Holmes

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on February 16, 2021 a copy of this filing was delivered via ECF on all

counsel of record.


/s/ Amy Mason Saharia
AMY MASON SAHARIA
Attorney for Elizabeth Holmes

# EXHIBIT 71

| From: | ████████ |
|-------|----------|
| To: | Bostic, John (USACAN); Schenk, Jeffrey (USACAN) |
| Cc: | ████████ |
| Subject: | Grand Jury Subpoena Investigation #2016R00024 - Theranos, Inc. |
| Date: | Monday, August 27, 2018 11:49:58 AM |
| Attachments: | 2018-08-27 Ltr ████ to M. Scussel re Grand Jury Investigation 2016R00024.pdf |

Hi Jeff and John,

Attached please find the transmittal letter accompanying today's production of Theranos' LIS database. The media will be delivered via courier today. The encryption key is 7Dh$fsB!dgs&6Fes!.

Best Regards,

████████ | **WilmerHale**

350 South Grand Avenue, Suite 2100
Los Angeles, CA 90071 USA

████████
████████
████████ @wilmerhale.com

**Please consider the environment before printing this email.**

This email message and any attachments are being sent by Wilmer Cutler Pickering Hale and Dorr LLP, are confidential, and may be privileged. If you are not the intended recipient, please notify us immediately—by replying to this message or by sending an email to postmaster@wilmerhale.com—and destroy all copies of this message and any attachments. Thank you.

For more information about WilmerHale, please visit us at http://www.wilmerhale.com.

# EXHIBIT 62

**Cc:** Jarod Wada <jwada@shrwood.com>; O'Neill, Stephen <oneill.stephen@dorsey.com>
**Subject:** Re: Theranos ABC; Follow up re AZ Lit subpoena

Thomas,

The LIS database was the most comprehensive (though still not fully comprehensive) company repository of clinical information -- patient contact info, doctor contact info, test dates and results, etc. It has, however, been decommissioned, and before the company formally closed we were advised that it be a herculean undertaking to get it up and running again.

As for the RFP on voiding and correcting, Wilmer should have the most complete records of how many tests were voided/corrected. I'd recommend contacting ██████████████ ████████ in Wilmer's LA office on that.

Hope this helps.

Best ███████████

On Fri, Oct 19, 2018 at 10:22 AM <hwang.thomas@dorsey.com> wrote:
██████████████

Following up on our call earlier this week, we have a couple of additional questions regarding the ████████████████████████ as follows:

· Can you provide a brief description as to what exactly is in the LIS database? We understand that it is comprised of patient information, but we would like to understand the scope of that information and also be certain that there is nothing else.



Thanks again,

**Thomas T. Hwang**
Attorney

DORSEY & WHITNEY LLP
305 Lytton Avenue| Palo Alto, CA 94301
**P:** 650.843.2757  **C:** 415.420.3289

TheranosABC00000371

STEPHANIE M. HINDS (CABN 154284)
Attorney for the United States,
Acting Under Authority Conferred By 28 U.S.C. § 515

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

JEFF SCHENK (CABN 234355)
JOHN C. BOSTIC (CABN 264367)
ROBERT S. LEACH (CABN 196191)
VANESSA BAEHR-JONES (CABN 281715)
Assistant United States Attorneys

    150 Almaden Boulevard, Suite 900
    San Jose, California 95113
    Telephone: (408) 535-5061
    Fax: (408) 535-5066
    Robert.Leach@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>ELIZABETH HOLMES,<br><br>    Defendant. | Case No. 18-CR-00258 EJD<br><br>JANUARY 8, 2021 DECLARATION OF AUSA ROBERT S. LEACH IN SUPPORT OF UNITED STATES' OPPOSITIONS TO DEFENDANT'S MOTIONS *IN LIMINE*<br><br>Date:  March 23, 2021<br>Time:  10:00 a.m.<br>Court: Hon. Edward J. Davila |

    I, Robert S. Leach, declare as follows:

    1.    I am an Assistant United States Attorney with the United States Attorney's Office for the

Northern District of California ("USAO"). I am one of the prosecutors assigned to this matter and have

been since 2016. I make this declaration in support of the United States' Opposition to Defendant's

Motions *in Limine*.

    2.    Attached as Exhibit 1 is a true and correct copy of document Bates-numbered TS-

0959196 to 0959268.

**ER-2922**

3.      Attached as Exhibit 2 is a true and correct copy of document Bates-numbered TS-0475901 to 0475906.

4.      Attached as Exhibit 3 is a true and correct copy of document Bates-numbered THPFM0003022508 to THPFM0003022516.

5.      Attached as Exhibit 4 is a true and correct copy of document titled Settlement Agreement and Release among Walgreens Boots Alliance, Inc., Walgreen Co., and Theranos, Inc.

6.      Attached as Exhibit 5 is a true and correct copy of document Bates-numbered US-REPORTS-0014398 to US-REPORTS-0014401.

7.      Attached as Exhibit 6 is a true and correct copy of document Bates-numbered TS-0484523 (SEC-USAO-EPROD-005968690).

8.      Attached as Exhibit 7 is a true and correct copy of document Bates-numbered CMS-DOJ-0208226.  The document has been redacted to remove patient and doctor identifiers.

9.      Attached as Exhibit 8 is a true and correct copy of document Bates-numbered CMS-DOJ-0220248.  The document has been redacted to remove patient and doctor identifiers.

10.     Attached as Exhibit 9 is a true and correct copy of document Bates-numbered THPFM0001526357 to THPFM0001526360.

11.     Attached as Exhibit 10 is a true and correct copy of document Bates-numbered TS-1137750 to TS-1137781.

12.     Attached as Exhibit 11 is a true and correct copy of document Bates-numbered TS-0812982 to TS-812993.

13.     Attached as Exhibit 12 is a true and correct copy of document Bates-numbered TS-0813437 to TS-0813446.

14.     Attached as Exhibit 13 is a true and correct copy of document Bates-numbered TS-1106137.

15.     Attached as Exhibit 14 is a true and correct copy of relevant portions of document Bates-numbered US-FDA-0035508 to US-FDA-0037188.

16.     Attached as Exhibit 15 is a true and correct copy of document Bates-numbered US-FDA-0024046 to US-FDA-0024093.

17.     Attached as Exhibit 16 is a true and correct copy of document Bates-numbered THPFM0002376499 to THPFM0002376505.

18.     Attached as Exhibit 17 is a true and correct copy of document Bates-numbered TS-1068300 to TS-1068317.

19.     Attached as Exhibit 18 is a true and correct copy of document Bates-numbered TS-1068274 to TS-1068299.

20.     Attached as Exhibit 19 is a true and correct copy of document Bates-numbered THPFM0000268641 to THPFM0000268642 (SEC-USAO-EPROD-000651531).

21.     Attached as Exhibit 20 is a true and correct copy of document Bates-numbered Ex. KK-SEC-TX-000000925.

22.     Attached as Exhibit 21 is a true and correct copy of document Bates-numbered ROUGHEAD_THERANOS_0000371 to ROUGHEAD_THERANOS_0000431.

23.     Attached as Exhibit 22 is a true and correct copy of document Bates-numbered THPFM0000875055 to THPFM0000875060.

24.     Attached as Exhibit 23 is a true and correct copy of document Bates-numbered Ex. NN-KOVACEVICH_THERANOS_0000451 to KOVACEVICH_THERANOS_0000490.

25.     Attached as Exhibit 24 is a true and correct copy of a Memorandum of Interview of Sarah Bennett on December 11, 2020.

26.     Attached as Exhibit 25 is a true and correct copy of document Bates-numbered THPFM0001815817 to THPFM0001815820.

27.     Attached as Exhibit 26 is a true and correct copy of document Bates-numbered THPFM0000869308 to THPFM0000869309 (SEC-USAO-EPROD-001252193).

28.     Attached as Exhibit 27 is a true and correct copy of document Bates-numbered THPFM0001191384 to THPFM0001191385 (SEC-USAO-EPROD-001574269).

29.     Attached as Exhibit 28 is a true and correct copy of document Bates-numbered TS-0906564 to TS-0906565.

30.     Attached as Exhibit 29 is a true and correct copy of a Memorandum of Interview of Jerry Hurst on August 3, 2020.

ER-2924

31.     Attached as Exhibit 30 is a true and correct copy of document Bates-numbered THPFM0005761694.

32.     Attached as Exhibit 31 is a true and correct copy of document Bates-numbered THPFM0005761722.

33.     Attached as Exhibit 32 is a true and correct copy of portions of document Bates-numbered SEC-USAO2-EPROD-000070971.

34.     Attached as Exhibit 33 is a true and correct copy of document Bates-numbered THPFM0001361669 to THPFM0001361670 (SEC-USAO-EPROD-001744554).

35.     Attached as Exhibit 34 is a true and correct copy of document Bates-numbered THPFM0005753213 to THPFM0005753221.

36.     Attached as Exhibit 35 is a true and correct copy of document Bates-numbered TS-1079044 to 1079050.

37.     Attached as Exhibit 36 is a true and correct copy of document Bates-numbered THPFM0000861075 to THPFM0000861077.

38.     Attached as Exhibit 37 is a true and correct copy of document Bates-numbered TS-0903725 to TS-0903727.

39.     Attached as Exhibit 38 is a true and correct copy of excerpts of testimony by Dr. Adam Rosendorff in a case against Defendant pending in Arizona.

40.     Attached as Exhibit 39 is a true and correct copy of document Bates-numbered TS-1078326 to TS-1078327.

41.     Attached as Exhibit 40 is a true and correct copy of a Memorandum of Interview of Dr. Sunil Dhawan on June 22, 2017 with select exhibits.

42.     Attached as Exhibit 41 is a true and correct copy of document Bates-numbered THER-2105783 to THER-2105786.

43.     Attached as Exhibit 42 is a true and correct copy of document Bates-numbered TS-1148890 to TS-1148895.

44.     Attached as Exhibit 43 is a true and correct copy of document Bates-numbered THPFM0001762818 (SEC-USAO-EPROD-002145703).

45.     Attached as Exhibit 44 is a true and correct copy of excerpts of a PowerPoint provided to my Office by counsel for Defendant prior to indictment.

46.     Attached as Exhibit 45 is a true and correct copy of document Bates-numbered THPFM0001559648 to THPFM0001559651 (SEC-USAO-EPROD-001942533).

47.     Attached as Exhibit 46 is a true and correct copy of document Bates-numbered THPFM0002163775 to THPFM0002163776 (SEC-USAO-EPROD-002546660).

48.     Attached as Exhibit 47 is a true and correct copy of document Bates-numbered THPFM0001386113 to THPFM0001386115 (SEC-USAO-EPROD-001768998).

49.     Attached as Exhibit 48 is a true and correct copy of document Bates-numbered THPFM0001361577 to THPFM0001361579 (SEC-USAO-EPROD-001744462).

50.     Attached as Exhibit 49 is a true and correct copy of document Bates-numbered THPFM0000500903 to THPFM0000500908 (SEC-USAO-EPROD-000883793).

51.     Attached as Exhibit 50 is a true and correct copy of document Bates-numbered THPFM00000500866 to THPFM00000500871 (SEC-USAO-EPROD-000883756).

52.     Attached as Exhibit 51 is a true and correct copy of document Bates-numbered THPFM0000313444 to THPFM0000313456.

53.     Attached as Exhibit 52 is a true and correct copy of a document Bates-numbered TS-0315655.

54.     Attached as Exhibit 53 is a true and correct copy of a document Bates-numbered TS-0315700 to TS-0315703.

55.     Attached as Exhibit 54 is a true and correct copy of a document Bates-numbered THPFM0001703374.

56.     Attached as Exhibit 55 is a true and correct copy of a document Bates-numbered TS-1103640 to TS-1103642.

57.     Attached as Exhibit 56 is a true and correct copy of a document Bates-numbered TS-1160602 to TS-1160635.

58.     Attached as Exhibit 57 is a true and correct copy of a document Bates-numbered THPFM0000853510 to THPFM0000853514.

59.    I have reviewed a privilege log provided by the law firm Wilmer Cutler Pickering Hale and Dorr LLP (WilmerHale).  According to an entry for a communication on this log, at 1:10 a.m. on August 29, 2018, a Theranos executive emailed a WilmerHale attorney (identified by the government for purposes of this filing as Attorney 1), and copied attorneys for the law firms Williams & Connolly LLP and Davis Wright Tremaine LLP.  According to the log, the email concerned, "information necessary to obtain legal advice regarding DOJ investigation and prepared in anticipation of litigation." Another entry on the log shows that at 1:33 a.m., a Davis Wright Tremaine attorney responded, copying an attorney for Williams & Connolly, among others.  The following day, August 29, 2018, the Davis Wright Tremaine attorney emailed again, also concerning, "legal advice regarding DOJ investigation." On September 5, 2018, an entry on the log shows that an attorney from Davis Wright Tremaine emailed an attorney for WilmerHale, copying a Williams & Connolly attorney and a senior Theranos official.

60.    Attached as Exhibit 58 is a true and correct copy of a document Bates-numbered THPFM0001362138 to THPFM0001362139.

61.    Attached as Exhibit 59 is a true and correct copy of a document Bates-numbered TheranosABC00041580 to TheranosABC00041581.

62.    Attached as Exhibit 60 is a true and correct copy of a document Bates-numbered TheranosABC00040289.

63.    Attached as Exhibit 61 is a true and correct copy of a document Bates-numbered THPFM0002519603 to THPFM0002519605.

64.    Attached as Exhibit 62 is a true and correct copy of a document Bates-numbered TheranosABC00000371.

65.    Attached as Exhibit 63 is a true and correct copy of an unsealed grand jury subpoena issued on June 4, 2018.

66.    Attached as Exhibit 64 is a true and correct copy of a document Bates-numbered TheranosABC00042290.

67.    Attached as Exhibit 65 is a true and correct copy of an email sent by an attorney from the law firm Wilmer Cutler Pickering Hale and Dorr LLP (WilmerHale) on July 30, 2018.

68.     Attached as Exhibit 66 is a true and correct copy of a document Bates-numbered TheranosABC00042200 to TheranosABC00042202.

69.     Attached as Exhibit 67 is a true and correct copy of a document Bates-numbered TheranosABC00039903.

70.     Attached as Exhibit 68 is a true and correct copy of a document Bates-numbered TheranosABC00037891 to TheranosABC00037892.

71.     Attached as Exhibit 69 is a true and correct copy of a document Bates-numbered Neetek_000746.

72.     Attached as Exhibit 70 is a true and correct copy of a document Bates-numbered TheranosABC00042260 to TheranosABC00042264.

73.     Attached as Exhibit 71 is a true and correct copy of an email sent by an attorney from the law firm WilmerHale on August 27, 2018.

74.     Attached as Exhibit 72 is a true and correct copy of a report written by the government's computer forensic expert, Bruce Pixley, and dated September 28, 2020.

75.     Attached as Exhibit 73 is a true and correct copy of a document Bates-numbered TheranosABC00037746 to TheranosABC00037747.

76.     Attached as Exhibit 74 is a true and correct copy of a document Bates-numbered Neetek_000587 to Neetek_000588.

77.     Attached as Exhibit 75 is a true and correct copy of a document Bates-numbered TheranosABC00039982 to TheranosABC00039983.

78.     Attached as Exhibit 76 is a true and correct copy of a document Bates-numbered TheranosABC00040096 to TheranosABC00040097.

79.     Attached as Exhibit 77 is a true and correct copy of a document Bates-numbered THPFM0001463733 to THPFM0001463739.

80.     Attached as Exhibit 78 is a true and correct copy of a document Bates-numbered THPFM0000273265 to THPFM0000273268.

81.     Attached as Exhibit 79 is a true and correct copy of a document Bates-numbered THPFM0003603101 to THPFM0003603102.

82.     Attached as Exhibit 80 is a true and correct copy of a document Bates-numbered THPFM0000288920 to THPFM0000288923.

83.     Attached as Exhibit 81 is a true and correct copy of a document Bates-numbered THPFM0000170839 to THPFM0000170841.

84.     Attached as Exhibit 82 is a true and correct copy of a letter served on Erika Cheung by the law firm Boies, Schiller & Flexner LLP on June 26, 2015.

85.     Attached as Exhibit 83 is a true and correct copy of a document Bates-numbered PFM-DEPO-00005085 to PFM-DEPO-00005091.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 8th day of January 2021.

*/s Robert S. Leach*
_____
ROBERT S. LEACH
Assistant United States Attorney

STEPHANIE M. HINDS (CABN 154284)
Attorney for the United States,
Acting Under Authority Conferred By 28 U.S.C. § 515

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

JEFF SCHENK (CABN 234355)
JOHN C. BOSTIC (CABN 264367)
ROBERT S. LEACH (CABN 196191)
VANESSA BAEHR-JONES (CABN 281715)
Assistant United States Attorneys

    150 Almaden Boulevard, Suite 900
    San Jose, California 95113
    Telephone: (408) 535-5061
    Fax: (408) 535-5066
    Robert.Leach@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>ELIZABETH HOLMES,<br><br>    Defendant. | Case No. 18-CR-00258 EJD<br><br>UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE EVIDENCE OF CMS SURVEY FINDINGS AND SANCTIONS PURSUANT TO RULES 401-403 AND 801-803 [ECF NO. 574]<br><br>Date:  March 23, 2021<br>Time:  10:00 a.m.<br>Court:  Hon. Edward J. Davila |

**TABLE OF CONTENTS**

INTRODUCTION………………………………………………………………………… 1

FACTUAL BACKGROUND…………………………………………………………….. 2

ARGUMENT……………………………………………………………………………… 6

    I.    Evidence of the CMS Survey Is Relevant and Not Excludable Under Rule 403…..……….. 6

    II.    The CMS Survey Observations Are Not Excludable Hearsay……………...…………… 9

CONCLUSION…………………………………………………………………………… 13

## TABLE OF AUTHORITIES

### Cases

*Manocchio v. Moran*, 919 F.2d 770 (1st Cir. 1990) .................................................................. 10

*Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193 (9th Cir. 2014) ........................................... 6

*Novick v. Shipcom Wireless, Inc.*, 946 F.3d 735 (5th Cir. 2020) ............................................... 6

*United States v. Edelmann*, 458 F.3d 791 (8th Cir. 2006) ........................................................ 10

*United States v. Fryberg*, 854 F.3d 1126 (9th Cir. 2017) ......................................................... 10

*United States v. Grady*, 544 F.2d 598 (2d Cir. 1976) ............................................................... 11

*United States v. Hansen*, 583 F.2d 325 (7th Cir. 1978) ........................................................... 10

*United States v. Hernandez–Rojas*, 617 F.2d 533 (9th Cir. 1980).......................................... 11

*United States v. Lopez*, 762 F.3d 852 (9th Cir. 2014)............................................................... 11

*United States v. Orellana-Blanco*, 294 F.3d 1143 (9th Cir. 2002) .......................................... 11

*United States v. Orozco*, 590 F.2d 789 (9th Cir. 1979) ............................................................ 11

*United States v. Pacific Gas & Elec. Co.*, 178 F. Supp. 3d 927 (N.D. Cal. 2016) ..................... 9

*United States v. Rodriguez-Soler*, 773 F.3d 2389 ..................................................................... 6

*United States v. Rosa*, 11 F.3d 315 (2d Cir. 1993) ................................................................... 10

*United States v. Sims*, 617 F.2d 1371 (9th Cir. 1980)............................................................... 12

*United States v. Stone*, 604 F.2d 922 (5th Cir. 1979) .............................................................. 11

### Statutes

28 U.S.C. § 515................................................................................................................... 1, 12

42 U.S.C. § 263a(g) ................................................................................................................. 2

### Rules

Fed. R. Evid. 401 .................................................................................................................... 6

Fed. R. Evid. 403 .................................................................................................................... 6

Fed R. Evid. 803(8).................................................................................................................. 9

Fed R. Evid. 803(8)(B) ........................................................................................................................ 11

### Regulations

42 C.F.R. § 493.1251(a)........................................................................................................................ 5

42 C.F.R. § 493.1773 ............................................................................................................................ 2

42 CFR § 493.1256(a)(c) ...................................................................................................................... 5

The government respectfully submits its Opposition to Defendant's Motion *in Limine* to Exclude Evidence of CMS Survey Findings and Sanctions Pursuant to Rules 401-403 and 801-803.

## INTRODUCTION

Defendant lured Theranos investors through claims about the accuracy and reliability of her blood analyzer and testing. In one investor PowerPoint, Defendant bragged:

- "Theranos' proprietary, patented technology runs comprehensive blood tests from a finger-stick and . . . generates significantly higher integrity data than currently possible. Theranos is the world's first and only CLIA-certified laboratory running its tests on micro-samples." ECF No. 588-2 at RDV012675.

- "Theranos is certified as a High Complexity CLIA Laboratory . . . requir[ing] the highest level of training, technique and result interpretation; most stringent standards; labs are surveyed routinely and randomly" *Id.* at RDV012677.

- "Theranos runs any test available in central laboratories, and processes all sample types . . . . Theranos provides the highest level of oversight, automation, and standardization in our pre- and post-analytic processes, ensuring the highest levels of accuracy and precision." *Id.* at RDV012700.

- "A New Standard in Quality. The highest levels of accuracy. Theranos Vitamin D <10% Coefficient of Variation. By systematically controlling and standardizing our processes, Theranos offers tests with the highest levels of accuracy." *Id.* at RDV012702.

- New Possibilities in Lab. . . . Comprehensive laboratory test menu available through Theranos. Theranos runs any test available in central labs. Theranos can process any sample type. . . . With CLIA certification, Theranos is a nationally accredited provider. Higher quality data. . . . The unprecedented lack of variation . . . ." *Id.* at RDV012704.

To prove Theranos's bona fides, Defendant even included an image of the Certificate of Compliance issued by Centers for Medicare & Medicaid Services ("CMS") in her investor PowerPoint. *Id.* at RDV012678.

Beginning in September 2015, CMS conducted an in-person survey of Theranos's Newark laboratory, examining documents provided by Theranos and interviewing Theranos personnel, including Defendant. The surveyors observed that Theranos's blood analyzer repeatedly failed quality control checks (yet Theranos continued to report patient results). They noted that Theranos's blood analyzer repeatedly produced values outside of ranges *Theranos* deemed acceptable (yet they continued to report patient results). With respect to Vitamin D, they noted quality control results for analyzers were showing coefficients of variation between 18.7% and 63.6% during certain periods in 2014 (yet they

continued to report patient results).  The deficiencies noted by the surveyors were so severe CMS determined they posed immediate jeopardy to patient health and safety.

The CMS survey results, embodied in its Form 2567, put the lie to Defendant's grandiose claims about Theranos's technology.  The form is highly probative of the falsity of Defendant's statements to investors and patients – indeed, its probative value could hardly be higher.  There is no prejudice – let alone undue prejudice – from admission of the form or CMS testimony about the form:  Defendant remains free to attack the basis of CMS's observations, to disclaim her knowledge of the operation of Theranos technology in its clinical laboratory, and to insist that she lacked intent to defraud.  To the extent the Form 2567 is hearsay, it falls within the public records exception.  Its primary authors, CMS surveyors Sarah Bennett and Gary Yamamoto, are expected to testify to its content and will be subject to cross-examination.  Defendant's written responses to the Form 2567 – which largely admitted the deficiencies observed by CMS – are not hearsay.  There simply is no basis to keep such highly relevant evidence from the jury.

Because the Form 2567 is highly relevant and not excludable under Rule 403, and because it falls within exceptions to the hearsay rule, it should be admitted.  CMS witnesses should be permitted to testify to what they observed and concluded.  Defendant's admissions should be admitted.  The Court should deny the motion.

## FACTUAL BACKGROUND

CMS regulates all laboratory testing (except research) performed on humans in the United States through the Clinical Laboratory Improvement Amendments ("CLIA").  The objective of the CLIA program is to ensure quality laboratory testing.  *See* https://www.cms.gov/Regulations-and-Guidance/Legislation/ CLIA.

A CLIA-certified laboratory like Theranos must permit CMS to conduct an inspection to assess the laboratory's compliance with CLIA.  *See* 42 U.S.C. § 263a(g); 42 C.F.R. § 493.1773.  Theranos had a laboratory in Palo Alto, which moved to Newark in 2014 and was "high-complexity."  January 8, 2021 Declaration of AUSA Robert S. Leach in Support of United States' Opposition to Defendant's Motions

//

*in Limine* ("1/8/2021 Leach Decl."), Ex. 15 at US-FDA-0024050.  It also had a laboratory in Arizona which was "moderate complexity," which limited the types of tests it could perform.  *See id.*

The focus of a CMS survey "is to assess how the laboratory monitors its operations and ensures the quality of its testing."  ECF No. 584-4 at 4 (Def. Ex. 35) (Interpretive Guidelines for Laboratories and Laboratory Services).  Procedures and interpretive guidelines issued by CMS underscore the connection between CMS regulations and test accuracy and reliability.  For example, they state:  "The principal focus of the outcome-oriented survey is *the effect* (outcome) of the laboratory's practices *on patient test results and/or patient care*.  The outcome-oriented survey process is intended to direct the surveyor to those requirements that will most effectively and efficiently *assess the laboratory's ability to provide accurate, reliable, and timely test results*."  ECF No. 584-4 at 4 (emphasis added).  They provide further:  "It is the surveyor's objective, using professional judgment, to determine, based on observation of the laboratory's (past and current) practices, interviews with the laboratory's personnel, and review of the laboratory's relevant documented records, *whether it is producing quality test results (i.e., accurate, reliable, and timely)*."  *Id.* (emphasis added).

Defendant herself repeatedly drew a connection between CMS's regulations and supervision and the accuracy and reliability of Theranos's blood tests.  For example, Defendant told one of her Board members "CMS CLIA Accreditation . . . Ensures accurate, reliable testing regardless of location":

## CMS CLIA Accreditation

> Theranos is certified as a High Complexity CLIA Laboratory

### Clinical Laboratory Improvement Amendment of 1988

- CLIA regulates all testing on humans for health purposes using quality standards
  - The more complex the test, the more stringent the standards

- Ensures accurate, reliable testing regardless of location

- Administered by , , & 

//

//

1/8/2021 Leach Decl. Ex. 21 at ROUGHEAD_THERANOS_ 0000396.  To rebut questions by a journalist about Theranos's "Testing Accuracy," Defendant pointed to CMS's CLIA certification, emphasizing that "Theranos' laboratories are CLIA-certified and subject to ongoing review and regular inspections by regulators."  *Id.* Ex. 22 at THPFM0000875055.  And, on Theranos's website and in communications with investors, under the heading "Accuracy and Reliability," Defendant wrote:  "CMS and CLIA:  To earn and maintain CLIA certification, Theranos must ensure the accuracy and reliability of our tests.  CLIA's purpose is to ensure quality laboratory testing and ensure accurate and reliable test results."  *Id.* Ex. 23 at KOVACEVICH_THERANOS_ 0000451.

Beginning in September 2015, CMS conducted an in-person survey of Theranos's Newark laboratory.  Defendant attended portions of the survey.  ECF No. 584-3 at 3 (Def. Ex. 34).

One of the CMS surveyors, Sarah Bennett, is expected to testify that "CMS is responsible for the implementation of the CLIA regulations, which are *designed to ensure the accuracy and reliability of laboratory testing*."  ECF No. 584-3 at 3 (Def. Ex. 34) (emphasis added).  In explaining the dividing line between FDA regulation and CMS regulation, Bennett is expected to testify "the manufacturing of tests is FDA, and the running of laboratory tests is CLIA."  *Id.*  Bennett is expected to testify that, before conducting the survey, CMS received a complaint that "QC [quality control] on the Edison devices was not acceptable and Theranos was still reporting patient results.  That part of the complaint was substantiated during the survey."  *Id.* at 5.

Bennett is expected to testify further:  "Theranos was not following its own QC procedures, and they were still reporting patient results."  *Id.*  And, "[i]f the QC is problematic, there is no way to assess whether the patient data is accurate and reliable.  If the laboratory runs the controls and they are unacceptable, then they should not be running patients after that."  *Id.* at 6.  "Another issue that CMS found was that QC results on their device had been out of range multiple times, yet Theranos was still reporting patient results during that time.  Theranos's solution was to simply adjust the mean."  *Id.* at 7.  "Theranos continued to report patient values despite having these QC problems."  *Id.*  The government anticipates she will testify:  "There is a systemic issue of quality.  Across the board, not just with the Edison but also their other testing."  1/18/2021 Leach Decl. Ex. 24 at 7.

On January 25, 2016, following the survey, CMS notified Theranos that it was "not in compliance with all of the Conditions required for certification in the CLIA program." ECF No. 581-1 at 2 (Def. Ex. 12). CMS advised Theranos that "the deficient practices of the laboratory pose[d] immediate jeopardy to patient health and safety," meaning that "immediate corrective action is necessary because the laboratory's non-compliance with one or more Condition-level requirement has already caused, is causing, or is likely to cause, at any time, serious injury or harm, or death, to individuals served by the laboratory or to the health and safety of the general public." *Id.* In its letter, CMS listed five specific conditions that were not met (including Hematology and Analytic Systems) and its attached Form CMS-2567, Statement of Deficiencies described numerous conditions and standards that were not met and observations CMS made. *Id.* Among other things, CMS observed:

- the laboratory failed the condition for analytic systems for, among many reasons, failing to ensure QC test results met acceptance criteria (ECF No. 581-1 at 14-15);[1]

- "the laboratory failed to have a procedure for [quality control] for the Edison 3.5 Theranos System[2] prior to 5/15/2014" even though the initial use dates for eight of the 12 analytes run on the system ranged from 11/6/2013 through 5/9/2014" (*id.* at 16);

- "the laboratory failed to ensure that QC for PT/INR was acceptable prior to reporting patient results from April 2015 through September 2015 (*id.* at 41-42);

- "the laboratory failed to ensure that . . . QC was acceptable for the Theranos Proprietary System (TPS) prior to reporting patient test results" (*id.* at 42-46);

- "the laboratory failed to have a quality assessment (QA) procedure to identify and correct problems with the QC values for the Theranos Proprietary System when precision did not meet the laboratory's requirement for precision" (*id.* at 54 & 56); and

- "Based on a review of validation documents on the Theranos Proprietary System (TPS), the laboratory director failed to ensure . . . the quality of results on the TPS; failed to ensure the establishment of performance specifications followed the laboratory's procedures to establish accuracy, precision, reportable range, and/or reference range" (*id.* at 80).

---

[1]    CLIA regulations require a laboratory to have quality control (QC) procedures to monitor the accuracy and precision of the complete testing process. *See, e.g.*, 42 C.F.R. § 493.1251(a), (b)(7-8); 42 CFR § 493.1256(a)(c).

[2]    Evidence will show Theranos's analyzer is variously referred to as Edison 3.5, Theranos Proprietary System 3.5 ("TPS"), and TSPU ("Theranos Sample Processing Unit"). This was the only Theranos analyzer ever used in its clinical laboratory to process blood tests, and it was only used for 12 assays. Despite its grandiose claims to investors, Theranos had stopped using its analyzer in its laboratory altogether by the time CMS inspectors arrived in September 2015. *See* 1/8/2021 Leach Decl. Ex. 6.

In its Form 2687, CMS documented numerous instances where (1) Theranos ran patient tests after failing QC (ECF No. 581-1 at 43-46); (2) QC results for multiple assays, for weeks on end, were at least two standard deviations from the mean (*id.* at 45-46); (3) QC results for multiple assays had coefficients of variation as high as 63.8% (*id.* at 55-56); (4) the overall percentage of QC samples on all tests on all devices was at or in excess of 20% (*id.* at 57-58); and (5) accuracy, precision, reportable range, and allowable bias for multiple assays did not meet even Theranos's criteria (*id.* at 80-81).

Theranos provided multiples responses to the Form CMS-2567, including submissions on February 12, 2016, and April 1, 2016. *See, e.g.*, ECF No. 588-4.  Theranos did not dispute many of CMS's observations, emphasized that the TSPU was phased out beginning December 2014 and fully retired by early 2015, conceded it was "dissatisf[ied] with prior QA oversight" and its ability to address "QC imprecision, QC failures, and QC trends," and admitted that "its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015." *Id.* at 3, 14-15, 16, 40-43.

## ARGUMENT

### I.   Evidence of the CMS Survey Is Relevant and Not Excludable Under Rule 403.

Evidence is relevant if it has "any tendency" to make a fact of consequence more or less probable than it would be without the evidence.  Fed. R. Evid. 401.  The relevancy requirement is "a very low bar" that "is not very hard to meet."  *United States v. Rodriguez-Soler*, 773 F.3d 2389, 293-294 (1st Cir. 2014); *see Novick v. Shipcom Wireless, Inc.*, 946 F.3d 735, 741 (5th Cir. 2020); *Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014).  Relevant evidence may not be excluded under Rule 403 unless its probative value is "substantially outweighed" by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.  Fed. R. Evid. 403.

Evidence regarding CMS's survey and its observations easily meets the low bar for relevance. The fact that Theranos was deviating from conditions and standards designed to ensure accuracy and reliability of blood tests has a tendency to show Theranos did not prioritize testing accuracy and was not

capable of consistently producing accurate and reliable results, as the operative indictment alleges.

Specific CMS observations, moreover, have a tendency to show Theranos was not capable of

consistently producing accurate and reliable results.  For example, CMS observed:

- Theranos repeatedly ran patient tests after failing quality control (ECF No. 581-1 at 43-46);

- QC results for multiple assays, for weeks on end, were at least two standard deviations from the mean (*id.* at 45-46);

- QC results for multiple assays had coefficients of variation as high as 63.8% (*id.* at 55-56);

- the overall percentage of QC samples on all tests on all devices was at or in excess of 20% (*id.* at 57-58); and

- accuracy, precision, reportable range, and allowable bias for multiple assays did not meet even Theranos's criteria (*id.* at 80-81).

Each of these observations alone and collectively has a tendency to show Theranos was not capable of

consistently producing accurate and reliable results.

CMS's observations with respect to quality control results for Vitamin D have a tendency to

show that Defendant's statements in her investor PowerPoint were false and misleading.  For example,

to investors, Defendant bragged: "A New Standard in Quality.  The highest levels of accuracy.

Theranos Vitamin D  <10% Coefficient of Variation.  By systematically controlling and standardizing

our processes, Theranos offers tests with the highest levels of accuracy."  Yet CMS observed

coefficients between 18.7% and 63.8% for certain Theranos devices between June and August 2014.

Defendant argues, with emphasis, that "*the CMS survey findings, critically, do not assess

accuracy and reliability of Theranos technology*."  ECF No. 574 at 4:24-25.  This distorts the surveyors'

role and the import of their findings.  CMS regulations of laboratories do not exist for their own sake;

they are designed to ensure accuracy and reliability of blood tests.  Indeed, when it suited her, Defendant

touted this connection to her constituents.  1/8/2021 Leach Decl. Ex. 21 at ROUGHEAD_THERANOS_

0000396 ("CMS CLIA Accreditation . . . ensures accurate, reliable testing").

//

//

Defendant also seizes on a single line from testimony by Sarah Bennett in the parallel SEC action, but again, her statement does nothing to undercut the relevance of the CMS survey and its observations.  The survey is designed to assess whether Theranos was meeting the conditions and standards embodied in CLIA, which are designed to ensure accuracy and reliability.  The fact that Theranos was not meeting CLIA conditions and standards has a tendency to show their tests were not accurate and reliable, and their specific observations support the same conclusion with respect to individual assays.  Indeed, to understand the link between the CLIA regulations and accuracy and reliability, one need to look no further than CMS's statement in its cover letter:  "the deficient practices of the laboratory pose immediate jeopardy to patient health . . . [i.e.,] the laboratory's non-compliance . . . has already caused, or likely to cause, at any time, serious injury or harm, or death, to individuals served by the laboratory or to the health and safety of the general public."  ECF No. 588-3 at 2.  To suggest, as Defendant does, that the CMS survey has no bearing on the accuracy and reliability of Theranos's tests strains any understanding of relevance.[3]

Defendant's Rule 403 arguments fair no better.  The relevance of the CMS survey is high and the alleged prejudice Defendant identifies are really disagreements with the inferences that should be drawn from the evidence.  Defendant argues the jury might give "special weight" to the assertions of a federal regulator as "authoritative" – but that is true any time a government agent testifies.  Defendant remains free to cross-examine CMS witnesses and attempt to undercut their observations.  She argues that some of CMS's observations were "subjective" and that other surveyors may have thought differently.  This simply does not hold for many of CMS's observations – *e.g.*, the high CVs for Vitamin D and other assays in quality control data, the reporting of patient results after failing quality control, high percentages of quality control samples for numerous assays exceeding two standard deviations.  It is also evident from Theranos's responses to the CMS survey that Defendant *agreed* with many of the observations.  More fundamentally, evidence is not excludable because it is "subjective"; the remedy is

---

[3]     For the reasons discussed in the government's Opposition to Defendant's Motion *In Limine* to Exclude Evidence Relating to Theranos' Interactions With Government Regulatory Agencies Under Rules of Evidence 401-404 and 408, Defendants statements and conduct during the survey are highly probative of her state of mind, intent, and knowledge.

cross-examination.  Defendant argues the jury will "equate CMS's findings" with the ultimate
conclusion that Defendant's tests were inaccurate and unreliable.  That too is an attack on the weight of
the evidence.  Defendant further argues the CMS survey results do not, standing alone, demonstrate her
knowledge of the deficiencies.  But they do have a tendency to show the falsity of Defendant's
statements, and highly relevant evidence does not become excludable under Rule 403 because it tends to
prove only one element.  The government is proving Defendant's knowledge through the totality of its
evidence.

Finally, Defendant cites *United States v. Pacific Gas & Elec. Co.*, 178 F. Supp. 3d 927 (N.D.
Cal. 2016), but that case is not binding, persuasive, or to the contrary.  PG&E was charged with
obstructing an investigation of a gas line explosion in San Bruno that killed 11 people, as well as
violations of the Pipeline Safety Act.  PG&E sought exclusion of a report by the National Transportation
Safety Board ("NTSB"), which found PG&E's integrity management program was the probable cause of
the explosion.  947-948.  The court observed the report had limited probative value because the cause of
the explosion was not at issue in the case.  Here, by contrast, the observations made by CMS –
particularly its observations that Theranos repeatedly ran patient tests after failing quality control; that
QC results for multiple assays, for weeks on end, were at least two standard deviations from the mean;
that QC results for multiple assays had coefficients of variation as high as 63.8%; and that the overall
percentage of QC samples on all tests on all devices was at or in excess of 20% at times – directly shows
the failings of the TSPU in practice and the inaccuracy and unreliability of Theranos's tests.  The Court
was also concerned the jury would punish PG&E for causing an explosion that was not at issue, but here
the accuracy and reliability of Theranos's tests is very much at issue.

## II.    The CMS Survey Observations Are Not Excludable Hearsay.

Under Federal Rule of Evidence 803(8), the rule against hearsay does not apply to:

A record or statement of a public office if:

(**A**) it sets out:

(**i**) the office's activities;

(**ii**) a matter observed while under a legal duty to report, but not including,
in a criminal case, a matter observed by law-enforcement personnel; or

          **(iii)** in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and

(B)     the opponent does not show that the sources of information or other circumstances indicate a lack of trustworthiness.

FED R. EVID. 803(8).  Rule 803(8)(A)(ii) thus permits admission of out-of-court statements of public offices setting out a matter observed while under a legal duty to report, except, in criminal cases such as this, a matter observed by "law-enforcement personnel."

The Ninth Circuit has adopted a "narrow understanding of the law enforcement exception." *United States v. Fryberg*, 854 F.3d 1126, 1132 (9th Cir. 2017).  Consistent with this, courts have found that civil government employees such as city building inspectors, medical examiners, and prison case managers are not "law-enforcement personnel" within the meaning of the rule.  *See United States v. Hansen*, 583 F.2d 325, 333 (7th Cir. 1978) ("It was argued . . . that the enforcement of the building code was a 'quasi-criminal' procedure.  It appears that failure to comply with the building code may result in a fine, but not in a criminal conviction.  We do not believe we are justified in broadening the interpretation of . . . 'police officers and other law enforcement personnel' to include city building inspectors."); *United States v. Rosa*, 11 F.3d 315 (2d Cir. 1993) (medical examiner); *Manocchio v. Moran*, 919 F.2d 770, 777 (1st Cir. 1990) (medical examiner); *United States v. Edelmann*, 458 F.3d 791, 813-14 (8th Cir. 2006) ("Wilson is not a police officer or a member of law enforcement; instead, she is an Inmate Systems Manager who produced the memorandum in the normal course of her duties.  The memorandum does not contain any opinions, findings, or conclusions; it is a record of events communicated to Wilson and recorded contemporaneously with the events. . . . Because Wilson does not qualify as a police officer or other law enforcement personnel, Rule 803(8)(B) does not apply to the memorandum Wilson created.").

Further, even when the statement sets out a matter observed by law enforcement, the Ninth Circuit has "looked to the purpose of the law enforcement exception in determining the admissibility of a public record."  *United States v. Hernandez–Rojas,* 617 F.2d 533, 535 (9th Cir. 1980) (holding a warrant of deportation signed by a US immigration officer was not excludable hearsay).  The rule, thus, "does not bar the admission of all law enforcement agency records."  *Edelmann*, 458 F.3d at 813.  The

Ninth Circuit has "noted that the *purpose* of the law enforcement exception is to 'exclude observations made by officials at the scene of the crime or apprehension, because observations made in an adversarial setting are less reliable than observations made by public officials in other situations.'" *United States v. Lopez*, 762 F.3d 852, 861 (9th Cir. 2014) (affirming admission of an ICE Form I-296 verification of removal) (quoting *United States v. Hernandez–Rojas,* 617 F.2d 533, 535 (9th Cir.1980)).[4]  The Ninth Circuit also has underscored "'(i)n adopting this exception, Congress was concerned about prosecutors attempting to prove their cases in chief simply by putting into evidence police officers' reports of their contemporaneous observations of crime.'" *United States v. Orozco*, 590 F.2d 789, 793–94 (9th Cir. 1979) (quoting *United States v. Grady*, 544 F.2d 598, 604 (2d Cir. 1976)) (alteration in original) (upholding admission of computer data cards generated by law-enforcement personnel).[5]  Thus, even when observations of law-enforcement personnel are involved, the Ninth Circuit distinguishes "observations made in an adversarial setting" and "routine, nonadversarial matters." *Hernandez-Rojas*, 617 F.2d at 535; *Orozco*, 590 F.2d at 793; *United States v. Orellana-Blanco*, 294 F.3d 1143, 1150 (9th Cir. 2002) (holding Rule 803(8)(A)(ii) does not apply to a law enforcement memorandum of interview and observing "the government should have called [the memorandum's author] as a witness").

The CMS Form 2567 meets the elements of Rule 803(8)(A)(ii).[6]  It is a record or statement of CMS setting out matters observed while under a duty to report.  The exception does not extend in criminal cases to matters observed by "law-enforcement personnel," but the CMS surveyors are not "law-enforcement personnel" within the meaning of the rule.  They are not the police.  They have no criminal law enforcement power.  They did not prepare the statement of deficiencies with a view to a

---

[4]     In *Hernandez-Rojas*, the Ninth Circuit affirmed admission of a warrant of deportation and cited with approval the Fifth Circuit's observation:  "Rule 803(8) is designed to allow admission of official records prepared for purposes independent of litigation."  617 F.2d at 535 (citing *United States v. Stone*, 604 F.2d 922 (5th Cir. 1979)).

[5]     The law-enforcement personnel exception thus avoids potential issues under the Confrontation Clause if the defendant is unable to cross-examine the author of the report.  *See* U.S. CONST. Amend. VI.

[6]     Defendant cannot show that the sources of information or other circumstances indicate a lack of trustworthiness.  *See* Fed R. Evid. 803(8)(B).

criminal prosecution. They are more akin to the city building inspector in *Hansen*, the medical examiners in *Rosa* and *Manocchio*, and the prison official in *Edelmann*.

Even if CMS surveyors are properly considered "law-enforcement personnel," the law-enforcement exception does not apply. The surveyors' observations were not made in an adversarial setting, in the same way a police report of a suspect interview at the scene of the crime is. Defendant characterizes some of their observations as subjective, but most are descriptions of documents provided by Theranos and notation of statements made by Defendant's agents. The form is a routine part of any CMS or state survey, prepared in the ordinary course of business of a civil agency, whose goal is to promote laboratory safety.[7]

Defendant notes that the Form 2567 includes out-of-court statements by Theranos personnel, but those are not hearsay because they are authorized admissions and statements of an agent or employee within the meaning of Federal Rule of Evidence 802(d)(2). *See generally* ECF No. 588 at 15-17.

Theranos's responses to the Form 2567, which largely concede CMS's observations, but argue that the deficiencies had been cured, are not hearsay and should not be excluded. Indeed, Defendant's concession regarding her QC programs are highly probative.

Finally, whether the Form 2567 is admitted or not, CMS surveyors (or Theranos employees) should not be precluded from testifying to their observations during the survey, their conclusions, and their interactions with Theranos and Defendant.

//

//

//

//

//

---

[7] None of the Ninth Circuit cases cited by Defendant is to the contrary. In *Orozco*, it was not disputed the government agent was "law-enforcement personnel" and the court ultimately affirmed admission of the evidence. *Orellana-Blanco* too involved conceded "law-enforcement personnel" and involved a government memorandum of interview that was certain to be used for litigation. *United States v. Sims,* 617 F.2d 1371, 1377 (9th Cir. 1980) likewise involved an FBI memorandum of interview.

**CONCLUSION**

For these reasons, the Court should deny the motion.

DATED:  January 8, 2021                    Respectfully submitted,

                                           STEPHANIE M. HINDS
                                           Attorney for the United States,
                                           Acting Under Authority Conferred
                                           By 28 U.S.C. § 515

                                           */s Robert S. Leach*
                                           _____
                                           JEFF SCHENK
                                           JOHN C. BOSTIC
                                           ROBERT S. LEACH
                                           VANESSA BAEHR-JONES
                                           Assistant United States Attorneys

STEPHANIE M. HINDS (CABN 154284)
Attorney for the United States,
Acting Under Authority Conferred By 28 U.S.C. § 515

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

JEFF SCHENK (CABN 234355)
JOHN C. BOSTIC (CABN 264367)
ROBERT S. LEACH (CABN 196191)
VANESSA BAEHR-JONES (CABN 281715)
Assistant United States Attorneys

     150 Almaden Boulevard, Suite 900
     San Jose, California 95113
     Telephone: (408) 535-5061
     Fax: (408) 535-5066
     Robert.Leach@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. 18-CR-00258 EJD |
| | ) |
|     Plaintiff, | ) UNITED STATES' MOTIONS *IN LIMINE* |
| | ) |
| v. | ) Date:  January 22, 2021 |
| | ) Time:  10:00 a.m. |
| ELIZABETH HOLMES, | ) Court:  Hon. Edward J. Davila |
| | ) |
|     Defendant. | ) |
| | ) |
| | ) |

## NOTICE OF MOTIONS AND MOTIONS

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD IN THIS ACTION:**

PLEASE TAKE NOTICE that on January 22, 2021 at 10 a.m., or as soon thereafter as the matter may be heard, in Courtroom 4, 5th Floor, of the United States District Court for the Northern District of California, 280 South 1st Street, San Jose, CA 95113, the United States will and hereby does move *in limine* for the following evidentiary orders:

1. Precluding Defendant Elizabeth Holmes ("Defendant") from offering an improper defense blaming her victims;

2. Precluding the Defendant from referencing punishment in front of the jury;

3. Precluding an improper advice-of-counsel defense;

4. Precluding a defense argument that the government's charging decisions were influenced by coordination with journalists or competitors;

5. Precluding the Defendant from presenting an improper good faith defense;

6. Admitting the Centers for Medicare and Medicaid Services' ("CMS") January 26, 2016 Form CMS-2567, Statement of Deficiencies;

7. Admitting text messages between Defendant and Ramesh Balwani offered by the government;

8. Admitting statements by Theranos, Inc. ("Theranos") and Theranos employees and agents offered by the government;

9. Excluding self-serving hearsay statements made and offered by Defendant;

10. Admitting relevant testimony from "non-paying" patients; and

11. Ordering the Defendant to produce reverse *Jencks* including any *in camera* proffers.

These motions are based upon the instant notice, the attached memorandum of points and authorities, the records in this case, and upon such argument as may be made at the hearing on the motions.

DATED:  November 20, 2020                 Respectfully submitted,

                                          STEPHANIE M. HINDS
                                          Attorney for the United States,
                                          Acting Under Authority Conferred
                                          By 28 U.S.C. § 515


                                          __/s/_____
                                          JEFF SCHENK
                                          JOHN C. BOSTIC
                                          ROBERT S. LEACH
                                          VANESSA BAEHR-JONES
                                          Assistant United States Attorneys

# TABLE OF CONTENTS

I.      MOTION *IN LIMINE* NO. 1:  THE COURT SHOULD PRECLUDE DEFENDANT
FROM OFFERING AN IMPROPER DEFENSE OF BLAMING HER VICTIMS ..................................1

II.     MOTION *IN LIMINE* NO. 2:  THE COURT SHOULD PRECLUDE THE DEFENSE
FROM REFERENCING PUNISHMENT IN FRONT OF THE JURY......................................................4

III.    MOTION *IN LIMINE* NO. 3:  THE COURT SHOULD PRECLUDE AN
IMPROPER ADVICE-OF-COUNSEL DEFENSE.......................................................................................5

IV.     MOTION *IN LIMINE* NO. 4:  THE COURT SHOULD PRECLUDE A DEFENSE
ARGUMENT THAT THE GOVERNMENT'S CHARGING DECISIONS WERE
INFLUENCED BY COORDINATION WITH JOURNALISTS OR COMPETITORS ...........................6

V.      MOTION *IN LIMINE* NO. 5:  THE COURT SHOULD PRECLUDE DEFENDANT
FROM PRESENTING AN IMPROPER GOOD FAITH DEFENSE .........................................................7

VI.     MOTION *IN LIMINE* NO. 6:  THE COURT SHOULD ADMIT CMS' JANUARY
26, 2016 FORM CMS-2567, STATEMENT OF DEFICIENCIES............................................................8

        A.      Factual Background ..............................................................................................................8

        B.      Argument ...............................................................................................................................9

VII.    MOTION *IN LIMINE* NO. 7:  THE COURT SHOULD ADMIT TEXT MESSAGES
BETWEEN DEFENDANT AND BALWANI OFFERED BY THE GOVERNMENT...........................10

        A.      Factual Background ............................................................................................................10

        B.      Argument .............................................................................................................................14

VIII.   MOTION *IN LIMINE* NO. 8:  THE COURT SHOULD ADMIT STATEMENTS BY
THERANOS AND THERANOS EMPLOYEES AND AGENTS OFFERED BY THE
GOVERNMENT.....................................................................................................................................15

IX.     MOTION *IN LIMINE* NO. 9:  THE COURT SHOULD EXCLUDE SELF-SERVING
HEARSAY STATEMENTS MADE AND OFFERED BY DEFENDANT .............................................17

X.      MOTION *IN LIMINE* NO. 10:  THE COURT SHOULD ADMIT RELEVANT
TESTIMONY FROM "NON-PAYING" PATIENT WITNESSES.........................................................20

XI.     MOTION *IN LIMINE* NO. 11:  THE COURT SHOULD ORDER DEFENDANT TO
PRODUCE REVERSE *JENCKS* INCLUDING ANY *IN CAMERA* PROFFERS...................................24

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Beech Aircraft Corp. v. Rainey*,
    488 U.S. 153 (1988) ............................................................................................ 19

*Hunt v. Blackburn*,
    128 U.S. 44 (1888) .............................................................................................. 5

*Neder v. United States*,
    527 U.S. 1 (1999) .......................................................................................... 2, 21

*SEC v. Jasper*,
    675 F.3d 1116 (9th Cir. 2012) ......................................................................... 10

*Shannon v. United States*,
    512 U.S. 573 (1994) ............................................................................................ 4

*Tome v. United States*,
    513 U.S. 150 (1995) .......................................................................................... 19

*United States v. Agne*,
    214 F.3d 47 (1st Cir. 2000) .............................................................................. 16

*United States v. Allen*,
    201 F.3d 163 (2d Cir. 2000) ............................................................................... 2

*United States v. Benny*,
    786 F.2d 1410 (9th Cir. 1986) ........................................................................... 7

*United States v. Biesiadecki*,
    933 F.2d 539 (7th Cir. 1991) ............................................................................. 2

*United States v. Blixt*,
    548 F.3d 882 (9th Cir. 2008) ............................................................................. 1

*United States v. Bush*,
    626 F.3d 527 (9th Cir. 2010) ......................................................................... 5, 6

*United States v. Castillo*,
    181 F.3d 1129 (9th Cir. 1999) ......................................................................... 23

*United States v. Chang Da Liu*,
    538 F.3d 1078 (9th Cir. 2008) ......................................................................... 19

*United States v. Ciccone*,
    219 F.3d 1078 (9th Cir. 2000) ........................................................................... 1

*United States v. Collicott*,
    92 F.3d 973 (9th Cir. 1996) ............................................................................. 19

*United States v. Colton*,
    231 F.3d 890 (4th Cir. 2000) ............................................................................. 1

*United States v. Coyle*,
    63 F.3d 1239 (3d Cir. 1995) .............................................................................. 2

*United States v. Daniel*,
    329 F.3d 480 (6th Cir. 2003) ............................................................................. 2

*United States v. DiStefano*,
    129 F. Supp. 2d 342 (S.D.N.Y. 2001) ................................................................ 3
*United States v. Fernandez*,
    839 F.2d 639 (9th Cir. 1988) ............................................................................ 19
*United States v. Frank*,
    956 F.2d 872 (9th Cir. 1992) .............................................................................. 4
*United States v. Fryberg*,
    854 F.3d 1126 (9th Cir. 2017) .......................................................................... 10
*United States v. Gibson*,
    690 F.2d 697 (9th Cir. 1982) ............................................................................ 16
*United States v. Hickey*,
    580 F.3d 922 (9th Cir. 2009) .......................................................................... 7, 9
*United States v. Ibarra-Alcarez*,
    830 F.2d 968 (9th Cir. 1987) .............................................................................. 6
United *States v. Jones*,
    982 F.2d 380 (9th Cir. 1992) ............................................................................ 23
*United States v. Kenny*,
    645 F.2d 1323 (9th Cir. 1982) .......................................................................... 18
*United States v. Kirk*,
    844 F.2d 660 (9th Cir. 1988) ...................................................................... 16, 18
*United States v. Kreimer*,
    609 F.2d 126 (5th Cir. 1980) .............................................................................. 2
*United States v. Lew*,
    875 F.2d 219 (9th Cir. 1989) ............................................................................ 20
*United States v. Lillard*,
    354 F.3d 850 (9th Cir. 2003) ............................................................................ 24
*United States v. Lindsey*,
    850 F.3d 1009 (9th Cir. 2017) ........................................................................ 1, 2
*United States v. Loftis*,
    843 F.3d 1173 (9th Cir. 2016) .......................................................................... 23
*United States v. Lopez*,
    762 F.3d 852 (9th Cir. 2014) ............................................................................ 10
*United States v. Matlock*,
    415 U.S. 164 (1974) .......................................................................................... 18
*United States v. Mitchell*,
    502 F.3d 931 (9th Cir. 2007) ............................................................................ 18
*United States v. Olano*,
    62 F.3d 1180 (9th Cir. 1995) .............................................................................. 4
*United States v. Ortega*,
    203 F.3d 675 (9th Cir. 2000) ............................................................................ 19
*United States v. Pelisamen*,
    641 F.3d 399 (9th Cir. 2011) ............................................................................ 18

*United States v. Pinson,*
   584 F.3d 972 (10th Cir. 2009) .............................................................. 5
*United States v. Ramsey,*
   785 F.2d 184 (7th Cir. 1986) .............................................................. 16
*United States v. Reed,*
   641 F.3d 992 (8th Cir. 2011) ............................................................... 7
*United States v. Svete,*
   556 F.3d 1157 (11th Cir. 2009) ........................................................... 2
*United States v. Thomas,*
   377 F.3d 232 (2d Cir. 2004)........................................................... 3, 14
*United States v. Utz,*
   886 F.2d 1148 (9th Cir. 1989) ........................................................... 24
*United States v. Warren,*
   25 F.3d 890 (9th Cir. 1994) ............................................................... 24
*United States v. Williams,*
   989 F.2d 1061 (9th Cir. 1993) ........................................................... 24
*United States v. Winkle,*
   477 F.3d 407 (6th Cir. 2003) ............................................................... 2
*United States v. Workman,*
   138 F.3d 1261 (8th Cir. 1998) ............................................................. 5
*United States v. Yeager,*
   331 F.3d 1216 (11th Cir. 2003) ........................................................... 2
*Wayte v. United States,*
   470 U.S. 598 (1985)............................................................................ 7
*Zal v. Steppe,*
   968 F.2d 924 (9th Cir. 1992) ............................................................... 4

**Statutes**

28 U.S.C. § 515............................................................................ 1, 2, 26
42 U.S.C. 263(a) .................................................................................. 8

**Rules**

Fed. R. Crim. P. 26.2(a)..................................................................... 24
Fed. R. Crim. P. 26.2(e)..................................................................... 25
Fed. R. Evid. 402.................................................................................. 7
Fed. R. Evid. 403.................................................................................. 7
Fed. R. Evid. 801(d)(2)(A) ........................................................... 14, 18
Fed. R. Evid. 801(d)(2)(B) ................................................................. 17
Fed. R. Evid. 801(d)(2)(D) ........................................................... 16, 17
Fed. R. Evid. 803(6) ........................................................................... 10

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

I.     **MOTION *IN LIMINE* NO. 1:  THE COURT SHOULD PRECLUDE DEFENDANT FROM OFFERING AN IMPROPER DEFENSE OF BLAMING HER VICTIMS**

At trial, the government anticipates that Defendant may attempt to justify her conduct by arguing or presenting evidence that the victims in this case – in particular, relatively sophisticated investor victims – could have or should have exercised more diligence or skepticism in their dealings with Theranos.  Defendant also may attempt to argue that the victims did not in fact rely on the materially false and misleading statements made by her and her co-conspirators.  Defendant should be precluded from pursuing this strategy, which would distract the jury from the central issues in this case: Defendant's intent to defraud and the falsity and materiality of her statements.

The Third Superseding Indictment ("TSI") in this case charges Defendant with multiple counts of wire fraud as well as conspiracy to commit wire fraud under two distinct schemes to defraud.  Because reliance and damages are not elements of these crimes, it is no defense that the victim of the fraud was negligent or gullible.  *See, e.g.*, *United States v. Blixt*, 548 F.3d 882, 889 (9th Cir. 2008) (In a mail fraud case, "[w]hat is important is the intent of the person making the statement that it be in furtherance of some fraudulent purpose.") (citation omitted); *United States v. Ciccone*, 219 F.3d 1078, 1083 (9th Cir. 2000) ("It is immaterial whether only the most gullible would have been deceived by the defendants' scheme…. [T]he wire fraud statute protects the naive as well as the worldly-wise.") (quotation and citation omitted).

Consistent with these principles, the Ninth Circuit has held in a wire fraud case that the defendant could not rely on a bank's negligence in verifying loan application information, and affirmed the district court's preclusion of evidence and argument on that topic.  *United States v. Lindsey*, 850 F.3d 1009, 1015 (9th Cir. 2017).  In *Lindsey*, the defendant, a mortgage loan officer, attempted to argue that mortgage lending in 2006-2007 functioned like the "Wild West," with banks not really caring about the quality of their mortgage lending.  *Id*. at 1012-13.  The district court ordered the defendant to "stay away" from such arguments.  *Id*.  The Ninth Circuit affirmed the district court's ruling, noting:

> Several of our sister circuits have held that a fraud victim's negligence is not a defense to criminal charges under the federal fraud statutes.  *See United States v. Colton*, 231 F.3d 890, 903 (4th Cir. 2000) ("The susceptibility of the victim of the fraud, in this case a

financial institution, is irrelevant to the analysis: If a scheme to defraud has been or is
intended to be devised, it makes no difference whether the persons the schemers intended
to defraud are gullible or skeptical, dull or bright." (internal quotation marks omitted));
*see also United States v. Svete*, 556 F.3d 1157, 1165 (11th Cir. 2009) (en banc) ("A
perpetrator of fraud is no less guilty of fraud because his victim is also guilty of
negligence."); *United States v. Allen*, 201 F.3d 163, 167 (2d Cir. 2000) (per curiam)
("The victim's negligence in permitting a crime to take place does not excuse the
defendant from culpability for [the] substantive offense . . . ."); *United States v. Coyle*, 63
F.3d 1239, 1244 (3d Cir. 1995) ("The negligence of the victim in failing to discover a
fraudulent scheme is not a defense to criminal conduct."); *United States v. Kreimer*, 609
F.2d 126, 132 (5th Cir. 1980) ("The victim's negligence is not a defense to criminal
conduct.").

*Id.* at 1014–15.

Similarly, the Supreme Court has confirmed that, while materiality is an element of the wire

fraud offense, "the government does not have to prove actual reliance upon the defendant's

misrepresentations." *Neder v. United States*, 527 U.S. 1, 25 (1999).[1]  In this regard, the proof required

to establish criminal fraud is entirely different from that required in a civil case.  *See id.* at 24-25.  Since

*Neder*, Courts of Appeal have routinely affirmed district court rulings precluding testimony relating to

the question of whether a defendant's fraudulent statements actually misled the intended victim.  *See*

*United States v. Biesiadecki*, 933 F.2d 539, 544 (7th Cir. 1991) (affirming district court's decision

precluding testimony from customers who were not misled by defendant's statements; holding that the

"excluded testimony of the other . . . customers would have improperly shifted the jury's attention away

from the knowledge and intent of [the defendant] and focused instead on the beliefs of the victims of the

alleged scheme to defraud."); *see also United States v. Yeager*, 331 F.3d 1216, 1221 (11th Cir. 2003);

*United States v. Daniel*, 329 F.3d 480, 486-87 (6th Cir. 2003).

This reasoning is consistent with similar rulings by other courts in cases involving fraudulent

schemes.  For example, it would be irrelevant if some bank or lender employee had overlooked a "red

flag" associated with a fraudulent loan application.  *United States v. Winkle*, 477 F.3d 407, 414 n.3 (6th

Cir. 2003) ("[T]he victim of a bank fraud is the bank, not the CEO of the bank, and approval of a bank

---

[1]      *Lindsey* also holds that "[a] false statement is material if it *objectively* had a tendency to
influence, or was capable of influencing, a lender to approve a loan.  This standard is not concerned with
a statement's subjective effect on the victim, but only the intrinsic capabilities of the false statement
itself."  850 F.3d at 1015 (emphasis in original; citation and internal quotations omitted).

officer does not relieve a defendant of liability for bank fraud.") (citations omitted).  Similarly, in a scheme to induce travel for a fraudulent purpose, the Second Circuit rejected the defendant's argument that the "foolishness of the [victim] in [the defendant's] scheme somehow vitiates [the defendant's] fraudulent intent."  *United States v. Thomas*, 377 F.3d 232, 243 (2d Cir. 2004) (collecting cases and upholding district court's exclusion of evidence and testimony relating to gullibility of victim).  Under the case law above, the Court should preclude the defense from arguing that the victims were negligent, were not actually misled, or were otherwise at fault in this case.

Defendant also might attempt to introduce a related improper defense focusing on the culture of Silicon Valley startups, arguing that founders in this area frequently use exaggeration and dramatic promises to generate needed attention for their companies and attract capital.  This defense is simply a region-specific version of "other people committed the same crime."  To be sure, Defendant was not the first person to commit fraud in connection with investments into a Bay Area startup.  At trial, the defense may attempt to minimize Defendant's conduct by eliciting testimony regarding other instances of similar fraudulent schemes, perhaps highlighting cases where no criminal charges were brought.  Such testimony would be improper, as there is no "other people did it too" defense to wire fraud or conspiracy.  Thus, reference to any wrongdoing committed by individuals other than the defendants or co-conspirators during voir dire or trial would be irrelevant and prejudicial, and should therefore be excluded pursuant to Federal Rules of Evidence 401-403.  *See United States v. King*, No. CR-08-002-E-BLW, 2009 U.S. Dist. LEXIS 32935, at *7-8 (D. Idaho Apr. 17, 2009) ("Evidence of selective prosecution . . . would be irrelevant and unfairly prejudicial to present to the jury."); *see also United States v. DiStefano*, 129 F. Supp. 2d 342, 348 (S.D.N.Y. 2001) (rejecting defendant's selective enforcement claim regarding the existence of other uncharged co-workers engaging in the same conduct).  The sole question for this trial is whether Defendant engaged in the charged conduct.  The Court should not allow any argument or evidence from Defendant suggesting that she should be acquitted because others have committed those offenses as well.

For these reasons, the Court should preclude Defendant from offering an improper defense of blaming her victims.

/ /

## II.    MOTION *IN LIMINE* NO. 2:  THE COURT SHOULD PRECLUDE THE DEFENSE FROM REFERENCING PUNISHMENT IN FRONT OF THE JURY.

The government moves to preclude, as irrelevant and prejudicial, any reference by the defense to the Defendant's alleged suffering or potential punishment during any phase of the trial, including jury selection, opening statements, examination of witnesses (including the Defendant, if she elects to testify), and summation.  Impermissible references to punishment could be overt; for example, "The defendant is facing a prison term if convicted."  But such references could also be subtler; for example, that "the Defendant is facing a lot of time," "the case has serious consequences for the Defendant," "the Defendant's liberty is at stake in this trial," or "your decision will have consequences for a long time to come."  Once the jury hears anything about punishment or other consequences, the bell simply cannot be unrung or the damage neutralized by a curative instruction.

"It has long been the law that it is inappropriate for a jury to consider or be informed of the consequences of their verdict." *United States v. Frank*, 956 F.2d 872, 879 (9th Cir. 1992).  "The jury's function is to find facts and to decide whether, on those facts, defendant is guilty of the crime charged." *Shannon v. United States*, 512 U.S. 573, 579 (1994).  Information about penalty and punishment "draw[s] the attention of the jury away from their chief function as the sole judges of the facts, opens the door to compromise verdicts, and confuses the issues to be decided."  *United States v. Olano*, 62 F.3d 1180, 1202 (9th Cir. 1995); *see also Shannon*, 512 U.S. at 579 ("[P]roviding jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion.").  Accordingly, the defense should be precluded from making any reference to the Defendant's alleged suffering or potential punishment in the presence of the jury, whether in statements, questions, or argument.

Other attempts at jury nullification are likewise improper.  "[N]either a defendant nor his attorney has a right to present to a jury evidence that is irrelevant to a legal defense to, or an element of, the crime charged.  Verdicts must be based on the law and the evidence, not on jury nullification as urged by either litigant." *Zal v. Steppe*, 968 F.2d 924, 930 (9th Cir. 1992) (Trott, J., concurring). Whether the types of comments cited above evoke punishment, encourage jury nullification, or both,

they are irrelevant and improper.  The Court should preclude the defense from making any such statements at trial.

## III.   MOTION *IN LIMINE* NO. 3:  THE COURT SHOULD PRECLUDE AN IMPROPER ADVICE-OF-COUNSEL DEFENSE

The defense should be precluded from soliciting testimony or making arguments suggesting that Defendant relied upon advice given to her by attorneys as a defense to the charged offenses.  This Court should preclude both (1) defense solicitation of testimony suggesting that attorneys made statements to Defendant or that Defendant relied upon such statements in an attempt to negate intent; and also (2) a formal advice-of-counsel defense and the associated jury instruction.  First, while falling short of presenting a full advice-of-counsel defense, and thus avoiding the affirmative obligations such a defense places upon its proponent, Defendant still may try to elicit testimony from attorney-witnesses suggesting that they made certain statements to her.  Additionally, Defendant may attempt to elicit testimony from former Theranos employees concerning statements attorneys may have made.  The Court should rule *in limine* that this type of testimony is prohibited.  First, while Defendant has put at least one of Theranos's attorneys, David Taylor, on her witness list, she has not waived any applicable privileges related to her relationships with counsel.  When defendants invoke an advice-of-counsel defense, they waive any attorney-client privilege they previously enjoyed.  *See, e.g., Hunt v. Blackburn*, 128 U.S. 44, 407-71 (1888) (when defendant entered into a defense which relied upon what her lawyer told her, she waived her right to object to him giving his own account); *United States v. Bush*, 626 F.3d 527, 539 (9th Cir. 2010) (an advice-of-counsel instruction requires the defendant to show he made a full disclosure of all material facts to his attorney); *United States v. Pinson*, 584 F.3d 972, 977 (10th Cir. 2009) (when defendant invoked an advice of counsel defense, he waived his attorney-client privilege as to all advice received concerning the same subject matter); *United States v. Workman*, 138 F.3d 1261, 1263 (8th Cir. 1998) (attorney-client privilege can be implicitly waived by raising an advice of counsel defense)  Since Defendant continues to assert the existence of an attorney-client privilege between herself and Boies Schiller Flexner LLP, she must therefore be precluded from eliciting statements made between Defendant and her attorneys.

Second, this Court should preclude Defendant from asserting a formal advice-of-counsel defense. While the government concedes that ordinarily the Court may wait until hearing the evidence presented at trial to rule on the appropriate jury instructions (such as an affirmative advice-of-counsel defense), the defense has given the government no notice of an intent to offer an advice-of-counsel defense. Moreover, the defense has continued to assert applicable privileges between herself and her attorneys. Therefore, she fails to meet the waiver prerequisite to asserting an advice-of-counsel defense, and should be precluded from asserting a formal advice-of-counsel defense. The Ninth Circuit has held that such a defense requires a showing by the Defendant that (1) she fully disclosed all material facts to her attorney and (2) she relied in good faith on the specific course of conduct recommended by her attorney. *See, e.g.*, *United States v. Ibarra-Alcarez*, 830 F.2d 968, 973 (9th Cir. 1987). Under Ninth Circuit law, the defendant is required to have affirmatively sought out advice from an attorney or other professional. *See United States v. Bush*, 626 F.3d 527, 539 (9th Cir. 2010) (defendant not entitled to an "advice of counsel" instruction because of failure to present evidence that he fully advised his attorney of his plan, received advice regarding that plan from the attorney, and followed that exact advice in good faith).

## IV.  MOTION *IN LIMINE* NO. 4: THE COURT SHOULD PRECLUDE A DEFENSE ARGUMENT THAT THE GOVERNMENT'S CHARGING DECISIONS WERE INFLUENCED BY COORDINATION WITH JOURNALISTS OR COMPETITORS

The defense should be precluded from making baseless assertions regarding coordination between the government's criminal investigation and third parties such as journalists or other lab testing companies. While third-party testimony may be relevant when the journalist or lab company employee was a percipient witness to relevant events, the defense should be precluded from arguing to the jury that the government's investigation or charging decisions were unduly influenced by the input of lab companies, such as Quest or LabCorp, or journalists, such as John Carreyrou. First, such a defense argument would be contrary to the evidence; the government did not coordinate with lab testing companies or journalists. Indeed, no attorney or agent on the prosecution team has ever had a substantive conversation with Mr. Carreyrou, Quest, or Labcorp in connection with this case. Second, by alleging such coordination happened, the defense would not only be arguing something untrue to the

jury, it would also be implying that such coordination is relevant for some determination the jury must make.  In other words, a defense argument suggesting coordination between the government and certain third parties fails the relevance test under Federal Rule of Evidence 401.

The Supreme Court has recognized that "[i]n our criminal justice system, the Government retains 'broad discretion' as to whom to prosecute."  *Wayte v. United States*, 470 U.S. 598, 607 (1985) (quotation omitted).  Inquiries into the government's charging decisions have no tendency to make the existence of any fact that is of consequence to the action more probable or less probable and are thus irrelevant.  FED. R. EVID. 402.  And even if the inquiries into the government's charging decisions had any marginal probative value, they are substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury.  FED. R. EVID. 403; *see also United States v. Reed*, 641 F.3d 992, 993-94 (8th Cir. 2011) (many factors unrelated to guilt may influence charging decisions and therefore their admission risks misleading the jury and confusing the issues).  Thus, Defendant should not be allowed to suggest that the jury consider the government's charging decisions, including baseless arguments that those decisions were unduly influenced by journalists or other outside sources.

## V.   MOTION *IN LIMINE* NO. 5:  THE COURT SHOULD PRECLUDE DEFENDANT FROM PRESENTING AN IMPROPER GOOD FAITH DEFENSE

Defendant might attempt to present evidence or argument that she should be acquitted because she acted in good faith.  Defendant might claim, despite her deception of investors, that she always intended to make those victims' investments profitable, such that the victims would suffer no loss when all was said and done.  That argument—and any argument along those lines—should be barred, as they do not constitute recognized legal defenses to the charges and are therefore improper and irrelevant.

The Ninth Circuit has recognized "[w]hile an honest, good-faith belief in the truth of the misrepresentations may negate intent to defraud, a good-faith belief that the victim will be repaid and will sustain no loss is no defense at all."  *United States v. Benny*, 786 F.2d 1410, 1417 (9th Cir. 1986) (actual loss is not an element of securities fraud).  In other words, even if Defendant genuinely intended that her victims' investments would return a profit for them once Theranos became successful, Defendant would still be guilty of the charged offenses if her actions otherwise met the elements.  *See United States v. Hickey*, 580 F.3d 922, 931 (9th Cir. 2009) (finding that the trial court properly excluded

expert testimony on good faith).  In light of the above, this Court should exclude evidence and

arguments that Defendant believed in good faith that her victims would be repaid and would sustain no

loss.

**VI.  MOTION *IN LIMINE* NO. 6:  THE COURT SHOULD ADMIT CMS' JANUARY 26, 2016 FORM CMS-2567, STATEMENT OF DEFICIENCIES**

**A.  Factual Background**

Defendant raised hundreds of millions of dollars based on claims that Theranos operated the

world's first and only high-complexity, CLIA-certified laboratory running its tests on micro-samples.[2]

She claimed to investors that Theranos generated significantly higher integrity data than currently

possible and met "[a] new standard in quality" with "[t]he highest levels of accuracy."  *See* Declaration

of AUSA Robert S. Leach in Support of United States' Motions *in Limine* ("Leach Decl."), Ex. A

(RDV012673 at pp.3 & 30).

Beginning in September 2015, CMS conducted a CLIA recertification and complaint survey of

Theranos's Newark laboratory.  Sarah Bennett and Gary Yamamoto were among the CMS surveyors;

the government currently intends to call one or both of them in its case-in-chief.  Based on the survey,

CMS found Theranos failed to comply with five conditions required for CLIA certification, as well as

numerous CLIA standards.  On January 26, 2016, CMS wrote Theranos regarding "CONDITION

LEVEL DEFICIENCIES – IMMEDIATE JEOPARDY."  Leach Decl. Ex. B (THER-0534383).  Based

on its survey, CMS determined that Theranos was not in compliance with all of the conditions required

for certification in the CLIA program.  CMS provided Theranos with a listing of all deficiencies

identified during the survey on a Form CMS-2567, Statement of Deficiencies.  The letter also stated

that, because Theranos failed to meet a condition-level requirement relating to hematology, "the

deficient practices of the laboratory pose immediate jeopardy to health and safety."  Among other

things, in the Form CMS-2567, CMS found Theranos failed to ensure that quality control ("QC") was

---

[2]  "CLIA" is an acronym for Clinical Laboratory Improvement Amendments.  *See* 42 U.S.C. 263a(a) *et seq*.  CLIA regulates laboratory testing and requires clinical laboratories to be certified by CMS before they can accept human samples for diagnostic testing.  CMS is also charged with implementing CLIA, including laboratory registration and surveys.  *See, e.g.,* https://www.cms.gov/Regulations-and-Guidance/ Legislation/ CLIA/ Program_Descriptions_Projects.
.

acceptable for the Theranos Proprietary System (TPS/Edison 3.5) prior to the reporting of patient test results, failed to ensure that quality control for PT/INR was acceptable prior to reporting patient test results, failed to verify accuracy, precision, and/or reportable reference range for numerous assays, and failed to verify the performance specifications and conduct of a third-party device it was using. *Id.* at THER-0534389-90, 394-95, 397, 403, 423-429, 435-440.

By letter dated April 1, 2016, after additional communications between Theranos and CMS, Theranos's lab director advised CMS that Theranos had "actually stopped running [a number of tests] either before or during the survey, and has not run them since."  The letter stated that "based on its dissatisfaction with prior QA oversight, the laboratory voided all results reported for the assays run on the Theranos Proprietary System 3.5 (TPS) in 2014 and 2015 and all reported PT/INR tests run on the Siemens Advia BCS XP instrument that went into use in October 2014 through September of 2015." *See, e.g.*, Leach Decl. Ex. C at p.2 (THER-0534701).

On April 18, 2016, Holmes stated publicly and to Theranos shareholders:  "I'm the founder and CEO of this company.  Anything that happens in this company is my responsibility, at the end of the day.  We stopped testing [in Newark], and have taken the approach of saying, let's rebuild this entire laboratory from scratch."  She said further "I know what we've built. . . ." *See, e.g.*, Leach Decl. Ex. D.

On October 24, 2016, Holmes caused Theranos to relinquish its CLIA certificate, close the Newark laboratory, and cease laboratory operations. *See, e.g.*, Leach Decl. Ex. E.

**B.      Argument**

The Court should admit the Form CMS-2567, Statement of Deficiencies.  It is clearly relevant evidence that Theranos, despite its representations to investors, was not capable of consistently producing accurate and reliable blood test results and that its proprietary analyzer had accuracy and reliability problems, as the TSI alleges.  It also demonstrates that Theranos had not met "[a] new standard in quality" with "[t]he highest levels of accuracy."

To the extent the Form CMS-2567, Statement of Deficiencies is arguably hearsay, it falls within the exception for public records. *See* FED. R. EVID. 803(8).  The exception applies to "[a] record or statement of a public office if: (A) it sets out: (i) the office's activities; [or] (ii) a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement

personnel . . . and (B) neither the source of information nor other circumstances indicate a lack of trustworthiness." The Form CMS-2567 is a statement of a public office (i.e., CMS) setting out matters observed while under a legal duty to report. *See, e.g.*, *United States v. Fryberg*, 854 F.3d 1126, 1131 (9th Cir. 2017) (affirming that a legal duty to report may exist in the absence of a statute or regulation expressly imposing duties to observe, report, and keep records and that the pertinent question is whether the creation and maintenance of the record at issue is appropriate to the function of the relevant government office given the nature of the responsibilities assigned to that office); *United States v. Lopez*, 762 F.3d 852, 862 (9th Cir. 2014). CMS surveyors like Bennett and Yamamoto, who through testimony may describe the survey and the Form CMS-2567, are not "law-enforcement personnel." Finally, there is nothing about the source of the information for the CMS form nor the circumstances under which it was prepared that indicate a lack of trustworthiness.[3]

To the extent the defense may suggest the Form CMS-2567 evidence is excludable under Rules 403 or 404(b), such arguments are mistaken. The evidence is direct evidence of the falsity of Defendant's statements. Its probative value is extremely high. Likewise, it is not improper "propensity" evidence but evidence of falsity, knowledge, intent, plan, and preparation – all permissible purposes under Rule 404(b). Finally, the CMS form is not unduly prejudicial.

For these reasons, the Court should admit CMS' January 26, 2016 Form CMS-2567, Statement of Deficiencies. The Court should also admit Theranos's statements in response to the Form CMS-2567 – which are not hearsay under Rule 801(d)(2)(A) through (D).

## VII.    MOTION *IN LIMINE* NO. 7:  THE COURT SHOULD ADMIT TEXT MESSAGES BETWEEN DEFENDANT AND BALWANI OFFERED BY THE GOVERNMENT

### A.    Factual Background

On September 6, 2016, the staff of the SEC issued a subpoena to Theranos requesting production of communications between Defendant and Balwani since the period January 1, 2010. Leach Decl. Ex. F. On July 7, 2017, an attorney with Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale"), who

---

[3]    The form also falls within the hearsay exception for records of regularly conducted activity. *See* Fed. R. Evid. 803(6); *SEC v. Jasper*, 675 F.3d 1116, 1122-1124 (9th Cir. 2012) (holding restated financial statements filed with the SEC fell within the hearsay exception for business records).

represented both Theranos and Defendant, produced to the SEC a document Bates-numbered TS-1036239 through TS-1036827 (the "SEC Spreadsheet"), which he represented to be "a spreadsheet containing business-related text messages, iMessages, and Skype exchanges between Elizabeth Holmes and Sunny Balwani." *Id.* Ex. G.  On July 11 and 13 and August 23, 2017, Defendant testified under oath before the SEC.  During testimony, the SEC Spreadsheet was shown to Defendant and marked as an exhibit.  Defendant testified she had no reason to believe the document is not a true collection of text messages between her and Balwani on her work cell phone.  *Id.* Ex. H (Holmes SEC Testimony p. 375-76).  Subsequently, a second attorney with WilmerHale submitted to the SEC a declaration under penalty of perjury certifying records of regularly conducted activity, which stated:  "I certify that the document produced at TS-1036239 through TS-1036827 is a spreadsheet containing Theranos business-related text messages, iMessages, and Skype exchanges between Ms. Holmes and Mr. Balwani.  These messages and exchanges were sourced from images taken of Ms. Holmes' business phones, as well as messaging applications on Ms. Holmes' computer." *Id.* Ex. I.

On September 6, 2017, the Grand Jury issued a subpoena to Theranos for "[a]ll text or SMS messages sent or received by cellular phones owned or paid for by Theranos, and used by either Elizabeth Holmes or Sunny Balwani." *Id.* Ex. J (Theranos-DOJ TL000093).  On October 3, 2017, WilmerHale represented to the government:  "With respect to Ms. Holmes's phones, we will produce all text message exchanges between Ms. Holmes and Mr. Balwani redacting only those that are sexual in nature." *Id.*  On November 7, 2017, WilmerHale produced to the FBI a document Bates-numbered THER-2566547 through THER-2567135 (the "DOJ Spreadsheet"), which WilmerHale represented to be "a spreadsheet reflecting text messages sent to and from Elizabeth Holmes and Ramesh Balwani as collected from Elizabeth Holmes's Company-issued devices.  These text messages were originally produced at TS-1036239 through TS-1036827, and are being reproduced today with revised redactions pursuant to the guidelines discussed on our October 2, 2017 call with Mr. Schenk and Mr. Bostic." *Id.* Ex. K.  The DOJ Spreadsheet generally has fewer redactions from the SEC Spreadsheet.

The Spreadsheets are replete with admissions by Defendant and Balwani that demonstrate their knowledge that their statements to investors were false and misleading and that Theranos's testing was beset with problems.  For example, on November 28, 2013, Balwani wrote:  "We are at $15m as of

today"—an apparent reference to Theranos's dwindling cash position.  Holmes replied:  "I saw that."

Leach Decl. Exs. L & M at 32.

On November 19, 2014, the Spreadsheets show the following texts:

| Date Time | Content | From Name | To Name |
|-----------|---------|-----------|---------|
| 11/19/2014 4:56:32 | Customer service seems to be terrible. Everyone complaining. | sunnybalwani@mac.com | Elizabeth Holmes |
| 11/19/2014 4:56:32 | Need to focus on ops.  Getting hurt in market. | sunnybalwani@mac.com | Elizabeth Holmes |
| 11/19/2014 4:58:07 | Yes. | Elizabeth Holmes | sunnybalwani@mac.com |
| 11/19/2014 4:58:15 | We have to own this. | Elizabeth Holmes | sunnybalwani@mac.com |
| 11/19/2014 4:58:40 | Lab, customer service, tat, all need director level people | sunnybalwani@mac.com | Elizabeth Holmes |
| 11/19/2014 4:58:40 | No.  She is still great.  She is just trying to manage a lot m | sunnybalwani@mac.com | Elizabeth Holmes |
| 11/19/2014 4:58:40 | She is doing all of this. | sunnybalwani@mac.com | Elizabeth Holmes |
| 11/19/2014 4:58:40 | Tracy seemed burnt out | sunnybalwani@mac.com | Elizabeth Holmes |
| 11/19/2014 4:59:18 | Exactly | Elizabeth Holmes | sunnybalwani@mac.com |
| 11/19/2014 4:59:49 | Hmm | Elizabeth Holmes | sunnybalwani@mac.com |
| 11/19/2014 4:59:58 | Burnt out like problem? | Elizabeth Holmes | sunnybalwani@mac.com |
| 11/19/2014 5:00:32 | We will help her | Elizabeth Holmes | sunnybalwani@mac.com |
| 11/19/2014 5:00:40 | By doing this | Elizabeth Holmes | sunnybalwani@mac.com |
| 11/19/2014 5:00:48 | Imo | sunnybalwani@mac.com | Elizabeth Holmes |
| 11/19/2014 5:00:48 | Need professionals across the board.  Need PMs and Allison out ASAP. | sunnybalwani@mac.com | Elizabeth Holmes |
| 11/19/2014 5:00:48 | Waste of time imp | sunnybalwani@mac.com | Elizabeth Holmes |
| 11/19/2014 5:00:48 | We need.  The lab and call center fixed.. | sunnybalwani@mac.com | Elizabeth Holmes |
| 11/19/2014 5:00:57 | Exactly | Elizabeth Holmes | sunnybalwani@mac.com |
| 11/19/2014 5:01:21 | Yes | Elizabeth Holmes | sunnybalwani@mac.com |
| 11/19/2014 5:01:33 | Met w all PMs here on new roles today | Elizabeth Holmes | sunnybalwani@mac.com |
| 11/19/2014 5:01:45 | Getting on pagers pre thx giving | Elizabeth Holmes | sunnybalwani@mac.com |
| 11/19/2014 5:02:50 | We need call center manager, new call center team, get recurrent crew out of docs facing communications | sunnybalwani@mac.com | Elizabeth Holmes |
| 11/19/2014 | Current crew out | sunnybalwani@mac.com | Elizabeth Holmes |

| Date Time | Content | | |
|---|---|---|---|
| 5:02:56 | | | |
| 11/19/2014 5:02:56 | Fundamentally we need to stop fighting fires by not creating them | sunnybalwani@mac.com | Elizabeth Holmes |
| 11/19/2014 5:03:19 | Yes | Elizabeth Holmes | sunnybalwani@mac.com |
| 11/19/2014 5:05:04 | 18C, ctn, tip coating | sunnybalwani@mac.com | Elizabeth Holmes |
| 11/19/2014 5:05:04 | Call center,tech support, everything | sunnybalwani@mac.com | Elizabeth Holmes |
| 11/19/2014 5:05:04 | It will be ideal to put all ops in Az so they are managed professionally and away from hq | sunnybalwani@mac.com | Elizabeth Holmes |
| 11/19/2014 5:05:04 | New lab dirs, lab manager like Tracy | sunnybalwani@mac.com | Elizabeth Holmes |
| 11/19/2014 5:05:04 | Rebuild | sunnybalwani@mac.com | Elizabeth Holmes |
| 11/19/2014 5:05:52 | Fundamentally we need to stop fighting fires by not creating them | Elizabeth Holmes | sunnybalwani@mac.com |
| 11/19/2014 5:06:06 | Need to fix root cause here | Elizabeth Holmes | sunnybalwani@mac.com |
| 11/19/2014 5:07:09 | Yes | Elizabeth Holmes | sunnybalwani@mac.com |
| 11/19/2014 5:07:12 | Exactly | Elizabeth Holmes | sunnybalwani@mac.com |
| 11/19/2014 5:07:50 | Call center manager and new doc facing call center in 1701. | sunnybalwani@mac.com | Elizabeth Holmes |
| 11/19/2014 5:08:56 | We can't scale with wag. | sunnybalwani@mac.com | Elizabeth Holmes |
| 11/19/2014 5:09:09 | They are terrible and we need swy and cvs | sunnybalwani@mac.com | Elizabeth Holmes |
| 11/19/2014 5:09:33 | It's time | Elizabeth Holmes | sunnybalwani@mac.com |

*See* Leach Decl. Exs. L & M at 53-54.

On November 28, 2014, the Spreadsheets show the following texts:

| Date Time | Content | From Name | To Name |
|---|---|---|---|
| 11/28/2014 23:12:42 | Normandy lab is a fucking disaster zone.  Glad I came here.  Will work on fixing this. | Sunny Balwani | Elizabeth Holmes |
| 11/28/2014 23:13:51 | Meant to be that your there apparently . . What happened | Elizabeth Holmes | Sunny Balwani |
| 11/28/2014 23:30:01 | Just called you to checkin.  Call anytime / when convenient | Elizabeth Holmes | Sunny Balwani |
| 11/28/2014 23:30:08 | In Normandy.  Will call when I leave. | Sunny Balwani | Elizabeth Holmes |
| 11/28/2014 23:31:24 | No rush.  Just checking in. | Elizabeth Holmes | Sunny Balwani |
| 11/28/2014 23:32:16 | I will get Tina out.  We need software person ruining [sic] this.  Between Tina and Max we have a mess. | Sunny Balwani | Elizabeth Holmes |

| 11/28/2014 23:33:23 | I could not agree more. | Elizabeth Holmes | Sunny Balwani |

*See* Leach Decl. Exs. L & M at 59.

On April 20, 2015, the Spreadsheets show:

| Date Time | Content | From Name | To Name |
|---|---|---|---|
| 4/20/2015 19:41:10 | Can we take FS [live] tomorrow | Elizabeth Holmes | Sunny Balwani |
| 4/20/2015 19:41:43 | ? | Sunny Balwani | Elizabeth Holmes |
| 4/20/2015 19:41:52 | U mean Gc? | Sunny Balwani | Elizabeth Holmes |
| 4/20/2015 19:41:52 | Very risky.  We need more software testing. | Sunny Balwani | Elizabeth Holmes |
| 4/20/2015 19:43:05 | Yes. | Elizabeth Holmes | Sunny Balwani |
| 4/20/2015 19:44:00 | Checking but very risky | Sunny Balwani | Elizabeth Holmes |

*See* Leach Decl. Exs. L & M at 127.

In addition, as CMS was performing its survey (described above), Balwani wrote: "Our validation reports are terrible.  Really painful going thru this process.  Same issues fda point out . . . . Going bad so far.  Pray.  Daniel has nothing ready.  Told me everything is in the binder.  Not there." Holmes replied shortly after: "Praying . . . . Praying continually."  *See* Leach Decl. Exs. L & M at 222-223.  On October 21, 2015, the same day Defendant falsely told *The Wall Street Journal* that Theranos "never used commercially available lab equipment for finger-stick based tests," Balwani confessed to her: "Worried about your 'all fingersticks on our technology' comment."  *Id.* at 240.

**B.      Argument**

The Court should admit the foregoing excerpts of the Spreadsheets, and any similar ones offered by the government.  The Spreadsheets are authentic and relevant.  Defendant's text messages to Balwani (and others) are not hearsay when offered by the government as an opposing party's statement.  *See* FED. R. EVID. 801(d)(2)(A) (providing a statement is not hearsay if "offered against an opposing party and was made by the party in an individual or representative capacity").  Balwani was Defendant's subordinate at Theranos, and thus his text messages to her are admissible for their truth (when offered by the government) because they are adopted admissions, authorized admissions, statements by a party's agent or employee on a matter within the scope of that relationship while it existed, or statements by a

co-conspirator during and in furtherance of the conspiracy.  *See id.* Rule 801(d)(2)(B)-(E).  And to the extent they are not, they are admissible to demonstrate Defendant's knowledge and intent and the effect on the hearer.  There are no other bases for exclusion.

For these reasons, the Court should admit the above-referenced texts from the Spreadsheets, and any similar ones offered by the government.

## VIII.   MOTION *IN LIMINE* NO. 8:  THE COURT SHOULD ADMIT STATEMENTS BY THERANOS AND THERANOS EMPLOYEES AND AGENTS OFFERED BY THE GOVERNMENT

Defendant was the founder, majority owner, chairman, president, and chief executive officer of Theranos.  In her words, she was "the ultimate decision maker for the company."  Leach Decl. Ex. H (Holmes SEC Testimony at p.167).  She has conceded:  "I was the CEO of the company, so I take responsibility for this company."  *Id.* at p.347; *see also id.* at p.240 ("I'm responsible for the company.") & p.488 (Q:  So what were your responsible for?  I was CEO of the company.").  She has conceded that she and Balwani were managing the company together and making decisions for the company together. *Id.* at p.856.  She controlled more than 51% of Theranos's outstanding shares.  Leach Decl. Ex. N (PFM-ROGS-00000046).  She had majority control of the voting power.  *Id.* Ex. O (THPFM0003051405). She was "involved in Theranos's vision, strategy, inventions, and creative pursuits . . . generally attended initial meetings with prospective investors . . . [and was] involved in communications with . . . Walgreens, Safeway, and potential partners."  *Id* Ex. N at pp.10, 23-24.  Because Defendant exercised total control over Theranos, statements by her company, its employees, and its agents are fairly attributed to her at trial.

Rule 801(d)(2) excludes from the hearsay definition (and thus the rule against hearsay) statements offered against an opposing party and

(A)      . . . made by the party in an individual or representative capacity;
(B)      . . . one the party manifested that it adopted or believed to be true;
(C)      . . . made by a person whom the party authorized to make a statement on the subject;
(D)      . . . made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or
(E)      . . . made by the party's coconspirator during and in furtherance of the conspiracy.

FED R. EVID. 801(d)(2) & 802.  "The rule specifies five categories of statements for which the responsibility of a party is considered sufficient to justify reception in evidence against [her]."  *Id.* advisory comm. note.

Applying these rules, the Ninth Circuit has repeatedly affirmed admission of statements by employees of private companies owned, controlled, and managed by an individual defendant.  For example, in *United States v. Kirk*, 844 F.2d 660 (9th Cir. 1988), the government charged the founder of a time share venture with conspiracy, wire fraud, and other offenses.  Kirk "ran the day-to-day operations" and exercised "control over the time share scheme."  *Id.* at 661.  The Ninth Circuit affirmed the conviction and admission of testimony from "Paradise Palms salespeople[] and co-defendants," holding that the statements "were admissible as nonhearsay statements of agents or employees under Fed. R. Evid. 801(d)(2)(D)."  *Id.* at 663.  The Ninth Circuit further stated:  "Many of the statements cited by Kirk as instances of hearsay were made by agents or employees of Paradise Palms.  The statements primarily described the nature and quality of the time share units, and the nature and extent of contractual obligations to prospective time share customers, therefore clearly falling within the scope of agency or employment."  *Id.*

Similarly, in *United States v. Gibson*, 690 F.2d 697, 699 (9th Cir. 1982), the government brought mail fraud, wire fraud, and other charges against Gibson, the founder, sole shareholder, chairman, and president of Gibson Marketing International, Inc. ("GMI"), which sold franchises and franchise distributorship rights.  *Id.* at 697.  At trial, the government introduced evidence of statements by GMI employees and salesmen against Gibson.  The Ninth Circuit found no error in admitting the statements.  The Ninth Circuit held that testimony by investors as to statements made by GMI employees were not hearsay but evidence of existence of the scheme.  *Id.* at 700-701.  The court added that "even if the testimony did fall within the hearsay definition, it would be admissible under either Rule 801(d)(2)(D) (statements by an agent) or Rule 801(d)(2)(E) (statements by a co-conspirator)."  *Id.* at 701.

Precedent from other circuits amply supports the common sense notion that the owner and president of a closely held company is responsible for the statements of the company's employees.  *United States v. Agne*, 214 F.3d 47, 54-55 (1st Cir. 2000) (citing cases); *United States v. Ramsey*, 785 F.2d 184, 191 (7th Cir. 1986) ("The victims testified to many statements of the four defendants . . . . The

defendants say that this was improper because the conspiracy was not established by sufficient non-hearsay evidence.  Marshall [the President of S.U.R.E., Inc.] cannot make this argument because the other three defendants were his employees at SURE, and a 'statement by his agent or servant concerning a matter within the scope of his agency or employment' is admissible without regard to the existence of a conspiracy." (quoting FED. R. EVID. 801(d)(2)(D)).

Accordingly, the Court should admit against Defendant relevant statements by Theranos agents and employees on matters within the scope of that relationship and while it existed.

The Court should also admit against Defendant statements by Theranos that she authorized or manifested that she adopted or believed to be true.  FED. R. EVID. 801(d)(2)(B) & (C).  For example, in prior litigation, Theranos, with Defendant's knowledge and approval, made sworn admissions under penalty of perjury.  Leach Decl. Exs. P, Q, & R.  Among other things, Theranos conceded that it earned less than $500,000 from blood testing revenue from 2013 to 2015; that its contracts with the Department of Defense were limited to three agreements producing de minimus revenue; that it modified third-party analyzers in order to process blood tests; that only 12 tests were ever run on a Theranos-manufactured device in its clinical lab; and that Theranos ceased all testing on Theranos-manufactured devices by June 2015.  Leach Decl. Ex. P at 35-38, Ex. Q at 22-24, 36-39, at Ex. R 22-23.  Holmes was a co-defendant in the lawsuit at the time the statements were made and her own interrogatory responses made reference to Theranos's statements (*see, e.g.*, Leach Decl. Ex. N at 16-18) – compelling the inference that she authorized her company's statements and manifested that she adopted or believed them to be true.

Accordingly, the Court should admit the discovery responses referenced above and any other statements by Theranos that Defendant authorized or manifested that she adopted or believed to be true, to the extent such responses are offered by the government.

## IX.    MOTION *IN LIMINE* NO. 9:  THE COURT SHOULD EXCLUDE SELF-SERVING HEARSAY STATEMENTS MADE AND OFFERED BY DEFENDANT

As founder of Theranos, Defendant represented the company in conversations with investors, in interviews with journalists, and in many other settings.  During the course of its investigation, the government has collected extensive evidence of previous statements by Defendant regarding Theranos's technology, business relationships, financial health, regulatory status, and other key topics.  The

government will seek to introduce Defendant's previous statements in its case-in-chief as proof that she

engaged in schemes to defraud investors and patients.  The Court, however, should reject any attempt by

Defendant to improperly admit her own prior statements.  Although Defendant may wish to introduce

witness testimony or direct evidence of self-serving statements she has made to the press, to victims, or

in her testimony to the SEC, such statements are inadmissible hearsay and must be excluded.

It is well settled that under Rule 801(d)(2)(A) of the Federal Rules of Evidence, only the

government can offer into evidence a defendant's prior statement.  The Rules of Evidence allow

admission of out-of-court statements if (1) made by the defendant and (2) offered against the defendant.

FED. R. EVID. 801(d)(2)(A); *see also United States v. Pelisamen*, 641 F.3d 399, 410 (9th Cir. 2011)

(defendant's own statements made during television interview admissible over hearsay objection).  The

admissibility of a defendant's statements under this rule does not depend on the substance of the

defendant's testimony at trial—or whether the defendant testifies at all.  *See United States v. Kenny*, 645

F.2d 1323, 1339-40 (9th Cir. 1982).  Indeed, a defendant's own out-of-court admissions "surmount all

objections based on the hearsay rule" and are "admissible for whatever inferences the [factfinder] could

reasonably draw."  *United States v. Matlock*, 415 U.S. 164, 172 (1974).[4]

While the Rules of Evidence allow the government to introduce out-of-court statements of

defendants and their agents, those rules preclude defendants from doing the same.  A plain reading of

Federal Rule of Evidence 801(d)(2)(A) exempts from hearsay only those party-opponent admissions that

are "offered against an opposing party."  FED. R. EVID. 801(d)(2) (emphasis added).  To the extent that

Defendant seeks admission at trial of her own out-of-court statements or those of agents acting on her

behalf, those statements constitute inadmissible hearsay unless they otherwise fall under an established

exception.  This is true even as to statements by Defendant that are arguably exculpatory, and even if

such exculpatory statements were not elicited on direct examination.  *See e.g.*, *United States v. Mitchell*,

502 F.3d 931, 964 (9th Cir. 2007) (defendant's attempt to elicit exculpatory statements he made during

---

[4]     Alternatively, certain statements made by Defendant—in particular, misrepresentations—are
admissible not for their truth but for the fact they were made.  *See, e.g.,* *United States v. Kirk*, 844 F.2d
660, 663 (9th Cir. 1988) (upholding admission of statements that constituted misrepresentations in a
fraudulent scheme).

interviews with agents was improper because "[t]hese statements were inadmissible hearsay; as [defendant] was attempting to introduce them himself, they were not party-opponent admissions"); *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000) ("[T]he district court did not abuse its discretion when it limited Ortega's ability to elicit his exculpatory hearsay statements on cross-examination" because otherwise "Ortega would have been able to place his exculpatory statements before the jury without subjecting himself to cross-examination, precisely what the hearsay rule forbids.") (quotation omitted); *United States v. Fernandez*, 839 F.2d 639, 640 (9th Cir. 1988) (district court properly precluded defense counsel from eliciting, on cross-examination, defendant's post-arrest statement denying participation in robbery).

The rule of completeness, codified in Rule 106 of the Federal Rules of Evidence, does not support a different result. As an initial matter, Rule 106 applies only to writings or recorded statements, not to oral conversations. *Ortega*, 203 F.3d at 682 ("the rule of completeness . . . applies to written and recorded statements."). Nor does the rule of completeness compel the admission of all statements made during the same event, e.g., the same interview. *Id.* ("[Defendant's] non-self-inculpatory statements are inadmissible even if they were made contemporaneously with other self-inculpatory statements."). Critically, the rule "does not compel admission of otherwise inadmissible hearsay evidence." *United States v. Collicott*, 92 F.3d 973, 983 (9th Cir. 1996) (quotation omitted). At trial, the Court should construe Rule 106 narrowly, applying it only where "misunderstanding or distortion can be averted only through presentation of another portion" or an excerpted document or recorded statement. *Id.* (quoting *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 172 (1988)).

Finally, Defendant cannot avoid the above restrictions simply by labelling her previous statements as prior consistent statements under Rule 801(d)(1)(B). A party seeking to admit statements under that rule must satisfy four elements: (1) the declarant-defendant must testify at trial and be subject to cross-examination; (2) there must be an express or implied charge of recent fabrication or improper influence or motive of the declarant-defendant's testimony; (3) the proponent must offer a prior consistent statement that is consistent with the challenged in-court testimony; and (4) the prior consistent statement must be made prior to the time that the supposed motive to falsify arose. *United States v. Chang Da Liu*, 538 F.3d 1078, 1086 (9th Cir. 2008); *see also Tome v. United States*, 513 U.S. 150, 157-

58 (1995).  The Court should reject any attempt by Defendant to exploit this rule without satisfying each of the above elements.

**X.      MOTION *IN LIMINE* NO. 10:  THE COURT SHOULD ADMIT RELEVANT TESTIMONY FROM "NON-PAYING" PATIENT WITNESSES**

The evidence at trial will show that Defendant devised and carried out two schemes to defraud: one targeting investors who purchased Theranos securities based on misleading information from Holmes, and the other targeting patients who purchased Theranos's testing services after being defrauded into believing that the company's tests were accurate and reliable.  While non-paying patients do not qualify as victims of the charged scheme under the Court's prior rulings, some of those patients have important knowledge that goes directly to key issues in this case, including the misrepresentations and misleading information Defendant targeted at all patients, the materiality of that deceptive information, the accuracy (or lack thereof) of Theranos's blood tests, Defendant's knowledge of the accuracy problems with Theranos's tests, and Defendant's overall intent to defraud patient customers.  In light of the Court's rulings, the government will not argue to the jury that they may convict based on a theory that treats non-paying patients as fraud victims.  However, patient customers with relevant information should be permitted to testify at trial regardless of whether they paid out of pocket for Theranos tests and became victims.

Ruling on a motion to dismiss filed by Defendants at the end of last year, the Court held that patients whose insurance paid for the blood testing services they received from Theranos are not victims of the charged fraud.  (ECF No. 330 at 28-33).  The Court's decision was based on *United States v. Lew*, 875 F.2d 219 (9th Cir. 1989).  Under *Lew*, in order to convict a defendant of mail fraud, the defendant must have intended "to obtain money or property from the one who is deceived."  *Id.* at 221.  Here, the Indictment alleges that Defendants sought to obtain money from patients—the "victim[s] of the deceit" under *Lew*.  *Id.* at 222.  Where individual wire fraud counts in the operative Indictment are based on wire transfers involving Theranos patients, those patients paid out of pocket for the blood testing services they received from Defendant's company.  Thus, the Indictment is in compliance with the Court's Order, and there is no risk of conviction based on a theory inconsistent with the Court's reading of *Lew*.

The Court's ruling on Defendant's motion to dismiss concerned the allegations in the Indictment, not the type of evidence the government may advance to prove those allegations. The government anticipates, however, that the defense may attempt to misconstrue the Court's earlier ruling to limit or exclude testimony from Theranos customers who did not pay Theranos out of pocket. But that testimony is admissible and consistent with the Court's order as long as non-paying patients are not described as victims of the fraud. Anticipated testimony from certain non-paying patients is also highly probative, as described below.

It is worth remembering that, although the Court partially granted Defendants' motion to dismiss as to non-paying patients, it rejected Defendants' argument that the Indictment failed to allege that any patients were defrauded. (ECF No. 330 at 35-38). The Court ruled that a patient is defrauded when he or she pays for a blood test that is held out as accurate and reliable when it is not. The Indictment alleges that Defendants knew about the problems with their technology but still misrepresented Theranos's ability to provide accurate and reliable results. When Defendants allegedly sent out inaccurate or unreliable test results, patients did not receive the benefit of the bargain. (*Id*. at 38). Thus, the Indictment presents a cognizable scheme to defraud patients. Defendant pursued that scheme by, among other things, (1) distributing marketing materials for Theranos touting the company's technology, (2) holding out Theranos's blood tests as suitable for clinical use; (3) directing Theranos employees to give misleading answers to patients who received inaccurate results from Theranos; and (4) continuing to offer blood testing services despite knowing that Theranos tests were not sufficiently accurate and reliable. Testimony from Theranos's customers will help establish that conduct and show its significance.

The patients on the government's witness list—both paying and insured—will testify as to facts that will greatly assist the jury in making their findings about the falsity of Defendant's statements, her knowledge of their falsity, and her intent to defraud patients in general. For example:

- One patient who may not have paid (initials "BG") received presentations from Theranos in the medical practice where she worked. She was impressed by Theranos based on what she heard, and later visited a Theranos Service Center in Arizona for a blood test. She later received a demonstrably inaccurate hCG result from Theranos, which caused her to believe

that she was in the process of losing a pregnancy.  Holmes and Balwani were made aware of the inaccurate result no later than October 15, 2014.  Balwani claimed the inaccurate result was due to human error, and the company subsequently voided the result in approximately March 2016.

- Another patient who may not have paid (initials "AM") worked at Walgreens in connection with Theranos's blood testing service centers at the pharmacy chain.  In that capacity, she was exposed to Theranos marketing information provided by employees of the company.  Based on that information, she then promoted Theranos's blood testing services to Walgreens customers, informing them that "it's accurate, less painful, there's less blood drawn, and Theranos is right here [in the Phoenix area]."  In September 2014, AM received an inaccurate hCG test from Theranos that failed to reveal the presence of an ectopic pregnancy.  She subsequently contacted Theranos to complain.  That same day, Christian Holmes (Defendant's brother) and Dan Edlin (who reported to Holmes) were advised of AM's inaccurate result.  She followed up with Theranos in August of 2015, at which time Defendant and Balwani were alerted to her complaints.  Theranos ultimately voided the result in March of 2016.

- Another similarly situated patient (initials "AT") recalls seeing Theranos advertisements in a magazine claiming that they could "get patients in and out of their testing facility quickly and that the blood draws would be done via finger stick."  Expecting Theranos to give accurate results, AT visited a Theranos service center in November 2015, receiving an inaccurate PT-INR test result from the company.  Theranos was alerted to the inaccurate test when the company received a request that the test be rerun because it was inconsistent with AT's normal results for that assay.

- Yet another patient (initials "SA") was exposed to Theranos advertisements that touted the company's ability to conduct a large number of blood tests from a fingerstick blood draw.  In October 2015, SA visited a Theranos location in Arizona, subsequently receiving an inaccurate estradiol test result.  Theranos was aware of the inaccurate result in November 2015 after SA reached out to the company.  Balwani was informed of the problem with the

test that same month.

- Finally, a patient who may not have paid for Theranos blood testing (initials "RG") was exposed to Theranos marketing on a billboard and on the radio, and understood from those representations that Theranos had "futuristic" technology capable of conducting blood tests from a fingerstick.  RG visited Theranos in September 2015 and subsequently received a result inaccurately indicating that he was HIV positive.  Numerous employees reporting to Holmes and Balwani became aware of RG's inaccurate HIV test by September 2015.

Testimony along the lines described above is relevant to the questions facing the jury, and it is well-settled that the scope of admissible trial evidence is not strictly limited to the charged conduct.  For example, Rule 404(b) of the Federal Rules of Evidence allows evidence of uncharged acts to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.  "Rule 404(b) is a rule of inclusion."  *United States v. Castillo*, 181 F.3d 1129, 1134 (9th Cir. 1999) (internal citation omitted).  "[U]nless the evidence of other acts only tends to prove propensity, it is admissible."  *Id.*  Prior acts are admissible "so long as the acts tended to make the existence of [the defendant's] knowledge or intent more probable than it would be without the evidence."  United *States v. Jones*, 982 F.2d 380, 382 (9th Cir. 1992).

Here, the facts offered by Theranos's customers—paying or non-paying—are probative of Defendant's knowledge and intent.  Those facts demonstrate that Defendant knew about the accuracy problems plaguing Theranos's tests but continued to hold them out as accurate and reliable, thus helping to prove Defendant's intent to defraud patients.  The facts offered by non-paying patients also show Defendant's plan and preparation to the extent they were exposed to the same set of marketing materials and misleading representations as the patients who ended up giving money to Theranos.  Because such evidence is useful for an approved purpose and does not bear on propensity, it should be allowed at trial.

Facts like the ones summarized above also are admissible without resort to Rule 404(b) because they are inextricably intertwined with the charged conduct.  *See United States v. Loftis*, 843 F.3d 1173, 1177-78 (9th Cir. 2016) ("other act" evidence is inextricably intertwined with the charged crime when it is: (1) "part of the transaction that serves as the basis for the criminal charge," and (2) necessary "in order to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of

the crime").  This standard is satisfied when the evidence at issue and the crime charged are "part of a single course of action."  *United States v. Warren*, 25 F.3d 890, 895 (9th Cir. 1994).  As the Ninth Circuit recognizes, "the policies underlying rule 404(b) are inapplicable when offenses committed as part of a single criminal episode become other acts simply because the defendant is indicted for less than all of his actions."  *United States v. Lillard*, 354 F.3d 850, 854 (9th Cir. 2003) (quoting *United States v. Williams*, 989 F.2d 1061, 1070 (9th Cir. 1993)).

In this case, Theranos's contacts with non-paying patient customers were part of the same course of action charged in the Indictment, even if those patients did not end up as victims.  A wire fraud charge requires proof "either that the victim was actually deprived of money or property *or* that the defendant intended to defraud the victim of the same."  *United States v. Utz*, 886 F.2d 1148, 1151 (9th Cir. 1989) (emphasis in original).  "A scheme to defraud, whether successful or not, remains within the purview of section 1341."  *Id.*  Here, Defendant scheme was to defraud patients and obtain their money.  Her conduct in furtherance of the scheme was directed at all potential customers of Theranos—the intended targets of the fraud.  A subset of those intended targets actually became customers, and a subset of that group paid Theranos for testing, becoming victims of the fraud.  Consistent with the above case law, the jury's verdict will not turn on the success of Defendant's plans but on her intent and the nature of the overall scheme.  Patient testimony is relevant and admissible if it bears on those issues.

For the foregoing reasons, the Court should permit testimony from patients who had relevant dealings with Theranos regardless of whether they paid Theranos for blood testing services.

## XI.    MOTION *IN LIMINE* NO. 11:  THE COURT SHOULD ORDER DEFENDANT TO PRODUCE REVERSE *JENCKS* INCLUDING ANY *IN CAMERA* PROFFERS

Defendant has failed to comply with the Court's deadline for production of witness statements under Rule 26.2(a) of the Federal Rules of Criminal Procedure.  The Court should order Defendant to comply with its previous order immediately, and should exclude the testimony of any defense witness for whom Defendant fails to timely disclose 26.2 material.

Rule 26.2 of the Federal Rules of Criminal Procedure, derived from the *Jencks* Act, requires a party to produce to the opposing party "any statement of [a testifying witness] that is in [that party's] possession and that relates to the subject matter of the witness's testimony."  FED. R. CRIM. P. 26.2(a).

Although the language of the rule contemplates production of this information during trial, courts frequently order early disclosure. On April 15, 2020, the Court set a number of deadlines aimed at readying the matter for trial. *See* ECF No. 374. In particular, the Court's Order set a deadline of July 24, 2020 for Defendant to complete her production of witness statements pursuant to Rule 26.2. The government has produced Rule 26.2 material to the defense on a rolling basis throughout the pendency of the case. Defendant, however, has not complied with the Court's Order to produce 26.2 material— neither on the July 24 deadline nor in the four months that have followed.

Accordingly, on November 13, 2020, the government sent a letter to Defendant's counsel referencing the July 24, 2020 deadline and requesting that she immediately produce all Rule 26.2 witness statements for all defense witnesses. On November 19, 2020, counsel for Defendant responded to the government's letter. Regarding the government's request for disclosures required by Rule 26.2, Holmes's counsel stated: "We are aware of our obligations under the current scheduling order and will produce any Rule 26.2 material according to that schedule." *See* Leach Decl. ¶ 20. The government assumes that Defendant's letter refers to the pretrial schedule set by the Court on August 11, 2020. *See* ECF No. 484. That schedule, however, does not include a renewed deadline for Defendant to comply with Rule 26.2, as that deadline had already passed when the Court issued its Order. Accordingly, Defendant appears to have disregarded the deadline set by the Court in April of this year, and it is unclear whether or when Defendant intends to comply with Rule 26.2.

Rule 26.2 itself provides the appropriate remedy in cases where a party ignores its obligations under the Rule. Subsection (e) of the rule states that "[i]f the party who called the witness disobeys an order to produce or deliver a statement, the court must strike the witness's testimony from the record." FED. R. CRIM. P. 26.2(e).

Accordingly, the Court should order Defendant to produce all 26.2 material in her possession within ten days of the hearing on this motion. This material should include any proffers made by Defendant to the Court and not disclosed to the government. To the extent maintaining such statements ex parte was warranted at the time, the government understands those concerns no longer apply. Should Defendant fail to produce such material for any of her witnesses by that date, the Court should exclude those witnesses' testimony at trial.

DATED:  November 20, 2020                Respectfully submitted,

                                         STEPHANIE M. HINDS
                                         Attorney for the United States,
                                         Acting Under Authority Conferred
                                         By 28 U.S.C. § 515


                                          /s/
                                         JEFF SCHENK
                                         JOHN C. BOSTIC
                                         ROBERT S. LEACH
                                         VANESSA BAEHR-JONES
                                         Assistant United States Attorneys

# Exhibit 34

LAW ENFORCEMENT SENSITIVE - FOR OFFICIAL USE ONLY



**Food and Drug Administration**
OFFICE OF CRIMINAL INVESTIGATIONS
MEMORANDUM OF INTERVIEW

CASE NUMBER:            2016-MWM-709-0576

CASE TITLE:             THERANOS, INC.

DOCUMENT NUMBER:        258754

PERSON INTERVIEWED:     Sarah Bennett, CMS/Division of Laboratory Services

PLACE OF INTERVIEW:     CMS, 7500 Security Blvd., Woodlawn, MD

DATE OF INTERVIEW:      09/12/2017

TIME OF INTERVIEW:      1000 EST

INTERVIEWED BY:         SA George Scavdis

OTHER PERSONS PRESENT:  See below

On September 12, 2017, the case agent interviewed Sarah Bennett, Centers for Medicare and Medicaid Services (CMS), regarding a CLIA (Clinical Laboratory Improvement Amendments) survey she conducted of Theranos, Inc.'s (Theranos) high complexity laboratory in 2015. Bennett is a medical technologist in CMS's Division of Laboratory Services (DLS). Also present during the interview were the following: AUSA Jeffrey Schenk, United States Attorney's Office for the Northern District of California; Jessica Chan, Securities and Exchange Commission (SEC), Division of Enforcement (DOE); Rahul Kolhatkar, SEC, DOE; Monique Winkler, SEC, DOE; Gary Williams, HHS, Office of the General Counsel (OGC); and Kelsey Schaefer, FDA, Office of the Chief Counsel (telephonically).

Bennett has a Bachelor's of Science degree in medical technology, and she has worked in laboratories for over 28 years. In 2007, she went to work for the Maryland state agency that conducted CLIA surveys, and she was the supervisor of the Laboratory Licensing and Surveying Department. That department was responsible for the implementation of CLIA. In addition to being a supervisor, she conducted surveys.

Bennett explained that a CMS Form 2567 is called a Statement of Deficiencies and Plan of Correction. Bennett was responsible for drafting a portion of the one issued to Theranos, and Gary Yamamoto was responsible for drafting the other portion. Bennett said that she can speak to the parts of the Form 2567 that she wrote, and that she wouldn't have written a deficiency if she didn't have the expertise to write it. In order to be able to write a deficiency, one needs to know the CLIA regulations, the requirements that are applicable to the laboratory being surveyed, and whether what is observed during a survey rises to the level of a deficiency. Bennett works with the Form 2567 within the course of her employment at CMS.

Bennett explained that with regard to CLIA, some states have their own regulations, and a laboratory that is housed in that state must follow whichever set of regulations is more stringent — either the state's, or the CLIA regulations. She further explained that only some of the state regulations may be more stringent than the corresponding CLIA regulations; it's not all or nothing. The State of California has its own state regulations, but Bennett is unsure whether those regulations are considered more stringent than the CLIA ones. Normally, if a state agency is conducting a laboratory survey, it would be looking at both the federal and the state regulations that apply to a laboratory. When Bennett surveyed Theranos, she was only looking at the laboratory's compliance with the federal CLIA regulations, because she was conducting a federal survey. When Bennett was a surveyor for the State of Maryland, she looked at deficiencies under both the state and federal CLIA regulatory schemes, and she would generate two different Form 2567s to reflect that. It's up to

LAW ENFORCEMENT SENSITIVE - FOR OFFICIAL USE ONLY

US-REPORTS-0006781

LAW ENFORCEMENT SENSITIVE - FOR OFFICIAL USE ONLY

the individual states as to whether they want to combine the results of a survey on one form or do them separately. Theranos never stated to CMS during or after the survey that they were following California state regulations as opposed to CLIA regulations.

In order to become a CLIA certified laboratory, a laboratory first completes and submits a CMS Form 116 (CLIA Application for Certification). When the Form 116 gets filed and approved, the system generates a CLIA number. Within 3 to 12 months after the generation of the CLIA number, the state conducts a survey of the laboratory, which results in either a finding of compliance or in a finding of deficiency. CMS collects a laboratory's Form 116 each time it conducts a survey. If a laboratory makes certain changes, like replacing its laboratory director, then it must complete and submit a new Form 116. CMS typically doesn't get that first Form 116 generated by a laboratory, because the initial survey is conducted by the state. The first two surveys of Theranos were done by the State of California, and CMS did the third. The first state survey occurred in either 2011 or 2012, and the second one occurred in 2013. It would have been normal for the state to survey them in 2015, however, due to the media attention Theranos was receiving at the time and due to the complaints CMS had received about Theranos, it was determined that Bennett and the CMS regional office (Yamamoto) would conduct the survey instead.

In 2014, Theranos came to CMS to explain their device and their business model. Bennett said that it's unusual for a company to do that. She believes that Elizabeth Holmes (Theranos's CEO) wanted to convince CMS that Theranos didn't need a CLIA certificate for their business model. Theranos gave them a flow chart of a business model which showed that the Theranos black boxes would be at sites in Walgreens, that they would be used to collect blood, and that they would send a signal back to Theranos's headquarters in Palo Alto, CA. CMS told them in that meeting that Theranos had to go to the FDA with their device. CMS also told Theranos at that meeting that Theranos did indeed need a CLIA certificate. Penny Keller and Judy Yost from CMS were involved in that meeting. Yost has since retired. Bennett has some e-mails relating to that meeting that she promised to provide at a later date through OGC.

CMS is responsible for the implementation of the CLIA regulations, which are designed to ensure the accuracy and reliability of laboratory testing. FDA interacts with the manufacturers of devices and test systems. CLIA interacts with the laboratory to make sure the laboratory is using those devices and test systems in the manner in which they are supposed to be used. In other words, the manufacturing of tests is FDA, and the running of laboratory tests is CLIA. A laboratory can run either FDA approved tests or tests that are unapproved which are called laboratory developed tests (LDTs). If a laboratory tweaks an FDA approved test, then there are other requirements under CLIA with regard to additional testing that the laboratory must perform to validate that test.

During the 2015 survey, Theranos didn't talk with Bennett about significant modifications that it was making to FDA cleared or approved tests that it was using in its CLIA laboratory. While there, Bennett looked at the Edison device, which Theranos had discontinued using by the time of the survey. Most of her review was "paper" review; she focused her review on their validation studies, which had to include accuracy, precision, reportable range, reference range, analytic specificity, and analytic sensitivity. She focused on quality control (QC) as well as on quality assessment (QA) issues that Theranos had identified in their QA monitoring program. Bennet explained that QA monitoring involves investigating problems with equipment, finding and implementing corrections, and monitoring those corrections. Yamamoto focused on Theranos's pre-analytic data.

Bennett does not use a CLIA "checklist" when she conducts laboratory surveys.  While conducting a survey, the areas Bennett focuses on are QC, QA, and proficiency testing. She picks those areas because those are areas where she can usually discover if there's a problem. Problems in those areas show there is some kind of breakdown in a company's overall quality system, because it demonstrates that the laboratory can't identify issues that arise. Bennett also looks at personnel qualifications very closely while she's on a survey.

The 2015 Theranos survey was both a recertification survey and a complaint survey; it's not unusual for CMS to combine surveys in this manner. The complaints regarding Theranos were received by Yamamoto in CMS's Region Nine.  Bennett has copies of the complaints that she will gather together and give to OGC.

US-REPORTS-0006782

LAW ENFORCEMENT SENSITIVE - FOR OFFICIAL USE ONLY

Bennett said that Yamamoto received a complaint from a former Theranos employee. Additionally, the State of New York received a complaint, which they said they sent to CMS; however, CMS said they never received that complaint, so nobody within CMS could track that down. CMS started its on-site survey of Theranos in September 2015, and it came back to finish the survey in November 2015. The survey was announced to Theranos ahead of time. During the survey, CMS found that Theranos had a lot of procedures that had been signed by their new laboratory director just a day or two before the start of the September survey.

CMS conducts biannual CLIA surveys of a laboratory; so, in 2015, Theranos was due to be surveyed. If a laboratory submits a new Form 116 because it has hired a new laboratory director or for some other reason, that fact would not trigger a CLIA survey. Typically, a recertification survey is conducted approximately six months before the expiration of a laboratory's CLIA certificate. If there's some extenuating circumstance, like with Hurricane Irma or Hurricane Harvey, surveys of affected laboratories won't be completed within the two-year time frame. If the state agency tries to schedule a survey and the laboratory gives them the run around, normally the state agency will notify the CMS regional office. The CMS regional office can take enforcement action, whereas the state cannot. They can continue to try and reschedule, and if the laboratory continues to refuse, CMS can cite them for refusing an inspection, which allows CMS to take certain enforcement actions. Bennett doesn't know if any of this happened with Theranos. The state agencies are agents of CMS; they are not CMS employees.

Bennett explained that it is unusual that CMS sent central office personnel (Bennett) out on the Theranos survey. With that being said, Bennett had experience as a surveyor and she was asked to go by her supervisor, Karen Dyer, the director of DLS. Bennett said that DLS is also known as the CLIA program. Bennett has conducted CLIA surveys for CMS on two other occasions.  Normally, re-certification surveys are conducted by the state agency, but because of the media attention associated with Theranos, the decision was made to send Yamamoto and Bennett. John Carreyou (a reporter for the Wall Street Journal) had been in contact with CMS about an article he was writing on Theranos. Carreyou talked to Dyer about the article. He has never spoken with Bennett. The CMS regional office conducts federal jurisdictional surveys. For instance, the National Institute of Health would be surveyed by CMS's Philadelphia Regional Office. Also, federal surveyors would be responsible for surveying the Maryland state laboratory, for example. Bennett was a natural to ask to do the survey because she has survey experience, and she had done it twice before. Most of the people within DLS are not surveyors. CMS knew the day that FDA went in to inspect Theranos (in August 2015). Bennett thinks FDA notified Dyer, and that Dyer told Bennett. The FDA inspection played no role in CMS deciding to involve its central office in the Theranos survey. Surveys are not coordinated between FDA and CMS; the two agencies have different authorities and they look at different things. They have different regulations, standards, and requirements that they're looking at. For instance, FDA would have been looking at the manufacturing, and CMS would have been looking at the testing. Typically, a laboratory is not both a manufacturer and a laboratory conducting tests.

Bennett said that going on site at Theranos was "very interesting."  Everything there is kept behind locked doors. She'd never been on a survey before where there was so much security, which she described as men wearing black suits and ear buds. There was never a time when Bennett and Yamamoto were not in view of a security guard; they even had to be escorted to the bathroom. Bennett's been on dozens of surveys and has never seen that before.  Theranos had both in-house attorneys and outside counsel at the survey, which is not something you'd typically see. It's also not typical to have stickers put on everything saying that it's exempt from release under FOIA. Bennett noted that it was unusual to ask a company for a document, for it to take the company a long time to produce it, and then for the document to be non-responsive; that is what happened with Theranos. CMS told them when they came back in November that practice was not acceptable, and that CMS would assume that if Theranos couldn't produce a document when CMS asked for it, then Theranos didn't have it.

Bennett didn't talk to any previous Theranos surveyors prior to the 2015 Theranos survey. She expected there to be some security because of the mystery surrounding the Edison device, which was proprietary, but she didn't expect that level of security in the non-proprietary laboratory. She had never surveyed a laboratory that developed a device before. The non-proprietary side of the Theranos laboratory was the portion of the laboratory where Theranos was using traditional FDA approved devices. Bennett didn't

LAW ENFORCEMENT SENSITIVE - FOR OFFICIAL USE ONLY

US-REPORTS-0006783

Case: 22-10312, 04/17/2023, ID: 12696875, DktEntry: 22-12, Page 151 of 300

LAW ENFORCEMENT SENSITIVE - FOR OFFICIAL USE ONLY
Case 5:18-cr-00258-EJD   Document 584-3   Filed 11/20/20   Page 5 of 10   Page 4 of 9

inspect the portion of the laboratory that tested blood obtained from finger stick testing; she only inspected the portion where Theranos was using samples obtained from venous blood draws. During the survey, Bennett and Yamamoto went into one laboratory that was portioned off, with Theranos telling them that the side portioned off was their research and development (R&D) area, and that they were not permitted to go in there. It's typical for a company to tell CMS that they can't go into an R&D area.

Bennett explained that when CMS initiates a complaint survey, the survey is typically focused on the subject of the complaint; however, if during that survey other issues are found that are not related to the complaint, then the scope of the survey can be expanded. Since the Theranos survey was both a recertification survey and a complaint survey, there wasn't a separate "portion" of the survey done to address the complaint; they just incorporated what the complaint issues were into the recertification survey.  In the case of the Theranos survey, the complaint that CMS received was about proficiency testing. More specifically, the complaint alleged that they were testing patients on their proprietary device, but doing their proficiency testing on the FDA approved devices. Proficiency testing is a CLIA requirement, and there are regulated analytes and unregulated analytes.  Proficiency testing normally consists of three events a year with five samples being tested for regulated analytes. The proficiency testing provider sends the blind samples to the laboratory, the laboratory runs the samples and sends the results back to the provider, who then grades the laboratory. The proficiency testing provider sends schedules to the laboratory, so the laboratory knows when the blind samples are coming. During the survey, CMS could not find any evidence to substantiate that part of the complaint about Theranos's proficiency testing. Bennett noted that it would have been very difficult to substantiate that, because Theranos could have hidden that easily and there would have been no way for CMS to find that unless CMS was given specific information about where to find it. The other part of the complaint that CMS received was that the QC on the Edison devices was not acceptable and Theranos was still reporting patient results. That part of the complaint was substantiated during the survey.

CMS requires that a laboratory run two levels of QC for each day of patient testing, and that the laboratory follow the manufacturer's ranges for those tests. A laboratory must verify those ranges before doing a new lot of QC. If a laboratory has its own device, it has to come up with its own QC procedures. Theranos was not following its own QC procedures, and they were still reporting patient results. Bennett explained that there are assayed controls and there are unassayed controls, where a laboratory has to determine what ranges are acceptable. Theranos was using commercial controls, which means they were purchasing control material to use on the Edison. On any system, a laboratory has to do QC. Most control material is purchased commercially; it's not developed by the laboratory or the device manufacturer. So, when Theranos tests the control material that they're using to do QC, they have to be within the ranges of what the manufacturer sets for that control. Theranos can't change those ranges. The package insert will list the devices that are cleared to be used with that control material, and it will give acceptable range limits for those devices. For the Edison, that device would not have been on any package insert for commercial control materials, so Theranos would have had to come up with their own way to determine QC values. With regard to QC testing, CMS is looking to see that Theranos is following its QC ranges. CMS is not assessing the validity of the ranges they've come up with, they're just looking to see if Theranos is following them. CMS is also checking to make sure that Theranos is not conducting patient tests when its device is out of range.

Bennett found many instances where Theranos ignored their own procedures for acceptability of controls. CMS would comment on it if they weren't following their own procedures, or if they were using assayed controls and they weren't following those ranges. CMS looked to see if Theranos developed their own ranges and whether their QC testing results were within their own definition of what was acceptable. During the survey of Theranos, Bennett asked for QC records for a particular date range in order to check this. She explained that what she normally gets back from a laboratory in response to this request is something called a Levy-Jennings Graph. This is generated by a computer, and it is used for QC only. She explained that the graph has a range of controls and a line that represents the mean. If a laboratory gets a value that is outside the range of controls, they have to react to that. For Theranos, those graphs were created by a computer (an LIS, or laboratory information system) that takes the controls and puts in the testing values. Theranos was using Westguard as a basis, but they were cherry picking what part of Westguard they wanted to use.

CMS looks at a laboratory's procedures and it looks to see that they are running them when they say they

US-REPORTS-0006784

LAW ENFORCEMENT SENSITIVE - FOR OFFICIAL USE ONLY

are supposed to be running them. CMS doesn't look to the patient data. If the QC is problematic, there is no way to assess whether the patient data is accurate and reliable. If the laboratory runs the controls in the morning and they are unacceptable, then they should not be running patients after that. The standard deviation is used for controls, not for patients; patients have a normal reference range. Patients are either going to be abnormally low or abnormally high. There is also a reportable range. CMS doesn't require that a laboratory track patient test results, but they do require a laboratory to address patients who were tested during a period when the laboratory was not functioning as it should have been.

Bennett will look at patient testing when she's on a survey if there's a problem with proficiency testing or QC. She wants to see if the laboratory has identified whether there was a QC problem, and if they continued to report patient results when there was one. There's no value to the raw data if you're not using it in context with something else. One place you might look at patient results is when you're looking at the final report with regard to what the LIS said, but Bennett didn't look at that on the Theranos survey. QC results have to be reviewed by an appropriate person at the laboratory. When Bennett asked for Levy-Jennings reports from Theranos, they went to their computer, put the dates in, and printed them out for her. Her understanding was that the information went right from their device into the LIS; it was not manually entered. The LIS system is populated with patient and QC data. The one device that Bennett saw at Theranos fed its results directly into the LIS.

Surveyors are the ones that decide what deficiencies to cite. Before CMS concludes the survey, they tell the laboratory what deficiencies they've found. With Theranos, Bennett sat with them at the end of every single day and told them what she and Yamamoto found. Sunny Balwani was there every day.  Holmes was not present during the September survey, but she came in November and followed Bennett around for two days. Bennett thinks CMS was at Theranos for three days in September and for four days in November. In November, Balwani went with Yamamoto, and Holmes went with Bennett. Theranos wanted details every day on what CMS had found, and at the end of the survey, CMS went over everything again with them. Bennett has a computer program that she writes the deficiencies in, and the program creates the Form 2567. The "Findings" section is the specific evidence that supports the "Deficiency" that is cited. Bennett has her handwritten notes from the survey, and she said that not everything in her notes is transferred into the Form 2567. Karen Fuller, Yamamoto's supervisor, was at the survey to observe, but she didn't take notes. During the survey, CMS received documents from Theranos that they took with them. Holmes was not happy and expressed her displeasure at the end of each day in November at what CMS had found. Heather King was very assertive in trying to convince CMS that what they were seeing wasn't really an issue.  Bennett's survey notes are geared toward what CMS was looking at with regard to CLIA compliance. If someone from Theranos made a comment that was a confirmation of something CMS saw that was a deficiency, then Bennett would have put that in the notes.

CMS started to create the Form 2567 after the September part of the survey, and it was completed after the November portion. CMS normally creates that form at the end of the survey. Bennett was looking at proficiency testing first and she found issues there, so she would have known on the first day of the survey that she would be issuing a Form 2567.

Bennet explained that within each condition there are multiple standards. If there is non-compliance, the surveyor has to make a determination of if it is just a "standard level" deficiency or if it rises to a "condition level" deficiency. If a laboratory sends a patient test report out and later finds out that it is wrong, the laboratory is required to do a certain report and send it to certain people in response. Within each of these component areas you have to react to it, fix it, and monitor it.  Title 42 CFR 493 lays out all of the CLIA regulations.

CMS knew when they left in September that Theranos was likely to get "condition level" deficiencies, and that they were IJ (In Jeopardy). IJ is a "condition level" deficiency that has the potential to cause patient harm. CMS hadn't made a final determination at the time of the survey. It's not unusual for CMS to make a determination of IJ. They talked about it with Theranos, but hadn't made a final decision. They were waiting for Theranos to produce a document related to PT/INR. PT/INR stands for Prothrombin International Normalized Ratio, which is a test to see if Coumadin is working. This test is measured in seconds. Bennett had discovered several issues with Theranos's INR, and one was that they had entered a mean normal

LAW ENFORCEMENT SENSITIVE - FOR OFFICIAL USE ONLY

Case: 22-10312, 04/17/2023, ID: 12696875, DktEntry: 22-12, Page 153 of 300

LAW ENFORCEMENT SENSITIVE - FOR OFFICIAL USE ONLY
Case 5:18-cr-00258-EJD   Document 584-3   Filed 11/20/20   Page 7 of 10   Page 6 of 9

prothrombin time. She explained that a laboratory has to run something like 20 samples and come up with an average. In order to calculate the INR, you need that number.  Theranos had a number in the computer and a document that showed that their INR had been calculated three days before CMS got there. Despite calculating that number three days prior to the survey, the reagents had been in use for six months prior to that, and Theranos couldn't produce a document showing that the INR had been arrived at for testing during that period. Doctors need to know that INR number because it speaks to how prone a patient is to getting clots or to bleeding out. CMS discovered this issue in September, and they went over this with Balwani and King at the end of the day. Bennett remembers that the conversation took place at the Theranos instrument. Bennett said she needed that document and they couldn't produce it. Another issue that CMS found was that QC test results on their device had been out of range multiple times, and yet Theranos was still reporting patient results during that time.  Theranos's solution was to simply adjust the mean. Langley G., who was the Theranos laboratory director at the time, was the individual who was said to implement that solution. Another issue that CMS found had to do with sample stability. Theranos missed that the manufacturer of the Thromboplastin that they were using changed the stability on their package insert. The package insert changed the stability from ten days to two days, and for six months Theranos was using that product with a five-day stability protocol. At the time of the survey, Sunil Dhawan was the Theranos lab director, and Bennett saw him once for a total of 30 minutes, and he talked to no one. During a survey, the laboratory director is not required to be present.

The PT/INR was one of the reasons that CMS called IJ. They couldn't tell if that six-month period whether the patient testing was done correctly.  Theranos wasn't even calculating their own reported values correctly. The other part of Theranos that Bennett looked at during the survey that was problematic was all of the validation and QC data for the Edison device.  Theranos continued to report patient values despite having these QC problems.  Bennett noted that Theranos had stopped using the Edison device by the time of this survey. Regardless, CMS can still look at any records from the previous two years of the date of inspection. CMS also cited Theranos for having a procedure that was not signed by the laboratory director. Before a laboratory director signs off on a procedure, it's not really usable in the laboratory.  CMS sees this often. They also see unqualified personnel as a common issue in laboratories.

One deficiency can lead to a determination of IJ, or it can be a mix of things. If CMS makes an initial determination of IJ, the company must work relatively quickly in order to abate that. In this case with regard to the timelines for enforcement, Theranos was given much longer than any other laboratory would have been given. In Bennett's opinion, this was due to the number of high profile people that were involved. The letter CMS sent to Theranos on January 25, 2016, is the IJ notification. Normally, CMS doesn't put exactly why something is IJ in its notification, other than that the determination is IJ. The allegation of compliance that a company sends in response must show that they've corrected the deficiency at the time of the submission. In Theranos's case, the evidence did not support a credible allegation of compliance. The letter that CMS sent Theranos in March tells them exactly why their response was not credible.

CMS cited Theranos for five "condition level" deficiencies. CMS was able to remove the testing personnel "condition level" deficiency, because Theranos removed the person in question from his position. At the time that CMS sent its July 2016 letter to Theranos, four "condition level" deficiencies remained. The main reason CMS called IJ was because of all the issues they found in hematology, not just the PT/INR issue.

The letter CMS sent to Theranos in July 2016 was the "Impose Notice," which told Theranos that the proposed sanctions would be imposed as of the date of the letter unless Theranos appealed. Theranos approached CMS about a settlement. Because CMS called IJ, they could limit Theranos's CLIA certificate by saying they couldn't test hematology after a certain time without waiting for a decision from an administrative law judge (ALJ). In Theranos's written responses to CMS in which they attempted to show they had corrected the cited deficiencies, Theranos would send CMS a copy of a faxed sheet saying something was corrected along with a corrected report, but CMS could never marry the two together; so, CMS never knew if Theranos actually notified all of their affected patients. Bennett said that over 50,000 patient test results were implicated. To date, CMS doesn't know if all of the affected patients have been notified. Theranos made the decision to void the test results; CMS didn't tell them to do that. CMS tells the laboratory they must fix a deficiency and the laboratory decides how they're going to fix it.  Theranos came to CMS

US-REPORTS-0006786

LAW ENFORCEMENT SENSITIVE - FOR OFFICIAL USE ONLY

sometime after the IJ determination to tell CMS how hard they worked and how they were in compliance, all in an effort to keep their CLIA license.

In this case, Theranos appealed after they received the July Impose Notice. Bennett explained that after CMS sends an Impose Notice, CMS can't talk to the company until the company appeals. This appeal goes to the Civil Remedies Division. Theranos both appealed and approached CMS about a settlement. When the laboratory files an appeal, it gets assigned to an ALJ, and the ALJ tells the company that they have to send in all of the documents that they're going to be using prior to the date of the hearing. CMS doesn't create any new documents on their side, but Bennett doesn't know if Theranos created new documents to submit as their evidence. In this case, there was no decision by the ALJ because a settlement was reached resulting in Theranos withdrawing their appeal. Bennett was not involved in the settlement at all. She assumes it was Kate Goodrich and maybe David Wright, but she has no idea who was involved in the settlement. Bennett suggested that the case agent ask Dyer to find out who was involved. Bennett said that anytime CMS revokes a laboratory's CLIA certificate, the owner/operator and the laboratory director are barred from running a laboratory for 2 years.

Bennett explained that it's CMS's ten regional offices that propose and impose sanctions. In this case, the letters sent from CMS to Theranos came from the regional office. All of the letters that went to Theranos after the first January 2016 letter went all the way up through CMS to at least Goodrich's level. This is not the normal process; it's usually handled by the region.

If CMS calls IJ, it gives CMS the ability to limit or suspend the CLIA certificate prior to a decision of the ALJ. That occurred in this case. CMS limited Theranos's CLIA certificate three days after Theranos received the letter. The "barring" of the laboratory director and the owner/operator from running a laboratory for two years occurs only when the revocation is imposed and final. There are only certain things a laboratory can appeal, and those things are called "initial determinations." In this case, revocation was never imposed. Bennett doesn't know the terms of the settlement other than hearing that Theranos's Arizona and California laboratories were all in one settlement, that Theranos voluntarily ceased testing at both laboratories, and that the laboratory directors wouldn't run another lab for a certain period of time. She heard that revocation was not a part of the settlement. The survey of the Arizona laboratory was in August or September of 2016, and Bennett and Yamamoto did that survey as well. When they were in the Arizona laboratory, they discovered significant issues and a Form 2567 was issued. The survey of the Arizona laboratory led to a determination of IJ as well for some of the same issues that CMS saw at the California laboratory. Theranos's Allegation of Compliance essentially said, "We were planning on closing before you came in, and we're closing." The laboratory director, Daniel Young, was present during the entirety of the survey. He was especially difficult to deal with, and talked in circles. He was there for the California laboratory survey as well, and spent most of his time with Yamamoto.

A revocation means that the CLIA number can no longer produce laboratory results. The difference between a revocation and a settlement is there's no black mark on the laboratory's record in the case of a settlement--they don't have a revocation on their CLIA history.

There's no separate form surveyors create to memorialize interviews they've conducted during a survey. They just have the information in their notes.

Bennett explained that CMS hadn't looked at the Edison device at the start of the Theranos survey in September and hadn't addressed all of the issues in the complaint, so that's why they had to go back in November. She said that, as far as she's concerned, if you don't have the right INR result there is a potential for patient harm based on that because you can't have any confidence in the patient results. She looked at patient data and saw three or more different lot numbers of Thrombin, and she couldn't even tell where the patient result came from when she looked at the data. It's the laboratory's responsibility to look at that and decide if any patients have been affected; it's not CMS's job.

The CLIA regulations have nothing to do with payment and billing. All Bennett can tell someone is whether a laboratory has met the CLIA regulations. She said there is a provision in their CLIA regulations with regard to

LAW ENFORCEMENT SENSITIVE - FOR OFFICIAL USE ONLY

US-REPORTS-0006787

LAW ENFORCEMENT SENSITIVE - FOR OFFICIAL USE ONLY

criminal violations, but it's not for CMS to determine whether something constitutes a criminal violation. During the interview, Bennett cited the provision as being section 493.1806(E)

In January 2014, Theranos came to CMS to have a meeting, and Holmes attended. Bennett doesn't know if there were any minutes taken and kept for that meeting, but she took a few notes. During the meeting, Theranos gave CMS some documents, including a flow chart. Dyer, Penny Keller, and Bennett were there. She doesn't know if Balwani attended. Theranos requested the meeting in order to show CMS their new technology, and because they thought they didn't need a CLIA waiver to put their black boxes in Walgreens. CMS told them they needed to go to FDA to get the CLIA waiver. Theranos didn't bring their Edison device to the meeting, and Bennett doesn't recall who from Theranos presented. They talked more about their business model—that they had a proprietary device to do a finger stick that would go into the Edison device, and that the Edison device would send an electronic signal to Palo Alto, CA, where the results would be interpreted. CMS considers a test system from the beginning to the end. In CMS's view, the device was receiving a specimen and doing the testing and that's where the results were generated, even though they were in electronic form. Theranos made some statements about what their hopes were with regard to tests they would run on the Edison. Bennett didn't have the impression that they were using the Edison at that time. The meeting was probably an hour long. They told Theranos if they wanted to get their device approved they had to go to FDA. They also told Theranos that if they wanted their device waived they had to go to FDA. Bennett was not involved with any CMS follow-up to that meeting.

There are three levels of testing: "waived," "moderate," and "high" level complexity. If a laboratory is only performing waived testing, they only need a certificate of waiver. Waived tests are tests where, in most cases, an inaccurate result won't cause patient harm (i.e. a urine pregnancy test or a blood glucose test). Any time you have a waived test and don't follow the manufacturer's instructions, it becomes a high complexity test. With moderate complexity testing, the personnel requirements are not as stringent as they are for high complexity. Performance specifications are the same for both moderate and high complexity. According to Bennett, performance specifications is CLIA speak for validation. FDA is responsible for the classifications of waived, moderate, or high. The finger stick samples Theranos was diluting and putting on traditional devices were high complexity because they had modified the manufacturers' instructions. The Edison device was high complexity because it was considered a laboratory developed test. All of the tests run on the Edison device were high complexity. A lab developed test is never CLIA waived.

Bennett said her understanding was that the state surveyor who performed the 2013 Theranos survey was unaware that Theranos was using the Edison device at the time and that the surveyor only inspected the traditional side of their laboratory.

Bennett said that pre-diluting samples on a regular basis is unusual, but that there is nothing in the CLIA regulations that prohibits Theranos from doing that. If they are diluting samples, they have to perform the validation.

At some point, Bennett was told by her management to stop communicating with Theranos, be it over e-mail or telephonically.


SUBMITTED: Electronically submitted by GEORGE SCAVDIS
_____
GEORGE SCAVDIS, SPECIAL AGENT                    DATE:    10/02/2017

APPROVED: Electronically approved by MARK MCCORMACK
_____
MARK MCCORMACK, SPECIAL AGENT IN CHARGE          DATE:    10/03/2017


DISTRIBUTION:   Orig:  MWFO
                cc:    Prosecution


LAW ENFORCEMENT SENSITIVE - FOR OFFICIAL USE ONLY

US-REPORTS-0006788

LAW ENFORCEMENT SENSITIVE - FOR OFFICIAL USE ONLY

ATTACHMENTS:  None

LAW ENFORCEMENT SENSITIVE - FOR OFFICIAL USE ONLY

US-REPORTS-0006789

# Exhibit 32

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
Western Division of Survey and Certification
San Francisco Regional Office
90 7th Street, Suite 5-300 (5W)
San Francisco, CA 94103-6707



Refer to: WDSC- GKY

## IMPORTANT NOTICE – PLEASE READ CAREFULLY

January 27, 2017

Daniel L. Young, Ph.D., Director                     CLIA Number: 03D2077896
Elizabeth Holmes, Owner
Ramesh Balwani, Owner
Theranos, Inc.
1365 N. Scottsdale Road, Suite 350
Scottsdale, AZ 85257                                 Via overnight mail *(Confirmation of successful
                                                     receipt constitutes proof of receipt.)*

RE:    IMPOSITION OF SANCTIONS

Dear Dr. Young, Ms. Holmes, and Mr. Balwani:

The Centers for Medicare & Medicaid Services (CMS) received an Allegation of Compliance
submission from Theranos dated December 30, 2016, in response to CMS' Notice of Proposed
Sanctions issued on November 29, 2016. After careful review, we have determined that the submission
does not constitute a credible allegation of compliance and acceptable evidence of correction for the
deficiencies cited on the Form CMS-2567 from the September 29, 2016 CLIA complaint survey. This
submission does not demonstrate that the laboratory has come into Condition-level compliance and
abated the immediate jeopardy. This determination is made based on our review of documents
submitted by Theranos as part of their submission, our inability to confirm whether the submitted
corrected/voided patient test reports represent a comprehensive collection of all such patient test
reports, and our concern that the process used to identify these reports is accurate.

Therefore, we are writing to notify you of the determination by the Centers for Medicare & Medicaid
Services (CMS) that Theranos, Inc. ("Theranos" or "the laboratory") located at the above address is
not in compliance with Clinical Laboratory Improvement Amendments of 1988 (CLIA) Condition-
level requirements, has not removed the finding of immediate jeopardy, and of the consequent
imposition of the following sanctions:

-    Revocation of the laboratory's CLIA certificate
-    Suspension of the laboratory's CLIA certificate
-    A Directed Portion of a Plan of Correction
-    Suspension of the laboratory's approval to receive Medicare and Medicaid payments
-    Cancellation of the laboratory's approval to receive Medicare and Medicaid payments

We acknowledge receipt of the laboratory's notice of closure dated October 5, 2016, and have given
this information consideration in our review of the laboratory's submissions. However, as advised in
our November 29, 2016 notice, sanctions cannot be avoided by the closure of the laboratory,

1

CMS3-000671

discontinuation of testing, voluntary withdrawal from the CLIA program, or changes in certificate to a lower level of testing.

We have determined that the evidence of compliance provided by the laboratory is not sufficient to remove the deficiencies. We are also unable to verify current compliance with CLIA requirements due to the laboratory's closure. Accordingly, we are proceeding with the imposition of sanctions as indicated in this letter.

**Imposed Sanctions**

Accordingly, pursuant to 42 C.F.R. §§ 493.1806, 193.1812, 493.1814, and 493.1840(a)(3), **based on the finding of immediate jeopardy and the laboratory's failure to meet all CLIA Condition-level requirements, and based on the failure by the owners and director of the laboratory to comply with certificate requirements and performance standards as evidenced by the deficiencies cited during the CLIA complaint survey completed on September 29, 2016,** CMS is taking action to impose the following sanctions against the CLIA certificate of Theranos, Inc.:

- 42 C.F.R. §§ 493.1806, 493.1840(a)(3), and 493.1840(e) – Principal Sanction: **Revocation** of the laboratory's CLIA certificate effective **March 28, 2017**. The laboratory has sixty (60) calendar days to appeal the determination to revoke the laboratory's CLIA certificate. If a timely hearing request is received, revocation of the laboratory's CLIA certificate will become effective following the administrative hearing decision, if our determination of non-compliance is upheld. *See* 42 C.F.R. § 493.1840(e)(1).

- 42 C.F.R. §§ 493.1806, 493.1812, 493.1840(a)(3), and 493.1840(d)(2)(i) – Principal Sanction: **Suspension** of the laboratory's CLIA certificate effective **February 4, 2017**, based on the finding of immediate jeopardy. Pursuant to 42 C.F.R. §§ 493.1840(d)(2)(i) and 493.1844(d)(2)(ii), the suspension will take effect regardless of whether a hearing is filed and will remain in effect until the laboratory's CLIA certificate is revoked.

- 42 C.F.R. §§ 493.1806(c)(1), 493.1832, 493.1844(d)(1), and 493.1844(g)(1) – Alternative Sanction: **Directed Portion of a Plan of Correction** effective **February 1, 2017**. By February 1, 2017, Theranos must provide a written notification to patients or clinicians who used the laboratory's services (and have not been previously notified of corrected/voided test results) from December 2014 to the present date. An appeal will not delay the due date for this submission or client notification by CMS.

Theranos may include the following language in the remaining patient notifications:

> The Theranos laboratory, located at (insert address), has ceased operations as of October 5, 2016. During an inspection by CMS on September 29, 2016, several deficiencies were cited that could have affected the accuracy of the test results generated by the laboratory. We recommend that you contact your health care provider and determine if the tests should be repeated   by   a   different clinical laboratory in your area.

- 42 C.F.R. §§ 493.1804(b), 493.1807(b), 493.1808(b), 493.1826, 493.1844(d)(1), and 493.1844(h)(2) – Medicare Alternative Sanction: **Suspension of the laboratory's approval to receive Medicare payments** for any services performed on or after **February 4, 2017**.

2

CMS3-000672

As a consequence of the suspension of the approval to receive Medicare for services performed, under Section 1902(a)(9)(C) of the Social Security Act and 42 C.F.R. § 440.30(c), payment under the Medicaid program, Title XIX of the Social Security Act, will no longer be available to the laboratory for all laboratory services performed effective **February 4, 2017**. *See also* 42 C.F.R. § 493.1809.

• 42 C.F.R. §§ 493.1807(a), 493.1808(a), 493.1842, and 493.1844(d)(3) – Principal Sanction: **Cancellation of the laboratory's approval to receive Medicare payments** for all laboratory services effective **March 28, 2017**. This sanction will be effectuated even if the laboratory files a timely appeal.

Moreover, in accordance with Section 1902(a)(9)(C) of the Social Security Act and 42 C.F.R. § 440.30(c) and 493.1809, payment under the Medicaid program, Title XIX of the Social Security Act, will no longer be available to the laboratory for all laboratory services effective **March 28, 2017**. *See* 42 C.F.R. § 440.2(b).

Although the laboratory has withdrawn from the CLIA program by notice dated October 24, 2016, its CLIA certificate will remain active until the sanctions identified above take effect.

**Appeal Rights**

If Theranos, Inc. does not believe that the determination upon which imposition of the sanction is based is correct, the laboratory may request a hearing before an administrative law judge (ALJ) of the Departmental Appeals Board (DAB) in accordance with 42 C.F.R. §§ 493.1844 and 498.40 - .78. A request for hearing must be filed **electronically** no later than **sixty (60) calendar** days after the date this letter is received. *See* 42 C.F.R. § 493.1844(f); DAB Civil Remedies Division Procedures (CDRP), § 2(b) (Effective January 1, 2015). You should file your request for an appeal (accompanied by a copy of this letter) via the DAB Electronic Filing System website (DAB E-File) at https://dab.efile.hhs.gov. Should you choose to file an appeal, you are required to e-file your appeal request unless you received a waiver from the DAB. *See* DAB CDRP §§ 2(b) and 6, available at http://www.hhs.gov/dab/divisions/civil/procedures/ divisionprocedures.html. Please note: all documents must be submitted to DAB E-File in Portable Document Format ("pdf").

A hard copy of the hearing request should be sent to:

> Karen Fuller, Manager
> State Oversight and CLIA Branch
> Division of Survey and Certification
> Centers for Medicare & Medicaid Services
> 90 Seventh St., Suite 5-300 (5W)
> San Francisco, California 94103-6707

The request for hearing must contain a statement as to the specific issues and findings of fact and conclusions of law in this determination with which the laboratory disagrees and the basis for the laboratory's contention that the specific issues and/or findings and conclusions are incorrect. Evidence and arguments may also be presented at the hearing, where counsel may represent the laboratory at its own expense.

3

CMS3-000673

**If a hearing is conducted and CMS' determination is upheld, the laboratory will be assessed a fee to cover the government's cost related to the hearing.** *See* 42 C.F.R. § 493.643(d)(2).

As noted above, if a timely request for hearing is filed, i.e., by **March 28, 2017**, CMS will not revoke the CLIA certificate until after an ALJ hearing that upholds the sanction determination. However, cancellation of all Medicare payments is effective **March 28, 2017**, regardless of whether a hearing is requested. *See* 42 C.F.R. § 493.1844(d)(1)-(3) and (h).

**When the laboratory's CLIA certificate is revoked, the laboratory will not be permitted to perform any testing, including waived testing and provider performed microscopy procedures, regardless of whether or not the laboratory charges for the testing.** Also, pursuant to 42 U.S.C. § 263a(i)(3) and 42 C.F.R. § 493.1840(a)(8), the owners and operator(s) (including the laboratory director) are prohibited from owning or operating (or directing) a laboratory for at least two (2) years from the date of the revocation. *See* 42 C.F.R. § 493.2 (defining "operator" and "owner").

In accordance with 42 C.F.R. § 493.1850(a)(2), information regarding the actions against the laboratory's CLIA certificate will appear in the Laboratory Registry for the calendar year in which the actions are imposed. In addition, pursuant to 42 C.F.R. § 493.1844(g)(1), we will notify the general public by means of a notice published in a local newspaper when these actions become effective as referenced above.

If you have any questions regarding this notice, please call Gary Yamamoto of my staff at (415) 744-3738.

Sincerely,

Steven D. Chickering
Western Division Survey & Certification Officer

cc:     Arizona Department of Health Services, Division of Public Health Services, Office of Laboratory Licensing and Certification, CLIA Certification Program

CMS, Central Office

Elizabeth Holmes, Owner
Ramesh Balwani, Owner
Daniel Young, Scottsdale, AZ, Laboratory Director
Theranos, Inc.
1701 Page Mill Road
Palo Alto, CA  94304

4

CMS3-000674

# Exhibit 31

Page 1

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA


SECURITIES AND EXCHANGE

COMMISSION,

        Plaintiff,

vs.                    CASE NO. 5:18-CV-01603-EJD

RAMESH "SUNNY" BALWANI,

        Defendant.

_____/


CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER


      The above-captioned video deposition of

SARAH BENNETT was held on Wednesday, January 29, 2020,

commencing at 8:35 a.m., at the Law Offices of DLA

Piper, 100 Light Street, Suite 1350, Baltimore,

Maryland, before Steven Poulakos, Notary Public.


REPORTED BY:  Steven Poulakos, RPR

Page 2

```
 1   APPEARANCES:

 2       ON BEHALF OF THE PLAINTIFF:

 3       SHARANYA SAI MOHAN, ESQUIRE

 4           U.S. Department of Justice

 5           450 Golden Gate Avenue

 6           9th Floor

 7           San Francisco, California  94102

 8           Telephone:  415.436.7198

 9           Email:  sharanya.mohan@usdoj.gov

10

11       ON BEHALF OF THE PLAINTIFF:

12       MARC D. KATZ, ESQUIRE

13           U.S. Securities and Exchange Commission

14           Division of the Enforecement

15           44 Montgomery Street

16           Suite 2800

17           San Francisco, California  94104

18           Telephone:  415.705.8121

19           Email:  katzma@sec.gov

20

21

22

23

24

25
```

```
                                                        Page  3
    1   APPEARANCES (Continued):

    2

    3       ON BEHALF OF THE PLAINTIFF:

    4       LINDSEY L. TURNER, ESQUIRE

    5       TAMARA CLARK, ESQUIRE (via telephone)

    6          U.S. Department of Health and Human Services

    7          330 Independence Avenue, S.W.

    8          Romm 5300

    9          Washington, D.C.  20201

   10          Telephone:  202.205.5867

   11          Email:  lindsay.turner@hhs.gov

   12

   13

   14

   15

   16

   17

   18

   19

   20

   21

   22

   23

   24

   25
```

```
                                                         Page 4
 1   APPEARANCES (Continued):

 2        ON BEHALF OF THE DEFENDANT:

 3        STEPHEN A. CAZARES, ESQUIRE

 4        AMANDA MARLAM McDOWELL, ESQUIRE

 5           Orrick, Herrington & Sutcliffe, LLP

 6           701 5th Avenue

 7           Suite 5600

 8           Seattle, Washington  98104

 9           Telephone:  206.839.4300

10           Email:  scazares@orrick.com

11                   amcdowell@orrick.com

12

13   ALSO PRESENT:  RAMESH "SUNNY" BALWANI

14                  IOANNIS ARSENIS, THE VIDEOGRAPHER

15

16

17

18

19

20

21

22

23

24

25
```

Page 5

```
 1                        INDEX

 2            Deposition of SARAH BENNETT

 3                   January 28, 2020

 4   Examination by:                          Page

 5   Mr. Cazares                                  7

 6

 7   Exhibit No.                              Marked

 8   Exhibit 393   State operations manual       61

 9   Exhibit 394   Surveyor notes                73

10   Exhibit 395   An email with an attachment  172

11   Exhibit 396   A letter                     187

12   Exhibit 397   Clawed back                  196

13

14             PREVIOUSLY MARKED EXHIBITS

15   Exhibit No.                              Marked

16   Exhibit 262   An email with an attachment  132

17

18

19

20

21

22

23

24

25
```

Page 35

00:37:29  1              MR. CAZARES:  That's okay.  I understand

00:37:31  2    these aren't simple.  That's fine.

          3    BY MR. CAZARES:

00:37:33  4        Q     Under CLIA rules and regulations, are you

00:37:36  5    the surveyor required to have evidence that the lab

00:37:39  6    director knew of the deficiency you discovered prior to

00:37:43  7    your visit and survey?

00:37:45  8              MR. KATZ:  Same objections.

00:38:01  9              THE WITNESS:  I can't really answer that

00:38:04 10    because like I said, they are responsible for the

00:38:06 11    overall management and operation of the laboratory, so

00:38:09 12    they have to know what's going on in their laboratory,

00:38:12 13    but do we have something specific that says they must,

00:38:16 14    no.

         15    BY MR. CAZARES:

00:38:17 16        Q     So does what mean whether or not you have

00:38:20 17    evidence that a lab director knew of a deficiency that

00:38:23 18    you've discovered that supported a condition-level

00:38:26 19    finding the lab director would still be responsible?

00:38:29 20              MR. KATZ:  Objection, leading, compound and

00:38:31 21    vague and ambiguous and misstates her testimony.

00:38:50 22              THE WITNESS:  I need you to repeat it again

00:38:50 23    because I'm thinking.

00:38:51 24              MR. CAZARES:  Can you read the question,

00:39:26 25    please?

Page 36

```
              1          (Reporter read back the record as requested.)
00:39:40      2          THE WITNESS:  Again, the lab director is
00:39:41      3   responsible for the overall management and operation of
00:39:45      4   that laboratory.  And if there are any actions taken
00:39:50      5   against a laboratory such as revocation, the laboratory
00:39:56      6   director then would be prohibited if a certificate is
00:40:01      7   revoked.
              8   BY MR. CAZARES:
00:40:03      9      Q    Again, I appreciate that information, but
00:40:05     10   it's not really responsive to the question.  The
00:40:08     11   question is --
00:40:08     12          MR. KATZ:  Object to the commentary.
             13   BY MR. CAZARES:
00:40:11     14      Q    -- in your determination that the lab
00:40:14     15   director -- let me back up.  In your finding of a
00:40:18     16   condition-level deficiency for a laboratory, are you
00:40:22     17   required to have evidence that the lab director was
00:40:25     18   aware of the deficiency that supported the
00:40:28     19   condition-level finding?
00:40:30     20          MR. KATZ:  Again, calls for a legal
00:40:31     21   conclusion, vague and ambiguous.
00:40:40     22          THE WITNESS:  Whether or not the laboratory
00:40:41     23   director knew about the deficient practice does not
00:40:45     24   enter into the determination of whether condition-level
00:40:48     25   noncompliance exists.
```

Page 37

```
             1   BY MR. CAZARES:
00:40:51     2       Q      Does the same go for the owners of the
00:40:54     3   laboratory?
00:40:55     4              MR. KATZ:  Objection, vague.
00:41:05     5              THE WITNESS:  I would say in my opinion,
00:41:10     6   yes, the same applies.  But, again, they're
00:41:15     7   responsible.  Regardless of whether they knew what was
00:41:20     8   occurring, they are responsible.
             9   BY MR. CAZARES:
00:41:25    10       Q      Thank you.  I appreciate that.
00:41:26    11       A      Okay.
00:41:37    12       Q      If we can back up now.  I didn't get into
00:41:43    13   your background unfortunately, so let's go back to
00:41:48    14   that.
00:41:48    15              Can you describe for me your educational
00:41:50    16   background?
00:41:53    17       A      I have a degree in medical technology from
00:41:54    18   the Medical College of Virginia, Virginia Commonwealth
00:41:57    19   University.
00:42:12    20       Q      And -- and did you do any postgraduate
00:42:16    21   studies?
00:42:17    22       A      I did not.
00:42:20    23       Q      And have you obtained any state or federal
00:42:23    24   licensing or licenses?
00:42:26    25       A      I'm certified by the American Board of
```

Page 97

02:08:06  1    regulations.  They were found to not be in compliance.

          2    BY MR. CAZARES:

02:08:12  3        Q      And did you discuss this issue with any of

02:08:15  4    the lab personnel?

02:08:25  5        A      I don't recall specifically, but I would

02:08:28  6    presume that when I found it, I would have asked them

02:08:32  7    about the five-day expiration as opposed to the two day

02:08:37  8    and the manufacturer's package insert.

02:08:39  9        Q      Were the lab personnel at Theranos aware of

02:08:41 10    the fact that they were using the Innovin beyond the

02:08:46 11    manufacturer indicated two days of stability?

02:08:49 12               MR. KATZ:  Objection, calls for

02:08:50 13    speculation.

02:08:52 14               THE WITNESS:  I don't know what they

02:08:53 15    were -- what they knew and what they didn't know.

          16    BY MR. CAZARES:

02:08:56 17        Q      Is that not part of your survey process?

02:08:57 18               MR. KATZ:  Objection, vague.

02:09:17 19               THE WITNESS:  Certainly that would have

02:09:18 20    been something that I would have looked into and I

02:09:26 21    don't -- I can't -- I don't know from my notes if I

02:09:37 22    interviewed anyone specifically, but in situations like

02:09:43 23    this, it's not necessarily require -- it's not

02:09:49 24    necessarily something that I might interview because I

02:09:52 25    had, you know, I had the documents that showed me that,

Page 98

02:09:55   1   in fact, they were not meeting the regulatory

02:09:57   2   requirements.

           3   BY MR. CAZARES:

02:09:59   4        Q     So it was a compliance violation regardless

02:10:02   5   of whether or not the lab personnel were aware of the

02:10:04   6   fact that they were using expired or otherwise Innovin

02:10:10   7   beyond the stability date indicated by the

02:10:14   8   manufacturer?

02:10:25   9        A     It is a regulatory noncompliance issue if

02:10:35  10   the laboratory has modified a test and not performed

02:10:40  11   the applicable requirements before testing patient

02:10:46  12   results.

02:10:48  13        Q     And in your survey work on this issue, did

02:10:51  14   you find or identify evidence that the laboratory

02:10:55  15   personnel were aware of the fact that they had modified

02:10:59  16   the manufacturer specified use of the Innovin?

02:11:06  17        A     To the best of my recollection, they were

02:11:10  18   surprised by what I found.

02:11:19  19        Q     Is -- stepping back from Theranos.  This

02:11:23  20   issue of expired reagent or in using reagent beyond the

02:11:28  21   stability date indicated by the manufacturer, is that

02:11:31  22   something in your experience that you have identified

02:11:33  23   in other laboratories you surveyed?

02:11:35  24        A     Yes.

02:11:47  25        Q     If you could turn to the next page or I

Page 157

03:35:51  1              THE WITNESS:  Once there's a determination

03:35:53  2   of noncompliance, you have to use your professional

03:35:58  3   surveyor judgment to determine what evidence you need

03:36:01  4   to support that noncompliance and there's no standard

03:36:05  5   set.  It all depends on the -- it's very situational.

          6   BY MR. CAZARES:

03:36:16  7         Q      In your own practice, is it your practice

03:36:18  8   to cite or refer to the most significant evidence or

03:36:23  9   most important evidence supporting your findings?

03:36:31 10         A      When I'm writing deficiencies, I am going

03:36:35 11   to include whatever findings support my deficient

03:36:39 12   practice statement which is the based on statement.

03:37:01 13         Q      So just so I understand the difference.  So

03:37:04 14   under for DTAG D2128 that we're looking at hematology.

03:37:08 15         A      Um-hmm.

03:37:09 16         Q      Sticking with that same page.  There's --

03:37:12 17   under hematology, there's 1 and 2 which is what?

03:37:18 18         A      Under 2128?

03:37:19 19         Q      Yeah.

03:37:20 20         A      That's the regulatory language.

03:37:21 21         Q      Okay.  So there's a 1 and 2 is the

03:37:23 22   regulatory language?

03:37:24 23         A      Which is pre-populated.

03:37:27 24         Q      And then there's -- this standard is not

03:37:29 25   met as evidenced by and then there's a based on review.

Page 166

03:49:53   1   guess, the risk relating to the condition or

03:49:55   2   noncompliance is more important than the number of

03:49:59   3   deficiencies?

03:50:01   4           MR. KATZ:  Objection, misstates the

03:50:01   5   witness's testimony and leading.

03:50:09   6           THE WITNESS:  What I'm saying is the number

03:50:11   7   of standards -- there's no requirement to have a

03:50:15   8   certain number of standards out of compliance in order

03:50:18   9   to call a condition.  It all is situation dependent and

03:50:21  10   what you find on the survey as to how serious the

03:50:26  11   particular noncompliance is.

          12   BY MR. CAZARES:

03:50:43  13       Q    In your experience, can -- or have you --

03:50:48  14   have you observed or known -- well, let me back up.  In

03:50:53  15   your experience, can two qualified experienced

03:50:55  16   surveyors come to different conclusions relating to

03:51:01  17   similar findings, similar laboratory records, and/or

03:51:05  18   personnel actions or failures to act?

03:51:08  19           MR. KATZ:  Objection, vague and calls for

03:51:13  20   speculation.

03:51:16  21           THE WITNESS:  I would say in my experience

03:51:18  22   when you're on a survey team, sometimes there are

03:51:24  23   discussions about citations between the surveyors, but

03:51:35  24   ultimately what is cited on the 2567 is the

03:51:40  25   determination that is made.

Page 167

```
            1   BY MR. CAZARES:
03:51:44    2       Q      Okay.  I appreciate that and that kind of
03:51:46    3   gets to what I'm getting at.
03:51:47    4       A      Right.
03:51:48    5       Q      But my point is, I mean, in your
03:51:49    6   experience, can two surveyors look at a lab and look at
03:51:52    7   the same evidence and come to different conclusions
03:51:55    8   regarding how serious the deficiencies are?
03:51:57    9           MR. KATZ:  Objection, vague, calls for
03:51:59   10   speculation.
03:52:09   11           THE WITNESS:  In my experience generally
03:52:15   12   when you're on a team, there is agreement as to the
03:52:23   13   level of the noncompliance.  However, you can have
03:52:31   14   differences of opinion about the citations or what
03:52:35   15   perhaps whether it should be cited as a standard or a
03:52:37   16   condition.
           17   BY MR. CAZARES:
03:52:42   18       Q      Thank you.
03:52:43   19           If we could continue on.  We're going to
03:52:46   20   skip several more pages and I think I'm on CMS10926 in
03:52:53   21   the right-hand corner.
03:52:54   22           Do you see that?
03:52:56   23       A      Let me get there.  Okay.
03:52:59   24       Q      Okay.  I'm looking at the top of the page
03:53:05   25   D6168 testing personnel.
```

Page 178

04:08:58  1   running the PTs on and the ISI value which is a value

04:09:03  2   that is determined by the manufacturer for each

04:09:06  3   thromboplastin lot number was also -- the number that

04:09:11  4   was on the manufacturer's package insert was also in

04:09:13  5   the instrument.

04:09:16  6        Q    So was -- does that mean that the lab by

04:09:20  7   9/23/15 was correctly calculating and utilizing the

04:09:24  8   MNPT in relation to the ISI?

04:09:27  9             MR. KATZ:  Objection, vague and misstates

04:09:30 10   her testimony.

04:09:31 11             THE WITNESS:  All I can say is that when I

04:09:33 12   checked the device, the MNPT reflected the value from

04:09:39 13   9/18/15 and the ISI reflected the value of the

04:09:42 14   manufacturer's package insert.

         15   BY MR. CAZARES:

04:09:43 16        Q    So does this mean the findings relating to

04:09:46 17   the PT/INR deficiency is historical, I guess, prior to

04:09:53 18   9/23/15?

04:09:54 19             MR. KATZ:  Objection, vague.

04:10:02 20             THE WITNESS:  Can you --

         21   BY MR. CAZARES:

04:10:03 22        Q    I guess what I'm getting at is by 9/23/15

04:10:06 23   as indicated in point 3 under laboratory findings, did

04:10:09 24   it appear that the laboratory was correctly utilizing

04:10:13 25   or using the correct MNPT in its PT/INR testing?

Page 179

```
04:10:18  1        A      And what I can say is that the numbers from
04:10:24  2   the MNPT data from September 18th and ISI value on the
04:10:31  3   manufacturer's package insert were in the device on
04:10:35  4   9/23/15.
04:10:35  5        Q      And is that what you would expect to find?
04:10:39  6        A      Yes.
04:10:39  7        Q      Now, under point 4, the document indicates
04:10:43  8   81 patients had PT/INR reported from April 1, 2015,
04:10:48  9   through September 19, 2015.  Is that an indication of
04:10:50 10   the number of patients affected by this deficiency or
04:10:52 11   noncompliance?
04:10:54 12        A      That is an indication of the number of
04:11:07 13   patients that Theranos reported to me that they had run
04:11:14 14   between those dates.
04:11:17 15        Q      And the fact that those 81 patients had
04:11:20 16   reported results are under -- for PT/INR from April 1,
04:11:24 17   2015, to September 19, 2015, does that necessarily mean
04:11:28 18   that those 81 patients were affected by the
04:11:30 19   noncompliance in that time period?
04:11:32 20             MR. KATZ:  Objection, vague, compound.
04:11:42 21             THE WITNESS:  What I can say about those 81
04:11:43 22   patients in my opinion is that there was the potential
04:11:50 23   because of the noncompliance to have issues with the
04:11:59 24   results.
         25   BY MR. CAZARES:
```

Page 184

04:18:07  1   were shifting downward, their response was to simply

04:18:11  2   shift their acceptable control values to match their

04:18:16  3   data.

04:18:16  4        Q    In your -- in your survey and inquiry into

04:18:20  5   this issue, were you able to identify who within

04:18:24  6   Theranos's lab made the decision to shift the control

04:18:29  7   values without the investigation you cited?

04:18:32  8             MR. KATZ:  Objection, vague and

04:18:35  9   argumentative, assumes facts not in evidence.

04:18:43 10             THE WITNESS:  My understanding was that it

04:18:45 11   was Mr. Gee who was in charge of quality control and

04:18:48 12   quality assurance as the QAQC manager.

         13   BY MR. CAZARES:

04:18:54 14        Q    I think there's a second page here, but

04:18:56 15   it's only a little bit.

04:18:58 16        A    There is.

04:18:59 17        Q    So if we could continue on to point 9 under

04:19:01 18   the laboratory findings portion of the presentation.

04:19:05 19   So 9 says:  "A study done by the surveyor comparing the

04:19:08 20   81 reported patient values versus the values

04:19:12 21   calculated -- the values -- calculated values using the

04:19:15 22   correct MNPT and ISI numbers show that 81 of 81 patient

04:19:19 23   values did not match.  INR value differences ranged

04:19:27 24   from .1 to .4."

04:19:30 25             So what is it you're reporting there?

Page 185

04:19:33  1        A     What I'm showing there is the fact that I

04:19:38  2   took the values, the PT values, the prothrombin time

04:19:48  3   values.  I put in the MNPT value that -- and the ISI

04:19:53  4   numbers that Theranos was using and the calculation

04:19:57  5   that I got did not match the reported result.  So, in

04:20:08  6   other words, the values that I got for the INR were

04:20:11  7   different than what was reported by Theranos.

04:20:15  8        Q     And does that mean those results reported

04:20:17  9   by Theranos were inaccurate or incorrect?

04:20:21 10        A     It means that they were different.

04:20:24 11        Q     And for someone who is not in the lab, what

04:20:26 12   does that mean to be different?

04:20:29 13        A     That means the value that should have been

04:20:31 14   reported was different than the value that was

04:20:34 15   reported.

04:20:35 16        Q     And saying it's different, is that

04:20:38 17   different -- saying that the values were different than

04:20:42 18   what was reported is not the same as the reported

04:20:47 19   results being inaccurate?

04:20:49 20             MR. KATZ:  Objection, vague.

04:20:53 21             THE WITNESS:  It's not my job to determine

04:20:54 22   whether a result is accurate.

         23   BY MR. CAZARES:

04:20:59 24        Q     We can continue on for number 10.  At

04:21:04 25   number 10, the last of the points, it says:  "The

Page 187

```
04:22:53  1    44 had values greater than or equal to 2 and that
04:22:57  2    includes the greater than or equal to 3.  And then of
04:23:01  3    those 44 patients, 16 of the 44 had values reported
04:23:06  4    that had were greater than or equal to 3.
04:23:18  5         Q    So what does that mean from a therapeutic
04:23:22  6    perspective?
04:23:23  7         A    That actually falls into the practice of
04:23:24  8    medicine how a physician or a medical professional is
04:23:28  9    going to react to those numbers.  But in order for a
04:23:31 10    medical professional to make an appropriate decision
04:23:35 11    about Coumadin or Warfarin therapy, they need to have
04:23:39 12    an accurate and reliable result.
04:23:44 13         Q    You can set that aside.
04:23:53 14              MS. MOHAN:  Can we go off the record?
04:23:59 15              MR. CAZARES:  Sure.
04:24:00 16              THE VIDEOGRAPHER:  We're going off the
04:24:05 17    record.  The time is 2:27 p.m.
         18              (Deposition recessed at 2:27 p.m.)
         19              (Deposition resumed at 2:29 p.m.)
04:24:09 20              THE VIDEOGRAPHER:  We are back on the
04:24:10 21    record.  The time is 2:29 p.m.
         22              (Bennett Exhibit 396 was marked for
         23    purposes of identification.)
         24    BY MR. CAZARES:
04:25:19 25         Q    Ms. Bennett, you've been handed a document
```

Page 188

04:25:21   1    marked 396.  It appears to be a letter dated

04:25:28   2    November 29, 2016, from CMS to Daniel Young, Elizabeth

04:25:32   3    Holmes, Ramesh Balwani.  Important notice.  Please read

04:25:37   4    carefully.

04:25:39   5              Do you have that in hand?

04:25:40   6         A    I do.

04:25:40   7         Q    Are you familiar with the document?

04:25:45   8         A    I've seen it.

04:25:46   9         Q    What is it?

04:25:52  10         A    It is a proposed sanction letter that

04:25:55  11    conditions were not met and there was immediate

04:26:00  12    jeopardy.

04:26:00  13         Q    And this is of the Theranos Arizona

04:26:04  14    laboratory?

04:26:05  15         A    Yes.  That's the address in the letter.

04:26:08  16         Q    And did you participate in the survey of

04:26:09  17    the Theranos's Arizona lab?

04:26:11  18         A    I did.

04:26:12  19         Q    And did you have a partner in that survey?

04:26:15  20         A    Mr. Yamamoto.

04:26:19  21         Q    Okay.  In the course of your survey of the

04:26:21  22    Arizona lab, did you take handwritten notes in the same

04:26:25  23    way as the notes that we saw earlier today relating to

04:26:28  24    your survey for the California lab for Theranos?

04:26:31  25         A    I believe so.

Page 189

```
04:26:32  1        Q      Did you provide those to requesters who
04:26:35  2   requested documents of you?
04:26:37  3        A      I believe so.
04:26:40  4        Q      Any -- can you give me some sense of how
04:26:42  5   voluminous your notes may be from the Arizona survey?
04:26:50  6        A      Not unless I would see them.
04:26:53  7        Q      But you're confident that you did take
04:26:54  8   handwritten notes and provided them to the requesters
04:26:56  9   who requested documentation from you relating to
04:27:01 10   Theranos?
04:27:02 11        A      Yes.
04:27:02 12        Q      I'm not suggesting otherwise.  I'm just
04:27:03 13   trying to confirm because --
04:27:04 14        A      Anything I was asked for, I turned over.
04:27:10 15        Q      Okay.  Did yourself and Mr. -- did yourself
04:27:13 16   and Mr. Yamamoto kind of use a division of labor in
04:27:20 17   dividing up responsibilities for the survey of the
04:27:23 18   Arizona lab?
04:27:24 19              MR. KATZ:  Objection, vague.
04:27:28 20              THE WITNESS:  We handled the division of
04:27:29 21   labor the same way that we did in California.  We
04:27:32 22   divided up the different areas we were looking at.
         23   BY MR. CAZARES:
04:27:36 24        Q      And can you give me some sense or describe
04:27:39 25   for me what happened on the first day of the survey of
```

Page 199

```
04:41:09  1    record.  I meant I have no further questions.  If you
04:41:13  2    have anything.
04:41:15  3              MR. KATZ:  No.
04:41:15  4              MS. MOHAN:  Yeah, just housekeeping.
04:41:16  5              MR. CAZARES:  Go ahead.
04:41:17  6              MS. MOHAN:  We'd like to designate the
04:41:19  7    transcript as confidential pursuant to the protective
04:41:22  8    orders in this case and the witness would like the
04:41:24  9    opportunity to review and sign the transcript as well.
04:41:27 10    And I also intended to designate the video as
04:41:30 11    confidential pursuant to the protective order.
04:41:34 12              MR. KATZ:  And the SEC's request for the
04:41:38 13    transcript is consistent with our national order and
04:41:43 14    what we did with the one yesterday.  Thank you very
04:41:45 15    much.
04:41:48 16              MS. McDOWELL:  We are also ordering a video
04:41:55 17    and transcript.
04:41:57 18              MS. MOHAN:  We're not ordering the video,
04:41:58 19    but we are ordering a copy of the transcript and
04:42:00 20    exhibits.
04:42:03 21              THE VIDEOGRAPHER:  Thank you very much.
04:42:03 22    This -- we're going off the record.  The time is
04:42:07 23    2:53 p.m. and this marks also the end of DVD number 3
04:42:12 24    and today's deposition of Ms. Sarah Bennett.
         25              (Deposition was concluded at 2:53 p.m.)
```

Page 200

 1                    CERTIFICATE OF DEPONENT

 2              I hereby certify that I have read and

 3   examined the foregoing transcript, and the same is a

 4   true and accurate record of the testimony given by me.

 5

 6              Any additions or corrections that I feel

 7   are necessary will be made on the Errata Sheet.

 8

 9

10                       _____

11                          Sarah Bennett

12

13

14

15                       _____

16                             Date

17

18   (If needed, make additional copies of the Errata Sheet

19   on the next page or use a blank piece of paper.)

20

21

22

23

24

25

Page 201

```
 1                      ERRATA SHEET

 2   Case: SEC V Ramesh "Sunny" Balwani

 3   Witness: Sarah Bennett              Date: 01/29/2020

 4   PAGE/LINE          SHOULD READ          REASON FOR CHANGE

 5   _____

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____
```

Page 202

```
 1      CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

 2              I, Steven Poulakos, registered Professional

 3      Reporter, the officer before whom the foregoing

 4      proceedings were taken, do hereby certify that the

 5      foregoing transcript is a true and correct record of

 6      the proceedings; that said proceedings were taken by me

 7      stenographically and thereafter reduced to typewriting

 8      under my supervision; and that I am neither counsel

 9      for, related to, nor employed by any of the parties to

10      this case and have no interest, financial or otherwise,

11      in its outcome.

12              IN WITNESS WHEREOF, I have hereunto set my

13      hand and affixed my notarial seal this 4th day of

14      February 2020.

15      My commission expires:

16      August 20, 2023

17

18

19

20      -------------------------

21      NOTARY PUBLIC IN AND FOR

22      THE STATE OF MARYLAND

23

24

25
```

# Exhibit 30

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
Western Division of Survey and Certification
San Francisco Regional Office
90 7th Street, Suite 5-300 (5W)
San Francisco, CA  94103-6707



Refer to: WDSC-GKY

## IMPORTANT NOTICE – PLEASE READ CAREFULLY

July 7, 2016

Sunil Dhawan, M.D., Director          CLIA Number: 05D2025714
Elizabeth Holmes, Owner
Ramesh Balwani, Owner
Theranos, Inc.
7333 Gateway Boulevard
Newark, CA  94560

RE:   IMPOSITION OF SANCTIONS

Dear Dr. Dhawan, Ms. Holmes, and Mr. Balwani:

We are writing to notify you of the determination by the Centers for Medicare & Medicaid Services (CMS) that Theranos, Inc. ("Theranos" or "the laboratory") located at the above address is not in compliance with Clinical Laboratory Improvement Amendments of 1988 (CLIA) Condition-level requirements, has not removed the finding of immediate jeopardy, and of the consequent imposition of the following sanctions:

- Revocation of the laboratory's CLIA certificate
- Limitation of the laboratory's CLIA certificate for the specialty of hematology
- A Civil Money Penalty
- A Directed Portion of a Plan of Correction
- Suspension of the laboratory's approval to receive Medicare and Medicaid payments for any services performed for the specialty of hematology
- Cancellation of the laboratory's approval to receive Medicare and Medicaid payments for all laboratory services

**CLIA Survey**

CMS conducted a CLIA recertification and complaint survey at Theranos in 2015.  The onsite portion of the survey was completed on November 20, 2015; however, the survey concluded with the receipt of critical information received from the laboratory on December 23, 2015.  Based on this survey, the laboratory was found to be out of compliance with five CLIA Condition-level requirements, in addition to numerous CLIA Standard-level requirements.

By letter dated January 25, 2016, CMS provided Theranos with a listing of all deficiencies identified during the survey on Form CMS-2567, Statement of Deficiencies.  The January 25, 2016 letter also notified the laboratory that the seriousness of the deficiencies cited under 42 C.F.R. § 493.1215 resulted in the finding of immediate jeopardy to patient health and safety, and requested

1

Confidential

THPFM0004806442
SEC-THERANOS-006238053

that the laboratory take immediate action to remove the jeopardy and bring any unmet Condition-level requirements into compliance.  In response to the January 25, 2016 letter, CMS received a submission from the laboratory on February 12, 2016.

After careful review, we determined that the laboratory's submission did not constitute a credible allegation of compliance and acceptable evidence of correction for the deficiencies cited during the CLIA recertification and complaint survey completed on December 23, 2015, and did not demonstrate that the laboratory had come into Condition-level compliance and abated the immediate jeopardy.

**CMS' Notice of Proposed Sanctions**

By letter dated March 18, 2016, we notified Theranos of our determination related to the laboratory's submission; provided the laboratory with our review of the submission; and proposed sanctions against the laboratory's CLIA certificate based on the finding of immediate jeopardy, the laboratory's failure to meet all CLIA Condition-level requirements, and the failure by the owners and director of the laboratory to comply with certificate requirements and performance standards as evidenced by the deficiencies cited during the CLIA recertification and complaint survey completed on December 23, 2015.  This letter described the proposed sanctions and gave the laboratory until March 28, 2016 to submit, in writing, any information or evidence as to why the sanctions should not be imposed.

In response, CMS received a second submission from the laboratory initially dated March 28, 2016, which was followed by a revised submission dated April 1, 2016.  Subsequent addendums to the second submission were received by CMS from the laboratory under cover letters dated April 7, 2016, April 18, 2016, and April 26, 2016.  (Collectively, these five submissions are referred to herein as the "second submission.")

**Review of the Laboratory's Second Submission**

After careful review, we have determined that the laboratory's second submission again does not constitute a credible allegation of compliance and acceptable evidence of correction for the deficiencies cited during the CLIA recertification and complaint survey completed on December 23, 2015, and does not demonstrate that the laboratory has come into Condition-level compliance and abated the immediate jeopardy.

The following explanation details why the laboratory's second submission does not constitute a credible allegation of compliance and acceptable evidence of correction:

**General Comments**

- *Flash Drives*

    Although related to all deficiencies cited, this general comment specifically addresses the laboratory's second submission responding to the deficiencies cited under D5413, D5423, D5481, D5779, D5791, D5793, D5805, D6086, D6170, and D6178.

2

Confidential

THPFM0004806443
SEC-THERANOS-006238053

Theranos provided CMS five passcode protected flash drives with its second submission labeled Exhibits KK, MM, NN, OO, and PP. After careful review, we note the following related to these flash drives:

- The information on the flash drives was difficult to evaluate and access. Corrected patient test reports and notification of corrected patient test reports for any specific patient specimen accession number were spread over several flash drives, and the corrected patient test reports were not always associated directly with the confirmation of notifications and receipts. This required all flash drives be reviewed in their entirety for any specific accession number to determine whether complete records were received. We were unable to search the flash drives by any criteria (e.g., patient name, date of visit, etc.) other than by the specimen accession numbers provided in the binder labeled Ex. MM.

- We are uncertain as to what the laboratory intended to submit as a "complete" record for each corrected patient test report submitted. Some of the corrected patient test reports had associated facsimile coversheets, and other corrected patient test reports had associated facsimile receipts, but not both. In other cases, we found only facsimile coversheets or receipts, but no associated correct patient report. We are unclear as to the following:

  o For those specimen accession numbers that had only facsimile coversheets, how did the laboratory verify receipt of the corrected patient reports?

  o For those specimen accession numbers that had only facsimile receipts, how does the laboratory (and CMS) know what information was actually transmitted to the authorized person?

  o How were the receipt confirmations generated?

It appears the information provided on the flash drives did not include "complete" documentation for all specimen accession numbers listed in the binder labeled Ex. MM. Furthermore, some of the specimen accession numbers listed in binder Ex. MM could not be found on any of the flash drives.

Consequently, we could not determine whether the laboratory provided documented evidence showing what corrective actions were taken for all patients found to have been affected by the deficient practice, and what corrective actions were taken for any other patients identified as having the potential to be affected by the same deficient practice.

- *Quality Assessment*

Although related to all deficiencies cited, this general comment specifically addresses the laboratory's second submission responding to the deficiencies cited under D2094, D2128, D5217, D5311, D5391, D5393, D5403, D5413, D5421, D5423, D5429, D5437, D5447,

3

Confidential

THPFM0004806444
SEC-THERANOS-006238053

**ER-3024**

D5449, D5469, D5477, D5481, D5775, D5779, D5781, D5787, D5791, D5793, D5801, D5805, D5821, D6086, D6093, D6102, and D6178.

In the April 1, 2016 portion of its second submission, the laboratory provided a revised quality assessment mechanism, but submitted no documentation to indicate that the revised quality assessment mechanism has been effectuated. In addition, the laboratory's submission states that "training on the revised QMPI [Quality Monitoring and Processing Improvement (quality assessment mechanism)] procedures has occurred. (Ex. BB, Tab 7 B-C)." We note that Ex. BB, Tab 7 B - C contains incomplete training documentation for only three laboratory personnel (one of training records did not include the same documents consistent with the other two records), none of whom appear on the laboratory's "Laboratory Personnel Report (CLIA), Form CMS-209" dated February 8, 2016. There is no evidence that the personnel listed on that form received the revised QMPI training.

The laboratory again failed to adequately address issues related to quality assessment and provide acceptable evidence of correction consisting of the required documentation and information as set forth in our January 25, 2016 and March 18, 2016 letters. Specifically, the laboratory failed to indicate what measure has been put in place or what systemic changes have been made to ensure the deficient practice does not recur, or how the corrective action is being monitored to ensure the deficient practice does not recur.

**Comments Related to Specific D-tags**

D2094

**The laboratory's allegation of compliance is not credible and evidence of correction is not acceptable.**

For ungraded proficiency testing results, Ex. BB, Tab 3, § 9.4.5.11 requires the laboratory to complete the Ungraded Section of Form CL FRM-00006-F1, titled "Proficiency Testing Investigation and Correction Action." The Ungraded Section of Form CL FRM-00006-F1 the laboratory provided in Ex. JJ, Tab 3A shows that only Question 4 was answered and not questions 1, 2, 3, 5, and 6.

The revised SOP (standard operating procedure) at Ex. BB, Tab 3, § 9.4.3.2 states that for proficiency testing (PT) results identified as "No appropriate target/response cannot be graded," the laboratory's PT results should be compared "to a similar method, all methods, or all participants statistics if provided." This allows the laboratory to determine the best fit for its data rather than have a clear-cut hierarchy for review of ungraded PT results. The SOP also did not clearly define who will be responsible for making the determination as to which category of results the laboratory's PT results would be compared against.

The April 1, 2016 letter accompanying the second submission states that the "documentation explains how the laboratory came to its conclusions related to patient outcomes (Ex. JJ, Tab 3A)." However, Ex. JJ, Tab 3A simply states: "**Patient Impact:** Based on PT investigation, no patient impact," and does not explain how the laboratory came to its conclusions that no patients were affected.

4

Confidential

THPFM0004806445
SEC-THERANOS-006238053

It is unclear from the revised procedure titled "PT Investigation and Corrective Action Form," and Patient Impact Assessment documentation what the actual acceptance criteria for PT samples are and what the laboratory should document. The form provided at Ex. JJ, Tab 3A, Question 4 states that the acceptance criteria is "SDI [standard deviation index] < 1.5." However, we note that the Patient Impact Assessment: Alkaline Phosphatase on ᵇ⁴ ᵇ⁴ (Ex. AA, Tab 13) allows ±30% as limits of acceptability. Further, the revised Proficiency Testing Procedure (Ex. BB, Tab 3) at § 9.4.5.3 includes the following:

> 9.4.5.3. Complete the General Section and document the average SDI or any SDI ≥ 2.0 if applicable.
>     a. Acceptable results: the lab target +/- PT allowable error
>     b. Acceptable results: the average SDI value of -1.5 to 1.5

In addition, we note that the Patient Impact Analysis identified a slight negative bias across all results. It states:

> In all such cases the level of alkaline phosphatase elevation is significant. . .The quantitative testing results themselves are of no clinical significance, with only gross degrees of elevation serving clinical utility. Therefore, any minimal negative bias, such as that identified in this case, when applied to any of these clinical scenarios, would have no clinical significance.

However, the revised Proficiency Testing Procedure (Ex. BB, Tab 3) requires in § 9.4.5.10 that a "review of patient tests results since the last PT event" is required for "incorrect results." There was no documentation submitted to indicate that any patient results were evaluated based on the requirement in the procedure, especially at the borderline abnormal high level.

D2128

**The laboratory's allegation of compliance is not credible and evidence of correction is not acceptable.**

The second submission included a revised Proficiency Testing Procedure (Ex. BB, Tab 3). Section 9.4.1 of this procedure provides instructions regarding the review of PT results and refers to §§ 9.4.1.1 - 9.4.1.3 of the procedure to evaluate unsatisfactory results, SDI, and bias, trends or shifts, respectively. We note that the procedure refers to incorrect sections; however, §§ 9.4.4.1 – 9.4.4.2 and §§ 9.4.5.2 – 9.4.5.3 did address these issues, and those sections were used to evaluate the laboratory's submission.

Based on the submission at Ex. JJ, Tab 2A, the laboratory did not follow its own procedure to review and evaluate the unacceptable response for BCI-11. The laboratory's revised PT procedure (Ex. BB, Tab 3) requires in § 9.4.5.10 that patient test results since the last PT event must be reviewed and "if the investigation demonstrates a problem with test performance, assess patient impact based on [where] the problem originated. . .Implement corrective action and notification." The latest submission at Ex. JJ, Tab 2 states that the unacceptable response for BCI-11 was investigated and explains how the laboratory came to its conclusions related to patient outcomes.

5

Confidential

THPFM0004806446
SEC-THERANOS-006238053

We note that on the Investigation and Corrective Action form it shows that BCI-11 was unacceptable, and indicates that the "CLS [clinical laboratory scientist] did not correctly identify the BCI-11..." and that there was "[n]o patient impact." However, there is no evidence submitted to support that patients were not impacted, nor was there documentation showing that the investigation included a review of patient results as required by the revised procedure.

D5024
**The laboratory's allegation of compliance is not credible and evidence of correction is not acceptable.**

See our reviews of D5403, D5447, D5481, and D5801.  For D5437, D5469, and D5779, see our Quality Assessment review under the General Comments.

D5217
**The laboratory's allegation of compliance is not credible and evidence of correction is not acceptable.**

In the April 1, 2016 submission, the laboratory states that it "failed to demonstrate proficiency" for troponin for both the first and second PT events of 2014.  However, because the laboratory was unable to determine the cause of the PT failures (Ex. JJ, Tab 1A), the laboratory voided all patient test results from March 2014 through October 2014. We are unable to determine if the laboratory's troponin test results for the third PT event of 2013 were also reviewed and found to be acceptable. The laboratory does state that troponin test results for the third PT event of 2014 were acceptable (Ex. JJ, Tab 1A); no documentation was included in the submission for CMS to verify this statement.  We are unclear as to why the laboratory did not perform a through retrospective review to determine when the last PT results for troponin were acceptable, and why patient results prior to March 2014 were not reviewed and possibly voided, when these patient test results fell in the time frame between the third PT event of 2013 and the first PT event of 2014 (where the laboratory voided patient troponin test results when the laboratory PT test results were unacceptable).

The April 1, 2016 portion of the second submission states on page 7 that: "Many corrected reports have been transmitted, and the remainder are being transmitted (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover."  An additional letter dated April 7, 2016 explained that the flash drive (Ex. OO) "contains copies of most of the remaining corrected reports, including receipt confirmations."  A review of binder Ex. MM, Tab 30 revealed 11 troponin specimen accession numbers for which corrected patient test reports were to have been generated, sent, and confirmed.  Based on the review of information on the flash drives (Ex. KK, MM, NN, OO, and PP), the records of corrected reports are incomplete.  The information provided in Ex. MM and on the four accessible flash drives showed corrected patient test reports for troponin from June 2014 through September 2014, but did not include any reports for March 2014 through May 2014 or October 2014, as it states in Ex. JJ, Tab 1A.

D5311
**The laboratory's allegation of compliance is not credible and evidence of correction is not acceptable.**

6

Confidential

THPFM0004806447
SEC-THERANOS-006238053

In its April 1, 2016 letter accompanying its second submission, the laboratory states: "Among other things, the revised assessment shows that [the] laboratory took corrective action in 2014 and 2015 for patients that may have been affected by offering a redraw and retest at no charge (Ex. AA, Tab 1; Ex. HH, Tab 10)." Included in Ex. AA, Tab 1 are statements of "Investigation" and "Patient Impact" in which the laboratory reiterates that, "if a specimen was not labeled or was mislabeled, it was the laboratory's practice in 2014 and 2015 to offer a redraw at no charge" and that "[the] laboratory took corrective action to address mislabeling by offering patients redraws at no charge." In this exhibit, the laboratory also references Ex. HH, Ex. 10.

Ex. HH, Ex. 10 is an attestation statement made by the laboratory's Corporate Controller stating: "If there is a problem with testing a patient sample because of a specimen labeling issue, the patient is offered a redraw at no additional charge." Other than the references to Ex. AA and Ex. HH, the laboratory provided no additional written evidence indicating such a policy existed in 2014 and 2015, or that the offer to redraw had actually occurred.

D5400
**The laboratory's allegation of compliance is not credible and evidence of correction is not acceptable.**

See our reviews of D5403, D5407, D5413, D5421, D5423, D5429, D5447, D5449, D5477, D5481, D5787, D5791, and D5793. For D5437, D5469, D5775, and D5779, see our Quality Assessment review under the General Comments.

D5403
**The laboratory's allegation of compliance is not credible and evidence of correction is not acceptable.**

Finding #2
The laboratory failed to submit documentation of any quality control (QC) procedure prior to May 15, 2014. Rather, the laboratory's submission includes an attestation (Ex. FF, Tab 13) from an employee who, based on documentation and interview at the time of the onsite survey, only performed dilutions on the   b 4  , but did not perform quality control or patient testing. Both the attestation and the laboratory's written submission state what the employee recalls as to the laboratory's QC procedure. Again, however, the laboratory did not provide any documented evidence that a QC procedure existed or was in use prior to May 15, 2014. We also note that the attestation states that the employee's duties included running QC, which is contrary to the information given to the surveyor at the time of the onsite survey, but did not indicate if he/she had responsibility for evaluating QC prior to releasing patient test results.

The second submission states the following in Ex. AA, Tab 3:

- Upon review of that response, including the entirety of the prior analysis of TPS [Theranos Propriety System] 3.5 QC data and patient test results distribution for all analytes during the time period examined, the laboratory made note of poor QC performance throughout. Therefore, the laboratory conducted an expanded retrospective analysis for 2014 and 2015.

7

THPFM0004806448
SEC-THERANOS-006238053

This data is presented in Ex. FF, Tabs 1-12.  The laboratory noted multiple and recurrent time periods (across all analytes tested) of abrupt shifts in QC target means, high rates of 1-2s QC rule failures, and QC CVs [Curricula Vitae] far exceeding limits for a stable testing process.  (Investigation section)

- Although the magnitude of QC deviations from target means does not necessarily reflect the exact nature and magnitude of bias on patient results because of differences in matrices, the QC failures identified by this comprehensive retrospective analysis reflect a global and long-term failure of the quality control program for this instrument, as well as failures of related quality assurance procedures that should have alerted the laboratory to correct such an unstable process.  Therefore, the laboratory has concluded that there is a possible patient impact for every test reported from the laboratory's TPS 3.5 instruments.  (Patient Impact section)

- The fraction of patient results truly impacted, and the nature and magnitude of any effect, are unknown.  Out of an abundance of caution, the laboratory has voided all patient test results reported from the TPS 3.5 instruments.  Many corrected reports have been transmitted. . .  (Corrective Action section)

Review of documents in Ex. FF, Tabs 1-12 revealed that only QC data was submitted.  There was no documentation in Ex. FF, Tabs 1-12 related to a "comprehensive retrospective review."  In addition, there was no documentation submitted related to "multiple and recurrent time periods (across all analytes tested) of abrupt shifts in QC target means, high rates of 1-2s QC rule failures, and QC CVs far exceeding limits for a stable testing process" that the laboratory noted.  We also note that no documentation was submitted in Ex. AA, Tab 3 or Ex. FF, Tabs 1-12 that indicated what the investigation into QC issues found as the root cause for the QC failures.

Based on the laboratory's submission at Ex. AA, Tab 3, the expanded retrospective analysis for 2014 and 2015 centered on QC issues, but failed to include 2013 in the expanded analysis.  Four tests (Vitamin D, TSH, Free T4, and Total PSA) were put into use for patient testing in 2013.  It is unclear why the 2013 QC data was not included, especially since the laboratory concluded that "there is a possible patient impact for every test reported from the laboratory's TPS 3.5 instruments."  We also note that the QC data submitted for the above four tests did not begin until various dates in March 2014.  We are unclear as to whether QC was performed from November 2013 through various dates in March 2014.

Based on documentation supplied by the laboratory at the time of the survey, the TPS was not used for patient testing after June 25, 2015.  However, the laboratory's submission states that the TPS 3.5 was "**fully retired** in early-August 2015."  Patient testing was "retired" later than when the laboratory previously indicated.  We note that no explanation was submitted regarding the disparity between the end dates provided at the time of the survey and the portion of the second submission dated April 1, 2016.

D5407

8

Confidential

**The laboratory's allegation of compliance is not credible and evidence of correction is not acceptable.**

In CMS' March 18, 2016 letter, we asked the laboratory to explain and provide documented evidence for the laboratory's statement: "The lab's overarching review of its systems and primary instruments has identified the patients affected or having the potential to be affected by this issue." In the April 1, 2016 portion of the second submission, the laboratory states, without submitting supporting documentation, that there is "no potential for this untimely signature by [the former laboratory director] to have affected patients because [the former laboratory director] ultimately approved the SOP without making any modifications or revision to it." However, in the same paragraph, the laboratory states that as a result of its review, "the laboratory issued corrected reports voiding PT/INR test results reported for the period October 2014 through September 2015. (Ex. AA, Tab7). The laboratory **stopped** using the BSC XP instrument on September 17, 2015, **and has not used it since then.**" However, documentation given to the surveyor by the laboratory at the time of the onsite survey indicated that the laboratory did, in fact, use the BCS XP for patient testing after September 17, 2015. The laboratory has not provided sufficient evidence to rebut the information contained in that documentation.   Also, these contradictory statements in the submissions call into question the reliability of the information contained in the submissions.

Further, CMS is unclear as to how the laboratory reached the conclusion that the untimely signature of the SOP by the former laboratory director did not affect or potentially affect patient test results given the conclusions that the laboratory reached in Ex. AA, Tab 7. Ex. AA, Tab 7, such as:

- Most results were "high or critical high" (~70%) each month. . .Such fluctuations in percentages of "critical high" and "low" patients in the distribution are not expected, again suggesting that the assay experienced biases that may have impacted patients during this time.

- Among abnormal values (i.e. those above the "normal" range), the laboratory observed an approximately normal distribution centered around the mean/median (~22 sec). However, during each month, there were fluctuations on either ends of those distributions.  This fluctuation is observed every month, suggesting that a systemic error is present in this test method that may have affected at least a fraction of patient samples during the time periods evaluated.

- As detailed above, multiple errors and potential biases were detected over the entire time period of this test offering.  This includes errors in the calculation of reported INR values, and positive and negative QC biases detected at multiple levels over multiple time periods.

- The laboratory director believes these multiple errors and possible biases call into question the analytical validity of all PT/INR tests resulted. . .the analytical and clinical validity of these results are uncertain. . .the laboratory believes there is a possibility of patient impact for all PT/INR tests resulted.

D5413

9

Confidential

THPFM0004806450
SEC-THERANOS-006238053

**The laboratory's allegation of compliance is not credible and evidence of correction is not acceptable.**

Finding #1
A new section added to the SOP at Ex. BB, Tab 13, § 8.8.1 states the following: "Any trained laboratory staff may record daily temperatures for all required equipment, including but not limited to CLA [clinical laboratory assistant], CLS, Supervisor, Manager and Director."

We note that in the April 1, 2016 portion of the second submission, the laboratory did not include a "complete set of training records on this SOP, which shows that the relevant laboratory personnel have been trained (Ex. BB, Tabs 13B-13C)" as stated in the submission. Based on the information provided by the laboratory on Form CMS-209, dated February 12, 2016, which was the latest submitted by the laboratory, training documentation was not included for three testing personnel, nor did the "Acknowledgement Form" (Ex. BB, Tab 13C) include six testing personnel listed on the Form CMS-209. In the letter accompanying the laboratory's second submission on page 18, the laboratory states that "the relevant laboratory personnel" have been trained, but did not include a list of the "relevant laboratory personnel."

In the April 1, 2016 portion of the second submission, the laboratory states:

- D5413 identifies six -20C freezers and four -80C freezers. In the lab's submission, we explain that five of those freezers did not contain materials that would be used in the future for clinical patient testing. Rather, they only contained material that might be used in the future for research and development.

- Based on the March 18 letter, it appears that there was a miscommunication when the CMS surveyors were onsite. D5413, Paragraph f, states that CMS had a discussion about these freezers with the "Director of Assay Systems and technical supervisor at 11/19/15 at approximately 11 am." The Director of Assays did not have any regular involvement with those freezers at that time and did not have the knowledge of their contents. The "technical supervisor" in attendance on November 19, 2015 joined the company on October 26, 2015; he also did not have regular involvement with those freezers at the time and did not have knowledge of their contents. (Ex. HH, Tab 8). To the extent CMS understood either of these individuals to be confirming the contents of these freezers or whether these freezers were used in clinical patient testing, there was a miscommunication.

Based on these statements, it is unclear whether the laboratory investigated what was in the freezers at the time of the onsite survey, and what the freezers had been used for prior to the onsite survey as the submission only speaks to future use of the freezers. It is also concerning to CMS that the laboratory claims that there was a miscommunication regarding the use of the freezers at the time of the survey. The technical supervisor (TS) who confirmed the freezer use was not a TS hired by the laboratory on October 26, 2015, but rather an individual identified on personnel documentation as a TS at the time of the onsite survey who had been with the laboratory for several years. The confirmation occurred while the surveyor was touring the laboratory with a group of four or five

10

Confidential

laboratory employees who, had the confirmation by the Director of Assays and TS been in error, should have communicated the correct information. Regardless, based on the information provided by the laboratory, it is still unclear to CMS if the freezers now identified by the laboratory as not in use for CLIA activities were being used at the time of, or prior to, the onsite survey.

Finding #2
In the April 1, 2016 portion of the second submission, the laboratory states: "The laboratory **stopped** running tests on the BCS XP on September 17, 2015, and has **not** run any tests on the Siemens BCS XP since then." However, documentation given to the laboratory at the time of the onsite survey indicated that the laboratory did, in fact, use the Siemens BCS XP for patient testing after September 17, 2015.

Review of Ex. HH, Tabs 11A – 11B revealed a photograph of a bottle with unknown contents labeled with open and expiration dates. Given that the package insert provided in Ex. HH, Tab 11B is for IRISpec CA/CB/CC, our review will assume that this is the QC material in the photographed bottle in Ex. HH, Tab 11A. It therefore appears that the laboratory is correctly labeling opened bottles or reagents.

However, we found no document to support correction of the evidence cited in the Statement of Deficiencies, Form CMS-2567. Exhibit BB, Tab 14 D of the laboratory's second submission indicates that training had occurred, via a case study, to specifically address the deficiency related to expired Innovin (thromboplastin). We note that the Form CMS-209 dated February 8, 2016 listed 12 testing personnel. One of the 12 is no longer working in the clinical laboratory based on the April 1, 2016 portion of the second submission (page 82, footnote 14), so the laboratory's submission is based on the remaining 11 testing personnel. The training documents related to the Innovin (thromboplastin) case study include six of the 11 on the Acknowledgement Form provided by the laboratory in Ex. BB, Tab 14D. We are unable to determine if the other five testing personnel have been retrained using the case study. We also note that the laboratory submitted training documents (Ex. BB, Tab 14B) on the revised reagent qualification procedure (CL SOP 07010) in Ex. BB, Tab 14C, which is missing training documentation for one individual. Finally, a change was made to the procedure (CL SOP 07010, Rev. D), which was approved on March 26, 2016. Training for six of the testing personnel was completed prior to March 26, 2016 (training documents show training occurred between February 1 and 4, 2016); therefore, those personnel were not trained on the revised procedure.

D5421
**The laboratory's allegation of compliance is not credible and evidence of correction is not acceptable.**

Finding #1
In the second submission, the laboratory states: "The laboratory referred to a 1.5 times %CV in its submission based upon Bio-Rad's coefficient of variation rate. . .Upon further review, the laboratory does not believe that Bio-Rad's coefficient of variation rate is applicable here."

11

Confidential

THPFM0004806452
SEC-THERANOS-006238053

The laboratory provided no further explanation for the inclusion of a "1.5 times %CV" in its first submission to CMS, or why the laboratory believes the Bio-Rad coefficient of variation rate is no longer applicable. This brings into question whether other information provided by the laboratory in its first or second submission to CMS is reliable.

Finding #2
In the second submission, the laboratory states: "The laboratory referred to a 1.5 times %CV in its submission based upon Bio-Rad's coefficient of variation rate. . .Upon further review, the laboratory does not believe that Bio-Rad's coefficient of variation rate is applicable here."

The laboratory provided no further explanation for the inclusion of a "1.5 times %CV" in its first submission to CMS, or why the laboratory believes the Bio-Rad coefficient of variation rate is no longer applicable. This brings into question whether other information provided by the laboratory in its first or second submission to CMS is reliable.

The laboratory states in its February 12, 2016 submission: "Before the lab resumes any test on the Advia XPT, the lab will ensure that the test has been re-verified pursuant to the lab's improved method verification procedures that have been approved by the laboratory director."

The second submission also states that the laboratory stopped running tests on the Advia XPT as of November 17, 2015. Neither the February 12, 2016 submission, nor the April 1, 2016 submission indicates when that laboratory would restart patient testing, therefore, requiring the re-verification as indicated. CMS was unable to determine if the new verification procedure had been effectuated given that the laboratory ceased testing.

While CMS understands that "normal patient distribution" is useful when evaluating, determining, or updating reference ranges (i.e., normal ranges), it is unclear from the laboratory's second submission (General and Ex. AA, Tab 7) how review of the normal patient distribution relates to the accuracy, precision, and reportable range of patient test results. The deficient practice identified by CMS revealed that the laboratory failed to verify the accuracy, precision and reportable range for specific tests performed on the Advia XPT chemistry system.

In response to CMS' March 18, 2016 letter, in the April 1, 2016 portion of the second submission, the laboratory states: "The laboratory has enclosed with this letter documentation supporting the matrix comparisons done by the manufacturer between serum and plasma showed correlation. (Ex. HH, Tab 13)."

Review of the manufacturer information for the tests submitted in Ex. HH, Tab 13 included precision claims for specimen sample types including serum, urine, and cerebral spinal fluid; however, no precision information for plasma samples was included in the submission. The only reference to plasma samples we find is from one of the manufacturer precision documents (alanine transaminase) which includes the following statement with regard to reportable range: "This method is linear from 0-1100 U/L for serum and plasma (lithium heparin)." We also note that no manufacturer information was supplied to support a correlation between serum and plasma

12

Confidential

THPFM0004806453
SEC-THERANOS-006238053

samples, nor did any of the submitted manufacturer documents in Ex. HH, Tab 13 address possible matrix effects.

The laboratory's protocol submitted with the February 12, 2016 submission (Ex. A, Tab 9, §4.2) states: "If the verification is performed by the vendor, the laboratory is involved in all aspects of the verification and the final verification documentation is reviewed and signed off by the Laboratory Director." However, in the second submission, Ex. BB, Tab 5 now states in § 4.1.2 that "the laboratory is responsible for all aspects of the assay verification. . ." This reflects a change in the procedure between the two submissions. The new revision (Rev. C) was approved on March 25, 2016. The training documentation submitted in Ex. BB, Tabs 5 B-C includes documentation for 11 of 12 testing personnel listed on Form CMS-209. However, documentation for eight of the 11 indicated that training occurred prior to the February 12, 2016 submission and the issuance of the new revisions. It is unclear if the eight testing personnel were trained on the change to the method verification procedure found in § 4.1.2.

In its second submission, the laboratory submitted a revised quality assessment mechanism, but submitted no documentation to indicate that the revised quality assessment mechanism had been effectuated. The laboratory simply stated that "the laboratory is capable of ensuring that the deficient practice in D5421 does not recur." It is unclear to CMS how the laboratory can ensure that the deficient practice does not recur when the laboratory has ceased testing.

D5423
**The laboratory's allegation of compliance is not credible and evidence of correction is not acceptable.**

The laboratory's February 12, 2016 submission states: "Before the lab resumes any test on the Advia XPT, the lab will ensure that the test has been re-verified pursuant to the lab's improved method verification procedures that have been approved by the laboratory director." The April 1, 2016 submission states that the laboratory stopped running patient tests on the Advia XPT as of November 17, 2015. Neither the February 12, 2016 submission nor the April 1, 2016 submission indicates when that laboratory plans to restart patient testing, therefore, requiring the re-verification as indicated. CMS was unable to determine if the new verification procedure had been effectuated as the laboratory ceased testing.

The laboratory provided no further explanation for the inclusion of a "1.5 times %CV" in its first submission to CMS, or why the laboratory believes the Bio-Rad coefficient of variation rate is no longer applicable. This brings into question whether other information provided by the laboratory in its first or second submission to CMS is reliable.

While CMS understands that "normal patient distribution" is useful when evaluating, determining or updating reference ranges (i.e., normal ranges), it is unclear from the laboratory's second submission (General and Ex. AA, Tab 7) how review of the normal patient distribution relates to the accuracy, precision, and reportable range of patient test results. The deficient practice identified by CMS revealed that the laboratory failed to verify the accuracy, precision and reportable range for specific tests performed on the Advia XPT chemistry system.

13

Confidential

THPFM0004806454
SEC-THERANOS-006238053

In the second submission the laboratory states that the alkaline phosphatase (ALP) reportable range should have been 12 - 909 U/L, but provided no documentation reflecting the amended reportable range (e.g., updated procedure) other than page 26 of the letter from the April 1, 2016 submission and Ex. AA, Tab 6. Although training documentation for method verification was included in the submission, it did not include documentation showing that training had occurred related to the amended reportable range for alkaline phosphatase.

Ex. AA, Tab 2 of the second submission asserts in the "Corrective Action" section: "There is no patient impact expected. Therefore, no corrected or voided reports were generated." We note, however, in Ex. AA, Tab 6 in the "Patient Impact" section the following statement: "The laboratory reported some quantitative alkaline phosphatase values outside its verified AMR [analytical measuring range]. Those quantitative values are invalid." In addition, we note in Ex. AA, Tab 6 in the "Corrective Action" section that the laboratory states: "All patient results for alkaline phosphatase reporting less than 12 U/L or greater than 909 U/L have been amended to correct the values to "<12 U/L" and ">909 U/L," respectively. Many corrected reports have been transmitted. . ." This inconsistency brings into question whether any other information provided by the laboratory in its first or second submission to CMS is reliable.

In response to CMS' March 18, 2016 letter, the laboratory's second submission it states: "The laboratory has enclosed with this letter documentation supporting the matrix comparisons done by the manufacturer between serum and plasma showed correlation. (Ex. HH, Tab 13)." Review of the manufacturer information for the tests submitted in Ex. HH, Tab 13 indicated no documentation related to alkaline phosphatase.

In its second submission, the laboratory submitted a revised quality assessment mechanism, but submitted no documentation to indicate that the revised quality assessment mechanism had been effectuated. The laboratory simply stated that "the laboratory is capable of ensuring that the deficient practice in D5421 does not recur." It is unclear to CMS how the laboratory can ensure that the deficient practice does not recur when the laboratory has ceased testing.

D5447
**The laboratory's allegation of compliance is not credible and evidence of correction is not acceptable.**

In the second submission, the laboratory states: "The laboratory referred to a 1.5 times %CV in its response based upon Bio-Rad's coefficient of variation rate. . .Upon further review, the laboratory does not believe that Bio-Rad's coefficient of variation rate is applicable here." The laboratory provided no further explanation for the inclusion of a "1.5 times %CV" in its first submission to CMS, or why the laboratory believes the Bio-Rad coefficient of variation rate is no longer applicable. This brings into question whether other information provided by the laboratory in its first or second submission to CMS is reliable.

D5449

14

Confidential

THPFM0004806455
SEC-THERANOS-006238053

**The laboratory's allegation of compliance is not credible and evidence of correction is not acceptable.**

In its second submission, the laboratory states:

> The laboratory has revised the CT/NG [*Chlamydia trachomatis/Neisseria gonorrhaeae*] SOP [Standard Operating Procedure] to include information about the positive QC materials used, how the statistical parameters of the QC materials would be determined, and how QC test results will be documented. (Ex. BB, Tab 16 § 9.1.5).

We find no information in Ex. BB, Tab 16 § 9.1.5 as the "how the statistical parameters of the QC materials would be determined."

Ex. BB, Tab 16 § 9.1.5 states: "The aliquots will be frozen and each aliquot when thawed will be used for two weeks while being stored at 2°C to 8°C after each run." The laboratory provided no documentation as to how the laboratory determined that thawed aliquots were viable for "two weeks while being stored at 2°C to 8°C."

D5477

**The laboratory's allegation of compliance is not credible and evidence of correction is not acceptable.**

In the second submission, the laboratory states:

> CMS appears to have had difficulty reading the handwriting on the Blood Agar 5% Quality Control Log Sheet, confusing a handwritten "3" with an "8." The "Blood Agar 5% Quality Control Log Sheet" states that the media was received on 1/13/16. . .Therefore, there is no reason to question that accuracy of this entry because the log shows that the media received the day before QC testing of this bacteriology media was completed. For the same reason, the February 11, 2016 review of the completed form was performed correctly, and there is no reason to question the effectiveness of the laboratory's oversight mechanism.

The log sheet from the date in question clearly shows that the media was received on January 18, 2016, and not January 13, 2016 as the laboratory claims, as the log sheet includes the date "1/18/2016" under the heading "Date received." Therefore, there is "reason to question the accuracy of this entry" and "reason to question the effectiveness of the laboratory's oversight mechanism."

D5481

**The laboratory's allegation of compliance is not credible and evidence of correction is not acceptable.**

Finding #1

In Ex. AA, Tab 7 of the second submission, the laboratory states that the laboratory had "examined all QC [quality control] data over the entire lifetime of this test offering (10/2014 – 9/2015). . ." (Ex. AA, Tab 7). We note that in the Investigation section at "2," the results of the investigation

15

Confidential

THPFM0004806456
SEC-THERANOS-006238053

only include conclusions from October 2014 through March 2015 which does not include the cited deficient practice from April 2015 through September 2015.

We note in the submission the laboratory states: "The laboratory **stopped** running tests on the BCS XP on September 17, 2015, and has **not** run any tests on the Siemens BCS XP since then." However, documentation given to the surveyor by the laboratory at the time of the onsite survey revealed that the laboratory did, in fact, use the Siemens BCS XP for patient testing after September 17, 2015.

In the laboratory's February 12, 2016 submission, it stated in the Patient Impact Assessment (Ex. I, Tab 1) that "remedial action was taken on 9/25/15," but "corrected reports were issued beginning on 11/10/15 and completed on 11/12/15." In the second submission, the laboratory states that it "undertook a thorough investigation. Given the number of issues to review, the investigation took time to complete properly." Based on the laboratory's February 12, 2016 submission, we assumed the investigation had already been completed which, based on the statement in the second submission, was an incorrect assumption.

We note that the laboratory now states that the "corrective actions were also affected by the absence of a full-time, on-site laboratory director." However, the laboratory director at the time of the onsite survey was still the laboratory director during this period of time, and the new laboratory director did not begin his regulatory responsibilities as the laboratory director until March 11, 2016. There continues to be no acceptable explanation as to why there was such a long period of time between the remedial action and the issuance of corrected reports.

The laboratory again failed to adequately address this deficient practice and provide acceptable evidence of correction consisting of the required documentation and information as set forth in our January 25, 2016 and March 18, 2016 letters.

Finding #2
Based on documentation supplied by the laboratory at the time of the onsite survey, the TPS was not used for patient testing after June 25, 2015. However, the laboratory's submission states that the TPS 3.5 was "fully retired in early-August 2015." Patient testing was "retired" later than when the laboratory previously indicated. We note that no explanation was submitted regarding the disparity between the end dates provided at the time of the onsite survey and the second submission. Neither submissions indicates when that laboratory plans to restart patient testing, which would require the laboratory to develop an updated procedure for the TPS. CMS was unable to determine if an updated QC procedure had been effectuated as the laboratory ceased testing.

The following chart outlines the initial use and end use dates of the TPS for patient testing (dates provided by the laboratory at the time of the onsite survey), as well as the range of QC values submitted by the laboratory in Ex. FF, Tabs 1-12.

| Test | Initial Use | End Use | QC Data Submitted |
|---|---|---|---|
| Vitamin D | 11/6/2013 | 3/10/2015 | 3/10/14-3/29/15 |
| TSH | 11/7/2013 | 2/4/2015 | 3/25/14-2/4/15 |

16

Confidential

| FT4 | 11/11/2013 | 2/4/2015 | 3/21/14-2/4/15 |
| TPSA | 11/11/2013 | 6/25/2015 | 3/21/14-6/16/15 |
| TT3 | 2/12/2014 | 2/4/2015 | 3/15/14-2/3/15 |
| TT4 | 2/12/2014 | 2/4/2015 | 3/15/14-2/4/15 |
| TST | 3/19/2014 | 3/10/2015 | 4/2/14-3/10/15 |
| HCG | 5/9/2014 | 1/19/2015 | 5/5/14-1/15/15 |
| SHBG | 7/28/2014 | 6/25/2015 | 7/30/14-6/9/15 |
| Vitamin B12 | 8/12/2014 | 3/6/2015 | 8/15/14-3/1/15 |
| Estradiol | 9/25/2014 | 12/18/2014 | 9/26/14-12/17/14 |
| Prolactin | 9/25/2014 | 12/18/2014 | 9/30/14-12/18/14 |

It is unclear why the submitted QC records do not cover the entirety of 2014 and 2015 as the submission claims, or why QC information for 2013 was not included in the expanded QC data review. In addition, it is unclear how the laboratory determined in the February 12, 2016 submission that review of QC indicated that a limited number, or no, corrected reports were to be issued but then "voided all patient test results reported from the TPS 3.5 instruments," as stated in its second submission. The voided results provided with the second submission include those from 2014 and 2015; however, the laboratory did not provide any evidence that the QC and patient results from 2013 were reviewed or voided. This brings into question whether other information provided by the laboratory in its first or second submission to CMS is reliable.

The laboratory again failed to adequately address this deficiency and provide acceptable evidence of correction consisting of the required documentation and information as set forth in our January 25, 2016 and March 18, 2016 letters.

D5791
**The laboratory's allegation of compliance is not credible and evidence of correction is not acceptable.**

Finding #1
In Ex. BB, Tab 13, § 4.5 of the second submission, the laboratory states that it "has revised this procedure" to clarify that "[i]t is the daily responsibility of the laboratory supervisor to monitor and record the temperatures. . ." We note that the word "designee" was removed from the updated procedure. However, in our March 18, 2016 letter we noted that "the laboratory states that training has occurred, but it was unclear who should be trained as the 'laboratory supervisor or designee' was not defined." We have the same concerns as the "laboratory supervisor" was not defined in the latest submission, and as such, we cannot verify that training has occurred.

The "Temperature-Controlled Storage Setup and Use" procedure submitted in Ex. BB, Tab 13, while signed by the new laboratory director, does not have an effective date as required on the form; however, the approval date is March 24, 2016. The updated procedure (i.e., Revision D) included a change as to who was responsible for monitoring and recording daily temperatures and humidity. It is unclear to CMS whether training occurred prior to March 24, 2016 when the updated procedure was approved. It is also unclear why the training documentation is not consistent for all trainees.

17

THPFM0004806458
SEC-THERANOS-006238053

**ER-3038**

The laboratory's second submission includes the following statements:

- D5413 identifies six -20C freezers and four -80C freezers. In the lab's submission, we explain that five of those freezers did not contain materials that would be used in the future for clinical patient testing. Rather, they only contained material that might be used in the future for research and development.

- Based on the March 18 letter, it appears that there was a miscommunication when the CMS surveyors were onsite. D5413, Paragraph f, states that CMS had a discussion about these freezers with the "Director of Assay Systems and technical supervisor at 11/19/15 at approximately 11 am." The Director of Assays did not have any regular involvement with those freezers at that time and did not have the knowledge of their contents. The "technical supervisor" in attendance on November 19, 2015 joined the company on October 26, 2015; he also did not have regular involvement with those freezers at the time and did not have knowledge of their contents. (Ex. HH, Tab 8). To the extent CMS understood either of these individuals to be confirming the contents of these freezers or whether these freezers were used in clinical patient testing, there was a miscommunication.

Based on these statements, it is unclear whether the laboratory investigated what was in the freezers at the time of the onsite survey and what the freezers had been used for prior to the onsite survey, as the submission only speaks to future use of the freezers. It is also concerning to CMS that the laboratory claims that there was a miscommunication regarding the use of the freezers at the time of the survey. The TS who confirmed the freezer use was not a TS hired by the laboratory on October 26, 2015, but rather an individual identified on personnel documentation as a TS at the time of the onsite survey who had been with the laboratory for several years. The confirmation occurred while the surveyor was touring the laboratory with a group of four to five laboratory employees who, had the confirmation by the Director of Assays and TS been in error, should have communicated the correct information. Regardless, based on the information provided by the laboratory, it is still unclear to CMS if the freezers now identified by the laboratory as not in use for CLIA activities were being used at the time of, or prior to, the onsite survey.

Based on the laboratory's second submission, it is still unclear as to how the article related to mean kinetic temperature (MKT) applies to the deficient practice as it was not incorporated into any procedures or investigations.

It is concerning to CMS how the laboratory's February 12, 2016 submission states that there was no patient impact due to the higher freezer temperatures, yet the April 1, 2016 submission states that this issue "may have had an [effect] on the Immulite controls stored in this freezer. . .based on this review, the laboratory has voided certain test results. (Ex. AA, Tab 4)" (page 48). This contradiction between the submissions brings into question whether any other information provided by the laboratory in its first or second submission to CMS is reliable.

Based on the second submission, it is unclear to CMS what temperature the laboratory is requiring for the storage of bacterial cultures. The laboratory states on page 48 in letter accompanying the

18

THPFM0004806459
SEC-THERANOS-006238053

ER-3039

second submission that the "laboratory labels bacterial cultures for storage at -80C or colder only because that allows for the longest period of viability, which is 10 years.  (Ex. II, Tab 26). However, bacterial cultures remain viable for 1-3 years when stored at -20C. (Ex. II, Tab 26)." The laboratory did not submit a procedure that stated the acceptable storage temperature for bacterial cultures.

Finding #2:
Based on the laboratory's submissions, CMS understands that the laboratory was using a CV of 20% (25% at the lower and upper limits of detection) for their lab-developed tests (LDTs).  The laboratory still has not addressed CVs greater than 20% (25%) cited on the Statement of Deficiencies nor has the laboratory explained why an LDT can be less precise than a predicate device for the same analyte.

The laboratory again failed to adequately address this deficiency and provide acceptable evidence of correction consisting of the required documentation and information as set forth in our January 25, 2016 and March 18, 2016 letters.

Finding #3
The laboratory's second submission states that QC was reviewed for 2014 and 2015 for each assay run on the TPS 3.5 (Ex. AA, Tab 3).  The laboratory failed to include 2013 QC information in its review even though four tests were initially put into use in November 2013.  Given this missing information, the QC information submitted appears incomplete.

Finding #4
Although the laboratory indicated it has ceased patient specimen testing, no statement has been made by the laboratory that patient specimens are no longer being collected.  We are assuming that the laboratory continues to collect patient specimens and send them to another laboratory for testing.  Given that the February 12, 2016 submission indicates that the laboratory's QMPI procedure was effective, CMS would expect to see the following documents specified in the laboratory's QMPI protocol as part of the second submission: monthly tracer assessment and QMPI meeting minutes for March and April 2016, and documented corrective actions related to the high number of clotted specimens received by the laboratory.  No such documentation was submitted.

D5793
**The laboratory's allegation of compliance is not credible and evidence of correction is not acceptable.**

Finding #1
See our review of D5403.  For D5437, D5469, and D5779, see our Quality Assessment review under the General Comments.

Finding#4
In the March 28, 2016 submission, the laboratory states:

Confidential

THPFM0004806460
SEC-THERANOS-006238053

The laboratory has reviewed September 2015 Anti-HBs [Hepatitis B surface antibody] QC data under criteria for acceptability that were in effect both prior to and after the September 11 change. (Ex. EE, Tab 4). The laboratory determined that there were no QC results that would have been "acceptable" under the pre-September 11 criteria and unacceptable under the post-September 11 criteria, or vice versa. To determine if these practices were more widespread for Anti-HBs testing, the laboratory examined QC date from 5/2015-9/2015. All QC values falling outside manufacturer's ranges (based on package insert) were noted.

Based on a review of Ex. EE, Tab 4, we note the following:

- On May 2, 2015, the level 2 QC material result was documented as 10.7. The manufacturer's acceptable range for level 2 was 11 - 21.
- On June 8, 2015, the level 2 QC material result was documented as 9.12. The manufacturer's acceptable range for level 2 was 11 - 21.
- On August 15, 2015, the level 3 QC material result was documented as 206. The manufacturer's acceptable range for level 3 was 226 – 340.
- On September 7, 2015, the level 3 QC material result was documented as 190. The manufacturer's acceptable range for level 3 was 226 – 340.
- On September 9, 2015, the level 3 QC material result was documented as 203. The manufacturer's acceptable range for level 3 was 226 – 340.

In Ex. EE, Tab 4, we find no documentation indicating that these QC values, which were outside the manufacturer's ranges, were documented as being unacceptable.

Finding #8

The laboratory's April 1, 2016 portion of its second submission does not address the following statement from CMS' March 18, 2016 letter:

The laboratory submitted a new quality control (QC) procedure (Ex. A, Tab1) which required in Section 8.2.1.1.a.-c., QC Pass/Fail Criteria, that QC must meet certain criteria as well as ". . .the required Westgard rule pass criteria." Westgard rules include a "10x" rule for rejecting QC when 10 consecutive control measurements fall on one side of the mean. We note that on page 17 of 19 (Ex. A, Tab 6) in the updated protocol that the 10x rule was included as part of the Westgard rules which the lab must follow. The lab provided no documentation that indicated that "10x" rule was evaluated as part of their review.

The laboratory again failed to adequately address this deficiency and provide acceptable evidence of correction consisting of the required documentation and information as set forth in our January 25, 2016 and March 18, 2016 letters.

Finding #9

The laboratory's second submission did not provide any documentation to explain why the laboratory did not follow its AAP protocol for the TPS as cited in the Statement of Deficiencies. In addition, we note that Ex. BB, Tabs 3B-3C contains incomplete training documentation (training records did not consistently include the same documents) and training documentation for

20

Confidential

two testing personnel listed on the Form CMS-209, Laboratory Personnel Report (CLIA), was not submitted.

The laboratory again failed to adequately address this deficiency and provide acceptable evidence of correction consisting of the required documentation and information as set forth in our January 25, 2016 and March 18, 2016 letters. Additionally, the laboratory again failed to address and provide acceptable evidence of correction consisting of: what measure has been put in place, what systemic changes have been made to ensure the deficient practice does not recur, or how the corrective action is being monitored to ensure the deficient practice does not recur.

Finding #10

In the laboratory's April 1, 2016 submission, Ex. BB, Tab 5, § 8.1.1.c states: "If the analyte has a medical decision level, at least 25% of the specimens must have analyte levels below this value and the remaining 25% above. If there are more than one medical decision level, specimen selection are above and below both levels." Although the term "medical decision level" is now defined by the laboratory, we find no documentation to indicate which analytes have a medical decision level, how that medical decision level is determined, and what the distribution of specimens would be if an analyte does not have a medical decision level.

It is continues to be unclear to CMS why medical decision levels were used to measure Vitamin D levels. Clearly, when Vitamin D levels are reported using the medical decision levels (e.g., deficiency, insufficiency, sufficiency, possible toxicity) instead of the reference range a different interpretation of the patient results would be reached. The reference range (9.3 - 47.9 ng/mL) overlaps the deficiency, insufficiency, and sufficiency medical decision levels.

It is unclear to CMS why the laboratory only included a review of QC starting January 1, 2014. The TPS was initially used to measure Vitamin D levels on November 6, 2013, based on documentation given to the surveyor at the time of the onsite survey.

The laboratory again failed to adequately address this deficiency and provide acceptable evidence of correction consisting of the required documentation and information as set forth in our January 25, 2016 and March 18, 2016 letters.

D5801

**The laboratory's allegation of compliance is not credible and evidence of correction is not acceptable.**

In Ex. GG, Tabs 1A-1C of the second submission, the laboratory states that the mean normal prothrombin time (MNPT) is "customer provided" and "established by the laboratory." However, in Ex. AA, Tab 7, the laboratory states that the MNPT is "provided by Siemens analysis of the laboratory's data." Based on these contradictory statements, it is still unclear who establishes the MNPT and how the MNPT is determined. Ex. GG, Tab 1B shows a letter dated October 2015 (after the issue with PT/INR was identified by the surveyor) from Siemens for Innovin (thromboplastin), lot number 539280, which indicated that the laboratory provided Siemens an MNPT of 8.5. We note, however, that at the time of the survey, the MNPT documentation, BCS XP instrument, and staff verified that the MNPT for this lot number was 8.0 as cited on the

21

Confidential

THPFM0004806462
SEC-THERANOS-006238053

**ER-3042**

Statement of Deficiencies. The second submission indicates a different MNPT. This brings into question whether other information provided by the laboratory in its first or second submission to CMS is reliable. It is unclear to CMS if the laboratory's new QMPI has been effectuated as the above issue with the MNPT has not been recognized by the laboratory.

We also note that in the second submission, the laboratory states it "issued corrected reports voiding PT/INR test results reported for the period of October 2014 through September 2015. (Ex. AA, Tab 7) The laboratory stopped using the BCS XP instrument on September 17, 2015, and has not used it since then." Documentation given to the surveyor by the laboratory at the time of the onsite survey indicated that the laboratory did, in fact, use the BCS XP for patient testing after September 17, 2015.

In its second submission, the laboratory submitted a revised quality assessment mechanism, but submitted no documentation to indicate that the revised quality assessment mechanism has been effectuated. In addition, the laboratory stated that "training on the revised QMPI procedures has occurred. (Ex. BB, Tab 7 B-C)." We note that Ex. BB, Tab 7 B-C contains incomplete training documentation (one of the training records did not include the same documents consistent with the other two records) for only three laboratory personnel, none of whom appear on the laboratory's Form CMS-209, dated February 8, 2016. It is also unclear to CMS if the laboratory's new QMPI will be effective, as the above issue (i.e., disparity of MNPT values for Innovin, lot number 539280) has not been recognized by the laboratory in either submission.

The laboratory again failed to address and provide acceptable evidence of correction consisting of: what measure has been put in place, what systemic changes have been made to ensure the deficient practice does not recur, or how the corrective action is being monitored to ensure the deficient practice does not recur.

D5805

**The laboratory's allegation of compliance is not credible and evidence of correction is not acceptable.**

Specifically for PT/INR, the list of accession numbers found in Ex. MM covered a period of time from October 8, 2014 through March 19, 2015. Based on Ex. AA, Tab 7, "the lifetime this test offering" on the Siemens BCS XP was "10/2014-9/2015." Ex. AA, Tab 7 further states: "All PT/INR results have been voided." CMS is unclear why accession numbers of voided PT/INR results were not submitted from March 20, 2015 to September 2015, including those patient specimens tested after September 17, 2015.

D5821

**The laboratory's allegation of compliance is not credible and evidence of correction is not acceptable.**

The laboratory's February 12, 2016 submission states in the Patient Impact Assessment (Ex. I, Tab 1) that "remedial action was taken on 9/25/15," but "corrected reports were issued beginning on 11/10/15 and completed on 11/12/15." In the second submission, the laboratory states that it "undertook a thorough investigation. Given the number of issues to review, the investigation took

22

THPFM0004806463
SEC-THERANOS-006238053

**ER-3043**

time to complete properly." Based on the February 12, 2016 submission, it appeared that the investigations were already complete making this statement confusing since the statement in the second submission suggests that the laboratory's investigations were ongoing after February 12, 2016. We also note that the laboratory now states that the "corrective actions were also affected by the absence of a full-time, on-site laboratory director." However, the laboratory director at the time of the survey was still the laboratory director during this period of time, and the new laboratory director did not begin his regulatory responsibilities as the laboratory director until March 11, 2016. There continues to be no acceptable explanation as to why there was such a long period of time between the remedial actions being taken and issuing corrected reports.

D6076
**The laboratory's allegation of compliance is not credible and evidence of correction is not acceptable.**

See our reviews of D6083, D6085, D6086, D6093, D6094, D6098, and D6102.

D6083
**The laboratory's allegation of compliance is not credible and evidence of correction is not acceptable.**

See our reviews of D5413 and D5791.

D6085
**The laboratory's allegation of compliance is not credible and evidence of correction is not acceptable.**

See our review of D6115.

D6086
**The laboratory's allegation of compliance is not credible and evidence of correction is not acceptable.**

Finding #2
In the second submission, Ex. BB, Tab 5, § 8.1.1.1.c states: "If the analyte has a medical decision level, at least 25% of the specimens must have analyte levels below this value and the remaining 25% above. If there are more than one medical decision level, specimen selection are above and below both levels." Although the term "medical decision level" is now defined by the laboratory, we find no documentation to indicate which analytes have a medical decision level, how that medical decision level is determined, and what the distribution of specimens would be if an analyte does not have a medical decision level.

Finding #3
In its second submission, the laboratory states:

> Additionally, the CV figures from the manufacturer's package insert are not relevant. . .Under this regulation [42 C.F.R § 493.1253(b)(2)], the precision of an LDT [laboratory

23

THPFM0004806464
SEC-THERANOS-006238053

**ER-3044**

developed test] is established solely by the laboratory. These regulations do **not** require a laboratory to compare the CV it establishes for an LDT – including an LDT that is based on a modification to an FDA-cleared or approved test system – with the %CV of "the predicate device." Likewise, there is nothing in 42 C.F.R. § [493.]1253(b)(1) that requires a laboratory to document why the CV that it has established for an LDT is different from the CV for "a predicate device."

The laboratory references 42 C.F.R § 493.1253(b)(1). However, we believe the laboratory meant to reference 42 C.F.R § 493.1253(b)(2).

It is our understanding that even though the laboratory made modifications to the testing procedures performed using the         b 4      , the end result of these modifications did not inherently change the manufacturer's testing protocol. Since the end result of the laboratory's modifications compared to the manufacturer's unmodified testing protocol is essentially the same, comparing the %CVs established by the laboratory for its modified protocol to the %CVs established by the manufacturer is reasonable and would establish the precision of the LTDs as required by 42 C.F.R § 493.1253(b)(2). We are unclear as to why the laboratory would not want to establish a test system's precision at least comparable to the precision established by the tests system manufacturer, and why the manufacturer's establish CVs are "not relevant."

Our review of D6086, Finding #3 in our March 18, 2016 notice remains unchanged.

Finding #6
In Ex. GG, Tabs 1A-1C it states that the MNPT is "customer provided" and "established by the laboratory." However, in Ex. AA, Tab 7, the laboratory states that the MNPT is provided by Siemens analysis of the laboratory's data. It is still unclear who establishes the MNPT and how the MNPT is determined. In Ex. GG, Tab 1B, it shows a letter dated October 14, 2015 from Siemens for Innovin (thromboplastin), lot number 539820, which indicated that the laboratory was provided a MNPT of 8.5. We note, however, that at the time of the survey, the MNPT documentation, BCS XP instrument, and staff verified that the MNPT for this lot number was 8.0 as cited on the Statement of Deficiencies. It is still unclear to CMS where the MNPT value of 8.0 or 8.5 for Innovin for lot number 539820 came from, as no documentation other than the letter from Siemens was provided. This brings into question whether other information provided by the laboratory in its first or second submission to CMS is reliable.

We also note in the laboratory's April 1, 2016 and April 17, 2016 portions of its second submission the laboratory states that it "issued corrected reports voiding PT/INR test results reported for the period of October 2014 through September 2015. (Ex. AA, Tab 7). The laboratory stopped using the BCS XP instrument on September 17, 2015, and has not used it since then." Documentation given to the surveyor by the laboratory at the time of the onsite survey indicated that the laboratory did, in fact, use the BCS XP for patient testing after September 17, 2015.

In Ex. BB, Tab 14D of the second submission, the laboratory indicated that training had occurred, via a case study, to specifically address the deficient practice related to expired Innovin (thromboplastin). We note that the Form CMS-209, dated February 8, 2016, listed 12 testing personnel. One of the 12 is no longer working in the clinical laboratory based on the April 1, 2016

24

Confidential

THPFM0004806465
SEC-THERANOS-006238053

**ER-3045**

portion of the second submission (page 82, footnote 14), so our response is based on the remaining 11 testing personnel. The training documents related to the Innovin (thromboplastin) case study include six of the 11 on the Acknowledgement Form provided by the laboratory in Ex. BB, Tab 14D. We are unable to determine if the other five testing personnel have retrained using the case study. We also note that the laboratory submitted training documents (Ex. BB, Tab 14B) on the revised reagent qualification procedure (CL SOP 07010) in Ex. BB, Tab 14C, which was missing documentation for one individual. We also observed that a change was made to the procedure (CL SOP 07010, Rev. D) which was approved on March 25, 2016. However, training for six of the testing personnel was completed between February 1 and 4, 2016, so they have not been trained on the revised procedure.

Additionally, in its second submission, the laboratory submitted a revised quality assessment mechanism, but submitted no documentation to indicate that the revised quality assessment mechanism had been effectuated. In addition, the laboratory stated that "training on the revised QMPI procedures has occurred. (Ex. BB, Tab 7 B-C)." We note that Ex. BB, Tab 7 B-C contains incomplete training documentation (one of training records did not include the same documents consistent with the other two records) for only three laboratory personnel, none of whom appear on the laboratory's Form CMS-209 dated February 8, 2016. It is also unclear to CMS if the laboratory's new QMPI will be effective as the above issue (i.e., disparity of MNPT values for Innovin lot number 539280) has not been recognized by the laboratory in either submission.

The laboratory again failed to adequately address this deficiency and provide acceptable evidence of correction consisting of the required documentation and information as set forth in our January 25, 2016 and March 18, 2016 letters. In addition, the laboratory again failed to address and provide acceptable evidence of correction consisting of: what measure has been put in place, what systemic changes have been made to ensure the deficient practice does not recur, or how the corrective action is being monitored to ensure the deficient practice does not recur.

D6093
**The laboratory's allegation of compliance is not credible and evidence of correction is not acceptable.**

Finding #1
See our review of D5481. For D5469, see our Quality Assessment review under the General Comments.

Finding #2
See our review of D5481.

We note that in the second submission, the laboratory states that it "issued corrected reports voiding PT/INR test results reported for the period of October 2014 through September 2015. (Ex. AA, Tab 7). The laboratory stopped using the BCS XP instrument on September 17, 2015, and has not used it since then." Documentation given to the surveyor by the laboratory at the time of the onsite survey revealed that the laboratory did, in fact, use the BCS XP for patient testing after September 17, 2015.

25

Confidential

THPFM0004806466
SEC-THERANOS-006238053

Additionally, in its second submission, the laboratory submitted a revised quality assessment mechanism, but submitted no documentation to indicate that the revised quality assessment mechanism has been effectuated. In addition, the laboratory stated that "training on the revised QMPI procedures has occurred. (Ex. BB, Tab 7 B-C)." We note that Ex. BB, Tab 7 B-C contains incomplete training documentation (one of training records did not include the same documents consistent with the other two records) for only three laboratory personnel, none of whom appear on the laboratory's Form CMS-209 dated February 8, 2016.

The laboratory again failed to adequately address this deficiency and provide acceptable evidence of correction consisting of the required documentation and information as set forth in our January 25, 2016 and March 18, 2016 letters. The laboratory again failed to address and provide acceptable evidence of correction consisting of: what measure has been put in place, what systemic changes have been made to ensure the deficient practice does not recur, or how the corrective action is being monitored to ensure the deficient practice does not recur.

D6094

**The laboratory's allegation of compliance is not credible and evidence of correction is not acceptable.**

Finding #2:
See our reviews of D5413, D5481, D5801, D5805, and D5821.

D6098

**The laboratory's allegation of compliance is not credible and evidence of correction is not acceptable.**

See our review of D5805.

D6102

**The laboratory's allegation of compliance is not credible and evidence of correction is not acceptable.**

Based on the personnel list provided in Ex. HH, Tab 9A, the training documentation in Ex. HH, Tabs 9B and 14-16 is inconsistent or incomplete. This deficiency referred to personnel being untrained or incompletely trained prior to testing and reporting patient results. For CLIA purposes, training and competency are two different requirements.

In the second submission, the laboratory still did not address why personnel were allowed to test patient samples without being fully trained on the TPS and in the venipuncture lab. It is not clear to CMS if training was effective since the laboratory has stated that they have stopped testing and that they were unable to find some training documents (attestations as to training were submitted in lieu of training documentation). We also note that it is unclear if training, in fact, occurred prior to reporting patient test results. Instead, some new documentation has "pending [initials] [date]" indicating that the training is pending, which includes a date prior to or after the survey. When the date reflected on the training documents (Ex. HH, Tabs 9B, 14-16) is prior to the survey, it appears

26

Confidential

THPFM0004806467
SEC-THERANOS-006238053

to have been added to the original documents presented at the onsite survey with no explanation as to why it was added or when training will occur.

The following statements are documented on the Patient Impact Assessment: Training Records (Ex. AA, Tab 12):

- TP6 – "training documents are largely complete"

- TP31 – "informally trained. . .when asked if she [TP31] thought this training was adequate, she stated it was, and that she felt competent to do the work that she was doing"

- The records for TP6 and TP11 show they received training on each instrument they operated even if the records did not comply with all components of the training and competency procedures. In addition, the laboratory's personnel files for TP6 and TP11 contain records of their competency to operate all of the instruments identified in D6102. Because the laboratory documentation reflects that TP6 and TP11 were competent to operate these instruments, there is no potential for patient impact from this deficiency related to TP6 and TP11.

- Instrument training and competency records for TP31 were not contained in her personnel file. However, her attestation that she receiving training and was competent to operate those instruments demonstrate that there is no potential patient impact as a result of this deficiency as it relates to TP31.

We note that in the second submission the laboratory still concedes that it has not provided complete training records. We also note that the attestation from TP31 indicates that she/he felt that she was trained; however, it should be noted that it is the laboratory director's responsibility to make this determination.

It is not clear to CMS how the laboratory can make the assertion that no patient impact or potential impact could have resulted from this deficient practice as the laboratory has voided all patient results from the TPS 3.5 (Ex. AA, Tab 3) and BCS XP (Ex. AA, Tab 7) as well as various results from the Immulite (Ex. AA, Tab 8). In addition, the laboratory's submission from February 12, 2016 indicates that many patient specimens had "corrected reports" issued based on the laboratory's initial review.

The laboratory again failed to adequately address this deficiency and provide acceptable evidence of correction consisting of the required documentation and information as set forth in our January 25, 2016 and March 18, 2016 letters. In addition, the laboratory again failed to address and provide acceptable evidence of correction consisting of: what measure has been put in place, what systemic changes have been made to ensure the deficient practice does not recur, or how the corrective action is being monitored to ensure the deficient practice does not recur.

D6108

27

Confidential

THPFM0004806468
SEC-THERANOS-006238053

**The laboratory's allegation of compliance is not credible and evidence of correction is not acceptable.**

See our review of D6115.

D6115

**The laboratory's allegation of compliance is not credible and evidence of correction is not acceptable.**

In the April 1, 2016 portion of the second submission on page 84, the laboratory stated that the TPS 3.5 was "fully retired in early-August 2015." However, based on documentation supplied by the laboratory at the time of the onsite survey, the TPS was not used for patient testing after June 25, 2015. We note that no explanation was submitted regarding the disparity between the end date provided at the time of the onsite survey and the end date provided in the second submission. The laboratory's second submission does not provide an explanation for the issues related to corrected results, accuracy, %CV, precision study, reference range, % recovery, and allowable bias.

Although the term "medical decision level" (MDL) is now defined by the laboratory, we find no documentation to indicate which analytes have a medical decision level, how that medical decision level is determined, and what the distribution of specimens would be if an analyte does not have a medical decision level. It is also unclear to CMS if patient results are reported with an MDL, how that will impact the normal and abnormal ranges for a given analyte, especially when the MDL does not overlap with or excludes the normal range.

Since the laboratory ceased patient testing using the TPS 3.5 and voided all patient test results performed using the TPS from 2014 and 2015, CMS was unable to determine if the updated method verification procedure had been effectuated.

The laboratory again failed to adequately address this deficiency and provide acceptable evidence of correction consisting of the required documentation and information as set forth in our January 25, 2016 and March 18, 2016 letters. In addition, the laboratory again failed to address and provide acceptable evidence of correction consisting of: what measure has been put in place, what systemic changes have been made to ensure the deficient practice does not recur, or how the corrective action is being monitored to ensure the deficient practice does not recur.

D6124

**The laboratory's allegation of compliance is not credible and evidence of correction is not acceptable.**

The "Training and Competency, Revision C" procedure submitted in Ex. BB, Tab 9 has an approval date of March 24, 2016. Revision C includes the competency assessment requirement for direct observation of routine patient testing and performance of instrument maintenance and function checks as well as the six CLIA regulatory procedural requirements set forth at 42 C.F.R. § 493.1451(b)(8). It is unclear as to how training occurred prior to March 24, 2016 when the updated procedure, which included changes to the competency assessment procedure related to

28

direct observation, was approved. It is also unclear why the training documentation is not consistent for all trainees.

We note that the updated procedure, "Training and Competency, Rev. C," includes the requirement for direct observation (§§ 6.9.4.1 and 6.9.4.4), but the Training and Competency Form (CL FRM-03016-F2) does not reflect this procedural requirement. For the purpose of this review, item "(6)" on the Training and Competency Form would best indicate where the direct observation should be reflected. Review of the submitted training documentation (Ex. BB, Tab 9B) indicated that one of 13 testing personnel had not been trained, and that at "(6)," all training had been by VE (verbal explanation) or RR (record review), not direct observation.

The laboratory's April 1, 2016  portion of the submission states that competency records were included "for the tests [testing personnel] are performing" (page 90), but does not address the incomplete competency records for the instruments the testing personnel were using at the time of, or prior to the onsite survey.

The laboratory again failed to adequately address this deficiency and provide acceptable evidence of correction consisting of the required documentation and information as set forth in our January 25, 2016 and March 18, 2016 letters. In addition, the laboratory again failed to address and provide acceptable evidence of correction consisting of: what measure has been put in place, what systemic changes have been made to ensure the deficient practice does not recur, or how the corrective action is being monitored to ensure the deficient practice does not recur.

D6168
**The laboratory's allegation of compliance is not credible and evidence of correction is not acceptable.**

See our reviews of D6170 and D6171.

D6170
**The laboratory's allegation of compliance is not credible and evidence of correction is not acceptable.**

In its second submission, the laboratory states:

> The "review" discussed in the submission was simply intended to refer to the analysis conducted to address the deficiency identified by CMS. The issue addressed by the "review" – i.e., failing to document corrective action for QC fails for the Fortessa and Canto – is the same issue identified by CMS in its deficiency, and thus did not constitute a new issue or occurrence.

As in the first submission to CMS, the laboratory again provided no documentation of investigation or corrective action for the "review" in the current submission.

29

Confidential

As noted in our March 18, 2016 letter, the laboratory again failed to adequately address this deficiency and provide acceptable evidence of correction consisting of the required documentation and information as set forth in our January 25, 2016 letter.

D6171
**The laboratory's allegation of compliance is not credible and evidence of correction is not acceptable.**

In the second submission, the laboratory states that "the job description for TP14 has been revised to be consistent with the job description of a Clinical Laboratory Associate [CLA] in the laboratory's personnel procedures (Ex. HH, Tab 7B)." We note this job description is essentially unchanged from the laboratory's February 12, 2016 submission and still contains CLIA regulatory responsibilities for testing personnel, and as such TP14 is required to meet the educational requirements. This job description was not signed by TP14. On April 17, 2016, CMS received an additional exhibit, Ex. PP, which states that "the laboratory had revised the job description for clinical laboratory associates and. . .TP14 subsequently executed the new job description form (Ex. PP, Tab 5)." Ex. PP, Tab 5 includes a job description (CL JOB-03027, Rev. A) for CLA's and was signed by TP14 on April 15, 2016. The job description in Ex. PP, Tab 5 is different than the job description submitted in Ex. HH, Tab 7B. We are unclear if the job description submitted in both Exs. HH and PP is specific to TP14 or intended for all CLAs, nor are we clear which job description is currently being used for CLAs.

The laboratory's submission does not provide any additional documentation to show that TP14 is qualified to perform high complexity testing. Based on the information provided to CMS, TP14 remains unqualified to perform high complexity testing. The laboratory's second submission states "that TP14 has not performed any test analyses between November 2015 and his execution of this revised job description (Ex. HH, Tab 7 A);" however, the laboratory still has not addressed any patient impact for testing performed by TP14 prior to November 2015.

The laboratory again failed to adequately address this deficiency and provide acceptable evidence of correction consisting of the required documentation and information as set forth in our January 25, 2016 and March 18, 2016 letters.

**Imposed Sanctions**

Accordingly, pursuant to 42 C.F.R. §§ 493.1806, 493.1812, 493.1814, and 493.1840(a)(3), **based on the finding of immediate jeopardy and the laboratory's failure to meet all CLIA Condition-level requirements, and based on the failure by the owners and director of the laboratory to comply with certificate requirements and performance standards as evidenced by the deficiencies cited during the CLIA recertification and complaint survey completed on December 23, 2015**, CMS is taking action to impose the following sanctions against the CLIA certificate of Theranos, Inc.:

- 42 C.F.R. §§ 493.1806(b), 493.1840(a)(3), and 493.1840(e) – Principal Sanction: **Revocation** of the laboratory's CLIA certificate effective **September 5, 2016**. The laboratory has sixty (60) calendar days to appeal the determination to revoke the laboratory's CLIA certificate. If

30

Confidential

THPFM0004806471
SEC-THERANOS-006238053

a timely hearing request is received, revocation of the laboratory's CLIA certificate will become effective following the administrative hearing decision, if our determination of non-compliance is upheld. *See* 42 C.F.R. 493.1840(e)(1).

- 42 C.F.R. §§ 493.1806(b), 493.1812, 493.1840(a)(3), and 493.1840(d)(2)(i) – Principal Sanction: **Limitation** of the laboratory's CLIA certificate for the specialty of hematology effective **July 15, 2016**, based on the finding of immediate jeopardy. Pursuant to 42 C.F.R. §§ 493.1840(d)(2)(i) and 493.1844(d)(2)(ii), the limitation will take effect regardless of whether a hearing request is filed and will remain in effect until the laboratory's CLIA certificate is revoked.

- 42 C.F.R. §§ 493.1806(c)(3), 493.1810(d), 493.1834, and 493.1844(d)(1) – Alternative Sanction: **Civil Money Penalty (CMP)** in the amount of $10,000 per day for each day of non-compliance effective **July 12, 2016**, and will continue to accrue until it can be verified that all the cited deficiencies have been corrected and the laboratory is in compliance with all Condition-level requirements or the laboratory's CLIA certificate is limited, whichever occurs first. As the laboratory was advised in our March 18, 2016 letter, if the laboratory requests a hearing, the CMP amount will not be collected until after the hearing decision is rendered. If the laboratory does not request a hearing, CMS may reduce the proposed amount by 35 percent. *See* 42 C.F.R. § 493.1834(e)(2)(iii).

- 42 C.F.R. §§ 493.1806(c)(1), 493.1832, and 493.1844(d)(1) and (g)(1) – Alternative Sanction: **Directed Portion of a Plan of Correction** effective **July 12, 2016**. The laboratory is directed to submit to this office within ten (10) calendar days from July 12, 2016, a list of the names and addresses of all physicians and other clients who have used some or all of the laboratory's services from January 2014 to the present date. CMS may use this list to advise the laboratory's clients of the nature of its non-compliance and the nature and effective date of any sanctions imposed against the laboratory's CLIA certificate. An appeal will not delay the due date for this submission or client notification by CMS.

- 42 C.F.R. §§ 493.1804(b), 493.1807(b), 493.1808(b), 493.1826, and 493.1844(d)(1) and (h)(2) – Medicare Alternative Sanction: **Suspension of the laboratory's approval to receive Medicare payments** for any services performed for the specialty of hematology on or after **July 15, 2016**.

  As a consequence of the suspension of the approval to receive Medicare payments for services performed for the specialty of hematology, under Section 1902(a)(9)(C) of the Social Security Act and 42 C.F.R. § 440.30(c), payment under the Medicaid program, Title XIX of the Social Security Act, will no longer be available to the laboratory for all laboratory services performed for the specialty of hematology effective **July 15, 2016**. *See also* 42 C.F.R. § 493.1809.

- 42 C.F.R. §§ 493.1807(a), 493.1808(a), 493.1842, and 493.1844(d)(3) – Principal Sanction: **Cancellation of the laboratory's approval to receive Medicare payments** for all laboratory services effective **September 5, 2016**. This sanction will be effectuated even if the laboratory files a timely appeal.

31

Confidential

THPFM0004806472
SEC-THERANOS-006238053

Moreover, in accordance with Section 1902(a)(9)(C) of the Social Security Act and 42 C.F.R. §§ 440.30(c) and 493.1809, payment under the Medicaid program, Title XIX of the Social Security Act, will no longer be available to the laboratory for all laboratory services effective **September 5, 2016**. *See* 42 C.F.R. § 440.2(b).

As the laboratory was previously advised, the above sanctions cannot be avoided by the closure of the laboratory, discontinuation of testing, voluntary withdrawal from the CLIA program, or changes in certificate to a lower level of testing.

**Appeal Rights**

If Theranos, Inc. does not believe that the determination upon which imposition of the sanction is based is correct, the laboratory may request a hearing before an administrative law judge (ALJ) of the Departmental Appeals Board (DAB) in accordance with 42 C.F.R. §§ 493.1844 and 498.40 - .78. A request for hearing must be filed **electronically** no later than **sixty (60) calendar days** after the date this letter is received. *See* 42 C.F.R. § 493.1844(f); DAB Civil Remedies Division Procedures (CDRP), § 2(b) (Effective January 1, 2015). You should file your request for an appeal (accompanied by a copy of this letter) via the DAB Electronic Filing System website (DAB E-File) at https://dab.efile.hhs.gov. Should you choose to file an appeal, you are required to e-file your appeal request unless you received a waiver from the DAB. *See* DAB CDRP §§ 2(b) and 6, available at http://www.hhs.gov/dab/divisions/civil/procedures/ divisionprocedures.html. Please note: all documents must be submitted to DAB E-File in Portable Document Format ("pdf").

A hard copy of the hearing request should be sent to:

> Karen Fuller, Manager
> State Oversight and CLIA Branch
> Division of Survey and Certification
> Centers for Medicare & Medicaid Services
> 90 Seventh St., Suite 5-300 (5W)
> San Francisco, California 94103-6707

The request for hearing must contain a statement as to the specific issues and findings of fact and conclusions of law in this determination with which the laboratory disagrees and the basis for the laboratory's contention that the specific issues and/or findings and conclusions are incorrect. Evidence and arguments may also be presented at the hearing, where counsel may represent the laboratory at its own expense.

**If a hearing is conducted and CMS' determination is upheld, the laboratory will be assessed a fee to cover the government's cost related to the hearing.** *See* 42 C.F.R. § 493.643(d)(2).

As noted above, if a timely request for hearing is filed, i.e., by **September 5, 2016**, CMS will not revoke the CLIA certificate until after an ALJ hearing that upholds the sanction determination. However, cancellation of all Medicare payments is effective **September 5, 2016**, regardless of whether a hearing is requested. *See* 42 C.F.R. § 493.1844(d)(1)-(3) and (h)(1).

32

Confidential

THPFM0004806473
SEC-THERANOS-006238053

**ER-3053**

**When the laboratory's CLIA certificate is revoked, the laboratory will not be permitted to perform any testing, including waived testing and provider performed microscopy procedures, regardless of whether or not the laboratory charges for the testing.** Also, pursuant to 42 U.S.C. § 263a(i)(3) and 42 C.F.R. § 493.1840(a)(8), the owners and operator(s) (including the laboratory director) are prohibited from owning or operating (or directing) a laboratory for at least two (2) years from the date of the revocation. *See* 42 C.F.R. § 493.2 (defining "operator" and "owner").

In accordance with 42 C.F.R. § 493.1850(a)(2), information regarding the actions against the laboratory's CLIA certificate will appear in the Laboratory Registry for the calendar year in which the actions are imposed. In addition, pursuant to 42 C.F.R. § 493.1844(g)(1), we will notify the general public by means of a notice published in a local newspaper when these actions become effective as referenced above.

If you have any question regarding this notice, please call Gary Yamamoto of my staff at (415) 744-3738.

Sincerely,

*Karen Fuller*

Karen Fuller, Manager
State Oversight and CLIA Branch
Division of Survey and Certification

cc:    California Department of Public Health, Laboratory Field Services

Ramesh Balwani, Owner          Certified Mail Number: 7000 1670 0007 4103 6770
Theranos, Inc.
1701 Page Mill Road
Palo Alto, CA 94304

Sunil Dhawan, M.D.             Certified Mail Number: 7000 1670 0007 4103 6787
East Bay Dermatology Medical Group
2557 Mowry Avenue, Suite 25
Fremont, CA 94538

33

Confidential

THPFM0004806474
SEC-THERANOS-006238053

# Exhibit 27

**theran⬡s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

April 1, 2016

**BY MESSENGER**

Ms. Karen Fuller
State Oversight and CLIA Branch
Division of Survey and Certification
Centers for Medicare and Medicaid Services
90 Seventh Street, Suite 5-300 (5W)
San Francisco, CA 94103-6707

Re:   **Updated Response of Theranos, Inc. to the March 18, 2016 Letter From Karen
      Fuller To Dr. Sunil Dhawan, Elizabeth Holmes, and Sunny Balwani (CLIA Number
      05D2025714)**

Dear Ms. Fuller,

This letter provides Theranos, Inc.'s response to your letter of March 18, 2016. We respond to
each of the reasons why CMS found that our response to a specific deficiency was insufficient by
providing additional information and supporting documentation, which we believe demonstrate
that our Newark, California laboratory has come into Condition-level compliance and abated the
immediate jeopardy.

Based on the productive discussions we have had with Sarah Bennett and Gary Yamamoto about
your March 18 letter, this response aims to ensure that there are not any miscommunications
about important issues that we have learned were unclear to CMS from our initial submission. In
addition, this response reflects work that the laboratory, under the direction of its new leadership,
has done to address CMS's feedback, including, for example, performing thorough re-review of
data and further revising procedures.

As set forth in this detailed response and through the enclosed supporting documentation:

  1. The laboratory has put in place new leadership, including a new full-time lab director and
     a new full-time clinical consultant, who is a co-director under California's regulations.
     The new laboratory director, Dr. Kingshuk Das, has been on-site full-time as of March
     14, 2016. He has extensive clinical laboratory experience, including as an Associate
     Medical Director of UCLA's Clinical Laboratories between August 2013 and March
     2016. The new clinical consultant, Dr. Don Tschirhart, has been on-site full-time as of
     March 14, 2016. He has over 15 years of experience as a hospital lab director.

  2. The laboratory's new leadership firmly believes that the laboratory will be able to ensure
     the deficient practices will not recur through its robust new quality systems and through
     the intense oversight being provided by the laboratory's new quality monitoring and
     improvement program and new audit procedures. Indeed, the laboratory's new audit

1

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534700

theran⬤s

1701 Page Mill Road     P 650.838.9292     theranos.com
Palo Alto, CA 94304     F 650.838.9165

procedures require both monthly tracer audits of pre-analytic, analytic and post-analytic processes and quarterly audits of the laboratory's quality systems. The results of these audits are then scrutinized at the laboratory's monthly QMPI Program meetings.

3.  Many of the issues raised in your March 18 letter appear to be premised on CMS's belief that the laboratory is running a number of tests that it actually stopped running either before or during the survey, and has not run since. We have clarified this issue below.

4.  The laboratory has undertaken aggressive corrective actions. For example, out of an extreme abundance of caution and based on its dissatisfaction with prior QA oversight, the laboratory voided all results reported for the assays run on the Theranos Proprietary System 3.5 (TPS) in 2014 and 2015 and all reported PT/INR tests run on the Siemens Advia BCS XP instrument that went into use in October 2014 through September of 2015.[1]

We believe that these considerable actions, when viewed together with the other information and documentation provided herein and in our initial submission, should leave no doubt that the Newark laboratory has come into Condition-level compliance and abated immediate jeopardy. For that reason, we submit that CMS should approve the laboratory's submission, and thereafter perform a revisit at which CMS will see that the laboratory's new leadership has implemented, enforced, and monitored the corrective actions.

We welcome further engagement with CMS on any of the information we have submitted to date, including the opportunity to address any questions or concerns CMS may have in real-time, in order to avoid any unnecessary delay or work for CMS and pursuant to our efforts to respond comprehensively to all issues raised by CMS.

Please note that these materials contain confidential commercial information and trade secrets that are statutorily exempt from disclosure under the Freedom of Information Act, 5 U.S.C. § 552(b)(4). We are providing this highly sensitive information to CMS in order to fully respond to the agency's inquiries. However, this is information that Theranos closely protects from public disclosure, and any disclosure by the agency of this information is likely to cause the company irreparable harm. As a result, in providing this information, we respectfully request the opportunity to provide redactions should you decide to disclose any of the documents to any member of the public for any reason, under FOIA procedures or otherwise. In addition, if the agency incorporates the substance of any of this information into correspondence or other agency-generated documents that may be publicly disclosed, we request the opportunity to redact the information from those documents as well. We also ask that you take steps to protect these documents from unauthorized disclosure

---

[1] A list of all accessions for which corrected reports have been issued is enclosed herein in Exhibit MM.

2
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                    THER-0534701
Fed. R. Crim. P. 6(e) material

theran⬤s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

**D2094**

**D2094 – March 18 Letter Statement 1:** *"Some documents pertaining to this deficiency referenced in the submission were not included. Specifically, the submission references 'Ex. A, Tab 4, § 7.1.2.2.d.2.' We found no such reference contained in the materials provided to CMS. In addition, Exhibit (Ex.) O, Tab 2 states: 'The QC data are presented here: <Exhibit D Tab 7, Tab 8>.' We found no 'Tab 7' or 'Tab 8' in Ex. D."*

    **Theranos Response to Statement 1 in D2094:** The citation reference to Ex. A, Tab 4, § 7.1.2.2.d.2 was an inadvertent transcription. The citation reference Ex. D, Tabs 7 and 8 were also inadvertent transcription errors, but the QC data were included in the initial submission in Exhibit O. We have enclosed another copy of that QC data for ALP with this letter at Ex. JJ, Tab 3B.

**D2094 – March 18 Letter Statement 2:** *"Although the laboratory's submitted protocol indicates that ungraded proficiency testing (PT) results will be evaluated, the submitted protocol does not explain how an investigation is performed and who must sign an investigation of ungraded PT samples."*

    **Theranos Response to Statement 2 in D2094:** The lab has revised its proficiency testing procedure (i) to indicate the protocol used to evaluate ungraded proficiency testing (PT); (ii) to explain how an investigation of ungraded PT is performed; and (iii) to explain who must sign an investigation of ungraded PT samples. (Ex. BB, Tab 3). The revised procedure requires the laboratory to use its Proficiency Testing Investigation and Corrective Action form to investigate ungraded PT, which must be approved by the lab director. (Ex. BB, Tab 3§ 9.4, F-1). Training on this revised SOP has occurred. (Ex. BB, Tabs 3B-3C).

**D2094 – March 18 Letter Statement 3:** *"In the submission, the laboratory concludes:*

- *'Not enough patient data available for meaningful analysis'*
- *'No evidence of systemic errors'*
- *'No patient impact expected'*

*However, no information as to how the laboratory came to these conclusions related to patient outcomes was submitted. Documentation contained in in Ex. O, Tab 2 also compares the 'Range of Means' with no explanation as to what this refers to or how it correlates to the laboratory's ungraded results. The submission merely indicates that 'the lab has investigated this ungraded PT event for ALP [alkaline phosphatase] and has documented its investigation and conclusion."*

    **Theranos Response to Statement 3 in D2094:** Pursuant to its revised proficiency testing procedure, the lab has documented its investigation of the ungraded ALP event for the 3rd event of 2014 using the Proficiency Testing Investigation and Corrective Action form. (Ex. JJ, Tab 3A). That documentation explains how the laboratory came to its conclusions related

3
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos          THER-0534702
Fed. R. Crim. P. 6(e) material

theran⬡s

1701 Page Mill Road     P 650.838.9292   theranos.com
Palo Alto, CA 94304     F 650.838.9165

to patient outcomes. (Ex. JJ, Tab 3A). Additionally, the laboratory has revised and clarified its analysis, including by removing the phrase "Range of Means." (Ex. AA, Tab 13).

**D2094 – March 18 Letter Statement 4:** *"Furthermore, a Quality Monitoring and Processing Improvement (QMPI), Program Meeting Agenda, CL FRM-00045-F1, that was submitted as part of Ex. A, Tab 13 and only includes PT for Alternative Proficiency Assessment (APA). Based on information included in the submitted agenda, all PT issues were not addressed as required in CL QOP-00045, Revision A (Ex. A, Tab 12) in Section 7.2.2.6 and 7.2.2.7."*

**Theranos Response to Statement 4 in D2094:** The lab has revised the QMPI Program procedures and meeting agenda to make clear that the agenda includes all PT issues as required in CL QOP-00045. (Ex. BB, Tab 7 § 7.5.2).[2]

**D2094 – March 18 Letter Statement 5:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In the submission, the laboratory indicates that a 'tracer audit **may** [emphasis added] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 5 in D2094:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8 § 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7§ 7.5).[3] Training on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

---

[2] Note, the prior version of the QMPI QOP that was included with the submission stated that QMPI Meetings would include a review of the "schedule" and "results" for "Proficiency Tests". (Ex. A, Tab 12, § 7.2.2.5).

[3] Note, the prior version of the QMPI Meeting Agenda that was included with the submission required a review of audit "Findings." (Ex. A, Tab 12, § 9.)

4

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                              THER-0534703
Fed. R. Crim. P. 6(e) material

**theran❂s**

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

<u>D2128</u>

**D2128 – March 18 Letter Statement 1:** *"The submission references 'Ex. A, Tab 4, § 7.1.2.2.d.2.' We found no such reference contained in the materials provided to CMS."*

**Theranos Response to Statement 1 in D2128:** The citation reference to Ex. A, Tab 4, § 7.1.2.2.d.2 was an inadvertent transcription error and should not have been included.

**D2128 – March 18 Letter Statement 2** *"Although the laboratory's submitted protocol indicates that unsatisfactory PT results would be investigated using CL FRM-00006-F1, the laboratory provided no documentation showing that the required form was used to investigate the unsatisfactory PT result. The laboratory also states that the 'lab has investigated the one unacceptable challenge and documented its investigation and conclusions'; however, CL FRM-00006-F1 documenting the investigation was not submitted per the laboratory's protocol."*

**Theranos Response to Statement 2 in D2128:** We note that there was not an "unsatisfactory PT result" reported by the American Proficiency Institute for the "Blood Cell ID (Educational)" 2nd event of 2014, because this educational event was "Not Graded." (Ex. JJ, Tab 2). Pursuant to its revised proficiency testing procedure, the laboratory has documented its investigation of this "Blood Cell ID (Educational)" 2nd event of 2014 that was "Not Graded" using the Proficiency Testing Investigation and Corrective Action form. (Ex. JJ, Tab 2).

Likewise, pursuant to its revised proficiency testing procedure, the laboratory has documented its investigation of the one unacceptable challenge for the "Blood Cell Identification" 2nd event of 2014 using the Proficiency Testing Investigation and Corrective Action form. (Ex. JJ, Tab 2A).

**D2128 – March 18 Letter Statement 3:** *"In the submission, the laboratory concludes:*

- *'Not enough patient data available for meaningful analysis'*
- *'No evidence of systemic errors'*
- *'No patient impact expected'*

*However, no information as to how the laboratory came to these conclusions related to patient outcomes was submitted. Documentation contained in Ex O, Tab 3 shows that the laboratory received a passing score of 80% for blood cell identification." While this is true, the CLIA regulations require that all unacceptable results have remedial action taken and that such remedial action be documented. The submission does not contain evidence of remedial action."*

**Theranos Response to Statement 3 in D2128:** Pursuant to its revised proficiency testing procedure, the laboratory has documented its investigation of the "Blood Cell ID (Educational)" 2nd event of 2014 that was "Not Graded" using the Proficiency Testing Investigation and Corrective Action form. (Ex. JJ, Tab 2). That documentation explains how the laboratory came to its conclusions related to patient outcomes. (Ex. JJ, Tab 2).

5
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material                                          THER-0534704

theran⬤s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

Pursuant to its revised proficiency testing procedure, the laboratory has documented its investigation of the one unacceptable challenge for "Blood Cell Identification" 2nd event of 2014 using the Proficiency Testing Investigation and Corrective Action form. (Ex. JJ, Tab 2A). That documentation explains how the laboratory came to its conclusions related to patient outcomes. (Ex. JJ, Tab 2A).

**D2128 – March 18 Letter Statement 4:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In the submission, the laboratory indicates that a 'tracer audit **may** [emphasis added [in the letter]] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 4 in D2128:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8 § 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab 7B-7C).

<u>D5024</u>:

The March 18 Letter states: *"See our reviews of D5403, D5437, D5447, D5469, D5481, D5779, and D5801."* Accordingly, we refer you to our responses to those reviews.

<u>D5217</u>

**D5217 – March 18 Letter Statement 1:** *"Some documents pertaining to this deficiency referenced in the submission were not included. Specifically, the submission references 'Ex. A, Tab 4, § 7.1.2.2.d.2.' We found no such reference contained in the materials provided to CMS. In addition, Exhibit (Ex.) O, Tab 2 states: 'The QC data are presented here: <Exhibit D Tab 7, Tab 8>.' We found no 'Tab 7' or 'Tab 8' in Ex. D."*

**Theranos Response to Statement 1 – D5217:** The citation reference to Ex. A, Tab 4, § 7.1.2.2.d.2 was an inadvertent transcription error and should not have been included. The citation reference Ex. D, Tabs 7 and 8 were also inadvertent transcription errors, but the QC data were included in the submission in Exhibit O. We have enclosed another copy of the QC data for Troponin with this letter at Ex. JJ, Tab 1B.

6
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                              THER-0534705
Fed. R. Crim. P. 6(e) material

**theran⊙s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

**D5217 – March 18 Letter Statement 2:** *"In the submission, the laboratory concludes:*

- *'Not enough patient data available for meaningful analysis'*
- *'No evidence of systemic errors'*
- *'No patient impact expected'*

*However, no information as to how the laboratory came to these conclusions related to patient outcomes was submitted.*

> **Theranos Response to Statement 2 – D5217:** The lab has revised its conclusions for the ungraded Troponin 2nd event of 2014; those conclusions are consistent with CMS's review in response to D5217 Statement 3 below. Pursuant to its revised proficiency testing procedure, the laboratory has documented its investigation and conclusion of the ungraded Troponin 2nd event of 2014 using the Proficiency Testing Investigation and Corrective Action form. (Ex. JJ, Tab 1A). That documentation explains how the laboratory came to its conclusions related to patient outcomes. (Ex. JJ, Tabs 1A-1B).

**D5217 – March 18 Letter Statement 3:** *"The laboratory states in Ex. O, Tab 1 that no peer data was available for the Siemens Immulite 2000. Based on lack of a peer group, the laboratory should compare its results to 'All Participants' values for troponin. Review of the laboratory's values versus the 'All Participants' values shows that four of five of the laboratory's troponin values for the second proficiency testing event of 2014 were unacceptable when compared to the 'All Participants' acceptable ranges. It appears the laboratory reviewed all of the mean values for all peer, instrument and method groups in order to determine an inappropriate acceptable range for its samples based on data not related to the 'All Participants' values."*

> **Theranos Response to Statement 3 – D5217:** Pursuant to its revised proficiency testing procedure, the laboratory has documented its investigation and conclusion of the ungraded Troponin 2nd event of 2014 using the Proficiency Testing Investigation and Corrective Action form. (Ex. JJ, Tab 1A). That documentation reflects the laboratory's revised investigation, analysis, and conclusions. (Ex. JJ, Tabs 1A-1B). Based on its investigation, the laboratory has concluded that its values versus the "All Participants" values show that four of five of the laboratory's troponin values for the second proficiency testing event of 2014 did not constitute passing values for this PT event. (Ex. JJ, Tabs 1A-1B). The enclosed documentation describes the investigation and remedial action taken to address the unacceptable values. (Ex. JJ, Tabs 1A-1B). As explained in that documentation, the laboratory has, out of an abundance of caution, issued corrected reports voiding all affected Troponin results. (Ex. JJ, Tab 1A). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5217 – March 18 Letter Statement 4:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not*

7

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                        THER-0534706
Fed. R. Crim. P. 6(e) material

theran⚬s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*establish the procedure by which these quarterly audits are to be conducted. In the submission, the laboratory indicates that a 'tracer audit* **may** *[emphasis added [in the letter]] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 4 – D5217:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

<u>D5311</u>

**D5311 – March 18 Letter Statement 1:** *"The submission references 'Ex. A, Tab 4, 7.1.2.2.d.2.' We found no such reference contained in the materials provided to CMS."*

**Theranos Response to Statement 1 – D5311:** The citation reference to Ex. A, Tab 4, § 7.1.2.2.d.2 was an inadvertent transcription error and should not have been included.

**D5311 – March 18 Letter Statement 2:** *"The laboratory concluded that 'this issue is not likely to affect patients' because its mislabel error rate is comparable to published industry mislabel error rates. No other information related to possible patient outcomes was provided. Even though the laboratory's error rate may be comparable, the laboratory must still pursue any corrective action(s) for patients that may have been affected by this deficient practice."*

**Theranos Response to Statement 2 – D5311:** The laboratory has revised its patient impact assessment analysis and conclusions to address CMS's review. (Ex. AA, Tab 1). Among other things, the revised assessment shows that laboratory took corrective action in 2014 and 2015 for patients that may have been affected by offering a redraw and retest at no charge. (Ex. AA, Tab 1; Ex. HH, Tab 10).

**D5311 – March 18 Letter Statement 3:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In the submission, the laboratory indicates that a 'tracer audit* **may** *[emphasis added [in the letter]] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would*

8
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                                    THER-0534707
Fed. R. Crim. P. 6(e) material

**theran⊙s**

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

*be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

> **Theranos Response to Statement 3 – D5311:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

<u>D5391</u>

<u>Finding #1</u>

**D5391 Finding #1 – March 18 Letter Statement 1:** *"The submission references 'Ex. A, Tab 4.' We found no such reference contained in the materials provided to CMS."*

> **Theranos Response to Statement 1 – D5391 Finding #1:** The citation reference to Ex. A, Tab 4, § 7.1.2.2.d.2 was an inadvertent transcription error and should not have been included.

**D5391 Finding #1 – March 18 Letter Statement 2:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In the submission, the laboratory indicates that a 'tracer audit **may** [emphasis added [in the letter]] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

> **Theranos Response to Statement 2 – D5391 Finding #1:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on

9
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material                                      THER-0534708

theran☉s

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

findings and analysis" during the QMPI Program meetings.  (Ex. BB Tab 7§ 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tab7B-C).

Finding #2

**D5391 Finding #2 – March 18 Letter Statement 1:**  *"The submission references 'Ex. A, Tab 18, § 3.7.1,' and 'Ex. A, Tab 23, §§ 7.14, 7.15, 8.6.1, 8.6.4, 8.6.5.'  We found no such reference contained in the materials provided to CMS."*

**Theranos Response to Statement 1 – D5391 Finding #2:**  The citation references to Ex. A, Tab 4, § 3.7.1 and Ex. A, Tab 23, §§ 7.14, 7.15, 8.6.1, 8.6.4, 8.6.5 were inadvertent transcription errors and should not have been included.

**D5391 Finding #2 – March 18 Letter Statement 2:**  *"At the time of the onsite survey, the laboratory failed to establish a written protocol for the daily review of patient specimens referred to other laboratories for testing to ensure timely receipt and reporting of test results performed by other laboratories.  The laboratory did not provide such a protocol with its submission."*

**Theranos Response to Statement 2 – D5391 Finding #2:**  The lab has implemented revised written procedures for referral testing, which includes the protocol for daily review of patient specimens referred to other laboratories for testing to ensure timely receipt and reporting of test results performed by other laboratories.  (Ex. BB, Tab 10 § 8.7).  The revised procedure requires written documentation of this daily review.  Training on that SOP has occurred.  (Ex. BB, Tabs 10B-10C).  The revised QMPI Program procedures require a review of referral testing and turnaround time.  (Ex. BB, Tab 7 §§ 7.5.3, 7.5.4).

**D5391 Finding #2 – March 18 Letter Statement 3:**  *"In addition, it is unclear how the laboratory's QMPI Program would ensure the establishment of written protocols for all the laboratory's processes."*

**Theranos Response to Statement 3 – D5391 Finding #2:**  The laboratory's improved document control procedures, SOP on SOPs, audit procedures, and QMPI Program ensure the laboratory has written protocols for all of the laboratory's processes.  (Ex. BB, Tabs 1-2, 7-8).  The document control procedures identify levels and categories of procedures (Ex. BB, Tab 1 §§ 3.11, 6.1); the SOP on SOPs includes procedures and templates to ensure that there are written protocols for all processes that should be covered by an SOP (Ex. BB, Tab 2); the revised audit procedures include monthly tracer audits that would identify any instance where a written protocol did not exist for a process (Ex. BB, Tab 8 § 8.1); and the QMPI Program requires review of tracer audit results and of written procedures that are new, revised or in process.  (Ex. BB, Tab 7§§ 7.1, 7.5).  Training on these procedures has occurred.  (Ex. BB, Tabs 1B-1C, 2B-2C, 7B-7C, 8B-8C).

10
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                                    THER-0534709
Fed. R. Crim. P. 6(e) material

**theranos**

| | | |
|---|---|---|
| 1701 Page Mill Road | P 650.838.9292 | theranos.com |
| Palo Alto, CA 94304 | F 650.838.9165 | |

<u>D5393</u>

**D5393 – March 18 Letter Statement 1:** *"The submission references 'Ex. A, Tab 23, §§ 7.14, 7.15, 8.6.1, 8.6.4, 8.6.5.' We found no such reference contained in the materials provided to CMS."*

**Theranos Response to Statement 1 – D5393:** The citation references to Ex. A, Tab 23, §§ 7.14, 7.15, 8.6.1, 8.6.4, 8.6.5 was an inadvertent transcription error and should not have been included.

**D5393 – March 18 Letter Statement 2:** *"At the time of the onsite survey, the laboratory failed to establish a written protocol for the daily review of patient specimens referred to other laboratories for testing to ensure timely receipt and reporting of test results performed by other laboratories. The laboratory did not provide such a protocol with its submission."*

**Theranos Response to Statement 2 – D5393** The lab has implemented revised written procedures for referral testing, which includes the protocol for daily review of patient specimens referred to other laboratories for testing to ensure timely receipt and reporting of test results performed by other laboratories. (Ex. BB, Tab 10 § 8.7). The revised procedure requires written documentation of this daily review. (Ex. BB, Tab 10 § 8.7, F-1). Training on that SOP has occurred. (Ex. BB, Tabs 1B-10C). The revised QMPI Program procedures require a review of referral testing and turnaround time. (Ex. BB, Tab 7 §§ 7.5.3, 7.5.4).

**D5393 – March 18 Letter Statement 3:** *"In addition, it is unclear how the laboratory's QMPI Program would ensure the establishment of written protocols for all of the laboratory's processes."*

**Theranos Response to Statement 3 – D5393:** The laboratory's improved document control procedures, SOP on SOPs, audit procedures, and QMPI Program ensure the laboratory has written protocols for all of the laboratory's processes. (Ex. BB, Tabs 1-2, 7-8). The document control procedures identify levels and categories of procedures (Ex. BB, Tab 1 §§ 3.11; 6.1); the SOP on SOPs includes procedures and templates to ensure that there are written protocols for all processes that should be covered by an SOP (Ex. BB, Tab 2); the revised audit procedures include monthly tracer audits that would identify any instance where a written protocol did not exist for a process (Ex. BB, Tab 8 § 8.1); and the QMPI Program requires review of tracer audit results and of written procedures that are new, revised or in process. (Ex. BB, Tab 7§§ 7.1, 7.5). Training on these procedures has occurred. (Ex. BB, Tabs 1B-1C, 2B-2C, 7B-7C, 8B-8C).

**D5393 – March 18 Letter Statement 4:** *"In addition, without daily written documentation, it is unclear as to how the laboratory's QMPI Program would ensure this quality assessment activity has been completed."*

**Theranos Response to Statement 4 – D5393:** The laboratory's revised written procedures for referral testing require written documentation of the daily review of referral testing. (Ex. BB, Tab 10 § 8.7, F-1). Training on the revised referral testing procedures has occurred.

11
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                           THER-0534710
Fed. R. Crim. P. 6(e) material

theran**s**

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

(Ex. BB, Tabs 10B-10C). The revised QMPI procedures require a review of referral testing and turnaround time. (Ex. BB, Tab 7 §§ 7.5.3, 7.5.4). Training on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

### D5400

The March 18 Letter states "*See our reviews of D5403, D5407, D5413, D5421, D5423, D5429, D5437, D5447, D5449, D5469, D5477, D5481, D5775, D5779, D5787, D5791, and D5793.*" Accordingly, we refer you to our responses to those reviews.

### D5403

Finding #1

**D5403 Finding #1 – March 18 Letter Statement 1:** *"Although the laboratory addressed the inclusion in its procedure manual of corrective actions to be taken when calibration or quality control (QC) results failed to meet the laboratory's criteria for acceptability when using the Siemens Advia 2120i instrument, in its submission the laboratory failed to address how it will ensure its procedure manuals include applicable components as required by 42 C.F.R. 493.1251(b)."*

    **Theranos Response to Statement 1 – D5403 Finding #1:** The lab's revised SOP on SOPs includes written protocols and SOP templates, which sets forth protocols for preparing procedure manuals that are consistent with 42 C.F.R. § 493.1251(b). (Ex. BB, Tab 2). The laboratory's revised document control policies further ensure that procedure manuals are consistent with 42 C.F.R. § 493.1251(b). (Ex. BB, Tab 1 §§ 6.1, 6.2, 6.3). The lab will monitor compliance with these procedures and 42 C.F.R. § 493.1251(b) through its monthly QMPI meetings, which include a review of written procedure manuals that are new, revised or in process. (Ex. BB Tab 7, §§ 7.1, 7.5.6). The lab will also ensure compliance through its revised audit procedures of pre-analytic, analytic, and post-analytic practices. (Ex. BB, Tab 8, §§ 8.1, 8.2). Training on these revised procedures has occurred. (Ex. BB, Tabs 1B-1C; 2B-2C; 7B-7C; 8B-8C).

**D5403 Finding #1 – March 18 Letter Statement 2:** *"To ensure appropriate and required calibration or QC corrective actions were taken, the laboratory indicated that quarterly audits will be performed and suggested that the audit results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In the submission, the laboratory indicates that a 'tracer audit **may** [emphasis added] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

    **Theranos Response to Statement 2 – D5403 Finding #1:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex BB,

12
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534711

**theran✦s**

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304    F 650.838.9165

Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth quarterly and tracer audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

Finding #2:

**D5403 Finding #2 – March 18 Letter Statement 1:** *"The laboratory was cited for not having a QC procedure for the 'Edison 3.5 Theranos System' prior to 5/15/14. The laboratory's submission states that it performed QC before and after 5/15/14; however, it did not address the citation. While the data submitted did show that QC was run prior to 5/15/14, the laboratory provided no information regarding any investigation as what procedure the laboratory was using to determine number, type, frequency, and acceptability criteria."*

**Theranos Response to Statement 1 – D5403 Finding #2:** D5403 Finding #2 relates to the Theranos Proprietary System 3.5 ("TPS") The laboratory has performed a review to determine number, type, frequency, and acceptability criteria for QC on the TPS 3.5 prior to May 15, 2014. Prior to May 15, 2014, the laboratory (i) used the same type of QC material as used after May 15, 2014; (ii) the laboratory ran at least two levels of QC prior to May 15, 2014; (iii) the laboratory was required to pass at least two levels of QC at least 24 hours before reporting a patient result; and (iv) the laboratory used the Westgard rules for the acceptance criteria. (Ex. FF, Tab 13).

**D5403 Finding #2 – March 18 Letter Statement 2:** *"The laboratory indicated that systemic errors using QC and patient test distribution over time as well as random errors were used to evaluate patient impact. Specifically, the laboratory indicated that 'QC data was reviewed to identify >2SD failure and periods of elevated CV. Namely, batches of 10 consecutive QC data points were analyzed and the CV was calculated for each QC level during this period. If the CV was >30%, then all patient results run during that time period will be voided.' Ex. E, Tab 1. That laboratory did not indicate how 'periods of elevated CV' were identified or what time periods were reviewed."*

**Theranos Response to Statement 2 – D5403 Finding #2:** This deficiency concerns the TPS 3.5, which was one of the Theranos proprietary technologies in use in 2014 and 2015. The laboratory began phasing out the TPS 3.5 in December 2014, and it was **fully retired** in early-August 2015.

The laboratory values CMS's feedback, and takes it very seriously. The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was fully retired in early-August 2015. As explained further in the

13
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                        THER-0534712
Fed. R. Crim. P. 6(e) material

**theranos**

| | 1701 Page Mill Road | P 650.838.9292 | theranos.com |
| | Palo Alto, CA 94304 | F 650.838.9165 | |

attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5. (Ex. AA, Tab 3). The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures. Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015. As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015. (Ex. AA, Tab 3). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5403 Finding #2 – March 18 Letter Statement 3:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In the submission, the laboratory indicates that a 'tracer audit* **may** *[emphasis added [in the letter]] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 3 – D5403 Finding #2:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

<u>D5407</u>

**D5407 – March 18 Letter Statement 1:** *"Although the laboratory's submitted protocol (provided at Ex. A, Tab 1 § 4.13) indicates that the laboratory director must sign all procedures prior to use, the response does not include an explanation as to why the cited procedures were not signed by the laboratory director prior to use as required by the laboratory's protocol available at the time of the onsite."*

**Theranos Response to Statement 1 – D5407:** D5407 states that the following procedures showed an effective date in December 2014, but were signed by the lab director on

14
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                    THER-0534713
Fed. R. Crim. P. 6(e) material

**theran⊖s**

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

September 19, 2015: CL SOP-09102 (ALP),[4] CL SOP-09161, Revision A (APO), CL SOP-09118 (Glucose),[5] CL SOP-09111 (CO2), CL SOP-10001, Revision B (Measuring Prothrombin Time-Innovin (PT)), and CL SOP-15036, Revision A (Edison 3.5 Theranos System Daily QC Procedure).

D5407 also states that CL SOP-06060, Revision A (SensoScientific Monitor) showed an effective date of June 23, 2015, but was not signed by the lab director until September 22, 2015.

Lastly, D5407 states that CL PLN-14003, Revision A (Master Validation Plan for Routine Chemistry Assays on Theranos Devices) showed an effective date of November 4, 2011, but was not signed by the lab director under September 19, 2015. To ensure that the record is correct with respect to this document, we note that CL PLN-14003, Revision A (Master Validation Plan for Routine Chemistry Assays on Theranos Devices), was authored and signed by the laboratory's then-lab director, Dr. Arnold Gelb, on November 4, 2011. (Ex. HH, Tab 12). Dr. Gelb remained the Lab Director until January 27, 2013. (Ex. HH, Tab 4C). Although Dr. Gelb signed CL PLN-14003, the subsequent lab directors did not sign and date CL PLN-14003 until Dr. Sunil Dhawan signed it on September 19, 2015. We recognize that those prior lab directors should have reviewed, dated and signed CL PLN-14003 before that date.

As reflected by the Lab Director deficiencies identified by CMS, the prior lab directors did not provide sufficient oversight over the documents cited in D5407. This appears to be one of the reasons why these documents were not timely reviewed and signed by the prior lab directors. In addition, the laboratory has found that its quality assurance oversight over these documents, including document control oversight, was not sufficient. The laboratory has hired a new lab director, who has approved enhanced document control policies and procedures to address this issue. (Ex. BB, Tab 1 §§ 5.1, 5.2, 5.3, 6.1, 6.2, 6.3). Training on those procedures has occurred. (Ex. BB, Tabs 1B-1C). The laboratory has also hired a Document Control Manager whose responsibilities include tracking new and revised policies and procedures to ensure that they are reviewed and approved by the lab director before they become effective. (Ex. HH, Tab 7C). In addition, the laboratory's revised QMPI Program procedures and agenda require review of procedures that are new, revised, or in process at monthly QMPI Program meetings. (Ex. BB, Tab 7 §§ 7.1, 7.5.6).

---

[4] D5407, Paragraph h, states that the Alkaline Phosphatase SOP that was made effective in December 2014 was "CL SOP-81102." This reference appears to be a typographical error because the Alkaline Phosphatase (ALP) SOP that was made effective in December 2014 was "CL SOP-09102."

[5] As another point of clarification only, we note that D5407, Paragraph h, states that the glucose procedure (CL SOP-09118) was not signed by the LD. That procedure was signed by the lab director, but not until September 19, 2015. We recognize that this signature date is still deficient under D5407, and provide this information only to clarify the record.

15
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                THER-0534714
Fed. R. Crim. P. 6(e) material

**theran⬡s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

**D5407 – March 18 Letter Statement 2:**  *"In Ex. L, Tab 26 the submission states: "The lab's overarching review of its systems and primary instruments has identified the patients affected or having the potential to be affected by this issue." The laboratory did not define the criteria used to make this determination or provide documentation as to how they came to this conclusion."*

**Theranos Response to Statement 2 – D5407:**  D5407 cites certain documents that were not timely signed and approved by the former lab director.

D5407 cites the follows SOPs for certain assays run on the Siemens Advia XPT because they had an effective date in December 2014, but were not signed by the former lab director until September 2015: (i) CL SOP-09161, Revision A (Apolipoprotein); (ii) CL SOP-09118 (Glucose); [6] (iii) CL SOP-09111 (CO2); and (iv) CL SOP-09102 (Alkaline Phophatase). [7] The laboratory and its new leadership do not approve of the fact these SOPs were given an effective date before Dr. Dhawan signed them.  However, there is no potential for these untimely signatures by Dr. Dhawan to have affected patients because Dr. Dhawan ultimately approved the SOPs without making any modifications or revisions to them.  To address other deficiencies identified by CMS, the laboratory's initial submission included a broader analysis of QC, proficiency testing results, and patient population distribution data for APO, Glucose, CO2, and ALP tests run on the Siemens Advia XPT for the entire period during which these SOPs were effective.  In response to CMS's review of D5793 Finding #8, the laboratory has extended this analysis to evaluate global quality control indicators. (Ex. AA, Tab 11).  Based on these analyses, the laboratory has issued corrected reports. (Ex. AA, Tab 11).  The laboratory **stopped** using the Siemens Advia XPT instrument on November 17, 2015, and **has not used it since then**.

D5407 also cites CL SOP-10001, Revision B (Measuring Prothrombin Time-Innovin (PT)), because it was made effective in December 2014, but was not signed by the former lab director until September 2015.  This SOP concerns PT/INR tests on the BCS XP.  Again, the laboratory and its new leadership do not approve of the fact this SOP was given an effective date before Dr. Dhawan signed the SOP.  However, there is no potential for this untimely

---

[6] As a point of clarification only, we note that D5407, Paragraph h, states that the glucose procedure (CL SOP-09118) was not signed by the LD.  That procedure was signed by the lab director, but not until September 19, 2015.  We recognize that this signature date is still deficient under D5407, and provide this information only to clarify the record.

[7] D5407, Paragraph h, states that the Alkaline Phosphatase SOP that was made effective in December 2014 was "CL SOP-81102."  This reference appears to be a typographical error because the Alkaline Phosphatase (ALP) SOP that was made effective in December 2014 was "CL SOP-09102."

16
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534715

**theran⊗s**

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

signature to have affected patients because Dr. Dhawan ultimately approved the SOP without making any modifications or revisions to it. To address other deficiencies identified by CMS, the laboratory has performed a broader analysis of all PT/INR tests run on this BCS XP instrument, which was **first put into use in October 2014.** Based on this analysis, which included a review of INR calculations, QC data, proficiency testing, and patient population distribution data, the laboratory issued corrected reports voiding PT/INR test results reported for the period October 2014 through September 2015. (Ex. AA, Tab 7). The laboratory **stopped** using the BCS XP instrument on September 17, 2015, and **has not used it since then**.

D5407 also cites CL SOP-15036, Revision A (Edison 3.5 Theranos System Daily QC Procedure), because it was made effective in December 2014, but was not signed by the former lab director until September 2015. This SOP concerns the Theranos Proprietary System (TPS), which was being phased-out beginning in December 2014 and was fully **retired** in mid-August 2015. Again, the laboratory and its new leadership do not approve of the fact this SOP was given an effective date before Dr. Dhawan signed the SOP to indicate his approval of it. However, there is no potential for this untimely signature to have affected patients because Dr. Dhawan ultimately approved the SOP without making any modifications or revisions to it. To address other deficiencies identified by CMS, the laboratory has performed a broad re-analysis of all QC related to tests run on the TPS 3.5 in 2014 and 2015. That analysis is discussed below and is enclosed with this letter at Tab AA, Ex. 3. Based on that analysis, the laboratory has, out of an extreme abundance of caution, voided all tests run on the TPS 3.5 in 2014 and 2015. Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

D5407 also cites CL SOP-06060, Revision A (SensoScientific Monitor) because it was made effective on June 23, 2015, but was not signed by the former lab director until September 2015. Again, the laboratory and its new leadership do not approve of the fact this SOP was given an effective date before Dr. Dhawan signed the SOP to indicate his approval of it. However, there is no potential for this untimely signature to have affected patients because Dr. Dhawan ultimately approved the SOP without making any modifications or revisions to it.

Finally, D5407 cites CL PLN-14003, Revision A (Master Validation Plan for Chemistry Assays on Theranos Devices). The plan is consistent with 42 C.F.R. § 493.1253(b). CL PLN-14003 was authored, approved, signed and dated by Dr. Arnold Gelb. Dr. Gelb was the

17
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534716

theran⊙s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

Laboratory Director when he approved CL PLN-14003.[8]  (Ex. HH, Tabs 4B, 4C, & 12).
Although Dr. Dhawan should have reviewed the plan sooner, he ultimately approved of it.
Because Dr. Dhawan approved of the plan without making any changes to it, no patients
have the potential to have been affected by the finding in D5407, Paragraph g.

<u>D5413</u>

Finding #1

**D5413 Finding #1 – March 18 Letter Statement 1:**  *"Although the laboratory's submitted
protocol indicates that the allowable temperature should be posted on the unit (see Ex. A, Tab
29), the response does not address the incorrect labeling for acceptable temperatures on the
freezer doors. Documentation contained in Ex. A, Tab 29, § 4.5 indicated that the laboratory
supervisor or designee was responsible for monitoring and recording temperatures. However,
we could not determine if the new procedure had been effectuated as no documentation was
submitted to show that the freezer units had been labeled appropriately."*

    **Theranos Response to Statement 1 – D5413 Finding #1:**  The new procedure has been
effectuated as reflected in the enclosed documentation showing that the freezer units have
been labeled appropriately.  (Ex. II, Tab 2).

**D5413 Finding #1 – March 18 Letter Statement 2:**  *"In addition, the laboratory states that
training had occurred subsequent to the survey, but it is not clear who should be trained as
'laboratory supervisor or designee' was not defined."*

    **Theranos Response to Statement 2 – D5413 Finding #1:**  The laboratory has revised this
procedure to define who should be trained.  The revised procedure is enclosed at Ex. BB, Tab
13.

**D5413 Finding #1 – March 18 Letter Statement 3:**  *"Training records provided in Ex. A, Tab
30 included only training documents for one general supervisor."*

    **Theranos Response to Statement 3 – D5413:**  The laboratory has enclosed with this letter a
complete set of training records on this SOP, which shows that the relevant laboratory
personnel have been trained.  (Ex. BB, Tabs 13B-13C).

**D5413 Finding #1 – March 18 Letter Statement 4:**  *"Several freezers were identified as "not
used in patient testing" (see Ex. N, Tab A); however, based on interviews during the onsite visit,*

---

[8] At the time that Dr. Gelb authored this plan, his qualifications included, among other things, a
Master of Science in Materials Science and Engineering (Biomedical); a Fellowship in MIT's
Medical Engineering Graduate Program; a Doctor of Medicine from Stanford University; an
internship in Internal Medicine at the University of Chicago Hospitals; a Fellowship in
Immunodiagnosis and Surgical Pathology at Stanford University; and a Fellowship in
Hematopathology at the University of California San Francisco.  (Ex. HH, Tab 4A).

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material                                                    THER-0534717

**theran⦿s**

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

*these freezers were identified as being used for CLIA activities. The submission did not include
a response or data related to the freezers identified as 'not used in patient testing.'"*

**Theranos Response to Statement 4 – D5413 Finding #1:** D5413 identifies six -20C
freezers and four -80C freezers. In the lab's submission, we explain that five of those
freezers did not contain materials that would be used in the future for clinical patient testing.
Rather, they only contained material that might be used in the future for research and
development.

Based on CMS's March 18 letter, it appears that there was a miscommunication when the
CMS surveyors were onsite. D5413, Paragraph f, states that CMS had a discussion about
these freezers with the "Director of Assay Systems and technical supervisor at 11/19/15 at
approximately 11 am." The Director of Assay Systems did not have any regular involvement
with those freezers at that time and did not have knowledge of their contents. The "technical
supervisor" in attendance on November 19, 2015 joined the company on October 26, 2015;
he also did not have regular involvement with those freezers at the time and did not have
knowledge of their contents. (Ex. HH, Tab 8). To the extent CMS understood either of these
individuals to be confirming the contents of these freezers or whether these freezers were
used in clinical patient testing, there was a miscommunication.

The laboratory has looked into this issue further, and has reconfirmed that the statements in
the laboratory's submission are accurate. As reflected in the enclosed documentation:

- On November 19, 2015, there were four -20 C freezers in the microbiology or BUGS
  laboratory. 7061 BUGS -20 C Freezer 4 did **not** contain any materials for future use
  in clinical patient testing. (Ex. II, Tab 3B).

- On November 19, 2015, there was one -20 C freezer in the Normandy laboratory.
  Clinical patient testing in the Normandy laboratory **stopped** on September 20, 2015,
  and there has **not** been any clinical patient testing in the Normandy laboratory since
  then. The 1 Normandy -20 C freezer did **not** contain any materials for future use in
  patient testing. (Ex. II, Tab 3C).

- On November 19, 2015, there were four -80 C freezers. 7098 -80 C Freezer 1 Nuair,
  7111 -80 C Freezer 2 Thermo, and 7113 -80 2 CLIA Lab did not contain any
  materials for future use in clinical patient testing. While named 7113 -80 2 CLIA
  Lab, it was only used to store old specimens that were not for use in clinical patient
  testing. (Ex. II, Tab 3A).

**D5413 Finding #1 – March 18 Letter Statement 5:** *"To ensure the deficient practice does not
recur, the laboratory indicated that quarterly audits will be performed and suggested that the
audits results would be reviewed within the laboratory's QMPI Program. However, the
laboratory did not establish the procedure by which these quarterly audits are to be conducted.
In the submission, the laboratory indicates that a 'tracer audit may [emphasis added [in the
letter]] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a*

19
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534718



| | 1701 Page Mill Road | P 650.838.9292 | theranos.com |
|---|---|---|---|
| | Palo Alto, CA 94304 | F 650.838.9165 | |

*'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 5 – D5413 Finding #1:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

<u>Finding #2</u>

**D5413 Finding #2 – March 18 Letter Statement 1:** *"The submission references 'Ex. I, Tabs 2-6.' We located these tabs, but found no documentation in Tabs 2, 5, and 6."*

**Theranos Response to Statement 1 – D5413 Finding #2:** There was an inadvertent copying error for Exhibit I to the initial submission. The laboratory has enclosed the applicable documents with this letter, as well as additional documents related to the laboratory's broader analysis of the PT/INR test over the entire time it was run on this Siemens BCS XP instrument. (Ex. GG).

**D5413 Finding #2 – March 18 Letter Statement 2:** *"Although the laboratory's submitted protocol indicates that the laboratory was required to check manufacturer package inserts prior to use (see Ex. A, Tab 31, §8.1.2), which was also stated in the laboratory's written procedure available prior to the onsite survey, the laboratory provided no documentation showing that this protocol has been effectuated and no indication that package inserts for new lot numbers have been checked."*

**Theranos Response to Statement 2 – D5413 Finding #2:** D5413 concerns the laboratory's failure to follow the manufacturer's instructions for the expiration date of one lot of Innovin (thromboplastin) used for Prothrombin Time/International Normalized Ratio (PT/INR) testing on the Siemens BCS XP. The laboratory **stopped** running tests on Siemens BCS XP on September 17, 2015, and has **not** run any tests on the Siemens BCS XP since then.

Although the laboratory is not running PT/INR tests on the Siemens BCS XP, we have enclosed documentation related to a different test that is in use, which shows that the laboratory has effectuated its protocol to check manufacturer's instructions for the expiration date. This documentation includes a photograph of the manufacturer's package insert for IRISpec and a photograph of the bottles showing a handwritten open date and expiration date that is consistent with the 15-day "open stability" specification contained in the package

20
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534719

**theranos**

1701 Page Mill Road          P 650.838.9292      theranos.com
Palo Alto, CA 94304          F 650.838.9165

insert . (Ex. HH, Tabs 11A-11B). As these photographs show, the laboratory effectuated its protocol by reviewing the manufacturer's instructions, initialed the material, and wrote the correct expiration date on the bottle. (Ex. HH, Tab 11A).

**D5413 Finding #2 – March 18 Letter Statement 3**: *"In addition, the submission states that "the lab has conducted training on those procedures;" however, the training documents submitted in Ex. A, Tab 32 do not include any training specific to the cited deficiency. We were unable to verify that training occurred as stated."*

> **Theranos Response to Statement 3 – D5413 Finding #2:** D5413 Finding #2 states that the laboratory "failed to follow the manufacturer instructions for expiration date of Innovin (thromboplastin) used for Prothrombin Time/International Normalized Mean Ratio (PT/INR) testing." The laboratory's submission included records for training on the revised reagent qualification and management procedures. (Ex. BB, Tab 14B). The training addressed review of manufacturer specification and package inserts. (Ex. BB, Tab 14). The laboratory has performed supplemental training that specifically focuses on reviewing and following manufacturer instructions for expiration dates. (Ex. BB, Tab 14D). That training used this deficiency about Innovin (thromboplastin) as a case study. (Ex. BB, Tab 14D).

**D5413 Finding #2 – March 18 Letter Statement 4**: *"In Ex. I, Tab 1, the laboratory provided lists of patient specimen accession numbers for which the laboratory issued corrected reports; however, the laboratory did not provide copies of the corrected reports."*

> **Theranos Response to Statement 4 – D5413 Finding #2:** To address this and other deficiencies related to PT/INR, the laboratory conducted a further patient assessment analysis that covers the entire period during which this Siemens BCS XP instrument was in use in the lab. (Ex. AA, Tab 7). As a result of that analysis, the laboratory has voided all results for PT/INR from October 2014 through September 2015. (Ex. AA, Tab 7). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK; Ex. GG, Tab 7). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5421**

Finding #1

**D5421 Finding #1– March 18 Letter Statement 1**: *The submission references "Ex. A, Tab 9, §7.2.4.4 and Ex. B, Tabs 46-50, 52-56, 57-61." We found no such references contained in the materials provided to CMS."*

> **Theranos Response to Statement 1 – D5421 Finding #1:** There was an inadvertent copying error for Exhibit I to the initial submission. The laboratory has enclosed the applicable documents with this letter, as well as additional documents related to the

21
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                    THER-0534720
Fed. R. Crim. P. 6(e) material

theran⊚s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

laboratory's broader analysis of the PT/INR test over the entire time it was run on this Siemens BCS XP instrument.  (Ex. GG).

**D5421 Finding #1– March 18 Letter Statement 2**: *"The laboratory's submitted protocol (Ex. A, Tab 9, § 4.2) states: 'If the verification is performed by the vendor, the laboratory is involved in all aspects of the verification and the final verification documentation is reviewed and signed off by the Laboratory Director.' We were unable to determine what specific aspects of the method verification the laboratory would be performing or if vendors would continue to perform method verifications."*

**Theranos Response to Statement 2 – D5421 Finding #1:**  The laboratory has further revised its method verification SOP to clarify that the procedure requires the laboratory to perform method verifications.  To be clear, the vendor will not continue to perform method verifications. (Ex. BB, Tab 5 § 4.1.2).

**D5421 Finding #1– March 18 Letter Statement 2:**  *"The submitted protocol included form CL FRM-00022-F1, Verification Results (Ex. A, Tab 9), which appears to be pre-signed by the laboratory director. We were unable to determine if the laboratory director will "review and sign off' on each method verification."*

**Theranos Response to Statement 2 – D5421 Finding #1:**  The copy of CL FRM-00022-F1 included with the submission was not a pre-signed form.  Rather, the laboratory director signed the version of the form attached to the revised method verification SOP simply to indicate that he approved of it as a new form that could be used. To eliminate any confusion or potential confusion caused by this way of approving forms, we have revised the lab's document control policy to make clear that forms attached to an SOP are part of the SOP, and therefore are approved when the lab director approves the SOP.  (Ex. BB, Tab 1). Consistent with this revision, the enclosed copy of CL FRM-00022-F1 no longer has any signatures on it.  (Ex. BB, Tab 5 F1).

**D5421 Finding #1– March 18 Letter Statement 3:**  *"We note that in the laboratory's submission related to test performance specifications for the Advia XPT instrument, it was the laboratory's policy to accept %CV values that were up to 1.5 times the %CV values stated by the instrument manufacturer for any given chemistry analyte.  In the submission, we found no explanation as to why 1.5 times the manufacturer's %CV was acceptable to the laboratory. We also note that the submitted re-verification of test performance specifications did not follow the submitted protocol for test verification; therefore, we could not determine if the re-verifications were adequate or how the laboratory determined if patients were affected or potentially affected."*

**Theranos Response to Statement 3 – D5421 Finding #1:**  Prior to the survey, the laboratory did not employ a policy to accept %CV values that were up to 1.5 times the %CV values stated by the manufacturer, and the verification reports that CMS reviewed did not use 1.5 times the %CV stated by the manufacturer.  Likewise, the laboratory's revised method

22
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                    THER-0534721
Fed. R. Crim. P. 6(e) material

theran♦s

1701 Page Mill Road    P 650.838.9292   theranos.com
Palo Alto, CA 94304     F 650.838.9165

verification procedure does not include a 1.5 times %CV policy. (Ex. BB, Tab 5).[9] Rather, it requires that the laboratory verify the manufacturer's imprecision claim. (Ex. BB, Tab 5 § 8.2). Training on the revised procedure has occurred. (Ex. BB, Tabs 5B-5C). Additionally, there appears to have been a miscommunication because the laboratory **stopped** running tests on the Siemens Advia XPT on November 17, 2015, and has **not** run any tests on the instrument since then. Accordingly, the laboratory has not re-verified any assay on the Siemens Advia XPT. References to method verification data in documents enclosed with the submission are to verification reports prepared **before** the survey began and before the laboratory's revised procedures were made effective (those reports were either reviewed by CMS or available to CMS during the survey), which were referenced for context.

Finding #2

**D5421 Finding #2– March 18 Letter Statement 1:** *"Although the laboratory's submitted protocol (Ex. A, Tab 9) included a method verification procedure which addressed verification of accuracy, precision, and reportable range, the laboratory provided no documentation showing that this protocol had been followed to re-verify performance specifications. The submission also stated: Before the lab resumes any test on the Advia XPT, the lab will ensure that the test has been re-verified pursuant to the lab's improved method verification procedures that have been approved by the laboratory director." The completion date for the correction of this deficiency was indicated on the submitted Allegation of Compliance as February 12, 2016, which, in order to determine correction, should include the re-verification documentation for the Advia XPT. However, the laboratory provided no documentation that the re-verification had been performed. We note that in the laboratory's submission related to test performance specifications for the Advia XPT instrument it was the laboratory's policy to accept %CV values that were up to 1.5 times the %CV values stated by the instrument manufacturer for any given chemistry analyte. In the submission, we found no explanation as to why 1.5 times the manufacturer's %CV was acceptable to the laboratory.*

    **Theranos Response to Statement 1 – D5421 Finding #2:** Prior to the survey, the laboratory did not employ a policy to accept %CV values that were up to 1.5 times the %CV values stated by the manufacturer, and the verification reports that CMS reviewed did not use 1.5 times the %CV stated by the manufacturer. Likewise, the laboratory's revised method verification procedure does not include a 1.5 times %CV policy. (Ex. BB, Tab 5).[10] Rather, it requires that the laboratory verify the manufacturer's imprecision claim. (Ex. BB, Tab 5 §

_____

[9] The laboratory referred to a 1.5 times %CV in its response based upon Bio-Rad's coefficient of variation rate. (http://www.qcnet.com/Portals/50/PDFs/QCWorkbook2008_Jun08.pdf). Upon further review, the laboratory does not believe that Bio-Rad's coefficient of variation rate is applicable here.

[10] The laboratory referred to a 1.5 times %CV in its response based upon Bio-Rad's coefficient of variation rate. (http://www.qcnet.com/Portals/50/PDFs/QCWorkbook2008_Jun08.pdf). Upon further review, the laboratory does not believe that Bio-Rad's coefficient of variation rate is applicable here.

23
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos             THER-0534722
Fed. R. Crim. P. 6(e) material

**theran⊛s**

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

8.2). Training on the revised procedure has occurred. (Ex. BB, Tabs 5B-5C). Additionally, there appears to have been a miscommunication because the laboratory **stopped** running tests on the Siemens Advia XPT on November 17, 2015, and has **not** run any tests on the instrument since then. Accordingly, the laboratory has not re-verified any assay on the Siemens Advia XPT. References to method verification data in documents enclosed with the submission are to verification reports prepared **before** the survey began and before the laboratory's revised procedures were made effective (those reports were either reviewed by CMS or available to CMS during the survey), which were referenced for context.

**D5421 Finding #2– March 18 Letter Statement 2:** *"We also found no explanation as how "normal patient distribution" related to determining if patients were affected or potentially affected."*

> **Theranos Response to Statement 2 – D5421 Finding #2:** The laboratory has enclosed a revised analysis to clarify its examination of these patient test result distributions, which should eliminate the confusion created by the phrase "normal patient distribution." (Ex. AA, Tab 5).

**D5421 Finding #2– March 18 Letter Statement 3:** *"In addition, the laboratory's submission (Ex. B, various analyte tabs) states: "Matrix comparisons done by the manufacturer between serum and plasma showed correlation." No documentation was submitted supporting this statement."*

> **Theranos Response to Statement 3 – D5421 Finding #2:** The laboratory has enclosed with this letter documentation supporting that matrix comparisons done by the manufacturer between serum and plasma showed correlation. (Ex. HH, Tab 13).

**D5421 Finding #2– March 18 Letter Statement 4:** *"The submission also states that "the lab has conducted training on these procedures to ensure that the practice is consistent with them," but the laboratory did not include complete training documentation to support this assertion."*

> **Theranos Response to Statement 4 – D5421 Finding #2:** The laboratory's submission included training documentation for seven laboratory personnel. The laboratory has enclosed with this letter additional training documentation for the lab's method verification procedures. (Ex. BB, Tabs 5B-5C).

**D5421 Finding #2– March 18 Letter Statement 5:** *"Because the laboratory has not shown whether it can follow its own validation protocols, it was uncertain whether the laboratory's quality assessment mechanisms could monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

> **Theranos Response to Statement 5 – D5421 Finding #2:** As stated above, there appears to have been a miscommunication because the laboratory **stopped** running tests on the Siemens

24
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534723

**theran⊛s**

| | |
|---|---|
| 1701 Page Mill Road | P 650.838.9292    theranos.com |
| Palo Alto, CA 94304 | F 650.838.9165 |

Advia XPT on November 17, 2015, and has **not** run any tests on the instrument since then. Accordingly, the laboratory has not re-verified any assay on the Siemens Advia XPT.

The laboratory is capable of ensuring that the deficient practice in D5421 does not recur. Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures. The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016. Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory. In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant. Dr. Tschirhart has over fifteen years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team. The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

<u>D5423</u>

**D5423 – March 18 Letter Statement 1:** *"Although the laboratory's submitted protocol (Ex. A, Tab 9) included a method verification procedure which addressed verification of accuracy, precision, and reportable range, the laboratory provided no documentation showing that this protocol had been followed to re-verify performance specifications. The submission also stated: Before the lab resumes any test on the Advia XPT, the lab will ensure that the test has been re-verified pursuant to the lab's improved method verification procedures that have been approved by the laboratory director." The completion date for the correction of this deficiency was indicated on the submitted Allegation of Compliance as February 12, 2016, which, in order to determine correction, should include the re-verification documentation for the Advia XPT. However, the laboratory provided no documentation that the re-verification had been performed. We note that in the laboratory's submission related to test performance specifications for the Advia XPT instrument, it was the laboratory's policy to accept %CV values that were up to 1.5 times the %CV values stated by the instrument manufacturer for any given chemistry analyte. In the submission, we found no explanation as to why 1.5 times the manufacturer's %CV was acceptable to the laboratory."*

**Theranos Response to Statement 1 – D5423:** Prior to the survey, the laboratory did not employ a policy to accept %CV values that were up to 1.5 times the %CV values stated by the manufacturer, and the verification reports that CMS reviewed did not use 1.5 times the %CV stated by the manufacturer. Likewise, the laboratory's revised method verification procedure does not include a 1.5 times %CV policy. (Ex. BB, Tab 5).[11] Rather, it requires

---

[11] The laboratory referred to a 1.5 times %CV in its response based upon Bio-Rad's coefficient of variation rate. (http://www.qcnet.com/Portals/50/PDFs/QCWorkbook2008_Jun08.pdf). Upon

25
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534724

ER-3080

**theranos**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

that the laboratory verify the manufacturer's imprecision claim. (Ex. BB, Tab 5 § 8.2).
Training on the revised procedure has occurred.  (Ex. BB, Tabs 5B-5C).  Additionally, there
appears to have been a miscommunication because the laboratory **stopped** running tests on
the Siemens Advia XPT on November 17, 2015, and has **not** run any tests on the instrument
since then.  Accordingly, the laboratory has not re-verified any assay on the Siemens Advia
XPT.  References to method verification data in documents enclosed with the submission are
to verification reports prepared **before** the survey began and before the laboratory's revised
procedures were made effective (those reports were either reviewed by CMS or available to
CMS during the survey), which were referenced for context.

**D5423 – March 18 Letter Statement 2:**  *"We also found no explanation as how "normal
patient distribution" relates to determining if patients were affected or potentially affected."*

   **Theranos Response to Statement 2** – **D5423:**  The laboratory has enclosed a revised
   analysis to clarify its examination of these patient test result distributions, which should
   eliminate the confusion created by the phrase "normal patient distribution." (Ex. AA, Tab 5).

**D5423 – March 18 Letter Statement 3:**  *"The laboratory's procedure as well as the method
verification for alkaline phosphatase was reviewed at the onsite survey and the reportable range
was documented as 0 - 1100 IU/L thus modifying the test. At the time of survey, the laboratory
stated that the reportable range was 10 - 1100 IU/L per the manufacturer, and that the
reportable range of 0 - 1100 IU/L was an error. The laboratory confirmed that the lowest
reportable value established by the manufacturer was 10 IU/L. The Patient Impact Analysis
submitted by the laboratory at Ex. B, Tab 6 now indicates that the reportable range should be 5 -
1100 IU/L which is still lower than the range established by the manufacturer; however, the
laboratory did not submit any documentation to support this new reportable range."*

   **Theranos Response to Statement 2 – D5423:**  The "Patient Impact Analysis" submitted by
   the laboratory at Ex. B, Tab 6 of its submission included a typographical error.  As reflected
   in the revised patient assessment enclosed with this letter, the reportable range should be 12 –
   909 U/L.  (Ex. AA, Tab 6).

**D5423 – March 18 Letter Statement 4:**  *"The Patient Impact Analysis also indicates that
review of the PT showed a negative bias for PT samples CAP C-A 2015 and CAP-B 2015, but
the laboratory determined that no corrected were needed. The submission also states: "There
were no significant trends or bias in patient population data." The laboratory provided no
explanations for these assertions."*

_____

further review, the laboratory does not believe that Bio-Rad's coefficient of variation rate is
applicable here.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                                           THER-0534725
Fed. R. Crim. P. 6(e) material

**theranos**

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

**Theranos Response to Statement 4 – D5423:** The laboratory's patient assessment analysis appears to have included an inadvertent copy and paste mistake. The laboratory has enclosed its revised analysis. (Ex. AA, Tab 2).

**D5423 – March 18 Letter Statement 5:** *"In addition, the laboratory's submission states at Ex. B, Tab 6: "Matrix comparisons done by the manufacturer between serum and plasma showed correlation." The laboratory submitted no documentation supporting this statement."*

**Theranos Response to Statement 5 – D5423:** The laboratory has enclosed with this letter documentation supporting that matrix comparisons done by the manufacturer between serum and plasma showed correlation. (Ex. HH, Tab 13).

**D5423 – March 18 Letter Statement 6:** *"The submission also states that "the lab has conducted training on these procedures to ensure that the practice is consistent with them," but did not include complete training documentation."*

**Theranos Response to Statement 6 – D5423:** The laboratory's submission included training documentation on the method verification procedures for seven laboratory personnel. The laboratory has enclosed with this letter additional training documentation for the lab's method verification procedures. (Ex. BB, Tabs 5B-5C).

**D5423 – March 18 Letter Statement 7:** *"Because the laboratory has not shown whether it can follow its own validation protocols, it is uncertain whether the laboratory's quality assessment mechanisms could monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

**Theranos Response to Statement 7 – D5423:** As stated above, there appears to have been a miscommunication because the laboratory **stopped** running tests on the Siemens Advia XPT on November 17, 2015, and has **not** run any tests on the instrument since then. Accordingly, the laboratory has not re-verified any assay on the Siemens Advia XPT.

The laboratory is capable of ensuring that the deficient practice in D5423 does not recur. Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures. The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016. Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory. In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant. Dr. Tschirhart has over fifteen years of experience as a clinical laboratory director, and is a valuable part of the

27
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                          THER-0534726
Fed. R. Crim. P. 6(e) material

**theran⬡s**

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

laboratory's new leadership and oversight team. The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

**D5429**

**D5429 – March 18 Letter Statement:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In the submission, the laboratory indicates that a 'tracer audit **may** [emphasis added [in the letter]] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement – D5429:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

**D5437**

Findings #1 & #2

**D5437 Findings #1 & #2 – March 18 Letter Statement 1:** *"At the time of the onsite survey, the laboratory failed to maintain calibration documentation for the complete blood count (CBC) instruments. In the submission, we found no evidence the laboratory has re-established its calibration documentation for the CBC instruments."*

**Theranos Response to Statement 1 – D5437 Findings #1 & #2:** There appears to have been a miscommunication. The laboratory **stopped** using its Siemens Advia 2120i instruments for clinical patient testing on November 17, 2015, and has **not** used them since then. The two Drew-3 instruments were retired before the survey began on September 22, 2015 and before the laboratory's revised procedures were made effective. Because the

28
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                                    THER-0534727
Fed. R. Crim. P. 6(e) material

theran⊕s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

laboratory's "CBC instruments" are not in use, the laboratory has not "re-established" calibration documentation for those instruments.

**D5437 Findings #1 & #2 – March 18 Letter Statement 2:**  *"In Ex. F, the laboratory provided lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports; however, the laboratory provided no documentation to indicate corrected reports were generated and issued."*

> **Theranos Response to Statement 2 – D5437 Findings #1 & #2:**  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5437 Findings #1 & #2 – March 18 Letter Statement 3:**  *"To ensure appropriate and required calibration or QC corrective actions were taken, the laboratory indicated that quarterly audits will be performed and suggested that the audit results would be reviewed within the laboratory's QMPI Program.  However, the laboratory did not establish the procedure by which these quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program.  However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted.  In the submission, the laboratory indicates that a 'tracer audit **may** [emphasis added] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

> **Theranos Response to Statement 3 – D5437 Finding #1 & #2:**
>
> The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB Tab 7§ 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tab7B-C).

**D5437 Findings #1 & #2 – March 18 Letter Statement 4:**  *"In addition, we note that in the laboratory's re-verification of test performance specifications for the CBC instruments, it was the laboratory's policy to accept %CV values that were up to 1.5 times the %CV values stated by*

29

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                             THER-0534728
Fed. R. Crim. P. 6(e) material

**theran⦿s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*the instrument manufacturer for any given CBC analyte. In the submission, we find no*
*explanation as to why 1.5 times the manufacturer's %CV is acceptable to the laboratory."*

**Theranos Response to Statement 4 – D5437 Finding #1 & #2:** Prior to the survey, the
laboratory did not employ a policy to accept %CV values that were up to 1.5 times the %CV
values stated by the manufacturer, and the verification reports that CMS reviewed did not use
1.5 times the %CV stated by the manufacturer.  Likewise, the laboratory's revised method
verification procedure does not include a 1.5 times %CV policy.  (Ex. BB, Tab 5).[12]  Rather,
it requires that the laboratory verify the manufacturer's imprecision claim.  (Ex. BB, Tab 5 §
8.2).  Training on the revised procedure has occurred.  (Ex. BB, Tabs 5B-5C). Additionally,
there appears to have been a miscommunication because the laboratory stopped running tests
on the Siemens Advia 2120i instruments on November 17, 2015, and has not run any tests on
the instruments since then.  The laboratory has retired its two Drew-3 instruments.
Accordingly, the laboratory has not re-verified any assay on "the CBC instruments."
References to method verification data in documents enclosed with the submission are to
verification reports prepared **before** the survey began and before the laboratory's revised
procedures were made effective (those reports were either reviewed by CMS or available to
CMS during the survey), which were referenced for context.

<u>D5447</u>

**D5447 – March 18 Letter Statement 1:**  *"Although the laboratory's submitted protocol*
*indicates that a two-level QC slide review is now required every day of patient testing when*
*using the Cellavision, the laboratory provided no documentation of or information about the QC*
*materials used, how the statistical parameters of the QC materials would be determined, how*
*QC test results will be documented, and whether laboratory staff has been trained on this new*
*protocol."*

**Theranos Response to Statement 1 – D5447:**  The laboratory has revised the Cellavision
SOP to include information about the QC materials used, how the statistical parameters of
the QC materials would be determined, and how QC test results will be documented.  (Ex.
BB, Tab 15 ).  However, this SOP is not presently in use, because the laboratory stopped
using the Cellavision on November 17, 2015, and has not used the Cellavision since then.
Because the Cellavision is not in use, the laboratory has not conducted a training on this
revised (but inactive) SOP.

---

[12] The laboratory referred to a 1.5 times %CV in its response based upon Bio-Rad's coefficient
of variation rate.  (http://www.qcnet.com/Portals/50/PDFs/QCWorkbook2008_Jun08.pdf). Upon
further review, the laboratory does not believe that Bio-Rad's coefficient of variation rate is
applicable here.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                              THER-0534729
Fed. R. Crim. P. 6(e) material

theran⊛s

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

**D5447 – March 18 Letter Statement 2:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In the submission, the laboratory indicates that a 'tracer audit* **may** *[emphasis added [in the letter]] be used, but did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

> **Theranos Response to Statement 2 – D5447:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

<u>D5449</u>

**D5449 – March 18 Letter Statement 1:** *"Although the laboratory's submitted protocol indicates that an external positive QC material would be included in each run of patient Chlamydia trachomatis/Neisseria gonorrhoeae (CT /NG) testing, the laboratory provided no documentation of the positive QC material used, how the statistical parameters of the positive QC material would be determined, how the positive QC test result will be documented, and whether laboratory staff has been trained on this new protocol."*

> **Theranos Response to Statement 1 – D5449:** The laboratory has revised the CT/NG SOP to include information about the positive QC materials used, how the statistical parameters of the QC materials would be determined, and how QC test results will be documented. (Ex. BB, Tab 16 § 9.1.5). The relevant laboratory personnel have been trained on this protocol. (Ex. BB, Tabs 16B-16C).

**D5449 – March 18 Letter Statement 2:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In the submission, the laboratory indicates that a 'tracer audit* **may** *[emphasis added [in the letter]] be used, but*

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material   THER-0534730

theran⬤s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*did not provided [sic] a protocol for a 'tracer audit,' the means by which a 'tracer audit' would be documented, and whether the results of a 'tracer audit' would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5449:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

<u>D5469</u>

<u>Finding #1</u>

**D5469 Finding #1 – March 18 Letter Statement 1:** *"Although the laboratory's submitted protocol indicates that the stated values of new commercially assayed CBC QC materials were to be verified through parallel testing against QC materials in use, the laboratory provided no documentation indicating that this protocol had been effectuated, no information as to how the results of the parallel testing will be documented, and no information as to whether laboratory staff has been trained on this new protocol."*

**Theranos Response to Statement 2 – D5469 Finding #1:** D5469 Finding #1 relates to the laboratory's "two Drew 3 instruments." The laboratory's two Drew-3 instruments were retired before the survey began on September 22, 2015. Since the survey, there has not yet been a need to perform parallel testing against QC materials in use because the laboratory has not approached a QC lot change for the tests that are in use. To ensure that there will not be an issue with documentation of such parallel testing in the future, the laboratory has further revised its procedures as to how the results of the parallel testing against QC materials in use must be documented. (Ex. BB, Tab 14 § 9). The laboratory staff has been trained on this documentation procedure. (Ex. BB, Tabs 14B-C).

To ensure that there is not any confusion, we note that the Advia 2120i CBC SOP is inactive (and is not in use) because the laboratory stopped using those instruments on November 17, 2015, and has not used them since then.

32
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                    THER-0534731
Fed. R. Crim. P. 6(e) material

theran○s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304     F 650.838.9165

**D5469 Finding #1 – March 18 Letter Statement 2:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5469 Finding #1:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB Tab 7§ 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tab7B-C).

Finding #2

**D5469 Finding #2 – March 18 Letter Statement 1:**  *"Although the laboratory's submitted protocol indicates that the stated values of new commercially assayed chemistry QC materials were to be verified through parallel testing against QC materials in use, the laboratory provided no documentation indicating that this protocol had been effectuated, no information as to how the results of the parallel testing will be documented, and no information as to whether laboratory staff has been trained on this new protocol."*

**Theranos Response to Statement 1 – D5469 Finding #2:**  D5469 Finding #2 relates to the chemistry assays on the Siemens Advia 1800 and Siemens Advia XPT instruments.  The laboratory stopped using the Siemens Advia 1800 instruments before the survey began on September 22, 2015, and has not used them since then.  The laboratory stopped using the Siemens Advia XPT instrument on November 17, 2015, and has not used it since then.  Since the survey, there has not yet been a need to perform parallel testing against QC materials in use because the laboratory has not approached a QC lot change for the tests that are in use.  To ensure that there will not be an issue with documentation of such parallel testing in the future, the laboratory has further revised its procedures as to how the results of the parallel

33
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534732

theran⊚s

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

testing against QC materials in use must be documented. (Ex. BB, Tab 14). The current procedures include worksheets for how to document parallel testing. (Ex. BB, Tab 14 F1-F4). The laboratory staff has been trained on this documentation procedure. (Ex. BB, Tabs 14B-14C).

**D5469 Finding #2 – March 18 Letter Statement 2:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5469 Finding #1:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

<u>D5477</u>

**D5477 – March 18 Letter Statement 1:** *"The laboratory submitted no written procedure for the bacteriology media QC protocol, and no information as to whether laboratory staff has been trained on this new protocol."*

**Theranos Response to Statement 1 – D5477:** The laboratory has enclosed with this letter its written procedure for the bacteriology media QC protocol and documentation showing that the relevant personnel have been trained on it. (Ex. BB, Tabs 4-4C).

**D5477 – March 18 Letter Statement 2:** *"In Ex. L, Tab 8, the submission included a completed form titled 'Blood Agar 5% Quality Control Log sheet.' We note that the entry for the media received on 1/18/16 indicates that QC testing of this bacteriology media was completed on 1/14/16, which is before the date the media was received by the laboratory. Yet, as documented*

34
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                    THER-0534733
Fed. R. Crim. P. 6(e) material

**theran⬤s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*on the form, the completed form was reviewed on 2/11/16 without any indication this entry had been reviewed. We question the accuracy of this entry as well as the effectiveness of the laboratory's oversight mechanism."*

**Theranos Response to Statement 2 – D5477:** CMS appears to have had difficulty reading the handwriting on the Blood Agar 5% Quality Control Log Sheet, confusing a handwritten "3" with an "8". The "Blood Agar 5% Quality Control Log Sheet" states that the media was received on 1/13/16. ((Ex. HH, Tabs 5A-5B). Therefore, there is no reason to question that accuracy of this entry because the log shows that the media was received the day before QC testing of this bacteriology media was completed. For the same reason, the February 11, 2016 review of the completed form was performed correctly, and there is no reason to question the effectiveness of the laboratory's oversight mechanism.

**D5469 Finding #2 – March 18 Letter Statement 3:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 3 – D5469 Finding #2:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

D5481

Finding #1

**D5481 Finding #1 – March 18 Letter Statement 1:** *"The submission references 'Ex. I, Tabs 2-6.' We located these tabs, but found no documentation in Tabs 2, 5, and 6."*

35
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                    THER-0534734
Fed. R. Crim. P. 6(e) material

**theran⊚s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

**Theranos Response to Statement 1 – D5481 Finding #2:** There was an inadvertent copying error for Exhibit I to the initial submission. The laboratory has enclosed the applicable documents with this letter, as well as additional documents related to the laboratory's broader analysis of the PT/INR test over the entire time it was run on this Siemens BCS XP instrument. (Ex. GG).

**D5481 Finding #1 – March 18 Letter Statement 2:** *"Although the laboratory's submitted protocol requires that QC values be acceptable prior to reporting patient results, the submission states: 'Theranos reviewed all quality control (QC) data for PT/INR [Prothombin Time/International Normalized Ratio] for the time period that this lot of Dade Innovin was in use.' The laboratory provided no documentation of this review other than stating it was performed.*

**Theranos Response to Statement 2 – D5481 Finding #1:** The laboratory has revised its patient assessment analysis for PT/INR, which is enclosed with this letter at Ex. AA, Tab 7. The revised assessment references supporting documentation identifying the time period that this lot of Dade Innovin was in use, as well as the QC data for that period. (Ex. AA, Tab 7; Ex. GG). That supporting documentation is also enclosed with this letter. (Ex. GG).

**D5481 Finding #1 – March 18 Letter Statement 3:** *We also found no documentation to indicate that the revised standard operating procedures (SOPS) have been effectuated. That is, we found no documentation of PT/INR QC failure investigations and corrective actions taken based on the revised SOPS."*

**Theranos Response to Statement 3 – D5481 Finding #1:** There appears to have been a miscommunication because the laboratory stopped running tests on the Siemens BCS XP, including PT/INR, on September 17, 2015, and has not run any tests on the instrument since then. Therefore, there have been no new QC failures for PT/INR to investigate or address through corrective action. The revised SOPs were implemented only after CMS identified the QC failures for PT/INR. The "review" discussed in the submission was simply intended to refer to the analysis conducted to address the deficiency identified by CMS. The issue addressed by the "review" — i.e., failing to document corrective action for QC fails for PT/INR — is the same issue identified by CMS in its deficiency, and thus did not constitute a new issue or occurrence.

**D5481 Finding #1 – March 18 Letter Statement 4:** *"In Ex. I, the laboratory provided lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were issued. We also note that the Patient Impact Assessment (Ex. I, Tab 1) states that "remedial action was taken on 9/25/15," but "corrected reports were issued beginning on 11/10/15 and completed on*

36
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534735

**theranos**

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

*11/12/15." There was no explanation as to why there was such a long period of time between the remedial action and issuing corrected reports.*

**Theranos Response to Statement 4 – D5481 Finding #1:** All of these corrected reports for PT/INR, along with documentation confirming that they were sent, are enclosed with this letter. (Ex. GG, Tab 7). On September 22 or 23, CMS identified a number of issues related to PT/INR tests during the period April to September 2015. The laboratory undertook a thorough investigation. Given the number of issues to review, the investigation took time to complete properly. Timeliness for proper completion of the investigation and associated corrective actions were also affected by the absence of a full-time, on-site laboratory director. The laboratory subsequently hired its new lab director, Dr. Kingshuk Das, who is highly qualified and has extensive clinical laboratory experience. As of March 14, 2016, Dr. Das joined Theranos on-site full-time at the Newark, California laboratory. Additionally, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant. Dr. Tschirhart has over fifteen years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team.

**D5481 Finding #1 – March 18 Letter Statement 5:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 5 – D5481 Finding #1:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

37
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                THER-0534736
Fed. R. Crim. P. 6(e) material

**theranos**

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

Finding #2

**D5481 Finding #2 – March 18 Letter Statement 1:** *"Although the laboratory submitted a QC protocol (Ex. A, Tab 9), the laboratory's submission did not include an updated protocol for QC specific to the Theranos Proprietary Devices."*

> **Theranos Response to Statement 1 – D5481 Finding #2:** This aspect of the review appears to be based on a miscommunication because Theranos **retired** the TPS 3.5 in early-August 2015.

**D5481 Finding #2 – March 18 Letter Statement 2:** *"The reference protocol states at §§ 8.1.9-8.1.10:*

> *'No instrument or test method can be used for the purpose of performing a test to report a result to a patient prior to having passed all required QC procedures at least once for the day on which the test is to be performed. It is the responsibility of all testing personnel to ensure this does not occur. Testing personnel must immediately take the appropriate action for all failed QC runs, refer to section 8.4.'*

*In addition, the laboratory's submission states:*

> *'To perform this analysis, systematic error was investigated using quality control (QC) data and patient distribution over time. The QC data was reviewed in Levey-Jennings plots and evaluated for bias trends. The patient data was summarized by plotting monthly means, monthly medians and monthly means ("average of normal" or AON) calculated from central 95% of values. In addition, random errors were evaluated by analysis of QC data. Namely, QC data was reviewed to identify >2SD failures and period of elevated CV. Namely, batches of 10 consecutive QC data points were analyzed and the CV was calculated for each QC level during this period. If the CV was >30%, then all patient results run during that time period will be voided. (Ex. E, Tab 1).'*

*The laboratory's response does not include an evaluation of unacceptable QC results or patients affected or potentially affected by the cited QC failures. It is not clear how evaluating aggregate patient (i.e., monthly means and medians) and QC (i.e., bias trends, >2SD, CV) data addressed specific days that the QC was unacceptable and patient results were reported.*

*The summary (Ex. E, Tab 1) included analytes tested on the Theranos Proprietary Device. We note that general statements such as, but not limited to, were included:*

- *'Monthly patient distribution variance were noted, but they could not be further substantiated by QC trends'*
- *'Patient results following a QC failure and during periods of high CV are being voided'*

38

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534737

**theran✱s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

- *'Patient distribution and QC trends did not reveal significant trends.'*
- *'Potential biases observed in patient distributions were found to be insignificant relative to the normal reference intervals'*

*The laboratory's submission did not provide any explanation or documentation to support these statements."*

**Theranos Response to Statement 2 – D5481 Finding #2:** This deficiency concerns the TPS 3.5, which was one of the Theranos proprietary technologies in use in 2014 and 2015. The laboratory began phasing out the TPS 3.5 in December 2014, and it was **fully retired** in early-August 2015.

The laboratory values CMS's feedback, and takes it very seriously. The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was fully retired in early-August 2015. As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5. (Ex. AA, Tab 3). The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures. Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015. As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015. (Ex. AA, Tab 3). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5481 Finding #2 – March 18 Letter Statement 3:** *"The submission (Ex. E) includes a list of patient specimen accession numbers for which the laboratory "identified reports," but does not specify or include documentation to indicate whether corrected reports were generated and issued."*

**Theranos Response to Statement 3 – D5481 Finding #2:** As indicated above, the laboratory has revised and broadened its analysis of this deficiency. Based on that analysis, which is described above and in the attached documentation, the laboratory has, out of an extreme abundance of caution, voided all results reported for assays run on the TPS 3.5 in 2014 and 2015. (Ex. AA, Tab 3). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

<u>D5775</u>

<u>Finding #1</u>

39
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                    THER-0534738
Fed. R. Crim. P. 6(e) material

**ER-3094**

**theran⊚s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

**D5775 Finding #1 – March 18 Letter Statement 1:** *"In the submitted protocol, the laboratory states: 'To ensure all manual differentials performed are comparable, ... manual differentials will be compared annually amongst the competent staff....' The laboratory provided no written procedure as to how "manual differentials will be compared annually.' In addition, the regulation requires the laboratory to conduct such evaluations twice a year, not annually."*

**Theranos Response to Statement 1 – D5775:** The laboratory has revised the Cellavision SOP to include procedures for how manual differential will be compared and to require that the laboratory perform such evaluations twice a year. (Ex. BB, Tab 15 § 9.1.4.2). Please note, however, that this SOP is inactive because the laboratory stopped using the Cellavision on November 17, 2015, and has not used it since then.

**D5775 Finding #1 – March 18 Letter Statement 2:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5775 Finding #1:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

Finding #2

**D5775 Finding #2 – March 18 Letter Statement 1:** *"Although the laboratory submitted a method/instrument comparison protocol (Ex. A, Tab 28), we were unable to determine if the protocol was effectuated. In its submission, the laboratory states: 'The lab's technical supervisors and the quality system director will be responsible for ensuring that these*

40
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                    THER-0534739
Fed. R. Crim. P. 6(e) material

**theran⬡s**

1701 Page Mill Road      P 650.838.9292      theranos.com
Palo Alto, CA 94304      F 650.838.9165

*procedures are followed.' However, the laboratory's submission did not include any documentation to indicate that the technical supervisors or the quality systems director had been trained on the method/instrumentation comparison protocols."*

**Theranos Response to Statement 1 – D5775 Finding #2:** This deficiency concerns method comparison for the TPS 3.5. As indicated above, the TPS 3.5 was fully **retired** in early-August 2015. Before the survey began, the laboratory had **stopped** running the same test using different methodologies or instruments, and the laboratory has **not** run the same test using different methodologies or instruments since then. As a result, the laboratory has had no reason to use the method verification protocol that it included with the submission. Although the laboratory does not have a need to use the revised method comparison protocol at this time, it has trained its technical supervisors and quality director on it. (Ex. BB, Tabs 12-12C).

**D5775 Finding #2 – March 18 Letter Statement 2:** *"The laboratory's submission also includes the following statement:*

> *Because TPS's [Theranos Proprietary Devices] were factory calibrated by Theranos, the laboratory did not perform additional method correlation studies. As part of this investigation, Theranos examined the correlation of different TPS to evaluate their concordance. Namely, for SHGB, TT3, Vitamin B12 and Vitamin D, patient distributions were compared across representative TPS's in use during the same period (Exhibit E Tab 12-A; Tab 24-A, Tab 33-A). These data showed similar patient distributions across the different devices. In addition, comparison of assay results across different assay levels and different TPS's demonstrates that the instruments were well correlated to each other (Exhibit F, Tab 12-A; Tab 24-A, Tab 33-A). Namely, the median result for each TPS was within the total allowable error thereby demonstrating that the same assay reference ranges were appropriate for TPS.*

*The laboratory's response indicates that not all TPS would be included in the correlation studies rather 'across representative TPS in use during the same period.' The laboratory submitted correlation studies for Sex Hormone Binding Globulin (SHBG) and Vitamin D (VitD) only (Ex E, Tabs 12-A, 24-A and 33-A, respectively). However, these studies did not include a date on either the summary or raw data, so we were unable to determine when the correlation studies occurred. The submission for SHBG also included information on one document with box plots that included three devices and another document that included box plots of six devices, so we were unable to determine what devices were actually used for SHBG testing.*

*The laboratory's submission offered no response to correlation studies for Vitamin B12 and no explanation for the disparity between the devices used for QC and the devices used for patient*

41
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                        THER-0534740
Fed. R. Crim. P. 6(e) material

**theran⬤s**

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

*testing. We also noted that there was no explanation as to where the total allowable error (TAE) of 24% on the raw data documentation came from or if any TAE was calculated for the submitted data. The laboratory used the median result for each proprietary device to determine if TAE was acceptable, but did not provide an explanation why the median results were used."*

**Theranos Response to Statement 2 – D5775 Finding #2:** This portion of CMS's March 18 letter concerns aspects of the patient assessment analysis for tests run on the TPS 3.5. The laboratory began phasing out the TPS 3.5 in December 2014, and it was **fully retired** in early-August 2015.

As reflected in its submission, the laboratory believes oversight, implementation and structure of its prior method comparison procedures were not satisfactory, which is why it has developed the improved method comparison procedures that were included with the submission. The laboratory has further revised those procedures in response to other feedback contained in CMS's March 18 letter. (Ex. BB, Tab 12). Training on these procedures has occurred. (Ex. BB, Tabs 12B-12C).

The laboratory values CMS's feedback, and takes it very seriously. The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was **fully retired** in early-August 2015. As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5. (Ex. AA, Tab 3). The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures. Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015. As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015. (Ex. AA, Tab 3). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5775 Finding #2 – March 18 Letter Statement 3:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would*

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                          THER-0534741
Fed. R. Crim. P. 6(e) material

**theran⊗s**

1701 Page Mill Road    P 650.838.9292   theranos.com
Palo Alto, CA 94304    F 650.838.9165

*be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5775 Finding #1:** audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB Tab 7§ 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tab7B-C).

<u>D5779</u>

**D5779 – March 18 Letter Statement 1**: *"In Ex. F, the laboratory provided lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were issued."*

**Theranos Response to Statement 1 – D5779:** Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5779 – March 18 Letter Statement 2:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5779:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to

43
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                    THER-0534742
Fed. R. Crim. P. 6(e) material

theran⬤s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB Tab 7§ 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tab7B-C).

**D5787**

**D5787 – March 18 Letter Statement 1:**  *"The laboratory submitted no written procedure for the documentation of the lot of bacteriology media used to test any given patient specimen, and no information as to whether laboratory staff has been trained on this new protocol."*

   **Theranos Response to Statement 1 – D5787:**  The laboratory has enclosed with this letter its written procedure for the documentation of bacteriology media QC protocol.  (Ex. BB, Tab 4 § 8.2).  The relevant laboratory personnel have been trained on that procedure, as reflected in the documentation enclosed at Ex. BB, Tabs 4B-4C.

**D5787 – March 18 Letter Statement 2:**  *"In its submission, the laboratory references Ex. L, Tab 6 which states: "When [media quality control] testing is completed the results are logged into an excel sheet with lot number and expiration date for each patient (see attached report)." We find no "attached report" in the submission and, therefore, no documentation indicating the laboratory's corrective action has been effectuated."*

   **Theranos Response to Statement 2 – D5787:**  The laboratory has effectuated its written bacteriology media QC protocol by logging each patient result into a separate excel worksheet that includes the lot number and expiration date for the bacteriology media lot used for that patient test.  We have enclosed examples of these excel spreadsheets, which show that the laboratory's corrective action has been effectuated.  (Ex. HH, Tab 6).

**D5787 – March 18 Letter Statement 3:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

   **Theranos Response to Statement 3 – D5787:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).

44
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                          THER-0534743
Fed. R. Crim. P. 6(e) material

**theran⬤s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

Training on these procedures has occurred.  (Ex. BB, Tabs 8B-C).  The revised procedures
establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and
require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.
(Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to
cover the quality management systems; provide the protocol for quarterly audits; and require
that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex.
BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth
tracer and quarterly audits are reviewed, analyzed and presented based on findings and
analysis" during the QMPI Program meetings.  (Ex. BB Tab 7§ 7.5).  Training on the revised
QMPI procedures has occurred.  (Ex. BB, Tab7B-C).

<u>D5791</u>

<u>Finding #1</u>

**D5791 Finding #1 – March 18 Letter Statement 1:**  *"The laboratory submitted a protocol for
the SensoScientific Monitoring in Ex. A, Tab 24. The response does not specifically address the
days that the freezers did not meet acceptable temperatures as documented in the SensoScientific
Monitoring Audit Node Log. We could not determine if the new procedure has been effectuated
as no documentation was submitted to show that the unacceptable freezer temperatures were
addressed.*

> **Theranos Response to Statement 1 – D5791 Finding #1:**  The laboratory has effectuated its
> revised procedures for the SensoScientific Monitoring that were included with our initial
> submission.  Two examples of the current system monitoring are enclosed with this letter.
> (Ex. II, Tabs 1A-1B).  First, on March 18, 2016, at about 11:00 a.m., the laboratory's Wi-Fi
> became temporarily inoperable.  All monitors went into failure mode and a down-time paper
> recording was initiated.  The Wi-Fi was brought back up and the system was restored by 6:00
> p.m.  Data was reclaimed from the monitors for the period in question, and this failure was
> documented in the enclosed Alarm History and Corrective Action (Ex. II, Tab 1A) and the
> enclosed Occurrence Report Form.  (Ex. II, Tab 1B).  Second, on March 19, 2016, freezer
> 7063 failed a temperature check.  The low magnitude and brevity of the failure was below
> the alarm threshold.  (Ex. II, Tab 4).  The failure was detected and evaluated on a weekly
> review.  (Ex. II, Tab 4).  As it had corrected itself less than 30 minutes after it occurred, there
> was no need for further action.  (Ex. II, Tab 4).  This demonstrates that the procedure is being
> followed and temperatures are being adequately monitored.  In addition, as stated in above
> regarding D5413, the laboratory has also posted signs on the freezers pursuant to the new
> procedures, as reflected in the attached documentation.  (Ex. II, Tab 2).

45
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material                                                                                    THER-0534744

**theran⊙s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

**D5791 Finding #1 – March 18 Letter Statement 2:** *In addition, the laboratory states that training has occurred, but it was not clear who should be trained as 'laboratory supervisor or designee' was not defined."*

**Theranos Response to Statement 2 – D5791 Finding #1:** The laboratory has revised this procedure to clarify that "[i]t is the daily responsibility of the laboratory supervisor to monitor and record the temperatures of refrigerators and freezers and the temperature and humidity of each lab room and ambient storage space." (Ex. BB, Tab 13 § 4.5). The revised procedure is enclosed at Ex. BB, Tab. 13.

**D5791 Finding #1 – March 18 Letter Statement 3:** *"Training records provided in Ex. A, Tab 30 included only training documents for one general supervisor."*

**Theranos Response to Statement 3 – D5791 Finding #1:** The laboratory has enclosed with this letter a complete set of training records on this SOP, which show that the relevant laboratory personnel have been trained. (Ex. BB, Tabs 13B-13C).

**D5791 Finding #1 – March 18 Letter Statement 4:** *"Several freezers were identified as 'not used in patient testing' (see Ex. N, Tab A); however, based on interviews during the onsite visit, these freezers were identified as being used for CLIA activities. The submission did not include a response or data related to the freezers identified as 'not used in patient testing.'"*

**Theranos Response to Statement 4 – D5791 Finding #1:** D5791 #1 identifies the same six -20 C freezers and four -80 freezers as D5413. In the laboratory's submission, we explain that five of those freezers did not contain materials that would be used in the future for clinical patient testing. Rather, they only contained material that might be used in the future for research and development.

Based on CMS's March 18 letter, it appears that there was a miscommunication when the CMS surveyors were onsite. D5413, Paragraph f, states that CMS had a discussion about these freezers with the "Director of Assay Systems and technical supervisor at 11/19/15 at approximately 11 am." The Director of Assay Systems did not have any regular involvement with those freezers at that time and did not have knowledge of their contents. The "technical supervisor" in attendance on November 19, 2015 joined the company on October 26, 2015 (Ex. HH, Tab 8); he also did not have regular involvement with those freezers at the time and did not have knowledge of their contents. To the extent CMS understood either of these individuals to be confirming the contents of these freezers or whether these freezers were used in clinical patient testing, there was a miscommunication.

The laboratory has looked into this issue further, and has reconfirmed that the statements in the laboratory's submission are accurate. As reflected in the enclosed documentation:

- On November 19, 2015, there were four -20 C freezers in the microbiology or BUGS laboratory. 7061 BUGS -20 C Freezer 4 did **not** contain any materials for future use in clinical patient testing. (Ex. II, Tab 3B).

46
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534745

theran⊛s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

- On November 19, 2015, there was one -20 C freezer in the capillary laboratory. Clinical patient testing in the Normandy laboratory **stopped** on September 20, 2015, and there has **not** been any clinical patient testing in the Normandy laboratory since then. The 1 Normandy -20 C freezer 7066 did **not** contain any materials for future use in patient testing. (Ex. II, Tab 3C).

- On November 19, 2015, there were four -80 C freezers. 7098 -80 C Freezer 1 Nuair, 7111 -80 C Freezer 2 Thermo, and 7113 -80 2 CLIA Lab did not contain any materials for future use in clinical patient testing. While the last of those three freezers was named 7113 -80 2 CLIA Lab, it was only used to store old specimens that were not for future use in clinical patient testing. (Ex. II, Tab 3A)

**D5791 Finding #1 – March 18 Letter Statement 5:** *"The laboratory submitted an article for the use of Mean Kinetic Temperatures (MKT) (Ex. N, Tab 1). This article relates to the handling, storage, and distribution of temperature sensitive pharmaceuticals, not clinical laboratory specimens, reagents, reference materials, etc. We are unclear as to how this article applies to this deficient practice, and note that the written procedure submitted by the laboratory at Ex. A, Tab 24 does not incorporate monitoring temperature by MKT."*

**Theranos Response to Statement 5 – D5791 Finding #1:** Although the article is not critical to our analysis, it is relevant because it provides a specific rationale for understanding the chemical effects of brief increases (or decreases) in temperature on pharmaceuticals, and by extrapolation, on chemical controls. The conclusion of the article is that brief periods of temperature elevation have little effect on the rate of chemical degradation on the product being stored. While we do not recommend storing chemical control material in an unstable environment, the article gives reassurance that chemical control materials subjected to a short period of increased temperature by mistake are unlikely to be chemically degraded.

**D5791 Finding #1 – March 18 Letter Statement 6:** *"The laboratory also submitted an article related to the storage of bacterial samples for optimal viability (Ex. N, Tab 22). We note that the submitted written procedure relates to determining acceptable temperature viability of bacterial samples does not include any references to this article. We are unclear as to how this article applied to this deficient practice."*

**Theranos Response to Statement 6 – D5791 Finding #1:** This article is cited in the laboratory's revised patient assessment for this deficiency, which is enclosed with this letter. (Ex. AA, Tab 4). This article is relevant because it shows that bacterial samples will remain viable for 10 years at -80C and for 1-3 years at -20C.

**D5791 Finding #1 – March 18 Letter Statement 7:** *"The laboratory submitted no evidence to support the following conclusion for the Sanyo JP Lab 7059 -20 freezer: '[The laboratory]*

47
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                          THER-0534746
Fed. R. Crim. P. 6(e) material

**ER-3102**

**theranos**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*determined that higher storage temperature had no effect on the calibrators or controls stored in this freezer. There is no patient impact from the change in temperature during the time period.'"*

**Theranos Response to Statement 7 – D5791 Finding #1:** The laboratory has revised its patient assessment analysis to provide more detail and documentation about its review of the effect this issue may have had on the Immulite controls stored in this freezer. (Ex. AA, Tab 4). Based on that review, the laboratory has voided certain test results. (Ex. AA, Tab 4). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5791 Finding #1 – March 18 Letter Statement 8:** *In addition, the laboratory stated for another freezer (1 BUGS 7120 -80 freezer) that the 'MKT remained between -70 and -86 C for the entire date range.' However, the laboratory indicated that "a small number of bacterial cultures ... labeled to be stored at -80C or colder" were stored in this freezer. It was unclear as to why it was appropriate to store 'bacterial cultures ... labeled to be stored at -80C or colder' to be stored at temperatures of -70C to -79C."*

**Theranos Response to Statement 8 – D5791 Finding #1:** The temperature at which these bacterial cultures are stored is not determined by a manufacturer. While the laboratory recognizes that it should have followed its procedures for maintaining the temperature of this freezer at -80C or colder, storage of these bacterial cultures at temperatures of -70C to -79C did not have the potential to affect patients receiving tests in 2014 and 2015. Most importantly, these bacterial cultures can only be used in patient testing after there is growth, which occurs **after** the bacterial culture is removed from the freezer. If there is no growth after the bacterial culture is removed from the freezer, then the culture is not viable and cannot be used in patient testing. Therefore, the higher temperature of this freezer did not have any potential to affect patients, even if even it had caused a bacterial culture to be unviable.

It is also worth noting that the temperature of -70C to -79C should not have had an impact on the viability of these bacterial cultures, which were put in these freezers after the laboratory moved to the Newark facility in October 2014. The laboratory labels bacterial cultures for storage at -80C or colder only because that allows for the longest period of viability, which is 10 years. (Ex. II, Tab 26). However, bacterial cultures remain viable for 1-3 years when stored at -20C. (Ex. II, Tab 26).

**D5791 Finding #1 – March 18 Letter Statement 9:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the*

48
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                    THER-0534747
Fed. R. Crim. P. 6(e) material

**theran⊛s**

| | 1701 Page Mill Road | P 650.838.9292 | theranos.com |
| | Palo Alto, CA 94304 | F 650.838.9165 | |

*laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 9 – D5791 Finding #1:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

Finding #2

**D5791 Finding #2 – March 18 Letter Statement 1:** *"The laboratory submitted a protocol for a Master Validation Plan (Ex. E, Tab 30B) which required the %CV of replicates to be not more than 20% (25% at the lower and upper limits of detection). The submitted protocol was different than the protocol presented to the surveyor at the time of the onsite survey which required the %CV of replicates to be not more than 15% (20% at the lower and upper limits of detection). The %CV in the protocol presented to the surveyor at the time of the onsite survey matched the %CV of the predicate devices. It is unclear as to why the TPS, which is covered by the Master Validation Plan, can now have %CV's for replicates greater than the predicate devices; no explanation was submitted. In addition, we note that the %CV's (18.7% - 63.8%) included in the submission does not appear to have been evaluated using this new protocol nor was it addressed in the laboratory's response provided at Ex. E, Tab 1."*

**Theranos Response to Statement 1 – D5791 Finding #2:** This deficiency concerns the TPS 3.5. As noted above, the TPS 3.5 was **fully retired** in early-August 2015.

With respect to these validation plans, there appears to have been a miscommunication. During the September 22-23, 2015 on-site visit, the laboratory understood that CMS had requested the validation plan for proprietary chemistry assays run on other Theranos technologies. The laboratory did not realize that CMS believed this plan was also the

49
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534748

theran☉s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

validation plan that applied to ELISA assays run on the TPS 3.5. After reviewing the Form 2567, we realized that there had been a miscommunication, which is why our submission included the ELISA Master Validation Plan.

As detailed above, the laboratory values CMS's feedback, and takes it very seriously. [13] The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was **fully retired** in early-August 2015. As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5. (Ex. AA, Tab 3). The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures. Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015. As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015. (Ex. AA, Tab 3). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5791 Finding #2 – March 18 Letter Statement 2:** *"The submission (Ex. E) includes a list of patient specimen accession numbers for which the laboratory "identified reports," but does not specify or include documentation to indicate whether corrected reports were generated and issued."*

**Theranos Response to Statement 2 – D5791 Finding #2:** As indicated above, the laboratory has revised and broadened its analysis of this deficiency and associated corrective actions. Based on that analysis, which is described above and in the attached documentation, the laboratory has, out of an extreme abundance of caution, voided all results reported for assays run on the TPS 3.5 in 2014 and 2015. (Ex. AA, Tab 3). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be

---

[13] In discussing establishment of precision for an LDT, the March 18 letter references a comparison of %CVs between an LDT and "predicate devices." We note, however, that CLIA regulations do not contain any regulation requiring that there be any correlation or equivalence of %CV between LDTs and predicate devices. Rather, the regulations require only that the precision for the test must be established for the LDT itself. 42 C.F.R. § 493.1253(b)(2). It also is generally accepted that accuracy is the only required performance specification that typically requires a correlation study. 42 C.F.R. § 493.1253(b)(2).

50
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                                    THER-0534749
Fed. R. Crim. P. 6(e) material

**theran⬤s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt
will be provided to CMS under separate cover.

Finding #3

**D5791 Finding #3 – March 18 Letter Statement 1:** *"The laboratory's review of the QC found
in Ex. F, Tab 1 did not specify what period of QC the laboratory reviewed."*

**Theranos Response to Statement 1 – D5791 Finding #3:** As indicated above, the
laboratory's analysis covers the entire period in which each assay run on the TPS 3.5 was in
use in 2014 and 2015. (Ex. AA, Tab 3).

**D5791 Finding #3 – March 18 Letter Statement 2:** *"The quality assessment (QA)
documentation related to QC data from the survey in July 2014, October 2014, and February
through June 2015. The laboratory's investigation did not indicate that the review had identified
the cited issues related to QC."*

**Theranos Response to Statement 2 – D5791 Finding #3:** The revised analysis enclosed
with this letter makes clear that the laboratory identified the cited issues related to QC. (Ex.
AA, Tab 3). The laboratory's review of QC in connection with the submission, as well as the
re-review reflected in the enclosed revised analysis, included a review of imprecision, QC
trends, and QC failures, including failures occurring where one of the two levels of control
had a value of 2SD or greater.

**D5791 Finding #3 – March 18 Letter Statement 3:** *"To ensure the deficient practice does not
recur, the laboratory indicated that quarterly audits will be performed and suggested that the
audits results would be reviewed within the laboratory's QMPI Program. However, the
laboratory did not establish the procedure by which these quarterly audits are to be conducted.
In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used,"
but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would
be documented, and whether the results of a "tracer audit" would be the information reviewed
by the QMPI Program."*

**Theranos Response to Statement 3 – D5791 Finding #3:** The laboratory has revised its
audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB,
Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised
procedures establish that tracer audits must occur monthly; provide the protocol for a tracer
audit; and require that tracer audits be documented using the tracer audit form, CL FRM
00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a
quarterly audit to cover the quality management systems; provide the protocol for quarterly
audits; and require that quarterly audits are documented using the audit record form, CL QOP
00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear
that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on

51
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                                    THER-0534750
Fed. R. Crim. P. 6(e) material

**theran⚬s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

Finding #4

**D5791 Finding #4 – March 18 Letter Statement 1:**  *"Although the laboratory's submitted protocol included information about quarterly audits and agenda items for the laboratory's QMPI Program, the submission does not provide specific actions to take when problems are identified, specifically related to clotted specimens. The laboratory states in Ex. L, Tab 35 that "[p]atient specimens that did not meet the lab's acceptance criteria were rejected ... " However, the issue was not that the clotted specimens were rejected, rather that the laboratory's QA program did not identify the high number of clotted specimens over a period of three quarters. The submission does not include any documentation showing that the issue was identified and corrected. We note that Ex. A, Tab 12, §7.2.1.6 indicates that the QMPI Program agenda included specimen rejection rate partitioned by rejection criteria, but does not require that any action be taken based on this agenda item. In addition, we note that in Ex. A, Tab 12, §7.1, the laboratory provided the frequency of the QMPI Program meetings, but does not indicate any action should be taken in the event it is determined that the quality metrics were not met."*

**Theranos Response to Statement 1 – D5791 Finding #4:**  The laboratory has further revised its QMPI Program procedures to ensure that the QMPI Program identifies specimen rejection issues promptly.  (Ex. BB, Tab 7 § 7.2.3.1). The procedure requires that when analyzing specimen rejection and redraws, the QMPI team will "[i]dentify any corrective action to take based on data such as retraining or a procedure change." (Ex. BB, Tab 7 § 7.2.3.1.e)

**D5791 Finding #4 – March 18 Letter Statement 2:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5791 Finding #4:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tab 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a

52
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                                    THER-0534751
Fed. R. Crim. P. 6(e) material

**theran⊗s**

|  |  |
|---|---|
| 1701 Page Mill Road | P 650.838.9292  theranos.com |
| Palo Alto, CA 94304 | F 650.838.9165 |

quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

<u>D5793</u>

<u>Finding #1</u>

The March 18 Letter states: *"See our reviews of D5403, D5437, D5469, and D5779."* Accordingly, we refer you to our responses to those reviews.

<u>Finding #2</u>

**D5793 Finding #2 – March 18 Letter Statement 1:** *In the submission, the laboratory states:*

> *Based on comprehensive review, multiple examples of failed QC without the appropriate documentation with no investigation or corrective action was identified which is now addressed with revised SOPS and training. Additional competency is on-going to ensure CLS demonstrate the required proficiency with quality control and the appropriate investigation, corrective action and notification.*

*We find no documentation to indicate that the 'revised SOPS' have been effectuated. That is, we find no documentation of cytometry QC failure investigations and corrective actions taken based on the 'revised SOPS' as discovered while conducting the 'comprehensive review.'"*

**Theranos Response to Statement 1 – D5793 Finding #2:** There appears to have been a miscommunication here because the laboratory **stopped** running tests on the flow cytometer before the survey began on September 22, 2015, and **has** not run any tests on the instrument since then. Because the flow cytometer is not in use, and has not been in use since the survey began, there has not been any new QC failures that required investigation or corrective action under the laboratory's new procedures. The "review" discussed in the submission was simply intended to refer to the analysis conducted to address the deficiency identified by CMS. The issue addressed by the "review" — i.e., failing to document corrective action for QC fails for the Fortessa and Canto — is the same issue identified by CMS in its deficiency, and thus did not constitute a new issue or occurrence.

**D5793 Finding #2 – March 18 Letter Statement 2:** *In Ex. J, the laboratory provided lists of patient specimen accession numbers for which the laboratory intended to issue corrected test*

53
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534752

**theran⊙s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304     F 650.838.9165

*reports. The laboratory provided no documentation to indicate corrected reports were generated and issued.*

**Theranos Response to Statement 2 – D5793 Finding #2:** Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5793 Finding #2 – March 18 Letter Statement 3:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 3 – D5793 Finding #2:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

Finding #3

**D5793 Finding #3 – March 18 Letter Statement 1:** *"In the submission, the laboratory states:*

- *'07/16/2015: Level 3 QC outside manufacturer's recommended range, and not repeated, therefore level 3 QC was out of control for the day'*
- *'09/01/2015 to 09/13/2015: all level 3 control results are outside the manufacturer's recommended range (negative bias)'*
- *'10/01/2015 - 10/31/2015: all level 3 control results are outside the manufacturer's recommended range (negative bias)'*
- *'All 3 levels of QC were not run on 11/04/2015, 11/05/2015, 11/07/2015, 11/08/2015, 11/09/2015, 11/10/2015, 11/12/2015, 11/14/2015, and 11/15/2015' [The laboratory*

54
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                                    THER-0534753
Fed. R. Crim. P. 6(e) material

**theran⊙s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*provided no information as to whether patient HCG specimens were tested on the November dates listed.]*

*Yet, the laboratory concluded: 'Results for urine HCG are quantitative with a cut off of 30 mUI/ml. Because of the nature of this assay no correct reports are required.'*

*Since QC failures may indicate possible test system problems and it is unknown as to how the HCG (human chronic gonadotropin) test results were used and interpreted, we question the laboratory's conclusion and the accuracy and reliability of any patient HCG test results reported on the July, September, October, and November dates listed."*

**Theranos Response to Statement 1 – D5793 Finding #3:** The laboratory has conducted a further review of this data and has revised its patient assessment analysis, as reflected in the enclosed documentation. (Ex. AA, Tab 8).

**D5793 Finding #3 – March 18 Letter Statement 2:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5793 Finding #3:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

Finding #4

**D5793 Finding #4 – March 18 Letter Statement 1:** *"In the submission, the laboratory states:*

- *'Anti-HBs is a qualitative assay with a positive cutoff of 11 so no corrected reports are*

55
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                    THER-0534754
Fed. R. Crim. P. 6(e) material

**theranos**

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

*required.'*
- *'Qualitative assay will not require corrected reports to be issued'*

*We are unclear as to how the laboratory came to these conclusions and the submission does not contain any documentation to support these statements."*

**Theranos Response to Statement 1 – D5793 Finding #4:**  The laboratory has conducted a further review of this data and has revised its patient assessment analysis, as reflected in the enclosed documentation.  (Ex. AA, Ex. 9).

**D5793 Finding #4 – March 18 Letter Statement 2:**  *"Nevertheless, to ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5793 Finding #4:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

Finding #5

**D5793 Finding #5 – March 18 Letter Statement 1:**  *"In the submission, the laboratory states: 'Corrected [LH] reports to be sent for patient samples analyzed for the following time period: 7/1/2015-7/8/2015; all patient samples analyzed in 8/2015 and 9/2015.' However, later in the submission, the laboratory concluded that '[b]ased on this review, 0 corrected reports are being issued.' From these conflicting statements, it is unclear whether the laboratory addressed patient outcomes. The laboratory provided no documentation to indicate that corrected LH (luteinizing hormone) patient reports were issued."*

56
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                        THER-0534755
Fed. R. Crim. P. 6(e) material

**theran⬤s**

1701 Page Mill Road      P 650.838.9292    theranos.com
Palo Alto, CA 94304      F 650.838.9165

**Theranos Response to Statement 1 – D5793 Finding #5:** The laboratory's patient assessment analysis for this finding appears to have included an inadvertent copy and paste mistake. The laboratory has enclosed its revised analysis, which explains why it has issued corrected reports for certain patients having the potential to be affected. (Ex. AA, Tab 10). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5793 Finding #5 – March 18 Letter Statement 2:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5793 Finding #5:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

Finding #6

**D5793 Finding #6 – March 18 Letter Statement 1:** *"In the submission, the laboratory states:*

- *"All patient results reported> 472 U/ml will need corrected reports."*
- *"Based on this review, 122 corrected [CA-125] reports are being issued to reflect the verified reportable range."*

*The laboratory provided no documentation to indicate corrected reports were generated and issued.*

57
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                    THER-0534756
Fed. R. Crim. P. 6(e) material

**theran☉s**

1701 Page Mill Road  P 650.838.9292  theranos.com
Palo Alto, CA 94304  F 650.838.9165

**Theranos Response to Statement 1 – D5793 Finding #6:** Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5793 Finding #6 – March 18 Letter Statement 2:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5793 Finding #6:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

Finding #7

**D5793 Finding #7 – March 18 Letter Statement 1:** *"The submission references "Ex. H, Tabs 1, 2 - 5, 16, 17 - 20, 21, 22 - 25, 26, 27 - 30, 36, 37 - 40,46, 47 - 50, 56, and 57 - 60." We found no such references in the materials provided to CMS."*

**Theranos Response to Statement 1 – D5793 Finding #7:** The citation references to Ex. H, Tabs 1, 2 - 5, 16, 17 - 20, 21, 22 - 25, 26, 27 - 30, 36, 37 - 40,46, 47 - 50, 56, and 57 – 60 were inadvertent transcription errors, and the inclusion of these blank tabs in the materials was an inadvertent copying error.

**D5793 Finding #7 – March 18 Letter Statement 2:** *"Throughout Ex. H, the submission includes lists of patient specimen accession numbers for which the laboratory intended to issue*

58
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534757

**theran⊛s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*corrected test reports. The laboratory provided no documentation to indicate corrected reports were generated and issued."*

> **Theranos Response to Statement 2 – D5793 Finding #7:** Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5793 Finding #7 – March 18 Letter Statement 3:** *"We found no information addressing how the laboratory will ensure the timely review of the effectiveness of any actions taken. Although the laboratory indicated that quarterly audits will be performed to ensure compliance with this deficient practice, it is unclear how quarterly audits will timely address the issues cited under this deficiency. Nevertheless, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

> **Theranos Response to Statement 3 – D5793 Finding #7:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

Finding #8

**D5793 Finding #8 – March 18 Letter Statement 1:** *"The submission references 'Ex. B, Tabs 51 and 53-55, and Ex. H, Tabs 1,2 - 5, 17 - 20, 26, 27 -30, 36, 37 - 40, 46, 47 - 50, 56, and 57 - 60.' We found no such references in the materials provided to CMS."*

> **Theranos Response to Statement 1 – D5793 Finding #8:** The citation references to Ex. B, Tabs 51 and 53-55, and Ex. H, Tabs 1,2 - 5, 17 - 20, 26, 27 -30, 36, 37 - 40, 46, 47 - 50, 56, and 57 - 60 were inadvertent transcription errors, and the inclusion of these blank tabs in the materials was an inadvertent copying error.

59

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                    THER-0534758
Fed. R. Crim. P. 6(e) material

**theran⊕s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

**D5793 Finding #8 – March 18 Letter Statement 2:** *"The laboratory submitted a new QC procedure (Ex. A, Tab 1) which requires QC Pass/Fail Criteria. Specifically, Section 8.2.1.1.a - c. provides that QC must meet certain criteria as well as '... the required Westgard rule pass criteria.' Westgard rules included a "10x" rule for rejecting QC when 10 consecutive control measurements fall on one side of the mean. We note that on page 17 of 19 (Ex. A, Tab 6) in the updated protocol that the "10x" rule was included as part of the Westgard rules which the lab must follow. The lab provided no documentation indicating that the "10x" rule was evaluated as part of its review... Because the laboratory has not shown whether it can follow its own QC protocols, it is unclear whether the laboratory's quality assessment mechanisms can monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

> **Theranos Response to Statement 2 – D5793 Finding #8:** The laboratory has extended this analysis to evaluate global quality control indicators, as reflected in the attached documentation. (Ex. AA, Tab 11). As a result of that analysis, the laboratory has voided additional results for certain chemistry assays. Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

The laboratory is capable of ensuring that the deficient practice in D5793 Finding #8 does not recur. Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures. The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016. Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory. In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant. Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team. The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

**D5793 Finding #8 – March 18 Letter Statement 3:** *"In Ex. B and Ex. H, the submission includes lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were generated and issued."*

> **Theranos Response to Statement 3 – D5793 Finding #8:** Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

60

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                        THER-0534759
Fed. R. Crim. P. 6(e) material

**theranos**

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

Finding #9

**D5793 Finding #9 – March 18 Letter Statement 1:** *"The laboratory did not submit any documentation in the referenced exhibits related to an updated protocol for Alternative Assessment Procedures (AAP); therefore, we have concluded that the current protocol applies. The laboratory's submission did not include any documentation to explain why the laboratory did not follow its AAP protocol for the Theranos Proprietary System. Because the laboratory has not shown whether it can follow its own AAP protocols, it is unclear whether the laboratory's quality assessment mechanisms can monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

**Theranos Response to Statement 1 – D5793 Finding #9:**  There appears to have been a miscommunication.  The TPS 3.5 was **fully retired** in early-August 2015.  In addition, the laboratory **stopped** using its other LDTs, and does not have plans to resume using them as it transitions to compliance with FDA quality systems requirements for its LDTs and introduces next generation technologies.  Accordingly, the AAP protocol that was used for tests run on these instruments in 2014 and 2015 is not in use.

Furthermore, although alternative proficiency testing is not required for any test that is in use in the lab, the laboratory's revised proficiency testing procedure includes new procedures for alternative proficiency assessment. (Ex. BB, Tab 3 § 9.2.4).  These alternative proficiency assessment procedures were in the version of the proficiency testing procedure included with our submission, and are also in the revised proficiency testing procedure enclosed with this letter.  (Ex. BB, Tab 3).  Training on the revised proficiency testing procedure has occurred. (Ex. BB, Tabs 3B-3C).  The QMPI procedures state that the "meeting standing agenda" includes a discussion of analytical quality metrics including proficiency testing results and overall performance. (Ex. BB, Tab 7 § 7.5.2.5).

The laboratory is capable of ensuring that the deficient practice in D5793 Finding #9 does not recur.  Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures.  The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016.  Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory.  In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant.  Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team.  The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

61
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534760

**theranos**

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

Finding #10

**D5793 Finding #10 – March 18 Letter Statement 1:** *Ex. A, Tab 9 of the submission contains the protocol "Method Validation." Section 8.4 of this protocol, "Reference Intervals," states:*

> *The reference intervals are established from a selected reference population. Typically, when both decreased and increased levels are clinically significant, it is defined as the interval between and including the lower and upper reference limits of the studies population. This is calculated as the central 95 percentile of the population distribution where the lower and upper reference limits are demarcated as the 2.5th and 97.5th percentiles of the underlying distribution of values ... The reference intervals are used to establish expected level in health "normal" individuals. Values outside the reference range are considered "abnormal" or "high" or "low."*

*In Ex. E, Tab 1, the laboratory states:*

> *[The] laboratory director decided to use medical decision limits based on national consensus. Accordingly, the following decision limits were displayed on all lab reports for Vitamin D. As noted in CLSI EP28-A3, "when decision limits determined by national or worldwide consensus exist, these limits, rather than reference intervals should be reported.*

*In Ex. E of the submission, the laboratory provided the following "medical decision limits:"*

| | |
|---|---|
| *Deficiency:* | *<20.0 ng/mL* |
| *Insufficiency:* | *20.0 - 29.0 ng/mL* |
| *Sufficiency:* | *30.0 - 100.0 ng/mL* |
| *Possible Toxicity:* | *>100.0 ng/mL* |

*We were unclear as to the laboratory's definition of "medical decision limits." No definition of this phrase was found in Section 3 - Definitions of the "Method Validation" protocol. In addition, no reference to CLSI EP28-A3 was found in the submitted protocol. We also note that the submitted protocol does not include a reference to "medical decision limits" as a criterion for determining reference range.*

**Theranos Response to Statement 1 – D5793 Finding #10:** D5793 Finding #10 relates to the TPS 3.5. The TPS 3.5 was **fully retired** in early-August 2015. The laboratory's revised method verification procedure references a "medical decision level," which is defined in the procedure as "[t]he concentration of analyte in blood or bodily fluid sample being analyzed at which some medical action is indicated for proper patient care. There may be several medical decision limits for a given analyte." (Ex. BB, Tab 5 § 3.9). In addition, this revised

62
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                    THER-0534761
Fed. R. Crim. P. 6(e) material

**theran⬤s**

| | 1701 Page Mill Road | P 650.838.9292   theranos.com |
| | Palo Alto, CA 94304 | F 650.838.9165 |

procedure references CLSI EP28-A3 (Ex. BB, Tab 5 § 10.6), which states: "for some analytes, reference intervals have been replaced by *decision limits [emphasis in original]*, established by national (or international) consensus. As examples, consider cholesterol and glycated hemoglobin." Training on the laboratory's revised method verification procedure has occurred. (Ex. BB, Tabs 5B-5C).

**D5793 Finding #10 – March 18 Letter Statement 2:** *Since the laboratory provided no definition of "critical medical decision level," no information regarding the laboratory's disparity between the reference range (9.3 - 47.9 ng/mL) in the validation documentation and raw data reports, and no explanation as to how a Vitamin D level could be both normal and deficient or insufficient, it is unclear as to whether the laboratory has followed its own "Method Validation" protocol set forth at Section 8.4…. Because the laboratory has not shown whether it could follow its own validation protocols, it is unclear whether the laboratory's quality assessment mechanisms can monitor the laboratory's corrective actions and ensure this deficient practice does not recur.*

**Theranos Response to Statement 2 – D5793 Finding #10:** D5793 Finding #10 concerns the TPS 3.5. There appears to have been a miscommunication because the TPS 3.5 was **fully retired** in early-August 2015. Accordingly, the laboratory has not re-validated any assay on the TPS 3.5. References to validation data in documents enclosed with the submission are to validation reports prepared **before** the survey began and **before** the laboratory's revised procedures were made effective (those reports were either reviewed by CMS or available to CMS during the survey).

Because there is a national consensus for the decision levels for Vitamin D, the laboratory was correct in using the national consensus instead of a reference interval established through a validation study. CLSI EP28-A3 states: "for some analytes, reference intervals have been replaced by *decision limits [emphasis in original]*, established by national (or international) consensus. As examples, consider cholesterol and glycated hemoglobin."

The laboratory's revised method verification procedure references a "medical decision level," which is defined in the procedure as "[t]he concentration of analyte in blood or bodily fluid sample being analyzed at which some medical action is indicated for proper patient care. There may be several medical decision limits for a given analyte." (Ex. BB, Tab 5 § 3.9). In addition, this revised procedure references CLSI EP28-A3. (Ex. BB, Tab 5 § 10.6). Training on the laboratory's revised method verification procedure has occurred. (Ex. BB, Tabs 5B-5C).

Additionally, the laboratory is capable of ensuring that the deficient practice in D5793#10 does not recur. Significantly, the laboratory has brought in an entirely new leadership team

63
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534762

**theran⊚s**

| | |
|---|---|
| 1701 Page Mill Road | P 650.838.9292   theranos.com |
| Palo Alto, CA 94304 | F 650.838.9165 |

that is directly involved with implementing and monitoring the laboratory's new procedures. The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016. Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory. In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant. Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team. The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

**D5793 Finding #10 – March 18 Letter Statement 3:** *"Throughout Ex. E, the laboratory provided a list of patient specimen accession numbers for which the laboratory 'identified reports,' but did not specify or submit documentation to indicate whether corrected reports were generated and issued."*

> **Theranos Response to Statement 2 – D5793 Finding #10:** This deficiency concerns the TPS 3.5, which was one of the Theranos proprietary technologies in use in 2014 and 2015. The laboratory began phasing out the TPS 3.5 in December 2014, and it was **fully retired** in early-August 2015.
>
> The laboratory values CMS's feedback, and takes it very seriously. The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was fully retired in early-August 2015. As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5. (Ex. AA, Tab 3). The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures. Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015. As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015. (Ex. AA, Tab 3). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

<u>D5801</u>

**D5801 – March 18 Letter Statement 1:** *"The submission references "Ex. I, Tabs 2-6." We located these tabs, but found no documentation in Tabs 2, 5 and 6."*

64
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                    THER-0534763
Fed. R. Crim. P. 6(e) material

**theranos**

| | |
|---|---|
| 1701 Page Mill Road | P 650.838.9292   theranos.com |
| Palo Alto, CA 94304 | F 650.838.9165 |

**Theranos Response to Statement 1 – D5801:** There was an inadvertent copying error for Exhibit I to the initial submission. The laboratory has enclosed the applicable documents with this letter, as well as additional documents related to the laboratory's broader analysis of the PT/INR test over the entire time it was run on this Siemens BCS XP instrument. (Ex. GG).

**D5801 – March 18 Letter Statement 2:** *"In the submission, the laboratory states:*

> *Before PT/INR testing resumes, the lab will also prepare a revised assay-specific procedure for PT/INR to reinforce that the International Normalized Ratio (INR) must be calculated accurately prior to reporting patient test results. The relevant testing personnel will be required to demonstrate competency to ensure the practice is consistent with these procedures.*

*We note that the laboratory provided no documentation to indicate that the inaccurate calculations were reviewed or that INR calculation using different lot numbers of Dade Innovin were reviewed for accuracy. In addition, we found that the laboratory did not provide documentation to ensure that PT/INR results reported from calculations were, and would continue to be, accurate."*

**Theranos Response to Statement 2 – D5801:** As noted above, the laboratory **stopped** running PT/INR tests on the Siemens BCS XP on September 17, 2015, and has **not** run any PT/INR tests since then. The laboratory has reviewed the inaccurate calculation and has reviewed the INR calculations for different lot numbers of Dade Innovin that were used with this Siemens BCS XP instrument from the time it was put in use in October 2014. As a result of this review, the laboratory has determined that certain INR calculations for prior lots were not accurate because the laboratory did not use the correct MNPT and ISI figures for those calculations. Based on this finding and other findings in the revised PT/INR patient assessment that is enclosed with this letter, the laboratory has voided all PT/INR results reported from October 2014 through September 2015. (Ex. AA, Tab 7). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

The laboratory is capable of ensuring that the deficient practice in D5801 does not recur. Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures. The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016. Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory. In addition, the laboratory has hired

65
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534764

**theran⬤s**

| | 1701 Page Mill Road | P 650.838.9292 | theranos.com |
| | Palo Alto, CA 94304 | F 650.838.9165 | |

Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant.  Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team.  The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

**D5801 – March 18 Letter Statement 2:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5801:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

<u>D5805</u>

**D5805 – March 18 Letter Statement 1:**  *"The submission references "Ex. I, Tabs 2-6." We located these tabs, but found no documentation in Tabs 2, 5 and 6."*

**Theranos Response to Statement 1 – D5805:**  There was an inadvertent copying error for Exhibit I to the initial submission.  The laboratory has enclosed the applicable documents with this letter, as well as additional documents related to the laboratory's broader analysis of the PT/INR test over the entire time it was run on this Siemens BCS XP instrument.  (Ex. GG).

**D5805 – March 18 Letter Statement 2:**  *In its submission, the laboratory states: 'The lab revised its patient reports during the survey so that the interpretive note appears only under the*

66
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                                                    THER-0534765
Fed. R. Crim. P. 6(e) material

**theranos**

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

*heading for patients with therapy.' However, no updated forms were shown to the surveyor during the survey and the laboratory's submission does not include documentation of the updated reports.*

**D5805 – March 18 Letter Statement 2:** As indicated above, the laboratory performed a patient assessment for PT/INR tests run on this BCS XP instrument with reagent lots that were used prior to the reagent lot identified in CMS's Form 2567. Based on that review, the laboratory has voided all PT/INR results from the time this BCS XP instrument was put in use in October 2014. (Ex. AA, Tab 7). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D5805 – March 18 Letter Statement 3:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 3 – D5805:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

<u>D5821</u>

**D5821 – March 18 Letter Statement 1:** *"The submission references "Ex. I, Tabs 2-6." We located these tabs, but found no documentation in Tabs 2, 5 and 6."*

67
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                        THER-0534766
Fed. R. Crim. P. 6(e) material

theran⊙s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

**Theranos Response to Statement 1 – D5821:** There was an inadvertent copying error for Exhibit I to the initial submission. The laboratory has enclosed the applicable documents with this letter, as well as additional documents related to the laboratory's broader analysis of the PT/INR test over the entire time it was run on this Siemens BCS XP instrument. (Ex. GG).

**D5821 – March 18 Letter Statement 2:** *"In Ex. I, the laboratory provided lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were issued. "We also note that the Patient Impact Assessment (Ex. I, Tab 1) states that 'remedial action was taken on 9/25/15,' but 'corrected reports were issued beginning on 11/10/15 and completed on 11/12/15.' There was no explanation as to why there was such a long period of time between the remedial action and issuing corrected reports."*

**Theranos Response to Statement 2 – D5821:** All of these corrected reports for PT/INR, along with documentation confirming that they were sent, are enclosed with this letter. (Ex. GG, Tab 7). On September 22 or 23, CMS identified a number of issues related to PT/INR tests during the period April to September 2015. The laboratory undertook a thorough investigation. Given the number of issues to review, the investigation took time to complete. Completion of the investigation was also hindered by the absence of a highly qualified, full-time laboratory director. The laboratory subsequently hired its new lab director, Dr. Kingshuk Das, who is highly qualified and has extensive clinical laboratory experience. As of March 14, 2016, Dr. Das joined Theranos full-time at the Newark, California laboratory.

**D5821 – March 18 Letter Statement 3:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D5821:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require

68
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534767

**theran⊚s**

|  | 1701 Page Mill Road | P 650.838.9292 | theranos.com |
|  | Palo Alto, CA 94304 | F 650.838.9165 | |

that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

<u>D6076</u>

The March 18 Letter states: *"See our reviews of D6083, D6085, D6086, D6093, D6094, D6098, and D6102."*  Accordingly, we refer you to our responses to those reviews.

<u>D6079</u>

The March 18 Letter states that "[b]ased on the laboratory's submission, this requirement is met."

<u>D6083</u>

The March 18 Letter states: *"See our reviews of D5413 and D5791."*  Accordingly, we refer you to our responses to those reviews.

<u>D6085</u>

The March 18 Letter states: *"See our review of D6115."*  Accordingly, we refer you to our responses to your review of D6115.

<u>D6086</u>

**D6086 Finding #1—March 18 Letter Statement 1:** *"The submission references 'Ex. A, Tab 9, F-1' and 'Ex. A, Tab 10, F-1.' We found no such references in the materials provided to CMS."*

**Theranos Response to Statement 1 in D6086 Finding #1:** The citation references to Ex. A, Tab 9, F-1 and Ex. A, Tab 10, F-1 were inadvertent transcription errors and should not have been included.

**D6086 Finding #1 – March 18 Letter Statement 2:** "*Throughout Ex. E, Tab 1, the laboratory provided lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were generated and issued."*

**Theranos Response to Statement 2 in D6086 Finding #1:** This deficiency concerns the TPS 3.5, which was one of the Theranos proprietary technologies in use in 2014 and 2015.  The laboratory began phasing out the TPS 3.5 in December 2014, and it was **fully retired** in early-August 2015.

69
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                                                    THER-0534768
Fed. R. Crim. P. 6(e) material

**theran☉s**

| | 1701 Page Mill Road | P 650.838.9292 | theranos.com |
| | Palo Alto, CA 94304 | F 650.838.9165 | |

The laboratory values CMS's feedback, and takes it very seriously. The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was fully retired in early-August 2015. As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5. (Ex. AA, Tab 3). The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures. Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015. As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015. (Ex. AA, Tab 3). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D6086 Finding #1 – March 18 Letter Statement 3:** *We found no information addressing how the laboratory will ensure the accurate review of test method validation documentation, the issue cited in the deficiency.*

> **Theranos Response to Statement 3 in D6086 Finding #1:** The TPS 3.5 was **fully retired** early-August 2015, and the laboratory is **not** using any LDTs.
>
> The laboratory has revised its method verification procedure to show how it will ensure the accurate review of test method verification documentation. (Ex. BB, Tab 5). As set forth in the revised procedures, the laboratory director is responsible for reviewing both the verification plan and the verification report. (Ex. BB, Tab 5 § 4.1). "The method verification procedure requires multiple reviews to include Quality to ensure protocols are followed." (Ex. BB, Tab 7 § 7.1.3.3).

Finding #2

**D6086 Finding #2—March 18 Letter Statement 1:** *"The submission references 'Ex. H, Tabs 1, 2-5, 16, 17 - 20, 21, 22 - 25, 26, 27 - 30, 36, 37 - 40, 46, 47 - 50, 56, and 57 - 60.' We found no such references in the materials provided to CMS."*

> **Theranos Response to Statement 1 in D6086 Finding #2:** The citation references to Ex. H, Tabs 1, 2-5, 16, 17 - 20, 21, 22 - 25, 26, 27 - 30, 36, 37 - 40, 46, 47 - 50, 56, and 57-60 were inadvertent.

70
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534769

ER-3125

**theran◉s**

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

**D6086 Finding #2—March 18 Letter Statement 2:** *"Ex. H contains lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were generated and issued."*

**Theranos Response to Statement 2 in D6086 Finding #2:** Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK.) Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D6086 Finding #2—March 18 Letter Statement 3:** *"At the time of the onsite survey, the laboratory's protocol 'Master Validation Plan for Routine Chemistry Assays on Theranos Devices,' stated: '... for establishing the trueness or comparability to two procedures. . .at least 50% of samples should be outside the reference interval.' For five validation documents (ALT, BUN, calcium, glucose, and sodium testing using the Advia 1800), a review of the test results used by the laboratory to establish 'the trueness or comparability of two procedures' showed that the laboratory did not follow its established protocol and use "at least 50% of samples ... outside the reference interval. The submission includes the protocol 'Method Validation,' at Ex. A, Tab 9, Section 8.1.1.1 ('A method comparison and bias estimation design'), which states: 'If the analyte has a critical medical decision level, at least 50% of the specimens must have analyte levels below this value and the remaining 50% above.' We are unclear as to the laboratory's definition of 'critical medical decision level.' No definition of this phrase was found in Section 3 - Definitions of the "Method Validation" protocol or in Ex. H."'*

**Theranos Response to Statement 3 in D6086 Finding #2:** D6086 Finding #2 relates to the chemistry assays on the Siemens Advia 1800 instruments. The laboratory **stopped** using the Siemens Advia 1800 instruments before the survey began on September 22, 2015, and has **not** used them since then.

The laboratory's revised method verification procedure references a "medical decision level," which is defined in the procedure as "[t]he concentration of analyte in blood or bodily fluid sample being analyzed at which some medical action is indicated for proper patient care. There may be several medical decision limits for a given analyte." (Ex. BB, Tab 5 § 3.9). In addition, this revised procedure references CLSI EP28-A3 (Ex. BB, Tab 5 § 10.6), which states: "for some analytes, reference intervals have been replaced by *decision limits [emphasis in original]*, established by national (or international) consensus. As examples, consider cholesterol and glycated hemoglobin." Training on the laboratory's revised method verification procedure has occurred. (Ex. BB, Tabs 5B-5C).

**D6086 Finding #2—March 18 Letter Statement 4:** *"In Ex. H of the submission, the laboratory provided the following 'assay validation' summary:*

71
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534770

theran⦾s

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

| Analyte | Number of Specimens Used | Specimen Value Range |
|---------|--------------------------|----------------------|
| ALT | 128 | 12-62 |
| BUN | 128 | 9-21 |
| Calcose | 128 | 9.2 -10.2 |
| Glucose | 128 | 65 - 142 |
| Sodium | 128 | 134 -142 |

*Since the laboratory provided no definition of 'critical medical decision level' and no information regarding the laboratory's panic or alert values for ALT, BUN, calcium, glucose, and sodium testing, it is unclear as to whether the laboratory has followed its own "Method Validation" protocol at Section 8.1.1.1. Because the laboratory has not shown whether it can follow its own validation protocols, it is unclear whether the laboratory's quality assessment mechanisms can monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

**Theranos Response to Statement 4 in D6086 Finding #2:** There appears to have been a miscommunication. The laboratory **stopped** using its Siemens Advia 1800 instruments for clinical patient testing before the survey began on September 22, 2015 and before the revised method verification procedures were effective, and has **not** used them since then. Accordingly, the laboratory has not re-validated any assay on the Siemens Advia 1800.

The laboratory's revised method verification procedure references a "medical decision level," which is defined in the procedure as "[t]he concentration of analyte in blood or bodily fluid sample being analyzed at which some medical action is indicated for proper patient care. There may be several medical decision limits for a given analyte." (Ex. BB, Tab 5 § 3.9). In addition, this revised procedure references CLSI EP28-A3 (Ex. BB, Tab 5 § 10.6), which states: "for some analytes, reference intervals have been replaced by *decision limits [emphasis in original]*, established by national (or international) consensus. As examples, consider cholesterol and glycated hemoglobin." Training on the laboratory's revised method verification procedure has occurred. (Ex. BB, Tabs 5B-5C).

The laboratory is capable of ensuring that the deficient practice in D6086 Finding #2 does not recur. Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures. The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016. Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory. In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant. Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team. The laboratory's new leadership team has installed an entirely redesigned QMPI

72
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                                    THER-0534771
Fed. R. Crim. P. 6(e) material

theran∅s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

Program, as well as robust audit procedures that required monthly and quarterly audits. With respect to method verification, the procedure now includes appropriate criteria for accuracy, precision, and other pertinent performance characteristics, and requires the lab director to review both the verification plan and verification report to ensure adherence to the criteria in the procedure. (Ex. BB, Tab 5 §§ 7.7, 8).

Finding #3

**D6086 Finding #3—March 18 Letter Statement 1:** *"Ex. H contains lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were generated and issued."*

> **Theranos Response to Statement 1 in D6086 Finding #3:** Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D6086 Finding #3—March 18 Letter Statement 2:** *"At the time of the onsite survey, for five validation documents reviewed (ALT, BUN, calcium, glucose, and sodium testing using the Advia 1800), laboratory summary information indicated that the laboratory obtained coefficient of variation (CV) results greater than CV's established by the instrument manufacturer. That is, ALT, BUN, calcium, glucose, and sodium test results obtained by the laboratory were statistically less precise than what would be expected using the Advia 1800. The laboratory provided no explanation for and no information pertaining to any investigation as to why the laboratory's test results were less precise. These validation documents were approved by the laboratory director as evidenced by his signature. In Ex. H of the submission, the laboratory provided summary data for ALT, BUN, calcium, glucose, and sodium similar to the CV data reviewed at the time of the onsite survey. Again, the laboratory provided no explanation for and/or information pertaining to any investigation as to why the laboratory's test results were less precise. Because the laboratory has not shown whether its assay verification procedures are adequate to determine assay precision characteristics, we question whether the laboratory's quality assessment mechanisms can monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

> **Theranos Response to Statement 2 in D6086 Finding #3:** D6086 Finding #3 concerns the laboratory's method for using capillary specimens to test for ALT, BUN, calcium, glucose and sodium using the Advia 1800 instruments that the laboratory modified. There appears to have been a miscommunication. The laboratory **stopped** using its Siemens Advia 1800 instruments for clinical patient testing before the survey began on September 22, 2015 and before the revised method verification procedures were effective, and has **not** used them

73
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                     THER-0534772
Fed. R. Crim. P. 6(e) material

ER-3128

**theran⊙s**

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

since then.  Accordingly, the laboratory has not re-validated any assay on the Siemens Advia 1800.

Additionally, the CV figures from the manufacturer's package insert are **not** relevant.  Under 42 C.F.R. § 1253(b)(1), a laboratory that "modifies an FDA-cleared or approved test system … must, before reporting patient results, establish for each test system the performance specifications for the following performance characteristics: (i) Accuracy, (ii) Precision, (iii) Analytical sensitivity, (iv) Analytical specificity to include interfering substances, (v) Reportable range of test results for the test system, (vi) Reference intervals (normal values), (vii) Any other performance characteristic required for test performance."  Under this regulation, the precision of an LDT is established solely by the laboratory.  These regulations do **not** require a laboratory to compare the CV it establishes for an LDT — including an LDT that is based on a modification to an FDA-cleared or approved test system — with the %CV of "the predicate device."  Likewise, there is nothing in 42 C.F.R. §1253(b)(1) that requires a laboratory to document why the CV that it has established for an LDT is different from the CV for "a predicate device."

Finding #4

**D6086 Finding #4—March 18 Letter Statement 1:** *"Ex. H contains lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were generated and issued."*

> **Theranos Response to Statement 1 in D6086 Finding #4:** Many corrected reports have been transmitted, and the remainder are being transmitted.  (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D6086 Finding #4—March 18 Letter Statement 2:** *"At the time of the onsite survey, for four validation documents reviewed (ALT, BUN, calcium, and glucose testing using the Advia 1800), laboratory summary information indicated that the reference range determined by the laboratory's testing differed from the reference range on the laboratory's test reports. The following was noted:*

| Analyte | Validation Document Reference Range | Test Report Reference Range |
|---|---|---|
| *ALT* | | *8-41 U/L* |
| *BUN* | *0- 52 UIL* | *6 - 24 mg/dL* |
| *Calcium* | *5.3 - 22.5 mg/dL* | *8.3 - 10.6 mg/dL* |
| *Glucose* | *8.18 -10.3 mg/dL* | *73 - 99 mg/dL* |
| | *64.0 - 112.3 mg/dL* | |

74
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534773

theran⊛s

|  | 1701 Page Mill Road | P 650.838.9292 | theranos.com |
| --- | --- | --- | --- |
|  | Palo Alto, CA 94304 | F 650.838.9165 | |

*In Ex. H of the submission, the laboratory provided the following reference ranges, some of which were still different than what appeared on the laboratory's test reports:*

| *Analyte* | *Reference Range* |
| --- | --- |
| *ALT* | *8-41 U/L* |
| *BUN* | *6.2 - 22 mg/dL* |
| *Calcium* | *8.2 - 10.3 mg/dL* |
| *Glucose* | *64 - 112 mg/dL* |

*Since the laboratory did not provide copies of any updated test reports in its submission, we are unable to determine whether the laboratory has corrected this deficient practice. Because the laboratory has not shown whether it had corrected this deficient practice, we are also unable to determine whether the laboratory's quality assessment mechanisms can monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

**Theranos Response to Statement 2 in D6086 Finding #4:**  As CMS observed in the Form 2567, the validation reports for these assays were dated in April 2015. These validated assays went live on April 22, 2015. The laboratory has issued corrected reports updating the reference ranges for ALT, Calcium, and BUN tests run on the Siemens Advia 1800 on or after April 2015. Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover. As noted above, the laboratory **stopped** running these tests on the Siemens Advia 1800 before the survey began on September, and has **not** run them since then.

The laboratory has not issued corrected reports for Glucose because the reference range used in patient reports was consistent with the national consensus, which was the correct range to use. As noted above, the revised method verification procedures enclosed with this letter references CLSI EP28-A3, which provides that when decision limits determined by national or worldwide consensus exist, these limits, rather than reference intervals should be reported. (Ex. BB, Tab 5 § 10.6).

The laboratory is capable of ensuring that the deficient practice in D6086 Finding #4 does not recur. Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures. The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016. Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory. In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant. Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight

75

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534774

**theran⊙s**

| | 1701 Page Mill Road | P 650.838.9292 | theranos.com |
| | Palo Alto, CA 94304 | F 650.838.9165 | |

team. The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

Finding #5

**D6086 Finding #5 – March 18 Letter Statement 1**: *"The submission references 'Ex. G, Tabs 31, 34, 36, 39, 41, 44, 46, 49, 51, 54, 56, 61, 64, 66, and 69.' We found no documents within these tabs."*

> **Theranos Response to Statement 1 in D6086 Finding #5:** The citation reference to Ex. G, Tabs 31, 34, 36, 39, 41, 44, 46, 49, 51, 54, 56, 61, 64, 66, and 69 was an inadvertent transcription error, and the inclusion of these blank tabs in the materials was an inadvertent copying error.

**D6086 Finding #5 – March 18 Letter Statement 2:** *"At the time of the onsite survey, the laboratory maintained no documentation showing that the validation documents for two Siemens Advia 2120i instruments had been reviewed and approved by the laboratory director. In Ex. G of the submission, we again found no information to indicate the Siemens Advia 2120i validation documents have been reviewed and approved by the director. Because the laboratory has not shown whether it has corrected this deficient practice, we are also unable to determine whether the laboratory's QA mechanisms can monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

> **Theranos Response to Statement 2 in D6086 Finding #5:** There appears to be a miscommunication. The laboratory **stopped** using its Siemens Advia 2120i instruments for clinical patient testing on November 17, 2015, and has **not** used them since then. The laboratory does not intend to rely on those verifications to perform any tests on the Siemens Advia 2120i instruments in the future. As described above, the laboratory has put in place mechanisms that will effectively monitor its corrective action and ensure that deficient practices do not recur. With respect to method verification, the current procedures require the lab director to approve both the verification plan prior to the verification and the verification report. (Ex. BB, Tab 5 § 7.7). "The method verification procedure requires multiple reviews to include Quality to ensure protocols are followed." (Ex. BB, Tab 7 § 7.1.3.3).

The laboratory is capable of ensuring that the deficient practice in D6086 Finding #5 does not recur. Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures. The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016. Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory. In addition, the laboratory has hired

76
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

theran●s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a
full-time clinical consultant. Dr. Tschirhart has over 15 years of experience as a clinical
laboratory director, and is a valuable part of the laboratory's new leadership and oversight
team. The laboratory's new leadership team has installed an entirely redesigned QMPI
Program, as well as robust audit procedures that required monthly and quarterly audits.

Finding #6

**D6086 Finding #6 – March 18 Letter Statement 1:** *"The submission references 'Ex. I, Tabs 2-
6.' We located these tabs, but found no documentation in Tabs 2, 5, and 6."*

**Theranos Response to Statement 1 – D6086 Finding #6:** There was an inadvertent
copying error for Exhibit I to the initial submission. The laboratory has enclosed the
applicable documents with this letter, as well as additional documents related to the
laboratory's broader analysis of the PT/INR test over the entire time it was run on this
Siemens BCS XP instrument. (Ex. GG).

**D6086 Finding #6 – March 18 Letter Statement 2:** *"See our review of D5413."*

**Theranos Response to Statement 2 – D6086 Finding #6:** See the laboratory's response to
your review of D5413.

**D6086 Finding #6 – March 18 Letter Statement 3:** *"Although the submitted protocol (Ex. A,
Tab 31, § 8.1.2) included the requirement to review all new manufacturer package inserts and
vendor notifications, the laboratory did not provide a response to the citation other than to state:
'Theranos did not have the documentation for the MNPT calculation done for lot #539280 in
3/2015 before it was put in use for patient testing.' It is unclear what investigation was
performed to determine how the Mean Normal Prothrombin Time (MNPT) for Dade Innovin lot
number 539280 was defined and entered into the Siemens BCS-XP."*

**Theranos Response to Statement 3 – D6086 Finding #6:** The lab personnel responsible for
MNPT for PT/INR tests run on the Siemens BCS XP at the time that this Dade Innovin lot
was put in use are no longer with the laboratory, which has limited the laboratory's ability to
determine precisely what occurred. Based on the laboratory's investigation, it appears that
the laboratory would determine the MNPT with the assistance of Siemens. Siemens would
then send the laboratory a letter containing both the MNPT and the ISI for the lot. The
laboratory would then be responsible for entering the MNPT and ISI numbers for the lot into
the BCS XP. The laboratory appears to have not properly entered the MNPT and ISI
numbers for this lot and the laboratory failed to have sufficient oversight to identify the
problem when it occurred.

77
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                    THER-0534776
Fed. R. Crim. P. 6(e) material

**theran⬤s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

As noted above, the laboratory **stopped** running PT/INR tests on September 17, 2015, and has **not** run any PT/INR tests since then.  The laboratory is capable of ensuring that the deficient practice in D6086 Finding #6 does not recur.  Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures.  The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016.  Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory.  In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant.  Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team.  The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

**D6086 Finding #6 – March 18 Letter Statement 4:**  *"In its submission the laboratory states "training has occurred," however, training documentation provided in Ex. A Tab 32 did not include all testing personnel listed on the CMS-209 (Ex. L, Tab 1 )."*

**Theranos Response to Statement 4 – D6086 Finding #6:**  The training records for this SOP provided with the submission included all testing personnel listed on the CMS-209 who run tests in the laboratory.  Please note that Chi Nguyen is no longer a member of the CLIA laboratory (we will update our Form 209 accordingly), which is why she does not appear on any of the training documentation.  The enclosed training records reflect that all testing personnel listed on the CMS-209 have been trained on the laboratory's enhanced protocol requiring review of all new manufacturer package inserts and vendor notifications.  (Ex. BB, Tabs 14B-14D).

**D6086 Finding #6 – March 18 Letter Statement 5:**  *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 5 – D6086 Finding #6:**  The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted.  (Ex. BB, Tab 8).  Training on these procedures has occurred.  (Ex. BB, Tabs 8B-8C).  The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer

78
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                                THER-0534777
Fed. R. Crim. P. 6(e) material

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 17, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Amy Mason Saharia
AMY MASON SAHARIA

April 17, 2023