No. 22-10312

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ELIZABETH A. HOLMES

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 5:18-CR-00258
Hon. Edward J. Davila

---

## EXCERPTS OF RECORD
## VOL. XII of LVII | ER-3135 to ER-3434

---

JOHN D. CLINE
LAW OFFICE OF JOHN D. CLINE
  600 Stewart Street
  Suite 400
  Seattle, WA 98101
  (360) 320-6435

KEVIN M. DOWNEY
LANCE A. WADE
AMY MASON SAHARIA
KATHERINE A. TREFZ
WILLIAMS & CONNOLLY LLP
  680 Maine Ave. S.W.
  Washington, D.C. 200024
  (202) 434-5000
  asaharia@wc.com

**theranos**

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2.  (Ex. BB, Tab 8 § 8.1).  In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1.  (Ex. BB, Tab 8 § 8.2).  The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings.  (Ex. BB, Tab 7 § 7.5).  Training on the revised QMPI procedures has occurred.  (Ex. BB, Tabs 7B-7C).

<u>D6093</u>

<u>Finding #1</u>

The March 18 Letter states: *"See our reviews of D5447, D5449, D5461, D5481, and D5779."*  Accordingly, we refer you to our responses to those reviews.

<u>Finding #2</u>

**D6093 Finding #2 – March 18 Letter Statement 1:**  The March 18 Letter states: *"See our reviews of D5481."*

    **Theranos Response to Statement 1 – D6093 Finding #2:**  We refer you to our response to your review of D5481.

**D6093 Finding #2 – March 18 Letter Statement 2:**  *"The submission references 'Ex. I, Tabs 2-6.' We located these tabs, but found no documentation in Tabs 2, 5, and 6."*

    **Theranos Response to Statement 2 – D6093 Finding #2:**  There was an inadvertent copying error for Exhibit I to the initial submission.  The laboratory has enclosed the applicable documents with this letter, as well as additional documents related to the laboratory's broader analysis of the PT/INR test over the entire time it was run on this Siemens BCS XP instrument.  (Ex. GG).

**D6093 Finding #2 – March 18 Letter Statement 3:**  *"The laboratory's submission did not include an explanation or documentation of an investigation regarding the adjustment of QC ranges."*

    **Theranos Response to Statement 3 – D6093 Finding #2:**  D6093#2, Paragraph k, states that "[o]n approximately 9/16/15, the laboratory adjusted the acceptable range for Citrol 3 to match the data" and that the "change was implemented without any investigation as to the reason for the shift in control values."  The laboratory **stopped** running PT/INR tests on September 17, 2015.  The laboratory's review of this issue has come to the same ultimate conclusion.  Under the laboratory's prior leadership and its old QA Program, the laboratory

79
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                                                 THER-0534778
Fed. R. Crim. P. 6(e) material

**theran⬤s**

| | |
|---|---|
| 1701 Page Mill Road | P 650.838.9292   theranos.com |
| Palo Alto, CA 94304 | F 650.838.9165 |

changed the control values for PT/INR on September 16, 2015 without documenting a proper investigation, and in contrast to what is required by the laboratory's new procedures. The laboratory's new leadership and new QMPI Program do **not** ascribe to this type of practice, as changes to QC values should not occur unless a full and documented investigation shows that the change is warranted. The laboratory **stopped** PT/INR testing on September 17, 2015, thus limiting the potential effect that this change to control values could have. The laboratory has not performed any PT/INR tests since September 17, 2015. As indicated above, the laboratory has broadened its investigation of PT/INR tests to encompass the entire period during which this BCS XP instrument was in use, which was October 2014 through September 2015. Based on that investigation, the laboratory has voided all PT/INR results reported during that period. (Ex. AA, Tab 7). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D6093 Finding #2 – March 18 Letter Statement 4:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit may [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 4 – D6093 Finding #2:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

<u>D6094</u>

<u>Finding #1</u>

<div align="center">

80

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

</div>

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534779

**theran⊙s**

|  |  |  |
| 1701 Page Mill Road | P 650.838.9292 | theranos.com |
| Palo Alto, CA 94304 | F 650.838.9165 |  |

The March 18 Letter states: *"See our reviews of D5391, D5393, D5791, and D5793."* Accordingly, we refer you to our responses to those reviews.

Finding #2

The March 18 Letter states: *"See our reviews of D5413, D5481, D5801, D5805, and 5821."* Accordingly, we refer you to our responses to those reviews.

**D6098**

The March 18 Letter states: *"See our review of D5805."* Accordingly, we refer you to our response to your review of D5805.

**D6102**

**D6102 – March 18 Letter Statement 1:** *"The laboratory submitted protocols relating to testing personnel training (Ex. A, Tab 16, §§ 4.5.3 and 6.4) which state the following:*

- *§ 4.5.3 'Testing personnel/trainee are responsible to ensure that training is properly documented using CL-FRM-03016-F4, Training Attendance Form, approved by the designated trainer and stored in the relevant binder.'*
- *§ 6.4 '... It is the responsibility of the trainee and trainer to ensure the SOP is accurate.'*

*However, the regulations require that the laboratory director, not the testing personnel, is responsible for ensuring that prior to testing patient specimens, all personnel have the appropriate training and have demonstrated that they can perform all testing operations to provide and report accurate results."*

**Theranos Response to Statement 1 in D6102:** The laboratory has revised its training and competency procedures to clarify that the laboratory director has the responsibility to ensure adherence to the Quality Management System, including the training and competency procedures. (Ex. BB, Tab 9 §§ 4.1, 4.7.6, 6.9.9.1). Training on these procedures has occurred. (Ex. BB, Tabs 9B-9C).

**D6102 – March 18 Letter Statement 2:** *"Training documentation submitted in Ex. A, Tab 11 only includes training on protocols related to testing personnel qualification requirements and delegation of responsibilities, as well as job descriptions. The laboratory provided no documentation or plan to train or retrain testing personnel on the Theranos Proprietary Device."*

**Theranos Response to Statement 2 in D6102:** There appears to have been a miscommunication because the TPS 3.5 was **fully retired** before the survey began on September 22, 2015. Because the TPS 3.5 is not being used, and will not be used in the

81
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                                                 THER-0534780
Fed. R. Crim. P. 6(e) material

**ER-3138**

**theran⊚s**

| | 1701 Page Mill Road | P 650.838.9292 | theranos.com |
| | Palo Alto, CA 94304 | F 650.838.9165 | |

future, the laboratory is not required to train or re-train personnel on tests that used to be run on that retired instrument.

**D6102 – March 18 Letter Statement 3:** "*Training documents submitted in Ex. A, Tab 17 only addressed review of the document control and training and competency protocols, but did not include training or retraining documentation for personnel performing testing in the venipuncture lab nor did it include an investigation if patient were affected or potentially affected when untrained or partially trained testing personnel were performing patent testing.*"

**Theranos Response to Statement 3 in D6102:** The laboratory previously submitted training and competency documentation for all testing personnel as part of its response to D6124. The laboratory has updated that documentation. A list showing which testing personnel operate each instrument currently in use is enclosed. (Ex. HH, Tab 9A).[14] Current training and competency documentation for those testing personnel and those instruments is also enclosed. (Ex. HH, Tab 9B).

D6102, paragraph a, concerns the personnel training documentation for the TPS 3.5. The TPS 3.5 was **fully retired** in early-August 2015. The laboratory values CMS's feedback, and takes it very seriously. The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was fully retired in early-August 2015. As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5. (Ex. AA, Tab 3). The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures. Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015. As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015. (Ex. AA, Tab 3). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

---

[14] Please note that Chi Nguyen, who is listed on the Form 209, is no longer a member of the CLIA laboratory (we will update our Form 209 accordingly), which is why she does not appear on any of the training documentation.

82
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534781

**theran⬤s**

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

As set forth in the attached analysis, the laboratory has enclosed training documentation for Testing Person #6 (TP6); Testing Person #11 (TP11); and Testing Person #31 (TP31). (Ex. HH, Tabs 14, 15, 16). The analysis of these training records is set forth in Ex. AA, Tab 12.

**D6102 – March 18 Letter Statement 4:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit **may** [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

> **Theranos Response to Statement 4 – D6102:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

## D6108

The March 18 Letter states: *"See our review of D6115."* Accordingly, we refer you to our response to your review of D6115.

## D6111

The March 18 Letter states: "Based on the laboratory's submission, this requirement is met."

## D6115

**D6115 – March 18 Letter Statement 1:** *"The laboratory submitted a protocol for a Master Validation Plan at Ex. E, Tab 30B which was a different protocol than presented to the surveyor. In Ex. E, Tab 1, under the Accuracy section, the submission indicates that 'some of the immunoassays on the TSP [Theranos Proprietary System] were 'calibrated' or 'corrected' to*

83
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                    THER-0534782
Fed. R. Crim. P. 6(e) material

**theran♥s**

1701 Page Mill Road     P 650.838.9292     theranos.com
Palo Alto, CA 94304     F 650.838.9165

*remove systemic bias between the two methods.' It is not clear what specific biases were used for each analyte which used a corrected results or if the corrected or uncorrected results was reported.*

**Theranos Response to Statement 1 – D6115:** This deficiency concerns the TPS 3.5, which was one of the Theranos proprietary technologies in use in 2014 and 2015. The laboratory began phasing out the TPS 3.5 in December 2014, and it was **fully retired** in early-August 2015.

The laboratory values CMS's feedback, and takes it very seriously. The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was fully retired in early-August 2015. As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5. (Ex. AA, Tab 3). The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures. Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015. As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015. (Ex. AA, Tab 3). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D6115 – March 18 Letter Statement 2:** *In addition, the Accuracy section described that the "samples spanned the medical decision levels (MDL)". We are unclear as to the laboratory's definition of "medical decision limits." No definition of this phrase was found in Section 3 - Definitions of the "Method Validation" protocol or in Ex. E. We also note that the submitted protocol does not include a reference to "medical decision limits" as a criterion for determining accuracy.*

**Theranos Response to Statement 2 – D6115:** D6115 concerns the TPS 3.5. The TPS 3.5 was **fully retired** before in early-August 2015. References to method validation data in documents enclosed with the submission are to validation reports prepared **before** the survey began and before the laboratory's revised procedures were made effective (those reports were either reviewed by CMS or available to CMS during the survey), which were referenced for context. In addition, the laboratory has further revised its method verification procedure, which now has no reference to "critical medical decision limits." (Ex. BB, Tab 5).

84
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                    THER-0534783
Fed. R. Crim. P. 6(e) material

theran⊛s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

The laboratory's revised method verification procedure references a "medical decision level," which is defined in the procedure as "[t]he concentration of analyte in blood or bodily fluid sample being analyzed at which some medical action is indicated for proper patient care. There may be several medical decision limits for a given analyte." (Ex. BB, Tab 5 § 3.9). In addition, this revised procedure references CLSI EP28-A3 (Ex. BB, Tab 5 § 10.6), which states: "for some analytes, reference intervals have been replaced by *decision limits [emphasis in original]*, established by national (or international) consensus. As examples, consider cholesterol and glycated hemoglobin." Training on the laboratory's revised method verification procedure has occurred. (Ex. BB, Tabs 5B-5C).

**D6115 – March 18 Letter Statement 3:** *"We also note that the laboratory's submission provided no indication why the validation report for SHBG had an effective date of 7/14/14, but was not approved by the laboratory director until 9/19/15, even though patient testing began 7/28/14."*

**Theranos Response to Statement 3 – D6115:** This issue is similar to the issue addressed in the discussion above regarding D5407. As reflected by the Lab Director deficiencies identified by CMS, the prior lab directors did not provide sufficient oversight over the documents cited in D5407 and D6115. This appears to be one of the reasons why these documents were not timely reviewed and signed by the prior lab directors. In addition, the laboratory has found that its quality assurance oversight over these documents, including document control oversight, was not sufficient. The laboratory has hired a new lab director, who has approved enhanced document control policies and procedures to address this issue. (Ex. BB, Tab 1 §§ 5.1, 5.2, 5.3, 6.1, 6.2, 6.3). Training on those procedures has occurred. (Ex. BB, Tabs 1B-1C). The laboratory has also hired a Document Control Manager whose responsibilities include tracking new and revised policies and procedures to ensure that they are reviewed and approved by the lab director before they become effective. (Ex. HH, Tab 7C). In addition, the laboratory's revised QMPI Program procedures and agenda require review of procedures that are new, revised, or in process at monthly QMPI Program meetings. (Ex. BB, Tab 7 §§ 7.1, 7.5.6).

**D6115 – March 18 Letter Statement 4:** *The laboratory's submission in Ex. E, Tab 1 states:*

*The procedure and acceptance criteria outlined in the "Guidance for Industry: Bioanalytical Method Validation, 2001" document from FDA was followed to establish the analytical measurement range (AMR) (reportable range) for these immunoassays run on the TPS. Theranos did not follow the validation plan for immunoassays (ELISAs) as outlined in Master Validation Plan for ELISA Assays on Theranos Devices.*

85
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                                THER-0534784
Fed. R. Crim. P. 6(e) material

ER-3142

theran⬤s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

*The laboratory's response does not include a copy of the FDA protocol, and does not state in the submitted master validation protocol, CL PLN-14002, Rev. A, that the FDA protocol should be used to determine AMR.*

*The laboratory submitted a protocol for a Master Validation Plan at Ex. E, Tab 30B which requires the %CV of replicates to be not more than 20% (25% at the lower and upper limits of detection). The submitted protocol was different than the protocol presented to the surveyor at the time of the onsite survey which required the %CV of replicates to be not more than 15% (20% at the lower and upper limits of detection). The %CV in the protocol presented to the surveyor at the time of the onsite survey matched the %CV of the predicate devices. Based on the protocol submitted in the submission, it is unclear as to why the TPS, which is covered by the Master Validation Plan, can now have %CV's for replicates greater than the predicate devices. No explanation for the change in %CV was submitted. In addition, we noted that the information submitted in Ex. E, Tab 1 did not include a 20-day precision study as required by the submitted protocol.*

*The laboratory's submitted protocol requires that 120 samples be used to determine Reference Intervals (see Ex. E, Tab 30B), Ex. E, Tab 1 states:*

> *However, the validation plan noted that the reference range would be established with 120 samples per partition. However, the study followed CLSI procedure for transferring a reference range - the process by which one adapts a previously established reference range to a new analytical method. Furthermore, the transferred reference range was verified following CLSI guidelines - namely "the process by which one ensures, with reasonable confidence, using a relative small number of reference individuals (eg, n=20), that a reference interval established elsewhere, or transferred from another study, can be used locally.*

*We question the laboratory's procedure for "transferring a reference range" since the laboratory provided no reference document to support "transferring a reference range." We note that the submitted protocol does not state in Section 18, Reference Range, that the laboratory can "transfer" a reference range. It is unclear as to how the laboratory determined that the predicate method's reference range could be adapted or "transferred" to the Theranos Proprietary Devices, which used different methodology than the predicate method.*

**Theranos Response to Statement 4 – D6115:** D6115 concerns the TPS 3.5. The TPS 3.5 was **fully retired** in early-August 2015. In addition, the laboratory **stopped** using its other LDTs, and does not have plans to resume using them as it transitions to compliance with FDA quality systems requirements for its LDTs and introduces next generation technologies. Accordingly, neither the master validation plan for ELISA assays nor "*Guidance for*

86
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                    THER-0534785
Fed. R. Crim. P. 6(e) material

**theran◉s**

| | |
|---|---|
| 1701 Page Mill Road | P 650.838.9292   theranos.com |
| Palo Alto, CA 94304 | F 650.838.9165 |

*Industry: Bioanalytical Method Validation, 2001"* are being used by the laboratory.  The laboratory does not plan to use either of those documents, plans or procedures in the future.

The laboratory will ensure that all future validation plans are documented and supported in accordance with the laboratory's new quality systems and procedures.  Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures.  The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016.  Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory.  In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant.  Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team.  The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

The laboratory values CMS's feedback, and takes it very seriously.  The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was **fully retired** in early-August 2015.  As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5.  (Ex. AA, Tab 3).  The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures.  Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015.  As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015.  (Ex. AA, Tab 3).  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.[15]

---

[15] In discussing establishment of precision for an LDT, the March 18 letter references a comparison of %CVs between an LDT and "predicate devices."  We note, however, that CLIA regulations do not contain any regulation requiring that there be any correlation or equivalence of %CV between LDTs and predicate devices.  Rather, the regulations require only that the precision for the test must be established for the LDT itself.  42 C.F.R. § 493.1253(b)(2).  It also is generally accepted that accuracy is the only required performance specification that typically requires a correlation study.  42 C.F.R. § 493.1253(b)(2).

87

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534786

ER-3144

theran⊙s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

**D6115 – March 18 Letter Statement 5:**  *"The laboratory's submission does not indicate that the % Recovery and Allowable Bias citations had been addressed…. Because the laboratory has not shown that it can follow its own validation protocols, it is unclear whether the laboratory's quality assessment mechanisms could monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

**Theranos Response to Statement 5 – D6115:**  D6115 concerns the TPS 3.5.  The TPS 3.5 was **fully retired** in early-August 2015.  In addition, neither the master validation plan for ELISA assays nor the master validation plan for chemistry assays are being used by the laboratory.  The laboratory does not plan to use either of those documents, plans or procedures in connection with clinical testing in the future.

The laboratory values CMS's feedback, and takes it very seriously.  The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was fully retired in early-August 2015.  As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends on the TPS 3.5.  (Ex. AA, Tab 3).  The laboratory has new leadership and a new QMPI Program with robust quality monitoring and program improvement procedures.  Based on its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015.  As corrective action, the laboratory has, out of an extreme abundance of caution, voided results reported for assays run on the TPS 3.5 in 2014 and 2015.  (Ex. AA, Tab 3).  Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

The laboratory is capable of ensuring that the deficient practice in D6115 does not recur. Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures.  The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016.  Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory.  In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant.  Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team.  The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits. For

88
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                                    THER-0534787
Fed. R. Crim. P. 6(e) material

theran⬤s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

example, § 8.1.1.3 of the method verification procedure lays out the requirements for a recovery design as part of an IVD verification. (Ex. BB, Tab 5 § 8.1.1.3).

**D6115 – March 18 Letter Statement 6:**  *"Ex. E contains a list of patient specimen accession numbers for which the laboratory 'identified reports', but did not specify, or submit documentation to show that corrected reports were generated and issued."*

> **Theranos Response to Statement 6 – D6115:**  As described above, the laboratory has revised its patient assessment analysis based upon a thorough re-review of QC data for the TPS 3.5.  Based on that analysis, the laboratory has, out of an extreme abundance of caution, voided all results reported for assays run on the TPS 3.5 in 2014 and 2015. (Ex. AA, Tab 3). Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK).  Transmission will be complete by March 31, 2016.  The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

<u>D6124</u>

**D6124 – March 18 Letter Statement 1:**  *"Ex. A, Tab 16, § 7.3 of the submission contains a competency assessment protocol, Annual Competency. However, the protocol does not address the cited deficiency that direct observation was required for instrument maintenance and function checks. The protocol at § 1.1.7 (page 12) allows for a choice of validation method of which direct observation is one choice. The submitted laboratory protocol also requires the use of CL FRM 03016-F3 for annual competency. This form also allows the assessor to choose the validation method for competency assessment. Neither the submitted protocol nor the form to document competency assessment indicate that the six required procedures for CLIA competency assessment are required."*

> **Theranos Response to Statement 1 in D6124:**  The laboratory has revised its training and competency procedures to clarify that the performance of maintenance and function checks <u>must</u> be directly observed (Ex. BB, Tab 9 §§ 6.9.4.4, 9.1), and to expressly require each of the procedures required by 42 CFR § 493.1451(b)(8)(iv). (Ex. BB, Tab 9 §§ 6.9.4).  Training on these procedures has occurred. (Ex. BB, Tabs 9B-9C).

**D6124 – March 18 Letter Statement 2:**  *"Ex. L, Tab 4 of the submission states: 'All testing personnel currently performing tests have completed competency testing with direct observation of, among other things, maintenance and function checks for the tests they are performing.' We are unable to determine if the documentation is complete as there is no information submitted about which testing personnel were performing testing on which instrument(s). Because the laboratory has not shown that it has corrected this deficient practice, we are also unable to determine whether the laboratory's quality assessment mechanisms can monitor the laboratory's corrective actions and ensure this deficient practice does not recur."*

<div align="center">89

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT</div>

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material                                                      THER-0534788

theran⊙s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

**Theranos Response to Statement 2 in D6124:** The laboratory's submission included training and competency documentation for all testing personnel on the instruments they were operating at that time. The laboratory subsequently made some minor staffing changes. A list showing which testing personnel operate each instrument currently in use is enclosed. (Ex. HH, Tab 9A). Current training and competency documentation for those testing personnel and those instruments is also enclosed. (Ex. HH, Tab 9B). That documentation shows that all testing personnel have completed competency testing for the tests they are performing. (Ex. HH, Tabs 9A-9B).

The laboratory is capable of ensuring that the deficient practice in D6124 does not recur. Significantly, the laboratory has brought in an entirely new leadership team that is directly involved with implementing and monitoring the laboratory's new procedures. The new laboratory director, Dr. Kingshuk Das, began working for the laboratory full-time as of March 14, 2016. Dr. Das is also one of the laboratory's technical supervisors, which further reflects his level of involvement in the laboratory. In addition, the laboratory has hired Donald Tschirhart, M.D to be a full-time co-director (under California regulations) and a full-time clinical consultant. Dr. Tschirhart has over 15 years of experience as a clinical laboratory director, and is a valuable part of the laboratory's new leadership and oversight team. The laboratory's new leadership team has installed an entirely redesigned QMPI Program, as well as robust audit procedures that required monthly and quarterly audits.

<u>D6170</u>

**D6170 – March 18 Letter Statement 1:** *"Ex. J, Tab 46 contains lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were generated and issued."*

> **Theranos Response to Statement 1 in D6170:** Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D6170 – March 18 Letter Statement 2:** *"The submission further states:*

- *"Based on comprehensive review, multiple examples of failed QC [quality control] without the appropriate documentation with no investigation or corrective action was identified which is now addressed with revised SOPS and training."*
- *" ... the review identified multiple examples where technical service provided PM and that service was not documented in addition to failed QC run as part of the service which is now addressed with revised SOPs and training."*

<div align="center">

90
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

</div>

FOIA Confidential Treatment Requested by Theranos                                         THER-0534789
Fed. R. Crim. P. 6(e) material

theran⊙s

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

*The laboratory provided no documentation of investigation or corrective action for these QC failures and lack of maintenance documentation."*

**Theranos Response to Statement 2 in D6170:** There appears to have been a miscommunication here because the laboratory **stopped** running tests on the Fortessa and Canto before the survey began on September 22, 2015, and has **not** run any tests on the instruments since then. Because the Fortessa and Canto instruments are not in use, and have not been in use since the survey began, there have not been any new QC failures or maintenance issues that required investigation or corrective action under the laboratory's new procedures. The "review" discussed in the submission was simply intended to refer to the analysis conducted to address the deficiency identified by CMS. The issue addressed by the "review" — i.e., failing to document corrective action for QC fails for the Fortessa and Canto — is the same issue identified by CMS in its deficiency, and thus did not constitute a new issue or occurrence.

**D6170 – March 18 Letter Statement 3:** *"Ex. A, Tab 10, § 5.10 states: 'Unlicensed laboratory personnel are responsible for performing the activities listed below, under direct and constant supervision by licensed test personnel, with strict adherence to regulatory requirements ...' California. The laboratory relied on its written policies and procedures to ensure that appropriately licensed testing personnel were performing and reporting patient test results. However, if the laboratory's policies and procedures are inconsistent with state requirements, we question whether this mechanism would prevent the deficient practice from recurring, and question the laboratory's document control system to ensure accurately written policies and procedures."*

**Theranos Response to Statement 3 in D6170:** The laboratory's policy does not permit unlicensed personnel to run patient tests, and the laboratory did not intend to imply otherwise. To eliminate any confusion or potential for confusion, however, the laboratory has revised this procedure to remove the language identified by CMS. (Ex. BB, Tab 6 § 5.10).

<u>D6171</u>

**D6170 – March 18 Letter Statement 1:** *"Ex. L, Tab 3 of the submission states: 'TP14 has been retrained to ensure that TP14 only performs activities within the scope of TP14's job description as a clinical laboratory associate, under the supervision of testing personnel. Because TP 14 is not testing personnel, the high complexity personnel educational requirements do not apply.' The CLIA job responsibilities in the job description provided at Ex. L, Tab 3 does include CLIA regulatory responsibilities for testing personnel, and as such TP14 was required to meet the educational requirements. The laboratory's submission does not provide any additional*

91
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0534790

**theranos**

| | 1701 Page Mill Road | P 650.838.9292 | theranos.com |
| | Palo Alto, CA 94304 | F 650.838.9165 | |

*documentation that establishes that TP14 was qualified to perform high complexity testing. TP14 remains unqualified to perform high complexity testing.*

**Theranos Response to Statement 1 in D6170:** The job description for TP14 has been revised to be consistent with the job description of a Clinical Laboratory Associate in the laboratory's revised personnel procedures. (Ex. HH, Tab 7B). The laboratory has confirmed that TP14 has not performed any test analyses between November 2015 and his execution of this revised job description. (Ex. HH, Tab 7A).

<u>D6178</u>

**D6178 – March 18 Letter Statement 1:** *"Ex. F contains lists of patient specimen accession numbers for which the laboratory intended to issue corrected test reports. The laboratory provided no documentation to indicate corrected reports were generated and issued."*

**Theranos Response to Statement 1 in D6178:** Many corrected reports have been transmitted, and the remainder are being transmitted. (Ex. KK). Transmission will be complete by March 31, 2016. The remainder of the transmittals and confirmations of receipt will be provided to CMS under separate cover.

**D6178 – March 18 Letter Statement 2:** *"To ensure the deficient practice does not recur, the laboratory indicated that quarterly audits will be performed and suggested that the audits results would be reviewed within the laboratory's QMPI Program. However, the laboratory did not establish the procedure by which these quarterly audits are to be conducted. In its submission, the laboratory indicates that a "tracer audit **may** [emphasis added] be used," but did not provided a protocol for a "tracer audit," the means by which a "tracer audit" would be documented, and whether the results of a "tracer audit" would be the information reviewed by the QMPI Program."*

**Theranos Response to Statement 2 – D6178:** The laboratory has revised its audit procedures to establish the procedures by which audits are to be conducted. (Ex. BB, Tab 8). Training on these procedures has occurred. (Ex. BB, Tabs 8B-8C). The revised procedures establish that tracer audits must occur monthly; provide the protocol for a tracer audit; and require that tracer audits be documented using the tracer audit form, CL FRM 00046 F2. (Ex. BB, Tab 8 § 8.1). In addition, the revised audit procedures require a quarterly audit to cover the quality management systems; provide the protocol for quarterly audits; and require that quarterly audits are documented using the audit record form, CL QOP 00046 F1. (Ex. BB, Tab 8 § 8.2). The QMPI Program QOP has been revised to make clear that "[b]oth tracer and quarterly audits are reviewed, analyzed and presented based on findings and analysis" during the QMPI Program meetings. (Ex. BB, Tab 7 § 7.5). Training on the revised QMPI procedures has occurred. (Ex. BB, Tabs 7B-7C).

<div align="center">92</div>

<div align="center">TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION<br>EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT</div>

FOIA Confidential Treatment Requested by Theranos                                         THER-0534791
Fed. R. Crim. P. 6(e) material

theran⬤s

1701 Page Mill Road    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

Sincerely,

Dr. Kingshuk Das
Laboratory Director
Theranos, Newark California Laboratory

93
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION
EXEMPT FROM DISCLOSURE UNDER FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                                    THER-0534792
Fed. R. Crim. P. 6(e) material

# Exhibit 7

**Holliman, Lakisha (USACAN)**

| | |
|---|---|
| **From:** | Stephen Master <stephen.r.master@gmail.com> |
| **Sent:** | Tuesday, February 18, 2020 5:35 PM |
| **To:** | Doerr, Tyle (USACAN) |
| **Cc:** | Leach, Robert (USACAN); Baehr-Jones, Vanessa (USACAN); Mendiola, Nenita (USACAN); Ramina.Hinajon@usdoj.gov |
| **Subject:** | Fwd: K signed SF1449 20P0035 Stephen Master_001.pdf |
| **Attachments:** | K signed SF1449 20P0035 Stephen Master_001.pdf |

Apologies, meant to reply all with this.

Steve

Sent from my iPad

Begin forwarded message:

> **From:** Stephen Master <stephen.r.master@gmail.com>
> **Date:** February 18, 2020 at 8:30:15 PM EST
> **To:** Tyle Doerr <tyle.doerr@usdoj.gov>
> **Subject: K signed SF1449 20P0035 Stephen Master_001.pdf**


> Sent from my iPad

1

USAO-006872

# Exhibit 6

*United States v. Elizabeth Holmes & Ramesh Balwani*, CR 18-258 EJD (N.D. Cal.),
Expert Report of Stephen Master, MD, PhD, FCAP, FAACC

March 6, 2020

I. Qualifications

I received my undergraduate degree in molecular biology from Princeton University and my MD and PhD (cell and molecular biology) from the University of Pennsylvania School of Medicine.  I then did a residency in Clinical Pathology at the Hospital of the University of Pennsylvania, including time serving as Chief Resident in Clinical Pathology.  After completing my residency, I spent a postdoctoral year as a research associate at Penn prior to joining the faculty as Assistant Professor of Pathology and Laboratory Medicine.  During my time at Penn, I was appointed Medical Director of the Endocrinology Laboratory at the Hospital of the University of Pennsylvania, and I also spent 5 years as director of the University of Pennsylvania translational core laboratory.  In 2015 I moved to Cornell as a faculty member at Weill Cornell Medical Center in New York City, where I was director of the Central Laboratory and Chief of Clinical Chemistry Laboratory Services at Weill Cornell Medicine / New York Presbyterian Hospital.  In 2018 I returned to Philadelphia at the Children's Hospital of Philadelphia, where I currently serve as Chief of the Division of Laboratory Medicine, Medical Director of the Michael Palmieri Laboratory for Metabolic and Advanced Diagnostics, and Associate Professor of Pathology and Laboratory Medicine at the Perelman School of Medicine, University of Pennsylvania.

1

I am Board Certified by the American Board of Pathology (ABP) in Clinical Pathology, and I have additional subspecialty Board Certification from ABP in Clinical Informatics.  I hold an active medical license in Pennsylvania.  I am a Fellow of the College of American Pathologists as well as of the Academy of the American Association for Clinical Chemistry.  I serve on the Board of Editors of the journal *Clinical Chemistry*, as well being an Associate Editor of *Clinical Proteomics* and Section Editor in Clinical Chemistry for the *Archives of Pathology and Laboratory Medicine*.  I have been active professionally in the American Association for Clinical Chemistry, having served on their Board of Directors for five years.  I serve as a member of the Harmonization Oversight Group of the International Council for the Harmonization of Clinical Laboratory Results.  I currently have over 75 publications, including original research articles, reviews, and book chapters.  In addition, I have lectured extensively at a national and international level on a variety of subjects related to Clinical Chemistry, including new paradigms for quality control.  Of note, I was a member of the panel that facilitated questions and answers following the Theranos presentation at the 2016 annual meeting of the American Association for Clinical Chemistry.

My CV is attached as Appendix A.

II.  Scope of Assignment

I have been retained by the United States Attorney's Office for the Northern District of California to testify as an expert witness in this matter.  For purposes of this report, I was asked to provide opinions on whether Theranos was market ready and able to produce accurate and reliable fingerstick results for tests such as Vitamin D, chloride, potassium, bicarbonate, HIV,

2

HbA1c, hCG, cholesterol, and sodium, whether Theranos adhered to normal industry standards for clinical laboratory testing from 2013-2015, and whether any lack of adherence had the potential to adversely impact test accuracy and reliability.  This report is intended to summarize my opinions and my anticipated testimony.  I reserve the right to supplement or revise this report or to address additional questions if asked and based on additional information received and the evidence presented at trial.  My compensation is $400 per hour.  This report and the opinions contained herein are based on my training in clinical pathology and chemistry, my experience as a laboratory medical director, and my knowledge of standards and best practices as established by federal regulations and by the College of American Pathologists ("CAP").  I also considered publicly available information, scholarly research, and materials produced in discovery in this case, which are identified in Appendix B.

III.  Background on Blood Testing

*Blood Testing: Samples*

Modern blood testing in the clinical laboratory begins with collection of a patient sample.  Traditionally, this is performed using a needle that punctures a vein in the arm, and this process is called venipuncture.  The blood that is collected from the vein in this way is called venous blood.  A second way of collecting blood involves using a sharp lancet to puncture the end of a finger or (in the case of a newborn) the heel of a foot.  The blood that is collected from these sources is known as capillary blood, because it comes from the very small blood vessels known as capillaries.  In certain hospital settings, blood is collected from an artery ("arterial blood").  As oxygen-filled blood travels through arteries, then into capillaries, and

3

finally into veins for its return trip to the heart, tissues along the way can take up or secrete substances.  As a result, there can be differences between arterial, capillary, and venous blood.

It is also worth noting that both arterial and venous blood samples are obtained using a needle inserted into a large enough blood vessel that there is very little concern about inadvertently collecting a significant amount of unwanted material.  In the case of capillary blood, however, the fingerstick can, under some circumstances, break apart cells and/or release fluid that does not come directly from the blood vessel (capillary) itself.  This may have more of an effect on some analytes than on others.  For example, blood glucose testing from a fingerstick is widely accepted except in certain situations where a patient is not adequately delivering blood to their fingertips.  Conversely, because the inside of a cell contains more potassium than the outside of a cell, breaking apart many cells could theoretically increase the amount of potassium in a sample (note that the same is true for any blood sample—arterial, venous, or capillary—if the red blood cells are broken apart; this is known as "hemolysis").

Under normal circumstances, blood is removed from the body begins to clot.  Given this issue, there are three primary ways that blood is handled for medical testing.  The first method involves testing the blood before it has a chance to clot, and this whole-blood method is the basis of some portable ("point-of-care") test devices such as glucose meters.  In the second method, blood is drawn into a tube where it is allowed to clot, and then this collection tube is spun in a device known as a centrifuge.  This spinning causes the clot itself to move to the bottom of the tube, and the remaining fluid, known as "serum", can be used for testing.  In the third method, the tube into which the blood is drawn contains what is known as an anticoagulant, which prevents clotting from taking place.  There are several widely-used

4

anticoagulants, including heparin, EDTA, and citrate.  When anticoagulated blood is spun in a centrifuge, the blood cells move to the bottom of the tube, and the remaining fluid is known as "plasma".  Of note, different tests that are performed on may have different requirements in terms of the type of anticoagulant that is acceptable.

Once an appropriate sample has been obtained, blood can be tested in a variety of ways.  A test for a given substance in the blood (or characteristic of the blood) is known as an "assay", and the substance being measured is known as the "analyte".  So, for example, an assay for Vitamin D is a laboratory test where Vitamin D (the analyte) is measured in a sample.  The instrument that performs the testing is considered a medical device, because it is used to diagnose a disease or other condition, and other components of blood testing, such as the tubes into which blood is drawn, are also considered medical devices.  There are a variety of ways that testing is actually performed, such as monitoring a chemical reaction that produces a detectable change in light absorption, measuring the binding of an antibody to an analyte, or making copies of DNA or RNA such that a specific sequence can be detected.  Most clinical laboratories utilize commercial instruments that accept a blood tube or smaller container, acquire up a small amount for testing, and return a result.

When the results of a blood test are reported, any quantitative result must include the "reference range" for that assay.  This represents the expected normal range for the assay, and is determined by measuring results from a large group of healthy individuals.  Upper and lower values of the normal range are set so that 95% of normal individuals fall in that range.  Clinicians can use the reference range to determine if there is likely to be a significant abnormality in a patient's lab result.

*Blood Testing: Assay Performance*

There are two basic concepts that characterize the performance of a laboratory test: accuracy and precision.  Accuracy refers to how close the result comes to the "true" amount of the analyte in a blood sample.  That is, if a gold-standard reference assay measures that a patient has 30 ng/mL of Vitamin D in their plasma, then we would expect that an accurate laboratory assay should also return a result that is close to 30 ng/mL.  If the typical result from a given assay returns 28 ng/mL, we say that this assay is exhibiting "bias".  A certain amount of bias is a normal and expected feature of laboratory tests; however, the degree of bias that is allowed depends on a number of issues, including the clinical implications for the patient.

Precision refers to the degree to which a laboratory test gives the same result when it measures an identical sample many times.  As with accuracy/bias, all laboratory tests have a certain amount of inherent imprecision.  To use one analogy from outside the laboratory, when a patient has their temperature measured, we understand that there is some variability.  One time it read 98.6˚F, and if it is remeasured immediately it might be 98.7, 98.5, or some other value that is close to the "true" temperature.  This does not mean that the patient's temperature is actually changing; it simply may reflect slight variations in measurement.  Similarly, laboratory tests will differ from measurement to measurement, simply due to random chance.  The amount that a test can change from run to run when measuring the same sample over and over can be expressed as the "percent coefficient of variation" (%CV).  If a test has a 5% CV, then most of the time (68% of the time) the measured value will be between 5% of the expected value.  For example, if the expected value of the test is 100, then most of the time the

6

measured value will be between 95 and 105 (this is equivalent to saying that it will be within 1

SD at this expected value).  Less frequently (27% of the time) it may be further away than 95-

105, but still between 90 and 110.  However, 95% of the time it will be between 90 and 110.

Because the imprecision of the test influences its interpretation, it is important that this

variation be carefully controlled and understood.  Typically, for a quantitative analyte in the

clinical lab, the maximum imprecision at which a value would be reported is 20%CV, and it is

much more common to have imprecision that is significantly less than 10%.

Accuracy and precision are linked, because the most important question is whether a

lab test can accurately guide patient care.  The concept of total allowable error (TEa) captures

this by asking how close to the "true" value a lab measurement can be while still being

appropriate for clinical use.  The total error in a measurement is a combination of the bias and

imprecision.  Even an assay with no bias can be unacceptable if the imprecision is too high.

Similarly, an assay that is perfectly precise, but which has excessive bias, will give an answer

that is medically misleading.  To fit within the TEa, the more bias an assay has, the more precise

it has to be; the more imprecise it is, the less bias it can tolerate.  If an assay is shown in

practice to have excessive bias or imprecision, it is not suitable for clinical use.

Another fundamental factor that affects lab performance is the presence of

interferences, including hemolysis (a breaking apart of the red blood cells that releases

hemoglobin), icterus (interference from a substance known as bilirubin), and lipemia (excessive

fat in the blood).  Because these interferences can significantly affect the laboratory value, it is

important the degree to which each assay is affected, as well as to develop a mechanism to

detect the presence of these interferences in a patient sample.

7

**ER-3160**

*Blood Testing: Regulation*

In the US, clinical testing is regulated by the Clinical Laboratory Improvements Amendments (CLIA), which specifies the legal requirements for engaging in medical testing and is broadly administered under the Center for Medicare and Medicaid Services (CMS). Labs that wish to do testing must acquire a CLIA certificate, and the type of CLIA certificate they obtain determines the type of testing that they are allowed to perform. Laboratories that engage in medium- or high-complexity testing must not only obtain the appropriate type of certificate, but are also subjected to regular inspections by the state / CMS or by a team sent from an approved accrediting agency.

The US Food and Drug Administration (FDA) classifies the degree of complexity (for example, medium- or high-complexity) associated with laboratory tests that they have approved or cleared. These classifications not only determine which laboratories can run the tests, but also specify the personnel requirements to run or oversee the tests. Tests become FDA-approved or cleared through a formal approval process that involves submission of specific types of data demonstrating important characteristics of the test, such as accuracy, precision, and the range of values over which the test gives valid results. FDA approval or clearance allows a manufacturer to legally sell the test to others, and CLIA specifies that a lab running an FDA-approved test must first verify the performance of the test in their own laboratory to ensure that it matches the specifications.

Although the majority of tests in most laboratories are FDA-approved or cleared assays, there is a provision under CLIA for laboratories to develop their own in-house tests, known as

8

lab-developed tests (LDTs).  LDTs are automatically classified as high-complexity tests, and thus

no LDTs could ever be legally run in a laboratory that was only certified for medium-complexity

testing.  LDTs can, of course, be an entirely new test that is created by a high-complexity

laboratory; however, any alteration to an FDA-approved or cleared test (such as a new sample

type) makes that test into an LDT.  In my experience, a disclaimer is always added to LDT results

indicating that the test is not FDA approved or cleared, but has been validated by the

laboratory.

One practical significance of LDT classification is that CLIA requires additional

experiments in order to determine that an LDT is suitable for clinical use.  Rather than simply

verifying existing performance specifications as with an FDA-approved test, an LDT requires

validation not only of accuracy, precision, and reportable range, but also of interferences and

other factors.  Additionally, the reference range must be established, which typically takes

many more samples than would be required to simply verify a reference range that had

previously been approved by the FDA.  As a benchmark, while verification of an established,

FDA-approved reference range can be performed with 20 samples, it is typical to use 120

samples to establish a new reference range for an LDT.

A second major requirement of CLIA is a designated laboratory director, who is legally

and medically responsible for results that are returned from the laboratory.  The director is

ultimately responsible for all aspects of testing, including the analytical portions as well as

reporting of results.  Because the laboratory director is ultimately responsible for determining

that the results are appropriate for medical use, it is critical that they be given appropriate

authority to ensure that staffing, processes, instrumentation, and other resources are

9

sufficient.  Further, for a high-complexity laboratory that is developing LDTs, the operation of

those LDTs and their maintenance is the responsibility of the laboratory director.

A third requirement of CLIA is that laboratories engage in proficiency testing (PT).

Proficiency testing is intended to ensure that different labs return values that match each other

to a significant degree.  Typically, identical samples are sent to multiple laboratories, and they

are each required to run that sample exactly as they would a patient sample.  PT results are

then sent back to be graded and compared to the results from other laboratories.  If the lab

returns values that are similar to what other labs have reported, they have passed their

proficiency testing for that analyte.  For a set of common analytes, CLIA mandates that the lab

enroll in an accredited PT program.  Under certain (relatively rare) circumstances where PT is

not available for a given analyte, it may be appropriate to document alternative ways of

assessing PT using patient samples that are exchanged between laboratories or to compare

patient samples to an existing assay for the same analyte.

In addition to proficiency testing, which occurs only a few times a year, CLIA also

mandates that a lab perform a quality control check at various intervals (daily, or even more

often).  Quality control (QC) is intended to ensure that the equipment and assay process are

functioning appropriately, and that nothing has changed that would affect patient results.

Typically, the lab has a standard set of quality control materials for each assay, and these cover

the important ranges that may be seen in patient samples (for example, one quality control

sample at the low end of the measurement range, and one at the high end).  When the assay is

established, the lab establishes an acceptable range for the quality control.  If a quality control

specimen is too far away from this acceptable range, specified rules are applied to determine if

the assay is "out of control".  An assay that fails quality control requires some sort of intervention, whether that is recalibration of the assay, or something more significant.  If an assay is found to be out of control after continuously running samples, the lab would need to determine whether the issues with the assay affected patient results that should be corrected or cancelled.


IV.  Summary of Opinions

*Preliminary comments*

Based on the documents that I reviewed, my understanding is that there were two primary methods that Theranos employed to measure analytes from fingerstick blood samples collected in small devices ("CTNs").  First, they had developed an instrument (often referred to as "Edison", version 3.5) that performed immunoassays.  Second, they used Tecan liquid handlers to dilute small samples and run them on traditional clinical chemistry analyzers obtained from other vendors (predominantly Siemens Diagnostics).  Because neither of these approaches used unmodified, FDA-cleared or approved assays in an unmodified form, they are both considered laboratory-developed tests (note that I am not here taking a position on the FDA's role in regulating these laboratory-developed test, simply pointing out their classification under CLIA).  There is a third class of testing that Theranos was performing using traditional venous samples on FDA-approved or cleared instruments from third-party vendors.  I will not make many comments about this last class of testing, since it is identical to the testing performed in most labs in the U.S.

11

Related to this discussion, it is my opinion that, when considering the two Theranos methods for testing fingerstick samples, only the first method employing an Edison-style (or, later in 2016, miniLab-style) instrument could ever, under any conceivable future model, have been developed into an instrument that could be deployed at a remote site in closer proximity to the patient (i.e. not at a central reference lab site).

*Assessment of Theranos blood testing technology*

In my opinion, Theranos was not market ready and able to produce accurate and reliable fingerstick results for tests such as Vitamin D, chloride, potassium, bicarbonate, cholesterol, and sodium.  In addition, there are substantial questions about the ability of their laboratory to provide patient-appropriate results for calcium, HIV, HbA1c, and hCG.  In the following section, I will provide some of the primary reasons and evidence that support this opinion.

In order to produce accurate and reliable results, a clinical assay must typically agree with the accepted results from a gold standard (accuracy), and it also must be able to do this reproducibly (reliable).  This reproducibility is referred to as precision, the imprecision of an assay can be measured as %CV.  As a benchmark, for example, a 2010 publication testing a commercially-available vitamin D assay showed a %CV of roughly 12-18%.  Theranos had a standard operating procedure protocol that indicated that validated assays must have 15%CV, with a possibility of 20%CV at the extremes of the assay.  However, the report of the CMS inspection from 2015 shows that, in the course of routine operations, Theranos QC measurements for this assay on a single instrument demonstrated a CV as high as 63.8%.  This

12

**ER-3165**

was not limited to a single instrument; of the other two instruments documented in the CMS report, one showed a CV of 31.9%, and the other still exceeded the written Theranos standard. This suggests a broader problem with Theranos manufacturing and maintenance, whether at the level of the Edison itself or of the reagent/consumable production.  This problem was not confined to a single assay: the CMS report documents similar issues with assays for Vitamin B12 and SHBG (sex hormone binding globulin), which were also run on the Edison.  The precision issues with Vitamin B12 were documented on 5 different instruments, further supporting the opinion that this was a widespread issue rather than a single "bad" instrument or assay.  An internal Theranos email from 2014 reports that 26% of QC runs failed across 7 assays running on the Edison platform.  Theranos themselves subsequently (and appropriately) voided all tests performed on this platform, effectively acknowledging that the results were not sufficiently accurate and reproducible for patient care.

The CMS QC data also demonstrates problems with the accuracy of Edison assays that were in operational use for patient samples.  The CMS report documents a Vitamin D instrument assay that delivered QC results >2SD from the target mean for 15 days in a row, suggesting a bias in the instrument.  It is not possible to be certain whether this was due to inherent issues with the technology, or with poor lab operational practice (although both cases can adversely affected the quality of the clinical laboratory results).  However, the same phenomenon is seen in multiple other instruments running multiple other assays, showing at a minimum that the accuracy of the instruments was not consistent.  Furthermore, testimony from the laboratory director (Adam Rosendorff) indicated that it would be lab policy to recalibrate an instrument that was failing QC, and we know from other testimony of an

13

example when QC was persistently out of control to the extent that points were removed from the calculation in bring the QC numbers into conformity.  For these reasons, it is reasonable to conclude that the instrument problems were not merely a result of poor operational practice, but were related to the quality of the instruments and assays themselves.

Precision and accuracy issues also affected fingerstick assays that were diluted on the Tecan liquid handler and measured on modified third-party instruments.  For example, a published report from a group at the Icahn School of Medicine demonstrated a significant negative bias in the measurement of cholesterol by Theranos compared with both Quest and LabCorp.  Although it is clearly the case for many analytes that there are issues of standardization and harmonization between assays used by various clinical laboratories, this amount of difference in cholesterol levels was beyond what would be expected given the standards of the field.  Additionally, inaccuracies in a lipid testing result were brought to the attention of the laboratory director in late 2014, who noted that they were inconsistent with commonly-utilized estimates of the relationship between the various components of the lipid test (such as cholesterol).  These strands of evidence support the idea that there were significant accuracy limitations to the Theranos fingerstick cholesterol test.

In April 2014, potassium fingerstick measurements were shown to be abnormally high 17% of the time.  In a healthy population, one would expect to see ~2.5% abnormally high values, and even accounting for prevalence of illness the percentage of high values indicates a fundamental issue with the assay as it was being performed.  There are at least two possible explanations for this: the Theranos assay had significant positive bias (i.e. was inaccurate), or the fingerstick collection modality, possibly including the CTN, led to high hemolysis rates which

artifactually elevated the potassium.  If the latter was the case, the laboratory clearly did not

have a robust method of detecting these hemolyzed samples prior to testing.  In either case,

Theranos was not providing an accurate potassium test during this time frame.

Other electrolyte measurements (e.g. sodium, chloride) were the subject of "frequent

complaints" from customers according to internal Theranos emails.  In an email dated October

27, 2014 from the laboratory director (Adam Rosendorff) to Sunny Balwani and Elizabeth

Holmes, Dr. Rosendorff indicates that the laboratory had instituted a policy of canceling

significantly high or low sodium values because "…we have no way of knowing for sure whether

the result is truly abnormal or artifactual to the assay, or related to a specimen integrity issue."

More generally, there are inherent limitations to the approach that Theranos had taken

for small-volume testing using diluted specimens compared with the original assays.  Because a

less concentrated specimen is more difficult to detect at low levels, both the precision and

lower limit of detection would be expected to be inferior.  While there might be technical

solutions to ameliorate this problem, Theranos' own internal documents discuss degradation of

precision due to a variety of factors in their process, as well as plans to decrease the amount of

dilution in order to improve performance.

Based on customer complaints and Theranos internal investigations, there were

significant issues with calcium, HIV, HbA1c, and hCG assays during the time that these were

performed on fingerstick samples.  In some cases, there are insufficient additional details in the

material I have reviewed to determine the cause of these issues, the relationship to either the

sample type or Theranos technology, or the resolution of the problems.  HbA1c issues appear

to be due to organizational problems with tests being done on different platforms, and

Theranos' practice of not reporting whether the result was obtained from fingerstick or venous blood exacerbated the confusion.  In the case of hCG, multiple inaccurate results had significant and negative clinical implications for patients.  Although in many cases I have not been able to identify a clear paper trail demonstrating the root cause of these inaccuracies, it is noteworthy that HIV, HbA1c, and hCG do not appear on the list of LDTs provided to the FDA by Theranos on 8/26/2015, and thus they had not been found to be suitable for continued clinical use by that point.

As mentioned above, the testimony of Adam Rosendorff indicates that Theranos did not adequately distinguish on reports whether a reported value came from a fingerstick or venous sample, and the reference ranges were not all appropriately adjusted to account for fingersticks.  This is evident in an examination of the primary documents.  For example, in the Theranos validation document for chloride, the same reference range was used for venous and fingerstick.  However, visual inspection shows a clear positive bias in the fingerstick samples.  By obscuring the nature of the sample and not providing an adjusted reference range, a clinician or patient would be unable to distinguish a true change vs. a difference that is due to the differing nature of venous and capillary blood and/or the assay.

Internal emails and documentation show that Theranos were struggling with a number of ongoing technical issues involving hemolysis, sample leakage, variations in materials that affected function, and other issues with the CTN.  This is consistent with the issues surrounding potassium (see above).  An internal company email from 2016 refers to fundamental design issues in the EDTA-containing collection device that cause hemolysis.

16

In 2016, in a public session at the Annual Meeting of the American Association for Clinical Chemistry, Theranos publicly announced an additional instrument (the "miniLab") that they had not previously used in clinical testing through 2013-2015.  Although some performance data were shown for a small number of assays, there were no clear data on the robustness of the machines in an operational setting, which would raise concerns based on the fact that previous Edison instruments that had reportedly passed validation were nonetheless shown by the QC performance to not yield reproducibly accurate, reliable results.  During the presentation, Theranos also acknowledged that what they showed was not ready for patient testing.

*Assessment of Theranos laboratory performance relative to industry standards*

In my opinion, Theranos did not adhere to normal industry standards for clinical laboratory testing from 2013-2015.  Further, this lack of adherence had the potential to adversely impact test accuracy and reliability.

In documented cases, it was noted that the Theranos QC system for Edison devices did not prevent samples from being run when the QC was out of the appropriate specifications.  On pp. 37-41 of the CMS report, the inspectors documented a large number of instances where the QC system designed to prevent running samples on an out-of-control instrument did not function.  Running patient samples when QC is giving values out of the acceptable range directly impacts the accuracy and reliability of the results that are returned to the patient or clinician.

17

Theranos did not appropriately engage in proficiency testing.  From the testimony of the lab director at the time, Adam Rosendorff, proficiency testing was only performed using unmodified third-party, FDA-approved platforms.  Proficiency testing for Theranos-modified third-party platforms and for the Edison was not performed, even when the Theranos-modified test became the primary test for the laboratory.  Additionally, Theranos developed an internal rationale for utilize so-called alternative proficiency testing.  In my opinion, it is not consistent with the standards of the field for a laboratory to unilaterally decide that they should be exempt from properly participating in PT for a listed CLIA analyte.  There are clear examples where a sufficient peer group does not exist for a method, and the authorized PT provider simply groups the results with others running the same analyte on a different platform.  In my opinion, the burden of proof would be on the laboratory to demonstrate to the PT provider that a significant commutability issue exists for their method.  Even granting Theranos' interpretation, however, alternative proficiency testing was not appropriately performed (to the laboratory director's knowledge) at any point prior to October 2014, and thus Theranos was not appropriately ensuring the ongoing accuracy of their assays.  The CMS report makes a similar point (not with PT *per se*, but with instrument-to-instrument comparison) for individual Edison analyzers.  Theranos did not adhere to industry standards, and this had the potential to adversely affect the accuracy of their results.  Additionally, if and when Theranos reported results of proficiency testing, those results were not derived from Theranos technology.

As recently as Fall 2015, Theranos did not have FDA approval or clearance for their CTN. This is significant, because (as described above) internal emails and documentation show that they were struggling with a number of ongoing technical issues involving hemolysis, sample

leakage, variations in materials that affected function, and other issues.  These issues in and of

themselves could affect the accuracy and reliability of their results.  Further, however, from a

regulatory perspective Theranos argued that their collection device, which was used in settings

far removed from their high-complexity laboratory, fell under the umbrella of their laboratory-

developed test.  In my experience, I am unaware of any laboratory that has similarly attempted

to extend the boundaries of their lab-developed test in this way.  Thus, it is my opinion that this

is not in accordance with normal industry standards, and, based on the reported issues, the lack

of demonstrating performance data sufficient to obtain FDA clearance for use of this device had

the potential to negatively impact their test results.

Finally, as stated in the section on the regulation of blood testing, in my experience a

disclaimer is always added to LDT results indicating that the test is not FDA approved or

cleared, but has been validated by the laboratory.  There was no indication on the report to a

clinician that would indicate that a given test was not FDA approved or cleared, or would allow

a clinician to distinguish in any way between tests that Theranos was performing by their own

methods and tests that Theranos was performing using traditional, approved third-party

analyzers.  The lab director, Adam Rosendorff, who is responsible for the reporting of results,

raised this issue; however, he was told by Mr. Balwani that such a disclaimer was not required.

19

**Appendix A: CV**

UNIVERSITY OF PENNSYLVANIA - PERELMAN SCHOOL OF MEDICINE
Curriculum Vitae

Date: 02/20/2020

Stephen R. Master, MD, PhD

Address:        Children's Hospital of Philadelphia
                34th and Civic Center Blvd., Room 5145

                Philadelphia, PA 19104-4399 USA

If you are not a U.S. citizen or holder of a permanent visa, please indicate the type of visa you have:
                none (U.S. citizen)

Education:

| Year | Degree | Institution |
|------|--------|-------------|
| 1990 | A.B. | Princeton University (Molecular Biology) |
| 2001 | Ph.D. | University of Pennsylvania School of Medicine (Cell and Molecular Biology) |
| 2002 | M.D. | University of Pennsylvania School of Medicine (Medicine) |
| 2011 | M.S.T.R. | University of Pennsylvania (Translational Research) |

Postgraduate Training and Fellowship Appointments:

| | |
|--|--|
| 2002-2004 | Resident in Clinical Pathology, Hospital of the University of Pennsylvania, Philadelphia |

Faculty Appointments:

| | |
|--|--|
| 2004-2005 | Research Associate, University of Pennsylvania School of Medicine Department of Pathology and Laboratory Medicine, University of Pennsylvania |
| 2005-2015 | Assistant Professor of Pathology and Laboratory Medicine at the Hospital of the University of Pennsylvania, University of Pennsylvania School of Medicine |
| 2015-2017 | Associate Professor, Weill Cornell Medical College |
| 2018-present | Associate Professor of Pathology and Laboratory Medicine at the Children's Hospital of Philadelphia, University of Pennsylvania School of Medicine |

Hospital and/or Administrative Appointments:

| | |
|--|--|
| 2003-2004 | Chief Resident in Clinical Pathology, Department of Pathology and Laboratory Medicine, Hospital of the University of Pennsylvania, Philadelphia |
| 2005-2015 | Attending Physician, Clinical Chemistry Laboratory, Hospital of the University of Pennsylvania |
| 2008-2015 | Attending Physician, Penn Presbyterian Medical Center |
| 2008-2015 | Attending Physician, Pennsylvania Hospital |
| 2008-2015 | Director, Endocrinology Laboratory, Hospital of the University of Pennsylvania |

Stephen R. Master, MD, PhD                                                                 Page 2

|  |  |
|---|---|
| 2014-2015 | Director, Endocrinology Section, Clinical Chemistry Core Lab, Children's Hospital of Philadelphia |
| 2015-2017 | Associate Attending Pathologist, Weill Cornell Medical Center, New York Presbyterian |
| 2015-2017 | Director, Central Laboratory, Weill Cornell Medical Center, New York Presbyterian |
| 2015-2017 | Chief, Clinical Chemistry Laboratory Services, Weill Cornell Medical Center, New York Presbyterian |
| 2016-2017 | Laboratory Director (CLIA License Holder), New York Presbyterian Hospital Westchester |
| 2018-present | Attending Physician, Children's Hospital of Philadelphia |
| 2018-present | Director, Central Lab Services, Children's Hospital of Philadelphia |

Other Appointments:

|  |  |
|---|---|
| 2005-2015 | Member, Graduate Group, Genomics and Computational Biology, University of Pennsylvania School of Medicine |
| 2010-2015 | Director, Translational Core Laboratory, Perelman School of Medicine, University of Pennsylvania |
| 2012-2015 | Director, Penn Diabetes Research Center RIA/Biomarkers Core, Perelman School of Medicine, University of Pennsylvania |
| 2018-present | Member, Institute for Biomedical Informatics, Perelman School of Medicine, University of Pennsylvania |

Specialty Certification:

|  |  |
|---|---|
| 2004 | American Board of Pathology (Clinical Pathology) |
| 2017 | American Board of Pathology (Clinical Informatics) |

Licensure:

|  |  |
|---|---|
| 2004-present | Pennsylvania |
| 2014-2018 | New York |

Awards, Honors and Membership in Honorary Societies:

|  |  |
|---|---|
| 1989-1990 | NSF Summer Undergraduate Research Fellowship |
| 1990 | Cum laude in Molecular Biology, Princeton University |
| 1991 | Dean's Letter of Commendation, SUNY at Buffalo School of Medicine |
| 1996-1999 | DOD Breast Cancer Predoctoral Training Award |
| 2001 | Endocrine Society Medical Student Achievement Award, University of Pennsylvania School of Medicine |
| 2001 | Endocrine Society Travel Award |
| 2003 | Best Scientific Session, Microarray and Tissue Array Analysis, APIII 2003 |
| 2004 | William Pepper Fellowship Award in Laboratory Medicine, Hospital of the University of Pennsylvania |

Stephen R. Master, MD, PhD                                              Page 3

| 2013 | American Association for Clinical Chemistry 2013 Division Achievement Award for "Advancing the Profession" |
| 2013 | 2012 Outstanding Speaker Award, American Association for Clinical Chemistry |
| 2015-2016 | Weill Cornell Healthcare Leadership Fellowship Award Weill Cornell Medical Center, New York Presbyterian |
| 2016 | 2015 Outstanding Speaker Award American Association for Clinical Chemistry |
| 2019 | Trailblazers of the Lab: The Power List 2019, thepathologist.com (https://thepathologist.com/power-list/2019) |

<u>Memberships in Professional and Scientific Societies and Other Professional Activities:</u>
  <u>International:</u>

| 2004-2005 | International Society for Computational Biology (Member 2017) |
| 2005-2009 | Human Proteome Organization (Member) |
| 2013-Present | International Consortium for Harmonization of Clinical Laboratory Results (ICHCLR) (committee member, Harmonization Oversight Group 2013-Present) |
| 2018-Present | Society for the Study of Inborn Errors of Metabolism |

  <u>National:</u>

| 2000-Present | American Association for the Advancement of Science (Member) |
| 2004-Present | American Association for Clinical Chemistry (Board of Directors 2017-2019 House of Delegates Chair 2014; House of Delegates Chair Elect 2013; Proteomics and Metabolomics Division Chair 2013-2014; Proteomics Division Chair Elect 2011-2012; Informatics Division Executive Committee Member 2017-present; OMICS consensus working group 2012; Proteomics Division Executive Committee Member 2008-2016; Proteomics Division Secretary 2008-2009; Proteomics Division Nominating committee 2006-2007 Editorial Advisory Board, Strategies, 2006-2009) |
| 2005-2006 | American Society for Biochemistry and Molecular Biology (Member) |
| 2005-present | American Society for Mass Spectrometry (Member) |
| 2005-present | College of American Pathologists (Fellow) |
| 2006-present | Academy of Clinical Laboratory Physicians and Scientists (Member) |

Stephen R. Master, MD, PhD                                             Page 4

2006-2007      American Society for Investigative Pathology (Member)

2009           National Institutes of Health (NCRR) (Study Section Reviewer: Mass Spectrometry
               Instruments Review Panel)

2010           National Institutes of Health (NIAID) (Review Section Member: "Modeling
               Immunity for Biodefense")

2014-Present   National Academy of Clinical Biochemistry (Fellow)

        Local:
2005-Present   American Association of Clinical Chemistry, Philadelphia Section (Chair-Elect 2010
               Chair 2011
               Past Chair 2012
               House of Delegates Representative 2012)


Editorial Positions:
              2005-Present    Journal of Molecular Diagnostics (reviewer)
              2005-Present    Clinical Chemistry (reviewer)
              2006-Present    DNA and Cell Biology (reviewer)
              2006-Present    Breast Cancer Research (reviewer)
              2008-Present    Journal of Proteome Research (reviewer)
              2008-Present    Archives of Pathology and Laboratory Medicine (section editor for
                              clinical chemistry)
              2008-Present    American Journal of Pathology (reviewer)
              2010-Present    BMC Cancer (reviewer)
              2010-Present    American Journal of Obstetrics and Gynecology (reviewer)
              2011-Present    Clinical Chemistry (Board of Editors; Associate Editor, 2015-2019)
              2013-Present    Clinical Proteomics (Editorial Board; Associate Editor 2016-present)
              2013-Present    Cancer Research (Board of Editors)
              2016-Present    Clinical Mass Spectrometry; (Editorial Board)

Academic and Institutional Committees:
              2003-2010    Institutional Review Board 2, University of Pennsylvania (Member)
              2005-2007    Molecular Pathology Faculty Search Committee
              2006         Genomics and Computational Biology Graduate Group Preliminary
                           Exam Committee
              2006-2015    Genomics and Computational Biology Curriculum Committee
              2007-2011    Department of Pathology REACH Committee
              2007         Department of Pathology GME working group (Clinical Chemistry)
              2008-2015    EMR Executive Commitee (UPHS)
              2009-2010    Department of Pathology LIS working group (Chair)
              2009-2015    Department of Pathology Research Samples working group
              2009-2015    Abramson Cancer Center CTSRMC (Member)
              2010-2015    Institutional Review Board 4, University of Pennsylvania (co-Chair)

Stephen R. Master, MD, PhD                                             Page 5

| | |
|---|---|
| 2011-2012 | University of Pennsylvania Biobank Sample Processing subcommittee (Chair) |
| 2011-2015 | University of Pennsylvania Biobank Informatics subcommittee (member) |
| 2012-2013 | University of Pennsylvania Department of Pathology Molecular Genetics working group (member) |
| 2012-2013 | University of Pennsylvania Department of Pathology Professional Development working group (member) |
| 2015-2017 | Member, Clinical Informatics and Quality Committee, Weill Cornell Medical Center |
| 2016-2017 | Co-Organizer, Weill Cornell Clinical Pathology Faculty Chalk Talk Series |
| 2016-2017 | Member, Utilization Committee, Weill Cornell Medical Center |

Major Academic and Clinical Teaching Responsibilities:

| | |
|---|---|
| 2003-2004 | Teaching Assistant, General Pathology |
| 2005-2014 | Medical student lecture: "Anatomy, Development, and Physiology of the Breast" |
| 2005-2007 | Resident Lecture: "Bioinformatics and Clinical Chemistry" (4x/yr starting 7/05) |
| 2006-2014 | Course Co-Director: GCB535 Introduction to Bioinformatics (co-director + 10 lectures) |
| 2006-2007 | Graduate/Fellow Lectures: "Introduction to Bioinformatics", "Introduction to Proteomics" (3 hrs) |
| 2006-2010 | Graduate Student Thesis supervisor, Logan Everett |
| 2006-2014 | Lecturer, MTR 603: 3 hours |
| 2006-2014 | Course co-Director (as of 2012): MTR603, Laboratory Diagnostics (currently give 6 lectures) |
| 2007 | Post-Doctoral Lecture: "Introduction to Proteomics" (2 hrs) |
| 2007-2014 | Resident Lecture: Blood Gases and Acid/Base balance (1x/quarter) |
| 2007-2008 | Clinical Pathology Resident Lecture, Introduction to Statistics |
| 2007 | Clinical Pathology Resident Lecture, Introduction to Bioinformatics |
| 2008-2010 | Post-doctoral supervisor, Charlene Bierl MD PhD |
| 2011-2015 | Resident Core Curriculum Lectures: Introduction to Bioinformatics (4 hrs total) |
| 2015-2017 | Faculty Director, Resident Management Course (1 month rotation), Weill Cornell Medical Center |
| 2015-2016 | Resident Lecture, "Introduction to the Central Lab" (1 hr./year) Weill Cornell Medical Center |
| 2016-2017 | Resident Informatics Lectures, "R for Pathologists" (12 hours)Weill Cornell Medical Center |
| 2016-2017 | Resident Lectures: "Why Lab Management Matters", Lab Stats 1", Lab Stats 2", "Validation of QC" (4 hours), Weill Cornell Medical Center |
| 2016-2017 | Resident RISE review session (1 hour), Weill Cornell Medical Center |

Stephen R. Master, MD, PhD                                          Page 6

|           |                                                                              |
|-----------|------------------------------------------------------------------------------|
| 2016-2017 | Medical Student Lecture: "Introduction to the Clinical Lab" (1hr./year), Weill Cornell Medical Center |
| 2017      | Resident Informatics Lectures, "R for Pathologists" (12 Hours), Weill Cornell Medical Center |
| 2017      | Resident Lectures: "Why Lab Management Matters", "Lab Stats 1", "Lab Stats 2", "Validation and QC" (4 hours), Weill Cornell Medical Center |
| 2018      | CHOP faculty/staff education, "A Newbie's Introduction to the R Statistical Programming Language" |
| 2019-Present | Lecture, "A (Brief) Introduction to Data Science for Laboratory Medicine", CHOP Pathology Informatics Course |
| 2019-Present | MBG/CBG Fellows lecture, "Introduction to Laboratory Regulation", 1x |

Lectures by Invitation:

|           |                                                                              |
|-----------|------------------------------------------------------------------------------|
| Jun, 2005 | "E Pluribus Unum: clinical quality control for genomic and proteomic assays", Pittsburgh, PA, Academy of Clinical Laboratory Physicians and Scientists 40th Annual Meeting |
| Oct, 2005 | "E Pluribus Unum: Clinical Quality Control for Multiplex Proteomic Assays", Washington, D.C., American Association of Clinical Chemistry Conference on "Proteomics: A New Diagnostic Frontier" |
| Dec, 2005 | "Bioinformatics and quality control for genomic and proteomic assays", Cairo, Egypt, 53rd Congress of the Egyptian Society for Clinical Chemistry (plenary lecture) |
| Apr, 2006 | "Pattern-based Diagnostic Algorithms and Clinical Quality Control", BioRad Laboratories, California |
| Sep, 2006 | "Clinical Grade Quality Control for Multiplex Assays: Can We Do It?" IBC Biomarkers and Molecular Diagnostics conference, Boston, MA (keynote) |
| Mar, 2007 | Introduction to Clinical Research, GenNext Translational Research Course, San Francisco, CA |
| Apr, 2007 | "Robust data, robust algorithms: from preanalytical variability to bioinformatic analysis", Genomic and Proteomic Sample Preparation Conference (GOT Summit), Boston, MA (keynote) |
| Jan, 2008 | "Prospects for Proteomics in the Clinical Laboratory: An Update", Egyptian Society for Clinical Chemistry 55th Scientific Conference, Cairo, Egypt |
| Jun, 2008 | "Mining the 24-hour proteome", Advion BioSciences Users Group Meeting, Denver, CO |
| Nov, 2008 | "Quality Control for Proteomics", Mass Spectrometry Applications in the Clinical Laboratory (MSACL-08), UCSD, San Diego, CA |
| Nov, 2008 | "Postanalytical Challenges for Multiplexed Biomarkers", Invitrogen Current Topics Meeting, San Diego, CA |
| Sep, 2009 | "How many analytes?  Optimizing multiplex assays for QC", Athena Society, Porto Heli, Greece |
| Oct, 2009 | "Quality Control for Multiplexed Clinical Assays", Roche GIN |

Stephen R. Master, MD, PhD                                                    Page 7

|  |  |
|---|---|
| | Conference, Basel, Switzerland |
| Jun, 2011 | "Keeping Multiplex Assays in Control", BioConference Live Clinical Diagnostics 2011, webcast |
| Jun, 2011 | "Keeping Multiplex Assays in Control", Pathology Grand Rounds, Temple University |
| Jul, 2011 | "Beyond Westgard: Multiplex Mass Spectrometry in Control" (short course), American Association for Clinical Chemistry, Atlanta, GA |
| Jul, 2011 | "Keeping Multiplex Assays in Control", Pathology Grand Rounds, University of Illinois at Chicago |
| Sep, 2011 | "Keeping Multiplex Assays in Control", NIH, Bethesda, MD |
| Jul, 2012 | "Proteomics Plus", American Association for Clinical Chemistry, Los Angeles, CA |
| Jul, 2012 | "Beyond Westgard Rules: Quality Control for Multiplex Mass Spectrometry" (short course), American Association for Clinical Chemistry, Los Angeles, CA |
| Jul, 2012 | "An Introduction to Bioinformatics for Clinical Chemists" (short course), American Association for Clinical Chemistry, Los Angeles, CA |
| Nov, 2012 | "Good Antibodies, Bad Antibodies: Interference in Immunoassays", AACC Southeast Section, Lexington, KY |
| Jul, 2013 | "Bioinformatics for Clinical Chemists" (short course), American Association for Clinical Chemistry, Houston, TX |
| Feb, 2014 | "Too Much Information?   Quality Control for Emerging Multiplex Assays", University of Washington, Seattle, WA |
| Jul, 2014 | "Clinical laboratory quality for emerging multiplex biomarkers", Weill Cornell Medical College, New York, NY |
| Mar, 2015 | "Breaking Up with Excel: A Newbie's Guide to the R Statistical Programming Language" (2-day short course with Daniel Holmes), Mass Spectrometry Applications in the Clinical Lab 2015, San Diego, CA |
| Jul, 2015 | "Big Data and the Clinical Laboratory", Society for Young Clinical Laboratorians", Atlanta, GA |
| Sep, 2015 | "Developing MRM Transitions", Mass Spectrometry Applications for the Clinical Lab EU, Salzburg, Austria |
| Sep, 2015 | "Quality Control for Multiplex Assays", HUPO World Congress Clinical Day, Vancouver, British Columbia, Canada |
| Sep, 2015 | "Breaking Up with Excel: A Newbie's Guide to the R Statistical Programming Language" (2-day short course with Daniel Holmes), Mass Spectrometry Applications in the Clinical Lab EU 2015, Salzburg, Austria |
| Nov, 2015 | "Clinical Quality Control for Multiplex Assays", Mass Spectrometry for Clinical Diagnosis 2015, National Sun Yat-Sen University, Kaohsiung, Taiwan |
| Nov, 2015 | "Clinical Quality Control for Multiplex Assays", Chang Gung Memorial Hospital, Linkou, Taiwan |
| Feb, 2016 | "Breaking Up with Excel: A Newbie's Guide to the R Statistical |

Stephen R. Master, MD, PhD                                                    Page 8

|  | Programming Language" (2-day short course with Daniel Holmes), Mass Spectrometry Applications in the Clinical Lab 2016, Palm Springs, CA |
|---|---|
| Aug, 2016 | "Little Steps with Big Data: An Introduction to the R Statistical Programming Language" (4-hour short course with Daniel Holmes), American Association for Clinical Chemistry, Philadelphia, PA |
| Aug, 2016 | Session Moderator, "Q&A with Qualcomm Tricorder XPRIZE Finalists", AACC 2017, San Diego, CA |
| Aug, 2016 | Session Moderator, "Meet the Expert" session with Qualcomm Tricorder XPRIZE Finalists, AACC 2017, San Diego, CA |
| Sep, 2016 | "Breaking Up with Excel: A Newbie's Guide to the R Statistical Programming Language" (2-day short course with Daniel Holmes), Mass Spectrometry Applications in the Clinical Lab EU 2016, Salzburg, Austria |
| Sep, 2016 | "Automated Lab Result Reporting", Chinese Society for Laboratory Medicine,   Chongqing, China |
| Nov, 2016 | "Perspectives on Harmonization of the Analytical Phase", Ontario Society for Clinical Chemistry Annual Scientific Meeting, Ontario, Canada |
| Nov, 2016 | "Quality Control in an Era of Complex Data", Asia-Pacific Federation for Clinical Biochemistry, Taipei, Taiwan |
| Nov, 2016 | "Breaking Up with Excel: A Newbie's Guide to the R Statistical Programming Language" (2-day short course with Daniel Holmes), Asia-Pacific Federation for Clinical Biochemistry, Taipei, Taiwan |
| Jan, 2017 | "Breaking Up with Excel: A Newbie's Guide to the R Statistical Programming Language" (2-day short course with Daniel Holmes), Mass Spectrometry Applications in the Clinical Lab 2017, Palm Springs, CA |
| Jan, 2017 | "Informatics Strategies for Multiplex Clinical Quality Control", CHOP Hematopathology Grand Rounds, Philadelphia, PA |
| Feb, 2017 | "Big Data in Medical Diagnostics", University of Pennsylvania Association of Senior and Emeritus Faculty, Philadelphia, PA |
| Mar, 2017 | "Bioinformatic Applications in Clinical Pathology", Pathology Grand Rounds, Washington University St. Louis, MO |
| Mar, 2017 | "Multiplex Clinical Quality Control for Emerging Diagnostics", Beth Israel Deaconess Hospital, Boston, MA |
| Jun, 2017 | "Bioinformatic Applications in Clinical Pathology", Children's Hospital of Philadelphia, Philadelphia, PA |
| Sep, 2017 | "Breaking Up with Excel: A Newbie's Guide to the R Statistical Programming Language" (2-day short course with Daniel Holmes), Mass Spectrometry Applications in the Clinical Lab EU 2017, Salzburg, Austria |
| Sep, 2017 | "Communicating with Physicians: Case Studies from the US System", Chinese Society for Laboratory Medicine, Hongzhou, China |
| Nov, 2017 | "FDA/CLIA Requirements for Validation of Laboratory Developed |

Stephen R. Master, MD, PhD                                                    Page 9

|  | Tests in the USA", 29th World Congress of World Association of Societies of Pathology and Laboratory Medicine (WASPaLM), Kyoto, Japan |
|---|---|
| Mar, 2018 | "Bioinformatic Applications in Clinical Pathology", Pathology Grand Rounds, ARUP Laboratories (University of Utah), Salt Lake City, UT |
| May, 2018 | "Bioinformatics and Quality Control for Multiplex Oncology Assays", Moffitt Cancer Center, Tampa, FL |
| Jul, 2018 | "Using R for Method Validation Studies", AACC Annual Meeting, Chicago, IL |
| Jul, 2018 | "Are you Feeding your Instruments the Right Water?", AACC Annual Meeting, Chicago, IL |
| Aug, 2019 | "R Showcase Demo", American Association for Clinical Chemistry Annual Meeting, Anaheim, CA |
| Aug, 2019 | "Getting Started with R for Laboratory Medicine: Stat of the Union", American Association for Clinical Chemistry Annual Meeting, Anaheim, CA |
| Nov, 2019 | "Big Data and AI in Laboratory Medicine", Best of AACC China, Shanghai |
| Nov, 2019 | "Data Quality Challenges for AI in Laboratory Medicine", Best of AACC China, Shanghai |
| Jan, 2020 | "Getting Started with R for Laboratory Medicine (and AP too!)" (3-day resident/faculty short course), Weill Cornell Medicine, New York |

Organizing Roles in Scientific Meetings:

| Dec, 2007 | co-organizer, CAMSI ("Critical assessment of mass spectral identifications") competition.   Round 1 was held in December 2007 |
|---|---|
| Jun, 2008 | Session chair, Academy of Clinical Laboratory Physicians and Scientists (ACLPS) Philadelphia, PA |
| Nov, 2008 | Session Chair, Invitrogen Current Topics Meeting San Diego, CA |
| Jul, 2009 | Organizing Committee Member, American Association for Clinical Chemistry (AACC) Proteomics Division Meeting Chicago, IL |
| Nov, 2009 | Organizing committee, "Translating Novel Biomarkers to Clinical Practice: Role and Opportunities for the Clinical Laboratory" Bethesda, MD |
| Nov, 2009 | Session co-chair, "Translating Novel Biomarkers to Clinical Practice: Role and Opportunities for the Clinical Laboratory" Bethesda, MD |
| Feb, 2011 | Session chair, "Mass Spectrometry Applications in the Clinical Laboratory" (MSACL 2011) San Diego, CA |
| Jul, 2011 | Short Course Moderator, American Association of Clinical |

Stephen R. Master, MD, PhD                                           Page  10

|  |  |
|---|---|
|  | Chemistry |
|  | Atlanta, GA |
| Jul, 2012 | Short Course Moderator, American Association for Clinical Chemistry |
|  | Los Angeles, CA |
| Feb, 2013 | Scientific Advisory Committee, MSACL (Mass Spectrometry Applications in the Clinical Laboratory) 2013 |
|  | San Diego, CA |
| Feb, 2013 | Organizing Committee, AACC Molecular Biomarker Diagnostic Applications (MBDxA) |
|  | San Diego, CA |
| Feb, 2013 | Session Chair, "Disease Markers", MSACL 2013 |
|  | San Diego, CA |
| Apr, 2013 | Session Chair, "Biomarkers: Buyer Beware", Oak Ridge Conference, American Association for Clinical Chemistry. |
|  | Baltimore, MD |
| Apr, 2013 | Planning Group, Oak Ridge Conference, American Association for Clinical Chemistry |
|  | Baltimore, MD |
| Jul, 2013 | Session Organizer / Moderator, "Proteomic and Metabolomic Biomarkers for the Clinical Laboratory: Shared Goals, Common Strategies", American Association for Clinical Chemistry Annual Meeting |
|  | Houston, TX |
| Mar, 2014 | Scientific Advisory Committee, MSACL (Mass Spectrometry Applications in the Clinical Laboratory) 2014 |
|  | San Diego, CA |
| Mar, 2015 | Scientific Advisory Committee, MSACL (Mass Spectrometry Applications in the Clinical Laboratory) |
|  | San Diego, CA |
| Jul, 2015 | Annual Meeting Organizing Committee Member, American Association for Clinical Chemistry Annual Meeting |
|  | Atlanta, GA |
| Sep, 2015 | Session Chair, "Proteomics Assay Development" |
|  | MSACL EU, Salzburg, Austria |
| 2015 | Annual Meeting Organizing Committee Member, American Association for Clinical Chemistry Annual Meeting |
|  | Atlanta, GA |
| Feb, 2016 | Scientific Advisory Committee, MSACL 2016 |
|  | Palm Springs, CA |
| Feb, 2016 | Session Chair, "Computational Aids to Assay Development in LC-MS/MS", MSACL 2016 |
|  | Palm Springs, CA |
| Aug, 2016 | Session Moderator, "In the Era of Digital Medicine, Patients are Connected and in Control - What Does this Mean for Laboratorians?", AACC 2016 |

Stephen R. Master, MD, PhD                                                    Page  11

|            | Philadelphia, PA |
|------------|------------------|
| Aug, 2016  | Q&A Moderator, Theranos Presentation, AACC 2016 |
|            | Philadelphia, PA |
| Jan, 2017  | Scientific Advisory Committee, MSACL 2017 |
|            | Palm Springs, CA |
| Jan, 2018  | Scientific Advisory Committee, MSACL 2018 |
|            | Palm Springs, CA |

Bibliography:

Research Publications, peer reviewed (print or other media):

1. Shah R, Matthews GJ, Shah RY, McLaughlin C, Chen J, Wolman M, Master SR, Chai B, Xie D, Rader DJ, Raj DS, Mehta NN, Budoff M, Fischer MJ, Go AS, Townsend RR, He J, Kusek JW, Feldman HI, Foulkes AS, Reilly MP: Study Investigators. Serum Fractalkine (CX3CL1) and Cardiovascular Outcomes and Diabetes: Findings from the Chronic Renal Insufficiency Cohort (CRIC) Study. Am J Kidney Dis 66(2): 266-73, Aug 15.

2. Poetter K, Jiang H, Hasssanzadeh S, Master SR, Chang A, Dalakas MC, Rayment I, Sellers JR, Fananapazir L, Epstein ND: Mutations in either the essential or regulatory light chains of myosin are associated with a rare myopathy in human heart and skeletal muscle. Nature Genetics 13(1): 63-9, May 1996.

3. Huber LJ, Yang TW, Sarkisian CJ, Master SR, Deng CX, Chodosh LA.: Impaired DNA damage response in cells expressing an exon 11-deleted murine Brca1 variant that localizes to nuclear foci. Mol Cell Biol 21(12): 4005-15, Jun 2001.

4. Sarkisian CJ, Master SR, Huber LJ, Ha SI, Chodosh LA.: Analysis of murine Brca2 reveals conservation of protein-protein interactions but differences in nuclear localization signals. J Biol Chem 276(40): 37640-8, Oct 2001.

5. Master SR, Hartman JL, D'Cruz CM, Moody SE, Keiper EA, Ha SI, Cox JD, Belka GK, Chodosh LA.: Functional microarray analysis of mammary organogenesis reveals a developmental role in adaptive thermogenesis. Mol Endocrinol 16(6): 1185-203, Jun 2002.

6. Li C, Fox CJ, Master SR, Bindokas VP, Chodosh LA, Thompson CB.: Bcl-X(L) affects Ca(2+) homeostasis by altering expression of inositol 1,4,5-trisphosphate receptors. Proc Natl Acad Sci U S A 99(15): 9830-5, July 2002.

7. D'Cruz CM, Moody SE, Master SR, Hartman JL, Keiper EA, Imielinski MB, Cox JD, Wang JY, Ha SI, Keister BA, Chodosh LA.: Persistent parity-induced changes in growth factors, TGF-beta3, and differentiation in the rodent mammary gland. Mol Endocrinol 16(9): 2034-51, Sep 2002.

8. Fox CJ, Hammerman PS, Cinalli RM, Master SR, Chodosh LA, Thompson CB.: The serine/threonine kinase Pim-2 is a transcriptionally regulated apoptotic inhibitor.

Stephen R. Master, MD, PhD                                              Page  12

        Genes Dev 17(15): 1841-54, Aug 2003.

9. Master SR, Stoddard AJ, Bailey LC, Pan TC, Dugan KL, Chodosh LA.: Genomic
analysis of early murine mammary gland development using novel probe-level
algorithms. Genome Biol 6: R20, Feb 2005.

10. Wang M *, Master SR *, Chodosh LA: Computational Expression Deconvolution in a
Complex Mammalian Organ. BMC Bioinformatics 7: 328, Jul 2006 Notes: * Both
authors contributed equally.

11. Tetzlaff MT, Liu A, Xu X, Master SR, Baldwin DA, Tobias JW, Livolsi VA, Baloch
ZW: Differential Expression of miRNAs in Papillary Thyroid Carcinoma
Compared to Multinodular Goiter Using Formalin Fixed Paraffin Embedded
Tissues. Endocr Path 18(3): 163-73, 2007.

12. Orwig KE, Ryu BY, Master SR, Mack M, Avarbock MR, Chodosh LA, Brinster RL:
Genes Involved in Post-transcriptional Regulation are Over Represented in
Stem/progenitor Spermatogonia of Cryptorchid Mouse Testes. Stem Cells 26(4):
927-938, Apr 2008.

13. Furlow PW, Percy MJ, Sutherland S, Bierl C, McMullin MF, Master SR, Lappin TR,
Lee FS: Erythrocytosis-associated HIF-2alpha mutations demonstrate a critical
role for residues C-terminal to the hydroxylacceptor proline. J Bio Chem 248(14):
9050-8, Apr 2009.

14. Kricka LJ, Milone M, Master SR, Shaw L, Young DS, Fontanilla R, Smith T,
Gardiner J, Cardamone D, Fleming M, Rhoads DG: Effect of a variable magnetic
field on clinical laboratory testing. Clin Chem 55: 1249-50, Jun 2009.

15. Everett L, Bierl C, Master SR: Statistical Bias in Multi-Stage Proteomic Search
Strategies. J Proteome Res 9(2): 700-707, Feb 2010.

16. Romero R, Kusanovic JP, Gotsch F, Erez O, Vaisbuch E, Mazaki-Tovi S, Moser A,
Tam S, Leszyk J, Master SR, Juhasz P, Pacora P, Ogge G, Gomez R, Yoon BH,
Yeo L, Hassan SS, Rogers W: Isobaric Labeling and Tandem Mass Spectrometry:
A Novel Approach for Profiling and Quantifying Proteins Differentially
Expressed in Amniotic Fluid in Preterm Labor with and without Intra-amniotic
Infection/Inflammation. J Maternal-Fetal and Neonatal Med 23(4): 261-80, Apr
2010.

17. Golugula A, Lee G, Master SR, Feldman MD, Tomaszewski JE, Speicher DW,
Madabhushi A: Supervised Regularized Canonical Correlation Analysis:
Integrating Histologic and Proteomic Measurements for Predicting Biochemical
Failures Following Prostate Surgery. BMC Bioinformatics 12(483), Dec 2011.

18. Ferguson JF, Hinkle CC, Mehta NN, Bagheri R, DerOhannessian SL, Shah R, Wolfe

Stephen R. Master, MD, PhD                                                                    Page  13

M, Bradfield JP, Hakonarson H, Wang X, Master SR, Rader DJ, Li M, Reilly MP: Translational studies of lipoprotein-associated phospholipase A2 in inflammation and atherosclerosis. J Am Coll Cardiol 59(8): 764-72, Feb 2012. PMCID: 22340269

19. Narayan SB, Master SR, Sireci AN, Bierl C, Stanley PE, Li C, Stanley CA, Bennett MJ: Short-Chain 3-Hydroxyacyl-Coenzyme A Dehydrogenase Associates with a Protein Super-Complex Integrating Multiple Metabolic Pathways. PLoS ONE 7(4): e35048, Apr 2012. PMCID: 22496890

20. Mehta NN, Heffron SP, Patel PN, Ferguson J, Shah RD, Hinkle CC, Krishnamoorthy P, Shah R, Tabita-Martinez J, Terembula K, Master SR, Rickels MR, Reilly MP: A human model of inflammatory cardio-metabolic dysfunction; a double blind placebo-controlled crossover trial. Journal of Translational Medicine 10: 124, Jun 2012. PMCID: 22709547

21. Mulvey CK, Ferguson JF, Tabita-Martinez J, Kong S, Shah RY, Patel PN, Master SR, Usman MH, Propert KJ, Shah R, Mehta NN, Reilly MP: Peroxisome Proliferator-Activated Receptor-alpha Agonism with Fenofibrate Does Not Suppress Inflammatory Responses to Evoked Endotoxemia. J Am Heart Assoc 1(4): e002923, Aug 2012.

22. Bing Z, Li JH, Master SR, Lee CCR, Puthiyveettil R, Tomaszewski JE: Fluorescence In Situ Hybridization of Chromosome Abnormalities of Upper Urinary Tract Urothelial Carcinoma in Paraffin Embedded Tissue. Am J Clin Pathol 138(3): 382-9, Sep 2012.

23. Bing Z, Master SR, Tobias JW, Baldwin DA, Xu XW, Tomaszewski JE: MicroRNA Expression Profiles of Seminoma from Paraffin-Embedded Formalin-Fixed Tissue. Virchows Archiv 461(6): 663-8, Dec 2012.

24. Bose S, Krishnamoorthy P,Varanasi A, Nair J,Schutta M,Braunstein S, Iqbal N, Schwartz S, St. Clair C, Master SR,Rader DJ,Reilly MP,Mehta NN: Measurement of waist circumference predicts coronary atherosclerosis beyond plasma adipokines. Obesity 21((1)): E118-23, Jan 2013.

25. Ferguson JF, Patel PN, Shah RY, Mulvey CK, Gadi R,Nijjar PS,Usman HM,Mehta NM,Shah R,Master SR,Propert KJ,Reilly MP: Race and gender variation in response to evoked inflammation. J Trans Med 11: 63, Mar 2013.

26. Song D, Li LS, Heaton-Johnson KJ, Arsenault PR, Master SR, Lee FS: Prolyl Hydroxylase Domain Protein 2 (PHD2) Binds a Pro-Xaa-Leu-Glu Motif, Linking it to the Heat Shock Protein 90 Pathway. J Biol Chem 288(14): 7662-74, Apr 2013.

27. Platt JM, Ryvkin P, Wannat J, Donahue G, Ricketts MD, Barrett S, Song S, Chavez

Stephen R. Master, MD, PhD                                          Page 14

    A, Abdallah K, Master SR, Wang LS, Johnson FB: Rap1 relocalization contributes to the chromatin-mediated gene expression profile and pace of cell senescence. <u>Genes Dev</u> 27(12): 1406-20, Jun 2013.

28. Scialla JJ*, Lau WL*, Reilly MP, Isakova T, Yang HY, Crouthamel MH, Chavkin NW, Rahman M, Wahl P, Amaral AP, Hamano T, Master SR, Nessel L, Chai B, Xie D, Kallem RR, Chen J, Lash JP, Kusek JW, Budoff MJ, Giachelli CM, Wolf M: Fibroblast Growth Factor 23 is not associated with and does not induce arterial calcification. <u>Kidney Int</u> 83(6): 1159-68, Jun 2013.

29. Ferguson JF, Matthews GJ, Townsend RR, Raj DS, Kanetsky PA, Budoff M, Fischer MJ, Rosas SE, Kanthety R, Rahman M, Master SR, Qasim A, Li M, Mehta NN, Shen H, Mitchell BD, O'Connell JR, Shuldiner AR, Ho WK, Young R, Rasheed A, Danesh J, He J, Kusek JW, Ojo AO, Flack J, Go AS, Gadegbeku CA, Wright JT Jr, Saleheen D, Feldman HI, Rader DJ, Foulkes AS, Reilly MP; CRIC Study Principal Investigators.: Candidate gene association study of coronary artery calcification in chronic kidney disease: findings from the CRIC study (Chronic Renal Insufficiency Cohort). <u>J Am Coll Cardiol</u> 62(9): 789-98, Aug 2013.

30. Rulander NJ, Cardamone D, Senior M, Snyder PJ, Master SR: Interference from Anti-Streptavidin Antibody. <u>Arch Pathol Lab Med</u> 137(8): 1141-6, Aug 2013.

31. Wertheim GBW, Smith C, Figueroa ME, Kalos M, Bagg A, Carroll M, Master SR: Microsphere-based Multiplex Analysis of DNA Methylation in Acute Myeloid Leukemia. <u>J Mol Diagn</u> 16(2): 207-15, Mar 2014.

32. Raess P, ven de Geijn G-J, Njo T, Klop B, Sukhachev D, Wertheim G, McAleer T, Master SR (*), Bagg A (*): Automated screening for myelodysplastic syndromes through analysis of complete blood count and cell population data parameters. <u>Am J Hematology</u> 89(4): 369-74, Apr 2014 Notes: (*) co-corresponding authors, contributed equally.

33. Song D, Li LS, Arsenault PR, Heaton-Johnson KJ, Master SR, Lee FS: Defective Tibetan PHD2 Binding to p23 Links High Altitude Adaptation to Altered Oxgen Sensing. <u>J Biol Chem</u> 289(21): 14656-65, May 2014.

34. Wing MR, Yang W, Teal V, Navaneethan S, Tao K, Ojo A, Guzman NN, Reilly M, Wolman M, Rosas SE, Cuevas M, Fischer M, Lustigova E, Master SR, Xie D, Appleby D, Joffe M, Kusek J, Feldman HI, Raj DS; for the Chronic Renal Insufficiency Cohort (CRIC) Study.: Race modifies the association between adiposity and inflammation in patients with chronic kidney disease: Findings from the CRIC study. <u>Obesity (Silver Spring)</u> 22(5): 1359-66, May 2014.

35. Babushok DV, Cardamone D, Rulander N, Master SR, Hexner EO: A Common, Under-Recognized Cause of Elevated Serum Erythropoietin. <u>Am J Med</u> Page: S0002-9343(14)00685-8, Aug 2014.

Stephen R. Master, MD, PhD                                                                 Page 15

36. Mehta NN, Matthews G,Krishnamoorthy P,Shah R,McLaughlin C,Patel P,Budoff
    M,Chen J,Wolman M,Go A,He J,Kanetsky PA,Master S,Rader DJ,Raj
    D,Gadegbeku CA,Shah R,Schreiber M,Fischer MJ,Townsend RR,Kusek
    J,Feldman HI,Foulkes A, Reilly MP,and the Chronic Renal Insufficiency Cohort
    (CRIC) Study Investigators: Higher plasma CXCL12 levels predict incident
    myocardial infarction and death in chronic kidney disease: Findings from the
    Chronic Renal Insufficiency Cohort Study. Eur Heart J 35(31): 2115-22, Aug
    2014.

37. Wertheim GBW, Smith C, Luskin M, Rager A, Figueroa ME, Carroll M, Master SR:
    Validation of DNA Methylation to Predict Outcome in Acute Myeloid Leukemia
    using xMELP. Clin Chem 61(1): 249-58, January 2015.

38. Liu KD, Yang W, Go AS, Anderson AH, Feldman HI, Fischer MJ, He J, Kallem RR,
    Kusek JW, Master SR, Miller ER, Rosas SE, Steigerwalt S, Tao K, Weir MR,
    Hsu CY: Urine Neutrophil Gelatinase-Associated Lipocalin and Risk of
    Cardiovascular Disease and Death in CKD: Results From the Chronic Renal
    Insufficiency Cohort (CRIC) Study. Am J Kidney Dis 65(2): 267-74, Feb 2015.

39. Wei S, Bing Z Yao Y, Master SRM: High Expression of miR-182 in Cytology
    Specimens of High-Grade Urothelial Cell Carcinoma: A Potential Diagnostic
    Marker. Acta Cytol 59(1): 109-12, Feb 2015.

40. Arsenault PR, Heaton-Johnson KJ, Li LS, Song D, Ferreira VS, Patel N, Master SR
    (*), Lee FS (*): Identification of Prolyl Hydroxylation Modifications in
    Mammalian Cell Proteins. Proteomics 15(7): 1259-67, Apr 2015.

41. Master CL, Scheiman M, Gallaway M, Goodman A, Robinson RL, Master SR, Grady
    MF: Vision Diagnoses are Common after Concussion in Adolescents. Clin Pediatr
    55(3): 260-7, Mar 2016.

42. Storey EP, Master SR, Lockyer JE, Podolak OE, Grady MF, Master CL: Near Point
    of Convergence after Concussion in Children. Optom Vis Sci
    94(1): 96-100, July   2016.

43. DiNardo CD #, Luskin MR #, Carroll M, Smith C, Harrison J, Pierce S, Kornblau S,
    Konopleva M, Kadia T, Katarjian H, Wertheim GM *, Master SR : Validation of
    a Clinical Assay of Multi-Locus DNA Methylation for Prognosis of Newly
    Diagnosed AML   Am J Hematol   8(10): 4362-67, 2016 Notes: #Both authors
    contributed equally.

44. Garrigan C, Han J, Tolomeo P, Johnson KJ, Master SR, Lautenbach E, Nachamkin I:
    Evaluation of a research use only luminex based assay for measurement of
    procalcitonin in serum samples. Am J Trasl Res 8(10): 4362-4369, 2016.

Stephen R. Master, MD, PhD                                        Page 16

45. Luskin ML, Gimotty PA, Smith C, Loren AW, Figueroa ME, Harrison J, Sun Z
     Tallman MS, Paietta EM, Litzow MR, Melnick A, Levine R, Fernandez HF,
     Luger SM, Carroll M, Master SR *, Wertheim GBW *.   : A Clinical Measure of
     DNA Methylation Predicts Outcome in De Novo AML. JCI Insight 1(9), 2016
     Notes: Both authors contributed equally.

46. Master CL, Master SR, Wiebe DJ, Storey EP, Lockyer JE, Podolak OE, Grady MF:
     Vision and Vestibular System Dysfunction Predicts Prolonged Concussion
     Recovery in Children. Clin J Sport Med Oct 2017.

47. Niazi MKK, Chung JH, Heaton-Johnson KJ, Martinez D, Castellanos R, Irwin MS,
     Master SR, Pawel BR, Gurcan MN, Weiser DA: Advancing clinicopathologic
     diagnosis of high-risk neuroblastoma using computerized image analysis and
     proteomic profiling. Pediatr Dev Pathol Jul, 2017 Notes: Epub ahead of print.

48. Wertheim GB, Luskin MR, Carroll M, Master SR: Microsphere-based assessment of
     DNA methylation for AML prognosis. Methods Mol Biol(1633), 125-136, 2017.

Research Publications, peer-reviewed reviews:
   1. Kricka LJ, Master SR, Joos TO, Fortina P: Current perspectives in protein array
      technology. Ann Clin Biochem 43: 457-67, Nov 2006.

   2. Master SR, Bierl C, Kricka LJ: Diagnostic challenges for multiplexed protein
      microarrays. Drug Discov Today 11(21-22): 1007-11, Nov 2006.

   3. Kricka LJ, Master SR: Validation and Quality Control of Protein Microarray-based
      Analytical Methods. Mol Biotechnol 38(1): 19-31, January 2008.

   4. Madabhushi A, Doyle S Lee G Basavanhally A, Monaco J, Masters S, Tomaszewski J,
      Feldman M: Integrated diagnostics: a conceptual framework with examples. Clin
      Chem Lab Med 48(7): 989-98, July 2010 Notes: last name was misspelled, not
      noted in proofs. PMCID: 20491597

   5. Gill EL, Master SR: Big Data Everywhere: The Impact of Data Disjunction in the
      Direct-to-Consumer Testing Model. Clin Lab Med 40(1): 51-59, Epub 2020 Jan 7
      2020.

Abstracts:
   1. Master SR.   Belka GK.   Dugan KD.   Hartman JL.   Moody SE.   D'Cruz CM.
      Chodosh LA.: Functional Microarray Analysis of Mammary Development
      Reveals Brown Adipose Tissue and a Role in Adaptive Thermogenesis. ENDO
      2002, San Francisco, CA June 2002.

   2. Master SR.   Stoddard AJ.   Bailey LC.   Dugan KD.   Chodosh LA.: Novel
      Approaches for Sensitive Detection of Gene Expression Changes using
      Oligonucleotide Microarrays. Advancing Practice, Instruction, and Innovation

Stephen R. Master, MD, PhD                                                          Page  17

through Informatics (APIII 2002), Pittsburgh, PA [selected for oral presentation] October 2003.

3. Master SR.  Kearns J.  Luning Prak E.  Johnson FB.  Sesok-Pizzini DA.  Kamoun M.: Rapid Primary Kidney Graft Loss in a Historically Sensitized Patient Despite Negative Current Sample Crossmatch by Flow Cytometry. Human Immunology 64(10 Suppl), S107 2003.

4. Sesok-Pizzini DA.  Luning Prak ET.  Johnson B.  Master S.  Kearns J.  Kamoun M.: HLA class I and class II antibodies of broad specificity identified in patients relisted for kidney transplants. Human Immunology 64(10 Suppl): S78, 2003.

5. Li LS. Hogarty MD. Master SR.: Proteomic Profiling of Genetically Diverse Neuroblastoma Cell Lines. Advances in Neuroblastoma Research 2006, Los Angeles, CA May 2006.

6. Everett L, Musselman I, Master SR: X!Tandem discriminant scores from high mass-accuracy precursor data. Human Proteome Organization (HUPO) 5th Annual World Congress, Long Beach, CA, October 2006 Oct 2006.

7. Tetzlaff MT, Liu A, Tobias J, Baldwin D, Master SR, Xu G, LiVolsi VA, Baloch ZW: Expression Profiles of micro-RNA in Paraffin Embedded Tissue from Benign and Malignant Thyroid Lesions. USCAP 2007 Annual Meeting (San Diego, CA) 2007.

8. Master SR, Nesvizhskii AI, Kall L, Noble WS: CAMSI: Critical assessment of mass spectral identifications. 4th Annual US Human Proteome Organization (HUPO) Conference [accepted for oral presentation] March 2008.

9. Bierl C, Prosser S, Master SR: Improved overall mass spectral acquisition rates using a novel HPLC storage loop. American Society for Mass Spectrometry Annual Meeting, Denver, CO June 2008.

10. Bierl C, Li LS, Everett LJ, Master SR: Quantitative neuroblastoma cell line comparison using a pooled SILAC reference sample. American Society for Mass Spectrometry 57th Annual Conference 2009.

11. Everett LJ, Bierl C, Master SR: Unbiased Statistical Analysis for Multi-Stage Proteomic Search Strategies. American Society for Mass Spectrometry 57th Annual Conference 2009.

12. Lee G, Doyle S, Monaco J, Feldman M, Tomaszewski J, Master S, Madabhushi A: Fusion of proteomic and histologic image features for predicting prostate cancer recurrence after radical prostatectomy. United States and Canadian Academy of Pathology (USCAP)   February 2011.

Stephen R. Master, MD, PhD                                                      Page 18

13. Raess P, Sukhachev D, Wertheim G, Master S, Chaves F, Bagg A: Detection of Myelodysplastic Syndromes through Analysis of Automated Complete Blood Count and VCS Parameters. XXV International Symposium on Technological Innovations in Laboratory Hematology, May 2012, Nice, France May 2012.

14. Wertheim G, Smith C, Figueroa M, Bagg A, Carroll M, Master S: A Novel Assay of DNA Methylation for Classification of Acute Myeloid Leukemia. XXV International Symposium on Technological Innovations in Laboratory Hematology, May 2012, Nice, France May 2012.

15. Luskin MR, Gimotty PA, Wertheim GB, Smith C, Sehgal AR, Luger SM, Master SR, Loren AW, Carroll MP: A Measure of DNA Methylation for Predicting Outcome in De Novo AML. 56th American Society of Hematology Annual Meeting and Exposition, San Francisco, CA   Dec 2014 Notes: Poster Presentation.

16. Castellanos R, Heaton-Johnson K, Chung J, Nieves E, Fremed M, Master SR, Weiser D: Limited intra-tumor versus inter-tumor heterogeneity as assessed by proteomic profiling of high-risk neuroblastoma. 106th Annual Meeting of the American Association for Cancer Research, Philadelphia, PA   Apr 2015 Notes: Poster Presentation.

17. Luskin MR, Gimotty P, Smith C, Loren A, Figueroa M, Harrison J, Sun Z, Tallman MS, Paietta E, Litzow MR, Paietta E, Levine RL, Fernandez HF, Luger S, Carroll M, Master S, Wertheim GB: A Clinical Measure of DNA Methylation Predicts Outcome in De Novo AML. 57th Annual American Society for Hematology Meeting and Exposition, Orlando, FL   Dec 2015 Notes: Poster Presentation.

18. Wertheim GB, Luskin M, Gimotty PA, Smith C, Loren AW, Figueroa M, Harrison J, Sun Z, Tallman S, Paietta EM, Litzow MR, Levine R, Melnick AM, Fernandez HF, Luger SM, Carroll M, Master SR: Integration of Multi-Locus DNA Methylation and Genetic Alterations Outperforms Genetic Assessment Alone for Outcome Prediction in Adult Patients with Acute Myeloid Leukemia. United States and Candien Academy of Pathology 2016 Annual Meeting Seattle, WA Mar 2016 Notes: Poster Presentation.

19. Wertheim G, Pillai V, Sargent R, Paessler M, Lewen M, Li J, Master S, Carroll M, Luskin M: Immunohistochemistry Identifies AML Subtypes with Distinct Genetics and Prognosis. United States and Canadian Academy of Pathology 2017 Annual Meeting, San Antonio, Texas   Mar 2017 Notes: Poster Presentation.

20. Master SR: Problems with Non-Harmonized Results: How do we Prevent Them? 69th American Association for Clinical Chemistry Annual Scientific Meeting, San Diego, CA   Aug 2017 Notes: Oral Presentation.

21. Master SR: Using R to Build a Real Time Machine Learning Algorithm to Screen for Myelodysplastic Syndrome. 69th American Association for Clinical Chemistry

Stephen R. Master, MD, PhD                                              Page  19

Annual Scientific Meeting, San Diego, CA   Aug 2017 Notes: Oral Presentation.

Editorials, Reviews, Chapters, including participation in committee reports (print or other media):

1. Master SR.   Mies C.: Gene-expression profiles and breast-cancer prognosis. Advances in Anatomic Pathology 10(6): 338-46, November 2003.

2. Master SR.   Chodosh LA.: Evolving views of involution. Breast Cancer Research 64(2): 89-92, February 2004.

3. Master SR.   Chodosh LA.: Large-scale transcriptional profiling of murine mammary development. Breast Disease 9: 47-57, 2004.

4. Master SR: Diagnostic proteomics: back to basics? Clinical Chemistry 51(8): 1333-4, August 2005.

5. Kricka LJ, Master SR: Validation and Quality Control of Protein Microarray-Based Analytical Methods. Microarrays in Clinical Diagnostics. Joos TO, Fortina P (eds.). Humana Press, Page: 233-255, 2005.

6. Kricka LJ, Master SR: Quality control and protein microarrays. Clin Chem 55: 1053-5, June 2009.

7. Lee G, Doyle S, Monaco J, Madabhushi A, Feldman MD, Master SR, Tomaszewski JE: A knowledge representation framework for integration, classification of multi-scale imaging and non-imaging data: Preliminary results in predicting prostate cancer recurrence by fusing mass spectrometry and histology. Biomedical Imaging: From Nano to Macro, 2009 IEEE International Symposium on Biomedical Imaging (ISBI) Page: 77-80, 2009.

8. Master SR: Getting the Details Right: Gene Signatures for Cancer Therapy. Clinical Chemistry 55(9): 1378-80, September 2010.

9. Heaton KJ, Master SR: Peptide Extraction from Formalin-Fixed Paraffin-Embedded Tissue. Curr Protoc Protein Sci Chapter 23(Unit 23.5), Aug 2011 Notes: doi: 10.1002/0471140864.ps2305s65.

10. Kim AS, Master SR, Dunphy CH: Molecular Profiling Methods in the Diagnosis of Hematologic Disorders. Laboratory Hematology Practice. Kottke-Marchant K, Davis BH (eds.). Blackwell Publishing Limited, Page: 244, 2012.

11. Master SR: Multiple Endocrine Neoplasia Type 2b. Clinical Decision Support:LABORATORY MEDICINE. Laposata MAlter DMelanson SEF (eds.). Decision Support in Medicine LLC, Wilmington, DE, 2012.

12. Master SR: Polyglandular Autoimmune Syndrome. Clinical Decision

Stephen R. Master, MD, PhD                                                    Page 20

    Support:LABORATORY MEDICINE. Laposata MAlter DMelanson SEF (eds.). Decision Support in Medicine LLC, Wilmington, DE, 2012.

13. Master SR: Multiple Endocrine Neoplasia Type 1. Clinical Decision Support:LABORATORY MEDICINE. Laposata MAlter DMelanson SEF (eds.). Decision Support in Medicine LLC, Wilmington, DE, 2012.

14. Master SR: McCune-Albright Syndrome. Clinical Decision Support:LABORATORY MEDICINE. Laposata MAlter DMelanson SEF (eds.). Decision Support in Medicine LLC, Wilmington, DE, 2012.

15. Master SR: Multiple Endocrine Neoplasia Type 2A. Clinical Decision Support: LABORATORY MEDICINE. Laposata MAlter DMelanson SEF (eds.). Decision Support in Medicine LLC, Wilmington, DE, 2012.

16. Master SR,Rader DJ: Beyond LDL-C in assessing cardiovascular risk: ApoB or LDL-P? Clin Chem 59(5): 723-25, May 2013.

17. Master SR, Meyer-Schönberger V: Learning from Our Mistakes: the Future of Validating Complex Diagnostics. Clin Chem 61(2): 347-48, Feb 2015.

18. Tolan NV, Parnas ML, Baudhuin LM, Cervinski MA, Chan AS, Holmes DT, Horowitz G, Klee EW, Kumar RB, Master SR: "Big Data" in Laboratory Medicine. Clin Chem 61(12): 1433-40, 2015.

19. Baum JE,Master SR: Defying Gravity   Journal of Applied Laboratory Medicine 1(3): 247-9, Oct 2016 Notes: https://itunes.apple.com/us/podcast/podcasts-jalm-talk-podcast/id1135885064#

20. Christensen RH, Master SR, Lo D, Baird GS, Wilding P, Jones PM: Theranos Session at the 2016 AACC Annual Meeting: Expectations, Impressions, and Takeaways. Journal of Applied Laboratory Medicine 1(3): 329, 2016.

21. Gronowski Ann M, Haymond Shannon, Master Stephen R: Improving Direct-to-Consumer Medical Testing. JAMA 318(16): 1613, 10 2017.

22. Li M, Diamandis EP, Paneth N, Yeo K-T J, Vogt H, Master SR: Wellness Initiatives: Benefits and Limitations. Clin Chem 63(6): 1063-68, 2017.

23. Master SR: Pathogens and Patterns: Does the Internet Contain Your Next Biomarker? Clin Chem 64(11): 1674, October 2018.

24. Obstfeld AE, Master SR, Miller WG: Using Big Data to Determine Reference Values for Laboratory Tests. JAMA 320(14): 1495-96, Oct 2018 Notes:   doi: 10.1001/jama.2018.10952.

Stephen R. Master, MD, PhD                                                Page  21

    25. Gill EL, Master SR: Hidden in Plain Sight: Machine Learning in Acute Kidney
        Injury. Clin Chem Feb 2020 Notes: https://doi.org/10.1093/clinchem/hvaa005.

Alternative Media:

    1. Klee GG, Master SR: Measurement and Quality Control in Protein Microassays.
        Clinical Chemistry   August 2009 Notes: podcast
        http://media.aacc.org/CCJPodcasts/082809Master.mp3.

    2. Master SR: Getting the Details Right: Gene Signatures for Cancer Therapy. Clinical
        Chemistry   2010 Notes: podcast,
        http://media.aacc.org/CCJPodcasts/091510_Master.mp3.

    3. Master SR: "In modern-day gold rush of genetic testing, profit placed above proof"
        On-camera interview, "In modern-day gold rush of genetic testing, profit placed
        above proof", CBS This Morning,
        http://www.cbsnews.com/news/cbs-news-investigation-genetic-tests-pathway-gen
        omics-profit-over-evidence/   Feb 2016.

    4. Haymond S, Grenache D, Holmes D, Master S   : We Can Improve At-Home Lab
        Tests. US News and World Report (op-ed)   Notes:
        http://www.usnews.com/opinion/articles/2016-06-28/3-ways-to-improve-direct-to
        -consumer-health-tests-like-theranos-and-23andme June 2016.

    5. Master SR: Defying Gravity. Journal of Applied Laboratory Medicine podcast
        November 2016   Notes:
        https://itunes.apple.com/us/podcast/podcasts-jalm-talk-podcast/id1135885064#
        November   2016.

    6. Master SR: Laborastories: A Lab Prevents a Lifetime of Misdiagnoses.
        https://www.aacc.org/community/laborastories/a-lab-prevents-a-lifetime-of-misdi
        agnoses Feb 2018.

**Appendix B : Documents Provided**

| | |
|---|---|
| 39.  Superseding Indictment.pdf | PANGARKAR, CHINMAY 12-11-2018_CONF_mini.pdf |
| COLAB-03032.pdf | THPFM0000277148.pdf |
| THER-AZ-00015739.pdf | THPFM0002240153-277 (1-25-2016 CMS Ltr).pdf |
| THER-AZ-00015752.pdf | |
| THER-AZ-00025873.pdf | EX_224-SEC-TX-000006861.pdf |
| THER-AZ-00027137.pdf | EX_203-SEC-TX-000005684.pdf |
| THER-AZ-00041624.pdf | EX_207-SEC-TX-000005741.pdf |
| THER-AZ-00044220.pdf | EX_208-SEC-TX-000005744.pdf |
| THER-AZ-00048696.pdf | EX_232-SEC-TX-000006992.pdf |
| THER-AZ-00057896.pdf | EX_263-SEC-TX-000007009.pdf |
| THER-AZ-00107535.pdf | EX_221-SEC-TX-000006261.pdf |
| THER-AZ-00107553.pdf | EX_265-SEC-TX-000007018.pdf |
| THER-AZ-00107599.pdf | EX_217-SEC-TX-000005787.pdf |
| THER-AZ-00107615.pdf | EX_201-SEC-TX-000005619.pdf |
| THER-AZ-00240244.pdf | EX_230-SEC-TX-000006981.pdf |
| THER-AZ-00258884.pdf | EX_214-SEC-TX-000005776.pdf |
| THER-AZ-00265965.pdf | EX_202-SEC-TX-000005683.pdf |
| THER-AZ-00272941.pdf | EX_220-SEC-TX-000006245.pdf |
| THER-AZ-00289661.pdf | EX_213-SEC-TX-000005771.pdf |
| THER-AZ-00289698.pdf | EX_206-SEC-TX-000005701.pdf |
| THER-AZ-00289809.pdf | EX_215-SEC-TX-000005783.pdf |
| THER-AZ-00290926.pdf | EX_212-SEC-TX-000005770.pdf |
| THER-AZ-00294920.pdf | EX_223-SEC-TX-000006854.pdf |
| THER-AZ-00326134.pdf | EX_262-SEC-TX-000007007.pdf |
| THER-AZ-00361651.pdf | EX_210-SEC-TX-000005749.pdf |
| THER-AZ-00361665.pdf | EX_226-SEC-TX-000006865.pdf |
| THER-AZ-00361672.pdf | EX_264-SEC-TX-000007012.pdf |
| THER-AZ-00361741.pdf | EX_231-SEC-TX-000006985.pdf |
| THER-AZ-00381746.pdf | EX_227-SEC-TX-000006955.pdf |
| THER-AZ-00381902.pdf | EX_211-SEC-TX-000005761.pdf |
| THER-AZ-00381940.pdf | EX_218-SEC-TX-000005924.pdf |
| THER-AZ-00381945.pdf | EX_204-SEC-TX-000005686.pdf |
| THER-AZ-00382007.pdf | EX_222-SEC-TX-000006850.pdf |
| THER-AZ-00383659.pdf | EX_267-SEC-TX-000007119.pdf |
| THER-AZ-00394054.pdf | EX_216-SEC-TX-000005785.pdf |
| THER-AZ-00567415.pdf | EX_266-SEC-TX-000007096.pdf |
| THER-AZ-00631426.pdf | EX_209-SEC-TX-000005748.pdf |
| THER-AZ-00655855.pdf | EX_261-SEC-TX-000007006.pdf |
| THER-AZ-00658025.pdf | EX_205-SEC-TX-000005696.pdf |
| THER-AZ-00748071.pdf | EX_228-SEC-TX-000006958.pdf |
| THER-AZ-00760817.pdf | EX_219-SEC-TX-000006234.pdf |
| THER-AZ-00784304.pdf | EX_225-SEC-TX-000006864.pdf |

| | |
|---|---|
| THER-AZ-00854722.pdf | EX_229-SEC-TX-000006965.pdf |
| THER-AZ-01032770.pdf | |
| THER-AZ-01241351.pdf | SEC-TX-000005499.pdf |
| THER-AZ-01364813.pdf | SEC-TX-000005379.pdf |
| THER-AZ-01371988.pdf | SEC-TX-000005256.pdf |
| THER-AZ-01382947.pdf | |
| THER-AZ-01384212.pdf | 2015 4 16.pdf |
| THER-AZ-01384213.pdf | 2014 11 24 SB concerned about redraws focus on ADVIAs.pdf |
| THER-AZ-01627558.pdf | 2015 3 20 PT problems specific assays.pdf |
| THER-AZ-01643987.pdf | 2014 10 7.pdf |
| THER-AZ-01814302.pdf | 2014 2 12 only 11 assays with signed validation reports.pdf |
| THER-AZ-01834407.pdf | 2014 10 6 TSH VitD.pdf |
| THER-AZ-01834457.pdf | 2014 2 5 T4 T3 Testost FSH Erika doesnt feel comfortable running |
| THER-AZ-01834598.pdf |    patient sample.pdf |
| THER-AZ-01964673.pdf | 2014 2 26 Vit D TPSA FT4 TSH SB complain more QC work.pdf |
| THER-AZ-01980804.pdf | 2015 8 16 A1c.pdf |
| THER-AZ-02178752.pdf | 2013 11 30 Vit D QC controls failed.pdf |
| THER-AZ-02202037.pdf | 2014 6 24.pdf |
| THER-AZ-02202444.pdf | 2013 11 30 v2 Vit D.pdf |
| THER-AZ-02202599.pdf | 2013 12 15.pdf |
| THER-AZ-02202656.pdf | 2015 10 20.pdf |
| THER-AZ-02202676.pdf | 2015 11 10 Suraj discourage.pdf |
| THER-AZ-02203176.pdf | 2013 9 15 Vit D.pdf |
| THER-AZ-02203225.pdf | 2014 4 23 HCG.pdf |
| THER-AZ-02219480.pdf | 2014 9 20.pdf |
| THER-AZ-02290798.pdf | 2014 2 23 Vit D SB Suraj.pdf |
| THER-AZ-02317961.pdf | 2014 2 5 V2 T4 T3 Testost FSH Erika doesnt feel comfortable |
| THER-AZ-02318740.pdf |    running patient sample.pdf |
| THER-AZ-02347548.pdf | 2015 11 15.pdf |
| THER-AZ-02348228.pdf | 2014 11 24 SB Suraj discuss Suraj becoming LD.pdf |
| THER-AZ-02352943.pdf | 2015 1 10.pdf |
| THER-AZ-02447705.pdf | 2014 2 21 Suraj SB transition Tyler.pdf |
| THER-AZ-02483587.pdf | 2015 10 19.pdf |
| THER-AZ-02487262.pdf | 2014 3 14 SB VitD looks good.pdf |
| THER-AZ-02502298.pdf | 2014 4 13.pdf |
| THER-AZ-02547993.pdf | |
| THER-AZ-02775612.pdf | ROSENDORFF, M.D., ADAM 02-26-2019_CONF_mini.pdf |
| THER-AZ-03274129.pdf | MOI_ARosendorff_2016.07.22 (reduced).pdf |
| THER-AZ-03274555.pdf | MOI_ARosendorff_2017.06.07 (reduced).pdf |
| THER-AZ-03274788.pdf | MOI_ARosendorff_2018.01.12.pdf |
| THER-AZ-03311173.pdf | |
| THER-AZ-03392468.pdf | Rosendorff, Adam.pdf (Rosendorff Deposition in *Colman*) |
| THER-AZ-03416369.pdf | Young, Daniel.pdf (Young Deposition in *Colman*) |
| THER-AZ-03540517.pdf | |

| | |
|---|---|
| THER-AZ-03541775.pdf | MOI_DYoung_2017.10.26.pdf |
| THER-AZ-03557708.pdf | MOI_DYoung_2017.10.26 (reduced) 2 of 2.pdf |
| THER-AZ-03563629.pdf | MOI_DYoung_2017.12.07.pdf |
| THER-AZ-03563962.pdf | MOI_DYoung_2017.10.26 (reduced) 1 of 2.pdf |
| THER-AZ-03563981.pdf | MOI_DYoung_2017.09.25.pdf |
| THER-AZ-03582349.pdf | MOI_DYoung_2018.02.08.pdf |
| THER-AZ-03582372.pdf | |
| THER-AZ-03582536.pdf | SEC-TX-000007818.pdf |
| THER-AZ-03587251.pdf | SEC-TX-000007446.pdf |
| THER-AZ-03587568.pdf | SEC-TX-000007288.pdf |
| THER-AZ-03588530.pdf | SEC-TX-000007122.pdf |
| THER-AZ-03604803.pdf | |
| THER-AZ-03605271.pdf | EX_238-SEC-TX-000007949.pdf |
| THER-AZ-03605347.pdf | EX_252-SEC-TX-000008069.pdf |
| THER-AZ-03605373.pdf | EX_240-SEC-TX-000007961.pdf |
| THER-AZ-03605469.pdf | EX_259-SEC-TX-000008448.pdf |
| THER-AZ-03605840.pdf | EX_233-SEC-TX-000007900.pdf |
| THER-AZ-03605862.pdf | EX_268-SEC-TX-000008455.pdf |
| THER-AZ-03606267.pdf | EX_257-SEC-TX-000008442.pdf |
| THER-AZ-03607910.pdf | EX_250-SEC-TX-000008062.pdf |
| THER-AZ-03608265.pdf | EX_260-SEC-TX-000008451.pdf |
| THER-AZ-03608306.pdf | EX_251-SEC-TX-000008064.pdf |
| THER-AZ-03608331.pdf | EX_245-SEC-TX-000007980.pdf |
| THER-AZ-03608389.pdf | EX_246-SEC-TX-000007992.pdf |
| THER-AZ-03608431.pdf | EX_254-SEC-TX-000008168.pdf |
| THER-AZ-03608447.pdf | EX_236-SEC-TX-000007945.pdf |
| THER-AZ-03608513.pdf | EX_256-SEC-TX-000008175.pdf |
| THER-AZ-03608623.pdf | EX_235-SEC-TX-000007906.pdf |
| THER-AZ-03632615.pdf | EX_247-SEC-TX-000008043.pdf |
| THER-AZ-03632625.pdf | EX_248-SEC-TX-000008048.pdf |
| THER-AZ-03643024.pdf | EX_244-SEC-TX-000007979.pdf |
| THER-AZ-03643649.pdf | EX_241-SEC-TX-000007974.pdf |
| THER-AZ-03643771.pdf | EX_258-SEC-TX-000008445.pdf |
| THER-AZ-03644656.pdf | EX_243-SEC-TX-000007978.pdf |
| THER-AZ-03646400.pdf | EX_253-SEC-TX-000008080.pdf |
| THER-AZ-03660456.pdf | EX_249-SEC-TX-000008058.pdf |
| THER-AZ-03692624.pdf | EX_239-SEC-TX-000007953.pdf |
| THER-AZ-03692639.pdf | EX_255-SEC-TX-000008173.pdf |
| THER-AZ-03720792.pdf | EX_234-SEC-TX-000007905.pdf |
| THER-AZ-03732961.pdf | EX_237-SEC-TX-000007946.pdf |
| THER-AZ-03743859.pdf | EX_242-SEC-TX-000007976.pdf |
| THER-AZ-03746331.pdf | |
| THER-AZ-03843551.pdf | SEC-USAO-EPROD-000398999_image.pdf |
| THER-AZ-03844930.pdf | SEC-USAO-EPROD-003097371_image.pdf |

| | |
|---|---|
| THER-AZ-03848984.pdf | Copy of SEC-USAO-EPROD-000415631.xlsx |
| THER-AZ-03854750.pdf | SEC-USAO-EPROD-000957184_image.pdf |
| THER-AZ-03873921.pdf | THER-0278433_image.pdf |
| THER-AZ-03875390.pdf | SEC-USAO-EPROD-003896671_image.pdf |
| THER-AZ-03875496.pdf | SEC-USAO-EPROD-006037582_image.pdf |
| THER-AZ-03877622.pdf | SEC-USAO-EPROD-000883746_image.pdf |
| THER-AZ-03888076.pdf | SEC-USAO-EPROD-000659926_image.pdf |
| THER-AZ-03895851.pdf | THPFM0000277045_image.pdf |
| THER-AZ-03896752.pdf | SEC-USAO-EPROD-000415631_image.pdf |
| THER-AZ-03939952.pdf | THER-0307522_image.pdf |
| THER-AZ-03944045.pdf | THER-0278543_image.pdf |
| THER-AZ-03971143.pdf | Copy of SEC-USAO-EPROD-003208807.xlsx |
| THER-AZ-03971894.pdf | SEC-USAO-EPROD-006037575_image.pdf |
| THER-AZ-03971935.pdf | SEC-USAO-EPROD-003208805_image.pdf |
| THER-AZ-03971955.pdf | Copy of SEC-USAO-EPROD-003208806.xlsx |
| THER-AZ-04008648.pdf | SEC-USAO-EPROD-000415616_image.pdf |
| THER-AZ-04207456.pdf | TS-0883810_image.pdf |
| THER-AZ-04207655.pdf | SEC-USAO-EPROD-000711204_image.pdf |
| THER-AZ-04210675.pdf | SEC-USAO-EPROD-000957215_image.pdf |
| THER-AZ-04211602.pdf | |
| THER-AZ-04213928.pdf | |
| THER-AZ-04214079.pdf | |
| THER-AZ-04214569.pdf | |
| THER-AZ-04241922.pdf | |
| THER-AZ-04243388.pdf | |
| THER-AZ-04243405.pdf | |
| THER-AZ-04245315.pdf | |
| THER-AZ-04246369.pdf | |
| THER-AZ-04246397.pdf | |
| THER-AZ-04246696.pdf | |
| THER-AZ-04250267.pdf | |
| THER-AZ-04253546.pdf | |
| THER-AZ-04253606.pdf | |
| THER-AZ-04303806.pdf | |
| THER-AZ-04316444.pdf | |
| THER-AZ-04329378.pdf | |
| THER-AZ-04353487.pdf | |
| THER-AZ-04452882.pdf | |
| THER-AZ-04486016.pdf | |
| THER-AZ-04501976.pdf | |
| THER-AZ-04518172.pptm | |
| THER-AZ-04518473.xlsx | |
| THER-AZ-04521640.pdf | |
| THER-AZ-04522281.xlsx | |

THER-AZ-04522841.xlsx
THER-AZ-04575022.xlsx
THER-AZ-04633447.pdf
THER-AZ-04681461.pptx
THER-AZ-04764557.xlsx
THER-AZ-04795805.pdf
THER-AZ-04796248.xlsx
THER-AZ-04810485.pptx
THER-AZ-04815984.xlsx
THER-AZ-04860064.xlsx
THER-AZ-04860066.xlsx
THER-AZ-04865536.pdf
THER-AZ-04893884.pptx
THER-AZ-04961217.xlsx
THER-AZ-05066959.pptx
THER-AZ-05066960.xlsx
THER-AZ-05066961.pdf
THER-AZ-05068520.xlsx
THER-AZ-05070412.xlsx
THER-AZ-05070413.xlsx
THER-AZ-05070414.xlsx
THER-AZ-05070584.xlsx
THER-AZ-05070585.xlsx
THER-AZ-05070586.xlsx
THER-AZ-05070608.xlsx
THER-AZ-05070765.xlsm
THER-AZ-05072586.xlsx
THER-AZ-05072693.xlsx
THER-AZ-05073103.xlsx
THER-AZ-05073132.xlsx
THER-AZ-05073178.xlsx
THER-AZ-05170968.pptx
THER-AZ-05172126.pdf
THER-AZ-05181291.xlsx
THER-AZ-05181295.xlsx
THER-AZ-05182852.xlsx
THER-AZ-05183906.xlsx
THER-AZ-05183950.xlsx
THER-AZ-05184000.xlsx
THER-AZ-05202675.xlsx
THER-AZ-05204950.xlsx
THER-AZ-05310957.pptx
THER-AZ-05311812.pdf
THER-AZ-05320703.xlsx

| | |
|---|---|
| THER-AZ-05322675.ppt | |
| THER-AZ-05323298.xlsx | |
| THER-AZ-05326515.ppt | |
| THER-AZ-05338139.pdf | |
| THER-AZ-05338184.xlsx | |
| THER-AZ-05338577.xlsx | |
| THER-AZ-05342657.xlsx | |
| THER-AZ-05349952.ppt | |
| THER-AZ-05367611.xlsx | |
| THER-AZ-05370711.xlsx | |
| THER-AZ-05370939.xlsm | |
| THER-AZ-05393292.pdf | |
| THER-AZ-05413883.pdf | |
| THER-AZ-05416476.pdf | |
| THER-AZ-05416480.pdf | |
| THER-AZ-05416481.pdf | |
| THER-AZ-05416482.pdf | |
| THER-AZ-05416483.pdf | |
| THER-AZ-05416484.pdf | |
| THER-AZ-05416485.pdf | |
| THER-AZ-05416486.pdf | |
| THER-AZ-05419510.pptx | |
| THER-AZ-05466651.xlsx | |
| THER-AZ-05466703.xlsx | |
| THER-AZ-05466704.xlsx | |
| THER-AZ-05466705.xlsx | |
| THER-AZ-05467739.xlsx | |
| THER-AZ-05467740.xlsx | |
| THER-AZ-05468260.pptx | |
| THER-AZ-05582240.pdf | |
| THER-AZ-05592156.pdf | |
| THER-AZ-05651376.xlsx | |
| THER-AZ-05992921.pdf | |
| THER-AZ-05992922.pdf | |
| THER-AZ-05992928.pdf | |
| THER-AZ-05992930.pdf | |
| THER-AZ-05992936.pdf | |
| WG000368.pdf | |
| WG006132.pdf | |
| WG028234.pdf | |
| CMS-014053_native.pdf | CDPH0000001_image.pdf |
| Select Rosendorff Emails.pdf | CDPH0000062_image.pdf |
| THPFM0004201054_image.pdf | CDPH0000315_image.pdf |

| | |
|---|---|
| THPFM0004806442_image.pdf<br>THPFM0004929096_image.pdf<br>THPFM0004990549_image.pdf<br>THPFM0005498546_image.pdf<br>TS-0485304_image.pdf | *Kidd et al.* Evaluation of direct-to-consumer low-volume lab tests<br>   in healthy adults.pdf<br>PFM-DEPO-00005457_image.pdf<br>PFM-DEPO-00005888_image.pdf<br>SEC-USAO-EPROD-000894765_image.pdf<br>THPFM0004993048_image.pdf<br>THPFM0004993049.xlsx<br>THPFM0004993050.xlsx<br>US-FDA-0015694_image.pdf<br>US-FDA-0015698_image.pdf<br>US-FDA-0015842_image.pdf<br>US-FDA-0015864_image.pdf<br>US-FDA-0015956_image.pdf<br>US-FDA-0015971_image.pdf<br>US-FDA-0024046_image.pdf<br>US-FDA-0024585_image.pdf<br>US-FDA-0024744_image.pdf<br>US-FDA-0024759_image.pdf<br>US-FDA-0024797_image.pdf<br>US-FDA-0024812_image.pdf<br>US-FDA-0024827_image.pdf<br>US-FDA-0030621_image.pdf<br>US-FDA-0033540_image.pdf<br>US-FDA-0033542_image.pdf<br>US-FDA-0033547_image.pdf<br>US-FDA-0033809_image.pdf<br>US-FDA-0034774_image.pdf<br>US-FDA-0037189_image.pdf |
| THPFM0000019373_image.pdf<br>THPFM0000153439_image.pdf<br>THPFM0000264724_image.pdf<br>THPFM0000273265_image.pdf<br>THPFM0000281404_image.pdf<br>THPFM0000288821_image.pdf<br>THPFM0000390937_image.pdf<br>THPFM0000497929_image.pdf<br>THPFM0000552562_image.pdf<br>THPFM0000567198_image.pdf<br>THPFM0000832674_image.pdf<br>THPFM0000863064_image.pdf<br>THPFM0001302355_image.pdf<br>THPFM0001402145_image.pdf<br>THPFM0001546948_image.pdf | SEC-USAO-EPROD-000648527_image.pdf<br>SEC-USAO-EPROD-001846618_image.pdf<br>Select Documents re ████████████████████<br>Select Documents re ████████████████████<br><br>SEC-USAO-EPROD-000383896_image.pdf<br>SEC-USAO-EPROD-000384524_image.pdf<br>SEC-USAO-EPROD-000384724_image.pdf<br>SEC-USAO-EPROD-000384877_image.pdf<br>SEC-USAO-EPROD-000430282_image.pdf<br>SEC-USAO-EPROD-000440274_image.pdf<br>SEC-USAO-EPROD-000530614_image.pdf<br>SEC-USAO-EPROD-001177428_image.pdf<br>SEC-USAO-EPROD-001199315_image.pdf<br>SEC-USAO-EPROD-001212697_image.pdf |

| | |
|---|---|
| THPFM0001558414_image.pdf<br>THPFM0002371824_image.pdf<br>THPFM0003603101_image.pdf<br>THPFM0003866605_image.pdf<br>THPFM0004228061_image.pdf<br>THPFM0004363242_image.pdf<br><br>THER-0298217_image.pdf<br>THER-2395701_image.pdf<br>THER-2395709_image.pdf<br>THER-2396974_image.pdf<br>THPFM0004222310_image.pdf<br>THPFM0004222311_image.pdf | SEC-USAO-EPROD-001212700_image.pdf<br>SEC-USAO-EPROD-001215565_image.pdf<br>SEC-USAO-EPROD-001215924_image.pdf<br>SEC-USAO-EPROD-001215931_image.pdf |
| SEC-641605.xlsx | SEC-USAO-EPROD-000516535_image.pdf<br>SEC-USAO-EPROD-000641192_image.pdf<br>BENNETT – CONFIDENTIAL PURSUANT TO PROTECTIVE<br>  ORDER129MINI.pdf (Bennett deposition in *SEC v. Balwani*)<br>YAMAMOTO – MINI.pdf (Yamamoto deposition in *SEC v. Balwani*) |

Additional documents and sources consulted:

Video recording of AACC 2016 Theranos presentation
cms.gov
www.westgard.com

# Exhibit 5



*United States Attorney*
*Northern District of California*

*150 Almaden Boulevard, Suite 900*          *(408) 535-5061*
*San Jose, California 95113*          *FAX (408) 535-5066*

September 28, 2020

VIA EMAIL

Lance Wade
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, DC 20005

Jeffrey B. Coopersmith
Orrick Herrington & Sutcliffe LLP
701 5th Avenue, Suite 5600
Seattle, WA 98104-7097

        Re:    <u>*United States v. Elizabeth Holmes and Ramesh "Sunny" Balwani*</u>
               CR-18-00258-EJD
               Supplemental Expert Notice

Dear Counsel:

Pursuant to Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure, the government hereby provides the following supplemental written summary of testimony that the government intends to use under Rules 702, 703, and/or 705 of the Federal Rules of Evidence during its case-in-chief at trial.  This disclosure is a supplement to the information contained in the government's previous disclosure dated March 6, 2020.  Pursuant to Rule 16(b)(1)(C) of the Federal Rules of Criminal Procedure, the government hereby requests from Defendants disclosure of testimony they intend to use under Rule(s) 702, 703, and/or 705 of the Federal Rules of Evidence as evidence at trial.  Please note that the backgrounds and qualifications of the following experts are summarized in the resumes and/or curricula vitae, which are attached hereto and incorporated by reference.

    1.  Bruce Pixley

Please see the attached report summarizing the testimony of Mr. Pixley.  His qualifications are summarized in the accompanying CV.

1

**ER-3204**

2.  Dr. Steven Linnerson

Dr. Linnerson is a fact / percipient witness, whose testimony may also cover topics and/or opinions informed by his knowledge, skill, experience, training, and education.  *See* Fed. R. Evid. 702.

Dr. Linnerson has practiced medicine for 37 years and has extensive experience as an OBGYN practitioner.  He has experience training resident physicians as well, and occupies a training role at his current practice.  Dr. Linnerson also discusses current developments in medical practice with the other members of his practice.  As a group, they commonly get into didactic discussions at regular provider meetings and product committee meetings.

Dr. Linnerson may testify that the hCG test is standard for OBGYN patients. In addition to detecting pregnancy, it can be a tumor marker.  hCG is a chemical that comes from a developing placenta, but it is also a marker for cells that make abnormal chemicals.  It is used as a tumor marker very rarely; its primary use is in detecting pregnancies.  That has been true throughout his entire career.  There are two types of hCG tests:  quantitative and qualitative.  Qualitative is either positive or negative, and quantitative gives you a number.  Typically, for qualitative testing, if a patient's hCG level was greater than 20, it was called positive, and if it was less than 20, it was called negative.  Quantitative hCG has been available for approximately 20 years.

In medical school and then in his residency, Dr. Linnerson was educated on hCG, including the role of hCG in pregnancy and the role of different levels.  Besides education in medical school and in residency, his continuing medical education has contributed to his knowledge of hCG.  ACOG (the American College of OBGYNs) has technical bulletins and articles that he reads to stay current.  Currently, OBGYNs must certify yearly, such that during active years of practice he engages in a lot of reading hCG quantitative levels as part of that certification process.  He reads articles on hCG and has discussions with the partners in his practice.  Additionally, years of treating patients has contributed to his knowledge base regarding hCG.

Dr. Linnerson has handled an estimated 200,000 office visits, and half of those visits were OB patients.  Through the years, he has handled about 30 deliveries a month and treated a total of 14,000-15,000 pregnant women.  Every one of those patients involved him looking at an hCG test.  Dr. Linnerson estimates that every delivery was preceded by 13 office visits. In a normal pregnancy, a physician will want to know if hCG levels are going up.  hCG levels also reveal whether a baby is okay, which is of heightened concern in patients who have a history of miscarriage or bleeding.  Dr. Linnerson said he has easily personally examined tens of thousands of hCG tests.  All the hCG test results that Dr. Linnerson examined were provided by outside labs.  Those tests were generally conducted by vein draw.

Dr. Linnerson may testify that all pregnancies start in the fallopian tube.  The sperm and the egg meet in the tube and then travels down the tube into the uterus.  If the fertilized egg gets stuck in the tube it leads to an ectopic pregnancy that can rupture the tube causing the patient to bleed internally.  If the pregnancy is stuck in the fallopian tube, the doctor generally must poison the embryo and cause it to dissolve in the tube to avoid danger to the mother.  hCG values are expected to go up 2/3 every 48 hours and they double every 72 hours in a normal pregnancy.  If

2

the pregnancy test goes 200, 400, 410, 550, the curve is flattening and that is a dangerous sign. The patient may lose the baby or require additional treatment.

Dr. Linnerson will testify that Theranos provided hCG test results to doctors in his practice that indicated clearly that pregnancies were not going to make it because the hCG levels were not doubling as they should have been. Despite those results, those patients were later determined to be carrying viable pregnancies. Dr. Linnerson may testify that hCG results can be plus or minus 10 percent, so doctors are careful to examine trends in test results. There are biological differences in the rates at which pregnancies grow. Despite there being a range of normal results, the values returned by Theranos to more than one of Dr. Linnerson's patients indicated unambiguously that pregnancies would not be viable. Dr. Linnerson will testify that, in the cases he observed at his practice, the Theranos test values were too low to have a biological explanation in light of the fact that the patients in question did not lose their pregnancies. It is not possible to obtain a viable pregnancy from the low hCG values some Theranos tests showed, proving that the test results must have been inaccurate. Dr. Linnerson will testify that lab error is the only explanation for the numbers he saw from Theranos.

   3.  Dr. Audra Zachman

Dr. Zachman is a fact / percipient witness, whose testimony may also cover topics and/or opinions informed by her knowledge, skill, experience, training, and education. *See* Fed. R. Evid. 702.

Dr. Zachman is a nurse practitioner with extensive experience treating pregnant patients and interpreting hCG results. Since she began practicing, Dr. Zachman has renewed her license every two years, and attends a conference every year. Although those tasks entail additional education, hCG values are so fundamental a part of obstetric practice that extensive additional education on the topic has been unnecessary. Dr. Zachman may testify that hCG is a standard tool used with obstetrics (OB) patients to confirm the presence and health of a pregnancy. The hCG hormone can be excreted in "pregnancy like" situations, such as in a molar pregnancy, where hCG levels are used to track the progress of a dangerous growth in the uterus that does not include a fetus. Dr. Zachman may testify that it is very clear when you are looking at qualitative hCG, that hCG is either present in the body or it's not. When you are looking at quantitative hCG, a treating doctor knows based on the patient's condition where that number should be. For example, if a test is yielding numbers in the hundreds of thousands and the patient is early on in her pregnancy, you would know that wasn't right.

Dr. Zachman received training on hCG while earning her doctorate in school. She continued to have extensive experience with hCG tests and interpreting test results while working at her practice. During times of active practice, Dr. Zachman averaged 20 patients a day, 5 days a week for four years, and three days a week for two years. During an average week. Dr. Zachman probably reviewed 25 hCG tests. She has therefore reviewed approximately 1,000 hCG tests or more over a full year during her years of practice. Over the course of her career, she has reviewed an estimated 5,000 quantitative hCG tests. In each of these cases, the hCG data comes from the outside lab conducting the test.

3

Dr. Zachman may testify that an hCG result tells her whether a patient is pregnant or not.  If Dr. Zachman already knows the patient is pregnant, it tells her how far along the pregnancy might be.  If she already knows how far along a pregnancy is based on other data, then the hCG value can give her additional important information, such as whether the pregnancy is likely to be viable or threatened.  hCG values may also indicate whether a pregnancy includes twins or triplets, or if it looks like a molar pregnancy.  With hCG results, it is important to look at the trend then looking at a specific value; the normal range can vary somewhat from person to person.  Thus, practitioners pay attention to how the patient's hCG values are trending over a period.  Dr. Zachman may testify that one would anticipate in a healthy pregnancy to see a doubling of hCG every 48 hours in the first couple of weeks of pregnancy, and then a plateau after that.  If the hCG numbers did not double according to this rule, it would give Dr. Zachman suspicion of a threatened viability.

Dr. Zachman may testify that, in a normal healthy pregnancy, it is not biologically possible for an hCG value to double, then level out and start to drop, but then resume its climb as normal.  In the case of a particular patient, ████████████, Dr. Zachman received hCG results from Theranos indicating that her hCG level was 12,500 one day, then 125 two days later.  Dr. Zachman may testify that, if accurate, those results would indicate a nonviable pregnancy.  Such a substantial drop, in fact, would indicate that the body had already begun to miscarry the pregnancy.  Results like that would be inconsistent with a viable pregnancy.  Following the 125 value, ████ received another Theranos test result two days later indicating an hCG value of 9,500.  Dr. Zachman may testify that that sequence of three test results should not be biologically possible.  Were Dr. Zachman to ignore the lowest value of 125, a drop from 12,500 to 9,500 over four days would still be indicative of a potential serious problem with the pregnancy.  In a normal healthy pregnancy, one would expect that number to rise from 12,500 to approximately 48,000 over that four-day period.  Based on this, it is clear that at least one of the Theranos test results was not accurate.

    4.  Dr. JoEllen B. Embry

Nurse Practitioner JoEllen Embry is a fact / percipient witness, whose testimony may also cover topics and/or opinions informed by her knowledge, skill, experience, training, and education. *See* Fed. R. Evid. 702.

Dr. Embry's medical practice focuses on women's health issues.  Specifically, her current practice focuses on Polycystic Ovarian Syndrome (PCOS).  PCOS is a pre-diabetic, pre-heart disease condition.  When Ms. Embry became a nurse practitioner, she went to endocrine conferences and sought out expert advice, she started really learning about PCOS.  In addition to PCOS, her practice also focuses on other endocrine problems.  This has been the case for at least 20 years.  Dr. Embry formerly would attend three to four large out of town conferences every year along with dozens of dinners throughout the year, all of which would feature speakers addressing topics relevant to her practice.  Since 1995 Dr. Embry has regularly attended conferences where endocrine issues and PCOS were discussed.  These have included conferences specifically focusing on PCOS from 2000 on.

4

Dr. Embry may testify that PCOS can be a complicated condition.  Women with PCOS do not ovulate regularly and many times they are overweight.  PCOS is the number one endocrine problem affecting women.  In some women, it shows up right from the moment they start their menstrual cycle.  In others, it shows up after their first pregnancy or after a hugely stressful event in their life that triggers hormone changes. Many women were probably born with it.  Most patients with PCOS have a family history of diabetes.  These women present with menstrual irregularities, excessive facial and/or body hair, acne, obesity (especially mid-section obesity), hair thinning, and/or velvety patches behind their neck.  The underlying problem is insulin resistance, which results in hormonal changes, including the production of excessive estrogen and testosterone.  A patient with PCOS may have elevated lipid levels.  Some women will have a period every month, but that doesn't mean they are ovulating.  Many have multiple follicles in their ovaries and around their ovaries. The condition leads to a problem of inflammation that can in turn lead to diabetes, heart disease, and fertility issues.  It can also lead to uterine cancer if the patient goes months and months without a menstrual cycle.

As a nurse practitioner focusing on women's health issues, Ms. Embry has treated between 65,000-75,000 individual patients.  Of those patients, 1,500 to 2,000 each year were treated for PCOS.  Thus, in her career she has treated approximately 30,000 PCOS patients.  Each of those PCOS patients had multiple testosterone lab tests ordered and reviewed by Dr. Embry.  In total, Dr. Embry has reviewed in excess of 100,000 testosterone lab results over her career.

Dr. Embry may testify that a healthy female patient's testosterone levels may typically be around 30 for total testosterone, with a level of 3 or 4 for free testosterone.  A patient with PCOS may have a testosterone level as high as 130 with a free testosterone level at 30.

Monitoring testosterone levels gives Dr. Embry an idea on how to treat PCOS.  Some women's testosterone levels are s a little elevated and they have a lot of symptoms, some have high levels but few symptoms.  By measuring their levels, Dr. Embry can prescribe the correct dose of Spironolactone, for example, which will help lower testosterone levels.  It is important that she have accurate test results to be able to manage the treatment and the dosage amount of Spironolactone.  Using this method, Dr. Embry has seen patients who presented with testosterone levels of 90 that were reduced over time to 40 or 50 in a year, which will bring improvements in their health.

In her experience with Theranos, Dr. Embry received testosterone results for patients she knew to be suffering from PCOS with levels so low as to indicate that the patient had no hint of PCOS.  Some of those suspect results were less than 1—lower than would be expected and healthy in a similarly aged patient with no endocrine disorder.  Dr. Embry may testify that menopausal women sometimes have testosterone levels that low, but that she was seeing these results in twenty-five year old patients known to have PCOS—patients who normally presented with testosterone levels of 30 or 40 but who were suddenly getting Theranos results indicating levels of less than 5.  Dr. Embry may testify that there could be no biological explanation for a drop of that nature given the history of the patients and their stable medication dosage, leading to the conclusion that Theranos's test results were inaccurate.

5

5.  Dr. Mark Burnes

Dr. Burnes is a fact / percipient witness, whose testimony may also cover topics and/or opinions informed by his knowledge, skill, experience, training, and education.  *See* Fed. R. Evid. 702.

Dr. Burnes is an experienced physician practicing in internal medicine.  He may testify about the blood test for PSA or Prostate Specific Antigen.  Pieces of the prostate organ get deposited in the bloodstream as debris and the PSA blood test is designed to measure the quantity of that.  As the prostate gets bigger with age, it produces more discarded tissue and PSA levels are expected to rise.  Any PSA level above 10 will get a physician's attention.  When monitoring PSA levels, however, it is important for doctors to be aware of trends.  A patient can have prostate cancer with a PSA level of 2.5 if their healthy baseline level would be five times lower at 0.5.  Conversely, a patient may experience PSA levels rising from 8 to 12 to 14 to 18 while still having negative biopsies for prostate cancer.

Dr. Burnes received training on interpreting PSA results in medical school, and has had additional experience since then.  Dr. Burnes has treated approximately 28 patients with prostate cancer over the course of his career.  He estimates that he has reviewed more than 5000 PSA results during his career as a practicing doctor.

Dr. Burnes may testify about his experience treating a patient who received Theranos test results for the PSA analyte.  That patient had previously tested at a level 2 for PSA, but one year later received a PSA result of 26 from Theranos.  Such a jump would be strongly indicative of a very aggressive form of prostate cancer.  A large jump in values like that could not be explained by prostatitis.  When prostate cancer shows up at a relatively young age like 45 it can be very aggressive and take the patient's life in five years.  An additional Theranos test returned a value of 1.71, then a third Theranos test yielded a PSA level of 22.8.  Dr. Burnes may testify that there is no biological explanation for such large jumps in PSA values.  There is no medical explanation for a drop from 26 to 1.71 over such a short time period.  Lab error / inaccurate testing is the only possibility.  Similarly, there is no medical explanation for the jump from 1.71 to 22.8 except for physical trauma to the prostate.  Even with severe prostatitis, a doctor would expect the level to rise from a 2 to a 6 or 8.

6.  Dr. Edward Szmuc

Dr. Szmuc is a fact / percipient witness, whose testimony may also cover topics and/or opinions informed by his knowledge, skill, experience, training, and education.  *See* Fed. R. Evid. 702.

Dr. Szmuc will testify that hCG is produced by placental tissue that is growing in an early pregnancy. Once a patient has a positive hCG test, which is anywhere from a value of 3 to 5, it indicates a pregnancy. Typically, the hCG number doubles every two to three days. Once a number gets up to about 100,000, it levels off and goes down; this occurs somewhere after six weeks. By that time, the physician should have confirmed an intrauterine pregnancy by ultrasound. After that, it's no longer necessary to follow the hCG numbers. Dr. Szmuc will testify about treating a patient who wanted to become pregnant and who was feeling well with no symptoms of pain, shoulder pain, or bleeding. That patient's first Theranos hCG test result was

6

positive, but Dr. Szmuc recalled the second Theranos hCG test result decreased. He will explain that when that happens, a doctor is concerned with the possibility of an ectopic pregnancy or an abnormal growing intrauterine pregnancy. Dr. Szmuc will testify that the second result did not make sense because the patient was not experiencing any other symptoms. Because Dr. Szmuc was not confident in the Theranos hCG result, he sent the patient out to another lab for her subsequent hCG test.

Dr. Szmuc will testify that with an ectopic pregnancy the hCG numbers usually either level out, go up slowly, or fall slowly. With an ectopic pregnancy, the hCG numbers do not double every two or three days. He will explain that if you look at a falling hCG number, that is usually associated with an abnormal intrauterine pregnancy, which is when the embryo stops growing. hCG numbers with an abnormal intrauterine pregnancy usually fall faster than they would in an ectopic pregnancy. Dr. Szmuc will explain that physicians are always trying to rule out an ectopic pregnancy. With an ectopic pregnancy, the growth of a placenta occurs in the tube, and the fetus cannot grow normally. If the pregnancy is in the end of the tube, there is more room to grow, the pregnancy can grow further long, and you can see the hCG numbers get much higher. If a pregnancy is ectopic, it qualifies as high risk. With an ectopic pregnancy, physicians are worried about rupture, significant hemorrhage, or the worst-case scenario of patient death. He will explain that if he treats a patient where he suspects an ectopic pregnancy, he would talk to that patient on a regular basis and get hCG numbers every two days or so. A physician would also need to get an ultrasound and make sure there is no blood in the patient's abdomen. The physician must work quickly to act before a rupture occurs. Sometimes it takes a week, sometimes it takes two weeks to determine definitively if a patient has an ectopic pregnancy. Dr. Szmuc said 2.7% of all maternal deaths in the United States result from ectopic pregnancies.

Dr. Szmuc first started using hCG tests during his residency, which was between the years of 1979-1983. To be specific, he started using hCG tests in 1982; before then, hCG numbers were not ascertainable, so physicians had to use other methods. He has been in practice for 37 years, and he probably utilizes hCG tests several times a week, every week. He estimates that he has reviewed over 10,000 hCG tests.  Dr. Szmuc will testiy that in his career, he has never observed a positive hCG test, followed by a lower hCG test 48 hours later, followed by a higher hCG test 48 hours after that. Dr. Szmuc will also testify that he has never had any issues with hCG tests and other laboratories in his career, other than the issues he had with Theranos.

   7.   Dr. Gerald S. Asin

Dr. Asin is a fact / percipient witness, whose testimony may also cover topics and/or opinions informed by his knowledge, skill, experience, training, and education.  *See* Fed. R. Evid. 702.

Dr. Asin will testify about A1c tests. Hemoglobin A1c (A1c) test is a diabetic test. A1c tests for the percentage of sugar attached to the red blood cell. Theranos A1c tests were either too high or too low; the Theranos results were not accurate.  If the A1c test is not accurate the patients' medicine (such as insulin) could be incorrectly changed, leading to an overdose or underdose in the patient. Normal A1c is less than 5.6% for a healthy patient, and less than 7% if diabetic (8%-11% would be high for a diabetic patient). Low hemoglobin, less than 5%, could result in a coma from the brain shutting down.

Dr. Asin will also testify about protein and calcium tests. Protein tests are ordered as part of a Comprehensive Metabolic Panel (CMP). Dr. Asin will testify that he found abnormalities with Theranos protein and calcium tests. He contacted the lab because he was getting erroneous results. Dr. Asin will further testify that too much protein, if not linked to another sickness, could indicate an issue with bone marrow or cancer. Low protein could indicate malnourishment. Overuse of antacids could impact protein. Although it would depend on the particular lab used, generally a normal range was 5-7 or 6-8 g/dL. Calcium tends to correlate with protein. Normal calcium is about 8.8 -10.4 mg/dL.

Doctors also adjust the calculation of calcium when they review CMP results, because if the protein is off it could be masking the actual calcium number. The equation was 1 protein to .8 calcium. If the protein reported on the CMP was off, the doctor would wrongly apply this ratio, which could either hide an actual issue with calcium or indicate there was an issue with calcium when one did not exist.

High or low calcium is very dangerous and could implicate the heart. When using Theranos tests, Dr. Asin saw calcium too high every week, as opposed to when he used other labs, when he only saw high calcium once to twice a month.

Dr. Asin will also testify about PSA tests. Dr. Asin will testify that some of his patients had uncharacteristically high PSA results from Theranos. The prostate-specific antigen (PSA) tests for the specific prostate antigen. The prostate secretes this antigen, and it tends to correlate with the increase in prostate size and risk of cancer. It is a test to look for cancer before symptoms might show.

For most men under 60 years old, normal PSA is below 4. As men get older, the prostate naturally grows larger, so the normal range is adjusted. For men over 70 years old, normal is below 5. For men over 80, normal is below 6. A physician's review of the results also looks at the change from year to year, not only if the number is technically in the normal range. Also, some men can have larger prostates without having cancer.

If PSA results are reported low incorrectly, cancer could be missed. If PSA results are reported high incorrectly, a man would have to have an additional, more invasive test. Specifically, a biopsy of the prostate would need to be done. In order to do a biopsy, a needle would be used, piercing through the colon to the prostate. In addition to conducting this test unnecessarily, the prostate biopsy could also have complications. Since the needle is pushed through the colon, fecal material could make its way into the blood. This would result in fevers and chills. For instance, Dr. Asin recently treated a patient who experienced this and spent one week hospitalized. It was also possible the needle could hit a blood vessel, leading to hemorrhaging that would require surgery.

Dr. Asin monitored his own PSA, and would expect his number to be lower at 54 than at 59. Hopefully his number was between 1 – 2, and generally less than 4. Dr. Asin will testify that his own PSA seemed higher than was accurate in a Theranos test. Dr. Asin had a prostate biopsy done on himself.

Dr. Asin ordered A1c, CMP, and PSA tests for all 33 years of his medical practice. For A1c, protein, and PSA, Dr. Asin ordered the tests every day, multiple times a day.

8.  Dr. Govind Acharya

Dr. Acharya is a fact / percipient witness, whose testimony may also cover topics and/or opinions informed by his knowledge, skill, experience, training, and education.  *See* Fed. R. Evid. 702.

Dr. Acharya will testify that BMP is a basic metabolic panel. BMP is a basic test ordered prior to operating, which Dr. Acharya has done for forty years. BMP was ordered before all surgeries, inpatient or outpatient, done by Dr. Acharya. BMP tested electrolytes: sodium, potassium, and fluoride.

An abnormality in BMP results would cause an issue with administering anesthesia. The most sensitive result was potassium, which had an effect on the heart and so was significant to the anesthesiologist. If potassium was off, it was possible that the patient could die on the table.

Dr. Acharya will testify that he ordered and evaluated thousands of BMP tests. Potassium numbers above 5 and below 3 were abnormal. For plastic surgery, this resulted in the surgery being cancelled. For the two patients Dr. Acharya remembered having an issue with the Theranos BMP, their potassium was over 5. This was very unusual for healthy patients, which these two patients were. That number would be expected in patients with kidney failure or cardiac issues, not healthy patients.

Dr. Acharya had not seen BMP test results that high since the first ten years of practice, because during that time he was doing emergency and trauma cases. Once Dr. Acharya moved to plastic surgery, which had been the last thirty years of practice, he will testify that he did not recall ever seeing potassium levels as high as those Theranos test results.

9.  Dr. John Couvaras

Dr. Couvaras is a fact / percipient witness, whose testimony may also cover topics and/or opinions informed by his knowledge, skill, experience, training, and education.  *See* Fed. R. Evid. 702.

Dr. Couvaras is an experienced physician practicing in obstetrics and reproductive endocrinology.  Over the course of his career as a treating physician, he has seen 10,000 or 11,000 patients who have had hCG tests, meaning that he has personally reviewed well over 10,000 hCG test results.  Dr. Couvaras may testify that hCG is a hormone used to indicate the presence and health of a pregnancy, and that hCG levels are expected to double or increase by a factor of 1.6 every 48 hours during a normal, healthy pregnancy.

Dr. Couvaras may further testify about his experience treating a pregnant patient who received an hCG test result showing a level of 160, indicating the presence of a pregnancy.  That patient

then received a Theranos hCG test three days later returning a value of less than 5, indicating the absence of a pregnancy. That same patient was tested a third time more than two weeks later and the Theranos test indicated an hCG level of 2150, again showing an established pregnancy.

Dr. Couvaras may testify that these values made no sense biologically. There is no medical explanation for an hCG value dropping that quickly. Even if the patient miscarried and there was still a sack in the uterus, the placenta would still be pumping out hCG such that higher levels would linger for weeks. On that basis, Dr. Couvaras may testify that the Theranos results are explainable only through lab error or inaccurate testing methods.

Dr. Couvaras may also testify that lovastatin is contraindicated for pregnant women.

10. Dr. Curtis Page

Dr. Page is a fact / percipient witness, whose testimony may also cover topics and/or opinions informed by his knowledge, skill, experience, training, and education. *See* Fed. R. Evid. 702.

Dr. Page will explain that the A1C test provides a look back on the previous three months of the average blood sugar of a patient. It tells the physician how well the patient's diabetes is being managed. It allows the physician to make clinical decisions based on the value it returns. Dr. Page will testify there is not a whole lot of evidence that an A1C that is too high or too low can affect clinical outcomes; it does not represent a critical value like a low potassium would, unless the results are either extremely high or extremely low.

Dr. Page will explain that what his practice found was that the A1C results their patients were getting from Theranos did not correlate with those patients' previous results. Nothing had changed dramatically in the patients as far as their condition, but their A1C results were changing. The patients were getting results from Theranos that were one to two orders of magnitude different than their previous results, and Dr. Page sent them to another lab for testing. The discrepancy called into question the integrity of the Theranos testing system, specifically whether it was giving accurate results.

Dr. Page will testify that the average person, when including babies and infants, has an A1C value of 4.2. The A1C value represents the percentage of red blood cells irreversibly tagged to a blood sugar molecule. Most adults have an A1C value of 5.0 to 5.6. If a person is diabetic, that person's A1C is at least 6.5. A person with diabetes that is well controlled will have an A1C value between 6.5 and 7.2. As a person gets older, their A1C number rises. Dr. Page will testify that an A1C between 6 and 9 is considered acceptable in some circumstances. In a younger person, an A1C around 6.5 to 7 is preferable. Once a patient's A1C gets higher than 9, that is indicative of very poor care, although it does not represent an acute emergency. If a patient's A1C is 14, that would be an immediate problem.

With Theranos's A1C test, a patient of Dr. Page's would have a value of 6.5 for years, and then all of a sudden, the Theranos value would be 8.0. That did not make sense to Dr. Page and his practice. It made him question the integrity of the test. There was a period of two to three months when Dr. Page's practice was getting inaccurate A1C results from Theranos. Some of the A1C

10

results from Theranos seemed normal, but some of them were not. Dr. Page will testify approximately 70 to 100 of his patients were affected. Theranos said the problem was with the machine. Theranos went back and refunded all the patients that were affected. There was a long delay after his practice notified Theranos of the problem and Theranos did an investigation.

Dr. Page first started interpreting A1C results when he was in medical school, and he has been interpreting them ever since, which is at least 20 years. He looks at A1C tests every day.

   11.  Dr. Adam Rosendorff

Dr. Rosendorff is a fact / percipient witness, whose testimony may also cover topics and/or opinions informed by his knowledge, skill, experience, training, and education.  *See* Fed. R. Evid. 702.  Dr. Rosendorff's opinions are further summarized in the reports of his interviews and his documented statements, all of which have been produced by the government.

Dr. Rosendorff is a medical doctor with years of experience as laboratory director at a number of clinical labs and companies.  He is currently Medical Director and CLIA [Clinical Laboratory Improvement Amendments] Laboratory Director of record at Millennium—a clinical toxicology laboratory that also conducts genetic analyses.  In that position, Rosendorff is responsible for ensuring testing is accurate and precise, reviewing quality control (QC) and quality assurance (QA), conducting proficiency testing through the College of American Pathologists (CAP), examining test result trends to determine if QC is meeting specifications, and interpreting urine and drug testing reports as necessary.  Previously, Dr. Rosendorff was Laboratory Director for Invitae, a CAP accredited clinical laboratory that conducted genetic analyses for cancers and other hereditary conditions.  Rosendorff's responsibilities at Invitae were the same as with Millennium, with the exception that he also was signatory on patient reports.  Invitae was a CAP deemed organization meaning that CAP reported its lab findings to CLIA.  CAP had higher standards than CLIA and had an area checklist that laboratories had to abide by.  While at Invitae, Rosendorff was also part time lab director for Precision Diagnostics.  Before Theranos, Dr. Rosendorff was Laboratory Director for Children's Hospital-University of Pittsburgh.  As lab director for Children's Hospital, Dr. Rosendorff was responsible for reviewing and approving validation reports for assays.  Dr. Rosendorff treated patients as part of his medical residency, and while at Children's Hospital, he often interacted with clinical physicians allowing him to gain a deeper understanding of the use of patient clinical lab testing.

Doctor Rosendorff is board certified in laboratory medicine/clinical pathology.  He has taken continuing education courses to maintain his medical license, and regularly reviews articles in the New England Journal of Medicine and other toxicology based publications.  Under his supervision as lab director, the labs Dr. Rosendorff has overseen have run hundreds of thousands of assays.  He has personally reviewed thousands of lab tests covering a wide variety of analytes, including some of the most common tests run in clinical chemistry, toxicology, genetics, and immunology.

Dr. Rosendorff may testify about the responsibilities of a lab director.  Laboratory directors must be familiar with the laws that govern laboratory operations which are outlined in CLIA regulations and Code of Federal Regulations.  Some states have state-specific laws.  For

example, New York State requires labs to meet specific regulations in order to run samples from patients that reside in New York. The lab director may delegate responsibility for maintaining compliance with state regulation to a QA manager. Lab directors oversee lab staff, but may delegate staffing duties and other logistic responsibilities to a lab manager and operations vice president. A lab director's ultimate goal is to run the lab smoothly, generate results that were of clinical use, ensure device calibrations were set, ensure QC was in range, review critical values to ensure no pre-analytic issues caused the result, and ensure that results are accurate and precise. A lab director cannot review every result and must trust that the other lab personnel are make decisions based on their best judgement and that the systems are working. A lab director can trust lower level employees because the director must also make sure lab personnel are qualified for their positions.

Ultimately, the laboratory director has the highest authority in the lab. The lab director's authority or decisions, regarding medical issues, cannot be overruled, especially by a superior that lacks a medical background. Thus, it would be inappropriate for a "business person," such as a CEO, to overrule a lab director's decision. Authority is derived from CLIA regulation. A laboratory director's decisions are made based on his or her medical education and training, and their experience running a clinical lab.

Dr. Rosendorff may testify that, under CLIA and as a matter of good laboratory practice, any assay that is going to be used for patient care needs to be validated to CLIA performance standards of accuracy, precision, linearity, upper limit of detection, lower limit of detection, and sensitivity. A validation report must be approved and signed before the assay can be used clinically. Proficiency testing post-validation continues to ensure the assay is meeting performance specifications, while quality control is used on a daily or shift-basis to determine if a device is "drifting." QC standards are determined by CAP checklist and the Clinical & Laboratory Standards Institute (CLSI) for any lab operating under good lab practices.

Dr. Rosendorff may explain that proficiency testing is a method to measure the ability of a lab to return an accurate result. The process relies on peers running the same analyte on the same type of analyzers. Success is measured by returning a measurement that was within two standard deviations from the results of the lab's peer group. Proficiency testing samples, such as CAP samples, are artificial samples containing a certain concentration of the analyte to be measured. The concentration is known to CAP, but unknown to the lab that is supposed to conduct the analysis. These samples are shipped to a lab and its peer group at the same time and are supposed to be measured in the same manner as a regular patient sample. In particular, CLIA dictates proficiency testing should be done using the most common method performed at the lab, which for Theranos, was finger-stick blood samples. CAP samples are designed to be stable. They are reliable and consistent when run on FDA devices in the manner they were designed to be run. During Dr. Rosendorff's tenue at Theranos, Balwani blamed unfavorable PT results at Theranos on bad PT samples. That was most likely not the explanation for Theranos's PT failure.

Dr. Rosendorff may testify about the differences between venous blood and capillary blood drawn from a finger-stick. For example, capillary blood may have more glucose, whereas glucose in venous blood tends to be metabolized. Cell lysis also presents problems for blood

collected by finger-stick. Cell lysis compromises a sample and there is no way to compensate for a sample contaminated with excess potassium due to cell lysis. LDL levels can also be affected by cell lysis as there is more LDL in red blood cells than serum. Edema or excess interstitial fluid on a person's fingertips can also affect the results derived from finger-stick blood. Capillary samples and venous samples should not be assumed to be the same in clinical lab testing. In particular, the different samples types should each have their own reference ranges.

Dr. Rosendorff may testify that assays like CMP, CBC, Vitamin D, HbA1c, TSH, PSA, and bicarbonate are assays that are commonly run as part of normal metabolic panels. These are not esoteric tests.

Dr. Rosendorff also may testify that Theranos's practice of diluting microsamples was disadvantageous because the Theranos process diluted samples below the Siemens device's lower level of quantitation (LLOQ). LLOQ was the value where the device could reliably measure while limit of detection (LOD) was the value at which the device produced a signal. These measurements are different. ROSENDORFF explained the Siemens instrument was qualified to measure values per the manufacturer. The manufacturer calculated the device's LLOQ by using samples of known concentrations that were diluted and run in an assay. Results were measured and error was calculated. Chemistry, hardware, and reagents were all integrated into the process of producing a result. Theranos processes were "breaking the system" to measure values lower than the LLOQ. ROSENDORFF said it was well known in the clinical lab community that, "the lower the value, the greater the error." Moreover, dilution issues can exacerbate the effect of device bias.

Dr. Rosendorff also may testify that Theranos's six-tip analyzer design ran assays in parallel and returned the average result, using Theranos-developed rules to address outliers for tip specific results. This process was not ideal because it may have tended to increase the appearance of precision beyond a lab test's true performance. It would have been better to run a given assay only once using a method with maximum accuracy and precision.

Dr. Rosendorff may testify that a clinical lab must be transparent about their testing, to include what devices are used. This information can be important for a physician to understand a result and place it in context. A lack of transparency can create problems in particular for patients who are tracking their historical test results. HbA1c is notorious for returning different results based on what device is used to conduct the assay.

Dr. Rosendorff may testify that critical results are supposed to be reported by the laboratory director or a trained clinical laboratory scientist (CLS). The individuals in these positions meet the legal requirements and have the necessary lab training to perform that function. Moreover, critical results should not be voided as potential erroneous results because that process may hide truly critical values. At Theranos, voiding results, such as for abnormal bicarbonate results, could have masked actual abnormal patient test values. For bicarbonate assays at Theranos in particular, the problems with sample stability rendered the assay not useful.

13

* * *

Please contact me if you believe that the notice that you have received provides inadequate notice under Rule 16(a)(1)(G).  The government reserves the right to supplement this disclosure of expert testimony.  To the extent the government determines that it intends to call any other expert witness to testify at trial based on its ongoing investigation, the identity and qualifications of any such additional witness(es), as well as the nature of the expert testimony and any related reports, will be disclosed immediately upon such a determination.

Please let us know if you have any questions, or would like to further discuss the matter raised above.

Very truly yours,

ADAM A. REEVES
Attorney for the United States,
Acting Under Authority Conferred
By 28 U.S.C. § 515

*/s/ John C. Bostic*

_____

JOHN C. BOSTIC
Assistant United States Attorney

14

**ER-3217**

# Exhibit 4



*United States Attorney*
*Northern District of California*

---

*150 Almaden Boulevard, Suite 900*                    *(408) 535-5061*
*San Jose, California 95113*                    Fax  *(408) 535-5066*

March 6, 2020

<u>*Via Email*</u>

Lance Wade, Esq.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, DC 20005

Jeffrey B. Coopersmith, Esq.
Orrick Herrington & Sutcliffe LLP
701 5th Avenue, Suite 5600
Seattle, WA 98104-7097

        Re:    <u>*United States v. Elizabeth Holmes and Ramesh "Sunny" Balwani*</u>
                CR-18-00258-EJD
                Expert Notice

Dear Counsel:

Pursuant to Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure, the government hereby discloses a written summary of testimony that the government intends to use under Rules 702, 703, and/or 705 of the Federal Rules of Evidence during its case-in-chief at trial.  Pursuant to Rule 16(b)(1)(C) of the Federal Rules of Criminal Procedure, the government hereby requests from Defendants disclosure of testimony they intend to use under Rule(s) 702, 703, and/or 705 of the Federal Rules of Evidence as evidence at trial.

    1.  Dr. Stephen R. Master

Please see the attached report summarizing the testimony of Dr. Master.  His qualifications are summarized in the accompanying CV.

    2.  Dr. Steven Linnerson

Dr. Linnerson is a fact / percipient witness, whose testimony may also cover topics and/or opinions informed by his knowledge, skill, experience, training, and education.  *See* Fed. R.

<div align="center">1</div>

Evid. 702.  Specifically, Dr. Linnerson will testify about hCG tests, the values in hCG tests, and how a physician would expect those values to double in 48 to 72 hours if a women is pregnant over this time period.  Dr. Linnerson will explain that an hCG blood test can detect pregnancy before it can be detected in a urine test.  If an hCG value stays flat or goes down, then a physician would expect the woman is no longer pregnant.  Dr. Linnerson will also explain that if a Theranos test showed a low value of hCG followed by a test from another laboratory a few days later with a very high value, this would tend to show that the Theranos test was wrong absent some other explanation, such as in the case of a pregnancy with twins or triplets.  Dr. Linnerson will further testify that his practice has never had problems with its hCG tests with other established laboratories before it started using Theranos.  His practice has been doing business with Sonora Quest and LabCorp for fifteen years and never had a problem.

Dr. Linnerson will also testify about a study his office conducted between Theranos and comparator laboratories.  According to this study, 67% of the Theranos hCG tests resulted in hCG values at least 10% higher than those obtained from the comparator laboratory.  He said this discrepancy would have led to clinical decisions about where the patient's embryos/fetuses were located in the body (i.e., whether the pregnancy was ectopic) and whether the pregnancy was viable or not.

Dr. Linnerson graduated from the University of Colorado, School of Medicine in 1977, and has 43 years of practice experience.  Dr. Linnerson specializes in Obstetrics & Gynecology and is affiliated with the Banner Desert Medical Center.

3.  Dr. Audra Zachman

Dr. Zachman is a fact / percipient witness, whose testimony may also cover topics and/or opinions informed by her knowledge, skill, experience, training, and education.  *See* Fed. R. Evid. 702.  Specifically, Dr. Zachman will testify about hCG tests and the values in hCG test results.  Dr. Zachman will testify that an hCG value of 1805 confirms that a patient is pregnant.  The value does not provide any information about the future viability of the pregnancy, but is a positive result in terms of whether the patient is currently pregnant.  It is normal to send a patient who has suffered from pervious miscarriages for hCG testing every 48 hours.  A normal pregnancy will see the hCG value double every 48 hours.  It is improbable that the hCG value would remain the same for those two tests.  In Dr. Zachman's experience, the hCG test is a reliable test which laboratories get right.  Dr. Zachman said seeing the exact same value one day and then again two days later would be unlikely and troubling.  Theranos's explanation as to the discrepancy in hCG test values for her patient, ████████████, was "not plausible."  Dr. Zachman has never had any other problems with hCG tests aside from the experience she had with her patient who was tested by Theranos.

Dr. Zachman is a board certified Women's Health Nurse Practitioner.  Dr. Zachman began her nursing career after graduating from Arizona State University with a Bachelor of Science Nursing degree.  She has worked in antepartum, postpartum, and labor and delivery.  She obtained a Doctorate of Nursing Practice specializing in women's health in 2013.

2

4. JoEllen B. Embry

Nurse Practitioner JoEllen Embry is a fact / percipient witness, whose testimony may also cover topics and/or opinions informed by her knowledge, skill, experience, training, and education. *See* Fed. R. Evid. 702. Specifically, Ms. Embry will testify about Poly Cystic Ovations Syndrome and normal versus abnormal levels of testosterone in patients experiencing this syndrome. Some patients whom Ms. Embry treats have male levels of testosterone with values as high as 120. According to Ms. Embry, a value of 30 to 40 for testosterone is normal for a woman. She prescribes her female patients with abnormally high testosterone levels specific medications to bring the levels down. The same patients with very high levels of testosterone were tested at Theranos and Theranos reported levels of less than one. Ms. Embry will testify that to this day, she has never had any patients with testosterone as low as what Theranos was reporting. According to Ms. Embry, the errors with regard to testosterone values and Theranos's test were blatant and obvious. Ms. Embry adjusts patients' medication based on lab results, and an incorrect adjustment could result in patient harm.

Ms. Embry will further testify that in 20 plus years of using Sonora Quest and LabCorp, she has never experienced any clinical errors with their lab results.

Ms. Embry received a Bachelor of Science, Nursing, from Arizona State University in 1983, and has been a practicing nurse since then. She obtained a Master's Degree in Nursing from the University of Phoenix in 1997. From 1996 until the present, Ms. Embry has worked as a Nurse Practitioner specializing in OB/GYN and women's health.

5. Dr. Edward Szmuc

Dr. Szmuc is a fact / percipient witness, whose testimony may also cover topics and/or opinions informed by his knowledge, skill, experience, training, and education. *See* Fed. R. Evid. 702. Specifically, Dr. Szmuc will testify about hCG tests. He will testify that hCG tests are laboratory tests done to either identify an early pregnancy or determine an ectopic pregnancy, which is a life threatening pregnancy. An expected hCG value would be between 2-1,000, and a normal pregnancy would show hCG levels doubling every 48 to 72 hours. hCG values for an ectopic pregnancy rise a little or stay the same. Dr. Szmuc will testify that he relies on these tests, that the hCG test is the most important lab work he orders as an OBGYN, and that a doctor must have full confidence in the results from hCG tests. In 30 years of using Sonora Quest, he never questioned their results.

Dr. Szmuc will further testify that he would normally order a third hCG test if he suspects an ectopic pregnancy or a miscarriage. He would typically continue to test until the test shows a negative result. But if hCG values stayed level, it could indicate an ectopic pregnancy that needed an intervention, surgical or pharmaceutical. In Dr. Szmuc's option, if you have an hCG of 5,000 and later one at 100,000, a next result below 5,000 indicates a problem with the test. If hCG is "below detectable threshold" it means negative for pregnancy. If he has a patient with a positive at home pregnancy test and he compares it with a blood test that registers a value of below detectable threshold, that would be a red flag. If an hCG result comes back invalid, that would be a red flag.

3

**ER-3221**

Dr. Szmuc attended the Medical College of Ohio, Medical School, obtaining an MD in 1979, and completed his OBGYN residency at the Boston City Hospital in 1983. He specializes in Gynecology, Obstetrics, Obstetrics and Gynecology.

6. Dr. Gerald S. Asin

Dr. Asin is a fact / percipient witness, whose testimony may also cover topics and/or opinions informed by his knowledge, skill, experience, training, and education. *See* Fed. R. Evid. 702. Specifically, Dr. Asin will testify about PSA tests, diabetic tests, protein and calcium tests, and HIV tests. A PSA test helps detect prostate cancer. If a PSA test comes back high, patients may need to undergo a biopsy in which a needle is inserted from the penis to the prostate. If a PSA test was incorrect, i.e., the test result numbers being incorrectly high, men could have to go through this unpleasant test unnecessarily. Dr. Asin will further testify that an HIV test result showing that it was reactive for HIV 1+2 antibodies, but non-reactive for HIV 1 antibody and HIV 2 antibody, separately, did not make any sense. It was not possible for the blood to have a combination of HIV 1 and 2, but not have either HIV 1 or 2 individually.

Dr. Asin is Board Certified in Internal Medicine. After earning his Bachelor of Science from Northwestern University in Evanston, Illinois, Dr. Asin attended the University of Oklahoma College of Medicine where he earned his Doctor of Medicine (MD) in 1987. He then continued his education in Milwaukee, Wisconsin and completed his residency in 1990 at the Medical College of Wisconsin. Dr. Asin has practiced in Arizona since 1992. He is currently an Associate Professor of Medicine at the University of Arizona College of Medicine and an affiliate of Scottsdale Healthcare.

7. Dr. Govind Acharya

Dr. Acharya is a fact / percipient witness, whose testimony may also cover topics and/or opinions informed by his knowledge, skill, experience, training, and education. *See* Fed. R. Evid. 702. Specifically, Dr. Acharya will testify about blood metabolic panel (BMP) tests, and among other things, the electrolyte analysis and potassium analysis in these tests. Dr. Acharya will testify that a BMP test is not complicated and these are very common tests. BMP was a usual pre-surgical screening, and if abnormal results came back a surgery could be called off. An abnormal result for a potassium test could indicate a heart issue that would not allow surgery. Dr. Acharya had patients whose Theranos tests showed abnormal potassium levels. Dr. Acharya knew the patients' medical histories, however, and did not think the test result were right, so he had them re-run at the hospital laboratory.

Dr. Acharya is a graduate of B.J. Medical College, Ahmedabad, India. He completed an internship at Mt. Sinai School of Medicine in New York followed by a residency in General Surgery at the University of Massachusetts. He completed his Plastic and Reconstructive Surgery training at the Medical College of Virginia. Dr. Acharya remained there as an Assistant Professor before moving to Phoenix in 1980. Dr. Acharya is certified by the American Board of Plastic Surgery and the American Board of Surgery. He has been in practice for over 30 years. Dr. Acharya is a member of the American Society of Plastic Surgeons, American Society of

4

Aesthetic Plastic Surgeons, Fellow of the American College of Surgeons and Fellow of the International College of Surgeons.  Dr. Acharya has performed thousands of Plastic Surgery procedures utilizing the latest surgical techniques.  He is involved in teaching, research and is on the clinical faculty of the Mayo Clinic College of Medicine.  He has also done medical missionary work to repair birth defects and war injuries.

    8.  Dr. John Couvaras

Dr. Couvaras is a fact / percipient witness, whose testimony may also cover topics and/or opinions informed by his knowledge, skill, experience, training, and education.  *See* Fed. R. Evid. 702.  Specifically, Dr. Couvaras will testify about hCG tests and values.  Dr. Couvaras will testify about a patient,       , who had a reading of 160 after her first hCG test at Sonora Quest.  When she was tested a second time (this time by Theranos), however, the result came back as "negative" for pregnancy.  The data went from a reading of 160 to a reading of less than detectable, which Dr. Couvaras considered a "chemical loss."  After the Theranos blood test which led Dr. Couvaras to conclude that      was no longer pregnant, Dr. Couvaras stopped the current treatment protocol, and began recycling      on medicines that a pregnant person should not be taking.  Subsequently,      called the office and said she had not had her period.  Dr. Couvaras told her to take another blood test, which she did on 09/22/2014.  That test was also performed by Theranos, and the results for progesterone came back as "high" and the results for beta were 2150.  When Dr. Couvaras saw those results, his initial thought was that      might have an ectopic pregnancy.  His notes for      stated that they should have come in to the office because they were missing something.  She came in to the office on 09/23/2014, and Dr. Couvaras performed an ultrasound on her.  The ultrasound revealed that there was a sac in her uterus, and Dr. Couvaras determined that she was six weeks pregnant.  The pregnancy they were seeing was in line with the pregnancy projected by the 09/03/2014 Sonora Quest Laboratory results.  Dr. Couvaras explained that, with a pregnant patient, you would expect to see the hCG value double every two days.  That holds true until the value levels off at somewhere between 5,000 and 12,000.  If you take the original hCG 160 value measured by Sonora Quest and you double it every two days, you would have expected to see a value of between 5,000 and 12,000 at the time of the second Theranos blood test.  The second Theranos blood test, though positive for pregnancy (2150), wasn't nearly as high as Dr. Couvaras would have expected it to be.  Dr. Couvaras never saw      after the 09/23/2014 office visit.  Dr. Couvaras will further testify that Lovastatin (one of the medicines      was taking) is contraindicated for pregnant patients.

Dr. Couvaras is a double board certified fertility specialist, who is also a board certified Reproductive Endocrinologist.  He received his training at the University of Texas Southwest Medical Center and completed his internship and residency at Baylor College of Medicine in Dallas.  He is also board certified in Obstetrics and Gynecology and an active member of the American Society of Reproductive Medicine.  He was the past director of Reproductive Endocrinology and Assisted Reproductive Medicine and past chairman of the Department of Obstetrics and Gynecology at Abrazo Scottsdale Hospital.  Dr Couvaras served as the 2017 President of Maricopa Medical Society, and has been on the Board Member since 2013.  He has also served on the board of Phoenix OBGYN Society 2014-2015.

5

9.  Dr. Curtis Page

Dr. Page is a fact / percipient witness, whose testimony may also cover topics and/or opinions informed by his knowledge, skill, experience, training, and education.  *See* Fed. R. Evid. 702. Specifically, Dr. Page will testify about A1C and CBC tests.  Dr. Page will testify that he experienced a high quantity of abnormal A1C tests with Theranos testing.  Dr. Page will further testify that he did not understand how Theranos could not have known they had a problem with A1Cs for a couple of months.  Dr. Page will testify that he did not think it would require a doctor to point out this kind of issue.

Dr. Page graduated in 1988 with an ABA in Biochemistry from Occidental College in Pasadena, California.  Dr. Page then went onto Harvard Medical School in Boston Massachusetts where he graduated in 1994.  While at Harvard he completed a research fellowship in wound healing and skin biology at the Brigham and Women's Hospital Department of Plastic Surgery.  He later completed two years of a General Surgery residency at Emory University in Atlanta from 1994-1997 and later a Family Practice residency in Brooklyn, NY at the Lutheran Medical Center from 1998-2000.  With a focus on advanced chronic disease management and population health, Dr. Page has taken a heightened interest in programs that are capable of improving both the quality and cost of health care.  As a member of the National Lipid Association and a graduate of the Bale and Doneen method, Dr. Page is currently actively practicing advanced lipid testing and cardiovascular prevention programs.  Dr. Page has developed AAFP sponsored Group Visit/Educational programs covering Smoking Cessation, Diabetes, COPD, CHF and Cardiovascular disease.

10. Daniel Young

Daniel Young is a fact / percipient witness, whose testimony may also cover topics and/or opinions informed by his knowledge, skill, experience, training, and education.  *See* Fed. R. Evid. 702.  Specifically, Dr. Young's anticipated testimony is described in memoranda of interview, grand jury testimony, and testimony in other proceedings, all of which have been previously produced.  *See, e.g.*, GJ-TRANSCRIPTS 000001-000710; COLM-000001-COLM-001849; US-REPORTS-0007227; US-REPORTS-0007375; US-REPORTS-0007668; US-REPORTS-0007694; US-REPORTS-0008040.

11. Dr. Adam Rosendorff

Dr. Rosendorff is a fact / percipient witness, whose testimony may also cover topics and/or opinions informed by his knowledge, skill, experience, training, and education.  *See* Fed. R. Evid. 702.  Specifically, Dr. Rosendorff's anticipated testimony is described in memoranda of interview, grand jury testimony, and testimony in other proceedings, all of which have been previously produced.  *See, e.g.*, GJ-TRANSCRIPTS 000001-000710; COLM-000001-COLM-001849; US-REPORTS-0007227; US-REPORTS-0007375; US-REPORTS-0007668; US-REPORTS-0007694; US-REPORTS-0008040.

Please contact me if you believe that the notice that you have received provides inadequate notice under Rule 16(a)(1)(G).  The government reserves the right to supplement this disclosure of expert testimony.  To the extent the government determines that it intends to call any other

6

expert witness to testify at trial based on its ongoing investigation, the identity and qualifications of any such additional witness(es), as well as the nature of the expert testimony and any related reports, will be disclosed immediately upon such a determination.

Please let us know if you have any questions, or would like to further discuss the matter raised above.

Very truly yours,

ADAM A. REEVES
Attorney for the United States,
Acting Under Authority Conferred
By 28 U.S.C. § 515

_____
VANESSA BAEHR-JONES
Assistant United States Attorney

# Exhibit 3



*United States Attorney*
*Northern District of California*

| *1301 Clay Street, Suite 340S* | *(510) 637-3680* |
| *Oakland, California 94612* | *Fax  (510) 637-3724* |

September 28, 2020

*By Email*

Lance Wade, Esq.
Kevin Downey, Esq.
Katie Trefz, Esq.
Amy Saharia, Esq.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, DC  20005

Re:     *United States v. Holmes*, CR 18-258 EJD

Dear Counsel,

On March 6, 2020, and April 3, 2020, and through our discovery letters, we notified you of evidence crimes, wrongs, or other acts the government may seek to introduce at trial.  We write to supplement those disclosures.  By providing this disclosure, the government is not conceding that the evidence described below (or previously) is properly considered Rule 404(b) evidence or is admissible only under the provisions of Rule 404(b).  The government may also assert that this evidence is admissible as direct evidence of the charged conduct, that it is inextricably intertwined with the events charged in the operative Indictment, that it shows a continuing course of conduct otherwise admissible under Rules 401 and 402, or that it simply is not subject to Rule 404(b).  We make these disclosures out of an abundance of caution and to avoid surprise about the government's intentions.  In addition to the evidence expressly cited below, the government reserves the right to admit alternative versions of the cited items, additional evidence needed to place the cited evidence in context, and other equivalent and similar evidence of the same acts.

With that in mind, we notify you as follows:

/ /

1

I.     **False and misleading representations directed at insured patients.**

The government may offer evidence of the following:

████████████

Before October 2014, ████████ received presentations from Theranos in the medical practice where she worked.  "Theranos's fingerstick blood draw was appealing to █████," and she saw Theranos testing as convenient and quicker than testing at a traditional laboratory.  US-REPORTS-0010790.  On or about October 4, 2014, █████ visited a Theranos Service Center in Phoenix, Arizona.  US-REPORTS-0011799.  After, she received an inaccurate hCG result from Theranos.  The results were faxed from Palo Alto to her physician in Arizona.  US-REPORTS-0011799.  Holmes and Balwani were made aware of the inaccurate result no later than October 15, 2014, and were advised █████ "was told she was miscarrying, which was not the case."  TS-1041959-961; TS-1078204-207; SEC-USAO-EPROD-000388965; SEC-USAO-EPROD-000402263-69.  Balwani claimed the inaccurate result was because of human error.  SEC-USAO-EPROD-000402263-69.  Theranos ultimately voided the result in or about March 2016.

The evidence is offered for the permitted purpose of intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy.  Such evidence tends to show Holmes and Balwani knew of problems with Theranos's hCG tests.  Such evidence tends to show Theranos was unable to provide accurate and reliable test results, that Holmes and Balwani knew Theranos was unable to provide accurate and reliable test results, as alleged in Paragraph 16, and statements to investors and patients were false and misleading.  Such evidence tends to show Holmes and Balwani's scheme contemplated the use of interstate wires.  Such evidence tends to show Holmes and Balwani understood the importance of accurate hCG tests and the consequences of inaccurate results, as well as the materiality of statements about accuracy to investors and patients.  Such evidence tends to show their knowledge and control over Theranos's operations.  Theranos's voiding of the test tends to show Theranos was unable to produce accurate and reliable test results.  Evidence that insured and other nonpaying patients were induced to use Theranos's services tends to show the existence of the scheme and the materiality of the statements.

████████████

████████ worked at Walgreens and, by virtue of her work, received and was exposed to Theranos marketing.  █████ spent a week at Theranos's corporate office to train to become a Theranos technician.  Her Theranos trainers talked about their tests being more accurate and requiring less blood.  █████ said that Walgreens had a health testing month.  Before Theranos partnered with her store, if a patient came in seeking an HbA1c test, she would direct them to an over-the-counter device.  Once Theranos partnered with her store, she would recommend to patients that they use a Theranos test.  She would tell the patients, "It's accurate, less painful, there's less blood drawn, and Theranos is right here."  This message that she presented was borne out of a combination of her Theranos training she received as well as the brochures Theranos created that were left for patients.  US-REPORTS-0010783-785

2

On or about September 24, 2014, ▮▮▮▮ visited a Theranos Service Center in Apache Junction, Arizona. CMS-DOJ-0208226. After, she received an inaccurate hCG result from Theranos. On or about October 1, 2014, she called to complain. THPFM0004992928. On or about October 1, 2014, Christian Holmes and Dan Edlin (who reported to Holmes) were advised of ▮▮▮ inaccurate result. SEC-USAO-EPROD-004138573; SEC-USAO-EPROD-004142263. Later, Balwani was advised ▮▮▮ was receiving suspect results. SEC-USAO-EPROD-001298981; SEC-USAO-EPROD-001298982. On or about August 28, 2015, ▮▮▮ wrote Theranos about her inaccurate result. THPFM0005249329. Holmes and Balwani were alerted to her complaints. SEC-USAO-EPROD-000879453; US-REPORTS-0070786. Theranos ultimately voided the result on or about March 28, 2016. CMS-DOJ-0208226.

The evidence is offered for the permitted purpose of intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy. Such evidence tends to show Holmes and Balwani knew of problems with Theranos's hCG tests. Such evidence tends to show Theranos was unable to provide accurate and reliable test results, that Holmes and Balwani knew Theranos was unable to provide accurate and reliable test results, as alleged in Paragraph 16, and statements to investors and patients were false and misleading. Such evidence tends to show Holmes and Balwani's scheme contemplated the use of interstate wires. Such evidence tends to show Holmes and Balwani understood the importance of accurate hCG tests and the consequences of inaccurate results, as well as the materiality of statements about accuracy to investors and patients. Such evidence tends to show their knowledge and control over Theranos's operations. Theranos's voiding of the test tends to show Theranos was unable to produce accurate and reliable test results. Evidence that insured and other nonpaying patients were induced to use Theranos's services tends to show the existence of the scheme and the materiality of the statements.

▮▮▮▮▮▮ was a patient of IVF Phoenix. US-FDA-0040578. On September 5, 2014, she visited a Theranos Service Center in Phoenix, Arizona. US-FDA-0040578. After, she received an inaccurate hCG test result measuring <7.82. US-FDA-0040578. The results were faxed from Palo Alto to her physician in Arizona. US-FDA-0040578. On September 19, 2014, she visited a Theranos Service Center in Phoenix, and received an hCG test result measuring 2150.01. US-FDA-0040578. No later than September 30, 2014, both Holmes and Balwani were notified by IVF Phoenix that, due to the inaccurate Theranos test result which indicated that ▮▮▮ was "negative" for pregnancy, ▮▮▮ fertility medications had been discontinued in order to prepare her for the next cycle. THPFM0000832674. They were also notified that, several weeks after the Theranos inaccurate test, ▮▮▮ was confirmed by IVF Phoenix to be carrying a baby with a heartbeat. THPFM0000832674; THPFM0000288921. Theranos ultimately voided the result on or about March 28, 2016. CMS-DOJ-0208226.

The evidence is offered for the permitted purpose of intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy. Such evidence tends to show Holmes and Balwani knew of problems with Theranos's hCG tests. Such evidence tends to show Theranos was unable to provide accurate and reliable test

3

results, that Holmes and Balwani knew Theranos was unable to provide accurate and reliable test results, as alleged in Paragraph 16, and statements to investors and patients were false and misleading. Such evidence tends to show Holmes and Balwani's scheme contemplated the use of interstate wires. Such evidence tends to show Holmes and Balwani understood the importance of accurate hCG tests and the consequences of inaccurate results, as well as the materiality of statements about accuracy to investors and patients. Such evidence tends to show their knowledge and control over Theranos's operations. Theranos's voiding of the test tends to show Theranos was unable to produce accurate and reliable test results. Evidence that insured and other nonpaying patients were induced to use Theranos's services tends to show the existence of the scheme and the materiality of the statements.



███████████  (formerly ███████████)

███████████  (formerly ███████████) was hired by Theranos in 2013 as a phlebotomist. US-REPORTS-0017505. Balwani interviewed her prior to hiring her, and she received training from Theranos. US-REPORTS-0017505. Her understanding was that Theranos had an "innovative" new technology that could run many tests, 70 to 100 in the beginning, through a couple of drops of blood from the finger. US-REPORTS-0017505. During the training, Theranos taught ███████ that Theranos was "better, and new, and so advanced." US-REPORTS-0017505. Theranos assigned ███████ to Walgreens Store #3177 in Scottsdale, AZ. US-REPORTS-0017505.

███████ received several inaccurate PT/INR results from Theranos in the month of August 2014. *See, e.g.*, SEC-USAO-EPROD-004699552; SEC-USAO-EPROD-003004453. Despite having health insurance through Theranos, ███████ paid out of pocket for at least some of her Theranos tests. US-REPORTS-0017505. ███████ had an email exchange with Tracy Masson, former Theranos vice president of operations, on August 25, 2014, notifying her of the inaccurate test results. *See, e.g.*, SEC-USAO-EPROD-004699552. After ███████ notified Theranos of her inaccurate test results, Theranos put its PT/INR fingerstick test "on hold." US-REPORTS-0017505. No one from Theranos ever gave her an explanation as to why her Theranos test results were inaccurate. US-REPORTS-0017505. Holmes and Balwani were advised of ███████ inaccurate test result. When a Theranos employee told Balwani "[a]s I mentioned, I had some concerns a few weeks back about sample stability for PT/INR only when patients are under Coumadin treatment" and was creating a study plan," Balwani stated to Holmes "[a]lways another study after the fact." *See, e.g.*, TS-1150122; THPFM0000057384.

The evidence is offered for the permitted purpose of intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy. Such evidence tends to show Holmes and Balwani knew of problems with Theranos's PT/INR tests. Such evidence tends to show Theranos was unable to provide accurate and reliable test results, that Holmes and Balwani knew Theranos was unable to provide accurate and reliable test results, as alleged in Paragraph 16, and statements to investors and patients were false and misleading. Such evidence tends to show Holmes and Balwani's scheme contemplated the use of interstate wires. Such evidence tends to show Holmes and Balwani understood the importance of accurate PT/INR tests and the consequences of inaccurate results, as well as the materiality of statements about accuracy to investors and patients. Such evidence tends to show

4

their knowledge and control over Theranos's operations.  Theranos's voiding of the test tends to show Theranos was unable to produce accurate and reliable test results.  Evidence that insured and other nonpaying patients were induced to use Theranos's services tends to show the existence of the scheme and the materiality of the statements.

Prior to about November 9, 2015, ███████████ was exposed to Theranos advertisements in a magazine advertising that they could "get patients in and out of their testing facility quickly and that the blood draws would be done via finger stick."  US-REPORTS-0014778.  She understood that Theranos's laboratory costs were much less than local laboratories, and she "absolutely has an expectation that a testing laboratory is giving accurate results and that it is of equal quality to other labs."  US-REPORTS-0014778.  On or about November 9, 2015, ██████ visited a Theranos Service Center in Mesa, Arizona.  After which, she received an inaccurate PT/INR test result from Theranos.  ABRAMS-000008.  Theranos learned of the inaccurate PT/INR test result on or around November 12, 2015, when it was requested that they rerun Ms. █████ PT/INR because "normally [███████] PT/INR is a lot higher and now █████] is taking a new medication and they believe the results may be incorrect."  *See, e.g.*, SEC-USAO-EPROD-003097628.

The evidence is offered for the permitted purpose of intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy.  Such evidence tends to show Holmes and Balwani knew of problems with Theranos's PT/INR tests.  Such evidence tends to show Theranos was unable to provide accurate and reliable test results, that Holmes and Balwani knew Theranos was unable to provide accurate and reliable test results, as alleged in Paragraph 16, and statements to investors and patients were false and misleading.  Such evidence tends to show Holmes and Balwani's scheme contemplated the use of interstate wires.  Such evidence tends to show Holmes and Balwani understood the importance of accurate PT/INR tests and the consequences of inaccurate results, as well as the materiality of statements about accuracy to investors and patients.  Such evidence tends to show their knowledge and control over Theranos's operations.  Theranos's voiding of the test tends to show Theranos was unable to produce accurate and reliable test results.  Evidence that insured and other nonpaying patients were induced to use Theranos's services tends to show the existence of the scheme and the materiality of the statements.

Prior to about October 30, 2015, ██████████ was exposed to Theranos advertisements that said, "One little prick and they could do all these tests."  US-REPORTS-0010804.  She thinks she saw the advertisements on a couple of billboards or on television.  US-REPORTS-0010804.  On or about October 30, 2015, ██████ visited a Theranos Service Center inside of a Walgreens in Phoenix, Arizona.  *See, e.g.*, SEC-USAO-EPROD-000715459; US-REPORTS-0010804.  After, she received an inaccurate estradiol test, which she viewed through Theranos's on-line portal.  US-REPORTS-0010804; ██████-000003.  Theranos learned of the inaccurate estradiol test as early as November 19, 2015, and again on November 23, 2015, in an email sent from █████ to customersupport@theranos.com.  *See, e.g.*, SEC-USAO-EPROD-001283843;

5

SEC-USAO-EPROD-000877524; SEC-USAO-EPROD-000715459.  Balwani was informed of the inaccurate estradiol test on or before November 24, 2015, saying "I assume this was run in AZ so need the AZ team to followup (sic.) on this asap and see what happened here."  *See, e.g.*, SEC-USAO-EPROD-000877519; SEC-USAO-EPROD-000772753.

        The evidence is offered for the permitted purpose of intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy.  Such evidence tends to show Holmes and Balwani knew of problems with Theranos's estradiol tests.  Such evidence tends to show Theranos was unable to provide accurate and reliable test results, that Holmes and Balwani knew Theranos was unable to provide accurate and reliable test results, as alleged in Paragraph 16, and statements to investors and patients were false and misleading.  Such evidence tends to show Holmes and Balwani understood the importance of accurate estradiol tests and the consequences of inaccurate results, as well as the materiality of statements about accuracy to investors and patients.  Such evidence tends to show their knowledge and control over Theranos's operations.  Evidence that insured and other nonpaying patients were induced to use Theranos's services tends to show the existence of the scheme and the materiality of the statements.

        ███████████

        Prior to about September 2015, ████████ saw Theranos advertisements on a billboard and heard advertisements on the radio advertising Theranos's "futuristic" technology that only needed a pin prick of blood and that did not require a requisition from the doctor.  US-REPORTS-0008571.  On or around September 8, 2015, ███ visited a Theranos Service Center in Gilbert, AZ.  KR-000008; SEC-USAO-EPROD-000716959.  After, he received an inaccurate HIV Ab/Ag test, which he accessed through Theranos's on-line portal.  KR-000008; US-REPORTS-0008571.  A day after ███ accessed the inaccurate test result, an employee from Theranos contacted him to say "Oh, we made a mistake," and inform him that his HIV Ab/Ag test was negative.  US-REPORTS-0008571.  Numerous employees reporting to Holmes and Balwani became aware of ███ inaccurate HIV Ab/Ag test on or before September 16, 2015.  *See, e.g.*, SEC-USAO-EPROD-000716959; SEC-USAO-EPROD-001355975.

        The evidence is offered for the permitted purpose of intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy.  Such evidence tends to show Holmes and Balwani knew of problems with Theranos's HIV tests.  Such evidence tends to show Theranos was unable to provide accurate and reliable test results, that Holmes and Balwani knew Theranos was unable to provide accurate and reliable test results, as alleged in Paragraph 16, and statements to investors and patients were false and misleading.  Such evidence tends to show Holmes and Balwani understood the importance of accurate HIV tests and the consequences of inaccurate results, as well as the materiality of statements about accuracy to investors and patients.  Such evidence tends to show their knowledge and control over Theranos's operations.  Evidence that insured and other nonpaying patients were induced to use Theranos's services tends to show the existence of the scheme and the materiality of the statements.

6

## II.   False and misleading representations directed at doctors.

The government may offer evidence of the following:

*Defendants directed Theranos's marketing materials toward doctors along with other intended recipients.*

A September 9, 2013 press release by Theranos stated:  "Consumers can now complete any clinician-directed lab test with as little as a few drops of blood and results available in a matter of hours. . . .  For the first time, Theranos is introducing CLIA-certified laboratory services with the ability to run its tests on micro-samples.  Theranos's proprietary laboratory infrastructure minimizes human error through extensive automation to produce high quality results.  Test results are available to physicians in a matter of hours, enabling fast diagnoses to help informed treatment choices. . . .  For the past 10 years, Theranos has worked relentlessly to reach a point at which we could help make actionable information accessible to physicians and patients at the time it matters most."  The release also stated Theranos offered consumers access to "less invasive and more affordable clinician-directed lab testing, from blood samples as small as a few drops, or 1/1000 the size of a typical blood draw."  These statements presented Theranos's technology as mature and ready for use in the clinical setting, when Defendants knew that Theranos's tests were not ready for launch and suffered from accuracy and consistency problems that made them unreliable.  [NEED BATES CITE]

In a Theranos flyer apparently from 2015, the company invited patients to "[b]ring any lab order from your clinician to your nearest Theranos Wellness Center location" to obtain a Theranos test.  This statement suggested to patients that Theranos tests were sufficiently accurate and reliable for use in the clinical setting, when in fact Defendants knew that Theranos tests suffered from accuracy and consistency problems that rendered them unreliable and unsuitable for medical decision-making.  [See, e.g., US-FDA-0037983]

In one flyer, Theranos stated that it "offers affordable STI tests, so it's easier to know."  This statement suggested that Theranos's STI tests were sufficiently accurate for patients to rely on them to "know" whether they had a given infection, when in fact Defendants knew that Theranos tests—including the assays for HIV and gonorrhea—suffered from accuracy and consistency problems rendering them unreliable.  [See, e.g., US-FDA-0037996]

One Theranos flyer claimed that Theranos was "revolutionizing every aspect of laboratory testing" (or "reinventing every aspect of laboratory testing") and invited patients to get a lab order from their physician.  These statements falsely presented Theranos as an advanced laboratory offering superior testing services accurate and reliable enough for use by physicians in making medical treatment decisions.  In fact, Defendants knew that Theranos relied in part on conventional testing methods and that its tests suffered from accuracy and consistency problems.  [See, e.g., US-FDA-0038001; THPFM0005547680]

In one piece of promotional material, Theranos stated, "We believe everyone has the right to information about their own health" and offered to provide such information through its lab tests, "[m]eaning now you can find out where you stand, and find out what's going on inside

7

your body," "get the information you need," and "detect potential problems early." All of these claims falsely suggested to patients that Theranos's test results could be relied upon to reflect the state of a patient's health and whether that patient was suffering from medical problems, when in fact Defendants knew that Theranos's tests suffered from accuracy and consistency problems that made them unreliable and unsuitable for use in the clinical setting. [See, e.g., US-FDA-0038006; THPFM0005547542]

Theranos advertised its hCG assay as a "Pregnancy Test" despite the fact that this assay suffered from accuracy and consistency problems that rendered it unsuitable for detecting pregnancy. Additionally, Theranos advised patients not to change their medical treatment before reviewing their test results with a physician, necessarily representing that physicians could rely on its tests for that purpose despite Defendants' knowledge of the prevalent accuracy problems with Theranos's tests. [See, e.g., US-FDA-0038011]

In a press release dated July 2, 2015, Theranos claimed that FDA had validated Theranos's approach for FDA review of its LDTs (Laboratory Developed Tests), and Holmes was quoted as saying that Theranos was committed to ensuring that its systems and LDTs "are of the highest quality, and that patients and their physicians have access to the most accurate information about their health." In fact, Defendants knew that FDA disagreed with Theranos's arguments regarding regulation of LDTs, and were aware that Theranos's tests suffered from accuracy and consistency problems that prevented them from offering patients "the most accurate information about their health." [See, e.g., THPFM0000021148-50]

In a press release dated July 16, 2015, Theranos claimed that a CLIA waiver for its HSV test meant that "FDA determined the Theranos test and technology is reliable and accurate and can be used in a broader set of locations outside of a traditional CLIA certified laboratory, including Theranos Wellness Centers." Holmes was quoted as saying that the company was continually innovating "to provide the best laboratory testing services in the world." In fact, Defendants knew that FDA prohibited Theranos from operating its analyzers outside of the lab setting, and were aware that their tests suffered from accuracy and reliability problems that made them inferior to conventional tests and unsuitable for use in the clinical context. [See, e.g., THPFM0005548113]

In a letter sent to a University in March 2016 pitching Theranos's immunity testing, Theranos's market access manager Jennifer Hanson wrote that Theranos was a diagnostic company with the goal of providing access to "accurate, affordable, real-time diagnostic information." In fact, Defendants knew that Theranos's tests were not sufficiently accurate and consistent to be relied upon in a medical setting. [See, e.g., THPFM0005548324]

In one print ad, Theranos recited its slogan, "one tiny drop changes everything" next to an image of a nanotainer, and claimed that "[n]ow it's easier to find out what's going on with your body." Defendants knew, however, that Theranos's tests suffered from accuracy and consistency problems that rendered them unreliable indicators of what was happening inside a patient's body. [See, e.g., THPFM0000314831]

8

In Theranos's Guide to Direct Testing for Arizona, the company touted patients' ability to obtain blood testing without a doctor's order, claiming that patients were now "free to engage with your physician and your health like never before." The guide also claimed that this would allow patients to "get a read on their health," "become more informed earlier," and work with doctors to "address potential problems sooner." A different version of the guide celebrated that it was now easier for patients to get "vital information about their health when it matters most," and specifically promoted Theranos's ability to help monitor thyroid, blood glucose, and sexual health. These statements suggested to patients that Theranos's tests were accurate reflections of their actual health status and that they were therefore suitable to be relied upon by doctors in diagnosing problems and making treatment decisions, when in fact Defendants knew that Theranos's tests—including assays targeting TSH, glucose, and certain STIs—suffered from accuracy and consistency problems that made them unreliable. [See, e.g., SEC-USAO-EPROD-000699159; SEC-USAO-EPROD-000037181-82]

In advertising used in connection with its partnership with Walgreens, Theranos claimed that it was "changing lab testing forever" with its ability to run all of its tests via micro-samples, and that its services made it "easy to know more about your own health," suggesting that Theranos tests provided accurate information about a patient's physical condition. Similarly, those same materials claimed that Theranos automated pre- and post-analytic process to minimize lab errors, and that the company "offer[ed] tests with the highest levels of accuracy." Defendants knew that Theranos's tests did not have the highest levels of accuracy but suffered from accuracy and consistency problems that made them inferior to conventional laboratory tests and unreliable for this purpose. [See, e.g., WAG-TH-DOJ-00069577-78]

_Defendants used Theranos's website to direct information to doctors as well as other intended recipients._

Theranos's website claimed that the company was "enabling providers, physicians, patients, and consumers alike with better health information," and stated that the company's products "empower people to take control of their health and to extract better information from healthcare tests and information systems than is possible using today's conventional infrastructure," suggesting that Theranos's technology provided accurate results superior to conventional labs' testing services. In fact, Defendants knew that Theranos's technology had significant disadvantages relative to conventional labs and that it was not capable of producing consistently accurate results. [See, e.g., US-FBI-0000060; US-FBI-0000067; US-FBI-0000110; US-FBI-0000135-45]

Similarly, Theranos's website stated elsewhere that the company's products "empower providers, physicians, and consumers alike with better health information," suggesting that Theranos's tests offered superior accuracy and reliability compared to competing tests and that they were suitably reliable for use in the clinical setting. In fact, Defendants knew that Theranos's tests suffered from accuracy problems that rendered them unreliable. [See, e.g., US-FBI-0000112; US-FBI-0000118; US-FBI-0000153]

Theranos's website claimed that its tests "made it easier to get access to the tests [patients] need" so that they and their physicians "can better track small changes that emerge

9

over time" to "help provide insight into where your health is headed, and the early detection of disease." These statements suggested that Theranos's tests were accurate, precise, and consistent enough for doctors and patients to rely upon in tracking changes in their health and diagnosing medical conditions. In fact, Defendants knew that Theranos's tests were not accurate or reliable enough for these purposes. [See, e.g., US-FBI-0000347]

In approximately August 2015, Theranos's website stated that the company was "pioneering a new era where people can engage with their health, and their physician, like never before." The website also claimed that Theranos's ability to "run a full range of assays on a single micro-sample" allowed it to conduct auto-reflex testing to "properly diagnose conditions." The website claimed that Theranos's rapid processing allowed analysis of "key markers before their analyte decay rates materially affect result integrity," this providing "insight into subtle trends in important analytes." In fact, Defendants knew that Theranos's assays suffered from accuracy and consistency problems that rendered them unreliable for providing insight into health conditions, properly diagnosing conditions, and tracking subtle trends in analytes. [See, e.g., Theranos website as of August 14, 2015 – Bates number pending]

In approximately August 2015, Theranos's website included a bio for Holmes stating that she had led the company to "enable a new paradigm of consumer health and prevention," making real the mission "to make actionable health information accessible to people everywhere… enabling early detection and intervention of disease." The bio also claimed that Theranos's breakthrough advancements had made it possible "to quickly process the full range of laboratory tests from a few drops of blood." Defendants knew, however, that Theranos relied on third-party devices for many of its tests, and that its assays suffered from accuracy and consistency problems that prevented them from reliably yielding actionable health information suitable for clinical use. [See, e.g., Theranos website as of August 14, 2015 – Bates number pending]

*Defendants used Theranos's Twitter account to direct messages at doctors along with other intended recipients.*

On November 17, 2013, Theranos retweeted "@theranosinc can test for almost anything with the 1/1,000 the amount of blood than a reg. test #science" with an image of a Theranos nanotainer containing a microsample of blood. [See https://twitter.com/BradTonoff/status/402210940327702528, available at https://twitter.com/theranos; US-REPORTS-0008793 through US-REPORTS-0008801]

On November 20, 2013, Theranos tweeted: "Empowering patients and speeding accurate diagnosis." [See https://twitter.com/theranos/status/403284724623216640; US-REPORTS-0008793 through US-REPORTS-0008801]

On or about November 20, 2013, Theranos retweeted: "Walgreens/Theranos deal brings rapid, accurate, low-cost blood testing to the local pharmacy . . . with results in 4 hours." [See https://twitter.com/PosseList/status/403215950394433536; US-REPORTS-0008793 through US-REPORTS-0008801]

10

On December 4, 2013, Theranos tweeted:  "The lab test.  Reinvented." With an image of a nanotainer compared to three large vials of blood.  [See https://twitter.com/theranos/status/408297103593447424; US-REPORTS-0008793 through US-REPORTS-0008801]

On December 4, 2013, Theranos tweeted:  "One tiny drop changes everything."  [See https://twitter.com/theranos/status/408327320823283712; US-REPORTS-0008793 through US-REPORTS-0008801]

On December 10, 2013, Theranos tweeted:  "Say goodbye, big bad needle" with an image of a small child.  [See https://twitter.com/theranos/status/410482810894290944; US-REPORTS-0008793 through US-REPORTS-0008801]

On January 28, 2014. Theranos tweeted:  "Not a big fan of needles?  Neither were we.  So we got rid of them."  Theranos included a series of images showing a single drop of blood being drawn from a fingertip using a tiny needle.  [See https://twitter.com/theranos/status/428272143969701888; US-REPORTS-0008793 through US-REPORTS-0008801]

On March 11, 2014, Theranos retweeted:  "Elizabeth Holmes built technology that can perform hundreds of tests on only one drop of blood."  [See https://twitter.com/socialcitizen/status/443397183791181824; US-REPORTS-0008793 through US-REPORTS-0008801]

On February 3, 2015, Theranos retweeted an image of a hand holding a nanotainer containing a tiny sample of blood, along with text reading:  "At Theranos, we're working to shape the future of lab testing.  Now, for the first time, our high-complexity CLIA-certified laboratory can perform your tests quickly and accurately on samples as small as a single drop."  [See https://twitter.com/brandchannel/status/562665880115744768; US-REPORTS-0008793 through US-REPORTS-0008801]

On April 20, 2015, Theranos retweeted an image of a person holding what appears to be a Theranos brochure or mailer displaying an image of a nanotainer and the text "the blood tests that need just a tiny sample."  [See https://twitter.com/tbutani/status/590280397692358656; US-REPORTS-0008793 through US-REPORTS-0008801]

On May 14, 2015, Theranos tweeted:  "Find out how we're making actionable health information more accessible."  [See https://twitter.com/theranos/status/599001739220529152; US-REPORTS-0008793 through US-REPORTS-0008801]

On June 2, 2015, Theranos tweeted:  "Know the facts when it comes to your health.  We offer glucose tests for as low as $2.70."  Theranos included an image of a soda can with text stating that approximately 24% of Americans have pre-diabetes and don't know it.  [See https://twitter.com/theranos/status/605769761885032450; US-REPORTS-0008793 through US-REPORTS-0008801]

11

On June 6, 2015, Theranos tweeted:  "A glucose test can help diagnose & monitor high/low blood glucose, diabetes, and pre-diabetes."  Theranos included an image advertising Theranos's glucose test at a rate of $2.70 compared to $5.39 as the Medicare Rate.  [See https://twitter.com/theranos/status/607222726286114816; US-REPORTS-0008793 through US-REPORTS-0008801]

On June 27, 2015, Theranos tweeted:  "Now it's easy and affordable to get tested, know for sure, and #ownyourhealth."  Theranos included an image of a red ribbon and text reading "National HIV Testing Day."  [See https://twitter.com/theranos/status/614826256480104448; US-REPORTS-0008793 through US-REPORTS-0008801]

On July 13, 2015, Theranos tweeted:  "The lab tests you need at prices you'll love." Theranos included an image listing relatively low prices for glucose, lipid panel, vitamin 25-OH, and HbA1c assays, as well as the text "the same low prices, for everyone."  [See https://twitter.com/theranos/status/620710104061493248; US-REPORTS-0008793 through US-REPORTS-0008801]

On September 4, 2015, Theranos posted to Twitter a short film by Errol Morris "about the fear of a typical blood draw" and stated, "We're changing the whole experience."  The video ended with the words:  "small samples, less blood.  Theranos.  The lab test.  Reinvented. hundreds of tests."  [See https://twitter.com/theranos/status/639845415307743232; US-REPORTS-0008793 through US-REPORTS-0008801]

*Defendants and their agents made statements directly to doctors in connection with Theranos's tests and specific results.*

A Theranos representative told Dr. Jessica Bramstedt that Theranos would conduct micro-testing on blood samples drawn from the fingertip; that Theranos was equivalent to other major labs like LabCorp and Sonora Quest, and that when Theranos lost its lab license, it was merely a "slap on the wrist" that would have a temporary effect on the company.  In fact, Defendants knew that Theranos depended on venous blood for many of its tests; that Theranos used different and unapproved methods for many of its tests that were not the equivalent of conventional laboratory tests; and that regulatory penalties imposed on Theranos were significant punitive measures.  [See, e.g., Jessica Bramstedt 302 Report, US-REPORTS-0015111]

Theranos representative Kimberly Alfonzo told Dr. Gerald Asin that Theranos could do all blood tests with a fingerstick draw, although Defendants knew that Theranos relied on venous blood for many of its tests.  [See, e.g., Gerald Asin 302 Report, US-REPORTS-0015043]

A Theranos sales representative told Dr. Nathan Matthews that Theranos's testing was accurate, although Defendants knew that Theranos's tests were plagued by accuracy and consistency problems.  On a conference call with Theranos representatives, those representatives told Dr. Matthews that Theranos went through all the necessary steps in their testing to make sure that it was done accurately, although Defendants knew that Theranos had inadequate proficiency testing and quality control protocols and that its tests suffered from accuracy problems.  [See, e.g., Nathan Matthews MOI dated 2/28/18, US-REPORTS-0008530]

12

Theranos representatives told Dr. Steve Linnerson that the company's device was FDA-approved and that it had met all the national laboratory standards.  In fact, Defendants knew that Theranos had not obtained the required FDA approvals and that the company's laboratory practices did not meet applicable standards.  In response to inaccurate test results, Theranos representatives told Dr. Linnerson that the company was having some equipment problems.  Defendants knew, however, that problems with Theranos's tests stemmed from fundamental deficiencies in the test methodology rather than isolated mechanical problems.  [See, e.g., Steven Linnerson MOI dated 3/1/18, US-REPORTS-0008577]

Theranos representatives told nurse practitioner Audra Zachman that the company's testing was valid and that all Theranos's testing could be done via fingerstick.  In fact, Defendants knew that Theranos tests suffered from accuracy problems and had not been properly validated, and that many of the company's tests could not be performed by fingerstick.  In discussing an inaccurate blood test, Theranos representatives falsely told Ms. Zachman that the problem had resulted from a misplaced decimal point although that was not a plausible result for the test results in question.  [See, e.g., Audra Zachman MOI dated 6/14/19, US-REPORTS-0011789]

A Theranos representative pitching the company's testing services told Dr. Edward Szmuc that the company had quality control and that its tests would be accurate, although Defendants knew that Theranos's tests had accuracy problems.  [See, e.g., Edward Szmuc MOI dated 3/3/20, US-REPORTS-0014799]

Theranos representatives told JoEllen Embry and Raymond Embry that its fingerstick technology had been validated, and emphasized its fingerstick testing method.  In fact, Defendants knew that Theranos's validation processes were insufficient, that its tests had accuracy problems, and that many of its tests could not be performed on fingerstick samples.  [See, e.g., JoEllen Embry and Raymond Embry MOI dated 3/3/20, US-REPORTS-0014802]

In a meeting with Erin Edgar, Holmes talked about microvolume testing and mentioned that Theranos was able to run every laboratory test, although Theranos relied on venous draws for many of its tests and was not capable of running every laboratory test on its proprietary devices.  [See, e.g., Erin Edgar MOI dated 3/9/20, US-REPORTS-0014994]

In May 2013 Elizabeth Holmes gave a presentation to Dr. Melissa Pessin and others at Memorial Sloan Kettering Cancer Center about Theranos's "new" laboratory testing technology.  Ms. Holmes brought the Theranos device to the presentation and gave a PowerPoint presentation that included a picture of the Theranos device, a picture of the "mini-tainer," and some graphs comparing the Theranos technology to some sort of standard technology.  The graphs showed the results correlated.  Ms. Holmes said the Theranos device would do thousands of tests, though it could not do them all at once.  She said the device could run tests in about 40 minutes, and that tests would cost half of what Medicare rates.  Ms. Holmes never told Ms. Pessin that Theranos was using third party devices to test blood samples or that they were diluting samples to run them.  [US-REPORTS-0017494]

13

After experiencing problems with its hCG test, Allison Hsieh informed Balwani that Theranos had removed the "pregnancy test" description from its hCG blood quant assay description because the company's test was not able to confirm a pregnancy. However, Theranos continued to offer the hCG blood test knowing that doctors and patients would rely on the assay to determine pregnancy status.  [See, e.g., THPFM0004228061]

After experiencing problems with its hCG test, Theranos switched the assay from fingerstick to venous draw.  Rather than inform doctors and patients that the switch was necessitated by a problem with the assay, Christian Holmes directed that doctors and patients be told that it was a "temporary" "routine quality check" related to Theranos's expanding patient population.  [See, e.g., THPFM0000555315, THPFM0000958955]

After experiencing problems with its PT/INR test, Theranos switched the assay from fingerstick to venous draw, telling doctors and patients only that it was a temporary switch. Christian Holmes directed Theranos customer service representatives to adhere to a script that deceptively omitted information about problems with the assay's accuracy.  [See, e.g., THPFM0000018472]

After experiencing problems with its complete metabolic panel assays, Theranos switched CMP from fingerstick to venous draw.  Christian Holmes suggested to Balwani that Theranos tell doctors and patients that the switch was related to an ongoing sample stability study.  When Balwani rejected that proposal, Christian Holmes reported that he had previously used language consistent with Holmes's direction stating that Theranos required larger samples because it was running each test in more than triplicate.  This explanation deceptively masked the true reason for the switch to venous draws.  [See, e.g., THPFM0000147443]

When Theranos switched PT/INR from fingerstick to venous after experiencing problems with the assay, Theranos representatives including Kimberly Alfonso explained the change by telling doctors and/or patients that Theranos had confidence in its testing and the switch to venous draws was intended simply to give the doctor the experience he or she was more accustomed to.  This explanation deceptively masked the true reason for the switch.  [See, e.g., THPFM0000204033]

Theranos ran HbA1c tests using two different methods:  venous blood on an Advia device and fingerstick on a DCA Vantage device.  Theranos's Lab Director, Dr. Adam Rosendorff, informed staff that this approach made "no sense whatsoever" and that it "goes against every recommendation."  Results from each of these types of HbA1c tests were provided to doctors without explanation as to the types of analyzers used to conduct the assays, creating a situation where doctors did not have the information they needed to place the results in context. This was especially problematic in situations where a single patient had Theranos multiple Theranos assays conducted using different methods, yielding different results that falsely suggested to the doctor that the patient's analyte values had changed.  This was the case with a patient treated by Dr. Phelan, who was the subject of internal emails at Theranos.  [See, e.g., THPFM0000003941; Rosendorff MOI, US-REPORTS-0007227]

14

In November 2014, a doctor contacted Theranos to report discrepant results for HDL and LDL for a particular patient.  Specifically, the Theranos-provided values for HDL and LDL were not adding up to the total cholesterol measurement the way they should have.  Rosendorff stated in response that the issue seemed "like a technical problem" as there were "no patient factors that would explain this."  Other at Theranos attempted to explain away the results and persuade Rosendorff to defend them to the physician, and he refused, citing his obligation to focus on the accuracy and reliability of Theranos's results and the fact that honesty and transparency with the patient were essential.  Holmes and Balwani were aware of this incident and sided against Rosendorff in the disagreement.  [See, e.g., THPFM0005008026; THPFM0003759624; TS-1124314]

<p style="text-align:center">****</p>

The evidence described above is offered for the permitted purpose of motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy.

Evidence that Holmes and Balwani made false and misleading statements to doctors tends to show their intent to defraud patients by conveying misleading information to their victims indirectly through patients' doctor representatives.

Evidence that Holmes and Balwani made false and misleading statements to doctors tends to show their plan to generate referrals to Theranos by deceiving patients through their doctors.

Evidence that Holmes and Balwani along with other Theranos staff made false and misleading statements to doctors tends to show their intent to defraud and the existence of the conspiracy.

Evidence that Holmes and Balwani made false and misleading statements to doctors about the capabilities of Theranos's technology tends to show Defendants' intent to defraud victims by causing them to believe Theranos's tests were accurate and reliable.

Evidence that Holmes and Balwani misled doctors regarding ongoing problems with Theranos's tests tends to show their intent to defraud and the absence of mistake.

Evidence that Holmes and Balwani misled doctors as to the quality control measures and safeguards Theranos put in place to ensure the accuracy of its tests tends to show Defendants' intent to defraud.

Evidence that Holmes and Balwani misled doctors about Theranos's reliance on venous draws and their use of third-party devices tends to show their intent to defraud by exaggerating the maturity and revolutionary nature of their technology.

Evidence that Holmes and Balwani directed false statements toward doctors tends to show their motive to capture market share by defrauding associated patients.

<p style="text-align:center">15</p>

### III.   False and misleading representations made to Theranos' Board.

The government may offer evidence of the following:

On or about March 2, 2010, Theranos' board met.  Holmes provided detailed updates on the company.  *See, e.g.*, THER-0335871.

On or about May 31, 2010, Theranos' board met.  Holmes provided detailed updates on commercial matters, convertible notes, and corporate and real estate matters, as well as valuations of the company's stock under Section 409A of the Internal Revenue Code.  Holmes was awarded additional shares.  *See, e.g.*, THER-0335796.

On or about January 14, 2013, Theranos' board met.  Holmes and Balwani attended. Four board members were given a stock option grant for 100,000 shares in exchange for their services and were to be paid $150,000 annually.  *See, e.g.*, THER-0335524.

In or about 2013 or early 2014, Holmes and Balwani provided Confidential Briefing Materials to board members stating, among other things, "Theranos' proprietary, patented technology runs comprehensive blood tests from a finger-stick and tests from micro-samples of other matrices outside of traditional lab settings and generates significantly higher integrity data than currently possible," "replac[e] old infrastructure with new," "real-time finger stick-based tests without need to drive to third-party sites," "the <5% CV yielded in Theranos' analysis results from elimination of pre-analytic errors, and provides for precise and actionable information that was previously inaccessible," "Theranos has quicker test run times and communicates results within 20-30 minutes after the sample arrives at the lab," "all 2000+ currently run tests/CPT codes are available through Theranos," "Theranos runs any test available in central laboratories," "Theranos can process any sample type," "Theranos Systems . . . [comprise] Minilab Devices," and "Theranos has been comprehensively validated over the course of the last seven years by ten of the fifteen largest pharmaceutical companies," as well as suggesting Theranos could accurately and reliably perform the most common blood tests and standard general chemistry panels.  *See, e.g.*, PFM-DEPO-00010787.

On or about July 15 and July 16, 2013, Theranos' board met.  Holmes and Balwani attended.  Holmes led a tour of the company's production facilities and gave detailed briefings on all aspects to Theranos's business, including product plans and historical and projected financial statements.  James Mattis and Richard Kovacevich joined the board and were given a stock option grant for 100,000 shares in exchange for their services and were to be paid $150,000 annually.  *See, e.g.*, THER-0335524; TS-0022451.  Holmes prepared a detailed 250+ page PowerPoint with misrepresentations similar to those detailed above and provided to investors. *See, e.g.*, THER-0337130.

On or about October 8, 2013, Theranos' board met.  Holmes and Balwani attended. Holmes gave detailed briefings on numerous aspects relating to Theranos's business, including product plans and historical and projected financial statements.  *See, e.g.*, THER-0335524; TS-0022465; SEC-USAO-EPROD-002629438.  The board discussed 409A valuations.  *Id.*

For the October 8, 2013 meeting, Holmes prepared a PowerPoint, stating, among other things:

- The actionable information you need, 1/1,000 the size of a typical blood draw.
- Theranos runs any test available in central laboratories, and processes all sample types. All tests match existing reimbursement codes. Theranos provides the highest level of oversight, automation, and standardization in our pre- and post-analytic processes, ensuring the highest levels of accuracy and precision.
- The highest levels of accuracy. By systematically controlling and standardizing our processes, Theranos offers tests with the highest levels of accuracy. Theranos automates pre- and post-analytic processes, drastically minimizing human processing – the cause of the majority of lab test errors.
- Theranos has been comprehensively validated over the course of the last seven years by ten of the fifteen largest pharmaceutical companies.

*See, e.g.*, TS-0023403; SEC-USAO-EPROD-000050361. Such statements were provided to outside investors as well. The PowerPoint also included news articles Holmes had procured and provided to investors.

On or about March 18, 2014, Theranos' board met. Holmes and Balwani attended. Holmes gave detailed briefings on numerous aspects relating to Theranos's business, including product plans and historical and projected financial statements. Riley Bechtel joined the board and was given a stock option grant for 500,000 shares in exchange for his services and was to be paid $150,000 annually. The Board discussed 409A valuations. *See, e.g.*, THER-0335524; TS-0022592.

On or about April 17, 2014, a board member told Holmes he told Roger Parloff (a reporter) that Theranos "will effect a revolutionary change in health care, providing significantly lower cost, greater efficiency, and higher quality." *See, e.g.*, SEC-USAO-EPROD-000128843. Holmes said that was wonderful to hear. *See, e.g.*, SEC-USAO-EPROD-000128929.

On or about May 9, 2014, Theranos' board met. Holmes and Balwani attended. Holmes gave detailed briefings on numerous aspects relating to Theranos's business, including product plans and historical and projected financial statements. William Frist joined the board and was given a stock option grant for 500,000 shares in exchange for his services and was to be paid $150,000 annually. The Board discussed 409A valuations. *See, e.g.*, THER-0335524; TS-0022607. Holmes provided a PowerPoint stating: "Patented technology can analyze samples as small as 1/1,000 the size of the typical blood draw. Proprietary infrastructure allows test analyses to be completed within hours. Value . . . highest levels of quality . . . full range of laboratory tests, from common panels to specialized tests." The PowerPoint displayed Theranos Systems as comprising "collection samples, TPSU 4s and Cartridges, and TLAS & Mobile/Web Apps" – not third party devices. *See, e.g.*, SEC-USAO-EPROD-002055775.

On or about May 24, 2014, Holmes provided talking points to a board member for an interview with Parloff. *See, e.g.*, SEC-USAO-EPROD-000129052.

17

Some time before May 29, 2014, Holmes told a board member that Theranos had audited financial statements and that Balwani was her former boyfriend. *See, e.g.*, SEC-USAO-EPROD-000029312.

On or about July 15, 2014, Theranos' board met. Holmes and Balwani attended. Holmes gave detailed briefings on numerous aspects relating to Theranos' business, including product plans and historical and projected financial statements. *See, e.g.*, THER-0335524; TS-0022625. Holmes prepared a 312-page PowerPoint for the board. *See, e.g.*, TS-0023854 (SEC-USAO-EPROD-000050812). Holmes described Theranos Systems as consisting of collection supplies, a TPSU 4s and cartridge, and "TLAS and Mobile/Web Apps" – omitting that Theranos was using third party devices to perform the majority of its testing. As she did with outside investors, she wrote: "Theranos' proprietary, patented technology runs comprehensive blood tests from a finger-stick and tests from micro-samples of other matrices, and generates significantly higher integrity data than currently possible"; "Theranos' micro-sample analysis is performed at amazing speeds, so we can report results faster than previously possible in less than 4 hours"; "[d]ata reported in high quality and in real-time becomes actionable information for improved decision making"; "A New Standard in Quality"; "The highest levels of accuracy"; "By systematically controlling and standardizing our process, Theranos tests with the highest levels of accuracy. Theranos automates pre-analytic and post-analytic processes, drastically minimizing human processing"; "Theranos has been comprehensively validated over the course of the last seven years by ten of the fifteen largest pharmaceutical companies"; "The full range of tests. A fraction of the costs." She also included slides purporting to show "Theranos Infectious Disease Work and Select Clinical Correlations" and stated "Theranos' technology infrastructure is able to perform any laboratory test. The following . . . demonstrate performance of tests when validated next to traditional laboratories and reference methods."

On or about July 23, 2014, Holmes told a Theranos board member: "Theranos has grown from cash from its contracts for some time." Holmes intended the board member to relay the message to a potential investor. *See, e.g.*, SEC-USAO-EPROD-000009206. Holmes made similar statements to other investors.

In or about August 2014, Theranos employees tested a board member's blood using a Siemens device, not a Theranos-manufactured analyzer. *See, e.g.*, SEC-USAO-EPROD-000429472; SEC-USAO-EPROD-006000464. Holmes was aware. *See, e.g.*, SEC-USAO-EPROD-006021872.

On or about September 14, 2014, Holmes provided talking points to a board member for an interview with a *New Yorker* reporter. *See, e.g.*, SEC-USAO-EPROD-000130080.

On or about October 21, 2014, Theranos' board met. Holmes and Balwani attended. Holmes gave detailed briefings on numerous aspects of Theranos' business, including product plans. *See, e.g.*, THER-0335524; TS-00226667. On or about October 21, 2014, Holmes prepared a 358-page PowerPoint for the board. *See, e.g.*, TS-0024166 (SEC-USAO-EPROD-000051124). Although Theranos was using its analyzer for less than 15 tests in its CLIA lab and was years away from FDA approval (if ever), Holmes stated that "Theranos' system will enable

18

healthcare workers to rapidly detect, treat, and monitor the Ebola virus in a decentralized manner so as to effectively facilitate containment." Although Walgreens told Balwani as early as August 2014 that Walgreens would not expand past 200 new stores in FY 2015, Holmes stated that 900 stores were planned. She described Theranos Systems as consisting of collection supplies, a TPSU 4s and cartridge, and "TLAS and Mobile/Web Apps" – omitting that Theranos was using third-party devices to perform the majority of its testing. Although Theranos was repeatedly reporting false hCG results, Holmes displayed a Theranos website image bragging that "Theranos takes the guesswork out of planning your pregnancy" and promising "Theranos accuracy" in 24 hours. She also included slides purporting to show "Theranos Infectious Disease Work and Select Clinical Correlations" and stated "Theranos' technology infrastructure is able to perform any laboratory test. The following . . . demonstrate performance of tests when validated next to traditional laboratories and reference methods."

On or about January 20, 2015, Theranos' board met. Holmes and Balwani attended. Holmes gave detailed briefings on numerous aspects of Theranos's business, including product plans and finances. *See, e.g.*, THER-0335524; TS-0022679.

On or about January 20, 2015, Holmes provided a PowerPoint to a board member stating "not disclosing . . . device capabilities" and describing "Theranos Systems" as consisting of "Collection Supplies, Device & Cartridges [with an image of a Theranos-manufactured analyzer], and Analytics System & Applications" – omitting use of third party devices. *See, e.g.*, SEC-USAO-EPROD-000027998; SEC-USAO-EPROD-000048468.

Prior to February 12, 2015, Holmes and Balwani provided a 409A valuation report to board members with financial projections inconsistent with those provided to outside investors. *See, e.g.*, SEC-USAO-EPROD-000017769.

In or about March 2015, Holmes told a board member "we redeveloped the lab infrastructure to make it possible to run any combination of lab tests from a tiny fingerstick." *See, e.g.*, PFM-DEPO-00014186-87.

On or about April 14, 2015, a Theranos board member told a magazine: "Elizabeth Holmes is a story that could happen only in America. After her sophomore year she left Stanford to devote herself to a vision of healthcare available as a basic human right. . . . [S]he is on the verge of achieving her vision – through a new method of blood testing that significantly reduces costs, tests for a whole range of infections, is mobile, and can therefore be easily transported . . . ." *See, e.g.*, SEC-USAO2-EPROD-000009919.

On or about April 15, 2015, Holmes met with board members. The PowerPoint states "not disclosing . . . device capabilities." *See, e.g.*, SEC-USAO-EPROD-000048795.

On or about July 14, 2015, Holmes met with board members. The PowerPoint states "not disclosing . . . device capabilities." *See, e.g.*, SEC-USAO-EPROD-000027830; SEC-USAO-EPROD-000049227.

Admiral Gary Roughead, a Theranos board member, testified:  "it was not until some of the press reporting that I became aware that there was extensive commercial analyzers in use."  PFM-DEPO-00010632.

Admiral Roughead testified he was not aware Theranos was using venous blood for purposes of running blood tests.  PFM-DEPO-00010733.

George Shultz, a Theranos board member, understood that all of the tests that Theranos ran were done on blood that was taken by fingerstick and put into the nanotainer.  PFM-DEPO-00014176.

George Shultz was under the assumption from discussions with Holmes that all the blood tests that Theranos ran were being run on Theranos-manufactured devices.  PFM-DEPO-00014178, 181, 183-184; PFM-DEPO-00014196; PFM-DEPO-00014199.

George Shultz would have wanted to know that Theranos was running blood tests not on the device that Holmes invented but on commercially available blood analyzers.  PFM-DEPO-00014183, 84, 97.

Holmes told George Shultz:  "we've redeveloped the lab infrastructure to make it possible to run any combination of lab tests from tiny droplets of blood.  People can come in and do full service laboratory testing with a fingerstick as opposed to having tubs taken from your arm.  We do that not just for basic tests, but for any test."  PFM-DEPO-00014186-87.

Holmes did not tell George Shultz that some of the blood tests that Theranos was running on patient blood were being run on commercially available blood analyzers made by third-party companies like Siemens.  PFM-DEPO-00014196-97.

According to Henry Kissinger, when he and the board members first saw the report that Theranos was using third party machines nobody thought of this possibility.  Holmes said the machines were used to test the standard to which the Theranos machines were calibrated.  Eventually, there was an implied retreat from this position by Holmes when she said the number of tests had gotten too large and they needed additional machines.  Theranos never took steps to get parallel tests.  US-REPORTS-0005021.

According to Kissinger, Holmes never said other machines were used for income from the wellness centers.  Holmes continued to say the machines were used for calibration and made vague references to people in the company misled her, including Balwani.  Holmes said she may have shown too much confidence in Balwani.  *Id.*

In or around October 2015, George Shultz wrote Holmes encouraging her to make a statement that "all of the tests are performed on Theranos-developed and produced machinery."  Holmes never told him, after he sent the letter, that the statement was false.  PFM-DEPO-00014220-21.

20

On October 17, 2015, Holmes told board members:  "During the time we are transitioning the nanotainers operations, we are still able to use all our proprietary technology, including our devices, which were approved for use this summer based on studies with +900 patient samples.  Note the name Edison was the name of the company's very first device (not our current systems) - this is one of many incorrect statements by the former employee who communicated this information to the WSJ reporter.  We do not have a good % number right now of how many tests will be done on our equipment during this temporary period, in addition to our first FDA-cleared test, as we are literally in the middle of having just completed this transition and mapping that out now, and this will likely continually evolve, including as we get additional clearances."  PFM-DEPO-00011002.

On or about October 26, 2015, Holmes and Balwani requested the board approve a false statement that Theranos board members were "familiar with the technology," which two board members characterized as "a stretch."  PFM-DEPO-00011015; PFM-DEPO-00011017.

On or about October 27, 2015, an assistant to a board member told Theranos's General Counsel a proposed statement was "the furthest" he would go and in its current form would "spark more controversy than it settles."  Theranos's General Counsel said she would provide it to Holmes.  *See, e.g.*, SEC-USAO2-EPROD-000009911; SEC-USAO2-EPROD-000012225 (10/29/2015 email by another board member to Holmes and Balwani echoing a similar sentiment).

On or about October 28, 2015, after being advised a proposed public statement by the board did "not really address the most critical issue; namely the allegations that Theranos' machine, Edison, might be giving faulty readings," Holmes and Balwani assured or suggested to the board that Theranos would publish meaningful comparative studies of Theranos devices and data in collaboration with independent third parties like the Cleveland Clinic.  Holmes and Balwani also misleadingly stated "'Edison' was the code name of one of our older devices; we had explained this to the reporter from the journal but he ignored this along with many other facts."  *See, e.g.*, PFM-DEPO-00011080.

On or about October 28, 2015, a board member advised Holmes to engage former Senator George Mitchell of DLA Piper to perform an independent review.  *See, e.g.*, THER-0325204.  Holmes was advised "the primary need for Theranos is to restore credibility by going through the painful but necessary process of identifying and addressing deficiencies and being willing to expose that process to sufficient transparency and scrutiny."  *Id.*; *see also* SEC-USAO-EPROD-000009214 (undated notes by board member emphasizing "urgent that persuasive, ind. 3rd party").  No such review was conducted.

On or about October 28, 2015, Holmes told board members:  "For rest of groups [sic] reference, I have been emailing with Bill on the clinical correlations we have, as well as independent blinded sample scores from our auditors that we have reviewed with the board every meeting.  Please let me know if anyone has questions on any aspect of this.  As I announced with Toby Cosgrove at Cleveland clinic on Monday, we are also preparing to publish our data including with independent third parties."  *See, e.g.*, PFM-DEPO-00011080; PFM-DEPO-00011053; SEC-USAO-EPROD-000066325.

On or about October 30, 2015, Holmes and Balwani were advised "[t]he sooner we can get real data like this to the public, the sooner we can put to rest the negative reports about Theranos.  The release of these comparative data would be much more significant than the general comments we have been making."  *See, e.g.*, SEC-USAO-EPROD-000066358.  They were further advised that earlier comments by Balwani "still do[] not address the request I made several weeks ago, which is for [Theranos] to contract with an independent lab to do an authoritative independent test on a significant number of subjects comparing the results of our system and a conventional blood testing system.  If those tests show the kind of results that you are reporting, that should end any serious controversy.  I think it is imperative that [Theranos] proceed immediately to contract for such tests, with the testing lab (or labs) reporting their results to the company and, independently, to the board."  *See, e.g.*, SEC-USAO-EPROD-000066368.

On or about November 1, 2015, Holmes falsely stated:  "the press around the FDA inspection . . . had nothing to do with our tests, devices, software, or the accuracy of our test methods.  The inspection reports focused only on the operations of one of our Nanotainer Tubes, and its transition from the lab framework policies to the FDA framework policies as part of Theranos' ongoing, voluntary commitment to transition its tests to FDA oversight."  *See, e.g.*, PFM-GJ-00000926.

On or about November 2, 2015, a board member advised Holmes and Balwani "we need to do even more. . . . [I]ndependent tests to prove our system's accuracy and reliability are the highest priority.  Perhaps the Cleveland Clinic tests will do that . . . The issues here involve no less than the company's reputation for integrity . . . ."  *See, e.g.*, PFM-DEPO-00011088.

On or before November 4, 2015, a board member was told tests were already underway at Cleveland Clinic.  *See, e.g.*, PFM-DEPO-00011098; *see also* PFM-DEPO-00011088.

On or about November 5, 2015, after being advised that "Theranos should immediately contract with one or two independent companies to . . . conduct comparative tests," Holmes and Balwani stated to board members "we are well aware of the importance of publishing independent comparative tests; that is in fact the heart of our strategy for disproving these falsehoods.  We have initiated these efforts, and are highly focused on the fact that time is of the essence here."  *See, e.g.*, PFM-DEPO-00011098; SEC-USAO-EPROD-000012357; SEC-USAO-EPROD-000066488; SEC-USAO-EPROD-000070661.

On or about November 12, 2015, when asked "[w]hat I take from the public debate is our proprietary equipment doesn't produce consistent results with itself or consistent results with other existing equipment.  Why wouldn't a comparative test be able to prove that our proprietary equipment is consistent in both of these cases.  Aren't those the allegations we need to prove wrong," Holmes told board members "that's data we already have – it's in our FDA applications."  When asked "why can't we ask an independent lab to run a series of samples on the box and compare them with first, the box itself, and second, other equipment, in order to answer the fundamental question:  whether our proprietary equipment is valid," Holmes said:  "We're doing that with Cleveland Clinic. . . . [T]hat's what we're doing."  Holmes also made

22

statements blaming Carreyrou stating he was on a "jihad."  Holmes further suggested its analyzer [i.e., the "TSPU"] was already approved for all tests.  Holmes said "[w]e've invited hospitals in and said, okay, you review this stuff."  When asked whether Holmes was implying that all Theranos's testing was conducted on the TSPU, Holmes stated:  "Unfortunately, that claim came from some of the original sources of the WSJ.  The fact of the matter is that if we collect a venipuncture sample, we don't use our equipment even though we could.  When we collect a finger prick, which is the proprietary stuff, we obviously use our equipment."  Holmes said *The Wall Street Journal* "refused our offer to send our technology to their office and demonstrate how it works. . . . Besides the *WSJ*, no one has ever cared when we use which devices in our labs.  We tell people in advance."  Holmes suggested because of the *Journal* article Theranos would not meet its revenue goal.  Holmes said Quest orchestrated this.  Holmes said Theranos did not need to make inflammatory statements anymore.  Holmes said Cleveland Clinic was "collecting hundreds of samples from their patients and they're going to run them in their labs while we run them in ours."  *See, e.g.*, SEC-USAO-EPROD-000070593.

On or about November 16, 2015, Holmes was advised by a board member that he strongly supports "an independent laboratory verify Theranos' pronouncements."  The board member also asked a second set of questions "concern[ing] the operation of Theranos' Wellness Centers.  Do they use Theranos or traditional equipment, and in what proportion?  And if they use largely traditional equipment, how does Theranos differentiate itself and achieve its stated objectives?"  *See, e.g.*, SEC-USAO2-EPROD-000009903; SEC-USAO2-EPROD-000009928.

On or about December 14, 2015, Holmes told board members the Cleveland Clinic had "already collected between 200-300 samples from their patients, which will be sent to the Theranos lab and the Cleveland Clinic lab" and tested for 30 tests.  *See, e.g.*, SEC-USAO-EPROD-000070623.

On or about January 20, 2016, Holmes told a board member the Cleveland Clinic had "vetted the data" and asked to form a partnership, and that the vetting included both blood samples and the machines.  She said the clinic had come to Palo Alto for a day and analyzed our technology, "which was successful."  She said: "What we're doing now is comparing our lab to their lab by testing the same blood samples."  *See, e.g.*, SEC-USAO-EPROD-000070646.

**** 

The evidence described above is offered for the permitted purpose of motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy.  Evidence that Holmes and Balwani made false and misleading statements to board members identical or substantially similar to those provided to outside investors tends to show Holmes and Balwani made such statements intentionally, with intent to defraud, and not by mistake.  Such evidence tends to show the materiality of the statements and the existence of the scheme.

Evidence that Holmes presented to board members about all aspects of Theranos's operations tends to show her control over Theranos and knowledge of its operations and tends to show Holmes did not defer to Balwani or was able to form intent to defraud.

Evidence that Holmes and Balwani presented to board members about 409A valuations tends to show a motive, knowledge of Theranos's finances, and knowledge that statements to investors regarding Theranos's historical and projected revenue were false.

Evidence that Holmes and Balwani made statements to board members about pharmaceutical clients identical or substantially similar to those provided to outside investors tends to show Holmes and Balwani made such statements intentionally, with intent, and not by mistake.  Such evidence tends to show the materiality of the statements and the existence of the scheme.

Evidence that Holmes and Balwani did not disclose to board members Theranos's use of third party devices tends to show intent to defraud.

Evidence that Holmes said Carreyrou was on a "jihad" tends to show intent to defraud and consciousness of guilty and disproves Holmes was unable to form intent to defraud because of a mental disease or defect.

Evidence that Holmes and Balwani provided false exculpatory statements to board members after negative press coverage tends to show consciousness of guilt and intent to defraud.

Evidence that Holmes and Balwani promised but failed to complete comparative studies of Theranos's device against competitors tends to show Theranos was unable to produce accurate and reliable results and Holmes's and Balwani's knowledge and consciousness of guilt.

## IV.   **False and misleading representations made to Walgreens.**

The government may offer evidence of the following:

On or about January 21, 2010, Holmes and Balwani authorized Carolyn Balkenhol to state to Walgreens:  "We have developed small point of care devices that, for the first time, can run any blood test in real-time for less than half the cost of central lab tests."  *See, e.g.*, WAG-TH-00010171-172; WAG-TH-DOJ-00025328.

On or about March 15, 2010, Holmes emailed Dr. Jay Rosan of Walgreens two documents titled "Theranos Systems at Walgreens_Overview" and "Theranos Systems at Walgreens_Partnership" that misrepresented Theranos's technology.  *See, e.g.*, THER-2436909-45.  Balwani was copied on the email.  Among other things, the documents falsely stated: "Theranos Systems have been comprehensively validated over the course of the last seven years by ten of the fifteen largest pharmaceutical companies"; "Theranos Systems at Walgreens allow for . . . Significant reductions in the cost of care by . . . enabling earlier, more accurate, more frequent and preventative screening"; "Theranos . . . has developed small point-of-care devices that, for the first time, can run any blood test in real-time for less than half the cost of central lab tests.  The systems run standard chemistry tests and proprietary tests that detect the earliest appearance of cancers and other diseases," and "Theranos cartridges contain . . . tests performing

identical assays with superior performance to those ordered by physicians across the country today."

On or about March 23, 2020, Holmes emailed Wade Miquelon (Walgreens CFO) and Rosan a PowerPoint titled "Theranos Systems at Walgreens." *See, e.g.*, WAG-TH-00006784-823; WAG-TH-00021950-988. Balwani was copied on the email. Among other things, the document falsely stated that "Theranos' proprietary, patented technology runs comprehensive blood tests from a finger-stick in real-time at the point of care, outside of traditional lab settings" and that "Theranos Systems have been comprehensively validated over the course of the last seven years by ten of the fifteen largest pharmaceutical companies," as well as suggesting Theranos could accurately and reliably perform the most common blood tests and standard general chemistry panels.

On or before March 25, 2010, Holmes and Balwani stated to Rosan in substance: "50-70% cheaper than tests done at lab . . . cuts entire infrastructure of clinical lab . . . no couriers, no expensive testing equipment, no teams of trained lab techs, no big buildings . . . 96% of tests done at big labs will be able to be done on these devices which will be CLIA approved and FDA approved . . . Consumer benefit – Finger stick versus blood draw – Results in 30 minutes instead of tomorrow." *See, e.g.*, WAG-TH-DOJ-00021948; WAG-TH-00006827 (4/26/2010 email); WAG-TH-00012066 (4/26/2010 email). Holmes made similar claims to Walgreens on or about April 30, 2010. *See, e.g.*, WAG-TH-DOJ-00021993; WAG-TH-DOJ-00024863; SEC-TX-000001925-1926.

On or about April 6, 2010, Holmes met with Rosan in Palo Alto. WAG-TH-00010182 (SEC-USAO2-EPROD-000238292); SEC-TX-000002033.

On or about April 14, 2010, Holmes emailed Rosan and Alex Jung and attached three documents she falsely described as "independent due diligence reports on Theranos Systems" "from GlaxoSmithKline, Pfizer, and Schering Plough after their own technical validation." *See, e.g.*, TS-0906360-414. In truth, the documents were prepared by Theranos and doctored to appear as the work product and conclusions of the pharmaceutical companies themselves. Holmes provided the same doctored reports to potential investors through at least 2014.

Prior to on or about May 3, 2010, Holmes and Balwani falsely stated to Miquelon in substance that three pharmaceutical companies had vetted Theranos. *See, e.g.*, WAG-TH-00009707-13 (SEC-USAO2-EPROD-000237823); SEC-TX-000002041.

On or about May 7, 2010, Holmes, with a copy to Balwani, emailed Rosan with a Regulatory Overview Summary stating "[a]fter receiving endorsement from FDA, Theranos Systems are the sole means for collecting all clinical data, including drug concentrations, and CRFs in registrational studies across a broad range of therapeutic areas." *See, e.g.*, WAG-TH-DOJ-00024877.

On or about July 30, 2010, Holmes signed a Theranos Master Purchase Agreement with Walgreens. *See, e.g.*, WAG-TH-DOJ-00000005-47. Balwani was aware of the agreement. Among other things, Holmes falsely stated that "Theranos has developed, and is developing,

generations of 'mini-lab- devices that can run any blood test in real-time for less than the traditional cost of central lab tests" and attached a "Theranos Base Assay Library" falsely suggesting Theranos devices could accurately and reliably run all of the listed tests.

On or about November 8, 2010, Holmes and Balwani participated in a meeting with Walgreens executives. *See, e.g.*, WAG-TH-DOJ-00001745-63. Among other things, Holmes and Balwani falsely stated "full menu of tests comparable to current central labs will be available through Theranos" and "within ~30 minutes at Walgreens locations a minimum of the top 95% of all routine blood and urine tests will be available."

On or about December 15, 2010, Holmes and Balwani provided to Walgreens a document titled "Theranos Regulatory and Business Model Approach" stating that the company was undergoing CLIA certification as a high complexity laboratory. *See, e.g.*, SEC-TX-000002059; WAG-TH-DOJ-00026801.

On or about March 10, 2011, Holmes emailed Rosan and counsel for Walgreens responses to how the proposed Walgreens relationship implicated certain federal laws. *See, e.g.*, WAG-TH-DOJ-00025180.

On or about June 2011, Holmes sent equity offering documents to Walgreens. *See, e.g.*, WAG-TH-00011857.

Around June 25, 2011, Holmes and Balwani met with Miquelon and another Walgreens representative. Walgreens told Homes it "didn't think it was a good idea . . . to enter into the market with Theranos without having a confirmatory conversation with the FDA" and "didn't think it is a good idea to do the 'Theranos based pilot' aka rented space model, as that may also in a sense just be a way of getting around the FDA . . . ." *See, e.g.*, SEC-TX-000002076; WAG-TH-00006863.

On or about January 16, 2012, Holmes and Balwani presented to Walgreens a "Project Normandy Briefing." *See, e.g.*, WAG-TH-DOJ-00000181-210. Among other things, Holmes and Balwani stated or suggested Theranos offered "the world's first finger-stick based CLIA-certified lab through retail RX" with "99.9% less blood"; "[s]tate of the art result turnaround: 4-24 hours"; and "[n]ation's lowest cost and highest quality laboratory provider." They also described their "CLIA Lab" would process samples "on Theranos devices" and claimed "[n]o regulatory risk."

In or around January 31, 2012, Holmes and Balwani told Rosan that Theranos "hopes to have an article published in JAMA within the next six months and an additional article by the end of the calendar year to add credibility to the offering." They said Theranos was working with the military in the hopes that the lifesaving application of their device would aid the military's efforts. She said she believed the Walgreens pilot could begin in May. *See, e.g.*, WAG-TH-DOJ-00000213.

In or around June 5, 2012, Theranos and Walgreens amended the Master Services Agreement. Among other things, Holmes and Balwani referred to the Theranos System as

comprising Devices, i.e. Theranos's analyzer, not third party analyzers. *See, e.g.*, WAG-TH-DOJ-00000048.

In or around June 22, 2012, Holmes and Balwani met with Rosan and another Walgreens representative. *See, e.g.*, WAG-TH-DOJ-000002825. Holmes and Balwani provided a test menu, and performed a demo with a new collection tool. They also provided a CLIA certificate and alleged "validation from an outside agency."

In or around January 2013, Walgreens sought information from Balwani supporting the value of the convertible promissory note Walgreens had purchased. *See, e.g.*, WAG-TH-DOJ-000002089.

In or around January 2013, Balwani made proposals to Walgreens "defeat[ing] the whole purpose of our soft pilot launch and timeline. We are only weeks away from launching and he wants to change the construct of the pilot . . . ." *See, e.g.*, SEC-TX-000002078.

In or around March 2013, Christian Holmes proposed telling Walgreens customers that "Theranos is conducting a clinical trial and testing a new patient management system." *See, e.g.*, WAG-TH-DOJ-00035752; WAG-TH-DOJ-00035894; WAG-TH-DOJ-00036023.

In or around July 2013, Rosan met with Holmes and Balwani and stated "I also hope that you were not too upset with the topics I brought up." *See, e.g.*, SEC-TX-000002086.

In or around August 2013, Holmes and Balwani met with Walgreens executives to discuss the upcoming launch. *See, e.g.*, SEC-TX-000002088; 2091.

Prior to October 18, 2013, Holmes and Balwani told Walgreens Theranos's device differs from competitors because its device is not "a point of care device with a small number of tests (about 30)" and "it can do 95% of all blood tests (in the thousands) and can actually be a replacement to any certified lab." Theranos was also different because it could do more than chemistry tests, including blood counts, cultures, etc. Holmes and Balwani also told or suggested that its results are dramatically more accurate. *See, e.g.*, WAG-TH-DOJ-000001065.

In or around December 2013, Holmes and Balwani agreed to amendments to the Master Services Agreement. *See, e.g.*, WAG-TH-00002204 (SEC-USAO-EPROD-000065246).

In or around April 2014, Balwani ascribed the high percentage of venous draws to doctors ordering many tests. *See, e.g.*, THPFM0001312680.

In or around May 2014, Theranos was still doing venous draws at Walgreens 40% of the time, which was "not good at all" and delivering a "poor patient experience." *See, e.g.*, WAG-TH-DOJ-00050954.

In or around August 2014, Nimesh Jhaveri of Walgreens told Balwani without a documented detailed plan it would be difficult for him to convince others of expansion beyond Arizona. *See, e.g.*, WAG-TH-00035711; WAG-TH-00035814; WAG-TH-00035811.

27

On or about October 17, 2015, Balwani requested Jhaveri remove signage at Walgreens that said "the blood tests that need just a tiny sample." *See, e.g.*, WAG-TH-00003683 (SEC-USAO-EPROD-000325241).

At some point in or after October 2015, Holmes falsely denied Walgreens had communicated to Theranos that no further Wellness centers were opening. *See, e.g.*, WAG-TH-00003870 (SEC-USAO-EPROD-000325426).

According to Wade Miquelon, Holmes and Balwani, in each other's company, said in 2010 that Theranos' Nanotainer and Edison device were capable of running most conventional blood tests using a small amount of blood drawn by a fingerstick. Holmes and Balwani said the Edison could run around 600 different types of blood tests pending further reagent development. Holmes and Balwani told Miquelon that Theranos's hurdles at the time were scaling the devices, not technological boundaries. Holmes and Balwani told Miquelon that Theranos had worked with pharmaceutical companies on clinical trials and had also performed real-time localized testing with the U.S. military. Specifically, Balwani told Miquelon that Theranos had conducted work with the military and that the Edison device was in the field on military helicopters in Afghanistan before 2012. Balwani even specifically identified a device and stated, "This is the one on the helicopter." Balwani also told Miquelon that Theranos blood collection devices resulted in instantaneous separation of blood, negating the need for a centrifuge. US-REPORTS-0014079.

Holmes told Miquelon that Theranos's board included technology people because Theranos was a technology company. Holmes said that medical professionals on the board would have only added bureaucracy. US-REPORTS-0014079.

After the Walgreens launch, Miquelon asked Holmes and Balwani about the number of blood draws that were being done via venipuncture. Holmes told Miquelon that Theranos's competitors were sending people into Walgreens stores to order esoteric blood tests in order to throw off the blood draw percentages. Holmes reassured Miquelon that the percent of fingerstick blood draws would quickly increase to 90%. US-REPORTS-0014079.

Walgreens was restricted from contacting Pfizer due to the non-disclosure agreement that Walgreens signed with Theranos. Miquelon is also expected to testify about how he learned several facts about Theranos's actual testing and dilution procedures after September 2015.

According to Dr. Jay Rosan, on or about and between 2010 and 2016, Holmes and Balwani each made certain statements to or in front of Rosan. Those include when Holmes and Balwani, in each other's company, said in 2010 that Theranos was working with major pharmaceutical companies. In a different meeting, Holmes and Balwani also showed Rosan a ruggedized version of the device that would be evaluated for use on a military helicopter. Holmes and Balwani told Rosan that Theranos would cost less than traditional labs, because Theranos had eliminated many of the costs associated with blood testing, such as couriers. Holmes told Rosan that major pharmaceutical companies had conducted independent due diligence. US-REPORTS-0012950.

28

Balwani told him that Theranos kept everything confidential, because Balwani feared others would copy Theranos's idea before it was introduced to the market. Also, even though Rosan requested financial statements from Theranos, and Holmes and Balwani said they would provide financial statements, Rosan never received them. US-REPORTS-0012950; US-REPORTS-0012961 to 13557.

According to Dan Doyle, for several years starting in 2010, Holmes and Balwani each made certain statements to or in front of Doyle. Those include when Holmes and Balwani, in each other's company, described in 2010 how Theranos technology worked, how much volume of testing Theranos could handle, and how quickly Theranos could scale. Holmes told Doyle that Theranos could move quickly and be open in thousands of Walgreens stores quickly. Holmes and Balwani told Doyle that Theranos devices were in use at multiple major pharmaceutical companies in clinical trials. In or around March 2010, Doyle recalls that Holmes and Balwani represented that Theranos could do 95% of all blood tests that were available. Doyle will testify that he understood this comment to mean that Theranos was able to perform these days presently (that day) and that 95% referred to volume of tests (that is 95% of ordered tests). Holmes and Balwani both represented that the U.S. military was using their device in the field and that the device was producing timely results. Holmes and Balwani both told Doyle that Theranos systems had been comprehensively validated, meaning that pharmaceutical companies validated Theranos technology and were using it themselves. Holmes and Balwani represented to Doyle that Theranos could perform general chemistry testing. Holmes and Balwani represented to Doyle that Theranos had outside auditors and audited financial statements. Holmes and Balwani criticized Walgreens' regulatory counsel as being too conservative. US-REPORTS-0012436.

Holmes told Doyle that Theranos could move quickly and be open in thousands of Walgreens stores quickly. Holmes and Balwani told Doyle that Theranos devices were in use at multiple major pharmaceutical companies in clinical trials. In or around March 2010, Doyle recalls that Holmes and Balwani represented that Theranos could do 95% of all blood tests that were available. Doyle is expected to testify that he understood this comment to mean that Theranos was able to perform these days presently (that day) and that 95% referred to volume of tests (that is 95% of ordered tests). Holmes and Balwani both represented that the U.S. military was using their device in the field and that the device was producing timely results. Holmes and Balwani both told Doyle that Theranos systems had been comprehensively validated, meaning that pharmaceutical companies validated Theranos technology and were using it themselves. Holmes and Balwani represented to Doyle that Theranos could perform general chemistry testing. Holmes and Balwani represented to Doyle that Theranos had outside auditors and audited financial statements. Holmes and Balwani criticized Walgreens' regulatory counsel as being too conservative.

According to Nimesh Jhaveri, on or about and between 2010 and 2016, Holmes and Balwani each made certain statements to or in front of Jhaveri. Those include after the Walgreens launch, when Balwani and Jhaveri discussed how Walgreens was not happy with the number of vein draws Theranos was conducting at Walgreens stores. Balwani told Jhaveri that the reason for the high number of vein draws was that cartridges were not ready for certain blood

29

tests that were ordered, that LabCorp and Quest were sending people in to Walgreens to order tests that required venous blood draws, and because doctors were ordering esoteric tests to test the Theranos system.  Aside the from Walgreens launch, Balwani also made representations to Jhaveri about Theranos, including that Theranos was doing work in with the military and pharmaceutical companies and that Theranos technology was being used "in the field."  Jhaveri received complaints from a nurse practitioner about the accuracy of Theranos test results, and elevated those concerns to Balwani.  Finally, after *The Wall Street Journal* article came out in October 2015, questioning Theranos technology, Balwani told Jhaveri that the article contained lies.  US-REPORTS-0012220.  In prior testimony, Jhaveri also stated he was unaware his blood had been tested by Theranos using a third party device just before the Walgreens launch was announced.  PFM-DEPO-00018619-20.

**\*\*\*\***

The evidence described above is offered for the permitted purpose of motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy.

Evidence that Holmes and Balwani provided doctored reports purportedly from pharmaceutical companies to Walgreens (and falsely characterized them as independent reports from pharmaceutical companies) tends to show they made the false and misleading statements alleged in the indictment intentionally, with intent to defraud, and not by mistake, including those described in Paragraph 12(h).  Claims to Walgreens that Theranos's tests were faster, cheaper, and comprehensive tend to show Holmes and Balwani similarly misled investors.

Evidence that Holmes and Balwani provided false and misleading PowerPoints and oral statements to Walgreens identical or substantially similar to those provided to outside investors tends to show Holmes and Balwani made such statements intentionally, with intent to defraud, and not by mistake.  Such evidence tends to show the materiality of the statements and the existence of the scheme.

Evidence that Holmes and Balwani failed to disclose to Walgreens it was using commercially available equipment to run patient blood tests tends to show an intent to deceive and corroborate that Theranos's device did not work.

Evidence that Walgreens, not Holmes and Balwani, did not to go forward without a conversation with the FDA tends to show Holmes and Balwani had a disregard for regulatory requirements.

Evidence that Holmes and Balwani made false and misleading statements to Walgreens about the military's use of Theranos's technology tends to show they made the false and misleading statements alleged in the indictment intentionally, with intent to defraud, and not by mistake, including those in Paragraph 12(E).

Evidence related to Walgreens is relevant to allegations in the Third Superseding Indictment that Theranos pursued a relationship with Walgreens.  Evidence related to Walgreens

is relevant to proving the truth or falsity of statements to investors about Walgreens, including those alleged in Paragraph 12(D).

Evidence Jhaveri's blood was tested on a third party device is relevant to the allegations in Paragraph 10 and 12(C), among others.

The evidence described above also shows Holmes's and Balwani's control and knowledge of Theranos's operations, including the Walgreens relationship, and its projects with pharmaceutical companies; their knowledge of problems with Theranos's technology; and Theranos's business plan. Evidence regarding the Walgreens relationship tends to show Holmes and Balwani's financial projections to investors – which were based on an expanding relationship with Walgreens – were false and lacked basis.

## V.   False and misleading representations made to Safeway.

The government may offer evidence of the following:

On or about April 16, 2010, Holmes emailed Safeway attaching three documents she falsely suggested were independent due diligence reports on Theranos Systems from GlaxoSmithKline, Pfizer, and Schering Plough after their own technical validation. Balwani was copied. In truth, the documents were prepared by Theranos and doctored to appear as the work product and conclusions of pharmaceutical companies. Holmes provided the same doctored reports to Walgreens and potential investors through at least 2014, which she characterized as exemplary reports from pharmaceutical companies. *See, e.g.*, THPFM0005638605-662; SEC-USAO2-EPROD-000036484. It gave Safeway's CEO comfort that Theranos worked with many pharmaceutical companies. *See, e.g.*, US-REPORTS-0000001.

On or about May 14, 2010, Holmes stated to Safeway: "Theranos started out of Stanford University in 2003. We have built a 'mini-lab' system that automates the process of running a broad range of assays on accelerated timelines with much smaller volumes of sample. Our system has been used as a replacement for central laboratories in pharmaceutical clinical trials over the past six years to measure drugs, proteins, enzymes, cellular markers, and viral loads. Our assays are validated under FDA / ICH guidelines." *See, e.g.*, SEC-USAO-EPROD-000016617.

Prior to May 19, 2010, Holmes falsely told Safeway, among other things, that Theranos could provide "full diagnostic blood, saliva and urine lab in a box" from "blood test samples result[ing] from a finger stick" "in 20 minutes" at a cost 40-70% less than competitors. Holmes also falsely stated that Theranos was "[c]urrently cash flow neutral." *See, e.g.*, PFM-DEPO-00017722; SEC-USAO-EPROD-000122138 (same); *see also* PFM-DEPO-00017746 (8/24/2010 Safeway Board presentation material); SEC-USAO-EPROD-000016615 (3/31/2020 letter from Steve Burd to Holmes stating "I enjoyed our meeting last week and was impressed with the capabilities of the Theranos blood analyzer" and expressing interest in verifying "that the blood analyzer can perform at least 85% of the blood work done by a standard retail lab today"); PFM-DEPO-00017581 at 30-34 (PFM deposition testimony of Robert Gordon).

31

On or about July 2, 2010, Holmes solicited an investment in Theranos from Safeway's CEO.  *See, e.g.*, SEC-USAO-EPROD-000016850.

On or about July 30, 2010, Holmes and Balwani provided to Safeway "Theranos Financial Projections."  Holmes and Balwani stated, among other things, Theranos would achieve $192 million in non-Safeway revenue in 2011 and a positive gross margin.  *See, e.g.*, SEC-USAO-EPROD-000016667.  Balwani was reluctant to provide the projections.  *See, e.g.*, US-REPORTS-0000001.

On or about September 20, 2010, Holmes signed a Theranos Master Purchase Agreement with Safeway.  *See, e.g.*, SEC-USAO-EPROD-000016526; SEC-USAO-EPROD-000122157 (10/19/2010 Safeway Board presentation); SEC-USAO-EPROD-000122718 (7/29/2010 email with draft agreement).  Balwani was aware of the agreement, and both he and Holmes were involved in its negotiation.  Among other things, Holmes and Balwani falsely stated or suggested that "Theranos has developed, and is developing, generations of 'mini-lab' devices that can run any blood test in real-time for less than the traditional cost of central lab tests" and "the ability to run blood tests from a finger-stick in 30 minutes or less in Safeway stores creates a new workflow, and a new diagnostic paradigm for healthcare," and attached a pricing schedule falsely suggesting Theranos devices could accurately and reliably run all of the listed tests.

In or about early 2011, Holmes provided a presentation to the Safeway board.  Balwani attended.  She drew blood from the finger of one of the board members.  She had a device set up in the corner and put the blood sample into that device.  She said no results could be provided because the device was not connected to the Palo Alto lab.  *See, e.g.*, PFM-DEPO-00017581 (Gordon Deposition) at 28-29; FBI-FD 302 of 9/23/2020 Interview of Larree Renda (forthcoming).  According to Safeway's CEO, Holmes said the machine could do 30 or more tests in one machine and had multiple cartridges.  These tests could be done in 30 minutes or less at a fraction of the cost.  *See, e.g.*, US-REPORTS-0000001.

In or around March 2011, Holmes provided an Executive Briefing to Safeway falsely stating, among other things, "Theranos' proprietary, patented technology runs comprehensive blood tests from a finger-stick and tests from micro-samples of other matrices in real-time outside of traditional lab settings and generates significantly higher integrity data than currently possible"; "Theranos Systems have been comprehensively validated over the course of the last seven years by ten of the fifteen largest pharmaceutical companies, with hundreds of thousands of assays processed"; and Theranos's service was more "cost-effective" than other labs.  *See, e.g.*, PFM-DEPO-00017807.

In or about June 2011, Holmes provided an Executive Briefing to Safeway falsely stating, among other things that "Theranos' proprietary, patented technology runs comprehensive blood tests from a finger-stick and tests from micro-samples of other matrices in real-time outside of traditional lab settings and generates significantly higher integrity data than currently possible" and "Theranos tests have been comprehensively validated over the course of the last seven years by ten of the fifteen largest pharmaceutical companies, with hundreds of thousands of assays processed."  The PowerPoint also falsely suggested "Theranos Systems" comprised minilab

devices that had been validated and were being used in a CLIA certified laboratory.  *See, e.g.*, SEC-USAO-EPROD-000122498.

Holmes left a meeting with Safeway and UCSF stating "Theranos would provide UCSF with a box."  By the time of Burd's government interview, Holmes had not done so.  *See, e.g.*, US-REPORTS-0000001.

Holmes suggested Theranos was missing launch deadlines because she was working with the Department of Defense.  Safeway's CEO was led to believe the boxes were already deployed and the military was actively deploying the boxes on helicopters, among other places all over the world.  *See, e.g.*, US-REPORTS-0000001.

Theranos lost samples and had to have customers go back for additional testing.  Safeway was surprised how long the tests would take at times.  Holmes resisted Safeway's efforts to see how their process worked.  *See, e.g.*, US-REPORTS-0000001.

In or about May 2012, Theranos tested Gordon's blood.  The results took more than a week and generated an elevated PSA result that was proved wrong by subsequent tests.  *See, e.g.*, PFM-DEPO-00017581(Gordon Deposition) at 72-74.

In or about July 2012, Holmes caused Safeway to think that Theranos had the ability to perform an in-house blood nicotine test when it truth Theranos was "sending them out."  *See* SEC-USAO-EPROD-000403646.

In or around August 2012, Holmes and Safeway discussed "[c]reat[ing] PR buzz to facilitate adoption" of Theranos's blood testing services.  Among other things, the two contemplated "[a] WSJ article will be released the day of our launch" – as Theranos ultimately did by having Joe Rago author a false and misleading article about Theranos around the time of the Walgreens launch.  *See, e.g.*, PFM-DEPO-00017821; SEC-USAO-EPROD-000122331.

On or about September 12, 2012, Holmes emailed Safeway's CEO, who advised Holmes: "I am genuinely concerned that Safeway's lab reputation gets worse by the day. . . . The sooner we get to 'finger stick' the better we will be."  Holmes replied:  "As you also know, we do not have all tests run in our lab onsite. . . . We have an average of 1-5 calls a week right now to the lab and all are on the same topic – when will the results be delivered to the doctor. . . . We have been struggling with the fact that SWY employees have been telling patients they will get their results in less than 24 hours without conferring with us . . . . [I]t does not make sense for us to invest in a full service dinosaur lab."  *See, e.g.*, SEC-USAO-EPROD-000016743.

On or about September 17, 2012, Holmes and Burd emailed about a "Hostage Exchange" – a proposal whereby Burd proposed exchanging a sales pitch for a contract.  *See, e.g.*, SEC-USAO-EPROD-000016746.

On or about September 17, 2012, Burd emailed Holmes "Key Milestones for Bay Area Launch" "[b]ased on our Friday conversation."  Among the milestones was a "Six store soft launch" that Theranos was not capable of achieving.  *See, e.g.*, SEC-USAO-EPROD-000016745.

On or about September 25, 2012, Burd advised Holmes: "I thought I would share with you what your team has communicated to Brian Hille (see attached). If the soft launch is likely to be as late as October 29, I need to know that now so I can slow down the hiring effort. I have always understood that something could get in our way, but this schedule has two weeks of finger stick and courier followed by two weeks of finger stick and on site processing. It also looks like your lab work is all being sent to Utah, not UCSF and not being done on site. It is the only way it could possibly take 3 to 5 days. I realize this is a temporary process but we should be doing everything possible to simulate the future in store process. As currently described, with 3 to 5 days before results, this is a very bad patient experience. In hindsight, we should have created a wholly owned subsidiary with a different name to avoid tarnishing the Theranos brand. We will overcome this, because this is a completely controlled workforce whose CEO is prepared to dictate the lab they can use. I firmly believe there are things we should be doing differently even in the short run. I am sure I don't have all the information you have, but given the small number of patients we could create a much better short term experience with little or no additional effort. It pains me not to do so. I don't want to take your time to reinvent this temporary process, but I am more than willing to work with Christian and Nick. If you want me to engage, I will, if you want me to back off, I will. I just know we can do better. Process is something we are very good at. Sorry to burden you with this. What would you like to do?" *See, e.g.*, SEC-USAO-EPROD-000016756.

On or about October 25, 2012, Burd advised Holmes: "Where are we on the schedule? We have hired 26 phlebotomists and have screened, interviewed and have identified 181 others that we are prepared to hire. We are also well down the path on selecting supervisors who will need either limited or class one training. I know we still have some uncertainty, but only you know how much. I am available all day to discuss the schedule or other issues. I should have a final point of view on the sales effort this morning. It has taken longer than I thought it would." *See, e.g.*, SEC-USAO-EPROD-000016776; SEC-USAO-EPROD-000016774.

On or about November 9, 2012, Burd told Holmes: "If we don't pick a launch date soon, we can forget about launching even six stores in 2012. If you have already decided it is not going to happen until next year, I would like to know. While it would be very unfortunate to not launch in Q4, based on the information I have, it looks pretty remote. I feel like a jogger running in place waiting for the stop light to turn green." *See, e.g.*, SEC-USAO-EPROD-000016779.

On or about November 12, 2012, in an email titled "Becoming Discouraged," Burd advised Holmes: "As I am sure you know, I am not easily discouraged. In fact, I can only recall having been discouraged once is the last 62 years. That said, I am getting close to my second event. It is not the delays and the uncertainty, it is not knowing all the obstacles....and believing that I could help remove many of them. I think all of this is compounded by the fact that I personally have so much at risk. I feel as strongly as you do about not going forward until we are ready. I also feel I could be so much more helpful if given the chance. In addition to setting a timetable for the 29 tasks, I would like to know all the remaining obstacles, if any." *See, e.g.*, SEC-USAO-EPROD-000016783.

On or about December 7, 2012, Burd told Holmes, among other things: "the on campus lab has operated for almost a year with a poor patient experience. ( this has nothing to do with the fact that we are doing vein draw). " *See, e.g.*, SEC-USAO-EPROD-000016790.

On or about December 18, 2012, Burd told Holmes: "Without recounting all the missed deadlines, it is crystal clear that either the most recently committed dates (September 24th and later December 6th) were far too ambitious, or there have been some overwhelming surprises along the way). I also worry that the demands or your core business or the newly acquired DOD business are consuming resources that would otherwise be committed to launch. . . . when I try to envision the Theranos 'to do' list, the work that remains to be done appears nothing short of daunting. I am not sure when or how it gets done." *See, e.g.*, SEC-USAO-EPROD-000016792; *see also* SEC-USAO-EPROD-000122217 (Holmes email with draft contract amendment).

On or about December 31, 2012, Burd wrote Holmes: "Thanks for your time today. We did not bridge the gap but I think we both learned enough from each other that we can reach an agreement on a revised contract. I think this session was much more valuable than slogging through the contract. We will not sit idle while waiting for your ideas. I will go to work on this tomorrow and try to find a path that works for both us. It may seem like we accomplished nothing, but I believe we accomplished a great deal. Let's hope our next conversation proves me right." *See, e.g.*, SEC-USAO-EPROD-000122934.

At some point in 2012 or 2013, Holmes caused Theranos to cease providing services on an on-campus facility at Safeway. *See, e.g.*, PFM-DEPO-00017581 (Gordon Deposition) at 69-71.

On or about January 2, 2013, in an email titled "Theranos-Safeway Proposal," Holmes wrote: "Today has turned in to dealing with the announcement. Our board is already raising fundamental issues with the 2010 deal in the context of the announcement today. The terms in the attachment were much worse terms for Theranos than our 2010 contract, which is now already under great scrutiny with today's announcement. It does not make sense for us to modify it along the lines of the attachment. I will be talking more with our board about the announcement and our contract (in the context of the announcement) in the coming days; we can follow up accordingly." *See, e.g.*, SEC-USAO-EPROD-000016803; *see also* SEC-USAO-EPROD-000122930 (1/2/2013 Burd email re same).

On or about January 3, 2013, Burd told Holmes: "We have now invested $367 million, completed 963 facilities and 511 facilities now have two rooms." *See, e.g.*, SEC-USAO-EPROD-000016804; SEC-USAO-EPROD-000122823.

On or about January 14, 2013, Burd asked whether it was possible that our launch date will occur after he retires from Safeway on May 14. Holmes said no. *See, e.g.*, SEC-USAO-EPROD-000016806.

On or about January 19, 2013, Burd wrote Holmes: "I cannot begin to tell you how disappointed I am that you redesigned the wordmark without ever telling us you were doing it. With all the work we did, we should have been informed. I realize it is your brand, but it will be

executed in our stores.  It sounds like you are locked in on this, so I am going to avoid giving you my opinion.  Barbara and I would not make a final decision without testing all form factors.  My suggested form factors are as follows:  letter head, business cards, devices, website retail POS (point of sale) outdoor store signs, in store bulkhead with Wellness Center lockup, overhead Wellness Center signs, and brochures.  When we did this last time it changed some of our thinking.  Many of these need to be photo shopped.

"You of course have complete control over your brand.  When it comes to the Wellness Center you have no choice...we must both agree.  I would suggest you have Chiat work with Barbara.  They should not do this by themselves.

"In two and one half years we have invested $400 million and more than 50,000 man hours.  I would like to know now how much of our effort you intend to replace without our participation.  I don't mind passing the baton to either Theranos or someone else.  What I mind is having it ripped from my hands.  I do not like wasting time.  This does not feel like a partnership.  We are still doing a lot of marketing work on your behalf.  If you are going to redo our efforts, we will stop working.  If you want to do all the work, we will stand down.  When you think you are ready to launch, we will review your marketing plan.  If it isn't good enough, we will spend time improving it before we launch.

"I have been asking for a more collaborative effort for more than a year.  You seem willing to collaborate with others, including holding weekly scheduled meetings, but not with us.

"I believe in you.  I believe in your company.  And I share your vision.  I want so much to help you change the world.  We are so good together when we collaborate.  But I have never been more frustrated.  I want to help, but you are making it difficult.  I have been completely transparent to you for two and one half years.  My transparency does not stem from naïveté, it is because I believe all great partnerships are transparent.

"If this feels like you are drinking out of a fire hydrant, I am sorry.  This is not about the wordmark; this about dozens of things.  I needed to get this off my chest.  I would have preferred to have this discussion in person, but I am not at all certain when that would happen.  My entire schedule revolves around yours.  In the interest of the broader objective and sensitive to your time, I have always been willing to accommodate you.  If you think I am overreacting, I am confident I could convince you otherwise in a face to face meeting.  Let me know how you would like to proceed."

*See, e.g.*, SEC-USAO-EPROD-000016810.

On or about January 30, 2013, Burd emailed Holmes regarding Contract Discussions:  "I have been putting a fair amount of energy into how best to conclude our contract discussions.  Up until late today, I was focused on the 'CEO' issue, trying to create a 'virtual' Steve Burd.  It occurred to me this is also about 'control' and about 'money'.  If I am correct about control and money, it would be helpful if you could rank these three issues from most important to least important.  If I am leaving something out, let me know."  *See, e.g.*, SEC-USAO-EPROD-000122929.

36

On or about February 18, 2013, Holmes provided Burd a letter of credit and an invoice demanding payment under the master services agreement.  *See, e.g.*, SEC-USAO-EPROD-000035825.

On or about February 26, 2013, Burd emailed Holmes a "Summary of Key Proposals for revised Contract."  *See, e.g.*, SEC-USAO-EPROD-000122928.

On or about March 24, 2013, Holmes proposed amending the Master Purchase Agreement.  Holmes stated that Gordon "was on all the shareholder calls with you in which you've discussed this publicly."  *See, e.g.*, SEC-USAO-EPROD-000122112.

On or about March 19, 2013, Gordon wrote Holmes requesting an explanation why Safeway's $25 million pre-purchase commitment was payable.  "Could you please explain your reasons for believing that the payment is now due?  Safeway does not wish to be in default of any obligation under the contract, and if you believe we are in default or in danger of being in default, we would appreciate your pointing to the provisions of the contract or other facts that give rise to this situation.  We are at a loss to understand why Theranos believes this payment is due now."  *See, e.g.*, SEC-USAO-EPROD-000122116; *see also* SEC-USAO-EPROD-000122204 (3/19/2013 Holmes response); SEC-USAO-EPROD-000122203 (3/22/2013 Burd/Holmes email discussing "Trigger Point for the $25 million").

On or about April 25, 2013, Burd emailed Holmes a draft amendment stating:  "I hope we can find a way to clear the impasse."  *See, e.g.*, SEC-USAO-EPROD-000122912.

On or about June 26, 2013, Holmes and Balwani met with two Safeway executives. Among other things, Safeway questioned why had Theranos decided to use a central lab and courier service as opposed to its device (TSPU) in all stores, whether this central lab model gave Theranos a meaningful competitive advantage over Quest and LabCorp, and whether the costs of the business model impacted the profitability of Theranos or Safeway.  *See, e.g.*, PFM-DEPO-00017852.

Holmes and Balwani falsely stated, among other things, "there is no technological problem with the devices and no plan to go without the devices in the stores"; "[t]he central lab contains the device; in fact, the device is the only way of obtaining results from the nanotainers"; and "[t]he device is currently capable of performing the routine blood tests (90% or more of the demand).  In order for Theranos to offer a full array of lab tests, it needs to offer the esoteric tests (the other 10% or so) that would require courier pickup to a central lab even if there were a device in the store.  So the courier service does not create an additional cost or change in the model."  *See, e.g.*, PFM-DEPO-00017853; PFM-DEPO-00017581 at 83-93.

In December 2013, Gordon emailed Balwani seeking to discuss, among other things, "status of devices and any plans to deploy them in stores."  *See, e.g.*, SEC-USAO-EPROD-000382479.

On or about February 14, 2014, Balwani provided Gordon a document estimating the value of Safeway's convertible notes to be $73m / 1% of co." *See, e.g.*, SEC-USAO-EPROD-000382442.

On or about February 17, 2014, Gordon told Balwani Safeway's auditors required additional financial information to prevent impairment of the notes. *See, e.g.*, SEC-USAO-EPROD-000124996; SEC-USAO-EPROD-000125159.

As of April 2014, there was no concrete plan to open 300 stores opened in California. *See, e.g.*, PFM-DEPO-00017581(Gordon Deposition) at 114.

On May 10, 2014, Gordon emailed Balwani stating that the two parties were not making progress on a rent model. He said "9 months ago, Elizabeth estimated that device availability for all stores was two-plus quarters away. If this capability is still not available, we would be interested in understanding what it is not. Are the issues related to technology, manufacturing cost, or something else?" *See, e.g.*, SEC-USAO-EPROD-000382548.

On or about May 21, 2014, Holmes emailed Safeway a document titled "Theranos Deal Economics and Recap of discussions with SWY thru May 21, 2014." *See, e.g.*, SEC-USAO-EPROD-000036124.

On or about May 29, 2014, Holmes stated to Safeway, with Balwani's knowledge, that there had been no progress on the Safeway launch in over a year. *See, e.g.*, SEC-USAO-EPROD-000382525; SEC-USAO-EPROD-000382551.

Prior to October 16, 2015, Gordon was unaware that Theranos was using commercially available equipment to run patient blood tests. *See, e.g.*, PFM-DEPO-00017581(Gordon Deposition) at 120.

After a negative *Wall Street Journal* article in or around October 16, 2015, Heather King, Theranos's General Counsel, who reported to Holmes, proposed joint Theranos/Safeway responses with inaccurate information. *See, e.g.*, PFM-DEPO-00017581(Gordon Deposition) at 123.

****

The evidence described above is offered for the permitted purpose of motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy.

Evidence that Holmes and Balwani provided doctored reports purportedly from pharmaceutical companies to Safeway (and falsely characterized them as independent reports from pharmaceutical companies) tends to show they made the false and misleading statements alleged in the indictment intentionally, with intent to defraud, and not by mistake, including those described in Paragraph 12(h). Claims to Safeway that Theranos's tests were faster, cheaper, and comprehensive tend to show Holmes and Balwani similarly misled investors.

38

Claims to Safeway that Theranos was "cash neutral" tend to corroborate similar claims to investors. False and misleading projections to Safeway tend to show that projections to investors were made knowingly; Holmes and Balwani's repeated failure to achieve anything close to projections to Safeway tends to show they knew projections to investors were false and misleading. Balwani's reluctance to provide projections to Safeway tends to show he knew they were unreliable.

Evidence that Holmes provided Executive Briefings to Safeway similar to those provided to investors tends to show statements to investors were made knowingly, with intent to defraud, and not by mistake. Evidence that Holmes refused to provide Theranos's technology to Safeway and UCSF tends to show she was aware the technology did not work. Evidence that Holmes suggested Theranos was missing launch deadlines because she was working with the Department of Defense tends to show she knew Theranos's technology was not working and disproves the claim she could not form intent to defraud because of a mental disease or defect. Evidence she told Safeway's CEO the boxes were already deployed and on helicopters corroborates misrepresentations to investors and evidences intent to defraud.

Evidence that Theranos lost samples and had to have customers go back for additional testing tends to show Theranos's technology did not work, despite representations to investors. Evidence of Gordon's blood test tends to tends to show Theranos's technology did not work, and corroborates evidence Holmes and Balwani used misleading demonstrations to attract investors.

Evidence that Burd told Holmes Theranos was unable to "get to finger stick" with Safeway or timely provide results to Safeway tends to show Holmes was aware of Theranos's technological challenges. Evidence that Holmes missed projected launch dates in 2012 with Safeway tends to show Holmes was aware projections to investors lacked basis.

Evidence that Holmes and Balwani demanded payments from Safeway in 2013 tends to show Theranos needed cash and a motive to defraud.

Evidence that Holmes and Balwani falsely stated to Safeway "there is no technological problem with the devices and no plan to go without the devices in the stores" tends to show an intent to defraud and to conceal issues with Theranos's technology.

Evidence that there was no concrete plan to open 300 stores opened in California tends to show Holmes and Balwani's claims to investors were false and that its projections to investors lacked basis.

Evidence that Holmes failed to disclose to Safeway it was using commercially available equipment to run patient blood tests tends to show an intent to deceive and corroborate that Theranos's device did not work.

Evidence that Holmes's General Counsel proposed issuing false information following a negative *Wall Street Journal* article shows Holmes's consciousness of guilt and disproves the claim that, because of a mental disease or defect, she did not act with intent to defraud.

39

The evidence described above also shows Holmes's and Balwani's control and knowledge of Theranos's operations, including the Safeway relationship, and its projects with pharmaceutical companies; their knowledge of problems with Theranos's technology; and Theranos's business plan. Evidence regarding the Safeway relationship tends to show Holmes and Balwani's financial projections to investors were false and lacked basis.

**VI.     False and misleading representations made to journalists.**

The government may offer evidence of the following:

In a September 8, 2013 article in the Wall Street Journal titled "Elizabeth Holmes: The Breakthrough of Instant Diagnosis," a journalist wrote, based on information supplied by Holmes and other Theranos representatives: "Theranos's processes are faster, cheaper, and more accurate than conventional methods and require only microscopic blood volumes, not vial after vial of the stuff." The article also stated that Theranos's technology could "run any combination of tests, including sets of follow-on tests, at once, very quickly, all from a single microsample." According to the article, Theranos's technology could achieve much lower variance ranges for a given test, with Holmes claiming that the company's tests have margins of "allowable error" targets less than 10%. These statements suggested that Theranos's tests were advanced and accurate, although Defendants knew that Theranos's assays experienced frequent accuracy and reliability problems. [MEDIA-000191]

In a November 6, 2013 video published by Wired, Holmes stated: "We built the first laboratory capable of processing any of our laboratory tests from a tiny droplet of blood, or what we call a microsample. So that, for the first time, people can get any of the laboratory tests that we do from a fingerstick, instead of having to do phlebotomy." Holmes similarly claimed: "And because we've made it possible to do testing on any analyte from the same microsample, unlike today where you have to draw a dedicated tube for each type of test you need to run, here we don't." Describing Theranos's purported automation aimed at removing lab error, Holmes said: "Then it becomes a question of how much we can minimize the variability that traditionally contributes to error in the laboratory process. 93% of error in the laboratory process is associated with what's called pre-analytic processing. So this is generally where humans do things - and it could be manually centrifuging a sample, it could be transport, temperature, all these different variances that can affect the analyte." "And we have invested over the course of the last ten years in automating these processes so we could minimize variability and standardize the framework." Holmes claimed that Theranos can do a "very large number of tests" ordered by physicians including some of the specialty and esoteric tests, noting that Theranos's first job was "figuring out how to do that from what we call the microsample, or the tiny sample. So we spent years investing in a lot of infrastructure to be able to automate that process, and we also developed new tests, to be able to run the exact same analytes but from a tiny sample. And we did this many times, in the context of being able to offer comprehensive laboratory services to physicians." [MEDIA-000392]

In an interview for a November 18, 2013 article in Medscape titled, "Creative Disruption? She's 29 and Set to Reboot Lab Medicine - Elizabeth Holmes Plans to revolutionize testing by using tiny blood draws and offering near-instantaneous results," Holmes stated that

after "redeveloping every test that is recognized by Medicare in the form of a CPT (Current Procedural Terminology) code to be able to run it on a tiny sample," Theranos "focused a great deal on these tests and validated and verified them over the years, building an infrastructure that was highly automated and standardized such that the quality of the data that we generate could be used in an actionable manner by clinicians," minimizing variability. Holmes also stated that Theranos was capable of automatically rerunning samples in response to out-of-range tests to provide additional information to doctors and patients. These statements suggested that Theranos's tests were highly accurate and reliable, when Defendants knew that Theranos had not properly validated its assays and that its assays suffered from accuracy and consistency problems that made them unreliable for clinical use. [MEDIA-000089]

In a November 27, 2013 video published by Fox Business, Holmes stated: "By being able to make it possible to do any of our laboratory tests from a tiny droplet of blood, we've now changed the experience for people everywhere." [MEDIA-000071]

In an interview for a February 18, 2014 article in Wired titled "This Woman Invented a Way to Run 30 Lab Tests on Only One Drop of Blood," Holmes touted Theranos's ability to provide test results quickly allowing for adaptive clinical trials where pharmaceutical companies could "change the dosing for a patient in real time or in a premeditated way, as opposed to waiting a long period and then deciding to change a dose." These statements suggested that Theranos's tests were accurate and reliable enough to support real-time dosing adjustments in clinical trials, although Defendants knew that Theranos's assays suffered from serious accuracy and consistency problems. [MEDIA-0000365]

In an interview for a March 1, 2014 article in Wired titled "One Drop, Infinite Data: How Elizabeth Holmes Built a Better Blood Test," Holmes stated: "We built the first laboratory capable of processing any of our laboratory tests from a tiny droplet of blood, or what we call a microsample. So that, for the first time, people can get any of the laboratory tests that we do from a fingerstick, instead of having to do phlebotomy." Holmes also discussed minimizing variability, and claimed: "93% of error in the laboratory process is associated with what's called pre-analytic processing. So this is generally where humans do things - and it could be manually centrifuging a sample, it could be transport, temperature, all these different variances that can affect the analyte… And we have invested over the course of the last ten years in automating these processes so we could minimize variability and standardize the framework." These statements suggested that Theranos's tests were accurate and consistent, with low variability. Defendants knew that Theranos relied on venous draws for many of its tests, that it did not use a high level of automation, and that the company's assays experienced repeated accuracy and consistency problems.

In a June 14, 2014 article in Fortune titled "This CEO is Out for Blood," based on interviews with Holmes, a journalist wrote that Theranos offered more than 200—and was ramping up to offer more than 1000—of the "most commonly ordered blood diagnostic tests, all without the need for a syringe." The article also discussed the small size of Theranos's proprietary analyzers and claimed that Theranos did not buy analyzers from third parties. The article attributed to Holmes a claim that Theranos was submitting all of its tests for FDA approval though it was not obligated to do so. These claims, which Holmes originated and

41

approved prior to the article's publication, presented Theranos's technology as mature and advanced, and therefore reliable.  In fact, Defendants knew that Theranos relied on venous draws and large, third-party analyzers for many of its tests, and experienced frequent accuracy problems.  [MEDIA-000012]

In an interview in connection with a July 8, 2014 article in USA Today titled "Change Agents:  Elizabeth Holmes Wants your Blood," Holmes stated:  "Over the last 10 years, Theranos has worked to redevelop all the tests run in a traditional laboratory to be able to take a tiny sample, a few droplets of blood, instead of the big tubes, that are traditionally drawn from an arm."  This statement suggested that Theranos's technology was advanced and as reliable as traditional laboratory tests, but Defendants knew that Theranos's assays suffered from regular accuracy and consistency problems.

In a July 8, 2014 video published by USA Today, Holmes stated:  "Over the last 10 years, Theranos has worked to redevelop all the tests run in a traditional laboratory to be able to take a tiny sample, a few droplets of blood, instead of the big tubes, that are traditionally drawn from an arm. And we've made the tests from these few droplets of blood available at prices that are unprecedented for Medicaid members, Medicare members, and everybody else, to be able to access the test they need."  [MEDIA-000449]

In a July 10, 2014 video published by Fox Business, Holmes stated that Theranos was beginning to work with hospital systems including InterMountain Health in Utah and Dignity in California.  Holmes also claimed that Theranos was working with UCSF to be able to bring its testing capabilities into the hospital setting along with the outpatient setting.  [MEDIA-000069]

In a September 8, 2014 video published by TechCrunch, Holmes stated that Theranos had developed a process" to replace the traditional phlebotomist, or the process of getting big tubes of blood from the arm," with "tiny nanocontainers, which you'll see just collect a few drops."  In that video, the host had his blood drawn by finger-stick as a demonstration.  Holmes also stated that Theranos had been generating cash from operations for some time, first through its work for pharmaceutical companies a year or two after the company was started.  Holmes claimed that that was the platform on which they had built the business.  Holmes claimed that, once nanotainer samples arrived at Theranos's lab:  "what we've done is re-develop all the chemistry associated with running these tests on traditional platforms to make it possible to run any laboratory test from a tiny droplet a blood."  Holmes went on to claim:  "And we've also built out novel analytical systems on which to run the chemistries, because traditional instrumentation requires much larger tubes of blood.  And then that data will be electronically sent to the ordering physician and integrated into their EMER systems, for example."  [MEDIA-000447]

In a video published on approximately October 8, 2014 by Fortune, Holmes touted the company's ability to run "every laboratory test" "on a tiny droplet of blood," and claimed that the company's tests were "highly automated to ensure the integrity of the process and integrity of the data."  Holmes went on to explain:  "We went through redeveloping every test that is run in a traditional laboratory to be able to operate on these tiny volumes of blood or other fluids - we do urine testing, feces testing, swaps and all sorts of other fluids.  And went test by test to be able to do that. And then we had to redevelop the analytical system to run those tests because

traditionally very large tubes of blood are required in order to run these tests, in traditional labs, and different tubes of blood are required - you need the green top, and the purple top, and the rainbow top, and all these other tops. And then we invested very heavily in software in the context of automating the traditional analytical process - and importantly what's called the pre-analytical and post-analytical processes wherein humans are traditionally involved in doing things like manually handling samples, centrifuging them, leaving them on counters.  And that's where 93% of the error and variability is introduced.  So we worked to design a process that is highly automated to help to minimize that variability and error."  These statements presented Theranos's tests as accurate and reliable due to their advanced nature and use of automation, but Defendants knew that Theranos did not heavily automate its testing procedures and that its assays suffered from regular accuracy and variability problems.  [MEDIA-000433]

During a video of a media appearance dated approximately October 16, 2014, Holmes claimed that Theranos was doing all R&D around their own platform, and had spent the last ten years redeveloping chemistry on a test-by-test basis.  [MEDIA-000070]

During a TEDMED speech in approximately November 2014, Holmes stated that Theranos had "made it possible to run comprehensive laboratory tests from a tiny sample, or a few drops of blood, that could be taken from a finger."  In fact, Defendants knew that Theranos could not run all laboratory tests from a fingerstick sample, and were aware that Theranos's assays suffered from accuracy and consistency problems that rendered them unreliable as clinical laboratory tests.  [MEDIA-000448]

During an appearance in connection with a December 5, 2014 article in The New Yorker titled "Blood, Simpler," Holmes stated that Theranos's blood tests "can help detect dozens of medical conditions, from high cholesterol to cancer, based on a drop or two of blood drawn with a pinprick from your finger."  Balwani is quoted in that article as saying, "Our platform is all about automation… we have automated the process from start to finish."  Holmes also claimed that Theranos had data showing "a perfect correlation between a fingerstick and a venipuncture for every test that we run," and that there had been "tens" of audits and "external third-party comparisons" of Theranos's tests.  Holmes also claimed not to have any government contracts but stated that Theranos earned revenue from the military, with Holmes stating that it was an important area in terms of potential for saving lives.  In fact, Defendants knew that Theranos had not significantly automated its testing protocols, that there were important differences between capillary and vein blood in the context of several of its assays, that third parties had not conducted comprehensive comparisons of Theranos's tests, and that the company's tests suffered from accuracy problems that made them unreliable for medical diagnoses.  [MEDIA-000173]

In a December 8, 2014 video published by Fortune, Holmes stated:  "We've done that by making it possible to do any lab test from a tiny drop of blood from a finger instead of having big needles stuck in your arm and tubes and tubes of blood taken out."  In that same video, Holmes claimed that Theranos could conduct all sorts of tests on a single drop of blood 1/100th to 1/1000th the amount that would normally need to be drawn.  Speaking to the accuracy of Theranos tests, Holmes stated:  "We defined our mission as access to actionable information at the time it matters.  And the information is only actionable if it is of the highest level of integrity, highest level of quality.  Which means we've done a huge number of studies over the last 11 and

half years to get to the point in which the data could be of that quality. And so we have been, for example, proactively submitting every single one of our tests to FDA because we believe it's so important in terms of a quality stamp. I think about it as my mom goes and gets a test at one of these locations, I want to know, every single time, that the data is flawless no matter what. So our approach has been to embrace regulation, because we see it as critical to realizing our mission." [MEDIA-000433]

In a March 1, 2015 article published by Wired, Holmes stated that Theranos can "get results, on average, in less than four hours," which she claimed was very helpful for doctors and patients. Holmes also stated that Theranos was "able to do all the testing using just a single microsample, rather than having to draw a dedicated tube for each type of test." [MEDIA-000045]

In a March 9, 2015 video published by Fox Business, Holmes stated: "We have spent the last, now almost 12 years, redeveloping every laboratory test to make it possible to run on tiny samples." [MEDIA-000043]

During an April 16, 2015 appearance on CBS This Morning with a segment title "Blood Sweat and No Fear," Holmes stated: "First we've created these little tiny tubes, which we call the nanotainers. Which are designed to replace the big traditional tubes that come from your arm. And instead allow for all the testing to be done from a tiny drop from a finger." This statement presented Theranos's technology as novel, advanced, and reliable. Defendants knew that Theranos's assays suffered from repeated accuracy problems that rendered them unreliable.

In a video published by CNBC on approximately April 27, 2015, Holmes held up a nanotainer and stated that it was "designed to replace the big vials that you take out of your arm when you draw blood traditionally, with a tiny drop that can come from a finger." [MEDIA-000424]

During a June 3, 2015 appearance on PBS / Charlie Rose, Holmes stated that Theranos didn't talk about its work for a long time because "we wanted to do it and then talk about it." Holmes also stated that Theranos produces the same results from its fingerstick tests that one would get if he or she went to a doctor and had them draw a vial of venous blood, claiming "effectively equivalent or identical results." Holmes also addressed the purported chemistry, hardware, and software advances that allowed Theranos to work with small samples, and stated that Theranos was going through the FDA approval process because FDA was the "gold standard" and that was "the way to do this for lab testing because the data is so important." Holmes also claimed that the FDA approval process would present an opportunity for Theranos to show "our performance, and the accuracy of our tests." These statements presented Theranos's tests as advanced, valid, and accurate. Defendants knew, however, that FDA was requiring Theranos to seek approval, and that Theranos's assays experienced frequent accuracy and consistency problems. [MEDIA-000443]

In connection with a June 27, 2015 article in the Economist, Holmes claimed that she spent ten years with the company in stealth mode without press releases or a company website.

44

Holmes claimed that, during that time, she perfected a way of doing hundreds of tests cheaply and quickly on a drop of blood, using lab-on-a-chip technology.  [MEDIA-000024]

During a September 10, 2015 interview at the Commonwealth Club, Holmes stated that Theranos's job was "to ensure that we provide the highest quality service, for every person, person by person," noting that the stakes in the industry were high:  "… you can't compromise on quality here. It's not a website, where if you know, oops, we didn't QA that thing, that's just not going to fly, right."  Holmes also claimed:  "Once you're in there, we can do many of our tests with very, very small samples of blood that can be taken from a finger.  As opposed to with big tubes of blood from the arm.  And so that means, you could get a finger stick, and with a few drops of blood, have your test done. And we've built  a backend infrastructure that allows for those tests to be run very quickly, so you'll get results in as close to real time as possible."  These statements suggest that Theranos was committed to providing the highest quality test results, but Defendants knew that Theranos's tests suffered from regular accuracy and consistency problems that rendered them unreliable.  [MEDIA-000430]

In a September 29, 2015 video published by CNBC, Holmes stated:  "Theranos has committed to an unprecedented level of transparency in our work."  "…We're the only lab to publish our proficiency testing score (which are our audit  scores as a lab).  We're the only lab to publish our data now through FDA decision summaries by being the first lab to submit all of our tests to FDA.  And we're the only lab to advocate for FDA regulation of lab developed tests, because we believe so strongly, that in order to realize a world in which prevention is a reality you have to hit that quality standard."  [MEDIA-000458]

During the October 8, 2015 Forbes 30 Under 30 Summit, Holmes claimed that Theranos relied on venous draws for "specialty tests" (like the Russell Viper venom assay) to give patients an alternative to more expensive labs that would charge them thousands of dollars.  Holmes also stated during that appearance that there are many technology companies that had grown too fast. Holmes claimed that Theranos was working in an area that was mission critical where you can't go too fast because what matters is the quality and integrity of what Theranos does and the people it serves.  [MEDIA-000432]

In an October 8, 2015 video published by Vanity Fair, Holmes stated:  "I think about it all the time in the context of my mom, and the information that we're generating, she does all of her tests through us, knowing that we're right every single time, and knowing that we're not compromising on quality, and knowing that we're, in every action that we take, approaching this with the seriousness that it deserves"…. "because it's not just building a glucose meter or cholesterol test, it's redeveloping 3,000 tests. And that is, that's a very long-term project. So we knew what we were getting into, but this is a space in which there aren't shortcuts."  Holmes also claimed that Theranos had invested a lot in being able to redevelop every test or every assay that's run in a traditional laboratory to be able to run on tiny drops of blood.  These statements represented that Theranos's tests were 100% accurate and that the company had taken the time it needed to perfect its technology.  Defendants knew, however, that Theranos had failed to conduct proper validation studies, and that its tests experienced regular accuracy and consistency problems.  [MEDIA-000450]

<div align="center">45</div>

During an October 15, 2015 appearance on Mad Money, Holmes claimed that Theranos had sent the Wall Street Journal "over a thousand pages of documentation demonstrating that the statements in their piece were false," and that partners like Cleveland Clinic and Walgreens had "seen our technology, worked with us, they've used our systems, and they understand what we're doing." Holmes also pushed back against claims that Theranos did the majority of its tests with commercially available machines, claiming that those devices were needed as a result of Theranos's decision to expand its test menu to include "all the specialty and esoteric tests that are traditionally run only very infrequently but cost a huge amount of money." Holmes claimed that Theranos had already done extensive testing, including a 900-patient study demonstrating the correlation between venous and finger-stick test results. Holmes claimed that such testing had been done "over and over again, for every single test." These statements suggested that the facts in that day's Wall Street Journal story were inaccurate and that Theranos could prove through documentation and qualified third-party confirmation that its technology was valid. Defendants knew, however, that the facts in the WSJ article were true, that Theranos's tests had regular accuracy and consistency problems, and that third parties had not used and validated Theranos's technology. In this same appearance, Holmes also repeated the false statement that Theranos relied on venous draws primarily for specialty tests. [MEDIA-000423]

On or about October 15, 2015, Holmes caused Theranos to issue a Statement from Theranos falsely denying the allegations in the Wall Street Journal article that same date. [THER-0592390]

In an October 21, 2015 video published by Wall Street Journal Live, Holmes claimed that Theranos had "never used commercially available lab equipment for fingerstick-based tests." Holmes further stated that Theranos's decision to collect fingerstick samples only for HSV had nothing to do with the tests, methodology, or accuracy of performance of Theranos's technology. Holmes further claimed that Theranos had voluntarily decided not to use its nanotainer tubes as part of its switch to the FDA system. During that same video, Holmes claimed that the company's rate of venous tests had increased due to the company's decision to offer rarer "esoteric" tests, and that these "specialty" tests were the cause of decreased fingerstick use at Theranos. Holmes also stated that those specialty tests used commercially available analyzers because they hadn't yet been transitioned to Theranos's proprietary instruments. These statements suggested that Theranos's technology was mature and capable of producing accurate and reliable results, but Defendants knew that problems with Theranos's tests required reliance on third-party devices for fingerstick and venous samples and that Theranos's assays were not sufficiently reliable for clinical use. [MEDIA-000452]

As reported in an October 22, 2015 article in the New York Times, Theranos claimed that it could do many different medical tests sing only a tiny amount of blood taken with a finger prick. The article also repeated Theranos's claim that it used proprietary lab equipment to deliver results much faster and more cheaply than traditional blood tests, which in some cases require several vials of blood to be drawn from the arm and several days to get a result. [MEDIA-000009]

In a November 2, 2015 video published by Fortune in connection with its Global Forum, Holmes stated that Theranos had "developed hundreds of tests over the course of the last 12

46

years that can run a tiny sample using proprietary Theranos technology." Holmes also claimed that Theranos was temporarily not using its proprietary sample collection device because it was transitioning to the "FDA quality system." When question about whether Theranos would still be able to achieve its goal of doing "comprehensive tests" from a finger stick, Holmes replied, "Absolutely, and we've done it in the past and we're going to continue to do it in the future." In that same video, Holmes claimed that Walgreens had not told them that they were stopping expansion to new stores, and stated that the two companies were looking at what the next steps would be in the relationship. [MEDIA-000042]

In a video published by CNN on approximately August 1, 2016, Holmes claimed that the company's black box / minilab was designed to allow the same operations that a technologist could do in a laboratory, with the video further claiming that the minilab could run up to 40 different tests on a tiny sample of blood. [MEDIA-000427]

_False statements made to Fortune's Roger Parloff_

In a series of interviews and meetings with journalist Roger Parloff, Holmes and Balwani made a number of false and misleading statements. Those statements ended up underlying articles that Parloff wrote about Theranos.

In a December 3, 2014 conversation with Parloff, Holmes stated that Theranos was making it possible to do any lab test from a tiny drop of blood from the finger instead of tubes of blood, and that Theranos could do all kinds of tests from a single drop of blood. She also claimed that Theranos's future was about scalability and replicability as they expanded across the country. She stated that test information is actionable only if it's of the highest level of integrity and quality, and claimed that Theranos had done a huge number of studies over the last 11 years to get to that point. [PARLOFF-0000183

In an April 7, 2014 conversation, Holmes stated that Theranos's tests did not exhaust the sample, and that that achievement is what took the company ten years and required the creation of infrastructure that could handle those microsamples. [PARLOFF-0000184]

In another April 7, 2014 conversation, Holmes claimed that there were many breakthroughs underlying Theranos's capabilities. She also stated her purported philosophy that it is important to execute first before talking about achievements. She further claimed that pharmaceutical work was an important part of Theranos's business. Holmes denied having anyone special in her life and stated that Theranos takes all her attention. [PARLOFF-0000185]

In an April 8, 2014 conversation, Holmes stated that she considered Theranos's progress to be revolutionary—especially the speed of Theranos's tests, with the company able to get information to doctors at the time they are seeing the patient. Holmes again claimed that Theranos's methods preserved enough of samples to conduct retests. Holmes claimed that Theranos had a revolutionary level of quality and a very low CV. She stated that Theranos does all sorts of different tests from microsamples such as CBC and others. She claimed that Theranos had done more than seventy from a single microsample. [PARLOFF-0000186]

47

During another April 8, 2014 conversation, Holmes stated that there was a high probability that Theranos would implement with UCSF and others. She stated that Theranos was not exclusive with Walgreens but could open with other partners too. She stated that the company had done so much work but never published, and said that those studies would proceed soon. [PARLOFF-0000187]

That same day, Holmes stated that Theranos offered the same tests as a traditional lab but with a smaller sample size, claiming that the only difference was the sample size. She touted Theranos's built-in capabilities for automatic follow-on tests and reflex testing. [PARLOFF-0000188]

On April 9, 2014, Balwani told Parloff that Holmes was the most important inventor of their time. He claimed that they had been patient with Theranos, taking a decade to get where they were. He stated that they were seeing Moore's Law in action, with Theranos being able to do a lot more every eighteen months. [PARLOFF-0000199]

On April 10, 2014, Holmes told Parloff that the major change with Theranos was the sample volume, and that Theranos had proprietary technology, and asked Parloff not to refer to the technology as "devices," but rather proprietary tests and systems to handle tiny samples. She told Parloff that she did not want to get into how many devices Theranos had, but went on to refer to a single analytical system and piece of hardware that takes up a lot less space than a traditional device. Holmes added that the Theranos machine is manageable for the military unlike competing technologies, and that the military was one application of Theranos's tech. [PARLOFF-0000189]

On May 12, 2014, Holmes told Parloff that they had comparative studies and validation data on Theranos's website and that no other labs do that. She stated that Theranos did proficiency testing more than required and did QC weekly. She stated that there was no need to publish their data before launch because their contracts were with pharma companies. She claimed that Theranos had correlations for every test and that they were seeking FDA clearance or approval for every test, and that the analyzer was approved as part of test approval. [PARLOFF-0000190]

On that same day, Holmes told Parloff that Theranos's platform can do all of the hundreds of tests that Quest can do on many different types of samples. Holmes said that Theranos processes the samples in a different way. She stated that Theranos would not sell its technology because they were trying to build a wonderful experience for individuals and physicians and make health info accessible and actionable. Holmes said that they had oversight and QC in place to assure integrity of data, recognizing the importance of information used for decision-making. Holmes said that criticism of fingerstick testing was absolutely false and that Theranos had demonstrated that with data. Holmes said that Theranos still conducts venipuncture because they were scaling as they built inventory and capacity, using vein draws to handle high volume of samples. Holmes stressed that Theranos's whole business was about eliminating venipuncture. Holmes added that Theranos could process all sample types. Explaining her sensitivity around the word "device," Holmes stated that it was due to trade

48

secrecy concerns because the fact that Theranos had a single device that could perform any test was a big deal.  [PARLOFF-0000191]

On May 21, 2014, Holmes stated that Theranos had deployed its systems to pharma and military over the years.  Now that the company had a test menu, infrastructure, and ability to serve, it could enter the core clinical care space.  When asked to explain the discrepancy between the 200 tests listed on Theranos's website and the claim that Theranos could handle 1000 CPT codes, Holmes stated that the number of tests on the website was expanding and that Theranos could conduct more tests (that were operationalized) even if they weren't listed on the website.  Holmes also claimed that Theranos could match a long list of Quest capabilities.  Holmes reminded Parloff again not to reveal that Theranos had one device that could do all testing, promising to get him approved language on that issue.  Holmes said that Theranos averages four-hour turnaround time in California and hours as opposed to days in Arizona.  [PARLOFF-0000192]

On May 28, 2014, Holmes distinguished between their website's claim of tests being validated under FDA and other guidelines but not yet approved.  Holmes claimed to have much more data regarding clinical validation that was not on the Theranos website.  Holmes also explained CAP accreditation claims and stressed that Theranos didn't want to be audited by someone from a competing company.  Holmes talked about proficiency testing and claimed that Theranos scored 100%.  Holmes stated that labs don't submit LDTs for peer-reviewed journals.  When confronted about Dignity and Intermountain's status with Theranos, Holmes claimed not to know and said she would get back to Parloff.  Holmes promised to send Parloff pharma reports going into the device in detail.  [PARLOFF-0000193]

On June 2, 2014, Holmes told Parloff that Dignity had actually assessed Theranos's technology.  She also stated that Theranos was not changing test methods, just optimizing chemistry to be able to run small tests.  Holmes said that she was ok with Parloff saying Theranos had "devices" but stressed that she didn't want the article to say Theranos had one device that could do everything and that that would be the follow-on story.  In the meantime, she requested that the article talk about "analyzers" to keep it ambiguous.  When asked to describe the size of the device, Holmes said it was bigger than a CPU.  Holmes stated that Theranos was still involved in pharma clinical studies and had been continuously since 2005.  Holmes claimed that Theranos could perform as many as 70 different tests from a single drop.  She also mentioned that she had met Balwani before 2004 but omitted the fact that they were dating.  [PARLOFF-0000194]

On November 17, 2014, Holmes said that UCSF wanted to send samples to Theranos but that Theranos was too busy, though they worked with UCSF when they did their test validation.  Holmes discussed a purportedly novel method of DNA amplification that was specific to Theranos.  Holmes said that Theranos's machines would become public when they went out, and would look the same as what Parloff had already seen.  [PARLOFF-0000195]

On February 2, 2015, Holmes told Parloff that Theranos had been making sure its locations realize excellent patient service and meet a high quality standard.  She also claimed to be working with FDA to create a model for regulation of LDTs.  [PARLOFF-0000196]

<div align="center">49</div>

On July 1, 2015, Holmes told Parloff that FDA was the highest bar for performance of Theranos's systems and that Theranos's interactions with FDA constituted a milestone. Holmes promised that Theranos would receive a waiver allowing them to go into retail. Holmes said that Theranos had 140 submissions to FDA with the goal of getting 140 clearances. She told Parloff that Theranos had published all of its PT data. She said that, of the 140 tests under submission, they would all be able to be run on finger-stick samples, but in some cases would run on other matrices partly to demonstrate that Theranos could return the same results for the two sample types. Holmes explained that Theranos had its high complexity lab in Newark, its moderate complexity in Scottsdale, and said that all LDTs were run at the high complexity location, where Theranos's QC showed the integrity of the tests. Holmes then stated that that year, Theranos had gone live with a reference lab service offering low cost. Theranos would do traditional venipuncture, sometimes on traditional equipment, as part of that service, but that Theranos was working to get more tests running on capillary samples. Holmes again steered Parloff away from stating that Theranos had one system capable of running clinical chemistry, DNA, and immunoassays because she did not want people to know it was the same machine. Holmes also stated that all of Theranos's machines were registered proactively with FDA. Holmes further explained the distinction between Theranos's lab locations, claiming that Theranos conducted its reference lab testing in Phoenix, after previously telling Parloff that the reference lab focused on esoteric tests. [PARLOFF-0000198]

<div align="center">****</div>

The evidence described above is offered for the permitted purpose of motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy.

Evidence that Holmes and Balwani made false and misleading statements to journalists tends to show Defendants' plan, preparation, and intent to defraud victims by transmitting misleading information to them indirectly through the press.

Evidence that Holmes and Balwani repeatedly made the same false and misleading statements to journalists tends to show their intent to defraud and absence of mistake.

Evidence that Holmes and Balwani repeatedly made the same false and misleading statements to journalists tends to show the existence of the conspiracy.

Evidence that Holmes deceived journalists regarding the capabilities of Theranos's analyzer tends to show Defendants' intent to defraud victims and the existence of the conspiracy.

Evidence that Holmes deceived journalists regarding the nature of Theranos's relationships with partner companies and government agencies tends to show Defendants' intent to defraud and their plan to associate themselves with well-regarded organizations that would boost their credibility.

Evidence that Holmes deceived journalists regarding the extent to which Theranos's technology had been validated by independent reviewers tends to show Defendants' intent to defraud by discouraging skepticism regarding Theranos's tests.

Evidence that Holmes deceived journalists regarding Theranos's reliance on third party devices tends to show Defendants' intent to defraud and consciousness of guilt.

Evidence that Holmes deceived journalists regarding Theranos's regulatory status tends to shoe Defendants intent to defraud by convincing victims that Theranos's technology had the government's stamp of approval.

Evidence that Holmes and Balwani deceived journalists regarding Theranos's achievements tends to show Defendants' motive to elevate their own status and that of Theranos by burnishing the company's reputation with the public.

## VII.   Fostering culture of secrecy and forcing employees and others to sign non-disclosure agreements.

The government may offer evidence of the following:

- Statements by David Boies to the effect that Holmes had an intense focus on confidentiality, almost paranoia that Quest and Labcorp would find out Theranos technology.  Holmes told the board to keep everything as protected and confidential as possible.  Holmes certainly made the point to the board of not discussing Theranos technology outside of the board meetings.  In general, Holmes was "obsessive" about confidentiality and did not want board members talking about the company at all.  US-REPORTS-0009314.

- Statements by Steve Burd to the effect:  "Holmes was very secretive.  He thought it was a highly secretive company, like other technology companies."  US-REPORTS-0000001.

- Statements by Sarah Cabayan to the effect that Theranos kept teams partitioned and did not allow them to communicate with each other.  US-REPORTS-0000399.

- Statements by Dr. William Clarke to the effect that "[h]e did not like the amount of secrecy at THERANOS."  US-REPORTS-0000575.

- Statements by Erica Cheung to the effect "I was nervous to make the complaint because the whole company really sort of made me uncomfortable . . . . The way that they were sort of handling secrecy and the fact that vendors would come in, we would have to hide things from people, we were constantly hiding things from all sorts of people, whether it was regulators or whether it was outside vendors . . . At this time when I left this job I also [saw] just how aggressive that Sunny was in talking to him . . . ."  PFM-DEPO-00004985.

51

- Statements by Michael Craig to the effect that Holmes and Balwani fostered a culture of secrecy and forced employees to sign non-disclosure agreements. US-REPORTS-0009787; US-REPORTS-0009794 to 0009845; THPFM0000979564 to 571.

- Statements by Andrea Cuppoletti to the effect that "CUPPOLETTI thought THERANOS was very secretive. CUPPOLETTI would receive emails with lists of words he could not tell people." US-REPORTS-0000613.

- Statements by Diana Dupuy to the effect that Theranos was a toxic place that had a "screw you" mentality. US-REPORTS-0015604.

- Statements by Daniel Edlin to the effect that "EDLIN did not ask questions about testing because he did not have a need to know. Information was siloed at THERANOS, meaning there was no encouragement to talk to other people from other groups. There was some level of secrecy as to what people were working on. EDLIN was told he could not tell people outside THERANOS what he was working on. EDLIN was told not to discuss certain things discussed at meetings with other people at THERANOS. It eventually became a part of EDLIN's understanding as to what he could discuss with others inside and outside THERANOS. EDLIN was also told to not discuss the DOD discussions with others." US-REPORTS-0004548.

- Statements by Kerry Denise Elenatinoba-Johnson to the effect that "THERANOS was very secretive. A woman fainted and they would not let the emergency crews into the office area." US-REPORTS-0000807.

- Statements by Surekha Gangakhedkar to the effect that Theranos had a strong non-disclosure agreement. She was not supposed to talk to anybody about the work she did, not even her spouse. At one point, she was asked to remove information from her Linkedin.com profile. Much of the data generated at Theranos was kept confidential and the individual groups within Theranos had access to only their particular subset. US-REPORTS-0000813.

- Statements by Robert Gordon to the effect that "Theranos seemed extremely concerned that having the box in a place where it might be viewed would be damaging to its business." PFM-DEPO-00017581 at 71-72.

- Statements by Christian Holmes to the effect that "BALWANI fostered the siloed culture at THERANOS which resulted in not having open lines of communication. At first, CHRISTIAN did not think THERANOS was siloed, but started to notice it more as the company grew and around the time of the WALGREENS launch. BALWANI said THERANOS was set up this way because he did not want miscommunication between people, however, CHRISTIAN did not agree with this management style at the time. ELIZABETH

52

was aware of this siloed culture, but she deferred to BALWANI. . . . CHRISTIAN thought BALWANI reacted irrationally when people gave negative opinions.  He would remove people from projects unnecessarily."  US-REPORTS-0006904.

- Statements by Stefan Hristu to the effect that everyone in the company operated in a silo and this was made worse after Balwani started.  US-REPORTS-0013672.

- Statements by Henry Kissinger to the effect that "[t]here was a large amount of secrecy around THERANOS technology because HOLMES' machine was so unique.  HOLMES was willing to show the machine, but she was not willing to show how it operated. The machine was not only the core of the business, but it was the business."  US-REPORTS-0005021.

- Statements by Chris Lucas to the effect that "[b]etween 2006 and the investment in 2013 HOLMES was very secretive about THERANOS.  LUCAS typically knew much more information about other companies in which he invested but for THERANOS he had almost no information provided to him in written form HOLMES would give presentations and bring the device to show to the group of investors."  US-REPORTS-0009029.

- Statements by Seth Michelson to the effect that "MICHELSON described the culture of Theranos as secretive and a Stalinist silo."  US-REPORTS-0013835.

- Statements by Tony Nugent to the effect that "NUGENT thought THERANOS had a culture which was siloed."  US-REPORTS-0004562; US-REPORTS-0004571 to 0004608.

- Statements by Channing Robertson to the effect that "[h]e understood Theranos employees did not widely share what they were working on.  It was part of Theranos culture HOLMES never said anything specific regarding this and ROBERTSON never received any instructions regarding secrecy."  US-REPORTS-0009716.

- Statements by Kim Romanski to the effect that "Theranos had a culture of secrecy no transparency they were constantly changing their minds and everything had to go through HOLMES who made all decisions."  US-REPORTS-0012779.

- Statements by Callie Raquel Rosendin to the effect that "[t]he culture at THERANOS was very intense and secretive. . . . ROSENDIN's concerns with THERANOS as a company were in regards to the culture which she described as oppressive and strange.  ROSENDIN further advised people were fired often at THERANOS."  US-REPORTS-0002366.

- Statements by Adam Rosendorff to the effect that "[h]e further described the Normandy lab as secretive. Dividers were installed in vendors were present." US-REPORTS-0007227.

- Statements by Tyler Shultz to the effect that he formed the impression that Theranos had secretive culture. PFM-DEPO-00004761-62.

- Statements by Rebecca Walker to the effect that "WALKER knew within the first week that she did not want to continue working at Theranos because she did not like the culture or the way they treated people. The company was very secretive and private. Accordingly Theranos employees were not allowed to talk to each other despite being in an open office space. WALKER made a friend while she was working there but in order to talk to her she would text her friend to meet her in the bathroom so they could talk. There was a list of words which employees were not allowed to use in emails which included screw and lamp." US-REPORTS-0014774.

- Statements by Daniel Young to the effect that "Theranos teams operated in silos with secrecy between teams. YOUNG deduced this was to prevent secrets from leaving Theranos." US-REPORTS-0007694.

- Statements by David Nathan Zalatan to the effect that "THERANOS was a very secretive company." US-REPORTS-0002523.

- Statements by Lisa Zuckerman to the effect that "Theranos had a bizarre culture and they seemed paranoid and secretive." US-REPORTS-0002526. In addition, at or around the time of Dignity's investment, "[d]ue diligence on Theranos was extremely limited given the secrecy and lack of transparency in which Theranos operates." SEC-USAO-EPROD-000067767.

On or about June 22, 2013, Holmes instructed her assistant, when making dinner reservations at a Michelin-rated restaurant for meetings with Walgreens, that they wanted "the most private, enclosed dinner / meeting area." SEC-USAO-EPROD-001191535.

At or around the time of his interview (in which he met with Holmes and Balwani), Dr. Rosendorff was not permitted to tour the CLIA lab. *See, e.g.*, Rosendorff Deposition/I*n re Arizona Theranos Inc. Litig.* at p.31.

In or around December 2014, Balwani's and Theranos's HR director had Dr. Rosendorff delete emails he had forwarded to himself before resigning from Theranos. "Sunny was exhibiting – trying to strong-arm me into deleting emails that I'd e-mailed to myself and threatening legal action and being intimidating, and I just wanted to meet with Elizabeth to sort of protect me from Sunny, I guess. . . . [H]e said that the HR director, Mona Ramamurthy, was going to sit down with me in front of my Gmail and make sure I deleted anything with reference to Theranos, then she was going to go through my Gmails. . . . He was just being really aggressive." *Id.* at 180-182; TS-0042709; TS-0042716; BALWANI-SEC_000340 to 344

(Rosendorff testimony in *Colman* case that "Sunny was harassing me" to delete his emails and forcing him to sign affidavit after termination).

In May 2015, Askon Niroomand advised Holmes and Balwani's head of HR: "the division between labs and strict secrecy procedures further increases these compliance and workflow issues. . . . Suppressed communication between employees, even within the same department, makes collaboration harder, increases the chance of errors and redundancies, prevents trust, and hurts employee motivation." THPFM0005579073.

On or about September 25, 2015, Erika Cheung told CMS: "Theranos takes confidentially and secrecy to an extreme level that has always made me scared to say anything. I really hope you do all you can to protect my identity from Theranos." PFM-DEPO-00005081.

**** 

The evidence described above is offered for the permitted purpose of motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy. Holmes and Balwani's fostering of a culture of secrecy tends to show consciousness of guilt and tends to show a belief that transparency would expose the falsity of what they claimed to investors, patients, and others. ███████████████ ██████████████████████████████████████████████ The evidence tends to show an agreement between Holmes and Balwani. Evidence that Holmes and Balwani forced employees and others to sign non-disclosure agreements tends to show consciousness of guilt and tends to show a belief that transparency would expose the falsity of what they claimed to investors, patients, and others.

## VIII. Restricting access to laboratory areas within Theranos.

The government may offer evidence of the following:

Dr. Rosendorff, Theranos's former lab director, stated that he viewed Theranos's Normandy laboratory as secretive. He noted that dividers were installed in the lab when vendors were present in order to hide the devices that were being used. Rosendorff also stated that Balwani had dividers installed in Theranos's Normandy lab in order to hide the Tecan devices Theranos used in conducting tests using diluted samples. Rosendorff stated that he believes Balwani intended to hide the fact that Theranos was using sample dilution for its "proprietary" tests. In connection with the presence of the dividers during an upcoming inspection of the Normandy lab, Balwani instructed that, if the inspector asked, staff should say that "this area is for future growth and is being organized" but is "restricted to the CLIA lab and authorized team." [See, e.g., Rosendorff MOI, US-REPORTS-0007227; THPFM0005762828; THPFM5761698]

Rosendorff also stated that, when CMS audited Theranos in 2013, Rosendorff was instructed not to show the Normandy lab to the CMS inspector because it would be more "simple" to show only the lab containing the predicate devices as opposed to Theranos's

proprietary TSPUs.  To Rosendorff's knowledge, the inspector never saw the Normandy lab or asked to see the TSPU machines.  Rosendorff believed the instructions came from Holmes and Balwani through Daniel Young.  [US-REPORTS-0002388]

Jim Twitchell was employed at Theranos as the Quality Director, where his role was to provide management representation to leadership and make sure FDA regulations and standards were met.  He was involved in design control, quality acceptance, validation testing, and inspection procedures as well as regulatory compliance.  [US-REPORTS-0008515]  Twitchell worked in development of the Theranos box analyzer, working with R&D and the manufacturing side and assisting with validations in that capacity.  At Theranos, Twitchell put together a small quality group.  Even as Director of Quality for Manufacturing, Twitchell had no access to Theranos's CLIA lab.  Twitchell observed that Theranos used access-coded badges for employees, and that everything at the company was very compartmentalized and siloed.  This was in stark contrast to other similar positions he had held at other companies.  [US-REPORTS-0017560]

Godfred Masinde began working for Theranos in May 2014 and worked in the microbiology lab.  Masinde stated that the two sections of the lab—chemistry and microbiology—were divided and were never mixed.  He explained that there was a hallway in the middle that divided the lab into the two sides.  Employees' access badges only opened what they had access to.  Masinde could not enter the chemistry section of the laboratory in Newark despite his position as technical supervisor of the microbiology lab.  [US-REPORTS-0017553]

Elle Goldberg was a Theranos phlebotomist who worked at a Walgreens store in Arizona.  She received training from Theranos in the form of written materials and presentations, including several meetings.  At some point during her employment, she visited Theranos headquarters in Palo Alto and met Holmes.  Goldberg observed that the laboratory at Theranos was "very off-limits" and was not part of the tour that she received.  She had no knowledge of how blood was being tested at Theranos despite the fact that she was a phlebotomist who appeared in Theranos promotional materials.  [US-REPORTS-0017505]

Jerry Hurst is a clinical scientist and microbiologist hired by Theranos in 2011 because Theranos wanted to get licensed in California as a clinical lab and get CLIA certified.  Hurst helped Theranos through the process of setting up their infrastructure and navigating the paperwork.  During that time period, Theranos never told Mr. Hurst about any proprietary or LDT (laboratory developed test) or in-house proprietary testing they wanted to do. The lab he helped them set up consisted of a small set of analyzers and test systems. During the time he was in that laboratory, he thought it was going to be just a traditional little laboratory. He had no idea at that time they were going to be performing LDTs.  As far as Hurst knew, Theranos was exclusively using FDA-approved test systems.  From 2013 onward, Hurst continued as an hourly consultant with Theranos.  He remembers Theranos being a "very controlling environment," with restricted access to areas of the facility.  Although he was a technical supervisor for Theranos for a period of time—a position that must come with unimpeded access to the lab—Hurst had to convince Theranos to allow him greater access.  From 2013 on, Hurst worked as a consultant for Theranos, advising on issues including proficiency testing.  The issues Theranos presented him with were routine, and Theranos never spoke to him about anything unique or proprietary in the

company's testing.  In 2013, Hurst conducted an audit of Theranos to advise them on compliance issues around their testing.  All they showed him were traditional FDA approved analyzers.  They didn't tell him they modified devices to run diluted samples.  At Theranos, he was always under escort and told where to go, contrary to his experiences working for other labs.  Hurst never saw Theranos's proprietary analyzer, and they never talked to him about it.  Between 2013 and 2015, Theranos never informed Hurst the company was performing LDTs.  Hurst recalls that, at Theranos's Palo Alto offices, he was never allowed to go upstairs, and understood that the lab was downstairs.  Hurst had additional contact with Balwani and Theranos regarding an audit in 2015.  Again, Theranos never made Hurst aware of its proprietary analyzer.  Even during the 2015 audit, Theranos kept Hurst from discovering that the company was using LDTs and proprietary analyzers in its CLIA lab.  Every analyzer shown to him was an FDA cleared third-party device.  Based on the above, it is clear that Theranos took efforts to exclude Hurst from the sections of Theranos's offices and lab that contained its proprietary TSPU analyzers.  [See, e.g., 8/3/20 Report of Interview of Hurst, US-REPORTS-0017529]

Dr. Rosendorff stated that he recalls Balwani not wanting Hurst to learn about Theranos's methods—especially before the Walgreens launch.  [See, e.g., Rosendorff MOI, US-REPORTS-0007227]

****

The evidence described above is offered for the permitted purpose of motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy.

Evidence that Holmes and Balwani restricted access to Theranos's laboratory tends to show their intent to defraud victims by concealing the methods they used to conduct patient tests and hide their reliance on commercially available devices.

Evidence that Holmes and Balwani restricted access to Theranos's laboratory tends to show their knowledge that victims were unaware of their use of commercially available devices and their absence of mistake in misleading victims into believing that Theranos only used its own proprietary devices.

Evidence that Holmes and Balwani restricted access to Theranos's laboratory even as to consultants conducting audits tends to show Defendants' intent to defraud and the absence of mistake in misleading victims.

Evidence that Holmes and Balwani took steps to conceal portions of Theranos's laboratory from government inspectors tends to show their intent to defraud, consciousness of guilt, and absence of mistake.

/ /

IX.   **Harassing, threatening, or otherwise influencing doctors or patients who had negative experiences with Theranos.**

The government may offer evidence of the following:

- Statements by Dr. Adrienne Stewart to the effect that:

  *The Wall Street Journal* reporter, John Carreyrou, found Dr. Stewart's practice when he was in Scottsdale, Arizona.  She remembers telling him there were some pros and some cons to Theranos, and that she had some test results from them she was questioning; Theranos didn't like that.  Theranos was like "Oh, you're wrong."  Then they tried to discredit everything.  When she spoke to Mr. Carreyrou, she wasn't expecting to be contacted by Theranos; the whole thing escalated quickly. . . . [S]he's pretty sure the Theranos sales representative came in and Dr. Stewart told him that they were recently interviewed by *The Wall Street Journal*, which escalated things.  What Dr. Stewart is describing occurred in the Summer of 2015. . . . She thinks Theranos called her office and were persistent about meeting.  They went ahead and met with some of the other doctors in the practice when she was out of town.  They showed up when she came back and at a time when she was seeing patients.  Theranos had a bunch of people in the lobby, and she told them to come back a couple of days later.  They did, and she took the meeting.  In general, it was an intimidation tactic.  They presented her with a letter to sign retracting anything she said to the *Wall Street Journal* reporter.  There were three or four people from Theranos present at the meeting, including Ms. King and Mr. Balwani.  She described herself as "pretty sure" that Ms. King and Mr. Balwani were there.  Dr. Stewart felt intimidated.  They tried to discredit her as a doctor. . . . She did not sign the prewritten letter Theranos presented to her.  She felt like she did nothing wrong, and she was there to protect and serve her patients, and they didn't like that she didn't sign the letter.  She was the only doctor from her practice present in that meeting.  After she heard what Theranos had to say about her claims regarding Ms. ███, it didn't cause her to doubt her previous clinical opinion. At the time, she was newly in her practice and she didn't want her name or practice drug into the ground."  US-REPORTS-0016096.

- Statements by Dr. Nicole Sundene to the effect that:  When John Carreyrou of *The Wall Street Journal* called Theranos and asked them for their rebuttal to Dr. Sundene's Theranos test results, Theranos started sending "crazy" people in to her office as patients.  Theranos called her office multiple times and flew out to her office on multiple occasions.  At the time, Amanda Miranda was her secretary.  Sunny Balwani and two other top employees of Theranos flew out to her practice on two occasions and threatened to sue Dr. Sundene.  He made those threats to Miranda, who kept the trio up at the receptionist desk and wouldn't let them back

to speak directly to Dr. Sundene. Miranda was literally scared of Balwani and the other Theranos employees. US-REPORTS-0008532.

- Statements by ██████████ to the effect that: When Theranos contacted her, she could tell they had her on speaker phone. ████ believes that Theranos had one or two lawyers on the call, as well as the Theranos founder. There was one person on the phone from Theranos asking all the questions, and that person was trying to make ████ feel "really stupid." ████ would explain something to that person and then that person would challenge her on everything that she said. ████ doesn't think that the person doing the challenging had a medical background. The person speaking on behalf of Theranos was a male, and ██ thinks he was one of the attorneys. After that call with Theranos, ████ didn't take any more of their phone calls. The first call lasted 5 or 10 minutes before ████ hung up. Theranos tried to call her back that same day after that first call, but ████ wouldn't pick up. US-REPORTS-0008527; *see, e.g.*, SEC-USAO-EPROD-003068293 (evidencing Holmes and Balwani were aware of outreach to ████ ).

****

The evidence described above is offered for the permitted purpose of motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy. Among other things, Holmes and Balwani's harassing of doctors and patients tends to show consciousness of guilt and a belief that transparency would expose the falsity of what they claimed to investors, patients, and others. ██████████████████████████████████████████████████████████████████████████ Such evidence tends to show knowledge of issues with Theranos's testing and control over Theranos's operations. Such evidence tends to show an agreement between Holmes and Balwani.

## X.  Threatening, influencing, or vilifying journalists in response to negative coverage of Theranos.

The government intends to offer evidence of the following:

In or about 2015, during a celebration after achieving a CLIA waiver for a single assay, Balwani stood up and got a cheer going: "Fuck quest." COLM-001372.

According to Serena Stewart, Holmes and Balwani lead the group in chants of "Fuck you Sonora Quest" and "Fuck you Carreyrou." They chanted "Fuck you Sonora Quest" because it was implied that the big laboratories, like Sonora Quest, were behind the questioning of Theranos. Stewart was also in California at Theranos's office a month before when Holmes chanted "Fuck you Carreyrou" there. No one really asked questions during these meetings, as they were generally scared of Balwani. US-REPORTS-0015130.

59

On or about July 7, 2015, after Rupert Murdoch wrote that he had spoken to *The Wall Street Journal* editor and a lawyer and "certainly nothing now" was to be published, Holmes stated: "As promised during our meeting, I've attached the Op Ed draft I've written on prevention and laboratory testing.  I had been thinking about sending it over to Joe Rago at WSJ, with whom we did the very first piece on Theranos, introducing our work to the world and into the public domain in 2013 after working for so many years in stealth mode. (As an FYI, Joe actually toured our laboratories, saw our technologies running, and was briefed on our technology in detail in 2013)."  SEC-USAO-EPROD-000536645.

On or about September 8, 2015, David Boies, at Theranos's direction, wrote the Editor-in-Chief of Dow Jones in an attempt to quash Carreyrou's pending story.  SEC-USAO-EPROD-002487614.

On or about September 8, 2015, Holmes emailed Murdoch and wrote:  "For the purpose of keeping you in the loop, I wanted to share the attached documents with you, including a briefing document that was sent from David to Gerard at WSJ today in the hopes that Gerard might meet with our team. I have also attached the material Theranos has shared with WSJ (responsive to questions from John Carreyrou) since the materials I gave you in July.  As I've reflected on this, I thought that were I in your shoes I would want to know/be in the loop on this one, and since you had the prior materials from July, wanted to give you the complete set.  We are very much hoping that Gerard will meet with our team.  If you have thoughts on that please do let me know."  SEC-USAO-EPROD-003493166.

On or about September 9, 2015, Murdoch stated he was checking internally about the meeting.  TS-110529.

On or about October 8, 2015, Boies and Heather King (Theranos's General Counsel) spoke to the Dow Jones' Editor-in-Chief and others in an attempt to quash Carreyrou's pending story.  THER-2507775

On or about October 16, 2015, Holmes wrote Murdoch stating "[i]t was disappointing to see the WSJ article, especially after all the comments they had relayed to you about it.  As we'd feared, this reporter chose to write a false and defamatory piece, despite over 1,000 pages of documents and reference documents, in total, that we'd given to him disproving the very points he put in the piece.  It has been evident he had an end in mind before this piece was ever written. In addition to the publication of many inaccurate and misleading statements we had refuted, it was frustrating to see the repeated reliance on anonymous sources. . . . It was also frustrating that they imply the Theranos technology does not produce accurate results, but never mentioned that David had offered to bring our device to the Journal's office and demonstrate it first hand by testing the Journal's own people.  You know that we had been trying to meet with Gerry for some time (and that I was reluctant to meet just with the reporter who in his first contact with us accused me in an email of causing someone's death and asked totally inappropriate questions about my personal life)."  SEC-USAO-EPROD-000034937.

On or about October 17, 2015, Holmes wrote Murdoch stating "[t]wo thoughts I want to briefly connect on / run by you – let me know if there's a convenient moment to give you a call." SEC-USAO-EPROD-000034936.

According to Nimesh Jhaveri, after the Carreyrou article was published, Theranos told Walgreens it was a lie.  Walgreens called Balwani and asked him questions about information published in the article and Balwani told them everything was a lie and that the author did not talk to Theranos.  US-REPORTS-0012220.

According to Roger Parloff, after he published an article to the effect that Holmes mislead him, Holmes contacted him and asked him to delete the part of the article about her/Theranos misleading him, and stated she would never intentionally mislead him.  However, Holmes did not provide any rebuttal or evidence to show that she did not mislead Parloff.  When Parloff refused Holmes advised that if he was not going to change it then they would have to take other action.  Theranos then provided *Fortune* with a letter from Brooke Buchanan, which Parloff thought read more like it had been written by Heather King.  In the first draft of this letter, Theranos claimed they thought Parloff was doing an article with a limited narrow focus on Intellectual Property (IP), because he was a legal journalist.  This statement was removed before it was published because an editor at *Fortune* contacted Buchanan and said she might want to reconsider claiming that they did not know it was going to be a feature article, and that she should think about her own reputation.  Buchanan then submitted a second draft of the letter, which did not include this statement, and was subsequently published.  US-REPORTS-0008842 & 8872.

**\*\*\*\***

The evidence described above is offered for the permitted purpose of motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy.  Among other things, Holmes and Balwani's threatening and influencing journalists in response to negative coverage tends to show consciousness of guilt and a belief that transparency would expose the falsity of what they claimed to investors, patients, and others. ███████████████████████████████████  Such evidence tends to show knowledge of issues with Theranos's testing and control over Theranos's operations.  Such evidence tends to show an agreement between Holmes and Balwani.

## XI.   Blaming and vilifying competing companies.

The government may offer evidence of the following:

- Statements from Wade Miquelon to the effect:  HOLMES said Theranos' competitors were sending people into Walgreens to order esoteric blood tests in order to throw off the blood draw percentages.  US-REPORTS-0014079.

- Statements from Nimesh Jhaveri to the effect:  BALWANI advised Walgreens that the reasons for the high number of venous blood draws included the

61

cartridges not being ready for tests that were being ordered, LabCorp and Quest sending people in to order tests which required venous blood draws, and doctors ordering esoteric tests.  US-REPORTS-0012220.

- Statements from Suraj Saksena to the effect:  SAKSENA learned about John Carreyrou's (CARREYROU) Wall Street Journal (WSJ) article right before it was published.  He attended an all-hands meeting where he learned of the impending article.  During the meeting, the attendees were told the article made several allegations that were false, and that this story was being pushed by LabCorp and Quest.  In addition, Theranos had engaged with CARREYROU for months prior to publishing the article.

\*\*\*\*

The evidence described above is offered for the permitted purpose of motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy.  Among other things, Holmes and Balwani's blaming or vilifying competitors tends to show consciousness of guilt. ██████████████████████ ███████████████████████████.  Such evidence tends to show knowledge Theranos's technology not capable of consistently producing accurate and reliable results, as alleged in the indictment.

**XII.    Threatening or intimidating employees and former employees.**

The government may offer evidence of the following:

- Statements by Tyler Shultz to the effect that he formed the impression that Theranos had a culture of intimidation and that people were afraid to speak up; that Theranos management made it known within the company that they are willing to sue ex-employees; and that there was a culture of fear.  PFM-DEPO-00004763-64.

- Statements by Tony Nugent to the effect that he witnessed conduct by Holmes or Balwani after Balwani joined the company that he would characterize as intimidation towards Theranos employees.  PFM-DEPO-00005990-59999; US-REPORTS-0004562.

On the day Rosendin (Holmes's former personal assistant) resigned, she was forced to sign various documents and then abruptly escorted out of the building.  US-REPORTS-0002373.

On or about August 11, 2012, Balwani threatened Rosendin with legal action when he suspected she was disclosing Holmes and Balwani's personal relationship.  US-REPORTS-0002384 US-REPORTS-0002373.

62

In or around December 2014, Balwani and Theranos's HR director had Dr. Rosendorff delete emails he had forwarded to himself before resigning from Theranos. "Sunny was exhibiting – trying to strong-arm me into deleting emails that I'd e-mailed to myself and threatening legal action and being intimidating, and I just wanted to meet with Elizabeth to sort of protect me from Sunny, I guess. . . . [H]e said that the HR director, Mona Ramamurthy, was going to sit down with me in front of my Gmail and make sure I deleted anything with reference to Theranos, then she was going to go through my Gmails. . . . He was just being really aggressive. *Id.* at 180-182; TS-0042709; TS-0042716; BALWANI-SEC_000340 to 344 (Rosendorff testimony in Colman case that "Sunny was harassing me" to delete his emails and forcing him to sign affidavit after termination).

On or about May 15, 2015, Theranos's attorneys ambushed Tyler Shultz at the home of his grandfather and threatened to sue him. US-REPORTS-0008460.

On or about June 26, 2015, Theranos threatened to sue Erika Cheung. PFM-DEPO-00004949, 4985; PFM-DEPO-00005078.

\*\*\*\*

The evidence described above is offered for the permitted purpose of motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy. Among other things, such evidence tends to show Holmes and Balwani's consciousness of guilt and tends to show they believed that transparency would expose the falsity of what they claimed to investors, patients, and others. ███████ ██████████████████████████████████████████ The evidence tends to show an agreement between Holmes and Balwani. Such evidences tends to show Holmes and Balwani knew that at Theranos, they had to hide or conceal the difference between the public picture they painted of Theranos and the true reality of Theranos.

## XIII.   False and misleading representations made to FDA, CMS, CDPH, and other regulatory organizations.

The government may offer evidence of the following:

On or about October 23, 2013, Holmes provided the FDA a list of tests run in Theranos's CLIA laboratory from samples collected in Theranos Wellness Centers. The list provided a column for test, chemistry, and device, and purported to show that, in certain circumstances, Theranos was using an "FDA cleared/approved" device but failed to disclose that Theranos was modifying third-party devices to perform certain tests. *See, e.g.*, THPFM0000154254.

According to Kerry Denise Elenatinoba-Johnson, on an unspecified date, Johnson needed to ask BALWANI how to walk the Laboratory Director and a consultant through the CLIA laboratory. BALWANI told her she needed to walk them around the outside of the building into a separate entrance. *See, e.g.*, US-REPORTS-0000807.

63

On or about December 3, 2013, following directions from Balwani, Young wrote to Dr. Rosendorff regarding Normandy Lab: "Let's not remind her [a CLIA inspector] about the downstairs lab unless she asks again.  Just simple if we can just show her the lab upstairs." *See, e.g.*, SEC- USAO2-EPROD-000070971.  Holmes was made aware of Young's instruction no later than June 2015. *See, e.g.*, TS-1133080.

In or about November 2014, Balwani approached his dermatologist, Dr. Sunil Dhawan, about serving as the Bay Area Lab Director in place of Dr. Rosendorff, who was raising concerns about Theranos's lab practices.  Balwani assured Dr. Dhawan the "time commitment is minimal." *See, e.g.*, US-REPORTS-0008350.

Between November 2014 and August 2015, Dr. Dhawan did no work for Theranos and instead negotiated the amount of Theranos equity he would be paid.  US- REPORTS-0008361-68.

On or about September 9, 2015, Balwani wrote Dr. Dhawan to finalize issues relating to Dr. Dhawan's compensation, and stated: "I also need your help on an additional matter.  We have a lab audit coming up on 9/22 at 9am . . . and wanted to see if you can be present for at least part of it."  Balwani also provided directions to the lab Dr. Dhawan was purportedly supervising. *See, e.g.*, US-REPORTS-0008371-72.

On September 15, 2015, Balwani thanked Dr. Dhawan for dropping by and advised he "need[ed] a couple of hours from you this coming weekend, unfortunately I have close to 300 SOP's that need signing." *See, e.g.*, US-REPORTS-0008373 (CTRL-DHAWAN-00009861).

On or about September 21, 2015, Holmes congratulated Dr. Dhawan on "joining a team defined by the excellence with which every objective is pursued." *See, e.g.*, US-REPORTS-0008387.  Despite the fact that Dr. Dhawan had done next to no work and had minimal familiarity with the Bay Area CLIA lab, Holmes and Balwani held him out to CMS inspectors as knowledgeable of Theranos's technology and practices.

On or about September 23, 2015, Theranos representatives attending a CMS inspection, with Holmes and Balwani's knowledge, told CMS inspectors "Theranos changes the platforms on which it runs tests from time to time.  The decision to move testing off of TSPUs and onto other platforms in this case was a business decision to transition to the manufacturing quality systems to QSR compliance under FDA guidelines and does not reflect on the reliability or accuracy of any platform." *See, e.g.*, SEC-USAO-EPROD-005968690.

****

The evidence described above is offered for the permitted purpose of motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy.

Among other things, evidence that Holmes failed to fully explain what tests, chemistries, and devices it was using tends to show consciousness that full regulatory scrutiny would expose

that Theranos was unable to provide accurate and reliable test results.  It tends to show Holmes's knowledge and control over Theranos's operation and dealings with regulators.

Evidence that Balwani directed Theranos employees to not show portions of the CLIA laboratory to a consultant and/or an inspector tends to show consciousness that full regulatory scrutiny would expose that Theranos was unable to provide accurate and reliable test results.

Evidence that Holmes and Balwani hired Balwani's dermatologist to serve as the CLIA laboratory director tends to show their control over Theranos's operations, their willingness to turn a blind eye to issues in the CLIA laboratory and patient safety, and that the laboratory was not the revolution in blood testing Theranos claimed it to be, and evidence that Holmes and Balwani held him out as serving from November 2014 to September 2015 and knowledgeable of Theranos's technology and practices tends to show consciousness that Theranos was unable to provide accurate and reliable test results.

Evidence that Theranos representatives, working at Holmes and Balwani's direction, falsely told CMS the decision to stop using the TSPU in the CLIA laboratory "does not reflect on the reliability or accuracy of any platform" tends to show intent to defraud and consciousness that full regulatory scrutiny would expose that Theranos's TSPU was unable to provide accurate and reliable test results.

## XIV.   <u>Violations of industry standards and government regulations or rules regarding research and development procedures, medical devices and clinical laboratory practices</u>.

The government may offer evidence of the following:

On or about November 10, 2013, Dr. Rosendorff emailed Balwani about "areas in which we are currently not compliant in terms of CLIA law."  *See, e.g.*, THPFM0000266077.

On or about December 10, 2013, the California Department of Public Health issued an IMPORTANT NOTICE-ACTION NECESSARY, advising Theranos of a number of deficiencies.  *See, e.g.*, THPFM0001203524.  Holmes and Balwani were provided a copy.  *See, e.g.*, SEC-USAO-EPROD-003713433 THPFM0005279630.

In or about February 2014, Dr. Rosendorff told Balwani "we need to migrate our proficiency testing to Theranos methods ASAP. . . . CLIA requires PT to be performed the same way we test patient samples.  Currently this is not 100% the case.  PT is a complex issue that needs to [be] vetted, but is essential[] in maintaining licensure and quality."  *See, e.g.*, TS-0231083.

On or about February 21, 2014, Holmes and Balwani were advised by Dr. Rosendorff:  "I do not feel that reporting this HDL in light of the spate of low HDLs we have been having is good medical practice."  *See, e.g.*, THPFM0001407063.

65

On or about October 28, 2014, Dr. Rosendorff advised Theranos employees, and ultimately Holmes and Balwani, it was "running HbA1c using 2 different methods – venous blood on ADVIA and FS on DCA Vantage. . . . it makes no sense whatsoever, it goes against every recommendation." Dr. Rosendorff stated further: "If my authority as laboratory director is counteracted again in this way, there will be serious consequences." *See, e.g.*, THPFM0000003941; TS-1081376.

In or around September 2015, CMS conducted a CLIA recertification and complaint survey, which concluded on or about November 20, 2015. Based on the survey, CMS found Theranos to be out of compliance with five CLIA Condition level requirements, in addition to numerous CLIA Standard-level requirements. *See, e.g.*, THER-0495513. Balwani urged Holmes to pray during the survey and admitted that "[o]ur validation reports are terrible. Really painful going thru this process." Holmes said she was "[p]raying literally non stop." THER-2566547.

On or about January 26, 2016, CMS wrote Theranos regarding "CONDITION LEVEL DEFICIENCIES – IMMEDIATE JEOPARDY." CMS wrote that as a result of its survey, it was determined that Theranos was not in compliance with all of the Conditions required for certification in the CLIA program. CMS provided Theranos with a listing of all deficiencies identified during the survey on Form CMS-2567, Statement of Deficiencies. The letter also notified the laboratory that the seriousness of the deficiencies resulted in a finding of immediate jeopardy of patient health and safety. *See, e.g.*, THER-0534383; THER-0495513. The letter listed the conditions not being met as 42 C.F.R. § 493.1215 (Hematology), 42 C.F.R. § 493.1250 (Analytic systems), 42 C.F.R. § 493.1441 (laboratory director), 42 C.F.R. § 493.1447 (technical supervisor), and 42 C.F.R. § 493.1487 (testing personnel), as well as other standards. Among other things, CMS found Theranos failed to ensure that quality control was acceptable for the Theranos Proprietary System (TPS/Edison 3.5) prior to the reporting of patient tests, failed to have a quality assessment procedure to identify and correct problems with the QC values for the TPS when precision did not meet the lab's requirement for precision, failed to ensure that the validation procedures performed on the TPS established performance specifications for accuracy, precision, reportable range, and/or reference range, and failed to ensure establishment of the performance specifications followed the laboratory's procedures.

On or about February 12, 2016, Theranos's General Counsel, with Holmes's knowledge, provided CMS with an "allegation of compliance and evidence of correction" in response to the Form 2567. *See, e.g.*, THER-0593739; THER-0495513.

By letter dated March 18, 2016, CMS notified Holmes and Balwani of its determination related to the laboratory's submission; provided the laboratory with its review of the submission; and proposed sanctions against the laboratory's CLIA certificate based on the finding of immediate jeopardy, the laboratory's failure to meet all CLIA Condition-level requirements, and the failure by the owners and director of the laboratory to comply with certificate requirements and performance standards as evidenced by the deficiencies cited during the CLIA recertification and complaint survey. *See, e.g.*, THER-0534655. Among other things, CMS determined that the laboratory's submission did not constitute a credible allegation of compliance and acceptable evidence of correction for the deficiencies cited during the CLIA recertification and complaint

66

survey, and did not demonstrate that the laboratory had come into Condition-level compliance and abated the immediate jeopardy.

On or about March 28, 2016, Theranos provided a written response, stating among other things it had ceased running all tests at issue in the Form 2567. *See, e.g.*, SEC-USAO-EPROD-005969471.

On or about April 1, 2016, Theranos's lab director wrote in response to CMS' March 18, 2016 letter setting forth reasons "we believe demonstrate that our Newark California laboratory has come into Condition-level compliance and abated the immediate jeopardy." The letter notes that Theranos has put in new leadership, that "deficient practices will not recur through its robust new quality systems and through intense oversight being provided by the laboratory's new quality monitoring and improvement program and audit procedures." The letter notes Theranos had "stopped running [a number of tests] either before or during the survey, and has not run them since." The letter notes Theranos "based on its dissatisfaction with prior QA oversight . . . had voided all results reported for the assays run on the Theranos Proprietary System 3.5 (TPS) in 2014 and 2015 and all reported PT/INR test run on the Siemens Advia BCS XP instrument that went into use in October 2014 through September of 2015." *See, e.g.*, THPFM0003765147; THER-0534700.

On or about April 17, 2016, Theranos provided supplemental information to CMS. *See, e.g.*, THER-0534793; THER-0534801 (email to CMS copying Holmes); SEC-USAO-EPROD-006024676 (emailed to CMS dated 4/25/2020 with attachments); SEC-USAO-EPROD-006024677; SEC-USAO-EPROD-006024824.

On or about April 18, 2016, Holmes stated publicly and to shareholders: "I'm the founder and CEO of this company. Anything that happens in this company is my responsibility, at the end of the day. We stopped testing [in Newark], and have taken the approach of saying, let's rebuild this entire laboratory from scratch." She said further "I know what we've built. . . ." *See, e.g.*, SEC-USAO-EPROD-000382615.

On or about July 7, 2016, CMS advised Holmes and Balwani that CMS had determined the Newark lab was not in compliance with the CLIA Condition-level requirements, that it had not removed the finding of immediate jeopardy, and of the consequent imposition of sanctions. *See, e.g.*, THER-0495513.

On or about October 24, 2016, Holmes directed Theranos to relinquish its CLIA license and ceased lab operations. *See, e.g.*, THPFM0005754133.

**\*\*\*\***

The evidence described above is offered for the permitted purpose of motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy. Among other things, evidence that Theranos violated CLIA regulations and industry standards tends to show that Theranos's technology was, in fact, not capable of consistently producing accurate and reliable results, as alleged in Paragraph 16,

and that its proprietary analyzer had accuracy and reliability problems, as alleged in Paragraph 12. Such evidence tends to show statements to investors, patients, and others were false and the materiality of such statements. Such evidence tends to show Holmes and Balwani's control over Theranos and knowledge of its operations. Evidence Theranos voided tests is an admission its prior statements were false. Theranos's statement it was "dissatisf[ied] with prior QA oversight" is an admission its prior statements were false. Theranos's statements to CMS are admissions it was not CLIA-complaint. Evidence of CLIA violations demonstrates the falsity of claims to investors that Theranos's "technological advances" and "laboratory infrastructure" were superior to conventional labs, as alleged in Paragraphs 6-10. Evidence of CLIA violations demonstrates the falsity of claims to investors that Theranos was an attractive investment because it operated a licensed, high complexity laboratory.

### XV.   Altering or tampering with third-party medical devices.

The government may offer evidence of the following:

Holmes admitted that, in 2013, before the clinical lab went live, Theranos made modifications to FDA approved machines to process tests on smaller samples. *See, e.g.*, SEC-TX-000005284. For example, Holmes testified "[s]peaking about the ADVIA specifically, we had taken our protocol, which is essentially our formula for how to make the chemistry work with the small volume, and, as I understand it, overtaken essentially the software in the instrument to implement our protocol. And then we modified the physical hardware. There's little cups that are used to contain the sample . . . we changed the geometry so that you didn't have . . . loss." SEC-TX-000005284 & 85; *id.* at 84 ("We purchased the machines, and then we modified the hardware."); *id.* at 5300 ("I was aware that we were doing it [i.e. using commercially available machines and modified protocols for patient testing]."); SEC-USAO-EPROD-000666750 (2/19/2014 email to Balwani, copied to Holmes, describing use of Advias in CLIA lab).

Holmes authorized Theranos's admission in prior litigation that the company used non-proprietary or commercially available machines or equipment to perform blood tests for commercial testing center patients, including Abbot, Beckman Coulter, and Siemens AG. *See, e.g.*, TS-0958390 (xx453); TS-0959027.

Holmes also authorized Theranos's admission in prior litigation that, from October 2013 to September 2015, the company modified the Siemens ADVIA 1800 analyzer, the BD Biosciences LSR Fortessa and FACSCanto II flow cytometers, and the Drew Scientific Drew-3 Hematology System to process General Chemistry, ELISA, and Cytometry blood tests on capillary samples or micro-samples. *See, e.g.*, TS-0959090, TS-0959114-123. Holmes was aware Theranos had done so. SEC-TX-00005295.

Additional emails demonstrate Holmes and Balwani's knowledge of modification of third-party devices. *See, e.g.*, TS-0546225 (8/2/2013 email re "throughput and latency estimates"). THPFM0003106027 (8/29/2013 email from Balwani to Holmes re Rosendorff "concerns about the launch discussing proposed use of ADVIA in CLIA lab"); THPFM0000269370.

68

On or about August 3, 2013, with Balwani's knowledge, Holmes directed Dr. Rosendorff: "You'll obviously need to make sure our micro-cups and protocols / modifications are not are not in any way visible to any Siemens rep." Dr. Rosendorff later reported to the two: "All 100 Siemens assays on the new ADVIA, the technical rep shouldn't need to login to the old instrument." *See, e.g.*, THPFM0000273433.

On or about August 21, 2013, Holmes ordered that the ELISA launch and validating Theranos's LDTs was the only priority of the ELISA team going forward, and that the team had 27 assays to validate on the Siemens Advia. *See, e.g.*, TS-0297862.

On or about August 23, 2013, Rose Edmonds, a development scientist under Holmes and Balwani's supervision, noted to Dr. Rosendorff, Surehka Gangakhedkar, and others "there is a small chance that Siemens techs will be around this weekend and if so, we must be discreet and not let them know that we are altering the chemistries and protocols on the ADVIA." *See, e.g.*, FBI-SG-0000003.

Surekha Gangakhedkar learned about devices being modified and was alarmed that chemistries were altered. She resigned from Theranos because she was not comfortable with the validation plan or with the use of multiple devices to complete validation. Gangakhedkar was also concerned about Theranos altering device chemistries and felt that the 4.0 device and nanotainers were not working properly. *See, e.g.*, US-REPORTS-0000813.

On or about November 3, 2013, Balwani directed, with Holmes's knowledge, that the two Advias on Normandy be 100% dedicated to CLIA micro samples starting that week and be "ready for primetime." Balwani and Holmes were advised Theranos employees were working with engineering to optimize T-cup dead volume so that the ISE assays could be properly executed on one of the ADVIAs. They were also advised about concerns with the feasibility of making Balwani's directive happen, including the need for properly trained personnel and updated validation reports. *See, e.g.*, TS-0795030.

Holmes and Balwani were aware in February 2014 that CLIA personnel were not reviewing QC data on a regular basis, despite the deficiency having arisen in a prior audit. *See, e.g.*, SEC-USAO-EPROD-000666750.

On or about May 3, 2014, Balwani admitted, and Holmes was told, "ISE on Advia is our sore point resulting in overwhelming majority of the redraws . . . so we need to solve this problem in a structured way." *See, e.g.*, TS-0550583.

In or around November 2014, Balwani acknowledged, and Holmes was advised, "to reduce our redraws and reruns, we need to focus first and foremost on Advias"; that "our problem around the 3 problem assays got worse when we made changes to Advia"; "and problems [were] coming from Normandy process." The two were advised "[s]ince we have moved to Newark, we have had to call the Siemens rep multiple times for both Advias. There were reagent probe sensor issues, probe alignment issues, etc. . . . Troubleshooting with an unstable system has been challenging." They were advised further: "Imprecision for our assays

is higher compared to neat Siemens protocol.  Different aspects of our process contribute to imprecision: Sample integrity, Tecan dilution, Advia processing and detection, use of P-protocols (dilution) and all need to be tightened."  *See, e.g.*, THER-0303315.

<div align="center">****</div>

The evidence described above is offered for the permitted purpose of motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy.  Among other things, evidence that Theranos altered or tampered with third party devices and concealed the changes tends to show that Theranos's proprietary analyzer was, in fact, not capable of consistently producing accurate and reliable results, as alleged in Paragraph 16, and that its proprietary analyzer had accuracy and reliability problems, as alleged in Paragraph 12.  Such evidence tends to show statements to investors, patients, and others were false and the materiality of such statements.  Such evidence tends to show Holmes and Balwani's control over Theranos and knowledge of its operations, as well as the existence of the scheme.

### XVI.  Multiplexing test results and disregarding outliers to mask inconsistency

In order to improve the apparent precision of its tests, Theranos changed its devices from a three-tip design to a six-tip design, such that each assay would be run six times on a given sample in parallel.  Theranos would then take the six results yielded by that approach, remove the high and low values of an assay, and average the remaining four values to determine a final result.  Dr. Adam Rosendorff stated that Daniel Young formulated the idea and Rosendorff remembers discussing the proposal with Holmes in early 2014 and getting her approval.  After implementing the change over the course of a month, the apparent precision of Theranos's tests improved.  In retrospect, Rosendorff stated that he has some concerns about the change to a six-tip method.  He believes that the process, which in effect too averages of averages, could make precision look better than it is.  [US-REPORTS-0007375]

Theranos employees emailed about setting up the six-tip method of sample processing in late January 2014.  [THPFM0004221367]  In March of that year, employees emailed again about the six-tip method, which had already been rolled out for patient testing.  In that email chain, employees discussed the fact that, at that time, they could not generate patient results using the six-tip method without sending the data for a script to be run.  The goal was to automate that process eventually so that the separate step of running a script was no longer needed.  [THPFM0000170882]  In July 2014, Rosendorff, Young, and other Theranos employees discussed the CV values being yielded by the six-tip method, citing values more favorable than earlier methods.  [THPFM0000109479]

Rosendorff also stated that running an assay multiple times for a given sample then reporting the average of the results is not good laboratory practice.  Dr. Rosendorff also specifically stated that Theranos's practice of running an assay on a sample multiple times in parallel and statistically combining the results while disregarding outliers was "not ideal."  Instead, he explained that it would be better to run the assay a single time using a highly accurate and reliable method, and report that result.  [Interview report pending production]

<div align="center">70</div>

<div align="center">**ER-3296**</div>

****

The evidence described above is offered for the permitted purpose of motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy.

Evidence that Theranos used a six-tip method to run assays multiple times in parallel before multiplexing the results and reporting the average tends to show Defendants' plan to conceal the accuracy and precision problems with Theranos's technology as well as their intent to defraud patients by offering and providing blood tests that were not as precise as they appeared to be.

Evidence that Theranos used a six-tip method to run assays multiple times in parallel before disregarding outliers tends to shoe Defendants' intent to defraud victims by concealing consistency and precision problems inherent in Theranos's approach to blood testing.

Evidence that Theranos's multiplexing method disregarded high and low values tends to show Defendants' knowledge of the flaws and precision problems in Theranos's technology.

## XVII.  Improperly setting and altering reference ranges

The government may offer evidence of the following:

Dr. Rosendorff stated that as lab director at Theranos, he set reference ranges for Theranos assays, including assays run by Theranos's "t-protocol" and on Theranos's Edison devices.  Theranos also used published reference ranges specific to other devices and specific populations.  Rosendorff stated that Theranos was "in a hurry" to proceed with the Walgreens launch.  If that had not been the case, he would have preferred to set reference ranges before the launch of clinical testing services.  Instead, Theranos launched its clinical testing services with Walgreens without conducting a formal reference range study.  The reference ranges for the tests Theranos conducted were under constant review after the launch.  Rosendorff also disagreed with others at Theranos as to whether there should be specific reference ranges for fingerstick samples distinct from the ranges for venous samples, with Rosendorff arguing for independent reference ranges.  [See, e.g., Rosendorff MOI, US-REPORTS-0007227; THPFM0001608214; THPFM0002747643]

Rosendorff also stated that reference ranges for finger-stick samples were set using a twenty-sample process.  He also stated that Theranos did not calculate the coefficient of variation, precision, or recovery with the finger-stick method.  [US-REPORTS-0007375]

In early June 2013, Holmes, Balwani, and others at Theranos emailed about setting and adjusting reference ranges in response to a particular demo result for a female patient.  In that email chain, Daniel Young examines the specific results and requests that certain changes be made to the reference ranges for multiple results.  One such adjustment causes a "low" value in

71

the patient's tests to become "normal."  Another adjustment keeps the patient's result for that assay outside the reference range, but brings it closer to that range.  [THPFM0000028250]

In November 2014, Dr. Rosendorff emailed Holmes and Balwani to advise them that Theranos tests should show references ranges "specific to the sample type and method being used," further advocating for information regarding sample type and method to be included on lab reports themselves.  Holmes and Balwani apparently rejected Rosendorff's proposal, with Balwani insisting that there was no difference between venous blood and capillary blood.  [See, e.g., THPFM0002747643]

****

The evidence described above is offered for the permitted purpose of motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy.

Evidence that Holmes and Balwani did not conduct sufficient studies to establish and support valid reference ranges for Theranos's tests tends to show their motive to launch Theranos's testing services as soon as possible to generate profits and capture market share at the expense of patient safety.

Evidence that Holmes and Balwani did not establish proper reference ranges based on sufficient evidence tends to show Defendants' intent to defraud victims by offering and providing blood testing services that produced unreliable results.

Evidence that Holmes and Balwani were in a hurry to launch testing services, requiring Theranos to set reference ranges during and after the launch, tends to show Defendants' intent to defraud victims before their previous false statements were exposed.

Evidence that Holmes and Balwani caused Theranos to adjust reference ranges based on patient results tends to show Defendants' intent to defraud patients by bringing abnormal results within normal ranges to avoid scrutiny of Theranos's tests.

Evidence that Theranos needed to adjust reference ranges based on patient results tends to show Defendants' knowledge that Theranos's tests were not sufficiently developed and suffered from calibration, accuracy, or reliability problems.

Evidence that Holmes and Balwani rejected their laboratory director's admonishments about the need for customized reference ranges for finger-stick versus venous samples tends to show their knowledge of those differences and their absence of mistake in treating those sample types as equivalents.

/ /

72

XVIII. **Withholding critical test results and other important information from doctors and patients.**

The government may offer evidence of the following:

When Theranos obtained invalid bicarbonate results due to sample stability issues or other problems, it would withhold the result from doctors and patients with no explanation. Holmes directed that, if customers called to inquire about such withheld results, Theranos representatives should respond that "CO2 results were not reported due to temporary unavailability of this test for this sample" and note that the company was growing as fast as it could. This statement was misleading because it deceptively concealed problems with Theranos's tests. [See, e.g., TS-1078095, TS-1076614-16]

When Theranos obtained critical test values for chloride, it conducted a redraw and/or rerun rather than reporting the critical value. This approach misled doctors and patients by masking potential accuracy problems with Theranos's tests. [See, e.g., TS-1078326]

After experiencing problems with its hCG test, Allison Hsieh informed Balwani that Theranos had removed the "pregnancy test" description from its hCG blood quant assay description because the company's test was not able to confirm a pregnancy. However, Theranos continued to offer the hCG blood test knowing that doctors and patients would rely on the assay to determine pregnancy status. [See, e.g., THPFM0004228061]

After experiencing problems with its hCG test, Theranos switched the assay from fingerstick to venous draw. Rather than inform doctors and patients that the switch was necessitated by a problem with the assay, Christian Holmes directed that doctors and patients be told that it was a "temporary" "routine quality check" related to Theranos's expanding patient population. [See, e.g., THPFM0000555315, THPFM0000958955]

After experiencing problems with its PT/INR test, Theranos switched the assay from fingerstick to venous draw, telling doctors and patients only that it was a temporary switch. Christian Holmes directed Theranos customer service representatives to adhere to a script that deceptively omitted information about problems with the assay's accuracy. [See, e.g., THPFM0000018472]

After experiencing problems with its complete metabolic panel assays, Theranos switched CMP from fingerstick to venous draw. Christian Holmes suggested to Balwani that Theranos tell doctors and patients that the switch was related to an ongoing sample stability study. When Balwani rejected that proposal, Christian Holmes reported that he had previously used language consistent with Holmes's direction stating that Theranos required larger samples because it was running each test in more than triplicate. This explanation deceptively masked the true reason for the switch to venous draws. [See, e.g., THPFM0000147443]

When Theranos switched PT/INR from fingerstick to venous after experiencing problems with the assay, Theranos representatives including Kimberly Alfonso explained the change by telling doctors and/or patients that Theranos had confidence in its testing and the switch to

73

venous draws was intended simply to give the doctor the experience he or she was more accustomed to.  This explanation deceptively masked the true reason for the switch.  [See, e.g., THPFM0000204033]

Theranos ran HbA1c tests using two different methods:  venous blood on an Advia device and fingerstick on a DCA Vantage device.  Theranos's Lab Director, Dr. Adam Rosendorff, informed staff that this approach made "no sense whatsoever" and that it "goes against every recommendation."  Results from each of these types of HbA1c tests were provided to doctors without explanation as to the types of analyzers used to conduct the assays, creating a situation where doctors did not have the information they needed to place the results in context.  This was especially problematic in situations where a single patient had Theranos multiple Theranos assays conducted using different methods, yielding different results that falsely suggested to the doctor that the patient's analyte values had changed.  This was the case with a patient treated by Dr. Phelan, who was the subject of internal emails at Theranos.  [See, e.g., THPFM0000003941; Rosendorff MOI, US-REPORTS-0007227]

Although Theranos used a variety of methods to conduct its blood tests, its lab reports sent to doctors and patients did not disclose method and sample type—important information that would allow recipients to put the results themselves in context.  In November of 2014, Dr. Rosendorff emailed Holmes and Balwani to advise that reference ranges should be specific to sample type and method.  In that same message, he stated his preference that physicians should "be aware if a test was performed on fingerstick versus venous blood," explaining that that information "should be made clear in the laboratory report."  According to Dr. Rosendorff, this information "would make the physician more understanding of discrepant results that might arise due to matrix/sample type effects."  During that same month, Dr. Rosendorff corresponded with Holmes, Balwani, and others regarding a physician who had inquired about a discrepancy in patient test results obtained from Theranos.  Dr. Rosendorff then explained that the difference in the patients' results from two tests ten days apart might have been due to the fact that Theranos tests the analyte on capillary blood while the other lab tests for that analyte using venous blood. In connection with that example, Rosendorff suggested that Theranos's lab reports should report "exactly what method and sample type is being used for testing on every lab report," and noted that he had made that proposal to Balwani the previous week.  Despite the above input, Theranos never disclosed that type of information on its reports sent to doctors and patients.  In particular, Balwani was resistant to Rosendorff's suggestion because he refused to acknowledge that there might be differences between venous and capillary blood.  [See, e.g., THPFM0005008031; THPFM0002747643]

**** 

The evidence described above is offered for the permitted purpose of motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy.

Evidence that Holmes and Balwani withheld critical results from doctors and patients— redrawing samples or voiding the results themselves—tends to show Defendants' intent to

defraud patients by depriving them of the information they believed they would receive when patronizing Theranos's services.

Evidence that Holmes and Balwani withheld critical results from doctors and patients tends to show Defendants' knowledge of the accuracy and reliability problems with Theranos's tests, to the extent that decision shows a lack of confidence in Theranos's test results.

Evidence that Holmes and Balwani withheld critical results from doctors and patients tends to show Defendants' intent to deceive victims by holding back information that might cause victims to suspect or discover the accuracy and reliability problems with Theranos's test results.

Evidence that Holmes and Balwani withheld critical results from doctors and patients tends to show Defendants' motive to preserve and enhance the company's reputation and market share at all costs.

Evidence that Defendants and other Theranos representatives made excuses for ongoing problems with Theranos's tests and withheld the true reasons for missing results tends to show the existence of the conspiracy.

Evidence that Defendants and their agents gave vague reasons for test failures rather than disclosing the underlying problems with the tests tends to show Defendants' intent to defraud.

Evidence that Defendants and their agents needed to generate excuses and vague explanations for missing test results tends to show Defendants' knowledge of the accuracy and reliability problems in Theranos's tests.

Evidence that Defendants and their agents did not disclose to doctors and patients the methods by which their tests were being conducted—or the nature of the devices used—tends to show Defendants' intent to defraud victims by concealing their reliance on third party devices.

## XIX.   **Declining to conduct or agree to meaningful comparative tests.**

The government may offer evidence of the following:

Toby Cosgrove is the former CEO of the Cleveland Clinic and heard about Theranos in mid-2014 through Bill Frist who was on Theranos's Board.  [US-REPORTS-0014814; SEC-FRISTW-E-0000065]  Cosgrove was excited about the prospect of Theranos based on what he heard the company could do, and believed Cleveland Clinic was well positioned to test the capabilities of the Theranos machine.  If the device performed well, Cleveland Clinic would have been interested in being among the early implementers of the technology.  Cosgrove met with Holmes six to eight times including during a visit by him to Theranos and a visit by Holmes to the Cleveland Clinic.  Though Cleveland Clinic overall was interested in testing the Theranos technology, some at the Clinic appeared to be skeptical of Theranos's claims.  On September 18, 2014, Theranos hosted Cosgrove and a larger group from Cleveland Clinic for a series of meetings discussing potential collaboration.  [THPFM0001777415]  Cosgrove recalls that

Theranos also came to the Cleveland Clinic to meet with him, and he did not see any equipment or testing devices that they had with them during that visit.  [US-REPORTS-0014814]

On December 19, 2014, Cleveland Clinic entered into a collaboration agreement with Theranos intended to establish a framework in which the parties would work together in furtherance of a long-term strategic alliance to further patient health.  The "current opportunities" for collaboration identified in the agreement included:  the Clinic assisting Theranos in studies of Theranos testing and new Theranos test development; on-site pilot studies involving placement of a Theranos test platform onsite at the Clinic; Theranos setting up and running a CLIA laboratory onsite at the Clinic; use of Theranos testing services for Clinic patients; and cooperation in clinical trials, with the Clinic working with Theranos on prospective studies to demonstrate the performance and impact of the Theranos infrastructure.  [CCF000000003]

From the time the parties entered into the above agreement and the eventual release of the Wall Street Journal article in October 2015, the Clinic's position was that it wanted to receive examples of Theranos technology to test it in their laboratory.  Cosgrove had email discussions regarding specific proposals contingent on the receipt of Theranos's devices.  [CCF000001002; CCF000000257]  If the technology performed well, the Clinic would report it as good.  The Clinic, however, never received a device from Theranos and Cosgrove never received an explanation as to why not.  [US-REPORTS-0014814]

Following the release of the Wall Street Journal article in October 2015, staff at the Cleveland Clinic discussed the need to understand how Theranos was using and testing its technology and get on the same page with Theranos on messaging about their relationship.  [CCF000000950]  Cosgrove remembers reaching out to Holmes and offering to help, and that he mentioned to her at that time that the Clinic was still ready to test Theranos's technology.  [US-REPORTS-0014814]  In response, he received an email from Theranos's in-house attorney providing him with Theranos's "core themes" in responding to the WSJ article.  [CCF000000750]

Cosgrove continued to press Holmes to send the Clinic a Theranos device they could evaluate, but Theranos never sent the device.  After the visit to Theranos in 2016, Cosgrove remembers a rapid decline in communication between the company and the Clinic, and the relationship petered out.  [US-REPORTS-0014814]

Byron Trott runs BDT Capital, and considered investing in Theranos following his introduction to Holmes in September 2014.  [US-REPORTS-0008637]  BDT met with Theranos and began its due diligence work leading up to an investment.  [BDTSEC_SD0001200]  BDT was impressed with the information it received from Theranos about the purported capabilities of its analyzers, but was especially focused on the representation that Theranos would be sending its box device to Cleveland Clinic for evaluation.  Trott wanted this testing to occur before BDT invested so that the Clinic could sign off on the device.  Trott became aware that the Clinic and Theranos announced a joint venture at some point, but that Theranos never sent the Clinic a device.  During the discussions, BDT sent Theranos a document summarizing its view of the company and for potential use with co-investors.  [BDTSEC_PST0005413]  Ultimately, BDT

76

declined to invest in Theranos largely due to Theranos's failure to send any devices to Cleveland Clinic for evaluation.  [US-REPORTS-0008637]

David Boies, as a member of Theranos's Board of Directors, also urged Holmes to conduct independent testing of Theranos's analyzers to prove the efficacy of the devices and to answer criticisms.  For example, in August 2016, Theranos published some test results to a limited extent.  Boies was not satisfied by this level of transparency because he believed that four-party testing—comparing Theranos to Quest, LabCorp, and reference labs—was the only way to resolve the doubts about the reliability of Theranos technology.  Theranos management said they were going to conduct that testing in 2015, but they never released the results as far as Boies knows.  At some point, management told Boies that the testing had started but had been held up by a confidentiality agreement.  Boies reported that fellow Board member William Perry also wanted independent testing of Theranos analyzers, i.e., he wanted Theranos to ship the Theranos box out to an independent lab who could confirm its capabilities.  Boies preferred the idea of multi-party testing because he believed it would show equivalent discrepancies between all participants.  When Boies met with representatives from the Wall Street Journal leading up to the publication of the Carreyrou article in October 2015, Boies offered to bring a device to the Wall Street Journal for testing.  He had not discussed this proposal with Theranos management beforehand or obtained approval from Holmes to make the offer.  He urged Theranos management to follow through on his offer and received messages that it would be done, but Theranos subsequently delayed and never ended up sending a device to the WSJ for evaluation.  Theranos never completed any approach for outside evaluation of its analyzers during Boies's time with the company, which stretched until February 2017.  [See, e.g., US-REPORTS-0009314; SEC-FRISTW-E-0000652; SEC-FRISTW-E-0000850; SEC-USAO-EPROD-004843969]

Dr. Melissa Pessin is the Chair of the department of laboratory medicine at Memorial Sloan Kettering Cancer Center (MSKCC).  Pessin learned of Theranos in 2013 and subsequently engaged in discussions with Theranos about potential collaboration.  MSKCC asked Theranos multiple times if they could place a Theranos analyzer onsite to conduct testing and evaluate its performance.  Theranos responded that it was not willing to take that step.  Later, Theranos offered to place a device at MSKCC with a Theranos employee running it, but that would have required a local, New York doctor.  [US-REPORTS-0017494]

Erin Edgar is a retired U.S. Army Colonel and had dealings with Theranos in connection with a potential collaboration with the military.  [US-REPORTS-0014994]  Edgar served as the command surgeon working for General Mattis and oversaw how CENTCOM would take care of casualties.  Edgar learned about Theranos in 2011 when Mattis sent him an email about the company and Holmes.  Edgar eventually met with Holmes at Theranos and was impressed by Holmes's claims about the technology.  [TS-0324480; TS-0326862; TS-0326863]  Edgar and Mattis were in agreement that the military should move forward with a pilot of the Theranos technology.  From that point forward, however, Edgar felt like Theranos was stalling for the following year and a half.  Edgar was trying to get one of Theranos's machines to conduct testing and Holmes would respond with promises that he was the company's top priority.  Still, he was kept waiting for the device.  [US-REPORTS-0014994]  Even when Edgar left to go to Fort Detrick, the Theranos project still was not moving forward, and Mattis expressed regret when he

77

retired in the first part of 2013 that the Theranos project had not gotten off the ground. Edgar had some further discussions with Theranos about working with the military's Institute of Surgical Research, but Edgar does not believe Theranos ever sent a machine to the ISR or to Fort Bragg. [US-REPORTS-0014994; TS-0324567] After an additional visit to Theranos where Edgar had a finger-stick blood draw done but never received the results, he began to lose hope that Theranos would follow through and send an analyzer for testing. Though CENTCOM was always ready to accept Theranos devices for evaluation, Theranos never sent a device to go to the field. Edgar's last contact with Holmes was in early 2013. At that time, he was still asking her when he would receive the Theranos device. She told him "next week," and kept assuring him that CENTCOM was their top priority. [US-REPORTS-0014994]

Dee Anna Smith is CEO of Sarah Cannon Cancer Center and first heard of Theranos and Holmes in 2007 or 2008. She knew Holmes as a "wonder" in the business and understood that Holmes had developed technology that would ease the burden of blood testing for patients. [US-REPORTS-0013566] After Smith met Holmes in 2014 during an event hosted by Bill Frist, Sarah Cannon Research Institute (SCRI) pursued a consulting relationship with Theranos. [SCRI_001324] Smith toured the Theranos facilities and was shown a Theranos blood testing device. [SCRI_001484] SCRI was willing to help Theranos, but felt pressure from Theranos to release a statement to the media that the parties were working together. [SCRI_001272; SCRI_001794] Such a statement ultimately was not issued due to the negative Wall Street Journal article in October 2015. Following the release of that article, Smith believed Theranos needed to counter that narrative by publishing their data, and believed that SCRI had the platform to assist Theranos in that way. [SCRI_001864; SCRI_001290; SCRI_002214; US-REPORTS-0013566] Ultimately, Theranos did not enlist SCRI's help and work with SCRI on generating and publishing data, and Smith did not understand Theranos's reason. SCRI never received the data it requested from Theranos.

In a September 29, 2015 video published by CNBC, Holmes responded to a question about Theranos's lack of peer-reviewed bona fides by stating: "We do it [answer our critics] by submitting to FDA. I mean you look at a peer review journal, someone spends 5 minutes on it, and you release a publication." "And in lab testing there is no higher standard than the FDA. And especially with the work we've done to advocate for individual right to get engaged in the testing process, you can't compromise on that." [MEDIA-000458]

<div align="center">****</div>

The evidence described above is offered for the permitted purpose of motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy.

Evidence that Holmes and Balwani were reluctant or unwilling to provide their devices to independent experts who would test the devices' capabilities tends to show Defendants' knowledge of the problems and weaknesses in Theranos's technology and their related knowledge of the falseness of their representations regarding the capabilities of Theranos's analyzers.

<div align="center">78</div>

Evidence that Defendants repeatedly promised to deliver devices to third parties for independent testing tends to show their intent to defraud by concealing the weaknesses in Theranos's technology.

Evidence that Holmes and Balwani were reluctant to let third parties evaluate their technology but still pursued relationships with third parties tends to show Defendants' motive to associate with other prominent individuals and entities.

Evidence that Holmes and Balwani pursued relationships with prominent third parties with no intention of following through and delivering devices tends to show Defendants' preparation and intent to defraud victims by associating themselves with reputable organizations in an effort to bolster their own credibility.

Evidence that Holmes and Balwani attempted to distract from their failure to allow sufficient independent testing by pointing to possible FDA approval tends to show Defendants' plan and intent to defraud victims by touting FDA approval they knew they had not obtained.

## XX.   **Destruction of the L.I.S. Database.**

The government may offer evidence of the following:

On June 4, 2018, a Grand Jury subpoena was issued as part of a criminal investigation into violations of 18 U.S.C. § 1343, wire fraud, and 18 U.S.C. § 1349, conspiracy to commit wire fraud, to the custodian of records for Theranos, Inc.  (Subpoena produced in discovery on July 23, 2020.)  The subpoena sought:  "The entirety of all blood test lab reports maintained in the L.I.S. [Laboratory Information Systems] database that Theranos provided to its patients."  The subpoena further clarified that the reports should be in the same format as they were originally provided to the patients, and the production of the database should include, a "softcopy or proxy of the L.I.S. database, along with any other proprietary software required to access and search the database."

The L.I.S. database contained patient test result from the time of the company's commercial launch in October 13, 2013, up to July 30, 2016.  (Theranos-DOJ TL000005.)  The L.I.S. database was Theranos's *only* method of storing and maintaining patient data and test results.  (Bates US-REPORTS-0018716–00018717.)  The searchable test result data in L.I.S. could include, among other items, time, doctor, assay type, the specific performing lab, and the type of device used to perform the test.  (*Id.*; Bates Theranos-DOJ TL000005.)  The L.I.S. database was used during quality control checks to compare Theranos patient test results and respond to audits.  (Bates US-REPORTS-0018716–00018717.)  The database also generated reports, and software and lab managers used L.I.S. to generate reports of test results.  (*Id.*)

On June 14, 2018, the government charged Elizabeth Holmes and Ramesh Balwani with wire fraud and conspiracy to commit wire fraud in an eleven-count indictment.  CR 18-258-EJD.

On or about August 28, 2018, lawyers for Wilmer Hale provided a hard drive to the U.S. Attorney's Office, which they represented in a transmittal letter contained a copy of the L.I.S.

database.  (Bates US-REPORTS-0010268 – US-REPORTS-0010273.)  Wilmer Hale attorney Katie Moran provided the password to the encrypted hard drive in an email.  (*See id.*)  All subsequent efforts by the government to access the information on this hard drive have failed.  A computer forensic expert retained by the U.S. Attorney's Office to assist in retrieving this data, Bruce Pixley, found that the "key" file on the hard drive, which would enable the sequel database to be reconfigured, is itself encrypted by a distinct password (not the one provided with the transmittal letter), and cannot be opened.  (*See* Sept. 28, 2020, Pixley Report ("In order to decrypt the backup, a person would need to know the password and have a copy of the 'key' file.")  Without the key file, the data files contained on the hard drive cannot be reconfigured into a sequel server and remain inaccessible.  (*See id.*)

On or about August 28–31, 2018, high-level managers within Theranos, Inc., including David Taylor, authorized the disassembly of the hardware that comprised the L.I.S. database as part of the closing of the company's Newark facility.  For example, in an August 28, 2018, email, Taylor wrote "the system [containing the L.I.S. database] will be put into storage this Friday and may thereafter be very difficult to resuscitate."  (Bates Neetek_000596.)  On or about August 31, 2018, Theranos employees and hired consultants took apart the hardware comprising the L.I.S. database.  This resulted in the permanent destruction of the database.  (*See id.*; Bates Neetek_000578; Bates US-REPORTS-0016253.)

High-level members of the company had communicated about this process over emails leading up to the date of the destruction, indicating that they knew that once the hardware was taken apart, the database would no longer be accessible.  (*See generally* Bates Neetek_000001–001100; *see also* Neetek_000596.)  High-level managers were also aware that the IT support staff who had copied the database onto the hard drives provided to the government in response to the subpoena did *not* have the password needed to decrypt the information contained on the hard drives.  (*See, e.g.*, Bates Neetek_000746, Neetek_000815–000817, Neetek_000855.)  For example, in emails dated July 18, 2018, and July 24, 2018, Theranos counsel Xan White informed senior leaders in Theranos—including David Taylor—that the copied database produced in response to the litigation request, "appears to require passwords that Antti alone may have."  (Bates Neetek_000817, Neetek_000855.)  According to emails, on or about August 8, 2018, Eric Caddenhead contacted former Theranos IT employee Antti Korhonen in an attempt to obtain the additional password.  (Neetek_000811; Neetek_000746.)

In an interview, Korhonen recalled being contacted by Caddenhead on behalf of Theranos in early August 2018.  Caddenhead asked him for the password that would access the master key file of the L.I.S. database, but Korhonen was unable to provide one that worked.  (Bates US-REPORTS-0017922.)  Caddenhead recalled during an interview that he told Michael Chung (who was an IT consultant hired to manage the Newark shutdown) in approximately August 2018 that if they took the L.I.S. database apart they would not be able to access it again because the encryption key would be lost.  (Bates US-REPORTS-0016253.)  In an interview, Chung recalled that he had meetings with John McChesney and others at Theranos to explain that once the servers were turned off, then a forensic team would be needed to recover the data on the LIS, but nobody on their team knew how to do this or if it would even be possible.  (Bates US-REPORTS-0016262–US-REPORT-0016265.)

In other words, senior managers within Theranos were aware that the hard drive provided to the government in response to the June 4, 2018, Grand Jury subpoena was inaccessible and useless when they authorized the destruction of the L.I.S. hardware in August 2018.

In addition to being inextricably intertwined with the offense, the above evidence is admissible under Rule 404(b) to show knowledge, intent, absence of mistake, and lack of accident. Specifically, destruction of the one database that stored all of Theranos's patient test records demonstrates consciousness of guilt. It tends to show that Theranos's highest managers participated in the destruction of a critical piece of evidence after a Grand Jury subpoena had been issued for this evidence and after the criminal case had been charged. The evidence demonstrating the destruction of the database also puts into context the patient test results that the government does have and tends to show that these inaccurate results were not one-off accidents or mistakes. Indeed, the destruction of the database places the government's evidence in context as part of a larger fraud scheme, one which Theranos was attempting to hide and conceal even after the indictment in this case.

## XXI.  **Obtaining personal benefit from position at Theranos.**

The government may offer evidence of the following:

Between 2010 and 2016, Holmes was paid hundreds of thousands of dollars and held Theranos securities valued in the billions of dollars. *See, e.g.,* PFM-ROGS-00000040. The evidence is offered for the permitted purpose of motive, intent, preparation, plan, knowledge, absence of mistake, and lack of accident. Holmes's financial stake and receipt of benefits from Theranos tend to show she had a financial incentive to commit the offenses, exercised control over Theranos, and was aware of its activities. It disproves Holmes's pubic suggestion and investor pitch that she was not motivated by money and acted for altruistic purposes. *See, e.g.,* SEC-USAO-EPROD-002625245. ████████████████████████████

Balwani's compensation is likewise offered to prove motive and intent.

In 2014, Holmes had her Theranos-paid assistants run personal errands, perform personal tasks, and purchase luxury goods, in communications often mingled with Theranos business. *See, e.g.,* SEC-USAO-EPROD-001175694; SEC-USAO-EPROD-001175665 (6/2014 emails from assistant Lisa Durkin to Holmes regarding Yellowstone Weekend, picking up Apple adapter, checking for Donna Karan thigh highs, picking up sheets, and purchasing Chanel pearl necklace); SEC-USAO-EPROD-001176349 (6/2014 email from Durkin to Holmes regarding purchase of pillow cases, lipstick, jewelry, fine wine, and Hermes and Birkin bags, as well as ELISA and HSV meeting and Parloff interview); SEC-USAO-EPROD-001204153 (10/28/2014 email from Durkin to Holmes regarding Theranos business and purchase of Mason Pearson brushes, Tom Ford shoes, fine wine, trips to Neiman Marcus, and research of bungalows in Hawaii); SEC-USAO-EPROD-001204223 (10/24/2014 email from Durkin to Holmes regarding meetings regarding CLIA and HSV2 and trips to Hermes and Neiman Marcus, modifications for a private shower in her bathroom, *Fortune* article reprints, wine purchases, Jimmy Choo shoes, Gucci items, and Tom Ford boots); SEC-USAO-EPROD-001204256 (10/22/2014 email from Durkin to Holmes regarding same, plus flights on corporate jet); SEC-USAO-EPROD-

81

001205188 (9/4/2014 email from Durkin to Holmes reporting she will go to Armani, Gucci, Chanel, Hermes and Bloomingdales – and reporting on investor presentations); SEC-USAO-EPROD-001205215 (8/30/2014 Durkin/Holmes email discussing food delivery to house, Hermes belts, new wallet, certain stylists, manicures at the Four Seasons, and meeting Cleveland Clinic CEO Delos Cosgrove); SEC-USAO-EPROD-001205225 (similar 8/29/2014 email); SEC-USAO-EPROD-001205336 (similar 8/25/2014 email); SEC-USAO-EPROD-001205348 (8/23/2014 email from Durkin to Holmes regarding Gucci, Hermes, Neiman's, and work items); SEC-USAO-EPROD-001206267 (6/28/2014 email reflecting scheduling of meeting with investment bankers, TV and media interviews, TedMed speech, Intermountain business, CLIA lab update, calls with investor, estimates for jet to Nashville); SEC-USAO-EPROD-001314378 (Durkin to-do list on or about 1/15/2014 regarding food delivery from Four Seasons and calling Neiman Marcus); SEC-USAO-EPROD-001043591 (10/2/2014 email from Durkin describing support for Holmes).

The evidence is offered for the permitted purpose of motive, intent, preparation, plan, knowledge, absence of mistake, and lack of accident. Holmes's receipt of benefits from Theranos tends to show she had a financial incentive to commit the offenses. It tends to show she coveted fame and luxury goods and disproves Holmes's pubic suggestion and investor pitch that she was not motivated by money and acted for altruistic purposes. The evidence tends to show she exercised control over Theranos, and was aware of its activities. ████████████████████████████████████████████████████████████████████████████████████ ████████████████████████

Throughout the time period of the conspiracy, Holmes closely monitored daily news to cultivate her image and coveted fame and media attention. *See, e.g.*, SEC-USAO-EPROD-001198532 (10/25/2014 17-page "media grid); SEC-USAO-EPROD-001212249; SEC-USAO-EPROD-002625245; SEC-USAO-EPROD-002787868; SEC-USAO-EPROD-003188132; SEC-USAO-EPROD-005053153; SEC-USAO-EPROD-000723875; SEC-USAO-EPROD-001198532; US-FDA-0038921. The evidence is offered for the permitted purpose of motive, intent, preparation, plan, knowledge, absence of mistake, and lack of accident. Evidence Holmes achieved fame and media attention tends to show motive and disproves Holmes's pubic suggestion and investor pitch that she was not motivated by money or acted for altruistic purposes. The evidence tends to show she exercised control over Theranos, and was aware of its activities. ████████████████████████████████████████████████████████████████████

Throughout the time period of the conspiracy, Holmes ingratiated herself with board members and others who might benefit her with gifts. *See, e.g.*, SEC-USAO-EPROD-001202724 (1/21/2015 Durkin/Holmes email re gifts). She also closely monitored details of board dinners to create the appearance of success and patriotism and to manage the information they received and followed. *See, e.g.*, SEC-USAO-EPROD-001203150 (1/13/2015 email regarding specific details of board meeting); SEC-USAO-EPROD-001204258 (10/22/2014 Durkin/Holmes email monitoring board binders and notes). The evidence is offered for the permitted purpose of motive, intent, preparation, plan, knowledge, absence of mistake, and lack of accident. The evidence tends to show she exercised control over Theranos, and was aware of

its activities. ██████████                ████████████████████
██████████████████████████████████

During the fraud, Holmes traveled on corporate jets and in luxury vehicles and stayed in luxury hotels. *See, e.g.*, SEC-USAO-EPROD-001314171 (1/27/2015 travel on Flite logistics aircraft and landmark limousine); SEC-USAO-EPROD-002150649 (discussing search for best five star hotels, whether another suite needs to be reserved for Balwani, invite to Clinton Foundation, and internal Theranos meetings); SEC-USAO-EPROD-003730862; SEC-USAO-EPROD-003730866. The evidence is offered for the permitted purpose of motive, intent, preparation, plan, knowledge, absence of mistake, and lack of accident. Holmes's receipt of benefits from Theranos tends to show she had a financial incentive to commit the offenses, exercised control over Theranos, and was aware of its activities. It disproves Holmes's pubic suggestion and investor pitch that she was not motivated by money or acted for altruistic purposes. ██████████████████████████████████████████████████
██████████████████████████████████

In or around September 2014, Holmes suggested at a TedMed conference her uncle's death was the inspiration for Theranos and that he died suddenly. *See, e.g.*, SEC-USAO-EPROD-000705421 (2/28/2016 email from E. Holmes to D. Edlin/E. Holmes stating that uncle's death was not sudden); SEC-USAO-EPROD-001205162. The evidence is offered for the permitted purpose of motive, intent, preparation, plan, knowledge, absence of mistake, and lack of accident. Such evidence disproves Holmes's pubic suggestion and investor pitch that she was not motivated by money and acted for altruistic purposes. ████████████████████████████
██████████████████████████

Balwani's Lamborghini or Porsche bore the license plate DASKAPITAL. US-REPORTS-0013672. The evidence is offered for the permitted purpose of motive and intent.

**XXII. Concealing the romantic relationship between Holmes and Balwani from investors and others.**

The government may offer evidence of the following:

- Testimony by Holmes that she never told investors that she and Balwani had a romantic relationship. SEC-TX-000005499.

- Statements by Callie Rosendin that, sometime between March 2011 and July 2012, despite discouraging interpersonal relationships amongst Theranos employees, Holmes and Balwani were involved in a romantic relationship. Approximately three to four months into Rosendin's employment at Theranos, Balwani went to her and told her to keep his relationship with Holmes quiet. US-REPORTS-0002366.

- Statements by Jeff Blickman that he knew Balwani and Holmes were dating before Blickman started at Theranos. Blickman was under the impression their

83

relationship was not to be talked about with others at Theranos.  Blickman got this direction from Christian Holmes.  US-REPORTS-0009349.

- Statements by Surekha Gangakhedkar that it was well known that Sunny Balwani and Elizabeth Holmes were in a relationship and that they were boyfriend and girlfriend.  Balwani was known to be running the company. The relationship between Holmes and Balwani was not disclosed.  US-REPORTS-0000813.

- Statements by Alex Taylor that he was not aware of any personal relationship between Holmes and Balwani.  Had he been advised of such a relationship, he would have taken it under advisement.  US-REPORTS-0002610.

- Statements by Scott Earthy that he was not aware of a personal relationship between Holmes and Balwani.  Earthy would have liked to have known if Holmes and Balwani had a personal relationship because there could have been a downside if the relationship did not work out.  US-REPORTS-0006026.

- Statements by Jerry Tubergen that he was not aware of a personal relationship between Balwani and Holmes before the investment was made.  Tubergen said he would have wanted to know because the disclosure might have mattered.  US-REPORTS-0008136.

- Statements by Don Lucas that he learned about Holmes and Balwani's relationship through media reports.  He was surprised and said it was material information to know.  Lucas did not invest in husband wife start ups because there is too much drama.  US-REPORTS-0011835.

- Statements by Christian Holmes that, at some point in the 2014/2015 time period, Holmes told him that she was disclosing the relationship to the board.  PFM-DEPO-00015017.

- Statements by Craig Hall to the effect that throughout Hall's interactions with Holmes beginning in or about 2006 and lasting through in or about 2013, Holmes concealed her romantic relationship with Balwani.  US-REPORTS-0007005; US-REPORTS-0007010 to 0007017.

- Statements by Dan Mosley to the effect that throughout Mosley's interactions with Holmes beginning in or about 2014 and lasting through in or about 2016, Holmes concealed her romantic relationship with Balwani.  US-REPORTS-0002767; US-REPORTS-0002776 to 0004299.

Holmes caused the distribution of a *New Yorker* article to members of the board and investors stating:  "Her home is a two-bedroom condo in Palo Alto, and she lives an austere life. Although she can quote Jane Austen by heart, she no longer devotes time to novels or friends, doesn't date, doesn't own a television, and hasn't taken a vacation in ten years."  SEC-USAO-

84

EPROD-000068053; SEC-USAO-EPROD-000068054; SEC-USAO2-EPROD-000041814; SEC-USAO2-EPROD-000041815; SEC-USAO-EPROD-001224372.

*** 

The evidence is offered for the permitted purpose of motive, intent, preparation, plan, knowledge, absence of mistake, and lack of accident, as well as the existence of the conspiracy. Among other things, evidence that Holmes and Balwani did not disclose the relationship tends to show the agreement and joint plan.  Such evidence tends to show intent – Holmes and Balwani feared that if investors knew it would raise questions about Balwani's role and qualifications. Such evidence is relevant to consciousness of guilt – public knowledge would undermine Holmes's public image that she lived an austere life devoted only to Theranos.  Such evidence is relevant to the materiality of statements made to investors.  Such evidence is also related to claims that Holmes and/or Balwani relied on the other and/or claims that because of a mental disease or defect she was unable to form intent to defraud.

*** 

The government reserves the right to introduce additional evidence covered by its previous disclosures, and further reserves the right to amend this notice in advance of trial based on its continuing investigation and trial preparation.

<div style="margin-left: 40%">

Very truly yours,

ADAM A. REEVES
Attorney for the United States,
Acting Under Authority Conferred
By 28 U.S.C. § 515

/s/

_____
ROBERT S. LEACH
JEFFREY SCHENK
JOHN C. BOSTIC
VANESSA BAEHR-JONES
Assistant United States Attorneys

</div>

Cc      Jeffrey Coopersmith, Esq. (by email)

# Exhibit 2



*United States Attorney*
*Northern District of California*

*1301 Clay Street, Suite 340S*      *(510) 637-3680*
*Oakland, California 94612*      *Fax  (510) 637-3724*

April 3, 2020

*By Email*

Lance Wade, Esq.
Kevin Downey, Esq.
Katie Trefz, Esq.
Amy Saharia, Esq.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, DC  20005

      Re:    *United States v. Holmes & Balwani*, CR 18-258 EJD

Dear Counsel,

      I write in response to your March 23, 2020 letter.  The government's Rule 404(b) notices are sufficient and satisfy the requirements of the local rule.  Our March 6, 2020 letter in particular provides sufficient detail such that the Court may rule on the admissibility of the proffered evidence.  We dispute any claim that you are surprised by any of the matters set forth in the March 6, 2020 letter.  We have sent you no fewer than sixteen discovery letters since July 2018 stating:  "The government also hereby gives notice that it may seek to introduce the other crimes, wrongs or acts committed by defendant which are referenced in the enclosed documents pursuant to Rules 404(b), 608 and/or 609 of the Federal Rules of Evidence."  We also dispute any claim that the government's Rule 404(b) disclosures significantly or unexpectedly "expand" the case.  Indeed, much of the March 6, 2020 letter and the matters set forth below are not properly considered 404(b) evidence but instead are disclosed out of an abundance of caution and to avoid surprise about the government's intentions.  By providing this disclosure, the government is not conceding that the evidence described below (or previously) is admissible only under the provisions of Rule 404(b).  The government may also assert that this evidence is admissible as direct evidence of the charged conduct, that it is inextricably intertwined with the events charged in the operative Indictment, that it shows a continuing course of conduct otherwise admissible under Rules 401 and 402, or that it simply is not subject to Rule 404(b).

      With that in mind, we supplement our prior disclosures as follows:

1

**False and misleading representations directed at insured patients.**

The government may call the following individuals: ███████████████. ████████████████████████████████████████████████████████████ ████████, and █████████. Their prior statements have been produced to you or are attached. The government may elicit testimony from them as set forth in such statements. The government may offer as exhibits the documents attached to and/or referenced in such prior statements, as well as records produced in discovery relating to tests Theranos performed for such insured patients (or ordered by their physicians) and/or complaint logs, including, without limitation:

SEC-USAO-EPROD-000715459
SEC-USAO-EPROD-000772753
SEC-USAO-EPROD-000853289
SEC-USAO-EPROD-000877519
SEC-USAO-EPROD-000877524
SEC-USAO-EPROD-000877573
SEC-USAO-EPROD-001283843
SEC-USAO-EPROD-001357766
SEC-USAO-EPROD-002185369
SEC-USAO-EPROD-002185371
SEC-USAO-EPROD-002190318
THPFM0004992347
TS-0231006
TS2-0000002

SEC-USAO-EPROD-002756209

US-FDA-0035497
US-FDA-0035498
US-FDA-0035499
US-FDA-0035500
US-FDA-0035501
US-FDA-0035502
US-FDA-0040555
SEC-USAO-EPROD-000402791
SEC-USAO-EPROD-000957089
SEC-USAO-EPROD-001257940
SEC-USAO-EPROD-001258104
SEC-USAO-EPROD-001266264
SEC-USAO-EPROD-001266297
SEC-USAO-EPROD-001274832
SEC-USAO-EPROD-001756237
SEC-USAO-EPROD-002702412
SEC-USAO-EPROD-003080215
SEC-USAO-EPROD-003985757

2

SEC-USAO-EPROD-003985822
SEC-USAO-EPROD-004870058

SEC-USAO-EPROD-000388965
SEC-USAO-EPROD-000402267
SEC-USAO-EPROD-000402268
SEC-USAO-EPROD-000402269
SEC-USAO-EPROD-000404900
SEC-USAO-EPROD-000563810
SEC-USAO-EPROD-000841020
SEC-USAO-EPROD-000950922

SEC-USAO-EPROD-000950923
SEC-USAO-EPROD-001349287
SEC-USAO-EPROD-001354559
SEC-USAO-EPROD-002319700
SEC-USAO-EPROD-006000512
SEC-USAO-EPROD-002573419
THER-1491275
THER-1491276

SEC-USAO-EPROD-000881245

SEC-USAO-EPROD-000879453
SEC-USAO-EPROD-000997304
SEC-USAO-EPROD-001289817
SEC-USAO-EPROD-002101857
SEC-USAO-EPROD-002383092
SEC-USAO2-EPROD-000177859
THPFM0003755688
THPFM0003826459
THPFM0004069370
THPFM0004509162
THPFM0004545609
THPFM0004653568

SEC-USAO-EPROD-000656798
SEC-USAO-EPROD-000400993
SEC-USAO-EPROD-000564319
SEC-USAO-EPROD-000656798
SEC-USAO-EPROD-002756209
SEC-USAO-EPROD-003070238
SEC-USAO-EPROD-004601915

THPFM0000018472

3

**False and misleading representations directed at doctors.**

The government may call the following individuals:  Gerald Asin, Jessica Bramstedt, JoEllen Embry, Raymond Embry, Steven Linnerson, Curtis Pages, Edward Szmuc, and Audra Zachman.  Their prior statements have been produced to you or are attached.  The government may elicit testimony from them as set forth in such statements.  The government may offer as exhibits the documents attached to and/or referenced in such interview reports, as well as records produced in discovery memorializing representations to doctors, including, without limitation:

    TS-1078095
    TS-1076614-16
    THPFM0000003941
    THPFM0002747643
    THPFM0005008026
    SEC-USAO-EPROD-000638580
    TS-1124314
    THPFM0003759724
    THPFM0003759624
    THPFM0000555315
    THPFM0000958955
    THPFM0000147443
    THPFM0000204033

**False and misleading representations made to Theranos's Board of Directors.**

The government may call the following individuals from Theranos' board:  Riley Bechtel, David Boies, William Frist, Henry Kissinger, Richard Kovacevich, James Mattis, Sam Nunn, William Perry, Channing Robertson, Gary Roughead, Robert Shapiro, and George Shultz.  Any prior statements to the government, and any known prior statements in the PFM, Colman, Arizona class action, or SEC proceedings, have been produced to you.  The government may elicit testimony from them as set forth in such statements.  The government may offer as exhibits the documents attached to and/or referenced in such prior statements as well as records produced in discovery memorializing misrepresentations or relating to board members, including, without limitation:

    PFM-DEPO-00010593-785
    PFM-DEPO-00014157-14227
    PFM-DEPO-00011053
    PFM-GJ-00000926
    SEC-USAO-EPROD-000009206
    SEC-USAO-EPROD-000009214
    SEC-USAO-EPROD-000009399
    SEC-USAO-EPROD-000010407
    SEC-USAO-EPROD-000012357
    SEC-USAO-EPROD-000017769
    SEC-USAO-EPROD-000027830

4

SEC-USAO-EPROD-000027998
SEC-USAO-EPROD-000032043
SEC-USAO-EPROD-000048468
SEC-USAO-EPROD-000048795
SEC-USAO-EPROD-000049227
SEC-USAO-EPROD-000050361
SEC-USAO-EPROD-000050812
SEC-USAO-EPROD-000051124
SEC-USAO-EPROD-000066325
SEC-USAO-EPROD-000066358
SEC-USAO-EPROD-000066368
SEC-USAO-EPROD-000066488
SEC-USAO-EPROD-000070593
SEC-USAO-EPROD-000070623
SEC-USAO-EPROD-000070643
SEC-USAO-EPROD-000070646
SEC-USAO-EPROD-000070661
SEC-USAO-EPROD-000128843
SEC-USAO-EPROD-000128929
SEC-USAO-EPROD-000129052
SEC-USAO-EPROD-000130080
SEC-USAO-EPROD-000429472
SEC-USAO-EPROD-002055775
SEC-USAO-EPROD-002629438
SEC-USAO-EPROD-002629781
SEC-USAO-EPROD-002629788
SEC-USAO-EPROD-002629796
SEC-USAO-EPROD-002629816
SEC-USAO-EPROD-002629820
SEC-USAO-EPROD-002629831
SEC-USAO-EPROD-002629843
SEC-USAO-EPROD-002629858
SEC-USAO-EPROD-002642562
SEC-USAO-EPROD-002642572
SEC-USAO-EPROD-002642580
SEC-USAO-EPROD-002642600
SEC-USAO-EPROD-003440256
SEC-USAO-EPROD-003441064
SEC-USAO-EPROD-003441405
SEC-USAO-EPROD-003966821
SEC-USAO-EPROD-004887198
SEC-USAO-EPROD-004888406
SEC-USAO-EPROD-004888426
SEC-USAO-EPROD-005786938
SEC-USAO-EPROD-006000464
SEC-USAO-EPROD-006021872

SEC-USAO2-EPROD-000009903
SEC-USAO2-EPROD-000009911
SEC-USAO2-EPROD-000009919
SEC-USAO2-EPROD-000009928
SEC-USAO2-EPROD-000010968
SEC-USAO2-EPROD-000012225
THER-0325204
THER-0335524
THER-0335796
THER-0335871
THER-0337106
THER-0337130
THER-0337131
THER-0337132
PFM-DEPO-00010632.
PFM-DEPO-00010789.
PFM-DEPO-00010792.
PFM-DEPO-00010643-57 & 793
PFM-DEPO-00010798
PFM-DEPO-00010801
PFM-DEPO-00010802
PFM-DEPO-00010814
PFM-DEPO-00010733
PFM-DEPO-00011002
PFM-DEPO-00011015
PFM-DEPO-00011017
PFM-DEPO-00011080
PFM-DEPO-00011098
PFM-DEPO-00011088
PFM-DEPO-00014176
PFM-DEPO-00014178, 181
PFM-DEPO-00014183,-84
PFM-DEPO-00014186-87
PFM-DEPO-00014196-9799, 14220-21
PFM-DEPO-00014199
SEC-USAO-EPROD-001193899

**False and misleading representations made to Walgreens.**

The government may call the following individuals from Walgreens:  Dan Doyle, Nimesh Jhaveri, Wade Miquelon, Kim Romanski, and Jay Rosen.   Any prior statements to the government, and any known prior statements in the PFM, Colman, Arizona class action, or SEC proceedings, have been produced to you.  The government may elicit testimony from them as set forth in such statements.  The government may offer as exhibits the documents attached to and/or referenced in such prior statements as well as records produced in discovery memorializing misrepresentations or relating to Walgreens, including, without limitation:

6

THER-2436909-45
WAG-TH-DOJ-00021950-988
WAG-TH-DOJ-00021948
WAG-TH_00010182; SEC-TX-000001925-1926
THER-AZ-06326446-500; TS-0906360-414
WAG-TH-00012056-65
WAG-TH-DOJ-00024875-77
WAG-TH-DOJ-00000005-47
WAG-TH-DOJ-00001745-63
WAG-TH-DOJ-00000181-210
WAG-TH-DOJ-00002825-36
PFM-DEPO-00018573
WAG-TH-00006788
WAG-TH-00006801
WAG-TH-00006827
WAG-TH-00002500-WAG-TH-00002514
WG002257-WG002259
WAG-TH-DOJ-00000040
WAG-TH-DOJ-00001748
SEC-TX-000001511
WAG-TH-00006788
WAG-TH-00006792
WAG-TH- 00009707
WAG-TH-00000216
WAG-TH-00006827
WAG000319

**False and misleading representations made to Safeway.**

The government may call the following individuals:  Steve Burd and Robert Gordon.
Any prior statements to the government, and any known prior statements in the PFM, Colman,
Arizona class action, or SEC proceedings, have been produced to you.  The government may
elicit testimony from them as set forth in such statements.  The government may offer as exhibits
the documents attached to and/or referenced in such prior statements as well as records produced
in discovery memorializing misrepresentations and relating to Safeway, including, without
limitation:

PFM-DEPO-00017581
SEC-TX-000003066
SEC-USAO-EPROD-000016526
SEC-USAO-EPROD-000016615
SEC-USAO-EPROD-000016617
SEC-USAO-EPROD-000016667
SEC-USAO-EPROD-000016732
SEC-USAO-EPROD-000016742

7

SEC-USAO-EPROD-000016743
SEC-USAO-EPROD-000016745
SEC-USAO-EPROD-000016746
SEC-USAO-EPROD-000016756
SEC-USAO-EPROD-000016774
SEC-USAO-EPROD-000016776
SEC-USAO-EPROD-000016779
SEC-USAO-EPROD-000016783
SEC-USAO-EPROD-000016790
SEC-USAO-EPROD-000016792
SEC-USAO-EPROD-000016803
SEC-USAO-EPROD-000016804
SEC-USAO-EPROD-000016806
SEC-USAO-EPROD-000016810
SEC-USAO-EPROD-000016831
SEC-USAO-EPROD-000016850
SEC-USAO-EPROD-000035825
SEC-USAO-EPROD-000036124
SEC-USAO-EPROD-000036142
SEC-USAO-EPROD-000055893
SEC-USAO-EPROD-000122112
SEC-USAO-EPROD-000122116
SEC-USAO-EPROD-000122138
SEC-USAO-EPROD-000122157
SEC-USAO-EPROD-000122171
SEC-USAO-EPROD-000122203
SEC-USAO-EPROD-000122204
SEC-USAO-EPROD-000122217
SEC-USAO-EPROD-000122331
SEC-USAO-EPROD-000122498
SEC-USAO-EPROD-000122718
SEC-USAO-EPROD-000122823
SEC-USAO-EPROD-000122912
SEC-USAO-EPROD-000122928
SEC-USAO-EPROD-000122929
SEC-USAO-EPROD-000122930
SEC-USAO-EPROD-000122934
SEC-USAO-EPROD-000122934
SEC-USAO-EPROD-000124996
SEC-USAO-EPROD-000125159
SEC-USAO-EPROD-000125163
SEC-USAO-EPROD-000132870
SEC-USAO-EPROD-000403646
THPFM0005638605
THPFM0005638609
THPFM0005638615

THPFM0005638641
PFM-DEPO-00017722
PFM-DEPO-00017746
PFM-DEPO-00017807
PFM-DEPO-00017819
PFM-DEPO-00017821
PFM-DEPO-00017852
PFM-DEPO-00017853

**False and misleading representations made to journalists.**

The government may call the following individuals:  Dan Edlin, Roger Parloff, Caitlin Roper, and Eric Topol.  Any prior statements to the government, and any known prior statements in the PFM, Colman, Arizona class action, or SEC proceedings, have been produced to you.  The government may elicit testimony from them as set forth in such statements.  The government may offer as exhibits the documents attached to and/or referenced in such prior statements as well as records produced in discovery memorializing representations to journalists, including, without limitation:

All documents Bates numbered PARLOFF including all recordings produced by Roger Parloff
Article, Wired, What health care needs is a real-time snapshot of you, Daniela Hernandez 11/6/2013
Article, Fortune, New blood, Roger Parloff, June 2014
Article, Forget Vials of Blood - New Tests Require Just One Drop: How a Stanford Dropout is revolutionizing the blood-testing industry, Liana Aghajanian
Article, Brand Channel, Breakthrough branding: Theranos, with Walgreens, Revolutionizes Healthcare, Sheila Shayon, 2/3/2015
Article, CNN, She's America's youngest female billionaire - and a dropout, 10/16/2014
Article, Wall Street Journal, Elizabeth Holmes: The Breakthrough of Instant Diagnosis, Joseph Rago, 9/8/13
Article, PR Newswire, Elizabeth Holmes, visionary silicon valley entrepreneur and passionate advocate…. 2015 Horatio Alger Award, 12/4/2014
Article, Economist, Holmes is where the heart is, 6/27/2013
Article, Singularity Hub Small fast and cheap Theranos is the poster child of med tech - and it's at Walgreens, Cameron Scott, 11/19/2013
Article & Video, Medscape Creative Disruption? She's 29 and Set to Reboot Lab Medicine - Elizabeth Holmes Plans to revolutionize testing by using tiny blood draws and offering near-instantaneous results, Eric Topol 11/18/2013
Video, Betting big on lab tests, 11/27/2013
Article, Wired, One drop infinite data, Caitlin Roper, March 2015
Theranos Twitter 11/2/2015
Article, The New Yorker, Ken Aueletta, Blood, Simpler, December 8, 2014
9/2014:  Holmes TEDMED interview
10/8/2014:  Holmes interview at Fortune Most Powerful Women
12/8/2014:  Holmes interview at Fortune Most Power Women

9

4/16/2015:  Holmes on CBS News
4/27/2015:  Holmes Interview with Jim Cramer
6/3/2015:  Holmes Interview with Charlie Rose
9/30/2015:  Holmes Interview with Bill Clinton
10/15/2015:  Holmes on Mad Money (Jim Cramer)
10/21/2015:  Holmes interview with WSJ (Jonathan Krim).
11/2/2015:  Holmes interview with Fortune (Alan Murray)
2016:  Today show interview
All articles/videos/media referenced in the government's bill of particulars
SEC-USAO-EPROD-000972051
SEC-USAO-EPROD-000972062
SEC-USAO-EPROD-000990339
SEC-USAO-EPROD-000990
SEC-USAO-EPROD-001204430
SEC-USAO-EPROD-000000343
SEC-USAO-EPROD-000000362

**Fostering culture of secrecy and forcing employees and others to sign non-disclosure agreements.**

The government may call the following individuals: Brad Arrington, David Boies, Sarah Cabayan, Erika Cheung, Michael Craig, Andrea Cuppoletti, Diana Dupuy, Dan Edlin, Surekha Gangakhedkar, Christian Holmes, Stefan Hristu, Heather King, Seth Michelson, Wade Miquelon, Roger Parloff, Channing Robertson, Mona Ramamurthy, Jan Reed, Kim Romanski, Jay Rosen, Adam Rosendorff, Callie Rosendin, Tyler Shultz, Daniel Young, and David Zatlan. Any prior statements to the government, and any known prior statements in the PFM, Colman, Arizona class action, or SEC proceedings, have been produced to you.  The government may elicit testimony from them as set forth in such statements.  The government may offer as exhibits the documents attached to and/or referenced in such prior statements as well as records produced in discovery memorializing Holmes and Balwani's fostering a culture of secrecy and forcing employees and others to sign NDAs, including, without limitation:

PFM-DEPO-00000335
PFM-DEPO-00000708
PFM-DEPO-00001061
PFM-DEPO-00001147
PFM-DEPO-00001153
PFM-DEPO-00001164
PFM-DEPO-00001207
PFM-DEPO-00001209
PFM-DEPO-00001211
PFM-DEPO-00004743
PFM-DEPO-00005457

**Restricting access to laboratory areas within Theranos.**

The government may call the following individuals:  Sarah Cabayan, Erika Cheung, Andrea Cuppoletti, Sunil Dhawan, Diana Dupuy, Dan Edlin, Christian Holmes, Kerry Elenatinba-Johnson, Tony Nugent, Jan Reed, Kim Romanski, Adam Rosendorff, and Daniel Young.  Any prior statements to the government, and any known prior statements in the PFM, Colman, Arizona class action, or SEC proceedings, have been produced to you.  The government may elicit testimony from them as set forth in such statements.  The government may offer as exhibits the documents attached to and/or referenced in such prior statements as well as records produced in discovery memorializing or relating to restricting access to laboratory areas within Theranos.

**Harassing, threatening, or otherwise influencing doctors or patients who had negative experiences with Theranos.**

The government may call the following individuals:  David Boies, ▮▮▮▮▮▮▮▮, and Nicole Sundene.  Any prior statements to the government, and any known prior statements in the PFM, Colman, Arizona class action, or SEC proceedings, have been produced to you.  The government may elicit testimony from them as set forth in such statements.  The government may offer as exhibits the documents attached to and/or referenced in such prior statements as well as records produced in discovery memorializing harassment, threats, or other influence of doctors or patients who had negative experiences with Theranos.

**Threatening, influencing, or vilifying journalists in response to negative coverage of Theranos.**

The government may call the following individuals:  David Boies, Brooke Buchanan, Nimesh Jhaveri, Heather King, Rupert Murdoch, and Roger Parloff.  Any prior statements to the government, and any known prior statements in the PFM, Colman, Arizona class action, or SEC proceedings, have been produced to you.  The government may elicit testimony from them as set forth in such statements.  The government may offer as exhibits the documents attached to and/or referenced in such prior statements as well as records produced in discovery memorializing threats, influence, or vilification of journalists in response to negative coverage with Theranos, including, without limitation:

    SEC-USAO-EPROD-002487614
    THER-2507775
    SEC-USAO-EPROD-000536645
    SEC-USAO-EPROD-000034936
    SEC-USAO-EPROD-000034937
    SEC-USAO-EPROD-000536602
    SEC-USAO-EPROD-001045197

**Blaming and vilifying competing companies.**

The government may call the following individuals:  Nimesh Jhaveri, Wade Miquelon, Roger Parloff, Suraj Suksena, and Serena Stewart.  Any prior statements to the government, and any known prior statements in the PFM, Colman, Arizona class action, or SEC proceedings, have been produced to you.  The government may elicit testimony from them as set forth in such statements.  The government may offer as exhibits the documents attached to and/or referenced in such prior statements as well as records produced in discovery memorializing Theranos' blaming and/or vilifying other companies, including, without limitation:

SEC-USAO-EPROD-002757301

**Threatening or intimidating employees and former employees.**

The government may call the following individuals:  Sarah Cabayan, Erika Cheung, Andrea Cuppoletti, Surekha Gangakhedkar, Rochelle Gibbons, Christian Holmes, Kerry Elenatinoba-Johnson, Seth Michaelson, Tony Nugent, Mona Ramamurthy, Callie Rosendin, Adam Rosendorff, Tyler Shultz, Daniel Young, and David Nathan Zalatan   Any prior statements to the government, and any known prior statements in the PFM, Colman, Arizona class action, or SEC proceedings, have been produced to you.  The government may elicit testimony from them as set forth in such statements.  The government may offer as exhibits the documents attached to and/or referenced in such prior statements as well as records produced in discovery memorializing threats or intimidation of employees or former employees, including, without limitation:

PFM-DEPO-00000335
PFM-DEPO-00000708
PFM-DEPO-00001061
PFM-DEPO-00001147
PFM-DEPO-00001153
PFM-DEPO-00001164
PFM-DEPO-00001207
PFM-DEPO-00001209
PFM-DEPO-00001211
PFM-DEPO-00004743
PFM-DEPO-00005457

**False and misleading representations made to FDA, CMS, CDPH, and other regulatory organizations.**

The government may call the following individuals:  Sarah Bennett, Erica Cheung, Sunil Dhawan, Heather King, Courtney Lias, Eileen Norkin, Mark Pandori, Adam Rosendorff, Tyler Shultz, Gary Yamamoto, and Daniel Young.  Any prior statements to the government, and any known prior statements in the PFM, Colman, Arizona class action, or SEC proceedings, have been produced to you.  The government may elicit testimony from them as set forth in such statements.  The government may offer as exhibits the documents attached to and/or referenced

in such prior statements as well as records produced in discovery memorializing representations to and efforts to conceal information from regulators, including, without limitation:

> SEC-USAO2-EPROD-000070971
> TS-1133080
> THPFM0001203524-532
> THPFM0004381689
> THPFM0000154254
> TS-0999042
> THPFM0000154254
> CTRL-DHAWAN-00009861

**Violations of industry standards and government regulations or rules regarding research and development procedures, medical devices and clinical laboratory practices.**

The government may call the following individuals:  Sarah Bennett, Erica Cheung, Sunil Dhawan, Max Fosque, Heather King, Courtney Lias, Mark Pandori, Adam Rosendorff, Tyler Shultz, Gary Yamamoto, and Daniel Young.  Any prior statements to the government, and any known prior statements in the PFM, Colman, Arizona class action, or SEC proceedings, have been produced to you.  The government may present expert testimony on this matter, which has been disclosed to you separately and is incorporated by reference.  The government may offer as exhibits the documents attached to and/or referenced in such prior statements as well as records produced in discovery memorializing violations of industry standards and other regulations, including, without limitation:

> CMS' report on its 2015 inspection and findings and correspondence with Theranos
> Sanctions imposed by CMS on Theranos arising from the 2015 inspection
> TS-1036460
> THPFM0000965933
> THPFM0001944964

**Altering or tampering with third-party medical devices.**

The government may call the following individuals:  Sarah Bennett, Jeff Blickman, Erika Chung, Sunil Dhawan, Dan Edlin, Richard Fernandez, Max Fosque, Sam Gong, Christian Holmes, Mark Pandori, Adam Rosendorff, and Daniel Young.   Any prior statements to the government, and any known prior statements in the PFM, Colman, Arizona class action, or SEC proceedings, have been produced to you.  The government may elicit testimony from them as set forth in such statements.  The government may offer as exhibits the documents attached to and/or referenced in such prior statements as well as records produced in discovery memorializing altering or tampering with third-party medical devices, including, without limitation:

> SEC-TX-000005300
> SEC-TX-000005285
> SEC-USAO-EPROD-000666750

13

TS-0958390
TS-0959027
TS-0959090

**Multiplexing test results and disregarding outliers to mask inconsistency.**

The government may call the following individuals: Sarah Bennett, Erika Chung, Sunil Dhawan, Max Fosque, Arnold Gelb, Christian Holmes, Mark Pandori, Adam Rosendorff, and Daniel Young.  Any prior statements to the government, and any known prior statements in the PFM, Colman, Arizona class action, or SEC proceedings, have been produced to you.  The government may elicit testimony from them as set forth in such statements.  The government may present expert testimony on this matter, which has been disclosed to you separately and is incorporated by reference.  The government may offer as exhibits the documents attached to and/or referenced in such prior statements as well as records produced in discovery memorializing multiplexing test results and disregarding outliers to mask inconsistency, including, without limitation:

THPFM0001388582
THPFM0001389956

**Improperly setting and altering reference ranges.**

The government may call the following individuals: Sarah Bennett, Erika Chung, Sunil Dhawan, Max Fosque, Arnold Gelb, Christian Holmes, Mark Pandori, Adam Rosendorff, and Daniel Young.  Any prior statements to the government, and any known prior statements in the PFM, Colman, Arizona class action, or SEC proceedings, have been produced to you.  The government may offer as exhibits the documents attached to and/or referenced in such prior statements as well as records produced in discovery memorializing improperly setting and/or altering reference ranges, including, without limitation:

THPFM0000057384
THPFM0000195849
THPFM0000829808
SEC-USAO-EPROD-000648943
SEC-USAO-EPROD-006313786

**Withholding critical test results and other important information from doctors and patients.**

The government may call the following individuals: Sarah Bennett, Sunil Dhawan, Max Fosque, Arnold Gelb, Christian Holmes, Mark Pandori, Adam Rosendorff, and Daniel Young. Any prior statements to the government, and any known prior statements in the PFM, Colman, Arizona class action, or SEC proceedings, have been produced to you. The government may elicit testimony from them as set forth in such statements. The government may offer as exhibits the documents attached to and/or referenced in such prior statements as well as records produced

14

in discovery memorializing withholding of critical test results and other important information from doctors and patients, including, without limitation:

THPFM0000277608
THPFM0000277617
THPFM0000017786
TS-1078326
PFM-DEPO-00018911
SEC-USAO-EPROD-000648962
SEC-USAO-EPROD-000650279
SEC-USAO-EPROD-000674427
SEC-USAO-EPROD-000935411
SEC-USAO-EPROD-000935416
SEC-USAO-EPROD-001186148
SEC-USAO-EPROD-001754657
SEC-USAO-EPROD-001898294
SEC-USAO-EPROD-001906221
SEC-USAO-EPROD-004138487
SEC-USAO-EPROD-006000464
THER-0293804

**Declining to conduct or agree to meaningful comparative tests.**

The government may call the following individuals:  David Boies, Skip Burris, William Clarke, Toby Cosgrove, Henry Kissinger, Kandice Marchant, Roger Parloff, Meredith Potter, and Dee Ann Smith.  Any prior statements to the government, and any known prior statements in the PFM, Colman, Arizona class action, or SEC proceedings, have been produced to you.  The government may elicit testimony from them as set forth in such statements.  The government may offer as exhibits the documents attached to and/or referenced in such prior statements as well as records produced in discovery demonstrating Theranos agreeing but ultimately declining to conduct meaningful comparative tests, including, without limitation:

SCRI_001864
SCRI_001291
CCF000000967-970
THPFM0001777415-436
CCF000000208-217
CF000000003-13
CCF000001002
CCF000000257-258
BOIES_THERANOS_0000143
CCF000000950-951
CCF000000952-954
CCF000000750-766
THPFM0000350174-181
TS-0055135

15

CCF000000801-803
TGPS00004008
THPFM0000416534-536
CCF000000014-60
THPFM0000556435
THPFM0004816765-69
THPFM0004816797
SEC-USAO-EPROD-000070593
SEC-USAO-EPROD-000070623
SEC-USAO-EPROD-000070643
SEC-USAO-EPROD-000070661
SEC-USAO-EPROD-000070646
Video:  Elizabeth Holmes October 15, 2015 appearance on *Mad Money*

**Decommissioning Theranos's Laboratory Information System database.**

The government may call David Taylor, Eric Caddenhead, and/or a custodian of records from the Theranos assignee.

**Obtaining personal benefit from position at Theranos.**

The government may call the following individuals:  Carolyn Balkenhol, Brooke Buchanan, Lisa Durkin, Dan Edlin, Season Flores, Kendra Fadil, Christian Holmes, Heather King, Patrick O'Neill, Callie Rosendin, Tyler Shultz, Dee Ann Smith, and Denise Yam.  Any prior statements to the government, and any known prior statements in the PFM, Colman, Arizona class action, or SEC proceedings, have been produced to you.  The government may elicit testimony from them as set forth in such statements.  The government may offer as exhibits the documents attached to and/or referenced in such prior statements as well as records produced in discovery memorializing benefits defendant Holmes received, including, without limitation:

PFM-ROGS-00000040
SEC-USAO-EPROD-000000003
SEC-USAO-EPROD-002795076
SEC-USAO-EPROD-001314378
SEC-USAO-EPROD-001314378
SEC-USAO-EPROD-001176349
SEC-USAO-EPROD-001175694
SEC-USAO-EPROD-001175665
SEC-USAO-EPROD-001206267
SEC-USAO-EPROD-001205348
SEC-USAO-EPROD-001205336
SEC-USAO-EPROD-001082330
SEC-USAO-EPROD-001205225
SEC-USAO-EPROD-001205215
SEC-USAO-EPROD-006053567
SEC-USAO-EPROD-000705421

16

SEC-USAO-EPROD-000723875
SEC-USAO-EPROD-001198532
SEC-USAO-EPROD-001205188
SEC-USAO-EPROD-001205162
SEC-USAO-EPROD-001043591
SEC-USAO-EPROD-001204256
SEC-USAO-EPROD-001204258
SEC-USAO-EPROD-001204223
SEC-USAO-EPROD-001204153
SEC-USAO-EPROD-001203150
SEC-USAO-EPROD-001202724
SEC-USAO-EPROD-001212249
SEC-USAO-EPROD-001314171
SEC-USAO-EPROD-001202480
SEC-USAO-EPROD-002150649
SEC-USAO-EPROD-002625245
SEC-USAO-EPROD-002787868
SEC-USAO-EPROD-003188132
SEC-USAO-EPROD-005053153
US-FDA-0038921
SEC Investigative Testimony Exhibit 210
Theranos' general ledger and tax returns

**Concealing the romantic relationship between Holmes and Balwani from investors and others.**

The government may call the following individuals:  Peter Anderson, Jeff Blickman, Davis Boies, Mark Campbell, Dan Edlin, Alan Eismann, William Frist, Brian Grossman, Chris Lucas, Craig Hall, Jared Hutchings, Heather King, Henry Kissinger, Dan Mosley, James Mattis, Tony Nugent, Roger Parloff, William Perry, Lisa Peterson, Callie Rosendin, Gary Roughead, George Shultz, Brian Tolbert, and Lisa Zuckerman.  Any prior statements to the government, and any known prior statements in the PFM, Colman, Arizona class action, or SEC proceedings, have been produced to you.  The government may elicit testimony from them as set forth in such statements.  The government may offer as exhibits the documents attached to and/or referenced in such prior statements as well as records produced in discovery relating to the concealment of the romantic relationship between Holmes and Balwani, including, without limitation:

SEC-USAO-EPROD-005800653
SEC-USAO2-EPROD-000041814
SEC-USAO2-EPROD-000041815
SEC-USAO-EPROD-000068053
SEC-USAO-EPROD-000068054
SEC-TX-000003320

***

17

The government reserves the right to introduce additional evidence covered by its previous disclosures, and further reserves the right to amend this notice in advance of trial based on its continuing investigation and trial preparation.

Very truly yours,

ADAM A. REEVES
Attorney for the United States,
Acting Under Authority Conferred
By 28 U.S.C. § 515

/s/
_____
ROBERT S. LEACH
JEFFREY SCHENK
JOHN C. BOSTIC
VANESSA BAEHR-JONES
Assistant United States Attorneys

Cc      Jeffrey Coopersmith, Esq. (by email)

18

# Exhibit 1



**U.S. Department of Justice**

*United States Attorney*
*Northern District of California*

---

*150 Almaden Boulevard, Suite 900*                    *(408) 535-5061*
*San Jose, California 95113*                          *Fax:(408) 535-5066*

March 6, 2020

**VIA EMAIL**

Lance Wade
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, DC 20005

Jeffrey B. Coopersmith
Orrick Herrington & Sutcliffe LLP
701 5th Avenue, Suite 5600
Seattle, WA 98104-7097

   Re: <u>United States v. Elizabeth Holmes and Ramesh "Sunny" Balwani</u>
     CR-18-00258-EJD
     Notice re Government's Intent to Introduce Certain Evidence

Dear Counsel:

  We write to provide notice that the government may seek to introduce certain evidence in its case in chief in the above-referenced matter.  This evidence is relevant to the charges in this case and is admissible to show, among other things, Defendants' motive, opportunity, intent, preparation, plan, knowledge, identity, consciousness of guilt, or absence of mistake or accident. See Fed. R. Evid. 404(b).

  Please note that, by providing this disclosure, the government is not conceding that this evidence is admissible only under the provisions of Rule 404(b).  The government may also assert that this evidence is admissible as direct evidence of the charged conduct, that it is inextricably intertwined with the events charged in the operative Indictment, or that it shows a continuing course of conduct otherwise admissible under Rules 401 and 402.

  The facts summarized below are supported by the evidence in the government's discovery production, including witness statements as reflected in summary memoranda and source documents such as emails, laboratory reports, and business records.

  This notice supplements the previous 404(b) disclosures that have accompanied the government's discovery productions in this case.  The government reserves the right to introduce additional evidence covered by those previous disclosures, and further reserves the right to amend this notice in advance of trial based on its continuing investigation and trial preparation.

1

1. **False and misleading representations directed at insured patients.**  As part of Defendants' scheme to defraud patients, they falsely represented to patients that Theranos's tests were accurate, reliable, and suitable for use in the clinical context, when Defendants knew that Theranos's tests were not properly validated and suffered from accuracy problems that rendered them unreliable and not suitable for informing clinical treatment decisions.  Defendants caused Theranos to misrepresent the accuracy and reliability of its tests in advertisements and other promotional materials distributed electronically and in print, and further misled patients as to the nature of Theranos's tests by offering their tests for use in the clinical context, necessarily implying that Theranos's tests could be relied upon for medical decision-making.  Patients who questioned or complained about Theranos's test results were falsely told that the company was having temporary, isolated problems with individual assays, were falsely assured that Theranos's tests could be relied upon, or were given other excuses that masked the limitations of Theranos's technology.  Defendants also misled insured and uninsured patients regarding the methods of blood collection used by Theranos, causing patients to believe that they could have any blood test performed using a finger-stick when Theranos relied on vein draws for a substantial portion of its tests.  These misrepresentations were directed at all potential customers of Theranos, including patients with and without medical insurance that might cover the cost of Theranos's tests.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, doctors and patients who patronized Theranos, marketing personnel employed or retained by Theranos, and former employees of Theranos.

2. **False and misleading representations directed at doctors.**  As part of Defendants' scheme to defraud patients, they falsely represented to doctors that Theranos's tests were accurate, reliable, and suitable for use in the clinical context, when Defendants knew that Theranos's tests were not properly validated and suffered from accuracy problems that rendered them unreliable and not suitable for informing clinical treatment decisions. Defendants' misrepresentations came in multiple forms, including advertising and promotional materials distributed electronically and in print, directed at doctors and health professionals acting as patient representatives who would later advise patients as to which blood testing services they should use.  Defendants also caused misrepresentations to be directed at doctors during real-time conversations between doctors and Theranos representatives.  For example, Dr. Linnerson in the Phoenix area was falsely told by Theranos representatives that the company's tests had obtained FDA approval.  Similarly, doctors who questioned or complained about Theranos's test results were falsely told that the company was having temporary, isolated problems with individual assays, were falsely assured that Theranos's tests could be relied upon, or were given other excuses that masked the limitations of Theranos's technology.  Other doctors were deceived as to the equipment and methods used for Theranos's tests, with the company withholding information necessary for doctors to place those test results in context.  See below. Defendants also misled doctors regarding the methods of blood collection used by Theranos, causing doctors to believe that patients could have any blood test performed using a finger-stick when Theranos relied on vein draws for a substantial portion of its tests.  Similarly, Defendants misled some doctors regarding the equipment on which Theranos's tests would be run and the location of that equipment.  Specifically, when Theranos partnered with doctors' offices to provide testing services in-house, Theranos would acquire office space within or near the doctor's practice and lead the doctor to believe that Theranos was maintaining and operating one of its small, Theranos-manufactured analyzers onsite.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but

2

not limited to, doctors and patients who patronized Theranos, marketing personnel employed or retained by Theranos, and former employees of Theranos.

3. **False and misleading representations made to Theranos's Board of Directors.** Defendants deceived Theranos's Board of Directors in furtherance of their schemes to defraud investors and patients. In particular, Defendants misrepresented the capabilities of Theranos's technology to the Board, making false claims about matters including: the capabilities of Theranos's analyzers; the accuracy and reliability of Theranos's tests; the existence of data proving the accuracy and reliability of Theranos's tests; the extent to which Theranos relied on third-party analyzers; the extent to which Theranos relied on vein draws; the nature of FDA's approval requirements for Theranos's tests; the extent to which Theranos's technology had been validated by other entities and organizations including hospitals; the success of Theranos's relationship with Walgreens; the revenues and financial health of the company; the truth of facts reported in the *Wall Street Journal*'s October 15, 2015 article discussing Theranos; and Defendants' willingness to submit Theranos's devices for independent testing or conduct comparison testing matching Theranos's test results against those from conventional labs. The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, members of Theranos's Board of Directors.

4. **False and misleading representations made to Walgreens.** In pursuing and maintaining Theranos's partnership with Walgreens, Defendants made misrepresentations to Walgreens representatives about matters including: the number of tests Theranos's analyzer could perform using a sample drawn from a finger-stick; the number of assays Theranos's devices could conduct on a single sample; whether Theranos's technology was mature and ready for commercial launch; the existence of technological boundaries affecting Theranos's ability to scale up its testing services; the accuracy and reliability of Theranos's tests and whether those tests were as accurate as or more reliable than competing tests from conventional labs; the extent to which Theranos relied on third-party analyzers; the extent to which Theranos relied on vein draws; the nature of FDA's approval requirements for Theranos's tests; whether Theranos conducted adequate proficiency testing; the extent to which Theranos's technology had been validated by other entities and organizations including pharmaceutical companies and research universities who had purportedly used Theranos's testing services for clinical trials or other studies; the purported use of Theranos's technology by the United States military; Theranos's ability to provide decentralized testing services at the point of care and the company's experience operating under that model; and the profitability and financial health of the company. The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to former Theranos employees as well as Walgreens personnel.

5. **False and misleading representations made to Safeway.** In pursuing a partnership between Theranos and Safeway, Defendants made misrepresentations to Safeway representatives about matters including: the number of tests Theranos's analyzer could perform; the number of assays Theranos's devices could conduct on a single sample; the accuracy and reliability of Theranos's tests; whether Theranos's technology was ready for commercial launch; the extent to which Theranos relied on third-party analyzers; the extent to which Theranos relied on vein draws; the nature of regulatory approval requirements for Theranos's tests; the extent to which Theranos's technology had been validated by other entities and organizations including pharmaceutical companies and research universities; the use of Theranos technology by the military; and the financial

3

health and projected profitability of the company.  Additionally, Holmes agreed to provide a Theranos analyzer to UCSF so that they could evaluate Theranos's technology partly for Safeway's benefit.  Theranos, however, never provided UCSF with a device to review.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees and Safeway representatives.

6. **False and misleading representations made to journalists.**  In promoting Theranos's business, Defendants and their representatives were interviewed by journalists and made a number of false and misleading statements to those journalists regarding the state of Theranos's business and the capabilities of Theranos's technology.  For example, Holmes made several misrepresentations to reporter Roger Parloff, including:  (1) that Theranos's level of quality and low coefficient of variation was revolutionary for a certified lab; (2) that Theranos had done 70 or more tests from a single microsample; (3) that Theranos was different from labs that used large machines in a centralized process; (4) that Theranos was exceeding requirements for proficiency testing; (5) that Theranos's platform could do all of the several hundred tests offered by Quest in a regional lab; (6) that Theranos had a single device that could perform any test; and (7) that Theranos's clinical laboratory consisted of hundreds of Theranos analyzer devices.  Simultaneously, Defendants did not correct the false conclusions that journalists reached based on Defendants statements, failing to clarify, for example, that Theranos's analyzer could perform only a limited number of assays and the company relied on third-party analyzers for a significant portion of its tests.  Moreover, when Defendants saw false statements about Theranos's capabilities repeated in press coverage, they did not correct those reports.  This remained the case even when other employees brought the inaccurate statements to their attention—for example, Theranos attorney Brad Arington confronted Holmes about multiple false statements in Roger Parloff's June 2014 *Fortune* article about Theranos.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees and attorneys as well as journalists who covered Theranos and conducted interviews of either Defendant.

7. **Fostering culture of secrecy and forcing employees and others to sign non-disclosure agreements.**  In order to prevent the spread of information regarding problems at Theranos, Defendants required employees to sign strict non-disclosure agreements.  Similar agreements were prerequisites to board members, potential investors, and other visitors obtaining information about the company, its technology, and its business.  Similarly, in their roles controlling the day-to-day operations of Theranos and overseeing the company's employees, Defendants took steps to silo information within Theranos, discouraging employees from sharing information about their work with other employees in the company and fostering a culture of internal secrecy.  These actions minimized the number of Theranos employees who were aware of problems relating to the company's research and development practices, technological capabilities, clinical laboratory practices, and business relationships.  In particular, Defendants discouraged employees from sharing information regarding Theranos's use of third-party analyzers for its tests, taking specific steps to conceal this fact from employees who did not already know.  Those steps included renaming third-party devices in Theranos's information management systems and assigning them code names so that employees who accessed these systems could not determine that those devices had in fact been manufactured by third-party companies.  Defendants were so restrictive in controlling employees' statements about Theranos that they required some employees to remove references to Theranos from the employees' LinkedIn profiles.  Defendants were similarly secretive

4

with investors, refusing to disclose to representatives like Lisa Peterson the identities of other investors in the company.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees and investors as well as potential and actual strategic partners of Theranos.

8. **Restricting access to laboratory areas within Theranos.**  Defendants set policies at Theranos that severely restricted access to the laboratory areas where Theranos tested patient samples.  Employees who did not work in the clinical laboratory generally were not able to access the areas, and visitors generally were not allowed to view those areas. These policies and practices prevented the dissemination of knowledge regarding problems with Theranos's proprietary analyzers as well as Theranos's use of third-party devices for many of its tests.  Similarly, while withholding access to the actual clinical lab, Defendants misled visitors to Theranos by intentionally giving them the impression that the clinical lab consisted of multiple Theranos TSPUs and did not include other conventional devices.  For example, when Vice President Biden visited Theranos in July 2015, Theranos did not show visitors the CLIA lab where patient sample testing was performed, but set up a room containing a large number of Theranos TSPU boxes on shelves, intending that visitors believe they were viewing the machines that ran Theranos's clinical tests.  Within Theranos's Normandy laboratory, Balwani ordered that wall dividers be installed to hide the Tecan devices Theranos used to dilute its samples. When Holmes was interviewed by Roger Parloff following his visit to Theranos's facilities, she responded to his request to see the lab by indicating that he had essentially already seen the lab because he had seen a room with multiple TSPU devices.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees, potential and actual strategic partners of Theranos, journalists, and others who visited Theranos.

9. **Harassing, threatening, or otherwise influencing doctors or patients who had negative experiences with Theranos.**  When doctors or patients made public statements about inaccurate Theranos test results and other negative experiences with the company, Defendants and their agents engaged in harassing, threatening, or other improper behavior in an effort to dissuade those providers from generating negative publicity for Theranos.  For example, when Arizona provider Dr. Nicole Sundene was cited in a *Wall Street Journal* article after providing information about an unreliable Theranos test result, Balwani visited her offices in person along with Christian Holmes and berated her and her staff, threatening to sue her.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees as well as doctors and patients who patronized Theranos's testing services.

10. **Threatening, influencing, or vilifying journalists in response to negative coverage of Theranos.**  When journalists investigated Theranos and wrote articles exposing misrepresentations made by Defendants concerning Theranos's business and technology, Defendants and their agents threatened and other attempted to improperly influence those journalists in an effort to suppress negative publicity.  For example, when Defendants learned that a reporter from the *Wall Street Journal* was investigating the company and planning to publish an article reporting unfavorable facts about the company and its technology, Defendants directed attorneys to reach out to the *Wall Street Journal* and attempt to dissuade the publication from releasing the article.  In a meeting with the reporter, John Carreyrou, his editor, and the publication's lawyers, Theranos's attorneys

5

insisted that the publication not move forward with the article, incorrectly claiming that it was based on false information. Holmes also attempted to persuade Rupert Murdoch exercise his power as owner of the *Journal* to kill the story before it could be published. Defendants also vilified journalists who printed negative articles about Theranos, blaming them for skepticism regarding Theranos and its technology in an effort to deflect blame and accountability from themselves and their company. For example, following publication of the October 15, 2015 *Wall Street Journal* article revealing problems with Theranos's blood testing services, Defendants on at least two occasions led employees in a chant of "Fuck you, Carreyrou," directed at the journalist who investigated and authored the article. The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees, attorneys representing Theranos or relevant news publications, and journalists who investigated and covered Theranos.

11. **Blaming and vilifying competing companies.** When Theranos was the subject of regulatory scrutiny or negative publicity, Defendants attributed blame to competing companies like Quest and LabCorp, stating and implying that those companies were influencing the government and/or the media. For example, after October 2015, when Theranos became the target of unfavorable reporting exposing problems with the company's operations, Holmes led employees in a chant of "Fuck you, SonoraQuest." Defendants made statements during this time period arguing that Theranos had been unfairly targeted for criticism as a result of action by competitors given Theranos's potential to disrupt the blood testing industry. The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees as well as journalists who covered Theranos.

12. **Threatening or intimidating employees and former employees.** Defendants and their agents directed threats and intimidating language at current and former Theranos employees in an effort to discourage employees from disseminating facts about the problems facing the company's technology and business. On multiple occasions, when employees left the company voluntarily or were terminated, Defendants corresponded or met with those employees to deliver stern reminders of the employee's obligations under nondisclosure agreements and threatened employees with consequences should they reveal any nonpublic information about Theranos's technology or business practices. When Dr. Adam Rosendorff resigned from Theranos, Balwani became angry Rosendorff had forwarded work emails to his personal account out of a fear that regulatory authorities might investigate Theranos's practices. Balwani insisted that Rosendorff sign a legal document confirming deletion of the emails. This exchanges caused Rosendorff to feel threatened. On other occasions, Defendants reacted angrily and attempted to threaten or intimidate employees whom they suspected to be the sources of negative publicity concerning Theranos. For example, following their review of some or all of the October 15, 2015 *Wall Street Journal* article discussing Theranos, Defendants directed board member George Schultz and Theranos attorneys to meet with Theranos employee Tyler Schultz because they believed some of the information in the article was provided by him. George Schultz conveyed to Tyler Schultz the warning from Defendants that Tyler's career would be adversely affected if he continued to share information about Theranos. During that conversation, Theranos lawyers waited at the house of Tyler Schultz's grandfather, subsequently ambushing Tyler Schultz and threatened him with legal action. On another occasion, Balwani became aware of a negative review of Theranos as an employer posted on website glassdoor.com. In response, Balwani aggressively interrogated several employees in an unsuccessful effort to determine the

6

source of the review and discourage further negative reviews. Generally, Holmes and Balwani fostered a culture that strongly discouraged skepticism or dissent from employees, enforcing that culture by reacting with hostility and intimidation to any questioning. The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees and members of the Board.

13. **False and misleading representations made to FDA, CMS, CDPH, and other regulatory organizations.** When Theranos was the subject of inspections by CMS and other regulatory organizations, Defendants' agents presented regulators with selected, non-comprehensive data of Theranos's test results in an effort to mask accuracy and consistency problems with Theranos's assays. Additionally, Theranos failed to develop, maintain, and follow appropriate standard operating procedures for its clinical lab, but drafted and/or approved such SOPs immediately before or during regulatory inspections in an effort to conceal this oversight. In connection with an inspection by CDPH, Balwani and others misled an inspector into believing that the Theranos CLIA laboratory was limited to a single area. The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees as well as regulatory agency personnel.

14. **Violations of industry standards and government regulations or rules regarding research and development procedures, medical devices and clinical laboratory practices.** In furtherance of their scheme to defraud, Defendants disregarded and failed to conform to industry standards as well as government regulations or rules regarding research and development procedures, medical devices and clinical laboratory standards. For example, in conducting research and development purportedly aimed at validating its assays, Theranos failed to conduct adequate validation studies, relying on insufficient data to claim that their tests were valid, accurate, and reliable. Theranos also cut corners in its Arizona research and development testing, failing to implement a clear protocol for informed consent for trial participants and fostering a coercive environment for testing. Theranos's CLIA lab was the site of several violations of these rules and standards including the use of expired reagents, failure to implement and carry out proper proficiency testing and quality control processes, and inadequate record-keeping. Under Defendants' supervision, Theranos's CLIA lab also improperly failed to develop, maintain, and follow adequate standard operating procedures for its clinical tests. Defendants also exercised an improper degree of control and influence over the operation of Theranos's CLIA lab despite their lack of medical education or training. Defendants, and Balwani in particular, were deeply involved in clinical decisions that should have been left to the discretion of the laboratory director—even overruling the laboratory director at times. In exercising that control, Defendants consistently made decisions that prioritized preserving Theranos's reputation and secrecy at the expense of providing complete information to doctors and patients. The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees as well as regulatory agency personnel, and expert witnesses.

15. **Altering or tampering with third-party medical devices.** Theranos's in-house manufactured analyzer—called the Edison, miniLab, or TSPU—was incapable of performing a large proportion of the clinical blood tests Theranos offered. The Theranos devices were also incapable of handling high-throughput activity required to support Theranos's business model. In response, Defendants caused Theranos to acquire several commercially available blood analyzer devices manufactured by third parties. Theranos

then altered and tampered with those devices by modifying them to run on smaller and/or diluted blood samples, contrary to industry standards and the manufacturers' intended use for such devices. The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees.

16. **Multiplexing test results and disregarding outliers to mask inconsistency.** In its clinical testing and/or its proficiency testing, Theranos operated its analyzers according to a protocol that included running each assay multiple times and then multiplexing the results in order to derive the final, reported result. As part of that protocol, so-called outlier results—individual results that deviated from the other results for a given assay on a given sample—were discarded and not accounted for. This approach tended to mask consistency problems with Theranos's tests. The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees.

17. **Improperly setting and altering reference ranges.** Theranos's lab practices deviated from industry standards and standard testing protocols approved by FDA and validated by the industry. In setting the reference ranges for its tests, Theranos improperly relied on reference ranges for common, FDA-approved tests and/or conducted insufficient studies to set and adjust its own reference ranges. Similarly, after Theranos began offering and providing clinical blood testing services, the company improperly adjusted reference ranges based on individual clinical results—without conducting sufficient studies to justify such an adjustment—in order to bring out-of-range results back into the newly adjusted "normal" range and avoid abnormal results to patients. The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees and expert witnesses.

18. **Withholding critical test results and other important information from doctors and patients.** In an effort to avoid additional scrutiny of its blood test results and laboratory practices, Theranos sometimes withheld test results that were in the "critical" range for a given analyte, i.e., results that indicated a patient might need urgent medical care. Additionally, Theranos withheld information from doctors and patients indicating what type of analyzer had been used for a given test, depriving doctors and patients of the facts needed to place certain assay results into context—for example, when multiple samples from a single patient had been run on different types of analyzers leading to otherwise unexplainable discrepancies in results. Theranos also withheld from doctors and patients the fact that Theranos's tests were not FDA approved, that Theranos relied on third-party analyzers for many of its tests, and other key facts regarding problems with their laboratory practices. The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees, expert witnesses, and doctors and patients who patronized Theranos's testing services.

19. **Declining to conduct or agree to meaningful comparative tests.** Despite the fact that Theranos's analyzers and testing procedures varied from industry standards and conventional, FDA-approved tests, Defendants declined to conduct sufficient comparative tests establishing that Theranos's test results delivered accurate and reliable results when compared to competing technology. Similarly, Theranos failed to conduct comprehensive and accurate comparison tests establishing that its assays could reliably be conducted on finger-stick samples as opposed to vein draws. Defendants also refused

8

to commission or authorize such comparative testing through Sarah Cannon, Cleveland Clinic, UCSF, or other independent third-parties, to publish the results of any such testing, and to provide that information to the company's board.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees, expert witnesses, representatives of potential and actual strategic partners of Theranos, and members of the Theranos Board.

20. **Decommissioning Theranos's Laboratory Information System database.**  Theranos maintained its clinical test data in a software database it called the Laboratory Information System ("LIS").  In October 2016, Theranos announced that it would cease offering clinical lab testing services.  Following that decision but before the company ceased operation in 2018, Theranos "decommissioned" its LIS, rendering it nonfunctional and converting the data to a format that is not readily retrievable.  This decision had the effect of obscuring or destroying detailed information regarding the specific tests Theranos conducted during the years of its clinical testing operation, hindering the government's investigation of Defendants.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees and representatives of the Theranos assignee.

21. **Obtaining personal benefit from position at Theranos.**  In addition to their salaries and other direct compensation, Defendants also obtained significant additional benefits from their positions at Theranos.  For example, the company regularly paid for luxury travel and accommodations for Holmes.  Additionally, Holmes routinely required her office assistant to perform a large number of personal tasks seemingly unrelated to the business of Theranos, including shopping for and returning household items, clothing, luxury fashion accessories, and beauty products.  Finally, both Holmes and Balwani were he beneficiaries of increased local and national standing as a result of their association with Theranos.  Holmes was featured in numerous publications and lauded as a visionary.  Defendants also associated with celebrities, dignitaries, and other wealthy and powerful individuals who were interested in Theranos.  Holmes collected a substantial salary from Theranos, which enabled her to live a luxurious lifestyle, driving a luxury SUV, renting an expensive home, and purchasing expensive merchandise.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees, journalists who investigated Theranos, members of the Theranos Board, and potential and actual investors in Theranos.

22. **Concealing the romantic relationship between Holmes and Balwani from investors and others.**  During much of the relevant time period, Defendants Holmes and Balwani were romantically involved.  This relationship was actively concealed from others to whom its existence would have been material, including:  prospective and actual investors; members of the Board of Directors; representatives of Walgreens, Safeway, and other partner organizations; Theranos employees; and journalists.  Defendants took steps to hide the existence of this relationship, such as commuting to work separately and avoiding being seen together outside of work.  On at least one occasion, when questioned by a journalist as to whether she was in a relationship, Holmes falsely stated that she was not.  The government may introduce these and similar facts through produced documents as well as through testimony from witnesses including, but not limited to, former Theranos employees as well as members of the Board of Directors, potential and actual

9

investors in Theranos, potential and actual strategic partners of Theranos, and journalists who interviewed Defendants.

Very truly yours,

ADAM A. REEVES
Attorney for the United States,
Acting Under Authority Conferred
By 28 U.S.C. § 515


/s/
JOHN C. BOSTIC
Assistant United States Attorney

10

JOHN D. CLINE (CA State Bar No. 237759)
50 California Street, Suite 1500
San Francisco, CA 94111
Telephone: (415) 662-2260 │Facsimile: (415) 662-2263
Email: cline@johndclinelaw.com

KEVIN M. DOWNEY (Admitted Pro Hac Vice)
LANCE A. WADE (Admitted Pro Hac Vice)
AMY MASON SAHARIA (Admitted Pro Hac Vice)
KATHERINE TREFZ (CA State Bar No. 262770)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC 20005
Telephone: (202) 434-5000 │Facsimile: (202) 434-5029
Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

Attorneys for Defendant ELIZABETH A. HOLMES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. CR-18-00258-EJD |
| | ) |
| Plaintiff, | ) **DECLARATION OF AMY MASON SAHARIA** |
| | ) **IN SUPPORT OF MS. HOLMES' MOTIONS** *IN* |
| v. | ) *LIMINE* **AND** *DAUBERT* **MOTIONS TO** |
| | ) **EXCLUDE EXPERT TESTIMONY** |
| ELIZABETH HOLMES and | ) |
| RAMESH "SUNNY" BALWANI, | ) Hon. Edward J. Davila |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |

I, AMY MASON SAHARIA, declare as follows:

1.     I represent Defendant Elizabeth Holmes and have been admitted to practice *pro hac vice*

in the above-captioned matter.  I submit this declaration in support of Ms. Holmes' Motions *in Limine*

and *Daubert* Motions To Exclude Expert Testimony.  Attached to this declaration are exhibits cited in

Ms. Holmes' Motions *in Limine* and *Daubert* Motions To Exclude Expert Testimony filed today,

November 20, 2020, in the above-captioned matter.  I attest to the following facts upon which the motions rely.

2. The government's June 26, 2020 witness list includes two journalists who interviewed Ms. Holmes and others associated with Theranos:  Roger Parloff and Dr. Eric Topol.  Mr. Parloff published several articles on Theranos in 2014 and 2015, two of which appear on the government's exhibit list:  a June 2014 profile of Theranos and Ms. Holmes in *Fortune* magazine titled "This CEO's out for Blood," and a December 2015 article for *Fortune*'s website titled "How Theranos Misled Me."  Dr. Topol interviewed Ms. Holmes in November 2013 for the website Medscape.com; the government has included as an anticipated trial exhibit what appears to be a transcript of that interview posted to the website under Dr. Topol's name.

3. Ms. Holmes' motions are supported by 64 exhibits.  Five exhibits (Exhibits 70-74) have been filed as attachments to Ms. Holmes' Administrative Motion for Leave to File Documents Under Seal ("Administrative Motion") because they contain confidential information.  The contents of each exhibit are as follows:

a.      Exhibit 1 is a true and correct copy of a March 6, 2020 letter from the government providing the government's initial Rule 404(b) disclosure.

b.      Exhibit 2 is a true and correct copy of an April 3, 2020 letter from the government providing the government's supplemental Rule 404(b) notice, redacted to conceal patient names pursuant to the protective order entered in this case.

c.      Exhibit 3 is a true and correct copy of a September 28, 2020 letter from the government providing the government's supplemental Rule 404(b) notice, redacted consistent with the Court's orders in this case.  An unredacted version is being filed under seal.

d.      Exhibit 4 is a true and correct copy of a March 6, 2020 letter from the government providing the government's Rule 16 disclosure re: expert testimony, redacted to conceal patient names pursuant to the protective order entered in this case.

e.      Exhibit 5 is a true and correct copy of a September 28, 2020 letter from the government providing the government's supplemental Rule 16 disclosure re: expert testimony, redacted

to conceal patient names pursuant to the protective order entered in this case.

      f.     Exhibit 6 is a true and correct copy of the expert report of Dr. Stephen Master, dated March 6, 2020, redacted to conceal patient names pursuant to the protective order entered in this case.

      g.     Exhibit 7 is a true and correct copy of a February 18, 2020 email from Stephen Master to Tyle Doerr, Robert Leach, Vanessa Baehr-Jones, Nenita Mendiola, and Ramina Hinajon, Bates-stamped USAO-006872.

      h.     Exhibit 8 is a true and correct copy of a February 28, 2020 and March 1, 2020 email exchange between Stephen Master and Robert Leach, Bates-stamped USAO-007115.

      i.     Exhibit 9 is a true and correct copy of a March 5, 2020 and March 6, 2020 email exchange between Stephen Master and Robert Leach, Bates-stamped USAO-006916.

      j.     Exhibit 10 is a true and correct copy of a March 5, 2020 and March 6, 2020 email exchange between Stephen Master and Robert Leach, Bates-stamped USAO-007057.

      k.     Exhibit 11 is a true and correct copy of an article entitled, "Evaluation of direct-to-consumer low-volume lab tests in healthy adults," that appeared in the May 2016 edition of *The Journal of Clinical Investigation*, and was authored by Brian A. Kidd, et al.

      l.     Exhibit 12 is a true and correct copy of a January 25, 2016 report prepared by the Centers for Medicare & Medicaid Services (CMS), Bates-stamped THPFM0002240153.

      m.     Exhibit 13 is a true and correct copy of a December 7, 2014 email exchange between Margaret Hamburg and Caitlin Pennington, and others, Bates-stamped FDA-0005633.

      n.     Exhibit 14 is a true and correct copy of a June 15, 2015 and June 16, 2015 email exchange between John Carreyrou, Alberto Gutierrez, and Jennifer Dooren, Bates-stamped FDA-0005757.

      o.     Exhibit 15 is a true and correct copy of an October 23, 2013 memorandum from Ellen Flannery and Christopher Pruitt of Covington & Burling LLP to the Office of In Vitro Diagnostics and Radiological Health regarding the Application of CLIA to Theranos' Testing Systems, Bates-stamped SEC2-USAO-EPROD-001297920.

       p.      Exhibit 16 is a true and correct copy of a November 26, 2013 letter and attachment from Jeffrey N. Gibbs of Hyman, Phelps & McNamara, P.C. to Alberto Gutierrez, Director, Office of In Vitro Diagnostics and Radiological Health, Food and Drug Administration, Bates-stamped THER-0957500.

       q.      Exhibit 17 is a true and correct copy of a March 12, 2020 letter from Katherine Trefz to the government, with Jeff Coopersmith in copy.

       r.      Exhibit 18 is a true and correct copy of an April 1, 2020 FBI Form 302 summary of an interview of Curtis Page, redacted to conceal personal identifiable information, and Bates-stamped US-REPORTS-0015101.

       s.      Exhibit 19 is a true and correct copy of an April 8, 2020 email from Katherine Trefz to the government.

       t.      Exhibit 20 is a true and correct copy of May 6, 9, 12, and 14, 2020 email exchanges between Robert Leach and defense counsel.

       u.      Exhibit 21 is a true and correct copy of an October 8, 2020 letter from Katherine Trefz to the government, with Jeff Coopersmith in copy.

       v.      Exhibit 22 is a true and correct copy of a November 4, 2020 email from the government to defense counsel.

       w.      Exhibit 23 is a true and correct copy of an October 27, 2014 and October 28, 2014 email exchange between Christian Holmes, Max Fosque, Adam Rosendorff, and others, Bates-stamped THPFM0000003941.

       x.      Exhibit 24 is a true and correct copy of November 10, 2013 email exchange between Sunny Balwani and Adam Rosendorff, and others, Bates-stamped THPFM0000266077.

       y.      Exhibit 25 is a true and correct copy of a February 21, 2014 email exchange between Adam Rosendorff, Sunny Balwani, Daniel Young, and Elizabeth Holmes, Bates-stamped THPFM0001407063.

       z.      Exhibit 26 is a true and correct copy of a February 15, 2014 and February 19, 2014 email exchange between Adam Rosendorff, Sunny Balwani, and Daniel Young, and others, Bates-

stamped TS-0231083.

aa.     Exhibit 27 is a true and correct copy of an April 1, 2016 letter from Dr. Kingshuk

Das, Laboratory Director, Theranos California Laboratory, to Ms. Karen Fuller, State Oversight and

CLIA Branch, Centers for Medicare and Medicaid Services, Bates-stamped THER-0534700.

bb.     Exhibit 28 is a true and correct copy of an April 17, 2017 consent decree between

the State of Arizona and Theranos, Inc., Bates-stamped TS-0936133.

cc.     Exhibit 29 is a true and correct copy of an April 14, 2017 settlement agreement

between the United States Department of Health and Human Services, Centers for Medicare & Medicaid

Services, Theranos, Inc., Dr. Sunil Dhawan, and Ramesh Balwani, Bates-stamped SEC-CMS-E-

0000648.

dd.     Exhibit 30 is a true and correct copy of a July 7, 2016 letter from the Centers for

Medicare & Medicaid Services to Sunil Dhawan, M.D., Elizabeth Holmes, Ramesh Balwani, and

Theranos, Inc., Bates-stamped THPFM0004806442.

ee.     Exhibit 31 is a true and correct copy of excerpts of the transcript of the January

28, 2020 deposition of Sarah Bennett from *SEC v. Balwani*, 5:18-cv-01603-EJD.

ff.     Exhibit 32 is a true and correct copy of a January 27, 2017 letter from the Centers

for Medicare & Medicaid Services to Daniel L. Young, Ph.D, Elizabeth Holmes, Ramesh Balwani, and

Theranos, Inc., Bates-stamped CMS3-000671.

gg.     Exhibit 33 is a true and correct copy of an October 14, 2016 letter from the

Centers for Medicare & Medicaid Services to Daniel L. Young, Ph.D, Elizabeth Holmes, Ramesh

Balwani, and Theranos, Inc., Bates-stamped CMS022128.

hh.     Exhibit 34 is a true and correct copy of September 12, 2017 Food and Drug

Administration Memorandum of Interview of Sarah Bennett, Bates-stamped US-REPORTS-0006781.

ii.      Exhibit 35 is a true and correct copy of the Center for Medicare and Medicaid

Services' Appendix C, Survey Procedures and Interpretive Guidelines for Laboratories and Laboratory

Services: Policy for Conducting Surveys, available at

https://web.archive.org/web/20130702201005/http://www.cms.gov/Regulations-and-

Guidance/Legislation/CLIA/Interpretive_Guidelines_for_Laboratories.html.

jj.      Exhibit 36 is a true and correct copy of a November 23, 2014, November 24, 2014, and November 25, 2014 email exchange between Brad Arington and Sunil Dhawan, M.D., Bates-stamped CTRL-DHAWAN-00007615.

kk.      Exhibit 37 is a true and correct copy of a June 12, 2015 letter and attachment from Brad Arington of Theranos, Inc. to the California Department of Public Health, Bates-stamped THER-2179627.

ll.      Exhibit 38 is a true and correct copy of a certificate of compliance issued by Centers for Medicare & Medicaid Services to East Bay Dermatology Medical Group, Bates-stamped THPFM0003619903.

mm.      Exhibit 39 is a true and correct copy of a curriculum vitae of Sunil S. Dhawan, M.D., Bates-stamped US-REPORTS-0008333.

nn.      Exhibit 40 is a true and correct copy of excerpts of a January 16, 2018 deposition of Adam Rosendorff, M.D. in *Colman v. Theranos, Inc., et al*., No. 5:16-cv-06822-NC, Bates-stamped COLM-000849.

oo.      Exhibit 41 is a true and correct copy of excerpts of a May 17, 2018 deposition of Daniel Young in *Colman v. Theranos, Inc., et al*., No. 5:16-cv-06822-NC, Bates-stamped COLM-001310.

pp.      Exhibit 42 is a true and correct copy of excerpts of a February 26, 2019 deposition of Adam Rosendorff, M.D. in *In re Arizona Theranos, Inc. Litigation*, No. 2:16-cv-2138, Bates-stamped TRANSCRIPTS-004298.

qq.      Exhibit 43 is a true and correct copy of U.S. Patent No. 10,391,497 B1, dated August 27, 2019, Bates-stamped HOLMES004524.

rr.      Exhibit 44 is a true and correct copy of the Advia® 1800 Chemistry System Operator's Guide by Siemens, Bates-stamped THER-0644560.

ss.      Exhibit 45 is a true and correct copy of a July 11, 2013 and July 12, 2013 email exchange between Sunny Balwani, Daniel Young, and Elizabeth Holmes, and others, Bates-stamped

THERDOJ-0004199.

tt.    Exhibit 46 is a true and correct copy of excerpts of Theranos, Inc.'s Responses and Objections to Plaintiffs' Second Set of Interrogatories in *Partner Investments, L.P. v. Theranos, Inc.*, C.A. No. 12816-VCL (Del. Ch.), Bates-stamped TS-0959090.

uu.    Exhibit 47 is a true and correct copy of a memorandum of interview relating to Adam Rosendorff's January 12, 2018 interview with the United States Attorney's Office, San Francisco, CA, Bates-stamped US-REPORTS-0007375.

vv.    Exhibit 48 is a true and correct copy of a May 25, 2016 article by Christopher Weaver and John Carreyrou in the *Wall Street Journal*; an October 16, 2015 article by John Carreyrou in the *Wall Street Journal*; an October 23, 2015 article by Michael Siconolfi, John Carreyrou, and Christopher Waver in the *Wall Street Journal*; a November 10, 2015 article by John Carreyrou in Dow Jones: Newswires; an article by Ken Auletta in *The New Yorker*; an October 22, 2015 article by Katie Benner and Andrew Pollack in the *New York Times*; an article by Sheelah Kolhaltkar and Caroline Chen in *Business Week*.

ww.    Exhibit 49 is a true and correct copy of an August 27, 28, 29 and 31, 2015 email exchange from Stayce Beck to Mary Hole, Yung Chan, Matthew Walburger, Eric Anderson, Seema Singh, Ian Pilcher, Lawton Lum, Sergio Chavez, Alberto Guttierez, James Woods, Scott McFarland, Lea Carrington, Ana Loloei Marsal, Steven Tjoe, Ileana Elder, and Courtney Lias, and others, Bates-stamped US-REPORTS-0007068.

xx.    Exhibit 50 is a true and correct copy of a September 2, 2015 email from Mary Hole to Matthew Walburger, Eric Anderson, Lawton Lum, Sergio Chavez, Seema Singh, and Darlene Almogela, with attachments, Bates-stamped US-REPORTS-0007073.

yy.    Exhibit 51 is a true and correct copy of an August 27, 28, 29, 31, and September 1 and 2, 2015 email exchange from Seema Singh to Sergio Chavez, Eric Anderson, Matthew Walburger, Mary Hole, Lawton Lum, and others, with attachments, Bates-stamped US-REPORTS-0007128.

zz.    Exhibit 52 is a true and correct copy of a September 11, 13, 14, 2014 email exchange between Mary Hole and Darlene Almogela, Lawton Lum, and Sergio Chavez, and others,

Bates-stamped US-REPORTS-0007142.

aaa.     Exhibit 53 is a true and correct copy of a September 16 and 17, 2015 email exchange, with one attachment, between Seema Singh and Mary Hole, Yung Chang, Matthew Walburger, Eric Anderson, Sergio Chavez, Lawton Lum, Darlene Almogela, Ian Pilcher, Yung Chan, Stayce Beck, Alberto Gutierrez, Ileana Elder, Courtney Lias, and others, Bates-stamped US-REPORTS-0007133.

bbb.     Exhibit 54 is a true and correct copy of a November 16, 2012 and August 6 and 7, 2013 email exchange between Elizabeth Holmes and Sally Hojvat, Alberto Gutierrez, James Woods, John Hobson, Uwe Scherf, and Sunny Balwani, Bates-stamped THER-0947247.

ccc.     Exhibit 55 is a true and correct copy of a January 21, 2014 email from Brad Arington to Yung Chan, Elizabeth Holmes, Sally Hojvat, and John Hobson, with an attachment, Bates-stamped THER-0961165.

ddd.     Exhibit 56 is a true and correct copy of an October 27, 2014 document entitled "510(k) Premarket Notification for the Capillary Tubes and Nanotainer™ Tubes, Bates-stamped THER-0972722.

eee.     Exhibit 57 is a true and correct copy of a November 1, 2013 email, with an attachment, from Elizabeth Holmes to Sally Hojvat and John Hobson, Bates-stamped THER-2500713.

fff.     Exhibit 58 is a true and correct copy of the March 27, 2018 Final Judgment as to Defendant Elizabeth Anne Holmes, ECF No. 9, in *Securities and Exchange Commission v. Holmes*, 5:18-cv-01602-EJD.

ggg.     Exhibit 59 is a true and correct copy of a May 6, 2020 letter from Katherine Trefz to the government, with Jeff Coopersmith in copy.

hhh.     Exhibits 60 through 69 are intentionally omitted.

iii.     Exhibit 70 is a true and correct copy of an April 1, 2020 FBI Form 302 memorandum relating to an interview of S.S., Bates-stamped US-REPORTS-0015124.  An unredacted copy has been tendered as an attachment to Ms. Holmes' Administrative Motion for Leave to File Documents Under Seal in order to conceal private health information.

jjj.     Exhibit 71 is a true and correct copy of a March 19, 2018 FBI Form 302 memorandum relating to an interview of M.E., bates-stamped US-REPORTS-0008719.  An unredacted copy has been tendered as an attachment to Ms. Holmes' Administrative Motion for Leave to File Documents Under Seal in order to conceal private health information.

kkk.     Exhibit 72 is a June 14, 2019 Food and Drug Administration Memorandum of Interview of B.G., Bates-stamped US-REPORTS-00101790.  An unredacted copy has been tendered as an attachment to Ms. Holmes' Administrative Motion for Leave to File Documents Under Seal in order to conceal private health information.

lll.     Exhibit 73 is a true and correct copy of an Excel spreadsheet labeled by the government as "complaint logs" in its Rule 404(b) correspondence, and Bates-stamped SEC-USAO-EPROD-002101857.  An unredacted copy has been tendered as an attachment to Ms. Holmes' Administrative Motion for Leave to File Documents Under Seal in order to conceal private health information.

mmm.  Exhibit 74 is a true and correct copy of a September 28, 2020 letter from the government providing the government's supplemental Rule 404(b) notice.  It is unredacted.  A redacted version is being filed as Exhibit 3.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.


Executed this 20th day of November, 2020 in Chevy Chase, MD.


AMY MASON SAHARIA
Attorney for Elizabeth Holmes

JOHN D. CLINE (CA State Bar No. 237759)
50 California Street, Suite 1500
San Francisco, CA 94111
Telephone: (415) 662-2260 │Facsimile: (415) 662-2263
Email: cline@johndclinelaw.com

KEVIN M. DOWNEY (Admitted Pro Hac Vice)
LANCE A. WADE (Admitted Pro Hac Vice)
AMY MASON SAHARIA (Admitted Pro Hac Vice)
KATHERINE TREFZ (CA State Bar No. 262770)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC 20005
Telephone: (202) 434-5000 │Facsimile: (202) 434-5029
Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

Attorneys for Defendant ELIZABETH A. HOLMES

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>v.<br><br>ELIZABETH HOLMES and<br>RAMESH "SUNNY" BALWANI,<br><br>　　　　Defendants. | Case No. CR-18-00258-EJD<br><br>**MS. HOLMES' MOTION TO EXCLUDE EVIDENCE OF CMS SURVEY FINDINGS AND SANCTIONS PURSUANT TO RULES 401-403 AND 801-803**<br><br>Date:　　January 22, 2021<br>Time:　　10:00 AM<br>CTRM:　4, 5th Floor<br><br>Hon. Edward J. Davila |

## MOTION TO EXCLUDE EVIDENCE OF CMS SURVEY FINDINGS AND SANCTIONS

PLEASE TAKE NOTICE that on January 22, 2021, at 10:00 a.m., or on such other date and time as the Court may order, in Courtroom 4 of the above-captioned Court, 280 South 1st Street, San Jose, CA 95113, before the Honorable Edward J. Davila, Defendant Elizabeth Holmes will and hereby does respectfully move the Court pursuant to Rules 401-403 and 801-803 of the Federal Rules of Evidence for an order precluding the government from introducing at trial evidence relating to the survey findings and sanctions by the Centers for Medicare & Medicaid Services.  The Motion is based on the below Memorandum of Points and Authorities, the record in this case, and any other matters that the Court deems appropriate.

DATED: November 20, 2020

/s/ Amy Mason Saharia
KEVIN DOWNEY
LANCE WADE
AMY MASON SAHARIA
KATHERINE TREFZ
Attorneys for Elizabeth Holmes

## TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................... 1

BACKGROUND ............................................................................................................... 1

    I.    Regulatory Background ...................................................................................... 1

    II.    Factual Background ............................................................................................ 2

ARGUMENT ..................................................................................................................... 3

    I.    Evidence of CMS Survey Findings and Sanctions Is Inadmissible Under Rules
        401-403 ............................................................................................................. 4

        A.    The CMS Survey Findings and Sanctions Are Irrelevant ....................... 4

        B.    The Risk of Unfair Prejudice and Jury Confusion Substantially
            Outweighs Any Probative Value ............................................................. 6

    II.    The CMS Reports and Other Documentation of CMS's Findings Are
        Inadmissible Hearsay ......................................................................................... 8

CONCLUSION ................................................................................................................. 11

# TABLE OF AUTHORITIES

## CASES

*Angelo v. Bacharach Instrument Co.*, 555 F.2d 1164 (3d Cir. 1977).........................................................7

*Nipper v. Snipes*, 7 F.3d 415, 417 (4th Cir. 1993) ....................................................................9

*United States v. Morales*, 720 F.3d 1194, 1202 (9th Cir. 2013).............................................. 11

*United States v. Orellana-Blanco*, 294 F.3d 1143(9th Cir. 2002) ....................................... 9, 10

*United States v. Orozco*, 590 F.2d 789 (9th Cir. 1979) ........................................................ 9, 10

*United States v. Pac. Gas & Elec. Co.*, 178 F. Supp. 3d 927 (N.D. Cal. 2016) ................................ 4, 6, 7

*United States v. Sims,* 617 F.2d 1371 (9th Cir. 1980)................................................................9

## RULES AND REGULATIONS

42 U.S.C. § 263a ............................................................................................................. 1

42 C.F.R. § 493 ....................................................................................................... *passim*

Fed. R. Evid. 402. ........................................................................................................... 4

Fed. R. Evid. 403 ............................................................................................................ 4

Fed. R. Evid. 803 ...................................................................................................... 9, 10

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendant Elizabeth Holmes moves, pursuant to Federal Rules of Evidence 401-403 and 801-803, to exclude evidence relating to the findings of surveys of Theranos' clinical laboratories conducted by the Centers for Medicare & Medicaid Services' ("CMS") in 2015 and 2016, including the survey reports and sanctions imposed by CMS. CMS inspectors cited Theranos' laboratories for violations of federal regulations governing clinical lab practices, as documented in the CMS survey reports. The inspectors, by their own admission, did not seek to determine whether Theranos' tests were accurate and reliable. The government could have pursued a criminal charge of intentional violation of the lab regulations cited by CMS if it believed the evidence supported such a charge. It did not. Instead it charged wire fraud. Evidence that Theranos was accused of violating federal regulations is irrelevant to the government's wire-fraud charges, as it does not tend to prove that Ms. Holmes knowingly misled investors about the capabilities of Theranos' proprietary testing technology or patients about the accuracy and reliability of Theranos tests. The evidence is also highly prejudicial and confusing. Finally, the survey reports and other documents purporting to identify violations by Theranos' laboratory are inadmissible hearsay. The evidence should be excluded.

## BACKGROUND

### I.    Regulatory Background

Under the Clinical Laboratory Improvement Amendments of 1988 ("CLIA"), 42 U.S.C. § 263a, all laboratories that perform clinical diagnostic testing on human samples must be certified under and, maintain compliance with, the regulations and conditions of certification as set forth by the Secretary of Health. *See* 42 C.F.R. §§ 493.2(d)(5), 493.5, 493.20. A laboratory's failure to comply with just one applicable condition may be grounds for suspension or revocation of its CLIA certificate. *Id.* § 493.1806.

Laboratories such as Theranos were required to meet the requirements specified in §§ 493.1230 through 493.1256, § 493.1269, and §§ 493.1281 through 493.1299. *See id.* § 493.1215. These requirements run the gamut: laboratories must ensure all written complaints and problems are documented, *id.* § 493.1233; have up-to-date written policies and procedures, *id.* § 493.1235; and ensure

proper storage of "test systems, equipment, instruments, reagents, materials and supplies" consistent with the manufacturer's instructions, *id.* § 493.1252.  There are also conditions that govern laboratory personnel.  *See id.* §§ 493.1441, 493.1447, 493.1487.

CMS audits laboratories to identify non-compliance with CLIA's mandates.  The available sanctions vary depending on the deficiency's severity and on whether CMS inspectors deem it poses immediate jeopardy to public health.  *See id.* §§ 493.1812, 493.1814, 493.1816.  In some cases, CMS may revoke the laboratory's ability to receive Medicare payment for its services; suspend, limit, or revoke the laboratory's CLIA certificate; impose a plan of correction; or impose civil monetary penalties.  *Id.* §§ 493.1806, 493.1807, 493.1812, 493.1814.  A laboratory has the right to appeal CMS's imposition of sanctions first to an administrative law judge within CMS and then to an agency appeals board.  *Id.* § 493.1844.  Upon a final agency action, the laboratory may seek judicial review.  *Id.*

Criminal sanctions are available if "an individual . . . is convicted of intentionally violating any CLIA requirement."  *Id.* § 493.1806.

## II.     Factual Background

On January 25, 2016, CMS issued a letter and a Form 2567 (collectively "January 2016 CMS Report") to Theranos summarizing its findings from its recent survey of Theranos' Newark, California laboratory.  Ex. 12 (THPFM0002240153).  The January 2016 CMS Report resulted from a recertification and complaint survey of the lab conducted by CMS in September and November 2015.  Ex. 34 at 2-3 (US-REPORTS-0006781).  Generally, "re-certification surveys are conducted by a state agency."  *Id.* at 3. A state agency was scheduled to conduct the survey of Theranos' Newark laboratory, but CMS decided to do so instead "due to the media attention Theranos was receiving at the time and due to the complaints CMS had received about Theranos."  *Id.* at 2.[1]  It was unusual for CMS both to conduct the survey and to send "central office personnel . . . out on the Theranos survey."  *Id.* at 3.

---

[1] A CMS witness told the government that CMS was in contact with Wall Street Journal reporter John Carreyrou about Theranos.  Ex. 34 at. 3.

In its January 2016 Report, CMS asserted that Theranos' California laboratory was in violation of various CLIA requirements. Ex. 12 at 1-2. CMS warned Theranos that if it did not remediate these deficiencies within 10 days, CMS would impose sanctions. *Id.* at 2.

Theranos and CMS then engaged in further communications, during which Theranos outlined the steps it was taking to resolve CMS's claimed deficiencies. *See* Ex. 27 at 2 (THER-0534700). Nevertheless, on July 7, 2016, CMS imposed the threatened sanctions. Ex. 30 (THPFM0004806442). Theranos appealed the sanctions to an administrative law judge; Theranos and CMS later settled the appeal before adjudication.[2]

Soon after the imposition of sanctions on Theranos' Newark laboratory, the same CMS employees surveyed Theranos' Arizona laboratory. Ex. 33 (CMS2022128); Ex. 31 at 188:13-20 (Jan. 28, 2020 Bennet Dep.) CMS cited the Arizona laboratory for various CLIA violations, Ex. 33, and ultimately imposed sanctions, Ex. 32 (CMS3-000671). Theranos later settled its challenge to these sanctions as part of a global settlement with CMS before the adjudication of its challenge by an administrative law judge.

The government intends to use CMS's deficiency findings and Theranos' subsequent correspondence with CMS about those findings to support its allegation that "Theranos' technology was . . . not capable of producing accurate and reliable results." Ex. 3 at 67-68 (Sept. 28, 2020 Gov't Supp. Rule 404(b) Notice). Category 14 of the government's Rule 404(b) notice is replete with references to the CMS inspections; CMS's survey findings; and Theranos' responses and correspondence with CMS. *Id.* at 66-67. Additionally, the government has identified the CMS employees who conducted the California and Arizona laboratory surveys on its witness list, and the government's hematology expert relies on the CMS findings as the sole basis for his opinion about Theranos' Vitamin D assay.

## ARGUMENT

CMS's findings that Theranos had violated CLIA regulations are irrelevant to the allegations against Ms. Holmes. The government has not charged Ms. Holmes with operating a laboratory that

---

[2] Ms. Holmes is separately moving to exclude evidence relating to the settlement and the remedial measures that Theranos voluntarily adopted in response to the CMS survey findings.

failed to comply with CLIA regulations.  As relevant here, it has charged her with allegedly

misrepresenting that Theranos was capable of producing accurate and reliable test results.  *CMS did not*

*assess whether Theranos was capable of producing accurate and reliable test results, let alone pass*

*judgment on the accuracy or reliability of Theranos' test results.*  Its findings thus do not advance the

government's case.  Even if they were marginally probative, the prejudicial nature of seemingly

authoritative government findings of noncompliance would swamp any probative value.  Finally, the

CMS survey reports and other documents reporting the CMS findings are inadmissible hearsay.

**I.**     **Evidence of CMS Survey Findings and Sanctions Is Inadmissible Under Rules 401-403**

Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it

would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R.

Evid. 401. If evidence does not pass this standard, it is inadmissible.  Fed. R. Evid. 402.  Even if

evidence has some relevance, it may still be excluded "if its probative value is substantially outweighed

by a danger of  . . . unfair prejudice, confusing the issues, [or] misleading the jury."  Fed. R. Evid. 403.

Evidence is unfairly prejudicial when it has "an undue tendency to suggest decision on an improper

basis, commonly, though not necessarily, an emotional one."  *United States v. Pac. Gas & Elec. Co.*,

(*PGE*) 178 F. Supp. 3d 927, 941 (N.D. Cal. 2016) (quoting *Old Chief v. United States*, 519 U.S. 172,

180 (1997)).

**A.**     **The CMS Survey Findings and Sanctions Are Irrelevant**

CMS's survey findings and the sanctions it imposed as a result of those findings are irrelevant to

the wire-fraud allegations in this case.  The Indictment alleges that Ms. Holmes represented to investors,

doctors, and patients that Theranos could provide accurate and reliable blood tests despite allegedly

knowing that "Theranos's proprietary analyzer had accuracy and reliability problems" and "was, in fact,

not capable of consistently producing accurate and reliable results."  Third Superseding Indictment, ECF

No. 469, ¶¶ 12(A), 16.  *The CMS survey findings, critically, do not assess accuracy and reliability of*

*Theranos technology*.  One CMS inspector has explained that the purpose of the CMS inspections was

only to evaluate whether the laboratory was compliant with federal regulations, and not to determine if

Theranos' tests were accurate.  Ex. 31 at 185: 16-22 ("[I]t's not [CMS's] job to determine whether a

result is accurate."). Notably, many of the deficiencies asserted by CMS did not concern Theranos' technology at all, but instead relate to lab personnel issues. Ex. 12 at 1-2; *see id.* at 93 (citing failures for not having updated training records for 31 lab workers). Whether lab directors or personnel had the correct qualifications does not bear on the capabilities of Theranos technology. Other cited deficiencies concerned regulations regarding lab operational practices and procedures. For example, CMS claimed that Theranos did not have "written policies and procedures detailing [its] patient specimen labeling policy," *id.* at 9; and did not have procedure manuals signed, dated, and approved by the laboratory director prior to use, *id*. at 12. None of that suggests that Theranos technology was not consistently capable of producing accurate and reliable test results. In fact, a CMS inspector confirmed that CMS commonly cites these deficiencies at laboratories. Ex. 31 at 98:16-22 [3]

More fundamentally, CMS assessed only whether Theranos was following its own procedures as laid out in its manuals. Ex. 34 at 4-5. As one CMS inspector explained, CMS only "looks at a laboratory's procedures," such as its own training, documentation, or quality control procedures, and "looks to see that they are running them when they say they are supposed to be running them." *Id.* Its findings thus are framed in terms of failure to follow corrective action policies or other procedures and to document that action. *See generally* Ex. 12. Importantly, "CMS doesn't look to the patient data." Ex. 34 at 4-5. CMS accordingly issued no findings regarding accuracy and reliability of any of Theranos' tests, let alone Theranos' technology. Because the CMS survey was not designed to, and did not, assess accuracy and reliability of a laboratory's tests, it is not probative of a fact of consequence in this case and would be particularly misleading to a jury.

---

[3] Several survey findings concerning the Prothrombin Time/International Normalized Ratio (PT/INR) test cited laboratory staff for failing to use the correct mean normal prothrombin time (MNPT) value when calculating patient results, resulting in a "fail[ure] to ensure that the reported [INR] was calculated accurately prior to reporting final patient results" for the time period 4/3/15 through 9/21/15. Ex. 12 at 70. Because Theranos used FDA-approved, commercially available devices and reagents for its PT/INR test, this computational error unique to the PT/INR test does not reflect any underlying technological or operational issues with Theranos' proprietary devices or other FDA-approved devices or tests in the CLIA lab. Even with respect to PT/INR, CMS' findings did not include a determination that patient test results necessarily were inaccurate. *See* Ex. 31 at 185:1-22 (describing PT/INR results based on her calculations as "different" than those reported by Theranos but emphasizing that "[i]t's "not [CMS'] job to determine whether a result is accurate").

*United States v. Pacific Gas & Elec. Co.*, 178 F. Supp. 3d 927 (N.D. Cal. 2016), considered similar issues in determining whether a report by the NTSB was admissible in an action against PG&E alleging knowing and willing violations of federal safety regulations.  The court held that the probative value of the report's conclusion that "PG&E's Integrity Management program was both deficient and ineffective, and was a probable cause of the accident," was minimal "because the ultimate issue of the NTSB investigation—the cause of the San Bruno explosion—is not at issue in this case."  *Id.* at 947-48. Similarly, here, the "ultimate issue" of the CMS surveys—whether Theranos' lab practices were in compliance with CMS regulations—"is not at issue in this case."  CMS did not investigate the real issue—whether Theranos technology could produce accurate and reliable results.  CMS's findings and ultimate sanctions are thus irrelevant.

### B.    The Risk of Unfair Prejudice and Jury Confusion Substantially Outweighs Any Probative Value

Because CMS did not investigate or issue findings on the accuracy and reliability of Theranos technology, the probative value of its findings relating to CLIA violations is, at best, minimal.  Even the government's hematology expert, Dr. Master, does not opine that CMS's findings of regulatory violations establish that Theranos' tests were inaccurate or unreliable.  Dr. Master offers only the speculative pseudo-opinion that violations of CLIA regulations had the *potential* to render Theranos tests' inaccurate and unreliable.  *See* Ex. 6 at 17 (Master Rpt.).  The probative value of this evidence is marginal at best.

On the other hand, the potential for unfair prejudice is great.  It is likely the jury will put special weight on the assertions of a federal agency in the laboratory testing space even if those assertions are not directly relevant to the issues in dispute.  There is a significant risk that the jury will assume that Theranos, and Ms. Holmes by extension, was deserving of punishment since CMS, an authoritative government agency, cited it for deficiencies and eventually imposed sanctions.

Additionally, the jury might improperly equate CMS's findings with the government's allegation that Theranos technology was not capable of producing accurate and reliable results.  But, as a CMS witness explained, CMS specifically does not reach that ultimate conclusion:  "we only need to

determine if there was *potential* or the *likelihood* [that a laboratory practice] has caused or *could have caused* harm to a patient." Ex. 31 at 135:16-22; 149 (emphasis added); *see also* 42 C.F.R. § 493.2. Accordingly, at best CMS's findings show only that "[t]here was a *potential* because of the noncompliance to have issues with the results." *Id.* at 179:21-24 (emphasis added). At bottom, as one CMS witness explained, "it's not CMS' job" to "decide if any patients have been affected" by the issues cited in its findings. Ex. 34 at 7. The risk that the jury will draw unwarranted inferences from this evidence is substantial and highly prejudicial.

For these reasons, "admitting the [agency's] conclusions [would] invite[] the jury to improperly substitute the [agency's] findings—under a different standard and for a different purpose—for its own findings about" the charges in this case. *PG&E*, 178 F. Supp. 3d at 947–48. There is "a substantial risk that the jury would 'punish' [Ms. Holmes] on the basis of [CMS's] conclusion" about CLIA violations, which is precisely the sort of improper basis that renders evidence unfairly prejudicial. *Id.* (citing *Old Chief*, 519 U.S. at 180); *see also Angelo v. Bacharach Instrument Co.*, 555 F.2d 1164, 1176 (3d Cir. 1977) (affirming exclusion of EEOC report under Rule 403).

The subjective nature of CMS's survey findings only amplifies the prejudice of admitting the findings. As one CMS witness explained, there is no standard for the "particular amount of evidence required under CLIA to make a condition-level finding." Ex. 31 at 33:1-10. According to the witness, CMS surveyors may "have differences of opinion about . . . whether [a deficiency] should be cited as a standard or condition." *Id.* at 167:11-16. It would be highly improper for the jury to substitute the subjective findings of *particular* CMS surveyors (which were never affirmed on appeal) regarding Theranos' compliance with CLIA violations for the jury's findings on the actual issues in this case.

The CMS survey findings of non-compliance with CLIA regulations also fail to demonstrate Ms. Holmes' knowledge of any such deficiencies before they were cited by CMS. This is because, as one CMS witness explained, "[w]hether or not the lab director [or owners of the laboratory] knew about the deficient practice does not enter into the determination of whether condition-level noncompliance exists." Ex. 31 at 36:14-25; 37:2-8. The imprimatur of authority inherent in a federal government agency's report of violations could cause the jury impermissibly to infer that Ms. Holmes knew about, or

even caused, the cited deficiencies.  The risk that the jury will reach conclusions about Ms. Holmes'

knowledge and intent about the deficiencies cited by CMS—which are not even at issue in this case—is

serious.  The even greater risk that the jury may infer knowledge and intent by Ms. Holmes from the

uncharged CMS findings in relation to the actual wire-fraud charges regarding the accuracy and

reliability of Theranos tests is intolerable and unfairly prejudicial.

Because any probative value of the findings and associated sanctions is substantially outweighed

by the risk of unfair prejudice and jury confusion, the CMS findings and sanctions should be excluded

under Rule 403.

## II.      The CMS Reports and Other Documentation of CMS's Findings Are Inadmissible Hearsay

Even if this evidence were otherwise admissible, the CMS reports and other documentation of

CMS's findings must be excluded as hearsay.  Under Federal Rules of Evidence 801 and 802, an out-of-

court statement offered for the truth of the matter asserted is inadmissible unless it falls within a hearsay

exception.  The CMS reports are public records, and the Ninth Circuit has held that "[w]hen public

records are used against a defendant in a criminal prosecution, the public records exception is the

exclusive applicable hearsay exception."  *United States v. Orellana-Blanco*, 294 F.3d 1143, 1149 (9th

Cir. 2002).  This is because Rule 803(8), governing public records, "speaks directly to public records

and carefully delineates the distinction between criminal and civil proceedings in order to protect a

defendant's rights under the confrontation clause."  *Orellana-Blanco*, 294 F.3d at 1149; *see also United

States v. Orozco*, 590 F.2d 789 (9th Cir. 1979) ("While governmental functions could be included within

the broad definition of 'business' in rule 803(6), such a result is obviated by rule 803(8)")

The CMS reports contain "factual findings from legally authorized investigations" and thus are

governed by Rule 803 (8)(a)(iii)  As relevant here, public records that contain factual findings from

legally authorized investigations are admissible "in a civil case *or against the government in a criminal

case.*"  Fed. R. Evid. 803(8)(a)(iii) (emphasis added).  Accordingly, under Rule 803(8), reports of public

agencies setting forth factual findings from legally authorized investigations are inadmissible against a

criminal defendant.  *Id.*; *United States v. Sims,* 617 F.2d 1371, 1377 (9th Cir. 1980); Fed. R. Evid. 803(8)(C) advisory committee's note.[4]

In this case, Rule 803(8) bars admission of the CMS survey reports and other CMS records documenting its survey findings.  As just explained, when the public record at issue is an evaluative report by a public agency, the report is only admissible in a criminal case if offered against the government.  The CMS reports were prepared by a government agency and contain factual findings from legally authorized investigations.  The reports were based on surveys conducted by CMS, a federal agency, and the purpose of the surveys was to determine whether the laboratory was in compliance with CLIA requirements as delineated in 42 C.F.R. § 493.1215 and in response to a complaint received about the lab.  Ex. 12 at 1; Ex. 34 at 2.  The reports expressly state that the surveyors conducted the survey pursuant to a legally authorized investigation: "[f]ederal regulations require onsite surveys to determine whether or not a laboratory is in compliance with the applicable regulations."  *E.g.*, Ex. 12 at 1.  The reports contain findings from the surveys:  each cited deficiency provides a "Findings Include" section that details CMS's findings.  *See, e.g., id.* at 52.  Accordingly, the government may not introduce the reports against Ms. Holmes.

No exception to Rule 803(8) applies here.  The Ninth Circuit has held that public records that relate to "routine, nonadversarial matters made in a nonadversarial setting, reflecting ministerial, objective observations," may be admitted against a criminal defendant.  *Orellana-Blanco*, 294 F.3d at 1150.  The exception, however, is inapplicable to public records generated by agencies or law enforcement that contain "subjective observations, summaries, opinions and conclusions."  *Id.*  For example, in *Orozco*, the Ninth Circuit held that Rule 803(8) did not bar admission against a criminal defendant of a Treasury Enforcement Communications System data report that captured the license plates of vehicles crossing the border, because the report simply recorded license plate numbers of all cars that passed by and therefore concerned routine, nonadversarial matters.  590 F.2d at 793.  By

---

[4] The current Rule 803(8)(A)(iii) is functionally equivalent to the provision formerly styled as Rule 803(8)(C), which applied to "factual findings resulting from an investigation made pursuant to authority granted by law."  *Nipper v. Snipes*, 7 F.3d 415, 417 (4th Cir. 1993).

contrast, in *Orellana-Blanc*, the Ninth Circuit held that the public-records exception barred admission of an immigration form generated after agency personnel interviewed the defendant because the report contained a subjective recordation of the preparer's observations and the government offered the report to show that the charged crime had been committed.  294 F.3d at 1150.  Because the report was not based on routine non-adversarial matters, the admission of the report was reversible error.  *Id.*

In this case, there was nothing "routine" or "ministerial" about the investigations that led to the CMS findings.  CMS personnel were substituted for the state officials who were initially scheduled to inspect the Theranos lab.  Ex. 34 at 2.  CMS took the "unusual" step of sending central office personnel to conduct the survey.  *Id.*  Critically, the CMS findings were based on the same types of subjective observations, summaries, and opinions at issue in *Orellana-Blanco*.  A CMS witness explained that the standard for a deficiency-level finding is entirely up to whoever is surveying the lab.  The surveyor explained that "once there's a determination of non-compliance, you have to use your professional surveyor judgment to determine what evidence you need to support that noncompliance and there's no standard set . . . it's very situational."  Ex. 31 at 157.  The findings in a CLIA survey can vary from surveyor to surveyor, and surveyors may "have differences of opinion about . . . whether it should be cited as a standard or condition."  *Id.* at 167:16-22.  These subjective determinations are nothing like the routine matter of recording by rote all license plate numbers that cross the border in *Orozco*.

Even if the CMS documents are themselves admissible as agency records, the reports themselves contain out-of-court statements of Theranos personnel presented for the truth of the matter asserted.  *See, e.g.*, Ex. 12 at 7 ("The QC/QA Manager confirmed on 11/18/15 that an investigation was not done or documented.").  The government cannot admit such statements for the truth of the matter asserted.  Nor can CMS witnesses testify about such out-of-court statements.  *See United States v. Morales*, 720 F.3d 1194, 1202 (9th Cir. 2013) ("In general, statements by third parties who are not government employees (or otherwise under a legal duty to report) may not be admitted pursuant to the public records exception but must satisfy some other exception in order to be admitted.").

**CONCLUSION**

For the foregoing reasons, Ms. Holmes respectfully requests an order precluding evidence relating to the CMS survey findings and sanctions, including but not limited to the CMS survey reports, Theranos' written responses to the survey reports, and other CMS documentation of its findings.

DATED:  November 20, 2020                    Respectfully submitted,


                                                        /s/ Amy Mason Saharia
                                                        KEVIN DOWNEY
                                                        LANCE WADE
                                                        AMY MASON SAHARIA
                                                        KATHERINE TREFZ
                                                        Attorneys for Elizabeth Holmes

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on November 20, 2020 a copy of this filing was delivered via ECF on all counsel of record.


/s/ Amy Mason Saharia
AMY MASON SAHARIA
Attorney for Elizabeth Holmes

JOHN D. CLINE (CA State Bar No. 237759)
50 California Street, Suite 1500
San Francisco, CA 94111
Telephone: (415) 662-2260 │ Facsimile: (415) 662-2263
Email: cline@johndclinelaw.com

KEVIN M. DOWNEY (Admitted Pro Hac Vice)
LANCE A. WADE (Admitted Pro Hac Vice)
AMY MASON SAHARIA (Admitted Pro Hac Vice)
KATHERINE TREFZ (CA State Bar No. 262770)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC 20005
Telephone: (202) 434-5000 │ Facsimile: (202) 434-5029
Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

Attorneys for Defendant ELIZABETH A. HOLMES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. CR-18-00258-EJD |
| Plaintiff, | ) |
| | ) **MS. HOLMES' MOTION TO EXCLUDE** |
| v. | ) **EVIDENCE OF REMEDIAL MEASURES AND** |
| | ) **SETTLEMENTS UNDER FEDERAL RULES OF** |
| ELIZABETH HOLMES and | ) **EVIDENCE 401-403, 407, AND 408** |
| RAMESH "SUNNY" BALWANI, | ) |
| | ) Date:    January 22, 2021 |
| Defendants. | ) Time:    10:00 AM |
| | ) CTRM:  4, 5th Floor |
| | ) |
| | ) Hon. Edward J. Davila |
| | ) |
| | ) |

## MOTION TO EXCLUDE EVIDENCE OF REMEDIAL MEASURES AND SETTLEMENTS

PLEASE TAKE NOTICE that on January 22, 2021, at 10:00 a.m., or on such other date and time as the Court may order, in Courtroom 4 of the above-captioned Court, 280 South 1st Street, San Jose, CA 95113, before the Honorable Edward J. Davila, Defendant Elizabeth Holmes will and hereby does respectfully move the Court pursuant to 401-403, 407, and 408 of the Federal Rules of Evidence to exclude evidence of Theranos' remedial measures.  The Motion is based on the below Memorandum of Points and Authorities, the record in this case, and any other matters that the Court deems appropriate.


DATED: November 20, 2020


/s/ Amy Mason Saharia
KEVIN DOWNEY
LANCE WADE
AMY MASON SAHARIA
KATHERINE TREFZ
Attorneys for Elizabeth Holmes

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

MEMORANDUM OF POINTS AND AUTHORITIES ...........................................................1

BACKGROUND ...................................................................................................................1

ARGUMENT ........................................................................................................................3

    I.    Evidence of Subsequent Remedial Measures and Settlements Is Irrelevant. ......................3

    II.    Rules 407 and 408 Bar the Evidence. ....................................................................5

        A.    Rule 407 Bars Evidence of Subsequent Remedial Measures. ................................5

        B.    Rule 408 Bars Evidence of the AGO and CMS Settlements. ................................6

    III.    Rule 403 Bars This Evidence. ................................................................7

CONCLUSION ....................................................................................................................10

### MEMORANDUM OF POINTS AND AUTHORITIES

The lynchpin of the government's patient case is that Ms. Holmes represented to customers and investors that "Theranos could provide accurate, fast, reliable, and cheap blood tests" when she "knew Theranos's technology was, in fact, not capable of consistently producing accurate and reliable results." Third Superseding Indictment, ECF No. 469, ¶ 16.  To prove this, the government proposes to use inadmissible, prejudicial evidence of settlements and remedial measures taken by Theranos.  The Court should preclude the government from introducing such evidence.

In particular, the government has suggested that Theranos' decision to void a small percentage of Theranos' test results, made allegedly in response to a sanctions threat by the Centers for Medicaid and Medicare (CMS), constitutes "an admission [that] its prior statements were false."  Ex. 3 at 68 (Sept. 28, 2020 Gov't Supp. Rule 404(b) Notice).  But the document on which the government relies makes clear that Theranos took this step "out of an extreme abundance of caution," and *not* as an admission of any wrongdoing.  Ex. 27 at 2 (THER-0534700).  Similarly, the government has suggested that it intends to introduce evidence that Theranos decided to provide refunds to customers as part of a settlement with the Arizona Attorney General's Office in order to prove that test results were inaccurate, even though the settlement expressly disclaims any such admission.  *See* ECF No. 267 at 2-3; *see also* Ex. 5 at 11 (Sept. 28, 2020 Gov't Supp. Rule 16 Disclosure).  This evidence is not relevant to the charges against Ms. Holmes, is highly prejudicial, and is barred by the prohibition against evidence of subsequent remedial measures and settlements.

### BACKGROUND

On January 25, 2016, CMS issued a letter to Theranos summarizing its finding of a recent review of Theranos' laboratory in Newark, California, pursuant to the Clinical Laboratory Improvement Amendments ("CLIA").[1]  Ex. 12 (THPFM0002240153).  The letter explained CMS's findings and included a "Form CMS-2567" with a list of deficiencies Theranos was instructed to correct.  *Id.* at 1-2.

---

[1] Congress passed the Clinical Laboratory Improvement Amendments (CLIA) in 1988, establishing quality systems standards for all laboratory testing.  Within the Centers for Medicare & Medicaid Services (CMS), State Survey Agencies enforce CLIA standards.

CMS cited Theranos for failing to meet five CLIA Condition-Level requirements, and several CLIA Standard-Level requirements.[2] *Id.* Three of the Condition-Level requirements concerned issues with Theranos laboratory personnel such as issues with its laboratory director and technical supervisor. *Id.* at 1. The other two concerned Theranos' compliance with CLIA regulations governing laboratory issues. CMS did not find that Theranos' tests were inaccurate or unreliable. CMS warned Theranos that if it did not remediate these deficiencies within 10 days, CMS would impose sanctions, which could include revocation of the lab's CLIA certification and cancellation of the lab's approval for Medicare payments, and which would effectively force the lab to cease operations. *Id.* at 2-3.

Theranos took aggressive and proactive steps to attempt to avoid the threatened sanctions. In a letter dated April 1, 2016, Theranos explained that it had implemented new measures, including, "out of an extreme abundance of caution and based on its dissatisfaction with prior [quality assurance] oversight . . . void[ing] all results reported for the assays run on the Theranos Proprietary System 3.5 (TPS) in 2014 and 2015 and all reported PT/INR tests run on the Siemens Advia BCS XP instrument [from] October 2014 through September of 2015." Ex. 27 at 2. Despite these steps, CMS imposed the threatened sanctions. Ex. 30 (THPFM0004806442). Theranos appealed the sanctions in an administrative proceeding.

On April 14, 2017, CMS entered a civil settlement with Theranos. Ex. 29 (SEC-CMS-E-0000648). The settlement: (i) resolved all outstanding legal and regulatory proceedings between CMS and Theranos; (ii) reduced Theranos' total civil monetary penalty to $30,000; (iii) prevented Theranos from owning or operating a clinical lab for two years; (iv) withdrew CMS's revocation of Theranos' CLIA operating certificates; and (v) withdrew Theranos' appeal of CMS's sanctions. Theranos expressly did not admit to CMS's allegations in the settlement. *Id.* Ms. Holmes was not party to the settlement.

---

[2] Condition-level deficiency means noncompliance with the conditions of certification as stated in the CLIA regulations. 42 C.F.R. § 488.705. Standard-level deficiency means noncompliance with one or more of the standards that make up each condition. *Id.*

After that settlement, the Arizona Attorney General's Office ("AGO") brought a consumer fraud action against Theranos that also ended in a settlement. The AGO alleged that between 2013 and 2016, Theranos sold approximately 1.5 million blood tests to more than 175,000 Arizonans, resulting in nearly 8 million test results. Ex. 28 (TS-0936133). In April 2017, Theranos entered into a consent decree (the "Arizona Settlement") with the AGO settling the consumer fraud action. *Id.* The consent decree declared that Theranos: (i) would not own, operate, or direct any CLIA lab in Arizona for two years; and (ii) must pay $4.65 million in consumer restitution. Theranos reimbursed each Arizona customer the full amount paid for testing—regardless of whether the results were voided or corrected. *Id.* at 4. Theranos expressly denied the AGO's allegations in the settlement. *Id.* at 2-3. Ms. Holmes was not a party to the AGO's consumer fraud action or the settlement.

The government intends to introduce evidence of Theranos' remedial measures and settlement with the AGO in order to prove that "Theranos was unable to produce accurate and reliable test results" *See, e.g.*, Ex. 3 at 2-5, 68. For example, it alleges, "Theranos's voiding of [customers'] test[s] tends to show Theranos was unable to produce accurate and reliable test results." *Id.* at 3-5. The government similarly asserts that "[e]vidence Theranos voided tests is an admission its prior statements [regarding the accuracy and reliability of Theranos technology] were false." *Id.* at 68. The government has also suggested that it intends to introduce evidence that Theranos decided to provide refunds to customers as part of a settlement with the Arizona AGO in support of its allegation that Theranos' technology was not capable of producing accurate and reliable test results. *See* ECF No. 267 at 2-3.

<div align="center">ARGUMENT</div>

**I.    Evidence of Subsequent Remedial Measures and Settlements Is Irrelevant.**

Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. If evidence does not pass this standard, it is inadmissible. Fed. R. Evid. 402. Evidence of Theranos' remedial measures and settlements is irrelevant to the charges in this case.

First, evidence regarding Theranos' decision to void tests is not probative of whether Ms. Holmes intended to defraud investors or paying customers. The government seeks to admit evidence of

the voided tests to show that Theranos was not able to produce accurate and reliable results, Ex. 3 at 68, and that Ms. Holmes' statements to the contrary were false, *id.* at 5. But, when Theranos voided a small percentage of its prior test results, it did not admit that Theranos' technology produced inaccurate results. Theranos made the voiding decision in the context of ongoing discussions with CMS in which the company was trying to show its willingness to correct quality assurance procedures and lab oversight issues cited by CMS, which had nothing to do with the accuracy of Theranos' tests results themselves. *See, e.g.*, Ex. 12 at 18 (citing failure to maintain freezer temperature ranges consistent with manufacturer's instructions). Indeed, Theranos made clear that it was voiding the tests out of "an extreme abundance of caution and based on its dissatisfaction with prior [quality assurance] oversight." Ex. 27 at 2. Theranos' decision to void tests because of uncertainty with how prior leadership operated the laboratory and in an abundance of caution does not tend to prove that Theranos' technology was incapable of consistently providing accurate and reliable results. ECF No. 469, ¶ 16.

Second, evidence that Theranos entered settlements with CMS and the AGO is likewise irrelevant. Theranos' settlement with CMS does not admit regulatory violations. And even if it did, none of the violations cited by CMS showed that Theranos was incapable of consistently producing accurate and reliable test results. As a CMS inspector who surveyed the Theranos laboratories explained, the purpose of the CMS inspections was only to evaluate whether the laboratories were compliant with federal regulations, and not to determine if Theranos' tests were accurate. Ex. 31 at 185:16-22 (Jan. 28, 2020 Bennet Dep.) ("[I]t's not [CMS's] job to determine whether a result is accurate."); *see also* Ms. Holmes' Mot. To Exclude Evidence of CMS Findings and Sanctions. Indeed, CMS did not mandate that Theranos void any test results. Theranos admitted nothing at all about that issue.

As for the AGO settlement, Theranos expressly denied that it had "engaged in any unlawful conduct, but has agreed to the entry of this Consent Decree in order to provide full reimbursement to Arizona consumers who purchased Defendant's blood testing services[.]" Ex. 28 at 2-3. The AGO consent decree explicitly states that it "should not be construed to be an admission by Defendant of any liability" and that the "terms of the Consent Decree shall not be cited as evidence of wrongdoing by

Defendant or its successors and assigns." *Id.* As a result, neither the fact of the settlement nor its terms (including the refunds) tend to prove that Theranos was incapable of consistently providing accurate and reliable results or any other fact of consequence in this action. Accordingly, the Court should exclude this evidence under Rules 401 and 402.

## II. Rules 407 and 408 Bar the Evidence.

### A. Rule 407 Bars Evidence of Subsequent Remedial Measures.

Even if Theranos' remedial steps to void tests were otherwise relevant, Rule 407 nonetheless would require their exclusion. "Under Federal Rule of Evidence 407, evidence of subsequent remedial measures is not admissible to prove culpable conduct by the party taking those measures." *Gilliam v. Am. Cas. Co., of Reading, Pennsylvania*, 735 F. Supp. 345, 351 n.9 (N.D. Cal. 1990). The Rule also prohibits use of these measures to show "a defect in a product or its design." Fed. R. Evid. 407. The purpose of Rule 407 is to encourage parties to improve safety "conditions without fear that subsequent measures will be used as evidence against them." *Gauthier v. AMF, Inc.*, 788 F.2d 634, 637 (9th Cir. 1986). "The courts have applied this principle to exclude evidence of subsequent repairs, installation of safety devices, changes in company rules, and discharge of employees." Fed. R. Evid. 407 advisory committee's note; *see also Flaminio v. Honda Motor Co.*, 733 F.2d 463, 468 (7th Cir. 1984) (excluding evidence of documents used to make design of product safer after accident); *Robertson v. McNeil-PPC Inc.*, 2015 WL 12698313, at *7 (C.D. Cal. Mar. 20, 2015) (excluding evidence of recall of medication); *Stearns v. Select Comfort Retail Corp.*, 2009 WL 1635931, at *9 (N.D. Cal. June 5, 2009) (noting that any evidence of attempted repairs or new design would be inadmissible); *Benedict v. Zimmer, Inc.*, 405 F. Supp. 2d 1026, 1035-36 (N.D. Iowa 2005) (excluding evidence of a subsequent change in the design of an artificial hip).

Rule 407 does not permit the government to introduce evidence relating to Theranos' remedial measures. The government seeks to offer evidence of Theranos' decision to void test results as proof of culpability on the part of Ms. Holmes—*i.e.*, to improperly show that she falsely stated that Theranos' tests were inaccurate and unreliable. For example, the government's Rule 404(b) notice points to five Theranos customers who allegedly received voided test results and seeks to introduce this fact as

evidence that "Theranos was unable to provide accurate and reliable results." *See, e.g.*, Ex. 3 at 2-5. Similarly, the government seeks to introduce evidence of voided tests to show "Defendants' intent to defraud patients by depriving them of the information they believed they would receive when patronizing Theranos's services," *id.* at 74-75, and as an admission that their prior statements about Theranos' technology were false. *Id.* at 68. Each purpose is intended to support the government's argument that Ms. Holmes is culpable of wire fraud, in part because of statements about the accuracy and reliability of Theranos technology. Because the government seeks to admit evidence of subsequent remedial measures for the express purpose of showing culpability and a purported defect in Theranos' technology, the Court should exclude this evidence under Rule 407.[3]

**B.     Rule 408 Bars Evidence of the AGO and CMS Settlements.**

"Federal Rule of Evidence 408 governs the admissibility of evidence of conduct or statements made during settlement negotiations." *Manzo v. Cty. of Santa Clara*, 2019 WL 2866047, at \*3 (N.D. Cal. July 3, 2019). It provides that "furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise the claim" is inadmissible "either to prove or disprove . . . a disputed claim or to impeach by a prior inconsistent statement or a contradiction." Fed. R. Evid. 408; *see also Rhoades v. Avon Prod., Inc.*, 504 F.3d 1151, 1161 (9th Cir. 2007) ("[E]vidence from settlement negotiations may not be considered in court when offered to prove liability." (internal quotation marks omitted)). The purpose of Rule 408 is to "ensure that parties may make offers during settlement negotiations without fear that those same offers will be used to establish liability should settlement efforts fail." *Rhoades*, 504 F.3d at 1161. While Rule 408 makes an exception for statements made in negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority when offered in a criminal case, Fed. R. Evid. 408(a)(2), the settlement itself remains inadmissible, *see* Fed. R. Evid. 408(a)(1); *see*

---

[3] Notably, the measures implemented by Theranos are among the measures that Department of Justice prosecutors consider in determining whether to prosecute corporations for misconduct. *See* Department of Justice Manual § 9-28.1000. It would be exceptionally unfair for the Department of Justice to encourage corporate CEOs to take remedial measures to attempt to avoid prosecution and then turn around and use the remedial measures as evidence of wrongdoing at trial.

*also id.* advisory committee's note ("An offer or acceptance of a compromise of any civil claim is excluded under the Rule if offered against the defendant as an admission of fault.").

The government has indicated its intent to use the settlements for this prohibited purpose. In prior brief, the government argued that the fact that Theranos "voided years of results from its proprietary analyzer and refunded test fees to tens of thousands of patients after its misrepresentations were exposed" proved that the test were unreliable and "worthless." ECF No. 267 at 11. Rule 408 bars the introduction of settlement evidence for that purpose, because "an offer or acceptance of a compromise is not very probative of the defendant's guilt" and "admitting such an offer or acceptance could deter a defendant from settling a civil regulatory action, for fear of evidentiary use in a subsequent criminal action." Fed. R. Evid. 408 advisory committee's note.

In *United States v. Hays*, for example, the government claimed that evidence of a settlement agreement "assisted the jury in its understanding of the breadth of the conspiracy." 872 F.2d 582, 589 (5th Cir. 1989). The court in *Hays* ruled that the government's stated purpose for admitting the evidence was "at direct odds with the clear mandates of Rule 408," and held that admission of evidence regarding the settlement was in error. The court reasoned that "[t]he potential impact of evidence regarding a settlement agreement with regard to a determination of liability is profound. It does not tax the imagination to envision the juror who retires to deliberate with the notion that if the defendants had done nothing wrong, they would not have [settled]." *Id.*

The same result should follow in this case. Admission of two settlements related to Theranos' testing will invite the jury to assume that if Ms. Holmes did nothing wrong, Theranos would not have entered settlements with two different entities. *Id.* The settlements should be excluded.

## III.  Rule 403 Bars This Evidence.

Even if this evidence were relevant, it must be excluded because its "probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403; *see also United States v. Hearst*, 563 F.2d 1331, 1336 (9th Cir. 1977). Evidence is unfairly prejudicial when it has "an undue tendency to suggest decision on an improper

basis, commonly, though not necessarily, an emotional one." *United States v. Pac. Gas & Elec. Co.*, 178 F. Supp. 3d 927, 941 (N.D. Cal. 2016) (citing *Old Chief v. United States*, 519 U.S. 172, 180 (1997)).

*United States v. PG&E* is instructive. There, the court ruled that the risk of unfair prejudice substantially outweighed the probative value of remedial measures an authoritative government agency imposed upon PG&E following its investigation of an explosion. *Id.* at 949. The court held that because the government had charged the defendant with violations of the Pipeline Safety Act regulations, remedial measures aimed at fixing deficiencies related to the regulation would be probative of the alleged violation of those regulations.[4] However, the court excluded the evidence, agreeing with PG&E that the risk the jury would assume that because an "authoritative government agency, imposed remedial measures, then PG&E is deserving of punishment" substantially outweighed any probative value. *Id.* (citing *Angelo v. Bacharach Instrument Co.*, 555 F.2d 1164, 1176 (3d Cir.1977) (holding that it was within the discretion of the trial judge to exclude an Equal Employment Opportunity Commission ("EEOC") determination letter because the probative value of the letter "was substantially outweighed by the dangers of unfair prejudice and misleading the jury inherent in an . . . EEOC evaluation of the ultimate factual issue in the case.")).

The same danger exists in this case. Evidence that Theranos invalidated certain test results in response to CMS's threatened sanctions will invite the jury to assume that Theranos admitted that the testing data was invalid. That assumption would be misleading and highly prejudicial. Theranos invalidated a small percentage of its total test results in a blanket fashion *independent of the accuracy of the tests*. And the probative value here is much lower than the evidence of remedial measures in *PG&E* because, unlike in *PG&E*, the government has *not* charged Ms. Holmes with willful violation of a regulatory regime and CMS did not itself find that Theranos' tests were inaccurate and unreliable. *See* 178 F. Supp. 3d at 949.

---

[4] Because the remedial measures were involuntary, the Court held that Rule 407 was not an automatic bar to the evidence's admission. 178 F. Supp. 3d at 951. In this case, Theranos' decision to void the tests was voluntary, and therefore Rule 407 applies.

The same danger exists with respect to the CMS and AGO settlements (and associated refunds). Evidence of the settlements would serve no purpose beyond improperly suggesting to the jury that Theranos and/or Ms. Holmes admitted fault on some level, and that CMS's and Arizona's claims against the defendants were legitimate. But litigants settle claims for various reasons, including the benefit of ending a case quickly, and refunds are given for a variety of business purposes. *See Stearn*, 2009 WL 1635931, at *9 (stating the "fact that [defendant] offered a full refund does not support the theory that it had a plan to deceive Plaintiffs"). Furthermore, the differing evidentiary burdens in civil versus criminal proceedings risk misleading the jury as to Ms. Holmes' liability. *See Trout v. Milton S. Hershey Med. Ctr.*, 572 F. Supp. 2d 591, 596 (M.D. Pa. 2008) ("Settlement agreements . . . are inadmissible regardless of relevance if offered to establish liability for or the amount of a claim or if introduction thereof would result in undue prejudice to an opposing party.").

In *United States v. Davis*, for example, the court held that, even if the government sought to admit a settlement for a purpose other than proving the defendant's guilt, it was inadmissible under Rule 403 because it was unfairly prejudicial. 2009 WL 3646459, at *5 (E.D. Pa. Nov. 4, 2009). The court reasoned that the limited probative value of the evidence was outweighed by the "risk that a jury will view the agreement as a confession of liability and guilt, regardless of the purpose for which the evidence is received." *Id.* The court observed that this prejudice was so great that "[e]ven a carefully crafted limiting instruction might not eliminate the prejudicial effect of the agreement." *Id.*

Finally, the evidence that Theranos voided tests and settled with CMS and the AGO is inadmissible because its admission would necessarily require time-consuming mini-trials. Ms. Holmes would be forced to rebut the government's allegations that these actions demonstrate knowledge of inaccurate tests. Doing so would require an extensive presentation of evidence about the decisions to void the tests and circumstances under which the settlements were executed, including the regulatory backdrop for CMS's actions. *See Negrete v. Allianz Life Ins. Co. of N. Am.*, 2013 WL 6535164, at *1 (C.D. Cal. Dec. 9, 2013) ("[A]llowing [the parties] to introduce this evidence would result in a series of 'mini-trials' regarding the grounds for the decisions and the regulatory schemes of the various states involved." (internal quotation marks and citation omitted (alteration in original)); *see also  Van v.*

*Language Line Servs.,* Inc., 2016 WL 3566980, at *3 (N.D. Cal. June 30, 2016) (excluding evidence of settlement to avoid mini-trial on the meaning of the provisions in the settlement agreement).  And Ms. Holmes' ability to present the full picture of the reasons for these actions may well be compromised by the extensive involvement of attorneys in these decisions.  Because the danger of unfair prejudice and jury confusion substantially outweighs any probative value of this evidence, the Court should also exclude it under Rule 403.

<div align="center">

**CONCLUSION**

</div>

For the foregoing reasons, Ms. Holmes respectfully requests an order precluding the government from introducing any evidence of subsequent remedial measures taken by Theranos, including voiding or refunding of tests, and the settlements with CMS and the Arizona Attorney General Office.

DATED: November 20, 2020                    Respectfully submitted,


                                            /s/ Amy Mason Saharia
                                            KEVIN DOWNEY
                                            LANCE WADE
                                            AMY MASON SAHARIA
                                            KATHERINE TREFZ
                                            Attorneys for Elizabeth Holmes

**CERTIFICATE OF SERVICE**

I hereby certify that on November 20, 2020 a copy of this filing was delivered via ECF on all

counsel of record.


/s/ Amy Mason Saharia
AMY MASON SAHARIA
Attorney for Elizabeth Holmes

JOHN D. CLINE (CA State Bar No. 237759)
50 California Street, Suite 1500
San Francisco, CA 94111
Telephone: (415) 662-2260 │Facsimile: (415) 662-2263
Email: cline@johndclinelaw.com

KEVIN M. DOWNEY (Admitted Pro Hac Vice)
LANCE A. WADE (Admitted Pro Hac Vice)
AMY MASON SAHARIA (Admitted Pro Hac Vice)
KATHERINE TREFZ (CA State Bar No. 262770)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC 20005
Telephone: (202) 434-5000 │Facsimile: (202) 434-5029
Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

Attorneys for Defendant ELIZABETH A. HOLMES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>v.<br><br>ELIZABETH HOLMES and<br>RAMESH "SUNNY" BALWANI,<br><br>     Defendants. | Case No. CR-18-00258-EJD<br><br>**DEFENDANT'S MOTION TO EXCLUDE EXPERT OPINION TESTIMONY OF DR. STEPHEN MASTER UNDER RULES 401-403 AND 702**<br><br>Date:    January 22, 2021<br>Time:   10:00 AM<br>CTRM: 4, 5th Floor<br><br>Hon. Edward J. Davila |

**NOTICE OF DAUBERT MOTION**

PLEASE TAKE NOTICE that on January 22, 2021 at 10:00 a.m., or on such other date and time as the Court may order, in Courtroom 4 of the above-captioned Court, 280 South 1st Street, San Jose, CA 95113, before the Honorable Edward J. Davila, Defendant Elizabeth Holmes will and hereby does respectfully move the Court pursuant to Rules 401-403 and 702 of the Federal Rules of Evidence for an Order excluding certain expert testimony of Dr. Stephen Master.  The Motion is based on the below Memorandum of Points and Authorities and Exhibits, the Declaration of Amy Mason Saharia, the record in this case, and any other matters that the Court deems appropriate.


DATED: November 20, 2020

                                        /s/ Amy Mason Saharia
                                        KEVIN DOWNEY
                                        LANCE WADE
                                        AMY MASON SAHARIA
                                        KATHERINE TREFZ
                                        Attorneys for Elizabeth Holmes

## TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................1

BACKGROUND ...............................................................................................................................2

       A.     The Accuracy and Reliability of Specified Theranos Tests....................................................2

       B.     Adherence to Industry Standards by Theranos ..................................................................5

ARGUMENT .....................................................................................................................................6

I.     EXPERT TESTIMONY MUST DERIVE FROM THE WITNESS'S SPECIALIZED
     KNOWLEDGE, RELATE TO A MATERIAL ASPECT OF THE CASE, AND
     REST ON A RELIABLE FOUNDATION AND VALID METHODS ...........................................6

II.    DR. MASTER'S OPINIONS ABOUT THERANOS' BLOOD TESTS SHOULD BE
     EXCLUDED ...............................................................................................................................8

       A.     Dr. Master's Opinion That There Are "Questions" About the Accuracy and
             Reliability of Certain Tests Would Not Help the Jury And Is Unreliable .........................8

       B.     Dr. Master's Opinions about All Ten Tests Lack Reliability ...........................................10

       C.     Dr. Master's Opinions as to "Problems" with the Edison Are Unreliable
             Speculation.....................................................................................................................17

III.   DR. MASTER'S OPINIONS ABOUT "NORMAL INDUSTRY STANDARDS"
     MUST BE EXCLUDED............................................................................................................19

       A.     Dr. Master's Opinions About Theranos' Compliance with Industry Standards
             Rest on Improper Legal Opinions....................................................................................19

       B.     Dr. Master's Opinions about Industry Standards Would Mislead, Rather Than
             Help, the Jury ...............................................................................................................22

IV.   DR. MASTER'S MISCELLANEOUS OBSERVATIONS ARE IRRELEVANT ......................23

V.    DR. MASTER IS NOT QUALIFIED TO OPINE ON FINGERSTICK TESTING ON
     THERANOS TECHNOLOGY ..................................................................................................24

VI.   AT A MINIMUM, THE COURT SHOULD HOLD A *DAUBERT* HEARING..........................25

CONCLUSION.................................................................................................................................25

## TABLE OF AUTHORITIES

### CASES

**Pages**

*Aguilar v. Int'l Longshoremen's Union Local No. 10*, 966 F.2d 443 (9th Cir. 1992) ..................19

*Cabrera v. Cordis Corp.*, 134 F.3d 1418 (9th Cir. 1998) .........................................................7, 12

*City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036 (9th Cir. 2014) ......................................7, 9

*Claar v. Burlington N. R.R.*, 29 F.3d 499 (9th Cir.1994) ............................................................7

*Daubert v. Merrell Dow Pharm. (Dauber II)*, 43 F.3d 1311 (9th Cir.1995) ........................ *passim*

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).................................. *passim*

*Enyart v. Nat'l Conf. of Bar Examn'rs, Inc.*, 823 F. Supp. 2d 995 (N.D. Cal. 2011)....................24

*Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457 (9th Cir. 2014) .........................................6

*Finestone v. Florida Power & Light Co.*, 2006 WL 267330 (S.D. Fla. Jan. 6, 2006)..................16

*G.E. Co.. v. Joiner*, 522 U.S. 136 (1997).......................................................................7, 13, 15, 18

*Gonzalez v. Valenzuela*, 2001 WL 36387147 (C.D. Cal. Nov. 26, 2001) .....................................10

*In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prod. Liab. Litig.*, 2000 WL
   876900 (E.D. Pa. June 20, 2000) ............................................................................................10

*In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004) ..................................10, 20

*In re Roundup Prods. Liab. Litig*, 390 F. Supp. 3d 1102 (N.D. Cal 2018)............................15, 17

*Jones v. United States*, 933 F. Supp. 894 (N.D. Cal. 1996)............................................................6

*Kumho Tire Co., v. Carmichael*, 526 U.S. 137 (1999) ...............................................................6, 7

*LeClercq v. Lockformer Co.*, 2005 WL 1162979 (N.D. Ill. Apr. 28, 2005) ................................14

*McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233 (11th Cir. 2005) ........................................7, 14

*McHugh v. United Service Auto. Ass'n*, 164 F.3d 451 (9th Cir.1999)..........................................21

*N.W. v. City of Long Beach*, 2016 WL 9021966 (C.D. Cal. June 7, 2016) ..................................20

*Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521 (6th Cir. 2012) ..................................7

*Pecover v. Elec. Arts Inc.*, 2010 WL 8742757 (N.D. Cal. Dec. 21, 2010) .............................11, 12

*Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.,* 1997 WL 34605244 (N.D. Cal. Jan. 6, 1997) .................................................................................................................19

*S.E.C. v. Capital Consultants, LLC*, 397 F.3d 733 (9th Cir. 2005) ................................................19

*Salinas v. Amteck of Kentucky, Inc*., 682 F. Supp. 2d 1022 (N.D. Cal. 2010)..............................25

*Sanchez v. Jiles*, 2012 WL 13005996 (C.D. Cal. June 14, 2012) ...........................................6, 23

*Scentsational Techs. v. PepsiCo, Inc.*, 2018 WL 1889763 (S.D.N.Y. Apr. 18, 2018) .................18

*United States v. Baras*, 2013 WL 6502846 (N.D. Cal. Dec. 11, 2013) ..........................................8

*United States v. Caputo*, 374 F. Supp. 2d 632 (N.D. Ill. 2005) ....................................................20

*United States v. Cordoba*, 104 F.3d 225 (9th Cir. 1997) ...............................................................7

*United States v. Hermanek*, 289 F.3d 1076 (9th Cir. 2002)........................................................6, 7

*United States v. Locascio*, 6 F.3d 924 (2nd Cir. 1993) ................................................................19

*United States v. Redlightning*, 624 F.3d 1090 (9th Cir. 2010)......................................................24

*United States v. Rincon*, 28 F.3d 921 (9th Cir. 1994)..............................................................7, 13

*Velazquez v. Costco Wholesale Corp.*, 2012 WL 13059928 (C.D. Cal. Oct. 12, 2012)...............11

*Vollrath Co. v. Sammi Corp.*, 9 F.3d 1455 (9th Cir. 1993)...........................................................11

*Wessmann v. Gittens*, 160 F.3d 790 (1st Cir. 1998) .............................................................11, 14

## RULES AND REGULATIONS

42 C.F.R. § 493.931………………………………………………………………………....3

Fed. R. Evid. 402 .....................................................................................................................6, 22

Fed. R. Evid. 403 .............................................................................................................................7

Fed. R. Evid. 702 ............................................................................................................... *passim*

## MEMORANDUM OF POINTS AND AUTHORITIES

The government's fraud case rests in large part on its allegations that Ms. Holmes represented Theranos' blood tests to be accurate and reliable but knew they were not consistently accurate and reliable. To support the proposition that Theranos' tests were not consistently accurate and reliable, the government has proffered the expert opinion of Dr. Stephen Master, a clinical pathologist. But nearly all of Dr. Master's opinions lack the relevancy, rigor, and reliability that the Federal Rules of Evidence require. They should be excluded.

Experts must ground their analysis in sufficient facts and data and apply a reliable methodology. Dr. Master describes in detail the scientific data analysis that experts in his field use to determine the accuracy and reliability of blood tests. *He did not, however, conduct that analysis for any of Theranos' tests.* Instead, he purports to reach opinions about the accuracy and reliability of Theranos' tests based on customer complaints, e-mails, and isolated snippets of data from limited time periods. His opinions rest on unsound extrapolation and speculation. Notably, Dr. Master himself concedes that he lacks sufficient information to render an opinion on accuracy and reliability for four of the tests for which the government requested an opinion. As for those tests, again based on anecdotes, he asserts only that the tests had "problems" of unknown origin. This unreliable non-opinion will not help the jury answer any question before it in this case.

Dr. Master also opines that Theranos' lab did not comply with his view of applicable "industry standards," and that this supposed noncompliance had the "potential" to jeopardize the accuracy and reliability of Theranos' test results. But he rests his opinion on "industry standards" on his interpretation of federal law and its application to Theranos. Those opinions on complicated questions of law—which Dr. Master is not qualified to give—are squarely impermissible under Rule 702. They will also confuse and mislead the jury. Ms. Holmes is not charged with negligent laboratory practices. Because Dr. Master opines only that the supposed noncompliance had the "potential" to affect the accuracy and reliability of Theranos' test results, his opinion does not fit this case and will not help the jury.

Dr. Master's opinions violate Rule 702 in every way. This Court should exercise its gatekeeping duty and exclude them.

## BACKGROUND

The government offers Dr. Master as an expert in clinical pathology and chemistry. *See* Ex. 6 (Master Report) at 3. It retained Dr. Master to opine on two sets of issues. *First*, it asked him to opine about the accuracy and reliability of tests "such as" a list of ten enumerated Theranos tests. *Id.* at 2-3. It is unclear how these ten tests were selected; the government claims in the Indictment that Theranos was unable to produce accurate or reliable results for 23 tests. *See* TSI ¶ 16, ECF 469. *Second*, it asked Dr. Master to opine about Theranos' lab practices—specifically (i) whether Theranos adhered to normal industry standards for clinical laboratory testing from 2013-2015, and (ii) whether any lack of adherence to normal industry standards had the potential to impact adversely test accuracy and reliability. Ex. 6 at 2-3. Dr. Master purports to base his opinions on his "training in clinical pathology and chemistry, [his] experience as a laboratory medical director and [his] knowledge of standards and best practices as established by federal regulations and by the College of American Pathologists." *Id.* at 3.

The government retained Dr. Master on February 19, 2020, less than 2 ½ weeks before its expert disclosure deadline. Ex. 7 (USAO-006872). On February 28, the government sent Dr. Master an outline of its desired opinions. Ex. 8 (USAO-007115-7116). Dr. Master responded on March 1 that he had received the outline but had not received other documents he had discussed with the government. *Id.* He received those documents later that day. *Id.* On March 5, Dr. Master reported that to "fully render the opinion" the government wanted with respect to four tests (HIV, HbA1c, hCG, and Calcium," he would need more documents. Ex. 9 (USAO-006916). Dr. Master sent the government the first draft of his report on March 5. *Id.* He sent the government the final report on March 7. Ex. 10 (USAO-007057). Dr. Master thus appears to have formulated his opinions about the reliability and accuracy of a set of ten distinct blood tests in the course of one week.

### A.    The Accuracy and Reliability of Specified Theranos Tests

Dr. Master's first sets of opinions concern whether Theranos was "able to produce accurate and reliable fingerstick results" for ten specified blood tests.[1] Ex. 6 at 2-3. Dr. Master expressly disclaims

---

[1] Dr. Master identifies only nine tests in the "scope of assignment" portion of his report, but his

offering any opinions on the many tests that Theranos performed on "traditional venous samples on FDA-approved or cleared instruments from third-party vendors." *Id.* at 11. The government has proffered no expert to opine about those tests.

Dr. Master first explains the general methodology by which a professional in the field of hematology determines whether a laboratory test is accurate and reliable. *Id.* at 6-7. According to Dr. Master, professionals make that determination by combining an assessment of two metrics—accuracy and precision. *Id.*

Accuracy, Dr. Master explains, refers to "how close the result comes to the 'true' amount of the analyte"—*i.e.*, the substance being tested—"in a blood sample." *Id.* at 6. If a "gold-standard reference" test measures a certain amount of an analyte in a patient's blood, then an accurate test would exhibit the same result. *Id.* Although any deviation from the gold standard is referred to as exhibiting "bias," Dr. Master notes that "[a] certain amount of bias is a normal and expected feature of [all] laboratory tests." *Id.* In other words, there is a certain amount of expected error in laboratory testing. In fact, one study concluded that "the total [lab] testing process error rate ranges widely from 0.1% to 3.0%." *See* J. Hammerling, A Review of Medical Errors in Laboratory Diagnostics and Where We Are Today, 43 LabMedicine 41 (2012).[2]

Precision, according to Dr. Master, refers to the degree to which a test produces the same result when it measures the same sample multiple times. Ex. 6 at 6-7. A test's precision is assessed using a measure known as the percent coefficient variation (%CV), which expresses how close a test will be to its expected value. *Id.* at 6-7. For example, if a test has a 10%CV, then most of the time the measured value of the test will be within 10% of its expected value. Thus, if a test has an expected value of 100, most of the time the measured value will be between 90 and 110. The higher the %CV, the higher the

report actually discusses ten tests: Vitamin D, chloride, potassium, bicarbonate, calcium, HIV, HbA1c, hCG, cholesterol, and sodium.

[2] Moreover, under federal lab regulations (CLIA), there can be substantial variations between labs on tests performed on the same sample, without any of the results considered to be inaccurate. For example, under CLIA, tests conducted at two different labs for cholesterol, high density lipoprotein (HDL) can produce results that vary by as much as 60 percent (+/- 30 percent of the target value), and both results are deemed accurate. 42 C.F.R. § 493.931(c).

variation, and the less precise the test.

Dr. Master next explains that the concept of total allowable error (TEa) helps determine "whether a lab test can accurately guide patient care" by accounting for both accuracy and precision. Specifically, to fit within the TEa, "the more bias an assay has, the more precise it has to be [and] the more imprecise it is, the less bias it can tolerate." *Id.* If a test result does not fit within the TEa, according to Dr. Master, it is not suitable for clinical use. *Id.*

After setting out the methodology by which professionals in his field accuracy and reliability, Dr. Master discusses ten specific Theranos tests. Notwithstanding his lengthy discussion of this methodology, he does not apply that methodology to Theranos' tests. He does not review a comprehensive set of Theranos data to attempt to calculate the accuracy, precision, or TEa for any test. He does not draw a representative sample of data to attempt to make such calculations. He applies no methodology to determine whether his opinions could hold across the three-year period of the charged conspiracy—*i.e.*, to determine whether Theranos was "consistently" able to produce accurate and reliable results. TSI ¶ 16, ECF 469. In fact, he does not engage in any data analysis at all.

Dr. Master divides his opinions regarding these ten tests into two categories. *First*, for six tests—Vitamin D, chloride, potassium, bicarbonate, cholesterol, and sodium—he opines that "Theranos was not market ready and able to produce accurate and reliable fingerstick results." Ex. 6 at 12.

Based on his review of a subset of tests in this first category, Dr. Master further opines there was a widespread issue with Theranos' "Edison" blood-testing device. *Id.* at 13-14. He acknowledges that "[i]t is not possible to be certain whether [any bias in the instrument] was due to inherent issues with the technology, or with poor lab operational practice." *Id.* at 13. He nonetheless finds it "reasonable to conclude that the instrument problems were not merely a result of poor operational practice, but were related to the quality of the instruments and [tests] themselves." *Id.* at 14.

*Second*, for the remaining four tests—calcium, HIV, HbA1c, and hCG—Dr. Master offers what amounts to a non-opinion. He states that "there are substantial questions about the ability of [Theranos'] laboratory to provide patient-appropriate results for calcium, HIV, HbA1c, and hCG," but notes that "there are insufficient additional details in the material I have reviewed to determine the cause of these

issues, the relationship to either the sample type or Theranos technology, or the resolution of the problems." *Id.* at 12, 15. He does *not* opine that Theranos was unable to produce accurate and reliable fingerstick results for these four tests.

### B.    Adherence to Industry Standards by Theranos

Dr. Master also assessed the "[r]egulation" of "[b]lood [t]esting" and Theranos' clinical laboratory's adherence to those regulations. Although he does not cite any actual provision of law or agency guidance, Dr. Master purports to describe:

> (1) the FDA approval and clearance process;
>
> (2) how the Clinical Laboratory Improvement Amendments ("CLIA") regulate labs running FDA-approved tests;
>
> (3) how CLIA regulates in-house tests known as "laboratory-developed tests," including how such tests must be verified;
>
> (4) how CLIA applies to alterations to FDA-approved tests;
>
> (5) CLIA's regulation of the position of designated laboratory director; and
>
> (6) CLIA's regulation of proficiency testing and quality control.

Ex. 6 at 8-11.

Dr. Master further opines that "Theranos did not adhere to normal industry standards for clinical laboratory testing from 2013-2015" and that "this lack of adherence had the potential to adversely impact test accuracy and reliability." *Id.* at 17. Based largely on the results of a survey by the Centers for Medicare and Medicaid Services (CMS), he opines that in certain cases "the Theranos QC [quality control] system for Edison devices did not prevent samples from being run when the QC was out of the appropriate specifications" and that "Theranos did not appropriately engage in proficiency testing." *Id.* at 17-18. He also notes that "Theranos did not have FDA approval or clearance for their CTN [collection device]," *id.* at 18, expressing his disagreement with the legal position advocated by Theranos through its lawyers, *id.* at 19. All of these supposed deficiencies, he opines, had the "potential" to negatively impact test results, although he offers no explanation for this opinion. *Id.* at 17-19.

## ARGUMENT

I.   **Expert Testimony Must Derive from the Witness's Specialized Knowledge, Relate to a Material Aspect of the Case, and Rest on a Reliable Foundation and Valid Methods**

Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), govern the admissibility of expert witness testimony.  Under Rule 702, expert testimony is admissible only when it (1) "will help the trier of fact to understand the evidence or to determine a fact in issue"; (2) "is based on sufficient facts or data"; (3) "is the product of reliable principles and methods"; and (4) the expert has "reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.  These requirements obligate the court to act as "gatekeeper" to enforce the bounds of permissible expert testimony.  *United States v. Hermanek*, 289 F.3d 1076, 1093 (9th Cir. 2002); *see also Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (Rule 702 "clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify").

For starters, the testimony must be "expert" testimony—*i.e.*, it must derive from the expert's "scientific, technical, or other specialized knowledge."  Fed. R. Evid. 702.  Testimony that merely "parrots [a lay witness's] version of events" flunks that requirement, and should be excluded to avoid "lend[ing] the special aura of credibility associated with expert testimony to [a lay witness's] account of the event."  *Sanchez v. Jiles*, 2012 WL 13005996, at *32 (C.D. Cal. June 14, 2012).

In addition to drawing from the witness's expertise, expert testimony must also be relevant to pass muster under Rule 702.  *Kumho Tire Co., v. Carmichael*, 526 U.S. 137, 141 (1999).  In other words, the expert testimony must "fit" the question the jury must answer, by "speak[ing] clearly and directly to an issue in dispute in the case" and "logically advance[ing] a material aspect of the proposing party's case," *Daubert v. Merrell Dow Pharm., (Daubert II)*, 43 F.3d 1311, 1315, 1321 n.17 (9th Cir.1995).  In making that assessment, courts "must look to the governing substantive standard."  *Id.* at 1320.  The "fit" requirement is more stringent than the relevancy requirement of Rule 402, reflecting "the special dangers inherent in scientific expert testimony."  *Jones v. United States*, 933 F. Supp. 894, 900 (N.D. Cal. 1996); *see also Daubert II*, 43 F.3d at 1321 n.17.

Finally, expert testimony must be reliable, which requires that "the reasoning or methodology

underlying the testimony is scientifically valid and . . . that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 600. "As a prerequisite to making the Rule 702 determination" of reliability, "the court must assure that the methods are adequately explained." *Hermanek*, 289 F.3d at 1093-94; *see also Claar v. Burlington N. R.R.*, 29 F.3d 499, 502 (9th Cir.1994) (experts must "explain [their] reasoning" because district court must "determine that [they] arrived at their conclusions using scientific methods and procedures"). "[A]n expert, whether basing testimony upon professional studies or personal experience, [must] employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. That means that "the analysis undergirding the experts' testimony" must "fall[] within the range of accepted standards governing how scientists conduct their research and reach their conclusions." *Daubert II*, 43 F.3d at 1317; *see City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014); *Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir. 1998). And, even where the expert invokes a methodology used by professionals in his field, the expert may not offer "overreaching" or unduly "speculative" conclusions. *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1247 (11th Cir. 2005). To guard against such opinions, courts must consider whether "there is simply too great an analytical gap between the data and the opinion proffered." *G.E. Co., v. Joiner*, 522 U.S. 136, 146 (1997). An expert's "reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity" are all "[r]ed flags" cautioning against admission of expert testimony. *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012).

Together, Rule 702's requirements help ensure that proffered expert testimony is scientifically sound, adequately supported, and helpful to the jury. Even if expert testimony satisfies Rule 702, however, a court may nonetheless exclude it under Rule 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *United States v. Rincon*, 28 F.3d 921, 925 (9th Cir. 1994); *see also United States v. Cordoba*, 104 F.3d 225, 228 (9th Cir. 1997), as amended (Feb. 11, 1997). "Since scientific expert testimony can be both powerful and quite misleading due to the difficulty in evaluating it, federal judges must 'exclude proffered scientific evidence under Rules 702 and 403 unless they are convinced that it speaks clearly and directly

to an issue in dispute in the case, and that it will not mislead the jury.'" *United States v. Baras*, 2013 WL 6502846, at *8 (N.D. Cal. Dec. 11, 2013).

These principles require excluding most of Dr. Master's opinions, for the following reasons.[3]

## II.    Dr. Master's Opinions about Theranos' Blood Tests Should be Excluded

Dr. Master's opinions on the accuracy and reliability of Theranos blood tests are unreliable.[4]  His opinions—and the inferences he draws from his opinions about the Edison technology—should be excluded for three reasons.  First, for four tests (HIV, HbA1c, hCG and Calcium), Dr. Master states that he has questions about their accuracy but lacks sufficient data to reach an opinion.  That nonopinion will not help the jury.  Second, for all of the tests, Dr. Master does not apply the methodology of experts in his field and bases his opinions on anecdotes or snippets of data, none of which reliably support his opinions.  Finally, the inferences that Dr. Master draws related to Theranos' Edison technology are unsupported and unreliable.

### A.    Dr. Master's Opinion That There Are "Questions" About the Accuracy and Reliability of Certain Tests Would Not Help the Jury And Is Unreliable

For four tests— HIV, HbA1c, hCG, and calcium—Dr. Master fails to provide an opinion as to their accuracy or reliability at all.  Dr. Master acknowledges that "there are insufficient details in the material [he] has reviewed to determine the cause" of any issues with these tests.  Ex. 6 at 15.  Yet he offers his musings anyway, reporting, based on anecdotes, his view that "there are substantial questions about the ability of [the] laboratory to provide patient-appropriate results" for these four tests.  *Id.* at 12.

This opinion is unhelpful to the jury and will produce confusion.  To assess whether proffered expert testimony would help the jury in a given case, courts "must look to the governing substantive standard."  *Daubert II*, 43 F.3d at 1320.  Here the substantive charge is wire fraud, and the government alleges that Ms. Holmes represented that Theranos' "devices could provide 'accurate, fast, reliable, and cheap blood test results," when she allegedly knew the tests could not "consistently produc[e] accurate

---

[3]    Ms. Holmes is not moving to exclude Dr. Master's opinions regarding background principles of accuracy and reliability.  His application of those principles to this case, however, is unreliable for the reasons discussed herein.

[4]    Attached hereto as Appendix A is a chart identifying the ten at-issue tests, his opinion as to each, and the bases for his opinions.

and reliable results."  TSI ¶ 16.

The government asked Dr. Master for an opinion on whether Theranos was capable of producing accurate and reliable results for these four tests.  His correspondence with the government reveals that he believed the information it provided did not allow him to answer that question.  *See* p.2, *supra*.  He thus opined only that he has "questions" about the tests' accuracy, while providing no way for the jury to resolve his "questions."  The role of an expert is to "assist the trier of fact to understand or to determine a fact in issue," *Daubert*, 509 U.S. at 592, not to provide the jury with questions it cannot answer.  Because Dr. Master's inconclusive opinion has limited (if any) probative value and is likely to confuse the jury, it must be excluded under both Rules 702 and 403.

Relatedly, even if he ventured an opinion, it would not be based on sufficient facts or data to be reliable.  The reason he was unable to provide the opinion the government asked for was because, according to Dr. Master, he lacked sufficient "details" to opine about the cause of the "problems" he identifies.  Ex. 6 at 15-16.  For example, with respect to the hCG (pregnancy) and hBA1C (glucose) tests, he observes that "in many cases [he has] not been able to identify a clear paper trail demonstrating the root of these inaccuracies."  *Id.* at 16.  Similarly, Dr. Master concedes that there were "insufficient additional details in the material" to determine how the anecdotal complaints he reviewed "relat[e] to either the sample type or Theranos technology."  *Id.* at 15.  Without those "additional details" Dr. Master has no way of knowing if these anecdotal complaints, which are the sole source for his opinion, involved tests "perform[ed] using traditional venous samples on FDA-approved or cleared instruments from third-party vendors"—tests for which he expressly states he is offering no opinion.  *Id.* at 11.  These concessions are fatal.  Opinions based on "unsubstantiated and undocumented information is the antithesis of . . . scientifically reliable expert opinion."  *City of Pomona*, 750 F.3d at 1044 (citation omitted).

Finally on this point, Dr. Master's "questions" about the reliability of these tests stem from improper speculation about the meaning of certain fact evidence.  Specifically, Dr. Master finds it "noteworthy" that the HIV, HbA1c, and hCG tests do not appear on lists of laboratory-developed tests (LDTs) that Theranos provided to FDA in 2015.  Ex. 6 at 16.  On that ground, he surmises that Theranos

did not find the tests "to be suitable for continued clinical use by that point." *Id.* But experts may not "testify as to the mental processes of the [parties]: what they knew, believed, assumed, or understood, on the basis of their own knowledge or communications from others." *Gonzalez v. Valenzuela*, 2001 WL 36387147, at *4 (C.D. Cal. Nov. 26, 2001). "Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony." *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004); *see also, e.g.*, *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prod. Liab. Litig.*, 2000 WL 876900, at *2 (E.D. Pa. June 20, 2000). Dr. Master cannot permissibly speculate about Theranos' motivation for not including those tests on the list he identifies.

> **B.     Dr. Master's Opinions about All Ten Tests Lack Reliability**

Dr. Master's opinions about the accuracy and reliability of all ten tests are unreliable. Rare is the expert opinion that describes the scientific methodology applied by experts in the field and then throws that methodology out the window. But, incredibly, that is what Dr. Master does. It is unclear that Dr. Master possessed the data he needed to conduct a reliable scientific analysis of the reliability and accuracy of Theranos' tests. Instead, Dr. Master cobbled together his opinions from anecdotal customer complaints, e-mails, and limited snippets of data. That is not the methodology of an expert.

> **1.     *HIV, HbA1c, hCG, calcium, sodium, chloride, and bicarbonate***

For the four tests discussed above, and an additional two tests for which he offers an actual opinion about accuracy and reliability—sodium and chloride —Dr. Master's opinions rest on mere anecdotes such as "customer complaints and Theranos internal investigations" of those complaints. Ex. 6 at 15; *see* Appendix A. To provide one example, for the hCG test, Dr. Master reviewed customer complaints and concludes that "multiple inaccurate results had significant and negative clinical implications for patients." Ex. 6 at 16. He makes no attempt to determine whether those "multiple inaccurate results" were representative of Theranos' hCG results or whether they fell within the permissible total allowable error. For a seventh test, bicarbonate, Dr. Master does not identify any basis for his opinion. His analysis begins and ends with his statement that Theranos was not market ready and able to produce accurate and reliable fingerstick results for this test. *Id.* at 12.

Dr. Master's reliance on anecdotes renders his opinions unreliable and thus inadmissible.

Experts must ground their analysis in "sound data," rather than "limited anecdotal evidence." *Vollrath Co. v. Sammi Corp.*, 9 F.3d 1455, 1462 (9th Cir. 1993); *see Velazquez v. Costco Wholesale Corp.*, 2012 WL 13059928, at *2 (C.D. Cal. Oct. 12, 2012) ("A collection of 25 anecdotal experiences is not a sufficient basis to express an opinion."). This is because anecdotal evidence "does not tend to show that a problem is pervasive" or that the evidence is representative of the expert's opinions. *Wessmann v. Gittens*, 160 F.3d 790, 805 (1st Cir. 1998); *see also Pecover v. Elec. Arts Inc.*, 2010 WL 8742757, at *7 (N.D. Cal. Dec. 21, 2010) (holding that expert's opinion based on anecdotal evidence was unreliable when expert provided no methodology by which she determined the evidence to "be representative of all or even most … opinions").

Dr. Master cannot base an opinion about accuracy or reliability (or for that matter "questions" regarding accuracy or reliability) on such "limited anecdotal evidence." *Vollrath Co.*, 9 F.3d at 1462 (excluding expert opinion when opinion was "inconclusive" and "based on anecdotal evidence"). That is especially true here, where, as Dr. Master admits, there is a certain amount of expected error in laboratory blood testing. *See* Ex. 6 at 6-7. Some number of unexpected or erroneous results—and corresponding complaints about such results—is to be expected. Dr. Master, however, cannot identify "the root cause of these inaccuracies." *Id.* at 15. He applies no methodology whatsoever to determine whether the anecdotal complaints are "representative" of a "pervasive" problem or simply an expected part of a laboratory practice. *Wessmann*, 160 F.3d at 805.

Dr. Master does not even acknowledge this problem, much less resolve it. He fails to provide even basic information regarding the complaints that he reviewed, such as the number of complaints for each test or the date each complaint was lodged. He does not assess whether the complaint reflected a statistically representative sample of test results or whether they covered the entire three-year period of the charged conspiracy. He does not ask whether the number of complaints were statistically significant rather than the result of mere chance. Dr. Master similarly fails to address how the volume of consumer complaints compare with the amount of error typically associated with certain laboratory tests. In short, Dr. Master has failed to put forward any methodology by which he determined that the cited complaints were representative of a larger problem. His opinions based on those complaints and other anecdotal

evidence are unreliable.[5]  *See Pecover*, 2010 WL 8742757, at \*7.

Nor, as already discussed, does Dr. Master even purport to be applying the scientific methodology he describes in his report.  *See* Ex. 6 at 6-7.  Conspicuously, he does not opine that an expert in his field would rely on "consumer complaints" to determine accuracy and reliability of a laboratory test.  This, standing alone, renders his opinions on these tests inadmissible.  *See Cabrera v. Cordis Corp*., 134 F.3d 1418, 1423 (9th Cir. 1998) (expert analysis that does not "follow[] a scientific method embraced by at least some other experts in the field" "does not satisfy *Daubert* or Rule 702").

Dr. Master purports to support his opinion with the observation that "there are inherent limitations to the approach that Theranos had taken for small-volume testing using diluted specimens compared with the original assays."  Ex, 6 at 15.  But that says nothing about whether any individual test was accurate or reliable.  Dr. Master concedes that "there might be technical solutions to ameliorate this problem," *id.*, yet he conducts no scientific analysis of the technical solutions employed by Theranos.  His speculation that "inherent limitations" to Theranos' testing methods rendered any particular test inaccurate or unreliable is just that:  speculation.

Rather than employ the methodology that he applies "independent of [this] litigation," Dr. Master appears to have arrived at his opinions "expressly for purposes of testifying."  *Daubert II*, 43 F.3d at 1318.  Given that context, the government "must come forward with other objective, verifiable evidence that the testimony is based on 'scientifically valid principles.'"  *Id.* at 1317-18. Yet Dr. Master fails to point to a single study, or any other "objective, verifiable evidence," to support his opinion that the tests were not accurate or reliable.  *Id.*  Dr. Master therefore has not carried his burden to "explain precisely how [he] went about reaching [his] conclusions and point to some objective source . . . to show

---

[5] With respect to sodium, Dr. Master bases his opinion on both consumer complaints and on an October 2014 email from Theranos' laboratory director.  *Id.*  According to Dr. Master, the email "indicates that the laboratory had instituted a policy of canceling significantly high or low sodium values" because the lab had "'no way of knowing for sure whether the result is truly abnormal or artifactual to the [test result], or related to a specimen integrity issue.'"  Ex. 6 at 15.  Dr. Master does not explain how a single e-mail from October 2014 supports his broader opinion that the sodium test was inaccurate and unreliable throughout the period of the charged conspiracy.  He also does not claim that experts in his field would typically draw such a conclusion from one e-mail.

that he has followed the scientific method" for these tests.  *Id.* at 1319.  His opinions must be excluded.[6]

### 2.    Cholesterol

The Court should also exclude Dr. Master's opinion that the cholesterol test was not accurate and reliable.  This opinion, in Dr. Master's words, rests on two "strands of evidence [that] support the idea that there were significant accuracy limitations to the Theranos fingerstick cholesterol test."  Ex. 6 at 14.  First, Dr. Master cites a "published report from a group at the Icahn School of Medicine."  *Id.*  Second, Dr. Master cites an incident in which an inaccurate testing result was brought to the attention of the lab director.  Neither provides reliable support for Dr. Master's conclusion.

*First*, Dr. Master discusses the Icahn Report, an observational study of 60 adults in Phoenix that sought to "compare the uncertainty and accuracy in 22 common clinical lab results between [Theranos] and [Quest and LabCorp]."  *See* Ex. 11 ("Icahn Report").  The Report concluded that Theranos' "testing services return results that mostly agree with other services with the exception of lipid panels," a panel that includes cholesterol.  *Id.* at 1735.  It did not reach a definitive conclusion that Theranos' lipids panel or cholesterol test was inaccurate or unreliable.  *See id.* at 1734.  Rather, the "result[]" of the report was that it "found nonequivalent lipid panel test results between Theranos and other clinical services."  *Id.*  The report further concluded that the "disparities between testing services [it] observed could ***potentially*** alter clinical interpretation and health care utilization," and noted that "greater transparency is needed for how Theranos calibrates its test to interpret the lipid panels properly."  *Id.* at 1740 (emphasis added).  In other words, the Icahn study concluded that further investigation was needed before a firm conclusion on the accuracy of Theranos' cholesterol tests could be reached.  Yet Dr. Master draws a conclusion anyway, purportedly based on the Icahn study.  Dr. Master's willingness to draw conclusions from the Icahn study weighs against the reliability of his opinion.  *Cf. Joiner*, 522 U.S. at 146 ("Given that [the

---

[6] Together with his opinion that Theranos' tests were not accurate or reliable, Dr. Master opines that the tests were not "market ready."  Ex. 6 at 12.  He does not define that concept, nor does he provide "sufficient detail" about the basis for his conclusion that Theranos' tests do not satisfy it.  *United States v. Rincon*, 28 F.3d 921, 924 (9th Cir.1994).  Dr. Master also provides no basis to conclude that he is qualified to offer an opinion regarding "market readiness."  Dr. Master thus should be precluded from offering an opinion on the undefined concept.

authors of the report] were unwilling to say that PCB exposure had caused cancer among the workers they examined, their study did not support the experts' conclusion that Joiner's exposure to PCB's caused his cancer.").

Moreover, the report identifies several limitations that Dr. Master failed to consider—an omission that further undercuts his reliance on the study.  These self-identified limitations include:  (1) the lack of technical replicates in the Theranos data; (2) the fact that the Theranos samples were shipped from Arizona to California; and (3) the inability to "manipulate collection variables to determine their imprecision contribution."  Ex. 11 at 1740-41.  The study further observes that the difference found between Theranos results and other laboratories "could arise from multiple sources: collection (low-volume finger prick versus venipuncture), processing (how the samples were prepped by the laboratory technicians), instrumentation (new versus existing technology), or some combination of these factors."  *Id.*  That Dr. Master fails to address significant limitations of the Icahn study highlights the "speculative" and "overreaching" nature of his conclusions.  *McClain*, 401 F.3d at 1247 ("expert's inclination to draw overreaching conclusions from self-limiting medical articles[] show[s] the speculative nature of his opinions"); *see also LeClercq v. Lockformer Co.,* 2005 WL 1162979, at *4 (N.D. Ill. Apr. 28, 2005) ( The expert's] failure to discuss the import of, or even mention, these material facts in his reports amounts to "cherrypick[ing] the facts he considered to render his opinion, and such selective use of facts fail to satisfy the scientific method and *Daubert*.")

*Second*, Dr. Master relies on evidence that "inaccuracies in a lipid testing result" were brought to the attention of the lab director in late 2014, and the director "noted" that the inaccuracies were inconsistent "with commonly-utilized estimates of the relationship between the various components of the lipid test."  Ex. 6 at 14.  Again, one snippet of evidence about an abnormal "lipid testing result" in 2014 falls far short of the type of data from which an expert can reliably determine whether a test was consistently accurate or reliable.  *Wessmann*, 160 F.3d at 805 (anecdotal evidence suspect because it "does not tend to show that a problem is pervasive").  Dr. Master's reliance on patently insufficient evidence further impugns the reliability of his cholesterol opinion.

### 3.    *Potassium*

Dr. Master's opinion regarding the potassium assay should also be excluded because the data on which he relies are woefully inadequate and his extrapolations from the limited data are unsupported and unsound.  *See Joiner*, 522 U.S. at 146 (opinion unreliable when "there is simply too great an analytical gap between the data and the opinion proffered").  "[B]oth unsound methods *and* unjustified extrapolations from existing data can require the Court to exclude an expert."  *In re Roundup Prods. Liab. Litig*, 390 F. Supp. 3d 1102, 1112 (N.D. Cal 2018).

Dr. Master opines that the potassium assay was inaccurate and unreliable because "[i]n April 2014, potassium fingerstick results were shown to be abnormally high 17% of the time."  Ex. 6 at 14.  He extrapolates from this unsourced data point from a single month to opine that there are "two possible explanations" for this result: the assay was inaccurate or "the fingerstick collection modality, possibly including the CTN, led to hemolysis rates which artifactually elevated the potassium."  *Id.*

This is sheer speculation and based on flawed methodology.  First, it is unclear what "data" Dr. Master reviewed in forming his opinion about the potassium assay.  He simply states that potassium fingerstick measurements "were shown to be abnormally high" for one month in 2014.  *Id.* Was this 17% figure derived from a report, a peer-reviewed study, an email?  Does this figure reflect data from the hundreds of devices employed by Theranos or just one device?  Would experts in his field rely on the source of that data in forming an opinion as to the accuracy of an assay?  Is this one data point enough?  Without this information, the Court does not have sufficient information to determine whether Dr. Master's opinion is reliable.

Second, Dr. Master provides no methodology for extrapolating data for one month to an opinion about whether Theranos could *consistently* produce accuracy and reliability potassium results for a three-year period.  He presents no corroborating data for any other time period, an no explanation for why he concludes that the assay was inaccurate or unreliable during those other time periods.  He just assumes the April 2014 data is representative of a three-year period.  That speculation is utterly unreliable.

### 4. *Vitamin D*

Dr. Master's opinion as to the Vitamin D assay extrapolates from equally paltry data. In support of his opinion that Theranos was "not market ready and *able to produce accurate and reliable* fingerstick test results for tests such as Vitamin D," he points only to a CMS report following a survey of a Theranos laboratory. Ex. 6 at 12. Master observes that "Theranos QC measurements for a single instrument demonstrated a CV (coefficient variation, *see* p.3, *supra*) as high as 63.8%" for the Vitamin D assay. *Id.* From this observation, Master opines that Theranos' Vitamin D assay was inaccurate and unreliable. A simple review of the CMS report shows that his opinion does not withstand scrutiny.

The CMS report identifies Vitamin D QC measurements from three (out of hundreds of) Theranos devices from the periods 6/29/14 through 7/24/14, 6/29/14 through 7/25/2014, and 8/21/14 through 8/30/2014. The 63.8% QC measurement on one device on which Master relies was limited to the week of "8/21/14 through 8/30/14." Ex. 12 at 54 (Jan. 25, 2016 CMS Report-THPFM0002240153). Nine days' worth of data for one device is patently insufficient to support an opinion that Theranos' technology was incapable of consistently producing accurate and reliable results over a three-year period. As for the other two instruments, the data were limited to one month and conflicting: one was less than 19% (an acceptable rate under Theranos standards) and the other approximately 30%. *Id.* at 54-55. Dr. Master incorrectly states that these CVs were above Theranos standards, Ex. 6 at 12-13; as just discussed, one of the devices was within Theranos standards. But more broadly, Dr. Master fails to explain why it is sufficient for an expert to rely on this limited set of data to extrapolate to an opinion that Theranos technology was not able *consistently* to produce accurate and reliable results over the three years charged in this case. He fails entirely to grapple with alternate explanations for these limited data; to assess any measures in response to these data; or to review any data from any other device or time period. Nor does he ground his review in this limited set of data in the methodology applied by experts in his field that he discusses in his report.

*Finestone v. Florida Power & Light Co.* is instructive. 2006 WL 267330 (S.D. Fla. Jan. 6, 2006). In *Finestone*, plaintiffs alleged that chemical exposure to radioactive sludge allegedly disposed by the defendants caused injuries. *Id.* at *12. One of the plaintiffs' experts opined that the sludge

contained radioactive isotopes based upon a sampling of the waste collected from the site.  The expert

however, failed to consider other samples, which if included would have reduced the average

concentration of the isotope.  The Court held that the "[the expert] cannot adequately explain why he

chose only the 32 samples with [the isotope] and not the remaining samples that had no [trace of that

isotope] to compute the average . . . at the Glades Cutoff site." *Id.* at 12.  Therefore, the expert's opinion

was not reliable.  *Id.*

Dr. Master's opinion is equally unreliable.  Rather than reviewing Vitamin D results over the

charged period of 2013 through 2015, Dr. Master's opinion is limited to just over a month's worth of

data on isolated devices for Vitamin D.  He identifies no methodology accepted in his field to

extrapolate from that limited data to a three-year period.  His opinions are based on "unjustified

extrapolations from existing [and extremely circumscribed] data." *See In re Roundup*, 390 F. Supp. 3d

at 1112.  The Court should therefore exclude his opinion as to the Vitamin D assays as unreliable.

**C.    Dr. Master's Opinions as to "Problems" with the Edison Are Unreliable Speculation**

Beyond his opinions about particular tests, Dr. Master also offers opinions about Theranos'

technology writ large.  In particular, Dr. Master opines that alleged problems with certain tests were

caused by systemic defects with Theranos' Edison testing technology, and not other variables.  Ex. 6 at

13-14.  But Dr. Master himself acknowledges that he cannot be sure about that conclusion.  Because Dr.

Master's opinion as to the Edison requires speculation based on limited data, it should be excluded.[7]

As a general matter, Dr. Master does not identify any methodology by which to determine the

*cause* of an allegedly inaccurate test—*i.e.*, whether observed inaccuracies resulted from a defective

device, defective reagents, operator error, flawed blood collection, or some other cause.  He simply

reviews limited CV data and then opines, without any explanation, on the causes for alleged

inaccuracies.  *See id.*  He does not explain how the methodology that experts use to assess accuracy can

---

[7] On the subject of Theranos' technology, Dr. Master also observes that "[i]nternal emails and documentation show that Theranos were struggling with a number of ongoing technical issues involving hemolysis, sample leakage, variations in materials that affected function, and other issues with the CTN [collective tube]." Ex. 6 at 16.  But he offers no opinion regarding the collection tube, and it is not the role of an expert simply to parrot "[i]nternal emails and documentation."  Dr. Master cannot permissibly offer an opinion on Theranos' collection tube at trial.

be used to assess causation of inaccuracies, nor does he suggest that an expert would determine causation with such methods. Absent any application of an actual methodology for determining causation, his opinion about causation is simply his *ipse dixit*.

To the extent Dr. Master bases his opinion on actual data, the "gap" between the data and his opinion is too great to support the opinion. *Joiner*, 522 U.S. at 146. First, he opines that the high %CV of the Vitamin D assay on three Edison devices over a one-month period in 2014 "suggests a broader problem with Theranos manufacturing and maintenance, whether at the level of the Edison itself or of the reagent/consumable production." Ex. 6 at 13. But he identifies no reliable methodology by which he turned this "suggestion" into a definitive opinion. Nor does he explain how data from a one-month period relating to just one test on just three devices can support an opinion about the reliability of the Edison technology writ large.

Similarly, Dr. Master points to a reference in the CMS report related to quality control (QC) results for an Edison device that ran a Vitamin D reference assay that "delivered QC results [greater than] two standard deviations from the target mean for 15 days in a row, suggesting a bias in the instrument." *Id.* Again, he does not explain what methodology he used to turn this suggestion into an opinion. He concedes that "it is not possible to be certain" whether the cited QC results arose "due to inherent issues with the technology, or with poor lab operational practice," but then nonetheless opines that it is "reasonable to conclude that the instrument problems were not merely a result of poor operational practice, but were related to the quality of the instruments and assays themselves." *Id.* at 13-14. This is "*ipse dixit*, pure speculation, or both": Dr. Master fails to explain why that conclusion is reasonable, and sets forth "no methodology" to support it. *Scentsational Techs. v. PepsiCo, Inc.*, 2018 WL 1889763, at *6 (S.D.N.Y. Apr. 18, 2018).

Lastly, Dr. Master supports his opinion about the Edison technology by pointing to the fact that Theranos voided tests performed on the Edison platform. According to Dr. Master, Theranos' decision to void those tests "effectively acknowledg[ed] that the results were not sufficiently accurate and

reproducible for patient care." Ex. 6 at 13. For the reasons already set forth, Dr. Master cannot permissibility speculate about Theranos' motivations for taking certain action. *See* pp. 9-10, *supra*.[8]

### III. Dr. Master's Opinions About "Normal Industry Standards" Must Be Excluded

Dr. Master also offers opinions about Theranos' laboratory practices generally. Specifically, he opines that "Theranos did not adhere to normal industry standards for clinical laboratory testing from 2013-2015," and that "this lack of adherence had the potential to adversely impact test accuracy and reliability." Ex. 6 at 17. The former opinion rests on impermissible legal opinions, involving complicated questions of law, while the latter is not relevant or helpful to the jury. Both warrant exclusion under Rule 702.

#### A. Dr. Master's Opinions About Theranos' Compliance with Industry Standards Rest on Improper Legal Opinions

Dr. Master's opinions about Theranos' compliance with "industry standards" are intertwined with his opinions about the content of federal law and its application to Theranos. His background discussion of industry practice purports to explain the legal requirements under CLIA and FDA regulations. Ex. 6 at 8-11. His cited basis for this opinion is his "knowledge of standards and best practices *as established by federal regulations* and by the College of American Pathologists ("CAP")." *Id.* at 3 (emphasis added). But experts may not "usurp either the role of the judge in instructing on the law or the role of the jury in applying the law." *United States v. Locascio*, 6 F.3d 924, 939 (2nd Cir. 1993). Dr. Master's subjective, non-lawyer interpretation of what federal law requires and how it applies to Theranos are thus "inappropriate subjects for expert testimony." *Aguilar v. Int'l Longshoremen's Union Local No. 10*, 966 F.2d 443, 447 (9th Cir. 1992); *see also S.E.C. v. Capital Consultants, LLC*, 397 F.3d 733, 749 (9th Cir. 2005) ("[E]xperts may interpret and analyze factual evidence but may not testify about the law.") *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.,* 1997 WL 34605244, at *8 (N.D. Cal. Jan. 6, 1997) ("interpretations and explanations of the law"

---

[8] Ms. Holmes is contemporaneously moving in limine to exclude evidence of the voiding of test results is irrelevant, unfairly prejudicial, and an inadmissible remedial measure. *See* Fed. R. Evid. 401-403, 407. Dr. Master's proffered testimony about that action is further inadmissible for all the reasons set forth in that motion.

are "inappropriate subjects for expert testimony").

As an initial matter, Dr. Master is not qualified to offer the legal opinions he offers.  He is not a lawyer and has never worked for CMS or FDA.  His experience as an individual regulated by federal law does not permit him to testify about the content of federal law or to draw reliable conclusions about the application of that law to Theranos' novel technology.  The application of CLIA and FDA regulations to Theranos' technology and its contemplated business model involved complex and evolving questions of law[9] on which Theranos engaged leading regulatory lawyers to engage with the agencies.[10]  It would be error for Dr. Master to venture his own opinions on these complex legal questions.  Because his proffered testimony does not relate to a matter within his "scientific, technical, or other specialized knowledge," it must be excluded.  Fed. R. Evid. 702.

Even if Dr. Master were qualified to provide general background testimony regarding how FDA and CMS operate, his application of federal law to the facts of this case is squarely impermissible.  "While expert testimony may be permissible to describe department or agency processes and procedures, such testimony should not prescribe legal standards to apply to the facts of the case."  *N.W. v. City of Long Beach*, 2016 WL 9021966, at *2 (C.D. Cal. June 7, 2016); *see also United States v. Caputo*, 374 F. Supp. 2d 632, 646 (N.D. Ill. 2005) (stating "[expert] may not testify about whether Defendants met their obligations under the Safe Medical Devices Act of 1990, because such testimony would constitute an impermissible legal conclusion").  Critically, an expert cannot evade this restriction by dressing up his opinions about legal compliance in the language of "industry practice."  *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d at 558 ("testimony encompassing an ultimate legal conclusion based upon the facts of the case is not [admissible] and may not be made so simply because it is presented in terms of industry practice").

---

[9] *See, e.g.*, Ex. 13 (FDA-0005633) (FDA e-mail acknowledging that there may be questions about whether FDA would "require [Theranos] to obtain approval/clearance under [its] *proposed* oversight framework" (emphasis added)); Ex. 14 (FDA-005757) (e-mail between FDA officials and Wall Street Journal journalist discussing evolving regulatory framework and acknowledging "loophole" in FDA regulations).

[10]     *See, e.g.*, Ex. 16 (THER-0957500) (letter from Hyman, Phelps, & McNamara, P.C. to FDA); Ex. 15  (SEC2-USAO-EPROD-001297920) (memorandum from Covington & Burling LLP to CMS).

In other words, Dr. Master cannot opine that Theranos failed to adhere to "industry practice" when that "practice" is informed by the "legal meaning" of federal requirements or his attempt to "interpret . . . policies." *McHugh v. United Service Auto. Ass'n,* 164 F.3d 451, 454 (9th Cir.1999). Yet that is precisely what he purports to do. Dr. Master offers three opinions regarding Theranos' supposed lack of compliance: (1) that Theranos' QC system inappropriately did not prevent samples from being analyzed when the QC was out of the supposed specifications, (2) that Theranos "did not appropriately engage in proficiency testing," and (3) that Theranos should have received FDA clearance for its collection device. Ex. 6 at 17-19. Each of those opinions rests on Dr. Master's view of federal law.

Dr. Master's view of what constitutes "industry practice" with respect to QC and proficiency testing is governed by CLIA's requirements. *See id.* at 10-11 ("A third requirement of CLIA is that laboratories engage in proficiency testing"; "CLIA also mandates that a lab perform a quality control check at various intervals (daily, or even more often)."). Indeed, with respect to proficiency testing, Dr. Master admits that Theranos' development of alternative proficiency testing rested on its "interpretation" of federal law, *id.* at 18 ("Even granting Theranos' interpretation . . . . "), and he purports to offer opinions about legal principles such as "the burden of proof," *id.* ("In my opinion, the burden of proof would be on the laboratory to demonstrate to the [proficiency testing] provider that a significant commutability issue exists for their method."). Dr. Master's opinions about Theranos' compliance with "industry standards" governing QC and proficiency testing are self-evidently impermissible legal opinions.

Likewise, Dr. Master's opinion about whether Theranos was required to obtain FDA clearance for its collection tube under FDA regulations is a legal opinion that he is not qualified to offer. *See* Ex. 6 at 19. Dr. Master acknowledges that Theranos advanced the legal position—through its lawyers—that its collection tube was "a laboratory-developed test" and thus did not require FDA clearance. *Id.* He apparently disagrees with that position. He identifies no experience that would qualify him as an expert in FDA's regulatory framework governing medical devices. Even if he were qualified in the field of medical devices, it is not the role of an expert, let alone a clinical pathology expert not trained as a lawyer, to opine that Theranos' counseled interpretation of federal law was incorrect.

**B.     Dr. Master's Opinions about Industry Standards Would Mislead, Rather Than Help, the Jury**

Dr. Master's opinions about industry standards, and Theranos' alleged lack of compliance with them, should be excluded for the independent reason that they do not "assist the trier of fact to understand or to determine a fact in issue." *Daubert*, 509 U.S. at 592.  Given that expert evidence has the potential to mislead the jury due to its powerful nature, this "fit" test is even more demanding than the basic relevance test of Rule 402.

Dr. Master opines only that Theranos' alleged "lack of adherence" to industry standards "had the *potential* to adversely impact test accuracy and reliability"—not that any failure in fact led to inaccurate or reliable results.  Ex. 6 at 17 (emphasis added).  The distinction is an important one because, as the Ninth Circuit has recognized, testimony that something *could* have an effect is materially different from testimony that something did, or was likely to, have an effect.  *See Daubert II*, 43 F.3d at 1321 (experts' testimony that medication *could* possibly have caused plaintiffs injuries was not helpful to the jury).  While the latter may be permissible expert testimony if supported by a reliable methodology and offered by a qualified expert, the former is speculation and is not helpful to the jury.  *Id.*

*Daubert II* is instructive.  On remand from the Supreme Court, the plaintiffs offered statistical evidence to prove that their birth defects were caused by their mothers' ingestion of a medication during pregnancy.  *Id.* at 1320–22.  The Ninth Circuit concluded that the expert evidence showed, at most, that the medication "*could possibly* have caused plaintiffs' injuries."  *Id.* at 1322 (emphasis added).  According to the Court, Rule 702 barred that kind of speculative testimony:  The question for the jury was whether the medication likely caused the injuries at issue in the case, not merely whether it might have done so.  *Id.*

Like the speculative testimony in *Daubert II*, Dr. Master's opinion that Theranos' industry-practice failings had the *potential* to adversely affect the accuracy of its tests fails Rule 702.  Whether Theranos needed FDA clearance for certain technology, for example, tells the jury nothing about the tests' accuracy and reliability.  This is why Master is forced to say that it had the "potential" to affect accuracy and reliability.  To be helpful to jury's assessment of accuracy and reliability, Dr. Master's testimony would need to show that Theranos' supposed deviations from industry practice affected the

integrity of its tests to such a degree that it would be *materially false* for someone with knowledge of the deviations to represent that Theranos' tests were accurate and reliable.  An opinion that Theranos' alleged noncompliance had the "potential to affect accuracy," whatever that may mean, falls well short of that mark.  The jury will be left to guess whether it did in fact affect accuracy of Theranos' blood tests.  And Dr. Master's testimony will mislead the jury into convicting Ms. Holmes for something that the government did not charge—*i.e.*, violations of federal law governing CLIA labs and FDA clearance requirements.  As a result, the opinions must be excluded under both Rules 702 and 403.

**IV.    Dr. Master's Miscellaneous Observations Are Irrelevant**

Dr. Master offers a few observations that are irrelevant and inadmissible for additional reasons. Specifically, he states that

- "[T]he testimony of Adam Rosendorff indicates that Theranos did not adequately distinguish on reports whether a reported value came from a fingerstick or venous sample, and the reference ranges were not all appropriately adjusted to account for fingersticks." Ex. 6 at 16.

- In 2016, Theranos publically announced an additional device (minilab) in a public session at the Annual Meeting of the American Association for Clinical Chemistry. "There was no clear data on the robustness of the machines in an operational setting," and that "would raise concerns based on the fact that previous Edison instruments" did not "yield reproducibly accurate, reliable results." *Id.* at 17.

- "[A] disclaimer is always added to LDT results indicating that the test is not FDA approved or cleared, but has been validated by the laboratory," but Theranos did not include a disclaimer. *Id.* at 19.

The first observation impermissibly parrots lay witness testimony.  *Sanchez*, 2012 WL 13005996.  Dr. Master identifies neither a methodology for determining whether reference ranges were properly adjusted, nor an industry standard requiring lab reports to identify the method of collection.

The second observation is not relevant because it is outside the relevant time frame, and it merely identifies a "concern," not an opinion.  Dr. Master himself recognizes that he is providing opinions about Theranos' practices only from 2013-2015. Ex. 6 at 3.  It is also flawed to the extent it rests on his unreliable opinion, discussed above, that the previous Edison instruments did not "yield reproducibly accurate, reliable results." *Id.* at 17.

The final observation is similarly irrelevant to whether Theranos' tests were accurate and

reliable.  Dr. Master does not opine as to how the non-inclusion of such a disclaimer affected the
reliability of accuracy of Theranos' tests.  He cites to no rule, regulation, or industry guidelines requiring
any such disclaimer, and says nothing about what recipients of lab reports would do with it.  And, to the
extent Dr. Master bases this opinion on federal law, he is not qualified to offer such an improper legal
opinion for all the reasons set forth above.

## V.     Dr. Master Is Not Qualified to Opine on Fingerstick Testing on Theranos Technology

Last but not least, Dr. Master's expert testimony should be excluded because he has not
demonstrated that he is qualified to provide opinions regarding the accuracy and reliability of fingerstick
testing on Theranos devices.  One "key inquiry is whether the witness has sufficient skill or knowledge
related to the pertinent field so that his inference will probably be of some assistance to the untrained
layman." *Enyart v. Nat'l Conf. of Bar Examn'rs, Inc.*, 823 F. Supp. 2d 995, 1001 (N.D. Cal. 2011).
Opinions outside a witness's expertise are inadmissible.  *See, e.g.*, *United States v. Redlightning*, 624
F.3d 1090, 1115 (9th Cir. 2010) (holding witness with expertise in psychological effects of a disorder
was not qualified to offer opinions related to physical or medical symptoms of that disorder).

Dr. Master states that his opinions are based on "his training in clinical pathology and chemistry,
[his] experience as a laboratory medical director, and [his] knowledge of best practices as established by
federal regulations and by the College of American Pathologists."  Ex. 6 at 3.  However, Dr. Master
expressly disclaims providing *any* opinion about Theranos testing using traditional venous samples on
FDA-approved or cleared devices of the sort he presumably uses in his laboratory.  *Id.* at 11.  Rather, the
government retained Dr. Master to "provide opinions on whether Theranos was market ready and able to
produce accurate and reliable fingerstick results" on its proprietary technology.  *Id.*  Dr. Master,
however, does not identify any relevant experience with fingerstick blood testing.  He does not claim to
have any knowledge of Theranos' proprietary technology, nor does he explain any steps he took to
become familiar with its technology.

Courts in this district routinely exclude expert testimony when the expert fails to provide a
connection between his or her background and experience and the precise subject on which the expert
will testify.  In *Salinas v. Amteck of Kentucky, Inc.*, for example, a witness with over thirty years of

experience in construction safety was not permitted to provide expert testimony regarding the adequacy of warning labels in a construction site.  682 F. Supp. 2d 1022 (N.D. Cal. 2010).  The court held that despite the witness's experience in workplace safety, there was no indication that the witness had professional training or qualifications in the design or adequacy of warning or safety labels.  *Id.* at 1030.  The court also found it significant that there was no indication that the witness had investigated a case with similar facts or had ever testified as a safety warnings expert. *Id.*

Similarly, although Dr. Master may be qualified to discuss hematology generally, or traditional blood testing methods with which he is familiar, he does not indicate any familiarity with fingerstick testing for the assays on which he ventures an opinion.  Additionally, Dr. Master does not reveal any relevant experience analyzing new testing technologies.  Dr. Master is not qualified to offer opinions on the accuracy and reliability of fingerstick testing on Theranos technology.

## VI.    At a Minimum, the Court Should Hold a *Daubert* Hearing

As stated above, Dr. Master's opinions raise more questions than answers, including with respect to the completeness on the data on which he relies (if any); the speed with which he generated his opinions after the government gave him a roadmap of desired conclusions; and his failure to apply the stated methodology to any of the at-issue tests.  The Court, at a minimum, should hold a *Daubert* hearing.  "Where the opposing party . . . raises a material dispute as to the admissibility of expert scientific evidence, the district court must hold an *in limine* hearing (a so-called *Daubert* hearing) to consider the conflicting evidence and make findings about the soundness and reliability of the methodology employed by the scientific experts."  *Daubert II.*, 43 F.3d at 1319 n.10 (citing Fed. R. Evid. 104(a)).  Ms. Holmes has put into dispute the admissibility and reliability of Dr. Master's opinions.  Ms. Holmes respectfully requests that the Court conduct a *Daubert* hearing.

<div align="center">CONCLUSION</div>

For the foregoing reasons, the Court should exclude Dr. Master's opinions concerning the HIV, HbA1c, hCG, calcium, bicarbonate, chloride, sodium, potassium, Vitamin D, and cholesterol assays; his opinions about problems with the Edison device; and his opinions about Theranos' compliance with "industry standards."

DATED:  November 20, 2020                    Respectfully submitted,

                                             /s/ Amy Mason Saharia
                                             KEVIN DOWNEY
                                             LANCE WADE
                                             AMY MASON SAHARIA
                                             KATHERINE TREFZ
                                             Attorneys for Elizabeth Holmes

**CERTIFICATE OF SERVICE**

I hereby certify that on November 20, 2020, a copy of this filing was delivered via ECF on all counsel of record.

/s/ Amy Mason Saharia
AMY MASON SAHARIA
Attorney for Elizabeth Holmes

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ELIZABETH A. HOLMES and RAMESH "SUNNY" BALWANI,<br><br>Defendant. | Case No.  18-cr-00258-EJD<br><br>**ORDER RE DEFENDANTS' MOTIONS TO DISMISS THE SECOND AND THIRD SUPERSEDING INDICTMENTS**<br><br>Re: Dkt. Nos. 493, 496, 497, 498, 499, 500 |

Defendants Elizabeth A. Holmes and Ramesh "Sunny" Balwani have been charged with defrauding the investors and patients of a health care and life sciences company called Theranos, Inc. ("Theranos").  On July 14, 2020, a grand jury in the Northern District of California returned the Second Superseding Indictment ("2SI") in this case.  Dkt. No. 448.  Two weeks later, on July 28, 2020, the grand jury returned the Third Superseding Indictment ("3SI"), which is now the operative charging document.  Dkt. No. 469.

Defendants have filed six motions to dismiss the Second and Third Superseding Indictments, all which were heard on October 6, 2020.  This omnibus order addresses them all.

## I.    BACKGROUND

Having set forth a comprehensive factual background in prior orders, *see, e.g.*, *United States v. Holmes*, No. 5:18-CR-00258-EJD, 2020 WL 666563, at *1 (N.D. Cal. Feb. 11, 2020), the Court focuses on the background relevant to the instant motions.

Prior to the 2SI and 3SI, the operative charging document had been the (First) Superseding

Indictment ("1SI").  The 1SI was returned on September 6, 2018 and was subsequently the subject of substantial litigation.  Dkt. No. 39 ("1SI").  As relevant here, Defendants previously moved to dismiss the 1SI on various grounds.  *See* Dkt. Nos. 204, 205, 206.  On February 11, 2020, the Court issued an Order Granting in Part & Denying in Part Defendants' Motions to Dismiss.  Dkt. No. 330.  Among other things, the Court dismissed counts "to the extent they rely on non-paying patients or doctors"; the Court also ordered the Government to produce a bill of particulars as to the specific misrepresentations underlying certain counts and to identify co-conspirators as to Count One.  *See id.* at 39.

As noted above, on July 14, 2020, the 2SI was returned by the grand jury.  Dkt. No. 448 ("2SI").  The 2SI was quickly superseded by the 3SI, which the grand jury returned on July 28, 2020 and is now the operative charging document.  Dkt. No. 469 ("3SI").  The 2SI differs from the 3SI only in that it is missing one count of wire fraud.  Defendants' present motions to dismiss therefore focus on the 3SI but apply equally to the 2SI.

Broadly, the 3SI alleges that Defendants Holmes and Balwani engaged in two schemes to defraud: a scheme to defraud Theranos investors and a scheme to defraud patients who used Theranos's services.  *Id.* ¶¶ 11-12, 14-15.  The 3SI charges Defendants with one count of conspiracy to commit wire fraud against Theranos investors in violation of 18 U.S.C. § 1349 (Count One); one count of conspiracy to commit wire fraud against Theranos patients in violation of 18 U.S.C. § 1349 (Count Two); six counts of wire fraud against Theranos investors in violation of 18 U.S.C. § 1343 (Counts Three through Eight); and four counts of wire fraud against Theranos patients in violation of 18 U.S.C. § 1343 (Counts Nine through Twelve).  Compared to the 1SI, the 3SI alleges three new substantive wire fraud counts relating to the patient scheme, Counts Nine, Ten, and Eleven, for Patients B.B., E.T., and M.E., respectively.  *See* 3SI at 10.  The 3SI also includes additional allegations about the investor fraud conspiracy.  *See id.* at 4–6.

Also relevant to the instant motion is the Superseding Information.  On March 16, 2020, grand jury proceedings were suspended in this District due to the COVID-19 national public

health emergency.  *See* General Order 72, IN RE: Coronavirus Disease Public Health Emergency
(adopted Mar. 16, 2020).  On April 30, 2020, the District ordered that grand jury proceedings
would remain suspended until June 2020.  General Order 72-2, IN RE: Coronavirus Disease
Public Health Emergency (adopted April 30, 2020).  During this period of suspension, on May 8,
2020, the Government filed the Superseding Information.  Dkt. No. 391.  The Superseding
Information is nearly identical to the 3SI, with only marginal differences in wording.  Defendants
moved to dismiss the Superseding Information on the ground that it violates their Fifth
Amendment right to be tried only upon "a presentment or indictment of a Grand Jury" and Federal
Rule of Criminal Procedure 7(a)(1).  Dkt. No. 399.  The Court denied the motion, holding that
although the Superseding Information does not "authorize the acceptance of a guilty plea or a
trial" on the charges contained therein, dismissal was not warranted.  *Id.* at 2.  In so doing, the
Court expressly withheld any decision on the "legal effect" of the Superseding Information, if any,
with regard to the statute of limitations.  *Id.* at 3.

On August 28, 2020, Defendants filed the instant motions to dismiss the 2SI and 3SI on
various grounds.  Dkt. Nos. 493, 496, 497, 498, 499, 500 ("Mot. No. 6"); *see also* Dkt. Nos. 495,
501-505 (joinders to the motions).  The Government opposed the motions on September 18, 2020,
Dkt. Nos. 514, 517-520, 522, and Defendants replied on October 2, 2020, Dkt. Nos. 541-46.
Below, the Court address each of the motions *seriatim*.

## II.   LEGAL STANDARD

Pursuant to Federal Rule of Criminal Procedure 12(b)(1), a criminal defendant may move
to dismiss an indictment in part or in whole without a trial on the merits.  Fed. R. Crim. P.
12(b)(1).  Generally, such a motion is "capable of determination" before trial if it "involves
questions of law rather than fact."  *United States v. Shortt Accountancy Corp.*, 785 F.2d 1448,
1452 (9th Cir. 1986).  As the issue of guilt is "the province of the ultimate finder of fact," *id.*, a
court considering a motion to dismiss presumes the allegations in the indictment to be true and
"analyz[e] whether a cognizable offense has been charged."  *United States v. Boren*, 278 F.3d 911,

914 (9th Cir. 2002).

### III.   MOTION TO DISMISS NO. 1 BASED ON PRE-INDICTMENT DELAY

Defendants' first motion to dismiss—filed by Defendant Balwani and joined by Defendant Holmes—is based on pre-indictment delay. *See* Dkt. No. 493 ("Mot. No. 1"); *see also* Dkt. No. 514 ("Opp. re Mot. No. 1"); Dkt. No. 546 ("Reply re Mot. No. 1"). That is, Defendants argue that the Government unreasonably delayed in filing the Second and Third Indictments, in violation of Defendants' Sixth Amendment right to a speedy trial and Federal Rule of Criminal Procedure 48(b).[1] Mot. No. 1 at 2. Below, the Court finds there has not been a violation of the Sixth Amendment and DENIES the motion.

#### A.   Relevant Background

To briefly review the relevant procedural history, the grand jury returned the first Indictment in this case on June 14, 2018. Dkt. No. 1. The Indictment charged Defendants with one count of conspiracy to commit wire fraud against Theranos investors, in violation of 18 U.S.C. § 1349 (Count One), one count of conspiracy to commit wire fraud against doctors and Theranos patients, in violation of 18 U.S.C. § 1349 (Count Two), and nine individual counts of wire fraud, in violation of 18 U.S.C. § 1343 (Counts Three through Eleven). *Id.* Defendants made initial appearances and were released on bail on June 15, 2018; they have remained out of custody throughout the proceedings. Dkt. No. 5, 7. Then, on September 6, 2018, a grand jury returned the 1SI, which modified the allegations regarding one of the individual wire fraud counts (Count Four). *See* Dkt. No. 39 ¶¶ 13, 24.

---

[1] The Supreme Court has also recognized a claim against undue pre-indictment delay under the Due Process Clause of the Fifth Amendment. *See, e.g.*, *Betterman v. Montana*, 136 S. Ct. 1609, 1613 (2016). Defendants have not asserted a Fifth Amendment claim in this case. In any event, Defendants cannot make out such a claim. As explained with regard to the Sixth Amendment claim, Defendants have not made the requisite showing of "actual, non-speculative prejudice"— "meaning proof that demonstrates exactly how the loss of evidence or witnesses was prejudicial"—as a result of the delay. *United States v. Barken*, 412 F.3d 1131, 1134 (9th Cir. 2005)); *United States v. Huntley*, 976 F.2d 1287, 1290 (9th Cir. 1992) ("The task of establishing the requisite prejudice for a possible due process violation is 'so heavy' that we have found only two cases since 1975 in which any circuit has upheld a due process claim.").

The Court conducted the status hearing to set Defendants' original trial date on June 28, 2019.  Dkt. No. 83.  At that time, the 1SI remained operative and the Defendants were to be tried together.  In the parties' joint status memorandum, the defense stated that "significant work remain[ed] before it will be prepared for trial" and therefore requested "a trial in September 2020, or as soon thereafter as would be convenient for the Court."  Dkt. No. 80 at 1-2.  "Although the government went into discussions with defense with a preference for a trial date during the first half of 2020," the Government did not oppose defendants' request for a later date.  *Id.*  The Court therefore set a joint trial date of July 28, 2020, without objection.  Dkt. No. 83.  The Court subsequently severed the Holmes and Balwani trials, with Holmes's trial to proceed on July 28, 2020 and Balwani's trial promptly to follow.  Dkt. No. 362.  The Holmes trial is estimated to last three months due to the complexity of the case.

Then, on March 16, 2020, this District issued a general order suspending all jury trials in light of the COVID-19 national emergency.  *See* General Order No. 72, IN RE: Coronavirus Disease Public Health Emergency.  This prohibition was repeatedly extended as the pandemic and associated public health response unfolded.  *See* General Order No. 72-5, IN RE: Coronavirus Disease Public Health Emergency (issued July 23, 2020) ("No new jury trial will be conducted through September 30, 2020.").  Accordingly, on April 15, 2020, the Court continued the Holmes trial to October 27, 2020.  Dkt. No. 374.

On July 14, 2020, as noted above, the grand jury returned the 2SI.  Dkt. No. 448.

Then, on July 20, 2020, the Court conducted a status conference to discuss whether the October 27, 2020 trial date remained viable in the face of the ongoing pandemic.  *See* Dkt. No. 463 (Transcript).  Defendant Holmes requested that the trial be further continued to April 2021, arguing that "a trial any time soon is just . . . not safe."  *Id.* at 66.  The defense described the many potential practical obstacles to conducting a trial, including: the length of the trial; the number of jurors needed; the number of witnesses (as many as 170, according to a recent Government witness list); that the witnesses would be coming from at least 15 different states; the need to

develop quarantine protocols; and constitutional ramifications.  *Id.* at 63-65.  The Government

indicated its readiness to move forward in October 2020 but agreed that "many of the challenges"

defense counsel raised "are real challenges and unique challenges to this case."  *Id.* at 76.  The

Government expressed that, in the event the Court deemed a continuance necessary, an earlier trial

date in February 2021 would be preferable.  *Id.*  The Court agreed with Defendant Holmes that the

October 2020 trial date was no longer practicable given the public health situation.  *Id.* at 77-80,

86.  Accordingly, in an order dated August 11, 2020, the Court reset the Holmes trial to March 9,

2021.  Dkt. No. 484.

      Finally, on July 28, 2020, the grand jury returned the 3SI.  Dkt. No. 469.

### B.   Discussion

      The Speedy Trial Clause of the Sixth Amendment guarantees that "[i]n all criminal

prosecutions, the accused shall enjoy the right to a speedy . . . trial."  U.S. Const. amend VI.  The

speedy trial right homes in on the period "from arrest or indictment through conviction," as the

right does not attach until that period begins.  *Betterman v. Montana*, 136 S. Ct. 1609, 1613

(2016).  Accordingly, most Sixth Amendment cases are based on *post-indictment* delay.  *Id.*

Nevertheless, the Ninth Circuit has applied the Sixth Amendment framework where, as here, the

Government is alleged to have unreasonably delayed in issuing a superseding indictment.  *See,*

*e.g.*, *United States v. Gregory*, 322 F.3d 1157, 1162 (9th Cir. 2003); *United States v. Sperow*, 412

F. App'x 4, 7 (9th Cir. 2010).  The U.S. Supreme Court has identified four factors (the "*Barker*

factors") to be considered in determining whether a delay between indictment and trial rises to the

level of a Sixth Amendment violation: "(1) the length of the delay; (2) the reason for the delay; (3)

the defendant's assertion of the right; and (4) the prejudice resulting from the delay."  *United*

*States v. King*, 483 F.3d 969, 976 (9th Cir. 2007) (citing *Barker v. Wingo*, 407 U.S. 514, 531-33

(1972)).

      At the outset, it is worth noting that Defendants do not claim the Speedy Trial Act has been

violated in this case.  The Court is mindful that "it will be an unusual case in which the time limits

of the Speedy Trial Act have been met but the sixth amendment right to speedy trial has been violated." *King*, 483 F.3d at 976 (internal quotation marks omitted). That is because, as a general matter, the "Speedy Trial Act affords greater protection to a defendant's right to a speedy trial than is guaranteed by the Sixth Amendment"; "therefore a trial which complies with the Act raises a strong presumption of compliance with the Constitution." *United States v. Baker*, 63 F.3d 1478, 1497 (9th Cir. 1995).

Moreover, the U.S. Supreme Court has emphasized that "statutes of limitations, which provide predictable, legislatively enacted limits on prosecutorial delay, provide 'the primary guarantee, against bringing overly stale criminal charges.'" *United States v. Lovasco*, 431 U.S. 783, 789 (1977). The Sixth Amendment therefore plays a "limited role" in this area. *Cf. United States v. Mora*n, 759 F.2d 777, 782 (9th Cir. 1985) (quoting *Lovasco*, 431 U.S. at 789); *see also United States v. Nicholas*, 990 F.2d 1264 (9th Cir. 1993) ("We have repeatedly emphasized that protection from lost testimony, as well as other evidence, generally falls solely within the ambit of the statute of limitations.").

With these principles in mind, the Court turns to the four relevant factors.

Start with the length of the delay. Under the Sixth Amendment, delay is measured from "the time of the indictment to the time of trial." *United States v. Gregory*, 322 F.3d 1157, 1162 (9th Cir. 2003). The Ninth Circuit has said that the length of delay must be at least presumptively prejudicial—i.e., one year from the time of the indictment to the time of the trial—to trigger a court's consideration of the other *Barker* factors. *Id.* at 1161-62; *see also King*, 483 F.3d at 976. And even if the delay passes the one-year threshold, it "does not weigh heavily" in the defendant's favor if it is not "excessively long." *Id.* (22–month delay was not "excessively long"); *see also United States v. Beamon*, 992 F.2d 1009, 1014 (9th Cir. 1993) (17–month and 20–month delays were not "great"). For instance, "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." *Barker*, 407 U.S. at 531; *see also King*, 483 F.3d at 976 (noting that the case was an "extraordinarily complex" conspiracy case

in finding no Sixth Amendment violation).

The Court notes that the Ninth Circuit has not clarified which indictment provides the starting point for measuring the relevant delay: the original Indictment, the 1SI, or the 2SI or 3SI. *See Gregory*, 322 F.3d at 1162 (assuming without deciding that the delay was measured from the 1SI rather than the challenged 3SI). Because the Government has opted for the original Indictment—as it first asserts the bulk of the charges—the Court will follow the Ninth Circuit's approach in *Gregory*, *see id.*, and assume that is correct. *Accord United States v. Cutting*, No. 14-CR-00139-SI-1, 2017 WL 66837, at *7 (N.D. Cal. Jan. 6, 2017). The Government concedes that 33 months will have elapsed between the date of the original Indictment and the Holmes trial date of March 9, 2021. Opp. re Mot. No. 2 at 11; *see* Dkt. No. 484. Defendant Balwani's trial date has not yet been set, but it will be no sooner. A 33-month delay is, of course, sufficient to trigger consideration of the other *Barker* factors. At the same time, this is a complex case, as the parties have repeatedly asserted and the Court has confirmed. *See, e.g.*, Dkt. Nos. 64, 80. The case involves two fraud conspiracies with multiple victims, two co-defendants, and voluminous discovery. The Court finds that the length of the delay was "not excessive" in light of this complexity. Accordingly, the length of delay factor does not "weigh heavily" in Defendants' favor. *See King*, 483 F.3d at 976; *Gregory*, 322 F.3d at 1162.

The next factor is the reason for the delay; it is "the focal point of the inquiry." *King*, 483 F.3d at 976. Defendants argue that the Government has failed to "offer any valid explanation" for the delay in filing the 2SI and 3SI. Mot. No. 1 at 10; Reply re Mot. No. 1 at 3-4. Defendants believe the Government "has had the information it needed to levy the new accusations" in the 2SI and 3SI "for years," yet has not explained why it omitted those allegations from the Indictment and the 1SI.

What Defendants' argument fails to recognize, however, is that the Sixth Amendment protects against an unreasonable delay in a defendant's *trial*. Defendants focus on the period between the filing of the 1SI in September 2018 and the filings of the 2SI and 3SI in July 2020.

But Defendants acknowledge that, as explained above, the relevant delay for Sixth Amendment purposes is "between indictment and trial," Mot. No. 1 at 9, Reply re Mot. No. 1 at 2. As to the reason for that delay, the original July 2020 trial date accounts for 25 of the 33 months between the original Indictment and Defendant's current trial date. The July 2020 trial date was set at the Defendants' request, to allow for their adequate preparation. Thus, Defendants—not the Government—are the reason for the bulk of the delay. *See King*, 483 F.3d at 976 (district judge granted continuances at the request of King and his attorney).

Nor can the remaining 8 months between the original July 2020 trial date and the current March 2021 trial date be attributed to the Government. Regardless whether the Government may have possessed the information necessary to bring the new charges in the 2SI and 3SI earlier, the shift in Defendants' trial dates was not caused by the filing of those superseding indictments; it was necessitated by the COVID-19 pandemic. From March 2020 until September 2020, jury trials were prohibited in this District. And although the strict prohibition was lifted on September 16, 2020, *see* General Order No. 72-6, IN RE: Coronavirus Disease Public Health Emergency (issued September 16, 2020) ("Jury trials may proceed in accordance with the logistical considerations necessitated by the Court's safety protocols."), the COVID-19 pandemic continues to pose a significant hurdle to conducting a jury trial—especially for a case of this complexity. The parties laid out these hurdles at the July 2020 hearing, and the Court clearly stated that its decision to reset the trial was driven by those and other concerns related to the pandemic. *See* Dkt. No. 463 at 66-86.

Hence, because the Government did not cause the delay in trial, the second factor "weighs heavily against finding a Sixth Amendment violation." *King*, 483 F.3d at 976.

The third *Barker* factor also does not counsel in favor of finding a Sixth Amendment violation. Defendants concede that they have not asserted their rights to a speedy trial and have instead agreed to exclusions of time under the Speedy Trial Act on various occasions. Mot. No. 1 at 11-12. Although Defendants now say that they were forced to agree to time exclusions because

of deficiencies in the Government's discovery productions, *see id.*, the fact remains that they never made such an argument at the time of the extensions. Consequently, Defendants' assertion of the speedy trial right remains retroactive. In any event, "[w]hile an improper or untimely assertion of speedy trial rights may weigh in favor of rejecting a defendant's motion to dismiss for violation of these rights, the mere fact of proper, timely assertion does not warrant dismissal." *United States v. Turner*, 926 F.2d 883, 889 (9th Cir. 1991).

The remaining and "critical" *Barker* factor is whether Defendants have been actually prejudiced as a result of the delay in trial. *Gregory*, 322 F.3d at 1162. "[N]o showing of prejudice is required when the delay is great and attributable to the government"; because that is not the case here, however, Defendants must "demonstrat[e] actual prejudice to prevail on [their] claim." *Id.* at 1162-63 (internal quotation marks omitted). "Actual prejudice is typically demonstrated in three ways: 'oppressive pretrial incarceration, anxiety and concern of the accused, and the possibility that the accused's defense will be impaired.'" *Id.* at 1163 (quoting *Doggett v. United States*, 505 U.S. 647, 654 (1992)).

In this case, Defendants have not met their burden of showing actual, non-speculative prejudice. Defendants first raise "the prospect of witnesses' unavailability and fading memories." Mot. No. 1 at 13. But Defendants have not pointed to any specific evidence that has been or will be lost,[2] making this claim too vague and speculative to rise to the level of actual prejudice. Defendants also emphasize "the need to pivot after more than two years to meet the expanded charges," which will consume additional resources. *Id.* Although that may be so, Defendants do not claim that they will be unable to do so effectively by the time of trial. The alleged strain on Defendants' resources is unfortunate, to be sure, but does not constitute actual prejudice under the

---

[2] Defendants point out that "two members of the board have passed away since the September 2018 [1SI]." Mot. No. 1 at 13. But according to Defendants' own evidence, these individuals—Donald Lucas and Thomas Peter Thomas—passed away in November and December 2019, respectively. Thus, they would have been unavailable for the original trial July 2020 trial date. Furthermore, Defendants have not specified what evidence these witnesses would have offered or otherwise shown that their unavailability significantly affects their defenses.

present circumstances.

In sum, none of the four *Barker* factors supports a finding of a Sixth Amendment violation. The Court therefore DENIES Defendants' motion to dismiss the 2SI and 3SI on Sixth Amendment grounds.

## IV.    MOTION TO DISMISS NO. 2 BASED ON STATUTE OF LIMITATIONS

The Court turns next to Defendants' motion to dismiss portions of the 2SI and 3SI as time-barred.  *See* Dkt. No. 498 ("Mot. No. 2"); Dkt. No. 518 ("Opp. re Mot. No. 2"); Dkt. No. 543 ("Reply re Mot. No. 2").  This motion was filed by Defendant Holmes and joined by Defendant Balwani.

Defendants' motion is divided into two arguments: one as to Counts Three through Eight and another as to Counts Ten and Eleven.  The Court considers each in turn and, for the reasons below, DENIES the motion to dismiss.

### A.    Counts Three through Eight

The Court begins with Defendants' argument as to Counts Three through Eight, the individual counts of wire fraud in connection with the scheme to defraud investors.  The parties agree that the five-year statute of limitations at 18 U.S.C. § 3282 applies to these counts.  The parties also agree that a version of these counts was contained in the 1SI, and that the 1SI was timely as to those counts.  The question at hand, then, is whether the return of the 1SI tolled the statute of limitations as to the version of Counts Three through Eight alleged in the 2SI and 3SI.

"Generally speaking, the return of an indictment tolls the statute of limitations with respect to the charges contained in the indictment."  *United States v. Pacheco*, 912 F.2d 297, 305 (9th Cir. 1990).  The tolling continues for a superseding indictment if it relates back to the original indictment—i.e., "if the allegations and charges are substantially the same in the old and new indictments."  *Pacheco*, 912 F.2d at 305.  On the other hand, if the superseding indictment "broadens or substantially amends" the charges, the statute of limitations would not be tolled. *United States v. Sears, Roebuck & Co.*, 785 F.2d 777, 778 (9th Cir. 1986) (internal quotations and

alterations omitted).  "The central concern in determining whether the counts in a superseding indictment should be tolled based on similar counts included in the earlier indictment is notice." *United States v. Liu*, 731 F.3d 982, 996–97 (9th Cir. 2013).  Accordingly, "[t]o determine whether a superseding indictment substantially broadens or amends a pending timely indictment, it is appropriate to consider whether the additional pleadings allege violations of a different statute, contain different elements, rely on different evidence, or expose the defendant to a potentially greater sentence."  *Liu*, 731 F.3d at 996–97 (internal quotation marks and alterations omitted).

Here, the Court finds that Counts Three through Eight are substantially the same in the old (1SI) and new (2SI and 3SI) indictments.  As "each use of the wires constitutes a separate violation of the wire fraud statute," *United States v. Garlick*, 240 F.3d 789, 793 (9th Cir. 2001), each of the challenged counts correspond to a wiring.  These wirings are specified in the 1SI, 2SI, and 3SI:

| COUNT | DATE | ITEM WIRED | WIRED FROM | WIRED TO |
|---|---|---|---|---|
| 3 | 12/30/2013 | $99,990 | Investor #1's Charles Schwab / Wells Fargo Bank account | Theranos's Comerica Bank account |
| 4 | 12/31/2013 | $5,349,900 | Investor #6's Pacific Western Bank account | Theranos's Comerica Bank account |
| 5 | 12/31/2013 | $4,875,000 | Investor #2's Texas Capital Bank account | Theranos's Comerica Bank account |
| 6 | 2/6/2014 | $38,336,632 | Investor #3's Citibank account | Theranos's Comerica Bank account |
| 7 | 10/31/2014 | $99,999,984 | Investor #4's Northern Chicago Bank account | Theranos's Comerica Bank account |
| 8 | 10/31/2014 | $5,999,997 | Investor #5's JP Morgan Chase account | Theranos's Comerica Bank account |

3SI at 9.  It is undisputed that all of these wirings were also charged in the 1SI, and that the 3SI

does not add any wires.  The statutory violation (wire fraud) remains the same and Defendants are not subject to greater sentences for these counts.  Indeed, the allegations in the 2SI and 3SI regarding Counts Three through Eight are "duplicated verbatim" from the 1SI.  *Pacheco*, 912 F.2d at 305.  All these factors weight heavily in favor of finding relation back.

Defendants nevertheless contend that the individual fraud counts have been broadened by the additional allegations in the 2SI and 3SI regarding the overarching scheme to defraud investors.  *See* Mot. No. 2 at 7-8.  In particular, the scheme to defraud is now alleged to span "2010 through 2015" instead of "2013 through 2015," and "certain business partners"— specifically, Walgreens and Safeway—are identified as other victims of Defendants' alleged conspiracy.  *See* 3SI ¶¶ 3, 11, 24.  In Defendants' view, these allegations render the scheme to defraud alleged in the 2SI and 3SI materially broader in length and scope than the one charged in the 1SI.

The Court disagrees.  It is undeniably true that the existence of a "scheme to defraud" is an element of wire fraud, and that the alleged scheme to defraud investors purports to satisfy that element for Counts Three through Eight.  But the new allegations in the 2SI and 3SI did not broaden the alleged scheme so substantially that Defendants lacked notice of the charges against them.  First, as to the inclusion of the language "certain business partners" to describe some of the investor victims, the Court finds this amendment did not in fact alter the scheme.  As explained below as to Motion to Dismiss No. 3, the Government has not redefined the term "investor"; the Government has simply clarified that "Theranos's investors included individuals, entities, certain business partners, members of its board of directors, and individuals and entities who invested through firms formed for the exclusive or primary purpose of investing in Theranos's securities." 3AC ¶ 3.  These are simply "additional details" regarding the existing charges—not substantial amendments to them.  *United States v. Spanier*, 744 F. App'x 351, 355 (9th Cir. 2018).  Moreover, though evidence of other victims is certainly relevant to the overarching scheme to defraud, the specific victims charged in Counts Three through Eight are Investors #1-#6; these victims are

unchanged across the charging documents at issue.  Under these circumstances, the Court sees no significant change to the challenged charges.

Defendants' argument regarding the change in the scheme's length fares no better.  It is true that the 2SI and 3SI, on their face, change the start date for the scheme from 2013 to 2010.  Importantly, however, the conduct alleged by the 2SI and 3SI remains the same—the content of the false and misleading statements, the means through which Defendants allegedly made those statements, the targets of the statements, and the wires.  That the Government now alleges Defendants' course of conduct to have begun three years earlier is a modest change, and does not defeat tolling.

With that, the Court finds that the versions of Counts Three through Eight in the 2SI and 3SI are substantially the same as the version alleged in the 1SI.  The 2SI and 3SI therefore relate back to the 1SI as to the relevant counts, making them timely under the statute of limitations.  Defendants' motion to dismiss Counts Three through Eight is DENIED.

### B.   Counts Ten and Eleven

Defendants argue that Counts Ten and Eleven are also time-barred.  These are two of the individual counts of wire fraud arising out of the scheme to defraud patients; they are based on new wirings not previously charged in the 1SI.

| COUNT | DATE | WIRED FROM | WIRED TO | DESCRIPTION |
|---|---|---|---|---|
| 10 | 5/11/2015 | California | Arizona | Patient E.T.'s laboratory blood test results |
| 11 | 5/16/2015 | California | Arizona | Patient M.E.'s laboratory blood test results |

3SI at 10.

Again, 18 U.S.C. § 3282 is the applicable statute of limitations.  It states, in pertinent part, that "no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed."  18 U.S.C. § 3283(a).  The parties agree, and it is a matter of record, that

neither the 2SI nor the 3SI satisfies this requirement, as they were not filed within five years of the above wires.  *See United States v. Beardslee*, 197 F.3d 378, 385 (9th Cir. 1999) ("A limitation period begins to run only when all the elements of the underlying offense have been committed."), *amended on denial of reh'g*, 204 F.3d 983 (9th Cir. 2000); *cf. United States v. Hymes*, 113 F. App'x 755, 756 (9th Cir. 2004) ("In the case of mail fraud, the crime is not complete until the defendant uses the mail or causes the mail to be used in execution of the scheme to defraud."). The parties also agree, however, that the Superseding Information filed on May 8, 2020 falls within five years of the wirings.  Accordingly, the Government argues that the Superseding Information tolled the statute of limitations as to Counts Ten and Eleven and that the 2SI and 3SI relate back to the Superseding Information.  Opp. re Mot. No. 2 at 6; *see, e.g.*, *United States v. Avery*, 747 F. App'x 482, 484 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 1215 (2019) ("The Indictment was timely since it related back to the earlier Information.").

In response, Defendants do not contest that the Superseding Information contains all the allegations in the 2SI and 3SI, and that relation back would therefore be appropriate.  Instead, Defendants contend that filing the Superseding Information was not enough to "institute" it within the meaning of 18 U.S.C. § 3283(a).  In Defendants' view, "[a]n information is 'instituted' only when it is effective to 'get established' or 'commence' a federal criminal case" and, in the case of a felony, an information is "effective to do so only . . . when it is accompanied by a waiver of indictment."  Mot. No. 2 at 10.

It is beyond dispute that, absent a waiver of indictment, the filing of an information in a felony case would not empower the Government to "prosecute" the defendant—i.e., to bring the defendant to trial or accept a guilty plea.  *See* U.S. Const. amend. V; Fed. R. Crim. P. 7(a)(1) ("An offense (other than criminal contempt) must be prosecuted by an indictment if it is punishable . . . by imprisonment for more than one year."); Fed. R. Crim. P. 7(b) (allowing a defendant to waive prosecution by indictment).  It does not follow, however, that an information must be effective for all prosecutorial actions in order for it to toll the statute of limitations.  For the below reasons, the

Court holds that the filing of an information without an accompanying waiver is sufficient to toll the statute of limitations—even though it may not be effective for other purposes.

First, as to the plain language of the statute, 18 U.S.C. § 3282 requires only that the "information" be "instituted" in order to satisfy the statute of limitations; there is no suggestion that further requirements must be met.  Defendants respond that the plain meaning of the word "institute" is "[t]o being or start; commence," or "to originate and get established."  Mot. No. 2 at 9.  That is true, as far as it goes.  But as the Government points out, the object of the word "instituted" is the "information"; thus, what must be "commenced" is not the entire criminal prosecution, but merely the "information."  18 U.S.C. § 3282(a); *accord United States v. Burdix-Dana*, 149 F.3d 741, 743 (7th Cir. 1998) ("There is nothing in the statutory language of 18 U.S.C. § 3282 that suggests a prosecution must be instituted before the expiration of the five year period; instead the statute states that the information must be instituted.").  In an existing criminal case like this one, an information may be "established" simply by filing it with the court.  Separately, a waiver may be obtained under Rule 7(b), but one is not required for an information to come into being.

That "[n]otice to the defendant is the central policy underlying the statutes of limitations," *Pacheco*, 912 F.2d at 305, further supports the Court's reading of § 3283.  Regardless whether the defendant has executed a waiver of indictment, a properly instituted information gives the defendant notice of the allegations of the charges contained therein.  The circumstances of this case illustrate the point.  In April 2020, the Government advised Defendants that it intended to supersede the indictment and provided a draft copy of the Superseding Information to Defendants.  Dkt. No. 372.  It was unable to obtain an indictment before the limitations period elapsed because grand jury proceedings were suspended in this District for the two months leading up to the deadline to assert Counts Ten and Eleven.  Thus, in filing the Superseding Information in May 2020, the Government had done all it could to provide notice of the impending charges to Defendants.  The Government then promptly sought and obtained the 2SI and 3SI in July 2020,

when grand jury proceedings had resumed.  The Court is therefore satisfied that allowing the Superseding Indictment to toll the limitations period is in keeping with the policy of notice to the defendant.

Third, contrary to Defendants' contention, the Supreme Court's holding in *Jaben v. United States*, 381 U.S. 214 (1965), does not dictate a different reading.  There, the Court interpreted the Internal Revenue Code's statute of limitations governing felony tax evasion, which provides that "[w]here a complaint is instituted before a commissioner of the United States within the period above limited, the time shall be extended until the date which is 9 months after the date of the making of the complaint before the commissioner of the United States."  *Id.* at 215-16 (quoting I.R.C. § 6531).  The Supreme Court found that "the complaint, to initiate the time extension, . . . must satisfy the probable cause requirement of [Federal] Rule [of Criminal Procedure] 4."  *Id.* at 220-21.  Rule 4 provided, in pertinent part, that "[i]f it appears from the complaint that there is probable cause to believe that an offense has been committed and that the defendant has committed it, a warrant for the arrest of the defendant shall issue . . . ."  *Id.* at 217 n.1.

Defendants take this holding to mean that the word "institute" necessarily means "adequate to begin effectively the criminal process prescribed by the Federal Criminal Rules."  Mot. No. 2 at 13.  But the term "institute" must be read in context, and *Jaben* involved statutory language that is materially different from that at hand.  To begin with, the *Jaben* Court considered when a *complaint* is instituted.  Critical to the Supreme Court's reasoning was that under Federal Rule of Criminal Procedure 3, a complaint must be "made upon oath before a commissioner or other officers empowered to commit persons charged with offenses against the United States."  381 U.S. at 217 (quoting the then-applicable version of Rule 3).  The statute of limitations at issue in *Jaben* also specified that the complaint must be "instituted *before a commissioner of the United States within the period above limited*" in order to trigger the extension.  Because "the Commissioner's basic functions under the Rules are to make the judgment that probable cause exists and to warn defendants of their rights," the Supreme Court explained, probable cause must be required for a

complaint to be "instituted" under I.R.C. § 6531; otherwise, the Commissioner's role would be a nullity.  *Id.* at 218.  By contrast, there are no analogous requirements for filing an information, and 18 U.S.C. § 3282 states only that an information must be "instituted."  As a result, *Jaben* is confined to its statutory context and sheds no light on the meaning of "instituted" here.

Meanwhile, the majority of those courts which have addressed this precise issue have also held that the filing of an information is sufficient to satisfy 18 U.S.C. § 3282.  *See United States v. Burdix-Dana*, 149 F.3d 741 (7th Cir. 1998) ("We hold that the filing of the information is sufficient to institute it within the meaning of 18 U.S.C. § 3282."); *United States v. Cooper*, 956 F.2d 960 (10th Cir. 1992) ("Rule 7(b) does not prohibit the filing of an information in the absence of waiver of indictment by the defendant.  Instead, the rule proscribes prosecution without waiver.  Therefore, the information could have been filed within the period of limitations, thus providing a valid basis for the prosecution."); *United States v. Briscoe*, No. CR RDB-20-0139, 2020 WL 5076053, at *2 (D. Md. Aug. 26, 2020) ("An information is 'instituted' when it is properly filed, regardless of the Defendant's waiver."); *United States v. Marifat*, WBS-17-0189, 2018 WL 1806690, at *2-3 (E.D. Cal. Apr. 17, 2018) (following *Burdix-Dana*); *United States v. Hsin–Yung*, 97 F.Supp.2d 24, 28 (D.D.C. 2000) (same); *United States v. Stewart*, 425 F. Supp. 2d 727, 731-35 (E.D. Va. 2006) (same); *United States v. Watson*, 941 F. Supp. 601, 603-04 (N.D.W. Va. 1996) (same).  The Court sees no reason to part company with these courts.

In sum, then, the Court finds that the Superseding Information sufficed to toll the statute of limitations as to Counts Ten and Eleven, that the 2SI and 3SI relate back to the Superseding Information, and that Counts Ten and Eleven are thus timely.  Defendants' motion to dismiss Counts Ten and Eleven is DENIED.

## V.   MOTION TO DISMISS NO. 3 BASED ON LACK OF NOTICE OR, IN THE ALTERNATIVE, FOR BILL OF PARTICULARS

Next, the Court considers Defendants' motion to dismiss the 3SI and 2SI in part on the ground that the indictments fail to provide fair notice of the charges.  Dkt. No. 496 ("Mot. No. 3"); *see also* Dkt. No. 522 ("Opp. re Mot. No. 3"); Dkt. No. 541 ("Reply re Mot. No. 3").  As an

alternative to dismissal, Defendants move for an order requiring the Government to provide a bill of particulars pursuant to Federal Rule of Criminal Procedure Rule 7(f).

An indictment must contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1).  The purpose of this requirement is "to enable [the defendant] to prepare his defense, to ensure that the defendant is prosecuted on the basis of facts presented to the grand jury, to enable him to plead jeopardy against a later prosecution, and to inform the court of the facts alleged so that it can determine the sufficiency of the charge." *United States v. Cecil*, 608 F.2d 1294, 1296 (9th Cir. 1979).  However, "the Government need not allege its theory of the case or supporting evidence, but only the essential facts necessary to apprise a defendant of the crime charged." *United States v. Buckley*, 689 F.2d 893, 897 (9th Cir. 1982) (internal quotation marks omitted).  "The test for sufficiency of the indictment is 'not whether it could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards." *United States v. Holden*, 806 F.3d 1227, 1233 (9th Cir. 2015) (internal quotations omitted).  And, the indictment stage "is not the appropriate time to require the Government to present its proof." *Buckley*, 689 F.2d at 900.

Defendants move to dismiss Count One (conspiracy to commit wire fraud against Theranos investors) and Counts Three through Eight (individual counts of wire fraud against Investors #1-#6) as insufficiently pleaded.  As noted above, Defendants are alleged to have "engaged in a scheme, plan, and artifice to defraud investors."  3SI ¶ 11.  Defendants say that prior to the 3SI and 2SI, they understood "investors" to mean the "finite set of individuals and entities that invested money in Theranos in return for company securities."  Mot. No. 3 at 1.  Defendants take no issue with this definition of the term "investor"; indeed, they concede that if the term "investor" is "limited to individuals and entities [that] purchased Theranos securities, they can be easily identified."  *Id.* at 10.  That is why, Defendants say, they did not move for disclosure of the names of alleged "investors" in the prior indictment.  *Id.* at 12.

Instead, Defendants' motion centers on Paragraph 3 of the 2SI and 3SI, which describe the

entity Theranos at a high level.  The pertinent part of the paragraph reads:

> When Theranos solicited and received financial investments from investors, the money was deposited into its Comerica Bank account. Theranos's investors included individuals, entities, certain business partners, members of its board of directors, and individuals and entities who invested through firms formed for the exclusive or primary purpose of investing in Theranos's securities.

3SI ¶ 3.  Defendants argue that the 3SI and 2SI apply a "new," "broader" definition of "investors" by explaining that "Theranos's investors included individuals, entities, certain business partners, members of its board of directors, and individuals and entities who invested through firms formed for the exclusive or primary purpose of investing in Theranos's securities," 3SI ¶ 3.  Mot. No. 3 at 8.  "In light of the government's new, vague, definition of 'investors,'"—which now sweeps in "certain business partners" and "members of the Board of Directors,"—Defendants say, "the universe of potentially defrauded individual or entity 'investors' is unknowable."  *Id.* at 9-10.  Defendants believe the 3SI and 2SI must therefore be dismissed as impermissibly vague; alternatively, Defendants ask that the Government be required to disclose which investors they are alleged to have defrauded, the representations allegedly made to the new categories of investors, and the basis of any alleged duties to disclose as to those investors.  *Id.* at 10-11; Reply re Mot. No. 3 at 6-9.

    But the Court is not persuaded that there has been any expansion in the definition of "investors" by the 3SI and 2SI.  The Ninth Circuit has made clear that an indictment should be "read as a whole" and "construed according to common sense."  *Buckley*, 689 F.2d at 899.  On their face, the new indictments do not disturb the prior, usual understanding of "investors" as meaning "individuals and entities that purchased Theranos securities."  Rather, read with common sense, the sentence at issue simply provides an additional description of the makeup of Theranos's investors.  That is, the sentence indicates that among the purchasers of Theranos securities are "certain business partners and "members of the Board of Directors."  Defendants do not dispute that a business partner or board member could also be an investor.  And to say that investors

included "business partners" and "members of its board of directors" does not signify that *any* business partner or board member could be an investor—even if they did not purchase securities. Thus, the Court does not believe the 2SI and 3SI "redefine" the term "investor."

Moreover, the Government confirms in their briefing that they continue to use "investors" in the traditional sense, i.e., to refer to individuals and entities that "paid money to Theranos and in return received Theranos securities." Opp. re Mot. No. 3 at 5. To demonstrate that is the case, the Government points to evidence showing (1) that Safeway and Walgreens—business partners of Theranos—obtained and exercised rights to obtain promissory notes convertible to Theranos stock, *see* Opp. re Mot. No. 3 at 5-6; and (2) that "multiple members of Theranos's Board appear as stockholders on Theranos's Stock Certificate Ledger," which lists "the year when a given member obtained Theranos shares, how many shares were acquired, and how the Board member paid Theranos," *see id.* at 6. The Government has thus shown that there exist business partners and board members who acquired Theranos securities. Under these circumstances, the Court sees no basis for the Defendants' concern that the Government "intends to charge deception of Board members" or business partners who did not purchase Theranos securities. Mot. No. 3 at 7-9. And to the extent Defendants worry that the Government will later attempt to treat as investors "business partners" or "members of the Board of Directors" who did not purchase securities, the Government will be precluded from doing so by its representations here and the Court's holding in partial reliance thereon.

In Reply, Defendants pivot to argue that the common understanding of "investor" refers only to "outsiders who purchased equity shares in an arms-length transaction" as opposed to all purchasers of Theranos securities. Reply re Mot. No. 2 at 4. But to the extent Defendants previously assumed that "investors" were so limited, they have not justified that assumption. There is no suggestion in the 1SI that the defrauded investors were confined to those who purchased equity stocks in arms-length transactions. Nor is it commonsensical to exclude holders of securities other than equity stocks from "investors." In fact, Defendants' own opening motion

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 17, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Amy Mason Saharia*
AMY MASON SAHARIA

April 17, 2023