No. 22-10312

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ELIZABETH A. HOLMES

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 5:18-CR-00258
Hon. Edward J. Davila

---

## EXCERPTS OF RECORD
## VOL. XIII of LVII | ER-3435 to ER-3678

---

JOHN D. CLINE
LAW OFFICE OF JOHN D. CLINE
  600 Stewart Street
  Suite 400
  Seattle, WA 98101
  (360) 320-6435

KEVIN M. DOWNEY
LANCE A. WADE
AMY MASON SAHARIA
KATHERINE A. TREFZ
WILLIAMS & CONNOLLY LLP
  680 Maine Ave. S.W.
  Washington, D.C. 200024
  (202) 434-5000
  asaharia@wc.com

brief repeatedly refers to investors as "individuals and entities that invested money in Theranos in return for company *securities*."  Mot. No. 3 at 1; *see also id.* at 10.  Thus, it is Defendants who now attempt to redefine the term "investor," arbitrarily narrowing it to exclude the convertible promissory notes allegedly acquired by Safeway and Walgreens.  The 3SI and 2SI are fully consistent with the common sense definition of investors.

Having found no change in the meaning of "investors" in the 3SI and 2SI, the Court also rejects Defendants' request for a bill of particulars specifying the misrepresentations made and duty to disclose owed to the investors who are business partners or board members.  The 3SI and 2SI contain the same allegations describing the specific misrepresentations as the 1SI, which this Court previously found to be sufficient to provide Defendants' notice.  *Holmes*, 2020 WL 666563, at *9.  The Government made clear at the hearing that those allegations apply also to the "business partner" investors and "board member" investors, and that it is not asserting any new or different misrepresentations as to those categories of investors.  The same is true of the allegations regarding the Defendants' duty to disclose: The Government continues to rely on the same theory previously blessed by this Court, see *Holmes*, 2020 WL 666563, at *11, as to all investors.  The Court affirms its prior holding that these allegations provide sufficient notice, and that a bill of particulars is not necessary.

Of course, should the Government attempt at trial to advance a distinct theory as to the business partners or board members that is not disclosed in the 3SI and 2SI, that will not be permitted.  But this is not the stage to evaluate the Government's evidence.  It is enough that the 3SI and 2SI provide sufficient notice of the charges against the Defendants, wherefore their motion to dismiss the 3SI and 2SI in part is DENIED.

## VI.   MOTION TO DISMISS NO. 4 BASED ON DUPLICITY

The Court must also DENY Defendants' fourth motion to dismiss, which relies on similar arguments as the third motion to dismiss.  In their motion, Defendants argue that Counts One and Three through Eight of the 2SI and 3SI should be dismissed as duplicitous.  *See* Dkt. No. 497

("Mot. No. 4"); *see also* Dkt No. 517 ("Opp. re Mot. No. 4"); Dkt. No. 542 ("Reply re Mot. No. 4").  "Duplicity is the joining in a single count of two or more distinct and separate offenses," *United States v. UCO Oil Co.*, 546 F.2d 833, 835 (9th Cir. 1976), and it is barred by the Fifth and Sixth Amendments, *see United States v. King*, 200 F.3d 1207, 1212 (9th Cir. 1999).  In this case, Defendants contend that the "scheme to defraud investors" alleged in the new indictments can no longer "fairly be read as a single scheme" because they "include a new definition of 'investors'" encompassing "individuals, entities, certain business partners, members of its board of directors, and individuals and entities who invested through firms formed for the exclusive or primary purpose of investing in Theranos's securities."  *See* Mot. No. 4 at 1.

But as the Court has already found, the 2SI and 3SI do not "broaden" the realm of "investors" alleged to be victims of the scheme to defraud.  Investors were, and are, the individuals and entities who purchased Theranos securities during the charged period.  The 3SI and 2SI simply clarifies that some of those individuals and entities are also "business partners" or "members of its board of directors, and that some of those individuals and entities made their investments "through firms formed for the exclusive or primary purpose of investing in Theranos's securities."  3SI ¶ 3.

And though Defendants attempt to split these investors into "five separate categories," the 3SI and 2SI do not contain any new or "separate" allegations for individual "categories."   For instance, although Theranos may have had special contractual obligations to Walgreens in connection with their business partnership, the Government's theory does not appear to rely upon those obligations.  Mot. No. 4 at 7.  The Government stated unequivocally that it is relying on the same alleged misrepresentations, the same methods and means for making those misrepresentations, and the same duty to disclose as to all relevant investors, as previously alleged in the 1SI.  *See* 3AC ¶¶ 12-13.  Hence, it is untrue that "the Indictments here provide no such connection among the disparate categories of so-called 'investors.'"  Mot. No. 4 at 6.

Moreover, as the Government points out, the Ninth Circuit takes a "broad view" of what

constitutes a "single scheme" to defraud.  As relevant here, "the defrauding of different people over an extended period of time, using different means and representations, may constitute but one scheme." *United States v. Morse*, 785 F.2d 771, 774 (9th Cir. 1986); *see also United States v. Bryan*, 868 F.2d 1032, 1037 (9th Cir. 1989) (scheme to defraud both taxpayers and the United States Treasury was not duplicitous).  In *Morse*, for instance, the Ninth Circuit held that an indictment charging a mail fraud scheme comprised of four separate investment programs—a program involving oil and gas drilling, a program placing video games in arcades, a program leasing heavy equipment to oil field operators, and a program reactivating old proven oil wells—was not duplicitous.  785 F.2d at 773-74.  Even though the victims were different and the companies through which the defendants operated were different, "the ventures comprising the scheme were of a similar nature in that all four were promoted as income producing tax shelters." *Id.* at 775.  Under this permissive standard, the instant scheme to defraud investors through similar misrepresentations and means easily qualifies.

Finally, Defendants are concerned that the Government may attempt to introduce evidence at trial of misrepresentations that were not made to obtain investments—for instance, "alleged misrepresentations . . . made to Walgreens and Safeway in pursuing and maintaining partnerships with the entities."  Mot. No. 4 at 7 (internal quotation marks omitted).  However, the admissibility of such evidence is properly raised in a motion in limine.  "A duplicity claim is directed at the face of the indictment," *United States v. Gordon*, 844 F.2d 1397, 1400 (9th Cir. 1988), and the 3SI and 2SI do not, on their face, charge multiple schemes to defraud.  The motion to dismiss for duplicity is therefore DENIED.

## VII.   MOTION TO DISMISS NO. 5 AND MOTION TO STRIKE FOR FAILURE TO STATE AN OFFENSE AGAINST DOCTORS

Defendants' fifth motion to dismiss claims that the 3SI and 2SI violate this Court's prior order holding that the 1SI had not sufficiently alleged a scheme to defraud doctors.  Dkt. No. 499 ("Mot. No. 5"); *see also* Dkt. No. 520 ("Opp. re Mot. No. 5"); Dkt. No. 544 ("Reply re Mot. No. 5").

This Court previously granted Defendants' motion to dismiss the 1SI in part for failure to allege that Defendants intended to deprive doctors of money or property. *United States v. Holmes*, No. 5:18-CR-00258-EJD, 2020 WL 666563, at *19 (N.D. Cal. Feb. 11, 2020). As the Court explained, the specific intent element of wire fraud "must be the intent to obtain money or property from the one who is deceived." *Id.* at *16 (quoting *United States v. Lew*, 875 F.2d 219, 221 (9th Cir. 1989) (alterations omitted)); *see also United States v. Miller*, 953 F.3d 1095, 1103 (9th Cir. 2020) (holding that "wire fraud requires the intent to deceive and cheat—in other words, to deprive the victim of money or property by means of deception"). This requirement is known as convergence. The Court found that the 1SI contained "no showing that the doctors lost money or property or that Defendants intended for them to lose money or property" and dismissed Counts Two and Nine through Eleven "to the extent they depend on doctor-victims." *United States v. Holmes*, No. 5:18-CR-00258-EJD, 2020 WL 666563, at *20 (N.D. Cal. Feb. 11, 2020).

Like the 1SI, the 2SI and 3SI contain no allegations suggesting that Defendants intended to deprive doctors of money or property. Yet—Defendants say—these new indictments continue to "depict both doctors and patients as independent victims of the alleged scheme to defraud." Mot. No. 5 at 3. Defendants therefore ask the Court to dismiss Counts Two and Nine through Twelve of the 3SI and Counts Two and Nine through Eleven of the 2SI because they continue to violate the convergence principle. Alternatively, Defendants ask for various references to "doctors" to be stricken.

In response, the Government disclaims any theory of liability based on doctors as victims, emphasizing that the 3SI "does away with any claim that doctors are fraud victims in this case." Opp. re Mot. No. 5 at 4. The Government says that they have significantly modified the allegations regarding the scheme—now referred to as "The Scheme to Defraud Patients," 3AC at 6, 8—to comply with the Court's ruling. The Government explains that the 3SI and 2SI still reference doctors, however, because "they fit into Defendants' fraud targeting patients." Opp. re Mot. No. 5 at 4. Specifically, the Government alleges that doctors served as one of the means

through which Defendants deceived patients. *Id.* at 5. According to the Government's theory, "these allegations reflect the obvious fact that doctors advise their patients on laboratory selection when tests are needed, and act as representatives of their patients when communicating with labs about test results." *Id.*

Having reviewed the 3SI and 2SI, the Court finds that the Government has indeed amended many of the allegations to reflect that doctors cannot be considered victims of the scheme to defraud. Defendants are correct that some of the allegations remain ambiguous. In particular, Paragraph 14 alleges:

> Between approximately 2013 and 2016, HOLMES and BALWANI, through advertisements and solicitations, encouraged and *induced doctors* and patients to use Theranos's blood testing laboratory services.

3SI ¶ 14. Paragraph 22 similarly alleges that Defendants devised

> a scheme and artifice to defraud as to a material matter and to obtain money by means of materially false and fraudulent representations, specifically by soliciting, encouraging, or otherwise *inducing doctors to refer and patients to pay for* and use its laboratory and blood testing services under the false and fraudulent pretense that Theranos technology produced reliable and accurate blood test results.

3SI ¶ 22. These allegations could be construed as depicting doctors as victims. But read as whole, the 3SI and 2SI make sufficiently clear that they allege a scheme to defraud *patients*. *See id.* at 6 (section titled "The Scheme to Defraud Patients"), 8 ("Conspiracy to Commit Wire Fraud against Theranos Patients"), ¶ 15 ("HOLMES and BALWANI devised a scheme to defraud patients"). Moreover, the Government has confirmed its understanding of and compliance with the Court's prior ruling. Accordingly, although the Court agrees that Paragraphs 14 and 22 "could have been more artful," *Hinton*, 222 F.3d at 672, they do not warrant dismissal and need not be stricken.

Defendants respond that the convergence principle also bars the Government from arguing that "Defendants deceived one group of individuals (here, doctors) in order to deprive another group of individuals (here, patients) of money or property." Mot. No. 5 at 3-4. But that is not the

Government's theory.  The Government's theory is that Defendants intended to deceive patients, and that part of the scheme to deceive patients involved deceiving doctors.  *See, e.g.*, 3SI ¶ 15 ("Based on these representations, many hundreds of patients paid Theranos, or Walgreens acting on behalf of Theranos, for blood tests and test results, sometimes following referrals from their misled doctors.").  To the extent Defendants believe "allegations that a defendant deceived one party" cannot be "probative . . . of an intent to defraud another," the Court cannot agree.  There is no question that doctors may serve as conduits of information to their patients.  That there must be "at least some level of convergence between the fraud and the loss" does not make irrelevant all misrepresentations made to individuals other than those deprived of money or property.  *United States v. Ali*, 620 F.3d 1062, 1070 (9th Cir. 2010).

To be sure, there are issues still to be decided regarding what the Government must prove in order to succeed on its conduit theory.  These issues are best resolved through jury instructions.  And to the extent Defendants believe that evidence of misrepresentations to doctors would confuse the jury, that is the proper subject of a motion in limine.  As to the present motion, however, the Court reaffirms that doctors are not legally cognizable victims of Defendants' alleged fraud, and will hold the Government to its promise not to "argue at trial that the jury should convict Defendants of wire fraud based on a scheme to defraud doctors."  Opp. re Mot. No. 5 at 4.  The motion to dismiss or alternatively to strike is DENIED.

## VIII.   MOTION TO DISMISS NO. 6 BASED ON PRIOR MOTIONS TO DISMISS

Defendants' sixth and final motion to dismiss restates and incorporates all of the arguments previously made as to the 1SI, which apply with equal force to the 3SI and 2SI.  *See* Dkt. No. 500 ("Mot. No. 6"); *see also* Dkt. No. 519 ("Opp. re Mot. No. 6"); Dkt. No. 545 ("Reply re Mot. No. 6").  Defendants' arguments made at Docket Numbers 204, 205, and 206 are hereby preserved as to the 3SI and 2SI.  The Court reaffirms its rulings as to those prior arguments[3], wherefore the

---

[3] Defendants also seek reconsideration of the Court's holding that the Government had adequately alleged a duty to disclose.  The Court finds that Defendants have not set forth grounds justifying reconsideration.  *See Pyramid Lake Paiute Tribe of Indians v. Hodel*, 882 F.2d 364, 369 n.5 (9th

motion to dismiss on those grounds is DENIED.  *See United States v. Holmes*, No. 5:18-CR-

00258-EJD, 2020 WL 666563 (N.D. Cal. Feb. 11, 2020).

**IT IS SO ORDERED.**

Dated: October 13, 2020

                                                                          _____
                                                                          EDWARD J. DAVILA
                                                                          United States District Judge

Cir. 1989) ("[T]he major grounds that justify reconsideration involve an intervening change of
controlling law, the availability of new evidence, or the need to correct a clear error or prevent
manifest injustice.").  However, Defendants are free to raise the issue of what the Government
must show to establish an informal fiduciary relationship for the purpose of jury instructions.

1

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                         SAN JOSE DIVISION

5

     UNITED STATES OF AMERICA,          )
6                                        )   CR-18-00258-EJD
                         PLAINTIFF,      )
7                                        )   SAN JOSE, CALIFORNIA
               VS.                       )
8                                        )   AUGUST 20, 2021
     ELIZABETH A. HOLMES,                )
9                                        )   PAGES 1 - 82
                         DEFENDANT.      )
10   _____    )

11

12                    TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE EDWARD J. DAVILA
13                  UNITED STATES DISTRICT JUDGE

14

     A P P E A R A N C E S:
15

     FOR THE PLAINTIFF:      UNITED STATES ATTORNEY'S OFFICE
16                           BY:   JOHN C. BOSTIC
                                   JEFFREY B. SCHENK
17                           150 ALMADEN BOULEVARD, SUITE 900
                             SAN JOSE, CALIFORNIA 95113
18
                             BY:   ROBERT S. LEACH
19                                 KELLY VOLKAR
                             1301 CLAY STREET, SUITE 340S
20                           OAKLAND, CALIFORNIA 94612

21       (APPEARANCES CONTINUED ON THE NEXT PAGE.)

22

     OFFICIAL COURT REPORTER:
23                           IRENE L. RODRIGUEZ, CSR, RMR, CRR
                             CERTIFICATE NUMBER 8074
24

         PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25            TRANSCRIPT PRODUCED WITH COMPUTER

2

1     A P P E A R A N C E S: (CONT'D)

2

3     FOR DEFENDANT HOLMES:   WILLIAMS & CONNOLLY LLP
                              BY:  KEVIN M. DOWNEY
4                                  LANCE A. WADE
                                   PATRICK LOOBY
5                                  KATHERINE TREFZ
                                   AMY SAHARIA
6                              725 TWELFTH STREET, N.W.
                              WASHINGTON, D.C. 20005
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

|   |   |   |
|---|---|---|
| | 1 | SAN JOSE, CALIFORNIA                                    AUGUST 20, 2021 |
| | 2 | P R O C E E D I N G S |
| 10:08AM | 3 | (COURT CONVENED AT 10:08 A.M.) |
| 10:08AM | 4 | THE COURT:  LET'S GO ON THE RECORD IN OUR MORNING |
| 10:08AM | 5 | MATTER.  THIS IS 18-258, UNITED STATES VERSUS ELIZABETH HOLMES. |
| 10:08AM | 6 | LET ME FIRST CAPTURE THE APPEARANCES OF THE PARTIES, |
| 10:08AM | 7 | PLEASE. |
| 10:08AM | 8 | WHO APPEARS FOR THE GOVERNMENT? |
| 10:08AM | 9 | MS. VOLKAR:  GOOD MORNING, YOUR HONOR. |
| 10:09AM | 10 | KELLY VOLKAR ON BEHALF OF THE GOVERNMENT, THE UNITED |
| 10:09AM | 11 | STATES OF AMERICA, AND ALONG WITH ME AT COUNSEL TABLE ARE MY |
| 10:09AM | 12 | COLLEAGUES:  ROBERT LEACH, JEFF SCHENK, JOHN BOSTIC, AND OUR |
| 10:09AM | 13 | SPECIAL CASE ADELAIDA HERNANDEZ. |
| 10:09AM | 14 | THE COURT:  THANK YOU.  GOOD MORNING. |
| 10:09AM | 15 | WHO APPEARS FOR THE DEFENDANT? |
| 10:09AM | 16 | MR. WADE:  GOOD MORNING, YOUR HONOR. |
| 10:09AM | 17 | LANCE WADE FROM WILLIAMS & CONNOLLY ON BEHALF OF |
| 10:09AM | 18 | MS. HOLMES, WHO IS PRESENT HERE IN THE COURTROOM TODAY. |
| 10:09AM | 19 | THE COURT:  THANK YOU.  GOOD MORNING. |
| 10:09AM | 20 | MR. WADE:  ALSO PRESENT WITH ME TODAY ARE |
| 10:09AM | 21 | MR. DOWNEY, MR. LOOBY, MS. TREFZ, AND MS. SAHARIA. |
| 10:09AM | 22 | THE COURT:  GOOD MORNING. |
| 10:09AM | 23 | THIS IS THE DATE AND TIME SET FOR SOME DISCUSSION ON SOME |
| 10:09AM | 24 | MOTIONS FILED BY MS. HOLMES.  THESE ARE, LET'S SEE, DOCKETS -- |
| 10:09AM | 25 | I BELIEVE IT'S 892, 895, 897, AND 899. |

4

| | | |
|---|---|---|
| 10:09AM | 1 | AND I HAVE RECEIVED YOUR PLEADINGS, THE REPLIES.  THANK |
| 10:09AM | 2 | YOU FOR THOSE. |
| 10:09AM | 3 | I THOUGHT I WOULD LIKE TO GO THROUGH THOSE -- THESE WITH |
| 10:10AM | 4 | STARTING WITH THE 895 I THINK IT IS.  THIS IS A MOTION TO |
| 10:10AM | 5 | EXCLUDE CERTAIN NEWS ARTICLES. |
| 10:10AM | 6 | MR. LOOBY, ARE YOU RISING TO THAT? |
| 10:10AM | 7 | MR. LOOBY:  YES.  GOOD MORNING, YOUR HONOR. |
| 10:10AM | 8 | I'LL BE ADDRESSING THIS MOTION. |
| 10:10AM | 9 | THE COURT:  WHAT WOULD YOU LIKE ME TO KNOW IN |
| 10:10AM | 10 | ADDITION TO WHAT YOU'VE TOLD US IN YOUR PLEADINGS? |
| 10:10AM | 11 | MR. LOOBY:  SO THANK YOU, YOUR HONOR. |
| 10:10AM | 12 | I THINK I CAN BE BRIEF. |
| 10:10AM | 13 | THE COURT:  THAT'S ALWAYS GOOD, MR. LOOBY. |
| 10:10AM | 14 | MR. LOOBY:  YES. |
| 10:10AM | 15 | AND THE REASON FOR THAT IS THAT THIS IS KIND OF A |
| 10:10AM | 16 | STRAIGHTFORWARD PRETRIAL CLEAN-UP MOTION.  THE SEVEN ARTICLES |
| 10:10AM | 17 | ATTACHED TO THE MOTION WE SUBMIT WOULD HAVE BEEN EXCLUDED UNDER |
| 10:10AM | 18 | THE COURT'S ANALYSIS IN ITS MAY IN LIMINE ORDER. |
| 10:10AM | 19 | IF YOU LOOK AT THE ARTICLES, THEY EACH CONTAIN REPORTING |
| 10:10AM | 20 | THE PARROTS "THE WALL STREET JOURNAL" REPORTING, AND OTHER |
| 10:10AM | 21 | CRITICAL COVERAGE OF THERANOS, INVESTIGATORY PIECES THAT THE |
| 10:10AM | 22 | GOVERNMENT HAS PROPOSED TO OFFER TO PROVIDE CONTEXT FOR |
| 10:11AM | 23 | MS. HOLMES AND THE COMPANY'S RESPONSE. |
| 10:11AM | 24 | THE COURT CORRECTLY HELD AND SAID THIS PURPOSE RELIES ON |
| 10:11AM | 25 | THE TRUTH OF THE ARTICLES FOR ITS RELEVANCE AND SO THEY MUST BE |

10:11AM 1     EXCLUDED.  THE GOVERNMENT'S OPPOSITION POSITS NO OTHER PURPOSE

10:11AM 2     FOR THESE ARTICLES.

10:11AM 3         SO THE COURT NEED NOT WAIT TO EXCLUDE THEM NOW ON HEARSAY

10:11AM 4     GROUNDS.  AND IF THERE WERE ANY RESERVATION ON THAT POINT, THEN

10:11AM 5     RULE 403 WOULD PROVIDE AN ALTERNATIVE BASIS.

10:11AM 6         SO UNLESS YOUR HONOR HAS ANY SPECIFIC QUESTIONS ABOUT THE

10:11AM 7     ARTICLES?

10:11AM 8           THE COURT:  WELL, I DO HAVE SOME.

10:11AM 9         DO THESE ARTICLES CONTAIN WHAT YOU WOULD DESCRIBE AS

10:11AM 10     ADMISSIONS THAT WOULD OTHERWISE BE ADMISSIBLE?

10:11AM 11           MR. LOOBY:  I DON'T BELIEVE SO, YOUR HONOR.  SOME OF

10:11AM 12     THEM PURPORT TO QUOTE MS. HOLMES --

10:11AM 13           THE COURT:  RIGHT.

10:11AM 14           MR. LOOBY:  -- OR OTHER REPRESENTATIVES OF THE

10:11AM 15     COMPANY.

10:11AM 16         AND SOME OF THEM ARE QUOTING PUBLIC APPEARANCES OF

10:11AM 17     MS. HOLMES, WHICH ARE ALSO ON THE GOVERNMENT'S EXHIBIT LIST IN

10:11AM 18     MANY CASES AS VIDEOS THAT THEY MAY PURPORT TO PLAY.

10:11AM 19         SO I DON'T THINK THAT THE ARTICLES THEMSELVES HAVE ANY

10:11AM 20     EVIDENTIARY VALUE SEPARATE AND APART FROM THOSE OTHER

10:12AM 21     STATEMENTS.

10:12AM 22         SO I DON'T SEE ANY ADMISSIONS IN THESE THAT HAVE LIKE AN

10:12AM 23     INDEPENDENT BASIS OR FOR ADMISSION.

10:12AM 24           THE COURT:  AND I THINK YOU UNDERSTAND WHY I ASKED

10:12AM 25     THE QUESTION.  THERE ARE QUOTES YOUR CLIENT APPEARED AT

6

10:12AM 1    CONFERENCES I THINK IN SOME OF THESE AND WAS INTERVIEWED, AND

10:12AM 2    THE ARTICLES SAYS MS. HOLMES WAS ASKED X AND SHE SAID X.

10:12AM 3            MR. LOOBY:  RIGHT.  AND SO THE ARTICLE AT THAT POINT

10:12AM 4    HAS A THRESHOLD HEARSAY ISSUE OF THE OUT-OF-COURT STATEMENT OF

10:12AM 5    THE REPORTER SAYING SHE SAID X.

10:12AM 6            THE COURT:  CORRECT.

10:12AM 7            MR. LOOBY:  AND IN SOME CASES IT'S PURPORTING TO

10:12AM 8    QUOTE AND OTHER TIMES IT IS PURPORTING TO PARAPHRASE AND THOSE

10:12AM 9    ARE EVEN MORE PROBLEMATIC IN SOME INSTANCES.

10:12AM 10           THE COURT:  I THINK WE CAN PUT THOSE ASIDE, THE

10:12AM 11   PARAPHRASE, RIGHT.

10:12AM 12           MR. LOOBY:  RIGHT, RIGHT.  BUT EVEN THE QUOTATIONS,

10:12AM 13   THE SELECTION OF THEM THAT ARE PLACED IN THE ARTICLE WHERE I

10:12AM 14   WOULD SAY THAT THE HEARSAY ISSUE STILL HASN'T BEEN SURMOUNTED

10:12AM 15   BY THE GOVERNMENT.

10:12AM 16        SO I DON'T THINK THAT THE ARTICLES ARE ADMISSIBLE JUST BY

10:12AM 17   BASIS OF HAVING THE QUOTATIONS BECAUSE OF THAT HEARSAY ISSUE.

10:13AM 18           THE COURT:  OR ANY PIECE OF THE ARTICLE THAT WOULD

10:13AM 19   IDENTIFY A QUOTE.  NOT THE ARTICLE IN TOTO BUT JUST THE QUOTE.

10:13AM 20   THAT'S NOT PARSABLE IN YOUR VIEW?

10:13AM 21           MR. LOOBY:  NO, YOUR HONOR, BECAUSE OF THAT HEARSAY

10:13AM 22   ISSUE OF THIS IS A REPORTER OR A NEWS AGENCY REPRODUCING AN

10:13AM 23   OUT-OF-COURT STATEMENT.  SO THERE'S THE DOUBLE LAYER THERE.

10:13AM 24        SO -- YES.

10:13AM 25           THE COURT:  ALL RIGHT.

**ER-3448**

10:13AM    1       MS. VOLKAR?

10:13AM    2          MS. VOLKAR:  GOOD MORNING, YOUR HONOR.

10:13AM    3          THE COURT:  I'M SORRY, MS. VOLKAR.  WE'LL ADJUST

10:13AM    4   THESE SCREENS OR THE LECTERNS AT SOME TIME SO WE DON'T HAVE

10:14AM    5   THAT IS BAR IN FRONT OF YOURS.

10:14AM    6       DON'T DO IT NOW.  THAT'S OKAY.

10:14AM    7          MS. VOLKAR:  THANK YOU, YOUR HONOR.  I'LL ALSO BE

10:14AM    8   BRIEF.

10:14AM    9       OF COURSE WE'RE HERE TODAY IN PART BECAUSE UNDER THE GUISE

10:14AM   10   OF FOLLOWING UP ON THE COURT'S PURPORTED INVITATION TO FILE

10:14AM   11   MORE MOTIONS, THE DEFENDANT IS IN FACT SEEKING TO SUBVERT

10:14AM   12   SEVERAL OF THE COURT'S THOUGHTFUL AND DETAILED RULINGS ON THE

10:14AM   13   MOTION IN LIMINE IN ITS MOTION IN LIMINE ORDER.

10:14AM   14       THE COURT HAS ALREADY ADDRESSED SEVERAL OF THESE MOTIONS

10:14AM   15   INCLUDING THE NEWS ARTICLE ONE.  THE DEFENDANT COULD HAVE AT

10:14AM   16   THAT TIME ATTACHED MORE MOTIONS.  THEY CERTAINLY SOUGHT BROAD

10:14AM   17   EXCLUSION AND DID NOT NECESSARILY HOLD BACK.  THEY DID NOT

10:14AM   18   IDENTIFY THE SEVEN ARTICLES AT THAT TIME, AND SO I BELIEVE THE

10:14AM   19   COURT'S ORDER DENYING ESSENTIALLY THE NON-ADDRESSED ONES STILL

10:14AM   20   STANDS, ESPECIALLY GIVEN THAT NO TESTIMONY HAS YET COME IN.

10:14AM   21       SO THE GOVERNMENT'S FIRST POINT IS THAT THIS ARTICLE IS

10:14AM   22   PREMATURE.  AT THIS POINT IN TIME NOTHING HAS ACTUALLY CHANGED

10:15AM   23   FROM THE COURT'S MOTION IN LIMINE ORDER.  NO TESTIMONY HAS BEEN

10:15AM   24   GIVEN.  THE TRIAL IS STILL IN THE FUTURE.  AND SEEKING TO

10:15AM   25   EXCLUDE THESE SEVEN ARTICLES AT THIS POINT IN TIME DOES NOT

8

10:15AM 1    ALLOW FOR THE OTHER MANNER IN WHICH THE TESTIMONY MAY COME IN

10:15AM 2    IF WE WERE TO DISCUSS THIS EVEN A MONTH FROM NOW.

10:15AM 3         NOW, WHAT MIGHT THOSE METHODS BE?

10:15AM 4         WELL, FIRST, BY THE TIME THAT CERTAIN WITNESSES ARE

10:15AM 5    ALLOWED TO TESTIFY, THE TRUTH OF THE ARTICLE OR THE TRUTH OF

10:15AM 6    WHAT IS IN THE ARTICLE MAY ALREADY BE PROVEN AT TRIAL THROUGH

10:15AM 7    LIVE TESTIMONY, THROUGH WITNESSES WHO EXPERIENCED IT FIRSTHAND,

10:15AM 8    AND AT THAT POINT IN TIME THE GOVERNMENT MAY NOT SEEK TO

10:15AM 9    INTRODUCE THE ARTICLE FOR THE PURPOSES OF THE TRUTH BUT MERELY

10:15AM 10   FOR THE EFFECT ON THE LISTENER.

10:15AM 11        IN PARTICULAR, IF THESE ARTICLES WERE SHARED WITH BOARD

10:15AM 12   MEMBERS OR INVESTORS AS A WAY -- AN THE EFFECT ON THE READER TO

10:15AM 13   SAY, YES, THERE WAS AN ARTICLE THAT MADE CLAIMS, BUT HERE'S WHY

10:15AM 14   THE COMPANY DOESN'T BELIEVE THAT THAT ARTICLE WAS ACCURATE.

10:15AM 15        THE COURT:  CAN I ASK YOU TO EXPAND ON THAT?

10:16AM 16   I NOTICED IN YOUR PLEADINGS YOU SUGGEST THE EFFECT ON THE

10:16AM 17   LISTENER, THE EFFECT ON THE READER.  IF YOU COULD EXPAND ON

10:16AM 18   THAT SO I COULD CAPTURE EXACTLY WHAT YOU MEAN, WHO IS THE

10:16AM 19   READER AND WHO IS THE LISTENER IN THAT ANALYSIS?

10:16AM 20        MS. VOLKAR:  ABSOLUTELY, YOUR HONOR.

10:16AM 21        THERE ARE SEVERAL WITNESSES, ONE OF WHOM THE DEFENDANT

10:16AM 22   HIRED IN PART TO HELP WITH THE MEDIA THAT CAME FROM

10:16AM 23   "THE WALL STREET JOURNAL'S" EXPOSE, SO TO SPEAK, OF WHAT WAS --

10:16AM 24   I'M HESITATING TO SAY THE TRUTH OF WHAT WAS GOING ON AT

10:16AM 25   THERANOS.  I KNOW THAT'S, OF COURSE, WHAT IS IN DEBATE, BUT

10:16AM 1    "THE WALL STREET JOURNAL'S" OCTOBER 2015 ARTICLE CAUSED A

10:16AM 2    REACTION AND DEFENDANT HOLMES ACTUALLY HIRED PEOPLE TO HELP

10:16AM 3    RESPOND TO THAT MEDIA.

10:16AM 4        SO THERE ARE CERTAIN WITNESSES WHOSE JOB IT WAS TO FIELD

10:16AM 5    REPORTERS TO TALK TO THEM TO PROVIDE QUOTES OF MS. HOLMES TO

10:16AM 6    REBUT OR RESPOND IN THE MEDIA TO THESE CLAIMS.

10:16AM 7        AND THOSE ARTICLES WERE POINTED TO IN A MANNER OF SAYING

10:17AM 8    THE COMPANY IS HANDLING THIS, THE COMPANY IS RESPONDING TO

10:17AM 9    THIS, AND THEY WERE MEANT TO SHOW -- IN THE GOVERNMENT'S

10:17AM 10   PERSPECTIVE, THEY WERE A WAY OF CONTINUING THE FRAUD, THEY WERE

10:17AM 11   A WAY OF CONTINUING TO CONCEAL WHAT WAS GOING ON, THE TRUTH OF

10:17AM 12   WHAT WAS HAPPENING AT THERANOS.

10:17AM 13       SO OUR POINT WOULD BE JUST AT THIS MOMENT IN TIME THE

10:17AM 14   GOVERNMENT DOES NOT NECESSARILY PLAN TO MENTION THESE SPECIFIC

10:17AM 15   ARTICLES IN ITS OPENING, BUT AT THE SAME TIME IT'S HARD TO

10:17AM 16   PREDICT IF THEY WON'T BECOME RELEVANT LATER ON FOR BOARD

10:17AM 17   MEMBERS OR INVESTORS OR POTENTIAL WITNESSES TO SAY WHY THEY

10:17AM 18   DIDN'T NECESSARILY -- "THE WALL STREET JOURNAL" WASN'T SORT OF

10:17AM 19   THE COLLAPSE OF EVERYTHING AND BOARD MEMBERS DIDN'T NECESSARILY

10:17AM 20   PLEA IMMEDIATELY THEREAFTER.

10:17AM 21           THE COURT:  I SEE.  SO ITS EFFECT ON THAT GROUP OF

10:17AM 22   INDIVIDUALS THAT YOU'VE JUST MENTIONED, BOARD MEMBERS,

10:17AM 23   POTENTIAL INVESTORS, THAT'S THE EFFECT THAT YOU'RE SPEAKING OF?

10:17AM 24           MS. VOLKAR:  AND, AGAIN, THAT'S ONE CATEGORY AND ONE

10:17AM 25   WAY TO GET AROUND THE HEARSAY.

10

10:17AM 1      ANOTHER WAY IS THE MEDIA PEOPLE THAT WERE HIRED IN ORDER

10:17AM 2   TO RESPOND TO "THE WALL STREET JOURNAL" ARTICLE THAT CAME OUT

10:18AM 3   AND TO ESSENTIALLY GO ON THE OFFENSIVE TO CLEAR THERANOS'S NAME

10:18AM 4   OF SORTS, THEY CAN ALSO TALK ABOUT -- SOMETIMES THEY WERE THE

10:18AM 5   ONES WHO WERE PROVIDING THE STATEMENTS TO THE MEDIA FOLKS, AND,

10:18AM 6   THEREFORE, THEY'RE OFTEN THE ONES PROVIDING THE QUOTES AND CAN

10:18AM 7   TALK ABOUT THE ACCURACY OF THOSE QUOTES.

10:18AM 8      THE COURT:  THANK YOU.

10:18AM 9      I THINK YOU MENTIONED IN YOUR OPPOSITION THAT THE MOTION

10:18AM 10  IS PREMATURE FROM YOUR POSITION IN THAT YOU SUGGEST THAT, AS

10:18AM 11  YOU JUST DID, THAT YOU INDICATE THAT YOU, THE GOVERNMENT, IS

10:18AM 12  NOT GOING TO RAISE ANY OF THESE SEVEN ARTICLES IN THEIR OPENING

10:18AM 13  STATEMENT; AND THAT RATHER THE COURT SHOULD RESERVE ITS RULING

10:18AM 14  ON THIS; AND THAT YOU, THE GOVERNMENT, WILL ADVISE MS. HOLMES

10:18AM 15  AND THE COURT SHOULD YOU WISH TO INTRODUCE ANY OF THESE

10:18AM 16  ARTICLES OR ANY INFORMATION CONTAINED IN THE ARTICLE PRIOR TO

10:18AM 17  ITS ADMISSION OR PRIOR TO YOUR GOING FORWARD SUCH THAT THE

10:19AM 18  PARTIES WOULD HAVE AN OPPORTUNITY TO THEN DISCUSS THE

10:19AM 19  ADMISSIBILITY OF THE ARTICLE OR THE PORTION OR THE SPEAKER AND

10:19AM 20  THE REASONS FOR?

10:19AM 21      MS. VOLKAR:  THAT'S CORRECT, YOUR HONOR.

10:19AM 22      THE COURT:  MR. LOOBY, WHAT'S WRONG WITH THAT?

10:19AM 23      MR. LOOBY:  WELL, I THINK, YOUR HONOR, I THINK THAT

10:19AM 24  THE GOVERNMENT'S EXHIBIT LIST IS NOW NUMBERING IN THE THOUSANDS

10:19AM 25  OF EXHIBITS AND TRIAL IS, YOU KNOW, MERE WEEKS AWAY AT THIS

10:19AM 1    POINT.

10:19AM 2         JUST FROM A TRIAL PREPARATION STANDPOINT, WE SUBMIT THAT

10:19AM 3    THE HEARSAY ISSUES IN THESE ARTICLES HAVE NOT BEEN SOLVED

10:19AM 4    EITHER BY THE OPPOSITIONS IN -- THE ARGUMENTS IN THE

10:19AM 5    GOVERNMENT'S OPPOSITION BRIEF OR IN THE NEW ARGUMENTS MADE HERE

10:19AM 6    TODAY.  SO WE SUBMIT THAT THE -- IT'S RIPE FOR ADJUDICATION

10:19AM 7    NOW.

10:19AM 8         THE COURT:  WELL, WHAT IS THE PREJUDICE OF WAITING

10:19AM 9    TO SEE IF THEY EVEN WISH TO USE THEM?

10:19AM 10        I TAKE THE MOTIONS, AND THIS MIGHT APPLY TO SOME OF THE

10:20AM 11   OTHER MOTIONS HERE AND NOT IN A PEJORATIVE SENSE, BUT THIS IS

10:20AM 12   -- FIRST OF ALL, LET ME JUST SAY AT A HIGH LEVEL, I THINK YOUR

10:20AM 13   TEAM HAS ACCEPTED THE COURT'S INVITATION THAT IT MENTIONED IN

10:20AM 14   DOCKET 798, ITS MIL ORDERS INDICATING AS TO SEVERAL, IF THE

10:20AM 15   PARTIES WISH TO RAISE SOMETHING IN THE FUTURE WITH MORE

10:20AM 16   SPECIFICITY, PARTICULARLY MS. HOLMES, THE COURT WOULD RECEIVE

10:20AM 17   THAT.

10:20AM 18        AND I TAKE YOUR FOUR MOTIONS THIS MORNING AS ACCEPTING

10:20AM 19   THAT INVITATION AND RAISING THOSE ISSUES, AND I APPRECIATE

10:20AM 20   THAT.  AND THE OFFER WAS MADE, AND THAT'S WHAT WE'RE HAVING

10:20AM 21   THIS DISCUSSION ABOUT.

10:20AM 22        BUT ATTENDANT TO THAT I'M HAVE JUST CURIOUS IF, AS

10:20AM 23   MS. VOLKAR SAYS, WE'RE ON NOTICE NOW AND SHOULD WE WISH TO

10:20AM 24   INTRODUCE ANY OF THESE, WE'LL -- WE CERTAINLY KNOW WHAT THE

10:20AM 25   CURRENT OBJECTIONS ARE.  THERE MAY BE ADDITIONAL OBJECTIONS

12

10:21AM 1    DEPENDING ON THE STATE OF THE EVIDENCE AT THE TIME THAT THESE

10:21AM 2    ARE SOUGHT TO BE INTRODUCED, AND THAT, THAT PLANE COULD CHANGE

10:21AM 3    BECAUSE WE DON'T KNOW WHAT WITNESSES MIGHT FOUNDATIONALLY BE

10:21AM 4    CALLED UPON TO TALK ABOUT SOME OF THESE ISSUES OR OTHERS THAT

10:21AM 5    MIGHT CHANGE THE LANDSCAPE OF ADMISSIBILITY.

10:21AM 6              MR. LOOBY:  RIGHT.

10:21AM 7              THE COURT:  I THINK THAT'S WHAT I HEAR MS. VOLKAR

10:21AM 8    SUGGESTING.

10:21AM 9              MR. LOOBY:  YEAH.  AND I THINK I DISAGREE WITH THAT

10:21AM 10   ANALYSIS FROM THE GOVERNMENT BECAUSE WHETHER OR NOT THERE IS

10:21AM 11   WITNESS TESTIMONY IN THE CASE THAT EITHER ECHOES OR PARALLELS

10:21AM 12   SOME OF THE KIND OF CONTENTIONS IN THE ARTICLES I DON'T THINK

10:21AM 13   WOULD BEAR ON THE HEARSAY ISSUES IN THE ARTICLES THEMSELVES IF

10:21AM 14   THEY'RE BEING OFFERED FOR THAT PURPOSE.

10:21AM 15       I DON'T THINK YOU CAN LIKE PROVE MID TRIAL THAT SOME

10:21AM 16   CONTENTION WAS TRUE OR NOT, AND THEN THE ARTICLE IS NO LONGER

10:21AM 17   HEARSAY BECAUSE SOME OTHER WITNESS IS VOUCHING FOR SOME FACT

10:21AM 18   CONTAINED WITHIN IT.  I DON'T THINK THAT'S HOW IT WORKS.

10:21AM 19       BUT BEYOND THAT, WHAT I HEARD IS THAT THE EFFECT ON THE

10:21AM 20   READER.  I CONCEIVE OF THAT AS THE SAME ARGUMENT, THE SAME

10:22AM 21   CONTEXT FOR THE COMPANY'S RESPONSE AND MS. HOLMES'S RESPONSE

10:22AM 22   THAT THE COURT ALREADY ADDRESSED IN ITS IN LIMINE RULING.

10:22AM 23       I UNDERSTAND WE'RE HERE ON THE EVE OF TRIAL, BUT WE HAD

10:22AM 24   HOPED THAT THIS PARTICULAR MOTION IN PARTICULAR WOULD BE RATHER

10:22AM 25   STRAIGHTFORWARD.  THIS IS A CLEAN-UP MOTION.  THESE ARTICLES

13

10:22AM  1    WITH DID NOT ATTACH TO THE PRIOR MOTION JUST TO LIMIT THE

10:22AM  2    NUMBER OF PAPERS.

10:22AM  3        SO I DON'T WANT TO BELABOR THE POINT, BUT I THINK THE

10:22AM  4    COURT'S ANALYSIS IS KIND OF THE RULE THAT WE'RE OPERATING UNDER

10:22AM  5    RIGHT NOW, AND THESE ARTICLES ARE EXCLUDED UNDER IT OR SHOULD

10:22AM  6    BE.

10:22AM  7            THE COURT:  UNTIL AND UNLESS THERE'S OTHERWISE

10:22AM  8    EVIDENCE THAT SUGGESTS THEIR ADMISSIBILITY.

10:22AM  9            MR. LOOBY:  CORRECT, AS THE NATURE OF ANY IN LIMINE

10:22AM 10    RULING FOR SURE, YOUR HONOR.

10:22AM 11        BUT I THINK AS OF RIGHT NOW IN TERMS OF WHETHER THIS

10:22AM 12    IN LIMINE RULING IS MORE OR LESS SUSCEPTIBLE TO RESOLUTION NOW

10:22AM 13    THAN ANY OTHER, I SUBMIT THAT IT IS.

10:22AM 14            THE COURT:  OKAY.  WELL, THANK YOU.

10:22AM 15        MS. VOLKAR, WHAT I THINK I HEAR YOU SAYING IS THANK YOU

10:23AM 16    FOR THE NOTICE AND WE'RE NOT GOING TO -- WE UNDERSTAND THE

10:23AM 17    COURT'S ORDER IN 798, AND WE'RE NOT GOING TO AT THIS TIME

10:23AM 18    INTRODUCE ANY OF THESE.  IF WE INTEND TO, WE'LL CERTAINLY

10:23AM 19    INFORM THE COURT OF THAT.  MS. HOLMES HAS THE RIGHT AT THAT

10:23AM 20    POINT TO LODGE ANY OBJECTIONS.

10:23AM 21            MS. VOLKAR:  THAT'S RIGHT, YOUR HONOR.  WE JUST

10:23AM 22    THINK IT'S SIMPLY PREMATURE AT THIS POINT IN TIME.  I THINK

10:23AM 23    WE'RE IN NO DIFFERENT POSITION THAN WE WERE WHEN WE WERE

10:23AM 24    ARGUING THESE MOTIONS BEFORE YOUR HONOR MONTHS AGO AND NOT A

10:23AM 25    SINGLE WITNESS HAS TESTIFIED YET, AND, THEREFORE, I THINK IT'S

14

10:23AM 1    PREMATURE TO RULE ON THESE NOW.

10:23AM 2          THE COURT: ALL RIGHT. ANYTHING FURTHER, MR. LOOBY?

10:23AM 3          MR. LOOBY: NO, YOUR HONOR.

10:23AM 4          THE COURT: ALL RIGHT. THANK YOU VERY MUCH. I

10:23AM 5    APPRECIATE IT. THANK YOU.

10:23AM 6      LET'S TURN TO 899. THIS IS MS. HOLMES'S RENEWED MOTION TO

10:23AM 7    EXCLUDE CERTAIN DOCTOR TESTIMONY.

10:23AM 8      GOOD MORNING, MS. TREFZ.

10:23AM 9          MS. TREFZ: GOOD MORNING, YOUR HONOR.

10:23AM 10          THE COURT: WHAT WOULD YOU LIKE ME TO KNOW ABOUT

10:24AM 11    THIS?

10:24AM 12          MS. TREFZ: YOUR HONOR, THIS MOTION IS ALSO A

10:24AM 13    CLEAN-UP MOTION, AND AS THE COURT NOTED, THIS IS MS. HOLMES'S

10:24AM 14    RENEWED MOTION TO EXCLUDE CERTAIN DOCTOR TESTIMONY. WE VIEW IT

10:24AM 15    AS FAIRLY SIMPLE.

10:24AM 16      THE COURT'S MOTION IN LIMINE ORDER INDICATED THAT IF THE

10:24AM 17    GOVERNMENT HAD NOT PROVIDED UPDATED DISCLOSURES AS TO CERTAIN

10:24AM 18    OF THE DOCTOR EXPERT WITNESS POTENTIAL AREAS OF TESTIMONY THAT

10:24AM 19    WE COULD RENEW OUR MOTION.

10:24AM 20      WE AGREED WITH THE GOVERNMENT THAT THEY WOULD PROVIDE

10:24AM 21    AMENDED DISCLOSURES AS OF JULY 30TH. THEY DID THAT.

10:24AM 22      THEIR AMENDED DISCLOSURES SUBSTANTIALLY NARROWED THE

10:24AM 23    POTENTIAL SCOPE OF THE TESTIMONY AND IN PARTICULAR, YOU KNOW,

10:24AM 24    IDENTIFIED PARTICULAR PATIENTS, CUT OUT SOME OF THE DOCTORS.

10:24AM 25      ALL WE'RE ASKING FOR HERE IS A RULING THAT DOCTOR EXPERT

15

10:24AM   1    TESTIMONY ABOUT ALLEGEDLY INACCURATE TESTS BEYOND WHAT HAS BEEN

10:25AM   2    NOTICED IN THIS JULY 30TH LETTER BE EXCLUDED AS INSUFFICIENTLY

10:25AM   3    DISCLOSED UNDER RULE 16.

10:25AM   4            THE COURT:  OKAY.  THANK YOU.

10:25AM   5        I TAKE THIS -- I LOOKED AT THIS AND IT SAID, "JUDGE, WE

10:25AM   6    RECEIVED YOUR ORDER AND ON AUGUST 20TH WE WOULD LIKE TO DISCUSS

10:25AM   7    TO REMIND YOU AND HAVE THE GOVERNMENT SAY WHAT YOU SAID AND NO

10:25AM   8    MORE."

10:25AM   9        IS THIS JUST A REAFFIRMING OF THE COURT'S PREVIOUS ORDER?

10:25AM  10            MS. TREFZ:  WELL, I THINK IT'S A LITTLE BIT

10:25AM  11    DIFFERENT.

10:25AM  12        IN A SENSE YES, BUT IN A SENSE IT'S A SLIGHTLY DIFFERENT

10:25AM  13    CONTEXT BECAUSE THE COURT TECHNICALLY DENIED OUR MOTION ON

10:25AM  14    RULE 16 BEFORE AND INVITED US TO RENEW THE MOTION.  SO WE ARE

10:25AM  15    NOW RENEWING THE MOTION.

10:25AM  16        SO LIKE I SAID, IT'S A LITTLE BIT OF A CLEANUP.  WE

10:25AM  17    UNDERSTAND THAT THE GOVERNMENT SAYS IT'S GOING TO HOLD ITSELF

10:25AM  18    TO THESE DISCLOSURES, WHICH IS GREAT.  WE WOULD JUST APPRECIATE

10:25AM  19    AN ORDER MAKING THAT CLEAR, AND WE THINK THAT THAT'S

10:25AM  20    APPROPRIATE BECAUSE, YOU KNOW, THERE ARE STILL EXHIBITS ON

10:26AM  21    THEIR EXHIBIT LIST AND WITNESSES DISCLOSED THAT HAVE BEEN SORT

10:26AM  22    OF WE THINK DISCLAIMED BY THE UPDATED DISCLOSURE.

10:26AM  23            THE COURT:  RIGHT.  THEY'RE NOT ON THE LIST ANYMORE.

10:26AM  24            MS. TREFZ:  WELL, THEY ARE IS THE PROBLEM.  AND SO

10:26AM  25    WE JUST WANT TO MAKE CLEAR THAT THEY'RE NOT IF THAT MAKES

UNITED STATES COURT REPORTERS

**ER-3457**

16

10:26AM 1    SENSE.

10:26AM 2             THE COURT:  FOR THIS PURPOSE?

10:26AM 3             MS. TREFZ:  WELL, FOR THIS PURPOSE BUT AT LEAST ONE

10:26AM 4    OF THE DOCTORS, FOR EXAMPLE, DR. ACHARYA, YOU KNOW, HIS CV IS

10:26AM 5    STILL ON THE GOVERNMENT'S EXHIBIT LIST AS OF MONDAY, AND HE WAS

10:26AM 6    STILL INCLUDED AS A POTENTIAL WITNESS ON THE GOVERNMENT'S -- ON

10:26AM 7    THE JUROR QUESTIONNAIRE.  AND FROM OUR PERSPECTIVE WE'RE NOT

10:26AM 8    SURE WHAT OF HIS TESTIMONY, POTENTIAL TESTIMONY THAT HAS NOT

10:26AM 9    BEEN, THAT HAS NOT BEEN DISCLAIMED COULD EVEN POSSIBLY COME IN.

10:26AM 10    SO WE'RE JUST A LITTLE BIT WEARY, AND WE WOULD JUST LIKE

10:26AM 11    IT TO BE CLEAR.

10:26AM 12             THE COURT:  OKAY.  MS. VOLKAR, YOU'RE RISING TO

10:27AM 13    THIS?

10:27AM 14             MS. VOLKAR:  I AM, YOUR HONOR.  THANK YOU.

10:27AM 15    THE FIRST THING THAT STRIKES ME, YOUR HONOR, IS THAT

10:27AM 16    COUNSEL'S STATEMENT CONFIRMS THAT THIS IS SIMPLY A MOTION TO

10:27AM 17    RECONSIDER YOUR HONOR'S PRIOR RULING, AND THE GOVERNMENT

10:27AM 18    SUBMITS THAT IT IS ENTIRELY UNNECESSARY.

10:27AM 19    THE -- COUNSEL READS YOUR RULING CORRECTLY, BUT TAKES IT

10:27AM 20    AS AN INVITATION THAT THE GOVERNMENT DOES NOT SEE.

10:27AM 21    YOUR HONOR SAID, "IF THE GOVERNMENT DOES NOT PROVIDE

10:27AM 22    UPDATED DISCLOSURES, YOU COULD BRING A MOTION."

10:27AM 23    THEY ASKED FOR THOSE UPDATED DISCLOSURES BY JULY 30TH, AND

10:27AM 24    WE GAVE THEM.  WE SUPPLEMENTED OUR DISCLOSURES, AND WE DID

10:27AM 25    EVERYTHING THAT THEY ASKED AND THIS COURT ORDERED US TO DO.

| | | |
|---|---|---|
| 10:27AM | 1 | AT THIS POINT IN TIME A FURTHER ORDER IS ABSOLUTELY |
| 10:27AM | 2 | UNNECESSARY. |
| 10:27AM | 3 | AND THE GOVERNMENT'S CONCERN HERE IS REALLY BASED ON |
| 10:27AM | 4 | SEVERAL OF THE DISPUTES THAT WE'VE HAD WITH THE DEFENSE AND |
| 10:27AM | 5 | WHAT THIS ORDER MIGHT MEAN. |
| 10:27AM | 6 | WHAT DO WE MEAN BY THAT? AS WE DESCRIBED IN OUR |
| 10:27AM | 7 | OPPOSITION, THIS IS AN EXAMPLE THE DEFENSE MIGHT TAKE THE |
| 10:27AM | 8 | SUPPLEMENTAL DISCLOSURE TO BE THE EQUIVALENT OF AN EXPERT |
| 10:28AM | 9 | REPORT AND TRY TO CLAIM THAT THE WITNESSES CANNOT TESTIFY |
| 10:28AM | 10 | BEYOND WHAT THE GOVERNMENT HAS DISCLOSED IN A NOTICE DISCLOSURE |
| 10:28AM | 11 | AS THE GENERAL TOPICS OF WHAT THEY MIGHT TALK ABOUT. |
| 10:28AM | 12 | THEY MIGHT ALSO USE THIS TO PROHIBIT ADDITIONAL EXPERT |
| 10:28AM | 13 | TESTIMONY OR OTHER WAYS THAT WE HAVEN'T YET THOUGHT ABOUT. |
| 10:28AM | 14 | BUT AT THE POINT IN TIME WHAT WE'RE TRYING TO SAY IS NO |
| 10:28AM | 15 | FURTHER ORDER IS NEEDED ON THIS TOPIC. THE COURT'S MOTION IN |
| 10:28AM | 16 | LIMINE ORDER ABSOLUTELY ADDRESSED THIS, TOLD THE GOVERNMENT |
| 10:28AM | 17 | WHAT TO DO, THE GOVERNMENT FOLLOWED EXACTLY WHAT THE COURT SAID |
| 10:28AM | 18 | TO DO AND PROVIDED ITS SUPPLEMENTAL DISCLOSURES. |
| 10:28AM | 19 | NOW, TO THE EXTENT THAT COUNSEL TALKS ABOUT THE ADDITIONAL |
| 10:28AM | 20 | DOCUMENT OR THE JUROR QUESTIONNAIRE, OF COURSE WE JUST DECIDED |
| 10:28AM | 21 | ON MONDAY THAT THE GOVERNMENT WILL BE PROVIDING THE FIRST HALF |
| 10:28AM | 22 | OF ITS WITNESSES BY A CERTAIN DATE, THE SECOND HALF OF ITS |
| 10:28AM | 23 | WITNESSES. |
| 10:28AM | 24 | DEFENSE COUNSEL IS GOING TO HAVE ALL OF THE NOTICE THAT IT |
| 10:28AM | 25 | NEEDS IN ORDER TO PREPARE ITS DEFENSE AS WE GO FORWARD. |

18

10:28AM 1      OF COURSE THE GOVERNMENT WAS REFINING ITS CASE AS TIME

10:29AM 2   WENT ALONG, BUT THAT DOES NOT MEAN THAT WE'RE GOING TO GO

10:29AM 3   BEYOND OR AGAINST OUR SUPPLEMENTAL DISCLOSURES.

10:29AM 4      WE MADE THEM ACCORDING TO THE COURT'S ORDER, AND WE STAND

10:29AM 5   BY THEM.  NO FURTHER ORDER IS NEEDED TO HOLD THE GOVERNMENT TO

10:29AM 6   ITS DISCLOSURES.

10:29AM 7        THE COURT:  DOES THE GOVERNMENT UNDERSTAND ITS

10:29AM 8   OBLIGATIONS, RESTRICTIONS, AND LIMITATIONS BASED ON THE COURT'S

10:29AM 9   ORDER IN DOCUMENT 798?

10:29AM 10          MS. VOLKAR:  IT DOES, YOUR HONOR.

10:29AM 11          THE COURT:  DO YOU NEED ANY CLARITY ABOUT THAT?

10:29AM 12          MS. VOLKAR:  NO, WE DO NOT, YOUR HONOR.

10:29AM 13          THE COURT:  THANK YOU.

10:29AM 14     MS. TREFZ.

10:29AM 15          MS. TREFZ:  THE ONLY THING I WOULD SAY, YOUR HONOR,

10:29AM 16  IS THAT I'M A LITTLE CONFUSED BY THE OBJECTION IN PART BECAUSE

10:29AM 17  WHAT I HEARD MS. VOLKAR SAY WAS, YOU KNOW, WE'RE CONCERNED THAT

10:29AM 18  THEY THINK THAT IF THE WITNESS TESTIFIES OUTSIDE OF WHAT HAS

10:29AM 19  BEEN DISCLOSED THAT, YOU KNOW, WE'RE GOING TO GET AN OBJECTION.

10:29AM 20     I THINK TWO MINOR POINTS RELATED TO THAT.  ONE IS THAT,

10:29AM 21  INDEED, IF THE WITNESS TESTIFIES OUTSIDE OF WHAT HAS BEEN

10:29AM 22  NOTICED IN THE EXPERT DISCLOSURE ON EXPERT TOPICS, YOU ARE

10:30AM 23  ABSOLUTELY GOING TO GET AN OBJECTION ON THAT, AND THAT IS TRUE

10:30AM 24  WHETHER OR NOT THE COURT ISSUES AN ORDER.  IT IS ACTUALLY NOT

10:30AM 25  REALLY, I THINK, ADDRESSED BY THE REQUESTED ORDER.

UNITED STATES COURT REPORTERS

**ER-3460**

19

10:30AM 1        OUR REQUESTED ORDER IS FAIRLY SPECIFIC, AND IT IS

10:30AM 2    ESSENTIALLY THESE ARE THE PATIENTS, AND THESE ARE THE TESTS

10:30AM 3    THAT THESE DOCTORS ARE GOING TO TALK ABOUT, AND THEY'RE NOT

10:30AM 4    GOING TO TALK ABOUT ANY OTHER PATIENTS, AND THEY'RE NOT GOING

10:30AM 5    TO TALK ABOUT ANY OTHER TESTS, AND THERE'S NOT GOING TO BE A

10:30AM 6    NEW DOCTOR TO COME IN TO TALK ABOUT AN ADDITIONAL PATIENT OR

10:30AM 7    TEST.  THAT'S WHAT WE'RE WORRIED ABOUT HERE.

10:30AM 8        AND OBVIOUSLY THE GOVERNMENT HAS ITS OBLIGATION WITH

10:30AM 9    RESPECT TO THE REST OF THE DISCLOSURES.  WE'VE MADE OUR

10:30AM 10   OBJECTIONS, YOU KNOW, IN THE PAST.  WE HAD A VERY LONG

10:30AM 11   DISCUSSION ABOUT IT BEFORE.  WE'RE NOT LOOKING TO RELITIGATE

10:30AM 12   THAT.

10:30AM 13       ALL WE'RE TRYING TO DO IS SAY THESE ARE THE TESTS, THESE

10:30AM 14   ARE THE PATIENTS, AND THAT'S IT.

10:30AM 15           THE COURT:  I THINK THAT'S WHAT THE DISCLOSURE SAYS.

10:30AM 16           MS. VOLKAR:  THAT'S CORRECT, YOUR HONOR.

10:30AM 17           THE COURT:  RIGHT.

10:30AM 18           MS. VOLKAR:  IN FACT, YOUR HONOR, IF I MAY?

10:31AM 19       COUNSEL'S STATEMENTS AGAIN SHOW EXACTLY WHAT THE

10:31AM 20   GOVERNMENT IS CONCERNED BY, WHICH IS THAT THE DISCLOSURE IS

10:31AM 21   GOING TO BE USED BEYOND WHAT IT IS, A DISCLOSURE MADE PURSUANT

10:31AM 22   TO THE RULES, PURSUANT TO THIS COURT'S ORDER, AND, OF COURSE,

10:31AM 23   THE GOVERNMENT IS GOING TO BE BOUND BY ITS DISCLOSURE.

10:31AM 24       WE ABSOLUTELY UNDERSTAND OUR OBLIGATIONS.  BUT TO THE

10:31AM 25   EXTENT THAT ANY FURTHER ORDER OF THE COURT IS GOING TO BE USED

20

10:31AM 1      AS SOMETHING TO BE USED AGAINST THE GOVERNMENT AS A TOOL IN THE

10:31AM 2      FUTURE PROCEEDINGS, THAT IS ABSOLUTELY WHAT WE ARE CONCERNED

10:31AM 3      ABOUT AND WHY WE THINK THERE'S NO NEED FOR A FURTHER ORDER.

10:31AM 4           THE COURT:  OKAY.  GREAT.  THANK YOU VERY MUCH.

10:31AM 5      THANKS FOR THE DISCUSSION.  I APPRECIATE IT.

10:31AM 6           LET'S MOVE TO 897, AND THIS IS MS. HOLMES'S MOTION TO

10:32AM 7      PARTIALLY REDACT AGENCY REPORTS.

10:32AM 8           MR. LOOBY, GOOD MORNING AGAIN.

10:32AM 9           MR. LOOBY:  GOOD MORNING AGAIN, YOUR HONOR.

10:32AM 10          SO AS WE NOTED IN OUR REPLY BRIEF, THE PARTIES AGREE THAT

10:32AM 11     THE THREE REPORTS ARE NOT FULLY ADMISSIBLE IN THEIR UNREDACTED

10:32AM 12     FORM.  THE REMAINING DISPUTES ARE RELATED TO THE TIMING FOR

10:32AM 13     WHEN THE COURT SHOULD RULE ON THE THREE GROUPINGS OF

10:32AM 14     REDACTIONS.

10:32AM 15          AS FOR ALL BUT ARGUABLY ONE OF THOSE GROUPINGS THE

10:32AM 16     REDACTIONS FOR DOUBLE HEARSAY, WHICH I'LL ADDRESS LAST, WE

10:32AM 17     SUBMIT THAT THE COURT MAY RULE ON THE REDACTIONS NOW.

10:32AM 18          SO AS FOR THE REDACTIONS FOR TESTS NOT IN THE BILL OF

10:32AM 19     PARTICULARS, THE GOVERNMENT HAS ARTICULATED NO PERMISSIBLE

10:32AM 20     PURPOSE FOR OFFERING PORTIONS OF THE CMS REPORT THAT RELATE

10:32AM 21     EXCLUSIVELY TO THOSE TESTS.

10:32AM 22          TO BE HONEST, I WOULD BE HARD PRESSED TO THINK OF ONE FOR

10:33AM 23     THEM.  THE GOVERNMENT OFFERED THE CMS FINDINGS AS EVIDENCE

10:33AM 24     BEARING ON ACCURACY AND RELIABILITY OF THERANOS'S TESTS.

10:33AM 25          THE COURT RULED ON THE WHOLE THAT THEY WERE RELEVANT FOR

10:33AM 1      THAT PURPOSE.

10:33AM 2          THE REDACTIONS SIMPLY SEEK TO SQUARE THAT RULING WITH THE

10:33AM 3      COURT'S SEPARATE RULING ON THE BILL OF PARTICULARS AND THE

10:33AM 4      TESTS NOT AT ISSUE IN THE CASE.

10:33AM 5          SO AS WE UNDERSTAND IT, THE GOVERNMENT HAS TWO MAIN

10:33AM 6      COMPLAINTS FOR THIS CATEGORY OF REDACTIONS.  THE FIRST IS THAT

10:33AM 7      THEY WEREN'T GIVEN A CHANCE TO ARTICULATE ANY PURPOSE AND THE

10:33AM 8      SECOND RELATES TO THE EXTENT OF THE REDACTIONS NECESSARY FOR

10:33AM 9      THIS PURPOSE.

10:33AM 10         ON THE FIRST ARGUMENT WE RESPECTFULLY SUBMIT THAT THE

10:33AM 11     OPPOSITION BRIEF WAS JUST THAT OPPORTUNITY TO ARTICULATE A NEW

10:33AM 12     RELEVANCE THEORY FOR THESE PORTIONS OF THE REPORT AND THE

10:33AM 13     GOVERNMENT CHOSE TO FOREGO IT.

10:33AM 14         ON THE SECOND POINT, THE PORTION OF THE REPORT THAT DEALS

10:33AM 15     WITH TESTS THAT ARE NOT AT ISSUE IN THIS CASE IS WHAT IT IS,

10:33AM 16     AND THAT'S BECAUSE WE HAVE TO MEET THE CMS REPORT WHERE IT IS.

10:34AM 17         THE REALITY THAT LARGE PORTIONS OF THE REPORT ARE

10:34AM 18     IRRELEVANT, IT NECESSARILY FOLLOWS FROM THE FACT THAT THERANOS

10:34AM 19     OFFERED A MUCH BROADER MENU OF TESTS THAN THOSE THAT THE

10:34AM 20     GOVERNMENT HAS INCLUDED IN ITS INDICTMENT IN THIS CASE.

10:34AM 21         SO IT'S NOT SURPRISING THAT AN AUDIT OF THE OVERALL LAB

10:34AM 22     WOULD SWEEP IN A LOT OF FINDINGS THAT ARE IRRELEVANT.

10:34AM 23         AND THOSE FINDINGS HAVE NO PLACE IN THE CASE UNDER THE

10:34AM 24     COURT'S ORDER, AND WE SUBMIT THAT THE COURT SHOULD ADOPT OUR

10:34AM 25     PROPOSED REDACTIONS FOR THIS PURPOSE.

10:34AM 1    SO AS FOR THE REDACTIONS FOR HIGH LEVEL OBSERVER ANALYSIS

10:34AM 2    UNDER RULE 803(8)(A), WE SUBMIT THAT THE COURT HAS BEFORE IT

10:34AM 3    WHAT IT NEEDS TO RULE ON THESE REDACTIONS AS WELL.  THESE ARE

10:34AM 4    LIMITED REDACTIONS TARGETED AT PORTIONS OF THE REPORT THAT

10:34AM 5    CONTAIN EVALUATIVE CONCLUSIONS THAT GO BEYOND FACTUAL

10:34AM 6    OBSERVATIONS.

10:34AM 7        SO IN TERMS OF THE VOLUME OF THE PROPOSED REDACTIONS,

10:34AM 8    THESE ARE ACTUALLY A MUCH SMALLER PORTION OF THE PROPOSED

10:35AM 9    REDACTIONS IN THE REPORTS.

10:35AM 10       THE PARTIES DISAGREE HERE --

10:35AM 11           THE COURT:  I'M SORRY TO INTERRUPT HERE.  ARE THESE

10:35AM 12   EXHIBIT 4?

10:35AM 13           MR. LOOBY:  YES.  SO THIS IS -- EXHIBIT 4 IS THE

10:35AM 14   FORM 483 FOR THE PALO ALTO FACILITY WITH OUR PROPOSED

10:35AM 15   REDACTIONS FOR THIS PURPOSE.

10:35AM 16           THE COURT:  SO LET ME ASK YOU, MR. LOOBY -- AND

10:35AM 17   THANKS FOR PROVIDING YOUR SUGGESTED REDACTIONS.  898-4, PAGE 2

10:35AM 18   OF 8 IT -- UNDER OBSERVATION 1 I THINK YOU INDICATE WHAT YOUR

10:35AM 19   DESIRED REDACTIONS ARE.  THOSE ARE THE SAME ON PAGE 4,

10:35AM 20   OBSERVATIONS 2, 3, 4.

10:35AM 21           MR. LOOBY:  YES.

10:35AM 22           THE COURT:  AS WELL AS OBSERVATION 5.

10:35AM 23           MR. LOOBY:  YES.

10:35AM 24           THE COURT:  AND IT'S THAT ONE SENTENCE, ISN'T IT,

10:35AM 25   "DESIGN VALIDATION DID NOT ENSURE THAT THE DEVICE CONFORMS TO

10:35AM 1    DEFINED USER NEEDS AND INTENDED USES"?

10:35AM 2            MR. LOOBY:  YES, YOUR HONOR.

10:35AM 3        SO THIS PORTION OF THE OBSERVATION IS LIKE THE TOP LEVEL

10:36AM 4    EVALUATIVE CONCLUSION, AND IT'S TIED TO SOME REGULATORY

10:36AM 5    REQUIREMENT OR OBLIGATION, AND IT'S SUPPORTED AFTER THE --

10:36AM 6    SPECIFICALLY BY FACTUAL OBSERVATIONS OR ELABORATION, AND WE

10:36AM 7    PROPOSE TO REDACT THOSE UNDER THE COURT'S ANALYSIS.

10:36AM 8        WE UNDERSTAND THAT THE COURT -- UNDER THE COURT'S ANALYSIS

10:36AM 9    THAT LARGE PORTIONS OF THESE REPORTS ARE GOING -- WERE HELD TO

10:36AM 10   BE ADMISSIBLE UNDER SUBSECTION 2 OF THE RULE, BUT WE SUBMIT

10:36AM 11   THAT UNDER THE COURT'S ANALYSIS AND CONSISTENT WITH IT IN THE

10:36AM 12   ROSA CASE, WHICH IS CITED, THAT THIS IS THE TYPE OF REDACTION

10:36AM 13   THAT EVEN IN A REPORT THAT FALLS UNDER THAT RULE IS STILL

10:36AM 14   SUBJECT TO PARTIAL EXCLUSION.

10:36AM 15       THE GOVERNMENT SAID, OH, THESE ARE SO SIMPLE.  WHY DID

10:36AM 16   THESE NEED TO BE REDACTED?

10:36AM 17       WE SUBMIT, YOUR HONOR, THEY HAVE IT ALL WRONG.  THESE ARE

10:36AM 18   ACTUALLY PORTIONS OF THE REPORT THAT REFLECT LIKE A LATER IN

10:36AM 19   TIME EVALUATION OF THE RECORD TO A REGULATORY STANDARD.  SO

10:37AM 20   THEY DO REFLECT A HIGH LEVEL ANALYSIS OF REGULATORY EXPERTISE

10:37AM 21   AND REGULATORY THINKING.

10:37AM 22           THE COURT:  THANK YOU.

10:37AM 23       WHEN I LOOKED AT THE FORM, THIS IS THE FDA 483 FORM AND IN

10:37AM 24   THE SECOND BOX -- ACTUALLY, THE FIRST BOX BELOW THE

10:37AM 25   INFORMATION, THAT IS, THE DISTRICT ADDRESS AND THE NAME OF THE

24

10:37AM 1    INDIVIDUAL SERVED, IF YOU LOOK IN THAT BOX, IT DESCRIBES WHAT

10:37AM 2    THE DOCUMENT IS, AND I THINK IN THAT BOX IT USES THE WORD

10:37AM 3    "OBSERVATIONS" I THINK FIVE TIMES.

10:37AM 4            MR. LOOBY:  YES.

10:37AM 5            THE COURT:  AND IT TALKS ABOUT OBSERVATIONS.

10:37AM 6        AND THEN IN THE NEXT LARGE BOX THERE'S ANOTHER WORD

10:37AM 7    "OBSERVATIONS" USED AGAIN.

10:37AM 8        AND THEN IN THE LARGE BOX THAT IS ACTUALLY THE REPORTING

10:37AM 9    PART OF THE BOX IT STARTS OFF TALKING ABOUT "WE OBSERVED,

10:37AM 10   DURING THE INSPECTION WE OBSERVED."

10:37AM 11       AND THEN IT SAYS, AS THE GOVERNMENT FORMS TEND TO DO,

10:37AM 12   REPETITIVE, OBSERVATION 1.  AND THEN IT HAS -- THE NEXT THING

10:38AM 13   IS THE SENTENCE THAT WE TALKED ABOUT THAT YOU WOULD LIKE

10:38AM 14   REDACTED.

10:38AM 15           MR. LOOBY:  YES.

10:38AM 16           THE COURT:  IT SEEMS TO BE, AT LEAST FROM THE

10:38AM 17   VERBIAGE, THAT THIS IS ALL OBSERVATIONAL AND NOT EVALUATIVE.

10:38AM 18           MR. LOOBY:  SO, YOUR HONOR, I THINK IT'S -- THE

10:38AM 19   LINGO IN THE 483 IS OBSERVATION, THE ENTIRE KIND OF, YOU KNOW,

10:38AM 20   THE ENTIRE CITATION IS FRAMED AS THAT.

10:38AM 21       BUT IT ACTUALLY GOES BEYOND THAT.  I THINK THERE'S THE

10:38AM 22   MONICKER OBSERVATION OF USING THAT WORD, AND THAT WORD ALIGNS

10:38AM 23   WITH THE ANALYSIS IN THE CASES AND THE RULE, BUT I THINK IT'S

10:38AM 24   ALMOST MORE OF A COINCIDENCE IN THAT SENSE BECAUSE THESE ARE --

10:38AM 25   TO BRING US OVER TO THE CMS REPORT, WHICH I THINK PRESENTS AN

25

10:38AM 1    ANALOGOUS SITUATION, THOSE ARE CALLED DEFICIENCIES, BUT THEY'RE

10:38AM 2    STRUCTURED ALMOST THE SAME WAY, WHICH IS, YOU KNOW, HERE'S THE

10:38AM 3    STANDARD THAT -- WE CAME AND WE LOOKED AT SOME EVIDENCE, HERE'S

10:38AM 4    THE EVIDENCE, AND THEN HERE'S OUR CONCLUSION.

10:38AM 5        SO THIS WHOLE THING IS FRAMED AS AN OBSERVATION, BUT WE

10:39AM 6    SUBMIT THAT THE SENTENCE THAT WE'VE PROPOSED TO BE REDACTED IS

10:39AM 7    ACTUALLY AN EVALUATIVE CONCLUSION WITHIN THAT OBSERVATION.

10:39AM 8        SO I UNDERSTAND, YOUR HONOR, THE WAY THAT THE FORM IS LAID

10:39AM 9    OUT.  IT COULD BE SUSCEPTIBLE TO BEING READ AS THESE ARE ALL

10:39AM 10   JUST FACTS THAT WE SAW LIKE LYING AROUND WHEN WE WERE WALKING

10:39AM 11   THROUGH THE LABORATORY OR LOOKING AT THE DOCUMENTATION, BUT IF

10:39AM 12   YOU LOOK AT THE CONTENT OF THE SENTENCE, IT'S ACTUALLY A LITTLE

10:39AM 13   BIT MORE THAN THAT.

10:39AM 14            THE COURT:  WELL, WHEN I COMPARE THAT ONE SENTENCE,

10:39AM 15   AND THEN BELOW IN EACH OF THE EXHIBITS THAT WE'VE TALKED ABOUT,

10:39AM 16   EACH OF THOSE THAT WE'VE TALKED ABOUT, IT SEEMS LIKE THE

10:39AM 17   LANGUAGE, FOR EXAMPLE, AFTER THE SENTENCE THAT WE WERE JUST

10:39AM 18   DISCUSSING IT, THEN THE NEXT WORD IS "SPECIFICALLY."

10:39AM 19       AND THEN IT LISTS A AND B.  AND THEY'RE CORRECT, IT IS

10:39AM 20   VERY SPECIFIC, ISN'T IT?  IT TALKS ABOUT FAILURE TO ADDRESS ALL

10:39AM 21   ASSAYS OF THE ASSAYS ADDRESSED, AND THEN IT LISTS THEM.

10:40AM 22   THERE'S NO REFERENCE TO ANY DOCUMENTATIONS TO ADDRESS FAILURES.

10:40AM 23   IT'S SPECIFIC INFORMATION.

10:40AM 24       AND IT SEEMS THAT THAT IS MORE, TO YOUR POINT, THAT SEEMS

10:40AM 25   TO BE MORE CLOSER TO YOUR POINT THAN THE ONE SENTENCE THAT YOU

10:40AM 1    SEEK TO HAVE REDACTED.

10:40AM 2         MR. LOOBY:  I UNDERSTAND THAT.

10:40AM 3    I THINK THE WAY I READ IT IS THAT YOU PROVIDED THIS TEST

10:40AM 4    PLAN ASSAY, AND THEN THE TITLE OF THE REPORT, AND THEN THIS IS

10:40AM 5    THE -- COMING AFTER IT IS LIKE THIS IS WHAT WE OBSERVED IN THE

10:40AM 6    REPORT.  WE LOOKED AT THE REPORT, AND THIS IS HOW WE INTERPRET

10:40AM 7    WHAT IT IS SAYING WHAT IS IN IT, WHAT IS NOT IN IT.

10:40AM 8    AND THEN YOU GO UP TO THE TOP AND THEY SAY, "BASED ON

10:40AM 9    THAT, BASED ON THAT, WE DON'T THINK THAT THIS DOCUMENTATION

10:40AM 10   ENSURES THE DEVICE CONFORMS TO DEFINE USER NEEDS AND INTENDED

10:40AM 11   USES."  THAT'S AN FDA LIKE REGULATORY REQUIREMENT.

10:40AM 12   SO I THINK EVEN THOUGH THESE LATER FACTS ARE MORE

10:40AM 13   SPECIFIC, THEY'RE ACTUALLY CHARACTERIZING A DOCUMENT THAT THE

10:41AM 14   AGENCY DID REVIEW, AND I GUESS YOU COULD SAY OBSERVED.

10:41AM 15   AND THEN THE TOP LEVEL CONCLUSION THAT WE'VE PROPOSED TO

10:41AM 16   REDACT IS, OKAY, WHAT DOES THAT MEAN IN TERMS OF THE COMPANY'S

10:41AM 17   REGULATORY COMPLIANCE?

10:41AM 18        THE COURT:  I SEE.

10:41AM 19   COULD A WITNESS CLEAR UP THAT, IF A WITNESS WERE PRODUCED

10:41AM 20   TO TESTIFY AS TO WHAT WAS DONE, WHAT THESE MEAN, WOULD THAT

10:41AM 21   REDUCE YOUR ANXIETY ABOUT REDACTION?

10:41AM 22        MR. LOOBY:  WELL, I THINK, YOUR HONOR, THIS WOULD

10:41AM 23   STILL BE AN OUT-OF-COURT STATEMENT.  SO EVEN IF A WITNESS COULD

10:41AM 24   COME IN, AND IT WAS ONE OF THE INSPECTORS OR SOMEONE WHO COULD

10:41AM 25   SPEAK FROM THEIR PERSONAL KNOWLEDGE ABOUT WHAT WAS FOUND IN THE

10:41AM 1      INSPECTION, I THINK THAT LIVE TESTIMONY WOULDN'T POSE -- IT MAY

10:41AM 2      POSE SOME OTHER ISSUES, BUT IT WOULDN'T POSE ANY HEARSAY ISSUES

10:41AM 3      AS A REPORT ADMITTED UNDER THE EXCEPTION FOR MATTERS OBSERVED

10:42AM 4      UNDER A DUTY TO REPORT.

10:42AM 5          SO I THINK THIS QUESTION ABOUT THE ADMISSIBILITY OF THE

10:42AM 6      REPORT IS SEPARATE FROM THAT.  SO I'M NOT SURE IF THAT WOULD

10:42AM 7      AFFECT OUR POSITION.

10:42AM 8              THE COURT:  OKAY.  ALL RIGHT.

10:42AM 9          LET ME ASK YOU IF I MADE A COMMENT ON 898-6, AND THAT'S

10:42AM 10     PAGE 6.

10:42AM 11             MR. LOOBY:  YES, YOUR HONOR.

10:42AM 12             THE COURT:  YOU HAVE THREE SPECIFIC REASONS TO ASK

10:42AM 13     THAT THIS BE REDACTED AS WELL AS THE FOLLOWING PAGES, I

10:42AM 14     BELIEVE.  WELL, IT'S JUST A, B, C AS TO THAT AND THE FOLLOWING

10:42AM 15     PAGE.

10:42AM 16             MR. LOOBY:  YES.  AND WE DID THE CODING JUST BECAUSE

10:42AM 17     IT IS SUCH A VOLUMINOUS REPORT.

10:42AM 18         SO WHEN AN ENTIRE TEST -- WHEN AN ENTIRE DEFICIENCY

10:42AM 19     RELATES TO A TEST NOT ISSUED, IT WILL SOMETIMES CAPTURE WITHIN

10:43AM 20     IT EVALUATIVE CONCLUSIONS THAT OTHERWISE WOULD BE REDACTABLE,

10:43AM 21     BUT BECAUSE THAT'S THE BLANKET REDACTION THAT KIND OF COVERS

10:43AM 22     IT.  SO YOU'LL SEE OFTENTIMES THERE'S A, B, AND C APPLYING TO

10:43AM 23     ALL OF THEM.

10:43AM 24             THE COURT:  OKAY.  WELL, LET'S WAIT FOR FURTHER

10:43AM 25     DISCUSSION AFTER I HEAR FROM THE GOVERNMENT.

28

10:43AM 1    ANYTHING ELSE YOU WANT ME TO --

10:43AM 2         MR. LOOBY:  YES.  I DID JUST WANT TO TALK ABOUT THE

10:43AM 3    CMS COVER LETTER FOR A MOMENT.

10:43AM 4         THE COURT:  RIGHT.

10:43AM 5         MR. LOOBY:  SO WE DISAGREE WITH THE GOVERNMENT THAT

10:43AM 6    THE COURT'S MAY ORDER CAN AND SHOULD BE READ TO HAVE ALREADY

10:43AM 7    ADMITTED THE CMS COVER LETTER.

10:43AM 8         THE COURT:  SO THAT'S AN INTERESTING ISSUE -- I KEEP

10:43AM 9    INTERRUPTING, AND I APOLOGIZE, MR. LOOBY, BUT I JUST WANT TO

10:43AM 10   CAPTURE MY THOUGHT.

10:43AM 11        MR. LOOBY:  YES.

10:43AM 12        THE COURT:  IT SEEMS WHEN WE WERE DISCUSSING THE

10:43AM 13   MOTIONS IN LIMINE, I BELIEVE THE GOVERNMENT WAS ACCURATE IN

10:43AM 14   SUGGESTING THAT YOUR TEAM TALKED ABOUT THE COVER LETTER AND

10:43AM 15   YOUR RESPONSE, AND IT WAS PART OF THE CONVERSATION REGARDING

10:43AM 16   THE CMS.  YOU CALLED IT OUT.

10:44AM 17        AND, OF COURSE, THE COURT DID NOT PARSE OUT EACH PAGE OF

10:44AM 18   THE CMS REPORT THAT IT SAID IT WAS GOING TO ALLOW IN.  IT SAID

10:44AM 19   THE CMS REPORT IS IN.

10:44AM 20        AND I THINK, MS. VOLKAR -- I DON'T MEAN TO SPEAK FOR

10:44AM 21   HER -- BUT IT SEEMS THAT THE GOVERNMENT'S POSITION IS, WELL, IT

10:44AM 22   WAS PART OF THE DISCUSSION AND IN FOR A PENNY, YOU KNOW, IT ALL

10:44AM 23   WAS SUBSUMED IN THAT.

10:44AM 24        AND YOU THINK DIFFERENTLY?

10:44AM 25        MR. LOOBY:  I THINK DIFFERENTLY.  AND, YOUR HONOR, I

10:44AM 1    REMEMBER IT WELL, OUR EXCHANGE ON THIS --

10:44AM 2         THE COURT:  RIGHT.

10:44AM 3         MR. LOOBY:  -- BECAUSE WE TALKED ABOUT THE IMMEDIATE

10:44AM 4    JEOPARDY FINDING AND WHETHER OR NOT THAT WAS RELEVANT OR

10:44AM 5    UNFAIRLY PREJUDICIAL.

10:44AM 6         AND THE IMMEDIATE JEOPARDY FINDING DOES APPEAR IN THE

10:44AM 7    LETTER, AND I THINK THE CONTEXT IS IMPORTANT THAT WE HAD MOVED

10:44AM 8    NOT TO EXCLUDE NOT JUST THE FORM 2567 AND ITS FINDINGS, BUT ALL

10:44AM 9    TESTIMONY AND EVIDENCE RELATING TO THE CMS INSPECTION AND ITS

10:44AM 10   FINDINGS.

10:44AM 11        AND WHEN WE WERE HAVING THAT EXCHANGE, I UNDERSTOOD IT TO

10:44AM 12   BE ABOUT, WELL, IS THIS RELEVANT?  IS IT UNFAIRLY PREJUDICIAL?

10:44AM 13        AND I UNDERSTAND, YOUR HONOR -- WE UNDERSTAND YOUR HONOR'S

10:45AM 14   RULING ON THAT, BUT WE DON'T UNDERSTAND A RELEVANCE OR UNFAIR

10:45AM 15   PREJUDICE RULING MEANING THAT ANY OUT-OF-COURT STATEMENT ABOUT

10:45AM 16   THE IMMEDIATE JEOPARDY FINDING IN ANY DOCUMENT IS NOT HEARSAY

10:45AM 17   BECAUSE IT RELATES TO A MATTER OBSERVED.

10:45AM 18        WE SUBMIT THAT ANY OUT-OF-COURT STATEMENT WOULD STILL NEED

10:45AM 19   TO FIT WITHIN A HEARSAY EXCEPTION.

10:45AM 20        THE GOVERNMENT HAD MOVED TO ADMIT SPECIFICALLY THE REPORT

10:45AM 21   ITSELF BECAUSE THEIR REQUESTED RELIEF WAS MORE NARROW, AND THE

10:45AM 22   COURT'S HEARSAY ANALYSIS PRECEDED WITH RESPECT TO THE REPORT.

10:45AM 23        SO WE DON'T THINK THAT THE CMS LETTER FITS WITHIN THE

10:45AM 24   EXCEPTION THAT THE REPORT HAS BEEN RULED TO FALL UNDER FOR ALL

10:45AM 25   OF THE REASONS STATED IN OUR BRIEFING, WHICH THE GOVERNMENT

10:45AM  1    LARGELY IGNORES.

10:45AM  2            THE COURT:  OKAY.  THANK YOU.

10:45AM  3        I INTERRUPTED YOU, MR. LOOBY.  DID YOU WANT TO --

10:45AM  4            MR. LOOBY:  OH.  JUST FINALLY, AND MAKE WE CAN

10:46AM  5    ADDRESS THIS A LITTLE LATER ON, BUT WITH RESPECT TO THE DOUBLE

10:46AM  6    HEARSAY REDACTIONS, WE UNDERSTAND THAT THE COURT'S RULING

10:46AM  7    PERMITS THE GOVERNMENT TO TRY TO LAY THE FOUNDATION TO ADMIT

10:46AM  8    THESE STATEMENTS IN THE REPORT.

10:46AM  9        WE SUBMIT THAT THEY HAVE NOT DONE SO NOW.  WE ALSO SUBMIT

10:46AM  10   THAT THEY WON'T BE ABLE TO DO SO WITH RESPECT TO THESE SPECIFIC

10:46AM  11   LAB STAFF WHO WERE QUOTED IN THE REPORT.

10:46AM  12       BUT WE ALSO ACKNOWLEDGE IF THE COURT WERE TO DEFER ON ANY

10:46AM  13   ISSUE RELATED TO THIS MOTION, THIS IS THE CATEGORY WHERE IT

10:46AM  14   MIGHT MAKE SENSE.

10:46AM  15       WE ASK, HOWEVER, THAT IF THE COURT DOES DEFER ON THIS

10:46AM  16   ISSUE, WE DO SO BY LEAVING THE REDACTIONS IN PLACE FOR NOW, AND

10:46AM  17   THEN WE CAN REVISIT THEM IF AND WHEN THE GOVERNMENT BELIEVES

10:46AM  18   THAT IT HAS LAID THE FOUNDATION FOR THE ADMISSION OF THOSE

10:46AM  19   PARTICULAR STATEMENTS.

10:46AM  20           THE COURT:  THANK YOU FOR THAT.  THANKS FOR THAT

10:46AM  21   OBSERVATION.  I THINK YOU'RE DOVETAILING ON THE COURT'S

10:46AM  22   INVITATION TO RAISE CERTAIN ISSUES AND CONCURRENT WITH THAT IS

10:46AM  23   WHAT IS THE TIMING FOR THAT?

10:46AM  24       AND YOU AND YOUR TEAM HAVE INDICATED, WELL, IT'S NOW.  WE

10:47AM  25   WANT TO TELL YOU WHAT OUR OBJECTIONS ARE AND THESE, I THINK

31

10:47AM 1    YOUR TEAM IS SUGGESTING, THESE OBJECTIONS ARE DIFFERENT FROM

10:47AM 2    OUR ARGUMENTS AT THE MIL HEARING BECAUSE THAT'S WHAT I ASKED

10:47AM 3    YOU TO DO, NOT SAME ARGUMENTS BUT DIFFERENT ARGUMENTS AS TO

10:47AM 4    SPECIFIC PIECES OF EVIDENCE.  THAT'S WHAT YOU'VE DONE HERE.

10:47AM 5        I APPRECIATE YOU RECOGNIZING AND USING THE WORD "DEFER."

10:47AM 6    BECAUSE IT JUST MAY BE -- WE DON'T KNOW.  THE TRIAL HAS NOT

10:47AM 7    STARTED YET.  THE EVIDENCE HAS NOT YET BEEN INTRODUCED.  AND I

10:47AM 8    SUPPOSE THERE IS A POSSIBILITY FOR FOUNDATIONAL PRESENTATION AS

10:47AM 9    TO SOME OF THESE THINGS, I THINK YOU CONCEDE THAT AS YOU'VE

10:47AM 10   JUST SAID, FOR SOME OF THESE, POTENTIALLY ALL BUT AT LEAST SOME

10:47AM 11   OF THEM.  I APPRECIATE THE OBSERVATION.

10:47AM 12           MR. LOOBY:  YES.  YOU KNOW, WE RAISE IT NOW BECAUSE

10:47AM 13   WE RECOGNIZE ALSO THAT THIS PRESENTS SOME DIFFICULT ISSUES, AND

10:47AM 14   THESE ARE LONG REPORTS WITH A LOT OF PROPOSED REDACTIONS.

10:47AM 15       WE SUBMIT THAT THIS IS THE TIME TO START TALKING ABOUT

10:47AM 16   THIS AND TO RAISE OUR OBJECTIONS ON IT AT THE COURT'S

10:48AM 17   INVITATION.

10:48AM 18       WE ALSO SUBMIT THAT SOME OF THEM, LIKE THE BILL OF

10:48AM 19   PARTICULARS TESTS, I MEAN, THE GOVERNMENT DIDN'T OFFER ANY

10:48AM 20   PERMISSIBLE PURPOSE.  THAT'S THE BULK OF THE REDACTIONS, AND I

10:48AM 21   DON'T SEE THAT CHANGING.

10:48AM 22       SO EVEN IF THE COURT WERE TO DEFER ON ADOPTING THE ACTUAL

10:48AM 23   REDACTIONS, I THINK THE GOVERNMENT HAS NOT OFFERED A

10:48AM 24   PERMISSIBLE PURPOSE FOR THOSE.

10:48AM 25           THE COURT:  AND THEY MAY NOT INTRODUCE THEM IN THEIR

32

10:48AM  1    CASE-IN-CHIEF FOR ALL WE KNOW.

10:48AM  2              MR. LOOBY:  RIGHT.  IN THEIR OPPOSITION, ONE OF

10:48AM  3    THEIR COMPLAINTS WAS, YOU KNOW, WE DIDN'T HAVE AN OPPORTUNITY

10:48AM  4    TO SAY WHICH PORTIONS OF THE REPORT WE ACTUALLY WANT TO USE AND

10:48AM  5    WHY.

10:48AM  6         YOU KNOW, IT'S -- AGAIN, I SOUND LIKE A BROKEN RECORD, BUT

10:48AM  7    TRIAL IS DAYS AWAY AT THIS POINT AND THESE ARE, YOU KNOW,

10:48AM  8    IMPORTANT PIECES OF EVIDENCE POTENTIALLY IN THE CASE.  I THINK

10:48AM  9    ANY CLARITY THAT WE CAN GAIN SOONER RATHER THAN LATER WOULD

10:48AM  10   AVOID DISRUPTING THE PROCEEDINGS AND JUST MAKE EVERYTHING

10:48AM  11   SIMPLER FOR EVERYBODY.

10:49AM  12             THE COURT:  OKAY.  THANK YOU.

10:49AM  13        MS. VOLKAR.

10:49AM  14             MS. VOLKAR:  THANK YOU, YOUR HONOR.

10:49AM  15        I WANT TO START WITH MY COLLEAGUE'S LAST COMMENT THERE

10:49AM  16   WHICH IS WE ARE DAYS AWAY FROM TRIAL AND THAT MAKES IT ALMOST

10:49AM  17   MORE ABSURD TO ME THAT PARTICULARLY WITH THIS RULING WITH THE

10:49AM  18   CMS, THIS IS NOT -- THIS IS THE MOST CLEAREST EXAMPLE OF A

10:49AM  19   MOTION TO RECONSIDER.  THIS IS NOT AN INSTANCE WHERE THE COURT

10:49AM  20   INVITED FURTHER COMMENT FROM DEFENSE COUNSEL.

10:49AM  21        THEY ESSENTIALLY TOOK YOUR HONOR'S RULING WITH RESPECT TO

10:49AM  22   THE FDA AND OTHER ASPECTS OF THE MOTION IN LIMINE RULING AND

10:49AM  23   ARE TRYING TO APPLY IT TO ONE OF THE CLEAREST, MOST CRISP

10:49AM  24   STATEMENTS THAT YOU HAVE MADE IN YOUR MOTION IN LIMINE ORDER,

10:49AM  25   WHICH IS TO GRANT THE GOVERNMENT'S ADMISSION OF THE CMS REPORT

10:49AM   1     AND TO DENY THEIR REQUEST TO NOT ONLY EXCLUDE THE CMS REPORT,

10:49AM   2     BUT THE CMS LETTER WHICH WAS TALKED ABOUT FOR AT LEAST A HALF

10:49AM   3     HOUR AT THE HEARING, NOT JUST FOR RELEVANCE AND UNDUE

10:49AM   4     PREJUDICE, BUT ALSO FOR HEARSAY.

10:49AM   5         THEY'RE TRYING TO TURN YOUR HONOR'S RULING ON ITS HEAD

10:49AM   6     MERE WEEKS BEFORE TRIAL.

10:49AM   7         AND THE GOVERNMENT AND WE STRENUOUSLY OBJECT TO BOTH THE

10:50AM   8     REPLY AND TO MR. LOOBY'S SUGGESTION THAT THE PARTIES AGREE THAT

10:50AM   9     SOME REDACTIONS ARE REQUIRED.

10:50AM  10         WE ABSOLUTELY DO NOT BOTH AGREE THAT REDACTIONS ARE

10:50AM  11     REQUIRED.  WE AGREE THAT YOUR HONOR MADE RULINGS IN OTHER

10:50AM  12     REGARDS, BUT YOUR HONOR CLEARLY ADMITTED THE CMS REPORT AND

10:50AM  13     WITHOUT ANY CAVEATS THAT I'M AWARE OF.

10:50AM  14         I JUST WANTED TO READ FROM YOUR HONOR'S ORDER WHICH SAYS,

10:50AM  15     "FOR THE REASONS ABOVE, THE COURT DENIES HOLMES'S MOTION TO

10:50AM  16     EXCLUDE THE EVIDENCE ARISING OUT OF THE CMS SURVEYS IN

10:50AM  17     QUESTION," THIS IS PAGE 20 OF ECF 798.  "THE COURT GRANTS THE

10:50AM  18     GOVERNMENT'S MOTION TO ADMIT THE JANUARY 26TH, 2016, FORM CMS

10:50AM  19     2567 STATEMENT OF DEFICIENCIES," PERIOD.

10:50AM  20         AND, YOUR HONOR, I KNOW THAT WE'RE GOING TO TALK A BIT

10:50AM  21     ABOUT WHY I THINK THEIR OTHER OBJECTIONS DON'T HAVE MERIT, BUT

10:50AM  22     I WANT TO START WITH THAT THIS IS THE CLEAREST EXAMPLE OF A

10:50AM  23     MOTION TO RECONSIDER THE COURT'S UNEQUIVOCAL STATEMENT THAT DID

10:50AM  24     NOT INVITE FURTHER COMMENT.

10:50AM  25         WITH THE FDA REPORTS, I COMPLETELY AGREE WITH YOUR HONOR,

34

| | | |
|---|---|---|
| 10:51AM | 1 | YOU INVITED FURTHER COMMENT, DEFENSE COUNSEL TOOK YOU UP ON IT, |
| 10:51AM | 2 | BUT IN THE MEANTIME THEY'RE TRYING TO BRING INTO YOUR COMMENTS |
| 10:51AM | 3 | ON THE FDA REPORTS A RULING THAT WAS CLEAR AND UNEQUIVOCAL ON |
| 10:51AM | 4 | THE CMS REPORT, AND, THEREFORE, TODAY WE'RE HAVING A LOT OF THE |
| 10:51AM | 5 | SAME DISCUSSIONS THAT WE HAD MONTHS AGO. |
| 10:51AM | 6 | AND I WANT TO START ON THAT POINT WITH THE BILL OF |
| 10:51AM | 7 | PARTICULARS BECAUSE ONE OF THE THINGS THAT I JUST HEARD |
| 10:51AM | 8 | OPPOSING COUNSEL SAY IS THAT THE GOVERNMENT HAS NEVER PROVIDED |
| 10:51AM | 9 | ANY THEORY OF RELEVANCE FOR THE ASSAYS NOT IN THE BILL OF |
| 10:51AM | 10 | PARTICULARS, BUT THAT'S ABSOLUTELY NOT CORRECT. |
| 10:51AM | 11 | THE GOVERNMENT PROVIDED EXACTLY THAT MULTIPLE THEORIES OF |
| 10:51AM | 12 | RELEVANCE IN ITS OPPOSITION TO -- OR SORRY, IN ITS OPPOSITION |
| 10:51AM | 13 | TO THE CMS REPORT AND IN CONNECTION WITH ITS MOTION IN LIMINE |
| 10:51AM | 14 | TO ACCEPT THE MOTION IN LIMINE REPORT. |
| 10:51AM | 15 | AND SPECIFICALLY -- ONE MOMENT, YOUR HONOR. |
| 10:52AM | 16 | (PAUSE IN PROCEEDINGS.) |
| 10:52AM | 17 | MS. VOLKAR: ECF 664 AT 5 THE GOVERNMENT EXPLAINED |
| 10:52AM | 18 | HOW IT COULD BE USED FOR SHOWING NOT JUST THAT THERE WERE |
| 10:52AM | 19 | INACCURATE AND UNRELIABLE TESTS FOR THE TESTS IN THE BILL OF |
| 10:52AM | 20 | PARTICULARS, BUT THEY COULD ALSO SHOW THAT THERE WERE |
| 10:52AM | 21 | DEFICIENCIES IN THERANOS'S OVERALL LAB PRACTICES AND A LACK OF |
| 10:52AM | 22 | DOCUMENTATION ABOUT QUALITY CONTROL OR QUALITY ASSURANCE FROM |
| 10:52AM | 23 | WHICH JURORS COULD INFER INFORMATION THAT IS RELEVANT ABOUT THE |
| 10:52AM | 24 | TESTS. |
| 10:52AM | 25 | AND WHAT I'M TRYING TO SAY THERE, YOUR HONOR, THERE ARE |

35

10:52AM  1    MULTIPLE WAYS IN WHICH THIS INFORMATION IN THE CMS REPORT COULD

10:52AM  2    BE RELEVANT EVEN IF IT'S NOT TALKING ABOUT THE INACCURACY OR

10:52AM  3    UNRELIABILITY OF AN ASSAY THAT IS NOT ON THE BILL OF

10:52AM  4    PARTICULARS.

10:52AM  5         AND I SAY THIS, AND I'M ACTUALLY GENUINELY SURPRISED ABOUT

10:52AM  6    OPPOSING COUNSEL'S ASSISTANCE ON THIS BECAUSE THIS WAS DEBATED

10:53AM  7    FOR HOURS AT THE MOTION IN LIMINE HEARING.  AND YOUR HONOR

10:53AM  8    THOROUGHLY AND THOUGHTFULLY WENT THROUGH THIS AND DECIDED IN

10:53AM  9    THE GOVERNMENT'S FAVOR THAT, YES, THIS WAS.

10:53AM  10        AND JUST AS AN EXAMPLE, AND I THINK YOUR HONOR WAS LOOKING

10:53AM  11   AT THIS, IF YOU LOOK AT THE FIRST FIVE PAGES OF THE CMS REPORT,

10:53AM  12   WHICH IS PAGE 6, 898-6 THAT YOU WERE REFERRING TO, IS ENTIRELY

10:53AM  13   HIGHLIGHTED.  AND THERE ARE PAGES AND PAGES AND PAGES OF THE

10:53AM  14   126 PAGE REPORT THAT ARE JUST ENTIRELY HIGHLIGHTED AND

10:53AM  15   REDACTED.

10:53AM  16        AND AS I STATED IN MY OPPOSITION TO THEIR MOTION TO

10:53AM  17   RECONSIDER, WHAT THEY SEEK TO DO IS TURN THE GOVERNMENT'S --

10:53AM  18   I'M SORRY, TO TURN THE COURT'S MOTION IN LIMINE GRANTING THE

10:53AM  19   GOVERNMENT'S -- I'M SORRY, THE COURT'S ORDER GRANTING THE

10:53AM  20   GOVERNMENT'S MOTION IN LIMINE TO INCLUDE THE CMS REPORT INTO

10:53AM  21   INCLUDING LESS THAN 15 PERCENT, LESS THAN A QUARTER OF THAT

10:53AM  22   REPORT.

10:53AM  23        THEY WANT TO TURN THE COURT'S ORDER ENTIRELY ON ITS HEAD

10:53AM  24   AND EXCLUDE THREE-QUARTERS OF THE REPORT AND MOST ANYTHING THAT

10:54AM  25   ACTUALLY RELATES TO WHAT THERANOS WAS OR WASN'T DOING IN THE

10:54AM 1    EYES OF CMS.

10:54AM 2        SO I JUST WANT TO STRENUOUSLY PUT FORTH THE GOVERNMENT'S

10:54AM 3    POSITION THAT OUT OF ALL OF THE MOTIONS, THIS ONE IS THE MOST

10:54AM 4    OBVIOUSLY A MOTION TO RECONSIDER WHERE THE COURT PREVIOUSLY

10:54AM 5    WAS.

10:54AM 6            THE COURT:  ALL RIGHT.  THANK YOU.

10:54AM 7            MR. LOOBY:  SO, YOUR HONOR, ON THE HEARSAY POINT IN

10:54AM 8    PARTICULAR, IN THE COURT'S ANALYSIS IN ITS IN LIMINE RULING AND

10:54AM 9    IT INCORPORATED THE DISCUSSION OF THE HEARSAY ISSUES FROM THE

10:54AM 10   FDA REPORT, AND THAT'S WHERE THE COURT OBSERVED THAT THERE ARE

10:54AM 11   SOME OBSERVATIONS IN THE FDA INSPECTION DOCUMENTS THAT GO

10:54AM 12   BEYOND MERE ANALYSIS, AND WE SUBMIT A MERE FACTUAL OBSERVATIONS

10:54AM 13   TO INCLUDE THE HIGH LEVEL ANALYSIS AND THAT THOSE MIGHT NOT BE

10:54AM 14   ADMISSIBLE UNDER THE HEARSAY RULE.

10:54AM 15       WE SUBMIT THE SAME IS TRUE WITH THE CMS REPORT.

10:54AM 16       AND I THINK THE OTHER THING ABOUT MY FRIEND'S ARGUMENT IS

10:55AM 17   THAT, YES, YOUR HONOR ADMITTED THE CMS REPORT ITSELF, BUT

10:55AM 18   YOUR HONOR ALSO EXCLUDED EVIDENCE RELATING TO ACCURACY AND

10:55AM 19   RELIABILITY OF TESTS NOT AT ISSUE IN THE BILL OF PARTICULARS.

10:55AM 20       IF YOU GO TO THAT FIRST DEFICIENCY ON PAGE 6 OF 898-6

10:55AM 21   BECAUSE WE WERE ALL THERE, IF YOU LOOK AT WHY IT'S COMPLETELY

10:55AM 22   IRRELEVANT AND JUSTIFIABLY REDACTED, THE CONTENT OF IT IS THAT

10:55AM 23   THE LABORATORY WAS ENROLLED IN A COLLEGE OF AMERICAN

10:55AM 24   PATHOLOGIST PT PROGRAM FOR THIS SPECIFIC ASSAY ALKALINE

10:55AM 25   PHOSPHATE, ALPTPPT, AND THAT THEY HAD A NONGRADED RESULT THAT

10:55AM  1    NEEDED TO BE INVESTIGATED.

10:55AM  2        I DON'T SEE HOW THIS IS RELEVANT TO ANY OF THE THEORIES

10:55AM  3    THAT THE GOVERNMENT HAS PUT FORWARD, AND SO WE PROPOSE THAT

10:56AM  4    THESE OBSERVATIONS BE REDACTED.

10:56AM  5        AND I HAVEN'T HEARD ANY RELEVANCE THEORY THAT WOULD MAKE

10:56AM  6    THIS AN ISSUE IN THE CASE.

10:56AM  7            THE COURT:  LOOKING AT THAT SAME PAGE, IT LOOKS LIKE

10:56AM  8    PARAGRAPH OR ITEM D, IS THAT THE HEARSAY OR AN EXAMPLE OF THE

10:56AM  9    HEARSAY THAT YOU THINK IS OBVIOUS HERE?

10:56AM 10            MR. LOOBY:  YES, YOUR HONOR.

10:56AM 11        SO THIS ONE IS CODED A, B, AND C BECAUSE IT CONTAINS

10:56AM 12    WITHIN IT ALL OF THE DIFFERENT REDACTIONS.  SO IT'S COMPLETELY

10:56AM 13    IRRELEVANT BECAUSE IT RELATES EXCLUSIVELY TO A TEST NOT AT

10:56AM 14    ISSUE.

10:56AM 15        AND I WILL SAY, YOUR HONOR, WE DIDN'T REDACT OBSERVATIONS

10:56AM 16    THAT RELATED TO LAB PRACTICES THAT COULD POTENTIALLY IMPACT

10:56AM 17    OTHER TESTS.  LIKE, FOR EXAMPLE, THERE ARE OBSERVATIONS ABOUT

10:56AM 18    FREEZER TEMPERATURES.  SO WHERE WE COULDN'T DETERMINE

10:56AM 19    ABSOLUTELY THAT THIS DOESN'T RELATE TO A TEST NOT AT ISSUE, WE

10:56AM 20    PROPOSED TO LEAVE THOSE UNREDACTED, EVEN THOUGH THE CONNECTION

10:56AM 21    BETWEEN THAT AND ANY ISSUE IN THE CASE IS A LITTLE TENUOUS IN

10:56AM 22    MY OPINION.

10:56AM 23        YOU KNOW, WE WERE CONSERVATIVE IN REDACTING FOR WHAT IS

10:56AM 24    NOT AT ISSUE IN THE CASE.  THE FACT THAT IT'S A SUBSTANTIAL

10:57AM 25    PORTION OF THE REPORT, I MEAN IT -- LIKE I SAID BEFORE, IT'S AN

38

| | | |
|---|---|---|
| 10:57AM | 1 | AUDIT OF THE ENTIRE LABORATORY PRACTICE AND DIFFERENT TESTS |
| 10:57AM | 2 | EACH HAVE THEIR OWN FINDINGS, AND THERE ARE CERTAIN TESTS THAT |
| 10:57AM | 3 | ARE NOT AT ISSUE IN THE CASE.  THERE A LOT OF TESTS THAT ARE |
| 10:57AM | 4 | NOT AT ISSUE IN THE CASE. |
| 10:57AM | 5 | THE COURT:  I UNDERSTAND. |
| 10:57AM | 6 | THIS GETTING BACK TO THIS D, IT SAYS, "THE GENERAL |
| 10:57AM | 7 | SUPERVISOR STATED THAT THE QUALITY CONTROL," ET CETERA.  THAT'S |
| 10:57AM | 8 | THE HEARSAY PORTION? |
| 10:57AM | 9 | MR. LOOBY:  YES. |
| 10:57AM | 10 | THE COURT:  AS WELL AS THE FOLLOWING E, "THE MANAGER |
| 10:57AM | 11 | CONFIRMED"? |
| 10:57AM | 12 | MR. LOOBY:  YES. |
| 10:57AM | 13 | THE COURT:  MAYBE THAT'S NOT AS STRONG OF A HEARSAY |
| 10:57AM | 14 | ISSUE, BUT THAT'S THE HEARSAY THAT YOU'RE TALKING ABOUT? |
| 10:57AM | 15 | MR. LOOBY:  YEAH.  THEY VARY IN THE WAY THAT THEY |
| 10:57AM | 16 | DESCRIBE THE INFORMATION ORALLY RELAYED FROM THE LAB STAFF, BUT |
| 10:57AM | 17 | IT'S ALL -- THE BASIS OF THE OBSERVATIONS ARE WHAT WAS TOLD TO |
| 10:57AM | 18 | THE INSPECTOR. |
| 10:57AM | 19 | MS. VOLKAR:  YOUR HONOR, IF I MAY?  I WANT TO |
| 10:57AM | 20 | RESPOND TO THAT AND ALSO TO SEVERAL COMMENTS THAT MR. LOOBY |
| 10:57AM | 21 | MADE EARLIER AS WELL. |
| 10:57AM | 22 | SO FIRST AND FOREMOST WITH THE DOUBLE HEARSAY, AGAIN, I GO |
| 10:57AM | 23 | BACK TO THIS IS ONE OF THE CLEAREST EXAMPLES OF SOMETHING THAT |
| 10:58AM | 24 | THE COURT HAS REALLY ALREADY DECIDED, AND THEY'RE JUST |
| 10:58AM | 25 | ESSENTIALLY ASKING THE COURT TO RECONSIDER OR TO REVISIT ITS |

10:58AM 1    PRIOR RULING.

10:58AM 2        AND WHAT DO I MEAN BY THAT?  IN A PRIOR PART -- IN A

10:58AM 3    DIFFERENT PART OF YOUR ORDER AT 2527 YOU TALKED ABOUT A

10:58AM 4    DIFFERENT CMS REPORT, THE SEPTEMBER 5TH, 2015 CMS LETTER AND

10:58AM 5    FOUND THAT IT WAS SUFFICIENTLY LINKED TO MS. HOLMES TO OVERCOME

10:58AM 6    THE AGENCY CONCERNS THAT YOUR HONOR HAD FOR THE ADOPTED

10:58AM 7    ADMISSIONS.

10:58AM 8        IN THAT SAME GOVERNMENT'S OPPOSITION ECF 677, THE

10:58AM 9    GOVERNMENT TALKED ABOUT ALSO THESE SAME CMS, THE SAME

10:58AM 10   INSPECTION, HOW MS. HOLMES SHADOWED THE CMS INSPECTOR DURING

10:58AM 11   ONE OF THEM.  EVERYONE SHE TALKED TO MS. HOLMES WAS THERE.

10:58AM 12       SO THE IDEA THAT THESE ARE DIFFERENT EVENTS OR THAT THE

10:58AM 13   STATEMENTS THAT MIGHT HAVE MADE THEIR WAY INTO THIS REPORT

10:58AM 14   DIDN'T HAVE MS. HOLMES ESSENTIALLY RIGHT THERE THE ENTIRE TIME

10:58AM 15   DOESN'T MAKE ANY SENSE.

10:58AM 16       AND I GO BACK TO YOUR HONOR FOUND THAT ESPECIALLY WHEN ALL

10:58AM 17   OF THESE ITEMS WERE CRYSTAL CLEAR IN EVERYONE'S MINDS MONTHS

10:59AM 18   AGO AS WE BRIEFED THIS EXTENSIVELY.  YES, YOUR HONOR'S RULING

10:59AM 19   ONLY RELATED TO ONE LETTER, BUT IT EXTENDS TO THESE OTHER ITEMS

10:59AM 20   AS WELL.

10:59AM 21       AND I WOULD POSIT THAT THAT'S WHY YOUR HONOR DID FIND THAT

10:59AM 22   THERE WAS NO HEARSAY PROBLEMS WITH THE CMS REPORT WHEN YOU

10:59AM 23   DECIDED TO ADMIT IT MONTHS AGO.

10:59AM 24       AND I ALSO -- ON THAT SAME TOPIC, THE CMS LETTER THAT WE

10:59AM 25   WERE TALKING ABOUT BEFORE, THERE WAS A LENGTHY BACK AND FORTH

40

10:59AM 1   BETWEEN THE PARTIES AND YOUR HONOR ABOUT WHETHER OR NOT THE CMS

10:59AM 2   LETTER CONSTITUTED HEARSAY AS WELL AS RELEVANCE AND UNDUE

10:59AM 3   PREJUDICE.

10:59AM 4       AND IN YOUR HONOR'S RULING WHEN YOU SAID YOU DID NOT FIND

10:59AM 5   A HEARSAY PROBLEM, YOU TALKED ABOUT THE CMS HEARSAY FINDINGS

10:59AM 6   AND SANCTIONS.  YOU DID NOT LIMIT IT JUST TO THE CMS REPORT

10:59AM 7   WHEN YOU FOUND THERE WAS NOT A HEARSAY PROBLEM.

10:59AM 8       AND SO I GO -- THEN THERE ARE, OF COURSE, REASONS FOR

10:59AM 9   THAT, WHICH, AGAIN, WE TALKED ABOUT MONTHS AGO, BUT I'M HAPPY

10:59AM 10  TO REPEAT HERE.

10:59AM 11      FOR EXAMPLE, THE CMS COVER LETTER TALKS ABOUT THE EFFECT

10:59AM 12  ON THE HEARER.  WHAT DID MS. HOLMES DO IN RESPONSE TO RECEIVING

11:00AM 13  THAT LETTER THAT WAS TITLED IMMEDIATE JEOPARDY.

11:00AM 14      WHAT WAS THE NEXT STEPS THAT THERANOS HAD TO TAKE IN A

11:00AM 15  LEGAL OBLIGATION WAY TO RESPOND TO AND REACT TO THAT?

11:00AM 16      AGAIN, I'M TRYING TO REPEAT ARGUMENTS THAT I KNOW

11:00AM 17  YOUR HONOR HAS ALREADY HEARD, BUT AT THE SAME TIME THIS HAS

11:00AM 18  BEEN DISCUSSED VERY THOROUGHLY, AND I GUESS THE GOVERNMENT'S

11:00AM 19  POSITION AT THE SIMPLEST IS THAT THIS HAS ALREADY BEEN

11:00AM 20  DISCUSSED AND DECIDED.

11:00AM 21      THE LAST PART THAT I WANTED TO TALK ABOUT WAS THE FDA

11:00AM 22  REPORTS.  AND I JUST WANTED TO SAY THAT THE GOVERNMENT AGREES

11:00AM 23  WITH YOUR HONOR, THEY SAY OBSERVATIONS.  THE SENTENCE THAT

11:00AM 24  THEY'RE SEEKING TO REDACT DOESN'T REALLY MAKE SENSE COMPARED TO

11:00AM 25  WHAT FOLLOWS BY THE WORD "SPECIFICALLY," AS YOU POINTED OUT.

41

| | | |
|---|---|---|
| 11:00AM | 1 | BUT REALLY THE CMS REPORT IS THE ONE THAT WE UNDERSTAND |
| 11:00AM | 2 | YOUR HONOR INVITED FURTHER COMMENT ON THE FDA REPORTS. |
| 11:01AM | 3 | THE CMS REPORT WE JUST THINK WE'RE SURPRISED WE'RE HERE |
| 11:01AM | 4 | TODAY DISCUSSING IT GIVEN HOW CLEAR YOUR HONOR'S RULING WAS AND |
| 11:01AM | 5 | HOW THOROUGHLY THE PARTIES DISCUSSED EXACTLY THESE ISSUES MERE |
| 11:01AM | 6 | MONTHS AGO. |
| 11:01AM | 7 | THE COURT: ALL RIGHT. THANK YOU. |
| 11:01AM | 8 | MR. LOOBY: YES, YOUR HONOR. AND I'LL BE BRIEF. |
| 11:01AM | 9 | JUST TWO POINTS. |
| 11:01AM | 10 | THE FIRST ONE RELATING TO THE SEPARATE LETTER CONVEYED |
| 11:01AM | 11 | FROM MR. BALWANI TO CMS THAT THE COURT HAD RULED -- WE HAD |
| 11:01AM | 12 | MOVED TO EXCLUDE THAT. IT WAS DISCLOSED AS 404(B) EVIDENCE, |
| 11:01AM | 13 | AND WE HAD MOVED TO EXCLUDE IT AS IRRELEVANT AND ALSO |
| 11:01AM | 14 | INSUFFICIENTLY TIED TO MS. HOLMES UNDER 401 AND 404(B). |
| 11:01AM | 15 | AND THE COURT'S RULING THAT IT WAS SUFFICIENTLY LINKED |
| 11:01AM | 16 | BECAUSE IT'S A RELEVANCE RULING, IT'S NOT AN AGENCY RULING THAT |
| 11:01AM | 17 | EVERY LAB STAFF INVOLVED IN THE CMS AUDIT WHO WERE SPOKEN TO BY |
| 11:01AM | 18 | THE CMS INSPECTORS, WHO WERE INVOLVED IN ANY WAY IN THE |
| 11:01AM | 19 | LABORATORY WERE MS. HOLMES'S AGENTS. |
| 11:01AM | 20 | MORE SPECIFICALLY, WE ALSO DISCUSSED WHETHER OR NOT |
| 11:02AM | 21 | GENERALLY AGENTS OR EMPLOYEES OF THERANOS WERE AGENTS OF |
| 11:02AM | 22 | MS. HOLMES OR THE COMPANY, AND THE COURT DEFERRED AND DENIED |
| 11:02AM | 23 | THE GOVERNMENT'S REQUEST TO FIND THAT AT THAT TIME. |
| 11:02AM | 24 | THE CMS LETTER FROM MR. BALWANI, THE LETTER FROM |
| 11:02AM | 25 | MR. BALWANI TO CMS DOESN'T PROVIDE THAT LINK. IT DOESN'T EVEN |

11:02AM 1    COME CLOSE IN MY OPINION.

11:02AM 2        SO I THINK THAT THAT -- WHETHER OR NOT THE GOVERNMENT CAN

11:02AM 3    LAY THE FOUNDATION FOR THE AGENCY LINK BETWEEN MS. HOLMES AND

11:02AM 4    THE SPECIFIC EMPLOYEES THAT ARE QUOTED IN THE CMS REPORT IS

11:02AM 5    UNRESOLVED AS OF NOW UNDER THE COURT'S PRIOR RULINGS.

11:02AM 6        AND THEN FINALLY, WITH REGARD TO THE CMS COVER LETTER.  I

11:02AM 7    UNDERSTAND IN OUR OPPOSITION WE HAD DEFINED THE COVER LETTER

11:02AM 8    AND THE REPORT COLLECTIVELY AND THAT WE HAD DISCUSSED THE COVER

11:02AM 9    LETTER AND THE REPORT TOGETHER HERE ON DIFFERENT BALANCES OF

11:02AM 10   RELEVANCE, UNFAIR PREJUDICE, HEARSAY, THE GAMUT.

11:03AM 11       BUT WHAT I DON'T HEAR FROM THE GOVERNMENT IS ANY

11:03AM 12   EXPLANATION FOR WHY IT FITS UNDER RULE 803(8)(A) OTHER THAN

11:03AM 13   JUST TRYING TO SAY THAT THE COURT HAS ALREADY DECIDED THIS.

11:03AM 14       WE DON'T READ THE COURT'S ORDER THAT WAY.  YOUR HONOR

11:03AM 15   KNOWS WHAT IT HELD AND DIDN'T HOLD.  AND SO IF THAT'S THE CASE,

11:03AM 16   WE WOULD SUBMIT THAT THE GOVERNMENT HAS MADE NO STRONG ARGUMENT

11:03AM 17   FOR WHY IT SHOULD BE ALSO ADMITTED BECAUSE IT IS AN

11:03AM 18   OUT-OF-COURT STATEMENT THAT THE COURT PURPORTS TO OFFER FOR ITS

11:03AM 19   TRUTH.

11:03AM 20       MS. VOLKAR:  YOUR HONOR, IF I MAY?

11:03AM 21       I WANT TO GO BACK TO -- I HEARD MR. LOOBY SAY THAT THEY

11:03AM 22   WERE CONSERVATIVE IN THEIR REDACTIONS, AND I THINK IT'S THE

11:03AM 23   GOVERNMENT'S CLEAR POSITION THAT IT JUST DEFIES LOGIC THAT YOU

11:03AM 24   CAN BE CONSERVATIVE IN YOUR REDACTION AND SEEK TO REDACT

11:03AM 25   THREE-QUARTERS OF A REPORT.

11:03AM  1       THE GOVERNMENT BELIEVES THAT TO THE EXTENT THAT THEIR

11:03AM  2   CONCERNS HAVE ANY MERIT, YOUR HONOR CAN COVER THIS BY A

11:03AM  3   LIMITING INSTRUCTION.

11:03AM  4       BUT I THINK AS FAR AS THE HEARSAY POINT GOES, WE HAVE

11:04AM  5   EXPLAINED HOW THIS FITS UNDER THE RELEVANT RULE.  WE'VE

11:04AM  6   EXPLAINED IT AT LENGTH IN THE MOTION IN LIMINE HEARING PROCESS,

11:04AM  7   AND YOUR HONOR, AGAIN, MAYBE I'M READING TOO MUCH INTO YOUR

11:04AM  8   RULING, BUT YOUR HONOR THOROUGHLY WENT THROUGH IT AND SIDED

11:04AM  9   WITH THE GOVERNMENT ESPECIALLY WITH RESPECT TO THE CMS

11:04AM 10   REPORT.

11:04AM 11       AND WE PUT FORTH THAT BECAUSE OF THE LENGTHY DISCUSSION

11:04AM 12   ABOUT THE CMS LETTER, YOUR HONOR ALSO REACHED THAT SAME

11:04AM 13   CONCLUSION WITH THE CMS LETTER IN DENYING THEIRS.

11:04AM 14       AND IF WE'RE WRONG ABOUT THAT, WE'RE HAPPY TO PROVIDE MORE

11:04AM 15   REASONS WHY WE THINK THAT IT FITS WITHIN THE HEARSAY EXCEPTION,

11:04AM 16   BUT WE JUST THINK THAT THEY READ IT TOO BROADLY.

11:04AM 17           THE COURT:  WHAT LIMITING INSTRUCTION WOULD YOU

11:04AM 18   SUGGEST?

11:04AM 19           MS. VOLKAR:  WELL, SPECIFICALLY -- SO THEY'VE

11:04AM 20   POINTED OUT THAT THE MAJORITY OF THEIR REDACTIONS RELATE TO

11:04AM 21   ASSAYS THAT ARE NOT IN THE BILL OF PARTICULARS.  AND WE THINK

11:04AM 22   THAT AN EASY SOLUTION IN ADMITTING THIS REPORT IS THAT TO THE

11:04AM 23   EXTENT THAT ANY OF THE PORTIONS TALK ABOUT ASSAYS THAT ARE NOT

11:04AM 24   IN A LIST WE CAN PROVIDE THEM OR A LIST THAT THE COURT COULD

11:05AM 25   READ OFF, YOU'RE NOT TO TAKE ANY STATEMENTS IN THE REPORT AS

44

11:05AM 1    STATING THAT THOSE WERE INACCURATE OR UNRELIABLE TESTS.

11:05AM 2        THE GOVERNMENT IS HERE TO PROVE THAT THERANOS HAD

11:05AM 3    INACCURATE OR UNRELIABLE TESTS IN THESE ASSAYS.  AND WE CAN

11:05AM 4    CRAFT LANGUAGE PERHAPS A LITTLE BIT MORE COHERENT THAN THAT

11:05AM 5    WITH SOME TIME, BUT THE GENERAL IDEA BEING THAT WHEN IT TALKS

11:05AM 6    ABOUT LACK OF DOCUMENTATION OR NOT HAVING QC POLICIES OR

11:05AM 7    QC PROTOCOLS, THAT MIGHT BE AN INDICATION THAT THE LAB WAS NOT

11:05AM 8    VERY WELL RUN, BUT THAT DOESN'T NECESSARILY BY IN AND OF ITSELF

11:05AM 9    MEAN THAT AN ASSAY THAT IS NOT ON THE BILL OF PARTICULARS WAS

11:05AM 10   INACCURATE OR UNRELIABLE, AND THE GOVERNMENT IS NOT SEEKING TO

11:05AM 11   PROVE THAT.

11:05AM 12       SO ANOTHER WAY OF SAYING WHAT I'M SAYING IS THAT THE

11:05AM 13   GOVERNMENT IS ABIDING BY THE COURT'S RULING ON THE BILL OF

11:05AM 14   PARTICULARS, BUT THAT ISN'T A REASON TO REDACT AS MUCH AS THEY

11:05AM 15   SEEK TO REDACT FROM THIS REPORT WHEN A LIMITING INSTRUCTION

11:05AM 16   COULD EASILY CURE IT AND ANY CONCERNS THAT THEY HAVE.

11:05AM 17       THE COURT:  ONE THING I DO WANT TO SAY, MR. LOOBY,

11:06AM 18   BEFORE YOU SPEAK TO THIS, I DO HAVE SOME CONCERN ABOUT THE

11:06AM 19   ADMISSION OF EVIDENCE OF A VIOLATION OF A CIVIL REGULATION AND

11:06AM 20   WHETHER OR NOT, OR WHETHER THAT'S GOING TO BE USED IN THE

11:06AM 21   GOVERNMENT'S CASE-IN-CHIEF TO ARGUE A CRIMINAL VIOLATION.

11:06AM 22       WE ALL KNOW THAT'S NOT PERMITTED.

11:06AM 23       AND SO I WANT TO DRAW CAUTION TO EVERYONE.  THAT'S WHERE I

11:06AM 24   THINK PERHAPS A LIMITING INSTRUCTION MIGHT BE NEEDED SHOULD

11:06AM 25   THAT COME UP, AND I ADVISE EVERYONE TO PAY ATTENTION TO THAT,

45

11:06AM 1    OR TO OTHERWISE, AS EVIDENCE EVOLVES OR IS INTRODUCED, THAT THE

11:06AM 2    PARTIES PAY ATTENTION TO THAT.  I DON'T WANT THAT CONCEPT TO BE

11:06AM 3    OVERLOOKED.

11:06AM 4        IT MAY BE THAT I'LL INVITE YOU TO THINK ABOUT WHAT TYPES

11:06AM 5    OF INSTRUCTIONS WOULD BE APPROPRIATE AT THE TIME THAT THAT

11:06AM 6    EVIDENCE IS INTRODUCED THAT THE JURY SHOULD KNOW ABOUT.

11:07AM 7            MS. VOLKAR:  THE GOVERNMENT IS HAPPY TO COMPLY WITH

11:07AM 8    THAT, YOUR HONOR.  THANK YOU.

11:07AM 9            MR. LOOBY:  AND JUST ONE FINAL WORD ON THAT,

11:07AM 10   YOUR HONOR, WHICH IS THAT THE COURT'S ORDER ON THE TEST NOT IN

11:07AM 11   THE BILL OF PARTICULARS PUTS THE ONUS ON THE GOVERNMENT TO

11:07AM 12   ARTICULATE A PERMISSIBLE PURPOSE OF RELEVANCE.  AND WHAT I

11:07AM 13   UNDERSTAND THE GOVERNMENT TO SAY IS THAT THESE OTHER PORTIONS

11:07AM 14   OF THE REPORT MIGHT SHOW THAT THERE WERE POOR LAB PRACTICES.

11:07AM 15       WE SUBMIT THAT THAT'S NOT RELEVANT AND IS ACTUALLY

11:07AM 16   ESPECIALLY PREJUDICIAL FOR THE REASON THAT YOU JUST

11:07AM 17   ARTICULATED, YOUR HONOR, WHICH IS THAT MS. HOLMES IS NOT ON

11:07AM 18   TRIAL FOR RUNNING A LAB THAT WAS IN VIOLATION OF THE CLIA

11:07AM 19   REGULATIONS, AND SO PUTTING BEFORE THE JURY EVEN WITH A

11:07AM 20   LIMITING INSTRUCTION A BIG THICK REPORT THAT PRIMARILY RELATES

11:07AM 21   TO THAT AND THAT IS THE PRIMARY RELEVANCE THEORY I THINK IS

11:07AM 22   VERY PROBLEMATIC, AND SO WE WOULD SUBMIT THAT THE REDACTIONS

11:07AM 23   ARE THE MORE APPROPRIATE PATH.

11:07AM 24            THE COURT:  OKAY.  ALL RIGHT.  THANK YOU VERY MUCH.

11:07AM 25            MS. VOLKAR:  THANK YOU, YOUR HONOR.

46

| | | |
|---|---|---|
| 11:07AM | 1 | THE COURT: YOU'RE WELCOME. |
| 11:08AM | 2 | NOW LET'S TURN TO 912. I THINK THAT IS THE ONLY MOTION |
| 11:08AM | 3 | LEFT. THIS IS MS. HOLMES'S MOTION TO STRIKE DR. DAS, I |
| 11:08AM | 4 | BELIEVE. |
| 11:08AM | 5 | (PAUSE IN PROCEEDINGS.) |
| 11:08AM | 6 | MR. WADE: GOOD MORNING, YOUR HONOR. |
| 11:08AM | 7 | LANCE WADE ON BEHALF OF MS. HOLMES. |
| 11:08AM | 8 | I THINK -- I JUST WANT TO BE SURE WE'RE ON THE SAME PAGE. |
| 11:09AM | 9 | I BELIEVE I HAVE DOCKET 892. |
| 11:09AM | 10 | THE COURT: OH, YOU MIGHT HAVE IT. I WAS REFERRING |
| 11:09AM | 11 | TO ONE OF THE OTHER PLEADINGS IN REGARDS TO THAT. |
| 11:09AM | 12 | MR. WADE: MAYBE ONE OF THE REPLIES. |
| 11:09AM | 13 | THE COURT: YES. |
| 11:09AM | 14 | MR. WADE: JUST SO THE RECORD IS CLEAR AND WE'RE ON |
| 11:09AM | 15 | THE SAME PAGE. |
| 11:09AM | 16 | THE COURT: IT IS CLEAR. THANK YOU. |
| 11:09AM | 17 | MR. WADE: WE'RE HERE TODAY -- THANK YOU. |
| 11:09AM | 18 | THIS IS NOT A RESULT OF AN INVITATION FROM THE COURT TO |
| 11:09AM | 19 | OFFER ANOTHER PLEADING. THIS IS SORT OF A DE NOVO ISSUE THAT |
| 11:09AM | 20 | RESULTED FROM THE GOVERNMENT'S UNTIMELY DISCLOSURE OF EXPERT |
| 11:09AM | 21 | WITNESS TESTIMONY. |
| 11:09AM | 22 | THE COURT: SO HERE'S -- I'M SORRY TO INTERRUPT YOU. |
| 11:09AM | 23 | BUT LET ME ASK YOU TO -- THIS IS WHAT I'M INTERESTED IN: AS TO |
| 11:09AM | 24 | THE NOTICE ISSUE, AND WHAT PREJUDICE, IF ANY, THAT BRINGS, WAS |
| 11:09AM | 25 | THERE A NOTICE ISSUE. IF THERE WAS, WHAT IS THE PREJUDICE OF |

11:09AM 1    THAT?  WHAT IS THE REMEDY, VARIOUS REMEDIES FOR THAT?

11:09AM 2        I KNOW YOU TALK IN YOUR PLEADINGS ABOUT A LACK OF ABILITY

11:09AM 3    TO INVESTIGATE AND ALSO TO DO A DAUBERT TYPE OF INVESTIGATION

11:10AM 4    AND/OR HEARING.

11:10AM 5        AND I REMIND ALL OF US THAT THERE IS STILL A DAUBERT

11:10AM 6    PENDING, ISN'T THERE, IN THIS CASE?  AND I'D LIKE YOU TO TALK A

11:10AM 7    LITTLE BIT ABOUT IF THERE IS A DAUBERT FOR THIS WITNESS,

11:10AM 8    ASSUMING THIS WITNESS IS BEING OFFERED AS AN EXPERT, WHETHER OR

11:10AM 9    NOT THAT DAUBERT, ONE OF THE REMEDIES MIGHT BE, SINCE WE HAVE A

11:10AM 10   DAUBERT HEARING THAT IS YET UNNOTICED, WOULD IT BE APPROPRIATE

11:10AM 11   TO CONTINUE A DAUBERT HEARING FOR THIS WITNESS, IF NEEDED, TO

11:10AM 12   THAT YET UNIDENTIFIED DATE?

11:10AM 13       THAT'S WHAT I'M -- THOSE ARE THE THINGS THAT I'M FOCUSSED

11:10AM 14   ON HERE.

11:10AM 15       AND I SUPPOSE WHEN THE GOVERNMENT GETS UP, I'M CURIOUS,

11:10AM 16   WHAT IS THIS WITNESS?  IS HE AN EXPERT OR IS HE A PERCIPIENT

11:10AM 17   WITNESS?

11:10AM 18       IF HE'S JUST A PERCIPIENT WITNESS, YOU PROBABLY WOULD SIT

11:10AM 19   DOWN.

11:11AM 20           MR. WADE:  IF HE WAS JUST A PERCIPIENT WITNESS,

11:11AM 21   YOUR HONOR, WE WOULDN'T HAVE FILED THE MOTION.

11:11AM 22       AND THE GOVERNMENT, TO TRY TO FORGIVE THE TARDY

11:11AM 23   DISCLOSURE, SUGGESTED JUST THAT.  I HAVE YET TO -- I HAVE YET

11:11AM 24   TO HAVE A CASE WHERE WE HAVE MADE AN OBJECTION UNDER 701 AND

11:11AM 25   702 WHERE THE GOVERNMENT HASN'T SAID -- HASN'T MADE THAT

11:11AM 1      ARGUMENT.

11:11AM 2          OF COURSE, THE NINTH CIRCUIT CASE LAW ON THIS IS QUITE

11:11AM 3      CLEAR.  AND WHEN THE -- WHEN THE TESTIMONY OF A PERCIPIENT

11:11AM 4      WITNESS GETS INTO THE REALM OF OFFERING A SCIENTIFIC OPINION

11:11AM 5      THAT IS BASED ON SPECIALIZED KNOWLEDGE, SCIENTIFIC TECHNICAL

11:11AM 6      KNOWLEDGE, ALGORITHMS AND THE LIKE, IT'S -- 702 APPLIES AND

11:11AM 7      RULE 16 APPLIES.  AND THAT'S WHERE WE ARE HERE.

11:11AM 8          THE COURT WILL NOTE I PASSED UP AND SHARED WITH COUNSEL

11:11AM 9      EXHIBIT 1 FOR THIS HEARING, WHICH IS ECF 893-3, BUT THIS TIME

11:12AM 10     WITH THE ATTACHMENTS.

11:12AM 11         TO AVOID CRASHING THE GOVERNMENT'S COMPUTER SYSTEM, WE

11:12AM 12     DECIDED NOT TO TRY TO FILE THIS ON ECF.  OF COURSE, THE

11:12AM 13     PROSECUTION HAS HAD THIS.  THEY PRODUCED IT TO US.

11:12AM 14         BUT IF YOU JUST FLIP THROUGH THIS, YOU'LL SEE THAT THIS IS

11:12AM 15     THE REPORT OF DR. DAS ON JUNE 7TH, 2021.  IT'S A FOUR PAGE

11:12AM 16     REPORT.  AND HE OPINES WITHIN THIS ON THE ATTACHMENTS TO THE

11:12AM 17     REPORT WHICH MAKE UP ABOUT 600 PAGES OF DATA AND OTHER SUMMARY

11:12AM 18     INFORMATION THAT CONTAINS EXTENSIVE ANALYSIS.

11:12AM 19         WITHIN THAT WHEN YOU LOOK AT THE REPORT CAREFULLY, AND, IF

11:12AM 20     NECESSARY, I'D BE HAPPY TO BRING THE COURT PARAGRAPH BY

11:12AM 21     PARAGRAPH THROUGH IT, BUT I DON'T WANT TO WASTE ANYONE'S TIME,

11:12AM 22     YOU WILL SEE THAT DR. DAS DID NOT PREPARE ANY OF THESE

11:12AM 23     MATERIALS.  NONE OF THEM.

11:12AM 24         THESE ARE MATERIALS THAT WERE PREPARED BY OTHERS, THEY

11:13AM 25     WERE PUT IN FRONT OF THE WITNESS BY THE GOVERNMENT, AND THEY

11:13AM 1    ASKED HIM FOR HIS INTERPRETATION AND HIS CONCLUSIONS, WHICH IS

11:13AM 2    EXACTLY THE SAME KIND OF TESTIMONY OR EXACTLY THE SAME KIND OF

11:13AM 3    PROCESS THAT YOU WOULD DO IF YOU RETAINED AN EXPERT AND ASKED

11:13AM 4    THEM TO OFFER OPINIONS.

11:13AM 5        SO WITH RESPECT TO VIRTUALLY EVERYTHING WITHIN THE

11:13AM 6    SECOND 302, IT IS, IT IS AKIN, DIRECTLY AKIN TO RETAINED EXPERT

11:13AM 7    TESTIMONY.

11:13AM 8        NOW, WITH RESPECT TO CERTAIN OTHER INFORMATION THAT THE

11:13AM 9    GOVERNMENT HAS IDENTIFIED, IT IS DEFICIENT IN THE SENSE THAT IT

11:13AM 10    DOESN'T GIVE US A SUFFICIENT BASES AND METHODOLOGY TO PREPARE

11:13AM 11    TO EXAMINE DR. DAS.

11:13AM 12        SO WITHIN THE FIRST 302 DR. DAS TALKS ABOUT SOME

11:13AM 13    CALCULATIONS THAT HE DID USING A SIGMA 6 ANALYSIS, AND THAT HE

11:14AM 14    CAME TO CERTAIN CONCLUSIONS AS A RESULT.

11:14AM 15        AND HE REFERENCES THE BASIS OF THAT, THE DOCUMENT, THAT HE

11:14AM 16    WAS SHOWN AT THE TIME, BUT WE DON'T HAVE THE DOCUMENT.  SO WE

11:14AM 17    HAVE NO WAY TO ASSESS WHETHER HIS CONCLUSIONS ARE RIGHT, WHAT

11:14AM 18    HIS CONCLUSIONS TRULY MEAN.  WE MAY AGREE WITH HIS CONCLUSIONS

11:14AM 19    DEPENDING UPON WHAT THE UNDERLYING INFORMATION WAS.

11:14AM 20        OF COURSE, MS. HOLMES WAS THE PERSON WHO HIRED DR. DAS TO

11:14AM 21    COME IN AND ADDRESS THESE ISSUES.  SO IT MAY WELL BE THAT WE

11:14AM 22    AGREE WITH THEM.  BUT WE DON'T HAVE THE BASIS TO KNOW WHAT HIS

11:14AM 23    SCIENTIFIC TESTIMONY IS GOING TO BE.

11:14AM 24        SIMILARLY, AT 893-4 IS A DOCUMENT WHICH IS A -- SOME SORT

11:14AM 25    OF DRAFT WRITING THAT WAS BEING PREPARED WITHIN THE COMPANY

11:14AM 1     THAT MAY HAVE BEEN PREPARED BY DR. DAS.

11:14AM 2        WE DON'T KNOW REALLY WHAT THIS DOCUMENT IS OTHER THAN AT

11:15AM 3     LEAST ONE LEVEL OF HEARSAY. IT'S A HEARSAY DOCUMENT BECAUSE

11:15AM 4     IT'S NOT A FINAL DOCUMENT IN ANY RESPECT, AND THERE ARE

11:15AM 5     PROBABLY IN CERTAIN CASES MULTIPLE LAYERS OF HEARSAY WITHIN

11:15AM 6     THIS.

11:15AM 7        BUT SIGNIFICANTLY, IF THE COURT LOOKS THROUGH THIS, IT

11:15AM 8     WILL SEE REPEATED SENTENCES THAT ARE FOLLOWED BY EXHIBIT XX.

11:15AM 9     EXHIBIT XX IS MERELY A PLACEHOLDER FOR WHATEVER THE DATA WAS

11:15AM 10     THAT WOULD SUPPORT THAT CONCLUSION IN THE VIEW OF THIS EXPERT

11:15AM 11     WITNESS.

11:15AM 12        SO --

11:15AM 13            THE COURT: SO LET ME --

11:15AM 14            MR. WADE: YES.

11:15AM 15            THE COURT: I DON'T MEAN TO INTERRUPT YOU, BUT I'M

11:15AM 16     GOING TO.

11:15AM 17        I'M REALLY INTERESTED IN RULE 16 AND WHAT ROLE THAT HAS AT

11:15AM 18     ALL IN YOUR REQUEST.

11:15AM 19            MR. WADE: RULE 16 IS AT THE HEART OF THE REQUEST,

11:15AM 20     YOUR HONOR, BECAUSE EVERYTHING --

11:15AM 21            THE COURT: THAT'S WHAT I'D LIKE YOU TO TALK ABOUT.

11:15AM 22            MR. WADE: YEAH. BECAUSE EVERYTHING THAT I JUST

11:15AM 23     IDENTIFIED IN CONNECTION WITH THAT IS MATERIAL THAT WOULD NEED

11:15AM 24     TO BE IDENTIFIED UNDER RULE 16.

11:15AM 25        THE GOVERNMENT PUSHES -- THE GOVERNMENT BASICALLY MAKES NO

51

11:16AM 1    SUBSTANTIVE DISCLOSURE WITH RESPECT TO DR. DAS.

11:16AM 2            THE COURT:  TELL ME A TIMELINE.

11:16AM 3            MR. WADE:  I'M SORRY?

11:16AM 4            THE COURT:  TIMELINE?

11:16AM 5            MR. WADE:  A TIMELINE OF THESE DISCLOSURES?  OH,

11:16AM 6    SURE.

11:16AM 7        THE GOVERNMENT PRODUCED AN INTERVIEW THAT THEY CONDUCTED

11:16AM 8    ON FEBRUARY 1ST, 2021.

11:16AM 9            THE COURT:  AND WHAT I'M SPECIFICALLY INTERESTED IN,

11:16AM 10   AND I'M JUST GIVING FAIR WARNING TO THE GOVERNMENT, I HAVE SOME

11:16AM 11   CONCERNS ABOUT THE RULE 16 DISCLOSURE, AND I'D LIKE TO KNOW

11:16AM 12   WHAT ARE THE TIMELINES FOR THE DISCLOSURE, THE NOTICE OF

11:16AM 13   DISCLOSURE AS AN EXPERT.  THAT'S REALLY WHAT I'M FOCUSSED ON.

11:16AM 14       I THINK I UNDERSTAND ALL OF THE THINGS THAT THIS WITNESS

11:16AM 15   WOULD PROVIDE AS AN EXPERT WITNESS.  I UNDERSTAND THAT.

11:16AM 16       I'M GOING TO ASK MS. VOLKAR WHETHER OR NOT THIS IS AN

11:16AM 17   EXPERT WITNESS OR A PERCIPIENT WITNESS.  THERE'S A DIFFERENCE.

11:16AM 18       AND THERE'S ACTUALLY -- THE REAL ISSUE IS WHAT THE

11:17AM 19   TESTIMONY IS, ISN'T IT, NOT WHAT TYPE OF WITNESS IT IS, IT'S

11:17AM 20   WHAT THE TESTIMONY OF THE WITNESS WILL BE.

11:17AM 21       BUT IF IT'S AN EXPERT, THEN I KNOW WE HAVE SOME -- RULE 16

11:17AM 22   GIVES US SOME GUIDANCE.  THAT'S WHAT I'M FOCUSSED ON, MR. WADE.

11:17AM 23   SO DO YOU WANT TO SHARE WITH ME YOUR THOUGHTS ON IT?

11:17AM 24           MR. WADE:  I BELIEVE IT GOES TO THE REMEDIES WHICH

11:17AM 25   WAS ONE OF THE TWO QUESTIONS THAT I WAS GOING TO GET TO NEXT.

11:17AM  1          SO, YES, I WILL.

11:17AM  2          THE DISCLOSURE OF DR. DAS AS A WITNESS OF ANY KIND, SO NOT

11:17AM  3     AN EXPERT WITNESS, BUT HE WAS NOT ADDED TO THE WITNESS LIST

11:17AM  4     UNTIL JUNE 3RD.

11:17AM  5          WE THEN RECEIVED WHAT THE GOVERNMENT SUGGESTS IS AN EXPERT

11:17AM  6     DISCLOSURE ON JULY 29TH, 2021.  THAT'S EXHIBIT A TO OUR MOTION.

11:17AM  7     YOU CAN SEE THE EMAIL.

11:17AM  8          IT'S NONSUBSTANTIVE.  IT DOESN'T SAY ESSENTIALLY ANYTHING.

11:17AM  9     IT JUST POINTS TO A VARIETY OF THINGS, INCLUDING THE DOCUMENTS

11:17AM  10    THAT I'VE IDENTIFIED, THE REPORTS, AND IT POINTS TO ALL OF THE

11:18AM  11    MATERIALS UPON WHICH DR. MASTER RELIED, THEIR RETAINED EXPERT,

11:18AM  12    ALL OF THE MATERIALS TO WHICH HE RELIED UPON IN OFFERING HIS

11:18AM  13    EXPERT OPINION AS FILED ON THE DOCKET.

11:18AM  14         THERE'S NO INDICATION THAT DR. DAS HAS ACTUALLY LOOKED AT

11:18AM  15    THOSE MATERIALS ACCORDING TO THE REPORTS OF THE INTERVIEW.

11:18AM  16         AND THE GOVERNMENT ESSENTIALLY SAYS, YOU KNOW, WITHIN

11:18AM  17    THESE, YOU KNOW, THOUSANDS OF PAGES OF MATERIAL IS THE EXPERT

11:18AM  18    DISCLOSURE, WHICH IS CLEARLY DEFICIENT FOR THE REASONS THAT

11:18AM  19    I'VE JUST IDENTIFIED.

11:18AM  20         SO WE GOT THAT NOTICE ON JULY 29TH, 2021.

11:18AM  21         THE COURT:  SO LET'S TALK ABOUT THE TIMELINE.

11:18AM  22         I THINK YOU DO THIS IN THE PLEADINGS, BUT I JUST WANT THE

11:18AM  23    RECORD TO BE CLEAR ABOUT THIS.

11:18AM  24         THERE WAS SOME DISCUSSION BETWEEN THE PARTIES, THAT IS YOU

11:18AM  25    AND THE GOVERNMENT, AS TO AN AGREED UPON DISCLOSURE DATE.

11:18AM 1       IS THAT CORRECT?  IS THAT ACCURATE?

11:19AM 2            MR. WADE:  THERE WAS, YOUR HONOR.

11:19AM 3       THE GOVERNMENT AGREED TO MAKE THEIR DISCLOSURES BY

11:19AM 4   MARCH 6TH OF 2020, APPROACHING 18 MONTHS AGO.

11:19AM 5            THE COURT:  RIGHT.  AND JUST WALK ME THROUGH THAT,

11:19AM 6   PLEASE, FOR THE RECORD.

11:19AM 7       WHAT HAPPENED NEXT?

11:19AM 8            MR. WADE:  THE GOVERNMENT MADE THEIR DISCLOSURE ON

11:19AM 9   MARCH 6TH OF 2020 OF CERTAIN LAB DIRECTORS THAT PREVIOUSLY

11:19AM 10  WORKED AT THERANOS.  THEY WERE OBVIOUSLY AWARE OF ALL OF THE

11:19AM 11  LAB DIRECTORS AT THERANOS GIVEN THEIR INVESTIGATION AND

11:19AM 12  INDICTMENT IN THIS CASE.

11:19AM 13      SINCE THEN WE HAVE SPENT THE ENSUING YEAR-PLUS PREPARING

11:19AM 14  TO EXAMINE THOSE WITNESSES, WORKING WITH EXPERTS AND WORKING TO

11:19AM 15  PREPARE TO EITHER CHALLENGE THE VALIDITY OF THE EXPERT

11:19AM 16  TESTIMONY OR TO CONFRONT THE WITNESSES AT TRIAL.

11:19AM 17      AS YOUR HONOR KNOWS, THERE WAS EXTENSIVE MOTIONS PRACTICE

11:19AM 18  STARTING LAST YEAR, I BELIEVE, AND BLENDING INTO THIS YEAR WITH

11:20AM 19  RESPECT TO DR. MASTER.

11:20AM 20      THE COURT IDENTIFIED CERTAIN DEFICIENCIES WITH RESPECT TO

11:20AM 21  DR. MASTER AND ORDERED A DAUBERT HEARING TO OCCUR.  THAT

11:20AM 22  DAUBERT HEARING, FOR REASONS THAT I BELIEVE THE COURT IS AWARE

11:20AM 23  OF, WILL LIKELY HAPPEN MID TRIAL CLOSER TO WHEN DR. MASTER

11:20AM 24  WOULD TESTIFY.

11:20AM 25           AND AMIDST ALL OF THIS, WHILE THE GOVERNMENT HAS BEEN

11:20AM  1    AWARE OF THESE ISSUES AND THEY'VE BEEN AWARE OF DR. DAS FOR

11:20AM  2    FIVE YEARS, BUT THEY WERE -- THEY SPOKE TO HIM AS A WITNESS IN

11:20AM  3    I BELIEVE JANUARY OR FEBRUARY, AND THEY SPOKE TO HIM AGAIN IN

11:20AM  4    JUNE.  THEY NEVER BOTHERED TO IDENTIFY AND DISCLOSE HIM AS A

11:20AM  5    WITNESS UNTIL JULY.

11:20AM  6           THE COURT:  OKAY.  I'M SORRY.  ALL RIGHT.

11:20AM  7         SO THE MARCH DATE, AND THEN THERE WAS SOME DISCUSSION

11:20AM  8    BETWEEN YOU AND THE GOVERNMENT.

11:20AM  9         WAS THERE SOME AGREEMENT ABOUT THE GOVERNMENT AGREED TO

11:20AM 10    DISCLOSE BY JULY 29TH, I BELIEVE IT WAS?

11:21AM 11           MR. WADE:  NO.

11:21AM 12           THE COURT:  OKAY.

11:21AM 13           MR. WADE:  THERE WAS NO AGREEMENT WITH RESPECT TO

11:21AM 14    DR. DAS AT ALL.  IT CAME OUT OF LEFT FIELD.

11:21AM 15           THE COURT:  WAS THERE AN AGREEMENT?  MY QUESTION WAS

11:21AM 16    NOT SPECIFIC TO DR. DAS.  MY QUESTION WAS, WAS THERE AN

11:21AM 17    AGREEMENT THAT DISCLOSURE WOULD BE MADE BY JULY 29TH?

11:21AM 18           MR. WADE:  NOT THAT I'M AWARE OF, YOUR HONOR.

11:21AM 19         YOU MAY HAVE BEEN REFERRING TO SOME OF THE SUPPLEMENTAL

11:21AM 20    DISCLOSURES THAT RELATED TO THE DOCTORS.

11:21AM 21           THE COURT:  WHAT, WHAT -- SO JUST FOCUSSED ON THIS

11:21AM 22    WITNESS.

11:21AM 23           MR. WADE:  YES.

11:21AM 24           THE COURT:  AND I'M TRYING TO GLEAN WHAT THE

11:21AM 25    DEADLINES WERE FOR DISCLOSURE OF EXPERTS.  THAT'S REALLY THE

11:21AM 1    QUESTION I WANT TO ASK YOU.

11:21AM 2              MR. WADE:  THE DEADLINES FOR DISCLOSURES OF EXPERTS

11:21AM 3    WAS MARCH OF 2020, PERIOD.

11:21AM 4              THE COURT:  OKAY.  OKAY.

11:21AM 5              MR. WADE:  AND THIS WITNESS WAS DISCLOSED THE END OF

11:21AM 6    JULY.

11:21AM 7              THE COURT:  JULY 29, 28, 29 I THINK IT WAS.

11:21AM 8              MR. WADE:  JULY 29TH OF 2021.

11:22AM 9              THE COURT:  AND THAT JULY 29TH DATE WAS AN

11:22AM 10   AGREED-UPON DISCLOSURE DATE THAT YOUR TEAM AND THE GOVERNMENT

11:22AM 11   ENGAGED FOR WHAT PURPOSE?  WHAT WAS SUPPOSED TO BE DISCLOSED BY

11:22AM 12   JULY 29TH?

11:22AM 13             MR. WADE:  THERE WAS NOT AGREEMENT THAT RELATED TO

11:22AM 14   THIS DISCLOSURE, YOUR HONOR.

11:22AM 15             THE COURT:  I UNDERSTAND THAT.

11:22AM 16         BUT WAS THERE ANY AGREEMENT THAT WAS MADE THAT THE

11:22AM 17   GOVERNMENT WOULD PROVIDE DISCLOSURES BY JULY 29TH?

11:22AM 18             MS. VOLKAR:  YOUR HONOR, I CAN ANSWER THAT QUESTION

11:22AM 19   IF YOU WOULD LIKE ME TO?

11:22AM 20             THE COURT:  THANK YOU.

11:22AM 21             MS. VOLKAR:  SO THE GOVERNMENT -- THE DEFENSE

11:22AM 22   COUNSEL ASKED THE GOVERNMENT TO DISCLOSE ANY OF THE TREATING

11:22AM 23   PHYSICIANS WITH RESPECT TO THE PATIENTS AND BECAUSE OF THE

11:22AM 24   COURT'S ORDER TALKING ABOUT GIVING THEM SUFFICIENT NOTICE AND

11:22AM 25   UNDER RULE 16 FOR EXPERT PURPOSES, THEY SENT US A LETTER ASKING

11:22AM 1    US TO DISCLOSE THAT BY JULY 30TH SO THAT WE WOULD MEET OUR

11:22AM 2    OBLIGATIONS AND MEET THE RULE 16 OBLIGATIONS WITH RESPECTS TO

11:22AM 3    THE TREATING PHYSICIANS.

11:22AM 4        AND OUR ARGUMENT IN OUR OPPOSITION IS THAT IF THAT WAS

11:22AM 5    SUFFICIENT NOTICE FOR THOSE EXPERTS, IT'S ALSO SUFFICIENT FOR

11:23AM 6    DR. DAS.

11:23AM 7            THE COURT:  THAT'S WHERE I WAS GETTING TO, MR. WADE.

11:23AM 8    SORRY TO TAKE YOU DOWN A CIRCUITOUS PATH ON THAT.

11:23AM 9        I THINK YOUR ARGUMENT IS THAT WHAT MS. VOLKAR JUST

11:23AM 10   INDICATED WAS FOR SPECIFIC DOCTORS, THE ONES WE'VE TALKED ABOUT

11:23AM 11   PREVIOUSLY.

11:23AM 12       BUT WHAT I THINK YOUR ARGUMENT IS, AND HELP ME, YOUR

11:23AM 13   ARGUMENT IS, WELL, IN ADDITION TO THOSE DOCTORS, THEY ALSO

11:23AM 14   IDENTIFIED DR. DAS AT THAT TIME; IS THAT WHAT HAPPENED?

11:23AM 15           MR. WADE:  IT WAS ACTUALLY A COMPLETELY SEPARATE

11:23AM 16   EVENT THAT HAD IN MANY WAYS -- AND PART OF THE REASON MAYBE I

11:23AM 17   WAS CONFUSED OR A LITTLE SLOW ON THE UPTAKE, YOUR HONOR, IS THE

11:23AM 18   DISCLOSURE OF DR. DAS REALLY HAD NOTHING TO DO WITH THE

11:23AM 19   TREATING PHYSICIANS.

11:23AM 20           THE COURT:  UNDERSTOOD.  THAT'S YOUR BEST ARGUMENT,

11:23AM 21   ISN'T IT?

11:23AM 22           MR. WADE:  YES.

11:23AM 23           THE COURT:  "WE GOT THIS INFORMATION ON JULY 29TH.

11:23AM 24   WE DIDN'T KNOW DR. DAS WAS GOING TO BE INCLUDED, AND WE WERE

11:23AM 25   SURPRISED TO HEAR ON JULY 29TH THAT THE GOVERNMENT HAS

11:23AM 1    IDENTIFIED AN EXPERT."

11:23AM 2           MR. WADE:  WE WOULD HAVE BEEN SURPRISED TO RECEIVE

11:23AM 3    THIS DISCLOSURE ON JULY 29TH OF 2020 --

11:24AM 4           THE COURT:  AGREED.

11:24AM 5           MR. WADE:  -- GIVEN THE DEADLINE.  BUT

11:24AM 6    PARTICULARLY --

11:24AM 7           THE COURT:  I THINK THAT'S YOUR ARGUMENT, ISN'T IT?

11:24AM 8           MR. WADE:  YES, THAT'S RIGHT.

11:24AM 9           THE COURT:  THAT'S WHAT I READ IN YOUR PLEADINGS.

11:24AM 10     WE EXPECTED TO GET CERTAIN DOCTORS, THE UNIVERSE OF

11:24AM 11   DOCTORS THAT WE TALKED ABOUT THE OTHER MOTION, AND WE AGREED WE

11:24AM 12   WOULD GET IT ON THE 29TH.

11:24AM 13     THE GOVERNMENT, IN ADDITION TO THAT, PROVIDED DR. DAS AS

11:24AM 14   AN EXPERT, AND WE'RE UPSET ABOUT THAT BECAUSE THE DISCLOSURE

11:24AM 15   WAS MONTHS, MONTHS BEFORE.

11:24AM 16           MR. WADE:  THAT'S RIGHT.

11:24AM 17           THE COURT:  IS THAT YOUR POSITION?

11:24AM 18           MR. WADE:  THAT IS OUR POSITION.  IT'S CLEARLY A

11:24AM 19   TARDY DISCLOSURE, AND IT'S CLEARLY A DEFICIENT DISCLOSURE AS

11:24AM 20   WELL.

11:24AM 21           THE COURT:  AS TO THE EXPERT.  OKAY.  AS TO AN

11:24AM 22   EXPERT.

11:24AM 23           MR. WADE:  YEAH.

11:24AM 24           THE COURT:  DR. DAS, AND THIS IS THE QUESTION THAT

11:24AM 25   MS. VOLKAR IS GOING TO ANSWER, WHETHER OR NOT -- WHO IS THIS

58

11:24AM  1       WITNESS AND WHAT IS HE.

11:24AM  2              LET ME SHIFT TO MS. VOLKAR FOR JUST A MINUTE.

11:24AM  3                  MR. WADE:  SURE.

11:24AM  4                  THE COURT:  MS. VOLKAR, THANK YOU FOR GETTING ME TO

11:24AM  5       AT LEAST TO WHERE I'M INTERESTED IN.

11:24AM  6                  MS. VOLKAR:  ABSOLUTELY, YOUR HONOR.

11:25AM  7              AND WITH THAT, I WANT TO TALK ABOUT WHO DR. DAS IS FOR

11:25AM  8       JUST A MOMENT, BECAUSE IT IS THE GOVERNMENT'S POSITION THAT

11:25AM  9       HE'S NOT AN EXPERT, HE IS A PERCIPIENT WITNESS.

11:25AM 10              BUT I WANT TO FIRST DIRECTLY ANSWER THE COURT'S QUESTIONS,

11:25AM 11       WHICH IS THE TIMELINE.

11:25AM 12              SO THE GOVERNMENT FIRST INTERVIEWED DR. DAS IN FEBRUARY OF

11:25AM 13       2021.  THE GOVERNMENT HADN'T INTERVIEWED HIM BEFORE THAT DATE.

11:25AM 14              TWO WEEKS LATER THE GOVERNMENT INCLUDED THAT SUMMARY OF

11:25AM 15       HIS INTERVIEW IN ITS RESPONSE IN CONNECTION WITH THE MOTION IN

11:25AM 16       LIMINE ORDER AND QUOTED FROM IT.  IN FACT, THE GOVERNMENT WAS

11:25AM 17       TALKING ABOUT HOW MULTIPLE LAB DIRECTORS HAD STATED THAT THE

11:25AM 18       TESTS WERE INACCURATE AND UNRELIABLE QUOTING DR. ROSENDORFF

11:25AM 19       QUOTING DR. DAS.

11:25AM 20              THEN DEFENDANT INCLUDED IN HER MATERIALS THE LETTER FROM

11:25AM 21       DR. DAS TO CMS WHICH CONTAINS A LOT OF HIS SAME STATEMENTS THAT

11:25AM 22       HE SAID TO THE GOVERNMENT IN HIS INTERVIEW.

11:25AM 23              AND THE COURT ULTIMATELY DISCUSSED THAT LETTER, THAT

11:25AM 24       APRIL 2016 LETTER TO CMS IN ITS MOTION IN LIMINE ORDER AT

11:25AM 25       PAGE 32.

11:26AM 1    JUNE 3RD THE GOVERNMENT PROVIDED AN AMENDED WITNESS LIST

11:26AM 2    AND INCLUDED DR. DAS.  AND TO THE EXTENT THAT THE COURT IS

11:26AM 3    CURIOUS ABOUT THE DATES THAT OCCURRED IN 2020, I JUST WANT TO

11:26AM 4    TAKE THE COURT BACK FOR A MOMENT AND REMIND EVERYONE IN THE

11:26AM 5    COURTROOM THAT AT THAT MOMENT IN TIME TRIAL WAS SCHEDULED FOR

11:26AM 6    JULY 2020.  THE GOVERNMENT WAS MEETING ITS DISCLOSURE

11:26AM 7    OBLIGATIONS WHEN TRIAL AT THE TIME WAS APPROXIMATELY FOUR

11:26AM 8    MONTHS AWAY.

11:26AM 9        AND, OF COURSE, THE GOVERNMENT, I'M SURE BOTH PARTIES,

11:26AM 10   CONTINUED WITH TRIAL PREPARATION DURING THOSE FOUR MONTHS, BUT

11:26AM 11   UNBEKNOWNST TO EVERYONE A GLOBAL PANDEMIC OCCURRED AND DELAYED

11:26AM 12   THE TRIAL DATE FOR MORE THAN A YEAR.  AND HERE WE ARE.

11:26AM 13       SO THAT'S MY LONGWINDED WAY OF SAYING THAT THERE ARE A LOT

11:26AM 14   OF THINGS THAT OCCURRED FROM THAT INITIAL DISCLOSURE DATE TO

11:26AM 15   THE DISCLOSURE DATE THAT WE'RE TALKING ABOUT NOW, AND TO THE

11:26AM 16   BEST OF MY KNOWLEDGE, THERE WAS NO INTERIM REQUIREMENT FOR AN

11:26AM 17   UPDATED WITNESS LIST.

11:26AM 18       AND TO THE EXTENT THAT THEY IN THEIR REPLY, THE DEFENDANT

11:26AM 19   SAYS HOW COULD WE KNOW TO CHALLENGE A WITNESS WHO WAS NOT

11:26AM 20   DISCLOSED TO US?  BUT MAYBE NOT THE VAST MAJORITY BUT A

11:27AM 21   SUBSTANTIAL PORTION OF THE DEFENDANT'S MOTIONS IN LIMINE

11:27AM 22   CHALLENGED ITEMS THAT WERE NOT YET ON THE GOVERNMENT'S OFFICIAL

11:27AM 23   EXHIBIT LIST OR WITNESS LIST, MOST OBVIOUSLY THE AGENCY REPORTS

11:27AM 24   THAT WE WERE JUST TALKING ABOUT A MOMENT AGO.  THE FDA REPORTS

11:27AM 25   AND THE CMS REPORTS WERE NOT AT THE TIME ON THE GOVERNMENT'S

11:27AM 1    EXHIBIT LIST.  IN FACT, THEY COMPLAIN ABOUT THAT IN THEIR

11:27AM 2    MOTIONS THAT ARE CURRENTLY BEFORE THE COURT.

11:27AM 3         BUT THAT DIDN'T STOP THEM FROM FILING A MOTION IN LIMINE

11:27AM 4    ABOUT IT.

11:27AM 5         THE REASON I BRING THAT IN, YOUR HONOR, IS BECAUSE DR. DAS

11:27AM 6    WAS DISCLOSED TO THEM, THE SUBSTANCE OF HIS TESTIMONY, IN

11:27AM 7    MID-FEBRUARY OF 2021, TWO WEEKS AFTER THE GOVERNMENT SPOKE TO

11:27AM 8    HIM.  THE GOVERNMENT --

11:27AM 9         THE COURT:  I'M SORRY TO INTERRUPT YOU, MS. VOLKAR.

11:27AM 10        SO THAT -- THE SUBSTANCE OF HIS TESTIMONY, I THINK YOU

11:27AM 11   JUST SAID, IS THAT SUFFICIENT TO PUT A PARTY ON NOTICE THAT

11:27AM 12   THIS IS GOING TO BE AN INTENDED EXPERT WITNESS?

11:27AM 13        MS. VOLKAR:  WELL, YOUR HONOR, AGAIN, THE

11:27AM 14   GOVERNMENT'S POSITION IS THAT HE IS NOT AN EXPERT, BUT I WOULD

11:28AM 15   ALSO SAY THAT AT THE VERY LEAST THEY WERE ON NOTICE OF THE

11:28AM 16   SUBSTANCE OF HIS TESTIMONY.

11:28AM 17        AND I THINK THAT'S PARTICULARLY IMPORTANT IN THIS CASE

11:28AM 18   WHEN ONE OF THEIR MOTIONS IN LIMINE MOVED TO EXCLUDE PORTIONS

11:28AM 19   OF DR. ROSENDORFF, ANOTHER LAB DIRECTOR'S TESTIMONY AS LACKING

11:28AM 20   EXPERT SUPPORT.

11:28AM 21        AS I POINT OUT IN MY OPPOSITION, A LOT OF THE COMPLAINTS

11:28AM 22   THAT THE DEFENDANT RAISED IN THAT MOTION IN LIMINE COULD APPLY

11:28AM 23   EQUALLY TO DR. DAS, WHICH IS ESSENTIALLY IN HIS ROLE AS A LAB

11:28AM 24   DIRECTOR, IN HIS DAY-TO-DAY BUSINESS AS HE WAS MAKING DECISIONS

11:28AM 25   THAT THE DEFENDANT HIRED HIM TO MAKE, THOSE MAY BE BASED ON

61

11:28AM 1    SCIENTIFIC OR PARTICULARIZED KNOWLEDGE, AND, THEREFORE, IT

11:28AM 2    NEEDS EXPERT SUPPORT.

11:28AM 3        YOUR HONOR LARGELY SIDED WITH THE GOVERNMENT AND SAID

11:28AM 4    ACTUALLY HE'S JUST TESTIFYING AS A PERCIPIENT WITNESS AND IN

11:28AM 5    HIS LAY CAPACITY, EVEN IF IT MIGHT BE MORE THAN THE AVERAGE

11:28AM 6    PERSON MIGHT KNOW OFF THE TOP OF THEIR HEAD, BUT BASED ON HIS

11:28AM 7    KNOWLEDGE AND EXPERIENCE, HE WAS DOING HIS DAY-TO-DAY JOB.

11:28AM 8        AND I'LL POINT YOUR HONOR --

11:29AM 9        THE COURT:  SO, MS. VOLKAR, IF -- AND I JUST HEARD

11:29AM 10   YOU SAY DR. DAS IS NOT BEING OFFERED BY THE GOVERNMENT AS AN

11:29AM 11   EXPERT WITNESS?

11:29AM 12       MS. VOLKAR:  WELL, YOUR HONOR, AND THIS IS THE LAST

11:29AM 13   POINT THAT I HAD WANTED TO MAKE --

11:29AM 14       THE COURT:  SURE.

11:29AM 15       MS. VOLKAR:  -- WHICH IS OUR POSITION IS THAT HE'S

11:29AM 16   NOT AN EXPERT.

11:29AM 17       IF YOU LOOK AT THE DISCLOSURE THAT WE SENT TO THE

11:29AM 18   DEFENDANT ON JULY 29TH, 2021, WE SAID ALTHOUGH WE SUBMIT IT IS

11:29AM 19   NOT NECESSARY, AND THE GOVERNMENT SAYS WE SUBMIT IT IS NOT

11:29AM 20   NECESSARY BECAUSE WE BELIEVE DR. DAS IS TESTIFYING AS A

11:29AM 21   PERCIPIENT WITNESS, NOT AN EXPERT WITNESS, BUT WE OURSELVES

11:29AM 22   WERE PUT ON NOTICE THAT DEFENDANT WAS LIKELY TO DISAGREE WITH

11:29AM 23   US BECAUSE IN A FOOTNOTE TO THEIR JUNE 25TH, 2021 FILING

11:29AM 24   REGARDING -- CONTESTING DR. MASTER'S SUPPLEMENTAL REPORT THEY

11:29AM 25   FLAGGED, THERE'S NO WAY THAT DR. DAS COULD TESTIFY ABOUT ANY OF

| | | |
|---|---|---|
| 11:29AM | 1 | THESE ITEMS THAT HE WITNESSED AS LAB DIRECTOR AT THERANOS |
| 11:29AM | 2 | BECAUSE THE GOVERNMENT HAS NOT NOTICED HIM AS AN EXPERT. |
| 11:30AM | 3 | SO HERE WE ARE JUNE 2021, WE, FOLLOWING THE COURT'S MOTION |
| 11:30AM | 4 | IN LIMINE ORDERS, BELIEVE WE ARE EVEN MORE SECURE IN OUR BELIEF |
| 11:30AM | 5 | THAT DR. DAS IS NOT AN EXPERT, WE GET NOTICE FOR THE FIRST TIME |
| 11:30AM | 6 | FROM THEM THAT THEY BELIEVE THAT DR. DAS IS -- THE SUBSTANCE OF |
| 11:30AM | 7 | HIS TESTIMONY, WHICH THEY'RE OBVIOUSLY AWARE OF, MIGHT BE |
| 11:30AM | 8 | EXPERT TESTIMONY. |
| 11:30AM | 9 | WITHIN A MONTH OF THAT, WE PROVIDED THAT DISCLOSURE OUT OF |
| 11:30AM | 10 | AN ABUNDANCE OF CAUTION SAYING ALTHOUGH WE SUBMIT IT'S NOT |
| 11:30AM | 11 | NECESSARY, WE ARE PROVIDING YOU YOUR RULE 16 NOTICE.  IF YOU |
| 11:30AM | 12 | BELIEVE THIS IS EXPERT TESTIMONY, THEN HE'S GOING TO TESTIFY |
| 11:30AM | 13 | ABOUT WHAT HE SAID IN THOSE INTERVIEWS.  WE DON'T BELIEVE IT IS |
| 11:30AM | 14 | EXPERT TESTIMONY. |
| 11:30AM | 15 | SO THAT'S MY WAY OF SAYING, YOUR HONOR, FOR THE NOTICE |
| 11:30AM | 16 | POINT, THEY HAD NOTICE OF THE SUBSTANCE.  AS SOON AS WE |
| 11:30AM | 17 | UNDERSTOOD THAT THEY MIGHT CONSIDER IT EXPERT TESTIMONY, EVEN |
| 11:30AM | 18 | IF WE DISAGREED, WE'VE PROVIDED THEM THAT NOTICE. |
| 11:30AM | 19 | AND TO YOUR POINT, YOUR HONOR, WHERE IS THE PREJUDICE? |
| 11:30AM | 20 | THAT IS OUR QUESTION, WHERE IS THE PREJUDICE? |
| 11:30AM | 21 | THEY ALREADY FILED MOTIONS IN LIMINE ON SIMILAR TOPICS |
| 11:30AM | 22 | WITH RESPECT TO DR. ROSENDORFF THAT COULD EASILY BE APPLIED OR |
| 11:31AM | 23 | THEY COULD ARGUE ABOUT WHETHER THEY ARE OR ARE NOT APPLICABLE |
| 11:31AM | 24 | TO DR. DAS.  THERE'S A DAUBERT HEARING.  THE BINDER THAT |
| 11:31AM | 25 | MR. WADE BROUGHT TODAY, THOSE ARE ALSO THE MATERIALS WITH |

63

11:31AM 1    RESPECT TO DR. MASTER.  THAT'S IN PART, PART OF THE REASON WHY

11:31AM 2    THEY ASKED TO MOVE AND TO VACATE THE DAUBERT HEARING WHICH

11:31AM 3    WOULD HAVE OTHERWISE ALREADY OCCURRED WITH RESPECT TO

11:31AM 4    DR. MASTER BECAUSE THEY WANTED TIME TO GO THROUGH THOSE

11:31AM 5    MATERIALS.

11:31AM 6        WHAT I'M SUBMITTING TO YOU, YOUR HONOR, IS THAT THESE

11:31AM 7    ISSUES HAVE BEEN THERE, ARE THERE, THEY'RE VERY MUCH AWARE OF

11:31AM 8    THEM.  THERE'S NO PREJUDICE WITH RESPECT TO THIS PURPORTEDLY

11:31AM 9    LATE DISCLOSURE OF DR. DAS.

11:31AM 10       NOW, WITH YOUR HONOR'S PERMISSION, I'D REALLY LIKE TO TALK

11:31AM 11    ABOUT WHY I THINK DR. DAS IS NOT AN EXPERT.

11:31AM 12        THE COURT:  THAT'S MY QUESTION IS IF HE'S NOT AN

11:31AM 13    EXPERT, THEN WE DON'T HAVE TO WORRY ABOUT RULE 16 AS AN EXPERT.

11:31AM 14    WE DON'T HAVE TO WORRY ABOUT DAUBERTS, ET CETERA.

11:31AM 15       BUT WHAT WE DO HAVE TO HAVE CONCERN ABOUT, THE COURT HAS

11:31AM 16    TO BE CONCERNED ABOUT IS WHETHER OR NOT HIS TESTIMONY WILL PART

11:32AM 17    FROM THAT OF A LAY OBSERVER AND MOVE INTO MORE TECHNICAL

11:32AM 18    TESTIMONY WHERE OTHER TYPES OF EXPERTISE ANALYSIS WOULD BE

11:32AM 19    REQUIRED TO RECEIVE.

11:32AM 20        MS. VOLKAR:  ABSOLUTELY, YOUR HONOR.

11:32AM 21       AND THAT'S WHERE I WANTED TO FIRST NOTE BECAUSE I DO

11:32AM 22    APOLOGIZE, IT'S NOT IN MY OPPOSITION, BUT JUST DOWN THE HALL

11:32AM 23    JUDGE FREEMAN ACTUALLY RECENTLY RULED ON A VERY SIMILAR ISSUE

11:32AM 24    WITH RESPECT TO ENGINEERS IN THE CHEN CASE, AS YOU MIGHT KNOW

11:32AM 25    IS STILL GOING ON AT THIS MOMENT IN TIME.  AND THAT'S CASE

**ER-3505**

64

11:32AM  1    NUMBER 5-17-CR-603, ECF 291, PAGES 15 TO 16.  SHE ACTUALLY

11:32AM  2    TALKS ABOUT HOW THE ENGINEERS ARE JUST TALKING ABOUT THEIR

11:32AM  3    DAY-TO-DAY ABILITIES.  THEY MAY HAVE PARTICULARIZED KNOWLEDGE.

11:32AM  4    THEY'RE NOT TESTIFYING ABOUT WHETHER OR NOT IT'S A TRADE

11:32AM  5    SECRETS, THE QUESTION THAT IS AT ISSUE IN THAT CASE, BUT

11:32AM  6    THEY'RE ALLOWED TO TALK ABOUT HOW THEY CAME TO THE DECISIONS

11:33AM  7    THEY REACHED, AND WHAT THEY WERE DOING, AND HOW THEY WERE

11:33AM  8    FURTHERING THEIR DAY-TO-DAY JOB THAT THEY WERE HIRED FOR.

11:33AM  9         THE COURT:  THERE ARE CASES THAT SPEAK TO THAT.  WE

11:33AM  10   KNOW THAT THERE ARE NINTH CIRCUIT CASES AND OTHER CIRCUITS THAT

11:33AM  11   TALK ABOUT THAT DISTINCTION.  THAT'S WHAT I SUPPOSE YOU'RE

11:33AM  12   GOING TO TELL ME NOW ABOUT WHY THIS WITNESS CAN TESTIFY AS A

11:33AM  13   LAY WITNESS AND WHETHER OR NOT THERE'S GOING TO BE CONCERNS

11:33AM  14   ABOUT EXPERTISE THAT THE COURT HAS TO POLICE OR THERE WILL BE

11:33AM  15   OBJECTIONS, THOSE TYPES OF THINGS.

11:33AM  16        WE ALL KNOW WHAT'S GOING TO HAPPEN.

11:33AM  17        MS. VOLKAR:  RIGHT.  THAT'S CORRECT, YOUR HONOR.

11:33AM  18        AND WE SUBMIT, AS WE PROVIDED A LITTLE BIT OF A

11:33AM  19   DESCRIPTION IN OUR OPPOSITION FOR THE COURT, THAT DR. DAS IS

11:33AM  20   GOING TO TESTIFY ABOUT HE WAS HIRED AS LAB DIRECTOR AT THERANOS

11:33AM  21   IN LATE 2015, STARTED AS A CONTRACTOR ROLE, BECAME A

11:33AM  22   FULL-FLEDGED EMPLOYEE IN 2016.

11:33AM  23        AND WHEN HE WAS INTERVIEWED BY THE DEFENDANT HOLMES AND

11:34AM  24   HER CODEFENDANT, BALWANI, HE WAS TOLD WE WANT YOU TO SORT OF

11:34AM  25   RESPOND TO SOMETHING.  HE DIDN'T KNOW EXACTLY WHAT IT WAS AT

| | | |
|---|---|---|
| 11:34AM | 1 | THE TIME, BUT IT TURNED OUT THEY HIRED HIM TO HELP RESPOND TO |
| 11:34AM | 2 | THE CMS INVESTIGATION.  AND BECAUSE OF THAT, HE WAS ONE OF THE |
| 11:34AM | 3 | KEY PEOPLE THAT WAS PUT IN CHARGE OF MARSHALLING AND GETTING |
| 11:34AM | 4 | THE FACTS AND RESPONDING TO CMS, AND HE ULTIMATELY CONCLUDED |
| 11:34AM | 5 | THAT CMS WAS 100 PERCENT CORRECT IN ITS FINDINGS. |
| 11:34AM | 6 | AND HE, IN HIS DAY-TO-DAY JOB, WAS REVIEWING WHAT THE LAB |
| 11:34AM | 7 | PRACTICES WERE, HOW THE TESTS WERE BEING RUN, THE QC, AND IN |
| 11:34AM | 8 | MULTIPLE DIFFERENT WAYS HE WAS TESTING WHETHER OR NOT HE |
| 11:34AM | 9 | THOUGHT IT WAS UP TO PAR, AND HE, IN HIS EXPERIENCE AS SOMEONE |
| 11:34AM | 10 | WHO WAS HIRED FOR THIS PURPOSE AS A LAB DIRECTOR, DETERMINED IT |
| 11:34AM | 11 | DID NOT MEET EVEN THE LOWEST BAR. |
| 11:34AM | 12 | AND WHEN HE WENT TO EXPLAIN THAT TO MS. HOLMES, THE CEO, |
| 11:34AM | 13 | WHEN HE WENT TO TELL HIS BOSS WE NEED TO DO SOMETHING |
| 11:34AM | 14 | DIFFERENTLY, HE DECIDED TO USE A SIGMA METRIC BECAUSE HE |
| 11:34AM | 15 | THOUGHT IT WAS THE EASIEST WAY TO CONVEY WHAT HE SAW AS A |
| 11:35AM | 16 | LARGER PROBLEM. |
| 11:35AM | 17 | SO HE USED ESSENTIALLY THIS MATHEMATICAL FORMULA, AND HE |
| 11:35AM | 18 | DESCRIBED EXACTLY HOW IT'S CALCULATED, IT'S ADDITION, |
| 11:35AM | 19 | SUBTRACTION, AND DIVISION, AND HE SAYS BASED ON DATA THAT IS |
| 11:35AM | 20 | INCLUDED IN THERANOS'S GENERATED DOCUMENTS, AND HE SAYS THIS |
| 11:35AM | 21 | PRODUCES ONE NUMBER THAT HE THINKS IT'S EASY TO CONVEY WHY HE |
| 11:35AM | 22 | HAD CONCERNS ABOUT THE ACCURACY OR RELIABILITY OF THE TESTS. |
| 11:35AM | 23 | SO WHAT I'M TRYING TO GET AT THERE, YOUR HONOR, IS THAT |
| 11:35AM | 24 | HE'S TALKING ABOUT IN HIS DAY-TO-DAY HE WAS INFORMING |
| 11:35AM | 25 | MS. HOLMES ABOUT WHY AND HOW THEY SHOULD RESPOND TO CMS.  HE |

11:35AM 1    WAS EXPLAINING WHY AND HOW HE THOUGHT THAT THERE WERE

11:35AM 2    DEFICIENCIES IN THE LAB THAT NEEDED TO BE CORRECTED, HE WAS

11:35AM 3    TALKING ABOUT THE QUALITY CONTROL AND ANY ERRORS THAT HE SAW IN

11:35AM 4    IT.

11:35AM 5        AND ALTHOUGH ALL OF THAT MAY SOUND SCIENTIFIC TO YOU OR I

11:35AM 6    OR OTHERS IN THE COURTROOM, AT THE END OF THE DAY, HE WAS DOING

11:36AM 7    THE JOB HE WAS HIRED TO DO, AND HE WAS PASSING ON THE

11:36AM 8    INFORMATION THAT HE WAS ASKED AND HIRED TO PASS ON.

11:36AM 9        AND WHEN HE COMES TO TESTIFY, IF YOUR HONOR WANTS TO PLACE

11:36AM 10   ANY LIMITATIONS ON, FOR EXAMPLE, HOW DETAILED HE DESCRIBES

11:36AM 11   THOSE UNDERLYING PROCESSES, AT THE END OF THE DAY WHAT HE'S

11:36AM 12   GOING TO TESTIFY ABOUT IS I DID MY JOB, AS A RESULT OF DOING MY

11:36AM 13   JOB, I DETERMINED THAT THESE TESTS DID NOT MEET EVEN THE LOWEST

11:36AM 14   BAR AND I HAD TO GO TELL MY BOSS THAT.  AND I NEEDED TO BE ABLE

11:36AM 15   TO EXPLAIN IT IN A WAY --

11:36AM 16       THE COURT:  AND IF HE SAYS THAT WITHOUT REFERENCE TO

11:36AM 17   A SIGMA ANALYSIS, OR SOMETHING LIKE THAT, THAT'S DIFFERENT,

11:36AM 18   ISN'T IT?

11:36AM 19       IF HE SAYS MY JOB IS TO ENSURE THAT THE LAB IS OPERATING

11:36AM 20   AS REPRESENTED AND IN COMPLIANCE WITH ALL REGULATIONS, I

11:36AM 21   CHECKED X TO DO THAT, AND I LOOK AT A SPREADSHEET, FOR EXAMPLE,

11:36AM 22   THAT TELLS ME, INFORMS ME OF MY RESPONSIBILITIES, AND I GATHER

11:36AM 23   THAT INFORMATION, AND I REPORT IT TO MY BOSS.

11:37AM 24       MS. VOLKAR:  I MOSTLY AGREE, YOUR HONOR.

11:37AM 25       I WOULD ALSO SUBMIT THAT THE SIGMA METRIC, MUCH LIKE

67

11:37AM  1    SEVERAL OF THE ITEMS THAT WE TALKED ABOUT WITH RESPECT TO

11:37AM  2    DR. ROSENDORFF IN THE MOTION IN LIMINE, THE MULTIPLEX SEEN, THE

11:37AM  3    REFERENCE RANGES, AT THE END OF THE DAY THESE ARE STILL THINGS

11:37AM  4    THAT DO NOT REQUIRE SOME ELABORATE METHODOLOGY OR DEEP

11:37AM  5    EXPLANATION, AT LEAST THAT'S THE GOVERNMENT'S POSITION.  AND SO

11:37AM  6    WE BELIEVE --

11:37AM  7          THE COURT:  WELL, THAT'S A QUESTION, IS IT EVERY DAY

11:37AM  8    LIFE REASONING?  DOES IT REQUIRE SPECIFIC SPECIALIST REASONING?

11:37AM  9    THAT'S THE ISSUE, ISN'T IT?

11:37AM  10      AND HE MAY TESTIFY I LOOK AT THIS, I GOT THE RESULTS, PART

11:37AM  11   OF THESE RESULTS I BELIEVE ARE GENERATED BY USING SOMETHING

11:37AM  12   CALLED THE SIGMA, WHATEVER IT IS, AND NOT TESTIFY ABOUT WHAT

11:37AM  13   THE SIGMA IS.  AND YOU MIGHT HAVE AN EXPERT COME IN AND SAY

11:37AM  14   THIS IS WHAT THE SIGMA IS, BUT IT DOESN'T COME THROUGH HIM.

11:37AM  15         MS. VOLKAR:  YOUR HONOR, THAT'S ENTIRELY POSSIBLE.

11:37AM  16   AND IF THE COURT WERE TO RULE THAT, THE GOVERNMENT WOULD

11:38AM  17   ABSOLUTELY FOLLOW THAT, ESPECIALLY BECAUSE, OF COURSE, WE STILL

11:38AM  18   HAVE DR. MASTER THAT I KNOW WE'VE BEEN TALKING ABOUT TODAY.

11:38AM  19      BUT I DO WANT TO POINT YOUR HONOR BACK TO THE CHEN CASE

11:38AM  20   WITH JUDGE FREEMAN THAT I MENTIONED BECAUSE IN HER ORDER SHE

11:38AM  21   ACTUALLY TALKS ABOUT HOW THE ADVISORY COMMITTEE NOTES POINT OUT

11:38AM  22   THAT IT'S SPECIALIZED KNOWLEDGE THAT ONE WOULDN'T NECESSARILY

11:38AM  23   HAVE BUT NOT NECESSARILY SOMETHING THAT WAS GARNERED JUST AS A

11:38AM  24   RESULT OF BEING IN HIS OR HER POSITION WITH THE EXPERTISE THAT

11:38AM  25   THEY HAVE.

68

11:38AM 1          THE COURT:  I THINK WE ALL UNDERSTAND THAT.  PEOPLE

11:38AM 2   HAVE JOB DESCRIPTIONS, AND THEY'RE ENTITLED TO TALK ABOUT THEIR

11:38AM 3   JOB DESCRIPTIONS.

11:38AM 4          BUT IF THEY START TALKING ABOUT THINGS THAT ARE OUTSIDE,

11:38AM 5   AS THE CASES TELL US, EVERY-DAY-LIFE-TYPE SITUATIONS, THAT

11:38AM 6   BECOMES THE ISSUE THEN, WHEN DOES, WHEN DOES A NON-EXPERT

11:38AM 7   TESTIMONY MORPH INTO EXPERTISE?

11:38AM 8          AS I'VE SAID, THAT'S SOMETHING THAT WE'LL PROBABLY HAVE TO

11:38AM 9   LOOK AT HERE.

11:39AM 10         IF YOU'RE NOT OFFERING THIS WITNESS AS AN EXPERT, THEN I

11:39AM 11  EXPECT MR. WADE'S TEAM WILL RISE TO THEIR FEET IF THEY BELIEVE

11:39AM 12  THAT THE TESTIMONY MOVES INTO THE EXPERTISE LANE.

11:39AM 13         MS. VOLKAR:  WELL, YOUR HONOR, IF THAT IS THE CASE,

11:39AM 14  THEN THE GOVERNMENT WOULD RESPECTFULLY REQUEST THAT DR. DAS BE

11:39AM 15  EXPLICITLY ALLOWED TO TESTIFY THAT HE RAN MULTIPLE TESTS, EVEN

11:39AM 16  IF HE DOESN'T TALK ABOUT WHAT THOSE TESTS ARE, AND HE

11:39AM 17  CONSIDERED IN MULTIPLE DIFFERENT WAYS HOW IT COULD -- WHETHER

11:39AM 18  IT WAS OR WAS NOT MEETING, AGAIN, THAT LOWEST BAR THAT HE

11:39AM 19  TALKED ABOUT, AND THAT WHEN HE DETERMINED IT WAS NOT, HE NEEDED

11:39AM 20  TO GO TELL HIS BOSS, AND HE CHOSE TO DO SO IN A WAY THAT MADE

11:39AM 21  SENSE.

11:39AM 22         THE COURT:  SURE.

11:39AM 23         MS. VOLKAR:  NONE OF THAT TALKED ABOUT ANY SCIENCE

11:39AM 24  PER SE, BUT WE WOULD WANT HIM TO BE ABLE TO TALK AND TESTIFY TO

11:39AM 25  THOSE FACTS WHICH IS EXACTLY WHAT HE SAID IN HIS INTERVIEWS.

UNITED STATES COURT REPORTERS

| | | |
|---|---|---|
| 11:39AM | 1 | THE COURT: OKAY. |
| 11:39AM | 2 | MR. WADE: WHAT COUNSEL JUST DESCRIBED, YOUR HONOR, |
| 11:39AM | 3 | IS AN OPINION THAT HE FORMED ON THE BASIS OF SCIENTIFIC |
| 11:39AM | 4 | KNOWLEDGE IN A METHODOLOGY. |
| 11:40AM | 5 | WITH ALL DUE RESPECT, THE 6 SIGMA CALCULATION, AS THE |
| 11:40AM | 6 | COURT WILL LEARN DURING THIS TRIAL, IS ANYTHING BUT EASY AND IT |
| 11:40AM | 7 | IS ANYTHING BUT DE RIGUEUR IN THE DAY-TO-DAY LIFE OF NEARLY |
| 11:40AM | 8 | ANYONE. IT IS QUITE A COMPLICATED CALCULATION. |
| 11:40AM | 9 | AND A BIG QUESTION WHEN YOU GET TO A CALCULATION LIKE THAT |
| 11:40AM | 10 | IS WHAT IS THE CALCULATION SO THAT THE DEFENDANT HAS NOTICE AND |
| 11:40AM | 11 | CAN CONFRONT THE WITNESS. |
| 11:40AM | 12 | THE CALCULATION IS BASED UPON DATA. WE DON'T KNOW WHAT |
| 11:40AM | 13 | THE DATA IS. |
| 11:40AM | 14 | SO THEY WANT TO OFFER THE ULTIMATE OPINION OF THIS EXPERT, |
| 11:40AM | 15 | BUT THEY DON'T WANT TO COMPLY WITH RULE 16 THAT GIVES US THE |
| 11:40AM | 16 | BASIS AND THE METHODOLOGY SO THAT WE CAN SAY THAT WAS CORRECT |
| 11:40AM | 17 | OR NOT CORRECT. |
| 11:40AM | 18 | HE DID IT IN HIS JOB. HIS JOB, SO WE'RE CLEAR, IS A |
| 11:40AM | 19 | PERCIPIENT WITNESS, HE WAS A UNIQUE PERCIPIENT WITNESS. HE |
| 11:40AM | 20 | WASN'T OBSERVING THE LAB ON A PROSPECTIVE BASIS. NONE OF THE |
| 11:41AM | 21 | ISSUES THAT THEY WANT TO TALK TO HIM ABOUT RELATE TO ONGOING |
| 11:41AM | 22 | SORT OF FORWARD LOOKING OR PRESENT SENSE ACTIVITY. |
| 11:41AM | 23 | THEY ALL RELATE TO RETROSPECTIVE ACTIVITY, HIM LOOKING AT |
| 11:41AM | 24 | DATA, LOOKING AT INFORMATION, PROVIDING A SPECIALIZED |
| 11:41AM | 25 | KNOWLEDGE, AND COMING TO OPINIONS. |

11:41AM 1     THE SECOND 302 HE DOES WITH RESPECT TO THE SIX INCH BINDER

11:41AM 2 ON YOUR HONOR'S DESK.  NONE OF THAT RELATES IN ANY WAY TO

11:41AM 3 ANYTHING THAT HE ACTUALLY DID AT THE TIME.  HE'S INTERPRETING

11:41AM 4 DOCUMENTS THAT HE DIDN'T AUTHOR.

11:41AM 5    THE COURT:  MR. WADE, IS IT -- IS THERE ANY WAY THAT

11:41AM 6 THIS WITNESS COULD TESTIFY AS A PERCIPIENT WITNESS IN YOUR

11:41AM 7 OPINION?

11:41AM 8    MR. WADE:  HE CAN.  PROBABLY I'M GUESSING 20 PERCENT

11:41AM 9 OF HIS TESTIMONY I THINK COULD COME IN.

11:41AM 10 I'D BE HAPPY -- IF THE COURT AND COUNSEL PREFER NOT TO

11:41AM 11 OFFER HIM AS AN EXPERT AND WANTS TO GO LINE BY LINE THROUGH THE

11:42AM 12 302'S AND THE EXHIBITS, I'D BE HAPPY TO POINT OUT THE EXPERT

11:42AM 13 TESTIMONY.  IT'S ACTUALLY NOT THAT DIFFICULT.  WHEN YOU LOOK AT

11:42AM 14 THE 302'S IT SAYS CONCLUDES OPINIONS.  IT'S VERY EXPLICIT.

11:42AM 15    THE COURT:  WELL, MS. VOLKAR TELLS US THEY'RE NOT

11:42AM 16 GOING TO OFFER HIM AS AN EXPERT.  SHE DID THAT AS AN ABUNDANCE

11:42AM 17 OF CAUTION BASED ON A FOOTNOTE IN ONE OF YOUR PLEADINGS, AND

11:42AM 18 SHE THOUGHT OUT OF AN ABUNDANCE OF CAUTION THEY SHOULD JUST

11:42AM 19 INDICATE AS MUCH.

11:42AM 20 WHAT SHE TELLS US TODAY THIS IS NOT AN EXPERT WITNESS.

11:42AM 21 THIS IS NOT A WITNESS THAT THEY INTEND TO HAVE A 702 HEARING OR

11:42AM 22 ANY OF THOSE ANALYSES.  IT'S A PERCIPIENT WITNESS.

11:42AM 23 WHAT WE'RE TALKING ABOUT NOW IS WHAT IS THE -- WHAT ARE

11:42AM 24 THE PARAMETERS FOR THAT PERCIPIENT WITNESS TESTIMONY AS OPPOSED

11:42AM 25 TO GETTING INTO THE EXPERT LANE AND STAYING IN THE PERCIPIENT

71

11:43AM 1   WITNESS LANE.  I THINK THAT'S WHAT WE'RE TALKING ABOUT.

11:43AM 2       I'M CURIOUS WHETHER THIS IS GOING TO BE BECAUSE HE'S NOT

11:43AM 3   GOING TO BE CALLED AS AN EXPERT WITNESS BUT RATHER AS A

11:43AM 4   PERCIPIENT WITNESS, IS THIS SOMETHING THAT WE'LL HAVE TO POLICE

11:43AM 5   AS THE WITNESS TESTIFIES?  IS THIS SOMETHING THAT THE

11:43AM 6   GOVERNMENT WOULD PROVIDE A PROFFER OR AN AREA, AND I'M NOT

11:43AM 7   ASKING YOU TO DO THAT, BUT PROVIDE SOME TYPE OF EVIDENCE OF

11:43AM 8   THESE ARE THE QUESTIONS THAT WE'RE GOING TO ASK?  THIS IS WHAT

11:43AM 9   IT IS.

11:43AM 10      YOU'VE TOLD ME ABOUT THAT ALREADY.  I HAVE SOME CONCERNS

11:43AM 11  ABOUT THE SIGMA 6, WHATEVER THAT IS.  I CAN'T EVEN PRONOUNCE IT

11:43AM 12  CORRECTLY IT'S SO COMPLICATED.

11:43AM 13      SO I THINK THAT'S PROBABLY OUTSIDE THE PURVIEW OF A

11:43AM 14  REASONABLE EVERY DAY LIFE JURY PERSON.  BUT I DO THINK -- LET

11:43AM 15  ME JUST CUT TO THE CHASE, I DO THINK, MR. WADE, THAT THE

11:43AM 16  WITNESS COULD TESTIFY AS A PERCIPIENT WITNESS AND NOT GET INTO

11:43AM 17  ANY OF THOSE SPECIFICS.  I DO THINK THAT'S POSSIBLE.

11:44AM 18      I TALKED A LITTLE BIT ABOUT A HYPOTHETICAL WHERE THAT

11:44AM 19  MIGHT HAPPEN.  THIS IS MY JOB, THIS IS WHAT I DO, I GET THE

11:44AM 20  RESULTS, I LOOK AT THE RESULTS, AND ACCORDING TO -- I COMPARE

11:44AM 21  IT TO WHATEVER IT IS, AND THAT'S NOT MY OPINION, IT'S THE

11:44AM 22  RESULTS, AND I'M REPORTING THE RESULTS.  YOU KNOW, IT'S AT A

11:44AM 23  HIGH LEVEL, OF COURSE.  BUT THOSE TYPES OF TESTIMONY DO NOT, IT

11:44AM 24  SEEMS, INTERFERE INTO AN EXPERT ANALYSIS.

11:44AM 25          MR. WADE:  YOUR HONOR, IF WE CAN PROPERLY AVOID THE

72

| | | |
|---|---|---|
| 11:44AM | 1 | OPINIONS AND CONCLUSIONS AND THINGS THAT HE DID BASED UPON HIS |
| 11:44AM | 2 | EXPERTISE, WE'D BE HAPPY TO LIMIT IT TO THAT 20 PERCENT AND, |
| 11:44AM | 3 | YOU KNOW, MOVE FORWARD. |
| 11:44AM | 4 | WHAT I'M HESITANT ABOUT, YOUR HONOR, IS WE'VE GOTTEN THIS |
| 11:44AM | 5 | DISCLOSURE OVER A YEAR LATE, AND COUNSEL IS RIGHT THAT THE |
| 11:44AM | 6 | TRIAL HAS MOVED, BUT WE'VE ALSO ALWAYS IN THIS CASE, AS |
| 11:44AM | 7 | EVERYONE KNOWS, WE CUED THOSE DISCLOSURES TO MOTIONS PRACTICE |
| 11:44AM | 8 | SO THAT WE CAN PREPARE AND PRESENT EVERYTHING IN AN ORDERLY |
| 11:45AM | 9 | WAY, WHICH WE'VE DONE WITH RESPECT TO ALL OF THE OTHER MATTERS |
| 11:45AM | 10 | THAT HAVE GONE UP, AND WE'VE PREPARED FOR TRIAL ACCORDINGLY. |
| 11:45AM | 11 | SO THIS IS, THIS IS UNQUESTIONABLY LATE. |
| 11:45AM | 12 | BUT MY CONCERN IS THAT IF WE WAIT AND DEFER ON THIS, WE'RE |
| 11:45AM | 13 | NOT GOING TO DRAW THE LINES THE WAY THAT WE THINK IS |
| 11:45AM | 14 | APPROPRIATE, AND THEN THEY'RE GOING TO TRY TO OFFER EXPERT |
| 11:45AM | 15 | TESTIMONY WITH EVEN LESS NOTICE. |
| 11:45AM | 16 | SO I DO HAVE SOME -- AND IF THE COURT WANTS TO WAIT AND |
| 11:45AM | 17 | JUST RULE AND DRAW THE LINES AND CALL BALLS AND STRIKES AND |
| 11:45AM | 18 | THIS IS IN, THIS IS OUT, WE WILL BE WILLING TO DEFER TO THAT. |
| 11:45AM | 19 | BUT I WANT TO BE MINDFUL OF THE CASES, YOUR HONOR, AS I |
| 11:45AM | 20 | HEAR COUNSEL TALK. THE NINTH CIRCUIT HAS BEEN VERY CLEAR AND |
| 11:45AM | 21 | AN ANALOGOUS SET OF CIRCUMSTANCES ARE THESE LAW ENFORCEMENT |
| 11:45AM | 22 | AGENT CASES WHERE YOU'RE DRIVING THE CAR AND YOU'RE OBSERVING |
| 11:45AM | 23 | THINGS AND THE CAR GOES FROM THIS LANE TO THAT LANE AND THAT |
| 11:45AM | 24 | LANE TO THIS LANE, AND I CAN RELAY ALL OF THAT TO THE JURY AND |
| 11:46AM | 25 | I CAN DO IT AND DESCRIBE IT AS AN FBI SPECIAL AGENT, ET CETERA, |

73

| | | |
|---|---|---|
| 11:46AM | 1 | ET CETERA, RIGHT? |
| 11:46AM | 2 | BUT WHEN I SAY THIS MEANS SOMETHING, I CONCLUDED THIS |
| 11:46AM | 3 | MEANT SOMETHING, THAT'S EXPERT TESTIMONY. |
| 11:46AM | 4 | THE COURT:  THAT'S FIGUEROA-LOPEZ THAT YOU'RE |
| 11:46AM | 5 | TALKING ABOUT. |
| 11:46AM | 6 | MR. WADE:  IT IS. |
| 11:46AM | 7 | THE COURT:  OF COURSE WE KNOW THAT THAT WAS A |
| 11:46AM | 8 | HARMLESS ERROR FINDING AT THE END, BUT THERE WAS MENTION OF |
| 11:46AM | 9 | THOSE FACTS AND WHAT HAPPENED AND HOW THERE WAS A CROSSOVER OF |
| 11:46AM | 10 | EXPERTISE, AND THAT'S A GOOD EXAMPLE IN THE DRUG CASES.  WELL, |
| 11:46AM | 11 | THIS WAS -- THE OFFICER TESTIFIED, I THINK, IN MY OPINION, |
| 11:46AM | 12 | THESE ARE ACTIVITIES THAT ARE DONE BY DRUG DEALERS.  IN MY |
| 11:46AM | 13 | OPINION, THESE ARE THINGS THAT ARE DONE BY DRUG DEALERS, |
| 11:46AM | 14 | ET CETERA, WITHOUT BEING PROPERLY, PROPERLY IDENTIFIED AS AN |
| 11:46AM | 15 | EXPERT WITNESS THE COURT SO FOUND.  EXACTLY. |
| 11:46AM | 16 | MR. WADE:  AND HIS OPINION WAS TIED TO ACTION IN |
| 11:46AM | 17 | THAT CASE AS WELL, WHICH IS IMPORTANT TO REMEMBER IN HIS LINE |
| 11:46AM | 18 | OF DUTY AND IN HIS JOB. |
| 11:46AM | 19 | THE COURT:  BASED ON TRAINING AND EXPERIENCE.  HAVE |
| 11:46AM | 20 | YOU EVER HEARD OF THAT BEFORE? |
| 11:46AM | 21 | MR. WADE:  BASED ON TRAINING AND EXPERIENCE IN HIS |
| 11:46AM | 22 | LINE OF DUTY MANY OF THE SAME THINGS THAT COUNSEL WAS JUST |
| 11:47AM | 23 | SPEAKING ABOUT WITH RESPECT TO DAS, AND HE TOOK ACTION BASED |
| 11:47AM | 24 | UPON THAT. |
| 11:47AM | 25 | THE COURT:  RIGHT. |

74

| | | |
|---|---|---|
| 11:47AM | 1 | MR. WADE: SAME THING. |
| 11:47AM | 2 | THE COURT: I UNDERSTAND. I THINK I GET THAT. |
| 11:47AM | 3 | MS. VOLKAR: YOUR HONOR, IF I MAY BE HEARD? |
| 11:47AM | 4 | SO FIRST OF ALL, I THINK PART OF THE REASON THAT WE'RE |
| 11:47AM | 5 | HERE TODAY IS WHAT CONCERNS ME IN HEARING MR. WADE'S STATEMENTS |
| 11:47AM | 6 | IS THAT THEY THINK ONLY 20 PERCENT OF DR. DAS'S TESTIMONY IS |
| 11:47AM | 7 | GOING TO BE ADMISSIBLE. |
| 11:47AM | 8 | FRANKLY, ALTHOUGH I UNDERSTAND THE STATEMENTS FROM |
| 11:47AM | 9 | YOUR HONOR, THE GOVERNMENT SUBMITS THAT EVERYTHING THAT IS IN |
| 11:47AM | 10 | HIS 302'S, THE INTERVIEWS OF HIM, WOULD NOT BE EXPERT TESTIMONY |
| 11:47AM | 11 | AND COMPLETELY UNDERSTAND IF THE COURT DISAGREES ON THE SIGMA |
| 11:47AM | 12 | POINT, FOR EXAMPLE, ALTHOUGH WE RESERVE OUR POSITION, BUT |
| 11:47AM | 13 | CERTAINLY NOT DOWN TO 20 PERCENT OF WHAT HE'S GOING TO TESTIFY |
| 11:47AM | 14 | ABOUT. |
| 11:47AM | 15 | ALL I'M SAYING IS THAT IT DOES SEEM THAT THIS IS SORT OF |
| 11:47AM | 16 | BREWING UP FOR FURTHER, FURTHER DEBATE, AND THAT SEEMS |
| 11:47AM | 17 | SOMETHING LIKE CLEARER LINES NEED TO BE DRAWN AT THIS POINT IN |
| 11:47AM | 18 | TIME, OR, AGAIN, ALTHOUGH THE COURT SUBMITS -- ALTHOUGH THE |
| 11:48AM | 19 | GOVERNMENT SUBMITS IT'S NOT NECESSARY, WE SUBMIT THERE'S NO |
| 11:48AM | 20 | PREJUDICE AND THAT THE DISCLOSURE OF HIM AS AN EXPERT WAS NOT |
| 11:48AM | 21 | UNTIMELY, AND TO THE EXTENT THAT THE COURT DISAGREES, DR. DAS |
| 11:48AM | 22 | COULD BE SUBMITTED FOR A <u>DAUBERT</u> HEARING. OF COURSE, WE HAVE |
| 11:48AM | 23 | ONE THAT IS NOT YET SCHEDULED ON SIMILAR TOPICS. WE STILL |
| 11:48AM | 24 | DISAGREE AND DON'T THINK THAT THEY'VE BEEN PREJUDICED IN ANY |
| 11:48AM | 25 | WAY, SHAPE, OR FORM. |

75

11:48AM 1          THEY ABSOLUTELY KNOW WHAT HE'S GOING TO TALK ABOUT.  THEY

11:48AM 2     ABSOLUTELY KNOW THE BASES FOR WHAT HE'S GOING TO TALK ABOUT.

11:48AM 3     IT OVERLAPS WITH SEVERAL WITNESSES.  THIS IS NOT THE FIRST TIME

11:48AM 4     THAT WE'VE BEEN TALKING ABOUT THIS.

11:48AM 5          I ACTUALLY WANTED TO POINT TO THE FIGUEROA-LOPEZ CASE THAT

11:48AM 6     YOUR HONOR HAS BEEN TALKING ABOUT.  THERE THEY FOUND -- WELL,

11:48AM 7     FIRST OF ALL, THEY FOUND THAT TESTIMONY ABOUT SUSPICIOUS

11:48AM 8     BEHAVIOR DIDN'T NECESSARILY CROSS THE LINES, BUT THERE WAS

11:48AM 9     CERTAINLY TESTIMONY THAT DID NOT CROSS THE LINE.

11:48AM 10          BUT EVEN WHEN THEY FOUND A RULE 16 VIOLATION IN A CASE

11:48AM 11     WHEN THE GOVERNMENT NEVER GAVE RULE 16 DISCLOSURE, THEY HELD IT

11:48AM 12     IS HARMLESS BECAUSE RULE 16 DOES NOT REQUIRE THE EXCLUSION OF

11:49AM 13     EFFECTIVE TESTIMONY.

11:49AM 14          IF THE PERSON HAS THE EXPERTISE AND HAS THE TESTIMONY THAT

11:49AM 15     SUPPORTS HIM AS AN EXPERT, THE COURT IN THAT CASE FOUND, WELL,

11:49AM 16     HE WOULD HAVE BEEN DEEMED AN EXPERT.

11:49AM 17          I SUBMIT TO YOUR HONOR HERE THAT THAT'S EXACTLY WHAT WE'RE

11:49AM 18     LOOKING AT.  DR. DAS IS AN EXPERT.  THE GOVERNMENT DID NOT

11:49AM 19     UNTIMELY DISCLOSE HIM.  THEY DISCLOSED HIM PROMPTLY WHEN WE

11:49AM 20     LEARNED THAT THE DEFENDANT MIGHT DISAGREE WITH US ABOUT THE

11:49AM 21     CATEGORY THAT HIS TESTIMONY CALLS INTO, THEY'VE HAD THE

11:49AM 22     SUBSTANCE OF HIS TESTIMONY FOR MORE THAN SIX MONTHS, AND,

11:49AM 23     AGAIN, THE GOVERNMENT SUBMITS THAT DR. DAS'S TESTIMONY SHOULD

11:49AM 24     BE ALLOWED IN, IN FULL AS PROPOSED.

11:49AM 25          AND IF THE COURT DOES DISAGREE WITH US, THEN PERHAPS WE

**ER-3517**

11:49AM  1    NEED TO HAVE A DAUBERT HEARING, BUT WE REALLY URGE THAT THAT'S

11:49AM  2    NOT NECESSARY.  HE IS AN EXPERT, AND HE IS QUALIFIED TO TALK

11:49AM  3    ABOUT THESE TOPICS.

11:49AM  4            THE COURT:  BUT YOU -- WHAT I HEARD YOU SAY

11:49AM  5    THOUGH -- I'M SORRY, MS. VOLKAR.  JUST SO I CAN GET CLARITY,

11:49AM  6    YOU'RE NOT -- IT'S NOT YOUR INTENT TO -- YOU DON'T BELIEVE THAT

11:49AM  7    YOU NEED TO OFFER HIM AS AN EXPERT, AND IT SOUNDS LIKE YOU'RE

11:50AM  8    NOT DOING THAT.

11:50AM  9            MS. VOLKAR:  THAT'S NOT OUR INTENTION, YOUR HONOR.

11:50AM 10      AGAIN, BECAUSE WE BELIEVE THAT HE'S TESTIFYING ABOUT WHAT

11:50AM 11    HE OBSERVED IN HIS ROLE AS LAB DIRECTOR.  WE BELIEVE THAT HE'S

11:50AM 12    TESTIFIED ABOUT THINGS THAT HE WITNESSED AND PARTICIPATED IN IN

11:50AM 13    THE ROLE THAT HE WAS HIRED FOR BY MS. HOLMES TO DO AT THERANOS,

11:50AM 14    AND SO BECAUSE OF THAT HE CAN CERTAINLY DO THAT WITHOUT

11:50AM 15    REFERENCE TO, FOR EXAMPLE, THE SIGMA METRICS.

11:50AM 16            THE COURT:  RIGHT.

11:50AM 17            MS. VOLKAR:  AGAIN, THE SIGMA METRICS WAS ONE OF

11:50AM 18    MULTIPLE TYPES OF ANALYSES HE RAN IN ORDER TO ANSWER THE

11:50AM 19    QUESTIONS THAT MS. HOLMES AND OTHERS AT THE COMPANY WANTED TO

11:50AM 20    KNOW WHICH WAS IN CONNECTION WITH THE CMS INSPECTION.

11:50AM 21      AND HE USED THE SIGMA METRIC IN PART BECAUSE HE THOUGHT IT

11:50AM 22    WAS ONE OF THE EASIEST WAYS TO EXPLAIN IT BECAUSE IT ULTIMATELY

11:50AM 23    RESULTS IN ONE NUMBER.

11:50AM 24            THE COURT:  THAT'S WHAT HE USED AS A TOOL TO CONVEY

11:50AM 25    THE INFORMATION.  I UNDERSTAND THAT.

77

11:50AM 1       AND HE MAY BE -- YOU'VE HEARD ME.  I THINK I HAVE SOME

11:50AM 2   CONCERNS WITH THAT IF HE'S NOT GOING TO BE AN EXPERT.

11:50AM 3       MS. VOLKAR:  UH-HUH.

11:50AM 4       THE COURT:  AND THAT'S A HEADS UP TO YOU HOW YOU

11:51AM 5   WANT TO FASHION YOUR EXAMINATION IF HE'S NOT AN EXPERT.

11:51AM 6       MS. VOLKAR:  YES.

11:51AM 7       THE COURT:  AND, MR. WADE, I'M NOT INCLINED TODAY TO

11:51AM 8   GIVE 20 PERCENT LIMITATION ON TESTIMONY BECAUSE WE DON'T KNOW

11:51AM 9   WHAT THAT IS YET.  BASED ON MS. VOLKAR'S REPRESENTATION HERE, I

11:51AM 10  DON'T THINK IT'S APPROPRIATE FOR ME TO WHOLESALE LIMIT ANYTHING

11:51AM 11  NOW.

11:51AM 12      I THINK I'VE SHARED WITH YOU MY CONCERNS.  I ASKED ABOUT

11:51AM 13  RULE 16.  I WAS CONCERNED ABOUT THAT AS AN EXPERT NOTICE.

11:51AM 14      WHAT I UNDERSTAND NOW IS, ALTHOUGH MS. VOLKAR BELIEVES

11:51AM 15  THERE'S NO RULE 16 VIOLATION SHE BELIEVES SHE CAN, IF NEEDED,

11:51AM 16  ENGAGE A DAUBERT OR OTHERWISE QUALIFY THIS WITNESS AS AN

11:51AM 17  EXPERT, BUT WHAT I HEAR HER TELLING US TODAY IS THIS WITNESS IS

11:51AM 18  GOING TO BE CALLED AS A PERCIPIENT WITNESS.

11:51AM 19      THE QUESTION OF WHETHER OR NOT THAT TESTIMONY LEAVES THE

11:51AM 20  PUBLIC ARENA, IF YOU WILL, OR CALLS UPON EXPERTISE FOR ITS

11:52AM 21  FOUNDATION IS ONE THAT WE'LL JUST HAVE TO WAIT AND SEE.

11:52AM 22      I'VE GIVEN YOU -- I DON'T WANT TO CALL IT AN ADMONITION,

11:52AM 23  BUT I'VE GIVEN YOU MY CONCERNS.  LET ME PUT IT THAT WAY.

11:52AM 24      MS. VOLKAR:  YOUR HONOR, IF I MAY JUST FOLLOW UP

11:52AM 25  WITH ONE MORE POINT RELATED TO DR. ROSENDORFF IN THE COURT'S

UNITED STATES COURT REPORTERS

**ER-3519**

78

11:52AM 1    MOTION IN LIMINE ORDER, WHEN DISCUSSING WHETHER OR NOT HE CAN

11:52AM 2    TALK ABOUT VIOLATIONS OF INDUSTRY STANDARD AND GOVERNMENT

11:52AM 3    REGULATIONS AND THOSE TYPES OF THINGS, I THINK ALONG A SIMILAR

11:52AM 4    VEIN HERE, THIS COURT HELD THAT HE COULD ABSOLUTELY TALK ABOUT

11:52AM 5    SUCH ITEMS WHEN EVALUATING MS. HOLMES'S INTENT IN THE ALLEGED

11:52AM 6    SCHEME TO DEFRAUD.

11:52AM 7        SO WE JUST WANTED TO PUT FORTH THAT OF COURSE THERE'S

11:52AM 8    ANOTHER ASPECT AS TO WHY ALL OF THIS IS RELEVANT AND PERTINENT

11:52AM 9    AND PERCIPIENT TESTIMONY.

11:52AM 10           THE COURT:  OKAY.  THANK YOU.

11:52AM 11           MR. WADE:  YOUR HONOR, A COUPLE OF MORE POINTS, AND

11:52AM 12   MAYBE THIS IS AN EFFORT TO TRY TO SEEK CLARITY HERE BECAUSE I

11:52AM 13   STILL -- I DON'T -- FIRST OF ALL, DR. ROSENDORFF IS A DISCLOSED

11:52AM 14   EXPERT, OKAY?  SO WE KNEW HE WAS GOING TO BE AN EXPERT, IT WAS

11:52AM 15   TIMELY, AND THE LITIGATION PROCEEDED WITH THE BENEFIT OF THAT.

11:52AM 16       SECOND, I HAVE HEARD COUNSEL SAY THEY BELIEVE THAT THEY

11:53AM 17   CAN OFFER EVERYTHING THAT THEY'VE IDENTIFIED AS PERCIPIENT

11:53AM 18   WITNESS TESTIMONY, AND THEY'RE NOT GOING TO DO A RULE 16

11:53AM 19   DISCLOSURE.

11:53AM 20       BUT RESPECTFULLY, YOUR HONOR, IT'S PLAIN FROM THE RECORD

11:53AM 21   BEFORE THE COURT THAT THAT IS NOT THE CASE.  SO KICKING THIS

11:53AM 22   CAN DOWN THE ROAD AND SAYING WE DON'T NEED TO GET DISCLOSURE

11:53AM 23   HERE IS CREATING A SERIOUS RISK OF THE NEED FOR A CONTINUANCE

11:53AM 24   DOWN THE ROAD BECAUSE I'M NOT EXACTLY SURE WHAT IT IS THAT

11:53AM 25   WE'RE SUPPOSED TO DO HERE.

11:53AM  1      AM I SUPPOSED TO PREPARE TO EXAMINE HIM AS A WITNESS

11:53AM  2   BECAUSE NOW I'M, QUOTE-UNQUOTE, "ON NOTICE OF HIS EXPERT

11:53AM  3   TESTIMONY"?  BECAUSE THAT NOTICE IS DEFICIENT.

11:53AM  4      AND SO IF -- AND IT'S NOT NECESSARILY CURABLE JUST THROUGH

11:53AM  5   A DAUBERT HEARING.  THERE WOULD BE ADDITIONAL BACK WORK THAT

11:53AM  6   WOULD NEED TO BE DONE.  SO I HAVE SOME SERIOUS CONCERNS ABOUT

11:54AM  7   JUST KICKING THIS CAN DOWN THE ROAD.

11:54AM  8      I WANT TO BE CLEAR, I THINK A LOT OF THESE ISSUES ARE

11:54AM  9   EXPERT WITNESSES -- EXPERT ISSUES, AND IF WE DEFER THEM, IT'S

11:54AM 10   CREATING RISK FOR THE COURT.

11:54AM 11         THE COURT:  WELL, I APPRECIATE YOU LOOKING OUT FOR

11:54AM 12   THE COURT.  I ALWAYS DO.

11:54AM 13         MR. WADE:  IT'S GREAT RISK FOR ALL OF US,

11:54AM 14   YOUR HONOR, BECAUSE I THINK WE ALL WANT TO PROCEED AS QUICKLY

11:54AM 15   AS WE CAN.

11:54AM 16         THE COURT:  WE ALL DO, WE WANT TO PROCEED AS

11:54AM 17   EFFICIENTLY AS WE CAN AND ALSO RESPECTING EVERYONE'S INTERESTS

11:54AM 18   AND RIGHTS IN THE CASE.

11:54AM 19      I HOPE I SHARED WITH YOU MY CONCERNS ABOUT THE RULE 16.  I

11:54AM 20   DON'T KNOW IF I COULD BE ANY MORE TRANSPARENT THAN TO TELL YOU

11:54AM 21   THAT.

11:54AM 22      WHAT I ALSO HEARD IS THAT THIS WITNESS IS GOING TO BE --

11:54AM 23   IS NOT CALLED AS AN EXPERT, BUT HE WILL BE CALLED AS A

11:54AM 24   PERCIPIENT WITNESS.

11:54AM 25         AND WE ALL KNOW IN LITIGATION EVERYONE PROCEEDS AT THEIR

80

11:54AM 1     OWN PERIL.  IF A WITNESS IS CALLED AND IF THERE'S A DIVERSION

11:54AM 2     FROM WHAT THE COURT BELIEVES IS APPROPRIATE TESTIMONY, I'M SURE

11:54AM 3     I'LL HEAR ABOUT IT.

11:55AM 4         THERE WAS A MOTION ASKING ME TO SO ADVISE THE JURY IN SOME

11:55AM 5     PRELIMINARY INSTRUCTIONS, IF I RECALL CORRECTLY, BUT -- SO

11:55AM 6     THAT'S -- THANK YOU FOR THE HELP HERE.  I DON'T WANT TO BE COY

11:55AM 7     HERE, BUT I WAS CONCERNED ABOUT RULE 16.  I THINK I'VE GOT

11:55AM 8     INFORMATION ABOUT THAT.

11:55AM 9         MY NEXT CONCERN WAS WHAT IS THIS WITNESS, PERCIPIENT OR

11:55AM 10    EXPERT?

11:55AM 11        IT SOUNDS LIKE MS. VOLKAR'S ARGUMENT IS THAT HE COULD BE

11:55AM 12    EITHER, HE COULD BE BOTH, BUT FOR TODAY'S PURPOSE, JUDGE, WE'RE

11:55AM 13    GOING TO CALL HIM AS A PERCIPIENT WITNESS, AND HE'S GOING TO

11:55AM 14    TESTIFY AS SUCH.

11:55AM 15        I'VE SHARED WITH YOU MY CONCERNS ABOUT THE SIGMA 6, AND I

11:55AM 16    DO THINK THAT THAT GOES BEYOND THE EVERY DAY LIFE EXPERIENCES

11:55AM 17    OF THE JURY, AND YOU CAN TAKE THAT CAUTION FOR WHAT IT IS AND

11:55AM 18    WHAT IT IS WORTH.

11:55AM 19        BUT THERE ARE OTHER AVENUES, AND WE ALL AGREE THAT THERE

11:55AM 20    ARE PERCIPIENT WITNESSES THAT CAN TESTIFY ABOUT THEIR JOBS,

11:55AM 21    ABOUT WHAT THEY DO, WHAT THEIR JOB TITLE ENCOMPASSES, AND WHAT

11:56AM 22    THEIR JOB DUTIES ARE, AND THOSE DON'T NECESSARILY GO INTO AN

11:56AM 23    EXPERTISE TYPE OF ANALYSIS.  IT'S WHAT THEY DO.  IT'S THE

11:56AM 24    INFORMATION THAT THEY GATHER WITHOUT ANY ANALYTICS.  IT'S WHAT

11:56AM 25    THEY DO.

81

11:56AM 1      MR. WADE, WHEN YOU GO BACK TO SCHOOL FOR YOUR KIDS AND

11:56AM 2  THEY SAY WHAT DOES A LAWYER DO?

11:56AM 3      WELL, I OBJECT BECAUSE I HAVE A DUTY TO OBJECT I'M

11:56AM 4  INFORMED.

11:56AM 5      WELL, WHAT DO YOU DO?

11:56AM 6      WELL, I OBJECT ABOUT RULE 805.

11:56AM 7      WELL, WHAT IS RULE 805?

11:56AM 8      AND THEN IF YOU START GETTING INTO A DISCOURSE WITH THESE

11:56AM 9  FIFTH GRADERS, THEN IT BECOMES EXPERTISE.  IF YOU SAY, WELL,

11:56AM 10 IT'S JUST SOMETHING THAT WE DO AND YOU CAN'T SAY WHAT IS

11:56AM 11 OUTSIDE OF THE COURT, THAT'S FAIR ENOUGH, THAT'S THE

11:56AM 12 DESCRIPTION.

11:56AM 13     SO LET ME JUST LEAVE IT WITH THAT.  THANK YOU FOR YOUR

11:56AM 14 HELP.  HAVE A GOOD WEEKEND, EVERYONE.  BE SAFE.

11:56AM 15     WE'LL PROBABLY -- ARE WE GOING TO GET TOGETHER NEXT WEEK

11:56AM 16 SOME TIME?  I THINK WE NEED TO GET TOGETHER TO TALK ABOUT JURY

11:57AM 17 SELECTION ISSUES.

11:57AM 18         MR. WADE:  WE'LL BE CONFERRING WITH THE GOVERNMENT,

11:57AM 19 AND WE'LL BE IN TOUCH WITH THE COURT.

11:57AM 20     HAVE WE WORKED OUT THE TIMING?  I THINK MONDAY THE NEXT

11:57AM 21 BATCH OF MATERIALS WILL COME BACK TO THE COURT GIVEN THE COURT

11:57AM 22 IS NOT AVAILABLE ON THE WEEKEND BUT WE'VE BEEN SHARING WITH THE

11:57AM 23 GOVERNMENT ON A TIMELY BASIS.

11:57AM 24         THE COURT:  GREAT.  TERRIFIC.  AND WE'LL HAVE TIME

11:57AM 25 NEXT WEEK TO MEET REGARDING ANY JURY SELECTION ISSUES THAT HAVE

11:57AM  1        NOT YET BEEN RESOLVED.

11:57AM  2                  MR. WADE:  GOOD.

11:57AM  3                  MR. LEACH:  AND, YOUR HONOR, WE DO HAVE THE HEARING

11:57AM  4        ON THURSDAY AS WELL.

11:57AM  5                  THE COURT:  WE DO.  SO WE'LL BE TOGETHER ON THAT

11:57AM  6        DATE AS WELL.

11:57AM  7                  MS. VOLKAR:  YES.  THANK YOU, YOUR HONOR.

11:57AM  8                  THE CLERK:  COURT IS ADJOURNED.

11:57AM  9            (COURT CONCLUDED AT 11:57 A.M.)

        10

        11

        12

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

1

2

3                      CERTIFICATE OF REPORTER

4

5

6

7        I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8    STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9    280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10   CERTIFY:

11       THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16   IRENE RODRIGUEZ, CSR, RMR, CRR
     CERTIFICATE NUMBER 8074

17

18

19          DATED:  AUGUST 23, 2021

20

21

22

23

24

25

# United States District Court

## FOR THE
### NORTHERN DISTRICT OF CALIFORNIA

VENUE:  SAN JOSE

---

UNITED STATES OF AMERICA,

V.

ELIZABETH A. HOLMES and
RAMESH "SUNNY" BALWANI,

CR 18-0258 EJD

| FILED |
| :---: |
| Jul 28 2020 |
| SUSAN Y. SOONG |
| CLERK, U.S. DISTRICT COURT |
| NORTHERN DISTRICT OF CALIFORNIA |
| SAN FRANCISCO |

DEFENDANT(S).

---

# THIRD SUPERSEDING INDICTMENT

118 U.S.C. § 1349 – Conspiracy;
18 U.S.C. § 1343 – Wire Fraud;
18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) – Forfeiture

---

A true bill.

/s/ Foreperson of the Grand Jury
                                    Foreman

---

Filed in open court this __28th____ day of

___ July ___ , 2020 _____.

                                    Clerk

Magistrate Judge Sallie Kim

                    Bail, $ __No Process__

---

ADAM A. REEVES
Attorney for the United States,
Acting Under Authority Conferred By 28 U.S.C. § 515

```
┌─────────────────────────────────┐
│           FILED                 │
│                                 │
│          Jul 28 2020            │
│                                 │
│        SUSAN Y. SOONG           │
│    CLERK, U.S. DISTRICT COURT   │
│  NORTHERN DISTRICT OF CALIFORNIA│
│         SAN FRANCISCO           │
└─────────────────────────────────┘
```

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. CR 18-258 EJD |
| | ) | |
| Plaintiff, | ) | <u>VIOLATIONS</u>: |
| | ) | |
| v. | ) | 18 U.S.C. § 1349 – Conspiracy; 18 U.S.C. § 1343 – |
| | ) | Wire Fraud; 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. |
| ELIZABETH A. HOLMES and | ) | § 2461(c) – Forfeiture |
| RAMESH "SUNNY" BALWANI, | ) | |
| | ) | SAN JOSE VENUE |
| Defendants. | ) | |
| | ) | |

**T H I R D   S U P E R S E D I N G   I N D I C T M E N T**

The Grand Jury charges that, at all relevant times:

<u>Introductory Allegations</u>

1.     The defendant Elizabeth A. Holmes ("HOLMES") resided in the Northern District of California, and owned and operated a health care and life sciences company called Theranos, Inc. ("Theranos" or "Company").  HOLMES founded Theranos in 2003, and served in the role of Chief Executive Officer from 2003 through 2018.

2.     The defendant Ramesh "Sunny" Balwani ("BALWANI") resided in the Northern District of California, and was employed by Theranos from September 2009 through 2016.  BALWANI served in various roles at Theranos: as a member of its Board of Directors, as its President, and as its Chief Operating Officer.

3.       Theranos was a corporation organized under the laws of the State of Delaware with its principal place of business in Palo Alto, California.  Theranos opened and maintained a corporate bank account in Palo Alto, California at Comerica Bank.  Comerica Bank is headquartered in Dallas, Texas.  When Theranos solicited and received financial investments from investors, the money was deposited into its Comerica Bank account.  Theranos's investors included individuals, entities, certain business partners, members of its board of directors, and individuals and entities who invested through firms formed for the exclusive or primary purpose of investing in Theranos's securities.

<u>The Business of Theranos</u>

4.       Theranos was a private health care and life sciences company.  Its stated mission was to revolutionize medical laboratory testing through allegedly innovative methods for drawing blood, testing blood, and interpreting the resulting patient data—all for the purpose of improving outcomes and lowering health care costs.

5.       During its first ten years, from approximately 2003 to approximately 2013, Theranos operated in what HOLMES called "stealth mode," with little public attention.  While operating in "stealth mode," Theranos pursued the development of proprietary technology that could run clinical tests using only tiny drops of blood instead of the vials of blood typically drawn from an arm vein for traditional analysis.  Theranos also worked to develop a method for drawing only a few drops of capillary blood from a patient's finger using a small lancet, and collecting and storing that blood in a proprietary device called the "nanotainer."  Theranos's stated goal was to produce a second proprietary device that could quickly and accurately analyze blood samples collected in nanotainers.  Theranos referred to these devices using several terms, including "TSPU" (or "Theranos Sample Processing Unit"), "Edison," and "miniLab."

6.       In or around 2013, Theranos began to publicize its technological advances.  According to Theranos, its proprietary methods and technologies carried several advantages over conventional blood testing.  For example, Theranos claimed that its laboratory infrastructure yielded test results in less time than conventional labs—requiring hours instead of days.  Theranos claimed that its proprietary technology and methods would minimize the risk of human error and generate results with the highest accuracy.  According to Theranos, the small blood sample size required for Theranos's proprietary tests,

and its method of collecting blood by finger stick, would also benefit elderly individuals with collapsed veins, individuals who required frequent blood tests due to chronic health conditions, and any individual who feared needles.  In addition, Theranos claimed that its blood tests provided substantial cost savings, advertising that it billed all of the tests on the Medicare Clinical Laboratory Fee Schedule at rates 50% or more below the published reimbursement rate.

7.      Prior to its commercial launch, HOLMES heavily promoted Theranos's supposed technological and operational capabilities.  In a September 2013 press release, Theranos claimed that it had "eliminat[ed] the need for larger needles and numerous vials of blood" by relying instead on samples "taken from a tiny finger stick or a micro-sample taken from traditional methods."  In another press release, dated November 13, 2013, Theranos touted its use of "blood sample[s] as small as a few drops—1/1000[th] the size of a typical blood draw."  In that same statement, the Company again declared that it had "eliminat[ed] the need for large needles and numerous vials of blood typically required for diagnostic lab testing."

8.      In addition to directing the actions of the Company, HOLMES also made statements to the media advertising the capabilities of Theranos's technology.  In an interview for a *Wall Street Journal* article published on September 9, 2013, HOLMES said that Theranos could "run any combination of tests, including sets of follow-on tests" at once, very quickly, all from a single small blood sample.

9.      Theranos also used its website to increase awareness of its technology.  On its website, Theranos displayed a nanotainer of blood balanced on a fingertip along with the slogan, "one tiny drop changes everything."  The website also assured visitors that "for the first time," Theranos's laboratory could perform tests "quickly and accurately on samples as small as a single drop."

Theranos's Partnership with Walgreens

10.      As part of its commercial launch, as early as 2010, Theranos pursued a partnership with national pharmacy chain Walgreens.  On September 9, 2013, Theranos announced that it would be rolling out Theranos "Wellness Centers" inside Walgreens retail locations.  In a press release on that date, Theranos promoted its testing services by stating that "consumers can now complete any clinician-directed lab test with as little as a few drops of blood and results available in a matter of hours."

Theranos offered tests to the public beginning in late 2013 through its Wellness Centers located in Walgreens stores in Palo Alto, California as well as in Phoenix, Arizona and surrounding areas.

<u>The Scheme to Defraud Investors</u>

11.     From a time unknown but no later than 2010 through 2015, HOLMES and BALWANI, and others known and unknown to the Grand Jury, through their company, Theranos, engaged in a scheme, plan, and artifice to defraud investors as to a material matter, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, by making materially false and misleading statements, and failing to disclose material facts with a duty to disclose.

12.     Beginning in approximately 2010, HOLMES and BALWANI made materially false and misleading statements to investors and failed to disclose material facts, using, among other things: (1) false and misleading written and verbal communications; (2) marketing materials containing false and misleading statements; (3) false and misleading financial statements, models, and other information; and (4) false and misleading statements to the media.  HOLMES and BALWANI:

(A) represented to investors that, at the time the statement was made, Theranos's proprietary analyzer—the TSPU, Edison, or miniLab—was presently capable of accomplishing certain tasks, such as performing the full range of clinical tests using small blood samples drawn from a finger stick and producing results that were more accurate and reliable than those yielded by conventional methods—all at a faster speed than previously possible; when, in truth, HOLMES and BALWANI knew that Theranos's proprietary analyzer had accuracy and reliability problems, performed a limited number of tests, was slower than some competing devices, and could not compete with larger, conventional machines in high-throughput, or the simultaneous testing of blood from many patients, applications;

(B) represented to investors that Theranos was presently a financially strong and stable company, including that Theranos would generate over $100 million in revenues and break even in 2014, and that Theranos expected to generate approximately $1 billion in revenues in 2015; when, in truth, HOLMES and BALWANI knew that Theranos had and would generate only modest revenues, roughly a few hundred thousand dollars or so, in 2014 and 2015;

(C) deceived investors through misleading technology demonstrations intended to cause potential investors to believe that blood tests were being conducted on Theranos's proprietary analyzer; when, in truth, HOLMES and BALWANI knew that Theranos's proprietary analyzer was running a "null protocol" during the demonstration to make the analyzer appear to be operating, but was not testing the potential investor's blood, and yet failed to disclose that fact;

(D) represented to investors that Theranos presently had an expanding partnership with Walgreens, that is, Theranos would soon dramatically increase the number of Wellness Centers within Walgreens stores; when, in truth, HOLMES and BALWANI knew, by late 2014, that Theranos's retail Walgreens rollout had stalled because of several issues, including that Walgreens's executives had concerns with Theranos's performance;

(E) represented to investors that Theranos presently had a profitable and revenue-generating business relationship with the United States Department of Defense, and that Theranos's technology had deployed to the battlefield; when, in truth, HOLMES and BALWANI knew that Theranos had limited revenue from military contracts and its technology was not deployed in the battlefield;

(F) represented to investors that Theranos did not need the Food and Drug Administration ("FDA") to approve its proprietary analyzer and tests, but instead that Theranos was applying for FDA approval voluntarily because it was the "gold standard"; when, in truth, HOLMES and BALWANI knew that by late 2013 and throughout 2014, the FDA was requiring Theranos to apply for clearance or approval for its analyzer and tests;

(G) represented to investors that Theranos conducted its patients' tests using Theranos-manufactured analyzers; when, in truth, HOLMES and BALWANI knew that Theranos purchased and used for patient testing third party, commercially-available analyzers;

(H) represented to investors that Theranos's technology had been examined, used, and validated by several national or multinational pharmaceutical companies and research institutions; when, in truth, HOLMES and BALWANI knew that these pharmaceutical companies and research institutions had not examined, used, or validated Theranos's technology; and

(I) represented to members of the media for publication many of the false and misleading statements described above within paragraph 12(A) – 12(H), and shared the resulting articles with potential investors both directly and via the Theranos website, knowing their statements to members of the media were false and misleading.

13.      After receiving false and misleading statements, misrepresentations, and omissions from HOLMES and BALWANI, persons known to the Grand Jury as Investors 1, 2, 3, 4, 5, and 6 initiated electronic wire transfers for the purpose of investing money in Theranos.  These wires, specifically alleged in paragraph 24 of this Third Superseding Indictment, used a domestic electronic funds transfer system known as the Fedwire system, which is owned and operated by the United States Federal Reserve System.  All Fedwire wire transfers alleged in this Third Superseding Indictment were electronically routed through Fedwire centers in East Rutherford, New Jersey, Dallas, Texas, or outside California and into Theranos's bank account in the Northern District of California.  All of the wire transfers alleged in this Third Superseding Indictment travelled between one state and another state.

<u>The Scheme to Defraud Patients</u>

14.      Between approximately 2013 and 2016, HOLMES and BALWANI, through advertisements and solicitations, encouraged and induced doctors and patients to use Theranos's blood testing laboratory services.

15.      HOLMES and BALWANI devised a scheme to defraud patients, through advertisements and marketing materials, through explicit and implicit claims concerning Theranos's ability to provide accurate, fast, reliable, and cheap blood tests and test results, and through omissions concerning the limits of and problems with Theranos's technologies.  Based on these representations, many hundreds of patients paid Theranos, or Walgreens acting on behalf of Theranos, for blood tests and test results, sometimes following referrals from their misled doctors.

16.      Despite representing to doctors and patients that Theranos could provide accurate, fast, reliable, and cheap blood tests and test results, HOLMES and BALWANI knew—through, among other means, their involvement in Theranos's day-to-day operations and their knowledge of complaints received from doctors and patients—that Theranos's technology was, in fact, not capable of consistently producing accurate and reliable results.  In particular, HOLMES and BALWANI knew that Theranos

was not capable of consistently producing accurate and reliable results for certain blood tests, including but not limited to bicarbonate, calcium, chloride, cholesterol/HDL/LDL, gonorrhea, glucose, HbA1c, hCG, HIV, LDH, potassium, PSA, PT/INR, sodium, testosterone, TSH, vitamin D (25-OH), and all assays conducted on Theranos's TSPU version 3.5, including estradiol, prolactin, SHBG, thyroxine (T4/free T4), triiodothyronine, and vitamin B-12.

17.     Despite their knowledge of Theranos's accuracy and reliability problems, HOLMES and BALWANI used interstate electronic wires to purchase advertisements intended to induce individuals to purchase Theranos blood tests at Walgreens stores in California and Arizona.  Through these advertisements, HOLMES and BALWANI explicitly represented to individuals that Theranos's blood tests were cheaper than blood tests from conventional laboratories to induce individuals to purchase Theranos's blood tests.  HOLMES and BALWANI held Theranos's blood tests out to individuals as accurate and reliable.  HOLMES and BALWANI:

(A)     transmitted, caused to be transmitted, or otherwise delivered to doctors and patients, including in the form of marketing materials and advertisements, materially false and misleading information concerning the accuracy and reliability of Theranos's blood testing services;

(B)     posted on the Theranos website, or otherwise represented to a broad audience including doctors and patients, materially false and misleading information concerning the accuracy and reliability of Theranos's blood testing services;

(C)     transmitted, caused to be transmitted, or otherwise delivered to doctors and patients Theranos blood test results where HOLMES and BALWANI knew that the tests performed on Theranos technology contained or were likely to contain:

(1)     inaccurate and unreliable results;

(2)     improperly adjusted reference ranges;

(3)     improperly removed "critical" results; and

(4)     results generated from improperly validated assays.

18.     Knowing that the accuracy and reliability of Theranos test results was questionable and suspect, HOLMES and BALWANI oversaw the electronic wiring of test results to patients, including persons known to the Grand Jury as Patients B.B, E.T., and M.E. in paragraph 26 of this Third

Superseding Indictment.  These wires, specifically, the wires alleged in paragraph 26 of this Third

Superseding Indictment, travelled between one state and another.

COUNT ONE:  18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud against Theranos Investors)

   19.   Paragraphs 1 through 18 are realleged and incorporated as if fully set forth herein.

   20.   From a time unknown but no later than approximately 2010 through approximately 2015,

within the Northern District of California, and elsewhere, the defendants,

ELIZABETH A. HOLMES and
RAMESH "SUNNY" BALWANI,

and others known and unknown to the Grand Jury, did knowingly and intentionally conspire and agree

together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section

1343, by devising a scheme and artifice to defraud as to a material matter and to obtain money by means

of materially false and fraudulent representations, specifically by soliciting investments through making

the false and fraudulent representations as set forth in this Third Superseding Indictment.

   All in violation of Title 18, United States Code, Section 1349.

COUNT TWO:  18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud against Theranos Patients)

   21.   Paragraphs 1 through 18 are realleged and incorporated as if fully set forth herein.

   22.   From in or about 2013 through 2016, within the Northern District of California, and

elsewhere, the defendants,

ELIZABETH A. HOLMES and
RAMESH "SUNNY" BALWANI,

and others known and unknown to the Grand Jury, did knowingly and intentionally conspire and agree

together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section

1343, by devising a scheme and artifice to defraud as to a material matter and to obtain money by means

of materially false and fraudulent representations, specifically by soliciting, encouraging, or otherwise

inducing doctors to refer and patients to pay for and use its laboratory and blood testing services under

the false and fraudulent pretense that Theranos technology produced reliable and accurate blood test

results.

   All in violation of Title 18, United States Code, Section 1349.

COUNTS THREE THROUGH EIGHT:  18 U.S.C. § 1343 (Wire Fraud)

     23.     Paragraphs 1 through 22 are realleged and incorporated as if fully set forth herein.

     24.     On or about the dates set forth below, within the Northern District of California, and elsewhere, the defendants,

ELIZABETH A. HOLMES and<br>
RAMESH "SUNNY" BALWANI,

for the purpose of executing the material scheme and artifice to defraud investors, and for obtaining money and property from investors by means of materially false and fraudulent pretenses, representations, promises, and material omissions with a duty to disclose, did knowingly transmit and cause to be transmitted by means of wire communication in interstate commerce certain writings, signs, signals, and pictures, that is, electronic funds transfers and payments from investor bank accounts to Theranos, as further set forth below:

| COUNT | DATE | ITEM WIRED | WIRED FROM | WIRED TO |
|---|---|---|---|---|
| 3 | 12/30/2013 | $99,990 | Investor #1's Charles Schwab/Wells Fargo Bank account | Theranos's Comerica Bank account |
| 4 | 12/31/2013 | $5,349,900 | Investor #6's Pacific Western Bank account | Theranos's Comerica Bank account |
| 5 | 12/31/2013 | $4,875,000 | Investor #2's Texas Capital Bank account | Theranos's Comerica Bank account |
| 6 | 2/6/2014 | $38,336,632 | Investor #3's Citibank account | Theranos's Comerica Bank account |
| 7 | 10/31/2014 | $99,999,984 | Investor #4's Northern Chicago Bank account | Theranos's Comerica Bank account |
| 8 | 10/31/2014 | $5,999,997 | Investor #5's JP Morgan Chase account | Theranos's Comerica Bank account |

     Each in violation of Title 18, United States Code, Section 1343.

COUNTS NINE THROUGH TWELVE:  18 U.S.C. § 1343 (Wire Fraud)

     25.    Paragraphs 1 through 24 are realleged and incorporated as if fully set forth herein.

     26.    On or about the dates set forth below, within the Northern District of California, and elsewhere, the defendants,

ELIZABETH A. HOLMES and
RAMESH "SUNNY" BALWANI,

for the purpose of executing the material scheme and artifice to defraud patients, and for obtaining money and property from patients by means of materially false and fraudulent pretenses, representations, promises, and material omissions with a duty to disclose, did knowingly transmit and cause to be transmitted by means of wire communication in interstate commerce certain writings, signs, signals, and pictures, that is, laboratory and blood test results, telephonic communications regarding test results, and payments for the purchase of advertisements soliciting patients and doctors for its laboratory business, as further set forth below, in violation of Title 18, United States Code, Section 1343:

| COUNT | DATE | WIRED FROM | WIRED TO | DESCRIPTION |
|---|---|---|---|---|
| 9 | 10/12/2015 | Arizona | California | Telephone call from Patient B.B to Theranos regarding laboratory blood test results |
| 10 | 5/11/2015 | California | Arizona | Patient E.T.'s laboratory blood test results |
| 11 | 5/16/2015 | California | Arizona | Patient M.E.'s laboratory blood test results |
| 12 | 8/3/2015 | Theranos's Wells Fargo Bank account in California | Horizon Media, Inc.'s J.P. Morgan Chase Bank account in New York | Electronic Funds Transfer in the amount of $1,126,661.00 to purchase advertisements for Theranos Wellness Centers |

     Each in violation of Title 18, United States Code, Section 1343.

<u>FORFEITURE ALLEGATION</u>:    18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) (Forfeiture of Wire Fraud Proceeds)

27.    The allegations of paragraphs 1 through 26 of this Third Superseding Indictment are realleged and by this reference fully incorporated herein for the purposes of alleging forfeiture pursuant to the provisions of 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

28.    Upon a conviction for the offense alleged in Counts One through Twelve, the defendants,

ELIZABETH A. HOLMES and
RAMESH "SUNNY" BALWANI,

shall forfeit to the United States all property, constituting and derived from proceeds traceable to said offenses, including but not limited to the following property:

(a)    a sum of money equal to the amount of proceeds obtained as a result of the offense.

If any of said property, as a result of any act or omission of the defendant-

(a)    cannot be located upon the exercise of due diligence;

(b)    has been transferred or sold to or deposited with a third person;

(c)    has been placed beyond the jurisdiction of the Court;

(d)    has been substantially diminished in value; or

(e)    has been commingled with other property which cannot be subdivided without difficulty;

Any and all interest defendant has in any other property (not to exceed the value of the above forfeitable property) shall be forfeited to the United States pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1).

///

///

///

///

///

///

///

///

The forfeiture is authorized by Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c); Title 21, United States Code, Section 853(p) as incorporated by Title 18, United States Code, Section 982(b)(1); and the Federal Rules of Criminal Procedure 32.2.

DATED:  July 28, 2020                               A TRUE BILL

                                                    /s/
                                                    _____
                                                    FOREPERSON

ADAM A. REEVES
Attorney for the United States,
Acting Under Authority Conferred By 28 U.S.C. § 515

*/s Robert S. Leach*
_____
JEFFREY SCHENK
ROBERT S. LEACH
JOHN C. BOSTIC
VANESSA BAEHR-JONES
Assistant United States Attorneys

AO 257 (Rev. 6/78)

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT  ☐ INFORMATION  ☒ INDICTMENT

☒ SUPERSEDING

Name of District Court, and/or Judge/Magistrate Location

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

### OFFENSE CHARGED

18 U.S.C. § 1349 – Conspiracy;
18 U.S.C. § 1343 – Wire Fraud;
18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) – Forfeiture

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

PENALTY:  All per count:
20 years imprisonment
$250,000 fine
3 years supervised release
$100 special assessment

☐ DEFENDANT - U.S

▶ Elizabeth Holmes

DISTRICT COURT NUMBER

CR 18-00258 EJD

**FILED**

Jul 28 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

### PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)

FBI, USPS, FDA

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. ATTORNEY  ☐ DEFENSE

SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant

MAGISTRATE CASE NO.

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

Name and Office of Person
Furnishing Information on this form    ADAM A. REEVES

Acting  ☒ U.S. Attorney  ☐ Other U.S. Agency

Name of Assistant U.S.
Attorney (if assigned)    Robert Leach, AUSA

### DEFENDANT

**IS NOT IN CUSTODY**
Has not been arrested, pending outcome this proceeding.
1) ☐ If not detained give date any prior summons was served on above charges ▶

2) ☐ Is a Fugitive

3) ☒ Is on Bail or Release from (show District)

NDCA

**IS IN CUSTODY**
4) ☐ On this charge

5) ☐ On another conviction

6) ☐ Awaiting trial on other charges

} ☐ Federal ☐ State

If answer to (6) is "Yes", show name of institution

Has detainer  ☐ Yes
been filed?  ☐ No

If "Yes"
give date
filed

**DATE OF ARREST** ▶

Month/Day/Year

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED TO U.S. CUSTODY**

Month/Day/Year

☐ This report amends AO 257 previously submitted

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:
☐ SUMMONS  ☒ NO PROCESS*  ☐ WARRANT

If Summons, complete following:
☐ Arraignment  ☐ Initial Appearance

Defendant Address:

Bail Amount:

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment*

Date/Time:                    Before Judge:

Comments:

AO 257 (Rev. 6/78)          Case 5:18-cr-00258-EJD   Document 469   Filed 07/28/20   Page 15 of 15

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT   ☐ INFORMATION   ☒ INDICTMENT

☒ SUPERSEDING

### OFFENSE CHARGED

18 U.S.C. § 1349 – Conspiracy;
18 U.S.C. § 1343 – Wire Fraud;
18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) – Forfeiture

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

PENALTY:   All per count:
20 years imprisonment
$250,000 fine
3 years supervised release
$100 special assessment

[+]

Name of District Court, and/or Judge/Magistrate Location

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

### DEFENDANT - U.S

► Ramesh "Sunny" Balwani

DISTRICT COURT NUMBER

CR 18-00258 EJD

**FILED**

Jul 28 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

### PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)

FBI, USPS, FDA

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. ATTORNEY   ☐ DEFENSE

SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant

MAGISTRATE CASE NO.

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

Name and Office of Person
Furnishing Information on this form      ADAM A. REEVES

Acting   ☒ U.S. Attorney   ☐ Other U.S. Agency

Name of Assistant U.S.
Attorney (if assigned)      Robert Leach, AUSA

### DEFENDANT

**IS *NOT* IN CUSTODY**

1) ☐ Has not been arrested, pending outcome this proceeding. If not detained give date any prior summons was served on above charges ►

2) ☐ Is a Fugitive

3) ☒ Is on Bail or Release from (show District)

NDCA

**IS IN CUSTODY**

4) ☐ On this charge

5) ☐ On another conviction        } ☐ Federal ☐ State

6) ☐ Awaiting trial on other charges

If answer to (6) is "Yes", show name of institution

Has detainer   ☐ Yes    If "Yes"
been filed?    ☐ No     give date filed

**DATE OF ARREST** ►                Month/Day/Year

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED TO U.S. CUSTODY**      Month/Day/Year

☐ This report amends AO 257 previously submitted

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:
☐ SUMMONS   ☒ NO PROCESS*   ☐ WARRANT

If Summons, complete following:
☐ Arraignment   ☐ Initial Appearance

Defendant Address:

Comments:

Bail Amount: _____

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment*

Date/Time: _____     Before Judge: _____

**ER-3540**

1

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                        SAN JOSE DIVISION

5

    UNITED STATES OF AMERICA,          )
6                                       )  CR-18-00258-EJD
                    PLAINTIFF,          )
7                                       )  SAN JOSE, CALIFORNIA
            VS.                         )
8                                       )  JULY 7, 2021
    ELIZABETH A. HOLMES,                )
9                                       )  PAGES 1 - 79
                    DEFENDANT.          )
10  _____     )
                                        )
11

12                 TRANSCRIPT OF ZOOM PROCEEDINGS
              BEFORE THE HONORABLE EDWARD J. DAVILA
13                 UNITED STATES DISTRICT JUDGE

14

   A P P E A R A N C E S:
15

   FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
16                        BY:  JOHN C. BOSTIC
                               JEFFREY B. SCHENK
17                        150 ALMADEN BOULEVARD, SUITE 900
                          SAN JOSE, CALIFORNIA 95113
18
                          BY:  ROBERT S. LEACH
19                             KELLY VOLKAR
                          1301 CLAY STREET, SUITE 340S
20                        OAKLAND, CALIFORNIA 94612

21        (APPEARANCES CONTINUED ON THE NEXT PAGE.)

22

   OFFICIAL COURT REPORTER:
23                           IRENE L. RODRIGUEZ, CSR, RMR, CRR
                             CERTIFICATE NUMBER 8074
24

         PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25            TRANSCRIPT PRODUCED WITH COMPUTER

2

```
 1        A P P E A R A N C E S: (CONT'D)

 2

 3     FOR DEFENDANT HOLMES:   WILLIAMS & CONNOLLY LLP
                               BY:  KEVIN M. DOWNEY
 4                                  LANCE A. WADE
                                    KATHERINE TREFZ
 5                                  AMY SAHARIA
                                    RICHARD CLEARY
 6                             725 TWELFTH STREET, N.W.
                               WASHINGTON, D.C. 20005
 7
                               LAW OFFICE OF JOHN D. CLINE
 8                             BY:  JOHN D. CLINE
                               ONE EMBARCADERO CENTER, SUITE 500
 9                             SAN FRANCISCO, CALIFORNIA 94111

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

| | | |
|---|---|---|
| | 1 | SAN JOSE, CALIFORNIA                                    JULY 7, 2021 |
| | 2 | P R O C E E D I N G S |
| 10:10AM | 3 | (COURT CONVENED AT 10:10 A.M.) |
| 10:10AM | 4 | THE COURT:  THANK YOU.  GOOD MORNING EVERYONE. |
| 10:10AM | 5 | LET'S CALL OUR MORNING MATTER.  THIS IS 18-258, |
| 10:10AM | 6 | UNITED STATES VERSUS ELIZABETH HOLMES. |
| 10:10AM | 7 | LET ME FIRST GET APPEARANCES OF THE PARTIES, PLEASE. |
| 10:10AM | 8 | WHO APPEARS FOR THE GOVERNMENT TODAY? |
| 10:10AM | 9 | MR. BOSTIC:  GOOD MORNING, YOUR HONOR. |
| 10:10AM | 10 | JOHN BOSTIC FOR THE UNITED STATES ALONG WITH ROBERT LEACH, |
| 10:10AM | 11 | JEFF SCHENK, AND KELLY VOLKAR. |
| 10:10AM | 12 | THE COURT:  THANK YOU.  GOOD MORNING EVERYONE. |
| 10:10AM | 13 | WHO APPEARS FOR THE DEFENDANT? |
| 10:10AM | 14 | MS. SAHARIA:  GOOD MORNING, YOUR HONOR. |
| 10:11AM | 15 | THIS IS AMY SAHARIA FOR MS. HOLMES.  WITH ME IS |
| 10:11AM | 16 | KEVIN DOWNEY, LANCE WADE, KATHERINE TREFZ, JOHN CLINE. |
| 10:11AM | 17 | I WILL NOTE THAT MY COLLEAGUE, RICH CLEARY, IS HERE IN |
| 10:11AM | 18 | THIS ROOM WITH ME BUT IS NOT APPEARING ON VIDEO. |
| 10:11AM | 19 | AND MS. HOLMES IS PRESENT.  I SEE HER ON THE SCREEN. |
| 10:11AM | 20 | WE DO HAVE A MECHANISM FOR COMMUNICATING WITH HER IF NEED |
| 10:11AM | 21 | BE, AND SHE DOES CONSENT TO PROCEEDING REMOTELY TODAY. |
| 10:11AM | 22 | THE COURT:  THANK YOU.  THANK YOU FOR THAT.  GOOD |
| 10:11AM | 23 | MORNING EVERYONE. |
| 10:11AM | 24 | THIS IS THE DATE AND TIME THAT WAS SET FOR THE MOTION. |
| 10:11AM | 25 | THIS INVOLVES DOCKETS 810.  IT'S PLAINTIFF'S -- EXCUSE ME -- |

4

10:11AM 1    ELIZABETH HOLMES'S MOTION TO SUPPRESS EVIDENCE.  THERE'S AN

10:11AM 2    OPPOSITION AT 846 AND A REPLY AT 850.  THESE ARE ALL DOCKETS.

10:11AM 3    I HAVE READ AND REVIEWED ALL OF THOSE DOCKETS, THE ATTACHMENTS

10:12AM 4    AND REFERENCES THERETO.

10:12AM 5        ARE THERE ANY OTHER DOCUMENTS THAT COUNSEL WISH TO DRAW TO

10:12AM 6    MY ATTENTION BEFORE WE GO FURTHER?

10:12AM 7        ANYTHING?

10:12AM 8            MS. SAHARIA:  NO, YOUR HONOR.

10:12AM 9        I WOULD JUST NOTE THAT OUR MOTION DOES CROSS-REFERENCE OUR

10:12AM 10   REPLY BRIEF IN SUPPORT OF OUR MOTION IN LIMINE TO EXCLUDE

10:12AM 11   ANECDOTAL EVIDENCE AND THE EXHIBITS ATTACHED TO THAT REPLY

10:12AM 12   BRIEF, AND SOME OF THOSE EXHIBITS MAY BE REFERENCED TODAY AS

10:12AM 13   WELL.

10:12AM 14           THE COURT:  ALL RIGHT.  THANK YOU.

10:12AM 15           MR. BOSTIC:  NO ADDITIONAL FILINGS FROM THE

10:12AM 16   GOVERNMENT.  THANK YOU, YOUR HONOR.

10:12AM 17           THE COURT:  THANK YOU.

10:12AM 18       SO THIS IS A MOTION TO SUPPRESS FILED.  THE FIRST THING I

10:12AM 19   WANTED TO ASK IS ARE WE PAST THE DEADLINE TO FILE RULE 12

10:12AM 20   MOTIONS TO SUPPRESS?  HAS THAT COME AND GONE?

10:12AM 21       WHO WANTS TO ANSWER THAT?  MR. BOSTIC?

10:12AM 22           MS. SAHARIA:  SO, YOUR HONOR --

10:12AM 23           THE COURT:  OH, YES, MS. SAHARIA.  YES.  THANK YOU.

10:12AM 24           MS. SAHARIA:  YES.  I'LL TAKE THAT.

10:12AM 25       SO, YOUR HONOR, THE DEADLINE FOR RULE 12 MOTIONS WAS IN

10:13AM 1    AUGUST OF 2020, BUT THAT MOTION -- THE DEADLINE FOR FILING

10:13AM 2    RULE 12 MOTIONS APPLIES ONLY WHEN THE MOTION IS REASONABLY

10:13AM 3    AVAILABLE AT THE TIME.  THIS MOTION WAS NOT REASONABLY

10:13AM 4    AVAILABLE AT THE TIME BECAUSE THE EVIDENCE ON WHICH IT IS BASED

10:13AM 5    WAS NOT AVAILABLE TO THE DEFENSE OR PRODUCED AT THAT TIME.

10:13AM 6        THE GOVERNMENT FIRST PRODUCED ITS BRADY LETTER DISCLOSING

10:13AM 7    ITS RULE IN THE LOSS OF LIS ONLY IN OCTOBER OF 2020 AND MUCH OF

10:13AM 8    THE EVIDENCE ON WHICH THE MOTION IS BASED HAS BEEN TRICKLED OUT

10:13AM 9    FROM THE GOVERNMENT IN THE MONTHS SINCE THEN.

10:13AM 10       JUST TO GIVE ONE EXAMPLE, OR TWO EXAMPLES.  WE LITIGATED

10:13AM 11   THE MOTION TO EXCLUDE ANECDOTAL TEST RESULTS AT A TIME WHEN THE

10:13AM 12   GOVERNMENT WAS WITHHOLDING SIGNIFICANT EVIDENCE RELATED TO ITS

10:13AM 13   ROLE IN THE LOSS OF THE LIS DATABASE, WHICH IS WHY THE

10:14AM 14   GOVERNMENT ITSELF WAS FORCED TO CONSENT TO OUR EXTENSION OF

10:14AM 15   TIME TO FILE A REPLY BRIEF GIVEN ITS LATE PRODUCTION OF

10:14AM 16   INFORMATION RELATED TO THESE EVENTS.

10:14AM 17       JUST AS ANOTHER EXAMPLE, THE GOVERNMENT MADE ANOTHER

10:14AM 18   PRODUCTION RELEVANT TO THIS MOTION ONLY IN MARCH OF THIS YEAR,

10:14AM 19   ON MARCH 30TH, AND I WOULD NOTE THAT SOME OF THOSE DOCUMENTS

10:14AM 20   HAVE BEEN IN THE GOVERNMENT'S POSSESSION SINCE DECEMBER.

10:14AM 21       SO WHILE WE WERE LITIGATING THE REPLY BRIEF AND

10:14AM 22   SUPPORTIVE -- OR THE ANECDOTAL EVIDENCE MOTION, THE GOVERNMENT

10:14AM 23   WAS WITHHOLDING DOCUMENTS RELEVANT TO THESE ISSUES.

10:14AM 24       SO WE THINK THIS MOTION WAS NOT REASONABLY AVAILABLE BACK

10:14AM 25   IN AUGUST OF 2020.  EVEN IF IT WAS, WE THINK THESE EVENTS

6

10:14AM  1     SURELY CONSTITUTE GOOD CAUSE FOR FILING THE MOTION NOW.  AND AS

10:14AM  2     YOU KNOW, YOUR HONOR, WE MOVED TO EXCLUDE THE GOVERNMENT'S

10:14AM  3     ANECDOTAL EVIDENCE UNDER THE RULES OF EVIDENCE.

10:15AM  4          THE COURT RULED ON THAT MOTION ONLY IN MAY FOLLOWING THE

10:15AM  5     MAY HEARING.  WE DID PREVIEW, AS WE WERE LITIGATING THOSE

10:15AM  6     ISSUES, THAT IF THIS EVIDENCE WERE TO BE DEEMED RELEVANT, THAT

10:15AM  7     WOULD RAISE DUE PROCESS CONCERNS.  THOSE DUE PROCESS CONCERNS

10:15AM  8     ARE NOW RIPE, WHICH IS WHY WE FILED THE MOTION NOW.

10:15AM  9          AND JUST AS A FINAL POINT ON THIS, YOUR HONOR, THE

10:15AM 10     GOVERNMENT CLAIMS THAT THE MOTION IS UNTIMELY ONLY IN A

10:15AM 11     FOOTNOTE OF THEIR BRIEF.  I THINK IT'S WELL ESTABLISHED THAT

10:15AM 12     FOOTNOTES ARE NOT SUFFICIENT TO PRESERVE AN ISSUE, AND I THINK

10:15AM 13     IF THE GOVERNMENT REALLY THOUGHT THE MOTION WAS UNTIMELY, YOU

10:15AM 14     WOULD EXPECT THAT ARGUMENT TO BE FULLY PRESENTED TO THE COURT,

10:15AM 15     WHICH IT WAS NOT.

10:15AM 16          THE COURT:  ALL RIGHT.  THANK YOU.

10:15AM 17          MR. BOSTIC, DO YOU WISH TO BE HEARD?

10:15AM 18          MR. BOSTIC:  YES, YOUR HONOR.  THANK YOU.  JUST

10:15AM 19     BRIEFLY.

10:15AM 20          ON THE LAST POINT, THE GOVERNMENT CHOSE TO MEET THIS

10:15AM 21     MOTION ON THE MERITS BECAUSE I THINK, AS WE'LL SEE SHORTLY, THE

10:15AM 22     GOVERNMENT HAS THE STRONGER ARGUMENT ON THE LAW AND THE FACTS,

10:15AM 23     BUT ON THE PROCEDURAL POINT, THE GOVERNMENT DOESN'T AGREE THAT

10:16AM 24     THIS MOTION IS TIMELY.

10:16AM 25          THE KEY FACTS THAT WOULD HAVE PUT THE DEFENSE ON NOTICE OF

10:16AM 1    THE CAUSE FOR BRINGING THIS MOTION OR WOULD HAVE LED THE

10:16AM 2    DEFENSE TO KNOW THAT SUCH A MOTION WAS POSSIBLE OR COLORABLE

10:16AM 3    WERE KNOWN TO THE DEFENSE LONG BEFORE THIS MOTION WAS FILED.

10:16AM 4        THE GOVERNMENT HAS CONTINUED TO COLLECT EVIDENCE RELEVANT

10:16AM 5    TO THESE ISSUES AS PART OF ITS ONGOING INVESTIGATION AND HAS

10:16AM 6    PRODUCED THOSE MATERIALS, SOME OF THEM SUBSEQUENT TO THE MOTION

10:16AM 7    FILING DEADLINE FOR WHICH RULE 12 MOTIONS, BUT THE KEY FACTS

10:16AM 8    THE GOVERNMENT CONTENDS WERE KNOWN TO THE DEFENSE LONG BEFORE.

10:16AM 9    THE GOVERNMENT ALSO DISAGREES WITH THE ARGUMENT THAT THE

10:16AM 10   COURT'S MOTION IN LIMINE RULING SOMEHOW RIPENED THIS MOTION.

10:16AM 11       THESE ARGUMENTS COULD HAVE BEEN BROUGHT IN PARALLEL TO OR

10:16AM 12   PREVIOUS TO THE COURT'S MOTION IN LIMINE ADJUDICATIONS.

10:16AM 13        THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.  THANK

10:16AM 14   YOU FOR THAT.  I WANT TO GET CLARIFICATION OF THE PARTY'S

10:16AM 15   POSITIONS ON THAT.

10:17AM 16       AND BECAUSE WE ARE ALL HERE, I THINK WE SHOULD GO FORWARD

10:17AM 17   WITH THIS MOTION.  LET ME JUST TELL YOU, I'VE READ YOUR

10:17AM 18   PLEADINGS, AND I APPRECIATE YOUR AUGMENTATION OF THOSE TODAY.

10:17AM 19       MY INTENT IS TO LISTEN TO WHAT YOU HAVE TO SAY AND MOST

10:17AM 20   LIKELY WE'LL TAKE THE MOTION UNDER SUBMISSION AND YOU'LL GET AN

10:17AM 21   ORDER OUT SHORTLY THEREAFTER.

10:17AM 22       SO LET ME START THEN.  MS. SAHARIA, ARE YOU SPEAKING ON

10:17AM 23   THE MOTION?

10:17AM 24          MS. SAHARIA:  YES, I AM, YOUR HONOR.

10:17AM 25          THE COURT:  ALL RIGHT.  THANK YOU.  WHAT WOULD YOU

8

10:17AM 1     LIKE ME TO KNOW?

10:17AM 2         MS. SAHARIA:  YOUR HONOR, LET ME COVER I THINK FOUR

10:17AM 3     TOPICS IN THIS PRESENTATION.  I'LL START WITH JUST A FEW

10:17AM 4     INTRODUCTORY REMARKS ABOUT THE MOTION TO PUT THE REST IN

10:17AM 5     FRAMING.  I'LL TOUCH ON A FEW OF THE LEGAL ISSUES THAT I THINK

10:17AM 6     ARISE OUT OF THE PARTY'S BRIEFS, AND THEN I WANT TO SPEND THE

10:17AM 7     BULK OF THE ARGUMENT ON WHAT WE THINK ARE THE KEY DISPUTED

10:17AM 8     FACTS THAT REQUIRE A HEARING, AND THEN I'LL JUST TOUCH AT THE

10:18AM 9     VERY END ON THE MOTION TO COMPEL THAT ACCOMPANIES THE MOTION TO

10:18AM 10     SUPPRESS.

10:18AM 11      SO JUST TO BEGIN, I JUST WANT TO MAKE CLEAR THAT AT THIS

10:18AM 12     JUNCTION THE QUESTION BEFORE THE COURT IS SIMPLY WHETHER TO

10:18AM 13     HOLD AN EVIDENTIARY HEARING.  WE DO THINK THAT THE CURRENT

10:18AM 14     RECORD SUFFICES TO REQUIRE SUPPRESSION, BUT THE COURT NEED NOT

10:18AM 15     MAKE THAT DECISION TODAY OR IN DECIDING THE MOTION AS IT

10:18AM 16     CURRENTLY STANDS.

10:18AM 17      THE COURT NEED ONLY HOLD FOR PRESENT PURPOSES THAT THE

10:18AM 18     MOTION RAISES AN ISSUE OF FACT, OF DISPUTED FACTS RELATED TO

10:18AM 19     WHETHER TO SUPPRESS EVIDENCE OR WHETHER TO IMPOSE SOME SORT OF

10:18AM 20     SANCTION FOR THE LOSS OF THIS EVIDENCE, AND THEN PROCEED TO

10:18AM 21     HOLD A HEARING AT WHICH POINT THE COURT CAN THEN MAKE ITS FINAL

10:18AM 22     DECISION BASED ON THE FULL RECORD DEVELOPED AT THAT HEARING.

10:18AM 23      THE QUESTION WITH RESPECT TO WHETHER TO HOLD A HEARING IS

10:18AM 24     WHETHER WE HAVE ALLEGED FACTS WITH SUFFICIENT DEFINITENESS,

10:18AM 25     CLARITY, AND SPECIFICITY TO ENABLE THE COURT TO DETERMINE THAT

9

10:19AM 1    CONTESTED ISSUES OF FACT EXIST, AND WE SUBMIT THAT WE HAVE MET

10:19AM 2    THAT REQUIREMENT EASILY WITH RESPECT TO BOTH OF THE LEGAL

10:19AM 3    THEORIES THAT ARE PRESENTED IN THE MOTION.

10:19AM 4        AS YOUR HONOR I'M SURE IS AWARE, THE MOTION PRESENTS TWO

10:19AM 5    DIFFERENT THEORIES FOR SUPPRESSING EVIDENCE OR FOR IMPOSING

10:19AM 6    SOME SORT OF SANCTION IN CASES OF LOSS OF EVIDENCE.  THE HIGHER

10:19AM 7    STANDARD IS THE DUE PROCESS STANDARD.

10:19AM 8        BUT IN THE NINTH CIRCUIT THERE IS A LESSER STANDARD, THE

10:19AM 9    LOUD HAWK STANDARD, THAT REQUIRES SANCTIONS IN CASES OF

10:19AM 10   GOVERNMENT LOSS OF EVIDENCE AND PURSUANT TO A BALANCING TEST,

10:19AM 11   AND THAT IS -- THAT STANDARD GOVERNS LESSER SANCTIONS SUCH AS

10:19AM 12   SUPPRESSION AND IT IS A LESSER STANDARD.

10:19AM 13       SO AT THIS POINT THE COURT NEED ONLY CONCLUDE THAT THERE

10:19AM 14   ARE DISPUTED ISSUES OF FACT THAT GO TO THAT BALANCING TEST TO

10:19AM 15   PROCEED FORWARD TO A HEARING AT WHICH POINT WE EXPECT THE

10:19AM 16   RECORD WILL SHOW THAT WE ARE ENTITLED TO SUPPRESSION OR OTHER

10:20AM 17   SANCTIONS BOTH UNDER LOUD HAWK AND UNDER THE DUE PROCESS

10:20AM 18   CLAUSE.

10:20AM 19       NOW, THE STANDARD FOR HOLDING A HEARING IS NOT TERRIBLY

10:20AM 20   DEMANDING.  THE COURT -- THE GOVERNMENT HAS CITED TO THE COURT

10:20AM 21   A NUMBER OF CASES IN WHICH COURTS HAVE DENIED SUPPRESSION AND

10:20AM 22   CASES OF FAILURE TO COLLECT OR PRESERVE EVIDENCE, BUT I WOULD

10:20AM 23   NOTE THAT IN MANY OF THOSE CASES THE COURT DID HOLD AN

10:20AM 24   EVIDENTIARY HEARING AND CONCLUDED THAT SUPPRESSION WAS NOT

10:20AM 25   REQUIRED ONLY BASED ON THE FACTS THAT WERE DEVELOPED AT THAT

UNITED STATES COURT REPORTERS

**ER-3549**

10:20AM 1    HEARING.  THOSE CASES INCLUDE LOUD HAWK, ROBERTSON, GIBSON,

10:20AM 2    BROWN, AND HINKSON.  IN ALL OF THOSE CASES THE COURT DID HOLD A

10:20AM 3    HEARING.

10:20AM 4        NOW, WE SUBMIT THAT THIS CASE IS FUNDAMENTALLY DIFFERENT

10:20AM 5    FROM THE CASES ON WHICH THE GOVERNMENT IS RELYING.  THE TYPICAL

10:20AM 6    CASE WHERE SUPPRESSION IS DENIED IS A CASE WHERE AN AGENT OUT

10:20AM 7    IN THE FIELD FAILS TO COLLECT EVIDENCE SUCH AS, LET'S SAY, A

10:20AM 8    BLOOD SAMPLE IN ORDER TO SUBJECT IT TO TESTS HAVING NO REASON

10:21AM 9    TO BELIEVE AT THE TIME THAT THOSE TESTS WOULD HAVE ANY

10:21AM 10   EXCULPATORY VALUE TO THE DEFENDANT.

10:21AM 11       AND IN A TYPICAL CASE WHERE SUPPRESSION IS DENIED, THE

10:21AM 12   AGENT WAS TYPICALLY FOLLOWING ROUTINE GOVERNMENT PROCEDURES IN

10:21AM 13   DECIDING NOT TO COLLECT THAT EVIDENCE, OR MAYBE AT WORST IT WAS

10:21AM 14   A MERE OVERSIGHT BY WHICH THAT EVIDENCE WAS NOT COLLECTED.

10:21AM 15       I THINK IT'S CLEAR FROM THE RECORD THAT THIS IS NOT THAT

10:21AM 16   TYPICAL CASE.  I WANT TO TALK IN MORE DETAIL ABOUT THE ACTUAL

10:21AM 17   EVIDENCE IN A LITTLE BIT, BUT LET ME JUST START WITH THREE

10:21AM 18   GENERAL OBSERVATIONS ABOUT THIS CASE.

10:21AM 19       FIRST, AT THE TIME OF THE EVENTS IN QUESTION, THE

10:21AM 20   GOVERNMENT UNQUESTIONABLY KNEW THAT AT THE LIS DATABASE WAS THE

10:21AM 21   MOST RELIABLE AND COMPREHENSIVE SET OF INFORMATION ABOUT

10:21AM 22   THERANOS'S TEST RESULTS, AND IT KNEW THAT THAT DATABASE HAD

10:21AM 23   EXCULPATORY VALUE GOING TO A CENTRAL ISSUE IN THE CASE.

10:21AM 24       SECOND, THE LOSS OF THE EVIDENCE IS NOT THE RESULT OF

10:21AM 25   STANDARD GOVERNMENT PROCEDURES OR EVEN OVERSIGHT.  THE

11

10:22AM 1      GOVERNMENT'S CONDUCT IN THIS CASE WAS SO UNUSUAL THAT IT FELT

10:22AM 2      COMPELLED TO WRITE A 23-PAGE BRADY LETTER TO THE DEFENSE

10:22AM 3      DESCRIBING ITS FAILURE TO PRESERVE THE LIS.

10:22AM 4          THE EVIDENCE TO DATE, WHICH TODAY IS STILL INCOMPLETE, BUT

10:22AM 5      THE EVIDENCE TO DATE SUGGESTS THAT PROSECUTORS, THE PROSECUTORS

10:22AM 6      PROSECUTING THIS CASE REPEATEDLY DISREGARDED ADVICE FROM THEIR

10:22AM 7      OWN SUPPORT STAFF REGARDING STEPS THAT THEY SHOULD TAKE TO

10:22AM 8      ACCESS AND PRESERVE THE LIS DATABASE.

10:22AM 9          THE COURT:  MS. SAHARIA, AT THE TIME THAT THEY

10:22AM 10     DISREGARDED, ACCORDING TO THE DOCUMENTS THAT I'VE READ, AT THE

10:22AM 11     TIME THAT THEY DISREGARDED THE ADVICE OF THEIR EXPERTS AS YOU

10:22AM 12     SUGGEST, THE LIS WAS DESTROYED, WASN'T IT?

10:22AM 13         MS. SAHARIA:  WELL, NOT EXACTLY, YOUR HONOR.

10:22AM 14     I THINK IT'S IMPORTANT TO KEEP IN MIND THAT THERE'S REALLY

10:22AM 15     TWO SOURCES OF DATA THAT ARE RELEVANT TO THIS DISCUSSION.

10:23AM 16     THERE IS THE LIS DATABASE.

10:23AM 17         THE COURT:  SURE.  WELL, LET ME TELL YOU WHAT I'M

10:23AM 18     TALKING ABOUT SO YOU UNDERSTAND.

10:23AM 19         MS. SAHARIA:  SURE.

10:23AM 20         THE COURT:  SO AS I UNDERSTAND IT THE LIS WAS

10:23AM 21     CREATED, AND MAYBE WE'LL TALK A LITTLE BIT MORE ABOUT THE

10:23AM 22     GENESIS OF THAT CREATION, BUT IT WAS CREATED.  IT CONTAINED ALL

10:23AM 23     OF THIS INFORMATION.  IT WAS IN THE CUSTODIAL POSSESSION OF

10:23AM 24     THERANOS.  THEY HAD IT ON SIGHT, OR SOMEWHERE, THE SERVERS WERE

10:23AM 25     THERE, AND THEN AT THE DEMISE OF THERANOS THE -- I SUPPOSE IT

10:23AM 1    WAS GOING TO BE DECONSTRUCTED, THAT IS, THE SERVERS.  IT SOUNDS

10:23AM 2    LIKE THE SERVERS MAY HAVE BEEN LEASED OR SOMETHING, BUT THEY

10:23AM 3    WERE TAKEN APART, AND THEY WERE GOING TO BE DECONSTRUCTED SUCH

10:23AM 4    THAT THE LIS AS IT EXISTED WOULD NO LONGER EXIST AND IT'S A

10:23AM 5    FIRST ITERATION SHALL I SAY.

10:24AM 6            MS. SAHARIA:  SURE.  SO LET ME --

10:24AM 7            THE COURT:  SO DIDN'T A COPY OF THAT, WHEN THE

10:24AM 8    GOVERNMENT RECEIVED A COPY IN AUGUST -- I THINK IT WAS AUGUST

10:24AM 9    27TH, WAS IT?  IS THAT WHEN THEY RECEIVED THEIR COPY?

10:24AM 10           MS. SAHARIA:  YES, YOUR HONOR, IT WAS IN AUGUST OF

10:24AM 11   2018.

10:24AM 12           THE COURT:  YES.

10:24AM 13       AND THEN FOUR DAYS LATER THERANOS CAUSED THE DEMISE OF THE

10:24AM 14   SERVERS, AND WHOEVER WAS IN CHARGE CAUSED THE DEMISE OF THE

10:24AM 15   SERVERS SUCH THAT THEY DID MAKE A COPY OF IT, AND THEY SENT IT

10:24AM 16   TO THE GOVERNMENT.

10:24AM 17       AND THEN FOUR DAYS LATER IT WAS DESTROYED, IF YOU WILL.

10:24AM 18   IT WAS DECOMMISSIONED I GUESS IS THE WORD, AND THE GOVERNMENT

10:24AM 19   DID NOT DECOMMISSION IT.  THE GOVERNMENT DIDN'T REQUEST IT TO

10:24AM 20   BE DECOMMISSIONED.  THAT WAS A UNILATERAL DECISION THAT WAS

10:24AM 21   MADE BY THERANOS.

10:24AM 22       AS I UNDERSTAND IT FROM THE DOCUMENTS I'VE READ, THAT THAT

10:24AM 23   DATE, THAT DECOMMISSIONING DATE WAS NOT PROVIDED TO THE

10:24AM 24   GOVERNMENT AT THE TIME THAT THE GOVERNMENT RECEIVED THE

10:25AM 25   DATABASE FROM THERANOS.  THAT'S WHAT I UNDERSTAND AT LEAST FROM

13

10:25AM 1    THE DOCUMENTS THAT YOU FILED.

10:25AM 2        I DON'T THINK YOU QUARREL WITH THE FACT THAT THE

10:25AM 3    GOVERNMENT DID NOT DESTROY THIS OR DECOMMISSION.  THAT WAS DONE

10:25AM 4    BY WHOEVER WAS IN CHARGE OF THERANOS.

10:25AM 5        AND I DON'T THINK YOU QUARRELLED WITH THE FACT THAT THE

10:25AM 6    GOVERNMENT WAS NOT GIVEN NOTICE OF THE DECOMMISSION DATE.  I

10:25AM 7    DON'T THINK YOU QUARREL WITH THAT.

10:25AM 8        THEN THE OTHER QUESTION I HAD IS APPARENTLY WHEN THE

10:25AM 9    GOVERNMENT RECEIVED WHAT THEY THOUGHT WAS A MIRROR IMAGE OF THE

10:25AM 10   DATABASE, THEY WERE NOT TOLD THAT A MISSING KEY, I GUESS THEY

10:25AM 11   CALL IT, TO ACCESS THE DATABASE WAS MISSING.

10:25AM 12       THEY WERE GIVEN A PASSWORD, AN ENCRYPTED PASSWORD THAT

10:25AM 13   WOULD ALLOW THEM TO OPEN THE DATABASE, BUT AT THE TIME THAT IT

10:25AM 14   WAS DELIVERED FROM THE LAWYERS, THE LAWYERS KNEW THAT THERE WAS

10:26AM 15   A KEY THAT WOULD NEED TO BE USED TO ACCESS THE MATERIAL.  THAT

10:26AM 16   WAS NOT PROVIDED IN THE DATABASE THAT WAS GIVEN TO THE

10:26AM 17   GOVERNMENT.

10:26AM 18       AND SO THE GOVERNMENT -- IN ESSENCE WHAT THEY WERE GIVEN

10:26AM 19   WAS A NONWORKING COPY, IF YOU WILL, OF THE DATABASE.  IN OTHER

10:26AM 20   WORDS, THEY COULDN'T ACCESS IT.  EVEN IF THEY HAD TRIED TO

10:26AM 21   ACCESS IT IN THE PARKING LOT ONCE THEY RECEIVED IT, THEY

10:26AM 22   WOULDN'T HAVE BEEN ABLE TO.

10:26AM 23       IS THAT THE STATE OF THINGS?

10:26AM 24           MS. SAHARIA:  WELL, I, I, I -- SOME OF THAT IS

10:26AM 25   CORRECT, YOUR HONOR, BUT I THINK THERE ARE INFERENCES DRAWN

UNITED STATES COURT REPORTERS

**ER-3553**

10:26AM 1      FROM THOSE FACTS THAT REQUIRE AN EVIDENTIARY HEARING.

10:26AM 2          SO LET ME TAKE THOSE TWO PIECES OF FACTS IN TURN.  ONE,

10:26AM 3      THE LIS SERVER, THE PHYSICAL SERVER; AND THEN, TWO, THE COPY OF

10:26AM 4      THE LIS.

10:26AM 5          SO WITH RESPECT TO THE LIS SERVER, YES, YOUR HONOR IS

10:27AM 6      CORRECT THAT THE SERVER -- I DON'T THINK THE CORRECT WORD IS

10:27AM 7      DESTROYED.  IT'S NOT AS THOUGH SOMEONE TOOK A HAMMER TO THE

10:27AM 8      SERVER AND, YOU KNOW, CRUSHED IT TO PIECES OUT IN THE PARKING

10:27AM 9      LOT.

10:27AM 10         THE GOVERNMENT KNEW FULL KNOW THAT THERANOS WAS CLOSING,

10:27AM 11     IT WAS PHYSICALLY CLOSING ITS OFFICE BUILDING, AND WHEN A

10:27AM 12     BUILDING CLOSES, THAT REQUIRES TAKING THE THINGS IN THE

10:27AM 13     BUILDING AND MOVING THEM.

10:27AM 14         WHAT THE GOVERNMENT APPRECIATED ABOUT WHAT THAT MEANT FOR

10:27AM 15     THE PHYSICAL LIS SERVER WOULD BE AN ISSUE TO EXPLORE AT THE

10:27AM 16     HEARING, BUT IT'S UNDISPUTED THE GOVERNMENT WAS FULL AWARE THAT

10:27AM 17     THERANOS WAS CLOSING AND YET IT WAITED A YEAR AND A HALF UNTIL

10:27AM 18     THE EVE OF THE COMPANY CLOSING TO REQUEST THE DATABASE.

10:27AM 19             THE COURT:  WELL, THERE WERE NEGOTIATIONS, WEREN'T

10:27AM 20     THERE?  WASN'T THE GOVERNMENT AND LAWYERS FOR THERANOS IN

10:27AM 21     NEGOTIATION ABOUT -- I MEAN, THERE WAS A TROVE OF EVIDENCE THAT

10:28AM 22     WAS BEING SOUGHT NOT ONLY FROM -- WHEN I SAY "THE GOVERNMENT" I

10:28AM 23     MEAN THIS PROSECUTION.

10:28AM 24         BUT THERE WAS ALSO LETTERS AND DOCUMENTATION FROM THE

10:28AM 25     S.E.C. AND SUBPOENAS FROM THE S.E.C. EARLIER.  WAS IT IN 2016

15

10:28AM 1    PERHAPS?  '15?  THERE WERE SUBPOENAS THAT WERE REQUESTING -- IT

10:28AM 2    SEEMED LIKE THE SAME TYPE OF INFORMATION WHEN WE LOOK AT THE

10:28AM 3    SUBPOENAS.  THEY TALK ABOUT -- THE S.E.C. SUBPOENAS TALK ABOUT

10:28AM 4    ALL THE INFORMATION REGARDING -- INFORMATION THAT COULD BE ON

10:28AM 5    THE LIS I SUPPOSE.

10:28AM 6        BUT IN ANY EVENT, THERE WERE NEGOTIATIONS BETWEEN THE

10:28AM 7    PROSECUTION, THE GOVERNMENT PROSECUTION IN THIS CASE AND THE

10:28AM 8    ATTORNEYS FOR THERANOS ABOUT RECEIVING INFORMATION.  WASN'T

10:28AM 9    THAT ONGOING?

10:28AM 10        MS. SAHARIA:  WELL, TO BE SURE, THE GOVERNMENT WAS

10:28AM 11   REQUESTING CERTAIN SUBSETS OF DATA THAT RESIDED IN THE LIS, BUT

10:28AM 12   THE FIRST TIME THAT THE GOVERNMENT SUBPOENAED THE LIS DATABASE

10:28AM 13   ITSELF WITH THE FULL ARRAY OF INFORMATION IN THE DATABASE WAS

10:28AM 14   ON JUNE 14TH, 2018, WHICH WAS ONLY TWO WEEKS BEFORE IT RETURNED

10:29AM 15   THE INDICTMENT IN THIS CASE AND AT A TIME WHEN IT KNEW FULL

10:29AM 16   WELL THAT THERANOS WAS ABOUT TO CLOSE.

10:29AM 17        THE COURT:  WELL, IT WAS JUNE 4TH.

10:29AM 18        WAS IT JUNE 4TH AND THEN THE INDICTMENT WAS JUNE 14TH?  I

10:29AM 19   CAN'T REMEMBER THE DATES, BUT IT WAS AROUND THAT SAME TIME

10:29AM 20   PERIOD.  I THINK YOU'RE CORRECT.

10:29AM 21        MS. SAHARIA:  YES.  I THINK IT WAS JUNE 4TH AND

10:29AM 22   JUNE 18TH, BUT IT'S AROUND THOSE PRECISE DATES, YOUR HONOR.

10:29AM 23        THE COURT:  RIGHT.

10:29AM 24        MS. SAHARIA:  WITH RESPECT TO THE DATABASE ITSELF,

10:29AM 25   IT IS CERTAINLY TRUE THAT WHEN THE COMPANY CLOSED, IT HAD NO

16

10:29AM 1    CHOICE BUT TO MOVE THE PHYSICAL SERVERS TO A DIFFERENT

10:29AM 2    LOCATION.  MY UNDERSTANDING IS I THINK THEY WERE INITIALLY

10:29AM 3    TRANSFERRED TO THE ASSIGNEE AND THEN AT SOME POINT RETURNED TO

10:29AM 4    THE LESSOR OF THAT EQUIPMENT.

10:29AM 5         AND IT IS, I THINK, CORRECT THAT ONCE THAT PHYSICAL MOVING

10:29AM 6    OF THE SERVERS OCCURRED, BECAUSE THEY HAD TO BE, YOU KNOW,

10:29AM 7    DISCONNECTED FROM EACH OTHER, THAT IS WHAT THE GOVERNMENT

10:30AM 8    CALLED THE DECOMMISSIONING OF THE LIS DATABASE.

10:30AM 9         BUT THERE IS SUBSTANTIAL EVIDENCE IN THE RECORD FROM

10:30AM 10   WITNESSES THAT THE GOVERNMENT HAS INTERVIEWED AND THESE ARE

10:30AM 11   AT -- LET ME MAKE SURE THAT I GIVE THE COURT THE CORRECT

10:30AM 12   EXHIBIT NUMBERS, THESE ARE -- HOLD ON.  THESE ARE DEFENSE

10:30AM 13   EXHIBITS 10, 11, AND 13, WITNESSES HAVE SAID THAT IT WOULD HAVE

10:30AM 14   CERTAINLY HAVE BEEN POSSIBLE TO RECONSTRUCT THE DATABASE USING

10:30AM 15   THE PHYSICAL SERVERS WITH SOME AMOUNT OF EFFORT.  PERHAPS OVER

10:30AM 16   A MONTH IT COULD HAVE BEEN RECONSTRUCTED USING THE PHYSICAL

10:30AM 17   EQUIPMENT.  THAT IS ONE OF THE AVENUES THAT THE GOVERNMENT

10:30AM 18   SUPPORT STAFF RECOMMENDED TO THE GOVERNMENT, THAT IT ACTUALLY

10:30AM 19   SEIZE THE PHYSICAL SERVERS AND USE THE PHYSICAL SERVERS TO GET

10:30AM 20   ACCESS TO THE LIS DATA.  THAT IS SOMETHING THAT THE GOVERNMENT

10:31AM 21   WAS DOING IN FACT.  BEFORE THERANOS CLOSED, IT ROLLED UP THE

10:31AM 22   TRUCKS TO THE COMPANY'S PHYSICAL LOCATION AND TOOK OTHER

10:31AM 23   PHYSICAL EQUIPMENT FROM THERANOS, BUT IT DIDN'T DO THAT FOR THE

10:31AM 24   LIS DATABASE.

10:31AM 25        THE COURT:  AND THAT'S BECAUSE IT SEEMED LIKE FROM

UNITED STATES COURT REPORTERS

10:31AM 1  THE RECORD IN SOME OF THE DOCUMENTATION THAT THERE WERE ONGOING

10:31AM 2  NEGOTIATIONS BETWEEN COUNSEL FOR THERANOS AND THE GOVERNMENT.

10:31AM 3  THERE WERE EMAILS THAT SUGGESTED -- THIS IS IN THE BRADY

10:31AM 4  LETTER, I THINK, THAT YOU MENTIONED.  IT'S PROBABLY

10:31AM 5  EXHIBIT 732-2, PARAGRAPHS 31, 34, 36, SOME OF THOSE PARAGRAPHS

10:31AM 6  IN THERE.  PARDON ME, I DON'T HAVE THEM AT MY FINGERTIPS

10:31AM 7  EXACTLY.  BUT THEY SUGGEST THAT THERE WAS AN EXCHANGE OF

10:31AM 8  INFORMATION, VERY CORDIAL, BETWEEN THE GOVERNMENT AND I THINK

10:31AM 9  IT WAS WILMER HALE ATTORNEYS WHO WERE IN CHARGE AT THAT TIME OF

10:31AM 10  NEGOTIATING THIS EXCHANGE OF INFORMATION.

10:31AM 11  IT APPEARS THAT SOME OF THESE EMAILS SAID THE TRUCKS WILL

10:31AM 12  BE HERE.  WILMER HALE SAID, WE'LL TELL YOU THE SIZE OF WHAT

10:32AM 13  YOU'RE COLLECTING SO YOU CAN ORGANIZE THE RIGHT TRUCKS,

10:32AM 14  CORRECT TRUCKS, AND GET THE RIGHT SIZE OF TRUCKS TO TAKE THINGS

10:32AM 15  AWAY.  BUT THERE WAS NEVER DISCUSSION, YOU'RE RIGHT, ABOUT THE

10:32AM 16  SERVERS.  THOSE WERE STILL CONNECTED, STILL ONLINE.

10:32AM 17  AND IT SEEMED LIKE CONCURRENT WITH THAT THE CONVERSATION

10:32AM 18  WAS ONGOING WITH THE GOVERNMENT ABOUT HOW TO GET THE LIS.

10:32AM 19  AND THEN ON AUGUST 27TH I THINK THERE WAS AN EMAIL --

10:32AM 20  PARDON ME.  LET ME BACKTRACK A MOMENT.  I THINK THERE WAS AN

10:32AM 21  EARLIER EMAIL FROM MR. BOSTIC THAT SAID, HEY, I'M JUST CHECKING

10:32AM 22  IN ON WHEN CAN WE GET THE DATABASE?  I'M WORKING WITH THERANOS

10:32AM 23  TO GET THAT FOR YOU WAS THE RESPONSE FROM WILMER.

10:32AM 24  AND THEN IT'S READY FOR YOU AUGUST 27TH, COME GET IT.

10:32AM 25  AND THEN FOUR DAYS LATER THEY DECOMMISSION, THEY, SOMEONE.

10:32AM  1    LET ME JUST BE CLEAR, I DON'T KNOW WHO DECOMMISSIONED IT, BUT

10:32AM  2    CAN WE AGREE THAT THE GOVERNMENT DID NOT DECOMMISSION THE

10:32AM  3    DATABASE?

10:32AM  4              MS. SAHARIA:  OF COURSE, YOUR HONOR.  THE GOVERNMENT

10:32AM  5    WAS NOT THERE AT THERANOS DECONNECTING THE WIRES.

10:33AM  6         THE GOVERNMENT DID KNOW THAT THERANOS WAS CLOSING.  AND

10:33AM  7    IT, AND IT, IT DID KNOW THAT, YOU KNOW, RELATIVELY SOON

10:33AM  8    THEREAFTER THAT ITS SUPPORT STAFF WERE RECOMMENDING THAT IT

10:33AM  9    ATTEMPT TO GET THE PHYSICAL HARDWARE, AND IT DIDN'T DO THAT.

10:33AM  10        NOW, LET ME TALK ABOUT THE COPY OF THE LIS THAT WAS

10:33AM  11   PRODUCED TO THE GOVERNMENT ON AUGUST 27TH.

10:33AM  12        THE GOVERNMENT HAS REPRESENTED THAT IT NEEDS -- THAT THAT

10:33AM  13   WAS PRODUCED WITHOUT A PASSWORD AND THAT IT CAN'T ACCESS THE

10:33AM  14   DATABASE WITHOUT A PASSWORD.

10:33AM  15        IT SAYS IN ITS OPPOSITION THAT -- THIS IS AT PAGE 6, THAT

10:33AM  16   ITS EFFORTS TO ACCESS THAT COPY OF THE LIS DATABASE HAVE

10:33AM  17   FAILED, BUT THEY PROVIDE PRECIOUS LITTLE EVIDENCE OF WHAT THOSE

10:33AM  18   EFFORTS ACTUALLY WERE OR IMPORTANTLY WHEN THEY OCCURRED.

10:33AM  19        AND I WILL NOTE THAT UNDER THE LOUD HAWK BALANCING TEST IT

10:34AM  20   IS THE GOVERNMENT'S DUTY TO JUSTIFY THE REASONABLENESS OF ITS

10:34AM  21   CONDUCT AND TO COME FORWARD WITH EVIDENCE JUSTIFYING ITS

10:34AM  22   CONDUCT.

10:34AM  23        AND THE REASON IT HASN'T COME FORWARD WITH THAT EVIDENCE,

10:34AM  24   I WOULD SUBMIT, IS BECAUSE THE ACTUAL EVIDENCE IS QUITE

10:34AM  25   DAMAGING TO THE GOVERNMENT ON THIS POINT.  IT RECEIVED THAT

10:34AM  1    COPY OF THE LIS DATABASE AS YOUR HONOR INDICATED IN LATE AUGUST

10:34AM  2    OF 2018 AT A TIME WHEN IT KNEW THAT THE COMPANY WAS ABOUT TO

10:34AM  3    CLOSE.

10:34AM  4        NOW, THE FIRST THING THAT WE ALWAYS DO WHEN WE OBTAIN A

10:34AM  5    PRODUCTION FROM THE GOVERNMENT IS WE OPEN IT AND WE CHECK IT

10:34AM  6    BECAUSE THERE ARE OFTEN TECHNICAL GLITCHES ASSOCIATED WITH

10:34AM  7    PRODUCTIONS, MISSING PASSWORDS, OR DATA THAT IS CORRUPTED OR

10:34AM  8    WHAT HAVE YOU, AND THE REASON FOR THAT IS TO MAKE SURE THAT YOU

10:34AM  9    PROMPTLY CAN CORRECT ANY PROBLEM.

10:34AM 10        THE GOVERNMENT DIDN'T DO THAT.  IT TOOK THREE WEEKS TO

10:34AM 11    ACCESS THE HARD DRIVE, EVEN THOUGH THERANOS WAS IMMINENTLY

10:34AM 12    CLOSING.  THIS IS AT THE BRADY LETTER WHICH IS EXHIBIT 88 TO

10:35AM 13    OUR ANECDOTAL EVIDENCE REPLY BRIEF, PARAGRAPHS 36 TO 43.

10:35AM 14        AND THEN IT TOOK TWO AND A HALF WEEKS FOR THE SUPPORT

10:35AM 15    PERSONNEL TO RELAY TO THE PROSECUTORS THAT THEY DIDN'T HAVE THE

10:35AM 16    RIGHT SOFTWARE TO PROCESS IT.  THAT'S EXHIBIT 88, PARAGRAPH 46.

10:35AM 17        NOW, WILMER HALE HAD TOLD THE GOVERNMENT A MONTH IN

10:35AM 18    ADVANCE WHAT SOFTWARE IT WAS GOING TO NEED TO PROCESS THE

10:35AM 19    DATABASE, AND THERE'S NO EVIDENCE THAT IT ACTED ON THAT

10:35AM 20    INFORMATION.

10:35AM 21        THE COURT:  DID WILMER HALE EVER PROVIDE INFORMATION

10:35AM 22    TO THE GOVERNMENT THAT THEY WOULD NEED THE KEY, THE MISSING

10:35AM 23    KEY?  WAS THAT EVER GIVEN TO THE GOVERNMENT?

10:35AM 24        MS. SAHARIA:  I HAVE NOT SEEN THAT EVIDENCE IN THE

10:35AM 25    RECORD, NOR HAVE I SEEN EVIDENCE THAT THE GOVERNMENT ATTEMPTED

20

10:35AM 1    TO OPEN THE DATABASE AND REALIZED IT NEEDED A PASSWORD.  FOR A

10:36AM 2    YEAR AND A HALF THE FIRST RECORDED ATTEMPT FROM THE GOVERNMENT

10:36AM 3    TO ASK FOR A PASSWORD FOR THE DATABASE OCCURRED IN MARCH OR

10:36AM 4    APRIL OF 2020.  THIS IS EXHIBIT 88, AGAIN, THEIR BRADY LETTER,

10:36AM 5    AT PARAGRAPH 52.

10:36AM 6         THE GOVERNMENT DOESN'T INDICATE EXACTLY WHEN THAT

10:36AM 7    OCCURRED.  THEY INDICATE THAT THEY REACHED OUT TO WILMER HALE

10:36AM 8    IN MARCH OR APRIL OF 2020.  I WOULD SUBMIT IT'S NOT A

10:36AM 9    COINCIDENCE THAT THAT IS THE VERY MOMENT WHEN WE STARTED ASKING

10:36AM 10   THE GOVERNMENT TO SUPPORT ITS ALLEGATIONS IN ITS 404(B) LETTER

10:36AM 11   THAT IT COULD NOT ACCESS THE LIS DATABASE.

10:36AM 12        BUT FOR A YEAR AND A HALF THE GOVERNMENT DID NOTHING WITH

10:36AM 13   THIS COPY OF THE LIS DATABASE SITTING ON A PARALEGAL'S SHELF,

10:36AM 14   AND IF IT HAD ACTED PROMPTLY AS YOU WOULD EXPECT A PROSECUTOR

10:36AM 15   WITH THE MOST CENTRAL EVIDENCE IN THE CASE TO DO, THEY VERY

10:36AM 16   WELL WOULD HAVE FOUND THE PASSWORD.  THEY VERY WELL WOULD --

10:37AM 17        THE COURT:  THEY WOULD HAVE FOUND THE PASSWORD, THE

10:37AM 18   KEY TO OPEN THIS?

10:37AM 19        MS. SAHARIA:  WELL, THEY, THEY, THEY PRESUMABLY --

10:37AM 20        THE COURT:  THEY NEVER HAD --

10:37AM 21        MS. SAHARIA:  RIGHT, THEY NEVER HAD THAT.

10:37AM 22        BUT THERE WAS EVIDENCE THAT THERE WERE PEOPLE CONNECTED

10:37AM 23   WITH THERANOS WHO MIGHT HAVE HAD THAT KEY IF THE GOVERNMENT HAD

10:37AM 24   PROMPTLY REALIZED THAT IT NEEDED IT.

10:37AM 25        AGAIN, THE SUPPORT STAFF SUGGESTED MULTIPLE THINGS THAT

21

| | | |
|---|---|---|
| 10:37AM | 1 | THE GOVERNMENT MIGHT HAVE DONE, WHICH WOULD HAVE, NUMBER ONE, |
| 10:37AM | 2 | LED IT TO REALIZE THAT IT NEEDED A SECOND PASSWORD TO OPEN THE |
| 10:37AM | 3 | LIS DATABASE. |
| 10:37AM | 4 | BUT SECOND OF ALL, WE DON'T KNOW IF THERE ARE OTHER WAYS |
| 10:37AM | 5 | THAT THE GOVERNMENT COULD HAVE ACCESSED THIS DATABASE, AND |
| 10:37AM | 6 | THEIR SUPPORT STAFF SUGGESTED THOSE AVENUES TO THEM. |
| 10:37AM | 7 | FIRST, THEY SUGGESTED THAT THEY CONNECT WITH THE FBI. THE |
| 10:37AM | 8 | GOVERNMENT HAS ACCESS TO THE MOST SOPHISTICATED COMPUTER |
| 10:37AM | 9 | EXPERTS IN THE WORLD AT THE FBI. WE ALL KNOW FROM PUBLIC |
| 10:38AM | 10 | RECORDING OF THE SOPHISTICATED TOOLS THAT THE FBI USES EVERY |
| 10:38AM | 11 | DAY TO ACCESS FORENSIC DATA FROM COMPUTERS. THERE'S NO |
| 10:38AM | 12 | EVIDENCE THAT THE GOVERNMENT ACTED ON THAT SUGGESTION. THERE'S |
| 10:38AM | 13 | NO EVIDENCE TO THIS DAY THAT THE GOVERNMENT HAS EVER ASKED ITS |
| 10:38AM | 14 | COUNTERPARTS IN THE FBI IF THEY COULD OPEN THE DATABASE. |
| 10:38AM | 15 | AGAIN, THE SUPPORT STAFF SUGGESTED THAT THEY GET THE |
| 10:38AM | 16 | PHYSICAL SERVERS. THERE'S NO EVIDENCE THAT THEY DID THAT. |
| 10:38AM | 17 | THERE'S NO EVIDENCE THAT THE GOVERNMENT DID MUCH OF |
| 10:38AM | 18 | ANYTHING FOR A YEAR AND A HALF, WHICH IS THE FIRST TIME THAT IT |
| 10:38AM | 19 | REALIZED IT NEEDED A PASSWORD. AND AT THAT POINT IT WAS TOO |
| 10:38AM | 20 | LATE TO TRACK DOWN THE PEOPLE WHO MIGHT HAVE THAT PASSWORD. |
| 10:38AM | 21 | THE COURT: RIGHT, BECAUSE THEY RECEIVED IT ON |
| 10:38AM | 22 | AUGUST 27TH, AND FOUR DAYS LATER IT WAS DECOMMISSIONED NOT BY |
| 10:38AM | 23 | THE GOVERNMENT BUT BY SOMEONE ELSE, SOMEONE, A THIRD PARTY. I |
| 10:38AM | 24 | DON'T KNOW WHO DID THAT, BUT PERHAPS IT'S IN THE PROCESS OF |
| 10:38AM | 25 | DECOMMISSIONING. |

22

10:38AM 1      SO FOR THOSE FOUR DAYS THE GOVERNMENT SHOULD HAVE,

10:38AM 2   ACCORDING TO YOUR POSITION, SHOULD HAVE ACCESSED IT TO

10:39AM 3   DETERMINE WHETHER OR NOT THEY COULD ACTUALLY OPEN IT UP IN

10:39AM 4   THOSE FOUR DAYS BECAUSE THAT WAS THE LIFESPAN OF THE DATABASE,

10:39AM 5   AT LEAST AS IT EXISTED BEFORE IT WAS DECOMMISSIONED.

10:39AM 6      SO THEY SHOULD HAVE DONE SOMETHING IN THOSE FOUR DAYS, BUT

10:39AM 7   THEY DIDN'T.  SO IT SEEMS LIKE WHATEVER THEY DID AFTERWARDS,

10:39AM 8   ISN'T THAT KIND OF IMMATERIAL BECAUSE THEY COULDN'T HAVE DONE

10:39AM 9   THAT?

10:39AM 10     732-4 I THINK IS A JUNE 25TH EMAIL FROM DAVID TAYLOR TO

10:39AM 11  SOMEBODY, AND IT'S REGARDING A MEETING ON THE LIS.  I THINK YOU

10:39AM 12  SEE THAT.  AND DIDN'T HE SAY "WE SHOULD JUST GIVE THE DOJ THE

10:39AM 13  DATABASE AND LET THEM FIGURE IT OUT.  THEY WON'T KNOW WHAT TO

10:39AM 14  DO WITH IT AND THAT THE PEOPLE WHO DO ARE IN INDIA.  OUR

10:39AM 15  EXPERTS ARE THE ONLY ONES WHO UNDERSTAND IT, AND WE DON'T WANT

10:39AM 16  TO MAKE THEM PERCIPIENT WITNESSES.  IS THERE ANYONE LEFT IN THE

10:39AM 17  COMPANY WHO CAN ASSIST US IN ACTUALLY GETTING THE DATABASE TO

10:39AM 18  THE GOVERNMENT?"  AND THIS WAS AT A PRE-INDICTMENT TIME.

10:40AM 19     AND THERANOS HAD, OF COURSE, CONTROL OF THE LIS.  THEY HAD

10:40AM 20  ACCESS TO IT.  SO DOESN'T THAT SUGGEST THAT AT LEAST THERE WAS

10:40AM 21  SOME KNOWLEDGE, I WON'T CALL IT SCIENTER, BUT THERE WAS SOME

10:40AM 22  KNOWLEDGE THAT THIS KEY HAD TO BE CREATED BACK THEN?

10:40AM 23     AND I'M GETTING A LITTLE AHEAD OF OURSELVES, BUT IT SEEMS

10:40AM 24  LIKE YOUR CLIENT, AT LEAST THE DEFENSE, WOULD HAVE ALSO KNOWN

10:40AM 25  OF THE IMPORTANCE OF THIS SUCH THAT -- AND THIS IS KIND OF A

UNITED STATES COURT REPORTERS

**ER-3562**

23

10:40AM   1    BALANCING, I SUPPOSE, PART OF OUR BALANCING CONVERSATION --

10:40AM   2    SUCH THAT BECAUSE YOUR CLIENT HAD, LET'S CALL IT, PRIVITY TO

10:40AM   3    THE DATABASE AND KNOWLEDGE OF ITS IMPORTANCE, SHE, TOO, COULD

10:40AM   4    HAVE SECURED A COPY.  IS THAT SOMETHING THAT SHOULD ENTER INTO

10:40AM   5    THE CONVERSATION OR THE EQUATION?

10:40AM   6         I'VE ASKED YOU A LOT THERE, MS. SAHARIA.  I APOLOGIZE.

10:40AM   7              MS. SAHARIA:  YEAH.  SO I THINK THAT THERE ARE THREE

10:40AM   8    COMPONENTS TO THAT.  LET ME START WITH THE FIRST ONE.

10:40AM   9         OUR ARGUMENT DOES NOT REST ON FOUR DAYS.  THE FACT THAT

10:41AM  10    THE COPY WAS PRODUCED AND FOUR DAYS LATER THE PHYSICAL SERVER

10:41AM  11    WAS TAKEN APART AND MOVED IS NOT MATERIAL TO OUR ARGUMENT

10:41AM  12    BECAUSE THERE ARE STEPS THAT THE GOVERNMENT REASONABLY SHOULD

10:41AM  13    HAVE TAKEN EVEN AFTER THOSE FOUR DAYS.

10:41AM  14         FIRST, REACHED OUT TO THERANOS -- FIGURED OUT THAT THEY

10:41AM  15    COULDN'T OPEN THE DATABASE AND WHY.  AND THE REASON PRESUMABLY,

10:41AM  16    ACCORDING TO THE GOVERNMENT, IS BECAUSE THEY LACKED THE

10:41AM  17    PASSWORD.  IT TOOK THEM A YEAR AND A HALF TO REALIZE THAT.  BUT

10:41AM  18    IF THEY REALIZED THAT PROMPTLY, NOT WITHIN FOUR DAYS BUT WITHIN

10:41AM  19    A REASONABLE AMOUNT OF TIME, THEY COULD HAVE TALKED TO

10:41AM  20    THERANOS'S COUNSEL, ALERTED THEM TO THIS ISSUE, AND THEY COULD

10:41AM  21    HAVE, ONE WOULD THINK, FOUND SOMEONE WHO HAD THE APPROPRIATE

10:42AM  22    PASSWORD.

10:42AM  23         THERE IS EVIDENCE IN THE RECORD OF VARIOUS PEOPLE WHO

10:42AM  24    MIGHT HAVE HAD THAT PASSWORD, NONE OF WHOM THE GOVERNMENT

10:42AM  25    APPROACHED AT THE RELEVANT TIME OR THEY DIDN'T APPROACH THE

24

10:42AM 1    COUNSEL EITHER TO TRY TO GET THE PASSWORD.

10:42AM 2        LIKEWISE, AS I'VE ALREADY INDICATED, THE PHYSICAL SERVER

10:42AM 3    WAS, WE BELIEVE THIS WOULD COME OUT AT A HEARING, STILL

10:42AM 4    AVAILABLE IN THE POSSESSION OF THE ASSIGNEE.  THEY COULD HAVE

10:42AM 5    TAKEN THE PHYSICAL SERVER AT THAT TIME AND USED THE PHYSICAL

10:42AM 6    SERVER TO ACCESS THE LIS DATABASE.

10:42AM 7        SO THAT'S, THAT'S -- I THINK THE FIRST QUESTION IS WE'RE

10:42AM 8    NOT SAYING THEY HAD TO DO ALL OF THESE THINGS IN FOUR DAYS, BUT

10:42AM 9    PROSECUTORS HAVE AN OBLIGATION TO ACT DILIGENTLY AND PROMPTLY

10:42AM 10   WHEN THEY'RE DEALING WITH THE MOST CRITICAL EVIDENCE IN THE

10:42AM 11   CASE AND EVIDENCE THAT HAS EXTREME EXCULPATORY VALUE TO A

10:42AM 12   DEFENDANT TO MAKE SURE THAT THAT EVIDENCE IS PRESERVED AND

10:42AM 13   AVAILABLE TO THE DEFENDANT, AND THEY DIDN'T DO THAT HERE.  SO

10:43AM 14   THAT'S THE FIRST QUESTION.

10:43AM 15       THE COURT:  YOUR CLIENT HAD, YOUR CLIENT HAD ACTUAL

10:43AM 16   POSSESSION OF THE DATABASE BEFORE IT WAS DECOMMISSIONED.

10:43AM 17       MS. SAHARIA:  WELL, THERANOS DID.

10:43AM 18       THE COURT:  YES.

10:43AM 19       MS. SAHARIA:  AT THE TIME OF THE DECOMMISSIONING,

10:43AM 20   MS. HOLMES WAS NOT CEO OF THE COMPANY.  SHE HAD ALREADY BEEN

10:43AM 21   INDICTED.

10:43AM 22       THE GOVERNMENT HAS PRODUCED NO EVIDENCE DESPITE ITS

10:43AM 23   CONTINUED INSINUATIONS THAT MS. HOLMES HAD ANY KNOWLEDGE OF ANY

10:43AM 24   OF THESE FACTS.

10:43AM 25       THE COURT:  SURE.  THAT WAS --

25

10:43AM  1          MS. SAHARIA:  NOW, WITH RESPECT TO WHETHER SHE COULD

10:43AM  2      HAVE SECURED THE DATABASE, I'M NOT SURE WHAT I CAN DISCLOSE

10:43AM  3      ABOUT THAT ISSUE WITHOUT DISCLOSING PRIVILEGED COMMUNICATIONS,

10:43AM  4      SO I DON'T FEEL COMFORTABLE ANSWERING YOUR HONOR'S QUESTION AT

10:43AM  5      THIS TIME OTHER THAN TO SAY THAT MS. HOLMES HAS ALWAYS BELIEVED

10:43AM  6      THAT THE DATABASE WOULD BE EXCULPATORY IN THIS CASE.

10:43AM  7          THE SECOND QUESTION THAT YOUR HONOR ASKED RELATES TO --

10:44AM  8          THE COURT:  THEN WHY DIDN'T YOU HAVE A COPY OF IT,

10:44AM  9      THEN?  I GUESS I'M NOT MISSING -- I'M MISSING THAT PART.  IS

10:44AM 10      THAT PART OF THE BALANCING THAT IT WAS NOT IN THE GOVERNMENT'S

10:44AM 11      POSSESSION, THE ACTUAL WORKING COPY?  THE GOVERNMENT NEVER HAD

10:44AM 12      AN ACTUAL WORKING COPY OF THE DATABASE.  THERANOS DID.

10:44AM 13          AND AS YOU JUST SAID, IT WAS ALWAYS IMPORTANT TO YOUR

10:44AM 14      CLIENT FOR THE EXCULPATORY REASONS.  SHE HAD COUNSEL AT THE

10:44AM 15      TIME THAT THIS WAS GOING ON.

10:44AM 16          DOES THAT FACT ENTER INTO THE BALANCING AT ALL?

10:44AM 17          MS. SAHARIA:  I'M RELUCTANT TO ANSWER THAT QUESTION

10:44AM 18      WITHOUT CONSULTING WITH THE REST OF MY TEAM AND MY CLIENT --

10:44AM 19          THE COURT:  OKAY.  SURE.  OF COURSE.

10:44AM 20          MS. SAHARIA:  -- BECAUSE I DON'T WANT TO REVEAL

10:44AM 21      PRIVILEGED COMMUNICATIONS OR COMMON INTEREST PRIVILEGED

10:44AM 22      COMMUNICATIONS, YOUR HONOR.

10:44AM 23          THE COURT:  OKAY.  FAIR ENOUGH.  FAIR ENOUGH.

10:44AM 24          MS. SAHARIA:  BUT I WILL CONSULT WITH MY TEAM ABOUT

10:44AM 25      THAT QUESTION.

10:45AM 1   YOU HAD ALSO ASKED A QUESTION ABOUT A PARTICULAR EMAIL

10:45AM 2   FROM MR. TAYLOR WHO DID BECOME THE CEO OF THE COMPANY. I DON'T

10:45AM 3   THINK ANYTHING IN THAT EMAIL REVEALS ANY SORT OF NEFARIOUS

10:45AM 4   INTENT TO HIDE A PASSWORD FROM THERANOS, EXCUSE ME, FROM THE

10:45AM 5   GOVERNMENT. THERE'S NOTHING I THINK IN THAT EMAIL ABOUT THAT

10:45AM 6   FACT, BUT I DO THINK THAT'S WHY ALL OF THESE ISSUES CREATE

10:45AM 7   DISPUTED ISSUES OF FACT THAT SHOULD BE EXPLORED AT A HEARING.

10:45AM 8   WHAT DID THE GOVERNMENT KNOW ABOUT THE IMPLICATIONS OF

10:45AM 9   THERANOS CLOSING?

10:45AM 10  WHY DID IT WAIT A YEAR AND A HALF TO SECURE THE MOST

10:45AM 11  IMPORTANT EVIDENCE IN THE CASE AT A TIME WHEN IT KNEW THE

10:45AM 12  COMPANY WAS ABOUT TO CLOSE AND THAT IT MAY LACK ACCESS TO THAT

10:45AM 13  INFORMATION?

10:45AM 14  WHY DID IT SIT WITH THE HARD COPY OF THE LIS DATABASE FOR

10:45AM 15  A YEAR AND A HALF?

10:46AM 16  WHY DID IT SHOW SUCH LITTLE INTEREST IN THIS EVIDENCE THAT

10:46AM 17  IT CLAIMS WOULD HAVE BEEN INCULPATORY, THE MOST RELEVANT

10:46AM 18  EVIDENCE IN THE CASE, AND IT SHOWED NO INTEREST IN ACCESSING IT

10:46AM 19  FOR A YEAR AND A HALF, AND BY THE TIME IT FINALLY TRIED TO

10:46AM 20  ACCESS IT, ALL OF THE WITNESSES WHO COULD HAVE PROVIDED A

10:46AM 21  PASSWORD PRESUMABLY DON'T HAVE ACCESS TO IT ANYMORE, AND THE

10:46AM 22  PHYSICAL SERVER THAT COULD HAVE BEEN RESTORED, ACCORDING TO THE

10:46AM 23  EXPERTS WHO WORKED AT THERANOS, ALSO HAD BEEN LOST?

10:46AM 24  SO IT IS FUNDAMENTALLY THE GOVERNMENT'S LACK OF DILIGENCE,

10:46AM 25  ITS FAILURE TO HEED THE ADVICE OF ITS STAFF THAT HAS PUT -- AND

10:46AM 1    ITS EXTREME DELAY IN TRYING TO GET THIS EVIDENCE IN THE FIRST

10:46AM 2    PLACE THAT IS AT LEAST PARTLY TO BLAME FOR OUR INABILITY TO USE

10:46AM 3    THE DATABASE.

10:46AM 4        I'VE JUMPED AHEAD TO KIND OF COVERING A LOT OF THE FACTS.

10:46AM 5    LET ME JUST, IF I MAY, TOUCH ON A FEW LEGAL ISSUES THAT I THINK

10:47AM 6    COME OUT OF THE PARTIES' BRIEFS, AND THEN I'LL GO BACK AND

10:47AM 7    COVER A FEW OF THE OTHER RELEVANT FACTS HERE.

10:47AM 8        AS I INDICATED AT THE BEGINNING, WE HAVE MOVED UNDER TWO

10:47AM 9    STANDARDS.  THE FIRST IS THE DUE PROCESS CLAUSE AND THE SECOND

10:47AM 10   IS LOUD HAWK.

10:47AM 11       THE LOUD HAWK STANDARD GOVERNS SANCTIONS THAT ARE LESS

10:47AM 12   THAN DISMISSAL SUCH AS SUPPRESSION, AND THE LOUD HAWK TEST IS

10:47AM 13   GOVERNED BY THEN JUDGE KENNEDY'S, JUSTICE KENNEDY'S CONCURRING

10:47AM 14   OPINION IN THAT CASE THAT HAS BEEN ADOPTED BY THE NINTH CIRCUIT

10:47AM 15   AS THE LAW OF THE CIRCUIT.

10:47AM 16       JUDGE KENNEDY ARTICULATED A BALANCING TEST THAT I THINK

10:47AM 17   YOUR HONOR HAS ALLUDED TO.  YOU HAVE ON ONE SIDE THE QUALITY OF

10:47AM 18   THE GOVERNMENT CONDUCT THAT IS WEIGHED AGAINST THE PREJUDICE TO

10:47AM 19   THE DEFENDANT.  AND AS JUDGE KENNEDY EXPLAINED, IT'S DONE ON A

10:47AM 20   SLIDING SCALE OF SORTS.  SO THE GREATER THE PREJUDICE TO THE

10:47AM 21   DEFENDANT, THE LESS CULPABLE CONDUCT YOU REQUIRE FROM THE

10:48AM 22   GOVERNMENT AND VICE VERSA, THE MORE CULPABLE THE GOVERNMENT

10:48AM 23   CONDUCT, THE LESS THE AMOUNT OF PREJUDICE THAT WOULD BE

10:48AM 24   REQUIRED.  AND IN CASES OF SEVERE PREJUDICE, FOR EXAMPLE, HE

10:48AM 25   SAID THE GOOD FAITH OR BAD FAITH OF THE GOVERNMENT MIGHT BE

28

10:48AM 1       IMMATERIAL TO CONDUCTING THAT BALANCING TEST.

10:48AM 2           AS I INDICATED BEFORE, IT'S THE GOVERNMENT'S BURDEN UNDER

10:48AM 3       THAT TEST TO JUSTIFY ITS CONDUCT, AND THEN THE DEFENDANT BEARS

10:48AM 4       THE BURDEN TO ESTABLISH PREJUDICE.

10:48AM 5           LET ME JUST TOUCH ON TWO ISSUES THAT RELATE TO THAT

10:48AM 6       BALANCING TEST THAT COME OUT OF THE GOVERNMENT'S OPPOSITION

10:48AM 7       BRIEF.

10:48AM 8           FIRST, THE GOVERNMENT REPEATEDLY CLAIMS IN ITS BRIEF THAT

10:48AM 9       BAD FAITH IS REQUIRED.  UNDER LOUD HAWK THAT IS SIMPLY

10:48AM 10      INCORRECT.  THAT'S AN INCORRECT STATEMENT OF THE LAW.

10:48AM 11          THE GOVERNMENT CITED JUDGE TRASK'S OPINION IN LOUD HAWK

10:48AM 12      FOR THAT PROPOSITION WHERE THEY STATED THAT BAD FAITH OR

10:48AM 13      CONNIVANCE IS REQUIRED.  BUT JUDGE TRASK'S OPINION IS NOT THE

10:49AM 14      LAW OF THE CIRCUIT, JUDGE KENNEDY'S OPINION IS.  AND AS I'VE

10:49AM 15      INDICATED, JUDGE KENNEDY'S OPINION IS CRYSTAL CLEAR THAT BAD

10:49AM 16      FAITH IS NOT REQUIRED.

10:49AM 17          THE SECOND IS THAT THE SAME INQUIRY UNDER LOUD HAWK

10:49AM 18      APPLIES TO A CASE WHERE THE GOVERNMENT EITHER FAILED TO

10:49AM 19      PRESERVE EVIDENCE IN ITS POSSESSION OR FAILED TO COLLECT

10:49AM 20      EVIDENCE.

10:49AM 21          WE THINK THIS IS NOT A CASE ABOUT A FAILURE TO COLLECT FOR

10:49AM 22      THE REASONS WE'VE BEEN DISCUSSING.  THE GOVERNMENT DID HAVE A

10:49AM 23      COPY OF THE LIS DATABASE IN ITS POSSESSION AND DIDN'T TAKE ANY

10:49AM 24      STEPS TO TRY TO MAKE IT WORK, BUT EVEN IF THE COURT THOUGHT

10:49AM 25      THAT THIS WAS A CASE ABOUT A FAILURE TO COLLECT, WHEN

UNITED STATES COURT REPORTERS

**ER-3568**

29

10:49AM 1   JUDGE KENNEDY ENUMERATED THE FACTORS THAT ARE RELEVANT TO THE

10:49AM 2   GOVERNMENT CONDUCT, ONE OF THE FACTORS IS, QUOTE, "WHETHER THE

10:49AM 3   EVIDENCE WAS LOST OR DESTROYED WHILE IN ITS CUSTODY."

10:49AM 4       SO THAT IS A RELEVANT FACTOR, WHETHER THE GOVERNMENT HAD

10:49AM 5   CUSTODY OF THE EVIDENCE WHEN IT WAS LOST, BUT IT'S NOT

10:50AM 6   DISPOSITIVE.  JUDGE KENNEDY CLEARLY ARTICULATED THAT AS ONE OF

10:50AM 7   SEVERAL RELEVANT FACTORS.  AND SO WE SUBMIT THAT THE

10:50AM 8   GOVERNMENT'S SUBMISSION TO THE COURT THAT THAT IS DISPOSITIVE

10:50AM 9   IS NOT SUPPORTED BY LOUD HAWK AND NO NINTH CIRCUIT CASE SO

10:50AM 10  HOLDS.

10:50AM 11      I'M NOT GOING TO DISCUSS THE DUE PROCESS INQUIRY UNTIL THE

10:50AM 12  COURT HAS QUESTIONS ABOUT THAT, BUT I WILL JUST NOTE THAT IT'S

10:50AM 13  ALSO CRYSTAL CLEAR UNDER NINTH CIRCUIT LAW THAT A FAILURE TO

10:50AM 14  COLLECT EVIDENCE CAN GIVE RISE TO A DUE PROCESS VIOLATION IF IT

10:50AM 15  OCCURS IN BAD FAITH, AND THAT'S THE MILLER VERSUS VASQUEZ CASE.

10:50AM 16      SO, YOUR HONOR, WE'VE ALREADY DISCUSSED SOME OF THE

10:50AM 17  RELEVANT FACTS THAT WE THINK GIVE RISE TO A DISPUTE OF FACT

10:50AM 18  WITH RESPECT TO THE GOVERNMENT'S CONDUCT.  THE GOVERNMENT

10:50AM 19  ITSELF HAS CONCEDED THAT DISPUTE IN THE PAST.  AT THE MAY 4TH

10:50AM 20  HEARING IT SAID, "WHEN IT COMES TO BLAME FOR THE LOSS OF THE

10:51AM 21  LIS, AS THE COURT CAN TELL THIS IS A VERY HOTLY DEBATED FACTUAL

10:51AM 22  DISPUTE."  THAT WAS AT PAGE 81 AND THEN AGAIN AT PAGE 83.  SO

10:51AM 23  THERE IS A FACTUAL DISPUTE HERE.  THE GOVERNMENT RECOGNIZES

10:51AM 24  THAT.

10:51AM 25      WE FULLY AGREE THERE IS A DISPUTE OF FACT.  EVEN IF THE

10:51AM 1    COURT THINKS THAT THERE IS SOME BLAME ON THE THERANOS SIDE,

10:51AM 2    AND, AGAIN, NONE OF THAT BLAME LIES WITH MS. HOLMES, THERE'S A

10:51AM 3    WHOLE HOST OF FACTS THAT ARE NOT YET CLEAR BOTH WITH RESPECT TO

10:51AM 4    WHAT HAPPENED ON THE THERANOS SIDE OF THINGS AND WITH RESPECT

10:51AM 5    TO WHAT HAPPENED ON THE GOVERNMENT'S SIDE OF THINGS AND IN

10:51AM 6    PARTICULAR THE REASONS WHY THE PROSECUTORS BOTH DELAYED SO LONG

10:51AM 7    IN ATTEMPTING TO COLLECT THE EVIDENCE AND THEN WHY THEY DELAYED

10:51AM 8    SO LONG IN ATTEMPTING TO ACCESS THE EVIDENCE SUCH THAT THE

10:51AM 9    ABILITY TO ACCESS IT OR TO OBTAIN THE PHYSICAL SERVER WAS AT

10:51AM 10   THAT POINT GONE.

10:52AM 11       THE GOVERNMENT CLEARLY KNEW THE VALUE OF LIS.  IT HAD

10:52AM 12   KNOWN FOR A YEAR AND A HALF, SINCE DECEMBER OF 2016 AT LEAST,

10:52AM 13   ABOUT THE LIS DATABASE.  IT KNEW THAT IT CONTAINED ALL OF THE

10:52AM 14   TEST RESULTS.  IT KNEW THAT IT IDENTIFIED THE SPECIFIC DEVICE

10:52AM 15   THAT GENERATED EACH RESULT WHICH IS VERY IMPORTANT EVIDENCE IN

10:52AM 16   THIS CASE THAT HAS BEEN LOST.  IT KNEW THAT THE ACCURACY AND

10:52AM 17   RELIABILITY OF THE TEST RESULTS WOULD BE CENTRAL TO ITS CASE

10:52AM 18   GIVEN THE ALLEGATIONS IN THE INDICTMENT, AND IT KNEW THAT SOME

10:52AM 19   DOCTORS WHO HAD SENT PATIENTS TO LIS BELIEVED THAT THEIR TEST

10:52AM 20   RESULTS WERE ACCURATE AND RELIABLE.  THOSE TEST RESULTS

10:52AM 21   OF COURSE RESIDED IN THE LIS AND CONSTITUTE EXCULPATORY

10:52AM 22   EVIDENCE THAT WAS IN THE LIS.

10:52AM 23       I'M NOT GOING TO REPEAT THE FACTS THAT WE HAVE TALKED

10:52AM 24   ABOUT WITH RESPECT TO THE GOVERNMENT'S BOTH DISREGARDING OF THE

10:53AM 25   ADVICE FROM THERANOS'S COUNSEL ABOUT WHAT THEY NEEDED TO DO TO

10:53AM 1    RESTORE THE DATABASE, TO OBTAIN THE SPECIFIC SOFTWARE, NOR --

10:53AM 2    AND THEN AS WELL AS THE ADVICE FROM THE SUPPORT STAFF.  JUST

10:53AM 3    FOR THE RECORD, THAT'S OUTLINED IN THE GOVERNMENT'S <u>BRADY</u>

10:53AM 4    LETTER AT PARAGRAPHS 46 TO 47 AND 49.  AS I INDICATED, THERE IS

10:53AM 5    REASON TO THINK THAT THOSE WOULD HAVE BEEN FRUITFUL AVENUES

10:53AM 6    EITHER CONSULTING WITH THE FBI OR OBTAINING THE ACTUAL PHYSICAL

10:53AM 7    HARDWARE WHICH MULTIPLE WITNESSES HAVE SAID COULD HAVE BEEN

10:53AM 8    RESTORED.

10:53AM 9         TO BE SURE THE GOVERNMENT -- YOU KNOW, I'M SURE WE'RE

10:53AM 10   GOING TO HEAR THIS -- WANTS TO PIN THE BLAME ON THE THERANOS

10:53AM 11   INDIVIDUALS WHO PRODUCED THE DATABASE COPY, AGAIN, THAT WAS

10:53AM 12   ONLY ONE OF TWO PATHS.  THAT DOESN'T ADDRESS THE SERVER ITSELF

10:54AM 13   AND THE GOVERNMENT'S FAILURE TO COLLECT THAT PHYSICAL SERVER.

10:54AM 14   BUT AGAIN, EVEN WITH RESPECT TO THAT, WHAT HAPPENED WITH THE

10:54AM 15   DATABASE COPY, THE RECORD IS JUST NOT VERY PRECISE ABOUT WHY

10:54AM 16   THAT HAPPENED, WHAT THOSE INDIVIDUALS THOUGHT ABOUT WHETHER THE

10:54AM 17   GOVERNMENT COULD ACCESS THAT COPY.

10:54AM 18        AND WITH THE BURDEN ON THE GOVERNMENT TO JUSTIFY ITS

10:54AM 19   CONDUCT AND THEIR FAILURE TO JUSTIFY THEIR EXTREME DELAYS IN

10:54AM 20   BOTH OBTAINING AND ACCESSING THE COPY, WE JUST THINK THEY

10:54AM 21   HAVEN'T MADE THAT SHOWING AT THIS POINT AND THAT IS WHY A

10:54AM 22   HEARING IS REQUIRED.

10:54AM 23        THE COURT:  THANK YOU.

10:54AM 24        LET ME ASK, MS. SAHARIA, WE'RE TALKING ABOUT ANECDOTAL,

10:54AM 25   AND THIS IS PART OF THE IN LIMINE MOTIONS, WHETHER OR NOT

32

10:54AM 1    ANECDOTAL INFORMATION CAN COME IN.  YOUR IN LIMINE MOTION,

10:54AM 2    MAYBE IT WAS THE GOVERNMENT'S, SOUGHT TO PRECLUDE YOU, HOUR

10:54AM 3    TEAM, FROM USING THE TERM "ANECDOTAL.  I THINK THERE WAS

10:54AM 4    SOMETHING PEJORATIVE ABOUT THAT TERM IN THE GOVERNMENT'S MIND.

10:55AM 5        AND I THINK I SAID, NO, YOU CAN PUT ON A DEFENSE.  YOU

10:55AM 6    CAN CALL IT WHAT YOU WOULD LIKE, ET CETERA.

10:55AM 7        IN THAT REGARD IT SEEMS LIKE THERE'S CRITICISM OF AT LEAST

10:55AM 8    THE STATE OF THE EVIDENCE NOW, PRETRIAL I UNDERSTAND, THAT

10:55AM 9    THERE WAS ARGUMENT IN LIMINE THAT, WELL, THEY'RE ONLY GOING TO

10:55AM 10   HAVE 11 WITNESSES WHO ARE TALKING TO TALK ABOUT BAD TESTS, I'LL

10:55AM 11   JUST CALL IT BAD TESTS, INCORRECT TESTS, AND THAT'S NOT ENOUGH.

10:55AM 12   AND THAT WAS, I THINK, THE DEFENSE ARGUMENT AS TO AN ISSUE.

10:55AM 13       BUT IN THE DOCUMENTS THAT I'VE READ IN REGARDS TO THIS

10:55AM 14   MOTION, I THINK YOU TALK ALSO ABOUT -- YOUR TEAM, NOT YOU BUT

10:55AM 15   YOUR TEAM, TALK ABOUT YOU HAVE OTHER DOCTORS WHO, INCLUDING A

10:55AM 16   DOCTOR WHO IS GOING TO SAY, OH, THEY WERE MY GO TO.  THERANOS

10:55AM 17   WAS MY GO-TO TESTER, AND I HAD GREAT CONFIDENCE IN THEM.

10:55AM 18       I RAISE THAT BECAUSE THAT SEEMS THAT YOU HAVE EVIDENCE

10:55AM 19   THAT YOU CAN PUT ON TO REBUT, TO CHALLENGE THE ANECDOTAL, I'LL

10:56AM 20   CALL IT, EVIDENCE THAT THE GOVERNMENT IS GOING TO PUT ON

10:56AM 21   VIS-A-VIS THESE DOCTORS THAT YOU HAVE IDENTIFIED AND OTHER

10:56AM 22   WITNESSES THAT YOU HAVE IDENTIFIED IN THESE PLEADINGS.

10:56AM 23       IS THAT ACCURATE?

10:56AM 24           MS. SAHARIA:  SO I THINK THAT QUESTION BRINGS US TO

10:56AM 25   THE SECOND PART OF THE BALANCING TEST, WHICH IS WHAT IS THE

10:56AM 1    PREJUDICE TO THE DEFENSE?

10:56AM 2       AND ONE OF THE FACTORS THAT JUDGE KENNEDY OUTLINED IN

10:56AM 3    LOUD HAWK IS THE ADEQUACY OF THE SUBSTITUTE EVIDENCE, IN THIS

10:56AM 4    CASE SUBSTITUTE EVIDENCE, ANECDOTES FROM INDIVIDUAL DOCTORS,

10:56AM 5    FOR INSTANCE, THAT THEY RECEIVED IN ACCURATE TEST RESULTS.

10:56AM 6       AND WE WOULD SUBMIT THAT THERE'S NO SUBSTITUTE FOR THE

10:56AM 7    LIS DATABASE.  THE GOVERNMENT ADMITTED THIS ITSELF IN ITS

10:56AM 8    OPPOSITION BRIEF TO OUR MOTION TO EXCLUDE ANECDOTAL EVIDENCE.

10:56AM 9    THIS WAS ECF 682, PAGE 1.  THEY SAID, "DATA IS A POWERFUL THING

10:57AM 10    BECAUSE IT SPEAKS FOR ITSELF."

10:57AM 11       WE TOTALLY AGREE WITH THAT.  THERE'S NOTHING LIKE HAVING

10:57AM 12    THE ACTUAL DATA AND THE ACTUAL TEST RESULTS AND ALL OF THE

10:57AM 13    INFORMATION ABOUT THOSE TEST RESULTS TO CONVINCE A JURY THAT

10:57AM 14    THE GOVERNMENT'S CASE IS WRONG.

10:57AM 15       AN ANECDOTE FROM A DOCTOR THAT THEY HAD A GOOD EXPERIENCE

10:57AM 16    IS NO SUBSTITUTE FOR HARD COLD SCIENTIFIC DATA THAT RESIDED IN

10:57AM 17    THE DATABASE.

10:57AM 18       I CAN GIVE THE COURT I THINK MAYBE FIVE EXAMPLES OF THE

10:57AM 19    EXTREME PREJUDICE THAT HAS ACCRUED TO MS. HOLMES FROM THE

10:57AM 20    INABILITY TO ACCESS THE LIS DATA THAT I THINK GO TO THIS

10:57AM 21    QUESTION.

10:57AM 22       THE FIRST IS VAST QUANTITIES OF ACCURATE AND RELIABLE TEST

10:57AM 23    RESULTS RESIDE IN THE LIS DATABASE, RESIDED IN THE DATABASE I

10:57AM 24    SHOULD SAY, ALMOST CERTAINLY MILLIONS OF THEM.

10:57AM 25       AND WE CAN, YOU KNOW, CALL A DOCTOR TO TALK ABOUT THEIR

34

10:58AM 1    ANECDOTAL EXPERIENCE TO TRY TO COUNTER THE GOVERNMENT'S

10:58AM 2    ANECDOTES, BUT THAT'S NO MATCH FOR THE MILLIONS OF WHAT WE

10:58AM 3    BELIEVE ARE MILLIONS OF ACCURATE RESULTS IN THE DATABASE.

10:58AM 4        NOW, THE GOVERNMENT RESPONDS TO THAT, WELL, THAT YOU CAN'T

10:58AM 5    KNOW FROM ANY ONE TEST RESULT IN THE DATABASE WHETHER IT WAS

10:58AM 6    ACCURATE OR NOT.  YOU KNOW, MAYBE IT WAS WITHIN A NORMAL RANGE,

10:58AM 7    BUT THE PATIENT ACTUALLY SHOULD HAVE HAD AN ABNORMAL TEST

10:58AM 8    RESULT, AND SO YOU CAN'T KNOW THAT IT'S ACCURATE.  THAT'S THEIR

10:58AM 9    RESPONSE.

10:58AM 10       PERHAPS IT'S TRUE AS TO ONE INDIVIDUAL TEST RESULT, BUT

10:58AM 11   WHEN YOU HAVE MILLIONS OF TEST RESULTS, YOU, OF COURSE, CAN

10:58AM 12   PERFORM ANALYSES WITH THAT DATA THAT WOULD LEAVE A JURY TO

10:58AM 13   CONCLUDE THAT THEY WERE ACCURATE AND RELIABLE.

10:58AM 14       FOR EXAMPLE, YOU COULD IDENTIFY THE SPREAD OF TEST RESULTS

10:58AM 15   THAT OCCURRED OVER VARIOUS REFERENCE RANGES AND DETERMINE HOW

10:58AM 16   MANY OF THEM FELL WITHIN THE EXPECTED RANGE.  WERE THERE AN

10:58AM 17   EXTREME NUMBER OF OUTLIERS OR NOT?  AND IF THERE WERE NOT, THAT

10:59AM 18   WOULD BE PRETTY GOOD EVIDENCE TO A JURY THAT THESE TESTS WERE

10:59AM 19   ACCURATE AND RELIABLE BECAUSE THEY FELL WITHIN THE EXPECTED

10:59AM 20   RANGE.  AND WE CAN'T --

10:59AM 21           THE COURT:  DID THE LIS -- I'M SORRY, MS. SAHARIA.

10:59AM 22           MS. SAHARIA:  YES.

10:59AM 23           THE COURT:  DID THE LIS ALLOW FOR THE INTRODUCTION

10:59AM 24   OF THIRD PARTY TESTS?

10:59AM 25       I THINK THE EVIDENCE SEEMS TO SHOW THAT THERE WERE THIRD

35

10:59AM 1    PARTY TESTS THAT WERE TAKEN FROM PATIENTS WHO, FOR WHATEVER

10:59AM 2    REASON, WANTED TO GET A TEST OUTSIDE OF THERANOS, THEY GOT A

10:59AM 3    DIFFERENT RESULT.  AND JUST FOR PURPOSES OF OUR DISCUSSION,

10:59AM 4    I'LL SAY THAT THEY BELIEVED THAT THAT THIRD PARTY TEST WAS MORE

10:59AM 5    ACCURATE.

10:59AM 6        AND DID THE LIS CONTAIN INFORMATION SUCH THAT THE ACCURATE

10:59AM 7    TESTS, THE THIRD PARTY TEST WAS REINTRODUCED INTO THE LIS?

10:59AM 8        MS. SAHARIA:  I DON'T BELIEVE SO, YOUR HONOR.  BUT

10:59AM 9    IF I'M WRONG, MR. WADE CAN JUMP IN AND SAY SO.

11:00AM 10       THERE ARE CIRCUMSTANCES WHERE THERANOS ITSELF WOULD SEND

11:00AM 11   CERTAIN TESTS OUT TO A THIRD PARTY VENDOR IF IT DIDN'T HAVE THE

11:00AM 12   CAPACITY TO CONDUCT THAT PARTICULAR TEST.  I UNDERSTAND THAT

11:00AM 13   THAT IS COMMON IN THE LABORATORY INDUSTRY.  THEY'RE CALLED

11:00AM 14   REFERENCE LABS.

11:00AM 15       I THINK THAT INFORMATION WOULD BE INCLUDED IN THE

11:00AM 16   LIS DATABASE.  THAT IS IMPORTANT INFORMATION, THE PARTICULAR

11:00AM 17   WAY THAT A TEST WAS CONDUCTED, WHICH DEVICE WAS IT CONDUCTED

11:00AM 18   ON.  WAS IT CONDUCTED ON THE THERANOS DEVICE OR WAS IT

11:00AM 19   CONDUCTED ON A COMMERCIALLY AVAILABLE DEVICE?  THAT'S CRITICAL

11:00AM 20   INFORMATION THAT IS NOW LOST TO US BECAUSE -- TAKE ONE OF THE

11:00AM 21   GOVERNMENT'S ANECDOTAL PATIENTS WHO IS GOING TO COME IN AND SAY

11:00AM 22   THEIR TEST RESULT WAS INACCURATE.  IF WE CAN SHOW AT THE LIS

11:00AM 23   DATABASE THAT THAT TEST RESULT WAS NOT RUN ON A THERANOS DEVICE

11:00AM 24   BUT WAS RUN ON SOME OTHER COMMERCIALLY AVAILABLE DEVICE, THAT

11:01AM 25   WOULD BE PRETTY GOOD EVIDENCE THAT THE ERROR WAS NOT THE RESULT

11:01AM 1    OF THERANOS TECHNOLOGY, IT WAS THE RESULT OF SOME OTHER FACTOR.

11:01AM 2        SO WE CAN'T MEET THE GOVERNMENT'S ANECDOTES WITHOUT ACCESS

11:01AM 3    TO THE FULL RANGE OF LIS DATA THAT RELATES TO THESE TEST

11:01AM 4    RESULTS.

11:01AM 5        THE COURT:  IS THAT ONE OF THE ALLEGATIONS THAT THE

11:01AM 6    GOVERNMENT MAKES THAT THERANOS WAS REPRESENTING THAT ALL OF THE

11:01AM 7    TESTS WERE DONE ON THEIR PROPRIETARY DEVICES WHEN, IN FACT,

11:01AM 8    THEY WERE DONE ON A SEPARATE DEVICE?  SO WOULDN'T THAT BE

11:01AM 9    INCULPATING EVIDENCE?

11:01AM 10       MS. SAHARIA:  WELL, WITH RESPECT TO THE PATIENT

11:01AM 11   COUNTS THAT WOULD BE EXCULPATING EVIDENCE, YOUR HONOR, BECAUSE

11:01AM 12   THEIR CLAIM IS THAT THERANOS TECHNOLOGY WAS INCAPABLE OF

11:01AM 13   PRODUCING ACCURATE AND RELIABLE RESULTS.

11:01AM 14       SO IF A PATIENT IS GOING TO COME IN AND TALK ABOUT AN

11:02AM 15   INACCURATE TEST RESULT BUT THE CAUSE OF THAT INACCURACY CANNOT

11:02AM 16   POSSIBLY BE THERANOS TECHNOLOGY, THAT WOULD BE EXCULPATORY

11:02AM 17   INFORMATION WITH RESPECT TO THAT INDIVIDUAL PATIENT BECAUSE IT

11:02AM 18   WOULD SHOW THE CAUSE MUST BE SOMETHING ELSE.

11:02AM 19       NOW, A FEW OTHER EXAMPLES.  WITH RESPECT TO THE CMS

11:02AM 20   REPORT, FOR EXAMPLE, WE CAN'T ADEQUATELY REBUT THE GOVERNMENT'S

11:02AM 21   RELIANCE ON THE CMS REPORT WITHOUT ACCESS TO LIS BECAUSE THE

11:02AM 22   DATA, YOU KNOW, THE SMALL SAMPLES OF DATA THAT ARE REFLECTED IN

11:02AM 23   THE CMS REPORT OF COURSE CAME OUT OF LIS.  THEY REFLECT

11:02AM 24   INFORMATION IN LIS, BUT THEY'RE ONLY FOR LIMITED TIME PERIODS.

11:02AM 25   AND WE LACK THE FULL DATA FROM LIS THAT WOULD BE NECESSARY TO

11:02AM 1    PUT THAT DATA IN CONTEST.

11:02AM 2         THE COURT:  IS THERE SOME DATA FROM LIS THAT EXISTS

11:02AM 3    THAT RELATES TO CMS, THOUGH?  I THOUGHT I READ SOMETHING THAT

11:02AM 4    SAID THAT THERE IS SOME DATA FROM THE LIS THAT EXISTS AND

11:03AM 5    PERHAPS THAT'S RELEVANT TO THE CMS?

11:03AM 6         MS. SAHARIA:  WELL, THERE IS SOME DATA FROM CMS THAT

11:03AM 7    WAS PRODUCED -- EXCUSE ME, FROM LIS THAT WAS PRODUCED OVER THE

11:03AM 8    COURSE OF THE GOVERNMENT'S INVESTIGATION IN RESPONSE TO

11:03AM 9    SPECIFIC REQUESTS FOR SPECIFIC KINDS OF INFORMATION, BUT IT'S

11:03AM 10   NOT THE FULL RANGE OF DATA.

11:03AM 11        NOW, I THINK WHAT YOUR HONOR MIGHT BE THINKING OF IS THAT

11:03AM 12   THE GOVERNMENT HAS REPEATEDLY REFERRED TO POTENTIAL TESTIMONY

11:03AM 13   FROM THERANOS'S LAB DIRECTOR IN 2016.  HIS NAME IS MR. DAS WHO

11:03AM 14   THEY WANT TO TESTIFY ABOUT VARIOUS ANALYSES THAT HE PERFORMED

11:03AM 15   FOLLOWING THE CMS REPORT, AND, OF COURSE, THOSE WOULD HAVE BEEN

11:03AM 16   PERFORMED USING DATA FROM THE LIS.

11:03AM 17        HOW ARE WE SUPPOSED TO CONFRONT HIS RECOLLECTION OF WHAT

11:03AM 18   ANALYSES HE PERFORMED OR TEST THE RELIABILITY OF HIS ANALYSES

11:04AM 19   WITHOUT ACCESS TO THE ACTUAL DATA ON WHICH HE BASED THOSE

11:04AM 20   ANALYSES?

11:04AM 21        THE LOSS OF THE LIS DATA IS QUITE EQUIVOCAL TO CONFRONTING

11:04AM 22   THAT KIND OF TESTIMONY THAT THEY WANT TO PUT AT ISSUE.  AND

11:04AM 23   SIMILARLY WITH THE TESTIMONY OF DR. MASTER, IN HIS SUPPLEMENTAL

11:04AM 24   REPORT HE CONDUCTS VARIOUS CALCULATIONS THAT USES INPUT, OTHER

11:04AM 25   CALCULATIONS PERFORMED BY UNIDENTIFIED THERANOS WITNESSES THAT

| | | |
|---|---|---|
| 11:04AM | 1 | THEY DID WITH THE LIS DATA.  SO HE'S NOW TWO OR THREE STEPS |
| 11:04AM | 2 | REMOVED FROM THE LIS DATA PERFORMING CALCULATIONS, AND WITHOUT |
| 11:04AM | 3 | ACCESS TO THE LIS DATA, IT'S UNCLEAR HOW WE CAN TEST THE |
| 11:04AM | 4 | RELIABILITY OF THOSE CALCULATIONS. |
| 11:04AM | 5 | SO THERE ARE ALL SORTS OF WAYS IN WHICH OUR LACK OF ACCESS |
| 11:04AM | 6 | TO THE LIS DATA BOTH DEPRIVES US OF THE MOST CRITICAL |
| 11:04AM | 7 | EXCULPATORY EVIDENCE IN THE CASE AND HINDERS OUR ABILITY TO |
| 11:04AM | 8 | CONFRONT THE GOVERNMENT'S WITNESSES, TO CONFRONT THE |
| 11:04AM | 9 | GOVERNMENT'S EVIDENCE. |
| 11:04AM | 10 | AND THEN WHAT IS ONE FINAL POINT WITH RESPECT TO THE |
| 11:05AM | 11 | PREJUDICE, AND I THINK THIS TOUCHES ON YOUR HONOR'S QUESTION |
| 11:05AM | 12 | ABOUT, YOU KNOW, KIND OF HOW THIS COULD PLAY OUT AT TRIAL.  YOU |
| 11:05AM | 13 | KNOW, JUDGE KENNEDY RECOGNIZED IN LOUD HAWK THE VERY SEVERE |
| 11:05AM | 14 | PREJUDICE THAT CAN ACCRUE WHEN THIS KIND OF -- EVIDENCE ABOUT |
| 11:05AM | 15 | LOSS OF DATA OR LOSS OF EVIDENCE IS PRESENTED TO A JURY. |
| 11:05AM | 16 | NO MATTER HOW CLEAR IT IS, AND WE THINK IT'S CRYSTAL CLEAR |
| 11:05AM | 17 | THAT MS. HOLMES HAD NO ROLE IN THESE EVENTS, THERE IS A SEVERE |
| 11:05AM | 18 | RISK OF PREJUDICE TO MS. HOLMES IF WE HAVE TO LITIGATE THESE |
| 11:05AM | 19 | FACTS ABOUT WHO LOST THE DATA IN FRONT OF THE JURY.  THE JURY |
| 11:05AM | 20 | MAY WELL SPECULATE ABOUT THE INTENTIONS OF THERANOS'S EMPLOYEES |
| 11:05AM | 21 | WITHOUT A PROPER BASIS FOR DOING SO, OR GOD FORBID, THEY MAY |
| 11:05AM | 22 | INFER THAT MS. HOLMES HAD SOMETHING TO DO WITH IT, EVEN THOUGH |
| 11:05AM | 23 | SHE DIDN'T, PERHAPS BECAUSE THE GOVERNMENT KEEPS TRYING TO |
| 11:06AM | 24 | INSINUATE THAT WITHOUT ANY FACTUAL BASIS FOR DOING THAT. |
| 11:06AM | 25 | IT WOULD BE VERY PREJUDICIAL FOR US TO HAVE TO LITIGATE |

11:06AM 1 THESE ISSUES IN FRONT OF THE JURY, AND THAT'S WHY WE THINK THE

11:06AM 2 APPROPRIATE COURSE IS FOR THE COURT TO HOLD AN EVIDENTIARY

11:06AM 3 HEARING BEFORE TRIAL OUTSIDE OF THE JURY'S PRESENCE WHERE WE

11:06AM 4 CAN DEVELOP THESE FACTS, AND THEN THE COURT CAN DETERMINE WITH

11:06AM 5 ALL OF THE FACTS BEFORE IT, WHICH ARE NOT YET BEFORE THE COURT,

11:06AM 6 WHAT THE APPROPRIATE REMEDY WOULD BE.

11:06AM 7 THE COURT: SO WE TALKED ABOUT THIS IN THE IN LIMINE

11:06AM 8 MOTIONS, DIDN'T WE? AND I THINK IN MY RULING ON THIS

11:06AM 9 PARTICULAR IN LIMINE MOTION THE COURT DEFERRED IT DEPENDENT ON

11:06AM 10 WHETHER OR NOT THE DEFENSE WAS GOING TO INTRODUCE THIS IN YOUR

11:06AM 11 CASE-IN-CHIEF. YOU MIGHT DECIDE TO -- AND I THINK I MENTIONED

11:06AM 12 OPENING THE DOOR. IF YOU DECIDE TO BLAME THE GOVERNMENT FOR

11:06AM 13 THIS AND VIS-A-VIS THE GOVERNMENT THE SAME THING, AND THAT'S A

11:07AM 14 QUESTION, ISN'T IT? IT'S STILL AN OPEN ENDED QUESTION AS TO IF

11:07AM 15 LIS IS GOING TO COME IN AT ALL.

11:07AM 16 IF IT DOESN'T COME IN, THEN WHAT YOU HAVE, AS I SUGGESTED

11:07AM 17 EARLIER, IS YOUR BATTLE OF ANECDOTAL DOCTORS TALKING ABOUT THE

11:07AM 18 ANECDOTAL INFORMATION, AND THE JURY CAN THEN DECIDE JUST BASED

11:07AM 19 ON THAT INFORMATION AT LEAST FOR WHATEVER ISSUE IT PRESENTS.

11:07AM 20 SO IF THE LIS DOESN'T COME IN, IT SEEMS LIKE YOU'RE ON

11:07AM 21 EVEN GROUND.

11:07AM 22 MS. SAHARIA: WELL, I RESPECTFULLY DISAGREE BECAUSE

11:07AM 23 THE GOVERNMENT WANTS TO PRESENT EVIDENCE ALL OF WHICH TIES BACK

11:07AM 24 TO THE LIST. THEY WANT TO PRESENT THE EVIDENCE OF DR. MASTER

11:07AM 25 THAT TIES BACK TO THE LIST. THEY WANT TO PRESENT THE EVIDENCE

40

11:07AM 1    OF DR. DAS, A THERANOS EMPLOYEE THAT TIES BACK TO THE LIS.

11:07AM 2    THEY WANT TO PRESENT THESE ANECDOTES THAT WE CAN'T, WE CAN'T

11:07AM 3    FULLY CONFRONT THE ANECDOTES WITHOUT KNOWING THE INFORMATION

11:08AM 4    ABOUT THEM IN THE LIS.

11:08AM 5        SO I DON'T THINK THAT WE'RE ON AN EVEN PLAYING FIELD JUST

11:08AM 6    BECAUSE BOTH PARTIES LACK ACCESS TO THE LIS.

11:08AM 7        NOW, THE COURT DID RECOGNIZE IN ITS RULING A COUPLE OF

11:08AM 8    THINGS THAT I THINK ARE RELEVANT TO THIS DISCUSSION.

11:08AM 9        YOU'RE ABSOLUTELY RIGHT THAT THE COURT DID NOTE THAT THE

11:08AM 10   DEFENSE MIGHT DECIDE TO PUT THE BLAME FOR THE LOSS OF THE

11:08AM 11   EVIDENCE AT ISSUE.  THAT, OF COURSE, IS A JUDGMENT CALL THAT WE

11:08AM 12   HAVEN'T MADE, AND I THINK OUR PREFERENCE IS TO AVOID THIS

11:08AM 13   ENTIRE SIDESHOW AT TRIAL, BUT I DO THINK THAT THAT HIGHLIGHTS

11:08AM 14   THE IMPORTANCE OF OUR MOTION TO COMPEL.  THE INFORMATION IN THE

11:08AM 15   GOVERNMENT'S BRADY LETTER THAT HAS STILL NOT BEEN PRODUCED TO

11:08AM 16   US, WHICH, NAMELY, ARE THE DOCUMENTS THAT UNDERLIE THAT BRADY

11:08AM 17   LETTER THAT THE GOVERNMENT REFUSES TO PRODUCE AND EVEN THE

11:08AM 18   IDENTITIES OF THE PEOPLE NAMED IN THE BRADY LETTER, HOW CAN WE

11:08AM 19   EXERCISE A JUDGMENT ABOUT WHETHER OR NOT TO PRODUCE EVIDENCE AT

11:08AM 20   TRIAL OR TO CALL WITNESSES ON THIS ISSUE IF THE GOVERNMENT

11:09AM 21   REFUSES TO TELL US WHO THE WITNESS ARE AND REFUSES TO ACTUALLY

11:09AM 22   GIVE US THE EVIDENCE?

11:09AM 23       SO I DO THINK THAT THAT ISSUE HIGHLIGHTS WHY THE COURT

11:09AM 24   SHOULD GRANT THE MOTION TO COMPEL, WHETHER OR NOT THE COURT

11:09AM 25   EVEN HOLDS A HEARING, WE THINK THAT MOTION TO COMPEL IS

| | | |
|---|---|---|
| 11:09AM | 1 | RELEVANT TO TRIAL. |
| 11:09AM | 2 | NOW, THE COURT DID SEPARATELY NOTE, APPROPRIATELY SO, THAT |
| 11:09AM | 3 | WE ARE ENTITLED TO HOLD THE GOVERNMENT TO ITS BURDEN AT TRIAL. |
| 11:09AM | 4 | WE, OF COURSE, HAVE THE FULL CAPABILITY TO ARGUE THAT THEY HAVE |
| 11:09AM | 5 | FAILED TO MEET THAT BURDEN BECAUSE THEY'VE PRESENTED AN |
| 11:09AM | 6 | ANECDOTAL CASE THAT IS LACKING IN DATA.  I THINK IT'S |
| 11:09AM | 7 | INEVITABLE THAT THE JURY WILL HEAR THAT THERE WAS SUCH A |
| 11:09AM | 8 | DATABASE, THAT THERE WAS AN LIS DATABASE, AND THE JURY WILL NO |
| 11:09AM | 9 | DOUBT APPRECIATE THAT THE DATABASE IS NOT BEFORE THEM.  AND I |
| 11:09AM | 10 | THINK IT IS APPROPRIATE FOR THE DEFENSE, YOU KNOW, WHETHER OR |
| 11:10AM | 11 | NOT EVIDENCE IS SUPPRESSED, I THINK IT'S APPROPRIATE FOR THE |
| 11:10AM | 12 | DEFENSE TO HOLD THE GOVERNMENT TO ITS BURDEN BY ARGUING TO THE |
| 11:10AM | 13 | JURY THAT THE DATA IS NOT BEFORE THE JURY, AND THE GOVERNMENT |
| 11:10AM | 14 | HAS NOT PRESENTED THAT DATA TO THE JURY WITHOUT BLAMING ANYONE |
| 11:10AM | 15 | FOR WHY IT'S -- THE GOVERNMENT IS NOT PRESENTING THAT DATA TO |
| 11:10AM | 16 | THE JURY.  I THINK THE DEFENSE HAS TO BE ABLE TO MAKE THAT |
| 11:10AM | 17 | ARGUMENT. |
| 11:10AM | 18 | BUT AGAIN, I THINK THE FACT THAT THAT ARGUMENT IS |
| 11:10AM | 19 | CRITICALLY AN IMPORTANT ARGUMENT TO THE DEFENSE JUST HIGHLIGHTS |
| 11:10AM | 20 | THAT THE REAL DANGER THAT THE JURY WILL SPECULATE AND DRAW |
| 11:10AM | 21 | INCORRECT INFERENCES FROM THE LACK OF DATA, WHICH IS WHY WE |
| 11:10AM | 22 | THINK THE ONLY APPROPRIATE REMEDY FOLLOWING A HEARING WOULD BE |
| 11:10AM | 23 | A SUPPRESSION. |
| 11:10AM | 24 | THE COURT:  OKAY.  THANK YOU VERY MUCH, MS. SAHARIA. |
| 11:10AM | 25 | MS. SAHARIA:  THANK YOU, YOUR HONOR. |

| | | |
|---|---|---|
| 11:10AM | 1 | THE COURT: YOU'RE WELCOME. |
| 11:10AM | 2 | MR. WADE: YOUR HONOR, I APOLOGIZE. THIS WOULD BE |
| 11:10AM | 3 | ONE OF THOSE MOMENTS WHERE IN A CONVENTIONAL HEARING I WOULD |
| 11:10AM | 4 | PASS MS. SAHARIA A NOTE. |
| 11:11AM | 5 | BUT WITH RESPECT TO THE PRIVILEGE ISSUE THAT WAS RAISED, |
| 11:11AM | 6 | IF I MIGHT ADDRESS THAT JUST VERY -- FOR 30 SECONDS? AND THAT |
| 11:11AM | 7 | IS JUST TO SAY MS. SAHARIA WAS NOT INVOLVED, I THINK, IN THE |
| 11:11AM | 8 | REPRESENTATION DURING THIS TIME PERIOD BETWEEN THE INDICTMENT |
| 11:11AM | 9 | AND THE SO-CALLED "DECOMMISSIONING OF THE LIS" OR IN OTHER |
| 11:11AM | 10 | WORDS PUTTING THE LIS IN THE STORAGE FACILITY, WHICH IS HOW I |
| 11:11AM | 11 | WOULD REFER TO IT. |
| 11:11AM | 12 | TO THE EXTENT THAT THE COURT HAS INQUIRIES WITH RESPECT TO |
| 11:11AM | 13 | MS. HOLMES'S KNOWLEDGE OF AND ACCESS TO THAT DATA AND HER |
| 11:11AM | 14 | PARTICIPATION IN SUBPOENA COMPLIANCE OR LACK THEREOF GIVEN HER |
| 11:11AM | 15 | STATUS IN THE INVESTIGATION, WE WOULD BE HAPPY TO PROVIDE A |
| 11:11AM | 16 | PROFFER TO THE COURT IN CAMERA EX PARTE ON THAT. I THINK IT |
| 11:11AM | 17 | WOULD ADDRESS ANY OF THE COURT'S CONCERNS. |
| 11:11AM | 18 | I DON'T THINK IT WOULD BE FAIR TO DRAW ANY ADVERSE |
| 11:11AM | 19 | INFERENCE FROM MS. HOLMES NOT CURRENTLY POSSESSING THE LIS. |
| 11:12AM | 20 | AND IF THE COURT WERE INTENDING TO DO THAT, WE WOULD REQUEST |
| 11:12AM | 21 | THE OPPORTUNITY TO JUST ADDRESS THAT BECAUSE I THINK AN |
| 11:12AM | 22 | EX PARTE HEARING WHERE WE EXCHANGE FOR TWO MINUTES ON THE |
| 11:12AM | 23 | PRIVILEGE ISSUES WOULD MORE THAN ADDRESS THE COURT'S CONCERN. |
| 11:12AM | 24 | THE COURT: WELL, THANK YOU. I WAS NOT INTENDING -- |
| 11:12AM | 25 | IT WAS NOT MY INTENT TO BROACH A PRIVILEGE TOPIC. |

11:12AM  1      AND, MS. SAHARIA, PLEASE KNOW THAT, THAT WAS NOT MY

11:12AM  2   INTENT, NOR, MR. WADE, THAT WAS NOT MY INTENT.  I WAS JUST

11:12AM  3   TRYING TO GET THE FACTUAL SCENARIO DOWN.  THE DATES, THE

11:12AM  4   TIMELINE OF WHAT OCCURRED I THINK SPEAK PERHAPS SUFFICIENT

11:12AM  5   EVIDENCE FOR THE COURT TO CONSIDER THE MOTION HERE.

11:12AM  6      I THINK WE KNOW THAT THE EVIDENCE SHOWS THAT ON INDICTMENT

11:12AM  7   IT WAS JUNE 14TH OR JUNE 18TH, WHATEVER IT WAS, I THINK

11:12AM  8   MS. HOLMES STEPPED DOWN AS CEO.  I THINK THERE IS INFORMATION

11:12AM  9   IN THE DOCUMENTS I'VE READ THAT SUGGESTS THAT SHE REMAINED AS

11:12AM 10   PRESIDENT OF THE BOARD, BUT SHE DID STEP DOWN AS CEO AT THE

11:13AM 11   TIME.  I RECOGNIZE THAT.

11:13AM 12      MY QUESTION TO MS. SAHARIA WAS REGARDING -- I THINK IT WAS

11:13AM 13   THE PREJUDICE.  THAT'S WHAT MOVED US TO THE PREJUDICE

11:13AM 14   CONVERSATION AROUND THE FACTS THAT AT THE TIME OF THE

11:13AM 15   DECOMMISSION.  I WISH IT WAS AS SIMPLE AS JUST PUTTING IN

11:13AM 16   STORAGE BECAUSE, MR. WADE, WE COULD JUST GET IT OUT OF STORAGE

11:13AM 17   AND OPEN IT UP AND THAT WOULD RESOLVE ALL OF THIS, BUT

11:13AM 18   APPARENTLY IT'S NOT THAT EASY.

11:13AM 19      THE QUESTION WAS AT THE TIME THAT IT WAS DECOMMISSIONED

11:13AM 20   AND PRIOR TO THE DECOMMISSION, AS EARLY AS JUNE WHEN THERE WAS

11:13AM 21   NOTICE OF THE INDICTMENT, CERTAINLY THE IMPORTANCE OF THE LIS

11:13AM 22   WAS CERTAINLY KNOWN TO THE DEFENSE.  AND FOR A PREJUDICE

11:13AM 23   ANALYSIS THE QUESTION WAS, WELL, THERE WAS PRIVITY THERE AND

11:13AM 24   DOESN'T THAT SUGGEST THAT, NOT FAULT, BUT THERE WAS AN

11:13AM 25   OPPORTUNITY TO PRESERVE WAS THE POINT THAT I WAS TRYING TO

11:14AM 1    MAKE.  THAT'S IT.

11:14AM 2        BUT THANK YOU FOR YOUR -- I APPRECIATE THE OFFER ABOUT IN

11:14AM 3    CAMERA.  I DON'T THINK IT'S NEEDED JUST NOW.

11:14AM 4        LET'S TURN TO THE GOVERNMENT.

11:14AM 5        MR. WADE:  YOUR HONOR, IF I MIGHT JUST SO THE RECORD

11:14AM 6    IS CLEAR ON THIS POINT.  I INFER FROM THE COURT'S COMMENT THAT

11:14AM 7    THERE IS AN INFERENCE THAT MS. HOLMES HAD ACCESS TO THE LIS

11:14AM 8    DURING THAT TIME PERIOD.

11:14AM 9        THE COURT:  OH.  NO.  MR. WADE, THAT'S NOT WHAT I

11:14AM 10   SAID.  MR. WADE, THAT'S NOT WHAT I SAID, SIR.  THAT'S NOT WHAT

11:14AM 11   I SAID THAT SHE HAD ACCESS TO IT.

11:14AM 12       I WAS STATING THE FACTS THAT SHE WAS STILL AT THE TIME,

11:14AM 13   SHE WAS -- THE RECORD WILL REFLECT THAT SHE WAS CEO OR WHATEVER

11:14AM 14   SHE WAS.

11:14AM 15       YOU RECALL IN MY ORDER ON THE IN LIMINE MOTIONS, I THINK I

11:14AM 16   GRANTED YOUR RELIEF.  I SAID THERE HAS TO BE A NEXUS, SOME TYPE

11:14AM 17   OF A SHOWING OF A CONNECTION TO YOUR CLIENT AND THE LIS, AND

11:14AM 18   THAT STILL HOLDS TRUE.  SO I THINK THAT -- I HOPE THAT ANSWERS

11:14AM 19   YOUR QUESTION.

11:15AM 20       MR. BOSTIC.

11:15AM 21       MR. WADE:  THANK YOU, YOUR HONOR.

11:15AM 22       MR. BOSTIC:  THANK YOU, YOUR HONOR.

11:15AM 23       I'LL START WITH JUST A FEW OF THE RELEVANT FACTS, AND I

11:15AM 24   THINK THE COURT HAS HIT SOME OF THE KEY ISSUES HERE OR ALL OF

11:15AM 25   THE KEY ISSUES.

11:15AM 1       JUST SO WE'RE CLEAR ON THE TIMELINE, THE GRAND JURY

11:15AM 2 SUBPOENAED THE RESULTS FROM THE LABORATORY INFORMATION SYSTEM,

11:15AM 3 THE LIS, IN APRIL OF 2018.  THAT SUBPOENA CALLED FOR THE ENTIRE

11:15AM 4 UNIVERSE OF LAB RESULTS FROM THE LIS.  SO THAT REQUEST, THAT

11:15AM 5 SUBPOENA WAS PENDING AS TO THERANOS FROM APRIL 2018 GOING

11:15AM 6 FORWARD.

11:15AM 7       LATER AS A RESULT OF DISCUSSIONS BETWEEN GOVERNMENT

11:15AM 8 COUNSEL AND THERANOS COUNSEL, THE GOVERNMENT SERVED OR RATHER

11:15AM 9 THE GRAND JURY ISSUED ANOTHER SUBPOENA WHICH THE GOVERNMENT

11:15AM 10 SERVED REQUESTING A SOFT COPY OF THE DATABASE ITSELF.  SO THE

11:15AM 11 DATABASE IN NATIVE FORM, ELECTRONIC FORM THAT WOULD HAVE

11:15AM 12 INCLUDED THAT SAME INFORMATION BUT WITH MORE CAPABILITY FOR

11:15AM 13 SORTING AND SEARCHING.  SO THAT REQUEST WAS AT THE BEGINNING OF

11:16AM 14 THE JUNE, THAT SUBPOENA.

11:16AM 15       THE LIS COPY WAS PRODUCED TO THE GOVERNMENT MONTHS LATER,

11:16AM 16 AT THE END OF AUGUST 2018, SEVERAL MONTHS AFTER THE GOVERNMENT

11:16AM 17 SERVED THE SUBPOENA REQUESTING ALL RESULTS FROM THE LIS.

11:16AM 18       AROUND THAT SAME TIME THE GOVERNMENT WAS IN CONTACT WITH

11:16AM 19 THERANOS COUNSEL ABOUT OBTAINING SOME EXEMPLARS OF THERANOS

11:16AM 20 ANALYZERS, AND THE DEFENSE HIGHLIGHTED THIS I THINK IN AN

11:16AM 21 EFFORT TO SUGGEST THAT THE GOVERNMENT SHOULD HAVE OR A

11:16AM 22 REASONABLE PROSECUTOR WOULD HAVE TAKEN THE SAME APPROACH AS TO

11:16AM 23 THE SERVERS HOUSING THE LIS THAT IT DID AS TO THOSE THERANOS

11:16AM 24 ANALYZERS, BUT THIS IS APPLES AND ORANGES IN A WAY THAT I THINK

11:16AM 25 IS CLEAR.

46

11:16AM 1      IN COLLECTING INFORMATION FROM THERANOS IN THE FORM OF LAB

11:16AM 2  RESULTS OR EMAILS OR OTHER INTERNAL DOCUMENTS, WE'RE TALKING

11:16AM 3  ABOUT ELECTRONICALLY STORED INFORMATION, ESI, WHICH IS

11:17AM 4  SOMETHING THAT LAWYERS AND INVESTIGATORS DEAL WITH REGULARLY.

11:17AM 5  IN COLLECTING THAT INFORMATION THE TYPICAL APPROACH, OF COURSE,

11:17AM 6  IS NOT TO GO IN AND SEIZE THE PHYSICAL DEVICES THEMSELVES,

11:17AM 7  ESPECIALLY WHEN THE BUSINESS IS OPERATING AND THAT WOULD BE

11:17AM 8  DISRUPTIVE TO THAT BUSINESS.

11:17AM 9      SO IT'S VERY COMMON AND STANDARD FOR ESI PRODUCTION TO BE

11:17AM 10  HANDLED BY TRANSFERRING AN ELECTRONIC COPY OF THAT INFORMATION.

11:17AM 11  ESI CAN BE COPIED BY ITS VERY NATURE.

11:17AM 12      MOREOVER, WITH ALMOST ALL ESI, CERTAINLY ALL ESI THAT I'VE

11:17AM 13  HAD EXPERIENCE WITH OTHER THAN THIS DATABASE, MOVING THE

11:17AM 14  HARDWARE THAT CONTAINS THAT ESI DOESN'T DISRUPT OR DESTROY THE

11:17AM 15  ESI. AND THAT WAS PROVEN IN THIS CASE, THE ASSIGNEE, WHEN IT

11:17AM 16  TOOK OVER THERANOS'S ASSETS, DID SUCCESSFULLY OBTAIN A LARGE

11:17AM 17  AMOUNT OF THERANOS'S NON-LIS, ELECTRONICALLY STORED

11:17AM 18  INFORMATION.

11:17AM 19      SO THERE WAS NO NOTICE TO THE GOVERNMENT THAT THE

11:17AM 20  SHUDDERING OF THERANOS WOULD RESULT IN THE LOSS OF THIS

11:18AM 21  INFORMATION, JUST TO MAKE THAT CLEAR, AND I THINK THE COURT

11:18AM 22  NOTED THAT ALREADY.

11:18AM 23      IN CONTRAST, THE THERANOS ANALYZERS, THE EXEMPLARS OF THE

11:18AM 24  EDISON, THE DIFFERENT VERSIONS OF THE TSPU, THE GOVERNMENT

11:18AM 25  NEEDED TO OBTAIN THOSE FOR THE SAKE OF HAVING THOSE PIECES OF

11:18AM 1    EVIDENCE, THE PHYSICAL DEVICES THEMSELVES.  THAT WASN'T TO

11:18AM 2    OBTAIN ESI STORED ON THOSE DEVICES.  SO THAT EXPLAINS THE

11:18AM 3    DIFFERENT APPROACH.

11:18AM 4        THE ASSIGNEE WENT LIVE A COUPLE OF WEEKS AFTER THE COPY OF

11:18AM 5    THE LIS WAS PRODUCED TO THE GOVERNMENT.  THE GOVERNMENT WAS

11:18AM 6    UNABLE TO ACCESS THE LIS OR AT LEAST THE COPY THAT IT OBTAINED,

11:18AM 7    AND AS A RESULT IT CONSULTED WITH THERANOS COUNSEL SHORTLY

11:18AM 8    AFTER OBTAINING IT, AND THEN LATER WITH ASSIGNEE COUNSEL TO TRY

11:18AM 9    TO GET HELP WITH ACCESSING THAT INFORMATION.

11:18AM 10       THOSE RESULTS OR THOSE EFFORTS WERE ULTIMATELY FUTILE.

11:18AM 11   AND THAT'S THE REAL POINT HERE THAT THE DEFENSE IS ATTEMPTING

11:18AM 12   TO, I THINK, INVITE THE COURT TO PENALIZE THE GOVERNMENT FOR

11:19AM 13   NOT GOING FURTHER DOWN ROADS THAT WOULD HAVE BEEN DEAD ENDS OR

11:19AM 14   ROADS THAT WERE INDICATING THAT THEY WERE DEAD ENDS, FIRST AS

11:19AM 15   TO THE COPY OF THE LIS THAT THE GOVERNMENT DID OBTAIN, AND,

11:19AM 16   SECOND, AS TO THE ORIGINAL VERSION OF THE LIS THAT WAS

11:19AM 17   DECOMMISSIONED OR REALLY IN EFFECT DESTROYED BY THERANOS IN

11:19AM 18   AUGUST 2018.  SO I'LL TAKE THOSE TWO COPIES ONE AFTER THE OTHER

11:19AM 19   JUST TO MAKE SURE THAT WE'RE CLEAR ON HOW THOSE WERE DEAD ENDS.

11:19AM 20       AS TO THE GOVERNMENT COPY, SO THE GOVERNMENT ATTEMPTED TO

11:19AM 21   GAIN ACCESS TO THE LIS COPY THAT THERANOS GAVE IT WITHIN WEEKS.

11:19AM 22   THE GOVERNMENT SUBMITS THAT'S A REASONABLE TIME GIVEN THE

11:19AM 23   VOLUME OF EVIDENCE IN THIS CASE AND THE OTHER EVENTS THAT WERE

11:19AM 24   HAPPENING AT THAT TIME.

11:19AM 25       THAT COPY, HOWEVER, WAS DOUBLE ENCRYPTED, AND THE

11:19AM 1    GOVERNMENT WAS NOT INFORMED OF THAT ENCRYPTION STATUS OR OF THE

11:19AM 2    EXISTENCE OF A SECOND ENCRYPTION KEY THAT WOULD BE NEEDED IN

11:19AM 3    ORDER TO ACCESS THOSE FILES.

11:19AM 4        DESPITE THE FACT THAT IN ITS REQUEST TO THERANOS THE

11:20AM 5    GOVERNMENT HAD ASKED FOR NOT JUST THE DATABASE BUT ALSO

11:20AM 6    ANYTHING THAT WAS REQUIRED TO ACCESSING, INCLUDING ANY SOFTWARE

11:20AM 7    THAT WAS REQUIRED TO ACCESS IT.

11:20AM 8        THAT COPY OF THE LIS, THE COPY RECEIVED FROM THERANOS, HAS

11:20AM 9    ALSO, BY THE WAY, BEEN PRODUCED TO THE DEFENSE.  SO THE DEFENSE

11:20AM 10   IN THIS CASE HAS THE SAME INFORMATION THAT THE GOVERNMENT HAS,

11:20AM 11   THE SAME VERSION OF THE LIS.

11:20AM 12       SO I'M CONFUSED TO HEAR THE DEFENSE COMPLAIN ABOUT THE

11:20AM 13   GOVERNMENT'S LACK OF EFFORTS TO ACCESS THAT DEVICE, THAT COPY,

11:20AM 14   BECAUSE THE DEFENSE HAS EQUIVALENT, IDENTICAL ACCESS TO THAT

11:20AM 15   SAME INFORMATION.  AND IF IT WERE ACCESSIBLE, PRESUMABLY WE

11:20AM 16   WOULDN'T BE IN THIS SITUATION BECAUSE THE GOVERNMENT, OR EXCUSE

11:20AM 17   ME, THE DEFENSE WOULD HAVE GONE THROUGH THE EFFORTS THAT IT

11:20AM 18   WANTED THE GOVERNMENT TO GO THROUGH, OBTAINED ACCESS TO THAT

11:20AM 19   DATABASE, THAT COPY OF THE DATABASE, AND THUS THERE WOULD BE NO

11:20AM 20   PREJUDICE TO THE DEFENSE BECAUSE THE DEFENDANT WOULD HAVE

11:20AM 21   ACCESS TO IT.

11:21AM 22       THE FACT THAT THE DEFENSE APPARENTLY HAS BEEN EQUALLY

11:21AM 23   UNSUCCESSFUL IN ACCESSING THAT COPY OF THE DATABASE JUST PROVES

11:21AM 24   THAT THAT COPY ITSELF WAS A DEAD END.  IT WAS NOT A VIABLE COPY

11:21AM 25   OF THE DATABASE.  SO THERE'S REALLY NO POINT IN SCRUTINIZING

11:21AM 1     THE GOVERNMENT'S CONDUCT AS TO ITS EFFORTS TO ACCESS THAT COPY

11:21AM 2     BECAUSE IT'S ALL MOOT.  NO PREJUDICE RESULTED FROM ANY LACK OF

11:21AM 3     EFFORT THERE, BECAUSE NO MATTER WHAT EFFORT WAS EXPENDED, THOSE

11:21AM 4     COPIES, THE COPY THAT WE HAVE, THE COPY THAT WE GAVE TO THE

11:21AM 5     DEFENSE, OUR UNDERSTANDING IS THAT THEY'RE JUST NOT VIABLE,

11:21AM 6     THEY CANNOT BE ACCESSED, ESPECIALLY WITHOUT THE SECOND

11:21AM 7     ENCRYPTION KEY THAT, YOU KNOW, FOR WHICH THERE'S NO TRACE.

11:21AM 8         LET ME MOVE TO THE ORIGINAL COPY THEN, THE COPY OF THE LIS

11:21AM 9     THAT THERANOS USED, THE COPY THAT WAS STORED AT THERANOS ON

11:21AM 10    HARDWARE, DISASSEMBLED BY THERANOS AFTER FOUR DAYS OF

11:22AM 11    PRODUCTION TO THE GOVERNMENT.  AS GOOD AS CONTEMPORANEOUSLY,

11:22AM 12    I'M LEAVING A VERY NARROW WINDOW FOR THE GOVERNMENT TO

11:22AM 13    UNDERSTAND AND REALIZE THAT WHAT IT HAD WAS NOT VIABLE AND THEN

11:22AM 14    TAKE THE STEPS NEEDED TO ANTICIPATE, PREDICT, AND THEN PREVENT

11:22AM 15    THERANOS FROM DESTROYING OR DISABLING THE ORIGINAL VERSION OF

11:22AM 16    THE LIS.  THAT'S A CRITICAL TIME PERIOD.  AND I THINK THE COURT

11:22AM 17    IS RIGHT TO FOCUS ON THAT THREE- OR FOUR-DAY PERIOD AND ASK

11:22AM 18    WHAT WOULD WE EXPECT?  WHAT SHOULD WE DEMAND THAT THE

11:22AM 19    GOVERNMENT HAD DONE DURING THAT NARROW TIME PERIOD?

11:22AM 20        BEFORE THERANOS TOOK THAT ACTION TO DECOMMISSION THE LIS,

11:22AM 21    THE EVIDENCE IN THE RECORD SHOWS THAT THERANOS EMPLOYEES KNEW

11:22AM 22    THAT SHUTTING DOWN THE DATABASE WOULD LIKELY BE A PERMANENT

11:22AM 23    MOVE.  THEY WENT FORWARD ANYHOW.

11:22AM 24        THE ASSIGNEE TOOK OVER THERANOS'S ASSETS A COUPLE OF WEEKS

11:22AM 25    LATER.  THE GOVERNMENT IS AWARE AND HAS SHARED THIS INFORMATION

50

11:22AM 1    WITH THE DEFENSE THAT BY MID SEPTEMBER THE ASSIGNEE WAS

11:23AM 2    INVESTIGATING THE LIS PARTLY IN RESPONSE TO REQUESTS FROM

11:23AM 3    PLAINTIFFS IN CIVIL CASES.  AND THE ASSIGNEE, DESPITE ITS

11:23AM 4    EFFORTS IN COORDINATING WITH THERANOS COUNSEL, CONTINUED TO BE

11:23AM 5    UNABLE TO GAIN ANY REAL OR MEANINGFUL ACCESS TO THAT LIS

11:23AM 6    INFORMATION.

11:23AM 7        BY MID OCTOBER THERANOS OUTSIDE COUNSEL AT WILMER HALE

11:23AM 8    CONFIRMED FOR THE ASSIGNEE THAT THEY COULDN'T ACCESS THE LIS

11:23AM 9    BECAUSE IT WAS DOUBLE ENCRYPTED.  SO WE KEEP COMING BACK TO

11:23AM 10   THIS ISSUE JUST LIKE THE COPY PRODUCED TO THE GOVERNMENT, THE

11:23AM 11   ORIGINAL COPY WAS DOUBLE ENCRYPTED, REQUIRED THIS PARTICULAR

11:23AM 12   ENCRYPTION KEY IN ORDER TO GAIN ACCESS, AND IT'S UNKNOWN WHERE

11:23AM 13   THAT KEY WAS, WHETHER IT HAD BEEN LOST ENTIRELY.  SO IT'S

11:23AM 14   COMPLETELY SPECULATIVE TO GUESS OR SUGGEST THAT EFFORTS BY THE

11:23AM 15   GOVERNMENT TARGETED AT THAT ORIGINAL COPY, THAT ORIGINAL

11:23AM 16   HARDWARE, WOULD HAVE PRODUCED ANY RESULTS.

11:23AM 17       THE DEFENSE REFERENCES WITNESS STATEMENTS SPECULATING THAT

11:24AM 18   THAT ORIGINAL COPY COULD HAVE BEEN RESURRECTED.  BUT IF THE

11:24AM 19   COURT LOOKS AT THOSE STATEMENTS, I THINK THE COURT WILL SEE

11:24AM 20   THAT THEY DON'T OR DON'T MERIT MUCH WEIGHT.

11:24AM 21       FIRST, NONE OF THOSE STATEMENTS ADDRESS THE NEED FOR THE

11:24AM 22   ENCRYPTION KEY AND THE DOUBLE ENCRYPTED STATUS OF THAT

11:24AM 23   DATABASE.  TO THE EXTENT THAT A WITNESS THOUGHT THAT THE

11:24AM 24   DATABASE MIGHT BE ABLE TO BE RESURRECTED, IT DOES NOT ACCOUNT

11:24AM 25   FOR AND DOESN'T PROVIDE A SOLUTION FOR THAT DOUBLE ENCRYPTED

11:24AM 1    STATUS.

11:24AM 2        ONE OF THE STATEMENTS THAT DEFENDANTS OR THE DEFENDANT

11:24AM 3    RELIES ON IS FROM A LAWYER WHO IN THAT SAME PROFFER TO THE

11:24AM 4    GOVERNMENT ADMITTED THAT HE DIDN'T HAVE A STRONG TECHNICAL

11:24AM 5    BACKGROUND, SO HE WAS JUST GIVING INFORMATION BASED ON HIS

11:24AM 6    UNDERSTANDING AT THE TIME, NOT TRYING TO ACT AS AN EXPERT TO

11:24AM 7    EXPLAIN WHAT WAS ACTUALLY POSSIBLE.

11:24AM 8        AS TO THE OTHER INDIVIDUALS WHO HAVE SOME MORE TECHNICAL

11:24AM 9    QUALIFICATIONS, ONE SAID HE DIDN'T THINK IT WOULD BE DIFFICULT

11:25AM 10   AT THE TIME THAT THE DATABASE WAS SHUT DOWN, BUT DIDN'T REALLY

11:25AM 11   PROVIDE AN OPINION THAT IT COULD HAVE BEEN RECONSTRUCTED

11:25AM 12   AFTERWARDS OR DIDN'T PROVIDE A CONTEMPORANEOUS OPINION AS OF

11:25AM 13   TODAY THAT HE THOUGHT IT REMAINED VIABLE AFTER IT WAS

11:25AM 14   DECOMMISSIONED.

11:25AM 15       ANOTHER SAID THAT HE THOUGHT THAT REASSEMBLING THE

11:25AM 16   DATABASE WOULD BE VERY DIFFICULT, BUT AGAIN, HE ALSO

11:25AM 17   SPECIFICALLY SAID THAT IT WOULD BE IMPOSSIBLE WITHOUT THE

11:25AM 18   PRIVATE ENCRYPTION KEY.  SO AGAIN, WE COME BACK TO THE

11:25AM 19   ENCRYPTION KEY THAT WAS NEVER PROVIDED TO THE GOVERNMENT AND OF

11:25AM 20   WHICH THE GOVERNMENT WAS NOT EVEN INFORMED.

11:25AM 21       SO THANKS TO THERANOS'S ACTIONS, THANKS TO THE ACTIONS OF

11:25AM 22   DEFENDANT'S COMPANY, THE ORIGINAL COPY OF THE LIS TURNED INTO A

11:25AM 23   DEAD END.  THANKS TO THE FORMAT IN WHICH IT WAS PRODUCED TO THE

11:25AM 24   GOVERNMENT, AND THE LACK OF THE COMPANY INFORMATION, THAT COPY

11:25AM 25   OF THE LIS WAS A DEAD END AS WELL.  THAT'S WHY WE'RE IN THIS

11:25AM  1   SITUATION.

11:25AM  2       SO TO SAY TO THE COURT, WELL, WE NEED TO DELVE FURTHER

11:26AM  3   INTO THE GOVERNMENT'S ACTIONS PURSUING THOSE TWO DEAD ENDS

11:26AM  4   DOESN'T MAKE SENSE, IT'S NOT RELEVANT TO THE INQUIRY, IT HAS NO

11:26AM  5   EFFECT ON THE PREJUDICE TO THE DEFENDANT, THE ALLEGED

11:26AM  6   PREJUDICE, AND WE SUBMIT IT WOULD BE A WASTE OF TIME.

11:26AM  7       THE COURT:  ALL RIGHT.  DO YOU WANT TO SPEAK TO THE

11:26AM  8   BRADY ISSUE?

11:26AM  9       MR. BOSTIC:  YES, YOUR HONOR, I'M HAPPY TO COVER THE

11:26AM  10  BRADY ISSUE.

11:26AM  11      SO HERE THERE'S SOME TENSION IN THE DEFENDANT'S POSITION,

11:26AM  12  AND, FRANKLY, THE IDEA THAT ON THE ONE HAND THE DEFENSE IS

11:26AM  13  ATTEMPTING TO USE THE FULSOMENESS OF THE GOVERNMENT'S

11:26AM  14  DISCLOSURE AS A CONCESSION AS AN ADMISSION OF WRONGDOING WHILE

11:26AM  15  ON THE OTHER HAND SAYING WE NEED MORE INFORMATION, THE COURT

11:26AM  16  SHOULD ORDER THAT THE GOVERNMENT NEEDS TO OPEN ITS FILES TO THE

11:26AM  17  DEFENSE SO THAT THE DEFENSE CAN PERUSE AND LOOK FOR ADDITIONAL

11:26AM  18  INFORMATION THAT MIGHT BE HELPFUL ON THIS ISSUE I THINK SHOULD

11:27AM  19  RAISE SOME CONCERNS WITH THE COURT.

11:27AM  20      THE GOVERNMENT HAS EXCEEDED ITS OBLIGATIONS IN THIS CASE

11:27AM  21  BY PROVIDING A VERY THOROUGH WRITTEN DISCLOSURE TO THE DEFENSE.

11:27AM  22  ADDITIONAL FACTS ARE -- THE UNDERLYING INFORMATION, UNDERLYING

11:27AM  23  THAT LETTER AND THE INTERNAL GOVERNMENT COMMUNICATIONS

11:27AM  24  THEMSELVES CERTAINLY ARE NOT RELEVANT OR HELPFUL TO THE DEFENSE

11:27AM  25  UNLESS THE COURT FINDS THAT THERE ARE DISPUTED ISSUES HERE TO

11:27AM   1    BE DECIDED, AND THE GOVERNMENT SUBMITS THAT THERE ARE NOT.

11:27AM   2        THE UNDISPUTED FACTS HERE ARE SUFFICIENT TO ESTABLISH THAT

11:27AM   3    THE DEFENDANT'S CLAIM CANNOT PROCEED, THAT THE DEFENDANT'S

11:27AM   4    REQUEST FOR THE SUPPRESSION MUST FAIL, AND THAT THERE'S NO NEED

11:27AM   5    FOR AN EVIDENTIARY HEARING.

11:27AM   6        AND WITH THE COURT'S PERMISSION, I WOULD LIKE TO HIGHLIGHT

11:27AM   7    SOME OF THE CASE LAW THAT I THINK ESTABLISHES THAT.

11:27AM   8            THE COURT:  SURE.

11:28AM   9            MR. BOSTIC:  THE LOUD HAWK OPINION ITSELF SAYS THAT

11:28AM   10   SUPPRESSION IS APPROPRIATE UNDER SOME CIRCUMSTANCES WHEN THE

11:28AM   11   GOVERNMENT LOSES OR DESTROYS TANGIBLE EVIDENCE PRIOR TO TRIAL.

11:28AM   12       NOW, THAT'S IN THE COURT'S OPINION ITSELF, NOT IN

11:28AM   13   JUDGE KENNEDY'S CONCURRENCE, BUT IN THE COURT'S OPINION WHICH

11:28AM   14   IS NINTH CIRCUIT PRECEDENT.

11:28AM   15       IN THIS CASE, AS WE JUST DISCUSSED, THE EVIDENCE WAS

11:28AM   16   ACTUALLY MORE UNDER THE DEFENDANT'S CONTROL THAN THE

11:28AM   17   GOVERNMENT'S, AND I'M NOT RAISING THIS TO ASSIGN BLAME OR

11:28AM   18   INSINUATE WRONGDOING ON THE DEFENDANT'S PART.

11:28AM   19       THE POINT HERE IS ABOUT ACCESS AND PREJUDICE, AND IT'S

11:28AM   20   GOING TO BE IMPOSSIBLE FOR THE DEFENDANT TO SHOW THAT SHE WAS

11:28AM   21   PREJUDICED BY THE LOSS OF THIS INFORMATION WHEN DURING THE

11:28AM   22   RELEVANT TIME PERIOD THE INDIVIDUAL INVOLVED WHO ACTUALLY HAD

11:28AM   23   EASIER ACCESS TO IT THAN THE GOVERNMENT WAS DEFENDANT HERSELF.

11:28AM   24       SO WHEN THE GOVERNMENT'S INVESTIGATION BEGAN, WHEN THE

11:28AM   25   S.E.C. SERVED DOCUMENT PRESERVATION NOTICES ON THERANOS, WHEN

54

11:28AM 1   THE GOVERNMENT SERVED GRAND JURY SUBPOENAS ON THERANOS CALLING

11:29AM 2   FOR PORTIONS OF THE LIS AND THEN THE ENTIRE THING, AT THOSE

11:29AM 3   TIME PERIODS THIS WAS DEFENDANT'S COMPANY THAT SHE HAD FOUNDED

11:29AM 4   OF WHICH SHE SERVED AS THE CHIEF EXECUTIVE OF WHICH SHE WAS A

11:29AM 5   MAJOR SHAREHOLDER.

11:29AM 6       EVEN AFTER INDICTMENT WHEN THE LIS WAS PRODUCED TO THE

11:29AM 7   DEFENDANT, DEFENDANT -- OR EXCUSE ME, PRODUCED TO THE

11:29AM 8   GOVERNMENT, THE DEFENDANT REMAINS CHAIR OF THE BOARD OF THE

11:29AM 9   COMPANY AND WAS STILL CONNECTED TO THE COMPANY.

11:29AM 10      IN CONTRAST, THE GOVERNMENT'S ACCESS TO THE EVIDENCE HERE

11:29AM 11  WAS VIA GRAND JURY SUBPOENA WHERE THE GOVERNMENT WAS DEFENDED

11:29AM 12  ON COMPLIANCE OF THE DOCUMENT CUSTODIAN, THERANOS ITSELF, AND

11:29AM 13  THE GOVERNMENT UNDERSTOOD THAT IT WAS OBTAINING THAT COMPLIANCE

11:29AM 14  DURING THE RELEVANT TIME PERIOD.  ONLY LATER DID IT BECOME

11:29AM 15  APPARENT THAT THE COPY THAT IT HAD OBTAINED FROM THERANOS WAS

11:29AM 16  NOT VIABLE.

11:29AM 17      UNDER THE CASE LAW THESE DISTINCTIONS MATTER.  THE

11:29AM 18  DIFFERENCE BETWEEN CASES WHERE THE GOVERNMENT ACTUALLY

11:30AM 19  POSSESSED THE EVIDENCE THAT WAS LOST AND CASES WHERE IT'S

11:30AM 20  ALLEGED THAT THE GOVERNMENT FAILED TO COLLECT, THESE

11:30AM 21  DISTINCTIONS MATTER AND THEY SERVE TO DEFEAT DEFENDANT'S

11:30AM 22  REQUEST HERE.

11:30AM 23      IN FACT, IT'S CRITICAL THAT NO COURT CASE HAS EVEN APPLIED

11:30AM 24  LOUD HAWK TO A SIMILAR SITUATION INVOLVING A FAILURE TO

11:30AM 25  COLLECT, AT LEAST NO CASE CITED BY THE DEFENDANT AND NO CASE

55

11:30AM  1      THAT THE GOVERNMENT CAN LOCATE.

11:30AM  2          FLYER ITSELF DOES NOT ADDRESS WHETHER SANCTIONS LIKE

11:30AM  3      SUPPRESSION ARE APPROPRIATE WHEN LAW ENFORCEMENT FAILS TO

11:30AM  4      COLLECT EVIDENCE IN THE FIRST PLACE.

11:30AM  5          IN U.S. VERSUS BROWN, THAT'S A DISTRICT CASE CITED BY THE

11:30AM  6      GOVERNMENT IN ITS BRIEFS, THE COURT CITES FLYER BUT NOTES THE

11:30AM  7      LACK OF CASE LAW APPLYING THIS TEST IN SITUATIONS LIKE THIS AND

11:30AM  8      IN THE ABSENCE OF THAT SUPPORT DECLINES TO EVEN ENGAGE IN

11:30AM  9      LOUD HAWK BALANCING IN THE FIRST PLACE, AFTER, BY THE WAY,

11:30AM  10     FINDING THAT THE FAILURE TO COLLECT BODY WORN CAMERA FOOTAGE IN

11:31AM  11     THAT CASE WASN'T A DUE PROCESS VIOLATION BECAUSE THERE WAS NOT

11:31AM  12     BAD FAITH OR SHOWING OF EXCULPATORY VALUE.

11:31AM  13         IT'S ALSO IMPORTANT THAT SOME OF THE CASES IN THIS AREA

11:31AM  14     ARE FOCUSSING ON THE NEED OR THE APPLICABILITY OF A JURY

11:31AM  15     INSTRUCTION REGARDING MISSING EVIDENCE.  SO ZUNIGA-GARCIA,

11:31AM  16     THAT'S A CASE RELIED UPON BY THE DEFENSE, INVOLVING A TOOL HELD

11:31AM  17     BY THE DEFENDANT AND A LARGER SET OF TOOLS USED FOR ALLEGEDLY

11:31AM  18     MODIFYING A GAS TANK TO SMUGGLE DRUGS, THAT CASE PROVIDED

11:31AM  19     LITTLE ANALYSIS OVERALL, BUT IT'S IMPORTANT TO NOTE THAT IN

11:31AM  20     THAT CASE THE EVIDENCE WAS LOST OR DESTROYED WHILE HELD BY THE

11:31AM  21     GOVERNMENT UNLIKE THE FACTS OF THIS CASE.  AND THAT CASE

11:31AM  22     INVOLVED A REMEDIAL JURY INSTRUCTION.

11:31AM  23         AND FOR CASES DEALING WITH REMEDIAL JURY INSTRUCTIONS, I

11:31AM  24     THINK IT'S IMPORTANT TO NOTE THAT THE NINTH CIRCUIT MODEL

11:31AM  25     INSTRUCTION, THAT'S MODEL INSTRUCTION 4.19 WHERE THE NOTES OF

56

11:32AM 1  THAT INSTRUCTION CITE THE LOUD HAWK CASE, THAT INSTRUCTION SAYS

11:32AM 2  IF YOU FIND THAT THE GOVERNMENT INTENTIONALLY DESTROYED OR

11:32AM 3  FAILED TO PRESERVE, AND INSERT DESCRIPTION OF EVIDENCE, THAT

11:32AM 4  THE GOVERNMENT KNEW OR SHOULD HAVE KNOWN WOULD BE EVIDENCE IN

11:32AM 5  THIS CASE, THEN THE JURY MAY INFER THAT THAT EVIDENCE WAS

11:32AM 6  UNFAVORABLE TO THE GOVERNMENT.

11:32AM 7      SO AGAIN, THIS IS THE NINTH CIRCUIT'S MODEL INSTRUCTION

11:32AM 8  ESSENTIALLY CODIFYING LOUD HAWK IN THE CONTEXT OF JURY

11:32AM 9  INSTRUCTIONS, AND IT'S EXPRESSLY WORDED IN THE CONTEXT OF CASES

11:32AM 10 WHERE THE GOVERNMENT INTENTIONALLY DESTROYING OR FAILING TO

11:32AM 11 PRESERVE EVIDENCE THAT IT KNOWS WOULD BE EXCULPATORY.

11:32AM 12     SO GIVEN THAT, AGAIN, AND THE LACK OF CASE LAW APPLYING

11:32AM 13 LOUD HAWK, LACK OF CASE LAW APPLYING THAT BALANCING TEST,

11:32AM 14 TWO CASES INVOLVING THE FAILURE TO COLLECT EVIDENCE, THERE ARE

11:32AM 15 SERIOUS QUESTIONS ABOUT WHETHER THAT TEST EVEN APPLIES IN THIS

11:32AM 16 SITUATION.

11:32AM 17     MARTINEZ VERSUS MARTINEZ, THAT'S A NINTH CIRCUIT CASE THAT

11:33AM 18 SAYS THAT THE FAILURE TO COLLECT POTENTIALLY USEFUL EVIDENCE

11:33AM 19 IS, QUOTE, "DISTINCTLY DIFFERENT" THAN A DESTRUCTION OF

11:33AM 20 EVIDENCE THAT IS ALREADY EXTANT.

11:33AM 21     SO, AGAIN, THE DEFENSE'S FAILURE TO CITE A CASE LIKE THIS

11:33AM 22 ONE WHERE THE COURT IMPOSED SANCTIONS WHERE THE GOVERNMENT DID

11:33AM 23 NOT DESTROY OR LOSE EVIDENCE I THINK IT REALLY MATTERS AND

11:33AM 24 WEAKENS THEIR CLAIM.

11:33AM 25     AND ALL THE MORE SO, NOT ONLY IS THERE NOT A CASE IMPOSING

57

11:33AM 1    SANCTIONS UNDER THOSE CIRCUMSTANCES, THERE CERTAINLY ISN'T A

11:33AM 2    CASE IMPOSING SANCTIONS WHERE THE GOVERNMENT ACTUALLY SOUGHT TO

11:33AM 3    OBTAIN THE EVIDENCE IN QUESTION WHERE THE GOVERNMENT WAS LED TO

11:33AM 4    BELIEVE THAT IT HAD OBTAINED THE EVIDENCE WHERE AT THE TIME THE

11:33AM 5    EVIDENCE WAS LOST, IT WAS ACTUALLY CONTROLLED BY THE DEFENDANT

11:33AM 6    OR PARTIES CONNECTED TO THE DEFENDANT RATHER THAN THE

11:33AM 7    GOVERNMENT, AND WHERE THE EVIDENCE WAS DESTROYED NOT BY THE

11:33AM 8    GOVERNMENT OR ITS AGENTS BUT BY INDIVIDUALS AFFILIATED WITH THE

11:34AM 9    DEFENDANT, THOSE FACTS PRESENT HERE TAKE THIS CASE SO FAR OUT

11:34AM 10   OF THE HEARTLAND OF AUTHORITY WHERE SANCTIONS LIKE THIS ARE

11:34AM 11   EVEN CONSIDERED OR IMPOSED THAT DEFENDANT'S REQUEST REALLY

11:34AM 12   REPRESENTS A SIGNIFICANT EXPANSION OF THE CASE LAW IN THIS

11:34AM 13   AREA.

11:34AM 14       AND GIVEN THE FACTS OF THIS CASE, THE GOVERNMENT WOULD

11:34AM 15   SUBMIT THAT THE FACTS SIMPLY ARE NOT COMPELLING ENOUGH TO

11:34AM 16   WARRANT THAT KIND OF EXPANSION EVEN IF ONE WERE SUPPORTED BY

11:34AM 17   THE LAW.

11:34AM 18           THE COURT:  ALL RIGHT.  THANK YOU, MR. BOSTIC.

11:34AM 19       ANYTHING FURTHER?

11:34AM 20           MR. BOSTIC:  NO, YOUR HONOR.

11:34AM 21       I HAVE ADDITIONAL THOUGHTS ON BAD FAITH AND THE

11:34AM 22   EXCULPATORY NATURE OF THE EVIDENCE, BUT IF THE COURT IS --

11:34AM 23   FEELS THAT IT'S PREPARED ON THOSE ISSUES, THEN I'M HAPPY TO

11:34AM 24   SUBMIT.

11:34AM 25           THE COURT:  WELL, WHY DON'T YOU STATE IT FOR THE

58

11:34AM 1 RECORD. WHY DON'T YOU -- I'LL LET YOU GO FORWARD AND TELL ME

11:34AM 2 YOUR THOUGHTS ON THOSE TWO TOPICS IF YOU WISH.

11:34AM 3 MR. BOSTIC: THANK YOU, YOUR HONOR. JUST VERY

11:35AM 4 BRIEFLY.

11:35AM 5 ON THE BAD FAITH ISSUE, AGAIN, THE LOUD HAWK OPINION OF

11:35AM 6 THE COURT DOES SAY THAT SUPPRESSION OF SECONDARY EVIDENCE IS

11:35AM 7 APPROPRIATE WHERE A DEFENDANT CAN SHOW BAD FAITH OR CONNIVANCE

11:35AM 8 ON THE PART OF THE GOVERNMENT.

11:35AM 9 THE CONCURRENCE BY JUDGE KENNEDY CONTAINS DICTA SAYING

11:35AM 10 THAT IN CASES OF SEVERE PREJUDICE, QUOTE, "SEVERE PREJUDICE,"

11:35AM 11 SUPPRESSION OR OTHER SANCTIONS CAN BE APPROPRIATE WITHOUT

11:35AM 12 REGARD TO GOOD FAITH OR CULPABILITY OF THE GOVERNMENT.

11:35AM 13 TWO POINTS ON THAT. FIRST, THIS IS NOT A CASE INVOLVING

11:35AM 14 SEVERE PREJUDICE. I'LL TALK ABOUT THAT BRIEFLY IN A MINUTE.

11:35AM 15 BUT MORE GENERALLY, WE SEE FROM THIS THAT THE DEFENSE'S

11:35AM 16 ARGUMENT REALLY RELIES ON CHERRY PICKING PHRASES LIKE THIS FROM

11:35AM 17 DICTA, BUT ALSO ASKING THE COURT TO IGNORE THE HOLDINGS OF

11:35AM 18 THESE CASES. THE HOLDINGS OF THESE CASES GENERALLY AND

11:35AM 19 CONSISTENTLY SHOW THAT THE BURDEN TO OBTAIN THIS KIND OF RELIEF

11:36AM 20 IS VERY HIGH AND THAT THE FOCUS OF THE COURT'S ANALYSIS IN

11:36AM 21 CASES LIKE THIS IS REALLY ON THE CULPABILITY AND THE BAD FAITH

11:36AM 22 OF GOVERNMENT ACTORS.

11:36AM 23 THE FLYER ITSELF, THE FLYER OPINION AFFIRMS THE DISTRICT

11:36AM 24 COURT'S FINDINGS REGARDING DUE PROCESS AND SUPPRESSION, SO

11:36AM 25 AFFIRMING THE DISTRICT COURT'S DECISION NOT TO FIND A DUE

11:36AM 1    PROCESS VIOLATION OR TO SUPPRESS EVIDENCE.  AND IN <u>FLYER</u> THE

11:36AM 2    NINTH CIRCUIT NOTES IN BOTH OF THOSE CONTEXTS THE DISTRICT

11:36AM 3    COURT'S FINDING IS NO BAD FAITH BY THE GOVERNMENT.  THAT'S A

11:36AM 4    CASE WHERE THE HARD DRIVE WAS MISHANDLED, BUT THE GOVERNMENT

11:36AM 5    DIDN'T INTENTIONALLY CORRUPT DATA.

11:36AM 6        SO, AGAIN, IN THAT CASE ALTHOUGH BAD FAITH MAY NOT BE AN

11:36AM 7    EXPLICIT REQUIREMENT, <u>FLYER</u> MAKES CLEAR THAT THE PRESENCE OR

11:36AM 8    ABSENCE OF BAD FAITH IS A CRITICAL DETERMINATION NOT JUST TO

11:36AM 9    THE DUE PROCESS QUESTION BUT ALSO TO THE QUESTION OF WHETHER

11:36AM 10   SANCTIONS ARE APPROPRIATE.

11:36AM 11       OTHER CASES ARE SIMILAR.  <u>U.S. VERSUS HENDRIX</u> CITED BY THE

11:37AM 12   GOVERNMENT AND ALSO <u>U.S. VERSUS ROBERTSON</u> FOCUSSED ON THE

11:37AM 13   GOVERNMENT'S CONDUCT AND THE CULPABILITY OR LACK THEREOF OF THE

11:37AM 14   GOVERNMENT'S CONDUCT.

11:37AM 15       JUST VERY BRIEFLY HERE ON THE EXCULPATORY NATURE OR THE

11:37AM 16   ALLEGED EXCULPATORY NATURE OF THE DATA IN THE LIS.  DEFENSE

11:37AM 17   COUNSEL SAID MULTIPLE TIMES THAT THIS WAS THE MOST CRITICAL

11:37AM 18   EVIDENCE IN THE CASE.  THE GOVERNMENT ABSOLUTELY DISAGREES WITH

11:37AM 19   THAT, AND THAT'S NOT SUPPORTED BY THE EVIDENCE.

11:37AM 20       CERTAINLY THE GOVERNMENT DID NOT VIEW THIS AS THE MOST

11:37AM 21   CRITICAL EVIDENCE IN THE CASE AT THE TIME OF INDICTMENT.  IF

11:37AM 22   THAT HAD BEEN THE CASE, OF COURSE THE GOVERNMENT WOULD HAVE

11:37AM 23   COLLECTED AND EXAMINED THAT EVIDENCE PRIOR TO CHARGING THE

11:37AM 24   CASE.

11:37AM 25       THIS CASE WAS CHARGED BASED ON THE OTHER EVIDENCE THAT

60

11:37AM 1    CONCLUSIVELY SHOWS THAT THERANOS'S TECHNOLOGY SUFFERED FROM

11:37AM 2    ACCURACY AND RELIABILITY PROBLEMS AS WELL AS THE WEALTH OF

11:37AM 3    EVIDENCE THAT ESTABLISHES THE INVESTOR FRAUD AS TO WHICH THE

11:37AM 4    LIS IS OF MINIMAL RELEVANCE.

11:37AM 5        SO I JUST WANT TO PUSH BACK ON THE DEFENSE'S

11:38AM 6    CHARACTERIZATION OF THIS AS THE UNDISPUTED MOST CRITICAL

11:38AM 7    EVIDENCE IN THE CASE.  THAT'S SIMPLY NOT TRUE, AND THAT'S

11:38AM 8    PARTLY BECAUSE OF THE LIMITATIONS OF THE LIS AND WHAT IT COULD

11:38AM 9    NOT DO.

11:38AM 10       I BELIEVE THE DEFENSE CONCEDES THAT THE LIS WOULD NOT

11:38AM 11   ALLOW EITHER PARTY TO IDENTIFY ACCURATE OR INACCURATE RESULTS

11:38AM 12   SIMPLY BY LOOKING AT THOSE RESULTS.  IT'S NOT THE CASE THAT WE

11:38AM 13   COULD OPEN IT UP AND SEE MILLIONS OF ENTRIES, ACCURATE ONES

11:38AM 14   HIGHLIGHTED IN GREEN AND INACCURATE ONES HIGHLIGHTED IN RED.

11:38AM 15       THE COURT HAS SEEN, I THINK, THAT THE WAY THAT WE SHOW AN

11:38AM 16   INDIVIDUAL RESULT IS INACCURATE IS BY COMPARING IT AGAINST

11:38AM 17   EITHER A REFERENCE TEST AT THE SAME TIME THAT INFORMATION WOULD

11:38AM 18   NOT HAVE BEEN INCLUDED IN THE LIS OR BY COMPARING A PATIENT'S

11:38AM 19   RESULT TO THE OTHER INFORMATION WE HAVE ABOUT THAT PATIENT'S

11:38AM 20   PRESENTATION.  FOR EXAMPLE, IF SOMEONE TESTS NEGATIVE FOR

11:38AM 21   PREGNANCY BUT THEN ENDS UP CARRYING A FETUS TO TERM, WE HAVE A

11:39AM 22   CONFLICT THERE BETWEEN THE BLOOD TESTS RESULTS AND THE REALITY

11:39AM 23   OF THE PATIENT'S CONDITION.  THAT KIND OF INFORMATION, THE

11:39AM 24   INFORMATION CONTAINED IN A PATIENT'S MEDICAL CHART, THE

11:39AM 25   INFORMATION THAT A DOCTOR CAN OBTAIN BY OBSERVING A PATIENT,

| | | |
|---|---|---|
| 11:39AM | 1 | THAT INFORMATION IS NOT CONTAINED IN THE LIS, EITHER. |
| 11:39AM | 2 | SO THE IDEA THAT THE LIS WOULD HAVE ENABLED THE PARTIES TO |
| 11:39AM | 3 | DETERMINE AN OVERALL FAILURE RATE OR REACH A CONCLUSIVE |
| 11:39AM | 4 | DETERMINATION ABOUT THERANOS'S OVERALL RELIABILITY IS SIMPLY |
| 11:39AM | 5 | FALSE. |
| 11:39AM | 6 | TO THE EXTENT THAT THE LIS WOULD HAVE BEEN USEFUL IN THIS |
| 11:39AM | 7 | CASE, IT WOULD HAVE BEEN USEFUL CERTAINLY TO THE GOVERNMENT IN |
| 11:39AM | 8 | CORROBORATING THE INFORMATION THAT THE GOVERNMENT INTENDS TO |
| 11:39AM | 9 | PRESENT FROM WITNESSES, INCLUDING INDIVIDUAL PATIENTS AND |
| 11:39AM | 10 | FORMER THERANOS EMPLOYEES WHO DID HAVE ACCESS TO THAT DATA, AND |
| 11:39AM | 11 | IT'S FROM THOSE EMPLOYEES THAT WE KNOW THAT THE LIS DATA WOULD |
| 11:40AM | 12 | NOT HAVE BEEN EXCULPATORY IN THIS CASE. |
| 11:40AM | 13 | THE INDIVIDUALS AT THERANOS WHO WORKED WITH THAT DATA, THE |
| 11:40AM | 14 | GOVERNMENT REGULATORS WHO HAD ACCESS TO SOME OF THAT DATA |
| 11:40AM | 15 | CONCLUDED THAT THE DATA SHOWED SERIOUS AND GLOBAL PROBLEMS WITH |
| 11:40AM | 16 | THERANOS'S ACCURACY AND RELIABILITY.  THAT'S HOW WE KNOW THAT |
| 11:40AM | 17 | WERE THIS EVIDENCE STILL AVAILABLE, WERE THE LIS STILL INTACT, |
| 11:40AM | 18 | IT ACTUALLY WOULD HAVE BEEN INCULPATORY RATHER THAN |
| 11:40AM | 19 | EXCULPATORY. |
| 11:40AM | 20 | THE DEFENSE'S SPECULATION OR ASSUMPTIONS ABOUT WHAT MIGHT |
| 11:40AM | 21 | HAVE BEEN POSSIBLE WERE THE DEFENSE TEAM ABLE TO ANALYZE THE |
| 11:40AM | 22 | LIS DATA JUST CAN'T SUPPORT THE REQUEST UNDER THE CASE LAW. |
| 11:40AM | 23 | WITH THAT THE GOVERNMENT WILL SUBMIT, YOUR HONOR. |
| 11:40AM | 24 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 11:40AM | 25 | MS. SAHARIA? |

11:40AM 1        MS. SAHARIA:  YES.  THANK YOU, YOUR HONOR.

11:40AM 2        LET ME COVER A FEW POINTS.  FIRST, LET ME JUST RESPOND

11:40AM 3 BRIEFLY TO MR. BOSTIC'S DISCUSSION OF THE CASE LAW JUST TO GET

11:41AM 4 THAT OUT OF THE WAY.

11:41AM 5        I DON'T OFTEN DO THIS, ACCUSE OPPOSING COUNSEL OF

11:41AM 6 MISCHARACTERIZING THE CASE LAW, BUT MR. BOSTIC IS

11:41AM 7 MISCHARACTERIZING LOUD HAWK.  I DON'T THINK HE'S DOING SO

11:41AM 8 INTENTIONALLY.

11:41AM 9        THE DISCUSSION OF REQUIRING BAD FAITH IS NOT THE OPINION

11:41AM 10 OF THE COURT, AND THAT'S CLEAR FROM THE OPENING, THE OPENING

11:41AM 11 DISCUSSION IN LOUD HAWK WHERE IT IDENTIFIED JUDGES WHO JOIN THE

11:41AM 12 OPINION.  I'M JUST GOING TO READ IT TO THE COURT.  "TRASK,

11:41AM 13 CIRCUIT JUDGE, FILES AN OPINION AND THE JUDGMENT OF THE COURT.

11:41AM 14 BROWNING, WRIGHT, CHOY, WALLACE,, ANDERSON, AND KENNEDY CONCUR

11:41AM 15 IN THE RESULT AND IN SECTIONS I, II, III, AND VI."

11:41AM 16        THE PART OF THE OPINION THAT MR. BOSTIC IS QUOTING TO THE

11:41AM 17 COURT IS SECTION IV OF THAT OPINION.  IT IS NOT THE OPINION OF

11:41AM 18 THE COURT.

11:41AM 19        WE DIDN'T CITE THIS CASE TO THE COURT BECAUSE I THOUGHT

11:42AM 20 THAT IT WAS CRYSTAL CLEAR THAT JUDGE KENNEDY'S OPINION IS NOT

11:42AM 21 DICTA BUT IS CONTROLLING LAW IN THE NINTH CIRCUIT, BUT SINCE

11:42AM 22 THE GOVERNMENT APPARENTLY DISAGREES, I WOULD CITE THE COURT TO

11:42AM 23 THE UNITED STATES VERSUS SIVILLA, 714 F. 3D 1168, NINTH CIRCUIT

11:42AM 24 2013 IN WHICH THE NINTH CIRCUIT SAYS THAT JUDGE KENNEDY'S

11:42AM 25 CONCURRING OPINION IN LOUD HAWK IS CONTROLLING LAW OF THIS

63

11:42AM 1    CIRCUIT TO DETERMINE WHETHER GOVERNMENT LOSS OF EVIDENCE

11:42AM 2    WARRANTS SANCTIONS LESS THAN DISMISSAL.

11:42AM 3        IT'S NOT DICTA.  THAT IS THE CONTROLLING LAW IN THIS

11:42AM 4    CIRCUIT, AND JUDGE TRASK'S DISCUSSION OF BAD FAITH IS NOT EVEN

11:42AM 5    THE OPINION OF THE COURT IN LOUD HAWK.  SO JUST TO GET THAT OUT

11:42AM 6    OF THE WAY.

11:42AM 7        A FEW OTHER ISSUES WITH RESPECT TO THE CASE LAW.  THE

11:42AM 8    GOVERNMENT RELIES VERY HEAVILY ON THE BROWN DISTRICT COURT CASE

11:42AM 9    FROM ANOTHER DISTRICT WHERE THE COURT SAID THAT A FAILURE TO

11:42AM 10   COLLECT EVIDENCE IS NOT ACTIONABLE UNDER LOUD HAWK, BUT THAT

11:43AM 11   COURT FAILED TO ACKNOWLEDGE THE LANGUAGE IN LOUD HAWK THAT

11:43AM 12   WHETHER THE EVIDENCE WAS IN THE GOVERNMENT'S CUSTODY IS JUST

11:43AM 13   ONE RELEVANT FACTOR.

11:43AM 14       LOUD HAWK DOES NOT MAKE THAT DISPOSITIVE.  IT CLEARLY IS

11:43AM 15   JUST ONE FACTOR OUT OF MANY, AND THAT DISTRICT COURT FAILS TO

11:43AM 16   RECOGNIZE THAT LANGUAGE IN LOUD HAWK.

11:43AM 17       THAT CASE ALSO, BY THE WAY, DOESN'T EVEN REALLY INVOLVE

11:43AM 18   THE FAILURE TO COLLECT THE EVIDENCE SO MUCH AS A FAILURE TO

11:43AM 19   CREATE THE EVIDENCE.  IT INVOLVES A SITUATION WHERE THE POLICE

11:43AM 20   OFFICERS WERE NOT WEARING THEIR BODY CAMS, AND THERE WAS NO

11:43AM 21   EVIDENCE TO EVEN BE COLLECTED.  THERE WAS NO VIDEO.  THE CLAIM

11:43AM 22   WAS JUST THAT THE POLICE OFFICERS HAD VIOLATED PROTOCOL BY

11:43AM 23   FAILING TO TURN ON THEIR VIDEO CAMS.

11:43AM 24       THE ZUNIGA-GARCIA CASE IS A LOUD HAWK CASE.  IT'S CRYSTAL

11:43AM 25   CLEAR FROM THAT CASE THAT INTENT IS NOT REQUIRED UNDER

64

11:43AM 1   LOUD HAWK.  AND, AGAIN, THE COURT OR THE GOVERNMENT CITED THE

11:43AM 2   MARTINEZ CASE FROM THE NINTH CIRCUIT.  THAT IS NOT A LOUD HAWK

11:44AM 3   CASE, EITHER, AND THE CONTROLLING NINTH CIRCUIT CASE LAW UNDER

11:44AM 4   THE DUE PROCESS CLAIM AND WHETHER A FAILURE TO COLLECT CAN RISE

11:44AM 5   TO THE LEVEL OF A DUE PROCESS VIOLATION IS MILLER VERSUS

11:44AM 6   VASQUEZ, AND IT CLEARLY HOLDS THAT IT CAN.

11:44AM 7       SO THAT'S JUST TO RESPOND TO SOME OF THE CASE LAW.

11:44AM 8       NOW, WITH RESPECT TO THE EVIDENCE, MR. BOSTIC GAVE A VERY

11:44AM 9   NICE CLOSING ARGUMENT ABOUT WHAT FINDINGS OF FACT HE WOULD LIKE

11:44AM 10  THE COURT TO REACH AT THE CONCLUSION OF AN EVIDENTIARY HEARING,

11:44AM 11  BUT THAT'S WHY WE WOULD NEED A HEARING SO THE COURT CAN JUDGE

11:44AM 12  CREDIBILITY FOR ITSELF.

11:44AM 13      I THINK MR. BOSTIC URGED THE COURT TO REACH CREDIBILITY

11:44AM 14  DETERMINATIONS BASED ON 302 MEMOS FROM THE FBI.  THAT'S CLEARLY

11:44AM 15  NOT APPROPRIATE.  THE COURT NEEDS TO HEAR THE EVIDENCE LIVE AND

11:44AM 16  DETERMINE WHETHER THOSE WITNESSES ARE CREDIBLE, HEAR THEIR

11:44AM 17  TESTIMONY FIRSTHAND AND DETERMINE WHETHER MR. BOSTIC'S

11:45AM 18  REPRESENTATIONS THAT THESE ARE DEAD ENDS ARE REALLY ACCURATE.

11:45AM 19  WE JUST DON'T KNOW BECAUSE WE DON'T HAVE ALL OF THE EVIDENCE

11:45AM 20  BEFORE US.

11:45AM 21      THE COURT:  WELL, MS. SAHARIA, LET ME ASK YOU, WHAT

11:45AM 22  -- IT SEEMS CLEAR THAT THERE'S NO DISPUTE THAT WHAT THE

11:45AM 23  GOVERNMENT HAS, WHAT THE GOVERNMENT WAS PROVIDED IS

11:45AM 24  INACCESSIBLE, AND IT WAS AT THE TIME THAT THEY RECEIVED IT

11:45AM 25  BECAUSE THEY DO NOT HAVE THE KEY.  THE DOCUMENTS THAT YOU

UNITED STATES COURT REPORTERS

**ER-3604**

11:45AM  1    SUPPLIED TO THE COURT, EXHIBITS AND THINGS, SHOW

11:45AM  2    CONTEMPORANEOUS EMAILS FROM WILMER AND OTHER PARTIES WHO WERE

11:45AM  3    IN CONTROL AT THE TIME, AT LEAST RECOGNITION THAT A KEY WAS

11:45AM  4    MISSING.  THERE'S MENTION OF NAMES OF INDIVIDUALS WHO CREATED

11:45AM  5    THE LIS, INDIVIDUALS WHO MIGHT HAVE THE KEY, INDIVIDUALS WHO

11:45AM  6    WERE IN INDIA.  I THINK I REFERENCED THOSE EARLIER.

11:45AM  7        BUT THERE'S NO DISPUTE, IS THERE, THAT THE GOVERNMENT HAD,

11:46AM  8    WHEN THEY RECEIVED THE LIS ON AUGUST 27, AND WHENEVER IT WAS,

11:46AM  9    2018, IT WAS A NONFUNCTIONING COPY?  IT WAS SOMETHING THAT WAS

11:46AM  10   GIVEN TO THEM THAT THEY EITHER RECEIVED IN GOOD FAITH OR

11:46AM  11   WHATEVER, BUT WHATEVER THEY RECEIVED IT WAS -- THEY COULD NOT

11:46AM  12   ACCESS IT, AND THEY DID NOT KNOW THAT AT THE TIME.

11:46AM  13       IS THAT IN DISPUTE?

11:46AM  14         MS. SAHARIA:  I DON'T DISPUTE THAT.

11:46AM  15       BUT WHAT I DO DISPUTE IS WHETHER -- HAD THE GOVERNMENT

11:46AM  16   ACTED PROMPTLY AND REASONABLY AS REASONABLE PROSECUTORS WOULD

11:46AM  17   HAVE DONE, WOULD THEY HAVE BEEN ABLE TO FIND THE INFORMATION

11:46AM  18   THEY NEEDED TO USE THE DATABASE COPY THAT THEY HAD?

11:46AM  19       NOW, IN MY OPENING PRESENTATION I NOTED FOR THE COURT THAT

11:46AM  20   IF YOU READ THE BRADY LETTER VERY CAREFULLY, IT APPEARS THAT

11:46AM  21   THE FIRST TIME THAT THE GOVERNMENT ASKED ANYONE FOR A PASSWORD

11:47AM  22   WAS A YEAR AND A HALF LATER, AND MR. BOSTIC DID NOT CHALLENGE

11:47AM  23   THAT IN HIS PRESENTATION.  HE NOTES THAT THERE WERE DISCUSSIONS

11:47AM  24   ABOUT HOW THEY COULDN'T ACCESS THE LIS DATABASE OCCURRING IN

11:47AM  25   THE U.S. ATTORNEY'S OFFICE IN LATE 2018, AND THAT APPEARS TO BE

66

11:47AM 1     TRUE.

11:47AM 2        BUT AT THE TIME, IT APPEARS FROM THE BRADY LETTER, AND

11:47AM 3     AGAIN, I URGE THE COURT TO READ THOSE PARAGRAPHS VERY

11:47AM 4     CAREFULLY, THE PARALEGALS AND SUPPORT STAFF WERE TELLING THE

11:47AM 5     GOVERNMENT THAT THE DATABASE WAS TOO BIG AND THEY DIDN'T HAVE

11:47AM 6     THE RIGHT SOFTWARE TO ACCESS IT.

11:47AM 7        NOW, MIND YOU, THE GOVERNMENT HAD BEEN TOLD LONG AGO WHAT

11:47AM 8     SOFTWARE IT WOULD NEED TO ACCESS IT AND APPARENTLY IT DIDN'T

11:47AM 9     GET IT, BUT THAT'S WHAT THEY WERE TALKING ABOUT IN LATE 2018.

11:47AM 10        THERE'S NO DISCUSSION IN THE BRADY LETTER THAT THE

11:47AM 11     GOVERNMENT REALIZED IT NEEDED A PASSWORD, WHICH IT WOULD HAVE

11:47AM 12     DONE IF IT DILIGENTLY OPENED THE LIS DATABASE, AND WE CAN'T

11:47AM 13     KNOW UNTIL WE HAVE AN EVIDENTIARY HEARING WHETHER THEY COULD

11:48AM 14     HAVE OBTAINED THAT PASSWORD OR WHETHER THEY COULD HAVE RESTORED

11:48AM 15     THE PHYSICAL LIS DATABASE, AS WITNESSES HAVE SAID THEY COULD

11:48AM 16     HAVE, IF THEY HAD OBTAINED THE PHYSICAL HARDWARE FROM THE

11:48AM 17     ASSIGNEE.  IT EXISTED.

11:48AM 18        IF THEY HAD ACTED PROMPTLY, THAT EQUIPMENT STILL EXISTED,

11:48AM 19     IT WAS WITH THE ASSIGNEE, THEY COULD HAVE COLLECTED IT.  AND,

11:48AM 20     YOU KNOW, MR. BOSTIC POINTED OUT THAT COLLECTING PHYSICAL

11:48AM 21     ANALYZERS IS DIFFERENT THAN COLLECTING ESI AND THE TYPICAL

11:48AM 22     APPROACH TO COLLECTING ESI IS JUST TO, YOU KNOW, COLLECT A COPY

11:48AM 23     OF THE DATA.

11:48AM 24        THAT MIGHT BE SO IN THE ORDINARY CASE, BUT WE KNOW THIS IS

11:48AM 25     NOT AN ORDINARY CASE BECAUSE THE GOVERNMENT'S OWN EXPERTS,

11:48AM 1    THEIR OWN ESI EXPERTS RECOMMENDED TO THE GOVERNMENT THAT THEY

11:48AM 2    TAKE STEPS TO EITHER GIVE IT TO THE FBI TO OPEN OR TO GO GET

11:48AM 3    THE PHYSICAL EQUIPMENT.  THEIR OWN EXPERTS TOLD THEM TO GO GET

11:48AM 4    THE PHYSICAL EQUIPMENT AND THEY DIDN'T DO IT.

11:48AM 5          THE COURT:  OKAY.  SO WOULD IT -- AS TO THE

11:49AM 6    DILIGENCE, AND I UNDERSTAND YOUR POINT ABOUT BEING CRITICAL OF

11:49AM 7    THE GOVERNMENT WAITING FOR A YEAR, 18 MONTHS, WHATEVER IT WAS

11:49AM 8    THAT THEY WAITED FOR.  SO WOULD THEY HAVE BEEN DILIGENT IF THEY

11:49AM 9    TRIED TO OPEN IT IN FIVE DAYS AT THE TIME THAT THEY RECEIVED

11:49AM 10   IT?  WOULD THAT HAVE BEEN DUE DILIGENCE?

11:49AM 11         MS. SAHARIA:  WELL, PERHAPS, YOUR HONOR.  I MEAN, I

11:49AM 12   WOULD HOPE THAT THEY WOULD TRY TO OPEN IT WITHIN A DAY OR TWO

11:49AM 13   OF RECEIVING IT.  THAT'S WHAT I THINK MOST PEOPLE DO WHEN THEY

11:49AM 14   RECEIVE PRODUCTIONS.  THEY DON'T SIT AROUND FOR FIVE DAYS,

11:49AM 15   ESPECIALLY WHEN THEY KNOW THAT THE PRODUCING COMPANY IS ABOUT

11:49AM 16   TO DISSOLVE.  I MEAN, I THINK THAT DISTINGUISHES THIS CASE FROM

11:49AM 17   THE ORDINARY CASE.

11:49AM 18         THE COURT:  BUT THEY DIDN'T KNOW.  THEY DIDN'T KNOW

11:49AM 19   THAT THE DATABASE WOULD BE DECOMMISSIONED FOUR DAYS AFTER THEY

11:49AM 20   RECEIVED IT, THOUGH, DID THEY?  IS THERE ANY DISPUTE ABOUT

11:49AM 21   THAT?

11:49AM 22         MS. SAHARIA:  MR. BOSTIC HAS REPRESENTED ORALLY TO

11:49AM 23   THE COURT THAT FACT, AND I HAVE NO BASIS TO QUARREL WITH THAT

11:50AM 24   ORAL REPRESENTATION TO THE COURT THAT HE DIDN'T KNOW THAT AT

11:50AM 25   THE TIME.

11:50AM  1          THEY CERTAINLY KNEW THE COMPANY WAS CLOSING.

11:50AM  2              THE COURT:  SURE.  I DIDN'T SEE ANY DOCUMENTATION,

11:50AM  3   ANY EMAILS OR ANYTHING THAT PUT ANY PARTY ON NOTICE THAT THE

11:50AM  4   DATABASE WOULD BE DECOMMISSIONED WHEN IT WAS.  I DIDN'T SEE

11:50AM  5   ANYTHING ABOUT THAT, NOR DID I SEE ANYTHING THAT GAVE

11:50AM  6   INFORMATION TO THE GOVERNMENT THAT WHAT THEY WERE GIVEN THEY

11:50AM  7   COULDN'T OPEN BECAUSE OF A LACK OF THIS KEY, I THINK THIS

11:50AM  8   PASSWORD KEY, THIS SECONDARY KEY THAT WAS NEEDED.

11:50AM  9          SO THEY WERE GIVEN SOMETHING AND IN ESSENCE FOUR DAYS

11:50AM  10  LATER IT -- THE LIS WAS -- THE ORIGINAL LIS WAS DESTROYED, AND

11:50AM  11  THE CRITICISM IS THE GOVERNMENT SHOULD HAVE OPENED THIS TO FIND

11:50AM  12  OUT THAT THEY HAD AN INOPERATIVE, INACCESSIBLE DATABASE PRIOR

11:51AM  13  TO THE DESTRUCTION OF THE LIS.

11:51AM  14              MS. SAHARIA:  WELL, NO.  AGAIN, THAT'S NOT PRECISELY

11:51AM  15  OUR -- MY POSITION.

11:51AM  16         IF THEY HAD ACTED PROMPTLY, WHETHER WITHIN FOUR DAYS OR

11:51AM  17  WHETHER WITHIN A WEEK, THERE WERE AVENUES AVAILABLE TO THE

11:51AM  18  GOVERNMENT TO USE THE COPY -- POTENTIALLY TO USE THE COPY IN

11:51AM  19  ITS POSSESSION OR TO GET THE ORIGINAL SERVER.

11:51AM  20         AND UNTIL WE HAVE AN EVIDENTIARY HEARING AND HEAR FROM THE

11:51AM  21  PEOPLE ON THE GROUND ABOUT WHAT THOSE AVENUES WOULD HAVE LED

11:51AM  22  TO, I DON'T THINK THAT WE CAN JUST TAKE FOR GRANTED THAT THESE

11:51AM  23  WERE DEAD ENDS AS MR. BOSTIC REPRESENTED THEM TO BE.

11:51AM  24         AGAIN, THEY COULD HAVE CONSULTED WITH THERANOS'S COUNSEL

11:51AM  25  ABOUT THE PASSWORD.  APPARENTLY THEY DIDN'T DO THAT FOR A YEAR

69

11:51AM 1    AND A HALF, AND PERHAPS AT THAT POINT IN TIME THEY COULD HAVE

11:51AM 2    FOUND THE PASSWORD.  PERHAPS THEY COULD -- I MEAN, THEY

11:51AM 3    CERTAINLY COULD HAVE OBTAINED THE PHYSICAL EQUIPMENT.

11:52AM 4        I THINK IT'S IMPORTANT TO KEEP IN MIND IN ADDITION THAT

11:52AM 5    THE ONLY REASON THAT WE'RE IN THIS POSITION AT ALL, THAT WE'RE

11:52AM 6    IN THIS POSITION OF THE FOUR-DAY GAP IS THAT THE GOVERNMENT

11:52AM 7    WAITED A YEAR AND A HALF FROM LEARNING ABOUT THE LIS DATABASE

11:52AM 8    TO EVEN BOTHER SUBPOENAING IT.

11:52AM 9        BY THE TIME THEY ASKED FOR THE DATABASE IN IT'S JUNE 4TH

11:52AM 10   SUBPOENA, THEY KNEW THE COMPANY WAS CLOSING SOON.  AND IF THEY

11:52AM 11   HAD ACTED PROMPTLY IN OBTAINING OR COLLECTING EVIDENCE IN THE

11:52AM 12   FIRST PLACE, WE VERY WELL WOULD HAVE NEVER BEEN IN THIS

11:52AM 13   SITUATION.

11:52AM 14           THE COURT:  BUT THERE WERE EARLIER SUBPOENAS AS

11:52AM 15   MR. BOSTIC IDENTIFIED.  THERE WERE EARLIER SUBPOENAS.  AND THE

11:52AM 16   SUBPOENAS IN THE REQUEST FOR PRODUCTION INDICATED DATABASE AND

11:52AM 17   ALL SOFTWARE NECESSARY TO ACCESS TO THAT.  I READ THOSE IN THE

11:52AM 18   SUBPOENAS AS WELL AS --

11:52AM 19           MS. SAHARIA:  THAT I DO NOT BELIEVE IS CORRECT,

11:52AM 20   YOUR HONOR.  THE FIRST SUBPOENA FOR THE DATABASE AND THE

11:52AM 21   SOFTWARE NECESSARY TO OPERATE IT WAS JUNE 4TH.  THEY HAD NEVER

11:53AM 22   BEFORE THAT DATE REQUESTED PRODUCTION OF THE DATABASE.

11:53AM 23       THEY HAD REQUESTED PRODUCTION OF INFORMATION FROM THE

11:53AM 24   DATABASE.  THERANOS WOULD GENERATE EXCEL SPREADSHEETS OF

11:53AM 25   CERTAIN DATA IN THE DATABASE AND PRODUCE THAT TO THE GOVERNMENT

11:53AM 1    AS EXCEL SPREADSHEETS.  BUT THE FIRST REQUEST FOR THE DATABASE

11:53AM 2    DIDN'T COME UNTIL JUNE 4TH, 2018.

11:53AM 3         WILMER HALE DID TELL THE GOVERNMENT WHAT SOFTWARE IT WOULD

11:53AM 4    NEED.  THAT SOFTWARE BELONGED TO MICROSOFT, AND THERANOS DIDN'T

11:53AM 5    FEEL IT APPROPRIATE APPARENTLY, WHICH MAKES SENSE TO ME, TO

11:53AM 6    GIVE THE GOVERNMENT, IT WOULD PROBABLY WOULD BREACH A LICENSE,

11:53AM 7    TO GIVE THE GOVERNMENT A COPY OF THE PUBLICLY AVAILABLE

11:53AM 8    MICROSOFT SOFTWARE.  AND SO IT TOLD THE GOVERNMENT WHAT

11:53AM 9    SOFTWARE TO GET, AND THERE'S NO EVIDENCE THAT IT DID.

11:53AM 10        JUST A FEW OTHER POINTS.  ON THE BRADY ISSUE, THE

11:53AM 11   INFORMATION IN THE BRADY LETTER, AND THIS GOES TO OUR MOTION TO

11:54AM 12   COMPEL, IT IS BRADY INFORMATION.  WHETHER OR NOT THE COURT

11:54AM 13   ULTIMATELY CONCLUDES THAT THE GOVERNMENT IS AT FAULT AND THAT

11:54AM 14   SUPPRESSION OR SOME OTHER SANCTION WOULD BE AN APPROPRIATE

11:54AM 15   REMEDY, THE FACT THAT THE GOVERNMENT RECEIVED THE MOST

11:54AM 16   COMPREHENSIVE COLLECTION OF TEST RESULT DATA AND MADE ALMOST NO

11:54AM 17   ATTEMPT TO EVEN OPEN IT FOR A YEAR AND A HALF IS HIGHLY

11:54AM 18   EXCULPATORY AND PROBATIVE EVIDENCE THAT THE GOVERNMENT DIDN'T

11:54AM 19   VIEW THIS AS VERY INCULPATORY OTHERWISE YOU WOULD THINK IT

11:54AM 20   WOULD TRY A LITTLE HARDER TO USE THIS DATA.  THAT IS RELEVANT

11:54AM 21   EVIDENCE.

11:54AM 22        WE ARE ENTITLED TO MAKE A JUDGMENT CALL AS TO WHETHER WE

11:54AM 23   WANT TO PRESENT THAT EVIDENCE AT TRIAL, AND WE CAN'T DO THAT

11:54AM 24   WITHOUT THE ACTUAL DOCUMENTS AND IDENTITIES OF THE INVOLVED

11:54AM 25   INDIVIDUALS.  SO THAT JUST GOES TO THE MOTION TO COMPEL.

71

11:54AM 1          JUST A FEW OTHER RESPONSES.

11:55AM 2          MR. BOSTIC POINTED OUT THAT THERE'S NO PREJUDICE HERE

11:55AM 3     BECAUSE TWO YEARS LATER IN 2020 THE GOVERNMENT PRODUCED A COPY

11:55AM 4     OF THE COPY TO MS. HOLMES.

11:55AM 5          OF COURSE MS. HOLMES DOES NOT HAVE ACCESS TO FBI COMPUTER

11:55AM 6     EXPERTS.  SHE DOESN'T HAVE ACCESS TO THE PHYSICAL SERVERS

11:55AM 7     BECAUSE THE GOVERNMENT DIDN'T COLLECT THEM AND BY NOW THEY'VE

11:55AM 8     BEEN RETURNED TO THE LESSORS OR DESTROYED, NOR DID SHE HAVE

11:55AM 9     TIMELY ACCESS TO -- IN THE WAKE OF THIS PRODUCTION TO PEOPLE

11:55AM 10    WHO MIGHT HAVE HAD THE PASSWORD.  AGAIN, THERE'S NO EVIDENCE

11:55AM 11    THAT MS. HOLMES HAD ANY KNOWLEDGE OF ANY OF THESE EVENTS, HAD

11:55AM 12    ANY KNOWLEDGE OF ANY PASSWORD ISSUE.

11:55AM 13         THE GOVERNMENT HAS AGAIN MADE SPECIOUS ASSERTIONS THAT SHE

11:55AM 14    MUST HAVE BEEN RESPONSIBLE FOR SUBPOENA COMPLIANCE.  SHE WAS

11:55AM 15    NOT RESPONSIBLE FOR SUBPOENA COMPLIANCE.

11:56AM 16         WE RESPECTFULLY REQUEST THE OPPORTUNITY TO PRESENT TO THE

11:56AM 17    COURT IN CAMERA A STATEMENT TO THIS EFFECT SO THE COURT

11:56AM 18    UNDERSTANDS WHAT MS. HOLMES DID OR DID NOT OR HAVE ACCESS TO AT

11:56AM 19    THE RELEVANT TIME.  WE THINK THAT THE INFORMATION IS

11:56AM 20    PRIVILEGED, BUT IT'S RELEVANT TO SOME OF THE COURT'S QUESTIONS,

11:56AM 21    AND WE WOULD RESPECT THE OPPORTUNITY TO PRESENT AN IN CAMERA

11:56AM 22    SUBMISSION TO THE COURT ON THAT ISSUE.

11:56AM 23         I'LL JUST CLOSE ON THE ISSUE OF PREJUDICE.  IT IS -- THE

11:56AM 24    LACK OF ACCESS TO THE DATABASE IS PREJUDICIAL BOTH WITH RESPECT

11:56AM 25    TO INDIVIDUAL TEST RESULTS AND MORE GENERALLY.

UNITED STATES COURT REPORTERS

**ER-3611**

72

11:56AM 1      WITH RESPECT TO THE INDIVIDUAL TEST RESULTS, THERE IS

11:56AM 2   SIGNIFICANT INFORMATION THAT WE CAN LEARN ABOUT THOSE

11:56AM 3   INDIVIDUAL TEST RESULTS FROM THE DATABASE.  EVEN IF YOU CAN'T,

11:56AM 4   YOU KNOW, YOU CAN'T LOOK AT THE DATABASE FOR SURE AND KNOW IF

11:57AM 5   SOMEONE WAS ACTUALLY PREGNANT OR NOT, BUT AS I SAID, THERE'S

11:57AM 6   INFORMATION IN THE DATABASE THAT GOES TO WHETHER WHAT MIGHT

11:57AM 7   HAVE CAUSED AN INACCURATE TEST RESULT.

11:57AM 8      AND WE COULD TAKE THE MULTITUDE OF DATA IN THAT DATABASE

11:57AM 9   AND PUT THAT INDIVIDUAL RESULT IN CONTEXT, YOU KNOW, HOW MANY

11:57AM 10  OF THESE WERE OUT OF WHACK?

11:57AM 11     YOU KNOW, THE GOVERNMENT'S DOCTOR EXPERTS HAVE SAID THAT

11:57AM 12  THESE RESULTS IN MANY CASES WERE OBVIOUS ERRORS TO THEM.

11:57AM 13     WELL, HOW MANY OTHER OBVIOUS ERRORS ARE THERE IN THE

11:57AM 14  DATABASE?  ARE THERE A LOT?  ARE THERE NONE?  IS THERE ONE OF,

11:57AM 15  YOU KNOW, HUNDREDS OF THOUSANDS OF SUCH RESULTS AND THIS IS

11:57AM 16  JUST ONE OF THEM?  THAT WOULD BE VERY PROBATIVE, AND WE DON'T

11:57AM 17  HAVE ACCESS TO THAT.

11:57AM 18     AND IT'S NOT SPECULATION FOR US TO SAY THAT THERE IS

11:57AM 19  EXCULPATORY VALUE TO THE DATABASE, AND THAT'S THE LANGUAGE THAT

11:57AM 20  THE COURTS USED IN DETERMINING WHETHER TO SUPPRESS EVIDENCE,

11:57AM 21  WHETHER THERE IS POTENTIAL EXCULPATORY VALUE, AND WHETHER THE

11:58AM 22  GOVERNMENT KNEW THAT AT THE RELEVANT TIME.

11:58AM 23     AND THERE'S NO QUESTION THAT THERE ARE MANY, MANY, MANY

11:58AM 24  MILLIONS OF ACCURATE TEST RESULTS IN THAT DATABASE THAT SHOW

11:58AM 25  THAT THERANOS WAS GENERATING ACCURATE AND RELIABLE TEST RESULTS

73

11:58AM 1    ACROSS A VERY BROAD RANGE OF TESTS AND ALL OF THAT IS HIGHLY

11:58AM 2    EXCULPATORY BOTH ON THE QUESTION OF FALSITY BUT ALSO WITH

11:58AM 3    RESPECT TO MS. HOLMES'S INTENT.

11:58AM 4         SO WITH THAT WE URGE THE COURT TO SET THIS MOTION FOR A

11:58AM 5    HEARING AND SEPARATELY I URGE THE COURT TO GRANT OUR MOTION TO

11:58AM 6    COMPEL.

11:58AM 7              THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH,

11:58AM 8    MS. SAHARIA.

11:58AM 9         MR. BOSTIC, MS. SAHARIA GETS THE LAST WORD, BUT IS THERE

11:58AM 10   ANYTHING YOU WANT TO SAY?  AND IF THERE IS, I'LL GIVE

11:58AM 11   MS. SAHARIA THE LAST WORD.

11:58AM 12             MR. BOSTIC:  THANK YOU, YOUR HONOR.

11:58AM 13        JUST ON THAT LAST POINT ABOUT THE PREJUDICE TO THE DEFENSE

11:58AM 14   AND THE EXCULPATORY NATURE OR ARGUABLE EXCULPATORY NATURE OF

11:58AM 15   THIS DATA.  I WOULD REFER THE COURT TO THE FLYER DECISION AND

11:59AM 16   THE ROBERTSON DECISION.

11:59AM 17        SO FLYER REJECTED THAT DEFENDANT'S SUPPRESSION ARGUMENTS

11:59AM 18   PARTLY BECAUSE THAT DEFENDANT DIDN'T SHOW THAT THE LOSS OF

11:59AM 19   EVIDENCE PREJUDICED HIM.  IN THAT CASE THE LOSS OF ELECTRONIC

11:59AM 20   INFORMATION MEANT THAT IT WAS ACTUALLY MORE DIFFICULT FOR THE

11:59AM 21   GOVERNMENT TO PROVE SUCCESSFUL DOWNLOADS OF THE INCRIMINATING

11:59AM 22   MATERIAL IN THAT CASE.

11:59AM 23             THE COURT:  BUT THE GOVERNMENT DISMISSED THE ONE

11:59AM 24   COUNT THAT INVOLVED -- WAS INVOLVED IN THIS CASE IF I RECALL

11:59AM 25   CORRECTLY.

| 11:59AM | 1 | MR. BOSTIC: CORRECT, YOUR HONOR. |
| 11:59AM | 2 | BUT THE DEFENDANT IN THAT CASE WANTED ADDITIONAL |
| 11:59AM | 3 | SUPPRESSION THAT THE COURT DENIED ON THE BASIS THAT THERE WAS |
| 11:59AM | 4 | AN INSUFFICIENT SHOWING THAT THE PREJUDICE WAS ACTUALLY APPLIED |
| 11:59AM | 5 | TO THE DEFENDANT HIMSELF AS OPPOSED TO THE GOVERNMENT. |
| 11:59AM | 6 | AND HERE WHEN WE'RE TALKING ABOUT CONTEXTUAL INFORMATION |
| 11:59AM | 7 | SURROUNDING INDIVIDUAL PATIENT RESULTS, THERE'S EVERY REASON TO |
| 11:59AM | 8 | BELIEVE THAT THE LACK OF THAT INFORMATION PUTS THE GOVERNMENT |
| 11:59AM | 9 | AT A DISADVANTAGE ALSO SO THAT THE DEFENSE OBVIOUSLY CAN -- YOU |
| 12:00PM | 10 | KNOW, IS AWARE OF THAT. BUT THIS IS NOT PREJUDICE UNIQUE TO |
| 12:00PM | 11 | THE DEFENDANT. IT IS NOT THE KIND OF PREJUDICE THAT SUPPORTS A |
| 12:00PM | 12 | FINDING OF SANCTIONS BEING WARRANTED UNDER LOUD HAWK. |
| 12:00PM | 13 | ROBERTSON SIMILARLY DECLINES TO ISSUE A REMEDIAL JURY |
| 12:00PM | 14 | INSTRUCTION UNDER LOUD HAWK PARTLY BECAUSE THAT COURT FOUND |
| 12:00PM | 15 | THAT THE EXCULPATORY VALUE OF THE EVIDENCE IN THAT CASE WAS NOT |
| 12:00PM | 16 | APPARENT. |
| 12:00PM | 17 | SO HERE WHEN THE DEFENSE TALKS ABOUT HOW MANY ACCURATE |
| 12:00PM | 18 | RESULTS THE LIS WOULD HAVE CONTAINED OR EVEN ASSUMES THAT IT |
| 12:00PM | 19 | WOULD BE POSSIBLE TO IDENTIFY WHICH RESULTS WERE ACCURATE IN |
| 12:00PM | 20 | THE LIS, THAT IS SPECULATION. IT'S THE KIND OF SPECULATION |
| 12:00PM | 21 | THAT THE COURT CAN'T RELY ON IN AN ANALYSIS LIKE THIS. |
| 12:00PM | 22 | AND IN ROBERTSON THE COURT HAD PREVIOUSLY FOUND THAT IT |
| 12:00PM | 23 | WAS COMPLETELY SPECULATIVE WHETHER THE VIDEO THAT WAS LOST IN |
| 12:00PM | 24 | THAT CASE WAS POTENTIALLY USEFUL TO THE DEFENSE AND THE SAME IS |
| 12:00PM | 25 | TRUE HERE. |

75

```
12:00PM   1        NOT ONLY HERE ARE WE FACING SPECULATION ABOUT THE NATURE

12:01PM   2    OF THE DATA IN THE LIS, SPECULATION WHICH IS CONTRARY TO WHAT

12:01PM   3    WITNESSES HAVE TOLD US AND WHAT OTHER DATA SHOWS, BUT WE'RE

12:01PM   4    ALSO FACING ANOTHER LAYER OF SPECULATION ABOUT WHETHER THAT

12:01PM   5    EVIDENCE WAS TRULY IN EXISTENCE AFTER THE ORIGINAL COPY OF THE

12:01PM   6    DATABASE WAS DISASSEMBLED IN AUGUST OF 2018.  SO WE HAVE

12:01PM   7    MULTIPLE LAYERS OF SPECULATION HERE COMPOUNDING EACH OTHER.

12:01PM   8        NOT ONLY CAN THE DEFENSE NOT SHOW THAT THIS EVIDENCE WOULD

12:01PM   9    HAVE BEEN EXCULPATORY, IT CAN'T EVEN SHOW THAT THE EVIDENCE WAS

12:01PM  10    ACCESSIBLE OR EXTANT POST AUGUST 2018.

12:01PM  11        THE COURT:  ALL RIGHT.  THANK YOU.

12:01PM  12        MS. SAHARIA.  AND THIS IS THE FINAL WORD, MS. SAHARIA.

12:01PM  13        MS. SAHARIA:  FINAL WORD.

12:01PM  14        SO WITH RESPECT TO THE FLYER CASE, THE COURT HELD THERE

12:01PM  15    WAS NO EVIDENCE OF PREJUDICE TO THE DEFENDANT BECAUSE HE HAD

12:01PM  16    ADMITTED TO THE AGENTS THAT CAME TO SEIZE HIS COMPUTER THAT HE

12:01PM  17    HAD DOWNLOADED THE PORN, SO THE FACT THAT THE COMPUTER WAS NOT

12:02PM  18    AVAILABLE TO HIM WAS NOT EXCULPATORY.  SO THAT'S NEITHER HERE

12:02PM  19    NOR THERE WITH RESPECT TO THIS CASE.

12:02PM  20        WITH RESPECT TO THE ROBERTSON CASE, THE COURT DID HOLD AN

12:02PM  21    EVIDENTIARY HEARING, AND IT WAS AFTER ALL OF THE EVIDENCE CAME

12:02PM  22    OUT AT THAT HEARING ABOUT WHAT THE VIDEO CAMERA SHOWED OR

12:02PM  23    DIDN'T SHOW AND WHICH WAY IT WAS POINTED AND THE FACT THAT IT

12:02PM  24    WAS ACTUALLY NOT EVEN -- THE VIEW OF THE CAR AT ISSUE WAS

12:02PM  25    OBSTRUCTED, ALL OF THAT EVIDENCE CAME OUT AT A HEARING AND ON
```

76

12:02PM 1    THE BASIS OF THAT EVIDENCE THE COURT CONCLUDED THAT THE

12:02PM 2    EXCULPATORY NATURE OF THE EVIDENCE WAS SPECULATIVE, AND,

12:02PM 3    THEREFORE, THERE WAS MINIMAL PREJUDICE.

12:02PM 4        I WILL NOTE THAT IN THAT CASE THE COURT ALSO RELIED ON THE

12:02PM 5    FACT THAT THE FAILURE TO PRESERVE THE EVIDENCE WAS DUE TO

12:02PM 6    ROUTINE OPERATION OF THE POSTAL SERVICE AND THAT THE

12:02PM 7    PROSECUTORS WERE NOT INVOLVED.  THIS IS A VERY DIFFERENT

12:02PM 8    SITUATION THAN ROBERTSON.

12:02PM 9        WE ARE NOT SPECULATING.  WE HAVE OFFERED THE COURT

12:03PM 10   EVIDENCE FROM WITNESSES INTERVIEWED BY THE GOVERNMENT THAT THE

12:03PM 11   DATABASE COULD HAVE THEN USED IF IT HAD BEEN PUT BACK TOGETHER

12:03PM 12   IN A TIMELY FASHION.

12:03PM 13       THE GOVERNMENT DOESN'T WANT TO BELIEVE THAT EVIDENCE, BUT

12:03PM 14   THAT'S EXACTLY WHY AN EVIDENTIARY HEARING IS REQUIRED SO THE

12:03PM 15   COURT CAN HEAR THAT EVIDENCE FIRSTHAND AND MAKE FINDINGS OF

12:03PM 16   FACT BASED ON THAT EVIDENCE.

12:03PM 17       THE GOVERNMENT WAS WELL AWARE THAT THIS WAS -- THIS WOULD

12:03PM 18   BE A COMPLEX DATABASE WHICH USED AND IT WAS PUT ON NOTICE OF

12:03PM 19   THAT FACT IN MAY.  WE DON'T DISPUTE THAT THIS IS A COMPLEX

12:03PM 20   DATABASE.  IT CERTAINLY WAS.  THE GOVERNMENT HAD PLENTY OF

12:03PM 21   NOTICE OF THE STEPS THAT IT COULD HAVE TAKEN TO BE ABLE TO USE

12:03PM 22   DATABASE, AND IT DIDN'T TAKE ANY OF THOSE STEPS.  THIS IS ALL

12:03PM 23   RELEVANT EVIDENCE THAT THE COURT SHOULD HEAR AT A HEARING.

12:03PM 24           THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.  THANK

12:03PM 25   YOU.

| | | |
|---|---|---|
| 12:03PM | 1 | AS I INDICATED AT THE OUTSET, I'M GOING TO REVIEW ALL OF |
| 12:04PM | 2 | YOUR COMMENTS AND REVIEW, ONCE AGAIN, THE PAPERS AND THE COURT |
| 12:04PM | 3 | WILL TAKE THE MOTION UNDER SUBMISSION, AND I'LL ISSUE AN ORDER |
| 12:04PM | 4 | SHORTLY THAT WILL HAVE THE COURT'S FINDINGS AND RULING ON THE |
| 12:04PM | 5 | MOTION AND ON THE REQUESTS FOR A HEARING AND OTHER INFORMATION. |
| 12:04PM | 6 | ANYTHING FURTHER BEFORE WE CLOSE TODAY? |
| 12:04PM | 7 | MS. SAHARIA:  YOUR HONOR, I THINK MR. DOWNEY WOULD |
| 12:04PM | 8 | LIKE TO ADDRESS A FEW -- ONE OR MORE ISSUES RELATING TO |
| 12:04PM | 9 | PRETRIAL ISSUES. |
| 12:04PM | 10 | THE COURT:  OKAY. |
| 12:04PM | 11 | MR. DOWNEY:  JUST A HOUSEKEEPING QUESTION.  I DON'T |
| 12:04PM | 12 | THINK WE'RE SCHEDULED TO BE TOGETHER BEFORE THE QUESTIONNAIRE |
| 12:04PM | 13 | WILL GO OUT.  AND HAS THE COURT FINALIZED THAT?  AND IS THERE |
| 12:04PM | 14 | ANYTHING THAT THE COURT NEEDS FURTHER FROM THE PARTIES ON THAT? |
| 12:04PM | 15 | THE COURT:  I DO NOT NEED ANYTHING FURTHER FROM YOU. |
| 12:04PM | 16 | AND YOU'LL GET THE COURT'S FINAL QUESTIONNAIRE SHORTLY. |
| 12:04PM | 17 | MR. DOWNEY:  GOOD.  THANK YOU, YOUR HONOR. |
| 12:04PM | 18 | AND THE OTHER QUESTION WAS JUST I KNOW YOUR HONOR HAD |
| 12:04PM | 19 | MENTIONED THAT AT SOME TIME PRIOR TO THE 31ST WE MIGHT GET |
| 12:04PM | 20 | TOGETHER. |
| 12:04PM | 21 | I ASSUME THE COURT WILL SET THAT DATE IN THE FUTURE, BUT I |
| 12:05PM | 22 | JUST WANTED TO ASK IF THE COURT WANTS TO SET IT NOW. |
| 12:05PM | 23 | THE COURT:  WELL, I'M HAPPY TO -- I DO THINK IT'S |
| 12:05PM | 24 | IMPORTANT THAT WE DO GET TOGETHER, ALL OF US, AT SOME POINT IN |
| 12:05PM | 25 | TIME, AND I WAS GOING TO LEAVE IT TO YOU TO SCHEDULE YOUR |

78

12:05PM  1    SCHEDULES TO MEET AND CONFER AND SEE WHAT WORKS FOR ALL OF YOUR

12:05PM  2    TEAMS.

12:05PM  3              MR. DOWNEY:  WE'LL DO THAT, YOUR HONOR.

12:05PM  4              THE COURT:  BUT I'M HAPPY TO HAVE YOU IN HERE IN THE

12:05PM  5    COURT.

12:05PM  6        I CAN TELL YOU THAT, AS YOU PROBABLY READ, WE'RE STARTING

12:05PM  7    TO RELAX THINGS.  OUR COURT HAS GIVEN US -- WE HAVE DECIDED TO

12:05PM  8    ALLOW EACH JUDGE THE DISCRETION AS TO WHETHER OR NOT TO TAKE

12:05PM  9    THE PLEXIGLASS DOWN THAT'S IN THE COURTROOM, AND YOU'VE HEARD

12:05PM  10   ME SPEAK ABOUT MY FONDNESS OF THE PLEXIGLASS IN THE COURTROOM.

12:05PM  11       I HAVEN'T ASKED IT TO BE REMOVED JUST YET.  IN THE SPIRIT

12:05PM  12   OF FULL DISCLOSURE, I'M CONSULTING WITH MY STAFF ALSO TO SEE

12:06PM  13   WHAT THEIR COMFORT LEVEL IS AS WELL BEFORE I MAKE ANY FINAL

12:06PM  14   DECISIONS, AND I'M HAPPY TO HEAR FROM YOU AS WELL ABOUT THAT,

12:06PM  15   TOO, THAT IS, BOTH SIDES, ABOUT YOUR CONCERNS, IF ANY, ABOUT

12:06PM  16   WHETHER OR NOT PLEXIGLASS SHOULD STAY IN PLACE AND WHAT YOUR

12:06PM  17   THOUGHTS ARE, AND, IF SO, IN WHAT CAPACITY.  THAT MIGHT BENEFIT

12:06PM  18   YOU AND YOUR WITNESSES AND ALL OF THE PARTIES.

12:06PM  19       SO YOU CAN LET ME KNOW THAT, TOO.

12:06PM  20       BUT, YES, I'D LIKE YOU TO MEET AND CONFER AND WORK WITH

12:06PM  21   MS. KRATZMANN AND SEE IF WE CAN GET AN AGREEABLE DATE WHEN WE

12:06PM  22   CAN ALL GET TOGETHER.

12:06PM  23             MR. DOWNEY:  FAIR ENOUGH, YOUR HONOR.  UNDERSTOOD,

12:06PM  24   YOUR HONOR.

12:06PM  25             THE COURT:  OKAY.  GREAT.  THANK YOU.

79

12:06PM  1          THEN LET ME JUST EXTEND OUR BEST WISHES TO EVERYONE IN

12:06PM  2   FUTURE ENDEAVORS, AND WE HOPE THE BEST AND EXTEND OUR GOOD WILL

12:06PM  3   TO ALL OF YOU, AND WE LOOK FORWARD TO SEEING YOU AGAIN ALL

12:07PM  4   HEALTHY, AND I LOOK FORWARD TO HAVING YOU ALL IN THE COURTROOM

12:07PM  5   AGAIN.

12:07PM  6          SO BEST WISHES.  THANK YOU.

12:07PM  7              MS. SAHARIA:  THANK YOU, YOUR HONOR.

12:07PM  8              MR. BOSTIC:  THANKS VERY MUCH.

12:07PM  9              MR. WADE:  THANK YOU, YOUR HONOR.

12:07PM  10             THE CLERK:  COURT IS ADJOURNED.  THIS WEBINAR SHALL

12:07PM  11  TERMINATE.

        12             (COURT CONCLUDED AT 12:07 P.M.)

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

                        UNITED STATES COURT REPORTERS

                              **ER-3619**

1

2

3                    CERTIFICATE OF REPORTER

4

5

6

7        I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8    STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9    280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10   CERTIFY:

11       THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16   _____
     IRENE RODRIGUEZ, CSR, RMR, CRR
17   CERTIFICATE NUMBER 8074

18
                 DATED:  JULY 9, 2021
19

20

21

22

23

24

25

1

2

3

4               UNITED STATES DISTRICT COURT

5               NORTHERN DISTRICT OF CALIFORNIA

6                     SAN JOSE DIVISION

7

8   UNITED STATES OF AMERICA,              Case No.  5:18-cr-00258-EJD

         Plaintiff,

9                                          **ORDER GRANTING IN PART &**
                                           **DENYING IN PART DEFENDANTS'**
10        v.                               **MOTION TO DISMISS THE**
                                           **SUPERSEDING INDICTMENT FOR**
11  ELIZABETH A. HOLMES and RAMESH         **LACK OF NOTICE; DENYING**
    "SUNNY" BALWANI,                       **MOTION TO DISMISS SUPERSEDING**
12                                         **INDICTMENT FOR FAILURE TO**
         Defendants.                       **ALLEGE FALSITY; GRANTING IN**
13                                         **PART & DENYING IN PART**
                                           **DEFENDANTS' MOTION TO DISMISS**
14                                         **COUNTS TWO AND NINE THROUGH**
                                           **ELEVEN OF SUPERSEDING**
15                                         **INDICTMENT**

16                                         Re: Dkt. Nos. 204, 205, 206

17        Defendants Elizabeth Holmes and Ramesh "Sunny" Balwani are charged with nine counts

18  of wire fraud in violation of 18 U.S.C. § 1343 and two counts of conspiracy to commit wire fraud

19  in violation of 18 U.S.C. § 1349.  The charges stem from Defendants' allegedly deceptive

20  representations about their company, Theranos, and its technology.  Three motions are before the

21  Court: (1) Defendants'[1] motion to dismiss the superseding indictment for lack of notice and, in the

22  alternative, for a bill of particulars; (2) Defendants' motion to dismiss the superseding indictment

23  in part for failure to allege falsity and motion to strike; and (3) Defendants' motion to dismiss

24  ────────────────

25  [1] While Defendant Holmes brought the three motions to dismiss, Defendant Balwani joined each
    motion and reply.  *See* Dkt. Nos. 207, 208, 209, 306, 307, 308.

26  Case No.: 5:18-cr-00258-EJD
    ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
27  DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
    TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
28  GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
    COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
                                         1

United States District Court
Northern District of California

1   counts two and nine through eleven of superseding indictment.  Having had the benefit of oral

2   argument on February 10, 2020 and having considered the Parties' papers, the Court **GRANTS in**

3   **part** and **DENIES in part** Defendants' (1) motion to dismiss for lack of notice and (2) motion to

4   dismiss counts two and nine through eleven and **DENIES** Defendants' motion to dismiss for

5   failure to allege falsity.

6   **I.      BACKGROUND**

7          **A. Factual Background**

8          Defendant Holmes founded Theranos, a health care and life sciences company, in 2003.

9   Superseding Indictment ¶ 1 ("SI"), Dkt. 39.  Defendant Holmes served as the Chief Executive

10  Officer of the company.  *Id.*  Defendant Balwani served as a board member, the President, and the

11  Chief Operating Officer of Theranos.  *Id.* ¶ 2.

12          Theranos' stated mission was to revolutionize medical laboratory testing through its

13  allegedly innovative methods of drawing blood, testing blood, and diagnosing patients.  *Id.* ¶ 5.

14  During the company's first ten years, it pursued the development of proprietary technology that

15  could run clinical tests using only tiny drops of blood.  *Id.*  Theranos also worked to develop a

16  method for drawing only a few drops of capillary blood from a patient's finger using a small

17  lancet.  *Id.*  That blood was then stored in a "nanotainer."  *Id.*  Theranos sought to develop a

18  second device, termed the "TSPU" (Theranos Sample Processing Unit), "Edison," or "miniLab,"

19  that could quickly and accurately analyze blood samples collected in the nanotainer.  *Id.*  The

20  Government contends that the promises of these devices were never realized; the devices

21  "consistently" produced inaccurate and unreliable results.  *Id.*  Despite this, Defendants began a

22  publicity campaign to promote the company.  And, in September 2013, Theranos offered blood

23  testing at Walgreens' "Wellness Centers" in California and Arizona.  *Id.* ¶ 10.

24          The Government argues that Defendants conspired to commit and committed two

25  fraudulent schemes: a scheme to defraud investors and a scheme to defraud doctors and patients.

26  Case No.: 5:18-cr-00258-EJD
    ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
27  DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
    TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
28  GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
    COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
                                              2

1    The Court outlines these below.

2        **Scheme to Defraud Investors.** Defendants allegedly made materially false and

3    misleading statements to investors and failed to disclose material facts to investors. Based on the

4    false statements, investors invested money in Theranos. Specifically, from 2013 to 2015,

5    Defendants made misstatements regarding:

6    1. **Theranos' Proprietary Analyzer:** Defendants allegedly made misstatements about

7       Theranos' proprietary analyzer—the TSPU, Edison, or miniLab—when they claimed the

8       analyzer was presently capable of accomplishing certain tasks, with more precision than

9       other blood tests, and at a faster rate, when, in fact, Defendants knew these statements were

10      false. *Id.* ¶ 12(A).

11   2. **Theranos' Financial Health:** Defendants allegedly misrepresented Theranos' financial

12      well-being when they told investors the company was financially strong and stable and

13      would make huge profits in 2014 and 2015 when, in fact, they knew Theranos would only

14      generate modest revenue. *Id.* ¶ 12(B).

15   3. **Technology Demonstrations:** Defendants allegedly deceived investors through

16      misleading technology demonstrations where they intended to cause potential investors to

17      believe blood tests were being conducted on Theranos' proprietary analyzer when, in fact,

18      Defendants knew the analyzer was operating in "null protocol." *Id.* ¶ 12(C).

19   4. **Walgreens' Partnership:** Defendants allegedly misled investors when they told them

20      Theranos had an expanding partnership with Walgreens when, in fact, the Walgreens

21      rollout had stalled due to concerns with Theranos' performance. *Id.* ¶ 12(D).

22   5. **United States Department of Defense ("DOD") Relationship:** Defendants allegedly told

23      investors the company had a profitable and revenue-generating business relationship with

24      the DOD and that Theranos technology was deployed on the battlefield. In fact,

25      Defendants knew that Theranos had limited revenue from military contracts and that its

26   Case No.: 5:18-cr-00258-EJD
     ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
27   DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
     TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
28   GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
     COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
                                          3

United States District Court
Northern District of California

1    technology was not used in the battlefield. *Id.* ¶ 12(E).

2    6.   **Food and Drug Administration ("FDA") Approval:** Defendants allegedly misled

3         investors when they told investors that Theranos did not need the FDA to approve its

4         proprietary analyzer and tests when, in fact, Defendants knew this to be false. *Id.* ¶ 12(F).

5    7.   **Patient Testing:** Defendants allegedly told investors that patient tests were conducted

6         using Theranos manufactured analyzers.  In fact, Defendants knew that Theranos used

7         third-party, commercially available analyzers. *Id.* ¶ 12(G).

8    8.   **Peer Review:** Defendants allegedly falsely told investors that Theranos technology had

9         been examined, used, and validated by several national or multinational pharmaceutical

10        companies and research institutions. *Id.* ¶ 12(H).

11   9.   **Media Representations:** Defendants allegedly made the false and misleading statements

12        described above to reporters and then shared the resulting articles directly with potential

13        investors and via the Theranos website. *Id.* ¶ 12(I).

14        **Scheme to Defraud Doctors and Patients.**  The Government argues from 2013 to 2016,

15   Defendants advertised and marketed Theranos technology to doctors and patients and falsely

16   claimed that the tests were accurate and reliable. *Id.* ¶¶ 15–16.  Claims about Theranos technology

17   were implicit and explicit. *Id.* ¶ 15.  Despite knowing that Theranos' technology[2] suffered from

18   recurring accuracy and reliability problems, Defendants allegedly advertised the tests as accurate

19   and reliable. *Id.* ¶ 17.  Specifically, Defendants used materially false and misleading marketing

20   materials and advertisements and transmitted Theranos blood results that Defendants knew

21   contained, or likely contained, inaccurate information. *Id.*  For instance, Theranos' public website

22   touted its labs ability to perform tests "quickly and accurately on samples as small as a single

23

24   ──────────────
     [2] The SI names specific blood tests—"calcium, chloride, potassium, bicarbonate, HIV, HbA1C,
25   hCG, and sodium"—but also notes that the list of known, inaccurate blood tests is not limited to
     this list.  SI ¶ 16.
26   Case No.: 5:18-cr-00258-EJD
     ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
27   DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
     TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
28   GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
     COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
                                    4

1    drop." *Id.* ¶ 9. Defendants also allegedly provided reports to patients that contained or were likely

2    to contain: (1) inaccurate and unreliable results; (2) improperly adjusted reference ranges defining

3    a normal or healthy result for a given test; (3) improperly removed "critical" results, *i.e.* results

4    suggesting a patient needed medical attention; and (4) results generated from improperly validated

5    assays, further decreasing the reliability of those tests. *Id.* ¶ 17.

6         **B. Procedural History**

7         Defendants filed three motions to dismiss. The first motion argues the SI must be

8    dismissed because it is unconstitutionally vague. Motion to Dismiss Superseding Indictment for

9    Lack of Notice and, in the Alternative, for a Bill of Particulars ("Notice Mot."), Dkt. 204. The

10   Government opposes this motion and argues that the SI is not vague because it gives Defendants

11   sufficient information to understand their charges. United States' Opposition to Defendants'

12   Motion to Dismiss Superseding Indictment for Lack of Notice, and, in the Alternative, for a Bill

13   of Particulars ("Notice Opp."), Dkt. 265. Defendants maintain that the SI fails to provide adequate

14   notice. Reply in Support of Motion to Dismiss Superseding Indictment for Lack of Notice

15   ("Notice Reply"), Dkt. 296.

16        The second motion argues that the SI must be dismissed because it does not support a

17   conclusion that Defendants' alleged statements and omissions were materially false. Motion to

18   Dismiss Superseding Indictment in Part for Failure to Allege Falsity ("Falsity Mot."), Dkt. 205.

19   The Government opposes this. United States' Opposition to Defendants' Motion to Dismiss the

20   Superseding Indictment in Part for Failure to Allege Falsity and Motion to Strike ("Falsity Opp."),

21   Dkt. 266. In their Reply, Defendants maintain that material falsity is not shown in the SI. Reply

22   in Support of Motion to Dismiss in Part for Failure to Allege Falsity ("Falsity Reply"), Dkt. 297.

23        The third motion argues that the counts in the SI (counts two and nine through eleven)

24   must be dismissed because they fail to allege the required element of specific intent to commit

25   wire fraud. Motion to Dismiss Counts Two and Nine Through Eleven of Superseding Indictment

26   Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
27   DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
28   GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
     5

United States District Court
Northern District of California

1  ("Counts Mot."), Dkt. 206.  The Government opposes this.  United States' Opposition to

2  Defendants' Motion to Dismiss Counts Two and Nine Through Eleven of Superseding Indictment

3  ("Counts Opp."), Dkt. 267.  Defendants maintain that these counts fail to allege intent to defraud.

4  Reply in Support of Motion to Dismiss Counts Two and Nine Through Eleven of Superseding

5  Indictment ("Counts Reply"), Dkt. 298.

6        The Court addresses each motion in turn.

7  **II.    DEFENDANTS' MOTION TO DISMISS FOR LACK OF NOTICE AND, IN**
8  **        THE ALTERNATIVE, FOR A BILL OF PARTICULARS**

9        **A.   Lack of Notice**

10             **1.   Legal Standard**

11       Federal Rule of Criminal Procedure 7 requires that an indictment contain a "plain, concise,

12  and definite written statements of the essential facts constituting the offense charged."  Fed. R.

13  Crim. P. 7(c)(1).  To pass constitutional muster, an indictment must

14             furnish the defendant with a sufficient description of the charges
               against him to enable him to prepare his defense, to ensure that the
15             defendant is prosecuted on the basis of facts presented to the grand
               jury, to enable him to plead jeopardy against a later prosecution, and
16             to inform the court of the facts alleged so that it can determine the
               sufficiency of the charge.

17  *United States v. Cecil*, 608 F.3d 1294, 1297 (9th Cir. 1979); *but see Russell v. United States*, 369

18  U.S. 749, 763 (1962)) ("[W]here the definition of an offence, whether it be at common law or by

19  statute, includes generic terms, it is not sufficient that the indictment shall charge the offence in

20  the same generic terms as in the definition; but it must state the species,—it must descend to

21  particulars." (quotation mark and citation omitted)).

22       At the motion to dismiss stage, "the issue in judging the sufficiency of the indictment is

23  whether the indictment adequately alleges the elements of the offense and fairly informs the

24  defendant of the charge, not whether the Government can prove its case."  *United States v.*

25  *Buckley*, 689 F.2d 893, 897 (9th Cir. 1982).  So long as the indictment contains the "essential facts

26  Case No.: 5:18-cr-00258-EJD
    ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
27  DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
    TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
28  GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
    COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
                                    6

1   necessary to apprise a defendant of the crime charged," the indictment must stand. *Id.* "Because

2   the requirement of a sufficient indictment serves these important purposes, the indictment must be

3   considered as it was actually drawn, not as it might have been drawn." *United States v. Pirro*, 212

4   F.3d 86, 92 (2d Cir. 2000); *see also United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002) ("In

5   ruling on a pre-trial motion to dismiss an indictment for failure to state an offense, the district

6   court is bound by the four corners of the indictment.").[3]

7   **2.  Analysis**

8   The essential elements of wire fraud are: (1) a scheme to defraud; (2) the use of a wire,

9   radio, or television to further the scheme; and (3) a specific intent to defraud. *United States v.*

10  *Lindsey*, 850 F.3d 1009, 1013 (9th Cir. 2017).[4]

11  Defendants argue that because wire fraud is "generic in nature," the SI must contain factual

12  particularity above and beyond the generic statutory language.  Notice Mot. at 3.  In Defendant's

13  view, because materially false or fraudulent representations are "part and parcel" of wire fraud, an

14  indictment must go beyond the "generic" requirements of wire fraud and specify, in detail, the

15  particular fraudulent representations and pretenses that make up an alleged scheme to defraud. *Id.*

16  at 4.  The Government rebuts this and argues that Defendants are on "fair notice" of what they will

17  face at trial.  Notice Opp. at 7.  In the Government's view, the SI outlines Defendants' overall

18  schemes to defraud investors, patients, and doctors, and provides details about those schemes. *Id.*

19  at 3–4.  The Government contends that an indictment need not allege verbatim quotes to

20  adequately provide notice. *Id.* at 11.  The Government argues the SI is constitutionally sound

21  because it provides details about the "substance" of the allegations and so Defendants have "fair

22

23  [3] For this reason, the Court does not consider Defendants' arguments about what the
    Government's motions assert. *See, e.g.*, Notice Reply at 1.

24  [4] Conspiracy requires an agreement "among two or more persons that would satisfy the elements
    of the substantive offense of wire fraud." *United States v. Hussain*, 2017 WL 4865562, at *5

25  (N.D. Cal. Oct. 27, 2017).  Hence, to state a charge of conspiracy, the indictment must adequately
    specify the underlying fraud.

26  Case No.: 5:18-cr-00258-EJD
    ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO

27  DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
    TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;

28  GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
    COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
    7

1    notice" about what they will face at trial. *Id.* at 8.

2         Defendants rely primarily on *Russell v. United States*, 369 U.S. 749 (1962), *United States*

3    *v. Cecil*, 608 F.2d 1294 (9th Cir. 1979), *United States v. Curtis*, 506 F.2d 985 (10th Cir. 1974),

4    and *United States v. Keuylian*, 23 F. Supp. 3d 1126 (C.D. Cal. 2014). In *Russell*, the Supreme

5    Court held that the indictment was unconstitutionally vague. 369 U.S. 754–55. There, the

6    defendants were convicted of refusing to answer certain questions posed by a congressional

7    subcommittee. *Id.* at 752. The indictment, however, failed to identify the subject matter under

8    congressional subcommittee inquiry. *Id.* This, the Supreme Court concluded, was a constitutional

9    violation because the underlying charge depended on the subject-matter of the questions. *Id.* at

10   764, 768. The indictment's failure to contain the subject-matter that was under inquiry resulted in

11   two main problems: (1) the defendant would be forced to proceed to trial with a "cryptic"

12   indictment that leaves the "chief issue[s] undefined" and (2) the prosecution could fill in the gaps

13   of an indictment by "surmise or conjecture." *Id.* at 766. The Supreme Court thus held that the

14   indictment failed the constitutional requirement of fair notice. *Id.*

15        In *Cecil*, the Ninth Circuit held that the indictment's "glaring lack of factual particularity"

16   ran afoul of the fair notice requirement. 608 F.2d at 1294. There, the "rather barren" indictment

17   mostly tracked the text of the relevant conspiracy statutes. *Id.* at 1296. It only made "two specific

18   allegations concerning the conspiracies:" (1) it identified the locations of the conspiracy and (2) it

19   stated the names of the alleged conspirators. *Id.* at 1297. The indictment, however, failed to place

20   the conspiracies within any timeframe or provide any facts or circumstance about the conspiracy.

21   *Id.* The complete lack of factual allegations prevented the defendants from understanding the

22   charges and preparing a defense.

23        Likewise, in *Curtis*, the Tenth Circuit held that the indictment was so vague that "the grand

24   jury may have had a concept of the scheme essentially different from that relied upon by the

25   government before the trial jury." 506 F.2d at 989. There, the defendant founded a dating service.

26   Case No.: 5:18-cr-00258-EJD
     ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
27   DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
     TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
28   GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
     COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
                                            8

1   *Id.* at 986–87.  All the indictment alleged was that the service was a sham, it provided no detail as

2   to why it was a sham.  *Id.*  Thus, on appeal, the court concluded that the indictment was

3   unconstitutionally vague because it contained no language about *what* conduct formed the scheme.

4   *Id.* at 992

5          Finally, in *Keuylian*, the court held that the indictment had to be dismissed because it

6   tracked the statutory language.  23 F. Supp. 3d at 1129.  The indictment never stated the alleged

7   false statements, misrepresentations, or false pretenses that constituted the scheme to defraud.  *Id.*

8          Defendants admitted at oral argument that the SI contains more detail than the indictments

9   at issue in the above cases.  Nevertheless, they argue that this case is analogous to those cases.

10   Defendants argue that because this case focuses on two complex, immense, and vast schemes, the

11   above cases support the requirement of an indictment with more specificity.  The SI's factual and

12   temporal span makes the omission of details like the names of speaker(s) and the targets, dates,

13   context, and verbatim wording of misstatements unconstitutional.

14          But Defendants misread *Russell*, *Cecil*, *Curtis*, and *Keuylian*.  Admittedly, none of these

15   cases require an indictment to contain such extensive detail.  The vastness of the schemes alleged

16   do not change this conclusion—the Government need not allege in the indictment its case theory

17   or the evidence underlying the charges.  The Government must only provide enough facts to

18   apprise a defendant of what defense should be prepared for trial.  Hence, the Government need not

19   allege specific misstatements to meet the "fair notice" requirement.  This is confirmed by *United*

20   *States v. Buckley*, 689 F.2d 893 (9th Cir. 1982).  "[A]n indictment should be: (1) read as a whole;

21   (2) read to include facts which are necessarily implied; and (3) construed according to common

22   sense." *Id.* at 899.  Common sense, not specific allegations is the standard.  *See Curtis*, 506 F.2d

23   at 990 ("While the particulars of the scheme . . . must be described with a degree of certainty

24   sufficient to . . . fairly to acquaint the defendant will [sic] the particular fraudulent scheme charged

25   against him, still the scheme itself need not be pleaded with all the certainty in respect of *time,*

26   Case No.: 5:18-cr-00258-EJD
    ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
27   DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
    TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
28   GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
    COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
                                        9

1   *place, and circumstance . . . .*" (emphasis added)).

2         Reading the indictment as a whole and with common sense, the Court holds that the SI is

3   constitutionally sound because it:

- **Establishes a Particular Factual Universe.**  The SI establishes the "universe" of facts giving rise to the charges.  For instance, paragraphs four through nine adequately apprise Defendants that Theranos' statements promising "quick" and "accurate" diagnostic blood testing using "a single drop [of blood]" are at issue and underlie the wire fraud and conspiracy charges.  *Compare* SI ¶¶ 4–9, *id.* § 10 (describing Theranos' partnership with Walgreens, their alleged fraudulent promises, and other facts giving rise to the charges), *with Keuylian*, 23 F. Supp. 3d at 1129 (dismissing indictment because it failed to describe any of the deceptive acts underlying the alleged scheme to defraud and thus only showed willful breach of contract).

- **States the Acts Underlying the Investor Scheme.**  After establishing that Theranos' representations about their blood tests form the basis of the SI, the indictment informs Defendants *what* misrepresentations underlie the scheme to defraud investors.  *See* SI ¶¶ 11–12 (establishing relevant time period as 2013–2015); *cf. Cecil*, 608 F.2d at 1297 (noting indictment's failure to establish a relevant timeframe).  The SI informs Defendants that nine misrepresentations form the basis of the scheme and thus that Defendants should focus their defense on these nine areas.  *Compare* SI ¶ 12 (claiming Theranos misrepresented its "proprietary analyzer," financial strength, use and examination of technology, partnership with Walgreens, U.S. Department of Defense, and FDA), *with Curtis*, 506 F.2d at 992 (holding indictment failed to provide notice because it lacked any detail as to what conduct formed scheme).

- **States the Acts Underlying the Doctor/Patient Scheme.**  The SI also informs Defendants what conduct underlies the scheme to defraud doctors and patients.  *See* SI ¶ 14 (establishing relevant time period as 2013–2016); *cf. Cecil*, 608 F.2d at 1297 (noting indictment's failure to establish a relevant timeframe).  The SI apprises Defendants that the conduct underlying this scheme is Theranos' allegedly deceptive "advertisements and marketing materials" that stated Theranos could provide "accurate, fast, reliable, and cheap blood tests and test results."  SI ¶ 15; *see also id.* ¶ 12(C) (alleging Defendants transmitted false blood tests).  Hence, unlike *Russell*, where the Supreme Court held the indictment invalid because it failed to specify the subject-matter underlying the charges, the SI tells Defendants the alleged misconduct forming the indictment.  369 U.S. at 754–55.

24        Defendants argue that even while the SI informs them of the events underlying the charges,

25  it nonetheless remains vague because it raises more questions and thus fails to provide fair notice.

26  Case No.: 5:18-cr-00258-EJD
    ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
27  DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
    TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
28  GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
    COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
                                        10

United States District Court
Northern District of California

1   For instance, Defendants point to Paragraph 12(A), which alleges that Defendants misrepresented

2   the capabilities of their proprietary analyzers.  Defendants argue the term "proprietary analyzer" is

3   vague since Theranos had many "proprietary analyzers."  But, read as a whole, the SI defines

4   "proprietary analyzers" as the Edison, miniLab, or TSPU.  Next, Defendants contend that no

5   timeframe is given as to the misrepresentations and that the range of statements the SI could cover

6   is too vast.  But the indictment expressly confines the investor scheme timeframe to 2013–2015

7   and informs Defendants about the subject-matter of the alleged misstatements.  SI ¶¶ 11, 12.

8        Defendants next argue that the FDA claim is vague because FDA guidance documents

9   indicated that Theranos did not need to obtain clearance.  Notice Mot. at 6.  The Government

10  argues they have contrary evidence.  Notice Opp. at 10.  This amounts to an evidentiary dispute.

11  The indictment stage, however, "is not the appropriate time to require the Government to present

12  its proof." *Buckley*, 689 F.2d at 900.  Ironically, the fact that Defendants can pick apart the truth

13  of the events in the indictment indicates that the SI is constitutionally sound—it means Defendants

14  *know* what they will face at trial.  *Cf.* Notice Mot. at 6 (arguing the *substance* of the Walgreens

15  allegation); *see also Curtis*, 506 F.2d at 987–88 (citing Form 3 of the Appendix of Forms annexed

16  to the Federal Rules of Criminal Procedure which requires false statements be alleged in substance

17  only and not by quotation).

18       Finally, Defendants argue Count Two is similarly vague because the Government fails to

19  define "reliable and accurate" or the meaning of "held out."  Notice Mot. at 8.  But, Count Two

20  expressly limits its factual universe to "advertisements and marketing materials" and "test results."

21  *See* SI ¶¶ 16–17.  The indictment, read as a whole, clarifies that Defendants are charged with

22  implicitly[5] and explicitly claiming that Theranos' tests could consistently produce accurate and

23

---
[5] Because the Court determines that the SI contains sufficient factual particularity to inform
Defendants what events underlie the charged counts, the Court finds that Defendants' arguments
about what conduct constitutes a misrepresentation and what "implicit" means better suited for the
Bill of Particulars analysis.

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
11

ER-3631

1    reliable results when, in fact, it could not.  *See Buckley*, 689 F.2d at 899.  Indeed, as Paragraph 9

2    of the SI states, the company's public website stated that Theranos' lab could perform tests

3    "quickly and accurately on samples as small as a single drop."  Because Defendants know both the

4    statutes they allegedly violated and the conduct underlying those alleged violations, the SI is

5    particularized enough to provide fair notice and Defendants' motion to dismiss for lack of fair

6    notice is **DENIED**.[6]

7            **B.  Bill of Particulars**

8            Rule 7(f) of the Federal Rules of Criminal Procedure provides that "[t]he court may direct

9    the government to file a bill of particulars."  A bill of particulars is appropriate where a defendant

10   requires clarification in order to prepare a defense and is "designed to apprise the defendant of the

11   specific charges being presented to minimize danger of surprise at trial, to aid in preparation and

12   to protect against double jeopardy."  *United States v. Long*, 706 F.2d 1044, 1054 (9th Cir. 1983);

13   *United States v. Mitchell*, 744 F.2d 701, 705 (9th Cir. 1984); *Yeargain v. United States*, 314 F.2d

14   881, 882 (9th Cir. 1963) ("The purpose of a bill of particulars is to protect a defendant against a

15   second prosecution for an inadequately described offense, and enable him to prepare an intelligent

16   defense.").  A defendant, however, is not entitled to "know all the evidence the government

17   intends to produce, but *only the theory* of the government's case."  *Yeargain*, 314 F.2d at 882

18   (emphasis added).  The decision to require a bill of particulars is within a trial court's broad

19   discretion.  *Long*, 706 F.2d at 1054.

20           Defendants seek an order compelling the Government to identify (1) the details concerning

21   the alleged false or fraudulent representations or omissions, (2) the names of persons who may

22   testify about being deceived, (3) the names of all known coconspirators, and (4) the facts giving

23   rise to an alleged duty to disclose and any material omissions that are alleged to have violated that

24

25   [6] The Court does not reach the Government's *United States v. Woods*, 335 F.3d 993 (9th Cir. 2003) argument.

     Case No.: 5:18-cr-00258-EJD

26
     ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
27   DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
     TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
28   GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
     COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
                                          12

1    duty.  The Court addresses each in turn.

2         **1.  Details Concerning the Alleged False or Fraudulent Representations**

3         Defendants contend that for Counts One and Two, the Government must specify the false

4    and fraudulent representations allegedly made by Defendants and any coconspirator(s) during the

5    course of the two frauds.  Defendants further argue that the Government must identify (1) who

6    made the representation, (2) the precise content of the representation, (3) the form of the

7    representation, *i.e.* oral or written, (4) the date of the representation, (5) to whom the

8    representation is alleged to have been made, and (6) the manner in which the representation is

9    claimed to be false or fraudulent.  *Id.* at 10.

10        Defendants contend that "[i]n cases less substantial than this one in scope and complexity,

11   courts have ordered the government to identify the specific false or misleading statements."

12   Notice Reply at 7.  As support, Defendants cite to *United States v. Bortnovsky*, 820 F.2d 572 (2d

13   Cir. 1987), *United States v. Caine*, 270 F. Supp. 801 (S.D.N.Y. 1967) (holding bill of particulars

14   required because indictment had no explanation about why the representations were false and

15   misleading), and *United States v. Trie*, 21 F. Supp.2d 7 (D.D.C. 1998).

16        In *Bortnovsky*, the Second Circuit held that the district court erred in denying the

17   defendants' motion for a bill of particulars.  820 F.2d at 573.  There, the defendants were indicted

18   for engaging in a scheme to defraud a federal agency.  *Id.*  The indictment alleged that defendants

19   "submit[ted] false claims for burglary losses to the Federal Insurance Administration" and "the

20   New York Property Insurance Underwriting Association."  *Id.* at 574.  While the indictment

21   provided a list of suspect pieces of mail along with their approximate dates of mailing and

22   addresses, it failed to specify the dates of the staged burglaries or enumerate which of the

23   numerous documents were falsified.  *Id.*  Thus, the "relevance of the key events was shrouded in

24   mystery at the commencement of and throughout the trial" meaning the defendants were "forced

25   to explain . . . events . . . unrelated to the charges pending.  *Id.* at 574–75.  The defendants' ability

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
13

United States District Court
Northern District of California

1    to view the 4,000 pages of documents at issue before trial was unhelpful because they had to

2    assess the "mountains of documents" without guidance as to which documents were relevant and

3    only had four days to complete the task. *Id.* Hence, without a bill of particulars as to which

4    documents and burglaries were fraudulent, the defendants could not adequately prepare a defense

5    for trial. *Id.*

6          Likewise, in *Trie*, the court granted the defendant's motion for a bill of particulars and

7    ordered the government to provide information as to "exactly what the false statements [were],

8    what about them [was] false, who made them, and how [the defendant] caused them to be made."

9    21 F. Supp. 2d at 22. There, the defendant was indicted for, among other things, making false

10   statements to the government. *Id.* at 13. The government provided the defendant with 45 pages of

11   excerpts in which the statements were contained. *Id.* at 21. The pages contained "175 names" and

12   "a variety of information about each person or entity listed." *Id.* This, the court held, rendered the

13   disclosure insufficient because "a defendant faced with false statements charges should not have to

14   waste precious pre-trial preparation time guessing which statements he has to defend against or

15   which contributor may be witnesses against him." *Id.*

16         Defendants argue this case is more complex than *Bortnovsky*, *Caine*, and *Trie* and thus a

17   bill of particulars is required. Notice Reply at 7. First, Defendants highlight that in the

18   Government's three recently filed oppositions, it offers a new theory of its case. *Id.* at 8 ("[T]he

19   government now claims to base its case in part on supposed 'implicit' representations without

20   identifying a basis for implying such representations."). They argue that they cannot determine

21   the "implicit representations" at issue when the SI provides no further detail as to this theory. *Id.*

22   Second, Defendants argue the conspiracy and schemes to defraud are vast—they span at least

23   three years and implicate the operations of a company that employed many hundreds of persons.

24   *Id.*; *cf. United States v. Stukenbrock*, No. 5:15-cr-00034-EJD at , Dkt. 143 (N.D. Cal. filed June

25   26, 2018) (denying bill of particulars after noting that scheme was "not particularly complex or

26   Case No.: 5:18-cr-00258-EJD
     ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
27   DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
     TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
28   GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
     COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
                                        14

United States District Court
Northern District of California

1 difficult to comprehend").

2          The Government argues that here, in contrast to *Bortnovsky*, *Caine*, and *Trie*, the SI gives

3 "notice of specific misrepresentations Defendants will need to address at trial" and thus goes

4 beyond the "generic" indictments at issue in three discussed cases.  Notice Opp. at 14; *see also*

5 *United States v. Bidloff*, 82 F. Supp. 2d 78, 84–85 (W.D.N.Y. 1999) ("[A]lthough the court in

6 *Caine* granted further particulars as to the specific pretenses . . . the indictment . . . failed to

7 provide any indication as to the substance of the falsehoods. . . . [It does not] establish[] a general

8 rule that particularization of specific false pretenses is required in every mail fraud prosecution.").

9 The Government also contends that Defendants have received extensive discovery that discloses

10 the scope of the evidence against them.[7]  Notice Opp. at 14–15.  In light of this discovery, the

11 Government argues a bill of particulars is unnecessary.  *Id.* at 16 (citing *United States v. Giese*,

12 597 F.2d 1170, 1180 ("[T]he government provided appellant with a large volume of information,

13 including physical evidence offered at trial, grand jury testimony, and memoranda which revealed

14 the government's theory of the case.  Full discovery also obviates the need for a bill of

15 particulars.")).

16          While the Government has provided Defendants with witness interviews, as demonstrated

17 by *Trie* this is not always specific enough to overcome the need for a bill of particulars.  Indeed,

18 the witness interviews do not identify the alleged misrepresentations.  Further, the universe of

19 potential misrepresentations is vast—the Government claims that Defendants made

20 misrepresentations to the media, on the Theranos website, and in advertisements and marketing

21 materials.  This is especially true for the doctor/patient fraud.  *See* SI ¶¶ 14–17 (confining the

22 scheme to "implicit and explicit" false claims made in Theranos "advertisements and marketing

23

24 _____

25 [7] Additionally, the Government argues that Defendants delay in bringing this motion for a bill of
particulars and their ability to litigate the case without a bill shows a bill of particulars is
unnecessary.  Notice Opp. at 15.

26 Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
27 DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
28 GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
15

United States District Court
Northern District of California

materials" but not labeling specific types of materials or the type of implicit conduct at issue); *cf.*

*Caine*, 270 F.3d at 806.  The Government's theory of "implicit" representations only expands the

scope of possible misrepresentations and the SI lacks any clear explanation of the Government's

implicit misrepresentation case theory.  In contrast, the investor fraud describes the specific type

of misrepresentations at issue.  *See id.* ¶ 12.  Defendants thus are not left to guess about the

Government's investor-fraud case theory.

Finally, much like in *Bortnovsky*, the discovery in this case is immense.  *See* Notice Reply

at 9 ("The government has produced more than 20 million pages of documents.");  *cf. Trie*, 21 F.

Supp. 2d at 21 (finding 45 pages of excerpt testimony with 175 names prohibitive).  These

realities create a substantial risk that Defendants may be unfairly surprised at trial.  Accordingly,

the Government must provide Defendants information as to the **doctor/patient fraud**.  The

Government shall identify (1) the specific implicit and explicit false and fraudulent

misrepresentations in the advertisements and marketing materials, (2) what about them is false, (3)

who made them, and (4) how Defendants caused them to be made.  This includes the particular

tests that the Government claims Theranos was not capable of consistently producing.  *See*

*Bortnovsky*, 820 F.2d at 574 (noting that a defendant should not be forced to prepare unnecessary

defenses); *Trie*, 21 F. Supp. 2d at 21 (noting that a defendant should not have to guess about what

statements he will have to defend against).

## 2.  Names of Investors, Doctors, or Patients Who May Testify

"It is not uncommon for the Government to be required to disclose the names of some

potential witnesses in a bill of particulars, where the information is necessary or useful in the

defendant's preparation for trial."  *Will v. United States*, 389 U.S. 90, 99 (1967).  This must be

balanced against the proposition that a bill of particulars is "not to obtain disclosure of evidence or

witnesses to be offered by the Government at trial."  *United States v. Nachamie*, 91 F. Supp. 2d

565, 570 (S.D.N.Y. 2000).

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
16

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Defendants argue they need a list of victims who may testify so that they can prepare to

2    confront those witnesses.  Notice Mot. at 11.  They argue this is necessary to "help the defense

3    attempt to identify the statements at issue."  Notice Reply at 11.  At present, however, the

4    Government has already disclosed to Defendants the names of alleged victims.  Notice Opp. at 17

5    ("Defendants have full access to all of the information in the government's possession concerning

6    the victims and how they might testify . . . .");  *see also* Notice Reply at 11 ("The government has

7    interviewed more than 120 witnesses and continues to interview more.").  Defendants, thus,

8    already have the names of people who may testify.  Accordingly, the request for names of victims

9    who may testify is **denied**.

10    ### 3.  Names of All Known Conspirators

11    Courts regularly employ a six-factor test to evaluate whether the Government should

12    identify unnamed coconspirators.  *United States v. Barrett*, 153 F. Supp. 3d 552, 572 (E.D.N.Y.

13    2015).  They look to: (1) the number of co-conspirators; (2) the duration and breadth of the alleged

14    conspiracy; (3) whether the government otherwise has provided adequate notice of the particulars;

15    (4) the volume of pretrial disclosure; (5) the potential danger to coconspirators and the nature of

16    the alleged criminal conduct; and (6) the potential harm to the Government's investigation.  *Id.*;

17    *see also United States v. Feil*, 2010 WL 1525263, at *3 (N.D. Cal. Apr. 15, 2010) (granting bill of

18    particulars requiring the government to name unnamed coconspirators due to lengthy duration and

19    scope of conspiracy and the heavy volume of discovery); *cf. United States v. DiCesare* 765 F.2d

20    890, 897 (9th Cir. 1985) (holding that it was not an abuse of discretion to deny the defendant's

21    request for a bill of particulars as to the names of coconspirators).

22    Defendants argue that the Government should identify all known coconspirators charged in

23    counts one and two.  *See* SI ¶¶ 20, 22 (alleging conspiracies among Defendants and "other known

24    and unknown to the Grand Jury").  They contend that in cases with sprawling indictments that

25    allege complex schemes, like this, courts regularly require the names of coconspirators to be

26    Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
27    DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
28    GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
17

1    disclosed.  They further argue that because the SI does not identify the speaker of the alleged

2    misrepresentations, an "unbounded set" of possible coconspirators exists and Defendants may be

3    unfairly surprised at trial by such coconspirator testimony.  Notice Mot. at 12.  Hence, they argue,

4    the universe of speakers must be limited.

5           The Government opposes this request and contends that it need not identify unnamed

6    coconspirators because Defendants fear of unfair surprise is unfounded.  Notice Opp. at 18.  The

7    Northern District of California's Criminal Local Rules already requires detailed pre-trial

8    disclosure of any co-conspirator statements intended to be offered under Fed. R. Evid.

9    801(d)(2)(E).  The Government also argues that the case law does not support the Defendants'

10   request.  Other cases that required a bill of particulars as to the unnamed coconspirators had more

11   defendants.  *Id.* at 18 (citing *United States v. Bazezew*, 783 F. Supp. 2d 160 (D.D.C. 2011)).

12          The Government's argument as to mandatory disclosures misses the mark.  There is no

13   guarantee the Criminal Local Rules will ameliorate the alleged lack of notice.  Coconspirator

14   statements could be offered for something other than "the truth of the matter asserted."  Moreover,

15   the number of named defendants in a case is irrelevant; it does not bear on the unfair surprise

16   inquiry.  Here, the relevant factors counsel towards requiring the Government to name all known

17   coconspirators.  First, the number of co-conspirators is vast.  Second, while the alleged

18   conspiracies only spanned three years, the scope of the alleged conspiracies is broad—they cover a

19   vast range of alleged misrepresentations made to investors, doctors, and patients about Theranos'

20   products and productivity.  Third, the SI is vague as to who else (beyond the Defendants) may be a

21   coconspirator.  Fourth, the volume of discovery is immense—millions of pages of documents have

22   been produced.  *Cf. Feil*, 2010 WL 1525263, at *3 (noting that the 70,000 plus pages of discovery

23   counseled in favor of granting bill of particulars as to request for coconspirator names).  Fifth, the

24   danger of harm to the coconspirators is not present in this case.  *See Nachamie*, 91 F. Supp. 2d at

25   573 ("[T]here is no legitimate concern that disclosing the names of unindicted coconspirators will

26   Case No.: 5:18-cr-00258-EJD
     ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO

27   DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
     TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;

28   GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
     COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
                                              18

United States District Court
Northern District of California

1    endanger those individuals or compromise the Government's investigation. . . . [T]his case charges

2    Medicare fraud—not narcotics trafficking or murder . . . .").

3         While these factors may counsel in favor of granting Defendants' request, the fear of unfair

4    surprise is obviated by the Court granting Defendants' first request for a bill of particulars as to the

5    specific misrepresentations pertaining to the doctor-patient fraud.  This requires the Government

6    to provide the names of speakers.  *Cf.* Notice Mot. at 12 (discussing how it is impracticable for

7    Defendants to guess at the "universe of speakers").  Accordingly, this request is **denied** as to count

8    two but **granted** as to count one.

9                    **4.  Facts Giving Rise to an Alleged Duty to Disclose/Material Omissions**

10        Defendants seek a bill of particulars about what facts underlie the Defendants' material

11   omissions and their duty to disclose.  *See* SI ¶¶ 13, 15, 24.  They argue that the SI lacks a

12   description of the alleged material omissions and fails to describe the basis of the alleged duty to

13   disclose.  Thus, they contend, the Government must identify (a) who made the alleged omission,

14   (b) precisely what is alleged to have been omitted, (c) when that omission is alleged to have

15   occurred, (d) the nature of the alleged duty to disclose, (e) to whom the duty allegedly was owed

16   and to whom the omission is alleged to have been directed, and (f) the manner in which the

17   omission is claimed to be fraudulent.  Notice Mot. at 13.  The Government argues in response the

18   SI already alleges the facts that Defendants withheld from their victims, like that Theranos relied

19   on third-party analyzers for its tests and that its Walgreens rollout had stalled.

20        The SI only alleges that Defendants had a "duty to disclose" "material facts."  It says

21   nothing about the *type* of duty or *what* facts must be disclosed.  *See, e.g.*, SI ¶ 11.  In another

22   opposition, however, the Government argues a "duty of trust" existed between Defendants and

23   investors and that Defendants' alleged "half-truths" gave rise to a duty to correct.  *See* Falsity Opp.

24   at 9.  Likewise, the Government grounds its omissions theory in the already-alleged material

25   misrepresentation—for instance, the Government argues that by telling investors the Walgreens

26   Case No.: 5:18-cr-00258-EJD
     ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
27   DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
     TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
28   GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
     COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
                                        19

United States District Court
Northern District of California

1    relationship was growing, when in fact it had stalled, Defendants omitted material information that

2    they had a duty to disclose.  Hence, Defendants can infer the Government's case-theory and there

3    is no need for a bill of particulars.  *See Yergain*, 314 F.2d at 882 (noting that a bill of particulars is

4    permissible to understand the Government's "theory of the . . .case").  Accordingly, this request is

5    **denied.**

6    **III.    DEFENDANTS' MOTION TO DISMISS SUPERSEDING INDICTMENT IN**
     **PART FOR FAILURE TO ALLEGE FALSITY AND MOTION TO STRIKE**

7

8         Defendants argue the SI fails to state an offense for conspiracy to commit wire fraud

9    because it fails to allege material falsity in Paragraphs 12(D), 12(E), and 16.  Falsity Mot. at 3–4.

10   They contend that the SI must be dismissed insofar as it relies on these allegations and that the

11   allegations should be struck to avoid prejudice.  *Id.* at 4.  Defendants further argue that the SI fails

12   to allege facts sufficient to support a fraud-by-omission theory because it alleges no duty to

13   disclose and identifies no material omissions.  *Id.* at 6.

14        **A.  Legal Standard**

15        Rule 7 requires that an indictment contain "a plain, concise, and definite written statements

16   of the essential facts constituting the offense charged."  Fed. R. Crim P. 7(c)(1).  An indictment's

17   failure to detail each element of the charged offense generally constitutes a "fatal defect."  *United*

18   *States v. Keith*, 605 F.2d 462, 464 (9th Cir. 1979); *see also United States v. Carroll*, 2015 WL

19   2251206, at *1 (N.D. Cal. May 13, 2015) ("An indictment fails to state an offense if it does not

20   allege facts which, if proven, would constitute a violation of 'the statute, rule, regulation, or other

21   provision of law that the defendant is alleged to have violated.'" (quoting Fed. R. Crim P.

22   7(c)(1))).

23        The Government argues that an indictment must be "liberally construed in favor of

24   validity."  Falsity Opp. at 4 (quoting *United States v. Holden*, 806 F.3d 1227, 1233 (9th Cir.

25   2015)).  This is the standard for post-trial review.  *Compare United States v. James*, 980 F.2d

United States District Court
Northern District of California

26   Case No.: 5:18-cr-00258-EJD
     ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
27   DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
     TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
28   GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
     COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
     20

1   1314, 1317 (9th Cir. 1970) ("When the sufficiency of the indictment is challenged *after trial*, it is

2   only required that the necessary facts appear in *any form* or *by fair construction* can be found

3   within the terms of the indictment." (quotation marks and citation omitted) (first emphasis

4   added)), *with United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000) ("The timing of the

5   defendant's objection is important to the level of scrutiny employed; a defendant who objects to

6   the indictment *before* trial . . . is entitled to *a more exacting review* of the indictment than one who

7   waits until after trial to object." (emphasis added)).  Hence, because this is a pretrial challenge to

8   the indictment, the "liberal construction" standard advocated by the Government is misplaced.

9   The relevant inquiry is whether the SI contains sufficient detail to state an offense for wire fraud

10   or conspiracy to commit wire fraud.  *See, e.g.*, *Carroll*, 2015 WL 2251206 at *1.

11       **B.  Analysis**

12         **1.  Wire Fraud/Conspiracy to Commit Wire Fraud**

13       Wire fraud requires: "(1) the existence of a scheme to defraud; (2) the use of wire, radio, or

14   television to further the scheme; and (3) a specific intent to defraud." *Lindsey*, 850 F.3d at 1013.

15   It is well-settled that materiality is an element of a "scheme or artifice to defraud" under the

16   federal wire fraud statute. *Neder v. United States*, 527 U.S. 1, 21–25 (1999).  Material falsehood

17   may be proven by means other than a specific false statement. *United States v. Omer*, 395 F.3d

18   1087, 1088 (9th Cir. 2005).  *Neder*, however, makes clear that in order to prove fraud, the

19   Government must prove the materiality of the falsehoods.  527 U.S. at 20–25.  An indictment's

20   failure to recite an essential element of the charged offense, namely materiality, is a fatal flaw that

21   requires dismissal of the indictment.  *Omer*, 395 F.3d at 1089.

22       The Government argues that, under this standard, it need not allege specific

23   misrepresentations because a scheme to defraud may rest on something other than false

24   statements.  Falsity Opp. at 4–5.  But this misses the point—the SI explicitly alleges that

25   Defendants made "materially false and misleading *statements* . . . and failed to disclose material

26   Case No.: 5:18-cr-00258-EJD

27   ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;

28   GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

21

United States District Court
Northern District of California

facts." SI ¶ 12.  The issue, thus, is not whether an indictment must plead specific

misrepresentations, but whether the indictment sufficiently alleges materiality as to the

misstatements at issue.[8]

"[A] false statement is material if it has a natural tendency to influence, or is capable of

influencing, the decision of the decisionmaking body to which it was addressed." *Neder*, 527 U.S.

at 16 (internal quotations and alterations omitted).  An indictment need not explain all factual

evidence to be proved at trial.  *United States v. Blinder,* 10 F.3d 1468, 1476 (9th Cir.1993).

Three alleged false statements are at issue: (1) the statements made to investors concerning

the Walgreens contract, see SI ¶ 12(D); (2) the statements made to investors concerning the

profitability of military contracts, see SI ¶ 12(E); and (3) the statements made to doctors and

patients concerning the accuracy and reliability of the blood tests, see SI ¶ 16.  Specifically, the SI

alleges:

- Defendants told investors that Theranos had an "expanding partnership" with Walgreens when, in fact, the partnership "had stalled" by late 2014.  SI ¶ 12(D).

- Defendants told investors they had a profitable relationship with the U.S. Department of Defense, and that Theranos technology had been deployed to the battlefield when, in fact, Defendants knew Theranos had limited revenue from its military contracts and that Theranos technology had not been deployed to the battlefield.  *Id.* ¶ 12(E).

- Defendants told doctors and patients that their devices could provide "accurate, fast,

---

[8] There is some tension between *United States v. Woods*, 335 F.3d 993 (9th Cir. 2003) and *Omer*, 395 F.3d 1087.  *Woods* seems to require that materiality be shown as to *each* alleged misstatement.  *See* 335 F.3d at 1000 ("*All* deceptive or misleading statements, false statements and half-truths, which are generally referred to as statements, and concealed, omitted and nondisclosed facts . . . *must be material to form the basis* of mail or wire fraud charges." (emphasis added)); *see also* Falsity Opp. at 5 (arguing alleged misstatements can be considered as material evidence of the fraud); *United States v. Hossain*, 2014 WL 4354125, at *3 (D. Nev. Sept. 2, 2014) (analyzing the four alleged false statements and finding that each was material).  In contrast, *Omer* states only the "materiality of the scheme or artifice must be alleged" and that "the materiality of the specific statement need not be pleaded."  395 F.3d at 1089.  This begs the question—pursuant to *Omer*, may the Court assess the statement's materiality in light of the whole indictment, *or* must the Court assess each statement's materiality individually?  Because *Omer* did not concern alleged misstatements, while *Woods* did, the Court follows *Woods'* instruction that each misstatement must be "material" to form the basis of the wire fraud charges.

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY; GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
22

United States District Court
Northern District of California

United States District Court
Northern District of California

1  reliable, and cheap blood tests and test results," when, in fact, they knew that these tests could not "consistently produc[e] accurate and reliable results." *Id.* ¶ 16.

2  Defendants fixate on the minute details in the indictment, like what the meaning of

3  "consistently" is. *See* Falsity Reply at 4–5. They also argue with semantics and point out that

4  Theranos could have an "expanding partnership" with Walgreens, even if it, at one point, had

5  "stalled." This misunderstands the relevant standard at a motion to dismiss phase. *See Buckley*,

6  689 F.2d at 897 (noting that at the motion to dismiss stage, "the issue in judging the sufficiency of

7  the indictment is whether the indictment adequately alleges the elements of the offense . . . not

8  whether the Government can prove its case." At trial, the defense may argue about the meaning of

9  Defendants' Walgreens representations. But, *at this stage*, such arguments are not appropriate; the

10  relevant inquiry is whether the indictment adequately alleges the elements of the offense.

11  Materiality does not require alleged misstatements to be accurate—it only requires the alleged

12  misstatements to have a "natural tendency to influence." The three above statements exceed this

13  standard; the first two tend to give the false impression to an investor that Theranos' business was

14  growing, that it was a profitable company, and that it was a good investment. Likewise, the third,

15  tends to give a false impression to the doctor and patient that Theranos' technology would provide

16  accurate results. The SI thus sufficiently alleges a factual basis for its claim that the alleged

17  misrepresentations were material.

18  **2. Fraud-by-Omission Theory**

19  "It is settled in this Circuit that a scheme to defraud need not be an active

20  misrepresentation. A nondisclosure or concealment may serve as a basis for the fraudulent

21  scheme." *United States v. Dowling*, 739 F.2d 1445, 1449 (9th Cir. 1984), *rev'd on other grounds*,

22  473 U.S. 207 (1985). The ability to use an omission to form the basis of a scheme to defraud is

23  narrow. *Id.* at 1450. It may only be used "when there exists an independent duty (either fiduciary

24  or derived from an explicit and independent statutory requirement) and such a duty has been

25  breached." *Id.* A contrary rule would bring "almost any illegal act within the province of

26  Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO

27  DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;

28  GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

23

1    the . . . fraud statute." *Id.*  Hence, an indictment must allege facts giving rise to a duty to disclose.

2    *See United States v. Lonich*, 2016 WL 324039, at *8 (N.D. Cal. Jan. 27, 2016) (holding that if the

3    government wishes to prosecute based on an omissions theory, the indictment must allege that

4    defendant owed a duty to disclose); *see also United States v. DuBo*, 186 F.3d 1177, 1179 (9th Cir.

5    1999) ("Implied, necessary elements, not present in the statutory language, must be included in an

6    indictment.").

7          The SI alleges that Defendants omitted material facts that they had a "duty to disclose."

8    *See* SI ¶¶ 11, 12, 15.  Defendants argue that the Government may not proceed with its fraud-by-

9    omission theory because the Government has not sufficiently alleged that they had a duty to

10   disclose information to investors, doctors, or patients.  Falsity Mot. at 6.  The Government rebuts

11   this and contends that Defendants had a duty to disclose omitted, material information pursuant to

12   a "duty of trust" and a "duty to correct" half-truths.  Falsity Opp. at 8.

13         Half-truths and omissions are distinct concepts.  *See, e.g.*, *United States v. Sumeru*, 449 F.

14   App'x 617, 621–22 (9th Cir. 2011) (noting that half-truths and omissions are different legal

15   theories); *United States v. Petrossi*, 786 F. App'x 286, 288–89 (2d Cir. 2019).  An actionable

16   omission occurs when the defendant *fails* to speak despite the existence of a duty requiring him to

17   speak.  In contrast, in a half-truths case, the duty to disclose arises because critical qualifying

18   information was omitted from speech.  While half-truths create a "duty to correct" speech,

19   omissions trigger an independent duty to speak.  Both, however, create a "duty to disclose."  *See*

20   SI ¶ 11, 12, 15.  Because omissions and half-truths are distinct theories, the Court addresses each

21   in turn.

22         Regarding omissions, the Government argues that an independent "duty of trust" existed

23   between Defendants and their investors.  "Fiduciary" is a broad term; it encompasses "informal"

24   trusting relationships where one party "acts for the benefit of another and induces the trusting

25   party to relax the care and vigilance which it would ordinarily exercise."  *United States v. Shields*,

26   Case No.: 5:18-cr-00258-EJD
     ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
27   DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
     TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
28   GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
     COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
                                        24

United States District Court
Northern District of California

1   844 F.3d 819, 822–23 (9th Cir. 2016).  The Government argues that by making misrepresentations

2   to investors, Defendants induced investors to relax their ordinary care and vigilance and thus

3   entered into a "trusting relationship" with the investors.  Falsity Opp. at 9.  In other words,

4   because the misrepresentations led investors to trust Defendants, Defendants owed investors a

5   duty of trust and were required to disclose all material omitted information, *i.e.* information about

6   Theranos' financial status, technological ability, etc.  *Id.*  Defendants argue rooting a duty of trust

7   in the representation itself threatens to "swallow[s] the *Shields* rule . . . by permitting juries to

8   convict on the basis of omissions whenever the government also alleges false statements, without

9   any independent duty to disclose."  Falsity Reply at 8–9; *see also Dowling*, 739 F.2d at 1449

10   (noting that omissions-liability is narrow).

11          Defendants fear is misplaced.  Simply alleging that a defendant misrepresented something

12   to an investor does not create a duty of trust.  Rather, the inquiry is whether the facts alleged in the

13   indictment show that a defendant, acting for the benefit of an investor, induced the investor to

14   relax the care and vigilance they would ordinarily exercise.  *See Shields*, 844 F.3d at 822–23.

15   Here, the SI does this—as shown in Paragraph 12(C), Defendants used deceptive technology

16   demonstrations to reassure investors that Theranos' proprietary technology worked.  Likewise, as

17   shown in Paragraphs 12(F) and 12(H), Defendants induced investors to trust Theranos technology

18   by misrepresenting that *others*, like the FDA, concluded that the technology worked.  Moreover,

19   Defendants, were both officers of Theranos; their position indicated that they knew about

20   Theranos' technology.  Accordingly, Defendants alleged misrepresentations were sufficient to

21   relax an investors ordinary duty of care because they purposefully caused an investor to believe

22   that Theranos was successful, profitable, and a secure investment.  The SI thus sufficiently alleges

23   that Defendants "duty to disclose" material omissions to investors was rooted in a duty of trust.

24   *See* SI ¶ 11, 12.

25          Regarding half-truths, "even in the absence of a trust relationship," one "cannot

26   Case No.: 5:18-cr-00258-EJD
    ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
27   DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
    TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
28   GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
    COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
                                   25

United States District Court
Northern District of California

1    affirmatively tell a misleading half-truth about a material fact." *See United States v. Laurienti*,

2    611 F.3d 530, 541 (9th Cir. 2010); *see also United States v. Harder*, 116 F. Supp. 3d 1197, 1206

3    (D. Or. 2015) ("Omissions of material fact and half-truths may be used to establish a scheme to

4    defraud."); *United States v. Montgomery*, 384 F.3d 1050, 1063–64 (9th Cir. 2004) (holding the

5    defendant's half-truths and concealment of material facts was actionable fraud).  Half-truths and

6    concealment may be premised on verbalized words, the arrangement of words, or the

7    circumstances in which they are conveyed.  *Lustiger v. United States*, 386 F.2d 132, 138 (9th Cir.

8    1967).

9            In the alternative to a duty of trust, once Defendants made inflated representations about

10   Theranos' success and profitability, they needed to tell the "whole truth," *i.e.*, that Theranos'

11   profitability was declining and that its partnership with Walgreens was stalling.  Likewise, by

12   representing their tests as "accurate" and "reliable," Defendants had a duty to disclose to doctors

13   and patients that their tests "consistently" produced wrong results.  Defendants argument that the

14   Government is "transforming" the duty to correct asserted half-truths into an independent duty to

15   disclose is thus misplaced.  Falsity Reply at 9.

16           The SI alleges that Defendants "omitted" information that they had a duty to disclose.  SI

17   ¶¶ 11, 12, 15–17, 26.  Hence, read as a whole, see *Buckley*, 689 F.2d at 899, the SI alleges that

18   Defendants had (1) a duty of trust with investors and, pursuant to that duty, had a duty to disclose

19   material information about Theranos' technology and profitability to investors, (2) a duty to

20   disclose to investors the "whole truth" about Theranos' technology and profitability based on their

21   "half-truths," and (3) a duty to disclose to doctors and patients the "whole truth" about Theranos

22   blood tests' accuracy and reliability based on their "half-truths."  *Cf.* Falsity Mot. at 7 (arguing

23   certain paragraphs contain only "boilerplate allegations of unspecified omissions).  Accordingly,

24   Defendants motion to dismiss for failure to allege falsity is **DENIED.**

25

26   Case No.: 5:18-cr-00258-EJD
     ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
27   DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
     TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
28   GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
     COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
                                    26

United States District Court
Northern District of California

United States District Court
Northern District of California

1    **IV.    DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE**
2    **THROUGH ELEVEN OF SUPERSEDING INDICTMENT**

3    Defendants argue that counts two and nine through eleven, which relate to the scheme to

4    defraud doctors and patients, must be dismissed because they do not allege that Defendants acted

5    with the specific intent to obtain money or property from any doctors or patients through deceit.

6    Counts Mot. at ECF 7.  Defendants contend that the SI's shortcomings are twofold: first, counts

7    two and nine through eleven fail to allege that Defendants intended to deprive non-paying patients

8    and doctors of their money or property.  *Id.*  Second, the counts fail to allege that Defendants

9    intended to deprive patients of the benefit of the bargain.  *Id.*  The Court addresses each in turn.

10    **A. Scheme to Obtain Money or Property from Victims**

11    As noted, to prevail on a charge of wire fraud, the Government must prove: (1) a scheme to

12    defraud; (2) the use of a wire, radio, or television to further the scheme; and (3) a specific intent to

13    defraud.  *United States v. Lindsey*, 850 F.3d at 1013.[9]  On a motion under Federal Rule of

14    Criminal Procedure 12, the failure to allege facts that, if proven, would satisfy the intent element

15    of the offense is a fatal defect requiring dismissal of the indictment.  *See United States v. Mitchell*,

16    867 F.2d 1232, 1233 (9th Cir. 1989) ("To charge a scheme to defraud under section 1341,

17    *McNally* requires an allegation that Mitchell intended to deprive the city of money or property.

18    The indictment in this case is devoid of any such allegation." (citations omitted)).

19    "[F]or purposes of the mail fraud statute, the thing obtained must be property in the hands

20    of the victim."  *Cleveland v. United States*, 531 U.S. 12, 15 (2000); *see also Carpenter v. United*

21    *States*, 484 U.S. 19, 25 n.6 (1987) ("The mail and wire fraud statutes share the same language in

22    relevant part, and accordingly we apply the same analysis to both sets of offenses here.").  The

23

24    [9] A conspiracy under Section 1349 "requires an agreement among two or more persons that would
satisfy the elements of the substantive offense" of wire fraud. *Hussain*, 2017 WL 4865562, at *5.
25    Accordingly, an indictment charging conspiracy to commit wire fraud must specify the underlying
fraud. *See supra* n.3.
26    Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
27    DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
28    GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
27

1   specific intent element of wire fraud, thus, "must be [the intent] to obtain money or property from

2   the one who is deceived." *United States v. Lew*, 875 F.2d 219, 221 (9th Cir. 1989); *see also*

3   *United States v. Ali*, 620 F.3d 1062, 1071 (9th Cir. 2010) ("[U]nder *Lew*, Microsoft must be the

4   victim from whom property was taken."); *Monterey Plaza Hotel Ltd. P'ship v. Local 483 of Hotel*

5   *Emps. & Rest. Emps. Union*, 215 F.3d 923, 927 (9th Cir. 2000) ("The purpose of the mail fraud

6   and wire fraud proscriptions is to punish wrongful transfers of property from the victim to the

7   wrongdoer, not to salve wounded feelings.").

8   **1.   "Non-Paying" Patients[10]**

9   The SI acknowledges that many of the alleged patient victims did not pay for Theranos

10  tests and so Defendants argue that these patients are not "victims" under *Lew*.  Counts Mot. at

11  ECF 9; *see also* SI ¶ 15 ("Based on [Defendants'] representations, [about Theranos's ability to

12  provide accurate, fast, reliable, and cheap blood tests and test results] many hundreds of patients,

13  paid, *or caused their medical insurance companies to pay*, Theranos, or *Walgreens acting on*

14  *behalf of Theranos*, for blood tests and tests results . . . ." (emphasis added)).  Defendants thus

15  argue that portions of the SI that rely on "non-paying" patient victims must be dismissed.

16  In *Lew*, the Ninth Circuit held that the defendant could not be convicted of mail fraud

17  because the government failed to allege and prove that the defendant had the specific intent to

18  deprive the alleged victim of property or money.  875 F.2d at 222.  There, the defendant, an

19  immigration attorney, allegedly misrepresented his immigrant-client's employment status to the

20  Department of Labor.  *Id.* at 220–21.  The government argued that defendant intended to defraud

21  his immigrant-clients of money because he made them pay a fee and deceived them into believing

22  that they could lawfully become permanent residents.  *Id.* at 220.  The court, however, disagreed

23  and found that there was no evidence that the defendant intended to deceive his clients.  *Id.*

24

---

25  [10] This class of patients refers to patients who did not pay for the blood-tests because their
    insurance provider paid in full for the test.

26  Case No.: 5:18-cr-00258-EJD
    ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO

27  DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
    TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;

28  GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
    COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

28

*United States District Court*
*Northern District of California*

1    Rather, the evidence showed that the defendant intended to deceive the Department of Labor.  *Id.*

2    at 221.  The jury instructions permitted the defendant to be convicted for wire fraud even though

3    the money was not received from the party deceived.  *Id.* at 221, 222.  This, the court held, was

4    improper because it failed to instruct the jury about the requisite convergence between the intent to

5    defraud and the intent to deprive a victim of money or property.  *Id.* at 222.  Due to this, the wire

6    fraud convictions were reversed.  *Id.* at 222.

7          *Ali* maintains *Lew*'s requirement of convergence.  In *Ali*, the defendants devised a scheme

8    in which they fraudulently obtained software and then resold the software for a profit.  620 F.3d at

9    1064.  Microsoft sells Academic Edition ("AE") software through its Authorized Education

10    Reseller ("AER") program.  *Id.*  Only authorized distributors could sell AE software and they

11    could only sell it to AERs.  *Id.* at 1064–65.  The defendants fraudulently attained AER status by

12    creating new companies under false names to purchase existing AER companies.  *Id.* at 1065.

13    This allowed the defendants to acquire and distribute AE software without ever becoming an

14    authorized distributor, thus diverting potential profits from Microsoft.  *Id.*  The Ninth Circuit first

15    determined that the diversion of profits qualified as "money or property" because it ultimately

16    denied Microsoft their right to full payment for AE software.  *Id.* at 1067.  The court next

17    concluded that there was convergence—the alleged victim, Microsoft, lost money.  *Id.* at 1068.

18    Accordingly, the defendants had the "intent to defraud" Microsoft.

19          Pursuant to *Lew* and *Ali*, the indictment must show that the defendant intended to deprive

20    the alleged victim of their money or property.  The Government does not allege that the patient-

21    victims had a property interest in receiving accurate test results or not being medically harmed.

22    *But see* Counts Opp. at 3–4 (discussing the trauma experienced by patients who received false

23    results); *cf. United States v. Slay*, 717 F. Supp. 689, 692 (E.D. Mo. 1989) (finding that while

24    *Carpenter* holds certain intangible property rights are within the scope of the wire fraud statute,

25    the right to accurate information is not a cognizable property interest); *United States v. Sadler*, 750

26    Case No.: 5:18-cr-00258-EJD

27    ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;

28    GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

29

United States District Court
Northern District of California

1    F.3d 585, 591 (6th Cir. 2014) ("[E]thereal right to accurate information doesn't fit within [limited

2    property rights protected by wire fraud statute]."); *Cleveland*, 531 U.S. at 27 ("Absent clear

3    statement by Congress, we will not read the mail fraud statute to place under federal

4    superintendence a vast array of conduct traditionally policed by the States."); *McNally v. United

5    States*, 483 U.S. 350, 359–60 (1987), *overruled on other grounds by Skilling v. United States*, 561

6    U.S. 358 (2010) ("The Court has often stated that when there are two rational readings of a

7    criminal statute, one harsher than the other, we are to choose the harsher one only when Congress

8    has spoken in clear and definite language.").

9          Instead, the Government argues the SI sufficiently alleges that Defendants deprived

10   patient-victims of "the money that Theranos's customers would pay for testing services." Counts

11   Opp. at 1. But there is a fundamental issue with the Government's theory—some customers did

12   not pay for their blood tests. Indeed, the SI specifically contemplates that not all patient-victims

13   paid for the test.

- **Paragraph 15:** HOLMES and BALWANI devised a scheme to defraud doctors and patients, through advertisements and marketing materials, through explicit and implicit claims concerning Theranos's ability to provide accurate, fast, reliable, and cheap blood tests and test results, and through omissions concerning the limits of and problems with Theranos's technologies. Based on these representations, many hundreds of patients paid, ***or caused their medical insurance companies to pay***, Theranos, or Walgreens acting on behalf of Theranos, for blood tests and test results, sometimes following referrals from their defrauded doctors.

- **Paragraph 26:** On or about the dates set forth below, within the Northern District of California, and elsewhere, the defendants, for the purpose of executing the material scheme and artifice to defraud doctors and patients, and for obtaining money and property from patients, doctors, ***and insurance companies*** by means of materially false and fraudulent pretenses, representations, promises, and material omissions with a duty to disclose, did knowingly transmit and cause to be transmitted by means of wire communication in interstate commerce certain writings, signs, signals, and pictures, that is, laboratory and blood test results and payments for the purchase of advertisements soliciting patients and doctors for its laboratory business, as further set forth below, in violation of Title 18, United States Code, Section 1343.

24   These paragraphs of the SI highlight the problem; the SI acknowledges that two types of

25   patient victims exist—ones who paid and ones whose insurance paid. Much like in *Lew*, there is

26   Case No.: 5:18-cr-00258-EJD
27   ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
28   GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
30

United States District Court
Northern District of California

1    divergence between the intent to defraud and the harm suffered.  Pursuant to the SI, the non-

2    paying patients did not suffer a monetary harm.  At first glance, this seems like the same scenario

3    as *United States v. Utz*, 886 F.2d 1148 (9th Cir. 1989).  There, the Ninth Circuit noted that it is

4    enough for "the government [to] charge and the jury [to] find either that the victim was actually

5    deprived of money or property *or* that the defendant intended to defraud the victim of the same.

6    *Utz*, 886 F.2d at 1151.  Closer review, however, shows that this case is unlike *Utz*.  The "intent to

7    defraud" still requires convergence; the defendant must intend to deprive the alleged victim of

8    money or property.  *Utz* does not eradicate this requirement.  Under the SI, non-paying patients

9    were not deprived of any money *and* because of their insurance-status, the SI contemplates that

10   Defendants did not intend to deprive them of money.  *Boren*, 278 F.3d at 914 ("D]istrict court is

11   bound by the four corners of the indictment.").  Indeed, insured customers are more like the third-

12   party distributors in *Ali*.  There, the third-party distributors, like the insured customers, were not

13   victims of the scheme because there was no showing that the defendants intended to deprive them

14   of money or property.  *Ali*, 320 F.3d at 1068; *cf. United States v. Bonallo*, 858 F.2d 1427, 1434 n.9

15   (9th Cir. 1988) (holding that "intent to defraud" met as to bank because bank was a victim of the

16   scheme).

17          In the alternative, the Government argues that insured patients were deprived money

18   because they paid premiums.  Counts Opp. at 12 ("[P]remiums . . . mean[] that the money health

19   insurance companies use to pay medical service providers is ultimately derived from, and

20   indirectly reimbursed by, the covered patients.  An indirect connection between the victim of the

21   fraud and funds obtained by the fraudster is acceptable . . . .").  But, even in "indirect connection"

22   cases, the victim must still be deprived of their property or money.  *See, e.g.*, *Bonallo*, 858 F.2d at

23   1434 n.9 (noting that indirect victim, the bank, still was deprived of money); *Ali*, 620 F.3d at 1062

24   (affirming wire fraud conviction even where Microsoft was not the target of the scheme because

25   Microsoft lost money from the scheme).  Here, in contrast to *Bonallo* and *Ali*, the patients would

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
31

United States District Court
Northern District of California

1    have paid their premiums *regardless* of Theranos' blood tests.  There is no showing or argument

2    by the Government that patients were required to pay a higher premium because of Theranos tests

3    or that premiums were specific for Theranos testing.  Hence, this case is not an "indirect

4    connection" case because insured victims did not lose money.

5          Finally, the Government's reliance on *United States v. Crawford* is misplaced.  *Crawford*

6    holds that a fraud conviction does not require the government to prove the identity of the fraud

7    victim.  239 F.3d 1086, 1092 (9th Cir. 2001).  There, the defendant sold a painting that did not

8    belong to her.  *Id.* at 1089.  The defendant argued on appeal that because ownership of the painting

9    had not yet been established, there was no identifiable victim and the government could not prove

10   she had the specific intent to defraud someone.  *Id.* at 1092.  The court disagreed and held that

11   because she knew she did not own the painting, she intended to deprive the owner, whoever that

12   may be, of its use.  *Id.* at 1093.

13         *Crawford* does not eradicate the requirement that a defendant's "intent must be to obtain

14   money or property from the one who is deceived."  *Lew*, 875 F.2d at 221.  The SI alleges that

15   Defendants intended to defraud two types of patients—ones who paid and ones whose insurance

16   paid for the blood tests.  Indeed, comparative to *Crawford*, where there was only *one possible*

17   *owner* of the painting, here, there are two sources of money.  Thus, even if the Government need

18   not prove specific patients' identities, it still must prove that Defendants intended to deprive the

19   *class* of victims of their money or property.  A contrary finding would make the wire fraud statue

20   limitless; any vague recitation of a class of persons would satisfy the statute.  But this would

21   contravene *McNally* and *Lew* because it would allow distinct sets of victims to be clumped into

22   one group, which would erode any type of convergence requirement.

23         There are four types of possible victims in the doctor/patient scheme: paying patients, non-

24   paying patients, doctors, and insurance companies.  The SI does not allege insurance companies

25   were defrauded.  It does, however, allege that insured patients were defrauded.  But it fails to

26   Case No.: 5:18-cr-00258-EJD
27   ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
     DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
     TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
28   GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
     COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
     32

United States District Court
Northern District of California

1   connect a specific intent to defraud to such patients because it does not show Defendants intended

2   to deprive them of money.  Rather, the SI indicates that the money flowed from the insurance

3   company.  Hence, the SI does not show that Defendants intended to obtain money from the non-

4   paying patient-victims, *i.e.*, the one who was allegedly deceived.  *See id.*

5          For these reasons, the Court **GRANTS** Defendants' motion to dismiss counts two and nine

6   through eleven to the extent they depend on insured and non-paying patient-victims.[11]

7                    **2.  Doctors**

8          Defendants next argue that the SI fails to allege that Defendants intended to deprive

9   doctors of money or property.  Counts Mot. at ECF 9.

10          The Government points the Court towards *United States v. Harkonen*, 510 F. App'x 633

11   (9th Cir. 2013).  In *Harkonen*, the Ninth Circuit held that there was sufficient evidence for the jury

12   to find that the defendant knowingly participated in a scheme to defraud and possessed the specific

13   intent to deceive or defraud.  510 F. App'x at 636.  There, the defendant issued a fraudulent press

14   release that overstated a pharmaceutical product's success and was "at least 'capable' of

15   influencing the decision of doctors to prescribe, or patients to seek, prescriptions of [the drug]."

16   *Id.*  Based on this, the jury convicted the defendant of wire fraud and the Ninth Circuit upheld the

17   conviction.  *Id.*

18          *Harkonen* is unhelpful to the Government's case.  It says *nothing* about (1) who the

19   defendant intended to defraud or (2) whether or not a property or money interest was alleged in the

20   indictment.  These are the issues before this Court.  Hence, *Harkonen* is unhelpful in answering

21   the question: can the Government maintain its allegation that Defendants had the specific intent to

22   defraud doctors of property or money?  *See Lew*, 875 F.2d at 222 (requiring a showing of intent to

23

24   [11] The Court does not view the presence of Walgreens as significant.  Theranos sponsored the tests
     and ran the results.  Defendants collected money from paying patients through Walgreens.  Hence,
25   Walgreens presence in the action is irrelevant.  Accordingly, this class of patients includes
     patients, with insurance, who either visited their doctors directly or used Walgreens.
26   Case No.: 5:18-cr-00258-EJD
     ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
27   DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
     TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
28   GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
     COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
                                      33

United States District Court
Northern District of California

1    defraud a victim of money or property).

2       The Court holds that the SI fails to allege that Defendants intended to deprive doctors of

3    their money or property.  The SI alleges that Defendants "induc[ed] doctors to refer and patients to

4    pay for and use its laboratory and blood testing services under the false and fraudulent pretense

5    that Theranos technology produced reliable and accurate blood test results."  SI ¶ 22; *see also id.*

6    ¶ 26 (alleging Defendants intended to defraud doctors of money and property).  The contrast

7    between doctors and patients is plain; the SI alleges patients *paid* while doctors *referred*.

8    Paragraph 26 does not save this conclusion—its bare-bones recitation that Defendants intended to

9    deprive doctors of money or property does not provide the "meat on the bones" sufficient to

10    satisfy the fair notice requirement discussed above.  Moreover, the Government's argument at trial

11    that a specific doctor lost property is unconvincing.  The Court is bound by the four-corners of the

12    indictment which fail to allege that Defendants intended to deprive doctors of their money or

13    property.  *See Boren*, 278 F.3d at 914 (noting that court is bound by four-corners of the

14    indictment).

15       In the alternative, the Government argues that the doctors were unwilling participants in

16    the alleged scheme and passed along fraudulent information to their patients in recommending

17    Theranos.  Counts Opp. at 12.  The Government relies on *United States v. Ciccone*, 219 F.3d

18    1078, 1084 (9th Cir. 2000) for support.  But this case is equally unhelpful.

19       *Ciccone* involved a telemarketing scheme where the defendant's employees made

20    misrepresentations to victims.  219 F.3d at 1083–85.  Specifically, the defendant paid solicitors to

21    telephone people as part of a scheme to get callers to send money to Feed America (the

22    defendant's organization).  *Id.* at 1080.  The solicitors told people that they had won money, a

23    fabulous prize, and the opportunity to donate to charitable causes.  *Id.*  But, first people had to pay

24    a sum to Feed America, who only returned 10% of their donation.  *Id.*  The defendant argued on

25    appeal that he could not be convicted of mail fraud because he did not personally make the calls.

26    Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
27    DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
28    GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
34

United States District Court
Northern District of California

1    *Id.* at 1083.  The Ninth Circuit rejected this argument and held that, even if he did not make the

2    calls, he directed his solicitor-employees to perpetrate the scheme by (1) providing solicitors with

3    lists identifying victims of other telemarketing schemes and (2) crafting the sales pitch that was

4    "rich with misrepresentations."  *Id.* at 1084.  The defendant's criminal liability was thus premised

5    on his own fraudulent behavior and his own intent to defraud the alleged victims.

6            This case differs from *Ciccone*.  First, there is no showing that Defendants directed doctors

7    to make misrepresentations to their patients.  Indeed, the defrauded doctors were not Theranos

8    employees (at least, pursuant to the SI).  The contrary is alleged.  The SI maintains that the

9    "defrauded doctors" referred patients to Theranos.  SI ¶ 15.  This shows that the doctors were *not*

10   operating at the direction of Defendants.  Second, in *Ciccone*, the alleged victims of the fraud lost

11   money and the defendant intended to defraud those victims.  There was thus convergence.  In

12   contrast, here, there is no showing that the doctors lost money or property or that Defendants

13   intended for them to lose money or property.

14           Furthermore, any similarity between *Ciccone* and this case is unhelpful to the Government.

15   The doctors can be compared to the telemarketer-employees who placed the calls, while the

16   recipients of the calls (the victims) can be compared to the paying patients.  There was no

17   argument that the defendant's telemarketer-employees were victims of the scheme.  *Ciccone*, 219

18   F.3d at 1080.  Thus, any comparison between the cases favors Defendants' argument that the SI

19   does not allege that the doctors were victims of the scheme to defraud.  Accordingly, *Ciccone* is

20   unpersuasive and the Court **GRANTS** Defendants request to dismiss counts two and nine through

21   eleven to the extent they depend on doctor-victims.

22           **B.  Benefit of the Bargain**

23           Defendants next argue that the SI must be dismissed as it relates to *all* patients because it

24   fails to allege that Defendants mispresented the "nature of the deal."  Counts Mot. at ECF 10.  In

25   Defendants view, the patient-victims got "what they paid for."  *Id.* at ECF 11.  The SI alleges that

26   Case No.: 5:18-cr-00258-EJD
     ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
27   DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
     TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
28   GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
     COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
                                              35

United States District Court
Northern District of California

1  Defendants claimed, through advertisements and marketing materials,  that Theranos could

2  produce accurate, fast, reliable, and cheap blood tests and results.  SI ¶ 15.  While the SI alleges

3  these claims were false, it does not explicitly allege that Theranos could *not* provide accurate, fast,

4  reliable, and cheap blood tests and test results.  Counts Mot. at ECF 10.  This is where Defendants

5  hang their hat.  In their view, because the SI does not explicitly claim that Defendants promised

6  patients a certain result, the SI fails to allege that Defendants misrepresented the nature of the deal.

7      The wire-fraud statute makes criminal any "scheme or artifice to defraud."  18 U.S.C.

8  § 1343.  As established above, the statute punishes schemes intended to "deprive [people] of their

9  money or property."  *Cleveland*, 531 U.S. at 19.  In this instance, that means the indictment must

10  allege that Defendants knowingly used an interstate wire communication to further a scheme to

11  defraud paying[12] patient-victims of their money or property.  "Money or property" at first glance

12  seems clear.  Indeed, as analyzed above, in the classic scenario, the relevant question is whether a

13  defendant intended to take a victim's money or property?  *See, e.g. Ali*, 620 F.3d at 1067

14  (Microsoft deprived of money); *Crawford*, 239 F.3d at 1088 (defendant took property of another).

15      This question can become harder to answer in the commercial setting.  In this case,

16  Defendants transacted with patients to provide a blood testing (a service).  There is no dispute that

17  some patients paid Theranos for this service.  *See* SI ¶ 15.  There is, however, a dispute as to

18  whether or not the patients *got what they paid for*.  Hence, the relevant inquiry is whether

19  Defendants misrepresented the nature of the bargain.  *See United States v. Takhalov*, 827 F.3d

20  1307, 1313 (11th Cir. 2016) ("[A] schemer who tricks someone to enter into a transaction has not

21  'schemed to defraud' so long as he does not intend to harm the person he intends to trick.  And

22

23  [12] Because the Court held above that the SI did not allege that Defendants had the SI to deprive
non-paying patient-victims of their money, this portion of the Order only addresses paying patient-
24  victims, *i.e.* patients who either paid in full for the blood tests or paid a co-pay for the blood test.
*See supra* IV.A.1.  Defendants do not argue that the "benefit of the bargain" theory applies to the
25  doctor-victims and so the Court does not discuss the doctor-victims in this portion of the Order.
*But see supra* IV.A.2.

26  Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
27  DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
28  GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
36

1  this is so even if the transaction would not have occurred but for the trick."); *United States v.*

2  *Shellef*, 507 F.3d 82, 108 (2d Cir. 2007) ("Our cases have drawn a fine line between schemes that

3  do no more than cause their victims to enter into transactions they would otherwise avoid—which

4  do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a

5  misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud

6  statutes.").

7        In *Takhalov*, the Eleventh Circuit held that, in the commercial context, a "scheme to

8  defraud" refers only to schemes in which a defendant "lies about the nature of the bargain itself."

9  827 F.3d at 1313.  There, the defendants were tried and convicted of wire fraud.  *Id.* at 1310.  The

10  defendants operated clubs and hired Eastern European women to pose as tourists, locate visiting

11  businessmen, and lure them into the defendants' clubs.[13]  *Id.*  The defendants asked for a jury

12  instruction that "[f]ailure to disclose the financial arrangement between the [Eastern European

13  women] and the Bar, in and of itself, is not sufficient to convict a defendant of any offense[.]"  *Id.*

14  at 1311 (first alteration in original).  The Eleventh Circuit held that the district court erred in

15  denying this instruction because the proposed instruction was an accurate statement of law.  The

16  presence of the women was irrelevant ; the victims still got what they "bargained" for.  *Id.* at

17  1315–16.  Hence, a defendant's lie about the nature of the bargain is actionable in two primary

18  forms.  First, the defendant might lie about the price of a good, *i.e.* represent that a good is $5

19  when it is in fact $10.  *Id.* at 1313–14.  Or, the defendant might lie about the characteristics of the

20  good, *i.e.* represent that a product is designer when it is in fact a knock-off.  *Id.* at 1314.

21        The following hypotheticals are instructive.  Imagine you go to the doctor's office for a

22  blood test.  The nurse tells you that before test, he will bring you apple juice.  Instead, because he

23  dislikes you, he brings you cranberry juice.  He takes your blood and you get your (accurate)

24

---

25  [13] Part of the scheme involved swindling the men once they were inside the club.  That part of the scheme was not at issue on appeal and is not discussed herein.

26  Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO

27  DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;

28  GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT

37

1   results.  Did you get what you bargained for?  Yes.  You still got your blood test and received the

2   correct results.  The fact that you got cranberry juice is irrelevant; you did not ask for juice; it was

3   secondary to the core transaction.  Next imagine, you go to the doctor's office for the same blood

4   test.  The nurse comes to your patient-room and tells you about a new type of blood test.  He says

5   this new test only requires a couple drops of blood but remains just as accurate and reliable as a

6   classic blood test.  You agree to use the new test, only to discover later that the test was neither

7   accurate nor reliable.  Have, you been defrauded?  Yes.  Why?  Because the misrepresentation

8   went to the value of the bargain.  You paid for something that you did not receive.  You paid for

9   an accurate and reliable test and, because you did not receive that, you have been deceived about

10  the characteristics of the good.  *See id.* at 1314.

11          The SI accords with the second scenario.  It alleges that Defendants used advertisements

12  and marketing materials to misrepresent Theranos' ability to provide accurate, reliable, fast, and

13  cheap blood tests.  SI ¶ 15.  It further alleges that Defendants knew that their technology was not

14  capable of producing "accurate and reliable results."  *Id.* ¶ 16.  And, despite knowing about the

15  problems with their technology, Defendants sent out inaccurate test results.  *Id.* ¶ 17.  Part of the

16  bargain struck with consumers was thus that the tests and results would be accurate and reliable.

17  The accuracy and reliability guarantees were "characteristics" of the good.  *See Takhalov*, 827

18  F.3d at 1314.  Viewing the indictment as a whole and with common sense, it is plain that it

19  sufficiently alleges that patients did not receive the benefit of the bargain.  *See Giese*, 597 F.2d at

20  1178 (noting that an indictment must be read with common sense).  They did not receive the

21  accurate and reliable test that they were promised.  Accordingly, this is not the "sweeping

22  expansion" Defendants claim it to be, see Counts Opp. at ECF 12, and the Court **DENIES**

23  Defendants' request to dismiss Counts Two and Nine through Eleven as to paying patient-victims.

24

25

26  Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
27  DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
28  GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
38

United States District Court
Northern District of California

V.     CONCLUSION

    For the foregoing reasons, the Court:

1. **GRANTS in part** and **DENIES in part** Defendants' Motion to Dismiss the SI for lack of
fair notice.  The Court holds the SI provides Defendants fair notice of the charges they face
but orders the Government to produce a bill of particulars as to the specific
misrepresentations underlying the doctor-patient fraud and the names of any co-
conspirators supporting count one.

2. **DENIES** Defendants' Motion to Dismiss the SI for failure to allege falsity.

3. **GRANTS in part** and **DENIES in part** Defendants' Motion to Dismiss Counts Two and
Nine through Eleven.  These counts remain as to paying patients, but to the extent they rely
on non-paying patients or doctors, they must be dismissed.

    **IT IS SO ORDERED.**

Dated: February 11, 2020

_____
EDWARD J. DAVILA
United States District Judge

United States District Court
Northern District of California

Case No.: 5:18-cr-00258-EJD
ORDER GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO
DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF NOTICE; DENYING MOTION
TO DISMISS SUPERSEDING INDICTMENT FOR FAILURE TO ALLEGE FALSITY;
GRANTING IN PART & DENYING IN PART DEFENDANTS' MOTION TO DISMISS
COUNTS TWO AND NINE THROUGH ELEVEN OF SUPERSEDING INDICTMENT
39

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

### CRIMINAL MINUTES

**Date:** November 4, 2019     **Time:** 10:14-12:19 pm     **Judge:** Edward J. Davila

**Total Time:** 2 Hrs.5 Mins.

**Case No.:** 18-cr-00258-EJD-   **Case Name:** UNITED STATES v. Elizabeth Holmes(P)(NC), Ramesh
1, 2                              Sunny Balwani(P)(NC)

**Attorney for Plaintiff:** John Bostic, Jeffrey Schenk, Robert Leach, Alison Daw
In-house Counsel: Lindsay Turner (CMS), Marci Norton, Jackie Martinez-Resly(FDA) via telephone
conference

**Attorney for Defendant:** Kevin Downey, Lance Wade, Katherine Trefz, Michelle Chen, Jeffrey
Coopersmith, Walter Brown, Randy Luske, Amanda McDowell, Stephen Cazares

**Deputy Clerk:** Adriana M. Kratzmann     **Court Reporter:** Irene Rodriguez

**Interpreter:** N/A     **Probation Officer:** N/A

### PROCEEDINGS – FURTHER STATUS CONFERENCE/MOTION TO COMPEL HEARING

Defendants' are present and out of custody.  Hearing held.
The Court will adopt the schedule in Exhibit F to Status Report (Dkt. 170 filed 10/31/2019);
The Court took the motion to compel *Production of Rule 16 Discovery and Brady Materials* (Dkt. 67
filed 4/15/2019), and Joinder re motion to compel by Defendant Balwani (Dkt. 68 filed 4/16/2019)
under submission and Court to issue order.  Counsel shall continue to meet and confer.
The Court set a further status conference for 1/13/2020 at 10:00 am; Hearing on Rule 12(b)(3)(A)-(D)
motions set for 2/10/2020 at 10:00 am and Pretrial conference set for 7/9/2020 at 10:00 am.
For the reasons stated previously on the record, time is excluded through 7/28/2020 pursuant to 18 U.S.C.
§3161(h)(7)(B)(iv).
In-house Counsel for CMS and FDA shall appear via telephone conference at the further status
conference.
**CASE CONTINUED TO: January 13, 2020 at 10:00 AM for further status conference.**
**Motion Hearing set for February 10, 2020 at 10:00 AM**
**Pretrial Conference set for July 9, 2020 at 10:00 AM**

# EXHIBIT F

## PROPOSED PRETRIAL SCHEDULE

| Date | Event |
|------|-------|
| Monday, September 16, 2019 | The Government previously agreed to complete its Rule 16(a) disclosures (except expert disclosures) by this date. The Government confirmed for the defense that it believes it complied with this production deadline. The defense believes the government has not satisfied its disclosure obligations. The Government shall remain obligated to produce any Rule 16(a) material it subsequently discovers. |
| Monday, December 16, 2019 | All pretrial motions pursuant to Rule 12(b)(3)(A)-(D) are to be filed. |
| Monday, January 13, 2020 | Responses to Rule 12(b)(3)(A)-(D) motions due. |
| Monday, January 27, 2020 | Replies in support of Rule 12(b)(3)(A)-(D) motions due. |
| Monday, February 3, 2020 | The Government shall complete its disclosure of *Jencks* materials. The Government shall remain obligated to produce any *Jencks* materials it subsequently discovers. |
| Monday, February 10, 2020 | Hearing on Rule 12(b)(3)(A)-(D) motions. |
| Friday, March 6, 2020 | The Government shall serve a summary under Rule 16 for each expert witness that it intends to call at trial in its case-in-chief. |
| Friday, March 6, 2020 | The Government shall provide notice of any evidence of other crimes, wrongs or acts which the Government intends to offer under Federal Rule of Evidence 404(b). |
| Wednesday, April 29, 2020 | Each defendant shall serve a summary pursuant to Rule 16 for each expert witness that defendant intends to call at trial in the defendant's case-in-chief. |
| Friday, May 1, 2020 | Each defendant shall complete the defendant's Rule 16 disclosures other than expert disclosures. |
| Friday, May 1, 2020 | The Government shall serve witness and exhibit lists for its case-in-chief.<br><br>The Government shall identify any statement the Government intends to offer under Federal Rule of Evidence 801(d)(2)(E). |

| Wednesday, May 13, 2020 | The Government shall serve a summary pursuant to Rule 16 for each expert witness that it intends to call at trial in rebuttal to expert testimony offered by any defendant. |
|---|---|
| Friday, May 15, 2020 | Each defendant shall serve witness and exhibit lists for the defendant's case-in-chief. |
| Friday, May 22, 2020 | Motions *in limine* and motions relating to experts due. |
| Friday, May 22, 2020 | Proposed jury instructions, juror questionnaire, and voir dire questions due. |
| Monday, June 8, 2020 | Responses to motions *in limine* and motions relating to experts due. |
| Monday, June 8, 2020 | The parties shall file a pretrial conference statement addressing the matters set forth in Local Rule 17.1-1.  The Government shall advise the Court that it has produced all *Brady* and *Giglio* information in its possession and will continue to produce any the government subsequently discovers. |
| Monday, June 22, 2020 | Replies in support of motions *in limine* and motions relating to experts due. |
| Thursday, July 9, 2020 | Pretrial Conference |
| Tuesday, July 28, 2020 | Jury Selection |
| Tuesday, August 4, 2020 | First Day of Trial |

CR 18 C0258

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA



*FILED*

JUN 14 2018

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

### *SAN JOSE DIVISION*

---

## THE UNITED STATES OF AMERICA
### vs.
### ELIZABETH A. HOLMES &
### RAMESH "SUNNY" BALWANI

---

## INDICTMENT

| | |
|---|---|
| **COUNT 1:** | **18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud against Theranos Investors** |
| **COUNT 2:** | **18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud against Doctors and Theranos Patients** |
| **COUNTS 3-8:** | **18 U.S.C. § 1343 – Wire Fraud** |
| **COUNTS 9-11:** | **18 U.S.C. § 1343 – Wire Fraud** |

*A true bill.*

_____
*Foreperson*

---

*Filed in open court this* 15th *day of* June
*A.D. 201*8

_____
*United States Magistrate Judge*

---

**Bail. $** No bail arrest warrants
as to each defendant
Initial appearance – arraignment
June 15, 2018

ER-3664

1  ALEX G. TSE (CABN 152348)
   Acting United States Attorney
2

3                                        F I L E D

4                                        JUN 1 4 2018

5                                        SUSAN Y. SOONG
                                         CLERK, U.S. DISTRICT COURT
                                         NORTHERN DISTRICT OF CALIFORNIA
6        SEALED BY ORDER                 SAN JOSE

7            OF COURT

8

9                        UNITED STATES DISTRICT COURT

10                    NORTHERN DISTRICT OF CALIFORNIA

11                            SAN JOSE DIVISION

                                     CR 18    00258  LHK    NC
12  UNITED STATES OF AMERICA,        ) No.:
                                     )
13       Plaintiff,                  ) VIOLATIONS:
                                     )
14       v.                          ) 18 U.S.C. § 1349 – Conspiracy; 18 U.S.C. § 1343 –
                                     ) Wire Fraud; 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C.
15  ELIZABETH A. HOLMES and          ) § 2461(c) – Forfeiture
    RAMESH "SUNNY" BALWANI,          )
16                                   ) SAN JOSE VENUE
         Defendants.                 )
17  _____)

18

19                       **I N D I C T M E N T**

20  The Grand Jury charges that, at all relevant times:

21                          Introductory Allegations

22       1.     The defendant Elizabeth A. Holmes ("HOLMES") resided in Los Altos Hills, California,

23  and owned and operated a health care and life sciences company called Theranos, Inc. ("Theranos" or

24  "Company").  HOLMES founded Theranos in 2003, and served in the role of Chief Executive Officer

25  from 2003 through the present.

26       2.     The defendant Ramesh "Sunny" Balwani ("BALWANI") resided in Atherton, California,

27  and was employed by Theranos from September 2009 through 2016.  BALWANI served in various roles

28  at Theranos: as a member of its Board of Directors, as its President, and as its Chief Operating Officer.

INDICTMENT

1    3.    Theranos was a corporation organized under the laws of the State of Delaware with its

2    principal place of business in Palo Alto, California.  Theranos opened and maintained a corporate bank

3    account in Palo Alto, California at Comerica Bank.  Comerica Bank is headquartered in Dallas, Texas.

4    When Theranos solicited and received financial investments from investors, the money was deposited

5    into its Comerica Bank account.

6                                                    The Business of Theranos

7    4.    Theranos was a private health care and life sciences company.  Its stated mission was to

8    revolutionize medical laboratory testing through allegedly innovative methods for drawing blood, testing

9    blood, and interpreting the resulting patient data—all for the purpose of improving outcomes and

10   lowering health care costs.

11   5.    During its first ten years, from approximately 2003 to approximately 2013, Theranos

12   operated in what HOLMES called "stealth mode," with little public attention.  While operating in

13   "stealth mode," Theranos pursued the development of proprietary technology that could run clinical tests

14   using only tiny drops of blood instead of the vials of blood typically drawn from an arm vein for

15   traditional analysis.  Theranos also worked to develop a method for drawing only a few drops of

16   capillary blood from a patient's finger using a small lancet, and collecting and storing that blood in a

17   proprietary device called the "nanotainer."  Theranos's stated goal was to produce a second proprietary

18   device that could quickly and accurately analyze blood samples collected in nanotainers.  Theranos

19   referred to these devices using several terms, including "TSPU" (or "Theranos Sample Processing

20   Unit"), "Edison," and "miniLab."

21   6.    In or around 2013, Theranos began to publicize its technological advances.  According to

22   Theranos, its proprietary methods and technologies carried several advantages over conventional blood

23   testing.  For example, Theranos claimed that its laboratory infrastructure yielded test results in less time

24   than conventional labs—requiring hours instead of days.  Theranos claimed that its proprietary

25   technology and methods would minimize the risk of human error and generate results with the highest

26   accuracy.  According to Theranos, the small blood sample size required for Theranos's proprietary tests,

27   and its method of collecting blood by finger stick, would also benefit elderly individuals with collapsed

28   veins, individuals who required frequent blood tests due to chronic health conditions, and any individual

INDICTMENT                                        2

1   who feared needles.  In addition, Theranos claimed that its blood tests provided substantial cost savings,

2   advertising that it billed all of the tests on the Medicare Clinical Laboratory Fee Schedule at rates 50%

3   or more below the published reimbursement rate.

4          7.      Prior to its commercial launch, HOLMES heavily promoted Theranos's supposed

5   technological and operational capabilities.  In a September 2013 press release, Theranos claimed that it

6   had "eliminat[ed] the need for larger needles and numerous vials of blood" by relying instead on

7   samples "taken from a tiny finger stick or a micro sample taken from traditional methods."  In another

8   press release, dated November 13, 2013, Theranos touted its use of "blood sample[s] as small as a few

9   drops—1/1000th the size of a typical blood draw."  In that same statement, the Company again declared

10   that it had "eliminate[ed] the need for large needles and numerous vials of blood typically required for

11   diagnostic lab testing."

12          8.      In addition to directing the actions of the Company, HOLMES also made statements to

13   the media advertising the capabilities of Theranos's technology.  In an interview for a *Wall Street*

14   *Journal* article published on September 9, 2013, HOLMES said that Theranos could "run any

15   combination of tests, including sets of follow-on tests" at once, very quickly, all from a single small

16   blood sample.

17          9.      Theranos also used its website to increase awareness of its technology.  On its website,

18   Theranos displayed a nanotainer of blood balanced on a fingertip along with the slogan, "one tiny drop

19   changes everything."  The website also assured visitors that "for the first time," Theranos's laboratory

20   could perform tests "quickly and accurately on samples as small as a single drop."

21                         Theranos's Partnership with Walgreens

22          10.      As part of its commercial launch, Theranos pursued a partnership with national pharmacy

23   chain Walgreens.  On September 9, 2013, Theranos announced that it would be rolling out Theranos

24   "Wellness Centers" inside Walgreens retail locations.  In a press release on that date, Theranos

25   promoted its testing services by stating that "consumers can now complete any clinician-directed lab test

26   with as little as a few drops of blood and results available in a matter of hours."  Theranos offered tests

27   to the public beginning in late 2013 through its Wellness Centers located in Walgreens stores in Palo

28   Alto, California as well as in Phoenix, Arizona and surrounding areas.

INDICTMENT                        3

The Scheme to Defraud Investors

11.     From a time unknown but no later than 2013 through 2015, HOLMES and BALWANI, and others known and unknown to the Grand Jury, through their company, Theranos, engaged in a scheme, plan, and artifice to defraud investors as to a material matter, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, by making materially false and misleading statements, and failing to disclose material facts with a duty to disclose.

12.     Beginning in approximately 2013, HOLMES and BALWANI made materially false and misleading statements to investors and failed to disclose material facts, using, among other things: (1) false and misleading written and verbal communications; (2) marketing materials containing false and misleading statements; (3) false and misleading financial statements, models, and other information; and (4) false and misleading statements to the media.  HOLMES and BALWANI:

(A) represented to investors that, at the time the statement was made, Theranos's proprietary analyzer—the TSPU, Edison, or miniLab—was presently capable of accomplishing certain tasks, such as performing the full range of clinical tests using small blood samples drawn from a finger stick and producing results that were more accurate and reliable than those yielded by conventional methods—all at a faster speed than previously possible; when, in truth, HOLMES and BALWANI knew that Theranos's proprietary analyzer had accuracy and reliability problems, performed a limited number of tests, was slower than some competing devices, and could not compete with larger, conventional machines in high-throughput, or the simultaneous testing of blood from many patients, applications;

(B) represented to investors that Theranos was presently a financially strong and stable company, including that Theranos would generate over $100 million in revenues and break even in 2014, and that Theranos expected to generate approximately $1 billion in revenues in 2015; when, in truth, HOLMES and BALWANI knew that Theranos had and would generate only modest revenues, roughly a few hundred thousand dollars or so, in 2014 and 2015;

(C) deceived investors through misleading technology demonstrations intended to cause potential investors to believe that blood tests were being conducted on Theranos's proprietary analyzer; when, in truth, HOLMES and BALWANI knew that Theranos's proprietary analyzer

INDICTMENT                                    4

was running a "null protocol" during the demonstration to make the analyzer appear to be

operating, but was not testing the potential investor's blood, and yet failed to disclose that fact;

(D) represented to investors that Theranos presently had an expanding partnership with

Walgreens, that is, Theranos would soon dramatically increase the number of Wellness Centers

within Walgreens stores; when, in truth, HOLMES and BALWANI knew, by late 2014, that

Theranos's retail Walgreens rollout had stalled because of several issues, including that

Walgreens's executives had concerns with Theranos's performance;

(E) represented to investors that Theranos presently had a profitable and revenue-

generating business relationship with the United States Department of Defense, and that

Theranos's technology had deployed to the battlefield; when, in truth, HOLMES and BALWANI

knew that Theranos had limited revenue from military contracts and its technology was not

deployed in the battlefield;

(F) represented to investors that Theranos did not need the Food and Drug Administration

("FDA") to approve its proprietary analyzer and tests, but instead that Theranos was applying for

FDA approval voluntarily because it was the "gold standard"; when, in truth, HOLMES and

BALWANI knew that by late 2013 and throughout 2014, the FDA was requiring Theranos to

apply for clearance or approval for its analyzer and tests;

(G) represented to investors that Theranos conducted its patients' tests using Theranos-

manufactured analyzers; when, in truth, HOLMES and BALWANI knew that Theranos

purchased and used for patient testing third party, commercially-available analyzers;

(H) represented to investors that Theranos's technology had been examined, used, and

validated by several national or multinational pharmaceutical companies and research

institutions; when, in truth, HOLMES and BALWANI knew that these pharmaceutical

companies and research institutions had not examined, used, or validated Theranos's technology;

and

(I) represented to members of the media for publication many of the false and misleading

statements described above within paragraph 12(A) – 12(H), and shared the resulting articles

INDICTMENT                                   5

1    with potential investors both directly and via the Theranos website, knowing their statements to

2    members of the media were false and misleading.

3        13.    After receiving false and misleading statements, misrepresentations, and omissions from

4    HOLMES and BALWANI, persons known to the Grand Jury as Investors 1, 2, 3, 4, and 5 initiated

5    electronic wire transfers for the purpose of investing money in Theranos. These wires, specifically

6    alleged in paragraph 24 of this Indictment, used a domestic electronic funds transfer system known as

7    the Fedwire system, which is owned and operated by the United States Federal Reserve System. All

8    Fedwire wire transfers alleged in this Indictment were electronically routed through Fedwire centers in

9    East Rutherford, New Jersey and/or Dallas, Texas and into Theranos's bank account in the Northern

10   District of California. All of the wire transfers alleged in this Indictment travelled between one state and

11   another state.

12                              The Scheme to Defraud Doctors and Patients

13       14.    Between approximately 2013 and 2016, HOLMES and BALWANI, through

14   advertisements and solicitations, encouraged and induced doctors and patients to use Theranos's blood

15   testing laboratory services.

16       15.    HOLMES and BALWANI devised a scheme to defraud doctors and patients, through

17   advertisements and marketing materials, through explicit and implicit claims concerning Theranos's

18   ability to provide accurate, fast, reliable, and cheap blood tests and test results, and through omissions

19   concerning the limits of and problems with Theranos's technologies. Based on these representations,

20   many hundreds of patients paid, or caused their medical insurance companies to pay, Theranos, or

21   Walgreens acting on behalf of Theranos, for blood tests and test results, sometimes following referrals

22   from their defrauded doctors.

23       16.    Despite representing to doctors and patients that Theranos could provide accurate, fast,

24   reliable, and cheap blood tests and test results, HOLMES and BALWANI knew that Theranos's

25   technology was, in fact, not capable of consistently producing accurate and reliable results. In

26   particular, HOLMES and BALWANI knew that Theranos was not capable of consistently producing

27   accurate and reliable results for certain blood tests, including but not limited to calcium, chloride,

28   potassium, bicarbonate, HIV, Hba1C, hCG, and sodium.

INDICTMENT                                6

17.     Despite their knowledge of Theranos's accuracy and reliability problems, HOLMES and BALWANI used interstate electronic wires to purchase advertisements intended to induce individuals to purchase Theranos blood tests at Walgreens stores in California and Arizona.  Through these advertisements, HOLMES and BALWANI explicitly represented to individuals that Theranos's blood tests were cheaper than blood tests from conventional laboratories to induce individuals to purchase Theranos's blood tests.  HOLMES and BALWANI held Theranos's blood tests out to individuals as accurate and reliable.  HOLMES and BALWANI:

(A)     transmitted, caused to be transmitted, or otherwise delivered to doctors and patients, including in the form of marketing materials and advertisements, materially false and misleading information concerning the accuracy and reliability of Theranos's blood testing services;

(B)     posted on the Theranos website, or otherwise represented to a broad audience including doctors and patients, materially false and misleading information concerning the accuracy and reliability of Theranos's blood testing services;

(C)     transmitted, caused to be transmitted, or otherwise delivered to doctors and patients Theranos blood test results where HOLMES and BALWANI knew that the tests performed on Theranos technology contained or were likely to contain:

(1)     inaccurate and unreliable results;

(2)     improperly adjusted reference ranges;

(3)     improperly removed "critical" results; and

(4)     results generated from improperly validated assays.

18.     Knowing that the accuracy and reliability of Theranos test results was questionable and suspect, HOLMES and BALWANI oversaw the electronic wiring of test results to patients, including persons known to the Grand Jury as Patients 1 and 2 in paragraph 26 of this Indictment.  These wires, specifically, the wires alleged in paragraph 26 of this indictment, travelled between one state and another.

COUNT ONE: 18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud against Theranos Investors)

19.     Paragraphs 1 through 18 are realleged and incorporated as if fully set forth herein.

INDICTMENT                                        7

ER-3671

1     20.    From a time unknown but no later than approximately 2013 through approximately 2015,

2  within the Northern District of California, and elsewhere, the defendants,

3                      ELIZABETH A. HOLMES and
                      RAMESH "SUNNY" BALWANI,

4

5  and others known and unknown to the Grand Jury, did knowingly and intentionally conspire and agree

6  together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section

7  1343, by devising a scheme and artifice to defraud as to a material matter and to obtain money by means

8  of materially false and fraudulent representations, specifically by soliciting investments through making

9  the false and fraudulent representations as set forth in this Indictment.

10     All in violation of Title 18, United States Code, Section 1349.

11  COUNT TWO:  18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud against Doctors and Theranos
    Patients)

12

13     21.    Paragraphs 1 through 18 are realleged and incorporated as if fully set forth herein.

14     22.    From in or about 2013 through 2016, within the Northern District of California, and

15  elsewhere, the defendants,

16                      ELIZABETH A. HOLMES and
                      RAMESH "SUNNY" BALWANI,

17

18  and others known and unknown to the Grand Jury, did knowingly and intentionally conspire and agree

19  together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section

20  1343, by devising a scheme and artifice to defraud as to a material matter and to obtain money by means

21  of materially false and fraudulent representations, specifically by soliciting, encouraging, or otherwise

22  inducing doctors to refer and patients to pay for and use its laboratory and blood testing services under

23  the false and fraudulent pretense that Theranos technology produced reliable and accurate blood test

24  results.

25     All in violation of Title 18, United States Code, Section 1349.

26  COUNTS THREE THROUGH EIGHT:  18 U.S.C. § 1343 (Wire Fraud)

27     23.    Paragraphs 1 through 22 are realleged and incorporated as if fully set forth herein.

28

INDICTMENT                  8

24.     On or about the dates set forth below, within the Northern District of California, and elsewhere, the defendants,

ELIZABETH A. HOLMES and<br>
RAMESH "SUNNY" BALWANI,

for the purpose of executing the material scheme and artifice to defraud investors, and for obtaining money and property from investors by means of materially false and fraudulent pretenses, representations, promises, and material omissions with a duty to disclose, did knowingly transmit and cause to be transmitted by means of wire communication in interstate commerce certain writings, signs, signals, and pictures, that is, electronic funds transfers and payments from investor bank accounts to Theranos, as further set forth below:

| COUNT | DATE | ITEM WIRED | WIRED FROM | WIRED TO |
|-------|------|-----------|-----------|----------|
| 3 | 12/30/2013 | $99,990 | Investor #1's Charles Schwab/Wells Fargo Bank account | Theranos's Comerica Bank account |
| 4 | 12/31/2013 | $5,349,900 | Investor #2's Pacific Western Bank account | Theranos's Comerica Bank account |
| 5 | 12/31/2013 | $4,875,000 | Investor #2's Texas Capital Bank account | Theranos's Comerica Bank account |
| 6 | 2/6/2014 | $38,336,632 | Investor #3's Citibank account | Theranos's Comerica Bank account |
| 7 | 10/31/2014 | $99,999,984 | Investor #4's Northern Chicago Bank account | Theranos's Comerica Bank account |
| 8 | 10/31/2014 | $5,999,997 | Investor #5's JP Morgan Chase account | Theranos's Comerica Bank account |

Each in violation of Title 18, United States Code, Section 1343.

COUNTS NINE THROUGH ELEVEN:  18 U.S.C. § 1343 (Wire Fraud)

25.     Paragraphs 1 through 24 are realleged and incorporated as if fully set forth herein.

INDICTMENT                                   9

26. On or about the dates set forth below, within the Northern District of California, and elsewhere, the defendants,

ELIZABETH A. HOLMES and<br>RAMESH "SUNNY" BALWANI,

for the purpose of executing the material scheme and artifice to defraud doctors and patients, and for obtaining money and property from patients, doctors, and insurance companies by means of materially false and fraudulent pretenses, representations, promises, and material omissions with a duty to disclose, did knowingly transmit and cause to be transmitted by means of wire communication in interstate commerce certain writings, signs, signals, and pictures, that is, laboratory and blood test results and payments for the purchase of advertisements soliciting patients and doctors for its laboratory business, as further set forth below, in violation of Title 18, United States Code, Section 1343:

| COUNT | DATE | WIRED FROM | WIRED TO | ITEM WIRED |
|---|---|---|---|---|
| 9 | 09/19/2014 | California | Arizona | Patient #1's laboratory blood test results |
| 10 | 11/25/2014 | California | Arizona | Patient #2's laboratory blood test results |
| 11 | 8/3/2015 | Theranos's Wells Fargo Bank account in California | Horizon Media, Inc.'s J.P. Morgan Chase Bank account in New York | Electronic Funds Transfer in the amount of $1,126,661.00 to purchase advertisements for Theranos Wellness Centers |

 Each in violation of Title 18, United States Code, Section 1343.

<u>FORFEITURE ALLEGATION:</u> 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) (Forfeiture of Wire Fraud Proceeds)

27. The allegations of paragraphs 1 through 26 of this Indictment are realleged and by this reference fully incorporated herein for the purposes of alleging forfeiture pursuant to the provisions of 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

28. Upon a conviction for the offense alleged in Counts One through Eleven, the defendants,

INDICTMENT        10

1
2

ELIZABETH A. HOLMES and
RAMESH "SUNNY" BALWANI,

3
4

shall forfeit to the United States all property, constituting and derived from proceeds traceable to said

offenses, including but not limited to the following property:

5
6

     (a)     a sum of money equal to the amount of proceeds obtained as a result of the offense.

     If any of said property, as a result of any act or omission of the defendant-

7
8

     (a)     cannot be located upon the exercise of due diligence;

9

     (b)     has been transferred or sold to or deposited with, a third person;

10

     (c)     has been placed beyond the jurisdiction of the Court;

11

     (d)     has been substantially diminished in value; or

12

     (e)     has been commingled with other property which cannot be subdivided without difficulty;

13

Any and all interest defendant has in any other property (not to exceed the value of the above forfeitable

14

property), shall be forfeited to the United States pursuant to Title 21, United States Code, Section

15

853(p), as incorporated by Title 18, United States Code, Section 982(b)(1).

16

     The forfeiture is authorized by Title 18, United States Code, Section 981(a)(1)(C) and Title 28,

17

United States Code, Section 2461(c); Title 21, United States Code, Section 853(p) as incorporated by

18

Title 18, United States Code, Section 982(b)(1); and the Federal Rules of Criminal Procedure 32.2.

19

DATED: 6-14-18

A TRUE BILL

20

FOREPERSON

21
22

ALEX G. TSE
Acting United States Attorney

23
24

BARBARA J. VALLIERE
Chief, Criminal Division

25
26

(Approved as to form: _____)

27

AUSA JEFFREY SCHENK
AUSA ROBERT LEACH

28

AUSA JOHN BOSTIC

INDICTMENT                                11

AO 257 (Rev. 6/78)

| **DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT** | |
|---|---|

BY: ☐ COMPLAINT   ☐ INFORMATION   ☒ INDICTMENT
☐ SUPERSEDING

Name of District Court, and/or Judge/Magistrate Location
~~SEALED BY ORDER~~
NORTHERN DISTRICT OF CALIFORNIA
~~OF COURT~~
SAN JOSE DIVISION

─── OFFENSE CHARGED ───

18 U.S.C. § 1349 (Conspiracy);
18 U.S.C. § 1343 (Wire Fraud);
18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c) (Forfeiture)

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

── DEFENDANT - U.S ──

▶ Elizabeth A. Holmes

DISTRICT COURT NUMBER

PENALTY:   All per count:
20 years imprisonment
$250,000 fine
3 years supervised release
$100 special assessment

CR 18   00258 LHK

─── DEFENDANT ───

IS *NOT* IN CUSTODY
Has not been arrested, pending outcome this proceeding.
1) ☒ If not detained give date any prior summons was served on above charges

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

─── PROCEEDING ───

Name of Complainant Agency, or Person (& Title, if any)

FBI, USPS, FDA

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. ATTORNEY   ☐ DEFENSE

SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant

MAGISTRATE CASE NO.

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

Name and Office of Person Furnishing Information on this form   Alex G. Tse
☒ U.S. Attorney   ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned)   SCHENK/BOSTIC/LEACH

IS IN CUSTODY
4) ☐ On this charge

5) ☐ On another conviction                ☐ Federal  ☐ State

6) ☐ Awaiting trial on other charges
If answer to (6) is "Yes", show name of institution

Has detainer been filed?   ☐ Yes   ☐ No
If "Yes" give date filed

DATE OF ARREST ▶
Month/Day/Year

Or... if Arresting Agency & Warrant were not

DATE TRANSFERRED TO U.S. CUSTODY ▶
Month/Day/Year

☐ This report amends AO 257 previously submitted

FILED
JUN 14 2018
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF COURT
SAN JOSE CALIFORNIA

─── ADDITIONAL INFORMATION OR COMMENTS ───

PROCESS:
☐ SUMMONS   ☐ NO PROCESS*   ☒ WARRANT      Bail Amount: No Bail
If Summons, complete following:
☐ Arraignment   ☐ Initial Appearance

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment*

Defendant Address:

Date/Time:              Before Judge:

Comments:

**ER-3676**

AO 257 (Rev. 6/78)

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT  ☐ INFORMATION  ☒ INDICTMENT  ~~SEALED BY ORDER OF THE COURT~~
☐ SUPERSEDING

Name of District Court, and/or Judge/Magistrate Location
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

### OFFENSE CHARGED

18 U.S.C. § 1349 (Conspiracy);
18 U.S.C. § 1343 (Wire Fraud);
18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c) (Forfeiture)

☐ Petty
☐ Minor
☐ Misde-
  meanor
☒ Felony

PENALTY:  All per count:
20 years imprisonment
$250,000 fine
3 years supervised release
$100 special assessment

CR 18  00258  LHK  NC

### DEFENDANT - U.S.

▶ Ramesh "Sunny" Balwani

DISTRICT COURT NUMBER

### PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)

FBI, USPS, FDA

☐ person is awaiting trial in another Federal or State Court,
give name of court

☐ this person/proceeding is transferred from another district
per (circle one) FRCrp 20, 21, or 40. Show District

☐ this is a reprosecution of
charges previously dismissed
which were dismissed on motion
of:
☐ U.S. ATTORNEY  ☐ DEFENSE

SHOW
DOCKET NO.

☐ this prosecution relates to a
pending case involving this same
defendant

MAGISTRATE
CASE NO.

☐ prior proceedings or appearance(s)
before U.S. Magistrate regarding this
defendant were recorded under

Name and Office of Person
Furnishing Information on this form    Alex G. Tse

☒ U.S. Attorney  ☐ Other U.S. Agency

Name of Assistant U.S.
Attorney (if assigned)    SCHENK/BOSTIC/LEACH

### DEFENDANT

IS *NOT* IN CUSTODY
Has not been arrested, pending outcome this proceeding.
1) ☒ If not detained give date any prior
summons was served on above charges ▶

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

FILED  JUN 14 2018  NORTHERN DISTRICT OF CALIFORNIA  SAN JOSE  CLERK, U.S. DISTRICT COURT

IS IN CUSTODY
4) ☐ On this charge

5) ☐ On another conviction

6) ☐ Awaiting trial on other charges
☐ Federal  ☐ State

If answer to (6) is "Yes", show name of institution

Has detainer  ☐ Yes  } If "Yes"
been filed?  ☐ No  give date
filed

DATE OF
ARREST ▶    Month/Day/Year

Or... if Arresting Agency & Warrant were not

DATE TRANSFERRED
TO U.S. CUSTODY ▶    Month/Day/Year

☐ This report amends AO 257 previously submitted

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:
☐ SUMMONS  ☐ NO PROCESS*  ☒ WARRANT
If Summons, complete following:
☐ Arraignment  ☐ Initial Appearance

Defendant Address:

Bail Amount: No Bail

* Where defendant previously apprehended on complaint, no new summons or
warrant needed, since Magistrate has scheduled arraignment

Date/Time:                Before Judge:

Comments:

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 17, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Amy Mason Saharia*
AMY MASON SAHARIA

April 17, 2023