No. 22-10312

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ELIZABETH A. HOLMES

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 5:18-CR-00258
Hon. Edward J. Davila

---

## EXCERPTS OF RECORD
### VOL. XXIV of LVII | ER-6548 to ER-6847

---

JOHN D. CLINE
LAW OFFICE OF JOHN D. CLINE
  600 Stewart Street
  Suite 400
  Seattle, WA 98101
  (360) 320-6435

KEVIN M. DOWNEY
LANCE A. WADE
AMY MASON SAHARIA
KATHERINE A. TREFZ
WILLIAMS & CONNOLLY LLP
  680 Maine Ave. S.W.
  Washington, D.C. 200024
  (202) 434-5000
  asaharia@wc.com

| | |
|---|---|
| 09:29:17 | 1 |
| 09:29:22 | 2 |
| 09:29:27 | 3 |
| 09:29:29 | 4 |
| 09:29:34 | 5 |
| 09:29:40 | 6 |
| 09:29:45 | 7 |
| 09:29:53 | 8 |
| 09:29:59 | 9 |
| 09:30:00 | 10 |
| 09:30:03 | 11 |
| 09:30:05 | 12 |
| 09:30:09 | 13 |
| 09:30:12 | 14 |
| 09:30:16 | 15 |
| 09:30:24 | 16 |
| 09:30:27 | 17 |
| 09:30:31 | 18 |
| 09:30:38 | 19 |
| 09:30:42 | 20 |
| 09:30:45 | 21 |
| 09:30:48 | 22 |
| 09:30:53 | 23 |
| 09:30:59 | 24 |
| 09:31:01 | 25 |

THE COMMUNITY USING ENGLISH, WE RECOGNIZE IT'S NOT YOUR FIRST

LANGUAGE.  THESE LAWYERS RECOGNIZE THAT.

AND I THINK I ALSO MENTIONED THAT, RECOGNIZING THAT, THE

LAWYERS WILL DO THEIR BEST, NOT JUST FOR YOU, BUT FOR YOUR

FELLOW JURORS, THEY WILL DO THEIR BEST TO MAKE THE INFORMATION

ACCESSIBLE, MAKE IT UNDERSTANDABLE, TO NOT USE COMPLICATED

WORDS THAT MIGHT CONFUSE ANYONE.  THAT'S WHAT LAWYERS TRY TO

DO, TO HELP THE JURY UNDERSTAND THE EVIDENCE, NOT TO CONFUSE

THE JURY.

AND THAT'S WHAT MY SENSE IS THESE LAWYERS ARE DOING IN

THIS CASE.

NOW, THE OTHER POINT YOU RAISED, YOU MENTIONED SHE'S SO

YOUNG, AND I THINK YOU WERE REFERRING TO THE DEFENDANT,

MS. HOLMES IN THIS CASE, AND THAT SUGGESTS TO ME THAT YOU HAVE

CONCERNS ABOUT THE QUESTION OF PUNISHMENT.

AND YOU SHOULD NOT BECAUSE YOU'RE NOT PERMITTED AS A JUROR

TO EVEN CONSIDER THAT AT ALL IN YOUR DELIBERATIONS.  THAT HAS

TO BE OFF THE TABLE.  YOU ARE ONLY, AS A JUROR, THE JUDGES OF

THE FACTS.  YOU GET TO DECIDE WHAT HAPPENED OR WHAT DIDN'T

HAPPEN.  YOU GET TO DECIDE WHAT THE EVIDENCE IS, AND THEN YOU

COME AND YOU TELL, YOU TELL ME, YOU TELL THE LAWYERS, YOU TELL

THE PUBLIC WHAT YOUR JURY FINDING IS.  AND THAT'S IT.

YOU MAY NOT CONSIDER PUNISHMENT IN ANY WAY.  THAT'S

FORBIDDEN.  YOU MAY NOT DO THAT.

AND I TELL YOU THAT TO -- HOPEFULLY THAT HELPS YOU, THAT

09:31:06  1    EASES YOUR CONSCIOUS.  NUMBER ONE, YOU WON'T BE CALLED UPON TO

09:31:10  2    DECIDE PUNISHMENT IN THE CASE SHOULD THAT BECOME AN ISSUE IN

09:31:13  3    THE CASE.  THAT'S NOT -- THAT'S NOT FOR YOUR DECISION.  THE

09:31:16  4    JURY DOESN'T DECIDE THAT.

09:31:19  5          DO YOU UNDERSTAND THAT?

09:31:19  6                JUROR:  UM-HUM.

09:31:20  7                THE COURT:  ALL RIGHT.  DOES THAT GIVE YOU SOME MORE

09:31:23  8    CONFIDENCE, OR DOES THAT GIVE YOU SOME REASSURANCE ABOUT YOUR

09:31:27  9    CONTINUED SERVICE AS A JUROR?

09:31:29  10               JUROR:  YES, SIR.

09:31:32  11               THE COURT:  OKAY.  I'M GOING TO ASK THESE LAWYERS IF

09:31:34  12   THEY HAVE ANY QUESTIONS FOR YOU.

09:31:36  13               MR. SCHENK:  THANK YOU.  JUST ONE QUESTION.

09:31:37  14               THE COURT:  YES.

09:31:38  15               MR. SCHENK:  I WANT TO JUST CONFIRM, YOU SAID THAT

09:31:41  16   YOU HAVE BEEN ABLE TO UNDERSTAND EVERYTHING SO FAR; IS THAT

09:31:43  17   RIGHT?

09:31:44  18               JUROR:  YES.

09:31:45  19               MR. SCHENK:  OKAY.  THANK YOU.

09:31:46  20               MR. DOWNEY:  NOTHING FROM US.

09:31:47  21               THE COURT:  OKAY.  THANK YOU.

09:31:49  22         DO YOU HAVE ANY OTHER QUESTIONS FOR ME?

09:31:51  23               JUROR:  NO, SIR.

09:31:52  24               THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

09:31:53  25         SO I HOPE I'VE -- AND THANK YOU FOR RAISING THIS.  THIS IS

09:31:57  1    THE APPROPRIATE THING TO DO AND I'M GRATEFUL THAT YOU TALKED TO

09:32:00  2    MS. KRATZMANN TO RAISE THIS, THIS QUESTION.  IT'S ABOUT YOUR

09:32:04  3    JURY SERVICE.

09:32:05  4         AND I JUST WANT TO INFORM YOU, IN THE STRONGEST TERMS

09:32:11  5    POSSIBLE, JURORS DO NOT DECIDE PUNISHMENT.  THAT'S NOT ANYTHING

09:32:15  6    THAT THEY SHOULD DO, THINK ABOUT, CONSIDER AT ALL WHEN THEY

09:32:20  7    DELIBERATE THE FACTS OF THE CASE.  YOU HAVE TO DECIDE WHAT

09:32:25  8    HAPPENED AND THEN YOU'LL RETURN AND YOU'LL TELL US ALL WHAT THE

09:32:29  9    JURY DECIDED IN THE CASE.

09:32:31  10        THE COURT WILL DO WHATEVER IT NEEDS TO DO AFTER IT HEARS

09:32:35  11   YOUR DECISION.  OKAY?

09:32:37  12              JUROR:  OKAY.

09:32:37  13              THE COURT:  ALL RIGHT.  ANY QUESTION ABOUT THAT?

09:32:39  14              JUROR:  NO.

09:32:39  15              THE COURT:  OKAY.  THANK YOU VERY MUCH.  THANK YOU.

09:32:42  16              JUROR:  THANK YOU.

09:32:43  17              THE COURT:  YOU'RE WELCOME.

09:32:51  18        (JUROR NUMBER 4, FORMER ALTERNATE JUROR NUMBER 2, NOT

09:32:54  19   PRESENT.)

09:32:55  20              THE COURT:  ALL RIGHT.  THANK YOU.  PLEASE BE SEATED.

09:32:58  21    THANK YOU.

09:32:59  22        THE RECORD SHOULD REFLECT FORMER ALTERNATE, NOW SEATED

09:33:02  23   JUROR NUMBER 4, HAS LEFT.

09:33:08  24        ANYTHING FURTHER FROM THE GOVERNMENT?

09:33:09  25        MR. DOWNEY, YOU WANT TO COME FORWARD?

2802

09:33:16   1          MR. SCHENK:  YOUR HONOR, IT SEEMS LIKE THERE'S TWO

09:33:18   2   ISSUES HERE, WHETHER THERE'S A LANGUAGE BARRIER AND WHETHER HER

09:33:21   3   CONCERNS ABOUT PUNISHMENT MAKE THIS NOT THE RIGHT TRIAL FOR

09:33:28   4   HER.

09:33:28   5       I THINK THAT THAT COLLOQUY DEMONSTRATED THAT NEITHER ONE

09:33:31   6   OF THOSE AT THIS POINT ARE A BASIS TO EXCUSE THE JUROR.  SHE

09:33:34   7   CONFIRMED SHE HAS UNDERSTOOD THE CONTENT OF THE PROCEEDINGS SO

09:33:38   8   FAR AND SHE UNDERSTOOD THAT PUNISHMENT IS NOT AN ISSUE BEFORE

09:33:41   9   THE JURY AND THEY'RE NOT TO CONSIDER THAT IN THEIR

09:33:45  10   DELIBERATIONS, AND IT SEEMED TO GIVE HER A MEASURE OF COMFORT.

09:33:49  11       SO I DON'T THINK IT'S NECESSARY TO EXCUSE HER.

09:33:51  12          MR. DOWNEY:  YOUR HONOR, I HAVE MY OWN VIEW OF THIS,

09:33:53  13   BUT MAY I JUST HAVE ONE MOMENT TO CONSULT WITH MY CLIENT?

09:33:57  14          THE COURT:  SURE, OF COURSE.

09:34:28  15       (PAUSE IN PROCEEDINGS.)

09:34:39  16          MR. CLINE:  YOUR HONOR, EXCUSE US JUST ONE SECOND,

09:34:42  17   PLEASE.

09:34:45  18       (DISCUSSION OFF THE RECORD AMONGST DEFENSE COUNSEL.)

09:34:45  19          MR. DOWNEY:  IT'S ALWAYS EASIER TO AGREE.  I THINK WE

09:34:51  20   AGREE THIS JUROR SHOULD CONTINUE.

09:34:52  21          THE COURT:  OKAY.  THANK YOU.

09:34:54  22       ALL RIGHT.  WE'LL BRING OUR PANEL IN IN JUST A MOMENT.

09:34:57  23       WE'RE NOT GOING TO MOVE THE ALTERNATE DOWN.  I THINK

09:34:59  24   IT'S -- IT MIGHT BE EASIER JUST TO ALLOW THE JUROR TO REMAIN IN

09:35:03  25   THE SEAT THAT SHE CURRENTLY OCCUPIES, AND THEN NEXT WEEK WE'RE

| | | |
|---|---|---|
| 09:35:08 | 1 | GOING TO DO THE LINEUP CHANGE AND -- A LINE CHANGE, AND YOU CAN |
| 09:35:14 | 2 | TELL MR. BOSTIC WHAT THAT IS. |
| 09:35:17 | 3 | (LAUGHTER.) |
| 09:35:20 | 4 | MR. SCHENK:  YES, YOUR HONOR. |
| 09:35:22 | 5 | THE COURT:  I'M HERE TO HELP, MR. BOSTIC. |
| 09:35:24 | 6 | ALL RIGHT.  THANK YOU. |
| 09:35:25 | 7 | MR. SCHENK:  THANK YOU. |
| 09:35:27 | 8 | THE CLERK:  COURT'S IN RECESS. |
| 09:35:32 | 9 | (RECESS FROM 9:35 A.M. UNTIL 9:38 A.M.) |
| 09:38:18 | 10 | (JURY IN AT 9:38 A.M.) |
| 09:38:28 | 11 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 09:38:48 | 12 | WE ARE BACK ON THE RECORD IN THE HOLMES MATTER.  ALL |
| 09:38:53 | 13 | COUNSEL ARE PRESENT, MS. HOLMES IS PRESENT.  OUR RECONSTITUTED |
| 09:38:59 | 14 | JURY IS PRESENT, AND ALTERNATE NUMBER 2 IS NOW JUROR NUMBER 4. |
| 09:39:06 | 15 | BUT WE'LL MOVE YOU NEXT WEEK WHEN WE DO A REARRANGEMENT.  THANK |
| 09:39:10 | 16 | YOU. |
| 09:39:10 | 17 | BEFORE WE BEGIN, MR. BOSTIC, I DO WANT TO INQUIRE OF THE |
| 09:39:14 | 18 | JURY, DURING THE BREAK, HAS ANYONE OR DID ANYONE HAVE CAUSE TO |
| 09:39:19 | 19 | SEE, HEAR, DISCUSS OR COME ACROSS ANY OUTSIDE INFORMATION ABOUT |
| 09:39:25 | 20 | THIS CASE SUCH THAT THEY'D LIKE TO INFORM ME? |
| 09:39:28 | 21 | IF SO, WOULD YOU PLEASE RAISE YOUR HAND AND LET ME KNOW? |
| 09:39:33 | 22 | AND, AGAIN, IF YOU WANT TO TALK PRIVATELY ABOUT THIS, I'M |
| 09:39:37 | 23 | HAPPY TO DO THAT. |
| 09:39:38 | 24 | I SEE NO HANDS.  THANK YOU. |
| 09:39:41 | 25 | DR. ROSENDORFF, IF YOU COULD PLEASE STATE YOUR NAME AGAIN |

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                    2804

09:39:43  1      FOR THE RECORD, PLEASE.

09:39:44  2              THE WITNESS:  ADAM ROSENDORFF.

09:39:46  3              THE COURT:  THANK YOU.  YOU'RE STILL UNDER OATH.

09:39:49  4              **(GOVERNMENT'S WITNESS, ADAM ROSENDORFF, WAS PREVIOUSLY**

09:39:49  5      **SWORN.)**

09:39:49  6              THE COURT:  AND MR. BOSTIC.

09:39:50  7              MR. BOSTIC:  THANK YOU, YOUR HONOR.

09:39:52  8                  **REDIRECT EXAMINATION (RESUMED**)

09:39:53  9      BY MR. BOSTIC:

09:39:53  10     Q.   GOOD MORNING, DR. ROSENDORFF.

09:39:55  11     A.   GOOD MORNING, SIR.

09:39:56  12     Q.   DO YOU RECALL WHEN WE LEFT OFF YESTERDAY, WE HAD BEEN

09:39:58  13     LOOKING AT SOME EMAILS REPORTING QUALITY CONTROL FAILURE FOR

09:40:04  14     THE EDISON ANALYZERS?

09:40:05  15     A.   YES, FROM LANGLY GEE.

09:40:08  16     Q.   CORRECT.  AND DO YOU RECALL LOOKING AT AN EMAIL WHERE ON A

09:40:11  17     GIVEN DAY MORE THAN HALF OF THE EDISON ANALYZERS HAD FAILED QC?

09:40:16  18     A.   YES.

09:40:17  19     Q.   WHEN IT CAME TO QUALITY CONTROLS PROBLEMS AT THERANOS,

09:40:21  20     WERE THOSE PROBLEMS LIMITED TO THE HCG ASSAY?

09:40:25  21     A.   NO.

09:40:25  22     Q.   I'D LIKE TO SHOW YOU EXHIBIT 13809, WHICH IS IN EVIDENCE.

09:40:29  23     IF WE COULD PUBLISH THAT.

09:40:34  24          DR. ROSENDORFF, DO YOU SEE IN FRONT OF YOU A THERANOS

09:40:37  25     PRESENTATION ENTITLED QUALITY SYSTEMS PRESENTATION?

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                           2805

09:40:40  1    A.   YES.

09:40:41  2    Q.   DO YOU RECALL REVIEWING THIS SLIDE DECK WITH MR. WADE

09:40:45  3    DURING YOUR CROSS-EXAMINATION?

09:40:46  4    A.   YES.

09:40:46  5    Q.   LET'S TURN TO WHAT I THINK IS PAGE 12 OF THIS EXHIBIT.

09:40:54  6         AND, DR. ROSENDORFF, DO YOU SEE A SLIDE TITLED QUALITY

09:40:57  7    CONTROL IN FRONT OF YOU?

09:40:58  8    A.   YES.

09:40:59  9    Q.   WE'VE REVIEWED OTHER DOCUMENTS IN EVIDENCE DURING THIS

09:41:05  10   TRIAL THAT SPEAK TO QUALITY CONTROL FAILURE RATES OF EDISON

09:41:10  11   DEVICES; CORRECT?

09:41:11  12   A.   YES.

09:41:11  13   Q.   AS LAB DIRECTOR AT THERANOS, DID YOU HAVE A GENERAL

09:41:16  14   UNDERSTANDING OF HOW THE EDISONS PERFORMED ON QUALITY CONTROL?

09:41:21  15   A.   YES.

09:41:21  16   Q.   WHEN IT COMES TO THE SPECIFIC NUMBERS DEPICTED IN THE

09:41:25  17   EXHIBIT IN FRONT OF YOU, CAN YOU VOUCH FOR THOSE SPECIFIC

09:41:28  18   NUMBERS?

09:41:29  19   A.   NO.  MY RECOLLECTION IS NOT GOOD ENOUGH TO VOUCH FOR THOSE

09:41:37  20   NUMBERS.

09:41:37  21   Q.   I'LL DRAW YOUR ATTENTION TO THE MIDDLE SECTION OF THAT

09:41:45  22   GRAPH AND THE RIGHT MOST SECTION.  THEY BOTH LIST QUALITY

09:41:50  23   CONTROL PERFORMANCE FOR QUARTER 1 OF 2014; IS THAT RIGHT?

09:41:54  24   A.   THE -- YES, THE MIDDLE AND THE RIGHT, CORRECT.

09:41:59  25   Q.   THE MIDDLE SECTION SAYS Q1 PREDICATE.  WHAT DOES PREDICATE

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                    2806

| | | |
|---|---|---|
| 09:42:03 | 1 | MEAN IN THIS CONTEXT? |
| 09:42:05 | 2 | A.   THE FDA APPROVED INSTRUMENTS. |
| 09:42:08 | 3 | Q.   THE NON-THERANOS INSTRUMENTS? |
| 09:42:11 | 4 | A.   CORRECT. |
| 09:42:11 | 5 | Q.   WHAT ABOUT Q1 THERANOS?  WHICH INSTRUMENTS WOULD THAT |
| 09:42:15 | 6 | REFER TO? |
| 09:42:15 | 7 | A.   ALL OF THE THERANOS LABORATORY DEVELOPED TESTS. |
| 09:42:18 | 8 | Q.   WOULD THAT INCLUDE THE EDISONS? |
| 09:42:20 | 9 | A.   YES. |
| 09:42:20 | 10 | Q.   WOULD IT ALSO INCLUDE, TO YOUR UNDERSTANDING, THE THERANOS |
| 09:42:23 | 11 | MODIFIED THIRD PARTY DEVICES? |
| 09:42:25 | 12 | A.   YES. |
| 09:42:25 | 13 | Q.   DO YOU SEE THAT UNDER EACH OF THOSE HEADINGS, THERE ARE |
| 09:42:29 | 14 | FOUR BULLET POINTS? |
| 09:42:30 | 15 | A.   YES. |
| 09:42:31 | 16 | Q.   I'LL DRAW YOUR ATTENTION TO THE THIRD BULLET POINT DOWN IN |
| 09:42:34 | 17 | EACH OF THOSE.  DO YOU SEE THAT THAT LISTS CONTROLS FAILED? |
| 09:42:38 | 18 | A.   YES. |
| 09:42:39 | 19 | Q.   IS THAT REFERRING TO QUALITY CONTROL PERFORMANCE? |
| 09:42:41 | 20 | A.   I BELIEVE SO, YES. |
| 09:42:42 | 21 | Q.   UNDER PREDICATE, THIS CHART INDICATES THAT .75 PERCENT |
| 09:42:49 | 22 | CONTROLS FAILED. |
| 09:42:50 | 23 | DO YOU SEE THAT? |
| 09:42:51 | 24 | A.   YES. |
| 09:42:51 | 25 | Q.   FOR THE THERANOS DEVICES IN CONTRAST, 2.9 PERCENT CONTROLS |

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                    2807

09:42:55  1    FAILED.

09:42:56  2         DO YOU SEE THAT?

09:42:57  3    A.   YES.

09:42:57  4    Q.   IN OTHER WORDS, THE THERANOS DEVICES FAILED CONTROLS MORE

09:43:00  5    THAN THREE TIMES AS OFTEN AS THE NON-THERANOS DEVICES ACCORDING

09:43:04  6    TO THIS?

09:43:04  7    A.   ACCORDING TO THIS, YES.

09:43:06  8    Q.   AND IS THAT GENERALLY CONSISTENT WITH YOUR RECOLLECTION OF

09:43:10  9    HOW THOSE TWO GROUPS OF ANALYZERS PERFORMED?

09:43:13 10    A.   NO.   THE MONTHLY QC FAILURE RATES I REVIEWED WITH LANGLY

09:43:20 11    SHOWED A MUCH HIGHER PERCENTAGE CONTROL FAILURE.

09:43:23 12    Q.   FOR WHICH CATEGORY OF DEVICE?

09:43:25 13    A.   JUST, JUST -- I THINK IT WAS ACROSS ALL THE DEVICES, THE

09:43:31 14    QC WAS SHOWING ACROSS ALL THE DEVICES.

09:43:34 15    Q.   HOW ABOUT WHEN IT COMES TO ANY DIFFERENCES IN PERFORMANCE

09:43:36 16    BETWEEN THE THERANOS DEVICE QUALITY CONTROL PERFORMANCE AND THE

09:43:41 17    UNMODIFIED DEVICE QUALITY CONTROL PERFORMANCE?  DID YOU SEE A

09:43:48 18    DIFFERENCE THERE AT THERANOS?

09:43:50 19    A.   YES.

09:43:50 20    Q.   AND WHAT WAS THAT DIFFERENCE?

09:43:52 21    A.   THE QUALITY CONTROL FAILED MUCH MORE FREQUENTLY ON THE

09:43:54 22    THERANOS DEVICES, OR LDT'S.

09:43:57 23    Q.   LET'S LOOK BRIEFLY AT PAGE 4 OF EXHIBIT 13809.

09:44:05 24         DO YOU SEE, DR. ROSENDORFF, A SLIDE ENTITLED THERANOS

09:44:08 25    LABORATORY LICENSURES?

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                    2808

| | | |
|---|---|---|
| 09:44:09 | 1 | A.   YES. |
| 09:44:10 | 2 | Q.   THE THIRD BULLET DOWN MENTIONS CLIA ARIZONA. |
| 09:44:13 | 3 | DO YOU SEE THAT? |
| 09:44:14 | 4 | A.   YES. |
| 09:44:15 | 5 | Q.   DID THERANOS OPERATE A LAB IN ARIZONA DURING YOUR TIME AS |
| 09:44:18 | 6 | LAB DIRECTOR? |
| 09:44:19 | 7 | A.   YES. |
| 09:44:20 | 8 | Q.   THIS INDICATES THAT THE LICENSE WAS RECEIVED ON JUNE 24TH, |
| 09:44:24 | 9 | 2014. |
| 09:44:25 | 10 | DO YOU SEE THAT? |
| 09:44:26 | 11 | A.   YES. |
| 09:44:27 | 12 | Q.   DID YOU HAVE AN UNDERSTANDING DURING YOUR TIME AT THE |
| 09:44:31 | 13 | COMPANY OF WHAT KINDS OF TESTS WERE RUN IN THE ARIZONA LAB |
| 09:44:34 | 14 | VERSUS IN THE CALIFORNIA LAB? |
| 09:44:36 | 15 | A.   MY UNDERSTANDING WAS ARIZONA WAS FDA APPROVED PREDICATE |
| 09:44:40 | 16 | INSTRUMENTS ONLY. |
| 09:44:42 | 17 | Q.   SO IN OTHER WORDS, NO THERANOS SPECIFIC DEVICES IN THE |
| 09:44:45 | 18 | ARIZONA LAB? |
| 09:44:46 | 19 | A.   CORRECT. |
| 09:44:46 | 20 | Q.   ON THAT SAME TOPIC OF LICENSES, YOU TESTIFIED THAT |
| 09:44:53 | 21 | THERANOS HAD A CLIA LICENSE IN 2013 AT THE TIME OF THE LAUNCH; |
| 09:44:57 | 22 | IS THAT CORRECT? |
| 09:44:58 | 23 | A.   YES. |
| 09:44:58 | 24 | Q.   WHO ISSUED THAT CLIA LICENSE? |
| 09:45:01 | 25 | A.   LABORATORY FIELD SERVICES, STATE OF CALIFORNIA. |

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                         2809

09:45:05  1      Q.   AND IS THERE AN AFFILIATION THERE WITH CMS?

09:45:08  2      A.   YES.  LFS PERFORMANCE INSPECTIONS ISSUES LICENSURE ON

09:45:15  3      BEHALF OF CMS.

09:45:16  4      Q.   AND DID THE GRANTING OF THAT LICENSE MEAN THAT EITHER CMS

09:45:23  5      OR LFS HAD EVALUATED AND APPROVED THE EDISON DEVICE

09:45:27  6      SPECIFICALLY?

09:45:27  7      A.   NO.

09:45:28  8      Q.   OKAY.  WE CAN TAKE THAT EXHIBIT DOWN.  THANK YOU.

09:45:33  9           I'D LIKE TO TALK BRIEFLY ABOUT A COUPLE OTHER ASSAYS OR

09:45:37 10      ASSAY CATEGORIES THAT YOU DISCUSSED WITH MR. WADE.

09:45:41 11           FIRST, DO YOU RECALL DISCUSSION YESTERDAY ABOUT A SPATE OF

09:45:44 12      LOW HDL RESULTS THAT THE THERANOS TECHNOLOGY PRODUCED?

09:45:49 13      A.   YES.

09:45:49 14      Q.   DO YOU RECALL A DISCUSSION OF THE STEPS THAT THERANOS TOOK

09:45:53 15      TO TRY AND ADDRESS THAT ISSUE?

09:45:55 16      A.   YES.

09:45:55 17      Q.   AND DO YOU RECALL THAT INCLUDING A DISCUSSION OF A STUDY

09:45:59 18      COMPARING RESULTS BETWEEN TWO DIFFERENT ADVIA MACHINES?

09:46:04 19      A.   YES.

09:46:05 20      Q.   OR AT LEAST MULTIPLE ADVIA MACHINES?

09:46:07 21      A.   YES.

09:46:08 22      Q.   CAN YOU REMIND US, WHAT KIND OF DEVICE AT THERANOS WAS

09:46:10 23      USED DURING THIS TIME TO TEST HDL?

09:46:12 24      A.   ADVIA 1800 MODIFIED FOR THE THERANOS LDT.

09:46:20 25      Q.   SO IT WAS A MODIFIED THIRD PARTY DEVICE NO LONGER IN THE

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                        2810

```
09:46:24   1       FDA APPROVED CATEGORY?

09:46:25   2       A.   CORRECT.  AS SOON AS YOU MAKE A MODIFICATION TO AN FDA

09:46:30   3       APPROVED DEVICE, IT IMMEDIATELY BECOMES A LABORATORY DEVELOPED

09:46:33   4       TEST.

09:46:34   5       Q.   YESTERDAY YOU MENTIONED THAT THAT STUDY SHOWED SOME

09:46:42   6       VARIATION BETWEEN ADVIA INSTRUMENTS WHEN IT CAME TO HDL.

09:46:47   7            DO YOU RECALL THAT?

09:46:48   8       A.   YES.

09:46:49   9       Q.   DO YOU RECALL WHETHER THE SAMPLE TYPE, VEIN OR

09:46:54  10       FINGERSTICK, HAD ANY EFFECT IN THAT STUDY ON THE LEVEL OF

09:46:58  11       VARIATION BETWEEN THOSE DEVICES?

09:46:59  12       A.   YES, IT DID.  THE VARIATION COMPARING VENOUS TO

09:47:06  13       FINGERSTICK WAS MUCH MORE PRONOUNCED WHEN FINGERSTICK SAMPLES

09:47:09  14       WERE ASSAYED ON EITHER INSTRUMENT.

09:47:12  15            THERE'S DATA TO THAT EFFECT.

09:47:16  16       Q.   AND HOW DID THERANOS ACTUALLY TEST HDL IN THE LAB?  WAS IT

09:47:21  17       ON VEIN SAMPLES ON THE MODIFIED SIEMENS ADVIA OR DID THEY USE

09:47:26  18       FINGERSTICK SAMPLES?

09:47:27  19       A.   FINGERSTICK.

09:47:28  20       Q.   DOES THAT MEAN THAT USING THE THERANOS APPROACH ON THESE

09:47:34  21       DEVICES ACTUALLY MADE THE DEVICES PERFORM WORSE?

09:47:38  22       A.   YES.  IT -- IT INCREASED THE, THE DIFFERENCES IN RESULTS

09:47:49  23       BETWEEN INSTRUMENTS.

09:47:51  24       Q.   AND ARE THOSE KINDS OF DIFFERENCES AND RESULTS BETWEEN

09:47:56  25       INSTRUMENTS SOMETHING THAT'S GOOD TO SEE IN A BLOOD TESTING LAB
```

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                    2811

09:47:59   1    OR BAD?

09:47:59   2    A.    BAD.

09:48:03   3    Q.    MR. WADE SUGGESTED TO YOU ON CROSS-EXAMINATION THAT THE

09:48:07   4    HDL PROBLEMS AT THERANOS WERE NOT THERANOS ASSAY PROBLEMS.

09:48:11   5          DO YOU RECALL THAT?

09:48:12   6    A.    SORRY.  I -- MR. WADE SUGGESTED THAT?

09:48:16   7    Q.    DO YOU RECALL A DISCUSSION ABOUT WHETHER THE HDL PROBLEMS

09:48:19   8    AT THERANOS WERE THERANOS ASSAY PROBLEMS OR NOT?

09:48:24   9    A.    YES.

09:48:25   10   Q.    WHAT WAS YOUR CONCLUSION AT THE TIME AS TO WHETHER THIS

09:48:29   11   REPRESENTED A PROBLEM WITH THE ASSAY OR NOT?

09:48:31   12   A.    I THOUGHT THERE WAS A PROBLEM WITH THE ASSAY.

09:48:33   13   Q.    MR. WADE, ON CROSS-EXAMINATION, SAID, I THINK, THAT HE

09:48:42   14   DIDN'T WANT TO HEAR YOUR ANALYSIS CURRENTLY.

09:48:45   15         I WOULD, THOUGH.  HOW DO YOU REACH THAT CONCLUSION THAT

09:48:49   16   THE HDL ISSUES WERE PROBLEMS WITH THE THERANOS ASSAY?

09:48:52   17   A.    SO WE, WE DID A STUDY WITH MATCHED VENOUS AND FINGERSTICK

09:49:06   18   WHERE THE RESULTS SHOULD BE VERY CLOSE TO EACH OTHER, COMPARING

09:49:11   19   ON EACH INSTRUMENT JUST LOOKING FROM INSTRUMENT TO INSTRUMENT.

09:49:15   20   THE VENOUS AND FINGERSTICK RESULT SHOULD BE PRETTY CLOSE, EVEN

09:49:19   21   IF THERE ARE DIFFERENCES BETWEEN THE TWO INSTRUMENTS.  IF YOU

09:49:21   22   JUST LOOK AT ONE INSTRUMENT, THOSE RESULTS SHOULD MATCH PRETTY

09:49:25   23   CLOSELY, AND THEY WEREN'T MATCHING.

09:49:26   24         SO TO MY MIND, THAT INDICATED A PROBLEM WITH -- THAT THE

09:49:31   25   ASSAY -- THE OTHER ISSUE WAS -- YEAH, I'LL JUST LEAVE IT THERE,

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                                    2812

```
09:49:34   1      YEAH.

09:49:35   2      Q.   I DON'T WANT TO CUT YOU OFF, THOUGH.

09:49:36   3      A.   NO.

09:49:38   4      Q.   PLEASE COMPLETE YOUR ANSWER.

09:49:40   5      A.   THAT'S FINE, YEAH.

09:49:41   6      Q.   LET'S TALK NEXT ABOUT ISE ASSAYS.  DO YOU RECALL A

09:49:46   7      DISCUSSION ON CROSS-EXAMINATION ABOUT THAT CATEGORY?

09:49:48   8      A.   YES.

09:49:49   9      Q.   IF WE COULD BRING UP, PLEASE, EXHIBIT 13893, WHICH IS IN

09:49:52  10      EVIDENCE.

09:50:01  11           DR. ROSENDORFF, DO YOU SEE AN EMAIL IN FRONT OF YOU THAT'S

09:50:03  12      DATED MAY 24TH, 2014?

09:50:07  13      A.   YES.

09:50:08  14      Q.   AND DO YOU RECALL DISCUSSING THIS EMAIL CHAIN ABOUT ISE'S

09:50:13  15      WITH MR. WADE ON CROSS?

09:50:14  16      A.   YES.

09:50:15  17      Q.   LET'S GO TO PAGE 2 OF THIS EMAIL, PLEASE.  AND LET'S ZOOM

09:50:24  18      IN ON THE -- SEE IF WE CAN CAPTURE ALL THAT TEXT IN DR. YOUNG'S

09:50:29  19      EMAIL.

09:50:32  20           AND, DR. ROSENDORFF, I WANT TO DRAW YOUR ATTENTION TO

09:50:35  21      ABOUT HALFWAY DOWN THAT SELECTION WHERE IT SAYS "ADDITIONAL

09:50:38  22      ISSUES THAT I PLAN TO HAVE THE TEAM ADDRESS."

09:50:41  23           DO YOU SEE THAT?

09:50:43  24      A.   YES.

09:50:43  25      Q.   THE BULLET POINT UNDER THAT SAYS "WE HAVE SEEN THAT
```

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                    2813

09:50:47  1    DILUTED VENOUS SAMPLES HAVE MUCH BETTER PRECISION THAN DILUTED

09:50:52  2    PCTN/CAPILLARY SAMPLES."

09:50:55  3         DO YOU SEE THAT?

09:50:57  4    A.   YES.

09:50:57  5    Q.   CAN YOU EXPLAIN IN PLAIN LANGUAGE WHAT THAT'S SAYING?

09:51:01  6    A.   SO JUST TO TRY TO EXPLAIN IT TO THE JURY, PRECISION MEANS

09:51:05  7    WHEN YOU TAKE A SAMPLE AND YOU DO REPEATED MEASUREMENT OF IT

09:51:08  8    AND YOU MAKE SURE THAT THE RESULT MATCHES EACH TIME YOU

09:51:14  9    MEASURE.  THAT'S WHAT PRECISION IS.

09:51:16  10        SO DANIEL IS DOING PRECISION ON DILUTED VENOUS BLOOD, AND

09:51:22  11   HE'S ALSO LOOKING AT PRECISION FOR THE -- FOR THIS -- WITH

09:51:28  12   THESE ISE ASSAYS ON CAPILLARY SAMPLES AND HE'S SAYING THAT THE

09:51:33  13   PRECISION IS MUCH BETTER WITH THE DILUTED VENOUS BLOOD THAN

09:51:37  14   WITH THE CAPILLARY BLOOD SAMPLES.

09:51:39  15   Q.   IS CAPILLARY ANOTHER WAY TO DESCRIBE FINGERSTICK SAMPLES?

09:51:42  16   A.   YES.

09:51:42  17   Q.   AND HOW DID THERANOS TEST ISE ANALYTES AT THIS TIME?  WAS

09:51:53  18   IT THROUGH VENOUS SAMPLES OR FINGERSTICK SAMPLES?

09:51:56  19   A.   FINGERSTICK.

09:51:57  20   Q.   THE KIND OF SAMPLE THAT WAS SHOWING HIGHER VARIABILITY; IS

09:52:01  21   THAT RIGHT?

09:52:02  22   A.   CORRECT.

09:52:02  23   Q.   THE BULLET POINT DOWN TOWARDS THE BOTTOM OF THE SELECTION

09:52:06  24   SAYS, "WE STARTED THIS WEEK MEASURING LITHIUM IN OUR

09:52:14  25   PCTN/CAPILLARY SAMPLES" --

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                        2814

```
09:52:15   1        A.   YES.

09:52:16   2        Q.   -- "TO ASSESS HEPARIN CONCENTRATIONS."

09:52:18   3             DO YOU SEE THAT?

09:52:18   4        A.   YES.

09:52:19   5        Q.   "INITIAL DATA SUGGEST A WIDE RANGE OF CONCENTRATIONS IN

09:52:22   6        OUR CAPILLARY SAMPLES, AND POSSIBLY CONCENTRATIONS THAT ARE

09:52:24   7        VERY HIGH."

09:52:25   8             DO YOU SEE THAT?

09:52:27   9        A.   YES.

09:52:27  10        Q.   AND HE SAYS THEY'RE CONTINUING TO WORK ON THAT; IS THAT

09:52:30  11        RIGHT?

09:52:30  12        A.   YES.

09:52:31  13        Q.   BASED ON THAT, WAS IT YOUR UNDERSTANDING, OR IS IT YOUR

09:52:33  14        UNDERSTANDING THAT THE ISE ISSUES AT THERANOS WERE SOLVED AT

09:52:37  15        THIS TIME, OR WAS THERE MORE WORK TO BE DONE?

09:52:40  16        A.   MORE WORK TO BE DONE.

09:52:41  17        Q.   WHEN IT COMES TO DIFFERENCES IN BEHAVIOR BETWEEN

09:52:49  18        FINGERSTICK SAMPLES AND VEIN SAMPLES, WAS THAT A RECURRING

09:52:53  19        SOURCE OF DIFFICULTY OR PROBLEMS AT THERANOS?

09:52:55  20        A.   YES.

09:52:56  21        Q.   OKAY.  WE CAN PUT THAT EXHIBIT ASIDE.  THANK YOU.

09:53:06  22             I'D LIKE TO TALK BRIEFLY ABOUT THE BICARBONATE ASSAY.  DO

09:53:10  23        YOU REMEMBER DISCUSSING THAT WITH MR. WADE?

09:53:13  24        A.   YES.

09:53:14  25        Q.   DO YOU RECALL A DISCUSSION OF A STUDY THAT DANIEL YOUNG
```

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                    2815

| | | |
|---|---|---|
| 09:53:16 | 1 | WAS DOING TO TRY AND ADDRESS PROBLEMS THAT THERANOS WAS HAVING |
| 09:53:19 | 2 | WITH THE BICARBONATE TEST? |
| 09:53:21 | 3 | A.   I DON'T RECALL THAT SPECIFICALLY. |
| 09:53:26 | 4 | Q.   ARE YOU GENERALLY -- LET ME START AGAIN. |
| 09:53:31 | 5 | DURING YOUR TIME AT THERANOS, WERE YOU GENERALLY AWARE OF |
| 09:53:34 | 6 | STUDIES THAT DR. YOUNG WOULD CONDUCT TO TRY TO ADDRESS ACCURACY |
| 09:53:39 | 7 | AND RELIABILITY PROBLEMS THAT POPPED UP WITH THERANOS TESTS? |
| 09:53:42 | 8 | A.   YES, CONTINUALLY. |
| 09:53:44 | 9 | Q.   THAT WAS A COMMON OCCURRENCE OR SITUATION AT THERANOS? |
| 09:53:47 | 10 | A.   VERY COMMON, YES. |
| 09:53:48 | 11 | Q.   AS A WHOLE, DID DR. YOUNG'S STUDIES GIVE YOU ANY REASON TO |
| 09:53:55 | 12 | DOUBT YOUR ULTIMATE DECISION TO LEAVE THE COMPANY IN 2014? |
| 09:53:59 | 13 | A.   NO. |
| 09:54:00 | 14 | Q.   WHY NOT? |
| 09:54:01 | 15 | A.   FREQUENTLY THE TROUBLESHOOTING WOULD BE DONE ON VENOUS |
| 09:54:07 | 16 | BLOOD, DILUTED VENOUS BLOOD, WHEREAS ACTUAL PATIENT SAMPLES WAS |
| 09:54:11 | 17 | CAPILLARY BLOOD COLLECTED IN CTN. |
| 09:54:14 | 18 | SO THE TROUBLESHOOTING DIDN'T CAPTURE ISSUES WITH BLOOD |
| 09:54:19 | 19 | COLLECTION. |
| 09:54:25 | 20 | NOT TO BE TOO CRITICAL, BUT AT TIMES I DIDN'T FULLY TRUST |
| 09:54:29 | 21 | THE DATA THAT WAS COMING OUT OF R&D FOR TROUBLESHOOTING. |
| 09:54:35 | 22 | EVEN AFTER THE SO-CALLED FIXES, I WAS STILL SEEING |
| 09:54:39 | 23 | ANOMALIES IN THE RESULTS, TOO MANY COMING OUT HIGH OR LOW, NOT |
| 09:54:45 | 24 | MATCHING UP WITH OTHER REFERENCE LABORATORIES, ET CETERA. |
| 09:54:49 | 25 | Q.   AND ARE YOU REFERRING TO -- |

| | | |
|---|---|---|
| 09:54:51 | 1 | MR. WADE:  YOUR HONOR, I MOVE TO STRIKE THAT LAST |
| 09:54:53 | 2 | ANSWER. |
| 09:54:54 | 3 | MR. BOSTIC:  I THINK IT'S DIRECTLY RESPONSIVE, YOUR |
| 09:54:57 | 4 | HONOR. |
| 09:54:57 | 5 | THE COURT:  OVERRULED. |
| 09:55:00 | 6 | BY MR. BOSTIC: |
| 09:55:01 | 7 | Q.  DR. ROSENDORFF, WHEN YOU SAY THAT YOU SAW CONTINUED |
| 09:55:06 | 8 | PROBLEMS NOT MATCHING UP TO REFERENCE LABS -- IS THAT WHAT YOU |
| 09:55:11 | 9 | JUST SAID? |
| 09:55:11 | 10 | A.  YES. |
| 09:55:12 | 11 | Q.  ARE YOU REFERRING TO RESULTS THAT YOU SAW FROM PATIENT |
| 09:55:16 | 12 | TESTING AT THERANOS? |
| 09:55:17 | 13 | A.  YES. |
| 09:55:18 | 14 | Q.  I'D LIKE TO SHIFT GEARS AND TALK ABOUT THE TIMING OF WHEN |
| 09:55:26 | 15 | THERANOS BEGAN OFFERING ITS TESTING SERVICES. |
| 09:55:30 | 16 | DO YOU RECALL SOME DISCUSSION ON CROSS-EXAMINATION ABOUT |
| 09:55:34 | 17 | WHEN THERANOS ACTUALLY LAUNCHED ITS SERVICES? |
| 09:55:37 | 18 | A.  YES. |
| 09:55:37 | 19 | Q.  DURING YOUR DIRECT EXAMINATION, WE TALKED ABOUT A DATE |
| 09:55:43 | 20 | THAT WAS IN YOUR MIND IN THE FIRST PART OF SEPTEMBER. |
| 09:55:50 | 21 | DO YOU RECALL THAT? |
| 09:55:51 | 22 | A.  YES. |
| 09:55:51 | 23 | Q.  AND THERE WAS A QUESTION ABOUT, OR A SERIES OF QUESTIONS |
| 09:55:54 | 24 | FROM MR. WADE ABOUT WHETHER THAT WAS A TRUE LAUNCH OR A SOFT |
| 09:55:56 | 25 | LAUNCH I THINK HE SAID. |

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                    2817

| | | |
|---|---|---|
| 09:55:58 | 1 | DO YOU RECALL THAT DISCUSSION? |
| 09:55:59 | 2 | A.   YES. |
| 09:55:59 | 3 | Q.   I'D LIKE YOU TO LOOK AT EXHIBIT 5407, WHICH IS IN |
| 09:56:03 | 4 | EVIDENCE. |
| 09:56:08 | 5 | IF WE COULD PUBLISH THAT, AND IF WE COULD ZOOM IN ON THE |
| 09:56:15 | 6 | BOTTOM HALF OF THIS PAGE, PLEASE. |
| 09:56:21 | 7 | OKAY.  DR. ROSENDORFF, YOU ARE NOT ON THIS EMAIL; CORRECT? |
| 09:56:25 | 8 | A.   CORRECT. |
| 09:56:26 | 9 | Q.   DO YOU SEE AN EMAIL AT THE TOP OF THAT SELECTION FROM |
| 09:56:32 | 10 | ELIZABETH HOLMES TO JIM, AND IT'S ADDRESSED TO GENERAL MATTIS? |
| 09:56:36 | 11 | A.   YES. |
| 09:56:37 | 12 | Q.   AND THE DATE IS SEPTEMBER 7TH, 2013; CORRECT? |
| 09:56:40 | 13 | A.   YES. |
| 09:56:43 | 14 | Q.   TWO DAYS BEFORE THE SEPTEMBER 9TH DATE THAT YOU |
| 09:56:45 | 15 | IDENTIFIED? |
| 09:56:46 | 16 | A.   CORRECT. |
| 09:56:47 | 17 | Q.   AND MS. HOLMES SAYS IN HER EMAIL, "GENERAL MATTIS, FYI, |
| 09:56:53 | 18 | THE BELOW WILL GO OUT TO OUR SHAREHOLDERS TONIGHT.  WE HAVE |
| 09:56:56 | 19 | BEGUN THE LAUNCH." |
| 09:56:57 | 20 | DO YOU SEE THAT? |
| 09:56:58 | 21 | A.   YES. |
| 09:56:59 | 22 | Q.   BELOW THAT, THERE'S A MESSAGE FROM MS. HOLMES APPARENTLY |
| 09:57:02 | 23 | TO THERANOS SHAREHOLDERS. |
| 09:57:04 | 24 | DO YOU SEE THAT? |
| 09:57:04 | 25 | A.   YES. |

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                    2818

09:57:05  1    Q.   AND THAT MESSAGE SAYS, "TO OUR SHAREHOLDERS, I AM

09:57:09  2    DELIGHTED TO SHARE THAT WE HAVE NOW BEGUN THE COMMERCIAL LAUNCH

09:57:11  3    OF THE NEW PRODUCTS AND SERVICES WE'VE BEEN WORKING ON FOR THE

09:57:14  4    PAST YEARS."

09:57:15  5         DO YOU SEE THAT?

09:57:16  6    A.   YES.

09:57:17  7    Q.   DO YOU SEE ANY MENTION OF A SOFT LAUNCH IN THIS MESSAGE?

09:57:20  8    A.   NO.

09:57:20  9    Q.   I'D LIKE TO SHOW YOU WHAT WE'VE MARKED AS EXHIBIT 1113,

09:57:33  10   AND I'M HANDING A COPY OF THAT TO THE COURT, AS WELL AS THE

09:57:35  11   NEXT FEW EXHIBITS THAT I'D LIKE TO INTRODUCE (HANDING).

09:57:39  12        THESE HAVE BEEN PROVIDED TO THE DEFENSE ALREADY.

09:57:49  13        MAY I APPROACH THE WITNESS, YOUR HONOR?

09:57:51  14             THE COURT:  YES.

09:57:53  15             MR. BOSTIC:  (HANDING.)

09:57:55  16             THE WITNESS:  THANK YOU.

09:57:56  17   BY MR. BOSTIC:

09:57:57  18   Q.   DR. ROSENDORFF, DO YOU HAVE EXHIBIT 1113 IN FRONT OF YOU?

09:58:00  19   A.   YES.

09:58:00  20   Q.   OKAY.  AND I'LL GIVE YOU A SECOND TO LOOK IT OVER, BUT CAN

09:58:05  21   YOU TELL ME GENERALLY WHAT IT IS?

09:58:07  22   A.   IT APPEARS TO BE A PRESS RELEASE THAT'S DATED

09:58:22  23   SEPTEMBER 9TH, 2013.  IT APPEARS TO BE A JOINT PRESS RELEASE

09:58:27  24   BETWEEN THERANOS AND WALGREENS, AND STATING THAT THERANOS IS

09:58:33  25   NOW ABLE TO --

UNITED STATES COURT REPORTERS

**ER-6568**

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                    2819

| | | |
|---|---|---|
| 09:58:34 | 1 | Q.   AND ACTUALLY, BEFORE YOU GET INTO THE CONTENTS, APOLOGIES. |
| 09:58:37 | 2 | A.   OH, I'M SORRY. |
| 09:58:39 | 3 | Q.   IS IT GENERALLY ON THE LAUNCH OF TESTING SERVICES? |
| 09:58:42 | 4 | A.   YES. |
| 09:58:42 | 5 | MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT MOVES TO |
| 09:58:43 | 6 | ADMIT EXHIBIT 1113. |
| 09:58:45 | 7 | MR. WADE:  NO OBJECTION, YOUR HONOR. |
| 09:58:46 | 8 | THE COURT:  IT'S ADMITTED, IT MAY BE PUBLISHED. |
| 09:58:48 | 9 | (GOVERNMENT'S EXHIBIT 1113 WAS ADMITTED IN EVIDENCE.) |
| 09:58:49 | 10 | BY MR. BOSTIC: |
| 09:59:01 | 11 | Q.   AND, DR. ROSENDORFF, DO YOU SEE THAT AT THE TOP OF THAT |
| 09:59:05 | 12 | PAGE, THIS IS A PRESS RELEASE DATED SEPTEMBER 9TH, 2013? |
| 09:59:08 | 13 | A.   YES. |
| 09:59:09 | 14 | Q.   THAT SEPTEMBER 9TH DATE, IS THAT THE DATE THAT YOU |
| 09:59:13 | 15 | RECALLED AS BEING THE LAUNCH DATE? |
| 09:59:15 | 16 | A.   YES. |
| 09:59:15 | 17 | Q.   THAT FIRST PARAGRAPH READS, "THERANOS, INCORPORATED AND |
| 09:59:21 | 18 | WALGREENS TODAY ANNOUNCED A LONG-TERM PARTNERSHIP TO BRING |
| 09:59:24 | 19 | ACCESS TO THERANOS'S NEW LAB TESTING SERVICE THROUGH WALGREENS |
| 09:59:28 | 20 | PHARMACIES NATIONWIDE." |
| 09:59:30 | 21 | DO YOU SEE THAT? |
| 09:59:31 | 22 | A.   YES. |
| 09:59:31 | 23 | Q.   IT SAYS, "AS THE SERVICE BECOMES AVAILABLE THROUGH |
| 09:59:35 | 24 | THERANOS WELLNESS CENTERS INSIDE WALGREENS STORES, CONSUMERS |
| 09:59:38 | 25 | WILL BE ABLE TO ACCESS LESS INVASIVE AND MORE AFFORDABLE |

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                          2820

```
09:59:42   1    CLINICIAN-DIRECTED LAB TESTING, FROM A BLOOD SAMPLE AS SMALL AS

09:59:46   2    A FEW DROPS, OR 1/1000 THE SIZE OF A TYPICAL BLOOD DRAW."

09:59:52   3         DO YOU SEE THAT?

09:59:52   4    A.   YES.

09:59:53   5    Q.   THERE'S SOME MENTION OF A FINGERSTICK METHOD OR

09:59:56   6    MICRO-SAMPLE.

09:59:57   7         DO YOU SEE THAT IN THE REMAINDER OF THAT PARAGRAPH?

09:59:59   8    A.   YES.

09:59:59   9    Q.   AND I'LL DRAW YOUR ATTENTION TO THE BOTTOM PARAGRAPH IN

10:00:07  10    THIS PAGE.  DO YOU SEE THAT THE SECOND SENTENCE OF THE THIRD

10:00:15  11    PARAGRAPH SAYS, "THERANOS'S PROPRIETARY LABORATORY

10:00:18  12    INFRASTRUCTURE MINIMIZES HUMAN ERROR THROUGH EXTENSIVE

10:00:21  13    AUTOMATION TO PRODUCE HIGH QUALITY RESULTS."

10:00:25  14         DO YOU SEE THAT?

10:00:27  15    A.   YES.

10:00:27  16    Q.   ANYWHERE IN THIS PRESS RELEASE DO YOU SEE THE PHRASE "SOFT

10:00:32  17    LAUNCH"?

10:00:33  18    A.   NO.

10:00:34  19    Q.   OKAY.  WE CAN PUT THAT EXHIBIT ASIDE.

10:00:40  20         THE PHRASE "SOFT LAUNCH," IS THAT A MEDICAL TERM IN YOUR

10:00:44  21    EXPERIENCE?

10:00:44  22    A.   NO.

10:00:45  23    Q.   IS THE PHRASE "SOFT LAUNCH" A TERM FROM CLINICAL

10:00:50  24    LABORATORY TESTING?

10:00:51  25    A.   NO.
```

UNITED STATES COURT REPORTERS

**ER-6570**

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                      2821

10:00:52   1    Q.   DO YOU RECALL THAT YOU DISCUSSED WITH MR. WADE ON A FEW

10:00:59   2    OCCASIONS THE CLIA REGULATIONS AND HOW THEY GOVERN CLINICAL LAB

10:01:04   3    TESTING?

10:01:05   4    A.   YES.

10:01:06   5    Q.   TO YOUR KNOWLEDGE, DO THOSE CLIA REGULATIONS PROVIDE ANY

10:01:09   6    SPECIAL, MORE RELAXED RULES FOR SOMETHING CALLED A SOFT LAUNCH?

10:01:13   7    A.   NO.

10:01:13   8    Q.   DURING YOUR CROSS, THERE WAS SOME DISCUSSION ABOUT THE

10:01:22   9    OVERALL TESTING VOLUME IN THE DAYS FOLLOWING SEPTEMBER 9TH.

10:01:27  10         DO YOU RECALL THAT?

10:01:27  11    A.   YES.

10:01:28  12    Q.   THERE WAS A SUGGESTION THAT THE OVERALL TESTING VOLUME

10:01:32  13    MIGHT HAVE BEEN RELATIVELY LOW.

10:01:34  14         DO YOU RECALL DISCUSSING THAT?

10:01:36  15    A.   YES.

10:01:37  16    Q.   DO YOU HAVE PERSONAL KNOWLEDGE OF THAT?  IN OTHER WORDS,

10:01:40  17    ARE YOU ABLE TO TESTIFY ONE WAY OR ANOTHER ABOUT THE ACTUAL

10:01:43  18    NUMBER OF TESTS THAT THERANOS WAS RUNNING DURING THAT TIME

10:01:46  19    PERIOD?

10:01:46  20    A.   NO.

10:01:46  21    Q.   ASSUMING THAT THE OVERALL TEST VOLUME WAS LOW DURING THE

10:01:51  22    INITIAL WEEKS FOLLOWING THAT LAUNCH DATE, WOULD THAT ELIMINATE

10:01:56  23    YOUR CONCERNS ABOUT ACCURACY PROBLEMS THAT THERANOS WAS SEEING

10:01:59  24    AT THAT TIME?

10:02:00  25    A.   NO.

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                                    2822

10:02:00  1        Q.   WHY NOT?

10:02:01  2        A.   IT -- SO IF YOU -- WHILE IT'S TRUE, IF YOU HAVE ACCURACY

10:02:13  3    PROBLEMS, YOU'RE GOING TO SEE MORE THE MORE TESTS THAT YOU RUN.

10:02:20  4    THAT'S JUST -- IF IT'S A FIXED PERCENTAGE OF TESTS THAT ARE

10:02:22  5    INACCURATE, YOU'RE GOING TO GET MORE INACCURATE TESTS THE MORE

10:02:26  6    TESTS YOU RUN.

10:02:27  7        BUT IN MY MIND, EVEN TESTING ONE PATIENT WITH A HIGH

10:02:30  8    PROBABILITY OF INACCURACY WAS HIGHLY PROBLEMATIC FOR ME.

10:02:35  9        Q.   DO YOU RECALL THAT SOME OF THE INCIDENTS WE REVIEWED

10:02:41 10    DURING YOUR DIRECT EXAMINATION RELATED TO INACCURATE TEST

10:02:46 11    RESULTS THAT WERE RELEASED BY THERANOS?

10:02:47 12        A.   YES.

10:02:48 13        Q.   ASSUMING THAT THE OVERALL TEST VOLUME WAS LOW DURING THAT

10:02:52 14    TIME PERIOD --

10:02:53 15        A.   YES.

10:02:54 16        Q.   -- DOES THAT HAVE ANY EFFECT ON THE SIGNIFICANCE OF

10:02:57 17    INDIVIDUAL INACCURATE TEST RESULTS?

10:03:00 18        A.   NO.

10:03:01 19        Q.   HOW ABOUT WHEN YOU PUT THOSE RESULTS INTO CONTEXT AND TRY

10:03:06 20    TO DETERMINE HOW SERIOUS A RED FLAG THEY ARE?  DOES IT MATTER

10:03:12 21    HOW MANY TESTS THE LAB IS PERFORMING IN THE BACKGROUND?

10:03:18 22        LET ME ASK A BETTER QUESTION.

10:03:21 23        IF YOU SEE -- I'LL GIVE YOU A HYPOTHETICAL.  IF YOU SEE 5

10:03:25 24    INACCURATE TEST RESULTS OUT OF A TOTAL OF 10,000 TESTS THAT A

10:03:30 25    LAB DID DURING A CERTAIN TIME PERIOD --

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                    2823

10:03:32  1      A.   YES.

10:03:33  2      Q.   -- VERSUS SEEING 5 INACCURATE TEST RESULTS OUT OF A TOTAL

10:03:36  3      OF 50 --

10:03:38  4      A.   YES.

10:03:38  5      Q.   -- RESULTS THAT A LAB DID DURING A CERTAIN TIME PERIOD, DO

10:03:42  6      THOSE TWO SITUATIONS CAUSE YOU TO HAVE DIFFERENT VIEWS ABOUT

10:03:45  7      THE LAB'S OVERALL PERFORMANCE?

10:03:47  8      A.   YES.

10:03:48  9      Q.   CAN YOU EXPLAIN WHY?

10:03:49 10      A.   IF THERE ARE 5 INACCURATE TESTS OUT OF 50, THAT'S A 10

10:03:54 11      PERCENT FAILURE RATE, FOR WANT OF A BETTER TERM.

10:04:00 12           IF IT'S 5 OUT OF 50,000, IT'S A MUCH LOWER RATE OF

10:04:05 13      FAILURE.

10:04:06 14           SO ANY ANALYTIC SYSTEM WILL GIVE YOU FAILURES, BUT YOU --

10:04:12 15      SO IT'S REALLY IMPORTANT TO TRACK THE SCALE AND THE PERIOD OF

10:04:17 16      TIME TABLES THAT YOU'RE SEEING.

10:04:19 17      Q.   ASSUMING THAT THERE WAS A RELATIVELY LOW TEST VALUE IN THE

10:04:24 18      DAYS FOLLOWING THE LAUNCH AT THERANOS --

10:04:28 19      A.   YES.

10:04:28 20      Q.   -- WERE YOU SATISFIED WITH THE NUMBER OF INACCURATE TEST

10:04:35 21      RESULTS THAT YOU WERE SEEING AT THE TIME?

10:04:36 22      A.   NO.

10:04:37 23      Q.   SPEAKING OF TESTING VOLUME, DO YOU RECALL YOUR PREVIOUS

10:04:44 24      TESTIMONY THAT YOU REVIEWED AT A DEPOSITION WHERE YOU COMPARED

10:04:48 25      THE NUMBER OF COMPLAINTS YOU RECEIVED AT THERANOS TO WHAT YOU

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                              2824

10:04:51   1    SAW AT UNIVERSITY OF PITTSBURGH?

10:04:53   2    A.   YES.

10:04:53   3    Q.   JUST SO THE RECORD IS CLEAR, WERE YOU TROUBLED BY THE

10:04:58   4    NUMBER OF DOCTOR AND PATIENT COMPLAINTS THAT YOU SAW COME IN

10:05:02   5    THE DOOR AT THERANOS?

10:05:03   6    A.   YES.

10:05:03   7    Q.   BY THE WAY, DID YOU KNOW ABOUT EACH AND EVERY DOCTOR OR

10:05:08   8    PATIENT COMPLAINT THAT CAME IN TO THE COMPANY DURING YOUR TIME

10:05:11   9    AS LAB DIRECTOR?

10:05:12  10    A.   NO.

10:05:13  11    Q.   THE ONES YOU SAW STILL TROUBLED YOU?

10:05:15  12    A.   YES.

10:05:18  13    Q.   WAS THE LEVEL OF COMPLAINTS THAT YOU SAW AT UNIVERSITY OF

10:05:22  14    PITTSBURGH EQUALLY TROUBLING TO YOU?

10:05:24  15    A.   NO.

10:05:27  16    Q.   WHY NOT?  WHY WERE THOSE TWO SITUATIONS DIFFERENT?

10:05:30  17    A.   SO AT THE UNIVERSITY OF PITTSBURGH, THE DISCUSSIONS WITH

10:05:37  18    THE PHYSICIANS WERE FREQUENTLY ABOUT WHAT TEST METHOD WE SHOULD

10:05:42  19    USE.  I REMEMBER FREQUENT CONVERSATIONS WITH THE

10:05:44  20    ENDOCRINOLOGISTS ABOUT HORMONES THAT WERE PRESENT IN VERY LOW

10:05:51  21    LEVELS THAT CAN BE TRICKY TO TEST ACCURATELY AND WHAT THE BEST

10:05:56  22    METHOD SHOULD BE.

10:05:57  23        THERE WERE A COUPLE OF COMPLAINTS, I REMEMBER ONE WAS

10:06:01  24    ABOUT A VERY HIGH PHOSPHOROUS.  IT HAD TO DO WITH A NURSE

10:06:08  25    DRAWING BLOOD FROM A CENTRAL CATHETER INSTEAD OF FROM THE ARM.

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                    2825

10:06:12  1        THE COMPLAINTS WERE NOT ABOUT TEST ACCURACY, PER SE.  THEY

10:06:18  2   WERE ABOUT -- THEY WERE COMPLAINTS ABOUT RESULTS, OCCASIONAL

10:06:23  3   FLIERS, RESULTS THAT DIDN'T MAKE SENSE.

10:06:25  4        BUT IT WAS NOT -- NONE OF THE CLINICIANS WERE QUESTIONING

10:06:29  5   THE ACCURACY OF THE LABORATORY.

10:06:31  6   Q.   I'D LIKE TO SHIFT GEARS AND TALK ABOUT PROFICIENCY

10:06:39  7   TESTING.

10:06:40  8        ON DIRECT, YOU TESTIFIED ABOUT THE LACK OF PROFICIENCY

10:06:44  9   TESTING AT THERANOS.

10:06:45  10        DO YOU RECALL THAT?

10:06:46  11   A.   YES.

10:06:47  12   Q.   THERE WAS, HOWEVER, SOME PROFICIENCY TESTING AT THE

10:06:50  13   COMPANY; ISN'T THAT RIGHT?

10:06:51  14   A.   YES.

10:06:52  15   Q.   ON WHAT DEVICES DID THERANOS CONDUCT REGULAR PROFICIENCY

10:06:58  16   TESTING WHEN YOU WERE AT THE COMPANY?

10:07:00  17   A.   THE -- THE ONLY PROFICIENCY TESTING DATA THAT I CAN RECALL

10:07:13  18   BEING RUN ACCORDING TO THE AAP WAS FOR VITAMIN D, I BELIEVE.

10:07:20  19   Q.   AND FOR NOW I'M ASKING YOU A BROADER QUESTION, NOT JUST

10:07:23  20   ABOUT AAP, BUT PROFICIENCY TESTING IN GENERAL.

10:07:29  21        DO YOU RECALL STANDARD PROFICIENCY TESTING OCCURRING AT

10:07:32  22   THERANOS?

10:07:32  23   A.   YES.

10:07:32  24   Q.   ON FDA APPROVED DEVICES?

10:07:34  25   A.   YES.

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                              2826

```
10:07:35  1     Q.   WOULD THAT BE THE NON-THERANOS AND NON-THERANOS MODIFIED

10:07:41  2     DEVICES?

10:07:41  3     A.   YES.

10:07:42  4     Q.   WHEN YOU ANSWERED ON DIRECT THAT THERE WAS NO PROFICIENCY

10:07:48  5     TESTING AT THERANOS, WAS THERE SOMETHING THAT WAS CONFUSING YOU

10:07:52  6     AT THAT TIME THAT CAUSED YOU TO GIVE THAT ANSWER?

10:07:53  7     A.   I, I WANTED TO CLARIFY THAT EVEN THOUGH I HAD WRITTEN AN

10:08:05  8     SOP OR AAP, BUT IT WASN'T BEING IMPLEMENTED ACROSS ALL OF THE

10:08:10  9     ASSAYS.

10:08:11  10    Q.   OUR CONVERSATION DURING DIRECT, DID IT FOCUS MORE ON THE

10:08:17  11    THERANOS SPECIFIC DEVICES OR THE UNMODIFIED FDA APPROVED

10:08:22  12    DEVICES?

10:08:22  13    A.   I ASSUMED YOU WERE TALKING ABOUT THE THERANOS DEVICES,

10:08:25  14    YES.

10:08:25  15    Q.   HOW ABOUT YOUR CONCERNS WHEN IT CAME TO TESTING ACCURACY?

10:08:29  16    DID THOSE CONCERNS RELATE MOSTLY TO THE THERANOS SPECIFIC

10:08:34  17    DEVICES OR THE UNMODIFIED THIRD PARTY DEVICES?

10:08:38  18    A.   THERANOS SPECIFIC DEVICES.

10:08:39  19    Q.   OKAY.  I'D LIKE TO SHOW YOU BRIEFLY EXHIBIT 10029, WHICH

10:08:46  20    IS IN EVIDENCE.

10:09:00  21         AND IF WE COULD ZOOM IN JUST ON THE TOP PART OF THE PAGE.

10:09:04  22         DR. ROSENDORFF, DO YOU SEE A COMPARATIVE EVALUATION REPORT

10:09:08  23    FROM THE AMERICAN PROFICIENCY INSTITUTE?

10:09:10  24    A.   YES.

10:09:10  25    Q.   DO YOU RECALL REVIEWING THIS DOCUMENT WITH MR. WADE DURING
```

UNITED STATES COURT REPORTERS

**ER-6576**

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                    2827

10:09:14  1    CROSS-EXAMINATION?

10:09:15  2    A.   YES.

10:09:15  3    Q.   I'LL ASK YOU TO TAKE A LOOK AT THIS PAGE.  FIRST OF ALL,

10:09:22  4    THIS IS DATED 2014.

10:09:25  5         DO YOU SEE THAT IN THE TOP LEFT?

10:09:27  6    A.   YES.

10:09:28  7    Q.   THE PROFICIENCY TESTING RESULTS THAT ARE REPORTED IN THIS

10:09:35  8    EXHIBIT, ARE THEY A RESULT OF PROFICIENCY TESTING ON THE

10:09:41  9    THERANOS EDISON DEVICE?

10:09:43  10   A.   NO.

10:09:44  11   Q.   WHAT DEVICE OR WHAT CATEGORY OF DEVICES IS REFLECTED IN

10:09:50  12   THIS PROFICIENCY TESTING DATA?

10:09:52  13   A.   THESE ARE IMMUNOASSAYS AS INDICATED ON THE, ON THE REPORT,

10:10:00  14   OR EVALUATION.  THEY WERE RUN ON THE SIEMENS IMMULITE 2000 WITH

10:10:08  15   IMMULITE REAGENT.

10:10:09  16   Q.   AND SO WOULD THAT HAVE BEEN AN UNMODIFIED, NON-THERANOS,

10:10:13  17   FDA APPROVED TESTING METHOD?

10:10:15  18   A.   CORRECT.

10:10:15  19   Q.   IF WE COULD ZOOM OUT.

10:10:17  20        DR. ROSENDORFF, LET ME KNOW IF THE TEXT IS TOO SMALL AND

10:10:20  21   WE CAN ZOOM BACK IN, BUT LOOKING AT THE ACTUAL ASSAYS INVOLVED

10:10:27  22   HERE, WERE ANY OF THESE ASSAYS RUN ON THE EDISON AT THERANOS?

10:10:34  23   A.   YES, ON -- YES, I BELIEVE ON PROLACTIN, PSA, TESTOSTERONE,

10:10:45  24   ESTRADIOL, FSH.  THOSE ARE THE ONES THAT I CAN RECALL.

10:10:49  25   Q.   AND ACTUALLY, I SHOULD HAVE ASKED YOU, WERE ANY OF THOSE

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                    2828

10:10:52   1    ASSAYS RUN ON EITHER THE EDISON OR THE THERANOS MODIFIED THIRD

10:10:56   2    PARTY DEVICES?  WOULD THAT CHANGE YOUR ANSWER?

10:11:01   3    A.   THEY WERE RUN ON THE EDISON.

10:11:04   4         THERE WAS ALSO -- I SHOULD SAY, THERE WAS ALSO AN ATTEMPT

10:11:07   5    TO RUN DILUTED FINGERSTICK SAMPLES ON THE IMMULITE.  I DON'T

10:11:13   6    RECALL WHETHER THAT WAS ACTUALLY IMPLEMENTED FOR PATIENTS OR

10:11:16   7    NOT.

10:11:17   8    Q.   OKAY.  UNDERSTOOD.

10:11:20   9         IN 2013 -- OR SORRY.

10:11:22  10         IN 2014, WERE SOME OF THESE ASSAYS BEING RUN ON THERANOS

10:11:28  11    SPECIFIC DEVICES OR THERANOS MODIFIED DEVICES?

10:11:32  12    A.   SOME OF THEM WERE BEING RUN ON THERANOS SPECIFIC DEVICES

10:11:37  13    AND OTHERS ON -- I'M SORRY.

10:11:39  14         SOME OF THEM WERE RUN ON FDA APPROVED DEVICES AND SOME OF

10:11:42  15    THEM ON THE EDISONS.

10:11:44  16    Q.   DO YOU HAVE AN UNDERSTANDING THEN AS TO WHY, FOR

10:11:47  17    PROFICIENCY TESTING, THE PROFICIENCY TESTING WOULD HAVE BEEN

10:11:52  18    DONE USING THE UNMODIFIED THIRD PARTY DEVICES?

10:11:54  19    A.   I DID NOT THINK THAT THIS WAS APPROPRIATE GIVEN THE FACT

10:12:02  20    THAT THE REGULATIONS STATE THAT YOU'RE SUPPOSED TO DO

10:12:05  21    PROFICIENCY TESTING ON YOUR MOST COMMONLY USED METHOD.  IN MANY

10:12:13  22    CASES, WE WERE NOT USING THE IMMULITE FOR A NUMBER OF THESE

10:12:19  23    ANALYTES.

10:12:23  24         I SENT AN E-MAIL LISTING THE ANALYTES FOR WHICH WE SHOULD

10:12:28  25    STOP THE CMS REPORTING BECAUSE CMS WAS UNDER THE IMPRESSION

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                                2829

```
10:12:33   1     THAT WE WERE STILL USING THE FDA DEVICES AS THE PREDOMINANT

10:12:38   2     DEVICES.

10:12:38   3     Q.   WE SAW THAT EMAIL DURING YOUR CROSS-EXAMINATION.  IS THAT

10:12:42   4     THE ONE YOU'RE REFERRING TO?

10:12:43   5     A.   YES, YES.

10:12:44   6     Q.   OKAY.  WE CAN TAKE THAT EXHIBIT DOWN.  THANK YOU.

10:12:48   7          AS TO THE EDISON AND THE MODIFIED THIRD PARTY DEVICES,

10:12:53   8     BASED ON WHAT YOU SAW AT THERANOS, WAS THERE EVER REGULAR

10:12:57   9     PROFICIENCY TESTING ACTUALLY IMPLEMENTED FOR THOSE KINDS OF

10:13:01  10     TESTS?

10:13:01  11     A.   NO.

10:13:02  12     Q.   ON CROSS-EXAMINATION, YOU WERE SHOWN AN SOP RELATING TO

10:13:08  13     THAT KIND OF PROFICIENCY TESTING ON THOSE DEVICES.

10:13:11  14          DO YOU RECALL THAT?

10:13:11  15     A.   YES.

10:13:12  16     Q.   IS THERE A DIFFERENCE IN A LAB BETWEEN HAVING A WRITTEN

10:13:17  17     SOP AND ACTUALLY IMPLEMENTING OR CARRYING OUT THAT SOP?

10:13:20  18     A.   YES, HUGE DIFFERENCE.

10:13:21  19     Q.   ON CROSS-EXAMINATION, YOU ALSO SAW THAT PROFICIENCY

10:13:27  20     TESTING AND AAP REMAINED A SUBJECT OF DISCUSSION THROUGHOUT

10:13:32  21     YOUR TIME AT THE COMPANY; IS THAT CORRECT?

10:13:35  22     A.   YES.

10:13:35  23     Q.   DID ANY OF THAT DISCUSSION REFRESH YOUR RECOLLECTION THAT

10:13:42  24     THERE WAS PROFICIENCY TESTING ON THOSE METHODS THAT YOU HAD

10:13:46  25     FORGOTTEN ABOUT, FOR EXAMPLE?
```

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                          2830

10:13:48   1       A.   SO R&D WAS DOING WHAT THEY WERE CALLING IQP.  I NEVER SAW

10:13:58   2    OR APPROVED THE PROCEDURE FOR IQP.  THEY WERE DOING THEIR OWN

10:14:02   3    THING.

10:14:03   4       Q.   I THINK WE'RE ABOUT TO LOOK AT SOME RELEVANT EXHIBITS FOR

10:14:08   5    THAT.

10:14:09   6            LET'S TAKE A QUICK LOOK AT EXHIBIT 2009 FIRST.  AND THIS

10:14:13   7    IS IN EVIDENCE.

10:14:23   8            DR. ROSENDORFF, DO YOU SEE EXHIBIT 2009 IS AN EMAIL CHAIN

10:14:26   9    FROM EARLY OCTOBER 2014?

10:14:28   10      A.   YES.

10:14:28   11      Q.   AND DO YOU RECALL DISCUSSING THIS EMAIL CHAIN AND THESE

10:14:33   12   CIRCUMSTANCES DURING YOUR TESTIMONY?

10:14:35   13      A.   YES.

10:14:35   14      Q.   LET'S LOOK NEXT AT EXHIBIT 7482, WHICH IS ALSO IN

10:14:40   15   EVIDENCE.  AND LET'S GO TO THE NEXT PAGE.

10:14:57   16           AND, DR. ROSENDORFF, DO YOU SEE THAT THIS IS A CONTINUED

10:15:03   17   EMAIL DISCUSSION ABOUT, I BELIEVE, TESTOSTERONE RESULTS?

10:15:21   18      A.   YES.

10:15:21   19      Q.   IF WE COULD ZOOM ON THE BOTTOM HALF OF THIS PAGE, PLEASE.

10:15:25   20           DO YOU RECALL REVIEWING THIS EMAIL DURING YOUR

10:15:27   21   CROSS-EXAMINATION WHERE YOU SAY, PLEASE LET CHRISTIAN HANDLE

10:15:32   22   THE COMMUNICATION WITH THE DOCTOR?

10:15:35   23      A.   YES.

10:15:36   24      Q.   DURING DIRECT, WE SPOKE ABOUT CHRISTIAN HOLMES'S ROLE IN

10:15:40   25    DEALING WITH INQUIRIES FROM PATIENTS AND DOCTORS.

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                    2831

10:15:44  1           DO YOU RECALL THAT?

10:15:44  2      A.   YES.

10:15:45  3      Q.   GENERALLY SPEAKING, WHAT WAS YOUR POSITION ON THE WAY THAT

10:15:51  4      CHRISTIAN HOLMES WAS INVOLVED IN SPEAKING WITH DOCTORS AND

10:15:56  5      PATIENTS AT THERANOS?

10:15:57  6      A.   I KNOW THAT CHRISTIAN WAS A MIDDLEMAN, INTERMEDIARY

10:16:05  7      BETWEEN CUSTOMER SERVICE OR THE REMOTE SITE IN ARIZONA AND

10:16:10  8      MYSELF.  SO HE WOULD BE RECEIVING THESE QUERIES AND COMPLAINTS.

10:16:18  9           AND I DON'T KNOW WHAT WOULD -- WHAT -- IN HIS MIND, I

10:16:22 10      DON'T KNOW WHAT DETERMINED WHAT SHOULD BE ESCALATED TO ME OR

10:16:25 11      WHAT HE COULD HANDLE HIMSELF OR HE WOULD BE HANDLING THROUGH

10:16:29 12      DANIEL.

10:16:30 13           I ASSUMED THAT IF THERE WERE MEDICAL ISSUES AT PLAY, HE

10:16:34 14      WOULD BE FORWARDING THOSE TO ME.

10:16:35 15      Q.   DID MR. HOLMES'S INVOLVEMENT IN THIS AREA HAVE AN EFFECT,

10:16:41 16      IN YOUR MIND, ON YOUR COMMUNICATIONS WITH DOCTORS AND PATIENTS?

10:16:44 17      A.   I -- I GUESS I WASN'T CLEAR ON WHAT CHRISTIAN HAD ALREADY

10:16:54 18      COMMUNICATED TO DOCTORS ON MANY OCCASIONS.

10:16:57 19      Q.   YOU TESTIFIED ON DIRECT ABOUT PRESSURE THAT YOU FELT IN

10:17:02 20      CONNECTION WITH YOUR COMMUNICATIONS WITH DOCTORS AND PATIENTS.

10:17:08 21           DO YOU RECALL THAT TESTIMONY?

10:17:09 22      A.   YES.

10:17:09 23      Q.   WAS CHRISTIAN HOLMES PART OF THAT PRESSURE?

10:17:12 24      A.   YES.

10:17:12 25      Q.   WHY IN THIS CASE, IN OCTOBER 2014, DID YOU EXPRESS A

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                    2832

10:17:16   1    PREFERENCE FOR CHRISTIAN TO HANDLE THIS PARTICULAR

10:17:18   2    COMMUNICATION WITH THAT DOCTOR?

10:17:19   3    A.   IN ORDER TO TALK HONESTLY AND TRANSPARENTLY WITH THE

10:17:24   4    DOCTOR, I NEEDED MORE INFORMATION FROM THE ELISA GROUP ON THAT

10:17:31   5    PARTICULAR ASSAY AND THAT RUN, ET CETERA.  I DID NOT RECEIVE

10:17:34   6    THAT, SO I DIDN'T FEEL LIKE I WAS EQUIPPED TO ADDRESS THE

10:17:39   7    ISSUES WITH THE DOCTOR.

10:17:40   8    Q.   LET'S GO TO PAGE 1 OF THIS EXHIBIT, AND LET'S ZOOM IN ON

10:17:51   9    THE TOP HALF OF THIS PAGE.

10:17:58   10        DR. ROSENDORFF, DO YOU RECALL REVIEWING THIS PORTION OF

10:18:00   11   THE EMAIL WITH MR. WADE?

10:18:01   12   A.   YES.

10:18:02   13   Q.   FIRST OF ALL, THIS IS AN EMAIL FROM SUNNY BALWANI TO YOU

10:18:08   14   CC'ING ELIZABETH HOLMES.

10:18:13   15        DO YOU SEE THAT?

10:18:13   16   A.   YES.

10:18:14   17   Q.   OR RATHER BCC'ING ELIZABETH HOLMES.

10:18:17   18        DO YOU SEE THAT?

10:18:18   19   A.   YES.

10:18:18   20   Q.   HIS EMAIL SAYS THAT WE ARE IN THE PROCESS OF RESPONDING TO

10:18:21   21   THE DOCTOR, BUT HE WANTS TO SHARE WITH YOU A FEW THOUGHTS.

10:18:26   22        UNDER NUMBER 1 HERE, MR. BALWANI SAYS THE SPURIOUS RESULT

10:18:32   23   IN ALL LIKELIHOOD SEEMS TO BE DUE TO HEMOLYSIS.

10:18:36   24        DO YOU SEE THAT?

10:18:36   25   A.   YES.

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                    2833

10:18:37   1       Q.   CAN YOU REMIND US WHAT HEMOLYSIS IS?

10:18:40   2       A.   HEMOLYSIS IS BREAKING OPEN OF RED BLOOD CELLS WITHIN THE

10:18:45   3    SAMPLE BEFORE IT'S TESTED.

10:18:47   4       Q.   AND WAS THAT A RECURRING SOURCE OF ISSUES AT THERANOS IN

10:18:51   5    YOUR EXPERIENCE?

10:18:52   6       A.   YES.

10:18:54   7       Q.   WAS THAT PROBLEM MORE OR LESS COMMON WITH FINGERSTICK

10:18:58   8    SAMPLES AS OPPOSED TO VEIN SAMPLES?

10:19:00   9       A.   MUCH, MUCH MORE COMMON WITH FINGERSTICK.

10:19:03   10      Q.   ALL RIGHT.  NUMBER 2 IN MR. BALWANI'S LIST HERE SAYS, "WE

10:19:09   11   ARE DOING MONTHLY (MOST CASES WEEKLY) IQP (AAP) FOR EACH ASSAY

10:19:16   12   ON EDISON AND OTHER DEVICES DOWNSTAIRS."

10:19:19   13      DO YOU SEE THAT?

10:19:20   14      A.   YES.

10:19:21   15      Q.   DID YOU AGREE WITH THAT STATEMENT?

10:19:22   16      A.   NO.

10:19:23   17      Q.   WHY NOT?

10:19:23   18      A.   I NEVER -- SO AS I'VE TESTIFIED, THERE WAS NOT A FORMAL

10:19:30   19   IQP POLICY OR SOP.  I DID NOT VIEW IQP AND AAP AS

10:19:39   20   INTERCHANGEABLE.  AND I DID NOT SEE THE DATA THAT HE'S

10:19:41   21   REFERRING TO.

10:19:42   22      Q.   DID YOU EVER HAVE A CHANCE TO LOOK AT ANY PORTION OF THE

10:19:46   23   DATA THAT RESULTED FROM THIS KIND OF TESTING AT THERANOS?

10:19:51   24      A.   YES.  I BELIEVE THAT I DID SEE DATA OVER THE COURSE OF A

10:19:57   25   WEEK LOOKING AT POTASSIUM VALUES THAT DANIEL HAD GENERATED.

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                              2834

```
10:20:03   1              I DON'T RECALL WHAT THE DATA INDICATED.

10:20:05   2       Q.   OKAY.  WERE YOU ABLE TO REACH ANY CONCLUSIONS ABOUT THE

10:20:12   3    COMPLETENESS OF THAT DATA OR THE APPROPRIATENESS OF THE TESTING

10:20:14   4    THAT THERANOS WAS RUNNING AT THAT TIME?

10:20:17   5       A.   INCOMPLETE.

10:20:17   6       Q.   AND WHAT MADE YOU CONCLUDE THAT THAT DATA WAS INCOMPLETE?

10:20:20   7       A.   WELL, FOR INSTANCE, FOR THE CBC ASSAY, I KEPT -- I KEPT

10:20:27   8    ASKING FOR THE AAP DATA, AND THEN EVENTUALLY SOMEBODY FROM R&D

10:20:35   9    SAID IT'S IN THIS FOLDER, IT'S ALL IN THIS FOLDER.

10:20:39  10              I WENT INTO THE FOLDER, IT WAS AN EXCEL SPREADSHEET THAT

10:20:42  11    WASN'T ANNOTATED, AND I NOTICED THAT THE SPREADSHEET ACTUALLY

10:20:46  12    HAD BEEN CHANGED A FEW MINUTES BEFORE MY INQUIRY.

10:20:53  13              AND I BELIEVE THERE'S AN EMAIL TO THAT EFFECT WITH

10:20:57  14    MR. BALWANI CHASTISING ME FOR MY FRUSTRATION ABOUT THAT.

10:21:00  15       Q.   AND DURING YOUR CROSS-EXAMINATION, YOU REVIEWED PORTIONS

10:21:07  16    OF THE CLIA REGULATIONS WITH MR. WADE.

10:21:10  17              DO YOU RECALL THAT?

10:21:10  18       A.   YES.

10:21:11  19       Q.   WHOSE RESPONSIBILITY UNDER THE REGULATIONS IS IT TO

10:21:14  20    IMPLEMENT PROFICIENCY TESTING AT A CLINICAL LABORATORY?

10:21:17  21       A.   THE LAB DIRECTOR.

10:21:21  22       Q.   WHEN YOU WERE ASKED THAT QUESTION ON CROSS-EXAMINATION,

10:21:25  23    YOU STARTED TO EXPLAIN THE PRACTICAL CONCERNS AROUND ACTUALLY

10:21:30  24    IMPLEMENTING --

10:21:31  25       A.   YES.
```

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                          2835

10:21:32    1      Q.   -- PROFICIENCY TESTING.

10:21:34    2      A.   YES.

10:21:34    3      Q.   CAN YOU EXPLAIN WHAT IT TAKES TO ACTUALLY IMPLEMENT

10:21:37    4      PROFICIENCY TESTING AT A LAB LIKE THERANOS?

10:21:39    5      A.   SO THERE WERE -- I DON'T KNOW HOW MANY ASSAYS WERE BEING

10:21:45    6      RUN, BUT IT WAS MANY, MANY ASSAYS ON DIFFERENT PLATFORMS.  AND

10:21:54    7      IT WOULD HAVE REQUIRED MAJOR COORDINATED EFFORTS WITHIN R&D AND

10:21:59    8      CLIA.  IT WOULD HAVE REQUIRED PEOPLE TO BE ASSIGNED DUTIES AND

10:22:03    9      TIMELINES TO COMPLETE THIS, A PLAN FORMED TO RECORD THE RESULTS

10:22:10   10      OF THE PROFICIENCY TESTING.

10:22:12   11           IT ALSO WOULD HAVE TIED UP A LOT OF EDISONS AND THE OTHER

10:22:18   12      LDT'S FOR THE PURPOSES OF PROFICIENCY TESTING AT VARIOUS TIMES.

10:22:26   13           IT ALSO WOULD HAVE INVOLVED REALLY DISCUSSING HOW TO DO

10:22:29   14      THE PROFICIENCY TESTING SPECIFICALLY FOR THE LDT'S THAT WERE

10:22:37   15      BEING RUN ON THE ADVIA.

10:22:39   16           DANIEL HAD MADE A FEW SUGGESTIONS, BUT THE SOP THAT I

10:22:42   17      WROTE WAS SPECIFIC FOR THE EDISONS, SO --

10:22:45   18      Q.   AND WHEN YOU THINK ABOUT ALL OF THE THINGS THAT WOULD BE

10:22:47   19      REQUIRED TO ACTUALLY IMPLEMENT AND FOLLOW THROUGH ON

10:22:50   20      PROFICIENCY TESTING --

10:22:51   21      A.   YES.

10:22:52   22      Q.   -- AS YOU'RE DESCRIBING, ARE THOSE THINGS THAT YOU COULD

10:22:56   23      HAVE ALL DONE ON YOUR OWN AT THERANOS?

10:22:58   24      A.   THAT I COULD HAVE DONE ON MY OWN?

10:23:01   25      Q.   YES.

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                    2836

10:23:01  1    A.   NO, ABSOLUTELY NOT.

10:23:03  2    Q.   WERE THERE THINGS THAT WOULD HAVE BEEN REQUIRED THAT WOULD

10:23:06  3    HAVE NEEDED THE SUPPORT OF UPPER MANAGEMENT IN ORDER TO

10:23:09  4    ACTUALLY FOLLOW THROUGH ON PROFICIENCY TESTING?

10:23:11  5    A.   YES.

10:23:11  6    Q.   WHEN YOU WERE AT THERANOS, DID YOU FEEL THAT YOU HAD THE

10:23:15  7    SUPPORT OF UPPER MANAGEMENT -- AND I SPECIFICALLY MEAN

10:23:19  8    MS. HOLMES AND MR. BALWANI -- WHEN IT CAME TO IMPLEMENTING

10:23:22  9    PROFICIENCY TESTING?

10:23:22 10    A.   NO.

10:23:23 11    Q.   WHAT MADE YOU FEEL THAT WAY?

10:23:25 12    A.   AFTER THE MEETING IN 2014 WHERE PROFICIENCY TESTING WAS

10:23:32 13    DISCUSSED, THERE WAS NO FOLLOW THROUGH.

10:23:44 14    Q.   THERE WAS SOME DISCUSSION DURING DIRECT AND ON

10:23:46 15    CROSS-EXAMINATION OF I BELIEVE A TEST THAT YOU CALLED A SPOT

10:23:49 16    CHECK.

10:23:50 17         DO YOU REMEMBER THAT?

10:23:50 18    A.   YES.

10:23:51 19    Q.   AND, FIRST OF ALL, LET'S LOOK AT EXHIBIT 1548, WHICH IS IN

10:23:56 20    EVIDENCE.

10:24:10 21         AND, DR. ROSENDORFF, DO YOU SEE AN EMAIL FROM FEBRUARY

10:24:13 22    2014?

10:24:13 23    A.   YES.

10:24:14 24    Q.   LET'S LOOK AT THE ATTACHMENT TO THIS EMAIL IN NATIVE.

10:24:25 25         OKAY.  DR. ROSENDORFF, DO YOU SEE IN FRONT OF YOU DATA

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                              2837

```
10:24:28   1      FROM THAT SPOT CHECK THAT WE PREVIOUSLY DISCUSSED?

10:24:30   2      A.   YES.

10:24:31   3      Q.   DURING CROSS-EXAMINATION, THERE WAS SOME DISCUSSION OF HOW

10:24:38   4      AAP OR ALTERNATIVE ASSESSMENT AND PROFICIENCY WAS DIFFERENT

10:24:41   5      FROM STANDARD PT.

10:24:43   6          DO YOU REMEMBER THAT?

10:24:44   7      A.   YES.

10:24:44   8      Q.   YOUR PREFERENCE BETWEEN THOSE TWO OPTIONS -- WELL, LET ME

10:24:51   9      JUST ASK.   WHAT WAS YOUR PREFERENCE BETWEEN THOSE TWO OPTIONS

10:24:53  10      AT THERANOS?   SHOULD THERANOS HAVE BEEN USING STANDARD

10:24:57  11      PROFICIENCY TESTING OR AAP FOR ITS COMPANY SPECIFIC TESTS?

10:25:00  12      A.   AAP.

10:25:01  13      Q.   THE DATA THAT WE'RE LOOKING AT IN THIS CHART DOES NOT

10:25:05  14      RESULT FROM AAP; IS THAT CORRECT?

10:25:07  15      A.   CORRECT.

10:25:07  16      Q.   YOU CALLED IT A SPOT CHECK BEFORE.   CAN YOU EXPLAIN WHAT

10:25:14  17      MADE YOU USE THAT TERM?   WHY IS THIS A SPOT CHECK IN YOUR VIEW?

10:25:17  18      A.   IT'S A -- IT'S A SNAPSHOT IN TIME USING COMMERCIALLY

10:25:23  19      AVAILABLE PT SPECIMENS TO BE RUN ON THE EDISONS.

10:25:30  20          THOSE PT SPECIMENS DID WORK ON THE IMMULITE AND THE

10:25:35  21      EDISONS WERE VALIDATED AGAINST THE IMMULITE.

10:25:42  22          SO I -- IN DISCUSSING THIS WITH THE GROUP, I THOUGHT IT

10:25:44  23      WAS A REASONABLE SPOT CHECK AND AUTHORIZED IT EVEN THOUGH IT

10:25:49  24      WASN'T PART OF A FORMAL SOP.

10:25:51  25      Q.   SO DESPITE YOUR PREFERENCE FOR AAP AND YOUR ADVOCACY FOR
```

UNITED STATES COURT REPORTERS

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                          2838

```
10:25:56   1     AAP IN THE COMPANY, DID YOU FEEL THAT THIS TEST WAS USEFUL IN

10:26:02   2     ASSESSING THE ACCURACY OF THERANOS TESTS?

10:26:06   3     A.   YES.

10:26:06   4     Q.   WHO WERE THE OTHER PEOPLE IN THE LAB WHO WERE INVOLVED IN

10:26:14   5     CONDUCTING THIS TESTING AND LOOKING AT THE DATA, IF YOU RECALL?

10:26:18   6     A.   I KNOW LANGLY GEE WAS COORDINATING IT.  MARK PANDORI AND

10:26:25   7     MYSELF DISCUSSED THE PLAN.  ERIKA CHEUNG, I BELIEVE, RAN MANY

10:26:30   8     OF THESE SAMPLES.

10:26:31   9     Q.   AND DID THOSE INDIVIDUALS SUPPORT THIS APPROACH OF DOING

10:26:36  10     THIS TESTING TO ASSESS THE ACCURACY OF THERANOS'S ASSAYS?

10:26:43  11     A.   YES.

10:26:43  12     Q.   MARK PANDORI ALSO HAD A SUPERVISORY POSITION IN THE LAB;

10:26:47  13     IS THAT CORRECT?

10:26:48  14     A.   I DON'T RECALL.

10:26:50  15     Q.   DO YOU RECALL GENERALLY WHAT MARK PANDORI'S ROLE AT

10:26:56  16     THERANOS WAS?

10:26:56  17     A.   I BELIEVE HE WAS HIRED AS A CO-LABORATORY DIRECTOR.  HE

10:27:01  18     HAD A LOT OF EXPERIENCE IN MICROBIOLOGY, SO THE COMPANY WAS --

10:27:08  19     I GUESS IT'S -- WELL, WHAT MARK TOLD ME WAS THAT HE WAS GOING

10:27:11  20     TO HEAD UP THE MICRO EFFORT AT THERANOS.

10:27:16  21     Q.   AND DID -- IS IT DR. PANDORI?

10:27:18  22     A.   YES.

10:27:19  23     Q.   DID DR. PANDORI KNOW WHAT AAP WAS?

10:27:22  24     A.   YES.

10:27:22  25     Q.   DID DR. PANDORI SUPPORT THE USE OF OR THE IMPLEMENTATION
```

UNITED STATES COURT REPORTERS

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                        2839

```
10:27:28   1      OF AAP AT THERANOS?

10:27:29   2      A.   WELL, AT THE TIME THE SPOT CHECK WAS DONE, DR. PANDORI WAS

10:27:34   3      NOT AWARE OF THE DISCUSSIONS -- PERHAPS WAS NOT AWARE OF THE

10:27:38   4      DISCUSSIONS THAT HAD HAPPENED BETWEEN ME AND DANIEL PREVIOUSLY

10:27:41   5      ON THE TOPIC OF AAP.

10:27:42   6      Q.   OKAY.  I UNDERSTAND THAT.

10:27:46   7           DURING YOUR TIME AT THERANOS, DID YOU COME TO UNDERSTAND

10:27:49   8      WHETHER DR. PANDORI HAD A PREFERENCE ON THE USE OF AAP AT

10:27:53   9      THERANOS?  DID HE SUPPORT IT OR WAS HE AGAINST IT?

10:27:55  10      A.   IN MY DISCUSSIONS WITH HIM, HE -- HE DIDN'T SEEM TO RULE

10:28:06  11      ONE WAY OR THE OTHER.

10:28:08  12      Q.   DO YOU RECALL REVIEWING A PRESENTATION ON AAP AND THE

10:28:10  13      BENEFITS OF AAP --

10:28:11  14      A.   YES.

10:28:12  15      Q.   -- PREPARED PARTLY BY DR. PANDORI?

10:28:14  16      A.   YES.

10:28:14  17      Q.   DID DR. PANDORI SUPPORT THE GENERATION OF THE TEST DATA

10:28:24  18      THAT WE'RE LOOKING AT HERE?

10:28:25  19      A.   YES, HE DID.

10:28:26  20      Q.   HOW WOULD YOU RESPOND TO THE CLAIM THAT BECAUSE THIS TEST

10:28:36  21      DATA WAS NOT GENERATED THROUGH THE FORMAL AAP SOP, THE FORMER

10:28:43  22      PROCEDURE -- THE FORMAL PROCEDURE AT THERANOS, THAT WE SHOULD

10:28:47  23      IGNORE THIS DATA, THAT IT DOESN'T MEAN ANYTHING?  WOULD YOU

10:28:49  24      AGREE WITH THAT?

10:28:50  25      A.   NO.  IT'S VERY FREQUENT IN CLINICAL LABORATORIES TO DO QC
```

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                    2840

| | | |
|---|---|---|
| 10:28:58 | 1 | CHECKS, PILOT STUDIES, TO DO EVALUATION OF METHODS THAT WOULD |
| 10:29:02 | 2 | NOT BE AN ONGOING PROCESS, SO IT WOULDN'T HAVE TO BE CAPTURED |
| 10:29:06 | 3 | IN SOP BECAUSE YOU'RE NOT PLANNING ON IMPLEMENTING IT ON A |
| 10:29:09 | 4 | REGULAR CADENCE. |
| 10:29:13 | 5 | Q.   THE -- |
| 10:29:15 | 6 | A.   AS LONG AS EVERYBODY IS CLEAR ON WHAT NEEDED TO BE DONE |
| 10:29:19 | 7 | AND HOW THE RESULTS WERE TO BE INTERPRETED. |
| 10:29:21 | 8 | Q.   WE WERE JUST TALKING ABOUT DR. PANDORI AT THERANOS.  WAS |
| 10:29:26 | 9 | HE STILL AT THE COMPANY WHEN YOU DEPARTED IN NOVEMBER 2014? |
| 10:29:30 | 10 | A.   NO. |
| 10:29:31 | 11 | Q.   DO YOU HAVE AN UNDERSTANDING AS TO WHY HE LEFT THE |
| 10:29:34 | 12 | COMPANY? |
| 10:29:35 | 13 | A.   YES, I CAN TELL YOU WHAT HE TOLD ME. |
| 10:29:37 | 14 | Q.   WHAT DID HE SAY? |
| 10:29:38 | 15 | MR. WADE:  OBJECTION, YOUR HONOR.  HEARSAY. |
| 10:29:40 | 16 | THE COURT:  SUSTAINED. |
| 10:29:42 | 17 | MR. BOSTIC:  THIS IS UNDER 803(3), YOUR HONOR. |
| 10:29:53 | 18 | THE COURT:  I'M GOING TO SUSTAIN THE OBJECTION. |
| 10:29:56 | 19 | BY MR. BOSTIC: |
| 10:29:58 | 20 | Q.   DR. ROSENDORFF, LET'S SHIFT GEARS. |
| 10:30:01 | 21 | WE CAN TAKE THAT EXHIBIT DOWN. |
| 10:30:02 | 22 | DO YOU RECALL A DISCUSSION DURING CROSS-EXAMINATION ABOUT |
| 10:30:05 | 23 | PATENTS HELD BY THERANOS? |
| 10:30:07 | 24 | A.   YES. |
| 10:30:08 | 25 | Q.   YOU SAID THAT THERANOS'S PATENTS, WHEN YOU WERE DECIDING |

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                                    2841

10:30:13   1        TO JOIN THE COMPANY, INCREASED YOUR EXCITEMENT ABOUT BEING PART

10:30:17   2        OF IT; IS THAT CORRECT?

10:30:18   3        A.   YES.

10:30:19   4        Q.   ONCE YOU DID JOIN, COULD YOU HAVE SKIPPED THE VALIDATION

10:30:23   5        PROCESS, IGNORED QUALITY CONTROL, AND JUST RELIED ON THOSE

10:30:27   6        PATENTS AS EVIDENCE THAT THE TESTS WERE ACCURATE?

10:30:30   7        A.   NO.

10:30:33   8        Q.   DOES THE FACT THAT A BLOOD TESTING METHOD IS PATENTED MEAN

10:30:36   9        THAT IT'S ACCURATE?

10:30:37   10       A.   NO.

10:30:37   11       Q.   DOES ONE HAVE ANYTHING TO DO WITH THE OTHER?

10:30:40   12       A.   NO.

10:30:41   13       Q.   DO YOU RECALL DISCUSSION DURING YOUR DIRECT EXAMINATION OF

10:30:52   14       A PRACTICE AT THERANOS OF GENERATING MULTIPLE RESULTS FOR A

10:30:55   15       GIVEN ASSAY AND THEN REMOVING TWO OF THEM AND AVERAGING THE

10:30:59   16       REST?

10:31:00   17       A.   YES.

10:31:00   18       Q.   DURING CROSS-EXAMINATION, YOU WERE ASKED SOME MORE

10:31:09   19       QUESTIONS ABOUT THAT.

10:31:10   20            DO YOU RECALL?

10:31:10   21       A.   YES.

10:31:11   22       Q.   I WANT TO BE CLEAR ABOUT WHETHER THAT PRACTICE WAS USED BY

10:31:15   23       THE THIRD PARTY DEVICES THAT YOU'VE WORKED WITH.

10:31:18   24            CAN WE BRING UP EXHIBIT 392, PLEASE.  THAT'S IN EVIDENCE.

10:31:32   25            AND, DR. ROSENDORFF, DO YOU SEE THAT EXHIBIT 392 IS THE

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                    2842

```
10:31:36   1      OPERATOR'S GUIDE FOR THE IMMULITE 2000?

10:31:39   2      A.   YES.

10:31:40   3      Q.   WAS THIS A THIRD PARTY DEVICE THAT YOU HAD EXPERIENCE WITH

10:31:43   4      AT THERANOS?

10:31:44   5      A.   YES.

10:31:45   6      Q.   LET'S GO TO PAGE 40 OF THIS EXHIBIT, PLEASE.

10:31:54   7           I'M SORRY, PAGE 40.  AND IF WE COULD ZOOM IN ON THE BOTTOM

10:32:03   8      HALF OF THAT PAGE.

10:32:07   9           DR. ROSENDORFF, DO YOU SEE A SECTION HERE TITLED

10:32:09  10      TECHNOLOGY, DATA REDUCTION AND THE CHEMILUMINESCENT REACTION

10:32:15  11      INTERNAL CALCULATIONS?

10:32:16  12      A.   YES.

10:32:17  13      Q.   JUST AT A VERY GENERAL LEVEL, WHAT DOES CHEMILUMINESCENT

10:32:22  14      MEAN IN THIS CONTEXT?

10:32:23  15      A.   IT'S THE SIGNAL THAT IS GENERATED WHEN THE ANALYTE IS

10:32:28  16      DETECTED BY THE ANTIBODY IN THE INSTRUMENT.  SO IT'S -- THAT

10:32:33  17      SIGNAL IS THEN TRANSLATED INTO AN ACTUAL CONCENTRATION.

10:32:38  18      Q.   IN OTHER WORDS, IS THE DEVICE MEASURING AN AMOUNT OF LIGHT

10:32:42  19      OUTPUT AND THEN CONVERTING THAT INTO A CONCENTRATION?

10:32:45  20      A.   YES.

10:32:45  21      Q.   THE LIST HERE TALKS ABOUT INTERNAL CALCULATIONS PERFORMED

10:32:55  22      BY THE SYSTEM WHEN DETERMINING TEST RESULTS.

10:32:59  23           DO YOU SEE THAT NEAR THE TOP OF THAT SECTION?

10:33:00  24      A.   YES.

10:33:01  25      Q.   TAKE A MOMENT TO JUST FAMILIARIZE YOURSELF WITH THE STEPS
```

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                    2843

10:33:04   1    1, 2, 3 LISTED HERE.

10:33:07   2    A.   OKAY.

10:33:08   3         (PAUSE IN PROCEEDINGS.)

10:33:27   4    BY MR. BOSTIC:

10:33:29   5    Q.   AND I'LL HAVE A QUESTION FOR YOU ABOUT SOMETHING ON THE

10:33:31   6    FOLLOWING PAGE.

10:33:41   7    A.   OKAY.

10:33:41   8    Q.   OKAY.  IF WE COULD TURN TO THE NEXT PAGE, PAGE 41.  AND

10:33:47   9    ZOOM IN ON THE TOP PORTION ONCE WE GET THERE.

10:33:58  10         DR. ROSENDORFF, DO YOU SEE THE CONTINUATION OF THAT LIST

10:33:59  11    WE WERE JUST LOOKING AT?

10:34:01  12    A.   YES.

10:34:01  13    Q.   ITEM 4 IN THIS LIST OF STEPS --

10:34:06  14    A.   YES.

10:34:07  15    Q.   -- TALKS ABOUT TAKING FIVE ONE-SECOND READINGS.

10:34:11  16         DO YOU SEE THAT?

10:34:11  17    A.   YES.

10:34:12  18    Q.   IS THIS THE SAME THING THAT THE THERANOS ANALYZER WAS

10:34:18  19    DOING?  IN OTHER WORDS, GENERATING MULTIPLE RESULTS FOR EACH

10:34:22  20    ASSAY AND THEN MANAGING THOSE MULTIPLE RESULTS?

10:34:26  21    A.   NO.  IF YOU LOOK AT NUMBER 5, WHAT THEY'RE SAYING IS THEY

10:34:32  22    TAKE DARK COUNT READINGS, WHICH I BELIEVE IS BACKGROUND, AND

10:34:39  23    THEY'RE SUBTRACTING IT FROM THE ACTUAL -- THERE'S FIVE READINGS

10:34:43  24    THAT ARE TAKEN.  THEY SUBTRACT THE BACKGROUND AND THEN THEY

10:34:46  25    AVERAGE THE FIVE.

UNITED STATES COURT REPORTERS

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                          2844

```
10:34:47   1              BUT THEY'RE NOT DISCARDING ANY OF THOSE FIVE.

10:34:49   2         Q.   SO NONE OF THE ACTUAL RESULTS ARE BEING DISCARDED IN THE

10:34:53   3    THIRD PARTY DEVICE; IS THAT CORRECT?

10:34:55   4         A.   CORRECT, CORRECT.

10:34:56   5         Q.   WHEN IT TALKS ABOUT TAKING FIVE ONE-SECOND READINGS, DOES

10:35:00   6    THAT MEAN THAT THE CHEMICAL REACTION IS ACTUALLY OCCURRING FIVE

10:35:06   7    SEPARATE TIMES?

10:35:06   8         A.   NO.  IT'S OCCURRING ONCE.  IT'S A -- IT'S DIFFERENT

10:35:10   9    SNAPSHOTS OF THE LIGHT THAT'S BEING PUT OUT DURING THOSE FIVE

10:35:15  10    SECONDS.

10:35:16  11         Q.   IN OTHER WORDS, LIKE TAKING FIVE PICTURES --

10:35:19  12         A.   PICTURES.

10:35:21  13         Q.   -- OF THE SAME OBJECT?

10:35:22  14         A.   YEAH, YEAH.

10:35:22  15         Q.   IS THAT DIFFERENT FROM HOW THE THERANOS DEVICE WORKED?

10:35:25  16         A.   RIGHT.  SO THE THERANOS DEVICE HAD SIX SEPARATE TIPS, AT

10:35:35  17    LEAST IN THE 3.5 CONFIGURATION, AND EACH TIP WOULD BE PUTTING

10:35:40  18    OUT ITS OWN CHEMILUMINESCENCE, OR LIGHT.

10:35:45  19         Q.   SO THIS IS NOT THE SAME AS THAT?

10:35:47  20         A.   NO, THEY'RE NOT.  THESE ARE FIVE READINGS FROM THE SAME

10:35:50  21    PIECE OF INSTRUMENTATION.  IT'S NOT SIX SEPARATE TIPS.

10:35:54  22         Q.   BY THE WAY, AT THERANOS, DO YOU RECALL DISCUSSION OF HOW

10:36:02  23    EDISON DEVICES WERE USED IN GROUPS OF THREE TO RUN A SINGLE

10:36:06  24    ASSAY?

10:36:06  25         A.   YES.
```

UNITED STATES COURT REPORTERS

**ER-6594**

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                    2845

10:36:07  1    Q.   AT THERANOS, WAS THAT APPROACH EVER TAKEN WITH THIRD PARTY

10:36:11  2    DEVICES?  DID IT REQUIRE MULTIPLE THIRD PARTY DEVICES TO RETURN

10:36:14  3    A SINGLE RESULT?

10:36:15  4    A.   NO.

10:36:16  5    Q.   WE CAN TAKE THAT EXHIBIT DOWN.  THANK YOU.

10:36:26  6         CHANGING TOPICS.

10:36:29  7         DO YOU RECALL TESTIMONY THAT YOU GAVE ABOUT AN INSPECTION

10:36:32  8    OF THERANOS IN 2013 AND WHERE THE INSPECTOR WAS GOING TO

10:36:37  9    INSPECT?

10:36:37  10   A.   YES.

10:36:38  11   Q.   LET'S LOOK BRIEFLY AT EXHIBIT 4047, WHICH IS IN EVIDENCE.

10:36:53  12   IF WE COULD ZOOM IN ON THE TOP HALF.  LET'S CAPTURE THE TEXT

10:37:03  13   BELOW ALSO.  ACTUALLY, IF WE COULD CAPTURE MS. HOLMES'S EMAIL

10:37:10  14   AT THE BOTTOM, PLEASE.  PERFECT.  THANK YOU.

10:37:18  15        DR. YOUNG, DO YOU SEE THIS EMAIL THAT YOU PREVIOUSLY

10:37:20  16   REVIEWED WHERE MS. HOLMES IS ASKING, IN ADVANCE OF AN

10:37:25  17   INSPECTION, ABOUT WHAT THE PATH WILL BE FOR WALKING THE

10:37:28  18   AUDITORS IN AND DOWNSTAIRS?

10:37:30  19   A.   YES.

10:37:30  20   Q.   IN FRONT OF YOU, YOU SHOULD HAVE -- ACTUALLY, YOU DON'T

10:37:37  21   HAVE IT BECAUSE I HAVEN'T GIVEN IT TO YOU YET.

10:37:40  22        MAY I APPROACH, YOUR HONOR?

10:37:42  23            THE COURT:  YES.

10:37:46  24            MR. BOSTIC:  (HANDING.)

10:37:49  25   Q.   I'VE JUST HANDED YOU WHAT'S MARKED AS EXHIBIT 4316.

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                          2846

10:37:53  1          DO YOU SEE THAT IN FRONT OF YOU?

10:37:55  2     A.   YES.

10:37:55  3     Q.   AND IS THAT AN EMAIL WHERE THE BOTTOM CHAIN IS FROM

10:38:02  4     DECEMBER 3RD, 2013?

10:38:03  5     A.   YES.

10:38:04  6     Q.   AND IS IT ANOTHER EMAIL ON THE TOPIC OF THESE INSPECTORS

10:38:10  7     AND WHERE THE INSPECTORS WILL BE ACTUALLY PHYSICALLY LOCATED IN

10:38:14  8     THE HEADQUARTERS?

10:38:15  9     A.   YES.

10:38:15 10          MR. BOSTIC:  YOUR HONOR, MOVE TO ADMIT EXHIBIT 4316.

10:38:21 11          MR. WADE:  NO OBJECTION, YOUR HONOR.

10:38:22 12          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:38:25 13     (GOVERNMENT'S EXHIBIT 4316 WAS ADMITTED IN EVIDENCE.)

10:38:25 14          MR. BOSTIC:  AND IF WE COULD ZOOM IN ON THE BOTTOM

10:38:34 15     HALF OF PAGE 1.

10:38:38 16     Q.   DR. ROSENDORFF, DO YOU SEE THAT EMAIL FROM DANIEL YOUNG TO

10:38:44 17     YOU ON DECEMBER 3RD, 2013?

10:38:45 18     A.   YES.

10:38:46 19     Q.   THIS IS A FEW DAYS AFTER THE EMAIL FROM MS. HOLMES THAT WE

10:38:48 20     JUST LOOKED AT; CORRECT?

10:38:50 21     A.   CORRECT.

10:38:50 22     Q.   THE TEXT OF THAT EMAIL SAYS, "LET'S NOT REMIND HER ABOUT

10:38:53 23     THE DOWNSTAIRS LAB UNLESS SHE ASKS AGAIN.  JUST SIMPLER IF WE

10:38:58 24     CAN JUST SHOW HER THE LAB UPSTAIRS."

10:39:00 25          DO YOU SEE THAT?

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                    2847

10:39:02   1      A.   YES.

10:39:02   2      Q.   WAS THIS DAY THE DAY OF THE INSPECTION?

10:39:04   3      A.   YES.

10:39:05   4      Q.   THE "HER" THAT DANIEL YOUNG IS REFERRING TO, IS THAT THE

10:39:09   5      INSPECTOR?

10:39:10   6      A.   YES.

10:39:10   7      Q.   AND CAN YOU REMIND US WHAT THE DIFFERENCE WAS BETWEEN THE

10:39:12   8      DOWNSTAIRS LAB AND THE UPSTAIRS LAB?

10:39:14   9      A.   THE DOWNSTAIRS LAB HAD THE LDT'S, THE MODIFIED METHODS,

10:39:22  10      MODIFIED -- THE THERANOS METHODS, ESSENTIALLY.

10:39:27  11           THE UPSTAIRS LAB HAD THE FDA APPROVED INSTRUMENTS.

10:39:30  12      Q.   MS. HOLMES'S EMAIL THAT WE JUST LOOKED AT, EXHIBIT 4047,

10:39:37  13      DO YOU RECALL WHETHER THAT INCLUDED DANIEL YOUNG ON THE EMAIL?

10:39:41  14      A.   I'M SORRY, I DON'T RECALL THE RECIPIENT LIST.

10:39:46  15      Q.   THAT'S OKAY.  LET'S GO BACK TO IT BRIEFLY.  AND LET'S --

10:40:01  16      THANK YOU.

10:40:01  17           DO YOU SEE THAT MS. HOLMES'S EMAILS, BOTH OF THEM ON THIS

10:40:05  18      CHAIN INCLUDED DANIEL YOUNG?

10:40:08  19      A.   YES.

10:40:08  20      Q.   NOW LET'S GO BACK TO EXHIBIT 4316 AND ZOOM BACK IN ON THE

10:40:18  21      BOTTOM PART.

10:40:22  22           DR. ROSENDORFF, ON NOVEMBER 7TH, 2014, IT APPEARS THAT YOU

10:40:29  23      FORWARDED THIS MESSAGE.

10:40:30  24           DO YOU SEE THAT?

10:40:31  25      A.   YES.

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                      2848

10:40:32   1      Q.   AND WE'VE REDACTED THE EMAIL ADDRESS THAT YOU FORWARDED IT

10:40:36   2      TO, BUT DO YOU RECALL FORWARDING THIS EMAIL TO YOUR GMAIL

10:40:40   3      ACCOUNT ON THAT DATE?

10:40:41   4      A.   YES, YES.

10:40:42   5      Q.   WHY DID YOU DO THAT ALMOST A YEAR LATER IN NOVEMBER 2014?

10:40:46   6      A.   I -- AGAIN, I WAS CONCERNED ABOUT POSSIBLE GOVERNMENT OR

10:40:54   7      CMS INVESTIGATIONS IN THE LABORATORY AND I WANTED TO HAVE

10:40:56   8      DOCUMENTATION OF THE DISCUSSIONS AROUND THE, THE DAY OF THE

10:41:00   9      INSPECTION.

10:41:01   10     Q.   AND WHAT WAS IT ABOUT THIS PARTICULAR EMAIL THAT YOU

10:41:03   11     THOUGHT NEEDED TO BE DOCUMENTED?

10:41:04   12     A.   IT TROUBLED ME THAT WE WEREN'T TALKING ABOUT THE

10:41:13   13     DOWNSTAIRS LAB.  IT APPEARS FROM DR. YOUNG'S EMAIL THAT SHE HAD

10:41:20   14     ASKED ABOUT IT.  I'M NOT REALLY -- I DON'T HAVE A VERY CLEAR

10:41:25   15     RECOLLECTION OF WHAT THE DISCUSSION WAS WITH THE REGULATOR.

10:41:29   16     THERE WAS SOMETHING ABOUT IT THAT BOTHERED ME, THOUGH.

10:41:33   17     Q.   DID YOU FEEL THAT THERANOS SHOULD HAVE BEEN MORE

10:41:35   18     TRANSPARENT WITH THE REGULATOR ON THAT OCCASION?

10:41:38   19     A.   WELL, WE -- WE SHOWED THE REGULATOR EVERYTHING SHE WANTED

10:41:43   20     TO SEE IN THE LAB, SO I THINK WE RESPONDED TO THE AUDIT

10:41:50   21     APPROPRIATELY.

10:41:51   22     Q.   DO YOU RECALL RECEIVING ANY ADDITIONAL INSTRUCTION FROM

10:42:02   23     MANAGEMENT ABOUT HOW TO HANDLE IT IF THE INSPECTOR DID ASK

10:42:06   24     ABOUT THE DOWNSTAIRS LAB OR ENTERED THE DOWNSTAIRS LAB?

10:42:10   25     A.   NO.

| 10:42:11 | 1 | Q.   I'D LIKE TO SHOW YOU WHAT WE'VE MARKED AS EXHIBIT 1295. |
|---|---|---|
| 10:42:17 | 2 | MAY I APPROACH, YOUR HONOR? |
| 10:42:18 | 3 | THE COURT:  YES. |
| 10:42:19 | 4 | MR. BOSTIC:  (HANDING.) |
| 10:42:22 | 5 | Q.   DR. ROSENDORFF, DO YOU HAVE EXHIBIT 1295 IN FRONT OF YOU? |
| 10:42:32 | 6 | A.   YES. |
| 10:42:32 | 7 | Q.   AND IS IT AN EMAIL DATED, AGAIN, DECEMBER 3RD, 2013, THE |
| 10:42:42 | 8 | SAME DATE AS THE INSPECTION? |
| 10:42:44 | 9 | A.   YES. |
| 10:42:45 | 10 | Q.   AND IS IT FROM SUNNY BALWANI TO YOU, DANIEL YOUNG, AND |
| 10:42:48 | 11 | OTHER EMPLOYEES AT THERANOS? |
| 10:42:49 | 12 | A.   YES. |
| 10:42:50 | 13 | MR. BOSTIC:  YOUR HONOR, MOVE TO ADMIT EXHIBIT 1295. |
| 10:42:52 | 14 | MR. WADE:  NO OBJECTION. |
| 10:42:52 | 15 | THE COURT:  IT'S ADMITTED, IT MAY BE PUBLISHED. |
| 10:43:06 | 16 | (GOVERNMENT'S EXHIBIT 1295 WAS ADMITTED IN EVIDENCE.) |
| 10:43:06 | 17 | BY MR. BOSTIC: |
| 10:43:07 | 18 | Q.   IF WE COULD ZOOM IN. |
| 10:43:09 | 19 | OKAY.  DR. ROSENDORFF, DO YOU SEE THAT THIS IS AN E-MAIL |
| 10:43:12 | 20 | FROM SUNNY BALWANI TO YOU AND OTHER MEMBERS OF THE STAFF ON THE |
| 10:43:14 | 21 | DATE OF THE INSPECTION? |
| 10:43:16 | 22 | A.   YES. |
| 10:43:16 | 23 | Q.   THE TEXT OF THE EMAIL READS, "FOR THE AREA INSIDE THE |
| 10:43:19 | 24 | NORMANDY LAB THAT IS CORDONED OFF BY THE DIVIDERS, IF THE |
| 10:43:23 | 25 | INSPECTOR ASKS, WE SHOULD SAY THIS AREA IS FOR FUTURE GROWTH |

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                          2850

10:43:26  1    AND IS BEING ORGANIZED (AS IS THE CASE) BUT IS STILL RESTRICTED

10:43:31  2    ONLY TO THE CLIA LAB AND AUTHORIZED TEAM (AS IS THE CASE)."

10:43:37  3        DO YOU SEE THAT?

10:43:38  4    A.   YES.

10:43:38  5    Q.   DO YOU RECALL A PORTION OF THE NORMANDY LAB BEING BEHIND

10:43:42  6    DIVIDERS FOR THIS INSPECTION?

10:43:44  7    A.   YES.

10:43:45  8    Q.   DO YOU RECALL WHAT WAS ON THE OTHER SIDE OF THAT DIVIDED

10:43:47  9    PORTION?

10:43:48 10    A.   THE EDISONS.

10:43:49 11    Q.   IN YOUR EXPERIENCE AS A LABORATORY DIRECTOR, IS IT NORMAL

10:43:53 12    FOR MANAGEMENT TO GIVE THIS KIND OF SCRIPTING TO A LABORATORY

10:43:57 13    DIRECTOR DIRECTING THEM ON HOW TO RESPOND TO INSPECTOR

10:44:01 14    QUESTIONS?

10:44:01 15    A.   NO.

10:44:02 16    Q.   OKAY.  WE CAN PUT THAT ASIDE.

10:44:14 17        DO YOU RECALL SOME DISCUSSION DURING CROSS-EXAMINATION OF

10:44:19 18    SITUATIONS WHERE A LAB DIRECTOR MIGHT COVER MULTIPLE LABS AT

10:44:23 19    THE SAME TIME?

10:44:23 20    A.   YES.

10:44:23 21    Q.   AND YOU TESTIFIED THAT YOU HAD SUPERVISED UP TO THREE LABS

10:44:28 22    AT ONCE IN YOUR CAREER?

10:44:29 23    A.   YES.

10:44:29 24    Q.   DURING YOUR TIME AT THERANOS, WERE YOU SERVING AS A LAB

10:44:33 25    DIRECTOR ANYWHERE ELSE?

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                           2851

```
10:44:35   1      A.   NO.

10:44:36   2      Q.   AND WHY WAS THAT?

10:44:39   3      A.   I WANTED TO GIVE MY FULL ENERGY AND ATTENTION TO THERANOS.

10:44:45   4      IT WAS A COMPLICATED LABORATORY WITH CONSTANT ISSUES COMING UP.

10:44:54   5      I DIDN'T FEEL I HAD THE BANDWIDTH TO BE RESPONSIBLE FOR ANOTHER

10:44:59   6      LABORATORY AT THAT TIME.

10:45:00   7      Q.   ARE SOME CLINICAL LABORATORIES MORE COMPLICATED TO

10:45:04   8      SUPERVISE THAN OTHERS?

10:45:05   9      A.   YES.

10:45:06  10      Q.   AND HOW DOES -- OR HOW DID THERANOS STACK UP IN YOUR

10:45:11  11      EXPERIENCE?

10:45:11  12      A.   IT'S THE MOST COMPLICATED LABORATORY I'VE EVER HAD TO

10:45:15  13      SUPERVISE OR DIRECT.

10:45:17  14      Q.   AND DID PART OF THAT RELATE TO THE PROBLEMS THAT YOU SAW

10:45:20  15      WHEN YOU WERE LABORATORY DIRECTOR?

10:45:22  16      A.   YES.

10:45:22  17      Q.   DO YOU RECALL A DISCUSSION DURING CROSS-EXAMINATION

10:45:30  18      REGARDING A TIME WHEN YOU CONSIDERED BRINGING SOMETHING CALLED

10:45:33  19      A QUI TAM LAWSUIT AGAINST THERANOS?

10:45:35  20      A.   YES.

10:45:36  21      Q.   BASED ON YOUR UNDERSTANDING, DOES THAT KIND OF LAWSUIT

10:45:40  22      INVOLVE THE FEDERAL GOVERNMENT AT ALL?

10:45:42  23      A.   YES.

10:45:42  24      Q.   HOW SO?  WHAT'S YOUR UNDERSTANDING?

10:45:45  25      A.   I BELIEVE THE LAWSUIT IS BROUGHT TO THE FEDERAL GOVERNMENT
```

| | | |
|---|---|---|
| 10:45:56 | 1 | EITHER THROUGH CMS OR THROUGH SOME OTHER AGENCY WITHIN THE |
| 10:46:00 | 2 | FEDERAL GOVERNMENT, HEALTH AND HUMAN SERVICES?  I'M NOT REALLY |
| 10:46:06 | 3 | SURE.  I KNOW THAT IT INVOLVES MEDICARE, WHICH IS A GOVERNMENT |
| 10:46:09 | 4 | RUN PROGRAM. |
| 10:46:11 | 5 | THERE IS A RELATER OR SOMEBODY WHO COMMUNICATES THE FRAUD |
| 10:46:17 | 6 | TO THE GOVERNMENT. |
| 10:46:19 | 7 | I KIND OF LOST TRACK OF YOUR QUESTION.  I DON'T KNOW, I'M |
| 10:46:21 | 8 | JUST -- I'M DESCRIBING MY UNDERSTANDING OF A QUI TAM. |
| 10:46:24 | 9 | Q.  THAT'S FINE.  I THINK YOU'VE ANSWERED IT. |
| 10:46:27 | 10 | A.  YEAH. |
| 10:46:27 | 11 | Q.  ON CROSS, MR. WADE SUGGESTED THAT YOU WERE SEEKING A |
| 10:46:30 | 12 | FINANCIAL REWARD IN EXPLORING THAT OPTION. |
| 10:46:33 | 13 | DO YOU RECALL THAT? |
| 10:46:34 | 14 | A.  YES. |
| 10:46:34 | 15 | Q.  WAS THAT YOUR GOAL IN CONSIDERING TAKING THAT STEP? |
| 10:46:36 | 16 | A.  NO. |
| 10:46:37 | 17 | Q.  WHAT WAS YOUR GOAL? |
| 10:46:38 | 18 | A.  TO CORRECT -- TO RIGHT THE WRONGS, BASICALLY, TO ALERT THE |
| 10:46:49 | 19 | PUBLIC OF WHAT WAS GOING ON AT THERANOS.  I FELT A |
| 10:46:52 | 20 | RESPONSIBILITY FOR THIS TO SEE THE LIGHT OF DAY. |
| 10:46:55 | 21 | I WAS UNSURE WHAT AVENUE TO PURSUE.  I WAS EXPLORING |
| 10:46:59 | 22 | DIFFERENT AVENUES. |
| 10:47:00 | 23 | Q.  OKAY.  WHEN YOU WERE QUESTIONED ABOUT THE POSSIBILITY OF A |
| 10:47:02 | 24 | FINANCIAL REWARD, YOU MENTIONED THE EXTENT TO WHICH THERANOS |
| 10:47:07 | 25 | WAS INVOLVED IN MEDICARE. |

UNITED STATES COURT REPORTERS

**ER-6602**

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                2853

```
10:47:09   1          DO YOU REMEMBER THAT?

10:47:10   2     A.   YES.

10:47:11   3     Q.   EXPLAIN WHAT THE CONNECTION WAS THERE IN YOUR MIND.

10:47:14   4     A.   MY UNDERSTANDING WHILE I WORKED AT THERANOS IS THAT MOST

10:47:17   5     OF THE PATIENTS WERE ACTUALLY PAYING OUT OF POCKET FOR THESE

10:47:21   6     TESTS BECAUSE THERANOS WAS TOUTING THE TESTS AS BEING MUCH

10:47:25   7     CHEAPER THAN OTHER LABS.

10:47:27   8          AND I -- I BELIEVE THERE WERE SOME PRIVATE INSURERS THAT

10:47:32   9     WERE INVOLVED IN PAYING FOR THE TESTS.

10:47:35  10          THERE WAS AN EFFORT TO RECOVER MONIES FROM PRIVATE

10:47:41  11     INSURERS BECAUSE THERE WAS SOME PAPERWORK ISSUE WITH BILLING.

10:47:46  12     I REMEMBER THAT.  SO I KNOW THAT PRIVATE INSURERS WERE

10:47:50  13     INVOLVED.

10:47:50  14          BUT I NEVER SAW ANY INFORMATION REGARDING MEDICARE

10:47:53  15     BILLING, SO I DIDN'T THINK THAT THERE ACTUALLY WOULD BE ANY

10:47:56  16     MONEY RECOVERABLE ON THE BASIS OF MEDICARE FRAUD.

10:47:58  17     Q.   IT WAS YOUR UNDERSTANDING THAT ANY FINANCIAL RECOVERY YOU

10:48:02  18     MIGHT GET FROM THE LAWSUIT WOULD BE BASED ON THE AMOUNT OF

10:48:06  19     THERANOS'S WORK WITH MEDICARE?

10:48:08  20     A.   YES.  IS THAT ACCURATE?  SORRY.

10:48:15  21     Q.   I DON'T WANT YOU TO REVEAL THE CONTENT OF ANY PRIVILEGED

10:48:19  22     CONVERSATION THAT YOU HAD WITH YOUR ATTORNEY --

10:48:21  23     A.   YES.

10:48:22  24     Q.   -- BUT CAN YOU TELL US WHEN YOU FIRST STARTED EXPLORING

10:48:25  25     THE POSSIBILITY OF A QUI TAM LAWSUIT AGAINST THERANOS?
```

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                    2854

```
10:48:28   1    A.   I BELIEVE MY FIRST MEETING WITH THE ATTORNEY WAS MID-2014.

10:48:35   2    Q.   ULTIMATELY, YOU DID NOT GET INVOLVED IN THAT KIND OF

10:48:39   3    LAWSUIT; CORRECT?

10:48:40   4    A.   CORRECT.

10:48:40   5    Q.   AND JUST TO BE CLEAR, YOU'RE TESTIFYING HERE IN A CRIMINAL

10:48:44   6    PROSECUTION; CORRECT?

10:48:45   7    A.   CORRECT.

10:48:46   8    Q.   DO YOU HAVE ANY HOPE OR EXPECTATION OF RECEIVING ANY

10:48:51   9    BENEFIT IN CONNECTION WITH YOUR TESTIMONY IN THIS PROSECUTION?

10:48:54  10    A.   NO.  ON THE CONTRARY.

10:48:56  11    Q.   DO YOU RECALL A DISCUSSION ABOUT YOUR FINANCIAL

10:49:01  12    COMPENSATION AT THERANOS?

10:49:03  13    A.   YES.

10:49:03  14    Q.   YOU TESTIFIED THAT WHEN YOU LEFT THE COMPANY, MR. BALWANI

10:49:08  15    INVITED YOU TO SAY ON.

10:49:09  16    A.   YES.

10:49:10  17    Q.   DID YOU ASK MR. BALWANI FOR A RAISE AT THAT TIME?

10:49:13  18    A.   NO.

10:49:13  19    Q.   WHEN YOU LEFT THE COMPANY, WAS YOUR DECISION TO LEAVE THE

10:49:17  20    COMPANY ABOUT MONEY?

10:49:18  21    A.   NO.

10:49:19  22    Q.   WHAT WAS IT ABOUT?

10:49:20  23    A.   IT WAS ABOUT PATIENT CARE AND MY INTEGRITY AS A PHYSICIAN.

10:49:25  24    Q.   I WANT TO CIRCLE BACK TO THE PRACTICE THAT YOU HAD OF

10:49:31  25    FORWARDING CERTAIN EMAILS TO YOUR PERSONAL EMAIL ACCOUNT.
```

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                    2855

10:49:35   1           DO YOU RECALL TESTIFYING ABOUT THAT?

10:49:36   2      A.   YES.

10:49:37   3      Q.   DURING YOUR CROSS-EXAMINATION, MR. WADE ACCUSED YOU OF

10:49:42   4      STEALING COMPANY TRADE SECRET INFORMATION.

10:49:45   5           DO YOU RECALL THAT?

10:49:45   6      A.   YES.

10:49:46   7      Q.   DID YOU EVER DISCLOSE ANY OF THE INFORMATION IN THE EMAILS

10:49:50   8      YOU FORWARDED TO ANY OTHER LABS OR COMPETITORS OF THERANOS?

10:49:54   9      A.   NO.

10:49:54  10      Q.   DID YOU EVER CONSIDER DOING THAT?

10:49:56  11      A.   NO.

10:49:57  12      Q.   BASED ON YOUR EXPERIENCE WITH THE THERANOS TESTING

10:50:02  13      METHODS, WOULD YOU HAVE WANTED OTHER METHODS -- EXCUSE ME.

10:50:05  14           WOULD YOU HAVE WANTED OTHER LABORATORIES TO USE THOSE

10:50:09  15      METHODS?

10:50:09  16      A.   NO.

10:50:10  17      Q.   MR. WADE ALSO CRITICIZED YOU FOR FORWARDING AN EMAIL TO

10:50:17  18      YOURSELF THAT CONTAINED PATIENT IDENTIFYING INFORMATION.

10:50:20  19           DO YOU RECALL THAT?

10:50:20  20      A.   YES.

10:50:21  21      Q.   DID THE WELFARE OF THOSE PATIENTS PLAY ANY ROLE IN YOUR

10:50:30  22      DECISION TO FORWARD THAT EMAIL TO YOURSELF?

10:50:32  23      A.   YES.

10:50:32  24      Q.   HOW SO?

10:50:33  25      A.   AS LABORATORY DIRECTOR, THOSE WERE PATIENTS UNDER MY CARE

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                    2856

10:50:39   1      AND I -- I WANTED TO BE ABLE TO RESPOND TO QUERIES THAT CAME TO

10:50:46   2      ME AFTER I LEFT THERANOS FROM ANY OF THOSE PATIENTS.

10:50:53   3          I DID NOT SHARE ANY OF THAT INFORMATION WITH THIRD

10:50:57   4      PARTIES.

10:50:57   5          AND AS I TESTIFIED, I DELETED ALL OF THOSE EMAILS I

10:51:02   6      BELIEVE THE EVENING THAT I LEFT THERANOS.

10:51:05   7      Q.   ON CROSS-EXAMINATION, MR. WADE ASKED YOU WHETHER CUSTOMER

10:51:12   8      SERVICE WAS IMPORTANT AT THERANOS.

10:51:13   9          DO YOU REMEMBER THAT QUESTION?

10:51:14  10      A.   YES.

10:51:15  11      Q.   YOUR ANSWER AT THE TIME WAS THAT YOU COULDN'T ANSWER YES

10:51:18  12      OR NO.

10:51:18  13          DO YOU REMEMBER THAT?

10:51:19  14      A.   YES.

10:51:19  15      Q.   WHAT'S THE COMPLETE ANSWER TO THAT QUESTION?  WHY COULDN'T

10:51:24  16      YOU ANSWER YES OR NO?

10:51:25  17      A.   I -- I THINK BECAUSE IF CUSTOMER SERVICE WAS TRULY

10:51:33  18      IMPORTANT TO THE COMPANY, THERE WOULD HAVE BEEN MUCH GREATER

10:51:35  19      DEGREE OF TRANSPARENCY WITH THE PUBLIC.

10:51:39  20      Q.   LET'S TALK SOME MORE ABOUT THE CLIA REGULATIONS GOVERNING

10:51:44  21      CLINICAL LAB PRACTICE.

10:51:46  22      A.   YES.

10:51:46  23      Q.   ON CROSS-EXAMINATION, MR. WADE SHOWED YOU SECTIONS OF THE

10:51:53  24      REGULATIONS THAT GIVE THE LABORATORY DIRECTOR RESPONSIBILITY

10:51:57  25      AND POWER OVER A NUMBER OF ISSUES IN THE LAB; IS THAT CORRECT?

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                    2857

10:52:01  1      A.   CORRECT.

10:52:01  2      Q.   AND IS THAT CONSISTENT WITH WHAT YOUR UNDERSTANDING WAS OF

10:52:04  3      THE ROLE WHEN YOU WERE LAB DIRECTOR AT THERANOS?

10:52:08  4      A.   SO CLIA ALSO MAKES THE OWNER OR THE OPERATOR OF THE

10:52:16  5      LABORATORY RESPONSIBLE IN THE EVENT THAT THERE ARE ANY

10:52:21  6      VIOLATIONS OF ANY OF THE CLIA STATUTES UNDER C.F.R. 493.

10:52:28  7           GO AHEAD.  I'M SORRY.

10:52:29  8      Q.   AND WERE YOU GENERALLY AWARE OF THE PROVISIONS OF THOSE

10:52:34  9      REGULATIONS DURING YOUR TIME AS LAB DIRECTOR AT THERANOS?

10:52:37 10      A.   YES.

10:52:41 11      Q.   DO YOU AGREE THAT THE POSITION OF LABORATORY DIRECTOR

10:52:45 12      COMES WITH CONSIDERABLE AUTHORITY?

10:52:46 13      A.   IT COMES WITH CONSIDERABLE RESPONSIBILITY AND AN

10:52:54 14      ASSUMPTION OF AUTHORITY, YEAH.

10:52:56 15      Q.   CAN YOU EXPLAIN THE DIFFERENCE BETWEEN RESPONSIBILITY AND

10:53:04 16      AUTHORITY IN THAT CONTEXT?

10:53:05 17      A.   SO RESPONSIBILITY IS WHAT YOU'RE LEGALLY RESPONSIBLE FOR

10:53:10 18      IN THE EYES OF CMS IN TERMS OF HOW THE LAB FUNCTIONS AND

10:53:13 19      PERFORMS, THE ACCURACY OF ITS TESTING, HOW THE LAB REPORTS

10:53:19 20      TESTING, HOW IT HANDLES SAMPLES, ET CETERA, ET CETERA.

10:53:22 21           AUTHORITY IS THE ACTUAL POWER TO MAKE THOSE THINGS HAPPEN

10:53:25 22      AND IMPLEMENT THEM IN THE LABORATORY.

10:53:30 23      Q.   LET'S TALK ABOUT ACTUAL POWER AT THERANOS THEN.

10:53:38 24           IN YOUR EXPERIENCE AT THE COMPANY, WHAT WAS THE POWER

10:53:40 25      DYNAMIC LIKE BETWEEN YOU ON THE ONE HAND AND ELIZABETH HOLMES

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                      2858

10:53:48  1      ON THE OTHER HAND, FOR EXAMPLE?

10:53:50  2      A.   CAN YOU BE -- CAN YOU BE MORE SPECIFIC?

10:54:00  3      Q.   SURE.

10:54:00  4      A.   YEAH.

10:54:01  5      Q.   IN YOUR ROLE AS LAB DIRECTOR AT THERANOS, DID YOU HAVE

10:54:05  6      CO-EQUAL POWER WITH MS. HOLMES IN THE COMPANY?  DID ONE OF YOU

10:54:10  7      HAVE AUTHORITY OVER THE OTHER?  TELL US HOW THAT WORKED.

10:54:13  8      A.   WELL, MR. BALWANI WAS HEAVILY INVOLVED IN DIRECTING THE

10:54:18  9      CLIA LABORATORY.  HE WOULD MAKE FIRING DECISIONS WITHOUT ME.

10:54:28 10           AND ALSO, AS WE'VE SEEN THROUGH THIS TRIAL, NUMEROUS

10:54:33 11      LABORATORY AND OPERATIONAL DECISIONS THAT DIDN'T INVOLVE ME.

10:54:37 12           AND I ASSUMED HE WAS DISCUSSING THOSE WITH ELIZABETH.

10:54:40 13      Q.   GENERALLY SPEAKING IN THE COMPANY, WHO HAD MORE POWER, YOU

10:54:45 14      OR THE CEO, MS. HOLMES?

10:54:47 15      A.   MS. HOLMES.

10:54:49 16      Q.   DID MS. HOLMES'S POWER AND HER AUTHORITY IN THE COMPANY

10:54:53 17      COME FROM THE CLIA REGULATIONS?

10:54:56 18      A.   NO.  IT CAME FROM BUSINESS PRIORITIES.

10:54:59 19      Q.   AND HER POSITION AT THE COMPANY?

10:55:01 20      A.   YES.

10:55:02 21      Q.   IF YOU HAD BEEN LAB DIRECTOR AND CEO OF THERANOS, IF YOU

10:55:17 22      HAD HAD THE POWER TO DO WHATEVER YOU WANTED AT THE COMPANY, CAN

10:55:20 23      YOU GIVE US SOME EXAMPLES OF THINGS THAT WOULD HAVE BEEN

10:55:22 24      DIFFERENT, THINGS THAT YOU WOULD HAVE DONE DIFFERENTLY?

10:55:25 25           MR. WADE:  OBJECTION, YOUR HONOR.

```
10:55:27   1              THE COURT:  SUSTAINED.

10:55:30   2        YOU CAN ASK A DIFFERENT METHOD.  AS TO THE FORM OF THE

10:55:37   3   QUESTION, OBJECTION SUSTAINED.

10:55:39   4   BY MR. BOSTIC:

10:55:39   5   Q.   DR. ROSENDORFF, DURING YOUR TIME AT THERANOS, WERE THERE

10:55:42   6   THINGS THAT YOU THOUGHT SHOULD HAVE BEEN DONE TO ENSURE THE

10:55:48   7   ACCURACY OF THE TESTING THAT YOU DIDN'T HAVE THE POWER TO DO?

10:55:52   8   A.   I MIGHT SUGGEST -- FOR INSTANCE, I MADE SUGGESTIONS ABOUT

10:56:01   9   BEING TRANSPARENT WITH CUSTOMERS ABOUT WHETHER FINGERSTICK OR

10:56:05  10   VENOUS BLOOD HAD BEEN DRAWN AND WHAT METHOD HAD BEEN USED.

10:56:10  11   THAT DIDN'T HAPPEN.

10:56:12  12        I HAD HAD A, AN ARGUMENT, PER SE, OR A DISCUSSION WITH

10:56:18  13   DANIEL DURING THE VALIDATION PHASE ABOUT THE FACT THAT ACTUALLY

10:56:24  14   PAIRED VENOUS AND FINGERSTICK SAMPLES WOULD BE A BETTER WAY TO

10:56:28  15   ASSESS ACCURACY THAN JUST DILUTING VENOUS.

10:56:31  16        BUT IN VIEW OF THE RUSH FOR THE LAUNCH, THAT WASN'T

10:56:34  17   SOMETHING THAT THE COMPANY WAS GOING TO AGREE TO.

10:56:41  18   Q.   IN THE SITUATIONS THAT YOU JUST DESCRIBED, WERE YOU THE

10:56:45  19   ULTIMATE DECIDER ON HOW THE COMPANY HANDLED THOSE SITUATIONS?

10:56:48  20   A.   NO.

10:56:49  21   Q.   WHO WERE THE ULTIMATE DECIDERS IN THOSE SITUATIONS?

10:56:54  22   A.   THE EXECUTIVES.

10:56:55  23   Q.   WHO ARE WE TALKING ABOUT THERE?

10:56:57  24   A.   ELIZABETH, SUNNY, AND DANIEL, WHO WAS THE VICE PRESIDENT.

10:57:00  25   Q.   DO YOU RECALL TESTIMONY DURING CROSS-EXAMINATION ABOUT
```

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                       2860

10:57:08   1    YOUR VIEW OF MS. HOLMES'S QUALIFICATIONS AND WHETHER SHE WOULD

10:57:11   2    HAVE BEEN QUALIFIED, FOR EXAMPLE, TO BE A LAB DIRECTOR HERSELF?

10:57:14   3    A.    YES.

10:57:14   4    Q.    AND YOU WERE ANSWERING BASED ON WHAT THE REGULATIONS

10:57:20   5    REQUIRE; IS THAT RIGHT?

10:57:22   6    A.    CORRECT.

10:57:23   7    Q.    IN PRACTICE AT THERANOS -- WELL, LET ME ASK A SEPARATE

10:57:30   8    QUESTION FIRST.

10:57:32   9        DOES THE SAME GO FOR MR. BALWANI AND YOUR TESTIMONY ABOUT

10:57:37  10    HIS QUALIFICATIONS?

10:57:38  11    A.    YES.

10:57:38  12    Q.    IN PRACTICE AT THERANOS, DID MS. HOLMES AND MR. BALWANI

10:57:47  13    NEED TO QUALIFY UNDER THE REGULATIONS TO INFLUENCE OPERATIONS

10:57:51  14    IN THE LABORATORY?

10:57:52  15    A.    YES.

10:57:52  16    Q.    AND THAT'S -- THAT WAS A REQUIREMENT BASED ON THE

10:57:56  17    REGULATIONS; CORRECT?

10:57:57  18    A.    YES.

10:57:57  19    Q.    IS THAT HOW IT ACTUALLY WORKED AT THE COMPANY IN PRACTICE?

10:58:00  20    A.    NO.

10:58:01  21    Q.    HOW DID IT WORK AT THE COMPANY IN PRACTICE?

10:58:03  22    A.    SUNNY HAD A STRONG HAND IN, IN THE OPERATIONS OF THE LAB.

10:58:10  23    FOR INSTANCE, HIS DECISION BEHIND MY BACK THAT VACUTAINERS

10:58:15  24    SHOULD BE ALIQUOTED INTO CTN'S THAT I HAD NO AWARENESS OF.

10:58:21  25        DANIEL YOUNG WAS HEAVILY INVOLVED IN CLIA LAB OPERATIONS.

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                    2861

| | | |
|---|---|---|
| 10:58:24 | 1 | AND MS. HOLMES WAS AWARE OF ALL OF THAT. |
| 10:58:33 | 2 | Q.   I'D LIKE TO SHOW YOU WHAT'S BEEN MARKED AS EXHIBIT 5417. |
| 10:58:37 | 3 | MAY I APPROACH, YOUR HONOR? |
| 10:58:39 | 4 | THE COURT:  YES. |
| 10:58:40 | 5 | MR. BOSTIC:  (HANDING.) |
| 10:58:43 | 6 | Q.   AND, DR. ROSENDORFF, DO YOU HAVE EXHIBIT 5417 IN FRONT OF |
| 10:58:53 | 7 | YOU? |
| 10:58:53 | 8 | A.   YES. |
| 10:58:54 | 9 | Q.   IS THAT AN EMAIL CHAIN WITH THE SUBJECT LINE PHYSICIAN |
| 10:59:00 | 10 | QUESTIONING RESULTS BETWEEN INDIVIDUALS AT THERANOS, INCLUDING |
| 10:59:04 | 11 | MR. BALWANI AND ELIZABETH HOLMES? |
| 10:59:06 | 12 | A.   YES. |
| 10:59:06 | 13 | MR. BOSTIC:  YOUR HONOR, MOVE TO ADMIT EXHIBIT 5417. |
| 10:59:15 | 14 | MR. WADE:  COURT'S INDULGENCE FOR ONE MOMENT. |
| 10:59:18 | 15 | (PAUSE IN PROCEEDINGS.) |
| 10:59:31 | 16 | MR. WADE:  NO OBJECTION. |
| 10:59:31 | 17 | THE COURT:  IT'S ADMITTED AND IT MAY BE PUBLISHED. |
| 10:59:39 | 18 | (GOVERNMENT'S EXHIBIT 5417 WAS ADMITTED IN EVIDENCE.) |
| 10:59:39 | 19 | BY MR. BOSTIC: |
| 10:59:40 | 20 | Q.   AND THIS IS AN EMAIL CHAIN, DR. ROSENDORFF, ABOUT THE |
| 10:59:42 | 21 | PHYSICIAN QUESTIONING RESULTS. |
| 10:59:45 | 22 | DO YOU SEE THAT? |
| 10:59:46 | 23 | A.   YES. |
| 10:59:46 | 24 | Q.   I'D LIKE TO DRAW YOUR ATTENTION TO THE BOTTOM OF THE FIRST |
| 10:59:49 | 25 | PAGE, PLEASE. |

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                                    2862

```
10:59:49   1       A.   OKAY.

10:59:50   2       Q.   AND IF WE COULD ZOOM IN JUST ON THE BOTTOM TWO MESSAGES.

10:59:56   3            DR. ROSENDORFF, DO YOU SEE AT THE BOTTOM, THERE'S AN EMAIL

10:59:58   4       FROM SUNNY BALWANI TO SOMEONE NAMED NICHOLAS MENCHEL?

11:00:02   5       A.   YES.

11:00:06   6       Q.   DO YOU RECALL WHO NICHOLAS MENCHEL WAS AT THE COMPANY?

11:00:10   7       A.   SO THERE WERE THREE INDIVIDUALS WHO WENT TO, OR ATTENDED

11:00:13   8       DUKE UNIVERSITY WITH EACH OTHER.  IT WAS MAX, NICK, AND ANOTHER

11:00:18   9       PERSON.  THEY WERE FACTOTUMS OF A SORT.  THEY PERFORMED MANY

11:00:26  10       DIFFERENT FUNCTIONS IN THE LAB.

11:00:28  11       Q.   OKAY.  MR. BALWANI'S E-MAIL TO MR. MENCHEL ON JULY 19TH,

11:00:33  12       2014 SAYS, "NICK, THIS WAS NOT COMMUNICATED TO ME UNTIL I SAW

11:00:39  13       THIS A FEW MINUTES AGO."  HE'S REFERRING TO AN EARLIER

11:00:42  14       CONVERSATION HERE.

11:00:43  15            HE THEN SAYS, "YOU KNOW, I AM RUNNING CLIA LAB NOW SO IF

11:00:47  16       YOU WANT TO STAY INVOLVED FROM CALL CENTER PERSPECTIVE, YOU

11:00:50  17       NEED TO MAKE APPOINT THAT I GET LOOKED IN."

11:00:55  18            DO YOU SEE THAT?

11:00:56  19       A.   YES, I DO.

11:00:57  20       Q.   JULY 2014, WERE YOU STILL PRESENT AT THE COMPANY?

11:01:02  21       A.   YES, I WAS.

11:01:03  22       Q.   WHAT WAS YOUR POSITION AT THE COMPANY IN JULY 2014?

11:01:05  23       A.   LABORATORY DIRECTOR.

11:01:07  24       Q.   WHAT'S YOUR REACTION TO MR. BALWANI'S STATEMENT, "I AM

11:01:10  25       RUNNING CLIA LAB NOW"?
```

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                           2863

11:01:12  1      A.    AFTER MARK PANDORI'S EXIT FROM THE COMPANY, SUNNY BALWANI

11:01:19  2      COMMUNICATED TO ME THAT HE HAD A UNIQUE SET OF SKILLS AND

11:01:24  3      TALENTS THAT WOULD QUALIFY HIM TO DIRECT THE CLIA LAB

11:01:27  4      ESSENTIALLY.

11:01:28  5           I DIDN'T RESPOND TO THAT.

11:01:32  6           AND SO I'M NOT SURPRISED THAT HE'S SAYING HERE, "I'M

11:01:35  7      RUNNING THE CLIA LAB NOW."  HE'S CLEARLY NOT QUALIFIED UNDER

11:01:39  8      THE REGULATIONS.

11:01:40  9      Q.    I'LL DRAW YOUR ATTENTION TO THE VERY TOP OF PAGE 1, AND IF

11:01:47 10      WE CAN ZOOM IN JUST ON THE TOP MESSAGE.

11:01:57 11           DO YOU SEE THAT AT THE TOP OF THIS EMAIL CHAIN, THERE'S

11:01:59 12      ANOTHER MESSAGE FROM MR. BALWANI ON THAT SAME DATE TO

11:02:02 13      NICHOLAS MENCHEL AND BCC'ING ELIZABETH HOLMES --

11:02:06 14      A.    YES.

11:02:07 15      Q.    -- FORWARDING TO HER THE REST OF THIS EMAIL CHAIN.

11:02:09 16           DO YOU SEE THAT?

11:02:10 17      A.    YES.

11:02:10 18      Q.    DID THE CLIA REGULATIONS GIVE YOU THE POWER AT THERANOS TO

11:02:21 19      OVERRULE ELIZABETH HOLMES AND SUNNY BALWANI?

11:02:25 20      A.    UM --

11:02:26 21      Q.    AND I'M ASKING IN PRACTICE BASED ON HOW IT ACTUALLY WORKED

11:02:30 22      AT THE COMPANY.

11:02:31 23      A.    SO THERE'S A CLEAR CONFLICT BETWEEN THE ORGANIZATIONAL

11:02:38 24      CHART AT THE COMPANY WHERE BOTH SUNNY AND ELIZABETH ARE ABOVE

11:02:43 25      ME IN THAT ORG CHART, I REPORT TO THEM AND I'M RESPONSIBLE TO

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                2864

11:02:47  1    THEM.

11:02:48  2        ON THE OTHER HAND, THE CLIA REGULATIONS SAY THAT I'M

11:02:50  3    RESPONSIBLE FOR ESSENTIALLY EVERYTHING THAT HAPPENS IN THE

11:02:53  4    LABORATORY.

11:02:54  5    Q.   AND IN PRACTICE AT THERANOS, DID ELIZABETH HOLMES AND

11:02:58  6    SUNNY BALWANI DEFER TO YOU ON THOSE ISSUES BASED ON THE CLIA

11:03:03  7    REGULATIONS?

11:03:04  8    A.   AT TIMES.

11:03:05  9    Q.   ALL THE TIME?

11:03:07 10    A.   NO.

11:03:07 11    Q.   DO YOU RECALL REVIEWING, DURING YOUR TESTIMONY, AN EMAIL

11:03:12 12    INCLUDING MR. BALWANI AND ELIZABETH HOLMES WHERE YOU RAISED

11:03:17 13    ISSUES REGARDING CLIA COMPLIANCE?

11:03:19 14    A.   YES.

11:03:20 15    Q.   AND IN CONNECTION WITH THE ISSUES YOU RAISED THERE, DID

11:03:25 16    MS. HOLMES AND MR. BALWANI DEFER TO YOUR JUDGMENT?

11:03:28 17    A.   SO I BELIEVE THAT WAS AN EMAIL I SENT ON A SUNDAY STATING

11:03:33 18    THAT WE WEREN'T IN COMPLIANCE WITH A NUMBER OF CLIA STATUTES.

11:03:38 19        AND SUNNY RESPONDED THAT HE WAS GOING TO GET THE TEAMS TO

11:03:40 20    WORK ON IT AND SPEND LONG HOURS.

11:03:43 21    Q.   DO YOU REMEMBER MS. HOLMES DIRECTING THAT EMAIL THAT NO

11:03:46 22    ONE SHOULD BE GUESSING ABOUT THOSE ISSUES?

11:03:48 23    A.   MS. HOLMES'S EMAIL ABOUT THE GUESSING WAS ABOUT -- WAS

11:03:54 24    BASICALLY PUTTING A STOP TO THE BACK AND FORTH ABOUT

11:03:58 25    PROFICIENCY TESTING.

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                          2865

```
11:04:00   1              SO IT WAS FOLLOWING ON THE HEELS OF THAT SPOT CHECK THAT

11:04:03   2     WE DISCUSSED, AND THERE WAS A DISCUSSION BETWEEN DANIEL AND

11:04:08   3     MYSELF AND SUNNY ABOUT WHAT'S APPROPRIATE IN TERMS OF

11:04:11   4     PROFICIENCY TESTING, AND ELIZABETH SAID, YOU KNOW, WE ENGAGED

11:04:16   5     DIRECTLY WITH YOUR COUNSEL A LONG TIME ABOUT THIS AND NOBODY

11:04:18   6     SHOULD BE GUESSING ON THESE MATTERS.

11:04:20   7     Q.   AND AT THE TIME, DID YOU FEEL THAT THAT'S WHAT YOU WERE

11:04:23   8     DOING?  WERE YOU GUESSING ON THOSE REGULATORY MATTERS?

11:04:26   9     A.   NO.

11:04:26  10     Q.   IN THAT SITUATION, DID MS. HOLMES DEFER TO YOU AS LAB

11:04:30  11     DIRECTOR?

11:04:31  12     A.   NO.

11:04:40  13              MR. BOSTIC:  MAY I HAVE A MOMENT, YOUR HONOR?

11:04:42  14              THE COURT:  YES.

11:04:44  15          (DISCUSSION OFF THE RECORD AMONGST GOVERNMENT COUNSEL.)

11:04:59  16     BY MR. BOSTIC:

11:05:02  17     Q.   DR. ROSENDORFF, YOU TESTIFIED A MOMENT AGO THAT UNDER THE

11:05:05  18     REGULATIONS, THE OWNER OR OPERATOR OF A LAB ALSO HAS

11:05:08  19     RESPONSIBILITIES.

11:05:09  20     A.   YES.

11:05:10  21     Q.   CAN YOU EXPLAIN HOW THAT FITS INTO THE PICTURE BASED ON

11:05:12  22     YOUR UNDERSTANDING?

11:05:13  23     A.   IF CMS DECIDES TO SANCTION THE LABORATORY BASED ON

11:05:21  24     NONCOMPLIANCE, IT CAN IMPOSE FINES AND PENALTIES ON EITHER THE

11:05:26  25     LABORATORY DIRECTOR OR THE OWNER/OPERATOR OR BOTH.
```

ROSENDORFF REDIRECT BY MR. BOSTIC (RES.)                           2866

11:05:31   1      Q.   DO YOU RECALL TESTIMONY DURING CROSS-EXAMINATION WHERE

11:05:39   2      MR. WADE ASKED YOU ABOUT WHETHER EVERY LAB MAKES OCCASIONAL

11:05:42   3      MISTAKES?

11:05:43   4      A.   YES.

11:05:44   5      Q.   AND DO YOU AGREE WITH THAT STATEMENT, THAT EVERY LAB

11:05:47   6      SOMETIMES MAKES MISTAKES?

11:05:48   7      A.   YES.

11:05:48   8      Q.   YOU'VE WORKED AT MULTIPLE LABS; IS THAT CORRECT?

11:05:52   9      A.   YES, MANY, MANY LABS.

11:05:54   10     Q.   APPROXIMATELY HOW MANY LABS HAVE YOU WORKED AT IN YOUR

11:05:57   11     13 YEARS OF EXPERIENCE?

11:05:58   12     A.   IT'S SIX NOW.  YEAH.

11:06:07   13     Q.   NONE OF THOSE LABS HAS BEEN PERFECT; IS THAT RIGHT?

11:06:10   14     A.   CORRECT.

11:06:11   15     Q.   WERE THE PROBLEMS THAT YOU SAW AT THERANOS IN LINE WITH

11:06:18   16     WHAT YOU WOULD EXPECT TO SEE AT ANY LABORATORY?

11:06:20   17     A.   NO.

11:06:20   18     Q.   WERE THEY WORSE THAN THAT?

11:06:22   19     A.   YES.

11:06:23   20     Q.   AT ANY OTHER LABORATORY, DID YOU EVER RESORT TO FORWARDING

11:06:29   21     EVIDENCE TO YOUR PERSONAL EMAIL ACCOUNT BECAUSE YOU WORRIED

11:06:31   22     ABOUT FUTURE INVESTIGATIONS INTO LAB PRACTICES?

11:06:34   23     A.   NO.

11:06:36   24           MR. BOSTIC:  NO FURTHER QUESTIONS.

11:06:37   25           THANK YOU, YOUR HONOR.

UNITED STATES COURT REPORTERS

```
11:06:38   1              THE COURT:  LET'S TAKE OUR MORNING BREAK NOW, LADIES

11:06:40   2      AND GENTLEMEN.

11:06:41   3          LET'S TAKE 45 MINUTES, 45 MINUTES.  AND THEN WE'LL COME

11:06:45   4      BACK.

11:06:46   5              WILL YOU HAVE CROSS-EXAMINATION, OR RECROSS?

11:06:48   6              MR. WADE:  I WILL, YOUR HONOR.

11:06:49   7              THE COURT:  ALL RIGHT.  THANK YOU.

11:06:52   8              THE CLERK:  COURT IS IN RECESS.

11:07:07   9              THE COURT:  YOU CAN STAND DOWN, DOCTOR, AS WELL.

11:07:12  10          (JURY OUT AT 11:07 A.M.)

11:07:28  11              THE COURT:  ALL RIGHT.  PLEASE BE SEATED.

11:07:30  12          THE RECORD SHOULD REFLECT OUR JURY HAS LEFT FOR THE BREAK,

11:07:33  13      AND DR. ROSENDORFF HAS LEFT THE COURTROOM.

11:07:36  14          MR. WADE?

11:07:36  15              MR. WADE:  YOUR HONOR, COUNSEL JUST, WITH A SERIES OF

11:07:40  16      QUESTIONS, ELICITED A COMPARISON OF THE THERANOS LAB AND ISSUES

11:07:45  17      WITHIN THE THERANOS LAB TO EVERY OTHER LAB IN WHICH

11:07:50  18      DR. ROSENDORFF WORKED OVER THE PERIOD OF 13 YEARS AND COMPARED

11:07:53  19      THE SIGNIFICANCE OF THOSE ISSUES.

11:07:56  20          THAT HAS OPENED THE DOOR TO THE CROSS-EXAMINATION THAT THE

11:07:59  21      GOVERNMENT TRIED TO PRECLUDE YESTERDAY, THAT THEY HAVE PUT THAT

11:08:04  22      AT ISSUE.  HE HAS TESTIFIED BEFORE THIS COURT, OR BEFORE THIS

11:08:07  23      JURY, AND NOW IT'S ONLY FAIR TO GO INTO THE PROBLEMS THAT

11:08:11  24      EXISTED WITHIN THOSE LABS SO THE JURY UNDERSTANDS THE FULL

11:08:14  25      PICTURE.
```

```
11:08:15   1           WITHOUT IT, IT'S A VERY MISLEADING CHARACTERIZATION BASED
11:08:20   2   ON QUESTIONS THAT THE GOVERNMENT JUST ASKED.
11:08:22   3           MR. BOSTIC:  I DISAGREE, YOUR HONOR.  THAT WAS IN
11:08:24   4   RESPONSE TO QUESTIONS ON CROSS ABOUT WHETHER LABS MAKE
11:08:30   5   MISTAKES, AND I THINK THE SIMPLE QUESTION OF WHETHER
11:08:35   6   DR. ROSENDORFF CATEGORIZES THE ISSUES AT THERANOS AS JUST
11:08:39   7   SIMPLE RUN OF THE MILL LABORATORY MISTAKES IS IN DIRECT
11:08:42   8   RESPONSE TO THAT LINE OF QUESTIONING ON CROSS.
11:08:45   9         I DON'T THINK HE SAID ANYTHING THAT OPENS THE DOOR TO THE
11:08:48  10   WIDE RANGE OF EVIDENCE THAT MR. WADE IS REFERENCING.
11:08:52  11           MR. WADE:  YOUR HONOR, THE TRANSCRIPT SPEAKS FOR
11:08:54  12   ITSELF.  HE -- HE OPENED UP 13 YEARS OF HIS LAB EXPERIENCE, ALL
11:08:58  13   OF HIS OTHER EXPERIENCES, AND ASKED HIM TO COMPARE THOSE ERRORS
11:09:03  14   TO THE ERRORS OF ALL THOSE OTHER COMPANIES AND HE SAID THERANOS
11:09:07  15   IS WORSE.
11:09:08  16         AND SO I THINK IT'S ONLY FAIR TO ALLOW THE DEFENSE TO GO
11:09:14  17   INTO THAT.
11:09:15  18         OTHERWISE IT'S AN INCREDIBLY MISLEADING PICTURE TO THE
11:09:18  19   JURY.  THE JURY CAN ASSESS WHETHER THEY'RE BETTER OR WORSE.
11:09:21  20         WE DON'T HAVE TO RELY ON DR. ROSENDORFF'S
11:09:24  21   CHARACTERIZATION.  WE NOW SHOULD HAVE THE ABILITY TO PROBE
11:09:26  22   THAT.
11:09:26  23           THE COURT:  WELL, THAT WOULD THEN -- IF WE ASK THE
11:09:29  24   JURY TO MAKE THAT DETERMINATION, THAT WOULD BE A SEPARATE MINI
11:09:32  25   TRIAL THAT YOU'VE TALKED TO ME ABOUT THAT CAUSED ME TO HAVE
```

2869

```
11:09:35   1        CONCERN ABOUT OTHER ISSUES.

11:09:37   2            NOW, I -- I UNDERSTAND THE NATURE OF THE QUESTION AND THE

11:09:40   3    FACT THAT, YOU KNOW, I THINK I'VE SAID FREQUENTLY, AND YOU

11:09:45   4    PROBABLY KNOW, THERE'S A DIFFERENCE BETWEEN TURNING THE KNOB

11:09:47   5    AND OPENING THE DOOR.

11:09:49   6            HAS THIS DOOR BEEN OPENED THEN AS TO THIS?

11:09:51   7            I DON'T SEE IT OPEN SUCH THAT YOU CAN GET INTO ALL OF THE

11:09:54   8    OTHER ISSUES THAT WERE IN THE OTHER THREE LABS.  I THINK THAT'S

11:09:57   9    WHAT WE'RE TALKING ABOUT.  IS THAT RIGHT?

11:09:59  10            MR. WADE:  THERE WERE THREE LABS THAT HAD -- HAVE HAD

11:10:02  11    MAJOR ISSUES --

11:10:03  12            THE COURT:  RIGHT.

11:10:04  13            MR. WADE:  -- IN HIS TENURE.

11:10:06  14            THE COURT:  RIGHT.  THE ONES WE TALKED ABOUT

11:10:08  15    YESTERDAY.

11:10:09  16            MR. WADE:  RIGHT, EXACTLY.

11:10:10  17            THE COURT:  FIRST OF ALL, THE MIDDLE LAB REGARDING

11:10:12  18    THE CRIMINAL INVESTIGATION, I DON'T THINK THIS LINE OF

11:10:14  19    QUESTIONING TOUCHES ON THAT AT ALL AND I WOULD NOT ALLOW YOU TO

11:10:18  20    PROBE INTO THAT.  I THINK THAT STILL IS PRECLUDED BASED ON THE

11:10:20  21    COURT'S RULING YESTERDAY.

11:10:22  22            ON THE OTHER ISSUES ABOUT WHETHER OR NOT HE'S SEEN

11:10:25  23    DIFFERENCES IN THE OTHER LABS, I MAY ALLOW YOU TO PROBE A

11:10:28  24    LITTLE BIT, BUT WE'RE NOT GOING TO GET INTO THE DOCUMENTS, ANY

11:10:32  25    OF THAT COLLATERAL TYPE EXTRINSIC MATERIAL.  I STILL THINK
```

2870

```
11:10:38   1      THAT'S INAPPROPRIATE TO DO.

11:10:40   2           I MAY PERMIT YOU TO ASK SOME QUESTIONS, TO FOLLOW UP

11:10:46   3      ABOUT, WELL, YOU SAID, HE TALKED ABOUT THE OTHER PLACES HE'S

11:10:49   4      WORKED AT WERE NOT AS BAD AS THIS, AND YOU CAN ASK HIM A LITTLE

11:10:52   5      BIT ABOUT THAT.

11:10:53   6           BUT WE'RE NOT GOING TO GET INTO A MINI TRIAL ON ALL THE

11:10:56   7      OTHER SUBJECTS AND THAT.

11:10:58   8           YOU CAN TALK TO HIM IN GENERAL.  I THINK THIS WAS A

11:11:00   9      GENERAL PROBE ABOUT A -- AND I UNDERSTAND YOUR CONCERN ABOUT

11:11:04  10      THE IMPACT IT MIGHT HAVE ON THE JURY.  YOU CAN CERTAINLY PROBE

11:11:07  11      WHETHER OR NOT THERE WERE ISSUES OF OTHER TRIALS.  YOU'VE

11:11:11  12      ELICITED FROM HIM YESTERDAY THAT AT ONE OF THE LABS HE WAS AT,

11:11:16  13      THEY HAD AN INVESTIGATION.

11:11:17  14           SO, AGAIN, AS WE TALKED YESTERDAY PRIOR TO YOUR

11:11:20  15      EXAMINATION ON THE TOPIC, I'LL ALLOW SOME LIMITED, VERY LIMITED

11:11:24  16      PROBING OF THIS.

11:11:26  17           I THINK YOUR QUESTIONING MAY ACTUALLY ENHANCE THE DAMAGE

11:11:30  18      THAT YOU'RE SEEKING TO AVOID BY RAISING SOME OTHER QUESTIONS,

11:11:35  19      BUT YOU KNOW, IT'S YOUR CASE.

11:11:37  20           BUT I WILL PERMIT SOME QUESTIONING ON THAT, BUT GENERALLY.

11:11:42  21      WE'RE NOT GOING TO GET INTO THE CMS REPORTS AND ALL OF THAT.  I

11:11:46  22      DON'T THINK THAT'S NECESSARY.

11:11:47  23           MR. WADE:  YOUR HONOR, I'LL CONFER WITH MY COLLEAGUES

11:11:51  24       DURING THE BREAK ON THIS ISSUE.

11:11:53  25           I WOULD JUST ASK IF -- ALTERNATIVELY, IF WE COME BACK AND
```

| | | |
|---|---|---|
| 11:11:58 | 1 | ASK THAT THAT EVIDENCE BE STRICKEN AND THAT THE GOVERNMENT BE |
| 11:12:00 | 2 | ADMONISHED.  I MEAN, THE COURT GAVE CLEAR DIRECTION ON THIS |
| 11:12:04 | 3 | ISSUE YESTERDAY.  YOU SAID YOU DIDN'T WANT MINI TRIALS.  WE |
| 11:12:08 | 4 | TALKED ABOUT THE POSSIBILITY OF OPENING THIS DOOR, WHICH IS NOW |
| 11:12:13 | 5 | WIDE OPEN AS THE GOVERNMENT -- AS THE GOVERNMENT WELL KNEW WHEN |
| 11:12:18 | 6 | IT WAS ASKING THOSE QUESTIONS ABOUT THE BREADTH OF HIS |
| 11:12:20 | 7 | EXPERIENCE. |
| 11:12:21 | 8 | THE COURT:  SO -- |
| 11:12:21 | 9 | MR. WADE:  I WAS VERY -- I WAS VERY CAREFUL, AS THE |
| 11:12:24 | 10 | COURT OBSERVED I'M SURE YESTERDAY, OF TRYING TO DRAW THE LINE |
| 11:12:28 | 11 | IN THE DIRECTION OF THE COURT, AND NOW WE HAVE COUNSEL, AT THE |
| 11:12:34 | 12 | END OF THE CROSS-EXAMINATION, OR AT THE END OF THE REDIRECT |
| 11:12:38 | 13 | EXAMINATION JUST BLOWING IT WIDE OPEN. |
| 11:12:40 | 14 | MR. BOSTIC:  YOUR HONOR, IF I CAN RESPOND TO THAT? |
| 11:12:41 | 15 | THE COURT:  WELL, WHAT YOU DID YESTERDAY WAS YOU GOT |
| 11:12:44 | 16 | HIS RESPONSE THAT HE HAS CONCERNS ABOUT HIS LICENSE BEING |
| 11:12:48 | 17 | SUSPENDED FOR TWO YEARS, AND YOU CHOSE TO STOP YOUR EXAMINATION |
| 11:12:50 | 18 | THEN.  YOU COULD HAVE GONE AND ASKED OTHER QUESTIONS, BUT YOU |
| 11:12:53 | 19 | STOPPED THERE, AND THAT'S WHERE IT IS. |
| 11:12:57 | 20 | I -- I WANT -- I'LL, OF COURSE, ALLOW YOU TO SPEAK, |
| 11:13:00 | 21 | MR. BOSTIC. |
| 11:13:00 | 22 | BUT I'D ALSO LIKE YOU TO COMMENT ON WHETHER OR NOT THE |
| 11:13:03 | 23 | COURT SHOULD JUST STRIKE THE LAST QUESTION AND ANSWER, THAT IS, |
| 11:13:09 | 24 | WERE -- THE COMPARING THE LABS IN HIS CAREER.  MAYBE WE STRIKE |
| 11:13:14 | 25 | THAT AND THAT TAKES CARE OF THE ISSUE. |

| | | |
|---|---|---|
| 11:13:16 | 1 | MR. BOSTIC:  SO, YOUR HONOR, FIRST, AS TO THE NEXUS |
| 11:13:22 | 2 | BETWEEN THAT QUESTIONING AND WHAT HAD COME BEFORE IN |
| 11:13:25 | 3 | DR. ROSENDORFF'S TESTIMONY, DURING HIS DIRECT, HE HAD SPOKEN |
| 11:13:27 | 4 | ABOUT HIS PREVIOUS EXPERIENCE. |
| 11:13:30 | 5 | DURING CROSS-EXAMINATION, I RECALL QUESTIONS SPECIFICALLY |
| 11:13:33 | 6 | ASKING DR. ROSENDORFF TO COMPARE HIS EXPERIENCE AT THERANOS, |
| 11:13:38 | 7 | AND SPECIFICALLY THE FREQUENCY OF COMPLAINTS TO THE FREQUENCY |
| 11:13:41 | 8 | OF COMPLAINTS THAT HE SAW AT UNIVERSITY OF PITTSBURGH. |
| 11:13:46 | 9 | SO THAT'S THE SAME KIND OF GENERAL QUESTION THAT DEFENSE |
| 11:13:49 | 10 | COUNSEL ASKED, ASKING DR. ROSENDORFF TO COMPARE THE SEVERITY |
| 11:13:51 | 11 | AND FREQUENCY OF ISSUES BETWEEN THOSE TWO LABS. |
| 11:13:54 | 12 | HE ANSWERED THAT QUESTION.  I ASKED HIM SOME QUESTIONS |
| 11:13:58 | 13 | ABOUT THAT ON REDIRECT, AGAIN, IN RESPONSE TO THAT LINE OF |
| 11:14:01 | 14 | QUESTIONING. |
| 11:14:02 | 15 | AS TO THE COURT'S PROPOSAL AS TO WHETHER STRIKING THAT |
| 11:14:05 | 16 | ANSWER WOULD BE PREFERABLE TO OPENING THE DOOR TO THE |
| 11:14:08 | 17 | INADMISSIBLE LINES OF QUESTIONING THAT THE DEFENSE RAISED |
| 11:14:11 | 18 | YESTERDAY, I THINK YES, THAT WOULD BE A CLEANER APPROACH AND |
| 11:14:15 | 19 | WOULD SOLVE ANY PREJUDICE THAT THE DEFENSE IS WORRIED ABOUT. |
| 11:14:18 | 20 | MR. WADE:  WELL, LET ME CONFER AS TO WHETHER WE CAN |
| 11:14:20 | 21 | UNRING THE BELL, BECAUSE THE JURY HAS ALREADY HEARD IT.  IT WAS |
| 11:14:23 | 22 | ONE OF THE LAST QUESTIONS THAT THEY HEARD AND THE ANSWERS THEY |
| 11:14:27 | 23 | HEARD BEFORE THE BREAK. |
| 11:14:28 | 24 | WITH RESPECT TO THE CROSS-EXAMINATION, IT WAS ACTUALLY THE |
| 11:14:31 | 25 | GOVERNMENT WHO EXAMINED DR. ROSENDORFF ON DIRECT COMPARING HIS |

```
11:14:36   1    EXPERIENCE AT THERANOS TO HIS PAST EXPERIENCE AT THE UNIVERSITY

11:14:40   2    OF PITTSBURGH AND ELICITED TESTIMONY THAT WAS DIRECTLY AT ODDS

11:14:43   3    WITH HIS PRIOR SWORN TESTIMONY, AND I IMPEACHED THE WITNESS ON

11:14:48   4    THAT.

11:14:48   5         I DID NOT GO INTO FUTURE EMPLOYMENT.  WE GOT DIRECTION

11:14:51   6    FROM THE COURT ON THAT AND I HONORED THAT DIRECTION.  SO --

11:14:54   7              THE COURT:  RIGHT.  WELL, I THINK THAT THE -- YOU'VE

11:14:58   8    ASKED ME TO STRIKE, MR. WADE, THROUGHOUT THE COURSE OF THIS

11:15:01   9    WITNESS'S TESTIMONY, CERTAIN TESTIMONY AND I'VE GRANTED THAT

11:15:04  10    REQUEST AND I'VE ADMONISHED THE JURY THEY'RE NOT TO CONSIDER

11:15:07  11    THAT EVIDENCE THAT'S STRICKEN.

11:15:09  12         THEY'LL BE INFORMED OF THAT, INSTRUCTED OF THAT IN THE

11:15:11  13    FINAL INSTRUCTIONS, AND I THINK THE JURY WILL FOLLOW THE

11:15:17  14    COURT'S INSTRUCTION.

11:15:18  15         SO LET ME JUST SAY, THAT'S MY INTENTION IS I'M GOING TO --

11:15:22  16    WHEN THEY COME OUT, I'LL HAVE THAT LAST QUESTION AT MY

11:15:26  17    FINGERTIPS FROM THE COURT REPORTER AND I WILL -- THAT ANSWER,

11:15:28  18    QUESTION AND ANSWER, AND I'LL HAVE THAT STRICKEN.  THEY'RE NOT

11:15:31  19    TO CONSIDER IT.  AND I THINK THAT TAKES CARE OF THE ISSUE, AND

11:15:34  20    THEN IT'S DONE.

11:15:34  21              MR. WADE:  I WOULD MAYBE JUST ADD, IF THE COURT COULD

11:15:37  22    SAY THAT WAS NOT AN APPROPRIATE QUESTION AND AN APPROPRIATE

11:15:39  23    ANSWER FOR THIS TRIAL.  BECAUSE --

11:15:41  24              THE COURT:  WELL --

11:15:42  25              MR. WADE:  -- IF IT'S JUST STRICKEN, YOU'RE RIGHT,
```

```
11:15:44   1     THERE'S ALL SORTS OF STUFF THAT'S BEEN STRICKEN AND I'M NOT

11:15:47   2     SURE THAT'S AN ADEQUATE REMEDY BECAUSE HE'S NOW COMPARED THIS

11:15:50   3     TO ALL THESE OTHER LABS WHERE THERE ARE ALL THESE OTHER ISSUES.

11:15:54   4          THE COURT:  WELL, THAT CALLS ME THEN TO -- YOU'RE

11:15:56   5     ASKING THE COURT THEN TO MAKE A MEASUREMENT AS TO EVERYTHING

11:15:58   6     THAT'S STRICKEN AND PUT SOME KIND OF VALUE ON THAT AS TO

11:16:02   7     WHETHER OR NOT I NEED TO ENHANCE THE COURT'S STRIKING.

11:16:08   8          THE PRELIMINARY INSTRUCTIONS INFORMED THE JURY THAT WHEN

11:16:10   9     SOMETHING IS STRICKEN, THEY MAY NOT CONSIDER IT.  THEY'RE NOT

11:16:13  10     TO CONSIDER IT.  WE DON'T HAVE GRADATIONS OF THAT.  THIS IS THE

11:16:17  11     LEVEL 1, A LEVEL 2, A LEVEL 3 VIOLATION.  THEY ARE NOT TO

11:16:20  12     CONSIDER IT AT ALL.

11:16:22  13          AND WE PRESUME THAT THE JURIES FOLLOW THE COURT'S

11:16:26  14     INSTRUCTIONS.

11:16:27  15          BUT I WILL ADMONISH THEM.  I'LL DO THAT.  AND MY SENSE

11:16:32  16     IS -- WE HAVE HOW MANY WEEKS LEFT IN THE TRIAL?  MY SENSE IS

11:16:37  17     THAT AN INSTRUCTION STRIKING THIS WILL, WILL SUFFICE TO REMEDY

11:16:43  18     WHAT WE NEED TO DO IN THIS CASE.  I THINK THAT'S SUFFICIENT.

11:16:46  19          SO I'LL CALL IT UP FROM THE COURT REPORTER AND WE'LL -- I

11:16:50  20     DON'T KNOW HOW STRONG YOU'D LIKE ME TO EMPHASIZE IT.  I KNOW

11:16:53  21     YOU WANT ME TO CHASTISE THE GOVERNMENT IN FRONT OF THE JURY.  I

11:16:57  22     DON'T THINK THAT'S NEEDED AT THIS POINT AND I DON'T THINK

11:16:59  23     THAT'S APPROPRIATE.

11:16:59  24          MR. WADE:  YOUR HONOR, WHAT I PARTICULARLY DON'T WANT

11:17:01  25     YOU TO DO IS READ THE TESTIMONY AGAIN BECAUSE -- AND THAT'S WHY
```

```
11:17:05   1      I'D LIKE TO CONFER WITH MY COLLEAGUES AND MAYBE WE CAN ADDRESS
11:17:08   2       THIS FOR TWO MINUTES BEFORE WE PULL THE JURY BACK.
11:17:11   3          I MEAN, THAT EXACERBATES THE PROBLEM.  LIKE I SAID, IT WAS
11:17:15   4      ONE OF THE LAST QUESTIONS.  IT WAS NOT -- AND YOU CAN'T UNRING
11:17:18   5      THAT BELL.  SO IT MAY BE THAT --
11:17:20   6          THE COURT:  WELL, I CAN.  I CAN TELL THEM NOT TO
11:17:23   7       CONSIDER IT AND IT'S THE APPROPRIATE THING TO DO.
11:17:25   8          AND THEN THEY'LL HAVE TO JUST -- THEY'LL FORGET ABOUT IT
11:17:30   9      AT THAT POINT, OR AT LEAST THEY WON'T LET IT INTO THEIR
11:17:33  10      DELIBERATIONS, AND IF THE GOVERNMENT TRIES TO ARGUE THAT, I'LL
11:17:37  11      SHUT THE GOVERNMENT DOWN IN THEIR FINAL ARGUMENT IF THEY TRY TO
11:17:40  12      RAISE THIS POINT.  THIS WAS THE WORST LAB HE'S EVER WORKED IN,
11:17:44  13      THEY WON'T BE PERMITTED TO ARGUE THAT.
11:17:46  14          SO I THINK WE CAN -- I THINK WE CAN RESOLVE IT.
11:17:50  15          I UNDERSTAND YOUR CONCERN.  I DO.  IT WAS AT THE END OF
11:17:54  16      HIS INFORMATION, AND IT WAS A LENGTHY EXAMINATION.
11:17:59  17          THIS WITNESS HAS ENDURED NOW FIVE DAYS OF EXAMINATION,
11:18:02  18      WHICH IS TO SAY, THE JURY HAS ENDURED FIVE DAYS OF QUESTION AND
11:18:06  19      ANSWER FROM THIS PARTICULAR WITNESS.  SO I THINK WE ALL
11:18:10  20      RECOGNIZE THAT.
11:18:10  21          MR. WADE:  I THINK WE ALL HAVE, YOUR HONOR.
11:18:13  22          MIGHT WE COME BACK JUST TWO MINUTES BEFORE WE CALL THE
11:18:16  23      JURY BACK --
11:18:17  24          THE COURT:  SURE, OF COURSE.
11:18:18  25          MR. WADE:  -- SO THAT I CAN CLARIFY THIS?
```

2876

| | | |
|---|---|---|
| 11:18:20 | 1 | THE COURT:  SURE. |
| 11:18:20 | 2 | MR. BOSTIC:  AND YOUR HONOR, FINAL POINT, TO |
| 11:18:22 | 3 | MR. WADE'S POINT ABOUT REREADING THE TESTIMONY, I THINK THAT |
| 11:18:25 | 4 | CAN BE ADDRESSED BY THE COURT DESCRIBING THE QUESTION ONLY AND |
| 11:18:28 | 5 | NOT READING THE ANSWER ITSELF.  THE GOVERNMENT WOULD HAVE NO |
| 11:18:31 | 6 | OBJECTION TO THAT, OF COURSE. |
| 11:18:32 | 7 | THE COURT:  OKAY.  THANK YOU. |
| 11:18:33 | 8 | MR. WADE:  YOUR HONOR, WILL WE GO UNTIL 3:00 TODAY? |
| 11:18:36 | 9 | THE COURT:  YES, YES. |
| 11:18:38 | 10 | THE CLERK:  COURT IS IN RECESS. |
| 11:18:39 | 11 | (THE LUNCH RECESS WAS TAKEN FROM 11:18 A.M. UNTIL |
| 11:56:34 | 12 | 11:56 A.M.) |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

2877

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
| 11:56:36 | 1  | **AFTERNOON SESSION** |
| 11:56:54 | 2  | (JURY OUT AT 11:56 A.M.) |
| 11:56:54 | 3  | THE COURT:  ALL RIGHT.  WE'RE BACK ON THE RECORD IN |
| 11:57:09 | 4  | THE HOLMES MATTER.  WE ARE OUTSIDE THE PRESENCE OF THE JURY. |
| 11:57:14 | 5  | ALL COUNSEL ARE PRESENT AND MS. HOLMES IS PRESENT. |
| 11:57:18 | 6  | MR. WADE:  YOUR HONOR, THANK YOU. |
| 11:57:19 | 7  | JUST FOLLOWING UP ON THE MATTER THAT WE WERE DISCUSSING |
| 11:57:22 | 8  | BEFORE THE BREAK, WE LOOKED BACK AT OUR NOTES RELATING TO THE |
| 11:57:27 | 9  | QUESTION AND ANSWER AND THE IMPACT OF THAT QUESTION AND ANSWER |
| 11:57:30 | 10 | AND WE BELIEVE IT'S NECESSARY TO EXPLORE THOSE OTHER |
| 11:57:35 | 11 | PROFESSIONAL EXPERIENCES. |
| 11:57:36 | 12 | THE COURT:  OF COURSE.  OF COURSE YOU DO, YES. |
| 11:57:39 | 13 | MR. BOSTIC? |
| 11:57:39 | 14 | MR. BOSTIC:  SO, YOUR HONOR, I UNDERSTAND THAT THE |
| 11:57:42 | 15 | COURT'S INTENTION WAS TO STRIKE -- I WASN'T SURE -- IT WASN'T |
| 11:57:47 | 16 | CLEAR HOW MUCH WE WERE TALKING ABOUT STRIKING. |
| 11:57:50 | 17 | MY UNDERSTANDING IS THAT THE CONTROVERSY IS OVER A |
| 11:57:56 | 18 | QUESTION ABOUT ISSUES ENCOUNTERED AT DR. ROSENDORFF'S OTHER |
| 11:58:00 | 19 | LABS AND WHETHER THE ISSUES AT THERANOS WERE WHAT HE CONSIDERED |
| 11:58:04 | 20 | TO BE TYPICAL LABORATORY ISSUES. |
| 11:58:07 | 21 | IN THE CONTEXT OF PREVIOUS QUESTIONS, I DON'T BELIEVE THAT |
| 11:58:11 | 22 | THAT HAS A PREJUDICIAL EFFECT. |
| 11:58:13 | 23 | TO THE EXTENT IT DOES, I THINK THAT STRIKING THAT SINGLE |
| 11:58:16 | 24 | QUESTION AND ANSWER IS THE REMEDY.  I DON'T THINK THAT GOING |
| 11:58:19 | 25 | INTO THE INADMISSIBLE LINES OF QUESTIONING THAT WE DISCUSSED |

**ER-6627**

2878

| | |
|---|---|
| 11:58:22 | 1 |
| 11:58:24 | 2 |
| 11:58:26 | 3 |
| 11:58:29 | 4 |
| 11:58:30 | 5 |
| 11:58:33 | 6 |
| 11:58:35 | 7 |
| 11:58:38 | 8 |
| 11:58:41 | 9 |
| 11:58:46 | 10 |
| 11:58:51 | 11 |
| 11:58:56 | 12 |
| 11:58:58 | 13 |
| 11:59:01 | 14 |
| 11:59:04 | 15 |
| 11:59:05 | 16 |
| 11:59:08 | 17 |
| 11:59:12 | 18 |
| 11:59:17 | 19 |
| 11:59:21 | 20 |
| 11:59:29 | 21 |
| 11:59:35 | 22 |
| 11:59:39 | 23 |
| 11:59:42 | 24 |
| 11:59:46 | 25 |

1   YESTERDAY IS THE SOLUTION HERE.

2        BUT WE'RE GUIDED BY THE COURT.

3        THE COURT:  YOU FLIPPED YOUR LECTERNS HERE, HAVEN'T

4   YOU?

5        MR. WADE:  I WAS KIND OF OCCUPYING THE SPACE HERE, SO

6   WE THOUGHT WE'D CHANGE PACE.

7      YOUR HONOR, FOR THE REASONS THAT I STATED PREVIOUSLY, WE

8   THINK THE BELL HAS BEEN RUNG.  THE GOVERNMENT OPENED THE DOOR.

9   I THINK AN INSTRUCTION WOULDN'T BE SUFFICIENT TO, TO CURE THAT

10  AND WE'LL NEED TO EXPLORE WITH HIM THE OTHER ISSUES THAT HE

11  ENCOUNTERED AT HIS LAB AND LET THE JURY DECIDE THE COMPARISON

12  BETWEEN THOSE, BECAUSE RIGHT NOW --

13       THE COURT:  WELL, LET'S TALK ABOUT THE DANGER OF THAT

14  THOUGH, MR. WADE.  I THINK THERE IS SOME PRESENT DANGER IN

15  DOING THAT.

16     WHAT WE WOULD BE DOING THEN IS TO ENGAGE IN THOSE MINI

17  TRIALS THAT YOU HAVE SUGGESTED I AVOID IN OUR MIL HEARING AND

18  OTHERS, AND IF WE -- IF WE PUT THE COMPARATORS, THAT IS, THE

19  OTHER LABORATORIES AND THIS WITNESS'S EXPERIENCE IN THEM TO THE

20  JURY AND ASK THEM TO WEIGH THAT AS THEY DELIBERATE THE FACTS OF

21  THIS CASE, I DO BELIEVE THAT PUTS YOUR CLIENT AT GREAT RISK,

22  BECAUSE WHAT IF THEY DECIDE, YOU KNOW, HE WAS RIGHT, THERANOS

23  WAS THE WORST PLACE HE WORKED AT?  THESE OTHER PLACES DIDN'T

24  HAVE THE SAME TYPE OF VIOLATIONS OR THIS AND THAT.  THEY DIDN'T

25  RISE TO THAT SEVERITY CERTAINLY THAT BRINGS A FEDERAL

2879

11:59:50   1    PROSECUTION.

11:59:51   2         MY CONCERN IS THAT THEY MIGHT THEN INAPPROPRIATELY USE

11:59:55   3    THAT TO JUDGE YOUR CLIENT AND THE CONDUCT OF THE ALLEGATIONS IN

11:59:59   4    THIS CASE.

12:00:02   5         IN ESSENCE, WE WOULD BE ASKING THE JURY TO SAY, OKAY, IN

12:00:06   6    DECIDING THE CREDIBILITY OF THIS WITNESS AND WHETHER OR NOT YOU

12:00:09   7    SHOULD BELIEVE THIS OR NOT, WE'RE GOING TO SHARE WITH YOU HIS

12:00:12   8    EXPERIENCES AND YOU CAN CONSIDER THOSE.

12:00:15   9         AND I THINK THERE'S GREAT PERIL FOR MS. HOLMES IF THEY

12:00:19  10    DECIDE, YOU KNOW, I THINK THAT WITNESS WAS RIGHT, ALL THE

12:00:22  11    EXPERIENCE HE HAD, LOOK AT THIS, LOOK AT THE CONDUCT HERE, IT

12:00:25  12    DOES NOT AT ALL COME CLOSE TO THIS.

12:00:28  13         AND I HAVE -- YOU KNOW, I HAVE GREAT RESPECT FOR THE

12:00:30  14    PROCESS HERE AND I DON'T THINK IT'S, IT'S FAIR TO PUT A JURY,

12:00:35  15    TO HAVE THEM MAKE THAT DECISION ON A COLLATERAL, EXTRINSIC

12:00:41  16    MATTER THAT RELATES TO THE WITNESS'S TESTIMONY AND THAT MIGHT

12:00:44  17    IN SOME WAY AFFECT THEIR DELIBERATIVE PROCESS.

12:00:48  18         NOW, I UNDERSTAND, WE CAN INSTRUCT THEM, YOU'RE NOT TO DO

12:00:51  19    THAT.  BUT, AGAIN, THEN WE START RINGING MULTIPLE BELLS, DON'T

12:00:55  20    WE?

12:00:56  21         I HOPE YOU APPRECIATE MY COMMENTS HERE AND MY CONCERN.  MY

12:00:59  22    THOUGHT IS THAT PERHAPS THE MOST EFFICIENT WAY TO RESOLVE THIS

12:01:03  23    IS TO TELL THEM THAT THERE WAS THIS QUESTION, AND I WON'T -- AT

12:01:06  24    YOUR SUGGESTION, I WON'T REPEAT IT TO RING THE BELL YET

12:01:10  25    AGAIN -- BUT I THINK THE CONTEXT OF THAT QUESTION WAS, WAS TO

2880

```
12:01:14   1   ELICIT, THIS WAS THE WORST PLACE HE WORKED AT, OR THERE WERE
12:01:17   2   MORE VIOLATIONS THAN ANY OTHER, AND I DON'T THINK THAT NEEDS --
12:01:22   3   THAT'S NOT NECESSARY FOR THEM, THE JURY, TO MAKE THEIR
12:01:25   4   DECISION.
12:01:25   5             MR. WADE:  IT WAS DESIGNED TO ELICIT HIS COMPARISON,
12:01:29   6   WHICH IS 702 INFORMATION.  IT'S AN ISSUE THAT THE GOVERNMENT --
12:01:35   7   I MEAN, THE COURT COULDN'T HAVE BEEN CLEARER YESTERDAY ON THESE
12:01:38   8   MATTERS AND THE GOVERNMENT ELICITED THAT TESTIMONY SPECIFICALLY
12:01:43   9   ON ITS DIRECT EXAMINATION.
12:01:45  10       SO WHILE I UNDERSTAND THE RISKS, WE THINK -- WE HAVE TO
12:01:50  11   BALANCE RISKS IN THIS CASE IN TERMS OF THE RISKS OF THAT ANSWER
12:01:54  12   AND CREDITING THAT TESTIMONY VERSUS OUR ABILITY TO TEST THAT
12:01:59  13   ANSWER AND TO LET THE JURY DECIDE WHETHER THEY -- WHICH
12:02:04  14   EVIDENCE THEY WANT TO BELIEVE.
12:02:05  15             THE COURT:  WELL, WHY DON'T WE JUST DISCARD THAT
12:02:08  16   EVIDENCE FROM THEIR, FROM THEIR KNOWLEDGE BY STRIKING IT SUCH
12:02:12  17   THAT THEY DON'T HAVE TO GO THROUGH THAT THOUGHT PROCESS AT ALL
12:02:16  18   AND, THEREFORE, WE CAN AVOID ANY DANGER THAT MIGHT COME FROM
12:02:22  19   IT?
12:02:22  20       I UNDERSTAND YOUR NEED NOW TO RISE AND RESPOND TO IT.  I
12:02:27  21   RESPECT THAT.  I DO.
12:02:28  22       BUT AS I SAID, I HAVE GREAT CONCERNS THAT IT COULD -- AND
12:02:33  23   YOU'VE WARNED ME SEVERAL TIMES OVER THE PAST MONTHS ABOUT MINI
12:02:38  24   TRIALS -- AND I SEE THIS AS A MINI TRIAL THAT DOESN'T BENEFIT
12:02:42  25   EITHER SIDE AND IT PERHAPS PRESENTS GREATER PERIL TO THE
```

2881

| | | |
|---|---|---|
| 12:02:45 | 1 | DEFENSE HERE. |
| 12:02:50 | 2 | MR. BOSTIC? |
| 12:02:50 | 3 | MR. BOSTIC:  NOT MUCH TO ADD, YOUR HONOR. |
| 12:02:51 | 4 | THE GOVERNMENT'S INTENT IN ASKING THAT QUESTION WAS TO |
| 12:02:54 | 5 | PROVIDE A RESPONSE TO PREVIOUS ANSWERS ABOUT LABS IN GENERAL, |
| 12:02:56 | 6 | THE FACT THAT MISTAKES HAPPEN AT LABS. |
| 12:03:00 | 7 | THE PARTIES DISAGREE AS TO THE EFFECT OF THAT QUESTION. |
| 12:03:03 | 8 | OF COURSE IT'S THE COURT'S VIEW THAT CONTROLS. |
| 12:03:07 | 9 | TO THE EXTENT THE EFFECT OF THAT QUESTION CARRIES SOME |
| 12:03:11 | 10 | DANGER OF SOME PREJUDICE TO THE DEFENSE, THE GOVERNMENT AGREES |
| 12:03:14 | 11 | WITH THE COURT THAT STRIKING THE QUESTION IS THE ANSWER. |
| 12:03:17 | 12 | WE'RE TALKING ABOUT ONE QUESTION AND ANSWER IN A VERY |
| 12:03:21 | 13 | LENGTHY WITNESS EXAMINATION, WHICH IS NOT YET OVER.  WE'RE |
| 12:03:24 | 14 | ABOUT TO ENTER RECROSS.  IT WON'T BE THE LAST THING THE WITNESS |
| 12:03:27 | 15 | SAYS ON THE STAND.  THIS WON'T BE THE LAST THING THE JURY |
| 12:03:30 | 16 | HEARS. |
| 12:03:31 | 17 | THERE ARE WEEKS LEFT IN THE TRIAL, AS THE COURT POINTED |
| 12:03:33 | 18 | OUT.  SO THIS IS NOT A SITUATION WHERE ANYTHING MORE THAN |
| 12:03:36 | 19 | STRIKING THAT ANSWER IS REQUIRED. |
| 12:03:38 | 20 | MR. WADE:  YOUR HONOR, OUR POSITION IS CLEAR ON THIS. |
| 12:03:41 | 21 | I UNDERSTAND MR. BOSTIC'S POSITION.  BUT HE ASKED THE QUESTION |
| 12:03:44 | 22 | AND THE ANSWER WAS GIVEN AND WE'VE MADE OUR JUDGMENT.  OUR |
| 12:03:47 | 23 | POSITION WOULD BE WE SHOULD EXPLORE IT. |
| 12:03:50 | 24 | IF THE COURT IS UNWILLING TO ALLOW US THE LATITUDE TO DO |
| 12:03:54 | 25 | THAT, I COULD GIVE A SPECIFIC PROFFER AS TO EXACTLY WHAT WE |

| | | |
|---|---|---|
| 12:03:59 | 1 | WOULD -- THE WAY WE WOULD EXPLORE IT EITHER NOW ORALLY OR IN |
| 12:04:04 | 2 | WRITING AND THE COURT COULD CONSIDER IT. |
| 12:04:07 | 3 | IF THE COURT'S NOT GOING TO CONSIDER THAT, WE WOULD ALSO |
| 12:04:10 | 4 | HAVE A PROPOSED INSTRUCTION THAT WE WOULD HAND UP. |
| 12:04:12 | 5 | WE DO NOT THINK THIS IS A CIRCUMSTANCE IN WHICH SIMPLY |
| 12:04:18 | 6 | STRIKING THIS QUESTION, GIVEN THE SIGNIFICANCE OF IT RIGHT |
| 12:04:21 | 7 | BEFORE THE BREAK, ONE OF THE LAST QUESTIONS, I BELIEVE IT MAY |
| 12:04:24 | 8 | HAVE BEEN KIND OF SET UP AS A SERIES OF QUESTIONS, WE DON'T |
| 12:04:28 | 9 | THINK THAT'S SUFFICIENT. |
| 12:04:29 | 10 | THE COURT:  ALL RIGHT.  WELL, THANK YOU. |
| 12:04:31 | 11 | WELL, I -- I APPRECIATE YOUR CONCERN.  YOU'VE TALKED ABOUT |
| 12:04:35 | 12 | YOUR BELIEF IN THE IMPACT OF THAT QUESTION ON THE JURY, THE |
| 12:04:40 | 13 | TIMING, THE STRATEGIC NATURE OF THE WAY IT WAS PRESENTED, ET |
| 12:04:44 | 14 | CETERA.  AND TRIALS ARE STRATEGIC.  I KNOW BOTH SIDES PREPARE |
| 12:04:47 | 15 | AND DO THE BEST YOU CAN. |
| 12:04:49 | 16 | THE QUESTION WAS -- LET ME SAY THIS:  IT'S UNFORTUNATE |
| 12:04:52 | 17 | THAT THE QUESTION WAS ASKED.  I'LL CONCEDE THAT.  I DO THINK |
| 12:04:55 | 18 | THAT IT DID CRACK PERHAPS THE DOOR, IT DID RAISE THE ISSUE. |
| 12:04:59 | 19 | THAT'S WHY WE'RE DISCUSSING IT HERE. |
| 12:05:01 | 20 | I DO THINK THAT THE REMEDY, THOUGH, THE APPROPRIATE REMEDY |
| 12:05:04 | 21 | HERE IS NOT TO ENGAGE IN A SERIES OF MINI TRIALS TO TEST |
| 12:05:08 | 22 | WHETHER OR NOT THERANOS WAS THE PLACE THAT HAD GREATER PROBLEMS |
| 12:05:13 | 23 | THAN ANY OTHER. |
| 12:05:14 | 24 | AS I TOLD YOU BEFORE, I WOULD ALLOW YOU SOME LATITUDE IN |
| 12:05:19 | 25 | TALKING ABOUT THAT SUBJECT WITHOUT GETTING INTO THE EXTRINSIC |

| | | |
|---|---|---|
| 12:05:23 | 1 | EVIDENCE, THOUGH, AND I -- I EXPECT THAT YOU WILL DELICATELY |
| 12:05:29 | 2 | ADVANCE THOSE QUESTIONS. |
| 12:05:31 | 3 | BUT I DO THINK THE APPROPRIATE REMEDY HERE, UNDER 403 AND |
| 12:05:39 | 4 | UNDER THE COURT'S INHERENT DISCRETION TO RUN THE TRIAL, IS THAT |
| 12:05:43 | 5 | TO ALLOW MINI TRIALS TO ENGAGE ON THIS PARTICULAR ISSUE WOULD |
| 12:05:50 | 6 | BE WASTEFUL OF TIME, IT WOULD CONFUSE THE JURY ON COLLATERAL |
| 12:05:54 | 7 | ISSUES THAT REALLY AREN'T, AREN'T GERMANE TO THE TRIAL IN THIS |
| 12:05:59 | 8 | CASE. |
| 12:06:00 | 9 | I WILL, THOUGH -- I DO RECOGNIZE THE IMPORT OF THE |
| 12:06:03 | 10 | QUESTION AND WHAT IT CAUSES AND MAY CAUSE THE JURY TO SPECULATE |
| 12:06:07 | 11 | ON, SO I WILL STRIKE THAT LAST QUESTION. |
| 12:06:11 | 12 | YOU HAVE SOMETHING YOU'D LIKE ME TO LOOK AT? |
| 12:06:13 | 13 | MR. WADE:  I WOULD.  IF I COULD HAND IT UP, YOUR |
| 12:06:16 | 14 | HONOR (HANDING)? |
| 12:06:17 | 15 | AND I'LL GIVE A COPY TO THE COURT REPORTER, TOO, SO IT CAN |
| 12:06:24 | 16 | BE MADE PART OF THE RECORD. |
| 12:06:26 | 17 | THE COURT:  THANK YOU. |
| 12:06:26 | 18 | MR. WADE:  WOULD THE COURT PREFER THAT I READ THIS SO |
| 12:06:29 | 19 | IT'S PART OF THE RECORD, OR CAN WE JUST APPEND IT AS PART OF |
| 12:06:32 | 20 | THE RECORD? |
| 12:06:32 | 21 | THE COURT:  LET ME ASK FIRST FOR MR. BOSTIC'S |
| 12:06:35 | 22 | COMMENTS ON THIS. |
| 12:06:36 | 23 | YOU HAVE THIS, MR. BOSTIC? |
| 12:06:37 | 24 | MR. BOSTIC:  I DO, YOUR HONOR. |
| 12:06:39 | 25 | I THINK THAT TO ACCOMPLISH THE PURPOSE, I'M NOT SURE IT'S |

2884

```
12:06:43   1    NECESSARY TO CHARACTERIZE THE QUESTION.  I THINK THE COURT

12:06:47   2    COMMENTED EARLIER ON ITS INCLINATION TO MAKE A JUDGMENT LIKE

12:06:55   3    THAT IN FRONT OF THE JURY.  I DON'T KNOW IF THE COURT'S

12:06:57   4    THINKING HAS CHANGED, BUT MY THINKING IS ALIGNED WITH WHAT I

12:07:01   5    UNDERSTAND THE COURT'S POSITION TO BE.

12:07:03   6        SO I'M NOT SURE CHARACTERIZING THE QUESTION IS NECESSARY.

12:07:06   7        I THINK OTHERWISE I'M NOT SURE FOR THE NEED TO DEVIATE

12:07:11   8    FROM THE COURT'S STANDARD INSTRUCTION WHEN IT COMES TO STRIKING

12:07:14   9    ANSWERS FROM THE RECORD.  BUT OTHERWISE I HAVE NO SUBSTANTIVE

12:07:20  10    OBJECTIONS TO THIS LANGUAGE.

12:07:21  11            MR. WADE:  YOUR HONOR, AS WE'VE MADE CLEAR IN SEEKING

12:07:24  12    TO EXPLORE THIS IN CROSS-EXAMINATION, WE THINK THIS IS

12:07:28  13    DIFFERENT IN KIND FROM THE OTHER ANSWERS AND REQUIRES MORE OF A

12:07:31  14    REMEDY.  THAT'S WHY WE'VE PROPOSED THIS INSTRUCTION.

12:07:34  15        OUR PREFERENCE WOULD BE TO EXPLORE IT IN

12:07:36  16    CROSS-EXAMINATION, BUT SHORT OF THAT, UNDERSTANDING THE COURT'S

12:07:40  17    RULING UNDER THE RULES OF EVIDENCE, WE WOULD ASK THAT THIS

12:07:45  18    INSTRUCTION BE GIVEN TO CURE THIS, THIS ISSUE.

12:07:48  19            THE COURT:  ALL RIGHT.  THANK YOU.

12:07:50  20            MR. WADE:  SHOULD I READ THIS, JUST FOR THE RECORD?

12:07:52  21            THE COURT:  I BEG YOUR PARDON.  YOU'D LIKE ME TO --

12:07:55  22    YOU WOULD LIKE ME TO ADVISE THE JURY OF THIS NOW WHEN THEY COME

12:08:00  23    IN?

12:08:00  24            MR. WADE:  YES.

12:08:00  25            THE COURT:  YOU SAID INSTRUCTION.  YOU MEANT NOW AS
```

2885

```
12:08:02   1      OPPOSED TO A FINAL INSTRUCTION?

12:08:04   2              MR. WADE:  YEAH, RIGHT.  RIGHT WHEN THE JURY RETURNS,

12:08:08   3      YOUR HONOR.

12:08:08   4              THE COURT:  RIGHT.  ALL RIGHT.  THANK YOU.

12:08:10   5          WELL, I LOOK AT THIS, I AM GOING TO STRIKE THE, THE MIDDLE

12:08:14   6      SENTENCE IN THE THIRD LINE.  I DON'T THINK THAT'S NECESSARY.

12:08:20   7          BUT I WILL READ TO THE JURY, WHEN THEY RETURN, THE

12:08:24   8      FOLLOWING:  "AT THE END OF HIS REDIRECT EXAMINATION,

12:08:29   9      DR. ROSENDORFF WAS ASKED TO COMPARE THERANOS WITH OTHER LABS

12:08:33  10      WHERE HE HAS WORKED.  YOU MUST ENTIRELY DISREGARD BOTH THE

12:08:38  11      QUESTION AND DR. ROSENDORFF'S ANSWER.  IT WOULD BE IMPROPER FOR

12:08:44  12      YOU TO GIVE ANY WEIGHT WHATSOEVER EITHER TO THE QUESTION OR TO

12:08:49  13      THE ANSWER."

12:08:51  14          THAT'S WHAT I'LL READ TO THEM WHEN THEY COME OUT.

12:08:55  15              MR. WADE:  AND JUST FOR THE RECORD, YOU'LL SKIP OVER

12:08:58  16      THE SENTENCE "THAT WAS AN INAPPROPRIATE QUESTION" THAT WE HAD

12:09:03  17      REQUESTED?

12:09:03  18              THE COURT:  THE ONE THAT YOU JUST READ INTO THE

12:09:05  19      RECORD, THAT YOU WANTED TO READ INTO THE RECORD?

12:09:07  20              MR. WADE:  YES, I DID, YOUR HONOR, JUST TO MAKE SURE

12:09:09  21      WE'RE CLEAR.

12:09:10  22              THE COURT:  YES.  THANK YOU FOR DOING THAT.  I WAS

12:09:12  23      GOING TO SUGGEST THAT WHAT I DELETED WAS WHAT MR. WADE JUST

12:09:15  24      READ --

12:09:16  25              MR. WADE:  THANK YOU, YOUR HONOR.
```

2886

| | | |
|---|---|---|
| 12:09:17 | 1 | THE COURT:  -- FROM THE PROPOSED INSTRUCTION. |
| 12:09:20 | 2 | OKAY.  ANYTHING ELSE? |
| 12:09:21 | 3 | OH, LET ME -- BUT, MR. WADE, I DID SAY THAT I WOULD ALLOW |
| 12:09:25 | 4 | YOU TO PROBE SOMEWHAT. |
| 12:09:27 | 5 | HAVING READ THIS INSTRUCTION, THOUGH, THEY'RE NOT TO |
| 12:09:30 | 6 | CONSIDER THAT, YOU SEE, SO THIS PRESENTS THEN ANOTHER DOOR THAT |
| 12:09:34 | 7 | YOU'RE FACING, DOESN'T IT? |
| 12:09:36 | 8 | MR. WADE:  MAYBE I'M NOT CLEAR ON WHAT IT IS THE |
| 12:09:39 | 9 | COURT IS WILLING TO LET ME PROBE. |
| 12:09:41 | 10 | THE COURT:  RIGHT. |
| 12:09:41 | 11 | MR. WADE:  I HAD UNDERSTOOD THE COURT SAYING I CAN'T |
| 12:09:44 | 12 | PROBE IT, SO MAYBE -- |
| 12:09:46 | 13 | THE COURT:  WELL, I -- I FIRST SAID, WHEN WE WERE |
| 12:09:50 | 14 | TALKING ABOUT POSSIBLE REMEDIES, I SAID I MIGHT LET YOU PROBE |
| 12:09:53 | 15 | INTO THIS. |
| 12:09:54 | 16 | BUT IF I'M GOING TO READ THIS INSTRUCTION NOW, I THINK IT |
| 12:09:56 | 17 | BEST TO KEEP THE WHITE BOARD COMPLETELY CLEAN SO THEY'RE NOT |
| 12:09:59 | 18 | REMINDED ABOUT ANYTHING. |
| 12:10:04 | 19 | IF I ALLOW YOU TO, AS I SAID I WAS GOING TO DO, ALLOW YOU |
| 12:10:07 | 20 | TO PROBE A LITTLE BIT ON THE AREA OF WHETHER OR NOT THIS WAS |
| 12:10:12 | 21 | THE WORST PLACE, OR WHATEVER IT WAS HE SAID ABOUT THAT, THAT |
| 12:10:16 | 22 | TANGENTIALLY KEEPS THAT -- THIS -- THAT QUESTION IN THEIR |
| 12:10:21 | 23 | MINDS, AND I'M ASKING THEM TO STRIKE IT. |
| 12:10:23 | 24 | SO WHAT I'M SUGGESTING NOW IS MAYBE WE SHOULD MOVE ON AND |
| 12:10:26 | 25 | YOU DON'T NEED TO ASK ANY QUESTIONS ABOUT IT BECAUSE THAT |

2887

```
12:10:28   1        QUESTION ISN'T IN THEIR MIND.

12:10:32   2               MR. WADE:  I APOLOGIZE IF I WAS CONFUSED, YOUR HONOR.

12:10:34   3        I UNDERSTOOD THAT YOU WERE NOT GOING TO ALLOW US TO PROBE THAT.

12:10:37   4        THAT'S WHAT I UNDERSTOOD TO BE THE COURT'S RULING.

12:10:39   5               THE COURT:  RIGHT.

12:10:40   6               MR. WADE:  WHAT MY REFERENCE WOULD BE WOULD BE TO

12:10:42   7        PROBE WITH RESPECT TO THE TWO, TWO PLACES OF EMPLOYMENT WHERE

12:10:48   8        THERE WERE SIGNIFICANT ISSUES WITHIN THE LAB, ONE BEING INVITAE

12:10:55   9        AND THE VOIDING OF THE 50,000 TESTS, THERE BEING A NUMBER OF

12:10:59  10        ERRONEOUS TESTS AND HIS SEPARATION FROM THE COMPANY AS A RESULT

12:11:02  11        OF THAT; AND THE OTHER BEING THE SIGNIFICANT ISSUES, INCLUDING

12:11:08  12        THE TESTING ACCURACY AND LAB PRACTICES DEFICIENCIES AT

12:11:13  13        PERKIN ELMER.

12:11:15  14          THAT WOULD HAVE BEEN WHAT I WOULD HAVE INTENDED TO PROBE,

12:11:17  15        AND I HAD UNDERSTOOD THAT THE COURT DOESN'T, DOESN'T WANT ME TO

12:11:21  16        GO INTO THAT.

12:11:22  17          AM I --

12:11:22  18               THE COURT:  THAT'S RIGHT.  AND I'M SORRY, WE'RE

12:11:24  19        TALKING KIND OF -- WE'RE SHIPS PASSING.

12:11:27  20               MR. WADE:  OKAY.

12:11:27  21               THE COURT:  BUT WHAT I'M GOING TO DO, BECAUSE THIS

12:11:29  22        ISSUE HAS BEEN RAISED AND IN LIGHT OF YESTERDAY'S RULING WHERE

12:11:32  23        I SAID YOU CAN'T GET INTO ANY OF THAT, TODAY THIS ISSUE CAME UP

12:11:38  24        FROM MR. BOSTIC'S QUESTION AND THE ANSWER.

12:11:40  25          THE REMEDY TODAY IS TO STRIKE THAT QUESTION AND THAT
```

2888

| | | |
|---|---|---|
| 12:11:43 | 1 | ANSWER, AND I THINK THAT TAKES CARE OF IT SUCH THAT YOU DON'T |
| 12:11:46 | 2 | NEED TO GO INTO ANY OF THE OTHER THINGS THAT I TALKED ABOUT. |
| 12:11:50 | 3 | MR. WADE:  RIGHT.  AND I UNDERSTAND THE COURT WILL |
| 12:11:52 | 4 | NOT LET ME GO INTO THOSE ISSUES.  CORRECT? |
| 12:11:55 | 5 | THE COURT:  I WILL NOT LET YOU GO INTO THOSE. |
| 12:11:58 | 6 | MR. WADE:  RIGHT, UNDERSTOOD. |
| 12:11:59 | 7 | THE COURT:  AS WE PREVIOUSLY DISCUSSED. |
| 12:12:01 | 8 | MR. WADE:  UNDERSTOOD. |
| 12:12:01 | 9 | THE COURT:  THAT'S NOT TO SAY THAT YOU CAN'T -- |
| 12:12:04 | 10 | YOU'RE GOING TO DO WHATEVER YOU'RE GOING TO DO ON RECROSS BASED |
| 12:12:07 | 11 | ON WHAT THE REDIRECT WAS. |
| 12:12:09 | 12 | MR. WADE:  RIGHT. |
| 12:12:09 | 13 | THE COURT:  OKAY.  ANY QUESTION ABOUT THAT? |
| 12:12:11 | 14 | MR. BOSTIC:  NOT FROM THE GOVERNMENT, YOUR HONOR. |
| 12:12:12 | 15 | THANK YOU. |
| 12:12:12 | 16 | THE COURT:  OKAY.  ALL RIGHT.  THANK YOU. |
| 12:12:14 | 17 | SHOULD WE ASK THE DOCTOR TO COME IN AND ASK OUR JURY TO |
| 12:12:17 | 18 | COME IN NOW? |
| 12:12:19 | 19 | MR. WADE:  SURE. |
| 12:12:19 | 20 | MR. BOSTIC:  YES, YOUR HONOR. |
| 12:12:20 | 21 | THE COURT:  ARE WE READY? |
| 12:12:26 | 22 | MR. BOSTIC:  YES. |
| 12:12:27 | 23 | THE COURT:  OKAY. |
| 12:12:36 | 24 | (PAUSE IN PROCEEDINGS.) |
| 12:12:37 | 25 | THE COURT:  OKAY.  FOLKS, I JUST WANT TO REMIND |

2889

```
12:12:40   1    EVERYONE THAT WE DON'T -- THOSE IN THE GALLERY, WE'RE NOT

12:12:43   2    HAVING BEVERAGES, AND SO IF YOU BROUGHT A BEVERAGE IN, YOU NEED

12:12:50   3    TO PLEASE REMOVE THE BEVERAGE, COFFEE DRINKS OR THOSE KINDS OF

12:12:54   4    THINGS.

12:12:57   5         (PAUSE IN PROCEEDINGS.)

12:14:12   6         THE COURT:  CAN I ASK COUNSEL, IS IT STILL SUGGESTED

12:14:16   7    THAT -- WE'RE GOING TO GO UNTIL 3:00 TODAY.  IS IT SUGGESTED

12:14:21   8    STILL THAT WE BREAK AT THE 1:30 TIMEFRAME?  IS THAT A GOOD

12:14:24   9    TIMEFRAME?

12:14:25  10         MR. WADE:  COURT'S INDULGENCE.

12:14:29  11         (DISCUSSION OFF THE RECORD AMONGST DEFENSE COUNSEL.)

12:14:40  12         MR. WADE:  (NODS HEAD UP AND DOWN.)

12:14:42  13         THE COURT:  OKAY.

12:14:43  14         (JURY IN AT 12:14 P.M.)

12:15:00  15         THE COURT:  ALL RIGHT.  THANK YOU.  PLEASE BE SEATED.

12:15:07  16    WE'RE BACK ON THE RECORD.  OUR JURY AND ALTERNATES ARE

12:15:11  17    PRESENT.  ALL COUNSEL AND MS. HOLMES ARE PRESENT.

12:15:14  18    DR. ROSENDORFF IS ON THE STAND AGAIN.

12:15:15  19         AND YOU HAVE SOME -- YOU'D LIKE TO ASK SOME QUESTIONS ON

12:15:18  20    RECROSS?

12:15:19  21         MR. WADE:  I DO, YOUR HONOR.

12:15:21  22         THE COURT:  YES.

12:15:22  23         BUT FIRST, LADIES AND GENTLEMEN, BEFORE WE BEGIN

12:15:25  24    MR. WADE'S QUESTIONING, I DO WANT TO INSTRUCT YOU ON SOMETHING,

12:15:28  25    SO PLEASE DO LISTEN.
```

ROSENDORFF RECROSS BY MR. WADE                                        2890

| | |
|---|---|
| 12:15:31 | 1 |       AT THE END OF HIS REDIRECT EXAMINATION, DR. ROSENDORFF WAS |
| 12:15:35 | 2 | ASKED TO COMPARE THERANOS WITH OTHER LABS WHERE HE HAS WORKED. |
| 12:15:43 | 3 | YOU MUST ENTIRELY DISREGARD BOTH THE QUESTION, THAT QUESTION, |
| 12:15:48 | 4 | AND DR. ROSENDORFF'S ANSWER.  IT WOULD BE IMPROPER FOR YOU TO |
| 12:15:53 | 5 | GIVE ANY WEIGHT WHATSOEVER EITHER TO THE QUESTION OR TO THE |
| 12:15:58 | 6 | ANSWER. |
| 12:16:00 | 7 |       JUST TO BE CLEAR, I AM STRIKING THOSE, THE QUESTION AND |
| 12:16:03 | 8 | THE ANSWER FROM THE RECORD AND YOU ARE NOT, NOT TO CONSIDER |
| 12:16:07 | 9 | EITHER OF THOSE THINGS IN YOUR DELIBERATIONS.  THEY ARE |
| 12:16:10 | 10 | STRICKEN. |
| 12:16:12 | 11 |       THANK YOU. |
| 12:16:13 | 12 |            MR. WADE:  THANK YOU, YOUR HONOR.  MAY I PROCEED? |
| 12:16:14 | 13 |            THE COURT:  YES. |
| 12:16:16 | 14 |                      **RECROSS-EXAMINATION** |
| 12:16:16 | 15 | BY MR. WADE: |
| 12:16:17 | 16 | Q.   GOOD AFTERNOON, DR. ROSENDORFF. |
| 12:16:19 | 17 | A.   HELLO. |
| 12:16:20 | 18 | Q.   I'D LIKE TO START BY BRINGING UP EXHIBIT 5417, WHICH IS IN |
| 12:16:27 | 19 | EVIDENCE AND THE GOVERNMENT ASKED YOU QUESTIONS ABOUT IT. |
| 12:16:33 | 20 |       WE'LL PUT IT UP ON THE SCREEN IF IT'S EASIER FOR YOU, |
| 12:16:36 | 21 | DOCTOR. |
| 12:16:36 | 22 | A.   ALL RIGHT. |
| 12:16:37 | 23 | Q.   THIS WAS ONE OF THE LOOSE DOCUMENTS THAT THE GOVERNMENT |
| 12:16:39 | 24 | HANDED YOU. |
| 12:16:40 | 25 | A.   YES. |

UNITED STATES COURT REPORTERS

ROSENDORFF RECROSS BY MR. WADE                                        2891

| | | |
|---|---|---|
| 12:16:41 | 1 | Q.   OKAY.  DO YOU RECALL THIS DOCUMENT? |
| 12:16:42 | 2 | A.   I HAVE IT IN FRONT OF ME. |
| 12:16:44 | 3 | Q.   OKAY.  IT'S A -- AND IF YOU'D LOOK AT THE -- IF WE CAN |
| 12:16:48 | 4 | BLOW UP THE BOTTOM EMAIL, YOU WERE ASKED SOME QUESTIONS ABOUT |
| 12:16:50 | 5 | THIS. |
| 12:16:51 | 6 | DO YOU SEE THAT? |
| 12:16:52 | 7 | A.   YES. |
| 12:16:53 | 8 | Q.   AND THE QUESTIONS THAT YOU WERE ASKED RELATED TO THE FACT |
| 12:16:59 | 9 | THAT MR. BALWANI STATED THAT HE WAS RUNNING THE CLIA LAB NOW, |
| 12:17:06 | 10 | SO HE WAS ASKING TO BE KEPT IN THE LOOP; RIGHT? |
| 12:17:08 | 11 | A.   YES. |
| 12:17:09 | 12 | Q.   AND YOU THOUGHT THIS WAS INAPPROPRIATE; CORRECT? |
| 12:17:12 | 13 | A.   YES. |
| 12:17:13 | 14 | Q.   OKAY.  AND I BELIEVE YOU TESTIFIED THAT HE MENTIONED |
| 12:17:18 | 15 | SOMETHING ABOUT THIS, BUT YOU HAD NO RESPONSE; RIGHT? |
| 12:17:21 | 16 | A.   CORRECT. |
| 12:17:21 | 17 | Q.   OKAY.  LET'S LOOK AT EXHIBIT 13950. |
| 12:17:30 | 18 | MAY I APPROACH, YOUR HONOR? |
| 12:17:31 | 19 | THE COURT:  YES. |
| 12:17:34 | 20 | MR. WADE:  (HANDING.) |
| 12:17:36 | 21 | Q.   DO YOU RECOGNIZE THIS TO BE AN EMAIL BETWEEN YOU AND |
| 12:17:54 | 22 | MR. BALWANI IN JUNE OF 2014 REGARDING CLIA LAB OPS? |
| 12:18:00 | 23 | A.   YES. |
| 12:18:01 | 24 | MR. WADE:  OKAY.  MOVE THE ADMISSION OF 13950. |
| 12:18:05 | 25 | MR. BOSTIC:  NO OBJECTION. |

ROSENDORFF RECROSS BY MR. WADE                                    2892

| | | |
|---|---|---|
| 12:18:06 | 1 | THE COURT:  IT'S ADMITTED AND IT MAY BE PUBLISHED. |
| 12:18:09 | 2 | (DEFENDANT'S EXHIBIT 13950 WAS ADMITTED IN EVIDENCE.) |
| 12:18:09 | 3 | MR. WADE:  THANK YOU. |
| 12:18:10 | 4 | Q.   LET'S START AT THE BOTTOM. |
| 12:18:12 | 5 | NOW, YOU PREVIOUSLY TESTIFIED THAT DR. PANDORI LEFT THE |
| 12:18:15 | 6 | LAB AROUND THIS TIME; RIGHT? |
| 12:18:17 | 7 | A.   YES. |
| 12:18:17 | 8 | Q.   AND IN RESPONSE TO THAT, FROM AN OPERATIONAL STANDPOINT, |
| 12:18:23 | 9 | MR. BALWANI STEPPED IN TO GIVE ASSISTANCE; CORRECT? |
| 12:18:25 | 10 | A.   YES. |
| 12:18:29 | 11 | Q.   OKAY.  AND IN THIS EMAIL, HE SPECIFICALLY RAISES THAT WITH |
| 12:18:34 | 12 | YOU; CORRECT? |
| 12:18:35 | 13 | A.   YES. |
| 12:18:36 | 14 | Q.   HE DIDN'T JUST WALK INTO THE LAB AND TAKE CONTROL OF IT |
| 12:18:38 | 15 | WITHOUT DISCUSSION WITH YOU, DID HE? |
| 12:18:40 | 16 | A.   YES. |
| 12:18:41 | 17 | Q.   THAT WOULD HAVE BEEN INAPPROPRIATE IF HE DID THAT; RIGHT? |
| 12:18:43 | 18 | A.   YES. |
| 12:18:43 | 19 | Q.   OKAY.  INSTEAD HE SENT YOU AN EMAIL AND HE SUGGESTED THAT |
| 12:18:50 | 20 | SINCE YOU'RE OUT FOR THE NEXT FEW DAYS, THIS IS NEEDED NO |
| 12:18:53 | 21 | MATTER WHAT. |
| 12:18:54 | 22 | DO YOU SEE THAT? |
| 12:18:55 | 23 | A.   YES. |
| 12:18:56 | 24 | Q.   BECAUSE YOU WERE ACTUALLY TAKING SOME VACATION DURING THIS |
| 12:18:59 | 25 | PERIOD. |

ROSENDORFF RECROSS BY MR. WADE                                    2893

```
12:19:00   1        DO YOU RECALL THAT?

12:19:01   2    A.   I DON'T RECALL.

12:19:01   3    Q.   OKAY.  BUT IS THAT WHAT YOU INFER FROM THAT COMMENT?

12:19:04   4    A.   YES.

12:19:05   5    Q.   OKAY.  AND IF DR. PANDORI WASN'T THERE AND YOU WEREN'T

12:19:07   6    THERE, HE WANTED TO MAKE SURE THERE WAS SOMEONE THERE TO HELP

12:19:11   7    KEEP THINGS MOVING; RIGHT?

12:19:12   8    A.   MY UNDERSTANDING IS THAT MR. BALWANI WANTED THIS TO BE A

12:19:18   9    PERMANENT ARRANGEMENT.

12:19:21  10    Q.   OKAY.  WELL, SO HE'S SAYING, BECAUSE -- NOW, WHEN

12:19:24  11    DR. PANDORI WAS THERE, YOU TESTIFIED THAT HE HAD SOME

12:19:27  12    SPECIALTIES?

12:19:28  13    A.   YES.

12:19:29  14    Q.   RIGHT?  BUT HE ALSO WAS VERY FOCUSSED ON THE LAB

12:19:32  15    OPERATIONS; RIGHT?

12:19:33  16    A.   YES.

12:19:34  17    Q.   HE WAS TAKING A LEAD ROLE IN THAT; RIGHT?

12:19:36  18    A.   WE BOTH WERE.

12:19:37  19    Q.   OKAY.  BUT IN THE LAB OPERATIONS, YOU DON'T NECESSARILY

12:19:39  20    HAVE TO BE A LAB DIRECTOR IF YOU'RE SUPERVISED BY A LAB

12:19:42  21    DIRECTOR; RIGHT?

12:19:43  22    A.   CORRECT.

12:19:44  23    Q.   OKAY.  AND SO DR. PANDORI WAS VERY INVOLVED IN TRYING TO

12:19:48  24    IMPLEMENT SOME OF THE PRACTICES AND PROCEDURES WITHIN THE LAB;

12:19:51  25    RIGHT?
```

```
12:19:51   1      A.   YES.

12:19:52   2      Q.   OKAY.  AND SO WHEN HE LEFT, MR. BALWANI GIVES YOU NOTICE

12:19:58   3      THAT HE WANTS TO STEP IN ON THE OPS ISSUES.

12:20:03   4           DO YOU SEE THAT?

12:20:04   5      A.   YES.

12:20:04   6      Q.   OKAY.  LIKE SCHEDULING, DEVICES, ORDERING INVENTORY,

12:20:09   7      DEPARTMENTALIZING PEOPLE, TEAM STRUCTURES, ET CETERA.

12:20:12   8           DO YOU SEE THAT?

12:20:13   9      A.   YES.

12:20:13  10      Q.   OKAY.  AND HE SAYS HE'LL FINALIZE AND PUT THIS IN PLACE

12:20:18  11      THIS WEEK.

12:20:19  12           YOU SEE THAT, OF COURSE?

12:20:20  13      A.   YES.

12:20:20  14      Q.   OKAY.  AND HE'LL KEEP YOU IN THE LOOP IN EVERY SINGLE

12:20:27  15      RELEVANT EMAIL OF COURSE, BUT BASICALLY WE NEED TO GET THE LAB

12:20:30  16      IN ORDER AS WE SCALE.

12:20:32  17           DO YOU SEE THAT?

12:20:32  18      A.   YES.

12:20:33  19      Q.   THAT'S BECAUSE THE NUMBER OF PATIENTS WAS INCREASING;

12:20:36  20      RIGHT?

12:20:36  21      A.   YES.

12:20:37  22      Q.   OKAY.  AND HE WANTED TO COME IN AND HELP FROM AN

12:20:40  23      OPERATIONAL STANDPOINT; RIGHT?

12:20:41  24      A.   WELL, HE WAS -- HE WAS DOING FAR MORE THAN THAT.

12:20:49  25      Q.   WELL, HE'S TELLING YOU HERE THAT HE'S GOING TO GET
```

ROSENDORFF RECROSS BY MR. WADE                                    2895

12:20:51   1     INVOLVED IN THE LAB FROM AN OPERATIONAL STANDPOINT?

12:20:54   2     A.   THAT'S WHAT HE'S SAYING, YEAH.

12:20:56   3     Q.   AND HE ACTUALLY SAYS, I'M UNIQUELY GIFTED AT

12:20:59   4     ORGANIZATIONAL STRUCTURES AND OPS.

12:21:00   5          DO YOU SEE THAT?

12:21:01   6     A.   YES.

12:21:02   7     Q.   HE FELT, BASED ON HIS BUSINESS EXPERIENCE, HIS EXTENSIVE

12:21:07   8     PRIOR BUSINESS EXPERIENCE, THAT HE HAD TALENTS IN THE

12:21:11   9     OPERATIONAL ISSUES; RIGHT?

12:21:12  10     A.   YES.

12:21:12  11     Q.   OKAY.  AND HE SAYS HE'LL FOCUS ON THIS FOR THE NEXT FEW

12:21:15  12     WEEKS; RIGHT?

12:21:16  13     A.   YES.

12:21:16  14     Q.   AND YOUR RESPONSE -- LET'S LOOK AT YOUR RESPONSE.

12:21:23  15     A.   I'M READING IT.

12:21:25  16     Q.   YEAH.  YOU AGREED; RIGHT?

12:21:26  17     A.   I JUST ACKNOWLEDGED HIS EMAIL.

12:21:29  18     Q.   WELL, YOU SAY THANKS; RIGHT?

12:21:31  19     A.   I DIDN'T SAY GO AHEAD AND, YOU KNOW, TAKE CONTROL OF THE

12:21:34  20     CLIA LAB.  I JUST ACKNOWLEDGED HIS EMAIL.  THAT'S IT.

12:21:37  21     Q.   YOU SAID THANKS; RIGHT?

12:21:39  22     A.   YES.

12:21:40  23     Q.   OKAY.  AND SO YOU KNEW HE WAS COMING IN AND YOU SAID

12:21:42  24     THANKS; RIGHT?  THAT'S WHAT THE EMAIL SAYS?  THOSE ARE YOUR

12:21:49  25     WORDS?

UNITED STATES COURT REPORTERS

**ER-6645**

ROSENDORFF RECROSS BY MR. WADE                                    2896

| | | |
|---|---|---|
| 12:21:50 | 1 | A.   I'M THANKING HIM FOR HIS EMAIL. |
| 12:21:51 | 2 | Q.   OKAY.  AND YOU THEN TALK ABOUT ANOTHER PROPOSAL THAT YOU |
| 12:21:54 | 3 | HAVE SINCE MARK PANDORI IS GONE; RIGHT? |
| 12:21:57 | 4 | A.   YES. |
| 12:21:57 | 5 | Q.   AND SOME, SOME DIFFERENT WORK THAT YOU'RE GOING TO TAKE |
| 12:22:00 | 6 | ON? |
| 12:22:00 | 7 | A.   YES. |
| 12:22:00 | 8 | Q.   RIGHT?  SO THIS WAS -- I BELIEVE YOU, IN YOUR DIRECT -- IN |
| 12:22:06 | 9 | YOUR REDIRECT TESTIMONY, YOU ACTUALLY USED THE WORDS UNIQUELY |
| 12:22:09 | 10 | GIFTED AT ORGANIZATIONAL STRUCTURES OR SOMETHING TO THAT |
| 12:22:12 | 11 | EFFECT; RIGHT? |
| 12:22:13 | 12 | A.   YES. |
| 12:22:13 | 13 | Q.   OKAY.  AND THAT'S, IN FACT, WHAT HE WROTE IN THIS EMAIL? |
| 12:22:17 | 14 | A.   YES. |
| 12:22:18 | 15 | Q.   AND THE GOVERNMENT DIDN'T SHOW YOU THIS EMAIL IN YOUR |
| 12:22:22 | 16 | PREPARATION, EITHER, DID THEY? |
| 12:22:23 | 17 | A.   NO. |
| 12:22:24 | 18 | Q.   NO.  AND THIS IS IN, I'LL NOTE, IN JUNE OF 2014. |
| 12:22:28 | 19 | DO YOU SEE THAT? |
| 12:22:29 | 20 | A.   YES. |
| 12:22:29 | 21 | Q.   AND JUNE OF 2014, RIGHT IN THIS PERIOD IS THE PERIOD WHEN |
| 12:22:36 | 22 | YOU WERE ALSO DEALING WITH SOME OF THOSE HCG ISSUES AND OTHER |
| 12:22:42 | 23 | THINGS; RIGHT? |
| 12:22:43 | 24 | A.   OKAY. |
| 12:22:43 | 25 | Q.   DO YOU REMEMBER THAT? |

ROSENDORFF RECROSS BY MR. WADE                                    2897

```
12:22:44   1    A.   I THINK SO.

12:22:44   2    Q.   OKAY.  AND SO YOU WERE ASKED A LOT OF QUESTIONS ABOUT THE

12:22:48   3    FACT THAT MR. BALWANI WAS ON EMAILS DURING THIS PERIOD, BUT HE

12:22:51   4    WAS TELLING YOU THAT HE WAS GOING TO BE ON THE EMAILS AND WORK

12:22:55   5    TO INCLUDE YOU BECAUSE HE'S GOING TO TRY AND ADDRESS

12:22:58   6    OPERATIONAL ISSUES; RIGHT?  HE'S TELLING YOU THAT?

12:23:01   7    A.   IS THERE A QUESTION HERE, SIR?

12:23:05   8    Q.   YEAH.  HE'S TELLING YOU THAT, RIGHT, IN THIS EMAIL?

12:23:09   9    A.   HE'S SAYING THAT HE'S GOING TO BE INVOLVED IN OPERATIONAL

12:23:12  10    ISSUES, YES.

12:23:13  11    Q.   HE'S GIVING YOU NOTICE OF THAT AND HE'S SAYING, "I WILL

12:23:19  12    KEEP YOU IN THE LOOP IN EVERY SINGLE RELEVANT EMAIL OF COURSE."

12:23:23  13         DO YOU SEE THAT?

12:23:24  14    A.   YES.

12:23:24  15    Q.   OKAY.  AND YOU THANKED HIM FOR IT.

12:23:45  16         AND JUST SO WE'RE CLEAR, SIR, YOU TESTIFIED THAT THERE

12:23:48  17    WERE SEVERAL LABS THAT YOU WORKED IN WHERE YOU WERE A PART-TIME

12:23:48  18    LAB DIRECTOR; RIGHT?

12:23:50  19    A.   CORRECT.

12:23:51  20    Q.   AND WHEN YOU WEREN'T -- THAT MEANS SOMETIMES YOU WEREN'T

12:23:52  21    THERE; RIGHT?

12:23:54  22    A.   AT THERANOS?

12:23:55  23    Q.   NO, NOT AT THERANOS.

12:23:57  24         WHEN YOU SERVE ON OCCASION AS A PART-TIME LAB DIRECTOR --

12:23:57  25    A.   YES.
```

```
12:23:59  1     Q.   -- THAT MEANS SOMETIMES YOU'RE NOT ON SITE AT THE LAB?

12:24:02  2     A.   CORRECT.

12:24:02  3     Q.   AND WHEN THAT HAPPENS, THERE ARE OTHER PEOPLE WHO TAKE ON

12:24:05  4     RESPONSIBILITIES TO IMPLEMENT THINGS IN, IN AID OF YOUR

12:24:09  5     DIRECTORSHIP?

12:24:10  6     A.   YES, THEY'RE ON THE ROSTER.

12:24:12  7     Q.   RIGHT.

12:24:12  8     A.   SUNNY WASN'T ON THE ROSTER.

12:24:16  9     Q.   WELL, WE'LL DEAL WITH THAT SEPARATELY.

12:24:19 10          IN FACT, HE WAS ON THE ROSTER OF THE CLIA LAB, WAS HE NOT?

12:24:23 11     A.   I DON'T BELIEVE.  THAT'S NEWS TO ME.

12:24:26 12     Q.   OKAY.

12:24:26 13     A.   IN WHAT CAPACITY, SIR?

12:24:29 14     Q.   ISN'T IT TRUE THAT MR. BALWANI WAS LISTED IN THE CLIA FORM

12:24:32 15     ON THE ROSTER FOR THE CLIA LAB?

12:24:34 16     A.   I DON'T BELIEVE HE WAS, NO.

12:24:36 17     Q.   OKAY.

12:24:39 18     A.   HE WOULDN'T HAVE QUALIFIED FOR ANY POSITION.

12:24:42 19     Q.   I WANT TO ASK YOU ABOUT THE LAUNCH.  OKAY?

12:24:53 20     A.   OKAY.

12:24:54 21     Q.   THE GOVERNMENT SHOWED YOU EXHIBIT 1113.  LET'S PULL THAT

12:25:04 22     UP.

12:25:12 23          AND THIS APPEARS, I BELIEVE YOU SAID, TO BE A PRESS

12:25:14 24     RELEASE; RIGHT?

12:25:15 25     A.   YES.
```

ROSENDORFF RECROSS BY MR. WADE                                              2899

```
12:25:16   1      Q.   YOU DON'T RECALL SEEING THIS PRESS RELEASE AT THE TIME?

12:25:18   2      A.   NO.

12:25:18   3      Q.   AND THE GOVERNMENT SHOWED YOU THE FIRST AND THIRD

12:25:23   4      PARAGRAPHS.  LET'S LOOK AT THE MIDDLE PARAGRAPH.

12:25:27   5           OKAY.  THIS SAYS THAT THERANOS AND WALGREENS ARE TAKING

12:25:32   6      THE FIRST STEP IN MAKING THIS SERVICE AVAILABLE TO CONSUMERS.

12:25:36   7           DO YOU SEE THAT?

12:25:37   8      A.   YES.

12:25:38   9      Q.   WITH THE FIRST THERANOS WELLNESS CENTER LOCATION OPENING

12:25:42  10      THIS MONTH.

12:25:44  11           DO YOU SEE THAT?

12:25:45  12      A.   YES.

12:25:46  13      Q.   IT DOESN'T SAY WHEN; RIGHT?

12:25:47  14      A.   YES.

12:25:48  15      Q.   IT DOESN'T SAY ON THAT DAY, DOES IT?  IT DOESN'T SAY IT'S

12:25:51  16      GOING TO HAPPEN ON SEPTEMBER 9TH?

12:25:54  17      A.   YES, CORRECT.

12:25:56  18      Q.   RIGHT.  AND, IN FACT, WHEN PEOPLE WERE WANTING TO MAKE

12:26:02  19      SURE THERE WAS TIME TO IMPLEMENT PROCEDURES, IN FACT, THEY

12:26:05  20      DELAYED THE PUBLIC LAUNCH UNTIL NOVEMBER OF 2013; CORRECT?

12:26:12  21      A.   I CAN'T SPECULATE ON WHY THE PUBLIC LAUNCH WAS DELAYED,

12:26:17  22      SIR.

12:26:17  23      Q.   BUT YOU KNOW IT WAS DELAYED?

12:26:18  24      A.   CORRECT.

12:26:19  25      Q.   OKAY.  AND --
```

ROSENDORFF RECROSS BY MR. WADE                                    2900

| | | |
|--|--|--|
|12:26:21|1|A.   I'M ALSO NOT CLEAR ON WHAT YOU MEAN BY "PUBLIC."  YOU|
|12:26:24|2|KNOW, FRIENDS AND FAMILY ARE STILL MEMBERS OF THE PUBLIC.|
|12:26:27|3|Q.   RIGHT.  SO -- I'M GLAD YOU RAISED THAT, BECAUSE YOU WERE|
|12:26:30|4|ASKED SOME QUESTIONS ABOUT FRIENDS AND FAMILY.|
|12:26:31|5|A.   YEAH.|
|12:26:32|6|Q.   DO YOU RECALL THAT?|
|12:26:33|7|A.   YES.|
|12:26:34|8|Q.   AND YOU WERE ASKED ABOUT IF THERE WERE ISSUES WITH THOSE|
|12:26:36|9|TESTS OR THINGS, THOSE WOULD STILL BE REAL ISSUES; RIGHT?|
|12:26:42|10|THEY'RE STILL PATIENTS; RIGHT, IF THEY'RE FRIENDS AND FAMILY?|
|12:26:46|11|     DO YOU RECALL THAT?|
|12:26:48|12|A.   YES.|
|12:26:48|13|Q.   OKAY.  AND THE GOVERNMENT SAID, AND IF ISSUES AROSE, EVEN|
|12:26:52|14|WITH A SMALL VOLUME, THOSE ARE STILL ISSUES THAT ARE SERIOUS;|
|12:26:57|15|RIGHT?|
|12:26:57|16|A.   CORRECT.|
|12:26:58|17|Q.   DO YOU RECALL THAT?|
|12:26:59|18|A.   CORRECT.|
|12:26:59|19|Q.   AND YOU SAID THEY WERE; RIGHT?|
|12:27:02|20|A.   YES.|
|12:27:02|21|Q.   NOW, YOU ACTUALLY DON'T KNOW OF ANY ISSUES THAT CAME UP|
|12:27:04|22|WITH RESPECT TO THE LAB RESULTS THAT WERE ACTUALLY PERFORMED|
|12:27:07|23|DURING THAT PUBLIC LAUNCH, DO YOU?|
|12:27:10|24|A.   I DON'T RECALL.|
|12:27:11|25|Q.   YOU HAVEN'T BEEN SHOWN A SINGLE EMAIL THAT SUGGESTS THAT|

UNITED STATES COURT REPORTERS

**ER-6650**

ROSENDORFF RECROSS BY MR. WADE                                          2901

```
12:27:13   1    THERE WAS AN ISSUE WITH RESPECT TO THOSE FEW LAB TESTS THAT

12:27:18   2    WERE OFFERED IN THAT FRIENDS AND FAMILY LAUNCH, HAVE YOU?

12:27:22   3    A.   SO FROM WHAT YOU SHOWED ME, IT LOOKS LIKE THEY WERE

12:27:27   4    RUNNING CBC'S AND A1C'S FOR THE FIRST TWO WEEKS OR SO.

12:27:31   5    Q.   RIGHT.   THEY WERE RUNNING TWO TESTS; RIGHT, SIR?

12:27:34   6    A.   YES.

12:27:34   7    Q.   I JUST WANT THERE TO BE CLARITY ON THIS ISSUE.   TWO TESTS?

12:27:37   8    DO YOU RECALL THAT?

12:27:38   9    A.   YES.

12:27:39  10    Q.   INITIALLY, YOU THOUGHT THAT THEY WERE RUNNING A WHOLE

12:27:41  11    RANGE OF TESTS; RIGHT?

12:27:42  12    A.   THAT'S WHAT I BELIEVED, YES.

12:27:44  13    Q.   BUT IT LOOKS -- THERE'S NO EVIDENCE OF THAT; RIGHT?

12:27:46  14    A.   WELL, I -- I HAD NO TRANSPARENCY, OR I WAS NOT AWARE OF

12:27:51  15    EXACTLY WHAT THEY WERE OFFERING AT THAT TIME.

12:27:52  16    Q.   WELL, THERE WERE NO VALIDATION REPORTS IN PLACE BEFORE

12:27:55  17    THEN; RIGHT?

12:27:56  18    A.   YES.

12:27:56  19    Q.   SO YOU WOULDN'T HAVE -- YOU WOULDN'T HAVE LET A TEST IN

12:27:59  20    THE LAB IF THERE WAS NO VALIDATION REPORT, WOULD YOU?

12:28:02  21    A.   OF COURSE NOT.

12:28:03  22    Q.   OKAY.   AND YOU RECALL -- I'M HAPPY TO BRING UP THAT

12:28:12  23    EMAIL -- BUT YOU RECALL THE EXCHANGE THAT YOU HAD WITH

12:28:15  24    MR. BALWANI WHERE HE ASKED IF THERE WAS ANYTHING THAT YOU

12:28:17  25    NEEDED IN ADVANCE OF THE GENERAL PUBLIC LAUNCH IN EARLY
```

ROSENDORFF RECROSS BY MR. WADE                                   2902

```
12:28:22   1    NOVEMBER OF 2013?

12:28:24   2    A.   YES.

12:28:24   3    Q.   YOU RECALL THAT?

12:28:25   4    A.   YES.

12:28:25   5    Q.   OKAY.  AND THAT'S WHEN THE LAB OPENED TO THE GENERAL

12:28:28   6    PUBLIC; RIGHT, SIR?

12:28:29   7    A.   FRIENDS AND FAMILY IS STILL THE PUBLIC.

12:28:34   8    Q.   OKAY.  LET'S BRING UP 24 -- 12464, WHICH IS IN EVIDENCE.

12:28:52   9         LET'S LOOK AT THE BOTTOM.

12:29:00  10         DO YOU SEE THAT?

12:29:01  11    A.   YES.

12:29:01  12    Q.   LET'S GO TO THE NEXT PAGE.

12:29:13  13         DO YOU SEE THAT THIS WAS THE POINT IN WHICH THIS WAS OPEN

12:29:17  14    TO PEOPLE OTHER THAN FRIENDS AND FAMILY; RIGHT, SIR?

12:29:19  15    A.   YES.

12:29:20  16    Q.   OKAY.  YOU WERE ASKED SOME QUESTIONS ABOUT THE

12:29:31  17    INSPECTIONS?

12:29:32  18    A.   YES.

12:29:32  19    Q.   THE INSPECTION IN 2013; CORRECT?

12:29:35  20    A.   YES.

12:29:35  21    Q.   NOW, THE GOVERNMENT BROUGHT UP A SERIES OF DOCUMENTS.

12:29:43  22    LET'S START WITH 4047, WHICH IS IN EVIDENCE.

12:29:55  23         OKAY.  YOU RECALL THAT THEY SHOWED YOU THIS ONE?

12:29:57  24    A.   YES.

12:29:58  25    Q.   OKAY.  AND THIS RELATES TO DISCUSSION ABOUT GOING TO THE
```

ROSENDORFF RECROSS BY MR. WADE                                        2903

| | | |
|---|---|---|
| 12:30:02 | 1 | LAB; RIGHT? |
| 12:30:03 | 2 | A.   YES. |
| 12:30:03 | 3 | Q.   AND THEN LET'S BRING UP 4316. |
| 12:30:18 | 4 | THEY SHOWED YOU THIS DOCUMENT; CORRECT? |
| 12:30:21 | 5 | A.   YES. |
| 12:30:22 | 6 | Q.   AND MS. HOLMES IS NOT ON THIS DOCUMENT; RIGHT? |
| 12:30:26 | 7 | A.   CORRECT. |
| 12:30:26 | 8 | Q.   NOW, LET'S BRING UP 12479.  AND LET'S BLOW UP THE TOP. |
| 12:30:50 | 9 | AND, AGAIN, THIS DOCUMENT THEY DIDN'T SHOW YOU, DID THEY? |
| 12:30:56 | 10 | A.   NO, I'VE SEEN IT BEFORE. |
| 12:31:01 | 11 | Q.   YOU'VE SEEN IT BEFORE, BUT THEY DIDN'T SHOW THIS TO YOU IN |
| 12:31:05 | 12 | THE REDIRECT, DID THEY? |
| 12:31:07 | 13 | A.   NOT IN THE REDIRECT, NO. |
| 12:31:08 | 14 | Q.   AND THEY DIDN'T EMPHASIZE THAT YOU HAD PREVIOUSLY |
| 12:31:11 | 15 | TESTIFIED THAT MS. HOLMES SEEMED WILLING TO SHOW THEM THE LAB |
| 12:31:15 | 16 | DOWNSTAIRS; RIGHT?  YOU PREVIOUSLY TESTIFIED TO THAT? |
| 12:31:20 | 17 | A.   YES. |
| 12:31:21 | 18 | Q.   YEAH.  AND JUST SO WE'RE CLEAR, BECAUSE I -- YOU NEVER |
| 12:31:27 | 19 | CONCEALED ANYTHING FROM THESE INSPECTORS; RIGHT, SIR? |
| 12:31:30 | 20 | A.   CORRECT. |
| 12:31:31 | 21 | Q.   YOU WOULDN'T DO THAT, WOULD YOU? |
| 12:31:32 | 22 | A.   NO. |
| 12:31:32 | 23 | Q.   IF SOMEONE ASKED YOU TO DO IT, YOU WOULDN'T DO IT? |
| 12:31:35 | 24 | A.   CORRECT. |
| 12:31:35 | 25 | Q.   RIGHT.  AND WITH RESPECT TO THE EDISON LABS, YOU SHOWED |

UNITED STATES COURT REPORTERS

ROSENDORFF RECROSS BY MR. WADE                                    2904

12:31:45   1    THEM AN EDISON VALIDATION REPORT; RIGHT?

12:31:47   2    A.   CORRECT.

12:31:48   3    Q.   YOU DISCUSSED THE EDISONS WITH THEM; RIGHT?

12:31:52   4    A.   YES, YES.

12:31:53   5    Q.   AND ARE YOU AWARE THERE WERE DETAILED -- THERE WAS

12:31:55   6    DETAILED INFORMATION ABOUT THE EDISONS AND ITS WHOLE TEST MENU

12:31:59   7    PROVIDED TO THE FDA AND CMS DURING THIS VERY SAME TIME PERIOD?

12:32:03   8    ARE YOU AWARE OF THAT?

12:32:04   9    A.   I WAS AWARE THAT THERANOS WAS VOLUNTARILY SUBMITTING DATA

12:32:09  10    TO THE FDA, OSTENSIBLY FOR THE PURPOSES OF GETTING FDA

12:32:17  11    APPROVAL.  I'M NOT REALLY SURE WHY THEY WERE DOING THAT.

12:32:20  12        I'M NOT AWARE OF ANY DOCUMENTATION THAT WAS SENT TO CMS

12:32:23  13    REGARDING THE EDISONS DURING THIS TIME.

12:32:25  14    Q.   OKAY.  YOU WEREN'T AWARE THAT THEY WERE DOING THAT BECAUSE

12:32:29  15    YOU WEREN'T INVOLVED IN THOSE PROCESSES; CORRECT?

12:32:31  16    A.   I DON'T -- I DON'T RECALL.

12:32:33  17    Q.   OKAY.  AND -- BUT YOU WERE AWARE THAT YOU SHARED

12:32:36  18    INFORMATION WITH THE INSPECTOR WHO WALKED IN THE DOOR IN 2013;

12:32:39  19    RIGHT?

12:32:39  20    A.   YES.

12:32:40  21    Q.   OKAY.  AND IF SHE HAD ASKED YOU TO GO DOWNSTAIRS AND SEE

12:32:45  22    THOSE DEVICES, YOU WOULD HAVE WALKED HER RIGHT DOWN; RIGHT?

12:32:48  23    A.   YES.

12:32:49  24    Q.   OKAY.  NOW, THE GOVERNMENT BROUGHT UP A LITTLE -- SOME

12:33:05  25    TESTIMONY WHERE IT WAS COMPARING THERANOS DEVICES AND

ROSENDORFF RECROSS BY MR. WADE                                    2905

12:33:09   1       UNMODIFIED DEVICES; RIGHT?

12:33:10   2       A.   YES.

12:33:11   3       Q.   DO YOU RECALL THAT?

12:33:12   4       A.   YES.

12:33:12   5       Q.   AND THERE WERE A LOT OF TESTS THAT WERE PERFORMED ON

12:33:15   6       UNMODIFIED DEVICES; RIGHT?

12:33:17   7       A.   CORRECT.

12:33:17   8       Q.   AND YOU TALKED ABOUT THE ARIZONA LABORATORY.

12:33:22   9            DO YOU RECALL THAT?

12:33:23   10      A.   YES.

12:33:23   11      Q.   AND THAT LABORATORY WAS A MODERATE COMPLEXITY LABORATORY;

12:33:26   12      RIGHT?

12:33:27   13      A.   I DON'T RECALL.

12:33:27   14      Q.   OKAY.  THAT -- BUT YOU DO RECALL THAT IT ONLY HAD

12:33:31   15      COMMERCIAL DEVICES?

12:33:32   16      A.   YES.

12:33:33   17      Q.   CORRECT?

12:33:33   18      A.   THAT WAS MY BELIEF, YES.

12:33:35   19      Q.   AND THERE WAS A LOT OF VOLUME OF TESTING THAT WAS

12:33:37   20      HAPPENING ON COMMERCIAL DEVICES AT THERANOS; CORRECT?

12:33:40   21      A.   CAN YOU BE MORE SPECIFIC?

12:33:46   22      Q.   YEAH.  THERE WAS A -- THERE WERE A MENU OF DIFFERENT TESTS

12:33:51   23      THERE WERE BEING OFFERED; RIGHT?

12:33:52   24      A.   YES.

12:33:53   25      Q.   AND I FORGET THE EXACT NUMBER, BUT YOU SAID MAYBE SEVEN TO


UNITED STATES COURT REPORTERS

**ER-6655**

2906

ROSENDORFF RECROSS BY MR. WADE

| | | |
|---|---|---|
| 12:33:57 | 1 | NINE TESTS WERE OFFERED ON THE EDISON; RIGHT? |
| 12:34:00 | 2 | A.   IN WHAT TIME PERIOD? |
| 12:34:02 | 3 | Q.   IN YOUR TENURE AT THERANOS. |
| 12:34:05 | 4 | A.   YES. |
| 12:34:05 | 5 | Q.   OKAY.  SO IN THAT TENURE, THERE WERE ABOUT SEVEN TO NINE |
| 12:34:09 | 6 | TESTS ON THE EDISON DEVICE? |
| 12:34:10 | 7 | A.   YES. |
| 12:34:11 | 8 | Q.   OKAY.  AND WHAT -- THERE WERE MAYBE ANOTHER 50 TO 60 OF |
| 12:34:18 | 9 | THE MODIFIED PREDICATES THAT WERE RUN ON THE ADVIA; IS THAT |
| 12:34:23 | 10 | RIGHT? |
| 12:34:23 | 11 | A.   THERE WERE 50 TO 60 THAT WERE VALIDATED, I BELIEVE.  I |
| 12:34:33 | 12 | CAN'T TESTIFY HERE TODAY, MY RECOLLECTION IS NOT GOOD ENOUGH TO |
| 12:34:38 | 13 | SAY HOW MANY WERE ACTUALLY DONE USING THE LDT. |
| 12:34:41 | 14 | Q.   OKAY.  AND THE THIRD CATEGORY ARE THOSE COMMERCIAL |
| 12:34:44 | 15 | DEVICES; RIGHT? |
| 12:34:45 | 16 | A.   YES. |
| 12:34:45 | 17 | Q.   AND THERE WERE OVER 100 TESTS THAT WERE AVAILABLE ON THE |
| 12:34:48 | 18 | COMMERCIAL DEVICES; RIGHT? |
| 12:34:49 | 19 | A.   YES. |
| 12:34:50 | 20 | Q.   AND I BELIEVE YOUR TESTIMONY IS THAT THERE WERE BASICALLY |
| 12:34:53 | 21 | NO ISSUES WITH RESPECT TO THOSE TESTS; RIGHT? |
| 12:34:55 | 22 | A.   THE COMMERCIAL DEVICES? |
| 12:34:56 | 23 | Q.   YEAH.  THEY PERFORMED WELL; RIGHT? |
| 12:34:59 | 24 | A.   IN GENERAL, YES. |
| 12:35:01 | 25 | Q.   OKAY.  LET'S PULL UP 13893. |

ROSENDORFF RECROSS BY MR. WADE                                    2907

```
12:35:27   1        YOU RECALL YOU WERE ASKED SOME QUESTIONS ABOUT THIS, THE

12:35:29   2   ISE'S?

12:35:30   3   A.   YES.

12:35:30   4   Q.   LET'S GO TO THE SECOND PAGE.  THIS WAS THE REPORT OUT FROM

12:35:38   5   DR. YOUNG.

12:35:39   6        DO YOU RECALL THAT?

12:35:40   7   A.   YES.

12:35:40   8   Q.   AND WE TESTIFIED -- WE HAD SOME DISCUSSION ABOUT THIS ON

12:35:43   9   CROSS-EXAMINATION.

12:35:45  10        DO YOU RECALL?

12:35:45  11   A.   I BELIEVE SO.

12:35:46  12   Q.   OKAY.  AND WE TALKED ABOUT SOME OF THE FINDINGS IN THE

12:35:50  13   FIRST HALF.

12:35:51  14        DO YOU SEE THAT?

12:35:52  15   A.   YES.

12:35:53  16   Q.   AND THEN WE, WE NOTED THAT THERE WAS STILL WORK THAT WAS

12:35:56  17   GOING TO BE DONE; RIGHT?

12:35:57  18   A.   YES.

12:35:58  19   Q.   BECAUSE EVEN THOUGH THERE HAD BEEN SOME SUCCESS, THERE WAS

12:36:03  20   STILL A DESIRE TO CONTINUE TO IMPROVE THE ASSAY; CORRECT?

12:36:06  21   A.   YES.

12:36:06  22   Q.   AND LET'S GO BACK TO THE FIRST PAGE.

12:36:09  23        AND YOU -- IN THIS EMAIL, YOU CONGRATULATED DR. YOUNG ON

12:36:16  24   HAVING CRACKED THIS; RIGHT?

12:36:17  25   A.   YES.
```

ROSENDORFF RECROSS BY MR. WADE                                         2908

12:36:18   1      Q.   BECAUSE EVERYONE BELIEVED AT THE TIME THAT THAT IS WHAT

12:36:20   2      HAD HAPPENED; RIGHT?

12:36:21   3      A.   YES.

12:36:22   4      Q.   IN GOOD FAITH; RIGHT?

12:36:23   5      A.   YES.

12:36:23   6      Q.   AND WHEN YOU OFFERED THE TEST, YOU BELIEVED IN GOOD FAITH

12:36:28   7      THAT IT WAS -- THAT THE PROBLEM HAD BEEN SOLVED?

12:36:30   8      A.   YES.

12:36:31   9      Q.   OKAY.  YOU WERE ASKED SOME QUESTIONS ON DIRECT ABOUT THE

12:36:46  10      LIS, OR ON REDIRECT ABOUT THE LIS.

12:36:50  11           DO YOU RECALL THAT?

12:36:50  12      A.   YES.

12:36:51  13      Q.   AND ONE THING THE GOVERNMENT ASKED YOU ABOUT WAS WHETHER

12:36:54  14      THE TEST RESULT INFORMATION THAT YOU WOULD GET FROM OTHER

12:36:58  15      COMPANIES WAS STORED WITHIN LIS.

12:37:02  16           DO YOU RECALL THAT?

12:37:02  17      A.   YES, YES.

12:37:03  18      Q.   AND YOU SAID OF COURSE IT WAS NOT; RIGHT?

12:37:05  19      A.   YES.

12:37:06  20      Q.   YEAH.  WHEN -- BUT WHEN INQUIRIES OF THAT KIND WOULD COME

12:37:12  21      IN AND YOU WOULD HAVE TO CONSIDER HOW THOSE RESULTS COMPARED TO

12:37:19  22      THERANOS'S RESULTS, YOU'D HAVE TO GO AND PULL A WHOLE LOT OF

12:37:23  23      INFORMATION FROM THE LIS INFORMATION SYSTEM; RIGHT?

12:37:26  24      A.   YES.  I WOULD SEE HOW THE THERANOS RESULTS HAD BEEN

12:37:31  25      TRENDING, I WOULD SEE HOW MANY ARE OUT OF REFERENCE RANGE, I

ROSENDORFF RECROSS BY MR. WADE                                         2909

12:37:36    1        WOULD DO AN INVESTIGATION.

12:37:36    2        Q.   DETAILS OF THE VISIT, PATIENT VISIT THAT WERE IN THERE;

12:37:40    3        RIGHT?  ANY INFORMATION?

12:37:42    4        A.   AT THE THERANOS COLLECTION SITE?

12:37:44    5        Q.   TO THE EXTENT THERE WAS INFORMATION ABOUT WHEN THE SAMPLE

12:37:46    6        WAS LOGGED?

12:37:48    7        A.   OH, YEAH, THAT'S PART OF THE ACCESSION.

12:37:54    8        Q.   DETAILS OF THE DEVICE IT WAS RUN ON?

12:37:57    9        A.   YES.

12:37:57   10        Q.   TIME AND LOCATION OF THE DRAW?

12:38:00   11        A.   YES.

12:38:01   12        Q.   THE PHLEBOTOMIST MAYBE IF IT WAS IN THERE?

12:38:07   13        A.   I DON'T RECALL.  THAT'S NOT A REQUIREMENT.

12:38:09   14        Q.   OKAY.  THE IMAGES OF THE SAMPLE YOU MIGHT LOOK AT?  WE'VE

12:38:12   15        SEEN THAT?

12:38:13   16        A.   I -- I DON'T RECALL IF THE IMAGES WERE AVAILABLE IN LIS.

12:38:17   17        Q.   YOU RECALL PULLING THOSE FOR PURPOSES OF LOOKING AT

12:38:20   18        WHETHER THERE WAS HEMOLYSIS IN THE SAMPLE?  YOU'D LOOK AT THE

12:38:24   19        IMAGES OF THE SAMPLE?

12:38:25   20        A.   I THINK IT WAS CLOTTING, AND I THINK SOMEBODY SENT ME

12:38:28   21        THOSE IMAGES.

12:38:29   22        Q.   OKAY.  BUT IN ANY EVENT, YOU MIGHT LOOK AT THE REFERENCE

12:38:32   23        RANGE; CORRECT?

12:38:32   24        A.   YES.

12:38:33   25        Q.   YOU MIGHT LOOK AT A WHOLE HOST OF OTHER INFORMATION THAT

ROSENDORFF RECROSS BY MR. WADE                                          2910

```
12:38:36   1    YOU HAVE WITHIN THE LAB AT THERANOS; RIGHT?

12:38:38   2    A.   YES.

12:38:39   3    Q.   AND THAT WOULD -- THE VAST MAJORITY OF THAT INFORMATION

12:38:42   4    WOULD BE STORED WITHIN LIS; CORRECT?

12:38:44   5    A.   YES, YES.

12:38:45   6    Q.   AND WITH RESPECT TO WHETHER -- HOW THE RESULTS COMPARED TO

12:38:55   7    OTHER RESULTS, THAT'S NOT SOMETHING THAT YOU KNOW JUST FROM --

12:39:01   8    OFF THE CUFF; RIGHT?  YOU NEED TO GATHER ALL THE RELEVANT FACTS

12:39:05   9    TO KNOW IF YOU'RE COMPARING APPLES TO APPLES; RIGHT?

12:39:08  10    A.   YES.

12:39:09  11    Q.   AND THERE IS -- I BELIEVE YOU'VE TESTIFIED BEFORE THERE'S

12:39:12  12    ALWAYS VARIABILITY TO A DEGREE, OR OFTEN VARIABILITY BETWEEN

12:39:16  13    TWO TESTS; RIGHT?

12:39:17  14    A.   CAN YOU CLARIFY YOUR STATEMENT?

12:39:20  15    Q.   WELL, YOU RECALL I WAS TALKING ABOUT THE SCALE THAT I

12:39:23  16    WOULD STEP ON, AND OFTENTIMES --

12:39:25  17    A.   OKAY.

12:39:26  18    Q.   I COULD DO IT THREE TIMES IN A ROW AND IT MIGHT BE A

12:39:29  19    LITTLE DIFFERENT?

12:39:29  20    A.   MINOR VARIATIONS.

12:39:31  21    Q.   MINOR VARIATIONS.

12:39:32  22         AND SO THERE COULD BE DIFFERENT VARIATIONS THAT WOULD --

12:39:35  23    THAT MIGHT -- THAT YOU HAVE TO ASSESS WHEN YOU'RE CONSIDERING

12:39:38  24    WHETHER OR NOT THE DIFFERENCES BETWEEN THE THERANOS TEST AND

12:39:43  25    THE TEST AT ANOTHER LAB ARE MEANINGFUL; RIGHT?
```

UNITED STATES COURT REPORTERS

**ER-6660**

ROSENDORFF RECROSS BY MR. WADE                                    2911

12:39:47   1        A.   RIGHT.  SO THE ONE ISSUE IS WHAT IS THE ERROR WITHIN THE

12:39:54   2        SAME METHOD IF YOU REPEAT THE SAMPLE?  THAT'S CALLED PRECISION.

12:39:59   3            THE OTHER MEDICAL ISSUE IS IF YOU GET A VASTLY DIFFERENT

12:40:03   4        RESULT DESPITE THE -- DESPITE THE SMALL AMOUNT OF ERROR THAT

12:40:09   5        HAPPENS WITH A GOOD LABORATORY TEST -- GOOD LABORATORY TESTS

12:40:13   6        DON'T HAVE VERY MUCH ERROR, RIGHT?

12:40:16   7            SO AS A PHYSICIAN, I WOULD HAVE TO LOOK AT THE QUEST

12:40:21   8        RESULTS, FOR INSTANCE, AND DETERMINE WHETHER THEY WERE

12:40:23   9        COMPARABLE TO THE THERANOS RESULTS.

12:40:25  10        Q.   AND BECAUSE SOMETIMES DIFFERENT METHODS REACH DIFFERENT

12:40:29  11        RESULTS ON THE SAME BLOOD; RIGHT?

12:40:34  12        A.   THEY SHOULDN'T BE THAT DIFFERENT.  NO, THEY SHOULDN'T BE.

12:40:37  13        Q.   WELL, YOU'RE AWARE THAT THERE'S A WHOLE MOVEMENT WITHIN

12:40:39  14        THE LAB, LABORATORY SCIENCE ABOUT HARMONIZATION OF DATA.  ARE

12:40:43  15        YOU AWARE OF THAT?

12:40:44  16        A.   I'M AWARE OF IT FOR A1C.

12:40:46  17        Q.   OKAY.  AND IT EXISTS FOR VITAMIN D AS WELL; RIGHT?

12:40:51  18            AND ARE YOU AWARE THAT THERE ARE EFFORTS AND TASK FORCES

12:40:56  19        THAT LOOK AT DIFFERENCES BETWEEN DATA AND TRY TO FIND WAYS TO

12:40:59  20        MAKE -- TO HARMONIZE THEM ACCORDING TO ONE STANDARD; RIGHT?

12:41:03  21        A.   YES.

12:41:03  22        Q.   OKAY.  BECAUSE SOMETIMES THOSE DIFFERENCES EXIST BETWEEN

12:41:06  23        DIFFERENT ASSAYS; RIGHT?

12:41:08  24        A.   RIGHT.  GO AHEAD.

12:41:10  25        Q.   SO THAT'S WHY, WHEN YOU GET THAT INFORMATION IN, YOU HAVE

ROSENDORFF RECROSS BY MR. WADE                                            2912

```
12:41:13   1    TO ACTUALLY LOOK AT ALL OF THE RELEVANT FACTS BEFORE REACHING A

12:41:17   2    JUDGMENT; RIGHT?

12:41:17   3    A.   YES.

12:41:18   4    Q.   YOU WERE ASKED SOME QUESTIONS ABOUT AAP ON REDIRECT.

12:42:25   5         DO YOU RECALL THAT?

12:42:26   6    A.   YES.

12:42:27   7    Q.   AND THEY BROUGHT YOU BACK TO THAT EMAIL THAT MS. CHEUNG

12:42:36   8    SENT AROUND; RIGHT?

12:42:37   9    A.   YES.

12:42:38  10    Q.   AND AT THE TIME, JUST SO THE RECORD IS CLEAR, THAT WASN'T

12:42:41  11    AN APPLICATION OF THE AAP POLICY; CORRECT?

12:42:44  12    A.   NO.

12:42:44  13    Q.   OKAY.  AND IF THERE WAS CONFUSION AS A RESULT OF THAT,

12:42:49  14    THAT PEOPLE THOUGHT THAT TESTS FAILED AAP OR PT, THEY WOULD BE

12:42:55  15    MISTAKEN; CORRECT?

12:42:56  16    A.   CORRECT.

12:42:57  17    Q.   BECAUSE THAT WASN'T AAP OR PT?

12:43:00  18    A.   WELL, IT WAS A QC SPOT CHECK USING PT SAMPLES.  SO I CAN

12:43:06  19    UNDERSTAND THE LEVEL OF CONCERN THAT WAS IN THE COMPANY.

12:43:08  20    Q.   WELL, AND YOU CAN UNDERSTAND WHY THERE WAS SOME CONFUSION;

12:43:11  21    RIGHT?  BECAUSE IT WAS PRECISION TESTING MATERIAL; RIGHT?

12:43:14  22    A.   PROFICIENCY.

12:43:15  23    Q.   THANK YOU AGAIN, DOCTOR.

12:43:18  24         PROFICIENCY TESTING MATERIAL?

12:43:21  25    A.   YES.
```

ROSENDORFF RECROSS BY MR. WADE                                    2913

```
12:43:22  1      Q.   BUT IT WASN'T BEING USED IN -- ACCORDING TO THE

12:43:25  2      PROFICIENCY TESTING POLICY AT THERANOS; RIGHT?

12:43:27  3      A.   CORRECT.

12:43:29  4      Q.   OKAY.  AND THE -- AGAIN, THAT PROFICIENCY TESTING POLICY

12:43:43  5      AND THE IMPLEMENTATION OF IT WAS THE RESPONSIBILITY OF YOU AND

12:43:47  6      MR. GEE AND OTHERS WITHIN THE LABORATORY; CORRECT?

12:43:53  7      A.   I THINK WE'VE DISCUSSED THE CHALLENGES AROUND THE

12:43:55  8      IMPLEMENTATION.

12:43:57  9      Q.   I THINK WE HAVE DISCUSSED THE CHALLENGES AROUND

12:44:00  10     IMPLEMENTATION, BUT IT WAS YOUR RESPONSIBILITY; RIGHT?

12:44:02  11     A.   YES.

12:44:03  12     Q.   AND I ALSO BELIEVE THAT YOU'VE TESTIFIED THAT THERE WAS

12:44:08  13     NOT A SINGLE EMAIL THAT YOU SENT ASKING FOR MORE RESOURCES FROM

12:44:12  14     MS. HOLMES THAT WAS NOT RESPONDED TO; CORRECT?

12:44:15  15     A.   IT WAS DISCUSSED IN THE MEETING WITH -- IN THE AAP

12:44:18  16     MEETING.

12:44:18  17     Q.   IN OCTOBER OF 2014?

12:44:20  18     A.   YEAH.

12:44:20  19     Q.   THE ONE YOU RESCHEDULED; RIGHT?

12:44:23  20     A.   CORRECT.

12:44:24  21     Q.   YEAH.  AND THE ONE THAT THERE WAS FOLLOW-UP ALMOST

12:44:28  22     IMMEDIATELY; CORRECT?

12:44:29  23     A.   CORRECT.

12:44:29  24     Q.   AND THE ONE WHERE YOU LEFT ABOUT A MONTH LATER; RIGHT?

12:44:32  25     A.   I BELIEVE SO.
```

UNITED STATES COURT REPORTERS

**ER-6663**

ROSENDORFF RECROSS BY MR. WADE                                                2914

```
12:44:32   1      Q.   OKAY.  YOU WERE QUESTIONED ABOUT THE CLIA REGULATIONS.

12:44:58   2           DO YOU RECALL THAT?

12:44:59   3      A.   IN -- ON REDIRECT?

12:45:01   4      Q.   ON REDIRECT.

12:45:01   5      A.   YEAH.

12:45:02   6      Q.   I'M TRYING TO LIMIT MY QUESTIONING TO MATTERS THAT WERE

12:45:04   7      RAISED BY MR. BOSTIC RECENTLY.

12:45:06   8      A.   UM-HUM.

12:45:07   9      Q.   DO YOU RECALL THAT?

12:45:08  10      A.   YES.

12:45:08  11      Q.   AND THERE WAS DISCUSSION OF -- WITH MR. BOSTIC ABOUT YOUR

12:45:15  12      RESPONSIBILITY UNDER THOSE REGULATIONS; CORRECT?

12:45:17  13      A.   YES.

12:45:18  14      Q.   AND HE ASKED YOU ABOUT -- YOU NOTED THE FACT THAT THE

12:45:22  15      OWNER AND OPERATOR IS RESPONSIBLE; RIGHT?

12:45:25  16      A.   YES.

12:45:26  17      Q.   OKAY.  AND THAT DOESN'T MEAN THAT THERE -- THAT THEY HAVE

12:45:31  18      THE SAME AUTHORITY; RIGHT?

12:45:32  19      A.   CLIA DOES NOT USE THE WORD "AUTHORITY" OR ADDRESS

12:45:40  20      AUTHORITY IN THE REGULATIONS.

12:45:41  21      Q.   RIGHT.  THAT'S MY POINT.  THE RESPONSIBILITY FOR ACTUALLY

12:45:43  22      DOING THE FUNCTIONS IS THE LAB DIRECTOR'S; RIGHT?

12:45:46  23      A.   YES.

12:45:47  24      Q.   AND THE RESPONSIBILITY FOR IMPLEMENTING ALL OF THE

12:45:52  25      PROCEDURES IS THE LAB DIRECTOR'S; RIGHT?
```

ROSENDORFF RECROSS BY MR. WADE                                    2915

```
12:45:59   1      A.   I TAKE OBJECTION TO YOUR INFERENCE THAT I WAS RESPONSIBLE

12:46:03   2      FOR THE EXECUTION OF THESE PROCEDURES.

12:46:07   3      Q.   WELL, ULTIMATELY THE REGULATIONS THERE SAY THAT IT IS YOUR

12:46:12   4      RESPONSIBILITY UNDER THE FEDERAL CLIA REGULATIONS TO IMPLEMENT

12:46:19   5      QUALITY CONTROL, AAP, TEST VALIDATION AND VERIFICATION, AND

12:46:26   6      OTHER ITEMS; CORRECT?

12:46:28   7      A.   YES.

12:46:28   8      Q.   OKAY.  AND YOU'RE ABLE TO DELEGATE THAT RESPONSIBILITY TO

12:46:32   9      PEOPLE?

12:46:32  10      A.   YES.

12:46:33  11      Q.   CORRECT?

12:46:34  12      A.   YES.

12:46:34  13      Q.   BUT ULTIMATELY IF IT GOES WRONG, IT'S YOUR RESPONSIBILITY;

12:46:38  14      RIGHT?

12:46:38  15      A.   AND THE OWNER/OPERATOR.

12:46:41  16      Q.   RIGHT.  BUT YOU HAVE TO BE SPECIALLY QUALIFIED TO DO THAT

12:46:44  17      WORK; RIGHT?

12:46:45  18      A.   YES.

12:46:45  19      Q.   OKAY.  AND JUST BECAUSE SOMEONE IS AN OWNER/OPERATOR

12:46:48  20      DOESN'T MEAN THEY CAN COME IN AND BE A LAB DIRECTOR; RIGHT?

12:46:51  21      A.   NO.

12:46:52  22      Q.   RIGHT.  SO IF THE OWNER/OPERATOR CAME IN AND STARTED

12:46:57  23      SAYING, LET'S OFFER THESE TESTS, THAT WOULD BE WRONG; RIGHT?

12:46:59  24      A.   YES.

12:47:00  25      Q.   AND IF THE OWNER/OPERATOR CAME IN AND STARTED ISSUING
```

ROSENDORFF RECROSS BY MR. WADE                                    2916

12:47:03  1    DIRECTIVES AND TELLING YOU EXACTLY WHAT TO DO WITHOUT THE

12:47:07  2    REQUISITE TRAINING, THAT WOULD BE WRONG; RIGHT, SIR?

12:47:09  3    A.   YES.

12:47:10  4    Q.   OKAY.  AND MS. HOLMES NEVER DID THAT; RIGHT?  SHE NEVER

12:47:16  5    DIRECTED YOU TO DO THINGS OR OVERRULED YOU ON THINGS, DID SHE?

12:47:23  6    A.   NO.

12:47:23  7    Q.   THE GOVERNMENT WENT THROUGH A BUNCH OF QUESTIONS ON HCG.

12:47:49  8         DO YOU RECALL THAT?

12:47:50  9    A.   YES.

12:47:51  10   Q.   AND THE GIST OF THE QUESTIONS RELATED TO KIND OF WHAT WAS

12:47:59  11   HAPPENING IN THIS FIRST WEEKEND IN JUNE WHEN YOU PUT A HALT TO

12:48:06  12   REPORTING RESULTS FROM THE EDISON ON HCG; RIGHT?

12:48:11  13   A.   IT WAS MAY 30TH.

12:48:12  14   Q.   MAY 30TH IS WHEN YOU PUT THE HALT TO IT; RIGHT?

12:48:15  15   A.   CORRECT.

12:48:16  16   Q.   AND THE ISSUE HAD COME UP THE DAY BEFORE INITIALLY; RIGHT?

12:48:19  17   A.   I BELIEVE SO.

12:48:19  18   Q.   AND I THINK MAYBE EVEN ON THAT DAY, THEY WERE TEMPORARILY

12:48:23  19   HALTED, AND THEN IT WAS PERMANENTLY HALTED THE NEXT DAY; RIGHT?

12:48:27  20   A.   TO BE HONEST, REVIEWING THE EMAILS, I'M NOT SURE WHAT

12:48:32  21   WAS -- I'M NOT SURE -- I'VE SEEN EMAILS TO THE EFFECT THAT THEY

12:48:36  22   CONTINUED RUNNING THEM ON EDISONS.  I WAS SEEKING CLARIFICATION

12:48:40  23   OF WHAT METHOD WE WERE ACTUALLY USING.  DANIEL WAS CLAIMING

12:48:45  24   THAT HE WASN'T INFORMED THAT THE HCG SHOULD GO ON THE EDISONS.

12:48:49  25        SO IT'S A LITTLE UNCLEAR TO ME.

ROSENDORFF RECROSS BY MR. WADE                                         2917

| | | |
|---|---|---|
| 12:48:51 | 1 | Q.   RIGHT.  AND I THINK YOU TESTIFIED YOU ACTUALLY -- APART |
| 12:48:54 | 2 | FROM THESE EMAILS, YOU DON'T HAVE ANY RECOLLECTION OF THIS; |
| 12:48:57 | 3 | RIGHT? |
| 12:48:58 | 4 | A.   I -- I DO NOT HAVE INDEPENDENT -- I REMEMBER THERE WAS A |
| 12:49:02 | 5 | PROBLEM WITH THE HCG. |
| 12:49:03 | 6 | Q.   YOU REMEMBER THERE WAS AN ISSUE THAT CAME UP WITH HCG? |
| 12:49:05 | 7 | A.   YES. |
| 12:49:06 | 8 | Q.   BUT WITH RESPECT TO WHO WAS DOING WHAT EXACTLY, YOU DON'T |
| 12:49:09 | 9 | RECALL THAT, DO YOU? |
| 12:49:10 | 10 | A.   NO. |
| 12:49:11 | 11 | Q.   OKAY.  LET'S LOOK -- I JUST WANT TO GO THROUGH -- I'VE |
| 12:49:25 | 12 | CREATED A DEMONSTRATIVE WHICH I'LL PUT UP, WHICH IS JUST |
| 12:49:44 | 13 | EXCERPTS FROM EMAILS THAT ARE IN EVIDENCE, AND I'M GOING TO |
| 12:49:52 | 14 | HAND IT TO YOU IN A SECOND.  I JUST WANT TO TELL YOU WHAT IT |
| 12:49:55 | 15 | IS.  OKAY? |
| 12:49:55 | 16 | YOU RECALL THAT THERE'S A LITTLE BIT OF CONFUSION AROUND |
| 12:50:00 | 17 | THIS ISSUE BECAUSE THERE ARE SEVERAL DIFFERENT EMAIL STRINGS |
| 12:50:03 | 18 | THAT ARE FROM DIFFERENT -- THAT HAVE DIFFERENT TIMED EMAILS ON |
| 12:50:06 | 19 | IT AND THEY'RE ALL KIND OF FLYING AROUND AT THE SAME TIME. |
| 12:50:08 | 20 | DO YOU RECALL THAT? |
| 12:50:09 | 21 | A.   YES. |
| 12:50:09 | 22 | Q.   OKAY.  WHAT WE'VE DONE IS WE'VE GONE THROUGH THOSE THREE |
| 12:50:12 | 23 | DIFFERENT EXHIBITS AND WE'VE JUST PUT THEM IN ORDER, OKAY, |
| 12:50:17 | 24 | ACCORDING TO THE TIME ON THE EMAILS.  OKAY? |
| 12:50:19 | 25 | A.   OKAY. |

```
12:50:20   1              MR. WADE:  AND I'M GOING TO OFFER THAT TO THE WITNESS

12:50:22   2       IF I MAY APPROACH.

12:50:23   3              THE COURT:  YES.

12:50:24   4              THE WITNESS:  YOUR HONOR, I HAVE TO PICK UP MY

12:50:25   5       DAUGHTER AT 3:45 AND I RESPECTFULLY ASK THE COURT THAT I BE

12:50:29   6       EXCUSED AT 2:00 O'CLOCK.

12:50:31   7              THE COURT:  ALL RIGHT.  THANK YOU FOR LETTING ME KNOW

12:50:33   8       THAT.  THANK YOU.

12:50:37   9              MR. WADE:  (HANDING.)

12:50:40  10              THE WITNESS:  THANK YOU.

12:50:42  11              MR. WADE:  YOUR HONOR, 2:00 O'CLOCK SHOULD NOT BE AN

12:50:44  12       ISSUE FROM OUR STANDPOINT.  I HOPE TO BE DONE WELL BEFORE 2:00

12:50:49  13       O'CLOCK.

12:50:53  14              THE COURT:  OKAY.

12:51:01  15              THE CLERK:  I'M JUST CONFIRMING THAT THIS CAN BE

12:51:04  16       DISPLAYED.

12:51:05  17              MR. WADE:  MAY I DISPLAY THIS, YOUR HONOR?

12:51:07  18              MR. BOSTIC:  NO OBJECTION FROM THE GOVERNMENT, YOUR

12:51:08  19       HONOR.

12:51:08  20       BY MR. WADE:

12:51:09  21       Q.   OKAY.  AND, AGAIN, ALL OF THESE EXHIBITS, I'M NOT -- I'M

12:51:13  22       TRYING TO SIMPLIFY THIS A LITTLE BIT.  BUT IF IT'S EVER

12:51:16  23       CONFUSING AND YOU WANT TO LOOK BACK AT THE INDIVIDUAL EXHIBITS,

12:51:19  24       FEEL FREE.  OKAY?

12:51:20  25       A.   SURE THING.
```

ROSENDORFF RECROSS BY MR. WADE                                    2919

```
12:51:21   1        Q.   OKAY.  LET'S START WITH 5419.  OKAY?

12:51:24   2        A.   UM-HUM.

12:51:25   3        Q.   AND IN 5419, THIS IS -- I'M JUST PICKING UP AT THE TIME OF

12:51:30   4   YOUR DIRECTION.

12:51:32   5        DO YOU SEE THAT?

12:51:32   6        A.   YES.

12:51:33   7        Q.   OKAY.  AND YOU SAY IN THAT FIRST ENTRY, "ALL FURTHER HCG

12:51:38   8   TESTING (CTN OR VACUTAINER) IS TO BE RUN ON THE IMMULITE."

12:51:46   9        RIGHT?

12:51:47  10        A.   YES.

12:51:47  11        Q.   OKAY.  YOU THEN SAY, "HOLD ALL EDISON CTN RESULTS - DO NOT

12:51:53  12   RELEASE."  RIGHT?

12:51:54  13        A.   YES.

12:51:55  14        Q.   THAT WAS IMPORTANT; CORRECT?

12:51:56  15        A.   YES.

12:51:56  16        Q.   BECAUSE THE MOST IMPORTANT THING IS YOU WANT TO MAKE

12:51:58  17   SURE -- YOU DIDN'T WANT TO MAKE SURE THAT THERE WERE -- THAT

12:52:00  18   THE ACTUAL RESULTS WENT OUT THE DOOR UNTIL THE ISSUE WAS

12:52:03  19   UNDERSTOOD; CORRECT?

12:52:04  20        A.   CORRECT.

12:52:04  21        Q.   OKAY.  AND THEN YOU TALKED ABOUT THE NEED TO GO BACK AND

12:52:11  22   MAKE CONTACT IF THERE WAS A NEED FOR A REDRAW DUE TO

12:52:15  23   INSUFFICIENT VOLUME FOR THE IMMULITE.

12:52:17  24        DO YOU SEE THAT?

12:52:18  25        A.   YES.
```

UNITED STATES COURT REPORTERS

ROSENDORFF RECROSS BY MR. WADE                                    2920

```
12:52:18   1      Q.   OKAY.  SO THEN THAT WAS AT 7:52 ON THE 30TH; RIGHT?

12:52:22   2      A.   YES.

12:52:23   3      Q.   OKAY.  IF WE GO TO THE NEXT EMAIL ON THE CHAIN, YOU CAN

12:52:26   4      SEE THAT'S JUNE 4TH AT 5:03.

12:52:30   5           DO YOU SEE THAT?

12:52:31   6      A.   YES.

12:52:32   7      Q.   AND MS. ALAMDAR NOTES THAT THERE WERE SOME RESULTS IN LIS

12:52:39   8      FOR HCG FOR EDISON.

12:52:41   9           DO YOU SEE THAT?

12:52:42  10      A.   YES.

12:52:42  11      Q.   AND SHE'S WONDERING WHETHER IT CAN BE RELEASED?

12:52:50  12      A.   YES.

12:52:50  13      Q.   BECAUSE SHE WASN'T ON THE OTHER EMAIL MAYBE, OR DIDN'T SEE

12:52:53  14      IT, IT WOULD SEEM.

12:52:54  15      A.   SHE WAS ON THE CLS EMAIL DISTRIBUTION LIST, YES, SHE WAS.

12:52:59  16      Q.   OKAY.  AND SHE'S ASKING YOU A QUESTION AS TO WHETHER SHE

12:53:01  17      CAN RELEASE IT?

12:53:02  18      A.   YES.

12:53:02  19      Q.   OKAY.  AND THAT WOULD HAVE BEEN YOUR JUDGMENT TO RESPOND

12:53:04  20      TO HER AT THAT POINT; RIGHT?

12:53:05  21      A.   I'M JUST REALLY CONFUSED AS TO WHY THE TEST WAS RUN ON THE

12:53:09  22      EDISON AND ON THE IMMULITE AT THIS TIME.

12:53:11  23      Q.   WELL, YOU MADE THE -- YOU HALTED THE TESTS ON FRIDAY;

12:53:16  24      RIGHT?

12:53:17  25      A.   CORRECT.
```

```
12:53:17   1      Q.   AND IT MAY HAVE BEEN THAT IT TOOK AWHILE TO GET OUT TO THE

12:53:21   2      PATIENT SERVICE CENTERS TO REVISE THE METHOD FOR HCG; RIGHT?

12:53:26   3      THEY MIGHT HAVE KEPT GOING FOR AWHILE WITH CTN'S?

12:53:30   4      A.   IT'S POSSIBLE.

12:53:31   5      Q.   OKAY.  BUT THE MOST IMPORTANT THING WAS THAT THE RESULTS

12:53:33   6      NOT BE REPORTED; CORRECT?

12:53:35   7      A.   CORRECT.

12:53:35   8      Q.   OKAY.  AND SHE'S ASKING WHETHER THE RESULTS COULD BE

12:53:38   9      REPORTED?

12:53:38  10      A.   YES.

12:53:39  11      Q.   AND I DON'T KNOW THAT WE HAVE A RESPONSE, BUT SHE'S

12:53:44  12      DIRECTING THAT INQUIRY TO YOU; RIGHT?

12:53:46  13      A.   YES.

12:53:47  14      Q.   OKAY.  LET'S LOOK AT THE NEXT EMAIL AT 5:09.

12:53:52  15           DO YOU SEE THAT?

12:53:53  16      A.   YES.

12:53:53  17      Q.   OKAY.  AND THAT SAYS THAT DANIEL -- DANIEL REPORTS TO

12:53:59  18      MR. BALWANI THAT HE WAS JUST SPEAKING WITH YOU ABOUT THIS.

12:54:02  19           DO YOU SEE THAT?

12:54:03  20      A.   YES.

12:54:03  21      Q.   AND DO YOU RECALL THERE WAS THAT EMAIL WHERE MR. BALWANI

12:54:06  22      WAS KIND OF MAD, HE WANTED TO MAKE SURE HE GOT YOU IN THE LOOP

12:54:10  23      WITH DANIEL, WITH DR. YOUNG AND DR. PANGARKAR?

12:54:13  24      A.   SEPARATE ISSUE.

12:54:15  25      Q.   NO, IT WAS ON THIS ISSUE IN THIS TIME PERIOD.
```

ROSENDORFF RECROSS BY MR. WADE                                    2922

```
12:54:18   1    A.   I RECALL AN EMAIL ABOUT R&D RUNNING EXPERIMENTS IN THE

12:54:21   2    CLIA LAB AND ME WANTING TO BE INFORMED OF THAT.

12:54:27   3    Q.   RIGHT.  AND DO YOU RECALL THOSE WERE HCG RESULTS RELATING

12:54:30   4    TO A STUDY THEY WERE DOING RIGHT IN THIS SAME TIME PERIOD?

12:54:33   5    A.   I DON'T RECALL.

12:54:33   6    Q.   OKAY.  WE'LL KEEP GOING.

12:54:35   7         DO YOU SEE THEN THE NEXT EMAIL IN THAT CHAIN, WHICH IS AT

12:54:39   8    5:12 -- OH, BY THE WAY, THE PRIOR EMAIL, IT SAYS, "WE WILL HOLD

12:54:44   9    THE RESULT," THE EMAIL FROM DANIEL, IT SAYS, "WE WILL HOLD THE

12:54:49   10   RESULT UNTIL THE STUDY WE ARE RUNNING ON THE EDISON ASSAY IS

12:54:53   11   DONE."

12:54:54   12        DO YOU SEE THAT?

12:54:55   13   A.   YES.

12:54:55   14   Q.   OKAY.  SO, AGAIN, HOLDING THE RESULTS; CORRECT?

12:54:58   15   A.   YES.

12:54:59   16   Q.   OKAY.  THAT WAS THE MOST IMPORTANT THING; RIGHT?

12:55:01   17   A.   YES.

12:55:01   18   Q.   OKAY.  LET'S GO TO THE NEXT EMAIL.

12:55:05   19        THIS IS AT 5:12 P.M.

12:55:07   20   A.   IT'S NOT CLEAR TO ME FROM DANIEL'S EMAIL WHAT RESULT HE'S

12:55:11   21   REFERRING TO, WHETHER IT'S RESULTS FROM THE IMMULITE OR RESULTS

12:55:14   22   FROM EDISON.

12:55:15   23   Q.   WELL, HE REFERS TO THE EDISON ASSAY, RIGHT, IN THAT EMAIL?

12:55:20   24   A.   YES.

12:55:20   25   Q.   OKAY.  BUT I -- FAIR POINT.  IT'S NOT CLEAR; RIGHT?  BUT
```

UNITED STATES COURT REPORTERS

**ER-6672**

| | | |
|---|---|---|
| 12:55:25 | 1 | HE SAYS HE'S HOLDING RESULTS UNTIL THE STUDY IS DONE? |
| 12:55:30 | 2 | A.   YEAH.  SO WHY IS HE WEIGHING IN ABOUT WHAT RESULTS SHOULD |
| 12:55:34 | 3 | BE HELD AND WHAT SHOULD BE RELEASED? |
| 12:55:36 | 4 | Q.   I THINK -- YOU SEE HE SAYS HERE, I WAS JUST SPEAKING WITH |
| 12:55:40 | 5 | ADAM ABOUT THIS? |
| 12:55:40 | 6 | A.   OKAY. |
| 12:55:41 | 7 | Q.   RIGHT?  MAYBE YOU WERE WEIGHING IN AND HE WAS JUST |
| 12:55:44 | 8 | CONVEYING THAT TO MR. BALWANI? |
| 12:55:45 | 9 | A.   I DON'T RECALL. |
| 12:55:46 | 10 | Q.   OKAY.  BECAUSE YOU DON'T REMEMBER ANY OF THIS; RIGHT? |
| 12:55:49 | 11 | A.   I'M SORRY? |
| 12:55:51 | 12 | Q.   DIDN'T YOU SAY -- |
| 12:55:52 | 13 | A.   THAT'S A VERY BROAD STATEMENT. |
| 12:55:54 | 14 | Q.   YOU RECALL THERE WAS AN ISSUE; RIGHT? |
| 12:55:55 | 15 | A.   YES. |
| 12:55:56 | 16 | Q.   BUT YOU DON'T RECALL ANY OF THE SPECIFICS; RIGHT? |
| 12:55:58 | 17 | A.   CORRECT. |
| 12:55:58 | 18 | Q.   OKAY.  LET'S GO TO THE NEXT EMAIL. |
| 12:56:02 | 19 | AND IT SAYS -- THAT'S AN EMAIL FROM, IN RESPONSE TO THE |
| 12:56:07 | 20 | PRIOR ONE THAT SAYS, FROM DANIEL YOUNG, "BY THE WAY, WE NEVER |
| 12:56:13 | 21 | SWITCHED TO IMMULITE IN LIS - IT WAS NOT CLEAR TO ME THAT THIS |
| 12:56:17 | 22 | DECISION WAS MADE." |
| 12:56:19 | 23 | DO YOU SEE THAT? |
| 12:56:20 | 24 | A.   YES. |
| 12:56:22 | 25 | Q.   AND YOU DON'T KNOW WHAT "THIS DECISION" HE'S REFERRING TO |

2924

```
12:56:24   1    THERE IS, DO YOU?

12:56:26   2    A.   I THINK HE'S TALKING ABOUT THE DECISION TO SWITCH HCG ONTO

12:56:29   3    THE IMMULITE.

12:56:29   4    Q.   RIGHT.  AND THAT'S WHETHER OR NOT IT WOULD BE COMMUNICATED

12:56:34   5    OUT TO THE PATIENT SERVICE CENTERS TO ALTER THE DRAW METHOD;

12:56:38   6    RIGHT?

12:56:38   7    A.   THAT WOULD BE PART OF IT, YEAH.

12:56:41   8    Q.   RIGHT?

12:56:41   9    A.   I DON'T KNOW IF DANIEL WAS ON THE CLS DISTRIBUTION LIST.

12:56:45  10    I JUST DON'T REMEMBER THAT.

12:56:46  11    Q.   BUT HE'S NOT SAYING THERE THAT YOU'RE GOING TO RELEASE ANY

12:56:49  12    RESULTS; RIGHT?  IT'S JUST A QUESTION OF WHETHER THAT CHANGE IN

12:56:53  13    COLLECTION METHOD HAD BEEN IMPLEMENTED IN LIS; RIGHT?

12:56:56  14    A.   I DON'T UNDERSTAND YOUR QUESTION.

12:57:02  15    Q.   DO YOU SEE ANY INDICATION THERE THAT HE'S GOING TO RELEASE

12:57:04  16    RESULTS?

12:57:09  17    A.   NO.

12:57:09  18    Q.   NO.  LET'S GO TO THE NEXT EMAIL.

12:57:13  19    A.   WELL, HE MIGHT BE -- I DON'T KNOW.  HE MIGHT BE STILL

12:57:16  20    AUTHORIZING RELEASE OF IMMULITE RESULTS.  I JUST DON'T -- IT'S

12:57:19  21    NOT CLEAR TO ME.

12:57:20  22    Q.   YOU DON'T SEE ANY INDICATION THAT HE IS, THOUGH, FROM

12:57:23  23    THESE EMAILS, DO YOU?  DO YOU?

12:57:24  24    A.   I CAN'T ANSWER YES OR NO.

12:57:25  25    Q.   OKAY.  YOU DON'T REMEMBER THAT LEVEL OF DETAIL ABOUT THESE
```

2925
ROSENDORFF RECROSS BY MR. WADE

| | | |
|---|---|---|
| 12:57:29 | 1 | EVENTS; RIGHT? |
| 12:57:31 | 2 | A.   NO.  IT WAS SEVEN YEARS AGO. |
| 12:57:33 | 3 | Q.   OKAY. |
| 12:57:33 | 4 | A.   MORE THAN SEVEN YEARS AGO. |
| 12:57:34 | 5 | Q.   LET'S JUST KEEP LOOKING AT THE EMAILS, BECAUSE I BELIEVE |
| 12:57:37 | 6 | THAT'S WHAT YOU'VE BEEN TESTIFYING ABOUT AND I JUST WANT TO |
| 12:57:39 | 7 | MAKE SURE THE RECORD IS CLEAR ON THE EMAILS.  OKAY? |
| 12:57:42 | 8 | A.   OKAY. |
| 12:57:43 | 9 | Q.   OKAY.  SO THEN THE NEXT EMAIL AT 5:14 IS A QUESTION FROM |
| 12:57:46 | 10 | MR. BALWANI ABOUT THE STUDY? |
| 12:57:47 | 11 | A.   YES. |
| 12:57:48 | 12 | Q.   YOU'RE NOT ON THAT? |
| 12:57:48 | 13 | A.   YES. |
| 12:57:49 | 14 | Q.   AND THEN THE NEXT EMAIL AT 5:16 IS AN EMAIL FROM YOU; |
| 12:57:53 | 15 | RIGHT? |
| 12:57:53 | 16 | A.   YES. |
| 12:57:54 | 17 | Q.   OKAY.  AND YOU, YOU NOTE THAT DANIEL, CHINMAY AND I |
| 12:58:01 | 18 | DISCUSSED THE PLAN FOR HCG; RIGHT? |
| 12:58:03 | 19 | A.   YES. |
| 12:58:03 | 20 | Q.   YOU'RE WORKING TOGETHER ON THIS; RIGHT? |
| 12:58:05 | 21 | A.   YES. |
| 12:58:06 | 22 | Q.   OKAY.  AND ALTHOUGH THERE ARE SEPARATE EMAIL CHAINS GOING, |
| 12:58:09 | 23 | YOU'RE BOTH REFERRING TO DISCUSSIONS YOU'RE HAVING WITH EACH |
| 12:58:12 | 24 | OTHER; RIGHT? |
| 12:58:12 | 25 | A.   YES. |

ROSENDORFF RECROSS BY MR. WADE                                          2926

| | | |
|---|---|---|
| 12:58:13 | 1 | Q.   AND YOU -- I TAKE IT IF YOU WROTE THAT YOU WERE DISCUSSING |
| 12:58:16 | 2 | THAT WITH THEM, YOU BELIEVED THAT TO BE TRUE AT THE TIME? |
| 12:58:18 | 3 | A.   YES. |
| 12:58:19 | 4 | Q.   OKAY.  AND YOU TALKED ABOUT THE METHOD -- |
| 12:58:21 | 5 | A.   SIR, TO -- I BELIEVE WE'VE GONE OVER THIS EMAIL BEFORE IN |
| 12:58:24 | 6 | YOUR PRIOR QUESTIONING.  IS IT NECESSARY TO REVISIT IT? |
| 12:58:30 | 7 | Q.   YOUR OBJECTION IS NOTED. |
| 12:58:32 | 8 | LET'S LOOK AT THE -- |
| 12:58:33 | 9 | THE COURT:  HE GETS TO ASK YOU QUESTIONS. |
| 12:58:35 | 10 | THE WITNESS:  OKAY. |
| 12:58:36 | 11 | BY MR. WADE: |
| 12:58:36 | 12 | Q.   LET'S LOOK AT THE GOING FORWARD. |
| 12:58:39 | 13 | OKAY?  DO YOU SEE THE GOING FORWARD? |
| 12:58:40 | 14 | A.   YES. |
| 12:58:41 | 15 | Q.   OKAY.  AND YOU ARE THE ONE WHO LAYS OUT EXACTLY WHAT'S |
| 12:58:44 | 16 | GOING TO HAPPEN THERE; RIGHT? |
| 12:58:46 | 17 | A.   YES. |
| 12:58:46 | 18 | Q.   OKAY.  BASED ON YOUR DISCUSSIONS WITH DANIEL AND CHINMAY; |
| 12:58:49 | 19 | RIGHT? |
| 12:58:50 | 20 | A.   YES. |
| 12:58:50 | 21 | Q.   AND YOU'RE REPORTING THAT TO MR. BALWANI? |
| 12:58:52 | 22 | A.   YES. |
| 12:58:53 | 23 | Q.   CORRECT? |
| 12:58:54 | 24 | A.   YES. |
| 12:58:54 | 25 | Q.   OKAY.  AND THEN THE NEXT EMAIL IN THIS WINDOW IS FROM |

ROSENDORFF RECROSS BY MR. WADE                                    2927

```
12:58:59   1        DR. PANGARKAR.
12:59:00   2            DO YOU SEE THAT?
12:59:01   3    A.   YES.
12:59:02   4    Q.   AND THAT'S EXHIBIT 5419.  THAT'S AN EMAIL WHERE HE'S
12:59:09   5    TALKING ABOUT THE STUDY THAT'S BEING DONE?
12:59:11   6    A.   YES.
12:59:11   7    Q.   AND THE IQP?
12:59:13   8            DO YOU SEE THAT?
12:59:14   9    A.   YES.
12:59:14  10    Q.   OKAY.  AND WE HAVE JUST TWO MORE.  I'LL BRING YOU TO THE
12:59:23  11    NEXT PAGE.
12:59:26  12            THIS IS NOW AT 6:29 P.M.; RIGHT?
12:59:29  13    A.   YES.
12:59:30  14    Q.   AND WE'RE IN A DIFFERENT EMAIL CHAIN NOW?
12:59:31  15    A.   YES.
12:59:32  16    Q.   BUT JUST AFTER THAT, IT'S THE NEXT EMAIL SEQUENTIALLY.
12:59:37  17            DANIEL NOTES THAT THEY'RE REPEATING THE IQP; RIGHT?
12:59:41  18    A.   YES.
12:59:42  19    Q.   AND THEN HE NOTES, IF WE NEED TO COLLECT THE VACUTAINERS
12:59:46  20    TOMORROW, WE'LL NEED TO SEND SPECIAL INSTRUCTIONS TO THE PSC'S;
12:59:51  21    RIGHT?
12:59:51  22            DO YOU SEE THAT?
12:59:52  23    A.   YES.
12:59:52  24    Q.   AND IT'S -- AND YOU'RE ON THIS EMAIL?
12:59:54  25    A.   YES.
```

ROSENDORFF RECROSS BY MR. WADE                                      2928

12:59:55  1    Q.   OKAY.  AND IT SAYS RIGHT NOW WE'RE NOT PLANNING ON DOING

12:59:58  2    THIS; RIGHT?

12:59:58  3    A.   YES.

12:59:59  4    Q.   OKAY.  AND SO WHAT HE'S SAYING IS THERE'S BASICALLY A

01:00:04  5    HOLD, AND IF WE DECIDE WE NEED REDRAWS SO THAT WE CAN SWITCH

01:00:10  6    THIS, THE CTN'S THAT WERE GOING TO THE EDISONS TO VACUTAINERS,

01:00:15  7    WE'LL DO IT; RIGHT?

01:00:16  8    A.   YES.

01:00:16  9    Q.   THAT'S WHAT HE'S SAYING RIGHT THERE; RIGHT?

01:00:18  10   A.   MY READING OF THIS IS THAT HE'S UNWILLING TO TELL THE

01:00:27  11   PSC'S TO SWITCH TO VACUTAINERS.

01:00:30  12   Q.   WELL, THERE'S A STUDY UNDERWAY; RIGHT, DOCTOR?

01:00:32  13   A.   YES.

01:00:33  14   Q.   OKAY.  AND WHAT HE'S -- ISN'T WHAT HE'S ESSENTIALLY SAYING

01:00:36  15   IS LET'S -- WE'RE ALMOST DONE, LET'S WAIT AND SEE WHAT IT

01:00:39  16   SHOWS?

01:00:39  17   A.   YES.

01:00:40  18   Q.   AND IF WE DON'T NEED TO GO OUT AND BOTHER THESE PEOPLE TO

01:00:43  19   GET ANOTHER BLOOD DRAW, WE WON'T DO IT; RIGHT?

01:00:46  20   A.   YES.

01:00:46  21   Q.   BUT IF WE DO NEED TO BOTHER THEM, WE'LL DO IT; RIGHT?

01:00:51  22   A.   THAT'S -- THAT'S AN INFERENCE.

01:00:57  23   Q.   IT SAYS, IF WE NEED TO COLLECT VACUTAINERS TOMORROW, WE

01:01:01  24   WOULD NEED TO SEND SPECIAL INSTRUCTIONS TO THE PSC'S; RIGHT?

01:01:04  25   A.   YES.

ROSENDORFF RECROSS BY MR. WADE                              2929

```
01:01:05   1      Q.   OKAY.  AND THEN THE LAST EMAIL IN THIS CHAIN JUST RELATES

01:01:11   2      TO HOW THAT WILL WORK WITHIN THE OPERATIONAL COMPONENTS OF THE

01:01:16   3      LIS; RIGHT?

01:01:17   4      A.   YES.

01:01:18   5      Q.   AND HOW IT WOULD BE COMMUNICATED OUT TO THE LAB, OR TO THE

01:01:23   6      PSC'S; RIGHT?

01:01:25   7      A.   YES.

01:01:25   8      Q.   THERE'S NOTHING IN ANY OF THESE EMAILS THAT SAYS THAT

01:01:28   9      THEY'RE GOING TO RELEASE RESULTS; RIGHT?

01:01:30  10      A.   CORRECT.

01:01:30  11      Q.   OKAY.  AND THERE'S NOTHING IN ANY OF THESE EMAILS THAT

01:01:35  12      SUGGESTS THAT YOUR DIRECTION, WHICH WAS THE FIRST EMAIL IN THE

01:01:38  13      CHAIN, HAS BEEN COUNTERMANDED; RIGHT?

01:01:40  14      A.   I'M NOT SURE IF THE CLS'S WERE RELEASING RESULTS BETWEEN

01:01:45  15      MAY 30TH AND JUNE 4TH.  I JUST DON'T KNOW.

01:01:48  16      Q.   WELL, YOU SEE THAT THEY'RE, THEY'RE ASKING YOU QUESTIONS

01:01:51  17      ABOUT WHETHER THEY CAN RELEASE RESULTS; RIGHT?

01:01:53  18      A.   YES.

01:01:54  19      Q.   AND WOULD YOU HAVE ANSWERED THOSE QUESTIONS IF THEY ASKED

01:01:56  20      THEM?

01:01:57  21      A.   YES.

01:01:57  22      Q.   AND WHAT ANSWER WOULD YOU HAVE GIVEN?

01:01:59  23      A.   TO NOT RELEASE RESULTS.

01:02:01  24      Q.   OKAY.  AND THE GOVERNMENT ALSO SHOWED YOU SOME DOCUMENTS

01:02:09  25      THAT RELATED TO QC THAT WAS PERFORMED.
```

UNITED STATES COURT REPORTERS

ROSENDORFF RECROSS BY MR. WADE                                        2930

| | | |
|---|---|---|
| 01:02:16 | 1 | DO YOU RECALL THAT?  ON THE EDISONS IN JUNE OF 2014? |
| 01:02:24 | 2 | A.   ON REDIRECT? |
| 01:02:28 | 3 | Q.   YES. |
| 01:02:28 | 4 | A.   ON REDIRECT? |
| 01:02:29 | 5 | Q.   YES.  DO YOU RECALL THAT? |
| 01:02:30 | 6 | A.   YES, I THINK AT THE VERY -- AT THE VERY BEGINNING OF THE |
| 01:02:36 | 7 | DAY, YES. |
| 01:02:37 | 8 | Q.   OKAY.  AND YOU'LL RECALL, MUCH OF THE QUESTIONING ON |
| 01:02:43 | 9 | CROSS-EXAMINATION CAME UP BECAUSE THE QUESTION WAS ASKED OF YOU |
| 01:02:50 | 10 | IN YOUR DIRECT EXAMINATION WHETHER YOU KNEW ABOUT THE FACT THAT |
| 01:02:56 | 11 | HCG WENT BACK ONTO EDISONS AFTER YOU ISSUED THAT DIRECTIVE AND |
| 01:03:03 | 12 | YOU SAID YOU WERE UNAWARE OF THAT; RIGHT? |
| 01:03:06 | 13 | A.   YES. |
| 01:03:06 | 14 | Q.   OKAY.  AND I SHOWED YOU SOME DOCUMENTS IN |
| 01:03:11 | 15 | CROSS-EXAMINATION THAT SUGGESTED YOU PROBABLY WERE AWARE IN MID |
| 01:03:16 | 16 | TO LATE MARCH; RIGHT? |
| 01:03:18 | 17 | DO YOU RECALL THAT? |
| 01:03:18 | 18 | A.   MY ORDER TO CEASE TESTING FOR HCG ON THE EDISONS WENT OUT |
| 01:03:25 | 19 | ON MAY 30TH. |
| 01:03:27 | 20 | Q.   RIGHT.  AND DO YOU RECALL IN CROSS-EXAMINATION I SHOWED |
| 01:03:29 | 21 | YOU MANY EMAILS FROM MID TO LATE MARCH THAT INDICATED THAT |
| 01:03:32 | 22 | EDISON WAS BACK ON? |
| 01:03:34 | 23 | DO YOU RECALL THAT? |
| 01:03:35 | 24 | A.   I'M SORRY.  MARCH IS BEFORE MAY. |
| 01:03:39 | 25 | Q.   I'M SORRY. |

ROSENDORFF RECROSS BY MR. WADE                                              2931

```
01:03:39   1      A.   I DON'T UNDERSTAND YOUR TIMELINE.

01:03:41   2      Q.   I'M SORRY.  I'M CONFUSING MY MONTHS BETWEEN MY HEAD AND MY

01:03:46   3      MOUTH.

01:03:46   4      A.   YOU REALLY ARE.

01:03:47   5      Q.   YEAH, I AM.  THANKS.

01:03:49   6           LET ME TRY IT AGAIN.

01:03:52   7           I SHOWED YOU A NUMBER OF EMAILS IN MID TO LATE JUNE --

01:03:58   8      A.   YES.

01:04:00   9      Q.   -- THAT SUGGESTED THAT YOU WERE AWARE THAT EDISON HCG

01:04:05  10      TESTS WERE BACK UP AND RUNNING; RIGHT?

01:04:07  11      A.   YES.

01:04:07  12      Q.   DO YOU RECALL THAT?

01:04:08  13      A.   YES.

01:04:09  14      Q.   AND THE GOVERNMENT DIDN'T SHOW YOU THOSE; RIGHT?

01:04:12  15      A.   CORRECT.

01:04:13  16      Q.   AND THEY DIDN'T SHOW YOU THOSE IN THE MEETING; RIGHT?

01:04:16  17      A.   CORRECT.

01:04:17  18      Q.   THAT YOU HAD ANSWERED WERE YOU AWARE, AND YOU SAID I WAS

01:04:19  19      NOT AWARE; RIGHT?

01:04:20  20      A.   YES.

01:04:20  21      Q.   OKAY.  LET'S LOOK AT EXHIBITS 5421 AND 5422.

01:04:39  22           NOW, THESE ARE GOVERNMENT EXHIBITS ABOUT THE QUALITY

01:04:43  23      CONTROL ON EDISONS; RIGHT?

01:04:46  24      A.   YES.

01:04:48  25      Q.   IN LATE JUNE; RIGHT?
```

ROSENDORFF RECROSS BY MR. WADE                                    2932

```
01:04:49   1      A.   YES.

01:04:50   2      Q.   AND IT TALKS ABOUT THE FACT THAT HCG IS COMING UP ON THE

01:04:54   3      EDISON; RIGHT?

01:04:55   4      A.   YES.

01:04:56   5      Q.   OKAY.  AND SO WHEN THE GOVERNMENT WAS ASKING YOU

01:04:59   6      QUESTIONS, THEY KNEW THAT HCG HAD COME BACK UP ON EDISONS AND

01:05:06   7      THAT YOU WERE AWARE OF IT BECAUSE THEY HAD THESE EMAILS, BUT

01:05:08   8      THEY DIDN'T SHOW YOU THESE EMAILS, DID THEY?

01:05:11   9      A.   THIS EMAIL SAYS THAT NINE EDISONS ARE FAILING LEVEL 1 FOR

01:05:19  10      HCG.

01:05:21  11      Q.   RIGHT.  BUT IT SAYS THEY'RE BRINGING UP HCG ON EDISONS;

01:05:24  12      RIGHT?  ISN'T THAT THE IMPLICATION OF THIS EMAIL?

01:05:27  13      A.   IT SAYS INSTRUMENT BRING UP.

01:05:31  14      Q.   RIGHT.  THEY'RE BRINGING THE HCG TEST --

01:05:33  15      A.   THEY'RE TRYING TO.

01:05:35  16      Q.   RIGHT.  SO IT WAS BACK ON EDISONS IF IT PASSED QUALITY

01:05:38  17      CONTROL; RIGHT?

01:05:39  18      A.   BUT IT -- THIS EMAIL INDICATES THAT HCG DID NOT PASS

01:05:43  19      QUALITY CONTROL.

01:05:44  20      Q.   WHICH EMAIL ARE YOU LOOKING AT, SIR?

01:05:46  21      A.   THE ONE ON THE LEFT.

01:05:47  22      Q.   THE ONE ON THE LEFT.  RIGHT.

01:05:52  23           AND IT INDICATES THAT WITHIN THE LABORATORY BRING UP,

01:05:56  24      THEY'RE WORKING TO GET THE HCG UP ONTO THE EDISON; RIGHT?

01:06:00  25      A.   YES.
```

UNITED STATES COURT REPORTERS

ROSENDORFF RECROSS BY MR. WADE                                    2933

| | | |
|---|---|---|
| 01:06:00 | 1 | Q.   OKAY.  AND THE OTHER EMAIL INDICATES THAT AS WELL; RIGHT? |
| 01:06:03 | 2 | A.   YES. |
| 01:06:03 | 3 | Q.   YEAH.  AND WE SAW THE OTHER DOCUMENTS WHERE YOU KNEW THAT |
| 01:06:07 | 4 | THE GOVERNMENT DIDN'T SHOW YOU; RIGHT?  THE OTHER DOCUMENTS |
| 01:06:10 | 5 | WHERE YOU KNEW IN LATE JUNE THAT HCG WAS BROUGHT UP ON THE |
| 01:06:13 | 6 | EDISON? |
| 01:06:16 | 7 | A.   THESE EMAILS SHOW THAT QC WAS BEING RUN FOR HCG ON THE |
| 01:06:21 | 8 | EDISONS. |
| 01:06:22 | 9 | Q.   SIR, THE GOVERNMENT NEVER SHOWED YOU THESE EMAILS ON YOUR |
| 01:06:25 | 10 | DIRECT TESTIMONY WHEN YOUR TESTIMONY WAS IN ERROR; RIGHT? |
| 01:06:30 | 11 | A.   CORRECT. |
| 01:06:31 | 12 | Q.   YEAH.  AND BY THE WAY, THOSE -- THE QUALITY CONTROL |
| 01:06:56 | 13 | RESULTS THAT WERE DEPICTED IN THOSE DOCUMENTS, YOU WERE GETTING |
| 01:06:59 | 14 | THEM IT LOOKED LIKE DAILY; RIGHT?  THEY SHOWED YOU A COUPLE OF |
| 01:07:02 | 15 | DAYS WORTH OF THOSE EMAILS FROM MR. GEE; RIGHT? |
| 01:07:06 | 16 | A.   NO, I WAS NOT RECEIVING QC INFORMATION DAILY FROM MR. GEE, |
| 01:07:10 | 17 | NO. |
| 01:07:11 | 18 | Q.   WELL, YOU SAW THE INSTRUMENT BRING UP INFORMATION? |
| 01:07:13 | 19 | A.   YES. |
| 01:07:13 | 20 | Q.   AND YOU WERE GETTING THOSE EMAILS DAILY; RIGHT? |
| 01:07:15 | 21 | A.   JUST IN THAT TIME PERIOD, THE 6-24 TIME PERIOD, 6-24, |
| 01:07:23 | 22 | 6-25, YES. |
| 01:07:23 | 23 | Q.   BUT YOU GOT THAT INFORMATION; RIGHT, SIR? |
| 01:07:25 | 24 | A.   YES. |
| 01:07:25 | 25 | Q.   AND WE'VE TALKED ABOUT HOW YOU GOT OTHER INFORMATION FROM |

ROSENDORFF RECROSS BY MR. WADE                                    2934

01:07:28    1     MR. GEE ON QUALITY CONTROL; RIGHT?

01:07:29    2     A.   YES.

01:07:30    3     Q.   AND IF YOU HAD ANY CONCERNS AS A RESULT OF THAT

01:07:32    4     INFORMATION ABOUT THE ACCURACY AND RELIABILITY OF THE TEST, YOU

01:07:35    5     WOULD HAVE TAKEN ACTION IMMEDIATELY; RIGHT?

01:07:37    6     A.   YES.

01:07:37    7     Q.   OKAY.  AND THAT'S TRUE GENERALLY WITH RESPECT TO CONCERNS,

01:07:43    8     BECAUSE YOU TALKED SOMETIMES ABOUT CONCERNS -- AND MAYBE IT

01:07:47    9     COMES UP WITH THE BENEFIT OF HINDSIGHT OR SOMETHING -- BUT WHEN

01:07:50   10     YOU WERE IN THE LAB IN REAL TIME, IF THERE WAS A CONCERN ABOUT

01:07:52   11     THE ACCURACY OR RELIABILITY OF A TEST, YOU ACTED ON IT; RIGHT?

01:07:56   12     A.   YES.

01:07:56   13     Q.   AND YOU WERE THE MOST KNOWLEDGEABLE, QUALIFIED, COMPETENT

01:08:00   14     PERSON TO ACT IN THAT REGARD WITHIN THERANOS; RIGHT?

01:08:03   15     A.   YES.

01:08:10   16     Q.   YOU WERE ASKED ON REDIRECT ABOUT COMPLAINTS.

01:08:18   17          DO YOU RECALL THAT?

01:08:19   18     A.   YES.

01:08:19   19     Q.   AND YOU WENT BACK ESSENTIALLY TO THE TESTIMONY THAT THE

01:08:27   20     COMPLAINTS WERE MORE FREQUENT AT THERANOS THAN THEY WERE AT THE

01:08:30   21     UNIVERSITY OF PITTSBURGH.

01:08:32   22          DO YOU RECALL THAT?

01:08:33   23     A.   ON A PERCENTAGE BASIS, YES.

01:08:35   24     Q.   YEAH.  YOU RECALL THAT THEY WERE MORE FREQUENT; RIGHT?

01:08:39   25     A.   ON A PERCENTAGE BASIS.

ROSENDORFF RECROSS BY MR. WADE                                    2935

01:08:40   1     Q.   AND YOU RECALL I SHOWED YOU YESTERDAY YOUR TESTIMONY FROM

01:08:44   2     2019 IN WHICH YOU SAID THAT THE DOCTOR COMPLAINTS WERE NOT MORE

01:08:49   3     FREQUENT; RIGHT?

01:08:51   4     A.   JUST IN TERMS OF THE NUMBER OF COMPLAINTS.  I BELIEVE I

01:08:54   5     CLARIFIED MY MEANING.

01:08:55   6     Q.   RIGHT.  YOU TESTIFIED THAT -- WELL, WE CAN LOOK AT IT.

01:09:00   7     LET'S LOOK AT IT.  11000, WHICH IS IN YOUR YELLOW BINDER.  AND

01:09:23   8     IT'S PAGE 122, DOCTOR.

01:09:43   9     A.   OKAY.

01:09:44  10     Q.   AND IF YOU LOOK AT LINE 12 OF 122?

01:09:50  11     A.   YES.

01:09:57  12     Q.   DOES THIS REFRESH YOUR RECOLLECTION THAT YOU WERE ASKED,

01:10:01  13     "WERE THESE TYPES OF PHYSICIAN COMPLAINTS COMMON DURING YOUR

01:10:04  14     TIME AT THERANOS?"

01:10:07  15          AND YOU ANSWERED, "THEY WEREN'T MORE COMMON THAN WHAT ONE

01:10:11  16     USUALLY SEES IN SOME LABS WITH HIGH VOLUME."

01:10:15  17          DO YOU SEE THAT?

01:10:16  18     A.   YES.

01:10:16  19     Q.   AND WAS THAT TRUTHFUL TESTIMONY AT THE TIME?

01:10:18  20     A.   YES.

01:10:19  21     Q.   OKAY.  AND YOU WERE ASKED IN THE NEXT QUESTION AND ANSWER

01:10:24  22     ABOUT HOW IT COMPARED TO YOUR TIME -- OR YOU OFFERED A

01:10:30  23     COMPARISON TO YOUR TIME AT UNIVERSITY OF PITTSBURGH.

01:10:33  24          DO YOU SEE THAT?

01:10:33  25     A.   YES.


                              UNITED STATES COURT REPORTERS

ROSENDORFF RECROSS BY MR. WADE                                          2936

| | | |
|---|---|---|
| 01:10:34 | 1 | Q.   OKAY.  AND YOU TESTIFIED THAT THEY WERE NOT MORE ANOMALOUS |
| 01:10:41 | 2 | THAN WHAT YOU SAW AT THE UNIVERSITY OF PITTSBURGH; CORRECT? |
| 01:10:47 | 3 | A.   YES. |
| 01:10:48 | 4 | Q.   OKAY.  AND THIS TESTIMONY THAT YOU OFFERED WAS IN 2019; |
| 01:10:51 | 5 | RIGHT? |
| 01:10:51 | 6 | A.   YES. |
| 01:10:52 | 7 | Q.   THAT WAS BEFORE THE EVENTS RELATING TO YOUR INSPECTION AT |
| 01:10:58 | 8 | CMS, AT PERKIN ELMER; RIGHT? |
| 01:11:03 | 9 | A.   YES. |
| 01:11:05 | 10 | Q.   AND YOU WERE TRUTHFUL IN THIS TESTIMONY; RIGHT, SIR? |
| 01:11:15 | 11 | A.   YES. |
| 01:11:18 | 12 |         MR. WADE:  I HAVE NO FURTHER QUESTIONS, YOUR HONOR. |
| 01:11:43 | 13 |         THE COURT:  MR. BOSTIC? |
| 01:11:44 | 14 |         MR. BOSTIC:  NO FURTHER QUESTIONS, YOUR HONOR.  THANK |
| 01:11:46 | 15 | YOU. |
| 01:11:46 | 16 |         THE COURT:  MAY THIS WITNESS BE EXCUSED? |
| 01:11:48 | 17 |         MR. BOSTIC:  FROM THE GOVERNMENT'S PERSPECTIVE, YES. |
| 01:11:50 | 18 |         MR. WADE:  HE MAY, YOUR HONOR. |
| 01:11:52 | 19 |         THE COURT:  YOU'RE EXCUSED, SIR.  THANK YOU. |
| 01:11:55 | 20 |         THE WITNESS:  THANK YOU VERY MUCH, YOUR HONOR. |
| 01:11:56 | 21 |         THE COURT:  YOU'RE WELCOME. |
| 01:12:22 | 22 |     DOES THE GOVERNMENT HAVE ANOTHER WITNESS? |
| 01:12:25 | 23 |         MR. LEACH:  WE DO, YOUR HONOR.  THE UNITED STATES |
| 01:12:27 | 24 | CALLS STEVE BURD. |
| 01:12:29 | 25 |         THE CLERK:  YOUR HONOR, I NEED A FEW MINUTES TO |

2937

```
01:12:31   1    COLLECT THESE ITEMS.

01:12:32   2            THE COURT:  OKAY.  ARE THESE -- ARE THESE YOUR

01:12:35   3    DOCUMENTS HERE?

01:12:42   4        THANK YOU.

01:12:46   5        (PAUSE IN PROCEEDINGS.)

01:13:29   6            THE COURT:  SIR, JUST GIVE ME JUST A MOMENT.  IF YOU

01:13:32   7    WOULD JUST WAIT JUST A MOMENT, SIR.  JUST HANG ON A SECOND.

01:13:37   8        (PAUSE IN PROCEEDINGS.)

01:13:53   9            THE COURT:  LADIES AND GENTLEMEN, STAND UP AND

01:13:55  10    STRETCH IF YOU'D LIKE FOR A MOMENT.

01:13:58  11        (STRETCH BREAK.)

01:14:10  12            THE COURT:  WE'RE GOING TO BREAK AT 3:00 O'CLOCK.  I

01:14:12  13    UNDERSTAND WE'LL PROBABLY TAKE A BRIEF RECESS IN ABOUT 20

01:14:17  14    MINUTES, LADIES AND GENTLEMEN.  IT'LL BE A BRIEF RECESS AND

01:14:19  15    THEN WE'LL CONTINUE.

01:14:21  16        ALL RIGHT.  SIR, IF YOU'D COME FORWARD, PLEASE.

01:14:24  17        PLEASE BE SEATED.  THANK YOU.

01:14:25  18        IF YOU'D COME FORWARD.  AND IF YOU WOULD FACE OUR

01:14:29  19    COURTROOM DEPUTY AND RAISE YOUR RIGHT HAND, SHE HAS A QUESTION

01:14:32  20    FOR YOU.

01:14:33  21            THE WITNESS:  OKAY.

01:14:35  22        (GOVERNMENT'S WITNESS, STEVE BURD, WAS SWORN.)

01:14:37  23            THE WITNESS:  YES.

01:14:43  24            THE COURT:  THANK YOU, SIR.

01:14:44  25        LET ME INVITE YOU TO TAKE A SEAT HERE AND MAKE YOURSELF
```

BURD DIRECT BY MR. LEACH

01:14:48  1    COMFORTABLE.  FEEL FREE TO ADJUST THE CHAIR AND MICROPHONE AS

01:14:51  2    YOU NEED, AND I'LL ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE

01:14:54  3    MICROPHONE.

01:14:55  4        WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

01:14:57  5    AND THEN SPELL IT, PLEASE.

01:14:59  6            THE WITNESS:  SURE.  MY NAME IS STEVE BURD, SPELLED

01:15:03  7    S-T-E-V-E, LAST NAME B-U-R-D.

01:15:07  8            THE COURT:  THANK YOU.

01:15:09  9        COUNSEL.

01:15:10  10           MR. LEACH:  THANK YOU, YOUR HONOR.

01:15:11  11                      **DIRECT EXAMINATION**

01:15:12  12   BY MR. LEACH:

01:15:13  13   Q.   MR. BURD, IF YOU'RE VACCINATED AND COMFORTABLE, WITH THE

01:15:17  14   COURT'S PERMISSION, YOU'RE FREE TO REMOVE YOUR MASK.

01:15:20  15           THE COURT:  YES.

01:15:21  16           THE WITNESS:  THANK YOU.

01:15:22  17           THE COURT:  YOU'RE WELCOME.

01:15:23  18   BY MR. LEACH:

01:15:24  19   Q.   GOOD AFTERNOON.  HOW ARE YOU, SIR?

01:15:25  20   A.   I'M TERRIFIC.

01:15:26  21   Q.   GREAT.  WAS THERE A TIME WHEN YOU SERVED AS THE CHIEF

01:15:29  22   EXECUTIVE OFFICER, OR CEO, OF SAFEWAY?

01:15:33  23   A.   YES, FOR A TOTAL OF 20 YEARS.

01:15:35  24   Q.   OKAY.  WHEN WERE YOU THE CEO OF SAFEWAY?

01:15:37  25   A.   IT WOULD HAVE BEEN MAY OF 1993 AT THE ANNUAL SHAREHOLDER'S

BURD DIRECT BY MR. LEACH                                                    2939

01:15:47   1    MEETING, RETIRING 20 YEARS LATER IN 2013 AT THAT SAME ANNUAL

01:15:53   2    SHAREHOLDER'S MEETING.

01:15:54   3    Q.   AND SAFEWAY IS THE SUPERMARKET CHAIN WITH THE LARGE

01:15:59   4    PRESENCE HERE IN THE NORTHERN DISTRICT OF CALIFORNIA?

01:16:01   5    A.   THAT'S CORRECT.

01:16:02   6    Q.   OKAY.  WAS SAFEWAY A PUBLIC COMPANY WHILE YOU WERE THE

01:16:06   7    CEO?

01:16:06   8    A.   IT WAS A PUBLIC COMPANY.

01:16:07   9    Q.   OKAY.  AND WHAT DOES THAT MEAN, TO BE A PUBLIC COMPANY?

01:16:10   10   A.   IT MEANS YOU HAVE A LARGE NUMBER OF SHAREHOLDERS AND YOU

01:16:16   11   HAVE OBLIGATIONS TO REPORT YOUR EARNINGS AND DISCUSS THE

01:16:21   12   DETAILS OF THOSE EARNINGS ON A QUARTERLY BASIS.

01:16:25   13        AND YOU OPERATE, I THINK, UNDER A SLIGHTLY DIFFERENT

01:16:28   14   REGULATORY AND SECURITY STRUCTURE THAN A PRIVATELY HELD

01:16:31   15   COMPANY.

01:16:31   16   Q.   OKAY.  AND YOU STEPPED DOWN AS THE CEO OF SAFEWAY IN ABOUT

01:16:35   17   MAY OF 2013?

01:16:37   18   A.   THAT'S CORRECT.

01:16:37   19   Q.   OKAY.  CAN YOU GIVE US A BALLPARK OF WHAT SAFEWAY'S ANNUAL

01:16:42   20   REVENUES IN THAT 2013 TIME PERIOD WERE?

01:16:45   21   A.   SURE.  IT WOULD HAVE BEEN IN THE RANGE OF $45 BILLION IN

01:16:50   22   SALES.  WE OPERATED IN 22 U.S. STATES, FIVE CANADIAN PROVINCES.

01:16:57   23   THOSE STATES INCLUDED ALASKA AND HAWAII.

01:17:00   24        AND WE HAD A 49 PERCENT INTEREST IN A MEXICAN RETAILER,

01:17:05   25   THE COMPANY WAS CALLED CASA LEY, C-A-S-A, L-E-Y.

UNITED STATES COURT REPORTERS

**ER-6689**

BURD DIRECT BY MR. LEACH

01:17:14   1    Q.   AND WOULD YOU BRIEFLY DESCRIBE YOUR EDUCATIONAL AND

01:17:17   2    PROFESSIONAL BACKGROUND BEFORE YOU BECAME THE CEO OF SAFEWAY?

01:17:20   3    A.   SURE.   TWO DEGREES IN ECONOMICS, ONE FROM CARROLL

01:17:27   4    UNIVERSITY IN WAUKESHA, WISCONSIN; A GRADUATE DEGREE AND

01:17:32   5    MASTER'S DEGREE IN ECONOMICS FROM THE UNIVERSITY OF WISCONSIN

01:17:36   6    IN MILWAUKEE.

01:17:37   7        I TOOK MY FIRST JOB IN SAN FRANCISCO WITH WHAT I WOULD

01:17:40   8    CALL A MINI CONGLOMERATE CONTROLLED BY A RAILROAD CALLED

01:17:44   9    SOUTHERN PACIFIC.   THEY, FOR EXAMPLE, FOUNDED THE COMPANY

01:17:47  10    CALLED SPRINT TODAY, WHICH EVERYBODY KNOWS.

01:17:49  11        I SPENT ABOUT FOUR YEARS THERE; WENT BACK TO WASHINGTON,

01:17:52  12    D.C., SERVED AS AN ECONOMIST FOR THE ASSOCIATION OF AMERICAN

01:17:57  13    RAILROADS; CAME BACK, ENDED UP IN THE FINANCE DEPARTMENT AT

01:18:01  14    THIS RAILROAD; LEFT THERE IN THE EARLY '80S TO JOIN A

01:18:05  15    CONSULTING FIRM, ARTHUR D. LITTLE.

01:18:08  16        I HAD BUILT A REPUTATION OF BEING A BIT OF A TURNAROUND

01:18:13  17    MANAGEMENT LEADER, AND SO I STARTED A STEADY LINE OF TURNAROUND

01:18:20  18    WORK, STUMBLED INTO A PRIVATE EQUITY FIRM CALLED KKR,

01:18:28  19    KOHLBERG, KRAVIS, ROBERTS & COMPANY, AND THEY GAVE ME A STEADY

01:18:30  20    DIET OF WORK.

01:18:31  21        PRIVATE EQUITY IS A TECHNIQUE WHERE YOU BUY COMPANIES,

01:18:34  22    MUCH THE WAY MOST OF US BUY HOMES, AND SO MOSTLY DEBT AND A

01:18:39  23    LITTLE BIT OF EQUITY.

01:18:40  24        AND SAFEWAY WAS ONE OF THOSE INVESTMENTS.   THEY INSTALLED

01:18:45  25    ME AS PRESIDENT IN 1992, AND SIX MONTHS LATER I WAS THE CEO.

BURD DIRECT BY MR. LEACH                                                2941

```
01:18:48   1        Q.   I'D LIKE TO DRAW YOUR ATTENTION, PLEASE, TO THE TIME

01:18:53   2    PERIOD 2010.

01:18:54   3        DO YOU HAVE THAT TIME PERIOD IN MIND?

01:18:56   4        A.   SURE.

01:18:57   5        Q.   IN OR AROUND THIS TIME, DID YOU BECOME FAMILIAR WITH A

01:19:00   6    COMPANY CALLED THERANOS?

01:19:01   7        A.   I DID.

01:19:01   8        Q.   HOW DID YOU BECOME FAMILIAR WITH THERANOS?

01:19:04   9        A.   I HAD FORMED A COMPANY CALLED SAFEWAY HEALTH, IT WAS FULLY

01:19:12  10    OWNED BY SAFEWAY, BECAUSE WE HAD DONE SOME EXTRAORDINARY THINGS

01:19:15  11    IN HEALTH CARE AND WE DECIDED WE WOULD DO THOSE THINGS FOR

01:19:18  12    OTHERS.

01:19:19  13        SO A COUPLE OF THE FOLKS FROM SAFEWAY HEALTH HAD HAD A

01:19:23  14    MEETING WITH ELIZABETH HOLMES SOMETIME IN I THINK MARCH OF THAT

01:19:32  15    YEAR, AND I DON'T KNOW HOW I LEARNED ABOUT IT, BUT SOMEBODY

01:19:35  16    TOLD ME ABOUT THIS MEETING AND I WAS IMMEDIATELY INTERESTED IN,

01:19:41  17    IN MEETING THERANOS, AND PARTICULARLY THE FOUNDER.

01:19:45  18        SO WE REACHED OUT, SET UP ANOTHER MEETING, AND I CAN

01:19:49  19    RECALL -- I DON'T KNOW THE DATE -- BUT IT WAS THE DAY I WAS

01:19:52  20    LEAVING FOR EUROPE ON VACATION, SO IT REALLY NEEDED TO HAPPEN

01:19:57  21    QUICKLY.

01:19:58  22        Q.   WHY WERE YOU IMMEDIATELY INTERESTED?

01:20:00  23        A.   IT WAS A FASCINATING CONCEPT.  YOU KNOW, THE NOTION -- YOU

01:20:06  24    KNOW, I WORKED FOR SAFEWAY FOR 20 YEARS, WHICH IS A LOW MARGIN

01:20:10  25    RETAILER.  WE MAKE 1 TO 3 PERCENT ON EACH DOLLAR OF SALES.
```

BURD DIRECT BY MR. LEACH                                                    2942

01:20:15   1        AND SO THE COST REDUCTION APPEALED TO ME, THE IDEA OF

01:20:19   2   GETTING A BLOOD TEST IN 20 OR 30 MINUTES APPEALED TO ME, THE

01:20:24   3   IDEA THAT IT WAS MINIATURIZED.

01:20:27   4        YOU KNOW, WE MADE A PRACTICE OF PUTTING DIFFERENT

01:20:29   5   BUSINESSES INSIDE OF OUR STORE SO WE COULD CONTINUE TO GROW TOP

01:20:33   6   LINE SALES, WE PUT PHARMACIES IN, WE PUT DELIS IN, WE PUT

01:20:40   7   BAKERIES IN.

01:20:40   8        THIS WAS AN OPPORTUNITY TO DO SOMETHING THAT WOULD BRING

01:20:43   9   EXTRA BUSINESS TO THE STORE.

01:20:44  10        WE BUILT 400-PLUS GAS STATIONS.  WHEN I PUT A GAS STATION

01:20:50  11   IN THE PARKING LOT, MY SALES WENT UP 6 PERCENT IN THE STORE.

01:20:54  12        SO I KNEW THIS WOULD HAVE NOT ONLY A PROFIT INTEREST OF

01:20:57  13   ITS OWN, BUT IT WOULD ALSO AFFECT THE ATTRACTION OF SAFEWAY TO

01:21:00  14   SHOPPERS AT LARGE.

01:21:02  15   Q.   AND I THINK I HEARD YOU SAY YOU WERE IMMEDIATELY

01:21:04  16   INTERESTED IN MEETING THE FOUNDER.  DID I HEAR THAT RIGHT?

01:21:07  17   A.   CORRECT.

01:21:07  18   Q.   WHY WAS THAT?

01:21:08  19   A.   WELL, THEY WERE STILL A SMALL COMPANY.  VISION WAS

01:21:14  20   IMPORTANT TO ME, AND WHO BETTER COULD EXPLAIN THAT VISION THAN

01:21:17  21   THE FOUNDER?

01:21:18  22        AND WHAT I HAD BEEN TOLD ABOUT ELIZABETH HOLMES, I WAS

01:21:24  23   EAGER TO MEET HER.

01:21:26  24   Q.   OKAY.  AND IN BETWEEN MARCH OF 2010 AND SEPTEMBER OF 2010,

01:21:31  25   DID YOU PURSUE THE POSSIBILITY OF A COMMERCIAL ARRANGEMENT WITH

BURD DIRECT BY MR. LEACH                                                    2943

01:21:36   1    THERANOS?

01:21:36   2    A.   WE DID.  IF I RECALL CORRECTLY, IT WAS SOMETIME IN

01:21:40   3    SEPTEMBER, AFTER MONTHS OF DISCUSSION AND NEGOTIATION, THAT WE

01:21:45   4    ACTUALLY SIGNED A CONTRACT.

01:21:47   5    Q.   OKAY.  IN BETWEEN THAT MARCH TIMEFRAME AND THE SIGNING OF

01:21:51   6    THE CONTRACT, DID YOU MEET WITH MS. HOLMES?

01:21:52   7    A.   ABSOLUTELY.

01:21:53   8    Q.   AND DID YOU HAVE CONVERSATIONS WITH HER?

01:21:55   9    A.   I DID.

01:21:55  10    Q.   OKAY.  ON MORE THAN ONE OCCASION?

01:21:58  11    A.   MORE THAN ONE OCCASION.

01:21:59  12    Q.   AND WERE YOU IMPRESSED?

01:22:00  13    A.   I WAS VERY IMPRESSED.

01:22:03  14    Q.   HOW SO?

01:22:04  15    A.   WELL, YOU KNOW, THERE ARE VERY FEW PEOPLE THAT I'VE MET IN

01:22:08  16    BUSINESS THAT I WOULD ACTUALLY SAY ARE CHARISMATIC.  SHE WAS

01:22:13  17    CLEARLY CHARISMATIC.  SHE WAS VERY SMART, OKAY?  AND SHE WAS

01:22:21  18    DOING ONE OF THE HARDEST THINGS THAT YOU CAN DO IN BUSINESS,

01:22:25  19    AND THAT'S TO CREATE AN ENTERPRISE FROM SCRATCH.

01:22:28  20         I HAVE DONE SIX STARTUPS ON MY OWN.  I'VE CREATED SEVERAL

01:22:33  21    COMPANIES INSIDE OF SAFEWAY.  THAT'S EASY.

01:22:36  22         DOING IT ON THE OUTSIDE IS REALLY HARD.

01:22:38  23    Q.   AND WHAT WAS THE NATURE OF THE BUSINESS RELATIONSHIP THAT

01:22:42  24    YOU WERE DISCUSSING WITH MS. HOLMES IN OR AROUND THIS TIME

01:22:45  25    PERIOD?

BURD DIRECT BY MR. LEACH

01:22:45  1    A.   SURE.  YOU KNOW, AS SOON AS I HEARD THE STORY, I REMEMBER

01:22:51  2    SENDING AN EMAIL, YOU KNOW, THE NEXT DAY, EVEN THOUGH I WAS IN

01:22:56  3    EUROPE, AND IT WAS -- IT WAS A SOMEWHAT DETAILED EMAIL.

01:23:00  4         I CAN'T GIVE YOU EVERY SPECIFIC, BUT WHEN SOMEBODY NEW

01:23:03  5    COMES IN WITH A PRODUCT OR WHATEVER, FIRST THING I WANT IS I

01:23:10  6    WANT AN EXCLUSIVE.  IF I CAN'T GET AN EXCLUSIVE, I WANT IT FOR

01:23:13  7    A YEAR.  YOU KNOW, I WANT SOMETHING BECAUSE I WANT TO PUT SOME

01:23:16  8    EFFORT INTO HELPING MAKE THIS HAPPEN, AND SO I WANT TO OWN IT

01:23:20  9    FOR AWHILE.

01:23:22  10        AND WE DID THAT WITH PRODUCE.  THERE'S A WATERMELON CALLED

01:23:26  11   A PURE HEART AND IT HAS A VERY SMALL RIND.  I MEAN -- AND WE

01:23:34  12   HAD THAT FOR OURSELVES FOR OVER A YEAR.

01:23:36  13        SO THAT WAS ONE THING I WANTED.

01:23:38  14        THE OTHER THING, WE HAD BUILT A COMPANY THAT WE LATER TOOK

01:23:44  15   PUBLIC, IT HAD A VALUATION OF ABOUT $3 AND A HALF BILLION, AND

01:23:47  16   IT WAS A -- IT WAS A FINANCIAL COMPANY THAT IF YOU GO INTO ANY

01:23:51  17   SUPERMARKET IN THE UNITED STATES, YOU'RE LIKELY TO FIND GIFT

01:23:55  18   CARDS THAT WE RESELL.

01:23:57  19        SO WE HAD CREATED A NETWORK INITIALLY THAT DIDN'T COMPETE

01:24:00  20   WITH SAFEWAY, AND THEN LEARNED WE COULD ACTUALLY SELL THEM TO

01:24:04  21   EVERY SUPERMARKET.

01:24:05  22        SO I WANTED TO BUILD A NETWORK FOR THIS NEW, NEW LAB

01:24:12  23   COMPANY THAT WOULD GIVE ME ANOTHER STREAM OF INCOME, NOT JUST

01:24:16  24   THE INCOME FOR HAVING A LAB IN OUR STORES.

01:24:18  25   Q.   OKAY.  YOU TALKED A LITTLE BIT ABOUT EXCLUSIVITY, A LITTLE

BURD DIRECT BY MR. LEACH                                           2945

01:24:23   1    BIT ABOUT HAVING THE NETWORK.

01:24:26   2        LET'S TAKE A STEP BACK, AND DESCRIBE FOR ME WHAT WAS IT

01:24:29   3    YOU THOUGHT THERANOS COULD OFFER SAFEWAY?

01:24:31   4    A.   WELL, YOU KNOW, THEY WERE TALKING ABOUT REPLACING A FULL

01:24:35   5    SCALE LAB, WHICH MEANT THAT YOU COULD DO ALMOST EVERY BLOOD

01:24:41   6    TEST IMAGINABLE.  I MEAN, EVEN, EVEN SOME OF THE NAME BRAND

01:24:45   7    LABS OUT THERE WILL GO TO A REFERENCE LAB FOR SOME VERY UNIQUE

01:24:49   8    THINGS.

01:24:50   9        AND SO WE THOUGHT, THAT'S A NICE CONNECTION TO THE

01:24:54  10    PHARMACIST.  WE WERE ALREADY DEEPLY INTO THE VACCINATION

01:24:59  11    BUSINESS, SO IT WAS AN ADD-ON INCOME STREAM.

01:25:04  12        IMAGINE COMING IN WITH A SCRIPT FOR HAVING A BLOOD TEST,

01:25:08  13    GETTING YOUR BLOOD DRAWN, AND WHILE SHOPPING -- IF YOU'RE DOING

01:25:12  14    YOUR WEEKLY SHOPPING, YOU'RE GOING TO BE IN THAT STORE FOR MORE

01:25:16  15    THAN 30 MINUTES.  AND BEFORE YOU LEAVE, YOU KNOW THE RESULTS OF

01:25:21  16    THAT BLOOD TEST -- THAT WAS THE OFFERING -- AND YOU COULD THEN

01:25:28  17    GO BACK TO THE PHARMACY AND, AFTER HAVING CALLED YOUR DOCTOR ON

01:25:32  18    YOUR CELL PHONE, YOU COULD GET A PRESCRIPTION.

01:25:34  19        SO THAT WAS AN INCREDIBLE PROCESS THAT WAS APPEALING TO

01:25:39  20    US.

01:25:39  21    Q.   AT ANY POINT IN TIME, DID MS. HOLMES SHOW YOU THE DEVICE

01:25:44  22    WITH WHICH SHE WOULD REPLACE THE CENTRAL LAB?

01:25:47  23    A.   SHE DID.  SHE ACTUALLY BROUGHT IT TO ONE OF OUR BOARD

01:25:51  24    MEETINGS.  I HAD HER PRESENT TO THE BOARD.  WE HAD A BOX IN THE

01:25:57  25    BACK OF THE ROOM.

BURD DIRECT BY MR. LEACH                                              2946

01:25:59   1        A BOARD MEMBER OFFERED TO BE A TEST CASE AND WE SAID, YOU

01:26:06   2   KNOW, JUST DO A PSA TEST, WHICH IS A PROSTATE SPECIFIC ANTIGEN

01:26:13   3   THAT YOU WANT TO KEEP AN EYE ON AS YOU GROW OLDER BECAUSE IT

01:26:17   4   COULD BE AN INDICATOR POSSIBLY OF EARLY PROSTATE CANCER.

01:26:22   5        AND SO THE BLOOD WAS DRAWN IN THE FINGERSTICK, IT WAS PUT

01:26:25   6   INTO THE MACHINE, THE MACHINE MADE A BUNCH OF NOISE -- IT

01:26:28   7   WASN'T REAL LOUD, BUT YOU COULD HEAR SOMETHING GOING ON -- AND

01:26:30   8   WE NEVER GOT A RESULT.

01:26:33   9        AND LATER, AS THIS BOARD MEMBER REACHED OUT TO FIND OUT

01:26:38   10  WHAT HIS PSA WAS -- AND IT WASN'T THE PSA HE WAS INTERESTED IN,

01:26:42   11  HE WANTED TO MAKE SURE THAT THERE WAS SOME CONFIRMATION

01:26:45   12  THERE -- HE WAS APPARENTLY TOLD --

01:26:48   13         MR. DOWNEY:  YOUR HONOR, JUST OBJECTION, HEARSAY, THE

01:26:51   14  NATURE OF THE TESTIMONY.

01:26:52   15         THE WITNESS:  I'M SORRY.

01:26:53   16         THE COURT:  WHY DON'T YOU ASK ANOTHER QUESTION?

01:26:55   17         THE WITNESS:  YEAH.

01:26:56   18         THE COURT:  ASK ANOTHER QUESTION.

01:26:57   19  BY MR. LEACH:

01:26:58   20  Q.   WAS THERE SOMETHING ABOUT THE SIZE OF THE DEVICE THAT WAS

01:27:00   21  ATTRACTIVE TO YOU?

01:27:01   22  A.   IT WAS QUITE SMALL.

01:27:03   23  Q.   WHY WAS THAT OF INTEREST TO SAFEWAY?

01:27:05   24  A.   IT WAS OF INTEREST BECAUSE IF IT WAS GOING TO TAKE 20 OR

01:27:08   25  30 MINUTES TO PROCESS A CARTRIDGE, I COULDN'T HAVE 12 PEOPLE IN

2947
BURD DIRECT BY MR. LEACH

01:27:11  1      THE WAITING ROOM AND JUST IMAGINE SIX HOURS FROM NOW WE'LL GET

01:27:15  2      TO YOU.

01:27:17  3           AND SO THE CONCEPT WAS TO STACK SIX OF THESE ON TOP OF ONE

01:27:21  4      ANOTHER AND PUT ANOTHER SIX NEXT TO IT, SO WE CREATED A SPACE

01:27:26  5      MUCH THE SIZE OF A LARGE REFRIGERATOR.

01:27:29  6      Q.   YOU ALSO TALKED ABOUT THE TIME PERIOD WITHIN WHICH RESULTS

01:27:33  7      COULD BE RETURNED, POSSIBLY WHEN SOMEBODY WAS SHOPPING.  WHY --

01:27:40  8      WAS THERE SOMETHING ABOUT THE SPEED OF THE DEVICE WHICH WAS OF

01:27:43  9      INTEREST TO YOU?

01:27:43  10     A.   YEAH.  IT WAS -- YOU KNOW, IF YOU HAVE A REALLY GOOD LAB,

01:27:46  11     YOUR DOCTOR MIGHT GET THE RESULTS IN 24 HOURS.  THEY MIGHT

01:27:49  12     DRIBBLE IN TO YOU A BIT AFTER THAT.

01:27:52  13          BUT AS I SAID EARLIER, THIS NOTION OF GETTING THE RESULTS

01:27:56  14     AND GETTING A PRESCRIPTION POSSIBLY BEFORE EVEN LEAVING THE

01:27:59  15     STORE, WE KNEW THAT WOULD BE APPEALING TO CUSTOMERS.

01:28:02  16     Q.   AND DID MS. HOLMES MAKE REPRESENTATIONS TO YOU IN THIS

01:28:06  17     PRELIMINARY PERIOD ABOUT THE SPEED WITH WHICH THERANOS COULD

01:28:09  18     TURN AROUND RESULTS?

01:28:10  19     A.   YES.  IT WAS DESCRIBED AS A RANGE OF 20 TO 30 MINUTES.

01:28:13  20     Q.   DID SHE ALSO DESCRIBE FOR YOU THE ACCURACY OF THE RESULTS

01:28:19  21     THAT COULD BE PRODUCED BY THE DEVICE?

01:28:20  22     A.   IN ONE OF HER PRESENTATIONS, THERE WAS A -- THERE WAS --

01:28:26  23     THERE WAS SOME COMMENT ABOUT THE ACCURACY, YOU KNOW, BEING EVEN

01:28:29  24     MORE ACCURATE THAN, YOU KNOW, TRADITIONAL, TRADITIONAL TESTING

01:28:33  25     UNITS.

BURD DIRECT BY MR. LEACH                                                    2948

```
01:28:35   1         BUT IT WAS NEVER -- WE NEVER GOT ANY DEEP INFORMATION

01:28:38   2    ABOUT THAT.  AND I'D BE HAPPY IF IT WERE JUST AS ACCURATE.

01:28:42   3    Q.   WAS ACCURACY RELEVANT TO YOU?

01:28:45   4    A.   OF COURSE.

01:28:45   5    Q.   WHY DO YOU SAY OF COURSE?

01:28:47   6    A.   WELL, WE -- YOU KNOW, WHEN YOU PUT ANOTHER BRAND IN YOUR

01:28:51   7    STORE -- AND WE PUT MANY OF THEM, YOU'LL FIND WELLS FARGOS AND

01:28:55   8    OTHER BRANDS IN OUR STORE, MAYBE A PANDA EXPRESS HERE AND

01:28:59   9    THERE -- OUR BRAND IS ON THE FRONT, THEIR BRAND IS INSIDE.

01:29:02  10         PEOPLE ARE GOING TO COME BACK TO US IF THEY GOT A NUMBER

01:29:06  11    THAT DIDN'T MAKE ANY SENSE TO THEIR PHYSICIAN.

01:29:11  12         AND, YOU KNOW, WE MUCH PREFER THEY COME BACK TO THERANOS,

01:29:14  13    BUT WE KNOW IT HAPPENED IN OUR STORE.

01:29:16  14         AND SO I THINK IT'S ALWAYS TRUE IN BUSINESS THAT YOU WANT

01:29:22  15    TO ALWAYS DEAL WITH FIRST RATE COMPANIES, PARTICULARLY WHEN YOU

01:29:29  16    ARE IN THE SAME ENVIRONMENT.

01:29:31  17         AND SO THAT WAS IMPORTANT TO US.

01:29:32  18    Q.   DID MS. HOLMES ALSO DESCRIBE FOR YOU THE NUMBER OF TESTS

01:29:36  19    THAT THE DEVICE COULD PERFORM?

01:29:37  20    A.   IT WAS DESCRIBED VARIOUS DIFFERENT WAYS.  SOMETIMES

01:29:43  21    REPLACING A TRADITIONAL LAB.  THAT WOULD IMPLY WELL OVER 300

01:29:49  22    DIFFERENT TESTS.

01:29:52  23         I REMEMBER ONE OF HER CARTRIDGE WAS DESCRIBED AS CAPABLE

01:29:56  24    OF DOING 95 PERCENT OF ALL TESTS.  THAT WAS IMPORTANT TO US

01:30:01  25    BECAUSE WE HAD TO INVENTORY THE CARTRIDGES AND WE HAD A LIMITED
```

BURD DIRECT BY MR. LEACH                                                2949

```
01:30:05   1    AMOUNT OF SPACE.

01:30:06   2         SO WE WERE CONSISTENTLY TOLD THAT IT ESSENTIALLY REPLACES

01:30:11   3    A TRADITIONAL, FULL BLOWN LAB.

01:30:15   4              MR. LEACH:  MAY I APPROACH THE WITNESS, YOUR HONOR?

01:30:17   5              THE COURT:  YES.

01:30:20   6              MR. LEACH:  (HANDING.)

01:30:27   7              THE WITNESS:  THANK YOU.

01:30:29   8    BY MR. LEACH:

01:30:33   9    Q.   MR. BURD, I'VE PLACED BEFORE YOU A BINDER OF DOCUMENTS AND

01:30:37  10    I'D LIKE TO DRAW YOUR ATTENTION, PLEASE, TO WHAT WE HAVE MARKED

01:30:41  11    AS EXHIBIT 336.

01:30:54  12    A.   YES, I SEE IT.

01:30:56  13    Q.   DO YOU SEE THERE'S SOME HANDWRITING ON THE FIRST PAGE OF

01:30:59  14    336 UP IN THE TOP RIGHT CORNER?

01:31:02  15    A.   YES.

01:31:02  16    Q.   DO YOU RECOGNIZE THE HANDWRITING?

01:31:04  17    A.   IT'S MY HANDWRITING.

01:31:05  18    Q.   OKAY.  AND DO YOU SEE A DATE DOWN IN THE BOTTOM LEFT

01:31:08  19    CORNER WHERE IT SAYS "BOARD MEETING, MAY 19TH, 2010"?

01:31:13  20    A.   I DO.

01:31:14  21    Q.   DO YOU RECOGNIZE THIS DOCUMENT?

01:31:15  22    A.   YES.

01:31:17  23    Q.   IS THIS A TRUE AND CORRECT COPY OF A POWERPOINT THAT YOU

01:31:22  24    PRESENTED TO THE SAFEWAY BOARD IN OR AROUND THIS TIME PERIOD?

01:31:25  25    A.   THAT'S CORRECT.
```

BURD DIRECT BY MR. LEACH                                              2950

01:31:27  1    Q.   OKAY.  AND DID YOU PREPARE THIS AT OR NEAR THE TIME OF THE

01:31:30  2    BOARD MEETING?

01:31:31  3    A.   IT WOULD HAVE BEEN PREPARED VERY CLOSE TO THE BOARD

01:31:36  4    MEETING.  YOU KNOW, I ALWAYS WAS IMPROVING THINGS, SO THESE DID

01:31:43  5    NOT GET HANDED OUT IN ADVANCE OF THE BOARD MEETING.  THIS WAS

01:31:46  6    PRESENTED LIVE TO THE BOARD MEMBERS FOR THE FIRST TIME.

01:31:50  7    Q.   OKAY.  AND DID YOU KEEP POWERPOINTS SUCH AS THIS IN THE

01:31:53  8    ORDINARY COURSE OF BUSINESS?

01:31:55  9    A.   WE USED THEM ALL THE TIME.

01:31:57  10   Q.   OKAY.  IT WAS YOUR REGULAR PRACTICE TO CREATE

01:31:59  11   PRESENTATIONS FOR THE BOARD ABOUT POSSIBLE OPPORTUNITIES FOR

01:32:03  12   THE COMPANY?

01:32:03  13   A.   IT WAS THE WAY WE CONDUCTED OUR BOARD MEETINGS, SO ALL THE

01:32:06  14   OTHER MATERIAL WAS IN A PRESENTATION FORMAT.

01:32:08  15   Q.   OKAY.  AND DID YOU DO YOUR BEST TO ACCURATELY REPORT THE

01:32:12  16   OPPORTUNITY THERANOS PRESENTED HERE TO SAFEWAY'S BOARD?

01:32:16  17   A.   ABSOLUTELY.

01:32:16  18   Q.   OKAY.  AND DOES THIS REFLECT YOUR UNDERSTANDING OF THE

01:32:19  19   POSSIBLE ARRANGEMENT FOR SAFEWAY?

01:32:21  20   A.   THAT'S CORRECT.

01:32:22  21         MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 336.

01:32:25  22         MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

01:32:26  23         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:32:30  24   (GOVERNMENT'S EXHIBIT 336 WAS ADMITTED IN EVIDENCE.)

01:32:30  25         MR. LEACH:  AND, MS. HOLLIMAN, IF WE COULD PLEASE GO

BURD DIRECT BY MR. LEACH                                                    2951

```
01:32:38   1    TO PAGE 2 OF THIS EXHIBIT.

01:32:40   2    Q.   DO YOU SEE UP AT THE TOP, MR. BURD, WHERE IT SAYS

01:32:43   3    DISRUPTIVE TECHNOLOGY OPPORTUNITY?

01:32:45   4    A.   CORRECT.

01:32:46   5    Q.   AND BENEATH THAT, THERE'S A BULLET, "CREATE A NEW IN STORE

01:32:51   6    PHARMACY SERVICE WITH A MINI-DIAGNOSTIC LAB."

01:32:55   7         IS THAT A TERM THAT MS. HOLMES USED WITH YOU,

01:32:59   8    MINI-DIAGNOSTIC LAB?

01:33:01   9    A.   YES.

01:33:02  10    Q.   I DIDN'T MEAN TO CUT YOU OFF.

01:33:03  11    A.   WELL, I WAS GOING TO TELL YOU THAT IT WOULD BE -- IT WOULD

01:33:07  12    BE COMMON PRACTICE FOR ME TO REVIEW THIS, YOU KNOW, WITH

01:33:13  13    ELIZABETH BEFORE I PRESENTED IT BECAUSE I'M OUT OF MY POWER

01:33:21  14    ALLEY, YOU KNOW, IN PRESENTING THESE THINGS.

01:33:24  15         SO I CAN'T -- I CAN'T TELL YOU FOR CERTAIN I DID, BUT THAT

01:33:27  16    WAS MY PRACTICE.

01:33:27  17    Q.   OKAY.  IS IT FAIR TO SAY THE INFORMATION RELATING TO

01:33:30  18    THERANOS IN THIS POWERPOINT CAME IN ONE FORM OR ANOTHER FROM

01:33:34  19    MS. HOLMES?

01:33:35  20    A.   CORRECT.

01:33:35  21    Q.   OKAY.  AND THAT TERM, "MINI-DIAGNOSTIC LAB," WHAT DID THAT

01:33:40  22    MEAN TO YOU?

01:33:41  23    A.   IT DOES WHAT A BIG LAB DOES.

01:33:43  24    Q.   AND WAS THAT ATTRACTIVE TO YOU AT THE TIME?

01:33:47  25    A.   VERY MUCH SO.
```

2952
BURD DIRECT BY MR. LEACH

01:33:48  1    Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PAGE 3.  AND IF WE

01:33:55  2    COULD ZOOM IN ON THE FOUR BULLETS.

01:33:57  3         DO YOU SEE WHERE IT SAYS "FULL DIAGNOSTIC BLOOD, SALIVA

01:34:02  4    AND URINE LAB IN A BOX"?

01:34:06  5    A.   CORRECT.

01:34:06  6    Q.   IS THAT LAB IN A BOX SYNONYMOUS WITH MINI-DIAGNOSTIC LAB?

01:34:12  7    A.   CORRECT.

01:34:13  8    Q.   THE NEXT BULLET SAYS "BLOOD TEST SAMPLES RESULT FROM A

01:34:17  9    FINGERSTICK."

01:34:18  10        IS THAT YOUR UNDERSTANDING OF WHAT THERANOS WAS OFFERING?

01:34:21  11   A.   CORRECT.

01:34:21  12   Q.   THERE'S THE TEST RESULTS IN 20 MINUTES.

01:34:23  13        IS THAT A REFERENCE TO GETTING THE TEST WHILE FOLKS WERE

01:34:26  14   GETTING THEIR GROCERIES?

01:34:27  15   A.   YES.

01:34:27  16   Q.   AND WAS THAT TIMING IMPORTANT TO YOU?

01:34:29  17   A.   IT WAS IMPORTANT, SURE.

01:34:31  18   Q.   AND WHY WAS THAT?

01:34:32  19   A.   BECAUSE THEY'LL GET THE RESULTS BEFORE THEY LEAVE THE

01:34:34  20   STORE.

01:34:35  21   Q.   THE LAST BULLET SAYS, "RETAIL PRICE IS 40 TO 70 PERCENT

01:34:39  22   LOWER THAN TWO DOMINANT COMPETITORS."

01:34:42  23        DO YOU SEE THAT LANGUAGE?

01:34:44  24   A.   YES.

01:34:44  25   Q.   WAS THAT RELEVANT TO YOU?

BURD DIRECT BY MR. LEACH                                                                    2953

01:34:45   1      A.   YES, IT WAS.

01:34:46   2      Q.   HOW SO?

01:34:47   3      A.   IT'S MUCH EASIER TO TAKE MARKET SHARE FROM EXISTING

01:34:54   4      COMPETITORS IF YOUR PRICE POINT IS CONSIDERABLY LOWER.

01:34:58   5          AND THAT WOULD ALSO BE ATTRACTIVE TO ALL OF THE INSURANCE

01:35:00   6      COMPANIES THAT WOULD BE, YOU KNOW, ADJUDICATING THESE CLAIMS

01:35:05   7      FOR ANYBODY THAT GOES TO A LAB.

01:35:07   8      Q.   AND WAS IT YOUR IMPRESSION, BASED ON YOUR DIALOGUE WITH

01:35:10   9      MS. HOLMES, THAT THIS WAS SOMETHING THERANOS COULD DO

01:35:13  10      PROFITABLY?

01:35:14  11      A.   YES.  THEY WEREN'T IN THE BUSINESS FOR CHARITY.  THEY

01:35:19  12      OBVIOUSLY MADE MONEY ON IT SOMEHOW.

01:35:20  13      Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO THE NEXT PAGE,

01:35:24  14      PAGE 4.

01:35:31  15          DO YOU SEE WHERE IT SAYS PHYSICAL DEVICE AND CARTRIDGES?

01:35:34  16      A.   UM-HUM.

01:35:35  17      Q.   AND THERE'S AN IMAGE --

01:35:37  18      A.   YES.

01:35:38  19      Q.   -- OF THE DEVICE?

01:35:39  20      A.   YES.

01:35:39  21      Q.   OKAY.  AT ANY POINT, DID YOU SEE A DEVICE LIKE THAT?

01:35:42  22      A.   I SAW A SIMILAR DEVICE.  I USED TO DESCRIBE IT AS A, THE

01:35:47  23      SIZE OF A LARGE BAGEL TOASTER, YOU KNOW?

01:35:51  24          SO I DIDN'T SEE THIS EXACT DEVICE.  IT WAS GOING THROUGH A

01:35:55  25      SERIES OF CHANGES, AND IT CONTINUED TO GO THROUGH CHANGES ALL

2954
BURD DIRECT BY MR. LEACH

```
01:36:01   1    DURING OUR DISCUSSIONS BECAUSE THIS WOULD NOT HAVE BEEN

01:36:03   2    STACKABLE IN THE SAME WAY THAT I HAD TALKED ABOUT EARLIER.

01:36:07   3    Q.   OKAY.  BUT YOUR UNDERSTANDING WAS IT WAS A DEVICE,

01:36:10   4    SOMETHING THE SIZE OF A BAGEL TOASTER, THAT COULD RUN A LARGE

01:36:16   5    VOLUME OF TESTS?

01:36:17   6    A.   YES.  I SAW PICTURES OF OTHER GENERATIONS OF THIS, AND SO

01:36:22   7    I'VE SEEN IT EVOLVE.

01:36:23   8    Q.   OKAY.  AND TO THE RIGHT THERE'S SOMETHING CALLED

01:36:26   9    CARTRIDGE.

01:36:27  10         WHAT WAS YOUR UNDERSTANDING OF THE CARTRIDGE?

01:36:29  11    A.   THE CARTRIDGE LOOKED TO ME LIKE IT WAS MADE OUT OF SOME

01:36:34  12    PLASTIC MATERIAL, AND THE EXTRACTED BLOOD SAMPLE WOULD GO

01:36:39  13    SOMEWHERE INTO THAT CARTRIDGE AND THE CARTRIDGE WOULD GO INTO

01:36:42  14    THE MACHINE.

01:36:43  15    Q.   WE'LL COME BACK TO THE CARTRIDGE IN A MINUTE.

01:36:48  16         BUT LET'S LOOK AT PAGE 5, IF WE COULD.

01:36:59  17         UP AT THE TOP, DO YOU SEE WHERE IT SAYS TECHNOLOGY

01:37:01  18    PARTNER - THERANOS?

01:37:04  19    A.   I DO.

01:37:05  20    Q.   OKAY.  I WANT TO DRAW YOUR ATTENTION TO THE SECOND BULLET

01:37:09  21    WHERE IT SAYS, "CURRENTLY CASH FLOW NEUTRAL WITH A CLIENT BASE

01:37:13  22    OF PHARMACEUTICAL COMPANIES."

01:37:15  23         IS THAT SOMETHING MS. HOLMES TOLD YOU?

01:37:18  24    A.   YES, IT IS.

01:37:19  25    Q.   OKAY.  WAS THAT RELEVANT TO YOU?
```

BURD DIRECT BY MR. LEACH                                              2955

```
01:37:21   1    A.   IT IS, BECAUSE IF THEY'RE CASH NEUTRAL AND WE'RE ABOUT TO

01:37:24   2    CREATE SOMETHING MUCH LARGER, IT SUGGESTS THAT WE CAN EASILY

01:37:28   3    GET THE PROFITABILITY, WHICH WOULD MAKE IT EASIER FOR HER TO

01:37:32   4    SHARE A MARGIN WITH US.

01:37:33   5    Q.   IF THERANOS WERE NOT CASH FLOW NEUTRAL, WOULD THAT HAVE

01:37:38   6    BEEN A DETERRENT TO YOU GOING FORWARD?

01:37:40   7    A.   IT WOULDN'T HAVE NECESSARILY PREVENTED US, BUT IT WOULD

01:37:45   8    HAVE BEEN CONSIDERED BECAUSE THEN THE ISSUE IS, WELL, HOW CLOSE

01:37:49   9    ARE YOU?  HOW MUCH MORE CAPITAL DO YOU NEED?  WHEN IS THIS

01:37:52   10   GOING TO GET DONE?

01:37:53   11       BUT THE FACT THAT THEY WERE CASH FLOW NEUTRAL SUGGESTED

01:37:56   12   THAT THEY HAD A REVENUE STREAM.

01:37:57   13   Q.   OKAY.  AND THEY WERE READY TO SCALE UP RIGHT NOW?  IS THAT

01:38:00   14   FAIR?

01:38:01   15   A.   THEY WERE READY TO GO.

01:38:02   16          MR. LEACH:   OKAY.  YOUR HONOR, THIS IS -- WOULD THIS

01:38:06   17   BE A CONVENIENT TIME FOR A BREAK?

01:38:08   18          THE COURT:   I THINK IT WOULD.  THANK YOU.

01:38:10   19       WE'RE GOING TO TAKE A BREAK JUST NOW, LADIES AND

01:38:12   20   GENTLEMEN.  LET'S TAKE ABOUT 15 MINUTES, PLEASE, 15 MINUTES.

01:38:16   21          YOU CAN STAND DOWN, SIR, AND WE'LL CONTINUE IN 15 MINUTES.

01:38:32   22          (RECESS FROM 1:38 P.M. UNTIL 1:59 P.M.)

01:59:46   23          (JURY IN AT 1:59 P.M.)

01:59:48   24          THE COURT:   ALL RIGHT.  WE'RE BACK ON THE RECORD.

01:59:53   25   OUR JURY IS PRESENT.  ALL COUNSEL AND MS. HOLMES ARE PRESENT.
```

BURD DIRECT BY MR. LEACH                                          2956

01:59:57  1          AND YOU CAN CONTINUE YOUR EXAMINATION.

01:59:58  2              MR. LEACH:  THANK YOU, YOUR HONOR.

01:59:59  3      Q.   MR. BURD, WE WERE, BEFORE THE BREAK, ON EXHIBIT 336, AND

02:00:07  4      I'D LIKE TO NOW DRAW YOUR ATTENTION, PLEASE, TO PAGE 16.

02:00:11  5          THIS IS YOUR POWERPOINT PRESENTATION TO THE SAFEWAY BOARD

02:00:14  6      ABOUT THE THERANOS OPPORTUNITY.

02:00:17  7      A.   OKAY.  YOU SAY 16.  I'M NOT SURE WHERE I WOULD FIND THAT.

02:00:31  8      SO I'M JUST PAGING THROUGH TO MATCH WHAT YOU HAVE ON THE

02:00:35  9      SCREEN.

02:00:35 10      Q.   DOWN AT THE BOTTOM OF THE DOCUMENT --

02:00:37 11      A.   OH, OKAY, IN THE FAR RIGHT.  I WAS LOOKING FOR 1-6 AND I

02:00:43 12      WASN'T LOOKING FOR 0-0-1-6.

02:00:44 13      Q.   OKAY.  WE DO IT TO MAXIMIZE CONFUSION.

02:00:47 14      A.   OKAY.

02:00:47 15      Q.   ARE YOU NOW ON PAGE 16, AND YOU SEE IT ON THE SCREEN?

02:00:50 16      A.   YES, I AM.

02:00:51 17      Q.   OKAY.  AND THIS IS A SLIDE TITLED ROLLOUT STRATEGY?

02:00:54 18      A.   YES.

02:00:54 19      Q.   OKAY.  AND THIS WAS WHAT YOU WERE ENVISIONING AT THE TIME

02:00:59 20      FOR A POTENTIAL ROLLOUT OF THE THERANOS DEVICE WITHIN SAFEWAY

02:01:03 21      STORES?

02:01:04 22      A.   CORRECT.

02:01:05 23      Q.   OKAY.  THE FOURTH BULLET, "BUILD A NETWORK OF MINI-LABS

02:01:21 24      AND PREPARE FOR LAUNCH," WHAT DID THAT REFER TO?

02:01:26 25      A.   THAT REFERRED TO GETTING OUR SUPERMARKETS TO ULTIMATELY


                        UNITED STATES COURT REPORTERS

2957
BURD DIRECT BY MR. LEACH

```
02:01:29   1    PARTICIPATE IN PUTTING MINI LABS IN THEIR STORES, AND BECAUSE

02:01:33   2    WE HAD BUILT A NETWORK FOR THIS OTHER COMPANY CALLED BLACK HAWK

02:01:37   3    NETWORK, WE THOUGHT WE COULD DO IT HERE.

02:01:41   4    Q.   LET'S LOOK AT THE NEXT PAGE, PAGE 17.

02:01:46   5         DO YOU SEE WHERE IT SAYS, ANTICIPATED PROGRAM ROLLOUT?

02:01:49   6    A.   I DO.

02:01:50   7    Q.   AND IS THIS YOUR DESCRIPTION OF THE TIMELINE YOU AND

02:01:56   8    MS. HOLMES HAD BEEN DISCUSSING ABOUT A POTENTIAL ROLLOUT OF THE

02:02:00   9    THERANOS MINI LAB?

02:02:02  10    A.   YES, AT THAT TIME, AND THIS WAS IN MAY OF 2010, THAT WAS

02:02:10  11    THE SCHEDULE.

02:02:12  12    Q.   OKAY.  AND DID THAT CHANGE AT SOME POINT?

02:02:18  13    A.   IT CONTINUOUSLY CHANGED.

02:02:21  14    Q.   OKAY.  TO THE LEFT, THERE'S A COLUMN ACTIVITY/WORK STEPS,

02:02:24  15    AND THERE'S ROW, CLOSE DEAL.

02:02:27  16         DO YOU SEE THAT?

02:02:28  17    A.   I DO.

02:02:29  18    Q.   OKAY.  AND THAT WAS ANTICIPATED FOR THE SECOND QUARTER OF

02:02:32  19    2010?

02:02:32  20    A.   YES, AND THAT'S THE -- CLOSE DEAL MEANT THE CONTRACT WHICH

02:02:36  21    WAS DONE IN SEPTEMBER.

02:02:37  22    Q.   OKAY.  CAN YOU EXPLAIN FOR US WHAT IS MEANT BY THE OTHER

02:02:39  23    ROWS, REIMBURSEMENT NEGOTIATIONS, UNDER-THE-RADAR TEST,

02:02:44  24    NORTHERN CALIFORNIA PILOT, AND SO FORTH?

02:02:46  25    A.   SURE.  REIMBURSEMENT NEGOTIATIONS MEANT THAT THERANOS
```

BURD DIRECT BY MR. LEACH                                                2958

02:02:50   1    NEEDED TO HAVE DISCUSSIONS WITH ALL THE KEY INSURANCE COMPANIES

02:02:57   2    TO MAKE SURE THAT THEY WOULD ACCEPT THEM AS A LAB AND THEY

02:03:01   3    WOULD AGREE TO A CERTAIN LEVEL OF PAY.  SO THAT WAS NOT -- THAT

02:03:05   4    WAS NOT SAFEWAY'S BURDEN, THAT WAS THE BURDEN OF THERANOS.

02:03:10   5         UNDER-THE-RADAR TEST, YOU KNOW, THERANOS WAS ALWAYS

02:03:16   6    CONCERNED ABOUT SECRECY, AND SO RATHER THAN DO THIS IN THE

02:03:22   7    BAY AREA -- WHICH I WOULD HAVE ENJOYED, BUT I UNDERSTOOD THE

02:03:29   8    SECRECY ASPECTS -- WE WOULD DO IT IN A REMOTE LOCATION WHERE

02:03:33   9    THERE WAS NOT EITHER A LABCORP OR QUEST, AND THOSE ARE THE TWO

02:03:36   10   LARGEST LABS IN THE NATION.  THEY EACH HAVE ABOUT 8,000 LABS.

02:03:42   11   Q.   AND THEN THE NORTHERN CALIFORNIA PILOT, WHAT DID THAT

02:03:45   12   MEAN?

02:03:46   13   A.   AT SOME POINT, ONCE WE CONFIRMED THAT EVERYTHING WAS

02:03:51   14   WORKING, THAT, YOU KNOW, OUR COSTS AND MARGINS WERE, YOU KNOW,

02:03:57   15   NEAR WHAT WE EXPECTED, WE WOULD CONSIDER A NORTHERN CALIFORNIA

02:04:01   16   PILOT.

02:04:03   17        NORTHERN -- SAFEWAY WAS ORGANIZED BY DIVISIONS, AND SO

02:04:07   18   NORTHERN CALIFORNIA, WHICH YOU CAN CONSIDER FROM ABOUT FRESNO

02:04:11   19   NORTH, THAT WAS NORTHERN CALIFORNIA.  SO SOMEWHERE IN THAT

02:04:15   20   GEOGRAPHY WE WOULD, WE WOULD DO A PILOT.

02:04:18   21   Q.   OKAY.  AND YOU WERE TELLING THE SAFEWAY BOARD, BASED ON

02:04:22   22   YOUR CONVERSATIONS WITH MS. HOLMES, THAT THIS WAS CONTEMPLATED

02:04:26   23   FOR THE FIRST QUARTER OF 2011?

02:04:29   24   A.   THAT'S -- THAT'S CORRECT.

02:04:30   25   Q.   OKAY.  THE NEXT ROW IS SWY CHAIN ROLLOUT.  IS SWY AN

BURD DIRECT BY MR. LEACH                                                    2959

```
02:04:36   1        ACRONYM FOR SAFEWAY?

02:04:37   2        A.   YES, IT IS.

02:04:38   3        Q.   AND THAT'S A ROLLOUT WITHIN SAFEWAY STORES AS OPPOSED TO

02:04:43   4        THE BLACK HAWK NETWORK THAT YOU'VE DESCRIBED?

02:04:46   5        A.   IT -- YES.  IT WAS SAFEWAY ONLY.

02:04:51   6             BLACK HAWK WAS JUST A VEHICLE WE'D USED ONCE BEFORE.  THIS

02:04:55   7        WOULDN'T BE BLACK HAWK.

02:04:57   8             THIS WOULD BE A NETWORK THAT WE CREATED, BUT WE WOULD

02:05:00   9        BEGIN IN SOME OF THOSE MARKETS AT THE SAME TIME WE ROLLED OUT,

02:05:03  10        BUT IT WOULD TAKE US LONGER TO COMPLETE.

02:05:05  11        Q.   SO THIS IS IN MAY OF 2010, MR. BURD.

02:05:11  12             I'D LIKE TO MOVE FORWARD IN TIME TO JULY OF 2010 AND DRAW

02:05:15  13        YOUR ATTENTION TO WHAT HAS BEEN MARKED AS EXHIBIT 370.

02:05:25  14             AND I OFFER 370 INTO EVIDENCE.

02:05:27  15             MR. DOWNEY:  NO OBJECTION.

02:05:28  16             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:05:30  17        (GOVERNMENT'S EXHIBIT 370 WAS ADMITTED IN EVIDENCE.)

02:05:31  18             MR. LEACH:  AND, MS. HOLLIMAN, IF WE COULD PLEASE

02:05:33  19        ENLARGE THE SUBSTANCE OF THE EMAIL IN THE FIRST HALF, WITH THE

02:05:37  20        HEADER.  IF WE COULD CAPTURE THE NAME AT THE TOP, TOO, PLEASE,

02:05:41  21        THAT WOULD BE GREAT.  THANK YOU.

02:05:46  22        Q.   MR. BURD, DOES THIS APPEAR TO BE AN EMAIL FROM MS. HOLMES

02:05:54  23        TO YOU AND SOMEONE NAMED ROBERT EDWARDS WITH A COPY TO

02:05:59  24        SUNNY BALWANI?

02:05:59  25        A.   THAT'S CORRECT.
```

BURD DIRECT BY MR. LEACH                                                    2960

02:06:00   1        Q.   OKAY.  WHO IS ROBERT EDWARDS?

02:06:01   2        A.   ROBERT EDWARDS AT THE TIME WAS THE CHIEF FINANCIAL OFFICER

02:06:04   3    OF SAFEWAY.

02:06:05   4        Q.   AND UP IN THE LEFT, THERE'S THE NAME BOB GORDON.

02:06:10   5             DO YOU SEE THAT?

02:06:12   6        A.   I DO.

02:06:13   7        Q.   WHO IS BOB GORDON?

02:06:15   8        A.   BOB GORDON WAS THE GENERAL COUNSEL OF SAFEWAY AT THAT

02:06:18   9    TIME.

02:06:18  10        Q.   OKAY.  AND THE SUBJECT OF THIS IS THERANOS FINANCIAL

02:06:23  11    PROJECTIONS.

02:06:24  12             DO YOU SEE THAT?

02:06:25  13        A.   I DO.

02:06:25  14        Q.   AND DO YOU SEE THERE'S AN ATTACHMENT, THERANOS PRO FORMA

02:06:29  15    STATEMENTS.XLS?

02:06:31  16        A.   YES.

02:06:32  17        Q.   AND DO YOU SEE WHERE MS. HOLMES WROTE, "DEAR STEVE,

02:06:36  18    ROBERT, AS PROMISED, PLEASE FIND HIGH LEVEL PROJECTIONS

02:06:39  19    ATTACHED TO THIS EMAIL."

02:06:42  20             WHAT'S YOUR UNDERSTANDING OF WHY MS. HOLMES WAS SENDING

02:06:45  21    THIS TO YOU?

02:06:46  22        A.   WE HAD ASKED FOR IT.

02:06:47  23        Q.   OKAY.  WHY DID YOU ASK FOR THIS?

02:06:48  24        A.   WE WANTED TO UNDERSTAND HOW THEY WERE PROJECTING THE

02:06:53  25    FUTURE AND HOW FAST THE BUSINESS MIGHT RAMP UP, AND THIS MIGHT

BURD DIRECT BY MR. LEACH                                                    2961

```
02:06:59  1     BE HELPFUL.  HIGH LEVEL MEANS NOT A FULL INCOME STATEMENT LINE

02:07:02  2     BY LINE, VERY HIGH LEVEL.

02:07:04  3     Q.   WAS THIS RELEVANT INFORMATION FOR YOU ASSESSING TO ENTER

02:07:13  4     INTO THE POSSIBLE OPPORTUNITY WITH THERANOS?

02:07:14  5     A.   YES, IT WAS.

02:07:16  6     Q.   HOW SO?

02:07:17  7     A.   WELL, THE REVENUE PROJECTIONS, YOU KNOW, WERE VERY STRONG,

02:07:24  8     AND THE OPERATING EXPENSES, YOU KNOW, WERE OBVIOUSLY LESS,

02:07:30  9     SAYING THAT WE'D BE PROFITABLE, THERANOS WOULD BE PROFITABLE.

02:07:33 10         AND, YOU KNOW, WHEN YOU HAVE A PARTNER IN BUSINESS AND YOU

02:07:37 11     NEGOTIATE AS BEST YOU CAN FOR YOUR MARGIN, YOU HAVE TO MAKE

02:07:40 12     SURE YOU'VE LEFT ENOUGH MARGIN FOR THEM THAT THEY ALSO MAKE

02:07:44 13     MONEY.  OTHERWISE YOU DON'T HAVE A PARTNERSHIP.

02:07:47 14     Q.   YOU'VE USED THAT TERM "MARGIN" A COUPLE TIMES, MR. BURD.

02:07:50 15     A.   YES.

02:07:51 16     Q.   CAN YOU JUST EXPLAIN TO US WHAT MARGIN IS?

02:07:53 17     A.   SURE.  SO MARGIN, IT'S USED IN LOTS OF DIFFERENT WAYS.

02:07:56 18         IN THIS PARTICULAR CASE, I'M TALKING ABOUT YOU GET, YOU

02:07:59 19     GET $10 IN REVENUE AND YOU'VE GOT $7 IN COST, YOUR MARGIN WOULD

02:08:03 20     BE $3.

02:08:05 21         AND OUT OF THAT MARGIN YOU HAVE TO PAY -- YOU KNOW, THAT'S

02:08:09 22     PER TEST.  YOU HAVE TO PAY SALARIES AND RENT ON THE STORES AND

02:08:12 23     A BUNCH OF OTHER THINGS.

02:08:14 24     Q.   SO LOW MARGIN MEANS YOU'RE MAKING A SMALL AMOUNT ON ANY

02:08:17 25     GIVEN SALE, AND A HIGH MARGIN MEANS YOU'RE MAKING A LARGE
```

BURD DIRECT BY MR. LEACH                                                2962

| | | |
|---|---|---|
| 02:08:20 | 1 | AMOUNT ON ANY GIVEN SALE? |
| 02:08:22 | 2 | A.   THAT'S CORRECT. |
| 02:08:23 | 3 | Q.   OKAY.  LET'S LOOK AT THE PROJECTIONS THAT ARE ATTACHED. |
| 02:08:26 | 4 | IF WE COULD PLEASE GO TO PAGE 2, AND IF IT'S POSSIBLE TO |
| 02:08:29 | 5 | HIGHLIGHT THE SUBSTANCE, ALL THE WAY DOWN.  GREAT. |
| 02:08:40 | 6 | DO YOU SEE WHERE IT SAYS PRO FORMA STATEMENT OF INCOME, |
| 02:08:43 | 7 | MR. BURD? |
| 02:08:44 | 8 | A.   YES, I DO. |
| 02:08:45 | 9 | Q.   AND TO THE RIGHT, THERE'S DIFFERENT YEARS, 2010, 2011, |
| 02:08:49 | 10 | 2012, AND 2013? |
| 02:08:51 | 11 | A.   YES. |
| 02:08:52 | 12 | Q.   OKAY.  WHY WERE YOU INTERESTED IN A PRO FORMA STATEMENT OF |
| 02:08:56 | 13 | INCOME FROM THERANOS? |
| 02:08:58 | 14 | A.   WELL, IF THEY WEREN'T GOING TO BE PROFITABLE, THEN THIS |
| 02:09:02 | 15 | PARTNERSHIP WASN'T GOING TO LAST LONG.  SO WE WANTED TO SEE HOW |
| 02:09:07 | 16 | THEY WERE GOING TO PROJECT THEIR OWN RESULTS HERE. |
| 02:09:11 | 17 | Q.   OKAY.  IN THE COLUMN 2011, THERE'S A ROW FOR U.S. REVENUE, |
| 02:09:18 | 18 | REVENUE FROM SAFEWAY NETWORK. |
| 02:09:21 | 19 | DID YOU UNDERSTAND THAT TO BE THE REVENUE THERANOS |
| 02:09:24 | 20 | ANTICIPATED EARNING FROM A RELATIONSHIP WITH SAFEWAY? |
| 02:09:31 | 21 | LET ME ASK A BETTER QUESTION. |
| 02:09:33 | 22 | A.   YEAH. |
| 02:09:34 | 23 | Q.   WHAT DID YOU UNDERSTAND THAT TO MEAN? |
| 02:09:36 | 24 | A.   YOU KNOW, LOOKING AT THIS THING 11 YEARS LATER, IT'S NOT |
| 02:09:42 | 25 | CLEAR TO ME -- IT'S LABELED REVENUE FROM SAFEWAY NETWORK.  THAT |

BURD DIRECT BY MR. LEACH                                         2963

02:09:47   1    WOULD SUGGEST IT'S THE NETWORK REVENUE ONLY.

02:09:50   2    Q.    OKAY.

02:09:50   3    A.    RIGHT?  AND THEN THE ALL OTHER REVENUE, IT'S ANYBODY'S

02:09:56   4    GUESS.  IS THAT OTHER CLIENTS PLUS SAFEWAY?  OR IS THAT JUST

02:10:00   5    SAFEWAY?  I CAN'T TELL YOU.

02:10:02   6    Q.    OKAY.  I DRAW YOUR ATTENTION TO -- WHAT WAS THE TOTAL U.S.

02:10:06   7    REVENUE THAT WAS PROJECTED BY THERANOS FOR 2011?

02:10:10   8    A.    223 MILLION.

02:10:14   9    Q.    OKAY. AND THEN BENEATH THAT, THERE'S OPERATING EXPENSES

02:10:18   10   AND COST OF REVENUE AND THERE'S 167 MILLION IN PARENTHESES.

02:10:23   11        WHAT DID YOU UNDERSTAND THAT TO BE?

02:10:26   12   A.    THAT WOULD BE -- YOU KNOW, ALL OF THE -- I'M NOT SURE WHY

02:10:30   13   THEY SAY COST OF REVENUE, BUT IT WOULD BE ALL THE OPERATING

02:10:33   14   EXPENSES OF THE BUSINESS.

02:10:34   15   Q.    OKAY.  AND WAS IT ATTRACTIVE TO YOU THAT THERANOS WAS

02:10:39   16   PROJECTING 223 MILLION IN REVENUE WITH OPERATING EXPENSES OF

02:10:44   17   167 MILLION?

02:10:44   18   A.    YES.

02:10:45   19   Q.    OKAY.  HOW SO?

02:10:46   20   A.    WELL, IT SAYS THEY'RE PROFITABLE.  IF YOU LOOK DOWN ONE

02:10:50   21   LINE FURTHER, IT'S CALLED EBITDA, IT'S IN THE SECOND BOX, THEY

02:10:56   22   HAVE CASH FLOW POSITIVE, AFTER PAYING ALL EXPENSES, OF

02:10:59   23   $56 MILLION.  THAT'S A GOOD RESULT.

02:11:03   24   Q.    AND WAS THIS CONSISTENT WITH STATEMENTS MS. HOLMES HAD

02:11:06   25   MADE TO YOU ABOUT THERANOS BEING CASH FLOW NEUTRAL?

BURD DIRECT BY MR. LEACH                                                2964

```
02:11:09   1      A.   WELL, YOU KNOW, THIS WAS 2010, SO THERE'S REALLY NOTHING

02:11:13   2      ON THE INCOME SIDE OF THIS STATEMENT THAT SAYS ANYTHING ABOUT

02:11:18   3      2010.  SO WE DIDN'T GET ANY CONFIRMATION THAT THEY WERE CASH

02:11:22   4      FLOW NEUTRAL IN 2010.

02:11:25   5      Q.   OTHER THAN WHAT MS. HOLMES HAD TOLD YOU PREVIOUSLY?

02:11:28   6      A.   CORRECT.

02:11:29   7      Q.   THIS WASN'T GIVING YOU CONFIRMATION OF THAT?

02:11:31   8      A.   IT DIDN'T GIVE US ANY NUMBERS.

02:11:34   9      Q.   OKAY.  HOW ABOUT THE FUTURE PERIODS, THE REVENUE OF

02:11:38  10      464 MILLION IN 2012 AND 934 MILLION IN 2013?  WAS THAT

02:11:45  11      ATTRACTIVE TO YOU?

02:11:46  12      A.   YES.

02:11:46  13      Q.   OKAY.  HOW SO?

02:11:48  14      A.   WELL, IT SAYS THE BUSINESS IS CONTINUING TO BUILD AND CASH

02:11:53  15      FLOW AND INCOME WOULD CONTINUE TO RISE, AND SO WE'RE NOT JUST

02:11:58  16      THREE YEARS AND IT'S OVER.  YOU KNOW, THERE'S SOME

02:12:02  17      SUSTAINABILITY HERE.

02:12:03  18      Q.   OKAY.  LET ME DRAW YOUR ATTENTION, PLEASE, TO EXHIBIT 378.

02:12:20  19          DO YOU HAVE THAT IN FRONT OF YOU, SIR?

02:12:23  20      A.   I BELIEVE I DO.  AUGUST 24TH?

02:12:25  21      Q.   YES.

02:12:26  22      A.   YES.

02:12:26  23      Q.   DO YOU SEE SOME HANDWRITING IN THE, I GUESS IT'S THE UPPER

02:12:32  24      LEFT CORNER IF IT'S ONE WAY, THE UPPER RIGHT CORNER IF

02:12:36  25      YOU'RE --
```

02:12:37   1      A.   YES.

02:12:37   2      Q.   OKAY.  AND DO YOU SEE THE FOOTER, BOARD MEETING UNDERSCORE

02:12:42   3      AUGUST 24TH, 2010?

02:12:43   4      A.   I DO.

02:12:44   5      Q.   OKAY.  IS THIS ANOTHER POWERPOINT RELATING TO THERANOS

02:12:49   6      THAT YOU PRESENTED TO THE SAFEWAY BOARD?

02:12:50   7      A.   YES, IT IS.

02:12:55   8           MR. LEACH:  OKAY.  YOUR HONOR, I OFFER EXHIBIT 378

02:12:57   9      INTO EVIDENCE.

02:12:58   10          MR. DOWNEY:  NO OBJECTION.

02:12:59   11          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:13:01   12      (GOVERNMENT'S EXHIBIT 378 WAS ADMITTED IN EVIDENCE.)

02:13:02   13          MR. LEACH:  AND MS. HOLLIMAN, IF WE COULD PLEASE GO

02:13:08   14      TO PAGE 2.

02:13:11   15      Q.   DO YOU SEE WHERE IT SAYS, THERANOS MINI BLOOD LAB DEAL,

02:13:16   16      MR. BURD?

02:13:17   17      A.   I DO.

02:13:17   18      Q.   OKAY.  AND IS THAT A REFERENCE TO THE MINI LAB DEVICE THAT

02:13:21   19      YOU UNDERSTOOD THERANOS WANTED TO PUT IN SAFEWAY STORES?

02:13:25   20      A.   YES, IT IS.

02:13:26   21      Q.   OKAY.  AND THERE ARE FOUR BULLETS, THE NETWORK; FEE

02:13:31   22      STRUCTURE; SAFEWAY'S FINANCIAL COMMITMENT; AND FINANCIALS.

02:13:35   23           DO YOU SEE THAT?

02:13:38   24      A.   YES.

02:13:39   25      Q.   I WANT TO DRAW YOUR ATTENTION, PLEASE, TO THE SLIDE FOR

BURD DIRECT BY MR. LEACH                                    2966

```
02:13:41  1      THE THERANOS FEE STRUCTURE.  IT'S ON PAGE 4.
02:13:54  2          DO YOU SEE THE FIRST BULLET, "WALGREENS AND SAFEWAY WILL
02:13:58  3   BE GUARANTEED TO HAVE THE LOWEST COST OF GOODS"?
02:14:04  4   A.   YES.
02:14:05  5   Q.   WHAT DID THAT MEAN?
02:14:06  6   A.   WE HAD BEEN TOLD THAT WALGREENS WAS ALSO GOING TO CARRY
02:14:09  7   THIS MINI LAB, AND IT WAS IMPORTANT TO US THAT THEY NOT GET OUT
02:14:13  8   AHEAD OF US.
02:14:15  9          AND SO THIS SAID THAT, ON THE COST SIDE OF THE EQUATION,
02:14:20 10   THEY WOULDN'T HAVE A COST ADVANTAGE.  WE'D HAVE -- YOU KNOW,
02:14:24 11   BOTH COMPANIES WOULD HAVE THE LOWEST COST, WHICH GAVE THEM THE
02:14:27 12   FREEDOM TO CHARGE NEW RETAILERS A HIGHER PRICE IF THEY CHOSE TO
02:14:32 13   DO SO.
02:14:34 14   Q.   OKAY.  AND THEN THE NEXT BULLET SAYS, "SAFEWAY WILL BE
02:14:39 15   GUARANTEED AN AVERAGE $10 GROSS MARGIN PER TEST."
02:14:47 16          WHAT DID THAT REFER TO?
02:14:48 17   A.   WHENEVER YOU DRAW BLOOD, HOWEVER YOU DRAW IT, IT CAN BE --
02:14:54 18   YOU CAN OFTEN GET SEVERAL DIFFERENT BLOOD TESTS FROM A SINGLE
02:14:58 19   VIAL OR A SINGLE SAMPLE.
02:15:00 20          AND SO IF YOU HAD A CHOLESTEROL TEST, THAT'S ONE TEST.  IF
02:15:05 21   YOU HAD A PSA TEST, THAT'S A SECOND TEST.  IF YOU HAD AN HBA1C,
02:15:11 22   ET CETERA.
02:15:13 23   Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO THE NEXT PAGE,
02:15:18 24   PAGE 5, AND FOCUS ON SAFEWAY'S FINANCIAL COMMITMENT.
02:15:27 25          AT A HIGH LEVEL, MR. BURD, CAN YOU DESCRIBE FOR US WHAT'S
```

BURD DIRECT BY MR. LEACH                                                    2967

```
02:15:32   1      DEPICTED HERE?

02:15:33   2      A.   WELL, WE INDICATED A POSSIBLE INVESTMENT IN THERANOS THAT

02:15:41   3      WOULD BE $55 MILLION.  THAT WOULD COME IN TWO EVENTS.  ONE IS A

02:15:49   4      PRE-PURCHASE OF INVENTORY WHEN CERTAIN MILESTONES WERE HIT, AND

02:15:56   5      THE 25 WOULD COME LATER.

02:15:57   6           AND THEN WE -- EARLY ON, WE ANTICIPATED SPENDING

02:16:01   7      $30 MILLION OF MONEY REMODELING OUR STORES.  THAT NUMBER TURNED

02:16:05   8      OUT TO BE VERY LOW BECAUSE WE PUT A BATHROOM IN EACH FACILITY,

02:16:09   9      WHICH MEANT WE DUG UP THE STORE AND THE CONCRETE.

02:16:12  10      Q.   OKAY.  SO I THINK YOU'RE REFERRING TO THE, AT FIRST, THE

02:16:17  11      FIRST BULLET, 55 MILLION CASH INVESTMENT.

02:16:21  12           DO YOU SEE THAT LANGUAGE?

02:16:22  13      A.   YES.

02:16:22  14      Q.   AND THEN IT SAYS, "25 MILLION IN NOTES CONVERTIBLE TO

02:16:25  15      EQUITY."

02:16:26  16           DO YOU SEE THAT?

02:16:27  17      A.   YES.

02:16:28  18      Q.   WHAT ARE NOTES CONVERTIBLE TO EQUITY?

02:16:31  19      A.   NOTES ARE BASICALLY A LOAN, YOU KNOW, LIKE A MORTGAGE OR

02:16:34  20      SOMETHING.  BUT YOU COULD CONVERT THAT INTO EQUITY AT SOME

02:16:38  21      POINT IN THE FUTURE IF THAT MADE GOOD SENSE TO YOU.

02:16:41  22      Q.   AND WHY WAS SAFEWAY INTERESTED IN DOING THAT?

02:16:45  23      A.   WELL, IF THE COMPANY WAS GOING TO BE A HIGH FLIER, YOU

02:16:50  24      KNOW, WE WOULDN'T WANT TO JUST HOLD DEBT.  WE WOULD WANT SOME

02:16:54  25      EQUITY IN THE COMPANY.
```

BURD DIRECT BY MR. LEACH                                                 2968

```
02:16:55   1      Q.   AND THEN THERE'S A "30 MILLION FOR PRE-PURCHASE OF

02:17:00   2      INVENTORY."

02:17:02   3           WHAT IS INVENTORY IN THIS CONTEXT?

02:17:05   4      A.   IN THIS CONTEXT, IT WAS THE CARTRIDGES.

02:17:09   5           SO AT THIS POINT, I'M NOT SURE WE HAD AN AGREEMENT ON THE

02:17:12   6      PRICE OF THE CARTRIDGE, BUT WE HAD TO WAREHOUSE THESE

02:17:17   7      CARTRIDGES AND WE HAD TO KEEP THEM IN OUR STORES.

02:17:20   8      Q.   LET'S LOOK AT THE NEXT PAGE, PLEASE, PAGE 6.

02:17:29   9           DO YOU SEE WHERE IT SAYS PILOT TESTS?

02:17:32  10      A.   YES.

02:17:33  11      Q.   AND THE FIRST BULLET, "JANUARY 2011 SCHEDULED FOR INITIAL

02:17:36  12      TEST."

02:17:37  13      A.   CORRECT.

02:17:38  14      Q.   WAS THAT YOUR UNDERSTANDING OF THE TIMING THAT YOU WERE

02:17:40  15      LOOKING FOR FOR THIS DEAL?

02:17:42  16      A.   YES.

02:17:43  17      Q.   OKAY.  "RURAL WASHINGTON STATE MARKET SELECTED DUE TO LACK

02:17:47  18      OF RETAIL LAB COMPETITORS."

02:17:51  19           YOU MENTIONED REMOTE LOCATIONS.  IS THAT RURAL WASHINGTON

02:17:55  20      STATE?

02:17:55  21      A.   THAT'S IT.

02:17:55  22      Q.   OKAY.  THAT'S WHERE YOU WANTED TO DO THE MINI PILOT?

02:17:59  23      A.   YES.

02:17:59  24      Q.   OKAY.  THAT'S WHERE THERANOS WANTED TO DO THE MINI PILOT?

02:18:03  25      A.   YEAH.  I THINK WE CALLED IT THE INITIAL TEST.
```

BURD DIRECT BY MR. LEACH                                                    2969

```
02:18:12   1    Q.   OKAY.  LET'S BRIEFLY LOOK AT PAGE 9, PLEASE.

02:18:22   2         AND IS THIS ANOTHER DESCRIPTION OF THE ANTICIPATED PROGRAM

02:18:26   3    ROLLOUT AS YOU SAW IT IN THIS TIME PERIOD?

02:18:29   4    A.   YES, IT IS.

02:18:31   5    Q.   OKAY.  THIS IS SIMILAR TO THE SLIDE WE SAW IN THE PRIOR

02:18:35   6    BOARD MEETING?

02:18:36   7    A.   SIMILAR.

02:18:36   8    Q.   OKAY.  LET ME PLEASE DRAW YOUR ATTENTION TO WHAT HAS BEEN

02:18:40   9    MARKED AS EXHIBIT 387.

02:18:46  10         AND I OFFER THIS INTO EVIDENCE.

02:18:48  11              MR. DOWNEY:  YOUR HONOR, I HAVE NO OBJECTION TO THIS.

02:18:50  12         I THINK THIS IS THE SAME AS THE SIGNED VERSION OF THE

02:18:53  13    DOCUMENT.  THIS VERSION IS NOT FULLY SIGNED, SO MAYBE WE CAN

02:18:57  14    SUBSTITUTE THAT AT THE APPROPRIATE TIME.

02:18:59  15              MR. LEACH:  I THINK IT'S SIGNED IN DIFFERENT PARTS,

02:19:01  16    WHICH I'LL GO THROUGH, YOUR HONOR.

02:19:03  17              THE COURT:  OKAY.  THIS IS ADMITTED AND IT MAY BE

02:19:05  18    PUBLISHED.

02:19:05  19         (GOVERNMENT'S EXHIBIT 387 WAS ADMITTED IN EVIDENCE.)

02:19:06  20              MR. LEACH:  AND IF WE COULD PLEASE HIGHLIGHT THE --

02:19:14  21    OR ZOOM IN ON THE SUBSTANCE OF THE DOCUMENT, MS. HOLLIMAN, ALL

02:19:18  22    THE WAY DOWN TO SCHEDULE H.

02:19:22  23              THE WITNESS:  DID YOU SAY A OR 8?

02:19:25  24    BY MR. LEACH:

02:19:26  25    Q.   I WAS GIVING MS. HOLLIMAN, OUR PARALEGAL, SOME DIRECTIONS
```

UNITED STATES COURT REPORTERS

**ER-6719**

                              BURD DIRECT BY MR. LEACH                    2970

02:19:30   1       ON WHAT TO HIGHLIGHT ON THE SCREEN.

02:19:31   2       A.   OKAY.

02:19:32   3       Q.   SO I'M GOING TO STAY ON PAGE 1 FOR NOW, AND YOU CAN EITHER

02:19:36   4       LOOK ON THE SCREEN OR AT THE HARD COPY, WHATEVER YOU PREFER,

02:19:39   5       MR. BURD.

02:19:40   6            DO YOU SEE AT THE TOP WHERE IT SAYS THERANOS MASTER

02:19:43   7       PURCHASE AGREEMENT?

02:19:44   8       A.   I DO.

02:19:45   9       Q.   OKAY.  AND IS THIS THE WRITTEN AGREEMENT BETWEEN SAFEWAY

02:19:47   10      AND THERANOS THAT WE'VE BEEN -- THAT YOU WERE CONTEMPLATING UP

02:19:52   11      UNTIL THIS POINT?

02:19:53   12      A.   YES.

02:19:53   13      Q.   OKAY.  AND YOU HAD A HAND IN NEGOTIATING THIS?

02:19:56   14      A.   I DID.

02:19:56   15      Q.   WHO DID YOU NEGOTIATE WITH FROM THERANOS?

02:19:59   16      A.   IT WAS ALMOST EXCLUSIVELY WITH ELIZABETH HOLMES.

02:20:08   17      SUNNY BALWANI WAS INVOLVED IN A COUPLE OF DISCUSSIONS, BUT MOST

02:20:12   18      OF IT WAS WITH ELIZABETH.

02:20:14   19      Q.   OKAY.  WAS THAT UNUSUAL?

02:20:18   20      A.   WHAT WAS UNUSUAL ABOUT IT IS THAT WE NEVER SAW AN

02:20:24   21      ATTORNEY.  AND YOU KNOW IT'S CUSTOMARY, WHEN YOUR GENERAL

02:20:28   22      COUNSEL IS IN THE ROOM, THEIR GENERAL COUNSEL'S ON THE PHONE.

02:20:31   23           SO ELIZABETH APPEARED TO BE NEGOTIATING THIS COMPLETELY ON

02:20:34   24      HER OWN, PROBABLY TALKING TO COUNSEL OFFLINE.  BUT I'VE NEVER

02:20:38   25      SEEN THAT DONE.


                              UNITED STATES COURT REPORTERS


                                   **ER-6720**

BURD DIRECT BY MR. LEACH                                          2971

```
02:20:38   1        Q.   THE DATE OF THIS AT THE TOP IS SEPTEMBER 20TH, 2010.  IS

02:20:44   2     THAT CONSISTENT WITH YOUR MEMORY?

02:20:46   3        A.   YES.

02:20:50   4        Q.   OKAY.  AND THIS AGREEMENT CONSISTS OF DIFFERENT SCHEDULES

02:20:53   5     A THROUGH H.

02:20:54   6             DO YOU SEE THAT IN THE BOTTOM RIGHT?

02:20:55   7        A.   I DO.

02:20:56   8        Q.   OKAY.  AND IF WE LOOK AT PAGE 2, PLEASE.

02:21:09   9             DO YOU SEE MS. HOLMES'S SIGNATURE?

02:21:13  10        A.   I DO.

02:21:14  11        Q.   OKAY.  AND IF WE COULD PLEASE GO TO PAGE 54.

02:21:27  12             IS THAT YOUR SIGNATURE?

02:21:29  13        A.   YES, IT IS.

02:21:30  14        Q.   OKAY.  AND YOU THINK THIS MAY HAVE BEEN -- OR COULD IT

02:21:33  15     HAVE BEEN THIS WAS SIGNED AT DIFFERENT TIMES BY THE DIFFERENT

02:21:36  16     PARTIES?

02:21:37  17        A.   IF IT WAS, IT WAS, YOU KNOW, ONE DAY AND THEN THE NEXT.

02:21:40  18        Q.   OKAY.  LET'S LOOK AT THE SCHEDULE A, PROGRAM OVERVIEW, ON

02:21:45  19     PAGE 3.  AND IF WE COULD ZOOM IN ON THE TOP HALF OF THE

02:21:56  20     DOCUMENT, PLEASE, MS. HOLLIMAN.

02:22:02  21             MR. BURD, DO YOU SEE THE FIRST PARAGRAPH UNDER THE

02:22:04  22     HEADING 1, BACKGROUND?

02:22:07  23        A.   YES.

02:22:08  24        Q.   OKAY.

02:22:09  25        A.   YES.
```

BURD DIRECT BY MR. LEACH                                                    2972

```
02:22:09   1    Q.   AND THIS SAYS, "THERANOS HAS DEVELOPED, AND IS DEVELOPING,

02:22:13   2    GENERATIONS OF 'MINI-LAB' DEVICES THAT CAN RUN ANY BLOOD TEST

02:22:19   3    IN REAL-TIME FOR LESS THAN THE TRADITIONAL COST OF CENTRAL LAB

02:22:23   4    TESTS."

02:22:24   5        IS THAT SOMETHING THAT MS. HOLMES HAD SAID TO YOU

02:22:26   6    PREVIOUSLY?

02:22:27   7    A.   YES, SHE DID.

02:22:28   8    Q.   OKAY.  AND WAS THAT RELEVANT TO YOU IN DECIDING TO ENTER

02:22:32   9    INTO THIS AGREEMENT AND PURCHASE THE NOTES?

02:22:35  10    A.   IT WAS ESSENTIAL.

02:22:36  11    Q.   OKAY.  "THE THERANOS SYSTEMS WILL RUN ROUTINE LABORATORY

02:22:41  12    TESTS AND PROPRIETARY TESTS THAT DETECT THE APPEARANCE OF

02:22:44  13    DISEASES, ENABLING EARLY INTERVENTION AND INITIATION OF

02:22:48  14    TREATMENT LONG BEFORE COMPLICATIONS EMERGE."

02:22:50  15        WAS THAT SOMETHING MS. HOLMES DESCRIBED TO YOU?

02:22:53  16    A.   YES.

02:22:53  17    Q.   OKAY.  AND WAS THAT RELEVANT TO YOU?

02:22:55  18    A.   YES.

02:22:56  19    Q.   WHY WAS THAT?

02:22:58  20    A.   I THINK THIS WAS PART OF THE VISION THAT, YOU KNOW,

02:23:03  21    CONSUMERS WOULD SOME DAY BE ABLE TO DO THIS ON THEIR OWN AND

02:23:08  22    OBVIOUSLY GET IT INTERPRETED BY A PROFESSIONAL.

02:23:11  23        BUT THAT WOULD SAY THAT IT WOULD BE HIGH DEMAND, YOU KNOW,

02:23:15  24    FOR THIS KIND OF SERVICE.

02:23:17  25    Q.   TO THE RIGHT THERE'S AN IMAGE OF WHAT LOOKS LIKE A MOBILE
```

2973

BURD DIRECT BY MR. LEACH

02:23:23  1    DEVICE AND THEN ANOTHER DEVICE IN THE MIDDLE AND SOMETHING TO

02:23:28  2    THE RIGHT.

02:23:29  3        DOES THAT APPEAR TO BE THE CARTRIDGE AND THE DEVICE THAT

02:23:32  4    WAS IN SOME OTHER BOARD SLIDES WE'VE LOOKED AT?

02:23:34  5    A.   IT DOES.

02:23:35  6    Q.   OKAY.  AND IS THIS WHAT YOU WERE CONTEMPLATING WOULD BE

02:23:39  7    USED IN SAFEWAY STORES?

02:23:41  8    A.   YOU KNOW, IT OR SOME VERSION OF IT.  YOU KNOW, AS I SAID,

02:23:44  9    IT CONTINUED TO EVOLVE.

02:23:46  10   Q.   OKAY.  IF WE COULD PLEASE ZOOM OUT, MS. HOLLIMAN, AND GO

02:23:50  11   TO THE BOTTOM TWO PARAGRAPHS.

02:23:57  12       MR. BURD, DO YOU SEE WHERE IT SAYS, "THE ABILITY TO RUN

02:24:00  13   BLOOD TESTS FROM A FINGER-STICK IN 30 MINUTES OR LESS AT

02:24:03  14   SAFEWAY'S STORES CREATES A NEW WORKFLOW AND A NEW DIAGNOSTIC

02:24:09  15   PARADIGM FOR HEALTH CARE"?

02:24:10  16       IS THAT CONSISTENT WITH REPRESENTATIONS THAT MS. HOLMES

02:24:14  17   MADE TO YOU?

02:24:14  18   A.   YES.

02:24:15  19   Q.   AND WAS THAT RELEVANT TO YOU?

02:24:16  20   A.   YES.

02:24:17  21   Q.   AND WAS THAT SOMETHING YOU BELIEVED THERANOS COULD DO AT

02:24:21  22   THE TIME?

02:24:21  23   A.   I SURE DID.

02:24:25  24   Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PAGE 5.  WE'VE TALKED

02:24:38  25   A LITTLE BIT ABOUT THE CONVERTIBLE NOTES, MR. BURD.

BURD DIRECT BY MR. LEACH                                              2974

```
02:24:41   1          AND IF WE COULD PLEASE HIGHLIGHT THE ENTIRETY OF 6A AND B?

02:24:45   2    DOWN A LITTLE BIT MORE, PLEASE.  A LITTLE BIT MORE.  THAT'LL

02:24:50   3    DO, MS. HOLLIMAN.  THAT'S GREAT.  THANK YOU.

02:24:55   4          DO YOU SEE IN NUMBER 6 WHERE IT SAYS CONVERTIBLE NOTES,

02:24:59   5    MR. BURD, UP IN THE TOP LEFT?

02:25:04   6    A.   YEAH, UP IN THE TOP LEFT.

02:25:08   7          IN THE FIRST PARAGRAPH, SMALL A?

02:25:10   8    Q.   WELL, I WAS TALKING JUST ABOUT THE HEADING, 6?

02:25:12   9    A.   OH, IN THE HEADING.  OKAY.  I WAS A LITTLE LOWER THAN YOU.

02:25:15  10    Q.   OKAY.  AND I WANTED TO DRAW YOUR ATTENTION TO 6B?

02:25:20  11    A.   YES.

02:25:21  12    Q.   1, 2, 3.

02:25:23  13          DOES THIS PROVIDE FOR SAFEWAY ACQUIRING -- HAVING THE

02:25:28  14    OPTION TO ACQUIRE A CONVERTIBLE NOTE IN THE AMOUNT OF

02:25:34  15    $10 MILLION?

02:25:34  16    A.   YES.

02:25:35  17    Q.   OKAY.  AND THERE ARE CERTAIN CONDITIONS ON SAFEWAY'S

02:25:39  18    ABILITY TO DO THAT?

02:25:40  19    A.   CORRECT.

02:25:41  20    Q.   AND WHEN YOU SAY CONVERTIBLE NOTE, AT SOME POINT THAT CAN

02:25:45  21    BE CONVERTED INTO EQUITY?

02:25:46  22    A.   CORRECT.

02:25:47  23    Q.   IS THAT WHAT YOU SAID EARLIER?  OKAY.

02:25:50  24          LET'S START -- LET ME DRAW YOUR ATTENTION TO THE BOTTOM

02:25:54  25    PART.  AND DO YOU SEE WHERE IT SAYS ADDITIONAL CONVERTIBLE
```

BURD DIRECT BY MR. LEACH                                           2975

02:26:04   1    NOTE?

02:26:04   2    A.   I DO.

02:26:05   3    Q.   AND DOES THIS PROVIDE FOR -- GIVE SAFEWAY THE ABILITY TO

02:26:09   4    ACQUIRE AN ADDITIONAL NOTE CONVERTIBLE INTO EQUITY, INTO

02:26:15   5    THERANOS EQUITY?

02:26:16   6    A.   YES, IT DOES.

02:26:17   7    Q.   OKAY.  LET ME DRAW YOUR ATTENTION, PLEASE, TO PAGE 8.

02:26:30   8         AND IF WE COULD ZOOM IN ON THE TOP PORTION OF THIS, ALL

02:26:34   9    THE WAY DOWN TO 3B.

02:26:42   10        MR. BURD, DO YOU SEE WHERE IT SAYS SCHEDULE B, PURCHASING

02:26:46   11   TERMS AND CONDITIONS?

02:26:47   12   A.   YES.

02:26:48   13   Q.   AND DOES THIS SCHEDULE LAY OUT ADDITIONAL TERMS OF THE

02:26:55   14   PURCHASE OF CARTRIDGES, THE PILOT PROGRAM, AND OTHER DETAILS

02:26:58   15   RELATING TO THE POTENTIAL LAUNCH IN SAFEWAYS?

02:27:01   16   A.   YES.

02:27:01   17   Q.   OKAY.  PARAGRAPH 2 INCLUDES SOMETHING CALLED BEST PRICE

02:27:06   18   GUARANTEE.

02:27:07   19        DO YOU SEE THAT?

02:27:08   20   A.   YES, I DO.

02:27:09   21   Q.   OKAY.  AND THIS SAYS, "FOR ALL CARTRIDGES DEFINED AS

02:27:15   22   AVAILABLE CARTRIDGES, THERANOS AGREES THAT NO UNITED STATES

02:27:20   23   RETAILER OR ENTITY OPERATING IN A RETAIL ENVIRONMENT SELLING

02:27:24   24   THERANOS SYSTEMS OR ANY DOCTOR," AND THEN IT CONTINUES.

02:27:31   25        IS THIS THE -- WHAT IS THIS PARAGRAPH GETTING AT?

BURD DIRECT BY MR. LEACH                                                    2976

```
02:27:33   1       A.   IN SOME CONTEXTS, THIS IS REFERRED TO AS KIND OF A FAVORED

02:27:37   2    NATIONS CLAUSE.  IT BASICALLY SAYS THAT WE WILL ALWAYS HAVE THE

02:27:43   3    LOWEST PRICE OFFERED IN THE MARKET.

02:27:44   4       Q.   OKAY.  AND WAS THAT IMPORTANT TO YOU?

02:27:47   5       A.   YES.

02:27:47   6       Q.   OKAY.  IF WE CAN PLEASE ZOOM OUT, MS. HOLLIMAN, AND I WANT

02:27:52   7    TO FOCUS ON 3B, THE PRE-PILOT PERIOD.  ALL THE WAY DOWN, YES.

02:28:09   8            DOES THIS PORTION LAY OUT SOME OF THE RESPONSIBILITIES OF

02:28:12   9    THE PARTIES RELATING TO THE PRE-PILOT PERIOD, MR. BURD?

02:28:16  10       A.   YES, IT DOES.

02:28:16  11       Q.   OKAY.  AND IN 3B1, IT SAYS, "THERANOS WILL SECURE THE

02:28:22  12    REGULATORY APPROVALS AND SAFEWAY WILL SECURE ANY APPROVALS

02:28:25  13    REQUIRED FOR THE PILOT OF THE PROGRAM UNDER CLIA AND OTHER

02:28:29  14    APPLICABLE LAWS, RULES AND REGULATIONS."

02:28:32  15            WAS THAT RELEVANT TO YOU?

02:28:33  16       A.   YES.

02:28:34  17       Q.   WHY WAS THERANOS SECURING REGULATORY APPROVALS RELEVANT TO

02:28:38  18    YOU?

02:28:38  19       A.   YOU CAN'T OPERATE A LAB ANYWHERE IN THIS COUNTRY THAT'S

02:28:45  20    NOT CLIA APPROVED, AND SO THEY NEEDED THAT TO GET SANCTIONED TO

02:28:54  21    HAVE A LAB AT ALL.

02:28:55  22       Q.   FURTHER DOWN IN 3B5, IT SAYS, "THERANOS WILL MEET AGREED

02:29:00  23    UPON SERVICE STANDARDS, INCLUDING THE PROVISION OF BLOOD TEST

02:29:03  24    RESULTS IN 30 MINUTES OR LESS, AND SATISFACTORY SERVICE AND

02:29:06  25    SUPPORT OF THE DELIVERABLES."
```

02:29:08  1          DO YOU SEE THAT LANGUAGE?

02:29:10  2      A.   YES.

02:29:10  3      Q.   AND WAS THAT 30 MINUTES OR LESS RELEVANT TO YOU?

02:29:12  4      A.   YES, THAT'S WHY IT WAS PUT HERE.

02:29:15  5      Q.   OKAY.  LET'S MOVE AHEAD TO PAGE 26.

02:29:33  6          AND DOES THIS SCHEDULE, MR. BURD, LAY OUT SOME OF THE

02:29:36  7  DEFINITIONS THAT ARE USED IN THIS AGREEMENT?

02:29:38  8      A.   YES.

02:29:39  9      Q.   OKAY.  IS THIS AN IMPORTANT PART OF THE AGREEMENT FOR YOU?

02:29:41  10     A.   YOU KNOW, DEFINITIONS ARE IMPORTANT.  THEY'RE IN EVERY

02:29:45  11  CONTRACT REGARDLESS OF WHO YOU'RE SIGNING IT WITH.

02:29:48  12     Q.   OKAY.  I'D LIKE TO DRAW YOUR ATTENTION TO NUMBER 8,

02:29:55  13  DEVICE.

02:29:58  14         DO YOU SEE WHERE IT SAYS, "'DEVICE' MEANS THERANOS'S

02:30:05  15  READER CAPABLE OF RUNNING CARTRIDGES," AND THEN CONTINUING ON?

02:30:09  16     A.   YES, I SEE THAT.

02:30:11  17     Q.   OKAY.  IS THAT CONSISTENT WITH YOUR IDEA OF THE MINI LAB

02:30:15  18  THAT WAS GOING TO BE PUT IN SAFEWAY STORES?

02:30:17  19     A.   YES, IT IS.

02:30:18  20     Q.   AT ANY POINT IN TIME, DID YOU DISCUSS WITH MS. HOLMES THE

02:30:23  21  IDEA OF PUTTING THIRD PARTY MACHINES IN SAFEWAY STORES?

02:30:30  22     A.   MEANING ANOTHER LAB?

02:30:32  23     Q.   CORRECT.

02:30:32  24     A.   NO.

02:30:32  25     Q.   HOW ABOUT MACHINES MANUFACTURED BY SOME PARTY OTHER THAN

BURD DIRECT BY MR. LEACH                                          2978

```
02:30:36   1    THERANOS?

02:30:36   2    A.   NO.

02:30:37   3    Q.   WERE YOU AT ALL INTERESTED IN THAT?

02:30:39   4    A.   NO.

02:30:39   5    Q.   WHY NOT?

02:30:43   6    A.   IT DIDN'T -- WHEN YOU CREATE A NEW BUSINESS LIKE THIS AND

02:30:47   7    A NEW OPPORTUNITY FOR A PARTNER, IT HAS TO BE SUFFICIENTLY

02:30:51   8    DIFFERENT FROM EVERYBODY ELSE IN THE MARKET.  IT HAS TO BE

02:30:54   9    LOWER COST, IT HAS TO BE QUICKER, IT HAS TO BE BETTER.  THOSE

02:30:57  10    ARE FEATURES THAT ARE ATTRACTIVE TO NEW CONSUMERS.

02:31:01  11    Q.   SO SAFEWAY SIGNS THE AGREEMENT WITH THERANOS IN OR AROUND

02:31:08  12    SEPTEMBER OF 2010?

02:31:10  13    A.   CORRECT.

02:31:10  14    Q.   OKAY.  SUBSEQUENT TO THAT TIME PERIOD, DID YOU HAVE

02:31:16  15    MEETINGS AND CONVERSATIONS WITH MS. HOLMES ABOUT THE ONGOING

02:31:19  16    RELATIONSHIP?

02:31:20  17    A.   WE, WE HAD LOTS OF PHONE CALLS, EMAILS.  WE WORKED -- WE

02:31:29  18    BOTH WORKED VERY HARD ON THIS, AND THIS WAS -- IT WAS STRATEGIC

02:31:33  19    TO SAFEWAY, WHICH IS WHY THE CEO OF SAFEWAY IS INVOLVED IN

02:31:37  20    THIS.  IT'S A BIG DEAL.

02:31:38  21    Q.   THAT'S WHAT I WANTED TO GET AT, MR. BURD.

02:31:40  22         WHO AT THERANOS DID YOU HAVE CONTACT WITH?

02:31:43  23    A.   MY CONTACT WAS ELIZABETH HOLMES.

02:31:46  24    Q.   OKAY.  DID YOU HAVE CONTACT WITH OTHERS AT THERANOS?

02:31:49  25    A.   SOME.  I HAD CONTACT WITH SUNNY BALWANI.  HE WOULD HAVE
```

BURD DIRECT BY MR. LEACH                                                    2979

```
02:31:56   1      BEEN THE SECOND MOST CONTACTED.

02:31:59   2          I HAD CONTACT WITH ELIZABETH'S BROTHER, I THINK HIS FIRST

02:32:05   3      NAME WAS CHRISTOPHER, BUT MUCH MORE LIMITED.

02:32:09   4          AND THEN I MET A FEW PEOPLE FROM THERANOS, BUT ONLY WHILE

02:32:13   5      DOWN AT THERANOS.

02:32:14   6      Q.   OKAY.  DID YOU MEET WITH THEM ONE ON ONE, OR WAS

02:32:18   7      MS. HOLMES INVOLVED IN THOSE CONTACTS?

02:32:20   8      A.   WE HAD A -- WE HAD A SMALL TEAM AT SAFEWAY THAT HAD A BIT

02:32:26   9      MORE INTERACTION WITH ELIZABETH'S BROTHER.  I WAS INVOLVED IN A

02:32:34  10      COUPLE OF THOSE PHONE CALLS.

02:32:37  11          WHEN ELIZABETH CAME UP TO THE COMPANY, MORE OFTEN THAN NOT

02:32:42  12      IT WAS JUST HER.

02:32:43  13          WHEN I WENT DOWN TO THERANOS -- I HAVE TO THINK ABOUT IT.

02:32:49  14      I THINK IT WAS COMMON FOR THE MEETING TO BE MOSTLY ELIZABETH

02:32:52  15      AND SHE WOULD BRING PEOPLE IN MAYBE FOR DIFFERENT THINGS.

02:32:55  16      Q.   OKAY.  WERE THERE OCCASIONS WHERE YOU MET WITH MS. HOLMES

02:32:59  17      AND MR. BALWANI TOGETHER?

02:33:00  18      A.   YES.

02:33:01  19      Q.   IN THOSE MEETINGS, WHO WAS IN CHARGE?

02:33:04  20      A.   ELIZABETH.

02:33:05  21      Q.   WHY DO YOU SAY THAT?

02:33:07  22      A.   I SAY THAT BECAUSE SHE NEVER HESITATED -- OR SHE NEVER

02:33:15  23      LOOKED OVER AT SUNNY TO SEE WHAT HE MIGHT HAVE BEEN THINKING.

02:33:19  24      SHE ANSWERED THESE QUESTIONS HERSELF.

02:33:24  25          YOU KNOW, SHE'S THE KIND OF LEADER -- YOU KNOW, IN MANY
```

BURD DIRECT BY MR. LEACH                                                2980

```
02:33:28   1    WAYS, I'M THAT KIND OF LEADER.  I'M INTO THE DETAILS AND I CAN

02:33:35   2    ANSWER ALL OF THE QUESTIONS THAT YOU WOULD ASK ME ABOUT A

02:33:38   3    SUPERMARKET.

02:33:38   4    Q.   SO AS THE CEO OF SAFEWAY, I TAKE IT YOU'VE HAD

02:33:42   5    INTERACTIONS WITH CEO'S OF OTHER COMPANIES?

02:33:45   6    A.   YES.

02:33:45   7    Q.   AND YOU'VE HAD INTERACTIONS WITH POLITICIANS OR REGULATORS

02:33:51   8    RELEVANT TO SAFEWAY'S BUSINESS?

02:33:52   9    A.   IN BOTH CATEGORIES, HUNDREDS.

02:33:54  10    Q.   OKAY.  AND HOW WOULD YOU COMPARE THOSE INTERACTIONS TO

02:33:58  11    YOUR INTERACTIONS WITH MS. HOLMES?

02:33:59  12    A.   I WOULD SAY THAT NOT ALL CEO'S ARE ALIKE, AND SHE WOULD

02:34:12  13    RISE TO THE TOP OF THE PILE IN TERMS OF, IN TERMS OF VISION, IN

02:34:18  14    TERMS OF COMMAND OF THE INFORMATION, CLEARLY IN TERMS OF

02:34:24  15    DELIVERY.  THERE WAS NOTHING ABOUT ELIZABETH HOLMES THAT WAS --

02:34:32  16    SHE WAS ALWAYS DECISIVE.

02:34:36  17    Q.   HOW ABOUT HER COMMAND WITHIN A PARTICULAR MEETING?  WOULD

02:34:41  18    YOU COMPARE IT TO ANYBODY ELSE?

02:34:42  19    A.   YOU KNOW, I'VE SOMETIMES USED THE TERM "OWNS THE ROOM,"

02:34:52  20    OKAY?  SO WHEN SHE PRESENTED TO OUR BOARD, WHEN SHE WAS

02:34:56  21    TALKING, SHE OWNED THE ROOM.

02:35:00  22         WHEN SHE -- WHENEVER SHE WAS TALKING, SHE OWNED THE ROOM.

02:35:05  23         I'VE HAD THE, I GUESS THE PRIVILEGE OF MEETING FOUR U.S.

02:35:09  24    PRESIDENTS.  WHEN THE PRESIDENT IS IN THE ROOM, LET ME JUST

02:35:13  25    TELL YOU, THE PRESIDENT OWNS THE ROOM.  NO ONE TALKS UNLESS
```

UNITED STATES COURT REPORTERS

**ER-6730**

| | | |
|---|---|---|
| 02:35:18 | 1 | SPOKEN TO. |
| 02:35:20 | 2 | BUT I WOULD TELL YOU THAT HER STYLE WAS VERY -- IT WAS |
| 02:35:25 | 3 | WARM, IT WAS FRIENDLY, IT WASN'T DICTATORIAL.  I ALWAYS THOUGHT |
| 02:35:32 | 4 | SHE WAS A GOOD LISTENER. |
| 02:35:33 | 5 | Q.  WERE YOU AWARE AT ANY POINT -- OR PRIOR TO 2015, WERE YOU |
| 02:35:39 | 6 | AWARE THAT MS. HOLMES HAD A ROMANTIC RELATIONSHIP WITH |
| 02:35:43 | 7 | MR. BALWANI? |
| 02:35:43 | 8 | A.  NO.  NO, I WAS NOT. |
| 02:35:45 | 9 | Q.  OKAY.  WOULD THAT HAVE BEEN RELEVANT TO YOU? |
| 02:35:47 | 10 | A.  YES. |
| 02:35:50 | 11 | Q.  WHY? |
| 02:35:50 | 12 | A.  IT WOULD HAVE SAID THAT -- I MEAN, IF I FOUND OUT MID-WAY, |
| 02:35:58 | 13 | I WOULD HAVE SAID, YOU KNOW, WHY DIDN'T I KNOW THIS BEFORE? |
| 02:36:01 | 14 | YOU KNOW? |
| 02:36:02 | 15 | IT JUST RAISES A QUESTION OF WHAT ELSE IS HIDDEN FROM |
| 02:36:06 | 16 | VIEW. |
| 02:36:06 | 17 | Q.  LET ME MOVE FORWARD IN TIME.  SO THE AGREEMENT IS SIGNED |
| 02:36:12 | 18 | IN SEPTEMBER OF 2010.  I WANT TO DRAW YOUR ATTENTION TO WHAT |
| 02:36:18 | 19 | WE'VE MARKED AS EXHIBIT 423. |
| 02:36:34 | 20 | DO YOU HAVE THAT IN FRONT OF YOU, SIR? |
| 02:36:36 | 21 | A.  I DO. |
| 02:36:36 | 22 | Q.  OKAY.  AND DO YOU SEE AN EMAIL FROM MS. HOLMES TO YOU |
| 02:36:39 | 23 | DATED MARCH 15TH, 2011? |
| 02:36:41 | 24 | A.  YES. |
| 02:36:43 | 25 | Q.  AND IS THE SUBJECT PRESENTATION FOR TOMORROW?  OR IT LOOKS |

BURD DIRECT BY MR. LEACH                                              2982

```
02:36:50   1    LIKE IT MIGHT BE A MISSPELLING?

02:36:51   2    A.   I'M GOING TO HAVE TO LOOK AT THIS A LITTLE BIT.  PLEASE

02:36:56   3    SEE ATTACHED.

02:37:04   4        YES, WHAT SHE'S REFERRING TO IS THE PRESENTATION AT THE

02:37:07   5    UPCOMING SAFEWAY BOARD MEETING, WHICH SHE WILL PRESENT.  MUCH

02:37:15   6    THE WAY I WOULD SHARE MY MATERIALS, SHE SHARED HERS.

02:37:19   7            MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 423.

02:37:22   8            MR. DOWNEY:  NO OBJECTION.

02:37:23   9            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:37:26  10        (GOVERNMENT'S EXHIBIT 423 WAS ADMITTED IN EVIDENCE.)

02:37:27  11            MR. LEACH:  AND IF WE COULD ZOOM IN ON THE TOP.

02:37:34  12    PERFECT, MS. HOLLIMAN.  THANK YOU.

02:37:36  13    Q.   SO THE ATTACHMENT, MR. BURD, SAYS THERANOS SWY BOD

02:37:44  14    MEETING.

02:37:44  15        YOU BELIEVE THAT TO BE A REFERENCE TO A SAFEWAY BOARD

02:37:47  16    MEETING WHERE MS. HOLMES PRESENTED?

02:37:49  17    A.   YES, IT IS.

02:37:50  18    Q.   OKAY.  AND YOU TESTIFIED EARLIER ABOUT A MEETING WHERE A

02:37:52  19    BOARD MEMBER'S FINGER WAS PRICKED AND TESTED ON THE THERANOS

02:37:57  20    DEVICE.

02:37:57  21    A.   YES.

02:37:58  22    Q.   OKAY.  AND WHAT HAPPENED WHEN -- DESCRIBE THAT FOR US, NOT

02:38:04  23    WHAT WAS -- NOT WHAT WAS REPORTED TO YOU LATER, BUT WHAT

02:38:07  24    HAPPENED IN THE BOARD MEETING WHEN THAT HAPPENED.

02:38:09  25    A.   WE LOOKED FOR A VOLUNTEER.  MIKE SHANNON SAID HE WOULD
```

BURD DIRECT BY MR. LEACH                                           2983

02:38:16  1        VOLUNTEER.  AND HE WENT THROUGH THE FINGER PRICK, WHICH IS NOT

02:38:20  2        A BIG DEAL, AND THE SAMPLE WAS EXTRACTED AND ULTIMATELY PUT

02:38:26  3        INTO A CARTRIDGE.

02:38:27  4        Q.   AND WAS A RESULT GENERATED?

02:38:29  5        A.   A RESULT WAS NOT GENERATED WHILE WE WERE IN THE ROOM.

02:38:33  6        Q.   OKAY.  DID MS. HOLMES SAY ANYTHING?

02:38:35  7        A.   SHE SAID SOMETHING THAT MADE US THINK WE WOULD GET IT

02:38:40  8        LATER.

02:38:40  9        Q.   OKAY.  TO YOUR KNOWLEDGE, DID SAFEWAY GET IT LATER?

02:38:43  10       A.   NO.

02:38:43  11       Q.   LET'S LOOK AT THE POWERPOINT, PLEASE.  IF WE COULD DRAW

02:38:48  12       YOUR ATTENTION TO PAGE 2.

02:38:52  13            DO YOU SEE WHERE IT SAYS THERANOS AT SAFEWAY, EXECUTIVE

02:38:57  14       BRIEFING 03.2011?

02:39:02  15       A.   I'M ALWAYS ONE AHEAD OF YOU HERE.

02:39:04  16            I SEE THAT, YES.

02:39:06  17       Q.   OKAY.  AND YOU BELIEVE THIS TO BE A POWERPOINT THAT

02:39:08  18       MS. HOLMES PRESENTED TO THE SAFEWAY BOARD?

02:39:10  19       A.   YES, I DO.

02:39:11  20       Q.   OKAY.  LET'S LOOK AT PAGE 3, PLEASE.

02:39:21  21            AND I WANT TO DRAW YOUR ATTENTION, MR. BURD, TO THE FIRST

02:39:25  22       BULLET ON THIS POWERPOINT WHERE IT SAYS, "THERANOS'S

02:39:30  23       PROPRIETARY, PATENTED TECHNOLOGY RUNS COMPREHENSIVE BLOOD TESTS

02:39:34  24       FROM A FINGER-STICK AND TESTS FROM MICRO-SAMPLES AND OTHER

02:39:40  25       MATRICES IN REAL-TIME OUTSIDE THE TRADITIONAL LAB SETTINGS AND

2984
BURD DIRECT BY MR. LEACH

```
02:39:43   1      GENERATES SIGNIFICANTLY HIGHER INTEGRITY DATA THAN CURRENTLY

02:39:47   2      POSSIBLE."

02:39:47   3           DO YOU SEE THAT LANGUAGE?

02:39:49   4      A.   I DO.

02:39:50   5      Q.   AND WAS THAT CONSISTENT WITH WHAT MS. HOLMES HAD BEEN

02:39:52   6      SAYING TO YOU FOR THE BETTER COURSE OF A YEAR IN CONNECTION

02:39:55   7      WITH THE SAFEWAY ARRANGEMENT?

02:39:56   8      A.   IT IS.  I THINK THE, THE INTEGRITY ELEMENT, MEANING

02:40:00   9      SUPERIOR, WASN'T SOMETHING THAT I LOCKED IN ON.  IT MAY HAVE

02:40:06  10      BEEN SAID BEFORE.  IT MAY NOT HAVE BEEN.

02:40:08  11      Q.   OKAY.  IT'S BEING SAID HERE IN THE POWERPOINT TO THE

02:40:11  12      SAFEWAY BOARD?

02:40:11  13      A.   YES.

02:40:14  14      Q.   AND WAS THAT RELEVANT TO YOU?

02:40:16  15      A.   YOU KNOW, AS LONG AS IT WAS JUST AS ACCURATE, I WAS FINE.

02:40:21  16           BUT THE OTHER ELEMENTS WERE QUITE RELEVANT, YOU KNOW,

02:40:25  17      REAL-TIME, COMPREHENSIVE.

02:40:29  18      Q.   OKAY.  LET'S LOOK AT PAGE 5, PLEASE.

02:40:38  19           IS THIS ANOTHER DEPICTION OF THE MINI LAB DEVICE AND THE

02:40:42  20      CARTRIDGES THAT WE'VE SEEN PREVIOUSLY?

02:40:44  21      A.   YES, IT IS.

02:40:47  22      Q.   AND WAS THIS CONSISTENT WITH YOUR UNDERSTANDING OF

02:40:50  23      THERANOS'S SYSTEMS?

02:40:51  24      A.   YES.

02:40:52  25      Q.   OKAY.  LET ME LOOK -- DRAW YOUR ATTENTION TO PAGE 6.
```

BURD DIRECT BY MR. LEACH                                              2985

02:41:00   1              DO YOU SEE WHERE IT SAYS, "VALIDATION OF THERANOS

02:41:04   2    SYSTEMS"?

02:41:04   3    A.   I DO.

02:41:05   4    Q.   AND THE FIRST PARAGRAPH, "THERANOS SYSTEMS HAVE BEEN

02:41:09   5    COMPREHENSIVELY VALIDATED OVER THE COURSE OF THE LAST SEVEN

02:41:12   6    YEARS BY TEN OF THE FIFTEEN LARGEST PHARMACEUTICAL COMPANIES,

02:41:16   7    WITH HUNDREDS OF THOUSANDS OF ASSAYS PROCESSED."

02:41:19   8              WAS THAT INFORMATION RELEVANT TO YOU?

02:41:21   9    A.   YES.

02:41:22  10    Q.   WHY?

02:41:23  11    A.   WELL, IT, IT MADE A BOLD STATEMENT THAT IT HAD BEEN FIELD

02:41:29  12    TESTED.  RESPECTABLE, YOU KNOW, COMPANIES, TECHNOLOGY

02:41:36  13    COMPANIES, YOU KNOW, HAD PROVED THIS TECHNOLOGY TO BE TRUE.

02:41:39  14    Q.   LET'S MOVE FORWARD IN TIME TO AUGUST OF 2011, AND I DRAW

02:41:49  15    YOUR ATTENTION, PLEASE, TO EXHIBIT 5426.

02:42:04  16    A.   YOU SAID 5426?

02:42:07  17    Q.   5426.  IT SHOULD BE IN THE BACK.

02:42:09  18    A.   OH, OKAY.

02:42:10  19              MR. LEACH:  AND I'LL OFFER THIS IN EVIDENCE.

02:42:15  20              THE WITNESS:  THAT WAS A HELPFUL HINT.  I'D HAVE BEEN

02:42:18  21    UP HERE FOR AWHILE.  OKAY.

02:42:21  22              MR. DOWNEY:  SORRY, YOUR HONOR.  BEAR WITH ME ONE

02:42:23  23    SECOND, PLEASE.

02:42:24  24         (PAUSE IN PROCEEDINGS.)

02:42:38  25              MR. DOWNEY:  NO OBJECTION.

BURD DIRECT BY MR. LEACH                                        2986

```
02:42:39   1              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:42:42   2              (GOVERNMENT'S EXHIBIT 5426 WAS ADMITTED IN EVIDENCE.)

02:42:42   3              MR. LEACH:  IF WE -- IF THERE'S A WAY TO HIGHLIGHT

02:42:49   4    THE SUBSTANCE ALL THE WAY FROM BANK OF AMERICA DOWN,

02:42:52   5    MS. HOLLIMAN.

02:42:58   6    Q.   DOES THIS APPEAR TO BE A, A WIRE PAYMENT BETWEEN THERANOS

02:43:05   7    AND SAFEWAY, MR. BURD?

02:43:08   8    A.   THAT'S WHAT IT APPEARS TO BE.

02:43:09   9    Q.   OKAY.  AND DO YOU SEE IN THE DEBIT AMOUNT THE VALUE,

02:43:16   10   $30 MILLION?

02:43:16   11   A.   YES.

02:43:17   12   Q.   OKAY.  AND IS THAT CONSISTENT WITH YOUR MEMORY OF THE

02:43:21   13   AMOUNT OF MONEY THAT SAFEWAY PAID TO THERANOS IN PART FOR THE

02:43:26   14   CONVERTIBLE NOTES?

02:43:27   15   A.   YES, IT IS.

02:43:28   16   Q.   OKAY.  AND DO YOU SEE THE VALID DATE, AUGUST 19TH, 2011?

02:43:36   17   A.   YES.

02:43:36   18   Q.   AND IS THAT CONSISTENT WITH YOUR MEMORY OF THE TIME PERIOD

02:43:40   19   OF SAFEWAY'S PAYMENT OF THE 30 MILLION?

02:43:42   20   A.   I DON'T ACTUALLY RECALL THE TIMEFRAME.

02:43:45   21   Q.   OKAY.

02:43:49   22        LET ME DRAW YOUR ATTENTION, PLEASE, TO EXHIBIT 495.

02:43:58   23        AND I OFFER 495 INTO EVIDENCE.

02:44:00   24              MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

02:44:02   25              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.
```

UNITED STATES COURT REPORTERS

                                                                              2987
BURD DIRECT BY MR. LEACH

02:44:04   1              (GOVERNMENT'S EXHIBIT 495 WAS ADMITTED IN EVIDENCE.)

02:44:05   2       BY MR. LEACH:

02:44:10   3       Q.   MR. BURD, DOES THIS APPEAR TO BE A COPY OF ONE OF THE

02:44:13   4       CONVERTIBLE PROMISSORY NOTES THAT SAFEWAY PURCHASED?

02:44:17   5       A.   YES.

02:44:18   6       Q.   OKAY.  AND DO YOU SEE THE DOLLAR AMOUNT IN THE LEFT FOR

02:44:20   7       $10 MILLION?

02:44:21   8       A.   I DO.

02:44:22   9       Q.   OKAY.  AND TO THE RIGHT, DO YOU SEE THE DATE,

02:44:25  10       DECEMBER 30TH, 2011?

02:44:26  11       A.   YES.

02:44:29  12       Q.   I DRAW YOUR ATTENTION, PLEASE, TO PAGE 6.

02:44:42  13            DO YOU SEE IN PARAGRAPH 3, IT SAYS, "REPRESENTATIONS AND

02:44:46  14       WARRANTIES OF INVESTOR"?

02:44:48  15            DO YOU SEE THAT?

02:44:50  16       A.   YES.

02:44:50  17       Q.   OKAY.  AND THE INVESTOR IN THIS CONTEXT IS SAFEWAY?

02:44:53  18       A.   LET ME JUST READ THIS A LITTLE BIT.

02:44:58  19       Q.   YES, PLEASE.

02:44:59  20            (PAUSE IN PROCEEDINGS.)

02:45:12  21              THE WITNESS:  CAN YOU ASK YOUR QUESTION AGAIN?

02:45:14  22       BY MR. LEACH:

02:45:15  23       Q.   THE INVESTOR IN THIS CONTEXT, IS THAT SAFEWAY?

02:45:22  24       A.   YES.

02:45:22  25       Q.   OKAY.  ONE OF THE REPRESENTATIONS AND WARRANTIES OF

BURD DIRECT BY MR. LEACH                                              2988

02:45:24   1      INVESTOR IN 3B, THERE'S A HEADING, EXPERIENCE.

02:45:30   2           DO YOU SEE THAT?

02:45:31   3      A.   YES.

02:45:31   4      Q.   AND IT SAYS, "INVESTOR IS EXPERIENCED IN INVESTING IN THE

02:45:35   5      SECURITIES OF DEVELOPMENT STAGE COMPANIES SUCH AS THE COMPANY.

02:45:39   6      INVESTOR IS ABLE TO FEND FOR ITSELF, CAN BEAR THE ECONOMIC

02:45:43   7      RISK."

02:45:43   8           DO YOU SEE THAT LANGUAGE?

02:45:44   9      A.   I DO.

02:45:45   10     Q.   AND THIS REPRESENTATION WAS TRUE AT THE TIME?

02:45:47   11     A.   YES.

02:45:56   12     Q.   FURTHER DOWN, IN F, THERE'S A PARAGRAPH, ACCREDITED

02:46:02   13     INVESTOR.

02:46:09   14     A.   I DO.

02:46:09   15     Q.   DO YOU SEE WHERE IT SAYS, "INVESTOR REPRESENTS THAT IT IS

02:46:12   16     AN 'ACCREDITED INVESTOR'"?

02:46:17   17     A.   I DO.

02:46:17   18     Q.   DO YOU UNDERSTAND THAT TO BE A TERM OF ART UNDER THE

02:46:20   19     SECURITIES LAWS?

02:46:21   20     A.   YEAH, SOMETHING TO DO WITH SECURITIES LAWS.  BUT MY

02:46:24   21     GENERAL COUNSEL WOULD TELL ME THAT WE'RE ACCREDITED.

02:46:29   22     Q.   OKAY.  THE THRUST IS THAT SAFEWAY IS SOPHISTICATED AND

02:46:31   23     CAPABLE?

02:46:31   24     A.   CAPABLE, YES.

02:46:32   25     Q.   AND AT THE TIME YOU MADE THE DECISION -- DID YOU APPROVE

BURD DIRECT BY MR. LEACH                                                    2989

02:46:34  1      THE PURCHASE OF THE CONVERTIBLE NOTES?

02:46:36  2      A.   I DID.

02:46:37  3      Q.   AT THE TIME, DID YOU RELY ON THE REPRESENTATIONS THAT

02:46:39  4      MS. HOLMES HAD MADE TO YOU OVER THE COURSE OF A NUMBER OF

02:46:42  5      YEARS?

02:46:42  6      A.   YES.

02:46:42  7      Q.   AND DID YOU BELIEVE THEM TO BE TRUE AND ACCURATE?

02:46:47  8      A.   I DID AT THE TIME.

02:46:48  9      Q.   LET'S LOOK BRIEFLY AT PAGE 11.

02:47:00  10     DO YOU SEE MS. HOLMES'S SIGNATURE LINE IN THE CONVERTIBLE

02:47:04  11     NOTE?

02:47:04  12     A.   YES.

02:47:05  13     Q.   LET ME DRAW YOUR ATTENTION TO 496.

02:47:11  14     AND I OFFER EXHIBIT 496 INTO EVIDENCE.

02:47:23  15           MR. DOWNEY:  I'M SORRY, MR. LEACH.  I DON'T THINK I

02:47:26  16     HAVE 496.

02:47:27  17           MR. LEACH:  I THINK I SHOWED IT TO YOU THIS MORNING.

02:47:30  18     YOU CAN HAVE MINE (HANDING).

02:47:38  19           MR. DOWNEY:  OBJECTION, YOUR HONOR.

02:47:40  20           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:47:43  21     (GOVERNMENT'S EXHIBIT 496 WAS ADMITTED IN EVIDENCE.)

02:47:44  22     BY MR. LEACH:

02:47:47  23     Q.   MR. BURD, IS THIS THE SECOND OF THE CONVERTIBLE NOTES THAT

02:47:50  24     SAFEWAY PURCHASED AT SOME POINT IN 2011?

02:47:52  25     A.   IT APPEARS TO BE.

BURD DIRECT BY MR. LEACH                                              2990

```
02:47:56   1      Q.   OKAY.  DO YOU SEE THE AMOUNT OF $15 MILLION TO THE LEFT?

02:47:59   2      A.   I DO.

02:48:00   3      Q.   OKAY.  AND DO YOU SEE THE DATE OF DECEMBER 30TH, 2011 TO

02:48:03   4      THE RIGHT?

02:48:04   5      A.   YES.

02:48:04   6      Q.   OKAY.  AND DO YOU SEE MS. HOLMES'S SIGNATURE ON PAGE 10?

02:48:08   7      A.   I DO.

02:48:19   8      Q.   LET ME MOVE FORWARD IN TIME, MR. BURD, TO THE TIME PERIOD

02:48:23   9      OF 2012.

02:48:26  10           DO YOU HAVE THAT TIME PERIOD IN MIND?

02:48:28  11      A.   OKAY.

02:48:29  12      Q.   OKAY.  AT THIS POINT, HAD SAFEWAY ROLLED OUT ANY THERANOS

02:48:36  13      DEVICES IN ITS STORES?

02:48:38  14      A.   NO.

02:48:38  15      Q.   BY THE END OF 2012, HAD THAT HAPPENED?

02:48:45  16      A.   NO.

02:48:45  17      Q.   OKAY.  OVER THE COURSE OF TIME, WERE YOU BECOMING

02:48:50  18      FRUSTRATED?

02:48:51  19      A.   YES.

02:48:51  20      Q.   WHY WERE YOU BECOMING FRUSTRATED?

02:48:53  21      A.   YOU KNOW, DEADLINES WERE CONTINUING TO BE MISSED.  WE

02:49:01  22      OFTEN WEREN'T GIVEN A LOT OF EXPLANATION FOR THAT.

02:49:03  23           AND I KEPT ASKING, YOU KNOW, GIVE ME SOME DETAILS HERE,

02:49:11  24      YOU KNOW, MAYBE WE CAN HELP.  WE'RE A BIG COMPANY, WE'VE GOT

02:49:14  25      LOTS OF RESOURCES.
```

BURD DIRECT BY MR. LEACH                                              2991

02:49:16  1           SO THAT WAS THE FRUSTRATING PART.

02:49:18  2           WE ALWAYS TRIED TO HELP THEM IN ANY WAY THAT WE COULD.

02:49:22  3      Q.   DID MS. HOLMES EVER ATTRIBUTE -- EVER ATTRIBUTE DELAYS IN

02:49:28  4      THE LAUNCH TO SOME TECHNICAL ISSUE WITH THE MINI LAB DEVICE?

02:49:32  5      A.   THE ONLY TECHNICAL ISSUE I GUESS THAT I RECALL WAS I WAS

02:49:40  6      TOLD THAT PART OF THE DELAY WAS THAT IN THINKING THROUGH

02:49:45  7      STACKING, YOU KNOW, SIX OF THESE MACHINES AND SIDE-BY-SIDE --

02:49:52  8      BECAUSE IF IT TAKES 30 MINUTES, YOU'VE GOT TO HAVE MORE THAN

02:49:55  9      ONE MACHINE -- THAT THERE WAS A LOT OF HEAT GENERATED AND THEY

02:50:00  10     WERE STRUGGLING WITH HOW TO DISSIPATE THAT HEAT SO THAT IT

02:50:04  11     WOULDN'T COMPROMISE THE INTEGRITY OF THE MACHINES.

02:50:07  12          AND I IMMEDIATELY OFFERED UP MY ENGINEERING TEAM BECAUSE

02:50:11  13     WE DEAL WITH HEAT AND COLD A LOT.

02:50:16  14          BUT SHE SAID THEY WOULD, THEY WOULD SOLVE IT.

02:50:18  15     Q.   OTHER THAN THIS HEAT ISSUE THAT AROSE FROM STACKING OF THE

02:50:22  16     DEVICES, DID MS. HOLMES EVER ATTRIBUTE THE DELAY TO SOME FORM

02:50:27  17     OF TECHNICAL ISSUE WITH THE MINI LAB DEVICE?

02:50:29  18     A.   I DON'T RECALL EVER HEARING ABOUT A TECHNICAL ISSUE.

02:50:32  19     Q.   OKAY.  DID SHE EVER TELL YOU THAT THERANOS HAD YET TO

02:50:36  20     VALIDATE A SINGLE TEST ON ITS MINI LAB DEVICE FOR USE IN THE

02:50:39  21     CLIA LAB?

02:50:40  22     A.   NO.

02:50:40  23     Q.   IN 2012, WOULD IT SURPRISE YOU TO LEARN THAT THERANOS HAD

02:50:47  24     YET TO VALIDATE A SINGLE TEST ON ITS MINI LAB DEVICE FOR USE IN

02:50:51  25     THE CLIA LAB?

BURD DIRECT BY MR. LEACH                                          2992

```
02:50:52   1      A.   YES.

02:50:53   2      Q.   WHY WOULD THAT HAVE SURPRISED YOU?

02:50:55   3      A.   BECAUSE I THOUGHT THE VALIDATION HAD TAKEN PLACE MUCH

02:50:58   4    EARLIER.

02:50:59   5      Q.   OKAY.  DID MS. HOLMES EVER TELL YOU THAT THERANOS WAS

02:51:03   6    USING ONLY FDA APPROVED MACHINES AND FDA APPROVED TESTS IN THE

02:51:07   7    CLIA LAB IN THIS 2012 TIME PERIOD?

02:51:10   8      A.   I'M NOT SURE I UNDERSTAND THE QUESTION.  ARE YOU -- ARE

02:51:14   9    YOU ASKING IF THEY'RE USING MACHINES THAT THEY DIDN'T DEVELOP?

02:51:18  10      Q.   YES.

02:51:18  11      A.   THAT'S A LITTLE COMPLICATED.

02:51:27  12      Q.   LET ME ASK --

02:51:28  13      A.   I CAN ANSWER IT.

02:51:32  14           WE WANTED THEM TO PUT A LAB ON CAMPUS SO WE COULD HAVE

02:51:35  15    REAL TIME, YOU KNOW, EXPERIENCE, AND WE THOUGHT THAT LAB WAS

02:51:40  16    GOING TO BE A MINI LAB.

02:51:43  17           AND THEN ELIZABETH EXPRESSED CONCERN ABOUT SECRECY BECAUSE

02:51:47  18    ONLY SAFEWAY EMPLOYEES WOULD BE USING THIS LAB.

02:51:51  19           AND SO WE KNEW AT THAT POINT THAT THEY WERE DRAWING BOTH

02:51:56  20    FINGERSTICK WHERE THEY COULD AND FULL VIALS AND THAT THEY WERE,

02:52:02  21    THEY WERE, I THINK, DOING SOME KIND OF VALIDATION, AND I THINK

02:52:05  22    IT WAS DESCRIBED MAYBE AS, YOU KNOW, REFINING.  OKAY?

02:52:09  23           AND SO SOME OF THOSE VIALS I BELIEVE WERE USED TO CREATE A

02:52:15  24    NUMBER OF BLOOD SAMPLES TO MAKE SURE YOU GOT CONSISTENT -- I

02:52:20  25    CONSIDERED IT AS A CALIBRATION PROCESS.
```

BURD DIRECT BY MR. LEACH                                         2993

```
02:52:23   1            AND WE ALSO KNEW THAT THEY WERE SENDING SOME OF THOSE OUT

02:52:27   2     TO OTHER LABS.

02:52:30   3     Q.    SO LET ME TRY TO UNPACK THAT A LITTLE BIT.

02:52:33   4            AT SOME POINT DID SAFEWAY REQUEST FOR SOME FORM OF PILOT

02:52:38   5     TO BE DONE ON ITS CAMPUS TO TEST THE THERANOS PROCESS?

02:52:42   6     A.    YES.

02:52:42   7     Q.    TELL US ABOUT THAT, PLEASE.

02:52:43   8     A.    WELL, WE WERE FAR INTO THIS THING AND WE'D NEVER REALLY

02:52:50   9     SEEN THE BOX WORK.  SO WE HAD A WELLNESS CENTER ON CAMPUS.  WE

02:52:56  10     HAD NURSES ON CAMPUS.  AND SO THAT BUILDING WAS SEPARATED FROM

02:53:01  11     THE MAIN OFFICE, SO WE THOUGHT IT WAS A PERFECT PLACE TO PUT

02:53:05  12     THIS LAB.

02:53:08  13            AND INITIALLY I THOUGHT WE WERE GOING TO GET THE REAL MINI

02:53:13  14     LAB, AND THEN I WAS TOLD, NO, WE'RE NOT GOING TO GET THE NEW

02:53:16  15     MINI LAB, WE'LL CONTINUE TO DO THOSE ANALYTICS DOWN AT

02:53:21  16     THERANOS.

02:53:21  17     Q.    OKAY.  AND I GUESS MY QUESTION WAS, DID MS. HOLMES EVER

02:53:28  18     TELL YOU THAT THE ONLY MACHINES THEY WERE USING IN THE CLIA LAB

02:53:31  19     WERE FDA APPROVED MACHINES IN THIS TIME PERIOD?

02:53:35  20     A.    SEE, I'M NOT SURE WHAT AN FDA APPROVED MACHINE IS, SO I

02:53:42  21     STRUGGLE WITH THAT QUESTION.

02:53:44  22            ARE YOU -- IF YOU'RE SAYING THEY'RE ONLY USING THE CLIA

02:53:52  23     WAVE MACHINES THAT THEY DEVELOPED THEMSELVES, IF THAT'S THE

02:53:54  24     QUESTION?

02:53:55  25     Q.    LET ME ASK A BETTER QUESTION.  WHEN YOU ENVISIONED WHAT
```

BURD DIRECT BY MR. LEACH                                                    2994

02:53:58   1      WAS HAPPENING IN THE CLIA LAB, DID YOU ENVISION THERANOS USING

02:54:01   2      THE MINI LAB DEVICES THAT HAD BEEN SHOWN TO YOU?

02:54:04   3      A.    YES.

02:54:05   4      Q.    AND IN 2012, WOULD IT SURPRISE YOU THAT NO MINI LAB WAS

02:54:13   5      USED IN THE CLIA LAB IN 2012?

02:54:15   6      A.    THAT NO MINI LAB?  YES.

02:54:20   7      Q.    AND WHY IS THAT?

02:54:21   8      A.    BECAUSE I THOUGHT THEY WERE USING PREDOMINANTLY THEIR MINI

02:54:28   9      LAB, BUT THAT THEY WERE, YOU KNOW, CALIBRATING THE MACHINE.  SO

02:54:33  10      IT DIDN'T BOTHER ME THAT THEY MIGHT HAVE SOME STANDARD

02:54:36  11      EQUIPMENT, YOU KNOW, AS A CALIBRATION DEVICE.

02:54:42  12          BUT IF THEY WERE USING OTHER MACHINES ONLY, THEN ALL WE

02:54:49  13      WERE TESTING WAS THE PHLEBOTOMIST'S ABILITY TO PRICK A FINGER

02:54:54  14      AND DRAW BLOOD, AND WE WANTED TO TEST THE TECHNOLOGY.

02:54:57  15      Q.    OKAY.  LET ME DRAW YOUR ATTENTION, PLEASE, TO WHAT HAS

02:55:04  16      BEEN MARKED AS EXHIBIT 718.

02:55:24  17          AND I BELIEVE THERE'S A STIPULATION FOR 718.  I OFFER IT

02:55:28  18      INTO EVIDENCE.

02:55:28  19              MR. DOWNEY:  YES, YOUR HONOR.  NO OBJECTION.

02:55:30  20              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:55:33  21          (GOVERNMENT'S EXHIBIT 718 WAS ADMITTED IN EVIDENCE.)

02:55:34  22      BY MR. LEACH:

02:55:36  23      Q.    MR. BURD, DOES THIS APPEAR TO BE AN EMAIL EXCHANGE BETWEEN

02:55:39  24      YOU AND MS. HOLMES IN OR AROUND DECEMBER 18TH, 2012?

02:55:43  25      A.    YES.

BURD DIRECT BY MR. LEACH                                                2995

```
02:55:43   1     Q.    OKAY.   AND THE SUBJECT IS PHONE CALL TO DISCUSS SCHEDULE.

02:55:47   2           DO YOU SEE THAT?

02:55:48   3     A.    YES.

02:55:49   4     Q.    AND AT THIS POINT IN TIME, ARE YOU WORKING HARD TO TRY TO

02:55:55   5     GET THE SAFEWAY LAUNCH HAPPENING?

02:55:57   6     A.    YES.

02:55:58   7     Q.    I DRAW YOUR ATTENTION TO THE SECOND PARAGRAPH FROM THE

02:56:04   8     BOTTOM.   DO YOU SEE WHERE IT SAYS, "WITHOUT RECOUNTING ALL THE

02:56:09   9     MISSED DEADLINES, IT IS CRYSTAL CLEAR THAT EITHER THE MOST

02:56:12  10     RECENTLY COMMITTED DATES (SEPTEMBER 24TH AND LATER

02:56:17  11     DECEMBER 6TH) WERE FAR TOO AMBITIOUS, OR THERE HAVE BEEN SOME

02:56:20  12     OVERWHELMING SURPRISES ALONG THE WAY.   I ALSO WORRY THAT THE

02:56:24  13     DEMANDS OF YOUR CORE BUSINESS OR THE NEWLY ACQUIRED DOD

02:56:28  14     BUSINESS ARE CONSUMING RESOURCES THAT WOULD OTHERWISE BE

02:56:30  15     COMMITTED TO LAUNCH."

02:56:32  16           DO YOU SEE THAT LANGUAGE?

02:56:33  17     A.    I DO.

02:56:34  18     Q.    WHAT DID YOU MEAN BY "THE NEWLY ACQUIRED DOD BUSINESS"?

02:56:39  19     A.    YOU KNOW, AS I KEPT PRESSING, YOU KNOW, FOR LAUNCH, ALWAYS

02:56:47  20     WANTING TO MAKE SURE THAT WE HAD NAILED EVERYTHING DOWN, I KEPT

02:56:52  21     ASKING WHY, WHAT ARE THE OBSTACLES, WHAT'S IN THE WAY?

02:56:55  22           AND ON -- IT WAS EITHER A PHONE CALL OR AN EMAIL, SHE TOLD

02:56:59  23     ME THAT THEY HAD BEEN DOING SOME WORK FOR THE DEPARTMENT OF

02:57:03  24     DEFENSE, THAT HER DEVICE WAS IN MEDEVAC UNITS AROUND THE WORLD

02:57:11  25     IN PLACES THAT, YOU KNOW, A LOT OF AMERICANS DIDN'T EVEN KNOW
```

BURD DIRECT BY MR. LEACH                                                2996

02:57:15  1     WE WERE.

02:57:17  2          AND WHEN I THOUGHT ABOUT THE COMPOSITION OF HER BOARD,

02:57:22  3     THAT WASN'T THAT -- IT WAS DISAPPOINTING, BUT IT WASN'T THAT

02:57:25  4     SURPRISING.

02:57:28  5     Q.   WHEN -- YOU MENTIONED SOMETHING ABOUT A MEDEVAC UNIT.

02:57:35  6     A.   YES.

02:57:36  7     Q.   WHAT DO YOU MEAN BY THAT?

02:57:37  8     A.   THAT MIGHT NOT BE THE RIGHT TERMINOLOGY HERE.

02:57:40  9          BUT, YOU KNOW, THAT'S WHERE YOU HAVE A -- YOU HAVE MEDICAL

02:57:45  10    CAPABILITY IN THE FIELD OF BATTLE THAT IS DEALING WITH INJURIES

02:57:54  11    WHEN PEOPLE THAT HAVE BEEN SHOT, AND OFTEN INFECTION IN THAT

02:57:59  12    FIELD IS A BIG DEAL.

02:58:01  13         AND SO TO BE ABLE TO, IN 20 MINUTES, DETERMINE THE KIND OF

02:58:05  14    INFECTION COULD SAVE SOMEBODY'S LIFE.

02:58:09  15         AND SO IT MADE SENSE THAT THE DOD WOULD WANT THIS UNIT IF

02:58:14  16    IT COULD DO THAT.

02:58:15  17         AND THEN THERE WERE GENERALS AND ADMIRALS AND OTHERS ON

02:58:20  18    THE BOARD, SO, YOU KNOW, I DIDN'T LIKE THE IDEA -- SHE SAID

02:58:24  19    THAT, TRUST ME, YOU KNOW, STRATEGICALLY, THIS WILL HAVE VALUE

02:58:28  20    TO US.

02:58:29  21         I THINK PRESUMABLY SOME KIND OF BRANDING VALUE WHEN YOU

02:58:33  22    COULD MAKE IT AVAILABLE.

02:58:34  23    Q.   IN THIS CONTEXT, DID MS. HOLMES TELL YOU THAT THERANOS

02:58:38  24    DEVICES WERE BEING USED ON THE BATTLEFIELD?

02:58:41  25    A.   I DON'T KNOW ABOUT THE WORD BATTLEFIELD BECAUSE, YOU KNOW,

BURD DIRECT BY MR. LEACH                                                2997

02:58:47  1    WE'VE HAD THESE SKIRMISHES, YOU KNOW.  BUT YOU CAN THINK OF

02:58:53  2    IRAQ OR AFGHANISTAN OR SOMETHING LIKE THAT.

02:58:55  3        BUT I'M NOT SURE THAT BATTLEFIELD IS THE RIGHT

02:58:59  4    DESCRIPTION, YOU KNOW, OF THAT.

02:59:00  5    Q.   LET ME ASK A BETTER QUESTION.  WHAT -- DESCRIBE THE

02:59:03  6    SUBSTANCE OF WHAT MS. HOLMES SAID TO YOU IN CONNECTION WITH THE

02:59:07  7    DOD.

02:59:07  8    A.   THE SUBSTANCE WAS WHERE THERE'S A MEDICAL NEED IN THE

02:59:11  9    MILITARY IN A REMOTE OUTPOST WHERE LABS ARE NOT AVAILABLE, WE

02:59:21  10   HAVE THE PERFECT SOLUTION.

02:59:22  11   Q.   OKAY.  AND SHE WAS USING THIS AS AN EXPLANATION FOR WHY

02:59:25  12   THERANOS WAS UNABLE TO GO FORWARD WITH SAFEWAY?

02:59:27  13   A.   THAT HAD NOT YET PULLED THE PLUG ON GOING FORWARD.

02:59:32  14   Q.   WITH SAFEWAY?

02:59:32  15   A.   WITH SAFEWAY.

02:59:33  16   Q.   OKAY.  AND DID SHE MAKE REFERENCE TO A MEDEVAC HELICOPTER?

02:59:37  17   A.   YES.

02:59:38  18   Q.   OKAY.  WHAT DID SHE SAY?

02:59:40  19   A.   I THINK SHE USED THE TERM THAT THEY WERE IN MEDEVAC

02:59:45  20   HELICOPTERS, SO THAT'S EVEN CLOSER THAN, YOU KNOW, HAVING A,

02:59:51  21   YOU KNOW, FACILITY SOMEWHERE IN AFGHANISTAN.

02:59:54  22   Q.   DID SHE TELL YOU THAT THIS INFORMATION COULD BE WIDELY

02:59:59  23   SHARED OR DISTRIBUTED WITHIN SAFEWAY?

03:00:02  24   A.   SHE SAID IT WAS, YOU KNOW, VERY CONFIDENTIAL.

03:00:05  25   Q.   AND AT THE TIME, WAS THIS EXPLANATION SATISFACTORY TO YOU?

2998
BURD DIRECT BY MR. LEACH

```
03:00:14   1      A.    THAT KIND OF IMPLIES I WAS HAPPY.

03:00:22   2            I WAS BOTHERED BY IT.  I WAS DISAPPOINTED.

03:00:28   3            IT SEEMED PLAUSIBLE.  IT JUST SEEMED LIKE ONE MORE DELAY

03:00:32   4      FOR US.

03:00:32   5      Q.    YOU WERE BOTHERED BY THE DELAY, BUT THE EXPLANATION AT THE

03:00:35   6      TIME MADE SENSE TO YOU?  IS THAT FAIR?

03:00:37   7      A.    IT MADE -- IT MADE SENSE.

03:00:39   8                 MR. LEACH:  OKAY.

03:00:40   9            YOUR HONOR, I'M MINDFUL OF THE TIME.  THIS MIGHT BE A GOOD

03:00:43  10      TIME FOR A BREAK.

03:00:43  11                 THE COURT:  ALL RIGHT.  LET'S DO THAT.

03:00:45  12            LADIES AND GENTLEMEN, I PROMISED YOU WE'D BREAK AT 3:00

03:00:49  13      TODAY, 3:00 TODAY.

03:00:50  14            WE'LL HAVE TO RESUME TUESDAY NEXT.  TUESDAY AT 9:00 A.M.,

03:00:54  15      COUNSEL, WE'LL RESUME.

03:00:56  16            SO, SIR, YOU'LL HAVE TO COME BACK TUESDAY NEXT AT

03:01:00  17      9:00 A.M. TO CONTINUE YOUR EXAMINATION.

03:01:02  18                 THE WITNESS:  SURE.

03:01:02  19                 THE COURT:  THANK YOU.

03:01:03  20            LADIES AND GENTLEMEN, IT'S A LONG WEEKEND, AND I JUST WANT

03:01:06  21      TO REMIND YOU AGAIN OF THE ADMONITION.

03:01:10  22            PLEASE DO NOT DO ANY INVESTIGATION ABOUT ANYONE, ANYTHING

03:01:14  23      INVOLVED IN THIS CASE.  DO NOT VISIT ANY LOCATIONS.  AND

03:01:18  24      PLEASE, AS BEST YOU CAN, AVOID ANY SOCIAL MEDIA, ANY RADIO,

03:01:25  25      TELEVISION, NEWSPAPER, ANYTHING THAT TOUCHES ON THIS ARTICLE.
```

2999

```
03:01:27   1        SHOULD YOU INADVERTENTLY COME ACROSS SOMETHING, PLEASE

03:01:30   2   TURN THAT, DISABLE THE DEVICE, TURN AWAY, DON'T OPEN THE PAGE

03:01:33   3   OF THE NEWSPAPER.  I DON'T REMEMBER HOW MANY OF YOU READ HARD

03:01:36   4   COPY NEWSPAPERS AS OPPOSED TO YOUR DEVICES, BUT PLEASE DON'T

03:01:40   5   ENGAGE THAT AT ALL.

03:01:43   6        IF DO YOU COME ACROSS THAT, WE'LL TALK ABOUT IT TUESDAY

03:01:46   7   WHEN I ASK YOU WHETHER OR NOT ANY OF THESE THINGS HAVE

03:01:49   8   HAPPENED.

03:01:50   9        THANK YOU FOR THAT.

03:01:51  10        ENJOY YOUR LONG WEEKEND.  BE SAFE, BE HEALTHY, AND WE'LL

03:01:55  11   SEE YOU BACK NEXT WEEK.  THANK YOU.

03:02:07  12             THE WITNESS:  EXCUSE ME.  I CAN LEAVE THIS RIGHT

03:02:09  13    HERE?

03:02:09  14             THE COURT:  YES, JUST LEAVE EVERYTHING THERE, SIR.

03:02:13  15             THE WITNESS:  THANK YOU.

03:02:14  16             THE COURT:  YOU'RE WELCOME.

03:02:19  17        (JURY OUT AT 3:02 P.M.)

03:02:25  18             THE COURT:  AND YOU CAN STAND DOWN, SIR.  THANK YOU.

03:02:27  19             THE WITNESS:  OKAY.  THANK YOU.

03:02:38  20             THE COURT:  PLEASE BE SEATED.

03:02:53  21        ALL RIGHT.  THE RECORD SHOULD REFLECT THAT THE JURY -- OUR

03:02:56  22   JURY HAS LEFT FOR THE WEEKEND.  THE WITNESS HAS LEFT THE

03:02:59  23   COURTROOM.  ALL COUNSEL AND THE DEFENDANT ARE PRESENT.

03:03:01  24        ANYTHING FURTHER BEFORE WE BREAK FROM THE GOVERNMENT?

03:03:04  25             MR. LEACH:  NO, YOUR HONOR.
```

3000

03:03:08  1              MR. DOWNEY:  NOTHING FROM THE DEFENSE, YOUR HONOR.

03:03:09  2              THE COURT:  ALL RIGHT.  THANK YOU.

03:03:10  3          ENJOY YOUR LONG WEEKEND, AND I HOPE YOU CAN SEE FAMILY

03:03:14  4      AGAIN PERHAPS OVER THE WEEKEND.  ENJOY.  WE'LL SEE YOU TUESDAY

03:03:18  5      NEXT.  THANK YOU.

03:03:20  6              MR. DOWNEY:  THANK YOU, YOUR HONOR.

03:03:20  7              MR. LEACH:  THANK YOU, YOUR HONOR.

03:03:21  8              THE CLERK:  COURT IS ADJOURNED.

03:03:23  9          (THE EVENING RECESS WAS TAKEN AT 3:03 P.M.)

         10

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

1

2

3                    CERTIFICATE OF REPORTERS

4

5

6

7        WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8   UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9   CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10  HEREBY CERTIFY:

11       THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12  A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13  ABOVE-ENTITLED MATTER.

14

15

16       _____
         IRENE RODRIGUEZ, CSR, CRR

17       CERTIFICATE NUMBER 8076

18

19       _____
         LEE-ANNE SHORTRIDGE, CSR, CRR

20       CERTIFICATE NUMBER 9595

21       DATED:  OCTOBER 6, 2021

22

23

24

25

3001

```
 1
 2                      UNITED STATES DISTRICT COURT
 3                    NORTHERN DISTRICT OF CALIFORNIA
 4                           SAN JOSE DIVISION
 5
     UNITED STATES OF AMERICA,      )  CR-18-00258-EJD
 6                                  )
                      PLAINTIFF,    )  SAN JOSE, CALIFORNIA
 7                                  )
            VS.                     )  VOLUME 17
 8                                  )
     ELIZABETH A. HOLMES,           )  OCTOBER 12, 2021
 9                                  )
                      DEFENDANT.    )  PAGES 3001 - 3278
10   _____  )  PAGES 3203 - 3278 SEALED
11
                    TRANSCRIPT OF TRIAL PROCEEDINGS
12             BEFORE THE HONORABLE EDWARD J. DAVILA
                    UNITED STATES DISTRICT JUDGE
13
     A P P E A R A N C E S:
14
     FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
15                         BY:  JOHN C. BOSTIC
                                JEFFREY B. SCHENK
16                         150 ALMADEN BOULEVARD, SUITE 900
                           SAN JOSE, CALIFORNIA 95113
17
                           BY:  ROBERT S. LEACH
18                              KELLY VOLKAR
                           1301 CLAY STREET, SUITE 340S
19                         OAKLAND, CALIFORNIA 94612
20        (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21
     OFFICIAL COURT REPORTERS:
22                         IRENE L. RODRIGUEZ, CSR, RMR, CRR
                           CERTIFICATE NUMBER 8074
23                         LEE-ANNE SHORTRIDGE, CSR, CRR
                           CERTIFICATE NUMBER 9595
24
          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25              TRANSCRIPT PRODUCED WITH COMPUTER
```

3002

```
 1        A P P E A R A N C E S: (CONT'D)

 2

 3    FOR DEFENDANT HOLMES:   WILLIAMS & CONNOLLY LLP
                              BY:  KEVIN M. DOWNEY
 4                                 LANCE A. WADE
                                   KATHERINE TREFZ
 5                                 RICHARD CLEARY
                                   PATRICK LOOBY
 6                            725 TWELFTH STREET, N.W.
                              WASHINGTON, D.C. 20005
 7
                              LAW OFFICE OF JOHN D. CLINE
 8                            BY:  JOHN D. CLINE
                              ONE EMBARCADERO CENTER, SUITE 500
 9                            SAN FRANCISCO, CALIFORNIA 94111

10
      ALSO PRESENT:           FEDERAL BUREAU OF INVESTIGATION
11                            BY:  ADELAIDA HERNANDEZ

12                            OFFICE OF THE U.S. ATTORNEY
                              BY:  LAKISHA HOLLIMAN, PARALEGAL
13                                 MADDI WACHS, PARALEGAL

14                            WILLIAMS & CONNOLLY
                              BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL
15
                              TBC
16                            BY:  BRIAN BENNETT, TECHNICIAN

17

18

19

20

21

22

23

24

25
```

**ER-6753**

3003

INDEX OF PROCEEDINGS

GOVERNMENT'S:

**STEVEN BURD**
DIRECT EXAM BY MR. LEACH (RES.)                    P. 3021
CROSS-EXAM BY MR. DOWNEY                           P. 3048
REDIRECT EXAM BY MR. LEACH                         P. 3145
RECROSS-EXAM BY MR. DOWNEY                         P. 3156

**WADE MIQUELON**
DIRECT EXAM BY
CROSS-EXAM BY
REDIRECT EXAM BY
RECROSS-EXAM BY

**NIMESH JHAVERI**
DIRECT EXAM BY
CROSS-EXAM BY
REDIRECT EXAM BY
RECROSS-EXAM BY

**ER-6754**

3004

```
 1                        INDEX OF EXHIBITS

 2
                                         IDENT.     EVIDENCE
 3        GOVERNMENT'S:

 4        375                                        3022
          670, PAGES 1 & 2                           3029
 5        684                                        3032
          693                                        3035
 6        699                                        3036
          701                                        3037
 7        715                                        3039
          770                                        3042
 8        813                                        3044
          820                                        3046
 9        281                                        3058
          332                                        3083
10

11

12        DEFENDANT'S:

13        7190                                       3073
          7104                                       3091
14        10537                                      3119
          7196                                       3124
15        12283                                      3128
          10568 & 10569                              3136
16

17

18

19

20

21

22

23

24

25
```

3005

| | 1 | SAN JOSE, CALIFORNIA                    OCTOBER 12, 2021 |
|---|---|---|

```
          1    SAN JOSE, CALIFORNIA                    OCTOBER 12, 2021

08:20AM   2                    P R O C E E D I N G S

08:35AM   3         (COURT CONVENED AT 8:35 A.M.)

08:35AM   4         (JURY OUT AT 8:35 A.M.)

08:35AM   5              THE COURT:  LET'S GO ON THE RECORD IN THE HOLMES

08:35AM   6    MATTER.  LET ME JUST CAPTURE THE APPEARANCES OF THE PARTIES,

08:36AM   7    PLEASE, ONCE AGAIN.

08:36AM   8         WHO APPEARS FOR THE GOVERNMENT?

08:36AM   9              MR. LEACH:  GOOD MORNING, YOUR HONOR.

08:36AM  10         ROBERT LEACH, JEFF SCHENK, JOHN BOSTIC, AND KELLY VOLKAR

08:36AM  11    FOR THE UNITED STATES.

08:36AM  12              THE COURT:  THANK YOU.  GOOD MORNING.

08:36AM  13         AND FOR THE DEFENSE?

08:36AM  14              MR. DOWNEY:  GOOD MORNING, YOUR HONOR.

08:36AM  15         KEVIN DOWNEY, LANCE WADE, KATIE TREFZ, AND ANDREW LEMENS

08:36AM  16    FROM WILLIAMS & CONNOLLY FOR MS. HOLMES, AND OUR COCOUNSEL

08:36AM  17    JOHN CLINE IS PRESENT, AND SO IS MS. HOLMES.

08:36AM  18              THE COURT:  THANK YOU.  GOOD MORNING.

08:36AM  19         I WANTED TO TOUCH BASE ABOUT THIS WEEK'S PROCEEDINGS.  WE

08:36AM  20    HAVE ONE WITNESS ON THE STAND, AND IF I RECALL CORRECTLY ABOUT

08:36AM  21    THE TIME ESTIMATE, YOU HAVE ABOUT ANOTHER HOUR OR SO,

08:36AM  22    MR. LEACH?

08:36AM  23              MR. LEACH:  YES, THAT'S RIGHT.

08:36AM  24              THE COURT:  OKAY.  AND THEN YOUR CROSS?

08:36AM  25              MR. DOWNEY:  YOUR HONOR, I THOUGHT WE WOULD PROBABLY
```

| | | |
|---|---|---|
| 08:36AM | 1 | BE TO SORT OF MID TO LATE AFTERNOON, SO I ADVISED MR. LEACH TO |
| 08:36AM | 2 | HAVE ANOTHER WITNESS AVAILABLE. |
| 08:36AM | 3 | THE COURT:  GREAT.  OKAY.  THANK YOU. |
| 08:36AM | 4 | AS FAR AS SCHEDULING, I WOULD LIKE TO GO UNTIL 3:00 TODAY |
| 08:37AM | 5 | IF WE COULD.  I'LL ASK THE JURY THAT, AND PERHAPS AS WELL |
| 08:37AM | 6 | TOMORROW, MAYBE 4:00 O'CLOCK TOMORROW IF WE CAN. |
| 08:37AM | 7 | FRIDAY WE'LL HAVE TO END AT 1:00 O'CLOCK, 1:00 O'CLOCK ON |
| 08:37AM | 8 | FRIDAY.  SO I'LL INFORM OUR JURY OF THAT SCHEDULE. |
| 08:37AM | 9 | ALSO, YOU RECALL THERE WAS AN ANCILLARY MOTION REGARDING |
| 08:37AM | 10 | THE QUESTIONNAIRES THAT WE HAD TALKED ABOUT, AND I INDICATED |
| 08:37AM | 11 | THAT I WOULD LIKE TO MEET WITH THE JURORS AND TALK WITH THEM IN |
| 08:37AM | 12 | MY CHAMBERS. |
| 08:37AM | 13 | YOU HAVE HAD THE WEEKEND TO THINK ABOUT THAT PROCESS. |
| 08:37AM | 14 | LET ME ASK, MR. DOWNEY, WHAT IS YOUR POSITION ABOUT |
| 08:37AM | 15 | WHETHER OR NOT YOU OR A MEMBER OF YOUR TEAM WOULD LIKE TO JOIN |
| 08:37AM | 16 | IN NOT THE CONVERSATION, BUT JUST TO BE PRESENT? |
| 08:37AM | 17 | MR. DOWNEY:  YOUR HONOR, AS I'VE SAID LAST WEEK, I |
| 08:37AM | 18 | THINK WE WOULD LIKE TO BE PRESENT.  OUR VIEW IS THAT UNDER |
| 08:38AM | 19 | RULE 43 AND INDEED UNDER THE DUE PROCESS CLAUSE, IT'S AN |
| 08:38AM | 20 | ELEMENT OF TRIAL FOR WHICH DEFENSE COUNSEL SHOULD BE PRESENT. |
| 08:38AM | 21 | THE COURT:  OKAY. |
| 08:38AM | 22 | MR. SCHENK:  GOOD MORNING, YOUR HONOR. |
| 08:38AM | 23 | I'VE LOOKED AT CASES BETWEEN OUR LAST CONVERSATION AND |
| 08:38AM | 24 | THIS MORNING AND I WOULD BE HAPPY TO SEND THEM TO THE COURT OR |
| 08:38AM | 25 | PROVIDE THEM TO THE DEFENSE. |

3007

08:38AM  1          MY UNDERSTANDING IS THAT THERE'S NOT A TON OF CASE LAW ON

08:38AM  2    THIS ISSUE.  THERE IS NO CONSTITUTIONAL RIGHT.  I THINK THE

08:38AM  3    CASE LAW IS PRETTY CLEAR ON THAT.

08:38AM  4          UNDER THE RULES OF PROCEDURE, THOUGH, I THINK THE QUESTION

08:38AM  5    IS A LITTLE BIT LESS CLEAR.

08:38AM  6          I THINK THAT WHEN THE JURY HAS NOT YET BEEN IMPANELED, THE

08:38AM  7    CASE LAW INSTRUCTS US THAT MS. HOLMES HAS A RIGHT TO BE

08:38AM  8    PRESENT.

08:38AM  9          I DON'T, THOUGH, THINK THAT THAT RIGHT IS THE SAME ONCE

08:38AM 10    THE JURY HAS BEEN SEATED, AND TO ENTERTAIN A MOTION OR A MATTER

08:39AM 11    LIKE THIS ONE, WHICH IS ANCILLARY TO THE SPECIFIC TRIAL

08:39AM 12    PROCEEDING.  IN FACT, THE COURT COULD CERTAINLY HAVE THIS

08:39AM 13    DIALOGUE AT THE END OF THE TRIAL WITH THE JURORS TO ASK THEM

08:39AM 14    HOW THEY FEEL ABOUT THE RELEASE OF CERTAIN INFORMATION IN THEIR

08:39AM 15    QUESTIONNAIRES, AND I DON'T THINK ANYBODY WOULD BE ARGUING TO

08:39AM 16    THE COURT THAT THE DEFENDANT HAS A RIGHT TO BE PRESENT AT THAT

08:39AM 17    STAGE.

08:39AM 18          AND I'M NOT SURE THAT THE ANALYSIS CHANGES ALL THAT MUCH,

08:39AM 19    BECAUSE THE CONVERSATION IS THE SAME.  THE COURT'S CONVERSATION

08:39AM 20    WITH THESE JURORS WOULD BE IDENTICAL IF IT HAD IT TODAY OR IF

08:39AM 21    IT HAD IT POST-TRIAL, AND I THINK IT WOULD BE FINE FOR THE

08:39AM 22    COURT TO HAVE THAT CONVERSATION WITH JURORS WITHOUT THE

08:39AM 23    PRESENCE OF THE DEFENDANT, THOUGH I WANT TO ANNOUNCE FOR THE

08:39AM 24    COURT, I THINK THE CASE LAW IS A LITTLE BIT UNCLEAR OR MAYBE

08:39AM 25    LESS THAN COMPLETELY DECIDED IN THE CIRCUIT.  AND, AGAIN, I'LL

08:39AM  1    BE HAPPY TO PROVIDE THE CASES THAT I'VE LOOKED AT TO COME TO

08:39AM  2    THAT CONCLUSION.

08:39AM  3              THE COURT:  WELL, THANK YOU.  THAT WAS MY INITIAL

08:40AM  4    ANALYSIS AS WELL, AND THAT'S WHAT I WAS TALKING ABOUT LAST

08:40AM  5    WEEK, MR. DOWNEY.

08:40AM  6        I KNOW YOU TALK ABOUT DUE PROCESS, AND I'M NOT CERTAIN

08:40AM  7    I'VE SEEN IT, AND MAYBE YOU CAN EDUCATE ME IN A WAY.  THE TRIAL

08:40AM  8    HAS BEGUN AND THE JURORS ARE HERE.  THIS IS TOUCHING ON NOT AN

08:40AM  9    EVIDENTIARY MATTER THAT THE JURY WOULD RECEIVE AND OTHERWISE

08:40AM  10   CONSIDER IN THEIR DELIBERATIONS, BUT IT'S MORE FUNCTIONALLY

08:40AM  11   WITH THE COURT AND PERSONAL TO THEM AS TO QUESTIONNAIRES AND

08:40AM  12   INFORMATION THAT MIGHT OR MIGHT NOT BE RELEASED PURSUANT TO THE

08:40AM  13   SECONDARY MOTION THAT IS NOT PART OF OUR TRIAL OTHER THAN IT'S

08:40AM  14   THE MEDIA COALITION, I THINK, DESIRE'S TO GAIN INFORMATION

08:40AM  15   ABOUT OUR JURY BASED ON THE ANSWER TO THE QUESTIONNAIRES.

08:40AM  16       SO, AGAIN, I, I AM NOT CERTAIN I SEE THE DUE PROCESS, IT

08:40AM  17   RISES TO A DUE PROCESS ISSUE.  I'M HAPPY TO RECEIVE SOMETHING

08:40AM  18   FROM YOU IF YOU WOULD LIKE TO PRESENT SOMETHING TO ME, ALTHOUGH

08:41AM  19   I THOUGHT WE SHOULD GET THE ISSUE RESOLVED SOMEHOW.

08:41AM  20       I EXPRESSED TO YOU LAST WEEK MY INITIAL RETICENCE ABOUT

08:41AM  21   HAVING COUNSEL PRESENT, AND IT'S NOT LIKE I DON'T WANT COUNSEL

08:41AM  22   PRESENT, I ENJOY COUNSEL, BUT FOR THIS PURPOSE I DIDN'T WANT TO

08:41AM  23   OTHERWISE OFFER ANY INTIMIDATION FOR OUR JURY IN THIS

08:41AM  24   QUESTIONNAIRE.

08:41AM  25       I'M TRYING TO THINK IF I HAD YOU OR A REPRESENTATIVE OF

08:41AM 1     YOUR TEAM, IT WOULD BE ONE FROM EACH TEAM BACK IN MY OFFICE.  I

08:41AM 2     SUPPOSE I CAN SEAT EACH OF YOU COMFORTABLY IN THE CORNER AND

08:41AM 3     HAVE THEIR BACKS TO YOU, AND I DON'T KNOW IF ANY OF YOU WOULD

08:41AM 4     OBJECT TO THAT.

08:41AM 5          AND I DON'T MEAN TO BE FLIP, I JUST DON'T WANT THE JURORS

08:41AM 6     TO BE OTHERWISE IN DISCOMFORT SUCH THAT THEIR RESPONSES TO MY

08:41AM 7     QUESTIONS WOULD BE LESS THAN CANDID AND THEY MIGHT OTHERWISE BE

08:41AM 8     INTIMIDATED FOR THE PURPOSE.

08:42AM 9          I ALSO DON'T WANT TO IN ANY WAY AFFECT THEIR JUDGMENT.

08:42AM 10         I SEE THEM AS TWO SEPARATE ISSUES.  THEY WILL SOON BE

08:42AM 11    DELIBERATING THIS CASE AND TO HAVE CONTACT WITH COUNSEL IN THE

08:42AM 12    INTIMACY OF THE JUDGE'S CHAMBERS WHILE THE CASE IS BEING TRIED

08:42AM 13    IS SOMETHING THAT CAUSES ME CONCERN AS WELL.

08:42AM 14         I KNOW YOU WON'T BE PARTICIPANTS OF THE CONVERSATION, THAT

08:42AM 15    IS, I'M NOT GOING TO PERMIT YOU TO SPEAK TO THE JURORS.  YOU'RE

08:42AM 16    THERE TO WITNESS.

08:42AM 17         BUT, AGAIN, I'M CONCERNED A LITTLE BIT ABOUT UNTOWARD

08:42AM 18    CONTACT WITH OUR JURORS IN THAT RESPECT ALSO.

08:42AM 19         THOSE ARE THE THINGS THAT I'M THINKING ABOUT FOR YOUR

08:42AM 20    BENEFIT.  I DON'T WANT THAT TO INFLUENCE THEIR DELIBERATIVE

08:42AM 21    PROCESS IN ANY WAY.

08:42AM 22         ANYTHING YOU WOULD LIKE TO SAY, MR. DOWNEY?

08:42AM 23              MR. DOWNEY:  NO, YOUR HONOR.  I THINK REALLY ONLY

08:42AM 24    TWO POINTS.

08:42AM 25         I THINK SOME OF THE CONCERNS THAT THE COURT HAS ARE THE

08:42AM   1      SAME CONCERNS THAT DEFENSE COUNSEL SHARES.

08:43AM   2           WE'RE CONCERNED ABOUT ADDRESSING THE JURORS ON THIS MATTER

08:43AM   3      PRIOR TO DELIBERATIONS AND, RESPECTFULLY, I THINK WE WOULD BE

08:43AM   4      CONCERNED ABOUT COUNSEL HAVING A COLLOQUY WITH THEM ON THIS

08:43AM   5      SUBJECT.

08:43AM   6           BUT WE'RE ALSO CONCERNED ABOUT THE COURT HAVING A DIALOGUE

08:43AM   7      WITH THEM, NOT BECAUSE THE COURT HAS ANY IMPROPER INTENT, BUT

08:43AM   8      JUST BECAUSE THAT TYPE OF A DIALOGUE, AS I SAID LAST WEEK, IS

08:43AM   9      UNPREDICTABLE AND CAN HAVE AN INFLUENCE ON THE DELIBERATIONS

08:43AM   10     LATER THAT NONE OF US CAN SEE.

08:43AM   11          SO I'M CONCERNED ABOUT THE PROCEDURE FOR THAT REASON,

08:43AM   12     WHICH IS ONE OF THE REASONS THAT ANIMATES OUR REQUEST TO BE

08:43AM   13     PRESENT.

08:43AM   14          SO I DON'T FUNDAMENTALLY DISAGREE ABOUT THE DYNAMIC AND

08:43AM   15     IT'S AWKWARDNESS, BUT IT'S JUST A QUESTION OF HOW WE CONDUCT IT

08:43AM   16     AND THE ABILITY TO PROTECT MS. HOLMES'S RIGHTS.

08:43AM   17          I THINK THE SECOND ISSUE ON WHICH I THINK WE HAD A

08:43AM   18     DISAGREEMENT LAST WEEK, AND I DISAGREE WITH MR. SCHENK FOR THE

08:44AM   19     SAME REASON, THE JURORS ARE ONLY HERE TO PARTICIPATE IN THIS

08:44AM   20     PROCEEDING.  THEY'RE NOT HERE IN AN ANCILLARY PROCEEDING.  THEY

08:44AM   21     WERE SUMMONED FOR THIS PROCEEDING.

08:44AM   22          THE MEDIA COALITION INTERVENED IN THIS PROCEEDING.  THIS

08:44AM   23     IS NOT A MATTER THAT IS ANCILLARY TO THE TRIAL.  THIS IS PART

08:44AM   24     OF THE TRIAL, AND I THINK HAVING A DIALOGUE WITH THEM ABOUT IT

08:44AM   25     PRIOR TO THE TIME THAT THEY DELIBERATE RUNS A LOT OF RISK.

08:44AM  1          THE COURT:  WELL, IT'S NOT PART OF THE TRIAL PROCESS

08:44AM  2     IN THE SENSE THAT IT'S EVIDENTIARY.  IT'S SEPARATE.  I SEE IT

08:44AM  3     AS A SEPARATE ISSUE.

08:44AM  4          IT RELATES TO THEM, THE JURORS PERSONALLY, AS TO THEIR

08:44AM  5     PERSONAL INFORMATION AND HOW MUCH, IF ANY, WILL BE RELEASED

08:44AM  6     PURSUANT TO THE MOTION OF THE MEDIA COALITION.

08:44AM  7          IT DOESN'T HAVE ANYTHING TO DO WITH THE EVIDENCE THAT IS

08:44AM  8     COMING IN IN THIS CASE OR ANYTHING ABOUT THEIR THOUGHT PROCESS

08:44AM  9     IN THAT REGARD.  IT RELATES TO THEM PERSONALLY AS I SAID WITH

08:44AM 10     THIS PERSONAL INFORMATION.

08:44AM 11          I SEE IT -- IT'S IN THE SAME TRIAL, BUT I DO THINK IT'S A

08:44AM 12     SEPARATE ISSUE IN AND OF ITSELF.

08:45AM 13          ALL RIGHT.  WELL, AND DO YOU HAVE A -- I DIDN'T ASK YOU TO

08:45AM 14     DO THIS, BUT LET ME ASK YOU, DO YOU HAVE THOUGHTS ABOUT --

08:45AM 15     YOU'RE CONCERNED ABOUT THE CONVERSATION THAT THE COURT HAS.

08:45AM 16          DO YOU WANT TO OFFER A SCRIPT?  DO YOU HAVE A SCRIPT TO

08:45AM 17     OFFER THE COURT FOR THIS PURPOSE?

08:45AM 18          MR. DOWNEY:  I DON'T.  I'M SURE YOUR HONOR HAS A

08:45AM 19     SCRIPT IN MIND.  I'D BE HAPPY TO RECEIVE IT FROM YOU AND TO

08:45AM 20     COMMENT AND, IF THERE'S ANY CONCERN ABOUT IT, TO LET THE COURT

08:45AM 21     KNOW THAT.

08:45AM 22          THE COURT:  WELL, I APPRECIATE THAT OFFER, BUT --

08:45AM 23          MR. DOWNEY:  I DON'T REALLY HAVE IN MIND PRECISELY

08:45AM 24     THE INFORMATION THAT THE COURT WOULD LIKE TO RECEIVE FROM THE

08:45AM 25     JURORS.

```
08:45AM   1        I RECOGNIZE THE AWKWARDNESS OF THE SITUATION NOT ONLY

08:45AM   2   BECAUSE OF THE DYNAMICS, BUT ALSO BECAUSE WE CONSENTED TO A

08:45AM   3   STATEMENT IN THE QUESTIONNAIRE THAT IT WOULD BE CONFIDENTIAL.

08:45AM   4   HOW THEY TOOK THAT, FRANKLY, I DON'T KNOW.

08:45AM   5        AND SO I'M RELUCTANT TO PRESCRIBE FOR THE COURT EXACTLY

08:46AM   6   HOW YOU CONDUCT THAT CONVERSATION.

08:46AM   7             THE COURT:  WELL, THANK YOU.

08:46AM   8        I THINK THIS IS APPROPRIATE.  IT WAS THE COURT'S

08:46AM   9   PROMISE -- LET ME SAY, WE HAD A HEARING ON THIS, IT WAS A

08:46AM  10   PUBLIC HEARING, AND I INDICATED TO THE MEDIA COALITION'S

08:46AM  11   LAWYERS, IT WAS THE COURT'S PROMISE THAT THIS WOULD BE

08:46AM  12   CONFIDENTIAL, AND NOW THE MEDIA COALITION HAS BROUGHT TO MY

08:46AM  13   ATTENTION THAT, JUDGE, YOU SHOULDN'T HAVE -- MR. ZANSBERG SAID

08:46AM  14   YOU SHOULDN'T HAVE PROMISED THAT BECAUSE, YOU KNOW, THERE'S

08:46AM  15   CERTAIN CASE LAW THAT SUGGESTS YOU SHOULDN'T HAVE DONE THAT.

08:46AM  16        SO IF ANYTHING, IT'S THE COURT TO FALL ON ITS SWORD, IF

08:46AM  17   YOU WILL, TO SAY, LADIES AND GENTLEMEN, PERHAPS I MISSPOKE, BUT

08:46AM  18   LET'S HAVE A CONVERSATION ABOUT THAT.

08:46AM  19        SO IT'S ON THE COURT TO HAVE THAT CONVERSATION, AND I'M

08:46AM  20   NOT GOING TO ASK COUNSEL TO OTHERWISE OPINE OR SPEAK TO THAT.

08:46AM  21        ALL RIGHT.  THANK YOU FOR THAT.

08:46AM  22        LET ME MOVE TO ANOTHER ISSUE, AND THIS IS THE ISSUE

08:46AM  23   THAT -- THIS INVOLVES MR. LEACH.

08:46AM  24        THANK YOU, MR. SCHENK.

08:46AM  25             MR. SCHENK:  THANK YOU.
```

08:46AM   1            THE COURT:  THIS IS THE QUESTION ABOUT WHETHER OR

08:46AM   2    NOT THE JURY SHOULD HEAR ABOUT MONETARY SUMS EXPENDED FOR THE

08:47AM   3    DEVELOPMENT OF SAFEWAY STORES IN ANTICIPATION OF THERANOS

08:47AM   4    MACHINES COMING IN.

08:47AM   5        WE TALKED ABOUT THIS.  I THINK THE NUMBER WAS 300 MILLION,

08:47AM   6    OR SOMETHING LIKE THAT.

08:47AM   7        MR. DOWNEY, YOU OBJECTED TO, I THINK, THE NUMBER

08:47AM   8    SPECIFICALLY, AND TALKED ABOUT ITS RELEVANCE TO THE CASE.  THIS

08:47AM   9    ISN'T PERHAPS, I THINK YOU SUGGEST, NOT THE APPROPRIATE FORUM

08:47AM  10    TO RAISE THAT NUMBER AT THIS TIME.

08:47AM  11        ANY MORE THOUGHTS -- I THINK YOU ASKED TO DISCUSS THIS IF

08:47AM  12    I'M NOT MISTAKEN, BUT MR. LEACH?

08:47AM  13            MR. LEACH:  WE DID DISCUSS IT, YOUR HONOR.  I DO

08:47AM  14    ANTICIPATE THAT IT WILL COME UP SHORTLY WITH MR. BURD.  THE

08:47AM  15    GOVERNMENT'S POSITION IS THAT THIS IS HIGHLY RELEVANT EVIDENCE

08:47AM  16    AND NOT UNDULY PREJUDICIAL.  IT'S EMBEDDED IN A NUMBER OF

08:47AM  17    EMAILS THAT MR. BURD SENDS TO MS. HOLMES.  IT SPEAKS TO THE

08:47AM  18    MATERIALITY OF THE STATEMENTS THAT WERE MADE TO MR. BURD.

08:48AM  19        IT SPEAKS TO MS. HOLMES'S STATE OF MIND TO SHOW HER

08:48AM  20    KNOWLEDGE THAT SAFEWAY WAS RELYING ON THE REPRESENTATIONS SHE

08:48AM  21    WAS MAKING.

08:48AM  22        THE NUMBER IS BIG.  IT'S AT 1.3 -- OVER 350 MILLION, AND

08:48AM  23    ANOTHER .400 MILLION.  BUT THERE ARE A LOT OF BIG NUMBERS IN

08:48AM  24    THIS CASE, AND IF THE RESPONSE TO IT IS SAFEWAY DIDN'T HAVE TO

08:48AM  25    DO THAT, THAT WAS GRATUITOUS AND THEY'VE GOT ANOTHER USE FOR

08:48AM  1      IT, THAT'S CERTAINLY INFORMATION THAT COULD BE DEVELOPED IN

08:48AM  2      CROSS-EXAMINATION.

08:48AM  3          BUT I DON'T SEE -- THIS IS HIGHLY RELEVANT.  I DON'T THINK

08:48AM  4      IT'S EXCLUDABLE UNDER 403 IN THE BALANCING, AND IT GOES TO HER

08:48AM  5      STATE OF MIND.  SO WE WOULD INTEND TO ELICIT IT.

08:48AM  6          THE COURT:  OKAY.  THANK YOU.

08:48AM  7          MR. DOWNEY:  YOUR HONOR, TO REMIND THE COURT,

08:48AM  8      YOUR HONOR IS RIGHT, WE'RE CONCERNED ABOUT THE NUMBER.  IT'S

08:48AM  9      ALSO AN ISSUE THAT REQUIRES A GREAT DEAL OF ADDITIONAL

08:48AM  10     EVIDENCE, AS I MENTIONED ON FRIDAY.

08:48AM  11         WE HAVE TO SHOW -- FIRST OF ALL, THERANOS INVESTED AN

08:49AM  12     ENORMOUS AMOUNT OF MONEY IN CUSTOMIZING ITS DEVICES TO BE

08:49AM  13     PLACED IN THAT SPACE.  SAFEWAY DEVELOPED THOSE SPACES KNOWING

08:49AM  14     THAT THEY HAD ALTERNATIVE USES, AND THEY USED THEM

08:49AM  15     ALTERNATIVELY TODAY.

08:49AM  16         IT'S NOT RELEVANT TO THE ISSUE, THE CENTRAL ISSUE, WHICH

08:49AM  17     IS, IS THAT MONEY OF WHICH THEY WERE DEFRAUDED?  IT'S CLEARLY

08:49AM  18     NOT.  IT'S A SIDE ISSUE UNDER WHICH BOTH PARTIES UNDERTOOK

08:49AM  19     SUBSTANTIAL EXPENSES AND SAFEWAY WAS ULTIMATELY NOT HARMED,

08:49AM  20     SOMETHING THIS WITNESS CAN'T TESTIFY TO BECAUSE THIS WITNESS

08:49AM  21     WASN'T AT SAFEWAY WHEN ALTERNATIVE USE WAS MADE OF THIS SPACE.

08:49AM  22         THE COURT:  IS IT RELEVANT TO SHOW, IF YOU WILL,

08:49AM  23     SUBSEQUENT CONDUCT OF SAFEWAY?  AND PUT ASIDE THE NUMBER FOR A

08:49AM  24     MOMENT, BUT I SUPPOSE IT SPEAKS TO A MATERIALITY, PERHAPS NOT

08:49AM  25     AS TO THE WIRE FRAUD MATERIALITY, BUT IT SEEMS TO HAVE SOME

08:50AM 1   RELEVANCE THAT SAFEWAY, THE FACT THAT THEY EXPENDED SOME

08:50AM 2   EFFORTS -- LET'S JUST CALL IT EFFORTS WITHOUT PUTTING A DOLLAR

08:50AM 3   SIGN ON IT -- THEY EXPENDED SOME EFFORTS AS A RESULT OF THE

08:50AM 4   CONTRACTUAL RELATIONSHIP THAT THEY HAD.

08:50AM 5       AND WITHOUT THAT, ISN'T IT MISLEADING TO THE JURY TO HEAR,

08:50AM 6   WELL, THEY INVESTED MONEY AND THEN THERE'S A WHOLE -- THERE'S A

08:50AM 7   VACUUM OF, WELL, OKAY, BUT WHAT DID THEY DO?  THEY DIDN'T DO

08:50AM 8   ANYTHING ABOUT IT, THEY JUST INVESTED THIS MONEY.

08:50AM 9       THAT DOESN'T TELL THE WHOLE STORY, IF YOU WILL, FOR A 403

08:50AM 10  ANALYSIS, NOT 404.  BUT THAT TYPE OF A STORY, I THINK, THE JURY

08:50AM 11  IS ENTITLED TO HEAR.

08:50AM 12      NOW, THE QUESTION IS, SHOULD THEY HEAR IT'S 380,

08:50AM 13  $400 MILLION?  AND, MR. LEACH, I TEND TO, I TEND TO AGREE THAT

08:50AM 14  UNDER A 403 ANALYSIS, THAT MIGHT BE MORE PREJUDICIAL THAN IT IS

08:50AM 15  PROBATIVE.  IT WOULD CAUSE THE JURY THEN TO THINK ABOUT --

08:51AM 16  THEY'LL FOCUS ON, JUST BECAUSE WE'RE HUMANS AND THAT'S WHAT WE

08:51AM 17  DO, THEY FOCUS ON THE BIGGER NUMBER.

08:51AM 18      THE 55 MILLION, WHICH IS THE INVESTMENT, AND WHICH IS THE

08:51AM 19  ALLEGATIONS OF THE FRAUD ITSELF I SUPPOSE, THAT'S THE NUMBER

08:51AM 20  SAFEWAY INVESTED, AT LEAST THAT'S WHAT WE HAVE HEARD SO FAR,

08:51AM 21  THAT WOULD BE DWARFED BY THE EXPENDITURE THAT THEY MADE ON ALL

08:51AM 22  OF THEIR STORES.

08:51AM 23      AND I HAVE SOME CONCERN THAT THE JURY, NOTWITHSTANDING THE

08:51AM 24  COURT'S INSTRUCTION OTHERWISE, THEY MIGHT FOCUS ON THAT IN SOME

08:51AM 25  UNTOWARD MANNER.

| 08:51AM | 1 | I'M WONDERING IF WE CAN FILTER, SANITIZE THE LANGUAGE.  I |

08:51AM  1      I'M WONDERING IF WE CAN FILTER, SANITIZE THE LANGUAGE.  I

08:51AM  2      THINK LAST WEEK I USED SUBSTANTIAL.  YOU CAN THINK OF ANY OTHER

08:51AM  3      ADJECTIVE YOU WANT I SUPPOSE.

08:51AM  4           MR. LEACH:  THERE'S TWO EXHIBITS, YOUR HONOR, WHERE

08:51AM  5      THE DOLLAR AMOUNT IS MENTIONED.  ONE OF THEM I CAN REFRAIN FROM

08:51AM  6      OFFERING.

08:51AM  7           THE SECOND ONE, I THINK IT'S EXHIBIT 770 FOR DEFENSE

08:52AM  8      COUNSEL, THERE'S A REFERENCE TO SAFEWAY IN TWO AND ONE HALF

08:52AM  9      YEARS INVESTED 400 MILLION AND MORE THAN 50,000 MAN HOURS.  I

08:52AM 10      CAN REDACT THE NUMBER BOTH FOR THE DOLLAR AMOUNT EXPENDED AND

08:52AM 11      THE NUMBER OF HOURS IF THAT'S THE COURT'S RULING.

08:52AM 12           THE COURT:  WELL, THANK YOU.

08:52AM 13      AS I SAID, IT DOES HAVE SOME RELEVANCE.  IT DOES.

08:52AM 14      I THINK, MR. DOWNEY, IF THE JURY IS NOT INFORMED THAT

08:52AM 15      SAFEWAY DID SOMETHING ABOUT IT, I THINK THAT'S NOT THE FULL

08:52AM 16      STORY BECAUSE CLEARLY SAFEWAY DID.

08:52AM 17      THE QUESTION ABOUT THE AMOUNT OF FUNDS THAT THEY EXPENDED

08:52AM 18      AND THE TENSION THAT I HAVE BETWEEN THAT AND THE ACTUAL CHARGE

08:52AM 19      IS SOMETHING THAT I'M CONCERNED ABOUT.

08:52AM 20           MR. DOWNEY:  I THINK AT THE END OF THE DAY,

08:52AM 21      YOUR HONOR, I THINK PRESENTED WITH THESE EXHIBITS WITH THAT

08:52AM 22      REDACTION, THAT'S FINE WITH US.

08:52AM 23      I DON'T WANT TO BE PUT IN THE POSITION CORRESPONDINGLY

08:53AM 24      WHERE WE HAVE A TRIAL WHERE WE SHOW ALL OF THE COSTS THAT WERE

08:53AM 25      UNDERTAKEN ON THE THERANOS SIDE WHICH DEMONSTRATES THEIR BELIEF

08:53AM  1    AND GOOD FAITH AS TO THE IMMINENCE OF THE PROJECT, HOW ANY

08:53AM  2    PURPORTED LOSS OF THOSE MONIES HAS BEEN MITIGATED AND WAS KNOWN

08:53AM  3    TO BE CAPABLE OF MITIGATION AT THE TIME THIS WAS UNDERTAKEN.

08:53AM  4        IF THE FACT IN EVIDENCE IS THAT THEY BELIEVED THAT THEY

08:53AM  5    WERE GOING TO HAVE A PARTNERSHIP WITH THERANOS AND THAT THERE

08:53AM  6    WERE GOING TO BE PATIENT SERVICE CENTERS IN THEIR STORES

08:53AM  7    WITHOUT TRYING TO QUANTIFY OR IMPLYING MORE ABOUT IT, THAT'S

08:53AM  8    FINE WITH US, YOUR HONOR.

08:53AM  9        THE COURT:  WELL, AND I DO THINK IT'S FAIR FOR THE

08:53AM  10   GOVERNMENT TO BE ABLE TO PROBE SUBSTANTIAL CHANGES TO THE

08:53AM  11   STORES.  IT SOUNDS LIKE THAT'S WHAT THEY DID.

08:53AM  12       IF THAT'S WHAT THE EVIDENCE IS, I THINK THEY'RE ENTITLED

08:53AM  13   TO, HE'S -- IF THIS WITNESS HAS KNOWLEDGE, HE WOULD BE ENTITLED

08:53AM  14   TO TESTIFY ABOUT WHAT THEY WERE GOING TO DO WITH THE ROLLOUT,

08:54AM  15   ET CETERA, ET CETERA.

08:54AM  16       I THINK HE TOLD US THEIR GAME PLAN WAS TO ALLOW FOR A

08:54AM  17   CUSTOMER TO COME IN AND DO FULL STOP SERVICE ON THEIR HEALTH

08:54AM  18   NEEDS WHILE THEY'RE SHOPPING, AND I THINK HE CAN DEVELOP THAT.

08:54AM  19       MR. DOWNEY:  YOUR HONOR, THAT'S NOT -- I DON'T HAVE

08:54AM  20   A CONCERN THAT THE PLAN AT LEAST AS OF THE TIME THAT THE

08:54AM  21   CONTRACT WAS SIGNED IN 2010 AND THEREAFTER WAS TO HAVE PATIENT

08:54AM  22   SERVICE CENTERS, THAT THE POTENTIAL THAT THOSE PATIENT SERVICE

08:54AM  23   CENTERS HAD A NUMBER OF IMPLICATIONS, THAT'S NOT SOMETHING TO

08:54AM  24   WHICH I OBJECT.

08:54AM  25       THE COURT:  ALL RIGHT.  THANK YOU.

08:54AM   1        SO, MR. LEACH, JUST TO BE CLEAR, I'M GOING TO -- THE

08:54AM   2    NUMBER -- I'M NOT GOING TO ALLOW YOU TO GET THE NUMBER IN, THE

08:54AM   3    300, 400, THAT TYPE OF THING.

08:54AM   4        BUT I WILL ALLOW YOU TO EXAMINE THE WITNESS AS TO THE

08:54AM   5    TYPES OF CHANGES THEY MADE, ANTICIPATED THINGS THAT THEY DID,

08:54AM   6    IF IT'S SUBSTANTIAL, WHATEVER THEY HAD TO DO ACROSS I DON'T

08:54AM   7    KNOW HOW MANY STORES THEY DID IT, BUT THAT WOULD BE

08:55AM   8    APPROPRIATE.

08:55AM   9        AGAIN, WE HAVE TO BE CAREFUL ABOUT DOORS.  I JUST REMIND

08:55AM  10    EVERYBODY ABOUT THAT.  OKAY.

08:55AM  11        ANYTHING FURTHER?

08:55AM  12            MR. LEACH:  JUST TO BE CLEAR, YOUR HONOR, THE NUMBER

08:55AM  13    OF STORES THAT THEY MADE RENOVATIONS TO, I CAN EXPLORE THAT

08:55AM  14    NUMBER?

08:55AM  15            THE COURT:  YES.

08:55AM  16            MR. LEACH:  IT'S JUST NOT THE TOTAL DOLLAR AMOUNT?

08:55AM  17            THE COURT:  CORRECT.

08:55AM  18            MR. LEACH:  UNDERSTOOD.  THANK YOU.

08:55AM  19            THE COURT:  ANY COMMENT ABOUT THAT, MR. DOWNEY?

08:55AM  20            MR. DOWNEY:  NO, YOUR HONOR.

08:55AM  21            THE COURT:  OKAY.

08:55AM  22            MR. DOWNEY:  YOUR HONOR, JUST ONE QUESTION.

08:55AM  23        HOWEVER THE ISSUE IS RESOLVED AROUND THE COLLOQUY WITH THE

08:55AM  24    JURORS, JUST SO WE CAN HAVE A MEANINGFUL DIALOGUE BETWEEN US AS

08:55AM  25    TO WHEN THE GOVERNMENT NEEDS TO HAVE THEIR WITNESSES PRESENT,

08:55AM  1    DID YOU HAVE A TIME SLOT IN MIND?

08:55AM  2            THE COURT:  THANK YOU.  WHAT I WAS HOPING TO DO IS

08:55AM  3    TO -- I'M NOT GOING TO TELL THEM ABOUT THIS THIS MORNING BEFORE

08:55AM  4    WE START EVIDENCE.  I JUST DON'T WANT THEM TO FOCUS ON THAT

08:55AM  5    WHILE THEY'RE HEARING THIS TESTIMONY.

08:55AM  6        I MAY TELL THEM JUST BEFORE THE BREAK THAT WHAT I INTEND

08:55AM  7    TO DO IS TALK TO THEM ABOUT THE MEDIA COALITION MOTION,

08:56AM  8    ET CETERA.  I INTEND TO PROVIDE THEM WITH THEIR QUESTIONNAIRES

08:56AM  9    AT THE BREAK SO THEY CAN LOOK THOSE OVER IF THEY WISH.

08:56AM 10        IF ANY JUROR WOULD LIKE TO SPEAK WITH ME TODAY, I'M HAPPY

08:56AM 11    TO RECEIVE THAT AND WE CAN DO THAT.  THEY'LL -- AND WE'LL END

08:56AM 12    TODAY AT 3:00 HOPEFULLY, AND THEN THEY CAN STAY AFTER IF

08:56AM 13    THEY'RE WILLING TO.

08:56AM 14        IF NOT, THEN I WILL TELL THEM IF SOME OF THEM WANT TO TAKE

08:56AM 15    THE QUESTIONNAIRE HOME WITH THEM, WE'LL PROVIDE THEM AN

08:56AM 16    ENVELOPE THAT THEY CAN TAKE IT IN, AND THEN TOMORROW WE CAN

08:56AM 17    DISCUSS IT EITHER AT A BREAK OR AT SOME TIME IN THE MORNING.

08:56AM 18        WE'LL SEE WHO CHOOSES TO DO THAT, AND THEN WE'LL

08:56AM 19    INCORPORATE THAT INTO OUR TIMEFRAME.

08:56AM 20        I'D LIKE TO DO IT AT THE END OF THE DAY IF I CAN, BUT --

08:56AM 21    AND I EXPECT, I ANTICIPATE THAT PROCESS IS GOING TO TAKE

08:56AM 22    PROBABLY 90 MINUTES I'M THINKING, IF EACH JUROR WANTS TO DO

08:56AM 23    THAT, QUERY WHETHER THEY'LL WANT TO STICK AROUND FOR THAT LONG

08:57AM 24    ALL AT ONE TIME.

08:57AM 25        SO WE'LL JUST DO THE BEST THAT WE CAN.

08:57AM  1          MR. DOWNEY:  AND IS IT THE COURT'S PREMISE THAT SOME

08:57AM  2     OF THEIR ADDRESSES AND SO FORTH FOR THE JURORS, WOULD SOME OF

08:57AM  3     THE INFORMATION BE REDACTED IN ANY EVENT?

08:57AM  4          THE COURT:  THEIR ADDRESSES ARE NOT --

08:57AM  5          MR. DOWNEY:  OKAY.

08:57AM  6          THE COURT:  -- IN THE QUESTIONNAIRE.  GEOGRAPHIC

08:57AM  7     LOCATION IS, BUT NOT ADDRESSES.

08:57AM  8          MR. DOWNEY:  OKAY.

08:57AM  9          THE COURT:  YES.  AND I DON'T THINK THE COALITION --

08:57AM  10    I THINK THE COALITION'S LAWYER INDICATED, I DON'T THINK HIS

08:57AM  11    COALITION OR ANY OF THE MEMBERS WERE SEEKING ADDRESSES.  SO,

08:57AM  12    YES.

08:57AM  13         MR. DOWNEY:  THANK YOU, YOUR HONOR.

08:57AM  14         MR. LEACH:  THANK YOU, YOUR HONOR.

08:57AM  15         THE COURT:  ALL RIGHT.  THANK YOU.

08:57AM  16         THE CLERK:  COURT IS IN RECESS.

08:57AM  17       (RECESS FROM 8:57 A.M. UNTIL 9:09 A.M.)

09:09AM  18       (JURY IN AT 9:09 A.M.)

09:09AM  19         THE COURT:  GOOD MORNING EVERYONE.  WE'RE BACK ON

09:09AM  20    THE RECORD WITH OUR JURY AND ALTERNATES ARE PRESENT,

09:09AM  21    RECONSTITUTED IN THE SEATING.  THANK YOU.  GOOD MORNING,

09:09AM  22    EVERYONE.

09:09AM  23       ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT.

09:09AM  24       AND MR. BURD IS ON THE STAND AGAIN.

09:09AM  25       BEFORE WE RESUME EXAMINATION, LADIES AND GENTLEMEN, LET ME

BURD DIRECT BY MR. LEACH (RES.)                                    3021

09:09AM   1     ASK YOU MEMBERS OF THE JURY AND OUR ALTERNATES, DURING THE LONG

09:09AM   2     WEEKEND, WHICH I HOPE YOU ALL ENJOYED, DID ANY OF YOU HAVE

09:09AM   3     OCCASION OR CAUSE TO COME ACROSS ANY INFORMATION OR DISCUSS

09:09AM   4     WITH ANYONE ANYTHING ABOUT THIS CASE?  DID YOU READ, HEAR,

09:09AM   5     LISTEN OR SPEAK WITH ANYONE ABOUT ANYTHING THAT INVOLVES THIS

09:09AM   6     CASE?

09:09AM   7          IF SO, WOULD YOU PLEASE RAISE YOUR HAND?

09:09AM   8          I SEE NO HANDS.

09:10AM   9          THANK YOU.

09:10AM  10          LET'S SEE, DID YOU WANT TO CONTINUE WITH YOUR DIRECT

09:10AM  11     EXAMINATION?

09:10AM  12               MR. LEACH:  I DID, YOUR HONOR.  THANK YOU.

09:10AM  13               THE COURT:  PLEASE, LET'S PROCEED.

09:10AM  14          SIR, IF YOU COULD ONCE AGAIN STATE YOUR NAME FOR THE

09:10AM  15     RECORD.

09:10AM  16               THE WITNESS:  MY NAME IS STEVE BURD, SPELLED

09:10AM  17     B-U-R-D.

09:10AM  18               THE COURT:  THANK YOU, SIR.  AND I'LL REMIND YOU,

09:10AM  19     SIR, YOU ARE STILL UNDER OATH.

09:10AM  20          **(GOVERNMENT'S WITNESS, STEVEN BURD, WAS PREVIOUSLY SWORN.)**

09:10AM  21                    **DIRECT EXAMINATION (RESUMED)**

09:10AM  22     BY MR. LEACH:

09:10AM  23     Q.   GOOD MORNING, MR. BURD.

09:10AM  24     A.   GOOD MORNING.

09:10AM  25     Q.   WHEN WE BROKE LAST WEEK WE WERE ON EXHIBIT 718 FROM

UNITED STATES COURT REPORTERS

BURD DIRECT BY MR. LEACH (RES.)                                    3022

09:10AM   1    DECEMBER OF 2012, AND DO YOU RECALL TESTIFYING ABOUT STATEMENTS

09:10AM   2    THAT MS. HOLMES MADE TO YOU ABOUT THERANOS'S RELATIONSHIP WITH

09:10AM   3    THE MILITARY?

09:10AM   4    A.   YES, I HAVE IT.

09:10AM   5    Q.   OKAY.  DO YOU RECALL TESTIFYING ABOUT STATEMENTS THAT

09:11AM   6    MS. HOLMES MADE TO YOU ABOUT THERANOS'S RELATIONSHIP WITH THE

09:11AM   7    MILITARY?

09:11AM   8    A.   YES, I DO.

09:11AM   9    Q.   AND THE DATE OF THIS EMAIL, EXHIBIT 718, IS IN OR AROUND

09:11AM  10    DECEMBER OF 2012; IS THAT CORRECT?

09:11AM  11    A.   CORRECT.

09:11AM  12    Q.   I'D LIKE TO MOVE A LITTLE BACKWARD IN TIME TO AUGUST OF

09:11AM  13    2012, AND IF I COULD PLEASE DRAW YOUR ATTENTION TO WHAT WE HAVE

09:11AM  14    MARKED AS EXHIBIT 375.

09:11AM  15    A.   I HAVE IT.

09:11AM  16    Q.   OKAY.  DOES THIS APPEAR TO BE AN EMAIL FROM

09:11AM  17    ELIZABETH HOLMES TO YOU ATTACHING A POWERPOINT IN ADVANCE OF A

09:11AM  18    SAFEWAY BOARD MEETING?

09:11AM  19    A.   YES.

09:11AM  20         MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 375.

09:11AM  21         MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

09:11AM  22         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:12AM  23    (GOVERNMENT'S EXHIBIT 375 WAS RECEIVED IN EVIDENCE.)

09:12AM  24         MR. LEACH:  MS. HOLLIMAN, IF WE CAN PLEASE ZOOM IN

09:12AM  25    ON THE TOP PORTION OF THE EMAIL.

BURD DIRECT BY MR. LEACH (RES.)                              3023

09:12AM   1        THANK YOU.

09:12AM   2   Q.   MR. BURD, DID MS. HOLMES PRESENT TO THE SAFEWAY BOARD ON

09:12AM   3   OCCASION?

09:12AM   4   A.   YES, I CAN RECALL AT LEAST TWICE WHEN SHE DID THAT.

09:12AM   5   Q.   OKAY.  AND LET ME DRAW YOUR -- ON OCCASION, DID SHE

09:12AM   6   PRESENT POWERPOINTS TO THE SAFEWAY BOARD OF DIRECTORS?

09:12AM   7   A.   ON ONE OCCASION FOR SURE.

09:12AM   8   Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PAGE 2 OF THIS

09:12AM   9   EXHIBIT.

09:12AM  10        DO YOU SEE THE DATE AUGUST OF 2012?

09:12AM  11   A.   I DO.

09:12AM  12   Q.   OKAY.  AT A HIGH LEVEL, WHAT WAS YOUR LEVEL OF

09:13AM  13   SATISFACTION WITH THE PACE OF THE ROLLOUT IN SAFEWAY STORES FOR

09:13AM  14   THERANOS'S DEVICES AT THIS POINT IN TIME?

09:13AM  15   A.   I WOULD SAY I WAS DISAPPOINTED BECAUSE WE MET -- THE

09:13AM  16   ORIGINAL DEADLINE FOR A PILOT WAS GOING TO BE IN THE FIRST

09:13AM  17   QUARTER.  THAT DIDN'T HAPPEN.

09:13AM  18        AT THIS POINT WE'RE INTO THE THIRD QUARTER.  SO, YOU KNOW,

09:13AM  19   THE DATES JUST KEPT BEING PUSHED BACK.

09:13AM  20   Q.   AND WAS THIS A SENTIMENT SHARED BY THE SAFEWAY BOARD?

09:13AM  21   A.   I WOULD SAY ANY TIME YOU MISS A DEADLINE THEY'RE

09:13AM  22   CONCERNED, RIGHT.

09:13AM  23        BUT IT WASN'T THE BIGGEST ISSUE ON THE TABLE.

09:13AM  24   Q.   THE BIGGEST ISSUE IN TERMS OF SAFEWAY OVERALL?

09:13AM  25   A.   CORRECT.

UNITED STATES COURT REPORTERS

**ER-6774**

3024
BURD DIRECT BY MR. LEACH (RES.)

09:13AM  1    Q.   LET ME DRAW YOUR ATTENTION TO PAGE 3.

09:13AM  2         DO YOU SEE THE HEADINGS OR THE BULLET:  SAFEWAY READINESS;

09:14AM  3    THERANOS READINESS; PACE OF ROLLOUT; AND FINANCIAL

09:14AM  4    IMPLICATIONS?

09:14AM  5    A.   YES.

09:14AM  6    Q.   AND WAS THIS A DOCUMENT THAT YOU AND MS. HOLMES WORKED ON

09:14AM  7    TOGETHER?

09:14AM  8    A.   WHEN YOU SAY "WORKED TOGETHER" THIS IS, ON THE THERANOS

09:14AM  9    PIECE, WHICH IS THIS LARGELY ABOUT.  IF I HAD DONE SOME SLIDES,

09:14AM 10    I WOULD HAVE SHOWN THEM TO HER, AND IF SHE HAD DONE SOME

09:14AM 11    SLIDES, SHE WOULD HAVE SHOWN THEM TO ME.

09:14AM 12    Q.   OKAY.  SO YOU WERE SPEAKING TO SAFEWAY'S READINESS AND SHE

09:14AM 13    WAS SPEAKING TO THERANOS'S READINESS; IS THAT FAIR?

09:14AM 14    A.   I CAN'T TELL UNTIL I GET TO THE SLIDES, BUT THE

09:14AM 15    INFORMATION ON THERANOS READINESS CAME FROM ELIZABETH.

09:14AM 16    Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PAGE 4.

09:14AM 17         DO YOU SEE WHERE IT SAYS PREPARING SAFEWAY FOR LAUNCH?

09:14AM 18    A.   YES.

09:14AM 19    Q.   AND THE BULLETS ARE:  COMPLETE ALL CONSTRUCTION; HIRE AND

09:15AM 20    TRAIN NEW EMPLOYEES; CREATE PR BUZZ TO FACILITATE ADOPTION; AND

09:15AM 21    FINALIZE LOGISTICS.

09:15AM 22         DO YOU SEE THAT?

09:15AM 23    A.   I DO.

09:15AM 24    Q.   AND LET ME FOCUS ON THE "COMPLETED ALL CONSTRUCTION," AND

09:15AM 25    I DRAW YOUR ATTENTION TO PAGE 5.

UNITED STATES COURT REPORTERS

BURD DIRECT BY MR. LEACH (RES.)                                    3025

09:15AM  1      A.   YES.

09:15AM  2      Q.   AND DO YOU SEE THE PHASE I CONSTRUCTION, 969 U.S. UNITS?

09:15AM  3      A.   I DO.

09:15AM  4      Q.   AND WHAT DOES THAT REFER TO?

09:15AM  5      A.   WE INTENDED TO PUT THE MINILAB IN 969 U.S. UNITS.

09:15AM  6      Q.   AND HAD SAFEWAY TAKEN EFFORTS TO MODIFY THOSE UNITS TO GET

09:15AM  7      THEM READY FOR THE THERANOS ROLLOUT?

09:15AM  8      A.   YES.   THE -- THIS IS JUST DEPICTING WHERE WE ARE IN THAT

09:15AM  9      PROCESS.

09:15AM 10      Q.   AND WHAT IS MEANT BY THE TWO COLUMNS PLANS COMPLETE AND

09:15AM 11      CONSTRUCTION COMPLETE?

09:15AM 12      A.   THE FIRST THING YOU HAVE TO DO IS DRAW PLANS, AND OFTEN

09:15AM 13      LOCAL APPROVALS ON THOSE.   ONCE THE PLANS ARE APPROVED AND A

09:16AM 14      PERMIT IS GRANTED, THEN YOU CAN BE IN CONSTRUCTION.

09:16AM 15      Q.   OKAY.   AND THAT WAS DONE FOR 100 PERCENT OF THE 969 U.S.

09:16AM 16      UNITS IN PHASE I?

09:16AM 17      A.   THAT'S CORRECT.

09:16AM 18      Q.   AND CONSTRUCTION WAS ACTUALLY COMPLETE AT THIS POINT IN

09:16AM 19      TIME FOR 98 PERCENT OF THE 969 U.S. UNITS?

09:16AM 20      A.   YES.

09:16AM 21      Q.   OKAY.   THERE'S A REFERENCE TO PHASE II CONSTRUCTION.   WHAT

09:16AM 22      IS THAT?

09:16AM 23      A.   WE DECIDED THAT THE VOLUME WOULD BE SUCH THAT WE SHOULD

09:16AM 24      REALLY HAVE TWO PLACES IN THE STORE, AND SO WE CREATED A SECOND

09:16AM 25      ROOM.   IT WAS 9 FEET DEEP, 5 FEET WIDE.   WE ALSO NEEDED THAT

BURD DIRECT BY MR. LEACH (RES.)                                    3026

09:16AM   1     BECAUSE SAFEWAY HAD A GROWING VACCINATION BUSINESS AND WE

09:16AM   2     NEEDED TO COEXIST WITH THE LAB IN THAT SPACE.

09:16AM   3     Q.   LET ME NEXT DRAW YOUR ATTENTION, PLEASE, TO PAGE 11.

09:17AM   4          DO YOU SEE THE HEADING LAUNCH WITH HEAVY PR EFFORT?

09:17AM   5     A.   I DO.

09:17AM   6     Q.   OKAY.  IS PR AN ACRONYM FOR PUBLIC RELATIONS?

09:17AM   7     A.   YES.

09:17AM   8     Q.   AND THE FIRST BULLET SAYS, "ELIZABETH WILL MEET WITH

09:17AM   9     EDITORIAL BOARDS OF ALL LOCAL NEWSPAPERS."

09:17AM  10          DO YOU SEE THAT?

09:17AM  11     A.   I DO.

09:17AM  12     Q.   AND WHERE DID THAT IDEA COME FROM?

09:17AM  13     A.   YOU KNOW, THE -- CREATING THE LAUNCH EFFORT AND THE

09:17AM  14     MARKETING, THAT WAS LARGELY IN THERANOS'S DOMAIN.  YOU KNOW, WE

09:17AM  15     PROVIDED SOME INPUT ON THAT, BUT THAT WAS LARGELY SOMETHING

09:17AM  16     THAT THEY WOULD DO.

09:17AM  17     Q.   "A WSJ ARTICLE WILL BE RELEASED THE DAY OF OUR LAUNCH."

09:17AM  18          DO YOU KNOW WHERE THAT IDEA CAME FROM?

09:17AM  19     A.   AGAIN, IT WOULD HAVE COME FROM THERANOS.

09:17AM  20     Q.   OKAY.  LET ME DRAW YOUR ATTENTION, PLEASE, TO PAGE 12.

09:18AM  21          DO YOU SEE THE HEADING OPERATIONAL LOGISTICS?

09:18AM  22     A.   YES.

09:18AM  23     Q.   AND THEN IN THE FIRST BULLET IT SAYS, "ONE CARTRIDGE WILL

09:18AM  24     SATISFY 95 PERCENT OF ALL CPT CODES."

09:18AM  25          WHERE DID THAT INFORMATION COME FROM?

BURD DIRECT BY MR. LEACH (RES.)                                        3027

09:18AM   1      A.   THAT CAME FROM THERANOS.

09:18AM   2      Q.   DID IT COME FROM MS. HOLMES?

09:18AM   3      A.   IT DID.

09:18AM   4      Q.   AND WHAT DOES THAT MEAN, THAT ONE CARTRIDGE WILL SATISFY

09:18AM   5   95 PERCENT OF ALL CPT CODES?

09:18AM   6      A.   IT MEANS THAT THE CARTRIDGES WHICH GO INTO THE MACHINES,

09:18AM   7   THAT A SINGLE CARTRIDGE, A SINGLE CONFIGURATION WILL BE CAPABLE

09:18AM   8   OF DOING ALL CPT CODES, AND A CPT CODE IS A BILLING CODE AND IT

09:18AM   9   IDENTIFIES A SPECIFIC BLOOD TEST.

09:18AM  10      Q.   AND WAS THIS INFORMATION RELEVANT TO YOU?

09:18AM  11      A.   IT WAS GREAT NEWS.

09:18AM  12      Q.   AND WHY WAS IT GREAT NEWS?

09:18AM  13      A.   BECAUSE WE HAD TO INVENTORY THESE CARTRIDGES IN EACH OF

09:19AM  14   THOSE STORES, AND IT MEANT THAT WE COULD HAVE MOSTLY THIS ONE

09:19AM  15   CARTRIDGE THAT DID 95 PERCENT, AND THEN A FEW OTHER CARTRIDGES

09:19AM  16   THAT WOULD, YOU KNOW, GET SOME LEVEL OF VOLUME, AND THEN THE

09:19AM  17   MOST ESOTERIC OF BLOOD TESTS MIGHT GO OUTSIDE.

09:19AM  18      Q.   AND BASED ON STATEMENTS FROM MS. HOLMES, WAS IT YOUR

09:19AM  19   UNDERSTANDING THAT THIS WAS SOMETHING THAT THERANOS COULD DO IN

09:19AM  20   AUGUST OF 2012?

09:19AM  21      A.   YES.

09:19AM  22      Q.   LET ME DRAW YOUR ATTENTION TO THE NEXT PAGE, PAGE 13.

09:19AM  23           DO YOU SEE WHERE IT SAID THERANOS READINESS ON KEY TASKS?

09:19AM  24      A.   YES.

09:19AM  25      Q.   AND THERE'S A REFERENCE TO:  ON-CAMPUS FACILITY; STATUS OF

BURD DIRECT BY MR. LEACH (RES.)                                    3028

09:19AM  1      ONLINE ADJUDICATION; PRODUCTION RATE OF PROCESSING PLATFORM;

09:19AM  2      PRODUCTION RATE OF CARTRIDGES.

09:19AM  3           DO YOU SEE THOSE BULLETS?

09:19AM  4      A.   I DO.

09:19AM  5      Q.   AND WHAT DID YOU UNDERSTAND PRODUCTION RATE OF PROCESSING

09:20AM  6      PLATFORM AND PRODUCTION OF RATE OF CARTRIDGES TO MEAN?

09:20AM  7      A.   IN ORDER TO DO THE MINILAB, YOU NEEDED BOTH A MACHINE AND

09:20AM  8      YOU NEEDED CARTRIDGES TO GO IN IT.

09:20AM  9           AND SO AS YOU BUILD UP FOR A LAUNCH, YOU NEED TO HAVE

09:20AM 10      AMPLE INVENTORY SO YOUR BUSINESS DOESN'T GET DISRUPTED.

09:20AM 11      Q.   AT ANY POINT IN TIME IN THIS BOARD MEETING OR THIS

09:20AM 12      AUGUST 2012 TIME PERIOD, DID MS. HOLMES RAISE WITH YOU ANY TYPE

09:20AM 13      OF TECHNOLOGICAL ISSUE WITH THE MINILAB DEVICE THAT WAS HOLDING

09:20AM 14      UP THE ROLLOUT?

09:20AM 15      A.   I DON'T RECALL THE TIMEFRAME, BUT THE ONLY TECHNICAL ISSUE

09:20AM 16      THAT I RECALL WAS THIS EXCESS HEAT GENERATED BY STACKING ONE

09:20AM 17      UNIT ON TOP OF THE OTHER.

09:20AM 18      Q.   THANK YOU.

09:20AM 19           YOU CAN PUT THAT -- I'D LIKE TO DRAW YOUR ATTENTION TO THE

09:20AM 20      NEXT DOCUMENT, MR. BURD, WHICH IS EXHIBIT 670.  I'M ONLY

09:21AM 21      FOCUSSED ON PAGES 2 AND 3 OF 670, MR. BURD.

09:21AM 22      A.   YES.

09:21AM 23      Q.   AND DOES IT APPEAR TO BE AN EMAIL EXCHANGE BETWEEN YOU AND

09:21AM 24      MS. HOLMES DATED SEPTEMBER 12TH, 2012?

09:21AM 25      A.   YES.

UNITED STATES COURT REPORTERS

BURD DIRECT BY MR. LEACH (RES.)

09:21AM   1          MR. LEACH:  YOUR HONOR, I OFFER PAGES 2 AND 3 OF

09:21AM   2     EXHIBIT 670.

09:21AM   3          MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

09:21AM   4          THE COURT:  THEY'RE ADMITTED, AND THEY MAY BE

09:21AM   5     PUBLISHED.

09:21AM   6          (GOVERNMENT'S EXHIBIT 670, PAGES 2 AND 3 WAS RECEIVED IN

09:21AM   7     EVIDENCE.)

09:21AM   8          MR. LEACH:  MS. HOLLIMAN, IF WE CAN PLEASE FOCUS ON

09:21AM   9     THE BOTTOM EMAIL IN THE CHAIN ON THE FIRST PAGE.

09:22AM  10     Q.   DO YOU SEE YOUR EMAIL ADDRESS IN THE FROM LINE, MR. BURD?

09:22AM  11     A.   I DO.

09:22AM  12     Q.   AND THE SUBJECT OF THIS IS ON CAMPUS FACILITY PERFORMANCE?

09:22AM  13     A.   CORRECT.

09:22AM  14     Q.   AND WHAT WAS THE ON CAMPUS FACILITY?

09:22AM  15     A.   WE HAD A HEALTH CENTER ON OUR CAMPUS, YOU KNOW, FOUR OR

09:22AM  16     FIVE BUILDINGS, AND THAT SEEMED THE LOGICAL PLACE TO PUT THIS

09:22AM  17     LAB, SO WE PUT IT OVER THERE IN THAT BUILDING.  THAT ALSO

09:22AM  18     CONTAINED AN EXERCISE FACILITY.

09:22AM  19     Q.   AND WHEN YOU SAY "PUT THIS LAB," WHAT DO YOU MEAN?  WHAT

09:22AM  20     WAS --

09:22AM  21     A.   WELL, THE ORIGINAL EXPECTATION IS THAT WE WOULD PUT A

09:22AM  22     THERANOS UNIT IN THERE.  THAT WAS THE REASON FOR WANTING AN ON

09:22AM  23     CAMPUS LAB, AND SO WE WOULD GET SOME REAL EXPERIENCE BECAUSE I

09:22AM  24     WAS REQUIRING THAT ALL SAFEWAY EMPLOYEES AND FAMILIES THAT

09:22AM  25     LIVED IN A CERTAIN RADIUS, THAT'S THE LAB THAT THEY WERE TO

BURD DIRECT BY MR. LEACH (RES.)                           3030

09:22AM   1    USE.  IF THEY USED THAT LAB, WE WOULD PAY FOR THEIR LAB COSTS.

09:23AM   2         AS IT TURNED OUT, WE DIDN'T GET -- WE DIDN'T GET A LAB

09:23AM   3    UNIT FROM THERANOS.  WE ENDED UP DRAWING BLOOD.  I BELIEVE IT

09:23AM   4    WAS MOSTLY VEIN DRAW, BUT SOME OF THAT WAS ALSO FINGERSTICK IF

09:23AM   5    THE PATIENT AGREED TO TWO DIFFERENT FORMS, AND THEN THEY LEFT

09:23AM   6    THE FACILITY TO BE, TO BE ANALYZED.

09:23AM   7    Q.   THE BLOOD WAS TAKEN FROM THE SAFEWAY FACILITY SOMEWHERE

09:23AM   8    ELSE; IS THAT RIGHT?

09:23AM   9    A.   CORRECT.

09:23AM   10   Q.   OKAY.  AND DID MS. HOLMES GIVE YOU AN EXPLANATION FOR WHY

09:23AM   11   THERE WERE VENOUS AND FINGERSTICK DRAWS?

09:23AM   12   A.   THE -- I THINK THE EXPLANATION WAS THAT THEY WANTED TO,

09:23AM   13   YOU KNOW, CONTINUE TO TEST AND CALIBRATE, YOU KNOW, THEIR

09:23AM   14   UNITS, AND YOU COULD GET BOTH THE FINGERSTICK AND YOU COULD GET

09:24AM   15   A REGULAR DRAW AND IN THEORY THOSE ALL TO TURN OUT REMARKABLY

09:24AM   16   THE SAME.

09:24AM   17   Q.   IN THIS EMAIL TO MS. HOLMES YOU WROTE, "I AM GENUINELY

09:24AM   18   CONCERNED THAT SAFEWAY'S LAB REPUTATION GETS WORSE BY THE DAY.

09:24AM   19   KEEP IN MIND, I HAVE NOW REQUIRED THAT OUR EMPLOYEES AND THEIR

09:24AM   20   NEARBY DEPENDENTS USE THIS LAB."

09:24AM   21        WHAT WERE YOU GETTING AT THERE?

09:24AM   22   A.   WELL, EVEN THOUGH IT WAS A LAB ON OUR FACILITY, I THINK

09:24AM   23   OUR EMPLOYEES KNEW THAT WE WERE NOT REALLY THE ONES OPERATING

09:24AM   24   IT, RIGHT, AND THAT THERE WAS A LAB INVOLVED.

09:24AM   25        AND I THINK WHENEVER YOU START SOMETHING NEW, YOU'RE GOING

BURD DIRECT BY MR. LEACH (RES.)                              3031

09:24AM  1    TO HAVE SOME ROUGH SPOTS.  BUT WE CONTINUED TO HAVE ROUGH

09:24AM  2    SPOTS.  WE HAD SAMPLES WHERE TEMPERATURE WAS NOT PROPERLY

09:24AM  3    CONTROLLED, WE HAD SAMPLES THAT WERE LOST, WE HAD RESULTS THAT

09:24AM  4    DIDN'T MAKE ANY SENSE.  THOSE ARE THE KINDS OF THINGS THAT I

09:25AM  5    WAS REFERRING TO.

09:25AM  6    Q.   OKAY.  LATER ON IN THAT PARAGRAPH YOU WROTE, "THE SOONER

09:25AM  7    WE GET TO 'FINGERSTICK,' THE BETTER WE WILL BE."

09:25AM  8         WHAT DID YOU MEAN BY THAT?

09:25AM  9    A.   WELL, WHAT I MEANT WAS THAT I REALLY WANTED A FULL TEST,

09:25AM 10    AND THE REASON WE DIDN'T END UP WITH A THERANOS UNIT IN THE

09:25AM 11    BUILDING IS THAT AFTER THINKING ABOUT IT MORE, ELIZABETH

09:25AM 12    THOUGHT THERE WAS A LOT MORE RISK THAT THE TECHNOLOGY GET OUT,

09:25AM 13    YOU KNOW, PARTICULARLY TO OTHER COMPETITORS.  THERE WAS

09:25AM 14    ACTUALLY A QUEST LOCATED ABOUT 50 YARDS FROM THIS BUILDING, A

09:25AM 15    QUEST LAB.

09:25AM 16    Q.   BENEATH YOU SUGGEST SOME CHANGES IN PROCEDURES, AND THEN

09:25AM 17    IN THE PARAGRAPH AFTER 4, YOU WROTE, "WHILE MY STAFF TELLS ME

09:25AM 18    THAT THERANOS PERFORMANCE IS MUCH BETTER THAN THE FIRST THREE

09:25AM 19    MONTHS, IT IS NOWHERE CLOSE TO THAT OF QUEST.  AS YOU KNOW, THE

09:26AM 20    VAST MAJORITY OF THEIR RESULTS ARE DELIVERED THE NEXT DAY."

09:26AM 21         WHAT WERE YOU GETTING AT THERE?

09:26AM 22    A.   WELL, THE TURN TIME WASN'T VERY PREDICTABLE, AND IT

09:26AM 23    TYPICALLY WOULD RUN TWO TO FOUR DAYS, AND SOME EVEN LONGER THAN

09:26AM 24    THAT.  AND SO IT'S DIFFICULT TO COMPETE, YOU KNOW, WITH A LAB

09:26AM 25    THAT GIVES YOU RESULTS SUBSTANTIALLY FASTER.

UNITED STATES COURT REPORTERS

3032
BURD DIRECT BY MR. LEACH (RES.)

09:26AM  1      Q.   LET ME NEXT DRAW YOUR ATTENTION TO WHAT WE'VE MARKED AS

09:26AM  2      EXHIBIT 684.

09:26AM  3           DOES THIS APPEAR TO BE ANOTHER EMAIL EXCHANGE BETWEEN YOU

09:26AM  4      AND MS. HOLMES DURING THIS SEPTEMBER 2012 TIME PERIOD?

09:26AM  5      A.   YES.

09:26AM  6              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 684.

09:26AM  7              MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

09:26AM  8              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:26AM  9         (GOVERNMENT'S EXHIBIT 684 WAS RECEIVED IN EVIDENCE.)

09:26AM 10              MR. LEACH:  AND IF WE CAN PLEASE ZOOM IN ON THE

09:27AM 11      MIDDLE EMAIL, MS. HOLLIMAN, THE ONE FROM MR. BURD.  THAT'S IT.

09:27AM 12      ALL OF THE WAY DOWN IF WE COULD.  PERFECT.

09:27AM 13      Q.   DO YOU SEE YOUR NAME IN THE FROM LINE OF THIS EMAIL,

09:27AM 14      MR. BURD?

09:27AM 15      A.   I DO.

09:27AM 16      Q.   AND THIS IS TO ELIZABETH HOLMES?

09:27AM 17      A.   YES.

09:27AM 18      Q.   IN THE FIRST PARAGRAPH YOU WROTE, "I THOUGHT I WOULD SHARE

09:27AM 19      WITH YOU WHAT YOUR TEAM HAS COMMUNICATED TO BRIAN HILLE."

09:27AM 20           WHO IS BRIAN HILLE?

09:27AM 21      A.   BRIAN HILLE WAS THE HEAD OF OUR PHARMACY OPERATIONS.

09:27AM 22      Q.   YOU THEN WRITE, "IF THE SOFT LAUNCH IS LIKELY TO BE AS

09:27AM 23      LATE AS OCTOBER 29TH, I NEED TO KNOW THAT NOW SO I CAN SLOW

09:27AM 24      DOWN THE HIRING EFFORT."

09:27AM 25           WHAT WERE YOU GETTING AT THERE?

BURD DIRECT BY MR. LEACH (RES.)                          3033

09:27AM   1      A.   THE EMPLOYEES IN THE STORE WHO WOULD BE RESPONSIBLE FOR

09:27AM   2      THE LAB WORK WOULD ACTUALLY BE EMPLOYEES OF SAFEWAY, SO WE WERE

09:28AM   3      IN THE PROCESS OF HIRING, YOU KNOW, A LOT OF FOLKS.   AND

09:28AM   4      SOMEWHERE ALONG THE LINE ELIZABETH THOUGHT IT BEST, I DIDN'T

09:28AM   5      DISAGREE, THAT WE ACTUALLY HIRE A PHLEBOTOMIST, BECAUSE THAT'S

09:28AM   6      WHAT PEOPLE WERE USED TO DEALING WITH WAS A PHLEBOTOMIST.

09:28AM   7      Q.   SO SAFEWAY WAS HIRING A NUMBER OF PHLEBOTOMISTS?

09:28AM   8      A.   WE HIRED AN OUTSIDE AGENCY TO DO THE HIRING, AND WE HIRED

09:28AM   9      BOTH PEOPLE WITH EXPERIENCE AND WE HIRED PEOPLE WITHOUT

09:28AM  10      EXPERIENCE, AND I RECALL AT ONE POINT WE HAD 26 PEOPLE HIRED

09:28AM  11      AND ANOTHER 400 POSSIBILITIES IN THE WAITING.

09:28AM  12      Q.   ALL IN ANTICIPATION OF THE LAUNCH WITH THERANOS IN SAFEWAY

09:28AM  13      STORES?

09:28AM  14      A.   CORRECT.

09:28AM  15      Q.   AND IN THE NEXT PARAGRAPH YOU WROTE, "IT ALSO LOOKS LIKE

09:28AM  16      YOUR LAB WORK IS BEING SENT TO UTAH, NOT UCSF, AND NOT BEING

09:28AM  17      DONE ON SITE.   IT IS THE ONLY WAY IT COULD POSSIBLY TAKE 3 TO

09:29AM  18      5 DAYS."

09:29AM  19           WHAT WERE YOU GETTING AT THERE?

09:29AM  20      A.   WELL, I THINK THE ORIGINAL INTENT WAS TO USE UCSF FOR SOME

09:29AM  21      OF THE ANALYSIS, YOU KNOW, PARTICULARLY THE RARER TESTS.   AND

09:29AM  22      THIS IS INFORMATION THAT I GOT UNDOUBTEDLY FROM BRIAN HILLE,

09:29AM  23      AND I DON'T KNOW HOW HE LEARNED THAT IT WAS BEING SENT TO UTAH,

09:29AM  24      BUT THAT'S WHAT HE TOLD ME.

09:29AM  25      Q.   WAS THAT SURPRISING TO YOU?

BURD DIRECT BY MR. LEACH (RES.)                        3034

09:29AM   1       A.   YEAH, IT'S A LONG WAYS AWAY.

09:29AM   2       Q.   AND DID MS. HOLMES GIVE YOU ANY EXPLANATION FOR WHY

09:29AM   3    THERANOS WAS SENDING TESTS EITHER TO UTAH OR TO UCSF?

09:29AM   4       A.   I DON'T RECALL AN EXPLANATION.  I KNEW THEY WERE DOING

09:29AM   5    SOME WORK DOWN IN THEIR FACILITY.

09:29AM   6       Q.   DID YOU THINK IT WAS FOR THE MAJORITY OF TESTS?  FOR A

09:29AM   7    PORTION OF THE TESTS?  WHAT WAS IN YOUR MIND?

09:29AM   8       A.   I REALLY DIDN'T KNOW.

09:30AM   9       Q.   IN THE THIRD PARAGRAPH YOU WROTE, "I FIRMLY BELIEVE THERE

09:30AM  10    ARE THINGS THAT WE SHOULD BE DOING DIFFERENTLY EVEN IN THE

09:30AM  11    SHORT RUN.  I AM SURE I DON'T HAVE ALL OF THE INFORMATION YOU

09:30AM  12    HAVE, BUT GIVEN THE SMALL NUMBER OF PATIENTS, WE COULD CREATE A

09:30AM  13    MUCH BETTER SHORT TERM EXPERIENCE WITH LITTLE OR NO ADDITIONAL

09:30AM  14    EFFORT.  IT PAINS ME NOT TO DO SO."

09:30AM  15        WHAT WERE YOU GETTING AT THERE?

09:30AM  16       A.   JUST THAT THE EXECUTION WASN'T GOOD.  YOU KNOW, IN THE

09:30AM  17    SUPERMARKET BUSINESS, WHICH IS SUCH LOW MARGIN, I MEAN,

09:30AM  18    OPERATIONS REALLY HAVE TO CLICK OR YOU DON'T MAKE ANY MONEY AT

09:30AM  19    ALL.

09:30AM  20        SO WE WERE REALLY FOCUSSED ON THE OPERATING ASPECTS OF

09:30AM  21    THIS FACILITY.

09:30AM  22       Q.   FURTHER DOWN BELOW YOU WROTE, "I JUST KNOW WE CAN DO

09:30AM  23    BETTER.  PROCESS IS SOMETHING THAT WE ARE VERY GOOD AT.  SORRY

09:30AM  24    TO BURDEN YOU WITH THIS."

09:30AM  25        WHAT WERE YOU COMMUNICATING THERE?

BURD DIRECT BY MR. LEACH (RES.)                                 3035

09:30AM   1    A.   IF THERE WAS SOMETHING THAT WE COULD DO TO HELP IMPROVE

09:30AM   2    THE PROCESS, WE WERE READY TO DO IT.

09:31AM   3    Q.   DID MS. HOLMES EVER TAKE YOU UP ON THAT?

09:31AM   4    A.   NO.

09:31AM   5    Q.   LET ME DRAW YOUR ATTENTION TO WHAT HAS BEEN MARKED AS

09:31AM   6    EXHIBIT 693.

09:31AM   7        IS THIS AN EMAIL EXCHANGE -- DOES THIS APPEAR TO BE AN

09:31AM   8    EMAIL EXCHANGE BETWEEN YOU AND ELIZABETH HOLMES IN THE

09:31AM   9    OCTOBER 2012 TIME PERIOD?

09:31AM   10   A.   YES.

09:31AM   11           MR. LEACH:   YOUR HONOR, I OFFER EXHIBIT 693.

09:31AM   12           MR. DOWNEY:   NO OBJECTION, YOUR HONOR.

09:31AM   13           THE COURT:   IT'S ADMITTED.   IT MAY BE PUBLISHED.

09:31AM   14       (GOVERNMENT'S EXHIBIT 693 WAS RECEIVED IN EVIDENCE.)

09:31AM   15           MR. LEACH:   AND IF WE CAN PLEASE ZOOM IN ON THE TOP

09:31AM   16   HALF.

09:31AM   17       THANK YOU, MS. HOLLIMAN.

09:31AM   18   Q.   MR. BURD, THE SUBJECT OF THIS IS SIX STORE LAUNCH

09:31AM   19   SCHEDULE.

09:31AM   20       DO YOU SEE THAT?

09:31AM   21   A.   YES.

09:31AM   22   Q.   AND WHAT DOES THAT REFER TO?

09:31AM   23   A.   THAT REFERS TO TRYING TO GO FROM THE ON CAMPUS FACILITY TO

09:32AM   24   SIX STORES, AND IT'S A BIT OF A PILOT.

09:32AM   25   Q.   AND THIS WAS SOMETHING THAT YOU WERE ENDEAVORING TO DO IN

                              UNITED STATES COURT REPORTERS

                                      **ER-6786**

BURD DIRECT BY MR. LEACH (RES.)                                    3036

09:32AM   1     THE FOURTH QUARTER OF 2012?

09:32AM   2     A.   THAT'S WHAT IT LOOKS LIKE FROM THIS MEMO.

09:32AM   3     Q.   OKAY.  DID MS. HOLMES EVER SAY TO YOU THAT THERE WAS SOME

09:32AM   4     TYPE OF TECHNOLOGICAL ISSUE GETTING IN THE WAY OF THAT?

09:32AM   5     A.   NO.

09:32AM   6     Q.   YOU WROTE, "WHERE ARE WE ON THE SCHEDULE?  WE HAVE HIRED

09:32AM   7     26 PHLEBOTOMISTS AND HAVE SCREENED, INTERVIEWED, AND HAVE

09:32AM   8     IDENTIFIED 181 OTHERS THAT WE ARE PREPARED TO HIRE."

09:32AM   9         IS THAT A REFERENCE TO THE HIRING THAT SAFEWAY ENGAGED IN

09:32AM   10    DURING THIS TIME PERIOD?

09:32AM   11    A.   YES.

09:32AM   12    Q.   LET ME NOW DRAW YOUR ATTENTION TO EXHIBIT 699.

09:32AM   13        IS THIS AN EMAIL BETWEEN YOU AND MS. HOLMES IN NOVEMBER OF

09:32AM   14    2012?

09:32AM   15    A.   YES.

09:32AM   16            MR. LEACH:  I OFFER EXHIBIT 699, YOUR HONOR.

09:32AM   17            MR. DOWNEY:  NO OBJECTION.

09:32AM   18            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:33AM   19        (GOVERNMENT'S EXHIBIT 699 WAS RECEIVED IN EVIDENCE.)

09:33AM   20    BY MR. LEACH:

09:33AM   21    Q.   DO YOU SEE THE SUBJECT SIX STORE LAUNCH, MR. BURD?

09:33AM   22    A.   YES.

09:33AM   23    Q.   AND IS THAT A REFERENCE SIMILAR TO THE EMAIL THAT WE JUST

09:33AM   24    LOOKED AT?

09:33AM   25    A.   CORRECT.

BURD DIRECT BY MR. LEACH (RES.)

09:33AM   1    Q.   OKAY.  YOU WROTE IN THE BOTTOM EMAIL, "IF WE DON'T PICK A

09:33AM   2    LAUNCH DATE SOON, WE CAN FORGET ABOUT LAUNCHING EVEN SIX STORES

09:33AM   3    IN 2012.  IF YOU HAVE ALREADY DECIDED IT IS NOT GOING TO HAPPEN

09:33AM   4    UNTIL NEXT YEAR, I WOULD LIKE TO KNOW.  WHILE IT WOULD BE VERY

09:33AM   5    UNFORTUNATE TO NOT LAUNCH IN Q4, BASED ON THE INFORMATION I

09:33AM   6    HAVE, IT LOOKS PRETTY REMOTE.  I FEEL LIKE A JOGGER RUNNING IN

09:33AM   7    PLACE WAITING FOR THE STOPLIGHT TO TURN GREEN."

09:33AM   8         WHAT DID YOU MEAN IN THAT LAST SENTENCE, THAT YOU FELT

09:33AM   9    LIKE A JOGGER RUNNING IN PLACE?

09:33AM  10    A.   WELL, WE WERE READY.  ON OUR END WE WERE COMPLETELY READY,

09:33AM  11    AND WE WERE JUST WAITING ON THERANOS WITH NO REAL EXPLANATION

09:33AM  12    AS TO WHY IT WAS BEING DELAYED.

09:34AM  13         SO THE JOGGER MAKES NO PROGRESS AT A STOPLIGHT.

09:34AM  14    Q.   LET ME NEXT DRAW YOUR ATTENTION TO EXHIBIT 701.

09:34AM  15         DOES THIS APPEAR TO BE ANOTHER EMAIL BETWEEN YOU AND

09:34AM  16    MS. HOLMES IN OR AROUND NOVEMBER OF 2012?

09:34AM  17    A.   YES.

09:34AM  18              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 701 INTO

09:34AM  19    EVIDENCE.

09:34AM  20              MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

09:34AM  21              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:34AM  22         (GOVERNMENT'S EXHIBIT 701 WAS RECEIVED IN EVIDENCE.)

09:34AM  23    BY MR. LEACH:

09:34AM  24    Q.   MR. BURD, THE SUBJECT OF THIS EMAIL IS BECOMING

09:34AM  25    DISCOURAGED.

BURD DIRECT BY MR. LEACH (RES.)                           3038

```
09:34AM   1              DO YOU SEE THAT LANGUAGE?

09:34AM   2     A.   I DO.

09:34AM   3     Q.   OKAY.  WERE YOU BECOMING DISCOURAGED AT THIS POINT IN

09:34AM   4     TIME?

09:34AM   5     A.   I WAS GETTING CLOSE.

09:34AM   6     Q.   YOU WROTE, "I CAN RECALL HAVING BEEN DISCOURAGED ONCE IN

09:34AM   7     THE LAST 62 YEARS.  THAT SAID, I AM GETTING CLOSE TO MY SECOND

09:35AM   8     EVENT."

09:35AM   9              WAS THAT TRUE AT THE TIME?

09:35AM  10     A.   YES.  I KNOW IT SOUNDS LIKE A BIT OF AN EXAGGERATION, BUT

09:35AM  11     I'M ONE OF THE MOST POSITIVE PEOPLE YOU'LL EVER MEET.  I DON'T

09:35AM  12     GET DISCOURAGED.

09:35AM  13     Q.   AND WHAT WAS DISCOURAGING YOU?

09:35AM  14     A.   WELL, DEADLINES WEREN'T MET, NO REAL EXPLANATION PROVIDED.

09:35AM  15     I FELT -- I FELT THAT THERE WERE OBSTACLES THAT WERE GETTING IN

09:35AM  16     THE WAY.  I DIDN'T THINK IT WAS THE BOX.  I THOUGHT THERE WERE

09:35AM  17     OTHER OBSTACLES.

09:35AM  18              AND WHEN YOU HAVE 185,000 EMPLOYEES, YOU'RE WILLING TO

09:35AM  19     DEVOTE SOME OF THOSE PEOPLE TO REMOVING THOSE OBSTACLES IF THAT

09:35AM  20     WOULD BE HELPFUL.

09:35AM  21     Q.   AND DID MS. HOLMES EVER TAKE YOU UP ON THAT?

09:35AM  22     A.   WE DID A COUPLE OF THINGS TOGETHER TO TRY TO GET THE

09:35AM  23     LOGISTICS RIGHT IN THE STORE, BUT THAT WAS A NATURAL THING.  IT

09:35AM  24     WAS GOING TO TAKE PLACE IN OUR STORES AND WE WORKED ON THAT

09:35AM  25     TOGETHER.
```

UNITED STATES COURT REPORTERS

BURD DIRECT BY MR. LEACH (RES.)

09:35AM   1          THERE WERE A NUMBER OF THINGS WE WORKED ON TOGETHER, BUT

09:35AM   2     WE DIDN'T REMOVE OBSTACLES TOGETHER.

09:35AM   3     Q.   LET ME NEXT DRAW YOUR ATTENTION TO EXHIBIT 715.

09:36AM   4          DOES THIS APPEAR TO BE AN EMAIL EXCHANGE BETWEEN YOU AND

09:36AM   5     MS. HOLMES IN THE DECEMBER 2012 TIME PERIOD?

09:36AM   6     A.   YES.

09:36AM   7              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 715 INTO

09:36AM   8     EVIDENCE.

09:36AM   9              MR. DOWNEY:  NO OBJECTION.

09:36AM  10              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:36AM  11         (GOVERNMENT'S EXHIBIT 715 WAS RECEIVED IN EVIDENCE.)

09:36AM  12              MR. LEACH:  AND, MS. HOLLIMAN, IF WE COULD PLEASE

09:36AM  13     FOCUS ON THE BOTTOM EMAIL FROM MR. BURD.

09:36AM  14     Q.   LET ME DRAW YOUR ATTENTION TO THE FIRST PARAGRAPH,

09:36AM  15     MR. BURD.

09:36AM  16          DO YOU SEE WHERE YOU WROTE, "I HAVE LOTS OF DATA POINTS

09:36AM  17     FROM YOUR TEAM THAT SUGGESTS THAT SAFEWAY AND THERANOS MAY NOT

09:36AM  18     HAVE ALWAYS BEEN ON THE SAME PAGE"?

09:36AM  19     A.   YES.

09:36AM  20     Q.   AND THEN YOU PROVIDE A PARTIAL LIST OF THAT?

09:37AM  21     A.   I DO.

09:37AM  22     Q.   IN NUMBER 1 YOU WROTE, "THE ON CAMPUS LAB HAS OPERATED FOR

09:37AM  23     ALMOST A YEAR WITH A POOR PATIENT EXPERIENCE.  (THIS HAS

09:37AM  24     NOTHING TO DO WITH THE FACT THAT WE ARE DOING VEIN DRAW.)"

09:37AM  25          WAS THAT YOUR VIEW AT THE TIME?

BURD DIRECT BY MR. LEACH (RES.)                                    3040

```
09:37AM   1        A.   YES.

09:37AM   2        Q.   AND WAS THAT A TOPIC THAT YOU HAD DISCUSSED WITH

09:37AM   3     MS. HOLMES ON MORE THAN ONE OCCASION?

09:37AM   4        A.   YES, IT WAS.

09:37AM   5        Q.   AND NUMBER 2 YOU WROTE, "THERANOS HAS BEEN SLOW TO REACT

09:37AM   6     TO OUR CONCERNS ABOUT THE ON CAMPUS LAB AND UNWILLING TO ALLOW

09:37AM   7     US TO FIX THE PROCESS OURSELVES."

09:37AM   8             WAS THAT YOUR VIEW AT THE TIME?

09:37AM   9        A.   YES.

09:37AM  10        Q.   AND WAS THAT SOMETHING THAT YOU HAD DISCUSSED WITH

09:37AM  11     MS. HOLMES ON MORE THAN ONE OCCASION?

09:37AM  12        A.   YES.

09:37AM  13        Q.   IF WE CAN GO TO THE NEXT PAGE, MS. HOLLIMAN.

09:37AM  14             I DRAW YOUR ATTENTION TO NUMBER 4, MR. BURD.

09:37AM  15        A.   YES.

09:37AM  16        Q.   YOU WROTE, "MY REPEATED SUGGESTIONS THAT WE ENGAGE IN A

09:38AM  17     COLLABORATIVE REVIEW OF THE PATIENT EXPERIENCE HAVE YET TO

09:38AM  18     GENERATE A POSITIVE RESPONSE.  THE PATIENT EXPERIENCE HAS BEEN

09:38AM  19     DESIGNED ENTIRELY BY THERANOS.  THIS IS NOT MY ONLY EXPERIENCE,

09:38AM  20     THIS IS MY TEAM'S EXPERIENCE."

09:38AM  21             WHAT DID YOU MEAN BY THAT?

09:38AM  22        A.   THAT WE WERE NOT PART OF THAT DETAILED PROCESS.  THINK OF

09:38AM  23     IT AS THE LOGISTICS OF A PATIENT COMES IN, HOW THEY GET CHECKED

09:38AM  24     IN, WHERE THEY SIT, YOU KNOW, ALL OF THE INFORMATION BEHIND IT

09:38AM  25     SO THAT IT'S HIGHLY AUTOMATED.  YOU KNOW, OF THE TWO COMPANIES,
```

BURD DIRECT BY MR. LEACH (RES.)                                       3041

09:38AM   1     WE WERE THE COMPANY THAT HAD PROBABLY GIVEN MILLIONS OF

09:38AM   2     VACCINATIONS, SO WE HAD PATIENT EXPERIENCE, AND WE WANTED TO

09:38AM   3     LEND THAT EXPERIENCE TO THE PROCESS.

09:38AM   4     Q.   AND THEN DOWN AT THE BOTTOM YOU WROTE, "I AM SORRY IF THIS

09:38AM   5     SOUNDS A BIT BLUNT.  CHALK IT UP TO THE LIMITATIONS OF EMAIL."

09:39AM   6          DID YOU THINK YOU WERE BEING BLUNT HERE?

09:39AM   7     A.   I THOUGHT I WAS BEING BLUNT.

09:39AM   8     Q.   WHY WERE YOU BEING BLUNT?

09:39AM   9     A.   NOTHING ELSE HAD WORKED.

09:39AM   10    Q.   LET ME MOVE FORWARD IN TIME, MR. BURD, TO JANUARY OF 2013.

09:39AM   11    I DRAW YOUR ATTENTION TO EXHIBIT 770.

09:39AM   12         MAY I HAVE ONE MOMENT, YOUR HONOR?

09:39AM   13              THE COURT:  YES.

09:39AM   14         (PAUSE IN PROCEEDINGS.)

09:39AM   15    BY MR. LEACH:

09:39AM   16    Q.   DOES THIS APPEAR TO BE AN EMAIL EXCHANGE BETWEEN YOU AND

09:40AM   17    MS. HOLMES ON OR ABOUT JANUARY 20TH OF 2013?

09:40AM   18    A.   YES.

09:40AM   19              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 770 INTO

09:40AM   20    EVIDENCE.

09:40AM   21              MR. DOWNEY:  SUBJECT TO THE REDACTIONS THAT COUNSEL

09:40AM   22    REPRESENTS WERE MADE, WE HAVE NO OBJECTION.

09:40AM   23              THE COURT:  ALL RIGHT.  YOU'VE MADE THOSE

09:40AM   24    REDACTIONS?

09:40AM   25              MR. LEACH:  WE HAVE, YOUR HONOR.

                        UNITED STATES COURT REPORTERS

3042
BURD DIRECT BY MR. LEACH (RES.)

09:40AM   1              THE COURT:  THANK YOU.  IT IS ADMITTED AND IT MAY BE

09:40AM   2      PUBLISHED WITH THE REDACTIONS.

09:40AM   3          (GOVERNMENT'S EXHIBIT 770 WAS RECEIVED IN EVIDENCE.)

09:40AM   4      BY MR. LEACH:

09:40AM   5      Q.   LET ME DRAW YOUR ATTENTION, MR. BURD, TO THE BOTTOM

09:40AM   6      PORTION OF PAGE 1, THE EMAIL FROM YOU TO MS. HOLMES.

09:40AM   7          DO YOU SEE THE DATE OF JANUARY 19TH, 2013?

09:40AM   8      A.   I DO.

09:40AM   9      Q.   AND THE FIRST SENTENCE READS, "I CANNOT BEGIN TO TELL YOU

09:40AM  10      HOW DISAPPOINTED I AM THAT YOU REDESIGNED THE WORDMARK WITHOUT

09:40AM  11      EVER TELLING US YOU WERE DOING IT."

09:40AM  12          WHAT WERE YOU TALKING ABOUT THERE?

09:40AM  13      A.   WE HAD PREVIOUSLY DONE, IN COOPERATION WITH ELIZABETH,

09:40AM  14      SOME WORK ON THE LOGO, HOW THE WORDS WOULD APPEAR BOTH INSIDE

09:41AM  15      AND OUTSIDE OF THE STORE, HOW THEY MIGHT APPEAR ON A LETTERHEAD

09:41AM  16      AT A TIME WHEN SHE DID NOT HAVE A TEAM IN PLACE TO DO THIS, OR

09:41AM  17      OFTEN YOU WOULD DO SOMETHING LIKE THIS WITH OUTSIDE EXPERTS,

09:41AM  18      AND SO WE HAD DONE ALL OF THIS WORK.  WE ALL SEEMED TO LIKE IT.

09:41AM  19          AND REGARDLESS, IF I'M GOING TO PUT A BRAND INSIDE OF MY

09:41AM  20      STORES, I HAVE TO APPROVE THE LOOK OF THAT BRAND.  I HAVE TO

09:41AM  21      BE -- I HAVE TO APPROVE THE COLORS, I HAVE TO APPROVE

09:41AM  22      EVERYTHING ABOUT IT BECAUSE IT COULD AFFECT OUR BRAND.

09:41AM  23      Q.   AND IF WE COULD GO TO PAGE 2, AND I WANT TO FOCUS YOU ON

09:41AM  24      THE FIRST PARAGRAPH, MR. BURD, ROUGHLY IN THE MIDDLE OF THE --

09:41AM  25      IF WE CAN ZOOM IN ON THE TOP HALF THERE, MS. HOLLIMAN.

BURD DIRECT BY MR. LEACH (RES.)                                    3043

09:42AM   1          THANK YOU.

09:42AM   2          AND, MR. BURD, I WANT TO DRAW YOUR ATTENTION TO THE

09:42AM   3     LANGUAGE IN THE FIRST PARAGRAPH AT THE TOP WHERE YOU SAY, "I

09:42AM   4     DON'T MIND PASSING THE BATON TO EITHER THERANOS OR ANYONE

09:42AM   5     ELSE."

09:42AM   6     A.   CAN YOU TELL ME AGAIN WHAT YOU'RE CITING?

09:42AM   7     Q.   SURE.  WE'RE ON PAGE 2 OF EXHIBIT 770.

09:42AM   8     A.   YES.

09:42AM   9     Q.   AND I DRAW YOUR ATTENTION TO THE FIRST PARAGRAPH AT THE

09:42AM  10     TOP.

09:42AM  11     A.   YES.

09:42AM  12     Q.   AND ROUGHLY THE THIRD SENTENCE SAYS, "I DON'T MIND PASSING

09:42AM  13     THE BATON."

09:42AM  14     A.   CORRECT.

09:42AM  15     Q.   "AND WHAT I MIND IS HAVING IT RIPPED FROM MY HANDS.  I DO

09:42AM  16     NOT LIKE WASTING TIME.  THIS DOES NOT FEEL LIKE A PARTNERSHIP."

09:42AM  17          WHAT WERE YOU HAVE GETTING AT THERE?

09:42AM  18     A.   JUST AS MUCH AS THERE WERE A LOT OF EMAILS AND PHONE

09:42AM  19     CALLS, ON SOME OF THE BUSINESS ISSUES IT WASN'T AS

09:42AM  20     COLLABORATIVE AS I THOUGHT IT SHOULD BE.

09:42AM  21     Q.   AND HOW DOES THAT RELATE TO THE REDOING OF THE WORDMARK?

09:43AM  22     A.   I MEAN, IT'S THEIR BRAND AND THEY CAN DO WHAT THEY CHOOSE

09:43AM  23     AND I THOUGHT A COURTESY CALL AT A MINIMUM WOULD BE USEFUL.

09:43AM  24     Q.   AND LET ME DRAW YOUR ATTENTION TO THE THIRD PARAGRAPH

09:43AM  25     WHERE YOU SAY "I BELIEVE IN YOU.  I BELIEVE IN YOUR COMPANY.

BURD DIRECT BY MR. LEACH (RES.)                                    3044

09:43AM   1    AND I SHARE YOUR VISION.  I WANT SO MUCH TO HELP YOU CHANGE THE

09:43AM   2    WORLD.  WE ARE SO GOOD TOGETHER WHEN WE COLLABORATE.  BUT I

09:43AM   3    HAVE NEVER BEEN MORE FRUSTRATED."

09:43AM   4         WAS IT TRUE YOU HAD NEVER BEEN MORE FRUSTRATED?

09:43AM   5    A.   IT'S TRUE.

09:43AM   6    Q.   AND WHY WAS THAT?

09:43AM   7    A.   WELL, ALL OF THE MISSED DEADLINES, THE LACK OF

09:43AM   8    COLLABORATION ON KEY ISSUES.  REMEMBER, IT'S NOW BEEN ALMOST

09:43AM   9    TWO YEARS SINCE WE HAD A LAUNCH DATE SCHEDULED.

09:43AM  10    Q.   AND BESIDES THE STACKING OF THE DEVICES AND THE HEAT THAT

09:43AM  11    YOU'VE TALKED ABOUT, DID MS. HOLMES EVER ATTRIBUTE THIS TO SOME

09:43AM  12    FORM OF TECHNOLOGICAL ISSUE?

09:43AM  13    A.   NO.

09:44AM  14    Q.   LET ME MOVE FORWARD IN TIME, MR. BURD, TO MARCH OF 2013

09:44AM  15    AND DRAW YOUR ATTENTION TO WHAT WE HAVE MARKED AS EXHIBIT 813.

09:44AM  16         DOES THIS APPEAR TO BE AN EMAIL FROM BOB GORDON TO

09:44AM  17    MS. HOLMES, WITH A COPY TO YOU, ON OR ABOUT MARCH 19TH, 2013?

09:44AM  18    A.   YES.

09:44AM  19              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 813.

09:44AM  20              MR. DOWNEY:  NO OBJECTION.

09:44AM  21              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:44AM  22         (GOVERNMENT'S EXHIBIT 813 WAS RECEIVED IN EVIDENCE.)

09:44AM  23    BY MR. LEACH:

09:44AM  24    Q.   MR. BURD, REMIND US, WHO IS BOB GORDON?

09:44AM  25    A.   BOB GORDON WAS THE GENERAL COUNSEL OF SAFEWAY.

BURD DIRECT BY MR. LEACH (RES.)                                    3045

09:44AM   1      Q.   SOMEONE YOU WORKED WITH CLOSELY?

09:44AM   2      A.   VERY CLOSELY.

09:44AM   3      Q.   AND THE SUBJECT IS THERANOS - INVOICE FOR INVENTORY

09:44AM   4      PRE-PURCHASE.

09:44AM   5           DO YOU SEE THAT?

09:44AM   6      A.   YES.

09:44AM   7      Q.   AND WHAT DOES THAT REFER TO?

09:44AM   8      A.   THERE WERE POINTS IN THE CONTRACT, POINTS OF PROGRESS, AND

09:45AM   9      WHEN THAT MILESTONE WAS REACHED, THERE WAS ADDITIONAL MONEY DUE

09:45AM  10      FROM US AND IT CAME IN THE FORM OF A PRE-PURCHASE OF INVENTORY.

09:45AM  11      Q.   SO SAFEWAY, UNDER THE CONTRACT, WAS OBLIGATED TO PAY

09:45AM  12      $25 MILLION TO PRE-PURCHASE SOME INVENTORY?

09:45AM  13      A.   YOU KNOW, IF CERTAIN CONDITIONS WERE MET.

09:45AM  14      Q.   AND WHAT WERE SOME OF THE CONDITIONS?

09:45AM  15      A.   THE CONDITIONS WOULD BE A PILOT THAT WE REGARDED AS A

09:45AM  16      SUCCESS, AND THE WAY -- WE SAID THAT WE ALONE WOULD DECIDE

09:45AM  17      WHETHER IT WAS SUCCESSFUL, AND THAT CONDITION HAD NOT BEEN MET.

09:45AM  18      Q.   AND HAD A PILOT TAKEN PLACE AT ALL AT THIS POINT?

09:45AM  19      A.   NO.

09:45AM  20      Q.   OKAY.  LET ME NEXT DRAW YOUR ATTENTION TO EXHIBIT 820.

09:46AM  21           DOES THIS APPEAR TO BE ANOTHER EMAIL RELATING TO THE

09:46AM  22      INVOICE THAT THERANOS SENT FOR THE $25 MILLION?

09:46AM  23      A.   YES.

09:46AM  24              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 820.

09:46AM  25              MR. DOWNEY:  NO OBJECTION.

BURD DIRECT BY MR. LEACH (RES.)                              3046

| | | |
|---|---|---|
| 09:46AM | 1 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 09:46AM | 2 | (GOVERNMENT'S EXHIBIT 820 WAS RECEIVED IN EVIDENCE.) |
| 09:46AM | 3 | MR. LEACH:  IF WE CAN ZOOM IN ON THE SUBSTANCE. |
| 09:46AM | 4 | THANK YOU, MS. HOLLIMAN. |
| 09:46AM | 5 | Q.   THE SUBJECT IS TRIGGER POINT FOR THE 25 MILLION. |
| 09:46AM | 6 | WHAT IS MEANT BY TRIGGER POINT? |
| 09:46AM | 7 | A.   IT'S THE CONDITION IN THE CONTRACT THAT SAYS WHEN IT IS |
| 09:46AM | 8 | MET WE WOULD PAY $25 MILLION. |
| 09:46AM | 9 | Q.   AND YOUR VIEW AT THE TIME WAS THAT IT HAD NOT BEEN MET? |
| 09:46AM | 10 | A.   CORRECT. |
| 09:46AM | 11 | Q.   YOU WROTE, "I HAD A LONG CHAT WITH BOB GORDON EARLIER |
| 09:46AM | 12 | TODAY ABOUT THE TRIGGERING EVENT.  AS WE DISCUSSED, WE WOULD |
| 09:46AM | 13 | LIKE TO SEE THE SPU IN ACTION." |
| 09:46AM | 14 | DO YOU SEE THAT? |
| 09:46AM | 15 | A.   YES. |
| 09:46AM | 16 | Q.   AND WHAT DID YOU MEAN BY THE SPU? |
| 09:46AM | 17 | A.   THAT'S THE UNIT ITSELF, THE ANALYZER. |
| 09:47AM | 18 | Q.   AND DID THAT EVER HAPPEN? |
| 09:47AM | 19 | A.   NO. |
| 09:47AM | 20 | Q.   YOU LEAVE SAFEWAY IN MAY OF 2013.  IS THAT YOUR TESTIMONY? |
| 09:47AM | 21 | A.   CORRECT. |
| 09:47AM | 22 | Q.   TO YOUR KNOWLEDGE, DID THERANOS EVER PUT A MINILAB DEVICE |
| 09:47AM | 23 | IN A SAFEWAY STORE? |
| 09:47AM | 24 | A.   TO MY KNOWLEDGE, NO. |
| 09:47AM | 25 | Q.   TO YOUR KNOWLEDGE, DID SAFEWAY EVER SUCCESSFULLY OFFER |

UNITED STATES COURT REPORTERS

BURD DIRECT BY MR. LEACH (RES.)                                          3047

09:47AM  1      THERANOS BLOOD TESTING SERVICES TO THE PUBLIC?

09:47AM  2      A.    NO.

09:47AM  3      Q.    OTHER THAN THE STACKING OF THE DEVICES AND THE HEAT ISSUES

09:47AM  4      THAT YOU'VE DESCRIBED, DID MS. HOLMES EVER ATTRIBUTE DELAYS OR

09:47AM  5      FAILURES TO DO THAT TO SOME TYPE OF TECHNOLOGICAL ISSUE?

09:47AM  6      A.    NO.  LET ME GO BACK TO THE PUBLIC.  I WANT TO MAKE SURE,

09:47AM  7      WHEN I SAY THE PUBLIC, I'M THINKING OF NONEMPLOYEES OF SAFEWAY

09:47AM  8      AND THEIR FAMILIES.

09:47AM  9      Q.    OTHER THAN THE ON CAMPUS FACILITY THAT WE'VE TALKED ABOUT?

09:48AM  10     A.    RIGHT.

09:48AM  11     Q.    DID MS. HOLMES EVER SUGGEST USING MODIFIED THIRD PARTY

09:48AM  12     MACHINES TO DO FINGERSTICK TESTING?

09:48AM  13     A.    NO.

09:48AM  14     Q.    WOULD THAT HAVE BEEN OF INTEREST TO YOU?

09:48AM  15     A.    NO.

09:48AM  16             MR. LEACH:  MAY I HAVE A MOMENT, YOUR HONOR?

09:48AM  17             THE COURT:  YES.

09:48AM  18         (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

09:48AM  19             MR. LEACH:  THANK YOU, MR. BURD.

09:48AM  20         I HAVE NO FURTHER QUESTIONS.

09:48AM  21         THANK YOU, YOUR HONOR.

09:48AM  22             THE COURT:  CROSS-EXAMINATION?

09:48AM  23             MR. DOWNEY:  YES, YOUR HONOR.

09:48AM  24         YOUR HONOR, MAY I HAVE A MOMENT?

09:49AM  25             THE COURT:  YES.


                        UNITED STATES COURT REPORTERS

BURD CROSS BY MR. DOWNEY                                            3048

```
09:49AM    1              (PAUSE IN PROCEEDINGS.)

09:49AM    2                   MR. DOWNEY:  YOUR HONOR, I HAVE A NOTEBOOK FOR THE

09:49AM    3    COURT AND THE WITNESS.  MAY I PASS A COPY UP AND APPROACH THE

09:49AM    4    WITNESS?

09:49AM    5                   THE COURT:  PLEASE.

09:49AM    6                   MR. DOWNEY:  (HANDING.)

09:49AM    7                        CROSS-EXAMINATION

09:49AM    8    BY MR. DOWNEY:

09:49AM    9    Q.   GOOD MORNING, MR. BURD.

09:49AM   10    A.   GOOD MORNING.

09:49AM   11    Q.   MY NAME IS KEVIN DOWNEY AND I REPRESENT MS. HOLMES.

09:49AM   12         I'M GOING TO REMOVE MY MASK, TOO, SO WE CAN HAVE THIS

09:50AM   13    CONVERSATION A LITTLE MORE COMPREHENSIBLY --

09:50AM   14    A.   GREAT.

09:50AM   15    Q.   -- FOR THE JURY.

09:50AM   16         AS I UNDERSTAND IT, YOU WERE THE CHIEF EXECUTIVE AT

09:50AM   17    SAFEWAY FOR ABOUT 20 YEARS.

09:50AM   18    A.   EXACTLY 20 YEARS.

09:50AM   19    Q.   AND I THINK YOU TESTIFIED ON DIRECT THAT SAFEWAY IS A VERY

09:50AM   20    LARGE, SUCCESSFUL ORGANIZATION; IS THAT RIGHT?

09:50AM   21    A.   CORRECT.

09:50AM   22    Q.   YOU MENTIONED $45 BILLION OR SO IN REVENUES AS OF 2010.

09:50AM   23         HOW MUCH OF THAT WOULD CONSTITUTE THE PROFIT OF SAFEWAY AT

09:50AM   24    THAT TIME?

09:50AM   25    A.   YOU KNOW, I DIDN'T COMMIT THOSE TO MEMORY, BUT WE USUALLY
```

BURD CROSS BY MR. DOWNEY                                                3049

09:50AM   1     HAD FREE CASH FLOW AFTER MEETING ALL EXPENSES AND AROUND A

09:50AM   2     BILLION THREE OR SOMETHING LIKE THAT.

09:50AM   3     Q.   AND PEOPLE THINK THAT BECAUSE YOU'RE THE CEO, YOU'RE THE

09:50AM   4     TOP GUY.  BUT, IN FACT, YOU HAD A BOARD OF DIRECTORS YOU HAD TO

09:50AM   5     REPORT TO; IS THAT CORRECT?

09:50AM   6     A.   THAT'S CORRECT.

09:50AM   7     Q.   AND IT WAS A VERY SOPHISTICATED BOARD?

09:50AM   8     A.   WE HAD PEOPLE WITH STRONG BUSINESS EXPERIENCE.  WE THINK

09:51AM   9     IT WAS A GOOD BOARD.

09:51AM  10     Q.   AND YOU HAD THE FORMER CHIEF EXECUTIVE OF WELLS FARGO;

09:51AM  11     CORRECT?

09:51AM  12     A.   CORRECT?

09:51AM  13     Q.   AND YOU HAD THE FORMER VICE CHAIR OF MACY'S; CORRECT?

09:51AM  14     A.   RIGHT.

09:51AM  15     Q.   AND YOU HAD THE FORMER CEO OF AT&T WIRELESS; CORRECT?

09:51AM  16     A.   CORRECT.

09:51AM  17     Q.   AND SO YOU HAD A LOT OF PEOPLE WHO HAD A LOT OF EXPERIENCE

09:51AM  18     IN BUSINESS?

09:51AM  19     A.   THAT'S CORRECT.

09:51AM  20     Q.   AND THEY WERE PEOPLE WHO WOULD ASK YOU QUESTIONS AND

09:51AM  21     COMMENT ON DECISIONS MANAGEMENT MADE IF THEY HAD AN ISSUE WITH

09:51AM  22     IT; CORRECT?

09:51AM  23     A.   CORRECT.

09:51AM  24     Q.   AND WITHIN THE COMPANY, OF COURSE YOU MENTIONED -- I THINK

09:51AM  25     YOU MENTIONED YOU HAD MORE THAN 175,000 EMPLOYEES AT THAT TIME;

BURD CROSS BY MR. DOWNEY                                              3050

```
09:51AM   1        CORRECT?

09:51AM   2        A.    CORRECT.

09:51AM   3        Q.    AND MANY OF THOSE ARE THE PEOPLE WE KNOW WHO WORK IN THE

09:51AM   4        STORES; CORRECT?

09:51AM   5        A.    MOST OF THEM WORK IN THE STORES.

09:51AM   6        Q.    OKAY.  BUT YOU ALSO HAVE A FUNCTION THAT YOU MIGHT CALL

09:51AM   7        THE CORPORATE FUNCTION, WHICH IS THE LAWYERS AND THE

09:51AM   8        ACCOUNTANTS AND SO FORTH?

09:51AM   9        A.    WE WOULD CALL THAT THE SUPPORT FUNCTION.

09:51AM  10        Q.    THE SUPPORT FUNCTION.

09:51AM  11              HOW MANY PEOPLE WORKED IN THE SUPPORT FUNCTION IN 2010?

09:51AM  12        A.    YOU KNOW, 2010 TO 2013 ARE KIND OF BLURRING, SO I'LL JUST

09:52AM  13        GIVE YOU ROUGH NUMBERS.

09:52AM  14        Q.    THAT'S FINE.

09:52AM  15        A.    ON CAMPUS WE HAD AROUND 3500 EMPLOYEES; AND THEN WE WERE

09:52AM  16        ORGANIZED DIVISIONALLY IN NINE DIVISIONS IN THE U.S. AND

09:52AM  17        CANADA, AND SO THEY HAD THEIR OWN SUPPORT FUNCTION.  IT MIGHT

09:52AM  18        BE ANYWHERE FROM 300 TO 700 PEOPLE.

09:52AM  19        Q.    AND YOU HAD, WORKING WITHIN THAT, A NUMBER OF PEOPLE WHO

09:52AM  20        REPORTED DIRECTLY TO YOU; CORRECT?

09:52AM  21        A.    CORRECT.

09:52AM  22        Q.    AND THAT WAS A STRONG EXECUTIVE TEAM IN YOUR VIEW?

09:52AM  23        A.    IT WAS.

09:52AM  24        Q.    OKAY.  YOU HAD A -- I THINK YOU MENTIONED YOU HAD A

09:52AM  25        GENERAL COUNSEL, MR. GORDON; CORRECT?
```

                                                                    3051
BURD CROSS BY MR. DOWNEY

09:52AM   1      A.   CORRECT.

09:52AM   2      Q.   AND YOU HAD A CHIEF FINANCIAL OFFICER, ROBERT EDWARDS;

09:52AM   3      CORRECT?

09:52AM   4      A.   CORRECT.

09:52AM   5      Q.   AND YOU HAD A NUMBER OF OTHER SENIOR EXECUTIVE VICE

09:52AM   6      PRESIDENT TYPES; CORRECT?

09:52AM   7      A.   YES.

09:52AM   8      Q.   AND YOU HAD AN ENTIRE DIVISION THAT WAS DEVOTED TO HEALTH

09:52AM   9      ISSUES AT SAFEWAY; CORRECT?

09:53AM  10      A.   WE HAD A SMALL COMPANY, A STARTUP, PROBABLY NOT MORE THAN

09:53AM  11      FIVE EMPLOYEES.

09:53AM  12      Q.   AND THAT WAS CALLED SAFEWAY HEALTH?

09:53AM  13      A.   SAFEWAY HEALTH.

09:53AM  14      Q.   OKAY.  AND WHEN THE COMPANY HAD ISSUES ON WHICH IT DIDN'T

09:53AM  15      HAVE INTERNAL CAPACITY TO UNDERTAKE DECISIONS OR CONDUCT ITS

09:53AM  16      OPERATIONS, YOU WOULD GET OUTSIDE ADVISORS; CORRECT?

09:53AM  17      A.   WE WOULD.

09:53AM  18      Q.   AND SO IF YOU NEEDED LAWYERS, YOU MIGHT HIRE A LAW FIRM;

09:53AM  19      CORRECT?

09:53AM  20      A.   YES.

09:53AM  21      Q.   AND IF YOU NEEDED TO UNDERTAKE A TRANSACTION, YOU MIGHT

09:53AM  22      HIRE PEOPLE TO HELP YOU WITH THAT TRANSACTION; CORRECT?

09:53AM  23      A.   YES.

09:53AM  24      Q.   AND YOU MIGHT HIRE INVESTMENT BANKERS; CORRECT?

09:53AM  25      A.   YEAH, FOR LARGE TRANSACTIONS.  SMALL ONES WE DO OURSELVES.

BURD CROSS BY MR. DOWNEY                                            3052

09:53AM   1      Q.   AND ACQUISITION ADVISORS AND SO FORTH; CORRECT?

09:53AM   2      A.   CORRECT.

09:53AM   3      Q.   OKAY.  AND AT THIS POINT IN YOUR 17TH OR 18TH YEAR,

09:53AM   4    WHATEVER IT WAS, AS THE CHIEF EXECUTIVE, YOU HAD BECOME A

09:54AM   5    PRETTY SOPHISTICATED NEGOTIATOR; IS THAT RIGHT?

09:54AM   6      A.   I THINK I'M PRETTY GOOD AT IT.

09:54AM   7           ON THE OTHER HAND, WE HAD -- THIS WAS LARGELY A UNIONIZED

09:54AM   8    COMPANY, SO I HAD PEOPLE NEGOTIATE FOR ME.  BUT I SET THE

09:54AM   9    STRATEGY, THEY EXECUTED THE STRATEGY, AND I APPROVED THE

09:54AM  10    OUTCOME.

09:54AM  11      Q.   WELL, YOU MENTIONED EVEN BEFORE YOU CAME TO SAFEWAY YOU

09:54AM  12    HAD A BACKGROUND IN PRIVATE EQUITY; CORRECT?

09:54AM  13      A.   I WORKED FOR KOHLBERG, KRAVIS, ROBERTS & COMPANY NOT AS AN

09:54AM  14    EMPLOYEE BUT AS AN ADVISOR FOR ALMOST TEN YEARS.

09:54AM  15      Q.   AND THAT'S A LARGE PRIVATE EQUITY FIRM THAT MAKES

09:54AM  16    INVESTMENTS IN COMPANIES; CORRECT?

09:54AM  17      A.   IT IS.

09:54AM  18      Q.   AND YOUR AFFILIATION YOU SAY LASTED TEN YEARS?

09:54AM  19      A.   CLOSE TO TEN YEARS.

09:54AM  20      Q.   AND YOU WERE AROUND TRANSACTIONS IN CONNECTION WITH THEIR

09:54AM  21    WORK; CORRECT?

09:54AM  22      A.   I WAS.

09:54AM  23      Q.   AND AT SAFEWAY STORES, YOU'VE ALSO ENGAGED IN NEGOTIATIONS

09:54AM  24    RELATED TO A NUMBER OF ACQUISITIONS OF A NUMBER OF BUSINESSES;

09:54AM  25    CORRECT?

BURD CROSS BY MR. DOWNEY                                              3053

09:55AM   1      A.   YES.

09:55AM   2      Q.   AND YOU STARTED SOME BUSINESSES.  I THINK YOU MENTIONED

09:55AM   3      THAT.

09:55AM   4      A.   I STARTED SOME BUSINESSES.

09:55AM   5      Q.   AND THEN THOSE ARE THE GAS STATIONS AND SO FORTH?

09:55AM   6      A.   ACTUALLY, I HADN'T THOUGHT ABOUT THAT.  THAT WOULD BE

09:55AM   7      NUMBER SEVEN.  I STARTED SEVEN BUSINESSES.

09:55AM   8      Q.   SEVEN BUSINESSES?

09:55AM   9      A.   YES.

09:55AM  10      Q.   OKAY.  NOW, YOU FIRST LEARNED ABOUT THERANOS IN 2010 OR

09:55AM  11      LATE 2009?

09:55AM  12      A.   I REMEMBER THE MONTH.  THE YEAR IS SOMEWHERE IN THESE

09:55AM  13      BINDERS.  THE MONTH WAS MARCH.

09:55AM  14      Q.   OKAY.  AND BEFORE YOU MET WITH MS. HOLMES, I THINK YOU

09:55AM  15      MENTIONED THAT SOME OTHER EXECUTIVES OF THE COMPANY HAD MET

09:55AM  16      WITH MS. HOLMES; CORRECT?

09:55AM  17      A.   CORRECT.

09:55AM  18      Q.   AND DO YOU KNOW ON HOW MANY OCCASIONS THEY HAD MET WITH

09:55AM  19      MS. HOLMES?

09:55AM  20      A.   I BELIEVE IT WAS JUST ONE.

09:55AM  21      Q.   OKAY.  AND DO YOU RECALL WHETHER A BOARD MEMBER OF

09:55AM  22      THERANOS HAD HAD A DISCUSSION WITH A BOARD MEMBER OF SAFEWAY,

09:55AM  23      OR RATHER, WITH THE CHIEF FINANCIAL OFFICER OF SAFEWAY ABOUT

09:56AM  24      THERANOS?

09:56AM  25      A.   YES.

BURD CROSS BY MR. DOWNEY                                               3054

09:56AM   1    Q.   AND THE CHIEF FINANCIAL OFFICER, AS YOU SAID, WAS

09:56AM   2    MR. EDWARDS; CORRECT?

09:56AM   3    A.   CORRECT.

09:56AM   4    Q.   AND THE BOARD MEMBER FROM THERANOS WAS MR. DON LUCAS;

09:56AM   5    CORRECT?

09:56AM   6    A.   THAT IS CORRECT.  I BELIEVE THEY SERVED ON A BOARD

09:56AM   7    TOGETHER AND THAT'S HOW THEY KNEW ONE ANOTHER.

09:56AM   8    Q.   SO THEY HAD A PRIOR RELATIONSHIP?

09:56AM   9    A.   CORRECT.

09:56AM   10   Q.   AND DID YOU LEARN ABOUT THAT CONVERSATION BEFORE YOU

09:56AM   11   ENTERED INTO DISCUSSIONS WITH MS. HOLMES?

09:56AM   12   A.   I DID NOT KNOW ABOUT THAT CONVERSATION.  I THINK IT TOOK

09:56AM   13   PLACE AFTER I MET ELIZABETH AND HEARD THE THERANOS STORY.

09:56AM   14   Q.   AND WHEN YOU HEARD THAT MR. LUCAS WAS A BOARD MEMBER, DID

09:56AM   15   YOU RECOGNIZE WHO HE WAS?

09:56AM   16   A.   I DID.

09:56AM   17   Q.   YOU UNDERSTOOD THAT HE HAD BEEN A SUBSTANTIAL INVESTOR IN

09:56AM   18   TECHNOLOGY COMPANIES; IS THAT RIGHT?

09:56AM   19   A.   CORRECT.

09:56AM   20   Q.   AND YOU UNDERSTOOD THAT HE HAD BEEN AFFILIATED WITH SOME

09:56AM   21   OF THE SUCCESS STORIES IN TECHNOLOGY; IS THAT CORRECT?

09:57AM   22   A.   CORRECT.

09:57AM   23   Q.   ORACLE AND SO FORTH?

09:57AM   24   A.   CORRECT.

09:57AM   25   Q.   AND DID YOU LEARN DETAILS ABOUT THE BUSINESS FROM YOUR --

UNITED STATES COURT REPORTERS

**ER-6805**

3055
BURD CROSS BY MR. DOWNEY

09:57AM   1     THE PEOPLE WHO WORKED FOR YOU PRIOR TO THE TIME THAT YOU MET

09:57AM   2     MS. HOLMES?

09:57AM   3     A.   NO.

09:57AM   4     Q.   THEY SIMPLY TOLD YOU THAT WE HAD A MEETING AND THEY WOULD

09:57AM   5     LIKE YOU TO HAVE A MEETING?

09:57AM   6     A.   WELL, THEY TOLD ME ABOUT THE MEETING.  I WOULDN'T SAY IT

09:57AM   7     WAS DETAILS.  I JUST HAD TO HEAR THAT IT WAS A MINILAB, RESULTS

09:57AM   8     IN 20, 30 MINUTES, AND I WAS IMMEDIATELY INTERESTED.

09:57AM   9     Q.   AND THEN YOU HAD THE MEETING I THINK YOU DESCRIBED ON

09:57AM  10     DIRECT; CORRECT?

09:57AM  11     A.   I'M SORRY.  SAY THAT AGAIN.

09:57AM  12     Q.   I'M SORRY.  YOU HAD THE MEETING WITH MS. HOLMES THAT YOU

09:57AM  13     DESCRIBED ON FRIDAY, WHICH I WON'T MAKE YOU REPEAT.

09:57AM  14     A.   YES.

09:57AM  15     Q.   BUT THIS WAS IN GENERAL TERMS.  THIS WAS THE MEETING WHERE

09:57AM  16     YOU WANTED TO GAIN AN IMPRESSION OF HER, LEARN ABOUT HER VISION

09:57AM  17     AND SO FORTH?

09:57AM  18     A.   CORRECT.

09:57AM  19     Q.   AND I THINK YOU TESTIFIED THAT YOU WERE IMPRESSED WITH HER

09:57AM  20     AS A RESULT OF THAT MEETING; CORRECT?

09:57AM  21     A.   YES.

09:58AM  22     Q.   YOU KNEW AT THE TIME THAT SHE WAS A VERY YOUNG

09:58AM  23     ENTREPRENEUR; CORRECT?

09:58AM  24     A.   YES.

09:58AM  25     Q.   YOU KNEW SHE WAS IN HER 20S OR SO?

BURD CROSS BY MR. DOWNEY                                                    3056

09:58AM  1      A.   RIGHT.

09:58AM  2      Q.   AND OF COURSE YOU KNEW THE COMPANY WAS A STARTUP; CORRECT?

09:58AM  3      A.   I KNEW THAT.  I MEAN, IT WAS A, IT WAS -- IT HAD STILL

09:58AM  4      BEEN IN BUSINESS FOR A WHILE, BUT I WOULD CLASSIFY IT AS A

09:58AM  5      STARTUP.

09:58AM  6      Q.   IT WAS ABOUT FIVE AND A HALF YEARS OLD OR SO?

09:58AM  7      A.   YES, YES.

09:58AM  8      Q.   AND DID YOU KNOW HOW MANY EMPLOYEES THE COMPANY HAD?

09:58AM  9      A.   I DID NOT.

09:58AM  10     Q.   AND DID YOU KNOW WHETHER THE COMPANY HAD EVER BEEN PART OF

09:58AM  11     A RETAIL PARTNERSHIP BEFORE MS. HOLMES'S DISCUSSIONS WITH YOU

09:58AM  12     AND OTHERS AT SAFEWAY?

09:58AM  13     A.   YOU KNOW, SOMEWHERE ALONG THE LINE, NOT IN THAT FIRST

09:58AM  14     MEETING, I LEARNED THAT THEY HAD DISCUSSIONS WITH WALGREENS.

09:58AM  15     Q.   THAT AT THE SAME TIME THEY WERE JUST HAVING DISCUSSIONS

09:58AM  16     WITH SAFEWAY, THERANOS WAS ALSO DISCUSSING POTENTIAL RETAIL

09:58AM  17     PARTNERSHIPS WITH OTHER RETAIL COMPANIES; IS THAT WHAT YOU

09:59AM  18     MEAN?

09:59AM  19     A.   THAT'S WHAT I MEAN.

09:59AM  20     Q.   OKAY.  BUT AS OF THAT TIME, THEY HAD NOT YET RUN ANY

09:59AM  21     RETAIL OPERATIONS; CORRECT?

09:59AM  22     A.   CORRECT.

09:59AM  23     Q.   AND THEIR WORK, AS YOU UNDERSTOOD IT, HAD LARGELY BEEN IN

09:59AM  24     CONNECTION WITH WORK WITH THE PHARMACEUTICAL INDUSTRY; CORRECT?

09:59AM  25     A.   THAT'S INITIALLY WHO THEY SAID THEY HAD TESTED OUT THEIR

BURD CROSS BY MR. DOWNEY                                                3057

09:59AM  1    DEVICE WITH.

09:59AM  2    Q.   SO YOU UNDERSTOOD THAT SAFEWAY OR WALGREENS OR ONE OF THE

09:59AM  3    OTHER COMPANIES THAT THEY WERE TALKING TO, THIS WOULD BE THEIR

09:59AM  4    FIRST CONSUMER-BASED DEPLOYMENT OF TECHNOLOGY; CORRECT?

09:59AM  5    A.   CORRECT.

09:59AM  6    Q.   AND YOU UNDERSTOOD, OF COURSE, AS A RESULT THAT THEY NEVER

09:59AM  7    SCALED THIS TECHNOLOGY OR BUILT TECHNOLOGY ON A BROAD BASIS;

09:59AM  8    CORRECT?

09:59AM  9    A.   I KNEW THEY DIDN'T HAVE A LOT OF CUSTOMERS, OKAY, SO THEY

09:59AM  10   HADN'T GEARED UP FOR A LOT OF PRODUCTION.

09:59AM  11   Q.   OKAY.  BUT NEVERTHELESS, FOR THE REASONS THAT I THINK YOU

09:59AM  12   SAID ON FRIDAY, YOU WERE IMPRESSED WITH MS. HOLMES AND WITH THE

09:59AM  13   COMPANY BASED ON WHAT YOU HAD LEARNED; CORRECT?

10:00AM  14   A.   CORRECT.

10:00AM  15   Q.   AND I THINK YOU TESTIFIED THAT YOU ALMOST IMMEDIATELY WERE

10:00AM  16   INTERESTED IN PURSUING A POTENTIAL PARTNERSHIP WITH THERANOS;

10:00AM  17   CORRECT?

10:00AM  18   A.   CORRECT.

10:00AM  19   Q.   AND YOU MENTIONED THAT YOU, SHORTLY AFTER THE MEETING,

10:00AM  20   THAT YOU THOUGHT YOU SENT AN EMAIL TO MS. HOLMES.

10:00AM  21        DO YOU RECALL THAT?

10:00AM  22   A.   I BELIEVE I DID.

10:00AM  23   Q.   OKAY.  LET ME SHOW YOU IN THE BINDER THAT I'VE PLACED IN

10:00AM  24   FRONT OF YOU EXHIBIT 281.

10:00AM  25   A.   YES.

BURD CROSS BY MR. DOWNEY                                                3058

10:00AM   1   Q.   IS THAT A LETTER THAT YOU SENT TO MS. HOLMES IN 2010 AFTER

10:00AM   2   THE MEETING THAT YOU DESCRIBED ON DIRECT?

10:00AM   3   A.   CORRECT.

10:00AM   4            MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

10:00AM   5   281.

10:01AM   6            MR. LEACH:  NO OBJECTION.

10:01AM   7            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:01AM   8        (GOVERNMENT'S EXHIBIT 281 WAS RECEIVED IN EVIDENCE.)

10:01AM   9   BY MR. DOWNEY:

10:01AM  10   Q.   NOW, AM I RIGHT THAT AFTER YOU HEARD ABOUT THERANOS, THAT

10:01AM  11   YOU UNDERSTOOD THAT THIS OPPORTUNITY MIGHT BE ONE THAT HAD A

10:01AM  12   LOT OF POTENTIAL FOR SAFEWAY?

10:01AM  13   A.   CORRECT.

10:01AM  14   Q.   AND I THINK YOU SAID ON DIRECT THAT ONE OF THE POTENTIALS

10:01AM  15   WAS THAT JUST BY HAVING A NEW BUSINESS, YOU WOULD DRAW MORE

10:01AM  16   PEOPLE INTO SAFEWAY STORES; CORRECT?

10:01AM  17   A.   YES.

10:01AM  18   Q.   AND ANOTHER POSSIBILITY WAS THAT WITH RESPECT TO TESTS

10:01AM  19   THAT WERE PERFORMED IN SAFEWAY STORES, YOU MIGHT REALIZE A

10:01AM  20   LITTLE BIT OF A PROFIT ON EACH TEST THAT WAS PERFORMED;

10:01AM  21   CORRECT?

10:01AM  22   A.   CORRECT.

10:01AM  23   Q.   AND SO THAT THERANOS MIGHT BE OFFERING A TEST IN YOUR

10:01AM  24   STORE AT, SAY, $12 AND YOU MIGHT BE ABLE TO RETAIN TWO OF THOSE

10:01AM  25   DOLLARS; CORRECT?

BURD CROSS BY MR. DOWNEY                                              3059

```
10:01AM    1    A.   YES.  YOUR EXAMPLE, THOUGH, IS A PRETTY LOW NUMBER.  A

10:01AM    2    TYPICAL TEST WOULD BE, YOU KNOW, OVER $30.

10:02AM    3    Q.   OKAY.  AND OUT OF THAT, HOW MUCH WOULD SAFEWAY PROJECT IT

10:02AM    4    MIGHT BE ABLE TO CAPTURE?

10:02AM    5    A.   WE HAD SOMETHING IN THE CONTRACT THAT SUGGESTED THAT --

10:02AM    6    WELL, IT DIDN'T SUGGEST, IT SAID THAT WE WANTED TO MAKE $10 PER

10:02AM    7    TEST.

10:02AM    8    Q.   OKAY.  AND YOU ALSO TALKED ABOUT -- HOW MANY TESTS --

10:02AM    9    A.   CAN I CLARIFY THAT AND MAKE SURE EVERYBODY UNDERSTANDS?

10:02AM   10    Q.   YEAH.

10:02AM   11    A.   WE WANTED $10 IN REVENUE FOR DOING A TEST.  WHEN SOMEONE

10:02AM   12    COMES IN FOR A BLOOD TEST, THEY TYPICALLY HAVE THREE AND A HALF

10:02AM   13    TESTS, SO THAT WOULD BE $35.  AND THE FACILITY'S ON OUR

10:02AM   14    PROPERTY WITH OUR LABOR, THAT'S NOT THE PROFIT YOU MAKE, IT'S

10:02AM   15    THE REVENUE THAT YOU MAKE.

10:02AM   16    Q.   SO IT WOULD BE YOUR GROSS REVENUE, AND THEN OUT OF THAT

10:02AM   17    YOU WOULD REALIZE A SMALLER NUMBER AS PROFIT; CORRECT?

10:02AM   18    A.   CORRECT.

10:02AM   19    Q.   BUT IN TERMS OF THE LARGER STORE AND SO FORTH, THAT WAS

10:02AM   20    ALREADY BUILT, CORRECT, SO THIS WAS POTENTIALLY A PROFITABLE

10:02AM   21    BUSINESS?

10:02AM   22    A.   AT THE NUMBERS THAT WE WERE LOOKING AT, YES.

10:02AM   23    Q.   AND YOU ALSO MENTIONED THAT YOU MIGHT FEATURE TO OTHER

10:02AM   24    STORES A NETWORK IN WHICH THERANOS SERVICES MIGHT BE OFFERED.

10:03AM   25         COULD YOU EXPLAIN THAT?
```

BURD CROSS BY MR. DOWNEY                                              3060

10:03AM   1    A.   SURE.  WE HAD BUILT A NETWORK OF RETAILERS TO SELL GIFT

10:03AM   2    CARDS THAT YOU'LL SEE IN MOST SUPERMARKETS IN THE UNITED STATES

10:03AM   3    CALLED AN END CAP.

10:03AM   4         SO WE HAD THESE PARTNERSHIPS THAT EXISTED, AND WE FELT WE

10:03AM   5    COULD DO THE SAME THING FOR THERANOS BECAUSE WE WERE ONLY 1500,

10:03AM   6    1800 STORES IN THAT TIMEFRAME AND WE THOUGHT WE COULD PUT

10:03AM   7    TOGETHER A NATIONWIDE NETWORK OF OTHER RETAILERS AND WE WOULD

10:03AM   8    GET A REALLY SMALL SLIVER OF INCOME FROM THAT.

10:03AM   9    Q.   AND WOULD THAT BE DONE BY A LICENSING AGREEMENT BETWEEN

10:03AM  10    YOU AND THE OTHER STORES, OR HOW WOULD IT WORK?

10:03AM  11    A.   IT WOULD BE -- YOU KNOW, I DON'T THINK WE GOT FAR IN THAT

10:03AM  12    BUT WE ENVISIONED THAT WE WOULD PUT THAT NETWORK TOGETHER,

10:03AM  13    THERANOS WOULD APPROVE THOSE RETAILERS, AND THEN I CAN'T

10:04AM  14    RECALL, I THINK IT WAS OUR REVENUE WOULD COME FROM THE RETAILER

10:04AM  15    ITSELF, THAT SMALL BIT OF PROFIT.

10:04AM  16    Q.   AND YOU MENTIONED ON, ON -- A MOMENT AGO THAT YOU LEARNED

10:04AM  17    AT SOME POINT DURING THE COURSE OF YOUR DISCUSSIONS WITH

10:04AM  18    THERANOS THAT THEY WERE ALSO TALKING TO OTHER RETAILERS;

10:04AM  19    CORRECT?

10:04AM  20    A.   THE ONLY RETAILER I KNEW THAT THEY WERE TALKING TO WAS

10:04AM  21    WALGREENS.  AT LEAST THAT'S MY MEMORY.

10:04AM  22         I HAD INTRODUCED ELIZABETH TO PEOPLE AT PUBLIX, HY-VEE,

10:04AM  23    AND I THINK OTHER RETAILERS AT AN ANNUAL FMI CONFERENCE.

10:04AM  24    Q.   OKAY.  BUT WHATEVER -- AT THIS EARLY STAGE WHERE YOU WERE

10:04AM  25    MEETING MS. HOLMES FOR THE FIRST TIME, YOU RECOGNIZED THAT

BURD CROSS BY MR. DOWNEY                                                3061

10:04AM   1    WHATEVER RETAILER MIGHT GET AN EXCLUSIVE CONTRACT WITH

10:04AM   2    THERANOS, THAT THAT COULD BE A UNIQUELY PROFITABLE OPPORTUNITY

10:04AM   3    FOR THAT RETAILER; CORRECT?

10:04AM   4    A.   SURE.  AND THAT WAS NOT DISCUSSED AT THAT MEETING.  THAT

10:05AM   5    WAS LAID OUT IN THIS LETTER.

10:05AM   6    Q.   OKAY.  WELL, LET'S LOOK AT EXHIBIT 281 AND LET'S LOOK AT

10:05AM   7    THE FIRST PARAGRAPH.

10:05AM   8         IN THIS PARAGRAPH, YOU LAY OUT A POTENTIAL ARRANGEMENT

10:05AM   9    WHERE SAFEWAY WOULD HELP TO LAUNCH THE THERANOS BLOOD ANALYZER;

10:05AM  10    CORRECT?

10:05AM  11    A.   CORRECT.

10:05AM  12    Q.   AND IN RETURN, SAFEWAY WOULD GET THE EXCLUSIVE RIGHTS IN

10:05AM  13    ALL RETAIL FOR SOME PERIOD OF TIME; CORRECT?

10:05AM  14    A.   IT WAS CONFINED TO THE RETAIL SUPERMARKETS.

10:05AM  15    Q.   WELL, AT THIS POINT IN TIME, WERE YOU SEEKING ACTUALLY

10:05AM  16    EXCLUSIVE RIGHTS ACROSS ALL FORMS OF RETAIL?

10:05AM  17    A.   I DON'T BELIEVE SO.  I CAN READ THIS THING AGAIN.

10:05AM  18    Q.   SURE.

10:05AM  19         (PAUSE IN PROCEEDINGS.)

10:06AM  20         THE WITNESS:  WE WERE THINKING, YOU KNOW, WHETHER IT

10:06AM  21    SAYS IT HERE OR NOT, WE WERE THINKING EXCLUSIVELY ABOUT A

10:06AM  22    SUPERMARKET NETWORK.

10:06AM  23    BY MR. DOWNEY:

10:06AM  24    Q.   OKAY, SO THAT WOULD PRECLUDE RETAILERS LIKE KROGER AND

10:06AM  25    OTHERS FROM OFFERING IT IF YOU WERE ABLE TO ACHIEVE THAT TYPE

BURD CROSS BY MR. DOWNEY                                              3062

10:06AM   1    OF EXCLUSIVITY?

10:06AM   2    A.   WE WOULD TRY TO BUILD IT INITIALLY SO IT WAS RETAILERS

10:06AM   3    THAT WE DIDN'T COMPETE WITH, BUT WE LEARNED FROM THE BLACK HAWK

10:06AM   4    NETWORK THAT WE PUT TOGETHER FOR GIFT CARDS THAT WE ULTIMATELY

10:06AM   5    SOLD THEM TO EVERYBODY, EVEN THOSE WE COMPETED WITH, AND IT WAS

10:06AM   6    PROFITABLE TO DO SO.  BUT WE WOULD START WITH NONCOMPETING

10:06AM   7    RETAILERS.

10:06AM   8    Q.   OKAY.  AND SO WOULD YOU BE ABLE TO PRECLUDE, IN YOUR VIEW,

10:07AM   9    FOOD RETAILERS LIKE WAL-MART?

10:07AM  10    A.   WE WOULDN'T HAVE PICKED THEM BECAUSE WE COMPETE WITH THEM

10:07AM  11    SO BROADLY.

10:07AM  12    Q.   OKAY.  SO THEY WOULD NOT HAVE BEEN PART OF THE NETWORK?

10:07AM  13    A.   CORRECT.

10:07AM  14    Q.   SO IF YOU GOT AN EXCLUSIVE DEAL, YOU COULD PRECLUDE

10:07AM  15    WAL-MART FOR A PERIOD OF TIME FROM HOSTING THERANOS DEVICES?

10:07AM  16    A.   CORRECT.

10:07AM  17    Q.   OKAY.  AND THAT WOULD BE TRUE ALSO OF ANY OTHER RETAILER

10:07AM  18    THAT IS PART OF THE FOOD RETAIL CHAIN?

10:07AM  19    A.   YES.

10:07AM  20    Q.   OKAY.  IF YOU LOOK AT THE FIRST PARAGRAPH AFTER YOUR

10:07AM  21    INTRODUCTORY PARAGRAPH, YOU INDICATE THAT YOU WILL ARRANGE A

10:07AM  22    MEETING BETWEEN MS. HOLMES AND UCSF SO THAT IT COULD VERIFY

10:07AM  23    THAT THE BLOOD ANALYZER COULD PERFORM 85 PERCENT OF BLOOD WORK

10:07AM  24    DONE BY A STANDARD RETAIL LAB; CORRECT?

10:07AM  25    A.   CORRECT.

BURD CROSS BY MR. DOWNEY                                           3063

```
10:07AM   1        Q.   DID YOU ARRANGE THAT MEETING?

10:08AM   2        A.   WE DID ARRANGE A MEETING WITH UCSF WHICH INCLUDED THE CEO,

10:08AM   3    THE CHIEF MEDICAL OFFICER, AND THE HEAD OF LABS, BUT THAT

10:08AM   4    WASN'T UNTIL 2011.

10:08AM   5        Q.   WELL, DO YOU RECALL AT THE TIME OF THIS DISCUSSION WITH

10:08AM   6    MS. HOLMES THAT YOU DID ARRANGE A MEETING BETWEEN MS. HOLMES

10:08AM   7    AND PHYSICIANS AT UCSF?

10:08AM   8        A.   I DON'T QUITE UNDERSTAND THE QUESTION.

10:08AM   9        Q.   WELL, I THINK YOU JUST DESCRIBED A MEETING --

10:08AM  10        A.   ARE YOU ASKING, DID I DO THAT BEFORE 2011?

10:08AM  11        Q.   YES.

10:08AM  12        A.   I'D HAVE TO GO LOOK AT A BUNCH OF EMAILS.  I CAN'T COMMIT

10:08AM  13    ONE WAY OR THE OTHER ON THAT.

10:08AM  14        Q.   WELL, LET ME SHOW YOU ONE EMAIL TO SEE IF IT REFRESHES

10:08AM  15    YOUR RECOLLECTION.

10:08AM  16        A.   SURE.

10:08AM  17        Q.   AND THIS IS NOT FOR DISPLAY, BUT EXHIBIT 7101.  AND YOU

10:09AM  18    CAN REVIEW AS MUCH OF THIS AS YOU WOULD LIKE TO REVIEW, BUT I'M

10:09AM  19    JUST REALLY INTERESTED IN THE FIRST PARAGRAPH.

10:09AM  20        FIRST OF ALL, LET ME JUST ASK, IS KEVIN SHACHMUT ONE OF

10:09AM  21    THE EXECUTIVES WHO YOU MENTIONED WHO WORKED WITHIN SAFEWAY

10:09AM  22    HEALTH AT THIS TIME?

10:09AM  23        A.   THAT'S CORRECT.

10:09AM  24        Q.   IS IT ACCURATE THAT YOU, AS OF 2010, HAD CONTACTS AT UCSF?

10:09AM  25        A.   I HAD A LONGSTANDING RELATIONSHIP AT UCSF.
```

UNITED STATES COURT REPORTERS

BURD CROSS BY MR. DOWNEY                                                    3064

10:09AM   1         I HAVE TO READ THE COMPLETE LETTER.  CAN I DO THAT?

10:09AM   2    Q.   SURE.  OF COURSE.

10:09AM   3    A.   OKAY.

10:10AM   4         (PAUSE IN PROCEEDINGS.)

10:10AM   5              THE WITNESS:  OKAY.

10:10AM   6    BY MR. DOWNEY:

10:10AM   7    Q.   ALL RIGHT.  I ASKED YOU ABOUT MR. SHACHMUT.

10:10AM   8         IS BRAD WOLFSEN ALSO ANOTHER SAFEWAY HEALTH EXECUTIVE?

10:10AM   9    A.   HE WAS AT THE TIME.

10:10AM  10    Q.   AND YOU -- AS YOU SAID, YOU HAVE A LONGSTANDING

10:10AM  11    RELATIONSHIP WITH UCSF; IS THAT CORRECT?

10:10AM  12    A.   CORRECT.

10:10AM  13    Q.   AND IS THAT IN PART BECAUSE SAFEWAY HAS BEEN A GENEROUS

10:10AM  14    DONOR TO UCSF?

10:10AM  15    A.   SAFEWAY HAS, YES.

10:10AM  16    Q.   AND YOU PERSONALLY HAVE?

10:10AM  17    A.   I PERSONALLY HAVE.

10:10AM  18    Q.   AND SO YOU HAVE HAD GOOD RELATIONSHIPS WITHIN UCSF; IS

10:10AM  19    THAT CORRECT?

10:10AM  20    A.   CORRECT.

10:10AM  21    Q.   AND DOES THIS REFRESH YOUR RECOLLECTION THAT YOU REACHED

10:10AM  22    OUT AROUND THE TIME OF YOUR INITIAL MEETING WITH MS. HOLMES TO

10:10AM  23    ASK UCSF TO EVALUATE THERANOS'S TECHNOLOGY AND WHAT CAPACITIES

10:10AM  24    IT HAD AT THAT TIME?

10:10AM  25    A.   IT DOESN'T.  THIS LETTER STATES THAT STEVE WILL BE

BURD CROSS BY MR. DOWNEY                                          3065

10:11AM   1    REACHING OUT TO HIS CONTACTS --

10:11AM   2    Q.   YOU DON'T HAVE TO READ IT.  I'M JUST --

10:11AM   3              THE COURT:  EXCUSE ME, COUNSEL.

10:11AM   4         THE LAST PORTION IS STRICKEN, LADIES AND GENTLEMEN.  THE

10:11AM   5    PORTION ABOUT READING THE LETTER IS JUST TO REFRESH THE

10:11AM   6    WITNESS'S RECOLLECTION.

10:11AM   7              THE WITNESS:  RIGHT.

10:11AM   8    BY MR. DOWNEY:

10:11AM   9    Q.   I'M JUST ASKING YOU IF, HAVING READ IT, YOU RECALL IT OR

10:11AM  10    NOT.

10:11AM  11    A.   I DON'T BELIEVE THAT -- BY THE 24TH I HAD NOT YET REACHED

10:11AM  12    OUT TO UCSF.

10:11AM  13    Q.   DO YOU KNOW DR. SUE DESMOND-HELLMANN?

10:11AM  14    A.   SHE'S MY ALAMO NEIGHBOR.  I LIVE IN ALAMO AND SHE LIVES

10:11AM  15    NEXT DOOR.

10:11AM  16    Q.   AND DO YOU KNOW SHE'S DONE MANY THINGS, BUT AMONGST THEM

10:11AM  17    SHE'S A VERY PROMINENT EPIDEMIOLOGIST?

10:11AM  18    A.   SHE'S ACTUALLY A CANCER DOCTOR.

10:11AM  19    Q.   RIGHT.  AND SHE FOCUSES ON BIOSTATISTICS AND CANCER

10:11AM  20    RESEARCH AND SO FORTH?

10:11AM  21    A.   SHE DID THAT AT GENENTECH, AND THEN SHE SERVED AS THE

10:11AM  22    CHANCELLOR AT UCSF.

10:11AM  23    Q.   AND THEN SHE HELPED TO DEVELOP SEVERAL WELL-KNOWN AND

10:12AM  24    CRITICALLY IMPORTANT CANCER DRUGS; CORRECT?

10:12AM  25    A.   CORRECT.

BURD CROSS BY MR. DOWNEY                                          3066

10:12AM  1    Q.   AND DO YOU RECALL REACHING OUT TO DR. DESMOND-HELLMANN IN

10:12AM  2    2010 TO ASK HER TO LOOK AT THERANOS'S TECHNOLOGY AND DATA?

10:12AM  3    A.   IT WOULDN'T BE UNUSUAL FOR ME TO CALL HER OR CONTACT HER

10:12AM  4    VIA EMAIL.

10:12AM  5    Q.   AND WOULD IT ALSO BE LOGICAL FOR YOU AT THAT TIME TO HAVE

10:12AM  6    ASKED UCSF TO BE THE INSTITUTION THAT EVALUATED THE TECHNOLOGY?

10:12AM  7    A.   I WAS INTERESTED IN WHAT THEY THOUGHT OF THE TECHNOLOGY,

10:12AM  8    YES.

10:12AM  9    Q.   DO YOU KNOW THAT AT THAT TIME MS. HOLMES BROUGHT THE

10:12AM  10   THERANOS BLOOD ANALYZER AND OTHER COMPONENTS OF THERANOS

10:12AM  11   TECHNOLOGY TO UCSF?

10:12AM  12   A.   I'M NOT AWARE THAT -- I HAVE A VIVID RECOLLECTION OF A

10:12AM  13   MEETING I HAD WITH THE INDIVIDUALS I MENTIONED EARLIER.

10:12AM  14   Q.   THAT WAS IN 2011?

10:12AM  15   A.   THAT WAS IN 2011.

10:13AM  16        I DON'T RECALL.  MAYBE YOU CAN SHOW ME AN EMAIL.  I DON'T

10:13AM  17   RECALL A 2010 MEETING.

10:13AM  18   Q.   SO IF SUCH A MEETING HAPPENED, IT IS NOT SOMETHING THAT

10:13AM  19   YOU WERE PRESENT IN; CORRECT?

10:13AM  20   A.   IF IT HAPPENED, I WASN'T PRESENT OR I DON'T RECALL IT.

10:13AM  21   Q.   AND NOT SOMETHING THAT YOU WERE AWARE OF?  YOU WERE NOT

10:13AM  22   AWARE OF IT?

10:13AM  23   A.   IF IT HAPPENED, I WASN'T AWARE OF IT.

10:13AM  24   Q.   OKAY.  NOW, DID YOU, AFTER THIS ORIGINAL MEETING, THIS

10:13AM  25   MEETING THAT YOU DESCRIBED ON DIRECT, DID YOU START TO WORK ON

UNITED STATES COURT REPORTERS

BURD CROSS BY MR. DOWNEY                                              3067

10:13AM   1     THE POTENTIAL STRUCTURE OF A DEAL WITH THERANOS?

10:13AM   2     A.   WE DID.  WE ALSO WORKED ON OUR DUE DILIGENCE PATH AS WELL.

10:13AM   3     Q.   WELL, I THINK -- DO YOU RECALL THAT MR. LEACH SHOWED YOU

10:13AM   4     ON DIRECT EXAMINATION A PRESENTATION THAT YOU HAD MADE TO THE

10:13AM   5     BOARD OF DIRECTORS OF SAFEWAY; CORRECT?

10:13AM   6     A.   CORRECT.

10:13AM   7     Q.   AND THAT WAS 45 DAYS LATER OR SO FORTH OR SOMETHING LIKE

10:14AM   8     THAT?

10:14AM   9     A.   I THINK IT WAS IN MAY.

10:14AM   10    Q.   IN MAY.

10:14AM   11         AND YOU TOLD THE BOARD AT THAT TIME THAT YOU WERE

10:14AM   12    EVALUATING A POTENTIAL DEAL WITH THERANOS; CORRECT?

10:14AM   13    A.   CORRECT.

10:14AM   14    Q.   AND YOU TOLD THE BOARD THAT YOU WOULD PERFORM DUE

10:14AM   15    DILIGENCE IN CONNECTION WITH THAT DEAL?

10:14AM   16    A.   CORRECT.

10:14AM   17    Q.   AND WERE YOU ASKED IN THAT MEETING ABOUT YOUR EVALUATION

10:14AM   18    OF THE REPRESENTATIONS THAT MS. HOLMES HAD MADE TO YOU

10:14AM   19    CONCERNING THE TECHNOLOGY?

10:14AM   20    A.   CAN YOU REPEAT THE QUESTION?

10:14AM   21    Q.   SURE.  DID BOARD MEMBERS ASK YOU WHAT THE CAPACITY OF THE

10:14AM   22    TECHNOLOGY WAS DURING THAT MEETING?

10:14AM   23    A.   YOU KNOW, I MADE A PRESENTATION, I REPRESENTED WHAT

10:14AM   24    THERANOS HAD REPRESENTED TO ME.  THEY ASKED QUESTIONS.  I

10:14AM   25    CERTAINLY DON'T REMEMBER WHAT THE QUESTIONS WERE.

BURD CROSS BY MR. DOWNEY                                            3068

10:14AM  1    Q.   BUT THEY ASKED YOU TO UNDERTAKE DUE DILIGENCE IN

10:15AM  2    CONNECTION WITH THOSE REPRESENTATIONS; CORRECT?

10:15AM  3    A.   WE TOLD THEM THAT WE WERE GOING TO DO DUE DILIGENCE.

10:15AM  4    Q.   IN FACT, IF YOU'D LET ME SHOW YOU THE EXHIBIT THAT YOU

10:15AM  5    WERE LOOKING AT ON DIRECT, IF YOU GO BACK TO THE WHITE BINDER

10:15AM  6    THAT MR. LEACH WAS SHOWING YOU AND GO TO EXHIBIT 336, WHICH IS

10:15AM  7    ALREADY IN EVIDENCE, AND I'M GOING TO DIRECT YOU TO PAGE 7.

10:15AM  8    A.   PAGE 7?

10:15AM  9    Q.   YES, SIR.

10:15AM  10       ON PAGE 7 AT A VERY HIGH LEVEL YOU OUTLINE A POSSIBLE DEAL

10:15AM  11   WITH THERANOS, AND THE FIRST THING YOU SAY, OF COURSE, IS THAT

10:15AM  12   IT WILL BE SUBJECT TO DUE DILIGENCE; CORRECT?

10:15AM  13   A.   I SAID THAT IN AN EARLIER CHART, I BELIEVE.

10:16AM  14   Q.   OKAY.  AND THE DEAL POINTS THAT YOU COMMUNICATED ON

10:16AM  15   PAGE 7, THIS WAS NOT THE DEAL THAT WAS ACTUALLY ULTIMATELY

10:16AM  16   NEGOTIATED, IS IT?

10:16AM  17   A.   NO.  IT WAS DIFFERENT.

10:16AM  18   Q.   OKAY.  SO, FOR EXAMPLE, YOU DID NOT MAKE -- SAFEWAY DID

10:16AM  19   NOT MAKE AN EQUITY INVESTMENT IN THERANOS, DID IT?

10:16AM  20   A.   NO, IT DID NOT.

10:16AM  21   Q.   AND SAFEWAY DID NOT TAKE A BOARD SEAT AT THERANOS, DID IT?

10:16AM  22   A.   IT WAS IN THE CONTRACT THAT THEY WOULD MAKE EVERY EFFORT

10:16AM  23   TO GIVE SAFEWAY A BOARD SEAT.

10:16AM  24   Q.   BUT YOU DID NOT ULTIMATELY TAKE A BOARD SEAT?

10:16AM  25   A.   WE DID NOT.  WE DID NOT.

BURD CROSS BY MR. DOWNEY                                              3069

10:16AM  1    Q.   OKAY.  LET ME ASK YOU -- AND, OF COURSE, AT ANY TIME IF

10:16AM  2    YOU WANT TO LOOK AT OTHER PARTS OF THE DOCUMENT, DO.

10:16AM  3    A.   SURE.

10:16AM  4    Q.   BUT I WANT TO DIRECT YOUR ATTENTION TO PAGE 18 OF THE SAME

10:17AM  5    EXHIBIT, 331.

10:17AM  6         PAGE 18 IS LABELED BUSINESS RISKS.

10:17AM  7         IS THIS PART OF A PRESENTATION THAT YOU GAVE TO THE

10:17AM  8    SAFEWAY BOARD ABOUT RISKS THAT HAD TO BE EVALUATED IN

10:17AM  9    CONNECTION WITH THE POTENTIAL DEAL WITH THERANOS?

10:17AM 10    A.   YES.

10:17AM 11    Q.   AND THE FIRST RISK THAT YOU IDENTIFIED IS REGULATORY

10:17AM 12    APPROVAL; CORRECT?

10:17AM 13    A.   CORRECT.

10:17AM 14    Q.   AND YOU UNDERSTOOD THAT THERE WERE POTENTIAL REGULATORY

10:17AM 15    RISKS INVOLVING VARIOUS FEDERAL REGULATORS; CORRECT?

10:17AM 16    A.   YES.

10:17AM 17    Q.   ANOTHER RISK WAS THAT THERANOS WOULD HAVE TO OBTAIN

10:17AM 18    CERTAIN APPROVALS OR WAIVERS UNDER CLIA; CORRECT?

10:17AM 19    A.   CORRECT.

10:17AM 20    Q.   AND CLIA IS ADMINISTERED BY CMS; CORRECT?

10:18AM 21    A.   CMS, WHICH IS MEDICARE.

10:18AM 22    Q.   OKAY.  AND I THINK YOU ALSO IDENTIFIED POTENTIAL RISKS

10:18AM 23    AROUND WHETHER THIRD PARTIES WHO WERE NECESSARY TO THE DEAL

10:18AM 24    WOULD AGREE TO THE DEAL.

10:18AM 25         SO, FOR EXAMPLE, YOU RECOGNIZED INSURANCE COMPANIES WOULD

BURD CROSS BY MR. DOWNEY                                    3070

10:18AM  1    HAVE TO SUPPORT THERANOS; CORRECT?

10:18AM  2    A.   CORRECT.

10:18AM  3    Q.   AND SO A RISK WAS THAT THAT WOULD NOT HAPPEN, THERANOS

10:18AM  4    WOULD NOT BE ABLE TO PERSUADE INSURANCE COMPANIES TO REIMBURSE

10:18AM  5    PATIENTS FOR THEIR SERVICES; CORRECT?

10:18AM  6    A.   CORRECT.

10:18AM  7    Q.   AND THAT'S -- THESE RISKS EXISTED BECAUSE IT WAS ALL VERY

10:18AM  8    EARLY IN TERMS OF THE DEAL; CORRECT?

10:18AM  9    A.   THAT'S RIGHT.

10:18AM  10   Q.   AND YOU WENT ON -- IF YOU WOULD JUST FLIP TO THE NEXT

10:18AM  11   PAGE -- YOU TELL THE BOARD AT THE END OF THIS PRESENTATION THAT

10:18AM  12   YOU WILL COMPLETE DUE DILIGENCE; CORRECT?

10:18AM  13   A.   CORRECT.

10:18AM  14   Q.   AND SOME OF THE ITEMS THAT YOU IDENTIFIED ON THE PRIOR

10:19AM  15   SLIDE, OR ADDRESSED, THAT YOU WOULD REVIEW THE REGULATORY

10:19AM  16   STRATEGY AND CONFIRM THE EQUITY VALUE AND THINGS LIKE THAT;

10:19AM  17   CORRECT?

10:19AM  18   A.   CORRECT.

10:19AM  19   Q.   AND YOU ALSO INDICATED THAT YOU WOULD VALIDATE THE

10:19AM  20   TECHNOLOGY WITH A SCIENTIFIC PANEL, INCLUDING JOHNS HOPKINS AND

10:19AM  21   UCSF; CORRECT?

10:19AM  22   A.   CORRECT.

10:19AM  23   Q.   NOW, IN TERMS OF CARRYING OUT THE DUE DILIGENCE OF THE

10:19AM  24   COMPANY, IT WAS ULTIMATELY YOUR RESPONSIBILITY, BUT OBVIOUSLY

10:19AM  25   YOU DIDN'T DO EVERY ASPECT OF IT; CORRECT?

BURD CROSS BY MR. DOWNEY                                          3071

10:19AM  1      A.   THAT'S CORRECT.

10:19AM  2      Q.   YOU HAD THE ABILITY TO DECIDE WHAT GOT DONE AND WHAT

10:19AM  3      DIDN'T GET DONE, BUT YOU DIDN'T NECESSARILY CARRY ALL OF IT

10:19AM  4      OUT; CORRECT?

10:19AM  5      A.   NOT ALL OF IT PERSONALLY, NO.

10:19AM  6      Q.   AND SO, FOR EXAMPLE, WITH RESPECT TO REGULATORY ISSUES,

10:19AM  7      YOU WOULD HAVE ASSIGNED -- YOU DID ASSIGN THAT RESPONSIBILITY

10:19AM  8      TO MR. GORDON, THE GENERAL COUNSEL; CORRECT?

10:20AM  9      A.   CORRECT.

10:20AM  10     Q.   AND WITH REGARD TO ANY FINANCIAL ISSUES, YOU WOULD HAVE

10:20AM  11     ASSIGNED THAT DUE DILIGENCE TO MR. EDWARDS; CORRECT?

10:20AM  12     A.   IN ALL LIKELIHOOD.

10:20AM  13     Q.   BY THE WAY, WITH RESPECT TO FINANCIAL ISSUES, DID YOU ASK

10:20AM  14     MS. HOLMES AT ANY TIME WHEN YOU WERE DEALING WITH HER, HOW MUCH

10:20AM  15     MONEY HAVE YOU SPENT DEVELOPING THIS TECHNOLOGY?

10:20AM  16     A.   I DON'T RECALL.

10:20AM  17     Q.   DO YOU KNOW IF MR. EDWARDS MADE THAT EVALUATION AS PART OF

10:20AM  18     HIS DUE DILIGENCE?

10:20AM  19     A.   I DON'T, I DON'T KNOW.

10:20AM  20     Q.   OKAY.  BUT IN TERMS OF THE BUSINESS MODEL, YOU WOULD HAVE

10:20AM  21     HAD SOME INPUT; CORRECT?

10:20AM  22     A.   THE BUSINESS MODEL, ABSOLUTELY.

10:20AM  23     Q.   AND MAYBE EXECUTIVES.  DID EXECUTIVES FROM SAFEWAY HEALTH

10:20AM  24     ALSO WORK ON DESIGNING THAT?

10:20AM  25     A.   THEY WOULD HAVE HAD A PERIPHERAL INVOLVEMENT.

BURD CROSS BY MR. DOWNEY                                                    3072

10:20AM   1    Q.   OKAY.  SO BY THE END OF THE DAY, THERE WOULD BE A FAIRLY

10:20AM   2    BIG TEAM WORKING ON EVALUATING THERANOS; CORRECT?

10:20AM   3    A.   A NUMBER OF DISCIPLINES.

10:21AM   4    Q.   AND AS WELL BECAUSE THE ISSUES WERE COMPLICATED WITH

10:21AM   5    REGULATORS, DID SAFEWAY ALSO ENGAGE OUTSIDE LAWYERS?

10:21AM   6    A.   ON THE REGULATORY ISSUE, YES.

10:21AM   7    Q.   OKAY.  SO IS IT FAIR TO SAY THAT IN THE PROCESS OF

10:21AM   8    CONSIDERING WHETHER TO DO A DEAL, SAFEWAY DID HUNDREDS OF HOURS

10:21AM   9    OF DUE DILIGENCE?

10:21AM  10    A.   AT LEAST 100.

10:21AM  11    Q.   AND YOU WOULD HAVE COMMUNICATED, LET'S SAY, WITH THERANOS

10:21AM  12    DURING THAT PERIOD ALMOST DAILY ABOUT ONE ASPECT OR ANOTHER OF

10:21AM  13    THE DEAL; CORRECT?

10:21AM  14    A.   WE WERE ON A PARALLEL PATH TO DO THE DEAL AND DO THE DUE

10:21AM  15    DILIGENCE.

10:21AM  16    Q.   OKAY.  LOOK AT, IF YOU WOULD, EXHIBIT 7190.

10:21AM  17         THE COURT:  I JUST WANT TO CORRECT YOU.  I THINK YOU

10:22AM  18    INDICATED THE EXHIBIT YOU WERE JUST DISCUSSING WAS 331, AND I

10:22AM  19    THINK IT WAS 336.

10:22AM  20         MR. DOWNEY:  I BEG YOUR PARDON, YOUR HONOR.  I DID

10:22AM  21    MISIDENTIFY IT.

10:22AM  22         THE WITNESS:  WHICH BINDER ARE WE IN?

10:22AM  23         MR. DOWNEY:  YOU CAN RETURN TO THE BLACK BINDER.

10:22AM  24         THE WITNESS:  AND GIVE ME THE EXHIBIT AGAIN.

10:22AM  25    BY MR. DOWNEY:

BURD CROSS BY MR. DOWNEY                                              3073

10:22AM  1      Q.   THE EXHIBIT IS 7190.

10:22AM  2      A.   I HAVE IT.

10:22AM  3      Q.   I'LL GIVE YOU A MINUTE TO LOOK AT IT, BUT MY QUESTION AT

10:22AM  4      THIS POINT IS, IS THIS AN EMAIL FROM YOU TO RICK JURGENS OF

10:22AM  5      HY-VEE COPYING MS. HOLMES?

10:22AM  6      A.   CORRECT.

10:22AM  7      Q.   AND YOU SENT THIS IN OR AROUND JULY OF 2011; CORRECT?

10:22AM  8      A.   CORRECT.

10:22AM  9           MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

10:22AM 10      EXHIBIT 7190.

10:23AM 11           MR. LEACH:  NO OBJECTION.

10:23AM 12           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:23AM 13      (DEFENDANT'S EXHIBIT 7190 WAS RECEIVED IN EVIDENCE.)

10:23AM 14      BY MR. DOWNEY:

10:23AM 15      Q.   I JUST WANT TO ASK YOU IF THE STATEMENT IN HERE IS AN

10:23AM 16      ACCURATE CHARACTERIZATION OF THE DUE DILIGENCE THAT SAFEWAY

10:23AM 17      PERFORMED WITH RESPECT TO THERANOS.

10:23AM 18      FIRST OF ALL, LET ME ASK YOU, RICK JURGENS IS THE CEO OF

10:23AM 19      ANOTHER FOOD RETAILER; CORRECT?

10:23AM 20      A.   HE WAS AT THE TIME.

10:23AM 21      Q.   AND HE WAS THE CEO OF HY-VEE?

10:23AM 22      A.   CORRECT.

10:23AM 23      Q.   AND HY-VEE WAS ONE OF THE COMPANIES THAT YOU CONSIDERED

10:23AM 24      BRINGING INTO THE NETWORK; CORRECT?

10:23AM 25      A.   THAT'S CORRECT.

BURD CROSS BY MR. DOWNEY                                                3074

```
10:23AM   1    Q.   AND SO YOU WERE HAVING DISCUSSIONS WITH HIM ABOUT WHETHER

10:23AM   2    HY-VEE WOULD BE INTERESTED IN SUCH A DEAL; CORRECT?

10:23AM   3    A.   I ACTUALLY INTRODUCED ELIZABETH TO THEM.

10:23AM   4    Q.   OKAY.  AND YOU WERE DISCUSSING IN THIS EMAIL WHAT DUE

10:23AM   5    DILIGENCE HY-VEE SHOULD DO IN TERMS OF EVALUATING A POTENTIAL

10:23AM   6    DEAL; CORRECT?

10:23AM   7    A.   WE TALKED ABOUT SOME ELEMENTS OF THAT, SURE.

10:24AM   8    Q.   SO IN THE FIRST NUMBERED PARAGRAPH, YOU INDICATE THAT YOU

10:24AM   9    TALKED TO -- YOU INDICATE TO MR. JURGENS, "YOU SHOULD FOCUS

10:24AM  10    YOUR QUESTIONS WITH ME (SAFEWAY HAS SPENT HUNDREDS OF HOURS ON

10:24AM  11    ITS OWN DUE DILIGENCE AND HAS COMMUNICATED ALMOST DAILY WITH

10:24AM  12    ELIZABETH AND THERANOS FOR MORE THAN ONE YEAR).  THIS GIVES

10:24AM  13    ELIZABETH MORE TIME TO CONCENTRATE ON ALL THAT SHE MUST GET

10:24AM  14    DONE BEFORE SAFEWAY'S LAUNCH."

10:24AM  15         AT THE TIME THAT WAS AN ACCURATE STATEMENT?

10:24AM  16    A.   IT WAS AN ACCURATE STATEMENT, BUT IT DESERVES A LITTLE

10:24AM  17    EXPLANATION.

10:24AM  18         BECAUSE I WAS SENSITIVE TO ELIZABETH'S TIME AND WE HAD

10:24AM  19    BEEN THROUGH A GOOD DEAL OF OUR OWN DUE DILIGENCE, THEY COULD

10:24AM  20    ASK ME THE QUESTIONS THAT I PROBABLY ASKED ALREADY AND I COULD

10:24AM  21    PROVIDE THE ANSWERS SO THEY DIDN'T HAVE TO GO TO ELIZABETH.

10:24AM  22    Q.   I UNDERSTAND.  SO YOU WERE INDICATING THAT YOU THOUGHT THE

10:24AM  23    GREATEST EFFICIENCY WOULD BE FOR SAFEWAY TO PROVIDE ANY -- BE

10:25AM  24    CONTACTED FIRST ABOUT ANY DILIGENCE QUESTIONS; CORRECT?

10:25AM  25    A.   CONTACTED FIRST, YES.
```

UNITED STATES COURT REPORTERS

3075

BURD CROSS BY MR. DOWNEY

```
10:25AM   1      Q.   BUT IT'S AN ACCURATE STATEMENT THAT SAFEWAY HAD SPENT
10:25AM   2      HUNDREDS OF HOURS ON DUE DILIGENCE ON THERANOS?
10:25AM   3      A.   IF I SAID IT IN THIS LETTER, IT'S TRUE.
10:25AM   4      Q.   AND DO YOU RECALL THAT SAFEWAY ASKED THERANOS FOR A NUMBER
10:25AM   5      OF DOCUMENTS DURING AND IN CONNECTION WITH PERFORMING DUE
10:25AM   6      DILIGENCE?
10:25AM   7      A.   WE DO -- I DO RECALL THAT, BUT I DON'T RECALL ALL OF THE
10:25AM   8      DOCUMENTS.
10:25AM   9      Q.   LET ME SHOW YOU A DOCUMENT WHICH IS IN THE BLACK NOTEBOOK,
10:25AM  10      WHICH IS EXHIBIT 10536.
10:26AM  11           NOW, THIS IS AN EMAIL THAT YOU ARE NOT A SENDER OR A
10:26AM  12      RECIPIENT.  I WANT TO ASK YOU IF THE DOCUMENTS LISTED ON HERE
10:26AM  13      ARE DOCUMENTS THAT YOU RECALL WERE PART OF THE DILIGENCE
10:26AM  14      PROCESS BETWEEN THERANOS AND SAFEWAY.
10:26AM  15      A.   IT LOOKS LIKE A NUMBER OF THEM WOULD HAVE BEEN PART OF
10:26AM  16      THAT PROCESS.
10:26AM  17      Q.   AND, FOR EXAMPLE, IT'S STANDARD AS PART OF DUE DILIGENCE,
10:26AM  18      ISN'T IT, FOR ONE COMPANY TO PROVIDE ITS CAPITALIZATION TABLE
10:26AM  19      TO THE OTHER COMPANY; CORRECT?
10:26AM  20      A.   TO ANY COMPANY LOOKING TO BUY OR INVEST IN THE COMPANY,
10:26AM  21      YES.
10:26AM  22      Q.   OKAY.  LET ME ASK YOU ABOUT A FEW ITEMS ON HERE.  DO YOU
10:26AM  23      RECALL WHETHER ANY ASSAY DEVELOPMENT REPORTS WERE SENT FROM
10:27AM  24      THERANOS TO SAFEWAY AS PART OF THE DILIGENCE PROCESS?
10:27AM  25      A.   I DON'T KNOW IF THIS IS A CORRECT DESCRIPTION, BUT WE WERE
```

BURD CROSS BY MR. DOWNEY                                          3076

10:27AM   1    PROVIDED WITH SOME INFORMATION REGARDING SOME WORK THAT

10:27AM   2    THERANOS HAD SAID THEY HAD DONE WITH SOME PHARMACEUTICAL

10:27AM   3    COMPANIES.

10:27AM   4    Q.   WELL, DO YOU REMEMBER RECEIVING A DEVELOPMENT REPORT ABOUT

10:27AM   5    HOW THEY HAD ACTUALLY GONE ABOUT DEVELOPING ASSAYS INTERNALLY

10:27AM   6    AT THERANOS?

10:27AM   7    A.   I DON'T RECALL.

10:27AM   8    Q.   OKAY.  BUT DO YOU RECALL RECEIVING PATENTS FROM THERANOS

10:27AM   9    THAT DETAILED THE INTELLECTUAL PROPERTY IT HAD OBTAINED?

10:27AM  10    A.   IT WOULD HAVE BEEN COMMON TO ASK FOR THEM, BUT THAT'S NOT

10:27AM  11    SOMETHING THAT I WOULD HAVE PERSONALLY REVIEWED.

10:27AM  12    Q.   WOULD THOSE ISSUES HAVE BEEN HANDLED BY MR. GORDON?

10:27AM  13    A.   THEY WOULD.

10:27AM  14    Q.   AND WITH REGARD TO ANY OF THE REPORTS THAT RELATED TO

10:28AM  15    SCIENTIFIC ISSUES, THE TECHNOLOGY OR THE DEVELOPMENT OF ASSAYS,

10:28AM  16    WHO WITHIN SAFEWAY WOULD HAVE EVALUATED THAT INFORMATION?

10:28AM  17    A.   I THINK THE FIRST LEVEL OF EVALUATION PROBABLY WOULD HAVE

10:28AM  18    BEEN KEN SHACHMUT AT SAFEWAY HEALTH; WE WOULD HAVE HAD OUR HEAD

10:28AM  19    OF PHARMACY LOOK AT THESE IN TERMS OF INTERNAL; I PERSONALLY

10:28AM  20    HAD CONVERSATIONS WITH THE LAB DIRECTORS AT JOHNS HOPKINS AND

10:28AM  21    THE LAB DIRECTOR AT UCSF.

10:28AM  22    Q.   OKAY.  LET'S TALK ABOUT -- WHO IS THE LAB DIRECTOR AT

10:28AM  23    JOHNS HOPKINS THAT YOU RECALL SPEAKING TO?

10:28AM  24    A.   YOU KNOW, WE'RE GOING BACK 11 YEARS, SO I DON'T RECALL.

10:28AM  25    I'M SURE WE CAN DO AN INTERNET SEARCH.

BURD CROSS BY MR. DOWNEY                                    3077

| | | |
|---|---|---|
| 10:28AM | 1 | Q.   WELL, LET ME ASK YOU A FEW NAMES BECAUSE I DON'T KNOW |
| 10:29AM | 2 | EXACTLY WHO YOU ARE REFERRING TO. |
| 10:29AM | 3 | A.   YEAH. |
| 10:29AM | 4 | Q.   LET ME ASK YOU, DO YOU RECALL CONTACTING A PHYSICIAN NAMED |
| 10:29AM | 5 | DR. JONATHAN SIMONS? |
| 10:29AM | 6 | A.   I RECALL TALKING TO JONATHAN. |
| 10:29AM | 7 | Q.   OKAY.  AND DR. SIMONS WAS THE CEO OF THE PROSTATE CANCER? |
| 10:29AM | 8 | A.   HE WAS AT THE TIME. |
| 10:29AM | 9 | Q.   AND HE'S AN ONCOLOGIST? |
| 10:29AM | 10 | A.   HE'S AN ONCOLOGIST. |
| 10:29AM | 11 | Q.   AND HE'S SOMEONE FOR WHOM YOU HAVE HIGH REGARD? |
| 10:29AM | 12 | A.   IN THE SCIENTIFIC COMMUNITY, YES. |
| 10:29AM | 13 | Q.   AND YOU SPOKE TO HIM ABOUT THE COMPANY? |
| 10:29AM | 14 | A.   I DID. |
| 10:29AM | 15 | Q.   AND YOU WANTED TO GET HIS IMPRESSIONS AND HIS EVALUATION |
| 10:29AM | 16 | OF THERANOS AND ITS TECHNOLOGY? |
| 10:29AM | 17 | A.   I ACTUALLY HAD HIM MEET ELIZABETH AS WELL. |
| 10:29AM | 18 | Q.   YOU HAD DR. SIMONS MEET WITH MS. HOLMES? |
| 10:29AM | 19 | A.   AND I WAS IN THE ROOM. |
| 10:29AM | 20 | Q.   AND DID THAT MEETING GIVE YOU ANY SENSE OF THE CAPACITIES |
| 10:29AM | 21 | OF THERANOS'S TECHNOLOGY? |
| 10:30AM | 22 | A.   YOU KNOW, OBVIOUSLY JONATHAN WAS IN NO POSITION AT A |
| 10:30AM | 23 | DINNER MEETING TO EVALUATE THE TECHNOLOGY.  HE THOUGHT IF |
| 10:30AM | 24 | THERANOS COULD DO THIS, THAT WOULD BE A BIT OF A GAME CHANGER. |
| 10:30AM | 25 | Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 7164. |

BURD CROSS BY MR. DOWNEY                                              3078

10:30AM   1      A.   I HAVE IT.

10:30AM   2      Q.   THIS WAS AN EMAIL THAT WAS SENT, APPEARS TO HAVE BEEN SENT

10:30AM   3      FROM DR. SIMONS TO MS. HOLMES AND YOURSELF; CORRECT?

10:30AM   4      A.   CORRECT.

10:30AM   5               MR. DOWNEY:  I MOVE THE ADMISSION, YOUR HONOR, OF

10:30AM   6      7164.

10:31AM   7               MR. LEACH:  HEARSAY, YOUR HONOR.

10:31AM   8               THE COURT:  THERE ARE TWO DOCUMENTS HERE,

10:31AM   9      MR. DOWNEY.

10:31AM   10              MR. DOWNEY:  YOUR HONOR, I THINK IF YOU SEE --

10:31AM   11              THE COURT:  IS IT BOTH OF THEM YOU'RE SEEKING

10:31AM   12     ADMISSION OF?  THE SECOND ITEM SEEMS TO BE A TWO-PAGE LETTER.

10:31AM   13              MR. DOWNEY:  YES, YOUR HONOR.

10:31AM   14         I THINK THE WAY THE DOCUMENT WORKS IS THAT THE FIRST PAGE

10:31AM   15     IS AN EMAIL AND THE EMAIL HAS AS AN ATTACHMENT A MEMO WHICH IS

10:31AM   16     REFERENCED IF YOU SEE THAT UNDER THE SUBJECT, AND THEN THERE'S

10:31AM   17     AN ATTACHMENT OF A PDF AND WITHIN THE PDF THERE'S A COVER

10:31AM   18     LETTER TO ANOTHER LETTER WHICH, IN TURN, FORWARDS THAT LETTER.

10:32AM   19     AND THIS WAS BEING SHARED, I THINK, WITH THE RECIPIENTS OF THIS

10:32AM   20     EMAIL.

10:32AM   21              THE COURT:  AND THE SECOND LETTER, ARE YOU ASKING

10:32AM   22     THAT THIS BE ADMITTED FOR THE TRUTH OF THE MATTER ASSERTED?  I

10:32AM   23     THINK I WOULD SUSTAIN A HEARSAY OBJECTION TO THAT SECOND PAGE.

10:32AM   24              MR. DOWNEY:  WELL, AT THE VERY LEAST, YOUR HONOR,

10:32AM   25     I'M ASKING THAT IT BE ADMITTED TO THE DEFENDANT'S STATE OF

10:32AM   1       MIND.

10:32AM   2           BUT I ALSO THINK IT GOES TO THE MATERIALITY ISSUES OF --

10:32AM   3       THIS WITNESS HAS TESTIFIED ON DIRECT ABOUT THOSE ISSUES WHICH

10:32AM   4       WERE IMPORTANT TO HIM IN EVALUATING AND CONTINUING UNDER THE

10:32AM   5       DEAL.

10:32AM   6           I THINK HE'S JUST TESTIFIED ABOUT CONVERSATIONS WITH THIS

10:33AM   7       WITNESS AND HIS REQUEST.  I THINK THIS RETAINS -- CONTAINS A

10:33AM   8       CONTEMPORANEOUS REFLECTION OF WHAT THOSE REFLECTIONS WERE.

10:33AM   9               THE COURT:  I'M GOING TO SUSTAIN THE OBJECTION.

10:33AM  10               MR. DOWNEY:  MAY I ASK, YOUR HONOR, IF ANY OF THE

10:33AM  11       COMPONENTS REFRESH THE RECOLLECTION OF THE WITNESS?

10:33AM  12               THE COURT:  YOU MAY, OF COURSE.  SURE.

10:33AM  13       BY MR. DOWNEY:

10:33AM  14       Q.   LET ME ASK YOU, MR. BURD, TO LOOK AT THE THIRD PAGE OF THE

10:33AM  15       EXHIBIT.  LET ME KNOW WHEN YOU HAVE THAT IN FRONT OF YOU.

10:33AM  16       A.   I DO.

10:33AM  17       Q.   AND LET ME ASK YOU TO LOOK AT THE -- THERE'S A SHORT

10:33AM  18       PARAGRAPH AND THEN THERE'S A QUESTION, AND UNDER THAT THERE'S

10:34AM  19       AN ANSWER.

10:34AM  20           IF YOU GO TO THE SECOND SENTENCE FROM THE BOTTOM, I WANT

10:34AM  21       TO ASK --

10:34AM  22       A.   ON THE FIRST PAGE OR THE SECOND PAGE?

10:34AM  23       Q.   ON THE FIRST PAGE.

10:34AM  24       A.   OKAY.

10:34AM  25       Q.   SO DO YOU SEE THAT THERE'S A QUESTION THAT BEGINS "WHAT DO

BURD CROSS BY MR. DOWNEY                                                3080

10:34AM 1    YOU KNOW"?

10:34AM 2    A.   I'M ON THE BOTTOM OF THE FIRST PAGE.

10:34AM 3    Q.   I'M ASKING YOU TO LOOK AT THE TOP OF THE THIRD PAGE OF THE

10:34AM 4    EXHIBIT, WHICH IS A LETTER, AND I THINK I CAN --

10:34AM 5    A.   OKAY.  ALL RIGHT.  SO I'M ON THAT PAGE.

10:34AM 6    Q.   ALL RIGHT.  SO I'M ASKING YOU TO LOOK AT THE FIRST

10:34AM 7    PARAGRAPH, THE PARAGRAPH UNDER THE FIRST QUESTION THAT IS POSED

10:34AM 8    THERE.

10:34AM 9    A.   YES.

10:34AM 10   Q.   AND THE SECOND TO THE LAST SENTENCE OF THAT ANSWER THAT

10:35AM 11   BEGINS "THERE ARE."

10:35AM 12   A.   CORRECT.

10:35AM 13   Q.   IS THAT -- IS THE STATEMENT CONTAINED THEREIN CONSISTENT

10:35AM 14   WITH WHAT DR. SIMONS CONVEYED TO YOU ABOUT THE STATE OF

10:35AM 15   THERANOS'S TECHNOLOGY?

10:35AM 16   A.   IT'S NOT SOMETHING THAT I RECALL.

10:35AM 17   Q.   OKAY.  DO YOU RECALL DR. SIMONS EVER SAYING TO YOU THERE

10:35AM 18   WERE OTHER EFFORTS THAT WERE BEING MADE WHICH WERE SIMILAR

10:35AM 19   EFFORTS TO THE EFFORT THAT THERANOS WAS UNDERTAKING TO GIVE

10:35AM 20   POINT OF CARE BLOOD TESTING?

10:35AM 21   A.   I DON'T RECALL THAT.

10:35AM 22   Q.   DO YOU RECALL HIM SAYING THAT THERANOS WAS IN A SUPERIOR

10:35AM 23   POSITION TO OTHER COMPANIES BASED ON ITS PATENTS?

10:35AM 24   A.   I DON'T RECALL THAT.

10:35AM 25   Q.   OKAY.  AND DO YOU RECALL LEARNING FROM HIM THAT RELATIVE

BURD CROSS BY MR. DOWNEY                                          3081

10:36AM   1    TO OTHER BIOTECH COMPANIES IN THE SAME SPACE, HE THOUGHT THAT

10:36AM   2    THERANOS WAS IN THE LEADING POSITION?

10:36AM   3    A.   I DON'T RECALL THAT.  HE DIDN'T EVALUATE THE TECHNOLOGY.

10:36AM   4    HE WAS ASKING OTHERS ABOUT WHAT THEY KNOW OF HER.

10:36AM   5    Q.   OKAY.  I JUST WANT TO ASK YOU A QUESTION THAT IS A LITTLE

10:36AM   6    BIT OFF TOPIC, BUT I'LL JUST ASK YOU TO GO BACK TO THE EMAIL --

10:36AM   7    A.   SURE.

10:36AM   8    Q.   -- FOR A MOMENT.

10:36AM   9    A.   YES.

10:36AM   10   Q.   AND I WANT TO JUST ASK YOU TO LOOK AT THE LAST PARAGRAPH

10:36AM   11   OF THE EMAIL THAT BEGINS "ELIZABETH."

10:36AM   12   A.   YES.

10:36AM   13   Q.   AND JUST TAKE A LOOK TO LOOK AT THAT.

10:36AM   14       MY QUESTION IS, DO YOU RECALL REFERENCES TO A 3.0 OR A 4.0

10:36AM   15   IN DISCUSSING THERANOS TECHNOLOGY?

10:36AM   16   A.   I DON'T.

10:36AM   17       WHAT I RECALL FROM THE DINNER MEETING IS THAT THERE WAS A

10:37AM   18   LOT OF DISCUSSION ABOUT CANCER BECAUSE HE WAS AN ONCOLOGIST,

10:37AM   19   AND THOSE WERE SOME VISIONS THAT ELIZABETH HAD THAT SHE MIGHT

10:37AM   20   BE ABLE TO DO WITH THE ANALYZER, AND JONATHAN WAS JUST

10:37AM   21   DESCRIBING A JAR OF JELLY BEANS AND THE DIFFERENT COLORS AND HE

10:37AM   22   WAS -- THAT'S WHEN HE STARTED TALKING ABOUT CYTOKINES, BUT THEY

10:37AM   23   WERE TALKING AT A LEVEL OF DETAIL THAT WAS A LITTLE ABOVE ME.

10:37AM   24   Q.   OKAY.  SO YOU DON'T REMEMBER HEARING AT THAT DINNER

10:37AM   25   REFERENCES TO DIFFERENT VERSIONS OF THERANOS TECHNOLOGY?

BURD CROSS BY MR. DOWNEY                                              3082

10:37AM   1      A.   I DON'T.

10:37AM   2      Q.   DO YOU RECALL LEARNING THAT AT ANY TIME?

10:37AM   3      A.   I WASN'T AWARE OF ANYBODY ELSE DOING IT.

10:37AM   4      Q.   WELL, DO YOU RECALL HEARING ABOUT DIFFERENT VERSIONS LIKE

10:37AM   5      A 2.0, A 3.0, A 4.0 OF THERANOS'S TECHNOLOGY?

10:37AM   6      A.   YES.  I THINK THAT, AS I SAID DURING MY DIRECT TESTIMONY,

10:37AM   7      THERE WERE -- THE BIO SENSOR, WHATEVER THE TERM IS, THE UNIT,

10:37AM   8      IT WENT THROUGH CONSTANT CHANGE, BOTH PHYSICAL AND I SUPPOSE IT

10:38AM   9      HAD NEW CAPABILITIES AND THEREFORE YOU'D HAVE A 1, 2, 3, JUST

10:38AM  10      AS MICROSOFT DOES.

10:38AM  11      Q.   AND AT THE TIME, NOT TODAY, BUT AT THE TIME --

10:38AM  12      A.   YES.

10:38AM  13      Q.   -- DID YOU HAVE AN UNDERSTANDING OF THE DIFFERENCES

10:38AM  14      BETWEEN THOSE VERSIONS?

10:38AM  15      A.   NO.

10:38AM  16      Q.   LET ME ASK YOU TO LOOK NOW AT EXHIBIT 332.

10:39AM  17      A.   ALL RIGHT.

10:39AM  18      Q.   IS THIS AN EMAIL THAT MS. HOLMES SENT TO DR. SIMONS

10:39AM  19      COPYING YOU IN 2010?

10:39AM  20      A.   IT IS.

10:39AM  21      Q.   AND IS THIS PART OF YOUR DISCUSSIONS WITH THERANOS ABOUT

10:39AM  22      ENTERING, POTENTIALLY ENTERING A DEAL?

10:39AM  23      A.   WAS IT PART OF THE THOUGHT PROCESS?  YES.

10:39AM  24              MR. DOWNEY:  YOUR HONOR, I WOULD MOVE THE ADMISSION

10:39AM  25      OF 332.

UNITED STATES COURT REPORTERS

**ER-6833**

BURD CROSS BY MR. DOWNEY                                        3083

```
10:39AM   1              MR. LEACH:  NO OBJECTION, YOUR HONOR.

10:39AM   2              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:39AM   3         (GOVERNMENT'S EXHIBIT 332 WAS RECEIVED IN EVIDENCE.)

10:39AM   4    BY MR. DOWNEY:

10:39AM   5    Q.  I'LL ASK YOU TO FOCUS ON THE SECOND FULL PARAGRAPH.  THE

10:39AM   6    PARAGRAPH ABOVE, I'M SORRY, THE PARAGRAPH THAT BEGINS "THERANOS

10:39AM   7    STARTED OUT."

10:40AM   8    A.  YES.

10:40AM   9    Q.  IN THAT PARAGRAPH, MS. HOLMES TOLD DR. SIMONS AND YOU THAT

10:40AM  10    THERANOS HAD BUILT A MINILAB SYSTEM THAT AUTOMATES THE PROCESS

10:40AM  11    OF RUNNING A BROAD RANGE OF ASSAYS ON ACCELERATED TIMELINES

10:40AM  12    WITH MUCH SMALLER VOLUMES OF SAMPLE; CORRECT?

10:40AM  13    A.  CORRECT.

10:40AM  14    Q.  AND IS THAT CONSISTENT WITH WHAT SHE TOLD YOU IN YOUR

10:40AM  15    MEETING IN MARCH OF 2010?

10:40AM  16    A.  CORRECT.

10:40AM  17    Q.  IN THE NEXT PARAGRAPH SHE GOES ON TO SAY, "WE HAVE HAD THE

10:40AM  18    OPPORTUNITY TO PRESENT THE VALIDATION DATA ON THE TECHNOLOGY

10:40AM  19    PLATFORM AND ON THE BROAD RANGE OF ASSAYS AT HOPKINS."

10:40AM  20         CORRECT?

10:40AM  21    A.  THAT'S WHAT IT SAYS.

10:40AM  22    Q.  AND HOPKINS YOU UNDERSTOOD TO BE A REFERENCE TO

10:41AM  23    JOHNS HOPKINS?

10:41AM  24    A.  CORRECT.

10:41AM  25    Q.  AND SHE THEN GOES ON TO IDENTIFY A VARIETY OF DOCTORS AT
```

UNITED STATES COURT REPORTERS

**ER-6834**

BURD CROSS BY MR. DOWNEY                                                3084

10:41AM   1    HOPKINS WHO HAVE PARTICIPATED IN THAT EVALUATION; CORRECT?

10:41AM   2    A.   CORRECT.

10:41AM   3    Q.   IS THIS WHEN YOU LEARNED THAT HOPKINS HAD UNDERTAKEN AN

10:41AM   4    EVALUATION OF THERANOS'S TECHNOLOGY?

10:41AM   5    A.   I CAN'T BE CERTAIN BECAUSE I KNOW PEOPLE AT HOPKINS AND

10:41AM   6    BECAUSE ELIZABETH SAID ONE OF THEIR ANALYZERS WAS PHYSICALLY ON

10:41AM   7    THEIR PROPERTY FOR A WHILE.  SHE INVITED ME TO TALK TO SOMEONE

10:41AM   8    AT HOPKINS, AND THAT'S THE PERSON THAT I CALLED.

10:41AM   9    Q.   AND IS THAT THE LABORATORY DIRECTOR THAT YOU ARE

10:41AM  10    RECALLING?

10:41AM  11    A.   I RECALL THEM AS A LABORATORY DIRECTOR.  IT ALMOST HAD TO

10:42AM  12    BE THE LABORATORY DIRECTOR BECAUSE THAT'S WHOSE OPINION I

10:42AM  13    WANTED TO HEAR.

10:42AM  14    Q.   DID YOU TALK TO ANY OF THE INDIVIDUALS WHO ARE IDENTIFIED

10:42AM  15    IN THE EMAIL THAT IS EXHIBIT 332?

10:42AM  16    A.   I DON'T RECALL TALKING.  THE NAME KICKLER SOUNDS A LITTLE

10:42AM  17    BIT FAMILIAR BUT, YOU KNOW, I TALKED TO THE PERSON THAT SHE

10:42AM  18    DIRECTED ME TO AND ASKED HIM WHETHER THIS BOX COULD DO WHAT SHE

10:42AM  19    SAID.

10:42AM  20    Q.   AND WAS THAT THE CONVERSATION THAT YOU HAD IN 2010?

10:42AM  21    A.   THAT WOULD HAVE BEEN IN 2010, YES.

10:42AM  22    Q.   OKAY.  AND WHAT DID THAT INDIVIDUAL TELL YOU?

10:42AM  23    A.   WHAT THEY SAID WAS THAT WE DIDN'T HAVE THE BOX HERE LONG

10:42AM  24    ENOUGH TO VALIDATE IT THE WAY WE WOULD LIKE.  IN OTHER WORDS,

10:42AM  25    THE BOX WAS TAKEN BACK BY THERANOS.

BURD CROSS BY MR. DOWNEY                                          3085

```
10:43AM   1        AND THE LAB DIRECTOR SAID, LOOK, IF THEY CAN DO THIS, IT'S

10:43AM   2   A GAME CHANGER, BUT I CAN'T VALIDATE FOR YOU THAT THEY'VE DONE

10:43AM   3   IT.  I DIDN'T HAVE ENOUGH TIME WITH THE BOX.

10:43AM   4   Q.   SO YOU UNDERSTOOD THAT IN 2010?

10:43AM   5   A.   CORRECT.

10:43AM   6   Q.   DID YOU LEARN FROM THAT DIRECTOR WHETHER OR NOT ANY DATA

10:43AM   7   HAD BEEN SHARED BY THERANOS WITH HOPKINS?

10:43AM   8   A.   I DID NOT.

10:43AM   9   Q.   NOW, IF I MIGHT ASK YOU, HOW FAMILIAR WERE YOU WITH THE

10:43AM  10   BLOOD TESTING BUSINESS BEFORE YOU BEGAN TALKING TO THERANOS IN

10:43AM  11   2010?

10:43AM  12   A.   YOU KNOW, I WAS FAMILIAR WITH WHO THE MAJOR LAB PLAYERS

10:43AM  13   WERE OUT THERE, QUEST AND LAB CORP., AND I WAS FAMILIAR WITH

10:43AM  14   THE TESTS, CPT CODES.

10:44AM  15        I KNEW THAT THOSE TWO LABS WERE MUCH CHEAPER THAN

10:44AM  16   OUTPATIENT HOSPITAL AND OTHERS, AND I ALSO KNEW -- AND THIS

10:44AM  17   SURPRISED ME -- THAT MEDICARE, WHO OFTEN HAS THE LOWEST RATES,

10:44AM  18   HAD THE HIGHEST LAB RATES.

10:44AM  19   Q.   SO YOU KNEW A LOT ABOUT THE BUSINESS?

10:44AM  20   A.   I KNOW MORE TODAY THAN I KNEW THEN.

10:44AM  21   Q.   BUT DID YOU ACTUALLY KNOW HOW THE MEDICAL PROCESS OF BLOOD

10:44AM  22   TESTING WORKED?

10:44AM  23   A.   IF YOU MEAN HOW ONE GETS A BLOOD TEST?  YOU GET A

10:44AM  24   PRESCRIPTION FROM A DOCTOR, THEY IDENTIFY THE TEST, THE SCRIPT

10:44AM  25   IS TAKEN TO A LAB AND THEY FULFILL THE REQUEST.
```

UNITED STATES COURT REPORTERS

BURD CROSS BY MR. DOWNEY                                          3086

10:44AM   1      Q.   I MEANT SOMETHING SLIGHTLY DIFFERENT.

10:44AM   2      A.   OKAY.

10:44AM   3      Q.   I MEANT, DID YOU UNDERSTAND THAT WHEN A LAB IS ANALYZING A

10:44AM   4      BLOOD SAMPLE WHAT THE DIFFERENT ELEMENTS OF THAT ARE?

10:45AM   5      A.   I'M NOT SURE WHAT YOU MEAN BY "ELEMENTS."

10:45AM   6      Q.   WELL, DID YOU KNOW, FOR EXAMPLE, THAT THERE ARE DIFFERENT

10:45AM   7      FORMS OF BLOOD TESTING MACHINES THAT PERFORM DIFFERENT KINDS OF

10:45AM   8      BLOOD TESTS?

10:45AM   9      A.   I WAS FAMILIAR WITH THE FACT THAT, THAT MOST FULL SCALE

10:45AM   10     LABS CAN DO MOST ANYTHING, AND THEN THERE WERE REFERENCE LABS

10:45AM   11     THAT COULD DO A BIT MORE.

10:45AM   12     Q.   OKAY.   AND YOU UNDERSTOOD THAT THOSE WERE LABS THAT

10:45AM   13     CONTAINED A SUBSTANTIAL AMOUNT OF HEAVY EQUIPMENT TO PERFORM

10:45AM   14     THAT TESTING?

10:45AM   15     A.   CORRECT.

10:45AM   16     Q.   DID YOU -- WERE YOU FAMILIAR WITH THE TERM "ASSAY" BEFORE

10:45AM   17     DISCUSSION OF THERANOS?

10:45AM   18     A.   I HADN'T HEARD THE TERM USED IN THIS WAY, BUT I UNDERSTOOD

10:45AM   19     THE TERM WHEN USED.

10:45AM   20     Q.   OKAY.   AND DID YOU COME TO LEARN THAT THERE WERE DIFFERENT

10:45AM   21     FORMS OF ASSAYS, DIFFERENT METHODS BY WHICH ASSAYS WORKED?

10:46AM   22     A.   I'M NOT SURE.

10:46AM   23          NOW, ARE YOU EQUATING AN ASSAY TO A SPECIFIC CPT CODE?

10:46AM   24     Q.   WELL, IT IS -- EFFECTIVELY I AM.

10:46AM   25     A.   OKAY.

UNITED STATES COURT REPORTERS

3087
BURD CROSS BY MR. DOWNEY

10:46AM  1    Q.   WHAT I AM REFERRING TO AS AN ASSAY IS THE METHOD BY WHICH

10:46AM  2    A PARTICULAR LAB ANALYZES AN ANALYTE IN THE BLOOD, SO A GLUCOSE

10:46AM  3    TEST OR A SODIUM TEST, THAT THERE ARE DIFFERENT ASSAYS FOR

10:46AM  4    EACH.

10:46AM  5    A.   SURE.

10:46AM  6    Q.   AND DID YOU UNDERSTAND THAT THE METHODS BY WHICH THEY WERE

10:46AM  7    ANALYZED FELL INTO DIFFERENT CATEGORIES?  WAS THAT SOMETHING

10:46AM  8    THAT YOU --

10:46AM  9    A.   NO, IT'S NOT THE LEVEL OF DETAIL THAT I HAD.

10:46AM 10    Q.   YOU KNEW THAT SOME BLOOD TESTS WERE PRETTY COMMONLY

10:46AM 11    ORDERED; CORRECT?

10:46AM 12    A.   CORRECT.

10:46AM 13    Q.   AND ONE OF YOUR GOALS, I THINK, IN DESIGNING THIS

10:46AM 14    PARTNERSHIP WAS TO MAKE SURE THAT THERANOS COULD TEST THOSE,

10:47AM 15    PLUS OTHER TESTS?

10:47AM 16    A.   CORRECT.

10:47AM 17    Q.   IN FACT, IN STARTING THE PARTNERSHIP, IS IT TRUE THAT

10:47AM 18    SAFEWAY PROVIDED TO THERANOS ITS DATA ABOUT WHICH TESTS WERE

10:47AM 19    ORDERED WITHIN SAFEWAY AND HOW FREQUENTLY THEY WERE ORDERED?

10:47AM 20    A.   WELL, WE HAD CLAIMS DATA.  I DON'T RECALL GIVING THEM

10:47AM 21    CLAIMS DATA.

10:47AM 22         BUT WE HAD INFORMATION THAT COULD TELL US THE TOP 25

10:47AM 23    ASSAYS, AS YOU REFER TO THEM, THE TOP 50, THE TOP 100, WHAT

10:47AM 24    THOSE PRICE POINTS WERE, YOU KNOW, FOR DIFFERENT LABS.  WE MAY

10:47AM 25    HAVE PROVIDED THAT.

UNITED STATES COURT REPORTERS

3088

BURD CROSS BY MR. DOWNEY

10:47AM   1    Q.   SO WHEN YOU SAY CLAIMS DATA -- YOU, OF COURSE, PROVIDE

10:47AM   2    INSURANCE TO A NUMBER OF SAFEWAY EMPLOYEES; CORRECT?

10:47AM   3    A.   FOR THE BENEFIT OF THE JURY, ALL LARGE COMPANIES ARE

10:47AM   4    SELF-INSURED AND SO THEY PAY ALL OF THE MEDICAL BILLS, AND AN

10:47AM   5    INSURANCE COMPANY LIKE AN AETNA OR A BLUE SHIELD JUST DOES THE

10:48AM   6    MECHANICS OF PROCESSING THE CLAIM.

10:48AM   7    Q.   OKAY.  AND SO YOU, YOU RECALL GENERALLY IN SOME FORM THAT

10:48AM   8    YOU WERE ABLE TO AGGREGATE INFORMATION FROM THAT DATA AND

10:48AM   9    PROVIDE IT TO THERANOS?

10:48AM   10   A.   WE DID THAT OFTEN FOR OUR OWN ANALYSIS TO LOWER COSTS.

10:48AM   11   Q.   DO YOU RECALL PROVIDING IT TO THERANOS?

10:48AM   12   A.   I DON'T.  BUT IF THEY HAD ASKED FOR IT, I WOULD HAVE

10:48AM   13   PROVIDED IT ON AN AGGREGATED BASIS.

10:48AM   14   Q.   OKAY.  DO YOU RECALL DISCUSSIONS BETWEEN THERANOS AND

10:48AM   15   SAFEWAY AS TO WHICH TESTS WERE THE MOST COMMONLY ORDERED TESTS?

10:48AM   16   A.   I DON'T RECALL.  BUT WE KNEW WHAT THEY WERE, AND IF WE

10:48AM   17   WERE ASKED, WE PROVIDED IT.

10:48AM   18   Q.   OKAY.  NOW, DID YOU UNDERSTAND AT THE TIME THAT YOU WERE

10:48AM   19   HAVING CONVERSATIONS WITH THERANOS THAT THERANOS HAD NOT YET

10:49AM   20   DEVELOPED AN ASSAY FOR EACH BLOOD TEST THAT CAN POTENTIALLY BE

10:49AM   21   OFFERED?

10:49AM   22   A.   WE THOUGHT THAT THERANOS HAD DEVELOPED ASSAYS FOR ALMOST

10:49AM   23   ALL.  AND IF YOU GET TO PROBABLY 200 ASSAYS, YOU WOULD BE

10:49AM   24   95 PERCENT OF ALL ASSAYS, AND MAYBE AT 100 YOU WOULD BE AT

10:49AM   25   LEAST AT 75 PERCENT.

BURD CROSS BY MR. DOWNEY                                              3089

10:49AM  1   Q.   SO AT SOME POINT SAFEWAY HAD THAT UNDERSTANDING OF WHAT

10:49AM  2   THERANOS HAD DONE?

10:49AM  3   A.   WELL, WE WERE RELYING ON THE FACT THAT THEY SAID THAT THEY

10:49AM  4   COULD DO VIRTUALLY ALL ASSAY TYPES.

10:49AM  5   Q.   AND DID YOU AUTHORIZE MR. WOLFSEN AND MR. SHACHMUT TO HAVE

10:49AM  6   CONVERSATIONS WITH MS. HOLMES ABOUT THAT?

10:49AM  7   A.   THEY MADE A TRIP DOWN TO THERANOS AND SPENT A FEW HOURS.

10:49AM  8   Q.   AND I THINK YOU INDICATED IN YOUR EMAIL TO MR. JURGENS

10:50AM  9   THAT SAFEWAY WAS COMMUNICATING ALMOST DAILY WITH THERANOS.

10:50AM 10   A.   IN ONE FORM OR ANOTHER.

10:50AM 11   Q.   AND DID MR. SHACHMUT AND MR. WOLFSEN COMMUNICATE WITH

10:50AM 12   REPRESENTATIVES OF THERANOS BY EMAIL ABOUT THE POTENTIAL DEAL?

10:50AM 13   A.   THEY WERE PART OF A DUE DILIGENCE TEAM, SO I DON'T THINK

10:50AM 14   THEY WOULD HAVE BEEN TALKING ABOUT A POTENTIAL DEAL.  BUT THEY

10:50AM 15   WOULD HAVE BEEN PURSUING DIFFERENT AVENUES OF DUE DILIGENCE.

10:50AM 16   Q.   AND THEY WOULD HAVE BEEN TRYING TO UNDERSTAND WHAT

10:50AM 17   THERANOS'S CAPACITIES WERE; CORRECT?

10:50AM 18   A.   CORRECT.

10:50AM 19   Q.   AND OTHER ASPECTS OF THERANOS?

10:50AM 20   A.   RIGHT.

10:50AM 21   Q.   AND THAT WAS TRUE BOTH BEFORE THE DEAL WAS AGREED TO AND

10:50AM 22   THEN AS TIME WENT ON AND PAYMENTS WERE REQUESTED BY THERANOS;

10:50AM 23   CORRECT?

10:50AM 24   A.   CORRECT.

10:50AM 25   Q.   AND IN DOING THAT, DID YOU UNDERSTAND THAT THEY AND OTHER

UNITED STATES COURT REPORTERS

BURD CROSS BY MR. DOWNEY                                    3090

10:51AM  1      SAFEWAY EMPLOYEES COMMUNICATED WITH THERANOS EMPLOYEES AND

10:51AM  2      EXECUTIVES BY EMAIL?

10:51AM  3      A.   THERE WOULD BE SOME EMAILS EXCHANGED I THINK DURING THE

10:51AM  4      DUE DILIGENCE PROCESS, AND THEN ONCE WE GOT DOWN TO THE

10:51AM  5      LOGISTICS AT THE STORE LEVEL, THERE WAS A SMALL TEAM AT

10:51AM  6      THERANOS AND A SMALL TEAM AT SAFEWAY.

10:51AM  7           BUT THE VAST MAJORITY OF COMMUNICATION WAS BETWEEN EITHER

10:51AM  8      MYSELF AND BOB GORDON, ELIZABETH, AND SUNNY.

10:51AM  9      Q.   AND TO THE EXTENT THAT EMPLOYEES COMMUNICATED BY EMAIL,

10:51AM  10     WAS THERE A SYSTEM AT SAFEWAY BY WHICH THAT EMAIL WAS

10:51AM  11     PRESERVED?

10:51AM  12     A.   I CAN'T TELL YOU.

10:51AM  13     Q.   DID YOU EVER SEE A LIBRARY OF ASSAYS THAT THERANOS -- THAT

10:51AM  14     YOU UNDERSTOOD THAT THERANOS COULD PERFORM?

10:51AM  15     A.   IN ONE OF THE EXHIBITS THEY OFFERED UP ABOUT JUST AS AN

10:52AM  16     EXAMPLE OF THEIR PRICING, AND THOSE WERE SOME OF THE TOP ASSAYS

10:52AM  17     IN TERMS OF VOLUME.

10:52AM  18     Q.   AND DO YOU KNOW THAT MS. HOLMES TOLD MR. WOLFSEN BY EMAIL

10:52AM  19     THAT THERANOS WAS NOT PRESENTLY CAPABLE OF PERFORMING ALL OF

10:52AM  20     THOSE TESTS?

10:52AM  21     A.   I DON'T KNOW THAT.  I'D LIKE TO SEE THE EMAIL.

10:52AM  22     Q.   WELL, LET ME ASK YOU TO LOOK AT EXHIBIT 7104.

10:52AM  23          YOUR HONOR, 7104 IS NOT AN EMAIL ON WHICH THIS WITNESS IS

10:52AM  24     COPIED.  I DO THINK THAT THIS IS AN IMPORTANT COMMUNICATION FOR

10:53AM  25     PURPOSES OF REFLECTING THE INTENT OF MS. HOLMES BOTH IN TERMS

BURD CROSS BY MR. DOWNEY                                                  3091

10:53AM  1      OF SENDING AND RECEIVING THE EMAIL.  SO I THINK IT COULD BE

10:53AM  2      ADMITTED ON THAT BASIS.

10:53AM  3           BUT ALTERNATIVELY I'LL HAVE TO CALL EITHER MR. WOLFSEN OR

10:53AM  4      MR. SHACHMUT.  SO I MOVE TO ADMIT IT.

10:53AM  5                MR. LEACH:  NO OBJECTION, YOUR HONOR.

10:53AM  6                THE COURT:  TO THE ADMISSION OF THIS EMAIL?

10:53AM  7                MR. LEACH:  CORRECT.

10:53AM  8                THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

10:53AM  9           (DEFENDANT'S EXHIBIT 7104 WAS RECEIVED IN EVIDENCE.)

10:53AM 10      BY MR. DOWNEY:

10:53AM 11      Q.   IF YOU LOOK AT THE BOTTOM OF THE EMAIL THAT STARTS ON

10:53AM 12      PAGE 1, MR. WOLFSEN WRITES TO MS. HOLMES AND SAYS HE'S RECEIVED

10:54AM 13      A REQUEST FROM PRESUMABLY SAFEWAY'S LAWYERS TO SEND THE

10:54AM 14      SELECTED ASSAYS FROM THE THERANOS ASSAY LIBRARY TO OUR OUTSIDE

10:54AM 15      COUNSEL WHO IS ASSISTING IN VARIOUS REGULATORY RESEARCH.

10:54AM 16           AND THEN HE GOES ON TO DISCUSS SOME REGULATORY ISSUES.

10:54AM 17           DO YOU SEE THAT AT THE BOTTOM OF THE FIRST PAGE?

10:54AM 18      A.   YES.

10:54AM 19      Q.   AND HE SENDS THAT EMAIL TO MS. HOLMES AND MR. SHACHMUT;

10:54AM 20      CORRECT?

10:54AM 21      A.   YES.

10:54AM 22      Q.   AND MS. HOLMES RESPONDS TO THAT AND SAYS THIS IS FINE, BUT

10:54AM 23      THAT LIST IS NOT AN ACCURATE REFLECTION OF THE TESTS WE WILL

10:54AM 24      ACTUALLY MAKE AVAILABLE IN THE STORES, THAT LIST IS THE LIBRARY

10:55AM 25      WE PROVIDE FOR OUR PHARMACEUTICAL CLIENTS' CLINICAL TRIALS.

| | | |
|---|---|---|
| 10:55AM | 1 | DO YOU SEE THAT? |
| 10:55AM | 2 | A.   I SEE THAT. |
| 10:55AM | 3 | Q.   AND I THINK YOU MENTIONED YOU UNDERSTOOD THAT THERANOS, |
| 10:55AM | 4 | PRIOR TO THE TIME THAT THEY ENTERED NEGOTIATIONS WITH SAFEWAY, |
| 10:55AM | 5 | HAD BEEN PURSUING PARTNERSHIPS WITH PHARMACEUTICAL COMPANIES; |
| 10:55AM | 6 | CORRECT? |
| 10:55AM | 7 | A.   THAT'S WHAT WE WERE TOLD, RIGHT. |
| 10:55AM | 8 | Q.   AND MS. HOLMES IS SAYING TO MR. WOLFSEN, THIS IS A LIBRARY |
| 10:55AM | 9 | OF ASSAYS WE FEATURE AND CAN DEVELOP AND VALIDATE AS PART OF |
| 10:55AM | 10 | OUR TRIAL WITH YOU; CORRECT? |
| 10:55AM | 11 | MR. LEACH:  OBJECTION.  THAT MISSTATES WHAT THIS |
| 10:55AM | 12 | SAYS, AND IT CALLS FOR SPECULATION. |
| 10:55AM | 13 | MR. DOWNEY:  I'LL WITHDRAW IT, YOUR HONOR. |
| 10:55AM | 14 | THE COURT:  THE QUESTION IS WITHDRAWN. |
| 10:55AM | 15 | BY MR. DOWNEY: |
| 10:55AM | 16 | Q.   IN ANY EVENT, MR. WOLFSEN RESPONDS TO MS. HOLMES AND SAYS, |
| 10:55AM | 17 | THANK YOU FOR THE CLARIFICATION, I HAD FORGOTTEN THAT THE LIST |
| 10:55AM | 18 | WAS A COMPOSITE OF CURRENT AND FUTURE TESTS. |
| 10:56AM | 19 | DO YOU SEE THAT? |
| 10:56AM | 20 | A.   I SEE THAT. |
| 10:56AM | 21 | Q.   IS THIS AN EMAIL AND THE COMMUNICATIONS CONTAINED HEREIN, |
| 10:56AM | 22 | DO YOU RECALL ANY CONVERSATION WITH MR. WOLFSEN OR MR. SHACHMUT |
| 10:56AM | 23 | ABOUT THAT IN OR AROUND APRIL OF 2010? |
| 10:56AM | 24 | A.   I DO NOT. |
| 10:56AM | 25 | THEY WERE SENT DOWN TO DISCUSS THE WORK THAT HAD BEEN DONE |

BURD CROSS BY MR. DOWNEY                                              3093

10:56AM   1    WITH PHARMACEUTICAL COMPANIES, AND THOSE PRESUMABLY WERE UNITS

10:56AM   2    IN PATIENT'S HOMES THAT WERE VALIDATING SOME VERY SPECIFIC

10:56AM   3    ASPECTS OF SOME DRUG THAT THEY WERE DEVELOPING.

10:56AM   4    Q.   AND APPARENTLY THEY WERE ALSO IN TOUCH WITH SAFEWAY'S

10:56AM   5    OUTSIDE LAWYERS; CORRECT?

10:56AM   6    A.   I THINK THAT BOB GORDON WOULD HAVE BEEN FOR SURE.

10:56AM   7         BUT, AGAIN, I THINK WE'RE TALKING ABOUT APPLES AND ORANGES

10:56AM   8    HERE.  THE KIND OF TESTS THAT WERE RUN FOR PHARMACEUTICAL TO MY

10:56AM   9    KNOWLEDGE WOULDN'T BE THE SAME KIND OF TESTS YOU WOULD RUN FOR

10:57AM  10    INDIVIDUALS, AND WE WERE REPEATEDLY TOLD THAT THEY COULD DO

10:57AM  11    VIRTUALLY ALL.

10:57AM  12    Q.   WELL, THAT REMAINS -- THAT DEPENDS ON THE EMAIL, I

10:57AM  13    SUPPOSE.

10:57AM  14         BUT I WANT TO ASK YOU WHAT YOUR UNDERSTANDING OF THE

10:57AM  15    PHARMACEUTICAL BUSINESS WAS.

10:57AM  16         DID YOU UNDERSTAND THAT THEY WOULD PARTNER WITH

10:57AM  17    PHARMACEUTICAL COMPANIES IN CONNECTION WITH PARTICULAR ASSAYS?

10:57AM  18    DID YOU UNDERSTAND THAT?

10:57AM  19    A.   I UNDERSTOOD THAT THEY WERE WORKING WITH PHARMACEUTICAL

10:57AM  20    COMPANIES AND, JUST AS I SAID, THEY WERE TRYING TO EVALUATE

10:57AM  21    REALTIME HOW THOSE DRUGS WERE AFFECTING MAYBE, YOU KNOW, PARTS

10:57AM  22    OF TRADITIONAL ASSAYS I DON'T KNOW.

10:57AM  23    Q.   BUT YOU UNDERSTOOD --

10:57AM  24    A.   IT'S A DIFFERENT APPLICATION.

10:57AM  25    Q.   BUT YOU UNDERSTOOD THAT THEY WERE WORKING WITH DIFFERENT

BURD CROSS BY MR. DOWNEY                                                    3094

10:57AM   1      PHARMACEUTICAL COMPANIES; CORRECT?

10:57AM   2      A.   I UNDERSTOOD THAT THAT'S WHAT THEY SAID THEY WERE DOING.

10:57AM   3      I NEVER PERSONALLY VALIDATED THAT.

10:57AM   4      Q.   OKAY.  BUT DID YOU UNDERSTAND THAT THE NATURE OF THOSE

10:57AM   5      PARTNERSHIPS WAS THAT THEY WOULD INVOLVE ONE OR TWO ASSAYS?

10:58AM   6      A.   I KNEW THAT.

10:58AM   7      Q.   LET ME ASK YOU ABOUT SOME REGULATORY ISSUES THAT WE

10:58AM   8      TOUCHED ON BEFORE.

10:58AM   9          YOUR HONOR, I THOUGHT, BECAUSE WE WILL GO UNTIL 3:00, I

10:58AM  10      THOUGHT WE MIGHT GO UNTIL 11:15 TODAY IF THAT'S -- GO UNTIL

10:58AM  11      11:15 AND HAVE A LITTLE BIT OF A LONGER BREAK.  SO LET ME JUST

10:58AM  12      COVER THIS MATTER.

10:58AM  13              THE COURT:  YOU PREVIEWED ME ASKING THE JURY IF THEY

10:58AM  14      CAN GO UNTIL 3:00.

10:58AM  15              MR. DOWNEY:  I BEG YOUR PARDON.

10:58AM  16              THE COURT:  SO THANKS FOR THAT.

10:58AM  17              MR. DOWNEY:  I'M BREAKING IT TO THEM SOFTLY.

10:58AM  18      Q.   LET ME ASK YOU ABOUT SAFEWAY'S EVALUATION OF THE LEGAL AND

10:58AM  19      REGULATORY ISSUES.

10:58AM  20          WE MENTIONED BEFORE CMS, AND THAT WAS ONE REGULATOR YOU

10:58AM  21      KNEW WOULD BE RELEVANT HERE; CORRECT?

10:58AM  22      A.   CORRECT.

10:58AM  23      Q.   AND THE FDA WAS ANOTHER; CORRECT?

10:58AM  24      A.   MAYBE THE FDA, MAYBE NOT.

10:59AM  25      Q.   THAT WAS AN OPEN QUESTION; CORRECT?

BURD CROSS BY MR. DOWNEY                                          3095

10:59AM   1      A.   CORRECT.

10:59AM   2      Q.   BUT YOU -- AND WHEN YOU ULTIMATELY ENTERED INTO AN

10:59AM   3      AGREEMENT, YOU ULTIMATELY INCLUDED A PROVISION WHICH SAID IF

10:59AM   4      THE FDA OBJECTS, WE HAVE THE RIGHT TO TERMINATE THE AGREEMENT;

10:59AM   5      CORRECT?

10:59AM   6      A.   I DON'T RECALL THAT, BUT THE DOCUMENT'S IN THESE BINDERS.

10:59AM   7      Q.   OKAY.  YOU UNDERSTOOD OVER TIME THAT THERANOS WAS WORKING

10:59AM   8      WITH BOTH OF THOSE REGULATORS; CORRECT?

10:59AM   9      A.   THEY SAID THEY WERE WORKING WITH BOTH, AND I KNEW THEY

10:59AM   10     WERE WORKING WITH CLIA, CLIA WAIVERS, BECAUSE I RECALLED THE

10:59AM   11     TIME WHEN ELIZABETH CALLED ME AND SAID THAT THEY HAD JUST BEEN

10:59AM   12     CLIA APPROVED.

10:59AM   13     Q.   RIGHT.  AT SOME POINT DURING THE RELATIONSHIP, THEIR LAB

10:59AM   14     HAD GOTTEN A CERTIFICATION FROM CLIA TO OPERATE AS A LAB?

10:59AM   15     A.   CORRECT, CORRECT.

10:59AM   16     Q.   BUT DURING THE TIME THAT YOU WERE NEGOTIATING THE

10:59AM   17     AGREEMENT IN 2010, MS. HOLMES NEVER SAID WE HAVE A CLIA

10:59AM   18     CERTIFICATION; CORRECT?

10:59AM   19     A.   NO, SHE DID NOT.  BUT SHE WAS EXPECTING TO GET ONE, AND I

11:00AM   20     BELIEVE THEY ULTIMATELY DID.

11:00AM   21     Q.   AND, IN FACT, FOR THE AGREEMENT TO GO FORWARD, THEY HAD TO

11:00AM   22     GET THAT; CORRECT?

11:00AM   23     A.   CORRECT.

11:00AM   24     Q.   AND SIMILARLY, DID YOU KNOW THAT THERANOS WAS TALKING TO

11:00AM   25     THE FDA ABOUT VARIOUS APPROVALS?

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 17, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Amy Mason Saharia
AMY MASON SAHARIA

April 17, 2023