No. 22-10312

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ELIZABETH A. HOLMES

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 5:18-CR-00258
Hon. Edward J. Davila

---

## EXCERPTS OF RECORD
### VOL. XXVI of LVII | ER-7141 to ER-7440

---

JOHN D. CLINE
LAW OFFICE OF JOHN D. CLINE
  600 Stewart Street
  Suite 400
  Seattle, WA 98101
  (360) 320-6435

KEVIN M. DOWNEY
LANCE A. WADE
AMY MASON SAHARIA
KATHERINE A. TREFZ
WILLIAMS & CONNOLLY LLP
  680 Maine Ave. S.W.
  Washington, D.C. 200024
  (202) 434-5000
  asaharia@wc.com

3538

```
 1
 2                    UNITED STATES DISTRICT COURT
 3                  NORTHERN DISTRICT OF CALIFORNIA
 4                        SAN JOSE DIVISION
 5
      UNITED STATES OF AMERICA,      )  CR-18-00258-EJD
 6                                   )
                     PLAINTIFF,      )  SAN JOSE, CALIFORNIA
 7                                   )
            VS.                      )  VOLUME 19
 8                                   )
      ELIZABETH A. HOLMES,           )  OCTOBER 14, 2021
 9                                   )
                     DEFENDANT.      )  PAGES 3538 - 3757
10    _____)
11                 TRANSCRIPT OF TRIAL PROCEEDINGS
12              BEFORE THE HONORABLE EDWARD J. DAVILA
                  UNITED STATES DISTRICT JUDGE
13
      A P P E A R A N C E S:
14
      FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
15                          BY:  JOHN C. BOSTIC
                                 JEFFREY B. SCHENK
16                          150 ALMADEN BOULEVARD, SUITE 900
                            SAN JOSE, CALIFORNIA 95113
17
                            BY:  ROBERT S. LEACH
18                               KELLY VOLKAR
                            1301 CLAY STREET, SUITE 340S
19                          OAKLAND, CALIFORNIA 94612
20         (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21
      OFFICIAL COURT REPORTERS:
22                          IRENE L. RODRIGUEZ, CSR, RMR, CRR
                            CERTIFICATE NUMBER 8074
23                          LEE-ANNE SHORTRIDGE, CSR, CRR
                            CERTIFICATE NUMBER 9595
24
          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25              TRANSCRIPT PRODUCED WITH COMPUTER
```

```
1         A P P E A R A N C E S:  (CONT'D)

2

3    FOR DEFENDANT HOLMES:    WILLIAMS & CONNOLLY LLP
                              BY:  KEVIN M. DOWNEY
4                                  LANCE A. WADE
                                   KATHERINE TREFZ
5                                  PATRICK LOOBY
                                   RICHARD CLEARY
6                                  ANDREW LEMENS
                              725 TWELFTH STREET, N.W.
7                             WASHINGTON, D.C. 20005

8                             LAW OFFICE OF JOHN D. CLINE
                              BY:  JOHN D. CLINE
9                             ONE EMBARCADERO CENTER, SUITE 500
                              SAN FRANCISCO, CALIFORNIA 94111
10

11   ALSO PRESENT:            FEDERAL BUREAU OF INVESTIGATION
                              BY:  ADELAIDA HERNANDEZ
12
                              OFFICE OF THE U.S. ATTORNEY
13                            BY:  LAKISHA HOLLIMAN, PARALEGAL
                                   MADDI WACHS, PARALEGAL
14
                              WILLIAMS & CONNOLLY
15                            BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL

16                            TBC
                              BY:  BRIAN BENNETT, TECHNICIAN
17

18

19

20

21

22

23

24

25
```

INDEX OF PROCEEDINGS

GOVERNMENT'S:


**ROBERTO AMENTA**
DIRECT EXAM BY MR. BOSTIC (RES.)          P. 3561
CROSS-EXAM BY MS. TREFZ                   P. 3570


**NIMESH JHAVERI**
DIRECT EXAM BY MR. SCHENK                 P. 3572
CROSS-EXAM BY MR. DOWNEY                  P. 3639
REDIRECT EXAM BY MR. SCHENK              P. 3694
RECROSS-EXAM BY MR. DOWNEY               P. 3705

**SUNIL DHAWAN**
DIRECT EXAM BY MR. SCHENK                 P. 3709
CROSS-EXAM BY MR. WADE                    P. 3745

1                          INDEX OF EXHIBITS

2

                                        IDENT.      EVIDENCE
3        GOVERNMENT'S:

4        5428                                       3568
         1711                                       3583
5        1755                                       3601
         1884                                       3605
6        1896                                       3610
         1909                                       3615
7        1906, PROVISIONALLY ADMITTED               3617
         1906, FULLY ADMITTED                       3618
8        2214                                       3621
         2275                                       3623
9        5387C                                      3627
         3755                                       3651
10       1673                                       3664
         2394                                       3673
11       2219                                       3713
         2248                                       3716
12       2663                                       3723
         2760                                       3725
13       2772                                       3727
         3041                                       3732
14       2791                                       3733
         2548                                       3739
15       2972                                       3741
         3217, PAGE 1                               3742
16       2553                                       3753

17

         DEFENDANT'S:
18

         7454                                       3690
19       7471                                       3691
         13961                                      3750
20       10531                                      3754

21

22

23

24

25

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
|          | 1  | SAN JOSE, CALIFORNIA                    OCTOBER 14, 2021       |
| 08:35AM  | 2  | P R O C E E D I N G S                                        |
| 08:35AM  | 3  | (COURT CONVENED AT 8:35 A.M.)                                |
| 08:35AM  | 4  | (JURY OUT AT 8:35 A.M.)                                      |
| 08:35AM  | 5  | THE COURT:  THANK YOU FOR YOUR COURTESY.  WE'RE ON           |
| 08:35AM  | 6  | THE RECORD IN THE HOLMES MATTER.  ALL COUNSEL ARE PRESENT AND |
| 08:35AM  | 7  | MS. HOLMES IS PRESENT.                                       |
| 08:35AM  | 8  | WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.                   |
| 08:35AM  | 9  | AND I THINK COUNSEL WANTED TO TALK ABOUT A FILING, A         |
| 08:35AM  | 10 | DEFENSE FILING LAST NIGHT I THINK IT WAS, IT'S DOCUMENT 1086. |
| 08:35AM  | 11 | YES, MR. LOOBY, YOU'RE RISING TO SPEAK TO THIS?             |
| 08:35AM  | 12 | MR. LOOBY:  I AM, YOUR HONOR.                               |
| 08:36AM  | 13 | THE COURT:  FIRST, LET'S GET A THRESHOLD QUESTION           |
| 08:36AM  | 14 | ANSWERED.                                                   |
| 08:36AM  | 15 | IS THE GOVERNMENT INTENDING TO DO SOMETHING WITH            |
| 08:36AM  | 16 | EXHIBIT 3217?                                               |
| 08:36AM  | 17 | MR. SCHENK:  GOOD MORNING, YOUR HONOR.                      |
| 08:36AM  | 18 | YES, WE ARE.  THE EXHIBIT, IF THE COURT HAS A COPY IN       |
| 08:36AM  | 19 | FRONT OF IT, HAS SORT OF TWO PARTS TO IT.  THE FIRST IS AN  |
| 08:36AM  | 20 | EMAIL SENT FROM HEATHER KING TO DR. DHAWAN ATTACHING THE    |
| 08:36AM  | 21 | DOCUMENT AND IT HAS SOME TEXT IN THE SUBJECT LINE, AND THEN THE |
| 08:36AM  | 22 | FOLLOWING PAGES ARE THE DOCUMENT FROM CMS.                  |
| 08:36AM  | 23 | THE COURT:  OKAY.  I THINK I HAVE IT -- I'M SORRY,          |
| 08:36AM  | 24 | GO AHEAD.                                                   |
| 08:36AM  | 25 | MR. SCHENK:  IT IS THE GOVERNMENT'S INTENTION TO           |

08:36AM 1    ADMIT BOTH THE EMAIL AND THE ATTACHMENT AND TODAY TO ASK

08:36AM 2    DR. DHAWAN, OR WHEN DR. DHAWAN TESTIFIES, TO ASK DR. DHAWAN IF

08:36AM 3    MS. KING SENT HIM THE ATTACHMENT, IF THAT WAS THE FIRST TIME

08:36AM 4    THAT HE HAD HEARD ABOUT CMS'S FINDINGS, IF HE REVIEWED THE

08:37AM 5    INFORMATION IN IT, AND TO ASK THE COURT TO PROVISIONALLY ADMIT

08:37AM 6    THE ATTACHMENT TODAY.

08:37AM 7        I DO NOT INTEND TO PUBLISH THE ATTACHMENT WITH DR. DHAWAN.

08:37AM 8    IT CONTAINS SOME FINDINGS OF CMS, INCLUDING COMMENTS REGARDING

08:37AM 9    THE PRACTICE OF VOIDING TESTS AT THERANOS.

08:37AM 10       YOUR HONOR RULED AT THE MOTION IN LIMINE STAGE SORT OF TWO

08:37AM 11   THINGS THAT ARE RELEVANT FOR THIS DISCUSSION.  FIRST, THAT THE

08:37AM 12   CMS FINDINGS ARE RELEVANT, BUT THAT THE PRACTICE OF VOIDING

08:37AM 13   TESTS REQUIRED SOME FOUNDATION BEFORE THE GOVERNMENT COULD

08:37AM 14   ADMIT IT, THE QUESTION OF VOLUNTARINESS AND ALSO THE RELEVANCE

08:37AM 15   OF THAT TIMEFRAME WHEN THE TESTS WERE VOIDED.

08:37AM 16       DR. DHAWAN IS NOT THE WITNESS TO LAY THAT FOUNDATION.

08:37AM 17   THAT'S WHY I DON'T INTEND TO PUBLISH THE UNDERLYING CONTENT OF

08:37AM 18   THE CMS REPORT AT THIS POINT.

08:37AM 19       BUT I DON'T THINK THAT IT'S EXCLUDABLE.  I THINK IT IS

08:37AM 20   PROPERLY ADMITTED EVIDENCE UNDER THE COURT'S RULING, AND I CAN

08:37AM 21   PROVIDE SOME ADDITIONAL ARGUMENTS ON THAT, BUT I DON'T WANT TO

08:38AM 22   HIJACK THE CONVERSATION IF THE COURT NOW WANTS TO TURN TO THE

08:38AM 23   DEFENSE.

08:38AM 24           THE COURT:  RIGHT.  THANK YOU.  I JUST WANTED TO

08:38AM 25   DETERMINE WHETHER OR NOT YOU WERE SEEKING TO ADMIT IT, THE

08:38AM  1    PURPOSE FOR ADMISSION.

08:38AM  2         LET ME ASK ALSO, IS IT ANTICIPATED THIS WITNESS WILL

08:38AM  3    TESTIFY TODAY?

08:38AM  4              MR. SCHENK:  YES, YOUR HONOR.

08:38AM  5         I BELIEVE THAT WE WILL FINISH MR. JHAVERI TODAY, AND THE

08:38AM  6    COURT SUGGESTED WE WILL GO UNTIL 3:00 TODAY.

08:38AM  7              THE COURT:  CORRECT.

08:38AM  8              MR. SCHENK:  AND I ANTICIPATE THERE WILL BE TIME

08:38AM  9    AFTER MR. JHAVERI FOR DR. DHAWAN TO TAKE THE STAND AND MAYBE

08:38AM  10   BEGIN OR FINISH THE DIRECT DEPENDING ON WHEN WE START.

08:38AM  11        I ALSO HAD A THOUGHT I WANTED TO SHARE ON THE 1:30

08:38AM  12   APPEARANCE BEFORE JUDGE COUSINS, BUT WE CAN TURN TO THAT AFTER.

08:38AM  13             THE COURT:  WELL, WHY DON'T WE TALK ABOUT THAT NOW,

08:38AM  14   RIGHT, IF YOU DON'T MIND?

08:38AM  15        I SAID I WOULD BREAK TO ALLOW COUNSEL TO PARTICIPATE IN

08:38AM  16   THAT.

08:38AM  17        WHAT ARE YOUR THOUGHTS?

08:38AM  18             MR. SCHENK:  WE TALKED ABOUT IT, AND I THINK FROM

08:39AM  19   THE GOVERNMENT'S PERSPECTIVE, IF THE COURT ALLOWED SOME PEOPLE,

08:39AM  20   MS. VOLKAR AND MR. BOSTIC, TO ATTEND THAT HEARING REMOTELY, BUT

08:39AM  21   TO LEAVE THE COURTROOM FOR IT.

08:39AM  22        AND I UNDERSTAND THAT MR. CLINE ALSO INTENDS TO LEAVE THE

08:39AM  23   COURTROOM FOR IT.

08:39AM  24        BUT TO CONTINUE THE TESTIMONY HERE IN TRIAL.  WE HAVE THE

08:39AM  25   JURY AND WE HAVE TRANSCRIPT TIME AVAILABLE.

08:39AM 1    I THINK, THOUGH, IT WOULD BE THE GOVERNMENT'S REQUEST THAT

08:39AM 2    MAYBE THE COURT SAY TO THE JURY THAT THERE'S ANOTHER HEARING

08:39AM 3    GOING ON OR SOMETHING LIKE THAT SO THE JURY DOESN'T WONDER WHY

08:39AM 4    THERE ARE COUNSEL WHO HAVE BEEN PRESENT EVERY DAY WHO ARE NOW

08:39AM 5    ABSENT.

08:39AM 6        BUT I THINK THAT WOULD BE THE WAY TO MAXIMIZE OUR TIME.

08:39AM 7            MR. CLINE:  WE'RE FINE WITH THAT.

08:39AM 8            THE COURT:  THANK YOU.

08:39AM 9        MR. CLINE?

08:39AM 10           MR. CLINE:  WE'RE FINE WITH THAT APPROACH.  I'LL

08:39AM 11   STEP OUT AT THE APPROPRIATE TIME, AND IF THE COURT WANTS TO

08:39AM 12   TELL THE JURY WHAT IS GOING ON, THAT'S FINE.

08:39AM 13           THE COURT:  AND THAT'S A 1:30 HEARING?

08:40AM 14           MR. SCHENK:  YES, YOUR HONOR.

08:40AM 15           THE COURT:  OKAY.  I DON'T KNOW WHERE THAT COMPORTS

08:40AM 16   WITH OUR SCHEDULE AND BREAKS AS WELL, AND WE'LL SEE WHERE THAT

08:40AM 17   MEASURES.

08:40AM 18           MR. CLINE:  BUT THE HEARING INVOLVES TWO MOTIONS AND

08:40AM 19   IT MAY TAKE A WHILE, SO IF THE COURT WERE TO BREAK FOR THAT, I

08:40AM 20   THINK IT WOULD SERIOUSLY INTERRUPT THE PROCEEDINGS.

08:40AM 21       WE'RE FINE WITH MR. SCHENK'S PROPOSAL.

08:40AM 22           THE COURT:  OKAY.  ALL RIGHT.

08:40AM 23       I WAS TALKING ABOUT THE NATURAL BREAK WHEN YOU LEAVE THE

08:40AM 24   COURTROOM, BUT WE'LL SEE HOW THAT PANS OUT.

08:40AM 25       ALL RIGHT.  THANK YOU FOR THE HEADS UP ON THAT.  THANK

08:40AM  1      YOU.

08:40AM  2            OKAY.  WITH THAT FOUNDATION, DO YOU CONCEDE THE MOTION?

08:40AM  3            MR. LOOBY:  NO, YOUR HONOR.

08:40AM  4      IT SOUNDS LIKE THE GOVERNMENT DOESN'T REALLY NEED TO MOVE

08:40AM  5      THE ADMISSION OF THIS EXHIBIT WITH THIS WITNESS IF THEY'RE NOT

08:40AM  6      INTENDING TO PUBLISH IT OR ASK HIM KIND OF QUESTIONS ABOUT THE

08:40AM  7      PARTICULARS IN IT.  SO THAT'S ONE OF THE REASONS WHY WE COULD

08:40AM  8      DEFER PERHAPS THE ADMISSIBILITY OF IT.

08:40AM  9      WE DISAGREE THAT IT'S ADMISSIBLE WHOLESALE.

08:40AM 10      AS WE EXPLAINED IN LAST NIGHT'S PLEADING, THERE'S A COUPLE

08:40AM 11      OF OBSTACLES TO THAT.  THERE'S THE HEARSAY ISSUES AND THEN THE

08:41AM 12      401, 403 BALANCING TEST, AND THEN THE THIRD ISSUE OF THE

08:41AM 13      VOIDING TESTS AS WELL THE GOVERNMENT HAS YET TO LAY A

08:41AM 14      FOUNDATION UNDER THE COURT'S IN LIMINE ORDER.

08:41AM 15            THE COURT:  SO -- THANK YOU.

08:41AM 16      SO, MR. SCHENK, IS IT YOUR INTENT THEN TO INTRODUCE THE

08:41AM 17      ENTIRETY OF THE DOCUMENT AND ALL OF ITS CONTENTS WITH SOME

08:41AM 18      REDACTIONS?

08:41AM 19            MR. SCHENK:  I INTEND TO OFFER IT AND ONLY PUBLISH

08:41AM 20      THE FIRST PAGE, TO NOT INSERT REDACTIONS ON THE CONTENT OF THE

08:41AM 21      LETTER.

08:41AM 22      THERE ARE SEVERAL REFERENCES TO VOIDED TESTS IN THERE, AND

08:41AM 23      I THINK THE BETTER PRACTICE WOULD BE FOR ME TO NOT PUBLISH IT,

08:41AM 24      NOT ASK ANY QUESTIONS ABOUT THE CONTENT OF THE LETTER TO

08:41AM 25      DR. DHAWAN, TO ASK HIM QUESTIONS ONLY ABOUT THE EMAIL THAT HAS

| | | |
|---|---|---|
| 08:41AM | 1 | VERY LITTLE CONTENT IN IT, AND THEN TO SAVE THE QUESTION ABOUT |
| 08:41AM | 2 | THE DOCUMENT COMING IN, EITHER THE ATTACHMENT -- THE ATTACHMENT |
| 08:41AM | 3 | EITHER COMING IN WHOLESALE OR LATER WITH REDACTIONS, DEPENDING |
| 08:42AM | 4 | ON HOW THE COURT INTERPRETS THE FOUNDATION THAT THE GOVERNMENT |
| 08:42AM | 5 | LAYS IN THE FUTURE. |
| 08:42AM | 6 | THE COURT:  WITH ANOTHER WITNESS? |
| 08:42AM | 7 | MR. SCHENK:  WITH A DIFFERENT WITNESS. |
| 08:42AM | 8 | THE COURT:  WITH A DIFFERENT WITNESS.  I SEE. |
| 08:42AM | 9 | MR. LOOBY:  RIGHT.  I GUESS WITHOUT KNOWING WHAT |
| 08:42AM | 10 | TYPE OF FOUNDATION THEY WOULD LAY WITH A DIFFERENT WITNESS, |
| 08:42AM | 11 | IT'S HARD TO SAY WHETHER OR NOT THEY'RE OFFERING THIS FOR THE |
| 08:42AM | 12 | TRUTH OF THE MATTER, WHICH I THINK, YOU KNOW, SOME OTHER |
| 08:42AM | 13 | WITNESS COULD MAYBE SPEAK TO.  I MEAN, DR. DHAWAN PROBABLY |
| 08:42AM | 14 | WOULDN'T. |
| 08:42AM | 15 | BUT REGARDLESS OF THAT, I THINK IT POSES PRETTY BIG |
| 08:42AM | 16 | HEARSAY ISSUES, AND I THINK COMPARING IT TO THE JANUARY 2016 |
| 08:42AM | 17 | REPORT IS INSTRUCTIVE ON THAT FRONT.  YOUR HONOR HAS HELD THAT |
| 08:42AM | 18 | THAT REPORT IS ADMISSIBLE UNDER RULE 803(8)(A)(2) AS A MATTER |
| 08:42AM | 19 | OBSERVED WHILE UNDER A DUTY TO REPORT. |
| 08:42AM | 20 | THE LETTER IS NOT THAT.  THE LETTER IS THE CULMINATION OF |
| 08:42AM | 21 | A ROUND OF COMMISSIONS AND CORRESPONDENCE BETWEEN CMS AND |
| 08:42AM | 22 | THERANOS, AND IT'S A NOTICE OF IMPOSITION OF SANCTIONS, THE |
| 08:43AM | 23 | FACT OF WHICH IS RELEVANT AND ADMISSIBLE UNDER THE COURT'S |
| 08:43AM | 24 | ORDER. |
| 08:43AM | 25 | BUT THE HEARSAY STATEMENT FROM CMS, HEARSAY STATEMENTS |

08:43AM 1    FROM CMS WITNESS KAREN FULLER, WHO IS THE SIGNATORY OF THE

08:43AM 2    LETTER, I THINK ARE NOT COVERED BY THE COURT'S PRIOR ORDERS.

08:43AM 3         IT'S REALLY, I THINK, INSTRUCTIVE OR A USEFUL WAY TO THINK

08:43AM 4    ABOUT IT AS MORE OF AN ADJUDICATION OF THE AGENCY AND THE

08:43AM 5    STRUCTURE.

08:43AM 6         THE COURT:  IT SEEMS LIKE -- PARDON ME FOR

08:43AM 7    INTERRUPTING YOU.

08:43AM 8         MR. LOOBY:  YES.

08:43AM 9         THE COURT:  IT SEEMS THAT, AND I'LL POINT THIS OUT

08:43AM 10   AND RAISE IT, IT SOUNDS LIKE WE'RE GOING TO GET TO THE REAL

08:43AM 11   ISSUES OF ADMISSIONS AT SOME TIME LATER.

08:43AM 12        MR. LOOBY:  YEAH.

08:43AM 13        THE COURT:  AND SO IT WILL BE DEFERRED -- SO I GUESS

08:43AM 14   THE OVERARCHING QUESTION IS, DO WE EVEN NEED TO ADMIT IT TODAY

08:43AM 15   CONDITIONALLY AND CAN WE DEFER THAT WHOLE RULING UNTIL LATER?

08:43AM 16   AND IF IT'S PROVISIONALLY ADMITTED, BUT NOT PUBLISHED, AND

08:43AM 17   EVERYONE RESERVES THEIR RIGHTS TO CHALLENGE ANY PUBLICATION, WE

08:44AM 18   CAN DO IT THAT WAY AS WELL.

08:44AM 19        BUT I LOOK AT -- A COUPLE OF THINGS JUMP OUT AT ME WHEN I

08:44AM 20   LOOK AT THIS -- AND I'M LOOKING AT MR. SCHENK HERE -- IT DOES

08:44AM 21   SEEM THAT THERE'S A LOT OF THE USE OF THE WORD CREDIBLE, NOT

08:44AM 22   CREDIBLE, NOT CREDIBLE.

08:44AM 23        JUST FOR OUR FUTURE CONVERSATION, THAT SEEMS TO BE MORE OF

08:44AM 24   A SUMMATION, ANALYSIS OF AN OPINION AS OPPOSED TO JUST THE

08:44AM 25   FINDING.  SO THAT'S ONE OF THE CONCERNS I HAD, AND IT'S A 403

08:44AM 1    CONCERN I SUPPOSE, AND THERE'S CONSISTENT USE OF THAT

08:44AM 2    THROUGHOUT THE DOCUMENT.

08:44AM 3        AND I THINK THAT'S WHAT YOU'RE SPEAKING TO, ONE OF THE

08:44AM 4    THINGS YOU'RE SPEAKING TO.

08:44AM 5            MR. LOOBY:  YEAH.  IN PARTICULAR UNDER RULE 403, WE

08:44AM 6    THINK THAT POSES AN ACUTE RISK OF UNFAIR PREJUDICE.

08:44AM 7        OBVIOUSLY THE WORD "CREDIBILITY" IS PART OF THE ANALYSIS

08:44AM 8    THAT CMS DOES WHEN IT EVALUATES A COMPANY'S RESPONSE.

08:44AM 9        BUT IN THE CONTEXT OF A CRIMINAL TRIAL, REPEATED, YOU

08:45AM 10   KNOW, ADMONITIONS OR STATEMENTS THAT THE AGENCY FOUND THERANOS

08:45AM 11   NOT CREDIBLE COULD EASILY BE TAKEN OUT OF CONTEXT AND PREJUDICE

08:45AM 12   MS. HOLMES.

08:45AM 13       AND THEN I WILL ALSO ADD, YOUR HONOR, THAT THE -- AT LEAST

08:45AM 14   FOR KIND OF WHICH FINDINGS WITHIN THE CMS REPORT THE GOVERNMENT

08:45AM 15   INTENDS TO EVEN PUT AT ISSUE IN THE CASE, IT WAS IN --

08:45AM 16   YOUR HONOR'S PRETRIAL RULING HAD INSTRUCTED THE GOVERNMENT TO

08:45AM 17   PROVIDE THE DEFENSE WITH NOTICE OF WHICH DEFICIENCIES ARE IN OR

08:45AM 18   ARE OUT, AND WE CAN REVISIT THE ADMISSIBILITY OF THE CMS REPORT

08:45AM 19   ITSELF IN THAT CONTEXT, AND THEY HAVE NOT DONE SO.

08:45AM 20       AND THIS LETTER KIND OF GOES, YOU KNOW, FROM TOP TO BOTTOM

08:45AM 21   THROUGH A LOT OF DEFICIENCIES THAT MAY NOT BE RELEVANT AT ALL

08:45AM 22   IN THE CASE, AND SO THAT'S ANOTHER 403 CONCERN THAT WE HAVE,

08:45AM 23   INCLUDING THAT THEY RELATE TO TESTS NOT AT ISSUE IN THE

08:45AM 24   INDICTMENT, INCLUDING THAT THEY RELATE TO ISSUES THAT THE

08:45AM 25   GOVERNMENT HAS NOT EVEN PROFFERED ARE RELEVANT UNDER ITS THEORY

08:45AM  1    OF ADMISSIBILITY FOR THE CMS SANCTIONS AND FINDINGS TO BEGIN

08:46AM  2    WITH.

08:46AM  3         SO I THINK IT'S VERY PREMATURE TO ADMIT THIS CONDITIONALLY

08:46AM  4    AND WE SUBMIT THAT IT SHOULDN'T BE ADMITTED AND WE DON'T THINK

08:46AM  5    THAT THEY WILL BE ABLE TO LAY THE PROPER FOUNDATION FOR IT NOW

08:46AM  6    OR LATER GIVEN THE HEARSAY AND RULE 403 CONCERNS, BUT CERTAINLY

08:46AM  7    NOT TODAY WITH THIS WITNESS WHO IT SOUNDS LIKE IS NOT GOING TO

08:46AM  8    BE SPEAKING TO THE CONTENT OF THE LETTER MUCH AT ALL.

08:46AM  9         THE COURT:  THANK YOU.

08:46AM  10        YOU DON'T PART COMPANY WITH MR. SCHENK ASKING THE WITNESS

08:46AM  11   ABOUT THE EMAIL, THE FIRST PAGE?

08:46AM  12        MR. LOOBY:  NO, YOUR HONOR.  THE EMAIL ITSELF WE

08:46AM  13   WOULDN'T OBJECT TO.  IT'S THE ATTACHMENT.

08:46AM  14        THE COURT:  AND THE WITNESS TESTIFYING THAT THE

08:46AM  15   WITNESS DID RECEIVE THE DOCUMENT, WHATEVER IT IS, BUT RECEIVED

08:46AM  16   SOMETHING?

08:46AM  17        MR. LOOBY:  CORRECT.  AND --

08:46AM  18        THE COURT:  I THINK THAT'S WHAT MR. SCHENK WANTS TO

08:46AM  19   DO, AT LEAST TODAY, AT A MINIMUM.

08:46AM  20        MR. SCHENK:  YES, YOUR HONOR.

08:46AM  21        THE COURT:  RIGHT.

08:46AM  22        MR. LOOBY:  RIGHT.  I THINK WE WOULDN'T OBJECT TO

08:46AM  23   THAT.

08:46AM  24        THERE ARE PERHAPS SOME FOLLOW-ON QUESTIONS ABOUT KIND OF

08:47AM  25   THE REPERCUSSIONS TO DR. DHAWAN OF THE IMPOSITION OF SANCTIONS

| | | |
|---|---|---|
| 08:47AM | 1 | AND THE EFFECTS ON HIS, LIKE, PROFESSIONAL OBLIGATIONS AND |
| 08:47AM | 2 | REPUTATION THAT WE MIGHT OBJECT TO IF THE GOVERNMENT GOES INTO |
| 08:47AM | 3 | IT. |
| 08:47AM | 4 | BUT AS TO KIND OF, YOU RECEIVED THE EMAIL, THIS IS WHAT |
| 08:47AM | 5 | THE EMAIL CONVEYED, THIS IS HOW YOU FOUND OUT ABOUT THE RESULTS |
| 08:47AM | 6 | OF THE INSPECTION, WE WOULDN'T OBJECT TO THAT. |
| 08:47AM | 7 | THE COURT:  OKAY. |
| 08:47AM | 8 | MR. SCHENK? |
| 08:47AM | 9 | MR. SCHENK:  YOUR HONOR, THE DEFENSE IS ARGUING AND |
| 08:47AM | 10 | THE COURT ASKED QUESTIONS ABOUT THE USE OF THE WORD "CREDIBLE" |
| 08:47AM | 11 | OR CREDIBILITY FINDINGS IN THE LETTER AND WHETHER IT'S |
| 08:47AM | 12 | DIFFERENT THAN AT THE MOTION IN LIMINE STAGE WHEN THE COURT |
| 08:47AM | 13 | FOUND CMS FINDINGS UNDER THE 403 BALANCING TO BE MORE |
| 08:47AM | 14 | PROBATIVE.  THE COURT WONDERS AND THE DEFENSE ARGUES IF THAT |
| 08:47AM | 15 | HAS SHIFTED NOW, AND IF, IN PARTICULAR, THE USE OF THE WORD |
| 08:47AM | 16 | "CREDIBLE" HAS AFFECTED THAT BALANCING. |
| 08:47AM | 17 | WE WOULD ARGUE TO THE COURT IT HASN'T BECAUSE OF |
| 08:47AM | 18 | DEVELOPMENTS DURING THE TRIAL. |
| 08:47AM | 19 | THE COURT RULED PRETRIAL THAT THE FINDINGS OF CMS ARE |
| 08:48AM | 20 | ADMISSIBLE AND THEY COME IN FOR PURPOSES BECAUSE THE GOVERNMENT |
| 08:48AM | 21 | IS NOT ARGUING TO THE JURY, CONVICT MS. HOLMES BECAUSE SHE |
| 08:48AM | 22 | VIOLATED CIVIL REGULATIONS.  AND WHEN THE GOVERNMENT IS NOT |
| 08:48AM | 23 | ADMITTING IT FOR THAT PURPOSE, BUT RATHER FOR PURPOSES LIKE |
| 08:48AM | 24 | KNOWLEDGE AND INTENT, THE COURT OUTLINED IN ITS MOTION IN |
| 08:48AM | 25 | LIMINE IT IS RELEVANT. |

08:48AM 1      THE DEFENSE HAD THE BENEFIT OF THAT PRETRIAL ORDER AS

08:48AM 2  WELL.  THEY KNEW THE WAY THAT THE GOVERNMENT WAS ALLOWED TO

08:48AM 3  LITIGATE THE CASE.

08:48AM 4      THEY THEN INTRODUCED CMS REGULATIONS IN THIS TRIAL, THE

08:48AM 5  ACTUAL REGULATIONS, AND WENT THROUGH THEM WITH DR. ROSENDORFF

08:48AM 6  AND ASKED IF HE COMPLIED WITH CERTAIN REGULATIONS.

08:48AM 7      SO TO NOW EXCLUDE THE COMMENTS THAT CMS MADE ABOUT WHETHER

08:48AM 8  THAT WAS ACTUALLY TRUE, WHETHER THERE WAS A SUFFICIENT BASIS IN

08:48AM 9  FACT TO BELIEVE THAT COMPLIANCE WITH THE REGULATIONS HAD BEEN

08:49AM 10  ACHIEVED, TO NOW DENY THE GOVERNMENT THE ABILITY TO PUT THAT IN

08:49AM 11  GIVES THE DEFENSE THE BENEFIT OF THE COURT'S PRETRIAL RULING TO

08:49AM 12  ARGUE ABOUT THE RELEVANCE OF THESE REGULATIONS.  FOR INSTANCE,

08:49AM 13  IF THE COURT HAD GONE THE OTHER WAY ON CMS, IT WOULD HAVE BEEN

08:49AM 14  MUCH HARDER TO ARGUE THAT THE REGULATIONS ARE RELEVANT.

08:49AM 15      SO NOW THE DEFENSE HAS PUT THOSE REGULATIONS IN, AND TO

08:49AM 16  SUGGEST THAT THE GOVERNMENT CAN'T NOW FOLLOW UP EVEN WITH THESE

08:49AM 17  CREDIBILITY FINDINGS IS TO LEAVE THE JURY WITH A MISIMPRESSION.

08:49AM 18      THERE ACTUALLY NOW HAS BEEN DIALOGUE BACK AND FORTH

08:49AM 19  BETWEEN THERANOS AND THE REGULATOR THAT IS SUMMARIZED IN THE

08:49AM 20  ATTACHMENT TO THIS EXHIBIT THAT SUGGESTS THE TYPE OF ARGUMENT

08:49AM 21  THAT THE DEFENSE WAS TRYING TO SUGGEST THROUGH ITS CROSS OF

08:49AM 22  DR. ROSENDORFF ISN'T TRUE, IS NOT SUPPORTED BY THE EVIDENCE.

08:49AM 23      AND IT IS BECAUSE OF THAT, IT IS BECAUSE OF THE CROSS THAT

08:49AM 24  THE DEFENSE HAS ELICITED THAT THE 403 BALANCING SHIFTS A LITTLE

08:50AM 25  BIT.

| | | |
|---|---|---|
| 08:50AM | 1 | AND THE COURT MIGHT BE RIGHT, IF THE DEFENSE HAD NOT |
| 08:50AM | 2 | ARGUED THE CMS REGS IN THE WAY THAT THEY HAVE, THE BALANCING |
| 08:50AM | 3 | UNDER 403 FOR THIS DOCUMENT WOULD BE DIFFERENT. |
| 08:50AM | 4 | BUT THAT ISN'T WHERE WE FIND OURSELVES. |
| 08:50AM | 5 | WHERE WE FIND OURSELVES IS THAT THE DEFENSE TOOK ADVANTAGE |
| 08:50AM | 6 | OF THE COURT'S RULING AT THE MOTIONS IN LIMINE STAGE TO OFFER |
| 08:50AM | 7 | CMS REGS AND TO MAKE ARGUMENTS TO THE JURY ON ITS CROSS BASED |
| 08:50AM | 8 | UPON THEM, AND THE GOVERNMENT SHOULD HAVE THAT SAME RIGHT. |
| 08:50AM | 9 | THE COURT:  THANK YOU.  FAIR POINT, AND I'LL ASK |
| 08:50AM | 10 | MR. LOOBY'S THOUGHT ABOUT THAT. |
| 08:50AM | 11 | BUT DO YOU -- DOES THE LETTER, THE DOCUMENT THAT YOU'RE |
| 08:50AM | 12 | SEEKING TO INTRODUCE, DOES IT TOUCH ON EACH OF THE AREAS THAT |
| 08:50AM | 13 | WERE OPINED OF THE WITNESS FROM THE DEFENSE, AND DO WE NEED TO |
| 08:50AM | 14 | LOOK AT THAT SO AS NOT TO BE TOO OVERBROAD?  IN OTHER WORDS, |
| 08:50AM | 15 | ARE THERE SPECIFIC INSTANCES OF INQUIRY ON CROSS THAT RELATE TO |
| 08:50AM | 16 | THE DOCUMENT YOU SEEK TO INTRODUCE, AND PERHAPS THAT'S A |
| 08:50AM | 17 | NARROWER FIELD THAN THE ENTIRETY OF THE DOCUMENT? |
| 08:51AM | 18 | MR. SCHENK:  YOUR HONOR, I HAVE NOT DONE THAT |
| 08:51AM | 19 | ONE-FOR-ONE MATCHING TO SEE IF THE FINDINGS IN THE LETTER |
| 08:51AM | 20 | RELATE, AS THE COURT SUGGESTS, ONE FOR ONE TO THE QUESTIONS |
| 08:51AM | 21 | THAT WERE ASKED OF DR. ROSENDORFF. |
| 08:51AM | 22 | THERE WERE FINDINGS IN THE LETTER REGARDING WHEN QC WAS |
| 08:51AM | 23 | DONE AND THE QC RECORDKEEPING. |
| 08:51AM | 24 | THE COURT:  RIGHT. |
| 08:51AM | 25 | MR. SCHENK:  AND QA AND OTHER TOPICS THAT CERTAINLY |

08:51AM 1     WERE COVERED WITH DR. ROSENDORFF.

08:51AM 2         BUT I CANNOT TELL THE COURT THAT THE LETTER ONLY INCLUDES

08:51AM 3     QUESTIONS THAT WERE COVERED WITH DR. ROSENDORFF.

08:51AM 4             THE COURT:  RIGHT.  THAT MIGHT MAKE A DIFFERENCE,

08:51AM 5     MR. LOOBY.

08:51AM 6             MR. LOOBY:  I THINK IT DOES.

08:51AM 7         BUT I THINK BEFORE ADDRESSING THAT, I THINK THE PRIMARY, I

08:51AM 8     THINK, ISSUE WITH THAT ARGUMENT IS THAT THIS LETTER, THIS

08:51AM 9     JULY 2016 LETTER DOESN'T REFLECT THE FINDINGS OF THE CMS

08:51AM 10    INSPECTION.  IT REFLECTS CMS'S EVALUATION OF SUBSEQUENT EVENTS

08:51AM 11    AND CORRESPONDENCE OF THERANOS'S ALLEGATIONS OF COMPLIANCE AND

08:51AM 12    CORRECTION OF ISSUES THAT WERE IDENTIFIED IN THE INSPECTION.

08:52AM 13        AND SO A LOT OF MR. SCHENK'S ARGUMENT GOES TO THE

08:52AM 14    ADMISSIBILITY OF THE FINDINGS THEMSELVES, YOU KNOW, EVEN -- AND

08:52AM 15    I DON'T BELIEVE THAT WE KIND OF OPENED THE DOOR AND WIDENED THE

08:52AM 16    BERTH OF, LIKE, WHAT WAS ALREADY AT ISSUE IN THIS CASE GIVEN,

08:52AM 17    YOU KNOW, THE FACT THAT THE CLIA REGULATIONS ARE PART OF THE

08:52AM 18    CASE.  SO I DON'T THINK THE ANALYSIS HAS SHIFTED.

08:52AM 19        BUT REGARDLESS, IF WHAT THEY WANT TO SHOW IS THAT THERE

08:52AM 20    WERE REGULATORY VIOLATIONS, THAT WOULD BE IN THE CMS REPORT

08:52AM 21    THAT THE COURT HAS ALREADY HELD IS ADMISSIBLE IN PART, OR IN

08:52AM 22    LARGE PART.

08:52AM 23        AND THIS SUBSEQUENT EXCHANGE WITH THE CREDIBILITY

08:52AM 24    DETERMINATIONS IS EVALUATING THERANOS'S SUBSEQUENT RESPONSES

08:52AM 25    AND IT'S ESSENTIALLY A BACK AND FORTH BETWEEN THE COMPANY AND

3555

08:52AM  1    THE AGENCY THAT FUNCTIONS LIKE PLEADINGS IN AN ADMINISTRATIVE

08:52AM  2    PROCEEDING.

08:52AM  3         AND, IN FACT, THIS JULY LETTER IS THE IMPOSITION OF

08:52AM  4    SANCTIONS LETTER THAT GAVE THERANOS APPEAL RIGHTS, AND THEY DID

08:52AM  5    NOTICE AN APPEAL FROM THIS DETERMINATION THAT WAS LATER

08:53AM  6    SETTLED.

08:53AM  7         AND SO I THINK THIS IS PRETTY FAR AFIELD FROM THE ACTUAL

08:53AM  8    FINDINGS.

08:53AM  9         NOW, IT DOES COPY AND PASTE AND PARAPHRASE SOME OF THE

08:53AM 10    ISSUES THAT ARE IDENTIFIED IN THE CMS REPORT, BUT THE COURT HAS

08:53AM 11    ALREADY HELD THAT THE REPORT OR PORTIONS OF IT ARE LIKELY TO BE

08:53AM 12    ADMITTED AT TRIAL, AND WE DON'T THINK THAT THIS LETTER IS THE

08:53AM 13    FINDINGS OF THE AGENCY.

08:53AM 14         THE COURT:  OKAY.

08:53AM 15    MR. SCHENK, ANYTHING IN RESPONSE?

08:53AM 16         MR. SCHENK:  I THINK THE WAY WE CAN HANDLE IT TODAY

08:53AM 17    IS THAT THE GOVERNMENT CAN OFFER THE EXHIBIT, THE COURT CAN

08:53AM 18    ADMIT THE EMAIL AND GIVE THE GOVERNMENT PERMISSION TO PUBLISH

08:53AM 19    THE EMAIL, AND IF THE COURT WANTS TO DEFER RULING ON THE

08:53AM 20    ADMISSIBILITY OF THE ATTACHMENT, WE'RE FINE WITH THAT FOR

08:53AM 21    TODAY'S PURPOSES.

08:53AM 22         THE COURT CERTAINLY SHOULDN'T GRANT THE MOTION THE DEFENSE

08:53AM 23    FILED, OR THE NOTICE THAT THE DEFENSE FILED LAST NIGHT.

08:53AM 24         AND I THINK IF THE QUESTION IS, WHAT DO WE DO WITH THE

08:53AM 25    DOCUMENT TODAY, THE COURT DEFERRING RULING ON THE DOCUMENT

08:54AM  1    TODAY WOULD BE FINE WITH THE GOVERNMENT.

08:54AM  2         AGAIN, WE INTEND TO PUBLISH.

08:54AM  3            THE COURT:  WELL, THANK YOU.

08:54AM  4    THAT WAS ONE OF THE THOUGHTS THAT I HAD JUST BASED ON

08:54AM  5    MR. LOOBY'S CONVERSATION IS THAT I DON'T NEED TO PROVISIONALLY

08:54AM  6    ADMIT IT TODAY.  IF YOU WANT TO ADMIT IT, I'LL DEFER ADMISSION.

08:54AM  7    IF YOU WANT ME TO STATE THAT ON THE RECORD, OR IF YOU JUST WANT

08:54AM  8    TO WAIT UNTIL ANOTHER PERIOD OF TIME, WHATEVER YOU WOULD LIKE

08:54AM  9    TO DO ON THAT, BUT IT WON'T BE ADMITTED TODAY, LET ME JUST SAY

08:54AM  10    THAT.

08:54AM  11    THE EMAIL WILL, AND THE REPRESENTATION THAT THERE WAS A

08:54AM  12    DOCUMENT ATTACHED TO THE EMAIL, THAT IS ADMISSIBLE.

08:54AM  13    BUT WHETHER OR NOT TODAY THE DOCUMENT COMES IN, THAT WON'T

08:54AM  14    BE TOUCHED ON.

08:54AM  15    AND THEN WE CAN LOOK AT THESE OTHER ISSUES AT SOME POINT

08:54AM  16    IN TIME WHEN YOU HAVE ANOTHER WITNESS, FOUNDATIONAL WITNESS

08:54AM  17    THAT YOU THINK IS APPROPRIATE, AND WE CAN ALL LOOK AT THESE

08:54AM  18    OTHER, INCLUDING THE ONE-FOR-ONE ANALYSIS.

08:54AM  19    AND, MR. LOOBY, YOUR COMMENTS THAT EVEN IF THIS IS ONE FOR

08:54AM  20    ONE, IT'S NOT REALLY A MATCH BECAUSE IT'S A DIFFERENT PURPOSE

08:55AM  21    AT A DIFFERENT TIME.

08:55AM  22            MR. LOOBY:  RIGHT.  IT'S A LITTLE DOWNSTREAM FROM

08:55AM  23    THE ACTUAL FINDINGS IN THE REPORT.

08:55AM  24            THE COURT:  RIGHT.

08:55AM  25            MR. LOOBY:  SO I'M AVAILABLE TO ANSWER ANY OF THE

| 08:55AM | 1 | COURT'S QUESTIONS IF AND WHEN THE ISSUE DOES RIPEN DOWN THE |
| 08:55AM | 2 | ROAD. |
| 08:55AM | 3 | THE COURT:  OKAY.  WE'LL TAKE A LOOK AT IT THEN. |
| 08:55AM | 4 | OKAY? |
| 08:55AM | 5 | MR. LOOBY:  THANK YOU, YOUR HONOR. |
| 08:55AM | 6 | THE COURT:  GREAT. |
| 08:55AM | 7 | MR. LOOBY:  ACTUALLY, ONE LAST ISSUE THAT IS |
| 08:55AM | 8 | SOMEWHAT RELATED TO THIS IS THAT DR. DHAWAN IN HIS INTERVIEWS |
| 08:55AM | 9 | WITH THE GOVERNMENT HAS SUGGESTED THAT HE BELIEVES THAT |
| 08:55AM | 10 | THERANOS MAY HAVE USED HIS NAME IN THE LAB TO PUT PEOPLE IN |
| 08:55AM | 11 | DANGER. |
| 08:55AM | 12 | WE'VE CONFERRED WITH THE GOVERNMENT ABOUT WHETHER OR NOT |
| 08:55AM | 13 | THEY INTEND TO ELICIT THAT TYPE OF TESTIMONY, AND I UNDERSTAND |
| 08:55AM | 14 | THAT THEY DO NOT, BUT THEY HAVE NOT ADMONISHED THE WITNESS TO |
| 08:55AM | 15 | AVOID THAT TYPE OF TESTIMONY. |
| 08:55AM | 16 | AND WE THINK THAT'S INADMISSIBLE TESTIMONY ON VARIOUS |
| 08:55AM | 17 | GROUNDS, 403 UNDER THE COURT'S IN LIMINE RULING ON IMPACT AND |
| 08:55AM | 18 | THE ISSUE OF, YOU KNOW, PATIENT HARM, AND 602 BECAUSE HE |
| 08:56AM | 19 | DOESN'T REALLY HAVE A BASIS IN HIS OWN PERSONAL KNOWLEDGE FOR |
| 08:56AM | 20 | THAT. |
| 08:56AM | 21 | MR. SCHENK:  DR. DHAWAN IN AN INTERVIEW SAID THAT HE |
| 08:56AM | 22 | WAS CONCERNED ABOUT WHETHER THE -- WHAT HE'S NOW LEARNED |
| 08:56AM | 23 | SUGGESTS THAT THERE WAS THE POSSIBILITY FOR PATIENT HARM OR |
| 08:56AM | 24 | WHETHER INDIVIDUALS WHO USED THE TESTING SERVICE WERE PUT IN |
| 08:56AM | 25 | DANGER AND THAT CAUSES HIM CONCERN. |

08:56AM   1        I THINK THAT IS OF THE SAME TYPE OF EVIDENCE AS MS. CHEUNG

08:56AM   2   OR DR. ROSENDORFF OR MS. GANGAKHEDKAR WHO ALL SAID THEY HAD

08:56AM   3   CONCERNS ABOUT THE TESTING, OF THERANOS ENTERING THE BLOOD

08:56AM   4   TESTING MARKET CREATING A RISK TO PATIENTS.  I THINK IT'S THE

08:56AM   5   SAME TYPE OF EVIDENCE AS THAT EVIDENCE IS, AND THAT EVIDENCE

08:56AM   6   HAS COME IN, AND IT'S CERTAINLY RELEVANT AND ADMISSIBLE, AND I

08:56AM   7   JUST DON'T KNOW THAT DR. DHAWAN'S IS OF A DIFFERENT TYPE SO I

08:56AM   8   HAVE INSTRUCTED HIM NOT TO SAY THAT DURING TRIAL.

08:56AM   9        THE COURT:  I THOUGHT YOU WERE REFERENCING PERSONAL

08:56AM  10   CONCERN OR JEOPARDY TO HIM PERSONALLY, EMPLOYMENT OR OTHERWISE.

08:57AM  11        MR. LOOBY:  THAT'S A SEPARATE ISSUE THAT WE HAVE NOT

08:57AM  12   CONFERRED WITH THE GOVERNMENT YET.  I WAS JUST FLAGGING WE MAY

08:57AM  13   OBJECT IF QUESTIONING GOES INTO THAT.

08:57AM  14     THIS IS A SEPARATE ISSUE ABOUT PATIENT HARM.

08:57AM  15        THE COURT:  OH.

08:57AM  16        MR. LOOBY:  IN THE CONTEXT OF THE INTERVIEW IT SEEMS

08:57AM  17   LIKE IT'S BASED OFF OF WHAT HE HAS SUBSEQUENTLY LEARNED.

08:57AM  18     WHAT HE SUBSEQUENTLY LEARNED MIGHT BE FROM CONSUMING NEWS

08:57AM  19   MEDIA, IT MIGHT BE FROM IT, YOU KNOW, REVIEWING DOCUMENTS THAT

08:57AM  20   HE WASN'T SHOWN IN REALTIME.

08:57AM  21     I THINK IT PUTS HIM IN A DIFFERENT CLASS FROM THE OTHER

08:57AM  22   WITNESSES WHO ARE TESTIFYING ABOUT WHAT THEY UNDERSTOOD ABOUT

08:57AM  23   EVENTS THAT THEY EXPERIENCED IN REAL TIME AND THIS TO ME FEELS

08:57AM  24   MORE --

08:57AM  25        THE COURT:  WELL, THAT'S A DISTINCTION.  I DON'T

3559

08:57AM   1       KNOW WHAT HIS -- WHEN HIS EPIPHANY OCCURRED, BUT YOU CAN

08:57AM   2       CERTAINLY INQUIRE ON THAT, AND YOU CAN DETERMINE WHEN IT WAS.

08:57AM   3              MR. SCHENK:  YES.  THANK YOU.

08:57AM   4              THE COURT:  WE'LL SEE.

08:57AM   5              MR. LOOBY:  YES.

08:57AM   6              THE COURT:  STAY TUNED I THINK AS THEY SAY.

08:58AM   7              MR. LOOBY:  THANK YOU, YOUR HONOR.

08:58AM   8              THE COURT:  OKAY.  ANYTHING ELSE FOR THIS MORNING?

08:58AM   9              MR. LOOBY:  NONE FROM US.

08:58AM   10             MR. SCHENK:  NO, YOUR HONOR.

08:58AM   11             THE COURT:  OKAY.  THANK YOU.

08:58AM   12         SO WE'LL START AND WE'LL SEE WHAT WE CAN GET THROUGH.  I

08:58AM   13      THINK THIS WITNESS WHO IS CURRENTLY ON THE STAND IS A BRIEF

08:58AM   14      WITNESS?

08:58AM   15             MR. SCHENK:  YES.

08:58AM   16             THE COURT:  AND THEN WE MOVE INTO IS IT MR. JHAVERI?

08:58AM   17             MR. SCHENK:  JHAVERI.

08:58AM   18             THE COURT:  JHAVERI.  THANK YOU.

08:58AM   19         WE'LL SEE HOW FAR WE GO.  YOU'LL LET ME KNOW ABOUT BREAKS

08:58AM   20      AND THINGS, AND THEN WE'LL COORDINATE THE ALLOWANCE OF YOU AND

08:58AM   21      YOUR TEAMS TO PARTICIPATE IN THE OTHER HEARING.

08:58AM   22         GREAT.

08:58AM   23             MR. SCHENK:  THANK YOU.

08:58AM   24             MR. LOOBY:  THANK YOU.

08:58AM   25         (RECESS FROM 8:58 A.M. UNTIL 9:18 A.M.)

3560

| | | |
|---|---|---|
| 09:18AM | 1 | (JURY IN AT 9:18 A.M.) |
| 09:18AM | 2 | THE COURT: ALL RIGHT. THANK YOU. WE'RE BACK ON |
| 09:18AM | 3 | THE RECORD IN THE HOLMES MATTER. ALL COUNSEL ARE PRESENT. |
| 09:18AM | 4 | MS. HOLMES IS PRESENT. |
| 09:18AM | 5 | OUR JURY IS PRESENT. OUR WITNESS IS ON THE STAND. |
| 09:18AM | 6 | GOOD MORNING, SIR. |
| 09:18AM | 7 | THE WITNESS: GOOD MORNING. |
| 09:18AM | 8 | THE COURT: GOOD MORNING AGAIN. |
| 09:18AM | 9 | LET ME ASK MY QUESTION AGAIN OF YOU. DID ANY OF YOU HAVE |
| 09:18AM | 10 | ANY OCCASION TO DISCUSS THIS CASE WITH ANYONE, COME ACROSS ANY |
| 09:19AM | 11 | MEDIA, SOCIAL OR OTHERWISE, SUCH THAT YOU WOULD LIKE TO INFORM |
| 09:19AM | 12 | ME NOW ABOUT THAT CONTACT? |
| 09:19AM | 13 | IF SO, PLEASE RAISE YOUR HAND. |
| 09:19AM | 14 | I SEE NO HANDS. |
| 09:19AM | 15 | THANK YOU. |
| 09:19AM | 16 | A COUPLE OF OTHER JUST HOUSEKEEPING MATTERS. FIRST OF |
| 09:19AM | 17 | ALL, WE HAD DISCUSSION, AS YOU KNOW, EACH OF YOU HAD DISCUSSION |
| 09:19AM | 18 | WITH ME IN MY CHAMBERS ABOUT THE QUESTIONNAIRES, AND I BELIEVE |
| 09:19AM | 19 | MS. KRATZMANN INFORMED YOU THAT WERE YOU NOT TO DISCUSS |
| 09:19AM | 20 | ANYTHING ABOUT THAT CONVERSATION WITH YOUR COLLEAGUES. |
| 09:19AM | 21 | THAT'S THE SAME ADMONITION ABOUT NOT DISCUSSING ANYTHING |
| 09:19AM | 22 | ABOUT THE CASE WITH EACH OTHER, THAT IS, ANY OF THE EVIDENCE, |
| 09:19AM | 23 | ANYTHING AT ALL. YOU MAY ONLY DO THAT ONCE THE CASE HAS BEEN |
| 09:19AM | 24 | SUBMITTED TO YOU FOR YOUR DELIBERATIONS. |
| 09:19AM | 25 | THE SAME APPLIES, I JUST WANT TO RATIFY MS. KRATZMANN'S |

AMENTA DIRECT BY MR. BOSTIC                                           3561

09:19AM   1    COMMENT TO YOU, YOU'RE NOT TO DISCUSS ANYTHING THAT WE

09:20AM   2    DISCUSSED IN OUR CONVERSATIONS ABOUT THE QUESTIONNAIRES WITH

09:20AM   3    EACH OTHER AS WELL.

09:20AM   4         THE OTHER HOUSEKEEPING MATTER IS THAT THIS AFTERNOON, I

09:20AM   5    THINK ABOUT 1:00 O'CLOCK, CLOSER TO 1:30, THAT SOME OF THESE

09:20AM   6    LAWYERS NEED TO ATTEND.  IT INVOLVES AN EVIDENTIARY MATTER.

09:20AM   7         BUT THEY NEED TO ATTEND TO THAT, AND THEY MAY GET UP AND

09:20AM   8    LEAVE THE COURTROOM.  I HAVE GIVEN THEM PERMISSION TO DO SO.

09:20AM   9         SO IF YOU SEE THEM LEAVE, THAT'S THE REASON WHY.  THEY

09:20AM  10    HAVE ANOTHER COURT APPEARANCE TO ATTEND TO, AND THEY WILL TRY

09:20AM  11    TO MAKE THAT -- AND THEY WILL TRY TO MAKE THEIR DEPARTURE AS

09:20AM  12    QUIET AS POSSIBLE.

09:20AM  13         BUT THAT'S WHAT IS HAPPENING.  I JUST WANTED TO LET YOU

09:20AM  14    KNOW THAT.  THANK YOU FOR THAT.

09:20AM  15         ANYTHING, COUNSEL, BEFORE WE BEGIN?

09:20AM  16              MR. SCHENK:  NO, YOUR HONOR.

09:20AM  17              THE COURT:  ALL RIGHT.  THANK YOU.

09:20AM  18         MR. BOSTIC, YOU WOULD LIKE TO CONTINUE?

09:20AM  19              MR. BOSTIC:  YES, YOUR HONOR.  THANK YOU.

09:21AM  20         **(GOVERNMENT'S WITNESS, ROBERTO AMENTA, WAS PREVIOUSLY**

09:21AM  21    **SWORN.)**

09:21AM  22                     **DIRECT EXAMINATION (RESUMED)**

09:21AM  23    BY MR. BOSTIC:

09:21AM  24    Q.   WELCOME BACK, MR. AMENTA.

09:21AM  25    A.   THANK YOU.

AMENTA DIRECT BY MR. BOSTIC                                          3562

| | | |
|---|---|---|
| 09:21AM | 1 | Q.   WOULD YOU STATE YOUR NAME FOR THE RECORD? |
| 09:21AM | 2 | A.   SURE.  IT'S ROBERTO, LAST NAME AMENTA, A-M-E-N-T-A. |
| 09:21AM | 3 | Q.   AND DO YOU KNOW YOU'RE STILL UNDER OATH? |
| 09:21AM | 4 | A.   YES. |
| 09:21AM | 5 | Q.   WHEN WE LEFT OFF YESTERDAY, WE WERE TALKING ABOUT |
| 09:21AM | 6 | EXHIBIT 4845, WHICH IS IN EVIDENCE. |
| 09:21AM | 7 | IF WE CAN CALL THAT UP AND GO TO PAGE 18. |
| 09:21AM | 8 | MR. AMENTA, GENERALLY SPEAKING, YOU'VE REVIEWED PAGES 18 |
| 09:21AM | 9 | THROUGH 24 OF EXHIBIT 4845 IN THE PAST? |
| 09:21AM | 10 | A.   I HAVE. |
| 09:21AM | 11 | Q.   AND WE'LL GET INTO SOME OF THE DETAILS OF WHAT IS ON THESE |
| 09:21AM | 12 | PAGES, BUT GENERALLY SPEAKING, WHAT IS ON EACH PAGE OF THIS |
| 09:21AM | 13 | DOCUMENT? |
| 09:21AM | 14 | A.   A FEDWIRE FUNDS TRANSFER. |
| 09:21AM | 15 | Q.   AND EACH PAGE IS A DIFFERENT FEDWIRE FUNDS TRANSFER? |
| 09:21AM | 16 | A.   CORRECT.  THERE'S A REFERENCE TO AN IMAD AND AN OMAD, |
| 09:22AM | 17 | I-M-A-D, O-M-A-D.  THAT IS AN INCOMING MESSAGE ACCOUNTABILITY |
| 09:22AM | 18 | DATA, AND OUTGOING MESSAGE ACCOUNTABILITY DATA, AND THAT'S |
| 09:22AM | 19 | UNIQUE TO FEDWIRE. |
| 09:22AM | 20 | Q.   AND WE'RE LOOKING ON THE SCREEN AT PAGE 18 OF |
| 09:22AM | 21 | EXHIBIT 4845. |
| 09:22AM | 22 | DO YOU SEE THE OMAD AND IMAD NUMBERS REFERENCED ON THIS |
| 09:22AM | 23 | PAGE? |
| 09:22AM | 24 | A.   I DO. |
| 09:22AM | 25 | Q.   AND HOW DOES FEDWIRE USE THOSE NUMBERS? |

AMENTA DIRECT BY MR. BOSTIC

09:22AM  1    A.   SO IT'S -- THE IMAD FOR THE SENDING BANK, IT'S THE YEAR,

09:22AM  2    MONTH, DAY OF THE TRANSACTION, AND THEN IT IS THE END POINT OF

09:22AM  3    THE FINANCIAL INSTITUTION, OR IN POINT OF THE FINANCIAL

09:22AM  4    INSTITUTION, AND THEN WHAT MESSAGE IT IS FOR THAT DAY AND FOR

09:22AM  5    THAT INSTITUTION.

09:22AM  6         SO THAT'S THE IMAD.

09:22AM  7         AND FOR THE OMAD, IT'S THE YEAR, MONTH, DAY, SO IT'S THE

09:22AM  8    BANK'S END POINT.  IT IS WHAT MESSAGE IT IS FOR THAT DAY.  IT'S

09:22AM  9    THE DATE, AND THEN IT'S THE TIME 13:58.

09:23AM  10        AND THEN REFERENCE TO FT03 IS THE DALLAS.

09:23AM  11   Q.   THANK YOU.

09:23AM  12        I SHOULD HAVE MENTIONED, IF YOU'RE COMFORTABLE WITH

09:23AM  13   TESTIFYING WITHOUT A MASK, YOU CAN REMOVE IT.

09:23AM  14   A.   THANK YOU.

09:23AM  15   Q.   THE OMAD AND IMAD NUMBERS, DOES FEDWIRE EVER REUSE THOSE

09:23AM  16   NUMBERS?  IN OTHER WORDS, COULD TWO DIFFERENT TRANSACTIONS EVER

09:23AM  17   HAVE THE SAME OMAD OR IMAD NUMBER?

09:23AM  18   A.   THEY'RE UNIQUE FOR THE TRANSACTION.

09:23AM  19   Q.   LOOKING AT PAGE 18 HERE, FOR THIS TRANSACTION WE ARE

09:23AM  20   LOOKING AT, WHAT WAS THE DATE OF THIS WIRE TRANSFER?

09:23AM  21   A.   SO IT'S DECEMBER 30TH OF 2013.

09:23AM  22   Q.   AND IS THERE A PORTION OF THE OMAD AND IMAD THAT GIVES YOU

09:23AM  23   THAT INFORMATION?

09:23AM  24   A.   YES.

09:23AM  25   Q.   AND WHAT WAS THE AMOUNT OF THIS WIRE TRANSFER?

AMENTA DIRECT BY MR. BOSTIC                                           3564

09:23AM   1    A.   THE AMOUNT IS FIELD TAG 2000, AND IT'S $99,990.

09:23AM   2    Q.   AND FROM THIS INFORMATION, WHO SENT THIS WIRE TRANSFER OF

09:23AM   3    $99,990?

09:24AM   4    A.   SURE.  SO IT'S THE SENDING BANK -- THE SENDING BANK, THE

09:24AM   5    3100 FIELD IS WELLS FARGO, AND THEY DID IT ON BEHALF OF

09:24AM   6    ALAN JAY EISENMAN AND CHARLES SCHWAB.

09:24AM   7    Q.   AND FINALLY, WHO WAS THIS TRANSFERRED TO ON THIS DATE?

09:24AM   8    A.   THE RECEIVING BANK IS COMERICA, AND IT WAS ON BEHALF OF

09:24AM   9    THERANOS.

09:24AM   10   Q.   THANK YOU.  LET'S GO TO THE NEXT PAGE, THAT'S EXHIBIT 19

09:24AM   11   OF 4845.  IF WE CAN ZOOM IN ON THE CONTENT.

09:24AM   12        MR. AMENTA, DO YOU SEE ANOTHER DOCUMENT RELATED TO ANOTHER

09:24AM   13   FEDWIRE TRANSFER?

09:24AM   14   A.   YES.

09:24AM   15   Q.   AND WHAT WAS THE DATE OF THIS TRANSFER?

09:24AM   16   A.   DECEMBER 31ST, 2013.

09:24AM   17   Q.   AND WHAT IS THE AMOUNT OF THIS TRANSFER?

09:24AM   18   A.   THE AMOUNT IS $5,349,900.

09:24AM   19   Q.   AND WHO SENT THIS WIRE TRANSFER IN THE AMOUNT OF

09:24AM   20   APPROXIMATELY $5.3 MILLION?

09:25AM   21   A.   SO THE SENDING BANK, WHILE IT'S NOT IN ITS SHORT FORM

09:25AM   22   NAME, IT'S THE ABA NUMBER, ROUTING NUMBER FOR PACIFIC WESTERN,

09:25AM   23   SO THAT'S THE SENDER, ABA (3100) ON BEHALF OF BLACK DIAMOND

09:25AM   24   VENTURES.

09:25AM   25   Q.   AND HOW ABOUT THE RECIPIENT?

AMENTA DIRECT BY MR. BOSTIC

| | | |
|---|---|---|
| 09:25AM | 1 | A.   AGAIN, THAT ABA ROUTING FOR THE RECEIVER IS COMERICA ON |
| 09:25AM | 2 | BEHALF OF THERANOS. |
| 09:25AM | 3 | Q.   THANK YOU. |
| 09:25AM | 4 | LET'S TURN TO THE NEXT PAGE, WHICH IS PAGE 20.  IF WE CAN |
| 09:25AM | 5 | ZOOM IN ON THE CONTENT HERE. |
| 09:25AM | 6 | MR. AMENTA, IS THIS INFORMATION RELATING TO A SEPARATE |
| 09:25AM | 7 | WIRE TRANSFER? |
| 09:25AM | 8 | A.   IT IS.  THIS IS ALSO DATED DECEMBER 31ST, 2013. |
| 09:25AM | 9 | Q.   OKAY.  AND IN WHAT AMOUNT WAS THIS WIRE TRANSFER? |
| 09:25AM | 10 | A.   THE AMOUNT FOR THIS TRANSACTION IS $4,875,000. |
| 09:25AM | 11 | Q.   AND WHO SENT THIS APPROXIMATELY $4.9 MILLION TRANSACTION |
| 09:26AM | 12 | ON THAT DATE? |
| 09:26AM | 13 | A.   TEXAS CAPITAL BANK ON BEHALF OF HALL PHOENIX/INWOOD LDT. |
| 09:26AM | 14 | Q.   AND THE RECIPIENT? |
| 09:26AM | 15 | A.   THE RECIPIENT IS COMERICA ON BEHALF OF THERANOS. |
| 09:26AM | 16 | Q.   THANK YOU.  LET'S TURN NOW TO THE NEXT PAGE, PAGE 21.  IF |
| 09:26AM | 17 | WE CAN ZOOM IN. |
| 09:26AM | 18 | ON PAGE 21, DO YOU SEE DETAILS FOR ANOTHER FEDWIRE |
| 09:26AM | 19 | TRANSMITTAL? |
| 09:26AM | 20 | A.   YES.  THE DATE FOR THIS ONE IS FEBRUARY 6TH, 2014. |
| 09:26AM | 21 | Q.   AND WHAT WAS THE AMOUNT OF THIS WIRE TRANSFER? |
| 09:26AM | 22 | A.   THE AMOUNT IS $38,336,632. |
| 09:26AM | 23 | Q.   OKAY.  AND WHO SENT THIS $38.3 MILLION TRANSFER ON THAT |
| 09:26AM | 24 | DATE? |
| 09:26AM | 25 | A.   CITIBANK ON BEHALF OF GOLDMAN SACHS AND PFM HEALTH CARE. |

AMENTA DIRECT BY MR. BOSTIC                                          3566

| | | |
|---|---|---|
| 09:26AM | 1 | Q.   AND FINALLY, THE RECIPIENT FOR THIS ONE? |
| 09:27AM | 2 | A.   THE RECIPIENT IS COMERICA ON BEHALF OF THERANOS. |
| 09:27AM | 3 | Q.   OKAY.  THANK YOU.  LET'S GO TO PAGE 22. |
| 09:27AM | 4 | IF WE CAN ZOOM IN ON THIS CONTENT. |
| 09:27AM | 5 | MR. AMENTA, FOR THE WIRE TRANSFER ON PAGE 22, WHAT WAS THE |
| 09:27AM | 6 | DATE? |
| 09:27AM | 7 | A.   OCTOBER 31ST OF 2014. |
| 09:27AM | 8 | Q.   AND THE AMOUNT OF THIS WIRE TRANSFER? |
| 09:27AM | 9 | A.   $99,999,984. |
| 09:27AM | 10 | Q.   AND FINALLY, WHO WERE THE SENDER AND RECIPIENT FOR THIS |
| 09:27AM | 11 | WIRE TRANSFER? |
| 09:27AM | 12 | A.   SO NORTHERN CHICAGO ON BEHALF LAKESHORE CAPITOL MANAGEMENT |
| 09:27AM | 13 | AND DYNASTY FINANCIAL. |
| 09:27AM | 14 | Q.   AND WHO IS THE RECIPIENT? |
| 09:27AM | 15 | A.   AND THE RECIPIENT IS COMERICA ON BEHALF OF THERANOS. |
| 09:27AM | 16 | Q.   AND THE FINAL PAGE IS 23.  LET'S LOOK AT THAT. |
| 09:28AM | 17 | MR. AMENTA, IF YOU COULD WALK US THROUGH THIS ONE.  WHAT |
| 09:28AM | 18 | ARE THE RELEVANT DETAILS OF THIS WIRE TRANSFER? |
| 09:28AM | 19 | A.   THE DATE IS OCTOBER 31ST OF 2014. |
| 09:28AM | 20 | THE AMOUNT IS $5,999,997. |
| 09:28AM | 21 | THE SENDING AND THE ORIGINATOR IS JP MORGAN CHASE, AND THE |
| 09:28AM | 22 | MOSLEY FAMILY HOLDINGS, AND THE BENEFICIARY IS COMERICA BANK |
| 09:28AM | 23 | FOR THERANOS. |
| 09:28AM | 24 | Q.   AND WE JUST LOOKED AT DETAILS FOR SIX SEPARATE WIRE |
| 09:28AM | 25 | TRANSFERS; IS THAT CORRECT? |

AMENTA DIRECT BY MR. BOSTIC                                          3567

09:28AM   1    A.   CORRECT.

09:28AM   2    Q.   AND EACH OF THOSE SIX WIRE TRANSFERS USED THE FEDWIRE

09:28AM   3    SYSTEM; IS THAT CORRECT?

09:28AM   4    A.   CORRECT.

09:28AM   5    Q.   YOU TESTIFIED EARLIER ABOUT THE SEQUENCE OF EVENTS AND THE

09:28AM   6    PROCESS NEEDED TO EXECUTE A FEDWIRE WIRE TRANSFER IN 2013,

09:28AM   7    2014.

09:28AM   8        DO YOU RECALL THAT TESTIMONY?

09:28AM   9    A.   I DO.

09:28AM   10   Q.   IS IT POSSIBLE FOR -- OR WAS IT POSSIBLE FOR A FEDWIRE

09:28AM   11   MONEY TRANSFER DURING THAT TIME PERIOD TO OCCUR WITHOUT AN

09:29AM   12   INTERSTATE WIRE COMMUNICATION?

09:29AM   13   A.   NO.

09:29AM   14   Q.   DID EACH OF THESE SIX WIRE TRANSFERS THEN NECESSARILY

09:29AM   15   INVOLVE A WIRE COMMUNICATION ACROSS STATE LINES?

09:29AM   16   A.   IT DID BETWEEN TEXAS AND NEW JERSEY.

09:29AM   17   Q.   BETWEEN THOSE TWO FEDWIRE FACILITIES?

09:29AM   18   A.   CORRECT.

09:29AM   19   Q.   IN FRONT OF YOU, DO YOU STILL HAVE A FEW EXHIBITS?  IF SO,

09:29AM   20   I'LL ASK YOU TO LOOK AT EXHIBIT NUMBER 5428.

09:29AM   21   A.   YES.

09:29AM   22   Q.   DO YOU HAVE THAT IN FRONT OF YOU?

09:29AM   23   A.   YES.

09:29AM   24   Q.   AND GENERALLY SPEAKING, WITHOUT GETTING INTO THE CONTENT,

09:29AM   25   WHAT IS EXHIBIT 5428?

AMENTA DIRECT BY MR. BOSTIC                                      3568

09:29AM   1        A.   IT'S A FEDWIRE FUNDS MESSAGE.

09:29AM   2        Q.   AND HAVE YOU REVIEWED 5428 BEFORE?

09:29AM   3        A.   I HAVE.

09:29AM   4             MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT MOVES TO

09:29AM   5        ADMIT 5428.

09:29AM   6             MS. TREFZ:  NO OBJECTION.

09:29AM   7             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:29AM   8        (GOVERNMENT'S EXHIBIT 5428 WAS RECEIVED IN EVIDENCE.)

09:30AM   9        BY MR. BOSTIC:

09:30AM  10        Q.   MR. AMENTA, DO YOU SEE ON YOUR SCREEN NOW THE DETAILS OF

09:30AM  11        THAT WIRE TRANSFER IN EXHIBIT 5428?

09:30AM  12        A.   I DO.

09:30AM  13        Q.   ON WHAT DATE WAS THIS WIRE TRANSMITTAL SENT?

09:30AM  14        A.   AUGUST 3RD OF 2015.  IT'S IN THE AMOUNT OF $1,126,661.

09:30AM  15             THE SENDING SIDE, THE SENDER FINANCIAL INSTITUTION WAS

09:30AM  16        WELLS FARGO ON BEHALF OF THERANOS, AND THE RECEIVING

09:30AM  17        INSTITUTION WAS JP MORGAN CHASE ON BEHALF OF HORIZON MEDIA,

09:30AM  18        INC.

09:30AM  19        Q.   SO UNLIKE THE PREVIOUS TRANSACTIONS WE LOOKED AT, THIS ONE

09:30AM  20        IS GOING FROM THERANOS TO A THIRD PARTY?

09:30AM  21        A.   THEY'RE THE ORIGINATOR INSTEAD OF THE BENEFICIARY,

09:30AM  22        CORRECT.

09:30AM  23        Q.   AND YOU PREVIOUSLY TOLD US ABOUT THE FEDWIRE TRANSFERS IN

09:30AM  24        2013 AND 2014.  THIS TRANSFER WAS IN 2015.  WAS THE PROCESS

09:30AM  25        DIFFERENT AT THAT TIME?

AMENTA DIRECT BY MR. BOSTIC                                          3569

| | | |
|---|---|---|
| 09:30AM | 1 | A.   IT STILL REQUIRED THE SAME TWO PROCESSING CENTERS. |
| 09:31AM | 2 | WHAT CHANGED IN NOVEMBER 10TH OF 2014 WAS THAT THE PRIMARY |
| 09:31AM | 3 | SITE ALTERNATED, SO IT WOULD EITHER BE NEW JERSEY OR DALLAS |
| 09:31AM | 4 | THAT WOULD BE THE PRIMARY SITE. |
| 09:31AM | 5 | THE SECOND PART THAT CHANGED WAS THE PROCESS FOR IT WOULD |
| 09:31AM | 6 | CHANGE.  SO IN THE EARLIER TIME PERIOD, APRIL 27TH, '09, |
| 09:31AM | 7 | PRE-DECEMBER 2014, THE DALLAS WOULD SEND IT TO THE NEW JERSEY |
| 09:31AM | 8 | FACILITY FOR PROCESSING. |
| 09:31AM | 9 | POST THAT NOVEMBER 2014 DATE, THE PROCESSING WOULD BE THE |
| 09:31AM | 10 | PRIMARY SITE WOULD SEND IT TO THE SECONDARY SITE FOR |
| 09:31AM | 11 | ACKNOWLEDGEMENT, AND THEN THE PRIMARY SITE WOULD THEN, AFTER |
| 09:31AM | 12 | RECEIVING ACKNOWLEDGEMENT, DO THE DEBITING AND CREDITING AND |
| 09:31AM | 13 | SENDING THE ADVICES TO THE FINANCIAL INSTITUTIONS. |
| 09:31AM | 14 | Q.   AND WHEN YOU'RE TALKING ABOUT THOSE TWO FEDWIRE FACILITIES |
| 09:31AM | 15 | COMMUNICATING WITH EACH OTHER IN THE 2015 TIMEFRAME, ARE THOSE |
| 09:31AM | 16 | AUTOMATED WIRE COMMUNICATIONS? |
| 09:31AM | 17 | A.   CORRECT. |
| 09:31AM | 18 | Q.   IN THE 2015 TIMEFRAME THEN, AND SPECIFICALLY IN AUGUST OF |
| 09:32AM | 19 | 2015, WOULD IT BE POSSIBLE FOR THIS WIRE TRANSFER TO OCCUR |
| 09:32AM | 20 | WITHOUT AN INTERSTATE WIRE COMMUNICATION? |
| 09:32AM | 21 | A.   NO. |
| 09:32AM | 22 | Q.   AND THE TRANSFER THAT IS DEPICTED IN EXHIBIT 5428, WAS |
| 09:32AM | 23 | THAT A WIRE TRANSFER THAT USED THE FEDWIRE SYSTEM? |
| 09:32AM | 24 | A.   IT WAS. |
| 09:32AM | 25 | MR. BOSTIC:  A MOMENT, YOUR HONOR? |

AMENTA CROSS BY MS. TREFZ                                           3570

| | | |
|---|---|---|
| 09:32AM | 1 | THE COURT:  YES. |
| 09:32AM | 2 | (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.) |
| 09:32AM | 3 | MR. BOSTIC:  NO FURTHER QUESTIONS, YOUR HONOR. |
| 09:32AM | 4 | THANK YOU, MR. AMENTA. |
| 09:32AM | 5 | THE WITNESS:  THANK YOU. |
| 09:32AM | 6 | THE COURT:  MS. TREFZ. |
| 09:32AM | 7 | **CROSS-EXAMINATION** |
| 09:32AM | 8 | BY MS. TREFZ: |
| 09:32AM | 9 | Q.  HI, MR. AMENTA.  MY NAME IS KATIE TREFZ.  I REPRESENT |
| 09:32AM | 10 | MS. HOLMES. |
| 09:32AM | 11 | A.  GOOD MORNING. |
| 09:32AM | 12 | Q.  I ONLY HAVE A COUPLE OF QUICK QUESTIONS FOR YOU. |
| 09:32AM | 13 | A.  SURE. |
| 09:32AM | 14 | Q.  ONE IS, ASIDE FROM HAVING PULLED THOSE RECORDS, YOU DON'T |
| 09:33AM | 15 | HAVE ANY PERSONAL KNOWLEDGE ABOUT THE REASONS WHY THE WIRES |
| 09:33AM | 16 | WERE SENT; CORRECT? |
| 09:33AM | 17 | A.  CORRECT. |
| 09:33AM | 18 | Q.  OR WHO WITHIN AN ORGANIZATION AUTHORIZED THEM; CORRECT? |
| 09:33AM | 19 | A.  THAT'S CORRECT. |
| 09:33AM | 20 | Q.  OR FOR WHAT PURPOSE THEY WERE SENT; CORRECT? |
| 09:33AM | 21 | A.  THAT'S CORRECT. |
| 09:33AM | 22 | MS. TREFZ:  THAT'S ALL. |
| 09:33AM | 23 | THANK YOU. |
| 09:33AM | 24 | THE WITNESS:  THANK YOU. |
| 09:33AM | 25 | MR. BOSTIC:  NOTHING FURTHER, YOUR HONOR. |

| | | |
|---|---|---|
| 09:33AM | 1 | THE COURT:  MAY THIS WITNESS BE EXCUSED? |
| 09:33AM | 2 | MR. BOSTIC:  YES. |
| 09:33AM | 3 | THE COURT:  MS. TREFZ? |
| 09:33AM | 4 | MS. TREFZ:  YES. |
| 09:33AM | 5 | THE COURT:  MR. AMENTA, YOU'RE EXCUSED.  THANK YOU. |
| 09:33AM | 6 | MR. SCHENK:  YOUR HONOR, THE UNITED STATES CALLS |
| 09:33AM | 7 | NIMESH JHAVERI. |
| 09:34AM | 8 | (PAUSE IN PROCEEDINGS.) |
| 09:34AM | 9 | THE COURT:  GOOD MORNING, SIR.  IF YOU WOULD COME |
| 09:34AM | 10 | FORWARD, PLEASE, AND FACE OUR COURTROOM DEPUTY RIGHT HERE. |
| 09:34AM | 11 | IF YOU WOULD RAISE YOUR RIGHT HAND, SHE HAS A QUESTION FOR |
| 09:34AM | 12 | YOU. |
| 09:34AM | 13 | **(GOVERNMENT'S WITNESS, NIMESH JHAVERI, WAS SWORN.)** |
| 09:34AM | 14 | THE WITNESS:  YES. |
| 09:34AM | 15 | THE COURT:  PLEASE HAVE A SEAT HERE, SIR.  MAKE |
| 09:34AM | 16 | YOURSELF COMFORTABLE.  FEEL FREE TO ADJUST THE CHAIR AND |
| 09:34AM | 17 | MICROPHONE AS YOU NEED. |
| 09:34AM | 18 | I'LL ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE. |
| 09:34AM | 19 | WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME |
| 09:34AM | 20 | AND THEN SPELL IT, PLEASE. |
| 09:34AM | 21 | THE WITNESS:  NIMESH JHAVERI.  FIRST NAME NIMESH, |
| 09:34AM | 22 | N-I-M-E-S-H.  LAST NAME JHAVERI, J-H-A-V-E-R-I. |
| 09:34AM | 23 | THE COURT:  THANK YOU. |
| 09:34AM | 24 | COUNSEL. |
| 09:35AM | 25 | MR. SCHENK:  THANK YOU, YOUR HONOR. |

|         |    |                                                            |
|---------|----|------------------------------------------------------------|
| 09:35AM | 1  | **DIRECT EXAMINATION**                                     |
| 09:35AM | 2  | BY MR. SCHENK:                                              |
| 09:35AM | 3  | Q.   GOOD MORNING, MR. JHAVERI.                             |
| 09:35AM | 4  | A.   GOOD MORNING.                                          |
| 09:35AM | 5  | Q.   IF YOU ARE FULLY VACCINATED, AND WITH THE COURT'S      |
| 09:35AM | 6  | PERMISSION, YOU MAY REMOVE YOUR MASK TO TESTIFY IF YOU WOULD|
| 09:35AM | 7  | LIKE.                                                       |
| 09:35AM | 8  | A.   THANK YOU.                                             |
| 09:35AM | 9  | Q.   AND I ALSO WILL REMOVE MY MASK.                        |
| 09:35AM | 10 | MR. JHAVERI, DID YOU WORK AT WALGREENS?                     |
| 09:35AM | 11 | A.   I DID.                                                 |
| 09:35AM | 12 | Q.   FOR HOW LONG?                                          |
| 09:35AM | 13 | A.   TWENTY-NINE YEARS.                                     |
| 09:35AM | 14 | Q.   LET'S COME BACK TO THAT IN A MOMENT.                   |
| 09:35AM | 15 | I WONDER IF YOU CAN EXPLAIN TO THE JURY YOUR EDUCATIONAL    |
| 09:35AM | 16 | BACKGROUND?                                                 |
| 09:35AM | 17 | A.   SURE.  I'M A REGISTERED PHARMACIST.  I HAVE A DEGREE IN|
| 09:35AM | 18 | PHARMACY, AS WELL AS I HAVE MY MBA IN ORGANIZATIONAL BEHAVIOR.|
| 09:35AM | 19 | Q.   AND WHERE DID YOU GET YOUR MBA?                        |
| 09:35AM | 20 | A.   I GOT MY MBA AT LAKE FORREST GRADUATE SCHOOL OF MANAGEMENT|
| 09:35AM | 21 | IN LAKE FORREST, ILLINOIS.                                  |
| 09:35AM | 22 | Q.   AND AFTER GRADUATING FROM BUSINESS SCHOOL, WHERE DID YOU|
| 09:35AM | 23 | GO TO WORK?                                                 |
| 09:35AM | 24 | A.   I ACTUALLY WENT TO WORK, AFTER PHARMACY SCHOOL, AT     |
| 09:35AM | 25 | WALGREENS.                                                  |

JHAVERI DIRECT BY MR. SCHENK                                    3573

09:35AM  1    Q.   OKAY.  AND DID YOU GET THE MBA WHILE YOU WERE WORKING?

09:36AM  2    A.   I DID.

09:36AM  3    Q.   AND DESCRIBE YOUR WORK HISTORY AT WALGREENS.  YOU SAID YOU

09:36AM  4    WERE THERE FOR 29 YEARS.  DID YOU HAVE THE SAME JOB THE WHOLE

09:36AM  5    TIME?

09:36AM  6    A.   NO.  I ACTUALLY STARTED AT WALGREENS IN 1989 AS A PHARMACY

09:36AM  7    TECHNICIAN AND STORE CLERK WHILE GOING THROUGH SCHOOL, AND THEN

09:36AM  8    BECAME A PHARMACIST, AND THEN WORKED IN VARIOUS POSITIONS OVER

09:36AM  9    THE YEARS UNTIL OCTOBER OF 2018.

09:36AM  10   Q.   AND YOU LEFT WALGREENS IN 2018?

09:36AM  11   A.   I DID.

09:36AM  12   Q.   WHILE YOU WERE WORKING AT WALGREENS, DID YOU BECOME

09:36AM  13   FAMILIAR WITH A COMPANY NAMED THERANOS?

09:36AM  14   A.   I DID.

09:36AM  15   Q.   DO YOU REMEMBER WHEN YOU FIRST BECAME FAMILIAR WITH

09:36AM  16   THERANOS?

09:36AM  17   A.   SOMETIME IN 2010, '11, APPROXIMATELY AT THAT TIME.

09:36AM  18   Q.   OKAY.  AND IF YOU WOULD PLEASE DESCRIBE THAT EXPOSURE TO

09:36AM  19   THE JURY.  WHAT HAPPENED IN 2010 OR 2011?

09:36AM  20   A.   SURE.  I WAS ACTUALLY WORKING AND LEADING A PROJECT TO

09:36AM  21   REDESIGN ALL OF OUR PHARMACIES TO BE MORE CUSTOMER CENTRIC AND

09:37AM  22   PATIENT CENTRIC AND REDESIGNING ALL OF THE PHARMACY AREAS TO

09:37AM  23   INCLUDE CERTAIN SPACES TO DELIVER CERTAIN HEALTH CARE SERVICES

09:37AM  24   SO PATIENTS COULD HAVE SIMPLY MORE THAN THEIR PHARMACY.

09:37AM  25        SO I RECEIVED A CALL FROM DR. JAY ROSAN, WHO WAS ALSO AT

JHAVERI DIRECT BY MR. SCHENK                                      3574

09:37AM  1    WALGREENS, AND THEY HAD BEEN MEETING WITH THE THERANOS TEAM,

09:37AM  2    THE LEADERSHIP TEAM, AND ASKED ME IF I WOULD BE WILLING TO GIVE

09:37AM  3    THEM A TOUR OF THE NEW SPACE.

09:37AM  4        WE HAD A PILOT STORE IN WHEELING, ILLINOIS, AND I WAS MORE

09:37AM  5    THAN HAPPY TO DO THAT, AND THAT'S WHEN I WAS EXPOSED TO

09:37AM  6    THERANOS MORE AND MR. BALWANI AND MS. HOLMES.

09:37AM  7    Q.   DID YOU MEET EMPLOYEES FROM THERANOS THAT DAY?

09:37AM  8    A.   I MET BOTH OF THEM AT THE STORE, YES.

09:37AM  9    Q.   AND BY "BOTH OF THEM," YOU MEAN MS. HOLMES AND

09:37AM 10    MR. BALWANI?

09:37AM 11    A.   THAT'S CORRECT.

09:37AM 12    Q.   AND THEN WHAT DID YOU DO WITH THEM THAT DAY?

09:37AM 13    A.   IT WAS A SHORT VISIT.  I PROVIDED THEM A TOUR OF THE

09:37AM 14    STORE, PROVIDED A TOUR OF THE SPACE WHERE WE CAN USE TO DELIVER

09:38AM 15    DIFFERENT SERVICES FROM DIABETES EDUCATION SESSIONS TO LAB

09:38AM 16    SESSIONS OR LAB SERVICES.

09:38AM 17        IT WAS A FLEXIBLE SPACE, AND WE REALLY JUST GAVE THEM A

09:38AM 18    TOUR OF THAT, THE WAITING AREA, AND THEN THE NEW PHARMACY WITH

09:38AM 19    THE PHARMACIST SITTING OUTSIDE OF THE PHARMACY.

09:38AM 20        IT WAS A VERY SHORT VISIT.  AFTER THAT THEY THANKED ME

09:38AM 21    AND, YOU KNOW, THAT WAS THE END OF THE VISIT.

09:38AM 22    Q.   DO YOU RECALL IF, DURING THIS SHORT VISIT, YOU DISCUSSED

09:38AM 23    THE THERANOS TECHNOLOGY OR WHAT THE BUSINESS MODEL AT THERANOS

09:38AM 24    WAS?

09:38AM 25    A.   NO.  OF COURSE IT WAS INSIDE OF THE STORE, SO IT WAS IN A

JHAVERI DIRECT BY MR. SCHENK                                      3575

09:38AM  1    PUBLIC SETTING, SO THERE WAS NO REALLY DETAILED DISCUSSION.  IT

09:38AM  2    WAS REALLY THE IDEA OF DELIVERING LAB SERVICES IN THAT SPACE.

09:38AM  3    Q.   OKAY.  ABOUT HOW LONG WAS THIS VISIT, DO YOU KNOW?

09:38AM  4    A.   ABOUT 15, 20 MINUTES.  IT WASN'T THAT LONG.

09:38AM  5    Q.   AND THEN AFTER THIS OCCASION, DID YOU HAVE ANOTHER

09:38AM  6    OPPORTUNITY TO REENGAGE IN THE THERANOS PROJECT?

09:38AM  7    A.   YES.  PROBABLY A COUPLE YEARS LATER WHEN WALGREENS OPENED

09:39AM  8    THE FIRST COUPLE OF STORES, I DID REENGAGE WITH THE THERANOS

09:39AM  9    TEAM, AS WELL AS UNDERSTANDING WHAT THE STORES LOOKED LIKE.

09:39AM  10   BUT THAT WAS THE NEXT TIME.

09:39AM  11   Q.   OKAY.  AND WOULD THAT HAVE BEEN IN 2013?

09:39AM  12   A.   THAT'S RIGHT.  I THINK IT WAS SOMETIME IN NOVEMBER, OR END

09:39AM  13   OF 2013.

09:39AM  14   Q.   OKAY.  AND DESCRIBE FOR THE JURY WHAT YOUR ROLE WAS AT

09:39AM  15   THAT POINT WHEN YOU REENGAGED IN THE LATTER PART OF 2013.

09:39AM  16   A.   YEAH.  MY ROLE HAD NOT CHANGED AT THAT TIME.  WE WERE

09:39AM  17   STILL DEVELOPING THE NEW LAYOUT, THE NEW EXPERIENCE, THE NEW

09:39AM  18   DESIGN OF OUR PHARMACIES IN STORES, AND WE CONTINUED TO DO

09:39AM  19   THAT.

09:39AM  20        SO I WAS STILL LEADING THAT AND TESTING THOSE STORES.  WE

09:39AM  21   HAD A HANDFUL OF STORES AT THAT TIME THAT WE WERE TESTING, AND

09:39AM  22   MY ROLE WAS TO UNDERSTAND THAT IF WE EXPANDED OR DELIVERED THIS

09:39AM  23   TYPE OF A SERVICE, IN THIS CASE LAB SERVICES WITH THERANOS, HOW

09:40AM  24   WOULD IT FIT INTO THE DESIGN OF THE STORE?  HOW WOULD IT FIT

09:40AM  25   INTO THE EXPERIENCE OF THE STORE?

JHAVERI DIRECT BY MR. SCHENK

09:40AM  1      IT'S QUITE DIFFICULT TO DO CONSTRUCTION IN A STORE AT A

09:40AM  2   MINUTE'S NOTICE.  WE WANT TO, YOU KNOW, NOT DISRUPT OUR TEAM

09:40AM  3   MEMBERS.  WE DON'T WANT TO DISRUPT OUR CUSTOMERS.  SO IT DOES

09:40AM  4   REQUIRE QUITE A BIT OF PLANNING.

09:40AM  5      SO THIS WAS MY ROLE WAS TO UNDERSTAND WHAT THE NEEDS ARE,

09:40AM  6   WHAT THE EXPECTATIONS ARE, AND HOW DOES IT FIT INTO OUR

09:40AM  7   PLANNING.

09:40AM  8   Q.   I SEE.  AND THEN IN THE EARLY PART OF 2014, DID YOU

09:40AM  9   RECEIVE A PROMOTION AT WALGREENS?

09:40AM 10   A.   I DID.

09:40AM 11   Q.   AND DESCRIBE THAT PROMOTION, PLEASE.

09:40AM 12   A.   SURE.  SO I DID RECEIVE A PROMOTION TO DIVISIONAL VICE

09:40AM 13   PRESIDENT OF HEALTH CARE SERVICES AND HEALTH CARE SERVICES

09:40AM 14   DEVELOPMENT, AND MY ROLE WAS A COMBINATION OF THE ROLE THAT I

09:40AM 15   HAD BEFORE, OVERSEEING A CONCEPT, THE REDESIGNING OF THE

09:40AM 16   STORES, WHICH WAS CALLED WELL EXPERIENCE, AS WELL AS SOME OF

09:40AM 17   THE OTHER INNOVATIONS THAT THE COMPANY WAS THINKING ABOUT AND

09:40AM 18   HOW DO WE OPERATIONALIZE AND EXECUTE ON THEM.

09:41AM 19      SO THE THERANOS PARTNERSHIP WAS NOW PART OF MY

09:41AM 20   RESPONSIBILITIES.

09:41AM 21   Q.   YOU USED A TERM JUST NOW, WELL EXPERIENCE.  IS THAT WHAT

09:41AM 22   YOU WERE DESCRIBING TO US EARLIER, THE PATIENT CENTERED FOCUS

09:41AM 23   OF WALGREENS STORES?

09:41AM 24   A.   THAT'S EXACTLY CORRECT.  THAT WAS THE INTERNAL TERM FOR

09:41AM 25   THE PROJECT WELL EXPERIENCE.  WE WERE TRYING TO CREATE THAT,

JHAVERI DIRECT BY MR. SCHENK                                    3577

09:41AM   1      QUOTE-UNQUOTE, WELL EXPERIENCE FOR OUR CUSTOMERS AND PATIENTS

09:41AM   2      AS THEY WALKED IN AND GIVE THEM ACCESS TO SERVICES.

09:41AM   3      Q.   WHEN YOU RECEIVED THIS PROMOTION, DID YOUR ENGAGEMENT IN

09:41AM   4      THE THERANOS PROJECT CHANGE, OR YOUR RESPONSIBILITIES VIS-A-VIS

09:41AM   5      THE THERANOS PROJECT?

09:41AM   6      A.   YES, IT DID.

09:41AM   7           ONCE I TOOK ON THE NEW ROLE MY RESPONSIBILITIES, I HAD A

09:41AM   8      TEAM THAT ACTUALLY REPORTED TO ME THAT WAS NOW RESPONSIBLE FOR

09:41AM   9      THE PARTNERSHIP AND REALLY OPERATIONALIZING THIS PARTNERSHIP

09:41AM  10      THAT WE HAD HAD WITH THERANOS, OPEN MORE STORES SO WE CAN TEST

09:41AM  11      AND LEARN AND CONTINUE TO REFINE.

09:41AM  12      Q.   YOU JUST USED A TERM, OPERATIONALIZE.

09:41AM  13           WHAT DO YOU MEAN BY THAT?

09:42AM  14      A.   YEAH.  OPERATIONALIZE IS A BROAD TERM, AND IT'S REALLY

09:42AM  15      TAKING AN IDEA AND BRINGING IT TO MARKET, HELPING IT BECOME A

09:42AM  16      REALITY.

09:42AM  17           IN THIS CASE THERE WAS ABOUT THREE STORES, IF I REMEMBER

09:42AM  18      CORRECTLY, THAT WERE OPEN WITH THERANOS WELLNESS SERVICES

09:42AM  19      INSIDE OF THEM, AND THE IDEA WAS, HOW DO WE EXPAND THAT

09:42AM  20      FURTHER?

09:42AM  21           AND THAT REQUIRED -- OPERATIONALIZING SOMETHING REQUIRES,

09:42AM  22      IN THE RETAIL SETTING, CONSTRUCTION, DESIGN, LAYOUT, HOW DO WE

09:42AM  23      TRAIN OUR EMPLOYEES AND TEAM MEMBERS TO ACTUALLY EXECUTE ON THE

09:42AM  24      SERVICE?  WHAT DOES THE CUSTOMER EXPERIENCE LOOK LIKE?  YOU

09:42AM  25      KNOW, WHEN A PATIENT COMES IN AND WHEN A CUSTOMER WALKS IN,

JHAVERI DIRECT BY MR. SCHENK                                      3578

09:42AM  1    WHAT HAPPENS?

09:42AM  2         ALL OF THOSE THOUGHTS AND IDEAS IS REALLY TO BRING IT INTO

09:42AM  3    AN EXECUTABLE WAY INSIDE OF A STORE, AND SO THAT'S WHAT I MEAN

09:42AM  4    BY OPERATIONALIZING.

09:42AM  5    Q.   THANK YOU.

09:42AM  6         WHEN YOU WERE DOING THIS WORK TO OPERATIONALIZE THE

09:43AM  7    THERANOS VENTURE, WERE YOU EVALUATING THE SUCCESS OF THE

09:43AM  8    THERANOS PROJECT?  YOU DESCRIBED THAT THERE WERE THREE STORES

09:43AM  9    OPENED.  WHERE WERE THOSE -- FIRST, WHERE WERE THOSE STORES?

09:43AM  10   A.   THE THREE STORES, ONE WAS IN CALIFORNIA IN PALO ALTO, AND

09:43AM  11   THE OTHER TWO WERE IN ARIZONA.

09:43AM  12   Q.   AND WERE YOU LOOKING AT CERTAIN METRICS OR JUST PAYING

09:43AM  13   ATTENTION TO HOW THE EXPERIENCE WAS GOING FOR CUSTOMERS TO

09:43AM  14   DETERMINE FURTHER EXPANSION?

09:43AM  15   A.   ABSOLUTELY.  WE HAD A SET OF METRICS THAT WE HAD DECIDED

09:43AM  16   WITH THE THERANOS TEAM, EVERYTHING FROM PATIENT WAIT TIME TO

09:43AM  17   HOW LONG IT TAKES TO CHECK YOU IN, TO MEASURES LIKE HOW MANY

09:43AM  18   MEMBERS WE'VE TRAINED, WHAT THE EXPERIENCE LEVELS LOOK LIKE.

09:43AM  19        AND THEN WE HAD SOME LAB RELATED MEASURES THAT WE ALSO

09:43AM  20   HAD, THE PERCENTAGE OF VENOUS VERSUS FINGERSTICK, BECAUSE THAT

09:43AM  21   WAS PART OF THE THERANOS VALUE PROPOSITION.

09:43AM  22        SO WE HAD SEVERAL OF THOSE MEASURES THAT WE LOOKED AT AND

09:44AM  23   MONITORED TO SEE, ARE WE SUCCEEDING?  ARE WE HITTING THE GOALS

09:44AM  24   THAT WE WANT TO HIT?  ARE WE ACHIEVING THE HYPOTHESIS THAT WE

09:44AM  25   SET OUT TO DO?

JHAVERI DIRECT BY MR. SCHENK                                    3579

09:44AM  1    Q.   WHEN A PATIENT WOULD COME INTO A WALGREENS THAT HAD A

09:44AM  2    THERANOS, WHAT SERVICES COULD THAT INDIVIDUAL RECEIVE FROM

09:44AM  3    THERANOS?

09:44AM  4    A.   WELL, THEY WERE ABLE TO RECEIVE THEIR TRADITIONAL LAB WORK

09:44AM  5    WHERE THEY OTHERWISE WOULD GO TO WITH A PROVIDER'S ORDER OR

09:44AM  6    PHYSICIAN'S ORDER, THEY COULD GO TO A LAB.

09:44AM  7         BUT IN THIS CASE THEY COULD GO TO WALGREENS PHARMACY AND

09:44AM  8    ACTUALLY RECEIVE A FINGERSTICK OR VENOUS DRAW AND HAVE THEIR

09:44AM  9    LABS DONE AND THOSE RESULTS WERE SENT TO THEIR PROVIDER WHO

09:44AM 10    ORDERED THOSE TESTS.

09:44AM 11    Q.   YOU SAID AT THIS STAGE ONE OF THE THINGS THAT YOU WERE

09:44AM 12    PAYING ATTENTION TO WAS THE PERCENT OF VENOUS DRAWS OR

09:45AM 13    FINGERSTICK DRAWS.  EXPLAIN THAT TO ME.  WHAT DO YOU MEAN?

09:45AM 14    A.   ABSOLUTELY.  SO IN A TRADITIONAL SETTING WHEN YOU WANT TO

09:45AM 15    GET YOUR LAB WORK DONE AND YOUR DOCTOR ORDERS LAB WORK AND YOU

09:45AM 16    NEED TO GET YOUR CHOLESTEROL CHECKED OR WHATEVER, YOUR BLOOD

09:45AM 17    COUNT, YOU'LL GO TO THE LAB AND THEY'LL TAKE SOME BLOOD OUT

09:45AM 18    FROM YOUR VENOUS, RIGHT BY YOUR ELBOW, OF SEVERAL TEST TUBES.

09:45AM 19         IN THE CASE OF THERANOS SERVICES, THE UNIQUE PART OF IT

09:45AM 20    WAS THAT YOU CAN DO THAT SAME TEST, THOSE SAME TESTS ON A SMALL

09:45AM 21    AMOUNT OF BLOOD THROUGH A FINGERSTICK, WHICH WAS EXTRAORDINARY,

09:45AM 22    AND THAT'S THE DIFFERENCE.

09:45AM 23         AND SO THE REAL AMAZING EXPERIENCE FOR PATIENTS WAS TO

09:45AM 24    COME IN, GET THOSE LABS THAT THEY TRADITIONALLY HAD THREE TEST

09:45AM 25    TUBES THAT THEY WERE TAKING OUT, BEING ABLE TO BE DONE WITH A

JHAVERI DIRECT BY MR. SCHENK                                         3580

09:45AM   1    FEW DROPS OF BLOOD AND THROUGH A FINGERSTICK.

09:45AM   2        SO IT WAS LESS PAINFUL, IT WAS MORE EFFICIENT, IT WAS

09:45AM   3    FASTER, AND THAT REALLY IS THE DIFFERENCE BETWEEN THE TWO.

09:46AM   4    Q.   AND WAS THE NUMBER OF FINGERSTICK DRAWS OR THE PERCENT,

09:46AM   5    WAS THAT IMPORTANT TO WALGREENS?  WAS THAT A STATISTIC THAT

09:46AM   6    WALGREENS PAID ATTENTION TO?

09:46AM   7    A.   IT WAS VERY IMPORTANT.  IT WAS VERY IMPORTANT BECAUSE

09:46AM   8    THAT'S -- THAT WAS THE THERANOS TECHNOLOGY THAT WE HAD SIGNED A

09:46AM   9    PARTNERSHIP ON.  IT WAS CHANGING THE LAB ENVIRONMENT, THE

09:46AM   10   ABILITY FOR A PATIENT TO GET THEIR LAB WORK DONE IN A LESS

09:46AM   11   PAINFUL WAY, AND LESS BLOOD REQUIRED WAS THE ACTUAL MAGIC THAT,

09:46AM   12   YOU KNOW, THAT WAS SO INTRIGUING TO US AS WALGREENS.

09:46AM   13   Q.   DURING THIS PERIOD OF TIME, DID YOU HAVE PERIODIC MEETINGS

09:46AM   14   WITH INDIVIDUALS FROM THERANOS TO DISCUSS THIS TOPIC, THE

09:46AM   15   PERCENT OF VENOUS DRAWS?

09:46AM   16   A.   YES, SIR.

09:46AM   17   Q.   DID YOU HAVE ONE MAJOR POINT OF CONTACT AT THERANOS, OR

09:46AM   18   MANY?

09:46AM   19   A.   MY MAJOR CONTACT OR DAY-TO-DAY CONTACT WAS MR. BALWANI.

09:46AM   20   HE WAS THE CHIEF OPERATING OFFICER.

09:46AM   21   Q.   SO WHEN YOU HAD THESE PERIODIC MEETINGS TO DISCUSS HOW THE

09:47AM   22   ROLLOUT WAS GOING, WERE YOU HAVING THOSE DISCUSSIONS QUITE

09:47AM   23   OFTEN WITH MR. BALWANI HIMSELF?

09:47AM   24   A.   YES.

09:47AM   25        MR. SCHENK:  YOUR HONOR, MAY I APPROACH?

JHAVERI DIRECT BY MR. SCHENK                                    3581

| | | |
|---|---|---|
| 09:47AM | 1 | THE COURT:  YES. |
| 09:47AM | 2 | MR. SCHENK:  (HANDING.) |
| 09:47AM | 3 | Q.  MR. JHAVERI, I'VE HANDED YOU A BINDER.  I WOULD ASK YOU TO |
| 09:47AM | 4 | OPEN IT AND TURN TO TAB 1711. |
| 09:47AM | 5 | A.  OKAY. |
| 09:47AM | 6 | Q.  DO YOU RECOGNIZE THIS DOCUMENT? |
| 09:47AM | 7 | A.  I DO. |
| 09:47AM | 8 | Q.  IS THIS AN EMAIL FROM AN INDIVIDUAL AT WALGREENS TO A |
| 09:47AM | 9 | GROUP OF INDIVIDUALS, INCLUDING YOURSELF AND MR. BALWANI, IN |
| 09:48AM | 10 | MAY OF 2014? |
| 09:48AM | 11 | A.  YES. |
| 09:48AM | 12 | Q.  AND DOES IT ALSO INCLUDE AS AN ATTACHMENT SOME SLIDES? |
| 09:48AM | 13 | A.  YES, IT DOES. |
| 09:48AM | 14 | MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 1711. |
| 09:48AM | 15 | MR. DOWNEY:  YOUR HONOR, NO OBJECTION TO THE EMAIL. |
| 09:48AM | 16 | I THINK THE ATTACHMENT HAS 801 PROBLEMS WITHIN 801 |
| 09:48AM | 17 | PROBLEMS. |
| 09:48AM | 18 | THE COURT:  MR. SCHENK? |
| 09:48AM | 19 | MR. SCHENK:  I'M NOT SURE WHICH SLIDES HE'S |
| 09:48AM | 20 | REFERRING TO OR WHAT THE SPECIFIC 801 OBJECTION IS. |
| 09:48AM | 21 | MR. DOWNEY:  WELL, YOUR HONOR, THERE ARE JUST |
| 09:48AM | 22 | VARIOUS STATEMENTS ON VIRTUALLY EVERY SLIDE FROM PAGE 10 TO |
| 09:48AM | 23 | REALLY FOLLOWING THEREAFTER WHICH ARE STATEMENTS BEING OFFERED |
| 09:48AM | 24 | TO STATE WHAT THE STATE OF THE PROGRAM WAS. |
| 09:49AM | 25 | THE COURT:  WHY DON'T YOU TRY TO LAY A FOUNDATION |

JHAVERI DIRECT BY MR. SCHENK                                    3582

09:49AM   1      AND LET'S GO FORWARD.

09:49AM   2              MR. SCHENK:  YES.  THANK YOU.

09:49AM   3      Q.   MR. JHAVERI, WOULD YOU LOOK AT THE SLIDES FOR A MOMENT?

09:49AM   4      THE SLIDES BEGIN ON PAGE 4 AND CONTINUE THROUGH THE REST OF THE

09:49AM   5      EXHIBIT THROUGH PAGE 17.

09:49AM   6      A.   IF I COULD JUST TAKE ONE MINUTE?

09:49AM   7      Q.   PLEASE.

09:49AM   8           (PAUSE IN PROCEEDINGS.)

09:49AM   9              THE WITNESS:  YES.

09:49AM  10      BY MR. SCHENK:

09:49AM  11      Q.   WERE THESE THE TYPES OF SLIDES PREPARED IN THE ORDINARY

09:49AM  12      COURSE OF BUSINESS FOR THE MEETINGS THAT WE JUST TALKED ABOUT?

09:49AM  13      A.   YES, THIS WAS IN PREPARATION FOR A STEERING COMMITTEE

09:49AM  14      MEETING IN MAY OF 2014, AND THESE SLIDES REFLECT THE

09:50AM  15      INFORMATION THAT WE SHARED WITH THE STEERING COMMITTEE.

09:50AM  16      Q.   AND WHEN THE SLIDES WERE PREPARED, DID YOU STRIVE TO

09:50AM  17      INCLUDE ACCURATE CONTENT WITHIN THE SLIDES?

09:50AM  18      A.   ABSOLUTELY.  YOU KNOW, IT WAS A PARTNERSHIP, SO THE

09:50AM  19      THERANOS TEAM AND THE WALGREENS TEAM, YOU KNOW, CREATED THESE

09:50AM  20      SLIDES TOGETHER SO WE CAN TELL THE STATUS OF THE PROGRAM

09:50AM  21      TOGETHER.

09:50AM  22      Q.   AND WERE THESE SLIDES PRESERVED SO THAT IF, AFTER THE

09:50AM  23      MEETING, YOU HAD A QUESTION ABOUT THE CONTENT OF A SLIDE OR

09:50AM  24      SOMETHING THAT WAS DISCUSSED, YOU COULD GO BACK TO THE SLIDES

09:50AM  25      AND LOOK AT THEM?

JHAVERI DIRECT BY MR. SCHENK                                          3583

09:50AM   1      A.   YES.

09:50AM   2                MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 1711.

09:50AM   3                MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

09:50AM   4                THE COURT:  IT'S ADMITTED.  THE EMAIL AND THE SLIDES

09:50AM   5      ARE ADMITTED.  THEY MAY BE PUBLISHED.

09:50AM   6                MR. SCHENK:  THANK YOU, YOUR HONOR.

09:50AM   7           (GOVERNMENT'S EXHIBIT 1711 WAS RECEIVED IN EVIDENCE.)

09:50AM   8      BY MR. SCHENK:

09:50AM   9      Q.   MR. JHAVERI, LET'S START WITH THE TOP PORTION OF THE EMAIL

09:50AM  10      FROM THE SENDER AND IT'S FROM A PATTY HAWORTH.

09:50AM  11           DO YOU SEE THAT?

09:50AM  12      A.   I DO.

09:50AM  13      Q.   AND WHO WAS MS. HAWORTH?

09:50AM  14      A.   PATTY HAWORTH WAS A PROJECT MANAGER WHO WAS LEADING ALL OF

09:51AM  15      THE PROJECT MANAGEMENT FUNDAMENTALS FOR THE PROJECT ITSELF.

09:51AM  16      Q.   AND WITHIN THE TO LINE, THE FIRST NAME IS YOU; IS THAT

09:51AM  17      RIGHT?  YOU RECEIVED THIS?

09:51AM  18      A.   THAT'S CORRECT.

09:51AM  19      Q.   AND THEN ABOUT THE FOURTH LINE OF THE RECIPIENTS, DO YOU

09:51AM  20      SEE S. BALWANI?

09:51AM  21      A.   I DO.

09:51AM  22      Q.   AND WAS THAT MR. BALWANI'S EMAIL ADDRESS?

09:51AM  23      A.   YES, SIR.

09:51AM  24      Q.   AND THE SUBJECT IS DIAGNOSTIC TESTING EXECUTIVE STEERING

09:51AM  25      COMMITTEE SLIDE DECK.

JHAVERI DIRECT BY MR. SCHENK                              3584

09:51AM   1          WHAT WAS THE EXECUTIVE STEERING COMMITTEE?

09:51AM   2     A.   THE EXECUTIVE STEERING COMMITTEE WAS A COMMITTEE THAT WE

09:51AM   3     HAD FORMED AT THE EXECUTIVE LEVEL AT BOTH COMPANIES, AND IT WAS

09:51AM   4     DONE PERIODICALLY TO JUST KEEP ALL OF THE EXECUTIVES ABREAST OF

09:51AM   5     WHAT IS GOING ON IN THE PROGRESSION OF THE PROJECT ITSELF.

09:51AM   6     Q.   AND THE CONTENT SUGGESTS THAT THE SLIDE DECK IS ATTACHED

09:51AM   7     FOR A MEETING TODAY.

09:51AM   8          DO YOU SEE THAT?

09:51AM   9     A.   I DO.

09:51AM   10    Q.   YOU DESCRIBED A MOMENT AGO THESE PERIODIC MEETINGS.  WAS

09:52AM   11    THIS IN ADVANCE OF A MEETING THAT OCCURRED IN MAY OF 2014?

09:52AM   12    A.   YES.  THIS SLIDE DECK WAS FOR THAT MEETING FOR THAT

09:52AM   13    PARTICULAR DAY.

09:52AM   14    Q.   THANK YOU.  AND I'D LIKE NOW TO HAVE YOU TURN TO PAGE 7 OF

09:52AM   15    THE EXHIBIT.

09:52AM   16         IF WE CAN JUST ZOOM IN ON THE TOP BOX.

09:52AM   17         THE MEMBERS OF THE EXECUTIVE STEERING COMMITTEE APPEAR TO

09:52AM   18    BE LISTED HERE.

09:52AM   19         DO YOU SEE YOUR NAME?

09:52AM   20    A.   I DO, SIR.

09:52AM   21    Q.   AND ALSO MR. BALWANI AS COO FROM THERANOS?

09:52AM   22    A.   YES, SIR.

09:52AM   23    Q.   AND THERE ARE SOME OTHER INDIVIDUALS FROM WALGREENS LISTED

09:52AM   24    WITH YOUR NAME.  I WONDER IF YOU'LL TELL US WHO THEY ARE?

09:52AM   25    A.   SURE.  THE FIRST NAME IS KERMIT CRAWFORD.  KERMIT WAS THE

JHAVERI DIRECT BY MR. SCHENK                                    3585

09:52AM   1    PRESIDENT OF PHARMACY SERVICES FOR WALGREENS AT THE TIME.

09:52AM   2         JASON DUBINSKY.  MR. DUBINSKY WAS THE FINANCIAL OFFICER.

09:53AM   3         BRAD FLEUGEL.  MR. FLEUGEL WAS THE CHIEF STRATEGY OFFICER

09:53AM   4    AT THE TIME.

09:53AM   5         ALEX GOURLAY.  ALEX WAS THE HEAD OF OUR FRONT STORE

09:53AM   6    OPERATIONS AT THAT TIME.  DAILY LIVING IS WHAT IT WAS CALLED.

09:53AM   7         AND THEN MYSELF.

09:53AM   8         MARK WAGNER WAS THE HEAD OF OUR STORE OPERATIONS.

09:53AM   9         AND THEN BRAD WASSON, WHO WAS MY BOSS, WAS THE HEAD OF THE

09:53AM  10    INNOVATIONS GROUP.

09:53AM  11    Q.   GREAT.  THANK YOU VERY MUCH.

09:53AM  12         IF YOU'LL NOW TURN TO PAGE 9.  IF YOU CAN ZOOM IN ON THIS

09:53AM  13    SLIDE, THE CONTENT.

09:53AM  14         IT'S ENTITLED CURRENT OPERATIONS METRICS.  WHAT DOES THAT

09:53AM  15    MEAN?  WHAT WERE THE CURRENT OPERATIONS METRICS?

09:53AM  16    A.   WELL, AS I REFERRED TO EARLIER, WE HAD DETERMINED -- "WE"

09:53AM  17    MEANING BOTH THE THERANOS TEAM AS WELL AS THE WALGREENS TEAM --

09:53AM  18    WHAT SHOULD WE BE MEASURING TO CONSTITUTE SUCCESS?  ARE WE

09:53AM  19    ACHIEVING THE SUCCESS FOR THIS PARTICULAR PROJECT AND HOW DO WE

09:54AM  20    MEASURE THAT?

09:54AM  21         AND SO THESE METRICS ARE IN REFERENCE TO THAT.  THESE WERE

09:54AM  22    THE ONES THAT WE DECIDED WOULD HAVE THE BIGGEST IMPACT ON THE

09:54AM  23    SUCCESS OF THE PROJECT, AND SO THAT'S WHAT WE WERE MEASURING.

09:54AM  24    Q.   GREAT.  AND THERE ARE -- THE TWO COLUMNS ON THE RIGHT EACH

09:54AM  25    HAVE DATES, FEBRUARY OF 2014 AND MAY OF 2014.

JHAVERI DIRECT BY MR. SCHENK                                    3586

09:54AM  1          DID THERANOS AND WALGREENS NOT JUST TRACK PROGRESS AT A

09:54AM  2   PARTICULAR MOMENT, BUT OVER TIME?

09:54AM  3   A.   WE DID.

09:54AM  4   Q.   LET'S START WITH THE FIRST LINE.  THE FIRST ROW IS NUMBER

09:54AM  5   OF STORES LAUNCHED.

09:54AM  6          DO YOU SEE THAT?

09:54AM  7   A.   I DO.

09:54AM  8   Q.   AND WHAT WAS THE NUMBER FOR FEBRUARY AND THEN MAY OF 2014?

09:54AM  9   A.   FEBRUARY WAS THREE STORES LAUNCHED.

09:54AM  10  Q.   AND THEN BY MAY?

09:54AM  11  A.   ELEVEN STORES LAUNCHED.

09:54AM  12  Q.   AND THE NEXT LINE IS AVERAGE PATIENTS PER STORE PER DAY.

09:54AM  13  WOULD YOU READ THOSE NUMBERS TO THE JURY?

09:54AM  14  A.   SURE.  ON FEBRUARY 7TH, 2014, IT WAS .8; AND IN MAY OF

09:55AM  15  2014, IT WAS 3.1.

09:55AM  16  Q.   WERE WALGREENS AND THERANOS TRACKING OR PAYING ATTENTION

09:55AM  17  TO THE AVERAGE NUMBER OF PATIENTS PER STORE PER DAY?

09:55AM  18  A.   YES, WE WERE.

09:55AM  19  Q.   AND WAS THAT NUMBER IMPORTANT IN DETERMINING WHETHER THE

09:55AM  20  PILOT WAS SUCCESSFUL?

09:55AM  21  A.   IT IS VERY IMPORTANT.  IT'S -- IT SHOWS A COUPLE OF

09:55AM  22  DIFFERENT THINGS.  NUMBER ONE, IT SHOWS ADOPTION OF THIS

09:55AM  23  SERVICE BY PATIENTS.  IT SHOWS, ARE WE GROWING NOT ONLY IN

09:55AM  24  STORE COUNT, BUT IN THE NUMBER OF PATIENTS PER STORE?

09:55AM  25          SO IT WAS VERY, VERY IMPORTANT.

JHAVERI DIRECT BY MR. SCHENK

09:55AM  1    AND IT ALSO ALLOWED US TO DETERMINE IF THERE WAS A RETURN

09:55AM  2    ON THE INVESTMENT THAT BOTH THERANOS AND WALGREENS IS MAKING.

09:55AM  3    Q.   THE NEXT LINE IS AVERAGE CHECK-IN, 10 TO 11 MINUTES IN

09:55AM  4    FEBRUARY, DOWN TO 8 MINUTES IN MAY.

09:55AM  5         WAS AVERAGE CHECK-IN SOMETHING THAT THERANOS AND WALGREENS

09:55AM  6    ALSO TRACKED?

09:55AM  7    A.   ABSOLUTELY.

09:55AM  8    Q.   WHY?

09:55AM  9    A.   THIS IS PART OF THE PATIENT EXPERIENCE.  AGAIN, THE ENTIRE

09:55AM  10   SERVICE WAS TO CREATE A NEW PATIENT EXPERIENCE, ONE THAT IS

09:56AM  11   EFFICIENT, ONE THAT IS LESS PAINFUL, ONE THAT IS LESS COST.

09:56AM  12        AND SO WHEN A PATIENT CAME IN TO CHECK IN FOR THIS

09:56AM  13   SERVICE, WE WANTED TO MAKE SURE THAT IT WAS GREAT FOR THEM, AND

09:56AM  14   IT WAS SHORT, AND SO THAT'S WHY WE MEASURED IT FOR EVERY

09:56AM  15   PATIENT.

09:56AM  16   Q.   THE NEXT ROW IS AVERAGE PERFORM, 95 PERCENT RANGE.

09:56AM  17        WHAT IS THAT?

09:56AM  18   A.   YEAH.  SO WHAT WE DID HERE WAS HOW MANY OF THOSE PATIENTS

09:56AM  19   WE ENDED UP THEN DID THE FULL, THEY RECEIVED THE FULL SERVICE,

09:56AM  20   AND HOW LONG IT TOOK FOR -- FROM WHEN THEY WENT INTO THE ROOM

09:56AM  21   TO GET THEIR LAB TESTS DONE, HOW LONG DID IT TAKE?

09:56AM  22        AND AGAIN, THAT WAS PART OF THE ENTIRE SERVICE.  SO AS WE

09:56AM  23   LOOK AT THESE NUMBERS, IT WAS SOMEWHERE BETWEEN 19 AND

09:56AM  24   20 MINUTES IN FEBRUARY, THE WHOLE EXPERIENCE; AND WE HAD THEN

09:56AM  25   REDUCED IT DOWN FROM 13 TO 17 MINUTES.

JHAVERI DIRECT BY MR. SCHENK                                    3588

09:57AM  1        AND SO THAT WAS PART OF THE FULL EXPERIENCE.

09:57AM  2   Q.   I SEE.

09:57AM  3        AND THEN THE NEXT ROW, VENOUS DRAWS.  IN FEBRUARY OF 2014

09:57AM  4   THEY WERE AT 43 PERCENT; AND IN MAY OF 2014 THEY ARE AT

09:57AM  5   39 PERCENT.

09:57AM  6        WAS THAT SOMETHING THAT THERANOS AND WALGREENS TRACKED?

09:57AM  7   A.   YES.

09:57AM  8   Q.   WHY?

09:57AM  9   A.   AGAIN, AS I EXPLAINED EARLIER, THERE WERE TWO METHODS OF

09:57AM 10   HOW TO DRAW BLOOD.  ONE WAS THROUGH A FINGERSTICK, AND THE

09:57AM 11   OTHER WAS THROUGH YOUR TRADITIONAL VENOUS DRAW.

09:57AM 12        SO, AGAIN, THE THERANOS SERVICE, THAT WAS TO DO IT THROUGH

09:57AM 13   A FINGERSTICK, AND SO WE WANTED TO MEASURE THAT WHEN PATIENTS

09:57AM 14   CAME IN, WERE THEY ACTUALLY RECEIVING A FINGERSTICK FOR THEIR

09:57AM 15   BLOOD DRAW OR WERE THEY ACTUALLY RECEIVING A VENOUS DRAW FOR

09:57AM 16   THEIR BLOOD DRAW?

09:57AM 17        AND SO THAT'S WHY WE MEASURED THIS.  THIS WAS A BIG PART

09:57AM 18   OF THE EXPERIENCE.

09:57AM 19   Q.   AND WHICH DIRECTION DID WALGREENS DESIRE TO SEE THAT

09:58AM 20   NUMBER GO, VENOUS DRAWS INCREASE OR DECREASE?

09:58AM 21   A.   DECREASE.

09:58AM 22   Q.   AND WHY WAS THAT?

09:58AM 23   A.   ULTIMATELY THAT WAS THE EXPERIENCE.  IF WE WERE DOING

09:58AM 24   VENOUS DRAWS, IF THE PATIENTS WERE RECEIVING A VENOUS DRAW WHEN

09:58AM 25   THEY WALKED INTO A THERANOS WELLNESS CENTER INSIDE OF A

JHAVERI DIRECT BY MR. SCHENK                                    3589

09:58AM  1    WALGREENS, THE EXPERIENCE IS NO DIFFERENT THAN GOING TO A LAB,

09:58AM  2    YOUR TRADITIONAL LAB.

09:58AM  3         SO WHAT WE WERE TRYING TO DO WAS TO MAKE SURE THAT THAT

09:58AM  4    NUMBER GETS TO ZERO, OR AS CLOSE AS POSSIBLE TO ZERO OVER TIME.

09:58AM  5    Q.   WHEN WALGREENS WAS EVALUATING WHETHER TO EXPAND THERANOS

09:58AM  6    SERVICES WITHIN WALGREENS STORES, WAS THIS NUMBER, VENOUS DRAW

09:58AM  7    PERCENT, RELEVANT TO THAT DETERMINATION?

09:58AM  8    A.   IT WAS.

09:58AM  9    Q.   WHY?

09:58AM  10   A.   AGAIN, IT'S PART OF THE EXPERIENCE AND IT'S PART OF THE

09:58AM  11   OFFERING.  YOU KNOW, IT'S, IT'S -- THIS WAS WHAT WAS BEING

09:58AM  12   TOUTED AS THE NEW TECHNOLOGY, THE NEW EXPERIENCE, AND SO IF

09:58AM  13   THIS NUMBER WAS IN THE 40 PERCENT OR HIGHER, OR NOT TO THE

09:59AM  14   POINT WHERE IT WAS CLOSE TO ZERO PERCENT, THE PATIENTS WERE NOT

09:59AM  15   RECEIVING THE SERVICE THAT THEY WERE PROMISED.

09:59AM  16   Q.   DID YOU DISCUSS THE IMPORTANCE OF VENOUS DRAW PERCENT WITH

09:59AM  17   MR. BALWANI?

09:59AM  18   A.   YES.

09:59AM  19   Q.   AND WOULD YOU TURN TO PAGE 10, THE NEXT PAGE.

09:59AM  20        THIS SLIDE IS CALLED VENOUS DRAWS.  AND THE FIRST LINE

09:59AM  21   READS, "ORIGINALLY ESTIMATED THAT BY END OF FEBRUARY 2014 WOULD

09:59AM  22   BE BELOW 20 PERCENT OF TOTAL DRAWS AND BELOW 10 PERCENT BY THE

09:59AM  23   END OF AUGUST."

09:59AM  24        DO YOU SEE THAT?

09:59AM  25   A.   I DO.

JHAVERI DIRECT BY MR. SCHENK                                    3590

09:59AM   1    Q.   AND THERE'S A REFERENCE TO BELOW 10 PERCENT BY END OF

09:59AM   2    2014.  AND THE SLIDE WE JUST LOOKED AT SHOWED THAT IT WAS

09:59AM   3    43 PERCENT; IS THAT RIGHT?

09:59AM   4    A.   THAT'S RIGHT.

09:59AM   5    Q.   AND THE NEXT SECTION ON THIS SLIDE UNDER CURRENT

09:59AM   6    PROJECTIONS HAS SOME PROJECTIONS INCLUDED.

10:00AM   7         FIRST, WHERE DID THESE PROJECTIONS COME FROM?

10:00AM   8    A.   THIS CAME FROM THE THERANOS TEAM.  MR. BALWANI PROVIDED

10:00AM   9    THAT.  WE ASKED HIM -- OBVIOUSLY WALGREENS IS NOT THE LAB.

10:00AM   10   WE'RE NOT THE DEVELOPER OF THIS TECHNOLOGY.

10:00AM   11        AND SO THIS CONTENT, THIS SLIDE WAS PROVIDED TO US BY

10:00AM   12   MR. BALWANI.

10:00AM   13   Q.   THE FIRST DASH READS, "BELOW 20 PERCENT BY END OF AUGUST

10:00AM   14   AT A 90 PERCENT CONFIDENCE LEVEL."

10:00AM   15        WHAT DOES THAT MEAN?

10:00AM   16   A.   SO HE WAS VERY CONFIDENT, 90 PERCENT, THAT WE WOULD GET TO

10:00AM   17   UNDER 20 PERCENT BY THE END OF AUGUST IN TERMS OF VENOUS DRAWS.

10:00AM   18   SO 80 PERCENT -- TO MAKE IT VERY SIMPLE, 80 PERCENT OF THE

10:00AM   19   PATIENTS COMING IN WOULD GET A FINGERSTICK.

10:00AM   20   Q.   I SEE.  AND BY THE END OF AUGUST 2014, WAS THAT ACHIEVED?

10:00AM   21   A.   NO, SIR.

10:00AM   22   Q.   IT THE NEXT DASH READS, "BELOW 10 PERCENT BY END OF

10:00AM   23   OCTOBER, WITH A GREATER THAN 95 PERCENT CONFIDENCE LEVEL."

10:01AM   24        FIRST, DID THIS ALSO COME FROM MR. BALWANI?

10:01AM   25   A.   YES, SIR.

JHAVERI DIRECT BY MR. SCHENK                              3591

10:01AM  1    Q.   DID IT COME TO PASS THAT BELOW 10 PERCENT OF THE PATIENTS

10:01AM  2    RECEIVED A VENOUS DRAW BY THE END OF OCTOBER?

10:01AM  3    A.   NO, IT DID NOT COME TO PASS.

10:01AM  4    Q.   THE NEXT DASH READS, "BELOW 5 PERCENT BY THE END OF 2014

10:01AM  5    AT A 90 PERCENT CONFIDENCE LEVEL."

10:01AM  6         DID MR. BALWANI PROVIDE THAT INFORMATION?

10:01AM  7    A.   YES, SIR.

10:01AM  8    Q.   AND DID THAT COME TO PASS?  DID LESS THAN 5 PERCENT OF THE

10:01AM  9    PATIENTS RECEIVE VENOUS DRAWS?

10:01AM  10   A.   NO, IT DID NOT COME TO PASS.

10:01AM  11   Q.   IT THEN CONTINUES, "AT WHICH POINT MOVE VENOUS DRAWS ONLY

10:01AM  12   TO DESIGNATED/24-HOUR STORES."

10:01AM  13        WHAT DOES THAT MEAN?

10:01AM  14   A.   SO THE IDEA HERE IS THAT THE FINGERSTICK CAN BE DONE BY A

10:01AM  15   PHARMACY TECHNICIAN THAT IS TRAINED TO DO A FINGERSTICK.

10:01AM  16        A VENOUS DRAW REQUIRES A PHLEBOTOMIST, A LICENSED

10:01AM  17   PHLEBOTOMIST THAT IS TRAINED.

10:01AM  18        AND SO WHEN WE DID RECEIVE A CERTAIN PERCENTAGE, LIKE

10:02AM  19   BELOW 5 PERCENT, WE WOULD THEN BE ABLE TO MOVE THE PHLEBOTOMIST

10:02AM  20   TO ONLY 24-HOUR LOCATIONS WHERE THE VENOUS DRAW WAS REQUIRED

10:02AM  21   STILL FOR CERTAIN TESTS.  AND SO THAT WAS THE IDEA.

10:02AM  22        AGAIN, TO PUT PHLEBOTOMISTS IN EVERY STORE WAS FINANCIALLY

10:02AM  23   NOT ACHIEVABLE OR NOT SUSTAINABLE; AND THEN, SECONDLY, AT THE

10:02AM  24   SAME TIME WE WERE NOT ACHIEVING THE EXPERIENCE THAT WE WANTED

10:02AM  25   TO ACHIEVE.

JHAVERI DIRECT BY MR. SCHENK                                    3592

10:02AM  1        SO THE IDEA HERE WAS TO GET THE PERCENTAGE DOWN TO A BELOW

10:02AM  2   5 PERCENT, AND SO 95 PERCENT OF THE PATIENTS WOULD GET A

10:02AM  3   FINGERSTICK, AND THOSE 5 PERCENT THAT STILL REQUIRED A VENOUS

10:02AM  4   DRAW, WE WOULD THEN DIRECT THOSE PATIENTS TO A 24-HOUR LOCATION

10:02AM  5   WHERE A PHLEBOTOMIST WOULD BE ON STAFF TO CONDUCT THE VENOUS

10:02AM  6   DRAW.

10:02AM  7   Q.   FROM AN ECONOMICS PERSPECTIVE, WHY IS IT BENEFICIAL TO

10:02AM  8   ONLY HAVE PHLEBOTOMISTS IN 24-HOUR LOCATIONS?

10:03AM  9   A.   WELL, NUMBER ONE, PHLEBOTOMISTS ARE TOUGH TO FIND, SO

10:03AM 10   STAFFING IS A CONCERN.

10:03AM 11        SECOND IS ALSO THERE IS AN ADDITIONAL SALARY NOW THAT HAS

10:03AM 12   TO BE PAID FOR.

10:03AM 13        WHAT WE WERE TRYING TO DO WITH THERANOS PARTNERSHIP IS TO

10:03AM 14   TRAIN SOME OF OUR TEAM MEMBERS, OUR PHARMACY TECHNICIANS WHO

10:03AM 15   WERE ALSO CERTIFIED IN PHARMACY, AND WE WERE TRAINING THEM TO

10:03AM 16   BECOME TECHNICIANS THAT THEY CAN DO FINGERSTICKS FOR SO WE

10:03AM 17   DON'T HAVE TO ADD AN ADDITIONAL INDIVIDUAL INSIDE OF A STORE.

10:03AM 18        SO IT KEPT THE COST PROFILE LOW, IT MADE THE EXPERIENCE

10:03AM 19   MORE SEAMLESS, AND IT MADE THE EXPERIENCE MORE EFFICIENT, AND

10:03AM 20   SO THAT'S WHY THIS WAS IMPORTANT FOR US.

10:03AM 21   Q.   DOES THE NEXT DASH BELOW THAT READS, "HOWEVER, THERE ARE

10:03AM 22   FEW TESTS THAT WE (WALGREENS AND THERANOS) MAY AGREE TO OFFER

10:03AM 23   FROM VENIPUNCTURE FOR SPECIALTY PHARMACY."

10:03AM 24        WHAT DOES THAT MEAN?  WHAT IS SPECIALTY PHARMACY?

10:04AM 25   A.   YEAH.  THERANOS WAS WORKING ON SOME MORE COMPLEX TESTS

JHAVERI DIRECT BY MR. SCHENK                          3593

10:04AM  1    THAT WOULD REQUIRE MORE BLOOD FOR THE TESTING, AND SO THIS

10:04AM  2    POINT WAS TO MAKE THAT IN THOSE 24-HOUR LOCATIONS WE WOULD

10:04AM  3    TRANSFER SOME OF THOSE MORE COMPLEX TESTS THAT DID REQUIRE MORE

10:04AM  4    BLOOD TO THOSE STORES.

10:04AM  5         AND SO THAT'S WHAT WE'RE REFERRING TO HERE, THAT THERE

10:04AM  6    MIGHT BE ALWAYS SOME TESTS THAT REQUIRE A FULL BLOOD DRAW.

10:04AM  7    Q.    AND WERE THESE MORE COMPLEX TESTS LESS COMMONLY ORDERED?

10:04AM  8    A.    THEY WERE LESS COMMONLY ORDERED, YES.

10:04AM  9    Q.    SO DID YOU UNDERSTAND THAT THERANOS COULD DO THE MORE

10:04AM 10    COMMONLY ORDERED TESTS BY FINGERSTICK, THAT THERE WOULD BE SOME

10:04AM 11    OF THESE LESS FREQUENTLY OR LESS COMMONLY ORDERED TESTS THAT

10:04AM 12    WOULD CONTINUE TO BE PERFORMED WITH A VEIN DRAW?

10:04AM 13    A.    THAT'S CORRECT.

10:04AM 14    Q.    AND THEN FINALLY IT READS, "WHY HIGHER NUMBER OF VENOUS

10:04AM 15    DRAWS SO FAR."

10:04AM 16         AND THEN IT GIVES A COUPLE OF REASONS.

10:04AM 17         WHO PROVIDED THESE REASONS?

10:04AM 18    A.    MR. BALWANI DID.

10:04AM 19    Q.    THE FIRST REASON IS "LEARNING PROCESS AROUND ORDERING

10:05AM 20    PATTERNS FOR ARIZONA."

10:05AM 21         DO YOU KNOW WHAT THAT MEANS?

10:05AM 22    A.    YES.  SO PART OF THE DISCUSSION THAT MR. BALWANI AND I

10:05AM 23    ALWAYS HAD IS HOW -- WHAT ARE YOU DOING -- "YOU" BEING

10:05AM 24    THERANOS -- TO CONTINUE TO REDUCE THE NUMBER OF VENOUS DRAWS?

10:05AM 25         AND THE REASONS THAT HE PROVIDED TO US WAS, ONE, THAT THEY

JHAVERI DIRECT BY MR. SCHENK                                    3594

10:05AM  1    WERE STILL LEARNING THE PATTERNS, THE ORDERING PATTERNS FROM

10:05AM  2    THE PHYSICIANS IN EACH OF THESE AREAS, AND SO AS THEY LEARN,

10:05AM  3    THEY CAN MAKE SURE THEIR NANOTAINERS AND THEIR TECHNOLOGY IS

10:05AM  4    PREPARED AND READY FOR A FINGERSTICK TYPE OF A DRAW.

10:05AM  5         AND SO THAT'S WHAT THIS IS REFERRING TO.

10:05AM  6    Q.   AND THEN THE NEXT DASH READS, "ORDERING PATTERNS ARE

10:05AM  7    DIFFERENT THAN ANTICIPATED AND THERANOS IS ADDING NEW

10:05AM  8    CARTRIDGES RAPIDLY TO ADDRESS THESE PATTERNS."

10:05AM  9         WHAT DOES THAT MEAN?

10:05AM 10    A.   THAT'S EXACTLY A LITTLE BIT MORE EXPANSION OF MY POINT

10:05AM 11    EARLIER IS AS THERANOS UNDERSTOOD WHAT THE PHYSICIANS WERE

10:06AM 12    ORDERING IN THOSE PARTICULAR AREAS, THEY CAN BETTER PREPARE

10:06AM 13    THEIR CARTRIDGES, THEIR NANOTAINERS, AND THEIR TECHNOLOGY TO BE

10:06AM 14    ABLE TO DO THESE TESTS ON A FINGERSTICK.

10:06AM 15    Q.   DID MR. BALWANI EXPLAIN TO YOU THAT ONE OF THE REASONS WHY

10:06AM 16    THERE WERE HIGH VENOUS DRAW NUMBERS WAS BECAUSE OF

10:06AM 17    TECHNOLOGICAL PROBLEMS WITH THE THERANOS TECHNOLOGY?

10:06AM 18    A.   NO.  HE ALWAYS EXPLAINED IT AS THEY WERE LEARNING FROM

10:06AM 19    WHAT WAS BEING ORDERED, AND AS THEY LEARNED, THEY WOULD MAKE

10:06AM 20    SURE THAT THEIR TECHNOLOGY WAS READY TO GO FOR -- WITH THE

10:06AM 21    CARTRIDGES TO BE ABLE TO DO A FINGERSTICK.

10:06AM 22    Q.   AND WHEN THERANOS DID A FINGERSTICK DRAW, WHERE DID YOU OR

10:06AM 23    WALGREENS THINK THAT THAT BLOOD WAS BEING TESTED, ON A THERANOS

10:06AM 24    DEVICE OR ON A DIFFERENT DEVICE?

10:06AM 25    A.   ON A THERANOS DEVICE.

JHAVERI DIRECT BY MR. SCHENK                                    3595

| | | |
|---|---|---|
| 10:06AM | 1 | Q.   DID YOU KNOW WHETHER THERANOS WAS MODIFYING THIRD PARTY |
| 10:06AM | 2 | DEVICES, CHANGING DEVICES THAT HAD BEEN MANUFACTURED BY SOMEONE |
| 10:06AM | 3 | OTHER THAN THERANOS TO TEST FINGERSTICK DRAWS? |
| 10:07AM | 4 | A.   NO. |
| 10:07AM | 5 | Q.   WOULD YOU NOW TURN TO THE 12TH PAGE.  AND THE SLIDE IS |
| 10:07AM | 6 | CALLED MARKETING RESEARCH OVERVIEW, AND IT'S THE LAST ONE ON |
| 10:07AM | 7 | THE RIGHT THAT I'D LIKE TO BLOW UP. |
| 10:07AM | 8 | AND UNDER THE WORD "MARKETING," DO YOU SEE THAT? |
| 10:07AM | 9 | A.   YES, SIR. |
| 10:07AM | 10 | Q.   IT LOOKS LIKE THERE'S SOME DISCUSSION OF EXTERNAL |
| 10:07AM | 11 | ADVERTISING TO GENERATE AWARENESS OF SERVICE AND PERCEPTION OF |
| 10:07AM | 12 | WALGREENS AS A HEALTH CARE INNOVATOR. |
| 10:07AM | 13 | WHAT DOES THAT MEAN? |
| 10:07AM | 14 | A.   THE ENTIRE SENTENCE OR -- |
| 10:07AM | 15 | Q.   FAIR QUESTION. |
| 10:07AM | 16 | WHAT WAS THE USE OF ADVERTISING -- FOR WHAT PURPOSE WAS |
| 10:07AM | 17 | ADVERTISING BEING DISCUSSED IN THESE MEETINGS? |
| 10:07AM | 18 | A.   YEAH.  SO THIS WAS A BRAND NEW SERVICE FOR WALGREENS, AND |
| 10:07AM | 19 | CERTAINLY THERANOS WAS A BRAND NEW COMPANY THAT WAS DEVELOPING |
| 10:08AM | 20 | THIS NEW SERVICE, AND WE WANTED TO MAKE SURE THAT PEOPLE KNEW |
| 10:08AM | 21 | THAT THE SERVICE WAS AVAILABLE. |
| 10:08AM | 22 | SO WHETHER IT WAS SIGNAGE ON A STORE OR SIGNAGE BY THE |
| 10:08AM | 23 | PHARMACY, OR BILLBOARDS, WHATEVER IT TAKES TO LET FOLKS KNOW |
| 10:08AM | 24 | THAT THIS NEW SERVICE IS AVAILABLE. |
| 10:08AM | 25 | AND THAT'S WHAT WE WERE TALKING ABOUT HERE IS, HOW DO WE |

JHAVERI DIRECT BY MR. SCHENK                                    3596

10:08AM  1    LET THE PUBLIC KNOW THAT THESE PARTICULAR STORES HAD THESE NEW

10:08AM  2    SERVICE THAT THEY CAN NOW LET THEIR PHYSICIANS KNOW ABOUT?

10:08AM  3         WALGREENS, AS A HEALTH CARE INNOVATOR, CERTAINLY WE WERE

10:08AM  4    TRYING TO EXPAND THE SERVICES BEYOND SIMPLY YOUR FRONT OF STORE

10:08AM  5    ITEMS, SHAMPOO, THINGS OF THAT NATURE, AND YOUR TRADITIONAL

10:08AM  6    PHARMACY.

10:08AM  7         SO WHAT THIS IS REFERRING TO IS THAT IT ALSO CONTINUES TO

10:08AM  8    PUSH FORWARD WALGREENS'S REPUTATION AS BEING AN INNOVATOR IN

10:08AM  9    THE HEALTH CARE SPACE.

10:08AM  10   Q.   SO DID THERANOS AND WALGREENS DISCUSS USING ADVERTISING TO

10:09AM  11   ENCOURAGE PATIENTS TO USE THE THERANOS BLOOD TESTING SERVICE?

10:09AM  12   A.   YES.  AND I WANT TO BE VERY CLEAR.  PATIENTS CAN'T WALK IN

10:09AM  13   AND GET THEIR LAB WORK DONE.

10:09AM  14        JUST LIKE TODAY, YOU CAN'T SIMPLY WALK INTO THE LAB AND

10:09AM  15   ASK FOR LABS, YOUR COMPLETE BLOOD PANEL OR THINGS OF THAT

10:09AM  16   NATURE TO BE DONE.

10:09AM  17        SO THE IDEA WAS THAT FOR PATIENTS TO KNOW ABOUT THIS

10:09AM  18   SERVICE AND THEN TO GO TO THEIR PROVIDER AND SAY, HEY, I NEED

10:09AM  19   LABS DONE, CAN I USE THAT NEW SERVICE?  THAT REQUIRES LESS

10:09AM  20   BLOOD AND IT'S LESS PAINFUL AND IT'S CONVENIENT AND IT'S AT MY

10:09AM  21   WALGREENS STORE.

10:09AM  22        THAT WAS THE IDEA HERE.

10:09AM  23        SO WE WERE TRYING TO LET THE PUBLIC KNOW THAT THIS NEW

10:09AM  24   INNOVATIVE SERVICE IS NOW AVAILABLE.

10:09AM  25   Q.   THROUGH ADVERTISING?

JHAVERI DIRECT BY MR. SCHENK                                         3597

10:09AM    1      A.    THROUGH ADVERTISING, YES.

10:09AM    2      Q.    AND YOU DESCRIBED THE INABILITY OF A PATIENT TO COME IN

10:09AM    3    AND GET THEIR OWN BLOOD TEST ORDERS.

10:09AM    4          DID THAT CHANGE AT SOME POINT IN ARIZONA, DO YOU KNOW?

10:09AM    5      A.    YEAH.  WHAT I REMEMBER IS AT SOME POINT ARIZONA DID ALLOW

10:10AM    6    PATIENTS TO DO SELF-DIRECTED LABS, AND THAT DID CHANGE AT A

10:10AM    7    CERTAIN POINT THEN, AND WE WERE MEASURING THAT AS WELL.

10:10AM    8      Q.    WOULD YOU TURN TO THE NEXT PAGE.  IT'S PAGE 13.  THIS

10:10AM    9    SLIDE INCLUDES MARKETING CONCEPTS.

10:10AM   10          DO YOU SEE THAT?

10:10AM   11      A.    YES, SIR.

10:10AM   12      Q.    WERE THESE PROPOSED OR DISCUSSED WAYS TO ADVERTISE THE

10:10AM   13    THERANOS BLOOD TESTING SERVICE?

10:10AM   14      A.    YES.

10:10AM   15      Q.    AND SO ONE OF THEM READS "THE SMALLER BLOOD TEST IS HERE."

10:10AM   16          DO YOU SEE THAT ONE?

10:10AM   17      A.    I DO.

10:10AM   18      Q.    AND THE ONE BELOW THAT READS, "THE SMALLER, SMARTER BLOOD

10:10AM   19    TEST."

10:10AM   20          DO YOU SEE THAT ONE?

10:10AM   21      A.    I DO.

10:10AM   22      Q.    AND IN EACH OF THOSE SLIDES THERE'S SOME IMAGES.  WHAT IS

10:10AM   23    THE IMAGE ON THE RIGHT OF EACH OF THOSE SLIDES?  DO YOU

10:10AM   24    RECOGNIZE IT?

10:10AM   25      A.    I DO.  THAT WAS THE IMAGE OF THE NANOTAINER THAT THEY WERE

JHAVERI DIRECT BY MR. SCHENK                                        3598

10:10AM  1    USING, AND THE BLOOD THAT IS INSIDE OF IT, THE PICTURE OF THE

10:11AM  2    BLOOD IS TO INDICATE THE SMALL AMOUNT OF BLOOD THAT IS REQUIRED

10:11AM  3    FOR THIS TEST.

10:11AM  4    Q.   AND SO WHEN THE BLOOD TESTING SERVICE WAS ADVERTISED TO

10:11AM  5    THE PUBLIC, DID YOU, IN THE ADS, HIGHLIGHT THE FINGERSTICK

10:11AM  6    NATURE OR THE SMALL BLEW DRAW NATURE OF THE TEST?

10:11AM  7    A.   WE DID.  WE DID.

10:11AM  8    Q.   AND WHY DID YOU HIGHLIGHT THAT PART OF THE SERVICE IN

10:11AM  9    PARTICULAR?

10:11AM  10   A.   AGAIN, AS I MENTIONED EARLIER, THE INNOVATION HERE WAS

10:11AM  11   THAT YOU CAN GET YOUR LABS DONE IN A FEW DROPS OF BLOOD WITH A

10:11AM  12   FINGERSTICK.  THAT WAS THE INNOVATION.

10:11AM  13       AND SO THAT'S WHAT WE WANTED TO TELL PATIENTS AND

10:11AM  14   CUSTOMERS ABOUT.

10:11AM  15       IF IT WAS SIMPLY ANOTHER, YOU KNOW, THREE TEST TUBES OF

10:11AM  16   BLOOD AT YOUR LOCAL LAB, WELL, THERE WASN'T ANYTHING INNOVATIVE

10:11AM  17   THERE.

10:11AM  18       WE WERE TRYING TO TELL, QUITE HONESTLY, ALL OF THE FOLKS

10:11AM  19   AROUND THE STORES THAT THIS NEW INNOVATION NOW EXISTS, AND IT

10:11AM  20   CAN BE AVAILABLE AT YOUR WALGREENS STORE.

10:11AM  21   Q.   THANK YOU.

10:12AM  22       WOULD YOU TURN NOW TO PAGE 15.

10:12AM  23       THIS SLIDE IS CALLED DIAGNOSTIC TESTING TIMELINE.

10:12AM  24       DO YOU SEE THAT?

10:12AM  25   A.   YES, SIR.

JHAVERI DIRECT BY MR. SCHENK                                    3599

10:12AM  1      Q.   AND THERE ARE A COUPLE OF STARS ON THERE, AND THEN ON THE

10:12AM  2      RIGHT THERE'S A LEGEND OR A KEY.

10:12AM  3           DO YOU SEE THAT?

10:12AM  4      A.   YES, I DO.

10:12AM  5      Q.   AND IT LOOKS LIKE -- MY COPY IS A LITTLE BLURRY, BUT IT

10:12AM  6      LOOKS LIKE IT SAYS DECISION TO SCALE BASED ON OPERATING MODEL.

10:12AM  7      A.   CORRECT.

10:12AM  8      Q.   AND WHAT DOES THAT MEAN?

10:12AM  9      A.   WELL, AS I MENTIONED EARLIER, THE OPERATING MODEL IS

10:12AM 10      EVERYTHING THAT IT TAKES TO LAUNCH A STORE AND TO CONTINUE TO

10:12AM 11      LAUNCH MORE STORES.

10:12AM 12           AND PART OF WHAT WE WERE DOING HERE, AND WHAT YOU SAW FROM

10:12AM 13      3 STORES TO 11 STORES, IS TO CONTINUE TO EXPAND OUR PILOT.

10:12AM 14           IT'S NOT EASY TO WAKE UP ONE DAY AND SAY WE'RE GOING TO

10:13AM 15      OPEN, YOU KNOW, HUNDREDS OF STORES.  AS I MENTIONED EARLIER, IT

10:13AM 16      REQUIRES TRAINING OF OUR STAFF, IT REQUIRES CONSTRUCTION, IT

10:13AM 17      REQUIRES PLANNING OF HOW WE DO CONSTRUCTION, WHAT THE

10:13AM 18      EXPERIENCE WILL LOOK LIKE, WHAT THE CUSTOMER SERVICE WILL LOOK

10:13AM 19      LIKE, HOW DO WE KEEP THE DUST OFF OF PRODUCTS AND PEOPLE, WHAT

10:13AM 20      DOES THE MARKETING AND THE I.T. LOOK LIKE?

10:13AM 21           AND SO WE HAVE TO PLAN FOR THAT, AND SOMETIMES IT TAKES

10:13AM 22      MONTHS AND, IN SOME CASE DEPENDING ON ZONING LAWS, YEARS.

10:13AM 23           SO AS WE PLAN FOR ANY PROJECT, LET ALONE THE THERANOS

10:13AM 24      PARTNERSHIP, WE DO A PROOF OF CONCEPT AND THEN A PILOT AND WE

10:13AM 25      EXTEND THAT PILOT.  AND AS WE LEARN MORE, WE CONTINUE TO

JHAVERI DIRECT BY MR. SCHENK                                    3600

10:13AM   1    EXPAND.  AND IF WE'RE HITTING THE TARGETS FOR ANY PROJECT, THEN

10:13AM   2    WE CONTINUE TO EXPAND.

10:13AM   3        SO WHAT THIS IS SHOWING IS WHEN IT WOULD BE TIME FOR US TO

10:13AM   4    MAKE THE DECISION FOR THE NEXT SET OF STORES AND WHAT WOULD

10:13AM   5    DETERMINE THAT, AND SO THAT'S WHAT THIS TIMELINE SHOWS.

10:13AM   6    Q.   AND WHEN THIS SLIDE WAS BEING DISCUSSED, DID YOU EXPLAIN

10:14AM   7    TO MR. BALWANI THAT FURTHER EXPANSION, MORE WALGREENS STORES

10:14AM   8    WITH THERANOS'S SERVICES WAS DEPENDENT UPON SUCCESS IN THE

10:14AM   9    PILOT?

10:14AM   10   A.   ABSOLUTELY.  MR. BALWANI AND I SPOKE ABOUT ALL OF THIS ON

10:14AM   11   A REGULAR BASIS ON WHAT CONSTITUTES SUCCESS, HOW TO EXPAND

10:14AM   12   FURTHER, WHAT WILL BE REQUIRED, WHAT DOES THE DESIGN LOOK LIKE

10:14AM   13   OF THE STORE TO, YOU KNOW, HOW FAST CAN WE GO?

10:14AM   14       SO, YES, MR. BALWANI WAS FULLY AWARE OF ALL OF THIS.

10:14AM   15   Q.   AND DID YOU EVER TELL MR. BALWANI THAT FURTHER EXPANSION

10:14AM   16   OR NATIONWIDE EXPANSION WITH WALGREENS WAS GUARANTEED?

10:14AM   17   A.   NO.

10:14AM   18   Q.   WOULD YOU TURN TO PAGE 17.  THIS SLIDE IS ENTITLED THE

10:14AM   19   PATH FORWARD.

10:14AM   20       AND THE FIRST BULLET READS, "OPERATIONS IMPROVEMENT."

10:15AM   21       WHAT IS THE FIRST BULLET UNDER THAT?

10:15AM   22   A.   "FOCUS ON VENOUS DRAWS REDUCTION."

10:15AM   23   Q.   WHAT DOES THAT MEAN?

10:15AM   24   A.   IT'S REDUCING THE PERCENTAGE OF DRAWS THAT ARE FROM THE

10:15AM   25   VENOUS VERSUS FINGERSTICK.

JHAVERI DIRECT BY MR. SCHENK                                    3601

| | | |
|---|---|---|
| 10:15AM | 1 | Q.   AND WAS THAT VERY IMPORTANT TO WALGREENS? |
| 10:15AM | 2 | A.   IT WAS. |
| 10:15AM | 3 | Q.   IF YOU'LL NOW GO DOWN TWO BULLETS WHICH BEING "ACHIEVE," |
| 10:15AM | 4 | "ACHIEVE 15 PATIENTS PER DAY PER STORE." |
| 10:15AM | 5 | WHAT DOES THAT MEAN? |
| 10:15AM | 6 | A.   AS I MENTIONED EARLIER, WE WERE MEASURING THE NUMBER OF |
| 10:15AM | 7 | PATIENTS THAT COME TO THE THERANOS WELLNESS SERVICES PER STORE |
| 10:15AM | 8 | PER DAY. |
| 10:15AM | 9 | AND WE WERE, IF YOU REMEMBER, AT 3.1 IN MAY.  WHAT WE WERE |
| 10:15AM | 10 | TRYING TO HIT IS THE 15 PATIENTS PER DAY AS OUR GOAL. |
| 10:15AM | 11 | Q.   THANK YOU. |
| 10:15AM | 12 | WOULD YOU NOW TURN TO EXHIBIT 1755. |
| 10:15AM | 13 | DO YOU RECOGNIZE THIS DOCUMENT? |
| 10:15AM | 14 | A.   I DO. |
| 10:16AM | 15 | Q.   IS THIS ANOTHER EMAIL FROM MS. HAWORTH TO INDIVIDUALS AT |
| 10:16AM | 16 | THERANOS AND WALGREENS, INCLUDING MR. BALWANI AND YOURSELF, AND |
| 10:16AM | 17 | ATTACHING SOME MEETING MINUTES? |
| 10:16AM | 18 | A.   YES. |
| 10:16AM | 19 | MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 1755. |
| 10:16AM | 20 | MR. DOWNEY:  NO OBJECTION, YOUR HONOR. |
| 10:16AM | 21 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 10:16AM | 22 | (GOVERNMENT'S EXHIBIT 1755 WAS RECEIVED IN EVIDENCE.) |
| 10:16AM | 23 | MR. SCHENK:  THANK YOU. |
| 10:16AM | 24 | Q.   THIS EMAIL WAS SENT IN JUNE OF 2014, AND IT LOOKS LIKE THE |
| 10:16AM | 25 | SUBJECT SUGGESTS THAT IT'S MEETING MINUTES FROM A MEETING THAT |

JHAVERI DIRECT BY MR. SCHENK                                    3602

10:16AM  1    HAPPENED AT THE END OF MAY OF THE SAME YEAR, OF 2014; IS THAT

10:16AM  2    RIGHT?

10:16AM  3    A.   THAT'S CORRECT.

10:16AM  4    Q.   AND SO WERE THESE PARTNERSHIP MEETINGS WHERE YOU AND

10:16AM  5    MR. BALWANI AND OTHERS ATTENDED, WERE THEY ROUGHLY MONTHLY?

10:16AM  6    A.   YEAH, APPROXIMATELY MONTHLY.

10:16AM  7    Q.   AND WERE THERE SOMETIMES POWERPOINT SLIDES PRESENTED LIKE

10:16AM  8    THE ONES WE JUST TALKED ABOUT?

10:16AM  9    A.   YES, THERE WOULD BE.

10:16AM 10    Q.   AND ON OTHER OCCASIONS WERE THERE MEETING MINUTES FROM THE

10:16AM 11    MEETING?

10:16AM 12    A.   YES, THERE WERE.

10:16AM 13    Q.   AND IF YOU WOULD TURN TO PAGE 6.  THIS LOOKS LIKE THE

10:17AM 14    FIRST PAGE OF THE MEETING MINUTES, AND I WANT TO ASK YOU ABOUT,

10:17AM 15    WITHIN THE CONTENT OF MEETING MINUTES, THE SECOND PARAGRAPH,

10:17AM 16    THE ONE THAT BEGINS WITH YOUR NAME.

10:17AM 17         DO YOU SEE THAT?

10:17AM 18    A.   I DO.

10:17AM 19    Q.   AND IT READS, "NIMESH REMINDED US OF HOW FAR WE HAVE COME

10:17AM 20    SINCE JANUARY.  WE ARE AT 21 STORES NOW."

10:17AM 21         AGAIN, THIS IS THE END OF MAY; IS THAT RIGHT?

10:17AM 22    A.   THAT'S CORRECT.

10:17AM 23    Q.   2014.

10:17AM 24         "A PILOT SHOULD NOT BE PERFECT.  IT SHOULD BE SO THAT WE

10:17AM 25    CAN LEARN EVERYTHING WE NEED TO SCALE.  THE LEARNINGS THAT ARE

JHAVERI DIRECT BY MR. SCHENK                              3603

10:17AM  1    COMING OUT OF THE FIRST 21 STORES ARE PRETTY GOOD.  WE MAY NOT

10:17AM  2    LIKE THEM, BUT WE ARE LEARNING."

10:17AM  3        WHAT DID YOU MEAN BY THAT, "WE MAY NOT LIKE THEM," THE

10:17AM  4    LEARNINGS, "BUT WE ARE LEARNING"?  WHAT DOES THAT MEAN?

10:17AM  5    A.  WE WERE IN THE THROES OF NOW EXPANDING, SO MORE PATIENTS

10:17AM  6    COME THROUGH THE STORES, AND WE UNDERSTAND EXACTLY WHAT IS

10:18AM  7    GOING ON, EVERYTHING FROM PATIENT WAIT TIME TO WHAT PERCENTAGE

10:18AM  8    OF VENOUS DRAWS, AND SOME THINGS WERE MOVING IN THE RIGHT

10:18AM  9    DIRECTION, AND SOME THINGS WERE NOT.

10:18AM  10       SO MY POINT HERE WAS THAT WE ARE STILL LEARNING.  WE ARE

10:18AM  11   CONTINUING TO LEARN.  YOU KNOW, IT'S DIFFICULT.  WE MAY NOT

10:18AM  12   LIKE ALL OF THE RESULTS.

10:18AM  13       BUT THAT'S WHAT PILOTS ARE FOR.  IT'S TO LEARN SO WE CAN

10:18AM  14   PERFECT THOSE THINGS THAT ARE NOT PERFECTED OR IMPROVE THAT ARE

10:18AM  15   NOT IMPROVED BEFORE WE SCALE.

10:18AM  16       SO THIS WAS MY MESSAGE TO BOTH THE THERANOS TEAM AS WELL

10:18AM  17   AS THE WALGREENS TEAM.

10:18AM  18   Q.  EVEN NEWS THAT YOU DIDN'T, YOU DIDN'T LIKE TO HEAR WAS

10:18AM  19   HELPFUL AT THIS POINT?  IS THAT WHAT YOU MEAN?  WE CAN BUILD

10:18AM  20   UPON AND GAIN FROM THAT KNOWLEDGE?

10:18AM  21   A.  ABSOLUTELY.  FOR EVERY TYPE OF PROJECT, YOU NEED TO HAVE A

10:18AM  22   BALANCED VIEW.  YOU JUST CAN'T HAVE ROSE COLORED GLASSES.  SO

10:18AM  23   THAT'S WHAT I'M TRYING TO SAY HERE.

10:18AM  24   Q.  DID YOU WANT TO SEE THIS PROJECT BE SUCCESSFUL?  DID YOU

10:18AM  25   WANT TO SEE THERANOS EXPAND IN WALGREENS STORES?

JHAVERI DIRECT BY MR. SCHENK                               3604

10:19AM   1    A.   ABSOLUTELY.

10:19AM   2    Q.   DID YOU AT THIS TIME STILL THINK THAT THERANOS WAS TESTING

10:19AM   3    THE FINGERSTICK BLOOD DRAWS ON THE THERANOS DEVICE?

10:19AM   4    A.   YES.

10:19AM   5    Q.   DID YOU HEAR OF THE DEVICE CALLED AN EDISON?  DOES THAT

10:19AM   6    TERM SOUND FAMILIAR TO YOU?

10:19AM   7    A.   I HAVE HEARD OF THAT.

10:19AM   8    Q.   AND SO DID YOU THINK THAT THE BLOOD TESTING WAS DONE ON AN

10:19AM   9    EDISON DEVICE?

10:19AM  10    A.   WHAT I KNEW WAS THAT WHETHER IT WAS EDISON OR ANOTHER

10:19AM  11    THERANOS DEVICE, IT WAS DONE ON A THERANOS DEVICE.

10:19AM  12    Q.   AND AT THIS TIME WHEN THE LEARNINGS AREN'T ALWAYS GOOD BUT

10:19AM  13    WE BENEFIT FROM THEM, DID YOU KNOW WHETHER THERANOS WAS TESTING

10:19AM  14    PATIENT'S BLOOD ON MODIFIED THIRD PARTY DEVICES?

10:19AM  15    A.   NO.

10:19AM  16    Q.   HOW ABOUT THE VENOUS DRAW PERCENT?  WERE YOU SATISFIED

10:19AM  17    WITH WHERE THAT NUMBER WAS AT THIS POINT?

10:19AM  18    A.   NO.  NO ONE WAS SATISFIED WITH THE HIGH PERCENTAGE.

10:19AM  19    Q.   WHEN YOU SAID NO ONE, DO YOU MEAN ALSO MR. BALWANI?

10:19AM  20    A.   ABSOLUTELY.

10:19AM  21    Q.   AND WHY DO YOU SAY THAT?

10:19AM  22    A.   BECAUSE, YOU KNOW, WE SPOKE ON A REGULAR BASIS ON WHAT

10:20AM  23    WILL CONSTITUTE SUCCESS, AND AS YOU SAW IN OUR PREVIOUS SLIDE,

10:20AM  24    HE WANTED TO REDUCE THEM AS WELL BECAUSE, AGAIN, THAT WAS THE

10:20AM  25    EXPERIENCE, THAT WAS THE INNOVATION, AND WE BOTH, AND OUR

JHAVERI DIRECT BY MR. SCHENK                                    3605

10:20AM   1    TEAMS, WANTED THOSE PERCENTAGES TO GO DOWN.

10:20AM   2    Q.   NOW, IF YOU'LL TURN, PLEASE, TO 1884.

10:20AM   3         IS THIS ANOTHER EMAIL FROM MS. HAWORTH TO A GROUP AT

10:20AM   4    WALGREENS AND THERANOS, INCLUDING MR. BALWANI AND YOU, NOW IN

10:20AM   5    AUGUST OF 2014?

10:20AM   6    A.   YES.

10:20AM   7    Q.   AND DOES IT ALSO INCLUDE SOME MEETING MINUTES?

10:20AM   8    A.   IT DOES.

10:20AM   9    Q.   AND A SLIDE DECK AS WELL?

10:21AM   10   A.   YES, IT DOES.

10:21AM   11        MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 1884.

10:21AM   12        MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

10:21AM   13        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:21AM   14   (GOVERNMENT'S EXHIBIT 1884 WAS RECEIVED IN EVIDENCE.)

10:21AM   15        MR. SCHENK:  THANK YOU.

10:21AM   16   Q.   LET'S START AGAIN AT THE TOP.  IS THIS WHAT WE HAVE SEEN A

10:21AM   17   COUPLE TIMES ALREADY, MS. HAWORTH SENDING A SLIDE DECK AROUND

10:21AM   18   THE TIME OF ONE OF THESE PARTNERSHIP MEETINGS?

10:21AM   19   A.   YES.

10:21AM   20   Q.   AND IS THIS ONE FOR AN AUGUST 2014 MEETING?

10:21AM   21   A.   YES.

10:21AM   22   Q.   IF YOU'LL TURN TO PAGE 5.  WITHIN THE MEETING MINUTES

10:21AM   23   THERE'S A SECTION LABELLED CURRENT STATUS.

10:21AM   24        DO YOU SEE THAT?

10:21AM   25   A.   I DO.

JHAVERI DIRECT BY MR. SCHENK                                    3606

10:21AM  1   Q.  AND THE FIRST ITEM IS 30 STORES CURRENTLY LIVE, (ARIZONA

10:21AM  2   29; CALIFORNIA 1.)

10:22AM  3       IS THAT RIGHT?

10:22AM  4   A.  YES.

10:22AM  5   Q.  AND SO WE'RE SEEING THE NUMBER OF STORES INCREASE.  IS

10:22AM  6   THAT STILL DURING THE PILOT PHASE?

10:22AM  7   A.  IT IS.

10:22AM  8   Q.  AND WERE YOU STILL PAYING ATTENTION TO THE METRICS WE

10:22AM  9   TALKED ABOUT TOWARDS THE BEGINNING OF YOUR TESTIMONY TO SEE

10:22AM 10   WHERE THE PILOT IS GOING?

10:22AM 11   A.  YES.

10:22AM 12   Q.  WOULD YOU TURN NOW TO PAGE 8.

10:22AM 13       AT THE BOTTOM THERE'S A SECTION CALLED PLAN FOR FISCAL

10:22AM 14   YEAR 2015.

10:22AM 15       THE FIRST BULLET IS, "NEXT MARKET IS NORTHERN CALIFORNIA

10:22AM 16   (5 STORES INITIALLY, THEN EXPAND FOR A TOTAL OF 40)."

10:22AM 17       AND THE SECOND BULLET IS, "EXPANSION BEYOND THE 5 STORES

10:22AM 18   WILL REQUIRE THERANOS DATA TO OBTAIN STORE SELECTION."

10:22AM 19       WHAT IS THAT REFERRING TO?

10:22AM 20   A.  WHAT WE WERE DOING WAS STARTING TO PLAN FOR POTENTIALLY

10:22AM 21   MORE MARKETS.  AS WE CONTINUED TO EXPAND THIS PILOT AND LEARN

10:23AM 22   MORE, WE WERE STARTING TO PLAN TO SAY, OKAY, WHERE DO WE GO

10:23AM 23   NEXT?

10:23AM 24       AND IN THIS PARTICULAR CASE WE WERE DISCUSSING NORTHERN

10:23AM 25   CALIFORNIA.  AND WHERE WE PUT THESE LOCATIONS WAS VERY, VERY

JHAVERI DIRECT BY MR. SCHENK                                    3607

10:23AM  1    IMPORTANT.  YOU KNOW, IT HAD TO BE NEAR SPECIFIC AREAS WHERE

10:23AM  2    THERE WAS A NEED FOR THIS SERVICE, WHERE THERE WERE PHYSICIANS

10:23AM  3    AND PROVIDERS THAT NEEDED THIS SERVICE.

10:23AM  4         AND SO THEY WOULD PROVIDE US WITH DATA THAT WOULD GIVE US

10:23AM  5    INPUT, INSIGHT INTO WHERE WE WOULD PUT THESE LOCATIONS, AND SO

10:23AM  6    THAT'S WHAT WE WERE ASKING FOR.

10:23AM  7    Q.   OKAY.  WAS THE THERANOS SERVICE EVER EXPANDED IN NORTHERN

10:23AM  8    CALIFORNIA?

10:23AM  9    A.   NOT BEYOND THE ONE STORE.

10:23AM  10   Q.   WOULD YOU HAD NOW TURN TO THE NEXT PAGE, PAGE 9.  UNDER

10:23AM  11   THE SECOND BULLET, THE SECOND SHADED BULLET, "INITIAL GOAL FOR

10:23AM  12   FISCAL YEAR 15."

10:24AM  13        IT CONTINUES SEPTEMBER THROUGH AUGUST.  WAS THAT THE

10:24AM  14   WALGREENS FISCAL YEAR, SEPTEMBER TO AUGUST?

10:24AM  15   A.   YES.

10:24AM  16   Q.   "WAS 500 STORES.  NEED TO REDEFINE THIS GOAL."

10:24AM  17        AND IN THE CHART UNDER THERANOS, 2015 IS DOWN TO 200.

10:24AM  18        DO YOU SEE THAT?

10:24AM  19   A.   I DO.

10:24AM  20   Q.   AND SO WHAT IS HAPPENING HERE?  CAN YOU EXPLAIN THAT TO

10:24AM  21   ME?

10:24AM  22   A.   YES.  SO, AGAIN, AS I MENTIONED EARLIER, SOME OF THE

10:24AM  23   RESULTS OF THE PILOT WERE GOOD, SOME OF THE RESULTS WERE NOT

10:24AM  24   GOOD.

10:24AM  25        FOR ALL OF THOSE REASONS, WE RESET THE NUMBER OF STORES

JHAVERI DIRECT BY MR. SCHENK                                    3608

10:24AM   1    THAT WE WANTED TO LAUNCH FROM 500 TO 200.  IT MADE MORE SENSE.

10:24AM   2    IT WAS MORE MANAGEABLE.  AND WE COULD CONTINUE TO DO A CRAWL,

10:24AM   3    WALK, RUN APPROACH.

10:24AM   4        WHAT YOU SEE HERE IS WELL EXPERIENCE, IS THE MODEL I SPOKE

10:24AM   5    ABOUT EARLIER, WHICH IS TO REDESIGN THE SPACE AND REDESIGN THE

10:24AM   6    PHARMACY TO BE MORE PATIENT AND CONSUMER CENTRIC.

10:25AM   7        SO WE WERE PLANNING FOR THOSE 2000 STORES, AND WHAT WE

10:25AM   8    WANTED TO DO WAS TO UNDERSTAND HOW MANY OF THOSE STORES WOULD

10:25AM   9    BECOME THERANOS WELLNESS CENTERS BECAUSE, AGAIN, WE WANTED TO

10:25AM  10    GO INTO A STORE AND CONSTRUCT ONCE, DISRUPT THE STORE ONCE,

10:25AM  11    DISRUPT CUSTOMERS AND PATIENTS ONCE.  SO THAT'S WHY WE ARE

10:25AM  12    PLANNING BOTH OF THEM AT THE SAME TIME.

10:25AM  13    Q.   I SEE.  WAS EVEN THIS 200 STORE NUMBER, WAS THAT EVER

10:25AM  14    GUARANTEED?

10:25AM  15    A.   NO.  AS YOU SAW WITH THE 500, IT WASN'T GUARANTEED.  WE

10:25AM  16    REDUCED THAT TO 200.

10:25AM  17    Q.   SO WHY IN 2014 ARE YOU TALKING ABOUT THE NUMBER OF 200

10:25AM  18    STORES?

10:25AM  19    A.   AGAIN, IT WAS ALL ABOUT PLANNING.  IF THE PILOT WAS GOING

10:25AM  20    WELL AND WE WANTED TO THEN QUICKLY EXPAND, YOU CAN'T JUST

10:25AM  21    QUICKLY EXPAND.  YOU HAVE TO PLAN FOR IT.

10:25AM  22        SO WHETHER IT WAS 5 STORES, 10 STORES, 200 STORES, OR 500

10:25AM  23    STORES, YOU STILL HAVE TO DO THE PLANNING BEHIND IT, AND THAT'S

10:26AM  24    WHAT WE WERE TRYING TO DO.

10:26AM  25        AND THAT PLANNING INCLUDED NOT ONLY THE WALGREENS, BUT THE

JHAVERI DIRECT BY MR. SCHENK                                    3609

| | | |
|---|---|---|
| 10:26AM | 1 | THERANOS TEAM TO MAKE SURE THAT THEY WERE READY. |
| 10:26AM | 2 | AND SO THAT'S WHAT WE WERE DOING HERE. |
| 10:26AM | 3 | Q.   DID YOU COMMUNICATE THIS IDEA TO MR. BALWANI?  AND BY |
| 10:26AM | 4 | "THIS IDEA," I MEAN THE NUMBER OF STORES NEEDED TO BE REDUCED |
| 10:26AM | 5 | FROM 500 TO 200, AND ALSO THAT THE 200 WASN'T GUARANTEED? |
| 10:26AM | 6 | A.   YEAH, NOT ONLY WAS IT COMMUNICATED, THIS WAS DECIDED |
| 10:26AM | 7 | TOGETHER.  IT WAS A PARTNERSHIP.  SO THESE DECISIONS WERE MADE |
| 10:26AM | 8 | TOGETHER.  IT WAS NOT DONE IN A VACUUM BY WALGREENS OR BY |
| 10:26AM | 9 | THERANOS. |
| 10:26AM | 10 | Q.   WAS THE VENOUS DRAW PERCENT, THE NUMBER OF VENOUS DRAWS |
| 10:26AM | 11 | THAT WERE HAPPENING, WAS THAT PART OF THE REASON TO REDUCE THE |
| 10:26AM | 12 | NUMBER OF STORES? |
| 10:26AM | 13 | A.   ONE OF THE REASONS, YES. |
| 10:26AM | 14 | Q.   OKAY.  WERE THERE OTHERS THAT YOU RECALL? |
| 10:26AM | 15 | A.   THE COST OF THE BUILDOUT WAS EXTREMELY HIGH AT THIS POINT. |
| 10:26AM | 16 | WE HAD NOT PERFECTED THE MODEL OR THE DESIGN.  WE WERE STILL |
| 10:26AM | 17 | CHANGING DESIGNS.  WHERE WE PUT IT INSIDE OF THE STORE ALSO |
| 10:26AM | 18 | ADDED TO THE COST. |
| 10:27AM | 19 | AND SO COST WAS AN OBSTACLE.  TRAINING OF OUR TEAM MEMBERS |
| 10:27AM | 20 | WAS AN OBSTACLE. |
| 10:27AM | 21 | AS I MENTIONED EARLIER, IF WE REQUIRED PHLEBOTOMISTS, |
| 10:27AM | 22 | HIRING OF THOSE PHLEBOTOMISTS WAS AN OBSTACLE. |
| 10:27AM | 23 | SO AGAIN, THE ENTIRE OPERATING MODEL WAS NOT PERFECTED, |
| 10:27AM | 24 | AND SO THAT'S WHY WE DECIDED TO REDUCE THAT NUMBER DOWN. |
| 10:27AM | 25 | Q.   OKAY.  AND I JUST WANTED TO REMIND YOU, THE EMAIL THAT |

JHAVERI DIRECT BY MR. SCHENK                                          3610

10:27AM  1    THIS IS ATTACHED TO, IT'S DATED AUGUST 11, 2014; IS THAT RIGHT?

10:27AM  2    A.   THAT'S RIGHT.

10:27AM  3    Q.   NOW IF YOU'LL TURN TO 1896.

10:27AM  4         IS THIS AN EMAIL FROM YOU TO MR. BALWANI ON AUGUST 15TH,

10:27AM  5    2014?

10:27AM  6    A.   YES.

10:27AM  7    Q.   ABOUT THE THERANOS-WALGREENS PARTNERSHIP?

10:27AM  8    A.   YES.

10:27AM  9         MR. SCHENK:   YOUR HONOR, THE GOVERNMENT OFFERS 1896.

10:27AM 10         MR. DOWNEY:   NO OBJECTION.

10:27AM 11         THE COURT:   IT'S ADMITTED.   IT MAY BE PUBLISHED.

10:27AM 12    (GOVERNMENT'S EXHIBIT 1896 WAS RECEIVED IN EVIDENCE.)

10:27AM 13    BY MR. SCHENK:

10:27AM 14    Q.   SO ABOUT FOUR DAYS AFTER THE DOCUMENT THAT WE WERE JUST

10:28AM 15    LOOKING AT, YOU SENT MR. BALWANI THIS EMAIL; IS THAT RIGHT?

10:28AM 16    A.   YES, SIR.

10:28AM 17    Q.   AND ALSO SOMEONE NAMED CASEY KOZLOWSKI.

10:28AM 18         DO YOU SEE THAT?

10:28AM 19    A.   I DO.

10:28AM 20    Q.   AND WHO WAS THIS INDIVIDUAL?

10:28AM 21    A.   CASEY KOZLOWSKI WAS THE DIRECTOR OF DIAGNOSTIC SERVICES

10:28AM 22    WHO REPORTED TO ME AND WAS DAY-TO-DAY ON THIS PARTICULAR

10:28AM 23    PROJECT.

10:28AM 24    Q.   OKAY.   IN THE FIRST SENTENCE YOU WRITE, "THERE HAS BEEN A

10:28AM 25    LOT OF DISCUSSION WITH THE NEW LEADERSHIP ON EVERYTHING OUR

JHAVERI DIRECT BY MR. SCHENK                                    3611

10:28AM  1    COMPANY IS DOING TO DRIVE HEALTH CARE AND OUR COMPANY.  AS YOU

10:28AM  2    CAN IMAGINE, OUR PARTNERSHIP IS AT THE CORE."

10:28AM  3         WHAT DID YOU MEAN, "NEW LEADERSHIP"?

10:28AM  4    A.   WE WERE AT THIS POINT -- "WE" AS WALGREENS -- WAS IN THE

10:28AM  5    PROCESS OF MERGING WITH BOOTS ALLIANCE IN THE UK AND IT HAD NOT

10:28AM  6    BEEN COMPLETED YET AT THIS TIME.

10:28AM  7         BUT AS WE WERE MERGING THE LEADERSHIP AND THEY WERE

10:28AM  8    UNDERSTANDING WHAT EACH OF THE COMPANIES WERE DOING, WE WANTED

10:29AM  9    TO MAKE SURE THAT THEY UNDERSTOOD OUR PARTNERSHIP WITH

10:29AM  10   THERANOS.

10:29AM  11        AND AS I SAID, THE PARTNERSHIP WAS AT THE CORE OF US,

10:29AM  12   WALGREENS, BECOMING A HEALTH CARE SERVICE PROVIDER.

10:29AM  13   Q.   AND YOU WRITE THAT "OUR PARTNERSHIP."  IS THAT THE

10:29AM  14   THERANOS-WALGREENS PARTNERSHIP IS AT THE CORE?

10:29AM  15   A.   THAT'S CORRECT.

10:29AM  16   Q.   AND WHAT DID YOU MEAN BY THAT?

10:29AM  17   A.   WHAT I HAD MEANT BY THAT IS THAT THE LAB SERVICES THAT

10:29AM  18   WILL BE DELIVERED THROUGH THERANOS AND WALGREENS, AND THAT

10:29AM  19   PARTNERSHIP WAS ONE OF THE FIRST SERVICES THAT WE WERE GOING TO

10:29AM  20   LAUNCH.

10:29AM  21   Q.   I SEE.

10:29AM  22   A.   AND THAT WAS THE CORE.

10:29AM  23   Q.   AND WAS THAT SOMETHING THAT THE BOOTS ALLIANCE FOLKS WERE

10:29AM  24   PAYING ATTENTION TO?

10:29AM  25   A.   YES.

JHAVERI DIRECT BY MR. SCHENK                                    3612

10:29AM  1    Q.   THE NEXT SENTENCE READS, "WE HAVE MADE UNBELIEVABLE

10:29AM  2    PROGRESS IN THE SHORT 5 MONTHS - I HAVE RECEIVED EMAILS FROM

10:29AM  3    SEVERAL LEADERS TELLING ME THIS."

10:29AM  4        DID YOU THINK THAT THAT WAS TRUE, THAT WALGREENS AND

10:29AM  5    THERANOS HAD MADE PROGRESS IN THE LAST FOUR OR FIVE MONTHS?

10:30AM  6    A.   WE DID.

10:30AM  7    Q.   AND DID YOU STILL THINK THAT THERANOS WAS TESTING THE

10:30AM  8    FINGERSTICK BLOOD ON THE EDISON DEVICE DEVICES?

10:30AM  9    A.   ON ONE OF THE DEVICES.

10:30AM  10   Q.   FORGIVE ME.  YOU DIDN'T KNOW WHAT IT WAS CALLED?

10:30AM  11   A.   THAT'S CORRECT.

10:30AM  12   Q.   I SEE.  DID YOU STILL NOT KNOW WHETHER THERANOS WAS

10:30AM  13   TESTING ON MODIFIED THIRD PARTY DEVICES?

10:30AM  14   A.   I DID NOT KNOW THAT.

10:30AM  15   Q.   THE NEXT SENTENCE READS, "HOWEVER, IT WILL BE IMPORTANT

10:30AM  16   THAT WE DRIVE WITH A SINGLE FOCUS TOGETHER.  THE 2 AREAS WHICH

10:30AM  17   MUST BE FOCUSSED ON ARE:"

10:30AM  18       AND THEN THE FIRST IS "PATIENTS PER DAY WITH A 4 PLUS

10:30AM  19   EXPERIENCE."

10:30AM  20       WOULD YOU EXPLAIN THAT TO THE JURY?

10:30AM  21   A.   SURE.  AT THE END OF EACH BLOOD DRAW FOR EVERY PATIENT, WE

10:30AM  22   WOULD HAND THEM AN IPAD, AND THAT IPAD WAS A SIMPLE

10:30AM  23   QUESTIONNAIRE OF HOW DID YOUR SERVICE GO, WERE YOU SATISFIED,

10:30AM  24   AND THERE WAS A FEW QUESTIONS, AND THEN IT WAS RATED 1 THROUGH

10:31AM  25   5.

JHAVERI DIRECT BY MR. SCHENK                                    3613

10:31AM  1       AND SO IF A PATIENT GAVE US A 5 EXPERIENCE, THAT WAS THE

10:31AM  2    BEST.  A 1 WOULD BE THE LOWEST.

10:31AM  3       SO WHAT I WAS ASKING FOR IS AS WE CONTINUED TO GROW AND AS

10:31AM  4    WE CONTINUED TO EXPAND, LET'S MAKE SURE THAT NOT ONLY OUR

10:31AM  5    PATIENTS PER DAY CONTINUES TO GROW, BUT WE'RE DELIVERING A

10:31AM  6    GREAT EXPERIENCE, A 4 PLUS EXPERIENCE.  THAT'S WHAT I'M

10:31AM  7    REFERRING TO HERE.

10:31AM  8    Q.   I SEE.  AND THEN THE NEXT ONE IS, "VENOUS PERCENT IN THE

10:31AM  9    10 PERCENT RANGE."

10:31AM  10      WHAT DOES THAT MEAN?

10:31AM  11   A.   AGAIN, IT'S THE VENOUS DRAW, THE TOTAL VENOUS DRAW

10:31AM  12   PERCENTAGE TO BE BELOW 10 PERCENT.  IT WAS HOVERING AROUND

10:31AM  13   40 PERCENT AT THIS TIME.  SO, AGAIN, A SINGULAR FOCUS ON

10:31AM  14   GETTING THAT PERCENTAGE DOWN BELOW 10 PERCENT.

10:31AM  15   Q.   AND ONE OF THE FIRST DOCUMENTS I SHOWED YOU HAD THE CHART

10:31AM  16   WHERE THE VENOUS DRAW IN FEBRUARY WAS AROUND 43 PERCENT, AND

10:31AM  17   WE'RE NOW IN AUGUST.

10:31AM  18      HAD, AT ANY POINT, THE VENOUS DRAW GOTTEN AROUND THIS

10:31AM  19   10 PERCENT RANGE THAT YOU WERE LOOKING FOR?

10:32AM  20   A.   NO, SIR.

10:32AM  21   Q.   HOW ABOUT AT ANY POINT DURING THE ENTIRE

10:32AM  22   THERANOS-WALGREENS RELATIONSHIP?  DID THE VENOUS DRAW PERCENT

10:32AM  23   EVER GET AROUND 10 PERCENT?

10:32AM  24   A.   NO, SIR.

10:32AM  25   Q.   THE NEXT IS, "WE NEED TO HAVE A DOCUMENTED DETAILED PLAN

JHAVERI DIRECT BY MR. SCHENK                              3614

10:32AM   1    ON BOTH OR IT WILL BE DIFFICULT FOR ME TO CONVINCE EXPANSION

10:32AM   2    BEYOND ARIZONA."

10:32AM   3         WHAT DID YOU MEAN BY THAT?

10:32AM   4    A.   WHAT I WAS REFERRING TO IS THESE WERE THE -- THESE THREE

10:32AM   5    METRICS RIGHT HERE WERE AT THE CORE OF THE SUCCESS THAT WE

10:32AM   6    NEEDED TO ACHIEVE, AND IF WE'RE GOING TO ACHIEVE THEM, LET'S

10:32AM   7    MAKE SURE THAT WE HAVE A PLAN.  HOW DO WE DO IT?  WHAT ARE THE

10:32AM   8    THINGS THAT WE NEED TO DO?  WHAT ARE THE PUTS AND TICKS THAT WE

10:32AM   9    HAVE TO HAVE?  AND HOW ARE WE GOING TO GET THERE?

10:32AM   10        AND IF WE DON'T GET THERE, IT'S HARD FOR ME TO CONVINCE

10:32AM   11   MYSELF, OR ANY LEADERSHIP AT WALGREENS, TO SAY WE SHOULD GO

10:32AM   12   FURTHER BECAUSE WE JUST WEREN'T HITTING THE METRICS THAT WE SET

10:32AM   13   OUT TO DO.

10:32AM   14   Q.   SO WAS THE PERCENT OF VENOUS DRAWS AN IMPORTANT FACTOR IN

10:32AM   15   DETERMINING EXPANSION BEYOND ARIZONA?

10:32AM   16   A.   YES, IT WAS.

10:33AM   17   Q.   AND FOUR DAYS EARLIER YOU HAD A MEETING WHERE YOU TALKED

10:33AM   18   ABOUT THE NEED TO REDUCE THE NUMBER OF STORES FROM 500 TO 200.

10:33AM   19        DO YOU RECALL THAT?

10:33AM   20   A.   I DO.

10:33AM   21   Q.   AND FOUR DAYS AFTER THAT MEETING YOU SEND AN EMAIL TO

10:33AM   22   MR. BALWANI, AND ARE YOU INFORMING HIM THAT EVEN EXPANSION

10:33AM   23   BEYOND ARIZONA IS IN QUESTION IF WE CAN'T GET THE VENOUS DRAWS

10:33AM   24   BELOW 10 PERCENT?

10:33AM   25   A.   YEAH, THE VENOUS DRAWS, THE PATIENTS PER DAY, AND THE

JHAVERI DIRECT BY MR. SCHENK                                    3615

10:33AM   1    EXPERIENCE ALL TOGETHER, WE NEED TO FOCUS IN ON THIS BEFORE WE

10:33AM   2    CAN GO BEYOND ARIZONA.

10:33AM   3    Q.   THANK YOU.  WOULD YOU NOW TURN TO 1909.

10:33AM   4         IS 1909 TWO EMAILS, ONE FROM YOU TO MR. BALWANI, AND THEN

10:33AM   5    A RESPONSE FROM MR. BALWANI TO YOU A FEW DAYS LATER,

10:33AM   6    AUGUST 21ST, 2014?

10:33AM   7    A.   YES.

10:34AM   8    Q.   AND IS THE SUBJECT MATTER THE THERANOS-WALGREENS

10:34AM   9    PARTNERSHIP?

10:34AM   10   A.   IT IS.

10:34AM   11        MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS

10:34AM   12   EXHIBIT 1909.

10:34AM   13        MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

10:34AM   14        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:34AM   15   (GOVERNMENT'S EXHIBIT 1909 WAS RECEIVED IN EVIDENCE.)

10:34AM   16   BY MR. SCHENK:

10:34AM   17   Q.   LET'S START WITH THE EMAIL ON THE BOTTOM FROM YOU TO

10:34AM   18   MR. BALWANI.  YOU ARE LISTING SOME TOPICS FOR DISCUSSION.

10:34AM   19        AND THE SECOND BULLET UP FROM THE BOTTOM READS, "VENOUS

10:34AM   20   DRAW PERCENTAGE PROGRESS."

10:34AM   21        DO YOU SEE THAT?

10:34AM   22   A.   I DO.

10:34AM   23   Q.   AND WERE YOU ANXIOUS TO DISCUSS THE VENOUS DRAW NUMBERS

10:34AM   24   WITH MR. BALWANI?

10:34AM   25   A.   YES, I WAS.

JHAVERI DIRECT BY MR. SCHENK                                    3616

10:34AM  1    Q.   MR. BALWANI RESPONDS THEN IN THE EMAIL AT THE TOP OF THIS

10:34AM  2    PAGE, AND IT'S THE FOURTH BULLET DOWN THAT I WANT TO DISCUSS

10:34AM  3    WITH YOU.  MR. BALWANI WRITES, "DISCUSS FURTHER YOUR COMMENT

10:34AM  4    ABOUT HAVING TO CONVINCE THE NEW MANAGEMENT FOR EXPANSION

10:34AM  5    BEYOND 40 STORES."

10:34AM  6         WERE THE 40 STORES A REFERENCE TO THE STORES IN ARIZONA?

10:34AM  7    A.   THAT'S CORRECT.

10:34AM  8    Q.   "IF THERE ARE ISSUES HERE, THEN WE NEED TO DISCUSS THIS

10:35AM  9    SOONER THAN LATER AS WE CAN'T SLOW DOWN OUR GROWTH FOR OBVIOUS

10:35AM 10    REASONS.  WOULD LIKE TO LEARN MORE HERE."

10:35AM 11         DO YOU KNOW WHAT HE WAS REFERRING TO?

10:35AM 12    A.   YES.  WE HAD A DISCUSSION ON THIS.  USUALLY WE HAD A

10:35AM 13    REGULARLY SCHEDULED MEETING TO DISCUSS TOPICS ON THE PROJECT

10:35AM 14    AND I WOULD PUT TOGETHER A FEW AGENDA ITEMS AND SO WOULD

10:35AM 15    MR. BALWANI, AND THEN WE WOULD DISCUSS THEM AND MAKE SURE WE

10:35AM 16    HAVE A PLAN FOR THEM.

10:35AM 17         SO THIS WAS A TOPIC THAT HE WANTED TO DISCUSS, AND I

10:35AM 18    EXPLAINED TO HIM EXACTLY WHAT I SAID EARLIER, THAT WE HAVE TO

10:35AM 19    HIT THE METRICS, WE HAVE TO MAKE SURE THAT THE MODEL IS

10:35AM 20    CORRECT, AND WE HAVE TO BE ABLE TO CREATE THE EXPERIENCE THAT

10:35AM 21    WE SET OUT TO DO.

10:35AM 22         IF WE DON'T, IT'S DIFFICULT TO EXPAND BEYOND THIS.

10:35AM 23    Q.   AND DID YOU HAVE A FOLLOW-UP CONVERSATION WITH MR. BALWANI

10:35AM 24    LIKE YOU HAD SUGGESTED?

10:35AM 25    A.   I DID.

JHAVERI DIRECT BY MR. SCHENK                                    3617

10:35AM  1     Q.   WOULD YOU NOW TURN TO 1906.

10:36AM  2          IS 1906 A CALENDAR INVITE FOR THAT DISCUSSION?

10:36AM  3     A.   YES, SIR.

10:36AM  4     Q.   AND DOES IT ALSO INCLUDE YOUR NOTES FROM THE PHONE

10:36AM  5     CONVERSATION?

10:36AM  6     A.   YES.

10:36AM  7              MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 1906.

10:36AM  8              MR. DOWNEY:  YOUR HONOR, I DON'T KNOW IF THE NOTES

10:36AM  9     ARE ADMISSIBLE.  THEY CAN CERTAINLY BE USED TO REFRESH THE

10:36AM  10    WITNESS.

10:36AM  11         (PAUSE IN PROCEEDINGS.)

10:36AM  12             THE COURT:  MR. SCHENK, I'LL ADMIT THE TOP PORTION,

10:36AM  13    AND THEN YOU CAN LAY A FOUNDATION FOR THE NOTES IF YOU CAN.

10:36AM  14             MR. SCHENK:  THANK YOU.

10:37AM  15         (GOVERNMENT'S EXHIBIT 1906 WAS PROVISIONALLY RECEIVED IN

10:37AM  16    EVIDENCE.)

10:37AM  17    BY MR. SCHENK:

10:37AM  18    Q.   MR. JHAVERI, WHAT WAS YOUR PRACTICE WITH REGARD TO TAKING

10:37AM  19    NOTES DURING A MEETING SUCH AS THIS ONE?

10:37AM  20    A.   NOT NECESSARILY WITH MR. BALWANI, BUT IT WAS JUST MY

10:37AM  21    PRACTICE WHENEVER I HAVE A MEETING, I WILL TAKE THE NOTES DOWN

10:37AM  22    IN THE MEETING ITSELF SO I HAVE A RECORD OF IT.  AND SO THIS IS

10:37AM  23    A COPY OF THAT.

10:37AM  24    Q.   AND SO THERE ARE SOME BULLETS.  WERE THOSE JUST A CUT AND

10:37AM  25    PASTE OF 1909, THE TOPICS THAT YOU WANTED TO DISCUSS?

JHAVERI DIRECT BY MR. SCHENK                                    3618

10:37AM   1    A.   EXACTLY.

10:37AM   2    Q.   AND THEN THE NOTES BELOW THE WORD "NOTES," WERE THOSE YOU

10:37AM   3    TAKING CONTEMPORANEOUS NOTES DURING THE MEETING?

10:37AM   4    A.   YES, AS WE WERE DISCUSSING EACH ITEM AND WHAT WE EITHER

10:37AM   5    DECIDED OR WHAT THE NEXT STEPS WERE, I WOULD NOTE THEM DOWN.

10:37AM   6    Q.   AND YOU SAID THIS WAS YOUR PRACTICE NOT JUST WITH

10:37AM   7    MR. BALWANI, BUT HOW YOU HANDLED NOTE TAKING DURING MEETINGS?

10:37AM   8    A.   CORRECT.

10:37AM   9    Q.   YOU GENERALLY TYPE THEM INTO THE CALENDAR INVITE ITSELF?

10:38AM  10    A.   THAT'S CORRECT.

10:38AM  11         MR. SCHENK:  YOUR HONOR, THE GOVERNMENT MOVES TO

10:38AM  12    ADMIT 1906.

10:38AM  13         MR. DOWNEY:  SAME OBJECTION.

10:38AM  14         THE COURT:  I'LL ALLOW IT.  THIS IS CONTEMPORANEOUS

10:38AM  15    WITH THE MEETING, SO THE OBJECTION IS OVERRULED.

10:38AM  16         MR. SCHENK:  THANK YOU, YOUR HONOR.  AND PERMISSION

10:38AM  17    TO PUBLISH.

10:38AM  18         THE COURT:  YES.

10:38AM  19      (GOVERNMENT'S EXHIBIT 1906 WAS RECEIVED IN EVIDENCE.)

10:38AM  20    BY MR. SCHENK:

10:38AM  21    Q.   FIRST IN THE BULLETS, WE AGAIN SEE REPEATED THE FOURTH

10:38AM  22    BULLET, VENOUS DRAW PERCENTAGE PROGRESS.

10:38AM  23         DO YOU SEE THAT?

10:38AM  24    A.   I DO.

10:38AM  25    Q.   AND THEN THE FINAL BULLET, IT LOOKS LIKE YOU JUST CUT AND

JHAVERI DIRECT BY MR. SCHENK                                    3619

10:38AM   1     PAST WHAT MR. BALWANI WROTE TO YOU THAT WE READ A MOMENT AGO

10:38AM   2     ABOUT WANTING TO DISCUSS YOUR POINT ABOUT HAVING TO CONVINCE

10:38AM   3     MANAGEMENT ABOUT EXPANSION; IS THAT RIGHT?

10:38AM   4     A.   YES.   AGAIN, WE COCREATED THE AGENDA ITEMS AND SO, YOU

10:38AM   5     KNOW, I JUST LISTED THEM OF THE TOPICS THAT WE NEEDED TO

10:38AM   6     DISCUSS.

10:38AM   7     Q.   OKAY.   UNDER NOTES AND THEN THE "EXPANSION" WORD, THE

10:38AM   8     FIRST BULLET IS "TEN PATIENTS PER DAY WITH EXTREMELY HIGH

10:39AM   9     CONFIDENCE BY END OF NOVEMBER, WE SHOULD BE HIGH CONFIDENCE

10:39AM  10     (THIS WEEK THE AVERAGE WAS 5.5)."

10:39AM  11          WHAT WERE YOU DISCUSSING WITH MR. BALWANI?

10:39AM  12     A.   THAT FIRST BULLET POINT REFERS TO THE PROGRESS, WHAT WERE

10:39AM  13     WE SEEING IN THE NUMBER OF PATIENTS THAT WERE USING THE

10:39AM  14     SERVICE, AND SO THE INFORMATION THAT WE DISCUSSED WAS BY THE

10:39AM  15     END OF NOVEMBER, MR. BALWANI FELT VERY STRONGLY THAT WE'LL HIT

10:39AM  16     THAT TEN PATIENTS PER DAY.

10:39AM  17          AND WE WERE ALREADY AT 5.5, AND SO THAT WAS THE POINT

10:39AM  18     HERE.

10:39AM  19     Q.   AND THEN THE SECOND BULLET HE'S TALKING ABOUT "GOING

10:39AM  20     AGAINST 2 DEEPLY ENTRENCHED COMPANIES."

10:39AM  21          DO YOU REMEMBER WHAT WAS BEING DISCUSSED AT THIS POINT?

10:39AM  22     A.   YES.   WE WERE -- THE TWO INCUMBENT PLAYERS IN THE LAB

10:39AM  23     SPACE WAS QUEST DIAGNOSTICS AND LAB CORP.

10:39AM  24          SO WHAT WE WERE DISCUSSING HERE IS THAT IT'S HIGHLY

10:39AM  25     COMPETITIVE, AND THE POINT WAS THAT WE WERE GOING AGAINST THEM

JHAVERI DIRECT BY MR. SCHENK                                    3620

10:39AM   1    IN TERMS OF CAPTURING PATIENTS.

10:40AM   2         AND SO THAT IS SOMETHING THAT WAS, YOU KNOW, SOMETHING TO

10:40AM   3    WATCH OUT FOR.

10:40AM   4    Q.   OKAY.  AND THEN THE THIRD ONE DOWN, "VENOUS DRAW

10:40AM   5    PERCENT -- HOW DO WE BALANCE -- BY END OF CALENDAR YEAR 2014 --

10:40AM   6    LESS THAN 10 PERCENT."

10:40AM   7         WHAT WAS DISCUSS HERE?

10:40AM   8    A.   THE DISCUSSION HERE WAS ABOUT HOW AND WHEN WILL THIS

10:40AM   9    PERCENTAGE GO DOWN AND WHAT WILL BE REQUIRED TO DO THAT.

10:40AM  10         SO THAT WAS THE DISCUSSION HERE.

10:40AM  11    Q.   WHEN THE DESIRE TO HAVE THE VENOUS DRAW PERCENT REDUCED OR

10:40AM  12    GO DOWN, DID MR. BALWANI EVER EXPLAIN TO YOU TECHNOLOGICAL

10:40AM  13    OBSTACLES TO ACHIEVING A VENOUS DRAW REDUCTION?

10:40AM  14    A.   NO.  THE REASONS THAT HE PROVIDED WERE THE TWO REASONS

10:40AM  15    THAT I MENTIONED EARLIER ABOUT THE PATTERNS, ORDERING PATTERNS

10:40AM  16    FROM PHYSICIANS AND MAKING SURE THAT THE CARTRIDGES WERE READY.

10:40AM  17         HE ALSO EXPLAINED TO ME THAT AT TIMES THERE ARE PHYSICIANS

10:40AM  18    WHO ARE ORDERING BOTH TESTS, ONE WITH A VENOUS DRAW AND ONE

10:41AM  19    WITH FINGERSTICKS, TO ENSURE THAT THEY'RE SEEING THE SAME

10:41AM  20    RESULTS.

10:41AM  21         SO THOSE WERE THE REASONS THAT HE PROVIDED.

10:41AM  22    Q.   SO MR. BALWANI SUGGESTED TO YOU THAT THE CAUSE OF THE

10:41AM  23    VENOUS DRAW NUMBERS WERE THE REQUESTS OR THE ACTIONS OF THE

10:41AM  24    PHYSICIANS, THE ORDERING PATTERNS OF PHYSICIANS, OR THE DESIRE

10:41AM  25    TO HAVE FINGERSTICK AND A VEIN DRAW ON THE SAME PATIENT AT THE

JHAVERI DIRECT BY MR. SCHENK                                          3621

10:41AM   1      SAME TIME?

10:41AM   2      A.   YES.

10:41AM   3      Q.   WOULD YOU TURN TO 2214.

10:41AM   4           IS THIS ANOTHER EMAIL FROM MS. HAWORTH TO THE GROUP FROM

10:41AM   5      THERANOS AND WALGREENS, INCLUDING YOURSELF AND MR. BALWANI,

10:41AM   6      FOLLOWING A NOVEMBER 2014 PARTNERSHIP MEETING WITH A SLIDE

10:41AM   7      DECK?

10:41AM   8      A.   YES.

10:41AM   9               MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 2214.

10:41AM  10               MR. DOWNEY:  NO OBJECTION.

10:41AM  11               THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:41AM  12          (GOVERNMENT'S EXHIBIT 2214 WAS RECEIVED IN EVIDENCE.)

10:41AM  13      BY MR. SCHENK:

10:41AM  14      Q.   IF YOU WOULD TURN TO PAGE 6.

10:42AM  15           SO NOW IN NOVEMBER OF 2014 DURING THIS MEETING, THIS SLIDE

10:42AM  16      IS LABELED "CURRENT STATUS," AND THEN THERE ARE SOME NAMES?  DO

10:42AM  17      YOU SEE THAT, TRACY/ KIMBERLY?

10:42AM  18      A.   YES.

10:42AM  19      Q.   AND WHAT IS THAT A REFERENCE TO, TRACY/KIMBERLY, IF YOU

10:42AM  20      KNOW?

10:42AM  21      A.   YEAH, TRACY AND KIMBERLY WERE TEAM MEMBERS OF THERANOS.

10:42AM  22           TRACY, IF I REMEMBER CORRECTLY, WAS IN CHARGE OF

10:42AM  23      OPERATIONS FOR ARIZONA, AND KIMBERLY WAS IN CHARGE OF THE SALES

10:42AM  24      TEAMS, AND SO THEY WERE GIVING THE STATUS.

10:42AM  25      Q.   I SEE.  THE FIRST BULLET IS "41 STORES CURRENTLY LIVE

JHAVERI DIRECT BY MR. SCHENK                                          3622

| | | |
|---|---|---|
| 10:42AM | 1 | (ARIZONA 40; CALIFORNIA 1)." |
| 10:42AM | 2 | IS THAT THE MAXIMUM NUMBER OF STORES THAT THERANOS BECAME |
| 10:42AM | 3 | AVAILABLE WITHIN WALGREENS? |
| 10:42AM | 4 | A.   YES. |
| 10:42AM | 5 | Q.   THE SECOND BULLET READS, "VENOUS DRAWS PERFORMED DURING |
| 10:42AM | 6 | 40 PERCENT OF VISIT (2014-YEAR TO DATE)." |
| 10:42AM | 7 | IS THAT RIGHT? |
| 10:43AM | 8 | A.   THAT'S CORRECT. |
| 10:43AM | 9 | Q.   AND WE SAW DURING YOUR TESTIMONY EARLIER THIS MORNING THAT |
| 10:43AM | 10 | IN FEBRUARY OF 2014 THE VENOUS DRAWS WERE AT 43 PERCENT. |
| 10:43AM | 11 | DO YOU RECALL THAT? |
| 10:43AM | 12 | A.   I DO. |
| 10:43AM | 13 | Q.   AND NOW IN NOVEMBER VENOUS DRAWS ARE STILL AT 40 PERCENT; |
| 10:43AM | 14 | IS THAT RIGHT? |
| 10:43AM | 15 | A.   YES. |
| 10:43AM | 16 | Q.   AND DID THE VENOUS DRAWS EVER GET TO A POINT THAT YOU OR |
| 10:43AM | 17 | WALGREENS WERE SATISFIED? |
| 10:43AM | 18 | A.   NO. |
| 10:43AM | 19 | Q.   WOULD YOU TURN NOW TO 2275. |
| 10:43AM | 20 | IS 2275 AN EMAIL FROM YOU TO MR. BALWANI THE NEXT MONTH? |
| 10:43AM | 21 | NOW WE'RE IN DECEMBER OF 2014? |
| 10:43AM | 22 | A.   YES. |
| 10:43AM | 23 | Q.   AND DOES THIS ALSO DISCUSS ISSUES RELATED TO THE |
| 10:43AM | 24 | THERANOS-WALGREENS PARTNERSHIP? |
| 10:43AM | 25 | A.   YES, IT DOES. |

JHAVERI DIRECT BY MR. SCHENK                                            3623

10:43AM   1              MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 2275.

10:43AM   2              MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

10:44AM   3              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:44AM   4         (GOVERNMENT'S EXHIBIT 2275 WAS RECEIVED IN EVIDENCE.)

10:44AM   5              MR. SCHENK:  THANK YOU.

10:44AM   6    Q.   THE TOPIC IS CONTRACT AND OTHER TOPICS.

10:44AM   7         DO YOU SEE THAT?

10:44AM   8    A.   I DO.

10:44AM   9    Q.   AND UNDER CONTRACT THERE'S A BULLET THAT BEGINS, "IN

10:44AM  10    ADDITION."

10:44AM  11         DO YOU SEE THAT?

10:44AM  12    A.   YES, I DO.

10:44AM  13    Q.   SO YOU WROTE TO MR. BALWANI, "IN ADDITION TO THE CONTRACT

10:44AM  14    TERMS ATTACHED, WE ARE ASKING FOR TRANSPARENCY ON THE

10:44AM  15    FOLLOWING:  FINANCIAL CONDITION OF THE COMPANY (NEED IT FOR OUR

10:44AM  16    AUDITORS), TECHNOLOGY/PROCESS DATA POINTS SO WE CAN REPRESENT

10:44AM  17    THERANOS IN A MORE COMPREHENSIVE MANNER."

10:44AM  18         WHAT DID YOU MEAN BY THAT?

10:44AM  19    A.   YEAH.  THERE ARE TWO POINTS HERE.  I HAD JUST RECEIVED A

10:44AM  20    CALL FROM OUR INVESTOR RELATIONS LEADERSHIP AND WE WERE

10:44AM  21    RECEIVING QUESTIONS NOT ONLY INTERNALLY BUT EXTERNALLY ON THE

10:44AM  22    PARTNERSHIP ITSELF.

10:44AM  23         AND INTERNALLY PART OF THE AUDIT OF ALL OF THE INVESTMENTS

10:45AM  24    THAT WALGREENS HAD MADE REQUIRED THAT WE HAD AN UNDERSTANDING

10:45AM  25    OF THE FINANCIAL CONDITION OF THE COMPANY THAT WE WERE

JHAVERI DIRECT BY MR. SCHENK                                    3624

10:45AM   1    INVESTING IN.

10:45AM   2         AND SO THAT WAS MY ASK HERE ON THE FIRST POINT.

10:45AM   3         AND THEN THE SECOND IS UNDERSTANDING A LITTLE BIT MORE

10:45AM   4    ABOUT WHAT IS GOING ON WITH THE TECHNOLOGY, SOME OF THE DATA

10:45AM   5    POINTS THAT THEY'RE SEEING.

10:45AM   6         SO WHEN WE RECEIVED QUESTIONS ON THERANOS, THAT WE CAN

10:45AM   7    ANSWER THEM IN A MORE COMPREHENSIVE, INTELLIGENT MANNER RATHER

10:45AM   8    THAN SIMPLY REFERRING THEM TO THERANOS THEMSELVES.

10:45AM   9    Q.   I SEE.  AND THEN NUMBER 4 ON THE EMAIL READS, "HOW LONG

10:45AM  10    WILL WE HAVE PHLEBOTOMISTS IN ARIZONA?  WHAT IS ACCEPTABLE

10:45AM  11    PERCENT OF VENOUS DRAWS TO DEPLOY HUB AND SPOKE MODEL?"

10:45AM  12         WHAT IS THAT A REFERENCE TO?

10:45AM  13    A.   THAT IS IN REFERENCE TO THE DISCUSSION THAT WE HAD

10:45AM  14    EARLIER.  SO AS I MENTIONED, VENOUS DRAWS REQUIRE A

10:46AM  15    PHLEBOTOMIST, A LICENSED PHLEBOTOMIST TO CONDUCT, AND SO IN THE

10:46AM  16    ARIZONA STORES WE HAD PHLEBOTOMISTS IN ALL OF THE STORES TO DO

10:46AM  17    THOSE VENOUS DRAWS, AND WHAT I AM ASKING IS SIMPLY AS THE

10:46AM  18    PERCENTAGE OF VENOUS DRAWS TEND TO GO DOWN, THEN WE CAN MOVE

10:46AM  19    THE PHLEBOTOMISTS, AND THEN MOVE THEM INTO THOSE 24-HOUR

10:46AM  20    LOCATIONS THAT WE DISCUSSED EARLIER.

10:46AM  21         SO THE HUB AND SPOKE MODEL IS IN REFERENCE TO THAT, WHERE

10:46AM  22    THE MAJORITY, THE SPOKES, ARE THE STORES THAT ARE DOING PURE

10:46AM  23    THERANOS FINGERSTICK SERVICES, AND THE HUB WOULD BE THE 24-HOUR

10:46AM  24    LOCATION WHERE WE WOULD BE ABLE TO DO NOT ONLY THE FINGERSTICK

10:46AM  25    SERVICES BUT ALSO, IF REQUIRED, THE VENOUS DRAW WITH A

JHAVERI DIRECT BY MR. SCHENK                                    3625

10:46AM  1    PHLEBOTOMIST.

10:46AM  2    Q.   I SEE.  SO THIS WAS IN DECEMBER OF 2014.  LET'S TALK

10:46AM  3    BRIEFLY JUST ABOUT THE FIRST TEN MONTHS OF 2015, JANUARY TO

10:46AM  4    ABOUT OCTOBER.

10:46AM  5         DID THE VENOUS DRAW NUMBER EVER GO DOWN TO A LEVEL AT

10:46AM  6    WHICH EXPANSION BEYOND THE 40 STORES IN ARIZONA OCCURRED?

10:47AM  7    A.   NO.

10:47AM  8    Q.   AND WAS THAT SOMETHING THAT YOU AND MR. BALWANI CONTINUED

10:47AM  9    TO TRACK?

10:47AM  10   A.   WE DID.

10:47AM  11   Q.   AND DID YOU CONTINUE TO DISCUSS THE REASONS WHY THE VENOUS

10:47AM  12   DRAW NUMBERS WERE WHERE THEY WERE?

10:47AM  13   A.   ABSOLUTELY.

10:47AM  14   Q.   AND DID THE REASONS THAT MR. BALWANI PROVIDED FOR YOU EVER

10:47AM  15   CHANGE, OR WERE THEY SIMILAR TO THE ONES THAT YOU ALREADY

10:47AM  16   TESTIFIED ABOUT?

10:47AM  17   A.   NO, THEY WERE SIMILAR.

10:47AM  18   Q.   IN OCTOBER -- AROUND OCTOBER OF 2015 DID YOU READ AN

10:47AM  19   ARTICLE ABOUT THERANOS?

10:47AM  20   A.   I DID.

10:47AM  21   Q.   AND GENERALLY SPEAKING, WAS THE ARTICLE NEGATIVE?

10:47AM  22   A.   IT WAS.

10:47AM  23   Q.   AFTER THE ARTICLE, DID YOUR ROLE IN THE OPERATIONALIZING

10:47AM  24   OF THE THERANOS RELATIONSHIP CHANGE?  YOUR ROLE IN IT, DID THAT

10:47AM  25   CHANGE?

JHAVERI DIRECT BY MR. SCHENK                                    3626

10:47AM   1    A.   YES, MY ROLE DID CHANGE.  OBVIOUSLY WE WERE NOT EXPANDING

10:47AM   2    BEYOND THE 41 STORES THAT WE ALREADY HAD.

10:47AM   3         AND BECAUSE OF THE ARTICLE, YOU KNOW, I TOOK A STEP BACK

10:47AM   4    AS WE WERE NOT EXPANDING ANYMORE, WE WERE JUST SIMPLY

10:47AM   5    MONITORING, AND OTHERS AT THE COMPANY TOOK LEAD.

10:48AM   6    Q.   AT SOME POINT, DID WALGREENS STOP OFFERING THERANOS BLOOD

10:48AM   7    TESTING SERVICES?  CAN YOU STILL GO TO WALGREENS AND GET

10:48AM   8    THERANOS BLOOD TESTING SERVICES?

10:48AM   9    A.   YES, WE DID STOP AT ONE POINT.

10:48AM  10    Q.   YOU DID STOP.  SORRY, I ASKED YOU TWO QUESTIONS.

10:48AM  11         DO YOU RECALL ROUGHLY WHEN YOU STOPPED?

10:48AM  12    A.   WE STOPPED ONE OF THE SERVICES IN JANUARY OF 2016 IN ONE

10:48AM  13    OF THE STORES.

10:48AM  14         AND THEN THE REST OF THE STORES WERE TURNED OFF SOMEWHERE

10:48AM  15    IN JUNE OF THAT YEAR, 2016.

10:48AM  16    Q.   THANK YOU.

10:48AM  17         YOUR HONOR, MAY I APPROACH?

10:48AM  18              THE COURT:  YES.

10:49AM  19              MR. SCHENK:  (HANDING.)

10:49AM  20    Q.   MR. BALWANI, I'VE HANDED YOU WHAT I'VE MARKED AS

10:49AM  21    EXHIBIT 5387C, AND THIS DOCUMENT IS 16 PAGES AND CONTAINS SOME

10:49AM  22    TEXT MESSAGES.

10:49AM  23         YOUR HONOR, I BELIEVE THE PARTIES ARE AGREEING TO ADMIT

10:49AM  24    THIS BASED ON A STIPULATION.

10:49AM  25              MR. DOWNEY:  THAT'S CORRECT, YOUR HONOR.

JHAVERI DIRECT BY MR. SCHENK                                        3627

10:49AM  1                    THE COURT:  ALL RIGHT.  THIS IS -- I'M SORRY, IS

10:49AM  2     THIS 5387C DID YOU SAY?

10:49AM  3                    MR. SCHENK:  YES, YOUR HONOR.

10:49AM  4                    THE COURT:  THAT'S ADMITTED, AND WITHOUT OBJECTION

10:49AM  5     IT MAY BE PUBLISHED.

10:49AM  6                    MR. SCHENK:  THANK YOU.

10:49AM  7            (GOVERNMENT'S EXHIBIT 5387C WAS RECEIVED IN EVIDENCE.)

10:49AM  8     BY MR. SCHENK:

10:49AM  9     Q.   MR. JHAVERI, I'D LIKE TO READ NOW SOME TEXT MESSAGES WITH

10:49AM 10     YOU.  I'LL HAVE YOU START, AND THEN IF YOU'LL FOLLOW ALONG WITH

10:49AM 11     ME, I JUST WANT TO IDENTIFY THE COLUMNS FOR YOU.

10:50AM 12            FIRST, THESE ARE NOT YOUR TEXT MESSAGES; IS THAT RIGHT?

10:50AM 13     A.   NO, THESE ARE NOT MY TEXT MESSAGES.

10:50AM 14     Q.   ARE THESE TEXT MESSAGES SENT BETWEEN MR. BALWANI AND

10:50AM 15     MS. HOLMES?

10:50AM 16     A.   YES, IT APPEARS TO BE.

10:50AM 17     Q.   SO THERE'S A COLUMN WITH A DATE THAT IS THE THIRD COLUMN,

10:50AM 18     DO YOU SEE THAT, AND THEY BEGIN MARCH OF 2010?

10:50AM 19     A.   YES, SIR.

10:50AM 20     Q.   AND THE NEXT COLUMN IS THE CONTENT.

10:50AM 21            DO YOU SEE THAT?

10:50AM 22     A.   YES.

10:50AM 23     Q.   AND THEN THE NEXT TWO COLUMNS ARE SENDER AND RECIPIENT.

10:50AM 24     SO THE FIRST NAME IS WHO SENT THE MESSAGE, AND THE SECOND IS

10:50AM 25     WHO RECEIVED IT; IS THAT RIGHT?

JHAVERI DIRECT BY MR. SCHENK                                    3628

| | | |
|---|---|---|
| 10:50AM | 1 | A.   THAT'S CORRECT. |
| 10:50AM | 2 | Q.   OKAY.  I'D LIKE TO READ THEM WITH YOU.  IF YOU WOULD, WHY |
| 10:50AM | 3 | DON'T YOU PLEASE START? |
| 10:50AM | 4 | A.   SURE. |
| 10:50AM | 5 | "WE HAVE AN OPPORTUNITY TO PUT TELEMEDICINE IN OUR |
| 10:50AM | 6 | CONTRACT WITH WAG." |
| 10:50AM | 7 | Q.   AND IS THAT A MESSAGE THAT MR. BALWANI SENT? |
| 10:50AM | 8 | A.   YES. |
| 10:50AM | 9 | Q.   AND THEN IT LOOKS LIKE MS. HOLMES RESPONDS, "WE SHOULD |
| 10:50AM | 10 | NAIL THAT." |
| 10:51AM | 11 | "AND ACTUALLY KICK IT OFF IN OUR MEETING WITH MAYO." |
| 10:51AM | 12 | "AND POSSIBLY CLEVELAND." |
| 10:51AM | 13 | "AND THEN BUILD THE TEAM HERE AS WE HIRE." |
| 10:51AM | 14 | "THEY WON'T BE READY OVERNIGHT ANYWAY." |
| 10:51AM | 15 | A.   "CLEVELAND CLINIC." |
| 10:51AM | 16 | Q.   "YES." |
| 10:51AM | 17 | MR. JHAVERI, I THINK THE NEXT ONE IS YOU. |
| 10:51AM | 18 | A.   YES. |
| 10:51AM | 19 | "WE WILL TALK, WE WILL BRING THIS UP AND NEGOTIATE AS LAST |
| 10:51AM | 20 | THING ONCE ALL ELSE IS DONE." |
| 10:51AM | 21 | Q.   "YES." |
| 10:51AM | 22 | A.   "I OPENED THE DOOR." |
| 10:51AM | 23 | Q.   "GREAT." |
| 10:51AM | 24 | A.   "WILL TELL U MORE IN PERSON." |
| 10:51AM | 25 | Q.   "K." |

JHAVERI DIRECT BY MR. SCHENK                                    3629

10:51AM    1    A.   "THEY WERE DROOLING OVER CLEVELAND CLINIC ANNOUNCEMENT."

10:51AM    2         "WE DID TESTER."

10:51AM    3         "YESTERDAY."

10:51AM    4    Q.   "EVERYONE IS."

10:51AM    5         "HOPEFULLY THEY'RE OFF PEER REVIEW."

10:51AM    6    A.   "WHICH IS WHY WE NEED TO DO GOOD-BYE CLEVELAND CLINIC."

10:52AM    7    Q.   "EXACTLY."

10:52AM    8         "ON CLEVELAND CLINIC."

10:52AM    9         AND THEN IF WE CAN TURN TO PAGE 2 AT THE TOP.

10:52AM   10    A.   "GOING THRU CVS CONTRACT.  WE CAN'T WORK WITH WAG OR CVS.

10:52AM   11    BOTH ARE SAME."

10:52AM   12         "AND SWY."

10:52AM   13    Q.   "CAN'T FORGET THAT."

10:52AM   14    A.   "WE NEED TO THINK THRU OUR DISCUSSION ON THIS TOPIC."

10:52AM   15    Q.   "MEANING TOMORROW'S?"

10:52AM   16    A.   "NO.  OUR OWN STORES."

10:52AM   17    Q.   "EXACTLY."

10:52AM   18    A.   "I AM THINKING.  IT WILL DEPEND ON DISCUSSION TOMORROW

10:52AM   19    WITH WAG."

10:52AM   20    Q.   AND NOW WE'RE TURNING TO THE THIRD PAGE.

10:52AM   21    A.   "IF CONTRACT TERMS AND WE DON'T HAVE 1000 STORES.  WHAT

10:53AM   22    HAPPENS TO 50M REMAINING INNOVATION PAYMENT."

10:53AM   23    Q.   "DEPENDS ON WHY TERMS."

10:53AM   24         "SCALE NOW IF NEED."

10:53AM   25    A.   "SO FORCE BUILD 1000 STORES?  I DON'T THINK THAT'S

JHAVERI DIRECT BY MR. SCHENK                                    3630

| | | |
|---|---|---|
| 10:53AM | 1 | INTELLIGENT." |
| 10:53AM | 2 | "WITH CONTRACT EXPIRING IN AUGUST OF 2017 MEANS BUILDING |
| 10:53AM | 3 | OUT 1000 BY FEBRUARY 2016.  NOT GOOD FOR US." |
| 10:53AM | 4 | "THERE ARE EQUAL NUMBER OF CVS AND WAG IN NEW YORK STATE |
| 10:53AM | 5 | BTW." |
| 10:53AM | 6 | Q.  AND NOW WE'RE TURNING TO PAGE 4. |
| 10:53AM | 7 | A.  "WHEN WE LAUNCH IN NEW YORK WE CAN LAUNCH WITH CVS AND |
| 10:53AM | 8 | GIVE THEM ONCE WE HAVE 50 E DONE, WE WILL BE INVINCIBLE. |
| 10:53AM | 9 | Q.  "AGREE." |
| 10:53AM | 10 | "IF TERMS BECAUSE WE TERM THEN WE RETURN.  THEY TERM AND |
| 10:54AM | 11 | WE DON'T WANT TO WE KEEP." |
| 10:54AM | 12 | A.  "WE DON'T WANT 1000 STORES WITH ASSHOLES." |
| 10:54AM | 13 | "200 WILL BE ENOUGH TO PROVE OUR POINT." |
| 10:54AM | 14 | Q.  "I KNOW." |
| 10:54AM | 15 | A.  "I WILL SAY WE KEEP 25 NO MATTER WHAT." |
| 10:54AM | 16 | Q.  "BUT THEN DEPENDING ON WHO TERMS SHOULD WORK." |
| 10:54AM | 17 | "AGREE." |
| 10:54AM | 18 | A.  "YES." |
| 10:54AM | 19 | "BUT IF NATURAL TERMS THEN WE RETURN 25." |
| 10:54AM | 20 | "IF THEY DON'T BUILD 500 WE KEEP 25." |
| 10:54AM | 21 | "CORRECT." |
| 10:54AM | 22 | Q.  "YES. |
| 10:54AM | 23 | "NATURAL MEANING WE BOTH DECIDE NOT TO REVIEW?  ALSO IF WE |
| 10:54AM | 24 | WANT TO RENEW BUT THEY DON'T." |
| 10:54AM | 25 | A.  "I WOULD LIKE TO KEEP SIMPLE.  IF THEY BUILD MINIMUM 500 |

JHAVERI DIRECT BY MR. SCHENK                                        3631

10:54AM  1    THEY GET ALL 50.  IF THEY DON'T WE KEEP MINIMUM 25.  I CAN ALSO

10:55AM  2    SAY IF THEY DON'T BUILD 500 WE KEEP ALL 50 SINCE WE BANKED ON

10:55AM  3    THEM."

10:55AM  4         "GOING TO WAG MEETING."

10:55AM  5         "DONE.  CALL WHEN U HAVE 30 MINUTES."

10:55AM  6    Q.   "AGREE WITH ABOVE."

10:55AM  7         "WILL CALL SOON."

10:55AM  8    A.   "MOSTLY TERRIBLE MEETING BUT NET NET IS WHAT WE WANT."

10:55AM  9         "LOVE YOU TOO."

10:55AM  10   Q.   THE -- I'M SORRY.  THAT'S YOU.

10:55AM  11   A.   "THE POINT ABOUT NARROWING DOWN MENU TO HIT HIGH FS

10:55AM  12   PERCENTAGE CAME TO ME LIKE GIFT OF GOD."

10:55AM  13   Q.   AND NOW WE'RE TURNING TO PAGE 5.

10:55AM  14   A.   "I WAS MEDITATING ON THIS MEETING ALL NIGHT AND ALL DAY."

10:55AM  15   Q.   "YOU NAILED IT."

10:55AM  16   A.   "WE MUST HIT OUR VOLUME GOALS NOW."

10:56AM  17        "WE NEED TO MAKE IT A MATTER OF LIFE AND DEATH."

10:56AM  18        "SURVIVAL.  WE MUST NOT LOSE."

10:56AM  19   Q.   NOW WE'RE TURNING TO PAGE 6.

10:56AM  20   A.   "BTW I SENT CVS DOCUMENT TO HEATHER AND CHRIS ON SATURDAY

10:56AM  21   AND HAVEN'T RECEIVED ANY FEEDBACK FROM THEM."

10:56AM  22   Q.   "OK I WILL BE THERE (LANDING IN 2 HOURS AND 10 MINUTES)

10:56AM  23   AND CAN MEET WITH ANY CANDIDATES WE THINK MAKES SENSE.  NOTHING

10:56AM  24   IS ON MY CALENDAR.  DO YOU WANT ME TO EMAIL HEATHER AND CHRIS

10:56AM  25   ON TURNING THE CVS DOCUMENT?"

JHAVERI DIRECT BY MR. SCHENK                                    3632

10:56AM   1      A.   "NO."

10:56AM   2      Q.   "ARE THEY HELPING YOU ON WAG CONTRACT?"

10:56AM   3      A.   "NO ONE ON WAG CONTRACT BEING WANT ANYONE ON WAG CONTRACT.

10:56AM   4      THIS U AND I NEED CLOSE OUR CHESTS."

10:56AM   5           "DON'T WANT."

10:56AM   6      Q.   NOW WE'RE TURNING TO PAGE 7.

10:57AM   7      A.   "I PRESENTED CA BUY ASKED ME WHY WE WOULDN'T DO CA WITH

10:57AM   8      WAG 'OUT OF CURIOSITY.'"

10:57AM   9           "I TOLD HIM CVS HAS BETTER FOOTPRINT IN SOCAL BUT

10:57AM  10      WALGREENS IS NOT TOO FAR BEHIND."

10:57AM  11      Q.   NOW ON TO PAGE 8.

10:57AM  12      A.   "CVS WON'T HAPPEN FOR ANOTHER YEAR."

10:57AM  13           "SO IF THEY WANT WE WILL MOVE WITHOUT THEM."

10:57AM  14           "WE WILL TALK ABOUT WAG WHEN U R BACK N."

10:57AM  15           "I SENT U CONTRACT AND COVER NOTE.  PLEASE SPEND TIME ON

10:57AM  16      THAT SO I CAN SEND OUT."

10:57AM  17      Q.   "HMM."

10:58AM  18           "YEAH."

10:58AM  19           "K."

10:58AM  20           "WHAT'S YOUR SENSE ON WHY 12 MO FOR SERVICE?"

10:58AM  21           "WHERE DID U LEAVE IT WITH HIM?"

10:58AM  22      A.   "THEY DON'T KNOW THE UPSIDE OR DOWNSIDE OF NOT HAVING

10:58AM  23      THIS."

10:58AM  24      Q.   "YEAH."

10:58AM  25           "WAS HE UPSET ABOUT MISSING PA?"

JHAVERI DIRECT BY MR. SCHENK                                    3633

10:58AM  1    A.   "AND THE FACT THAT WE ARE NOT GROWING WITH WAG IS

10:58AM  2    SOMETHING THAT THEY ARE TRYING TO UNDERSTAND."

10:58AM  3        "THEY ARE ALL LEMMINGS.  THEY ONLY WANT IT IF OTHERS WANT

10:58AM  4    IT."

10:58AM  5    Q.   "THINKING."

10:58AM  6    A.   "THE MINUTE I SAID CALIFORNIA HIS QUESTION WAS WHY CVS,

10:58AM  7    WHY NOT WALGREENS?"

10:58AM  8    Q.   "I KNOW."

10:58AM  9    A.   "INSTEAD IF THERANOS WAS STRATEGIC TO THEM HE WOULD HAVE

10:58AM  10   JUMPED ON IT."

10:58AM  11   Q.   "SEEING OUR LOCATIONS IN PA WILL BE THE SAME REACTION."

10:58AM  12   A.   "THEY DON'T THINK OF US AS STRATEGIC.  EVERY CONVERSATION

10:58AM  13   I HAVE WITH HIM HE SPEND AT LEAST HALF OF IT IN WHEN WE CAN PUT

10:58AM  14   DEVICES IN MINUTE CLINICS."

10:59AM  15       "JUST LIKE 3 YEARS AGO."

10:59AM  16   Q.   NOW ON TO PAGE 9.

10:59AM  17       MS. HOLLIMAN, I THINK THAT'S PAGE 16.  DO WE HAVE 9 NEXT?

10:59AM  18   THAT'S IT.

10:59AM  19   A.   "HIGHEST VOLUME DAY TODAY .547 IN WAG."

10:59AM  20   Q.   AND NOW ON TO PAGE 10.

10:59AM  21   A.   "JC ARTICLE IS OUT."

10:59AM  22   Q.   PAGE 11?

11:00AM  23   A.   "I AM OK WITH LESS BLOOD AND DISCOMFORT IN HOLDING

11:00AM  24   STATEMENT."

11:00AM  25   Q.   "ALMOST ODD IF NOT THERE."

JHAVERI DIRECT BY MR. SCHENK                                        3634

```
11:00AM   1              AND NOW PAGE 12.

11:00AM   2      A.   "OK."

11:00AM   3           "JUST WORRIED ABOUT FDA AND CMS."

11:00AM   4           "BUT OK."

11:00AM   5           "HAVE TO TAKE THIS RISK."

11:00AM   6      Q.   "WE MADE SUCH BIG DEAL WHEN THEY WERE HERE ABOUT

11:00AM   7      VENIPUNCTURE BEING LESS BLOOD I AM COMFORTABLE WITH IT."

11:00AM   8           "CRAMER WANTS EXCLUSIVE."

11:00AM   9           "NO OTHER T.V."

11:00AM  10      A.   "WAIT FOR DAVID."

11:01AM  11      Q.   NOW ON TO PAGE 13.

11:01AM  12           "SENDING DRAFT RUPERT EMAIL.  THE LANGUAGE ABOUT WHAT JC

11:01AM  13      SAID IS DAVID'S LANGUAGE DYING."

11:01AM  14           "FYI."

11:01AM  15      A.   "OK."

11:01AM  16           "WHICH PART IS DAVID LANGUAGE."

11:01AM  17      Q.   "THE PART ABOUT WHY I DIDN'T WANT TO TALK TO JC (HIS

11:01AM  18      ACCUSATIONS) AS WELL AS THE OTHER PARAGRAPHS THAT WEREN'T THERE

11:01AM  19      BEFORE.  EVERYTHING NEW EXCEPT THE ONE SENTENCE I ADDED ON THE

11:01AM  20      NEW ARTICLE."

11:01AM  21           "I AM COMFORTABLE WITH SAYING THE DEATH AND SEX THING TO

11:01AM  22      RUPERT BC IT MAKES THE POINT."

11:01AM  23      A.   "DON'T."

11:01AM  24      Q.   "DON'T WHAT?"

11:01AM  25      A.   "DON'T MAKE THE DEATH AND SEX POINT.  NOT OK."
```

JHAVERI DIRECT BY MR. SCHENK                                    3635

| | | |
|---|---|---|
| 11:01AM | 1 | Q.   "CHALLENGE IS YOU SAW HOW EVERYONE REACTED IN PRESS TO ME |
| 11:01AM | 2 | NOT MEETING WITH HIM." |
| 11:01AM | 3 | "THEY DIDN'T THINK HIM CHALLENGING ME ON PATENTS WAS |
| 11:02AM | 4 | REMOTELY A GOOD REASON NOT TO MEET WITH HIM." |
| 11:02AM | 5 | A.   "BUT WE HAVE ENUFF POINTS TO SAY I DIDN'T MEET WITH HIM |
| 11:02AM | 6 | BECAUSE OF HIS FALSE ACCUSATIONS AND DIDN'T HAVE TO MEET WITH |
| 11:02AM | 7 | SOMEONE WHO WAS ATTACKING ME WITHOUT EVEN MEETING WITH ME.  FOR |
| 11:02AM | 8 | EXAMPLE PATENTS." |
| 11:02AM | 9 | "I WOULDN'T OPEN UP USE PERSONAL LIFE OR MURDER BECAUSE |
| 11:02AM | 10 | ENOUGH PEOPLE ON TWITTER WILL ASSUME THAT THERE IS SOMETHING |
| 11:02AM | 11 | THERE. |
| 11:02AM | 12 | "IT'S FILTH." |
| 11:02AM | 13 | "AND WE NEED TO GET OUT OF FLIRTY." |
| 11:02AM | 14 | "FILTH." |
| 11:02AM | 15 | Q.   "AGREE FOR SURE ON OUTSIDE WORLD.  EVEN WHEN RUPERT TO |
| 11:02AM | 16 | MAKE POINT." |
| 11:02AM | 17 | A.   "IF U FEEL STRONGLY ABOUT MURDER.  BUT NOT PERSONAL LIFE." |
| 11:02AM | 18 | "I THINK IT IS IMPORTANT TO SEND THIS EMAIL BUT DOESN'T |
| 11:03AM | 19 | HELP WITH PUBLIC BEATING.  ALL OUR PARTNERS ARE BAILING ONE AT |
| 11:03AM | 20 | A TIME AND SAME WITH OUR INVESTORS." |
| 11:03AM | 21 | Q.   AND NOW ON TO PAGE 14. |
| 11:03AM | 22 | A.   "DIGNITY WAG EVERYONE IS POSTURING TO WALK AWAY.  WE R |
| 11:03AM | 23 | LOSING LEVERAGE FAST." |
| 11:03AM | 24 | Q.   "HAVE YOU TALKED TO WAG?" |
| 11:03AM | 25 | A.   "THEY ARE NOT TALKING FOR NOW UNTIL THEIR LAWYERS SAY SO." |

JHAVERI DIRECT BY MR. SCHENK                                    3636

11:03AM   1     Q.   "TO US?"

11:03AM   2     A.   "YES."

11:03AM   3          "AT C LEVEL."

11:03AM   4     Q.   "THEIR LAWYERS TOLD THEM NOT TO TALK TO US?"

11:03AM   5     A.   "YES."

11:03AM   6     Q.   "WOW."

11:03AM   7     A.   "IN SO MANY WORDS."

11:03AM   8          "NOT EXACTLY BUT THEY WILL BRING ALL OF THIS UP ABOUT

11:03AM   9     FINGERSTICK, ET CETERA, IN CONTRACT NEGOTIATIONS."

11:03AM   10         "IT IS GOING TO BE A VERY DIFFICULT 12 MONTHS."

11:04AM   11         "OUR CLIA LAB FAILED MPV PT AT ALL 5 LEVELS.  JUST FOUND

11:04AM   12    OUT.  DEALING WITH IT."

11:04AM   13    Q.   NOW ON TO PAGE 15.

11:04AM   14    A.   "MISS OLD DAYS.  THESE DAYS ARE NOT WORTH WHATEVER WE R

11:04AM   15    TRYING TO DO HERE."

11:04AM   16         "NIM JUST TEXTED ME.  WANTS TO TALK URGENTLY."

11:04AM   17    Q.   "U CALLING HIM?"

11:04AM   18    A.   "HE WILL CALL ME WHEN READY."

11:04AM   19    Q.   "LET ME KNOW HOW IT GOES.  THE FACTS ARE ON OUR SIDE."

11:04AM   20    A.   "I KNOW.  I AM STRONG ON FACTS.  THEY ALWAYS REACT TO

11:04AM   21    ANYTHING BUT I WILL BE STRONG."

11:04AM   22    Q.   AND FINALLY PAGE 16.

11:04AM   23    A.   "OK.  WAG FREAKING OUT.  LACK OF TRANSPARENCY."

11:05AM   24         "WHY THEY FOUND THIS ALL OUT THRU MEDIA AND NOT THRU US."

11:05AM   25    Q.   "K.  THAT'S WHAT WE'LL DO."

JHAVERI DIRECT BY MR. SCHENK                                              3637

| | | |
|---|---|---|
| 11:05AM | 1 | "HOW WAS NIM? |
| 11:05AM | 2 | A.   "WHY WE DIDN'T TELL THEM ABOUT TURNING OFF NANOTAINER A." |
| 11:05AM | 3 | Q.   "DID YOU TELL HIM IT LITERALLY JUST HAPPENED?" |
| 11:05AM | 4 | A.   "YES." |
| 11:05AM | 5 | Q.   "AND WE HADN'T FINALIZED PLAN W FDA YET AND STILL |
| 11:05AM | 6 | HAVEN'T." |
| 11:05AM | 7 | A.   "I TOLD HIM WE WERE SURPRISED BY THE ARTICLE AS MUCH AS |
| 11:05AM | 8 | THEY R." |
| 11:05AM | 9 | "YES." |
| 11:05AM | 10 | "BUT IT WAS MATTER OF COMMUNICATION.  I HAD ACTUALLY |
| 11:05AM | 11 | THOUGHT ABOUT IT BUT GOT TOO BUSY TO CHAT WITH U." |
| 11:05AM | 12 | Q.   "THEN LET'S SHOW THEM THAT THIS LITERALLY IS STILL UP IN |
| 11:05AM | 13 | AIR." |
| 11:05AM | 14 | "SO WE LITERALLY JUST DECIDED SINCE THE DISCUSSION IS |
| 11:05AM | 15 | GETTING AIRED OUT IN PRESS?" |
| 11:05AM | 16 | A.   "OK." |
| 11:05AM | 17 | "HOWEVER ISSUE IS WE DIDN'T TELL THEM IN ADVANCE ABOUT |
| 11:05AM | 18 | SWITCHING." |
| 11:05AM | 19 | Q.   "WE'LL HAVE TO PRESENT WELL THAT WE HADN'T DECIDED TO." |
| 11:06AM | 20 | A.   "BAD IDEA.  AT THIS POINT THEY KNOW.  SO NEED TO BE |
| 11:06AM | 21 | TRANSPARENT." |
| 11:06AM | 22 | Q.   "HOW LONG HAS IT BEEN THAT WE DIDN'T TELL THEM?" |
| 11:06AM | 23 | A.   "3-4 WEEKS." |
| 11:06AM | 24 | Q.   "I'M TRYING TO REMEMBER WHAT OUR THINKING WAS ON THAT." |
| 11:06AM | 25 | A.   "NONE.  WE JUST DIDN'T TELL THEM THINKING UNDER NEW MODEL |

JHAVERI DIRECT BY MR. SCHENK                                    3638

11:06AM  1      THIS DOESN'T MATTER."

11:06AM  2           "BUT ATTACKS LIKE THIS SCARE THEM AS THEY SCARE EVERYONE."

11:06AM  3      Q.   "YEAH."

11:06AM  4           MR. JHAVERI, WE JUST READ TEXT MESSAGES BETWEEN MARCH OF

11:06AM  5      2015 AND OCTOBER OF 2015.

11:06AM  6           DURING THIS PERIOD, WERE YOU WORKING DILIGENTLY TO

11:06AM  7      OPERATIONALIZE THERANOS BLOOD TESTING SERVICES INSIDE OF

11:06AM  8      WALGREENS STORES?

11:06AM  9      A.   YES.

11:06AM  10                MR. SCHENK:  YOUR HONOR, MAY I HAVE ONE MOMENT?

11:06AM  11                THE COURT:  YES.

11:07AM  12           (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

11:07AM  13                MR. SCHENK:  NO FURTHER QUESTIONS.  THANK YOU.

11:07AM  14                THE COURT:  ALL RIGHT.  THANK YOU.

11:07AM  15           DO YOU HAVE CROSS-EXAMINATION?

11:07AM  16                MR. DOWNEY:  I WILL, YOUR HONOR.

11:07AM  17                THE COURT:  LET'S TAKE OUR MORNING RECESS NOW,

11:07AM  18      LADIES AND GENTLEMEN.

11:07AM  19           SHOULD WE TAKE 25 MINUTES?  LET'S DO THAT.  25 MINUTES.

11:07AM  20      25 MINUTES.

11:07AM  21           YOU MAY STAND DOWN, SIR.  YOU CAN STAND DOWN AND WE'LL

11:07AM  22      TAKE 25 MINUTES.

11:07AM  23                MR. SCHENK:  THANK YOU.

11:07AM  24           (RECESS FROM 11:07 A.M. UNTIL 11:45 A.M.)

11:45AM  25                THE COURT:  ALL RIGHT.  THANK YOU.  WE'RE BACK ON

JHAVERI CROSS BY MR. DOWNEY                                    3639

| | | |
|---|---|---|
| 11:45AM | 1 | THE RECORD. |
| 11:45AM | 2 | ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN. |
| 11:45AM | 3 | OUR JURY IS PRESENT, AND OUR WITNESS IS ON THE STAND. |
| 11:46AM | 4 | MR. DOWNEY, YOU HAVE CROSS? |
| 11:46AM | 5 | MR. DOWNEY:  I DO, YOUR HONOR. |
| 11:46AM | 6 | YOUR HONOR, DURING THE BREAK I ASKED MS. KRATZMANN TO PASS |
| 11:46AM | 7 | UP A COPY OF THE EXHIBITS FOR YOU AND PLACE ONE ON THE WITNESS |
| 11:46AM | 8 | STAND FOR MR. JHAVERI. |
| 11:46AM | 9 | THE COURT:  THANK YOU. |
| 11:46AM | 10 | **CROSS-EXAMINATION** |
| 11:46AM | 11 | BY MR. DOWNEY: |
| 11:46AM | 12 | Q.   GOOD LATE MORNING TO YOU, MR. JHAVERI.  MY NAME IS |
| 11:46AM | 13 | KEVIN DOWNEY AND I REPRESENT MS. HOLMES. |
| 11:46AM | 14 | I'M GOING TO REMOVE MY MASK AS WELL SO WE CAN HEAR EACH |
| 11:46AM | 15 | OTHER DURING THIS CONVERSATION. |
| 11:46AM | 16 | A.   SURE. |
| 11:46AM | 17 | Q.   YOU'VE WORKED IN AND AROUND RETAIL OPERATIONS FOR DECADES |
| 11:46AM | 18 | AT THIS POINT; RIGHT? |
| 11:46AM | 19 | A.   THAT'S CORRECT. |
| 11:46AM | 20 | Q.   AND IT'S A HARD THING TO OPEN A RETAIL STORE, ISN'T IT? |
| 11:46AM | 21 | A.   IT IS. |
| 11:46AM | 22 | Q.   AND IT IS A HARD THING TO EVEN OPEN A DEPARTMENT WITHIN A |
| 11:46AM | 23 | RETAIL STORE? |
| 11:46AM | 24 | A.   IT IS. |
| 11:46AM | 25 | Q.   AND IT'S A HARD THING TO MANAGE A STORE; CORRECT? |

JHAVERI CROSS BY MR. DOWNEY                                           3640

11:46AM  1      A.   IT IS VERY DIFFICULT TO MANAGE A STORE.

11:46AM  2      Q.   AND EVEN TO MANAGE A DEPARTMENT WITHIN A STORE; CORRECT?

11:46AM  3      A.   CORRECT.

11:46AM  4      Q.   THERE'S A LOT TO IT?

11:47AM  5      A.   THERE'S MANY THINGS THAT ARE REQUIRED.

11:47AM  6      Q.   OKAY.  AND IF THE JOB THAT IS ASKED OF YOU IS TO OPEN 1500

11:47AM  7      STORES IN A YEAR, THAT'S A VERY HARD JOB; CORRECT?

11:47AM  8      A.   THAT IS VERY DIFFICULT, YES.

11:47AM  9      Q.   BUT IF THE SENIOR MANAGEMENT OF YOUR COMPANY ASKS YOU TO

11:47AM  10     DO THAT, THAT'S SOMETHING THAT YOU HAVE TO TRY TO ACCOMPLISH;

11:47AM  11     CORRECT?

11:47AM  12     A.   IF THEY ASK ME TO DO SOMETHING, YES, I WILL DO IT IN THE

11:47AM  13     BEST WAY THAT I CAN.

11:47AM  14     Q.   OKAY.  LET'S TALK ABOUT THE SITUATION THAT WAS IN PLACE

11:47AM  15     WHEN YOU REALLY STARTED WORKING ON THE RELATIONSHIP BETWEEN

11:47AM  16     THERANOS AND WALGREENS JUST SO I'M CLEAR ON THIS.

11:47AM  17          YOU WERE NOT INVOLVED IN THE NEGOTIATION OF ANY OF THE

11:47AM  18     AGREEMENTS BETWEEN WALGREENS AND THERANOS; CORRECT?

11:47AM  19     A.   NO, SIR.

11:47AM  20     Q.   AND THERE WERE OTHER EXECUTIVES AT THERANOS WHO DID

11:47AM  21     THOSE -- OR AT WALGREENS WHO DID THAT?

11:48AM  22     A.   THAT'S CORRECT.

11:48AM  23     Q.   THAT INCLUDED, FOR EXAMPLE, MR. WASSON, WHO WAS THE CEO,

11:48AM  24     AND MR. MIQUELON, WHO WAS THE CFO?

11:48AM  25     A.   I DON'T KNOW WHO WERE INVOLVED, BUT I WAS NOT INVOLVED IN

JHAVERI CROSS BY MR. DOWNEY                                    3641

11:48AM  1     THAT.

11:48AM  2     Q.   BUT YOU DO KNOW THAT ONE OF THE PRINCIPAL PLAYERS IN THE

11:48AM  3     RELATIONSHIP BETWEEN WALGREENS AND THERANOS WAS DR. JAY ROSAN;

11:48AM  4     CORRECT?

11:48AM  5     A.   THAT'S CORRECT.

11:48AM  6     Q.   AND DR. ROSAN WAS A SENIOR EXECUTIVE AT WALGREENS;

11:48AM  7     CORRECT?

11:48AM  8     A.   THAT'S CORRECT.

11:48AM  9     Q.   AND WHEN YOU TOOK OVER THE RELATIONSHIP WITH MR. BALWANI,

11:48AM  10    YOU UNDERSTOOD THAT DR. ROSAN HAD BEEN INVOLVED FOR MANY YEARS

11:48AM  11    IN THAT RELATIONSHIP; CORRECT?

11:48AM  12    A.   YES, I UNDERSTOOD THAT.

11:48AM  13    Q.   NOW, WHEN YOU STARTED WORKING TO -- I'LL USE THE WORD YOU

11:48AM  14    USED.  WHEN YOU STARTED WORKING TO OPERATIONALIZE THE PLAN THAT

11:48AM  15    WAS IN PLACE TO OPEN A NUMBER OF THERANOS CENTERS IN WALGREENS

11:48AM  16    STORES, DID SOMEONE BRIEF YOU ON THE SITUATION?

11:49AM  17    A.   WELL, IF I CAN STEP BACK A LITTLE BIT.  THERE WAS NO PLAN

11:49AM  18    TO OPERATIONALIZE THE SERVICES.  THEY HAD THREE STORES OPENED

11:49AM  19    WHEN I HAD TAKEN OVER ON THE OPERATIONAL PIECE.

11:49AM  20         SO WE WERE DEVELOPING A FULL PLAN TO GET THIS DONE, AND

11:49AM  21    THAT'S PART OF MY RESPONSIBILITY, AS WELL AS MY TEAM'S

11:49AM  22    RESPONSIBILITY.

11:49AM  23    Q.   OKAY.  AND JUST SO THAT I'M CLEAR, YOU HAD NOT PLAYED A

11:49AM  24    ROLE IN ANY KIND OF EVALUATION OF THE TECHNOLOGY OF THERANOS

11:49AM  25    PRIOR TO THE TIME ANY AGREEMENTS WERE SIGNED; IS THAT RIGHT?

JHAVERI CROSS BY MR. DOWNEY                                          3642

| | | |
|---|---|---|
| 11:49AM | 1 | A.   THAT'S CORRECT, SIR. |
| 11:49AM | 2 | Q.   AND THAT WAS DONE BY OTHERS AT WALGREENS AND OUTSIDE |
| 11:49AM | 3 | CONSULTANTS ADVISING THEM; CORRECT? |
| 11:49AM | 4 | A.   THAT IS CORRECT. |
| 11:49AM | 5 | Q.   AND AS FAR AS YOU KNOW, ADEQUATE DUE DILIGENCE WAS DONE IN |
| 11:49AM | 6 | THAT REGARD; CORRECT? |
| 11:49AM | 7 | A.   THAT IS CORRECT. |
| 11:49AM | 8 | Q.   AND YOU ALSO WERE NOT INVOLVED IN CONTACT WITH MS. HOLMES; |
| 11:49AM | 9 | IS THAT CORRECT? |
| 11:49AM | 10 | A.   NO.  I HAD VERY LITTLE CONTACT WITH MS. HOLMES. |
| 11:49AM | 11 | Q.   OKAY.  AND THAT WAS TRUE THROUGHOUT THE TIME THAT YOU WERE |
| 11:50AM | 12 | INVOLVED IN THE THERANOS-WALGREENS RELATIONSHIP; CORRECT? |
| 11:50AM | 13 | A.   YEAH, I MET WITH MS. HOLMES MAYBE TWO OR THREE TIMES AT |
| 11:50AM | 14 | MOST. |
| 11:50AM | 15 | Q.   OKAY.  NOW, WHEN YOU GOT YOUR ORIGINAL BRIEFING -- LET ME |
| 11:50AM | 16 | JUST ORIENT MYSELF IN TERMS OF THE DATE -- DID YOU BEGIN |
| 11:50AM | 17 | WORKING ON THE PARTNERSHIP IN EARNEST IN LATE 2013 OR EARLY |
| 11:50AM | 18 | 2014? |
| 11:50AM | 19 | A.   IN EARLY 2014. |
| 11:50AM | 20 | Q.   AND THERE WERE A FEW STORES OPEN AT THAT TIME; CORRECT? |
| 11:50AM | 21 | A.   WHEN I TOOK OVER RESPONSIBILITY, THERE WERE THREE STORES |
| 11:50AM | 22 | OPEN, TWO IN ARIZONA AND ONE IN CALIFORNIA. |
| 11:50AM | 23 | Q.   AND DID YOU TRY AND GET A SENSE OF WHAT WAS GOING ON IN |
| 11:50AM | 24 | THOSE STORES? |
| 11:50AM | 25 | A.   YES, I DID. |

JHAVERI CROSS BY MR. DOWNEY                                              3643

11:50AM   1    Q.   AND DID YOU LEARN RELATIVELY EARLY IN YOUR DEALINGS WITH

11:50AM   2    THERANOS THAT A NUMBER OF BLOOD DRAWS WERE BEING CONDUCTED BY

11:50AM   3    VENOUS DRAW?

11:50AM   4    A.   YES, YES.  PART OF MY ONBOARDING WAS ALSO TO UNDERSTAND

11:50AM   5    FROM MY TEAM, OUR TEAM, THE WALGREENS TEAM, WHAT THE STATUS WAS

11:51AM   6    AT THE STORES, WHERE THEY STOOD, WHAT THEY WERE SEEING, AND

11:51AM   7    THEN THAT WAS PART OF MY LEARNING.

11:51AM   8    Q.   OKAY.  AND SO YOU LEARNED AT THAT POINT THAT THERE WERE

11:51AM   9    SOME BLOOD DRAWS THAT WERE BEING TAKEN BY FINGERSTICK; CORRECT?

11:51AM  10         AND I THINK YOU SAID THAT THERE WERE SOME DRAWS THAT WERE

11:51AM  11    BEING TAKEN BY VEIN, THAT WERE VENOUS DRAWS; CORRECT?

11:51AM  12    A.   THAT'S CORRECT.

11:51AM  13    Q.   BUT REALLY THERE ARE THREE TYPES OF BLOOD DRAWS; CORRECT?

11:51AM  14    THERE'S THE FINGERSTICK DRAW THAT YOU MENTIONED; THERE'S THE

11:51AM  15    TRADITIONAL VENOUS DRAW; AND THEN YOU CAN TAKE A MICROSAMPLE

11:51AM  16    DRAW FROM THE ARM AS WELL; CORRECT?

11:51AM  17    A.   YES.

11:51AM  18    Q.   AND THAT'S CONSIDERED A VENOUS DRAW; CORRECT?

11:51AM  19    A.   THAT'S CORRECT.

11:51AM  20    Q.   AND YOU LEARNED THAT PART OF THERANOS'S OPERATION IN THE

11:51AM  21    STORE WAS THAT THEY WERE TAKING CERTAIN SAMPLES FROM THE VEIN

11:51AM  22    AS MICROSAMPLES; CORRECT?

11:51AM  23    A.   THAT'S CORRECT.

11:51AM  24    Q.   AND THAT WAS PUBLICLY ANNOUNCED PRIOR TO THE, TO THE

11:52AM  25    PARTNERSHIP BEGINNING OPERATIONS; CORRECT?

JHAVERI CROSS BY MR. DOWNEY                                          3644

| | | |
|---|---|---|
| 11:52AM | 1 | A.   YES, THERE WERE VENOUS DRAWS THAT WERE AT PEDIATRIC LEVEL |
| 11:52AM | 2 | DOSES, OR BLOOD DRAWS, THAT WERE PART OF THAT. |
| 11:52AM | 3 | Q.   OKAY.  NOW, WHEN YOU BEGAN WORK ON THE PARTNERSHIP, DID |
| 11:52AM | 4 | YOU SIT DOWN AND READ THE AGREEMENTS THAT WERE IN PLACE BETWEEN |
| 11:52AM | 5 | THERANOS AND WALGREENS? |
| 11:52AM | 6 | A.   I DID, SIR. |
| 11:52AM | 7 | Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 1083. |
| 11:52AM | 8 | A.   IS THAT IN WHICH BINDER? |
| 11:52AM | 9 | Q.   I BELIEVE IT SHOULD BE IN VOLUME 2 OF THE TWO BINDERS THAT |
| 11:52AM | 10 | YOU HAVE, BUT I CAN HELP YOU LOCATE IT IF YOU HAVE DIFFICULTY. |
| 11:52AM | 11 | A.   YEAH. |
| 11:52AM | 12 | THE CLERK:  THAT WAS PREVIOUSLY ADMITTED, COUNSEL. |
| 11:53AM | 13 | BY MR. DOWNEY: |
| 11:53AM | 14 | Q.   DO YOU HAVE THAT IN FRONT OF YOU? |
| 11:53AM | 15 | A.   IS THAT WHAT IS ON THE SCREEN NOW? |
| 11:53AM | 16 | Q.   IT IS, YES. |
| 11:53AM | 17 | A.   YES. |
| 11:53AM | 18 | Q.   AND DO YOU SEE THAT THIS IS AN EMAIL BETWEEN MR. MIQUELON, |
| 11:53AM | 19 | THE WALGREENS CFO, AND MS. HOLMES. |
| 11:53AM | 20 | DO YOU SEE THAT? |
| 11:53AM | 21 | A.   I DO. |
| 11:53AM | 22 | Q.   AND DO YOU SEE THAT HE SAYS THAT HE'S ATTACHING A |
| 11:53AM | 23 | CONCEPTUAL FRAMEWORK? |
| 11:53AM | 24 | A.   YES. |
| 11:53AM | 25 | Q.   AND THIS WAS SENT IN SEPTEMBER OF 2013. |

JHAVERI CROSS BY MR. DOWNEY                                    3645

11:53AM  1        AND IS THAT ABOUT FIVE OR SIX MONTHS BEFORE YOU BEGAN

11:53AM  2    WORKING ON THE PARTNERSHIP?

11:53AM  3    A.    THAT'S CORRECT.

11:53AM  4    Q.    OKAY.  LET ME ASK YOU TO TAKE A LOOK AT THE FIRST

11:53AM  5    PARAGRAPH, WHICH IS ON PAGE 2 OF THE EXHIBIT.

11:53AM  6        AND I WANT TO LOOK AT THIS FIRST PARAGRAPH, ROMAN NUMERAL

11:53AM  7    I WHICH IS UP ON THE SCREEN.

11:54AM  8        AND DO YOU SEE THERE IN THE TERM SHEET, MR. MIQUELON

11:54AM  9    EXPRESSED THAT WALGREENS WAS WILLING TO COMMIT TO DEVELOPING

11:54AM  10   THERANOS LAB SERVICES AT 1500 LOCATIONS IN THE FIRST 12 MONTHS

11:54AM  11   AFTER THE START OF THE ROLLOUT?

11:54AM  12   A.    YES.

11:54AM  13   Q.    AND DO YOU SEE THAT HE WAS ALSO WILLING TO COMMIT TO AN

11:54AM  14   ADDITIONAL 1500 LOCATIONS IN THE FOLLOWING 12 MONTHS?

11:54AM  15   A.    I DO SEE THAT.

11:54AM  16   Q.    AND THE ROLLOUT THAT THAT CONTEMPLATES, THAT'S A BIG JOB;

11:54AM  17   RIGHT?

11:54AM  18   A.    THAT IS A BIG JOB.

11:54AM  19   Q.    FOR MANY OF THE REASONS THAT YOU TALKED ABOUT WHEN YOU

11:54AM  20   WERE ON DIRECT EXAMINATION WITH MR. SCHENK; RIGHT?  YOU HAVE TO

11:54AM  21   TRAIN PEOPLE; CORRECT?  OFTEN YOU HAVE TO BUILD OUT IN A

11:54AM  22   FACILITY; CORRECT?

11:54AM  23   A.    THAT'S CORRECT.

11:54AM  24   Q.    AND YOU HAVE TO FIGURE OUT HOW THE PROCESS IS GOING TO

11:54AM  25   WORK OF PATIENTS RELATING TO THE SERVICE; CORRECT?

JHAVERI CROSS BY MR. DOWNEY                                        3646

11:54AM   1   A.   THAT'S CORRECT.

11:54AM   2   Q.   AND SO THIS COMMITMENT WAS A HUGE COMMITMENT ON THE PART

11:55AM   3   OF WALGREENS; CORRECT?

11:55AM   4   A.   YES, IT WAS.

11:55AM   5   Q.   AND WHO WAS WORKING ON THAT TYPE OF A COMMITMENT AROUND

11:55AM   6   THE TIME OF THE LAUNCH?

11:55AM   7   A.   AT THE TIME OF THE LAUNCH --

11:55AM   8   Q.   ON THE WALGREENS SIDE?

11:55AM   9   A.   I DO NOT KNOW EXACTLY WHO WAS WORKING ON IT AT THAT TIME,

11:55AM  10   BUT I KNOW THERE WERE SOME FOLKS, DR. ROSAN WAS ONE OF THEM,

11:55AM  11   THAT WAS INVOLVED, AND THERE WAS A SMALL TEAM LED BY

11:55AM  12   KIM ROMANSKI WHO WAS PART OF IT.

11:55AM  13   Q.   AND WHO WAS WORKING ON WHAT YOU LATER STARTED TO WORK ON,

11:55AM  14   WHICH WAS THE OPERATIONALIZATION OF THE PROGRAM?

11:55AM  15   A.   I HAD PUT IN A TEAM, A LARGER TEAM LED BY CASEY KOZLOWSKI,

11:55AM  16   WE MENTIONED HER NAME EARLIER, WHO LED THE TEAM WHO REPORTED TO

11:55AM  17   ME.

11:55AM  18   Q.   I DON'T MEAN TO INTERRUPT, BUT I MEANT BEFORE YOU BEGAN

11:55AM  19   WORK.

11:55AM  20   A.   OH.  AS I SAID, THE INDIVIDUALS THAT I JUST TALKED ABOUT,

11:55AM  21   DR. ROSAN AND KIM ROMANSKI AND HER TEAM WERE WORKING ON IT

11:55AM  22   BEFORE I STARTED.

11:55AM  23   Q.   OKAY.  AND THEN YOU CAME AT SOME POINT IN 2014 AND YOU PUT

11:56AM  24   IN PLACE A LARGER TEAM?

11:56AM  25   A.   THAT'S CORRECT.

JHAVERI CROSS BY MR. DOWNEY                                      3647

11:56AM   1    Q.   LET ME ASK YOU NOW TO LOOK AT -- I WANT TO SHOW YOU A COPY

11:56AM   2    OF THE CONTRACT THAT WAS IN PLACE BETWEEN THERANOS AND

11:56AM   3    WALGREENS.  IT HAS ALSO BEEN PREVIOUSLY ADMITTED AND IT IS

11:56AM   4    EXHIBIT 1387.  AND IF YOU WANT TO LOOK AT THE ENTIRETY, IT

11:56AM   5    SHOULD BE IN THAT SAME NOTEBOOK.

11:56AM   6         SORRY.  I'M POINTING YOU TO THE WRONG EXHIBIT.

11:56AM   7         YES, OKAY.  1387, NOT 1837.

11:57AM   8         DO YOU SEE THAT?

11:57AM   9    A.   I DO.

11:57AM  10    Q.   AND IF YOU REVIEW THE ENTIRE DOCUMENT, DO YOU SEE THAT

11:57AM  11    THAT'S A LETTER AND IT WAS SIGNED BETWEEN ELIZABETH HOLMES AT

11:57AM  12    THE END ON THE LAST PAGE AND MARK VAINISI FROM WALGREENS.

11:57AM  13         DO YOU SEE THAT?

11:57AM  14    A.   I DO.

11:57AM  15    Q.   AND THIS WAS THE MOST RECENT AMENDMENT TO THE

11:57AM  16    THERANOS-WALGREENS MASTER SERVICES AGREEMENT; CORRECT?

11:57AM  17    A.   THAT'S I'M AWARE OF, YES.

11:57AM  18    Q.   AND THIS WAS ONE OF THE DOCUMENTS THAT YOU REVIEWED AT THE

11:57AM  19    TIME THAT YOU BECAME THE PERSON IN CHARGE OF OPERATIONALIZING

11:57AM  20    THE THERANOS-WALGREENS PARTNERSHIP; CORRECT?

11:57AM  21    A.   THAT'S CORRECT.

11:57AM  22    Q.   IF YOU LOOK AT THE SECOND FULL PARAGRAPH ON PAGE 1 OF THE

11:58AM  23    DOCUMENT, IT BEGINS THAT -- DO YOU SEE THE FIRST SENTENCE

11:58AM  24    THERE?  IT INDICATED IT WAS THE INTENTION OF THE PARTIES TO

11:58AM  25    DEVELOP A MUTUALLY BENEFICIAL STRATEGIC RELATIONSHIP THAT

JHAVERI CROSS BY MR. DOWNEY                                    3648

11:58AM   1    FACILITATES THE SUCCESSFUL DEPLOYMENT OF THERANOS NATIONALLY,

11:58AM   2    ESTABLISHES WALGREENS AS THE NATIONAL PARTNER FOR LABORATORY

11:58AM   3    SERVICES THAT THERANOS IS ABLE TO PROVIDE, AND THERANOS AS

11:58AM   4    WALGREENS'S NATIONAL PARTNER FOR SUCH THERANOS SERVICES.

11:58AM   5         DO YOU SEE THAT?

11:58AM   6    A.   I DO.

11:58AM   7    Q.   AND THAT WAS REALLY THE PURPOSE OF THIS AGREEMENT, TO GIVE

11:58AM   8    SOME EXCLUSIVITY RIGHTS TO WALGREENS ON THE ONE HAND AND TO

11:58AM   9    HELP FACILITATE A NATIONAL ROLLOUT FOR THERANOS ON THE OTHER;

11:58AM   10   CORRECT?

11:58AM   11   A.   THAT'S CORRECT.

11:58AM   12   Q.   IS THERE ANY MENTION IN THIS DOCUMENT OF THE PERCENTAGE OF

11:58AM   13   DRAWS THAT WOULD BE ON FINGERSTICK?

11:58AM   14   A.   I DO NOT KNOW.  I WOULD HAVE TO READ THROUGH THE WHOLE

11:59AM   15   DOCUMENT.

11:59AM   16   Q.   OKAY.  IF -- IF THERE WERE NOT, DOES THAT SURPRISE YOU?

11:59AM   17   A.   IT DEPENDS ON THE CONTRACT, RIGHT?  SO IT'S NOT SIMPLY

11:59AM   18   JUST THERANOS.

11:59AM   19        DEPENDING ON HOW THE INDIVIDUALS AND THE TWO PARTIES

11:59AM   20   CONSTRUCTED THE CONTRACT, SOMETIMES IT'S A HIGHER LEVEL

11:59AM   21   CONTRACT AND THE DETAILS ARE THEN IN A SEPARATE SOW, OR

11:59AM   22   STATEMENT OF WORK, OR SERVICE LEVEL AGREEMENT.

11:59AM   23        SO I WOULD NOT BE SURPRISED IF ALL OF THOSE SPECIFICS ARE

11:59AM   24   NOT IN THIS MASTER SERVICES AGREEMENT.

11:59AM   25   Q.   WELL, DO YOU KNOW OF ANY AGREEMENT BETWEEN THERANOS AND

JHAVERI CROSS BY MR. DOWNEY                                    3649

11:59AM   1    WALGREENS THAT CONTAINS A COMMITMENT ON THERANOS'S PART AS TO

11:59AM   2    THE PERCENTAGE OF BLOOD DRAWS THAT WILL BE VENOUS?

11:59AM   3    A.   I AM NOT AWARE OF THAT.

11:59AM   4    Q.   OKAY.  AND YOU UNDERSTAND THAT UNDER THIS CONTRACT,

11:59AM   5    WALGREENS PAID THERANOS AN INNOVATION FEE; CORRECT?

11:59AM   6    A.   I DO.

11:59AM   7    Q.   AND THE PURPOSE OF PAYING THERANOS THAT INNOVATION FEE WAS

12:00PM   8    TO ASSIST IT IN SCALING UP SO THAT THERE COULD BE A NATIONAL

12:00PM   9    ROLLOUT; CORRECT?

12:00PM  10    A.   THAT WAS PART OF IT, YES.

12:00PM  11    Q.   AND, OF COURSE, PART OF IT WAS TO OBTAIN THE EXCLUSIVITY

12:00PM  12    THAT WALGREENS OBTAINED UNDER THE AGREEMENT; CORRECT?

12:00PM  13    A.   CORRECT.

12:00PM  14    Q.   AND YOU TESTIFIED ON DIRECT THAT THERE WAS NO GUARANTEE,

12:00PM  15    CORRECT, THAT THERE WOULD BE A ROLLOUT NATIONALLY OR EVEN

12:00PM  16    BEYOND A CERTAIN NUMBER OF STORES; CORRECT?

12:00PM  17    A.   THAT'S CORRECT.

12:00PM  18    Q.   BUT YOU UNDERSTOOD THAT WHEN WALGREENS MADE THIS

12:00PM  19    COMMITMENT AT THE END OF 2014, IT WAS WALGREENS'S INTENTION TO

12:00PM  20    DO EVERYTHING IT COULD TO FACILITATE AND DRIVE A NATIONAL

12:00PM  21    ROLLOUT OVER THE NEXT TWO YEARS; CORRECT?

12:00PM  22    A.   WE HAD EVERY INTENTION TO GO TO A NATIONAL ROLLOUT, AGAIN,

12:00PM  23    IF IT WAS OPERATIONALLY FEASIBLE, THE METRICS WERE MADE, AND

12:00PM  24    THE ACTUAL SERVICE DELIVERED ON ITS PROMISE.

12:01PM  25    Q.   AND THE PROCESS OF DOING THOSE THINGS, AGAIN, THAT WAS A

JHAVERI CROSS BY MR. DOWNEY                                    3650

| | | |
|---|---|---|
| 12:01PM | 1 | HUGE TASK FOR WALGREENS TO PERFORM; CORRECT? |
| 12:01PM | 2 | A.   ABSOLUTELY.  IT WAS A HUGE TASK FOR BOTH PARTIES. |
| 12:01PM | 3 | Q.   NO QUESTION.  A HUGE TASK FOR THERANOS; CORRECT? |
| 12:01PM | 4 | A.   YES. |
| 12:01PM | 5 | Q.   AND THERANOS NEVER HAD ANY EXPERIENCE PRIOR TO THE |
| 12:01PM | 6 | WALGREENS LAUNCH WITH REGARD TO ROLLING OUT STORES WHERE THERE |
| 12:01PM | 7 | WOULD BE CONSUMER LAB SERVICES OFFERED; CORRECT? |
| 12:01PM | 8 | A.   I CAN'T SPEAK TO WHAT THEIR EXPERIENCE WAS, BUT I CAN TELL |
| 12:01PM | 9 | YOU IT WAS A HUGE UNDERTAKING FOR BOTH PARTIES. |
| 12:01PM | 10 | Q.   RIGHT.  AND WALGREENS HAD SIGNIFICANT EXPERIENCE IN THAT |
| 12:01PM | 11 | AREA; CORRECT? |
| 12:01PM | 12 | A.   ABSOLUTELY. |
| 12:01PM | 13 | Q.   AND WHATEVER THERANOS THOUGHT, YOU KNEW THIS WAS GOING TO |
| 12:01PM | 14 | BE A HUGE TASK; CORRECT? |
| 12:01PM | 15 | A.   CORRECT. |
| 12:01PM | 16 | Q.   OKAY.  LET ME ASK YOU TO LOOK AT EXHIBIT 3755 AND ASK IF |
| 12:02PM | 17 | YOU CAN IDENTIFY WHAT THIS IS. |
| 12:02PM | 18 | A.   YEP.  THIS IS SOMETHING CALLED A PROGRAM CHARTER, AND SO |
| 12:02PM | 19 | FOR ANY TYPE OF PROJECT OR PROGRAM THAT WE AT WALGREENS WOULD |
| 12:02PM | 20 | LAUNCH, THAT WE WOULD HAVE A DOCUMENT THAT STARTS TO SET FORTH |
| 12:02PM | 21 | WHAT THE INTENTION WAS, WHAT WE'RE TRYING TO DO, HOW WE'RE |
| 12:02PM | 22 | GOING TO DO IT.  IT'S AN ITERATIVE DOCUMENT, SO AS WE LEARN |
| 12:02PM | 23 | MORE, WE UPDATE IT. |
| 12:02PM | 24 | BUT THE IDEA HERE IS TO START TO DOCUMENT WHAT OUR PLAN |
| 12:02PM | 25 | COULD LOOK LIKE. |

JHAVERI CROSS BY MR. DOWNEY                                          3651

12:02PM   1    Q.   OKAY.  AND IT EXIST IN SOME -- IN SOME FORM IT'S STORED

12:02PM   2    SOMEWHERE AND SOMEBODY HAS THE AUTHORITY TO MODIFY IT AS YOU GO

12:02PM   3    FORWARD?

12:02PM   4    A.   YES, SIR.

12:02PM   5    Q.   AND LET ME ASK YOU TO LOOK AT THE DATES THAT APPEAR

12:02PM   6    TOWARDS THE FRONT OF THE DOCUMENT.

12:03PM   7         DO YOU SEE THAT ON 3755, A LISTING OF DATES?

12:03PM   8    A.   ARE YOU REFERRING TO THE DOCUMENT VERSION CONTROL?

12:03PM   9    Q.   YES.

12:03PM   10   A.   YES, I DO.

12:03PM   11   Q.   AND THAT INDICATES DATES ON WHICH REVISIONS ARE MADE TO

12:03PM   12   THE PROGRAM CHARTER; CORRECT?

12:03PM   13   A.   THAT'S RIGHT.

12:03PM   14   Q.   LET ME ASK YOU TO LOOK AT -- WELL, WHAT DATE WAS THIS

12:03PM   15   VERSION CURRENT AS OF?

12:03PM   16   A.   ACCORDING TO THIS DOCUMENT, 3-5-2014.

12:03PM   17   Q.   AND WAS THAT AROUND THE TIME THAT YOU WERE GETTING

12:03PM   18   INVOLVED WITH THE PROGRAM?

12:03PM   19   A.   YES, SIR.

12:03PM   20   Q.   AND LET ME ASK YOU TO LOOK AT PAGE 2, THE EXECUTIVE

12:03PM   21   SUMMARY.

12:03PM   22        OH, YOUR HONOR, I MOVE THE ADMISSION OF 3755.

12:03PM   23         MR. SCHENK:  NO OBJECTION.

12:03PM   24         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:03PM   25         (GOVERNMENT'S EXHIBIT 3755 WAS RECEIVED IN EVIDENCE.)

JHAVERI CROSS BY MR. DOWNEY                                        3652

12:03PM   1    BY MR. DOWNEY:

12:03PM   2    Q.   ON THE SECOND PAGE I'M INTERESTED IN DIRECTING YOUR

12:04PM   3    ATTENTION TO THE TOP HALF OF THE DOCUMENT WHICH IS CAPTIONED

12:04PM   4    EXECUTIVE SUMMARY.

12:04PM   5        DO YOU SEE THAT?

12:04PM   6    A.   I DO.

12:04PM   7    Q.   AND THEN IN THE PARAGRAPH JUST AFTER THE FIRST SET OF

12:04PM   8    BULLET POINTS IT SAYS, "THE OVERALL GOAL IS TO EXPAND TO 2500

12:04PM   9    STORES NATIONWIDE BY THE END OF FY16."

12:04PM  10        FY REFERS TO FISCAL YEAR?

12:04PM  11    A.   THAT'S RIGHT, FISCAL YEAR FOR WALGREENS.

12:04PM  12    Q.   OKAY.  AND THE FISCAL YEAR FOR WALGREENS ACTUALLY ENDED IN

12:04PM  13    THE MIDDLE OF THE CALENDAR YEAR; CORRECT?

12:04PM  14    A.   IT DID.  THE FISCAL YEAR STARTS IN AUGUST AND THEN ENDS IN

12:04PM  15    SEPTEMBER.

12:04PM  16    Q.   OKAY.  SO WHEN THIS DOCUMENT SAYS THAT THE GOAL WAS TO

12:04PM  17    EXPAND TO 2500 STORES NATIONWIDE BY THE END OF FISCAL YEAR '16,

12:04PM  18    THAT WOULD MEAN THAT THE GOAL WAS TO EXPAND TO 2500 STORES BY

12:04PM  19    SEPTEMBER OF 2016; CORRECT?

12:04PM  20    A.   YEAH, LET ME JUST CORRECT MYSELF.  I REVERSED THE MONTHS.

12:05PM  21    IT'S FROM SEPTEMBER 1ST THROUGH AUGUST 31ST OF THE FOLLOWING

12:05PM  22    YEAR.  SO IT WOULD BE AUGUST 31ST.

12:05PM  23    Q.   OKAY.  SO THE GOAL WAS TO EXPAND TO 2500 STORES BY

12:05PM  24    SEPTEMBER 1ST OF 2016; CORRECT?

12:05PM  25    A.   2016, CORRECT.

JHAVERI CROSS BY MR. DOWNEY                                    3653

12:05PM   1     Q.  I BEG YOUR PARDON.  NOW I'VE MISSTATED THE YEARS -- NO, I

12:05PM   2     HAVEN'T ACTUALLY.  LET ME TRY IT AGAIN AND WE'LL GET THE YEARS

12:05PM   3     STRAIGHT.

12:05PM   4         THE GOAL AS STATED IN THIS DOCUMENT WAS FOR THE THERANOS

12:05PM   5     PARTNERSHIP TO EXPAND TO 2500 STORES NATIONWIDE BY

12:05PM   6     SEPTEMBER 1ST, 2016; CORRECT?

12:05PM   7     A.  THAT'S CORRECT.  SO THE FISCAL YEAR -- JUST TO BE VERY

12:05PM   8     CLEAR, FISCAL YEAR '16 STARTED IN AUGUST OF 2015 -- OR

12:05PM   9     SEPTEMBER OF 2015 AND WENT TO AUGUST OF 2016.

12:05PM   10    Q.  OKAY.  AND THEN IT REFERENCES WHAT THE PLAN FOR FISCAL

12:05PM   11    YEAR '14 WAS.  DO YOU SEE THAT?

12:06PM   12    A.  I DO.

12:06PM   13    Q.  AND IT INDICATES THAT THE PLAN FOR FISCAL YEAR 2015 WAS TO

12:06PM   14    ROLL OUT DIAGNOSTIC TESTING SERVICES TO 40 STORES BY

12:06PM   15    AUGUST 1ST, 2014; CORRECT?

12:06PM   16    A.  THAT'S CORRECT.

12:06PM   17    Q.  AND THAT WAS REALLY THE PROJECT THAT YOU WERE WORKING ON

12:06PM   18    WITH MR. BALWANI THAT YOU WERE TALKING ABOUT IN YOUR DIRECT

12:06PM   19    EXAMINATION?

12:06PM   20    A.  YEAH.  THE PLAN WAS, WHEN I TOOK OVER, TO GET TO 40 STORES

12:06PM   21    BY THE END OF THAT FISCAL YEAR, AND WE HAD 41 STORES SOMETIME

12:06PM   22    BY SEPTEMBER OR OCTOBER OF THAT YEAR.  I CAN'T EXACTLY

12:06PM   23    REMEMBER.

12:06PM   24    Q.  OKAY.  NOW, THIS WAS -- HOW MUCH OF YOUR TIME WERE YOU

12:06PM   25    DEVOTING TO HELPING WITH THIS PARTNERSHIP?

JHAVERI CROSS BY MR. DOWNEY                                      3654

12:06PM  1     A.   I HAD SEVERAL TEAMS REPORTING TO ME ON VARIOUS PROGRAMS,

12:06PM  2     SO IT'S HARD TO SAY FROM A PERCENTAGE STANDPOINT.  BUT THIS

12:06PM  3     WAS -- AS I MENTIONED EARLIER TODAY, IT'S A CORE PART OF WHAT

12:06PM  4     WE WERE TRYING TO DO.

12:06PM  5     Q.   IT WAS A SUBSTANTIAL PART OF YOUR TIME; CORRECT?

12:06PM  6     A.   IT WAS A SIZEABLE PORTION.

12:06PM  7     Q.   LET ME ASK YOU TO LOOK AT THE NEXT SET -- THE BOTTOM HALF

12:07PM  8     OF THAT DOCUMENT, WHICH IS LABELLED BUSINESS NEED/OPPORTUNITY.

12:07PM  9          DO YOU SEE THAT?

12:07PM 10     A.   YES, SIR.

12:07PM 11     Q.   AND IT SAYS, IF YOU READ THE FIRST SENTENCE UNDER

12:07PM 12     "OPPORTUNITY," IT INDICATES THAT THERE WAS A FORECASTED SIZE

12:07PM 13     FOR A MARKET OF $73 BILLION.

12:07PM 14          DO YOU KNOW WHAT THAT REFERS TO?

12:07PM 15     A.   YES.  THAT WAS THE MARKET SIZE OF THE LABORATORY MARKET

12:07PM 16     FOR THE U.S.

12:07PM 17     Q.   OKAY.  AND THEN IN THE SECOND PARAGRAPH IT SAYS, "THE

12:07PM 18     WALGREENS REVENUE OPPORTUNITY, AT A CAPTURE RATE OF 100 PERCENT

12:07PM 19     OF THE MARKET, IS 6.3 BILLION BASED ON CURRENT CONTRACT."

12:07PM 20          CAN YOU EXPLAIN THAT?

12:07PM 21     A.   THIS WAS WHAT THE OPPORTUNITY FOR US, FOR WALGREENS WAS,

12:07PM 22     TO CAPTURE PART OF THAT $73 BILLION.  IF WE WERE TO ACHIEVE

12:07PM 23     WHAT WAS STATED IN THE CONTRACT, I BELIEVE 1500 STORES, OR

12:08PM 24     WHATEVER THAT NATIONWIDE LAUNCH WAS.  AND SO THIS WAS REFERRING

12:08PM 25     TO THAT.

JHAVERI CROSS BY MR. DOWNEY                                                3655

12:08PM   1    Q.   SO ADDING $6.3 BILLION TO WALGREENS'S REVENUE WOULD BE A

12:08PM   2    SUBSTANTIAL ACHIEVEMENT; IS THAT CORRECT?

12:08PM   3    A.   ABSOLUTELY.

12:08PM   4    Q.   AND THAT'S WHY -- I DON'T WANT TO EMBARRASS YOU, BUT YOU

12:08PM   5    WERE A SENIOR EXECUTIVE IN THE COMPANY?

12:08PM   6    A.   CORRECT.

12:08PM   7    Q.   AND THAT'S WHY IT WAS SO MUCH OF YOUR TIME; CORRECT?

12:08PM   8    A.   IT WAS, YES.

12:08PM   9    Q.   LET ME ASK YOU NEXT TO LOOK AT PAGE 5 OF THE DOCUMENT.

12:08PM   10        DO YOU SEE THE TOP PORTION OF THAT DOCUMENT, WHICH IS A

12:08PM   11   FINANCIAL OUTLOOK?

12:08PM   12   A.   I DO.

12:08PM   13   Q.   AND DO YOU SEE THAT IT PROJECTS A CERTAIN NUMBER OF

12:08PM   14   PATIENTS PER DAY FOR FISCAL YEAR '14 AND FISCAL YEAR '15?

12:09PM   15        DO YOU SEE THAT?

12:09PM   16   A.   I DO.

12:09PM   17   Q.   AND DO YOU SEE THAT FOR FISCAL YEARS, BOTH OF THOSE YEARS,

12:09PM   18   THE PROJECTION IS THAT FIVE PATIENTS A DAY WOULD COME INTO THE

12:09PM   19   STORE?

12:09PM   20   A.   THAT'S CORRECT.

12:09PM   21   Q.   DID YOU EVALUATE THAT METRIC WHEN YOU HAD THE 40 STORE

12:09PM   22   PILOT?

12:09PM   23   A.   WE DID.

12:09PM   24   Q.   DID YOU ACHIEVE FIVE PATIENTS PER STORE PER DAY?

12:09PM   25   A.   WE ACHIEVED 5.5, I BELIEVE, BY AUGUST OF 2014.

JHAVERI CROSS BY MR. DOWNEY                                      3656

12:09PM   1    Q.   OKAY.  IF YOU LOOK -- AND THEN THE HOPE WAS AFTER THAT

12:09PM   2    THAT, THE NUMBER OF PATIENTS PER STORE PER DAY WOULD GROW;

12:09PM   3    CORRECT?

12:09PM   4    A.   THAT'S CORRECT.

12:09PM   5    Q.   AND THAT WOULD HAPPEN WITH MARKETING AND WORD OF MOUTH AND

12:09PM   6    SO FORTH; CORRECT?

12:09PM   7    A.   THAT'S CORRECT.

12:09PM   8    Q.   BY THE WAY, WHEN WE TALK ABOUT THE PRODUCT THAT WAS BEING

12:09PM   9    OFFERED BY WALGREENS AND THE EFFORT TO GENERATE INTEREST IN IT,

12:09PM   10   WERE THERE OTHER SERVICES THAT OFFERED A FINGERSTICK DRAW FOR

12:10PM   11   PURPOSES OF CLINICAL BLOOD TESTING?

12:10PM   12   A.   YEAH, WE HAD SOME STORES THAT ACTUALLY PROVIDED GLUCOSE

12:10PM   13   TESTING OR HEMOGLOBIN AIC TESTING FOR DIABETES, AND SO WE DID,

12:10PM   14   NOT ALL OF THE STORES, BUT SOME STORES DID HAVE THAT AS AN

12:10PM   15   OFFERING.

12:10PM   16        AND THOSE POINT OF CARE TESTING WERE PRIMARILY

12:10PM   17   DIRECTIONAL.  IT WAS SOMETHING THAT YOU WOULD TAKE HOME, YOUR

12:10PM   18   DIABETES METER, THINGS OF THAT NATURE, AND WE WOULD DO THAT FOR

12:10PM   19   THE PATIENT AT THE STORE.

12:10PM   20        AGAIN, IT IS NOT A MECHANISM WHEREBY YOU CAN MAKE A

12:10PM   21   DIAGNOSIS OF THOSE PARTICULAR TESTS, BUT IT GIVES THE PATIENT

12:10PM   22   AN IDEA OF WHERE THEY STAND.

12:10PM   23        AND SO IF THEY SEE ANY TYPE OF UNUSUAL NUMBERS, THEN THEY

12:10PM   24   CAN GO AND SEE THEIR PROVIDER FOR ANY TYPE OF FURTHER

12:10PM   25   EVALUATION.

JHAVERI CROSS BY MR. DOWNEY                                        3657

12:10PM   1   Q.   SO THAT'S, FOR EXAMPLE, SOMETHING THAT SOME OF US ARE

12:10PM   2   UNFORTUNATELY FAMILIAR WITH, THAT IF YOU SUFFER FROM A

12:11PM   3   PARTICULAR DISEASE THAT REQUIRES YOU TO MONITOR YOUR GLUCOSE,

12:11PM   4   YOU NEED THAT TYPE OF A METER OR SOMETHING THAT COULD PERFORM

12:11PM   5   MONITORING OF ONE ANALYTE IN YOUR BLOOD; CORRECT?

12:11PM   6   A.   THAT'S RIGHT.

12:11PM   7   Q.   BUT THERE WAS NO SERVICING THAT WAS OFFERING A BROAD RANGE

12:11PM   8   OF ASSAYS WITH FINGERSTICK BLOOD DRAW, WAS THERE?

12:11PM   9   A.   NO, SIR.

12:11PM  10   Q.   SO PART OF THE EXCITEMENT ABOUT THERANOS THAT YOU SAW WAS

12:11PM  11   THAT THAT WAS BEING OFFERED WITHIN WALGREENS; CORRECT?

12:11PM  12   A.   THAT'S CORRECT.

12:11PM  13   Q.   AND AT THE TIME THAT YOU JOINED, ABOUT 60 PERCENT OF THE

12:11PM  14   PATIENTS WHO CAME IN WERE HAVING THEIR BLOOD DRAWN BY

12:11PM  15   FINGERSTICK; CORRECT?

12:11PM  16   A.   BASED ON THE NUMBERS THAT WE SAW, YES.

12:11PM  17   Q.   OKAY.  AND AS YOU UNDERSTOOD IT, THERANOS WAS WORKING TO

12:11PM  18   INCREASE THAT PERCENTAGE OF PATIENTS; CORRECT?

12:11PM  19   A.   YEAH.  THEY WERE WORKING ON REDUCING THAT VENOUS DRAW TO,

12:11PM  20   YOU KNOW, LESS THAN 10 PERCENT.

12:11PM  21   Q.   AND DID YOU UNDERSTAND THAT IF A PATIENT CAME IN AND HAD

12:12PM  22   TO BE TESTED BY VENOUS DRAW FOR EVEN ONE ANALYTE IN THEIR

12:12PM  23   BLOOD, THAT WOULD NECESSITATE A VENOUS DRAW?

12:12PM  24   A.   THAT IS CORRECT.

12:12PM  25   Q.   AND DOES THAT RELATE TO THE COMMENTS THAT MR. BALWANI WAS

JHAVERI CROSS BY MR. DOWNEY                                    3658

12:12PM   1    MAKING TO YOU ABOUT THE CONFIGURATION OF CARTRIDGES?

12:12PM   2    A.   I DON'T KNOW WHAT HE WAS STATING.

12:12PM   3         WHAT HE WAS TELLING ME WAS, AS I STATED EARLIER, THAT THEY

12:12PM   4    WERE STILL TRYING TO DETERMINE THE PATTERNS OF THE PRESCRIBING,

12:12PM   5    THEY WERE STILL TRYING TO UNDERSTAND HOW TO MAKE SURE THAT THE

12:12PM   6    CARTRIDGES WERE READY.

12:12PM   7         HE ALSO STATED THAT INITIALLY THERE ARE SOME PHYSICIANS

12:12PM   8    THAT WILL TEST TO MAKE SURE THAT THE VALUES THAT THEIR PATIENTS

12:12PM   9    ARE RECEIVING FROM A FINGERSTICK VERSUS A VENOUS DRAW ARE THE

12:12PM  10    SAME.

12:12PM  11         AND SO THOSE ARE THE REASONS THAT HE PROVIDED THROUGHOUT

12:12PM  12    ALL OF OUR DISCUSSIONS.

12:12PM  13    Q.   AND DID YOU KNOW THAT DURING THE COURSE OF CONTRACT

12:13PM  14    NEGOTIATIONS BETWEEN THERANOS AND WALGREENS, THE PARTIES HAD

12:13PM  15    EXCHANGED A SUBSTANTIAL AMOUNT OF DATA TRYING TO FIGURE OUT

12:13PM  16    WHICH TESTS WOULD BE COMMONLY ORDERED?

12:13PM  17    A.   I'M NOT AWARE OF THAT.

12:13PM  18    Q.   LET'S RETURN TO MARCH OF 2014.

12:13PM  19    A.   UH-HUH.

12:13PM  20    Q.   I WANT TO ASK YOU ABOUT ONE ELEMENT OF THE COST THAT YOU

12:13PM  21    SAID WOULD MAKE THE USE OF VENOUS DRAWS UNATTRACTIVE FOR

12:13PM  22    WALGREENS, AND THAT WAS PHLEBOTOMISTS.

12:13PM  23         DO YOU RECALL THAT?

12:13PM  24    A.   THAT'S CORRECT.

12:13PM  25    Q.   BUT UNDER THE TERMS OF THE AGREEMENT, IT'S ACTUALLY

JHAVERI CROSS BY MR. DOWNEY                                                3659

12:13PM  1    THERANOS THAT BORE THE COSTS OF PHLEBOTOMISTS, ISN'T IT?

12:13PM  2    A.   ABSOLUTELY CORRECT.

12:13PM  3    Q.   AND THEY CONTINUED TO PAY THAT COST OVER TIME?

12:13PM  4    A.   CORRECT.

12:13PM  5    Q.   WERE YOU ALSO INVOLVED IN THE NEGOTIATIONS BETWEEN

12:13PM  6    THERANOS AND THIRD PARTY PAYORS, LIKE INSURERS, TO INSURE THAT

12:14PM  7    PATIENTS WOULD GET COVERAGE FOR THERANOS SERVICES?

12:14PM  8    A.   NO.  THE WALGREENS TEAM WAS NOT INVOLVED IN THAT.

12:14PM  9    Q.   LET ME ASK YOU TO LOOK AT PAGES 12 AND 13 OF THIS CHARTER

12:14PM  10   DOCUMENT.

12:14PM  11       DO YOU SEE AT THE BOTTOM -- I'M INTERESTED IN THE SEGMENT

12:14PM  12   THAT CARRIES OVER THAT IS LABELLED OPERATIONAL READINESS.

12:14PM  13   A.   I DO.

12:14PM  14   Q.   AND THIS LISTS MANY OF THE ITEMS THAT YOU DETAILED ON YOUR

12:14PM  15   DIRECT EXAMINATION; CORRECT?  THESE ARE THINGS THAT HAVE TO BE

12:14PM  16   DONE IN ORDER FOR A STORE TO OPEN AND AN INFRASTRUCTURE TO BE

12:14PM  17   ESTABLISHED?

12:14PM  18   A.   YEAH.  THESE ARE SOME OF THE ISSUES I THINK.  CONSTRUCTION

12:14PM  19   IS NOT IN HERE, AND ZONING AND DESIGNING AND ALL OF THOSE

12:14PM  20   THINGS ARE NOT IN HERE.  BUT THESE ARE SOME OF THOSE ITEMS.

12:15PM  21   Q.   OKAY.  AND IN THIS EVALUATION OF OPERATIONAL READINESS,

12:15PM  22   THERE'S NO REFERENCE TO HOW THE BLOOD IS BEING DRAWN BY

12:15PM  23   PATIENTS WHO USE THE SERVICE, IS THERE?

12:15PM  24   A.   NO.

12:15PM  25   Q.   LET ME ASK YOU TO LOOK AT PAGE 21 OF THE CHARTER DOCUMENT.

UNITED STATES COURT REPORTERS
**ER-7263**

JHAVERI CROSS BY MR. DOWNEY                                      3660

12:15PM   1         BY THE WAY, WAS THIS A THERANOS OR WAS THIS AN INTERNAL

12:15PM   2    WALGREENS DOCUMENT?

12:15PM   3    A.   THIS WAS AN INTERNAL WALGREENS DOCUMENT.

12:15PM   4    Q.   OKAY.  LET ME ASK YOU TO LOOK AT PAGE 21.

12:15PM   5         AND IF YOU LOOK AT THE TOP HALF OF THE PAGE, IT INDICATES

12:15PM   6    THE KEY PROGRAM RISKS.

12:15PM   7         DO YOU SEE THAT?

12:15PM   8    A.   YES, SIR.

12:15PM   9    Q.   AND IT INDICATES -- THE FIRST RISK IT IDENTIFIES IS THAT

12:15PM   10   THERANOS DEVICES AND TESTS HAVE TO OBTAIN REGULATORY APPROVALS.

12:16PM   11        AND THAT WAS TRUE; CORRECT?

12:16PM   12   A.   ABSOLUTELY.

12:16PM   13   Q.   AND SOME OF THOSE REGULATORY APPROVALS WERE OBTAINED

12:16PM   14   BEFORE YOUR WORK WITH THERANOS; CORRECT?

12:16PM   15   A.   YES.

12:16PM   16   Q.   AND THERE HAD BEEN CERTIFICATION OF FACILITIES AS CLIA

12:16PM   17   LABS; CORRECT?

12:16PM   18   A.   YES.

12:16PM   19   Q.   BUT YOU UNDERSTOOD THAT THERANOS WAS STILL SEEKING

12:16PM   20   REGULATORY APPROVALS FROM THE FDA ON OTHER ISSUES?

12:16PM   21   A.   THEY WERE SEEKING APPROVAL ON FDA FOR TESTS AND THINGS OF

12:16PM   22   THAT NATURE.

12:16PM   23   Q.   AND THEN THIS GOES ON TO LIST FIVE ADDITIONAL RISKS THAT

12:16PM   24   ATTACH TO THE PROGRAM, AND THEY INCLUDED ABILITY TO SECURE

12:16PM   25   FAVORABLE PAYOR CONTRACTS.

JHAVERI CROSS BY MR. DOWNEY                                    3661

12:16PM   1          DO YOU SEE THAT?

12:16PM   2     A.   YES.

12:16PM   3     Q.   AND WHAT DOES THAT REFER TO?

12:16PM   4     A.   THE IDEA HERE WAS THAT THERANOS WAS WORKING ON ENSURING

12:16PM   5     THAT THE THERANOS LAB SERVICES ARE REIMBURSED BY CERTAIN

12:16PM   6     PAYORS, IN THIS CASE HCSC, WHICH IS THE FOR BLUE CROSS, BLUE

12:16PM   7     SHIELD, UNITED, AND WELLPOINT.

12:16PM   8     Q.   SO THOSE ARE ISSUES THAT HAD TO BE RESOLVED BETWEEN

12:17PM   9     THERANOS AND THOSE INSURERS?

12:17PM   10    A.   YES.  AS I STATED, WE AT WALGREENS WERE NOT INVOLVED IN

12:17PM   11    THAT WORK.

12:17PM   12    Q.   AND THIRD, IT REFERS TO DEVELOPING PRODUCTIVE PROVIDER

12:17PM   13    RELATIONSHIPS.

12:17PM   14         WHAT DOES THAT REFER TO?

12:17PM   15    A.   THIS IS REFERRING TO THE PROVIDERS ARE THE PHYSICIANS, THE

12:17PM   16    PRESCRIBERS, THE ONES WHO ARE ORDERING THE LAB TESTS, AND TO

12:17PM   17    ENSURE THAT THERE ARE GOOD RELATIONSHIPS WITH THEM SO THEY

12:17PM   18    UNDERSTAND WHAT THIS NEW SERVICE IS AND THEY UNDERSTAND WHAT

12:17PM   19    THE PATIENT WILL RECEIVE, AND HOW IT WORKS.

12:17PM   20         AND SO THAT STRATEGY, AGAIN, WAS PART OF THERANOS'S TEAM'S

12:17PM   21    STRATEGY TO GO DO.

12:17PM   22    Q.   AND THE FOURTH ITEM WAS TO ENSURE THAT THERANOS DELIVERS

12:17PM   23    WHAT IS NEEDED, INCLUDING I.T. SYSTEMS FOR THE PILOT.

12:17PM   24         WHAT DOES THAT REFER TO?

12:17PM   25    A.   WELL, THERE WERE CERTAIN SYSTEMS THAT -- AGAIN, THE ENTIRE

JHAVERI CROSS BY MR. DOWNEY                                     3662

```
12:17PM   1    SERVICE WAS NOT ON A WALGREENS PLATFORM.  IT WAS ON A THERANOS

12:18PM   2    I.T. PLATFORM.

12:18PM   3         AND SO THE CHECK IN OF THE PATIENT, THE IPAD THAT I

12:18PM   4    REFERRED TO FOR PATIENT EVALUATION OF THE SERVICE, ALL OF THOSE

12:18PM   5    THINGS WERE BUILT BY THERANOS AND DELIVERED BY THEM SO WE CAN

12:18PM   6    ACTUALLY EXECUTE THE MODEL.

12:18PM   7    Q.   AND THAT'S SOMETHING THAT YOU CONTINUED TO MONITOR DURING

12:18PM   8    YOUR MEETINGS --

12:18PM   9    A.   ABSOLUTELY, YES.

12:18PM  10    Q.   -- WITH PEOPLE AT THERANOS?

12:18PM  11    A.   YES, ABSOLUTELY.

12:18PM  12    Q.   AND THEN THE NEXT ITEM IS DIRECT PATIENT TRAFFIC FOR LAB

12:18PM  13    SERVICES.

12:18PM  14         AND IT LOOKS LIKE THAT INVOLVES MARKETING AND WORKING WITH

12:18PM  15    PRESCRIBERS AND PAYORS TO GENERATE INTEREST.

12:18PM  16         DO YOU SEE THAT?

12:18PM  17    A.   I DO.

12:18PM  18    Q.   AND THE LAST SAYS THE ABILITY TO LEVERAGE FIELD SALES

12:18PM  19    FORCE TO FOCUS ON THE PROJECT BETA INITIATIVE.

12:18PM  20         WHAT DOES THAT REFER TO?

12:18PM  21    A.   SO PROJECT BETA WAS AN INTERNAL TERM FOR THE THERANOS

12:18PM  22    PARTNERSHIP.  OBVIOUSLY ONCE WE STARTED TO LAUNCH IT, WE

12:19PM  23    REMOVED THE PROJECT BETA TERM.  IT WAS JUST A NICKNAME, IF YOU

12:19PM  24    WANT TO CALL IT THAT, THAT WE USED AT WALGREENS.

12:19PM  25         SO WHAT WE WERE TRYING TO DO WAS INDICATE THAT AS WE OPEN
```

JHAVERI CROSS BY MR. DOWNEY                                    3663

12:19PM   1    STORES, WE NEED TO HAVE SUPPORT AT THE FIELD LEVEL.  SO IF

12:19PM   2    STORES HAVE ANY QUESTIONS, IF BOTH THE THERANOS TEAM AND/OR THE

12:19PM   3    WALGREENS TEAM HAD ANY ISSUES OR CONCERNS OR QUESTIONS, THAT

12:19PM   4    THERE WOULD BE A FIELD TEAM THAT COULD SUPPORT THEM, THAT COULD

12:19PM   5    POTENTIALLY EVEN VISIT THE STORE TO ADDRESS AN ISSUE, AND

12:19PM   6    THAT'S WHAT WE'RE FOCUSSING ON.

12:19PM   7    Q.    OKAY.  NOW, AS OF THE TIME THAT THIS DOCUMENT WAS CURRENT

12:19PM   8    IN MARCH OF 2014, MANY, MANY PEOPLE AT WALGREENS KNEW THAT A

12:19PM   9    CERTAIN PERCENTAGE OF THERANOS BLOOD DRAWS WERE VENOUS;

12:19PM   10   CORRECT?

12:19PM   11   A.    THERE WAS A GOOD NUMBER THAT KNEW.

12:19PM   12   Q.    AND THAT WAS NOT, HOWEVER, IDENTIFIED AS A KEY PROGRAM

12:19PM   13   RISK IN THE PROGRAM CHARTER, WAS IT?

12:19PM   14   A.    NO, NOT FROM THIS PARTICULAR DOCUMENT.

12:19PM   15   Q.    OKAY.  LET ME ASK YOU TO LOOK AT EXHIBIT 1673.

12:20PM   16   A.    OKAY.

12:20PM   17   Q.    IS THIS AN EMAIL THAT YOU SENT TO A LARGE NUMBER OF

12:20PM   18   INDIVIDUALS BOTH FROM WALGREENS AND A FEW FROM THERANOS?

12:20PM   19   A.    YES.

12:20PM   20   Q.    AND ARE YOU DISCUSSING HERE THE EXPANSION OF THERANOS

12:20PM   21   STORES?

12:20PM   22   A.    THE EMAIL WAS TO INFORM THE RELEVANT FOLKS ON THE TEN

12:20PM   23   STORES THAT ARE NOW LIFE IN PHOENIX.

12:21PM   24            MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

12:21PM   25   1673.

JHAVERI CROSS BY MR. DOWNEY                                            3664

12:21PM   1                    MR. SCHENK:  NO OBJECTION.

12:21PM   2                    THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:21PM   3              (GOVERNMENT'S EXHIBIT 1673 WAS RECEIVED IN EVIDENCE.)

12:21PM   4        BY MR. DOWNEY:

12:21PM   5        Q.   IF YOU SEE THE FIRST PARAGRAPH, IT STATES THAT -- IT

12:21PM   6        REITERATES THAT IN SEPTEMBER OF 2013, THERANOS AND WALGREENS

12:21PM   7        HAD ANNOUNCED THEIR PARTNERSHIP; CORRECT?

12:21PM   8        A.   YES.

12:21PM   9        Q.   AND THEN IN THE SECOND PARAGRAPH IT NOTES THAT ON THAT

12:21PM   10       DATE, WHICH IS APRIL 15TH, 2014, EIGHT ADDITIONAL THERANOS

12:21PM   11       CENTERS HAD OPENED IN PHOENIX; CORRECT?

12:21PM   12       A.   CORRECT.

12:21PM   13       Q.   AND IT INDICATES THAT THERANOS HAD PROVIDED THE

12:21PM   14       PHLEBOTOMISTS THE SUPPORT TO WALGREENS PERSONNEL; CORRECT?

12:21PM   15       A.   YES.

12:21PM   16       Q.   AND THEN IT ANNOUNCED BELOW THAT, ANTICIPATED THE

12:21PM   17       ADDRESSES THAT WOULD BE THE ADDRESSES FOR THE LOCATIONS;

12:22PM   18       CORRECT?

12:22PM   19       A.   YES.

12:22PM   20       Q.   ALL RIGHT.  AND THEN IT STATES AT THE BOTTOM OF THAT PAGE

12:22PM   21       WHAT YOU CAN SAY AND WHAT YOU CANNOT SAY.

12:22PM   22            DO YOU SEE THAT?

12:22PM   23       A.   I DO.

12:22PM   24       Q.   ALL RIGHT.  AND IF YOU LOOK UNDER "WHAT YOU CAN NOT SAY,"

12:22PM   25       THE SECOND BULLET POINT SAYS, "FUTURE MARKET EXPANSIONS PLANS

JHAVERI CROSS BY MR. DOWNEY                                          3665

12:22PM  1    OUTSIDE OUR NORTHERN CALIFORNIA OR PHOENIX MARKET.  ONLY

12:22PM  2    MENTION OUR RELATIONSHIP AND THAT THE COMPANIES PLAN TO OFFER

12:22PM  3    THE SERVICE AT WALGREENS LOCATIONS NATIONWIDE."

12:22PM  4        DO YOU SEE THAT?

12:22PM  5    A.  I DO.

12:22PM  6    Q.  AND THE REASON WHY YOU WROTE THIS EMAIL IS BECAUSE

12:22PM  7    WALGREENS WAS MAKING AN ANNOUNCEMENT THAT WOULD GENERATE SOME

12:22PM  8    ATTENTION WHERE INDIVIDUALS IN WALGREENS MIGHT BE ASKED ABOUT

12:22PM  9    IT; CORRECT?

12:22PM 10    A.  CORRECT.  IT WAS JUST TO MAKE SURE THAT PEOPLE HAVE THE

12:22PM 11    RELEVANT FACTS.

12:22PM 12    Q.  AND THERE MIGHT BE SOME INFORMATION THAT YOU DIDN'T WANT

12:22PM 13    THE WALGREENS PERSONNEL TO BE TALKING ABOUT PUBLICLY; CORRECT?

12:23PM 14    A.  PUBLICLY OR INTERNALLY BECAUSE THEY WERE JUST NOT INFORMED

12:23PM 15    OF WHAT WAS GOING ON.

12:23PM 16    Q.  SO YOU IN ESSENCE WERE TELLING THEM THAT THIS IS AN

12:23PM 17    ACCURATE DESCRIPTION OF WHERE WE ARE WITH THERANOS AND SAY

12:23PM 18    THIS, BUT DON'T SAY ANYTHING MORE?

12:23PM 19    A.  CORRECT.

12:23PM 20    Q.  OKAY.  AND THIS WAS AS OF MID-APRIL; CORRECT?

12:23PM 21    A.  THIS WAS APRIL 15TH.

12:23PM 22    Q.  OKAY.  NOW, YOU REVIEWED DURING THE COURSE OF YOUR DIRECT

12:23PM 23    EXAMINATION WITH MR. SCHENK THE MINUTES AND POWERPOINTS OF A

12:23PM 24    SERIES OF MEETINGS BETWEEN MAY AND I THINK THE FALL, PERHAPS

12:23PM 25    EARLY WINTER OF 2014.

JHAVERI CROSS BY MR. DOWNEY                                          3666

12:23PM   1          DO YOU RECALL THAT?

12:23PM   2      A.   YES.

12:24PM   3      Q.   I WANT TO REDIRECT YOUR ATTENTION TO SOME OF THE SAME

12:24PM   4      EXHIBITS.  AND THE FIRST IS EXHIBIT 1755, WHICH IS ALREADY IN

12:24PM   5      EVIDENCE.

12:24PM   6      A.   1755 IS NOT IN MY BINDER.

12:24PM   7      Q.   DO YOU STILL HAVE A WHITE BINDER?

12:24PM   8      A.   YES.

12:24PM   9      Q.   YES, IT SHOULD BE IN YOUR BINDER.

12:24PM  10      A.   I HAVE IT.

12:24PM  11      Q.   AND DO YOU SEE ON THE FIRST PAGE THAT THIS IS THE MINUTES

12:25PM  12      OF A MAY 28TH MEETING BETWEEN WALGREENS PERSONNEL AND THERANOS

12:25PM  13      PERSONNEL?

12:25PM  14      A.   YES.

12:25PM  15      Q.   DO YOU SEE THAT?

12:25PM  16          IF YOU GO TO PAGE 7 OF THE EXHIBIT -- AND JUST TO REORIENT

12:25PM  17      US, THIS IS A RECORD OF WHAT WAS SAID DURING THE COURSE OF

12:25PM  18      THESE MEETINGS BETWEEN THE TWO COMPANIES; CORRECT?

12:25PM  19      A.   THAT'S CORRECT.

12:25PM  20      Q.   OKAY.  IF YOU LOOK AT THE TOP OF PAGE 7, THE FIRST

12:25PM  21      PARAGRAPH, IT SAYS, "NICOLE LEITER STATED THAT CHALLENGES ARE

12:25PM  22      WHAT WE EXPECT IN A PILOT."

12:25PM  23          WHO IS NICOLE LEITER?

12:25PM  24      A.   NICOLE LEITER AT THE TIME HAD ARIZONA OPERATIONS FOR

12:25PM  25      WALGREENS.

UNITED STATES COURT REPORTERS

**ER-7270**

JHAVERI CROSS BY MR. DOWNEY                                    3667

12:25PM   1   Q.   AND THE SECOND SENTENCE SAYS, "THE CHALLENGE IS HOW TO

12:25PM   2   REACT QUICKLY TO ADDRESS THE GAPS."

12:26PM   3        DO YOU SEE THAT?

12:26PM   4   A.   I DO.

12:26PM   5   Q.   AND THE LAST SENTENCE OF THAT PARAGRAPH SAYS, "PER NIMESH,

12:26PM   6   40 IS IN THE BAG, WE NEED TO THINK ABOUT SCALE."

12:26PM   7        DO YOU SEE THAT?

12:26PM   8   A.   I DO.

12:26PM   9   Q.   AND THIS DOCUMENT IS AS OF MAY 28TH, 2015?  OR 2014?

12:26PM  10   A.   THAT'S CORRECT.

12:26PM  11   Q.   ALL RIGHT.  I WANT TO LOOK AT ANOTHER SET OF THOSE

12:26PM  12   MINUTES.

12:26PM  13        LET ME ASK YOU TO LOOK AT THE EXHIBIT 1884.

12:27PM  14   A.   I HAVE IT.

12:27PM  15   Q.   IS THIS ANOTHER SET OF PARTNERSHIP MEETING MINUTES

12:27PM  16   REFLECTING WHAT HAPPENED IN MEETINGS BETWEEN THERANOS AND

12:27PM  17   WALGREENS?

12:27PM  18   A.   YES.

12:27PM  19            MR. DOWNEY:  YOUR HONOR, I THINK 1884 IS IN EVIDENCE

12:27PM  20   ALREADY, BUT IF NOT, I WOULD MOVE ITS ADMISSION.

12:27PM  21            MR. SCHENK:  IT IS IN EVIDENCE.

12:27PM  22            THE COURT:  THANK YOU, MR. SCHENK.

12:27PM  23   BY MR. DOWNEY:

12:27PM  24   Q.   LET ME DIRECT YOUR ATTENTION TO PAGE 5.

12:27PM  25        I WANT TO IN PARTICULAR ADDRESS YOUR ATTENTION TO THE

JHAVERI CROSS BY MR. DOWNEY                                          3668

12:27PM   1    BULLET POINT THAT BEGINS, "THERANOS EXPERIENCE SURVEY SUMMARY

12:28PM   2    RESULTS."

12:28PM   3         DO YOU SEE THE REFERENCE TO EXPERIENCE SURVEY?

12:28PM   4    A.   I DO.

12:28PM   5    Q.   AND WHAT IS AN EXPERIENCE SURVEY IN THIS CONTEXT?

12:28PM   6    A.   THIS IS WHAT I REFERRED TO EARLIER ABOUT THE PATIENT

12:28PM   7    EXPERIENCE WHEN THEY WERE GIVEN THE IPAD AND THEY WOULD ANSWER

12:28PM   8    A FEW QUESTIONS AFTER THEY RECEIVED THE SERVICE.  THIS IS WHAT

12:28PM   9    THIS IS REFERRING TO.

12:28PM   10   Q.   OKAY.  AND THIS INDICATES THAT "THERANOS EXPERIENCE SURVEY

12:28PM   11   SUMMARY RESULTS ARE OFF THE CHARTS."

12:28PM   12        DO YOU SEE THAT?

12:28PM   13   A.   YES, I DO.

12:28PM   14   Q.   AND DOES THAT REFLECT THAT THERE WAS SATISFACTION WITH THE

12:28PM   15   THERANOS SERVICES IN THE WALGREENS STORES AS OF THIS DATE?

12:28PM   16   A.   YES.

12:28PM   17   Q.   LET ME ASK YOU TO LOOK IN THAT SAME DOCUMENT AT PAGE 8.

12:29PM   18        NOW, ONE OF THE CONSIDERATIONS IN EVALUATING THE

12:29PM   19   PARTNERSHIP WAS HOW QUICKLY PATIENTS COULD GET THEIR TEST

12:29PM   20   RESULTS; CORRECT?

12:29PM   21   A.   THAT'S RIGHT.

12:29PM   22   Q.   BUT THE LABS DURING THIS PHASE OF THE ARRANGEMENT WERE

12:29PM   23   LOCATED OFF SITE; CORRECT?

12:29PM   24   A.   THE LABS WERE OFF SITE, CORRECT.

12:29PM   25   Q.   DO YOU RECALL HOW QUICKLY THERANOS WAS ABLE TO TURN AROUND

JHAVERI CROSS BY MR. DOWNEY

12:29PM  1    THE RESULTS AFTER THEY WERE SENT TO THE THERANOS LAB?

12:29PM  2    A.   I THINK, IF I REMEMBER CORRECTLY, IT WAS WITHIN 48 HOURS

12:29PM  3    THE RESULTS WERE COMING THROUGH.

12:29PM  4    Q.   LET ME ASK YOU TO LOOK AT THE FIFTH BULLET POINT AT THE

12:29PM  5    TOP OF THIS DOCUMENT BEGINNING "THERANOS CAN TURN AROUND."

12:30PM  6         DO YOU SEE THAT?

12:30PM  7    A.   YES.

12:30PM  8    Q.   AND SO THERE MIGHT BE AN ADDITIONAL TIME OF ONE HOUR, BUT

12:30PM  9    THAT WOULD BE BECAUSE PRESUMABLY OF THE TRANSPORT OR THE

12:30PM  10   STORAGE; CORRECT?

12:30PM  11   A.   YEAH.  AGAIN, ONCE IT LEFT THE WALGREENS STORE, THERANOS

12:30PM  12   CONTROLLED THE SAMPLE, THE TESTING, AND THEN THE RESULTS BACK

12:30PM  13   TO THE APPROPRIATE PROVIDER.

12:30PM  14        SO IT'S HARD FOR US TO UNDERSTAND EXACTLY WHAT WAS CAUSING

12:30PM  15   SOME OF THOSE DELAYS, BUT, YES, THEY WOULD BE IN CONTROL OF

12:30PM  16   THAT.

12:30PM  17   Q.   ALL RIGHT.  LET ME ASK YOU TO LOOK AT THE BOTTOM OF THAT

12:30PM  18   SAME PAGE ON PAGE 8.

12:30PM  19        WAS IT A TYPICAL DISCUSSION IN THESE MEETINGS AS TO WHAT

12:30PM  20   FUTURE PLANS FOR EXPANSION WERE?

12:30PM  21   A.   ABSOLUTELY.  YOU KNOW, WHENEVER WE HAD THESE PARTNERSHIP

12:30PM  22   MEETINGS, THERE WERE TWO PURPOSES, TWO OR THREE -- TWO MAIN

12:30PM  23   PURPOSES FOR THESE PARTNERSHIP MEETINGS.

12:30PM  24        ONE WAS TO DEVELOP THE PARTNERSHIP AND DEVELOP THE

12:30PM  25   RELATIONSHIP; BUT SECOND IS TO DISCUSS NOT ONLY THE STATUS OF

JHAVERI CROSS BY MR. DOWNEY                                        3670

12:31PM   1    THE CURRENT NATURE OF THE PARTNERSHIP AND HOW THE SERVICE IS

12:31PM   2    GOING, BUT ALSO TO DISCUSS WHAT OUR FUTURE PLANS COULD BE.  YOU

12:31PM   3    KNOW, WHERE SHOULD WE BE THINKING?  HOW SHOULD WE BE THINKING

12:31PM   4    ABOUT IT?

12:31PM   5         AND SO THIS TYPE OF DISCUSSION IS NOT UNIQUE TO THIS

12:31PM   6    PARTICULAR DATE.  IT IS A COMMON DISCUSSION THAT WE HAD.

12:31PM   7    Q.   OKAY.  LET ME ASK YOU TO LOOK ON PAGE 9, WHICH IS A

12:31PM   8    CONTINUATION OF THAT SECTION.  AND I'D ASK YOU TO LOOK AT THE

12:31PM   9    BULLET POINT THAT BEGINS, INITIAL GOAL FOR FISCAL YEAR WAS 500

12:31PM   10   STORES.

12:31PM   11        DO YOU SEE THAT?

12:31PM   12   A.   YES, SIR.

12:31PM   13   Q.   AND UNDERNEATH THAT, IT SAYS WE NEED TO REDEFINE THIS

12:31PM   14   GOAL.

12:31PM   15        DO YOU SEE THAT?

12:31PM   16   A.   YES.

12:31PM   17   Q.   AND THEN UNDERNEATH THAT THERE'S A BULLET POINT THAT TALKS

12:31PM   18   ABOUT A NATIONWIDE GOAL.

12:32PM   19        DO YOU SEE THAT?

12:32PM   20   A.   YES.

12:32PM   21   Q.   AND THAT INDICATES THE GOAL -- A GOAL MIGHT BE 2000 TO

12:32PM   22   2500 STORES NATIONWIDE.

12:32PM   23        DO YOU SEE THAT?

12:32PM   24   A.   YES.

12:32PM   25   Q.   AND DO YOU RECALL IN THE ORIGINAL AGREEMENT, OR ACTUALLY

JHAVERI CROSS BY MR. DOWNEY                                          3671

12:32PM  1    IN THE AGREEMENT THAT WAS SIGNED AT THE END OF DECEMBER 2013,

12:32PM  2    THE PROPOSAL WAS THAT THERE WOULD BE 3000 STORES ROLLED OUT.

12:32PM  3        DO YOU RECALL THAT?

12:32PM  4    A.  I DON'T RECALL THAT, BUT, YES.

12:32PM  5    Q.  OKAY.  SO THE PROJECTION OF 2000 TO 2500 STORES WAS A

12:32PM  6    REDUCTION IN WHAT WAS DESCRIBED IN THAT DECEMBER 2013

12:32PM  7    AGREEMENT; CORRECT?

12:32PM  8    A.  IF THE NUMBER WAS REDUCED, YES.

12:32PM  9        AGAIN, AS I MENTIONED EARLIER, WHENEVER DISCUSSIONS OF

12:32PM  10   LAUNCH ARE HAD, WE LOOK AT ALL OF THE VARIABLES OF BOTH

12:32PM  11   PARTIES, IN THIS CASE THERANOS AS WELL AS WALGREENS, AND WE

12:32PM  12   CHANGE THOSE NUMBERS BASED ON WHAT WE'RE SEEING, THE RESULTS

12:33PM  13   THAT WE'RE EXPERIENCING, THE PATIENT EXPERIENCE THAT YOU TALKED

12:33PM  14   ABOUT THAT WE ARE SEEING.

12:33PM  15       SO WHAT YOU'RE SEEING IS REALLY THOSE TYPES OF INPUTS

12:33PM  16   GOING INTO WHAT THE NUMBER OF LAUNCHES SHOULD BE.

12:33PM  17       NATIONWIDE LAUNCH?  YES.  WE HAD EVERY INTENTION AS

12:33PM  18   WALGREENS TO LAUNCH NATIONWIDE.

12:33PM  19       BUT AGAIN, HOW WE LAUNCH, WHAT WE DO, HOW WAS WE GO IS

12:33PM  20   DEPENDENT ON MANY, MANY VARIABLES THAT I SPOKE ABOUT EARLIER.

12:33PM  21   Q.  OKAY.  BUT AS OF AUGUST OF 2014, THIS 2500 WAS YOUR

12:33PM  22   PROJECTION; CORRECT?

12:33PM  23   A.  CORRECT.

12:33PM  24   Q.  ALL RIGHT.  I WANT TO ASK YOU A LITTLE BIT MORE ABOUT THE

12:34PM  25   PATIENT FEEDBACK FEATURE OF THE SERVICES.

JHAVERI CROSS BY MR. DOWNEY                                          3672

12:34PM   1        WHAT DO YOU GENERALLY REMEMBER ABOUT THE FEEDBACK THAT THE

12:34PM   2   COMPANIES RECEIVED AS TO THEIR EXPERIENCE IN THERANOS SERVICE

12:34PM   3   CENTERS IN WALGREENS STORES?

12:34PM   4   A.   YEAH.   I -- WHAT I REMEMBER IS THAT THE SERVICE LEVELS

12:34PM   5   WERE BETWEEN 4 AND 5 ON A SCALE OF 1 TO 5.

12:34PM   6        SO PATIENTS WERE SATISFIED WITH THE SERVICES THAT THEY

12:34PM   7   WERE RECEIVING.   I QUITE HONESTLY DON'T REMEMBER THE QUESTIONS

12:34PM   8   THAT WERE ASKED.   BUT GENERALLY SPEAKING, THE EXPERIENCE WAS

12:34PM   9   GOOD.

12:34PM  10   Q.   OKAY.   AND THAT WAS A POSITIVE ASPECT OF THE PARTNERSHIP I

12:34PM  11   ASSUME?

12:34PM  12   A.   IT IS, YES.

12:34PM  13   Q.   BECAUSE ULTIMATELY THAT'S THE MOST IMPORTANT THING;

12:34PM  14   CORRECT?

12:34PM  15   A.   IT'S ONE OF THE MOST IMPORTANT THINGS, RIGHT.

12:34PM  16        YOU KNOW, PATIENT EXPERIENCE, ALONG WITH SOME OF THE OTHER

12:35PM  17   METRICS, ARE ALL IMPORTANT.

12:35PM  18        AND WE HAVE TO BALANCE THAT, WHETHER IT'S THE COST OF THE

12:35PM  19   BUILD OUT, THE PATIENT WAIT TIME, THE VENOUS DRAW, OR ALL OF

12:35PM  20   THOSE THINGS THAT WE AS BOTH PARTNERS DETERMINED WERE THE KEY

12:35PM  21   TO SUCCESS HAD TO BE EVALUATED.

12:35PM  22   Q.   WELL, DID YOU GET A LOT OF FEEDBACK THAT THE PATIENTS WERE

12:35PM  23   CONCERNED ABOUT THE FORM OF THE BLOOD DRAW?

12:35PM  24   A.   I DON'T REMEMBER ANYTHING SPECIFIC THAT CAME TO ME WHERE A

12:35PM  25   PATIENT HAD STATED ANYTHING ABOUT THE DRAW.

JHAVERI CROSS BY MR. DOWNEY

| | | |
|---|---|---|
| 12:35PM | 1 | Q.   OKAY.  LET ME ASK YOU TO LOOK AT EXHIBIT 2394.  WE MIGHT |
| 12:35PM | 2 | BE BACK TO YOUR OTHER NOTEBOOK NOW. |
| 12:36PM | 3 | DO YOU SEE THAT? |
| 12:36PM | 4 | A.   I DO HAVE 2394.  IT'S A -- CAN YOU JUST CONFIRM WHICH |
| 12:36PM | 5 | DOCUMENT, BECAUSE I DON'T SEE IT ON THE SCREEN. |
| 12:36PM | 6 | Q.   I DON'T THINK I'VE YET MOVED IT INTO EVIDENCE. |
| 12:36PM | 7 | THE CLERK:  HUH-UH. |
| 12:36PM | 8 | BY MR. DOWNEY: |
| 12:36PM | 9 | Q.   CAN I ASK YOU, IF YOU LOOK AT IT IN THE NOTEBOOK, WHAT IT |
| 12:36PM | 10 | IS?  ARE YOU ABLE TO FIND IT? |
| 12:36PM | 11 | A.   YES.  IT IS IN THE WHITE BINDER, AND IT IS FEBRUARY 17TH, |
| 12:36PM | 12 | 2015, WALGREENS-THERANOS PARTNERSHIP MEETING SLIDE DECK. |
| 12:36PM | 13 | Q.   OKAY.  AND IS THIS SOMETHING THAT WAS PREPARED AS PART OF |
| 12:36PM | 14 | THE SERIES OF MEETINGS BETWEEN THERANOS AND WALGREENS |
| 12:36PM | 15 | CONCERNING THE RELATIONSHIP BETWEEN THE TWO COMPANIES? |
| 12:36PM | 16 | A.   YES. |
| 12:36PM | 17 | MR. DOWNEY:  LET ME MOVE THE ADMISSION OF 2394. |
| 12:36PM | 18 | MR. SCHENK:  NO OBJECTION. |
| 12:36PM | 19 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 12:37PM | 20 | (GOVERNMENT'S EXHIBIT 2394 WAS RECEIVED IN EVIDENCE.) |
| 12:37PM | 21 | BY MR. DOWNEY: |
| 12:37PM | 22 | Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 2394, PAGE 7. |
| 12:37PM | 23 | DO YOU SEE THAT? |
| 12:37PM | 24 | A.   YES, I DO. |
| 12:37PM | 25 | Q.   AND IS THIS A REFLECTION OF THE AVERAGE PATIENT EXPERIENCE |

JHAVERI CROSS BY MR. DOWNEY                                    3674

12:37PM   1    IN THERANOS SERVICE CENTERS AS OF JANUARY 2015?

12:37PM   2    A.   YES, AS OF JANUARY 2015, IT'S VERY CONSISTENT WITH WHAT I

12:37PM   3    REMEMBER.

12:37PM   4    Q.   AND DID THE PATIENTS USING THE SERVICE RATE IT AT ABOUT

12:37PM   5    4.81 PERCENT -- I'M SORRY, 4.81?

12:37PM   6    A.   YEAH.

12:37PM   7    Q.   THE OVERALL EXPERIENCE 4.81.

12:37PM   8        DO YOU SEE THAT?

12:37PM   9    A.   I DO.

12:37PM  10    Q.   AND DO YOU SEE THAT THE CHECK IN PROCESS WAS THE PROCESS

12:38PM  11    THAT THE PATIENTS WERE THE LEAST HAPPY WITH IN THEIR AGGREGATE

12:38PM  12    SCORES.

12:38PM  13        DO YOU SEE THAT?

12:38PM  14    A.   I DO.

12:38PM  15    Q.   AND DO YOU SEE THAT THE FACILITIES RATED AT ABOUT 4.79.

12:38PM  16        DO YOU SEE THAT?

12:38PM  17    A.   I DO.

12:38PM  18    Q.   AND DO YOU SEE THAT THE SKILL OF THE TECHNICIAN WAS ABOUT

12:38PM  19    4.86?

12:38PM  20    A.   CORRECT.

12:38PM  21    Q.   AND SO THESE WERE PRETTY GOOD RESULTS FOR A NEW VENTURE,

12:38PM  22    WEREN'T THEY?

12:38PM  23    A.   YES.  NO, THIS WAS VERY GOOD.

12:38PM  24    Q.   I HAVE A SLIDE I WANT TO SHOW YOU IN THAT SAME DECK, WHICH

12:38PM  25    IS PAGE 10 AND PAGE 11.

JHAVERI CROSS BY MR. DOWNEY                                          3675

12:38PM  1        I DON'T KNOW IF YOU CAN SEE THIS WITHOUT THE COLOR

12:38PM  2    COORDINATION, BUT THIS IS A QUESTION THAT WAS POSED TO PATIENTS

12:38PM  3    WHO VISITED A THERANOS SERVICE CENTER; CORRECT?

12:38PM  4    A.   YES.

12:38PM  5    Q.   AND DO YOU SEE THAT ABOUT 82 AND A HALF PERCENT OF

12:39PM  6    PATIENTS WERE DEFINITELY COMING BACK WAS THEIR INDICATION AFTER

12:39PM  7    THEY'VE HAD AN EXPERIENCE AT THERANOS SERVICE CENTERS?

12:39PM  8    A.   YES.

12:39PM  9    Q.   AND ABOUT 15 PERCENT SAID THAT THEY WERE LIKELY TO RETURN;

12:39PM  10   CORRECT?

12:39PM  11   A.   I'M ASSUMING THAT ALL OF THE COLORS ARE EXACTLY THE SAME.

12:39PM  12   Q.   YEAH.  AND THE NUMBER WHO SAID THAT THEY WOULD NOT RETURN

12:39PM  13   WAS A VERY, VERY SMALL PERCENTAGE; CORRECT?

12:39PM  14   A.   YES.

12:39PM  15   Q.   LESS THAN 1 PERCENT; CORRECT?

12:39PM  16   A.   YES.

12:39PM  17   Q.   AND IN ADDITION TO ASKING FOR A RATING OF THE THERANOS

12:39PM  18   SERVICE CENTERS, DID YOU ALSO ASK PEOPLE FOR COMMENTS ON HOW

12:39PM  19   THE FACILITIES WERE OPERATING?

12:39PM  20   A.   YEAH.  I DON'T REMEMBER EXACTLY, BUT I COULD BELIEVE THAT

12:39PM  21   THERE WAS A COMMENT SECTION FREE FORM AT THE END.

12:39PM  22   Q.   OKAY.  LET ME ASK YOU TO LOOK AT PAGE 14, AND WE'LL START

12:40PM  23   WITH THE BAD NEWS FIRST.

12:40PM  24        THIS IS THE PAGE THAT IS LABELLED "HERE'S WHAT PEOPLE ARE

12:40PM  25   COMPLAINING ABOUT."

JHAVERI CROSS BY MR. DOWNEY                                         3676

12:40PM   1      A.   I SEE IT.

12:40PM   2      Q.   AND THESE ARE COMMENTS THAT WERE MADE BY INDIVIDUAL

12:40PM   3      PATIENTS AT -- WHO CAME TO A THERANOS SERVICE CENTER.

12:40PM   4           DO YOU SEE THAT?

12:40PM   5      A.   YES.

12:40PM   6      Q.   AND MANY OF THOSE COMMENTS RELATE TO SERVICE ISSUES;

12:40PM   7      CORRECT?

12:40PM   8      A.   YES, IT SEEMS SO.

12:40PM   9      Q.   AND THINGS LIKE DIFFICULTY CHECKING IN; CORRECT?

12:40PM   10     A.   YEAH, THAT WAS ONE OF THE REASONS.

12:40PM   11     Q.   OKAY.  AND SOME PEOPLE DIDN'T LIKE THE LAYOUT OF THE

12:40PM   12     FACILITY AS IN THE LAST COMMENT.

12:40PM   13          DO YOU SEE THAT?

12:41PM   14     A.   YES.

12:41PM   15     Q.   BUT NONE OF THESE PEOPLE COMPLAINED ABOUT THE KIND OF

12:41PM   16     BLOOD DRAW THAT THEY GOT; RIGHT?

12:41PM   17     A.   NOT IN THESE COMMENTS, NO.

12:41PM   18     Q.   OKAY.  AND IF YOU LOOK AT THE PRIOR TWO PAGES, I'M SAVING

12:41PM   19     THE GOOD NEWS FOR LAST, THERE'S ANOTHER SECTION "HERE'S WHAT

12:41PM   20     PEOPLE ARE SAYING," AND THESE ARE THE POSITIVE COMMENTS THAT

12:41PM   21     PEOPLE EXPERIENCED; CORRECT?

12:41PM   22     A.   CORRECT.

12:41PM   23     Q.   AND THESE ARE ALL VERY POSITIVE COMMENTS ABOUT THEIR

12:41PM   24     EXPERIENCE AT A THERANOS SERVICE CENTER WITHIN WALGREENS;

12:41PM   25     CORRECT?

JHAVERI CROSS BY MR. DOWNEY                                              3677

12:41PM   1    A.   YES.

12:41PM   2    Q.   AND I ASSUME THAT YOU RECEIVED THESE COMMENTS AS A

12:41PM   3    POSITIVE SIGN OF HOW THE PARTNERSHIP WAS DOING?

12:41PM   4    A.   YEAH, PATIENT EXPERIENCE WAS ONE OF THE METRICS THAT WE

12:41PM   5    WERE MEASURING, SO ABSOLUTELY.

12:41PM   6    Q.   AND SOMETIMES PEOPLE COMMENTED THAT ALL ASPECTS OF THE

12:42PM   7    SERVICE WERE GREAT AS IN THE SECOND TO LAST COMMENT ON THE

12:42PM   8    BOTTOM OF PAGE 13.

12:42PM   9         DO YOU SEE THAT WHERE IT SAYS "THERANOS IS SO MUCH BETTER

12:42PM  10    THAN QUEST DIAGNOSTICS.  I WAS IN AND OUT IN UNDER 10 MINUTES,

12:42PM  11    THE STAFF WAS COURTEOUS AND THE ACTUAL BLOOD DRAWING WAS WAY

12:42PM  12    LESS SCARY THAN WHAT I AM USED TO."

12:42PM  13         DO YOU SEE THAT?

12:42PM  14    A.   I DO.

12:42PM  15    Q.   AND YOU CONTINUED TO GET POSITIVE FEEDBACK ON THE SERVICES

12:42PM  16    PROVIDED IN THE THERANOS SERVICE CENTERS THROUGHOUT YOUR TIME

12:42PM  17    WORKING ON THIS PARTNERSHIP; CORRECT?

12:42PM  18    A.   YEAH, THE SERVICE CENTER LEVELS WERE, AS I SAID, BETWEEN 4

12:42PM  19    AND 5.

12:42PM  20    Q.   AND WHEN YOU SAY SERVICE LEVELS, I JUST WANT TO BE CLEAR,

12:42PM  21    THAT MEANS THE ENTIRE EXPERIENCE OF THE PATIENT WHEN THEY USE

12:42PM  22    THE FACILITY; CORRECT?

12:42PM  23    A.   YES.  MY APOLOGIES.  WHAT I'M REFERRING TO IS THE SERVICE

12:43PM  24    EXPERIENCE THAT WE WERE MEASURING THROUGH THE IPADS AND THE

12:43PM  25    QUESTIONNAIRE.

JHAVERI CROSS BY MR. DOWNEY                                        3678

12:43PM   1    Q.   NOW, I WANT TO ASK YOU ABOUT THE RELATIONSHIP AS IT

12:43PM   2    EVOLVED OVER TIME BETWEEN WALGREENS AND THERANOS.

12:43PM   3        AM I RIGHT THAT THE LEADERSHIP OF WALGREENS CHANGED IN

12:43PM   4    AUGUST OF 2014?

12:43PM   5    A.   AT SOME TIME AFTER THE MERGER, SOME OF THE LEADERSHIP

12:43PM   6    CHANGED.

12:43PM   7    Q.   OKAY.  AND MR. MIQUELON, FOR EXAMPLE, LEFT?

12:43PM   8    A.   CORRECT.

12:43PM   9    Q.   AND DID DR. ROSAN STAY AT THERANOS -- OR AT WALGREENS AT

12:43PM  10    THAT POINT?

12:43PM  11    A.   YOU KNOW, I DON'T KNOW.  I DON'T REMEMBER THE EXACT TIME.

12:43PM  12    Q.   AND AUGUST OF 2014 IS THE TIME PERIOD THAT WE LOOKED AT

12:43PM  13    WHERE YOU STARTED TO RAISE CONCERNS ABOUT THE NUMBER OF STORES

12:44PM  14    THAT WOULD OPEN; CORRECT?

12:44PM  15    A.   WHEN YOU SAY "RAISE CONCERNS," I'M NOT SURE.

12:44PM  16    Q.   WELL, I THINK YOU INDICATED THAT THE PLAN WAS TO OPEN A

12:44PM  17    CERTAIN NUMBER, BUT THAT YOU MIGHT HAVE TO OPEN A LESSER

12:44PM  18    NUMBER; CORRECT?

12:44PM  19    A.   THAT'S RIGHT.

12:44PM  20    Q.   AND DO YOU RECALL THAT WE LOOKED AT THE NUMBERS PROJECTING

12:44PM  21    THAT THE NUMBER OF STORES WOULD GO DOWN FROM 3000 TO 2000 OR

12:44PM  22    2500 NATIONWIDE?

12:44PM  23    A.   YEAH, WHAT WE -- JUST TO BE VERY CLEAR, IN APRIL OF 2014,

12:44PM  24    ABOUT A MONTH, MONTH AND A HALF AFTER I TOOK OVER, WE GAVE THE

12:44PM  25    EXECUTIVE TEAM, THE EXECUTIVE COMMITTEE, A FULL VIEW AS TO

JHAVERI CROSS BY MR. DOWNEY                                        3679

12:44PM   1    WHERE WE WERE AND WHAT WE WERE GOING TO MEASURE FOR FURTHER

12:44PM   2    SCALE, AND THAT WE WOULD MONITOR THAT.

12:44PM   3        BASED ON THOSE RESULTS, WE WOULD CONTINUE TO EXPAND.

12:44PM   4        AND IF WE ARE NOT SEEING THE RESULTS, WE WILL SLOW DOWN

12:44PM   5    THE ROLLOUT.

12:44PM   6        AGAIN, THE INTENTION WAS ALWAYS TO GO NATIONWIDE.  WE

12:44PM   7    WOULD NEVER GO INTO A PARTNERSHIP WITH A COMPANY LIKE THERANOS

12:44PM   8    WHO HAS DEVELOPED SOMETHING INNOVATIVE LIKE THIS TO NOT GO

12:45PM   9    NATIONWIDE.

12:45PM  10        BUT IN ORDER FOR US TO GO NATIONWIDE, WE, AS BOTH

12:45PM  11    COMPANIES, AGREED UPON WHAT THE METRICS WERE, WHAT THE

12:45PM  12    EXPERIENCE SHOULD LOOK LIKE, WHAT THE COST SHOULD BE, YOU KNOW,

12:45PM  13    WHAT ARE CERTAIN ATTRIBUTES LIKE THE VENOUS DRAW OR HOW WE

12:45PM  14    TRAIN.

12:45PM  15        AS WE HIT THOSE MEASURES AND BOTH COMPANIES ARE SATISFIED,

12:45PM  16    WE WILL CONTINUE TO EXPAND, AND THAT'S WHAT WE EXPLAINED TO THE

12:45PM  17    EXECUTIVE TEAM.

12:45PM  18    Q.   AND THE DECISION AS TO WHETHER OR NOT THERANOS WOULD

12:45PM  19    EXPAND IN WALGREENS STORES DID NOT LIE WITH YOU, DID IT?

12:45PM  20    A.   I WAS ONE OF THE INDIVIDUALS THAT WOULD BE GIVING INPUT

12:45PM  21    INTO THAT DECISION.

12:45PM  22    Q.   BUT IT WAS THE EXECUTIVE TEAM THAT WOULD ULTIMATELY MAKE

12:45PM  23    THAT DECISION; CORRECT?

12:45PM  24    A.   BASED ON THE INFORMATION THAT I PROVIDE THEM AND BASED

12:45PM  25    ON WHAT THE INFORMATION IS THAT I TELL THEM ON HOW THE PROJECT

JHAVERI CROSS BY MR. DOWNEY                                      3680

12:45PM  1    WAS GOING.

12:45PM  2    Q.   WELL, YOU WERE THE GUY ON THE GROUND; CORRECT?

12:45PM  3    A.   I WAS THE GUY ON THE GROUND.

12:45PM  4    Q.   AND SO YOU'RE GIVING THEM INFORMATION AND ADVICE, ET

12:45PM  5    CETERA?

12:45PM  6    A.   YES.  MY TEAM AND I ARE BOTH GIVING INFORMATION, AND WE'RE

12:46PM  7    DOING IT TOGETHER WITH THE THERANOS TEAM.

12:46PM  8         AS YOU NOTED, MR. BALWANI WAS RIGHT THERE WITH ME AT THE

12:46PM  9    EXECUTIVE COMMITTEE MEETINGS.  AND SO WE ARE PROVIDING A STATUS

12:46PM 10    TOGETHER AS A PARTNER IN THIS TOGETHER.

12:46PM 11    Q.   AND SO -- AND YOU REPORTED TO THEM, I ASSUME, THAT THE

12:46PM 12    PATIENTS WHO WERE USING THE SERVICE CENTER SEEMED TO BE PRETTY

12:46PM 13    HAPPY; CORRECT?

12:46PM 14    A.   YES.

12:46PM 15    Q.   AND YOU REPORTED TO THEM THAT ALTHOUGH THE LEVEL OF VENOUS

12:46PM 16    DRAW WAS NOT AT THE LEVEL YOU WANTED, IT HAD DECREASED OVER

12:46PM 17    TIME; CORRECT?

12:46PM 18    A.   IT HOVERED AROUND BETWEEN 43, 40 TO 39 PERCENT IS WHAT WE

12:46PM 19    SAW AND EXPERIENCED, AND WHATEVER THE RESULTS WERE AT THE TIME,

12:46PM 20    THAT'S WHAT WE REPORTED TO THE EXECUTIVE TEAM.

12:46PM 21    Q.   SO, SO 65 PERCENT OR 55 PERCENT OR SO OF PATIENTS WERE

12:46PM 22    GETTING THE FINGERSTICK; CORRECT?

12:46PM 23    A.   THAT'S CORRECT.

12:46PM 24    Q.   AND THE REMAINING WERE PATIENTS WHO NEEDED SOME TESTS THAT

12:47PM 25    REQUIRED A VENOUS DRAW, CORRECT, THE 43 PERCENT THAT YOU

JHAVERI CROSS BY MR. DOWNEY                                    3681

12:47PM   1    REFERENCED?

12:47PM   2    A.   YES.

12:47PM   3    Q.   AND THEY MIGHT NEED A BLOOD TEST IN WHICH 10 OR 11 ASPECTS

12:47PM   4    OF THEIR BLOOD WERE BEING TESTED; CORRECT?

12:47PM   5    A.   THAT COULD BE A POSSIBILITY, YES.

12:47PM   6    Q.   AND IF ANY ONE OF THOSE ANALYTES NEEDED A VENOUS TEST,

12:47PM   7    THEN THE PATIENT HAD TO HAVE A VENOUS TEST; CORRECT?

12:47PM   8    A.   YES.  THAT WAS THE DECISION TO MAKE SURE THAT THE PATIENT

12:47PM   9    EXPERIENCE WAS RIGHT, SO THE PATIENT HAS NOT -- EITHER HAS A

12:47PM  10    VENOUS DRAW PLUS A FINGERSTICK AT THE SAME TIME.

12:47PM  11    Q.   OKAY.  NOW, IF I GO -- YOU NO LONGER ARE AFFILIATED WITH

12:47PM  12    WALGREENS?

12:47PM  13    A.   I AM NOT, SIR.

12:47PM  14    Q.   BUT IF I GO INTO A WALGREENS TODAY, CAN I GET MY BLOOD

12:47PM  15    TESTED?

12:47PM  16    A.   IT DEPENDS ON WHAT YOU'RE ASKING FOR BLOOD TESTED.

12:47PM  17        SO THERE ARE STORES THAT COULD BE DOING THAT.  IT'S HARD

12:47PM  18    FOR ME TO SPEAK AT THAT.  I'M NOT THERE ANYMORE.

12:47PM  19    Q.   WELL, YOU KNOW THAT LAB CORP. HAS OPENED FACILITIES IN

12:48PM  20    WALGREENS STORES?

12:48PM  21    A.   YES.

12:48PM  22    Q.   AND YOU KNOW THAT THE METHOD OF DRAWING BLOOD IN THOSE

12:48PM  23    LAB CORP. CENTERS IN WALGREENS STORES IS VENOUS?

12:48PM  24    A.   THAT IS CORRECT.

12:48PM  25    Q.   SO WALGREENS MADE THE DECISION TO OPEN FACILITIES IN ITS

JHAVERI CROSS BY MR. DOWNEY                                    3682

12:48PM   1    STORES THAT OFFERED ONLY VENOUS BLOOD DRAWS; CORRECT?

12:48PM   2    A.   THAT WAS THEIR DECISION.

12:48PM   3    Q.   AND THAT WAS AT SOME POINT AFTER YOUR DEPARTURE?

12:48PM   4    A.   YEAH.

12:48PM   5    Q.   DID THERE COME A TIME IN THE SUMMER OF 2014 WHERE YOU HAD

12:48PM   6    AN OPPORTUNITY TO INTERACT WITH THE CHIEF MEDICAL OFFICER OF

12:48PM   7    WALGREENS ABOUT THERANOS?

12:48PM   8    A.   I CAN'T TELL YOU EXACTLY WHAT TIME.  DR. LEIDER AND I

12:49PM   9    INTERACTED ALL OF THE TIME ON VARIOUS ISSUES INCLUDING

12:49PM   10   THERANOS.

12:49PM   11   Q.   AND JUST TO BE CLEAR, DR. LEIDER WAS DR. HARRY LEIDER?

12:49PM   12   A.   HARRY LEIDER.

12:49PM   13   Q.   AND HE WAS THE CHIEF MEDICAL OFFICER AT WALGREENS;

12:49PM   14   CORRECT?

12:49PM   15   A.   THAT IS CORRECT.

12:49PM   16   Q.   AND WALGREENS HAD GOTTEN SOME INFORMATION THAT CAUSED IT

12:49PM   17   TO WANT TO LOOK AT DATA ABOUT THERANOS BLOOD TESTS; CORRECT?

12:49PM   18   A.   CAN YOU BE MORE SPECIFIC EXACTLY?  AGAIN, I SPOKE TO HIM

12:49PM   19   ABOUT A LOT OF THINGS.

12:49PM   20   Q.   WELL, LET ME ASK YOU --

12:49PM   21   A.   YEAH.

12:49PM   22   Q.   -- DO YOU RECALL WHAT OCCASIONED YOUR INTERACTIONS WITH

12:49PM   23   DR. LEIDER ABOUT THERANOS?

12:49PM   24   A.   WELL, THERE WERE A LOT OF DIFFERENT OCCASIONS.  WE GAVE

12:49PM   25   HIM STATUS ON WHAT WAS GOING ON.

JHAVERI CROSS BY MR. DOWNEY                                    3683

12:49PM  1      THERE WAS AN INCIDENT THAT OCCURRED THAT ONE OF OUR NURSE

12:49PM  2   PRACTITIONERS, ONE OF THE NURSE PRACTITIONERS FROM TAKE CARE

12:49PM  3   CLINICS HAD VOICED A CONCERN, AND SO I BROUGHT DR. LEIDER IN,

12:49PM  4   AND AS WELL AS DR. CARROLL, WHO IS THE CHIEF MEDICAL OFFICER

12:49PM  5   FOR CLINICS.

12:49PM  6      AND SO THAT WAS A TOPIC OF DISCUSSION THAT WE HAD.

12:50PM  7   Q.   AND THE NATURE OF THE DISCUSSION THAT YOU HAD WAS, WAS THE

12:50PM  8   QUESTION OF WHETHER THERANOS TESTS WERE SUFFICIENTLY ACCURATE;

12:50PM  9   IS THAT RIGHT?

12:50PM 10   A.   THAT'S RIGHT.

12:50PM 11   Q.   AND SO YOU BROUGHT THOSE GENTLEMEN IN BECAUSE THEY HAD

12:50PM 12   MEDICAL EXPERTISE; CORRECT?

12:50PM 13   A.   CORRECT, AND DR. LEIDER WAS A FORMER LAB DIRECTOR.

12:50PM 14   Q.   AND YOU RAISED THAT -- THE QUESTIONS THAT HAD BEEN POSED

12:50PM 15   TO YOU WITH THERANOS; CORRECT?

12:50PM 16   A.   YES.  WHAT I DID WAS I HAD BOTH PAT CARROLL, DR. CARROLL,

12:50PM 17   AND HARRY LEIDER, DR. LEIDER, AS WELL AS MR. BALWANI, AND THEY

12:50PM 18   HAD A CONFERENCE CALL WITH SEVERAL OF THE FOLKS OVER AT

12:50PM 19   THERANOS.

12:50PM 20   Q.   AND MR. BALWANI BROUGHT SEVERAL OF THE SCIENTISTS INTO THE

12:50PM 21   PROCESS BECAUSE THE QUESTIONS WERE ABOUT MEDICAL ISSUES AND

12:50PM 22   SCIENTIFIC ISSUES?

12:50PM 23   A.   THAT IS MY UNDERSTANDING.

12:50PM 24   Q.   OKAY.  AND WHAT WAS THE OUTCOME OF THAT PROCESS?

12:50PM 25   A.   THE OUTCOME WAS THAT BOTH DR. CARROLL AND DR. LEIDER WERE

JHAVERI CROSS BY MR. DOWNEY                                          3684

12:50PM   1    SATISFIED WITH THE ANSWERS THAT THEY RECEIVED.

12:50PM   2    Q.   OKAY.

12:51PM   3    A.   AND WE ADDRESSED THE ISSUES WITH THE NURSE PRACTITIONER.

12:51PM   4         MR. DOWNEY:  OKAY.  YOUR HONOR, MAY I JUST HAVE A

12:51PM   5    MOMENT?

12:51PM   6         THE COURT:  SURE.

12:51PM   7         (PAUSE IN PROCEEDINGS.)

12:51PM   8    BY MR. DOWNEY:

12:51PM   9    Q.   ONE MORE SUBJECT, MR. JHAVERI.

12:51PM  10         I WANT TO ASK YOU, YOU MENTIONED ON YOUR DIRECT

12:51PM  11    EXAMINATION THAT YOU BECAME AWARE OF AN ARTICLE CRITICAL OF

12:51PM  12    THERANOS IN 2015; CORRECT?

12:51PM  13    A.   THAT'S CORRECT.

12:51PM  14    Q.   AND AFTER THAT, JOURNALISTS BEGAN RAISING QUESTIONS WITH

12:52PM  15    YOU ABOUT WHY WALGREENS WAS IN A PARTNERSHIP WITH THERANOS;

12:52PM  16    CORRECT?

12:52PM  17    A.   I DID NOT SPEAK TO ANY OF THE JOURNALISTS.

12:52PM  18    Q.   WELL, LET ME ASK YOU TO TAKE A LOOK AT EXHIBIT 7660, AND

12:52PM  19    I'LL GIVE YOU A MINUTE TO REVIEW THIS.

12:52PM  20    A.   YES.

12:52PM  21    Q.   IN THE FIRST PARAGRAPH, A QUOTATION IS ATTRIBUTED TO YOU

12:52PM  22    BY THIS JOURNALIST.

12:52PM  23         DO YOU SEE THAT?

12:52PM  24    A.   I DO.

12:52PM  25    Q.   AND WAS THIS -- WERE YOU -- DOES THIS REFRESH YOUR

JHAVERI CROSS BY MR. DOWNEY                                3685

12:53PM  1    RECOLLECTION THAT THAT'S A STATEMENT THAT YOU MADE IN 2016?

12:53PM  2    A.   YES, THE STATEMENT WAS MADE IN THE CONTEXT.

12:53PM  3         THIS INTERVIEW WAS ABOUT WALGREENS'S MOVE INTO HEALTH CARE

12:53PM  4    SERVICES, AND SO THAT'S WHAT THE TOPIC WAS WITH THE ECONOMIST

12:53PM  5    AND SO THEY ASKED ME A COUPLE OF QUESTIONS ABOUT THERANOS

12:53PM  6    PARTNERSHIP, AND THE QUOTE THAT I MADE WAS ACTUALLY IN

12:53PM  7    REFERENCE TO IF NURSE PRACTITIONERS WERE RECEIVING ANY TYPE OF

12:53PM  8    INCORRECT RESULTS OR INACCURATE RESULTS, WOULD WE KNOW?

12:53PM  9    Q.   OKAY.  AND WHEN YOU WERE DEPOSED, OR WHEN YOU ASKED THAT

12:53PM 10    QUESTION, YOU SAID, TRUST ME, IF THE RESULTS WERE NOT THERE, WE

12:53PM 11    WOULD HEAR --

12:53PM 12         MR. SCHENK:  YOUR HONOR, OBJECTION.  IT'S NOT IN

12:53PM 13    EVIDENCE.

12:53PM 14    BY MR. DOWNEY:

12:53PM 15    Q.   I'M JUST ASKING, DOES THIS REFRESH YOUR RECOLLECTION AS TO

12:53PM 16    WHAT YOU SAID?

12:54PM 17    A.   YES.

12:54PM 18    Q.   AND TELL US WHAT YOU SAID IN RESPONSE TO THOSE INQUIRIES.

12:54PM 19         THE COURT:  YOU CAN ANSWER.

12:54PM 20         THE WITNESS:  OKAY.  WHAT THEY -- BASED ON THE

12:54PM 21    INQUIRY, WHAT I SAID WAS -- AGAIN, THE ASK WAS IF NURSE

12:54PM 22    PRACTITIONERS RECEIVED ANY TYPE OF INACCURATE RESULTS FOR THEIR

12:54PM 23    PATIENTS, WOULD YOU KNOW AND WOULD THEY TELL YOU?

12:54PM 24         AND MY COMMENT WAS DIRECTLY, TRUST ME, IF THERE WAS

12:54PM 25    SOMETHING INACCURATE, WE WOULD KNOW.

JHAVERI CROSS BY MR. DOWNEY                                    3686

12:54PM   1        JUST LIKE THE ONE I SPOKE ABOUT EARLIER WHERE THEY WERE --

12:54PM   2   THEY INFORMED US THAT THEY POTENTIALLY THOUGHT THERE WAS A BAD

12:54PM   3   RESULT.

12:54PM   4        SO THAT WAS MY REFERENCE.

12:54PM   5   BY MR. DOWNEY:

12:54PM   6   Q.   AND WHEN YOU SAID "WE WOULD KNOW," THAT WAS A RHETORICAL

12:54PM   7   STATEMENT; CORRECT?  YOU WERE SAYING WE HAVEN'T HEARD THAT;

12:54PM   8   CORRECT?

12:54PM   9   A.   NO.  WHAT I WAS REFERRING TO IN ALL OF OUR FIELD

12:54PM  10   OPERATIONS -- LET ME TAKE A STEP BACK HERE.

12:54PM  11        WHETHER IT'S IN THE PHARMACY OR IN THE TAKE CARE CLINICS,

12:54PM  12   WE HAVE A LEVEL OF MANAGEMENT THAT GOES ALL OF THE WAY TO THE

12:55PM  13   TOP.

12:55PM  14        AND SO WHAT I WAS REFERRING TO SPECIFICALLY HERE IS IF A

12:55PM  15   NURSE PRACTITIONER HAD A CONCERN ABOUT SOME TYPE OF RESULT,

12:55PM  16   THAT THEY WOULD RAISE IT TO THEIR MANAGEMENT AND THAT IT WOULD

12:55PM  17   COME TO US OR TO THE APPROPRIATE TEAM THAT WAS ACTUALLY RUNNING

12:55PM  18   THAT PARTICULAR PROJECT.

12:55PM  19   Q.   UNDERSTOOD.

12:55PM  20   A.   SO THAT'S WHAT I WAS REFERRING TO HERE.

12:55PM  21   Q.   UNDERSTOOD.

12:55PM  22        DURING YOUR DIRECT EXAMINATION YOU WERE SHOWN AND YOU READ

12:55PM  23   A SERIES OF TEXTS BETWEEN MR. BALWANI AND MS. HOLMES.

12:55PM  24        DO YOU RECALL THAT?

12:55PM  25   A.   YES, SIR.

JHAVERI CROSS BY MR. DOWNEY                                          3687

12:55PM  1    Q.   AND YOU SAW SOME DISCUSSION IN THOSE TEXTS ABOUT CVS;

12:55PM  2    CORRECT?

12:55PM  3    A.   YES, SIR.

12:55PM  4    Q.   AND CVS IS A SIGNIFICANT COMPETITOR TO WALGREENS; CORRECT?

12:55PM  5    A.   YES.

12:55PM  6    Q.   AND DID YOU KNOW IN 2015 THAT THERANOS WAS TALKING TO CVS

12:55PM  7    ABOUT A POTENTIAL PARTNERSHIP?

12:55PM  8    A.   I DID NOT SPEAK TO ANYONE IN DETAIL ABOUT CVS OR ANYTHING

12:55PM  9    LIKE THAT.  THAT WAS NOT MY PURVIEW.

12:55PM  10   Q.   AND DID YOU HAVE ANY KNOWLEDGE THAT THERANOS WAS PURSUING

12:56PM  11   A PARTNERSHIP WITH CVS?

12:56PM  12   A.   WHAT I KNEW WAS EARLY ON WHEN THERANOS WAS LOOKING FOR A

12:56PM  13   PARTNER, THEY HAD SPOKEN TO SEVERAL CHAINS, SAFEWAY BEING ONE

12:56PM  14   OF THEM, CVS, AND WALGREENS.

12:56PM  15   Q.   AND THAT WAS IN 2010?

12:56PM  16   A.   WHENEVER I -- IT WAS SOMETIME IN 2013, 2014 WHEN I BECAME

12:56PM  17   MORE INVOLVED IN THE PROJECT.

12:56PM  18   Q.   YOU LEARNED THAT IN 2013 AND 2014?

12:56PM  19   A.   RIGHT.

12:56PM  20   Q.   BUT WHAT YOU JUST REFERENCED IS KNOWLEDGE ABOUT WHAT HAD

12:56PM  21   HAPPENED IN 2010; CORRECT?

12:56PM  22   A.   YEAH.  I DON'T KNOW THE TIMEFRAME, SIR, TO BE HONEST.

12:56PM  23   Q.   WHENEVER THE WALGREENS-THERANOS INITIAL AGREEMENT HAD BEEN

12:56PM  24   MADE; CORRECT?

12:56PM  25   A.   CORRECT.

JHAVERI CROSS BY MR. DOWNEY                                      3688

12:56PM  1    Q.   AND DID YOU KNOW ANYTHING ABOUT CONVERSATIONS BETWEEN CVS

12:56PM  2    AND THERANOS IN 2015?

12:56PM  3    A.   I DON'T KNOW THE DETAILS OF THAT.

12:56PM  4    Q.   DID YOU KNOW THAT THERANOS WAS PURSUING A POTENTIAL

12:56PM  5    PARTNERSHIP WITH CVS BECAUSE OF -- WELL, DID YOU KNOW THAT THEY

12:56PM  6    WERE PURSUING THAT TYPE OF PARTNERSHIP?

12:57PM  7    A.   NO.

12:57PM  8    Q.   ALL RIGHT.

12:57PM  9         YOUR HONOR, JUST ONE MOMENT.

12:57PM 10         (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

12:57PM 11              MR. DOWNEY:  YOUR HONOR, I JUST WANT TO QUICKLY

12:57PM 12    INTRODUCE TWO DOCUMENTS AND I'LL BE DONE.

12:57PM 13    Q.   I KNOW YOU TESTIFIED YOU DIDN'T HAVE MUCH CONTACT WITH

12:57PM 14    MS. HOLMES.  BUT ON OCCASION YOU EMAILED HER; IS THAT CORRECT?

12:57PM 15    A.   I DID.

12:57PM 16    Q.   AND I WANT TO SHOW YOU AN EMAIL BETWEEN YOU AND

12:57PM 17    MS. HOLMES.  I WANT TO SHOW YOU A DOCUMENT AND ASK YOU IF IT'S

12:57PM 18    AN EMAIL BETWEEN YOU AND MS. HOLMES, AND THAT'S EXHIBIT 7454.

12:58PM 19    YEAH.

12:58PM 20    A.   IS THAT IN VOLUME 1, SIR?

12:58PM 21    Q.   IT SHOULD BE IN VOLUME 2 OF THE BLACK BINDERS.

12:58PM 22    A.   I HAVE IT.

12:58PM 23    Q.   AND CAN YOU TELL ME WHAT THIS IS?

12:58PM 24    A.   YES.  THIS IS MR. BALWANI HAD FORWARDED TO MYSELF AND

12:58PM 25    BRAD WASSON WHO, AS I MENTIONED, WAS MY BOSS AT THE TIME, A

JHAVERI CROSS BY MR. DOWNEY                                    3689

12:59PM   1    LINK TO THE "FORTUNE" MAGAZINE ARTICLE THAT MS. HOLMES WAS ON

12:59PM   2    THE COVER OF.

12:59PM   3    Q.   OKAY.

12:59PM   4    A.   AND I HAD SENT AN EMAIL TO MS. HOLMES CONGRATULATING HER.

12:59PM   5    Q.   WELL, LET ME MOVE THE ADMISSION OF 7454.

12:59PM   6         MR. SCHENK:  NO OBJECTION.

12:59PM   7         THE COURT:  INCLUDING THE SECOND PAGE?  YOU WANT THE

12:59PM   8    SECOND PAGE?

12:59PM   9         MR. DOWNEY:  I DON'T NEED THE SECOND PAGE.  LET'S

12:59PM  10    SAY 7454A.

12:59PM  11         THE COURT:  ALL RIGHT.

12:59PM  12      ANY OBJECTION TO THAT?

12:59PM  13         MR. SCHENK:  YOUR HONOR, I THINK THE WHOLE THING

12:59PM  14    SHOULD GO IN.  I'M NOT SURE IT'S SEPARATE.  I THINK IT'S ALL

12:59PM  15    PART OF THE EMAIL FROM --

12:59PM  16         THE COURT:  WELL, THAT'S MY INQUIRY.

12:59PM  17         MR. DOWNEY:  I DON'T OBJECT TO IT COMING IN, BUT I

12:59PM  18    DIDN'T ATTACH THE ENTIRE ARTICLE, SO I CAN TRY TO AMEND THAT IN

12:59PM  19    THE FUTURE.

12:59PM  20         THE COURT:  WELL, THIS WHAT I HAVE.

12:59PM  21         MR. DOWNEY:  YES.

12:59PM  22         THE COURT:  YOU WANT WHAT I'M HOLDING?

12:59PM  23         MR. DOWNEY:  YES.

12:59PM  24         THE COURT:  YOU WANT BOTH SIDES?

12:59PM  25         MR. DOWNEY:  THAT'S FINE, YOUR HONOR, YES.

JHAVERI CROSS BY MR. DOWNEY                                      3690

| | | |
|---|---|---|
| 12:59PM | 1 | THE COURT:  ANY OBJECTION? |
| 12:59PM | 2 | MR. SCHENK:  NO.  THANK YOU. |
| 12:59PM | 3 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 12:59PM | 4 | (DEFENDANT'S EXHIBIT 7454 WAS RECEIVED IN EVIDENCE.) |
| 01:00PM | 5 | BY MR. DOWNEY: |
| 01:00PM | 6 | Q.  SO THIS IS AN ARTICLE ABOUT MS. HOLMES THAT MR. BALWANI |
| 01:00PM | 7 | FORWARDED TO YOU; CORRECT? |
| 01:00PM | 8 | A.  CORRECT. |
| 01:00PM | 9 | Q.  AND THEN YOU WROTE TO MS. HOLMES; CORRECT? |
| 01:00PM | 10 | A.  I DID. |
| 01:00PM | 11 | Q.  AND YOU SENT HER GOOD WISHES IN YOUR FIRST PARAGRAPH; |
| 01:00PM | 12 | CORRECT? |
| 01:00PM | 13 | A.  YES. |
| 01:00PM | 14 | Q.  AND THEN YOU SAY IN THE SECOND PARAGRAPH, "I AM SURE SUNNY |
| 01:00PM | 15 | AND CHRISTIAN ARE KEEPING YOU IN THE LOOP." |
| 01:00PM | 16 | CORRECT? |
| 01:00PM | 17 | A.  YES. |
| 01:00PM | 18 | Q.  AND CHRISTIAN IS A REFERENCE TO CHRISTIAN HOLMES; CORRECT? |
| 01:00PM | 19 | A.  YES. |
| 01:00PM | 20 | Q.  AND THAT'S MS. HOLMES'S BROTHER WHO ALSO WORKED AT |
| 01:00PM | 21 | THERANOS? |
| 01:00PM | 22 | A.  CORRECT. |
| 01:00PM | 23 | Q.  AND YOU SAID, "TEAMS ARE WORKING WELL TOGETHER AND A LOT |
| 01:00PM | 24 | OF PROGRESS BEING MADE.  SEE YA SOON." |
| 01:00PM | 25 | CORRECT? |

JHAVERI CROSS BY MR. DOWNEY                                          3691

01:00PM  1    A.   CORRECT.

01:00PM  2    Q.   AND LET ME ASK YOU TO LOOK AT 7471.

01:01PM  3    A.   YES, SIR.

01:01PM  4    Q.   IS THIS AN EMAIL BETWEEN YOU AND MS. HOLMES IN SEPTEMBER

01:01PM  5    OF 2014?

01:01PM  6    A.   IT IS.

01:01PM  7    Q.   AND THE ATTACHMENT IS AN ANNOUNCEMENT RELATED TO A LIST OF

01:01PM  8    HONOREES?

01:01PM  9    A.   YES.

01:01PM  10           MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

01:01PM  11   7471.

01:01PM  12           MR. SCHENK:  NO OBJECTION.

01:01PM  13           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:01PM  14      (DEFENDANT'S EXHIBIT 7471 WAS RECEIVED IN EVIDENCE.)

01:01PM  15   BY MR. DOWNEY:

01:01PM  16   Q.   IF YOU JUST FOCUS ON THE ADDRESS AT THE BOTTOM -- AT THE

01:01PM  17   TOP, RATHER, INDICATING IT'S FROM YOU TO MS. HOLMES, YOU SENT

01:01PM  18   THIS IN SEPTEMBER OF 2014; CORRECT?

01:01PM  19   A.   CORRECT.

01:01PM  20   Q.   AND THIS IS A LITTLE BIT AFTER -- A COUPLE OF WEEKS AFTER

01:01PM  21   THE MEETINGS THAT YOU HAD WITH MR. BALWANI WHERE YOU INDICATED

01:01PM  22   YOU MIGHT BE SCALING DOWN THE NUMBER OF STORES; CORRECT?

01:01PM  23   A.   THAT'S CORRECT.

01:01PM  24   Q.   OKAY.  AND IN THIS EMAIL, YOU SEND GOOD WISHES TO HER

01:02PM  25   AGAIN; CORRECT?

JHAVERI CROSS BY MR. DOWNEY                                    3692

01:02PM    1    A.   YES.

01:02PM    2    Q.   AND IN THE SECOND SENTENCE YOU SAID, "AS YOU KNOW WE ARE

01:02PM    3    MAKING GREAT PROGRESS IN OUR PARTNERSHIP."

01:02PM    4         CORRECT?

01:02PM    5    A.   YES.

01:02PM    6              MR. DOWNEY:  NOTHING FURTHER, YOUR HONOR.

01:02PM    7              THE COURT:  ANY REDIRECT?

01:02PM    8              MR. SCHENK:  YES, YOUR HONOR.

01:02PM    9              THE COURT:  FOLKS, IF YOU WANT TO STAND AND STRETCH,

01:02PM   10    PLEASE FEEL FREE.

01:02PM   11              JUROR:  CAN I USE THE RESTROOM?

01:02PM   12              THE COURT:  WHY DON'T WE TAKE A BREAK.  WHY DON'T WE

01:02PM   13    DO THAT?

01:02PM   14         SORRY, MR. SCHENK.  LET'S TAKE A BREAK.  20 MINUTES.

01:02PM   15              MS. TREFZ:  IF WE CAN DO 20 MINUTES, THAT WOULD BE

01:02PM   16    IT FOR THE REST OF THE DAY.

01:02PM   17              THE COURT:  LET'S DO 20 MINUTES.

01:02PM   18         YOU CAN STAND DOWN, SIR, AND WE CAN TAKE A BREAK FOR

01:02PM   19    20 MINUTES.

01:03PM   20         (JURY OUT AT 1:03 P.M.)

01:03PM   21              THE COURT:  YOU CAN WAIT OUTSIDE, SIR.  YOU CAN GO.

01:03PM   22    THANK YOU.

01:03PM   23         ALL RIGHT.  THANK YOU.

01:03PM   24         THE RECORD SHOULD REFLECT THAT THE JURY HAS LEFT FOR THE

01:03PM   25    BREAK AND THE WITNESS HAS LEFT THE COURTROOM AND ALL COUNSEL

3693

01:03PM  1    AND MS. HOLMES ARE PRESENT ONCE AGAIN.

01:03PM  2         IT'S ABOUT TEN AFTER 1:00.  I KNOW THERE'S THE 1:30

01:03PM  3    HEARING.  I DON'T KNOW, SHOULD WE -- COUNSEL HERE IN THE

01:04PM  4    COURTROOM, DID YOU INTEND TO -- ANY COUNSEL HERE IN THE

01:04PM  5    COURTROOM, DID YOU INTEND TO JOIN OR ASSIST YOUR COLLEAGUES IN

01:04PM  6    THAT MATTER?

01:04PM  7         MR. BOSTIC:  FOR THE GOVERNMENT, YOUR HONOR, JUST

01:04PM  8    ME, I THINK, AND I WOULDN'T ASK THAT TRIAL PROCEEDINGS BE

01:04PM  9    STOPPED.  I THINK THEY SHOULD CONTINUE IF THE OTHER PARTIES ARE

01:04PM  10   AMENABLE TO IT.

01:04PM  11        THE COURT:  THAT WAS MY INQUIRY.  THANK YOU,

01:04PM  12   MR. BOSTIC.

01:04PM  13        MR. DOWNEY:  FOR THE DEFENSE, YOUR HONOR, MR. CLINE

01:04PM  14   IS GOING TO ATTEND THE 1:30 HEARING AND THE DEFENSE IS FINE

01:04PM  15   WITH PROCEEDING.

01:04PM  16        THE COURT:  YOU HAVE FULL TRUST AND CONFIDENCE IN

01:04PM  17   MR. CLINE?

01:04PM  18      (LAUGHTER.)

01:04PM  19        THE COURT:  THE RECORD WILL REFLECT THAT THERE WAS

01:04PM  20   NO RESPONSE TO THAT.  THERE WAS NO RESPONSE BUT LAUGHTER I

01:04PM  21   THINK IS WHAT I HEARD.

01:04PM  22      ALL RIGHT.  THANK YOU.

01:04PM  23        MR. DOWNEY:  I HAVE COMPLETE CONFIDENCE IN HIM.

01:04PM  24        THE COURT:  I'M SURE YOU DO.  THANK YOU.  LET'S TAKE

01:04PM  25   OUR BREAK.  THANK YOU.

JHAVERI REDIRECT BY MR. SCHENK                                        3694

| | | |
|---|---|---|
| 01:05PM | 1 | THE CLERK:  COURT IS IN RECESS. |
| 01:05PM | 2 | (RECESS FROM 1:05 P.M. UNTIL 1:32 P.M.) |
| 01:32PM | 3 | (JURY IN AT 1:32 P.M.) |
| 01:32PM | 4 | THE COURT:  PLEASE BE SEATED.  WE'RE BACK ON THE |
| 01:32PM | 5 | RECORD.  ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT.  OUR |
| 01:32PM | 6 | JURY IS PRESENT. |
| 01:32PM | 7 | MR. JHAVERI IS BACK ON THE STAND. |
| 01:32PM | 8 | MR. SCHENK, YOU HAVE SOME REDIRECT? |
| 01:32PM | 9 | MR. SCHENK:  YES.  THANK YOU, YOUR HONOR. |
| 01:32PM | 10 | **REDIRECT EXAMINATION** |
| 01:32PM | 11 | BY MR. SCHENK: |
| 01:32PM | 12 | Q.   GOOD AFTERNOON AGAIN, MR. JHAVERI. |
| 01:32PM | 13 | A.   GOOD AFTERNOON. |
| 01:32PM | 14 | Q.   I WOULD LIKE TO COVER A COUPLE OF THE TOPICS THAT YOU |
| 01:32PM | 15 | DISCUSSED WITH MR. DOWNEY AND JUST MAKE SURE I UNDERSTAND YOUR |
| 01:32PM | 16 | ANSWERS, IF THAT'S OKAY. |
| 01:32PM | 17 | A.   SURE. |
| 01:32PM | 18 | Q.   THE FIRST TOPIC I WANT TO TALK ABOUT IS TOWARDS THE |
| 01:32PM | 19 | BEGINNING OF YOUR CROSS-EXAMINATION, YOU TALKED ABOUT THE |
| 01:32PM | 20 | NUMBER OF TIMES THAT YOU MET MS. HOLMES AS OPPOSED TO YOUR |
| 01:32PM | 21 | INTERACTIONS WITH MR. BALWANI. |
| 01:32PM | 22 | DO YOU RECALL THAT TESTIMONY? |
| 01:32PM | 23 | A.   YES. |
| 01:32PM | 24 | Q.   ON ONE OF THE OCCASIONS THAT YOU MET MS. HOLMES, WAS IT |
| 01:32PM | 25 | DURING A DEMONSTRATION OF THE THERANOS TECHNOLOGY? |

JHAVERI REDIRECT BY MR. SCHENK                                    3695

01:33PM   1    A.   YES, IT WAS AT THEIR CORPORATE OFFICE.

01:33PM   2    Q.   IN PALO ALTO?

01:33PM   3    A.   IN PALO ALTO.

01:33PM   4    Q.   AND WHAT DO YOU RECALL ABOUT THAT?

01:33PM   5    A.   WE HAD A -- IT WAS A MEET AND GREET WITH BOTH LEADERSHIP

01:33PM   6    TEAMS AND WE WERE IN THE CONFERENCE ROOM.  MS. HOLMES AND

01:33PM   7    MR. BALWANI GAVE US A LITTLE BIT MORE OF OVERVIEW OF THE

01:33PM   8    SERVICE AND WHAT THEY WERE TRYING TO DO.

01:33PM   9         AND THEN WE WENT, AFTER THAT, TO ACTUALLY GET OUR BLOOD

01:33PM  10    TESTED.  AND SO WE WENT IN THE ROOM NEXT DOOR AND THEY DID A

01:33PM  11    FINGERSTICK ON US, A COUPLE OF US THAT WANTED TO GET IT DONE.

01:33PM  12    I DID GET IT DONE FOR ME.

01:33PM  13         AND THEN THEY ALSO HAD A BLACK MACHINE THAT WAS ON THE

01:33PM  14    TABLE THERE THAT THEY SHOWED US.

01:33PM  15         AND THAT'S ABOUT IT.  THAT WAS MY MEETING WITH HER.

01:33PM  16    Q.   AND WHEN YOU SAID THE MACHINE ON THE TABLE, DID YOU

01:33PM  17    UNDERSTAND THAT TO BE THE THERANOS PROCESSING UNIT, THE

01:33PM  18    THERANOS TECHNOLOGY?

01:33PM  19    A.   THE THERANOS TECHNOLOGY, THAT'S CORRECT.

01:33PM  20    Q.   DID YOU UNDERSTAND THAT THE DEMONSTRATION THAT YOU WERE

01:33PM  21    RECEIVING WOULD MIMIC OR MIRROR A PATIENT EXPERIENCE, WHAT THEY

01:34PM  22    WERE GIVING TO YOU WAS WHAT A WALGREENS PATIENT WOULD

01:34PM  23    EXPERIENCE?

01:34PM  24    A.   CORRECT.  THEY SHOWED US THE FINGERSTICK, THE NANOTAINER

01:34PM  25    AND HOW THEY EXTRACTED THE BLOOD, AND SO IT WAS THE EXPERIENCE

JHAVERI REDIRECT BY MR. SCHENK                              3696

01:34PM   1     THAT POTENTIALLY A PATIENT WOULD SEE.

01:34PM   2     Q.   THANK YOU.

01:34PM   3          MS. KRATZMANN, COULD I HAVE THE ELMO.  THANK YOU.

01:34PM   4          I'D LIKE TO SHOW YOU EXHIBIT 1387.  I BELIEVE YOU WERE

01:34PM   5     SHOWN THIS BY MR. DOWNEY.

01:34PM   6          DO YOU RECALL YOUR TESTIMONY ABOUT THIS DOCUMENT?

01:34PM   7     A.   YES, SIR.

01:34PM   8     Q.   AND AN AMENDED OR A REVISED SERVICES AGREEMENT?

01:34PM   9     A.   YES.

01:34PM  10     Q.   AND I THINK THAT MR. DOWNEY ASKED YOU IF, ANYWHERE IN THIS

01:35PM  11     DOCUMENT, THERE WAS DISCUSSION OF THE PERCENT OF VENOUS DRAWS.

01:35PM  12          DO YOU RECALL THAT TESTIMONY?

01:35PM  13     A.   YES, SIR.

01:35PM  14     Q.   AND I THINK YOU SAID I'D HAVE TO LOOK THROUGH IT, BUT I

01:35PM  15     DON'T RECALL FOR SURE.

01:35PM  16          IS THAT RIGHT?

01:35PM  17     A.   CORRECT.

01:35PM  18     Q.   AND MR. DOWNEY, I THINK, SAID WOULD IT -- WOULD YOU BE

01:35PM  19     SURPRISED IF IT WASN'T IN THE DOCUMENT.

01:35PM  20          DO YOU RECALL THAT?

01:35PM  21     A.   YES, SIR.

01:35PM  22     Q.   WAS VENOUS DRAW AN IMPORTANT METRIC THAT WALGREENS WAS

01:35PM  23     TRACKING, REGARDLESS OF WHETHER IT'S IN THIS DOCUMENT OR NOT?

01:35PM  24     A.   YES, IT WAS.

01:35PM  25     Q.   WAS THE ACCURACY OF THERANOS TESTS IMPORTANT TO WALGREENS?

JHAVERI REDIRECT BY MR. SCHENK                    3697

01:35PM  1     A.   CRITICALLY IMPORTANT.

01:35PM  2     Q.   IS ACCURACY IN THERE?

01:35PM  3     A.   NOT THAT I KNOW OF.

01:35PM  4     Q.   BUT IT'S STILL SOMETHING THAT IS IMPORTANT TO WALGREENS?

01:35PM  5     A.   CORRECT.

01:35PM  6     Q.   NOW I'M SHOWING YOU 3755, ALREADY ADMITTED, THAT

01:36PM  7     MR. DOWNEY SHOWED YOU, AND IN THIS DOCUMENT IT TALKS ABOUT, IF

01:36PM  8     YOU RECALL, SOME LANGUAGE ABOUT THERE BEING 2500 STORES AND

01:36PM  9     THAT BEING THE GOAL FOR AUGUST OF 2016.

01:36PM  10         DO YOU RECALL THAT?

01:36PM  11    A.   YES, SIR.

01:36PM  12    Q.   WHAT ASSUMPTIONS WERE BAKED INTO THAT GOAL?

01:36PM  13    A.   THE ASSUMPTIONS, AGAIN, AS I MENTIONED EARLIER, IS

01:36PM  14    OPERATIONALIZING THE SERVICE, AND PART OF THAT WAS HITTING ON

01:36PM  15    THE METRICS THAT WE HAD DEFINED, EVERYTHING FROM PATIENT

01:36PM  16    EXPERIENCE TO WAIT TIMES TO VENOUS DRAWS, AS WELL AS COST OF

01:36PM  17    THE BUILDOUT.

01:36PM  18         BUT THOSE WERE SOME OF THE BIGGER THINGS THAT REALLY

01:37PM  19    INFORMED US ON WHEN TO LAUNCH, HOW TO LAUNCH, AND HOW MUCH TO

01:37PM  20    LAUNCH.

01:37PM  21    Q.   SO EVEN THOUGH THE DOCUMENT HAS 2500 STORES AS A GOAL,

01:37PM  22    THAT WASN'T GUARANTEED, OR IT WASN'T EVER EXPRESSED TO THERANOS

01:37PM  23    THAT THAT WAS GUARANTEED; IS THAT RIGHT?

01:37PM  24    A.   I PERSONALLY HAD NEVER SAID THAT IT WAS GUARANTEED.

01:37PM  25         AND, AGAIN, WHETHER IT WAS BRAD WASSON OR KERMIT CRAWFORD,

JHAVERI REDIRECT BY MR. SCHENK                                    3698

01:37PM   1    THEY WOULD EXPECT ME TO PROVIDE THE RIGHT INFORMATION TO MAKE

01:37PM   2    THOSE DECISIONS.

01:37PM   3    Q.   I'D LIKE TO SHOW YOU, THIS IS PAGE 12 OF THAT SAME

01:37PM   4    EXHIBIT, EXHIBIT 3755.  AND ON PAGE 12 WE SEE OPERATIONAL

01:37PM   5    READINESS.

01:37PM   6         DO YOU SEE THAT?

01:37PM   7    A.   YES, SIR.

01:37PM   8    Q.   MR. DOWNEY ASKED YOU IF VENOUS DRAWS, OR THE PERCENT OF

01:37PM   9    VENOUS DRAWS, WAS LISTED IN OPERATIONAL READINESS, AND I THINK

01:38PM  10    YOU SAID IT WAS NOT LISTED THERE.  IS THAT RIGHT?

01:38PM  11    A.   THAT'S RIGHT.

01:38PM  12    Q.   AND WAS VENOUS DRAWS STILL SOMETHING THAT WAS IMPORTANT TO

01:38PM  13    WALGREENS, EVEN THOUGH IT WAS NOT LISTED ON OPERATIONAL

01:38PM  14    READINESS?

01:38PM  15    A.   YES, IT WAS.

01:38PM  16    Q.   AND HOW ABOUT THE ACCURACY OF THERANOS BLOOD TESTS?  IS

01:38PM  17    THAT LISTED IN OPERATIONAL READINESS?

01:38PM  18    A.   NO, SIR.

01:38PM  19    Q.   AND WAS THE ACCURACY OF THERANOS BLOOD TESTS STILL

01:38PM  20    NEVERTHELESS IMPORTANT TO WALGREENS?

01:38PM  21    A.   YES.

01:38PM  22    Q.   NOW I'M SHOWING YOU WHAT HAS BEEN ADMITTED AS 1884.  THESE

01:38PM  23    ARE MEETING MINUTES.

01:38PM  24         DO YOU RECALL THIS DISCUSSION WITH MR. DOWNEY?

01:38PM  25    A.   YES, SIR.

3699
JHAVERI REDIRECT BY MR. SCHENK

| | | |
|---|---|---|
| 01:38PM | 1 | Q. AND NUMBER 6 WAS "MOSTLY IMPROVED PATIENT EXPERIENCE." |
| 01:39PM | 2 | MR. DOWNEY ASKED YOU SOME QUESTIONS ON A FEW DOCUMENTS |
| 01:39PM | 3 | ABOUT THE EXPERIENCE THAT PATIENTS HAD, AND YOU TESTIFIED THAT |
| 01:39PM | 4 | IT WAS MEASURED ON A SCALE OF 1 OR 0 TO 5 AND THAT THERE WERE |
| 01:39PM | 5 | MOSTLY 4 AND 5'S; IS THAT RIGHT? |
| 01:39PM | 6 | A. THAT'S CORRECT. |
| 01:39PM | 7 | Q. WHEN IN THE VISIT, OR WHEN IN THE PATIENT'S EXPERIENCE DO |
| 01:39PM | 8 | THEY GIVE THAT FEEDBACK? WHEN DOES THE PATIENT FILL OUT THE |
| 01:39PM | 9 | SURVEY? |
| 01:39PM | 10 | A. IT WAS AT THE END OF THE FULL SERVICE. THAT'S WHEN THE |
| 01:39PM | 11 | IPAD WAS GIVEN TO THEM, AND THAT'S WHEN THEY FILL IT OUT. |
| 01:39PM | 12 | Q. DO THEY HAVE THEIR TEST RESULTS BY THE TIME THEY'RE |
| 01:39PM | 13 | FILLING OUT THAT SURVEY? |
| 01:39PM | 14 | A. NO, SIR. |
| 01:39PM | 15 | Q. SO IF A PATIENT, LET'S SAY, WAS PREGNANT BUT WAS TOLD THAT |
| 01:39PM | 16 | THEY WERE NOT PREGNANT BY A TEST FROM THERANOS, THAT MIGHT |
| 01:39PM | 17 | AFFECT THEIR OPINION OR THEIR IMPRESSION OF THE EXPERIENCE? |
| 01:39PM | 18 | A. IT COULD. |
| 01:39PM | 19 | Q. BUT THAT WOULD NOT BE CAPTURED IN A SURVEY TAKEN AT THE |
| 01:39PM | 20 | END OF THEIR VISIT TO THE THERANOS AT WALGREENS? |
| 01:40PM | 21 | A. NO. THE RESULTS WERE NOT AVAILABLE TO THE PATIENT AT THE |
| 01:40PM | 22 | TIME OF THE SURVEY. |
| 01:40PM | 23 | Q. ALSO WITHIN THOSE SAME MEETING MINUTES, MR. DOWNEY READ |
| 01:40PM | 24 | YOU A LINE ABOUT ONE HOUR TURN AROUND TIME ONCE THE SAMPLE |
| 01:40PM | 25 | REACHED THE THERANOS LAB. |

JHAVERI REDIRECT BY MR. SCHENK                               3700

01:40PM  1        DO YOU RECALL THAT TESTIMONY?

01:40PM  2    A.   YES, SIR.

01:40PM  3    Q.   FIRST OF ALL, WHERE DID THIS INFORMATION COME FROM THAT IT

01:40PM  4    TOOK AN HOUR?  WHERE WOULD THE SOURCE HAVE BEEN?

01:40PM  5    A.   THAT INFORMATION COMES FROM THERANOS.

01:40PM  6    Q.   AND DID SOMEONE FROM THERANOS EVER TELL YOU THAT IF

01:40PM  7    THERANOS DEVICES FAILED QUALITY CONTROL CHECKS, THEY COULDN'T

01:40PM  8    BE USED AT THAT POINT AND THAT THAT WOULD AFFECT THE TURN

01:40PM  9    AROUND TIME?  DID THEY EXPLAIN THAT TO YOU?

01:40PM  10   A.   I DON'T RECALL EVER HAVING THAT INFORMATION.

01:41PM  11   Q.   AND PRESUMABLY THAT WOULD AFFECT AN HOUR, ONE HOUR TURN

01:41PM  12   AROUND TIME; IS THAT RIGHT?

01:41PM  13   A.   CORRECT.

01:41PM  14   Q.   I'M NOW SHOWING YOU WHAT WAS ADMITTED AS 2394.  THIS IS

01:41PM  15   THE 12TH PAGE OF THAT EXHIBIT, SOME SURVEY RESPONSES OR SCORES.

01:41PM  16        DO YOU SEE THAT?

01:41PM  17   A.   YES, SIR.

01:41PM  18   Q.   AND IT'S BROKEN OUT ABOUT SORT OF THE STAGE IN THE

01:41PM  19   PROCESS, THE INDIVIDUAL'S EXPERIENCE WITH THAT STAGE; IS THAT

01:41PM  20   RIGHT?

01:41PM  21   A.   THAT'S RIGHT.

01:41PM  22   Q.   AND DOES THAT ROUGHLY TRACK HOW THE IPAD ASKED FOR

01:41PM  23   RESPONSES AT THE VARIOUS STAGES?

01:42PM  24   A.   CAN YOU ASK THAT QUESTION AGAIN, SIR?

01:42PM  25   Q.   SURE.  YOU SAID THE PATIENT WOULD FILL OUT THEIR SURVEY

JHAVERI REDIRECT BY MR. SCHENK                                    3701

01:42PM  1    RESPONSES ON AN IPAD.  THE KINDS OF QUESTIONS THAT THE PATIENT

01:42PM  2    WAS ASKED TO ANSWER, DID THEY FIT INTO THESE CATEGORIES?

01:42PM  3    A.   YES, THAT'S CORRECT.

01:42PM  4    Q.   SO WAS THERE ANY CATEGORY ABOUT THE ACCURACY OF THE TEST?

01:42PM  5    A.   I DON'T RECALL HAVING ANYTHING LIKE THAT.

01:42PM  6    Q.   AND WOULD THE PATIENT KNOW ANYTHING ABOUT THE ACCURACY OF

01:42PM  7    THE TEST WHEN THEY'RE COMPLETING THIS?

01:42PM  8    A.   NO.  AS I STATED, THE RESULTS ARE NOT YET AVAILABLE TO

01:42PM  9    THEM.  THEY HAD JUST TAKEN -- THE BLOOD WAS JUST DRAWN AT THAT

01:42PM  10   POINT.

01:42PM  11   Q.   AT THIS TIME DURING YOUR TESTIMONY, MR. DOWNEY ALSO ASKED

01:42PM  12   YOU IF YOU KNEW WHETHER THE FORM OF THE BLOOD TEST, WHETHER IT

01:42PM  13   WAS A FINGERSTICK OR VEIN DRAW, MATTERED TO PATIENTS, IF THAT

01:42PM  14   WAS SOMETHING THAT PATIENTS CARED ABOUT.

01:42PM  15        DO YOU RECALL THAT TESTIMONY?

01:42PM  16   A.   YES.

01:42PM  17   Q.   DID WALGREENS AND THERANOS DISCUSS ADVERTISING THE PATIENT

01:42PM  18   EXPERIENCE, WHAT THE PATIENTS WOULD EXPERIENCE IF THEY CAME TO

01:43PM  19   A THERANOS AT A WALGREENS?

01:43PM  20   A.   YES.  WE, WE HAD AN ENTIRE PLAN TO MARKETING BOTH FROM A

01:43PM  21   SCIENCE STANDPOINT, FROM A COMMUNICATIONS STANDPOINT, AND HOW

01:43PM  22   THAT EXPERIENCE WOULD LOOK.

01:43PM  23   Q.   AND DID YOU MARKET OR ADVERTISE THE FINGERSTICK NATURE OF

01:43PM  24   THE TEST?

01:43PM  25   A.   YES.  IF YOU RECALL, THE SIGNAGE HAD A PICTURE OF A SMALL

3702
JHAVERI REDIRECT BY MR. SCHENK

01:43PM   1    AMOUNT OF BLOOD, AND THE LANGUAGE THAT WE USED WAS A SMALLER

01:43PM   2    TEST, AND THE IDEA WAS THAT IT WOULD USE A SMALL AMOUNT OF

01:43PM   3    BLOOD, AND IT WAS A PAINLESS, EFFICIENT TEST.

01:43PM   4        SO THAT'S WHAT WE USED FOR MARKETING.

01:43PM   5    Q.   DID WALGREENS THINK THAT IT WAS WORTH SPENDING MONEY ON

01:43PM   6    ADVERTISING TO MARKET THE FINGERSTICK?

01:43PM   7    A.   YES.

01:43PM   8    Q.   I THINK I MAY HAVE SAID THAT THE SLIDE I JUST SHOWED YOU

01:44PM   9    WAS PAGE 12.  IT WAS ACTUALLY PAGE 7.  I'M NOW SHOWING YOU

01:44PM  10    PAGE 12, BOTH OF EXHIBIT 2394.

01:44PM  11        SO ON EXHIBIT 2394, PAGE 12, I'M SHOWING YOU A SLIDE THAT

01:44PM  12    MR. DOWNEY SHOWED YOU THAT HAS WHAT PATIENTS WERE SAYING AND

01:44PM  13    QUOTES FROM PATIENTS.

01:44PM  14        DO YOU RECALL THIS TESTIMONY?

01:44PM  15    A.   YES.

01:44PM  16    Q.   FIRST OF ALL, WHO PREPARED THIS SLIDE?

01:44PM  17    A.   I BELIEVE THIS WAS PREPARED BY THE THERANOS TEAM.

01:44PM  18    Q.   WHEN THERANOS PREPARED THIS SLIDE, DID THEY THEN DECIDE

01:44PM  19    THE CONTENT, WHAT KINDS OF FEEDBACK TO PROVIDE TO WALGREENS?

01:44PM  20    A.   YEAH.  WE DIDN'T -- WALGREENS'S TEAM DID NOT HAVE ACCESS

01:44PM  21    TO ANY OF THE RAW DATA FROM THE SURVEY RESULTS.

01:45PM  22        THE RESULTS WERE THEN RECAPPED FOR US THROUGH THE THERANOS

01:45PM  23    TEAM.

01:45PM  24        SO THIS WOULD BE INFORMATION THAT THEY SAW ON SURVEYS AND

01:45PM  25    THEN THEY PRESENTED THAT TO US.

JHAVERI REDIRECT BY MR. SCHENK                              3703

01:45PM  1    Q.   MR. DOWNEY ASKED YOU SOME QUESTIONS ABOUT SOMEONE NAMED

01:45PM  2    DR. LEIDER.

01:45PM  3         DO YOU REMEMBER THAT TESTIMONY?

01:45PM  4    A.   YES, SIR.

01:45PM  5    Q.   AND I THINK YOU TESTIFIED THAT THERE WAS A DISCUSSION

01:45PM  6    INVOLVING YOURSELF, MR. BALWANI, DR. LEIDER, MAYBE SOME OTHERS,

01:45PM  7    AND THAT AT THE END OF THE CALL YOU THOUGHT THAT DR. LEIDER, OR

01:45PM  8    MAYBE THE PARTICIPANTS GENERALLY, WERE SATISFIED WITH THE

01:45PM  9    COMMENTS THAT WERE MADE ABOUT, WAS IT THE ACCURACY OF TESTS?

01:45PM  10   A.   YES.  IT WAS AROUND THE ACCURACY OF A PARTICULAR TEST, I

01:45PM  11   DON'T RECALL WHICH TEST IT WAS, THAT WAS BROUGHT UP BY ONE OF

01:45PM  12   THE NURSE PRACTITIONERS.

01:45PM  13        AND SO DR. CARROLL, WHO OVERSEES THE NURSE PRACTITIONERS,

01:45PM  14   HAD RAISED THAT TO US, TO ME, SO I BROUGHT IN DR. LEIDER AND

01:46PM  15   DR. CARROLL AND INFORMED MR. BALWANI OF THIS, AND THAT'S WHAT

01:46PM  16   CAUSED THE MEETING TO OCCUR.

01:46PM  17        MR. BALWANI, DR. LEIDER, DR. CARROLL, AND THERANOS'S TEAM

01:46PM  18   WAS ON THE PHONE, AND SO THEY HAD A CONFERENCE CALL TO DISCUSS

01:46PM  19   WHAT HAPPENED, WHY THIS HAPPENED.

01:46PM  20        AND I WAS NOT IN THE MEETING AS I WAS RUNNING ANOTHER

01:46PM  21   MEETING AT THE TIME, AND SO WHAT I WAS TOLD WAS THAT THEY WERE

01:46PM  22   SATISFIED WITH WHAT WAS TOLD TO THEM BY THE THERANOS TEAM.

01:46PM  23   Q.   I SEE.  YOU WEREN'T THERE, YOU JUST HEARD DR. LEIDER

01:46PM  24   AFTERWARDS SAY, WHATEVER IT IS THAT I HEARD SATISFIED ME?

01:46PM  25   A.   THAT'S CORRECT.

3704

JHAVERI REDIRECT BY MR. SCHENK

01:46PM   1    Q.   DO YOU KNOW WHETHER WALGREENS WAS GIVEN ACCESS TO RAW TEST

01:46PM   2    DATA TO BE SATISFIED, TO REACH THAT CONCLUSION THAT THEY WERE

01:46PM   3    SATISFIED?

01:46PM   4    A.   FOR THAT PARTICULAR ISSUE I DO NOT REMEMBER.

01:46PM   5    Q.   DO YOU KNOW WHETHER THEY WERE GIVEN THE THERANOS

01:46PM   6    TECHNOLOGY, A BOX TO UP OPEN AND LOOK INSIDE AND TO REACH THE

01:46PM   7    CONCLUSION THAT THEY SHOULD BE SATISFIED?

01:47PM   8    A.   I'M NOT AWARE OF THAT.

01:47PM   9    Q.   I'M NOW GOING TO SHOW YOU 7454 THAT WAS ALSO ADMITTED.

01:47PM  10         THIS WAS AN EMAIL THAT YOU SENT TO MS. HOLMES AFTER

01:47PM  11    MR. BALWANI SENT YOU AN ARTICLE, AN ARTICLE THAT APPEARED IN

01:47PM  12    "FORTUNE" MAGAZINE, AND IF YOU LOOK ON THIS COVER UNDER THAT

01:47PM  13    HEADING, "AIM TO REVOLUTIONIZE HEALTH CARE," THERE'S A

01:47PM  14    JOURNALIST'S NAME.

01:47PM  15         DO YOU SEE THAT?

01:47PM  16    A.   LET ME SEE IF I CAN READ IT.

01:47PM  17    Q.   I'M HAPPY TO READ IT TO YOU.  I'M JUST WONDERING IF YOU

01:48PM  18    SEE IT AT LEAST GENERALLY.

01:48PM  19    A.   OH, BY ROGER PARLOFF?

01:48PM  20    Q.   YES, CORRECT.

01:48PM  21         WHEN MR. BALWANI SENT YOU THIS ARTICLE, DID YOU ASSUME

01:48PM  22    THAT THE CONTENTS, THE DESCRIPTIONS ABOUT THERANOS WERE

01:48PM  23    ACCURATE?

01:48PM  24    A.   YES.

01:48PM  25    Q.   AND WHEN YOU THEN RESPONDED TO MS. HOLMES AND COMPLIMENTED

JHAVERI RECROSS BY MR. DOWNEY                                      3705

01:48PM  1    HER ON THIS COVERAGE, DID YOU ASSUME THAT THE DESCRIPTIONS IN

01:48PM  2    THE ARTICLE ABOUT THERANOS WERE ACCURATE?

01:48PM  3    A.   YES.

01:48PM  4    Q.   YOU ALSO AT THIS TIME SENT AN EMAIL, THE EXHIBIT NUMBER

01:48PM  5    WAS 7471, IN SEPTEMBER OF 2014 WHERE YOU WERE COMPLIMENTARY TO

01:48PM  6    MS. HOLMES.

01:48PM  7        DO YOU RECALL THAT?

01:48PM  8    A.   YES.

01:48PM  9    Q.   AND WHEN YOU SENT THAT EMAIL, WERE YOU STILL ACTING UNDER

01:48PM 10    THE ASSUMPTION THAT MS. HOLMES HAD BEEN HONEST WITH YOU DURING

01:48PM 11    ALL OF YOUR INTERACTIONS WITH HER AND WITH THERANOS?

01:48PM 12    A.   YES.

01:48PM 13            MR. SCHENK:   THANK YOU, YOUR HONOR.

01:48PM 14            MR. DOWNEY:   YOUR HONOR, JUST VERY BRIEFLY.

01:49PM 15                      **RECROSS-EXAMINATION**

01:49PM 16    BY MR. DOWNEY:

01:49PM 17    Q.   MR. JHAVERI, YOU TESTIFIED ON REDIRECT ABOUT THE

01:49PM 18    DEMONSTRATION THAT YOU HAD RECEIVED OF THERANOS TECHNOLOGY.

01:49PM 19        DO YOU RECALL THAT?

01:49PM 20    A.   YES, SIR.

01:49PM 21    Q.   AND THERE WERE VARIOUS TIMES THAT YOU HAD ACTUALLY TRIED

01:49PM 22    TO GET A BLOOD DRAW IN CONNECTION WITH THOSE -- WITH THERANOS?

01:49PM 23    A.   YES.

01:49PM 24    Q.   AND SOMETIMES YOU GOT A DRAW THAT WAS A FINGERSTICK;

01:49PM 25    CORRECT?

JHAVERI RECROSS BY MR. DOWNEY                                3706

01:49PM   1    A.   CORRECT.

01:49PM   2    Q.   AND SOMETIMES YOU GOT A VENOUS DRAW; CORRECT?

01:49PM   3    A.   THAT'S CORRECT.

01:49PM   4    Q.   AND PART OF THAT WAS AN EVALUATION OF HOW THE PROGRAM WAS

01:49PM   5    RUNNING, WHETHER THE SERVICE WAS GOOD, ET CETERA?

01:49PM   6    A.   YEAH.  PART OF THAT WAS FOR ME TO EXPERIENCE WHAT A

01:50PM   7    PATIENT WILL EXPERIENCE, AND SO I DID HAVE A LAB ORDER SENT IN

01:50PM   8    FOR ME AT ONE OF THE STORES BECAUSE I WANTED TO EXPERIENCE WHAT

01:50PM   9    A PATIENT WOULD WALK IN AND EXPERIENCE THEMSELVES, AND SO THAT

01:50PM   10   WAS THE REASON.

01:50PM   11   Q.   AND YOUR PERSONAL EXPERIENCE OF THOSE SERVICES WAS

01:50PM   12   POSITIVE; CORRECT?

01:50PM   13   A.   YES.

01:50PM   14   Q.   YOU WERE ASKED ABOUT WHETHER THERE WAS AN EXPECTATION AT

01:50PM   15   WALGREENS THAT THE TESTS BE ACCURATE; CORRECT?

01:50PM   16        AND YOU UNDERSTOOD THAT, OF COURSE, THE BLOOD TESTS, THAT

01:50PM   17   THERANOS WOULD MAKE EVERY EFFORT FOR THE BLOOD TESTS TO BE

01:50PM   18   ACCURATE; CORRECT?

01:50PM   19   A.   I WOULD ASSUME SO, YES.

01:50PM   20   Q.   NO ONE WOULD WANT TO OFFER INACCURATE BLOOD TESTS;

01:50PM   21   CORRECT?

01:50PM   22   A.   I WOULDN'T THINK SO, YES.

01:50PM   23   Q.   YOU WERE ASKED BY MR. SCHENK ABOUT DEVICES FAILING QUALITY

01:50PM   24   CONTROL.

01:50PM   25        DO YOU RECALL THAT?

JHAVERI RECROSS BY MR. DOWNEY                                    3707

| | | |
|---|---|---|
| 01:50PM | 1 | A.   YES. |
| 01:50PM | 2 | Q.   YOU WOULD HOPE, WOULD YOU NOT, IF A DEVICE FAILED QUALITY |
| 01:51PM | 3 | CONTROL, THAT IT WOULD NOT BE USED FOR TESTING THAT DAY; |
| 01:51PM | 4 | CORRECT? |
| 01:51PM | 5 | A.   I WOULD HOPE THAT WOULD BE THE CASE, YES. |
| 01:51PM | 6 | Q.   AND YOUR EXPECTATION IS THAT THE THERANOS LAB WOULD REMOVE |
| 01:51PM | 7 | THAT DEVICE FROM TESTING FOR THE DAY; CORRECT? |
| 01:51PM | 8 | A.   YES, THAT WOULD BE MY ASSUMPTION. |
| 01:51PM | 9 | Q.   AND YOU WOULD WANT THEM TO MAKE SURE THAT THE DEVICE WAS |
| 01:51PM | 10 | NOT USED AGAIN IN TESTING UNTIL IT HAD PASSED QUALITY CONTROL; |
| 01:51PM | 11 | CORRECT? |
| 01:51PM | 12 | A.   CORRECT. |
| 01:51PM | 13 | Q.   YOU TALKED ABOUT YOUR INTERACTIONS WITH DR. LEIDER AND THE |
| 01:51PM | 14 | THERANOS TEAM. |
| 01:51PM | 15 | DO YOU RECALL THAT? |
| 01:51PM | 16 | A.   YES. |
| 01:51PM | 17 | Q.   DO YOU KNOW WHETHER HE WAS GIVEN CORRELATION DATA RELATED |
| 01:51PM | 18 | TO THERANOS TESTS? |
| 01:51PM | 19 | A.   AGAIN, I DO NOT KNOW WHAT WAS PROVIDED TO HIM DURING THAT |
| 01:51PM | 20 | CALL. |
| 01:51PM | 21 | Q.   OKAY.  YOU WERE ASKED ABOUT WHETHER DR. LEIDER OR OTHERS |
| 01:51PM | 22 | AT WALGREENS WERE GIVEN A THERANOS DEVICE. |
| 01:51PM | 23 | DO YOU RECALL THAT? |
| 01:51PM | 24 | A.   YES. |
| 01:51PM | 25 | Q.   DO YOU KNOW WHETHER DR. ROSAN WAS GIVEN A THERANOS DEVICE? |

JHAVERI RECROSS BY MR. DOWNEY                                      3708

01:51PM   1      A.   I DO NOT KNOW THAT.

01:52PM   2      Q.   OKAY.  MR. SCHENK ASKED YOU ABOUT THE ARTICLE THAT YOU

01:52PM   3      FORWARDED TO MS. HOLMES.

01:52PM   4           DO YOU RECALL THAT?

01:52PM   5      A.   YES, SIR.

01:52PM   6      Q.   AND DO YOU RECALL AS YOU SIT HERE TODAY THE CONTENTS OF

01:52PM   7      THAT ARTICLE?

01:52PM   8      A.   I COULDN'T STATE EXACTLY WHAT WAS IN THE ARTICLE.

01:52PM   9      Q.   OKAY.  FAIR ENOUGH.

01:52PM   10          THANK YOU.

01:52PM   11              MR. SCHENK:  NOTHING FURTHER.

01:52PM   12              THE COURT:  MAY THIS WITNESS BE EXCUSED?

01:52PM   13              MR. SCHENK:  YES, YOUR HONOR.

01:52PM   14              THE COURT:  MR. DOWNEY, MAY THIS WITNESS BE EXCUSED?

01:52PM   15              MR. DOWNEY:  YES, SIR.

01:52PM   16              THE COURT:  YOU'RE EXCUSED, SIR.  THANK YOU VERY

01:52PM   17      MUCH.

01:52PM   18              THE WITNESS:  THANK YOU.

01:52PM   19              THE COURT:  YOU'RE WELCOME.  YOU CAN JUST LEAVE ALL

01:52PM   20      OF THE BINDERS AND THINGS THERE.

01:52PM   21              THE WITNESS:  THANK YOU.

01:52PM   22              THE COURT:  THE GOVERNMENT HAS ANOTHER WITNESS?

01:52PM   23              MR. SCHENK:  YES, YOUR HONOR.  THE UNITED STATES

01:53PM   24      CALLS DR. SUNIL DHAWAN.

01:53PM   25              THE COURT:  ALL RIGHT.  THANK YOU.

DHAWAN DIRECT BY MR. SCHENK

01:53PM   1            (PAUSE IN PROCEEDINGS.)

01:53PM   2            THE COURT:  GOOD AFTERNOON, SIR.  IF YOU WOULD STAND

01:53PM   3   THERE FOR JUST A MOMENT, OUR COURTROOM DEPUTY WILL BE WITH YOU

01:53PM   4   IN JUST A SECOND.

01:53PM   5       IF YOU WOULD RAISE YOUR RIGHT HAND WHILE YOU FACE HER, SHE

01:53PM   6   HAS A QUESTION FOR YOU.

01:53PM   7            **(GOVERNMENT'S WITNESS, SUNIL DHAWAN, WAS SWORN.)**

01:54PM   8            THE WITNESS:  YES.

01:54PM   9            THE COURT:  THANK YOU, SIR.  PLEASE HAVE A SEAT

01:54PM  10   HERE.  PLEASE MAKE YOURSELF COMFORTABLE.  FEEL FREE TO ADJUST

01:54PM  11   THE CHAIR AND MICROPHONE AS YOU NEED.

01:54PM  12       I'LL ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE.

01:54PM  13       WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

01:54PM  14   AND THEN SPELL IT, PLEASE.

01:54PM  15            THE WITNESS:  SUNIL S. DHAWAN.  S-U-N-I-L, S, LAST

01:54PM  16   NAME IS D-H-A-W-A-N.

01:54PM  17            THE COURT:  THANK YOU.

01:54PM  18       COUNSEL.

01:54PM  19            MR. SCHENK:  THANK YOU, YOUR HONOR.

01:54PM  20                    **DIRECT EXAMINATION**

01:54PM  21   BY MR. SCHENK:

01:54PM  22   Q.   GOOD AFTERNOON, DR. DHAWAN.

01:54PM  23       IF YOU ARE FULLY VACCINATED, AND WITH THE COURT'S

01:54PM  24   PERMISSION, YOU CAN REMOVE YOUR MASK AND TESTIFY WITHOUT THE

01:54PM  25   MASK IF YOU WOULD LIKE.

DHAWAN DIRECT BY MR. SCHENK                                          3710

01:54PM  1    A.   SURE.

01:54PM  2    Q.   DR. DHAWAN, HOW ARE YOU CURRENTLY EMPLOYED?

01:54PM  3    A.   AT THE CENTER FOR DERMATOLOGY IN FREMONT AND MILPITAS,

01:55PM  4    CALIFORNIA.

01:55PM  5    Q.   DO YOU MIND PULLING THE MICROPHONE JUST A LITTLE BIT

01:55PM  6    CLOSER?

01:55PM  7    A.   SURE.  FREMONT AND MILPITAS, CALIFORNIA.

01:55PM  8    Q.   AT THE CENTER FOR DERMATOLOGY?

01:55PM  9    A.   YES.

01:55PM 10    Q.   AND WHAT DO YOU DO THERE?

01:55PM 11    A.   I'M A DERMATOLOGIST AND RUN A CLINICAL TRIAL PRACTICE.

01:55PM 12    Q.   AND WHAT IS THAT, THE CLINICAL TRIAL PRACTICE?

01:55PM 13    A.   WE RUN CLINICAL TRIALS FOR LARGE AND SMALL DRUG COMPANIES

01:55PM 14    AND DEVICE COMPANIES AND ARTIFICIAL INTELLIGENCE DEVICES,

01:55PM 15    THINGS LIKE THAT IN DERMATOLOGY.

01:55PM 16    Q.   AND HOW LONG HAVE YOU HAD THAT PRACTICE?

01:55PM 17    A.   I'VE BEEN IN PRACTICE FOR 32 YEARS IN DERMATOLOGY, AND

01:55PM 18    18 YEARS IN CLINICAL RESEARCH PRACTICE.

01:55PM 19    Q.   AND WHEN DID YOU GET YOUR MEDICAL DEGREE?

01:55PM 20    A.   AT THE UNIVERSITY OF SOUTHERN CALIFORNIA IN 1983.

01:55PM 21    Q.   OKAY.  AND DID YOU WORK SOMEWHERE AFTER YOU GRADUATED FROM

01:55PM 22    MEDICAL SCHOOL AND BEFORE YOUR PRACTICE?

01:55PM 23    A.   I WAS IN TRAINING TWICE.  I TRAINED IN INTERNAL MEDICINE

01:55PM 24    AND THEN WORKED FOR A YEAR IN BETWEEN, AND THEN DID A RESIDENCY

01:55PM 25    IN DERMATOLOGY.

DHAWAN DIRECT BY MR. SCHENK                                          3711

01:55PM  1    Q.   OKAY.  AT YOUR CURRENT MEDICAL PRACTICE, DO YOU HAVE

01:56PM  2    EXPERIENCE RUNNING LAB TESTS?

01:56PM  3    A.   YES, WE DO.

01:56PM  4    Q.   WOULD YOU DESCRIBE THAT FOR US?

01:56PM  5    A.   IT'S HISTOPATHOLOGY CURRENTLY, COMPLEX HISTOPATHOLOGY

01:56PM  6    BASED ON THE CLIA REQUIREMENTS.

01:56PM  7    Q.   WHAT IS HISTOPATHOLOGY?

01:56PM  8    A.   ANALYZING SLIDES THAT HAVE BEEN PREPARED FROM BIOPSY

01:56PM  9    SPECIMENS THAT ARE TAKEN FROM PATIENTS.

01:56PM  10   Q.   SO A PATIENT IS BIOPSIED, THAT SUBSTANCE IS PUT ON A

01:56PM  11   SLIDE, AND THEN YOU LOOK AT THE SLIDE UNDER A MICROSCOPE?

01:56PM  12   A.   YES.

01:56PM  13   Q.   DO YOU KNOW SOMEONE NAMED SUNNY BALWANI?

01:56PM  14   A.   YES, I DO.

01:56PM  15   Q.   AND HOW DO YOU KNOW HIM?

01:56PM  16   A.   HE WAS A PATIENT OF MINE FOR ALMOST, I THINK, 15 YEARS IF

01:56PM  17   I REMEMBER CORRECTLY.

01:56PM  18   Q.   DID -- DURING THE COURSE OF TREATING MR. BALWANI, DID HE

01:56PM  19   TELL YOU WHERE HE WORKED?

01:57PM  20   A.   INITIALLY HE WAS DOING SOME STARTUPS FROM WHAT I RECALL,

01:57PM  21   AND THEN HE TOLD ME, I THINK SOMETIME IN '14 OR '15, THAT HE

01:57PM  22   WAS WORKING AT THERANOS.

01:57PM  23   Q.   IN 2014 OR 2015?

01:57PM  24   A.   MY RECOLLECTION, YES.

01:57PM  25   Q.   OKAY.  WAS THERE A POINT IN TIME WHEN MR. BALWANI ASKED IF

DHAWAN DIRECT BY MR. SCHENK                                           3712

01:57PM   1    YOU WANTED TO WORK FOR THERANOS?

01:57PM   2    A.   HE ASKED IF I WOULD TAKE ON THE ROLE AS A LAB DIRECTOR, OR

01:57PM   3    A MEDICAL DIRECTOR.

01:57PM   4    Q.   MR. BALWANI ASKED IF YOU WOULD SERVE AS THE LAB DIRECTOR

01:57PM   5    AT THERANOS?

01:57PM   6    A.   FOR A LIMITED LENGTH OF TIME.

01:57PM   7    Q.   OKAY.  THE JOB WOULD BE FOR A LIMITED PERIOD OF TIME?

01:57PM   8    A.   AS WAS TOLD TO ME, YES.

01:57PM   9    Q.   AND DID MR. BALWANI TELL YOU WHY THERANOS NEEDED A LAB

01:57PM   10   DIRECTOR?

01:57PM   11   A.   I BELIEVE THAT EITHER THE PREVIOUS LAB DIRECTOR HAD

01:58PM   12   LEFT -- THAT'S WHAT I WAS LED TO BELIEVE.

01:58PM   13   Q.   YOU SAID "LED TO BELIEVE."  BY MR. BALWANI?

01:58PM   14   A.   YES.

01:58PM   15   Q.   DID HE TELL YOU ANYTHING ABOUT THE CIRCUMSTANCES?  DID HE

01:58PM   16   TELL YOU --

01:58PM   17   A.   NO.

01:58PM   18   Q.   DID HE TELL YOU THE PRIOR LAB DIRECTOR'S NAME?

01:58PM   19   A.   I CAN'T RECALL.

01:58PM   20   Q.   HE MAY HAVE, YOU JUST DON'T REMEMBER?

01:58PM   21   A.   I DON'T REMEMBER.

01:58PM   22   Q.   LET'S TURN --

01:58PM   23        ACTUALLY, YOUR HONOR, MAY I APPROACH?

01:58PM   24             THE COURT:  YES.

01:58PM   25             MR. SCHENK:  THANK YOU.

DHAWAN DIRECT BY MR. SCHENK                                    3713

01:58PM   1          (HANDING.)

01:58PM   2      Q.   DR. DHAWAN, CAN I ASK YOU TO TURN TO EXHIBIT 2219 IN YOUR

01:58PM   3      BINDER.

01:58PM   4          YOUR HONOR, I BELIEVE -- THE GOVERNMENT IS OFFERING THIS

01:58PM   5      BASED ON A STIPULATION BETWEEN THE PARTIES.

01:58PM   6              MR. WADE:   CORRECT, YOUR HONOR.

01:58PM   7              THE COURT:   THANK YOU, MR. WADE.

01:58PM   8          IT'S ADMITTED.   IT MAY BE PUBLISHED.

01:59PM   9          (GOVERNMENT'S EXHIBIT 2219 WAS RECEIVED IN EVIDENCE.)

01:59PM  10              MR. SCHENK:   THANK YOU.

01:59PM  11              THE WITNESS:   I'M SORRY.   I SEE 2214.   MAYBE I'M

01:59PM  12      MISSING SOMETHING.

01:59PM  13      BY MR. SCHENK:

01:59PM  14      Q.   THE 9 MIGHT LOOK LIKE A 4.   LET'S GO WITH THAT EXHIBIT.

01:59PM  15      IT ALSO IS ON THE SCREEN IN FRONT OF YOU.

01:59PM  16      A.   YEAH, I DON'T SEE IT IN HERE.

01:59PM  17          YEAH, I SEE IT ON THE SCREEN.   SORRY.   YES.

01:59PM  18      Q.   WE CAN GO ON THE SCREEN IF THAT'S NOT WORKING FOR YOU.

01:59PM  19      A.   NO, THAT'S FINE.

01:59PM  20      Q.   SO IS THIS AN EMAIL EXCHANGE BETWEEN YOURSELF AND

01:59PM  21      MR. BALWANI IN NOVEMBER OF 2014?

01:59PM  22      A.   YES.

01:59PM  23      Q.   AND IF WE COULD START ON PAGE 2 AT THE BOTTOM.   IT LOOKS

01:59PM  24      LIKE ON NOVEMBER 14TH, 2014, MR. BALWANI WROTE TO YOU, "SUNIL.

01:59PM  25          "THANKS FOR TAKING MY CALL.

DHAWAN DIRECT BY MR. SCHENK                                               3714

01:59PM  1        "THE TIME COMMITMENT IS VERY MINIMAL.  THIS WILL BE MOSTLY

02:00PM  2   AN ON CALL CONSULTING ROLE AND I AM EXTREMELY CONFIDENT THAT IT

02:00PM  3   WON'T INTERFERE WITH YOUR WORK OR WITH YOUR FAMILY LIFE.  I AM

02:00PM  4   ATTACHING THE REQUIREMENTS HERE.  PLEASE LET ME KNOW IF YOU

02:00PM  5   WILL BE ABLE TO DO THIS OR PERHAPS SOMEONE ELSE YOU KNOW.  THIS

02:00PM  6   WILL BE 1-3 MONTHS," AND THEN IT CONTINUES ON THE NEXT PAGE,

02:00PM  7   "ROLE."

02:00PM  8        DO YOU SEE THAT?

02:00PM  9   A.   YES.

02:00PM 10   Q.   AND THEN AT THE BOTTOM OF THAT NEXT PAGE, IT LOOKS LIKE

02:00PM 11   MR. BALWANI INCLUDED SOME CLIA REGULATIONS.

02:00PM 12        DO YOU RECALL THAT?

02:00PM 13   A.   YES.  I MEAN, BASED ON THIS EMAIL, YES.

02:00PM 14   Q.   AND WAS THIS THE TIMEFRAME WE WERE JUST TALKING ABOUT?

02:00PM 15   THE PERIOD OF TIME IS NOVEMBER OF 2014, AND MR. BALWANI IS

02:00PM 16   ASKING YOU IF YOU COULD SERVE IN A ROLE AT THERANOS?

02:00PM 17   A.   YES.

02:00PM 18   Q.   ABOVE THE EMAIL I JUST READ TO YOU, ON THE SECOND PAGE YOU

02:00PM 19   RESPOND TO MR. BALWANI, "SUNNY.

02:01PM 20        "I CAN DO THIS - WHAT IS NEXT STEP?"

02:01PM 21        IS THAT RIGHT?

02:01PM 22   A.   YES.

02:01PM 23   Q.   WHEN YOU AGREED TO BE THE LAB DIRECTOR, WHAT DID YOU

02:01PM 24   UNDERSTAND THERANOS DID?

02:01PM 25   A.   LAB -- DRAWING BLOOD AND RUNNING LAB TESTS.

DHAWAN DIRECT BY MR. SCHENK                                    3715

02:01PM   1    Q.   DO YOU KNOW ON WHAT DEVICES THEY TESTED BLOOD?

02:01PM   2    A.   GENERALLY WHAT I HAD SEEN ON -- IN THE INTERNET AND

02:01PM   3    GOOGLING THE MATERIAL, YES.

02:01PM   4    Q.   AND WHAT DID YOU LEARN?

02:01PM   5    A.   I MEAN, I LEARNED IT WAS SUPPOSED TO BE A NOVEL, NEW

02:01PM   6    METHOD OF RUNNING BLOOD TESTS ON A NEW PLATFORM.

02:01PM   7    Q.   WHEN YOU WERE THINKING ABOUT TAKING THIS JOB TO WORK AT

02:01PM   8    THERANOS, YOU OBTAINED INFORMATION ABOUT WHAT THERANOS DID BY

02:01PM   9    LOOKING ON GOOGLE?

02:01PM  10    A.   BASICALLY, YES.

02:01PM  11    Q.   AND HOW ABOUT IN YOUR CONVERSATIONS WITH MR. BALWANI?  DID

02:01PM  12    HE DESCRIBE TO YOU WHAT THERANOS DID AND WHAT YOUR JOB WOULD

02:01PM  13    BE?

02:01PM  14    A.   BASED ON THE EMAIL IS ESSENTIALLY WHAT OUR DISCUSSION WAS

02:02PM  15    AND THERE WAS NO -- I BELIEVE WE HAD ONE SHORT CONVERSATION

02:02PM  16    ABOUT IT.

02:02PM  17    Q.   OKAY.  AND NOW IF WE CAN GO TO THE FIRST PAGE OF THIS

02:02PM  18    EXHIBIT, AT THE VERY TOP THERE'S AN EMAIL FROM MR. BALWANI TO

02:02PM  19    YOU, NOVEMBER 19TH, 2014, AND HE WRITES IN THAT SECOND

02:02PM  20    PARAGRAPH, "WE HAVE ALL PAPERWORK IN PLACE AND I WILL HAVE ONE

02:02PM  21    OF THE COURIERS BRING IT BY YOUR OFFICE TOMORROW A.M. FOR YOUR

02:02PM  22    SIGNATURE."

02:02PM  23         DO YOU RECALL WHETHER THAT HAPPENED?  DID MR. BALWANI

02:02PM  24    BRING PAPERWORK TO YOU AND YOU SIGNED AND BECAME LAB DIRECTOR?

02:02PM  25    A.   I DON'T EXACTLY RECALL THE DATE, BUT I BELIEVE WE HAD A

DHAWAN DIRECT BY MR. SCHENK                                    3716

02:02PM   1    TIMEFRAME AROUND THAT TIME.  BUT I'D HAVE TO GO BACK AND LOOK

02:02PM   2    AT THE RECORDS.

02:02PM   3    Q.  YOU DON'T REMEMBER EXACTLY THE DATE, BUT GENERALLY AROUND

02:02PM   4    THIS TIME?

02:02PM   5    A.  GENERALLY, YES.

02:02PM   6    Q.  OKAY.  IF YOU COULD NOW TURN IN YOUR BINDER TO 2248.

02:03PM   7        YOUR HONOR, THE GOVERNMENT IS OFFERING THIS EXHIBIT

02:03PM   8    PURSUANT TO STIPULATION.

02:03PM   9            MR. WADE:  THAT'S CORRECT, YOUR HONOR.

02:03PM  10            THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

02:03PM  11        (GOVERNMENT'S EXHIBIT 2248 WAS RECEIVED IN EVIDENCE.)

02:03PM  12            THE WITNESS:  I APOLOGIZE.  I HAVE 2275, AND I'M

02:03PM  13    SORRY, 2275 AND 2239.  I JUST DON'T HAVE 22 --

02:03PM  14    BY MR. SCHENK:

02:03PM  15    Q.  YOU DON'T HAVE 2248?

02:03PM  16    A.  IT'S NOT IN THIS SEQUENCE THAT I'M LOOKING AT, SO I'M

02:03PM  17    SORRY.  2248, I DO NOT HAVE THAT HERE.

02:03PM  18    Q.  AND IT'S ON THE SCREEN IN FRONT OF YOU.  LET ME KNOW IF --

02:03PM  19    A.  YEAH, I SEE IT.

02:03PM  20            THE COURT:  HE'S GOING TO SWAP BINDERS WITH THE

02:03PM  21    CLERK.

02:03PM  22            MR. SCHENK:  THANK YOU VERY MUCH.

02:03PM  23    Q.  NOW WE'RE LOOKING AT 2248.  IT'S AN EMAIL TO YOU.

02:04PM  24        FIRST OF ALL, THAT'S YOUR EMAIL ADDRESS, BUT REDACTED; IS

02:04PM  25    THAT RIGHT?

DHAWAN DIRECT BY MR. SCHENK                                    3717

02:04PM   1     A.   YES, YES.

02:04PM   2     Q.   WHAT I'M LOOKING AT ON THE SCREEN?

02:04PM   3     A.   YES.

02:04PM   4     Q.   THANK YOU.  THE CONTENT SAYS, "HI DR. DHAWAN.

02:04PM   5          "ATTACHED PLEASE FIND AN EXECUTED COPY OF THE CONSULTING

02:04PM   6     AGREEMENT FOR YOUR RECORDS."

02:04PM   7          AND I WANT TO ASK YOU SOME QUESTIONS ABOUT THE CONSULTING

02:04PM   8     AGREEMENT, SO LET'S TURN TO PAGE 2.

02:04PM   9          AND IN THE FIRST PARAGRAPH IT WAS ENTERED INTO AS OF, AND

02:04PM   10    THEN THERE'S A DATE, NOVEMBER 19TH, 2014.

02:04PM   11         IS THAT CONSISTENT WITH YOUR RECOLLECTION OF WHEN YOU

02:04PM   12    BECAME AN EMPLOYEE AT THERANOS?

02:04PM   13    A.   YES.

02:04PM   14    Q.   AND IF WE COULD TURN NOW TO PAGE 6.

02:04PM   15         THERE'S SOME SIGNATURES ON PAGE 6.

02:04PM   16         FIRST, IS THAT YOUR SIGNATURE?

02:04PM   17    A.   YES.

02:04PM   18    Q.   AND THEN IS THERE A SIGNATURE ABOVE THE NAME

02:05PM   19    SUNNY BALWANI?

02:05PM   20    A.   YES, THAT -- I ASSUME THAT'S HIS SIGNATURE, YEAH.

02:05PM   21    Q.   THERE'S A SIGNATURE ABOVE THAT?

02:05PM   22    A.   YES, YES, YES.

02:05PM   23    Q.   AND THEN IF YOU'LL TURN TO THE NEXT PAGE, PAGE 7,

02:05PM   24    EXHIBIT A, THE FIRST IS YOUR PRINCIPAL COMPANY CONTACT IS

02:05PM   25    SUNNY BALWANI, PRESIDENT, COO.

DHAWAN DIRECT BY MR. SCHENK                    3718

02:05PM   1          DO YOU SEE THAT?

02:05PM   2     A.   YES.

02:05PM   3     Q.   AND WAS MR. BALWANI YOUR PRINCIPAL CONTACT DURING THE TIME

02:05PM   4     YOU WORKED AT THERANOS?

02:05PM   5     A.   YES.

02:05PM   6     Q.   UNDER NUMBER 2, THE SERVICES, IT LISTS THE SERVICES AND IT

02:05PM   7     SAYS, "SERVING AS A LABORATORY DIRECTOR AND CLINICAL CONSULTANT

02:05PM   8     OF THERANOS'S CLIA LABORATORY IN CALIFORNIA AND FULFILLING THE

02:05PM   9     DUTIES OF A CALIFORNIA-LICENSED AND CLIA-QUALIFIED CLINICAL

02:05PM   10    LABORATORY DIRECTOR AND CLINICAL CONSULTANT."

02:05PM   11         IS THAT CONSISTENT WITH WHAT YOUR ROLE AT THERANOS WAS?

02:05PM   12    A.   YES.

02:05PM   13    Q.   AND UNDER COMPENSATION, IT SAYS THAT YOU WILL BE PAID

02:06PM   14    $5,000 PER MONTH.

02:06PM   15         IS THAT THE INITIAL PAYMENT OFFER THAT YOU RECEIVED FROM

02:06PM   16    THERANOS?

02:06PM   17    A.   YES.

02:06PM   18    Q.   WAS THERE A POINT IN TIME WHEN YOU TALKED TO MR. BALWANI

02:06PM   19    ABOUT CONVERTING THAT FROM CASH TO STOCK OPTIONS?

02:06PM   20    A.   YES.

02:06PM   21    Q.   AND WHAT DO YOU RECALL ABOUT THAT?

02:06PM   22    A.   I ASKED IF THAT COULD BE DONE, AND I THINK HE SAID IT

02:06PM   23    COULD BE.

02:06PM   24    Q.   AND DID YOU EVER CASH ANY CHECKS YOU RECEIVED FROM

02:06PM   25    THERANOS?

DHAWAN DIRECT BY MR. SCHENK                                    3719

02:06PM  1    A.   NO.

02:06PM  2    Q.   HOW ABOUT OPTIONS?  DO YOU RECALL RECEIVING OPTIONS?

02:06PM  3    A.   I RECEIVED AN OPTION, I BELIEVE THEY'RE CALLED RSU'S.

02:06PM  4    Q.   RSU'S?

02:06PM  5    A.   I BELIEVE.  I'D HAVE TO GO BACK AND LOOK AT MY RECORDS.

02:06PM  6    BUT THERE WERE SOME OPTIONS GRANTED TO ME.

02:06PM  7    Q.   OKAY.  NOW I'D LIKE TO TALK TO YOU ABOUT A CHUNK OF TIME.

02:06PM  8        IN NOVEMBER OF 2014, YOU SIGNED THIS CONTRACT AND BECAME A

02:06PM  9    LAB DIRECTOR AT THERANOS; IS THAT RIGHT?

02:06PM  10   A.   YES.

02:06PM  11   Q.   NOW, TALK TO ME ABOUT NOVEMBER OF 2014 THROUGH ABOUT JUNE

02:07PM  12   OR JULY OF 2015, SO SEVEN OR EIGHT MONTHS, SOMETHING LIKE THAT.

02:07PM  13       SO I FIRST WANT TO KNOW, WHAT TYPE OF WORK DID YOU DO?

02:07PM  14   DID YOU GO TO THERANOS EVERY DAY?

02:07PM  15   A.   NO.

02:07PM  16   Q.   HOW MANY TIMES DID YOU GO TO THERANOS DURING THAT PERIOD

02:07PM  17   OF TIME THAT I JUST OUTLINED?

02:07PM  18   A.   SO THIS IS GOING BACK SIX YEARS.

02:07PM  19       SO MY RECOLLECTION IS WE VISITED THE LAB.  I CAN'T TELL

02:07PM  20   YOU THE NUMBER OF TIMES, BUT IT WASN'T VERY MANY.  I BELIEVE I

02:07PM  21   WENT.  AND THEN I WENT AGAIN, AND THAT WAS ABOUT IT.

02:07PM  22   Q.   SO TWO TIMES?

02:07PM  23   A.   PROBABLY.  I'D HAVE TO LOOK BACK AT MY RECORDS.

02:07PM  24   Q.   AND SO THAT'S TWO TIMES DURING THE COURSE OF TIME I

02:07PM  25   OUTLINED FOR YOU?

DHAWAN DIRECT BY MR. SCHENK                                          3720

02:07PM  1    A.   YES.  I BELIEVE UNTIL AUGUST.

02:07PM  2    Q.   UNTIL AUGUST OF 2015?

02:07PM  3    A.   YES.

02:07PM  4    Q.   OKAY.  WE'LL TAKE THAT SEPARATELY IN A MOMENT.

02:07PM  5         DURING THIS PERIOD OF TIME, DID YOU SEE THE THERANOS

02:07PM  6    TECHNOLOGY, A DEVICE OR SOMETHING?

02:07PM  7    A.   ON ONE TOUR OF THE LAB, I BELIEVE I DID.  BUT THIS IS

02:08PM  8    GOING BACK QUITE SOME TIME.

02:08PM  9    Q.   OKAY.  DO YOU REMEMBER WHO GAVE YOU THAT TOUR?

02:08PM  10   A.   SUNNY AND OTHER STAFF MEMBERS IN THE LAB.

02:08PM  11   Q.   DO YOU RECALL DURING THE TOUR IF MR. BALWANI DESCRIBED TO

02:08PM  12   YOU WHAT YOU WERE LOOKING AT AND WHAT THE DEVICE WAS?

02:08PM  13   A.   HE NAMED THEM.

02:08PM  14   Q.   DO YOU RECALL WHAT HE CALLED THEM?

02:08PM  15   A.   WELL, ONE WAS A SIEMENS DEVICE, AND I DON'T RECALL THE

02:08PM  16   OTHER PART OF THE CONVERSATION.

02:08PM  17   Q.   ONE -- I'M SORRY -- YOU SAID WAS?

02:08PM  18   A.   SIEMENS.

02:08PM  19   Q.   OKAY.  AND HOW ABOUT DEVICES -- DID MR. BALWANI SAY HE WAS

02:08PM  20   SHOWING YOU ANY DEVICES THAT WERE MANUFACTURED BY THERANOS?

02:08PM  21   A.   I DON'T RECALL.

02:08PM  22   Q.   OKAY.  DURING THIS PERIOD OF TIME, NOVEMBER TO JUNE OR

02:08PM  23   JULY, AGAIN, DID YOU HAVE ANY OCCASION TO INTERACT WITH A

02:08PM  24   PATIENT?  DID A PATIENT CALL YOU AND ASK QUESTIONS ABOUT THEIR

02:08PM  25   LAB RESULTS?

DHAWAN DIRECT BY MR. SCHENK                                          3721

02:08PM   1    A.   NO.

02:08PM   2    Q.   DID A DOCTOR EVER CALL YOU AND ASK QUESTIONS ABOUT THEIR

02:08PM   3    LAB RESULTS?

02:09PM   4    A.   NO.

02:09PM   5    Q.   DID YOU EVER INTERACT WITH EMPLOYEES OF THERANOS THAT

02:09PM   6    WORKED IN THE LAB?

02:09PM   7    A.   NO.

02:09PM   8    Q.   THERE WASN'T ONE TIME THAT YOU SPOKE TO A THERANOS

02:09PM   9    EMPLOYEE THAT WORKED IN THE LAB?

02:09PM   10   A.   I DON'T RECALL ANY CONVERSATIONS IN THAT LENGTH OF TIME

02:09PM   11   OTHER THAN BEFORE AUGUST, I BELIEVE.

02:09PM   12   Q.   WAS THERE A TIME WHEN SOMEONE WORKED IN THE LAB AND HAD A

02:09PM   13   QUESTION ABOUT WHETHER THEY SHOULD REPORT A RESULT?  THEY DID A

02:09PM   14   BLOOD TESTS AND ACHIEVED A RESULT AND THEY WONDERED WHETHER

02:09PM   15   THIS RESULT SHOULD BE REPORTED?  DID THAT EVER HAPPEN WHERE

02:09PM   16   SOMEONE CAME TO YOU WITH THAT QUESTION?

02:09PM   17   A.   I GOT NO CONTACT THAT I CAN RECALL FROM SOMEONE BY EMAIL

02:09PM   18   OR BY PHONE.

02:09PM   19   Q.   WAS THERE AN OCCASION WHEN THE THERANOS -- DO YOU KNOW THE

02:09PM   20   CONCEPT OF QUALITY CONTROL, QC?

02:09PM   21   A.   YES.  WE HAVE TO IMPLEMENT THAT IN WHAT WE DO CURRENTLY.

02:09PM   22   Q.   YOU DO THAT AT YOUR DERMATOLOGY?

02:10PM   23   A.   WE HAVE TO, YEAH.

02:10PM   24   Q.   AND WAS THERE EVER A TIME WHEN SOMEONE AT THERANOS CALLED

02:10PM   25   YOU WITH QUESTIONS REGARDING THE QC WORK THAT THERANOS WAS

DHAWAN DIRECT BY MR. SCHENK                                    3722

02:10PM  1    DOING?

02:10PM  2    A.   NO.

02:10PM  3    Q.   CAN YOU ESTIMATE FOR ME HOW MANY HOURS YOU WORKED FOR

02:10PM  4    THERANOS DURING THIS PERIOD OF TIME?  I DON'T MEAN EACH WEEK, I

02:10PM  5    JUST MEAN TOTAL.

02:10PM  6    A.   I'D HAVE TO LOOK -- THINK BACK TO MY SCHEDULE OR -- IT

02:10PM  7    CAN'T HAVE BEEN MORE THAN FIVE OR TEN, AND MAYBE NOT -- I MEAN,

02:10PM  8    IT JUST WAS NOT A LOT.

02:10PM  9    Q.   MAYBE FIVE OR TEN TOTAL HOURS --

02:10PM  10   A.   YEAH.

02:10PM  11   Q.   -- FROM NOVEMBER 2014 THROUGH JUNE OR JULY OF 2015?

02:10PM  12   A.   YEAH.

02:10PM  13   Q.   DO YOU KNOW -- LET'S TURN NOW TO AUGUST OF 2015.

02:11PM  14   A.   YES, YES.

02:11PM  15   Q.   DO YOU KNOW WHETHER THE FDA DID AN INSPECTION AT THERANOS

02:11PM  16   IN AUGUST OF 2015?

02:11PM  17   A.   I WAS NEVER TOLD ABOUT -- OR I DON'T RECALL BEING TOLD

02:11PM  18   ANYTHING ABOUT AN FDA INSPECTION IN AUGUST OF 2015.

02:11PM  19   Q.   FROM NOVEMBER OF 2014 THROUGH AUGUST NOW OF 2015, DID YOU

02:11PM  20   EVER HIRE ANYONE TO WORK IN THE LAB?

02:11PM  21   A.   NO.

02:11PM  22   Q.   DURING THAT SAME PERIOD OF TIME, DID YOU EVER FIRE ANYONE

02:11PM  23   THAT WORKED IN THE LAB?

02:11PM  24   A.   NO.

02:11PM  25   Q.   DO YOU KNOW WHO MADE THE HIRING DECISIONS OR THE FIRING

DHAWAN DIRECT BY MR. SCHENK                                      3723

02:11PM  1    DECISIONS AT THE LAB?

02:11PM  2    A.   I WAS NEVER TOLD THAT.

02:11PM  3    Q.   IF YOU'LL TURN IN YOUR BINDER TO 2663.

02:12PM  4         YOUR HONOR, THE GOVERNMENT OFFERS 2663 PURSUANT TO

02:12PM  5    STIPULATION OF THE PARTIES.

02:12PM  6              MR. WADE:  THAT'S CORRECT, YOUR HONOR.

02:12PM  7              THE COURT:  IT'S ADMITTED BY STIPULATION, AND IT MAY

02:12PM  8    BE PUBLISHED.

02:12PM  9              MR. SCHENK:  THANK YOU.

02:12PM  10        (GOVERNMENT'S EXHIBIT 2663 WAS RECEIVED IN EVIDENCE.)

02:12PM  11   BY MR. SCHENK:

02:12PM  12   Q.   NOW WE'RE IN AUGUST OF 2015.

02:12PM  13        AUGUST 4TH, SOMEONE NAMED LANGLY GEE IS SENDING AN EMAIL

02:12PM  14   TO YOU AND ANOTHER INDIVIDUAL NAMED DANIEL YOUNG.

02:12PM  15        DO YOU SEE THAT?

02:12PM  16   A.   YES.

02:12PM  17   Q.   AND MR. GEE WRITES, "HI DR. DHAWAN:

02:12PM  18        "MY NAME IS LANGLY GEE AND I AM THE QA/QC MANAGER FOR

02:12PM  19   THERANOS, INC."

02:12PM  20        HAD YOU MET MR. GEE BEFORE THIS DATE?

02:12PM  21   A.   I DON'T -- NO, I DON'T REMEMBER MEETING HIM BEFORE THIS

02:12PM  22   DATE.

02:12PM  23   Q.   AND DOES IT SEEM LIKE HE'S INTRODUCING HIMSELF TO YOU?

02:12PM  24   A.   YES.

02:12PM  25   Q.   AND IN THE SECOND PARAGRAPH HE WRITES, "I WAS GIVEN YOUR

DHAWAN DIRECT BY MR. SCHENK                                          3724

02:12PM   1    EMAIL ADDRESS FROM DANIEL YOUNG AND I AM TO BEGIN SENDING YOU

02:13PM   2    DOCUMENTS FOR YOUR SIGNATURE."

02:13PM   3         THERE'S A REFERENCE TO AN INDIVIDUAL NAMED DANIEL YOUNG.

02:13PM   4         DO YOU REMEMBER MEETING HIM AT THIS TIME?  WAS HE A KNOWN

02:13PM   5    NAME TO YOU?

02:13PM   6    A.   I DON'T RECALL MEETING HIM.

02:13PM   7    Q.   HE SAYS THAT HE'S GOING TO BEGIN SENDING DOCUMENTS TO YOU

02:13PM   8    FOR YOUR SIGNATURE.

02:13PM   9         DO YOU RECALL THAT HAPPENING?  DO YOU RECALL BEING SENT

02:13PM  10    DOCUMENTS FROM THERANOS THAT NEEDED YOUR SIGNATURE?

02:13PM  11    A.   YES.

02:13PM  12    Q.   THE EMAIL CONTINUES, "MY FIRST SET OF SEVEN DOCUMENTS

02:13PM  13    (VALIDATION, SOP'S AND EMPLOYEE TRAINING) HAS TO DO WITH

02:13PM  14    THERANOS'S NEW LAUNCH OF T-CELL, B CELL, NK-CELL ASSAY."

02:13PM  15         DO YOU SEE THAT?

02:13PM  16    A.   YES.

02:13PM  17    Q.   DO YOU HAVE EXPERIENCE WITH SOP'S?

02:13PM  18    A.   WE USE THEM IN OUR CLINICAL TRIAL PRACTICE, AND WE HAVE

02:13PM  19    SOME FOR OUR PRACTICE AS WELL.

02:13PM  20    Q.   "THESE DOCUMENTS WILL ARRIVE IN YOUR EMAIL TODAY THROUGH

02:13PM  21    THE DOCUSIGN APPLICATION.  PLEASE REVIEW THESE DOCUMENTS AND I

02:14PM  22    HAVE SET UP A SPECIFIC PAGE ON EACH DOCUMENT FOR YOU TO

02:14PM  23    ELECTRONICALLY SIGN, PRINT NAME AND DATE."

02:14PM  24         AND IT CONTINUES, "ONCE YOU RECEIVE THE EMAIL, YOU WILL

02:14PM  25    HAVE 30 DAYS TO REVIEW THE DOCUMENTS AND SEND THEM BACK TO ME.

3725

DHAWAN DIRECT BY MR. SCHENK

02:14PM   1    GOING FORWARD THERE WILL BE AT LEAST ANOTHER 300-400 MORE

02:14PM   2    DOCUMENTS FOR YOUR REVIEW.  I WOULD LIKE TO ASK YOUR OPINION AS

02:14PM   3    TO HOW YOU WOULD LIKE THEM SENT, IE, ALL AT ONCE, 50 PER WEEK.

02:14PM   4    PLEASE ADVISE."

02:14PM   5         DO YOU RECALL THIS EMAIL BEING FOLLOWED UP WITH DOCUMENTS

02:14PM   6    THAT YOU NEEDED TO SIGN?

02:14PM   7    A.   YES.

02:14PM   8    Q.   IF WE CAN TURN NOW TO 2760.

02:14PM   9         YOUR HONOR, THE GOVERNMENT OFFERS THIS PURSUANT TO

02:14PM  10    STIPULATION OF THE PARTIES.

02:14PM  11              MR. WADE:  THAT'S CORRECT.

02:14PM  12              THE COURT:  IT'S ADMITTED BY STIPULATION, AND IT MAY

02:14PM  13    BE PUBLISHED.

02:14PM  14              MR. SCHENK:  THANK YOU.

02:14PM  15         (GOVERNMENT'S EXHIBIT 2760 WAS RECEIVED IN EVIDENCE.)

02:14PM  16    BY MR. SCHENK:

02:14PM  17    Q.   AND IF WE CAN START ON THE SECOND PAGE OF THIS EMAIL

02:15PM  18    CHAIN.

02:15PM  19         WE HAVE NOW MOVED INTO SEPTEMBER.

02:15PM  20         MR. BALWANI IS WRITING YOU AN EMAIL SEPTEMBER 9, 2015.

02:15PM  21         DO YOU SEE THAT?

02:15PM  22    A.   YES.

02:15PM  23    Q.   AND IN IT I WANT TO DRAW YOUR ATTENTION -- WELL, FIRST,

02:15PM  24    THE PARAGRAPH THAT BEGINS, "THE ISSUANCE," IS THAT TALKING

02:15PM  25    ABOUT THE STOCK OPTIONS THAT WE TALKED ABOUT A MOMENT AGO?

DHAWAN DIRECT BY MR. SCHENK                                      3726

02:15PM  1    A.   YES.

02:15PM  2    Q.   AND THE SECOND PARAGRAPH -- I'M SORRY, THE PARAGRAPH AFTER

02:15PM  3    THAT IT BEGINS, "I ALSO NEED," IS WHERE I WANT TO ASK YOU SOME

02:15PM  4    QUESTIONS.

02:15PM  5        "I ALSO NEED YOUR HELP ON AN ADDITIONAL MATTER.  WE HAVE A

02:15PM  6    LAB AUDIT COMING UP ON 9-22 AT 9:00 A.M. (THESE HAPPEN ONCE

02:15PM  7    EVERY TWO YEARS), AND WANTED TO SEE IF YOU CAN BE PRESENT FOR

02:15PM  8    AT LEAST THE FIRST PART OF IT.  I HAVE A VERY CAPABLE TEAM THAT

02:15PM  9    HAS TAKEN CARE OF ALL OF THE DETAILS AS ALWAYS, BUT WOULD LIKE

02:15PM 10    TO HAVE YOU HERE FOR THE FIRST PART OR SO AND THE INTRODUCTION

02:15PM 11    OF OUR TEAM.  IN PREPARATION FOR THE LAB AUDIT, I WILL

02:15PM 12    PERSONALLY WALK YOU THROUGH ALL OF THE LATEST UPDATES WITH OUR

02:16PM 13    TEAM -- WE HAVE HIRED MANY EXPERTS FROM THE INDUSTRY TO MAKE

02:16PM 14    SURE LAB IS FLAWLESS AND AUDIT READY, SO I DON'T ANTICIPATE ANY

02:16PM 15    HICKUPS, BUT AS ALWAYS, WANT YOU TO BE FAMILIAR WITH IT.

02:16PM 16        "LET ME KNOW IF I CAN GET AN HOUR FROM YOU THIS WEEK IN

02:16PM 17    THE A.M. OR AFTER WORK, AN HOUR NEXT WEEK ANYTIME AT YOUR

02:16PM 18    CONVENIENCE, AND THEN SOME TIME ON 9/229, 9:00 A.M.  AS ABOVE,

02:16PM 19    I CAN PLAN TO HAVE MY TEAM PICK UP AND DROP YOU OFF FOR ALL OF

02:16PM 20    THESE DATES SO YOU DON'T HAVE TO WORRY ABOUT COMMUTE."

02:16PM 21        ON 9-22, SEPTEMBER 22ND, DID YOU GO TO THERANOS FOR AN

02:16PM 22    AUDIT OR INSPECTION?

02:16PM 23    A.   YES.

02:16PM 24    Q.   AND WAS THAT AN INSPECTION CONDUCTED BY CMS?

02:16PM 25    A.   YES.

3727

DHAWAN DIRECT BY MR. SCHENK

02:16PM 1    Q.  IN ADVANCE OF THAT DID YOU SIGN DOCUMENTS AT THERANOS?

02:17PM 2    A.  WHATEVER WAS SENT TO ME, YES.

02:17PM 3    Q.  OKAY.  LET'S NOW GO UP IN THE CHAIN.  AND IT LOOKS LIKE

02:17PM 4    YOU'RE TALKING ABOUT SCHEDULE ON THE FIRST PAGE OF THIS EMAIL.

02:17PM 5         DO YOU TALK ABOUT CONFIRMING ON THE 22ND AND THEN IT LOOKS

02:17PM 6    LIKE YOU SAY TOMORROW AT 6:00 P.M. FOR SIGNING AND WALKTHROUGH.

02:17PM 7         DO YOU SEE THAT?

02:17PM 8    A.  YES.

02:17PM 9    Q.  AND SO IS IT POSSIBLE THAT YOU SIGNED THE DOCUMENTS AND

02:17PM 10   ALSO MAYBE HAD A WALKTHROUGH IN ADVANCE OF THE INSPECTION?

02:17PM 11   A.  YES.  IT'S GOING BACK SIX YEARS, BUT YES.

02:17PM 12   Q.  OKAY.  COULD YOU NOW TURN TO 2772.

02:17PM 13        YOUR HONOR, THE GOVERNMENT OFFERS EXHIBIT 2772 PURSUANT TO

02:17PM 14   STIPULATION.

02:17PM 15             MR. WADE:  THAT'S CORRECT, YOUR HONOR.

02:17PM 16             THE COURT:  IT'S ADMITTED BY STIPULATION, AND IT MAY

02:18PM 17   BE PUBLISHED TO THE JURY.

02:18PM 18             MR. SCHENK:  THANK YOU.

02:18PM 19        (GOVERNMENT'S EXHIBIT 2772 WAS RECEIVED IN EVIDENCE.)

02:18PM 20   BY MR. SCHENK:

02:18PM 21   Q.  A COUPLE OF DAYS LATER NOW SEPTEMBER 15TH, 2015, AND

02:18PM 22   THERE'S AN EMAIL EXCHANGE BETWEEN YOU AND MR. BALWANI.  AND

02:18PM 23   LET'S START WITH HIS EMAIL TO YOU.  HE WRITES, "THANKS FOR

02:18PM 24   DROPPING BY.

02:18PM 25        "I NEED A COUPLE OF HOURS FROM YOU THIS COMING WEEKEND.

3728

DHAWAN DIRECT BY MR. SCHENK

02:18PM  1    UNFORTUNATELY I HAVE CLOSE TO 300 SOP'S THAT NEED SIGNING.  I

02:18PM  2    CAN HAVE TEAM SEND THIS OUT 50 AT A TIME EACH DAY THIS WEEK

02:18PM  3    ELECTRONICALLY AS THAT MIGHT BE EASIER.  SORRY FOR THE LAST

02:18PM  4    MINUTE ON THIS I WAS TRYING TO FIND A WAY TO AVOID DOING THIS

02:18PM  5    MANUALLY...THANKS IN ADVANCE."

02:18PM  6         SO THIS WAS SENT ON MONDAY, SEPTEMBER 14TH, AND HE ASKS IF

02:18PM  7    YOU'RE AVAILABLE THAT COMING WEEKEND, SO FIVE, SIX, SEVEN DAYS

02:18PM  8    LATER; IS THAT RIGHT?

02:18PM  9    A.   YES.

02:18PM  10   Q.   AND YOU RESPOND, "SUNNY.

02:18PM  11        "LET'S DO THIS ON SATURDAY -- I CAN SIGN AT YOUR

02:19PM  12   FACILITY."

02:19PM  13        SO IS IT SUGGESTED IN THIS EMAIL OR DO YOU HAVE A

02:19PM  14   RECOLLECTION OF GOING TO THE FACILITY TO SIGN THESE DOCUMENTS?

02:19PM  15   A.   I BELIEVE I WENT TO THE FACILITY.

02:19PM  16             MR. SCHENK:  YOUR HONOR, MAY I APPROACH?

02:19PM  17             THE COURT:  YES.

02:19PM  18             MR. SCHENK:  (HANDING.)

02:19PM  19             MR. WADE:  WITH THE COURT'S INDULGENCE.

02:19PM  20             THE COURT:  OKAY.

02:20PM  21   BY MR. SCHENK:

02:20PM  22   Q.   DR. DHAWAN, I'VE HANDED YOU A BINDER THAT CONTAINS

02:20PM  23   ADMITTED EXHIBITS.

02:20PM  24        THESE EXHIBITS WERE ADMITTED, I BELIEVE, BY STIPULATION OF

02:20PM  25   THE PARTIES, YOUR HONOR, DURING DR. ROSENDORFF'S TESTIMONY.

DHAWAN DIRECT BY MR. SCHENK                                     3729

02:20PM  1        THE BINDER IS LABELLED VALIDATION REPORTS.  IT CONTAINS 59

02:20PM  2   TABS.  I'VE COUNTED TO SAVE YOU THE TIME.

02:20PM  3        WHAT I'M GOING TO ASK YOU TO DO, DR. DHAWAN, IS TO LOOK AT

02:20PM  4   THE FIRST PAGE OF EACH TAB AND TELL ME IF YOU SIGNED THAT

02:20PM  5   DOCUMENT ON 9-19-2015, SEPTEMBER 19TH, 2015.

02:20PM  6        AND IF I COULD JUST SHOW ONE OF THEM, WHICH IS AN ADMITTED

02:20PM  7   EXHIBIT FOR THE JURY, 9387.

02:21PM  8             THE COURT:  YES, THAT CAN BE PUBLISHED.

02:21PM  9             MR. SCHENK:  THANK YOU, YOUR HONOR.

02:21PM 10             THE WITNESS:  THE ONES WHERE I SIGNED, THAT'S MY

02:21PM 11   SIGNATURE.

02:21PM 12   BY MR. SCHENK:

02:21PM 13   Q.  SO, FOR INSTANCE, ON THE SCREEN AT THE VERY BOTTOM THAT

02:21PM 14   SIGNATURE NEXT TO THE DATE 9-19, THAT'S YOUR SIGNATURE?

02:21PM 15   A.  YES, SIR.

02:21PM 16   Q.  SO IF YOU WOULD TAKE A MINUTE NOW AND LOOK AT EACH

02:21PM 17   INDIVIDUAL REPORT IN THERE AND TELL ME IF YOU FIND ANY THAT YOU

02:21PM 18   DID NOT SIGN ON 9-19-2015.

02:21PM 19        (PAUSE IN PROCEEDINGS.)

02:21PM 20             THE WITNESS:  NO.  THESE ARE ALL OF MY SIGNATURES.

02:22PM 21   BY MR. SCHENK:

02:22PM 22   Q.  CAN I ASK YOU TO LOOK AT TAB 99086.

02:23PM 23   A.  I'M SORRY, CAN YOU SAY THAT AGAIN.  I'M LOOKING FOR IT.

02:23PM 24   Q.  THE TAB NUMBER?

02:23PM 25   A.  YEAH.

DHAWAN DIRECT BY MR. SCHENK                                    3730

02:23PM  1    Q.  9086?

02:23PM  2    A.  YES.

02:23PM  3    Q.  AND DID YOU SIGN THAT ONE ON 9-19-2015?

02:23PM  4    A.  THAT WAS THE ONLY ONE THAT DOESN'T HAVE MY SIGNATURE.

02:23PM  5    SORRY, I MISSED THAT.  THE REST OF THEM DO.

02:23PM  6    Q.  SO OF THE 59 EXHIBITS IN HERE --

02:23PM  7    A.  I'M SORRY, I MISSED ONE.  I'M SORRY.

02:23PM  8    Q.  -- 58 OF THEM YOU SIGNED ON SEPTEMBER 19TH, 2015?

02:24PM  9    A.  YES.

02:24PM  10   Q.  AND I WANT TO TALK TO YOU A LITTLE BIT ABOUT THAT DATE

02:24PM  11   9-19-2015.  WAS THAT A SATURDAY?  IT LOOKS LIKE A --

02:24PM  12   A.  YES.

02:24PM  13   Q.  AND WHEN YOU WERE AT THERANOS SIGNING THESE DOCUMENTS, HOW

02:24PM  14   CLOSELY DID YOU READ THEM?

02:24PM  15   A.  I REVIEWED THE FIRST PAGES AND I SPENT PROBABLY MANY HOURS

02:24PM  16   THERE.

02:24PM  17   Q.  AND DID YOU TALK TO MR. BALWANI OR OTHER PEOPLE AT

02:24PM  18   THERANOS TO GET COMFORTABLE WITH THE CONTENTS?

02:24PM  19   A.  YES.  I ASKED IF ADAM ROSENDORFF HAD REVIEWED THESE AND

02:24PM  20   SIGNED THEM, AND IT LOOKED LIKE HIS SIGNATURE WAS EVERYWHERE

02:24PM  21   AND SO I WAS ESSENTIALLY COSIGNING AGAIN.

02:24PM  22   Q.  AND DID IT MATTER TO YOU THAT SOMEONE NAMED

02:24PM  23   ADAM ROSENDORFF HAD SIGNED THE DOCUMENT BEFORE YOU?

02:24PM  24   A.  HE WAS, I BELIEVE, THE PREVIOUS LAB DIRECTOR.

02:24PM  25   Q.  HE WAS THE LAB DIRECTOR THAT YOU CAME IN TO REPLACE?

3731

DHAWAN DIRECT BY MR. SCHENK

02:24PM  1    A.   RIGHT, OR WORK FOR THE THREE MONTHS THAT I WAS SUPPOSED TO

02:24PM  2    WORK, YES.

02:24PM  3    Q.   AND WHY DID HIS SIGNATURE PROVIDE COMFORT TO YOU?

02:25PM  4    A.   HE MIGHT HAVE EVEN BEEN THERE, MY ASSUMPTION WAS, FOR A

02:25PM  5    SIGNIFICANT AMOUNT OF TIME AND HAD BEEN WORKING THERE SO IT

02:25PM  6    GAVE ME SOME REASSURANCE THAT THERE HAD BEEN SOME SUPERVISION

02:25PM  7    BEFORE MY TIME OF ARRIVAL.

02:25PM  8    Q.   ON THE EXHIBIT THAT WE'RE LOOKING AT ON THE SCREEN, THIS

02:25PM  9    ONE IS 9387, IT LOOKS LIKE IT'S A VALIDATION DOCUMENT FOR A

02:25PM  10   CERTAIN ELISA ASSAY ON THE EDISON 3.X.

02:25PM  11       DO YOU SEE THAT?

02:25PM  12   A.   YES.

02:25PM  13   Q.   AND WHEN YOU SIGNED THIS DOCUMENT, HAD YOU EVER SEEN THE

02:25PM  14   EDISON DEVICE RUN THIS ASSAY?

02:25PM  15   A.   I HAD NOT SEEN IT RUN THE ASSAY, NO.

02:25PM  16   Q.   HAD YOU EVER SEEN THE EDISON DEVICE RUN ANY ASSAY?

02:26PM  17   A.   I WAS NEVER SHOWN THE EDISON DEVICE RUNNING AN ASSAY.

02:26PM  18   Q.   DO YOU RECALL WHEN YOU WERE REVIEWING THOSE DOCUMENTS DID

02:26PM  19   YOU EVER FIND A DOCUMENT AND MAKE A COMMENT AND SAY, YOU KNOW

02:26PM  20   WHAT, WE SHOULD CHANGE THIS AND THIS SHOULD BE DIFFERENT?  DID

02:26PM  21   THAT EVER HAPPEN AT ANY POINT THAT DAY?

02:26PM  22   A.   IT DID NOT HAPPEN THAT DAY.

02:26PM  23   Q.   HOW ABOUT OTHER DAYS?  WAS THERE A DAY THAT I'M NOT

02:26PM  24   FOCUSSED ON RIGHT NOW WHERE YOU READ A VALIDATION REPORT OR AN

02:26PM  25   SOP THAT YOU SAID I WANT THIS TO READ DIFFERENTLY?  DO YOU

DHAWAN DIRECT BY MR. SCHENK                                    3732

02:26PM   1    RECALL THAT?

02:26PM   2    A.   YEAH, I DON'T RECALL EVER DOING THAT.

02:26PM   3    Q.   CAN I ASK YOU TO LOOK -- I'M SORRY TO JUMP.  YOU CAN PUT

02:26PM   4    THAT BINDER ASIDE -- LOOK AT THE ORIGINAL BINDER 3041.

02:27PM   5         YOUR HONOR, THE GOVERNMENT OFFERS THIS DOCUMENT BY

02:27PM   6    STIPULATION.

02:27PM   7              MR. WADE:  THAT'S CORRECT, YOUR HONOR.

02:27PM   8              THE COURT:  IT'S ADMITTED BY STIPULATION, AND IT MAY

02:27PM   9    BE PUBLISHED.

02:27PM  10         (GOVERNMENT'S EXHIBIT 3041 WAS RECEIVED IN EVIDENCE.)

02:27PM  11    BY MR. SCHENK:

02:27PM  12    Q.   I'M SORRY.  DR. DHAWAN, DID YOU SIGN THIS DOCUMENT IN

02:27PM  13    DECEMBER OF 2015?

02:27PM  14    A.   I DON'T RECALL THE EXACT DATE, BUT THAT WOULD BE MY

02:27PM  15    DOCUSIGN SIGNATURE, YES.

02:27PM  16    Q.   AND THE DOCUMENT IS AN SOP FOR REPORTING CRITICAL VALUES.

02:27PM  17         DO YOU SEE THAT?

02:27PM  18    A.   YES.

02:27PM  19    Q.   AND DO YOU HAVE EXPERIENCE WITH CRITICAL VALUES?  DO YOU

02:27PM  20    KNOW WHAT THAT PHRASE MEANS?

02:27PM  21    A.   YEAH.  WHEN I WAS IN TRAINING AND WHEN I WAS DOING

02:27PM  22    INTERNAL MEDICINE WE WOULD RECEIVE AND SEE CRITICAL VALUES

02:27PM  23    CURRENTLY FOR BLOOD TESTS.

02:27PM  24    Q.   SURE.  SO YOU HAVE SOME EXPERIENCE WITH IT IN YOUR

02:27PM  25    PRACTICE AND IN YOUR EDUCATION?

02:27PM   1   A.   YES, RIGHT.

02:27PM   2   Q.   DURING THE TIME THAT YOU WORKED AT THERANOS, WAS THERE AN

02:27PM   3   OCCASION WHEN YOU AS LAB DIRECTOR NEEDED TO REPORT OUT A

02:28PM   4   CRITICAL VALUE?

02:28PM   5   A.   I WAS NEVER GIVEN ANY CRITICAL VALUES TO LOOK AT.

02:28PM   6   Q.   THE ENTIRE TIME YOU WERE AT THERANOS YOU NEVER WERE SHOWN

02:28PM   7   ONE CRITICAL VALUE?

02:28PM   8   A.   NO.

02:28PM   9   Q.   AND I JUST WANT TO CONFIRM UNDER YOUR SIGNATURE ON THIS

02:28PM  10   DOCUMENT THERE'S A JOB TITLE.

02:28PM  11        DO YOU SEE THAT?

02:28PM  12   A.   YES.

02:28PM  13   Q.   YOUR JOB TITLE IS LABORATORY DIRECTOR; IS THAT RIGHT?

02:28PM  14   A.   YES.

02:28PM  15   Q.   AND WOULD YOU NOW TURN TO 2791.

02:28PM  16        THE GOVERNMENT OFFERS 2791 BY STIPULATION?

02:28PM  17             MR. WADE:  THAT'S CORRECT.

02:28PM  18             THE COURT:  IT'S ADMITTED BY STIPULATION, AND IT MAY

02:28PM  19   BE PUBLISHED.

02:28PM  20             MR. SCHENK:  THANK YOU.

02:28PM  21        (GOVERNMENT'S EXHIBIT 2791 WAS RECEIVED IN EVIDENCE.)

02:28PM  22   BY MR. SCHENK:

02:29PM  23   Q.   ON THIS DOCUMENT, FIRST THE EMAIL IS DATED MONDAY,

02:29PM  24   SEPTEMBER 21ST, 2015.

02:29PM  25        WE SAW EARLIER A REFERENCE TO SEPTEMBER 22ND.  WAS THE

3734

DHAWAN DIRECT BY MR. SCHENK

02:29PM 1    22ND THE DAY OF THE CMS INSPECTION THAT WE WERE TALKING ABOUT?

02:29PM 2    A.   YES.

02:29PM 3    Q.   SO THE DAY BEFORE SOMEONE NAMED MONA RAMAMURTHY SENT YOU

02:29PM 4    THIS EMAIL AND ATTACHES SOME DOCUMENTS.

02:29PM 5         DO YOU SEE THAT?

02:29PM 6    A.   YES.

02:29PM 7    Q.   AND IT SAYS "DEAR DR. DHAWAN.

02:29PM 8         "CONGRATULATIONS.  IT IS WITH GREAT PLEASURE THAT I WRITE

02:29PM 9    TO PRESENT YOU THESE TERMS OF EMPLOYMENT TO JOIN THE THERANOS

02:29PM 10   TEAM."

02:29PM 11        DID YOU THINK THAT YOU HAD BEEN WORKING AT THERANOS FOR

02:29PM 12   QUITE A WHILE BEFORE THIS DATE?

02:29PM 13   A.   AS A CONSULTANT BASED ON THE ORIGINAL AGREEMENT.

02:29PM 14   Q.   OKAY.  AND WAS THIS CHANGING YOUR STATUS?

02:29PM 15   A.   ACCORDING TO THIS, YES.

02:30PM 16   Q.   IF YOU'LL TURN TO THE NEXT PAGE.

02:30PM 17        IT SAYS AT THE TOP, "DEAR SUNIL.

02:30PM 18        "ON BEHALF OF THERANOS INC. (THE COMPANY), I AM PLEASED TO

02:30PM 19   CONFIRM THE TERMS OF YOUR EMPLOYMENT AS LABORATORY DIRECTOR

02:30PM 20   REPORTING TO SUNNY BALWANI."

02:30PM 21        AND THEN BELOW THERE'S A PARAGRAPH THAT BEGINS YOUR START

02:30PM 22   DATE.  DO YOU SEE THAT?

02:30PM 23   A.   YES.

02:30PM 24   Q.   YOUR START DATE WITH THE COMPANY IS JUNE 1ST, 2015; IS

02:30PM 25   THAT RIGHT?

DHAWAN DIRECT BY MR. SCHENK                                3735

02:30PM  1    A.   YES.

02:30PM  2    Q.   THAT'S WHAT IT SAYS?

02:30PM  3    A.   YES.

02:30PM  4    Q.   THEY SENT YOU A DOCUMENT ON SEPTEMBER 21ST THAT SAID YOUR

02:30PM  5    START DATE WAS JUNE 1ST; IS THAT RIGHT?

02:30PM  6    A.   YES.

02:30PM  7    Q.   AND BY THIS POINT YOU HAD ALREADY SIGNED AT LEAST ALL

02:30PM  8    THOSE VALIDATION REPORTS IN THE BINDER THAT WE HAD JUST TALKED

02:31PM  9    ABOUT?

02:31PM  10   A.   YES.

02:31PM  11   Q.   THE NEXT DATE SEPTEMBER 22ND WAS THE INSPECTION.

02:31PM  12        WERE YOU PRESENT FOR THE INSPECTION?

02:31PM  13   A.   YES, THAT MORNING.

02:31PM  14   Q.   AND DESCRIBE THAT TO THE JURY.  WHAT WAS YOUR EXPERIENCE

02:31PM  15   THAT DAY?

02:31PM  16   A.   I WAS IN THE ROOM WHEN THE INSPECTORS WALKED IN, I WAS

02:31PM  17   INTRODUCED, AND THEN THE INSPECTORS SAT WITH THE LAB TEAM AND

02:31PM  18   MR. BALWANI, IF MY RECOLLECTION IS CORRECT.

02:31PM  19        AND THEN AFTER ABOUT AN HOUR, I THINK, I WAS ASKED TO STEP

02:31PM  20   OUT BECAUSE THERE WAS NO QUESTIONS ASKED OF ME.  AND I WAS

02:31PM  21   THERE I THINK ANOTHER HOUR UNTIL PROBABLY BETWEEN 8:00 AND

02:31PM  22   10:00, 10:30, MAYBE 11:00 MAX, AND I WAS NOT ASKED ANY

02:31PM  23   QUESTIONS, AND I WAS NOT INQUIRED OF IN ANY WAY.

02:32PM  24   Q.   DID YOU TALK TO MS. HOLMES THAT DAY?

02:32PM  25   A.   I RECALL MEETING HER IN THE HALLWAY.

DHAWAN DIRECT BY MR. SCHENK                                    3736

02:32PM   1    Q.   YOU SAID MEETING.  WAS THAT THE FIRST TIME YOU MET

02:32PM   2    MS. HOLMES?

02:32PM   3    A.   YES.

02:32PM   4    Q.   YOU SIGNED ON IN NOVEMBER OF 2014 AND SEPTEMBER 21ST,

02:32PM   5    2015, WAS THE FIRST TIME YOU MET MS. HOLMES?

02:32PM   6    A.   YES.

02:32PM   7    Q.   AND HOW ABOUT THE SECOND DAY?  DO YOU KNOW WHETHER THE

02:32PM   8    INSPECTION CARRIED OVER THE NEXT DAY?

02:32PM   9    A.   IT DID FROM MY RECOLLECTION, BUT I WAS NOT ASKED TO COME

02:32PM   10   BACK.

02:32PM   11   Q.   YOU DIDN'T GO THAT DAY?

02:32PM   12   A.   NO.  I ASKED WHETHER I NEEDED TO BE THERE, AND THEY SAID

02:32PM   13   NO, NO NEED FOR ME TO BE THERE.

02:33PM   14            MR. SCHENK:  YOUR HONOR, MAY I APPROACH?

02:33PM   15            THE COURT:  YES.

02:33PM   16            MR. SCHENK:  (HANDING.)

02:33PM   17        YOUR HONOR, I WOULD LIKE TO SHOW THE WITNESS SOME TEXT

02:33PM   18   MESSAGES.  THESE ARE EXHIBIT 5387B.  B WAS ALREADY PREVIOUSLY

02:33PM   19   ADMITTED.  THESE ARE THREE PAGES FROM -- THE PAGE NUMBERS ARE

02:33PM   20   26, 27, AND 28.

02:33PM   21            THE COURT:  YES.  THANK YOU.

02:33PM   22            MR. SCHENK:  AND PERMISSION TO PUBLISH?

02:33PM   23            THE COURT:  YES.

02:33PM   24            MR. SCHENK:  THANK YOU.

02:33PM   25   Q.   DR. DHAWAN, I'M SHOWING YOU TEXT MESSAGES THAT WERE SENT

DHAWAN DIRECT BY MR. SCHENK

02:34PM 1    BETWEEN MR. BALWANI AND MS. HOLMES ON THESE TWO DAYS THAT WE'RE

02:34PM 2    TALKING ABOUT, SEPTEMBER 22ND AND SEPTEMBER 23RD OF 2015.

02:34PM 3        YOU WERE NOT ON THESE TEXT MESSAGES; IS THAT RIGHT?

02:34PM 4    A.   NO.

02:34PM 5    Q.   OKAY.  MR. BALWANI STARTS, "CAN YOU SEE HIM?

02:34PM 6    A.   "YES, I CAN."

02:34PM 7    Q.   "VERY HOSTILE SO FAR.  THEY SAY HAVE COMPLAINTS."

02:34PM 8        AND DO YOU MIND READING THE NEXT ONE?

02:34PM 9    A.   "THEY SHOULD KNOW THE ENTIRE LAB INDUSTRY IS AND WILL BE

02:34PM 10   SEEDLING EVERYONE THEY CAN GET TO FILE COMPLAINTS."

02:34PM 11   Q.   AND THEN IF YOU CAN CONTINUE THE NEXT TWO.

02:34PM 12   A.   "I'M SURE TYLER IS ONE AS THEY PROB GOT FROM NY.  ADAM IS

02:34PM 13   THE OTHER -- FROM CA AND THOSE EXACTLY PLAY TO LAB INDUSTRY

02:34PM 14   COMMENTARY TO HURT US."

02:34PM 15       AND THEN, "JC HIMSELF PLAYING LITERALLY OFF LAB COMMENTS

02:34PM 16   IS LIKELY THE OTHER."

02:34PM 17   Q.   "GARY IS TRYING TO BE PRO THERANOS."

02:35PM 18   A.   "YES."

02:35PM 19   Q.   AND WOULD YOU CONTINUE.

02:35PM 20   A.   OH, YES, SORRY.

02:35PM 21       "HMFR.

02:35PM 22       "PRAYING LITERALLY NONSTOP.

02:35PM 23       "DO YOU WANT ME TO STEP OUT OF FDA CALL?

02:35PM 24       "NO.

02:35PM 25       "OFF CAN TALK ANY TIME.

DHAWAN DIRECT BY MR. SCHENK                                          3738

02:35PM   1            "DON'T WORRY.  WE WILL RESUME AT 1.  LUNCH BREAK NOW.

02:35PM   2            "CALL IF YOU WANT TO TALK."

02:35PM   3       Q.  THANK YOU.

02:35PM   4            AND NOW WE'LL TURN TO THE NEXT PAGE, PAGE 27.

02:35PM   5            MR. BALWANI WRITES, "OUR VALIDATION REPORTS ARE TERRIBLE.

02:35PM   6       REALLY PAINFUL GOING THRU THIS PROCESS.  SAME ISSUES FDA

02:35PM   7       POINTED OUT?"

02:35PM   8            MS. HOLMES RESPONDS, "CAN WE GET SOMEONE HERE TO

02:35PM   9       SUPPLEMENT/UPDATE/HELP EXPLAIN?

02:35PM  10            "OR IS THE FEEDBACK COMING FROM FDA."

02:35PM  11            MR. BALWANI RESPONDS "NO."

02:35PM  12            MS. HOLMES WRITES, "WE CAN PROVIDE OUR FDA SUBMISSION

02:35PM  13       DATA."

02:35PM  14            AND MR. BALWANI RESPONDS, "NOT FROM FDA.  NOTHING TO DO

02:36PM  15       WITH FDA."

02:36PM  16            AND THEN MS. HOLMES WRITES, "WILL MAKE SURE ALL TEAMS ARE

02:36PM  17       REVIEWING REPORTS.  LET ME KNOW ANYTHING ELSE CAN DO TO

02:36PM  18       SUPPORT."

02:36PM  19            MR. BALWANI, "GOING BAD SO FAR.  PRAY.

02:36PM  20            "DANIEL HAS NOTHING READY.

02:36PM  21            "TOLD ME EVERYTHING IS IN THE BINDERS.

02:36PM  22            "NOT THERE."

02:36PM  23            MS. HOLMES, "PRAYING.

02:36PM  24            "AT MY DESK.

02:36PM  25            "TELL ME HOW I CAN HELP.

DHAWAN DIRECT BY MR. SCHENK                                          3739

02:36PM   1          "I'M COMING THERE."

02:36PM   2          AND THEN ON PAGE 28, THE FINAL TEXT IN THIS SET FROM

02:36PM   3   MS. HOLMES.

02:36PM   4          "PRAYING CONTINUALLY."

02:36PM   5          DR. DHAWAN, DURING THE INSPECTION, DID YOU HAVE ANY IDEA

02:36PM   6   WHETHER THE INSPECTION WAS GOING WELL OR NOT GOING WELL?

02:36PM   7   A.   I WAS NOT IN THE GROUP WHERE THE INSPECTION WAS HAPPENING,

02:36PM   8   I WAS SITTING IN THE BACK.

02:36PM   9   Q.   SO THERE --

02:36PM   10  A.   I WAS SITTING FAR -- NOT VERY CLOSE TO WHERE THE ACTUAL

02:37PM   11  INSPECTORS WERE SITTING.

02:37PM   12  Q.   AND YOU DIDN'T KNOW WHETHER MS. HOLMES OR MR. BALWANI WERE

02:37PM   13  PRAYING DURING THE INSPECTION, THAT WAS NOT SOMETHING THAT YOU

02:37PM   14  WERE AWARE OF?

02:37PM   15  A.   I DIDN'T -- I WAS NOT AWARE OF THAT, NO.

02:37PM   16  Q.   IF YOU COULD NOW GO BACK TO YOUR BINDER, IT'S TAB 2548.

02:37PM   17         YOUR HONOR, THE GOVERNMENT OFFERS 2548 PURSUANT TO

02:37PM   18  STIPULATION?

02:37PM   19              MR. WADE:  CORRECT, YOUR HONOR.

02:37PM   20              THE COURT:  IT'S ADMITTED BY STIPULATION, AND IT MAY

02:37PM   21  BE PUBLISHED.

02:37PM   22         (GOVERNMENT'S EXHIBIT 2548 WAS RECEIVED IN EVIDENCE.)

02:37PM   23  BY MR. SCHENK:

02:37PM   24  Q.   AND IF WE CAN START AT THE VERY BOTTOM.  THERE'S AN

02:37PM   25  OCTOBER 19TH, 2015 EMAIL, AND IT READS, "COULD YOU PLEASE

DHAWAN DIRECT BY MR. SCHENK                                    3740

02:38PM   1    CONTACT ME AS A MATTER OF URGENCY.  OUR CONVERSATION WILL BE ON

02:38PM   2    A BACKGROUND BASIS.  I WILL NOT QUOTE YOU OR EVEN SAY WE HAVE

02:38PM   3    BEEN IN CONTACT.  BUT IT IS IMPERATIVE THAT WE SPEAK?"

02:38PM   4         AND THEN THE EMAIL ABOVE IS FROM YOU FORWARDING THIS TO

02:38PM   5    MR. BALWANI; IS THAT RIGHT?

02:38PM   6    A.   YES.

02:38PM   7    Q.   AND YOU WRITE, "SUNNY.

02:38PM   8         "FYI.

02:38PM   9         "I TALKED TO THIS GUY SUPERFICIALLY -- TOLD HIM TO CALL

02:38PM   10   YOU ALL DIRECTLY FOR INFO.

02:38PM   11        "CALL ME FOR DETAILS."

02:38PM   12        WHO WAS "THIS GUY"?

02:38PM   13   A.   I BELIEVE HE WAS A REPORTER FROM THE FINANCIAL TIMES.

02:38PM   14   Q.   AND MR. BALWANI THEN RESPONDS TO YOU AT THE TOP.

02:38PM   15        "THANKS, WILL SPEAK IN THE A.M.  THANKS FOR THE HELP AND

02:38PM   16   STICKING BY.  APPRECIATE IT?

02:38PM   17        "IN FUTURE, JUST DON'T ANSWER ANY QUESTIONS AS THEY WILL

02:38PM   18   TRAP YOU OR MISQUOTE YOU.  WE ARE TRYING TO GET ON TOP OF THE

02:39PM   19   SITUATION AND RELEASE OUR STATEMENTS TO REFUTE THE FALSEHOODS,

02:39PM   20   BUT THIS STUFF TAKES TIME."

02:39PM   21        MR. BALWANI TALKS ABOUT "THE SITUATION" IN THIS EMAIL.

02:39PM   22        WAS -- DID YOU HAVE SEPARATE CONVERSATIONS WITH

02:39PM   23   MR. BALWANI ABOUT WHATEVER IT IS THAT HE'S REFERRING TO AS "THE

02:39PM   24   SITUATION"?

02:39PM   25   A.   NO.

3741

DHAWAN DIRECT BY MR. SCHENK

02:39PM  1    Q.   DID MR. BALWANI BRIEF YOU AT ANY POINT ABOUT WHAT HE WAS

02:39PM  2    CONCERNED ABOUT, WHAT WAS HAPPENING, WHAT SITUATION HE WAS

02:39PM  3    TRYING TO GET ON TOP OF?

02:39PM  4    A.   WE DID NOT HAVE A DIRECT CONVERSATION ABOUT THE SITUATION,

02:39PM  5    BUT I HAD BEEN NOW READING IN THE MEDIA ABOUT WHAT WAS

02:39PM  6    HAPPENING.

02:39PM  7    Q.   OKAY.  SO -- I'M SORRY TO INTERRUPT YOU.

02:39PM  8         YOU LEARNED ABOUT INFORMATION IN THE MEDIA, BUT NOT FROM

02:39PM  9    THE PERSON THAT WAS YOUR POINT OF CONTACT AT THE TIME?

02:39PM  10   A.   NO, I DID NOT LEARN FROM HIM.

02:39PM  11   Q.   OKAY.  WOULD YOU TURN TO TAB 2972.

02:40PM  12        YOUR HONOR, THE GOVERNMENT OFFERS EXHIBIT 2972 BY

02:40PM  13   STIPULATION.

02:40PM  14            THE COURT:  IT'S ADMITTED BY STIPULATION AND MAY BE

02:40PM  15   PUBLISHED.

02:40PM  16        (GOVERNMENT'S EXHIBIT 2972 WAS RECEIVED IN EVIDENCE.)

02:40PM  17   BY MR. SCHENK:

02:40PM  18   Q.   DR. DHAWAN, NOW WE'VE MOVED INTO NOVEMBER OF 2015.

02:40PM  19   DANIEL YOUNG IS WRITING YOU AN EMAIL AND IN IT DR. YOUNG

02:40PM  20   WRITES, "DEAR DR. DHAWAN:

02:40PM  21        "I AM TRYING TO SCHEDULE A MEETING TO REVIEW OUR MONTHLY

02:40PM  22   QC DATA FOR SEPTEMBER AND OCTOBER.  ARE YOU ABLE TO JOIN IN

02:40PM  23   THIS WEDNESDAY BY PHONE?  IF SO, WHAT TIME(S)."

02:40PM  24        MY QUESTION WAS THAT SOMETHING YOU DID BEFORE?  HAD YOU

02:40PM  25   REVIEWED MONTHLY QC DATA WITH DR. YOUNG BEFORE THIS?

3742

DHAWAN DIRECT BY MR. SCHENK

02:40PM  1    A.   NO, I HAD NOT.

02:40PM  2    Q.   DO YOU KNOW WHETHER YOU EVEN DID IT ON THIS OCCASION,

02:40PM  3    WHETHER THIS CALL HAPPENED?

02:41PM  4    A.   I DON'T THINK I DID.  I JUST DON'T RECALL NOW GOING BACK

02:41PM  5    SIX YEARS.

02:41PM  6    Q.   I'D LIKE YOU NOW TO TURN TO 3217.

02:41PM  7         YOUR HONOR, AT THIS TIME THE GOVERNMENT MOVES PAGE 1 OF

02:41PM  8    3217 INTO EVIDENCE.

02:41PM  9              MR. WADE:  NO OBJECTION TO PAGE 1.

02:41PM  10             THE COURT:  PAGE 1 OF EXHIBIT 3217 IS ADMITTED, AND

02:41PM  11   IT MAY BE PUBLISHED.

02:41PM  12             MR. SCHENK:  THANK YOU, YOUR HONOR.

02:41PM  13        (GOVERNMENT'S EXHIBIT 3217, PAGE 1, WAS RECEIVED IN

02:41PM  14   EVIDENCE.)

02:41PM  15   BY MR. SCHENK:

02:41PM  16   Q.   DR. DHAWAN, ON THIS DOCUMENT, ON THIS EMAIL SOMEONE NAMED

02:41PM  17   HEATHER KING IS SENDING YOU AN EMAIL.

02:41PM  18        DO YOU KNOW WHO HEATHER KING WAS?

02:41PM  19   A.   I BELIEVE SHE WAS, AS WRITTEN HERE, THE GENERAL COUNSEL

02:41PM  20   FOR THERANOS.

02:41PM  21   Q.   AND DO YOU KNOW IF YOU HAD MET HER OR WAS THIS THE FIRST

02:41PM  22   INTERACTION YOU HAD WITH HER?  DO YOU RECALL?

02:41PM  23   A.   MY RECOLLECTION IS THAT SHE WAS AT THE INSPECTION.  I

02:41PM  24   BELIEVE SHE WAS THERE.

02:41PM  25   Q.   OKAY.

3743

DHAWAN DIRECT BY MR. SCHENK

02:41PM 1    A.   BUT THERE WERE A LOT OF PEOPLE THERE THAT I DIDN'T

02:42PM 2    RECOGNIZE SO.

02:42PM 3    Q.   I'M SORRY.  THE SUBJECT IS CMS NOTICE ON IMPOSITION OF

02:42PM 4    SANCTIONS.

02:42PM 5         DO YOU SEE THAT?

02:42PM 6    A.   YES.

02:42PM 7    Q.   AND UNTIL THIS DATE, JULY OF 2016, AND WE GO BACK TO THE

02:42PM 8    SEPTEMBER 21ST, 2015 DATE, DID YOU KNOW DURING THAT PERIOD OF

02:42PM 9    TIME WHETHER THE INSPECTION, THE CMS INSPECTION HAD GONE WELL

02:42PM 10   OR HAD GONE POORLY?

02:42PM 11   A.   I, I HAD -- NO ONE HAD INFORMED ME EITHER WAY.

02:42PM 12   Q.   SO WAS THIS EMAIL THE WAY YOU LEARNED THAT THERE WERE SOME

02:42PM 13   CHALLENGES RESULTING FROM THE INSPECTION?

02:42PM 14   A.   YES.

02:43PM 15              MR. SCHENK:  YOUR HONOR, MAY I HAVE ONE MOMENT?

02:43PM 16              THE COURT:  YES.

02:43PM 17   (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

02:43PM 18   BY MR. SCHENK:

02:43PM 19   Q.   DR. DHAWAN, WAS THERE A MOMENT WHEN THAT YOU STOPPED BEING

02:43PM 20   THE LAB DIRECTOR AT THERANOS?

02:43PM 21   A.   I AM NOT SURE WHAT THAT DATE WAS HONESTLY.

02:43PM 22        I'M -- MY ASSUMPTION WAS THAT AFTER OCTOBER I BELIEVE THAT

02:43PM 23   THEY HAD HIRED SOMEONE ELSE AND -- BUT, AGAIN, I'M GOING BACK

02:43PM 24   SIX YEARS, AND I'LL HAVE TO LOOK AT AND REVIEW ALL OF THE

02:43PM 25   RECORDS.

DHAWAN DIRECT BY MR. SCHENK                                    3744

02:43PM   1        BUT THERE WAS NO FORMAL TERMINATION NOTICE OR ANYTHING

02:43PM   2   LIKE THAT THAT WAS GIVEN TO ME, BUT I -- THEY JUST -- I WAS NOT

02:43PM   3   RECEIVING ANY MORE COMMUNICATIONS, SO MY ASSUMPTION WAS THAT MY

02:43PM   4   TIME WAS OVER, YOU KNOW, WHATEVER CONSULTING JOB I HAD TO DO

02:43PM   5   WAS OVER AT THAT POINT.

02:43PM   6   Q.   YOU JUST SAID A MOMENT AGO OCTOBER.  WHICH YEAR WAS THAT?

02:43PM   7   A.   2015.  IT WOULD HAVE BEEN AFTER THE INSPECTION.

02:43PM   8   Q.   AFTER THE INSPECTION, THE NEXT MONTH?

02:44PM   9   A.   RIGHT.

02:44PM  10   Q.   BUT YOU DIDN'T RECEIVE A DOCUMENT, THAT WAS JUST YOUR

02:44PM  11   ASSUMPTION?

02:44PM  12   A.   YES.

02:44PM  13   Q.   THANK YOU.

02:44PM  14        THANK YOU, YOUR HONOR.  NO FURTHER QUESTIONS.

02:44PM  15             THE COURT:  CROSS-EXAMINATION.

02:44PM  16             MR. WADE:  MAYBE THE JURY WANTS TO STRETCH FOR A

02:44PM  17   MINUTE, YOUR HONOR.

02:44PM  18             THE COURT:  WOULD YOU LIKE TO STAND UP AND STRETCH,

02:44PM  19   LADIES AND GENTLEMEN.

02:44PM  20        WE'RE GOING TO END AT 3:00 O'CLOCK.  I SHOULD TELL YOU

02:44PM  21   JUST A POINT OF CLARIFICATION, I HAVE TO TELL YOU THAT OUR

02:44PM  22   CLOCK IN THE COURTROOM IS ABOUT FIVE MINUTES -- I THINK IT'S

02:44PM  23   ABOUT FIVE MINUTES FAST, BUT FEEL FREE TO STAND AND STRETCH IF

02:44PM  24   YOU WOULD LIKE.

02:45PM  25             (PAUSE IN PROCEEDINGS.)

DHAWAN CROSS BY MR. WADE                                          3745

02:45PM  1          THE COURT:  MR. WADE.

02:45PM  2          MR. WADE:  THANK YOU, YOUR HONOR.

02:45PM  3                    **CROSS-EXAMINATION**

02:45PM  4   BY MR. WADE:

02:45PM  5   Q.  GOOD AFTERNOON.  MY NAME IS LANCE WADE, AND I REPRESENT

02:45PM  6   ELIZABETH HOLMES.  I'D LIKE TO ASK YOU A FEW QUESTIONS.

02:45PM  7        YOUR HONOR, MAY I APPROACH?

02:45PM  8          THE COURT:  YES.

02:46PM  9   BY MR. WADE:

02:46PM  10  Q.  (HANDING.)

02:46PM  11       I'VE HANDED YOU A BINDER OF DOCUMENTS.  I MAY REFER TO

02:46PM  12  SOME DOCUMENTS IN THAT BINDER, AND I MAY REFER TO SOME IN THE

02:46PM  13  WHITE BINDER.  OKAY?  I'LL TRY TO KEEP CLEAR WHICH IS WHICH.

02:46PM  14       DR. DHAWAN, I'M NOT SURE IT CAME THROUGH IN YOUR -- IN

02:46PM  15  SOME OF YOUR DIRECT TESTIMONY, BUT IS IT FAIR TO SAY THAT

02:46PM  16  YOU'RE A HIGHLY TRAINED PROFESSIONAL?

02:46PM  17  A.  YES, I HAVE POST GRADUATE TRAINING, YES.

02:46PM  18  Q.  COULD YOU JUST WALK THROUGH YOUR -- THE TRAINING THAT YOU

02:46PM  19  RECEIVED IN CONNECTION WITH THE PRACTICE OF MEDICINE?

02:46PM  20  A.  I DID MY M.D., AND THEN I DID INTERNAL MEDICINE RESIDENCY,

02:46PM  21  AND THEN FINISHED A DERMATOLOGY RESIDENCY.

02:46PM  22  Q.  AND YOU'VE HAD A SUCCESSFUL PRACTICE IN THE BAY AREA FOR A

02:46PM  23  NUMBER OF YEARS?

02:46PM  24  A.  YES.

02:46PM  25  Q.  BOTH AS A BUSINESS PERSON AND AS A PRACTICING PHYSICIAN?

DHAWAN CROSS BY MR. WADE                                    3746

02:47PM   1    A.   YES.

02:47PM   2    Q.   AND THAT'S HOW YOU CAME TO KNOW MR. BALWANI?

02:47PM   3    A.   YES.

02:47PM   4    Q.   AND PRIOR TO THAT MORNING IN SEPTEMBER OF 2015 THAT YOU

02:47PM   5    TALKED ABOUT, YOU HADN'T INTERACTED WITH MS. HOLMES PREVIOUSLY;

02:47PM   6    IS THAT CORRECT?

02:47PM   7    A.   NO.

02:47PM   8    Q.   AND YOUR INTERACTIONS WITH HER WERE JUST LIMITED TO A FEW

02:47PM   9    MINUTES IN LENGTH?

02:47PM   10   A.   THEY WERE LIMITED TO SAYING HELLO.

02:47PM   11   Q.   JUST A GREETING?

02:47PM   12   A.   THAT'S BASICALLY IT.

02:47PM   13   Q.   MR. BALWANI, YOU UNDERSTOOD, WAS THE PRESIDENT AND CHIEF

02:47PM   14   OPERATING OFFICER OF THERANOS?

02:47PM   15   A.   YES, THAT WAS HIS -- YEAH.

02:47PM   16   Q.   AND YOU KNEW THAT FROM YOUR RELATIONSHIP WITH HIM PRIOR TO

02:47PM   17   ANY WORK CONNECTION TO THERANOS?

02:47PM   18   A.   I DON'T RECALL WHEN HE TOLD ME THAT, BUT IT WAS ON, I

02:47PM   19   BELIEVE SOME EMAIL TRAILS, BUT I'LL HAVE TO LOOK BACK.

02:48PM   20   Q.   BUT YOU UNDERSTOOD THAT HE'S ONE OF THE TOP TWO EXECUTIVES

02:48PM   21   IN THE COMPANY?

02:48PM   22   A.   MY ASSUMPTION WAS THAT HE WAS ONE OF THE HIGHER

02:48PM   23   EXECUTIVES, YES.

02:48PM   24   Q.   AND IN ADDITION TO THAT ROLE, HE WAS ACTUALLY, AT THE TIME

02:48PM   25   HE WAS INTERACTING WITH YOU, RUNNING THE LABORATORY FROM AN

DHAWAN CROSS BY MR. WADE                                          3747

02:48PM   1    OPERATIONAL STANDPOINT; CORRECT?

02:48PM   2    A.   I CAN'T COMMENT ON THAT BECAUSE I WAS NEVER TOLD THAT HE

02:48PM   3    WAS RUNNING THE LABORATORY, I WAS NEVER GIVEN THAT.  BUT IT WAS

02:48PM   4    MY ASSUMPTION, YES.

02:48PM   5    Q.   OKAY.  HE SEEMED TO BE KNOWLEDGEABLE BASED UPON YOUR

02:48PM   6    INTERACTIONS WITH HIM?

02:48PM   7    A.   BASED UPON MY INTERACTIONS WITH HIM, YES.

02:48PM   8    Q.   AND AT THE TIME THAT MR. BALWANI CAME TO YOU TO MAKE

02:48PM   9    INQUIRIES ABOUT GETTING YOUR ASSISTANCE AS THE LAB DIRECTOR AT

02:48PM  10    THERANOS, DO YOU RECALL THAT HE ACTUALLY ASKED IF EITHER YOU

02:48PM  11    KNEW SOMEONE WHO WOULD MEET THE QUALIFICATIONS OR WHETHER YOU

02:48PM  12    YOURSELF WOULD MEET THE QUALIFICATIONS TO BE LAB DIRECTOR?

02:49PM  13    A.   HE ASKED ME THAT QUESTION, YES.

02:49PM  14    Q.   IN NOVEMBER OF 2014 DID YOU UNDERSTAND THAT HE WAS IN A

02:49PM  15    BIT OF A PINCH AND NEEDED SOMEONE ON SHORT NOTICE?

02:49PM  16    A.   I NEVER USED THOSE WORDS.

02:49PM  17    Q.   YOU HAD TALKED ABOUT THE PRIOR LAB DIRECTOR.

02:49PM  18         DID YOU COME TO LEARN THAT THERE WERE SOME INTEGRITY

02:49PM  19    ISSUES THAT WOULD RESULT IN HIS NEED TO SEPARATE FROM THE

02:49PM  20    COMPANY ON SHORT NOTICE?

02:49PM  21    A.   I WAS NEVER TOLD THAT.

02:49PM  22    Q.   OKAY.  BUT YOU UNDERSTOOD BASED ON YOUR INTERACTIONS WITH

02:49PM  23    MR. BALWANI THAT THERE WAS A NEED TO GET SOMEONE IN QUICKLY?

02:49PM  24    A.   HE NEVER SAID QUICKLY, BUT THERE WAS A NEED TO GET SOMEONE

02:49PM  25    IN.

DHAWAN CROSS BY MR. WADE                                            3748

02:49PM  1        MY IMPRESSION WAS BASED ON THAT ONE EMAIL THAT -- I'M

02:49PM  2    FORGETTING WHERE IT IS NOW -- THAT THEY NEEDED SOMEONE FOR A

02:50PM  3    SHORT AMOUNT OF TIME, AND THAT WAS ALL I WAS TOLD.

02:50PM  4    Q.   AND YOU MENTION THAT EMAIL.  LET'S TAKE A LOOK AT THAT

02:50PM  5    EMAIL.  IT'S IN YOUR WHITE BINDER.  IT'S EXHIBIT 2219 WHICH IS

02:50PM  6    IN EVIDENCE.

02:50PM  7        DO YOU SEE THAT DOCUMENT UP ON YOUR SCREEN?

02:50PM  8    A.   YES, SIR.

02:50PM  9    Q.   AND THIS IS THE EMAIL THAT YOU'RE REFERRING TO?

02:51PM 10    A.   ARE YOU ASKING ABOUT HIS POSITION OR THE EMAIL THAT HE

02:51PM 11    SENT ME ABOUT WHAT I'M SUPPOSED TO DO?

02:51PM 12    Q.   I HAD ASKED YOU ABOUT WHETHER THERE WAS SOME URGENCY IN

02:51PM 13    BRINGING SOMEONE IN, AND I THINK YOU MENTIONED YOU SURMISED

02:51PM 14    THAT FROM THE EMAIL.

02:51PM 15        WAS THIS THE EMAIL THAT YOU WERE REFERRING TO?

02:51PM 16    A.   YES, I WOULD -- THIS IS THE ONLY -- IF THAT'S THE EMAIL

02:51PM 17    THAT WAS SENT, YES.

02:51PM 18    Q.   AND IF YOU, IF YOU LOOK ON THE BOTTOM OF THE FIRST PAGE --

02:51PM 19    I'M SORRY.  LET ME GO TO THE BOTTOM OF THE SECOND PAGE.  I

02:51PM 20    THINK MR. SCHENK ASKED YOU A COUPLE OF QUESTIONS ABOUT THIS.

02:51PM 21        DO YOU SEE THAT EMAIL WHERE MR. BALWANI IS MAKING INQUIRY

02:51PM 22    OF WHETHER YOU OR ANYONE ELSE YOU KNOW WOULD MEET THE

02:51PM 23    REQUIREMENTS THAT WERE NECESSARY TO STEP IN AS CLINICAL LAB

02:51PM 24    DIRECTOR; RIGHT?

02:51PM 25    A.   YES.

DHAWAN CROSS BY MR. WADE                                          3749

02:52PM  1    Q.   AND YOU RESPONDED THAT YOU COULD DO THIS?

02:52PM  2    A.   BASED ON WHAT HE WAS ASKING, YES.

02:52PM  3    Q.   AND YOU ASKED FOR SOME INFORMATION ABOUT WHAT WAS REQUIRED

02:52PM  4    FROM A QUALIFICATION STANDPOINT IN THAT EMAIL THERE?

02:52PM  5    A.   YES.

02:52PM  6    Q.   AND YOU HAD SERVED AS A LAB DIRECTOR IN YOUR OWN LAB;

02:52PM  7    RIGHT?

02:52PM  8    A.   YES.

02:52PM  9    Q.   AND WITHIN YOUR OWN LAB, HOW MANY PEOPLE WORKED IN YOUR

02:52PM 10    LAB?

02:52PM 11    A.   INCLUDING THE PEOPLE RUNNING OR DOING THE DOCUMENTATION,

02:52PM 12    TWO OR THREE.

02:52PM 13    Q.   TWO OR THREE.

02:52PM 14         AND IS IT FAIR TO SAY FOR THE MOST PART THAT THEY RAN THE

02:52PM 15    LAB AND YOU SUPERVISED THE LAB?

02:52PM 16    A.   YES.

02:52PM 17    Q.   AND THEY WOULD PREPARE THE DOCUMENTATION, YOU WOULD REVIEW

02:52PM 18    IT AND SIGN IT?

02:52PM 19    A.   YES.

02:52PM 20    Q.   IN A WAY THAT WAS SIMILAR TO SOME OF THE THINGS THAT YOU

02:52PM 21    DID OR HAD DONE AT THERANOS; IS THAT RIGHT?

02:52PM 22    A.   YES, THEY WOULD GIVE ME DOCUMENTS TO SIGN, YES.

02:52PM 23    Q.   AND YOU WERE RELYING UPON THEM TO PREPARE THE DOCUMENTS

02:53PM 24    BUT YOU WOULD REVIEW THEM BEFORE YOU WOULD SIGN THEM; IS THAT

02:53PM 25    RIGHT?

DHAWAN CROSS BY MR. WADE                                             3750

02:53PM   1    A.   I WOULD RELY ON THEM TO PREPARE THEM CORRECTLY, YES.

02:53PM   2    Q.   DO YOU RECALL THAT AFTER MR. BALWANI HAD THIS EXCHANGE

02:53PM   3    WITH YOU, AS REFERENCED IN EXHIBIT 2219, THAT HE PUT YOU IN

02:53PM   4    TOUCH WITH THERANOS'S REGULATORY COUNSEL, MR. ARINGTON?

02:53PM   5    A.   I DON'T RECALL HAVING A CONVERSATION -- THIS IS GOING BACK

02:53PM   6    SIX YEARS, SO I DON'T RECALL HAVING A CONVERSATION WITH

02:53PM   7    MR. ARINGTON AT THE TIME, BUT IF I DID, I DID.

02:53PM   8    Q.   WHY DON'T WE TAKE A LOOK AT EXHIBIT 13961, WHICH SHOULD BE

02:53PM   9    IN YOUR BLACK BINDER.

02:54PM   10        DO YOU HAVE IT THERE, DR. DHAWAN?

02:54PM   11   A.   YEAH.

02:54PM   12   Q.   AND DO YOU RECOGNIZE THIS TO BE AN EMAIL BETWEEN YOU AND

02:54PM   13   BRAD ARINGTON OF THERANOS DISCUSSING SOME REGULATORY ISSUES IN

02:54PM   14   NOVEMBER OF 2014?

02:54PM   15   A.   YES, I SEE THAT EMAIL RIGHT THERE, YES.

02:54PM   16            MR. WADE:  I MOVE THE ADMISSION OF 13961.

02:54PM   17            MR. SCHENK:  NO OBJECTION.

02:54PM   18            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:54PM   19        (DEFENDANT'S EXHIBIT 13961 WAS RECEIVED IN EVIDENCE.)

02:55PM   20   BY MR. WADE:

02:55PM   21   Q.   ONCE WE HAVE THE EMAIL UP, WE'LL GO TO THE LAST EMAIL ON

02:55PM   22   THE BOTTOM OF THE CHAIN, AND I THINK IT'S THE FOURTH PAGE.

02:55PM   23   IT'S MR. ARINGTON'S EMAIL TO YOU ON NOVEMBER 21ST, 2014.

02:55PM   24        I'LL DO THE ELMO WITH THIS ONE.

02:55PM   25        DO YOU SEE THAT EMAIL?

DHAWAN CROSS BY MR. WADE                                          3751

02:55PM   1      A.   YES.

02:55PM   2      Q.   AND DO YOU RECALL IN THIS TIME PERIOD -- DO YOU RECALL

02:55PM   3      MR. ARINGTON WAS THE SENIOR REGULATORY COUNSEL AT THERANOS?

02:55PM   4      A.   YES, THAT'S WHAT IS WRITTEN HERE.

02:56PM   5      Q.   AND HE WAS A LAWYER WHOSE JOB IT WAS TO DOT THE I'S AND

02:56PM   6      CROSS THE T'S FROM FROM A REGULATORY STANDPOINT?  WAS THAT YOUR

02:56PM   7      UNDERSTANDING?

02:56PM   8      A.   YES.

02:56PM   9      Q.   OKAY.  AND HE WAS REACHING OUT TO YOU TO GATHER SOME

02:56PM  10      INFORMATION IN THIS EMAIL TO MAKE SURE THAT YOU MET THE

02:56PM  11      REGULATORY QUALIFICATIONS TO SERVE IN THIS POSITION; IS THAT

02:56PM  12      RIGHT?

02:56PM  13      A.   YES.

02:56PM  14      Q.   AND OVER A FEW DAYS IT LOOKS LIKE YOU EXCHANGED EMAILS AND

02:56PM  15      PHONE CALLS WHERE MR. ARINGTON MADE SURE THAT YOU MET ALL OF

02:56PM  16      THE REQUIREMENTS.

02:56PM  17           DO YOU RECALL THAT?

02:56PM  18      A.   YES.

02:56PM  19      Q.   AND YOU PROVIDED HIM THE INFORMATION THAT HE NEEDED IN

02:56PM  20      ORDER TO MAKE SURE THAT YOU MET THE REQUIREMENTS?

02:56PM  21      A.   YES.

02:56PM  22      Q.   OKAY.  AND THEN A SHORT TIME LATER SOME PAPERWORK WAS

02:56PM  23      PREPARED.

02:56PM  24           DO YOU RECALL THAT?  FORMALLY PUTTING YOU ON THE CLIA

02:56PM  25      LICENSE?

DHAWAN CROSS BY MR. WADE                                    3752

02:56PM 1    A.   YEAH.   THIS IS AGAIN GOING BACK SIX YEARS, BUT IF I COULD

02:56PM 2    SEE THE DOCUMENTS THAT YOU HAVE.

02:56PM 3    Q.   YES.

02:56PM 4    A.   I RECALL SOMETHING BEING DONE TO THAT EFFECT.

02:57PM 5    Q.   WE'LL GET TO THE DOCUMENTS EITHER TODAY OR TOMORROW

02:57PM 6    MORNING.

02:57PM 7    A.   UH-HUH.

02:57PM 8    Q.   DO YOU RECALL ABOUT THE SAME TIME THERE WAS ANOTHER LAB

02:57PM 9    DIRECTOR THAT WAS ADDED TO THE LICENSE AT THERANOS?

02:57PM 10   A.   I DON'T RECALL THAT.

02:57PM 11   Q.   DO YOU RECALL A WOMAN BY THE NAME OF LYNETTE SAWYER, WHO

02:57PM 12   IS A PH.D., SERVING AS A LAB DIRECTOR AT THERANOS DURING THIS

02:57PM 13   SAME PERIOD?

02:57PM 14   A.   I DON'T RECALL HER NAME.

02:57PM 15   Q.   OKAY.   LET'S SEE IF WE CAN REFRESH YOUR RECOLLECTION ON

02:57PM 16   THIS.

02:57PM 17       LET'S TAKE A LOOK AT EXHIBIT 2553.

02:58PM 18       DO YOU HAVE THAT DOCUMENT IN FRONT OF YOU?

02:58PM 19   A.   YES.

02:58PM 20   Q.   AND THE FIRST PAGE IS COVER CORRESPONDENCE.

02:58PM 21       BUT DO YOU SEE THE SECOND PAGE OR THE THIRD PAGE IS AN

02:58PM 22   APPLICATION FOR RENEWAL OF THE CLIA LABORATORY LICENSE?

02:58PM 23       DO YOU SEE THAT?

02:58PM 24   A.   YES.

02:58PM 25   Q.   OKAY.   AND IS THAT YOUR SIGNATURE ON THIS DOCUMENT?

DHAWAN CROSS BY MR. WADE                                              3753

02:58PM   1      A.   YES.

02:58PM   2              MR. WADE:  YOUR HONOR, I MOVE THE ADMISSION OF

02:58PM   3      EXHIBIT 2553.

02:58PM   4              MR. SCHENK:  JUST ONE MOMENT, YOUR HONOR, PLEASE.

02:58PM   5          (PAUSE IN PROCEEDINGS.)

02:59PM   6              THE COURT:  THE ENTIRETY OF THIS DOCUMENT, MR. WADE?

02:59PM   7              MR. WADE:  I'M GOING TO GET TO OTHER PIECES OF IT,

02:59PM   8      SO I'LL MOVE THE ADMISSION OF IT NOW.

02:59PM   9              MR. SCHENK:  NO OBJECTION.

02:59PM  10              THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

02:59PM  11          (GOVERNMENT'S EXHIBIT 2553 WAS RECEIVED IN EVIDENCE.)

02:59PM  12      BY MR. WADE:

02:59PM  13      Q.   AND UP ON YOUR SCREEN DO YOU SEE THE THIRD PAGE OF

02:59PM  14      EXHIBIT 2553 THAT I REFERENCED PREVIOUSLY?

02:59PM  15      A.   YES.

02:59PM  16      Q.   AND DO YOU SEE THAT THERE ARE TWO LAB DIRECTORS WHO ARE

02:59PM  17      IDENTIFIED FOR THERANOS ON THIS CERTIFICATE?

02:59PM  18      A.   YES.

02:59PM  19      Q.   OKAY.  AND DO YOU HAVE ANY FAMILIARITY WITH RESPECT TO

02:59PM  20      WHAT MS. -- I'M SORRY, DR. SAWYER WAS DOING AT THERANOS?

02:59PM  21      A.   I NEVER MET DR. SAWYER.

02:59PM  22      Q.   YOU NEVER MET HER SO IT MAY HAVE BEEN SHE WAS DOING

02:59PM  23      SEPARATE FUNCTIONS FROM THE FUNCTIONS YOU PERFORMED AT

02:59PM  24      THERANOS; IS THAT FAIR?

02:59PM  25      A.   YES, BUT I NEVER MET HER.

DHAWAN CROSS BY MR. WADE                                              3754

03:00PM  1    Q.   OKAY.  ARE YOU AWARE IN CONNECTION WITH YOUR REVIEW OF

03:00PM  2    POLICIES THAT DR. SAWYER SIGNED MANY POLICIES EARLIER IN YOUR

03:00PM  3    TENURE BEFORE I THINK IN THAT GAP WHERE YOU WERE TOLD WHERE YOU

03:00PM  4    DIDN'T RECEIVE ANY COMMUNICATIONS FROM THE COMPANY?

03:00PM  5    A.   CAN YOU RE-ASK THAT QUESTION.  I'M SORRY, I DIDN'T

03:00PM  6    UNDERSTAND.

03:00PM  7    Q.   YES.  IT WASN'T A VERY GOOD QUESTION.

03:00PM  8         LET ME JUST SHOW YOU A DOCUMENT.  TAKE A LOOK AT 10531.

03:00PM  9    A.   YES.

03:00PM  10   Q.   THIS IS A DOCUMENT THAT WAS SIGNED BY DR. SAWYER.

03:01PM  11        DO YOU SEE THAT?

03:01PM  12   A.   YES.

03:01PM  13   Q.   AND DID YOU HAVE AN OCCASION TO REVIEW THIS PARTICULAR

03:01PM  14   DOCUMENT WHEN YOU WERE WORKING WITH THERANOS?

03:01PM  15   A.   I DON'T RECALL EVER SEEING THIS DOCUMENT.

03:01PM  16   Q.   OKAY.

03:01PM  17        MOVE THE ADMISSION OF 10531.

03:01PM  18             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:01PM  19        (DEFENDANT'S EXHIBIT 10531 WAS RECEIVED IN EVIDENCE.)

03:01PM  20   BY MR. WADE:

03:01PM  21   Q.   DO YOU SEE A DOCUSIGN THERE FOR DR. SAWYER?

03:01PM  22   A.   YES.

03:01PM  23   Q.   AND THIS IS FOR A MAY 5TH, 2015 DOCUMENT?

03:01PM  24   A.   YES.

03:01PM  25   Q.   AND THAT'S WHEN SHE SIGNED IT.  IT WAS ACTUALLY EFFECTIVE

3755

| | | |
|---|---|---|
| 03:01PM | 1 | EARLIER. |
| 03:01PM | 2 | DO YOU SEE THAT? |
| 03:01PM | 3 | A.   YES. |
| 03:01PM | 4 | Q.   OKAY. |
| 03:01PM | 5 | THE COURT:  SHOULD WE STOP NOW? |
| 03:01PM | 6 | MR. WADE:  NOW IS A GOOD TIME TO STOP. |
| 03:01PM | 7 | THE COURT:  WE'LL TAKE OUR EVENING RECESS NOW, |
| 03:01PM | 8 | LADIES AND GENTLEMEN.  PLEASE RECALL THAT WE'RE GOING TO RESUME |
| 03:02PM | 9 | TOMORROW AT 9:00 A.M., 9:00 A.M., PLEASE.  AND WE WILL STOP AT |
| 03:02PM | 10 | 1:00 P.M., 1:00 P.M. TOMORROW AFTERNOON. |
| 03:02PM | 11 | IN THE INTERIM, PLEASE REMEMBER THE ADMONITION NOT TO DO |
| 03:02PM | 12 | ANY INVESTIGATION, VISIT ANY PLACE, OR IN ANY OTHER WAY TRY TO |
| 03:02PM | 13 | BECOME FAMILIAR WITH THIS CASE OR ANYTHING TO DO WITH IT BY ANY |
| 03:02PM | 14 | INDEPENDENT RESEARCH. |
| 03:02PM | 15 | PLEASE AVOID ANY MEDIA, INCLUDING SOCIAL MEDIA AND OTHER |
| 03:02PM | 16 | CONTACT WITH YOUR FRIENDS AND FAMILY IN THIS REGARD. |
| 03:02PM | 17 | BUT WE'LL SEE YOU TOMORROW MORNING AT 9:00 A.M.  THANK YOU |
| 03:02PM | 18 | VERY MUCH. |
| 03:02PM | 19 | AND YOU CAN STAND DOWN, SIR.  THANK YOU. |
| 03:02PM | 20 | THE WITNESS:  CAN I ASK YOU A QUESTION? |
| 03:02PM | 21 | THE COURT:  WELL, JUST A SECOND.  LET'S JUST LET THE |
| 03:02PM | 22 | JURY GO AND THEN YOU CAN ASK A QUESTION. |
| 03:02PM | 23 | THE WITNESS:  I'M SORRY. |
| 03:02PM | 24 | THE COURT:  NO, NOT AT ALL. |
| 03:03PM | 25 | (JURY OUT AT 3:03 P.M.) |

3756

03:03PM  1              THE COURT:  ALL RIGHT.  PLEASE BE SEATED.  DOCTOR?

03:03PM  2              THE WITNESS:  I HAVE TO BE HERE FROM 9:00 TO 1:00?

03:03PM  3              THE COURT:  YES, 9:00 TO 1:00 TOMORROW.

03:03PM  4              THE WITNESS:  I HAVE PATIENTS.

03:03PM  5              THE COURT:  9:00 O'CLOCK TO 1:00.

03:03PM  6              THE WITNESS:  THAT'S ALL I WANTED TO KNOW.  THANK

03:03PM  7      YOU.

03:03PM  8              MR. WADE:  WE'LL BE DONE BEFORE 1:00.  HOPEFULLY

03:03PM  9      WELL BEFORE 1:00.

03:03PM 10              THE WITNESS:  DO YOU HAVE ANY GUESS?  I HAVE PEOPLE

03:03PM 11      VERY ANXIOUS WAITING TO SEE ME AND I'M TRYING TO BE -- TRYING

03:03PM 12      TO ALLAY THEIR ANXIETIES.

03:03PM 13              THE COURT:  WELL, WE'LL BE FINISHED BY 1:00 O'CLOCK

03:03PM 14      REGARDLESS.

03:03PM 15              THE WITNESS:  THAT WOULD BE GREAT.  THANK YOU.

03:04PM 16              THE COURT:  ALL RIGHT.  THANK YOU.

03:04PM 17          THE RECORD SHOULD REFLECT THAT THE WITNESS HAS LEFT FOR

03:04PM 18      THE DAY AND THE JURY HAS LEFT FOR THE DAY.

03:04PM 19          ALL COUNSEL AND MS. HOLMES IS PRESENT.

03:04PM 20          ANYTHING FURTHER?

03:04PM 21              MR. SCHENK:  NO, YOUR HONOR.

03:04PM 22              MR. WADE:  NO, YOUR HONOR.

03:04PM 23          I WOULD JUST NOTE THE COLORS OF YOUR TIE AND FOR

03:04PM 24      MR. BOSTIC'S BENEFIT IT'S NOT HALLOWEEN, SO GO GIANTS.

03:04PM 25              THE COURT:  THANK YOU, SIR.  THANK YOU VERY MUCH.  I

3757

03:04PM   1          APPRECIATE IT.

03:04PM   2               WE'LL SEE YOU TOMORROW.  THANK YOU.

03:04PM   3                    THE CLERK:  COURT IS ADJOURNED.

03:04PM   4          (COURT ADJOURNED AT 3:04 P.M.)

          5

          6

          7

          8

          9

         10

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

1

2

3                    CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8     UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9     CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10    HEREBY CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16         _____
           IRENE RODRIGUEZ, CSR, CRR
           CERTIFICATE NUMBER 8076
17

18         _____
19         LEE-ANNE SHORTRIDGE, CSR, CRR
           CERTIFICATE NUMBER 9595
20

21              DATED:  OCTOBER 14, 2021

22

23

24

25

1

2                       UNITED STATES DISTRICT COURT

3                     NORTHERN DISTRICT OF CALIFORNIA

4                           SAN JOSE DIVISION

5

    UNITED STATES OF AMERICA,        )   CR-18-00258-EJD
6                                    )
                       PLAINTIFF,    )   SAN JOSE, CALIFORNIA
7                                    )
             VS.                     )   VOLUME 20
8                                    )
    ELIZABETH A. HOLMES,             )   OCTOBER 15, 2021
9                                    )
                       DEFENDANT.    )   PAGES 3758 - 3880
10   _____)

11

12                   TRANSCRIPT OF TRIAL PROCEEDINGS
                 BEFORE THE HONORABLE EDWARD J. DAVILA
13                   UNITED STATES DISTRICT JUDGE

    A P P E A R A N C E S:
14

15   FOR THE PLAINTIFF:      UNITED STATES ATTORNEY'S OFFICE
                             BY:  JOHN C. BOSTIC
16                                JEFFREY B. SCHENK
                             150 ALMADEN BOULEVARD, SUITE 900
17                           SAN JOSE, CALIFORNIA 95113

18                           BY:  ROBERT S. LEACH
                                  KELLY VOLKAR
19                           1301 CLAY STREET, SUITE 340S
                             OAKLAND, CALIFORNIA 94612

20       (APPEARANCES CONTINUED ON THE NEXT PAGE.)

21

    OFFICIAL COURT REPORTERS:
22                           IRENE L. RODRIGUEZ, CSR, RMR, CRR
                             CERTIFICATE NUMBER 8074
23                           LEE-ANNE SHORTRIDGE, CSR, CRR
                             CERTIFICATE NUMBER 9595
24

25       PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
             TRANSCRIPT PRODUCED WITH COMPUTER

1     A P P E A R A N C E S: (CONT'D)

2

3   FOR DEFENDANT HOLMES:   WILLIAMS & CONNOLLY LLP
                      BY:  KEVIN M. DOWNEY
4                        LANCE A. WADE
                        KATHERINE TREFZ
5                        ANDREW LEMENS
                        PATRICK LOOBY
6                        RICHARD CLEARY
                   725 TWELFTH STREET, N.W.
7                   WASHINGTON, D.C. 20005

8                   LAW OFFICE OF JOHN D. CLINE
                   BY:  JOHN D. CLINE
9                   ONE EMBARCADERO CENTER, SUITE 500
                   SAN FRANCISCO, CALIFORNIA 94111
10

11   ALSO PRESENT:        FEDERAL BUREAU OF INVESTIGATION
                   BY:  ADELAIDA HERNANDEZ
12
                   OFFICE OF THE U.S. ATTORNEY
13                   BY:  LAKISHA HOLLIMAN, PARALEGAL
                     MADDI WACHS, PARALEGAL
14
                   WILLIAMS & CONNOLLY
15                   BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL

16                   TBC
                   BY:  BRIAN BENNETT, TECHNICIAN
17

18

19

20

21

22

23

24

25

1

2                      INDEX OF PROCEEDINGS

3          GOVERNMENT'S:

4          **SUNIL DHAWAN**
           CROSS-EXAM BY MR. WADE (RES.)           P. 3779
5          REDIRECT EXAM BY MR. SCHENK             P. 3827
           RECROSS-EXAM BY MR. WADE                P. 3836
6          FURTHER REDIRECT EXAM BY MR. SCHENK     P. 3836

7

8          **DANIEL EDLIN**
           DIRECT EXAM BY MR. BOSTIC               P. 3846
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXHIBITS

```
                                   IDENT.      EVIDENCE
GOVERNMENT'S:

4533                                           3803
4528                                           3822
959                                            3872



DEFENDANT'S:

10566                                          3781
10567                                          3782
10562                                          3783
10525                                          3785
10526                                          3786
10529                                          3789
10577                                          3795
10578                                          3797
9941                                           3806
9962                                           3807
10010                                          3809
10527                                          3812
10528                                          3813
```

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
|          | 1  | SAN JOSE, CALIFORNIA                    OCTOBER 15, 2021      |
| 08:33AM  | 2  | P R O C E E D I N G S                                        |
| 08:33AM  | 3  | (COURT CONVENED AT 8:33 A.M.)                                |
| 08:33AM  | 4  | (JURY OUT AT 8:33 A.M.)                                       |
| 08:33AM  | 5  | THE COURT:  LET'S GO ON THE RECORD IN THE HOLMES             |
| 08:33AM  | 6  | MATTER.  ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT.    |
| 08:34AM  | 7  | WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.                   |
| 08:34AM  | 8  | I UNDERSTAND THAT COUNSEL WANTED TO SPEAK ABOUT SOMETHING    |
| 08:34AM  | 9  | THIS MORNING?                                                |
| 08:34AM  | 10 | MR. DOWNEY:  GOOD MORNING, YOUR HONOR.                       |
| 08:34AM  | 11 | KEVIN DOWNEY FOR MS. HOLMES.  I WANTED TO PREVIEW FOR THE    |
| 08:34AM  | 12 | COURT TWO ISSUES THAT MAY ARISE DURING THE TESTIMONY OF      |
| 08:34AM  | 13 | DAN EDLIN, WHO I THINK WILL BE CALLED AT SOME POINT LATER THIS |
| 08:34AM  | 14 | MORNING.                                                     |
| 08:34AM  | 15 | ONE OF THE ISSUES IS FAMILIAR TO THE COURT, BUT I WANTED     |
| 08:34AM  | 16 | TO REFAMILIARIZE THE COURT BECAUSE IT'S BEEN A WHILE SINCE IT |
| 08:34AM  | 17 | CAME UP.                                                     |
| 08:34AM  | 18 | TWO OF THE EXHIBITS THAT ARE ON THE GOVERNMENT'S LIST OF     |
| 08:34AM  | 19 | EXHIBITS FOR MR. EDLIN SEEM TO RELATE TO A CLAIM THAT        |
| 08:34AM  | 20 | MS. HOLMES ATTEMPTED TO DEFRAUD OR MAKE MISREPRESENTATIONS TO |
| 08:34AM  | 21 | THE DEPARTMENT OF DEFENSE.                                   |
| 08:34AM  | 22 | I THINK THE GOVERNMENT AGREES WITH US THAT DEFRAUDING THE    |
| 08:34AM  | 23 | DEPARTMENT OF DEFENSE IS NOT PART OF THE CASE.  IT'S NOT 404(B) |
| 08:34AM  | 24 | EVIDENCE.  SO I THINK THE -- I THINK THAT THAT PROHIBITION   |
| 08:35AM  | 25 | APPLIES AS AGREED TO BY THE GOVERNMENT.                      |

08:35AM 1     THEY SAY, HOWEVER, THAT THE PRESENTATION SENT TO THE DOD

08:35AM 2     IS INEXTRICABLY INTERTWINED WITH THE REST OF MS. HOLMES'S

08:35AM 3     CONDUCT AND MS. HOLMES'S REPRESENTATIONS TO INVESTORS.

08:35AM 4         THAT REALLY CAN'T BE TRUE.  WE KNOW THAT THE

08:35AM 5     REPRESENTATIONS THAT THEY SEEK TO INTRODUCE WERE MADE ABOUT A

08:35AM 6     YEAR AND A HALF AFTER THERE WERE REPRESENTATIONS TO INVESTORS

08:35AM 7     IN THE WAVE IN 2010 INVESTORS AND ABOUT A YEAR AND A HALF

08:35AM 8     BEFORE THE NEXT SET OF INVESTORS.

08:35AM 9         THERE'S NO APPARENT RELATIONSHIP BETWEEN THE

08:35AM 10    REPRESENTATIONS MADE IN THIS POWERPOINT PRESENTATION MADE TO

08:35AM 11    THE DOD OR ANY RELATIONSHIP TO DIRECT REPRESENTATIONS TO

08:35AM 12    INVESTORS.

08:35AM 13        ALSO, OBVIOUSLY THE NATURE OF THE EVIDENCE IS POTENTIALLY

08:36AM 14    INFLAMMATORY, SO THERE'S ALSO A 403 ISSUE.

08:36AM 15        SO WE HAVE ASKED PREVIOUSLY THAT THIS BE EXCLUDED IN A

08:36AM 16    PRIOR PLEADING, BUT I WANTED TO REFAMILIARIZE THE COURT.

08:36AM 17        IF YOU WOULD LIKE ME TO PASS UP THE TWO EXHIBITS THAT I

08:36AM 18    THINK WE HAVE CONCERNS ABOUT, I'D BE HAPPY TO.

08:36AM 19            THE COURT:  WELL, THAT WOULD BE HELPFUL.  SURE.

08:36AM 20            THE CLERK:  DO YOU HAVE AN EXTRA COPY, COUNSEL?

08:36AM 21            MR. DOWNEY:  I HAVE AN EXTRA COPY FOR THE COURT.  I

08:36AM 22    DON'T THINK I HAVE A SECOND COPY.  I CAN PROVIDE THESE

08:36AM 23    (HANDING.)

08:36AM 24        THESE ARE, YOUR HONOR, EXHIBITS 504 AND 551.  551 IS A

08:36AM 25    MORE LENGTHY POWERPOINT PRESENTATION.  504 IS A SHORTER

08:36AM  1    DOCUMENT WHICH JUST HAS AT THE BACK A NUMBER OF REPRESENTATIONS

08:37AM  2    THAT I ANTICIPATE THAT MR. BOSTIC WILL SEEK TO ASK MR. EDLIN

08:37AM  3    ABOUT ON HIS DIRECT EXAMINATION.

08:37AM  4           THE COURT:  ALL RIGHT.  THANK YOU.

08:37AM  5      I'M NOT GOING TO GO THROUGH THESE JUST NOW, BUT I DO WANT

08:37AM  6    TO HEAR COMMENT.

08:37AM  7         GOOD MORNING, MR. BOSTIC.

08:37AM  8           MR. BOSTIC:  GOOD MORNING, YOUR HONOR.

08:37AM  9         JOHN BOSTIC FOR THE UNITED STATES.

08:37AM  10      I'M HAPPY TO EXPLAIN HOW THESE PARTICULAR EXHIBITS FIT IN

08:37AM  11   WITH THIS CASE AND WHY THEY'RE ADMISSIBLE.

08:37AM  12      FIRST, THE GOVERNMENT DOESN'T AGREE THAT THESE WOULD NOT

08:37AM  13   BE ADMISSIBLE UNDER 404.  I'LL CIRCLE BACK TO THAT, BUT JUST TO

08:37AM  14   MAKE THAT CLEAR.

08:37AM  15      THEY ARE ABSOLUTELY INEXTRICABLY INTERTWINED WITH THE

08:37AM  16   FRAUD CHARGED IN THIS CASE.  THE PRESENTATIONS THAT DEFENSE

08:37AM  17   COUNSEL IS REFERENCING ARE PART OF HOW THERANOS'S RELATIONSHIP

08:37AM  18   AND CONTACTS WITH THE MILITARY BEGAN AND WERE MAINTAINED.  THE

08:37AM  19   NATURE OF THAT RELATIONSHIP WITH THE MILITARY IS A CORE PART OF

08:38AM  20   THIS CASE BECAUSE PART OF THIS CASE INVOLVES MS. HOLMES'S FALSE

08:38AM  21   STATEMENTS TO OTHERS ABOUT THE NATURE OF THAT RELATIONSHIP.

08:38AM  22      SO THE GOVERNMENT NEEDS TO BE ABLE TO SHOW WHAT THE TRUTH

08:38AM  23   WAS, WHAT WAS ACTUALLY HAPPENING, AND THE PROGRESSION AND

08:38AM  24   NATURE OF THAT RELATIONSHIP OVER TIME.

08:38AM  25      THESE COMMUNICATIONS WITH THE MILITARY ARE PART OF TELLING

08:38AM 1   THAT STORY, SO THE JURY NEEDS TO HAVE THAT CONTEXT.

08:38AM 2       MORE SPECIFIC TO THE FALSE STATEMENTS IN THOSE

08:38AM 3   COMMUNICATIONS, THEY'RE INEXTRICABLY INTERTWINED WITH THE

08:38AM 4   SCHEME TO DEFRAUD HERE BECAUSE, LIKE MANY OF THE TOPICS AT

08:38AM 5   ISSUE, THE DEFENDANT'S MISLEADING STATEMENTS ON THE TOPIC OF

08:38AM 6   THE MILITARY OFTEN CAME IN THE FORM OF EXAGGERATIONS,

08:38AM 7   INCREASING THE IMAGE OR IMPRESSION OF WHAT WAS ACTUALLY

08:38AM 8   HAPPENING WITH THE MILITARY, WHEREAS WHERE THINGS ACTUALLY

08:38AM 9   STOOD WERE AT A MUCH MORE KIND OF RUDIMENTARY OR SUPERFICIAL

08:39AM 10  LEVEL.

08:39AM 11      IN ORDER TO HAVE SOMETHING TO EXAGGERATE IN THE FIRST

08:39AM 12  PLACE, MS. HOLMES HAD TO GET THE MILITARY ON THE HOOK, AS IT

08:39AM 13  WERE.  SHE HAD TO GET THEM INTERESTED IN THERANOS'S TECHNOLOGY

08:39AM 14  SO THAT THERE COULD BE SOME LEVEL OF CONTACT FOR HER TO THEN

08:39AM 15  CHARACTERIZE TO OTHERS.

08:39AM 16      IN ORDER TO GET THE MILITARY INTERESTED IN THERANOS'S

08:39AM 17  TECHNOLOGY, MISREPRESENTATIONS ABOUT WHAT THAT TECHNOLOGY COULD

08:39AM 18  DO WERE NECESSARY.

08:39AM 19      SO THAT WAS PART OF THE OVERALL SCHEME TO DEFRAUD BECAUSE

08:39AM 20  IT WAS NECESSARY TO INITIATE AND CONTINUE AND MAINTAIN THAT

08:39AM 21  CONTACT WITH THE MILITARY IN ORDER, REALLY IN SERVICE OF THE

08:39AM 22  CHARGED FRAUD AS TO INVESTORS IN THIS CASE.

08:39AM 23      IT'S ALSO VERY RELEVANT TO MS. HOLMES'S KNOWLEDGE OF THE

08:39AM 24  FALSITY OF THE REPRESENTATIONS SHE MADE LATER.  BECAUSE

08:39AM 25  MS. HOLMES KNEW THAT THE MILITARY'S INTEREST WAS PREMISED ON

08:40AM 1    THE MILITARY'S IMPRESSION OF WHAT THE THERANOS TECHNOLOGY WAS

08:40AM 2    CAPABLE OF, AND BECAUSE SHE KNEW THAT IMPRESSION WAS FALSE

08:40AM 3    BASED ON HER MISLEADING STATEMENTS IN THE EARLY STAGES OF THOSE

08:40AM 4    CONVERSATIONS, SHE WAS AWARE THAT THE DEALINGS WITH THE

08:40AM 5    MILITARY WERE LIKELY NOT TO GET OFF THE GROUND, AND THAT THE

08:40AM 6    MILITARY WAS UNLIKELY TO ACTUALLY BE ABLE TO USE THERANOS'S

08:40AM 7    TECHNOLOGY.

08:40AM 8         SO BEING ABLE TO SHOW THAT IS VERY RELEVANT AND PROBATIVE

08:40AM 9    OF HER KNOWLEDGE OF FALSITY AND HER INTENT TO DECEIVE LATER

08:40AM 10   REGARDING THOSE STATEMENTS TO THE MILITARY.

08:40AM 11        THE COURT:  SO IT'S THE TIMING THAT I THINK YOU'RE

08:40AM 12   CONCERNED WITH, MR. DOWNEY.

08:40AM 13        MR. DOWNEY:  IT'S IN PART, YOUR HONOR, THE TIMING,

08:40AM 14   BUT IT'S ALSO A DIFFERENT ISSUE.

08:40AM 15        JUST TO RESET THE TABLE AS TO WHAT THE ALLEGATIONS ARE AS

08:40AM 16   TO DOD, THEY'RE NOT ABOUT EXAGGERATIONS OF THE CAPACITY OF

08:40AM 17   THERANOS TECHNOLOGY.

08:40AM 18        THE ALLEGATION OF THE INDICTMENT AS IT RELATES TO DOD IS

08:41AM 19   THAT INVESTORS WERE TOLD THAT THERE WAS REVENUE IN CONNECTION

08:41AM 20   WITH DOD PROJECTS, BUT THERE WAS NOT SIGNIFICANT REVENUE IN

08:41AM 21   CONNECTION WITH THOSE PROJECTS.

08:41AM 22        THAT HAS NOTHING TO DO WITH STATEMENTS MADE 18 MONTHS AWAY

08:41AM 23   FROM ANY REPRESENTATIONS TO INVESTORS.

08:41AM 24        THE QUESTION IS SIMPLY A FINANCIAL ONE OF WHAT WAS THE

08:41AM 25   FINANCIAL STRENGTH OF THAT RELATIONSHIP.

08:41AM   1          I THINK TO SUGGEST THAT PRESENTATIONS MADE TO DOD OVER A

08:41AM   2    LONG PERIOD OF TIME NEED TO COME INTO THE CASE HAS NOTHING TO

08:41AM   3    DO WITH THE ALLEGATION.

08:41AM   4          NOT TO MENTION, YOUR HONOR, THAT IT'S CLEARLY BOTH

08:41AM   5    DESIGNED TO AND IS INFLAMMATORY.

08:41AM   6              MR. BOSTIC:  AND, YOUR HONOR, JUST TO CORRECT A

08:41AM   7    POINT THERE.  IT'S NOT THE CASE THAT THE MISREPRESENTATIONS

08:41AM   8    ABOUT THE MILITARY WERE LIMITED TO THE AMOUNT OF REVENUE THAT

08:41AM   9    THERANOS WAS GETTING.  I THINK THE COURT HAS ALREADY HEARD

08:41AM  10    TESTIMONY FROM WITNESSES WHO WERE TOLD THAT THE THERANOS DEVICE

08:41AM  11    WAS BEING USED BY THE MILITARY.

08:41AM  12          INVESTORS WILL, OR ARE EXPECTED TO TESTIFY THAT MS. HOLMES

08:42AM  13    TOLD THEM THAT THE THERANOS DEVICE WAS IN ACTIVE USE BY THE

08:42AM  14    MILITARY AND THAT WAS A MATERIAL FACT FOR THEM.  THEY CARED

08:42AM  15    ABOUT THAT.

08:42AM  16          THAT FACT WAS NOT TRUE.  AND IN ORDER TO SHOW THAT

08:42AM  17    MS. HOLMES KNEW THAT IT WASN'T TRUE, IT'S IMPORTANT FOR THE

08:42AM  18    JURY TO UNDERSTAND THAT THAT USE WAS NEVER GOING TO OCCUR

08:42AM  19    BECAUSE THE MILITARY'S INTEREST IN THE DEVICE IN THE FIRST

08:42AM  20    PLACE WAS BASED ON A FALSE IMPRESSION OF WHAT THE DEVICE COULD

08:42AM  21    DO.

08:42AM  22              THE COURT:  DO YOU INTEND TO, DO YOU INTEND TO

08:42AM  23    INTRODUCE THE ENTIRETY OF THIS -- I GUESS THIS IS A POWERPOINT

08:42AM  24    PRESENTATION?

08:42AM  25              MR. BOSTIC:  I WOULD, YOUR HONOR.

3768

08:42AM   1          AND I READ THE DEFENSE'S OBJECTION AS ONLY APPLYING TO THE

08:42AM   2     FALSE STATEMENTS, SO THAT'S WHAT I'M FOCUSSING ON.

08:42AM   3          BUT IT'S THE FALSE STATEMENTS THAT ARE A VERY PIVOTAL PART

08:42AM   4     OF THAT EXHIBIT, AGAIN, FOR THE PURPOSES OF SHOWING

08:42AM   5     MS. HOLMES'S KNOWLEDGE THAT THE MILITARY WAS UNLIKELY TO END UP

08:43AM   6     USING THE THERANOS DEVICE, AND THAT MONTHS LATER WHEN SHE WAS

08:43AM   7     TELLING INDIVIDUALS THAT THE DEVICE WAS IN USE BY THE MILITARY,

08:43AM   8     THAT COULD NOT HAVE BEEN TRUE BECAUSE OF WHAT THE MILITARY

08:43AM   9     ACTUALLY WANTED.

08:43AM  10               THE COURT:  AND TELL ME AGAIN THE TIMING OF WHEN

08:43AM  11     THIS PRESENTATION WAS PRESENTED.

08:43AM  12               MR. BOSTIC:  I BELIEVE -- LET'S SEE.  I'LL TURN TO

08:43AM  13     THOSE EXHIBITS, BUT I BELIEVE THEY'RE IN 2012.  MAYBE DEFENSE

08:43AM  14     COUNSEL HAS --

08:43AM  15               MR. DOWNEY:  IT'S JANUARY OF 2012, YOUR HONOR.

08:43AM  16               THE COURT:  THANK YOU.

08:43AM  17               MR. BOSTIC:  IT'S CERTAINLY WITHIN THE TIME PERIOD

08:43AM  18     OF THE CHARGED FRAUD.

08:43AM  19               THE COURT:  IT SOUNDS LIKE WE'LL GET TO THIS WITNESS

08:43AM  20     TODAY, AND YOU INTEND TO EXAMINE ON THIS TODAY AT SOME TIME?

08:43AM  21               MR. BOSTIC:  WE WILL GET TO THIS WITNESS TODAY.  I'M

08:43AM  22     NOT SURE WHETHER WE'LL GET TO THIS TOPIC TODAY.

08:43AM  23               THE COURT:  OKAY.

08:43AM  24               MR. BOSTIC:  AND WE WON'T GET TO THIS TOPIC BEFORE A

08:43AM  25     BREAK TODAY, IF THE COURT INTENDS TO TAKE A BREAK.

08:43AM    1        THE COURT:  I THINK WE WILL TAKE A BREAK AT 11:00

08:43AM    2   AND IT PROBABLY WILL BE A 30 MINUTE BREAK OR SOMETHING LIKE

08:43AM    3   THAT AS I UNDERSTAND IT.

08:43AM    4        MR. DOWNEY:  YOUR HONOR, JUST TO HELP THE COURT, TO

08:44AM    5   THE EXTENT THAT IT IS HELPFUL, THIS WAS THE SUBJECT OF TWO OR

08:44AM    6   THREE PAGES OF BRIEFING BY BOTH SIDES AT 1000 AND 1004 OF THE

08:44AM    7   DOCKET.  AND JUST SO THE COURT HAS IT HANDY, I COULD HAND THOSE

08:44AM    8   PLEADINGS UP.

08:44AM    9        THE COURT:  I DO RECALL THE COLLOQUY ON THAT.  I'M

08:44AM   10   HAPPY TO RECEIVE THEM.

08:44AM   11        YOU'VE BEEN IN MY OFFICE.  YOU'VE SEEN THE BOXES, SO I'M

08:44AM   12   SURE WE COULD FIND IT.

08:44AM   13        MR. DOWNEY:  WELL, I'M HAPPY TO KEEP THEM, TOO.

08:44AM   14        IF IT'S GOOD FOR THE COURT.

08:44AM   15        BUT IF I MAY, I'LL PASS IT UP THROUGH MS. KRATZMANN IF

08:44AM   16   IT'S HANDY.

08:44AM   17        THE COURT:  SURE.

08:44AM   18        MR. DOWNEY:  I HAVE TO SAY I'M ALSO A LITTLE

08:44AM   19   UNCERTAIN AS TO WHAT MR. BOSTIC IS DESCRIBING AS FALSE

08:44AM   20   STATEMENTS, SO I CAN'T REALLY RESPOND TO HIS ARGUMENT.

08:44AM   21        BUT I CAN TELL YOU HIS CHARACTERIZATION OF WHAT IS IN THE

08:44AM   22   INDICTMENT IS AN OVERSTATEMENT OF THE CHARGE.

08:44AM   23        THERE'S NOT SOME GENERAL ALLEGATION THAT THERE ARE

08:44AM   24   MISREPRESENTATIONS ABOUT DOD.  IT'S VERY FOCUSSED ON REVENUE AS

08:44AM   25   YOU WOULD EXPECT.

08:44AM 1          THE COURT:  WELL, THAT WAS PART OF OUR -- THERE WAS

08:44AM 2     A BILL OF PARTICULARS, THERE WAS A MOTION TO DISMISS, AND IT

08:45AM 3     DID TOUCH ON JUST WHAT WAS THE MILITARY REPRESENTATION, THE

08:45AM 4     REPRESENTATION TO THE MILITARY, WHAT WAS THAT ALLEGATION ABOUT,

08:45AM 5     AND I RECALL US TALKING AT LENGTH ABOUT THE REPRESENTATION

08:45AM 6     ABOUT THE MONETARY INVESTMENT AND WHETHER OR NOT THERE WERE --

08:45AM 7     THE CONTRACT WAS AS LARGE AS IT WAS REPRESENTED.

08:45AM 8          ALL RIGHT.  WELL, THANK YOU FOR BRINGING THIS TO MY

08:45AM 9     ATTENTION.  I'M GOING TO NEED TO LOOK AT IT, AND THANK YOU FOR

08:45AM 10    LETTING ME KNOW THAT.

08:45AM 11         WE MAY OR MAY NOT GET TO THAT, BUT I'LL LOOK TO IT DURING

08:45AM 12    OUR BREAK TODAY.  WE'RE ONLY GOING UNTIL 1:00 TODAY AS YOU

08:45AM 13    KNOW.

08:45AM 14         MR. DOWNEY:  ONE OTHER ISSUE, YOUR HONOR.

08:45AM 15         THE COURT:  YES.

08:45AM 16         MR. DOWNEY:  IT MAY OR MAY NOT BE PART OF TODAY'S

08:45AM 17    PRESENTATION.  THERE'S A DOCUMENT THAT THE GOVERNMENT SENT US

08:45AM 18    LAST NIGHT AS A POTENTIAL EXHIBIT, WHICH IS EXHIBIT 1496, 1496,

08:45AM 19    WHICH CONTAINS A REPORT WHICH WAS PREPARED BY MR. EDLIN AND

08:45AM 20    SENT TO MS. HOLMES, WHICH IS THE COMMENTARY OF A NUMBER OF

08:46AM 21    INDIVIDUALS, A COMPTROLLER IN THE MILITARY, UNIDENTIFIED OTHER

08:46AM 22    PERSONNEL, WHICH ARE IN THE NATURE OF SPECULATING CRITICISM OF

08:46AM 23    THERANOS.

08:46AM 24         I THINK THAT THAT EVIDENCE, IF YOU JUST TAKE A LOOK AT THE

08:46AM 25    EXHIBIT, YOU'LL SEE THAT THERE'S NO FOUNDATION FOR THE HEARSAY

08:46AM  1    COMMENTS THAT ARE CONTAINED IN THE DOCUMENT, AND I THINK IT

08:46AM  2    IS -- EVEN IF A FOUNDATION WERE LAID, I THINK IT'S 403 EVIDENCE

08:46AM  3    WITH HIGHLY INFLAMMATORY, NOT TO MENTION UNINFORMED, COMMENTS.

08:46AM  4         MR. BOSTIC:  SO, YOUR HONOR, THIS IS AN EMAIL FROM

08:46AM  5    THE WITNESS, DANIEL EDLIN, TO MS. HOLMES AND HER BROTHER,

08:46AM  6    CHRISTIAN HOLMES, REPORTING ON A MEETING THAT HE HAD JUST HAD

08:46AM  7    WITH REPRESENTATIVES FROM THE MILITARY.  THIS IS IN JANUARY OF

08:46AM  8    2014.

08:46AM  9         AS REPORTED BY MR. EDLIN DIRECTLY TO THE DEFENDANT, THE

08:46AM  10   MILITARY WAS SKEPTICAL AND CRITICAL OF THE INFORMATION THAT IT

08:47AM  11   HAD RECEIVED FROM THERANOS AT THAT POINT.

08:47AM  12        THIS IS RELEVANT.  IT GOES TO THE DEFENDANT'S STATE OF

08:47AM  13   MIND AND HER KNOWLEDGE REGARDING THE STATUS OF THE RELATIONSHIP

08:47AM  14   WITH THE MILITARY AND THE HEALTH OF THAT RELATIONSHIP, THE

08:47AM  15   INTEREST OF THE MILITARY IN THE THERANOS DEVICE.

08:47AM  16        THE WITNESS IS EXPECTED TO TESTIFY ABOUT THE SUBSTANCE OF

08:47AM  17   THIS CONVERSATION.  THE EMAIL CONSTITUTES HIS NOTES FROM THAT

08:47AM  18   CONVERSATION AND SHOWS THAT THE SUBSTANCE WAS REPORTED DIRECTLY

08:47AM  19   TO THE DEFENDANT.

08:47AM  20        IT'S RELEVANT AS TO ANY SUBSEQUENT, FOR EXAMPLE, ANY

08:47AM  21   SUBSEQUENT STATEMENTS THAT SHE MADE ABOUT THE STATUS OF THINGS

08:47AM  22   WITH THE MILITARY.

08:47AM  23        MR. DOWNEY:  WELL, AGAIN, YOUR HONOR, THESE ARE NOT

08:47AM  24   COMMENTS ABOUT THE VIEWS OF THE, QUOTE-UNQUOTE, MILITARY.

08:47AM  25        THIS IS A DISCUSSION OF ONE MEETING IN WHICH PEOPLE WITH

08:47AM 1     NO EXPERTISE IN THE TECHNOLOGY MAKE SPECULATIVE COMMENTS ABOUT

08:47AM 2     THE TECHNOLOGY.

08:47AM 3         IT'S NOT AN ELEMENT OF THE MILITARY THAT IS ANY KIND OF A

08:47AM 4     BASIS FOR MS. HOLMES'S CLAIMS ABOUT REVENUE FROM DOD.  SO IT'S

08:48AM 5     A LITTLE BIT LIKE ADMITTING IN A CASE EVIDENCE ABOUT A CUSTOMER

08:48AM 6     WHO DECLINES TO BUY A PRODUCT AND CLAIMING THAT THAT POTENTIAL

08:48AM 7     CUSTOMER IS, YOU KNOW, THE VICTIM OF EITHER A FRAUD OR SOME

08:48AM 8     KIND OF DEFECTIVE PRODUCT.

08:48AM 9         THIS IS AMONGST MANY ELEMENTS OF THE MILITARY WITH WHICH

08:48AM 10    THERANOS DEALT AND IT HAS REALLY NOTHING TO DO WITH THE CLAIMS

08:48AM 11    MADE OR THE CLAIMS ALLEGED TO BE FALSE.

08:48AM 12        THE COURT:  SO ARE THESE -- THIS IS MR. EDLIN'S

08:48AM 13    INTERPRETATION, OR HIS NOTES OF COMMENTS AT A MEETING WHERE IT

08:48AM 14    SOUNDS LIKE THE TECHNOLOGY WAS PRESENTED.

08:48AM 15        MR. DOWNEY:  WELL, I THINK ACTUALLY IN GENERAL TERMS

08:48AM 16    THAT'S CORRECT.

08:48AM 17        BUT ACTUALLY WHAT MS. HOLMES ASKED MR. EDLIN TO DO WAS TO

08:48AM 18    SEND THE MOST EGREGIOUS COMMENTS THAT HAD BEEN MADE, NOT ALL OF

08:48AM 19    THE COMMENTS THAT TOOK PLACE IN A MEETING.  SHE WANTED TO KNOW,

08:49AM 20    WHAT ARE THE CRITICISMS OF US BY THESE PARTICULAR PEOPLE IN THE

08:49AM 21    MEETING SO I CAN KNOW WHAT THEY ARE?

08:49AM 22        THE COURT:  DOESN'T THAT GO TO MR. BOSTIC'S POINT IS

08:49AM 23    HER STATE OF MIND?

08:49AM 24        MR. DOWNEY:  IT WOULD ONLY GO THERE IF THE CLAIM WAS

08:49AM 25    THAT SHE WAS MAKING REPRESENTATIONS ABOUT THIS ELEMENT OF THE

3773

08:49AM 1    MILITARY AND SAYING THIS ELEMENT OF THE MILITARY HAS NEVER BEEN

08:49AM 2    CRITICAL OF US.

08:49AM 3        THAT'S NOT THE ISSUE IN THE CASE.

08:49AM 4        THE ISSUE IS, WHAT IS THE REVENUE ASSOCIATED WITH ANY

08:49AM 5    ELEMENT OF DOD?

08:49AM 6        AND I THINK WHEN YOUR HONOR HEARS THE EVIDENCE, THE

08:49AM 7    PERSONNEL REFERENCED HERE HAVE NOTHING TO DO WITH ANY ELEMENT

08:49AM 8    OF THE MILITARY THAT WAS RELEVANT ULTIMATELY TO THERANOS OR ITS

08:49AM 9    PROGRAMS.

08:49AM 10           MR. BOSTIC:  YOUR HONOR, IT'S SIMPLY NOT TRUE THAT

08:49AM 11   THE ISSUE IS LIMITED TO THE AMOUNT OF REVENUE DERIVED FROM THE

08:49AM 12   CONTACTS WITH THE MILITARY.

08:49AM 13       ALSO AT THE ISSUE IS STATEMENTS THAT MS. HOLMES MADE ABOUT

08:49AM 14   THE MILITARY'S USE OF THE PRODUCT, THE MILITARY'S INTEREST IN

08:49AM 15   THE PRODUCT.

08:49AM 16       MS. HOLMES'S STATEMENTS WERE NOT SPECIFIC TO INDIVIDUAL

08:49AM 17   COMPONENTS OF THE MILITARY.  THEY TENDED TO BE MORE VAGUE THAN

08:50AM 18   THAT.  SHE SPOKE ABOUT THE MILITARY AND THE DEPARTMENT OF

08:50AM 19   DEFENSE IN GENERAL.

08:50AM 20       GIVEN THAT, INPUT FROM INDIVIDUALS ASSOCIATED WITH THE

08:50AM 21   MILITARY ABOUT THEIR INTEREST IN THE THERANOS DEVICE, ABOUT

08:50AM 22   INFORMATION THAT THEY HADN'T RECEIVED FROM THERANOS,

08:50AM 23   INFORMATION THAT THEY WOULD NEED TO BE ABLE TO MOVE FORWARD,

08:50AM 24   THESE THINGS ARE CLEARLY RELEVANT TO HER MENTAL STATE AND HER

08:50AM 25   KNOWLEDGE OF WHERE THINGS STOOD ON THAT FRONT.

08:50AM 1      THE FACT THAT THIS IS A SELECTION OF COMMENTS FROM THAT

08:50AM 2   MEETING ISN'T RELEVANT.  THE DEFENSE CAN CERTAINLY COVER THAT

08:50AM 3   ON CROSS IF THEY NEED TO.

08:50AM 4      IT'S ALSO EVIDENT FROM THE DOCUMENT ITSELF AND THAT'S WHAT

08:50AM 5   THE WITNESS WILL TESTIFY TO.

08:50AM 6      THE DEFENSE CAN ASK THE WITNESS ABOUT ANYTHING ELSE THAT

08:50AM 7   HE REMEMBERS FROM THAT MEETING.

08:50AM 8      AND AS TO COUNSEL'S COMMENT THAT THESE ARE UNINFORMED

08:50AM 9   COMMENTS, THEY'RE NOT BEING OFFERED FOR THE TRUTH TO THE EXTENT

08:51AM 10  THAT THEY CHARACTERIZE THE THERANOS TECHNOLOGY.

08:51AM 11     THE CRITICAL FACT HERE IS THAT THIS WAS THE MILITARY'S

08:51AM 12  VIEW, THESE REPRESENTATIVES' VIEW OF THE INFORMATION THAT THEY

08:51AM 13  RECEIVED FROM THERANOS AT THE TIME, AND IT GOES TO WHAT THEY'RE

08:51AM 14  TELLING THERANOS ABOUT THE LIKELIHOOD OF THINGS MOVING FORWARD

08:51AM 15  AND THEIR CONTINUED INTEREST, OR LACK THEREOF, IN THE THERANOS

08:51AM 16  TECHNOLOGY.

08:51AM 17          THE COURT:  SO DO WE NEED TO KNOW WHAT THE CONTEXT

08:51AM 18  OF THIS CONVERSATION WAS?  AND IT SEEMS LIKE THAT IS SOMETHING

08:51AM 19  THAT WOULD BE APPROPRIATE, THAT IS, WHAT IS THE FLOW OF THIS

08:51AM 20  CONVERSATION, MR. EDLIN?  DID MS. HOLMES ASK HIM TO SEEK OUT

08:51AM 21  INFORMATION?  WAS HE UNDER INSTRUCTIONS FROM HIS EMPLOYER TO

08:51AM 22  COLLECT THIS INFORMATION AND REPORT BACK?

08:51AM 23     THAT'S A DIFFERENT SCENARIO, I THINK, AND IT MIGHT HAVE

08:51AM 24  SOME STRONGER RELEVANCE PERHAPS IF HE WAS OPERATING UNDER THOSE

08:51AM 25  INSTRUCTIONS AND WAS REPORTING BACK AS REQUESTED FOR WHATEVER

08:52AM  1    REASON.

08:52AM  2        I JUST DON'T KNOW WHAT THE FOUNDATION IS AND HOW IT'S

08:52AM  3    GOING TO COME IN.  I APPRECIATE YOU TELLING ME THAT THIS

08:52AM  4    DOCUMENT EXISTS, BUT I THINK CONTEXTUALLY IT WOULD BE HELPFUL,

08:52AM  5    AND I'M SURE YOU'LL LAY A FOUNDATION FOR THIS.

08:52AM  6        I THINK I UNDERSTAND, MR. DOWNEY, WHAT YOU'RE TALKING

08:52AM  7    ABOUT, BUT --

08:52AM  8            MR. DOWNEY:  YOUR HONOR, I ACTUALLY AGREE.  I THINK

08:52AM  9    IT'S DIFFICULT TO PARSE WHAT EACH OF US IS SAYING, SO I THINK

08:52AM 10    THE FOUNDATION THAT WOULD NEED TO BE ESTABLISHED TO ADMIT THIS

08:52AM 11    DOCUMENT IS THAT SOMEHOW THESE INDIVIDUALS WITHIN ONE ELEMENT

08:52AM 12    OF DOD HAVE SOME RELATIONSHIP TO THE REPRESENTATIONS THAT

08:52AM 13    MS. HOLMES WAS MAKING.

08:52AM 14        I THINK YOU'LL SEE WHEN THE EVIDENCE COMES IN THESE

08:52AM 15    INDIVIDUALS DO NOT REPRESENT AN ELEMENT OF THE MILITARY WITH

08:52AM 16    WHICH THERANOS DEVELOPED OR SOUGHT TO DEVELOP A RELATIONSHIP.

08:52AM 17            MR. BOSTIC:  AND, YOUR HONOR, I WOULD JUST DISAGREE

08:52AM 18    THERE.  I THINK TO THE EXTENT THAT THIS DOCUMENT, FOR EXAMPLE,

08:52AM 19    REFLECTS COMMENTS FROM A CERTAIN LIEUTENANT COLONEL, IT'S NOT

08:53AM 20    THE CASE THAT THIS IS ONLY RELEVANT IF MS. HOLMES LATER MADE

08:53AM 21    FALSE STATEMENTS ABOUT WHAT THAT LIEUTENANT COLONEL THOUGHT OF

08:53AM 22    THE THERANOS TECHNOLOGY, THAT KIND OF ONE-TO-ONE RELATIONSHIP

08:53AM 23    IS TOO HIGH A BAR FOR RELEVANCE.

08:53AM 24            THE COURT:  I DON'T KNOW WHAT THE CONTEXT IS.  IF

08:53AM 25    MR. EDLIN WAS SENT OUT TO COLLECT INFORMATION FROM DOD

08:53AM 1    REPRESENTATIVES, MILITARY, WHOEVER IT MIGHT BE, AND IF IT'S A

08:53AM 2    GENERAL LARGE, BROAD CAST NET THAT WAS CAST, AND IF THESE ARE

08:53AM 3    REPRESENTATIVES OF, THAT'S ONE THING.

08:53AM 4        IF IT WAS SPECIFIC, I WANT YOU TO TALK TO THE AIR FORCE

08:53AM 5    AND ALL OF THAT, THAT'S A DIFFERENT CONTEXT, I THINK.

08:53AM 6        MR. DOWNEY:  AND I THINK WHAT YOUR HONOR WILL SEE,

08:53AM 7    BUT I AGREE WITH YOUR HONOR THE CONTEXT WILL BE IMPORTANT, I

08:53AM 8    THINK WHAT YOU'LL SEE IS THAT THIS IS A MEETING IN CONNECTION

08:53AM 9    WITH ADVANCING A PROGRAM IN CONNECTION WITH ONE ELEMENT OF THE

08:53AM 10   MILITARY.

08:53AM 11       A LOT OF THE CONTRACTING PERSONNEL I THINK HAD FRUSTRATION

08:53AM 12   WITH THERANOS.

08:54AM 13       ONE OF THE COMMENTS RELATES TO THE EXPRESSION OF

08:54AM 14   FRUSTRATION BECAUSE THEY HAVEN'T HIRED A MILITARY VETERAN TO

08:54AM 15   HELP WITH FACILITATING THE CONTRACTING PROCESSES, NOT SOMEONE

08:54AM 16   WHO HAD THE RELEVANT EXPERTISE OR THE NATURE OF THE MEETING IS

08:54AM 17   THAT, NOT SOMETHING BROADER THAN THAT.

08:54AM 18       I THINK ONE OF THE SPEAKERS IS IDENTIFIED AS A

08:54AM 19   COMPTROLLER.

08:54AM 20       THE COURT:  WELL, I THINK YOU HAVE EXPERIENCE WITH

08:54AM 21   THE GOVERNMENT, MR. DOWNEY, IN CASES AND YOU KNOW HOW THE

08:54AM 22   GOVERNMENT BUREAUCRACY WORKS WITH MEETINGS AND HOW DIFFERENT

08:54AM 23   INDIVIDUALS -- AND I KNOW MR. BOSTIC IS INTIMATE WITH

08:54AM 24   GOVERNMENT BUREAUCRACY -- WE KNOW HOW THOSE MEETINGS SOMETIMES

08:54AM 25   ARE STAFFED, THEY'RE CALLED, ET CETERA, AND THAT'S PART OF THE

08:54AM 1    CONTEXT I'M SURE WILL BE DEVELOPED BY BOTH SIDES.  BUT THANKS

08:54AM 2    FOR IDENTIFYING THIS EARLY.

08:54AM 3         I'VE JUST BEEN HANDED -- OH, ANYTHING ELSE FROM ON THIS?

08:54AM 4              MR. DOWNEY:  NO, NOT FROM US.

08:54AM 5              MR. BOSTIC:  NO, YOUR HONOR.

08:54AM 6              THE COURT:  I'VE JUST BEEN HANDED AN EMAIL FROM ONE

08:55AM 7    OF OUR JURORS WHO -- HE OVERSLEPT AND HE'S ON HIS WAY.  HIS

08:55AM 8    GOOGLE MAP TELLS HIM HE'LL BE HERE BY 9:30.  I PRESUME THAT

08:55AM 9    ASSUMES HE OBEYS ALL OF THE BASIC SPEED LAWS, WHICH WE HOPE HE

08:55AM 10   DOES, AND SO THAT'S -- IT SOUNDS LIKE WE WON'T START UNTIL 9:30

08:55AM 11   AT LEAST UNTIL HE GETS HERE.

08:55AM 12        PERHAPS HE WAS WATCHING SOME TERRIBLE T.V. SHOW LAST NIGHT

08:55AM 13   THAT CAUSED HIS DISMAY.

08:55AM 14        (LAUGHTER.)

08:55AM 15             MR. DOWNEY:  CONDOLENCES, YOUR HONOR.

08:55AM 16             THE COURT:  THERE'S NO JOY IN MUDVILLE.

08:55AM 17             MR. BOSTIC:  EVEN I HEARD ABOUT THAT, YOUR HONOR.

08:55AM 18        (LAUGHTER.)

08:55AM 19             THE COURT:  ALL RIGHT.  THANKS VERY MUCH.  THANKS

08:55AM 20   FOR THIS.  THAT GIVES US SOME TIME.  THANK YOU.

08:55AM 21             THE CLERK:  COURT WILL BE IN RECESS.

08:55AM 22        (RECESS FROM 8:55 A.M. UNTIL 9:47 A.M.)

09:47AM 23        (JURY IN AT 9:47 A.M.)

09:47AM 24             THE COURT:  ALL RIGHT.  GOOD MORNING.  LET'S GO ON

09:47AM 25   THE RECORD IN THE HOLMES MATTER.

| | | |
|---|---|---|
| 09:47AM | 1 | ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT. |
| 09:47AM | 2 | OUR JURY IS PRESENT.  GOOD MORNING, LADIES AND GENTLEMEN. |
| 09:47AM | 3 | WE'LL CALL OUR WITNESS IN IN JUST A MOMENT. |
| 09:47AM | 4 | LET ME JUST ASK THE JURY, OVER THE RECESS, DID ANY OF YOU |
| 09:47AM | 5 | HAVE OCCASION TO COME ACROSS ANY INFORMATION, READ ANYTHING, OR |
| 09:47AM | 6 | HAVE COMMUNICATION FROM ANYONE ABOUT ANYTHING TO DO WITH THIS |
| 09:48AM | 7 | CASE? |
| 09:48AM | 8 | IF SO, PLEASE SHOW ME YOUR HAND IF YOU WOULD. |
| 09:48AM | 9 | I SEE NO HANDS. |
| 09:48AM | 10 | THANK YOU VERY MUCH.  THANK YOU. |
| 09:48AM | 11 | DO WE HAVE THE WITNESS HERE?  LET'S HAVE OUR WITNESS |
| 09:48AM | 12 | RETURN. |
| 09:48AM | 13 | MR. WADE, I THINK YOU WERE EXAMINING. |
| 09:48AM | 14 | MR. WADE:  I AM, YOUR HONOR. |
| 09:48AM | 15 | THE COURT:  THANK YOU.  GOOD MORNING, SIR. |
| 09:48AM | 16 | IF YOU COULD TAKE THE STAND AGAIN, DOCTOR, WE'LL RESUME |
| 09:48AM | 17 | YOUR EXAMINATION. |
| 09:48AM | 18 | MAKE YOURSELF COMFORTABLE.  ADJUST THE CHAIR AND |
| 09:48AM | 19 | MICROPHONE AS YOU NEED. |
| 09:48AM | 20 | I THINK YOU INFORMED ME YESTERDAY THAT YOU HAD BEEN |
| 09:48AM | 21 | VACCINATED. |
| 09:48AM | 22 | THE WITNESS:  YES, SIR. |
| 09:48AM | 23 | THE COURT:  AND IF YOU WISH TO TAKE YOUR MASK OFF, |
| 09:48AM | 24 | YOU MAY.  THANK YOU. |
| 09:48AM | 25 | IF YOU COULD STATE YOUR NAME AGAIN, PLEASE. |

| | | |
|---|---|---|
| 09:48AM | 1 | THE WITNESS:  SUNIL DHAWAN. |
| 09:48AM | 2 | THE COURT:  THANK YOU.  I'LL ENCOURAGE YOU TO SPEAK |
| 09:48AM | 3 | DIRECTLY INTO THE MICROPHONE. |
| 09:48AM | 4 | I THINK THIS YOUNG MAN HAS SOME MORE QUESTIONS FOR YOU. |
| 09:49AM | 5 | **CROSS-EXAMINATION (RESUMED)** |
| 09:49AM | 6 | BY MR. WADE: |
| 09:49AM | 7 | Q.  GOOD MORNING, DR. DHAWAN. |
| 09:49AM | 8 | A.  GOOD MORNING. |
| 09:49AM | 9 | Q.  I THINK WHEN WE LEFT OFF WE WERE TALKING A LITTLE BIT |
| 09:49AM | 10 | ABOUT SOME OF THE INTERACTIONS THAT YOU HAD WITH THERANOS AND |
| 09:49AM | 11 | I'D LIKE TO PICK UP ON THAT. |
| 09:49AM | 12 | YOU WERE SHOWN DOCUMENT 2553, WHICH IS IN EVIDENCE. |
| 09:49AM | 13 | DO YOU STILL HAVE THAT DOCUMENT IN FRONT OF YOU?  IT'S THE |
| 09:49AM | 14 | FIRST DOCUMENT IN THE BLACK BINDER, I BELIEVE. |
| 09:49AM | 15 | A.  YES. |
| 09:49AM | 16 | Q.  AND I'M JUST CALLING YOUR ATTENTION TO THE FIFTH PAGE OF |
| 09:49AM | 17 | THIS EXHIBIT. |
| 09:49AM | 18 | I THINK WHEN WE LEFT OFF THIS WAS -- WE WERE TALKING ABOUT |
| 09:49AM | 19 | THE FACT THAT LYNETTE SAWYER SERVED AS THE CO-LABORATORY |
| 09:50AM | 20 | DIRECTOR AT THERANOS DURING THIS PERIOD. |
| 09:50AM | 21 | DO YOU RECALL THAT? |
| 09:50AM | 22 | A.  I SEE HER NAME HERE, YES. |
| 09:50AM | 23 | Q.  OKAY.  AND I'D JUST LIKE TO NOTE NEXT TO THE HOURS WORK |
| 09:50AM | 24 | SPENT IN THIS DOCUMENT, DO YOU SEE THAT COLUMN UP THERE? |
| 09:50AM | 25 | A.  YES. |

DHAWAN CROSS BY MR. WADE (RES.)                                    3780

09:50AM    1    Q.   IT NOTES THAT THE CO-LABORATORY DIRECTORS WERE ONLY GOING

09:50AM    2    TO WORK 1 TO 5 HOURS AS NEEDED; CORRECT?

09:50AM    3    A.   YES.

09:50AM    4    Q.   AND THERE'S NO SUGGESTION IN THIS DOCUMENT OR ANY

09:50AM    5    SUGGESTION THAT YOU'RE AWARE OF THAT YOU WERE GOING TO BE

09:50AM    6    WORKING FULL TIME ON THIS JOB; RIGHT?

09:50AM    7    A.   NO.

09:50AM    8    Q.   OKAY.  AND I THINK WHEN YOU WERE ON DIRECT EXAMINATION,

09:50AM    9    MR. SCHENK ASKS YOU SOME QUESTIONS ABOUT THIS PERIOD BETWEEN

09:50AM   10    NOVEMBER AND JULY AND NOTED THAT YOU HADN'T REALLY DONE MUCH ON

09:51AM   11    AN AS-NEEDED BASIS FOR THERANOS.

09:51AM   12         DO YOU RECALL THAT?

09:51AM   13    A.   YES.

09:51AM   14    Q.   AND DO YOU KNOW IF THAT'S BECAUSE WHEN THERE WERE SERVICES

09:51AM   15    THAT WERE NEEDED IN THIS PERIOD, THAT THEY WERE CALLING ON

09:51AM   16    MS. SAWYER TO DO THOSE SERVICES?

09:51AM   17    A.   I DON'T KNOW WHO THEY WERE CALLING.

09:51AM   18    Q.   OKAY.  BUT THEY WEREN'T CALLING YOU?

09:51AM   19    A.   NO.

09:51AM   20    Q.   RIGHT.  LET'S GO TO 10566 AND JUST FLESH OUT THIS

09:51AM   21    CHRONOLOGY A LITTLE BIT.  IT'S IN THAT SAME BOOK.

09:51AM   22         DO YOU HAVE THAT IN FRONT OF YOU, DOCTOR?

09:51AM   23    A.   YES.

09:51AM   24    Q.   OKAY.  DO YOU SEE 10566, IF YOU WOULD LOOK AT A COUPLE OF

09:52AM   25    PAGES, DO YOU RECOGNIZE THIS TO BE THE PAPERWORK RELATING TO

DHAWAN CROSS BY MR. WADE (RES.)                              3781

09:52AM   1    YOUR GOING ON TO THE CLIA LICENSE AT THERANOS?

09:52AM   2    A.   YES.

09:52AM   3              MR. WADE:  I WOULD MOVE THE ADMISSION OF 10566.

09:52AM   4              MR. SCHENK:  NO OBJECTION.

09:52AM   5              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:52AM   6         (DEFENDANT'S EXHIBIT 10566 WAS RECEIVED IN EVIDENCE.)

09:52AM   7    BY MR. WADE:

09:52AM   8    Q.   AND IF WE COULD JUST GO TO THE SECOND PAGE.

09:52AM   9         DO YOU SEE THAT THIS WAS FROM DOCTOR -- THIS WAS A LETTER

09:52AM   10   THAT WAS SENT TO THE REGULATORS FROM BRAD ARINGTON.

09:52AM   11        DO YOU SEE THAT?

09:52AM   12   A.   YES.

09:52AM   13   Q.   AND THAT WAS THE SENIOR REGULATORY COUNSEL AT THERANOS WHO

09:52AM   14   YOU WERE DEALING WITH WHEN YOU WERE SIGNING UP WITH THE

09:52AM   15   COMPANY.

09:52AM   16        DO YOU RECALL THAT?

09:52AM   17   A.   YES.

09:52AM   18   Q.   OKAY.  AND HE SENT IN THIS PAPERWORK, AND JUST FOCUSSING

09:52AM   19   ON THE SECOND PAGE, THIS NOTES THAT YOU WENT ON TO THE LICENSE

09:53AM   20   NOVEMBER 19TH, 2014.

09:53AM   21        DO YOU SEE THAT?

09:53AM   22   A.   YES.

09:53AM   23   Q.   AND DO YOU RECALL AT THE TIME WHEN YOU INITIALLY WENT ON

09:53AM   24   THE LICENSE THAT DR. ROSENDORFF WAS STILL ON THE LICENSE FOR

09:53AM   25   ABOUT A MONTH AS WELL?

DHAWAN CROSS BY MR. WADE (RES.)                                    3782

```
09:53AM   1      A.   I DON'T RECALL THAT THAT WAS HAPPENING.

09:53AM   2      Q.   OKAY.  WELL, LET'S LOOK AT 10567.

09:53AM   3           YOUR HONOR, I BELIEVE THIS IS A PUBLIC RECORD.  I WOULD

09:53AM   4      MOVE THE ADMISSION OF 10567.

09:53AM   5                MR. SCHENK:  NO OBJECTION.

09:53AM   6                THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:53AM   7           (DEFENDANT'S EXHIBIT 10567 WAS RECEIVED IN EVIDENCE.)

09:54AM   8      BY MR. WADE:

09:54AM   9      Q.   AND DO YOU SEE, DOCTOR, THIS IS A LETTER FROM

09:54AM  10      DR. ROSENDORFF IN WHICH HE WAS REMOVING HIMSELF FROM THE CLIA

09:54AM  11      LICENSE DECEMBER 17TH, 2014?

09:54AM  12      A.   YES.

09:54AM  13      Q.   OKAY.  AND SO AT THAT POINT, HE WAS NO LONGER GOING TO BE

09:54AM  14      SERVING AS THE CO-LABORATORY DIRECTOR WITH YOU?

09:54AM  15      A.   ACCORDING TO THIS PAPERWORK, YES.

09:54AM  16      Q.   OKAY.  ARE YOU AWARE ON ABOUT THAT SAME DATE THAT

09:54AM  17      MS. SAWYER WAS ADDED TO THE LICENSE?

09:54AM  18      A.   I DON'T SEE THAT HERE.

09:54AM  19      Q.   OKAY.  I'LL TURN YOUR ATTENTION TO 10562.

09:55AM  20           DO YOU HAVE THAT IN FRONT OF YOU, DOCTOR?

09:55AM  21      A.   YES.

09:55AM  22                MR. WADE:  AND THIS IS A PUBLIC RECORD, SO I WOULD

09:55AM  23      MOVE THE ADMISSION OF 10562.

09:55AM  24                MR. SCHENK:  NO OBJECTION.

09:55AM  25                THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.
```

DHAWAN CROSS BY MR. WADE (RES.)                                    3783

09:55AM   1              (DEFENDANT'S EXHIBIT 10562 WAS RECEIVED IN EVIDENCE.)

09:55AM   2       BY MR. WADE:

09:55AM   3       Q.   AND DO YOU SEE THIS IS A LETTER I THINK THE SAME DAY OR

09:55AM   4       MAYBE THE NEXT DAY AFTER DR. ROSENDORFF WENT OFF THE LICENSE?

09:55AM   5       A.   YES.

09:55AM   6       Q.   AND DO YOU SEE, IF YOU TURN TO THE SECOND PAGE, THAT THIS

09:56AM   7       IS PAPERWORK THAT SHOWS THAT DR. SAWYER WAS GOING ON TO THE

09:56AM   8       LICENSE?

09:56AM   9       A.   YES.

09:56AM   10      Q.   AND IT WAS ACTUALLY EFFECTIVE AS OF NOVEMBER 19TH, 2014.

09:56AM   11           DO YOU SEE THAT?

09:56AM   12      A.   YES.

09:56AM   13      Q.   OKAY.  SO ACCORDING TO THIS PAPERWORK, SHE SERVED AS THE

09:56AM   14      CO-LABORATORY DIRECTOR AT THERANOS; CORRECT?

09:56AM   15      A.   YES.

09:56AM   16      Q.   OKAY.  AND YOU RECALL THAT WE SAW THAT ONE OF THOSE

09:56AM   17      POLICIES -- AND AGAIN, SHE WAS SERVING, ACCORDING TO THE RECORD

09:56AM   18      WE LOOKED AT BEFORE, IN A SIMILAR PART-TIME CAPACITY AS YOU

09:56AM   19      WERE ON AN AS-NEEDED BASIS; CORRECT?

09:56AM   20      A.   YES.

09:56AM   21      Q.   AND DO YOU RECALL YESTERDAY WE SAW ONE OF THE POLICIES

09:56AM   22      FROM THAT PERIOD BETWEEN NOVEMBER AND AUGUST WHERE DR. SAWYER

09:56AM   23      SIGNED ONE OF THE SOP'S?

09:56AM   24      A.   YES.

09:56AM   25      Q.   LET'S GO TO ANOTHER ONE, 10525.

DHAWAN CROSS BY MR. WADE (RES.)                          3784

```
09:57AM   1            DO YOU HAVE THAT IN FRONT OF YOU?

09:57AM   2       A.   YES.

09:57AM   3       Q.   AND DO YOU RECOGNIZE THIS AS A VERIFICATION DOCUMENT WHEN

09:57AM   4       THEY WERE BRINGING AN ASSAY ON TO A SIEMENS ADVIA 2400?

09:57AM   5       A.   THAT'S WHAT IT APPEARS TO BE, YES.

09:57AM   6       Q.   AND YOU SEE DR. SAWYER'S SIGNATURE DOWN THERE ON THE

09:57AM   7       BOTTOM (INDICATING)?

09:57AM   8       A.   YES.

09:57AM   9            MR. WADE:  I MOVE THE ADMISSION OF 10525.

09:57AM  10            MR. SCHENK:  FOUNDATION.

09:57AM  11            THE COURT:  DO YOU WANT TO LAY A LITTLE MORE

09:57AM  12       FOUNDATION, COUNSEL?

09:57AM  13       BY MR. WADE:

09:57AM  14       Q.   YOU UNDERSTAND THAT WHEN TESTS ARE BROUGHT ONTO LINE, OR

09:58AM  15       BROUGHT ONLINE WITHIN A LAB, THAT THERE ARE REGULATIONS WHERE

09:58AM  16       THE LAB DIRECTOR VERIFIES THAT IT'S APPROPRIATE TO BRING THE

09:58AM  17       TEST ONLINE?

09:58AM  18       A.   YES.

09:58AM  19       Q.   AND THAT EITHER LAB DIRECTOR CAN ATTEST TO THAT

09:58AM  20       VERIFICATION AND CERTIFY THAT IT'S APPROPRIATE FOR THE TEST TO

09:58AM  21       BE OFFERED WITHIN THE LAB?

09:58AM  22       A.   YES.

09:58AM  23       Q.   AND THAT -- AND YOUR CO-LABORATORY DIRECTOR, DR. SAWYER,

09:58AM  24       WOULD HAVE HAD THE ABILITY UNDER THE LAW TO, TO SERVE THAT

09:58AM  25       FUNCTION; CORRECT?
```

DHAWAN CROSS BY MR. WADE (RES.)                              3785

| | | |
|---|---|---|
| 09:58AM | 1 | A.   IF THAT'S WHAT THE LAW STATES, YES. |
| 09:58AM | 2 | Q.   AND WHEN THAT'S DONE, THESE RECORDS WOULD BE MAINTAINED |
| 09:58AM | 3 | WITHIN THE CLIA LAB SO IF THERE ARE EVER ANY QUESTIONS ABOUT |
| 09:58AM | 4 | WHETHER -- WHEN A TEST WAS VERIFIED, THERE WOULD BE |
| 09:59AM | 5 | DOCUMENTATION OF THAT; CORRECT? |
| 09:59AM | 6 | A.   YES. |
| 09:59AM | 7 | Q.   OKAY. |
| 09:59AM | 8 |     I WOULD MOVE THE ADMISSION OF 10525. |
| 09:59AM | 9 |         MR. SCHENK:  NO OBJECTION. |
| 09:59AM | 10 |         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 09:59AM | 11 |     (DEFENDANT'S EXHIBIT 10525 WAS RECEIVED IN EVIDENCE.) |
| 09:59AM | 12 | BY MR. WADE: |
| 09:59AM | 13 | Q.   AND YOU HAD MENTIONED THAT YOU SAW A SIEMENS ADVIA WHEN |
| 09:59AM | 14 | YOU TOURED THE COMPANY. |
| 09:59AM | 15 |     DO YOU RECALL THAT? |
| 09:59AM | 16 | A.   YES. |
| 09:59AM | 17 | Q.   AND THAT'S ONE OF THE DEVICES THAT MR. BALWANI AND OTHERS |
| 09:59AM | 18 | IN THE LAB SHOWED YOU? |
| 09:59AM | 19 | A.   YES. |
| 09:59AM | 20 | Q.   OKAY.  AND YOU UNDERSTOOD THAT THE COMPANY WAS USING |
| 09:59AM | 21 | SIEMENS ADVIA EQUIPMENT? |
| 09:59AM | 22 | A.   YES, I SEE THAT THERE. |
| 09:59AM | 23 | Q.   OKAY.  I JUST WANT TO FOCUS YOUR ATTENTION ON THE BOTTOM. |
| 09:59AM | 24 |     AND DR. SAWYER -- BY THIS SIGNATURE, DR. SAWYER IS |
| 09:59AM | 25 | VERIFYING THE APPROPRIATENESS OF USING THIS ASSAY IN THE |

DHAWAN CROSS BY MR. WADE (RES.)                                    3786

09:59AM   1      THERANOS CLINICAL LAB AS OF JANUARY 11TH, 2015; CORRECT?

10:00AM   2      A.   YES.

10:00AM   3      Q.   OKAY.  AND IF I CAN DRAW YOUR ATTENTION TO EXHIBIT 10526.

10:00AM   4           DO YOU HAVE THAT IN FRONT OF YOU?

10:00AM   5      A.   YES.

10:00AM   6      Q.   AND YOU UNDERSTAND THAT, FROM YOUR EXPERIENCE WITH YOUR

10:00AM   7      OWN LAB AND OTHERWISE, THAT WHEN TESTS ARE OFFERED IN A LAB,

10:00AM   8      STANDARD OPERATING PROCEDURES ARE CREATED?

10:00AM   9      A.   YES.

10:00AM   10     Q.   AND THOSE PROCEDURES SET FORTH A MANNER BY WHICH A TEST

10:00AM   11     SHOULD BE PERFORMED WITHIN THE LAB?

10:00AM   12     A.   YES.

10:00AM   13     Q.   AND THAT IT'S IMPORTANT TO DOCUMENT THAT STANDARD

10:00AM   14     PROCEDURE AND SIGN OFF ON IT SO THERE'S A RECORD IF ANYONE EVER

10:00AM   15     ASKS QUESTIONS ABOUT IT?

10:00AM   16     A.   YES.

10:00AM   17     Q.   OKAY.  AND DO YOU RECOGNIZE 10526 TO BE SUCH A RECORD?

10:01AM   18     A.   IT STATES THAT IT'S -- YEAH, STANDARD OPERATING PROCEDURE,

10:01AM   19     YES.

10:01AM   20              MR. WADE:  OKAY.  I MOVE THE ADMISSION OF 10526.

10:01AM   21              MR. SCHENK:  NO OBJECTION.

10:01AM   22              THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

10:01AM   23          (DEFENDANT'S EXHIBIT 10526 WAS RECEIVED IN EVIDENCE.)

10:01AM   24     BY MR. WADE:

10:01AM   25     Q.   AND THIS IS ONE OF THOSE STANDARD OPERATING PROCEDURES;

DHAWAN CROSS BY MR. WADE (RES.)                                      3787

10:01AM   1      CORRECT?

10:01AM   2      A.   YES.

10:01AM   3      Q.   OKAY.  AND YOU SEE THERE THAT DR. SAWYER SIGNED OFF ON

10:01AM   4      THIS DOCUMENT LATE MARCH 2015?

10:01AM   5           DO YOU SEE THAT?

10:01AM   6      A.   YES.

10:01AM   7      Q.   AND YOU ALSO SEE THAT THERE ARE A NUMBER OF OTHER PEOPLE

10:01AM   8      WHO HAD WORKED ON THIS PROCEDURE WHO ALSO SIGNED OFF; CORRECT?

10:01AM   9      A.   YES.

10:01AM   10     Q.   AND THOSE ARE PEOPLE WHO HAVE DIFFERENT CLIA LICENSES OR

10:01AM   11     CERTIFICATIONS AS NOTED IN THEIR TITLES?

10:01AM   12     A.   YES.

10:01AM   13     Q.   AND JUST SO WE'RE CLEAR, THERE'S NOT A REQUIREMENT THAT

10:02AM   14     BOTH LAB DIRECTORS SIGN OFF ON DOCUMENTS; CORRECT?  IT ONLY

10:02AM   15     REQUIRES ONE LAB DIRECTOR TO SIGN OFF ON DOCUMENTS; CORRECT?

10:02AM   16     A.   AS FAR AS I'M AWARE OF, YES.

10:02AM   17     Q.   YEAH.  AND I TAKE IT, SIR, THERE WAS NOTHING THAT MADE YOU

10:02AM   18     UNCOMFORTABLE ABOUT THE FACT THAT THERANOS HAPPENED TO ASK

10:02AM   19     DR. SAWYER TO SIGN OFF ON THESE DURING THIS PERIOD RATHER THAN

10:02AM   20     YOU?  THAT DIDN'T UPSET YOU, DID IT?

10:02AM   21     A.   I WAS NEVER AWARE THAT SHE WAS SIGNING OFF ON ALL OF

10:02AM   22     THESE.

10:02AM   23     Q.   RIGHT.  BUT -- AND AS BEST YOU CAN TELL, SHE FILED THE

10:02AM   24     APPROPRIATE PAPERWORK WITH CLIA; CORRECT?

10:02AM   25           MR. SCHENK:  OBJECTION.  CALLS FOR SPECULATION.

DHAWAN CROSS BY MR. WADE (RES.)                                    3788

10:03AM   1            THE WITNESS:  I DON'T -- I --

10:03AM   2            THE COURT:  EXCUSE ME FOR JUST A SECOND.

10:03AM   3       IF YOU WANT TO LAY A FOUNDATION.

10:03AM   4            MR. WADE:  SURE.

10:03AM   5   Q.   YOU SAW THE PAPERWORK WHERE DR. SAWYER SIGNED THE

10:03AM   6   PAPERWORK TO BECOME A LAB DIRECTOR AT THERANOS; CORRECT?

10:03AM   7   A.   WHAT I JUST SAW, YES.

10:03AM   8   Q.   AND THE FACT THAT SHE WAS ACTING AS THE LABORATORY

10:03AM   9   DIRECTOR ON THERANOS SIGNED DOCUMENTS, THAT DOESN'T GIVE YOU

10:03AM  10   ANY CONCERN, DOES IT?

10:03AM  11   A.   I CAN'T GIVE YOU AN OPINION.  I MEAN, IF SHE'S CERTIFIED,

10:03AM  12   IF SHE'S A PH.D., THEN SHE'S ALLOWED TO BE A LAB DIRECTOR.

10:03AM  13        BUT I CAN'T VERIFY THAT SHE IS OR ISN'T.

10:03AM  14   Q.   RIGHT.  I UNDERSTAND.

10:03AM  15        BUT PUT DIFFERENTLY --

10:03AM  16   A.   UH-HUH.

10:03AM  17   Q.   -- IN THIS PERIOD WHERE THE GOVERNMENT WAS FOCUSSED ON

10:03AM  18   WHERE YOU WERE NOT ACTING AS THE LABORATORY DIRECTOR, IT

10:03AM  19   APPEARS THAT THERE WAS SOMEONE ELSE ACTING AS THE LABORATORY

10:03AM  20   DIRECTOR AT THERANOS; CORRECT?

10:03AM  21   A.   BASED ON THE SIGNATURES.  THAT'S ALL I CAN TELL YOU.

10:03AM  22   Q.   SURE.  I UNDERSTAND.

10:04AM  23        AND LET'S GO TO 10529.

10:04AM  24        DO YOU HAVE THAT DOCUMENT IN FRONT OF YOU, DOCTOR?

10:04AM  25   A.   YES.

DHAWAN CROSS BY MR. WADE (RES.)                                    3789

10:04AM   1    Q.   AND DO YOU RECOGNIZE THIS TO BE AN EMAIL FROM LANGLY GEE

10:04AM   2    TO YOU?

10:04AM   3    A.   YES.

10:04AM   4    Q.   AND THIS RELATES TO SOME REGULATORY PAPERWORK RELATING TO

10:04AM   5    THERANOS LAB?

10:04AM   6    A.   YES.

10:04AM   7    Q.   OKAY.

10:04AM   8         I WOULD MOVE THE ADMISSION OF 10529.

10:05AM   9              MR. SCHENK:  YOUR HONOR, I THINK THIS IS IN

10:05AM  10    EVIDENCE.

10:05AM  11              THE COURT:  LET'S SEE.  MS. KRATZMANN?

10:05AM  12              MR. SCHENK:  I THINK IT'S 2972.

10:05AM  13              THE CLERK:  WHAT WAS THAT NUMBER, COUNSEL?

10:05AM  14              MR. SCHENK:  I'M SORRY, THAT'S NOT THE RIGHT NUMBER.

10:05AM  15         YOUR HONOR, NO OBJECTION.  I'M NOT SURE THIS IS IN OR NOT.

10:05AM  16              MR. WADE:  I THINK IT'S A DIFFERENT DOCUMENT, JEFF.

10:05AM  17              THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

10:05AM  18         (DEFENDANT'S EXHIBIT 10529 WAS RECEIVED IN EVIDENCE.)

10:05AM  19    BY MR. WADE:

10:05AM  20    Q.   NOW, THIS IS AN EMAIL FROM LANGLY GEE.

10:05AM  21         DO YOU SEE THAT?

10:05AM  22    A.   YES.

10:05AM  23    Q.   AND YOU UNDERSTOOD THAT LANGLY GEE WAS THE FULL-TIME

10:05AM  24    QUALITY CONTROL AND QUALITY ASSURANCE MANAGER AT THERANOS?

10:05AM  25    A.   YES.

DHAWAN CROSS BY MR. WADE (RES.)                                      3790

10:05AM   1      Q.   AND DO YOU RECALL, I BELIEVE MR. SCHENK SHOWED YOU A

10:05AM   2      DOCUMENT YESTERDAY, IN THE SAME TIME PERIOD WHERE MR. GEE TOLD

10:05AM   3      YOU THAT HE WAS GOING TO SEND YOU A FEW HUNDRED SOP'S TO

10:05AM   4      REVIEW.

10:05AM   5           DO YOU RECALL THAT?

10:05AM   6      A.   YES.

10:05AM   7      Q.   AND THERE'S ANOTHER EMAIL THAT I DON'T THINK MR. SCHENK

10:06AM   8      SHOWED YOU -- MAYBE IT WILL REFRESH YOUR RECOLLECTION -- THAT

10:06AM   9      YOU RESPONDED AND ASKED THAT HE SEND ABOUT 50 A WEEK SO YOU CAN

10:06AM   10     SPACE YOUR REVIEW OUT OVER TIME.

10:06AM   11          DO YOU RECALL THAT?

10:06AM   12     A.   YES.

10:06AM   13     Q.   AND THIS, I BELIEVE, WAS ONE OF THE FIRST PERIODS WHERE

10:06AM   14     YOU WERE BEING ASKED TO REVIEW POLICIES; CORRECT?

10:06AM   15     A.   YES.

10:06AM   16     Q.   OKAY.  AND I BELIEVE IT'S THE -- WITHIN A DAY OR TWO

10:06AM   17     MR. GEE SENDS YOU THIS DOCUMENT.

10:06AM   18          AND DO YOU SEE THAT THIS DOCUMENT NOTES THAT MS. SAWYER

10:06AM   19     WAS COMING OFF OF THE CLIA LICENSE IN THIS PERIOD AND THERE WAS

10:06AM   20     SOME PAPERWORK NEEDED IN CONNECTION WITH THAT?

10:06AM   21     A.   YES.

10:06AM   22     Q.   AND DOES THIS REFRESH YOUR RECOLLECTION THAT PART OF THE

10:07AM   23     REASON WHY YOU WEREN'T CALLED UPON TO REVIEW POLICIES AND

10:07AM   24     PROCEDURES UNTIL AUGUST WAS BECAUSE MS. SAWYER HAD SERVED THAT

10:07AM   25     FUNCTION PRIOR TO THEN?

DHAWAN CROSS BY MR. WADE (RES.)                                    3791

10:07AM   1     A.   I WAS NEVER MADE AWARE THAT SHE WAS DOING THAT PREVIOUSLY.

10:07AM   2     Q.   ALL RIGHT.  WITHIN THIS DOCUMENT, YOU UNDERSTOOD THAT SHE

10:07AM   3     HAD PREVIOUSLY BEEN ON -- AS THE LAB DIRECTOR AND SHE WAS BEING

10:07AM   4     REMOVED AT THIS POINT; RIGHT?

10:07AM   5     A.   THAT'S -- YEAH, THAT'S WHAT IT SAYS.

10:07AM   6     Q.   AND THAT HAPPENS TO COINCIDE WITH THE TIME WHERE YOU'RE

10:07AM   7     NOW ASKED TO REVIEW POLICIES; CORRECT?

10:07AM   8     A.   YES.

10:07AM   9     Q.   OKAY.  AND IF YOU JUST -- IF WE LOOK AT THE NEXT PAGE, WE

10:07AM  10     SEE -- I THINK WE HAD -- THERE WAS A VERSION OF THIS BEFORE WE

10:07AM  11     LOOKED AT WHERE SHE WAS IDENTIFIED; CORRECT?

10:07AM  12     A.   YES.

10:07AM  13     Q.   BUT NOW THIS VERSION OF THE ROSTER, THE LABORATORY

10:08AM  14     PERSONNEL REPORT, NOW REMOVES HER FROM THAT; CORRECT?

10:08AM  15     A.   YES.

10:08AM  16     Q.   AND SO -- AND IN THIS TIME THEN, YOU'RE ASKED TO TAKE ON A

10:08AM  17     LITTLE MORE RESPONSIBILITY; CORRECT?

10:08AM  18     A.   YES.

10:08AM  19     Q.   OKAY.  AND THAT'S NOTED IN MR. GEE'S EMAIL IN THE FIRST

10:08AM  20     PAGE WHERE HE SAYS HE'S GOING TO START SENDING YOU 50 SOP'S PER

10:08AM  21     WEEK.

10:08AM  22          DO YOU SEE THAT?

10:08AM  23     A.   YES.

10:08AM  24     Q.   AND DO YOU UNDERSTAND THAT PART OF THE REASON WHY THESE

10:08AM  25     SOP'S WERE BEING SENT TO YOU WAS BECAUSE THE COMPANY WAS

DHAWAN CROSS BY MR. WADE (RES.)                                    3792

10:08AM  1    GETTING ALL OF THEIR PAPERWORK IN ORDER BECAUSE THEY KNEW THAT

10:08AM  2    THE CLIA AUDIT WAS COMING UP AND THEY WANTED ALL OF THE I'S

10:08AM  3    DOTTED AND THE T'S CROSSED?

10:08AM  4    A.   YES.

10:08AM  5    Q.   OKAY.  AND YOU DIDN'T WANT ALL OF THOSE POLICIES AT ONE

10:08AM  6    TIME; CORRECT?

10:08AM  7    A.   NO.

10:08AM  8    Q.   YOU WANTED TO HAVE A LITTLE MORE TIME TO SPACE OUT YOUR

10:09AM  9    REVIEW OF THOSE DOCUMENTS; ISN'T THAT RIGHT?

10:09AM  10   A.   YES.

10:09AM  11   Q.   AND MR. GEE SAYS THAT HE'LL SEND YOU 50 A WEEK; IS THAT

10:09AM  12   RIGHT?

10:09AM  13   A.   YES.

10:09AM  14   Q.   AND IF WE GO TO THE SECOND PAGE OF THIS EXHIBIT, THIS

10:09AM  15   DOCUMENT IDENTIFIES CLIA PERSONNEL WHO WORK WITHIN THE LAB;

10:09AM  16   CORRECT?

10:09AM  17   A.   YES.

10:09AM  18   Q.   AND JUST SO WE'RE CLEAR, AT THE POINT THAT YOU WERE

10:09AM  19   SERVING IN THIS AS-NEEDED ROLE FOR THE LAB, THE LAB WAS PRETTY

10:09AM  20   WELL ESTABLISHED AT THIS POINT; CORRECT?

10:09AM  21   A.   THAT WOULD BE MY ASSUMPTION, YES.

10:09AM  22   Q.   YEAH.  I MEAN, YOU UNDERSTOOD THAT THEY HAD HAD A

10:09AM  23   LONG-TIME LAB DIRECTOR IN DR. ROSENDORFF PREVIOUSLY?

10:09AM  24   A.   YES.

10:09AM  25   Q.   AND MR. SCHENK SHOWED YOU A LOT OF THE DOCUMENTS WHERE YOU

DHAWAN CROSS BY MR. WADE (RES.)                                    3793

| | | |
|---|---|---|
| 10:09AM | 1 | REVIEWED HIS WORK ESSENTIALLY. |
| 10:09AM | 2 | DO YOU RECALL THAT? |
| 10:09AM | 3 | A.   YES. |
| 10:09AM | 4 | Q.   AND WE'LL LOOK AT SOME OF THOSE DOCUMENTS, BUT AS A |
| 10:10AM | 5 | GENERAL MATTER, DID THE ROSTER OF PEOPLE AND THE FACT THAT |
| 10:10AM | 6 | THERE WAS THIS LAB DIRECTOR PREVIOUSLY GIVE YOU COMFORT AS TO |
| 10:10AM | 7 | THE MATERIALS THAT YOU WERE SIGNING OFF ON? |
| 10:10AM | 8 | A.   YES.  YOU'RE DEPENDENT ON THE PEOPLE WHO ARE WORKING ON |
| 10:10AM | 9 | THESE DOCUMENTS. |
| 10:10AM | 10 | Q.   AND, IN FACT, SIR, YOU'RE SPECIFICALLY AUTHORIZED TO |
| 10:10AM | 11 | DEPEND ON THOSE PEOPLE WHEN YOU SERVE AS A LABORATORY DIRECTOR; |
| 10:10AM | 12 | CORRECT? |
| 10:10AM | 13 | A.   IF THAT'S IN THE STATUTE, YES. |
| 10:10AM | 14 | Q.   YEAH, LET'S TAKE A LOOK AT THAT. |
| 10:10AM | 15 | IF WE CAN GO TO 7603, AND THIS IS A BIG DOCUMENT, SO WE'LL |
| 10:10AM | 16 | PUT UP ON THE SCREEN THE RELEVANT PORTION.  IT'S IN EVIDENCE. |
| 10:10AM | 17 | YOU'RE WELCOME TO LOOK AT ANY PORTION, BUT I WANT TO DRAW |
| 10:10AM | 18 | YOUR ATTENTION TO 1445. |
| 10:10AM | 19 | DO YOU SEE THAT?  IT'S ON THE SCREEN.  IT'S ACTUALLY ON |
| 10:11AM | 20 | THE SCREEN. |
| 10:11AM | 21 | IF WE CAN JUST HIGHLIGHT (C) AND (D) JUST SO IT'S A LITTLE |
| 10:11AM | 22 | BIT BIGGER. |
| 10:11AM | 23 | DO YOU SEE THAT, DOCTOR? |
| 10:11AM | 24 | A.   YES. |
| 10:11AM | 25 | Q.   OKAY.  AND THIS NOTES THAT YOU HAVE TO BE ACCESSIBLE TO |

DHAWAN CROSS BY MR. WADE (RES.)                                    3794

10:11AM   1    THE LABORATORY TO PROVIDE ON SITE TELEPHONE OR ELECTRONIC

10:11AM   2    CONSULTATION AS NEEDED; RIGHT?

10:11AM   3    A.   YES.

10:11AM   4    Q.   AND YOU WERE SO AVAILABLE; CORRECT?

10:11AM   5    A.   YES.

10:11AM   6    Q.   AND THEN IT SAYS, "EACH INDIVIDUAL MAY DIRECT NO MORE THAN

10:11AM   7    FIVE LABORATORIES."

10:11AM   8         DO YOU SEE THAT?

10:11AM   9    A.   YES.

10:11AM   10   Q.   AND THAT MEANS THAT YOU COULD -- IT'S OKAY TO SERVE, UNDER

10:11AM   11   THE REGULATIONS, AS A PART-TIME LAB DIRECTOR?

10:11AM   12   A.   BASED ON WHAT (D) SAYS, YES.

10:11AM   13   Q.   AND YOU WERE A LAB DIRECTOR OF YOUR OWN LAB, BUT YOU WERE

10:12AM   14   JUST A LAB DIRECTOR OF TWO LABS; CORRECT?

10:12AM   15   A.   YES.

10:12AM   16   Q.   OKAY.  AND WHEN YOU'RE NOT A FULL-TIME LAB DIRECTOR, YOU

10:12AM   17   HAVE TO RELY UPON SOME PEOPLE TO PERFORM SOME OF THE DAY-TO-DAY

10:12AM   18   FUNCTIONS; CORRECT?

10:12AM   19   A.   YES.

10:12AM   20   Q.   BECAUSE NO ONE WAS PRETENDING THAT YOU WERE THERE EACH AND

10:12AM   21   EVERY DAY; RIGHT?  YOU WERE THERE AS NEEDED; CORRECT?

10:12AM   22   A.   THAT'S WHAT I WAS ASKED TO DO, YES.

10:12AM   23   Q.   RIGHT, RIGHT.  AND THAT'S WHAT THIS REGULATION ALLOWS;

10:12AM   24   CORRECT?

10:12AM   25   A.   YES.

DHAWAN CROSS BY MR. WADE (RES.)                                    3795

10:12AM  1    Q.   AND DO YOU RECALL THAT AS A RESULT OF THAT, THAT YOU

10:12AM  2    PREPARED SOME FORMAL WRITTEN DELEGATIONS WHERE YOU FORMALLY

10:12AM  3    DELEGATED TASKS -- OR YOU SIGNED OFF ON FORMAL DELEGATIONS

10:12AM  4    WHERE YOU FORMALLY DELEGATED TASKS TO SOME OF THESE OTHER

10:13AM  5    FULL-TIME EMPLOYEES WITHIN THE CLIA LAB?

10:13AM  6    A.   I'D HAVE TO REVIEW THOSE, BUT --

10:13AM  7    Q.   WHY DON'T WE PULL ONE UP.  LET'S LOOK AT 10577.

10:13AM  8         DO YOU HAVE THAT IN FRONT OF YOU, DOCTOR?

10:13AM  9    A.   YES.

10:13AM 10    Q.   AND DO YOU SEE THAT 10577 IS A FORMAL WRITTEN DELEGATION

10:13AM 11    WHERE YOU'RE DELEGATING DAY-TO-DAY RESPONSIBILITIES TO

10:13AM 12    FULL-TIME EMPLOYEES WITHIN THE LABORATORY?

10:13AM 13    A.   YES.

10:13AM 14              MR. WADE:  OKAY.  I MOVE THE ADMISSION OF 10577.

10:13AM 15              MR. SCHENK:  NO OBJECTION.

10:13AM 16              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:13AM 17         (DEFENDANT'S EXHIBIT 10577 WAS RECEIVED IN EVIDENCE.)

10:13AM 18    BY MR. WADE:

10:13AM 19    Q.   OKAY.  AND THIS DOCUMENT ASSIGNS CERTAIN DAY-TO-DAY

10:14AM 20    RESPONSIBILITIES.

10:14AM 21         IF WE CAN -- WELL, FIRST OF ALL, IT SETS FORTH THE MINIMUM

10:14AM 22    QUALIFICATIONS NEEDED FOR SOMEONE TO SERVE AS THE TECHNICAL

10:14AM 23    SUPERVISOR; CORRECT?

10:14AM 24    A.   YES.

10:14AM 25    Q.   AND THAT WAS IMPORTANT BECAUSE YOU NEEDED TO MAKE SURE

DHAWAN CROSS BY MR. WADE (RES.)                                    3796

10:14AM  1    THAT THEY MET THE REGULATORY STANDARDS; ISN'T THAT RIGHT?

10:14AM  2    A.   YES.

10:14AM  3    Q.   OKAY.  AND IF WE GO TO THE DUTIES AND RESPONSIBILITIES,

10:14AM  4    HERE THERE'S A FORMAL WRITTEN DELEGATION OF THOSE

10:14AM  5    RESPONSIBILITIES TO MS. ALAMDAR.

10:14AM  6         DO YOU REMEMBER MS. ALAMDAR?

10:14AM  7    A.   YES, I MET HER.

10:14AM  8    Q.   YEAH.  AND SHE WAS AN EXPERIENCED LAB PERSON.

10:14AM  9         DO YOU RECALL THAT?

10:14AM 10    A.   I DON'T HAVE HER CV IN FRONT OF ME, BUT I RECALL THAT SHE

10:14AM 11    WASN'T -- THAT THIS WAS HER POSITION, YES.

10:14AM 12    Q.   AND SHE WAS VERY INVOLVED IN THE ACTIVE DAY-TO-DAY

10:14AM 13    MANAGEMENT OF THE LABORATORY; CORRECT?

10:15AM 14    A.   THAT'S MY ASSUMPTION, YES.

10:15AM 15    Q.   AND BY THIS DOCUMENT, SHE'S DELEGATED A LOT OF THOSE

10:15AM 16    DAY-TO-DAY RESPONSIBILITIES; CORRECT?

10:15AM 17    A.   YES.

10:15AM 18    Q.   AND DO YOU SEE, FOR EXAMPLE, NUMBER 1 DELEGATES TO HER

10:15AM 19    THAT SHE'S RESPONSIBLE FOR PROVIDING DAY-TO-DAY SUPERVISION OF

10:15AM 20    THE HIGH COMPLEXITY TEST PERFORMANCE BY TESTING PERSONNEL.

10:15AM 21         DO YOU SEE THAT?

10:15AM 22    A.   YES.

10:15AM 23    Q.   AND THEN THERE ARE A NUMBER OF OTHER OBLIGATIONS THAT ARE

10:15AM 24    DELEGATED TO HER; CORRECT?

10:15AM 25    A.   YES.

DHAWAN CROSS BY MR. WADE (RES.)                                    3797

| | | |
|---|---|---|
| 10:15AM | 1 | Q.   AND AS A PART-TIME LAB DIRECTOR, IT'S NECESSARY FOR YOU TO |
| 10:15AM | 2 | DO THIS BECAUSE YOU CAN'T BE THERE EVERY DAY AND PERFORM THESE |
| 10:15AM | 3 | FUNCTIONS; CORRECT? |
| 10:15AM | 4 | A.   YES. |
| 10:15AM | 5 | Q.   OKAY.  AND LET'S GO TO 10578. |
| 10:16AM | 6 | DO YOU HAVE THAT DOCUMENT IN FRONT OF YOU, DOCTOR? |
| 10:16AM | 7 | A.   YES. |
| 10:16AM | 8 | Q.   AND THIS IS ANOTHER DELEGATION, FORMAL WRITTEN DELEGATION |
| 10:16AM | 9 | OF RESPONSIBILITIES TO ANOTHER FORMAL -- ANOTHER FULL-TIME LAB |
| 10:16AM | 10 | EMPLOYEE AT THERANOS; CORRECT? |
| 10:16AM | 11 | A.   YES. |
| 10:16AM | 12 | MR. WADE:  MOVE THE ADMISSION OF 10578. |
| 10:16AM | 13 | MR. SCHENK:  NO OBJECTION. |
| 10:16AM | 14 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 10:16AM | 15 | (DEFENDANT'S EXHIBIT 10578 WAS RECEIVED IN EVIDENCE.) |
| 10:16AM | 16 | BY MR. WADE: |
| 10:16AM | 17 | Q.   AND THE GENERAL SUPERVISOR IS ACTUALLY A PRETTY SENIOR |
| 10:16AM | 18 | POSITION WITHIN THE LAB; CORRECT? |
| 10:16AM | 19 | A.   YES. |
| 10:16AM | 20 | Q.   AND THIS WAS DELEGATED -- IT'S A LITTLE HARD TO READ THE |
| 10:16AM | 21 | PRINT -- TO MR. GODFRED MASINDE? |
| 10:16AM | 22 | A.   I MET HIM, YES. |
| 10:16AM | 23 | Q.   AND HE ASSUMED CERTAIN DAY-TO-DAY RESPONSIBILITIES TO |
| 10:16AM | 24 | ENSURE THAT THE CLIA OBLIGATIONS WERE MET; CORRECT? |
| 10:16AM | 25 | A.   YES. |

DHAWAN CROSS BY MR. WADE (RES.)                                    3798

10:16AM  1     Q.   OKAY.  AND THOSE ARE SET FORTH WITHIN THE NUMBERED ITEMS

10:17AM  2     IN THIS DOCUMENT; IS THAT RIGHT?

10:17AM  3     A.   YES.

10:17AM  4     Q.   AND YOU SIGNED OFF ON THIS DOCUMENT INFORMALLY DELEGATING

10:17AM  5     THOSE RESPONSIBILITIES TO HIM; CORRECT?

10:17AM  6     A.   YES.

10:17AM  7     Q.   AND LET'S GO BACK BRIEFLY TO EXHIBIT 2553, WHICH I THINK

10:17AM  8     IS THE FIRST DOCUMENT.

10:17AM  9          IF WE CAN JUST GO TO PAGE 10 OF THE EXHIBIT, I'M SORRY,

10:17AM  10    PAGE 11 OF THE EXHIBIT.

10:18AM  11         AND THE ROSTER OF PEOPLE, WE'VE TALKED ABOUT THESE A

10:18AM  12    COUPLE OF TIMES.

10:18AM  13         DO YOU RECALL?

10:18AM  14    A.   YES.

10:18AM  15    Q.   AND THE PEOPLE WHO YOU FORMERLY DELEGATED RESPONSIBILITIES

10:18AM  16    TO, AS A PART-TIME LAB DIRECTOR, YOU WERE DEPENDING ON THESE

10:18AM  17    PEOPLE TO PERFORM THEIR FUNCTIONS AS WELL; CORRECT?

10:18AM  18    A.   YES.

10:18AM  19    Q.   AND THIS ROSTER OF PEOPLE, THAT'S A PRETTY LONG ROSTER OF

10:18AM  20    PEOPLE WHO ARE INVOLVED IN RUNNING THE LAB ON A FULL-TIME

10:18AM  21    BASIS; ISN'T IT?

10:18AM  22    A.   THERE'S A LOT OF NAMES ON THIS LIST, YES.

10:18AM  23    Q.   RIGHT.  AND A LOT OF PEOPLE WORKING FULL TIME WITHIN THE

10:18AM  24    LAB; CORRECT?

10:18AM  25    A.   I ASSUME THEY ARE, YES.

DHAWAN CROSS BY MR. WADE (RES.)                                    3799

10:18AM   1      Q.   WELL, YOU SAW SOME OF THEM WHEN YOU WERE THERE FOR YOUR

10:18AM   2      VISIT; RIGHT?

10:18AM   3      A.   YES, YES.

10:18AM   4      Q.   AND IT WAS A BUSY PLACE?

10:18AM   5      A.   YES, THERE WERE LOTS OF PEOPLE.

10:18AM   6      Q.   AND IN ADDITION TO THIS, YOU UNDERSTOOD MR. BALWANI WAS

10:19AM   7      VERY ACTIVE IN THE MANAGEMENT OF THE LAB; CORRECT?

10:19AM   8      A.   THAT WAS MY UNDERSTANDING.

10:19AM   9      Q.   HE WAS THE PERSON WHO HIRED AND FIRED PEOPLE AND HELPED

10:19AM  10      WITH PROCESSES; CORRECT?

10:19AM  11      A.   THAT WAS MY UNDERSTANDING, YES.

10:19AM  12      Q.   AND HE WAS A VERY SENIOR OFFICER WITHIN THE COMPANY.  I

10:19AM  13      THINK WE TALKED ABOUT YESTERDAY; CORRECT?

10:19AM  14      A.   YES, THAT'S MY UNDERSTANDING.

10:19AM  15      Q.   OKAY.  AND DO YOU RECALL YESTERDAY -- I BELIEVE ON THE

10:19AM  16      FLOOR THERE THERE'S A BIG BLACK BINDER.  IT'S SOMEWHAT

10:19AM  17      DAUNTING.

10:19AM  18           BUT MR. SCHENK ASKED YOU A COUPLE OF QUESTIONS ABOUT THE

10:20AM  19      VALIDATION REPORTS WITHIN THAT.

10:20AM  20           DO YOU RECALL THAT?

10:20AM  21      A.   YES.

10:20AM  22      Q.   AND YOU HAD SIGNED, YOU HAD SIGNED OFF ON THOSE VALIDATION

10:20AM  23      REPORTS, CORRECT, WITH THE EXCEPTION OF ONE, I BELIEVE.

10:20AM  24      A.   YES.

10:20AM  25      Q.   OKAY.  AND LET'S, LET'S TAKE A LOOK.  I THINK MR. SCHENK

DHAWAN CROSS BY MR. WADE (RES.)                                    3800

10:20AM  1   SHOWED YOU I BELIEVE IT WAS 9387, WHICH IS TOWARD THE BACK.

10:20AM  2   A.   YES.

10:20AM  3   Q.   AND MR. -- THIS IS A VALIDATION REPORT FOR THE TPSA ELISA

10:21AM  4   ASSAY ON THE EDISON 3.X THERANOS SYSTEM.

10:21AM  5       DO YOU SEE THAT?

10:21AM  6   A.   YES.

10:21AM  7   Q.   AND THIS IS ONE OF THOSE INSTANCES WHERE YOU SEE YOU WERE

10:21AM  8   REVIEWING SOMETHING THAT FOUR PEOPLE HAD PREVIOUSLY SIGNED OFF

10:21AM  9   ON; CORRECT?

10:21AM  10  A.   YES.

10:21AM  11  Q.   AND THREE OF WHOM WERE PH.D.'S?

10:21AM  12  A.   YES.

10:21AM  13  Q.   AND YOU UNDERSTOOD THAT THESE WERE ALL FULL-TIME EMPLOYEES

10:21AM  14  AT THERANOS?

10:21AM  15  A.   THAT'S WHAT WOULD -- THAT'S WHAT I ASSUMED, YES.

10:21AM  16  Q.   AND THEY HAD SPENT A LOT OF TIME WORKING ON THIS; CORRECT?

10:21AM  17  A.   I DON'T KNOW HOW MUCH TIME THEY SPENT ON IT, BUT I WOULD

10:21AM  18  THINK SO, YEAH.

10:21AM  19  Q.   WELL, YOU SEE A LOT OF DATA AND INFORMATION?

10:21AM  20  A.   YEAH, YEAH, SO I WOULD ASSUME, YES.

10:21AM  21  Q.   AND YOU WERE ESSENTIALLY UPDATING THAT YOU HAD REVIEWED

10:21AM  22  THE DOCUMENT AS WELL, BUT YOU WERE RELYING UPON THEIR WORK; IS

10:21AM  23  THAT RIGHT?

10:21AM  24  A.   YES.

10:21AM  25  Q.   OKAY.  AND TO THE BEST OF YOUR KNOWLEDGE, THERE'S ACTUALLY

DHAWAN CROSS BY MR. WADE (RES.)                                      3801

10:21AM  1    NO REQUIREMENT THAT YOU HAVE TO SIGN OFF AGAIN ON VALIDATION

10:22AM  2    REPORTS ONCE THEY'RE PUT WITHIN THE LAB, IS THERE?

10:22AM  3    A.   I'D HAVE TO REVIEW THE STATUTE, BUT I DON'T BELIEVE THERE

10:22AM  4    IS.

10:22AM  5    Q.   YEAH.  AND MAYBE THIS WAS JUST DEEMED A GOOD PRACTICE,

10:22AM  6    SINCE YOU WERE COMING IN, TO HAVE YOU LOOK OVER EVERYTHING?

10:22AM  7    A.   IT'S ALWAYS A GOOD PRACTICE TO SIGN AND REVIEW.

10:22AM  8    Q.   YOU WERE HAPPY TO LOOK AT THESE WHEN THEY SHOWED THEM TO

10:22AM  9    YOU?

10:22AM  10   A.   I WAS GIVEN THAT JOB, AND YES.

10:22AM  11   Q.   AND YOU ACCEPTED IT?

10:22AM  12   A.   I DID IT.

10:22AM  13   Q.   SO IT WAS A GOOD PRACTICE, BUT IT WASN'T A LEGAL

10:22AM  14   REQUIREMENT OR ANYTHING?

10:22AM  15   A.   IF IT'S NOT IN THE STATUTE, YEAH.

10:22AM  16   Q.   AND YOU HAVE NEVER SEEN A STATUTE THAT WOULD REQUIRE IT?

10:22AM  17   A.   NO.

10:22AM  18   Q.   AND WITH RESPECT TO SOME OF THESE, I DON'T KNOW IF YOU

10:22AM  19   RECALL, BUT SOME OF THEM HAD AS MANY AS, YOU KNOW, NINE OR TEN

10:22AM  20   PEOPLE WHO SIGNED OFF ON THOSE.

10:22AM  21        AND IS IT FAIR TO SAY, IF I WENT THROUGH AND ASKED YOU

10:22AM  22   QUESTIONS ABOUT THAT, YOU WERE RELYING UPON THE GOOD WORK OF

10:22AM  23   THOSE PEOPLE WHO HAD DOCUMENTED ALL OF THIS WORK PREVIOUSLY;

10:23AM  24   CORRECT?

10:23AM  25   A.   YES.

DHAWAN CROSS BY MR. WADE (RES.)                                    3802

10:23AM  1    Q.   AND YOU DIDN'T HAVE ANY REASON TO NOT -- TO THINK THAT

10:23AM  2    WORK WAS UNRELIABLE; CORRECT?

10:23AM  3    A.   NOTHING -- NO.  NO.

10:23AM  4    Q.   OKAY.  AND THIS PARTICULAR REPORT, THE 9387, THAT'S FOR

10:23AM  5    THE EDISON -- THAT'S FOR THE EDISON DEVICE.

10:23AM  6         DO YOU SEE THAT?

10:23AM  7    A.   YES.

10:23AM  8    Q.   AND MR. SCHENK ASKED YOU SOME QUESTIONS ABOUT THE EDISON

10:23AM  9    DEVICE.

10:23AM 10         DO YOU RECALL THAT?

10:23AM 11    A.   YES.

10:23AM 12    Q.   AND AGAIN, YOUR INTERACTIONS WITH THE COMPANY REALLY

10:23AM 13    INCREASED IN AUGUST AFTER MS. SAWYER LEFT; CORRECT?

10:23AM 14    A.   YES.

10:23AM 15    Q.   OKAY.  AND I DON'T THINK MR. SCHENK WENT THROUGH THIS, BUT

10:23AM 16    ARE YOU AWARE THAT AS OF AUGUST OF 2015, THERANOS WAS ACTUALLY

10:23AM 17    NOT RUNNING ANY TESTS ON THE THERANOS DEVICE, ON THE EDISON

10:23AM 18    DEVICE?

10:23AM 19    A.   I FOUND THAT OUT LATER, BUT, YES, I DIDN'T -- I WASN'T

10:24AM 20    AWARE THAT THEY WEREN'T RUNNING IT AT THAT TIME.

10:24AM 21    Q.   SO AT THE TIME THAT YOU'RE COMING IN IN AUGUST, THEY'RE

10:24AM 22    NOT RUNNING A SINGLE TEST ON THE EDISON DEVICE; CORRECT?

10:24AM 23    A.   THAT'S, THAT'S WHAT WAS -- THAT'S WHAT I'VE BEEN TOLD,

10:24AM 24    YEAH.

10:24AM 25         BUT I WAS NOT TOLD THAT AT THAT TIME.

UNITED STATES COURT REPORTERS

**ER-7407**

DHAWAN CROSS BY MR. WADE (RES.)                          3803

| | | |
|---|---|---|
| 10:24AM | 1 | Q.   WELL, LET'S LOOK AT EXHIBIT 4533, WHICH I'LL HAND UP. |
| 10:24AM | 2 | MAY I APPROACH, YOUR HONOR? |
| 10:24AM | 3 | THE COURT:  YES. |
| 10:24AM | 4 | MR. WADE:  (HANDING.) |
| 10:24AM | 5 | Q.  LET ME KNOW ONCE YOU'VE HAD A CHANCE TO REVIEW THAT, |
| 10:25AM | 6 | DOCTOR. |
| 10:25AM | 7 | (PAUSE IN PROCEEDINGS.) |
| 10:25AM | 8 | THE WITNESS:  OKAY. |
| 10:25AM | 9 | BY MR. WADE: |
| 10:25AM | 10 | Q.  OKAY.  AND DOES THIS REFRESH YOUR RECOLLECTION THAT |
| 10:25AM | 11 | THERANOS ACTUALLY, AT THE TIME THAT YOU ENGAGED IN AUGUST OF |
| 10:25AM | 12 | 2015, WASN'T RUNNING ANY TESTS ON THE EDISON DEVICE? |
| 10:25AM | 13 | A.  ACCORDING TO THIS, YOU KNOW, ACCORDING TO THESE DOCUMENTS, |
| 10:25AM | 14 | YES. |
| 10:25AM | 15 | MR. WADE:  I MOVE THE ADMISSION OF 4533. |
| 10:25AM | 16 | MR. SCHENK:  NO OBJECTION. |
| 10:25AM | 17 | THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED. |
| 10:25AM | 18 | (GOVERNMENT'S EXHIBIT 4533 WAS RECEIVED IN EVIDENCE.) |
| 10:25AM | 19 | MR. WADE:  AND IF WE CAN BLOW UP THE BOX IN THE |
| 10:25AM | 20 | BOTTOM. |
| 10:25AM | 21 | Q.  ACTUALLY, WE SHOULD LOOK AT THE DATE FIRST. |
| 10:25AM | 22 | DO YOU SEE THAT THIS IS DATED SEPTEMBER 23RD, 2015; |
| 10:25AM | 23 | CORRECT? |
| 10:25AM | 24 | A.  YES. |
| 10:25AM | 25 | Q.  AND THIS IS JUST A SHORT TIME, WITHIN A COUPLE OF DAYS OF |

DHAWAN CROSS BY MR. WADE (RES.)                                      3804

10:25AM   1      THAT CMS INSPECTION.

10:25AM   2          DO YOU RECALL THAT?

10:25AM   3      A.   YES.

10:25AM   4      Q.   OKAY.  AND IF YOU LOOK AT THE BOTTOM, THIS IDENTIFIES WHEN

10:26AM   5      TESTS WERE FIRST RUN ON -- WHEN PARTICULAR ASSAYS WERE FIRST

10:26AM   6      RUN ON THE EDISON DEVICE AND WHEN THEY ENDED; CORRECT?

10:26AM   7      A.   YES.

10:26AM   8      Q.   AND THE LAST DATES IDENTIFIED THERE ARE JUNE 25TH, 2015;

10:26AM   9      CORRECT?

10:26AM  10      A.   YES.

10:26AM  11      Q.   AND THAT WAS BEFORE YOU ENGAGED ACTIVELY WITH THE COMPANY

10:26AM  12      AFTER DR. SAWYER LEFT; CORRECT?

10:26AM  13      A.   YES.

10:26AM  14      Q.   OKAY.  SO THERE WOULDN'T NECESSARILY EVEN HAVE BEEN A

10:26AM  15      REASON FOR MR. BALWANI OR OTHERS TO SHOW YOU THE EDISON DEVICE

10:26AM  16      ON THE TOUR; ISN'T THAT RIGHT?

10:26AM  17      A.   I CAN'T COMMENT.  I MEAN, YOU'LL HAVE TO MAKE THAT

10:26AM  18      ASSUMPTION.  YOU KNOW, I'M NOT SURE I CAN MAKE THAT COMMENT.

10:26AM  19      Q.   WELL, YOU DIDN'T ASK -- LET ME ASK THIS:  YOU DIDN'T ASK

10:26AM  20      THEM TO SHOW YOU THE OTHER DEVICES THAT THEY WEREN'T RUNNING

10:26AM  21      TESTS ON, DID YOU?

10:27AM  22      A.   IF THEY'RE NOT RUNNING TESTS ON THEM, YEAH.

10:27AM  23      Q.   RIGHT.  SO TO THE EXTENT THAT YOU'RE BEING ASKED TO SIGN

10:27AM  24      PAPERWORK THAT RELATES TO THE 3.5 DEVICE, THAT'S MAYBE -- WAS

10:27AM  25      THAT JUST LIKE A MINISTERIAL FUNCTION TO MAKE SURE THAT

DHAWAN CROSS BY MR. WADE (RES.)                                          3805

10:27AM   1    EVERYTHING HAD BEEN DOCUMENTED AND THEY HAD IT FOR THE FILES?

10:27AM   2    A.   THAT'S NORMALLY WHAT -- WHEN YOU'RE COSIGNING DOCUMENTS,

10:27AM   3    THAT'S USUALLY TO MAKE SURE THAT, YEAH, THAT'S WHY IT'S DONE.

10:27AM   4    Q.   AND THEN THEY LOG THEM IN THE FILES SO IF ANYONE HAS ANY

10:27AM   5    QUESTIONS, THEY CAN COME AND PULL THEM OUT AND PEOPLE CAN LOOK

10:27AM   6    AT THEM; CORRECT?

10:27AM   7    A.   THAT'S USUALLY THE FUNCTION OF THAT, YES.

10:27AM   8    Q.   OKAY.  LET ME LOOK AT A COUPLE OF POLICIES.  I PROMISE YOU

10:27AM   9    I WON'T SHOW YOU EVERY DOCUMENT IN THE BINDER (INDICATING).

10:28AM  10         MAY I APPROACH, YOUR HONOR?

10:28AM  11              THE COURT:  YES.

10:28AM  12    BY MR. WADE:

10:28AM  13    Q.   IF I COULD CALL YOUR ATTENTION TO EXHIBIT 9941, WHICH I

10:28AM  14    BELIEVE SHOULD BE THE FIRST DOCUMENT IN THE BINDER.

10:28AM  15         DO YOU SEE THAT?

10:28AM  16    A.   YES.

10:28AM  17    Q.   AND THIS IS A STANDARD OPERATING PROCEDURE FOR PROFICIENCY

10:29AM  18    TESTING FOR THERANOS LAB DEVELOPED TESTS.

10:29AM  19         DO YOU SEE THAT?

10:29AM  20    A.   YES.

10:29AM  21    Q.   AND YOU SIGNED OFF ON THIS IN SEPTEMBER OF 2015?

10:29AM  22    A.   YES.

10:29AM  23              MR. WADE:  MOVE THE ADMISSION OF 9941.

10:29AM  24              MR. SCHENK:  NO OBJECTION.

10:29AM  25              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

DHAWAN CROSS BY MR. WADE (RES.)                                    3806

10:29AM   1           (DEFENDANT'S EXHIBIT 9941 WAS RECEIVED IN EVIDENCE.)

10:29AM   2       BY MR. WADE:

10:29AM   3       Q.   OKAY.  AND THIS WAS, THIS WAS ONE OF THOSE DOCUMENTS

10:29AM   4       WHERE, AFTER YOU CAME IN AND YOU WERE ENGAGED WITH THE COMPANY

10:29AM   5       IN AUGUST AND SEPTEMBER, WHERE YOU WERE ASKED TO REVIEW AND

10:29AM   6       SIGN; IS THAT CORRECT?

10:29AM   7       A.   YES.

10:29AM   8       Q.   AND YOU WERE RELYING UPON DR. SAKSENA AND DR. YOUNG AND

10:29AM   9       THEIR EXPERTISE WHEN YOU SIGNED OFF ON THIS; IS THAT CORRECT?

10:29AM  10       A.   YES.

10:29AM  11       Q.   IN FACT, DO YOU RECALL THAT DR. SAKSENA WAS ACTUALLY IN

10:29AM  12       THE PROCESS -- HE WAS A FULL-TIME EMPLOYEE AT THERANOS;

10:30AM  13       CORRECT?

10:30AM  14       A.   IF THAT'S IN THE RECORD, THEN YES.

10:30AM  15       Q.   AND DO YOU RECALL ACTUALLY THAT HE WAS IN THE PROCESS OF

10:30AM  16       GETTING SOME CERTIFICATIONS TO BECOME THE FULL-TIME LABORATORY

10:30AM  17       DIRECTOR AT THERANOS AND SOUGHT YOUR ASSISTANCE IN CONNECTION

10:30AM  18       WITH THAT?

10:30AM  19       A.   I DON'T RECALL THAT.

10:30AM  20       Q.   OKAY.  WE'LL COME BACK TO THAT.

10:30AM  21           BUT IN CONNECTION -- AND YOU SEE DR. YOUNG WAS A PH.D. AS

10:30AM  22       WELL; CORRECT?

10:30AM  23       A.   YES.

10:30AM  24       Q.   OKAY.  LET ME TURN YOU TOWARD THE BACK OF THE BINDER.  LET

10:30AM  25       ME TURN YOU TO EXHIBIT 9962.

DHAWAN CROSS BY MR. WADE (RES.)                                    3807

10:31AM  1          DO YOU HAVE THAT ONE IN FRONT OF YOU?

10:31AM  2     A.   YES.

10:31AM  3     Q.   AND DO YOU RECOGNIZE THIS TO BE THE QUALITY SYSTEMS MANUAL

10:31AM  4     THAT YOU SIGNED OFF ON IN SEPTEMBER OF 2015?

10:31AM  5     A.   YES.

10:31AM  6               MR. WADE:  MOVE THE ADMISSION OF 9962.

10:31AM  7               MR. SCHENK:  NO OBJECTION.

10:31AM  8               THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:31AM  9          (DEFENDANT'S EXHIBIT 9962 WAS RECEIVED IN EVIDENCE.)

10:31AM 10     BY MR. WADE:

10:31AM 11     Q.   AND AGAIN, THIS IS THE QUALITY SYSTEMS MANUAL THAT WAS

10:31AM 12     PREPARED BY NUMEROUS PEOPLE WITHIN THE COMPANY AND YOU WERE

10:31AM 13     ASKED TO REVIEW AND SIGN OFF ON; IS THAT RIGHT?

10:31AM 14     A.   YES.

10:31AM 15     Q.   AND THESE ARE PEOPLE WHO WERE ALL FULL-TIME EMPLOYEES AT

10:31AM 16     THERANOS?

10:31AM 17     A.   I BELIEVE SO, YES.

10:31AM 18     Q.   AND DO YOU SEE DR. MASINDE IS THE ONE WHO ACTUALLY

10:31AM 19     PREPARED THIS AS THE TECHNICAL SUPERVISOR?

10:31AM 20     A.   YES.

10:31AM 21     Q.   AND LANGLY GEE WAS INVOLVED IN THIS BECAUSE HE WAS DOING

10:32AM 22     FULL-TIME QUALITY ASSURANCE AND QUALITY CONTROL WORK?

10:32AM 23     A.   YES.

10:32AM 24     Q.   OKAY.  AND I WANT TO JUST DRAW YOUR ATTENTION TO THE LAST

10:32AM 25     PAGE OF THIS WHICH SHOWS THE REVISION HISTORY.

DHAWAN CROSS BY MR. WADE (RES.)                                    3808

10:32AM  1        DO YOU SEE THAT?

10:32AM  2    A.   YES.

10:32AM  3    Q.   AND THE REVISION HISTORY YOU MADE -- BASED ON YOUR REVIEW

10:32AM  4    OF THESE DOCUMENTS AND OTHER DOCUMENTS, DO YOU UNDERSTAND THAT

10:32AM  5    ONE OF THE THINGS THAT THE FULL-TIME PEOPLE WOULD DO WITHIN THE

10:32AM  6    COMPANY IS THAT THEY WOULD CONTINUOUSLY UPDATE AND IMPROVE THE

10:32AM  7    PROCEDURES AS THEY GOT MORE AND MORE EXPERIENCE WITHIN THE LAB?

10:32AM  8    A.   YES.

10:32AM  9    Q.   AND THAT'S -- THIS REVISION HISTORY REFLECTS A NUMBER OF

10:32AM 10    ITERATIONS OF THIS DOCUMENT?

10:32AM 11    A.   YES.

10:32AM 12    Q.   AND YOU WERE JUST BEING ASKED TO SIGN OFF ON THE LATEST

10:32AM 13    COPY OF THIS WITH THE NEWEST IMPROVEMENTS; IS THAT RIGHT?

10:33AM 14    A.   YES.

10:33AM 15    Q.   OKAY.  LET ME SHOW YOU ONE MORE.

10:33AM 16        LET'S GO TO 110, WHICH I THINK IS THE SECOND TO THE LAST

10:33AM 17    DOCUMENT IN THAT BINDER.  SO THAT'S 10010 I GUESS I SHOULD SAY.

10:33AM 18        DO YOU HAVE THAT IN FRONT OF YOU, DOCTOR?

10:33AM 19    A.   YES.

10:33AM 20    Q.   AND DO YOU RECOGNIZE THIS TO BE A QUALITY CONTROL STANDARD

10:33AM 21    OPERATING PROCEDURE THAT YOU WERE ASKED TO SIGN OFF ON IN

10:33AM 22    SEPTEMBER OF 2015?

10:33AM 23    A.   YES.

10:33AM 24            MR. WADE:  MOVE THE ADMISSION OF 10010.

10:33AM 25            MR. SCHENK:  NO OBJECTION.

UNITED STATES COURT REPORTERS

**ER-7413**

DHAWAN CROSS BY MR. WADE (RES.)                                    3809

10:33AM   1           THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

10:33AM   2           (DEFENDANT'S EXHIBIT 10010 WAS RECEIVED IN EVIDENCE.)

10:34AM   3    BY MR. WADE:

10:34AM   4    Q.   OKAY.  SIMILAR TO OTHER DOCUMENTS, THERE ARE THREE

10:34AM   5    FULL-TIME EMPLOYEES WHO HAD PREPARED THIS IN ADVANCE OF YOUR

10:34AM   6    REVIEW OF IT; IS THAT CORRECT?

10:34AM   7    A.   YES.

10:34AM   8    Q.   INCLUDING MR. GEE, WHO WAS FULL TIME RESPONSIBLE FOR

10:34AM   9    QUALITY CONTROL?

10:34AM  10    A.   YES.

10:34AM  11    Q.   AND OTHER PEOPLE WHO WERE -- HAD SENIOR FUNCTIONS WITHIN

10:34AM  12    THE LAB AT THIS TIME; IS THAT RIGHT?

10:34AM  13    A.   YES.

10:34AM  14    Q.   OKAY.  AND SIMILARLY, IF WE JUST GO TO THE BACK OF THE

10:34AM  15    DOCUMENT AND LOOK AT THE REVISION HISTORY.

10:34AM  16         AS WITH OTHER POLICIES AND PROCEDURES THAT YOU SAW IN THE

10:34AM  17    LAB, THIS REFLECTED THAT THERE WERE NUMEROUS AND ONGOING

10:34AM  18    ITERATIONS AND DEVELOPMENTS OF THE POLICIES WITHIN THE LAB; IS

10:34AM  19    THAT RIGHT?

10:34AM  20    A.   YES.

10:34AM  21    Q.   OKAY.  THANK YOU.

10:34AM  22         YOU CAN SET THAT BINDER ASIDE.

10:35AM  23         LET ME ASK YOU, IN THE WHITE BINDER YOU WERE ASKED ABOUT A

10:35AM  24    POLICY BY MR. SCHENK, WHICH I BELIEVE IS EXHIBIT 3041, WHICH IS

10:35AM  25    IN EVIDENCE.

DHAWAN CROSS BY MR. WADE (RES.)                                    3810

10:35AM    1            DO YOU SEE THAT?

10:35AM    2       A.   YES.

10:35AM    3       Q.   AND MR. SCHENK HAD ASKED YOU -- THIS RELATES TO CRITICAL

10:35AM    4       VALUES; CORRECT?

10:35AM    5       A.   YES.

10:35AM    6       Q.   AND FROM YOUR TRAINING, YOU'RE VERY FAMILIAR WITH CRITICAL

10:36AM    7       VALUES AND WHAT THEY ARE; RIGHT?

10:36AM    8       A.   YES.

10:36AM    9       Q.   OKAY.  AND IF YOU GO -- AND I THINK THERE WAS SOME

10:36AM   10       DISCUSSION ABOUT CRITICAL VALUES.  I JUST WANT TO MAKE SURE THE

10:36AM   11       RECORD IS CLEAR.

10:36AM   12            THE CRITICAL VALUES ARE ALL ACTUALLY SET FORTH IN THE BACK

10:36AM   13       OF THE DOCUMENT, IS THAT RIGHT, IN APPENDIX A ON PAGE 9?

10:36AM   14       A.   YES.

10:36AM   15       Q.   AND GOING FORWARD.

10:36AM   16       A.   YES.

10:36AM   17       Q.   AND JUST SO -- THERE MAY HAVE BEEN SOME CONFUSION.  I JUST

10:36AM   18       WANT TO MAKE SURE IT'S CLEAR.

10:36AM   19            THIS GIVES THE GUIDELINES FOR WHAT ARE CONSIDERED TO BE

10:36AM   20       CRITICAL VALUES BY THE COMPANY WHEN THEY GET RESULTS WITHIN THE

10:36AM   21       LABORATORY; CORRECT?

10:36AM   22       A.   YES.

10:36AM   23       Q.   AND THEN IF YOU LOOK EARLY IN THE PROCEDURE, IT THEN SAYS

10:36AM   24       EXACTLY WHAT PEOPLE ARE SUPPOSED TO DO WHEN THEY GET CRITICAL

10:36AM   25       VALUES; RIGHT?

DHAWAN CROSS BY MR. WADE (RES.)                                      3811

10:36AM   1            IF I CAN CALL YOUR ATTENTION TO PAGE 4 OF THE EXHIBIT.

10:37AM   2            DO YOU SEE UNDER PARAGRAPH 7 THERE'S ACTUALLY A VERY

10:37AM   3       SPECIFIC PROCEDURE THERE?

10:37AM   4       A.   YES.

10:37AM   5       Q.   AND THAT PROCEDURE GOES DOWN TO THE LEVEL OF DETAIL WHERE

10:37AM   6       THEY PROVIDE A SCRIPT AS TO EXACTLY WHAT IS SUPPOSED TO BE SAID

10:37AM   7       WHEN A CRITICAL VALUE IS REPORTED TO A DOCTOR; RIGHT?

10:37AM   8       A.   YES.

10:37AM   9       Q.   AND THEY GIVE A SCRIPT AND A VERY PRECISE PROCEDURE ABOUT

10:37AM   10      WHAT IS SUPPOSED TO HAPPEN WHEN A CRITICAL VALUE IS REPORTED TO

10:37AM   11      A PATIENT; CORRECT?

10:37AM   12           IF YOU LOOK ON THE NEXT PAGE?

10:37AM   13      A.   YES.

10:37AM   14      Q.   AND DID THIS SEEM LIKE A GOOD PROCEDURE TO YOU?

10:38AM   15      A.   YES.

10:38AM   16      Q.   OKAY.  AND IF YOU GO TO THE FRONT PAGE OF THAT AGAIN JUST

10:38AM   17      QUICKLY.  BY THE TIME THIS WAS PREPARED, DO YOU SEE THAT THERE

10:38AM   18      WAS A NEW LABORATORY MANAGER REFLECTED THERE?

10:38AM   19      A.   YES.

10:38AM   20      Q.   MS. CENDEJAS.

10:38AM   21           AND THEN THERE'S A NEW TECHNICAL SUPERVISOR AND A NEW

10:38AM   22      GENERAL SUPERVISOR.

10:38AM   23           DO YOU SEE THAT?

10:38AM   24      A.   YES.

10:38AM   25      Q.   AND DO YOU RECALL THAT TOWARD THE END OF 2015 THAT THERE

DHAWAN CROSS BY MR. WADE (RES.)                                    3812

| | | |
|---|---|---|
| 10:38AM | 1 | WERE ACTUALLY A NUMBER OF NEW AND ADDITIONAL EXPERTS WHO WERE |
| 10:38AM | 2 | BROUGHT IN TO THE LAB, NEW NAMES THAT WERE APPEARING? |
| 10:38AM | 3 | A.   YEAH, THE NAMES THAT I SEE HERE, YES. |
| 10:38AM | 4 | Q.   OKAY.  LET'S GO TO 10527. |
| 10:39AM | 5 | A.   YES. |
| 10:39AM | 6 | Q.   DO YOU HAVE THAT IN FRONT OF YOU, DOCTOR? |
| 10:39AM | 7 | A.   YES. |
| 10:39AM | 8 | Q.   AND I BELIEVE THIS -- WE TALKED ABOUT DIFFERENT EMAILS OF |
| 10:39AM | 9 | THIS NATURE PREVIOUSLY. |
| 10:39AM | 10 | DO YOU RECALL THAT? |
| 10:39AM | 11 | A.   YES. |
| 10:39AM | 12 | Q.   AND MR. SCHENK I BELIEVE SHOWED YOU THE BOTTOM EMAIL IN |
| 10:39AM | 13 | THIS CHAIN. |
| 10:39AM | 14 | DO YOU RECALL THAT? |
| 10:39AM | 15 | A.   YES. |
| 10:39AM | 16 | MR. WADE:  I MOVE THE ADMISSION OF 10527. |
| 10:39AM | 17 | MR. SCHENK:  NO OBJECTION. |
| 10:39AM | 18 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 10:40AM | 19 | (DEFENDANT'S EXHIBIT 10527 WAS RECEIVED IN EVIDENCE.) |
| 10:40AM | 20 | BY MR. WADE: |
| 10:40AM | 21 | Q.   THIS WAS THE EMAIL WHERE YOU WERE ASKING THAT DOCTOR -- OR |
| 10:40AM | 22 | MR. GEE SEND YOU ONLY 50 POLICIES A WEEK; CORRECT? |
| 10:40AM | 23 | A.   YES. |
| 10:40AM | 24 | Q.   AND I'M ASKING YOU THIS BECAUSE I WANT TO ASK SOME |
| 10:40AM | 25 | QUESTIONS ABOUT THAT PERIOD LEADING UP TO THE CMS AUDIT AND |

DHAWAN CROSS BY MR. WADE (RES.)                                    3813

```
10:40AM   1    SOME QUESTIONS RELATING TO THAT.

10:40AM   2    A.   YES.

10:40AM   3    Q.   AND SO THAT KIND OF RAMP UP PERIOD STARTS HERE IN -- BLESS

10:40AM   4    YOU -- IN EARLY AUGUST?

10:40AM   5    A.   YES.

10:40AM   6    Q.   AND LET'S LOOK AT 10528, WHICH I BELIEVE IS IN EVIDENCE.

10:40AM   7    IT MIGHT BE A DIFFERENT --

10:40AM   8         THE COURT'S INDULGENCE FOR A MOMENT.

10:41AM   9         (PAUSE IN PROCEEDINGS.)

10:41AM  10              MR. WADE:  YOUR HONOR, THIS DOCUMENT MAY BE IN

10:41AM  11    EVIDENCE, AND WE'LL WORK IT OUT LATER.

10:41AM  12         IT'S THE SAME DOCUMENT.  I'LL JUST MOVE IT IN AND WE CAN

10:41AM  13    CLARIFY THAT.

10:41AM  14              MR. SCHENK:  NO OBJECTION.

10:41AM  15              THE COURT:  IT'S ADMITTED.

10:41AM  16         (DEFENDANT'S EXHIBIT 10528 WAS RECEIVED IN EVIDENCE.)

10:41AM  17              MR. WADE:  I JUST WANT TO MAKE SURE THAT THE

10:41AM  18    REDACTIONS ARE APPROPRIATE, AND I'M COMFORTABLE WITH THIS

10:41AM  19    DOCUMENT.

10:41AM  20    Q.   DO YOU HAVE 10528 IN FRONT OF YOU, SIR?

10:41AM  21    A.   YES.

10:41AM  22    Q.   OKAY.  I THINK YOU WERE ASKED SOME QUESTIONS ABOUT THIS BY

10:41AM  23    MR. SCHENK.

10:41AM  24         DO YOU RECALL THAT?

10:41AM  25    A.   YES.
```

DHAWAN CROSS BY MR. WADE (RES.)                                    3814

10:41AM   1    Q.   AND AGAIN, THIS IS THE PERIOD WHERE DR. SAWYER LEFT AND

10:41AM   2    YOU WERE BEING ASKED TO SPEND MORE TIME AT THE COMPANY?

10:42AM   3    A.   YES.

10:42AM   4    Q.   OKAY.  AND MR. BALWANI HAD TALKED TO YOU ABOUT -- YOU SEE

10:42AM   5    HERE IN THE THIRD FULL PARAGRAPH, HE SAYS THAT WE HAVE A LAB

10:42AM   6    AUDIT COMING UP ON 9/22 AT 9:00 A.M.

10:42AM   7         DO YOU SEE THAT?

10:42AM   8    A.   YES.

10:42AM   9    Q.   AND HE NOTED THAT THEY HAPPEN EVERY TWO YEARS; RIGHT?

10:42AM   10   A.   YES.

10:42AM   11   Q.   AND YOU KNEW THAT BECAUSE YOU HAD BEEN THROUGH THESE

10:42AM   12   BEFORE; CORRECT?

10:42AM   13   A.   YES.

10:42AM   14   Q.   AND HE WANTED TO SEE IF YOU COULD BE PRESENT FOR THAT; IS

10:42AM   15   THAT RIGHT?

10:42AM   16   A.   YES.

10:42AM   17   Q.   OKAY.  AND HE THEN STATES, "I HAVE A VERY CAPABLE TEAM

10:42AM   18   THAT HAS TAKEN CARE OF ALL OF THE DETAILS AS ALWAYS, BUT WOULD

10:42AM   19   LIKE TO HAVE YOU HERE FOR THE FIRST PART OR SO AND THE

10:42AM   20   INTRODUCTION OF OUR TEAM."

10:43AM   21        DO YOU SEE THAT?

10:43AM   22   A.   YES.

10:43AM   23   Q.   OKAY.  AND DO YOU REMEMBER DISCUSSING WITH MR. BALWANI

10:43AM   24   THAT THE COMPANY HAD BROUGHT IN SOME OUTSIDE EXPERTS TO HELP IT

10:43AM   25   PREPARE AND DO MOCK AUDITS IN ADVANCE OF THIS CMS AUDIT?

DHAWAN CROSS BY MR. WADE (RES.)                                    3815

10:43AM  1    A.   I DON'T RECALL THOSE CONVERSATIONS.  THIS IS GOING BACK

10:43AM  2    SIX YEARS.

10:43AM  3         SO IF THEY HAPPENED, THEY HAPPENED.  BUT I DON'T RECALL

10:43AM  4    THE SPECIFIC CONVERSATIONS ABOUT THE MOCK AUDITS.

10:43AM  5    Q.   OKAY.  FAIR ENOUGH.  I'LL SHOW YOU SOME DOCUMENTS AND SEE

10:43AM  6    IF I CAN REFRESH YOUR RECOLLECTION IN A MINUTE.

10:43AM  7    A.   YES.

10:43AM  8    Q.   BUT DO YOU SEE THAT HE SAID THAT HE HAD A FULL TEAM WHO

10:43AM  9    WAS PREPARING FOR IT; RIGHT?

10:43AM 10    A.   YES.

10:43AM 11    Q.   OKAY.  AND HE NOTES HERE THAT HE WILL PERSONALLY WALK YOU

10:43AM 12    THROUGH THE LATEST UPDATES WITH THE TEAM; RIGHT?

10:43AM 13    A.   YES.

10:43AM 14    Q.   AND I THINK YOU TESTIFIED ABOUT THAT.  YOU WENT AND YOU

10:43AM 15    DID A WALK THROUGH WITH THE WHOLE TEAM; CORRECT?

10:44AM 16    A.   YES.

10:44AM 17    Q.   AND WAS THAT HELPFUL TO YOU?

10:44AM 18    A.   YES.

10:44AM 19    Q.   AND THE NEXT CLAUSE THERE SAYS, "WE HAVE HIRED MANY

10:44AM 20    EXPERTS FROM THE INDUSTRY TO MAKE SURE LAB IS FLAWLESS AND

10:44AM 21    AUDIT READY, SO I DON'T ANTICIPATE ANY HICKUPS, BUT AS ALWAYS,

10:44AM 22    WANTED YOU TO BE FAMILIAR WITH IT."

10:44AM 23         DO YOU SEE THAT?

10:44AM 24    A.   YES.

10:44AM 25    Q.   OKAY.  SO WAS IT YOUR UNDERSTANDING THAT MR. BALWANI,

DHAWAN CROSS BY MR. WADE (RES.)                                      3816

10:44AM   1    GOING INTO THIS AUDIT, THOUGHT THAT THE LAB WAS IN GREAT SHAPE;

10:44AM   2    RIGHT?

10:44AM   3              MR. SCHENK:  OBJECTION.  SPECULATION.

10:44AM   4              THE COURT:  YOU'RE ASKING HIM WHAT MR. BALWANI

10:44AM   5    THOUGHT.

10:44AM   6              MR. WADE:  I'M ASKING IF IT WAS HIS UNDERSTANDING

10:44AM   7    BASED ON WHAT MR. BALWANI TOLD HIM IN THIS DOCUMENT.

10:44AM   8              THE COURT:  WELL, YOU CAN ASK HIM ABOUT WHAT THE

10:44AM   9    DOCUMENT SAYS.

10:44AM  10              MR. WADE:  WELL, I -- I BELIEVE I CAN ASK HIM ABOUT

10:44AM  11    HIS UNDERSTANDING ABOUT -- BASED ON HIS INTERACTIONS WITH

10:44AM  12    MR. BALWANI.

10:44AM  13              THE COURT:  YOU CAN ASK HIM WHAT DOES THIS DOCUMENT

10:44AM  14    MEAN TO HIM.

10:44AM  15              MR. WADE:  OKAY.  WELL, YOUR HONOR, MAYBE IF I

10:44AM  16    WITHDRAW THIS QUESTION AND TRY AGAIN, MAYBE I'LL DRAW ANOTHER

10:45AM  17    OBJECTION.

10:45AM  18    Q.  WAS IT YOUR UNDERSTANDING, BASED ON THE COMMUNICATIONS

10:45AM  19    WITH MR. BALWANI, WRITTEN AND ORAL, THAT HE FELT LIKE THE LAB

10:45AM  20    WAS IN GOOD SHAPE GOING INTO THE AUDIT?

10:45AM  21              MR. SCHENK:  SPECULATION.

10:45AM  22              THE COURT:  SUSTAINED.  YOU CAN ASK IT ANOTHER WAY.

10:45AM  23    BY MR. WADE:

10:45AM  24    Q.  WAS IT YOUR UNDERSTANDING AS A RESULT OF THIS EMAIL,

10:45AM  25    RECEIVING THIS EMAIL, THAT THE LAB -- THAT PEOPLE AT THERANOS

DHAWAN CROSS BY MR. WADE (RES.)                                    3817

10:45AM  1    BELIEVED THE LAB TO BE IN GOOD SHAPE?

10:45AM  2             MR. SCHENK:  SPECULATION.

10:45AM  3             THE COURT:  WE CAN GO A LONG WAYS WITH THIS, BUT IS

10:45AM  4    THERE ANOTHER WAY THAT YOU CAN ASK HIM THE QUESTION THAT IS NOT

10:45AM  5    SPECULATION?

10:45AM  6             MR. WADE:  I'M ASKING ABOUT HIS UNDERSTANDING AND

10:45AM  7    HE'S COMMUNICATING ON THESE ISSUES.

10:45AM  8             THE COURT:  AND THE OBJECTION HAS BEEN SPECULATION

10:45AM  9    AND THE COURT SUSTAINED IT, SO --

10:45AM 10    BY MR. WADE:

10:45AM 11    Q.   YOU RECEIVED THIS COMMUNICATION FROM MR. BALWANI; CORRECT?

10:45AM 12    A.   THE EMAIL, YES.

10:45AM 13    Q.   OKAY.  AND YOU SEE WHERE HE SAYS, "WE HAVE HIRED MANY

10:46AM 14    EXPERTS," RIGHT?  YOU SEE THAT?

10:46AM 15    A.   YES.

10:46AM 16    Q.   AND HE SAYS THAT THEY WANT TO MAKE SURE THAT THE LAB IS

10:46AM 17    FLAWLESS AND AUDIT READY.

10:46AM 18         DO YOU SEE THAT?

10:46AM 19    A.   YES.

10:46AM 20    Q.   AND YOU SEE WHERE HE SAYS HE DOESN'T ANTICIPATE ANY

10:46AM 21    HICCUPS.

10:46AM 22         DO YOU SEE THAT?

10:46AM 23    A.   YES.

10:46AM 24    Q.   AND WHAT DID YOU UNDERSTAND HIM TO MEAN BY HE DIDN'T

10:46AM 25    ANTICIPATE ANY HICCUPS?

DHAWAN CROSS BY MR. WADE (RES.)                                    3818

10:46AM  1    A.   THAT THERE SHOULDN'T BE ANY ISSUES.

10:46AM  2    Q.   IN THE INSPECTION?

10:46AM  3    A.   YES.

10:46AM  4    Q.   OKAY.  BUT NOTWITHSTANDING ALL OF THOSE OUTSIDE EXPERTS

10:46AM  5    WHO WERE INVOLVED, HE WANTED TO MAKE SURE THAT YOU COULD COME

10:46AM  6    AND BE COMFORTABLE WITH EVERYTHING; CORRECT?

10:46AM  7    A.   HE WANTED ME TO BE THERE FOR AT LEAST PART OF THAT

10:46AM  8    INSPECTION, YES.

10:46AM  9    Q.   AND FOR A WALK THROUGH IN ADVANCE OF THAT; CORRECT?

10:46AM  10   A.   YES.

10:46AM  11   Q.   AND YOU ACTUALLY IN THIS PERIOD, STARTING AUGUST 8TH, OR

10:47AM  12   WHATEVER IT IS, UNTIL SEPTEMBER, YOU MADE A COUPLE OF TRIPS TO

10:47AM  13   THE COMPANY; CORRECT?

10:47AM  14   A.   I DON'T RECALL THE NUMBER, BUT I DID MAKE TRIPS TO THE

10:47AM  15   COMPANY, YES.

10:47AM  16   Q.   OKAY.  AND WHEN YOU WERE AT THE COMPANY, DID YOU INTERACT

10:47AM  17   WITH OTHER -- YOU INTERACTED WITH SOME OF THE OTHER LAB

10:47AM  18   EMPLOYEES AS WELL?

10:47AM  19   A.   I MET THEM.

10:47AM  20   Q.   AND THEY SHOWED YOU THE DIFFERENT -- THE STATE OF THE LAB

10:47AM  21   AT THE TIME?

10:47AM  22   A.   YES, WE DID A WALK THROUGH.

10:47AM  23   Q.   OKAY.  AND DID THEY COMMUNICATE TO YOU THE READINESS FOR

10:47AM  24   THE CLIA INSPECTION?

10:47AM  25   A.   WE DIDN'T HAVE ANY CONVERSATIONS -- I DIDN'T HAVE ANY

DHAWAN CROSS BY MR. WADE (RES.)                                    3819

10:47AM  1    CONVERSATIONS PARTICULARLY ABOUT THE READINESS FOR THE CLIA

10:48AM  2    INSPECTION.

10:48AM  3    Q.   OKAY.  JUST THESE COMMUNICATIONS WITH MR. BALWANI?

10:48AM  4    A.   PREDOMINANTLY WITH MR. BALWANI, YES.

10:48AM  5    Q.   OKAY.  AND THEN DO YOU RECALL THAT THE COMPANY HAD A

10:48AM  6    LABORATORY CONSULTING FIRM THAT IT USED TO HELP MAKE SURE ITS

10:48AM  7    POLICIES AND PROCEDURES WERE STATE OF THE ART AND THAT IT WAS

10:48AM  8    PREPARED FOR THE CLIA INSPECTIONS?

10:48AM  9    A.   HE INDICATED THAT THERE WAS A COMPANY INVOLVED WITH THAT,

10:48AM  10   YES.

10:48AM  11   Q.   OKAY.  AND DO YOU RECALL THE NAME JERRY HURST?  IS THAT A

10:48AM  12   NAME THAT IS FAMILIAR TO YOU?

10:48AM  13   A.   I DON'T RECALL THAT NAME.

10:48AM  14   Q.   OKAY.  LET ME JUST SEE IF I COULD REFRESH YOUR

10:48AM  15   RECOLLECTION.

10:48AM  16       TAKE A LOOK AT 13173.

10:49AM  17       JUST READ IT TO YOURSELF AND LET ME KNOW WHEN YOU'VE HAD A

10:49AM  18   CHANCE TO REVIEW THE EMAIL, SIR.

10:50AM  19       (PAUSE IN PROCEEDINGS.)

10:50AM  20           THE WITNESS:  I'M DONE.

10:50AM  21   BY MR. WADE:

10:50AM  22   Q.   DOES THIS REFRESH YOUR RECOLLECTION THAT THERE WAS A

10:50AM  23   GENTLEMEN NAMED JERRY HURST AT LABORATORY CONSULTING SERVICES

10:50AM  24   WHO HELPED THE COMPANY PREPARE WITH MOCK AUDITS FOR THE CLIA

10:50AM  25   INSPECTION?

DHAWAN CROSS BY MR. WADE (RES.)                                    3820

10:50AM   1    A.   I WAS MADE AWARE THAT SOMEBODY WAS HELPING WITH A MOCK

10:50AM   2    AUDIT, BUT I DIDN'T KNOW IT WAS MR. HURST.

10:50AM   3    Q.   OKAY.  AND DO YOU KNOW WHETHER THE COMPANY ACTUALLY DID

10:50AM   4    MULTIPLE MOCK AUDITS?

10:50AM   5    A.   I WAS NEVER TOLD THAT.

10:50AM   6    Q.   OKAY.  LET'S TAKE A LOOK AT 4528.

10:50AM   7         THE CLERK:  452A OR 8?

10:50AM   8         MR. WADE:  8.

10:51AM   9    Q.   AND I THINK ON YOUR DIRECT TESTIMONY YOU SAID WHEN YOU

10:51AM   10   ATTENDED THE AUDIT THAT THERE WAS SORT OF AN INTRODUCTORY

10:51AM   11   PRESENTATION THAT WAS GIVEN TO THE PEOPLE WHO WERE COMING IN

10:51AM   12   FOR THE INSPECTION.

10:51AM   13        DO YOU RECALL THAT?

10:51AM   14   A.   EVERYONE WAS INTRODUCED.

10:51AM   15   Q.   YEAH.  AND DO YOU RECALL THE POWERPOINT PRESENTATION THAT

10:51AM   16   WAS GIVEN ON SEPTEMBER 22ND, 2015 TO THOSE INSPECTORS?

10:51AM   17   A.   I DON'T RECALL THE EXACT PRESENTATION.

10:51AM   18   Q.   OKAY.  WELL, HAVE A LOOK AT EXHIBIT 4528 AND SEE IF

10:51AM   19   THIS -- IF YOU RECOGNIZE THIS TO BE A POWERPOINT PRESENTATION

10:51AM   20   THAT WAS GIVEN TO THE CLIA INSPECTORS?

10:52AM   21        (PAUSE IN PROCEEDINGS.)

10:52AM   22        THE WITNESS:  THIS LOOKS LIKE A CLIA PRESENTATION,

10:52AM   23   YEAH.

10:52AM   24   BY MR. WADE:

10:52AM   25   Q.   AND DO YOU RECALL BEING THERE FOR THAT PRESENTATION, AT

DHAWAN CROSS BY MR. WADE (RES.)                                    3821

10:52AM   1    LEAST THE INTRODUCTION PORTION OF THAT PRESENTATION?

10:52AM   2    A.   THE INTRODUCTION, YES.

10:52AM   3              MR. WADE:  MOVE THE ADMISSION OF 4528.

10:52AM   4              MR. SCHENK:  FOUNDATION.

10:52AM   5              THE COURT:  MAYBE A LITTLE MORE FOUNDATION WOULD BE

10:52AM   6    HELPFUL.

10:52AM   7    BY MR. WADE:

10:52AM   8    Q.   I BELIEVE YOU TESTIFIED THAT EVERYONE SORT OF GATHERED

10:52AM   9    INITIALLY AND THERE WERE A NUMBER OF PEOPLE WHO WERE AROUND THE

10:52AM   10   TABLE AND YOU WERE SORT OF SITTING IN THE BACK; IS THAT RIGHT?

10:52AM   11   A.   YES.

10:52AM   12   Q.   AND AS PART OF THAT -- THIS WAS ON SEPTEMBER 22ND, 2015?

10:52AM   13   A.   YES.

10:52AM   14   Q.   AND THEN AS PART OF THE INTRODUCTION, THE COMPANY WANTED

10:52AM   15   TO GIVE SOME OVERVIEW INFORMATION ABOUT THEIR LAB OPERATIONS.

10:53AM   16        DO YOU RECALL THAT?

10:53AM   17   A.   YES.

10:53AM   18   Q.   AND KIND OF INTRODUCE WHO THE RELEVANT PEOPLE WERE IN THE

10:53AM   19   CLIA LAB?

10:53AM   20   A.   YES.

10:53AM   21   Q.   AND THEY DISPLAYED A POWERPOINT PRESENTATION AND KIND OF

10:53AM   22   WALKED THEM THROUGH THAT.

10:53AM   23        DO YOU RECALL THAT?

10:53AM   24   A.   NOW THAT YOU'VE REFRESHED MY MEMORY, YES.

10:53AM   25   Q.   AND THIS IS THAT PRESENTATION, CORRECT, SIR?

DHAWAN CROSS BY MR. WADE (RES.)                                    3822

10:53AM   1      A.   IT LOOKS LIKE IT.

10:53AM   2              MR. WADE:  OKAY.  I MOVE THE ADMISSION OF 4528.

10:53AM   3              MR. SCHENK:  NO OBJECTION.

10:53AM   4              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:53AM   5          (GOVERNMENT'S EXHIBIT 4528 WAS RECEIVED IN EVIDENCE.)

10:53AM   6      BY MR. WADE:

10:53AM   7      Q.   OKAY.  LET'S GO AND LOOK AT A COUPLE OF THESE SLIDES.  IN

10:53AM   8      PARTICULAR, LET'S GO TO I BELIEVE IT'S SLIDE 7.

10:54AM   9          THIS IS THE ORG CHART FOR THE CLIA LAB THAT WAS DISPLAYED

10:54AM  10      FOR THE INSPECTORS; IS THAT RIGHT?

10:54AM  11      A.   IT LOOKS LIKE IT, YES.

10:54AM  12      Q.   YES.  AND THIS SHOWS ALL OF THE DIFFERENT PERSONNEL WHO

10:54AM  13      WERE INVOLVED IN THE OPERATION OF THE CLIA LAB; IS THAT RIGHT?

10:54AM  14      A.   YES, YES.

10:54AM  15      Q.   OKAY.  INCLUDING THE PEOPLE -- AT THIS TIME THERE WERE TWO

10:54AM  16      PEOPLE SERVING AS THE GENERAL SUPERVISOR; IS THAT RIGHT?

10:54AM  17      A.   YES.

10:54AM  18      Q.   AND THERE WAS ONE PERSON SERVING AS THE TECHNICAL

10:54AM  19      SUPERVISOR; RIGHT?

10:54AM  20      A.   YES.

10:54AM  21      Q.   AND THOSE BELOW THE LABORATORY DIRECTOR, THOSE ARE THE

10:54AM  22      HIGHEST POSITIONS WITHIN A CLIA LAB; IS THAT RIGHT?

10:54AM  23      A.   USUALLY, YES.

10:54AM  24      Q.   OKAY.  AND THEN IF WE JUST GO TO THE NEXT PAGE -- WE WILL

10:55AM  25      NEED TO WIPE THIS, MS. KRATZMANN.

DHAWAN CROSS BY MR. WADE (RES.)                                    3823

10:55AM   1          THANK YOU.

10:55AM   2          THE NEXT PAGE, DO YOU SEE THE SPECIFIC PERSONNEL WHO ARE

10:55AM   3     INVOLVED IN ALL OF THESE OPERATIONS ARE IDENTIFIED?

10:55AM   4     A.   YES.

10:55AM   5     Q.   AND THIS WAS A BIG OPERATION; IS THAT RIGHT?

10:55AM   6     A.   A LARGE NUMBER OF PEOPLE, YES.

10:55AM   7     Q.   YEAH.  AND IF YOU GO TO PAGE 11.  YOUR CREDENTIALS ARE

10:55AM   8     IDENTIFIED THERE.

10:55AM   9          DO YOU SEE THAT?

10:55AM   10    A.   YES.

10:55AM   11    Q.   AND IF YOU GO -- AND WE'VE TALKED ABOUT THOSE IN YOUR

10:55AM   12    DIRECT AND IN OUR INTRODUCTORY INTERACTIONS.

10:55AM   13         IF YOU GO TO THE NEXT PAGE, YOU SEE DR. DANIEL YOUNG --

10:55AM   14    A.   YES.

10:55AM   15    Q.   -- IS IDENTIFIED THERE.

10:55AM   16         AND DO YOU RECALL AT THIS TIME, IN ADDITION TO THE HIGH

10:55AM   17    COMPLEXITY LABORATORY THAT YOU SERVED AS THE LAB DIRECTOR FOR,

10:56AM   18    THERE WAS A MODERATE COMPLEXITY LABORATORY IN ARIZONA?

10:56AM   19    A.   YES, AND MY UNDERSTANDING WAS THAT DR. YOUNG WAS THE LAB

10:56AM   20    DIRECTOR THERE.

10:56AM   21    Q.   HE SERVED AS THE LAB DIRECTOR THERE; CORRECT?

10:56AM   22    A.   YES.

10:56AM   23    Q.   AND THAT'S REFLECTED HERE.

10:56AM   24         DO YOU SEE THAT?

10:56AM   25    A.   YES.

DHAWAN CROSS BY MR. WADE (RES.)                                    3824

10:56AM   1    Q.   AND HE WAS ALSO INVOLVED IN ASSISTING WITH THE OPERATIONS

10:56AM   2    OF THE NEWARK LAB AS WELL; CORRECT?

10:56AM   3    A.   THAT WAS MY UNDERSTANDING.

10:56AM   4    Q.   YEAH.  AND IF YOU GO TO PAGE 14.

10:56AM   5         WE HAD TALKED ABOUT DR. SAKSENA.

10:56AM   6         DO YOU RECALL THAT?

10:56AM   7    A.   YES.

10:56AM   8    Q.   AND DR. SAKSENA HAD HAD SIGNIFICANT EXPERIENCE WORKING AS

10:56AM   9    THE DIRECTOR OF ASSAY SYSTEMS AT THERANOS.

10:56AM  10         DO YOU RECALL THAT?

10:56AM  11    A.   THAT'S WHAT IT STATES HERE, YES.

10:56AM  12    Q.   AND THEN IN ADDITION TO THAT THIS GOES THROUGH -- IF WE GO

10:57AM  13    TO 15 BRIEFLY -- THIS SETS FORTH THE QUALIFICATIONS AND

10:57AM  14    EXPERIENCE OF DR. MASINDE.

10:57AM  15         DO YOU SEE THAT?

10:57AM  16    A.   YES.

10:57AM  17    Q.   AND THE NEXT PAGE, THE QUALIFICATIONS OF MS. ALAMDAR.

10:57AM  18         DO YOU SEE THAT?

10:57AM  19    A.   YES.

10:57AM  20    Q.   AND THEN THE NEXT PAGE, MR. SIDHU TOOK ON A -- HAD A

10:57AM  21    SENIOR ROLE IN THE LAB.

10:57AM  22         DO YOU RECALL THAT?

10:57AM  23    A.   YES.

10:57AM  24    Q.   AND THEN FINALLY THE NEXT -- IT'S MR. GEE WAS THE

10:57AM  25    LONG-TIME QUALITY CONTROL MANAGER; CORRECT?

DHAWAN CROSS BY MR. WADE (RES.)                                    3825

10:57AM   1    A.   YES.

10:57AM   2    Q.   AND DO YOU RECALL THAT IN CONNECTION WITH THESE

10:57AM   3    INTERACTIONS WITH THE REGULATORS IN 2015, THAT ONE OF THE

10:58AM   4    REGULATORS CAME IN AND MADE COMMENTS ABOUT HOW CMS WAS UNDER

10:58AM   5    PRESSURE TO INSPECT THERANOS BECAUSE OF REPORTERS THAT WERE

10:58AM   6    MAKING INQUIRIES OF CMS.

10:58AM   7         DO YOU RECALL THAT?

10:58AM   8    A.   I OVERHEARD THAT, YES.

10:58AM   9    Q.   YEAH.  AND THAT THEY WERE SAYING THAT AS A RESULT OF THOSE

10:58AM   10   INQUIRIES, THEY FELT A NEED TO COME IN IN A PARTICULAR WAY IN

10:58AM   11   THAT INSPECTION?

10:58AM   12   A.   I DIDN'T HEAR THAT STATEMENT.

10:58AM   13   Q.   OKAY.  WELL, WHAT DO YOU RECALL BEING SAID BY THAT

10:58AM   14   REGULATOR?

10:58AM   15   A.   THAT IT WAS REPEATEDLY SAID THAT THEY WERE UNDER SCRUTINY.

10:58AM   16   Q.   UH-HUH.

10:58AM   17   A.   THAT WAS BASICALLY MY UNDERSTANDING.

10:58AM   18   Q.   DO YOU RECALL WHETHER ANY OF THE REGULATORS SUGGESTED THAT

10:59AM   19   THERE WAS A PARTICULAR REPORTER WHO WAS ON A CRUSADE AGAINST

10:59AM   20   THE COMPANY?

10:59AM   21   A.   I DON'T RECALL THAT.

10:59AM   22   Q.   LET ME SEE IF I CAN REFRESH YOUR -- TAKE A LOOK AT 15324.

10:59AM   23   YOU'RE NOT ON THIS DOCUMENT.

10:59AM   24        JUST READ IT TO YOURSELF FOR A SECOND, DOCTOR.

10:59AM   25        (PAUSE IN PROCEEDINGS.)

DHAWAN CROSS BY MR. WADE (RES.)                                    3826

10:59AM   1              THE WITNESS:  OKAY.

11:00AM   2      BY MR. WADE:

11:00AM   3      Q.   DOES THAT REFRESH YOUR RECOLLECTION THAT SOMEONE WITHIN

11:00AM   4      CMS THOUGHT A PARTICULAR REPORTER WAS ON A CRUSADE AGAINST THE

11:00AM   5      COMPANY?

11:00AM   6      A.   I DIDN'T HEAR THAT SPECIFIC STATEMENT.

11:00AM   7      Q.   OKAY.  DID YOU COME LATER -- I THINK MR. SCHENK ASKED YOU

11:00AM   8      SOME QUESTIONS, YOU WERE CONTACTED BY REPORTERS YOURSELF.

11:00AM   9           DO YOU RECALL THAT?

11:00AM  10      A.   YES.

11:00AM  11      Q.   AND WERE YOU AWARE THAT THERE WAS A REPORTER WHO WAS

11:00AM  12      ACTUALLY THREATENING TO WRITE A STORY SUGGESTING THAT YOU WERE

11:00AM  13      NOT LEGALLY QUALIFIED TO SERVE AS THE LABORATORY DIRECTOR?

11:00AM  14      A.   I DON'T RECALL -- I DON'T REMEMBER GETTING -- HEARING

11:00AM  15      ABOUT THAT.

11:00AM  16      Q.   OKAY.  BUT YOU WERE LEGALLY QUALIFIED TO SERVE AS A LAB

11:00AM  17      DIRECTOR; CORRECT?

11:00AM  18      A.   I HAVE THE DEGREES AND THE -- YES.

11:00AM  19      Q.   AND YOU MET THE REQUIREMENTS, CORRECT, SIR?

11:00AM  20      A.   THE STATUTORY REQUIREMENTS.

11:00AM  21              MR. WADE:  OKAY.  I HAVE NO FURTHER QUESTIONS AT

11:01AM  22      THIS TIME, YOUR HONOR.  I PASS THE WITNESS.

11:01AM  23           THANK YOU, DOCTOR.

11:01AM  24              THE COURT:  REDIRECT?

11:01AM  25              MR. SCHENK:  YES, YOUR HONOR.

DHAWAN REDIRECT BY MR. SCHENK                                          3827

| | | |
|---|---|---|
| 11:01AM | 1 | **REDIRECT EXAMINATION** |
| 11:01AM | 2 | BY MR. SCHENK: |
| 11:01AM | 3 | Q.   GOOD MORNING, DR. DHAWAN. |
| 11:01AM | 4 | A.   GOOD MORNING, SIR. |
| 11:01AM | 5 | Q.   I JUST WANT TO FOLLOW UP ON A COUPLE OF QUESTIONS THAT |
| 11:01AM | 6 | MR. WADE ASKED YOU, AND I'LL TELL YOU SORT OF THE THEME OF MY |
| 11:02AM | 7 | QUESTIONS IS GOING TO BE TO JUST CLARIFY, WHEN YOU WERE |
| 11:02AM | 8 | ANSWERING QUESTIONS, WHETHER YOU WERE MAKING ASSUMPTIONS IN |
| 11:02AM | 9 | YOUR ANSWERS OR WHETHER YOU KNEW THE FACTS THAT YOU WERE |
| 11:02AM | 10 | SHARING. |
| 11:02AM | 11 | AND I WANT TO START WITH -- I DON'T HAVE A PARTICULAR |
| 11:02AM | 12 | PLACE TO POINT YOU TO, IT WAS ASKED OF YOU REPEATEDLY -- |
| 11:02AM | 13 | WHETHER THIS EMPLOYEE WAS A FULL-TIME EMPLOYEE AT THERANOS, |
| 11:02AM | 14 | FILL IN THE BLANK WITH AN EMPLOYEE'S NAME, AND YOU WERE ASKED |
| 11:02AM | 15 | IF THAT EMPLOYEE WAS A FULL-TIME EMPLOYEE. |
| 11:02AM | 16 | YOU ANSWERED AT SOME TIMES YES. |
| 11:02AM | 17 | DID YOU KNOW THAT THAT WAS A FULL TIME EMPLOYEE OR WERE |
| 11:02AM | 18 | YOU MAKING ASSUMPTIONS? |
| 11:02AM | 19 | A.   IT WAS ASSUMPTIONS. |
| 11:02AM | 20 | Q.   OKAY. |
| 11:02AM | 21 | A.   BASED ON SEEING THEM IN THE LAB, MY ASSUMPTION WAS THAT |
| 11:02AM | 22 | THEY WERE FULL-TIME EMPLOYEES. |
| 11:02AM | 23 | Q.   WHEN YOU WERE TELLING THIS JURY THAT X EMPLOYEE WAS A |
| 11:02AM | 24 | FULL-TIME EMPLOYEE, YOU WERE SAYING, SORT OF BASED ON WHAT I |
| 11:02AM | 25 | WOULD ASSUME TO BE TRUE. |

DHAWAN REDIRECT BY MR. SCHENK                                    3828

11:02AM  1      BUT YOU NEVER MET THAT PARTICULAR EMPLOYEE, SO YOU DIDN'T

11:02AM  2      KNOW WHETHER THEY WERE FULL TIME; IS THAT FAIR?

11:03AM  3      A.   I DIDN'T SEE THEIR EMPLOYMENT RECORD, SO I COULDN'T SAY

11:03AM  4      THEY WERE FULL TIME.  I WOULD SEE THEM AT THE LAB, BUT THAT'S

11:03AM  5      ABOUT IT.

11:03AM  6      Q.   OKAY.  AND DID YOU EVER HAVE A CONVERSATION WITH AN

11:03AM  7      EMPLOYEE WITHIN THE LAB WHERE YOU ASKED THAT PERSON WHETHER

11:03AM  8      THEY WERE FULL TIME OR NOT?

11:03AM  9      A.   I NEVER ASKED THAT QUESTION.

11:03AM 10      Q.   YOU WERE ASKED A GROUP OF QUESTIONS ABOUT LYNETTE SAWYER.

11:03AM 11      DO YOU REMEMBER THAT?

11:03AM 12      A.   YES.

11:03AM 13      Q.   AND DO YOU KNOW WHETHER LYNETTE SAWYER EVER VISITED THE

11:03AM 14      LAB?

11:03AM 15      A.   I NEVER MET -- I DON'T RECALL EVER MEETING LYNETTE SAWYER,

11:03AM 16      SO I CAN'T TELL YOU WHETHER SHE EVER WENT TO THE LAB.

11:03AM 17      Q.   DO YOU KNOW WHETHER LYNETTE SAWYER WAS EVER SHOWN THE

11:03AM 18      EDISON DEVICE?

11:03AM 19      A.   I DON'T KNOW ANY OF THAT.

11:03AM 20      Q.   DO YOU KNOW WHETHER THERANOS GAVE LYNETTE SAWYER SOP'S

11:03AM 21      INVOLVING FDA CLEARED DEVICES AND THEN GAVE YOU THE EDISON

11:03AM 22      SOP'S?  DO YOU KNOW WHETHER THAT HAPPENED OR NOT?

11:03AM 23      A.   I DO NOT.

11:03AM 24      Q.   MR. WADE ASKED YOU, WHEN YOU WERE SIGNING SOP'S OR

11:04AM 25      VALIDATION DOCUMENTS, IF YOU WERE RELYING ON THE GOOD WORK OF

DHAWAN REDIRECT BY MR. SCHENK                                    3829

11:04AM   1   OTHER EMPLOYEES, THE NAMES THAT APPEARED ON THOSE DOCUMENTS

11:04AM   2   BEFORE YOUR NAME.

11:04AM   3       DO YOU RECALL THOSE QUESTIONS?

11:04AM   4   A.   YES.

11:04AM   5   Q.   AND YOU SAID YES, THAT YOU WERE RELYING ON THEIR GOOD

11:04AM   6   WORK.

11:04AM   7       I'M WONDERING IF YOU WERE MAKING AN ASSUMPTION THAT THEY

11:04AM   8   HAD DONE GOOD WORK, OR DO YOU KNOW THAT THEY HAD DONE GOOD

11:04AM   9   WORK?

11:04AM  10   A.   I WAS ASSUMING THAT THEY HAD DONE GOOD WORK.

11:04AM  11   Q.   OKAY.  AND WHEN YOU SAW THAT THE DOCUMENT WAS MULTIPLE

11:04AM  12   PAGES, THE VALIDATION REPORT OR THE SOP --

11:04AM  13   A.   YES.

11:04AM  14   Q.   -- AND IF THAT DOCUMENT HAD ADDITIONAL INFORMATION, LIKE

11:04AM  15   DATA, WERE YOU MAKING THE ASSUMPTION THAT THAT DATA WAS

11:04AM  16   ACCURATE?

11:04AM  17   A.   YES.  I WOULD ASSUME IF IT WAS THERE, IT WOULD BE

11:04AM  18   ACCURATE.

11:04AM  19   Q.   YOU DIDN'T ASK ANYBODY FOR INFORMATION TO SUBSTANTIATE THE

11:04AM  20   DATA; IS THAT RIGHT?

11:04AM  21   A.   MY ASSUMPTION WAS THAT THE DATA WAS CORRECT, SO I DIDN'T

11:04AM  22   GO FURTHER.

11:04AM  23   Q.   OKAY.  AND WHEN YOU WERE REVIEWING THOSE DOCUMENTS AND

11:05AM  24   ASSUMING THAT THE INDIVIDUALS WHO SIGNED IT BEFORE YOU, WERE

11:05AM  25   YOU ASSUMING THAT THEY HAD LOOKED AT THE UNDERLYING DATA?

DHAWAN REDIRECT BY MR. SCHENK                                        3830

| | | |
|---|---|---|
| 11:05AM | 1 | A.   THAT'S GENERALLY THE STANDARD, THAT THEY HAVE LOOKED AT |
| 11:05AM | 2 | THE DATA, AND THAT'S USUALLY WHAT HAPPENS. |
| 11:05AM | 3 | Q.   OKAY.  MR. WADE ASKED YOU HOW MANY EMPLOYEES WERE IN YOUR |
| 11:05AM | 4 | LAB AT THE DERMATOLOGY PRACTICE. |
| 11:05AM | 5 |     DO YOU RECALL THAT? |
| 11:05AM | 6 | A.   UH-HUH, YES. |
| 11:05AM | 7 | Q.   AND I THINK YOU SAID THERE WERE TWO OR THREE. |
| 11:05AM | 8 | A.   YES. |
| 11:05AM | 9 | Q.   IS THAT RIGHT? |
| 11:05AM | 10 |     HOW MANY WORKED AT THERANOS, DO YOU KNOW? |
| 11:05AM | 11 | A.   THE NUMBER HERE, WHICH IS, YOU KNOW, 20, 30, 40, EXCLUDING |
| 11:05AM | 12 | THE PEOPLE ON THE PHONE, THE BANK AND ALL THE OTHER PLACES.  I |
| 11:05AM | 13 | MEAN, YEAH, IT WAS A LARGE NUMBER OF PEOPLE. |
| 11:05AM | 14 | Q.   SIGNIFICANTLY MORE PEOPLE WORKED AT THERANOS THAN IN YOUR |
| 11:05AM | 15 | LAB? |
| 11:05AM | 16 | A.   YES. |
| 11:05AM | 17 | Q.   AND AS LAB DIRECTOR, DID YOU SPEND SIGNIFICANTLY MORE TIME |
| 11:05AM | 18 | WORKING AT YOUR LAB THAN AT THERANOS? |
| 11:05AM | 19 | A.   YES. |
| 11:05AM | 20 | Q.   AND WERE THE TESTS THAT WERE BEING DONE AT THERANOS MORE |
| 11:05AM | 21 | COMPLICATED OR MORE DIFFICULT THAN THE TESTS THAT YOU RAN IN |
| 11:06AM | 22 | YOUR LAB? |
| 11:06AM | 23 | A.   YES. |
| 11:06AM | 24 | Q.   WHY DO YOU SAY THAT? |
| 11:06AM | 25 | A.   BECAUSE THERE WERE MORE COMPLEX BLOOD TESTS BEING DONE |

DHAWAN REDIRECT BY MR. SCHENK                                    3831

11:06AM   1     THERE.

11:06AM   2     Q.   AND WERE YOU ASSUMING THAT PEOPLE AT THERANOS WERE

11:06AM   3     CONDUCTING THOSE TESTS IN AN ACCURATE MANNER?

11:06AM   4     A.   THAT WAS MY ASSUMPTION.

11:06AM   5     Q.   AND DID DO YOU ANYTHING TO CONFIRM THAT?

11:06AM   6     A.   I DIDN'T HAVE ANY REASON OR NEED TO CONFIRM IT.

11:06AM   7     Q.   AND WHY DO YOU SAY THAT?

11:06AM   8     A.   MY ASSUMPTION IS THAT PEOPLE WITH ADVANCED DEGREES SUCH AS

11:06AM   9     MINE ARE GOING TO DO WORK ACCURATELY AND APPROPRIATELY.

11:06AM   10    Q.   OKAY.  SO EVEN WHEN YOU WERE WORKING AT THERANOS, YOU WERE

11:06AM   11    MAKING SOME ASSUMPTIONS?

11:06AM   12    A.   YES, YES.

11:06AM   13    Q.   YOU WERE ASSUMING -- GOT IT.  GOT IT.

11:06AM   14         IN YOUR CURRENT LAB, HOW OFTEN DO YOU SPEAK TO THOSE TWO

11:06AM   15    OR THREE EMPLOYEES?

11:06AM   16    A.   SIX, EIGHT TIMES A DAY.

11:06AM   17    Q.   WAS THERE -- OTHER THAN MR. BALWANI --

11:06AM   18    A.   YES.

11:06AM   19    Q.   -- WAS THERE ANY EMPLOYEE AT THERANOS THAT YOU EVER SPOKE

11:07AM   20    TO SIX OR EIGHT TIMES THE ENTIRE TIME YOU WORKED AT THERANOS?

11:07AM   21    A.   NOT THAT I CAN RECALL, NO.

11:07AM   22    Q.   BUT YOUR OWN EMPLOYEES YOU SPEAK TO SIX OR EIGHT TIMES

11:07AM   23    EACH DAY?

11:07AM   24    A.   WE HAVE TO.

11:07AM   25    Q.   WITH LESS COMPLICATED TESTS?

DHAWAN REDIRECT BY MR. SCHENK                                    3832

11:07AM   1    A.   YES.

11:07AM   2    Q.   MR. WADE SHOWED YOU VALIDATION REPORTS THAT MS. SAWYER

11:07AM   3    SIGNED?

11:07AM   4    A.   YES.

11:07AM   5    Q.   DO YOU RECALL THAT?

11:07AM   6         ONE WAS FOR A SIEMENS DEVICE?

11:07AM   7    A.   YES.

11:07AM   8    Q.   AND ONE WAS FOR A ROCHE DEVICE?

11:07AM   9    A.   YES.

11:07AM   10   Q.   AND DID YOU EVER SEE THERANOS RUNNING SIEMENS MACHINES?

11:07AM   11   DID YOU INVESTIGATE THE WAY THAT THERANOS WAS USING THE SIEMENS

11:07AM   12   MACHINES?

11:07AM   13   A.   I WOULD -- I NEVER HAD THE OPPORTUNITY TO.

11:07AM   14   Q.   AND HOW ABOUT THE ROCHE?

11:08AM   15   A.   NEVER HAD THE OPPORTUNITY TO.

11:08AM   16   Q.   ON ONE OF THE ROSTERS, OR MAYBE MORE THAN ONE, I SAW

11:08AM   17   MR. BALWANI'S NAME.

11:08AM   18   A.   YES.

11:08AM   19   Q.   DID YOU KNOW THAT MR. BALWANI WAS WORKING IN THE LAB?

11:08AM   20   A.   I SAW HIS NAME ON THE ROSTER.  MY ASSUMPTION WAS THAT HE

11:08AM   21   WAS WORKING IN THE LAB.

11:08AM   22   Q.   IN ANY OF YOUR CONVERSATIONS WITH HIM BEFORE YOU TOOK THE

11:08AM   23   JOB, OR AT THE TIME, DID HE TELL YOU THAT HE WAS WORKING IN THE

11:08AM   24   LAB?

11:08AM   25   A.   OTHER THAN CHIEF OPERATING OFFICER, NO.  I MEAN, THERE WAS

DHAWAN REDIRECT BY MR. SCHENK                                    3833

11:08AM    1    NO STATEMENT THERE.

11:08AM    2    Q.   AND I THINK HE WAS LISTED UNDER A CLA, A CLINICAL

11:08AM    3    LABORATORY ASSISTANT; IS THAT RIGHT?

11:08AM    4    A.   I'D HAVE TO LOOK AT THE DOCUMENT, BUT, YES, I BELIEVE SO.

11:08AM    5    Q.   OKAY.  AND IS IT -- AND I'M HAPPY TO SHOW YOU THAT

11:08AM    6    DOCUMENT.  MAYBE LET'S DO THAT.

11:08AM    7         THE BINDER IN FRONT OF YOU, THE EXHIBIT THAT THE DEFENSE

11:08AM    8    WAS SHOWING YOU IN A BLACK BINDER, 4528.  THAT WAS THE

11:09AM    9    POWERPOINT FOR THE CMS INSPECTION.

11:09AM   10    A.   WHICH SLIDE WOULD YOU LIKE ME TO GO TO?

11:09AM   11    Q.   MY -- THE COPY I HAVE DOESN'T HAVE PAGE NUMBERS.  IT'S, I

11:09AM   12    WOULD SAY, ABOUT SEVEN OR EIGHT PAGES IN.  IT'S AN ORG CHART?

11:09AM   13    A.   YEAH, THE COMPLICATED ORG CHART.

11:09AM   14    Q.   YES.

11:09AM   15    A.   YES.

11:09AM   16    Q.   AND SO IF YOU LOOK ALL OF THE WAY TO THE RIGHT UNDER

11:09AM   17    CLINICAL LABORATORY ASSISTANT, DO YOU SEE MR. BALWANI LISTED

11:09AM   18    THERE?

11:09AM   19    A.   YES.

11:09AM   20         MR. SCHENK:  MS. KRATZMANN, COULD I -- THANK YOU.

11:10AM   21    Q.   SO YOU SEE THE CLINICAL LABORATORY ASSISTANT BUBBLE, AND

11:10AM   22    WITHIN THAT YOU SEE MR. BALWANI'S NAME?

11:10AM   23    A.   YES.

11:10AM   24    Q.   AND IN YOUR EXPERIENCE, DO CLA'S MAKE ALL OF THE HIRING

11:10AM   25    DECISIONS IN THE LAB?

DHAWAN REDIRECT BY MR. SCHENK                                        3834

11:10AM   1      A.   NORMALLY IT'S SOMEBODY HIGHER UP THAN THAT.

11:10AM   2      Q.   IN YOUR EXPERIENCE, DO CLA'S MAKE ALL OF THE FIRING

11:10AM   3      DECISIONS IN THE LAB?

11:10AM   4      A.   NO.   NORMALLY IT'S HIGHER LEVEL PEOPLE IN THE LAB.

11:10AM   5      Q.   AND IF A TEST THAT THE LAB IS RUNNING IS PRODUCING

11:10AM   6      CONCERNING RESULTS, IT'S INACCURATE OR MAYBE FAILING QC, WHO

11:10AM   7      MAKES THE DECISION TO STOP RUNNING THAT TEST?

11:10AM   8      A.   THE HIGHER LEVEL EMPLOYEES, LABORATORY DIRECTORS, THE

11:10AM   9      SUPERVISORS REPORTING UP TO THE LABORATORY DIRECTORS USUALLY.

11:10AM   10     Q.   WAS THERE EVER AN OCCASION WHILE YOU WERE LABORATORY

11:10AM   11     DIRECTOR AT THERANOS --

11:10AM   12     A.   YES.

11:10AM   13     Q.   -- WHERE YOU SAID, WE SHOULD STOP RUNNING THIS TEST?

11:10AM   14     A.   I WAS NEVER GIVEN ANY DATA TO SAY THAT.

11:11AM   15     Q.   MR. WADE SHOWED YOU SOME DOCUMENTS WHERE YOU WERE

11:11AM   16     DELEGATING AUTHORITY.   YOU DELEGATED AUTHORITY TO MS. ALAMDAR

11:11AM   17     AND THEN MR. MASINDE.

11:11AM   18          DO YOU RECALL THAT?

11:11AM   19     A.   YES.

11:11AM   20     Q.   AND WHEN YOU WERE TALKING ABOUT DELEGATING TO EITHER THE

11:11AM   21     TECHNICAL SUPERVISOR OR THE GS, AGAIN, WERE YOU MAKING AN

11:11AM   22     ASSUMPTION ASSUMING THAT THEY WERE DOING THEIR WORK, OR DID YOU

11:11AM   23     KNOW THAT THEY WERE DOING THEIR WORK?

11:11AM   24     A.   MY ASSUMPTION WAS THAT THEY WOULD BE DOING THEIR WORK.

11:11AM   25     Q.   MR. WADE SHOWED YOU THE VALIDATION REPORT THAT I SHOWED

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 17, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Amy Mason Saharia*
AMY MASON SAHARIA

April 17, 2023