No. 22-10312

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ELIZABETH A. HOLMES

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 5:18-CR-00258
Hon. Edward J. Davila

---

## EXCERPTS OF RECORD
## VOL. XXVII of LVII | ER-7441 to ER-7740

---

JOHN D. CLINE
LAW OFFICE OF JOHN D. CLINE
  600 Stewart Street
  Suite 400
  Seattle, WA 98101
  (360) 320-6435

KEVIN M. DOWNEY
LANCE A. WADE
AMY MASON SAHARIA
KATHERINE A. TREFZ
WILLIAMS & CONNOLLY LLP
  680 Maine Ave. S.W.
  Washington, D.C. 200024
  (202) 434-5000
  asaharia@wc.com

DHAWAN REDIRECT BY MR. SCHENK                                            3835

11:11AM   1     YOU YESTERDAY ABOUT CRITICAL VALUES.

11:12AM   2          DO YOU REMEMBER THAT?

11:12AM   3     A.   YES.

11:12AM   4     Q.   AND MR. WADE SHOWED YOU THAT THERE WAS A SCRIPT IN THERE

11:12AM   5     THAT WAS TO BE READ.

11:12AM   6          DO YOU RECALL THAT?

11:12AM   7     A.   YES, YES.

11:12AM   8     Q.   AND DO YOU KNOW WHETHER THERANOS WAS FOLLOWING THAT SOP IN

11:12AM   9     PRACTICE?

11:12AM   10    A.   I DO NOT KNOW THAT.

11:12AM   11    Q.   DO YOU KNOW WHETHER THERANOS HAD A PRACTICE OF IGNORING A

11:12AM   12    CRITICAL VALUE OR NOT?

11:12AM   13    A.   I HAVE NO KNOWLEDGE OF THAT.

11:12AM   14    Q.   SO WHEN YOU SEE AN SOP ABOUT CRITICAL VALUES AND THE

11:12AM   15    SCRIPT, AND YOU SIGNED IT, WERE YOU MAKING THE ASSUMPTION THAT

11:12AM   16    THERANOS WOULD FOLLOW?

11:12AM   17    A.   THAT'S USUALLY WHAT YOU'RE SUPPOSED TO DO WITH SOP'S IS

11:12AM   18    FOLLOW THE SOP.

11:12AM   19    Q.   AND IF YOU'RE A LAB DIRECTOR WHO IS NOT GIVEN INFORMATION

11:12AM   20    ABOUT DEVIATIONS FROM THE SOP, YOU WOULDN'T KNOW WHETHER THEY

11:12AM   21    WERE FOLLOWING IT OR NOT; IS THAT RIGHT?

11:12AM   22    A.   YES, I WOULD NOT KNOW.

11:13AM   23          MR. SCHENK:   THANK YOU, YOUR HONOR.   NO FURTHER

11:13AM   24    QUESTIONS.

11:13AM   25          MR. WADE:   I BELIEVE I HAVE TWO QUESTIONS.

DHAWAN FURTHER DIRECT BY MR. SCHENK                                3836

| | | |
|---|---|---|
| 11:13AM | 1 | **RECROSS-EXAMINATION** |
| 11:13AM | 2 | BY MR. WADE: |
| 11:13AM | 3 | Q.   DR. DHAWAN, YOU WENT INTO THESE INTERACTIONS AND LOOKED AT |
| 11:13AM | 4 | THESE POLICIES AND LOOKED AT THESE ORG CHARTS AND YOU ASSUMED |
| 11:13AM | 5 | THAT THESE 30 OR 40 PEOPLE WERE GOING TO WORK EACH AND EVERY |
| 11:13AM | 6 | DAY ACTING HONESTLY AND IN GOOD FAITH; CORRECT? |
| 11:13AM | 7 | A.   THAT IS MY ASSUMPTION WITH ALL OF THE EMPLOYEES THAT WORK |
| 11:13AM | 8 | FOR ME. |
| 11:13AM | 9 | Q.   AND IS THAT YOUR ASSUMPTION AS A HUMAN BEING? |
| 11:13AM | 10 | MR. SCHENK:  OBJECTION.  RELEVANCE. |
| 11:13AM | 11 | MR. WADE:  WITHDRAWN. |
| 11:14AM | 12 | Q.   YOU WERE RELYING UPON PEOPLE TO ACT IN ACCORDANCE WITH THE |
| 11:14AM | 13 | POLICIES AND TO ACT IN GOOD FAITH; IS THAT RIGHT, SIR? |
| 11:14AM | 14 | A.   YES. |
| 11:14AM | 15 | Q.   AND YOU WERE NOT GIVEN ANY INFORMATION FOR YOU TO SUGGEST |
| 11:14AM | 16 | THAT YOU SHOULD DO OTHERWISE, CORRECT, SIR? |
| 11:14AM | 17 | A.   I WAS NOT GIVEN ANY OTHER INFORMATION, NO. |
| 11:14AM | 18 | MR. WADE:  THANK YOU. |
| 11:14AM | 19 | **FURTHER REDIRECT EXAMINATION** |
| 11:14AM | 20 | BY MR. SCHENK: |
| 11:14AM | 21 | Q.   WHEN YOU WERE MAKING THIS ASSUMPTION THAT THE EMPLOYEES OF |
| 11:14AM | 22 | THERANOS WERE ACTING A CERTAIN WAY, WERE YOU AT THERANOS?  WERE |
| 11:14AM | 23 | YOU PRESENT TO REACH THAT ASSUMPTION OR TO REACH THAT |
| 11:14AM | 24 | CONCLUSION? |
| 11:14AM | 25 | A.   I WAS NOT THERE.  I WAS NOT THERE, BUT MY ASSUMPTION WAS |

DHAWAN FURTHER DIRECT BY MR. SCHENK                                    3837

| | | |
|---|---|---|
| 11:14AM | 1 | THAT THEY WOULD BE DOING THE WORK THAT THEY WERE SUPPOSED TO |
| 11:14AM | 2 | DO. |
| 11:14AM | 3 | Q.   SO YOU WERE SITTING IN YOUR OFFICE -- |
| 11:14AM | 4 | A.   RIGHT. |
| 11:14AM | 5 | Q.   -- WHEN YOU WERE MAKING THIS ASSUMPTION? |
| 11:14AM | 6 | A.   RIGHT. |
| 11:14AM | 7 | MR. SCHENK:  THANK YOU. |
| 11:14AM | 8 | MR. WADE:  NO FURTHER QUESTIONS. |
| 11:14AM | 9 | THE COURT:  MAY THIS WITNESS BE EXCUSED? |
| 11:15AM | 10 | MR. SCHENK:  YES, SIR. |
| 11:15AM | 11 | MR. WADE:  YES, SIR. |
| 11:15AM | 12 | THE COURT:  YOU CAN STAND DOWN, SIR.  THANK YOU. |
| 11:15AM | 13 | I THINK THE GOVERNMENT HAS ANOTHER WITNESS. |
| 11:15AM | 14 | MR. BOSTIC:  YES, YOUR HONOR. |
| 11:15AM | 15 | THE COURT:  LET ME STATE, WE WERE GOING TO TAKE OUR |
| 11:15AM | 16 | BREAK, I THINK, AT 11:30, AND I THINK WE WERE GOING TO TAKE |
| 11:15AM | 17 | ABOUT 30 MINUTES. |
| 11:15AM | 18 | SHOULD WE TAKE OUR BREAK NOW?  IS THAT -- WHY DON'T WE DO |
| 11:15AM | 19 | THAT.  LET'S TAKE OUR 30 MINUTE BREAK NOW, AND THEN WE'LL AT |
| 11:15AM | 20 | LEAST GET YOUR NEXT WITNESS ON. |
| 11:15AM | 21 | THANK YOU.  SO WE'LL BE IN RECESS, LADIES AND GENTLEMEN. |
| 11:15AM | 22 | THANK YOU. |
| 11:16AM | 23 | (JURY OUT AT 11:16 A.M.) |
| 11:16AM | 24 | THE COURT:  PLEASE BE SEATED.  THANK YOU. |
| 11:16AM | 25 | THE RECORD SHOULD REFLECT THAT OUR JURY HAS LEFT FOR A |

3838

| | | |
|---|---|---|
| 11:16AM | 1 | RECESS.  ALL COUNSEL AND MS. HOLMES IS PRESENT. |
| 11:16AM | 2 | EXCUSE ME.  WE'RE STILL IN SESSION, PLEASE.  THANK YOU. |
| 11:16AM | 3 | MR. WADE. |
| 11:16AM | 4 | MR. WADE:  YOUR HONOR, I'D LIKE TO RAISE ONE ISSUE |
| 11:16AM | 5 | THAT HAS NOW COME UP A COUPLE OF TIMES WITH A COUPLE OF |
| 11:16AM | 6 | WITNESSES AND IT'S CONCERNING TO THE DEFENSE. |
| 11:16AM | 7 | THE GOVERNMENT HAS ASKED QUESTIONS IN A WAY TO TRY TO |
| 11:16AM | 8 | CREATE THE IMPRESSION WITH THIS JURY THAT SOME EMPLOYEES ARE |
| 11:16AM | 9 | FALSIFYING INFORMATION OR FALSIFYING DATA AND ASKING QUESTIONS |
| 11:16AM | 10 | THAT SUGGEST THAT THERE'S SOME UNDERLYING INTEGRITY ISSUE WITH |
| 11:16AM | 11 | THE DATA WHEN THERE'S NO EVIDENCE TO THAT EFFECT IN THIS |
| 11:16AM | 12 | RECORD. |
| 11:16AM | 13 | AND, AND I'M DEEPLY TROUBLED BY THAT SUGGESTION AND THE |
| 11:16AM | 14 | IMPLICATION OF THAT. |
| 11:17AM | 15 | COUNSEL HAS TO HAVE A GOOD FAITH BASIS TO ASK THOSE |
| 11:17AM | 16 | QUESTIONS AND SHOULD NOT TRY TO CREATE A FALSE IMPRESSION TO |
| 11:17AM | 17 | THIS JURY. |
| 11:17AM | 18 | THE COURT:  IS THIS RELATED TO MR. SCHENK'S RECENT |
| 11:17AM | 19 | QUESTIONS? |
| 11:17AM | 20 | MR. WADE:  SOME OF THE RECENT QUESTIONS RELATING |
| 11:17AM | 21 | THAT YOU DIDN'T KNOW ABOUT THE DATA, AND THEY WERE ASKED IN A |
| 11:17AM | 22 | WAY - AND THEY DID IT WITH DR. ROSENDORFF AS WELL -- TO TRY TO |
| 11:17AM | 23 | CREATE THE IMPRESSION THAT THERE IS SOME UNDERLYING |
| 11:17AM | 24 | FALSIFICATION OF DATA. |
| 11:17AM | 25 | THERE'S NOT EVIDENCE OF THAT TO MY KNOWLEDGE IN THIS CASE, |

11:17AM   1    BUT IT, IT IS INNUENDO THAT CREATES A FALSE IMPRESSION WITH THE

11:17AM   2    JURY, AND IT'S VERY TROUBLING TO THE DEFENSE.

11:17AM   3              THE COURT:  MR. SCHENK, DO YOU WANT TO COMMENT?

11:17AM   4              MR. SCHENK:  I'LL LIMIT MY COMMENTS TO DR. DHAWAN.

11:17AM   5        DR. DHAWAN WAS MAKING A TREMENDOUS NUMBER OF ASSUMPTIONS

11:17AM   6    IN HIS WORK AT THERANOS AND IN HIS ANSWERS TO MR. WADE.

11:17AM   7        WHAT I DID WAS HIGHLIGHT THAT FACT.

11:17AM   8        MR. DHAWAN HAD NO IDEA WHERE THE UNDERLYING DATA CAME

11:18AM   9    FROM, AND THAT WAS THE POINT THAT I HIGHLIGHTED FOR THE JURY.

11:18AM  10        MR. DHAWAN, DR. DHAWAN DID NOT DO ANY FURTHER LOOKING

11:18AM  11    BEYOND THE PAGES TO SEE WHERE THE DATA CAME FROM.

11:18AM  12        SO IT'S A DIFFERENT POINT THAN WHAT MR. WADE IS ACCUSING

11:18AM  13    ME OF DOING.

11:18AM  14        I WASN'T SUGGESTING TO DR. DHAWAN THAT SOMEONE AT THERANOS

11:18AM  15    WAS MANIPULATING DATA.  WHAT I WAS SUGGESTING WAS THAT

11:18AM  16    DR. DHAWAN HAD NO IDEA WHERE THE DATA CAME FROM.  DR. DHAWAN

11:18AM  17    SIGNED DOCUMENTS, AND HE DIDN'T KNOW WHERE THAT INFORMATION

11:18AM  18    CAME FROM OR THE SOURCE OF THE INFORMATION, AND THAT IS A

11:18AM  19    COMPLETELY APPROPRIATE FACT FOR THE JURY TO WEIGH.

11:18AM  20              THE COURT:  YOU KNOW, MR. WADE, THAT'S WHAT I

11:18AM  21    THOUGHT HE WAS DOING.  HE WAS -- IT SEEMED TO ME THE

11:18AM  22    EXAMINATION WAS, YOU SIGNED THESE 50, 49 DIFFERENT DOCUMENTS,

11:18AM  23    BUT YOU DIDN'T -- AND YOU RELAYED ON -- AND I THINK YOU DID A

11:18AM  24    GOOD JOB OF SAYING THAT'S COMPLETELY, ACCORDING TO STATUTE, YOU

11:18AM  25    RELIED ON SOMEBODY ELSE'S WORK; AND THEN THE REDIRECT WAS,

| 11:19AM | 1 | THAT'S RIGHT, BUT YOU DID NOT FLIP THROUGH THE PAGES AND DO ANY |
| 11:19AM | 2 | OF THE ANALYSIS YOURSELF. |
| 11:19AM | 3 | IS THAT IMPROPER? |
| 11:19AM | 4 | MR. WADE:  I DON'T THINK IT'S IMPROPER TO SAY THAT |
| 11:19AM | 5 | YOU DIDN'T DO ANY OF THE UNDERLYING ANALYSIS, AND I CAN LOOK AT |
| 11:19AM | 6 | THE TRANSCRIPT AND WE CAN RAISE THIS AT ANOTHER TIME. |
| 11:19AM | 7 | BUT THERE HAVE BEEN QUESTIONS, TO ME THE IMPLICATION OF |
| 11:19AM | 8 | WHICH ARE THAT THERE IS SOME UNDERLYING INTEGRITY ISSUE WITH |
| 11:19AM | 9 | THE DATA. |
| 11:19AM | 10 | EXAMINATION OF, WITH RESPECT TO THIS DOCUMENT YOU DON'T |
| 11:19AM | 11 | KNOW ANYTHING ABOUT THIS DATA, YOU DIDN'T PERFORM THE |
| 11:19AM | 12 | CALCULATIONS, YOU WEREN'T INVOLVED IN THE DEVELOPMENT WORK, |
| 11:19AM | 13 | THAT'S ONE THING. |
| 11:19AM | 14 | THERE HAVE BEEN QUESTIONS WITH A COUPLE OF WITNESS NOW |
| 11:19AM | 15 | THAT, TO OUR EAR -- AND WE CAN POINT THEM TO THE COURT AND |
| 11:19AM | 16 | MAYBE SEEK A DIRECTION TO THE JURY ON IT -- THAT CREATE THE |
| 11:19AM | 17 | IMPRESSION THAT THERE IS SOME UNDERLYING FALSIFICATION OR DATA |
| 11:19AM | 18 | INTEGRITY ISSUE AND TO MY KNOWLEDGE THERE IS NOT. |
| 11:19AM | 19 | THE COURT:  OKAY.  ARE YOU CONCERNED THAT THE |
| 11:19AM | 20 | GOVERNMENT IN THEIR CLOSING ARGUMENT WILL SO ARGUE?  IS THAT |
| 11:20AM | 21 | YOUR CONCERN? |
| 11:20AM | 22 | MR. WADE:  I'M CONFIDENT, BASED ON WHAT MR. SCHENK |
| 11:20AM | 23 | SAID, THAT THEY WON'T. |
| 11:20AM | 24 | BUT I JUST DON'T WANT THIS CONTINUED ERROR OF THE |
| 11:20AM | 25 | IMPLICATION BEING THAT THERE'S SOME UNDERLYING INTEGRITY ISSUE |

3841

11:20AM  1    BECAUSE I THINK THAT'S -- I THINK IT'S FALSE TO MY KNOWLEDGE.

11:20AM  2        I DON'T THINK THERE'S A GOOD FAITH BASIS TO ASK IT AND I

11:20AM  3    THINK IT CREATES A MISIMPRESSION TO THE JURY.

11:20AM  4        THE COURT:  DO YOU INTEND TO SO ARGUE TO THE JURY IN

11:20AM  5    CLOSING ARGUMENT?

11:20AM  6        MR. SCHENK:  IN CLOSING, THE GOVERNMENT IS GOING TO

11:20AM  7    ARGUE THE EVIDENCE.  SO WE WILL REVIEW THE TRANSCRIPT AND SEE

11:20AM  8    WHAT THE WITNESSES TESTIFIED TO AND LIMIT ARGUMENT TO THE FACTS

11:20AM  9    THAT HAVE COME IN THROUGH EVIDENCE.

11:20AM 10        I'D LIKE TO SPEND A LITTLE BIT OF TIME ON THE QUESTION OF

11:20AM 11    WHETHER THERE HAVE BEEN STATEMENTS FROM WITNESSES THAT CALL THE

11:20AM 12    INTEGRITY OF THE DATA INTO QUESTION.

11:20AM 13        MY RECOLLECTION IS THAT THERE ACTUALLY HAVE BEEN SOME

11:20AM 14    STATEMENTS FROM WITNESSES THAT HAVE CALLED INTO QUESTION THE

11:20AM 15    INTEGRITY OF THE DATA, WHICH WOULD ALLOW US TO MAKE THE EXACT

11:20AM 16    ARGUMENT THAT MR. WADE IS SUGGESTING WE SHOULDN'T MAKE.

11:20AM 17        SO I DON'T WANT TO COMMIT TO THE COURT RIGHT NOW THAT WE

11:21AM 18    WON'T MAKE THAT ARGUMENT.  WE WILL LOOK AT THE TRANSCRIPTS AND

11:21AM 19    SEE WHAT THE EVIDENCE THAT THE JURY HAS HEARD THAT ALLOWS ONE

11:21AM 20    TO CONCLUDE.

11:21AM 21        THE COURT:  WHAT ABOUT THIS WITNESS AND THIS

11:21AM 22    WITNESS'S TESTIMONY?

11:21AM 23        MR. SCHENK:  THIS WITNESS WASN'T THERE ENOUGH TO

11:21AM 24    KNOW ABOUT THE INTEGRITY OF THE DATA.  WE DEFINITELY DON'T

11:21AM 25    INTEND TO ARGUE THAT THIS WITNESS SUBSTANTIATES A CLAIM NOW

```
11:21AM   1    THAT THE INTEGRITY OF THE DATA AT THERANOS WAS FALSE.  THIS
11:21AM   2    WITNESS PROVES A DIFFERENT POINT.
11:21AM   3         THE COURT:  ANYTHING FURTHER YOU'D LIKE TO COMMENT
11:21AM   4    ABOUT MR. WADE'S OBSERVATIONS FROM HIS TEAM ABOUT AT LEAST THIS
11:21AM   5    LAST WITNESS?
11:21AM   6         MR. SCHENK:  NO.  THANK YOU.
11:21AM   7         MR. WADE:  WE'LL REST ON THE POSITION FOR NOW.
11:21AM   8       I WANTED TO RAISE IT WITH THE COURT BECAUSE WE'VE SEEN IT
11:21AM   9    IN A COUPLE OF INSTANCES, AND I WOULD SUGGEST THAT IF THAT'S AN
11:21AM  10    AREA WHERE MR. SCHENK BELIEVES IT'S APPROPRIATE TO INQUIRE,
11:21AM  11    THAT WE RAISE THAT ISSUE AND ADDRESS IT BEFORE IT SPILLS OUT IN
11:21AM  12    FRONT OF THE JURY BECAUSE IT, IT HAS OBVIOUSLY VERY PREJUDICIAL
11:21AM  13    IMPLICATIONS FOR OUR CLIENT AND I DON'T THINK IT'S SOMETHING
11:21AM  14    THAT SHOULD POP OUT WILLY NILLY, SO WE WOULD LIKE THE
11:22AM  15    OPPORTUNITY TO BE HEARD ON THAT.
11:22AM  16         THE COURT:  WELL, I APPRECIATE YOUR SENSITIVITY TO
11:22AM  17    IT, AND I KNOW THE DEFENSE EARS ARE SOMETIMES FINER TUNED
11:22AM  18    TOWARDS ISSUES AND THINGS.
11:22AM  19       BUT LET ME SAY THAT MY OBSERVATION WAS, AT LEAST WITH THIS
11:22AM  20    WITNESS, THE QUESTIONING WAS, PARTICULARLY ON REDIRECT, SEEMED
11:22AM  21    TO FOCUS ON, YOU DIDN'T DO ANY INDEPENDENT ANALYSIS, YOU RELIED
11:22AM  22    ON THE ASSUMPTIONS THAT YOU MADE, WHICH HE'S ENTITLED TO DO.
11:22AM  23    AS YOU POINTED OUT, THAT'S WHAT A LAB DIRECTOR CAN DO.
11:22AM  24       SO I THINK THERE WAS AN EVEN BALANCE ON THAT.  YOU DID
11:22AM  25    THAT ON YOUR CROSS AND RECROSS.
```

| | | |
|---|---|---|
| 11:22AM | 1 | SO I DON'T THINK IT WAS AS MUCH OF AN ISSUE WITH THIS |
| 11:22AM | 2 | WITNESS.  PERHAPS THE TUNE CAME UP ON IT WHICH CAUSED YOU TO |
| 11:22AM | 3 | RISE TO YOUR FEET ON THIS, AND THERE MAY BE WITNESSES, PAST |
| 11:22AM | 4 | WITNESSES THAT YOU HAD SOME CONCERN ABOUT AS WELL. |
| 11:22AM | 5 | MR. WADE:  AND THE COURT MAY BE RIGHT, AND I |
| 11:22AM | 6 | CERTAINLY ACCEPT THAT MR. SCHENK IS SAYING THAT IT WASN'T HIS |
| 11:23AM | 7 | INTENTION AND I ACCEPT THAT FROM MR. SCHENK. |
| 11:23AM | 8 | IF THERE'S SOME CONCERN WE SEE IN LOOKING AT THE |
| 11:23AM | 9 | TRANSCRIPT, WE'LL RERAISE IT.  BUT I THINK IT'S GOOD TO HAVE |
| 11:23AM | 10 | NOTED THIS ISSUE SO WE'RE ALL AWARE OF IT GOING FORWARD. |
| 11:23AM | 11 | THE COURT:  OKAY.  GREAT. |
| 11:23AM | 12 | MR. SCHENK:  THANK YOU. |
| 11:23AM | 13 | MR. WADE:  THANK YOU. |
| 11:23AM | 14 | THE COURT:  ALL RIGHT.  THANKS. |
| 11:23AM | 15 | THE CLERK:  COURT IS IN RECESS. |
| 11:23AM | 16 | (RECESS FROM 11:23 A.M. UNTIL 11:58 A.M.) |
| 11:58AM | 17 | (JURY OUT AT 11:58 A.M.) |
| 11:58AM | 18 | THE COURT:  ALL RIGHT.  THANK YOU.  WE'RE BACK ON |
| 11:58AM | 19 | THE RECORD IN THE HOLMES MATTER. |
| 11:58AM | 20 | ALL COUNSEL ARE PRESENT AND MS. HOLMES IS PRESENT.  THE |
| 11:58AM | 21 | JURY IS NOT PRESENT. |
| 11:58AM | 22 | I JUST WANTED TO BRING TO COUNSEL'S ATTENTION AN EMAIL |
| 11:58AM | 23 | THAT MS. KRATZMANN RECEIVED FROM ONE OF OUR JURORS. |
| 11:58AM | 24 | THE EMAIL INFORMS THAT THIS JUROR'S MOTHER-IN-LAW JUST |
| 11:58AM | 25 | PASSED.  SHE DOESN'T KNOW YET ABOUT ARRANGEMENTS, BUT SHE MAY |

3844

| 11:58AM | 1 | NEED TO TRAVEL SOON. |
| 11:58AM | 2 | SHE ASKED MS. KRATZMANN WHAT THE NEXT STEPS SHOULD BE. |
| 11:58AM | 3 | I ASKED MS. KRATZMANN TO INQUIRE WHAT THE TRAVEL DISTANCE |
| 11:58AM | 4 | MIGHT BE, AND I BELIEVE IT INVOLVES THE MIDWEST.  SO -- AND AS |
| 11:58AM | 5 | OF YET, I'M INFORMED FROM MS. KRATZMANN THAT THIS WAS JUST |
| 11:58AM | 6 | SUDDEN NEWS, SO WE WILL -- I'LL ASK MS. KRATZMANN TO KEEP IN |
| 11:59AM | 7 | CONTACT WITH THE JUROR.  WE'LL GET WHATEVER INFORMATION WE |
| 11:59AM | 8 | RECEIVE, AND THEN I'LL LET YOU KNOW AND WE CAN ADJUST |
| 11:59AM | 9 | ACCORDINGLY. |
| 11:59AM | 10 | WHILE WE'RE ON THE TOPIC, I SHOULD INFORM YOU, AND I'D |
| 11:59AM | 11 | LIKE TO INFORM YOU, THAT I HAVE A DEAR FRIEND WHO IS CRITICALLY |
| 11:59AM | 12 | ILL NOW AND PROBABLY WON'T MAKE IT MUCH LONGER I'M INFORMED, |
| 11:59AM | 13 | AND THIS IS SOMEBODY WHO IS VERY CLOSE TO ME AND HIRED ME IN MY |
| 11:59AM | 14 | FIRST JOB IN THE PUBLIC DEFENDER'S OFFICE, AND SO HE'S VERY |
| 11:59AM | 15 | CLOSE TO ME AND MY FAMILY. |
| 11:59AM | 16 | THAT MAY CAUSE ANOTHER BREAK.  IF THERE'S A MEMORIAL |
| 11:59AM | 17 | SERVICE, I WOULD LIKE TO ATTEND THAT WITH YOUR PERMISSION, AND |
| 11:59AM | 18 | IF WE CAN ADJUST THAT SHOULD THAT COME TO PASS, I'D LIKE TO DO |
| 11:59AM | 19 | THAT. |
| 11:59AM | 20 | BUT, AGAIN, WE'LL SEE WHAT BRINGS US. |
| 11:59AM | 21 | AND I DID HAVE OCCASION TO LOOK AT MY SCHEDULE ALSO, |
| 12:00PM | 22 | NOVEMBER 17TH IS A DATE THAT I'LL BE UNAVAILABLE FOR AN HOUR |
| 12:00PM | 23 | FROM 10:30 TO 11:30.  I HAD PROMISED A LAW SCHOOL PROFESSOR |
| 12:00PM | 24 | FRIEND THAT I WOULD MAKE MYSELF AVAILABLE TO HIM AND HIS CLASS |
| 12:00PM | 25 | FOR THAT HOUR.  SO I APOLOGIZE FOR THAT INTERRUPTION, BUT I |

3845

| | | |
|---|---|---|
| 12:00PM | 1 | WANT TO LET YOU KNOW THAT KNOW SO YOU CAN SCHEDULE AROUND THAT. |
| 12:00PM | 2 | IT'S AN HOUR. |
| 12:00PM | 3 | SO THAT'S THE LATEST NEWS FOR OUR SCHEDULE. |
| 12:00PM | 4 | SO THANK YOU.  WE'LL KEEP YOU POSTED ON THE JUROR'S |
| 12:00PM | 5 | SITUATION, AND I'LL TRY TO INFORM YOU AS BEST I CAN ON MY DEAR |
| 12:00PM | 6 | FRIEND'S SITUATION. |
| 12:00PM | 7 | OKAY.  THANK YOU.  I'LL STEP DOWN AND WE'LL BRING THE JURY |
| 12:00PM | 8 | IN, AND WE'RE GOING TO END AT 1:00 O'CLOCK HERE TODAY. |
| 12:00PM | 9 | I DON'T THINK WE'LL GET TO THIS ISSUE, MR. BOSTIC, THAT WE |
| 12:00PM | 10 | TALKED ABOUT. |
| 12:00PM | 11 | MR. BOSTIC:  NO, YOUR HONOR.  THAT WILL COME UP ON |
| 12:01PM | 12 | TUESDAY. |
| 12:01PM | 13 | THE COURT:  OKAY.  GREAT.  THANK YOU. |
| 12:01PM | 14 | THE CLERK:  COURT IS IN RECESS. |
| 12:01PM | 15 | (RECESS FROM 12:01 P.M. UNTIL 12:05 P.M.) |
| 12:05PM | 16 | THE COURT:  ALL RIGHT.  THANK YOU.  WE'RE BACK ON |
| 12:05PM | 17 | THE RECORD. |
| 12:05PM | 18 | OUR JURY IS PRESENT, ALL COUNSEL ARE PRESENT, AND |
| 12:05PM | 19 | MS. HOLMES IS PRESENT. |
| 12:05PM | 20 | MR. BOSTIC, YOU HAVE ANOTHER WITNESS? |
| 12:05PM | 21 | MR. BOSTIC:  YES, YOUR HONOR. |
| 12:05PM | 22 | THE UNITED STATES CALLS DANIEL EDLIN. |
| 12:05PM | 23 | (PAUSE IN PROCEEDINGS.) |
| 12:05PM | 24 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 12:06PM | 25 | SIR, IF YOU WOULD PLEASE COME FORWARD, AND IF YOU COULD |

EDLIN DIRECT BY MR. BOSTIC                                         3846

12:06PM   1    STAND OVER HERE FACING OUR COURTROOM DEPUTY.  IF YOU WOULD

12:06PM   2    RAISE YOUR RIGHT HAND, SHE HAS A QUESTION FOR YOU.

12:06PM   3           **(GOVERNMENT'S WITNESS, DANIEL EDLIN, WAS SWORN.)**

12:06PM   4              THE WITNESS:  YES.

12:06PM   5              THE COURT:  THANK YOU.

12:06PM   6         PLEASE HAVE A SEAT HERE, SIR, AND MAKE YOURSELF

12:06PM   7    COMFORTABLE.  PLEASE FEEL FREE TO ADJUST THE CHAIR AND THE

12:06PM   8    MICROPHONE AS YOU NEED.

12:06PM   9         I'LL ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE.

12:06PM  10         WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

12:06PM  11    AND THEN SPELL IT, PLEASE.

12:06PM  12              THE WITNESS:  DANIEL EDLIN.  D-A-N-I-E-L, E-D-L-I-N.

12:06PM  13              THE COURT:  COUNSEL.

12:06PM  14              MR. BOSTIC:  THANK YOU, YOUR HONOR.

12:06PM  15                        **DIRECT EXAMINATION**

12:06PM  16    BY MR. BOSTIC:

12:06PM  17    Q.   GOOD AFTERNOON, MR. EDLIN.

12:07PM  18    A.   GOOD AFTERNOON.

12:07PM  19    Q.   MR. EDLIN, IF YOU'RE FULLY VACCINATED AND COMFORTABLE

12:07PM  20    DOING SO, I UNDERSTAND THE COURT WILL GIVE YOU PERMISSION TO

12:07PM  21    TESTIFY WITHOUT YOUR MASK.

12:07PM  22    A.   YES, I AM.

12:07PM  23              THE COURT:  YOU CAN REMOVE YOUR MASK IF YOU WISH.

12:07PM  24    THANK YOU.

12:07PM  25              THE WITNESS:  THANK YOU.

EDLIN DIRECT BY MR. BOSTIC                                          3847

12:07PM   1    BY MR. BOSTIC:

12:07PM   2    Q.   MR. EDLIN, WAS THERE A TIME WHEN YOU WERE EMPLOYED BY A

12:07PM   3    COMPANY CALLED THERANOS?

12:07PM   4    A.   YES.

12:07PM   5    Q.   AND WHAT WERE YOUR APPROXIMATE DATES OF EMPLOYMENT AT THE

12:07PM   6    COMPANY?

12:07PM   7    A.   I WAS EMPLOYED FROM SEPTEMBER 2011 THROUGH DECEMBER 2016.

12:07PM   8    Q.   OKAY.  WE'LL TALK MORE ABOUT THIS IN A LITTLE BIT, BUT FOR

12:07PM   9    NOW CAN YOU GIVE US AN OVERVIEW OF YOUR GENERAL ROLE OR YOUR

12:07PM   10   ROLES AT THE COMPANY?

12:07PM   11   A.   SO I WAS FIRST HIRED AS A SENIOR PRODUCT MANAGER AND I

12:07PM   12   REPORTED TO CHRISTIAN HOLMES, HE WAS THE TEAM LEAD.

12:07PM   13       WORK IN THAT ROLE MAINLY FOCUSSED ON SUPPORTING

12:07PM   14   RELATIONSHIPS WITH BUSINESS PARTNERS AND POTENTIAL PARTNERS.

12:07PM   15       I WAS ON A TEAM OF OTHER PRODUCT MANAGERS, AND IN SOME OF

12:08PM   16   THE ROLES I WORKED ALONGSIDE THEM.  THAT INCLUDED SUPPORTING

12:08PM   17   WORK WITH WALGREENS AND RETAIL PARTNERS.  I WORKED TO

12:08PM   18   OPERATIONALIZE THE WALGREENS PARTNERSHIP AND PLAN THE ROLLOUT

12:08PM   19   OF THERANOS CENTERS IN WALGREENS STORES.

12:08PM   20       I ALSO WORKED ALONGSIDE SOME OF THE OTHER PRODUCT MANAGERS

12:08PM   21   SUPPORTING WORK WITH MARKETING AND COMMUNICATIONS AGENCIES.

12:08PM   22       I ALSO WORKED DIRECTLY WITH ELIZABETH TO SUPPORT

12:08PM   23   RELATIONSHIPS WITH MILITARY AND PHARMACEUTICAL COMPANIES.

12:08PM   24       AND I ALSO COORDINATED TECHNOLOGY DEMONSTRATIONS FOR

12:08PM   25   GUESTS AND VISITORS.

EDLIN DIRECT BY MR. BOSTIC                                      3848

12:08PM   1        SO I WAS IN THAT ROLE FOR ABOUT THREE YEARS.

12:08PM   2        AND AFTER KIND OF THE WALGREENS PARTNERSHIP GOT OFF THE

12:08PM   3   GROUND, I WAS WORKING MORE DIRECTLY WITH ELIZABETH, AND I

12:09PM   4   RECEIVED A PROMOTION TO A LEAD STRATEGIC OPERATIONS OFFICE OF

12:09PM   5   THE CEO, AND IN THAT ROLE I STILL SUPPORTED PARTNERSHIPS AND

12:09PM   6   POTENTIAL BUSINESS RELATIONSHIPS, STILL WORKED ON MEDIA AND

12:09PM   7   COMMUNICATIONS.

12:09PM   8        AND THEN THERE WAS ALSO KIND OF AN OPERATIONAL ASPECT TO

12:09PM   9   THE ROLE WHERE I WOULD WORK WITH SOME OF THE OTHER MEMBERS OF

12:09PM  10   ELIZABETH'S OFFICE, LIKE HER ASSISTANTS, TO MAKE SURE THAT

12:09PM  11   CERTAIN PROJECTS AND FEEDBACK THAT REQUIRED HER ATTENTION WERE

12:09PM  12   COMPLETED, YOU KNOW, IN A TIMELY FASHION.

12:09PM  13   Q.   THANK YOU.

12:09PM  14        THE PROMOTION THAT YOU JUST MENTIONED, WHEN DID IT TAKE

12:09PM  15   EFFECT?

12:09PM  16   A.   IT TOOK EFFECT END OF 2014 INTO THE BEGINNING OF 2015.

12:09PM  17   Q.   YOU SAID YOU LEFT THE COMPANY IN DECEMBER OF 2016; IS THAT

12:09PM  18   CORRECT?

12:09PM  19   A.   THAT'S RIGHT.

12:09PM  20   Q.   DID YOU LEAVE THE COMPANY VOLUNTARILY?

12:09PM  21   A.   YES, I DID.

12:09PM  22   Q.   AT A HIGH LEVEL IN GENERAL TERMS, WHAT WAS YOUR REASON FOR

12:10PM  23   DECIDING TO LEAVE THE COMPANY AT THAT TIME?

12:10PM  24   A.   I LEFT THE COMPANY FOR TWO BASIC REASONS.  FIRST WAS I

12:10PM  25   WANTED TO GO TO BUSINESS SCHOOL, WHICH I DID.

EDLIN DIRECT BY MR. BOSTIC                                           3849

12:10PM   1          SECOND, YOU KNOW, AT THAT TIME I NO LONGER BELIEVED, BASED

12:10PM   2     ON WHAT I WAS SEEING, THAT THE COMPANY WAS CAPABLE OF STANDING

12:10PM   3     BEHIND THE CLAIMS IT HAD BEEN MAKING ABOUT THE TECHNOLOGY.

12:10PM   4          THIS WAS ABOUT A YEAR AFTER THE FIRST

12:10PM   5     "WALL STREET JOURNAL" CAME OUT, AND THE COMPANY MADE SEVERAL

12:10PM   6     ATTEMPTS TO PROVE ITS TECHNOLOGY, BUT THEY WERE ALL

12:10PM   7     UNSUCCESSFUL, AND I JUST NO LONGER WANTED TO BE IN THAT TYPE OF

12:10PM   8     ENVIRONMENT.

12:10PM   9     Q.   WE'LL CIRCLE BACK ON SOME OF THOSE DETAILS LATER, BUT FOR

12:10PM  10     NOW LET'S START AT THE BEGINNING OF THE STORY.

12:10PM  11          FIRST, CAN YOU SUMMARIZE YOUR EDUCATION FOR US AND ANY

12:10PM  12     WORK HISTORY THAT CAME BEFORE THERANOS.

12:10PM  13     A.   FOR MY UNDERGRADUATE, I ATTENDED DUKE UNIVERSITY.  I

12:10PM  14     MAJORED IN PUBLIC POLICY AND HAD A CERTIFICATE IN MARKETS AND

12:11PM  15     MANAGEMENT.

12:11PM  16          I ALSO RECEIVED MY MASTER'S IN BUSINESS ADMINISTRATION

12:11PM  17     FROM THE UCLA ANDERSON SCHOOL OF MANAGEMENT IN 2019.

12:11PM  18          I GRADUATED FROM DUKE IN 2009.

12:11PM  19          FIRST JOB WAS AS A SALES AND RESEARCH ASSISTANT AT TELSEY

12:11PM  20     ADVISORY GROUP, T-E-L-S-E-Y.  IT WAS AN EQUITY RESEARCH SALES

12:11PM  21     AND TRADING FIRM IN NEW YORK CITY.

12:11PM  22     Q.   WAS THAT YOUR ONLY JOB BEFORE JOINING THERANOS?

12:11PM  23     A.   YES.

12:11PM  24     Q.   LET'S TALK ABOUT THERANOS THEN.

12:11PM  25          HOW DID YOU INITIALLY HEAR ABOUT THE COMPANY?

EDLIN DIRECT BY MR. BOSTIC                                          3850

12:11PM  1    A.   SO I ATTENDED DUKE WITH ELIZABETH'S BROTHER CHRISTIAN AND

12:11PM  2    HE'S ONE OF MY CLOSEST FRIENDS, AND I ACTUALLY FIRST MET

12:11PM  3    ELIZABETH WHEN I WAS IN COLLEGE AT, YOU KNOW, GRADUATION AND

12:11PM  4    BIRTHDAY DINNERS.  SHE WAS INTRODUCED, YOU KNOW, AS CHRISTIAN'S

12:12PM  5    SISTER, AND I WAS AWARE THAT SHE HAD DROPPED OUT OF STANFORD TO

12:12PM  6    START HER OWN COMPANY.

12:12PM  7         UNDER LESS THAN TWO YEARS AFTER GRADUATION, CHRISTIAN HAD

12:12PM  8    GONE TO WORK AT THERANOS AND I KNEW THAT HE WAS DOING THAT.

12:12PM  9         AND THEN A COUPLE MONTHS LATER, HE GAVE ME A CALL TO

12:12PM  10   ACTUALLY TELL ME THAT THERE WAS AN OPPORTUNITY OPEN AT THERANOS

12:12PM  11   TO JOIN THE COMPANY AND JOIN HIS TEAM, AND HE ALSO TOLD ME THAT

12:12PM  12   HE HAD PRESENTED THE SAME OPPORTUNITY TO A FEW OF OUR OTHER

12:12PM  13   CLASSMATES AND FRIENDS FROM DUKE UNIVERSITY.

12:12PM  14        SO WE DIDN'T REALLY DISCUSS TOO MANY DETAILS AT THE TIME,

12:12PM  15   BUT IT SOUNDED LIKE THERE WAS A LOT OF, YOU KNOW, POTENTIAL.

12:12PM  16        AND CAME TO THE THERANOS OFFICERS TO INTERVIEW AS A GROUP,

12:12PM  17   AND HEARD MORE ABOUT THE OPPORTUNITY.  IT SOUNDED INCREDIBLY

12:12PM  18   EXCITING AND SOUNDED LIKE A REALLY GREAT OPPORTUNITY AT THAT

12:13PM  19   TIME, I WAS 24 AT THE TIME, AND SO WE INTERVIEWED AND WE GOT

12:13PM  20   THE OFFERS AND, YEAH, WE DID THAT.

12:13PM  21   Q.   SORRY.

12:13PM  22   A.   YEAH, SURE.

12:13PM  23   Q.   THANK YOU.  LET ME ASK YOU SOME QUESTIONS ABOUT THAT.

12:13PM  24        SO AT THE TIME WHEN YOU WERE COMING OUT TO INTERVIEW AT

12:13PM  25   THERANOS, WHAT WAS EXCITING TO YOU ABOUT THAT OPPORTUNITY?

EDLIN DIRECT BY MR. BOSTIC                                          3851

12:13PM   1      A.   OUR UNDERSTANDING -- MY UNDERSTANDING WAS THAT THE COMPANY

12:13PM   2      HAD DEVELOPED, YOU KNOW, BREAKTHROUGH, GROUNDBREAKING

12:13PM   3      PROPRIETARY TECHNOLOGY THAT WOULD MAKE IT POSSIBLE TO DO

12:13PM   4      FINGERSTICK BLOOD TESTING AND ELIMINATE THE NEED FOR VENOUS

12:13PM   5      SAMPLE, WHICH HAD THE OPPORTUNITY TO HELP PATIENTS IN A NUMBER

12:13PM   6      OF DIFFERENT WAYS WHO OTHERWISE COULDN'T GET THEIR BLOOD DRAWN,

12:13PM   7      YOU KNOW, THROUGH THE ARM.

12:13PM   8           AND TESTS WOULD BE MORE AFFORDABLE, THEY WOULD BE MORE

12:13PM   9      ACCESSIBLE.

12:14PM  10           I UNDERSTOOD THAT THE COMPANY HAD JUST SIGNED A DEAL WITH

12:14PM  11      WALGREENS, AND THAT PART OF MY ROLE WOULD BE TO OPERATIONALIZE

12:14PM  12      AND BRING TO LIFE THAT PARTNERSHIP.

12:14PM  13      Q.   AND WHAT WAS YOUR SOURCE FOR THIS INFORMATION?  WHEN WERE

12:14PM  14      YOU LEARNING THESE THINGS?

12:14PM  15      A.   THE SOURCE OF THE INFORMATION WAS ELIZABETH AND SUNNY AND

12:14PM  16      CHRISTIAN, AND WE FIRST HEARD ABOUT THIS INFORMATION DURING OUR

12:14PM  17      INTERVIEWS.  AND THEN WHEN I JOINED THE COMPANY WE LEARNED

12:14PM  18      MORE.

12:14PM  19      Q.   AS PART OF THE JOB INTERVIEW PROCESS, DID YOU MEET

12:14PM  20      INDIVIDUALLY WITH MR. BALWANI AND MS. HOLMES?

12:14PM  21      A.   I DID.

12:14PM  22      Q.   AND DO YOU REMEMBER LEARNING OF SOME MORE DETAILS ABOUT

12:14PM  23      THE COMPANY AND ITS TECHNOLOGY DURING THOSE MEETINGS?

12:14PM  24      A.   THE INTERVIEWS WERE -- THERE WAS A GROUP PORTION OF THE

12:14PM  25      INTERVIEW AND AN INDIVIDUAL PORTION, AND IN EACH OF THOSE

EDLIN DIRECT BY MR. BOSTIC                                          3852

| | | |
|---|---|---|
| 12:14PM | 1 | CONVERSATIONS I WAS ABLE TO LEARN MORE ABOUT THE COMPANY. |
| 12:14PM | 2 | Q.   AT SOME POINT DID YOU SIGN A NONDISCLOSURE AGREEMENT WITH |
| 12:15PM | 3 | THERANOS? |
| 12:15PM | 4 | A.   YES. |
| 12:15PM | 5 | Q.   AND WAS THAT BEFORE OR AFTER YOU ACTUALLY STARTED WORKING |
| 12:15PM | 6 | THERE? |
| 12:15PM | 7 | A.   I'M NOT SURE EXACTLY. |
| 12:15PM | 8 | Q.   AS A RESULT OF JOB INTERVIEWS THAT YOU HAD, WERE YOU |
| 12:15PM | 9 | OFFERED A POSITION AT THERANOS? |
| 12:15PM | 10 | A.   YES. |
| 12:15PM | 11 | Q.   AND YOU ACCEPTED? |
| 12:15PM | 12 | A.   YES. |
| 12:15PM | 13 | Q.   OF THE GROUP THAT YOU WERE JUST MENTIONING, THE GROUP OF |
| 12:15PM | 14 | YOU WHO HAD ALL GONE TO COLLEGE TOGETHER, DID OTHER INDIVIDUALS |
| 12:15PM | 15 | ALSO ACCEPT SIMILAR POSITIONS AT THERANOS? |
| 12:15PM | 16 | A.   YES, EVERYONE ACCEPTED OFFERS FOR THE SAME POSITION AS A |
| 12:15PM | 17 | SENIOR PRODUCT MANAGER. |
| 12:15PM | 18 | Q.   AND WHO ELSE WAS IN THAT GROUP?  WHAT ARE THEIR NAMES? |
| 12:15PM | 19 | A.   JEFF BLICKMAN, NICK MENCHEL, SANI HADZIAHMETOVIC, WHICH |
| 12:15PM | 20 | MIGHT BE DIFFICULT TO SPELL.  THOSE WERE THE FOUR OF US THAT |
| 12:15PM | 21 | JOINED INITIALLY. |
| 12:16PM | 22 | AND MAX FOSQUE JOINED A YEAR LATER. |
| 12:16PM | 23 | AND THEN A FEW YEARS LATER ANOTHER PERSON JOINED AS WELL, |
| 12:16PM | 24 | BUT THAT WAS -- YEAH. |
| 12:16PM | 25 | Q.   WHEN YOU FIRST JOINED, WAS THIS IN 2011? |

EDLIN DIRECT BY MR. BOSTIC                                        3853

```
12:16PM   1      A.   YES.

12:16PM   2      Q.   AND WHAT MONTH IN 2011 APPROXIMATELY?

12:16PM   3      A.   SEPTEMBER.

12:16PM   4      Q.   OKAY.  AND YOU SAID THAT YOUR INITIAL JOB TITLE WAS SENIOR

12:16PM   5      PRODUCT MANAGER; IS THAT CORRECT?

12:16PM   6      A.   CORRECT.

12:16PM   7      Q.   AND WHO WERE YOU REPORTING TO IN THAT ROLE?

12:16PM   8      A.   I'VE REPORTED DIRECTLY TO CHRISTIAN.  HE WAS THE TEAM

12:16PM   9      LEAD.

12:16PM  10      Q.   AND BESIDES REPORTING WITH HIM -- SORRY.

12:16PM  11           BESIDES REPORTING TO HIM, DID YOU ALSO WORK WITH HIM IN

12:16PM  12      YOUR WORK AT THERANOS?

12:16PM  13      A.   YES.

12:16PM  14      Q.   AND DID THAT CHANGE OVER TIME?  IN OTHER WORDS, WHO YOU

12:16PM  15      WERE WORKING WITH AND WHO YOU WERE REPORTING TO, DID THAT

12:16PM  16      CHANGE OVER THE MONTHS AND YEARS THAT YOU WERE AT THERANOS?

12:16PM  17      A.   IT DID.  INITIALLY I REPORTED TO CHRISTIAN, AND THEN ONCE

12:17PM  18      I RECEIVED MY PROMOTION, I REPORTED TO ELIZABETH.

12:17PM  19      Q.   AND BEFORE YOU RECEIVED THE PROMOTION -- YOU SAID THAT WAS

12:17PM  20      AT THE BEGINNING OF 2015?

12:17PM  21      A.   THAT'S RIGHT.

12:17PM  22      Q.   BEFORE THAT TIME PERIOD, HAD YOU BEGUN TO WORK MORE AND

12:17PM  23      MORE WITH MS. HOLMES ON PROJECTS?

12:17PM  24      A.   YES.

12:17PM  25      Q.   AND COULD YOU GIVE ME A SENSE OF HOW FREQUENTLY YOU WERE
```

3854
EDLIN DIRECT BY MR. BOSTIC

```
12:17PM   1    IN CONTACT WITH MS. HOLMES DURING YOUR TIME AT THE COMPANY?

12:17PM   2    AND I UNDERSTAND THAT THAT PROBABLY CHANGED OVER TIME.

12:17PM   3    A.   IT DID CHANGE OVER TIME.  I WOULD SAY, YOU KNOW, INITIALLY

12:17PM   4    A COUPLE TIMES A WEEK, IF NOT MORE, AND AS MY TIME PROGRESSED

12:17PM   5    AT THE COMPANY, IT EVENTUALLY BECAME ON A DAILY BASIS.

12:17PM   6    Q.   AND WHEN YOU TALK ABOUT CONTACT WITH MS. HOLMES, HOW DID

12:17PM   7    YOU COMMUNICATE WITH HER ABOUT WORK?  ARE WE TALKING EMAILS?

12:17PM   8    IN PERSON?  TELEPHONE?  SOME COMBINATION?

12:17PM   9    A.   IT WAS MAINLY EMAILS AND IN-PERSON CONVERSATIONS.

12:18PM  10    Q.   THROUGH YOUR CONTACT WITH MS. HOLMES AND THROUGH WORKING

12:18PM  11    WITH HER, DID YOU COME TO HAVE A SENSE OF HER WORKING HOURS AT

12:18PM  12    THE COMPANY, HOW FREQUENTLY SHE WAS THERE?

12:18PM  13    A.   YES.

12:18PM  14    Q.   AND WHAT WAS YOUR SENSE OF THAT?

12:18PM  15    A.   SHE WAS IN THE OFFICE ALL THE TIME REALLY FROM, YOU KNOW,

12:18PM  16    EARLY MORNING TO LATE IN THE EVENING.

12:18PM  17    Q.   AND WAS THAT TRUE THROUGHOUT YOUR TIME AT THE COMPANY AS

12:18PM  18    FAR AS YOU SAW?

12:18PM  19    A.   YES.

12:18PM  20    Q.   HOW ABOUT WEEKENDS?  WAS MS. HOLMES EVER THERE ON

12:18PM  21    WEEKENDS?

12:18PM  22    A.   YES.

12:18PM  23    Q.   WERE YOU THERE --

12:18PM  24    A.   REGULARLY, YES.

12:18PM  25    Q.   AND WERE YOU THERE ON WEEKENDS ALSO AND SEE HER THERE?
```

EDLIN DIRECT BY MR. BOSTIC                                              3855

12:18PM   1      A.   YES.

12:18PM   2      Q.   I'D LIKE TO ASK YOU ABOUT HOW INFORMATION WAS HANDLED AT

12:18PM   3      THERANOS.  GENERALLY SPEAKING, DID YOU GET A SENSE OF HOW

12:18PM   4      INFORMATION MOVED AROUND THE COMPANY?

12:18PM   5      A.   I CAN ONLY REALLY SPEAK TO, I GUESS, MY TEAM AND THE

12:19PM   6      INFORMATION THAT I WAS INVOLVED WITH, BUT GENERALLY VIA EMAIL

12:19PM   7      OR IN PERSON MEETINGS WITHIN THE TEAM THAT I WAS ON.

12:19PM   8      Q.   AND LET ME ASK SPECIFICALLY IN YOUR EXPERIENCE, WAS

12:19PM   9      INFORMATION FREELY SHARED AT THE COMPANY BETWEEN EMPLOYEES,

12:19PM  10      BETWEEN GROUPS?

12:19PM  11      A.   I THINK THE INFORMATION WAS SHARED MORE AMONGST THAT

12:19PM  12      PARTICULAR TEAM, AND THERE WASN'T MUCH INFORMATION SHARING

12:19PM  13      ACROSS TEAMS, AT LEAST AS I OBSERVED.

12:19PM  14      Q.   AND IN YOUR EXPERIENCE, WAS THAT BECAUSE OF THE

12:19PM  15      PREFERENCES OF THE TEAM MEMBERS AND YOURSELF OR WAS THAT

12:19PM  16      BECAUSE OF DIRECTION FROM ABOVE IN THE COMPANY?

12:19PM  17      A.   DIRECTION FROM ABOVE.

12:19PM  18      Q.   AND CAN YOU EXPLAIN THAT?  WHAT WAS THAT DIRECTION?

12:19PM  19      A.   FOR THE PROJECTS THAT I WORKED ON, I WAS TOLD BY, YOU

12:20PM  20      KNOW, CHRISTIAN, AND ALSO ELIZABETH AND SUNNY, TO NOT SHARE

12:20PM  21      INFORMATION ABOUT WHAT WE WERE WORKING ON OUTSIDE OF, OUTSIDE

12:20PM  22      OF THE TEAM THAT I WAS ON BECAUSE IT WAS CONSIDERED

12:20PM  23      CONFIDENTIAL TO JUST THE TEAM THAT I WAS ON.

12:20PM  24      Q.   SO THAT WENT EVEN FOR OTHER EMPLOYEES OF THE COMPANY WHO

12:20PM  25      WERE NOT PART OF THAT TEAM WITHIN THE COMPANY?

EDLIN DIRECT BY MR. BOSTIC                                    3856

12:20PM  1    A.   I CAN'T FULLY SPEAK FOR THEM.  BUT THERE WAS GENERALLY A

12:20PM  2    KIND OF INSTRUCTION THAT I WAS ON A, YOU KNOW, NEED-TO-KNOW

12:20PM  3    BASIS AND THAT INFORMATION THAT I NEEDED TO KNOW RELATIVE TO

12:20PM  4    THE WORK I WAS DOING I COULD SEEK, BUT ASIDE FROM THAT, I HAD

12:20PM  5    NO NEED TO ASK ABOUT IT AND SHOULDN'T ASK ABOUT IT.

12:20PM  6    Q.   HOW ABOUT AS TO INDIVIDUALS OUTSIDE OF THE COMPANY?  WERE

12:21PM  7    THERE RESTRICTIONS ON WHAT INFORMATION NEEDED TO BE KEPT WITHIN

12:21PM  8    THERANOS AND COULDN'T BE SHARED WITH THE PUBLIC, FOR EXAMPLE?

12:21PM  9    A.   WELL, IT WAS MY UNDERSTANDING THAT NO INFORMATION COULD BE

12:21PM  10   SHARED WITH THE PUBLIC UNLESS IT WAS, YOU KNOW, APPROVED, AND I

12:21PM  11   KNOW THAT EVERYONE WHO CAME TO THE COMPANY SIGNED A

12:21PM  12   NONDISCLOSURE AGREEMENT AND THE INTENT WAS TO MAKE SURE THAT

12:21PM  13   THAT INFORMATION WAS NOT COMMUNICATED EXTERNALLY.

12:21PM  14   Q.   AND WHO COMMUNICATED THAT DIRECTION OR POLICY TO YOU AT

12:21PM  15   THERANOS?

12:21PM  16   A.   I RECEIVED THAT FROM -- THAT DIRECTION FROM CHRISTIAN AND

12:21PM  17   ALSO FROM ELIZABETH AND FROM SUNNY.

12:21PM  18   Q.   WE WERE JUST TALKING ABOUT HOW SOME INDIVIDUALS AT

12:21PM  19   THERANOS WERE NOT TO KNOW CERTAIN THINGS THAT OTHER INDIVIDUALS

12:21PM  20   AT THE COMPANY KNEW.

12:21PM  21       IN YOUR EXPERIENCE, WAS THERE ANYTHING THAT NEEDED TO BE

12:22PM  22   KEPT FROM MS. HOLMES OR FROM MR. BALWANI?

12:22PM  23   A.   NO.

12:22PM  24   Q.   WERE THERE OTHER PEOPLE IN THE COMPANY BESIDES THOSE TWO

12:22PM  25   WHO YOU UNDERSTOOD WERE ALLOWED TO KNOW EVERY PIECE OF

EDLIN DIRECT BY MR. BOSTIC                                              3857

12:22PM   1    INFORMATION AT THE COMPANY?

12:22PM   2    A.   NO.

12:22PM   3    Q.   YOU TESTIFIED A FEW MINUTES AGO THAT YOU HAD A ROLE IN

12:22PM   4    CONNECTION WITH THE ROLLOUT OF THERANOS TESTING AT WALGREENS;

12:22PM   5    IS THAT CORRECT?

12:22PM   6    A.   THAT'S CORRECT.

12:22PM   7    Q.   AND CAN YOU TELL US ABOUT THAT ROLE?  WHAT KIND OF WORK

12:22PM   8    DID YOU DO THERE?

12:22PM   9    A.   SO IN THAT ROLE I WAS ON A TEAM WITH OTHER PRODUCT

12:22PM   10   MANAGERS AND WE WORKED DIRECTLY WITH THE RETAIL PHARMACY

12:22PM   11   OPERATIONS TEAM FROM WALGREENS TO PLAN OUT THE STORE OPERATION.

12:22PM   12   THAT INCLUDED PICKING A GEOGRAPHY IN A PILOT AREA, WHICH WAS IN

12:23PM   13   ARIZONA.

12:23PM   14       AND MY WORK REALLY FOCUSSED ON THE FRONT END CUSTOMER

12:23PM   15   EXPERIENCE PROCESS FOR SOMEONE WHO VISITED A WALGREENS STORE,

12:23PM   16   AND THE FULL PROCESS THAT THEY WENT FROM BASICALLY BEGINNING OF

12:23PM   17   THAT VISIT UNTIL THE END.

12:23PM   18       SO THAT INCLUDED SOME OF THE BRANDING AND MARKETING IN THE

12:23PM   19   STORE.  THERE WAS AN ASPECT OF SOME SOFTWARE AND APPLICATIONS

12:23PM   20   THAT WERE -- THAT A PHARMACIST USED TO CHECK A PATIENT IN, AND

12:23PM   21   THEN THERE WAS A SOFTWARE, YOU KNOW, APP THAT GUIDED A

12:23PM   22   TECHNICIAN OR A PHLEBOTOMIST TO COLLECT -- USE THE RIGHT TUBES

12:23PM   23   TO COLLECT BLOOD FROM A PATIENT BASED ON THEIR ORDER.

12:23PM   24   Q.   AND JUST TO ORIENT US IN TIME, DO YOU HAVE A RECOLLECTION

12:23PM   25   OF WHEN THERANOS FIRST STARTED OFFERING TESTING SERVICES

EDLIN DIRECT BY MR. BOSTIC                                      3858

12:23PM   1    THROUGH WALGREENS?

12:23PM   2    A.   YES.  IT WAS AROUND SEPTEMBER OF 2013.

12:24PM   3    Q.   AS PART OF YOUR ROLE IN CONNECTION WITH THAT TESTING

12:24PM   4    SERVICE, DID YOU COME TO HAVE SOME LEVEL OF UNDERSTANDING ABOUT

12:24PM   5    WHAT DEVICES THERANOS WAS USING TO PERFORM BLOOD TESTS?

12:24PM   6    A.   I WAS FAMILIAR WITH SOME OF THE DEVICES THAT THERANOS HAD

12:24PM   7    AT THE TIME.

12:24PM   8    Q.   AND WHAT DEVICES WERE YOU FAMILIAR WITH AT THERANOS?  AND

12:24PM   9    LET'S TALK ABOUT THE 2013, 2014 TIME PERIOD.

12:24PM  10    A.   RIGHT.  SO I WASN'T AWARE EXACTLY OF WHAT WAS USED TO

12:24PM  11    PERFORM THE TESTS FOR WALGREENS, BUT I DID BECOME FAMILIAR WITH

12:24PM  12    THE EDISON VERSION, EDISON 3.0 OF THE THERANOS DEVICE

12:24PM  13    RELATIVELY EARLY ON IN MY EMPLOYMENT.

12:24PM  14         I FIRST BECAME AWARE OF IT THROUGH SOME EXISTING SLIDE

12:25PM  15    DECK PRESENTATIONS THAT MY TEAM AND I WORKED TO BASICALLY

12:25PM  16    REFORMAT.

12:25PM  17         THERE WAS A SLIDE WITH AN IMAGE OF THE DEVICE, FOR

12:25PM  18    EXAMPLE.

12:25PM  19         I ALSO ATTENDED MEETINGS WHERE THE DEVICE WAS PRESENT IN A

12:25PM  20    ROOM AND THERE WAS A TECHNOLOGY DEMONSTRATION.

12:25PM  21    Q.   THE EDISON 3.0 AND DID YOU MENTION THE 3.5 AS WELL?

12:25PM  22    A.   THE 3.5 WAS A VERSION OF THE EDISON.  I THINK IT WAS IN

12:25PM  23    THE SAME ENCLOSURE, BUT I UNDERSTAND THAT THERE WAS SOME

12:25PM  24    DIFFERENT COMPONENTS WITHIN IT.

12:25PM  25    Q.   IN 2013 OR 2014, DID YOU HAVE AN UNDERSTANDING AS TO

EDLIN DIRECT BY MR. BOSTIC                                            3859

```
12:25PM   1    WHETHER THERANOS WAS USING THE EDISON, EITHER THE 3.0 OR THE

12:25PM   2    3.5, TO CONDUCT PATIENT TESTING?

12:25PM   3    A.    AT THAT TIME I DID NOT HAVE THAT UNDERSTANDING.

12:25PM   4    Q.    LATER ON DID YOU COME TO LEARN WHETHER THERANOS WAS USING

12:26PM   5    THE EDISON FOR PATIENT TESTING?

12:26PM   6    A.    I DID.

12:26PM   7    Q.    AND WHAT WAS THE ANSWER THERE?

12:26PM   8    A.    THAT IT DID USE THOSE DEVICES FOR PATIENT TESTING.

12:26PM   9    Q.    IN 2013 AND 2014, DID YOU HAVE AN UNDERSTANDING OF WHAT

12:26PM  10    THE CAPABILITIES OF THE EDISON WERE?  IN OTHER WORDS, WHAT

12:26PM  11    KINDS OF TESTS IT COULD RUN, WHAT KINDS OF TESTS IT COULD NOT

12:26PM  12    RUN?

12:26PM  13    A.    I'M NOT SURE IF I KNEW THE FULL EXTENT IN 2013 OR 2014.

12:26PM  14    Q.    AND DID YOUR JOB IN 2013 AND 2014 REQUIRE YOU TO KNOW

12:26PM  15    EXACTLY WHICH ASSAYS COULD BE RUN ON THE EDISON AND WHICH COULD

12:26PM  16    NOT.

12:26PM  17    A.    NO.

12:26PM  18    Q.    BESIDES THE EDISON AND THE OTHER TWO VERSIONS THAT WE JUST

12:26PM  19    TALKED ABOUT, WERE THERE OTHER THERANOS BUILT ANALYZERS THAT

12:26PM  20    YOU BECAME FAMILIAR WITH WHILE YOU WERE AT THE COMPANY?

12:27PM  21    A.    YES.

12:27PM  22    Q.    AND WHAT WERE THOSE?

12:27PM  23    A.    THAT WAS THE MINILAB.  THERE ARE A FEW DIFFERENT NAMES.

12:27PM  24    THE MINILAB WAS ONE, THE EDISON 4.0 AND THE 4 SERIES.  THESE

12:27PM  25    WERE CONSIDERED THE NEXT GENERATION VERSION OF THE THERANOS
```

EDLIN DIRECT BY MR. BOSTIC                                              3860

| | | |
|---|---|---|
| 12:27PM | 1 | DEVICES, AND MY UNDERSTANDING WAS THAT THOSE DEVICES HAD |
| 12:27PM | 2 | INCREASED CAPABILITIES AND THE ABILITY TO DO MORE TESTS THAN |
| 12:27PM | 3 | THE EDISON VERSION, THE 3.0 VERSION. |
| 12:27PM | 4 | Q.   THANK YOU.  YOU CALLED THOSE NEXT GENERATION DEVICES. |
| 12:27PM | 5 |      THESE NEXT GENERATION DEVICES, TO YOUR KNOWLEDGE, WERE |
| 12:27PM | 6 | THOSE EVER USED FOR CLINICAL PATIENT TESTING DURING YOUR TIME |
| 12:27PM | 7 | AT THE COMPANY? |
| 12:27PM | 8 | A.   I DID LEARN THAT THEY WERE NOT USED FOR PATIENT TESTING IN |
| 12:27PM | 9 | 2016, MY LAST YEAR AT THE COMPANY. |
| 12:27PM | 10 | Q.   AND JUST SO WE'RE CLEAR ON THAT ANSWER, YOU'RE SAYING THAT |
| 12:28PM | 11 | YOU LEARNED IN 2016 ABOUT WHETHER THEY HAD BEEN USED FOR |
| 12:28PM | 12 | CLINICAL PATIENT TESTING? |
| 12:28PM | 13 | A.   CORRECT. |
| 12:28PM | 14 | Q.   AND BASED ON WHAT YOU LEARNED IN 2016, HAD THEY BEEN USED |
| 12:28PM | 15 | AT ANY POINT IN TIME FOR CLINICAL PATIENT TESTING AT THERANOS? |
| 12:28PM | 16 | A.   NO. |
| 12:28PM | 17 | Q.   IN THE 2013, 2014 TIME PERIOD, WERE YOU AWARE OF |
| 12:28PM | 18 | THERANOS'S USE OF THIRD PARTY DEVICES TO RUN SOME BLOOD TESTS? |
| 12:28PM | 19 | A.   I WAS AWARE THAT THERANOS USED THIRD PARTY DEVICES TO RUN |
| 12:28PM | 20 | VENOUS TESTS AT THAT TIME, 2013, 2014. |
| 12:28PM | 21 | Q.   OKAY.  UNDERSTOOD. |
| 12:28PM | 22 |      AT THAT TIME DID YOU HAVE ANY KNOWLEDGE OF THERANOS USING |
| 12:28PM | 23 | MODIFIED THIRD PARTY DEVICES TO RUN FINGERSTICK BLOOD SAMPLES? |
| 12:28PM | 24 | A.   NO. |
| 12:28PM | 25 | Q.   AND DID YOU LEARN ABOUT THAT AT SOME POINT WHEN YOU WERE |

EDLIN DIRECT BY MR. BOSTIC                                              3861

12:28PM  1    AT THE COMPANY?

12:29PM  2    A.   YES.

12:29PM  3    Q.   AND WHEN DID YOU LEARN ABOUT THAT?

12:29PM  4    A.   I LEARNED THAT IN 2016.

12:29PM  5    Q.   AND HOW DID IT COME TO BE, IF YOU REMEMBER, THAT YOU

12:29PM  6    LEARNED ABOUT THE COMPANY'S USE OF MODIFIED THIRD PARTY

12:29PM  7    DEVICES?

12:29PM  8    A.   AT THAT TIME AT THE BEGINNING OF 2016, THERANOS HELD A

12:29PM  9    NUMBER OF DIFFERENT MEETINGS WITH A NUMBER OF LAB DIRECTORS

12:29PM 10    FROM ACROSS THE COUNTRY WITH THE GOAL BEING FORMING A

12:29PM 11    SCIENTIFIC AND MEDICAL ADVISORY BOARD, AND IN THOSE MEETINGS

12:29PM 12    ASPECTS OF THE DEVICES IN THE CLINICAL LAB WERE DISCUSSED, AND

12:29PM 13    IN THOSE CONVERSATIONS I LEARNED ABOUT LAB DEVELOPED TESTS THAT

12:29PM 14    HAD BEEN DEVELOPED ON THIRD PARTY ANALYZERS TO TEST FINGERSTICK

12:29PM 15    SAMPLES.

12:29PM 16    Q.   YOU SPOKE EARLIER ABOUT YOUR ROLE IN CONNECTION WITH THE

12:30PM 17    WALGREENS ROLLOUT SPECIFICALLY.

12:30PM 18        DO YOU RECALL THAT?

12:30PM 19    A.   YES.

12:30PM 20    Q.   AND IN CONNECTION WITH THAT ROLE, DID YOU COME TO HAVE A

12:30PM 21    BASIC UNDERSTANDING OF HOW THE THERANOS WALGREENS LOCATIONS

12:30PM 22    OPERATED?

12:30PM 23        I'M JUST ASKING YES OR NO FOR NOW.  DID YOU COME TO HAVE A

12:30PM 24    BASIC UNDERSTANDING OF HOW A THERANOS LOCATION AT A WALGREENS

12:30PM 25    WOULD WORK?

EDLIN DIRECT BY MR. BOSTIC                                           3862

12:30PM 1    A.   YES, A WELLNESS CENTER, YEP, RIGHT.

12:30PM 2    Q.   AND WERE YOU INVOLVED AT ALL IN SETTING UP THOSE LOCATIONS

12:30PM 3    AND HELPING TO GET THEM OPERATIONAL?

12:30PM 4    A.   YES.

12:30PM 5    Q.   AT THE WALGREENS LOCATIONS, WHO WERE THE STAFF MEMBERS

12:30PM 6    THAT THERANOS PATIENTS WOULD ACTUALLY INTERACT WITH?

12:30PM 7    A.   PATIENTS INTERACTED WITH WALGREENS TECHNICIANS, AND ALSO

12:30PM 8    PHLEBOTOMISTS IN THE STORES.

12:30PM 9    Q.   AND AS TO THE TECHNICIANS AND PHLEBOTOMISTS, WERE THEY

12:31PM 10   BOTH WALGREENS EMPLOYEES OR WERE THEY THERANOS EMPLOYEES?

12:31PM 11       DO YOU RECALL?

12:31PM 12   A.   I BELIEVE INITIALLY THEY WERE WALGREENS EMPLOYEES, BUT

12:31PM 13   THERANOS EMPLOYEES WERE ALSO IN THAT ROLE.

12:31PM 14   Q.   AS TO THE INDIVIDUALS WHO WERE WORKING AT THE WALGREENS

12:31PM 15   WHO INTERACTED WITH PATIENTS, WAS THERANOS INVOLVED IN TRAINING

12:31PM 16   THOSE INDIVIDUALS?

12:31PM 17   A.   YES.

12:31PM 18   Q.   AND WERE YOU INVOLVED SPECIFICALLY IN THAT TRAINING?

12:31PM 19   A.   YES.

12:31PM 20   Q.   WHAT DO YOU RECALL ABOUT THAT TRAINING PROGRAM?

12:31PM 21   A.   I RECALL THAT THERE WERE MEETINGS WITH SEVERAL OF THE

12:31PM 22   WALGREENS TECHNICIANS WHERE, YOU KNOW, A CERTAIN PREDETERMINED

12:31PM 23   TRAINING PROGRAM WAS DEVELOPED, AND IN ONE MEETING I AND THE

12:31PM 24   OTHER PRODUCT MANAGERS GAVE A TRAINING, BUT THERE WAS A TRAIN

12:32PM 25   THE TRAINER TYPE OF MODEL.

EDLIN DIRECT BY MR. BOSTIC                                              3863

```
12:32PM   1        SO THE IDEA WAS ONCE YOU TRAIN WALGREENS PHARMACISTS OR

12:32PM   2   TECHNICIANS, THEY WOULD THEN BE ABLE TO TRAIN THEIR COLLEAGUES.

12:32PM   3   Q.   AND BESIDES YOU AT THERANOS, WHO ELSE DO YOU RECALL BEING

12:32PM   4   INVOLVED IN KIND OF HELPING CREATE AND IMPLEMENT THAT TRAINING

12:32PM   5   PROGRAM?

12:32PM   6   A.   OTHER MEMBERS OF THE PRODUCT MANAGEMENT TEAM THAT WE

12:32PM   7   DISCUSSED.

12:32PM   8   Q.   THE OTHER INDIVIDUALS THAT YOU HAD GONE TO COLLEGE WITH?

12:32PM   9   A.   RIGHT.

12:32PM  10   Q.   DURING YOUR TIME AT THE COMPANY, WERE THERE SOME PROJECTS

12:32PM  11   THAT YOU WORKED ON THAT YOU HANDLED BY YOURSELF AND WERE THERE

12:32PM  12   OTHER PROJECTS THAT INVOLVED APPROVAL OR REQUIRED APPROVAL FROM

12:32PM  13   MS. HOLMES?

12:32PM  14   A.   YES.

12:32PM  15        AND I WOULD -- I WOULD ADD IN YOUR PRIOR QUESTION, THERE

12:32PM  16   WERE ALSO OTHER MEMBERS WITHIN, WITHIN THE COMPANY THAT WE

12:32PM  17   WORKED WITH TO DEVELOP THAT, TRAINING INCLUDING CONSUMABLES

12:33PM  18   ENGINEERS AND SOME OF THE OTHER ENGINEERS WITHIN THE COMPANY.

12:33PM  19   Q.   AND AS TO THAT TRAINING PROGRAM, DID THAT TRAINING PROGRAM

12:33PM  20   RISE TO THE LEVEL WHERE THE CEO, MS. HOLMES, WOULD HAVE BEEN

12:33PM  21   INVOLVED IN APPROVING ASPECTS OF IT?

12:33PM  22   A.   YES.

12:33PM  23   Q.   DID THAT TRAINING INCLUDE CONVEYING TO THE STAFF AT

12:33PM  24   WALGREENS SOME OF THE BENEFITS OR POSITIVE ATTRIBUTES OF THE

12:33PM  25   THERANOS TECHNOLOGY?
```

EDLIN DIRECT BY MR. BOSTIC                                          3864

12:33PM   1     A.   I'M NOT SURE IF IT SPECIFICALLY MENTIONED THE TECHNOLOGY

12:33PM   2     ITSELF, BUT I DO REMEMBER THAT AS PART OF THE TRAINING THERE

12:33PM   3     WAS CONTENT RELATED TO IMPROVING ACCESSIBILITY AND

12:33PM   4     AFFORDABILITY FOR PATIENTS TO GET LAB TESTS DONE, AND THAT

12:33PM   5     THERANOS WAS AN INNOVATIVE SILICON VALLEY TECHNOLOGY COMPANY.

12:34PM   6     Q.   AND THAT POSITIVE INFORMATION ABOUT THE THERANOS SERVICE,

12:34PM   7     WHAT WAS THE PURPOSE OF INCLUDING THAT IN THE TRAINING PROGRAM,

12:34PM   8     IF YOU RECALL?

12:34PM   9     A.   THE PURPOSE WAS TO MAKE SURE THAT THE -- IT WAS TO HELP

12:34PM   10    THE WALGREENS TECHNICIANS GET EXCITED AND BUY INTO THE

12:34PM   11    TECHNOLOGY AND THE NEW LAB OFFERING AND CREATE SOME EXCITEMENT

12:34PM   12    BEHIND THIS NEW SERVICE THAT WAS BEING OFFERED.

12:34PM   13    Q.   AND IN DOING THAT, DID THE COMPANY ALSO HOPE TO CREATE

12:34PM   14    EXCITEMENT IN THE PATIENTS AND CUSTOMERS WHO WERE COMING INTO

12:34PM   15    THE WALGREENS LOCATIONS?

12:34PM   16    A.   CAN YOU REPEAT THE QUESTION?  SORRY.

12:34PM   17    Q.   SURE.  IN PROVIDING THAT POSITIVE INFORMATION TO THE

12:34PM   18    WALGREENS STAFF, WAS IT ALSO HOPED THAT THAT WOULD RESULT IN

12:34PM   19    BUILDING EXCITEMENT FOR THE WALGREENS CUSTOMERS WHO INTERACTED

12:34PM   20    WITH THE STAFF?

12:35PM   21    A.   I THINK THE INTENT WAS TO MAKE SURE THAT THOSE

12:35PM   22    INTERACTIONS WERE POSITIVE.

12:35PM   23         AND I WOULDN'T NECESSARILY SAY TO INCREASE THEIR

12:35PM   24    EXCITEMENT, BUT TO MAKE SURE THAT THOSE INTERACTIONS, YOU KNOW,

12:35PM   25    WERE POSITIVE FOR THE CUSTOMER EXPERIENCE.

EDLIN DIRECT BY MR. BOSTIC                                          3865

| | | |
|---|---|---|
| 12:35PM | 1 | Q.   AS PART OF YOUR ROLE AT THE COMPANY, DID YOU SOMETIMES |
| 12:35PM | 2 | HANDLE TOURS OF THE THERANOS FACILITY? |
| 12:35PM | 3 | A.   YES. |
| 12:35PM | 4 | Q.   AND WHAT THERANOS FACILITIES DID YOU HANDLE TOURS FOR? |
| 12:35PM | 5 | A.   I WAS ASKED TO, ON OCCASION, GIVE TOURS OF THE THERANOS -- |
| 12:35PM | 6 | I BELIEVE IT WAS THE 1701 FACILITY, AND -- YEAH, THAT'S WHAT I |
| 12:35PM | 7 | CAN RECALL. |
| 12:35PM | 8 | AND IN THOSE TOURS I WOULD WALK WITH GUESTS AROUND THE |
| 12:36PM | 9 | BUILDING, WE WOULD LOOK AT SOME OF THE EMPLOYEE WORK SPACE, |
| 12:36PM | 10 | OFTENTIMES THE R&D LAB, AND THAT WAS THE EXTENT. |
| 12:36PM | 11 | Q.   AND WAS 1701, WAS THAT THE ADDRESS OF THE THERANOS |
| 12:36PM | 12 | HEADQUARTERS? |
| 12:36PM | 13 | A.   THAT WAS THE ADDRESS OF THE THERANOS HEADQUARTERS, RIGHT. |
| 12:36PM | 14 | Q.   AND WHO WERE THE INDIVIDUALS RECEIVING THESE TOURS |
| 12:36PM | 15 | GENERALLY SPEAKING? |
| 12:36PM | 16 | A.   GENERALLY IT WAS A MIX OF INDIVIDUALS. |
| 12:36PM | 17 | SOMETIMES IT WAS POTENTIAL BUSINESS PARTNERS AND VISITORS. |
| 12:36PM | 18 | ESSENTIALLY ANY VISITOR WHO ASKED AND ELIZABETH GAVE PERMISSION |
| 12:36PM | 19 | TO GIVE A TOUR, THAT WOULD BE THE POTENTIAL. |
| 12:36PM | 20 | Q.   WHAT KIND OF PERMISSION OR APPROVAL WAS REQUIRED FOR |
| 12:36PM | 21 | SOMEONE TO BE GRANTED A TOUR OF THE THERANOS HEADQUARTERS? |
| 12:36PM | 22 | A.   APPROVAL FROM ELIZABETH AND/OR SUNNY. |
| 12:36PM | 23 | Q.   YOU MENTIONED SOME AREAS THAT YOU RECALL GIVING TOURS OF. |
| 12:37PM | 24 | DO YOU RECALL EVER GIVING ANYONE A TOUR OF THE THERANOS |
| 12:37PM | 25 | CLINICAL LAB DURING ANY OF THOSE VISITS? |

EDLIN DIRECT BY MR. BOSTIC                                          3866

12:37PM   1     A.   NO.

12:37PM   2     Q.   AND ONCE SOMEONE WAS ALLOWED TO DO A TOUR, WHOSE DECISION

12:37PM   3     WAS IT, KIND OF WHAT AREAS OF THE FACILITY THAT THEY WERE

12:37PM   4     ALLOWED TO SEE?

12:37PM   5     A.   IT WAS ELIZABETH'S DECISION, AND I RECALL THAT WE HAD

12:37PM   6     DISCUSSED WHAT A POTENTIAL TOUR WOULD LOOK LIKE, AND THEN -- SO

12:37PM   7     WE ESTABLISHED WHAT THAT WOULD BE, AND THEN FOR FUTURE TOURS I

12:37PM   8     WOULD JUST FOLLOW THAT DIRECTION.

12:37PM   9     Q.   WERE THERE ANY OCCASIONS WHERE, IN ADVANCE OF TOURS, YOU

12:37PM  10     WERE ASKED TO MAKE CHANGES TO ANY AREAS OF THE FACILITY AT

12:37PM  11     THERANOS?

12:37PM  12     A.   YES.

12:37PM  13     Q.   WHAT DO YOU RECALL ABOUT THAT?

12:37PM  14     A.   I RECALL THAT IN ADVANCE OF A TOUR THERE WOULD BE CERTAIN

12:38PM  15     AREAS OF SOME OF THE LABS THAT WERE HIDDEN BY A PARTITION,

12:38PM  16     OFTENTIMES AREAS WHERE THERE WERE THERANOS DEVICES TO MAKE SURE

12:38PM  17     THAT WHOEVER WAS ON THE TOUR COULDN'T SEE THEM.

12:38PM  18     Q.   AND DO YOU REMEMBER THAT HAPPENING MORE THAN ONCE?

12:38PM  19     A.   YES.

12:38PM  20     Q.   HOW ABOUT SITUATIONS WHERE SOMETHING MIGHT BE ADDED TO ANY

12:38PM  21     OF THE FACILITIES AT THERANOS?  DO YOU RECALL EVER INSTALLING

12:38PM  22     OR SETTING UP DEVICES IN ADVANCE OF A TOUR?

12:38PM  23     A.   YES.

12:38PM  24     Q.   AND WHAT DO YOU REMEMBER ABOUT THAT?

12:38PM  25     A.   WELL, FOR, FOR TECHNOLOGY DEMONSTRATIONS, THERE WOULD

EDLIN DIRECT BY MR. BOSTIC                                                    3867

12:38PM  1    TYPICALLY BE A ROOM SET UP WITH THERANOS DEVICES, AND THAT WAS

12:38PM  2    KIND OF STANDARD OPERATING PROCEDURE FOR MOST VISITORS.

12:38PM  3         AND I DO RECALL ANOTHER INSTANCE IN WHICH, IN ONE OF THE

12:39PM  4    ROOMS ADJACENT TO THE CLINICAL LAB, ELIZABETH ASKED THAT I WORK

12:39PM  5    WITH DANIEL YOUNG, WHO WAS A SCIENTIST AT THERANOS, TO SET UP A

12:39PM  6    NUMBER OF THE MINILAB TOWER VERSION, SO THAT WAS THE MINILAB

12:39PM  7    THAT HAD COMPONENTS STACKED UPON ONE ANOTHER.

12:39PM  8         AND I SET THOSE UP IN ONE OF THE ROOMS ADJACENT TO THE

12:39PM  9    CLINICAL LAB ON ONE OCCASION.

12:39PM  10   Q.   AND WAS THAT OCCASION IN ADVANCE OF ONE OF THESE VIP

12:39PM  11   VISITS THAT WE'VE BEEN TALKING ABOUT?

12:39PM  12   A.   YES.

12:39PM  13   Q.   AND DO YOU RECALL APPROXIMATELY WHEN THAT WAS?

12:39PM  14   A.   I BELIEVE THAT THAT WAS AROUND THE SUMMER TIME OF 2013.

12:39PM  15   Q.   CAN YOU TELL US MORE ABOUT WHAT THAT ROOM LOOKED LIKE?

12:39PM  16   WHAT WAS THE DIRECTION FROM MS. HOLMES ABOUT WHAT WAS TO BE

12:39PM  17   THERE AND HOW TO SET IT UP?

12:39PM  18   A.   I DON'T RECALL WHAT -- IF THERE WAS ANYTHING IN THAT ROOM

12:40PM  19   BEFOREHAND.

12:40PM  20        ELIZABETH ASKED THAT I SET UP ABOUT 10 TO 15 OF THE

12:40PM  21   MINILAB DEVICES IN THAT ROOM KIND OF NEXT TO EACH OTHER AGAINST

12:40PM  22   THE WALL.

12:40PM  23        ALL OF THE DEVICES HAD -- YOU KNOW, OPERATED THE SAME,

12:40PM  24   TOUCHSCREEN AND KIND OF A SCREEN ON THE DEVICE.

12:40PM  25        ONE OF THEM COULD ALSO ACCEPT A CARTRIDGE IF NEEDED.

EDLIN DIRECT BY MR. BOSTIC                                                3868

12:40PM    1         SO I THINK A DAY BEFORE THE MEETING I WORKED WITH DANIEL

12:40PM    2    TO SET THOSE DEVICES UP.

12:40PM    3         THE MEETING AND TOUR HAPPENED, AND THEN ABOUT A DAY OR TWO

12:40PM    4    LATER I ASKED ELIZABETH IF THOSE DEVICES SHOULD REMAIN IN THERE

12:40PM    5    AND SHE SAID NO, SO I WORKED WITH DANIEL TO GET THOSE REMOVED.

12:40PM    6    Q.   A FEW QUESTIONS ABOUT THAT.

12:40PM    7         FIRST OF ALL, IN THE 2013 TIME PERIOD, DO YOU KNOW WHETHER

12:40PM    8    THE MINILAB ANALYZER WAS BEING USED BY THERANOS TO RUN ANY

12:41PM    9    CLINICAL PATIENT TESTING?

12:41PM   10    A.   MY UNDERSTANDING IS THAT IT WASN'T -- AND THIS WAS PART OF

12:41PM   11    WHAT I LEARNED IN, YOU KNOW, IN 2016 -- WAS THAT NONE OF THE

12:41PM   12    MINILABS HAD BEEN USED FOR CLINICAL PATIENT TESTING.

12:41PM   13    Q.   OF THE DEVICES THAT MS. HOLMES ASKED YOU TO PLACE IN THAT

12:41PM   14    ROOM ON OCCASION, WERE ALL OF THEM CAPABLE OF ACCEPTING A

12:41PM   15    CARTRIDGE TO RUN A SAMPLE?

12:41PM   16    A.   I AM NOT SURE.  I ONLY REMEMBER MAKING SURE THAT ONE OF

12:41PM   17    THE DEVICES COULD.

12:41PM   18    Q.   AND WAS THAT THE INSTRUCTION FROM MS. HOLMES, THAT AT

12:41PM   19    LEAST ONE OF THEM NEEDED TO BE CAPABLE OF THAT?

12:41PM   20    A.   YES.

12:41PM   21    Q.   AND WERE THE DEVICES THERE FOR STORAGE?  IN OTHER WORDS,

12:41PM   22    WERE THEY JUST SITTING THERE UNPLUGGED, OR WERE THEY POWERED

12:41PM   23    ON?

12:41PM   24    A.   THEY WERE POWERED ON.

12:41PM   25    Q.   THE MEETING THAT MS. HOLMES ASKED YOU TO DO THAT IN

EDLIN DIRECT BY MR. BOSTIC                                      3869

12:42PM   1    ADVANCE OF, WERE YOU PART OF THAT MEETING?

12:42PM   2    A.   THERE WERE SEVERAL PARTS OF THAT MEETING, AND I WAS A PART

12:42PM   3    OF SOME OF THEM, BUT NOT ALL OF THEM.

12:42PM   4    Q.   HOW ABOUT THE PART OF THE MEETING, IF THERE WAS ONE, WHERE

12:42PM   5    INDIVIDUALS WERE SHOWN THE ROOM THAT YOU SET UP?  DID YOU EVER

12:42PM   6    SEE INDIVIDUALS OBSERVE THAT ROOM?

12:42PM   7    A.   NO.

12:42PM   8    Q.   DO YOU RECALL WHETHER, FROM THAT ROOM THAT HELD THOSE

12:42PM   9    DEVICES, ANY OTHER PORTIONS OF THE CLINICAL LAB COULD BE SEEN?

12:42PM   10   A.   I DON'T KNOW IF THEY COULD OR NOT.

12:42PM   11   Q.   A FEW MINUTES AGO YOU TALKED ABOUT TECHNOLOGY

12:42PM   12   DEMONSTRATIONS OF THE THERANOS TECHNOLOGY; IS THAT RIGHT?

12:42PM   13   A.   RIGHT.

12:42PM   14   Q.   AND HOW DID THOSE DEMONSTRATIONS WORK?

12:42PM   15   A.   SO TYPICALLY I WOULD BE NOTIFIED THAT A GUEST WAS VISITING

12:43PM   16   THERANOS, EITHER BY -- I LEARNED THAT THROUGH MULTIPLE WAYS,

12:43PM   17   EITHER FROM ELIZABETH OR FROM HER ASSISTANTS, OR FROM SUNNY OR

12:43PM   18   HIS ASSISTANTS, AND MY ROLE WAS TO COORDINATE THE DIFFERENT

12:43PM   19   PERSONNEL WITHIN THE COMPANY, AND THERE WOULD BE A NUMBER OF

12:43PM   20   DIFFERENT GROUPS THAT WOULD CONTRIBUTE TO THAT PROCESS.

12:43PM   21        FIRST, THERE WOULD BE ENGINEERS WHO WOULD PREPARE THE

12:43PM   22   DEVICE AND CERTAIN CARTRIDGES, AND THEY WOULD SET UP A NUMBER

12:43PM   23   OF DEVICES IN A ROOM.  SO THEY -- I WOULD NOTIFY THEM.  THEY

12:43PM   24   WOULD MAKE SURE THAT EVERYTHING WAS IN THE ROOM.

12:43PM   25        I WOULD ALSO NOTIFY SOME OF THE LAB PERSONNEL AND

EDLIN DIRECT BY MR. BOSTIC                                          3870

12:43PM   1    ENGINEERS THAT A DEMO COULD HAPPEN, A DEMONSTRATION COULD

12:43PM   2    HAPPEN, SO THAT IF A SAMPLE WAS COLLECTED AND THEY NEEDED TO

12:43PM   3    PROCESS THE SAMPLE, THAT THEY WOULD BE READY TO DO THAT AT A

12:44PM   4    MOMENT'S NOTICE.

12:44PM   5         THERE WERE ALSO PHLEBOTOMISTS WHO WOULD COLLECT THE ACTUAL

12:44PM   6    SAMPLE.  SO THEY WERE ALSO ON NOTICE THAT ONE OF THESE

12:44PM   7    TECHNOLOGY DEMONSTRATIONS COULD HAPPEN.

12:44PM   8         ONCE -- IF IT CAME TO THAT POINT IN TIME IN A MEETING TO

12:44PM   9    ACTUALLY DO THE DEMONSTRATION, I WOULD LET THE FOLKS KNOW THAT

12:44PM  10    IT WAS HAPPENING AND ENSURE THAT LAB PERSONNEL WERE AVAILABLE

12:44PM  11    TO EITHER RECEIVE A SAMPLE IF THE INTENT WAS TO TEST THE SAMPLE

12:44PM  12    IN THE LAB.

12:44PM  13         OTHER TIMES THE SAMPLE WAS JUST TESTED ON THE DEVICE

12:44PM  14    ITSELF IN THAT MOMENT.

12:44PM  15         THEN THE LAB PERSONNEL PROCESSED THE SAMPLE, AND THEN

12:44PM  16    OFTEN DANIEL YOUNG WOULD REVIEW THE FINAL TEST RESULTS AND

12:45PM  17    PROVIDE ANY EDITS OR COMMENTARY THAT WAS NEEDED.

12:45PM  18    Q.   AND AGAIN, WHO WAS THE BENEFICIARY OF THESE TECHNOLOGY

12:45PM  19    DEMONSTRATIONS?  WHO WAS THE AUDIENCE FOR THEM?

12:45PM  20    A.   IT WAS A RANGE OF DIFFERENT TYPES OF VISITORS, BUT

12:45PM  21    POTENTIAL BUSINESS PARTNERS, INVESTORS ON OCCASION, SOME BOARD

12:45PM  22    MEMBERS DID THIS, AND THEN JUST OTHER UNAFFILIATED, I WOULD

12:45PM  23    SAY, GUESTS, VIP'S.

12:45PM  24    Q.   AND WAS IT PART OF YOUR JOB TO COORDINATE THE PLACEMENT OF

12:45PM  25    DEVICES IN THE ACTUAL REFERENCE ROOMS WHERE THE MEETINGS WITH

EDLIN DIRECT BY MR. BOSTIC                                        3871

12:45PM   1    THESE VIP'S WOULD BE HELD?

12:45PM   2    A.   YES.

12:45PM   3    Q.   AND GENERALLY SPEAKING, WHAT KINDS OF DEVICES WOULD YOU BE

12:45PM   4    ASKED TO PLACE IN THOSE CONFERENCE ROOMS?

12:45PM   5    A.   THE EDISON, THE EDISON VERSIONS AND THE MINILAB VERSIONS.

12:46PM   6    Q.   THE THERANOS MANUFACTURED ANALYZERS?

12:46PM   7    A.   THE THERANOS ANALYZERS, RIGHT.

12:46PM   8         MR. BOSTIC:  MAY I APPROACH, YOUR HONOR?

12:46PM   9         THE COURT:  YES.

12:46PM   10   BY MR. BOSTIC:

12:46PM   11   Q.   MR. EDLIN, I'VE HANDED YOU A BINDER OF DOCUMENTS.  IF I

12:46PM   12   COULD ASK YOU TO START BY TURNING TO TAB 959, PLEASE.

12:46PM   13        THE COURT:  WHILE HE DOES THAT, ANTHONY, CAN I SEE

12:46PM   14   YOU FOR JUST A SECOND?

12:46PM   15   BY MR. BOSTIC:

12:46PM   16   Q.   MR. EDLIN, JUST TAKE A MOMENT TO REVIEW EXHIBIT 959.

12:47PM   17        (DISCUSSION OFF THE RECORD.)

12:47PM   18        THE COURT:  THANK YOU, ANTHONY.

12:47PM   19   BY MR. BOSTIC:

12:47PM   20   Q.   MR. EDLIN, HAVE YOU HAD A MOMENT TO REVIEW EXHIBIT 959?

12:47PM   21   A.   YES.

12:47PM   22   Q.   AND ARE YOU LOOKING AT AN EMAIL CHAIN FROM AUGUST OF 2013

12:47PM   23   INVOLVING YOU AND OTHER INDIVIDUALS AT THERANOS?

12:47PM   24   A.   YES.

12:47PM   25   Q.   AND WITHOUT GETTING INTO THE CONTENT, WHAT IS THE GENERAL

EDLIN DIRECT BY MR. BOSTIC                                    3872

12:47PM  1    SUBJECT MATTER OF THIS EMAIL?

12:47PM  2    A.   THE SUBJECT MATTER IS A TECHNOLOGY DEMONSTRATION.

12:47PM  3    Q.   WERE EMAILS USED FOR THE ROUTINE COORDINATION OF THESE

12:47PM  4    TECHNOLOGY DEMONSTRATIONS?

12:47PM  5    A.   THAT WAS THE PRIMARY METHOD THAT THESE WERE COORDINATED,

12:47PM  6    YES.

12:47PM  7    Q.   AND WAS THAT THE MECHANISM BY WHICH THE DIFFERENT

12:47PM  8    INDIVIDUALS INVOLVED IN THE DEMONSTRATION KNEW WHERE THINGS

12:48PM  9    STOOD STATUS-WISE AND WHAT THE NEXT STEPS WERE GOING TO BE?

12:48PM  10   A.   YES.

12:48PM  11   Q.   AND DID THE EMAILS THEN SERVE AS A RECORD OF THE PROCESS

12:48PM  12   FOR CONDUCTING THESE DEMONSTRATIONS AS PART OF THERANOS'S

12:48PM  13   BUSINESS?

12:48PM  14   A.   I THINK GENERALLY, YES.  THERE WERE, I'M SURE, OTHER

12:48PM  15   INSTANCES WHERE THERE WERE, YOU KNOW, VERBAL CONVERSATIONS AS

12:48PM  16   WELL.

12:48PM  17        MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT MOVES TO

12:48PM  18   ADMIT EXHIBIT 959.

12:48PM  19        MR. DOWNEY:  NO OBJECTION.

12:48PM  20        THE COURT:  IT'S ADMITTED, AND IT MAY BE SHOWN TO

12:48PM  21   THE JURY.

12:48PM  22   (GOVERNMENT'S EXHIBIT 959 WAS RECEIVED IN EVIDENCE.)

12:48PM  23        MR. BOSTIC:  MS. HOLLIMAN, IF WE CAN PROJECT THAT

12:48PM  24   AND START WITH PAGE 2.  AND IF WE CAN ZOOM IN ON THE TOP HALF

12:48PM  25   OF THE PAGE.

EDLIN DIRECT BY MR. BOSTIC                                           3873

| | | |
|---|---|---|
| 12:48PM | 1 | Q.   MR. EDLIN, DO YOU SEE AN EMAIL FROM YOU ON AUGUST 8TH, |
| 12:48PM | 2 | 2013? |
| 12:48PM | 3 | A.   YES. |
| 12:48PM | 4 | Q.   YOU EMAIL A GROUP OF INDIVIDUALS.  ARE THOSE OTHER |
| 12:49PM | 5 | EMPLOYEES AT THERANOS? |
| 12:49PM | 6 | A.   YES. |
| 12:49PM | 7 | Q.   YOU SAY, "GENTLEMEN. |
| 12:49PM | 8 | "FOR THE EXECUTIVE MEETING ON 8/13, WE'LL NEED TO HAVE A |
| 12:49PM | 9 | 4S AND MINILAB SET UP IN INTERVIEW ROOM NUMBER 1." |
| 12:49PM | 10 | DO YOU SEE THAT? |
| 12:49PM | 11 | A.   YES. |
| 12:49PM | 12 | Q.   WAS THIS IN CONNECTION WITH AN UPCOMING TECHNOLOGY |
| 12:49PM | 13 | DEMONSTRATION? |
| 12:49PM | 14 | A.   YES. |
| 12:49PM | 15 | Q.   AND YOU GO ON TO SAY, "PLAN A IS TO HAVE BOTH ABLE TO RUN |
| 12:49PM | 16 | NULL PROTOCOLS." |
| 12:49PM | 17 | DO YOU SEE THAT? |
| 12:49PM | 18 | A.   YES. |
| 12:49PM | 19 | Q.   AND IT SAYS, "PLAN B IS TO HAVE THE 4S ABLE TO RUN A CBC, |
| 12:49PM | 20 | IF POSSIBLE." |
| 12:49PM | 21 | DO YOU SEE THAT? |
| 12:49PM | 22 | A.   YES. |
| 12:49PM | 23 | Q.   AND DOES CBC STAND FOR COMPLETE BLOOD COUNT? |
| 12:49PM | 24 | A.   YES. |
| 12:49PM | 25 | Q.   AND WHAT WAS THE NULL PROTOCOL AT THERANOS? |

EDLIN DIRECT BY MR. BOSTIC                                    3874

```
12:49PM   1    A.   SO THE DEVICES RAN A NUMBER OF DIFFERENT PROTOCOLS BASED

12:49PM   2    ON A CARTRIDGE, AND A PROTOCOL IS ESSENTIALLY INSTRUCTIONS ON

12:49PM   3    THE PROCESSES THAT A DEVICE UNDERGOES.

12:50PM   4         A NULL PROTOCOL WAS ESSENTIALLY AN EMPTY PROTOCOL.

12:50PM   5         IF, LET'S SAY, NO CARTRIDGE WAS INSERTED INTO A DEVICE OR

12:50PM   6    IF A CARTRIDGE WAS INSERTED INTO A DEVICE WITHOUT A BLOOD

12:50PM   7    SAMPLE, BOTH OF THOSE CASES A TEST WASN'T INTENDED TO BE RUN,

12:50PM   8    THEN THE NULL PROTOCOL WOULD ACTIVATE.

12:50PM   9    Q.   AND WHAT WOULD IT DO THEN IF IT WASN'T RUNNING A SAMPLE?

12:50PM  10    A.   IF IT WASN'T RUNNING A SAMPLE, I'M NOT SURE EXACTLY WHAT

12:50PM  11    IT WOULD DO.

12:50PM  12    Q.   IF A SAMPLE WAS PUT INTO THE DEVICE THAT WAS SET TO RUN

12:50PM  13    THE NULL PROTOCOL, WOULD IT ACTUALLY CONDUCT THE SAMPLE AND --

12:50PM  14    I'M SORRY, LET ME START AGAIN.

12:50PM  15         IF A BLOOD SAMPLE WAS PUT INTO A DEVICE THAT WAS SET TO

12:50PM  16    RUN THE NULL PROTOCOL, WOULD THE DEVICE ACTUALLY ANALYZE THE

12:50PM  17    BLOOD?

12:50PM  18    A.   I DON'T BELIEVE SO.

12:50PM  19    Q.   THIS EMAIL SAYS "PLAN A IS TO HAVE BOTH DEVICES ABLE TO

12:51PM  20    RUN NULL PROTOCOLS.

12:51PM  21         "PLAN B IS TO HAVE THE 4S ABLE TO RUN A CBC, IF POSSIBLE."

12:51PM  22         DO YOU SEE THAT?

12:51PM  23    A.   YES.

12:51PM  24    Q.   AND WHY WAS THERE THE NEED FOR ALTERNATIVE PLANS HERE AND

12:51PM  25    WHY DOES IT SAY THAT THE 4S MIGHT BE ABLE TO RUN A CBC, IF
```

EDLIN DIRECT BY MR. BOSTIC                                                3875

12:51PM   1    POSSIBLE?

12:51PM   2    A.   AT THIS TIME ENGINEERING TEAMS WERE -- I THINK IT WAS

12:51PM   3    UNSURE WHETHER OR NOT THE DEVICE WAS CAPABLE OF RUNNING THE

12:51PM   4    CBC.

12:51PM   5         SO IF IT WAS CAPABLE, THEN IT WOULD RUN THAT.  THAT'S WHY

12:51PM   6    IT SAYS "IF POSSIBLE."

12:51PM   7         IF NOT, THEN THE DEVICE WOULD NOT RUN THE CBC.

12:51PM   8    Q.   CONTINUING IN YOUR EMAIL.

12:51PM   9         YOU SAY, "MOST LIKELY WE WILL COLLECT A NUMBER OF SAMPLES

12:51PM  10    AND STORE THEM IN THE SHIPPING CONTAINER LIKE THE LAST MEETING

12:52PM  11    WE HAD, AND THEN PROCESS THEM SEPARATELY IN THE LAB."

12:52PM  12         IS THAT RIGHT?

12:52PM  13    A.   RIGHT.

12:52PM  14    Q.   IN THIS CASE, WHERE WOULD THE ACTUAL ANALYSIS HAPPEN?  WAS

12:52PM  15    THE SAMPLE BEING TESTED IN THE CONFERENCE ROOM?

12:52PM  16    A.   IN, IN THAT SCENARIO.

12:52PM  17         SO THE SCENARIO IN WHICH A NUMBER OF SAMPLES WERE STORED

12:52PM  18    IN A SHIPPING CONTAINER AND THEN PROCESSED SEPARATELY IN THE

12:52PM  19    LAB, THAT -- IN THAT SCENARIO, THE SAMPLES WOULD BE PROCESSED

12:52PM  20    IN THE LAB AS OPPOSED TO IN THE CONFERENCE ROOM ITSELF.

12:52PM  21    Q.   LET'S LOOK AT -- CONTINUING IN THIS EMAIL CHAIN, GO TO

12:52PM  22    PAGE 1 AND ZOOM IN ON THE BOTTOM HALF.

12:52PM  23         ON THE BOTTOM OF YOUR SCREEN THERE, DO YOU SEE AN EMAIL

12:52PM  24    FROM MICHAEL CRAIG?

12:52PM  25    A.   YES.

EDLIN DIRECT BY MR. BOSTIC                                                3876

| | | |
|---|---|---|
| 12:52PM | 1 | Q.   AND WHO WAS MICHAEL CRAIG AT THERANOS? |
| 12:53PM | 2 | A.   MICHAEL WAS A SOFTWARE DEVELOPER, I BELIEVE. |
| 12:53PM | 3 | Q.   HE RESPONDS TO THIS EMAIL THREAD TO SAY, "I WOULD |
| 12:53PM | 4 | RECOMMEND THE DEMO APP, ALTHOUGH EITHER WOULD WORK.  THE DEMO |
| 12:53PM | 5 | APP MERELY SHIELDS PROTOCOL FAILURES FROM THE CLIENT." |
| 12:53PM | 6 | DO YOU SEE THAT? |
| 12:53PM | 7 | A.   YES. |
| 12:53PM | 8 | Q.   AND WHAT IS YOUR UNDERSTANDING OF WHAT THAT MEANT? |
| 12:53PM | 9 | A.   MY UNDERSTANDING IS THAT THE DEMO APP WOULD BE USED IN |
| 12:53PM | 10 | TECHNOLOGY DEMONSTRATIONS AND IF, DURING THE PROCESSING, AN |
| 12:53PM | 11 | ERROR OCCURRED, THIS APP WOULD NOT SAY ON THE SCREEN, IT WOULD |
| 12:53PM | 12 | NOT EXPRESS THAT AN ERROR HAD TAKEN PLACE. |
| 12:53PM | 13 | I THINK IT WOULD SAY, YOU KNOW, RUNNING OR PROCESSING OR |
| 12:53PM | 14 | INITIALIZING. |
| 12:53PM | 15 | Q.   SO EVEN IN THE INDICATION OF AN ERROR THAT PREVENTED THE |
| 12:53PM | 16 | MACHINE FROM RETURNING A RESULT, IT WOULD APPEAR TO BE STILL |
| 12:53PM | 17 | WORKING ON THE RESULT. |
| 12:53PM | 18 | IS THAT A FAIR DESCRIPTION? |
| 12:54PM | 19 | A.   RIGHT.  AND, AND REGARDLESS OF WHAT WAS HAPPENING WITH THE |
| 12:54PM | 20 | DEVICE, FOR EXAMPLE, IF NO CARTRIDGE WAS INSERTED OR IF A |
| 12:54PM | 21 | CARTRIDGE WAS INSERTED, THE DEVICE WOULD EFFECTIVELY SHOW A |
| 12:54PM | 22 | SIMILAR STATUS ON THE SCREEN. |
| 12:54PM | 23 | Q.   OKAY.  YOU RESPOND TO THAT EMAIL AND YOU SAY, "NEVER A BAD |
| 12:54PM | 24 | THING.  LET'S GO WITH DEMO, THANKS." |
| 12:54PM | 25 | DO YOU SEE THAT? |

3877
EDLIN DIRECT BY MR. BOSTIC

| | | |
|---|---|---|
| 12:54PM | 1 | A.   YES. |
| 12:54PM | 2 | Q.   AND WHY DID YOU THINK THE DEMO APP WOULD BE THE BEST |
| 12:54PM | 3 | CHOICE FOR THIS PARTICULAR DEMONSTRATION? |
| 12:54PM | 4 | A.   WELL, MICHAEL RECOMMENDED TO ME THAT THAT APP SHOULD BE |
| 12:54PM | 5 | USED AND I TRUSTED HIS RECOMMENDATION HERE.  AND THAT'S THE |
| 12:54PM | 6 | MAIN REASON WHY I AGREED THAT THAT SHOULD BE USED. |
| 12:54PM | 7 | Q.   IN THE NEXT EMAIL DANIEL YOUNG WRITES TO THE GROUP TO SAY, |
| 12:54PM | 8 | "WE HAVE RE-ALLOCATED THE 4S DEVICES, SO THEY ARE NOT AVAILABLE |
| 12:55PM | 9 | FOR PREPARING TO RUN CBC FOR THIS DEMO, UNFORTUNATELY." |
| 12:55PM | 10 | DO YOU SEE THAT? |
| 12:55PM | 11 | A.   (NODS HEAD UP AND DOWN.) |
| 12:55PM | 12 | Q.   I'M SORRY.  WE JUST NEED AN AUDIBLE ANSWER FOR THE COURT |
| 12:55PM | 13 | REPORTER. |
| 12:55PM | 14 | A.   YES. |
| 12:55PM | 15 | Q.   DOES THAT MEAN THAT ACTUALLY HAVING THE DEVICE RUN THE |
| 12:55PM | 16 | TEST IN THE ROOM WOULD NO LONGER BE AN OPTION? |
| 12:55PM | 17 | A.   YES. |
| 12:55PM | 18 | Q.   LET'S ZOOM IN ON THE TOP HALF OF THIS PAGE, PLEASE. |
| 12:55PM | 19 | OKAY.  MR. EDLIN, DO YOU SEE THAT YOU THEN RESPOND AND ASK |
| 12:55PM | 20 | WHEN THE 4S AND MINILAB WERE SCHEDULED TO BE MOVED TO THE |
| 12:55PM | 21 | INTERVIEW ROOM? |
| 12:55PM | 22 | A.   YES. |
| 12:55PM | 23 | Q.   AND THE ANSWER FROM SUMARTHA ANEKAL IS THAT THE ASSAY |
| 12:56PM | 24 | TEAMS ARE PLANNING ON USING THE 3.5 DEVICES TOMORROW. |
| 12:56PM | 25 | DO YOU SEE THAT? |

EDLIN DIRECT BY MR. BOSTIC                                              3878

12:56PM   1    A.   YES.

12:56PM   2    Q.   AND SAMARTHA ANEKAL SAYS, "I WILL HAVE A BETTER IDEA AFTER

12:56PM   3    LOOKING AT THE TSH DATA FROM TODAY IF WE CAN RUN THE TSH

12:56PM   4    ASSAY."

12:56PM   5         DO YOU HAVE AN UNDERSTANDING OF WHAT THAT WAS REFERRING

12:56PM   6    TO?

12:56PM   7    A.   NO.

12:56PM   8    Q.   THE DATE OF THIS EMAIL IS AUGUST 13TH, 2013.

12:56PM   9         DO YOU SEE THAT?

12:56PM   10   A.   YES.

12:56PM   11   Q.   AND WAS THIS A MONTH OR LESS UNTIL THERANOS BEGAN OFFERING

12:56PM   12   TESTING SERVICES?

12:56PM   13   A.   YES.

12:56PM   14   Q.   I'LL ASK YOU TO TURN TO --

12:56PM   15        ACTUALLY, YOUR HONOR, IF THE COURT WANTED TO BREAK AT

12:56PM   16   1:00, I'M ABOUT TO SWITCH TO A DIFFERENT EXHIBIT.

12:56PM   17             THE COURT:  MAYBE -- AND IT SOUNDS LIKE IT WILL TAKE

12:56PM   18   LONGER THAN THE TIME WE HAVE LEFT?

12:56PM   19             MR. BOSTIC:  I BELIEVE SO, YOUR HONOR.

12:56PM   20             THE COURT:  THANK YOU.  I APPRECIATE THAT.  WE'LL

12:57PM   21   CREATE SOME EFFICIENCIES HERE.

12:57PM   22        LADIES AND GENTLEMEN, WE'LL BREAK THEN FOR THE WEEKEND.

12:57PM   23   PLEASE RECALL THE ADMONITION THAT I'LL GIVE YOU ONCE AGAIN.

12:57PM   24        OVER THE WEEKEND, PLEASE DO NOT DO ANY RESEARCH ABOUT

12:57PM   25   ANYTHING INVOLVED WITH THIS CASE OR ANYONE INVOLVED WITH IT.

12:57PM   1    PLEASE AVOID ANY MEDIA, SOCIAL MEDIA, NEWS MEDIA, RADIO,

12:57PM   2    TELEVISION, OR OTHER CONVERSATIONS ABOUT THE CASE WITH YOUR

12:57PM   3    FAMILY, FRIENDS, OR OTHERS.  DO NOT TALK ABOUT THE CASE.  DO

12:57PM   4    NOT MAKE ANY DECISIONS OR EVEN ATTEMPT TO BEGIN DELIBERATIONS

12:57PM   5    ABOUT THIS CASE AT ALL.

12:57PM   6         REMEMBER, YOU'RE NOT PERMITTED TO DO THAT UNTIL THE CASE

12:57PM   7    IS OVER AND YOU ARE COLLECTIVELY IN THE JURY DELIBERATION ROOM

12:57PM   8    WITH YOUR FELLOW JURORS.  ONLY THEN WILL YOU BEGIN TO MAKE

12:57PM   9    DECISIONS ABOUT THE EVIDENCE IN THE CASE.

12:57PM  10         WITH THAT, LADIES AND GENTLEMEN, I WILL THANK YOU.

12:57PM  11         ENJOY YOUR WEEKEND.  I UNDERSTAND -- I THOUGHT I HEARD

12:57PM  12    SOMETHING ON THE RADIO THIS MORNING THAT THERE MIGHT BE

12:57PM  13    SOMETHING PRECIOUS CALLED RAIN THIS WEEKEND.  SO I HOPE IT

12:57PM  14    COMES.  I HOPE YOU ENJOY THAT.

12:58PM  15         (LAUGHTER.)

12:58PM  16         THE COURT:  AND HAVE A GOOD, RESTFUL WEEKEND.  WE'LL

12:58PM  17    SEE YOU ON TUESDAY NEXT, TUESDAY AT 9:00 A.M. WE'LL START.

12:58PM  18         AND IF YOU HAVE ANY OTHER INFORMATION REGARDING YOUR

12:58PM  19    SERVICE AT ALL, OR SCHEDULING ISSUES, WOULD YOU PLEASE CONTINUE

12:58PM  20    TO CONTACT MS. KRATZMANN ABOUT THAT INFORMATION?  THAT WOULD BE

12:58PM  21    HELPFUL.

12:58PM  22         AND I WILL SHARE THAT INFORMATION THAT WE RECEIVE WITH

12:58PM  23    COUNSEL AND WE CAN SCHEDULE ACCORDINGLY.

12:58PM  24         SO THANK YOU VERY MUCH FOR THAT.

12:58PM  25         ENJOY YOUR WEEKEND.  THANK YOU.

```
12:58PM   1            SIR, YOU CAN STAND DOWN.  WE'LL SEE YOU ON TUESDAY AT 9:00

12:58PM   2     O'CLOCK.

12:59PM   3            (JURY OUT AT 12:59 P.M.)

12:59PM   4             THE COURT:  MR. EDLIN, YOU CAN STAND DOWN.  THANK

12:59PM   5     YOU.

12:59PM   6            PLEASE BE SEATED, LADIES AND GENTLEMEN.

12:59PM   7            ALL RIGHT.  THANK YOU.  THE RECORD SHOULD REFLECT THAT OUR

12:59PM   8     JURY HAS LEFT FOR THE WEEKEND.  THE WITNESS HAS LEFT THE

12:59PM   9     COURTROOM.

12:59PM  10            ALL COUNSEL AND MS. HOLMES ARE PRESENT.

12:59PM  11            ANYTHING FURTHER BEFORE WE BREAK FOR THE WEEKEND, COUNSEL?

12:59PM  12             MR. SCHENK:  NOT FROM THE GOVERNMENT.

12:59PM  13             MR. DOWNEY:  NOTHING FROM THE DEFENSE, YOUR HONOR.

12:59PM  14             THE COURT:  ALL RIGHT.  THANK YOU.  ENJOY YOUR

12:59PM  15     WEEKENDS.  WE'LL SEE YOU NEXT WEEK.  THANK YOU.

12:59PM  16             MR. SCHENK:  THANK YOU.

12:59PM  17             THE CLERK:  COURT IS ADJOURNED.

01:01PM  18            (COURT ADJOURNED AT 1:01 P.M.)

         19

         20

         21

         22

         23

         24

         25
```

1

2

3                    CERTIFICATE OF REPORTERS

4

5

6

7        WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11       THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16       _____
         IRENE RODRIGUEZ, CSR, CRR
         CERTIFICATE NUMBER 8076

17

18       _____

19       LEE-ANNE SHORTRIDGE, CSR, CRR
         CERTIFICATE NUMBER 9595

20

21       DATED:  OCTOBER 15, 2021

22

23

24

25

3881

1

2                    UNITED STATES DISTRICT COURT

3                  NORTHERN DISTRICT OF CALIFORNIA

4                        SAN JOSE DIVISION

5

   UNITED STATES OF AMERICA,          )   CR-18-00258-EJD
6                                      )
                       PLAINTIFF,      )   SAN JOSE, CALIFORNIA
7                                      )
               VS.                     )   VOLUME 21
8                                      )
   ELIZABETH A. HOLMES,                )   OCTOBER 19, 2021
9                                      )
                       DEFENDANT.      )   PAGES 3881 - 4102
10   _____  )

11                TRANSCRIPT OF TRIAL PROCEEDINGS
12            BEFORE THE HONORABLE EDWARD J. DAVILA
                  UNITED STATES DISTRICT JUDGE
13
   A P P E A R A N C E S:
14
   FOR THE PLAINTIFF:      UNITED STATES ATTORNEY'S OFFICE
15                         BY:   JOHN C. BOSTIC
                                 JEFFREY B. SCHENK
16                         150 ALMADEN BOULEVARD, SUITE 900
                           SAN JOSE, CALIFORNIA 95113
17
                           BY:  ROBERT S. LEACH
18                              KELLY VOLKAR
                           1301 CLAY STREET, SUITE 340S
19                         OAKLAND, CALIFORNIA 94612

20        (APPEARANCES CONTINUED ON THE NEXT PAGE.)

21

   OFFICIAL COURT REPORTERS:
22                         IRENE L. RODRIGUEZ, CSR, RMR, CRR
                           CERTIFICATE NUMBER 8074
23                         LEE-ANNE SHORTRIDGE, CSR, CRR
                           CERTIFICATE NUMBER 9595
24
          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25             TRANSCRIPT PRODUCED WITH COMPUTER

```
1        A P P E A R A N C E S: (CONT'D)

2

3     FOR DEFENDANT HOLMES:    WILLIAMS & CONNOLLY LLP
                               BY:  KEVIN M. DOWNEY
4                                   LANCE A. WADE
                                    KATHERINE TREFZ
5                                   PATRICK LOOBY
                                    J.R. FLEURMONT
6                                   RICHARD CLEARY
                                    ANDREW LEMENS
7                              725 TWELFTH STREET, N.W.
                               WASHINGTON, D.C. 20005
8
                               LAW OFFICE OF JOHN D. CLINE
9                              BY:  JOHN D. CLINE
                               ONE EMBARCADERO CENTER, SUITE 500
10                             SAN FRANCISCO, CALIFORNIA 94111

11
      ALSO PRESENT:            FEDERAL BUREAU OF INVESTIGATION
12                             BY:  ADELAIDA HERNANDEZ

13                             OFFICE OF THE U.S. ATTORNEY
                               BY:  LAKISHA HOLLIMAN, PARALEGAL
14                                  MADDI WACHS, PARALEGAL

15                             WILLIAMS & CONNOLLY
                               BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL
16
                               TBC
17                             BY:  BRIAN BENNETT, TECHNICIAN

18

19

20

21

22

23

24

25
```

```
 1                        INDEX OF PROCEEDINGS
 2        GOVERNMENT'S:
 3
 4        DANIEL EDLIN
          DIRECT EXAM BY MR. BOSTIC (RES.)        P. 3915
 5        CROSS-EXAM BY MR. DOWNEY                 P. 4060
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3884

INDEX OF EXHIBITS

|  |  |  | IDENT. | EVIDENCE |
|---|---|---|---|---|
| GOVERNMENT'S: | | | | |
| 860 | | | | 3917 |
| 871 | | | | 3926 |
| 905 | | | | 3929 |
| 966 | | | | 3933 |
| 957 | | | | 3936 |
| 1014 | | | | 3938 |
| 1157 | | | | 3943 |
| 2327 | | | | 3947 |
| 4366 | | | | 3950 |
| 3070 | | | | 3952 |
| 528 | | | | 3958 |
| 3965 | | | | 3966 |
| 3981 | | | | 3969 |
| 5438 | | | | 3973 |
| 1090 | | | | 3982 |
| 1753 | | | | 3988 |
| 1940 | | | | 3994 |
| 4869 | | | | 3997 |
| 5413 | | | | 4003 |
| 4237 | | | | 4007 |
| 504 | | | | 4014 |
| 551 | | | | 4037 |
| 588 | | | | 4043 |
| 1027 | | | | 4045 |
| 5435 | | | | 4051 |

DEFENDANT'S:

| 7747 | 4063 |
|---|---|
| 13982 | 4063 |
| 9790 | 4065 |
| 12715 | 4074 |
| 10462 | 4087 |

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
|          | 1  | SAN JOSE, CALIFORNIA                    OCTOBER 19, 2021      |
| 08:38AM  | 2  | P R O C E E D I N G S                                        |
| 08:38AM  | 3  | (COURT CONVENED AT 8:38 A.M.)                                |
| 08:38AM  | 4  | (JURY OUT AT 8:38 A.M.)                                       |
| 08:38AM  | 5  | THE COURT:  LET'S GO ON THE RECORD IN THE HOLMES             |
| 08:38AM  | 6  | MATTER.  ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT.    |
| 08:38AM  | 7  | WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.                   |
| 08:38AM  | 8  | I WANTED TO TALK ABOUT A COUPLE OF THINGS WITH COUNSEL.      |
| 08:38AM  | 9  | FIRST OF ALL, WE HAD CONVERSATION LAST WEEK WITH A JUROR     |
| 08:38AM  | 10 | WHO LOST A RELATIVE.  I UNDERSTAND -- I'VE RECEIVED INFORMATION |
| 08:39AM  | 11 | ABOUT THAT JUROR'S TRAVEL PLANS.  RESPECTING THAT, WE WILL NOT |
| 08:39AM  | 12 | BE IN SESSION ON OCTOBER 29TH, FRIDAY, OCTOBER 29TH.  THE JUROR |
| 08:39AM  | 13 | PLANS TO TRAVEL THE 27TH OR 28TH, BUT WE'LL RETURN THE       |
| 08:39AM  | 14 | FOLLOWING WEEK, SO IT SHOULDN'T DISRUPT OUR SCHEDULE THE     |
| 08:39AM  | 15 | FOLLOWING WEEK.                                              |
| 08:39AM  | 16 | WE WILL BE ABLE TO RESUME ON -- I THINK NOVEMBER 2ND WOULD   |
| 08:39AM  | 17 | BE THE NEXT TRIAL DAY?                                       |
| 08:39AM  | 18 | THE CLERK:  YES, YOUR HONOR.                                 |
| 08:39AM  | 19 | THE COURT:  SO THAT WILL BE OUR SCHEDULE.  WE'LL TRY         |
| 08:39AM  | 20 | TO MAKE UP SOME OF OUR TIME.  I'LL ASK IF MAYBE WE CAN EXTEND |
| 08:39AM  | 21 | OUR COURT DAYS UNTIL 4:00 O'CLOCK A COUPLE OF DAYS.          |
| 08:39AM  | 22 | SO THAT'S THAT FOR SCHEDULING.  I'LL INFORM THE JURY OF      |
| 08:39AM  | 23 | THAT WHEN THEY COME IN.                                      |
| 08:39AM  | 24 | AND THEN I RECEIVED DOCUMENT 1098.  MR. CLINE, I THINK YOU   |
| 08:40AM  | 25 | FILED THAT.                                                  |

08:40AM 1          MR. CLINE:  I DID, YOUR HONOR.

08:40AM 2          THE COURT:  GOOD MORNING.

08:40AM 3          MR. CLINE:  THIS HAS TO DO WITH DR. WEBER WHO I

08:40AM 4    DON'T THINK WILL BE ON TODAY.  THIS WILL BE AN EDLIN DAY.

08:40AM 5    PERHAPS WE CAN TAKE IT UP TOMORROW MORNING.

08:40AM 6          THE COURT:  SURE.  WE CAN CHAT ABOUT IT A LITTLE

08:40AM 7    MORE TODAY SINCE YOU'RE HERE.

08:40AM 8          MR. CLINE:  THAT'S FINE.

08:40AM 9          THE COURT:  MR. LEACH.

08:40AM 10         MR. LEACH:  YES, YOUR HONOR.

08:40AM 11      THE GOVERNMENT INTENDS TO CALL SHANE WEBER, WHO WAS A

08:40AM 12   DIRECTOR OF DIAGNOSTICS AT PFIZER.  HIS JOB WAS ESSENTIALLY TO

08:40AM 13   EVALUATE TECHNOLOGIES THAT MIGHT BE OF INTEREST TO PFIZER, AND

08:40AM 14   IN THE COURSE OF HIS WORK HE PREPARED A REPORT REVIEWING

08:40AM 15   THERANOS'S TECHNOLOGY.

08:40AM 16      THIS REPORT IS DEEPLY RELEVANT TO THE ALLEGATIONS IN THE

08:40AM 17   INDICTMENT.  THE DEFENDANT MADE SWEEPING CLAIMS TO INVESTORS

08:40AM 18   THAT PFIZER HAD VALIDATED THERANOS'S TECHNOLOGY.  SHE

08:40AM 19   ESSENTIALLY TOLD HER INVESTORS WHAT PFIZER THOUGHT, AND THE

08:41AM 20   FIRST STEP OF PROVING THAT IS TO SHOW WHAT PFIZER ACTUALLY

08:41AM 21   THOUGHT, AND THIS DOCUMENT DOES THAT IN MANY, MANY WAYS.

08:41AM 22      THE DOCUMENT PROVES THE FALSITY OF THE DEFENDANT'S

08:41AM 23   STATEMENTS TO INVESTORS, AND FOR THAT REASON IT PASSES ANY 401

08:41AM 24   RELEVANCE OBJECTION.

08:41AM 25      WITH RESPECT TO 403, I UNDERSTAND THE ARGUMENT TO BE,

08:41AM   1     WELL, THIS DOCUMENT DOESN'T GO DIRECTLY TO ELIZABETH HOLMES,

08:41AM   2     AND THEREFORE, THE JURY MIGHT WRONGLY INFER THAT THIS DOCUMENT

08:41AM   3     WAS PROVIDED TO THE DEFENDANT.

08:41AM   4         THAT'S A MATTER FOR CROSS-EXAMINATION.  THE GOVERNMENT

08:41AM   5     WILL NOT SUGGEST THAT THE DOCUMENT WENT DIRECTLY TO HER, AND

08:41AM   6     THAT'S A MATTER THAT MR. CLINE CAN EXPLORE AND EVALUATE WITH

08:41AM   7     THIS PARTICULAR WITNESS.

08:41AM   8         BUT IT DOESN'T UNDERCUT THE PROBITY OF THE EVIDENCE IN

08:41AM   9     TERMS OF SHOWING THE FALSITY OF THE STATEMENT, AND THERE'S NO

08:42AM  10     GENUINE PREJUDICE IF YOU CAN EXPLORE THAT PARTICULAR ASPECT OF

08:42AM  11     IT.

08:42AM  12         I WILL SAY THAT DR. WEBER DOES HAVE A CONVERSATION WITH

08:42AM  13     MS. HOLMES AFTER THE REVIEW WHERE HE TELLS MS. HOLMES PFIZER

08:42AM  14     HAS NO INTEREST IN GOING FORWARD WITH THERANOS'S TECHNOLOGY.

08:42AM  15         HE DOESN'T COMMUNICATE THE SPECIFIC REASONS TO HER, AND

08:42AM  16     THE GOVERNMENT WON'T SUGGEST THAT THE DOCUMENT WENT TO HER, BUT

08:42AM  17     THEY ARE TIED IN THAT WAY, AND THE EVIDENCE IS PROBATIVE OF

08:42AM  18     FALSITY, WHICH IS SOMETHING THAT THE GOVERNMENT NEEDS TO

08:42AM  19     SUPPORT ITS ALLEGATIONS.

08:42AM  20         THERE'S ALSO A BUSINESS RECORDS OBJECTION TO THIS.  I

08:42AM  21     BELIEVE I CAN LAY A FOUNDATION WITH DR. WEBER THAT THIS IS THE

08:42AM  22     TYPE OF DOCUMENT THAT HE PREPARED IN THE ORDINARY COURSE OF

08:42AM  23     BUSINESS, THAT HE WAS UNDER A DUTY TO REPORT ACCURATELY, THAT

08:42AM  24     THIS WAS MAINTAINED IN THE ORDINARY COURSE, THAT THIS WAS THE

08:42AM  25     FINAL VERSION OF HIS REPORT TO HIS SUPERIORS.

08:42AM   1        SO I BELIEVE THAT WE CAN LAY A FOUNDATION UNDER 803(6) FOR

08:42AM   2    THE BUSINESS RECORDS EXCEPTION.

08:43AM   3        AND FOR ALL OF THOSE REASONS, THIS IS HIGHLY PROBATIVE

08:43AM   4    EVIDENCE THAT SHOWS THE FALSITY OF WHAT MS. HOLMES WAS SAYING

08:43AM   5    ABOUT WHAT PFIZER DID AND THOUGHT AND IT SHOULD COME IN.

08:43AM   6        THE COURT:  LET ME ASK YOU -- THANK YOU.  LET ME ASK

08:43AM   7    YOU, TWO OTHER OBJECTIONS WERE 702 AND THEN 403, OF COURSE, AND

08:43AM   8    UNDER 702, IT SEEMS LIKE THERE'S A COUPLE OF THE PARAGRAPHS --

08:43AM   9    THERE'S 25 QUESTIONS THAT WERE ANSWERED.  THIS IS THE PART THAT

08:43AM  10    I'M FOCUSSING ON.

08:43AM  11        AND THERE WERE THREE OR FOUR QUESTIONS, PERHAPS MORE, THAT

08:43AM  12    TALK ABOUT SPECIFIC, USE SPECIFIC SCIENTIFIC TERMS AND WHETHER

08:43AM  13    CERTAIN PROCESSES WERE USED, AND THAT MIGHT BE A 702 ISSUE.  I

08:43AM  14    LOOKED AT THAT, AND YOU'RE SEEKING TO INTRODUCE THE DOCUMENT IN

08:43AM  15    TOTO I ASSUME?

08:43AM  16        MR. LEACH:  YES, YOUR HONOR.  ALTHOUGH IF THERE ARE

08:43AM  17    PARTICULAR QUESTIONS IN THE QUESTIONS THAT MR. WEBER PUT TO THE

08:43AM  18    FOLKS AT THERANOS, I THINK THOSE CAN BE REDACTED.

08:43AM  19        I DO THINK THIS IS MORE ALONG THE LINES OF PERCIPIENT --

08:44AM  20    IT'S A PERCIPIENT EVALUATION.  THERE'S CERTAINLY SOME TECHNICAL

08:44AM  21    ASPECTS TO WHAT HE'S ASKING, BUT IT'S NO DIFFERENT THAN WHAT

08:44AM  22    DR. ROSENDORFF, THE ASPECTS OF WHAT DR. ROSENDORFF TESTIFIED TO

08:44AM  23    THAT SHEKAR GANGAKHEDKAR TESTIFIED TO, AND I THINK THOSE ARE

08:44AM  24    QUITE -- BUT IF THERE ARE PARTICULAR QUESTIONS THAT THE COURT

08:44AM  25    VIEWS IN THAT LAND, I AM PREPARED TO REDACT THOSE.

3889

08:44AM  1          THE COURT:  WELL, MAYBE THEY WERE -- MAYBE I WAS

08:44AM  2     USING MY PERSONAL STANDARD, BUT YOU LOOK AT 17 THROUGH 20,

08:44AM  3     SOMETHING LIKE THAT, AND IN THAT RANGE I THINK THERE ARE SOME

08:44AM  4     VERY TECHNICAL -- IT LOOKS LIKE THERE ARE TECHNICAL QUESTIONS

08:44AM  5     THAT -- AND I DON'T KNOW IF THAT'S SOMETHING THAT WOULD BE

08:44AM  6     REDACTED OR WHATEVER, BUT THAT WAS THE 702 ISSUE THAT I LOOKED

08:44AM  7     AT.

08:44AM  8          AND THEN FROM A 403 STANDPOINT, THERE'S SOME -- IT SEEMS

08:44AM  9     LIKE HE USES SOME TERMS, "UNCONVINCING" AND OTHER TERMS LIKE

08:44AM 10     THAT THAT MY SENSE IS WHAT THE 403 OBJECTIONS WERE ABOUT.

08:45AM 11          MR. LEACH:  THE -- YOUR HONOR, I DON'T THINK THERE'S

08:45AM 12     A 403 ISSUE THERE BECAUSE IT'S MS. HOLMES THAT IS PURPORTING TO

08:45AM 13     TALK ABOUT WHAT PFIZER THOUGHT, AND IF WHAT PFIZER THOUGHT WAS

08:45AM 14     THE REPORT THAT WE RECEIVED FROM THERANOS IS UNCONVINCING OR

08:45AM 15     LACKING IN FOUNDATION, YOU KNOW, THAT'S PROBATIVE EVIDENCE OF

08:45AM 16     WHAT WAS IN, YOU KNOW, THIS WITNESS'S MIND AT THE TIME WHEN

08:45AM 17     HE'S ASKED TO REVIEW THE TECHNOLOGY.

08:45AM 18          AND SO --

08:45AM 19          THE COURT:  I'M SORRY TO INTERRUPT YOU.  PARDON ME.

08:45AM 20          ON PAGE 3 I THINK IT IS, QUESTION 3 USES A TERM "ARE NOT

08:45AM 21     BELIEVABLE, UNCONVINCINGLY, POORLY PREPARED," THOSE TYPES OF

08:45AM 22     STATEMENTS.  I'M NOT ADVOCATING FOR MR. CLINE, BUT BASED ON HIS

08:45AM 23     PLEADINGS, IT SEEMS LIKE THAT'S WHAT HE'S REFERENCING.

08:45AM 24          MR. CLINE:  AND I MIGHT ADD -- SORRY TO INTERRUPT,

08:46AM 25     YOUR HONOR -- BUT TERMS LIKE "EVASIVE" AND "NONRESPONSIVE" --

08:46AM 1    AND AGAIN, I'M SORRY TO INTERRUPT MR. LEACH AND YOUR HONOR --

08:46AM 2    BUT THIS WAS AN INTERNAL PFIZER REPORT.  NOT ONLY DID IT NOT GO

08:46AM 3    TO MS. HOLMES, IT DIDN'T GO TO THERANOS AT ALL.

08:46AM 4         MR. -- DR. WEBER DID HAVE A CONVERSATION WITH MS. HOLMES.

08:46AM 5              THE COURT:  SIXTY MINUTES ACCORDING TO THIS, IT WAS

08:46AM 6    ABOUT AN HOUR.

08:46AM 7              MR. CLINE:  WELL, THERE WAS THAT CONVERSATION AND HE

08:46AM 8    CAN TESTIFY ABOUT THAT OF COURSE, BUT THEN THERE WAS A LATER

08:46AM 9    CONVERSATION IN JANUARY OF 2009 WHERE HE CONVEYED THE VIEW, AS

08:46AM 10   MR. LEACH HAS SAID, THAT PFIZER DID NOT HAVE AN INTEREST IN

08:46AM 11   DOING BUSINESS WITH THERANOS.

08:46AM 12        HE CAN TESTIFY ALL ABOUT THAT CONFERENCE BECAUSE THAT

08:46AM 13   OBVIOUSLY GOES TO MS. HOLMES'S KNOWLEDGE AND INTENT.

08:46AM 14        IT'S THE PEJORATIVE NATURE OF THIS INTERNAL TO PFIZER, NOT

08:46AM 15   CONVEYED TO MS. HOLMES THAT IS SO OBJECTIONABLE UNDER 403, AND

08:46AM 16   THEN, OF COURSE, THERE'S THE 702 ISSUE THAT YOUR HONOR HAS ALSO

08:46AM 17   FLAGGED.

08:46AM 18             THE COURT:  BUT IS IT APPROPRIATE FOR HIM TO SAY, AS

08:47AM 19   A REPRESENTATIVE OF PFIZER, I WAS TASKED TO DO, MY JOB IS TO

08:47AM 20   LOOK AT BUSINESS OPPORTUNITIES TO EVALUATE WHETHER OR NOT THAT

08:47AM 21   BUSINESS ARRANGEMENT AND ENGAGEMENT IS SOMETHING THAT IS

08:47AM 22   APPROPRIATE FOR OUR BUSINESS, SOMETHING THAT WE SHOULD DO.

08:47AM 23        AND MY ANALYSIS OF THAT IS THE FOLLOWING.

08:47AM 24        ISN'T THAT APPROPRIATE?

08:47AM 25             MR. CLINE:  I THINK IT IS.  I THINK WHAT HE COULD

08:47AM   1    SAY IS, I WAS TASKED TO REVIEW THIS, I DID REVIEW IT, I TALKED

08:47AM   2    TO PEOPLE INTERNALLY AT PFIZER, AND I CONCLUDED THAT THERE WAS

08:47AM   3    NO BUSINESS -- NO BASIS FOR FURTHER BUSINESS BETWEEN PFIZER AND

08:47AM   4    THERANOS, I RECOMMENDED THAT INTERNALLY, AND THEN I CALLED

08:47AM   5    MS. HOLMES IN JANUARY OF 2009 AND I CONVEYED, WHATEVER HE'S

08:47AM   6    GOING TO SAY HE CONVEYED TO HER.  THERE'S AN EMAIL WHERE HE

08:47AM   7    TALKS ABOUT IT.

08:47AM   8         ALL OF THAT IS FAIR GAME.

08:47AM   9         IT'S THE SORT OF DETAILED BOTH SCIENTIFIC ON ONE HAND THAT

08:47AM  10    IS THE 702 ISSUE, AND THEN THE SORT OF HIGHLY PEJORATIVE

08:47AM  11    CHARACTERIZATION THAT IS THE 403 ISSUE THAT I DON'T THINK

08:48AM  12    SHOULD COME IN.

08:48AM  13              THE COURT:  OKAY.

08:48AM  14         MR. LEACH?

08:48AM  15              MR. LEACH:  YOUR HONOR, THE DEFENDANT PURPORTED TO

08:48AM  16    SPEAK ABOUT WHAT PFIZER THOUGHT.  THIS IS THE BEST EVIDENCE

08:48AM  17    AVAILABLE OF WHAT THIS PARTICULAR WITNESS FROM PFIZER REALLY

08:48AM  18    THOUGHT IN THE MOMENT WHILE HE'S GETTING ANSWERS FROM

08:48AM  19    MS. HOLMES ABOUT HER TECHNOLOGY.

08:48AM  20         HE PUTS QUESTIONS TO HER, SHE DOESN'T ANSWER THEM.  SHE

08:48AM  21    DEFLECTS.  THEY'RE NONINFORMATIVE.  THAT'S HIS CONCLUSION IN

08:48AM  22    THE MOMENT.

08:48AM  23         AND I -- YOU KNOW, PART OF THE GOVERNMENT -- YOU KNOW,

08:48AM  24    PART OF THE ALLEGATION IS PROVING THE FALSITY OF THE STATEMENT.

08:48AM  25         AND SO, YES, THESE ARE HARSH WORDS, BUT THESE ARE WORDS

3892

08:48AM   1    THAT HE THOUGHT IN THE MOMENT, THEY'RE WORDS THAT WERE RELEVANT

08:48AM   2    TO HIM IN ASSESSING THE TECHNOLOGY, AND THEY'RE FODDER FOR

08:48AM   3    CROSS-EXAMINATION, HOW THOROUGH WAS YOUR REVIEW?  YOU KNOW,

08:48AM   4    WHAT WAS THE SPECIFIC QUESTION?

08:48AM   5         BUT THIS IS A PERCIPIENT REACTION TO WHAT, YOU KNOW, HE

08:49AM   6    WAS DOING IN THE MOMENT, AND THE FACT THAT THEY DON'T LIKE WHAT

08:49AM   7    HE CONCLUDED IS NOT A 403 PROBLEM, PARTICULARLY IN LIGHT OF HOW

08:49AM   8    PROBATIVE THIS IS OF, OF THE FALSITY OF THE DEFENDANT'S

08:49AM   9    STATEMENTS.

08:49AM  10              THE COURT:  IT LOOKS LIKE THE TRAJECTORY, THE

08:49AM  11    GENESIS I SHOULD SAY IS THE OCTOBER -- THIS IS EXHIBIT 2, I

08:49AM  12    THINK, IF I'M READING YOUR PLEADINGS CORRECT, AN OCTOBER 11,

08:49AM  13    2008 EMAIL FROM YOUR CLIENT TO PFIZER, I THINK, HERE'S OUR

08:49AM  14    REPORT.  IT'S ALMOST LIKE AN INVITATION.  HERE'S WHAT WE HAVE

08:49AM  15    DONE, THIS IS WHAT WE CAN DO, THIS IS OUR PRODUCT, GO FOR IT,

08:49AM  16    LOOK AT IT.

08:49AM  17         AND THEN MR. WEBER IS TASKED BY PFIZER TO DO JUST THAT,

08:49AM  18    AND THEN HE FILES HIS REPORT.

08:49AM  19         IS THAT THE CHRONOLOGY?

08:49AM  20              MR. LEACH:  THAT'S EXACTLY RIGHT, YOUR HONOR.

08:49AM  21              MR. CLINE:  THAT IS THE CHRONOLOGY.  THERE HAD BEEN

08:49AM  22    A LENGTHY INTERACTION BETWEEN THERANOS AND PFIZER BEFORE

08:49AM  23    DR. WEBER EVER GOT INVOLVED.

08:50AM  24         THEN PFIZER TASKED HIM, IN OCTOBER OR SO, TO REVIEW THE

08:50AM  25    REPORT THAT THERANOS SUBMITTED.

08:50AM   1          HE CONDUCTS THE REVIEW OVER THE NEXT COUPLE OF MONTHS.  HE

08:50AM   2    DOES HAVE THIS CONVERSATION WITH MS. HOLMES AND OTHERS, AND HE

08:50AM   3    PREPARES THIS INTERNAL DOCUMENT, WHICH IS THE SUBJECT OF OUR

08:50AM   4    MOTION.

08:50AM   5          HE THEN HAS A TELEPHONE CALL IN JANUARY OF 2009, AND THE

08:50AM   6    INTERNAL DOCUMENT, AS I'VE SAID, DIDN'T EVER GO TO THERANOS OR

08:50AM   7    MS. HOLMES.  IT WAS PURELY FOR INTERNAL PFIZER USE.

08:50AM   8          THEN HE HAS A TELEPHONE CALL WITH MS. HOLMES IN JANUARY OF

08:50AM   9    2009 WHERE HE SAYS POLITELY, AS HE SAYS IN HIS EMAIL

08:50AM  10    MEMORIALIZING THIS CONVERSATION, THAT THERE'S NO -- HE DOESN'T

08:50AM  11    SEE ANY BUSINESS FUTURE BETWEEN -- AT THE MOMENT BETWEEN

08:50AM  12    THERANOS AND PFIZER.  HE KEEPS OPEN THE POSSIBILITY OF SOME

08:50AM  13    CHANGE.

08:50AM  14          WITH ALL DUE RESPECT TO MR. LEACH, THAT'S THE BEST

08:50AM  15    EVIDENCE OF MS. HOLMES'S KNOWLEDGE AND INTENT, WHAT SHE WAS

08:50AM  16    ACTUALLY TOLD, NOT SOME INTERNAL PFIZER DOCUMENT THAT IS

08:51AM  17    HARSHLY CRITICAL BUT NEVER GOES TO HER.  SHE NEVER SEES IT.

08:51AM  18    IT'S NEVER CONVEYED TO HER.

08:51AM  19          THAT'S NOT EVIDENCE OF HER KNOWLEDGE OR INTENT AT ALL.

08:51AM  20    IT'S JUST PREJUDICIAL.

08:51AM  21              THE COURT:  WELL, IS HE ENTITLED, IS MR. LEACH

08:51AM  22    ENTITLED TO QUESTION THE WITNESS AS TO WHY HE FORMED -- WHY

08:51AM  23    PFIZER -- AS A REPRESENTATIVE OF PFIZER, WHY PFIZER DECIDED NOT

08:51AM  24    TO DO BUSINESS?  CAN'T HE PROBE THAT?

08:51AM  25              MR. CLINE:  I THINK PERHAPS AT A HIGH LEVEL HE CAN.

08:51AM   1    I MEAN, I'M NOT SAYING THAT DR. WEBER CAN'T SAY ANYTHING ABOUT

08:51AM   2    WHY HE CAME TO THE CONCLUSION THAT HE CAME TO.

08:51AM   3        WHAT I'M SAYING IS THAT THE SORT OF SCIENTIFIC ANALYSIS,

08:51AM   4    WHICH IS THE 702 ISSUE, SHOULD NOT COME IN.  IT CAN BE

08:51AM   5    DESCRIBED AT A HIGH LEVEL.  IT SHOULD NOT COME IN IN DETAIL.

08:51AM   6        AND THE PEJORATIVE CHARACTERIZATION ABOUT THE INTERACTIONS

08:51AM   7    WITH THERANOS SHOULD NOT COME IN.

08:51AM   8            THE COURT:  OKAY.

08:51AM   9            MR. CLINE:  BECAUSE, AGAIN, IF HE HAD TOLD

08:51AM  10    MS. HOLMES, I THINK YOU'RE BEING EVASIVE AND DEFLECTIVE, YOU'RE

08:52AM  11    A BAD PERSON, MAYBE THAT COMES IN BECAUSE IT GOES TO HIS

08:52AM  12    KNOWLEDGE AND INTENT.

08:52AM  13        HE DIDN'T.  HE HAD A MUCH DIFFERENT CONVERSATION WITH HER

08:52AM  14    THAN WHAT IS REPRESENTED IN THIS REPORT.

08:52AM  15        AND I THINK IT'S JUST UNFAIR TO HER AND MISLEADING TO THE

08:52AM  16    JURY TO SUGGEST THAT SOMEHOW THIS REPORT REFLECTS WHAT WAS IN

08:52AM  17    MS. HOLMES'S MIND AND HER KNOWLEDGE AND INTENT.

08:52AM  18            THE COURT:  MR. LEACH?

08:52AM  19            MR. LEACH:  THE WHY IS IMPORTANT, YOUR HONOR, AND

08:52AM  20    THE WHY IS IMPORTANT NOT JUST FOR MS. HOLMES'S INTENT, BUT THE

08:52AM  21    FALSITY OF THE STATEMENTS THAT SHE'S MAKING.

08:52AM  22        THE GOVERNMENT DOESN'T NEED TO PROVE THROUGH A SINGLE

08:52AM  23    PIECE OF EVIDENCE ALL OF THE ELEMENTS, KNOWLEDGE AND FALSITY

08:52AM  24    AND MATERIALITY.  WE CAN DO THAT IN PIECES.

08:52AM  25        THIS IS EVIDENCE OF THE FALSITY OF THE DEFENDANT'S

| | | |
|---|---|---|
| 08:52AM | 1 | STATEMENTS.  SHE HELD HERSELF OUT AS BEING KNOWLEDGEABLE ABOUT |
| 08:52AM | 2 | WHAT PFIZER REALLY THOUGHT. |
| 08:52AM | 3 | PFIZER THOUGHT HER ANSWERS WERE DEFLECTIVE, EVASIVE, |
| 08:53AM | 4 | NONINFORMATIVE, AND THEY MEMORIALIZED THAT IN A REPORT THAT IS |
| 08:53AM | 5 | PART OF THEIR ROUTINE BUSINESS ACTIVITIES. |
| 08:53AM | 6 | I UNDERSTAND THAT IT LOOKS FORCEFUL IN DEMONSTRATING HOW |
| 08:53AM | 7 | STRONGLY PFIZER FELT ABOUT THIS, AND THIS IS CRITICAL CONTEXT |
| 08:53AM | 8 | FOR WHY THERE'S NO MORE WORK AFTER THIS. |
| 08:53AM | 9 | SO WE WILL NOT SUGGEST THAT THE DOCUMENT WENT TO |
| 08:53AM | 10 | MS. HOLMES. |
| 08:53AM | 11 | BUT THE WHY HERE IS CRITICAL.  I REALLY -- IT, IT -- THE |
| 08:53AM | 12 | GOVERNMENT DOESN'T NEED TO PROVE KNOWLEDGE, FALSITY, |
| 08:53AM | 13 | MATERIALITY, AND THE WHY ALL IN ONE COMMUNICATION.  WE CAN DO |
| 08:53AM | 14 | IT IN PIECES, AND THIS IS AN IMPORTANT PIECE OF THE FALSITY. |
| 08:53AM | 15 | THE COURT:  OKAY.  ALL RIGHT. |
| 08:53AM | 16 | WELL, THANK YOU FOR THE HELP THIS MORNING. |
| 08:53AM | 17 | I THINK -- WOULD YOU AGREE, MR. LEACH, THAT WE'RE NOT |
| 08:53AM | 18 | GOING TO GET TO THIS WITNESS TODAY? |
| 08:53AM | 19 | MR. LEACH:  IF WE'RE GOING TO GET TO HIM, I THINK IT |
| 08:53AM | 20 | WOULD BE VERY LATE. |
| 08:53AM | 21 | THE COURT:  RIGHT. |
| 08:53AM | 22 | MR. LEACH:  SO I THINK IT WOULD BE VERY LATE.  I |
| 08:53AM | 23 | THINK WE HAVE TIME TO REACH A CONCLUSION ON THIS. |
| 08:53AM | 24 | THE COURT:  OKAY.  OKAY. |
| 08:53AM | 25 | MR. LEACH:  AND I CERTAINLY WON'T GET INTO IT |

08:54AM  1    WITHOUT ANOTHER DISCUSSION.

08:54AM  2              THE COURT:  ALL RIGHT.  THANK YOU.  OF COURSE.

08:54AM  3    THANK YOU FOR THAT.

08:54AM  4         LET'S TALK WITH MR. BOSTIC ABOUT MR. EDLIN AND SEE WHERE

08:54AM  5    THAT GOES.

08:54AM  6              MR. CLINE:  THANK YOU, YOUR HONOR.

08:54AM  7              THE COURT:  THANK YOU, MR. CLINE.

08:54AM  8         I THINK WE WERE HAVING A DISCUSSION ABOUT A DOCUMENT,

08:54AM  9    MR. BOSTIC.

08:54AM  10             MR. BOSTIC:  YES.  GOOD MORNING, YOUR HONOR.

08:54AM  11             THE COURT:  GOOD MORNING.

08:54AM  12             MR. BOSTIC:  THE DEFENSE HAD RAISED CONCERNS ABOUT

08:54AM  13   TWO EXHIBITS THAT I BELIEVE THE GOVERNMENT INTENDED TO EXPLORE

08:54AM  14   WITH MR. EDLIN.

08:54AM  15        THOSE TWO EXHIBITS WERE 504 AND 551.  THOSE SHOULD BE IN

08:54AM  16   THE COURT'S BINDER.

08:54AM  17        THEY BOTH INCLUDE PRESENTATIONS OR MEMORANDA SENT FROM

08:54AM  18   THERANOS TO THE MILITARY.  THOSE PRESENTATION WERE APPROVED BY

08:54AM  19   MS. HOLMES WE EXPECT THIS WITNESS WILL TESTIFY.

08:54AM  20        AND THE CONTENT INCLUDES SOME FALSE STATEMENTS.

08:54AM  21   SPECIFICALLY EXHIBIT 504 INCLUDES THE REPRESENTATION TO THE

08:54AM  22   MILITARY, EACH THERANOS DEVICE CAN RUN EVERY TEST CURRENTLY

08:55AM  23   AVAILABLE THROUGH TRADITIONAL OR HOSPITAL LAB INFRASTRUCTURE.

08:55AM  24   I PARAPHRASED THE SECOND PORTION OF THAT.

08:55AM  25        THAT WAS NOT TRUE AT THE TIME.  IT WAS NEVER TRUE DURING

08:55AM 1    THE OPERATION OF THERANOS.

08:55AM 2        THE FACT THAT THAT REPRESENTATION WAS MADE TO THE MILITARY

08:55AM 3    IS NOT BEING PRESENTED AS CHARACTER EVIDENCE AGAINST

08:55AM 4    MS. HOLMES.  IT'S ANYTHING BUT EXTRANEOUS TO THE CHARGED FRAUD.

08:55AM 5    IT'S INEXTRICABLY INTERTWINED WITH THE CHARGED FRAUD FOR TWO

08:55AM 6    REASONS.

08:55AM 7        FIRST, THIS WAS PART OF THE OVERALL SCHEME TO MISLEAD

08:55AM 8    INVESTORS AS TO THE NATURE OF THERANOS'S CONTACTS WITH THE

08:55AM 9    MILITARY.

08:55AM 10       IN ORDER TO MAKE THAT DECEPTION MORE BELIEVABLE, IN ORDER

08:55AM 11   TO ADD A KERNEL OF TRUTH TO FALSE STATEMENTS ABOUT THERANOS'S

08:55AM 12   CONTACT WITH THE MILITARY, IT WAS IMPORTANT FOR THE MILITARY TO

08:55AM 13   HAVE SOME LEVEL OF CONNECTION WITH THERANOS.  IT WAS NECESSARY

08:56AM 14   TO GET THE MILITARY ON THE HOOK, AS IT WERE, AND TO ESTABLISH

08:56AM 15   THAT RELATIONSHIP THAT COULD THEN BE EXAGGERATED LATER.

08:56AM 16       SECONDLY, THIS EVIDENCE IS IMPORTANT BECAUSE IT SHOWS THAT

08:56AM 17   MS. HOLMES WAS AWARE OF THE FALSITY OF HER STATEMENTS WHEN SHE

08:56AM 18   WAS CLAIMING THAT THE THERANOS DEVICE HAD BEEN DEPLOYED BY THE

08:56AM 19   MILITARY.

08:56AM 20       AND BY THE WAY, JUST TO BE CLEAR, THE INDICTMENT IN THIS

08:56AM 21   CASE EXPRESSLY SAYS THAT A CATEGORY OF FALSE STATEMENTS AT

08:56AM 22   ISSUE HERE IS NOT JUST THE AMOUNT OF REVENUE IN THE THERANOS

08:56AM 23   MILITARY RELATIONSHIP, BUT ALSO WHETHER THE DEVICE WAS, IN

08:56AM 24   FACT, DEPLOYED.

08:56AM 25       THE INDICTMENT ALLEGES THAT HOLMES SAID IT WAS WHEN, IN

08:56AM   1    FACT, IT WAS NOT.

08:56AM   2         TO PROVE THAT SHE WAS AWARE THAT THAT WAS NOT HAPPENING,

08:56AM   3    IT'S IMPORTANT FOR THE JURY TO UNDERSTAND THAT THE MILITARY'S

08:56AM   4    INTEREST IN THE THERANOS DEVICE IN THE FIRST PLACE WAS PREMISED

08:56AM   5    ON A FALSEHOOD.

08:56AM   6         THE MILITARY WANTED A DEVICE THAT COULD DO ALL OF THESE

08:57AM   7    TESTS, A LAB IN A BOX THAT COULD DO EVERYTHING THAT A

08:57AM   8    CONVENTIONAL LAB COULD DO.  THAT WAS THE BASIS FOR THE

08:57AM   9    MILITARY'S INTEREST, AND THOSE WERE THE TERMS ON WHICH

08:57AM   10   MS. HOLMES GOT THE MILITARY INTERESTED.

08:57AM   11        BECAUSE SHE KNEW THAT'S WHAT THEY WANTED, AND BECAUSE SHE

08:57AM   12   KNEW THAT THE COMPANY COULDN'T DELIVER ON THAT SPECIFIC

08:57AM   13   PROMISE, SHE WAS WELL AWARE THAT THE DEVICE WAS NOT BEING USED

08:57AM   14   BY THE MILITARY WHEN SHE WAS TELLING PEOPLE IT WAS, AND THAT IT

08:57AM   15   WAS UNLIKELY TO BE USED BY THE MILITARY IN ITS CURRENT FORM

08:57AM   16   BECAUSE IT COULD NOT DO WHAT SHE TOLD THE MILITARY IT COULD DO.

08:57AM   17        THE COURT:  AND WHAT IS THE CHRONOLOGY -- WE TALKED

08:57AM   18   ABOUT THIS BEFORE WITH MR. DOWNEY.

08:57AM   19        I THINK MR. DOWNEY'S POINT WAS A POINT THAT YOU RAISED,

08:57AM   20   THE FINANCIAL ARRANGEMENT, AND HE SUGGESTS, MR. DOWNEY -- AND I

08:57AM   21   DON'T MEAN TO SPEAK FOR YOU, MR. DOWNEY -- BUT YOU SUGGESTED

08:57AM   22   LAST WEEK THAT THAT WAS THE CRITICAL -- YOU CAN COME FORWARD.

08:57AM   23   THANK YOU. -- THAT WAS THE COMPONENT THAT THE INDICTMENT

08:57AM   24   SUGGESTS, THAT THE FINANCIAL RELATIONSHIP WAS NOT AS GREAT AS

08:58AM   25   SHE SUGGESTS THAT IT WAS, AND THAT WAS THE FALSITY, IF YOU

08:58AM 1    WILL, AS OPPOSED TO BEING AN INTEGRAL PART, AN IMPORTANT PART

08:58AM 2    OF THE OVERALL SCHEME, IF YOU WILL, THE PLAN AS YOU'VE JUST

08:58AM 3    ARTICULATED.

08:58AM 4         THERE IS A DISTINCTION THERE, MR. DOWNEY.

08:58AM 5              MR. BOSTIC:  AND, YOUR HONOR, MR. DOWNEY AND I ARE

08:58AM 6    TALKING ABOUT THE SAME PARAGRAPH OF THE INDICTMENT.  IT'S JUST

08:58AM 7    THAT HE'S TALKING ABOUT ONE PORTION OF IT, WHILE I'M TALKING

08:58AM 8    ABOUT ANOTHER.

08:58AM 9              THE COURT:  SURE.

08:58AM 10             MR. DOWNEY:  YOUR HONOR, I THINK THERE'S A COUPLE OF

08:58AM 11   ISSUES.

08:58AM 12        ONE IS WE KNOW AS A BASIC MATTER THIS CAN'T BE INTRODUCED

08:58AM 13   AS PROPENSITY EVIDENCE.  MUCH OF WHAT MR. BOSTIC JUST SAID IS

08:58AM 14   OF THE NATURE THAT THERE IS, YOU KNOW, THESE FALSE STATEMENTS

08:58AM 15   WERE MADE IN ONE PLACE, AND THEY'RE MADE IN ANOTHER PLACE, AND

08:58AM 16   MAKING THEM IN MULTIPLE PLACES MAKES THEM MORE CREDIBLE IN

08:58AM 17   OTHER PLACES.  THAT'S DRESSED UP PROPENSITY EVIDENCE THAT IS

08:58AM 18   PRECLUDED UNDER 404(A).

08:59AM 19        SECOND, THE HISTORY OF THIS CASE IS IMPORTANT.  AS

08:59AM 20   YOUR HONOR KNOWS, WE ASKED, AFTER THE INDICTMENT WAS

08:59AM 21   SUPERSEDED, WHO ARE THE RELEVANT BUSINESS PARTNERS?  AND WE

08:59AM 22   SPECIFICALLY ASKED, IS THE DEPARTMENT OF DEFENSE, FOR ANY

08:59AM 23   REASON, ONE OF THOSE BUSINESS PARTNERS THAT IS BEING REFERENCED

08:59AM 24   IN ANY WAY IN THE INDICTMENT?

08:59AM 25             THE GOVERNMENT SAID NO.

08:59AM   1          AS WELL IN THE HISTORY OF THE CASE, WE -- THE 404(B)

08:59AM   2     NOTICE GAVE 80 PAGES OF DISCLOSURE OF REPRESENTATIONS,

08:59AM   3     MISREPRESENTATIONS THAT WERE MADE ON THE VERY ISSUES THAT

08:59AM   4     MR. BOSTIC IS NOW TOUCHING ON, AND NONE OF IT REFERENCED ANY OF

08:59AM   5     WHAT HE'S REFERRING TO NOW, INCLUDING THE EXHIBIT THAT IS AT

08:59AM   6     ISSUE HERE.  551.

08:59AM   7          SO I, I THINK IT'S -- HE IS NOW LEFT SORT OF STANDING ON

08:59AM   8     THE THIN READ OF TRYING TO MAKE AN INEXTRICABLY INTERTWINED

09:00AM   9     EVIDENCE, BUT WHAT HE'S TRYING TO ARGUE IS CONTRARY TO THE

09:00AM  10     RECORD.

09:00AM  11          THE INVESTOR PRESENTATIONS, THE DEPARTMENT OF DEFENSE

09:00AM  12     PRESENTATIONS THAT HE WANTS TO INTRODUCE LONG POST-DATE THE

09:00AM  13     RELATIONSHIP BETWEEN THERANOS AND THE DEPARTMENT OF DEFENSE.

09:00AM  14          EXHIBIT 551 IS A DOCUMENT THAT WAS SENT TO AN ARMY SURGEON

09:00AM  15     THAT THERANOS HAD BEEN WORKING WITH FOR YEARS.

09:00AM  16          SO I THINK WE CAN MISPORTRAY THE HISTORY OF THE CASE,

09:00AM  17     MISPORTRAY WHETHER IT'S PROPENSITY EVIDENCE, AND MISPORTRAY THE

09:00AM  18     FACTS, BUT UNDER NOT -- BUT UNDER ANY OF THOSE THREE CONCERNS,

09:00AM  19     NONE OF THIS SHOULD COME IN.

09:00AM  20          THE COURT:  SO I THINK WHAT I HEAR MR. BOSTIC SAYING

09:00AM  21     IS THAT IN ORDER TO GET AND KEEP INVESTORS INTERESTED AND TO

09:00AM  22     USE THE MILITARY AS AN IMPRIMATUR, WE HAVE THE MILITARY, SO

09:00AM  23     THAT SHOULD BE AN INTEREST TO AN INVESTOR BECAUSE IF THE

09:01AM  24     MILITARY IS INTERESTED IN THE TOPIC IN THE TECHNOLOGY, THEN

09:01AM  25     THAT IMPRIMATUR WILL ENCOURAGE OTHER INVESTORS TO INVEST.

09:01AM   1          I THINK -- IS THAT WHAT YOU'RE SAYING, MR. BOSTIC?

09:01AM   2               MR. BOSTIC:  YES, YOUR HONOR.  I THINK IT'S THE

09:01AM   3    FALSE STATEMENTS ABOUT THERANOS'S RELATIONSHIP WITH THE

09:01AM   4    MILITARY WERE MATERIAL TO INVESTORS.  THE JURY WILL HEAR THAT.

09:01AM   5          IN ORDER TO MAKE THOSE STATEMENTS MORE CREDIBLE, AND IN

09:01AM   6    ORDER TO MAKE THEM MORE DIFFICULT TO DETECT AS FALSE

09:01AM   7    STATEMENTS, IT WAS IMPORTANT FOR THERANOS TO HAVE AN ACTUAL

09:01AM   8    RELATIONSHIP WITH THE MILITARY, AND IN ORDER TO CREATE THAT

09:01AM   9    RELATIONSHIP, IN ORDER TO CREATE THAT INTEREST ON THE PART OF

09:01AM   10   THE MILITARY, MS. HOLMES RELIED ON FALSE MISREPRESENTATIONS TO

09:01AM   11   THE MILITARY.

09:01AM   12         SO IT WAS ALL IN SERVICE OF THE SCHEME TO DEFRAUD

09:01AM   13   INVESTORS.

09:01AM   14              THE COURT:  AND WHAT ABOUT THE TIMING?  THIS IS

09:01AM   15   SOMETHING I'M CONCERNED ABOUT, THE TIMING OF IT.  IT SOUNDS

09:02AM   16   LIKE THERE'S AN 18-MONTH SWING ON EITHER SIDE OF THIS, AND DOES

09:02AM   17   THAT DO ANYTHING TO THE RELEVANCE OF IT THEN?

09:02AM   18              MR. BOSTIC:  SO I'M NOT SURE I UNDERSTAND

09:02AM   19   MR. DOWNEY'S POINT THERE, TO BE HONEST.

09:02AM   20         THE KEY CHRONOLOGY POINT HERE IS THAT THOSE FALSE

09:02AM   21   STATEMENTS TO THE MILITARY PREDATED FALSE STATEMENTS THAT

09:02AM   22   MS. HOLMES MADE TO INVESTORS AND OTHERS ABOUT THE STATUS OF THE

09:02AM   23   THERANOS MILITARY RELATIONSHIP.

09:02AM   24         SO BECAUSE MS. HOLMES KNEW ABOUT THESE FALSE STATEMENTS TO

09:02AM   25   THE MILITARY, KNEW THAT THE MILITARY'S CONTINUED INTEREST WAS

09:02AM  1    BASED ON A FALSE IMPRESSION OF WHAT THE THERANOS DEVICE COULD

09:02AM  2    DO, SHE KNEW MONTHS LATER, YEARS LATER, THAT WHEN SHE WAS

09:02AM  3    TELLING ANYONE THAT THE THERANOS DEVICE WAS BEING USED BY THE

09:02AM  4    MILITARY, THAT THAT WAS FALSE, THAT THAT COULD NOT BE THE CASE

09:02AM  5    BECAUSE THE MILITARY WASN'T INTERESTED IN THE THERANOS DEVICE

09:02AM  6    AS IT EXISTED, IT WAS INTERESTED IN THE THERANOS DEVICE AS IT

09:02AM  7    HAD BEEN REPRESENTED BY MS. HOLMES EARLIER.

09:02AM  8              THE COURT:  AND SO DOES IT MATTER ABOUT THE TIMING

09:02AM  9    OF THOSE?  I UNDERSTAND THAT IF THERE WAS KNOWLEDGE AT TIME ONE

09:03AM  10   THAT THIS DIDN'T WORK OR THERE WAS AN ISSUE WITH IT, AND THEN

09:03AM  11   TIME THREE I'M MAKING A REPRESENTATION TO INVESTORS THAT'S

09:03AM  12   CONTRARY TO -- THAT'S MISLEADING, THAT'S ONE THING.

09:03AM  13       AND I'M NOT SURE -- AND I THINK THAT'S WHAT IS MR. DOWNEY

09:03AM  14   IS TALKING ABOUT, THAT -- THERE'S SOME BREAK THERE IN THAT

09:03AM  15   TIMELINE.

09:03AM  16             MR. BOSTIC:  I THINK THESE EVENTS DO OCCUR IN THE

09:03AM  17   CORRECT ORDER FOR ADMISSIBILITY BECAUSE THE FALSE STATEMENTS TO

09:03AM  18   THE MILITARY THAT WE'RE SEEKING TO ADMIT DO PREDATE THE FALSE

09:03AM  19   STATEMENTS TO INVESTORS.

09:03AM  20       IF I WERE SEEKING TO ADMIT A FALSE STATEMENT TO THE

09:03AM  21   MILITARY IN 2016 OR 2017, THEN IT MIGHT BE LESS CLEAR HOW THAT

09:03AM  22   RELATES TO MS. HOLMES'S KNOWLEDGE YEARS EARLIER WHEN SHE WAS

09:03AM  23   MISREPRESENTING TO INVESTORS THE NATURE OF THE MILITARY

09:03AM  24   RELATIONSHIP.  BECAUSE THIS IS IN 2012, IT DOES BEAR ON HER

09:03AM  25   KNOWLEDGE LATER WHEN THOSE STATEMENTS WERE MADE.

09:04AM 1      THE COURT:  SO YOU SEEK TO GET THIS INFORMATION IN

09:04AM 2 NOW, AND THEN PERHAPS LATER YOU'LL CALL IN INVESTORS WHO ACTED

09:04AM 3 IN RELIANCE ON THIS EVIDENCE?  IS THAT HOW THAT WILL WORK?

09:04AM 4      MR. BOSTIC:  SO THE INVESTORS RELIED ON WHAT

09:04AM 5 MS. HOLMES TOLD THEM ABOUT THE STATUS OF MILITARY RELATIONSHIP

09:04AM 6 AFTER SHE HAD MADE THESE MISREPRESENTATIONS TO THE MILITARY.

09:04AM 7      THESE MISREPRESENTATIONS ARE IMPORTANT TO SHOW THAT WHEN

09:04AM 8 MS. HOLMES SAID WHAT SHE SAID TO INVESTORS, SHE KNEW IT WAS

09:04AM 9 FALSE.

09:04AM 10      MR. DOWNEY:  YOUR HONOR, IF I MAY?

09:04AM 11      THE STATUS OF THE RELATIONSHIP WITH THE MILITARY WHEN

09:04AM 12 MS. HOLMES SPEAKS TO INVESTORS IS WHAT IT IS.

09:04AM 13      IF THE REPRESENTATIONS ARE IN 2013, LATE 2013, AND WE'RE

09:04AM 14 TALKING ABOUT EARLY 2012 IS WHEN THIS DOCUMENT IS, THE STATUS

09:04AM 15 OF THAT RELATIONSHIP IS WHAT IT IS.  THAT SHOULD BE EVALUATED

09:04AM 16 BY AN EVALUATION OF WHAT THAT RELATIONSHIP LOOKED LIKE AND

09:05AM 17 MS. HOLMES'S STATE OF MIND AS TO WHERE IT WAS AND WHERE IT WAS

09:05AM 18 GOING.

09:05AM 19      IT HAS NOTHING TO DO WITH THE INITIATION OF THE

09:05AM 20 RELATIONSHIP OR REPRESENTATIONS THAT WERE MADE TO CREATE IT,

09:05AM 21 YOU KNOW, 18 TO 24 OF MONTHS BEFORE.

09:05AM 22      IT'S COMPLETELY DISCONNECTED AND BEING INTRODUCED TO SHOW

09:05AM 23 SOME PURPORTED PROPENSITY.

09:05AM 24      I THINK THE CONCERN THAT THE GOVERNMENT HAS IS THERE'S A

09:05AM 25 VERY RICH DIALOGUE BETWEEN THE GOVERNMENT AND THERANOS OVER A

09:05AM 1    LONG PERIOD OF TIME, MANY YEARS, DATING YEARS BACK BEFORE THE

09:05AM 2    PRESENTATION THAT THE GOVERNMENT IS ATTEMPTING TO INTRODUCE,

09:05AM 3    AND THEY WANT TO NULLIFY THE SIGNIFICANCE OF THAT.

09:05AM 4         THAT'S WHAT THIS IS ABOUT.

09:05AM 5              MR. BOSTIC:  YOUR HONOR, ON THAT --

09:05AM 6              THE COURT:  ISN'T THAT SOMETHING YOU CAN PROBE ON

09:05AM 7    CROSS-EXAMINATION?

09:05AM 8              MR. DOWNEY:  WELL, OF COURSE I CAN.

09:05AM 9         BUT IT HAS NOTHING REALLY TO DO WITH THESE

09:05AM 10   REPRESENTATIONS.  WHAT I'LL BE PROBING ON CROSS-EXAMINATION IS,

09:05AM 11   WHAT WAS THE STATUS OF THE RELATIONSHIP.  THAT'S WHAT IS

09:05AM 12   RELEVANT IN THE CASE.

09:05AM 13             MR. BOSTIC:  YOUR HONOR, I JUST HAVE TO POINT OUT

09:06AM 14   SOME TENSION IN THE POSITION THAT THE DEFENSE IS TAKING NOW

09:06AM 15   VERSUS THE POSITION THAT IT TOOK A FEW MINUTES AGO WHEN IT SAID

09:06AM 16   THAT ALL THAT MATTERED WAS MS. HOLMES'S STATE OF MIND, THAT

09:06AM 17   IT'S ALL ABOUT SHOWING WHAT SHE WAS AWARE OF, HER KNOWLEDGE,

09:06AM 18   HER INTENT, AND THAT THESE THINGS NEED TO BE JUDGED FROM HER

09:06AM 19   PERSPECTIVE, NOT JUST BASED ON WHAT THE REALITY WAS.

09:06AM 20        I'M NOW HEARING SOMETHING LIKE THE OPPOSITE, THAT THE

09:06AM 21   GOVERNMENT IS ONLY ENTITLED TO EXPLORE WHAT WAS HAPPENING IN

09:06AM 22   THAT RELATIONSHIP AND THAT EVIDENCE OF WHAT MS. HOLMES KNEW AND

09:06AM 23   THE STATEMENTS THAT SHE MADE AREN'T RELEVANT.

09:06AM 24        BUT, OF COURSE, THIS IS A WIRE FRAUD CASE.  IT DOES ALL

09:06AM 25   COME BACK TO MS. HOLMES'S INTENT, AND HER STATEMENTS JUST

| | | |
|---|---|---|
| 09:06AM | 1 | MONTHS BEFORE SHE WAS MAKING FALSE MISREPRESENTATIONS TO |
| 09:06AM | 2 | INVESTORS ON THIS SAME TOPIC ARE HIGHLY PROBATIVE OF HER INTENT |
| 09:06AM | 3 | THERE. |
| 09:06AM | 4 |       MR. DOWNEY:  YOUR HONOR, IF I MAY, AND I KNOW WE'VE |
| 09:06AM | 5 | EXHAUSTED THIS ISSUE, I THINK THAT STATEMENT DEMONSTRATES THE |
| 09:06AM | 6 | PROBLEM.  THE GOVERNMENT IS ENTITLED TO EXPLORE MS. HOLMES'S |
| 09:06AM | 7 | STATE OF MIND.  THEY'RE NOT ENTITLED TO EXPLORE IT THROUGH |
| 09:07AM | 8 | PROPENSITY EVIDENCE. |
| 09:07AM | 9 |       THE COURT:  ALL RIGHT.  THANK YOU FOR THE |
| 09:07AM | 10 | CONVERSATION.  I APPRECIATE IT. |
| 09:07AM | 11 |     I'LL STEP DOWN AND I'LL BRING OUR JURY OUT. |
| 09:07AM | 12 |       MR. DOWNEY:  YOUR HONOR, UNFORTUNATELY, I HAVE ONE |
| 09:07AM | 13 | OTHER THING BASED ON A DISCLOSURE THAT I GOT FROM THE |
| 09:07AM | 14 | GOVERNMENT THIS MORNING. |
| 09:07AM | 15 |       THE COURT:  OH. |
| 09:07AM | 16 |       MR. DOWNEY:  THIS IS NOT A NEW ISSUE TO THE COURT, |
| 09:07AM | 17 | BUT TO US IT WAS A SURPRISING ONE. |
| 09:07AM | 18 |     MR. BOSTIC DISCLOSED TO US THIS MORNING THAT HE WANTS TO |
| 09:07AM | 19 | SEEK TO INTRODUCE THROUGH THIS WITNESS THE CUSTOMER |
| 09:07AM | 20 | SPREADSHEETS THAT WERE THE SUBJECT OF PRETRIAL LITIGATION, OR |
| 09:07AM | 21 | THE SUBJECT OF THE COURT'S MOTION IN LIMINE ORDER. |
| 09:07AM | 22 |     THE -- APPARENTLY HE INTENDS TO INTRODUCE THE ENTIRE |
| 09:07AM | 23 | EXHIBIT.  AS THE COURT KNOWS, THE COURT HAS ALREADY RULED THAT |
| 09:07AM | 24 | THE CONTENTS OF THAT SPREADSHEET ARE INADMISSIBLE UNDER 403 AND |
| 09:07AM | 25 | FOR OTHER REASONS AS CONFUSING, UNDULY PREJUDICIAL, NOT |

3906

09:08AM  1    RELEVANT.

09:08AM  2        THE COURT DID RULE THAT THE EXISTENCE OF THAT KIND OF LOG

09:08AM  3    MIGHT BE SOMETHING THAT COULD BE EXPLORED AT TRIAL.

09:08AM  4        THIS WITNESS WAS ASKED LAST WEEK IF HE HAD EVER SEEN THIS.

09:08AM  5    HE SAID THAT HE HAD NOT.

09:08AM  6        THERE'S NOTHING IN MANY, MANY INTERVIEWS, I THINK EIGHT OR

09:08AM  7    NINE JENCKS INTERVIEWS, THAT REFLECTS ANY KNOWLEDGE OR ANY

09:08AM  8    CONVEYING OF THIS TO MS. HOLMES.

09:08AM  9        I'M AT A LOSS TO UNDERSTAND WHY WE'RE IN THIS LITIGATION

09:08AM  10   HAVING SPENT A LOT OF TIME ON IT PRETRIAL.

09:08AM  11            THE COURT:  MR. BOSTIC?

09:08AM  12            MR. BOSTIC:  YOUR HONOR, FIRST, I HAVE A COPY OF THE

09:08AM  13   EXHIBIT AND REPORT THAT I'M HANDING UP A COPY OF NOW (HANDING).

09:08AM  14            THE COURT:  SURE.  THANK YOU. -

09:08AM  15            MR. BOSTIC:  SO, YOUR HONOR, THIS IS EXHIBIT 5439,

09:08AM  16   WHICH IS AN EMAIL FROM A THERANOS EMPLOYEE TO SUNNY BALWANI

09:08AM  17   ATTACHING A LOG OF COMPLAINTS AS OF SEPTEMBER 2013.  THE

09:08AM  18   COMPLAINT LOG CONTAINS I THINK SOMEWHERE NORTH OF 150 PATIENT

09:09AM  19   COMPLAINT ENTRIES.

09:09AM  20        IN PRETRIAL LITIGATION IN THE MOTION IN LIMINE STAGE, MY

09:09AM  21   UNDERSTANDING WAS THAT THE COURT DEFERRED RULING ON THE

09:09AM  22   ADMISSIBILITY OF THE COMPLAINT LOGS.  THE COURT RECOGNIZED THAT

09:09AM  23   THERE WAS CASE LAW SUBMITTED BY THE GOVERNMENT SHOWING THAT

09:09AM  24   THOSE COMPLAINT LOGS CAN BE ADMISSIBLE AT LEAST FOR NOTICE,

09:09AM  25   SOMETIMES FOR THE TRUTH OF THE MATTER DEPENDING ON THE

09:09AM   1    FOUNDATION LAID.

09:09AM   2         THE GOVERNMENT HELD -- EXCUSE ME.  THE COURT HELD THAT IF

09:09AM   3    A BUSINESS RECORDS FOUNDATION CAN BE LAID, THEN SUCH A LOG

09:09AM   4    MIGHT COME IN FOR THE TRUTH.  IF NOT, THEN THE LOG MAY BE

09:09AM   5    ADMITTED FOR NOTICE.

09:09AM   6         IN THIS CASE, I'M NOT SURE HOW MUCH FOUNDATION THIS

09:09AM   7    WITNESS WILL BE ABLE TO LAY FOR THIS PARTICULAR COMPLAINT LOG,

09:09AM   8    BUT THE WITNESS MAY BE ABLE TO LAY A FOUNDATION FOR EMAIL USE

09:09AM   9    AT THERANOS GENERALLY SPEAKING, AND THE USE OF EMAILS TO CONVEY

09:09AM  10    INFORMATION ABOUT COMPLAINTS.  THAT MAY BE SUFFICIENT TO BRING

09:10AM  11    THIS IN AS A BUSINESS RECORD.

09:10AM  12         I ALSO WANT TO POINT OUT THAT IN THE TRIAL TO DATE, THE

09:10AM  13    DEFENSE HAS ON SEVERAL OCCASIONS PUBLISHED TO THE JURY

09:10AM  14    FAVORABLE CUSTOMER FEEDBACK FROM THERANOS.  IN THE OPENING,

09:10AM  15    DEFENSE COUNSEL SAID, I BELIEVE THIS IS PAGE 562 OF THE

09:10AM  16    TRANSCRIPT, THAT "THERANOS RECEIVED FAVORABLE CUSTOMER REVIEWS

09:10AM  17    FROM DOCTORS AND PATIENTS LIKE THIS PHYSICIAN WHO TOLD THE

09:10AM  18    COMPANY THAT," AND THEN WENT ON TO DISPLAY AND QUOTE A

09:10AM  19    FAVORABLE ACCOUNT FROM A DOCTOR ABOUT THE EXPERIENCE AND THE

09:10AM  20    ACCURACY OF THERANOS RESULTS.

09:10AM  21         SINCE THEN, IN THE CROSS OF DR. ROSENDORFF WITH

09:10AM  22    EXHIBIT 13809 AND IN THE CROSS-EXAMINATION OF MR. JHAVERI WITH

09:10AM  23    EXHIBIT 2394, THE DEFENSE AGAIN PUBLISHED TO THE JURY THE

09:10AM  24    SUBSTANCE OF FAVORABLE PATIENT FEEDBACK ASKING THE WITNESSES

09:10AM  25    ABOUT THE LACK OF NEGATIVE FEEDBACK.

3908

| | | |
|---|---|---|
| 09:10AM | 1 | IN SO DOING, THE DEFENSE ACTUALLY INJECTED INTO THE CASE |
| 09:11AM | 2 | THE QUESTION OF WHETHER THERANOS RECEIVED COMPLAINTS, HOW MANY, |
| 09:11AM | 3 | AND WHAT THE SUBSTANCE WAS. |
| 09:11AM | 4 | SO ON THAT BASIS ALSO THE GOVERNMENT WOULD SEEK TO ADMIT |
| 09:11AM | 5 | AT LEAST PORTIONS OF THE EXHIBIT IN FRONT OF THE COURT. |
| 09:11AM | 6 | AND WE WOULD, I THINK, BE SEEKING TO ADMIT IT TODAY IF WE |
| 09:11AM | 7 | CAN LAY A FOUNDATION, AND THEN PUBLISH IT AT ANOTHER TIME AFTER |
| 09:11AM | 8 | DISCUSSING SOME REDACTION ISSUES WITH THE DEFENSE AND THE |
| 09:11AM | 9 | COURT. |
| 09:11AM | 10 | THE COURT:  WOULD YOU -- THANK YOU.  WOULD YOU SEEK |
| 09:11AM | 11 | TO INTRODUCE THE TOTALITY OF THIS -- THE DOCUMENT ITSELF OR |
| 09:11AM | 12 | PARSE IT OUT OR -- I DON'T KNOW WHAT THE TIMEFRAME IS OR OTHER |
| 09:11AM | 13 | QUESTIONS ABOUT THE COMPLAINTS. |
| 09:11AM | 14 | MR. BOSTIC:  I WOULD SEEK TO ADMIT THE ENTIRE THING, |
| 09:11AM | 15 | YOUR HONOR, I THINK SUBJECT TO REDACTING SENSITIVE INFORMATION |
| 09:11AM | 16 | AND SUBJECT TO OTHER THOUGHTS THAT THE COURT MIGHT HAVE ON |
| 09:11AM | 17 | PORTIONS THAT COULD NOT COME IN.  BUT, YES. |
| 09:11AM | 18 | THE COURT:  AND IT REMAINS TO BE SEEN WHETHER THE |
| 09:11AM | 19 | WITNESS CAN LAY THE FOUNDATION IN ANY EVENT. |
| 09:11AM | 20 | MR. BOSTIC:  THAT'S RIGHT, YOUR HONOR. |
| 09:11AM | 21 | I THINK THIS WITNESS IS NOT FAMILIAR WITH THIS PARTICULAR |
| 09:12AM | 22 | COMPILATION OF COMPLAINTS, BUT CERTAINLY CAN TESTIFY TO, LIKE I |
| 09:12AM | 23 | SAID, THE USE OF EMAILS AT THERANOS AND IN CONNECTION WITH |
| 09:12AM | 24 | COMPLAINTS GENERALLY. |
| 09:12AM | 25 | THE COURT:  OKAY. |

| | | |
|---|---|---|
| 09:12AM | 1 | MR. DOWNEY? |
| 09:12AM | 2 | MR. DOWNEY:  YOUR HONOR, JUST TO SORT OF LAY OUT THE |
| 09:12AM | 3 | ISSUES THAT I THINK WILL PRESENT. |
| 09:12AM | 4 | THIS WILL NOT BE QUALIFIED AS A BUSINESS RECORD BY THIS |
| 09:12AM | 5 | WITNESS, OR BY ANY OTHER, BECAUSE, FIRST OF ALL, THIS IS NOT |
| 09:12AM | 6 | SOMETHING THAT IS A RECORD OF DETAILS OR COMPLAINTS THAT WAS |
| 09:12AM | 7 | MADE AT OR NEAR THE TIME THAT THOSE COMPLAINTS WERE RECEIVED. |
| 09:12AM | 8 | THIS IS A COMPILATION EXHIBIT OF INFORMATION FROM MANY |
| 09:12AM | 9 | DIFFERENT SOURCES THAT WAS PREPARED IN THE SECOND HALF OF 2015 |
| 09:12AM | 10 | APPARENTLY.  IT'S NOT A BUSINESS RECORD THAT WAS BEING KEPT IN |
| 09:12AM | 11 | REAL TIME, OR THE EVENTS THAT IT DESCRIBES ARE BEING DISCUSSED |
| 09:12AM | 12 | AND RECORDED IN THE MANNER OF A BUSINESS RECORD. |
| 09:13AM | 13 | MANY OF THE ENTRIES, I THINK, IF THE COURT HAS THE TIME TO |
| 09:13AM | 14 | LOOK AT THEM, THE COURT WOULD RECOGNIZE THAT THE NATURE OF THE |
| 09:13AM | 15 | SPREADSHEET IS NOT THAT.  THAT'S APPARENT FROM MANY OF THE |
| 09:13AM | 16 | ENTRIES. |
| 09:13AM | 17 | ALSO, THIS IS NOT A RECORD OF THERANOS INFORMATION.  THIS |
| 09:13AM | 18 | IS A RECORD OF HEARSAY STATEMENTS, OFTEN MADE MANY MONTHS |
| 09:13AM | 19 | BEFORE, BY DOCTORS, CUSTOMERS, OTHER PROVIDERS. |
| 09:13AM | 20 | THE CONTENT OF THE STATEMENTS WITHIN THIS RECORD ARE |
| 09:13AM | 21 | CLEARLY HEARSAY AND WOULD THEMSELVES BE PRECLUDED.  SO THERE'S |
| 09:13AM | 22 | A SECOND LEVEL OF HEARSAY THAT I THINK WOULD BE INADMISSIBLE. |
| 09:13AM | 23 | AND THE BUSINESS RECORDS ISSUE, EVEN IF SOMEHOW OVERCOME |
| 09:13AM | 24 | AT THE FIRST LEVEL, WOULD NOT BE OVERCOME AT THE SECOND LEVEL. |
| 09:13AM | 25 | THAT'S A LOT OF THE CONVERSATION THAT WE HAD WITH |

3910

09:13AM   1      YOUR HONOR IN THE PRETRIAL PERIOD.

09:13AM   2          ALSO, YOUR HONOR, I THINK IF THE PURPOSE OF THE ADMISSION

09:13AM   3      OF THIS DOCUMENT IS TO SHOW THAT THERE WERE PROBLEMS OR

09:14AM   4      INACCURACY IN THE TECHNOLOGY, I THINK THAT IS WHAT YOUR HONOR'S

09:14AM   5      ORDER PRECLUDED DURING THE PRETRIAL PHASE.

09:14AM   6          AND I DON'T MEAN TO SPEAK OR CONSTRUE YOUR HONOR'S ORDER.

09:14AM   7      YOU CAN CERTAINLY DO THAT.  BUT THAT'S AT 798 OF THE DOCKET.

09:14AM   8          SO I DON'T SEE ANY SCENARIO UNDER WHICH THIS CAN BE

09:14AM   9      QUALIFIED AS A BUSINESS RECORD, AND I THINK TALKING IN FRONT OF

09:14AM  10      THE JURY ABOUT THIS DOCUMENT IN AND OF ITSELF RUNS THE RISK OF

09:14AM  11      PREJUDICE.

09:14AM  12          AS TO THE ISSUE OF WHAT WE HAVE TALKED ABOUT BEFORE, I'M

09:14AM  13      HAPPY TO TALK ABOUT THOSE OTHER INSTANCES.

09:14AM  14          BUT, FOR EXAMPLE, WITH MR. JHAVERI, MR. JHAVERI CLAIMED

09:14AM  15      THAT BECAUSE OF VARIOUS ISSUES OF PERFORMANCE, THE

09:14AM  16      WALGREENS-THERANOS RELATIONSHIP WAS FALLING APART.  THIS WAS

09:14AM  17      USED TO CAST DOUBT ON THAT GIVEN THAT THE FEEDBACK THAT THEY

09:15AM  18      WERE GETTING ALL EXCEEDED THE METRICS THAT THEY HAD MADE.

09:15AM  19          THAT WAS REFLECTED IN A WALGREENS BUSINESS RECORD, NOT IN

09:15AM  20      A THERANOS BUSINESS RECORD, AND WASN'T INTRODUCED FOR ANY

09:15AM  21      PURPOSE OTHER THAN TO CAST DOUBT ON WHAT MR. JHAVERI WAS

09:15AM  22      SAYING.

09:15AM  23          SO I THINK THIS IS -- WE RAISE THIS BECAUSE THIS IS A BIG

09:15AM  24      ISSUE, AND I THINK TO BE TALKING ABOUT IT IN FRONT OF THE JURY

09:15AM  25      WITHOUT A REAL PROFFER AS TO WHAT THIS WITNESS KNOWS WHEN WE

| | | |
|---|---|---|
| 09:15AM | 1 | KNOW HE SAID HE DIDN'T KNOW ABOUT IT IS NOT PROPER. |
| 09:15AM | 2 | THE COURT:  I GUESS WE'LL JUST SEE WHAT THE WITNESS |
| 09:15AM | 3 | SAYS AND WHETHER OR NOT -- THANK YOU FOR THE HEADS UP.  AND I |
| 09:15AM | 4 | APPRECIATE YOUR CANDOR THAT HE MAY NOT BE ABLE TO ESTABLISH IT |
| 09:15AM | 5 | FOR THIS, AND YOU MIGHT HAVE TO FIND ANOTHER PURPOSE. |
| 09:15AM | 6 | BUT WHAT MR. MR. BOSTIC'S POINT THAT YOUR TEAM HAS RAISED, |
| 09:15AM | 7 | ON A COUPLE OF OCCASIONS, NOTICES FROM DOCTORS, COMMENTS FROM |
| 09:15AM | 8 | DOCTORS THAT HAVE BEEN APPROVING OF THE TECHNOLOGY?  AND |
| 09:15AM | 9 | MR. BOSTIC, I HEAR HIM SAYING, WE SHOULD BE ABLE TO COUNTER |
| 09:16AM | 10 | THAT WITH THE FACT THAT ACTUALLY THERE WERE COMPLAINTS |
| 09:16AM | 11 | RECEIVED. |
| 09:16AM | 12 | MR. DOWNEY:  YEAH, THERE'S A SIGNIFICANT DIFFERENCE |
| 09:16AM | 13 | BETWEEN THOSE TWO CATEGORIES. |
| 09:16AM | 14 | I WILL TELL THE COURT THAT I CAN SHOW AS SOON AS TODAY |
| 09:16AM | 15 | THAT THE COMMENTS THAT WE'RE REFERRING TO WERE CONVEYED TO |
| 09:16AM | 16 | MS. HOLMES. |
| 09:16AM | 17 | WE KNOW THAT THE GOVERNMENT HAS NO PROFFER, NO PROOF IN |
| 09:16AM | 18 | THE RECORD FROM THEIR EXTENSIVE PRETRIAL INVESTIGATION THAT |
| 09:16AM | 19 | THESE LOGS, ANY CONTENTS OF THESE LOGS WERE CONVEYED TO |
| 09:16AM | 20 | MS. HOLMES.  THAT'S CRITICAL, YOUR HONOR, AS TO THE ISSUE. |
| 09:16AM | 21 | WHAT WE HAVE BEEN INTRODUCING EITHER IS FOR A DIFFERENT |
| 09:16AM | 22 | PURPOSE OR WILL BE INTRODUCED BECAUSE IT RELATES TO ACTUAL |
| 09:16AM | 23 | FACTS KNOWN BY THE DEFENDANT. |
| 09:16AM | 24 | MR. BOSTIC:  AND, YOUR HONOR, ON THAT POINT, ONE |
| 09:16AM | 25 | REASON THAT THE GOVERNMENT IS SEEKING TO INTRODUCE THIS |

3912

09:16AM 1    PARTICULAR EXHIBIT, AS OPPOSED TO OTHER COMPLAINT LOGS, IS THAT

09:16AM 2    THIS ONE ACTUALLY WAS SENT DIRECTLY TO MR. BALWANI.

09:16AM 3    MR. BALWANI IS THE INDICTED COCONSPIRATOR IN THIS CASE.

09:16AM 4        THERE HAS ALREADY BEEN EVIDENCE, AND THERE WILL CONTINUE

09:16AM 5    TO BE MORE EVIDENCE IN THE TRIAL, ABOUT THE CLOSE WORKING

09:17AM 6    AND/OR PERSONAL RELATIONSHIP THAT MS. HOLMES AND MR. BALWANI

09:17AM 7    HAD.

09:17AM 8        MR. BALWANI'S KNOWLEDGE OF SOMETHING LIKE THIS IS

09:17AM 9    PROBATIVE AS TO WHETHER MS. HOLMES HAD KNOWLEDGE OR NOT.

09:17AM 10            THE COURT:  THAT'S A DIFFERENT ISSUE ALSO,

09:17AM 11   MR. DOWNEY, ISN'T IT?

09:17AM 12            MR. DOWNEY:  WELL, THAT'S A DIFFERENT ISSUE, BUT I

09:17AM 13   THINK MR. BOSTIC HAS STATED THE PRECISE REASON THAT IT IS

09:17AM 14   PROHIBITED TO INTRODUCE IT.

09:17AM 15       IT'S NINTH CIRCUIT LAW THAT KNOWLEDGE TO A COCONSPIRATOR

09:17AM 16   CANNOT BE CONTRIBUTED TO THE DEFENDANT.  I CAN GIVE THE COURT A

09:17AM 17   CITE TO THAT.  IT'S PHILLIPS VERSUS UNITED STATES, 356 F.2D 297

09:17AM 18   AT 306.

09:17AM 19            THE COURT:  I THINK MR. WADE INFORMED US OF THAT

09:17AM 20   CASE SOME TIME AGO.

09:17AM 21            MR. DOWNEY:  YEAH, IT'S ONE OF HIS FAVORITES.

09:17AM 22       (LAUGHTER.)

09:17AM 23            MR. DOWNEY:  BUT I THINK THAT THE STATEMENT THAT

09:17AM 24   MR. BOSTIC MAKES AS TO WHY AND HOW HE WANTS TO INTRODUCE IT

09:17AM 25   SHOWS IT RUNS INTO THE PROHIBITED PURPOSE.

| | | |
|---|---|---|
| 09:17AM | 1 | THE COURT:  WELL, FOR THAT REASON. |
| 09:17AM | 2 | MR. DOWNEY:  YES. |
| 09:17AM | 3 | THE COURT:  UNDER A COCONSPIRATOR. |
| 09:17AM | 4 | MR. DOWNEY:  RIGHT. |
| 09:17AM | 5 | THE COURT:  RIGHT.  UNDERSTOOD. |

09:17AM  6   ALL RIGHT.  WELL, THIS IS A GREAT WAY TO START THE

09:18AM  7  MORNING.

09:18AM  8       MR. DOWNEY:  I APOLOGIZE, YOUR HONOR.  I STARTED THE

09:18AM  9  MORNING THE SAME WAY.

09:18AM  10       THE COURT:  WELL, GREAT.  THANK YOU.

09:18AM  11   I'LL STEP DOWN AND WE'LL BRING OUR JURY OUT AND AT LEAST

09:18AM  12  START SOME EVIDENCE NOW.

09:18AM  13   THANK YOU FOR THE CONVERSATIONS.

09:18AM  14   ANYTHING ELSE BEFORE I STEP DOWN?

09:18AM  15       MR. DOWNEY:  NO, YOUR HONOR.

09:18AM  16       MR. BOSTIC:  NO, YOUR HONOR.

09:18AM  17   JUST ON THE MILITARY EXHIBITS, THE GOVERNMENT DOES INTEND

09:18AM  18  TO COVER THOSE WITH MR. EDLIN.  I'M NOT SURE WHETHER IT WILL

09:18AM  19  HAPPEN BEFORE OUR FIRST BREAK, BUT I CERTAINLY WON'T DO SO

09:18AM  20  WITHOUT FURTHER GUIDANCE FROM THE COURT.

09:18AM  21       THE COURT:  THANK YOU.  I APPRECIATE THAT.

09:18AM  22   SHOULD OUR BREAK BE -- DO YOU KNOW, MR. DOWNEY, WHAT TIME

09:18AM  23  THAT SHOULD BE?

09:18AM  24       MR. DOWNEY:  I THINK IN THAT 11:00 O'CLOCK WINDOW,

09:18AM  25  BUT I'D LEAVE IT TO MR. BOSTIC TO IDENTIFY WHEN HE'S AT A

3914

| | | |
|---|---|---|
| 09:18AM | 1 | LOGICAL POINT. |
| 09:18AM | 2 | THE COURT:  OKAY.  SO WE'LL LOOK AT 11:00, 11:15, |
| 09:18AM | 3 | SOMETHING LIKE THAT.  ALL RIGHT.  CLOSER TO 11:00. |
| 09:18AM | 4 | OKAY.  THANK YOU. |
| 09:18AM | 5 | MR. DOWNEY:  THANK YOU, YOUR HONOR. |
| 09:18AM | 6 | THE COURT:  ALL RIGHT. |
| 09:18AM | 7 | THE CLERK:  COURT IS IN RECESS. |
| 09:18AM | 8 | (RECESS FROM 9:18 A.M. UNTIL 9:30 A.M.) |
| 09:30AM | 9 | (JURY IN AT 9:30 A.M.) |
| 09:30AM | 10 | THE COURT:  ALL RIGHT.  THANK YOU.  GOOD MORNING. |
| 09:30AM | 11 | WE ARE BACK ON THE RECORD IN THE HOLMES MATTER.  ALL |
| 09:30AM | 12 | COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT. |
| 09:30AM | 13 | OUR JURY AND ALTERNATES ARE PRESENT.  GOOD MORNING, LADIES |
| 09:30AM | 14 | AND GENTLEMEN.  I HOPE YOU HAD A PLEASANT WEEKEND. |
| 09:30AM | 15 | LET ME FIRST ASK YOU THAT QUESTION THAT I ASK YOU EVERY |
| 09:30AM | 16 | DAY IN THE MORNING.  DURING OUR BREAK, YOUR BREAK, HAVE ANY OF |
| 09:30AM | 17 | YOU HAD OCCASION TO DO ANY INVESTIGATION, HAVE COMMUNICATIONS |
| 09:30AM | 18 | WITH OR SEE ANYTHING ABOUT THIS CASE OR ANYTHING TO DO WITH IT |
| 09:30AM | 19 | OVER YOUR BREAK? |
| 09:30AM | 20 | IF SO, PLEASE RAISE YOUR HAND IF YOU WOULD. |
| 09:30AM | 21 | I SEE NO HANDS.  THANK YOU. |
| 09:30AM | 22 | I DO WANT TO TELL YOU ABOUT A CHANGE IN OUR SCHEDULE.  WE |
| 09:31AM | 23 | WILL NOT BE IN SESSION ON FRIDAY, OCTOBER 29TH.  SO WE'LL -- WE |
| 09:31AM | 24 | WILL NOT BE IN SESSION THAT DAY. |
| 09:31AM | 25 | WE WILL BE IN SESSION THE FOLLOWING TUESDAY, THE 2ND, BUT |

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3915

09:31AM   1    WE'LL NOT BE IN SESSION -- THIS IS NEXT WEEK, I BELIEVE.  MY

09:31AM   2    GOODNESS, THE MONTH IS FLYING.  THE WEEK OF THE 26TH, 25TH,

09:31AM   3    WE'LL BE IN SESSION THAT TUESDAY AND WEDNESDAY ONLY, AND THEN

09:31AM   4    NOT THAT FRIDAY, JUST FOR YOUR SCHEDULING PURPOSES.

09:31AM   5         GREAT.  THANK YOU.

09:31AM   6         MR. BOSTIC, ARE YOU READY TO CONTINUE?

09:31AM   7              MR. BOSTIC:  YES, YOUR HONOR.

09:31AM   8              THE COURT:  GREAT.

09:31AM   9         MR. EDLIN, COULD YOU PLEASE STATE YOUR NAME AGAIN FOR THE

09:31AM  10    RECORD.

09:31AM  11              THE WITNESS:  YES, YOUR HONOR.

09:31AM  12         DANIEL EDLIN.

09:31AM  13              THE COURT:  THANK YOU.  AND I'LL REMIND YOU, SIR,

09:31AM  14    YOU ARE STILL UNDER OATH.

09:31AM  15         **(GOVERNMENT'S WITNESS, DANIEL EDLIN, WAS PREVIOUSLY**

09:31AM  16    **SWORN.)**

09:31AM  17              THE COURT:  MR. BOSTIC.

09:32AM  18              MR. BOSTIC:  THANK YOU, YOUR HONOR.

09:32AM  19                   **DIRECT EXAMINATION (RESUMED)**

09:32AM  20    BY MR. BOSTIC:

09:32AM  21    Q.   MR. EDLIN, IF YOU ARE STILL COMFORTABLE TESTIFYING WITHOUT

09:32AM  22    A MASK, I UNDERSTAND THE COURT WILL PERMIT YOU TO REMOVE YOURS.

09:32AM  23         WELCOME BACK, MR. EDLIN.

09:32AM  24    A.   THANK YOU.

09:32AM  25    Q.   LAST WEEK WE TALKED ABOUT TECHNOLOGY DEMONSTRATIONS AT

EDLIN DIRECT BY MR. BOSTIC (RES.)                                3916

09:32AM  1    THERANOS.

09:32AM  2         DO YOU RECALL THAT TESTIMONY?

09:32AM  3    A.   YES.

09:32AM  4    Q.   AND THESE DEMONSTRATIONS WERE FOR VIP VISITORS AT

09:32AM  5    THERANOS; IS THAT CORRECT?

09:32AM  6    A.   PREDOMINANTLY, YES.

09:32AM  7    Q.   DO YOU RECALL TESTIFYING ABOUT SOMETHING CALLED THE NULL

09:32AM  8    PROTOCOL AND SOMETHING ELSE CALLED THE DEMO APP BEING USED IN

09:32AM  9    CONNECTION WITH THOSE DEMONSTRATIONS?

09:32AM  10   A.   YES, I DO.

09:32AM  11   Q.   AND CAN YOU REMIND US WHAT THOSE WERE, STARTING WITH THE

09:32AM  12   NULL PROTOCOL, JUST IN YOUR OWN WORDS?

09:32AM  13   A.   THE NULL PROTOCOL WAS A PART OF THE DEMO APPLICATION.

09:32AM  14        DEMO APPLICATION WAS SET UP ON DEVICES FOR TECHNOLOGY

09:32AM  15   DEMONSTRATIONS, AND PER SOME OF THE EMAILS WE'VE REVIEWED LAST

09:33AM  16   WEEK, IN THE DEMO APPLICATION IT SHIELDED DEVICE ERRORS FROM

09:33AM  17   VIEW.

09:33AM  18        AND THE NULL PROTOCOL WAS USED FOR -- WAS NOT INTENDED FOR

09:33AM  19   THE SAMPLES TO BE TESTED FOR USE.

09:33AM  20   Q.   WHEN THE NULL PROTOCOL WAS ACTIVE, IS IT CORRECT THAT THE

09:33AM  21   MACHINE MADE NO ATTEMPT TO ACTUALLY ANALYZE THE SAMPLE IN THE

09:33AM  22   DEVICE?

09:33AM  23   A.   I BELIEVE SO, YES.

09:33AM  24   Q.   IN CONTRAST WITH JUST THE DEMO APP ALONE, THE DEVICE WOULD

09:33AM  25   ATTEMPT TO RETURN A RESULT IF POSSIBLE?

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3917

09:33AM   1    A.   YES.

09:33AM   2    Q.   BUT WHEN THE DEMO APP WAS FUNCTIONING, IF THE DEVICE TRIED

09:33AM   3    TO RETURN A RESULT AND ENCOUNTERED AN ERROR, WOULD THAT ERROR

09:33AM   4    APPEAR ON THE SCREEN?

09:33AM   5    A.   I DON'T BELIEVE SO.

09:33AM   6    Q.   IF I COULD ASK YOU TO TURN IN THE BINDER IN FRONT OF YOU

09:34AM   7    TO EXHIBIT 860.

09:34AM   8         AND DO YOU HAVE 860 IN FRONT OF YOU?

09:34AM   9    A.   YES.

09:34AM   10   Q.   IS THIS AN EMAIL CHAIN BETWEEN EMPLOYEES AT THERANOS,

09:34AM   11   INCLUDING YOURSELF, ELIZABETH HOLMES, AND SUNNY BALWANI?

09:34AM   12   A.   YES.

09:34AM   13   Q.   AND DOES THIS RELATE TO THE PROCESSING OF ONE OF THE

09:34AM   14   DEMONSTRATION SAMPLES WE'VE BEEN TALKING ABOUT?

09:34AM   15   A.   YES.

09:34AM   16         MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

09:34AM   17   EXHIBIT 860.

09:34AM   18         MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

09:34AM   19         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:35AM   20       (GOVERNMENT'S EXHIBIT 860 WAS RECEIVED IN EVIDENCE.)

09:35AM   21         MR. BOSTIC:  MS. HOLLIMAN, IF WE CAN START ON

09:35AM   22   PAGE 12.  AND IF WE CAN JUST ZOOM IN ON THE BOTTOM OF PAGE 12

09:35AM   23   TO GET THE HEADER INFORMATION.

09:35AM   24   Q.   MR. EDLIN, DO YOU SEE WE'RE ABOUT TO LOOK AT AN EMAIL FROM

09:35AM   25   YOU ON MAY 31ST, 2013?

EDLIN DIRECT BY MR. BOSTIC (RES.)                          3918

09:35AM   1      A.   YES.

09:35AM   2      Q.   AND THE SUBJECT LINE IS "SAMPLE RUNNING RIGHT NOW."

09:35AM   3           DO YOU SEE THAT?

09:35AM   4      A.   I DO.

09:35AM   5      Q.   AND LET'S GO TO THE NEXT PAGE, PAGE 13.  AND LET'S ZOOM IN

09:35AM   6      ON THE TOP OF THE PAGE.

09:35AM   7           MR. EDLIN, YOU WRITE, "WHAT IS THE STATUS?  IT'S ALREADY

09:35AM   8      BEEN RUNNING FOR 1 HOUR AND 15 MINUTES AND HAS BEEN STUCK ON

09:35AM   9      99 PERCENT FOR ABOUT 8 MINUTES."

09:35AM  10           DO YOU SEE THAT?

09:35AM  11      A.   YES.

09:35AM  12      Q.   IS THIS RELATING TO AN ONGOING DEMONSTRATION TEST THAT WAS

09:36AM  13      HAPPENING AT THE TIME?

09:36AM  14      A.   YES.

09:36AM  15      Q.   AND WHAT WAS THE PURPOSE OF THIS EMAIL THAT YOU SENT?

09:36AM  16      A.   THIS -- I RECALL THAT WE HAD A MEETING, AND IN THE MEETING

09:36AM  17      A DEMO TEST WAS RUN ON AN EDISON DEVICE, AND THE SAMPLE WAS

09:36AM  18      PROCESSING AS THE MEETING CONTINUED, AND I WAS JUST KEEPING

09:36AM  19      TABS OF HOW LONG IT HAD BEEN RUNNING AND THE STATUS, AND I'M

09:36AM  20      SENDING AN EMAIL BACK TO SOME OF THE SOFTWARE DEVELOPERS AND

09:36AM  21      ENGINEERS TO CHECK WHAT WAS THE STATUS OF THE TEST.

09:36AM  22      Q.   OKAY.  LET'S MOVE FORWARD IN TIME AND WE'LL MOVE PAST SOME

09:36AM  23      MORE DISCUSSION ABOUT THAT TIMING.

09:36AM  24           LET'S GO TO PAGE 10 OF THIS EXHIBIT.  MR. EDLIN, DO YOU

09:36AM  25      SEE AT THE BOTTOM OF THE PAGE THERE IS THE DATA THAT RESULTED

EDLIN DIRECT BY MR. BOSTIC (RES.)                              3919

```
09:37AM   1      FROM THAT DEMONSTRATION RUN?

09:37AM   2      A.   YES.

09:37AM   3      Q.   LET'S GO UP FROM THERE AND LET'S ZOOM IN ON THE TEXT OF

09:37AM   4      THE EMAIL IN THE MIDDLE OF THE PAGE THAT READS "HI DANIEL."

09:37AM   5           DO YOU SEE THAT?

09:37AM   6      A.   YES.

09:37AM   7      Q.   AND WHO IS THIS EMAIL MESSAGE FROM?

09:37AM   8      A.   THIS MESSAGE IS FROM ME TO DANIEL YOUNG.

09:37AM   9      Q.   OKAY.  AND WHAT WAS DANIEL YOUNG'S ROLE IN CONNECTION WITH

09:37AM  10      TECHNOLOGY DEMONSTRATIONS LIKE THIS?

09:37AM  11      A.   DANIEL WAS, I BELIEVE, AT SOME POINT A VICE PRESIDENT OF

09:37AM  12      THERANOS SYSTEMS, AND DANIEL WOULD REVIEW AND APPROVE ALL DEMO

09:37AM  13      REPORTS AND RESULTS BEFORE THEY WERE SENT OUT TO THE RESPECTIVE

09:37AM  14      PATIENT.

09:37AM  15      Q.   AT THE BOTTOM OF YOUR EMAIL YOU SAY THAT YOU'LL BASE YOUR

09:38AM  16      SCHEDULE ON DANIEL YOUNG'S AVAILABILITY SO THAT WE CAN FINALIZE

09:38AM  17      THE REPORTS AND GET THEM TO EAH FOR APPROVAL AS SOON AS

09:38AM  18      POSSIBLE.

09:38AM  19           DO YOU SEE THAT?

09:38AM  20      A.   YES.

09:38AM  21      Q.   AND WHO WAS EAH?

09:38AM  22      A.   ELIZABETH.

09:38AM  23      Q.   AND WHAT DID THAT MEAN, GETTING THE REPORTS TO HER FOR

09:38AM  24      APPROVAL?

09:38AM  25      A.   I THINK IN THIS CASE ELIZABETH WANTED TO REVIEW THE
```

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3920

09:38AM   1    REPORTS BEFORE THEY WERE SENT OUT.

09:38AM   2    Q.   AND WAS THAT SOMETHING THAT HAPPENED AT OTHER TIMES IN

09:38AM   3    CONNECTION WITH THESE TECHNOLOGY DEMONSTRATIONS?

09:38AM   4    A.   THERE WERE OTHER TIMES WHEN THAT HAPPENED, YES.

09:38AM   5    Q.   LET'S LOOK AT THE BOTTOM HALF OF PAGE 8.  APOLOGIES FOR

09:38AM   6    THE FORMATTING HERE.

09:38AM   7         DO YOU SEE AN EMAIL FROM YOU LATER ON IN THIS CHAIN?

09:39AM   8    A.   YES.

09:39AM   9    Q.   AND YOU ARE WRITING TO DANIEL YOUNG AND CC'ING

09:39AM  10    ELIZABETH HOLMES AND SUNNY BALWANI; IS THAT CORRECT?

09:39AM  11    A.   YES.

09:39AM  12    Q.   STARTING IN THE SECOND PARAGRAPH OF YOUR EMAIL, AND IT

09:39AM  13    STARTS AT THE VERY BOTTOM OF THE PAGE, IT SAYS, "IT LOOKS" --

09:39AM  14    AND THEN LET'S GO ON TO PAGE 9.

09:39AM  15         IF WE CAN ZOOM IN ON THE TOP OF PAGE 9.

09:39AM  16         YOU SAY, "IT LOOKS LIKE THERE IS SOME DISCREPANCY BETWEEN

09:39AM  17    THE TWO INFECTIOUS PANEL RUNS.

09:39AM  18         "- ANY THOUGHTS ON WHY THIS IS THE CASE?"

09:39AM  19         DO YOU SEE THAT?

09:39AM  20    A.   YES.

09:39AM  21    Q.   AND DO YOU RECALL WHY THERE WERE TWO DIFFERENT RUNS IN

09:39AM  22    CONNECTION WITH THIS TECHNOLOGY DEMONSTRATION?

09:39AM  23    A.   ONE OF THE RUNS TOOK PLACE IN THE MEETING, WHICH WAS IN

09:39AM  24    NEW YORK, AND THEN ANOTHER RUN TOOK PLACE IN PALO ALTO.

09:40AM  25    Q.   AND DO YOU RECALL WHETHER THOSE TWO RUNS WERE TAKEN FROM

EDLIN DIRECT BY MR. BOSTIC (RES.)                                     3921

09:40AM  1      THE SAME PATIENTS OR DIFFERENT PATIENTS?

09:40AM  2      A.   I BELIEVE THEY WERE TAKEN FROM THE SAME PATIENT.

09:40AM  3      Q.   AND HOW ABOUT WHETHER THEY WERE TESTED ON TWO DIFFERENT

09:40AM  4      DEVICES OR THE SAME DEVICE?

09:40AM  5      A.   I DON'T RECALL THAT SPECIFICALLY.

09:40AM  6      Q.   OKAY.  LET'S LOOK AT THE TOP OF -- LET'S GO TO PAGE 7

09:40AM  7      ACTUALLY AND LOOK AT THE BOTTOM HALF OF THAT.

09:40AM  8           AND DO YOU SEE ANOTHER EMAIL FROM YOU IN THE BOTTOM HALF

09:40AM  9      OF PAGE 7?

09:40AM  10     A.   YES.

09:40AM  11     Q.   AND IN THAT EMAIL YOU TALK ABOUT HOW ONE SAMPLE WAS

09:40AM  12     DEPOSITED INTO A CARTRIDGE AND RUN ONSITE AND THAT IT HAD BEEN

09:40AM  13     SHIPPED TO NEW YORK CITY IN STANDARD PACKAGING.

09:40AM  14          DO YOU SEE THAT?

09:40AM  15     A.   YES.

09:40AM  16     Q.   AND LET'S FLIP THE PAGE AND GO TO PAGE 8, THE TOP OF

09:40AM  17     PAGE 8.  AND IT TALKS ABOUT SOME OTHER PROCESSING DETAILS.

09:41AM  18          AND THEN YOU SAY, "BOTH CARTRIDGES WERE RUN ON THE SAME

09:41AM  19     READER."

09:41AM  20          DO YOU SEE THAT?

09:41AM  21     A.   YES.

09:41AM  22     Q.   AND SO THIS IS A SITUATION WHERE THE TWO RUNS INVOLVE THE

09:41AM  23     SAME PATIENT AND THE SAME ANALYZER; CORRECT?

09:41AM  24     A.   CORRECT.

09:41AM  25     Q.   LET'S GO BACK TO PAGE 7, AND ZOOM IN ON MS. HOLMES'S EMAIL

EDLIN DIRECT BY MR. BOSTIC (RES.)                                  3922

09:41AM   1       AT THE TOP OF THAT PAGE.

09:41AM   2           MS. HOLMES SAYS, "THE DISCREPANCY WILL BE A PROBLEM.  WE

09:41AM   3       NEED TO SEE IF WE CAN CORRECT FOR IT."

09:41AM   4           DO YOU SEE THAT?

09:41AM   5       A.   YES.

09:41AM   6       Q.   LET'S GO TO -- FIRST, IF YOU WOULD JUST LOOK AT PAGE 5 IN

09:41AM   7       FRONT OF YOU.

09:41AM   8           DO YOU SEE THAT AT THE BOTTOM THERE'S AN EMAIL FROM

09:41AM   9       DANIEL YOUNG FURTHER ON IN THIS CHAIN?

09:41AM  10       A.   YES.

09:41AM  11       Q.   OKAY.  LET'S LOOK AT THE BODY OF THAT MESSAGE ON PAGE 6.

09:42AM  12       AND IF WE CAN ZOOM IN ON THE MIDDLE PARAGRAPH.

09:42AM  13           DR. YOUNG SAYS, "FOR MUMPS, I AM INCLINED TO BELIEVE THAT

09:42AM  14       THE RUN IN P.A. IS CORRECT."

09:42AM  15           IS THAT PALO ALTO?

09:42AM  16       A.   THAT'S CORRECT.

09:42AM  17       Q.   AND HE HAVE SAYS FOR A NUMBER OF REASONS.  HE EXPLAINS HIS

09:42AM  18       THINKING.

09:42AM  19           AND THEN HE SAYS IN THE BOTTOM OF THAT PARAGRAPH, "ALL

09:42AM  20       TESTS RAN HIGHER IN THE SECOND RUN IN PALO ALTO, SUGGESTING TO

09:42AM  21       ME, THAT THE ASSAY RUNS WERE A LITTLE LOW IN THE RUN IN

09:42AM  22       NEW YORK CITY (NOT SURE WHY)."

09:42AM  23           DO YOU SEE THAT?

09:42AM  24       A.   YES.

09:42AM  25       Q.   AND HE SAYS, "THERE COULD HAVE BEEN TOO LITTLE SAMPLE IN

EDLIN DIRECT BY MR. BOSTIC (RES.)                                     3923

09:42AM  1    THE FIRST RUN, A PROBLEM IN THE DILUTION, OR AN ISSUE WITH THE

09:42AM  2    CARTRIDGE."

09:42AM  3        IN OTHER WORDS, DR. YOUNG DOESN'T HAVE A SOLID EXPLANATION

09:42AM  4    FOR WHAT MIGHT BE GOING ON HERE; IS THAT RIGHT?

09:42AM  5    A.   I THINK THAT'S FAIR.

09:42AM  6    Q.   LET'S GO TO PAGE 5 AND LOOK AT THE MIDDLE.

09:43AM  7        ACTUALLY, IF YOU COULD JUST CAPTURE THE TOP HALF OF THAT

09:43AM  8    PAGE.

09:43AM  9        LET'S START A LITTLE FURTHER DOWN.  IF WE CAN CAPTURE JUST

09:43AM  10   THE, JUST THE MIDDLE MESSAGE FOR NOW.

09:43AM  11       IN THIS EMAIL YOU WRITE TO MS. HOLMES, DO YOU SEE THAT,

09:43AM  12   HER ADDRESS IN THE SECOND PARAGRAPH?

09:43AM  13       YOU SAY "ELIZABETH -- PLEASE ADVISE ON HOW TO REPORT THE

09:43AM  14   INFECTIOUS PANEL RESULTS."

09:43AM  15       WAS IT MS. HOLMES'S FINAL DECISION AS TO HOW THIS

09:43AM  16   DISCREPANCY WAS GOING TO BE RESOLVED?

09:43AM  17   A.   IN THIS CASE.

09:43AM  18       I THINK THERE WAS --

09:43AM  19   Q.   GO AHEAD.

09:43AM  20   A.   -- CONVERSATION BETWEEN HER AND DANIEL ON THIS AND

09:43AM  21   TOGETHER THEY DECIDED, RIGHT.

09:43AM  22   Q.   OKAY.  LET'S LOOK AT THE FINAL OUTCOME, AND THAT'S ON

09:44AM  23   PAGE 4, AND IF WE CAN ZOOM IN ON THE TOP HALF OF PAGE 4.

09:44AM  24       DO YOU SEE THERE MS. HOLMES RESPONDING TO THE INPUT FROM

09:44AM  25   DR. YOUNG SAYS, "AGREE ON THE PALO ALTO MEASLES RESULT.  WE'LL

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3924

```
09:44AM   1    ONLY INCLUDE THAT ONE FROM PALO ALTO.  I WOULD INTEGRATE THE

09:44AM   2    PALO ALTO ONLY INFECTIOUS RESULTS WITH THE REST OF THE REPORT

09:44AM   3    RESULTS AND THEN ONLY CALL OUT AS INFECTIOUS THE ONES WE

09:44AM   4    KNOW --" I'M SORRY, "THE ONES WE SHOW FOR BOTH PALO ALTO AND

09:44AM   5    NEW YORK."

09:44AM   6        DO YOU SEE THAT?

09:44AM   7    A.   YES.

09:44AM   8    Q.   LET'S LOOK BRIEFLY AT PAGE 3 IN THIS EXHIBIT.  AND IF WE

09:44AM   9    CAN ZOOM IN ON THE MIDDLE MESSAGE THERE FROM DANIEL YOUNG.

09:44AM  10        IN THIS EMAIL DANIEL YOUNG BEGINS A PARAGRAPH "DAN, FOR

09:45AM  11    BILIRUBIN, TOTAL."

09:45AM  12        DO YOU SEE THAT?

09:45AM  13    A.   YES.

09:45AM  14    Q.   ARE YOU THE DAN THAT HE'S ADDRESSING THERE?

09:45AM  15    A.   YES.

09:45AM  16    Q.   AND HE SAYS, "CAN YOU CHANGE THE REFERENCE RANGE TO .1 TO

09:45AM  17    1.0 AND REMOVE THE L INDICATOR, PLEASE?"

09:45AM  18        CAN YOU EXPLAIN WHAT THAT MEANS?

09:45AM  19    A.   IN THE TEST RESULTS REPORT, THERE WERE A NUMBER OF PIECES

09:45AM  20    OF INFORMATION.  THERE WAS THE RESULT AND THEN ALSO A REFERENCE

09:45AM  21    RANGE.  AND IF A RESULT WAS OUT OF THE REFERENCE RANGE, A HIGH

09:45AM  22    OR LOW, REPRESENTED BY AN H OR L, WAS INCLUDED IN THE REPORT.

09:45AM  23        AND IN THIS INSTRUCTION HE ASKED ME TO CHANGE THE

09:45AM  24    REFERENCE RANGE TO .1 TO 1.0 AND REMOVE THE L INDICATOR, WHICH

09:45AM  25    STANDS FOR LOW.
```

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3925

```
09:45AM   1    Q.   SO WOULD THE EFFECT OF THIS CHANGE BE TO CONVERT WHAT WAS

09:46AM   2    GOING TO BE A LOW RESULT INTO A NORMAL RESULT?

09:46AM   3    A.   I THINK THAT WOULD BE THE OUTCOME OF THIS CHANGE, BUT I'M

09:46AM   4    NOT SURE IF THAT WAS THE INTENT TO CHANGE THE REFERENCE RANGE.

09:46AM   5    Q.   UNDERSTOOD.

09:46AM   6         LOOKING AT THE PARAGRAPH JUST BELOW THAT ONE, THERE'S SOME

09:46AM   7    TALK ABOUT CALCIUM.

09:46AM   8         DO YOU SEE THAT?

09:46AM   9    A.   YES.

09:46AM   10   Q.   AND DR. YOUNG SAYS, "DAN, CAN YOU CHANGE THE RANGE TO 8.4

09:46AM   11   TO 10.7?  IT DOES NOT CHANGE THE OUTCOME, BUT SHOWS THE RESULT

09:46AM   12   TO BE CLOSER TO THE REFERENCE RANGE."

09:46AM   13        DO YOU SEE THAT?

09:46AM   14   A.   YES.

09:46AM   15   Q.   AND THE REFERENCE RANGE DEFINES WHAT THE NORMAL RESULT IS

09:46AM   16   FOR A BLOOD TEST; IS THAT ACCURATE?

09:46AM   17   A.   RIGHT.  I BELIEVE WITHIN THAT RANGE IS, QUOTE-UNQUOTE,

09:46AM   18   HEALTHY OR NORMAL.

09:46AM   19   Q.   OKAY.  IF I COULD ASK YOU TO LOOK IN YOUR BINDER AT

09:46AM   20   EXHIBIT 871.  THAT SHOULD BE THE NEXT ONE IN ORDER.

09:47AM   21        AND LET ME KNOW WHEN YOU HAVE IT IN FRONT OF YOU.

09:47AM   22   A.   I DO.

09:47AM   23   Q.   IS THIS AN EMAIL CHAIN INCLUDING YOU, IF YOU LOOK AT THE

09:47AM   24   SECOND PAGE, AND THEN PROGRESSING TO AN EMAIL FROM

09:47AM   25   SUNNY BALWANI TO ELIZABETH HOLMES ABOUT ANOTHER DEMO?
```

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3926

09:47AM   1    A.   YES.

09:47AM   2              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

09:47AM   3    EXHIBIT 871.

09:47AM   4              MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

09:47AM   5              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:47AM   6         (GOVERNMENT'S EXHIBIT 871 WAS RECEIVED IN EVIDENCE.)

09:47AM   7              MR. BOSTIC:  AND LET'S START WITH PAGE 2 OF 871.

09:47AM   8         AND IF WE COULD ZOOM IN ON THE BOTTOM HALF.

09:47AM   9    Q.   DO YOU SEE THAT THIS STARTS WITH AN EMAIL FROM

09:47AM  10    CHRISTIAN HOLMES TO YOU, DANIEL YOUNG, AND SAMARTHA ANEKAL

09:47AM  11    ABOUT A DEMO NEXT TUESDAY?

09:48AM  12    A.   YES, I'M COPIED ON THAT FIRST EMAIL.

09:48AM  13    Q.   AND CHRISTIAN HOLMES SAYS, SUNNY MENTIONED HE'D LIKE TO

09:48AM  14    RUN A DEMO DURING AN EXEC MEETING NEXT TUESDAY, RUNS FROM 12:00

09:48AM  15    TO 2:00 P.M. IN OUR OFFICE HERE.

09:48AM  16         DO YOU SEE THAT?

09:48AM  17    A.   YES.

09:48AM  18    Q.   LET'S LOOK AT THE TOP HALF OF THIS PAGE.

09:48AM  19         THERE'S AN EMAIL FROM YOU IN THAT SELECTION THAT SAYS,

09:48AM  20    "JUST CAUGHT UP WITH SUNNY.  HE DEFINITELY WANTS TO HAVE A

09:48AM  21    MINILAB, AND THEN EITHER A 4S OR MONO BAY (WHICHEVER IS WORKING

09:48AM  22    BETTER)."

09:48AM  23         DO YOU SEE THAT?

09:48AM  24    A.   YES.

09:48AM  25    Q.   AND THOSE THREE DEVICES, THE 4S, THE MINILAB, AND THE

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3927

09:48AM   1    MONOBAY, CAN YOU REMIND US WHICH CATEGORY THOSE DEVICES FELL

09:48AM   2    INTO?  WERE THEY KIND OF CURRENT GEN THERANOS TECHNOLOGY OR

09:48AM   3    NEXT GENERATION THERANOS TECHNOLOGY?

09:48AM   4    A.   THOSE DEVICES WERE PART OF THE NEXT GENERATION, WHICH WAS

09:48AM   5    THE 4.0 SYSTEM.

09:49AM   6    Q.   TO YOUR KNOWLEDGE, WERE THESE NEXT GEN DEVICES EVER USED

09:49AM   7    BY THERANOS IN ACTUAL CLINICAL PATIENT TESTING?

09:49AM   8    A.   NOT TO MY KNOWLEDGE.

09:49AM   9    Q.   AS PART OF YOUR ROLE IN CONNECTION WITH THESE

09:49AM  10    DEMONSTRATIONS, WERE YOU IN CHARGE OF MAKING SURE THAT THE

09:49AM  11    REQUESTED DEVICES WERE ACTUALLY PLACED IN THE CONFERENCE ROOMS?

09:49AM  12    A.   I WOULD COMMUNICATE THE NEED TO CERTAIN PERSONNEL, LIKE

09:49AM  13    ENGINEERS, WHO WOULD OFTENTIMES ACTUALLY PUT THE DEVICES IN THE

09:49AM  14    ROOMS.

09:49AM  15    Q.   AND SO YOU COORDINATED IT, BUT YOU WEREN'T NECESSARILY THE

09:49AM  16    ONE PHYSICALLY PUTTING THE DEVICES IN PLACE?

09:49AM  17    A.   CORRECT.

09:49AM  18    Q.   WHOSE DECISION WAS IT WHICH DEVICES ACTUALLY ENDED UP IN

09:49AM  19    THE CONFERENCE ROOMS WHERE THE VIP'S MET?

09:49AM  20    A.   THE DECISION ON THE TYPES OF DEVICES WAS USUALLY DIRECTED

09:49AM  21    BY ELIZABETH AND/OR SUNNY, AND THEN THE ENGINEERS WOULD DECIDE

09:49AM  22    WHICH OF THOSE DEVICES WERE WORKING IN THE RIGHT WAY AND THEY

09:49AM  23    WOULD PUT THEM IN THERE.

09:49AM  24    Q.   OKAY.  LET'S LOOK AT PAGE 1 OF THIS EXHIBIT, AND LET'S

09:50AM  25    ZOOM IN ON THE MIDDLE OF THIS PAGE.

EDLIN DIRECT BY MR. BOSTIC (RES.)                              3928

09:50AM  1        WE TALKED ABOUT THE DESIRE TO HAVE A MINILAB IN THIS ROOM;

09:50AM  2    IS THAT CORRECT?

09:50AM  3    A.   THAT'S CORRECT.

09:50AM  4    Q.   AND THERE'S A MESSAGE FROM SUNNY BALWANI IN THE MIDDLE OF

09:50AM  5    THE PAGE SAYING, "GIVEN ML DOESN'T HAVE CYTO, WHAT ARE WE

09:50AM  6    PLANNING ON RUNNING ON ML? "

09:50AM  7        DO YOU SEE THAT?

09:50AM  8    A.   YES.

09:50AM  9    Q.   AND IS ML SHORT FOR MINILAB?

09:50AM 10    A.   YES.

09:50AM 11    Q.   AND DO YOU HAVE AN UNDERSTANDING AS TO WHAT CYTO REFERS

09:50AM 12    TO?

09:50AM 13    A.   I BELIEVE IT REFERS TO CYTOMETRY.

09:50AM 14    Q.   AND WOULD THAT INCLUDE TESTS LIKE A CBC, COMPLETE BLOOD

09:50AM 15    COUNT?

09:50AM 16    A.   THAT'S MY UNDERSTANDING.

09:50AM 17    Q.   LET'S LOOK AT THE TOP PART OF THE PAGE ABOVE THAT.

09:50AM 18        AND DO YOU SEE THAT DANIEL YOUNG RESPONDS TO MR. BALWANI,

09:51AM 19    "RIGHT NOW, WE ARE NOT PLANNING ON RUNNING ANYTHING ON THE ML,

09:51AM 20    UNFORTUNATELY.  THE GENERAL CHEMISTRY AND ELISA ASSAYS ARE NOT

09:51AM 21    PERFORMING ADEQUATELY FOR A DEMO AT THE MOMENT."

09:51AM 22        DO YOU SEE THAT?

09:51AM 23    A.   I DO.

09:51AM 24    Q.   AND AT THE TOP OF THE PAGE, DO YOU SEE THAT MR. BALWANI

09:51AM 25    FORWARDS THAT MESSAGE TO MS. HOLMES WITH "VERY FRUSTRATING"?

EDLIN DIRECT BY MR. BOSTIC (RES.)                          3929

| | | |
|---|---|---|
| 09:51AM | 1 | A.   YES. |
| 09:51AM | 2 | Q.   OKAY.  WE CAN PUT THAT ONE ASIDE. |
| 09:51AM | 3 | LET'S TURN NEXT TO EXHIBIT 905. |
| 09:51AM | 4 | LOOKING AT 905, WAS THIS ANOTHER EMAIL CHAIN RELATING TO A |
| 09:51AM | 5 | DEMONSTRATION AND PROCESSING THOSE RESULTS AT THERANOS? |
| 09:51AM | 6 | A.   YES. |
| 09:51AM | 7 | MR. BOSTIC:  YOUR HONOR, MOVE EXHIBIT 905 INTO |
| 09:51AM | 8 | EVIDENCE. |
| 09:51AM | 9 | MR. DOWNEY:  NO OBJECTION, YOUR HONOR. |
| 09:51AM | 10 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 09:52AM | 11 | (GOVERNMENT'S EXHIBIT 905 WAS RECEIVED IN EVIDENCE.) |
| 09:52AM | 12 | MR. BOSTIC:  AND IF WE CAN START, MS. HOLLIMAN, ON |
| 09:52AM | 13 | PAGE 5.  AND IF WE CAN ZOOM IN ON THE BOTTOM TWO-THIRDS OF THE |
| 09:52AM | 14 | PAGE. |
| 09:52AM | 15 | Q.   MR. EDLIN, DO YOU SEE AN EMAIL FROM YOU TO DANIEL YOUNG |
| 09:52AM | 16 | AND ELIZABETH HOLMES WITH THE SUBJECT OF DEMO RESULTS FOR 7/11? |
| 09:52AM | 17 | A.   YES. |
| 09:52AM | 18 | Q.   AND YOU SAY, "ATTACHED PLEASE FIND THE 6 DEMO REPORTS FOR |
| 09:52AM | 19 | TODAY." |
| 09:52AM | 20 | IS THAT CORRECT? |
| 09:52AM | 21 | A.   YES. |
| 09:52AM | 22 | Q.   AND THEN YOU SAY, "PLEASE NOTE THE FOLLOWING:" |
| 09:52AM | 23 | YOU SAY, "CREATINE HAS BEEN REMOVED FOR ALL REPORTS AS PER |
| 09:52AM | 24 | PAUL'S SUGGESTION." |
| 09:52AM | 25 | DO YOU SEE THAT? |

EDLIN DIRECT BY MR. BOSTIC (RES.)                           3930

09:52AM  1    A.   YES.

09:52AM  2    Q.   AND YOU ASK WHETHER THAT SECTION NEEDS TO CHANGE ITS NAME

09:52AM  3    TO JUST METABOLIC PANEL.

09:52AM  4         DO YOU SEE THAT?

09:53AM  5    A.   YES.

09:53AM  6    Q.   AND YOU THEN NOTE THAT VITAMIN D HAS BEEN REMOVED FOR ALL

09:53AM  7    MALE HEALTH PANELS.

09:53AM  8         IS THAT RIGHT?

09:53AM  9    A.   YES.

09:53AM  10   Q.   AND THEN YOU NOTE THAT TT4 AND TT3 HAS BEEN REMOVED FROM

09:53AM  11   ALL THYROID PANELS.

09:53AM  12        IS THAT RIGHT?

09:53AM  13   A.   YES, PER DANIEL'S SUGGESTION.

09:53AM  14   Q.   AND THEN YOU ALSO SAY FT4 HAS ALSO BEEN REMOVED FROM THE

09:53AM  15   THYROID PANEL IN F2.

09:53AM  16        DO YOU SEE THAT?

09:53AM  17   A.   YES.

09:53AM  18   Q.   AND DO YOU HAVE AN UNDERSTANDING AS TO WHY THESE RESULTS

09:53AM  19   WERE BEING REMOVED FROM THE DEMONSTRATION REPORTS?

09:53AM  20   A.   THEY WERE REMOVED BECAUSE THAT'S WHAT DANIEL AND THE

09:53AM  21   SCIENTISTS RECOMMENDED THAT I DO.

09:53AM  22   Q.   AND BASED ON YOUR TIME AT THERANOS AND YOUR EXPERIENCE

09:53AM  23   WITH THESE DEMONSTRATIONS, WHAT WERE THE REASONS WHY INDIVIDUAL

09:53AM  24   RESULTS MIGHT BE TAKEN OUT OF REPORTS BEFORE THEY WERE SENT TO

09:53AM  25   VIP'S?

EDLIN DIRECT BY MR. BOSTIC (RES.)                                  3931

09:53AM   1    A.   THEY MIGHT BE TAKEN OUT IF WHOEVER REVIEWED IT DIDN'T

09:53AM   2    THINK THAT THEY WERE VALID OR THAT THEY HAD PERFORMED

09:53AM   3    ADEQUATELY.

09:54AM   4    Q.   AND LET'S LOOK JUST AT THE TOP OF PAGE 5 WHILE WE ARE

09:54AM   5    HERE.

09:54AM   6         AND DO YOU SEE THE TAIL END OF AN EMAIL FROM DANIEL YOUNG

09:54AM   7    THERE ON YOUR SCREEN?

09:54AM   8    A.   YES.

09:54AM   9    Q.   AND HE SAYS, "I AM CONCERNED ABOUT THE TSH VALUES F2, M5

09:54AM  10    AND M6" --

09:54AM  11         WERE THOSE DIFFERENT INDIVIDUALS WHO HAD THEIR BLOOD TEST

09:54AM  12    THE?

09:54AM  13    A.   YES.  I THINK THEY STAND FOR MALE AND FEMALE.

09:54AM  14    Q.   -- "WHICH WERE ALL DONE ON THE THYROID PANEL.  I DO THINK

09:54AM  15    THAT THESE ARE ALL RUNNING LOW, POSSIBLY ABNORMALLY.  TO BE

09:54AM  16    CONSERVATIVE, I WOULD REMOVE ALL OF THESE THREE RESULTS."

09:54AM  17         IS THAT THE REASON WHY YOU WERE SAYING THAT THE RESULTS

09:54AM  18    MIGHT BE TAKEN OUT?

09:54AM  19    A.   YES.

09:54AM  20    Q.   LET'S LOOK AT PAGE 4 BRIEFLY.  AND IF WE CAN ZOOM IN ON

09:54AM  21    THE BOTTOM HALF OF THAT PAGE.

09:54AM  22         OKAY.  UNDER M4 FOR THAT INDIVIDUAL, DO YOU SEE

09:55AM  23    DANIEL YOUNG SAYS, "I THINK THIS RESULT OF LESS THAN 3.2 DOES

09:55AM  24    NOT SEEM RIGHT.  I WOULD JUST REMOVE THIS RESULT COMPLETELY"?

09:55AM  25    A.   YES.

EDLIN DIRECT BY MR. BOSTIC (RES.)                                3932

09:55AM   1      Q.   AND AT THE BOTTOM OF THE PAGE HE SAYS, "FOR M5, I WOULD

09:55AM   2   REMOVE THE OUT OF RANGE RESULTS FOR ALKALINE PHOSPHATASE AND

09:55AM   3   CHLORIDE."

09:55AM   4        DO YOU SEE THAT?

09:55AM   5      A.   YES.

09:55AM   6      Q.   AND DID YOU HAVE A BASIS AT THE TIME TO JUDGE THE REASONS

09:55AM   7   FOR REMOVING THESE INDIVIDUAL RESULTS?

09:55AM   8      A.   I DID NOT.

09:55AM   9      Q.   AND THEN FINALLY, LET'S GO TO PAGE 1 OF THIS EXHIBIT.  AND

09:55AM  10   IF WE CAN ZOOM IN ON THE BOTTOM PORTION OF THE PAGE, THE BOTTOM

09:55AM  11   HALF.

09:55AM  12        DO YOU SEE AT THE TOP OF THAT SELECTION AN EMAIL FROM

09:55AM  13   DANIEL YOUNG TO YOU, CC'ING ELIZABETH HOLMES?

09:56AM  14      A.   YES.

09:56AM  15      Q.   AND HE SAYS, FOR SUBJECT F2, "PLEASE CHANGE BUN TO 6-21

09:56AM  16   MILLIGRAMS PER DECILITER."

09:56AM  17        DO YOU SEE THAT?

09:56AM  18      A.   YES.

09:56AM  19      Q.   HE SAYS, "THIS BRINGS THE RESULTS IN THE REFERENCE RANGE."

09:56AM  20        DO YOU SEE THAT?

09:56AM  21      A.   YES.

09:56AM  22      Q.   AND IS THIS ANOTHER CHANGE OF THE RANGE THAT BRINGS A

09:56AM  23   DEMONSTRATION RESULT WITHIN THAT RANGE OR HEALTHY RANGE?

09:56AM  24      A.   THAT'S WHAT THIS MESSAGE INDICATES.

09:56AM  25      Q.   YOU CAN PUT THAT ONE ASIDE.

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3933

| | | |
|---|---|---|
| 09:56AM | 1 | LET'S LOOK NEXT AT EXHIBIT 966, PLEASE. |
| 09:56AM | 2 | AND, MR. EDLIN, DO YOU SEE THAT THIS EMAIL RELATES TO |
| 09:56AM | 3 | ANOTHER SERIES OF DEMONSTRATION RESULTS FROM AUGUST OF 2013? |
| 09:57AM | 4 | A.   YES. |
| 09:57AM | 5 | MR. BOSTIC:  YOUR HONOR, I OFFER EXHIBIT 966. |
| 09:57AM | 6 | MR. DOWNEY:  NO OBJECTION, YOUR HONOR. |
| 09:57AM | 7 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 09:57AM | 8 | (GOVERNMENT'S EXHIBIT 966 WAS RECEIVED IN EVIDENCE.) |
| 09:57AM | 9 | BY MR. BOSTIC: |
| 09:57AM | 10 | Q.   AND, MR. EDLIN, DO YOU SEE THAT THIS IS AN EMAIL THAT |
| 09:57AM | 11 | ATTACHES SOME LAB REPORTS? |
| 09:57AM | 12 | A.   YES. |
| 09:57AM | 13 | Q.   AND WE'RE NOT GOING TO PUBLISH THE LAB REPORTS THEMSELVES, |
| 09:57AM | 14 | BUT DO YOU RECALL A TIME IN AUGUST OF 2013 WHEN A GROUP OF |
| 09:57AM | 15 | INDIVIDUALS FROM WALGREENS VISITED THERANOS? |
| 09:57AM | 16 | A.   YES. |
| 09:57AM | 17 | Q.   DO YOU SEE THAT THE ATTACHED LAB REPORTS INCLUDE THE |
| 09:57AM | 18 | INITIALS N.J.? |
| 09:57AM | 19 | A.   YES. |
| 09:57AM | 20 | Q.   AND DO YOU RECALL MEETING AN INDIVIDUAL FROM WALGREENS |
| 09:57AM | 21 | NAMED NIMESH JHAVERI? |
| 09:57AM | 22 | A.   I DON'T RECALL. |
| 09:57AM | 23 | Q.   OKAY.  DO YOU SEE THAT THERE'S ANOTHER REPORT FOR THE |
| 09:58AM | 24 | INITIALS B.W.? |
| 09:58AM | 25 | A.   YES. |

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3934

09:58AM  1    Q.   AND DO YOU RECALL HAVING ANY CONTACT WITH AN INDIVIDUAL

09:58AM  2    FROM WALGREENS NAMED BRADLEY WASSON?

09:58AM  3    A.   I DON'T RECALL SPECIFICALLY.

09:58AM  4    Q.   OKAY.  IN THIS EMAIL -- FIRST OF ALL, THIS IS AN EMAIL

09:58AM  5    FROM DANIEL YOUNG TO YOU, CHRISTIAN HOLMES, ELIZABETH HOLMES,

09:58AM  6    AND SUNNY BALWANI AMONG OTHERS; CORRECT?

09:58AM  7    A.   YES.

09:58AM  8    Q.   AND IN THAT EMAIL, DANIEL YOUNG SAYS IN THE SECOND

09:58AM  9    PARAGRAPH -- LET'S ZOOM IN ON THE TEXT.

09:58AM 10         HE SAYS, "I 'CORRECTED,'" AND HE PUTS THAT IN QUOTES, "I

09:58AM 11    'CORRECTED' ASSAY RESULTS THAT I ATTRIBUTED TO BCD COLLECTION

09:58AM 12    PROBLEMS."

09:58AM 13         DO YOU SEE THAT?

09:58AM 14    A.   YES.

09:58AM 15    Q.   AND WHAT DOES BCD STAND FOR?

09:58AM 16    A.   BCD STANDS FOR BLOOD COLLECTION DEVICE.  IT WAS THE TOOL

09:59AM 17    USED TO COLLECT FINGERSTICK BLOOD FROM A PATIENT.

09:59AM 18    Q.   AND WAS THAT A THERANOS SPECIFIC DEVICE?

09:59AM 19    A.   YES.  IT WOULD COLLECT BLOOD AND THEN TRANSFER IT INTO A

09:59AM 20    NANOTAINER.

09:59AM 21    Q.   DR. YOUNG SAYS, "THE GC RESULTS LOOK GOOD AFTER SUCH

09:59AM 22    CLEANUP."

09:59AM 23         DO YOU SEE THAT?

09:59AM 24    A.   YES.

09:59AM 25    Q.   AND TWO PARAGRAPHS DOWN HE SAYS, "EACH SUBJECT HAD THE

EDLIN DIRECT BY MR. BOSTIC (RES.)                    3935

09:59AM  1    THYROID PANEL PERFORMED.  I REMOVED THE THYROID RESULTS THAT I

09:59AM  2    FELT WERE QUESTIONABLE."

09:59AM  3         DO YOU SEE THAT?

09:59AM  4    A.   YES.

09:59AM  5    Q.   AND HE SAYS, "THERE ARE A FEW OUT OF RANGE RESULTS LEFT IN

09:59AM  6    THE REPORT, BUT THEY ARE VERY CLOSE TO THE REFERENCE RANGE."

09:59AM  7         AND HE SAYS, "(NOTE THAT I THINK THERE IS SOMETHING WRONG

09:59AM  8    WITH THE TT3 ASSAY/REAGENTS, AND AM FOLLOWING UP WITH SHARADA.

09:59AM  9    I REMOVED ALL TT3 RESULTS.)"

09:59AM  10        DO YOU SEE THAT?

09:59AM  11   A.   YES.

09:59AM  12   Q.   DO YOU KNOW WHETHER THE INDIVIDUALS FROM WALGREENS WERE

10:00AM  13   TOLD ABOUT THE ERRORS ENCOUNTERED IN CONNECTION WITH THEIR DEMO

10:00AM  14   TESTS?

10:00AM  15   A.   I DON'T KNOW.

10:00AM  16   Q.   YOU CAN PUT THAT ASIDE.

10:00AM  17        LET'S LOOK AT EXHIBIT 957, PLEASE.

10:00AM  18        DO YOU HAVE 957?

10:00AM  19   A.   YES.  YES.

10:00AM  20   Q.   IS THIS ANOTHER EMAIL EXCHANGE RELATING TO THAT SAME GROUP

10:00AM  21   OF SIX SAMPLES FOR DEMONSTRATION?

10:00AM  22   A.   I BELIEVE SO.  IT WAS ON THE SAME DAY.

10:00AM  23            MR. BOSTIC:  YOUR HONOR, I OFFER EXHIBIT 957.

10:00AM  24            MR. DOWNEY:  YOUR HONOR, I DON'T KNOW IF HE'S

10:00AM  25   OFFERING THE ENTIRE EXHIBIT OR SOMETHING LESS THAN THE ENTIRE

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3936

```
10:00AM   1      EXHIBIT.

10:00AM   2                THE COURT:  MR. BOSTIC?

10:00AM   3                MR. BOSTIC:  YOUR HONOR, I HAVE THIS AS A FIVE PAGE

10:01AM   4      EXHIBIT, AND MY INTENTION IS TO OFFER THE ENTIRE THING.

10:01AM   5                MR. DOWNEY:  WOULD YOU GIVE ME A MOMENT, YOUR HONOR?

10:01AM   6                THE COURT:  SURE.

10:01AM   7            (PAUSE IN PROCEEDINGS.)

10:01AM   8                MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

10:01AM   9                THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:01AM   10           (GOVERNMENT'S EXHIBIT 957 WAS RECEIVED IN EVIDENCE.)

10:01AM   11               MR. BOSTIC:  AND IF WE CAN START WITH PAGE 2 OF

10:01AM   12     EXHIBIT 957, MS. HOLLIMAN.  AND LET'S ZOOM IN ON THE MIDDLE OF

10:01AM   13     THIS PAGE.  IF WE CAN CAPTURE THE MIDDLE TWO MESSAGES.

10:01AM   14     Q.   MR. EDLIN, DO YOU SEE THAT YOU'RE LOOKING AT TWO EMAILS

10:01AM   15     FROM YOU ON AUGUST 13TH, 2013?

10:01AM   16     A.   YES.

10:01AM   17     Q.   CAN YOU EMAIL THIS GROUP TO SAY, "HI ALL - WE WILL BE

10:02AM   18     COLLECTING THE FINGERSTICK SAMPLES VERY SOON."

10:02AM   19          DO YOU SEE THAT?

10:02AM   20     A.   YES.

10:02AM   21     Q.   AND YOUR NEXT EMAIL SAYS, "WE HAVE SIX SAMPLES; PLEASE

10:02AM   22     MEET IN THE LAB FOR THE HANDOFF."

10:02AM   23          DO YOU SEE THAT?

10:02AM   24     A.   YES.

10:02AM   25     Q.   AND CAN YOU REMIND US HOW THIS WORKFLOW WORKED?  WHERE
```

EDLIN DIRECT BY MR. BOSTIC (RES.)                                          3937

```
10:02AM   1    WERE THE SAMPLES COLLECTED, AND THEN WHAT HAPPENED NEXT TO GET

10:02AM   2    THEM ACTUALLY PROCESSED?

10:02AM   3    A.   IN THIS CASE, SAMPLES WERE COLLECTED IN A MEETING ROOM.  I

10:02AM   4    BELIEVE THAT THERE WERE PHLEBOTOMISTS COLLECTING FINGERSTICK

10:02AM   5    SAMPLES AND THEY WERE PUT INTO A SHIPPING CONTAINER.

10:02AM   6         IN THIS EMAIL -- THIS IS AN EMAIL TO ALL OF THE SCIENTISTS

10:02AM   7    AND -- WHO WOULD BE PERFORMING THE TESTS.

10:02AM   8         SO I'M NOTIFYING THEM THAT THE SAMPLES WILL BE COLLECTED

10:02AM   9    SOON, AND THEN I MET THEM IN THE LAB AND GAVE THEM THE SAMPLES

10:02AM   10   FOR THEM TO PROCESS.

10:02AM   11   Q.   OKAY.  LET'S LOOK AT PAGE 1 OF EXHIBIT 957.  AND LET'S

10:03AM   12   ZOOM IN ON THE BOTTOM PORTION OF THE PAGE.

10:03AM   13        THERE'S AN EMAIL FROM SOMEONE NAMED NICHOLAS HAASE.

10:03AM   14        DO YOU SEE THAT?

10:03AM   15   A.   YES.

10:03AM   16   Q.   AND WHO WAS HE AT THERANOS?

10:03AM   17   A.   I BELIEVE HE WAS ONE OF THE SCIENTISTS.

10:03AM   18   Q.   HIS EMAIL SAYS, "UPDATE:  WE JUST STARTED THE ADVIA RUN OF

10:03AM   19   ALL SAMPLES."

10:03AM   20        DO YOU SEE THAT?

10:03AM   21   A.   YES.

10:03AM   22   Q.   AND FOR THIS DEMONSTRATION, WAS ALL THE TESTING TAKING

10:03AM   23   PLACE ON A THERANOS MANUFACTURED ANALYZER?

10:03AM   24   A.   I DON'T KNOW.

10:03AM   25   Q.   DO YOU KNOW WHAT ADVIA REFERS TO IN THAT EMAIL?
```

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3938

10:03AM   1    A.   I DO.

10:03AM   2    Q.   AND WHAT IS THAT?

10:03AM   3    A.   ADVIA IS A THIRD PARTY DEVICE.

10:03AM   4    Q.   OKAY.  WERE YOU PRESENT FOR ANY PORTION OF THE MEETING

10:04AM   5    WITH THE WALGREENS INDIVIDUALS, OTHER THAN THE DRAW OF THE

10:04AM   6    FINGERSTICK SAMPLES?

10:04AM   7    A.   I BELIEVE SO.

10:04AM   8    Q.   DO YOU KNOW WHETHER ANY OF THE INDIVIDUALS FROM WALGREENS

10:04AM   9    WERE TOLD THAT THEIR SAMPLES WERE GOING TO BE RUN ON THIRD

10:04AM  10    PARTY DEVICES AS OPPOSED TO THERANOS DEVICES?

10:04AM  11    A.   I DON'T KNOW.

10:04AM  12    Q.   LET'S LOOK NOW AT EXHIBIT 1014.  IF YOU COULD TURN TO THAT

10:04AM  13    ONE IN YOUR BINDER.  LET ME KNOW WHEN YOU HAVE 1014.

10:04AM  14    A.   I DO.

10:04AM  15    Q.   AND IS EXHIBIT 1014 ANOTHER EMAIL CHAIN RELATING TO

10:04AM  16    PLANNING AND RESULTS FOR A TECHNOLOGY DEMONSTRATION AT

10:04AM  17    THERANOS?

10:04AM  18    A.   YES.

10:04AM  19         MR. BOSTIC:  YOUR HONOR, MOVE TO ADMIT EXHIBIT 1014.

10:05AM  20         MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

10:05AM  21         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:05AM  22    (GOVERNMENT'S EXHIBIT 1014 WAS RECEIVED IN EVIDENCE.)

10:05AM  23         MR. BOSTIC:  AND IF WE CAN START WITH PAGE 4.

10:05AM  24    Q.   MR. EDLIN, DO YOU RECALL ARRANGING A DEMONSTRATION FOR A

10:05AM  25    JOURNALIST WITH "THE WALL STREET JOURNAL" NAMED JOSEPH RAGO?

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3939

| | | |
|---|---|---|
| 10:05AM | 1 | A.   YES. |
| 10:05AM | 2 | Q.   AND WAS IT IN APPROXIMATELY AUGUST OF 2013 THAT THAT |
| 10:05AM | 3 | HAPPENED? |
| 10:05AM | 4 | A.   YES. |
| 10:05AM | 5 | Q.   LET'S ZOOM IN ON THE BOTTOM PORTION OF PAGE 4, PLEASE. |
| 10:05AM | 6 | OKAY.  MR. EDLIN, DO YOU SEE AN EMAIL FROM YOU TO A GROUP |
| 10:05AM | 7 | OF INDIVIDUALS AT THERANOS? |
| 10:05AM | 8 | A.   YES. |
| 10:05AM | 9 | Q.   AND THE SUBJECT LINE IS IMPORTANT DEMO THIS THURSDAY, |
| 10:06AM | 10 | 8/22? |
| 10:06AM | 11 | A.   YES. |
| 10:06AM | 12 | Q.   YOUR EMAIL MENTIONS THERE IS GOING TO BE ONE MALE PATIENT, |
| 10:06AM | 13 | ONE FINGERSTICK DRAW, AND TIMING IS TO BE DECIDED. |
| 10:06AM | 14 | DO YOU SEE THAT? |
| 10:06AM | 15 | A.   YES. |
| 10:06AM | 16 | Q.   AND YOU SAY IN THE NEXT SECTION, "PLANNED TESTS WILL |
| 10:06AM | 17 | CONSIST OF SOME COMBINATION OF THE FOLLOWING:  CBC, CHEMICAL |
| 10:06AM | 18 | 14, LIPIDS, THYROID PANEL OR MALE HEALTH." |
| 10:06AM | 19 | DO YOU SEE THAT? |
| 10:06AM | 20 | A.   YES. |
| 10:06AM | 21 | Q.   AND YOU THEN SAY, "FOR THIS DEMO WE WILL NEED TO TURN |
| 10:06AM | 22 | AROUND RESULTS FASTER THAN EVER BEFORE -- IDEALLY IN 1 HOUR AND |
| 10:06AM | 23 | NO LONGER THAN 2 HOURS." |
| 10:06AM | 24 | DO YOU SEE THAT? |
| 10:06AM | 25 | A.   YES. |

EDLIN DIRECT BY MR. BOSTIC (RES.)                                3940

10:06AM   1    Q.   AND CAN YOU EXPLAIN WHAT YOU MEAN BY "FASTER THAN EVER

10:06AM   2    BEFORE" IN CONNECTION WITH THIS 1 TO 2 HOUR TIME GOAL?

10:06AM   3    A.   TYPICALLY FOR DEMOS, RESULTS WOULD BE RETURNED WITHIN THAT

10:06AM   4    DAY, LIKELY BY THE END OF THE DAY, AND THIS MEETING TOOK PLACE

10:06AM   5    IN THE MIDDLE OF THE DAY AND THE GOAL WAS TO RETURN THOSE

10:06AM   6    RESULTS IN THE MIDDLE OF THE DAY, SO NOT THAT EVENING.

10:07AM   7    Q.   BELOW THAT SECTION WHERE YOU TALK ABOUT THE EQUIPMENT THAT

10:07AM   8    WILL BE NECESSARY, YOU SAY, "SAM AND MICHAEL - SIMILAR TO LAST

10:07AM   9    WEEK, PLEASE SET UP TWO MINILABS, ONE 4S AND ONE 3.5, IN

10:07AM   10   INTERVIEW ROOM NUMBER 1."

10:07AM   11        DO YOU SEE THAT?

10:07AM   12   A.   YES.

10:07AM   13   Q.   AND YOU SAY THAT "THOSE ANALYZERS SHOULD HAVE THE DEMO APP

10:07AM   14   THAT CAN RUN NULL PROTOCOLS."

10:07AM   15        DO YOU SEE THAT?

10:07AM   16   A.   YES.

10:07AM   17   Q.   AND I'LL ASK YOU TO LOOK AT PAGE 3 OF EXHIBIT 1014.

10:07AM   18        DO YOU SEE IN FRONT OF YOU THE PROPOSED WORKFLOW FOR THAT

10:07AM   19   UPCOMING DEMO?

10:07AM   20   A.   YES.

10:07AM   21   Q.   CAN YOU EXPLAIN -- FROM REVIEWING THIS DOCUMENT, CAN YOU

10:07AM   22   TELL WHETHER THIS DEMO WAS GOING TO REQUIRE THE USE OF THIRD

10:08AM   23   PARTY DEVICES OR WHETHER ALL OF THE TESTING COULD BE

10:08AM   24   ACCOMPLISHED USING THERANOS DEVICES?

10:08AM   25   A.   I CAN'T TELL.

EDLIN DIRECT BY MR. BOSTIC (RES.)                              3941

10:08AM   1    Q.   OKAY.  LET'S LOOK AT PAGE 2.  AND LET'S ZOOM IN ON THE TOP

10:08AM   2    PART OF THAT PAGE.

10:08AM   3         DO YOU SEE AT THE TOP OF THAT PAGE AN EMAIL FROM YOU TO

10:08AM   4    SUNNY BALWANI?

10:08AM   5    A.   YES.

10:08AM   6    Q.   AND YOU SAY, "SUNNY.

10:08AM   7         "UNFORTUNATELY BY THE LOOKS OF THE THYROID PANEL RESULTS

10:08AM   8    BELOW IT APPEARS TO HAVE HAD MAJOR ISSUES AGAIN.  THIS IS AFTER

10:08AM   9    CALIBRATION WAS RE-DONE YESTERDAY, AFTER A CLINICAL CORRECTION

10:08AM  10    WAS PUT IN PLACE FOR TT3, AND AFTER DANIEL REVIEWED RECENT DATA

10:08AM  11    AND SAID HE WAS CONFIDENT THAT AT LEAST 5 OF THESE RESULTS

10:08AM  12    WOULD WORK."

10:08AM  13         DO YOU SEE THAT?

10:08AM  14    A.   YES.

10:08AM  15    Q.   AND DO YOU RECALL AROUND THIS TIME THE THYROID PANEL

10:08AM  16    RESULTS WERE THROWING UP REPEATED PROBLEMS?

10:08AM  17    A.   I DO.

10:08AM  18    Q.   AND JUST TO BE CLEAR, THIS IS BEFORE THERANOS BEGAN

10:09AM  19    OFFERING TESTING SERVICES TO THE PUBLIC; IS THAT RIGHT?

10:09AM  20    A.   THAT'S CORRECT.

10:09AM  21    Q.   APPROXIMATELY HOW MUCH IN ADVANCE OF THE PUBLIC LAUNCH WAS

10:09AM  22    THIS DEMO TAKING PLACE?

10:09AM  23    A.   THIS WAS ABOUT A MONTH BEFORE THE INITIAL LAUNCH WITH

10:09AM  24    WALGREENS.

10:09AM  25    Q.   OKAY.  LET'S LOOK AT PAGE 1 TO SEE MR. BALWANI'S RESPONSE.

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3942

10:09AM   1    AND LET'S ZOOM IN ON THE BOTTOM PORTION OF THAT PAGE.

10:09AM   2          MR. BALWANI SAYS, "TO SAY THIS IS DEEPLY DISAPPOINTING

10:09AM   3    WILL BE A GROSS UNDERSTATEMENT.  WE HAVE BEEN ASKING TO GET

10:09AM   4    THIS CARTRIDGE BUILT AND QAED AND TESTING FOR MONTHS NOW AND

10:09AM   5    EVERY SINGLE RUN WE HAVE HAD ON THYROID PANEL HAS BEEN A

10:09AM   6    DISASTER."

10:09AM   7          DO YOU SEE THAT?

10:09AM   8    A.   YES.

10:09AM   9    Q.   LET'S LOOK AT THE EMAIL MESSAGE JUST ABOVE THAT ONE FROM

10:10AM   10   SUREKHA GANGAKHEDKAR.

10:10AM   11         AND IN HER EMAIL, SHE MENTIONS THAT THE TG AB ASSAY WAS

10:10AM   12   OORL DUE TO SUBSTRATE EVAPORATION.

10:10AM   13         DO YOU SEE THAT?

10:10AM   14   A.   YES.

10:10AM   15   Q.   AND WHAT DOES OORL STAND FOR IF YOU RECALL?

10:10AM   16   A.   I BELIEVE IT'S OUT OF RANGE LOW.

10:10AM   17   Q.   UNDER NUMBER 6 ON THAT LIST, UNDER FT4, IT SAYS "RESULT

10:10AM   18   REPORTED HIGH."  THEN IT SAYS, "SINCE WE DO NOT HAVE SAMPLE TO

10:10AM   19   TEST ON THE REFERENCE METHOD, NOT POSSIBLE TO MAKE A CONCLUSION

10:10AM   20   ON THE HIGH RESULTS."

10:10AM   21         DO YOU SEE THAT?

10:10AM   22   A.   YES.

10:10AM   23   Q.   FINALLY, AT THE TOP OF THIS PAGE, CAN YOU SEE THAT

10:11AM   24   MR. BALWANI FORWARDS THIS EMAIL CHAIN TO MS. HOLMES?

10:11AM   25   A.   YES.

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3943

10:11AM   1    Q.   OKAY.  LET'S LOOK AT EXHIBIT 1157 NEXT.

10:11AM   2         ARE YOU LOOKING AT 1157?

10:11AM   3    A.   YES.

10:11AM   4    Q.   AND IS THIS ANOTHER EMAIL CHAIN BETWEEN YOU AND OTHERS AT

10:11AM   5    THERANOS RELATING TO THE COORDINATION OF A DEMONSTRATION?

10:11AM   6    A.   YES.

10:11AM   7              MR. BOSTIC:  YOUR HONOR, I OFFER EXHIBIT 1157.

10:11AM   8              MR. DOWNEY:  IS THIS OFFERED AS A BUSINESS RECORD,

10:11AM   9    YOUR HONOR?  OR ON WHAT BASIS IS IT OFFERED?  I WOULD JUST ASK

10:11AM  10    THE COURT TO INQUIRE OF MR. BOSTIC.

10:12AM  11              THE COURT:  MR. BOSTIC?

10:12AM  12              MR. BOSTIC:  AS A BUSINESS RECORD, YOUR HONOR,

10:12AM  13    CONSISTENT WITH THE PAST FEW EXHIBITS.

10:12AM  14              MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

10:12AM  15              THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

10:12AM  16         (GOVERNMENT'S EXHIBIT 1157 WAS RECEIVED IN EVIDENCE.)

10:12AM  17              MR. BOSTIC:  AND, MS. HOLLIMAN, IF WE CAN START ON

10:12AM  18    PAGE 2, PLEASE, AND ZOOM IN ON THE BOTTOM HALF.

10:12AM  19    Q.   MR. EDLIN, THE DATE THAT THIS WAS HAPPENING IS

10:12AM  20    SEPTEMBER 23RD, 2013, APPROXIMATELY; IS THAT RIGHT?

10:12AM  21    A.   YES.

10:12AM  22    Q.   AND WAS THIS AFTER THE PUBLIC LAUNCH THAT YOU REFERENCED A

10:12AM  23    MINUTE OR TWO AGO?

10:12AM  24    A.   I BELIEVE SO.  SHORTLY THEREAFTER.

10:12AM  25    Q.   IN YOUR MESSAGE, YOU NOTE THAT A PATIENT IS COMING IN THE

EDLIN DIRECT BY MR. BOSTIC (RES.)                          3944

10:12AM  1   FOLLOWING MORNING.  AND YOU SAY "PLEASE PLAN TO RUN THE SAME

10:12AM  2   TEST THAT WE DID FOR LAST WEEK'S PATIENT."  AND YOU LIST THE

10:13AM  3   TEST THERE.

10:13AM  4        DO YOU SEE THAT?

10:13AM  5   A.   YES.

10:13AM  6   Q.   AND YOU SAY, "WE WILL ALSO NEED TO SET UP MINILABS AND A

10:13AM  7   4S IN INTERVIEW ROOM NUMBER 1."

10:13AM  8        DO YOU SEE THAT?

10:13AM  9   A.   YES.

10:13AM  10  Q.   LET'S LOOK AT PAGE 1 BRIEFLY.  AND LET'S ZOOM IN ON THE

10:13AM  11  TOP MESSAGE.

10:13AM  12       HERE'S AN EMAIL FROM YOU TO THE GROUP SAYING "PAUL AND

10:13AM  13  TEAM.

10:13AM  14       "PLEASE PLAN ON RUNNING THIS SAMPLE USING THE SAME

10:13AM  15  PROCESSES AS LAST WEEK, IE, THE CURRENT WORKFLOW IN NORMANDY."

10:13AM  16       DO YOU SEE THAT?

10:13AM  17  A.   YES.

10:13AM  18  Q.   AND WHAT WAS NORMANDY AT THERANOS?

10:13AM  19  A.   NORMANDY WAS ONE OF THE LABS.

10:13AM  20  Q.   WAS THAT THE CLINICAL LAB WHERE PATIENT SAMPLES WERE

10:13AM  21  TESTED?

10:13AM  22  A.   IT WAS THE NAME OF ANOTHER LAB.

10:13AM  23  Q.   YOU THEN SAY, "TO ANSWER PAUL'S QUESTION, I BELIEVE THAT

10:13AM  24  ADVIA IS USED FOR THIS FOR GC ASSAYS."

10:14AM  25       DO YOU SEE THAT?

EDLIN DIRECT BY MR. BOSTIC (RES.)                                3945

10:14AM  1     A.   YES.

10:14AM  2     Q.   AND YOU TESTIFIED BEFORE THAT ADVIA WAS A THIRD PARTY

10:14AM  3     DEVICES, NOT A THERANOS DEVICE?

10:14AM  4     A.   THAT'S MY UNDERSTANDING NOW, YES.

10:14AM  5     Q.   DID YOU HAVE A DIFFERENT UNDERSTANDING AT THE TIME?

10:14AM  6     A.   I DIDN'T -- THIS ISN'T INFORMATION THAT I WOULD HAVE HAD,

10:14AM  7     AND SO IT'S SOMETHING THAT I WOULD HAVE -- INFORMATION I WOULD

10:14AM  8     HAVE PASSED ALONG.

10:14AM  9     Q.   DURING THIS TIME PERIOD, WHO DID YOU RELY ON FOR YOUR

10:14AM  10    KNOWLEDGE OF WHAT DEVICES WERE USED FOR WHAT?

10:14AM  11    A.   MAINLY DANIEL YOUNG OR SOME OF THE OTHER SCIENTISTS.

10:14AM  12         BUT LOOKING AT THIS EMAIL, GIVEN THAT THE MESSAGE BEFORE

10:14AM  13    WAS SENT TO DANIEL, IT LOOKS LIKE I WOULD HAVE GOTTEN THAT

10:14AM  14    INFORMATION FROM DANIEL AND PASSED IT BACK TO PAUL.

10:14AM  15    Q.   SO JUST TO BE CLEAR ABOUT WHAT IS HAPPENING FOR THE DEMO

10:14AM  16    IN THIS EMAIL, YOU SAW THAT IN THE CONFERENCE ROOM WERE

10:15AM  17    MINILABS AND A 4S IN THE INTERVIEW ROOM.

10:15AM  18         DO YOU RECALL THAT?

10:15AM  19    A.   I DON'T RECALL IT SPECIFICALLY, BUT THAT'S WHAT IT SAYS IN

10:15AM  20    THE EMAIL, YEAH.

10:15AM  21    Q.   OKAY.  AND THE TEST ITSELF WAS GOING TO BE RUN PURSUANT TO

10:15AM  22    THE CURRENT WORKFLOW IN NORMANDY, WHICH WOULD INCLUDE THE

10:15AM  23    ADVIA; IS THAT CORRECT?

10:15AM  24    A.   COULD YOU REPEAT THE QUESTION, SIR?

10:15AM  25    Q.   SURE.  WAS THE ACTUAL TEST GOING TO BE RUN BASED ON THE

EDLIN DIRECT BY MR. BOSTIC (RES.)                                        3946

| | | |
|---|---|---|
| 10:15AM | 1 | CURRENT WORKFLOW IN NORMANDY AS YOUR EMAIL SAYS, AND WOULD THAT |
| 10:15AM | 2 | INCLUDE THE ADVIA THIRD PARTY ANALYZER? |
| 10:15AM | 3 | A.   I DON'T KNOW WHERE THAT, WHERE THAT, WHERE THE ADVIA WAS. |
| 10:15AM | 4 | Q.   I SEE.   OKAY. |
| 10:15AM | 5 | LET ME JUST ASK THEN, WAS THIS TEST GOING TO BE RUN, AT |
| 10:15AM | 6 | LEAST PARTLY, ON THE THIRD PARTY ADVIA BASED ON YOUR |
| 10:16AM | 7 | UNDERSTANDING? |
| 10:16AM | 8 | A.   BASED ON MY UNDERSTANDING IN THIS EMAIL. |
| 10:16AM | 9 | BUT I DON'T REMEMBER SPECIFICALLY. |
| 10:16AM | 10 | Q.   OKAY.   WERE YOU EVER ASKED TO PLACE A THIRD PARTY ANALYZER |
| 10:16AM | 11 | IN AN INTERVIEW ROOM FOR A VIP MEETING? |
| 10:16AM | 12 | A.   NOT THAT I RECALL. |
| 10:16AM | 13 | Q.   DO YOU KNOW WHAT THE TECAN DEVICE IS? |
| 10:16AM | 14 | A.   I'M FAMILIAR WITH THAT NAME. |
| 10:16AM | 15 | Q.   AND DID THERANOS HAVE TECAN DEVICES THAT IT WOULD USE TO |
| 10:16AM | 16 | DILUTE SAMPLES? |
| 10:16AM | 17 | A.   I LEARNED LATER IN 2016 THAT THAT WAS A TOOL THAT WAS USED |
| 10:16AM | 18 | TO DILUTE SAMPLES, YES. |
| 10:16AM | 19 | Q.   DURING YOUR TIME WHEN YOU WERE WORKING ON THESE TECHNOLOGY |
| 10:16AM | 20 | DEVICES, WERE YOU EVER ASKED TO PUT A TECAN INTO AN INTERVIEW |
| 10:16AM | 21 | ROOM FOR A VIP MEETING? |
| 10:16AM | 22 | A.   I WAS NOT. |
| 10:16AM | 23 | Q.   YOU TESTIFIED EARLIER THAT YOU DON'T EVER RECALL GIVING A |
| 10:17AM | 24 | VIP A TOUR OF THE CLINICAL LABORATORY WHERE THE ANALYZERS WERE; |
| 10:17AM | 25 | IS THAT CORRECT? |

EDLIN DIRECT BY MR. BOSTIC (RES.)                          3947

10:17AM   1     A.   THAT'S CORRECT.

10:17AM   2     Q.   OKAY.  WE CAN PUT THAT ONE ASIDE.

10:17AM   3          I'LL ASK YOU TO TURN TO EXHIBIT 2327, PLEASE.

10:17AM   4          LET ME KNOW IF YOU DON'T HAVE THAT ONE.  I HAVE A --

10:17AM   5     A.   I HAVE IT.

10:17AM   6     Q.   AND IS EXHIBIT 2327 AN EMAIL BETWEEN ELIZABETH HOLMES AND

10:17AM   7     RUPERT MURDOCH?

10:17AM   8     A.   YES.

10:17AM   9     Q.   AND DO YOU RECOGNIZE MS. HOLMES'S EMAIL ADDRESS?

10:17AM  10     A.   I DO.

10:17AM  11          MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

10:17AM  12     EXHIBIT 2327.

10:17AM  13          MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

10:17AM  14          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:18AM  15      (GOVERNMENT'S EXHIBIT 2327 WAS RECEIVED IN EVIDENCE.)

10:18AM  16          MR. BOSTIC:  LET'S ZOOM IN ON THE TOP PORTION TO

10:18AM  17     CAPTURE THOSE TWO EMAIL MESSAGES.

10:18AM  18     Q.   MR. EDLIN, WHO IS RUPERT MURDOCH?

10:18AM  19     A.   I DON'T KNOW HIS EXACT TITLE, BUT I BELIEVE HE'S THE

10:18AM  20     CHAIRMAN OF FOX.

10:18AM  21     Q.   DO YOU RECALL A TIME AT THERANOS WHEN HE HAD SOME

10:18AM  22     COMMUNICATIONS OR INVOLVEMENT WITH THE COMPANY?

10:18AM  23     A.   I DO REMEMBER THAT HE CAME FOR A MEETING.

10:18AM  24     Q.   IN THIS EMAIL MS. HOLMES WRITES TO HIM, "IT WAS WONDERFUL

10:18AM  25     TO HAVE YOU HERE TODAY."

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3948

10:18AM  1        THIS IS DATED JANUARY 2015.

10:18AM  2        DO YOU SEE THAT?

10:18AM  3   A.   YES.

10:18AM  4   Q.   AND SHE SAYS, "I SO LOOK FORWARD TO THE OPPORTUNITY TO

10:18AM  5   CONTINUE OUR CONVERSATIONS, INCLUDING ONE DAY A MORE DETAILED

10:18AM  6   CONVERSATION ON CHINA...

10:18AM  7        "I WOULD BE AN HONOR TO HAVE YOU AS PART OF OUR COMPANY."

10:19AM  8        DO YOU SEE THAT?

10:19AM  9   A.   YES.

10:19AM 10   Q.   AND DO YOU RECALL MR. MURDOCH CONSIDERING A POTENTIAL

10:19AM 11   INVESTMENT IN THERANOS AROUND THIS TIME?

10:19AM 12   A.   I DO RECALL THAT INVESTMENT BINDERS WERE SENT TO HIM AT

10:19AM 13   ONE POINT, AND I DO RECALL THAT HE CAME TO THERANOS FOR A

10:19AM 14   MEETING.

10:19AM 15   Q.   WERE YOU INVOLVED IN THE CREATION OR SENDING OF THOSE

10:19AM 16   INVESTMENT BINDERS?

10:19AM 17        THE COURT:  SIR, COULD YOU SPEAK INTO THAT

10:19AM 18   MICROPHONE.  PULL THAT A LITTLE CLOSER TO YOU.  THAT MIGHT BE

10:19AM 19   HELPFUL.  AND IF YOU COULD REPEAT YOUR LAST ANSWER, PLEASE.

10:19AM 20        MR. BOSTIC:  WOULD YOU LIKE THE PREVIOUS QUESTION?

10:19AM 21        THE WITNESS:  YES.

10:19AM 22        THE COURT:  WHY DON'T YOU DO THAT?  THANK YOU,

10:19AM 23   MR. BOSTIC.

10:19AM 24   BY MR. BOSTIC:

10:19AM 25   Q.   THE QUESTION WAS, DO YOU RECALL A TIME WHEN MR. MURDOCH

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3949

| | | |
|---|---|---|
| 10:19AM | 1 | WAS CONSIDERING INVESTING IN THERANOS? |
| 10:19AM | 2 | A.   I RECALL THAT INVESTMENT BINDERS WERE SENT TO HIM, AND HE |
| 10:19AM | 3 | DID COME TO THERANOS FOR A MEETING AS WELL. |
| 10:19AM | 4 | Q.   AND DID YOU HAVE A ROLE IN PREPARING OR SENDING THOSE |
| 10:19AM | 5 | INVESTOR BINDERS? |
| 10:19AM | 6 | A.   I DON'T REMEMBER. |
| 10:19AM | 7 | Q.   IN MR. MURDOCH'S RESPONSE TO MS. HOLMES, HE SAYS, "THANKS, |
| 10:20AM | 8 | ELIZABETH.  ENJOYED EVERY MINUTE OF IT.  ANY BLOOD RESULTS?" |
| 10:20AM | 9 | DO YOU SEE THAT? |
| 10:20AM | 10 | A.   YES. |
| 10:20AM | 11 | Q.   LET'S LOOK AT EXHIBIT 4366. |
| 10:20AM | 12 | A.   OKAY. |
| 10:20AM | 13 | Q.   AND LET'S SEE. |
| 10:20AM | 14 | IS THIS AN EMAIL DISCUSSING DEMONSTRATION RESULTS FOR |
| 10:20AM | 15 | MR. MURDOCH? |
| 10:20AM | 16 | A.   YES. |
| 10:21AM | 17 | MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT MOVES TO |
| 10:21AM | 18 | ADMIT EXHIBIT 4366. |
| 10:21AM | 19 | MR. DOWNEY:  YOUR HONOR, I DON'T HAVE ANY OBJECTION |
| 10:21AM | 20 | TO IT. |
| 10:21AM | 21 | I DON'T KNOW IF THERE'S A PROTOCOL AROUND REDACTION OF ANY |
| 10:21AM | 22 | INFORMATION.  THERE'S A LOT OF DISCUSSION OF HEALTH INFORMATION |
| 10:21AM | 23 | IN HERE, SO I DON'T KNOW WHAT THE GOVERNMENT'S INTENT IS. |
| 10:21AM | 24 | MR. BOSTIC:  AND, YOUR HONOR, THE GOVERNMENT'S COPY |
| 10:21AM | 25 | OF THIS THAT WILL BE PUBLISHED HAS BEEN SIGNIFICANTLY REDACTED. |

EDLIN DIRECT BY MR. BOSTIC (RES.)                                  3950

10:21AM  1              THE COURT:  ALL RIGHT.  THANK YOU.

10:21AM  2          THANK YOU FOR THE INQUIRY.

10:21AM  3              MR. DOWNEY:  FAIR ENOUGH.

10:21AM  4              THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED

10:21AM  5      IN REDACTED FORM.

10:21AM  6          (GOVERNMENT'S EXHIBIT 4366 WAS RECEIVED IN EVIDENCE.)

10:21AM  7              MR. BOSTIC:  LET'S JUST LOOK FIRST AT THE TOP

10:21AM  8      SECTION OF THIS PAGE, PLEASE.

10:22AM  9      Q.   MR. EDLIN, DO YOU SEE SOME DISCUSSION OF SOME QUESTIONS

10:22AM 10      ABOUT RESULTS THAT WERE RETURNED IN CONNECTION WITH THIS

10:22AM 11      DEMONSTRATION?

10:22AM 12      A.   YES.

10:22AM 13      Q.   AND ONE NOTE SAYS, "C02 IS RUN WAY EARLIER THAN USUAL, SO

10:22AM 14      IT'S A BIT HIGH."

10:22AM 15          DO YOU HAVE AN UNDERSTANDING OF WHAT THAT WAS REFERRING

10:22AM 16      TO?

10:22AM 17      A.   NO.

10:22AM 18      Q.   THE NEXT BULLET SAYS, "ISE'S ARE A BIT LOW."

10:22AM 19          WHAT DID ISE STAND FOR?

10:22AM 20      A.   IT WAS A CLASSIFICATION OF CERTAIN TESTS.

10:22AM 21      Q.   DO YOU RECALL WHETHER THAT CATEGORY OF TESTS WAS RUN ON

10:22AM 22      THE EDISON OR ON A THIRD PARTY DEVIC DEVICE?

10:22AM 23      A.   I DON'T.

10:22AM 24      Q.   THERE'S ALSO A QUESTION WHETHER THERE'S A WAY FOR US TO

10:22AM 25      VALIDATE LIPIDS IN THE FUTURE VIA SOME SORT OF FORMULA.

EDLIN DIRECT BY MR. BOSTIC (RES.)                             3951

```
10:22AM   1            DO YOU SEE THAT?

10:22AM   2       A.   YES.

10:22AM   3       Q.   AND THEN FINALLY THERE A NOTE, "WE HAVE NO SAMPLE FOR

10:22AM   4       RERUN SINCE IT WAS A SHORT DRAW."

10:22AM   5            DO YOU SEE THAT?

10:22AM   6       A.   YES.

10:22AM   7       Q.   AND DO YOU KNOW WHAT "SHORT DRAW" REFERS TO?

10:23AM   8       A.   IT REFERS TO THE AMOUNT OF BLOOD THAT WAS COLLECTED IN THE

10:23AM   9       SAMPLE.  SO A SHORT DRAW WOULD BE LESS, LESS BLOOD.

10:23AM  10       Q.   THIS WAS JANUARY 2015.  AT THIS POINT, FOR APPROXIMATELY

10:23AM  11       HOW LONG HAD THERANOS BEEN PERFORMING CLINICAL PATIENT TESTING?

10:23AM  12       A.   SO THERANOS BEGAN TESTING IN WELLNESS CENTERS IN I BELIEVE

10:23AM  13       IT WAS SEPTEMBER OF 2013.

10:23AM  14       Q.   SO A YEAR AND CHANGE?

10:23AM  15       A.   YES.

10:23AM  16       Q.   AND YOU CAN PUT THAT ASIDE.

10:23AM  17            LET'S LOOK AT EXHIBIT 3070, PLEASE.

10:23AM  18       A.   CAN YOU REPEAT THE EXHIBIT PLEASE?

10:23AM  19       Q.   3070.  LET ME KNOW WHEN YOU'RE THERE.

10:24AM  20       A.   I'M THERE.

10:24AM  21       Q.   ARE YOU LOOKING AT AN EMAIL FROM THE DECEMBER 2015 TIME

10:24AM  22       PERIOD?

10:24AM  23       A.   YES.

10:24AM  24       Q.   AND IS THIS AN EMAIL CHAIN RELATING TO RESULTS FOR ANOTHER

10:24AM  25       VIP GUEST?
```

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3952

| | | |
|---|---|---|
| 10:24AM | 1 | A.   YES. |
| 10:24AM | 2 | MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS |
| 10:24AM | 3 | EXHIBIT 3070 IN REDACTED FORM. |
| 10:24AM | 4 | MR. DOWNEY:  NO OBJECTION, YOUR HONOR. |
| 10:24AM | 5 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED IN |
| 10:24AM | 6 | REDACTED FORM. |
| 10:24AM | 7 | (GOVERNMENT'S EXHIBIT 3070 WAS RECEIVED IN EVIDENCE.) |
| 10:24AM | 8 | MR. BOSTIC:  AND IF WE CAN ZOOM IN ON THE BOTTOM |
| 10:24AM | 9 | MESSAGE. |
| 10:24AM | 10 | Q.   MR. EDLIN, DO YOU SEE WE'RE ABOUT TO LOOK AT AN EMAIL FROM |
| 10:24AM | 11 | YOU TO DANIEL YOUNG AND SOMEONE NAMED BROOKE BUCHANAN AT |
| 10:25AM | 12 | THERANOS? |
| 10:25AM | 13 | A.   YES. |
| 10:25AM | 14 | Q.   AND THE SUBJECT SAYS MESSAGING FOR VIP GUEST, AND THE NAME |
| 10:25AM | 15 | REDACTED? |
| 10:25AM | 16 | A.   YES. |
| 10:25AM | 17 | Q.   AND LET'S LOOK AT PAGE 2. |
| 10:25AM | 18 | AND YOUR EMAIL SAYS AT THE TOP, "YESTERDAY WE SENT THIS |
| 10:25AM | 19 | INDIVIDUAL HIS RESULTS FROM THE STUDY IN WHICH WE COMPARE |
| 10:25AM | 20 | FINGERSTICK CTN RESULTS TO VENOUS RESULTS." |
| 10:25AM | 21 | DO YOU SEE THAT? |
| 10:25AM | 22 | A.   YES. |
| 10:25AM | 23 | Q.   DO YOU RECALL AROUND THIS TIME PERIOD THERE WAS A STUDY |
| 10:25AM | 24 | COMPARING THERANOS FINGERSTICK RESULTS TO VENOUS RESULTS? |
| 10:25AM | 25 | A.   YES. |

EDLIN DIRECT BY MR. BOSTIC (RES.)                    3953

10:25AM   1    Q.   THE NEXT LINE OF YOUR EMAIL SAYS, "IN CONNECTION WITH

10:25AM   2    THOSE RESULTS, WE WERE UNABLE TO RETURN 5 TEST RESULTS FOR THE

10:25AM   3    CTN FOR THE FOLLOWING REASONS."

10:25AM   4         DO YOU SEE THAT?

10:25AM   5    A.   YES.

10:25AM   6    Q.   AND UNDER POTASSIUM, CHLORIDE, AND SODIUM, IT SAYS,

10:25AM   7    "SAMPLE BECAME CONTAMINATED UNDER CENTRIFUGATION."

10:26AM   8         DO YOU SEE THAT?

10:26AM   9    A.   YES.

10:26AM   10   Q.   AND UNDER ROOT CAUSE, IT SAYS, "THE CONTAMINATION OF THE

10:26AM   11   CTN IS NOT DUE TO ANY HUMAN ERROR."

10:26AM   12        DO YOU SEE THAT?

10:26AM   13   A.   YES.  THAT'S WHAT TINA, A SCIENTIST, TOLD ME.

10:26AM   14   Q.   AND IT LOOKS LIKE SHE ALSO TOLD YOU, WE DON'T KNOW WHY OR

10:26AM   15   HOW THIS HAPPENED.

10:26AM   16        DO YOU SEE THAT?

10:26AM   17   A.   YES.

10:26AM   18   Q.   SHE SAYS, OR YOU REPORT, "WHEN WE DID REVIEWS OF THESE

10:26AM   19   FAILED SAMPLES IN THE PAST, WE SAW A THINNER GEL LAYER THAN

10:26AM   20   USUAL, BUT IT WASN'T THE CASE FOR THIS SAMPLE."

10:26AM   21        SO, IN OTHER WORDS, THIS WAS A MYSTERY; IS THAT RIGHT?

10:26AM   22   A.   YES.  I TOOK THIS PARAGRAPH DIRECTLY FROM TINA AND THIS IS

10:26AM   23   WHAT SHE INDICATED, SO SHE DIDN'T KNOW WHY.

10:26AM   24   Q.   MOVING DOWN TO CALCIUM AND TOTAL PROTEIN, YOU REPORT,

10:26AM   25   "THESE TWO RESULTS WERE STATISTICALLY SIGNIFICANTLY TOO HIGH

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3954

10:26AM  1    RELATIVE TO THE VENOUS REPORT, AND THEREFORE DANIEL RECOMMENDED

10:26AM  2    WE DID NOT REPORT THESE."

10:26AM  3         IN OTHER WORDS, WAS THERE TOO GREAT OF A DIFFERENCE OR A

10:26AM  4    DISAGREEMENT BETWEEN THE THERANOS FINGERSTICK RESULTS AND THE

10:27AM  5    VENOUS RESULTS?

10:27AM  6    A.   THAT'S RIGHT.

10:27AM  7    Q.   AND UNDER B THERE, AGAIN, IT SAYS "ROOT CAUSE - UNKNOWN."

10:27AM  8         DO YOU SEE THAT?

10:27AM  9    A.   YES.

10:27AM  10   Q.   AND LET'S GO TO PAGE 1 OF THIS EXHIBIT AND LET'S ZOOM IN

10:27AM  11   ON THE BOTTOM HALF.

10:27AM  12        AND DO YOU SEE A MESSAGE FROM CHRISTIAN HOLMES TO

10:27AM  13   ELIZABETH HOLMES AND SUNNY BALWANI ON DECEMBER 27TH ON THIS

10:27AM  14   TOPIC?

10:27AM  15   A.   YES.

10:27AM  16   Q.   CHRISTIAN HOLMES SAYS "FYI - THIS IS THE DOC EAH" --

10:27AM  17        IS THAT ELIZABETH HOLMES?

10:27AM  18   A.   YES.

10:27AM  19   Q.   "THIS IS THE DOC ELIZABETH HOLMES MET AT FORBES CONFERENCE

10:27AM  20   AND INVITED TO DO COMPARISON.  HE WAS VERY PLEASANT IN PERSON

10:27AM  21   BUT NOTED HE INTENDS TO WRITE ABOUT HIS EXPERIENCE AND

10:27AM  22   RESULTS."

10:27AM  23        DO YOU SEE THAT?

10:27AM  24   A.   YES.

10:27AM  25   Q.   AND LET'S LOOK AT MS. HOLMES'S RESPONSE JUST ABOVE THAT.

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3955

10:27AM  1        AND MS. HOLMES WRITES, CC'ING YOU HERE; IS THAT RIGHT?

10:28AM  2    A.   YES.

10:28AM  3    Q.   SHE SAYS, "YOU CAN SAY WE DO RUN THOSE ASSAYS, BUT WE'RE

10:28AM  4    NOT ABLE TO RUN THEM ON THIS SAMPLE, APPARENTLY DUE TO A HUMAN

10:28AM  5    ERROR IN SAMPLE HANDLING."

10:28AM  6        DO YOU SEE THAT?

10:28AM  7    A.   YES.

10:28AM  8    Q.   DO YOU RECALL THAT WE JUST READ A PORTION OF THE EMAIL

10:28AM  9    WHERE TINA REPORTED THAT THE CONTAMINATION OF THE CTN WAS NOT

10:28AM 10    DUE TO ANY HUMAN ERROR?

10:28AM 11    A.   I DO RECALL THAT.

10:28AM 12    Q.   AND MS. HOLMES WAS SAYING THAT WE WERE NOT ABLE TO RUN

10:28AM 13    THOSE ASSAYS ON THE SAMPLE, BUT, IN FACT, DIDN'T THE EARLIER

10:28AM 14    PORTION OF THE EMAIL INDICATE THAT THOSE ASSAYS HAD BEEN RUN ON

10:28AM 15    THE SAMPLE, THEY JUST PRODUCED QUESTIONABLE RESULTS?

10:28AM 16    A.   THAT'S RIGHT.

10:28AM 17        MR. DOWNEY:  I'M SORRY TO INTERRUPT.  I'M SORRY,

10:28AM 18    MR. BOSTIC.

10:28AM 19        ON THE ISSUE THAT I HAD ON THE REDACTIONS, I JUST WANT TO

10:29AM 20    MAKE SURE WE HAVE A CONSISTENT APPROACH.  THE NAME OF THIS

10:29AM 21    PATIENT HAS BEEN REDACTED THROUGHOUT, WHICH SEEMS CORRECT

10:29AM 22    BECAUSE THERE'S A DISCUSSION OF HOW WE'VE ADMITTED A FEW AND

10:29AM 23    PUBLISHED A FEW EXHIBITS WHERE THE SAME KIND OF INFORMATION HAS

10:29AM 24    BEEN ASSOCIATED WITH PARTICULAR INDIVIDUALS.

10:29AM 25        WE'LL FOLLOW WHATEVER PROTOCOL THE COURT WISHES, AND I'M

EDLIN DIRECT BY MR. BOSTIC (RES.)                           3956

10:29AM  1     SURE MR. BOSTIC WILL, TOO.

10:29AM  2          I JUST WANT TO BE CLEAR SO AS TO NOT INADVERTENTLY HAVE A

10:29AM  3     PUBLICATION OF PERSONAL HEALTH INFORMATION.

10:29AM  4              THE COURT:  WELL, THANK YOU FOR THAT.  I THINK NONE

10:29AM  5     OF US WANT THAT TO HAPPEN.

10:29AM  6          OUR BINDERS, THAT IS, YOURS AND MINE, MAY HAVE EXHIBITS

10:29AM  7     THAT ARE DIFFERENT THAN WHAT IS IN YOUR BINDER, MR. BOSTIC,

10:29AM  8     THAT ULTIMATELY WOULD BE PUBLISHED, OR AT LEAST THE EXHIBITS

10:29AM  9     THAT HAVE BEEN SUBMITTED TO THE COURT FOR PUBLICATION.

10:29AM 10          IS THAT RIGHT?

10:29AM 11              MR. BOSTIC:  THAT'S CORRECT, YOUR HONOR.

10:29AM 12          AND DEPENDING ON THE EXHIBIT, SOMETIMES THE NAME WILL BE

10:29AM 13     REDACTED OR THE RESULTS, THE PRIVATE INFORMATION WILL BE

10:29AM 14     REDACTED.

10:29AM 15              THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

10:30AM 16     BY MR. BOSTIC:

10:30AM 17     Q.   MR. EDLIN, YOU TESTIFIED BEFORE THAT THIS WAS ALL IN

10:30AM 18     CONNECTION WITH A STUDY THAT WAS MEANT TO COMPARE THE THERANOS

10:30AM 19     FINGERSTICK RESULTS TO VENOUS DRAW; IS THAT CORRECT?

10:30AM 20     A.   THAT'S RIGHT.

10:30AM 21     Q.   AND IS THAT THE SAME THING, OR IS THAT A WAY TO TEST THE

10:30AM 22     ACCURACY OF THE THERANOS RESULTS?

10:30AM 23     A.   THE INTENT WAS TO ASSESS HOW THOSE FINGERSTICK RESULTS

10:30AM 24     COMPARE TO THE VENOUS RESULTS.

10:30AM 25     Q.   OKAY.  WE CAN PUT THAT ONE ASIDE.

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3957

10:30AM  1        LET'S TALK ABOUT THERANOS'S INVOLVEMENT WITH

10:30AM  2    PHARMACEUTICAL COMPANIES.

10:30AM  3        DID YOU HAVE ANY ROLE THERE IN THERANOS'S PARTNERSHIPS AND

10:30AM  4    WORK WITH PHARMACEUTICAL COMPANIES?

10:30AM  5    A.   I DID HAVE A SMALL ROLE.

10:30AM  6    Q.   CAN YOU GIVE US AN OVERVIEW OF WHAT THAT ROLE WAS?

10:30AM  7    A.   I BELIEVE THERE WERE A COUPLE DIFFERENT EXISTING

10:30AM  8    RELATIONSHIPS WITH PHARMACEUTICAL COMPANIES, AND AT ONE POINT

10:31AM  9    ELIZABETH ASKED ME TO FACILITATE INFORMATION SHARING AND

10:31AM  10   COMMUNICATION WITH THOSE COMPANIES.

10:31AM  11   Q.   AND DO YOU RECALL APPROXIMATELY WHEN IN YOUR TIME AT

10:31AM  12   THERANOS YOU STARTED TO WORK ON THOSE PROJECTS?

10:31AM  13   A.   THIS WAS PROBABLY IN THE FIRST SIX MONTHS OR SO.

10:31AM  14   Q.   AND AROUND THAT TIME, WAS THERE SIGNIFICANT WORK HAPPENING

10:31AM  15   WITH PHARMACEUTICAL COMPANIES AT THERANOS AS FAR AS YOU SAW?

10:31AM  16   A.   I PERSONALLY DIDN'T SEE SIGNIFICANT WORK HAPPENING, BUT

10:31AM  17   THAT'S NOT SOMETHING THAT I HAD MUCH INSIGHT INTO.

10:31AM  18   Q.   I'LL ASK YOU TO LOOK AT EXHIBIT 528 IN YOUR BINDER.

10:32AM  19   A.   528?

10:32AM  20   Q.   528, UH-HUH.

10:32AM  21   A.   OKAY.

10:32AM  22   Q.   AND IS THIS AN EMAIL CHAIN INCLUDING YOU,

10:32AM  23   ELIZABETH HOLMES, AND OTHERS AT THERANOS ABOUT WORK WITH

10:32AM  24   CELGENE?

10:32AM  25   A.   YES.

EDLIN DIRECT BY MR. BOSTIC (RES.)                          3958

10:32AM   1           MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

10:32AM   2     EXHIBIT 528.

10:32AM   3           MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

10:32AM   4           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:32AM   5        (GOVERNMENT'S EXHIBIT 528 WAS RECEIVED IN EVIDENCE.)

10:32AM   6     BY MR. BOSTIC:

10:32AM   7     Q.   AND AROUND THIS TIME, MR. EDLIN, DO YOU REMEMBER THERANOS

10:32AM   8     HAVING A CONTRACT TO PERFORM SOME TESTING FOR A PHARMACEUTICAL

10:32AM   9     COMPANY CALLED CELGENE?

10:32AM  10     A.   I DON'T REMEMBER THE NATURE OF THAT CONTRACT.

10:32AM  11     Q.   LET'S LOOK AT THIS EMAIL CHAIN.  LET'S GO TO PAGE 8 FIRST,

10:33AM  12     AND IF WE CAN ZOOM IN ON THE TOP PART OF THE PAGE, THE TOP

10:33AM  13     HALF.

10:33AM  14         MR. EDLIN, DO YOU SEE THAT YOU'RE LOOKING AT AN EMAIL FROM

10:33AM  15     DANIEL YOUNG ON THIS TOPIC?

10:33AM  16     A.   YES.

10:33AM  17     Q.   HE SAYS, "BASED ON THE LATEST INFO, I THINK WE MAY BE ABLE

10:33AM  18     TO PERFORM THE FOLLOWING TESTS AT THERANOS WITH 1 MILLILITER OF

10:33AM  19     WHOLE BLOOD, BUT SOME QUESTIONS STILL REMAIN."

10:33AM  20         DO YOU SEE THAT?

10:33AM  21     A.   YES.

10:33AM  22     Q.   AND THEN HE PROVIDES TWO LISTS.  ONE IS TITLED "ASSAYS ON

10:33AM  23     THERANOS DEVICES," AND THE OTHER SAYS, "KITS."

10:33AM  24         DO YOU SEE THAT?

10:33AM  25     A.   YES.

EDLIN DIRECT BY MR. BOSTIC (RES.)                                      3959

10:33AM   1    Q.   AND CAN YOU EXPLAIN WHAT WE'RE LOOKING AT HERE?  WHAT ARE

10:33AM   2    THESE TWO LISTS?

10:33AM   3    A.   I CAN'T GIVE MUCH DETAIL BEYOND WHAT IS ON HERE.  IT LOOKS

10:33AM   4    LIKE THE TOP ARE TESTS THAT CAN BE RUN ON A THERANOS DEVICE,

10:34AM   5    AND I THINK A KIT REFERS TO A THIRD PARTY DEVICE.

10:34AM   6    Q.   IN OTHER WORDS, THE ASSAYS RUN ON KITS WOULD NOT BE RUN ON

10:34AM   7    A THERANOS MANUFACTURED DEVICE?

10:34AM   8    A.   I DON'T KNOW.  I DON'T KNOW DEFINITIVELY WHETHER OR NOT

10:34AM   9    THEY COULD.

10:34AM  10    Q.   IN THE PARAGRAPH -- ACTUALLY, MS. HOLLIMAN, IF WE CAN

10:34AM  11    SCROLL DOWN A LITTLE BIT TO CAPTURE THE REST OF THAT PARAGRAPH

10:34AM  12    AT THE BOTTOM.  PERFECT.  THANK YOU.

10:34AM  13         DO YOU SEE, MR. EDLIN, UNDER HEPCIDIN, THERE'S SOME

10:34AM  14    REFERENCE TO DRG'S KIT.

10:34AM  15         DO YOU SEE THAT?

10:34AM  16    A.   YES.

10:34AM  17    Q.   AND THEN THERE'S A REFERENCE TO INTRINSIC LIFESCIENCES.

10:34AM  18         DO YOU SEE THAT?

10:34AM  19    A.   YES.

10:34AM  20    Q.   THERE'S ANOTHER REFERENCE TO MY BIOSOURCE?

10:34AM  21    A.   YES.

10:34AM  22    Q.   AND WERE ANY OF THOSE COMPANIES AFFILIATED WITH OR PART OF

10:35AM  23    THERANOS IN ANY WAY?

10:35AM  24    A.   I DIDN'T HAVE -- NOT TO MY KNOWLEDGE.

10:35AM  25    Q.   LET'S LOOK AT PAGE 5, PLEASE.  AND AT THE BOTTOM OF THAT

EDLIN DIRECT BY MR. BOSTIC (RES.)                              3960

10:35AM   1      PAGE, IF WE CAN ZOOM IN ON THE MESSAGE FROM MS. HOLMES.

10:35AM   2           MS. HOLMES WRITES TO DANIEL YOUNG, YOU, AND

10:35AM   3      SUREKHA GANGADKHEDKAR.

10:35AM   4           DO YOU SEE THAT?

10:35AM   5      A.   YES.

10:35AM   6      Q.   SHE SAYS, "OK - DAN, IN PARALLEL WITH THIS FOLLOW UP WITH

10:35AM   7      SUREKHA, PLEASE PREPARE A DRAFT TO VICKI TO SEND OUT AS EARLY

10:35AM   8      AS POSSIBLE TOMORROW MORNING AFTER WE'VE REVIEWED AND SIGNED

10:35AM   9      OFF ON IT."

10:35AM   10          DO YOU SEE THAT?

10:35AM   11     A.   YES.

10:35AM   12     Q.   AND WAS SHE GIVING THIS DIRECTION TO DANIEL YOUNG OR TO

10:35AM   13     YOU?  WHAT WAS YOUR UNDERSTANDING?

10:35AM   14     A.   MY UNDERSTANDING IS THAT SHE GAVE THIS DIRECTION TO ME.

10:36AM   15     Q.   AND IS THAT CONSISTENT WITH YOUR ROLE AS BEING INVOLVED IN

10:36AM   16     THE PHARMACEUTICAL COMPANY BUSINESS WITH THERANOS?

10:36AM   17     A.   THAT'S CONSISTENT WITH MY ROLE, YES.

10:36AM   18     Q.   SHE SAYS IN HER EMAIL, "THE DRAFT SHOULD CONFIRM THE

10:36AM   19     SAMPLE VOLUME AND LIST OF ASSAYS THAT WILL BE AVAILABLE,

10:36AM   20     INCLUDING THE BREAKDOWN OF WHICH ONES WILL BE DONE THROUGH THE

10:36AM   21     CLIA LAB."

10:36AM   22          DO YOU SEE THAT?

10:36AM   23     A.   YES.

10:36AM   24     Q.   LET'S LOOK AT PAGE 4, AND IF WE CAN ZOOM IN ON THE DRAFT

10:36AM   25     EMAIL THAT YOU PREPARED.

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3961

10:36AM   1        AND HERE'S YOUR DRAFT EMAIL; IS THAT CORRECT?

10:36AM   2    A.   YES.

10:36AM   3    Q.   AND IF WE SCROLL DOWN A LITTLE BIT, WE SEE THAT YOU

10:36AM   4    INCLUDE THOSE LISTS.  ONE LIST THAT SAYS ASSAYS DEVELOPED ON

10:36AM   5    THERANOS DEVICES.

10:36AM   6        DO YOU SEE THAT?

10:37AM   7    A.   YES.

10:37AM   8    Q.   AND THE BOTTOM PORTION OF THIS PAGE.

10:37AM   9        AND THEN IF WE JUST GLANCE QUICKLY AT PAGE 5, AT THE TOP

10:37AM   10   THERE'S A SECTION WHERE YOU LIST "ASSAYS USING THIRD PARTY KIT

10:37AM   11   THROUGH THERANOS'S CLIA LAB."

10:37AM   12       DO YOU SEE THAT?

10:37AM   13   A.   YES.  I'M TAKING JUST WHAT DANIEL YOUNG HAD SAID IN THE

10:37AM   14   PREVIOUS EMAIL AND PUTTING THAT INTO AN EMAIL DRAFT.

10:37AM   15   Q.   SHOWING THE BREAKDOWN BETWEEN WHAT THERANOS COULD DO AND

10:37AM   16   WHAT IT NEEDED TO RELY ON KITS FOR; CORRECT?

10:37AM   17   A.   CORRECT.

10:37AM   18   Q.   AND LET'S LOOK AT PAGE 3 OF THIS EXHIBIT, AND LET'S ZOOM

10:37AM   19   IN ON THE TOP HALF OF THE PAGE.

10:37AM   20       DANIEL YOUNG SAYS HERE, "COMMENTS ON THE DRAFT."

10:37AM   21       HIS FIRST BULLET POINT SAYS, "WE SHOULD NOT DISTINGUISH IF

10:37AM   22   WE ARE USING THERANOS DEVICES/CHEMISTRY OR KITS.  WE CAN JUST

10:38AM   23   STAR SOME ASSAYS AS ONES THAT WILL BE RUN IN THE THERANOS CLIA

10:38AM   24   LAB (AND POSSIBLY NOTE THAT THE OTHERS WILL BE TRANSITIONED

10:38AM   25   INTO THE CLIA LAB OVER TIME)."

EDLIN DIRECT BY MR. BOSTIC (RES.)                              3962

| | | |
|---|---|---|
| 10:38AM | 1 | DO YOU SEE THAT? |
| 10:38AM | 2 | A.   YES. |
| 10:38AM | 3 | Q.   AND HE ALSO SAYS, FOR LANGUAGE READING, "PLEASE SEE BELOW |
| 10:38AM | 4 | FOR OUR LIST OF ASSAYS THAT WE PLAN TO DEVELOP BY MARCH.  WE |
| 10:38AM | 5 | SHOULD NOT MENTION THIS HERE, BUT JUST SAY THAT WE AIM TO |
| 10:38AM | 6 | DEPLOY IN THEIR TRIAL." |
| 10:38AM | 7 | DO YOU SEE THAT? |
| 10:38AM | 8 | A.   YES. |
| 10:38AM | 9 | Q.   LET'S LOOK AT PAGE 2 OF THIS EXHIBIT AND SEE YOUR REVISED |
| 10:38AM | 10 | DRAFT.  AND IF WE CAN ZOOM IN ON THE TOP PORTION.  AND LET'S |
| 10:38AM | 11 | CAPTURE A LITTLE BIT MORE SO WE CAN GET THE TEXT OF THE |
| 10:38AM | 12 | ASTERISK COMMENT. |
| 10:38AM | 13 | PERFECT.  THANK YOU. |
| 10:38AM | 14 | MR. EDLIN, IS THIS THE REVISED DRAFT THAT YOU PREPARED IN |
| 10:39AM | 15 | RESPONSE TO MR. YOUNG'S COMMENTS, OR DR. YOUNG'S COMMENTS? |
| 10:39AM | 16 | A.   YES. |
| 10:39AM | 17 | Q.   YOU SAY "HI VICKI. |
| 10:39AM | 18 | "PLEASE SEE BELOW FOR OUR LIST OF ASSAYS WHICH WE AIM TO |
| 10:39AM | 19 | DEPLOY IN YOUR TRIAL." |
| 10:39AM | 20 | AND NOW INSTEAD OF TWO LISTS, THERE'S ONE LIST; IS THAT |
| 10:39AM | 21 | CORRECT? |
| 10:39AM | 22 | A.   THAT'S RIGHT. |
| 10:39AM | 23 | Q.   AND THE LIST INCLUDES THE ASSAYS THAT WE PREVIOUSLY SAW |
| 10:39AM | 24 | COULD BE DONE ON THERANOS DEVICES AND THE ONES THAT NEEDED |
| 10:39AM | 25 | KITS; IS THAT CORRECT? |

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3963

10:39AM   1     A.   CORRECT.

10:39AM   2     Q.   AND THIS REVISED DRAFT EMAIL MAKES NO MENTION OF THIRD

10:39AM   3     PARTY KITS, THOUGH; IS THAT CORRECT?

10:39AM   4     A.   NO.  PER DANIEL YOUNG'S COMMENTS, IT SAYS BELOW THAT

10:39AM   5     OTHERS MAY BE TRANSITIONED INTO THE CLIA LAB OVER TIME.

10:39AM   6     Q.   LET'S LOOK AT THE TOP OF PAGE 1 OF THIS EXHIBIT.  AND THE

10:39AM   7     FINAL EMAIL IN THIS CHAIN IS FROM ELIZABETH HOLMES AND SHE

10:40AM   8     SAYS, IN CONNECTION WITH THESE CELGENE ASSAYS AND THE DRAFT

10:40AM   9     MESSAGE, "I AM ON BOARD WITH THIS.

10:40AM   10         "OK TO SEND OUT WITH DANIEL'S COMMENTS BELOW."

10:40AM   11         DO YOU SEE THAT?

10:40AM   12    A.   I DO.

10:40AM   13         AND THERE WAS ONE ADDITIONAL SUGGESTION FROM THE DRAFT

10:40AM   14    THAT WE JUST REVIEWED.

10:40AM   15    Q.   CORRECT.  THAT'S MENTIONED BELOW?

10:40AM   16    A.   RIGHT.

10:40AM   17    Q.   IN THE MIDDLE OF PAGE 1?

10:40AM   18    A.   RIGHT.

10:40AM   19    Q.   LET'S TAKE A QUICK LOOK AT THAT.

10:40AM   20         SO IN ADDITION TO DR. YOUNG'S PREVIOUS COMMENTS, HE MAKES

10:40AM   21    ANOTHER SUGGESTION ABOUT THE CONTENT OF YOUR DRAFT EMAIL;

10:40AM   22    CORRECT?

10:40AM   23    A.   CORRECT.

10:40AM   24    Q.   AND MS. HOLMES SIGNS OFF ON THE DRAFT EMAIL AND GIVES YOU

10:40AM   25    THE OKAY TO SEND IT?

EDLIN DIRECT BY MR. BOSTIC (RES.)                           3964

10:40AM  1      A.   YES.

10:40AM  2      Q.   OKAY.  WE CAN PUT THAT ASIDE.

10:40AM  3           DURING YOUR TIME AT THERANOS, DID YOU HAVE A ROLE IN

10:40AM  4      CONNECTION WITH THE MARKETING OF THE COMPANY'S SERVICES?

10:41AM  5      A.   I DID.

10:41AM  6      Q.   DID THAT ROLE INCLUDE ANY INPUT OR WORK ON THE PUBLIC

10:41AM  7      WEBSITE OF THE COMPANY?

10:41AM  8      A.   YES.

10:41AM  9      Q.   AND CAN YOU GIVE US AN OVERVIEW OF THAT WORK?

10:41AM 10      A.   SO THE COMPANY -- THERANOS WORKED WITH A NUMBER OF

10:41AM 11      DIFFERENT MARKETING AND/OR COMMUNICATIONS OR PUBLIC RELATIONS

10:41AM 12      COMPANIES IN THE LEAD UP TO THE COMMERCIAL LAUNCH WITH

10:41AM 13      WALGREENS AND THEREAFTER, AND I WORKED WITH THOSE COMPANIES

10:41AM 14      ALONGSIDE SOME OF THE MEMBERS OF THE PROJECT MANAGEMENT TEAM TO

10:41AM 15      INTERFACE WITH THEM, TRACK DELIVERABLES, MAKE SURE THAT THINGS

10:41AM 16      GOT COMPLETED.

10:41AM 17      Q.   DID YOU -- DID THAT WORK INCLUDE WORKING WITH MS. HOLMES

10:42AM 18      ON MARKETING FOR THE COMPANY?

10:42AM 19      A.   YES.  YEP.

10:42AM 20      Q.   GO AHEAD.  HOW DID, HOW DID YOU AND MS. HOLMES WORK OR

10:42AM 21      COLLABORATE IN CONNECTION WITH THAT TOPIC?

10:42AM 22      A.   ELIZABETH WORKED CLOSELY WITH THE MARKETING AGENCIES AND

10:42AM 23      THE PERSONNEL TO DISCUSS THE VISION AND ALSO STRATEGY FOR THE

10:42AM 24      CONTENT.

10:42AM 25      Q.   AND WHEN IT CAME TO THE WEBSITE SPECIFICALLY, WAS

EDLIN DIRECT BY MR. BOSTIC (RES.)                          3965

10:42AM  1   MS. HOLMES INVOLVED IN CREATING, REVIEWING, AND APPROVING THE

10:42AM  2   CONTENT?

10:42AM  3   A.   SHE WAS INVOLVED IN REVIEWING AND APPROVING.

10:42AM  4        AS FOR THE CREATING, USUALLY THE MARKETING AGENCIES WOULD

10:42AM  5   CREATE CONTENT BASED ON DISCUSSIONS THAT THEY DID HAVE WITH

10:42AM  6   ELIZABETH AND A GROUP OF PEOPLE.

10:42AM  7   Q.   FROM YOUR TIME AT THE COMPANY AND YOUR WORK ON THAT

10:43AM  8   PROJECT, HOW WOULD YOU CHARACTERIZE MS. HOLMES'S LEVEL OF

10:43AM  9   INVOLVEMENT IN REVIEWING AND APPROVING THAT CONTENT?  WAS SHE

10:43AM 10   VERY INVOLVED?  DETAIL ORIENTED?  WAS SHE KIND OF CHECKED OUT?

10:43AM 11   WHAT WAS YOUR EXPERIENCE?

10:43AM 12   A.   VERY INVOLVED AND DETAIL ORIENTED.

10:43AM 13        THERE WERE STEPS ALONG THE WAY IN TERMS OF DEVELOPMENT

10:43AM 14   THAT PROBABLY DIDN'T REACH HER REVIEW EVERY TIME.  BUT FOR THE

10:43AM 15   END PRODUCT AND WHAT ACTUALLY WENT ONTO THE WEBSITE, SHE DID

10:43AM 16   HAVE A HAND -- SHE DID REVIEW THAT.

10:43AM 17   Q.   I'LL ASK YOU TO LOOK AT EXHIBIT 3965 IN YOUR BINDER.  LET

10:43AM 18   ME KNOW ONCE YOU GET THERE.

10:44AM 19   A.   OKAY, I'M THERE.

10:44AM 20   Q.   AND DO YOU SEE AN EMAIL FROM JEFFREY BLICKMAN TO

10:44AM 21   MS. HOLMES, CC'ING SUNNY BALWANI AND YOU, ADDRESSING THE

10:44AM 22   CONTENT OF THE DRAFT THERANOS WEBSITE?

10:44AM 23   A.   YES.

10:44AM 24        MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

10:44AM 25   EXHIBIT 3965.

EDLIN DIRECT BY MR. BOSTIC (RES.)                                      3966

10:44AM   1        MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

10:44AM   2        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:44AM   3        (GOVERNMENT'S EXHIBIT 3965 WAS RECEIVED IN EVIDENCE.)

10:44AM   4        MR. BOSTIC:  IF WE COULD -- LET'S START WITH WHO IS

10:44AM   5   ON THIS EMAIL.

10:44AM   6   Q.   FIRST, WHO WAS JEFF BLICKMAN ON THIS EMAIL?

10:44AM   7   A.   JEFF BLICKMAN WAS A PROJECT MANAGER AND WE WERE ON THE

10:44AM   8   SAME TEAM.

10:44AM   9   Q.   IN HIS EMAIL, HE WRITES TO ELIZABETH SAYING, "HERE'S THE

10:44AM   10  PDF SCREENSHOT OF LATEST DOT COM" --

10:44AM   11       WAS THAT THE DRAFT WEBSITE?

10:44AM   12  A.   YES.

10:44AM   13  Q.   -- "TO SEND TO COUNSEL, ALONG WITH JIM'S (ABRIDGED)

10:45AM   14  FEEDBACK FROM TODAY, REMOVED ANYTHING BASED ON PERSONAL

10:45AM   15  OPINION."

10:45AM   16       DO YOU SEE THAT?

10:45AM   17  A.   YES.

10:45AM   18  Q.   AND THIS EMAIL WAS DATED SEPTEMBER 4TH, 2013; IS THAT

10:45AM   19  RIGHT?

10:45AM   20  A.   THAT'S RIGHT.

10:45AM   21  Q.   AND WHEN WAS THE WEBSITE GOING TO GO PUBLIC?  OR WHEN WERE

10:45AM   22  THOSE CHANGES GOING TO TAKE EFFECT, IF YOU KNOW?

10:45AM   23  A.   THESE CHANGES WERE INTENDED TO GO PUBLIC AT THE SAME TIME,

10:45AM   24  OR THE NIGHT BEFORE THE WALGREENS, THE FIRST WALGREENS STORED

10:45AM   25  OPENED.

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3967

| | | |
|---|---|---|
| 10:45AM | 1 | Q.   SO WITHIN A WEEK OR SO OF THE DATE OF THE EMAIL THAT WE'RE |
| 10:45AM | 2 | LOOKING AT, APPROXIMATELY? |
| 10:45AM | 3 | A.   I'M NOT SURE OF THE EXACT DATE, SO IT COULD BE NINE DAYS |
| 10:45AM | 4 | OR TEN DAYS.  BUT IN THAT GENERAL TIMEFRAME. |
| 10:45AM | 5 | Q.   IN THESE COMMENTS THAT ARE BEING PASSED ON TO MS. HOLMES, |
| 10:45AM | 6 | QUESTION 1 SAYS, "WHAT IS THE SOURCE/BACKUP DATA FOR 'AT |
| 10:45AM | 7 | THERANOS, WE CAN PERFORM ALL LAB TESTS ON A SAMPLE 1/1,000TH |
| 10:46AM | 8 | THE SIZE OF A TYPICAL BLOOD DRAW.'" |
| 10:46AM | 9 | DO YOU SEE THAT? |
| 10:46AM | 10 | A.   YES. |
| 10:46AM | 11 | Q.   POINT NUMBER 2 SAYS, FOR THE CONTENT, "OUR REVOLUTION/OUR |
| 10:46AM | 12 | TECHNOLOGY," AND THE QUOTE, "A TINY DROP IS ALL IT TAKES.  WE |
| 10:46AM | 13 | OFTEN USE MORE THAN ONE DROP, SO WE SHOULD SAY," AND THEN THERE |
| 10:46AM | 14 | ARE SOME ALTERNATIVES INCLUDED. |
| 10:46AM | 15 | DO YOU SEE THAT? |
| 10:46AM | 16 | A.   YES. |
| 10:46AM | 17 | Q.   AND DO YOU KNOW WHETHER THESE CHANGES WERE IMPLEMENTED ON |
| 10:46AM | 18 | THE THERANOS PUBLIC WEBSITE? |
| 10:46AM | 19 | A.   I DON'T RECALL SPECIFICALLY. |
| 10:46AM | 20 | Q.   LET'S LOOK AT PAGE 4 OF THIS EXHIBIT.  LET'S ZOOM IN ON |
| 10:46AM | 21 | THE TOP PORTION AND SEE IF WE CAN GET THE TEXT TO SHOW UP. |
| 10:46AM | 22 | IS THIS A PAGE FROM THE DRAFT THERANOS WEBSITE AS IT |
| 10:46AM | 23 | EXISTED AT THE TIME OF THE EMAIL THAT WE'VE BEEN LOOKING AT? |
| 10:46AM | 24 | A.   YES, I BELIEVE SO. |
| 10:46AM | 25 | Q.   HERE UNDER THE GRAPHIC AND THE TEXT, THE LAB TESTS |

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3968

| | | |
|---|---|---|
| 10:47AM | 1 | REINVENTED, DO YOU SEE THERE'S TEXT THAT SAYS, "AT THERANOS WE |
| 10:47AM | 2 | CAN PERFORM ALL LAB TESTS ON A SAMPLE 1/1,000TH THE SIZE OF A |
| 10:47AM | 3 | TYPICAL BLOOD DRAW." |
| 10:47AM | 4 | A.   YES. |
| 10:47AM | 5 | Q.   IS THAT THE TEXT THAT WAS BEING ADDRESSED IN THE COMMENT |
| 10:47AM | 6 | THAT WE JUST LOOKED AT? |
| 10:47AM | 7 | A.   YES. |
| 10:47AM | 8 | Q.   I JUST WANT TO POINT OUT TO YOU A COUPLE OF OTHER THINGS |
| 10:47AM | 9 | ON THIS PAGE. |
| 10:47AM | 10 | FIRST, JUST BELOW THAT, DO YOU SEE SOME TEXT READING, "A |
| 10:47AM | 11 | TINY DROP IS ALL IT TAKES"? |
| 10:47AM | 12 | A.   YES. |
| 10:47AM | 13 | Q.   AND THEN IF WE ZOOM OUT.  AND ZOOM IN ON THE PORTION |
| 10:47AM | 14 | READING 10 PERCENT.  SORRY, A LITTLE HIGHER TO THE LEFT WHERE |
| 10:47AM | 15 | IT SAYS, "HIGHEST LEVELS OF ACCURACY." |
| 10:47AM | 16 | DO YOU SEE THAT PORTION? |
| 10:47AM | 17 | A.   YES. |
| 10:47AM | 18 | Q.   IF I COULD ASK YOU NOW TO TURN TO EXHIBIT 3981. |
| 10:48AM | 19 | A.   OKAY. |
| 10:48AM | 20 | Q.   AND ARE WE LOOKING NOW AT AN EMAIL CHAIN INCLUDING YOU AND |
| 10:48AM | 21 | OTHER INDIVIDUALS AT THERANOS ALSO ON THE TOPIC OF WEBSITE |
| 10:48AM | 22 | COMMENTS? |
| 10:48AM | 23 | A.   YES.  I'M ON THE LAST EMAIL OF THIS CHAIN. |
| 10:48AM | 24 | MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS |
| 10:48AM | 25 | EXHIBIT 3981. |

EDLIN DIRECT BY MR. BOSTIC (RES.)                              3969

10:48AM   1              MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

10:48AM   2              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:48AM   3          (GOVERNMENT'S EXHIBIT 3981 WAS RECEIVED IN EVIDENCE.)

10:48AM   4              MR. BOSTIC:  LET'S ZOOM IN ON THE BOTTOM HALF OF

10:48AM   5     THIS PAGE.

10:48AM   6     Q.   MR. EDLIN, DO YOU SEE AN EMAIL FROM KATE BEARDSLEY TO

10:48AM   7     ELIZABETH HOLMES?

10:48AM   8     A.   YES.

10:48AM   9     Q.   AND MS. BEARDSLEY'S EMAIL ADDRESS IS @BEARDSLEYLAWPLLC.

10:49AM  10          DO YOU SEE THAT?

10:49AM  11     A.   YES.

10:49AM  12     Q.   AND WHO WAS KATE BEARDSLEY?

10:49AM  13     A.   I DON'T BELIEVE I KNEW HER.

10:49AM  14     Q.   AND SHE WROTE IN HER EMAIL, "I AM FORWARDING THE

10:49AM  15     HYMAN, PHELPS COMMENTS."

10:49AM  16          DO YOU SEE THAT?

10:49AM  17     A.   YES.

10:49AM  18     Q.   AND DO YOU KNOW WHAT HYMAN, PHELPS WAS?

10:49AM  19     A.   I DON'T RECALL.

10:49AM  20     Q.   I'LL DRAW YOUR ATTENTION TO AN EMAIL BELOW THAT FROM

10:49AM  21     SOMEONE NAMED JAMIE WOLSZON.

10:49AM  22          DO YOU SEE THAT?

10:49AM  23     A.   YES.

10:49AM  24     Q.   AND DO YOU REMEMBER WHO THAT WAS?

10:49AM  25     A.   NO.

EDLIN DIRECT BY MR. BOSTIC (RES.)                          3970

```
10:49AM    1    Q.   IN JAMIE'S EMAIL, WE SEE, "PLEASE FIND BELOW MY COMMENTS

10:49AM    2    TO THE THERANOS WEBSITE.  SEVERAL OF THESE COMMENTS REPEAT

10:49AM    3    THROUGHOUT THE WEBSITE SO I DO NOT NECESSARILY MENTION EACH

10:49AM    4    INSTANCE.  AS DISCUSSED, THEY FALL WITHIN THE CATEGORIES OF

10:49AM    5    SUBSTANTIATION FOR SUPERLATIVE OR COMPARATIVE PERFORMANCE

10:49AM    6    CLAIMS," AND OTHER TOPICS.

10:50AM    7         DO YOU SEE THAT?

10:50AM    8    A.   YES.

10:50AM    9    Q.   LET'S TURN THE PAGE AND GO TO PAGE 2.

10:50AM   10         IF WE CAN ZOOM IN ON THE TOP PORTION.

10:50AM   11         DO YOU SEE NOW WE'RE LOOKING AT BULLET COMMENTS GIVING

10:50AM   12    FEEDBACK TO THE DRAFT BEFORE IT IS LAUNCHED?

10:50AM   13    A.   YES.

10:50AM   14    Q.   AND LET'S LOOK AT SOME OF THESE POINTS OF FEEDBACK.

10:50AM   15         THE TOP ONE SAYS, "PLEASE REMOVE REFERENCES TO 'ALL' TESTS

10:50AM   16    AND REPLACE WITH STATEMENTS SUCH AS 'MULTIPLE' OR 'SEVERAL.'

10:50AM   17    IT IS HIGHLY UNLIKELY THAT THE LABORATORY CAN PERFORM EVERY

10:50AM   18    CONCEIVABLE TEST BOTH FROM A LOGISTICAL STANDPOINT AND BECAUSE

10:50AM   19    THE CLIA CERTIFICATION DESIGNATES SPECIFIC SPECIALTIES OF TESTS

10:50AM   20    THE LAB PERFORMS."

10:50AM   21         DO YOU SEE THAT COMMENT?

10:51AM   22    A.   YES.

10:51AM   23    Q.   AND JUST BELOW THAT THERE ANOTHER COMMENT THAT SAYS, "FOR

10:51AM   24    A SIMILAR REASON, REPLACE 'FULL RANGE' WITH 'BROAD RANGE.'"

10:51AM   25         DO YOU SEE THAT?
```

EDLIN DIRECT BY MR. BOSTIC (RES.)                                     3971

10:51AM  1    A.   YES.

10:51AM  2    Q.   AND DO YOU KNOW WHETHER THESE COMMENTS WERE IMPLEMENTED ON

10:51AM  3    THE THERANOS WEBSITE?

10:51AM  4    A.   I DON'T RECALL SPECIFICALLY.

10:51AM  5    Q.   AND DO YOU RECALL A DISCUSSION WITH MS. HOLMES ABOUT THIS

10:51AM  6    FEEDBACK?

10:51AM  7    A.   NO.

10:51AM  8    Q.   LET'S GO DOWN A LITTLE BIT.  THERE'S A BULLET THAT SAYS

10:51AM  9    REPLACE, AND IT SAYS, "REPLACE 'FASTER AND EASIER' WITH 'FAST

10:51AM 10    AND EASY.'"

10:51AM 11         DO YOU SEE THAT CHANGE?

10:51AM 12    A.   YES:

10:51AM 13    Q.   THERE'S A SUGGESTION BELOW IT, OR A REQUEST TO REPLACE

10:51AM 14    THE, QUOTE, "'HIGHEST QUALITY' WITH 'HIGH QUALITY.'"

10:51AM 15         DO YOU SEE THAT?

10:51AM 16    A.   YES.

10:51AM 17    Q.   AND LET'S ZOOM BACK OUT AND ZOOM BACK IN ON THE BOTTOM

10:51AM 18    HALF OF THIS PAGE.

10:52AM 19         AND DO YOU SEE THERE IS A QUESTION THAT SAYS, "WHAT

10:52AM 20    SUBSTANTIATION DO YOU HAVE FOR 'HAVE RESULTS TO YOU AND YOUR

10:52AM 21    DOCTOR FASTER THAN PREVIOUSLY POSSIBLE?'"

10:52AM 22    A.   YES.

10:52AM 23    Q.   AND THERE'S ALSO ANOTHER COMMENT SIMILAR TO WHAT WE SAW

10:52AM 24    BEFORE, THIRD FROM THE BOTTOM, THAT SAYS, "REPLACE 'HIGHEST

10:52AM 25    LEVELS OF ACCURACY' WITH 'HIGH LEVELS OF ACCURACY.'"

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3972

10:52AM   1          DO YOU SEE THAT?

10:52AM   2     A.   YES.

10:52AM   3     Q.   LET'S GO TO THE NEXT PAGE, PAGE 3, AND WE'LL JUST

10:52AM   4     HIGHLIGHT A FEW MORE POINTS OF FEEDBACK HERE.

10:52AM   5          DO YOU SEE THE THIRD ONE DOWN SAYS, "CHANGE 'MORE PRECISE'

10:52AM   6     TO 'PRECISE'"?

10:52AM   7     A.   YES.

10:52AM   8     Q.   AND LET'S ZOOM IN ON THE BOTTOM HALF OF THIS PAGE.

10:53AM   9          DO YOU SEE, THIRD FROM THE BOTTOM, THERE'S A REQUEST TO

10:53AM  10     "REMOVE REFERENCES TO ONCOLOGY AND PEDIATRICS - THIS INCREASES

10:53AM  11     RISK."

10:53AM  12          DO YOU SEE THAT?

10:53AM  13     A.   YES.

10:53AM  14     Q.   AND FINALLY, LET'S GO TO PAGE 4 OF THIS EXHIBIT.  AT THE

10:53AM  15     TOP THERE IT SAYS, "ENSURE SUBSTANTIATION FOR 'UNPRECEDENTED

10:53AM  16     SPEED AND ACCURACY.'"

10:53AM  17          DO YOU SEE THAT?

10:53AM  18     A.   YES.

10:53AM  19     Q.   AND IS THIS A REQUEST, IN OTHER WORDS, TO MAKE SURE

10:53AM  20     THERE'S BACKUP FOR THAT CLAIM?

10:53AM  21     A.   I THINK SUBSTANTIATION AND BACKUP ARE PROBABLY SYNONYMS

10:53AM  22     HERE.

10:53AM  23     Q.   AND FINALLY, LET'S LOOK AT THE BOTTOM OF THIS LIST, AND

10:53AM  24     THE SECOND BULLET FROM THE BOTTOM, WHICH SAYS, "REMOVE

10:53AM  25     'UNRIVALLED ACCURACY.'"

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3973

10:54AM   1        DO YOU SEE THAT?

10:54AM   2   A.   YES.

10:54AM   3   Q.   AND LET'S LOOK AT A SIMILAR EMAIL FROM A LITTLE BIT

10:54AM   4   EARLIER.  LET'S LOOK AT 5438.

10:54AM   5        FOR THE COURT'S REFERENCE AND COUNSEL'S REFERENCE, THIS

10:54AM   6   MIGHT BE INSIDE THE RED WELD INSIDE OF THE BINDER?

10:54AM   7             THE COURT:  THANK YOU.

10:54AM   8             THE WITNESS:  I SEE THAT.

10:54AM   9   BY MR. BOSTIC:

10:54AM  10   Q.   IS EXHIBIT 5438 AN EMAIL CHAIN INCLUDING YOU, MS. HOLMES,

10:54AM  11   AND OTHERS AT THERANOS ABOUT THE WEBSITE CONTENT?

10:54AM  12   A.   YES.

10:54AM  13             MR. BOSTIC:  YOUR HONOR, I OFFER EXHIBIT 5438.

10:55AM  14             MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

10:55AM  15             THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

10:55AM  16        (GOVERNMENT'S EXHIBIT 5438 WAS RECEIVED IN EVIDENCE.)

10:55AM  17             MR. BOSTIC:  AND LET'S START BY ZOOMING IN ON THE

10:55AM  18   BOTTOM HALF OF THE PAGE.

10:55AM  19   Q.   MR. EDLIN, DO YOU SEE THAT AT THE BOTTOM OF THE PAGE

10:55AM  20   THERE'S AN EMAIL FROM YOU TO MS. HOLMES ABOUT WEBSITE CONTENT?

10:55AM  21   A.   YES.

10:55AM  22   Q.   AND AT THE TOP OF THE SELECTION SHE SAYS, "THEY SHOULD NOT

10:55AM  23   USE THE WORLD UNRIVALLED IN ACCURACY AS WE'VE DISCUSSED MANY

10:55AM  24   TIMES."

10:55AM  25        DO YOU SEE THAT?

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3974

```
10:55AM   1    A.   YES.

10:55AM   2    Q.   AND THEN LET'S LOOK AT YOUR EMAIL IN RESPONSE IN THE TOP

10:55AM   3    PORTION OF THE PAGE.

10:56AM   4         AND YOU RESPOND WITH WHAT YOU SAY ARE SOME SUGGESTIONS

10:56AM   5    INSTEAD OF UNRIVALLED ACCURACY.

10:56AM   6         DO YOU SEE THAT?

10:56AM   7    A.   YES.

10:56AM   8    Q.   AND ONE SAYS UNRIVALLED QUALITY?

10:56AM   9    A.   YES.

10:56AM  10    Q.   AND WHAT WAS THE THINKING IN SUGGESTING "QUALITY" INSTEAD

10:56AM  11    OF "ACCURACY," IF YOU RECALL?

10:56AM  12    A.   I DON'T RECALL.

10:56AM  13    Q.   AND DID YOU VIEW THOSE TERMS AS SYNONYMOUS?

10:56AM  14    A.   YES.

10:56AM  15    Q.   AND LET'S GO BACK TO MS. HOLMES'S EMAIL IN THE MIDDLE OF

10:56AM  16    THE PAGE.

10:56AM  17         SHE SAYS AT THE BOTTOM OF THAT SELECTION, "IN AUTO REFLEX

10:56AM  18    TESTING, WE SHOULD ADD A LINE ABOUT BECAUSE WE CAN RUN THE FULL

10:56AM  19    RANGE OF ASSAYS FROM A SINGLE MICRO-SAMPLE."

10:56AM  20         DO YOU SEE THAT CLAIM?

10:56AM  21    A.   I DO.

10:56AM  22    Q.   AND WE CAN PUT THAT ONE ASIDE.

10:56AM  23         YOUR HONOR, IF THE COURT WANTED TO BREAK AT 11:00, I'M

10:57AM  24    ABOUT TO MOVE TO A DIFFERENT TOPIC.

10:57AM  25              THE COURT:  LET'S DO THAT NOW.  LET'S TAKE OUR
```

EDLIN DIRECT BY MR. BOSTIC (RES.)                              3975

```
10:57AM   1    BREAK.  IT WILL BE ABOUT 30 MINUTES, 30 MINUTES.

10:57AM   2         AND, LADIES AND GENTLEMEN, I THOUGHT WE WOULD GO UNTIL

10:57AM   3    3:00 TODAY.  IS THAT ALL RIGHT?  ANY ONE IN THE JURY WITH AN

10:57AM   4    OBJECTION TO THAT?

10:57AM   5         I SEE NO HANDS.  THANK YOU.

10:57AM   6         WE'LL GO UNTIL 3:00 TODAY, MAYBE 4:00 TOMORROW.  IF YOU

10:57AM   7    COULD CHECK WITH YOUR NEEDS AND I'LL ASK YOU AT THE END OF

10:57AM   8    TODAY WHETHER OR NOT WE CAN DO THAT.

10:57AM   9         LET'S TAKE OUR BREAK NOW.  THANKS VERY MUCH.

10:58AM  10         (JURY OUT AT 10:58 A.M.)

10:58AM  11            THE COURT:  PLEASE BE SEATED.  THANK YOU.

10:58AM  12         THE RECORD SHOULD REFLECT --

10:58AM  13         AND YOU CAN STAND DOWN, SIR.

10:58AM  14            THE WITNESS:  THANK YOU.

10:58AM  15            THE COURT:  THANK YOU.  OUR JURY HAS LEFT.  ALL

10:58AM  16    COUNSEL AND MS. HOLMES ARE PRESENT, AND THE WITNESS HAS LEFT

10:58AM  17    THE COURTROOM.  MR. EDLIN HAS LEFT.

10:58AM  18         ANYTHING FURTHER, MR. BOSTIC, BEFORE WE BREAK?

10:58AM  19            MR. BOSTIC:  NO, YOUR HONOR.  THANK YOU.

10:58AM  20            THE COURT:  MR. DOWNEY?

10:58AM  21            MR. DOWNEY:  NO, YOUR HONOR.

10:58AM  22         JUST OUTSIDE OF THE PRESENCE OF THE JURY, ON THE ISSUE I

10:58AM  23    RAISED, THE ISSUE RELATED TO PERSONAL HEALTH INFORMATION, IT'S

10:58AM  24    COMPLEX WITH THESE EXHIBITS.

10:58AM  25         SO THERE WERE TWO INDIVIDUALS WITH WHOM MR. BOSTIC IN HIS
```

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3976

10:58AM   1   QUESTIONING ASSOCIATED RESULTS WHICH WERE THEN DISCUSSED IN THE

10:58AM   2   EMAILS THAT HE WAS MENTIONING.

10:58AM   3       YOU KNOW, IT MAY NOT BE A SUFFICIENT CONNECTION, BUT THE

10:59AM   4   APPROACH WITH A DIFFERENT EMAIL WAS TO TAKE THE SAME KIND OF

10:59AM   5   INFORMATION AND MAKE ALL OF THE DOCUMENTS THEN CONSISTENT WITH

10:59AM   6   ANY FORM OF DISCLOSURE AND HE DIDN'T USE THE PATIENT'S NAME.

10:59AM   7       WE SHOULD JUST HAVE A CONSISTENT APPROACH, AND WHATEVER

10:59AM   8   APPROACH THE COURT PREFERS IS FINE WITH ME.

10:59AM   9           THE COURT:  MR. BOSTIC?

10:59AM  10           MR. BOSTIC:  SO, YOUR HONOR, I'M NOT SURE -- I

10:59AM  11   APPRECIATE WHERE COUNSEL IS COMING FROM, AND THIS IS AN ISSUE

10:59AM  12   THAT IS VERY IMPORTANT TO THE COURT AND BOTH PARTIES.

10:59AM  13       A CONSISTENT APPROACH ISN'T POSSIBLE HERE, OR NOT THE BEST

10:59AM  14   WAY TO GO BECAUSE DIFFERENT EXHIBITS ARE OFFERED FOR DIFFERENT

10:59AM  15   PURPOSES.

10:59AM  16       SOMETIMES IT'S IMPORTANT TO KNOW THAT A CERTAIN INDIVIDUAL

10:59AM  17   WHO ENDED UP INVESTING IN THE COMPANY CAME IN FOR A

10:59AM  18   DEMONSTRATION, AND THAT DEMONSTRATION WAS RUN ON NON-THERANOS

10:59AM  19   EQUIPMENT.

10:59AM  20       AT OTHER TIMES THE IDENTITY OF THE PERSON MIGHT BE BESIDE

10:59AM  21   THE POINT AND THE RESULTS MIGHT BE MORE IMPORTANT BECAUSE THEY

10:59AM  22   HIGHLIGHT ISSUES THAT THERANOS WAS HAVING WITH THE EQUIPMENT

11:00AM  23   THAT WERE ELEVATED OR KNOWN BY MS. HOLMES.

11:00AM  24       SO IN THOSE TWO SITUATIONS, DIFFERENT PORTIONS OF THE

11:00AM  25   DOCUMENTS WOULD BE REDACTED.

| | | |
|---|---|---|
| 11:00AM | 1 | IT'S THE GOVERNMENT'S APPROACH TO TRY TO MAKE SURE THAT AT |
| 11:00AM | 2 | NO POINT ARE WE PUBLICIZING SOMEONE'S IDENTITY ALONG WITH |
| 11:00AM | 3 | SENSITIVE HEALTH INFORMATION, BUT BECAUSE OF THE NATURE OF THIS |
| 11:00AM | 4 | CASE -- |
| 11:00AM | 5 | THE COURT:  RIGHT.  I CAPTURE THAT DISTINCTION, AND |
| 11:00AM | 6 | I THINK YOU DO, TOO, MR. DOWNEY.  DIFFERENT PURPOSES COMING IN. |
| 11:00AM | 7 | BUT I DO APPRECIATE THAT WE SHOULD HAVE SOME PROPHYLACTIC |
| 11:00AM | 8 | MEASURES FOR RELEASE OF PII AND HEALTH INFORMATION.  THAT'S |
| 11:00AM | 9 | CRITICAL.  WE DON'T WANT TO HAVE A MISTAKE ON THAT. |
| 11:00AM | 10 | AND SOMETIMES, AS WE NOTED, YOU AND I, MR. DOWNEY, HAVE |
| 11:00AM | 11 | BINDERS THAT HAVE UNREDACTED, I THINK, INFORMATION, AND THE |
| 11:00AM | 12 | GOVERNMENT IS, IN THEIR EXAMINATION, USING PERHAPS THE SAME |
| 11:00AM | 13 | DOCUMENTS. |
| 11:00AM | 14 | BUT THE ONES THAT ACTUALLY GET ADMITTED AND PUBLISHED WILL |
| 11:00AM | 15 | HAVE REDACTIONS.  I'M TAKING IT ON GOOD FAITH FROM BOTH SIDES |
| 11:01AM | 16 | THAT THAT IS GOING TO OCCUR. |
| 11:01AM | 17 | MR. BOSTIC:  THAT'S CORRECT, YOUR HONOR. |
| 11:01AM | 18 | AND JUST TO BE CLEAR, THE VERSION APPEARING ON THE COURT'S |
| 11:01AM | 19 | SCREEN IS THE SAME VERSION THAT IS BEING SHOWN TO THE JURY AND |
| 11:01AM | 20 | THE VERSION THAT SHOULD CONTAIN THE REDACTIONS THAT WE'VE PUT |
| 11:01AM | 21 | IN PLACE. |
| 11:01AM | 22 | THE COURT:  RIGHT.  THAT'S HOW I THINK WE HAVE BEEN |
| 11:01AM | 23 | PROCEEDING. |
| 11:01AM | 24 | MR. DOWNEY:  TO BE SURE, THE EXHIBITS ARE REDACTED, |
| 11:01AM | 25 | AND TO BE SURE, MR. BOSTIC IS DOING THE BEST HE CAN, AS WE ARE, |

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3978

11:01AM   1     AND NO ONE --

11:01AM   2               THE COURT:  SURE.

11:01AM   3               MR. DOWNEY:  -- IS PERFECT WITH THIS.

11:01AM   4         THE ISSUE, THOUGH, IS A LITTLE DIFFERENT.  THE ISSUE IS

11:01AM   5     THERE WAS A NAME IN THE QUESTIONING ABOUT WALGREENS, FOR

11:01AM   6     EXAMPLE.  ONE COULD PUT TOGETHER THE DISCUSSION OF THE TEST

11:01AM   7     RESULTS IN THE EMAIL AND ASSOCIATE IT WITH THAT NAME AND KNOW

11:01AM   8     WHAT RESULTS WERE.

11:01AM   9         NOW, I SHOULD SAY THAT THESE DEMONSTRATIONS AREN'T DONE

11:01AM  10     FOR CLINICAL PURPOSES AND SO IN A SENSE THEY MAY NOT -- THE

11:01AM  11     ISSUE MAY NOT MATTER.

11:01AM  12         BUT, FOR EXAMPLE, WITH ANOTHER OF THE INDIVIDUALS WITH THE

11:02AM  13     LATE DECEMBER 2015 EMAIL, I DON'T HAVE THE NUMBER, THAT -- THE

11:02AM  14     NAME WAS REMOVED AND THE RESULT -- IN ALL RELEVANT PLACES, SO

11:02AM  15     IT WAS JUST A DIFFERENT APPROACH.

11:02AM  16         I THINK WE SHOULD JUST DO THE BEST WE CAN, AND I'M NOT,

11:02AM  17     CERTAINLY NOT CRITICIZING --

11:02AM  18               THE COURT:  RIGHT.

11:02AM  19               MR. DOWNEY:  -- MR. BOSTIC IN ANY WAY.

11:02AM  20         I JUST WANT TO BE CAUTIOUS BECAUSE OF THE OBVIOUS ISSUES.

11:02AM  21               THE COURT:  RIGHT.  THANK YOU FOR THAT.

11:02AM  22         AND THE COURT NEEDS TO BE COGNIZANT OF THAT AS WELL.

11:02AM  23         I DO UNDERSTAND THAT THE DOCUMENTS SOMETIMES ARE USED FOR

11:02AM  24     DIFFERENT PURPOSES, AND THAT'S WHERE THERE -- WE HAVE TO TRACK

11:02AM  25     THAT.  IT SOUNDS LIKE BOTH OF YOU HAVE RECOGNIZED THAT AND THE

EDLIN DIRECT BY MR. BOSTIC (RES.)                                3979

| | | |
|---|---|---|
| 11:02AM | 1 | EXHIBITS THAT YOU INTEND TO OFFER, THE PURPOSES THAT THEY'RE |
| 11:02AM | 2 | BEING OFFERED FOR AND THE NEEDS OF REDACTION, OR NOT, AS TO |
| 11:02AM | 3 | THOSE DOCUMENTS. |
| 11:02AM | 4 | I'M SURE YOU HAVE THE SAME ISSUES, BUT I APPRECIATE BOTH |
| 11:02AM | 5 | SIDES' ATTENTION TO THIS. |
| 11:02AM | 6 | MR. DOWNEY:  THERE'S NO QUESTION IT'S A DIFFICULT |
| 11:02AM | 7 | ISSUE. |
| 11:02AM | 8 | THE COURT:  RIGHT.  IT IS INDEED.  ALL RIGHT.  THANK |
| 11:03AM | 9 | YOU. |
| 11:03AM | 10 | MR. DOWNEY:  THANK YOU, YOUR HONOR. |
| 11:03AM | 11 | THE CLERK:  COURT IS IN RECESS. |
| 11:03AM | 12 | (RECESS FROM 11:03 A.M. UNTIL 11:37 A.M.) |
| 11:37AM | 13 | (JURY IN AT 11:37 A.M.) |
| 11:37AM | 14 | THE COURT:  ALL RIGHT.  THANK YOU.  THANK YOU FOR |
| 11:37AM | 15 | YOUR PATIENCE.  WE'RE BACK ON THE RECORD.  ALL PARTIES |
| 11:37AM | 16 | PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN. |
| 11:37AM | 17 | MR. BOSTIC. |
| 11:37AM | 18 | MR. BOSTIC:  THANK YOU, YOUR HONOR. |
| 11:37AM | 19 | Q.   MR. EDLIN, DURING YOUR TIME WORKING AT THERANOS, DID YOU |
| 11:37AM | 20 | HAVE ANY CONTACT WITH JOURNALISTS WHO WERE COVERING THE |
| 11:37AM | 21 | COMPANY? |
| 11:37AM | 22 | A.   YES. |
| 11:37AM | 23 | Q.   AND HOW DID THAT COME TO BE?  WHAT WAS YOUR ROLE IN |
| 11:37AM | 24 | CONNECTION WITH DEALING WITH JOURNALISTS? |
| 11:37AM | 25 | A.   INITIALLY JOURNALISTS WOULD SEND EMAILS TO THE COMPANY |

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3980

| | | |
|---|---|---|
| 11:37AM | 1 | REQUESTING MEETINGS OR THAT THEY WERE INTERESTED IN DOING A |
| 11:37AM | 2 | PIECE, AND I WOULD INTERFACE AND OFTEN HELP COORDINATE THEIR |
| 11:38AM | 3 | VISITS. |
| 11:38AM | 4 | Q.  IN THAT ROLE, DID YOU COME TO HAVE ANY CONTACT WITH A |
| 11:38AM | 5 | REPORTER NAMED JOSEPH RAGO FROM "THE WALL STREET JOURNAL"? |
| 11:38AM | 6 | A.  I DO RECALL THAT HE, THAT HE DID VISIT.  I DON'T BELIEVE |
| 11:38AM | 7 | THAT I COMMUNICATED WITH HIM FOR THAT VISIT. |
| 11:38AM | 8 | Q.  YOU RECALL HIM VISITING THERANOS? |
| 11:38AM | 9 | A.  YES. |
| 11:38AM | 10 | Q.  DO YOU RECALL HIM INTERVIEWING MS. HOLMES? |
| 11:38AM | 11 | A.  YES. |
| 11:38AM | 12 | Q.  I'LL ASK YOU -- |
| 11:38AM | 13 | A.  I WASN'T PRESENT FOR THE INTERVIEW, BUT I DO RECALL THAT |
| 11:38AM | 14 | HE DID THAT. |
| 11:38AM | 15 | Q.  OKAY.  UNDERSTOOD. |
| 11:38AM | 16 | DO YOU RECALL APPROXIMATELY WHEN HE WAS WORKING ON A STORY |
| 11:38AM | 17 | REGARDING THERANOS? |
| 11:38AM | 18 | A.  IT WAS, I BELIEVE, WITHIN TWO TO THREE WEEKS OF THE |
| 11:38AM | 19 | WALGREENS LAUNCH. |
| 11:38AM | 20 | Q.  SO APPROXIMATELY SEPTEMBER OF 2013? |
| 11:38AM | 21 | A.  YES. |
| 11:38AM | 22 | Q.  I'LL ASK YOU TO LOOK AT EXHIBIT 1090 IN THE BINDER IN |
| 11:38AM | 23 | FRONT OF YOU. |
| 11:39AM | 24 | AND FOR THE COURT AND THE DEFENSE, THIS MIGHT BE IN THE |
| 11:39AM | 25 | RED WELD. |

EDLIN DIRECT BY MR. BOSTIC (RES.)                                3981

| | | |
|---|---|---|
| 11:39AM | 1 | THE COURT:  THANK YOU. |
| 11:39AM | 2 | THE WITNESS:  OKAY.  I SEE IT. |
| 11:39AM | 3 | BY MR. BOSTIC: |
| 11:39AM | 4 | Q.   YOU'RE LOOKING AT EXHIBIT 1090? |
| 11:39AM | 5 | A.   YES. |
| 11:39AM | 6 | Q.   IS IT AN EMAIL CHAIN INCLUDING YOU, ELIZABETH HOLMES, |
| 11:39AM | 7 | SUNNY BALWANI, AND OTHERS AT THERANOS REGARDING THE CONTENT OF |
| 11:39AM | 8 | THAT JOSEPH RAGO ARTICLE? |
| 11:39AM | 9 | A.   YES. |
| 11:39AM | 10 | MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS |
| 11:39AM | 11 | EXHIBIT 1090. |
| 11:39AM | 12 | MR. DOWNEY:  NO OBJECTION, YOUR HONOR. |
| 11:39AM | 13 | THE COURT:  DO YOU HAVE IT, MR. DOWNEY? |
| 11:39AM | 14 | MR. DOWNEY:  I HAVE IT. |
| 11:39AM | 15 | THE COURT:  OKAY. |
| 11:39AM | 16 | MR. DOWNEY:  YOUR HONOR, MAY I JUST DOUBLE-CHECK |
| 11:39AM | 17 | WITH MR. BOSTIC? |
| 11:40AM | 18 | THE COURT:  SURE. |
| 11:40AM | 19 | (DISCUSSION OFF THE RECORD.) |
| 11:40AM | 20 | THE COURT:  I THINK I DO. |
| 11:40AM | 21 | IT WILL BE ADMITTED.  IT MAY BE PUBLISHED.  I DON'T THINK |
| 11:40AM | 22 | I HAVE A COPY IN THE BINDER OR THE RED WELD, BUT IT MAY HAVE |
| 11:40AM | 23 | BEEN -- |
| 11:40AM | 24 | THE CLERK:  (HANDING.) |
| 11:40AM | 25 | MR. BOSTIC:  APOLOGIES FOR THAT, YOUR HONOR. |

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3982

11:40AM   1              THE COURT:  THANK YOU.  IT'S ADMITTED, AND IT MAY BE

11:40AM   2       PUBLISHED.

11:40AM   3              (GOVERNMENT'S EXHIBIT 1090 WAS RECEIVED IN EVIDENCE.)

11:40AM   4       BY MR. BOSTIC:

11:40AM   5       Q.   MR. EDLIN, I'D DIRECT YOUR ATTENTION TO THE BOTTOM HALF,

11:40AM   6       IF WE CAN ZOOM IN, THE BOTTOM HALF OF PAGE 1.

11:40AM   7              AND DO YOU SEE AN EMAIL FROM JOSEPH RAGO TO

11:40AM   8       ELIZABETH HOLMES AND JEFFREY BLICKMAN?

11:40AM   9       A.   YES.

11:40AM  10       Q.   AND IS THE SUBJECT LINE READ BACK?

11:40AM  11       A.   YES.

11:40AM  12       Q.   AND LET'S LOOK AT PAGE 2 OF THIS EXHIBIT.

11:41AM  13              AND IF WE CAN ZOOM IN ON THE TOP HALF OF THE PAGE.

11:41AM  14              SO, MR. EDLIN, WHAT WE'RE LOOKING AT NOW, IS THIS THE TEXT

11:41AM  15       OF THE DRAFT ARTICLE THAT HAD NOT YET BEEN PUBLISHED?

11:41AM  16       A.   I BELIEVE SO.

11:41AM  17       Q.   THIS EMAIL WAS SENT ON SEPTEMBER 6TH, 2013.

11:41AM  18              WAS THIS BEFORE THE WALGREENS LAUNCH AND BEFORE THE

11:41AM  19       PUBLICATION OF THIS ARTICLE?

11:41AM  20       A.   YES.

11:41AM  21       Q.   SO WHAT WE'RE LOOKING AT IS THE JOURNALIST SENDING A DRAFT

11:41AM  22       OF THE ARTICLE TO MS. HOLMES IN ADVANCE OF THE PUBLICATION?

11:41AM  23       A.   EITHER THE ARTICLE OR PARTS OF THE ARTICLE.

11:41AM  24       Q.   OKAY.  LET'S LOOK AT THE TOP HALF OF PAGE 1.

11:41AM  25              WHILE WE'RE ZOOMING IN THERE, DO YOU HAVE AN UNDERSTANDING

EDLIN DIRECT BY MR. BOSTIC (RES.)                    3983

11:42AM 1    AS TO WHAT THE PURPOSE WAS OF PROVIDING MS. HOLMES WITH A DRAFT

11:42AM 2    OF THE ARTICLE IN ADVANCE, OR PORTIONS OF IT?

11:42AM 3    A.    AS I'M LOOKING AT HIS EMAIL BELOW, HE ASKED IF ANY POINTS

11:42AM 4    NEED TO BE CLARIFIED OR IF HE HAS EXPLAINED SOMETHING

11:42AM 5    INCOMPLETELY OR LEFT SOMETHING OUT, THAT OFFERED THE

11:42AM 6    OPPORTUNITY FOR ELIZABETH AND JEFF TO CORRECT IT IN THIS CASE.

11:42AM 7    Q.    OKAY.  AND SO, IN OTHER WORDS, IF THERE WAS SOMETHING THAT

11:42AM 8    NEEDED TO BE CHANGED OR SOMETHING CLARIFIED, THIS WOULD BE THE

11:42AM 9    CHANCE TO DO IT BEFORE THE PUBLICATION OF THE ARTICLE?

11:42AM 10   A.    THAT'S RIGHT.

11:42AM 11   Q.    LOOKING AT THE TOP PORTION OF PAGE 1, DO YOU SEE AN EMAIL

11:42AM 12   FROM JEFF BLICKMAN TO ELIZABETH HOLMES AND OTHERS AT THERANOS?

11:42AM 13   A.    YES.

11:42AM 14   Q.    HE SAYS, "WENT THROUGH THIS AND HIGHLIGHTED A FEW THINGS

11:42AM 15   IN YELLOW DIRECTLY IN HIS EMAIL, AND SUMMARIZED BELOW.  THERE

11:42AM 16   ARE A FAIR AMOUNT OF ISSUES THAT I'VE NOTED, SOME MORE

11:42AM 17   CONCERNING THAN OTHERS, PLEASE TAKE A LOOK."

11:43AM 18       DO YOU SEE THAT?

11:43AM 19   A.    YES.

11:43AM 20   Q.    AND I NOTES A FEW ITEMS.  FIRST, FOR EXAMPLE, UNDER QUOTE

11:43AM 21   NUMBER 2, MR. BLICKMAN NOTES THAT THE ARTICLE CALLED MS. HOLMES

11:43AM 22   A 30-SOMETHING CHEMICAL ENGINEER, AND HE SAID THAT WAS

11:43AM 23   INACCURATE.

11:43AM 24       DO YOU SEE THAT?

11:43AM 25   A.    RIGHT.

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3984

11:43AM   1    Q.   QUOTE NUMBER 3, HE NOTICED A, QUOTE, "GROUP COLLEGE-KID

11:43AM   2    HOUSE."  HE THOUGHT THAT WAS POORLY WORDED.

11:43AM   3         DO YOU SEE THAT?

11:43AM   4    A.   I DO.

11:43AM   5    Q.   AND THE SECTION LABELLED MAIN COPY, THE FIRST BULLET POINT

11:43AM   6    SAYS THAT NEARLY 500 EMPLOYEES WOULD BE AN OVERSTATEMENT.

11:43AM   7         DO YOU SEE THAT COMMENT?

11:43AM   8    A.   I DO.

11:43AM   9    Q.   AND A FEW DOWN FROM THERE, THERE'S A BULLET POINT THAT

11:43AM   10   SAYS "HE CALLS OUT QUOTE 'IMPROVED ACCURACY' WHEN TALKING ABOUT

11:43AM   11   REDUCTION OF HUMAN ERROR THRU AUTOMATION."

11:43AM   12        DO YOU SAY THAT?  OR DO YOU SEE THAT?

11:43AM   13   A.   YES.

11:43AM   14   Q.   AND DO YOU HAVE AN UNDERSTANDING AS TO WHY MR. BLICKMAN

11:43AM   15   WAS INCLUDING THIS MENTION OF IMPROVED ACCURACY IN THIS LIST OF

11:44AM   16   THINGS THAT NEEDED TO BE FIXED ABOUT THE DRAFT ARTICLE?

11:44AM   17   A.   I DON'T KNOW WHY SPECIFICALLY HE CALLED IT OUT, BUT THERE

11:44AM   18   WAS AN ONGOING DISCUSSION ABOUT WORDING AROUND ACCURACY AND HOW

11:44AM   19   THAT WOULD BE REPRESENTED ON THE WEBSITE.

11:44AM   20   Q.   AND WAS THAT ONGOING DISCUSSION PART OF WHAT WE SAW IN

11:44AM   21   PREVIOUS EXHIBITS ABOUT THE WEBSITE CONTENT?

11:44AM   22   A.   YES.

11:44AM   23   Q.   DO YOU RECALL THAT DISCUSSION ABOUT ACCURACY CLAIMS IN ANY

11:44AM   24   OTHER CONTEXTS BESIDES THE WEBSITE CONTENT AND THE CONTENT OF

11:44AM   25   THIS ARTICLE?

EDLIN DIRECT BY MR. BOSTIC (RES.)                              3985

11:44AM  1    A.   NOTHING ELSE IS COMING TO MIND RIGHT NOW.

11:44AM  2    Q.   DO YOU RECALL -- LET ME ASK, WERE YOU PART OF ANY

11:44AM  3    DISCUSSIONS FOLLOWING UP ON THIS EMAIL ABOUT WHETHER THAT

11:44AM  4    IMPROVED ACCURACY CLAIM NEEDED TO BE CLARIFIED IN THE DRAFT

11:45AM  5    ARTICLE?

11:45AM  6    A.   NOT THAT I RECALL.

11:45AM  7    Q.   LET'S LOOK AT THE ARTICLE ITSELF, WHICH IS ALREADY IN

11:45AM  8    EVIDENCE.  IF I COULD PUBLISH EXHIBIT 1106.

11:45AM  9         MR. EDLIN, DO YOU SEE THAT THIS IS THE PUBLISHED

11:45AM  10   "WALL STREET JOURNAL" ARTICLE TITLED "ELIZABETH HOLMES:  THE

11:45AM  11   BREAKTHROUGH OF INSTANT DIAGNOSIS"?

11:45AM  12        SORRY.  I DON'T THINK THIS IS IN YOUR BINDER, BUT IT'S ON

11:45AM  13   THE SCREEN IN FRONT OF YOU.

11:45AM  14   A.   OKAY.  I SEE THIS ARTICLE.

11:45AM  15   Q.   AND DO YOU SEE THIS IS BY JOSEPH RAGO AND PUBLISHED

11:45AM  16   SEPTEMBER 8TH, 2013?

11:45AM  17   A.   YES.

11:45AM  18   Q.   AND THAT'S APPROXIMATELY TWO DAYS AFTER THE EMAIL THAT WE

11:45AM  19   WERE JUST LOOKING AT?

11:45AM  20   A.   YES.

11:45AM  21   Q.   LET'S ZOOM OUT AND ZOOM BACK IN ON THE FIRST INDENTED

11:45AM  22   PARAGRAPH, ABOUT HALFWAY DOWN THAT PAGE.

11:46AM  23        DO YOU SEE THIS PARAGRAPH IN THE FINAL ARTICLE READS, "THE

11:46AM  24   SECRET THAT HUNDREDS OF EMPLOYEES ARE NOW REFINING INVOLVES

11:46AM  25   DEVICES THAT AUTOMATE AND MINIATURIZE MORE THAN 1,000

EDLIN DIRECT BY MR. BOSTIC (RES.)                    3986

11:46AM   1    LABORATORY TESTS."

11:46AM   2         DO YOU SEE THAT?

11:46AM   3    A.   YES.

11:46AM   4    Q.   AND IT THEN SAYS, "THERANOS'S PROCESSES ARE FASTER,

11:46AM   5    CHEAPER AND MORE ACCURATE THAN THE CONVENTIONAL METHODS AND

11:46AM   6    REQUIRE ONLY MICROSCOPIC BLOOD VOLUMES."

11:46AM   7         DO YOU SEE THAT?

11:46AM   8    A.   YES.

11:46AM   9    Q.   THE FINAL ARTICLE THEN DOES CONTAIN CLAIMS ABOUT

11:46AM   10   THERANOS'S PROCESSES BEING MORE ACCURATE?

11:46AM   11   A.   YEAH, I'M LOOKING AT JEFF'S EMAIL, AND THE QUOTE THERE WAS

11:46AM   12   IMPROVED ACCURACY.

11:46AM   13   Q.   LET'S LOOK AT PAGE 2 OF THIS ARTICLE.

11:47AM   14        FROM YOUR PERSPECTIVE, IS THERE A DIFFERENCE BETWEEN A

11:47AM   15   TEST BEING MORE ACCURATE AND HAVING IMPROVED ACCURACY?

11:47AM   16   A.   I THINK THEY'RE SYNONYMOUS.

11:47AM   17   Q.   ON PAGE 2 THERE'S A PARAGRAPH THAT BEGINS, TOWARD THE

11:47AM   18   BOTTOM OF THE PAGE, IT SAYS, "ANOTHER THERANOS ADVANCE"?

11:47AM   19   A.   YES.

11:47AM   20   Q.   AND IT SAYS "ANOTHER THERANOS ADVANCE IS ITS TESTING'S

11:47AM   21   ACCURACY.  MS. HOLMES BELIEVES THE CHAIN OF CONVENTIONAL

11:47AM   22   LABORATORY CUSTODY INTRODUCES TOO MANY OPPORTUNITIES FOR ERROR,

11:47AM   23   'WHICH IS BASICALLY WHERE EVER HUMANS ARE INVOLVED.'" AND THEN

11:47AM   24   IT GOES ON TO EXPLAIN A LITTLE MORE ABOUT THAT.

11:47AM   25        SO DO YOU SEE ANOTHER CLAIM ABOUT THERANOS TESTING

EDLIN DIRECT BY MR. BOSTIC (RES.)                          3987

11:47AM   1    ACCURACY IN THE FINAL ARTICLE?

11:47AM   2    A.   I DO.

11:47AM   3    Q.   WE CAN PUT THAT ASIDE.

11:48AM   4         THE ARTICLE THAT WE JUST LOOKED AT, THE JOSEPH RAGO PIECE,

11:48AM   5    WERE YOU PART OF ANY DISCUSSIONS AT THERANOS ABOUT WHETHER THAT

11:48AM   6    ARTICLE SHOULD BE SENT TO INVESTORS OR POTENTIAL INVESTORS IN

11:48AM   7    THERANOS, IF YOU RECALL?

11:48AM   8    A.   I DON'T RECALL.

11:48AM   9    Q.   I'LL ASK YOU TO LOOK NEXT AT EXHIBIT 1753.

11:48AM   10        AND WHILE YOU'RE TURNING THERE, DO YOU RECALL INTERACTING

11:48AM   11   WITH ANOTHER JOURNALIST NAMED ROGER PARLOFF?

11:48AM   12   A.   I DO.

11:48AM   13   Q.   AND WHO WAS ROGER PARLOFF?

11:48AM   14   A.   ROGER PARLOFF WAS A REPORTER FOR "FORTUNE" MAGAZINE.

11:48AM   15   Q.   AND HOW DID YOU COME TO HAVE CONTACT WITH HIM WHEN YOU

11:48AM   16   WERE WORKING AT THERANOS?

11:48AM   17   A.   I BELIEVE THAT ONE OF THE PUBLIC RELATIONS CONSULTANTS WHO

11:49AM   18   WAS WORKING FOR THERANOS SET UP THAT INTERVIEW BETWEEN

11:49AM   19   ELIZABETH AND MR. PARLOFF.

11:49AM   20        IN FOLLOWUP TO THEIR INTERVIEW, THERE WERE A NUMBER OF

11:49AM   21   FOLLOW-UP ITEMS AND REQUESTED INFORMATION THAT ELIZABETH ASKED

11:49AM   22   THAT I HELP COMPILE.

11:49AM   23   Q.   LOOKING AT EXHIBIT 1753, DO YOU SEE AN EMAIL CHAIN BETWEEN

11:49AM   24   YOU AND MS. HOLMES AND OTHERS DEALING WITH THAT TO DO LIST FOR

11:49AM   25   THE JOURNALIST ROGER PARLOFF?

EDLIN DIRECT BY MR. BOSTIC (RES.)                                      3988

11:49AM   1        A.   YES.

11:49AM   2                   MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

11:49AM   3        EXHIBIT 1753.

11:49AM   4                   MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

11:49AM   5                   THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:49AM   6              (GOVERNMENT'S EXHIBIT 1753 WAS RECEIVED IN EVIDENCE.)

11:49AM   7                   MR. BOSTIC:  AND IF WE CAN START ON PAGE 5.  AND IF

11:49AM   8        WE CAN ZOOM IN ON THE MIDDLE OF THE PAGE STARTING WITH THAT

11:49AM   9        EMAIL MESSAGE.

11:49AM  10        Q.   MR. EDLIN, DO YOU SEE AN EMAIL FROM YOU TO MS. HOLMES AND

11:50AM  11        OTHERS ON MAY 21ST, 2014?

11:50AM  12        A.   YES.

11:50AM  13        Q.   AND WAS THIS DURING THE TIME PERIOD WHERE MR. PARLOFF WAS

11:50AM  14        WORKING ON HIS ARTICLE ON THERANOS?

11:50AM  15        A.   I BELIEVE SO.

11:50AM  16        Q.   YOU WRITE, "ELIZABETH, PLEASE SEE BELOW FOR THE UPDATED,

11:50AM  17        AGGREGATED LIST OF FOLLOW-UP ITEMS FOR ROGER PARLOFF."

11:50AM  18             DO YOU SEE THAT?

11:50AM  19        A.   YES.

11:50AM  20        Q.   AND WHAT WAS THIS LIST OF FOLLOW-UP ITEMS?

11:50AM  21        A.   THIS WAS A LIST OF REQUESTED INFORMATION THAT WAS BROKEN

11:50AM  22        DOWN INTO TOPIC AND INFORMATION AREA.

11:50AM  23        Q.   AND WERE THESE ALL ITEMS THAT WERE INTENDED TO GO TO

11:50AM  24        MR. PARLOFF TO BE INCORPORATED INTO HIS ARTICLE?

11:50AM  25        A.   I DON'T KNOW EXACTLY.  THESE WERE, THESE WERE FOLLOW-UP

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3989

| | | |
|---|---|---|
| 11:50AM | 1 | QUESTIONS FROM AN INTERVIEW THAT MR. PARLOFF CONDUCTED WITH |
| 11:50AM | 2 | ELIZABETH.  I DIDN'T KNOW HOW OR WHETHER THEY WOULD BE USED IN |
| 11:50AM | 3 | THE ARTICLE. |
| 11:50AM | 4 | Q.   DID MR. PARLOFF HAVE ANY OTHER DEALINGS WITH THERANOS |
| 11:51AM | 5 | SEPARATE FROM WORKING ON THE ARTICLE THAT HE INTENDED TO |
| 11:51AM | 6 | PUBLISH? |
| 11:51AM | 7 | A.   NOT TO MY KNOWLEDGE. |
| 11:51AM | 8 | Q.   I'LL DRAW YOUR ATTENTION TO JUST TO A COUPLE OF ITEMS IN |
| 11:51AM | 9 | THIS LIST OF ACTION ITEMS. |
| 11:51AM | 10 | FIRST LET'S ZOOM OUT AND ZOOM BACK IN ON THE BOTTOM HALF |
| 11:51AM | 11 | OF THE PAGE. |
| 11:51AM | 12 | FIRST -- SO WE SEE A NUMBERED LIST WITH ACTION ITEMS HERE; |
| 11:51AM | 13 | CORRECT? |
| 11:51AM | 14 | A.   YES. |
| 11:51AM | 15 | Q.   AND THEN IN THE FAR RIGHT COLUMN THERE ARE INITIALS |
| 11:51AM | 16 | LISTED. |
| 11:51AM | 17 | DO YOU SEE THOSE? |
| 11:51AM | 18 | A.   YES. |
| 11:51AM | 19 | Q.   AND WHAT DOES THAT TELL US, THE INITIALS THAT MIGHT BE |
| 11:51AM | 20 | NEXT TO A CERTAIN ACTION ITEM? |
| 11:51AM | 21 | A.   THAT TELLS US WHO AT THE COMPANY WOULD BE RESPONSIBLE FOR |
| 11:51AM | 22 | PROVIDING THAT INFORMATION. |
| 11:51AM | 23 | Q.   OKAY.  SO WHEN WE LOOK AT, FOR EXAMPLE, ITEM NUMBER 12 |
| 11:51AM | 24 | WHERE IT SAYS "LANGUAGE ON WHAT HE CAN SAY ABOUT OUR HAVING |
| 11:51AM | 25 | DEVICES, AND HOW MANY DEVICES WE ARE USING IN EACH FACILITY. |

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3990

11:52AM  1        "HOW MANY ANALYZERS PER SAMPLE HE'S ALLOWED TO TALK ABOUT.

11:52AM  2        "BEING ABLE TO WORK WITHIN A SMALLER SPACE - LANGUAGE ON

11:52AM  3    THIS."

11:52AM  4        WHO WAS RESPONSIBLE FOR HANDLING THAT ACTION ITEM IN

11:52AM  5    CONNECTION WITH MR. PARLOFF'S ARTICLE?

11:52AM  6    A.   ELIZABETH'S NAME IS NEXT TO THAT.

11:52AM  7    Q.   HOW ABOUT FOR NUMBER 16?  THERE'S AN ACTION ITEM

11:52AM  8    REQUESTING, "LANGUAGE ON WHY WE DO SOME VENIPUNCTURE."

11:52AM  9        DO YOU SEE THAT?

11:52AM  10   A.   YES.

11:52AM  11   Q.   AND SO, IN OTHER WORDS, THE REASON WHY THERANOS DID SOME

11:52AM  12   VENOUS DRAW SAMPLES?

11:52AM  13   A.   CORRECT.

11:52AM  14   Q.   AND WHO WAS ASSIGNED TO HANDLE THAT ACTION ITEM FOR

11:52AM  15   MR. PARLOFF?

11:52AM  16   A.   ELIZABETH.

11:52AM  17   Q.   AND HOW ABOUT NUMBER 17, "LANGUAGE ON THE DEVICE

11:52AM  18   COMPARISON AND LAB COMPARISON BETWEEN THERANOS AND QUEST."

11:52AM  19       WHO WAS RESPONSIBLE FOR THAT ONE?

11:52AM  20   A.   ELIZABETH.

11:52AM  21   Q.   LET'S GO BACK TO PAGE 1 OF THIS EXHIBIT.

11:53AM  22       AND IF WE LOOK AT THE TOP PORTION OF THE PAGE.  LET'S

11:53AM  23   ACTUALLY CAPTURE FROM THE VERY TOP DOWN TO ABOUT A THIRD DOWN.

11:53AM  24       PERFECT.  THANK YOU.

11:53AM  25       MR. EDLIN, DO YOU SEE AT THE TOP THERE'S AN EMAIL FROM

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3991

11:53AM   1    ELIZABETH HOLMES TO YOU ON JUNE 1ST, 2014?

11:53AM   2    A.   YES.

11:53AM   3    Q.   AND THIS EMAIL ATTACHES A PDF.

11:53AM   4         DO YOU SEE THAT?

11:53AM   5    A.   YES.

11:53AM   6    Q.   AND THE PDF IS TITLED PFIZER THERANOS SYSTEM VALIDATION

11:53AM   7    FINAL REPORT.

11:53AM   8         IS THAT RIGHT?

11:53AM   9    A.   YES.

11:53AM   10   Q.   AND LET'S TAKE A QUICK LOOK AT THAT ATTACHMENT, AND IT'S

11:53AM   11   ON PAGE 7 OF THE EXHIBIT.

11:53AM   12        AND, MS. HOLLIMAN, LET'S ZOOM IN ON THE TOP HALF OF THE

11:53AM   13   PAGE.

11:54AM   14        MR. EDLIN, DO YOU SEE THE REPORT THAT MS. HOLMES ATTACHED

11:54AM   15   IN HER EMAIL TO YOU THAT WE WERE JUST LOOKING AT?

11:54AM   16   A.   I DO.

11:54AM   17   Q.   AND DO YOU RECOGNIZE THIS DOCUMENT?

11:54AM   18   A.   I, I RECOGNIZE IT, YES.

11:54AM   19   Q.   WHAT'S YOUR UNDERSTANDING OF WHAT THIS DOCUMENT IS?

11:54AM   20   A.   MY UNDERSTANDING IS THAT THIS REPORT DETAILS A STUDY THAT

11:54AM   21   THERANOS COLLABORATED WITH PFIZER ON.

11:54AM   22   Q.   DO YOU KNOW HOW THIS REPORT WAS PRODUCED?

11:54AM   23        AND LET ME ASK ACTUALLY, DO YOU KNOW WHO ACTUALLY CREATED

11:54AM   24   THIS REPORT?

11:54AM   25   A.   I DON'T.

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3992

| | | |
|---|---|---|
| 11:54AM | 1 | Q.   WERE YOU INVOLVED IN THE CREATION OF THIS REPORT? |
| 11:54AM | 2 | A.   NO. |
| 11:54AM | 3 | Q.   HOW ABOUT THE PFIZER LOGO AT THE TOP? |
| 11:54AM | 4 | DO YOU KNOW HOW THE PFIZER LOGO CAME TO APPEAR AT THE TOP |
| 11:54AM | 5 | OF THIS REPORT? |
| 11:54AM | 6 | A.   I DON'T. |
| 11:54AM | 7 | Q.   WERE YOU INVOLVED IN THE PLACEMENT OF THE PFIZER LOGO AT |
| 11:54AM | 8 | THE TOP OF THIS REPORT? |
| 11:54AM | 9 | A.   NO. |
| 11:54AM | 10 | Q.   WERE YOU PART OF ANY DISCUSSIONS AT THERANOS ABOUT THE |
| 11:55AM | 11 | PLACEMENT OF THE PFIZER LOGO ON THIS REPORT? |
| 11:55AM | 12 | A.   NO. |
| 11:55AM | 13 | Q.   OKAY.  WE CAN PUT THAT ASIDE. |
| 11:55AM | 14 | SO BESIDES JOSEPH RAGO AND ROGER PARLOFF, ARE YOU FAMILIAR |
| 11:55AM | 15 | WITH A REPORTER NAMED JENNY GOLD WORKING ON A PIECE REGARDING |
| 11:55AM | 16 | THERANOS? |
| 11:55AM | 17 | A.   I DON'T KNOW IF SHE EVER WROTE A PIECE.  I DO REMEMBER |
| 11:55AM | 18 | THAT SHE WAS INTERESTED IN WRITING A PIECE. |
| 11:55AM | 19 | Q.   DO YOU REMEMBER GETTING A QUESTION OR QUESTIONS FROM HER |
| 11:55AM | 20 | ABOUT THERANOS IN CONNECTION WITH HER REPORTING? |
| 11:55AM | 21 | A.   YES. |
| 11:55AM | 22 | Q.   AND WHAT QUESTION OR QUESTIONS DO YOU REMEMBER GETTING |
| 11:55AM | 23 | FROM MS. GOLD? |
| 11:55AM | 24 | A.   I REMEMBER SHE WAS PREDOMINANTLY INTERESTED IN A |
| 11:55AM | 25 | PERCENTAGE OF WHICH THERANOS TEST COULD BE RUN ON A FINGERSTICK |

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3993

| | | |
|---|---|---|
| 11:55AM | 1 | COMPARED TO A VENOUS DRAW. |
| 11:55AM | 2 | Q.   WHEN WE LOOKED AT THE LIST OF ACTION ITEMS FOR |
| 11:56AM | 3 | ROGER PARLOFF, USE OF VENOUS DRAWS WAS AN ITEM ASSIGNED TO |
| 11:56AM | 4 | MS. HOLMES; IS THAT CORRECT? |
| 11:56AM | 5 | A.   YES. |
| 11:56AM | 6 | Q.   WHEN YOU WERE ASKED THIS QUESTION BY MS. GOLD, DID YOU |
| 11:56AM | 7 | SEEK ANY GUIDANCE FROM MS. HOLMES ON HOW TO RESPOND? |
| 11:56AM | 8 | A.   I DID. |
| 11:56AM | 9 | Q.   AND DID YOU GET GUIDANCE? |
| 11:56AM | 10 | A.   I DID. |
| 11:56AM | 11 | Q.   WHAT DID MS. HOLMES TELL YOU? |
| 11:56AM | 12 | A.   THE GUIDANCE WAS ESSENTIALLY TO NOT PROVIDE AN EXACT |
| 11:56AM | 13 | PERCENTAGE BECAUSE THAT PERCENTAGE WAS ALWAYS CHANGING WEEK BY |
| 11:56AM | 14 | WEEK BASED ON WHAT WAS ACTUALLY BEING ORDERED IN THE LAB. |
| 11:56AM | 15 | Q.   ALL RIGHT.  LET'S SHIFT TOPICS AND TALK ABOUT CONTACT WITH |
| 11:56AM | 16 | INVESTORS. |
| 11:56AM | 17 | AS PART OF YOUR KIND OF MULTIFACETED ROLE AT THE COMPANY, |
| 11:56AM | 18 | DID YOU HAVE ANY CONTACT WITH POTENTIAL OR ACTUAL INVESTORS |
| 11:57AM | 19 | WITH THERANOS? |
| 11:57AM | 20 | A.   I DID. |
| 11:57AM | 21 | Q.   AND WHAT WAS THE NATURE OF THAT CONTACT? |
| 11:57AM | 22 | A.   ON OCCASION -- THIS WAS RARE -- AN INVESTOR OR A POTENTIAL |
| 11:57AM | 23 | INVESTOR WOULD COME TO THERANOS OFFICES, AND I THINK WE |
| 11:57AM | 24 | DISCUSSED EARLIER ON SIMILAR OCCASIONS, I WOULD GIVE A TOUR IF |
| 11:57AM | 25 | ELIZABETH COULDN'T GIVE THE TOUR OR DID NOT GIVE THE TOUR. |

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3994

| | | |
|---|---|---|
| 11:57AM | 1 | I WAS ALSO ASKED AT TIMES TO PREPARE BINDERS AND SEND |
| 11:57AM | 2 | BINDERS TO THE INVESTORS BASED ON AN APPROVED CHECKLIST OF |
| 11:57AM | 3 | ITEMS, AND I WOULD -- ONCE I COMPILED THOSE BINDERS, I WOULD |
| 11:57AM | 4 | HAVE -- OR ELIZABETH ASKED TO REVIEW THEM, AND ONCE THEY WERE |
| 11:57AM | 5 | REVIEWED AND APPROVED, ON SOME OCCASIONS I WOULD SEND THOSE OUT |
| 11:58AM | 6 | TO INVESTORS. |
| 11:58AM | 7 | Q.   AND THESE WERE BINDERS OF INFORMATION ABOUT THERANOS TO GO |
| 11:58AM | 8 | TO INVESTORS? |
| 11:58AM | 9 | A.   YES. |
| 11:58AM | 10 | Q.   YOU SAID THAT THE MATERIALS FOR THOSE BINDERS CAME FROM A |
| 11:58AM | 11 | PREAPPROVED LIST OF MATERIALS; IS THAT RIGHT? |
| 11:58AM | 12 | A.   YES. |
| 11:58AM | 13 | Q.   WHO APPROVED THE LIST OF PREAPPROVED MATERIALS? |
| 11:58AM | 14 | A.   ELIZABETH. |
| 11:58AM | 15 | Q.   OKAY.  LET'S LOOK AT EXHIBIT 1940. |
| 11:58AM | 16 | DO YOU HAVE 1940 IN FRONT OF YOU? |
| 11:58AM | 17 | A.   YES.  YES. |
| 11:58AM | 18 | Q.   IS THIS AN EMAIL FROM YOU TO MS. HOLMES IN SEPTEMBER OF |
| 11:58AM | 19 | 2014 ABOUT ASSEMBLING INVESTMENT MATERIALS BINDERS? |
| 11:58AM | 20 | A.   YES. |
| 11:58AM | 21 | MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS |
| 11:58AM | 22 | EXHIBIT 1940. |
| 11:59AM | 23 | MR. DOWNEY:  NO OBJECTION, YOUR HONOR. |
| 11:59AM | 24 | THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED. |
| 11:59AM | 25 | (GOVERNMENT'S EXHIBIT 1940 WAS RECEIVED IN EVIDENCE.) |

                    EDLIN DIRECT BY MR. BOSTIC (RES.)                3995

11:59AM   1              MR. BOSTIC:  AND LET'S LOOK FIRST AT PAGE 2.  ZOOM

11:59AM   2     IN AT THE TOP.

11:59AM   3     Q.   MR. EDLIN, DO YOU SEE AN EMAIL FROM MS. HOLMES TO YOU AND

11:59AM   4     JEFF BLICKMAN ON SEPTEMBER 15TH, 2014 ASKING FOR THE CONTENTS

11:59AM   5     OF THE TWO BINDERS AND WHAT'S NOT IN THEM THAT WAS IN OTHERS?

11:59AM   6     A.   I DO.

11:59AM   7     Q.   AND THEN LET'S GO TO PAGE 1.  AND LET'S ZOOM IN ON THE TOP

11:59AM   8     HALF OF PAGE 1.

11:59AM   9          CAN YOU EXPLAIN WHAT INFORMATION YOU'RE PROVIDING IN THE

11:59AM  10     EMAIL ON THE SCREEN?

11:59AM  11     A.   THIS INFORMATION RELATES TO THE CONTENT THAT WAS IN EACH

12:00PM  12     OF THE INVESTMENT BINDERS.

12:00PM  13     Q.   AND IS THIS THE LIST OF EXACTLY WHAT WAS IN THOSE BINDERS

12:00PM  14     THAT MS. HOLMES WAS JUST ASKING FOR IN THE EMAIL THAT WE LOOKED

12:00PM  15     AT?

12:00PM  16     A.   YES, THESE ARE THE DIFFERENT DOCUMENTS THAT EACH HAD THEIR

12:00PM  17     OWN LABEL IN THE BINDER.

12:00PM  18     Q.   OKAY.  AND WAS EACH OF THESE ITEMS PART OF THAT LIST OF

12:00PM  19     PREAPPROVED ITEMS THAT YOU WERE JUST REFERENCING?

12:00PM  20     A.   YES.

12:00PM  21     Q.   AND ARE THESE THE KINDS OF ITEMS THAT WERE ROUTINELY SENT

12:00PM  22     TO POTENTIAL INVESTORS IN THE COMPANY?

12:00PM  23     A.   AS IT RELATES TO WHAT I HELPED TO PREPARE, YES.

12:00PM  24     Q.   OKAY.  YOU CAN PUT THAT ONE ASIDE.

12:00PM  25              MAY I APPROACH, YOUR HONOR?

EDLIN DIRECT BY MR. BOSTIC (RES.)                          3996

| | | |
|---|---|---|
| 12:00PM | 1 | THE COURT:  YES. |
| 12:01PM | 2 | MR. BOSTIC:  (HANDING.) |
| 12:01PM | 3 | MS. KRATZMANN, THANK YOU. |
| 12:01PM | 4 | BY MR. BOSTIC: |
| 12:01PM | 5 | Q.  (HANDING.) |
| 12:01PM | 6 | MR. EDLIN, I'VE PUT IN FRONT OF YOU WHAT HAS BEEN MARKED |
| 12:01PM | 7 | AS EXHIBIT 4869. |
| 12:01PM | 8 | DO YOU HAVE THAT? |
| 12:01PM | 9 | A.  I DO. |
| 12:01PM | 10 | Q.  AND I'LL POINT OUT THAT THERE'S A COVER PAGE AND THEN |
| 12:01PM | 11 | EXCERPTED MATERIALS BEHIND IT. |
| 12:01PM | 12 | I'LL ASK YOU IF YOU, GENERALLY SPEAKING, CAN TELL US WHAT |
| 12:01PM | 13 | EXHIBIT 4869 IS? |
| 12:01PM | 14 | A.  I BELIEVE THIS REFERS TO NUMBER 7, CONFIDENTIAL THERANOS |
| 12:02PM | 15 | BRIEFING. |
| 12:02PM | 16 | Q.  SO IS THIS A PORTION OF AN INVESTOR BINDER? |
| 12:02PM | 17 | A.  YES, I BELIEVE SO. |
| 12:02PM | 18 | Q.  AND IS THIS THE KIND OF ITEM THAT YOU WOULD HAVE INCLUDED |
| 12:02PM | 19 | IN THE PACKAGES THAT YOU SENT OUT AT MS. HOLMES'S REQUEST? |
| 12:02PM | 20 | A.  THIS WOULD HAVE BEEN INCLUDED IN A TYPICAL INVESTMENT |
| 12:02PM | 21 | RELATED BINDER. |
| 12:02PM | 22 | Q.  OKAY.  AND CAN YOU TELL FROM THIS SPECIFIC EXHIBIT WHICH |
| 12:02PM | 23 | INVESTOR THIS PRESENTATION WENT TO? |
| 12:02PM | 24 | A.  I CAN. |
| 12:02PM | 25 | Q.  I'M SORRY? |

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3997

| | | |
|---|---|---|
| 12:02PM | 1 | A.   I CAN. |
| 12:02PM | 2 | Q.   AND WHO WAS THAT? |
| 12:02PM | 3 | A.   RUPERT MURDOCH. |
| 12:02PM | 4 | MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT MOVES TO |
| 12:02PM | 5 | ADMIT EXHIBIT 4869. |
| 12:02PM | 6 | MR. DOWNEY:  YOUR HONOR, I HAVE NO OBJECTION TO THE |
| 12:02PM | 7 | ADMISSION OF 4869. |
| 12:02PM | 8 | THERE'S AN ATTACHED 4869A, WHICH I'M SURE I WILL NOT HAVE |
| 12:03PM | 9 | AN OBJECTION TO. |
| 12:03PM | 10 | THERE'S A LOT OF MATERIAL IN BETWEEN THAT IS MISSING, AND |
| 12:03PM | 11 | I AGREE WITH MR. BOSTIC THAT I WOULD REVIEW THAT FOR |
| 12:03PM | 12 | COMPLETENESS, AND IF THERE IS ANY NEED TO SUPPLEMENT THIS WITH |
| 12:03PM | 13 | A 4869B, I'LL DO THAT DURING MY EXAMINATION. |
| 12:03PM | 14 | THE COURT:  THANK YOU. |
| 12:03PM | 15 | MR. BOSTIC, YOU'RE FINE WITH THAT? |
| 12:03PM | 16 | MR. BOSTIC:  YES.  THANK YOU. |
| 12:03PM | 17 | THE COURT:  ALL RIGHT.  THIS WILL BE ADMITTED.  IT |
| 12:03PM | 18 | MAY BE PUBLISHED. |
| 12:03PM | 19 | (GOVERNMENT'S EXHIBIT 4869 WAS RECEIVED IN EVIDENCE.) |
| 12:03PM | 20 | BY MR. BOSTIC: |
| 12:03PM | 21 | Q.   AND, MR. EDLIN, WHILE WE'RE ON THAT TOPIC, THE INVESTOR |
| 12:03PM | 22 | BINDERS, AS WE JUST SAW FROM THE EMAIL, WOULD INCLUDE MANY |
| 12:03PM | 23 | COMPONENTS; IS THAT CORRECT? |
| 12:03PM | 24 | A.   THAT IS CORRECT. |
| 12:03PM | 25 | Q.   THE PRESENTATION THAT WE'RE ABOUT TO LOOK AT WOULD JUST BE |

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3998

12:03PM  1    ONE COMPONENT OF MANY THAT WOULD BE INCLUDED IN A TYPICAL

12:03PM  2    INVESTMENT BINDER?

12:03PM  3    A.   THAT'S CORRECT.

12:03PM  4    Q.   I'D LIKE TO JUST SHOW YOU SOME OF THE CONTENT OF THIS

12:04PM  5    PRESENTATION.

12:04PM  6         FIRST, LET'S START WITH PAGE 3.  AND DO YOU SEE THERE A

12:04PM  7    SLIDE ENTITLED THERANOS INCORPORATED?

12:04PM  8    A.   YES.

12:04PM  9    Q.   AND DO YOU SEE THAT UNDER THE LINE THAT SAYS THAT THERANOS

12:04PM  10   IS HEADQUARTERED IN PALO ALTO, CALIFORNIA AND IS A

12:04PM  11   SILICON VALLEY-BASED COMPANY FOUNDED IN 2003, THERE'S A

12:04PM  12   PARAGRAPH THAT SAYS, "THERANOS'S PROPRIETARY, PATENTED

12:04PM  13   TECHNOLOGY RUNS COMPREHENSIVE BLOOD TESTS FROM A FINGERSTICK."

12:04PM  14        DO YOU SEE THAT?

12:04PM  15   A.   I DO.

12:04PM  16   Q.   AND IT ALSO SAYS THAT THE TECHNOLOGY TESTS FROM

12:04PM  17   MICRO-SAMPLES OF OTHER MATRICES.

12:04PM  18        DO YOU SEE THAT?

12:04PM  19   A.   YES.

12:04PM  20   Q.   AND IT SAYS "IT GENERATES SIGNIFICANTLY HIGHER INTEGRITY

12:04PM  21   DATA THAN CURRENTLY POSSIBLE."

12:04PM  22        DID I READ THAT CORRECTLY?

12:04PM  23   A.   YES.

12:04PM  24   Q.   LET'S LOOK AT SLIDE 15 OF THIS EXHIBIT.  AND DO YOU SEE A

12:05PM  25   SLIDE ENTITLED COST SAVINGS?

UNITED STATES COURT REPORTERS
**ER-7606**

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    3999

12:05PM  1    A.   YES.

12:05PM  2    Q.   AND IN THE SECOND BULLET POINT FROM THE BOTTOM, THE

12:05PM  3    PRESENTATION SAYS, "THE UNPRECEDENTED LACK OF VARIATION FROM

12:05PM  4    SYSTEM TO SYSTEM YIELDS HIGHER INTEGRITY DATA AND LONGITUDINAL

12:05PM  5    TRENDING, ENABLING EARLIER INSIGHT INTO THE ONSET/PROGRESSION

12:05PM  6    OF DISEASE AND REDUCING UNNECESSARY SECONDARY PROCEDURES FROM

12:05PM  7    RESULTS WHICH CURRENTLY SHOW UP AS FALSE POSITIVE RESULTS."

12:05PM  8         DO YOU SEE THAT?

12:05PM  9    A.   YES.

12:05PM  10   Q.   AND IS THIS ANOTHER CLAIM ABOUT THE ACCURACY OF THERANOS

12:05PM  11   TESTS?

12:05PM  12   A.   MY UNDERSTANDING IS THAT VARIATION AND COEFFICIENT OF

12:06PM  13   VARIATION DOES RELATE TO ACCURACY, SO YES.

12:06PM  14   Q.   LET'S LOOK NEXT AT PAGE 28 OF THIS PRESENTATION.

12:06PM  15        DO YOU SEE A SLIDE THAT SAYS, SAME TESTS, A WHOLE NEW

12:06PM  16   APPROACH?

12:06PM  17   A.   I DO.

12:06PM  18   Q.   AND BENEATH THAT IT READS, "THE ACTIONABLE INFORMATION YOU

12:06PM  19   NEED 1/1000TH THE SIZE OF A TYPICAL BLOOD DRAW."

12:06PM  20        DO YOU SEE THAT?

12:06PM  21   A.   YES.

12:06PM  22   Q.   AND THAT 1/1000TH LANGUAGE, DO YOU RECALL THAT BEING

12:06PM  23   HIGHLIGHTED AS SOMETHING THAT THERE WAS SOME QUESTION ABOUT IN

12:06PM  24   CONNECTION WITH THE WEBSITE CONTENT?

12:06PM  25   A.   I DO, NOT SPECIFICALLY WHAT IT WAS, BUT I DO REMEMBER THAT

EDLIN DIRECT BY MR. BOSTIC (RES.)                                4000

12:06PM   1     IT WAS CALLED OUT.

12:06PM   2     Q.   ON THAT SAME PAGE THERE'S A LINE THAT SAYS, "THERANOS RUNS

12:06PM   3     ANY TEST AVAILABLE IN CENTRAL LABORATORIES, AND PROCESSES ALL

12:06PM   4     SAMPLE TYPES," BENEATH A PHOTO OF THE FINGERSTICK METHOD.

12:07PM   5          DO YOU SEE THAT?

12:07PM   6     A.   I DO.

12:07PM   7     Q.   AND THE BOTTOM PARAGRAPH, "THE THERANOS PROVIDES THE

12:07PM   8     HIGHEST LEVEL OF OVERSIGHT, AUTOMATION, AND STANDARDIZATION IN

12:07PM   9     OUR PRE AND POST ANALYTICAL PROCESSES, ENSURING THE HIGHEST

12:07PM   10    LEVELS OF ACCURACY AND PRECISION."

12:07PM   11         DO YOU SEE THAT?

12:07PM   12    A.   YES.

12:07PM   13    Q.   AND THAT KIND OF LANGUAGE ABOUT THE HIGHEST LEVELS OF

12:07PM   14    ACCURACY AND PRECISION, IS THAT THE KIND OF LANGUAGE THAT WE

12:07PM   15    READ A FEW EXHIBITS AGO WHERE THERE WERE SOME CONCERNS ABOUT

12:07PM   16    INCLUDING THAT KIND OF LANGUAGE ON THE WEBSITE?

12:07PM   17    A.   YES.

12:07PM   18    Q.   WERE YOU PART OF ANY DISCUSSIONS WITH MS. HOLMES ABOUT

12:07PM   19    WHETHER THAT KIND OF LANGUAGE SHOULD BE INCLUDED IN INVESTOR

12:07PM   20    PRESENTATIONS?

12:07PM   21    A.   NOT THAT I RECALL.

12:07PM   22    Q.   DO YOU RECALL EVER RECEIVING ANY DIRECTION FROM MS. HOLMES

12:07PM   23    TO REMOVE ANY LANGUAGE LIKE THAT ABOUT ACCURACY FROM THE

12:07PM   24    INVESTOR PRESENTATIONS?

12:07PM   25    A.   NO.

EDLIN DIRECT BY MR. BOSTIC (RES.)                            4001

```
12:07PM   1    Q.   FINALLY, LET'S TAKE A LOOK AT PAGE 30 AND LET'S ZOOM IN ON

12:08PM   2    THE CONTENT THERE.

12:08PM   3         BENEATH THE GRAPHIC ABOUT -- ACTUALLY ABOVE THE GRAPHIC

12:08PM   4    ABOUT A 10 PERCENT COEFFICIENT OF VARIATION, THERE'S LANGUAGE

12:08PM   5    THAT READS, "THE HIGHEST LEVELS OF ACCURACY."

12:08PM   6         DO YOU SEE THAT?

12:08PM   7    A.   I DO.

12:08PM   8    Q.   AND BENEATH THAT GRAPHIC THE TEXT READS, "BY

12:08PM   9    SYSTEMATICALLY CONTROLLING AND STANDARDIZING OUR PROCESSES,

12:08PM   10   THERANOS OFFERS TESTS WITH THE HIGHEST LEVELS OF ACCURACY."

12:08PM   11        DID I READ THAT CORRECTLY?

12:08PM   12   A.   YES.

12:08PM   13   Q.   THIS PRESENTATION, WAS IT CREATED SPECIFICALLY FOR

12:09PM   14   CONSIDERATION BY RUPERT MURDOCH?

12:09PM   15   A.   I THINK MOST OF, OR AT LEAST A PART OF THIS PRESENTATION

12:09PM   16   ALREADY EXISTED AND IT WAS PART OF A GROUP OF DOCUMENTS, RIGHT,

12:09PM   17   THAT WERE INCLUDED IN THE BINDERS.

12:09PM   18        SO I'M NOT SURE IF ANYTHING CHANGED BETWEEN THIS BINDER

12:09PM   19   AND A DIFFERENT BINDER.  BUT THIS PRESENTATION OF ITSELF, THE

12:09PM   20   CONFIDENTIAL THERANOS BRIEFING, THAT WAS INCLUDED IN ALL OF THE

12:09PM   21   INVESTMENT BINDERS TO MY KNOWLEDGE.

12:09PM   22   Q.   THANK YOU.  SORRY TO INTERRUPT.

12:09PM   23        SO YOU RECALL AT LEAST VERSIONS OF THE SAME PRESENTATION

12:09PM   24   BEING SENT TO OTHER POTENTIAL INVESTORS IN THE COMPANY?

12:09PM   25   A.   YES.
```

UNITED STATES COURT REPORTERS

**ER-7609**

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    4002

12:09PM   1      Q.   OKAY.  WE CAN PUT THAT ASIDE.

12:10PM   2           LET'S SWITCH TOPICS.  LET ME ASK, WERE YOU GENERALLY AWARE

12:10PM   3      OF CALLS OR COMMUNICATIONS THAT THERANOS WOULD GET FROM

12:10PM   4      PATIENTS OR DOCTORS ABOUT QUESTIONABLE OR INACCURATE TEST

12:10PM   5      RESULTS?

12:10PM   6      A.   I'M AWARE THAT THERE WAS A CUSTOMER SERVICE GROUP THAT

12:10PM   7      FIELDED CUSTOMER COMPLAINTS, BUT THAT REALLY WASN'T PART OF MY

12:10PM   8      JOB RESPONSIBILITIES.

12:10PM   9      Q.   THE PEOPLE WHO WORKED IN THAT CUSTOMER SERVICE GROUP,

12:10PM  10      WHERE DID THEY SIT, IF YOU RECALL?

12:10PM  11      A.   WE WERE IN A COUPLE OF DIFFERENT BUILDINGS.  I REMEMBER IN

12:10PM  12      THE 1601 BUILDING THEY SAT IN A ROOM AT THE THERANOS

12:11PM  13      HEADQUARTERS.

12:11PM  14      Q.   AND THAT WAS IN PALO ALTO?

12:11PM  15      A.   THAT'S RIGHT.

12:11PM  16      Q.   I'LL ASK YOU TO LOOK AT EXHIBIT 5413 IN YOUR BINDER.

12:11PM  17      A.   OKAY.

12:11PM  18      Q.   AND IS EXHIBIT 5413 AN EMAIL CHAIN IN JULY 2014 INCLUDING

12:11PM  19      YOU AND MS. HOLMES ABOUT A PATIENT CALL?

12:11PM  20      A.   I'M COPIED ON THE EMAIL.  THERE ARE A NUMBER OF OTHER

12:11PM  21      PEOPLE ON THE EMAIL AS WELL.

12:11PM  22      Q.   OTHERWISE DID I ACCURATELY DESCRIBE EXHIBIT 5413?

12:12PM  23      A.   YES.

12:12PM  24      Q.   AND AS PART OF THERANOS'S BUSINESS, WERE THERE SOMETIMES

12:12PM  25      EMAIL COMMUNICATIONS RELATING TO PATIENT CALLS OR TESTING

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    4003

12:12PM   1    ISSUES THAT AROSE AT THE COMPANY?

12:12PM   2    A.   YES.

12:12PM   3              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT MOVES TO

12:12PM   4    ADMIT 5413.

12:12PM   5              MR. DOWNEY:  NO OBJECTION TO 5413, YOUR HONOR.

12:12PM   6              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:12PM   7         (GOVERNMENT'S EXHIBIT 5413 WAS RECEIVED IN EVIDENCE.)

12:12PM   8              MR. BOSTIC:  AND IF WE CAN START ON PAGE 2 AT THE

12:12PM   9    BOTTOM.  AND IF WE CAN ZOOM IN THERE.

12:12PM   10   Q.   MR. EDLIN, DO YOU RECALL -- DO YOU SEE THAT THIS BEGINS

12:13PM   11   WITH AN EMAIL FROM SOMEONE NAMED AMELIA AGUIRRE TO

12:13PM   12   CHRISTIAN HOLMES AND YOURSELF?

12:13PM   13   A.   YES.

12:13PM   14   Q.   AND MS. AGUIRRE WRITES, "I RECEIVED A CALL FROM PATIENT,"

12:13PM   15   AND WE REDACTED THE NAME.  "HE EXPRESSED THAT HE DOES NOT

12:13PM   16   BELIEVE THAT OUR RESULTS WERE NOT ACCURATE FROM HIS LAST VISIT

12:13PM   17   AND HIS PHYSICIAN AGREES (NOT CONSISTENT WITH HISTORY)."

12:13PM   18        LET'S CONTINUE READING ON THE FOLLOWING PAGE, PAGE 3.

12:13PM   19        AND THE EMAIL GOES ON TO SAY, "THE PATIENT CAME TO

12:13PM   20   THERANOS MOST RECENTLY ON 7/22 AND THE RESULTS FOR INR WERE .9.

12:13PM   21   HIS PHYSICIAN SENT HIM TO LAB CORP. TWO DAYS LATER BECAUSE HE

12:13PM   22   BELIEVED THE LAB RESULTS WERE LOW AND HIS RESULT AT LAB CORP.

12:13PM   23   FOR INR WAS 3.1 (WHICH PATIENT SAYS IS MORE CONSISTENT WITH HIS

12:13PM   24   HISTORY, WHICH IS USUALLY 2.0 AND 3.0.)"

12:14PM   25        DO YOU SEE THAT?

EDLIN DIRECT BY MR. BOSTIC (RES.)                                4004

12:14PM   1    A.   YES.

12:14PM   2    Q.   IT GOES ON TO SAY, "HE CURRENTLY HAS STANDING IN ORDER FOR

12:14PM   3    PT/INR FROM HIS DOCTOR, HOWEVER, HE DOES NOT WANT TO CONTINUE

12:14PM   4    TO COME TO THERANOS EVEN THOUGH HE HAS A STANDING ORDER UNTIL

12:14PM   5    WE VERIFY THAT OUR RESULTS ARE ACCURATE."

12:14PM   6         DO YOU SEE THAT?

12:14PM   7    A.   YES, I DO.

12:14PM   8    Q.   LET'S LOOK BACK AT PAGE 2 OF THIS EXHIBIT AND ZOOM IN ON

12:14PM   9    THE MIDDLE OF THE PAGE.

12:14PM   10        DO YOU SEE AN EMAIL THERE FROM CHRISTIAN HOLMES IN

12:14PM   11   RESPONSE FORWARDING THIS TO SOMEONE NAMED MAX FOSQUE.

12:14PM   12   A.   YES.

12:14PM   13   Q.   AND CHRISTIAN SAYS, "MAX - WITH DAN AND ME OUT, CAN YOU

12:14PM   14   PULL THE RESULTS HISTORY FOR THIS PATIENT ON THE INR HE'S

12:14PM   15   ASKING ABOUT?  ELIZABETH WANTS TO REVIEW THEN HAVE SOMEONE CALL

12:15PM   16   THE PATIENT/DOC BACK."

12:15PM   17        DO YOU SEE THAT?

12:15PM   18   A.   YES.

12:15PM   19   Q.   FROM YOUR EXPERIENCE AT THE COMPANY AND WORKING WITH

12:15PM   20   MS. HOLMES, DO YOU HAVE AN UNDERSTANDING WHAT HER ROLE WAS IN

12:15PM   21   THESE SITUATIONS REVIEWING INSTANCES WHERE PATIENTS CALLED?

12:15PM   22   A.   I THINK SOMETIMES SHE WOULD BE INVOLVED AND SOMETIMES SHE

12:15PM   23   WOULD NOT BE INVOLVED.

12:15PM   24   Q.   WHEN SHE WAS INVOLVED, DO YOU HAVE AN UNDERSTANDING OF

12:15PM   25   WHAT SHE WOULD DO, WHAT HER FUNCTION WAS?

                              EDLIN DIRECT BY MR. BOSTIC (RES.)                    4005

12:15PM    1    A.   I BELIEVE SHE DISCUSSED MESSAGING WITH WHOEVER WAS

12:15PM    2    INTERFACING OR INTERACTING WITH THE CUSTOMER OR THE PHYSICIAN.

12:15PM    3    Q.   LET'S LOOK AT PAGE 1 OF THIS EXHIBIT, AND LET'S ZOOM IN ON

12:15PM    4    THE TOP MESSAGE.

12:15PM    5         ACTUALLY, LET'S SEE IF WE CAN CAPTURE THE TOP HALF OF THE

12:15PM    6    PAGE DOWN THROUGH THAT MESSAGE.

12:15PM    7         PERFECT.

12:16PM    8         MR. EDLIN, DO YOU SEE AN EMAIL FROM MS. HOLMES TO

12:16PM    9    MAX FOSQUE, CHRISTIAN HOLMES, YOU, AND SUNNY BALWANI AT THE

12:16PM   10    BOTTOM THERE?

12:16PM   11    A.   YES.

12:16PM   12    Q.   SHE SAYS, "MAX - NEED YOU TO TRIAGE THIS, THEN COME BRIEF

12:16PM   13    ME ON WHAT HAPPENED.  FROM THERE WE'LL DECIDE WHO WILL CALL."

12:16PM   14         DO YOU SEE THAT?

12:16PM   15    A.   YES.

12:16PM   16    Q.   AND ON THE TOP EMAIL, CHRISTIAN HOLMES SAYS, "BASICALLY

12:16PM   17    HAVE NISHIT LOOK AT THE DATA AND SEE IF ANYTHING WENT WRONG

12:16PM   18    (IDENTIFY THE ISSUE) THEN WORK WITH ELIZABETH ON SCRIPTING

12:16PM   19    WHILE SUNNY ADDRESSES ROOT CAUSE OF ANY ISSUE INTERNALLY."

12:16PM   20         DO YOU SEE THAT?

12:16PM   21    A.   I DO.

12:16PM   22    Q.   AND WHAT IS YOUR UNDERSTANDING OF WHAT "SCRIPTING" MEANT

12:16PM   23    IN THIS CONTEXT?

12:16PM   24    A.   I DON'T RECALL THIS SPECIFIC ISSUE, BUT WHAT THIS SEEMS TO

12:16PM   25    ME IS THAT IT'S REFERRING TO TALKING POINTS OR MESSAGING.

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    4006

| | | |
|---|---|---|
| 12:16PM | 1 | Q.   YOU CAN PUT THAT ONE ASIDE, AND I'LL ASK YOU TO TURN TO |
| 12:17PM | 2 | EXHIBIT 4237. |
| 12:17PM | 3 | LET ME KNOW ONCE YOU'RE THERE. |
| 12:17PM | 4 | A.   OKAY. |
| 12:17PM | 5 | Q.   AND I'LL ASK YOU TO LOOK AT PAGE 4 OF EXHIBIT 4237. |
| 12:17PM | 6 | AND ON THAT PAGE, DO YOU SEE AN EMAIL FROM SOMEONE NAMED |
| 12:17PM | 7 | ELENA SCHEER TO YOU AND CHRISTIAN HOLMES AND OTHERS? |
| 12:17PM | 8 | A.   YES. |
| 12:17PM | 9 | Q.   AND IS THIS RELATED TO ANOTHER PATIENT CALL OR PATIENT |
| 12:17PM | 10 | COMPLAINT? |
| 12:17PM | 11 | A.   YES. |
| 12:17PM | 12 | MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 4237. |
| 12:18PM | 13 | MR. DOWNEY:  I'M NOT CERTAIN WHAT THE BASIS IS FOR |
| 12:18PM | 14 | ADMISSION, SO I WOULD OBJECT ON 801 GROUNDS. |
| 12:18PM | 15 | MR. BOSTIC:  YOUR HONOR, I BELIEVE THIS SHOULD COME |
| 12:18PM | 16 | IN AS A BUSINESS RECORD. |
| 12:18PM | 17 | THE COURT:  DO YOU WANT HIM TO LAY A FOUNDATION IF |
| 12:18PM | 18 | HE CAN, MR. DOWNEY? |
| 12:18PM | 19 | MR. DOWNEY:  MAY I JUST TAKE A MOMENT? |
| 12:18PM | 20 | THE COURT:  SURE.  OF COURSE. |
| 12:18PM | 21 | (PAUSE IN PROCEEDINGS.) |
| 12:18PM | 22 | MR. DOWNEY:  NO, YOUR HONOR. |
| 12:18PM | 23 | WITH THE OPPORTUNITY TO REVIEW, I DON'T THINK IT'S |
| 12:18PM | 24 | NECESSARY. |
| 12:18PM | 25 | THE COURT:  THANK YOU.  IT IS ADMITTED.  IT MAY BE |

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    4007

12:18PM   1    PUBLISHED.

12:18PM   2            (GOVERNMENT'S EXHIBIT 4237 WAS RECEIVED IN EVIDENCE.)

12:18PM   3            MR. BOSTIC:  THANK YOU, YOUR HONOR.

12:18PM   4    Q.   MR. EDLIN, LET'S GO BACK TO PAGE 4 AND READ THAT ORIGINAL

12:18PM   5    EMAIL.

12:18PM   6         AT THE BOTTOM THERE, DO YOU SEE THIS IS AN EMAIL FROM

12:19PM   7    ELENA SCHEER TO YOU, CHRISTIAN HOLMES, AND MAX FOSQUE?

12:19PM   8    A.   YES.

12:19PM   9    Q.   AND THE SUBJECT LINE IS PHYSICIAN AND PATIENT CALL

12:19PM  10    NEEDED -- HCG RESULTS.

12:19PM  11         DO YOU SEE THAT?

12:19PM  12    A.   YES.

12:19PM  13    Q.   AND DO YOU RECALL WHO ELENA SCHEER WAS AT THE COMPANY?

12:19PM  14    A.   SHE WAS A CUSTOMER SERVICE ASSOCIATE.

12:19PM  15    Q.   SHE WAS ONE OF THE STAFF MEMBERS WHO DEALT WITH INCOMING

12:19PM  16    CALLS AND COMPLAINTS FROM PATIENTS?

12:19PM  17    A.   THAT'S RIGHT.

12:19PM  18    Q.   LET'S LOOK AT THE TEXT OF HER EMAIL AND TURN TO PAGE 5 OF

12:19PM  19    THIS EXHIBIT.

12:19PM  20         AND HER EMAIL READS, "I JUST SPOKE TO," AND THEN PATIENT

12:19PM  21    NAME, "SHE IS A WAG TECH."

12:19PM  22         IS "WAG" SHORT FOR WALGREENS?

12:19PM  23    A.   YES.

12:19PM  24    Q.   "SHE IS A WALGREENS TECH AND TOLD HER DOCTOR SHE WANTED TO

12:19PM  25    USE OUR SERVICES FOR HER HCG QUANT TEST.  SHE CAME IN TWICE -

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    4008

12:19PM  1    ONCE ON THE 24TH (RESULT 120.20 MILLIUNITS PER MILLILITER) AND

12:20PM  2    ONCE ON THE 26TH, (LESS THAN 7.82 MILLIUNITS PER MILLILITER)."

12:20PM  3        DO YOU SEE THAT?

12:20PM  4    A.   YES.

12:20PM  5    Q.   SHE WRITES, "DOCTOR WAS UNSURE ABOUT THE RESULTS SO HAD

12:20PM  6    HER GO TO QUEST WHERE HER RESULT WAS MUCH, MUCH HIGHER."

12:20PM  7        DO YOU SEE THAT?

12:20PM  8    A.   YES.

12:20PM  9    Q.   AND SHE SAYS, "NOW THEY ARE WONDERING ABOUT ACCURACY OR IF

12:20PM  10   HER SAMPLE WAS SWITCHED."

12:20PM  11       IS THAT CORRECT?

12:20PM  12   A.   YES.

12:20PM  13   Q.   LET'S GO FORWARD IN TIME IN THIS EMAIL CHAIN TO PAGE 1,

12:20PM  14   AND LET'S ZOOM IN ON THE TOP PORTION OF THE PAGE.

12:20PM  15       FIRST, DO YOU HAVE AN UNDERSTANDING OF WHAT THE HCG TEST

12:20PM  16   WAS AND HOW IT WAS USED?

12:20PM  17   A.   I BELIEVE IT WAS A PREGNANCY TEST.

12:20PM  18   Q.   DO YOU SEE ON YOUR SCREEN AN EMAIL FROM CHINMAY PANGARKAR

12:20PM  19   TO MAX FOSQUE, DANIEL YOUNG, AND CHRISTIAN HOLMES?

12:21PM  20   A.   YES.

12:21PM  21   Q.   AND RESPONDING ON THIS TOPIC, CHINMAY PANGARKAR SAYS, "IT

12:21PM  22   IS POSSIBLE THAT THE SAMPLE GOT SWITCHED?  OTHERWISE, THIS ONE

12:21PM  23   SEEMS LIKE ANOTHER ONE OF THESE OUTLIERS.  WE ARE GETTING MORE

12:21PM  24   OF THESE.  THE HCG FOR THIS PATIENT (ASSUMING IT IS NORMAL

12:21PM  25   PREGNANCY) SHOULD BE MORE THAN 240."

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    4009

12:21PM  1          DO YOU SEE THAT?

12:21PM  2     A.   YES.

12:21PM  3     Q.   DO YOU HAVE IN FRONT OF YOU AN EXHIBIT MARKED 5439?

12:21PM  4          I THINK YOU MIGHT NOT.

12:21PM  5          MAY I APPROACH, YOUR HONOR?

12:21PM  6              THE COURT:  YES.

12:21PM  7              THE WITNESS:  I DON'T.

12:21PM  8     BY MR. BOSTIC:

12:22PM  9     Q.   (HANDING.)

12:22PM  10         MR. EDLIN, DO YOU HAVE EXHIBIT 5439 IN FRONT OF YOU?

12:22PM  11    A.   YES.

12:22PM  12    Q.   THIS IS AN EMAIL THAT YOU'RE NOT ON; IS THAT CORRECT?

12:22PM  13    A.   YES.

12:22PM  14    Q.   CAN YOU TELL US WHO THE EMAIL IS FROM AND TO?

12:22PM  15    A.   THE EMAIL IS FROM MAX FOSQUE TO SUNNY BALWANI.

12:22PM  16    Q.   AND I'LL ASK YOU TO JUST FLIP THROUGH THE ATTACHED PAGES

12:22PM  17    IF YOU WOULDN'T MIND.

12:22PM  18         I'LL ASK YOU ALSO TO JUST TAKE A QUICK LOOK AT THE NAMES

12:22PM  19    OF THE ATTACHMENTS ON THE FIRST PAGE AND FAMILIARIZE YOURSELF

12:22PM  20    WITH THAT.

12:23PM  21    A.   OKAY.

12:23PM  22    Q.   YOU PREVIOUSLY TESTIFIED THAT YOU WERE AWARE THAT THERE

12:23PM  23    WERE INDIVIDUALS AT THERANOS WHO KIND OF HELMED THE PHONE LINES

12:23PM  24    SO THAT WHEN CALLS FROM PATIENTS OR DOCTORS CAME IN, THERE

12:23PM  25    WOULD BE SOMEONE TO ANSWER?

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    4010

12:23PM  1    A.   THAT'S RIGHT.

12:23PM  2    Q.   DID YOU HAVE AN UNDERSTANDING OF WHAT HAPPENED WHEN THOSE

12:23PM  3    CALLS CAME IN?  OBVIOUSLY THE THERANOS EMPLOYEE WOULD SPEAK TO

12:23PM  4    THE PATIENT OR DOCTOR; IS THAT RIGHT?

12:23PM  5    A.   A CUSTOMER SERVICE REPRESENTATIVE.

12:23PM  6    Q.   RIGHT.  WHAT WAS THE PROCESS AFTER THAT?  FOR EXAMPLE, WAS

12:23PM  7    INFORMATION GAINED DURING THOSE CALLS PRESERVED AT THERANOS?

12:23PM  8         DO YOU KNOW?

12:23PM  9    A.   WELL, THIS EXHIBIT LOOKS LIKE SOME TYPE OF LOG, BUT THIS

12:23PM  10   IS THE FIRST TIME THAT I'M SEEING THIS.

12:23PM  11   Q.   THIS IS THE FIRST TIME THAT YOU'RE SEEING THIS TYPE OF

12:23PM  12   DOCUMENT?

12:23PM  13   A.   RIGHT.

12:23PM  14        MR. DOWNEY:  OBJECTION, YOUR HONOR, TO FURTHER

12:24PM  15   DISCUSSION OF THE EMAIL FOR THE REASONS THAT WE DISCUSSED.

12:24PM  16        THE COURT:  WELL, LET'S SEE YOUR NEXT QUESTION, WHAT

12:24PM  17   THE NEXT QUESTION IS.

12:24PM  18   BY MR. BOSTIC:

12:24PM  19   Q.   DURING YOUR TIME AT THERANOS, WERE YOU AWARE THAT THE

12:24PM  20   COMPANY PRESERVED RECORDS OF CALLS AND COMPLAINTS THAT CAME IN

12:24PM  21   FROM DOCTORS OR PATIENTS?

12:24PM  22   A.   I WAS NOT AWARE OF THAT.

12:24PM  23   Q.   WERE YOU HAVE GENERALLY AWARE THAT THE COMPANY -- THAT

12:24PM  24   INDIVIDUALS AT THE COMPANY USED EMAIL TO COMMUNICATE ABOUT

12:24PM  25   CALLS AND COMPLAINTS THAT CAME IN FROM DOCTORS AND PATIENTS?

                            EDLIN DIRECT BY MR. BOSTIC (RES.)                4011

12:24PM   1      A.   I WOULDN'T SAY I HAD SPECIFIC KNOWLEDGE OF THAT, OF HOW

12:24PM   2      EMAIL WAS USED FOR THAT.  EMAIL WAS USED AS THE PRIMARY METHOD

12:24PM   3      OF COMMUNICATION AT THE COMPANY I WOULD SAY.

12:24PM   4      Q.   AND WOULD THAT HAVE INCLUDED ISSUES THAT CAME UP THAT WERE

12:24PM   5      RAISED BY DOCTORS AND PATIENTS, FOR EXAMPLE?

12:24PM   6      A.   IT LIKELY COULD HAVE.

12:24PM   7      Q.   AND DO YOU HAVE AN UNDERSTANDING, BASED ON YOUR TIME AT

12:25PM   8      THE COMPANY, OF THE ROLE THAT MR. BALWANI PLAYED WHEN IT CAME

12:25PM   9      TO THE TESTING SERVICES OF THE COMPANY?

12:25PM   10     A.   SUNNY WAS THE PRESIDENT AND CHIEF OPERATING OFFICER, AND

12:25PM   11     MY UNDERSTANDING WAS THAT HE OVERSAW THE CLINICAL LAB

12:25PM   12     OPERATION.

12:25PM   13     Q.   WHEN ISSUES CAME UP RELATING TO PATIENT TESTS, WERE THOSE

12:25PM   14     ISSUES ROUTINELY RAISED TO MR. BALWANI AS PART OF THE NORMAL

12:25PM   15     OPERATION OF THE COMPANY?

12:25PM   16     A.   I DON'T KNOW.  I WASN'T REALLY A PART OF THAT PROCESS.

12:25PM   17     Q.   DO YOU RECALL WHETHER MR. BALWANI HAD ANY RESPONSIBILITIES

12:25PM   18     IN CONNECTION WITH THE OPERATION OF THE CLINICAL LAB AT

12:26PM   19     THERANOS?

12:26PM   20     A.   YES.

12:26PM   21     Q.   AND WHAT WERE HIS RESPONSIBILITIES?

12:26PM   22     A.   AS THE CHIEF OPERATING OFFICER, I BELIEVE HE OVERSAW THE

12:26PM   23     CLINICAL LAB OPERATION AND WAS IN.

12:26PM   24          MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT MOVES TO

12:26PM   25     ADMIT 5439.

                          EDLIN DIRECT BY MR. BOSTIC (RES.)                    4012

12:26PM   1              MR. DOWNEY:  OBJECTION UNDER 403, 404(A), 801, AND

12:26PM   2     THE REASONS WE DISCUSSED THIS MORNING.

12:26PM   3              THE COURT:  MR. BOSTIC, I'M GOING TO HAVE TO SUSTAIN

12:26PM   4     THE OBJECTION.

12:26PM   5              MR. BOSTIC:  OKAY.  ALL RIGHT.  I CAN MOVE ON FOR

12:26PM   6     NOW.

12:26PM   7     Q.   MR. EDLIN, YOU CAN PUT THAT ASIDE.  THANK YOU.

12:26PM   8          LET'S SHIFT GEARS AND TALK ABOUT THERANOS'S DEALINGS WITH

12:26PM   9     THE MILITARY IF WE COULD.

12:26PM  10          FIRST, ARE YOU AWARE, DURING YOUR TIME AT THE COMPANY, OF

12:26PM  11     ANY COMMUNICATIONS THAT THERANOS HAD WITH REPRESENTATIVES OF

12:26PM  12     THE U.S. ARMED FORCES?

12:26PM  13     A.   I AM.

12:26PM  14     Q.   DID YOU HAVE A ROLE IN THOSE COMMUNICATIONS?

12:27PM  15     A.   I DID.

12:27PM  16     Q.   AND WHAT WAS YOUR ROLE GENERAL SPEAKING?

12:27PM  17     A.   I HELPED TO SUPPORT RELATIONSHIPS WITH DIFFERENT PARTS OF

12:27PM  18     THE MILITARY AND WITH THE DEPARTMENT OF DEFENSE, AND I WORKED

12:27PM  19     DIRECTLY WITH ELIZABETH TO SUPPORT THOSE RELATIONSHIPS AND

12:27PM  20     COMMUNICATE WITH REPRESENTATIVE FROM EACH DEPARTMENT.

12:27PM  21     Q.   AND WHEN YOU TALK ABOUT "RELATIONSHIPS," WHAT DO YOU MEAN?

12:27PM  22     WHAT WAS THE END GOAL OF THESE COMMUNICATIONS?

12:27PM  23     A.    THE END GOAL WAS TO SET UP A RESEARCH PROGRAM THAT WOULD

12:27PM  24     COMPARE THERANOS TESTING TO THE TESTING AVAILABLE AT THE

12:27PM  25     MILITARY AT THAT TIME, OR AVAILABLE TO THE MILITARY AT THAT

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    4013

12:27PM  1     TIME.

12:27PM  2     Q.   UNDERSTOOD.

12:28PM  3          SO THE GOAL WAS TO HAVE THAT COMPARISON WHERE THE THERANOS

12:28PM  4     TECHNOLOGY COULD BE PUT UP AGAINST WHAT WAS CURRENTLY BEING

12:28PM  5     USED BY THE MILITARY?

12:28PM  6     A.   THAT'S RIGHT, IN COMPARISON.

12:28PM  7          AND THE STUDIES WERE SET UP IN A SET OF SORT OF PHASED

12:28PM  8     APPROACH WHERE CERTAIN COMPARATIVE TESTING WAS DONE FIRST, AND

12:28PM  9     THEN THERE WERE OTHER SERIES OF TESTING AFTERWARD IF THOSE

12:28PM  10    PRECEDING PHASES WERE ACCEPTABLE.

12:28PM  11    Q.   AND WHAT ABOUT THE PLAN FOR AFTER THAT TESTING PHASE?

12:28PM  12    WHAT WAS THE POINT OF HAVING THIS KIND OF AN EVALUATION DONE?

12:28PM  13    A.   THE POINT WAS TO DETERMINE WHETHER OR NOT THERANOS TESTING

12:28PM  14    DEVICES AND THE SYSTEMS COULD BE USED FOR SOLDIERS AND

12:28PM  15    PERSONNEL IN THE MILITARY IN THE FIELD.

12:29PM  16    Q.   FROM THERANOS'S PERSPECTIVE, DID YOU UNDERSTAND THAT THE

12:29PM  17    COMPANY WAS INTERESTED IN PURSUING THAT KIND OF POTENTIAL USE

12:29PM  18    BY THE MILITARY?

12:29PM  19    A.   I THINK THERE WAS MUTUAL INTEREST IN PURSUING THAT

12:29PM  20    APPROACH.

12:29PM  21    Q.   I'LL ASK YOU TO LOOK IN YOUR BINDER AT EXHIBIT 504,

12:29PM  22    PLEASE.

12:29PM  23         FIRST, LET ME JUST ASK YOU, TO YOUR KNOWLEDGE, DID THE

12:29PM  24    MILITARY EVER END UP USING THERANOS TECHNOLOGY IN THE CLINICAL

12:29PM  25    TREATMENT OF SOLDIERS?

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    4014

12:29PM  1    A.   NOT TO MY KNOWLEDGE.

12:29PM  2    Q.   DO YOU HAVE EXHIBIT 504 IN FRONT OF YOU?

12:29PM  3    A.   I DO.

12:30PM  4    Q.   IS IT AN EMAIL CHAIN INCLUDING YOU, MS. HOLMES, AND

12:30PM  5    SOMEONE NAMED STEPHEN COOK?

12:30PM  6    A.   YES.

12:30PM  7    Q.   AND WHO WAS STEPHEN COOK?

12:30PM  8    A.   STEPHEN COOK, STEPHEN COOK WAS A PART OF SPECIAL

12:30PM  9    OPERATIONS COMMAND AND MY POINT OF CONTACT FOR -- REGARDING

12:30PM  10   THIS PROPOSED RESEARCH STUDY.

12:30PM  11   Q.   AND WAS THIS EMAIL COMMUNICATION IN FURTHERANCE OF

12:30PM  12   EXPLORING THAT RELATIONSHIP BETWEEN THERANOS AND THE MILITARY?

12:30PM  13   A.   YES.

12:30PM  14        MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT MOVES TO

12:30PM  15   ADMIT EXHIBIT 504.

12:30PM  16        MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

12:30PM  17        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:30PM  18   (GOVERNMENT'S EXHIBIT 504 WAS RECEIVED IN EVIDENCE.)

12:31PM  19        MR. BOSTIC:  AND IF WE CAN ZOOM IN ON -- ACTUALLY,

12:31PM  20   LET'S START ON PAGE 4 OF THE EXHIBIT.  AND IF WE CAN ZOOM IN ON

12:31PM  21   THE TOP HALF OF THE PAGE.

12:31PM  22   Q.   MR. EDLIN, DO YOU SEE AN EMAIL SENT ON DECEMBER 15TH,

12:31PM  23   2011?

12:31PM  24   A.   YES.

12:31PM  25   Q.   AND THE EMAIL IS FROM MAJOR STEPHEN COOK.

UNITED STATES COURT REPORTERS

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    4015

| | | |
|---|---|---|
| 12:31PM | 1 | DO YOU SEE THAT? |
| 12:31PM | 2 | A.   YES. |
| 12:31PM | 3 | Q.   AND IT'S ADDRESSED TO MS. HOLMES. |
| 12:31PM | 4 | AND IN THE MIDDLE OF THE EMAIL IT MENTIONS "MORE EXTENSIVE |
| 12:31PM | 5 | ENVIRONMENTAL TESTING - AND DEVICE FUNCTION ON BOARD EVACUATION |
| 12:31PM | 6 | PLATFORMS." |
| 12:31PM | 7 | DO YOU SEE THAT? |
| 12:31PM | 8 | A.   YES. |
| 12:31PM | 9 | Q.   AND CAN YOU EXPLAIN WHAT YOU UNDERSTOOD THAT TO MEAN AT |
| 12:31PM | 10 | THE TIME IN CONNECTION WITH MILITARY INVOLVEMENT? |
| 12:31PM | 11 | A.   AT THE TIME OF THIS EMAIL, I HAD BEEN AT THE COMPANY FOR |
| 12:32PM | 12 | ABOUT THREE MONTHS SO I'M NOT SURE IF I HAD THAT UNDERSTANDING |
| 12:32PM | 13 | AT THAT POINT IN TIME, BUT I BELIEVE AN ONBOARD EVACUATION |
| 12:32PM | 14 | PLATFORM REFERS TO A MEDEVAC. |
| 12:32PM | 15 | Q.   AND IS A MEDEVAC A KIND OF MILITARY VEHICLE? |
| 12:32PM | 16 | A.   YES, A HELICOPTER, I BELIEVE. |
| 12:32PM | 17 | Q.   AND LOOKING AT THE PARAGRAPH ABOVE THAT, THERE'S INTEREST |
| 12:32PM | 18 | EXPRESSED IN RECEIVING A SUMMARY OF THE EXISTING TECHNOLOGY AND |
| 12:32PM | 19 | THERANOS'S IMPRESSION OF WHERE SOMEONE NAMED KYLE SIMS WOULD |
| 12:32PM | 20 | LIKE TO TAKE THE TECHNOLOGY. |
| 12:32PM | 21 | DO YOU SEE THAT? |
| 12:32PM | 22 | A.   YES. |
| 12:32PM | 23 | Q.   LET'S TURN THE PAGE TO LOOK AT PAGE 3 OF THIS EXHIBIT. |
| 12:32PM | 24 | LET'S ZOOM IN ON THE MIDDLE OF THE PAGE. |
| 12:32PM | 25 | AND DO YOU SEE A FOLLOW-UP EMAIL FROM MAJOR COOK? |

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    4016

12:33PM  1    A.   YES.

12:33PM  2    Q.   HE SAYS TO YOU AND MS. HOLMES, "STILL WAITING FOR FEEDBACK

12:33PM  3    ON THE BELOW INQUIRY."

12:33PM  4         AND THEN HE SAYS HE'S "TRYING TO DETERMINE IF OUR

12:33PM  5    ASSESSMENT WILL BE IN THE FORM OF APPROXIMATELY 3 EACH DEVICES

12:33PM  6    OVER A TRIAL OF 12-MONTH SERVICE CONTRACT."

12:33PM  7         DO YOU SEE THAT?

12:33PM  8    A.   YES.

12:33PM  9    Q.   AND IS IT YOUR UNDERSTANDING THAT THIS TRIAL PERIOD WOULD

12:33PM  10   INVOLVE ACTUAL CLINICAL USE OF THE DEVICE, OR IS IT EVALUATION

12:33PM  11   OF THE DEVICE FOR POTENTIAL USE?

12:33PM  12   A.   EVALUATION OF THE DEVICE FOR POTENTIAL USE.

12:33PM  13   Q.   LET'S LOOK AT PAGE 2 OF THIS EMAIL.  ZOOM IN ON THE MIDDLE

12:33PM  14   OF THE PAGE HERE.

12:34PM  15        AND WE SEE AN EMAIL FROM YOU TO MAJOR COOK IN JANUARY OF

12:34PM  16   2012; IS THAT CORRECT?

12:34PM  17   A.   CORRECT.

12:34PM  18   Q.   AND IN THE MIDDLE OF THE FIRST FULL PARAGRAPH THERE, YOU

12:34PM  19   SAY, "WITH REGARD TO THE ROUGH ORDER OF MAGNITUDE THAT WOULD

12:34PM  20   SUPPORT A 12-MONTH EVALUATION PERIOD, WE KINDLY ASK THAT YOU

12:34PM  21   SEND A TOTAL LIST OF ASSAYS YOU WOULD LIKE TO TEST."

12:34PM  22        DO YOU SEE THAT?

12:34PM  23   A.   YES.

12:34PM  24   Q.   AT THIS TIME IN EARLY 2012, DID YOU PERSONALLY HAVE AN

12:34PM  25   UNDERSTANDING OF WHAT ASSAYS THE THERANOS-BUILT ANALYZER COULD

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    4017

12:34PM  1    ACTUALLY RUN?

12:34PM  2    A.   NO.

12:34PM  3    Q.   DID YOU UNDERSTAND AT THIS TIME THAT THERE WERE SOME

12:34PM  4    ASSAYS THE THERANOS DEVICE COULD PERFORM AND OTHERS IT COULD

12:34PM  5    NOT?

12:34PM  6    A.   I'M NOT SURE.  I DIDN'T KNOW WHICH TESTS COULD BE

12:34PM  7    PERFORMED AND WHICH COULDN'T.

12:34PM  8    Q.   DID YOU LATER COME TO HAVE A BETTER UNDERSTANDING THAT

12:34PM  9    THERE WERE SOME TESTS THE DEVICE COULD DO AND OTHERS THAT IT

12:35PM  10   COULD NOT?

12:35PM  11   A.   I DID COME TO THAT UNDERSTANDING.

12:35PM  12   Q.   LET'S LOOK AT PAGE 1 OF THIS EXHIBIT.  ZOOM IN ON THE

12:35PM  13   BOTTOM HALF.

12:35PM  14        IN THIS EMAIL FROM MAJOR COOK, HE SAYS, "ACTUALLY MY

12:35PM  15   VERBAL REQUESTS OF LAST WEEK CHANGED FROM MY WRITTEN INQUIRY

12:35PM  16   THAT YOU ANSWERED BELOW.  AS YOU KNOW, WE'RE LOOKING TO

12:35PM  17   EVALUATE YOUR SYSTEM TO DETERMINE ITS UTILITY ACROSS THE

12:35PM  18   OPERATIONS AND ENVIRONMENTS IN WHICH WE'D LIKE TO DEPLOY IT."

12:35PM  19        DO YOU SEE THAT?

12:35PM  20   A.   YES.

12:35PM  21   Q.   AND A COUPLE OF PARAGRAPHS DOWN HE TALKS ABOUT 3 DEVICES

12:35PM  22   (GPS DISABLED) - RUNNING UP TO 400 ASSAYS EACH PER MONTH,

12:35PM  23   INCLUDING ASSAYS LIKE COMPLETE BLOOD COUNT AND CHEM 7.

12:35PM  24        DO YOU SEE THAT?

12:35PM  25   A.   YES.

EDLIN DIRECT BY MR. BOSTIC (RES.)                                   4018

12:35PM  1      Q.   LET'S LOOK AT THE TOP MESSAGE IN THIS EMAIL CHAIN.

12:36PM  2           THIS IS A MESSAGE FROM YOU BACK TO MAJOR COOK; IS THAT

12:36PM  3      RIGHT?

12:36PM  4      A.   YES.

12:36PM  5      Q.   AND YOU THANK HIM FOR THE INFORMATION THAT HE PROVIDED,

12:36PM  6      AND YOU ATTACH WHAT YOU CALL AN OVERVIEW OF THE THERANOS U.S.A.

12:36PM  7      SOC PROJECT.

12:36PM  8           DO YOU SEE THAT?

12:36PM  9      A.   YES.

12:36PM 10      Q.   LET'S LOOK AT THAT ATTACHMENT ON PAGE 5 OF THAT EXHIBIT.

12:36PM 11      AND IF WE CAN ZOOM IN ON THE TOP HALF OF THE PAGE.

12:36PM 12           FIRST OF ALL, MR. EDLIN, ARE YOU GENERALLY FAMILIAR WITH

12:36PM 13      THE DOCUMENT THAT WE'RE LOOKING AT?

12:36PM 14      A.   YES.

12:36PM 15      Q.   WHO CREATED THIS DOCUMENT?

12:36PM 16      A.   I DON'T REMEMBER SPECIFICALLY.

12:36PM 17      Q.   DO YOU RECALL WHETHER YOU MADE ANY CHANGES TO THIS

12:37PM 18      DOCUMENT BEFORE SENDING IT TO MAJOR COOK ON THIS DATE?

12:37PM 19      A.   I BELIEVE THAT I DID MAKE CHANGES, YES.

12:37PM 20      Q.   WAS MS. HOLMES INVOLVED AT ALL IN FINALIZING OR APPROVING

12:37PM 21      THE CONTENT OF THIS DOCUMENT BEFORE YOU SENT IT TO MAJOR COOK?

12:37PM 22      A.   YES, EVERY -- EVERYTHING IN THIS DOCUMENT WAS REVIEWED AND

12:37PM 23      APPROVED BY ELIZABETH.

12:37PM 24      Q.   TELL ME ABOUT HOW THAT WORKED IN GENERAL WHEN IT CAME TO

12:37PM 25      YOUR COMMUNICATIONS WITH THE MILITARY.  WHAT WAS MS. HOLMES'S

EDLIN DIRECT BY MR. BOSTIC (RES.)                    4019

12:37PM  1    LEVEL OF INVOLVEMENT THERE?

12:37PM  2    A.   SHE WAS HIGHLY INVOLVED.  I WOULD SAY ANY SUBSTANTIVE

12:37PM  3    COMMUNICATION THAT I HAD WITH THE MILITARY I EITHER DISCUSSED

12:37PM  4    WITH HER AHEAD OF TIME, OUR DISCUSSIONS INFORMED EMAIL DRAFTS

12:38PM  5    THAT I WOULD THEN SEND BACK TO HER TO REVIEW AND APPROVE BEFORE

12:38PM  6    I SENT THEM BACK OUT.

12:38PM  7        I ALSO MADE SURE THAT SHE WAS AWARE OF ANY INBOUND

12:38PM  8    COMMUNICATION THAT WE DID GET FROM MEMBERS OF THE MILITARY.

12:38PM  9        AND ASIDE FROM, YOU KNOW, SCHEDULING AND THINGS LIKE THAT,

12:38PM  10   I REVIEWED EVERYTHING WITH HER.

12:38PM  11   Q.   LET'S LOOK AT THIS MEMORANDUM SPECIFICALLY.  AND UNDER

12:38PM  12   BACKGROUND, THIS MEMORANDUM SENT TO THE MILITARY SAYS,

12:38PM  13   "THERANOS HAS CREATED A POINT-OF-SERVICE LABORATORY

12:38PM  14   INFRASTRUCTURE THAT GENERATES REAL-TIME DATA FROM A FINGERSTICK

12:38PM  15   OF BLOOD OR OTHER MICRO-VOLUMES OF DIFFERENT SAMPLE TYPES

12:38PM  16   DELIVERING HIGHER QUALITY DATA THAN PREVIOUSLY POSSIBLE."

12:38PM  17       DO YOU SEE THAT?

12:38PM  18   A.   YES.

12:38PM  19   Q.   AND IT GOES ON TO SAY, "THIS TECHNOLOGY IS AN INDUSTRY

12:38PM  20   FIRST, WITH PROFOUND EFFECTS ON THE ABILITY TO TRIAGE AND

12:38PM  21   STABILIZE PATIENTS VIA QUANTITATIVE READS FROM MICRO-SAMPLE

12:39PM  22   SIZES IN REAL-TIME IN THE FIELD."

12:39PM  23       DO YOU SEE THAT?

12:39PM  24   A.   YES.

12:39PM  25   Q.   AND THERE'S A LIST OF BULLET POINTS.  THE FIRST ONE READS,

EDLIN DIRECT BY MR. BOSTIC (RES.)                                   4020

12:39PM   1    "EACH THERANOS DEVICE CAN RUN EVERY TEST CURRENTLY AVAILABLE

12:39PM   2    THROUGH THE TRADITIONAL CENTRALIZED OR HOSPITAL LABORATORY

12:39PM   3    INFRASTRUCTURE."

12:39PM   4        DO YOU SEE THAT?

12:39PM   5    A.   YES.

12:39PM   6    Q.   AT THE TIME THAT YOU SENT THIS PRESENTATION TO THE

12:39PM   7    MILITARY, DID YOU KNOW WHETHER THAT PARTICULAR STATEMENT WAS

12:39PM   8    TRUE?

12:39PM   9    A.   I DID NOT.

12:39PM  10    Q.   DID YOU ASSUME IT WAS TRUE?

12:39PM  11    A.   I ASSUMED IT WAS TRUE.  I HAD NO REASON TO THINK IT WASN'T

12:39PM  12    TRUE.

12:39PM  13    Q.   WHEN IT SAYS, "EACH THERANOS DEVICE CAN RUN EVERY TEST

12:39PM  14    CURRENTLY AVAILABLE THROUGH THE TRADITIONAL CENTRALIZED OR

12:39PM  15    HOSPITAL LABORATORY INFRASTRUCTURE," WHAT WAS YOUR SENSE AS TO

12:39PM  16    WHY THAT FACT WOULD MATTER TO THE MILITARY?

12:39PM  17    A.   CAN YOU REPEAT WHICH FACT THAT WAS?

12:39PM  18    Q.   SURE.

12:39PM  19    A.   THE HIGHLIGHTED?

12:39PM  20    Q.   IT'S THE FIRST BULLET POINT --

12:39PM  21    A.   UH-HUH.

12:40PM  22    Q.   -- ABOUT EACH DEVICE BEING ABLE TO RUN EVERY TEST.

12:40PM  23    A.   I'M SORRY.  CAN YOU REPEAT THE QUESTION?

12:40PM  24    Q.   SURE.  THE QUESTION IS, WHAT WAS YOUR SENSE AS TO WHY

12:40PM  25    SOMETHING LIKE THAT WOULD MATTER TO THE MILITARY?

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    4021

12:40PM   1    A.   WELL, THE MILITARY DID EXPRESS INTEREST IN, IN ONE DEVICE

12:40PM   2    THAT COULD DO ALL OF ITS DESIRED TESTING, AND I WAS TOLD THAT

12:40PM   3    THIS DEVICE WAS SMALLER, MORE PORTABLE THAN THE EXISTING

12:40PM   4    EQUIPMENT THAT THEY DID HAVE, AND THAT HAD A NUMBER OF

12:40PM   5    DIFFERENT BENEFITS.

12:40PM   6    Q.   A FEW BULLET POINTS DOWN, THE SECOND TO THE BOTTOM BULLET

12:40PM   7    POINT SAYS, "THERANOS MANUFACTURES ALL OF ITS TECHNOLOGIES AND

12:40PM   8    SYSTEMS WITHIN THE UNITED STATES."

12:40PM   9         DO YOU SEE THAT?

12:40PM   10   A.   I DO.

12:40PM   11   Q.   AT THIS TIME DO YOU KNOW WHETHER THE COMPANY OWNED ANY

12:41PM   12   THIRD PARTY ANALYZERS?

12:41PM   13   A.   I BELIEVE IT DID.

12:41PM   14   Q.   LET'S LOOK AT THE NEXT PAGE.  THAT'S PAGE 6 OF THIS

12:41PM   15   DOCUMENT.

12:41PM   16        AND UNDER PROJECT SCOPE, DO YOU SEE THERE'S A SECTION

12:41PM   17   TITLED THERE MEDEVAC?

12:41PM   18   A.   YES.

12:41PM   19   Q.   AND IN THIS THERANOS MEMO IT SAYS, "MEDEVAC:  THE ABILITY

12:41PM   20   TO TEST AND TRIAGE WOUNDED SOLDIERS AT THE TIME OF IMPACT AND

12:41PM   21   DURING EVACUATION (E.G. IN A HELICOPTER) AND AVOID DELAYED CARE

12:41PM   22   DUE TO UNAVAILABLE MEDICAL INFORMATION WHILE THE SOLDIER IS IN

12:41PM   23   TRANSIT."

12:41PM   24        DO YOU SEE THAT?

12:41PM   25   A.   YES.

EDLIN DIRECT BY MR. BOSTIC (RES.)                              4022

| | | |
|---|---|---|
| 12:41PM | 1 | Q.   AND UNDER TELECOMMUNICATIONS, THE END OF THAT PARAGRAPH |
| 12:41PM | 2 | TALKS ABOUT "THERANOS FIELD SYSTEM'S RUGGED, MODULAR DESIGN |
| 12:42PM | 3 | WITH INTEGRATED COMMUNICATIONS CAPABILITY AND GPS ENABLE FULL |
| 12:42PM | 4 | OPERABILITY IN THE FIELD." |
| 12:42PM | 5 | DO YOU SEE THAT? |
| 12:42PM | 6 | A.   I DO. |
| 12:42PM | 7 | Q.   AND BASED ON YOUR KNOWLEDGE AT THE TIME, DID YOU HAVE A |
| 12:42PM | 8 | BASIS TO KNOW WHETHER THOSE STATEMENTS WERE TRUE OR FALSE? |
| 12:42PM | 9 | A.   I DIDN'T HAVE THAT BASIS. |
| 12:42PM | 10 | Q.   THIS PRESENTATION AT THE TOP SAYS U.S.A. SOC AND THERANOS; |
| 12:42PM | 11 | IS THAT RIGHT? |
| 12:42PM | 12 | A.   YES. |
| 12:42PM | 13 | Q.   AND WHAT DID U.S.A. SOC STAND FOR? |
| 12:42PM | 14 | A.   UNITED STATES OF AMERICA SPECIAL OPERATIONS COMMAND. |
| 12:42PM | 15 | Q.   WHAT DO YOU RECALL ABOUT FUTURE DEVELOPMENTS BETWEEN |
| 12:42PM | 16 | THERANOS AND U.S. SPECIAL OPERATIONS COMMAND? |
| 12:42PM | 17 | FOR EXAMPLE, DID SPECIAL OPERATIONS COMMAND EVER RECEIVE |
| 12:43PM | 18 | DEVICES FROM THERANOS? |
| 12:43PM | 19 | A.   YES, I BELIEVE THEY RECEIVED THREE DEVICES. |
| 12:43PM | 20 | Q.   AND TELL ME ABOUT WHAT.  WHAT DO YOU RECALL? |
| 12:43PM | 21 | A.   I RECALL THAT WE HAD SPENT MONTHS, IF NOT YEARS, |
| 12:43PM | 22 | DISCUSSING A POTENTIAL RESEARCH PROGRAM WITH SPECIAL OPERATIONS |
| 12:43PM | 23 | COMMAND, AND AT ONE POINT I THINK THERE WAS AN AGREEMENT OR A |
| 12:43PM | 24 | CONTRACT IN PLACE, AND TOWARDS THE END OF THAT RELATIONSHIP |
| 12:43PM | 25 | THERANOS SENT THREE DEVICES TO A WAREHOUSE IN KENTUCKY, I |

                    EDLIN DIRECT BY MR. BOSTIC (RES.)                    4023

12:43PM   1    BELIEVE, TO SPECIAL OPERATIONS COMMAND.

12:43PM   2    Q.   AND THOSE DEVICES, AGAIN, WERE THEY FOR THE PURPOSE OF USE

12:43PM   3    IN CLINICAL TESTING TO TREAT SOLDIERS, OR WERE THEY FOR

12:43PM   4    EVALUATION PURPOSES?

12:43PM   5    A.   THEY WERE FOR EVALUATION PURPOSES.

12:44PM   6    Q.   DO YOU RECALL ANYTHING ABOUT THE CAPABILITY OF THOSE

12:44PM   7    DEVICES, WHAT THEY COULD DO, WHAT THEY COULD NOT DO?

12:44PM   8    A.   I DO.

12:44PM   9    Q.   AND WHAT DO YOU REMEMBER ABOUT THAT?

12:44PM   10   A.   I REMEMBER THAT THE DEVICES COULD DO A CERTAIN SUBSET.  I

12:44PM   11   WAS TOLD THAT THE DEVICES COULD DO A CERTAIN SUBSET OF TESTING,

12:44PM   12   BUT NOT ALL TESTING.

12:44PM   13   Q.   DO YOU RECALL WHETHER THE DEVICES THAT WERE SENT TO

12:44PM   14   SPECIAL OPERATIONS COMMAND COULD DO A CBC, FOR EXAMPLE?

12:44PM   15   A.   I RECALL BEING TOLD THAT THEY COULD NOT.

12:44PM   16   Q.   HOW ABOUT KIND OF WHAT BECAME OF THOSE DEVICES?  ARE YOU

12:44PM   17   AWARE OF SPECIAL OPERATIONS COMMAND EVER ACTUALLY USING THOSE

12:44PM   18   DEVICES AS PART OF THE EVALUATION THAT WE'VE BEEN TALKING

12:44PM   19   ABOUT?

12:44PM   20   A.   I'M NOT AWARE THAT THAT HAPPENED.  I RECALL THAT THE

12:44PM   21   DEVICES WERE SENT, RECEIVED, BUT THEN NO ADDITIONAL ACTION WAS

12:45PM   22   TAKEN.

12:45PM   23   Q.   I'LL ASK YOU NOW TO LOOK AT EXHIBIT 551 IN YOUR BINDER.

12:45PM   24        DO YOU HAVE THAT IN FRONT OF YOU?

12:45PM   25   A.   I DO.

EDLIN DIRECT BY MR. BOSTIC (RES.)                                4024

12:45PM  1    Q.   IS THIS AN EMAIL BETWEEN YOU, MS. HOLMES, AND SOMEONE

12:45PM  2    NAMED KEVIN CHUNG?

12:45PM  3    A.   YES.

12:45PM  4    Q.   WHO WAS KEVIN CHUNG?

12:45PM  5    A.   KEVIN CHUNG WAS A DOCTOR.

12:45PM  6    Q.   AND WHO DID HE WORK FOR?

12:45PM  7    A.   JUDGING BY HIS EMAIL, IT WAS THE ARMY, I BELIEVE, AND I

12:45PM  8    THINK HE WAS BASED IN -- AT THE U.S.A. ARMY INSTITUTE OF

12:45PM  9    SURGICAL RESEARCH IN SAN ANTONIO.

12:45PM  10   Q.   DO YOU RECALL HAVING INTERACTIONS WITH THAT COMPONENT OF

12:45PM  11   THE MILITARY WHEN YOU WERE AT THERANOS?

12:45PM  12   A.   I DO.

12:46PM  13            MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

12:46PM  14   EXHIBIT 551.

12:46PM  15            MR. DOWNEY:  OBJECTION FOR THE REASONS THAT WE

12:46PM  16   DISCUSSED EARLIER, YOUR HONOR.

12:46PM  17            THE COURT:  IS IT THE ENTIRE CONTENT OF 551,

12:46PM  18   INCLUDING THE EXHIBIT IN THE BACK?

12:46PM  19            MR. BOSTIC:  YES, YOUR HONOR.

12:46PM  20            THE COURT:  AND I'D LIKE TO TALK TO COUNSEL ABOUT

12:46PM  21   THIS.

12:46PM  22        MAYBE WE SHOULD HAVE A SIDE-BAR.

12:46PM  23        MS. RODRIGUEZ, SHOULD WE DO THAT IN THE BACK?  LET'S DO

12:46PM  24   THAT.

12:46PM  25        SO, MR. DOWNEY, WOULD YOU JOIN MR. BOSTIC AND MYSELF?

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    4025

```
12:46PM   1            LADIES AND GENTLEMEN, I JUST NEED TO TALK TO THESE LAWYERS

12:46PM   2   ABOUT SOMETHING.  WE'RE GOING TO STEP -- OUR PROTOCOL FOR THIS

12:46PM   3   IS WE'RE GOING TO STEP INTO THE ROOM JUST BEHIND US HERE TO DO

12:46PM   4   THIS.  I'M GOING TO TAKE OUR COURT REPORTER WITH US.

12:46PM   5            WHILE I'M GONE, YOU ARE NOT TO DISCUSS ANYTHING ABOUT THIS

12:46PM   6   CASE AT ALL, YOU'RE NOT TO FORM ANY OPINIONS, YOU'RE NOT TO IN

12:46PM   7   ANY WAY REACH ANY CONCLUSION ABOUT ANYTHING ABOUT THE CASE.

12:46PM   8            WHAT YOU MAY DO WHILE I'M GONE IS STAND AND STRETCH.  I

12:47PM   9   DON'T THINK THIS WILL BE LONG AT ALL.

12:47PM  10            AND, SIR, MR. EDLIN, SAME WITH YOU, SIR.  YOU CAN STAY IN

12:47PM  11   PLACE AND STAND DOWN AND STRETCH IF YOU WOULD LIKE, BUT THERE

12:47PM  12   WILL BE NO TALKING IF YOU WOULD LIKE.

12:47PM  13            JUROR:  CAN I USE THE RESTROOM FACILITIES?

12:47PM  14            THE COURT:  SHOULD WE TAKE A BREAK?  WHY DON'T WE DO

12:47PM  15   THAT?  WE'LL TAKE A 10 MINUTE BREAK, OR A 12 MINUTE BREAK.

12:47PM  16            MY THOUGHT WAS WE WOULD TAKE A BREAK AT 1:30 FOR ABOUT

12:47PM  17   30 MINUTES, BUT LET'S TAKE A 10 MINUTE BREAK NOW.

12:47PM  18            FOLKS, I THINK YOU CAN STAY.

12:47PM  19            YOU CAN STAND DOWN, SIR, IF YOU WOULD, AND I'LL ASK YOU TO

12:47PM  20   STEP OUT INTO THE HALLWAY IF YOU WOULD, SIR.

12:47PM  21            THE WITNESS:  THANK YOU, YOUR HONOR.

12:47PM  22       (JURY OUT AT 12:47 P.M.)

12:48PM  23            THE COURT:  THANK YOU.  PLEASE BE SEATED.

12:48PM  24       THE RECORD SHOULD REFLECT THAT OUR JURY HAS LEFT.  ALL

12:48PM  25   COUNSEL AND MS. HOLMES REMAIN.
```

EDLIN DIRECT BY MR. BOSTIC (RES.)                          4026

12:48PM  1          MR. DOWNEY, WHY DON'T YOU COME FORWARD.  THANK YOU.

12:48PM  2          OKAY.  SO NOW WE'RE AT 551.  WE TALKED ABOUT THIS A LITTLE

12:48PM  3   THIS MORNING.

12:48PM  4          AND, MR. BOSTIC, TELL ME AGAIN, YOU SEEK TO INTRODUCE NOT

12:48PM  5   JUST THE EMAILS, WHICH ARE PREFATORY TO THE EXHIBIT, BUT THE

12:48PM  6   EXHIBIT ITSELF IN TOTO.

12:48PM  7          AND I THINK WE HAD SOME DISCUSSION THIS MORNING ABOUT WERE

12:48PM  8   YOU GOING TO LOOK THROUGH THE EXHIBIT TO SEE IF THERE WAS

12:48PM  9   ANYTHING THAT YOU WANTED TO CALL OR PULL FROM IT, OR HAVE YOU

12:48PM 10   DECIDED YOU SEEK TO ADMIT THE ENTIRETY OF THE EXHIBIT?

12:48PM 11          MR. BOSTIC:  SO, YOUR HONOR, I'M VERY OPEN TO THE

12:48PM 12   COURT'S THOUGHTS ON THAT, AND I'M SENSITIVE TO THE DEFENSE'S

12:49PM 13   CONCERNS, ALTHOUGH I DISAGREE WITH THEM.

12:49PM 14          I -- AT THIS TIME I WOULD SEEK TO ADMIT THE ENTIRE

12:49PM 15   PRESENTATION, THE PRESENTATION AS A WHOLE, AND IN PART IT

12:49PM 16   CONSTITUTES STATEMENTS MADE BY MS. HOLMES, THROUGH MR. EDLIN AS

12:49PM 17   AN AGENT, TO THE MILITARY.

12:49PM 18          TO THE EXTENT THAT THERE ARE FALSE STATEMENTS, THEY ARE

12:49PM 19   RELEVANT FOR THE REASONS DISCUSSED PREVIOUSLY.

12:49PM 20          THE COURT:  OKAY.  THANK YOU.

12:49PM 21          MR. DOWNEY?

12:49PM 22          MR. DOWNEY:  YOUR HONOR, I DON'T HAVE TO ADD REALLY

12:49PM 23   TO WHAT WE DISCUSSED THIS MORNING.  I HAVE THE CONCERNS

12:49PM 24   UNDER -- FOR VARIOUS REASONS ABOUT THIS EXHIBIT, SO WE OBJECT

12:49PM 25   TO THE ADMISSION AT LEAST OF THE ATTACHMENT TO THE EXHIBIT.

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    4027

12:49PM  1          THE COURT:  WELL, WHAT WE HAVE NOW, I THINK WHAT'S

12:49PM  2    DIFFERENT NOW, MR. DOWNEY, IS THIS WITNESS INDICATING THAT IN

12:49PM  3    ALL OF HIS, I'LL CALL IT INTERFACE COMMUNICATIONS WITH THE

12:49PM  4    MILITARY, HE RAN THOSE THROUGH YOUR CLIENT AND BY YOUR CLIENT

12:50PM  5    FOR HER AFFIRMATION, AND SHE, PER HIS TESTIMONY, APPROVED THOSE

12:50PM  6    COMMUNICATIONS.

12:50PM  7          IT WOULD SEEM THEN THAT THERE IS AT LEAST A PERSONAL

12:50PM  8    RATIFICATION THROUGH AGENCY OR OTHERWISE FOR THE DOCUMENT TO

12:50PM  9    COME IN.

12:50PM  10          MR. DOWNEY:  WELL, THE ISSUE, YOUR HONOR, THE REASON

12:50PM  11    WE WERE OBJECTING WAS NOT AS TO THAT.

12:50PM  12          THE REASON WE ARE OBJECTING IS THAT THIS IS IN THE NATURE

12:50PM  13    OF PROPENSITY EVIDENCE.

12:50PM  14          IT'S ALSO NOT RELEVANT TO THE CONSPIRACY THAT IS ALLEGED

12:50PM  15    IN THE INDICTMENT WHICH RELATES TO THE STATUS AT A LATER POINT.

12:50PM  16          SO I, I ACKNOWLEDGE THE TESTIMONY OF THE WITNESS, BUT THAT

12:50PM  17    FUNDAMENTALLY WAS NOT OUR -- THE BASIS ON WHICH WE OBJECT.

12:50PM  18          THE COURT:  SURE.  SO I'M JUST KIND OF GOING THROUGH

12:50PM  19    THIS STEP BY STEP.

12:50PM  20          FOUNDATIONALLY AT LEAST, IT WOULD SEEM TO BE ADMISSIBLE

12:50PM  21    FOR THAT -- ON THOSE GROUNDS.

12:50PM  22          BUT LET ME MOVE TO YOUR OBJECTION, WHICH IS YOU THINK IT'S

12:50PM  23    DISCONNECTED FROM THE CHARGES THAT ARE IN THE INDICTMENT.

12:51PM  24          AND LET ME JUST ASK THIS QUESTION, MR. BOSTIC.  AGAIN,

12:51PM  25    GOING OVER OUR CONVERSATION THIS MORNING, IT WOULD SEEM THAT IF

EDLIN DIRECT BY MR. BOSTIC (RES.)                            4028

12:51PM  1    THE GOVERNMENT HAD A WITNESS WHO WOULD TESTIFY OR HAD TESTIFIED

12:51PM  2    PRIOR TO MR. EDLIN THAT HE OR SHE INVESTED IN RELIANCE ON A

12:51PM  3    REPRESENTATION THAT THERE WAS A RELATIONSHIP, BUSINESS

12:51PM  4    RELATIONSHIP WITH THE MILITARY, THAT WOULD SUPPORT THE RELIANCE

12:51PM  5    OF THAT INVESTOR, AND THEN PERHAPS COULD BE SEEN, AS YOU

12:51PM  6    REPRESENTED THIS MORNING -- AND I THINK IT MOVES AWAY FROM A

12:51PM  7    404 OR ANY OF THAT OTHER ANALYSIS -- I THINK THEN IT MOVES MORE

12:51PM  8    TOWARDS THE INEXTRICABLY INTERTWINED THAT MR. BOSTIC WAS

12:51PM  9    TALKING ABOUT, MR. DOWNEY.  IT WOULD SEEM THAT THAT WOULD BE

12:52PM  10   THE PATH, OR AT LEAST A LOGICAL PATH TO PURSUE UNDER THE

12:52PM  11   INEXTRICABLY INTERTWINED AS PART OF THE OVERALL SCHEME, PLAN,

12:52PM  12   M.O., ET CETERA.

12:52PM  13       I THINK MR. BOSTIC, BY INTRODUCING THIS NOW, I SUPPOSE I

12:52PM  14   WOULD ASK YOU, DO YOU HAVE A WITNESS THAT IS GOING TO SO

12:52PM  15   TESTIFY OR LAY THAT -- SOME TYPE OF FOUNDATION FOR THAT?

12:52PM  16           MR. BOSTIC:  SO JUST TWO THINGS I WOULD NOTE ON

12:52PM  17   THAT, YOUR HONOR.  THE FIRST IS JUST TO POINT OUT, AS THE

12:52PM  18   COURT, OF COURSE, KNOWS, RELIANCE IS NOT AN ELEMENT HERE.

12:52PM  19           THE COURT:  RIGHT.

12:52PM  20           MR. BOSTIC:  INSTEAD, THE FOCUS IS ON THE

12:52PM  21   DEFENDANT'S MENTAL STATE AND WHETHER SHE INTENDED TO DECEIVE

12:52PM  22   WITH THE STATEMENTS SHE WAS MAKING.

12:52PM  23       AND, OF COURSE, THAT INCORPORATES THE CONCEPT OF

12:52PM  24   MATERIALITY.

12:52PM  25       I THINK THE MATERIALITY OF THESE FALSE STATEMENTS IS

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    4029

| | | |
|---|---|---|
| 12:52PM | 1 | SELF-EVIDENT. IT'S EASY TO UNDERSTAND WHY A -- SOMEONE SEEKING |
| 12:52PM | 2 | INVESTMENT FOR HER COMPANY MIGHT WANT TO EXAGGERATE OR |
| 12:53PM | 3 | MISREPRESENT THE EXTENT OF A RELATIONSHIP WITH THE MILITARY. |
| 12:53PM | 4 | THE MILITARY BRINGS PRESTIGE. IT SENDS A SIGNAL THAT A |
| 12:53PM | 5 | PIECE OF TECHNOLOGY OR A PIECE OF EQUIPMENT HAS REACHED A |
| 12:53PM | 6 | CERTAIN LEVEL THAT IS GOOD ENOUGH FOR THE STRONGEST MILITARY |
| 12:53PM | 7 | FORCE IN THE WORLD. |
| 12:53PM | 8 | SO I THINK FOR THOSE REASONS MATERIALITY IS SELF-EVIDENT |
| 12:53PM | 9 | REGARDLESS OF WHAT A WITNESS SAYS. |
| 12:53PM | 10 | THAT SAID, I DO EXPECT UPCOMING WITNESSES TO TESTIFY THAT |
| 12:53PM | 11 | THAT WAS A MATERIAL FACT TO THEM. I DON'T THINK THEY'LL FRAME |
| 12:53PM | 12 | IT IN TERMS OF RELIANCE I THINK FOR THE REASON I JUST |
| 12:53PM | 13 | DISCUSSED. |
| 12:53PM | 14 | THE COURT: AND I USED THE WORD "RELIANCE" AND I |
| 12:53PM | 15 | MEANT TO SAY "MATERIAL," I BEG YOUR PARDON, THANK YOU FOR |
| 12:53PM | 16 | CORRECTING ME, BECAUSE YOU'RE ABSOLUTELY RIGHT, RELIANCE |
| 12:53PM | 17 | DOESN'T HAVE THAT. AT LEAST FOR THIS PURPOSE, IT DOESN'T. |
| 12:53PM | 18 | THE WITNESS MAY HAVE A DIFFERENT VIEW OF IT. |
| 12:53PM | 19 | SO THAT'S WHAT I WAS LOOKING AT, MR. DOWNEY, AND IT WOULD |
| 12:53PM | 20 | SEEM THAT THAT IS A STRONGER STATEMENT FOR ADMISSION AS PART OF |
| 12:54PM | 21 | THE INEXTRICABLY INTERTWINED SCOPE OF THE SCHEME, I'LL CALL IT |
| 12:54PM | 22 | SCHEME, I'LL JUST USE THAT FOR OUR CONVERSATION, THE PLAN. |
| 12:54PM | 23 | MR. DOWNEY: WELL, NONE OF WHAT MR. BOSTIC JUST SAID |
| 12:54PM | 24 | RELATES TO WHAT WAS REPRESENTED TO THE DEPARTMENT OF DEFENSE. |
| 12:54PM | 25 | IT RELATES TO, WHAT IS THE STATUS OF THAT RELATIONSHIP? |

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    4030

12:54PM  1      WHAT IS THE NATURE OF THAT RELATIONSHIP?  ET CETERA.

12:54PM  2          THE REPRESENTATIONS THAT WERE MADE TO INITIATE THE

12:54PM  3      RELATIONSHIP -- WHICH BY THE WAY, THIS POWERPOINT IS NOT --

12:54PM  4      ISN'T RELEVANT TO THAT.  SHE'S NOT CLAIMING TO THE INVESTORS, I

12:54PM  5      SAID SOMETHING DIFFERENT THAN WHAT IS IN THIS POWERPOINT.

12:54PM  6          I DON'T SEE THE RELATIONSHIP BETWEEN, YOU KNOW, A SERIES

12:54PM  7      OF REPRESENTATIONS MADE WITH ONE ASPECT OF THE MILITARY AT SOME

12:54PM  8      POINT DURING THEIR RELATIONSHIP TO WHAT AN INVESTOR BELIEVES

12:55PM  9      LATER ABOUT THE STATUS OF THE RELATIONSHIP OR THE CHARACTER OF

12:55PM  10     THE RELATIONSHIP, OR AS THE INDICTMENT IS ACTUALLY ABOUT,

12:55PM  11     WHETHER THERE'S REVENUE OR NOT.

12:55PM  12             MR. BOSTIC:  SO I'M TRYING TO FIND A DIFFERENT WAY

12:55PM  13     TO SAY IT.

12:55PM  14         EVERY COMMUNICATION WITH THE MILITARY WOULD NECESSARILY

12:55PM  15     AFFECT THE ONGOING STATUS AND HEALTH OF THE RELATIONSHIP

12:55PM  16     BETWEEN THERANOS AND THE MILITARY.

12:55PM  17         SO THE FACT THAT THIS WASN'T THE FIRST COMMUNICATION

12:55PM  18     DOESN'T MEAN THAT THIS WASN'T PART OF WHAT WENT INTO THE

12:55PM  19     MILITARY'S THINKING WHEN IT DECIDED TO CONTINUE ITS

12:55PM  20     RELATIONSHIP AND ITS DISCUSSIONS WITH THERANOS.

12:55PM  21         SO EVERYTHING SAID BY HOLMES TO THE MILITARY IS RELEVANT

12:55PM  22     TO THE ONGOING STATUS OF THAT RELATIONSHIP GOING FORWARD IN

12:55PM  23     TIME.

12:55PM  24         MORE IMPORTANTLY, THOUGH, IT'S HOLMES'S KNOWLEDGE THAT IS

12:56PM  25     IMPORTANT HERE.  THE FACT THAT HOLMES MADE DELIBERATE

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    4031

12:56PM   1   MISREPRESENTATIONS TO THE MILITARY BEFORE THAN MAKING

12:56PM   2   MISREPRESENTATIONS ABOUT THE STATUS OF THE RELATIONSHIP WITH

12:56PM   3   THE MILITARY IS RELEVANT BECAUSE ONE SHOWS HER KNOWLEDGE OF THE

12:56PM   4   OTHER.

12:56PM   5        BECAUSE HOLMES KNEW THAT THE RELATIONSHIP WITH THE

12:56PM   6   MILITARY, THE MILITARY'S INTEREST IN THE THERANOS DEVICE WAS

12:56PM   7   PREMISED ON FALSEHOODS, THAT THE MILITARY WAS INTERESTED IN A

12:56PM   8   VERSION OF THE DEVICE THAT DIDN'T ACTUALLY EXIST, BECAUSE SHE

12:56PM   9   KNEW THAT, SHE KNEW THAT THE DEVICE WAS UNLIKELY OR COULD NEVER

12:56PM  10   BE USED BY THE MILITARY IN ITS CURRENT FORM.

12:56PM  11        AND THAT MEANS THAT WHEN SHE REPRESENTED TO OTHERS THAT IT

12:56PM  12   WAS DEPLOYED, THAT IT WAS BEING USED TO TREAT SOLDIERS, THAT IT

12:56PM  13   HAD BEEN ON A HELICOPTER, THERE'S NO WAY THAT SHE COULD HAVE

12:56PM  14   BEEN MISTAKEN ABOUT THAT BECAUSE IN HER MIND SHE WOULD REMEMBER

12:57PM  15   THAT MONTHS EARLIER, A YEAR EARLIER, SHE HAD TOLD THE MILITARY

12:57PM  16   THAT THE DEVICE COULD DO SOMETHING THAT IT COULD NOT DO.

12:57PM  17        AND SHE WOULD KNOW THAT UNLESS SHE MADE THAT FALSEHOOD

12:57PM  18   TRUE, THAT THE RELATIONSHIP WITH THE MILITARY COULD NOT HAVE

12:57PM  19   PROGRESSED TO THE POINT THAT SHE WAS REPRESENTING IT TO BE AT.

12:57PM  20        THAT'S WHY IT MATTERS.

12:57PM  21             THE COURT:  THANK YOU, MR. BOSTIC.

12:57PM  22        IS IT PREDICATED ON ANOTHER WITNESS COMING FORWARD AND

12:57PM  23   INDICATING THAT THE REPRESENTATION WAS MADE?

12:57PM  24             MR. BOSTIC:  YOUR HONOR, I THINK THE COURT HAS

12:57PM  25   ALREADY HEARD AND THE JURY HAS ALREADY HEARD FROM WITNESSES WHO

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    4032

12:57PM   1    TESTIFIED ABOUT REPRESENTATIONS THAT THEY HEARD FROM MS. HOLMES

12:57PM   2    ABOUT THE STATUS OF THINGS WITH THE MILITARY.

12:57PM   3         MORE OF THAT IS COMING.

12:57PM   4         IF THE COURT VIEWS THE ADMISSIBILITY OF THIS DOCUMENT AS

12:57PM   5    CONTINGENT ON THAT, I WOULD ASK THAT IT BE CONDITIONALLY

12:57PM   6    ADMITTED TODAY SUBJECT TO A MOTION TO STRIKE IF THAT FOUNDATION

12:57PM   7    ISN'T LAID, BUT IT WILL BE.

12:57PM   8              MR. DOWNEY:  YOUR HONOR, EVEN IF SUCH A WITNESS WERE

12:57PM   9    TO BE PRODUCED, THERE ARE ABOUT 20 LAYERS OF IMPLICATION OR

12:58PM  10    INFERENCE BETWEEN THESE REPRESENTATIONS IN JANUARY OF 2012 AND

12:58PM  11    WHAT MS. HOLMES WAS THINKING IN SEPTEMBER OF 2013 OR

12:58PM  12    THEREAFTER, OR MUCH LESS WHAT SHE WAS THINKING TWO YEARS

12:58PM  13    BEFORE.

12:58PM  14         AND I DON'T THINK THERE IS ANY KIND OF A FOUNDATION THAT

12:58PM  15    HAS BEEN LAID FOR THAT, NOR DO I THINK THAT THEY COULD PROMISE

12:58PM  16    A WITNESS TO SHOW IT.

12:58PM  17         I HAVE NO ISSUE, YOUR HONOR, WITH THE TYPES OF DISCUSSIONS

12:58PM  18    OF THE RELATIONSHIP THAT MR. BOSTIC HAS BEEN ELICITING.

12:58PM  19         IT'S TO TRY TO PUT A POWERPOINT IN AND THEN ESSENTIALLY

12:58PM  20    INTRODUCE A NEW THEORY OF CRIMINAL LIABILITY, WHICH IS THAT

12:58PM  21    MS. HOLMES DEFRAUDED THE DEPARTMENT OF DEFENSE AFTER WE'VE HAD,

12:58PM  22    YOU KNOW, A GREAT DEAL OF PRETRIAL PRACTICE AND NO NOTICE AS TO

12:58PM  23    THE THEORY THAT MR. BOSTIC HAS ARTICULATED.

12:58PM  24              THE COURT:  WELL, LET'S ASK MR. BOSTIC IF THAT'S

12:59PM  25    WHAT HIS INTENT IS.

EDLIN DIRECT BY MR. BOSTIC (RES.)                                4033

12:59PM   1              MR. BOSTIC:  NO, YOUR HONOR, AND THE GOVERNMENT

12:59PM   2    WON'T ARGUE TO THE CONTRARY AT ANY POINT TO THE JURY.

12:59PM   3              THE COURT:  SO LET ME ASK YOU, MR. BOSTIC,

12:59PM   4    THERE'S -- THE REPORT IS, WHAT IS IT, 80-SOME PAGES, 75 PAGES,

12:59PM   5    76 PAGES LONG SOME OF THIS INFORMATION -- AND THANK YOU,

12:59PM   6    MR. DOWNEY, FOR -- I THINK WHAT I HEAR YOU SAYING IS THAT I

12:59PM   7    DON'T HAVE ANY PROBLEM WITH HIM TALKING ABOUT THESE DOCUMENTS.

12:59PM   8    SOME OF THEM, THE INTRODUCTION IS WHAT IT SOUNDS LIKE WHAT YOU

12:59PM   9    OBJECT TO AS TO SOME OF THOSE SLIDES HERE.

12:59PM  10         FOLLICLE STIMULATING HORMONE, IS THAT IMPORTANT FOR THE

12:59PM  11    PURPOSE THAT YOU ARE SEEKING TO INTRODUCE THIS?  THAT'S ON

12:59PM  12    PAGE 54.

12:59PM  13         CLINICAL SAMPLES OF COUMADIN.  I DON'T WANT TO GO THROUGH

12:59PM  14    THOSE.

12:59PM  15         THE CARBON DIOXIDE, ALL OF THE TESTING AND ASSAYS, IS THAT

12:59PM  16    SOMETHING THAT YOU NEED TO GET INTO?

12:59PM  17         IS THE PURPOSE TO SHOW THAT MR. HOLMES REACHED OUT THROUGH

01:00PM  18    MR. EDLIN TO FURTHER A RELATIONSHIP WITH THE MILITARY?  IS THAT

01:00PM  19    REALLY THE PURPOSE AT THIS POINT IN TIME?

01:00PM  20              MR. BOSTIC:  IT IS, YOUR HONOR, AND TO SHOW THE

01:00PM  21    REPRESENTATIONS THAT WERE MADE ABOUT WHAT THE THERANOS

01:00PM  22    TECHNOLOGY COULD DO.

01:00PM  23              THE COURT:  RIGHT.

01:00PM  24              MR. BOSTIC:  AND I THINK, TO THE COURT'S QUESTION,

01:00PM  25    THE IMPORTANT PARTS OF THE PRESENTATION FOR THAT PURPOSE GO UP

EDLIN DIRECT BY MR. BOSTIC (RES.)                    4034

01:00PM  1    THROUGH APPROXIMATELY PAGE 26.

01:00PM  2         AND I THINK AS TO THE PORTIONS AFTERWARDS THAT DELVE MORE

01:00PM  3    INTO TECHNICAL DETAILS, I WOULD BE HAPPY TO FOREGO ADMITTING

01:00PM  4    THAT IF THAT WOULD ADDRESS THE COURT'S CONCERNS.

01:00PM  5         THE COURT:  I LOOK AT -- MAYBE I'M -- I LOOK AT

01:00PM  6    PAGE 29 AS PROBABLY THE PAGE THAT CONCLUDES THE CONVERSATION.

01:00PM  7    PAGE 30 IS THE PRICING.  I DON'T KNOW IF --

01:00PM  8         MR. DOWNEY:  WELL, YOUR HONOR, BEFORE YOU LABOR

01:00PM  9    THROUGH THE DOCUMENT, I BELIEVE IT'S A BINARY CHOICE BETWEEN --

01:00PM  10        THE COURT:  RIGHT.

01:00PM  11        MR. DOWNEY:  -- EITHER THE EMAIL AND THE

01:00PM  12   PRESENTATION.

01:00PM  13        I ACTUALLY WOULDN'T WANT TO OMIT THE BALANCE OF THE DATA

01:01PM  14   HERE BECAUSE THIS IS A PRESENTATION BEING SENT TO A PHYSICIAN

01:01PM  15   TO BE REVIEWED BY OTHER PHYSICIANS AND PEOPLE WITH EXPERTISE ON

01:01PM  16   THE SUBJECT.

01:01PM  17        AND THE DATA REFLECTS WHAT STAGE THE DEVELOPMENT OF THE

01:01PM  18   ASSAYS ARE AT, WHAT THE VARIATION IS, ET CETERA.

01:01PM  19        SO THEY'RE NOT RECEIVING THIS AND HEARING THIS AS

01:01PM  20   MR. BOSTIC IS EXPRESSING IT OR TRYING TO CHARACTERIZE THE FIRST

01:01PM  21   26 PAGES.

01:01PM  22        I THINK ACTUALLY THE BALANCE OF THE EXHIBIT IS QUITE

01:01PM  23   IMPORTANT IF IT COMES IN AT ALL.

01:01PM  24        THE COURT:  WELL, THANK YOU FOR THAT.

01:01PM  25        IT SEEMS TO ME, I THINK WHAT WE HEARD MR. EDLIN SAY, IS

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    4035

01:01PM  1      THAT THERE WERE PHASES OF THIS RELATIONSHIP, AND THIS MAY OR

01:01PM  2      MAY NOT HAVE BEEN THE INITIAL START OF THE RELATIONSHIP.

01:01PM  3          IT JUST SEEMED TO ME THAT THE OTHER INFORMATION, THE

01:01PM  4      ASSAYS AND ALL OF THE TESTINGS, MIGHT BE A LITTLE TECHNICAL FOR

01:01PM  5      THE PURPOSE SOUGHT.

01:01PM  6          IF YOU WANT ALL OF IT IN SO YOU CAN EXAMINE, I'M CERTAINLY

01:02PM  7      GOING TO ALLOW THAT TO COME IN.

01:02PM  8          I WAS CERTAINLY TRYING TO MAKE IT SOMEWHAT ACCESSIBLE FOR

01:02PM  9      ALL OF YOU, AND PARTICULARLY FOR THE JURY.

01:02PM 10          WELL, THANK YOU FOR THE CONVERSATION.  I AM GOING TO

01:02PM 11      RECOGNIZE YOUR OBJECTIONS AND OVERRULE THE OBJECTIONS AND ALLOW

01:02PM 12      THIS TO BE ADMITTED FOR THE REASONS STATED.

01:02PM 13          I DO THINK, AT LEAST PRESENTLY, THE EVIDENCE HAS SHOWN

01:02PM 14      THAT THIS IS MATERIAL.  IT IS, AT LEAST AS SHOWN TO DATE NOW,

01:02PM 15      THIS COULD BE ARGUED AS INEXTRICABLY INTERTWINED WITH THE SCOPE

01:02PM 16      OF THE SCHEME/PLAN.

01:02PM 17          YOU INDICATE THAT YOU HAVE A WITNESS THAT IS GOING TO

01:02PM 18      TESTIFY ABOUT THE MATERIALITY.  THAT WOULD BE HELPFUL.

01:02PM 19          I DON'T LIKE TO PROVISIONALLY ADMIT THINGS.  I THINK I

01:02PM 20      HAVE DONE THAT ON TWO PIECES OF EVIDENCE NOW, AND AT THE TIME

01:02PM 21      WHEN WE COME TO OUR CHARGING CONFERENCE, WE'LL HAVE TO ALL

01:02PM 22      REMEMBER WHAT THOSE WERE AGAIN AND SEE IF THE FOUNDATION HAS

01:02PM 23      BEEN LAID.

01:02PM 24          BUT I DO THINK, JUST BASED ON THE EVIDENCE NOW, THAT THE

01:02PM 25      COURT CAN FIND IT'S NOT 404(B), IT'S NOT INTRODUCED FOR THAT

EDLIN DIRECT BY MR. BOSTIC (RES.)                    4036

01:03PM  1    PURPOSE, BUT RATHER IT CAN BE SEEN AND WOULD BE INTRODUCED AS

01:03PM  2    EVIDENCE THAT IS INEXTRICABLY INTERTWINED WITH THE PLAN.

01:03PM  3        SO I'LL OVERRULE YOUR OBJECTIONS AS YOU'VE STATED THEM AND

01:03PM  4    WE'LL ADMIT THE DOCUMENT IN TOTO BASED ON YOUR COMMENTS.

01:03PM  5        THANK YOU, MR. DOWNEY.

01:03PM  6        SHOULD WE BRING OUR JURY IN?  SHOULD WE BREAK AGAIN AT

01:03PM  7    1:30?

01:03PM  8            MS. TREFZ:  YES, PLEASE.

01:03PM  9            THE COURT:  LET'S BRING OUR JURY IN AND THEN WE'LL

01:03PM  10   GO --

01:03PM  11           MR. DOWNEY:  THANK YOU, YOUR HONOR.

01:03PM  12           THE COURT:  THANK YOU.

01:03PM  13       (JURY IN AT 1:03 P.M.)

01:05PM  14           THE COURT:  ALL RIGHT.  THANK YOU.  PLEASE BE

01:05PM  15   SEATED.  WE'RE BACK ON THE RECORD.  OUR JURY IS PRESENT.

01:05PM  16       ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

01:05PM  17       MR. EDLIN HAS RETURNED TO THE STAND.

01:05PM  18       THANK YOU, LADIES AND GENTLEMEN, FOR THE BREAK.

01:05PM  19       I DO WANT TO TELL YOU, I DO NEED TO TAKE A BREAK AT 1:30,

01:05PM  20   1:35 AGAIN, AND IT WILL BE OUR 30 MINUTE BREAK, AND THEN WE'LL

01:05PM  21   GO UNTIL 3:00 TODAY.  AND THEN I'LL ASK YOU, WHEN WE FINISH

01:06PM  22   TODAY, IF WE CAN GO UNTIL 4:00 TOMORROW.  THANK YOU.

01:06PM  23       MR. BOSTIC.

01:06PM  24           MR. BOSTIC:  THANK YOU, YOUR HONOR.

01:06PM  25   Q.  MR. EDLIN, WHEN WE STARTED OUR BREAK WE WERE LOOKING AT

EDLIN DIRECT BY MR. BOSTIC (RES.)                                4037

01:06PM   1    EXHIBIT 551 IN OUR BINDER.

01:06PM   2         DO YOU HAVE THAT IN FRONT OF YOU?

01:06PM   3    A.  I DO.

01:06PM   4         MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT MOVES TO

01:06PM   5    ADMIT EXHIBIT 551.

01:06PM   6         THE COURT:  I'LL ADMIT IT, NOTING MY COMMENTS

01:06PM   7    EARLIER.  THANK YOU.

01:06PM   8         (GOVERNMENT'S EXHIBIT 551 WAS RECEIVED IN EVIDENCE.)

01:06PM   9         MR. BOSTIC:  MAY I PUBLISH IT, YOUR HONOR?

01:06PM  10         THE COURT:  YES.

01:06PM  11         MR. BOSTIC:  MS. HOLLIMAN, IF WE CAN ZOOM IN ON THE

01:06PM  12    TOP HALF OF THIS PAGE.

01:06PM  13         MR. EDLIN, WE WERE TALKING ABOUT KEVIN CHUNG AND THE

01:06PM  14    SURGICAL INSTITUTE COMPONENT.

01:06PM  15         DO YOU RECALL THAT?

01:06PM  16    A.  YES.

01:06PM  17    Q.  WAS THIS ANOTHER INTERACTION THAT THERANOS HAD WITH A

01:06PM  18    COMPONENT OF THE U.S. MILITARY?

01:06PM  19    A.  YES.

01:07PM  20    Q.  AND GIVE US A PREVIEW, WHAT WAS THE CULMINATION OF THIS

01:07PM  21    INTERACTION WITH THE MILITARY?

01:07PM  22    A.  KEVIN CHUNG -- WELL, FOR THIS SPECIFIC EMAIL OR WITH

01:07PM  23    DR. CHUNG?

01:07PM  24    Q.  I MEAN WITH DR. CHUNG IN GENERAL.  FOR EXAMPLE, DID THIS

01:07PM  25    INTERACTION EVENTUALLY RESULT IN THERANOS DEVICES BEING USED

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    4038

01:07PM  1    FOR A STUDY?

01:07PM  2    A.   YES.  SO DR. CHUNG WAS THE LEAD INVESTIGATOR FOR A

01:07PM  3    RESEARCH STUDY, ALONG WITH THE AMERICAN BURN ASSOCIATION, AND

01:08PM  4    IN THAT STUDY THERANOS DEVICES WERE USED IN A NUMBER OF

01:08PM  5    DIFFERENT ACADEMIC RESEARCH INSTITUTIONS AND HOSPITALS IN THE

01:08PM  6    U.S. FOR TECH -- FOR RESEARCH PURPOSES FOR CERTAIN BIOMARKERS.

01:08PM  7    Q.   AND THAT USE IN THOSE INSTITUTIONS, WAS THAT CLINICAL USE

01:08PM  8    OF THE DEVICE?  AND WHAT I MEAN WAS, WERE DOCTORS USING THE

01:08PM  9    RESULTS GENERATED BY THE THERANOS ANALYZERS TO MAKE TREATMENT

01:08PM  10   DECISIONS ABOUT PATIENTS?

01:08PM  11   A.   I DON'T BELIEVE SO, NO.

01:08PM  12   Q.   AND WAS ALL OF THE USE IN CONNECTION WITH THAT -- WITH

01:08PM  13   THIS STUDY ON U.S. SOIL AS FAR AS YOU KNOW?

01:08PM  14   A.   AS FAR AS I KNOW, ALL OF THE DIFFERENT HOSPITALS THAT WERE

01:08PM  15   A PART OF THE STUDY WERE IN THE U.S.

01:08PM  16   Q.   SO THIS STUDY DIDN'T INVOLVE THE USE OF THERANOS

01:09PM  17   TECHNOLOGY IN WAR ZONES OVERSEAS, FOR EXAMPLE?

01:09PM  18   A.   THAT'S CORRECT.

01:09PM  19   Q.   LET'S TURN TO PAGE 7 OF THIS EXHIBIT.

01:09PM  20        AND ARE WE LOOKING AT AN ATTACHMENT, OR A PORTION OF AN

01:09PM  21   ATTACHMENT THAT YOU SENT TO DR. CHUNG ATTACHED TO THE EMAIL

01:09PM  22   THAT WE JUST SAW?

01:09PM  23   A.   YES.

01:09PM  24   Q.   AND LIKE I ASKED YOU FOR THE LAST ATTACHMENT, DID

01:09PM  25   MS. HOLMES REVIEW AND APPROVE THIS IN PARTICULAR BEFORE YOU

EDLIN DIRECT BY MR. BOSTIC (RES.)                    4039

01:09PM  1    SENT IT TO DR. CHUNG?

01:09PM  2    A.   I BELIEVE SHE DID, YES.

01:09PM  3    Q.   AND WAS HER INVOLVEMENT WITH THIS INTERACTION WITH THE

01:09PM  4    MILITARY ON THE SAME LEVEL AS WHAT YOU PREVIOUSLY DISCUSSED?

01:10PM  5    A.   YES.

01:10PM  6    Q.   LOOKING AT THE TEXT ON THE SCREEN, I JUST WANT TO POINT

01:10PM  7    YOU TO A FEW PORTIONS.

01:10PM  8        FIRST, UNDER THAT FIRST BULLET POINT, DO YOU SEE WHERE IT

01:10PM  9    SAYS, "THERANOS'S PROPRIETARY, PATENTED TECHNOLOGY RUNS

01:10PM  10   COMPREHENSIVE BLOOD TESTS FROM A FINGERSTICK"?

01:10PM  11   A.   YES.

01:10PM  12   Q.   IT ALSO SAYS, "TESTS FOR MICRO-SAMPLES OF OTHER MATRICES

01:10PM  13   IN REAL-TIME OUTSIDE OF TRADITIONAL LAB SETTINGS AND GENERATES

01:10PM  14   SIGNIFICANTLY HIGHER INTEGRITY DATA THAN CURRENTLY POSSIBLE."

01:10PM  15       DO YOU SEE THAT?

01:10PM  16   A.   I DO.

01:10PM  17   Q.   LET'S TURN TO PAGE 15 IN THIS PRESENTATION.

01:10PM  18       DO YOU SEE A SLIDE TITLED OVERVIEW:  THERANOS SYSTEMS?

01:10PM  19   A.   I DO.

01:11PM  20   Q.   DO YOU RECOGNIZE THE DEVICES THAT ARE PICTURED IN THE

01:11PM  21   UPPER LEFT HAND OF THAT PAGE?

01:11PM  22   A.   I DO.

01:11PM  23   Q.   AND WHAT ARE THOSE DEVICES?

01:11PM  24   A.   THE MULTICOLORED DEVICE ON THE LEFT IS AN EDISON 3 SERIES

01:11PM  25   OR 3.0.

EDLIN DIRECT BY MR. BOSTIC (RES.)                          4040

```
01:11PM   1          THE PICTURE ON THE RIGHT IS OF THE MINILAB TOWER, AND
01:11PM   2     THAT'S NOT TO SCALE.
01:11PM   3     Q.   OKAY.  HOW MUCH BIGGER WAS THE MINILAB TOWER THAN THE
01:11PM   4     EDISON?
01:11PM   5     A.   THE EDISON -- IT WAS SIGNIFICANTLY BIGGER OR TALLER.  I
01:11PM   6     THINK THE MINILAB TOWER WAS SOMEWHERE BETWEEN FOUR TO FIVE
01:11PM   7     FEET.  I DON'T REMEMBER EXACTLY.
01:11PM   8          THE EDISON WAS SOMEWHERE BETWEEN ONE AND TWO FEET TALL.
01:11PM   9     Q.   AND BASED ON YOUR EARLIER TESTIMONY, WAS THE EDISON 3
01:12PM  10     SERIES USED BY THERANOS IN ACTUAL PATIENT TESTING?
01:12PM  11     A.   I HAVE -- I LEARNED THAT IT WAS, YES.
01:12PM  12     Q.   WAS THE MINILAB TOWER USED BY THERANOS IN ACTUAL CLINICAL
01:12PM  13     PATIENT TESTING?
01:12PM  14     A.   NOT TO MY KNOWLEDGE.
01:12PM  15     Q.   LET'S TURN THE PAGE TO PAGE 16.  ZOOM IN ON THE TOP OF
01:12PM  16     PAGE 16.
01:12PM  17          AND DO YOU SEE WHERE IT SAYS, "UNLIKE EXISTING POINT OF
01:12PM  18     CARE TECHNOLOGIES, THERANOS ANALYZERS RUN ANY TEST AVAILABLE IN
01:12PM  19     CENTRAL LABORATORIES"?
01:12PM  20     A.   I DO SEE THAT.
01:12PM  21     Q.   AT THE TIME THIS WAS SENT IN MARCH OF 2012, DID YOU HAVE A
01:12PM  22     BASIS TO UNDERSTAND WHETHER THAT STATEMENT WAS TRUE OR NOT?
01:12PM  23     A.   I DIDN'T HAVE THE BASIS TO UNDERSTAND WHETHER IT WAS TRUE
01:13PM  24     OR NOT, BUT I HAD NO REASON TO BELIEVE THAT IT WASN'T TRUE.
01:13PM  25     Q.   HOW ABOUT THE SECOND BULLET POINT THERE?  IT SAYS,
```

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    4041

01:13PM  1    "THERANOS IS CAPABLE OF RUNNING ANY COMBINATION OF TEST WITHIN

01:13PM  2    THE SAME CARTRIDGE FOOTPRINT."

01:13PM  3         WOULD IT BE THE SAME ANSWER FOR THAT, THAT YOU DIDN'T HAVE

01:13PM  4    A BASIS TO KNOW, BUT YOU HAD NO REASON TO DOUBT IT?

01:13PM  5    A.   THAT'S CORRECT.

01:13PM  6    Q.   LET'S LOOK AT PAGE 23, PLEASE.

01:13PM  7         AND ON PAGE 23, DO YOU SEE THERE'S A SECTION ADDRESSING

01:13PM  8    ACCURACY?

01:13PM  9    A.   YES.

01:13PM  10   Q.   AND THE TEXT TO THE RIGHT OF THAT SAYS, "THE LESS THAN

01:13PM  11   5 PERCENT CV YIELDED IN THERANOS'S ANALYSIS RESULTS FROM

01:13PM  12   ELIMINATION OF PRE-ANALYTIC ERRORS, AND PROVIDES FOR PRECISE

01:14PM  13   AND ACTIONABLE INFORMATION THAT WAS PREVIOUSLY INACCESSIBLE."

01:14PM  14        DO YOU SEE THAT?

01:14PM  15   A.   I DO.

01:14PM  16   Q.   AND AT THE BOTTOM THERE IS A LINE THAT SAYS, "THERANOS HAS

01:14PM  17   QUICKER TEST RUN TIMES AND COMMUNICATES MOST RESULTS IN LESS

01:14PM  18   THAN 20 MINUTES."

01:14PM  19        DO YOU SEE THAT?

01:14PM  20   A.   I DO.

01:14PM  21   Q.   THE TIMING CLAIM, WAS THAT YOUR EXPERIENCE WHEN IT CAME TO

01:14PM  22   YOUR WORK WITH THE DEMOS OF THERANOS TECHNOLOGY?

01:14PM  23   A.   THAT WAS NOT MY EXPERIENCE.

01:14PM  24   Q.   HOW WAS IT DIFFERENT FROM YOUR EXPERIENCE?

01:14PM  25   A.   THE RUN TIMES IN DEMOS WERE USUALLY LONGER THAN 20

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    4042

01:14PM   1      MINUTES.

01:14PM   2      Q.   LET'S LOOK AT PAGE 24.  AND ON PAGE 24, DO YOU SEE THE

01:14PM   3      SLIDE IS TITLED FINGERSTICK-BASED TESTING?

01:14PM   4      A.   YES.

01:14PM   5      Q.   AND THERE'S A BULLET POINT ON THE LEFT SIDE THAT SAYS,

01:15PM   6      "ALL 2000 PLUS CURRENTLY RUN TESTS/CPT CODES ARE AVAILABLE

01:15PM   7      THROUGH THERANOS."

01:15PM   8           DO YOU SEE THAT?

01:15PM   9      A.   YES.

01:15PM   10     Q.   AND IT SAYS BELOW THAT, "THERANOS RUNS ANY TEST AVAILABLE

01:15PM   11     IN CENTRAL LABORATORIES."

01:15PM   12     A.   I SEE THAT.

01:15PM   13     Q.   AND IN MARCH OF 2012, DID YOU KNOW WHETHER THE THERANOS

01:15PM   14     ANALYZERS THAT WE JUST LOOKED AT WERE CAPABLE OF RUNNING THIS

01:15PM   15     WIDE RANGE OF TESTS?

01:15PM   16     A.   IN MARCH OF 2012, I DID NOT HAVE THAT KNOWLEDGE.

01:15PM   17     Q.   ON THE RIGHT SIDE OF THE PAGE, UNDER HIGHER QUALITY DATA,

01:15PM   18     THERE'S A BULLET POINT THAT SAYS, "THE UNPRECEDENTED LACK OF

01:15PM   19     VARIATION WITH THERANOS YIELDS HIGHER INTEGRITY DATA AND

01:15PM   20     LONGITUDINAL TRENDING."

01:15PM   21           DO YOU SEE THAT?

01:15PM   22     A.   I DO.

01:15PM   23     Q.   AND WE CAN PUT THAT ASIDE.

01:15PM   24           I'LL ASK YOU TO LOOK AT EXHIBIT 588, PLEASE.

01:16PM   25           DO YOU HAVE 588 IN FRONT OF YOU?

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    4043

01:16PM   1    A.   I DO.

01:16PM   2    Q.   IS THIS AN EMAIL CHAIN BETWEEN MS. HOLMES AND SOMEONE

01:16PM   3    NAMED ERIN EDGAR?

01:16PM   4    A.   YES.

01:16PM   5            MR. BOSTIC:  YOUR HONOR, I MOVE TO ADMIT

01:16PM   6    EXHIBIT 588.

01:16PM   7            MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

01:16PM   8            THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

01:16PM   9        (GOVERNMENT'S EXHIBIT 588 WAS RECEIVED IN EVIDENCE.)

01:16PM  10    BY MR. BOSTIC:

01:16PM  11    Q.   AND MR. EDLIN, CAN YOU TELL US WHO ERIN EDGAR WAS?

01:16PM  12    A.   COLONEL EDGAR WAS IN U.S. CENTRAL COMMAND.

01:16PM  13    Q.   AND WHAT IS U.S. CENTRAL COMMAND?

01:16PM  14    A.   A DIVISION OF THE DEPARTMENT OF DEFENSE.

01:16PM  15    Q.   AND IS THERE A PARTICULAR GEOGRAPHICAL AREA THAT U.S.

01:16PM  16    CENTRAL COMMAND OVERSEES?

01:16PM  17    A.   I BELIEVE IT'S THE MIDDLE EAST.

01:16PM  18    Q.   DO YOU RECALL HAVING CONVERSATIONS WITH ERIN EDGAR IN

01:16PM  19    CONNECTION WITH POTENTIAL USE OF THERANOS TECHNOLOGY?

01:16PM  20    A.   I'M NOT SURE IF I COMMUNICATED WITH HIM DIRECTLY, BUT I DO

01:17PM  21    RECALL SEEING AND BEING ON EMAILS WHERE -- WITH HIM.

01:17PM  22    Q.   LOOKING AT THE BOTTOM EMAIL IN THIS CHAIN, COLONEL EDGAR

01:17PM  23    EMAILS MS. HOLMES AND SAYS, "ELIZABETH.

01:17PM  24        "I'VE GOTTA UPDATE THE BOSS ON WEDNESDAY ON OUR EFFORT TO

01:17PM  25    GET THE ANALYZERS INTO THE THEATRE."

                        EDLIN DIRECT BY MR. BOSTIC (RES.)                    4044

01:17PM   1            AND THE SUBJECT LINE SAYS THERANOS UPDATE TO

01:17PM   2      GENERAL MATTIS.

01:17PM   3            DO YOU SEE THAT?

01:17PM   4      A.    YES.

01:17PM   5      Q.    AND WHAT DO YOU RECALL AROUND THIS TIME ABOUT ONGOING

01:17PM   6      EFFORTS TO GET THE ANALYZERS INTO THEATRE WITH CENTCOM?

01:17PM   7      A.    SIMILAR TO THE WORK THAT WAS DONE WITH SPECIAL OPERATIONS

01:17PM   8      COMMAND, THERE WAS A SET OF EVALUATIVE STEPS THAT THERANOS AND

01:17PM   9      U.S. CENTRAL COMMAND WERE TRYING TO PLAN WITH THE GOAL OF

01:18PM  10      HAVING THERANOS TESTING, YOU KNOW, ULTIMATELY AVAILABLE IN

01:18PM  11      HOSPITALS, I BELIEVE IT WAS IN AFGHANISTAN.

01:18PM  12            BUT FIRST THE RESEARCH PROCESS REQUIRED EVALUATIVE STEPS

01:18PM  13      AND COMPARATIVE STUDIES BETWEEN THERANOS TESTING AND AVAILABLE

01:18PM  14      TESTING AT THE MILITARY.

01:18PM  15      Q.    WAS THAT EVALUATION A PREREQUISITE TO ACTUAL CLINICAL USE

01:18PM  16      BY THE MILITARY BASED ON YOUR UNDERSTANDING?

01:18PM  17      A.    YES.   THERE WAS ALSO SOME SECURITY RELATED TESTING THAT

01:18PM  18      WAS ALSO A PREREQUISITE.

01:18PM  19      Q.    LET'S LOOK AT EXHIBIT 1027, AND WE'RE MOVING FROM APRIL

01:18PM  20      AHEAD A FEW MONTHS.   LET ME KNOW WHEN YOU HAVE 1027 IN FRONT OF

01:18PM  21      YOU.

01:19PM  22      A.    I DO.

01:19PM  23      Q.    AND IS 1027 AN EMAIL BETWEEN YOU, REPRESENTATIVES OF

01:19PM  24      CENTCOM, AND THEN INCLUDING ELIZABETH HOLMES AT THE TOP?

01:19PM  25      A.    YES.

01:19PM   1                MR. BOSTIC:  YOUR HONOR, I OFFER 1027.

01:19PM   2                MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

01:19PM   3                THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:19PM   4          (GOVERNMENT'S EXHIBIT 1027 WAS RECEIVED IN EVIDENCE.)

01:19PM   5                BY MR. BOSTIC:  AND IF WE CAN START ON PAGE 5 OF

01:19PM   6    THIS EXHIBIT.  AND IF WE CAN ZOOM IN ON THE MESSAGE IN THE

01:19PM   7    MIDDLE OF THE PAGE.

01:19PM   8    Q.   MR. EDLIN, IS THIS FURTHER COMMUNICATION IN ATTEMPTS TO

01:19PM   9    TRY TO GET THE THERANOS ANALYZERS IN CENTCOM'S HANDS FOR

01:19PM  10    EVALUATION?

01:19PM  11    A.   YES.

01:19PM  12    Q.   AND SOMEONE NAMED MARTIN DRAKE WITH CENTCOM EMAILS

01:20PM  13    MS. HOLMES AND IDENTIFIES HIMSELF AS THE SCIENCE ADVISOR WITH

01:20PM  14    U.S. CENTRAL COMMAND.

01:20PM  15         DO YOU SEE THAT?

01:20PM  16    A.   YES.

01:20PM  17    Q.   HE SAYS, "GENERAL MATTIS CHARGED OUR COMMAND SURGEON AND

01:20PM  18    ME TO CONDUCT INVESTIGATION INTO THE COMPARATIVE BENEFITS OF

01:20PM  19    YOUR TECHNOLOGY."

01:20PM  20         DO YOU SEE THAT?

01:20PM  21    A.   I DO.

01:20PM  22    Q.   A COUPLE LINES DOWN, HE SAYS, "REGRETTABLY THE WINDOW OF

01:20PM  23    OPPORTUNITY IS CLOSING FOR ME TO BE ABLE TO CONTINUE TO

01:20PM  24    DEDICATE RESOURCES TO THIS EXPERIMENT.  FUNDING IS EXPIRING AND

01:20PM  25    PERSONNEL ARE BEING RE-DIRECTED TO OTHER ONGOING PROJECTS."

EDLIN DIRECT BY MR. BOSTIC (RES.)                                4046

01:20PM   1        HAD THIS PROJECT BEEN IN THE WORKS FOR SOME TIME AT THIS

01:20PM   2   POINT?

01:20PM   3   A.   YES.

01:20PM   4   Q.   AND WHAT WAS YOUR SENSE AT THIS TIME AS TO WHY THERE HAD

01:20PM   5   BEEN DELAYS, OR WHAT THE REASON WAS THAT IT HADN'T MOVED PAST

01:20PM   6   THE POINT OF WHERE IT WAS AT?

01:21PM   7   A.   I'M NOT SURE IF I KNOW EXACTLY WHY OR IF I COULD PINPOINT

01:21PM   8   EXACTLY WHY, BUT THERE WAS THIS FUNDING OPPORTUNITY THAT WAS

01:21PM   9   CLOSING AND THE PERSONNEL WERE GOING ON TO OTHER PROJECTS, SO

01:21PM  10   WE JUST DIDN'T HAVE ENOUGH TIME TO COMPLETE, TO COMPLETE THE

01:21PM  11   STUDY.

01:21PM  12   Q.   LET'S LOOK AT PAGE 1 OF THIS EXHIBIT, AND LET'S ZOOM IN ON

01:21PM  13   THE MESSAGE IN THE MIDDLE OF THE PAGE.

01:21PM  14        HERE'S ANOTHER MESSAGE FROM MARTIN DRAKE.

01:21PM  15        DO YOU SEE THAT?

01:21PM  16   A.   YES.

01:21PM  17   Q.   AND IN THE SECOND FULL PARAGRAPH OF HIS MESSAGE, HE SAYS,

01:21PM  18   "IN ORDER FOR US TO REQUEST RESOURCES IN FINANCIAL YEAR '14 TO

01:21PM  19   CONDUCT THIS LOE, WE WILL REQUIRE A FIRM COMMITMENT FROM YOU

01:21PM  20   WHEN THERANOS WILL BE AVAILABLE, IN THEATRE, AND READY FOR

01:21PM  21   TEST."

01:21PM  22        DO YOU SEE THAT?

01:21PM  23   A.   YES.

01:21PM  24   Q.   AND THAT ABBREVIATION HE USES LOE.  DO YOU RECALL WHAT

01:22PM  25   THAT STANDS FOR?

EDLIN DIRECT BY MR. BOSTIC (RES.)                                          4047

01:22PM  1    A.    IT STANDS FOR LIMITED OBJECTIVE EXPERIMENT.

01:22PM  2    Q.    AND WOULD THIS LIMITED OBJECTIVE EXPERIMENT BE ACTUAL

01:22PM  3    CLINICAL USE OF THE THERANOS ANALYZER IN THE TREATMENT OF

01:22PM  4    SOLDIERS, OR MERELY EVALUATION?

01:22PM  5    A.    EVALUATION.

01:22PM  6    Q.    HIS EMAIL GOES ON TO SAY, "PLEASE PICK A DATE IN CALENDAR

01:22PM  7    YEAR 2014 WHEN YOU KNOW BEYOND DOUBT YOU WILL BE READY TO

01:22PM  8    TEST."

01:22PM  9          DO YOU SEE THAT?

01:22PM  10   A.    I DO.

01:22PM  11   Q.    DID YOU HAVE A CONVERSATION WITH MS. HOLMES ABOUT HOW TO

01:22PM  12   RESPOND TO THIS REQUEST FROM THE MILITARY FOR A DATE CERTAIN?

01:22PM  13   A.    I DID, YES.

01:22PM  14   Q.    AND WHAT DIRECTION DID YOU GET FROM MS. HOLMES?

01:22PM  15   A.    THE DIRECTION I GOT WAS FIRST TO I THINK CONSULT WITH AND

01:23PM  16   SPEAK TO ONE OF THE -- I DON'T KNOW IF I SPOKE TO HIM DIRECTLY

01:23PM  17   OR IF HE SPOKE TO ELIZABETH, BUT HE WAS ONE OF THE SYSTEMS

01:23PM  18   ENGINEERING LEADS, SAM ANEKAL, AND HE WAS NOTIFIED OF THIS

01:23PM  19   PLAN, AND I WAS DIRECTED TO PROVIDE A DATE OF I BELIEVE IT WAS

01:23PM  20   A YEAR LATER, AUGUST OF 2014.

01:23PM  21   Q.    THANK YOU.  SORRY TO TALK OVER YOU.

01:23PM  22         LET'S LOOK AT THAT.

01:23PM  23   A.    OKAY.

01:23PM  24   Q.    IN THE TOP EMAIL ON THIS PAGE.

01:23PM  25         LOOKING AT THE PARAGRAPH THAT SAYS, "LOOKING AHEAD TO

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    4048

| | | |
|---|---|---|
| 01:23PM | 1 | 2014." |
| 01:23PM | 2 | DO YOU SEE THAT? |
| 01:23PM | 3 | A.   YES. |
| 01:23PM | 4 | Q.   IT SAYS, "WE WOULD BE ABLE TO DELIVER ALL OF OUR EQUIPMENT |
| 01:23PM | 5 | TO THEATRE AND BEGIN TESTING BY AUGUST 1ST." |
| 01:23PM | 6 | DO YOU SEE THAT? |
| 01:23PM | 7 | A.   I DO. |
| 01:23PM | 8 | Q.   WAS IT MS. HOLMES'S DIRECTION TO YOU THAT YOU SHOULD |
| 01:24PM | 9 | PROPOSE A DATE ONE YEAR OUT FOR THE DATE WHEN THERANOS COULD BE |
| 01:24PM | 10 | READY FOR THE TEST? |
| 01:24PM | 11 | A.   YES. |
| 01:24PM | 12 | Q.   WHEN IT CAME TO THE CENTCOM RELATIONSHIP AND THOSE |
| 01:24PM | 13 | CONTACTS, WAS THERE A POINT AT WHICH A THERANOS DEVICE ACTUALLY |
| 01:24PM | 14 | WENT TO A MILITARY BASE? |
| 01:24PM | 15 | A.   NOT TO MY KNOWLEDGE. |
| 01:24PM | 16 | Q.   WAS THERE A POINT WHERE THE THERANOS DEVICE WAS BROUGHT TO |
| 01:24PM | 17 | A MILITARY FACILITY FOR CYBER TESTING? |
| 01:24PM | 18 | A.   YES. |
| 01:24PM | 19 | Q.   WHAT DO YOU RECALL ABOUT THAT? |
| 01:24PM | 20 | A.   I RECALL VISITING THE MACDILL AIR FORCE BASE IN TAMPA, |
| 01:24PM | 21 | FLORIDA.  CHRISTIAN HOLMES AND I WENT DOWN TO WORK WITH CYBER |
| 01:24PM | 22 | SECURITY TESTING TEAM THERE. |
| 01:25PM | 23 | I BELIEVE WE TRAVELED WITH TWO THERANOS DEVICES, AND THEY |
| 01:25PM | 24 | WERE BROUGHT TO A TESTING FACILITY, AND SECURITY TESTING, AND |
| 01:25PM | 25 | THEY UNDERWENT SECURITY TESTING. |

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    4049

01:25PM   1    Q.   DID THAT TESTING HAVE ANYTHING TO DO WITH THE CLINICAL

01:25PM   2    PERFORMANCE OF THE ANALYZER?

01:25PM   3    A.   NO.   IT WAS MORE -- I THINK THE GOAL OF THAT TESTING WAS

01:25PM   4    TO MAKE SURE THAT IF A THERANOS DEVICE WENT ON TO THE MILITARY

01:25PM   5    SERVER, THAT IT WOULD BE SECURE AND WOULDN'T HAVE SECURITY

01:25PM   6    VULNERABILITIES.

01:25PM   7    Q.   AS PART OF THAT TESTING, WERE THERE ANY BLOOD SAMPLES OR

01:25PM   8    ACTUAL ANALYSES PERFORMED BY THE DEVICE?

01:25PM   9    A.   NO.

01:25PM   10   Q.   AS PART OF THE CONVERSATIONS WITH CENTCOM, TO YOUR

01:25PM   11   KNOWLEDGE, WAS A DEVICE EVER SENT TO A MILITARY BASE IN THE

01:26PM   12   MIDDLE EAST?

01:26PM   13   A.   NOT TO MY KNOWLEDGE.

01:26PM   14   Q.   DO YOU RECALL SEPARATE DEALINGS BETWEEN THERANOS AND A

01:26PM   15   COMPONENT OF THE MILITARY CALLED AFRICOM?

01:26PM   16   A.   YES, I DO.

01:26PM   17   Q.   AND WHAT WAS AFRICOM?

01:26PM   18   A.   AFRICOM WAS A COMPONENT OF THE DEPARTMENT OF DEFENSE IN

01:26PM   19   AFRICA, SO AFRICA COMMAND.

01:26PM   20   Q.   AND SO WAS THERE A POINT AT WHICH THERANOS DEVICES WERE

01:26PM   21   GIVEN TO REPRESENTATIVES FROM AFRICOM?

01:26PM   22   A.   YES.

01:26PM   23   Q.   AND WHAT DO YOU REMEMBER ABOUT THAT?

01:26PM   24   A.   I RECALL THAT AFTER AN IN-PERSON MEETING WITH LIEUTENANT

01:26PM   25   COLONEL IN AFRICA COMMAND, THERE WAS INTEREST IN PURSUING A

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    4050

01:26PM  1    RESEARCH STUDY WITH THERANOS, AND FOLLOWING THAT MEETING, WE

01:27PM  2    DID ENGAGE IN A PROOF OF CONCEPT STUDY FOR THE LIEUTENANT

01:27PM  3    COLONEL TO GET EXPERIENCE USING THERANOS DEVICES AT A TRAINING

01:27PM  4    SITE IN AFRICA.

01:27PM  5    Q.   AND DID THE DEVICE ACTUALLY TRAVEL TO AFRICA FOR USE AT

01:27PM  6    THAT TRAINING SITE?

01:27PM  7    A.   IT DID.

01:27PM  8    Q.   DID THAT USE INVOLVE THE ACTUAL CLINICAL TESTING OF

01:27PM  9    PATIENT SAMPLES BY THE MILITARY?

01:27PM  10   A.   THAT'S NOT MY UNDERSTANDING OF IT.

01:27PM  11   Q.   AND DID THAT USE INVOLVE ANY CLINICAL USE OF THE DEVICE?

01:27PM  12   IN OTHER WORDS, DID DOCTORS LOOK AT THE RESULTS AND RELY ON

01:27PM  13   THEM TO MAKE TREATMENT DECISIONS FOR PATIENTS?

01:27PM  14   A.   NO.

01:27PM  15   Q.   I'LL ASK YOU TO TURN IN YOUR BINDER TO EXHIBIT 5435.

01:28PM  16        AND FOR THE COURT AND THE DEFENSE, THIS MAY BE IN THE RED

01:28PM  17   WELD.

01:28PM  18        MR. EDLIN, DO YOU HAVE EXHIBIT 5435 IN FRONT OF YOU?

01:28PM  19   A.   YES.

01:28PM  20   Q.   AND IS THIS AN EMAIL CHAIN INCLUDING YOU, MS. HOLMES --

01:28PM  21   ACTUALLY JUST BETWEEN YOU AND MS. HOLMES RELATING TO THAT

01:28PM  22   AFRICOM CONTACT?

01:28PM  23   A.   YES.

01:28PM  24        MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

01:28PM  25   EXHIBIT 5435.

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    4051

01:28PM   1              MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

01:28PM   2              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:28PM   3         (GOVERNMENT'S EXHIBIT 5435 WAS RECEIVED IN EVIDENCE.)

01:28PM   4    BY MR. BOSTIC:

01:28PM   5    Q.   AFTER THE AFRICOM USE, DO YOU RECALL SOME DISCUSSION

01:28PM   6    WITHIN THERANOS ABOUT THE EDISON'S TEMPERATURE MEASUREMENT?

01:29PM   7    A.   YES.

01:29PM   8    Q.   AND HOW DID THAT TOPIC COME UP?

01:29PM   9    A.   WELL, THE TEMPERATURE CONDITIONS IN AFRICA AND AT THE

01:29PM  10    TRAINING SITES INCLUDED HIGH TEMPERATURES, AND THE LIEUTENANT

01:29PM  11    COLONEL WAS INTERESTED IN DATA TO REPRESENT HOW THE THERANOS

01:29PM  12    DEVICES PERFORMED IN THOSE HIGH TEMPERATURES.

01:29PM  13         AND AT ONE POINT I COMMUNICATED WITH VARIOUS DEPARTMENT

01:29PM  14    HEADS IN THERANOS TO UNDERSTAND WHETHER THAT DATA HAD BEEN

01:29PM  15    GENERATED OR IF IT EXISTED.

01:29PM  16    Q.   AND WERE YOU ABLE TO FIND DATA TO RESPOND TO THE INQUIRY

01:29PM  17    FROM THE MILITARY WHEN IT CAME TO THAT TEMPERATURE ISSUE?

01:29PM  18    A.   I WAS, I WAS SENT SUMMARIES OF THE DATA, BUT I DON'T

01:30PM  19    BELIEVE THAT IT WAS ACTUALLY SENT TO THE MILITARY.

01:30PM  20    Q.   LET'S LOOK AT PAGE 4 OF THIS EXHIBIT.

01:30PM  21         MR. EDLIN, DO YOU SEE AN EMAIL FROM YOU TO

01:30PM  22    ELIZABETH HOLMES ON MARCH 28TH, 2013?

01:30PM  23    A.   YES.

01:30PM  24    Q.   AND DOES THIS RELATE TO THE TOPIC THAT WE'VE BEEN

01:30PM  25    DISCUSSING?

                          UNITED STATES COURT REPORTERS

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    4052

01:30PM  1    A.   YES.

01:30PM  2    Q.   THIS EMAIL CONTAINS INFORMATION ABOUT THE EDISON'S

01:30PM  3    TEMPERATURE MANAGEMENT CAPABILITIES; IS THAT RIGHT?

01:30PM  4    A.   THAT'S RIGHT.

01:30PM  5    Q.   AT THE BOTTOM OF THE SELECTION HERE, THERE'S INFORMATION

01:30PM  6    AND IT LOOKS LIKE IT CAME FROM GARY.  DO YOU RECALL WHO GARY

01:30PM  7    WAS AT THERANOS?

01:30PM  8    A.   GARY WAS A SCIENTIST, AND HE HAD BEEN WITH THE COMPANY FOR

01:30PM  9    A NUMBER OF YEARS.

01:30PM  10   Q.   THERE'S A QUOTE BELOW HIS NAME THAT SAYS, "NOPE, THE

01:31PM  11   EDISON DID NOT HAVE A WAY TO COOL DOWN.  THEY WOULD HAVE SHUT

01:31PM  12   DOWN."

01:31PM  13        DO YOU SEE THAT?

01:31PM  14   A.   I DO.

01:31PM  15   Q.   IS THAT INFORMATION THAT YOU GOT ABOUT THE EDISON'S

01:31PM  16   CAPABILITIES?

01:31PM  17   A.   YES.

01:31PM  18   Q.   LET'S LOOK BELOW THAT AT THE NEXT SET OF BULLET POINTS.

01:31PM  19        BELOW THE NAME TONY, THERE'S A QUOTE THAT SAYS, "THE

01:31PM  20   EDISON 3.0 FOR VARIOUS REASONS OPERATES IN A FAIRLY NARROW

01:31PM  21   INDOOR AMBIENT TEMPERATURE RANGE OF 22 TO 28 DEGREES CELSIUS.

01:31PM  22   72 TO 82 DEGREES FAHRENHEIT."

01:31PM  23        DO YOU SEE THAT?

01:31PM  24   A.   I DO.

01:31PM  25   Q.   AND BELOW THAT IT SAYS, "LOWER THAN THIS REQUIRED TOO LONG

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    4053

01:31PM  1      TO REACH INTERNAL OPERATING TEMPERATURE.

01:31PM  2           "HIGHER THAN THIS, WE HAVE NO WAY TO COOL THE DEVICE."

01:31PM  3           DO YOU SEE THAT?

01:31PM  4      A.   I DO.

01:31PM  5      Q.   IS THIS INDICATING THAT THE EDISON NEEDS TO BE KEPT IN A

01:31PM  6      TEMPERATURE RANGE OF 72 TO 82 DEGREES TO FUNCTION PROPERLY?

01:31PM  7      A.   THAT SEEMS TO BE WHAT THIS DESCRIPTION INDICATES, YES.

01:32PM  8      Q.   AND DOES THE MILITARY IN THE MIDDLE EAST AND IN AFRICA

01:32PM  9      OPERATE IN SOME AREAS WHERE IT GETS MUCH COLDER THAN 72 DEGREES

01:32PM  10     AND MUCH HOTTER THAN 82 DEGREES, IF YOU KNOW?

01:32PM  11     A.   I KNOW THAT IT GETS MUCH HOTTER.

01:32PM  12     Q.   DID THE CONVERSATIONS WITH AFRICOM EVER RESULT IN CLINICAL

01:32PM  13     USE ON PATIENTS OF THE THERANOS ANALYZER?

01:32PM  14     A.   NOT TO MY KNOWLEDGE.

01:32PM  15     Q.   THINKING OF ALL OF YOUR CONTACTS WITH THE MILITARY DURING

01:32PM  16     YOUR TIME AT THERANOS AND ALL OF YOUR KNOWLEDGE, TO YOUR

01:32PM  17     KNOWLEDGE, WAS THE THERANOS ANALYZER EVER USED BY THE MILITARY

01:32PM  18     CLINICALLY IN THE TREATMENT OF DEPLOYED SOLDIERS?

01:32PM  19     A.   NOT TO MY KNOWLEDGE.

01:32PM  20     Q.   TO YOUR KNOWLEDGE, WAS THE THERANOS ANALYZER EVER DEPLOYED

01:33PM  21     TO A BATTLEFIELD OR A WAR ZONE FOR CLINICAL USE?

01:33PM  22     A.   NOT TO MY KNOWLEDGE.

01:33PM  23     Q.   TO YOUR KNOWLEDGE, WAS THE THERANOS ANALYZER EVER SENT TO

01:33PM  24     THE MIDDLE EAST BY THE MILITARY AT ALL?

01:33PM  25     A.   NOT TO MY KNOWLEDGE.

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    4054

01:33PM  1      Q.   AND TO YOUR KNOWLEDGE, DID THE MILITARY EVER INSTALL A

01:33PM  2   THERANOS ANALYZER ON A MEDEVAC OR OTHER MILITARY HELICOPTER?

01:33PM  3      A.   NOT TO MY KNOWLEDGE.

01:33PM  4           MR. BOSTIC:  YOUR HONOR, THIS MIGHT BE A GOOD TIME

01:33PM  5   FOR A BREAK.

01:33PM  6           THE COURT:  YOU HAVE ADDITIONAL EXAMINATION?

01:33PM  7           MR. BOSTIC:  I DO.  NOT MUCH, BUT SOME.

01:33PM  8           THE COURT:  OKAY.  LET'S TAKE OUR AFTERNOON RECESS,

01:33PM  9   LADIES AND GENTLEMEN.  WE'LL TAKE 30 MINUTES, AND WE'LL BE

01:33PM 10   BACK.

01:33PM 11        YOU CAN STAND DOWN, SIR.

01:33PM 12        (RECESS TAKEN AT 1:33 P.M.)

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    4055

01:33PM   1                        **AFTERNOON SESSION**

02:04PM   2              (JURY IN AT 2:03 P.M.)

02:04PM   3                  THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.  PLEASE

02:04PM   4       BE SEATED.

02:04PM   5          WE'RE BACK ON THE RECORD.  THE JURY IS PRESENT.  COUNSEL

02:04PM   6       AND MS. HOLMES ARE PRESENT.

02:04PM   7          MR. BOSTIC.

02:04PM   8                  MR. BOSTIC:  THANK YOU, YOUR HONOR.

02:04PM   9       Q.   MR. EDLIN, WHEN WE STOPPED FOR THE BREAK, WE WERE

02:04PM  10       DISCUSSING THE VARIOUS CONTACTS THAT THERANOS HAD HAD WITH THE

02:04PM  11       MILITARY.

02:04PM  12          DO YOU RECALL THAT TESTIMONY?

02:04PM  13       A.   YES.

02:04PM  14       Q.   AND WE TALKED ABOUT HOW NONE OF THOSE CONTACTS RESULTED IN

02:04PM  15       ACTUAL CLINICAL USE OF THE ANALYZER; IS THAT CORRECT?

02:04PM  16       A.   YES.

02:04PM  17       Q.   DID YOU EVER DISCUSS WITH MS. HOLMES THE REASON WHY NONE

02:04PM  18       OF THOSE ENGAGEMENTS WENT BEYOND THE POINTS THAT THEY DID?

02:04PM  19       A.   THERE WAS A DISCUSSION DURING THE PROCESS OF WHY CERTAIN

02:04PM  20       THINGS COULD NOT GET INITIATED AT THAT TIME, AT THOSE TIMES.

02:05PM  21       Q.   SORRY.  AND WHAT, IF ANYTHING, DO YOU RECALL MS. HOLMES

02:05PM  22       TELLING YOU ABOUT THAT?

02:05PM  23       A.   IT WAS MY UNDERSTANDING, BASED ON CONVERSATIONS WITH

02:05PM  24       ELIZABETH, THAT THE RESOURCES REQUIRED TO SUPPORT THOSE

02:05PM  25       PROGRAMS WERE DIRECTED IN SUPPORT OF THE CLINICAL LAUNCH WITH

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    4056

02:05PM   1    WALGREENS AND THE RETAIL LAUNCH.

02:05PM   2    Q.   IN OTHER WORDS, THERANOS COULDN'T DO BOTH THINGS AT ONCE,

02:05PM   3    PROCEED WITH THE COMMERCIAL LAUNCH AND MOVE FORWARD WITH THE

02:05PM   4    MILITARY PROJECT?

02:05PM   5    A.   WELL, THE MILITARY PROJECTS WOULD HAVE REQUIRED CERTAIN

02:05PM   6    RESOURCES BEING ALLOCATED THERE AND THEY NEVER WERE IN A WAY

02:05PM   7    THAT WOULD SUPPORT THOSE PROGRAMS.

02:05PM   8    Q.   DID MS. HOLMES EVER TELL YOU THAT PART OF THE REASON WHY

02:05PM   9    THOSE PROJECTS NEVER GOT OFF THE GROUND HAD SOMETHING TO DO

02:05PM   10   WITH LIMITATIONS IN THE CAPABILITIES OF THE THERANOS ANALYZER?

02:06PM   11   A.   SHE DID NOT TELL ME THAT.

02:06PM   12   Q.   AS PART OF YOUR EMPLOYMENT AT THERANOS, DID YOU HAVE

02:06PM   13   OPPORTUNITIES TO OBSERVE MS. HOLMES AND MR. BALWANI WORKING

02:06PM   14   TOGETHER?

02:06PM   15   A.   I DID.

02:06PM   16   Q.   HOW DID YOU HAVE THOSE OPPORTUNITIES?

02:06PM   17   A.   ON SEVERAL OCCASIONS I WAS IN MEETINGS WITH THE TWO OF

02:06PM   18   THEM AND OBSERVED THEM WORKING AND INTERACTING.

02:06PM   19   Q.   AND WHERE WAS YOUR DESK OR OFFICE LOCATED IN RELATION TO

02:06PM   20   MR. BALWANI'S AND MS. HOLMES'S OFFICES?

02:06PM   21   A.   SO IN MY TIME AT THERANOS I WAS IN THREE DIFFERENT

02:06PM   22   OFFICES, AND IN THE FIRST TWO OFFICES MY DESK WAS IN A POD OF

02:06PM   23   OTHER DESKS THAT WERE OUTSIDE OF THEIR TWO OFFICES.  I THINK IN

02:07PM   24   ALL THREE BUILDINGS BOTH ELIZABETH AND SUNNY'S OFFICE WERE NEXT

02:07PM   25   DOOR TO EACH OTHER AND THEY HAD GLASS DOORS, THEY COULD -- OR

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    4057

02:07PM   1    GLASS WALLS SO YOU COULD SEE INSIDE.

02:07PM   2         AND IN THE THIRD BUILDING I WAS IN, I WAS DOWN THE HALL

02:07PM   3    FROM THEIR OFFICES.

02:07PM   4    Q.   AND DID THAT PROXIMITY GIVE YOU MORE OPPORTUNITIES TO SEE

02:07PM   5    HOW THEY WORKED TOGETHER?

02:07PM   6    A.   IT GAVE ME OPPORTUNITIES TO SEE WHAT WAS HAPPENING IN

02:07PM   7    THEIR OFFICES AND THEY OFTENTIMES, YOU KNOW, ATE LUNCH TOGETHER

02:07PM   8    AND WERE IN DISCUSSION WITH ONE ANOTHER.

02:07PM   9    Q.   SO BESIDES THEM, YOU SAID, EATING LUNCH TOGETHER AND BEING

02:07PM   10   IN DISCUSSION WITH EACH OTHER, WAS THERE ANYTHING ELSE THAT

02:07PM   11   STANDS OUT TO YOU ABOUT THEIR WORKING RELATIONSHIP AND THE WAY

02:07PM   12   THEY WORKED TOGETHER AT THE COMPANY?

02:07PM   13   A.   NOTHING REALLY STANDS OUT.

02:08PM   14   Q.   HOW ABOUT THE DYNAMIC BETWEEN THEM?  DID THEY OPERATE,

02:08PM   15   FROM WHAT YOU SAW, AS CO-EQUALS IN THE COMPANY WITH THE SAME

02:08PM   16   LEVEL OF AUTHORITY OR WAS ONE IN CHARGE COMPARED TO THE OTHER?

02:08PM   17   A.   I WAS IN MEETINGS WHERE SUNNY, SUNNY SAID THAT HE WOULD

02:08PM   18   DEFER TO ELIZABETH ON CERTAIN THINGS AND GENERALLY, YOU KNOW,

02:08PM   19   ELIZABETH WAS THE CEO, AND I THINK SHE HAD KIND OF THE FINAL

02:08PM   20   DECISION MAKING AUTHORITY.

02:08PM   21        BUT I WAS ONLY PRESENT WITH THE TWO OF THEM IN KIND OF A

02:08PM   22   SUBSET OF THEIR INTERACTIONS.

02:08PM   23   Q.   DURING THOSE INTERACTIONS, DO YOU RECALL EVER SEEING THEM

02:08PM   24   DISAGREE ABOUT ANYTHING WHEN IT CAME TO OPERATION OF THE

02:08PM   25   COMPANY?

EDLIN DIRECT BY MR. BOSTIC (RES.)                                    4058

02:08PM  1    A.   I DID SEE THEM DISAGREE ABOUT, I'M NOT SURE IF I COULD

02:09PM  2    CONSIDER IT THE OPERATION, BUT ABOUT CERTAIN TOPICS.

02:09PM  3    Q.   OKAY.  AND TOPICS RELATED TO THERANOS?

02:09PM  4    A.   RIGHT.

02:09PM  5    Q.   AND WHEN THERE WERE DISAGREEMENTS BETWEEN THE TWO OF THEM,

02:09PM  6    WHEN THEY SAW THINGS DIFFERENTLY, WHICH ONE OF THEM WAS IN

02:09PM  7    CHARGE?  WHICH ONE OF THEM MADE THE FINAL DECISION IF YOU

02:09PM  8    RECALL?

02:09PM  9    A.   I DON'T RECALL THAT THERE WAS ALWAYS NECESSARILY A

02:09PM  10   DECISION THAT WAS MADE.  SOMETIMES THERE WAS A DISCUSSION THAT

02:09PM  11   WAS LEFT UNRESOLVED, BUT I DID HEAR TIMES WHEN SUNNY WOULD

02:09PM  12   DEFER TO ELIZABETH.

02:09PM  13   Q.   DID YOU EVER SEE MR. BALWANI OVERRULE MS. HOLMES WHEN IT

02:09PM  14   CAME TO SOMETHING ABOUT WHAT WOULD HAPPEN AT THERANOS?

02:09PM  15   A.   I THINK THERE WERE CERTAIN SUBJECTS WHERE HE HAD MORE OF

02:09PM  16   AN EXPERTISE BUT -- I'M SORRY, WHAT WAS THE QUESTION THERE?

02:10PM  17   Q.   THE QUESTION WAS WHETHER YOU EVER SAW HIM OVERRULE HER,

02:10PM  18   OVERRULE A DECISION THAT SHE HAD MADE AT THERANOS?

02:10PM  19   A.   I CAN'T RECALL A SPECIFIC MOMENT, BUT I AM -- YEAH, I

02:10PM  20   CAN'T THINK OF ONE THAT I CAN REMEMBER OFF THE TOP OF MY HEAD.

02:10PM  21   Q.   HOW ABOUT THEIR PERSONAL RELATIONSHIP.  WHEN YOU WERE

02:10PM  22   WORKING AT THE COMPANY, WERE YOU AWARE THAT THEY WERE

02:10PM  23   ROMANTICALLY INVOLVED?

02:10PM  24   A.   I WAS.

02:10PM  25   Q.   AND HOW DID YOU KNOW THAT?

EDLIN DIRECT BY MR. BOSTIC (RES.)                                        4059

| | | |
|---|---|---|
| 02:10PM | 1 | A.   WHEN I WAS FIRST INTRODUCED TO SUNNY WHILE I WAS IN |
| 02:10PM | 2 | COLLEGE HE WAS INTRODUCED TO ME AS ELIZABETH'S BOYFRIEND. |
| 02:10PM | 3 | Q.   AND APPROXIMATELY WHAT YEAR WOULD THAT HAVE BEEN? |
| 02:10PM | 4 | A.   AROUND 2004, 2005. |
| 02:10PM | 5 | Q.   AND WHEN YOU WERE WORKING AT THE COMPANY, WERE YOU AWARE |
| 02:10PM | 6 | THAT THEY WERE IN A RELATIONSHIP? |
| 02:10PM | 7 | A.   YES. |
| 02:10PM | 8 | Q.   DID YOU EVER HAVE THE OPPORTUNITY TO SPEND TIME WITH THEM |
| 02:11PM | 9 | SOCIALLY OUTSIDE OF THE OFFICE? |
| 02:11PM | 10 | A.   YES. |
| 02:11PM | 11 | Q.   HOW DID THAT HAPPEN? |
| 02:11PM | 12 | A.   ON SOME OCCASIONS ELIZABETH INVITED CHRISTIAN AND MYSELF |
| 02:11PM | 13 | AND OTHER MEMBERS OF THE PROJECT MANAGEMENT TEAM OUT TO DINNER |
| 02:11PM | 14 | OR TO SUNNY'S HOUSE FOR DINNER. |
| 02:11PM | 15 | Q.   AND WAS MS. HOLMES LIVING WITH MR. BALWANI AT THE TIME? |
| 02:11PM | 16 | A.   YES. |
| 02:11PM | 17 | Q.   DURING THOSE INTERACTIONS, WAS THERE ANYTHING THAT STOOD |
| 02:11PM | 18 | OUT IN YOUR MIND ABOUT THE WAY THAT MS. HOLMES AND MR. BALWANI |
| 02:11PM | 19 | ACTED TOGETHER? |
| 02:11PM | 20 | A.   NOT IN PARTICULAR.  IT WAS ALWAYS MORE OF A RELAXED, YOU |
| 02:11PM | 21 | KNOW, SETTING OUTSIDE OF WORK.  WE DIDN'T REALLY DISCUSS WORK. |
| 02:11PM | 22 | IT WAS MUCH MORE RELAXED.  SOCIAL. |
| 02:12PM | 23 | MR. BOSTIC:  MAY I HAVE A MOMENT, YOUR HONOR? |
| 02:12PM | 24 | THE COURT:  YES. |
| 02:12PM | 25 | (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.) |

EDLIN CROSS BY MR. DOWNEY                                    4060

02:12PM  1              MR. BOSTIC:  THANK YOU, YOUR HONOR.

02:12PM  2         NO FURTHER QUESTIONS AT THIS TIME.

02:12PM  3              THE COURT:  ALL RIGHT.  THANK YOU.

02:12PM  4         CROSS-EXAMINATION?

02:12PM  5              MR. DOWNEY:  YOUR HONOR, MAY I JUST TAKE A MOMENT TO

02:12PM  6    GET SET UP?

02:12PM  7              THE COURT:  YES.

02:12PM  8         (PAUSE IN PROCEEDINGS.)

02:13PM  9              MR. DOWNEY:  MAY I APPROACH THE WITNESS, YOUR HONOR?

02:13PM 10              THE COURT:  YES.  THANK YOU.

02:13PM 11              MR. DOWNEY:  (HANDING.)

02:13PM 12                         **CROSS-EXAMINATION**

02:13PM 13    BY MR. DOWNEY:

02:13PM 14    Q.  GOOD AFTERNOON, MR. EDLIN.  MY NAME IS KEVIN DOWNEY, AND I

02:13PM 15    REPRESENT MS. HOLMES.

02:13PM 16         I WANT TO START --

02:13PM 17    A.  HELLO.

02:13PM 18    Q.  THANK YOU.  I WANT TO START BY ASKING YOU ABOUT THE

02:13PM 19    TECHNOLOGY AT THERANOS AND TRYING TO GET THE VARIOUS FORMS OF

02:13PM 20    TECHNOLOGY STRAIGHT SO IT'S CLEAR.

02:13PM 21         FIRST OF ALL, YOU REMEMBER THAT THERE WAS A -- WELL, I

02:13PM 22    SHOULD START BY SAYING YOU YOURSELF WERE NOT AN EXPERT IN THE

02:13PM 23    TECHNOLOGY; CORRECT?

02:13PM 24    A.  CORRECT.

02:13PM 25    Q.  YOU WERE A RELATIVELY RECENT COLLEGE GRADUATE WHEN YOU

EDLIN CROSS BY MR. DOWNEY                                            4061

02:14PM   1    STARTED AT THERANOS?

02:14PM   2    A.   THAT'S RIGHT.

02:14PM   3    Q.   AND YOU -- I THINK YOUR MAJOR WAS IN PUBLIC POLICY?

02:14PM   4    A.   THAT'S RIGHT.

02:14PM   5    Q.   BUT YOU CAME TO BE FAMILIAR WITH THE TECHNOLOGY DURING THE

02:14PM   6    COURSE OF YOUR TIME AT THE COMPANY; IS THAT RIGHT?

02:14PM   7    A.   THAT'S RIGHT.

02:14PM   8    Q.   I WANT TO SHOW YOU SOME PICTURES OF VARIOUS FORMS OF THE

02:14PM   9    TECHNOLOGY AND ASK IF YOU CAN IDENTIFY THEM.

02:14PM   10        FIRST OF ALL, I WANT TO SHOW YOU AN EXHIBIT THAT HAS BEEN

02:14PM   11   PREVIOUSLY ADMITTED AS EXHIBIT 5388.

02:14PM   12        AND THIS IS IN EVIDENCE, YOUR HONOR.

02:14PM   13            THE COURT:   THANK YOU.

02:14PM   14   BY MR. DOWNEY:

02:14PM   15   Q.   IT SHOULD BE ON THE SCREEN.  IT'S ALREADY IN EVIDENCE.

02:14PM   16   A.   OKAY.

02:14PM   17   Q.   DO YOU RECOGNIZE THAT AS A SERIES 3 THERANOS DEVICE?

02:15PM   18   A.   YES, I DO.

02:15PM   19   Q.   AND THIS DEVICE IS A 3.0 DEVICE; CORRECT?

02:15PM   20   A.   I THINK IT COULD BE A 3.0 OR A 3.5.

02:15PM   21   Q.   OKAY.  THE INTERNAL WORKINGS MIGHT BE DIFFERENT, BUT THE

02:15PM   22   EXTERNAL APPEARANCE IS THE SAME BETWEEN A 3.0 AND A 3.5;

02:15PM   23   CORRECT?

02:15PM   24   A.   CORRECT.

02:15PM   25   Q.   AND YOU UNDERSTOOD THAT THE 3.0 HAD THE ABILITY TO PROCESS

EDLIN CROSS BY MR. DOWNEY                                    4062

02:15PM  1    CERTAIN CLASSES OF ASSAYS; CORRECT?

02:15PM  2    A.   THERE BECAME A TIME WHEN I LEARNED WHAT IT COULD DO,

02:15PM  3    THAT'S RIGHT.

02:15PM  4    Q.   AND YOU UNDERSTOOD THAT THE 3.5 HAD THE CAPACITY TO

02:15PM  5    PROCESS SOME ADDITIONAL ASSAYS; IS THAT RIGHT?

02:15PM  6    A.   I'M NOT SURE I HAD THAT UNDERSTANDING.

02:15PM  7    Q.   OKAY.

02:15PM  8    A.   I KNOW THAT THE INTERNAL COMPONENTS WERE DIFFERENT, WERE

02:15PM  9    UPDATED.

02:15PM  10   Q.   OKAY.  BUT YOU DIDN'T HAVE EXPERTISE IN WHAT ASSAY IS

02:16PM  11   ASSOCIATED WITH WHICH DEVICE OR HOW THEY WORK FROM AN INTERNAL

02:16PM  12   PERSPECTIVE; IS THAT FAIR?

02:16PM  13   A.   I DIDN'T HAVE AN EXPERTISE.

02:16PM  14   Q.   YOU WERE FAMILIAR WITH THE 3.0, BECAUSE IT WAS INVOLVED IN

02:16PM  15   SOME OF THE PROJECTS THAT YOU WERE INVOLVED WITH; CORRECT?

02:16PM  16   A.   IT WAS INVOLVED IN SOME OF THE PROJECTS AND IN MEETINGS

02:16PM  17   AND DEMONSTRATIONS.

02:16PM  18   Q.   OKAY.  FOR EXAMPLE, THE 3.0 WAS INVOLVED IN THE BURN STUDY

02:16PM  19   THAT YOU DISCUSSED WITH MR. BOSTIC; CORRECT?

02:16PM  20   A.   CORRECT.

02:16PM  21   Q.   OKAY.  I'D LIKE YOU TO LOOK IN YOUR NOTEBOOK AT

02:16PM  22   EXHIBIT 7747.

02:16PM  23   A.   I SEE IT.

02:16PM  24   Q.   DO YOU RECOGNIZE THIS DEVICE AS A 4. -- A 4S DEVICE OF

02:17PM  25   THERANOS?

EDLIN CROSS BY MR. DOWNEY                                                4063

| 02:17PM | 1 | A.   YES. |
| 02:17PM | 2 | Q.   OKAY. |
| 02:17PM | 3 | YOUR HONOR, I MOVE THE ADMISSION OF EXHIBIT 7747. |
| 02:17PM | 4 | MR. BOSTIC:  NO OBJECTION. |
| 02:17PM | 5 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 02:17PM | 6 | (DEFENDANT'S EXHIBIT 7747 WAS RECEIVED IN EVIDENCE.) |
| 02:17PM | 7 | BY MR. DOWNEY: |
| 02:17PM | 8 | Q.   AND IS THIS A DEVICE, A DEVICE THAT WAS DEVELOPED |
| 02:17PM | 9 | SPECIFICALLY IN CONNECTION WITH THERANOS'S WORK WITH THE |
| 02:17PM | 10 | MILITARY? |
| 02:17PM | 11 | A.   YES. |
| 02:17PM | 12 | Q.   LET ME ASK YOU TO LOOK IN YOUR BINDER AT EXHIBIT 13982. |
| 02:18PM | 13 | A.   JUST A MOMENT. |
| 02:18PM | 14 | Q.   I CAN GIVE YOU A COPY IF YOU HAVE TROUBLE LOCATING IT. |
| 02:18PM | 15 | A.   OKAY.  I'VE GOT IT. |
| 02:18PM | 16 | Q.   IS THIS A SERIES 4.0 DEVICE OF THERANOS? |
| 02:18PM | 17 | A.   I BELIEVE IT IS, YES. |
| 02:18PM | 18 | MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT |
| 02:18PM | 19 | EXHIBIT 13982. |
| 02:18PM | 20 | MR. BOSTIC:  NO OBJECTION. |
| 02:18PM | 21 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 02:18PM | 22 | (DEFENDANT'S EXHIBIT 13982 WAS RECEIVED IN EVIDENCE.) |
| 02:18PM | 23 | BY MR. DOWNEY: |
| 02:19PM | 24 | Q.   AND THIS 4.0 DEVICE IS CAPABLE OF RUNNING ONE TEST AT A |
| 02:19PM | 25 | TIME; IS THAT CORRECT? |

EDLIN CROSS BY MR. DOWNEY                                    4064

02:19PM  1    A.   I'M NOT SURE.

02:19PM  2    Q.   YOU CAME TO LEARN THAT THERE WAS A DIFFERENT VERSION IN

02:19PM  3    THE 4 SERIES CALLED A MINILAB; CORRECT?

02:19PM  4    A.   SO THE MINILAB REFERRED TO TWO DIFFERENT VERSIONS OF THE

02:19PM  5    4 SERIES WHILE I WAS AT THE COMPANY.  INITIALLY THE MINILAB

02:19PM  6    REFERRED TO A STACKED TOWER, AND THEN LATER ON THE MINILAB

02:19PM  7    REFERRED TO THE 4S DEVICE.

02:19PM  8    Q.   WHAT WAS THE DIFFERENCE BETWEEN THE MINILAB AND THIS 4.0

02:19PM  9    DEVICE?

02:19PM  10   A.   BETWEEN THE MINILAB ALSO KNOWN AS THE 4S AND THIS 4.0

02:19PM  11   DEVICE; RIGHT?

02:20PM  12   Q.   THAT'S FAIR, YES.

02:20PM  13   A.   THE 4S WAS SMALLER IN SIZE.

02:20PM  14   Q.   I'M SORRY.  I WAS ASKING YOU WHAT'S THE DIFFERENCE BETWEEN

02:20PM  15   THE 4.0 DEVICE THAT IS ON THE SCREEN.

02:20PM  16   A.   AND THE 4S MINILAB?

02:20PM  17   Q.   LET'S TAKE THEM ONE AT A TIME.

02:20PM  18   A.   OKAY.

02:20PM  19   Q.   WHAT IS THE DIFFERENCE BETWEEN THE 4S AND THE 4.0 DEVICE?

02:20PM  20   A.   THE 4.0 DEVICE WAS ALSO REFERRED TO AS A MONOBAY, AND THE

02:20PM  21   MONOBAY 4.0 WAS LARGER IN SIZE THAN THE 4S.

02:20PM  22   Q.   OKAY.  AND DID THEY HAVE DIFFERENT INTENDED USES?

02:20PM  23   A.   MY UNDERSTANDING WAS THAT THE 4S WAS DEVELOPED BECAUSE IT

02:20PM  24   WAS SMALLER, LIGHTER, AND MORE PORTABLE THAN THE MONOBAY, THAN

02:21PM  25   THIS 4.0.

EDLIN CROSS BY MR. DOWNEY                                              4065

02:21PM  1    Q.   OKAY.  AND WHAT IS THE DIFFERENCE BETWEEN THE 4.0 AND THE

02:21PM  2    MINILAB TOWER THAT YOU MENTIONED?

02:21PM  3    A.   THE MINILAB TOWER, MY UNDERSTANDING, IS ESSENTIALLY THE

02:21PM  4    SAME COMPONENTS THAT YOU HAVE IN THIS 4.0 STACKED ON TOP OF

02:21PM  5    EACH OTHER.  SO THERE'S ESSENTIALLY FOUR OR FIVE OF THESE

02:21PM  6    STACKED ON ONE ANOTHER.

02:21PM  7    Q.   OKAY.  SO INSTEAD OF RUNNING ONE SAMPLE AT A TIME, THEY

02:21PM  8    HAVE THE CAPACITY TO RUN MULTIPLE SAMPLES AT A TIME?

02:21PM  9    A.   THAT WAS WHAT I WAS TOLD THAT DEVICE WAS DESIGNED TO DO.

02:21PM 10    Q.   OKAY.  LET ME ASK YOU TO LOOK AT EXHIBIT 9790.

02:22PM 11    A.   OKAY.

02:22PM 12    Q.   ARE THE TWO LARGE DEVICES IN THIS PHOTOGRAPH THERANOS

02:22PM 13    MINILABS?

02:22PM 14    A.   THEY APPEAR TO BE.

02:22PM 15         MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

02:22PM 16    9790.

02:22PM 17         MR. BOSTIC:  NO OBJECTION.

02:22PM 18         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:22PM 19    (DEFENDANT'S EXHIBIT 9790 WAS RECEIVED IN EVIDENCE.)

02:22PM 20    BY MR. DOWNEY:

02:22PM 21    Q.   AND IF YOU LOOK AT THIS PHOTOGRAPH YOU SEE THE TWO DEVICES

02:22PM 22    SET UP NEXT TO EACH OTHER.  GIVE US A SENSE OF HOW LARGE THOSE

02:22PM 23    DEVICES ARE?

02:22PM 24    A.   I DON'T RECALL SPECIFICALLY, BUT I THINK THEY WERE IN THE

02:22PM 25    FOUR TO FIVE FEET RANGE.

EDLIN CROSS BY MR. DOWNEY                                          4066

02:22PM   1    Q.   OKAY.  AND IS THE DEVICE, THE SMALLER DEVICE, THAT FROM

02:23PM   2    OUR PERSPECTIVE IS ON THE LEFT, IS THAT A DIFFERENT 4 SERIES

02:23PM   3    DEVICE?

02:23PM   4    A.   I DON'T KNOW.

02:23PM   5    Q.   DO YOU KNOW WHEN WORK ON THE STACKED TOWER MINILAB BEGAN

02:23PM   6    AT THERANOS?

02:23PM   7    A.   I DON'T KNOW SPECIFICALLY.

02:23PM   8    Q.   BUT ALL OF THESE DEVICES WERE ANALYZERS THAT WERE USED IN

02:23PM   9    CONNECTION WITH ANALYZING BLOOD SAMPLES; CORRECT?

02:23PM   10   A.   ALL OF THESE DEVICES WERE ANALYZERS.  THE -- AND I THINK

02:23PM   11   THEY WERE INTENDED TO BE USED TO ANALYZE SAMPLES, RIGHT, BLOOD

02:23PM   12   SAMPLES, YES.

02:23PM   13   Q.   AND WHAT THEY HAD IN COMMON WAS THAT THE SAMPLES THAT THEY

02:24PM   14   WERE INTENDED TO PROCESS WERE SMALL SAMPLES OF BLOOD; CORRECT?

02:24PM   15   A.   THAT'S MY UNDERSTANDING.  MY UNDERSTANDING IS THAT THEY

02:24PM   16   PROCESSED NANOTAINERS WHICH HAD SMALL SAMPLES.

02:24PM   17   Q.   AND THE NANOTAINERS ARE DEVICES THAT THE BLOOD WAS

02:24PM   18   DEPOSITED INTO AFTER IT WAS DRAWN; CORRECT?

02:24PM   19   A.   RIGHT.

02:24PM   20   Q.   AND THEN THE NANOTAINER WAS PLACED IN THESE DEVICES AND

02:24PM   21   THE BLOOD TEST WAS RUN; CORRECT?

02:24PM   22   A.   IT WAS PLACED INTO A CARTRIDGE, AND THEN THE CARTRIDGE WAS

02:24PM   23   PLACED INTO THESE DEVICES AND RUN.

02:24PM   24   Q.   SO THERE ARE FOUR OR FIVE DIFFERENT PIECES OF HARDWARE

02:24PM   25   THAT WERE REFERENCED DURING YOUR TIME AT THERANOS; CORRECT?

EDLIN CROSS BY MR. DOWNEY                                          4067

02:24PM   1    A.   CORRECT.

02:24PM   2    Q.   AND TO USE THOSE ANALYZERS TO ANY EFFECT, YOU HAD TO HAVE

02:25PM   3    AN ASSAY, CORRECT, DEVELOPED TO ACTUALLY RUN THE TEST?

02:25PM   4    A.   CAN YOU REPEAT THE QUESTION.

02:25PM   5    Q.   LET ME REPHRASE THE QUESTION TO BE BETTER.

02:25PM   6    A.   YEAH.

02:25PM   7    Q.   AN ASSAY IS THE CHEMISTRY THAT IS USED TO ACTUALLY ANALYZE

02:25PM   8    A SAMPLE OF BLOOD; CORRECT?

02:25PM   9    A.   THAT'S MY UNDERSTANDING.

02:25PM  10    Q.   AND FOR THESE -- IN CONNECTION WITH THESE DEVICES, THE

02:25PM  11    ASSAY IS ON THE CARTRIDGE; RIGHT?  THAT IS DEPOSITED INTO THE

02:25PM  12    DEVICE TO RUN THE TEST; IS THAT CORRECT?

02:25PM  13    A.   MY UNDERSTANDING WAS THAT CERTAIN CHEMICALS WERE ON THE

02:25PM  14    CARTRIDGE, AND THAT ONCE THE CARTRIDGE WAS PLACED INTO THE

02:25PM  15    DEVICE, DIFFERENT COMPONENTS IN THE DEVICE WOULD RUN TESTS

02:25PM  16    USING THOSE MATERIALS.

02:25PM  17    Q.   OKAY.  AND YOU UNDERSTOOD DURING YOUR TIME AT THERANOS

02:25PM  18    THAT DIFFERENT ASSAYS WERE BEING DEVELOPED; CORRECT?

02:25PM  19    A.   CORRECT.

02:25PM  20    Q.   AND AT SOME POINT YOU SAW REPORTS ABOUT THE DEVELOPMENT OF

02:26PM  21    ASSAYS; CORRECT?

02:26PM  22    A.   CORRECT.

02:26PM  23    Q.   AND IN YOUR RESPONSIBILITIES WORKING WITH MS. HOLMES, YOU

02:26PM  24    WERE SOMETIMES RESPONSIBLE FOR MAKING AVAILABLE CERTAIN

02:26PM  25    MATERIALS THAT BUSINESS PARTNERS MIGHT BE INTERESTED IN;

EDLIN CROSS BY MR. DOWNEY                                          4068

02:26PM   1     CORRECT?

02:26PM   2     A.   CORRECT.

02:26PM   3     Q.   AND SOMETIMES HOSPITALS, FOR EXAMPLE, MIGHT BE INTERESTED

02:26PM   4     IN SEEING THOSE DEVELOPMENT REPORTS; CORRECT?

02:26PM   5     A.   I DON'T RECALL WHETHER A HOSPITAL SAW THE DEVELOPMENT

02:26PM   6     REPORT.  THEY DID SEE A PRESENTATION THAT INCLUDED CLINICAL --

02:26PM   7     IT WAS A CLINICAL OVERVIEW, AND THERE WERE COMPARISONS BETWEEN

02:26PM   8     THERANOS TESTS AND PREDICATE METHODS.

02:27PM   9     Q.   OKAY.  HOW MANY ASSAYS DID YOU SEE DEVELOPMENT REPORTS

02:27PM   10    FOR?

02:27PM   11    A.   I DON'T REMEMBER SPECIFICALLY, BUT IT WAS PROBABLY NORTH

02:27PM   12    OF AT LEAST 40.

02:27PM   13    Q.   OKAY.  AND ANOTHER ELEMENT OF THE TECHNOLOGY THAT YOU

02:27PM   14    UNDERSTOOD THERANOS WAS USING WAS SOFTWARE; CORRECT?

02:27PM   15    A.   YES.

02:27PM   16    Q.   AND SOFTWARE HAD MANY, MANY DIFFERENT PURPOSES IN

02:27PM   17    CONNECTION WITH THE TECHNOLOGY; CORRECT?

02:27PM   18    A.   CORRECT.

02:27PM   19    Q.   SOME OF IT WAS JUST USED TO RUN THE DEVICE; CORRECT?

02:27PM   20    A.   CORRECT.

02:27PM   21    Q.   BUT SOME OF IT WAS USED FOR THINGS LIKE PREDICTIVE

02:27PM   22    MODELING; CORRECT?

02:27PM   23    A.   THAT'S MY UNDERSTANDING, YES.

02:27PM   24    Q.   AND OVER TIME YOU SAW INSTANCES WHERE SOFTWARE ON THE

02:27PM   25    DEVICE WAS MODIFIED; CORRECT?

EDLIN CROSS BY MR. DOWNEY                                        4069

02:27PM   1    A.   YES.

02:27PM   2    Q.   AND IT MIGHT BE MODIFIED DEPENDING ON THE INTENDED USE OF

02:28PM   3    THE DEVICE; CORRECT?

02:28PM   4    A.   THAT'S RIGHT.

02:28PM   5    Q.   AND ALL OF THE TECHNOLOGIES THAT WE'VE JUST TALKED ABOUT

02:28PM   6    WORKING TOGETHER WERE REFERRED TO IN THERANOS AS THERANOS

02:28PM   7    SYSTEMS; CORRECT?

02:28PM   8    A.   I'M TRYING TO REMEMBER.  I BELIEVE THEY WERE REFERRED TO

02:28PM   9    AS THERANOS SYSTEMS, YES.

02:28PM  10    Q.   OKAY.  AND MUCH OF WHAT YOU'RE RECOUNTING NOW ABOUT THE

02:28PM  11    TECHNOLOGY AT THERANOS IS THINGS THAT YOU LEARNED FROM OTHERS

02:28PM  12    AT THERANOS; CORRECT?

02:28PM  13    A.   THAT'S CORRECT.

02:28PM  14    Q.   AND YOU HAD OCCASION DURING THE COURSE OF YOUR SERVICE AT

02:28PM  15    THERANOS TO INTERACT WITH A HARDWARE TEAM, FOR EXAMPLE?

02:29PM  16    A.   I INTERACTED WITH CERTAIN MEMBERS OF THAT TEAM ON

02:29PM  17    OCCASION.

02:29PM  18    Q.   OKAY.  I THINK YOU MENTIONED ON DIRECT AN INTERACTION WITH

02:29PM  19    DR. ANEKAL; IS THAT RIGHT?

02:29PM  20    A.   THAT'S RIGHT.

02:29PM  21    Q.   AND YOUR INTERACTIONS WITH THEM WOULD LARGELY BE AROUND

02:29PM  22    GATHERING INFORMATION EITHER AT MS. HOLMES'S REQUEST OR IN

02:29PM  23    CONNECTION WITH SOMETHING RELATED TO WHAT SHE WAS DOING; IS

02:29PM  24    THAT RIGHT?

02:29PM  25    A.   YES.

EDLIN CROSS BY MR. DOWNEY                                        4070

02:29PM  1    Q.   OKAY.  SO, FOR EXAMPLE, YOU TALKED ON YOUR DIRECT

02:29PM  2    EXAMINATION ABOUT THE WEBSITE; CORRECT?

02:29PM  3    A.   THAT'S RIGHT.

02:29PM  4    Q.   AND DO YOU RECALL THAT YOU WENT TO VARIOUS MEMBERS OF THE

02:29PM  5    VARIOUS SCIENTIFIC TEAMS TO ASK THEM QUESTIONS ABOUT ASPECTS OF

02:29PM  6    THERANOS'S TECHNOLOGY?

02:29PM  7    A.   I REMEMBER FROM WHAT I SAW IN THE MATERIALS IN THE DIRECT

02:30PM  8    THAT I DID COMMUNICATE WITH DR. YOUNG, WITH DANIEL YOUNG.  I

02:30PM  9    DON'T RECALL THE EXTENT OF THOSE CONVERSATIONS WITH OTHER

02:30PM 10    MEMBERS OF THE TEAM.

02:30PM 11    Q.   OKAY.  BUT OVER TIME DURING YOUR TIME THERE YOU TALKED TO

02:30PM 12    AT LEAST ONE MEMBER OF THE HARDWARE TEAM; CORRECT?

02:30PM 13    A.   CORRECT.

02:30PM 14    Q.   AND YOU TALKED TO THE ASSAY TEAM LEADS ON SOME OCCASIONS;

02:30PM 15    CORRECT?

02:30PM 16    A.   CORRECT.

02:30PM 17    Q.   AND YOU ALSO TALKED TO SOME OF THE INDIVIDUALS INVOLVED IN

02:30PM 18    SOFTWARE; CORRECT?

02:30PM 19    A.   CORRECT.

02:30PM 20    Q.   AND AS A RESULT OF THAT, YOU BECAME SOMEWHAT FAMILIAR WITH

02:30PM 21    WHAT EACH OF THEIR DUTIES WERE IN THE COMPANY; CORRECT?

02:30PM 22    A.   I'D SAY AT A HIGH LEVEL.

02:30PM 23    Q.   OKAY.  DID YOU INTERACT AT ALL WHILE YOU WERE AT THE

02:30PM 24    COMPANY WITH CHANNING ROBERTSON?

02:30PM 25    A.   YES.

EDLIN CROSS BY MR. DOWNEY                                                4071

| | | |
|---|---|---|
| 02:30PM | 1 | Q.   AND ON WHAT OCCASIONS DID YOU DO THAT? |
| 02:31PM | 2 | A.   I RECALL CERTAIN OCCASIONS WHERE HE CAME TO THE OFFICE AND |
| 02:31PM | 3 | HIS WORKSPACE WAS CLOSE TO MY WORKSPACE AND SOMETIMES WE WOULD |
| 02:31PM | 4 | INTERACT. |
| 02:31PM | 5 | Q.   OKAY.  AND DR. ROBERTSON HAD BEEN A MENTOR TO MS. HOLMES |
| 02:31PM | 6 | AT STANFORD; CORRECT? |
| 02:31PM | 7 | A.   CORRECT. |
| 02:31PM | 8 | Q.   AND HE PLAYED A FORMAL ROLE AT THE COMPANY; CORRECT? |
| 02:31PM | 9 | A.   WHEN I WAS THERE, I'M NOT SURE WHETHER I WOULD CONSIDER |
| 02:31PM | 10 | THE ROLE A FORMAL ROLE. |
| 02:31PM | 11 | Q.   HOW WOULD YOU DESCRIBE DR. ROBERTSON'S ROLE? |
| 02:31PM | 12 | A.   I KNEW THAT HE HAD INTERACTIONS WITH ELIZABETH, AND I'M |
| 02:31PM | 13 | AWARE THAT ON SOME OCCASIONS HE WOULD ATTEND MEETINGS WITH SOME |
| 02:32PM | 14 | OF THE SCIENTIFIC LEADS AT THE COMPANY, BUT BEYOND THAT, I'M |
| 02:32PM | 15 | NOT EXACTLY SURE WHAT HIS ROLE WAS IN THE COMPANY. |
| 02:32PM | 16 | Q.   AND DR. ROBERTSON IS A PROMINENT CHEMICAL ENGINEER; |
| 02:32PM | 17 | CORRECT? |
| 02:32PM | 18 | A.   YES. |
| 02:32PM | 19 | Q.   OKAY.  AND HE HAS AN EXCELLENT REPUTATION IN THE FIELD OF |
| 02:32PM | 20 | CHEMICAL ENGINEERING; CORRECT? |
| 02:32PM | 21 | A.   I BELIEVE SO. |
| 02:32PM | 22 | Q.   OKAY.  YOU DON'T RECALL PRECISELY YOUR INTERACTIONS WITH |
| 02:32PM | 23 | HIM, BUT YOU THINK YOU HAD THEM OVER TIME?  IS THAT A FAIR |
| 02:32PM | 24 | SUMMARY OF WHAT YOU RECALL? |
| 02:32PM | 25 | A.   I RECALL THAT WE HAD SOME INTERACTIONS AFTER THE FIRST |

EDLIN CROSS BY MR. DOWNEY                                                4072

02:32PM  1    ARTICLES CAME OUT IN "THE WALL STREET JOURNAL," WHICH WAS IN

02:32PM  2    OCTOBER OF 2015, AND I THINK HE WAS CONCERNED ABOUT THOSE

02:32PM  3    ARTICLES AND WHAT THE COMPANY WAS DOING TO TRY TO REBUT SOME OF

02:32PM  4    THOSE CLAIMS OR HOW HE WAS WORKING THROUGH THAT.  I THINK WE

02:32PM  5    HAD SOME CONVERSATIONS AROUND THAT.

02:32PM  6    Q.   IS THAT THE FIRST TIME THAT YOU RECALL INTERACTING WITH

02:32PM  7    HIM?

02:32PM  8    A.   WE INTERACTED EARLIER THAN THAT.

02:33PM  9    Q.   OKAY.  ALL RIGHT.  BUT UP UNTIL THEN YOU DON'T RECALL WHAT

02:33PM 10    THOSE INTERACTIONS WERE?

02:33PM 11    A.   I DON'T RECALL THAT THEY WERE WORK RELATED.

02:33PM 12    Q.   OKAY.

02:33PM 13    A.   THEY WERE MORE NON-WORK RELATED.

02:33PM 14    Q.   OKAY.  I WANT TO ASK YOU ABOUT SOME OF THE DOCUMENTS THAT

02:33PM 15    YOU WERE SHOWN ON YOUR DIRECT EXAMINATION, SO I'M GOING TO PUT

02:33PM 16    UP EXHIBIT 5419, WHICH IS A DOCUMENT THAT IS ALREADY IN

02:33PM 17    EVIDENCE THAT YOU WENT THROUGH WITH MR. BOSTIC.

02:33PM 18        I'LL DRAW THIS UP ON THE SCREEN AND JUST TO REMIND YOU.

02:33PM 19    IF YOU GO TO THE SECOND PAGE OF THE DOCUMENT.  THIS IS

02:33PM 20    DISCUSSION ABOUT A PATIENT ABOUT HCG.

02:33PM 21        DO YOU REMEMBER THAT DISCUSSION?

02:33PM 22    A.   YES.

02:33PM 23    Q.   OKAY.  NOW, YOU DON'T HAVE ANY RECOLLECTION OF ISSUES

02:34PM 24    RELATED TO THAT OTHER THAN WHAT YOU'VE HEARD ON -- IN -- FROM

02:34PM 25    REVIEWING THE DOCUMENTS TODAY; IS THAT RIGHT?

EDLIN CROSS BY MR. DOWNEY                                          4073

02:34PM   1        A.    THAT'S RIGHT.

02:34PM   2                MR. BOSTIC:  YOUR HONOR, I'M SORRY.  MY APOLOGIES.

02:34PM   3    I DON'T BELIEVE THIS DOCUMENT WAS SHOWN TO THIS WITNESS JUST TO

02:34PM   4    CLARIFY.

02:34PM   5                THE COURT:  I'M NOT SURE -- IS THIS IN EVIDENCE?

02:34PM   6    I'M NOT SURE IT IS.

02:34PM   7                THE CLERK:  YOUR HONOR, HE -- I BELIEVE YOU STATED

02:34PM   8    5419.

02:34PM   9        5413 IS IN EVIDENCE, BUT NOT 5419 TODAY.

02:34PM   10               MR. DOWNEY:  LET ME CHECK.

02:34PM   11       (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

02:34PM   12               MR. DOWNEY:  YES, I BEG YOUR PARDON, 5413.

02:34PM   13       Q.    THIS IS THE DOCUMENT RELATED TO PATIENT TESTING ISSUES

02:34PM   14   THAT MR. BOSTIC SHOWED YOU.

02:35PM   15       DO YOU REMEMBER THAT?

02:35PM   16       A.    YES, THIS LOOKS MORE FAMILIAR.

02:35PM   17       Q.    OKAY.  AND THIS RELATES TO A CALL THAT A PATIENT HAD MADE

02:35PM   18   TO THERANOS AND A DISCUSSION OF THE RESPONSE TO THAT CALL;

02:35PM   19   CORRECT?

02:35PM   20       A.    CORRECT.

02:35PM   21       Q.    AND YOU RECALL TESTIFYING ON YOUR DIRECT EXAMINATION THAT

02:35PM   22   ON SOME OCCASIONS MS. HOLMES WOULD BE -- BECOME INVOLVED WITH

02:35PM   23   THOSE ISSUES; CORRECT?

02:35PM   24       A.    CORRECT.

02:35PM   25       Q.    DO YOU KNOW WITH RESPECT TO THE EXAMPLE IN THIS EMAIL WHAT

EDLIN CROSS BY MR. DOWNEY                                              4074

02:35PM   1     THE RESOLUTION OF IT WAS?

02:35PM   2     A.   I DON'T KNOW.

02:35PM   3     Q.   CAN I ASK YOU TO LOOK IN YOUR BINDER AT EXHIBIT 12715.

02:36PM   4     A.   I SEE THAT.

02:36PM   5     Q.   AND IF YOU LOOK AT THIS EMAIL, YOU SEE PART OF IT CONTAINS

02:36PM   6     THE CONVERSATION THAT TAKES PLACE IN EXHIBIT 5413?

02:36PM   7     A.   YES.

02:36PM   8     Q.   AND THEN YOU SEE THE CONVERSATION CONTINUES THEREAFTER

02:36PM   9     ABOVE ON THE SAME SUBJECT?

02:36PM  10     A.   THAT'S RIGHT.

02:36PM  11     Q.   CORRECT?

02:36PM  12          YOUR HONOR, I MOVE THE ADMISSION OF 12715.

02:36PM  13              MR. BOSTIC:  NO OBJECTION.

02:36PM  14              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:36PM  15          (DEFENDANT'S EXHIBIT 12715 WAS RECEIVED IN EVIDENCE.)

02:36PM  16     BY MR. DOWNEY:

02:36PM  17     Q.   IF YOU GO TO THE THIRD PAGE OF THIS EXHIBIT, DO YOU SEE

02:36PM  18     THE EMAIL AT THE BOTTOM IS AN EMAIL BETWEEN MS. HOLMES AND

02:37PM  19     MR. FOSQUE?

02:37PM  20     A.   YES.

02:37PM  21     Q.   AND DO YOU REMEMBER THIS WAS AN INSTANCE WHERE A COMPLAINT

02:37PM  22     WAS RAISED TO HER AND SHE'S ASKING MR. FOSQUE TO COME TALK AND

02:37PM  23     TO FIGURE OUT WHAT HAPPENED; CORRECT?

02:37PM  24     A.   CORRECT.

02:37PM  25     Q.   AND THEN IF YOU MOVE UP THE EXHIBIT AND GO TO THE PRIOR

EDLIN CROSS BY MR. DOWNEY                                                4075

| | | |
|---|---|---|
| 02:37PM | 1 | PAGE, YOU SEE THAT MR. FOSQUE PROVIDED SOME DATA AS TO WHAT WAS |
| 02:37PM | 2 | HAPPENING WITH THAT PATIENT; CORRECT? |
| 02:37PM | 3 | A.   CORRECT. |
| 02:37PM | 4 | Q.   AND HE PROVIDED SOME DATA ABOUT WHEN THE SAMPLE WAS TAKEN |
| 02:37PM | 5 | AND ANALYSIS OF QUALITY CONTROL IN CONNECTION WITH THE SAMPLE; |
| 02:37PM | 6 | CORRECT? |
| 02:37PM | 7 | A.   I KNOW HE MENTIONS NISHIT IS LOOKING INTO THE QUALITY |
| 02:37PM | 8 | CONTROL DATA.  I'M NOT SURE IF THIS IS THAT OR NOT, BUT -- |
| 02:38PM | 9 | Q.   OKAY.  AND WHO IS NISHIT? |
| 02:38PM | 10 | A.   I BELIEVE HE WAS A SCIENTIST AT THERANOS. |
| 02:38PM | 11 | Q.   OKAY.  IF YOU GO TO THE PRIOR PAGE YOU SEE ANOTHER EMAIL |
| 02:38PM | 12 | FROM MR. FOSQUE IN THE MIDDLE OF THE PAGE, AND HE EXPLAINS |
| 02:38PM | 13 | FURTHER AN ANALYSIS OF THE PROBLEM THAT IS SHOWN WITH RESPECT |
| 02:38PM | 14 | TO THAT DATA; CORRECT? |
| 02:38PM | 15 | A.   RIGHT. |
| 02:38PM | 16 | Q.   AND THIS IS NOT I THINK A PORTION THAT YOU TALKED ABOUT |
| 02:38PM | 17 | THIS MORNING, BUT IF YOU SEE IN THE FIRST PARAGRAPH, IT SEEMS |
| 02:38PM | 18 | TO INDICATE THAT HE HAD A CONVERSATION WITH ADAM; IS THAT |
| 02:38PM | 19 | RIGHT? |
| 02:38PM | 20 | A.   YES. |
| 02:38PM | 21 | Q.   AND IS ADAM A REFERENCE TO DR. ROSENDORFF? |
| 02:38PM | 22 | A.   THAT'S MY INTERPRETATION HERE. |
| 02:38PM | 23 | Q.   OKAY.  AND HE -- DR. ROSENDORFF, OF COURSE, WAS A CLINICAL |
| 02:39PM | 24 | LAB DIRECTOR; CORRECT? |
| 02:39PM | 25 | A.   CORRECT. |

EDLIN CROSS BY MR. DOWNEY                                          4076

02:39PM   1    Q.    OKAY.  YOU CAN GO TO THE TOP OF THE EMAIL AT THE TOP OF

02:39PM   2    THE PAGE.

02:39PM   3          YOU SEE THAT THIS IS AN EMAIL FROM MR. BALWANI TO

02:39PM   4    MR. FOSQUE AND HE SAYS, "ADAM CAN HANDLE THIS."

02:39PM   5          DO YOU SEE THAT?

02:39PM   6    A.    YES.

02:39PM   7    Q.    AND HE SAYS, "GIVE HIM ALL THE DATA"?

02:39PM   8    A.    CORRECT.

02:39PM   9    Q.    CORRECT.  AND YOU'RE COPIED ON THIS EMAIL; CORRECT?

02:39PM  10    A.    CORRECT.

02:39PM  11    Q.    AND IT WOULD HAVE BEEN A SENSIBLE PROCESS FOR THE CLINICAL

02:39PM  12    LAB DIRECTOR TO HAVE A CONVERSATION WITH A PATIENT IN THESE

02:39PM  13    CIRCUMSTANCES; IS THAT CORRECT?

02:39PM  14    A.    I THINK THAT'S SENSIBLE.

02:39PM  15    Q.    OKAY.  DO YOU RECALL THIS SPECIFIC INCIDENT OR NOT?

02:39PM  16    A.    I DON'T.

02:39PM  17    Q.    OKAY.  NOW I'D LIKE TO BRING UP EXHIBIT 4237, WHICH IS

02:40PM  18    ALREADY IN EVIDENCE.

02:40PM  19          IF YOU GO TO THE BOTTOM OF THAT PAGE --

02:40PM  20    A.    IS THIS IN THE BINDER OR ALREADY ON THE SCREEN?

02:40PM  21    Q.    YOU CAN LOOK AT THE SCREEN.  IT'S ALREADY ADMITTED INTO

02:40PM  22    EVIDENCE.

02:40PM  23    A.    OKAY.

02:40PM  24    Q.    AND IF YOU SEE AT THE TOP THIS IS A DISCUSSION OF A

02:40PM  25    PHYSICIAN AND PATIENT CALL ABOUT HCG RESULTS.

4077
EDLIN CROSS BY MR. DOWNEY

02:40PM  1      DO YOU REMEMBER BEING SHOWN THIS DOCUMENT ON YOUR DIRECT

02:40PM  2   EXAMINATION?

02:40PM  3   A.   YES.

02:40PM  4   Q.   IF YOU GO TO THE BOTTOM OF PAGE 4 AND YOU CARRY OVER TO

02:40PM  5   THE NEXT PAGE.

02:40PM  6      DO YOU SEE THERE'S AN EMAIL THERE FROM MS. SCHEER TO YOU

02:41PM  7   AND TO MR. FOSQUE AND MS. HOLMES; CORRECT?

02:41PM  8   A.   YES.

02:41PM  9   Q.   AND SHE RECOUNTS WHAT THE COMPLAINT IS THAT HAD COME IN;

02:41PM 10   CORRECT?

02:41PM 11   A.   CORRECT.

02:41PM 12   Q.   BUT IF YOU REVIEW THIS EXHIBIT FROM THERE YOU CAN DRAW

02:41PM 13   THAT DOWN AND CONTINUE UP.  YOU CAN GO TO THE PRIOR PAGE.  YOU

02:41PM 14   CAN GO TO THE PRIOR PAGE FROM THAT.  KEEP GOING.  ALL RIGHT.

02:41PM 15      DO YOU SEE ON THE BOTTOM EMAIL THAT STARTS ON PAGE 1 AND

02:41PM 16   CARRIES OVER, YOU WERE THEN DROPPED FROM THIS CONVERSATION;

02:41PM 17   CORRECT?

02:41PM 18   A.   CORRECT.

02:41PM 19   Q.   AND IT'S NOT SOMETHING THAT WAS FURTHER SOMETHING THAT YOU

02:41PM 20   RECALLED DISCUSSING WITH MS. HOLMES OR ANYONE ELSE; CORRECT?

02:41PM 21   A.   CORRECT.

02:41PM 22   Q.   LET ME ASK YOU ABOUT YOUR TESTIMONY CONCERNING

02:42PM 23   RELATIONSHIPS WITH PHARMACEUTICAL COMPANIES.

02:42PM 24      I THINK YOU WERE ASKED ABOUT A RELATIONSHIP BETWEEN

02:42PM 25   THERANOS AND CELGENE.

EDLIN CROSS BY MR. DOWNEY                                              4078

| | | |
|---|---|---|
| 02:42PM | 1 | DO YOU REMEMBER THAT? |
| 02:42PM | 2 | A.   I DO. |
| 02:42PM | 3 | Q.   AND DID YOU PLAY A LARGE ROLE WITH REGARD TO THAT PROJECT? |
| 02:42PM | 4 | A.   NO. |
| 02:42PM | 5 | Q.   AND DID YOU HAVE A FULL UNDERSTANDING OF ALL OF THE |
| 02:42PM | 6 | PROGRAMS THAT WERE IN PLACE BETWEEN CELGENE AND THERANOS? |
| 02:42PM | 7 | A.   NO. |
| 02:42PM | 8 | Q.   OKAY.  DO YOU ACTUALLY RECALL ANY OF THE PROGRAMS THAT |
| 02:42PM | 9 | WERE IN PLACE? |
| 02:42PM | 10 | A.   I ONLY RECALL THE PROGRAM THAT WAS DISCUSSED IN THE EMAIL |
| 02:42PM | 11 | CHAIN THAT WE REVIEWED EARLIER. |
| 02:42PM | 12 | Q.   OKAY.  TAKE A LOOK AT EXHIBIT 528.  GO TO THE BOTTOM OF |
| 02:43PM | 13 | THE EMAIL.  I'M SORRY, THE VERY BOTTOM.  THE LAST PAGE. |
| 02:43PM | 14 | DO YOU RECALL THAT -- YOU CAN MOVE UP FROM THERE AND GO TO |
| 02:43PM | 15 | THE PRIOR PAGE. |
| 02:43PM | 16 | DO YOU RECALL THIS DISCUSSION ABOUT 16 DIFFERENT ASSAYS |
| 02:43PM | 17 | BEING RUN WITH CELGENE? |
| 02:43PM | 18 | A.   YES. |
| 02:43PM | 19 | Q.   AND IN THIS INSTANCE THERE WAS A DISCUSSION OF SOME ASSAYS |
| 02:43PM | 20 | BEING RUN WITH THERANOS ASSAYS; CORRECT? |
| 02:43PM | 21 | A.   CORRECT. |
| 02:43PM | 22 | Q.   AND SOME ASSAYS BEING RUN ON KITS; CORRECT? |
| 02:44PM | 23 | A.   CORRECT. |
| 02:44PM | 24 | Q.   CAN YOU GO TO THE PRIOR PAGE. |
| 02:44PM | 25 | DID YOU KNOW WHAT A KIT WAS AT THE TIME THAT YOU RECEIVED |

EDLIN CROSS BY MR. DOWNEY                                    4079

02:44PM   1        THIS EMAIL?

02:44PM   2        A.   I DON'T RECALL.

02:44PM   3        Q.   LET ME ASK YOU ABOUT THE SUBJECT OF TRADE SECRETS.

02:44PM   4             DO YOU REMEMBER YOU TALKED A LITTLE BIT ABOUT

02:44PM   5        CONFIDENTIALITY ON FRIDAY?

02:44PM   6        A.   YES.

02:44PM   7        Q.   DID YOU HEAR DISCUSSION ABOUT TRADE SECRETS WHEN YOU WERE

02:44PM   8        AT THERANOS?

02:44PM   9        A.   I DID.

02:44PM   10       Q.   OKAY.  DID YOU UNDERSTAND THAT THERANOS WAS CONCERNED

02:45PM   11       ABOUT PROTECTING TRADE SECRETS?

02:45PM   12       A.   YES.

02:45PM   13       Q.   AND DID YOU HEAR THAT FROM MR. BALWANI, FOR EXAMPLE?

02:45PM   14       A.   I DID.

02:45PM   15       Q.   AND YOU HEARD THAT FROM OTHERS AT THE COMPANY?

02:45PM   16       A.   YES.

02:45PM   17       Q.   AND DID YOU UNDERSTAND THAT THE COMPANY THOUGHT THAT IT

02:45PM   18       HAD DEVELOPED VERY VALUABLE TECHNOLOGY; CORRECT?

02:45PM   19       A.   THAT'S RIGHT.

02:45PM   20       Q.   AND YOU TESTIFIED FRIDAY ABOUT A NUMBER OF PRACTICES

02:45PM   21       RESTRICTING THE FLOW OF INFORMATION AT THE COMPANY.

02:45PM   22            DO YOU REMEMBER THAT?

02:45PM   23       A.   I DO.

02:45PM   24       Q.   AND DID YOU UNDERSTAND THAT SOME OF THOSE PROCEDURES WERE

02:45PM   25       ASSOCIATED WITH PROTECTING THERANOS'S TRADE SECRETS?

EDLIN CROSS BY MR. DOWNEY                                              4080

02:45PM   1       A.   YES.

02:45PM   2       Q.   OKAY.  YOU, HOWEVER, WERE ABLE, BECAUSE OF YOUR ROLE AT

02:45PM   3       THE COMPANY, TO INTERACT WITH DIFFERENT TEAMS IN CONNECTION

02:45PM   4       WITH YOUR DUTIES; CORRECT?

02:45PM   5       A.   THAT'S RIGHT.

02:45PM   6       Q.   SO YOU INTERACTED WITH SCIENTISTS AND GOT SOME INFORMATION

02:45PM   7       FROM THEM; CORRECT?

02:46PM   8       A.   CORRECT.

02:46PM   9       Q.   AND YOU WOULD OFTEN RELY ON SCIENTISTS IN CARRYING OUT

02:46PM  10       YOUR DUTIES; CORRECT?

02:46PM  11       A.   I WOULD RELY ON THE INFORMATION THAT THEY GAVE ME, RIGHT.

02:46PM  12       Q.   OKAY.  WELL, YOU MENTIONED DURING THE COURSE OF YOUR

02:46PM  13       TESTIMONY THIS MORNING DR. YOUNG; CORRECT?

02:46PM  14       A.   CORRECT.

02:46PM  15       Q.   AND YOU MENTIONED THAT HE WAS THE VICE PRESIDENT OF THE

02:46PM  16       COMPANY; CORRECT?

02:46PM  17       A.   HE WAS A VICE PRESIDENT I BELIEVE, RIGHT.

02:46PM  18       Q.   AND HE WAS THE SENIOR SCIENTIST AT THE COMPANY; CORRECT?

02:46PM  19       A.   CORRECT.

02:46PM  20       Q.   AND YOU FOUND HIM, DURING YOUR TIME AT THE COMPANY, TO BE

02:46PM  21       KNOWLEDGEABLE; CORRECT?

02:46PM  22       A.   YES.

02:46PM  23       Q.   AND YOU HAD CONFIDENCE IN WHAT HE WAS TELLING YOU?

02:46PM  24       A.   DEFINITELY.

02:46PM  25       Q.   AND IF ISSUES RELATED TO A QUESTION INVOLVING SCIENCE OR

EDLIN CROSS BY MR. DOWNEY                                           4081

02:46PM   1   TECHNOLOGY CAME UP, YOU WOULD CERTAINLY DEFER TO HIS JUDGMENT;

02:46PM   2   CORRECT?

02:46PM   3   A.   CERTAINLY.

02:46PM   4   Q.   AND ON MANY OCCASIONS WHEN YOU HAD TO GET -- PROVIDE

02:46PM   5   INFORMATION TO MS. HOLMES, YOU ACTUALLY GOT THAT INFORMATION

02:47PM   6   FROM DR. YOUNG; CORRECT?

02:47PM   7   A.   THAT DID HAPPEN OFTEN.

02:47PM   8   Q.   AND ON MANY OCCASIONS WHEN THERE WERE PROGRAMS THAT

02:47PM   9   INVOLVED THE DEVELOPMENT, FURTHER DEVELOPMENT OF ASSAYS AND SO

02:47PM  10   FORTH, DR. YOUNG WOULD BE ONE SOURCE FOR WHOM YOU WOULD GET THE

02:47PM  11   INFORMATION; CORRECT?

02:47PM  12   A.   CORRECT.

02:47PM  13   Q.   AND YOU ALSO HAD THE CHANCE TO INTERACT WITH MEMBERS OF

02:47PM  14   THE ASSAY TEAM; CORRECT?

02:47PM  15   A.   CORRECT, THERE WERE A NUMBER OF DIFFERENT TEAMS.

02:47PM  16   Q.   OKAY.   AND IF THEY PROVIDED YOU WITH INFORMATION, YOU

02:47PM  17   RELIED ON IT; CORRECT?

02:47PM  18   A.   YES.

02:47PM  19   Q.   AND SAME WITH REGARD TO THE SOFTWARE TEAM; CORRECT?

02:47PM  20   A.   CORRECT.

02:47PM  21   Q.   AND THE HARDWARE TEAM; CORRECT?

02:47PM  22   A.   CORRECT.

02:47PM  23   Q.   AND SO IN CARRYING OUT YOUR DUTIES FROM THE TIME THAT YOU

02:47PM  24   STARTED AT THERANOS UNTIL LATE IN 2015, YOU NEVER TOOK A STEP

02:47PM  25   ON BEHALF OF THE COMPANY WHERE YOU THOUGHT YOU WERE DECEIVING

EDLIN CROSS BY MR. DOWNEY                                    4082

02:47PM  1    SOMEONE; CORRECT?

02:47PM  2    A.   CORRECT.

02:47PM  3    Q.   YOU NEVER MADE A STATEMENT TO THE DEPARTMENT OF DEFENSE

02:48PM  4    THAT YOU THOUGHT WAS FALSE; CORRECT?

02:48PM  5    A.   CORRECT.

02:48PM  6    Q.   YOU NEVER FACILITATED THE DELIVERY OF INFORMATION TO

02:48PM  7    INVESTORS THAT YOU BELIEVED WAS FALSE; CORRECT?

02:48PM  8    A.   CORRECT.

02:48PM  9    Q.   YOU NEVER HAD ANY INTERACTIONS WITH REPRESENTATIVES OF

02:48PM  10   PHARMACEUTICAL COMPANIES THAT YOU BELIEVED WAS FRAUDULENT; IS

02:48PM  11   THAT RIGHT?

02:48PM  12   A.   THAT'S RIGHT.

02:48PM  13   Q.   YOU NEVER IN ALL OF YOUR WORK ON MARKETING AND THE WEBSITE

02:48PM  14   OF THE COMPANY, YOU NEVER TOOK STEPS TO PUT FORWARD ANY CLAIM

02:48PM  15   THAT YOU BELIEVED TO BE FALSE; CORRECT?

02:48PM  16   A.   CORRECT.

02:48PM  17   Q.   AND THE SAME WOULD BE TRUE THAT -- WITH RESPECT TO

02:48PM  18   JOURNALISTS; CORRECT?

02:48PM  19   A.   CORRECT.

02:48PM  20   Q.   ALL OF THE INFORMATION THAT YOU PROVIDED TO JOURNALISTS

02:48PM  21   YOU BELIEVED TO BE CORRECT; CORRECT?

02:48PM  22   A.   CORRECT.

02:48PM  23   Q.   AND IN PART, THAT INFORMATION WAS OFTEN RELIANT ON

02:49PM  24   INFORMATION THAT YOU HAD GOTTEN FROM THE SCIENTISTS IN THE

02:49PM  25   COMPANY; CORRECT?

EDLIN CROSS BY MR. DOWNEY                                          4083

02:49PM   1     A.   CORRECT.

02:49PM   2     Q.   OKAY.  ALL RIGHT.  LET'S TALK ABOUT THE RELATIONSHIP

02:49PM   3     BETWEEN THERANOS --

02:49PM   4          WELL, YOUR HONOR, I'M STARTING A NEW TOPIC.  SHOULD --

02:49PM   5               THE COURT:  YOU WON'T FINISH IT IN 12 MINUTES?

02:49PM   6               MR. DOWNEY:  WELL, IF WE HAVE 12 MINUTES, I THINK I

02:49PM   7     CAN MAKE SOME PROGRESS.

02:49PM   8               THE COURT:  SURE.  LET'S DO THAT.

02:49PM   9               MR. DOWNEY:  OKAY.

02:49PM  10     Q.   LET'S TALK ABOUT THE RELATIONSHIP THAT THERANOS HAD WHICH

02:49PM  11     GENERATED THE BURN STUDY.

02:49PM  12     A.   OKAY.

02:49PM  13     Q.   I THINK YOU MENTIONED THAT DR. CHUNG WAS INVOLVED IN THAT;

02:49PM  14     CORRECT?

02:49PM  15     A.   CORRECT.

02:49PM  16     Q.   AND THAT RELATIONSHIP WAS ALREADY IN PLACE AT THE TIME

02:49PM  17     THAT YOU ARRIVED AT THE COMPANY; CORRECT?

02:49PM  18     A.   CORRECT.

02:49PM  19     Q.   AND HAD THE STUDY STARTED WHEN YOU CAME TO THE COMPANY?

02:49PM  20     A.   AT LEAST SOME PART OF THE STUDY HAD STARTED, YES.

02:49PM  21     Q.   OKAY.  BUT FROM THE TIME THAT YOU ARRIVED UNTIL REALLY THE

02:50PM  22     TIME THAT YOU LEFT THERANOS, THAT'S AN ISSUE THAT YOU HAD

02:50PM  23     MANAGEMENT RESPONSIBILITY WITH RESPECT TO; CORRECT?

02:50PM  24     A.   MY ROLE IN THAT STUDY WAS AS A CLIENT SOLUTIONS LEAD.

02:50PM  25     Q.   TELL US WHAT THAT MEANS.

EDLIN CROSS BY MR. DOWNEY                                           4084

02:50PM    1    A.   SO WHEN I -- AFTER I JOINED THE COMPANY THERE WAS A, A

02:50PM    2    MEMBER OF DANIEL YOUNG'S TEAM WHO HAD BEEN PLAYING A CLIENT

02:50PM    3    SOLUTIONS LEAD, AND HE LEFT THE COMPANY, AND ELIZABETH ASKED ME

02:50PM    4    TO STEP IN HIS PLACE.

02:50PM    5         AND THAT ROLE LARGELY SUPPORTED THE STUDY WHEN IT CAME TO

02:50PM    6    COMMUNICATIONS WITH THE DIFFERENT RESEARCH COORDINATORS AT THE

02:50PM    7    DIFFERENT HOSPITALS.

02:50PM    8    Q.   UH-HUH.

02:50PM    9    A.   IF THEY HAD ANY ISSUES WITH DEVICES, THEY WOULD CONTACT ME

02:50PM   10    AND I WOULD -- I PERSONALLY WOULD COMMUNICATE WITH THE SOFTWARE

02:50PM   11    ENGINEERS AND HELP TRIAGE THOSE ISSUES, AND IF A DEVICE NEEDED

02:51PM   12    TO BE REPLACED, I WORKED WITH THE RESEARCH COORDINATORS TO DO

02:51PM   13    THAT.

02:51PM   14         AT ONE POINT I ALSO DID A TRAINING AT ONE OR MORE OF THE

02:51PM   15    HOSPITALS WITH THE RESEARCH COORDINATORS, AND THAT WAS

02:51PM   16    PREDOMINANTLY MY ROLE IN THAT PROGRAM.

02:51PM   17    Q.   WELL, LET'S TAKE A STEP BACK.  DR. CHUNG WAS THE LEADING

02:51PM   18    DOCTOR IN CONNECTION WITH THAT PROGRAM; CORRECT?

02:51PM   19    A.   RIGHT.

02:51PM   20    Q.   AND THE STUDY WAS BEING CONDUCTED OUT OF THE U.S. ARMY

02:51PM   21    INSTITUTE OF SURGICAL RESEARCH; CORRECT?

02:51PM   22    A.   THERE WERE MULTIPLE SITES THAT PARTICIPATED IN THE STUDY,

02:51PM   23    BUT I BELIEVE THAT WAS THE -- I DON'T KNOW HOW I WOULD DESCRIBE

02:51PM   24    IT IN THE CONTEXT OF THE STUDY.

02:51PM   25    Q.   OKAY.  WHEN YOU SAY, "MULTIPLE SITES," YOU MEAN THAT

EDLIN CROSS BY MR. DOWNEY                                    4085

02:51PM   1    THERANOS DEVICES WERE DEPLOYED AND WERE SENT TO BE LOCATED IN

02:51PM   2    DIFFERENT HOSPITALS ACROSS THE UNITED STATES; IS THAT RIGHT?

02:51PM   3    A.   THAT'S RIGHT.

02:52PM   4    Q.   AND THE POINT OF THE STUDY WAS TO DO AN EVALUATION OF

02:52PM   5    SEPSIS IN CONNECTION WITH BURN VICTIMS; CORRECT?

02:52PM   6    A.   I BELIEVE SO.

02:52PM   7    Q.   AND YOU CAME TO LEARN AS A RESULT OF YOUR WORK IN

02:52PM   8    CONNECTION WITH THE BURN STUDY, THAT BURN VICTIMS HAVE A

02:52PM   9    PARTICULAR SUSCEPTIBILITY TO DEVELOPING SEPSIS AND THE

02:52PM  10    INFECTION CONSEQUENCES THAT FOLLOW FROM THAT; CORRECT?

02:52PM  11    A.   I CAME TO THAT UNDERSTANDING, YES.

02:52PM  12    Q.   OKAY.  AND IN CONNECTION WITH THE STUDIES, SOME OF THE

02:52PM  13    PATIENTS WHO WERE UNDER ANALYSIS WERE MILITARY MEMBERS;

02:52PM  14    CORRECT?

02:52PM  15    A.   I DIDN'T KNOW THAT.

02:52PM  16    Q.   OKAY.  DO YOU KNOW THAT THE ARMY INSTITUTE OF SURGICAL

02:52PM  17    RESEARCH, FOR EXAMPLE, TREATS MEMBERS OF THE MILITARY?

02:52PM  18    A.   I'M NOT SURE I KNOW THAT.

02:53PM  19    Q.   OKAY.  YOU MENTIONED THAT YOU BECAME INVOLVED WITH DEVICES

02:53PM  20    AT THE DIFFERENT LOCATIONS; CORRECT?

02:53PM  21    A.   CORRECT.

02:53PM  22    Q.   AND YOU'RE REFERRING TO THE LOCATIONS THAT WERE PART OF

02:53PM  23    THE BURN STUDY DURING THE TIME THAT YOU WERE AT THERANOS;

02:53PM  24    CORRECT?

02:53PM  25    A.   THEY WERE PARTICIPATING SITES IN THAT STUDY, RIGHT.

EDLIN CROSS BY MR. DOWNEY                                              4086

02:53PM    1      Q.   OKAY.  AND THE WAY THAT YOUR INVOLVEMENT REALLY BEGAN IS

02:53PM    2      THAT YOU HELD A TRAINING TO TRAIN PERSONNEL FROM THOSE

02:53PM    3      DIFFERENT HOSPITALS HOW TO USE THE THERANOS DEVICE; CORRECT?

02:53PM    4      A.   I DON'T BELIEVE THAT THAT WAS HOW MY ROLE STARTED, BUT

02:53PM    5      THAT DID HAPPEN AT SOME POINT.

02:53PM    6      Q.   OKAY.  TELL US HOW YOUR ROLE STARTED?

02:53PM    7      A.   WELL, I MENTIONED THAT ONE OF THE MEMBERS OF

02:53PM    8      DANIEL YOUNG'S TEAM WHO HELD HIS CLIENT SOLUTIONS LEAD, HE LEFT

02:54PM    9      THE COMPANY AND ELIZABETH ASKED THAT I STEP IN AND THAT I STEP

02:54PM   10      INTO THAT ROLE.  SO THAT'S HOW -- THAT'S WHERE MY INVOLVEMENT

02:54PM   11      IN THAT STUDY STARTED.

02:54PM   12      Q.   OKAY.  AND AFTER THAT POINT YOU BECAME INVOLVED WITH

02:54PM   13      SENDING THE DEVICES TO LOCATIONS ACROSS THE COUNTRY; CORRECT?

02:54PM   14      A.   WHEN I STARTED, DEVICES WERE IN SOME LOCATIONS AND THEN

02:54PM   15      ADDITIONAL HOSPITALS JOINED.  SO I DID SEND TO HOSPITALS THAT

02:54PM   16      DID NOT YET HAVE THE DEVICES.

02:54PM   17      Q.   OKAY.  LET'S LOOK AT -- I'M SORRY.  DID YOU WANT TO SAY

02:54PM   18      MORE?

02:54PM   19      A.   AND THROUGHOUT THAT PROCESS I PARTNERED WITH SOFTWARE

02:54PM   20      ENGINEERS TO PREPARE THOSE DEVICES AND PACKAGE THEM AND GET

02:54PM   21      THEM SENT OUT.

02:54PM   22      Q.   OKAY.  LET'S LOOK AT EXHIBIT 10462.

02:55PM   23           TAKE A MOMENT TO REVIEW THAT IN YOUR BINDER.

02:55PM   24           (PAUSE IN PROCEEDINGS.)

02:55PM   25                THE WITNESS:  OKAY.

EDLIN CROSS BY MR. DOWNEY                                    4087

02:55PM   1     BY MR. DOWNEY:

02:55PM   2     Q.   IS THIS AN EMAIL SENT TO YOU BY A REPRESENTATIVE OF U.S.A.

02:55PM   3     MEDCOM IN CONNECTION WITH THE BURN STUDY?

02:55PM   4     A.   YES.

02:55PM   5           MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

02:55PM   6     10462.

02:55PM   7           MR. BOSTIC:  NO OBJECTION.

02:55PM   8           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:55PM   9       (DEFENDANT'S EXHIBIT 10462 WAS RECEIVED IN EVIDENCE.)

02:56PM  10     BY MR. DOWNEY:

02:56PM  11     Q.   IF YOU GO TO THE BOTTOM EMAIL ON PAGE 2, THIS IS AN EMAIL

02:56PM  12     TO A WOMAN NAMED ELSA COATES TO A LARGE NUMBER OF PEOPLE

02:56PM  13     INCLUDING YOURSELF.

02:56PM  14       DO YOU SEE THAT?

02:56PM  15     A.   I DO.

02:56PM  16     Q.   AND SHE IS SETTING UP A TRAINING PROGRAM, AMONG OTHER

02:56PM  17     THINGS, ON THERANOS READERS.

02:56PM  18       DO YOU SEE THAT IN THE PARAGRAPH THAT BEGINS, "OUR

02:56PM  19     OBJECTIVE IS TO"?

02:56PM  20     A.   YES.

02:56PM  21     Q.   OKAY.  AND THIS IS THE TRAINING THAT YOU WERE REFERRING TO

02:56PM  22     A MOMENT AGO?

02:56PM  23     A.   THIS WAS ONE OF THE TRAININGS.  THERE WERE MULTIPLE.

02:56PM  24     Q.   OKAY.  AND DO YOU SEE THAT THERE'S A LARGE LIST OF

02:56PM  25     ATTENDEES AT THE TOP OF THE EMAIL?

EDLIN CROSS BY MR. DOWNEY                                          4088

02:56PM   1    A.   I DO.

02:56PM   2    Q.   AND IS ELSA COATES SOMEONE WHO YOU WORKED WITH TO

02:56PM   3    COORDINATE THE STUDY?

02:56PM   4    A.   YES.

02:56PM   5    Q.   AND IS SHE AN ARMY NURSE?

02:57PM   6    A.   I THINK IT SAYS THAT SHE'S A CLINICAL RESEARCH NURSE

02:57PM   7    COORDINATOR.

02:57PM   8    Q.   AND SHE WORKED WITH DR. CHUNG IN CONNECTION WITH THE

02:57PM   9    STUDY; CORRECT?

02:57PM  10    A.   CORRECT.

02:57PM  11    Q.   SO WHEN YOU PERFORMED THE TRAINING, THE DEVICES WOULD THEN

02:57PM  12    BE LOCATED IN THE HOSPITAL; CORRECT?

02:57PM  13    A.   YES.

02:57PM  14    Q.   AND YOU WOULD ON OCCASION TALK TO PEOPLE AT THE LOCATIONS

02:57PM  15    ABOUT THEIR USE OF THE THERANOS DEVICE; CORRECT?

02:57PM  16    A.   CORRECT.

02:57PM  17    Q.   SOMETIMES THERE WOULD BE AN ISSUE WITH THEIR CONNECTIVITY,

02:57PM  18    FOR EXAMPLE?

02:57PM  19    A.   THAT'S RIGHT.

02:57PM  20    Q.   OR SOMETIMES THEY NEEDED CARTRIDGES TO REPLACE THE

02:57PM  21    CARTRIDGES THAT THEY HAD; CORRECT?

02:57PM  22    A.   CORRECT.

02:57PM  23    Q.   AND YOU WERE THE PERSON AT THERANOS RESPONSIBLE FOR

02:57PM  24    GETTING THAT TO THEM OR PROVIDING THEM WITH THAT INFORMATION?

02:57PM  25    A.   AS IT RELATED TO THE NURSE COORDINATORS, RIGHT.

EDLIN CROSS BY MR. DOWNEY                                                4089

02:58PM   1        IF IT RELATED TO GETTING CERTAIN SUPPLIES OR HELPING TO

02:58PM   2    TRIAGE AN ISSUE WITH THE READER, I DID COMMUNICATE WITH THEM,

02:58PM   3    YES.

02:58PM   4    Q.   AND IN CONNECTION WITH THE STUDY, DATA WAS BEING

02:58PM   5    GENERATED; CORRECT?

02:58PM   6    A.   YES.

02:58PM   7    Q.   AND THE THERANOS READERS WERE TAKING BLOOD SAMPLES.  BLOOD

02:58PM   8    SAMPLES WERE BEING TAKEN FROM PATIENTS AND ANALYZED IN THE

02:58PM   9    THERANOS READERS; CORRECT?

02:58PM  10    A.   YES.

02:58PM  11    Q.   AND THEN THE RESULTS OF THOSE TESTS WOULD BE SENT BACK

02:58PM  12    DIGITALLY TO THERANOS; CORRECT?

02:58PM  13    A.   YES.

02:58PM  14    Q.   AND YOU WOULD PROVIDE DATA FROM THAT STUDY TO DR. CHUNG;

02:58PM  15    CORRECT?

02:58PM  16    A.   I'M NOT SURE WHETHER I PROVIDED IT OR DANIEL YOUNG

02:58PM  17    PROVIDED IT BECAUSE I DID PARTNER WITH HIM.  HE, HE WAS LEADING

02:58PM  18    THE THERANOS EFFORTS ON THE STUDY BEFORE I JOINED AND BEFORE I

02:59PM  19    BECAME INVOLVED, AND WHEN IT CAME TO DATA, I WOULD CONSULT WITH

02:59PM  20    HIM BECAUSE THAT WAS HIS AREA OF EXPERTISE.

02:59PM  21    Q.   HOW MANY YEARS DID THE STUDY GO ON FOR?

02:59PM  22    A.   I DON'T REMEMBER EXACTLY, BUT I THINK THREE TO FOUR.

02:59PM  23    Q.   YOU SAW THE EXHIBIT THAT WE -- YOU SAW THE EXHIBIT DURING

02:59PM  24    YOUR DIRECT EXAMINATION OF MATERIALS BEING SENT TO DR. CHUNG;

02:59PM  25    CORRECT?

EDLIN CROSS BY MR. DOWNEY                                                    4090

02:59PM   1    A.   CORRECT.

02:59PM   2    Q.   BY THE TIME THAT THAT EMAIL WAS SENT, DID THERANOS ALREADY

02:59PM   3    HAVE A RELATIONSHIP WITH DR. CHUNG?

02:59PM   4    A.   I BELIEVE SO.   THERANOS HAD THE RELATIONSHIP BEFORE I EVEN

03:00PM   5    GOT THERE.

03:00PM   6              MR. DOWNEY:   ALL RIGHT.   YOUR HONOR, THIS MIGHT BE A

03:00PM   7    GOOD PLACE.

03:00PM   8              THE COURT:   SURE.   THANK YOU, MR. DOWNEY.

03:00PM   9         LET'S TAKE OUR EVENING BREAK, LADIES AND GENTLEMEN.   I

03:00PM   10   UNDERSTAND THAT WE WILL ONLY BE ABLE TO GO UNTIL 3:00 TOMORROW,

03:00PM   11   JUST UNTIL 3:00 TOMORROW.

03:00PM   12        I DON'T KNOW IF FRIDAY WE CAN CAPTURE UNTIL 4:00.   I'D

03:00PM   13   LIKE TO DO THAT JUST TO GET SOME TIME.

03:00PM   14        BUT IN THE INTERIM, LADIES AND GENTLEMEN, I REMIND YOU OF

03:00PM   15   THE ADMONITION, PLEASE DO NOT DO ANY INDEPENDENT INVESTIGATION,

03:00PM   16   DO NOT DO ANY RESEARCH INVOLVED IN THIS CASE OR ANYONE INVOLVED

03:00PM   17   WITH IT.

03:00PM   18        PLEASE REFRAIN FROM LOOKING AT SOCIAL MEDIA THAT MIGHT

03:00PM   19   TOUCH ON THIS CASE OR ANY OTHER NEWS MEDIA.   IF YOU DO COME

03:00PM   20   ACROSS SOMETHING, PLEASE TURN AWAY AND TURN IT OFF, AND I'LL

03:00PM   21   ASK YOU AGAIN TOMORROW MORNING WHETHER OR NOT ANY OF THOSE

03:00PM   22   CIRCUMSTANCES HAVE OCCURRED.

03:00PM   23        HAVE A GOOD AFTERNOON, GOOD EVENING.   WE'LL SEE YOU

03:00PM   24   TOMORROW, PLEASE, AT 9:00 O'CLOCK.

03:00PM   25        9:00 O'CLOCK, PLEASE, MR. EDLIN.

03:01PM  1          THE WITNESS:  YES, YOUR HONOR.  THANK YOU.

03:01PM  2          (JURY OUT AT 3:01 P.M.)

03:01PM  3          THE COURT:  PLEASE BE SEATED.  THANK YOU.

03:01PM  4      THE RECORD SHOULD REFLECT THAT OUR JURY HAS LEFT FOR THE

03:01PM  5  EVENING, AND THE WITNESS HAS LEFT THE COURTROOM.  AND ALL

03:01PM  6  COUNSEL ARE PRESENT AND MS. HOLMES IS PRESENT.

03:01PM  7      LET ME JUST ASK, JUST TIMING, MR. DOWNEY, WHAT DO YOU

03:01PM  8  THINK?  HOW MUCH --

03:01PM  9          MR. DOWNEY:  I THINK IT WILL BE A GOOD CHUNK OF THE

03:01PM  10  DAY TOMORROW.

03:01PM  11          THE COURT:  WITH THIS WITNESS?

03:01PM  12          MR. DOWNEY:  WITH THIS WITNESS.

03:01PM  13          THE COURT:  OKAY.

03:01PM  14          MR. DOWNEY:  AND SHORTENING OF IT MIGHT EVEN BE THE

03:01PM  15  TOTAL OF THE DAY.

03:01PM  16          THE COURT:  GOTCHA.  OKAY.  I JUST ASK THAT FOR THE

03:02PM  17  GOVERNMENT'S INFORMATION FOR THEIR NEXT WITNESS.

03:02PM  18      MR. LEACH.

03:02PM  19          MR. LEACH:  YES, YOUR HONOR.  BRIEFLY, IF I MAY, ON

03:02PM  20  THAT POINT.

03:02PM  21      WE HAVE TWO OUT-OF-TOWN WITNESSES LINED UP:  SHANE WEBER,

03:02PM  22  WHO WE TALKED ABOUT EARLIER THIS MORNING; AND LISA PETERSON,

03:02PM  23  WHO IS A REPRESENTATIVE OF ONE OF THE INVESTORS.

03:02PM  24      BASED ON THE REPRESENTATIONS FROM MR. DOWNEY, I DOUBT

03:02PM  25  WE'LL GET TO MS. PETERSON, BUT IF WE DO, SHE'S UNAVAILABLE ON

03:02PM 1    FRIDAY.  SO I WOULD ASK THE COURT'S PERMISSION TO, IF WE START,

03:02PM 2    TO BE ABLE TO TAKE OTHER WITNESSES OUT OF ORDER AND CONTINUE

03:02PM 3    WHEN SHE BECOMES AVAILABLE AGAIN.

03:02PM 4              THE COURT:  OH, I SEE.  AS OPPOSED TO TRYING TO GET

03:02PM 5    HER IN THIS WEEK?

03:02PM 6              MR. LEACH:  CORRECT.  I SEE NO PROSPECT OF

03:02PM 7    COMPLETING HER ON WEDNESDAY, AND WE HAVE ADDITIONAL WITNESSES

03:02PM 8    FOR FRIDAY.  I SEE SOME POSSIBILITY OF STARTING HER, BUT HER

03:02PM 9    NOT BEING AVAILABLE ON FRIDAY, AND I JUST WANT TO MAKE SURE

03:02PM 10   THAT THAT'S OKAY WITH THE COURT.

03:02PM 11             THE COURT:  SURE.  THAT'S FINE WITH ME.

03:03PM 12       AND I'M SURE IF YOU MEET AND CONFER WITH DEFENSE COUNSEL,

03:03PM 13   THEY'RE NOT GOING TO OBJECT TO THAT.  IT MAKES SENSE NOT TO

03:03PM 14   INTERRUPT A WITNESS'S TESTIMONY BY A DAY OR TWO OR THREE,

03:03PM 15   WHATEVER IT IS.  SO THANK YOU FOR LETTING ME KNOW THAT.

03:03PM 16             MR. LEACH:  OKAY.

03:03PM 17             THE COURT:  AND I WILL ENDEAVOR TO SEE IF WE CAN

03:03PM 18   INCREASE OUR TIME WITH THE JURY.  PLEASE RECALL INITIALLY I

03:03PM 19   SAID 2:00 O'CLOCK, AND THAT WAS IN REGARDS TO OUR COVID

03:03PM 20   SITUATION AND ASSURING THE JURY OF KEEPING THEM FROM BEING IN

03:03PM 21   AN ENCLOSED ENVIRONMENT NOTWITHSTANDING THE MEASURES THAT WE

03:03PM 22   HAVE TAKEN TO ASSIST.

03:03PM 23       I DO THINK AS THE TRIAL HAS GONE ON, THE JURY HAS BECOME A

03:03PM 24   LITTLE MORE COMFORTABLE ABOUT STAYING, AND AT LEAST THAT'S MY

03:03PM 25   SENSE.  THERE'S BEEN NO OBJECTIONS, OTHER THAN SOME SCHEDULE

4093

03:03PM  1    CONFLICTS, TO STAYING LATER.  SO I'LL CONTINUE TO ADVANCE THAT

03:03PM  2    WITH THEM.

03:03PM  3        ANYTHING FURTHER?  MR. DOWNEY, WERE YOU GOING TO --

03:03PM  4            MR. DOWNEY:  YOUR HONOR, I JUST WANT TO SAY, I THINK

03:04PM  5    THIS IS ABUNDANTLY CLEAR, BUT I JUST WANT TO MAKE SURE THE

03:04PM  6    WITNESS, WHILE THE WITNESS IS UNDER CROSS-EXAMINATION HE

03:04PM  7    DOESN'T CONSULT WITH THE GOVERNMENT.  HE DID MEET WITH

03:04PM  8    MR. BOSTIC YESTERDAY AFTER HIS TESTIMONY BEGAN, SO I JUST WANT

03:04PM  9    TO MAKE SURE THAT DURING CROSS-EXAMINATION THERE'S NO FURTHER

03:04PM  10   INTERACTION.

03:04PM  11           THE COURT:  OKAY.

03:04PM  12           MR. BOSTIC:  WE'LL ABIDE BY THAT, YOUR HONOR.

03:04PM  13           THE COURT:  OKAY.

03:04PM  14       (DISCUSSION OFF THE RECORD.)

03:04PM  15           THE COURT:  THANK YOU.  LADIES AND GENTLEMEN, I HAVE

03:04PM  16   TO BRING SOMETHING TO -- THIS IS NOT REALLY COUNSEL'S ISSUE,

03:04PM  17   BUT IT DOES AFFECT OUR JURORS.

03:04PM  18       APPARENTLY THERE IS SOMEONE USING A KEYBOARD THAT IS NOT A

03:04PM  19   SILENT KEYBOARD IN THE AUDIENCE, AND I'M GOING TO ASK YOU TO

03:04PM  20   PLEASE, IF WHOEVER YOU ARE, I DON'T KNOW IF YOU ARE OR IF THAT

03:05PM  21   IS HAPPENING, WE'RE GETTING THE REPORTS FROM THE JURORS THAT

03:05PM  22   THEY CAN HEAR SOMEONE OPERATING A KEYBOARD.

03:05PM  23       AS YOU RECALL, I HAD PERMITTED, OF COURSE, THOSE DEVICES,

03:05PM  24   BUT THEY MUST BE SILENT, SILENT KEYBOARDS.

03:05PM  25       IF IT CONTINUES, I THINK I'M GOING TO ASK THE

4094

| | | |
|---|---|---|
| 03:05PM | 1 | UNITED STATES MARSHAL STAND IN THE COURTROOM AND SHOULD SHE |
| 03:05PM | 2 | HEAR A KEYBOARD, I'LL ASK HER TO TAKE APPROPRIATE ACTION. |
| 03:05PM | 3 | THAT'S ABOUT ALL I CAN DO. |
| 03:05PM | 4 | THE CLERK:  THEY CAN GO TO THE OVERFLOW ROOM. |
| 03:05PM | 5 | THE COURT:  THAT'S TRUE. |
| 03:05PM | 6 | AND IF YOU HAVE A KEYBOARD THAT YOU CAN'T DISABLE OR |
| 03:05PM | 7 | YOU'RE UNABLE TO OBTAIN A SILENT KEYBOARD, I WOULD INVITE YOU |
| 03:05PM | 8 | TO THE OVERFLOW ROOM THAT WE HAVE.  I'M TOLD THAT THERE'S |
| 03:05PM | 9 | GENEROUS SEATING AVAILABLE THERE. |
| 03:05PM | 10 | SO IT COULD BE THAT THE MARSHAL WILL ASK THE OFFENDING |
| 03:05PM | 11 | PARTY, AND I DON'T MEAN TO PUT IT THAT WAY, BUT THE PARTY WITH |
| 03:05PM | 12 | THE KEYBOARD TO GO TO THE OVERFLOW ROOM SUCH THAT OUR JURORS |
| 03:06PM | 13 | ARE NOT -- OUR JURY IS NOT DISTRACTED FROM THAT NOISE.  SO I |
| 03:06PM | 14 | JUST WANT TO PUT THAT OUT THERE. |
| 03:06PM | 15 | MS. VOLKAR, DID YOU HAVE SOMETHING THAT YOU WANTED TO |
| 03:06PM | 16 | ADDRESS?  YES, I SEE YOU NODDING YOUR HEAD.  SO WHY DON'T YOU |
| 03:06PM | 17 | COME FORWARD IF YOU WOULD, PLEASE. |
| 03:06PM | 18 | OH.  NOW I'M REALLY CONFUSED. |
| 03:06PM | 19 | MS. VOLKAR, NICE TO SEE YOU AGAIN. |
| 03:06PM | 20 | MS. TREFZ, NICE TO SEE YOU. |
| 03:06PM | 21 | MS. VOLKAR:  THANK YOU, YOUR HONOR.  WE STROVE FOR |
| 03:06PM | 22 | MAXIMUM CONFUSION IN THAT SETUP. |
| 03:06PM | 23 | WE REALLY JUST WANTED TO BRING THE TEXT MESSAGES TO A |
| 03:06PM | 24 | CLOSE.  OVER THE PAST SEVERAL WEEKS THE PARTIES HAVE BEEN |
| 03:06PM | 25 | WORKING TO NARROW ANY DISAGREEMENTS, AND WE HAVE GOTTEN IT DOWN |

03:07PM 1    TO ABOUT ONE PAGE YOU'LL BE HAPPY TO HEAR I HOPE.

03:07PM 2         AND WITH THAT WE SUBMITTED THROUGH MS. KRATZMANN THE ONE

03:07PM 3    PAGE WITH BATES ENDING IN 293.

03:07PM 4         THE GOVERNMENT'S POINT HERE -- I'M SORRY, THE GOVERNMENT

03:07PM 5    HAS AGREED TO THE VAST MAJORITY OF DEFENDANT'S RULE 106

03:07PM 6    COMPLETENESS DESIGNATIONS, AND THIS IS THE SOLE PAGE WHERE WE

03:07PM 7    HAVE A REMAINING OBJECTION.

03:07PM 8         THE OBJECTION IS REALLY THAT THE CHUNK OF PAGES IN THE

03:07PM 9    MIDDLE -- AND I DO HAVE A COPY.  I THINK MS. KRATZMANN MAY HAVE

03:07PM 10   JUST PROVIDED ONE, BUT I DO HAVE A COPY TO HAND UP IF THAT'S

03:07PM 11   HELPFUL.

03:07PM 12            THE COURT:  IS THIS THE SAME (INDICATING)?  YEAH.

03:07PM 13            MS. VOLKAR:  (HANDING.)

03:07PM 14        SO, YOUR HONOR, YOU MAY SEE THAT THE FIRST BATCH OF TEXT

03:07PM 15   MESSAGES ARE SUBMITTED BY DEFENSE COUNSEL FOR RULE 106 ARE

03:08PM 16   ACTUALLY FOR AN ENTIRELY DIFFERENT DAY.  THEY OCCUR ON

03:08PM 17   AUGUST 27TH, 2015.  THEY REFER TO A CALL OR REFERRING TO

03:08PM 18   DANIEL, I ASSUME DR. YOUNG.  THEY DO NOT APPEAR TO HAVE ANY

03:08PM 19   CONNECTION, FROM THE GOVERNMENT'S PERSPECTIVE, WITH THE BOTTOM

03:08PM 20   TWO TEXT MESSAGES WHICH WERE OUR ORIGINAL SUGGESTED ADMISSIONS,

03:08PM 21   AND, THEREFORE, WE REQUEST THAT THE APPROXIMATELY SIX TEXT

03:08PM 22   MESSAGES IN THAT FIRST BATCH BE STRUCK AS INAPPROPRIATE UNDER

03:08PM 23   RULE 106.

03:08PM 24            THE COURT:  OKAY.  THANK YOU.

03:08PM 25            MS. TREFZ:  YOUR HONOR, THE TEXT MESSAGES FROM

4096

03:08PM 1     AUGUST 27TH ARE RELATED, AS ARE THE ONES FROM AUGUST 28TH, TO

03:08PM 2     THE ONGOING FDA INSPECTION.

03:08PM 3          THE RELEVANT TOPIC WAS ACTUALLY DISCUSSED THE DAY BEFORE

03:08PM 4     IN THE MESSAGES THAT THE GOVERNMENT IS SEEKING TO INTRODUCE AND

03:08PM 5     THE DAY AFTER BECAUSE THE FDA INSPECTION WAS ONGOING.

03:09PM 6          DR. YOUNG AND DR. ANEKAL BOTH HAD ROLES IN RESPONDING TO

03:09PM 7     THAT INVESTIGATION OR INSPECTION INCLUDING RELATED TO CTN'S AND

03:09PM 8     THE NANOTAINERS AND THE 4.1 DEVICE.  WE THINK THESE ARE

03:09PM 9     APPROPRIATE UNDER 106 TO, YOU KNOW, IN FAIRNESS BE KIND OF READ

03:09PM 10    AT THE SAME TIME.  IT'S OBVIOUSLY A LITTLE BIT HARD WHEN YOU'RE

03:09PM 11    READING SOMEONE ELSE'S TEXT MESSAGES TO UNDERSTAND WHAT THE

03:09PM 12    CONTEXT IS FOR THEM, BUT I'M --

03:09PM 13         THE COURT:  WELL, THAT'S THE REAL -- CAN YOU EXPLAIN

03:09PM 14    THAT?  I KNOW YOU JUST TOLD ME THAT THEY RELATE TO A TOPIC THAT

03:09PM 15    HAPPENED A DAY BEFORE.  SO UNDER THE 106 CONTEXT, HOW DOES THIS

03:09PM 16    FULFILL 106 OBJECTIVE?

03:09PM 17         MS. TREFZ:  RIGHT.  SO THE FDA INSPECTION WAS

03:09PM 18    ONGOING BEFORE AND IT WAS ONGOING AFTER THESE MESSAGES.

03:09PM 19         THE TEXT MESSAGES ON AUGUST 28TH THAT FOLLOW THESE ARE

03:10PM 20    ALSO RELATED TO THE FDA INSPECTION AS ARE THE ONES ON PRIOR

03:10PM 21    PAGES FROM PRIOR DAYS.

03:10PM 22         AND SO WE WOULD SUBMIT THAT IF WE'RE GOING TO PUT IN TEXT

03:10PM 23    MESSAGES ABOUT KIND OF SOME OF THESE FDA INSPECTION ISSUES,

03:10PM 24    THEN IT'S RELEVANT AND IMPORTANT TO UNDERSTAND MS. HOLMES'S

03:10PM 25    STATE OF MIND AND HER -- AND THE INFORMATION THAT SHE'S BEING

4097

03:10PM   1    PROVIDED THROUGHOUT THAT INSPECTION.  AND THE ONES FROM

03:10PM   2    AUGUST 27TH ARE RELATED TO, YOU KNOW, TO THE FDA INSPECTION AS

03:10PM   3    WELL.

03:10PM   4          MS. VOLKAR:  YOUR HONOR, WHILE IT MAY HAVE OCCURRED

03:10PM   5    DURING THE COURSE OF THE FDA INSPECTION, IT'S HARD TO SEE WHAT

03:10PM   6    "GOOD TIME TO CALL DANIEL OR SAM," "YES WE R DONE," "CALL ME

03:10PM   7    WITH THEM," "MEANING VERY GOOD," HAS ANYTHING TO DO WITH THE

03:11PM   8    POTASSIUM DATA ON 4.1 AND 4.5 IS ON ADVIA.

03:11PM   9       IT'S JUST THAT THE MESSAGES THAT THE DEFENSE COUNSEL

03:11PM  10    IDENTIFIED THESE AS BEING RULE 106 TO ON THEIR FACE DO NOT SEEM

03:11PM  11    TO HAVE ANY REAL CONNECTION.

03:11PM  12       AND I WOULD SAY IF DEFENSE COUNSEL WANTS TO SUBMIT TEXT

03:11PM  13    MESSAGES OF THEIR OWN, OF COURSE WE'LL HAVE TO DEAL WITH ANY

03:11PM  14    HEARSAY PROBLEMS OR DIFFERENT BARRIERS THAT THEY MAY HAVE TO

03:11PM  15    OVERCOME, BUT RULE 106 DOES NOT SEEM TO BE THE APPROPRIATE

03:11PM  16    METHOD TO INTRODUCE THESE TEXT MESSAGES.

03:11PM  17          THE COURT:  MS. TREFZ, I'M TRYING TO FIND THE

03:11PM  18    CONNECTION HERE.  THERE SEEMS TO BE SOME ATTENUATION BETWEEN

03:11PM  19    THESE TEXTS.

03:11PM  20          MS. TREFZ:  WELL, IT'S HARD TO READ TEXTS OUT OF

03:11PM  21    CONTEXT IF YOU'RE NOT THE PERSON WHO WROTE THEM OR RECEIVED

03:11PM  22    THEM, SO I UNDERSTAND THAT.

03:11PM  23       I THINK WHAT YOU SEE HERE IS MR. BALWANI TELLING

03:11PM  24    MS. HOLMES ON AUGUST 27TH "INCREDIBLE DAY TO BE HONEST,"

03:12PM  25    "MEANING VERY GOOD."

4098

03:12PM  1        THE INSPECTION THEN CONTINUES THE NEXT DAY AND HE IS --

03:12PM  2    YOU KNOW, REPORTS FURTHER INTERACTIONS ABOUT THE INSPECTION.

03:12PM  3        IT'S HARD FOR ME TO -- BECAUSE THE TEXT MESSAGES DON'T

03:12PM  4    LITERALLY SAY THE FDA INSPECTION WAS VERY GOOD, ALL I CAN DO IS

03:12PM  5    REPRESENT TO THE COURT THAT THIS IS WHAT THEY'RE ABOUT.

03:12PM  6        AND, YOU KNOW, I THINK 106'S REQUIREMENT IS THAT IT CAN BE

03:12PM  7    A PART OF THE SAME DOCUMENT OR IT CAN BE A SEPARATE DOCUMENT

03:12PM  8    BUT IN FAIRNESS SHOULD BE PRESENTED AT THE SAME TIME.

03:12PM  9        YOU KNOW, THE GOVERNMENT, I THINK, IN MANY CASES HAS, YOU

03:12PM 10    KNOW, READ PARTS OF TEXT MESSAGES, YOU KNOW, THROUGH WITNESSES

03:12PM 11    AND OTHER ITEMS, AND WE WOULD JUST SUGGEST THAT IT'S

03:12PM 12    APPROPRIATE TO INCLUDE THE TEXT MESSAGES AND THE EXHIBIT, I

03:12PM 13    GUESS, REGARDLESS OF WHETHER WHOEVER IS PRESENTING THEM AND

03:12PM 14    WHATEVER WITNESS IS READING THEM, YOU KNOW, AND ACTUALLY READS

03:13PM 15    THEM OUT LOUD.

03:13PM 16        THE COURT:  NO.  SURE.  AND WE'VE GONE THROUGH THIS

03:13PM 17    WITH OTHER TEXTS, AND I THINK I AGREED WITH MANY OF THE

03:13PM 18    OFFERINGS OF THE DEFENSE THAT THEY WERE 106 CONNECTED.

03:13PM 19        I HAVE TO CONFESS AS I SIT HERE AND LOOK AT THEM, AND

03:13PM 20    AGAIN, I JUST LOOKED AT THIS NOW, AND I JUST SEE THERE'S SOME

03:13PM 21    ATTENUATION.  I JUST DON'T SEE THE CONNECTION, THE REAL 106

03:13PM 22    CONNECTION.

03:13PM 23        MS. TREFZ:  IF I MAY, YOUR HONOR?

03:13PM 24        I THINK MS. VOLKAR PROVIDED YOU ONE PAGE, BUT THE TEXT

03:13PM 25    MESSAGES FROM AUGUST 28TH CONTINUE ON TO THE NEXT COUPLE OF

03:13PM  1    PAGES OF THE EXHIBIT, AND SO I JUST HOPE IF WE DON'T RESOLVE

03:13PM  2    THIS NOW AND YOU WANT TO GO BACK AND TAKE A LOOK AT THEM.

03:13PM  3            THE COURT:  WELL, THAT'S A GOOD SUGGESTION.  LET ME

03:13PM  4    DO THAT.

03:13PM  5            MS. TREFZ:  I'M SORRY.

03:13PM  6            MS. VOLKAR:  YOUR HONOR, IF I MAY?

03:13PM  7        HOPING THAT WE COULD GET TO A RESOLUTION ON THIS, IF NOT

03:13PM  8    TODAY, SOON, THE GOVERNMENT HAS PREPARED AND WOULD LIKE TO MOVE

03:13PM  9    TO ADMIT IN THE NEAR FUTURE EXHIBIT 5387D, WHICH IS ALL OF THE

03:14PM  10   TEXT MESSAGES THAT THE GOVERNMENT SOUGHT TO ADMIT WITH ALL OF

03:14PM  11   THE RULE 106 COMPLETENESS SUGGESTIONS, INCLUDING THE ONES THAT

03:14PM  12   ARE AT ISSUE RIGHT NOW BECAUSE WE WERE NOT SURE WHETHER -- WHAT

03:14PM  13   THE COURT'S RULING ON THOSE WOULD BE.  SO WE WOULD BE HAPPY TO

03:14PM  14   PASS THIS UP AND ALSO EITHER NOW OR IN THE VERY NEAR FUTURE WE

03:14PM  15   WOULD LIKE TO MOVE IT INTO EVIDENCE.

03:14PM  16           THE COURT:  SURE.

03:14PM  17       AND THIS, THIS -- WHAT YOU HAVE IN YOUR HAND INCORPORATES

03:14PM  18   WHAT I WAS JUST TALKING WITH MS. TREFZ ABOUT, THE INCLUSION OF

03:14PM  19   106 THAT THE DEFENSE WANTED.

03:14PM  20           MS. VOLKAR:  THAT'S CORRECT.  IT HAS THE TEXTS

03:14PM  21   SEVERAL TIMES AND SO THERE WAS 5387B, WHICH IS ABOUT 30 PAGES

03:14PM  22   YOUR HONOR WENT THROUGH AND ACCEPTED MOST OF THE RULE 106, AND

03:14PM  23   I THINK YOU MAYBE SUSTAINED THE OBJECTION TO THREE OR FOUR OF

03:14PM  24   THOSE HAVE BEEN REDACTED FROM THIS VERSION.

03:14PM  25           THE COURT:  RIGHT.

4100

03:14PM 1          MS. VOLKAR:  SO THIS INCORPORATES EVERYTHING TO DATE

03:14PM 2    OF THE COURT'S RULING AND SOME TEXT MESSAGES THAT WE HAD BEEN

03:14PM 3    IN DISCUSSION WITH DEFENSE ABOUT FOR THE LAST SEVERAL WEEKS,

03:15PM 4    BUT WE WANTED ONE HOLISTIC DOCUMENT TO BE ABLE TO PROVIDE TO

03:15PM 5    THE JURY WAS OUR WISH.

03:15PM 6          THE COURT:  SURE.  OF COURSE.

03:15PM 7          MS. VOLKAR:  AND IT DOES HAVE RIGHT NOW THEIR

03:15PM 8    SUGGESTIONS ON THIS PAGE 293, BECAUSE WE WERE NOT YET SURE WHAT

03:15PM 9    YOUR HONOR'S RULING WOULD BE.

03:15PM 10         THE COURT:  DOES IT HAVE THE CONTEXTUAL CONNECTION

03:15PM 11   THAT MS. TREFZ IS SUGGESTING?

03:15PM 12         MS. VOLKAR:  IT DOES, YOUR HONOR, AND I'M HAPPY TO

03:15PM 13   POINT YOU TO THOSE PAGES IF THAT WOULD BE HELPFUL.

03:15PM 14         THE COURT:  YES, THAT WOULD BE HELPFUL.  I'M GOING

03:15PM 15   TO TAKE MS. TREFZ SUGGESTION AND LOOK AT THIS TONIGHT.

03:15PM 16          DID YOU WANT TO TELL ME WHICH PAGE I SHOULD LOOK AT,

03:15PM 17   MS. VOLKAR?

03:15PM 18         MS. VOLKAR:  I'M HAPPY TO, YOUR HONOR.  SO IF YOU

03:15PM 19   LOOK AT THE EXHIBIT NUMBER IN THE BOTTOM MIDDLE.

03:15PM 20         THE COURT:  YES.

03:15PM 21         MS. VOLKAR:  THE ONE PAGE I HANDED YOU IS PAGE

03:15PM 22   NUMBER 96 OF THE EXHIBIT.

03:15PM 23         THE COURT:  OKAY.

03:15PM 24         MS. VOLKAR:  AND THE PAGE THAT MS. TREFZ WAS

03:15PM 25   REFERRING TO CONTINUES ON TO PAGE 97.

4101

03:16PM  1          MS. TREFZ:  AND THEN I WOULD JUST NOTE THAT IF YOU

03:16PM  2     COULD KIND OF LOOK BACK A DAY AND YOU CAN SEE THE KIND OF --

03:16PM  3     SOME OF THE BEGINNING OF THE FDA INSPECTION.  AND AS WE SAID,

03:16PM  4     IT'S HARD TO UNDERSTAND THE FULL CONTEXT OF THE MESSAGES KIND

03:16PM  5     OF IN A VACUUM, BUT HOPEFULLY THAT WILL HELP.

03:16PM  6          THE COURT:  SO IF I LOOK AT IT, MS. TREFZ, IT WILL

03:16PM  7     BE CRYSTAL CLEAR WHAT YOU'RE TELLING ME?

03:16PM  8          MS. TREFZ:  WE'LL SEE, YOUR HONOR.  I'M SURE YOU'LL

03:16PM  9     LET ME KNOW.

03:16PM  10          THE COURT:  OKAY.

03:16PM  11          MS. VOLKAR:  AND, YOUR HONOR, IF I MAY?

03:16PM  12     I JUST WANT TO POINT OUT THAT EVEN IF THEY'RE MEETING WITH

03:16PM  13     THE FDA OVER A SERIES OF DAYS, A CONVERSATION ABOUT ONE MEETING

03:16PM  14     DOESN'T ALWAYS NECESSARILY BLEED INTO OR RELATE TO THE OTHER

03:16PM  15     MEETING.

03:16PM  16     AND THE GOVERNMENT'S POSITION IS THE ONLY REASON WE RAISED

03:16PM  17     AN OBJECTION TO THIS ONE IS, FROM OUR PERSPECTIVE, EVEN WITH

03:16PM  18     THE BENEFIT OF THE PAGES BEFORE AND AFTER, WE JUST DO NOT SEE

03:16PM  19     ANY CONNECTION BETWEEN THAT DAY, THE AUGUST 27TH MESSAGES, AND

03:17PM  20     THE NEXT DAY WHEN THEY'RE TALKING ABOUT THE NANOTAINER.

03:17PM  21     AND I WILL POINT OUT FOR THE RECORD, WE DID ACCEPT DEFENSE

03:17PM  22     COUNSEL'S SUGGESTED ADDITION OF THE TOP OF THOSE THREE BOTTOM

03:17PM  23     ONES THAT IS ON THE SAME SUBJECT AND ON THE SAME DAY TALKING

03:17PM  24     ABOUT THERE WERE GOOD DATA ON THE NANOTAINERS AND THEN OUR TWO

03:17PM  25     NEXT MESSAGES WERE ALSO ABOUT THE NANOTAINER.

4102

03:17PM  1           SO WE DID IN GOOD FAITH LOOK AT WHAT WAS ON THE SAME TOPIC

03:17PM  2     AND FAIRLY COVERED BY RULE 106.

03:17PM  3               THE COURT:  OKAY.  GREAT.

03:17PM  4          WELL, THANK YOU.  I'LL LOOK AT THESE THIS EVENING AND THEN

03:17PM  5     MAYBE WE CAN TALK ABOUT IT IN THE MORNING.  GREAT.

03:17PM  6               MS. VOLKAR:  THANK YOU, YOUR HONOR.

03:17PM  7               MS. TREFZ:  THANK YOU.

03:17PM  8               THE COURT:  ANYTHING ELSE FROM EITHER SIDE?

03:17PM  9               MR. BOSTIC:  NO, YOUR HONOR.

03:17PM 10               MR. DOWNEY:  NO, YOUR HONOR.

03:17PM 11               THE COURT:  OKAY.  THANK YOU.

03:17PM 12               THE CLERK:  COURT IS ADJOURNED.

03:17PM 13          (COURT ADJOURNED AT 3:17 P.M.)

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

```
 1
 2
 3                      CERTIFICATE OF REPORTERS
 4
 5
 6
 7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE
 8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
 9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO
10    HEREBY CERTIFY:
11          THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS
12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE
13    ABOVE-ENTITLED MATTER.
14
15
16          _____
            IRENE RODRIGUEZ, CSR, CRR
            CERTIFICATE NUMBER 8076
17
18          _____
19          LEE-ANNE SHORTRIDGE, CSR, CRR
            CERTIFICATE NUMBER 9595
20
21          DATED:  OCTOBER 19, 2021
22
23
24
25
```

4103

1

2                     UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                         SAN JOSE DIVISION

5
        UNITED STATES OF AMERICA,        )   CR-18-00258-EJD
6                                        )
                         PLAINTIFF,      )   SAN JOSE, CALIFORNIA
7                                        )
               VS.                       )   VOLUME 22
8                                        )
        ELIZABETH A. HOLMES,             )   OCTOBER 20, 2021
9                                        )
                         DEFENDANT.      )   PAGES 4103 - 4317
10      _____ )

11                   TRANSCRIPT OF TRIAL PROCEEDINGS
12              BEFORE THE HONORABLE EDWARD J. DAVILA
                   UNITED STATES DISTRICT JUDGE
13
        A P P E A R A N C E S:
14
        FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
15                             BY:   JOHN C. BOSTIC
                                     JEFFREY B. SCHENK
16                             150 ALMADEN BOULEVARD, SUITE 900
                               SAN JOSE, CALIFORNIA 95113
17
                               BY:   ROBERT S. LEACH
18                                   KELLY VOLKAR
                               1301 CLAY STREET, SUITE 340S
19                             OAKLAND, CALIFORNIA 94612

20          (APPEARANCES CONTINUED ON THE NEXT PAGE.)

21
        OFFICIAL COURT REPORTERS:
22                             IRENE L. RODRIGUEZ, CSR, RMR, CRR
                               CERTIFICATE NUMBER 8074
23                             LEE-ANNE SHORTRIDGE, CSR, CRR
                               CERTIFICATE NUMBER 9595
24
             PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25               TRANSCRIPT PRODUCED WITH COMPUTER

```
1         A P P E A R A N C E S: (CONT'D)

2

3    FOR DEFENDANT HOLMES:    WILLIAMS & CONNOLLY LLP
                              BY:  KEVIN M. DOWNEY
4                                  LANCE A. WADE
                                   KATHERINE TREFZ
5                                  PATRICK LOOBY
                                   J.R. FLEURMONT
6                                  ANDREW LEMENS
                              725 TWELFTH STREET, N.W.
7                             WASHINGTON, D.C. 20005

8                             LAW OFFICE OF JOHN D. CLINE
                              BY:  JOHN D. CLINE
9                             ONE EMBARCADERO CENTER, SUITE 500
                              SAN FRANCISCO, CALIFORNIA 94111
10

11   ALSO PRESENT:            FEDERAL BUREAU OF INVESTIGATION
                              BY:  ADELAIDA HERNANDEZ
12
                              OFFICE OF THE U.S. ATTORNEY
13                            BY:  LAKISHA HOLLIMAN, PARALEGAL
                                   MADDI WACHS, PARALEGAL
14
                              WILLIAMS & CONNOLLY
15                            BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL

16                            TBC
                              BY:  BRIAN BENNETT, TECHNICIAN
17

18

19

20

21

22

23

24

25
```

INDEX OF PROCEEDINGS

GOVERNMENT'S:


**DANIEL EDLIN**
CROSS-EXAM BY MR. DOWNEY (RES.)            P. 4128
REDIRECT EXAM BY MR. BOSTIC                P. 4267
RECROSS-EXAM BY MR. DOWNEY                 P. 4305

**SHANE WEBER**
DIRECT EXAM BY MR. LEACH                   P.
CROSS-EXAM BY MR. CLINE                    P.
REDIRECT EXAM BY MR. LEACH                 P.
RECROSS-EXAM BY MR. CLINE                  P.

```
 1                          INDEX OF EXHIBITS

 2
                                       IDENT.       EVIDENCE
 3       GOVERNMENT'S:

 4       5387D                                      4108
         3696                                       4225
 5

 6       DEFENDANT'S:

 7       7694                                       4128
         10444                                      4133
 8       13993                                      4137
         13986                                      4141
 9       10446                                      4142
         10457                                      4148
10       10472                                      4153
         13977                                      4159
11       7244                                       4168
         7243                                       4177
12       13988                                      4199
         10464                                      4218
13       7217                                       4221
         10466                                      4224
14       10469                                      4227
         10468                                      4228
15       10532                                      4231
         13935                                      4234
16       10467                                      4238
         13979                                      4242
17       13980                                      4244
         7365                                       4247
18       10554                                      4251
         10555                                      4254
19       10558                                      4256
         7687                                       4265
20       12251                                      4280

21

22

23

24

25
```

4107

```
         1    SAN JOSE, CALIFORNIA                    OCTOBER 20, 2021

08:37AM  2                   P R O C E E D I N G S

08:37AM  3         (COURT CONVENED AT 8:37 A.M.)

08:37AM  4         (JURY OUT AT 8:37 A.M.)

08:37AM  5              THE COURT:  WE ARE ON THE RECORD IN THE HOLMES

08:37AM  6    MATTER.  ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT.

08:37AM  7         GOOD MORNING.

08:37AM  8         WE'RE OUTSIDE THE PRESENCE OF THE JURY.

08:37AM  9         I JUST WANTED TO -- IS MS. VOLKAR HERE?  YES.  I SEE

08:37AM 10    MS. VOLKAR IS HERE.  MS. TREFZ IS HERE.

08:37AM 11         I THOUGHT WE WOULD ADDRESS THE ISSUE OF THE TEXTS, AND I

08:37AM 12    DID REVIEW THE DOCUMENTS AGAIN LAST NIGHT AT MS. TREFZ'S

08:38AM 13    REQUEST AND MS. VOLKAR'S REQUEST.

08:38AM 14         AS I SAID LAST -- YESTERDAY, THE CONNECTION BETWEEN THESE

08:38AM 15    TWO TEXTS FROM THE 27TH AND 28TH, THE SIXTH TEXT -- OH, YOU'RE

08:38AM 16    BACK AGAIN.

08:38AM 17              MS. TREFZ:  YES, JUST FOR MAXIMUM CONFUSION,

08:38AM 18    YOUR HONOR.

08:38AM 19         (LAUGHTER.)

08:38AM 20              THE COURT:  AS I SAID LAST NIGHT, THEY SEEM TO BE

08:38AM 21    ATTENUATED.  106 TALKS ABOUT FAIRNESS AND WHAT IS FAIR FOR

08:38AM 22    COMPLETENESS TO COMPLETE THE CONVERSATION, THE CONTEXTUAL

08:38AM 23    NATURE OF IT.

08:38AM 24         I LOOK AT THESE AND I THINK, WELL, IT IS -- AS I SAID, I

08:38AM 25    SUPPOSE THERE'S A WAY TO READ INTO IT THAT THERE IS SOME
```

08:38AM 1    CONTEXTUAL CONTACT WITH WHAT WAS OCCURRING ON THE 28TH.

08:38AM 2         IN THE SPIRIT OF THAT AND IN THE SPIRIT OF 106, I WILL

08:39AM 3    ALLOW THOSE TO COME IN, MS. VOLKAR.  AND YOU'VE PREPARED, I

08:39AM 4    THINK, THE DOCUMENT ACCORDING WITH THAT, SO I'LL ALLOW -- I

08:39AM 5    DON'T KNOW IF IT WAS A REQUEST FROM MS. TREFZ, BUT I'LL ALLOW

08:39AM 6    THEM IN.

08:39AM 7         AND THEN WOULD YOU SEEK THEN, IS THIS GOING TO BE ADMITTED

08:39AM 8    NOW?  WOULD YOU LIKE TO DO THAT NOW?

08:39AM 9         MS. VOLKAR:  YES, YOUR HONOR, THANK YOU.

08:39AM 10        THE UNITED STATES WOULD LIKE TO MOVE TRIAL EXHIBIT 5387D.

08:39AM 11        THE COURT:  OKAY.

08:39AM 12        MS. TREFZ:  WE MAY HAVE SPECIFIC OBJECTIONS TO

08:39AM 13   PARTICULAR PARTS SHOULD THEY CHOOSE TO READ THEM, BUT THERE'S

08:39AM 14   NO AUTHENTICATION, AS WE'VE ALREADY DISCUSSED, OBJECTION AND I

08:39AM 15   THINK WE ADDRESSED RULE 106, SO I THINK IT CAN COME IN WITH THE

08:39AM 16   POTENTIAL FOR PARTICULAR SECTIONS TO BE STRICKEN IF THERE'S AN

08:39AM 17   OBJECTION AT THE TIME THAT THEY'RE READ.

08:39AM 18        THE COURT:  OKAY.  WHAT I HEARD YOU SAY IS NO REAL

08:39AM 19   OBJECTION NOW, JUDGE, BUT IF WE HAVE FURTHER OBJECTIONS, WE'LL

08:39AM 20   RAISE THEM AT THE MOMENT.

08:39AM 21        MS. TREFZ:  CORRECT.

08:39AM 22        THE COURT:  GREAT.  OKAY.  IT'S RECEIVED WITH THAT

08:39AM 23   RECOGNITION.  THANK YOU.

08:40AM 24        MS. VOLKAR:  THANK YOU, YOUR HONOR.

08:40AM 25        (GOVERNMENT'S EXHIBIT 5387D WAS RECEIVED IN EVIDENCE.)

08:40AM 1                THE COURT:  ANYTHING ELSE ON THIS?

08:40AM 2                MS. VOLKAR:  NO, YOUR HONOR.

08:40AM 3                THE COURT:  LET ME INQUIRE AS TO THE CURRENT WITNESS

08:40AM 4       WE HAVE.  MAYBE I'LL TURN TO MR. DOWNEY.

08:40AM 5                MR. DOWNEY:  YOUR HONOR, I THINK MY EXPECTATION IS

08:40AM 6       THAT WE WOULD FINISH HIM TODAY, AND WE HOPEFULLY WILL START THE

08:40AM 7       OTHER WITNESS THAT THE GOVERNMENT HAS HERE, MR. WEBER.

08:40AM 8           I THINK IT SOUNDS LIKE, FROM OUR CONVERSATIONS WITH THE

08:40AM 9       GOVERNMENT, IF MR. WEBER IS -- STARTS AFTER THE SECOND BREAK,

08:40AM 10      HE MIGHT BE FINISHED TODAY.  THAT SOUNDS TO BE THE CASE, BUT

08:40AM 11      I'LL LET MR. LEACH SPEAK TO THAT.

08:40AM 12               THE COURT:  OKAY.  THANK YOU.

08:40AM 13               MR. LEACH:  I ANTICIPATE ABOUT 45 MINUTES OF DIRECT

08:40AM 14      EXAMINATION FOR MR. WEBER, YOUR HONOR.

08:40AM 15               THE COURT:  OKAY.  SO IT SOUNDS LIKE MR. EDLIN WILL

08:40AM 16      BE ON THROUGH OUR MORNING BREAK AT LEAST.

08:40AM 17               MR. DOWNEY:  YES.

08:40AM 18               THE COURT:  AT LEAST WITH YOU.

08:41AM 19               MR. DOWNEY:  YES.

08:41AM 20               THE COURT:  MR. DOWNEY, AND THEN I DON'T KNOW IF

08:41AM 21      THERE'S ANY REDIRECT, RECROSS AFTER THAT, BUT WE MAY GET INTO

08:41AM 22      MR. WEBER SOMETIME -- I'M HOPING THAT WE CAN GO UNTIL 4:00

08:41AM 23      TODAY, AS I SAID, AND WE MAY GET INTO -- YES, I THINK WE'RE

08:41AM 24      GOING UNTIL 4:00.

08:41AM 25               MR. LEACH:  I THOUGHT THE COURT INDICATED 3:00 -- I

08:41AM 1    THOUGHT WE WERE GOING TO ASK THE JURORS, AND THEN AT SOME POINT

08:41AM 2    YESTERDAY IT SEEMED LIKE ONE OF THE JURORS COULD NOT GO UNTIL

08:41AM 3    4:00, BUT MAYBE I AM, TOO.

08:41AM 4        THE SMARTEST PERSON IN THE ROOM, THE COURT REPORTER, JUST

08:41AM 5    SAID 3:00.

08:41AM 6        (LAUGHTER.)

08:41AM 7        THE COURT:  SO WE'LL GO UNTIL 3:00.  IF WE CAN GO TO

08:41AM 8    4:00, WE WILL DO IT.

08:41AM 9        I HAVE TOMORROW AVAILABLE, AND MS. KRATZMANN EMAILED THE

08:41AM 10   JURORS TO SEE IF THEY COULD COME IN TOMORROW.  ONE OF THEM

08:41AM 11   CANNOT, SO THAT ELIMINATES TOMORROW.  SO WE WILL NOT BE IN

08:42AM 12   SESSION TOMORROW.

08:42AM 13       AND I THINK I ASKED FOR 4:00 ON FRIDAY.  I'M PRETTY

08:42AM 14   CONFIDENT THAT I DID THAT.  WE'LL SEE WHAT WE CAN DO.  YES, I

08:42AM 15   DID THAT.

08:42AM 16       OKAY.  SO BACK TO MR. WEBER.  HE PROBABLY WOULD START THEN

08:42AM 17   AT MAYBE 1:00 O'CLOCK OR SOMETHING LIKE THAT?  IS THAT AFTER

08:42AM 18   THAT BREAK DO YOU THINK?

08:42AM 19       MR. LEACH:  THAT SOUNDS ABOUT RIGHT.

08:42AM 20       THE COURT:  I'M NOT PUTTING TIME CONSTRAINTS.

08:42AM 21       MR. DOWNEY:  I'M NOT TOTALLY CERTAIN.  I WAS

08:42AM 22   THINKING MORE AFTER THE SECOND BREAK.

08:42AM 23       THE COURT:  OKAY.

08:42AM 24       MR. DOWNEY:  YEAH.

08:42AM 25       THE COURT:  AND I THINK WE DO STILL HAVE TO --

| | | |
|---|---|---|
| 08:42AM | 1 | THERE'S AN ISSUE AS TO MR. WEBER, STILL, AND THERE'S SOME |
| 08:42AM | 2 | DOCUMENTS. |
| 08:42AM | 3 | MR. DOWNEY:  THAT'S RIGHT. |
| 08:42AM | 4 | THE COURT:  WHEN SHOULD WE TALK ABOUT THAT AGAIN? |
| 08:42AM | 5 | MR. LEACH:  I'M PLEASED TO DO IT NOW, YOUR HONOR, OR |
| 08:42AM | 6 | AFTER -- DURING THE FIRST BREAK. |
| 08:42AM | 7 | THE COURT:  MR. CLINE IS -- |
| 08:42AM | 8 | MR. CLINE:  WHATEVER YOUR HONOR WOULD LIKE. |
| 08:42AM | 9 | THE COURT:  WELL, LET'S, LET'S CHAT A LITTLE BIT |
| 08:42AM | 10 | ABOUT IT NOW FOR A COUPLE OF MINUTES. |
| 08:42AM | 11 | MR. CLINE, WHY DON'T YOU CONTINUE YOUR COMMENTS ABOUT |
| 08:42AM | 12 | THAT. |
| 08:43AM | 13 | MR. CLINE:  WELL, WHAT WE'RE TALKING ABOUT IS THIS |
| 08:43AM | 14 | INTERNAL REPORT THAT DR. WEBER PREPARED AT PFIZER, AND THERE |
| 08:43AM | 15 | ARE SEVERAL ISSUES WITH IT.  ONE IS A 702 ISSUE BECAUSE IT |
| 08:43AM | 16 | CONTAINS SPECIALIZED KNOWLEDGE FOR SURE THAT WOULD FALL UNDER |
| 08:43AM | 17 | 702. |
| 08:43AM | 18 | THE OTHER ISSUE IS A 403 ISSUE BECAUSE IT HAS A VARIETY OF |
| 08:43AM | 19 | PRETTY PEJORATIVE COMMENTS ABOUT MS. HOLMES, ABOUT THERANOS, |
| 08:43AM | 20 | WHICH I THINK ARE CERTAINLY UNFAIRLY PREJUDICIAL, AND THE |
| 08:43AM | 21 | PROBATIVE VALUE PERHAPS IS NOT ZERO, BUT IT'S PRETTY LOW, AND |
| 08:43AM | 22 | IT'S LOW BECAUSE THIS DOCUMENT WAS NEVER COMMUNICATED TO |
| 08:43AM | 23 | THERANOS OR TO MS. HOLMES. |
| 08:43AM | 24 | THERE WAS A PHONE CALL BETWEEN DR. WEBER AND MS. HOLMES |
| 08:43AM | 25 | WHERE HE CONVEYED THAT PFIZER DID NOT -- WASN'T INTERESTED AT |

08:43AM  1    THAT POINT IN DOING FURTHER BUSINESS, AND OF COURSE THAT'S FAIR

08:43AM  2    GAME.

08:43AM  3        I ALSO, AS I THINK WE DISCUSSED YESTERDAY, YOUR HONOR,

08:44AM  4    DON'T HAVE ANY OBJECTION TO DR. WEBER TESTIFYING THAT HE WAS

08:44AM  5    ASKED TO PREPARE AND CONDUCT A REVIEW, THAT HE CONDUCTED THE

08:44AM  6    REVIEW, THAT HE CONCLUDED THAT THERE WAS NO BUSINESS BASIS FOR

08:44AM  7    THERANOS AND PFIZER TO GO FORWARD, THAT HE CONVEYED THAT

08:44AM  8    RECOMMENDATION TO HIS SUPERIORS AT PFIZER, THAT HE THEN TALKED

08:44AM  9    TO MS. HOLMES ABOUT THAT CONCLUSION.  THAT'S ALL, AS FAR AS I'M

08:44AM  10   CONCERNED, THAT'S ALL FAIR GAME.

08:44AM  11       BUT TO ALLOW IN THIS QUITE PREJUDICIAL INTERNAL REPORT

08:44AM  12   THAT MS. HOLMES, NEITHER MS. HOLMES NOR ANYONE ELSE AT THERANOS

08:44AM  13   EVER SAW UNTIL THIS CASE BEGAN JUST SEEMS PROFOUNDLY UNFAIR TO

08:44AM  14   ME, AND SO THAT'S WHY WE'VE ASKED TO EXCLUDE IT.

08:44AM  15            THE COURT:  MR. LEACH?

08:44AM  16            MR. LEACH:  YOUR HONOR, THE DEFENDANT MADE SWEEPING

08:44AM  17   CLAIMS PURPORTING TO SPEAK ABOUT WHAT PFIZER THOUGHT.  SHE

08:45AM  18   CLAIMED TO HAVE THAT KNOWLEDGE.  SHE CLAIMED TO KNOW PFIZER

08:45AM  19   VALIDATED THIS TECHNOLOGY.

08:45AM  20       PFIZER DID NOT VALIDATE THIS TECHNOLOGY.  MR. WEBER LOOKED

08:45AM  21   AT IT AND IT DETAILED WHAT PFIZER THOUGHT.

08:45AM  22       THIS IS POWERFUL EVIDENCE OF THE FALSITY OF THE

08:45AM  23   DEFENDANT'S STATEMENTS.  THE WHY HERE IS VERY IMPORTANT BECAUSE

08:45AM  24   I EXPECT PART OF THE CROSS TO BE, WELL, PFIZER LEFT OPEN THE

08:45AM  25   POSSIBILITY OF RECONNECTING IN SIX MONTHS, THERE WAS -- THE

08:45AM 1    DEFENSE HAS MARKED SOME EXHIBITS AFTER THIS REPORT WHERE

08:45AM 2    MS. HOLMES IS PROPOSING NEW BUSINESS TO PFIZER.

08:45AM 3        AND THIS DOCUMENT SPEAKS TO THE CONVICTION OF THEIR

08:45AM 4    FEELINGS AT THE TIME AND THE DEFINITIVENESS OF THE REVIEW THAT

08:45AM 5    THEY DID.

08:45AM 6        SHE PURPORTED TO SPEAK ABOUT WHAT THEY THOUGHT, AND IT

08:45AM 7    JUST SEEMS THAT THERE'S NO 403 ISSUE WITH THIS WITNESS TELLING

08:46AM 8    THIS JURY WHAT HE THOUGHT AT THE TIME ABOUT WHAT HE WAS ASKED

08:46AM 9    TO REVIEW.

08:46AM 10       AND I ALSO DON'T UNDERSTAND THE DISTINCTION BETWEEN ASKING

08:46AM 11   THIS MAN, WHAT DID YOU DO, WHAT DID YOU CONCLUDE, WHY DID YOU

08:46AM 12   COME TO THAT CONCLUSION, BUT NOT ADMITTING THE BUSINESS RECORD

08:46AM 13   THAT HE PREPARED MEMORIALIZING ALL OF THAT.

08:46AM 14       SO THIS DEFENDANT PURPORTED TO SPEAK FOR PFIZER, PURPORTED

08:46AM 15   TO COMMUNICATE THAT PFIZER VALIDATED THIS TECHNOLOGY.

08:46AM 16       THIS IS EVIDENCE THAT THOSE STATEMENTS ARE FALSE.

08:46AM 17   CROSS-EXAMINATION IS THE CURE FOR THIS, YOU KNOW, WHAT DID YOU

08:46AM 18   DO?  WHAT DID YOU MEAN?  WHAT WERE THE LIMITS OF YOUR REVIEW?

08:46AM 19       BUT I DON'T THINK THERE'S ANY REASON TO SANITIZE THE

08:46AM 20   CONCLUSIONS THAT THIS PERCIPIENT WITNESS CAME TO.

08:46AM 21           THE COURT:  WELL, THAT WAS OUR DISCUSSION YESTERDAY,

08:46AM 22   I THINK.  I HAD RAISED -- I THINK I SHARED WITH YOU, AT LEAST

08:46AM 23   MY RECOGNITION, OF SOME OF THE WORDS THAT WERE PEJORATIVE,

08:47AM 24   PERHAPS HIS OPINION, AND WHETHER OR NOT THOSE SHOULD BE

08:47AM 25   REDACTED OR NOT, OR YOUR COMMENTS ON IT.

08:47AM 1      I THINK, MR. CLINE, I THINK THAT'S WHAT YOU FOUND MOST

08:47AM 2    OFFENSIVE.

08:47AM 3           MR. CLINE:  WORDS LIKE "EVASIVE," "DEFLECTIVE,"

08:47AM 4    "UNFOUNDED," THERE'S REALLY A WHOLE SERIES OF REALLY PEJORATIVE

08:47AM 5    TERMS THAT HE USED, AND IT'S UNDERSTANDABLE THAT HE WOULD USE

08:47AM 6    THEM IN AN INTERNAL PFIZER DOCUMENT.  HE'S COMMUNICATING

08:47AM 7    CANDIDLY WITH HIS COLLEAGUES.

08:47AM 8       BUT NONE OF THAT WAS COMMUNICATED TO MS. HOLMES AND THAT'S

08:47AM 9    THE PROBLEM.

08:47AM 10      WHAT THE JURY WILL END UP WITH IS THIS EXTREMELY

08:47AM 11   PEJORATIVE DOCUMENT AND, YES, WE CAN ALWAYS ARGUE IT DIDN'T GO

08:47AM 12   TO MS. HOLMES.  BUT THEY'RE GOING TO HAVE IT THERE AND IT'S

08:47AM 13   GOING TO HAVE A REAL POWERFUL IMPACT.

08:47AM 14      YOU KNOW, I WAS -- WHAT MS. HOLMES ALLEGEDLY SAID FALSELY

08:48AM 15   WAS THAT PFIZER HAD COMPREHENSIVELY VALIDATED THE THERANOS

08:48AM 16   TECHNOLOGY.  THAT'S THE FALSITY.

08:48AM 17      I DON'T HAVE ANY PROBLEM WITH DR. WEBER TESTIFYING THAT HE

08:48AM 18   DID NOT COMPREHENSIVELY VALIDATE THE TECHNOLOGY AND, AS FAR AS

08:48AM 19   HE KNOWS, NO ONE AT PFIZER DID EITHER.

08:48AM 20      THAT'S FINE.  AND IF I WERE TO ATTACK HIM FOR STATING

08:48AM 21   THAT, THEN I SUPPOSE I MIGHT OPEN THE DOOR SOMEWHERE.  P.

08:48AM 22      BUT THIS REPORT IS SO DAMAGING IN ITS TONE AND IN SOME OF

08:48AM 23   THE TERMS THAT IT USES THAT I JUST DON'T THINK THAT IT SHOULD

08:48AM 24   COME IN.

08:48AM 25           MR. LEACH:  YOUR HONOR, RESPECTFULLY, I THINK THAT

08:48AM 1   PROVES THE POWER OF THIS DOCUMENT AND WHY 403 CAN'T POSSIBLY

08:48AM 2   KEEP IT OUT.

08:48AM 3        THE SALIENT ISSUE IS, DID PFIZER VALIDATE THERANOS'S

08:48AM 4   TECHNOLOGY?

08:48AM 5        THE ANSWER IN THIS DOCUMENT IS A DEFINITIVE ABSOLUTELY

08:48AM 6   NOT.

08:48AM 7        AND THE DEFENSE HAS TRIED TO SUGGEST WITH OTHER PHARMA

08:49AM 8   COMPANIES, WELL, THEY PAID FOR IT, THAT'S KIND OF VALIDATION,

08:49AM 9   WELL, THERANOS COMPLETED THIS STUDY, THAT'S KIND OF VALIDATION.

08:49AM 10        THIS IS THE PROOF THAT PFIZER DID NOT VALIDATE THIS, AND

08:49AM 11   THE FORCEFULNESS WITH WHICH THEY DID IT, YOU KNOW, IS RELEVANT.

08:49AM 12        AND YES, THAT BOTTOM LINE TONE IS NOT COMMUNICATED TO

08:49AM 13   THERANOS, BUT THAT SHOULD NOT COME AS A SURPRISE TO ANYBODY.  I

08:49AM 14   DON'T THINK PEOPLE IN BUSINESS SAY THINGS LIKE THIS WHEN

08:49AM 15   THEY'RE TRYING TO KEEP OPEN SOME -- YOU KNOW, WHEN THEY'RE

08:49AM 16   TRYING TO KEEP OPEN POSSIBILITIES.

08:49AM 17        SO I JUST THINK THAT EVERYTHING THAT MR. CLINE JUST SAID

08:49AM 18   IS PROOF OF THE PROBATIVE VALUE OF THIS.

08:49AM 19        WE'RE NOT TALKING ABOUT SOME STRAY ISSUES, SOMETHING, YOU

08:49AM 20   KNOW, THAT 403 WOULD TYPICALLY THINK ABOUT, YOU KNOW, NOT

08:49AM 21   RELATING TO AN ELEMENT OF THE OFFENSE.

08:49AM 22        THIS IS THE CORE OF ONE OF HER MAIN CLAIMS AND I THINK THE

08:49AM 23   FORCEFULNESS WITH WHICH PFIZER IS COMING TO ITS CONCLUSIONS IS

08:49AM 24   POWERFUL PROOF THAT THEY DIDN'T VALIDATE THIS AND SOMETHING

08:50AM 25   THAT WE SHOULD BE PERMITTED TO DEMONSTRATE.

08:50AM  1          THE COURT:  WELL, I THINK I TALKED YESTERDAY ABOUT

08:50AM  2   THE GENESIS OF THE REPORT, THAT IS, I THINK FROM -- MS. HOLMES

08:50AM  3   REACHED OUT, THERE WAS AN INTERNAL THEN WORK DONE, ANALYSIS

08:50AM  4   DONE OF THE REPORT FROM MS. HOLMES FOR HER COMPANY, AND THEN

08:50AM  5   THIS IS THE WORK PRODUCT.

08:50AM  6          MR. CLINE:  WHAT HAPPENED, YOUR HONOR, IS THERANOS

08:50AM  7   DID A BUNCH OF WORK FOR PFIZER, SUBMITTED A REPORT.

08:50AM  8          PFIZER THEN ASSIGNED DR. WEBER TO EVALUATE IT.  HE DID.

08:50AM  9          THAT EVALUATION IS THIS INTERNAL REPORT, AND HE THEN

08:50AM  10  COMMUNICATED WITH MS. HOLMES.

08:50AM  11         IF THE FACT THAT HE DID NOT -- "HE" DR. WEBER -- DID NOT

08:50AM  12  COMPREHENSIVELY VALIDATE THERANOS'S TECHNOLOGY, I DOUBT VERY

08:50AM  13  MUCH THAT I'M GOING TO CHALLENGE THAT ON CROSS.

08:51AM  14         WHETHER OTHERS AT PFIZER LATER TOOK A DIFFERENT VIEW IS

08:51AM  15  SOMETHING THAT HE KNOWS NOTHING ABOUT, AND THAT'S NOT GOING TO

08:51AM  16  BE THE SUBJECT OF MY CROSS.

08:51AM  17         WHAT IS TROUBLING HERE IS, FIRST OF ALL, THERE'S THE 702

08:51AM  18  ISSUE BECAUSE THERE'S A LOT OF SORT OF DETAILED SCIENCE

08:51AM  19  DOCUMENTS.

08:51AM  20         AND THEN THERE'S THE 403 ISSUE, WHICH REALLY HAS NOTHING

08:51AM  21  TO DO WITH WHETHER PFIZER COMPREHENSIVELY VALIDATED THE

08:51AM  22  TECHNOLOGY.  IT'S MORE ABOUT THEY WERE EVASIVE, THEY WERE

08:51AM  23  DEFLECTIVE AND THEY WERE JUST PEJORATIVE KIND OF STUFF THAT

08:51AM  24  GOES TO MS. HOLMES'S HONESTY BASICALLY.

08:51AM  25         AND I DON'T SEE HOW THAT CAN COME IN.

4117

08:51AM 1    LET ME DRAW A CONTRAST HERE TO SHOW THE DISTINCTION THAT

08:51AM 2    I'M DRAWING.

08:51AM 3    DR. SUNG TESTIFIED, AS YOU RECALL, ABOUT THE CELGENE

08:51AM 4    INTERACTION, THE INTERACTION BETWEEN CELGENE AND THERANOS.  AND

08:51AM 5    SHE PRESENTED IN HER TESTIMONY A POWERPOINT THAT SHE AND ONE OF

08:52AM 6    HER COLLEAGUES HAD PREPARED THAT SORT OF ANALYZED THERANOS'S

08:52AM 7    PERFORMANCE VERSUS THE PERFORMANCE OF ANOTHER PLATFORM.

08:52AM 8    WE DIDN'T HAVE ANY OBJECTION TO THAT.  IT CAME IN AND WE

08:52AM 9    DISCUSSED IT.  THE REASON IS THAT POWERPOINT GOT CONVEYED TO

08:52AM 10   MS. HOLMES.  THERE'S NO DISPUTE ABOUT THAT.

08:52AM 11   IF THE REPORT THAT WE HAVE BEEN TALKING ABOUT NOW HAD BEEN

08:52AM 12   CONVEYED TO MS. HOLMES, WE WOULD HAVE A DIFFERENT STORY HERE.

08:52AM 13   BUT IT WASN'T.  IT WASN'T.  THIS WAS SOMETHING THAT SAT IN

08:52AM 14   THE BOWELS OF PFIZER UNDISCLOSED FOR YEARS AND IT'S NOW

08:52AM 15   SURFACING JUST, IN MY VIEW, TO TAINT THIS CASE.  IT SHOULDN'T

08:52AM 16   BE ALLOWED.

08:52AM 17        THE COURT:  MR. LEACH, WHAT ABOUT THAT, THE

08:52AM 18   DISTINCTION BETWEEN DR. SUNG'S TESTIMONY AND WHAT THEY DID WITH

08:52AM 19   THE TECHNOLOGY AND THEIR OPINION ON IT?

08:52AM 20        MR. LEACH:  I NOTED WHAT THEY DID WITH DR. SUNG,

08:53AM 21   YOUR HONOR.

08:53AM 22   BUT I DON'T THINK IT MATTERS IN ANY WAY.  ONE OF THE

08:53AM 23   THINGS THAT THE GOVERNMENT HAS TO PROVE IS THE FALSITY OF THE

08:53AM 24   STATEMENT, LET ALONE THE INTENT OF MS. HOLMES AND THE KNOWLEDGE

08:53AM 25   OF THE FALSITY.

08:53AM  1      SO, YES, THEY CHOSE THAT TACTIC WITH DR. SUNG, BUT I DON'T

08:53AM  2   THINK IT'S DISPOSITIVE OR ILLUMINATIVE OF WHETHER THIS

08:53AM  3   PARTICULAR DOCUMENT IS ADMISSIBLE.

08:53AM  4      HE HAD A CONVERSATION WITH ELIZABETH HOLMES AND I THINK

08:53AM  5   IT'S COMPLETELY FAIR GAME TO ASK, DID SHE ANSWER YOUR

08:53AM  6   QUESTIONS?  WAS SHE RESPONSIVE?  WERE YOU PERSUADED BY THAT?

08:53AM  7      AND, YOU KNOW, THE WITNESS -- I DON'T THINK THERE'S A

08:53AM  8   MEANINGFUL DIFFERENCE BETWEEN I WASN'T SATISFIED WITH IT OR I

08:53AM  9   FOUND IT WAS UNRESPONSIVE OR, YOU KNOW, SHE WAS EVADING THE

08:53AM 10   QUESTION OR AVOIDING THE QUESTION.

08:53AM 11      I MEAN, THOSE ARE QUESTIONS THAT WE PUT TO WITNESSES ALL

08:53AM 12   OF THE TIME IN THEIR INTERACTIONS WITH OTHER WITNESSES.

08:53AM 13      AND THEY -- PART OF THE DEFENSE HERE IS THE PHARMA

08:53AM 14   COMPANIES DID VALIDATE THERANOS'S TECHNOLOGY OR THEY DID DO

08:54AM 15   WORK WITH SOME OF THE PHARMA COMPANIES, AND THIS IS THE PROOF

08:54AM 16   THAT IT WAS NOT VALIDATION.

08:54AM 17      AND SO SOME OF THE MATTERS IN THIS MEMO ARE COMMUNICATED

08:54AM 18   TO MS. HOLMES, THE BOTTOM LINE THAT WE DON'T WANT TO CONTINUE

08:54AM 19   BUSINESS.

08:54AM 20      I GRANT MR. CLINE'S POINT BUT NOT EVERY WORD IS USED

08:54AM 21   THERE.

08:54AM 22      BUT THIS IS EVIDENCE OF THE FALSITY OF THE STATEMENT, AND

08:54AM 23   THE FALSITY OF THE STATEMENT IS VERY MUCH AT ISSUE IN THIS

08:54AM 24   CASE.

08:54AM 25      THE PREJUDICE HERE, YOU KNOW, THE TONE THAT HE'S TAKING,

4119

| | | |
|---|---|---|
| 08:54AM | 1 | THE HARSH WORDS ARE THINGS THAT CAN BE CONVEYED THROUGH |
| 08:54AM | 2 | CROSS-EXAMINATION THAT THIS DOCUMENT NEVER WENT TO HER. |
| 08:54AM | 3 | THERE'S NO RISK OF UNFAIR PREJUDICE FROM THAT. |
| 08:54AM | 4 | SO I JUST DON'T SEE HOW 403 CAN KEEP THIS OUT, AND THIS IS |
| 08:54AM | 5 | VERY PROBATIVE EVIDENCE OF FALSITY OF THE STATEMENT. |
| 08:54AM | 6 | THE COURT:  SO HE HAD A CONVERSATION WITH MS. HOLMES |
| 08:54AM | 7 | PRIOR TO THIS REPORT BEING DRAFTED.  THIS REPORT -- |
| 08:54AM | 8 | MR. LEACH:  YES. |
| 08:55AM | 9 | THE COURT:  THIS REPORT REFLECTS HIS INVESTIGATION, |
| 08:55AM | 10 | HIS WORK, AS WELL AS HIS THOUGHTS SUBSEQUENT TO HIS |
| 08:55AM | 11 | CONVERSATION WITH MS. HOLMES? |
| 08:55AM | 12 | MR. LEACH:  YES. |
| 08:55AM | 13 | MR. CLINE:  I'M SORRY, YOUR HONOR.  I JUST WANTED TO |
| 08:55AM | 14 | SAY HE HAD A ONE-HOUR CONFERENCE CALL WITH MS. HOLMES AND |
| 08:55AM | 15 | VARIOUS OTHER PEOPLE FROM THERANOS.  MS. HOLMES APPARENTLY DID |
| 08:55AM | 16 | THE TALKING ACCORDING TO HIM.  BUT I THINK THAT WAS THE EXTENT |
| 08:55AM | 17 | OF HIS CONTACT WITH MS. HOLMES. |
| 08:55AM | 18 | THE COURT:  I SEE.  SO THAT WAS THAT ONE PHONE CALL? |
| 08:55AM | 19 | MR. LEACH:  THERE WAS ONE PHONE CALL WITH MS. HOLMES |
| 08:55AM | 20 | AND HER TEAM.  I ANTICIPATE THE WITNESS WILL TESTIFY THAT |
| 08:55AM | 21 | MS. HOLMES DID VIRTUALLY ALL OF THE TALKING DURING THE CALL. |
| 08:55AM | 22 | THE COURT:  AND THEN FOLLOWING THAT PHONE CALL AND |
| 08:55AM | 23 | HIS RESEARCH, HE THEN DRAFTED THE REPORT THAT WE'RE TALKING |
| 08:55AM | 24 | ABOUT? |
| 08:55AM | 25 | MR. LEACH:  YES. |

4120

08:55AM 1        THE COURT:  AND THE REPORT IN ESSENCE IS THIS THE

08:55AM 2    DOCUMENT THAT SAYS PFIZER IS NOT INTERESTED?

08:55AM 3        MR. LEACH:  YES.

08:55AM 4        THE COURT:  AND SOMEHOW THAT WAS CONVEYED TO

08:55AM 5    MS. HOLMES OR HER COMPANY?

08:55AM 6        MR. LEACH:  YES.  AND THERE'S THE -- THE REPORT

08:56AM 7    ITSELF IS DATED DECEMBER 31ST, 2008.  THERE ARE RECOMMENDATIONS

08:56AM 8    IN IT TO THE EFFECT OF THERANOS DOES NOT HAVE ANY DIAGNOSTIC OR

08:56AM 9    CLINICAL INTEREST TO PFIZER.  IT'S RECOMMENDED THAT NO FURTHER

08:56AM 10   INVESTMENT BE MADE.

08:56AM 11       AND THEN AT THE END OF JANUARY THERE'S A CALL BETWEEN THIS

08:56AM 12   WITNESS AND MS. HOLMES WHERE HE CONVEYS THE BOTTOM LINE

08:56AM 13   CONCLUSION THAT WE'RE NOT GOING TO GO FORWARD, THAT WE DON'T

08:56AM 14   HAVE AN INTEREST, YOU KNOW, YOU CAN CALL US IN SIX MONTHS IF

08:56AM 15   YOU WANT.

08:56AM 16       BUT THOSE BOTTOM LINE CONCLUSIONS ARE COMMUNICATED TO

08:56AM 17   MS. HOLMES SUBSEQUENT TO HIS REVIEW, WHICH SHE KNEW HE WAS

08:56AM 18   UNDERTAKING, OR PFIZER WAS UNDERTAKING.

08:56AM 19       THE COURT:  AND THAT PHONE CALL, WHEN THAT

08:56AM 20   INFORMATION WAS GIVEN TO MS. HOLMES, WAS THAT THE BOARD CALL,

08:56AM 21   THIS CALL THAT YOU WERE TALKING ABOUT, MR. CLINE?

08:56AM 22       MR. CLINE:  NO.  HERE'S THE SEQUENCE, YOUR HONOR.

08:56AM 23   IT GETS A LITTLE CONVOLUTED.

08:56AM 24       DR. WEBER'S FIRST CONTACT WITH THERANOS IS NOVEMBER 2008,

08:56AM 25   THIS IS WHEN HE'S ASKED TO CONDUCT THIS REVIEW.

4121

08:56AM 1      SHORTLY AFTER THAT, I THINK ON THE 13TH, HE HAS A CALL

08:57AM 2  WITH THERANOS, INCLUDING MS. HOLMES, WHERE, ACCORDING TO HIM,

08:57AM 3  MS. HOLMES DOES ALL OF THE TALKING.

08:57AM 4      HE GETS OTHER MATERIALS AND HE PREPARES THIS INTERNAL

08:57AM 5  REPORT WHICH IS NOT COMMUNICATED TO THERANOS.  IT'S DATED, AS

08:57AM 6  MR. LEACH SAID, I THINK DECEMBER 30TH OR 31ST, 2008.

08:57AM 7      AT THE END OF JANUARY, LIKE JANUARY 30TH OR SO, 2009, HE

08:57AM 8  HAS A PHONE CALL WITH MS. HOLMES WHERE HE CONVEYS, AS MR. LEACH

08:57AM 9  SAYS, SORT OF THE TOP LINE CONCLUSION.

08:57AM 10      TO BE CLEAR, WE HAVE NO PROBLEM AT ALL IN HIM DESCRIBING

08:57AM 11  THAT PHONE CALL IN AS MUCH DETAIL AS HE WANTS.  THERE'S AN

08:57AM 12  EMAIL IN WHICH HE SUMMARIZES IT.  ALL OF THAT IS FINE.

08:57AM 13      HE CAN ALSO TESTIFY ABOUT THE PHONE CALL THAT HE HAD WITH

08:57AM 14  MS. HOLMES BEFORE HE PREPARED THE REPORT.

08:57AM 15      BUT THE REPORT ITSELF WITH ITS PEJORATIVE

08:57AM 16  CHARACTERIZATIONS IS UNFAIRLY PREJUDICIAL AND SHOULD NOT COME

08:57AM 17  IN.

08:57AM 18      I WANT TO ADD ONE OTHER THING.  I AM NOT GOING TO SUGGEST

08:58AM 19  FOR A SECOND -- AND I DON'T THINK ANYBODY ON OUR SIDE WILL

08:58AM 20  SUGGEST -- THAT DR. WEBER VALIDATED THE THERANOS TECHNOLOGY.

08:58AM 21  IT IS PERFECTLY CLEAR THAT DR. WEBER DIDN'T LIKE THERANOS'S

08:58AM 22  TECHNOLOGY.

08:58AM 23      WHETHER OTHERS AT PFIZER AT SOME LATER POINT OR, FOR THAT

08:58AM 24  MATTER, AT AN EARLIER POINT HAD A DIFFERENT VIEW IS NOT

08:58AM 25  SOMETHING THAT HE CAN TESTIFY ABOUT.  HE WAS INVOLVED IN THIS

| | | |
|---|---|---|
| 08:58AM | 1 | FOR ABOUT THREE MONTHS, NOVEMBER, DECEMBER, JANUARY, THERE'S AN |
| 08:58AM | 2 | EMAIL IN FEBRUARY, JUST A STRAY EMAIL.  BUT BASICALLY HE HAD |
| 08:58AM | 3 | ABOUT A THREE MONTH ENGAGEMENT IN A MULTIYEAR RELATIONSHIP. |
| 08:58AM | 4 | HE DID NOT COMPREHENSIVELY VALIDATE THE THERANOS |
| 08:58AM | 5 | TECHNOLOGY.  THERE'S NO QUESTION ABOUT THAT, AND I'M NOT GOING |
| 08:58AM | 6 | TO FOR A SECOND SUGGEST OTHERWISE. |
| 08:58AM | 7 | BUT TO ALLOW IN THIS INTERNAL UNDISCLOSED PEJORATIVE |
| 08:58AM | 8 | ASSESSMENT, AGAIN, I THINK IS UNFAIRLY PREJUDICIAL. |
| 08:58AM | 9 | THE COURT:  WELL, COULDN'T MR. LEACH IN HIS DIRECT |
| 08:58AM | 10 | EXAMINATION GO LINE BY LINE, IF HE WANTED TO, WITH THIS REPORT |
| 08:59AM | 11 | AND ASK THE WITNESS HIS THOUGHTS?  WOULDN'T HE BE ABLE TO DO |
| 08:59AM | 12 | THAT? |
| 08:59AM | 13 | MR. CLINE:  UP TO A POINT, AND IT WOULD PROBABLY BE |
| 08:59AM | 14 | POSSIBLE TO REDACT THIS REPORT OR TO HAVE THAT TYPE OF |
| 08:59AM | 15 | TESTIMONY. |
| 08:59AM | 16 | WHAT I DON'T THINK HE SHOULD BE PERMITTED TO DO IS HAVE |
| 08:59AM | 17 | DR. WEBER TESTIFY THAT MS. HOLMES WAS EVASIVE OR DEFLECTIVE.  I |
| 08:59AM | 18 | MEAN, THAT'S IN ESSENCE A COMMENT ON HER CREDIBILITY. |
| 08:59AM | 19 | THE COURT:  NO.  I THINK I CAPTURE THAT. |
| 08:59AM | 20 | BUT IF MR. LEACH WERE TO POSE, WELL, YOU HAD THIS |
| 08:59AM | 21 | CONVERSATION, YOU PUT THIS FORWARD, WHAT WAS HER RESPONSE? |
| 08:59AM | 22 | HE'LL SAY WHATEVER IT WAS. |
| 08:59AM | 23 | AND THEN MR. LEACH, IS HE THEN ABLE TO ASK, WELL, HOW DID |
| 08:59AM | 24 | YOU FIND HER RESPONSE? |
| 08:59AM | 25 | MR. CLINE:  AND HE CAN SAY, I FOUND THE RESPONSE |

| | | |
|---|---|---|
| 08:59AM | 1 | UNSATISFACTORY.  IT DIDN'T ANSWER MY QUESTION.  WHAT |
| 08:59AM | 2 | HAPPENED -- |
| 08:59AM | 3 | THE COURT:  COULD HE SAY, I FOUND HER EVASIVE? |
| 08:59AM | 4 | MR. CLINE:  I DON'T THINK HE COULD, BECAUSE AGAIN, |
| 09:00AM | 5 | THEN HE'S COMMENTING ON HER CREDIBILITY AND I DON'T THINK HE |
| 09:00AM | 6 | CAN DO THAT. |
| 09:00AM | 7 | WHAT HE CAN -- WHAT HAPPENED AFTER THIS PHONE CALL, THIS |
| 09:00AM | 8 | WAS SORT OF AN INTRODUCTORY PHONE CALL.  THIS WAS ONE WEEK |
| 09:00AM | 9 | AFTER DR. WEBER GOT INVOLVED. |
| 09:00AM | 10 | THEN THERE WAS A SERIES OF WRITTEN QUESTIONS THAT HE PUT |
| 09:00AM | 11 | TO THERANOS. |
| 09:00AM | 12 | THERANOS RESPONDED, NOT MS. HOLMES, SOMEONE ELSE AT |
| 09:00AM | 13 | THERANOS RESPONDED TO THESE QUESTIONS. |
| 09:00AM | 14 | THAT'S A DOCUMENT, AND THAT DOCUMENT CAN COME IN, AND HE |
| 09:00AM | 15 | CAN SAY, I DIDN'T FIND THESE ANSWERS TO BE SATISFACTORY. |
| 09:00AM | 16 | I DON'T HAVE, AGAIN, ANY PROBLEM WITH HIS SORT OF BOTTOM |
| 09:00AM | 17 | LINE CONCLUSION THAT HE WAS NOT SATISFIED WITH -- HE CONCLUDED |
| 09:00AM | 18 | THAT THERANOS AND PFIZER DID NOT HAVE ANY BASIS FOR A BUSINESS |
| 09:00AM | 19 | RELATIONSHIP.  THAT CLEARLY IS HIS CONCLUSION. |
| 09:00AM | 20 | THE COURT:  IT SOUNDS LIKE WHAT YOU'RE CONCERNED |
| 09:00AM | 21 | ABOUT, MR. CLINE, IS HIM USING THESE TERMS. |
| 09:00AM | 22 | MR. CLINE:  I'M CONCERNED, REALLY, ABOUT TWO MAIN |
| 09:00AM | 23 | THINGS.  ONE IS HIM USING THESE TERMS, AND IN PARTICULAR HAVING |
| 09:01AM | 24 | THIS DOCUMENT COME IN SO IT'S NOT JUST A BIT OF TESTIMONY THAT |
| 09:01AM | 25 | PASSES AND I'VE CROSS-EXAMINED. |

09:01AM   1          THIS IS A DOCUMENT THAT IS GOING TO BE IN FRONT OF THE

09:01AM   2    JURY WHEN IT DELIBERATES, AND CHARACTERIZING MS. HOLMES AS

09:01AM   3    EVASIVE AND DEFLECTIVE AND A SERIES OF OTHER PEJORATIVE --

09:01AM   4          THE COURT:  WELL, THAT'S HIS OPINION.

09:01AM   5      IS THAT PROPER OPINION, MR. LEACH?  WHY ISN'T THAT COMMENT

09:01AM   6    ON HER CHARACTER?

09:01AM   7          MR. LEACH:  THESE ARE PERCIPIENT OBSERVATIONS OF A

09:01AM   8    WITNESS.  I THINK ALL OF THE TIME -- FIRST OF ALL, YOUR HONOR,

09:01AM   9    THIS IS A FRAUD CASE AND THE FACT THAT THE DEFENDANT IS BEING

09:01AM   10   MISLEADING IN THIS INTERACTION, YOU KNOW, ISN'T OUT OF PLACE

09:01AM   11   HERE.

09:01AM   12     BUT I THINK WE ASK WITNESSES ALL OF THE TIME, DID SOMEBODY

09:01AM   13   ANSWER THAT QUESTION?

09:01AM   14     NO.

09:01AM   15     DID YOU THINK THEY WERE BEING EVASIVE WITH YOU?

09:01AM   16     YES.

09:01AM   17     THESE ARE THE CONCLUSIONS HE REACHED IN THE MOMENT.  THIS

09:01AM   18   IS WITHIN 701, NOT 702.

09:01AM   19     AND I DON'T UNDERSTAND WHY WE NEED TO SANITIZE THE WORDS

09:01AM   20   IF WE CAN SAY HE WASN'T SATISFIED, AS OPPOSED TO THE CONCLUSION

09:02AM   21   THAT HE ACTUALLY REACHED.

09:02AM   22     I HAVE SOME OTHER COMMENTS WITH RESPECT TO THE CHRONOLOGY,

09:02AM   23   YOUR HONOR.

09:02AM   24     IT'S CORRECT THAT MR. WEBER COMES ON THE SCENE IN 2008 AND

09:02AM   25   HE REVIEWS THE WORK THAT HAPPENS BEFORE THEN.

| | | |
|---|---|---|
| 09:02AM | 1 | BUT THERE IS ZERO WORK BETWEEN PFIZER AND THERANOS AFTER |
| 09:02AM | 2 | HIM, AND MR. WEBER IS AT THE COMPANY DURING THIS TIME PERIOD. |
| 09:02AM | 3 | SO, YOU KNOW, MR. WEBER WAS THE GUY WHO WAS TASKED WITH |
| 09:02AM | 4 | THIS, WHO WOULD HAVE BEEN CONSULTED IF THERE WAS SOME GREATER |
| 09:02AM | 5 | RELATIONSHIP DOWN THE LINE. |
| 09:02AM | 6 | THE QUESTIONS ARE ACTUALLY SENT BEFORE THE MEETING WITH |
| 09:02AM | 7 | MS. HOLMES, AND I JUST -- SHE SENT A REPORT TO PFIZER, SHE |
| 09:02AM | 8 | ASKED THEM TO REVIEW IT.  THIS IS THE MAN WHO REVIEWED IT.  HE |
| 09:02AM | 9 | SHOULD BE ALLOWED TO TESTIFY TO WHAT HE THOUGHT ABOUT IT. |
| 09:02AM | 10 | THE COURT:  YES, I GET THAT.  AND I CAME OUT HERE |
| 09:02AM | 11 | WITHOUT THE DOCUMENT IN MY HAND. |
| 09:02AM | 12 | WHAT EXHIBIT NUMBER IS IT AGAIN? |
| 09:02AM | 13 | MR. CLINE:  167. |
| 09:02AM | 14 | THE COURT:  THANK YOU.  WE'LL TRACK IT DOWN HERE, |
| 09:03AM | 15 | AND I WANT TO LOOK AT IT AGAIN DURING THE BREAK. |
| 09:03AM | 16 | I DO WANT TO ASK, I KNOW WE TALKED ABOUT THIS YESTERDAY, |
| 09:03AM | 17 | TOO -- |
| 09:03AM | 18 | DO YOU HAVE A COPY FOR ME, MR. CLINE?  THANK YOU.  THAT'S |
| 09:03AM | 19 | VERY KIND OF YOU. |
| 09:03AM | 20 | MR. CLINE:  I BELIEVE I DO. |
| 09:03AM | 21 | THE COURT:  WE WERE TALKING ABOUT SOME OF THE |
| 09:03AM | 22 | SCIENTIFIC TERMS AND WHETHER OR NOT THAT GETS INTO EITHER 702 |
| 09:03AM | 23 | TERRITORY, AND IT SOUNDS LIKE, MR. LEACH, I THINK YESTERDAY YOU |
| 09:03AM | 24 | SAID YOU NEED NOT GO INTO THAT, YOU DON'T INTEND TO. |
| 09:03AM | 25 | MR. LEACH:  CORRECT, YOUR HONOR. |

4126

09:03AM  1          THE COURT:  AND HOW WOULD YOU HANDLE THAT, THEN,

09:03AM  2     WITH THIS EXHIBIT?

09:03AM  3          MR. LEACH:  I WOULD BE PREPARED TO REDACT THE

09:03AM  4     QUESTIONS, YOUR HONOR, MENTIONED.  I THINK IT STARTED AT

09:03AM  5     QUESTION 17 ON PAGE 5.  I DIDN'T INTEND TO ASK HIM QUESTIONS

09:03AM  6     ABOUT THOSE, AND IF WE'RE WORRIED ABOUT THAT GOING INTO THE

09:03AM  7     RECORD, WE'RE PREPARED TO REDACT THOSE.

09:03AM  8          THE COURT:  I THINK I MENTIONED SOME NUMBERS

09:03AM  9     YESTERDAY THAT I HAD LOOKED AT.

09:04AM  10          (PAUSE IN PROCEEDINGS.)

09:04AM  11          THE COURT:  ALL RIGHT.  ALL RIGHT.

09:04AM  12          WELL, THANK YOU FOR THE HELP.  I'M NOT GOING TO -- I'M

09:04AM  13     GOING TO LOOK AT THIS SOME MORE.  WE'RE GOING TO HAVE SOME TIME

09:04AM  14     TODAY TO LOOK AT THIS BEFORE WE CALL THE WITNESS.

09:04AM  15          ANYTHING ELSE IN CLOSING, MR. CLINE?

09:04AM  16          MR. LEACH:  NO, YOUR HONOR.  THANK YOU.

09:04AM  17          THE COURT:  GREAT.  THANKS VERY MUCH.  GREAT.  THANK

09:04AM  18     YOU.

09:04AM  19          ANYTHING ELSE BEFORE WE BRING OUR JURY IS IN?

09:04AM  20          MR. DOWNEY:  NOT FROM US, YOUR HONOR.

09:04AM  21          THE COURT:  WE'LL TAKE A BREAK ABOUT 11:00 A.M.

09:04AM  22     MR. DOWNEY, WILL THAT WORK?

09:04AM  23          MR. DOWNEY:  THAT'S FINE.

09:04AM  24          THE COURT:  ALL RIGHT.  THANK YOU.

09:04AM  25          (RECESS FROM 9:04 A.M. UNTIL 9:11 A.M.)

4127

| | | |
|---|---|---|
| 09:11AM | 1 | (JURY IN AT 9:11 A.M.) |
| 09:11AM | 2 | THE COURT:  ALL RIGHT.  THANK YOU.  GOOD MORNING. |
| 09:11AM | 3 | WE'RE BACK ON THE RECORD.  ALL COUNSEL ARE PRESENT. |
| 09:12AM | 4 | MS. HOLMES IS PRESENT.  OUR JURY IS PRESENT. |
| 09:12AM | 5 | WE'LL CALL OUR WITNESS IN IN JUST A MOMENT. |
| 09:12AM | 6 | BUT, LADIES AND GENTLEMEN, GOOD MORNING.  LET ME JUST ASK |
| 09:12AM | 7 | YOU AGAIN THAT QUESTION. |
| 09:12AM | 8 | DURING OUR BREAK, DID ANY OF YOU HAVE ANY OCCASION TO COME |
| 09:12AM | 9 | ACROSS ANY INFORMATION VIA MEDIA OR CONVERSATION WITH A LIVE |
| 09:12AM | 10 | PERSON OR DO ANY INVESTIGATION ABOUT ANYTHING ABOUT THIS CASE? |
| 09:12AM | 11 | IF SO, PLEASE RAISE YOUR HAND.  AND AGAIN, PLEASE KNOW |
| 09:12AM | 12 | THAT WE CAN TALK PRIVATELY ABOUT THAT IF THAT OCCURRED. |
| 09:12AM | 13 | I SEE NO HANDS.  THANK YOU VERY MUCH. |
| 09:12AM | 14 | WE'LL GO UNTIL 3:00 TODAY, LADIES AND GENTLEMEN.  AND THEN |
| 09:12AM | 15 | I'M HOPING THAT WE CAN GO UNTIL 4:00 ON FRIDAY. |
| 09:12AM | 16 | I SEE NO HANDS TO OBJECT TO THAT.  GREAT.  THANK YOU VERY |
| 09:12AM | 17 | MUCH.  THANK YOU. |
| 09:12AM | 18 | AND, MR. EDLIN, THANK YOU.  MAKE YOURSELF COMFORTABLE |
| 09:12AM | 19 | THERE.  IT LOOKS LIKE YOU'LL HAVE TO ADJUST THAT MICROPHONE |
| 09:13AM | 20 | SOMEHOW. |
| 09:13AM | 21 | THE WITNESS:  THANK YOU. |
| 09:13AM | 22 | THE COURT:  WHEN YOU ARE COMFORTABLE, WOULD YOU |
| 09:13AM | 23 | PLEASE STATE YOUR NAME AGAIN, PLEASE. |
| 09:13AM | 24 | AND THEN, MR. DOWNEY, YOU HAVE ADDITIONAL QUESTIONS I |
| 09:13AM | 25 | THINK. |

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4128

09:13AM  1              THE WITNESS:  DANIEL EDLIN.

09:13AM  2              THE COURT:  THANK YOU.  AND YOU'RE STILL UNDER OATH,

09:13AM  3      SIR.

09:13AM  4          **(GOVERNMENT'S WITNESS, DANIEL EDLIN, WAS PREVIOUSLY**

09:13AM  5      **SWORN.)**

09:13AM  6                      **CROSS-EXAMINATION (RESUMED)**

09:13AM  7      BY MR. DOWNEY:

09:13AM  8      Q.   GOOD MORNING, MR. EDLIN.

09:13AM  9      A.   GOOD MORNING.

09:13AM 10      Q.   I'D LIKE TO BEGIN TODAY BY ASKING YOU TO LOOK IN THE

09:13AM 11      NOTEBOOK THAT I GAVE YOU AT EXHIBIT 7694.

09:13AM 12           DO YOU RECALL YESTERDAY THAT WE WERE TALKING ABOUT THE

09:14AM 13      BURN STUDY WHICH THERANOS COLLABORATED WITH DR. CHUNG?

09:14AM 14      A.   YES.

09:14AM 15      Q.   WERE THE RESULTS OF THAT STUDY ULTIMATELY PUBLISHED?

09:14AM 16      A.   YES.

09:14AM 17      Q.   AND IS EXHIBIT 7694 A COPY OF THAT PUBLISHED STUDY?

09:14AM 18      A.   YES.

09:14AM 19              MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT

09:14AM 20      EXHIBIT 7694.

09:14AM 21              MR. BOSTIC:  NO OBJECTION.

09:14AM 22              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:14AM 23          (DEFENDANT'S EXHIBIT 7694 WAS RECEIVED IN EVIDENCE.)

09:14AM 24      BY MR. DOWNEY:

09:14AM 25      Q.   IF YOU LOOK AT THE FIRST PAGE OF THAT EXHIBIT, IS THAT A

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4129

09:14AM  1     SCIENTIFIC CHARACTERIZATION OF THE STUDY AND THE TITLE?

09:14AM  2     A.   YES.

09:14AM  3     Q.   AND IF YOU LOOK AT -- IF I COULD DIRECT YOUR ATTENTION TO

09:14AM  4     THE SEVENTH PAGE OF THE EXHIBIT, YOU'LL SEE STARTING IN THE

09:14AM  5     BOTTOM LEFT-HAND CORNER, THERE'S A SERIES OF ACKNOWLEDGEMENTS?

09:14AM  6     A.   YES.

09:14AM  7     Q.   AND DO YOU SEE THAT YOU AND MS. HOLMES AND DR. CHUNG WERE

09:15AM  8     ACKNOWLEDGED FOR YOUR ASSISTANCE IN CONNECTION WITH THIS STUDY?

09:15AM  9     A.   YES.

09:15AM  10    Q.   AND DO YOU RECALL THAT THIS STUDY TOOK PLACE OVER FOUR

09:15AM  11    YEARS?

09:15AM  12    A.   THAT SOUNDS ABOUT RIGHT.

09:15AM  13    Q.   AND IF YOU WOULD LOOK BACK AT THE FIRST PAGE, DO YOU SEE

09:15AM  14    THAT THE PUBLICATION OF THIS STUDY WAS IN EARLY 2017?

09:15AM  15    A.   YES.

09:15AM  16    Q.   AND THAT WAS ABOUT FIVE YEARS AFTER THE EXHIBIT THAT THE

09:15AM  17    GOVERNMENT WENT THROUGH WITH YOU WHERE YOU FORWARDED A

09:15AM  18    PRESENTATION TO DR. CHUNG.

09:15AM  19         DO YOU RECALL THAT?

09:15AM  20    A.   I DO.

09:15AM  21    Q.   LET ME ASK YOU TO LOOK BACK AT THAT EXHIBIT.  IT'S IN YOUR

09:15AM  22    GOVERNMENT BINDER AND IT'S EXHIBIT 551.

09:16AM  23         AND I THINK YOU TESTIFIED -- DO YOU HAVE THAT?

09:16AM  24    A.   I DO.

09:16AM  25    Q.   AND THIS IS ALREADY ADMITTED, YOUR HONOR.

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4130

09:16AM   1        I THINK YOU TESTIFIED THAT DR. CHUNG HAD BEEN INVOLVED

09:16AM   2   WITH THERANOS FOR A PERIOD BEFORE YOUR INITIAL CONTACT WITH

09:16AM   3   HIM; CORRECT?

09:16AM   4   A.   CORRECT.

09:16AM   5   Q.   I'D LIKE TO ASK YOU TO FLIP THROUGH, WITHOUT REALLY

09:16AM   6   STUDYING, PAGES 36 AND FORWARD IN THIS PRESENTATION UNTIL THE

09:16AM   7   END OF THE PRESENTATION ON PAGE 80.

09:17AM   8   A.   OKAY.

09:17AM   9   Q.   AND DO YOU SEE THAT MOST OF THIS PRESENTATION IS DATA THAT

09:17AM  10   THERANOS WAS PROVIDING TO DR. CHUNG ABOUT THE PERFORMANCE OF

09:17AM  11   ITS ASSAYS?

09:17AM  12   A.   YES.

09:17AM  13   Q.   AND DO YOU SEE ON PAGE 36 THAT THERE IS A LIST OF ABOUT

09:17AM  14   EIGHT ASSAYS AND SOME DATA ABOUT HOW THEY PERFORM?

09:17AM  15   A.   YES.

09:17AM  16   Q.   AND IS THE SIGNIFICANCE OF THIS DATA, IN LAYMAN'S TERMS,

09:17AM  17   THAT THEY SHOW A STRAIGHT LINE AND YOU LOOK FOR HOW CLOSE THE

09:17AM  18   DOTS ARE TO THAT LINE TO EVALUATE THE EFFECTIVENESS OF THE

09:17AM  19   ASSAY?

09:17AM  20   A.   I BELIEVE A STRAIGHT LINE WOULD BE A CORRELATION OF 1.0,

09:18AM  21   AND THAT CLOSER TO THAT STRAIGHT LINE, THE HIGHER THE

09:18AM  22   CORRELATION.

09:18AM  23   Q.   OKAY.  AND DO YOU SEE, IF YOU LOOK THROUGH THIS, THAT SOME

09:18AM  24   OF THE CORRELATIONS ARE QUITE GOOD, LIKE ON PAGE 36 IN THE

09:18AM  25   UPPER RIGHT-HAND CORNER, THE CORRELATION IS .999?

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 17, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Amy Mason Saharia*
AMY MASON SAHARIA

April 17, 2023