No. 22-10312

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ELIZABETH A. HOLMES

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 5:18-CR-00258
Hon. Edward J. Davila

---

## EXCERPTS OF RECORD
## VOL. XXVIII of LVII | ER-7741 to ER-8040

---

JOHN D. CLINE
LAW OFFICE OF JOHN D. CLINE
  600 Stewart Street
  Suite 400
  Seattle, WA 98101
  (360) 320-6435

KEVIN M. DOWNEY
LANCE A. WADE
AMY MASON SAHARIA
KATHERINE A. TREFZ
WILLIAMS & CONNOLLY LLP
  680 Maine Ave. S.W.
  Washington, D.C. 200024
  (202) 434-5000
  asaharia@wc.com

EDLIN CROSS BY MR. DOWNEY (RES.)                          4131

09:18AM   1    A.   YES.

09:18AM   2    Q.   BUT DO YOU SEE IN OTHER PLACES IN THE PRESENTATION THAT

09:18AM   3    THE CORRELATION IS LESS GOOD?

09:18AM   4        LET ME DIRECT YOUR ATTENTION, FOR EXAMPLE, TO SLIDE NUMBER

09:18AM   5    48, WHICH IS ON TRIAL PAGE -- TRIAL EXHIBIT PAGE 52.

09:18AM   6        AND DO YOU SEE HERE ON THE LEFT-HAND SIDE, FOR EXAMPLE,

09:18AM   7    WITH ASSAYS BASED ON URINE, THERE'S A SIGNIFICANT DROP IN THE

09:18AM   8    PERCENTAGE OF CORRELATION FROM .999 TO .966; CORRECT?

09:19AM   9    A.   I'M NOT SURE I WOULD CONSIDER THAT A SIGNIFICANT DROP.

09:19AM  10    Q.   OKAY.

09:19AM  11    A.   IT'S HUNDREDTHS OF THE PERCENTAGE.

09:19AM  12    Q.   OKAY.  BUT IT VARIES FROM THE .999 IN THE OTHER ASSAY?

09:19AM  13    A.   IT DOES VARY.

09:19AM  14    Q.   AND IF YOU CONTINUE FORWARD THROUGH THE PRESENTATION, YOU

09:19AM  15    SEE THAT THERE IS JUST DATA ABOUT A NUMBER OF THE ASSAYS THAT

09:19AM  16    THERANOS HAD DEVELOPED; CORRECT?

09:19AM  17    A.   CORRECT.

09:19AM  18    Q.   AND ALL OF THAT WAS PRESENTED TO DR. CHUNG; CORRECT?

09:19AM  19    A.   CORRECT.

09:19AM  20    Q.   DO YOU BELIEVE THAT DR. CHUNG HAD THE ABILITY TO

09:19AM  21    UNDERSTAND THAT DATA?

09:19AM  22    A.   I DO.  I HAVE NO REASON TO DOUBT IT.

09:19AM  23    Q.   DO YOU KNOW WHAT AUDIENCE DR. CHUNG WAS PRESENTING THIS

09:19AM  24    DATA TO?

09:19AM  25    A.   I'D HAVE TO JUST LOOK EARLIER IN THE EMAIL.

| | | |
|---|---|---|
| 09:19AM | 1 | Q.   LET ME JUST ASK YOU IF YOU LOOK BACK AT PAGE -- AT |
| 09:20AM | 2 | EXHIBIT 551 AT THE TOP OF PAGE 3. |
| 09:20AM | 3 | A.   CLINICAL -- IT SAYS CLINOPS. |
| 09:20AM | 4 | Q.   ALL RIGHT.  AND HE SUGGESTS HE'S GOING TO SHARE IT WITH |
| 09:20AM | 5 | THE CLINOPS GUY IN THE MILITARY? |
| 09:20AM | 6 | A.   RIGHT. |
| 09:20AM | 7 | Q.   DO YOU KNOW WHO CLINOPS ARE? |
| 09:20AM | 8 | A.   I DON'T KNOW FOR SURE. |
| 09:20AM | 9 | Q.   I THINK YOU'VE TESTIFIED YESTERDAY THAT YOU -- YOU CAN PUT |
| 09:20AM | 10 | THOSE EXHIBITS ASIDE. |
| 09:20AM | 11 | I THINK YOU TESTIFIED YESTERDAY THAT YOU HAD DISCUSSIONS, |
| 09:20AM | 12 | ON THERANOS'S BEHALF, WITH THE UNITED STATES AFRICAN COMMAND. |
| 09:20AM | 13 | DO YOU RECALL THAT? |
| 09:20AM | 14 | A.   YES. |
| 09:20AM | 15 | Q.   AND YOUR PRINCIPAL CONTACT AT THE UNITED STATES AFRICAN |
| 09:20AM | 16 | COMMAND WAS DR. MELISSA GIVENS; IS THAT RIGHT? |
| 09:20AM | 17 | A.   THAT'S RIGHT. |
| 09:20AM | 18 | Q.   AND THE SHORTHAND REFERENCE FOR THE UNITED STATES AFRICAN |
| 09:21AM | 19 | COMMAND IS AFRICOM; CORRECT? |
| 09:21AM | 20 | A.   CORRECT. |
| 09:21AM | 21 | Q.   AND THAT'S THE UNIFIED COMMAND OF ALL OF THE MILITARY |
| 09:21AM | 22 | SERVICES IN THE UNITED STATES THAT HAVE SOME OPERATION IN |
| 09:21AM | 23 | AFRICA; CORRECT? |
| 09:21AM | 24 | A.   I'M NOT POSITIVE ON THE SPECIFIC DIRECTION. |
| 09:21AM | 25 | Q.   AND COLONEL GIVENS WAS A SENIOR MEDICAL OFFICER WITHIN |

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4133

09:21AM    1    AFRICOM; CORRECT?

09:21AM    2    A.   I BELIEVE SO.

09:21AM    3    Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 10444.

09:21AM    4    A.   OKAY.

09:21AM    5    Q.   DO YOU HAVE THAT IN FRONT OF YOU?

09:21AM    6    A.   I DO.

09:21AM    7    Q.   AND IF YOU LOOK AT THE TOP OF THAT EMAIL, DO YOU SEE THAT

09:21AM    8    THIS IS A SERIES OF EMAIL CHANGES BETWEEN YOU AND DR. GIVENS

09:21AM    9    AND MS. HOLMES RELATED TO POTENTIAL WORK BY THERANOS WITH

09:22AM   10    AFRICOM?

09:22AM   11    A.   YES.

09:22AM   12            MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

09:22AM   13    10444.

09:22AM   14            MR. BOSTIC:  NO OBJECTION.

09:22AM   15            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:22AM   16    (DEFENDANT'S EXHIBIT 10444 WAS RECEIVED IN EVIDENCE.)

09:22AM   17    BY MR. DOWNEY:

09:22AM   18    Q.   COULD I DIRECT YOUR ATTENTION TO THE SECOND PAGE OF THIS

09:22AM   19    EXHIBIT, WHICH I'LL DISPLAY ON THE SCREEN.

09:22AM   20        AND IS THIS AN EMAIL THAT DR. GIVENS SENT TO YOU AND

09:22AM   21    MS. HOLMES IN APRIL OF 2012?

09:22AM   22    A.   YES.

09:22AM   23    Q.   AND DO YOU SEE IN THE FIRST PARAGRAPH SHE'S LOOKING TO SET

09:22AM   24    UP A MEETING WITH YOU AND MS. HOLMES?

09:22AM   25    A.   YES.

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4134

09:22AM   1    Q.   AND SHE ASKS THE QUESTION, "HAS THERE BEEN ANY PROGRESS IN

09:22AM   2    CONFIGURING A SYSTEM THAT WE WOULD SOON BE ABLE TO --" AND I'M

09:22AM   3    NOT SURE WHAT THE NEXT WORD IS, EITHER EMPLOY OR DEPLOY, "SOON

09:23AM   4    TO AFRICA?"

09:23AM   5         DO YOU SEE THAT?

09:23AM   6    A.   YES.

09:23AM   7    Q.   AND HAD YOU BEEN HAVING DISCUSSIONS AT THIS TIME WITH

09:23AM   8    DR. GIVENS ABOUT DEPLOYING THE SYSTEM TO AFRICA?

09:23AM   9    A.   I BELIEVE THOSE DISCUSSIONS WERE UNDERWAY.

09:23AM   10   Q.   AND IF YOU LOOK AT THE SECOND PARAGRAPH, SHE GOES ON TO

09:23AM   11   DETAIL THE KIND OF SYSTEM THAT SHE WOULD BE ABLE TO OPERATE

09:23AM   12   WITH IN AFRICA; CORRECT?

09:23AM   13   A.   YES.

09:23AM   14   Q.   AND SHE'S DESCRIBING A BLOOD ANALYZER HERE; CORRECT?

09:23AM   15   A.   YES.

09:23AM   16   Q.   AND SHE'S DESCRIBING THE FEATURES OF A BLOOD ANALYZER THAT

09:23AM   17   WOULD WORK FOR HER FOR, AT LEAST AN INITIAL EVALUATION AND

09:23AM   18   DEPLOYMENT IN AFRICA; CORRECT?

09:23AM   19   A.   CORRECT.

09:23AM   20   Q.   AND IF YOU LOOK AT THE SECOND SENTENCE OF THAT PARAGRAPH,

09:23AM   21   SHE SAYS, "I HAVE SEVERAL TRIPS TO AFRICA COMING UP IN THE NEXT

09:23AM   22   FEW MONTHS AND REALLY WANT TO TEST THE EQUIPMENT/PROCESS AND

09:24AM   23   THEN MOVE FORWARD WITH FIELDING IT FOR FULL TIME USE IF THE

09:24AM   24   TEST RUNS GO WELL."

09:24AM   25         DO YOU SEE THAT?

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4135

09:24AM   1    A.   YES.

09:24AM   2    Q.   AND SHE WAS TRYING TO ARRANGE A MEETING WITH YOU AND

09:24AM   3    MS. HOLMES TO PURSUE THAT; CORRECT?

09:24AM   4    A.   YES.

09:24AM   5    Q.   DID YOU ULTIMATELY HAVE A MEETING WITH DR. GIVENS TO

09:24AM   6    PURSUE THAT KIND OF AN ARRANGEMENT?

09:24AM   7    A.   I RECALL HAVING ONE MEETING IN PERSON WITH HER.  IT WAS

09:24AM   8    LIKELY BEFORE THIS, ALTHOUGH I'M NOT EXACTLY SURE.

09:24AM   9    Q.   OKAY.  BUT YOU CONTINUED DISCUSSIONS AFTER THIS ABOUT THE

09:24AM  10    POSSIBILITY OF DEPLOYING A DEVICE IN AFRICA WITH

09:24AM  11    COLONEL GIVENS?

09:24AM  12    A.   YES.

09:24AM  13    Q.   DO YOU SEE IN THIS -- IN THE REFERENCE IN THE SECOND

09:24AM  14    PARAGRAPH ASKING ABOUT PROGRESS, SHE REFERS TO CONFIGURING A

09:24AM  15    SYSTEM.

09:24AM  16         DO YOU SEE THAT?

09:24AM  17    A.   YES.

09:24AM  18    Q.   WHAT DOES THAT MEAN?

09:24AM  19    A.   CUSTOMIZING THE SYSTEM FOR THIS SPECIFIC USE CASE.

09:25AM  20    Q.   OKAY.  SO THE THERANOS ANALYZERS WEREN'T JUST

09:25AM  21    OFF-THE-SHELF PRODUCTS.  IF THEY WERE USED FOR A PARTICULAR

09:25AM  22    PURPOSE, THEY WOULD HAVE TO BE CUSTOMIZED FOR THAT PURPOSE; IS

09:25AM  23    THAT RIGHT?

09:25AM  24    A.   THAT'S RIGHT.

09:25AM  25    Q.   AND THEN YOU SEE IF THE TEST WENT WELL, SHE WANTED TO MOVE

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4136

| | | |
|---|---|---|
| 09:25AM | 1 | FORWARD WITH DEPLOYING THE DEVICE; CORRECT? |
| 09:25AM | 2 | A.   YES. |
| 09:25AM | 3 | Q.   AND THAT TEST DID GO FORWARD; CORRECT? |
| 09:25AM | 4 | A.   THERE WAS, THERE WAS A STUDY WITH HER, WITH -- YES. |
| 09:25AM | 5 | Q.   AND AFTER THE DISCUSSION WITH HER, DID SHE WORK ON |
| 09:25AM | 6 | DESIGNING A PROTOCOL FOR THAT STUDY? |
| 09:25AM | 7 | A.   YES. |
| 09:25AM | 8 | Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 13993. |
| 09:26AM | 9 | YOUR HONOR, MAY I APPROACH THE WITNESS? |
| 09:26AM | 10 | THE COURT:  YES. |
| 09:26AM | 11 | MR. DOWNEY:  THIS IS NOT IN HIS NOTEBOOK. |
| 09:26AM | 12 | (HANDING.) |
| 09:26AM | 13 | Q.   IF YOU LOOK AT THE TOP OF EXHIBIT 13993, DO YOU SEE THAT |
| 09:26AM | 14 | THIS IS A SERIES OF EMAILS BETWEEN YOU AND DR. GIVENS FROM JUNE |
| 09:26AM | 15 | OF 2012 RELATED TO DEPLOYING AN AFRICAN -- A THERANOS DEVICE |
| 09:26AM | 16 | FOR AFRICOM? |
| 09:26AM | 17 | A.   YES. |
| 09:26AM | 18 | MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT |
| 09:26AM | 19 | EXHIBIT 13993. |
| 09:26AM | 20 | MR. BOSTIC:  YOUR HONOR, NO OBJECTION. |
| 09:27AM | 21 | I JUST NOTE THAT THIS EXHIBIT IS MISSING THE ATTACHMENT, |
| 09:27AM | 22 | OR APPEARS TO BE. |
| 09:27AM | 23 | THE COURT:  SAY AGAIN. |
| 09:27AM | 24 | MR. BOSTIC:  THERE APPEARS TO BE AN ATTACHMENT TO |
| 09:27AM | 25 | THIS EMAIL THAT THIS EXHIBIT IS MISSING. |

EDLIN CROSS BY MR. DOWNEY (RES.)

```
09:27AM    1              MR. DOWNEY:  WELL, I'D BE HAPPY TO SUPPLEMENT THAT,
09:27AM    2    YOUR HONOR, AND I'LL FIND THE ATTACHMENT.
09:27AM    3              THE COURT:  OKAY.
09:27AM    4              MR. DOWNEY:  AND I'LL ATTACH IT AS EXHIBIT A TO
09:27AM    5    13993.
09:27AM    6              THE COURT:  ALL RIGHT.  13993 IS ADMITTED.  IT MAY
09:27AM    7    BE PUBLISHED.
09:27AM    8         AND YOU'LL SUPPLY AN ATTACHMENT AS NEEDED.
09:27AM    9              MR. DOWNEY:  YES, SIR.
09:27AM   10              THE COURT:  THANK YOU.
09:27AM   11         (DEFENDANT'S EXHIBIT 13993 WAS RECEIVED IN EVIDENCE.)
09:27AM   12              MR. DOWNEY:  IF WE CAN GO ON THE SCREEN TO THE
09:27AM   13    BOTTOM OF PAGE 2 OF THIS SERIES OF EMAILS.
09:27AM   14    Q.   DO YOU SEE THAT YOU'RE DISCUSSING HERE WITH DR. GIVENS
09:27AM   15    SOME OF THE DETAILS OF THE CUSTOMIZATION OF THE DEVICE?
09:28AM   16    A.   YES.
09:28AM   17    Q.   AND DO YOU SEE THAT IF YOU GO UP -- AND YOU'RE ASKING HER
09:28AM   18    A SERIES OF QUESTIONS ABOUT HOW THE CARTRIDGES WILL BE STORED;
09:28AM   19    CORRECT?
09:28AM   20    A.   CORRECT.
09:28AM   21    Q.   AND HOW THE DEVICE WILL BE POWERED, IF YOU LOOK AT THE
09:28AM   22    LAST SECTION OF THE EMAIL?
09:28AM   23    A.   CORRECT.
09:28AM   24    Q.   AND THEN YOU ASK HER, IN THE SECOND TO LAST QUESTION THAT
09:28AM   25    YOU ASKED TOWARDS THE BOTTOM OF THE EMAIL, YOU ASK, "HOW WILL
```

EDLIN CROSS BY MR. DOWNEY (RES.)                            4138

09:28AM  1    THE DEVICE BE TRANSPORTED IN THE FIELD?  DO YOU PLAN ON KEEPING

09:28AM  2    THE DEVICE IN ITS PACKAGING IN BETWEEN USE?  WHAT KIND OF

09:28AM  3    CONDITIONS MIGHT BE ON THE MEDEVAC FROM GERMANY TO UGANDA?"

09:28AM  4         DO YOU SEE YOU WERE ASKING THOSE QUESTIONS?

09:28AM  5    A.   YES.

09:28AM  6    Q.   AND WHY WERE YOU ASKING HER THOSE QUESTIONS?

09:28AM  7    A.   I BELIEVE THIS INFORMATION WAS REQUESTED BY SOME OF THE

09:29AM  8    MEMBERS OF THE TEAM THAT OPERATE, THAT OPERATED THE DEVICE, AND

09:29AM  9    IT WAS CUSTOMIZING THE DEVICE.

09:29AM  10   Q.   SO THAT WOULD BE DR. YOUNG AND PEOPLE WORKING UNDER HIM?

09:29AM  11   A.   THAT'S RIGHT.

09:29AM  12   Q.   AND SHE RESPONDS TO THIS EMAIL BEGINNING ON THE PRIOR PAGE

09:29AM  13   AND SHE DESCRIBES THE LOGISTICS THAT THE DEVICE WILL GO THROUGH

09:29AM  14   TO GET TO AFRICA; CORRECT?

09:29AM  15   A.   RIGHT.

09:29AM  16   Q.   AND SHE DESCRIBES IN THE SECOND PARAGRAPH THAT THE

09:29AM  17   EQUIPMENT WILL BE FLOWN COMMERCIALLY; CORRECT?

09:29AM  18   A.   CORRECT.

09:29AM  19   Q.   AND THEN IN THE LAST PART OF THAT PARAGRAPH, SHE DESCRIBES

09:29AM  20   WHAT -- THE SITE WHERE THE DEVICE WILL BE LOCATED, THE

09:29AM  21   CONDITIONS THERE; CORRECT?

09:29AM  22   A.   CORRECT.

09:29AM  23   Q.   AND SHE INDICATES THERE'S NO AIR CONDITIONING IN THE

09:30AM  24   BUILDING AND THE TEMPERATURE WILL BE BETWEEN 100 AND

09:30AM  25   110 DEGREES FAHRENHEIT; CORRECT?

EDLIN CROSS BY MR. DOWNEY (RES.)                               4139

09:30AM  1    A.   CORRECT.

09:30AM  2    Q.   AND SHE ALSO DETAILS HOW SHE'S GOING TO SHIP THE DEVICE.

09:30AM  3         AND SO YOU'RE WORKING ON ALL OF THOSE LOGISTICS WITH HER;

09:30AM  4    RIGHT?

09:30AM  5    A.   CORRECT.

09:30AM  6    Q.   IF YOU LOOK TOWARD THE SECOND TO THE LAST SENTENCE, SHE

09:30AM  7    GOES ON AGAIN TO EMPHASIZE THAT THE TEMPERATURES WILL RANGE

09:30AM  8    FROM 100 DEGREES FAHRENHEIT WITH HIGH HUMIDITY, BUT THEN IN

09:30AM  9    FLIGHT THE TEMPERATURES WILL DROP TO ABOUT 60 DEGREES

09:30AM  10   FAHRENHEIT.

09:30AM  11        DO YOU SEE THAT?  THAT'S ON THE SECOND PAGE TOWARDS THE

09:30AM  12   END OF THAT EMAIL.

09:31AM  13   A.   I DO SEE THAT.

09:31AM  14   Q.   SO YOU'RE WORKING ON THIS PROTOCOL WITH HER KNOWING THAT

09:31AM  15   THIS IS GOING TO BE A DEPLOYMENT IN SEVERE WEATHER CONDITIONS

09:31AM  16   POTENTIALLY?

09:31AM  17   A.   RIGHT.

09:31AM  18   Q.   AND YOU WERE INFORMING THE SCIENTISTS AT THERANOS THAT

09:31AM  19   THESE WOULD BE THE CONDITIONS?

09:31AM  20   A.   YES.

09:31AM  21   Q.   IN PART BECAUSE THIS WAS INFORMATION THAT THEY HAD ASKED

09:31AM  22   FOR; CORRECT?

09:31AM  23   A.   RIGHT.

09:31AM  24   Q.   DO YOU KNOW WHETHER THE DEVICE WAS CONFIGURED BY THE

09:31AM  25   SCIENTISTS AT THERANOS TO DEAL WITH THOSE EXTREME WEATHER

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4140

09:31AM  1    CONDITIONS?

09:31AM  2    A.   I DON'T KNOW.

09:31AM  3    Q.   OKAY.

09:31AM  4         YOUR HONOR, MAY I APPROACH THE WITNESS AGAIN?

09:31AM  5              THE COURT:  YES.

09:32AM  6              MR. DOWNEY:  (HANDING.)

09:32AM  7    Q.   I'M SHOWING YOU WHAT HAS BEEN MARKED AS EXHIBIT 13986.  IS

09:32AM  8    THIS AN EMAIL BETWEEN DR. YOUNG AND MS. HOLMES AND YOURSELF AND

09:32AM  9    CHRISTIAN HOLMES RELATED TO THERANOS'S AFRICOM DEPLOYMENT?

09:32AM  10   A.   YES.

09:32AM  11             MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT

09:32AM  12   EXHIBIT 13986.

09:33AM  13             MR. BOSTIC:  YOUR HONOR, APOLOGIES.  I DON'T SEE A

09:33AM  14   BATES NUMBER ON THIS DOCUMENT.

09:33AM  15             MR. DOWNEY:  WE HAVE RECOVERED IT FROM -- WE DID NOT

09:33AM  16   GET IT OUT OF THE PRODUCTION FROM THERANOS.  I'D BE HAPPY TO

09:33AM  17   EXPLAIN TO THE COURT HOW WE DID.

09:33AM  18             THE COURT:  DO YOU HAVE A --

09:33AM  19             MR. DOWNEY:  I THINK THE WITNESS HAS AUTHENTICATED

09:33AM  20   IT.

09:33AM  21             THE COURT:  RIGHT, HE HAS.

09:33AM  22        AND, MR. BOSTIC, YOU'RE CONCERNED THAT THIS IS OUTSIDE OF

09:33AM  23   DISCOVERY?

09:33AM  24             MR. BOSTIC:  THAT'S MY CONCERN, YOUR HONOR.  I'M

09:33AM  25   JUST RAISING IT AS A QUESTION.

EDLIN CROSS BY MR. DOWNEY (RES.)

| | | |
|---|---|---|
| 09:33AM | 1 | THE COURT: RIGHT. I'LL ADMIT IT NOW, AND WE CAN |
| 09:33AM | 2 | HAVE A DISCUSSION ABOUT IT LATER, BUT I THINK THE FOUNDATION IS |
| 09:33AM | 3 | THERE. SO IT'S ADMITTED, AND IT MAY BE PUBLISHED. |
| 09:33AM | 4 | (DEFENDANT'S EXHIBIT 13986 WAS RECEIVED IN EVIDENCE.) |
| 09:33AM | 5 | MR. DOWNEY: I'LL SHOW YOU AND BLOW UP THE TOP OF |
| 09:33AM | 6 | THIS EMAIL SO IT'S EASIER TO SEE. |
| 09:33AM | 7 | Q. DO YOU SEE THIS IS AN EMAIL FROM DR. YOUNG TO YOU IN JUNE |
| 09:34AM | 8 | OF 2012 RELATED TO THE AFRICOM PROJECT? |
| 09:34AM | 9 | A. I DO. |
| 09:34AM | 10 | Q. AND HE'S REPORTING TO YOU ABOUT TESTING THAT HE DID ON THE |
| 09:34AM | 11 | DEVICE THAT IS BEING SENT TO DR. GIVENS FOR DEPLOYMENT IN |
| 09:34AM | 12 | AFRICA; CORRECT? |
| 09:34AM | 13 | A. CORRECT. |
| 09:34AM | 14 | Q. AND HE REPORTS THAT HE'S DONE "48 HOURS OF CONTINUAL |
| 09:34AM | 15 | TESTING OF THE READER AT 110 DEGREES FAHRENHEIT COMPLETED |
| 09:34AM | 16 | SUCCESSFULLY TONIGHT. WE RAN 100 PROTOCOLS SEQUENTIALLY - SO I |
| 09:34AM | 17 | FEEL VERY GOOD ABOUT RELIABILITY FOR THIS DEPLOYMENT." |
| 09:34AM | 18 | DO YOU SEE THAT? |
| 09:34AM | 19 | A. YES. |
| 09:34AM | 20 | Q. AND DO YOU RECALL THAT THERE WAS CONFIGURATION OF THE |
| 09:34AM | 21 | DEVICE RELATED TO THE TEMPERATURE IN AFRICA? |
| 09:34AM | 22 | A. THIS REFRESHES MY RECOLLECTION. |
| 09:34AM | 23 | Q. OKAY. AND DID YOU THEN SEND THE DEVICE TO DR. GIVENS FOR |
| 09:35AM | 24 | DEPLOYMENT IN AFRICA? |
| 09:35AM | 25 | A. YES. |

EDLIN CROSS BY MR. DOWNEY (RES.)

| | | |
|---|---|---|
| 09:35AM | 1 | Q.  CAN I ASK YOU TO LOOK AT EXHIBIT 10446. |
| 09:35AM | 2 | A.  YES. |
| 09:35AM | 3 | Q.  IS THIS AN EMAIL EXCHANGE BETWEEN YOU AND DR. GIVENS AND |
| 09:35AM | 4 | MS. HOLMES RELATED TO THE AFRICOM DEPLOYMENT? |
| 09:35AM | 5 | A.  YES. |
| 09:35AM | 6 | MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF |
| 09:35AM | 7 | EXHIBIT 10446. |
| 09:35AM | 8 | MR. BOSTIC:  NO OBJECTION. |
| 09:35AM | 9 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 09:35AM | 10 | (DEFENDANT'S EXHIBIT 10446 WAS RECEIVED IN EVIDENCE.) |
| 09:35AM | 11 | MR. DOWNEY:  CAN WE BLOW UP THE BOTTOM HALF OF THE |
| 09:35AM | 12 | EMAIL. |
| 09:36AM | 13 | Q.  IS THIS A REPORT THAT DR. GIVENS HAD GIVEN YOU AFTER SHE |
| 09:36AM | 14 | HAD TAKEN THE DEVICE TO AFRICA AND USED IT IN LOCATIONS OVER |
| 09:36AM | 15 | THERE? |
| 09:36AM | 16 | A.  YES. |
| 09:36AM | 17 | Q.  AND DO YOU SEE SHE REPORTED, "I MADE IT BACK FROM 2 TRIPS |
| 09:36AM | 18 | TO AFRICA AND MANAGED TO WORK THROUGH ALL THE CASES IN THE |
| 09:36AM | 19 | PROTOCOL." |
| 09:36AM | 20 | DO YOU SEE THAT? |
| 09:36AM | 21 | A.  I DO. |
| 09:36AM | 22 | Q.  AND WHEN SHE REFERS TO THE PROTOCOL, THIS WAS NOT ACTUAL |
| 09:36AM | 23 | TESTING ON PATIENTS; CORRECT? |
| 09:36AM | 24 | A.  CORRECT. |
| 09:36AM | 25 | Q.  AND THE STUDY WAS NOT DESIGNED TO CONDUCT ACTUAL BLOOD |

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4143

09:36AM   1    TESTING ON PATIENTS, WAS IT?

09:36AM   2    A.   IT WAS NOT.

09:36AM   3    Q.   AT DR. GIVENS'S REQUEST, THE RESULTS THAT WERE TO BE

09:36AM   4    GENERATED WERE ARTIFICIAL RESULTS AND SHE WAS TESTING THE

09:36AM   5    VIABILITY OF THE DEVICE IN A DEPLOYED ENVIRONMENT; RIGHT?

09:36AM   6    A.   CORRECT.

09:36AM   7    Q.   AND SHE GOES ON TO SAY, "THE MACHINE TRAVELED WELL AND

09:37AM   8    FUNCTIONED WELL.  MY ONLY COMPLAINT IS THE TOUCH SCREEN - VERY

09:37AM   9    FRUSTRATING."

09:37AM   10       AND WAS SHE REFERRING THERE TO THE INTERFACE ON THE FRONT

09:37AM   11   OF THE THERANOS ANALYZER?

09:37AM   12   A.   YES.

09:37AM   13   Q.   AND SHE HAD SOME DIFFICULTY OPERATING THAT INTERFACE?

09:37AM   14   A.   YES.

09:37AM   15   Q.   OKAY.  AND THEN SHE GOES ON TO REPORT THAT SHE'LL BE

09:37AM   16   PREPARING A FULL REPORT AND SHE'LL HAVE SEVERAL PICTURES OF THE

09:37AM   17   MACHINE BEING USED IN CAMEROON, UGANDA, AND SOUTH SUDAN.

09:37AM   18       IS THIS THE FIRST TIME THAT YOU HAD LEARNED THAT SHE HAD

09:37AM   19   ACTUALLY DEPLOYED THE DEVICE IN THOSE LOCATIONS?

09:37AM   20   A.   I BELIEVE THERE WAS PREVIOUS COMMUNICATION ABOUT CAMEROON

09:37AM   21   AND UGANDA, BUT I THINK THIS WAS THE FIRST TIME THAT I HAD

09:37AM   22   HEARD OF SOUTH SUDAN.

09:37AM   23   Q.   AND THEN SHE GOES ON TWO PARAGRAPHS LATER TO WRITE,

09:37AM   24   "BECAUSE THE MACHINE SEEMED TO FUNCTION WELL IN THE

09:38AM   25   ENVIRONMENT, I AM GOING TO WRITE A PRE-PROPOSAL TO SUBMIT TO

EDLIN CROSS BY MR. DOWNEY (RES.)                                        4144

09:38AM   1    THE U.S. SOCOM."  THAT'S A REFERENCE TO SPECIAL OPERATIONS;

09:38AM   2    CORRECT?

09:38AM   3    A.   YES.

09:38AM   4    Q.   AND SHE WAS HOPING TO GAIN FUNDING FOR A FULL PROPOSAL;

09:38AM   5    CORRECT?

09:38AM   6    A.   CORRECT.

09:38AM   7    Q.   NOW, DO YOU RECALL YESTERDAY THAT MR. BOSTIC SHOWED YOU AN

09:38AM   8    EXHIBIT RELATED TO QUESTIONS ABOUT THE OPERATION OF THE DEVICE

09:38AM   9    IN EXTREME TEMPERATURES?

09:38AM   10   A.   YES.

09:38AM   11   Q.   LET ME ASK YOU TO PULL THAT BACK UP, WHICH IS ALREADY IN

09:38AM   12   EVIDENCE, AND I'LL PULL IT ON THE SCREEN.  IT'S EXHIBIT 5435.

09:38AM   13        AND I'LL DIRECT YOUR ATTENTION AND ASK THAT THE SCREEN BE

09:38AM   14   DIRECTED TO PAGE 4 OF THAT EXHIBIT.

09:38AM   15        AND DO YOU RECALL MR. BOSTIC SHOWING YOU THIS YESTERDAY

09:39AM   16   WITH THE COMMENTS OF SEVERAL OF THE SCIENTISTS ABOUT WHETHER

09:39AM   17   THE DEVICE COULD OPERATE IN EXTREME TEMPERATURES?

09:39AM   18   A.   YES.

09:39AM   19   Q.   AND YOU HAD RAISED QUESTIONS WITH THIS -- REGARDING THIS

09:39AM   20   WITH DR. YOUNG; CORRECT?  THAT'S --

09:39AM   21   A.   CORRECT.

09:39AM   22   Q.   THAT'S THE REFERENCE TO DANIEL?

09:39AM   23   A.   CORRECT.

09:39AM   24   Q.   AND AT THIS TIME YOU HADN'T HEARD BACK FROM HIM; CORRECT?

09:39AM   25   A.   CORRECT.

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4145

09:39AM   1    Q.   AND THEN BELOW THAT YOU HAD ALSO ASKED QUESTIONS OF

09:39AM   2    MR. FRENZEL, CORRECT, GARY FRENZEL?

09:39AM   3    A.   CORRECT.

09:39AM   4    Q.   AND MR. FRENZEL WAS NOT A HARDWARE PERSON AT THERANOS, WAS

09:39AM   5    HE?

09:39AM   6    A.   I BELIEVE HE WAS ON THE SCIENCE AND CHEMISTRY SIDE.

09:39AM   7    Q.   OKAY.  AND HE SAYS, "THE EDISON DID NOT HAVE A WAY TO COOL

09:39AM   8    DOWN.  THEY WOULD HAVE SHUT DOWN."

09:39AM   9         DO YOU SEE THAT?

09:40AM   10   A.   I DO.

09:40AM   11   Q.   NOW, MR. FRENZEL WAS NOT INVOLVED IN THE AFRICOM PROJECT,

09:40AM   12   WAS HE?

09:40AM   13   A.   NO.

09:40AM   14   Q.   AND AFTER THE DEPLOYMENT BY DR. GIVENS, THE DEVICE DID NOT

09:40AM   15   SHUT DOWN, DID IT?

09:40AM   16   A.   I HAVE NO KNOWLEDGE OF IT SHUTTING DOWN.

09:40AM   17   Q.   OKAY.  DO YOU RECALL THAT SHE REPORTED BACK TO YOU THAT

09:40AM   18   THE DEVICE FUNCTIONED WELL?

09:40AM   19   A.   YES.

09:40AM   20   Q.   LET'S GO DOWN TO THE NEXT TWO COMMENTS.

09:40AM   21        THESE ARE ALSO COMMENTS FROM INDIVIDUALS WHO WERE NOT

09:40AM   22   INVOLVED IN THE AFRICOM DEPLOYMENT; CORRECT?

09:40AM   23   A.   CORRECT.

09:40AM   24   Q.   THAT'S TRUE OF TONY; CORRECT?

09:40AM   25   A.   CORRECT.

EDLIN CROSS BY MR. DOWNEY (RES.)                              4146

09:40AM   1    Q.   AND IF YOU GO TO THE BOTTOM, IT REFERENCES SUREKHA;

09:40AM   2    CORRECT?

09:40AM   3    A.   CORRECT.

09:40AM   4    Q.   AND THAT'S A REFERENCE TO MS. GANGAKHEDKAR?

09:40AM   5    A.   CORRECT.  I DON'T RECALL EXACTLY WHO WAS INVOLVED WITH THE

09:40AM   6    PREPARATION OF THE EQUIPMENT AND CARTRIDGES AND THE DEVICE, BUT

09:41AM   7    SHE WAS ON ONE OF THE ASSAY DEVELOPMENT -- SHE LED ONE OF THE

09:41AM   8    ASSAY DEVELOPMENT TEAMS.

09:41AM   9    Q.   SHE DID SOMETHING SIMILAR TO WHAT MR. FRENZEL DID?

09:41AM   10   A.   I DON'T KNOW EXACTLY WHAT THEY DID.

09:41AM   11   Q.   OTHER THAN DR. YOUNG, DO YOU KNOW WHO WAS INVOLVED IN THE

09:41AM   12   PREPARATION OF THE DEVICE A YEAR BEFORE THIS EMAIL?

09:41AM   13   A.   DANIEL HAD A TEAM, AND I BELIEVE AT THAT TIME I JUST

09:41AM   14   INTERACTED WITH DANIEL ABOUT THIS.

09:41AM   15   Q.   OKAY.  BUT YOU DIDN'T KNOW WHO WAS ON MR. -- DR. YOUNG'S

09:41AM   16   TEAM?

09:41AM   17   A.   CORRECT.

09:41AM   18   Q.   OKAY.  I WANT TO ASK YOU NOW ABOUT THE RELATIONSHIP

09:41AM   19   BETWEEN THERANOS AND CENTCOM.

09:41AM   20        DO YOU RECALL DURING THE COURSE OF THAT RELATIONSHIP YOU

09:41AM   21   HAD CONTACT WITH A DOCTOR AT CENTCOM NAMED ERIN EDGAR?

09:42AM   22   A.   CORRECT.

09:42AM   23   Q.   LET ME ASK YOU TO LOOK BACK AT EXHIBIT 588, WHICH IS IN

09:42AM   24   EVIDENCE.

09:42AM   25        I WANT TO SHOW YOU AT THE TOP OF THIS A DATE BY WHICH

EDLIN CROSS BY MR. DOWNEY (RES.)

09:42AM  1    DISCUSSIONS WERE HAPPENING BETWEEN THERANOS AND CENTCOM RELATED

09:42AM  2    TO A POTENTIAL DEPLOYMENT.

09:42AM  3        DO YOU SEE THAT THERE WERE DISCUSSIONS AT LEAST AS EARLY

09:42AM  4    AS APRIL 24TH, 2012?

09:42AM  5    A.  YES.

09:42AM  6    Q.  AND DO YOU KNOW IF DISCUSSIONS BETWEEN CENTCOM AND

09:42AM  7    THERANOS REGARDING A POTENTIAL THERANOS DEPLOYMENT HAD BEEN

09:42AM  8    GOING ON BEFORE APRIL OF 2012?

09:42AM  9    A.  I'M NOT SURE.

09:43AM  10   Q.  ULTIMATELY I THINK YOU TESTIFIED YESTERDAY THAT CENTCOM

09:43AM  11   DID APPROVE A LIMITED OBJECTIVE EXPERIMENT TO EVALUATE

09:43AM  12   THERANOS'S TECHNOLOGY; CORRECT?

09:43AM  13   A.  CORRECT.

09:43AM  14   Q.  LET ME ASK YOU TO LOOK AT EXHIBIT 10457.

09:43AM  15       IF YOU'LL LOOK AT THE FIRST PAGE, IS THIS AN EMAIL FROM

09:43AM  16   YOU TO MS. HOLMES FORWARDING THE MILITARY'S APPROVAL OF THAT

09:43AM  17   LOE?

09:43AM  18   A.  YES.

09:43AM  19   Q.  AND THIS APPROVAL WAS SENT TO MS. HOLMES IN DECEMBER OF

09:43AM  20   2012; CORRECT?

09:43AM  21   A.  CORRECT.

09:43AM  22   Q.  DO YOU KNOW WHY IT TOOK FROM EARLIER IN THE YEAR, APRIL OF

09:44AM  23   2012 AT LEAST, UNTIL THE END OF THE YEAR FOR AN EXPERIMENT TO

09:44AM  24   BE APPROVED BY THE MILITARY?

09:44AM  25   A.  THAT'S JUST HOW LONG IT TOOK TO PLAN IT AND HAVE BACK AND

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4148

09:44AM   1   FORTH BETWEEN THE COMPANIES TO ALIGN ON THE, ON THE GOALS OF

09:44AM   2   THE OBJECTIVE EXPERIMENT.

09:44AM   3   Q.   OKAY.  SOME OF THAT RELATES TO CUSTOMIZATION OF THE

09:44AM   4   DEVICE; CORRECT?

09:44AM   5   A.   CORRECT.

09:44AM   6   Q.   AND SOME OF IT RELATES TO THE MILITARY DECIDING WHAT

09:44AM   7   ASSAYS IT WANTS TO USE IN CONNECTION WITH THE EXPERIMENT;

09:44AM   8   CORRECT?

09:44AM   9   A.   CORRECT.

09:44AM  10   Q.   AND THEN THERE ARE OTHER ASPECTS TO DEALING WITH THE

09:44AM  11   GOVERNMENT BUREAUCRACY THAT YOU HAD TO DEAL WITH AND CUT

09:44AM  12   THROUGH TO GET THE EXPERIMENT APPROVED; CORRECT?

09:44AM  13   A.   CORRECT.

09:44AM  14   Q.   AND DO YOU SEE IN THE EMAIL AT THE TOP OF 10457 THAT YOU

09:44AM  15   INDICATE THAT EVEN IN THE APPROVAL --

09:44AM  16        MR. BOSTIC:  YOUR HONOR, I DON'T BELIEVE THIS IS IN

09:45AM  17   EVIDENCE.

09:45AM  18        MR. DOWNEY:  WELL, I WASN'T GOING TO ADMIT IT, BUT

09:45AM  19   I'LL MOVE TO ADMIT 10547.

09:45AM  20        THE COURT:  ANY OBJECTION?

09:45AM  21        MR. BOSTIC:  NO OBJECTION.

09:45AM  22        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:45AM  23      (DEFENDANT'S EXHIBIT 10457 WAS RECEIVED IN EVIDENCE.)

09:45AM  24   BY MR. DOWNEY:

09:45AM  25   Q.   DO YOU SEE IN THE SECOND SENTENCE, MS. HOLMES -- YOU'RE

EDLIN CROSS BY MR. DOWNEY (RES.)                               4149

09:45AM   1      TELLING MS. HOLMES THAT EVEN AS THIS WAS APPROVED, THE MILITARY

09:45AM   2      HAD ADJUSTED THE ASSAYS THAT IT WANTED FOR THE LIMITED

09:45AM   3      OBJECTIVE EXPERIMENT?

09:45AM   4      A.   I DO SEE THAT, YES.

09:45AM   5      Q.   OKAY.  AND IT LOOKS LIKE IT HAD ADDED ABOUT FOUR NEW

09:45AM   6      ASSAYS; CORRECT?

09:45AM   7      A.   CORRECT.

09:45AM   8      Q.   NOW, AFTER THE EXPERIMENT WAS APPROVAL BY THE MILITARY, I

09:45AM   9      THINK YOU TESTIFIED THAT YOU TRAVELED TO A MILITARY BASE WITH

09:45AM  10      THE DEVICE; IS THAT RIGHT?

09:45AM  11      A.   I BELIEVE IT WAS SHIPPED THERE.  BUT I DID TRAVEL THERE,

09:46AM  12      YES.

09:46AM  13      Q.   OKAY.  AND SO YOU -- THE DEVICE WAS SHIPPED, BUT YOU ALSO

09:46AM  14      WENT THERE AND SHOWED THE DEVICE TO MEMBERS OF THE MILITARY?

09:46AM  15      A.   CORRECT.  WELL, THEY -- I THINK IT WAS A MIX OF

09:46AM  16      CONTRACTORS AND MEMBERS OF THE MILITARY, YES.

09:46AM  17      Q.   OKAY.  AND WAS ONE OF THE PURPOSES OF THAT TO EVALUATE

09:46AM  18      WHETHER OR NOT THE DEVICE WAS SECURE SO THAT IT COULD BE

09:46AM  19      DEPLOYED?

09:46AM  20      A.   YES.

09:46AM  21      Q.   AND DID THERANOS'S DEVICE PASS THOSE SECURITY TESTS?

09:46AM  22      A.   I BELIEVE SO.

09:46AM  23      Q.   WERE THERE ANY SPECIAL CONFIGURATIONS THAT HAD TO BE MADE

09:46AM  24      TO THE DEVICE TO QUALIFY IT TO BE PART OF AN EXPERIMENT WITH

09:46AM  25      THE MILITARY?

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4150

09:46AM   1    A.   YES.

09:47AM   2    Q.   AND CAN YOU DESCRIBE THOSE?

09:47AM   3    A.   UM, I'M SORRY, CAN YOU REPEAT THE QUESTION?

09:47AM   4    Q.   WERE THERE ANY MODIFICATIONS, FOR SECURITY PURPOSES, THAT

09:47AM   5    HAD TO BE MADE TO THE DEVICE FOR THIS PROGRAM?

09:47AM   6    A.   YES.  THERE WAS CONCERN FROM -- MAINLY FROM SUNNY THAT

09:47AM   7    GIVING THE DEVICE TO THE TEAM THAT TESTED IT IN -- DURING THAT

09:47AM   8    TESTING WOULD OPEN UP A POSSIBILITY OF INFORMATION BEING

09:47AM   9    DISCLOSED THAT SUNNY DID NOT WANT BEING DISCLOSED.  HE THOUGHT

09:47AM  10    THAT IT LEFT OPEN THE CHANCE THAT ANYONE LOOKING AT THE DEVICE

09:47AM  11    WOULD BE ABLE TO UNDERSTAND ALL OF THE DIFFERENT COMPONENTS AND

09:47AM  12    CONFIGURATIONS IN THE DEVICE, AND HE DID NOT WANT TO GIVE THAT

09:48AM  13    OPEN OF A DEVICE TO THOSE TESTING IT.

09:48AM  14         SO HE -- PER HIS DIRECTION, THE TEAM OF ENGINEERS, I

09:48AM  15    THINK, DISABLED SOME OF THE PORTS SO THAT THE PEOPLE TESTING IT

09:48AM  16    WOULDN'T BE ABLE TO RUN A FULL SET OF TESTS, I BELIEVE.

09:48AM  17    Q.   AND HOW LONG DID THAT RECONFIGURATION TAKE?

09:48AM  18    A.   I DON'T REMEMBER.

09:48AM  19    Q.   WHEN YOU SHOWED THE DEVICE TO THE MILITARY, DID THEY HAVE

09:48AM  20    A COMMENT ABOUT THE HARDWARE IN CONNECTION WITH THE MILITARY

09:48AM  21    USE?

09:48AM  22    A.   YES.

09:48AM  23    Q.   DO YOU RECALL THEM SAYING THAT THEY THOUGHT THE DEVICE WAS

09:48AM  24    TOO BIG?

09:48AM  25    A.   YES, TOO BIG AND TOO HEAVY.

EDLIN CROSS BY MR. DOWNEY (RES.)                    4151

| | | |
|---|---|---|
| 09:48AM | 1 | Q.  AND WAS THE DEVICE THAT YOU HAD TAKEN -- STRIKE THAT. |
| 09:48AM | 2 | WAS THE DEVICE THAT YOU HAD SHIPPED A 4.0 MONOBAY? |
| 09:49AM | 3 | A.  YES. |
| 09:49AM | 4 | Q.  AND IN RESPONSE TO THAT FEEDBACK FROM THE MILITARY, DID |
| 09:49AM | 5 | THERANOS BEGIN TO WORK ON A SPECIALIZED MILITARY DEVICE? |
| 09:49AM | 6 | A.  YES, THE 4S. |
| 09:49AM | 7 | Q.  AND DO YOU RECALL THE DATE OF THAT TRIP TO THE MILITARY |
| 09:49AM | 8 | BASE? |
| 09:49AM | 9 | A.  I BELIEVE IT WAS IN 2013. |
| 09:49AM | 10 | Q.  AND WAS THAT THE MACDILL AIR FORCE BASE IN TAMPA? |
| 09:49AM | 11 | A.  YES. |
| 09:49AM | 12 | Q.  NOW, SHORTLY AFTER THAT TRIP, DID PERSONS IN THE MILITARY |
| 09:49AM | 13 | BEGIN TO COMMUNICATE WITH YOU SAYING THAT THEY WANTED TO DEPLOY |
| 09:49AM | 14 | THE DEVICE RIGHT AWAY? |
| 09:49AM | 15 | A.  THEY WERE INTERESTED IN DEPLOYING THE DEVICE AS SOON AS |
| 09:49AM | 16 | POSSIBLE. |
| 09:49AM | 17 | Q.  LET ME SHOW YOU EXHIBIT 10472. |
| 09:50AM | 18 | IS THIS AN EMAIL FROM YOU TO VARIOUS MEMBERS OF THE |
| 09:50AM | 19 | MILITARY AND VARIOUS THERANOS PERSONNEL THAT IS PART OF A LONG |
| 09:50AM | 20 | CHAIN OF COMMUNICATIONS RELATED TO THE THERANOS CENTCOM |
| 09:50AM | 21 | PROJECT? |
| 09:50AM | 22 | A.  YES. |
| 09:50AM | 23 | Q.  AND IF YOU LOOK AT THE SECOND EMAIL ON THE FIRST PAGE, |
| 09:50AM | 24 | THERE'S A COMMUNICATION FROM A JAMES SOMMER. |
| 09:50AM | 25 | DO YOU SEE THAT? |

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4152

09:50AM   1    A.   YES.

09:50AM   2    Q.   WHO IS JAMES SOMMER?

09:50AM   3    A.   JAMES SOMMER WORKED AT CENTCOM.  I BELIEVE HE WAS AN ARMY

09:51AM   4    SCIENCE ADVISOR, AND HE WORKED TO -- WORKED WITH THERANOS TO

09:51AM   5    HELP TO SECURE THE DEVICES FOR THE STUDY, OBTAIN THE DEVICES

09:51AM   6    FOR THE STUDY.

09:51AM   7    Q.   OKAY.  SO HE SENT THIS IN FEBRUARY OF 2013; CORRECT?

09:51AM   8    A.   YES.

09:51AM   9    Q.   AND THIS WAS JUST A COUPLE OF MONTHS AFTER THE LIMITED

09:51AM  10    OBJECTIVE EXPERIMENT WAS USED; CORRECT?

09:51AM  11    A.   CAN YOU REPEAT THE QUESTION?

09:51AM  12    Q.   THIS WAS JUST A COUPLE OF MONTHS AFTER THE LIMITED

09:51AM  13    OBJECTIVE EXPERIMENT HAD BEEN APPROVED BY THE MILITARY?

09:52AM  14    A.   I DON'T KNOW EXACTLY WHEN IT WAS APPROVED.

09:52AM  15    Q.   LET ME JUST ASK YOU TO LOOK BACK AT EXHIBIT 10457, WHICH

09:52AM  16    WAS JUST ADMITTED A MOMENT AGO, AND WE CAN DISPLAY THE FIRST

09:52AM  17    PAGE OF THAT.

09:52AM  18    A.   YEP.  YES.

09:52AM  19    Q.   AND DO YOU SEE ON THE TOP THAT THAT'S AN EMAIL AT LEAST OF

09:52AM  20    YOU FORWARDING IT TO MS. HOLMES IN DECEMBER; CORRECT?

09:52AM  21    A.   YES, THAT'S CORRECT.

09:52AM  22    Q.   AND THEN BELOW THAT THERE'S AN INDICATION THAT THE

09:52AM  23    APPROVAL MAY HAVE BEEN IN NOVEMBER; CORRECT?

09:52AM  24    A.   CORRECT.

09:52AM  25    Q.   SO MR. SOMMER IS COMMUNICATING TO YOU IN FEBRUARY THAT

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4153

09:52AM   1    THINGS WERE GETTING MESSED UP WITH THE SEQUESTRATION.

09:52AM   2        DO YOU SEE THAT?

09:52AM   3    A.   I DO.

09:52AM   4    Q.   AND HE INDICATED THAT THAT WOULD AFFECT THE UPCOMING

09:52AM   5    LIMITED OBJECTIVE EXPERIMENT; CORRECT?

09:52AM   6    A.   CORRECT.

09:52AM   7    Q.   AND HE SAID -- ESSENTIALLY ASKED YOU TO SHIP THE DEVICE

09:53AM   8    SOON BECAUSE OTHERWISE HE WOULD NOT BE ABLE TO TRAVEL TO

09:53AM   9    THEATRE WITH IT; CORRECT?

09:53AM   10   A.   CORRECT.

09:53AM   11   Q.   NOW, YOU RESPONDED TO THIS EMAIL THAT SAME DAY.

09:53AM   12        DO YOU SEE THAT ABOVE?

09:53AM   13   A.   YES.

09:53AM   14   Q.   OKAY.

09:53AM   15        YOUR HONOR, I WOULD MOVE TO ADMIT 10472.

09:53AM   16            MR. BOSTIC:  NO OBJECTION.

09:53AM   17            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:53AM   18        (DEFENDANT'S EXHIBIT 10472 WAS RECEIVED IN EVIDENCE.)

09:53AM   19   BY MR. DOWNEY:

09:53AM   20   Q.   AND ON THE TOP OF THIS PAGE, DO YOU SEE THAT YOU'RE

09:53AM   21   RESPONDING TO MR. SOMMER'S SUGGESTION THAT THE DEVICE HAD TO BE

09:53AM   22   SHIPPED SOON.

09:53AM   23        DO YOU SEE THAT?

09:53AM   24   A.   YES.

09:53AM   25   Q.   I'D LIKE TO HIGHLIGHT THE PARAGRAPH THAT IS IN ITALICS.

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4154

09:53AM   1        AND YOU TELL HIM IN THIS EMAIL, "AS PER OUR PREVIOUS

09:53AM   2   DISCUSSIONS, THE 4S DEVICES WE ARE SHIPPING HAVE BEEN SPECIALLY

09:54AM   3   BUILT FOR THE PURPOSES OF OUR LIMITED OBJECTIVE EXPERIMENT."

09:54AM   4        CORRECT?

09:54AM   5   A.   CORRECT.

09:54AM   6   Q.   AND THAT WAS TRUE?

09:54AM   7   A.   TO MY KNOWLEDGE.

09:54AM   8   Q.   AND YOU SAID, "IN SO DOING WE HAVE HAD TO REVALIDATE AND

09:54AM   9   RETEST EVERY ASPECTS OF THE DEVICE CONFIGURATION TO ENSURE THAT

09:54AM  10   THESE SYSTEMS MEET OUR STANDARDS AND EXPECTATIONS."

09:54AM  11        DO YOU SEE THAT?

09:54AM  12   A.   YES.

09:54AM  13   Q.   AND YOU UNDERSTOOD FROM DR. YOUNG AND OTHERS THAT THAT WAS

09:54AM  14   TRUE; CORRECT?

09:54AM  15   A.   AND FROM ELIZABETH, YES.

09:54AM  16   Q.   AND FROM MR. BALWANI; CORRECT?

09:54AM  17   A.   I DON'T REMEMBER EXACTLY.

09:54AM  18   Q.   OKAY.  AND IN THE NEXT SENTENCE YOU SAY THAT "WE HAVE

09:54AM  19   SIGNIFICANTLY ACCELERATED THERANOS'S PREVIOUSLY PLANNED RELEASE

09:54AM  20   OF 4S IN ORDER TO MEET OUR OBJECTIVES FOR THIS PROGRAM."

09:55AM  21        DO YOU SEE THAT?

09:55AM  22   A.   YES.

09:55AM  23   Q.   AND THAT WAS TRUE AS FAR AS YOU KNEW?

09:55AM  24   A.   YES.

09:55AM  25   Q.   HAD YOU BEEN FAMILIAR BEFORE WITH THE SCHEDULE FOR RELEASE

EDLIN CROSS BY MR. DOWNEY (RES.)                                4155

09:55AM  1    OF THE MILITARY 4S?

09:55AM  2    A.   I'M NOT SURE I UNDERSTAND THE QUESTION.

09:55AM  3    Q.   WELL, DID YOU KNOW WHAT THE SCHEDULED RELEASE DATE

09:55AM  4    ORIGINALLY WAS FOR THE 4S AT THERANOS?

09:55AM  5    A.   NO.

09:55AM  6    Q.   OKAY.  IF YOU SEE THE NEXT SENTENCE, YOU GO ON TO SAY,

09:55AM  7    "FURTHER, WE HAVE ADDED ADDITIONAL FEATURES TO OUR USER

09:55AM  8    INTERFACE CAPABILITIES FOLLOWING OUR VTC SESSION WITH

09:55AM  9    MAJOR NELSON, AND WE HAVE BEEN INCORPORATING NEWLY RECEIVED

09:55AM  10   INFORMATION FROM --" IS THAT LIEUTENANT COLONEL ROMERO?

09:55AM  11   A.   YES.

09:55AM  12   Q.   "-- TO ENSURE THAT THE DEVICE IS ABLE TO OPERATE UNDER THE

09:55AM  13   I.T. AND SECURITY REQUIREMENTS OF THE NETWORK IN THEATRE."

09:55AM  14        AND WAS THAT A DESCRIPTION OF WHAT THE COMPANY HAD BEEN

09:55AM  15   DOING AS A RESULT OF THE FEEDBACK THAT YOU GOT AT THE MEETING

09:56AM  16   AT THE MACDILL AIR FORCE BASE?

09:56AM  17   A.   THAT'S WHAT I WAS TOLD.

09:56AM  18   Q.   AND YOU TOLD HIM THAT THESE PROCESSES GUIDED OUR DELIVERY

09:56AM  19   TIMELINES.

09:56AM  20        DO YOU SEE THAT?

09:56AM  21   A.   YES.

09:56AM  22   Q.   AND THEN YOU -- YOU GO ON TO SAY IN THE LAST SENTENCE, "AS

09:56AM  23   A RAPIDLY GROWING COMPANY, WE ARE" -- "AS A RAPIDLY GROWING

09:56AM  24   COMPANY WE ARE MANAGING THESE TIMELINES AS BEST AS POSSIBLE

09:56AM  25   WHILE MAKING SURE THAT THE INTEGRITY OF OUR PRODUCTS AND

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4156

09:56AM   1    PROGRAM GOALS ARE NOT COMPROMISED."

09:56AM   2        NOW, YOU COULD OBSERVE EVERY DAY THAT THIS WAS A RAPIDLY

09:56AM   3    GROWING COMPANY; CORRECT?

09:56AM   4    A.   CORRECT.

09:56AM   5    Q.   AND YOU KNEW YOU WERE WORKING HARD IN CONNECTION WITH THIS

09:56AM   6    PROJECT; CORRECT?

09:56AM   7    A.   CORRECT.

09:56AM   8    Q.   THIS IS A PROJECT THAT YOU WANTED -- PERSONALLY WOULD HAVE

09:56AM   9    LIKED TO HAVE SEEN HAPPEN; CORRECT?

09:56AM   10   A.   CORRECT.

09:56AM   11   Q.   AND YOUR WORK HERE WAS DESIGNED TO BENEFIT BOTH THERANOS;

09:57AM   12   CORRECT?

09:57AM   13   A.   CORRECT.

09:57AM   14   Q.   BUT ALSO MEMBERS OF THE MILITARY WHO MIGHT BENEFIT FROM

09:57AM   15   THIS DEPLOYMENT; CORRECT?

09:57AM   16   A.   CORRECT.

09:57AM   17   Q.   AND YOU PROCEEDED IN GOOD FAITH IN TRYING TO DO THAT;

09:57AM   18   CORRECT?

09:57AM   19   A.   YES.

09:57AM   20   Q.   ALL RIGHT.  NOW, DID YOU HAVE FURTHER DISCUSSIONS AFTER

09:57AM   21   THIS EXCHANGE WITH MEMBERS OF THE MILITARY ABOUT DEPLOYING THE

09:57AM   22   4S DEVICE AT CENTCOM?

09:57AM   23   A.   YES.

09:57AM   24   Q.   AND I THINK WE SAW YESTERDAY THAT THERE WAS AN EXCHANGE

09:57AM   25   ABOUT REQUESTING THAT THE DEPLOYMENT BE DEFERRED UNTIL 2014.

EDLIN CROSS BY MR. DOWNEY (RES.)                                          4157

09:57AM   1            DO YOU RECALL THAT?

09:57AM   2     A.    YES.

09:57AM   3     Q.    OKAY.  LET ME ASK YOU TO LOOK BACK AT EXHIBIT 1027.

09:58AM   4            AND IF YOU SEE ON THE TOP HERE, THIS IS AN EMAIL, DRAFT

09:58AM   5     EMAIL THAT YOU SENT TO MS. HOLMES; CORRECT?

09:58AM   6     A.    CORRECT.

09:58AM   7     Q.    AND YOU PROPOSED A DATE, BASED ON YOUR CONVERSATION WITH

09:58AM   8     DR. ANEKAL, OF AUGUST 1ST FOR THE DEPLOYMENT; CORRECT?

09:58AM   9     A.    CORRECT.

09:58AM  10     Q.    AND WAS THAT DEPLOYMENT THEN DEFERRED UNTIL AUGUST 1ST OF

09:58AM  11     2014?

09:58AM  12     A.    WELL, IT DIDN'T INITIATE ON AUGUST 1ST.

09:58AM  13     Q.    CORRECT.  BUT AS OF AUGUST 1ST, 2013, WAS THE DATE OF

09:58AM  14     DEPLOYMENT DEFERRED UNTIL AUGUST 1ST, 2014?

09:58AM  15     A.    YES.

09:58AM  16     Q.    AND DID YOU CONTINUE TO WORK IN CONNECTION WITH THIS

09:58AM  17     PROGRAM AFTER AUGUST 1ST OF 2013?

09:58AM  18     A.    YES.

09:58AM  19     Q.    AND YOU WERE ALSO WORKING ON A NUMBER OF ISSUES RELATED TO

09:58AM  20     THE RETAIL LAUNCH; CORRECT?

09:59AM  21     A.    YES.

09:59AM  22     Q.    AND YOU WERE WORKING ON A NUMBER OF ISSUES RELATED TO

09:59AM  23     RAISING MONEY FOR INVESTORS; CORRECT?

09:59AM  24     A.    I WOULDN'T NECESSARILY SAY THAT.

09:59AM  25     Q.    WELL, YOU HAD SOME DUTIES THAT TOOK TIME FROM YOUR

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4158

09:59AM   1    CALENDAR, DIDN'T YOU?

09:59AM   2    A.   YES.

09:59AM   3    Q.   AND YOU HAD A NUMBER OF OTHER DUTIES THAT ALSO WERE

09:59AM   4    IMPORTANT; CORRECT?

09:59AM   5    A.   YES.

09:59AM   6    Q.   AND THIS WAS AN ENVIRONMENT THAT WAS VERY HECTIC; CORRECT?

09:59AM   7    A.   YES.

09:59AM   8    Q.   AND I THINK YOU'VE TESTIFIED ON DIRECT THAT YOU OBSERVED

09:59AM   9    MS. HOLMES WORKING VERY HARD EVERY DAY.  CORRECT?

09:59AM   10   A.   CORRECT.

09:59AM   11   Q.   BUT YOU ALSO WERE WORKING VERY HARD EVERY DAY; CORRECT?

09:59AM   12   A.   CORRECT.

09:59AM   13   Q.   OKAY.  LET'S TALK FOR A FEW MINUTES ABOUT THE RELATIONSHIP

09:59AM   14   BETWEEN THERANOS AND THE SPECIAL OPERATIONS COMMAND.

09:59AM   15        SPECIAL OPERATIONS COMMAND IS THE UNIFIED COMMAND FOR ALL

09:59AM   16   OF THE MILITARY SERVICES SPECIAL OPERATIONS; CORRECT?

09:59AM   17   A.   CORRECT.

09:59AM   18   Q.   OKAY.  LET ME ASK YOU TO LOOK BACK AT EXHIBIT 504, WHICH

10:00AM   19   IS IN EVIDENCE AND WHICH MR. BOSTIC SHOWED YOU DURING HIS

10:00AM   20   EXAMINATION.

10:00AM   21        IF YOU LOOK AT THE TOP OF THE EMAIL ON PAGE 1, WHICH IS

10:00AM   22   BLOWN UP ON YOUR SCREEN, THIS IS A DIALOGUE FROM A LITTLE BIT

10:00AM   23   EARLIER IN TIME BETWEEN SPECIAL OPERATIONS AND THERANOS;

10:00AM   24   CORRECT?

10:00AM   25   A.   CORRECT.

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4159

10:00AM  1    Q.   THIS IS FROM JANUARY OF 2012; CORRECT?

10:00AM  2    A.   CORRECT.

10:00AM  3    Q.   AND IN THE FIRST PARAGRAPH OF THIS DOCUMENT, YOU ASKED A

10:00AM  4    REPRESENTATIVE OF SOCOM TO PROVIDE A COMPREHENSIVE LIST OF ALL

10:00AM  5    OF THE ASSAYS THAT SOCOM PLANNED TO TEST IN CONNECTION WITH ITS

10:01AM  6    EVALUATION OF THERANOS DEVICES; CORRECT?

10:01AM  7    A.   CORRECT.

10:01AM  8    Q.   AND WHY DID YOU NEED THAT INFORMATION?

10:01AM  9    A.   THAT INFORMATION WAS NEEDED IN ORDER TO CUSTOMIZE ALL OF

10:01AM  10   THE EQUIPMENT.

10:01AM  11   Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 13977, WHICH IS IN THE

10:01AM  12   NOTEBOOK THAT I JUST GAVE YOU.

10:01AM  13   A.   OKAY.

10:01AM  14   Q.   IS THIS AN EXCHANGE OF EMAILS BETWEEN YOURSELF AND

10:01AM  15   REPRESENTATIVES OF THE MILITARY RELATED TO POTENTIALLY

10:01AM  16   DEPLOYING THERANOS EQUIPMENT FOR SPECIAL OPERATIONS?

10:02AM  17   A.   YES.

10:02AM  18        MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT 13977.

10:02AM  19        MR. BOSTIC:  NO OBJECTION.

10:02AM  20        THE COURT:  IT'S ADMITTED AND IT MAY BE PUBLISHED.

10:02AM  21   (DEFENDANT'S EXHIBIT 13977 WAS RECEIVED IN EVIDENCE.)

10:02AM  22        MR. DOWNEY:  I'D LIKE TO GO TO THE BOTTOM OF PAGE 2.

10:02AM  23   Q.   THIS IS A DOCUMENT BEING FORWARDED TO YOU BY AN INDIVIDUAL

10:02AM  24   NAMED NATHAN JORDAN.

10:02AM  25        DO YOU SEE THAT?

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4160

10:02AM   1      A.   YES.

10:02AM   2      Q.   AND DO YOU KNOW WHO THAT IS?

10:02AM   3      A.   A CONTRACTOR.

10:02AM   4      Q.   A MILITARY --

10:02AM   5      A.   A MILITARY CONTRACTOR, YES.

10:02AM   6      Q.   A MILITARY CONTRACTOR.

10:02AM   7           AND HE'S FORWARDING YOU HERE A COUNTERSIGNED MODIFICATION

10:02AM   8      FOR YOUR RECORDS; CORRECT?

10:02AM   9      A.   YES.

10:02AM  10      Q.   AND DOES THAT REFER TO A MODIFICATION OF THE AGREEMENT

10:02AM  11      THAT HAD BEEN ENTERED INTO BETWEEN SPECIAL OPERATIONS AND --

10:03AM  12      SPECIAL OPERATIONS COMMAND AND THERANOS TO CONDUCT AN

10:03AM  13      EXPERIMENT?

10:03AM  14      A.   YES.

10:03AM  15      Q.   OKAY.  IF YOU RECALL THE DOCUMENT THAT I SHOWED YOU A

10:03AM  16      MOMENT AGO, IT WAS DATED JANUARY 2012; CORRECT?

10:03AM  17      A.   CORRECT.

10:03AM  18      Q.   AND THE DOCUMENT WAS STILL BEING MODIFIED MORE THAN A YEAR

10:03AM  19      LATER; CORRECT?

10:03AM  20      A.   YES.

10:03AM  21      Q.   STRIKE THAT.

10:03AM  22           AND THE TERMS OF THE RELATIONSHIP WERE STILL BEING

10:03AM  23      NEGOTIATED MORE THAN A YEAR LATER; CORRECT?

10:03AM  24      A.   YES.

10:03AM  25      Q.   SO THIS WAS IN FEBRUARY OF 2013; CORRECT?

EDLIN CROSS BY MR. DOWNEY (RES.)                          4161

10:03AM   1      A.   CORRECT.

10:03AM   2      Q.   AND IF YOU GO TO THE EMAIL ABOVE THAT -- I'M SORRY, THE

10:03AM   3      NEXT EMAIL UP TOWARDS THE TOP OF THE PAGE.

10:03AM   4           THIS IS AN EMAIL SENT TO YOU BY STEPHANIE ELDER.  WHO WAS

10:04AM   5      STEPHANIE ELDER?

10:04AM   6      A.   I DON'T REMEMBER HER EXACT TITLE, BUT SHE WAS PART OF THE

10:04AM   7      MILITARY.  I WAS IN DISCUSSIONS WITH HER REGARDING PLANS FOR

10:04AM   8      THIS STUDY.

10:04AM   9      Q.   OKAY.  AND SO IN APRIL OF 2013, SHE ASKED YOU FOR AN

10:04AM  10      UPDATE ON WHERE YOU ARE WITH THE DEVICES; CORRECT?

10:04AM  11      A.   CORRECT.

10:04AM  12      Q.   AND THIS IS ABOUT TWO MONTHS AFTER THE MODIFICATION HAD

10:04AM  13      BEEN SIGNED; CORRECT?

10:04AM  14      A.   CORRECT.

10:04AM  15      Q.   OKAY.  IF YOU GO TO THE EMAIL ABOVE THAT.

10:04AM  16           DO YOU SEE THAT YOU RESPONDED TO HER SAYING, "THANK YOU

10:04AM  17      FOR YOUR EMAIL; I HOPE YOU ARE DOING WELL.  WE HAVE BEEN

10:04AM  18      PREPARING FOR THIS AND I AM HOPING TO CONNECT WITH YOU, IF YOU

10:04AM  19      THINK IT WOULD BE OF VALUE, TO DISCUSS THE PLANS FOR INITIATING

10:04AM  20      OUR PROGRAM."

10:04AM  21           AND YOU GIVE HER A PHONE NUMBER; CORRECT?

10:05AM  22      A.   CORRECT.

10:05AM  23      Q.   AND IF YOU CAN GO TO THE EMAIL ABOVE THAT.  THIS IS ABOUT

10:05AM  24      FIVE DAYS LATER.

10:05AM  25           YOU SAY, "I JUST WANTED TO MAKE SURE THAT YOU SAW MY

EDLIN CROSS BY MR. DOWNEY (RES.)                          4162

10:05AM    1    EMAIL."  CORRECT?

10:05AM    2    A.   YES.

10:05AM    3    Q.   AND YOU WANTED TO MAKE SURE YOU HEARD FROM HER; CORRECT?

10:05AM    4    A.   YES.

10:05AM    5    Q.   AND LET'S GO TO THE NEXT EMAIL.  THIS IS ABOUT A MONTH

10:05AM    6    LATER; CORRECT?

10:05AM    7    A.   CORRECT.

10:05AM    8    Q.   AND YOU SENT ANOTHER EMAIL TO MS. ELDER; CORRECT?

10:05AM    9    A.   CORRECT.

10:05AM   10    Q.   AND YOU ASKED HER AGAIN TO CONNECT; CORRECT?

10:05AM   11    A.   CORRECT.

10:05AM   12    Q.   AND IF YOU GO TO THE EMAIL ABOVE THAT, YOU FOLLOWED UP

10:05AM   13    AGAIN IN JULY; CORRECT?

10:05AM   14    A.   YES.

10:05AM   15    Q.   SO YOU WERE TRYING TO CONNECT WITH MS. ELDER ABOUT THE

10:05AM   16    DETAILS OF DEPLOYING A DEVICE, AND AT LEAST IN THIS PERIOD SHE

10:05AM   17    WAS NOT BEING RESPONSIVE; CORRECT?

10:05AM   18    A.   CORRECT.

10:05AM   19    Q.   OKAY.  ULTIMATELY, I THINK YOU TESTIFIED YESTERDAY, THAT

10:05AM   20    YOU WERE ABLE TO SHIP SOME DEVICES TO SOCOM; CORRECT?

10:06AM   21    A.   CORRECT.

10:06AM   22    Q.   AND ARE THOSE THE MODIFIED DEVICES THAT YOU DESCRIBED

10:06AM   23    EARLIER TODAY THAT WERE MODIFIED PER MR. BALWANI'S DIRECTION?

10:06AM   24    A.   THEY'RE DIFFERENT.

10:06AM   25    Q.   OKAY.  WERE THEY 4S DEVICES?

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4163

10:06AM   1     A.   THEY WERE 4S DEVICES.

10:06AM   2     Q.   AND DID SOCOM PERFORM THE EXPERIMENT WITH THOSE DEVICES?

10:06AM   3     A.   NO.

10:06AM   4     Q.   DID YOU EVER HEAR FROM SOCOM AS TO WHY?

10:06AM   5     A.   NO.

10:06AM   6     Q.   ALL RIGHT.  I WANT TO TURN TO A DIFFERENT TOPIC.

10:06AM   7          DO YOU RECALL DISCUSSING YESTERDAY WITH MR. BOSTIC A

10:06AM   8     NUMBER OF DEMONSTRATIONS THAT THERANOS DID FOR VARIOUS VIP'S?

10:06AM   9     A.   YES.

10:06AM  10     Q.   AND I THINK YOU TESTIFIED THAT YOU PLAYED SOME ROLE WITH

10:07AM  11     REGARD TO THOSE DEMONSTRATIONS; CORRECT?

10:07AM  12     A.   CORRECT.

10:07AM  13     Q.   YOU WERE A COORDINATOR OF THE LOGISTICS?

10:07AM  14     A.   CORRECT.

10:07AM  15     Q.   OKAY.  AND YOU WOULD DO THINGS LIKE MAKE SURE THE ROOM WAS

10:07AM  16     SET UP; CORRECT?

10:07AM  17     A.   CORRECT.

10:07AM  18     Q.   AND YOU WOULD MAKE SURE THAT THE ENGINEERS HAD GOTTEN THE

10:07AM  19     DEVICES INTO THE ROOM THAT MR. BALWANI OR MS. HOLMES EXPECTED;

10:07AM  20     CORRECT?

10:07AM  21     A.   CORRECT.

10:07AM  22     Q.   AND YOU WOULD WORK WITH OTHERS ON THE TEAM AT THERANOS TO

10:07AM  23     ENSURE THAT THE DEMONSTRATION WAS READY TO GO; CORRECT?

10:07AM  24     A.   CORRECT.

10:07AM  25     Q.   AND SOMETIMES IN A PARTICULAR DEMONSTRATION THERE MIGHT BE

EDLIN CROSS BY MR. DOWNEY (RES.)                              4164

10:07AM   1    AS MANY AS 15 TO 20 PEOPLE INVOLVED; CORRECT?

10:07AM   2    A.   IN TERMS OF THE NUMBER OF PEOPLE AT THE COMPANY, AT

10:07AM   3    THERANOS, INVOLVED IN PREPARING?

10:07AM   4    Q.   LET ME STRIKE THAT.

10:07AM   5         I THINK WE SAW YESTERDAY SOME EMAILS BETWEEN YOU AND A

10:07AM   6    NUMBER OF PEOPLE AT THERANOS WHO WERE SCIENTISTS RELATED TO THE

10:07AM   7    DEMONSTRATIONS; CORRECT?

10:07AM   8    A.   CORRECT.

10:07AM   9    Q.   AND ANY NUMBER OF THOSE SCIENTISTS MIGHT BE INVOLVED IN

10:08AM  10    ONE WAY OR ANOTHER WITH THE DEMONSTRATION; CORRECT?

10:08AM  11    A.   CORRECT.

10:08AM  12    Q.   OKAY.  AND DR. YOUNG WAS THE TECHNICAL LEAD FOR THE

10:08AM  13    DEMONSTRATIONS; CORRECT?

10:08AM  14    A.   HE ULTIMATELY REVIEWED AND APPROVED ALL OF THE RESULTS

10:08AM  15    FROM THE DEMOS.

10:08AM  16    Q.   OKAY.  AND HE WOULD, HE WOULD WORK WITH THE SCIENTISTS TO

10:08AM  17    GET READY FOR THE DEMONSTRATION; CORRECT?

10:08AM  18    A.   CORRECT.

10:08AM  19    Q.   AND IF ANY SCIENTIFIC OR TECHNICAL ISSUES AROSE, HE WAS

10:08AM  20    THE PERSON WHO WAS THERE TO ADDRESS THEM; CORRECT?

10:08AM  21    A.   THERE WERE -- I THINK THERE WERE SPECIFIC INSTANCES WHERE

10:08AM  22    OTHER ENGINEERS WOULD ADDRESS PROBLEMS AS WELL.

10:08AM  23    Q.   IN SOME INSTANCES IT MIGHT BE SOMEBODY WORKING UNDER

10:08AM  24    DR. YOUNG; CORRECT?

10:08AM  25    A.   WELL, THERE ARE A NUMBER OF DIFFERENT TEAMS ON THE

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4165

10:08AM   1    HARDWARE SIDE, AND I KNOW THAT -- I DON'T KNOW WHETHER DANIEL

10:08AM   2    MANAGED ALL OF THEM.

10:08AM   3    Q.   OKAY.  SO THERE MIGHT BE AN EXAMPLE OF AN INSTANCE WHERE

10:09AM   4    THERE WAS AN ISSUE WITH RESPECT TO THE HARDWARE AND YOU TALK TO

10:09AM   5    A HARDWARE ENGINEER; CORRECT?

10:09AM   6    A.   RIGHT.

10:09AM   7    Q.   AND AT THE END, I THINK -- DID YOU SAY THAT DR. YOUNG

10:09AM   8    WOULD VERIFY THE SAMPLE?  OR WHAT WAS THE TERMINOLOGY THAT YOU

10:09AM   9    USED?

10:09AM  10    A.   REVIEW, APPROVE, AND VERIFY.

10:09AM  11    Q.   NOW, NOT ALL OF THE DEMONSTRATIONS WERE THE SAME; CORRECT?

10:09AM  12    A.   CORRECT.

10:09AM  13    Q.   SOME TOOK PLACE IN LOCATIONS THAT WERE AWAY FROM THERANOS;

10:09AM  14    RIGHT?

10:09AM  15    A.   CORRECT.

10:09AM  16    Q.   MS. HOLMES AND OTHERS MIGHT TRAVEL TO SOMEONE ELSE'S

10:09AM  17    OFFICE AND PERFORM A DEMONSTRATION THERE; CORRECT?

10:09AM  18    A.   CORRECT.

10:09AM  19    Q.   AND SOMETIMES THE DEMONSTRATION WOULD BE AT THERANOS'S

10:09AM  20    HEADQUARTERS; CORRECT?

10:09AM  21    A.   CORRECT.

10:09AM  22    Q.   AND WERE THERE INSTANCES WHERE EVEN SOME INDIVIDUALS

10:09AM  23    WANTED TO GO TO THE WALGREENS STORE AND HAVE A DEMONSTRATION

10:09AM  24    THERE?

10:09AM  25    A.   YES.  THEY WENT TO THE WALGREENS STORE.  I WOULD CONSIDER

EDLIN CROSS BY MR. DOWNEY (RES.)                                   4166

10:10AM    1    THAT DIFFERENT FROM A DEMONSTRATION BECAUSE IN WALGREENS IT

10:10AM    2    WAS -- THAT WAS THE CLINICAL LAB TESTING PROCESS VERSUS A

10:10AM    3    DEMONSTRATION, WHICH WAS SEPARATE.

10:10AM    4    Q.   SO THOSE WHO WENT TO WALGREENS GOT AN ACTUAL CLINICAL

10:10AM    5    TEST; CORRECT?

10:10AM    6    A.   CORRECT.

10:10AM    7    Q.   THEY, THEY MIMICKED WHAT ANY PATIENT COMING IN WHO WANTED

10:10AM    8    A BLOOD TEST FROM WALGREENS WOULD GET?

10:10AM    9    A.   CORRECT.

10:10AM   10    Q.   I'D LIKE TO ASK YOU TO LOOK AT EXHIBIT 7244.

10:11AM   11    A.   OKAY.

10:11AM   12    Q.   IS THIS AN EMAIL EXCHANGE BETWEEN SEVERAL INDIVIDUALS AT

10:11AM   13    THERANOS, INCLUDING YOURSELF, RELATED TO A DEMONSTRATION THAT

10:11AM   14    WAS DONE IN 2012?

10:11AM   15    A.   YES.

10:11AM   16         MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT 7244.

10:11AM   17         MR. BOSTIC:  HEARSAY, YOUR HONOR.

10:11AM   18    BY MR. DOWNEY:

10:11AM   19    Q.   WERE RECORDS RELATED TO THE DEMONSTRATIONS THAT WERE

10:11AM   20    PERFORMED AT THERANOS PREPARED CONTEMPORANEOUS WITH THE

10:11AM   21    DEMONSTRATION?

10:11AM   22    A.   CAN YOU REPEAT THAT?

10:11AM   23    Q.   SURE.  WERE -- SOMETIMES DEMONSTRATIONS WERE PERFORMED AT

10:11AM   24    THERANOS; CORRECT?

10:11AM   25    A.   CORRECT.

EDLIN CROSS BY MR. DOWNEY (RES.)

10:11AM  1     Q.   AND THERE WOULD BE DETAILS RELATED TO THE LOGISTICS OF

10:11AM  2     SETTING UP THE DEMONSTRATION; CORRECT?

10:11AM  3     A.   CORRECT.

10:11AM  4     Q.   AND THERE MIGHT BE DETAILS ABOUT MAKING ARRANGEMENTS AFTER

10:12AM  5     THE DEMONSTRATION WAS PERFORMED; CORRECT?

10:12AM  6     A.   CORRECT.

10:12AM  7     Q.   AND INDIVIDUALS AT THERANOS WOULD COMMUNICATE WITH EACH

10:12AM  8     OTHER BY EMAIL OFTEN ABOUT THAT; CORRECT?

10:12AM  9     A.   CORRECT.

10:12AM  10    Q.   AND THOSE COMMUNICATIONS WOULD BE AROUND THE SAME TIME AS

10:12AM  11    THE DEMONSTRATION; CORRECT?

10:12AM  12    A.   CORRECT.

10:12AM  13    Q.   AND EMAILS AT THERANOS WERE PRESERVED IN THE THERANOS

10:12AM  14    SYSTEM; CORRECT?

10:12AM  15    A.   I BELIEVE SO.

10:12AM  16    Q.   OKAY.

10:12AM  17         YOUR HONOR, I MOVE TO ADMIT 7244.

10:12AM  18              MR. BOSTIC:  YOUR HONOR, SAME OBJECTION.  THIS EMAIL

10:12AM  19    SEEMS TO BE AFTER THE FACT FROM THE PROCESSES THAT MR. DOWNEY

10:12AM  20    WAS ASKING ABOUT.

10:12AM  21              THE COURT:  IS THIS CONTEMPORANEOUS WITH THE

10:12AM  22    DEMONSTRATION THAT YOU'RE SEEKING?

10:12AM  23              MR. DOWNEY:  WELL, IT'S A COUPLE WEEKS AFTER BECAUSE

10:12AM  24    IT'S A REPORT BACK FROM AN INDIVIDUAL WHO PARTICIPATED.

10:12AM  25              THE COURT:  SO I THINK FOR 803(6), MAYBE YOU CAN

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4168

10:12AM  1        DEVELOP A LITTLE MORE FOUNDATION ON THAT.

10:12AM  2                 MR. DOWNEY:  SURE.

10:12AM  3        Q.  WELL, FIRST OF ALL, LET ME ASK YOU, WAS THIS EMAIL

10:13AM  4        COMMUNICATED TO MS. HOLMES?

10:13AM  5        A.  YES.

10:13AM  6                 MR. DOWNEY:  YOUR HONOR, UNDER 803 I THINK I'M

10:13AM  7        ENTITLED TO ADMIT IT.

10:13AM  8                 THE COURT:  I'LL ADMIT IT.  IT MAY BE PUBLISHED.

10:13AM  9             (DEFENDANT'S EXHIBIT 7244 WAS RECEIVED IN EVIDENCE.)

10:13AM 10        BY MR. DOWNEY:

10:13AM 11        Q.  LET ME ASK YOU TO LOOK AT THE BOTTOM HALF OF THE FIRST

10:13AM 12        PAGE.

10:13AM 13             DO YOU SEE THIS IS AN EMAIL FROM MR. BALWANI IN 2012 ABOUT

10:13AM 14        A DEMONSTRATION; CORRECT?

10:13AM 15        A.  YES.

10:13AM 16        Q.  AND IF YOU LOOK AT THE SUBJECT, IT'S ABOUT A DEMONSTRATION

10:13AM 17        THAT WAS DONE IN THE MIDDLE OF JULY IN 2012 IN CHICAGO.

10:13AM 18             DO YOU SEE THAT?

10:13AM 19        A.  I DO.

10:13AM 20        Q.  AND THAT WAS ABOUT A LITTLE OVER A YEAR BEFORE THE RETAIL

10:13AM 21        LAUNCH IN WALGREENS; CORRECT?

10:13AM 22        A.  YES.

10:13AM 23        Q.  AND THE REFERENCE TO CHICAGO CAUSES ME TO ASK, WAS THIS A

10:13AM 24        DEMONSTRATION DONE FOR WALGREENS EXECUTIVES?

10:14AM 25        A.  I'M NOT POSITIVE, BUT THEY DID HAVE OFFICES IN ILLINOIS.

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4169

10:14AM   1    Q.   AND DO YOU SEE THAT MR. BALWANI WAS REPORTING BACK ON

10:14AM   2    INFORMATION THAT HE LEARNED ABOUT THE DEMONSTRATION IN THE

10:14AM   3    FIRST PARAGRAPH OF HIS EMAIL AT THE BOTTOM?

10:14AM   4    A.   YES.

10:14AM   5    Q.   AND DO YOU SEE THAT HE'S COMMUNICATING THAT TO DR. YOUNG;

10:14AM   6    CORRECT?

10:14AM   7    A.   YES.

10:14AM   8    Q.   AND TO VARIOUS REPRESENTATIVES OF ASSAY TEAMS WITHIN THE

10:14AM   9    COMPANY; CORRECT?

10:14AM   10   A.   YES.

10:14AM   11   Q.   AND ALSO TO PERSONNEL WHO WORKED ON THE HARDWARE AT THE

10:14AM   12   COMPANY; CORRECT?

10:14AM   13   A.   CORRECT.

10:14AM   14   Q.   AND TO THE CLINICAL, THEN CLINICAL LAB DIRECTOR; CORRECT?

10:14AM   15   A.   CORRECT.

10:14AM   16   Q.   AND HAD ALL OF THOSE INDIVIDUALS BEEN INVOLVED IN ONE WAY

10:14AM   17   OR ANOTHER WITH PREPARING FOR THIS DEMONSTRATION?

10:14AM   18   A.   I DON'T RECALL.

10:14AM   19   Q.   OKAY.  BUT OFTEN PERSONNEL, THE PERSONNEL IN ALL OF THOSE

10:14AM   20   CATEGORIES WOULD BE INVOLVED IN PREPARING FOR A DEMONSTRATION?

10:15AM   21   A.   I'M NOT SURE IF I WOULD SAY THAT ALWAYS.

10:15AM   22   Q.   BUT YOU DO RECALL OCCASIONS WHERE PERSONNEL FROM THE ASSAY

10:15AM   23   TEAM, THE HARDWARE TEAM, DR. YOUNG, AND OTHER SCIENTISTS WERE

10:15AM   24   INVOLVED; CORRECT?

10:15AM   25   A.   YES.

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4170

10:15AM  1    Q.   ALL RIGHT.  IF YOU SEE THE REPORT THAT MR. BALWANI GIVES

10:15AM  2    IN THE PARAGRAPH THAT BEGINS, "I HEARD BACK," HE REPORTS THAT

10:15AM  3    HE HEARD BACK FROM AN EXECUTIVE THAT THEY HAD PERFORMED A

10:15AM  4    DEMONSTRATION ON, AND HE REPORTS THAT THE EXECUTIVE'S RESULTS

10:15AM  5    FROM THE DEMONSTRATION WERE IDENTICAL TO RESULTS THAT THE

10:15AM  6    EXECUTIVE GOT FROM A DOCTOR.

10:15AM  7         DO YOU SEE THAT?

10:15AM  8    A.   I DO.

10:15AM  9    Q.   NOW, YOU WERE SHOWN YESTERDAY A NUMBER OF DOCUMENTS THAT

10:16AM  10   RELATED TO DEMONSTRATIONS WHERE THERE WAS A DISCUSSION BETWEEN

10:16AM  11   INDIVIDUALS AT THERANOS RELATED TO SOME DISCREPANCY OR

10:16AM  12   UNCERTAINTY ABOUT THE RESULTS.

10:16AM  13        DO YOU RECALL THAT?

10:16AM  14   A.   YES.

10:16AM  15   Q.   BUT DOZENS OF DEMONSTRATIONS WERE PERFORMED AT THERANOS;

10:16AM  16   CORRECT?

10:16AM  17   A.   CORRECT.

10:16AM  18   Q.   AND MANY OF THEM RESULTED IN REPORTS BACK FROM THOSE WHO

10:16AM  19   RECEIVED THE DEMONSTRATION THAT THE RESULTS WERE SIMILAR OR

10:16AM  20   IDENTICAL TO THOSE THAT THEY RECEIVED FROM OTHER BLOOD TESTS?

10:16AM  21   A.   I REALLY DIDN'T RECEIVE COMMUNICATION BACK FROM THE

10:16AM  22   INDIVIDUALS WHO DID THE DEMO REGARDING THEIR TEST RESULTS.

10:16AM  23   Q.   YOU DID NOT PARTICIPATE IN THAT?

10:16AM  24   A.   I DID NOT.

10:16AM  25   Q.   OKAY.  NOW, AS WELL AS BEING AT DIFFERENT LOCATIONS -- BY

EDLIN CROSS BY MR. DOWNEY (RES.)                                4171

10:17AM  1    THE WAY, WITH REGARD TO THE DEMONSTRATION THAT WE JUST LOOKED

10:17AM  2    AT, THAT'S A DEMONSTRATION WHERE THE DEVICE WAS TAKEN TO

10:17AM  3    CHICAGO; CORRECT?

10:17AM  4    A.   YES.

10:17AM  5    Q.   AND THAT'S A DEMONSTRATION THAT WOULD HAVE BEEN RUN WHERE

10:17AM  6    THE BLOOD WAS DRAWN FROM THE EXECUTIVE; CORRECT?

10:17AM  7    A.   I WASN'T THERE, BUT, YES, THAT'S WHAT WOULD HAVE HAPPENED.

10:17AM  8    Q.   OKAY.  AND THEN THAT WOULD BE INSERTED INTO A CARTRIDGE;

10:17AM  9    CORRECT?

10:17AM  10   A.   CORRECT.

10:17AM  11   Q.   AND THE CARTRIDGE WOULD BE INSERTED INTO THE ANALYZER;

10:17AM  12   CORRECT?

10:17AM  13   A.   CORRECT.

10:17AM  14   Q.   AND THE BLOOD TEST RESULTS WOULD BE GENERATED FROM THAT;

10:17AM  15   CORRECT?

10:17AM  16   A.   CORRECT.

10:17AM  17   Q.   AND THAT'S ONE FORM OF DEMONSTRATION; CORRECT?

10:17AM  18        THERE ARE OTHER FORMS OF DEMONSTRATION; CORRECT?

10:17AM  19   A.   CORRECT.

10:17AM  20   Q.   AT SOME POINTS PEOPLE WOULD COME TO THERANOS AND THEY

10:17AM  21   WOULDN'T WANT TO HAVE THEIR BLOOD DRAWN, BUT THEY WOULD WANT TO

10:17AM  22   SEE HOW THE DEVICE WORKED; CORRECT?

10:17AM  23   A.   CORRECT.

10:17AM  24   Q.   AND THEY MIGHT BE INTERESTED IN THE INTERFACE OF THE

10:17AM  25   DEVICE, FOR EXAMPLE?

EDLIN CROSS BY MR. DOWNEY (RES.)

10:17AM  1    A.   CORRECT.

10:17AM  2    Q.   AND CAN YOU DESCRIBE TO US WHAT KIND OF INFORMATION WAS

10:18AM  3    CONVEYED BY THE INTERFACE OF THE THERANOS DEVICE?

10:18AM  4    A.   IT WAS A GRAPHIC USER INTERFACE, AND THERE WERE CERTAIN

10:18AM  5    BUTTONS THAT COULD BE PRESSED THAT WOULD INDICATE IF THE USER

10:18AM  6    WANTED TO RUN A TEST OR NOT.

10:18AM  7    Q.   OKAY.  AND WOULD INFORMATION ABOUT THE PATIENT GETTING THE

10:18AM  8    BLOOD TEST BE ENTERED INTO THE USER INTERFACE, FOR EXAMPLE?

10:18AM  9    A.   YES.

10:18AM  10   Q.   AND MEDICAL HISTORY; CORRECT?

10:18AM  11   A.   IT COULD BE.

10:18AM  12   Q.   OKAY.  AND SOME INDIVIDUALS WOULD JUST WANT TO SEE HOW

10:18AM  13   THAT INTERFACE WORKED; CORRECT?

10:18AM  14   A.   YES.

10:18AM  15   Q.   BUT IF YOU RAN THE DEVICE WITHOUT BLOOD IN IT, THE DEVICE

10:18AM  16   WOULD AUTOMATICALLY SHUT DOWN; CORRECT?

10:18AM  17   A.   I DON'T THINK I AGREE WITH THAT.

10:19AM  18   Q.   OKAY.  WELL, WAS THE -- WAS THERE A PROTOCOL THAT NORMALLY

10:19AM  19   WAS IN PLACE ON THE DEVICE, REFERRED TO AS THE NORMANDY

10:19AM  20   PROTOCOL?

10:19AM  21   A.   THAT WAS ONE OF THE PROTOCOLS.  AT ONE POINT THERE -- THE

10:19AM  22   PROTOCOLS WERE CONTINUALLY DEVELOPED, AND AT ONE POINT THERE

10:19AM  23   WAS THE DEMO PROTOCOL WHICH WE DISCUSSED, OR THE DEMO APP WHICH

10:19AM  24   WE DISCUSSED YESTERDAY.

10:19AM  25   Q.   WELL, LET'S TALK ABOUT THE NORMANDY PROTOCOL FIRST AND

EDLIN CROSS BY MR. DOWNEY (RES.)                           4173

10:19AM  1    THEN WE'LL TALK ABOUT THE OTHER PROTOCOLS.

10:19AM  2    A.   OKAY.

10:19AM  3    Q.   UNDER THE NORMANDY PROTOCOL, WHAT WOULD HAPPEN IF YOU

10:19AM  4    INSERTED A CARTRIDGE INTO A DEVICE BUT THERE WAS NO BLOOD

10:19AM  5    SAMPLE IN IT?

10:19AM  6    A.   I DON'T RECALL.

10:19AM  7    Q.   OKAY.  IF YOU, IF YOU USED THE NULL PROTOCOL SOFTWARE,

10:19AM  8    WHAT WOULD HAPPEN IF YOU INSERTED A CARTRIDGE AND THERE WAS NO

10:19AM  9    BLOOD SAMPLE IN IT?

10:19AM 10    A.   THE NULL PROTOCOL WOULD RUN, BUT --

10:20AM 11    Q.   BUT NO TEST WOULD BE PERFORMED; CORRECT?

10:20AM 12    A.   CORRECT.

10:20AM 13    Q.   AND IN SOME INSTANCES, I THINK WE DISCUSSED A MOMENT AGO,

10:20AM 14    INDIVIDUALS WOULD COME AND THEY WOULDN'T WANT THEIR BLOOD

10:20AM 15    DRAWN; CORRECT?

10:20AM 16    A.   CORRECT.

10:20AM 17    Q.   AND THE NULL PROTOCOL COULD BE USED IN CONNECTION WITH

10:20AM 18    THOSE DEMONSTRATIONS; CORRECT?

10:20AM 19    A.   CORRECT.

10:20AM 20    Q.   LET ME SHOW YOU IN THE GOVERNMENT'S BINDER AN EXHIBIT THAT

10:20AM 21    WAS ADMITTED YESTERDAY, WHICH IS EXHIBIT 959.

10:20AM 22    A.   OKAY.

10:20AM 23    Q.   IF YOU GO TO WHERE THE EMAIL CHAIN STARTS ON THE SECOND

10:20AM 24    PAGE, THIS APPEARS TO BE YOU SETTING UP -- DIRECTING THE SETUP

10:21AM 25    OF EQUIPMENT BASED ON DIRECTIONS YOU HAD GOTTEN FROM EITHER

EDLIN CROSS BY MR. DOWNEY (RES.)                               4174

10:21AM   1    MS. HOLMES OR MR. BALWANI; CORRECT?

10:21AM   2    A.   YES.

10:21AM   3    Q.   AND YOU'RE ASKING THAT CERTAIN THERANOS DEVICES BE SET UP

10:21AM   4    IN AN INTERVIEW ROOM; CORRECT?

10:21AM   5    A.   YES.

10:21AM   6    Q.   AND THESE COMMUNICATIONS WERE IN CONNECTION WITH A, WITH A

10:21AM   7    PLANNED DEMONSTRATION; CORRECT?

10:21AM   8    A.   YES.

10:21AM   9    Q.   AND IF YOU LOOK AT THE EMAIL TOWARDS THE -- THE SECOND

10:21AM  10    EMAIL, YOU'RE ASKING, SHOULD WE USE THE NORMANDY APP OR THE

10:21AM  11    DEMO APP; CORRECT?

10:21AM  12    A.   CORRECT.

10:21AM  13    Q.   AND THEN IN THE NEXT -- AND THEN IN THE SECOND TO THE LAST

10:21AM  14    PARAGRAPH, YOU SAY, "IF WE RUN THE NULL PROTOCOL, WE DON'T NEED

10:21AM  15    THE CARTRIDGE TO BE AS TIGHT AS IT WAS LAST TIME IN THE CONTEXT

10:22AM  16    OF INSERTING THE COLLECTION CONTAINERS."

10:22AM  17        DO YOU SEE THAT?

10:22AM  18    A.   YES.

10:22AM  19    Q.   AND THEN DO YOU RECALL IN THE EMAIL CHAIN ABOVE

10:22AM  20    MICHAEL CRAIG RECOMMENDED TO YOU THAT YOU USE THE DEMO APP;

10:22AM  21    CORRECT?

10:22AM  22    A.   CORRECT.

10:22AM  23    Q.   NONE OF THIS CONVERSATION WAS ABOUT PLAYING A TRICK ON THE

10:22AM  24    PEOPLE GETTING A DEMO, WAS IT?

10:22AM  25    A.   NO.

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4175

10:22AM  1    Q.   THIS WAS -- THIS CONVERSATION WAS ABOUT THE VARIOUS THINGS

10:22AM  2    THAT COULD HAPPEN WHEN PEOPLE CAME TO GET A DEMONSTRATION AT

10:22AM  3    THERANOS; CORRECT?

10:22AM  4    A.   CORRECT.

10:22AM  5    Q.   SOMEONE MIGHT SHOW UP AND SAY, I DON'T WANT TO HAVE MY

10:22AM  6    BLOOD DRAWN TODAY; CORRECT?

10:22AM  7    A.   CORRECT.

10:22AM  8    Q.   SOMEBODY MIGHT SHOW UP AND SAY, I DO WANT TO HAVE MY BLOOD

10:22AM  9    DRAWN; CORRECT?

10:22AM  10   A.   CORRECT.  IT WAS VERY IN THE MOMENT.

10:22AM  11   Q.   RIGHT.  AND SO YOU NEEDED TO BE PREPARED FOR ALL OF THESE

10:22AM  12   DIFFERENT SCENARIOS; CORRECT?

10:22AM  13   A.   CORRECT.

10:22AM  14   Q.   AND THERE WERE DIFFERENT PROTOCOLS DESIGNED FOR ALL OF

10:22AM  15   THOSE DIFFERENT SCENARIOS; CORRECT?

10:23AM  16   A.   CORRECT.

10:23AM  17   Q.   BECAUSE AT THE END OF THE DAY, YOU WERE WORKING AS HARD AS

10:23AM  18   YOU COULD TO DEMONSTRATE THE TECHNOLOGY IN THE MOST APPEALING

10:23AM  19   WAY POSSIBLE; CORRECT?

10:23AM  20   A.   CORRECT.

10:23AM  21   Q.   BUT YOU WERE NOT TRYING TO DECEIVE ANYBODY IN THIS

10:23AM  22   DEMONSTRATION PROCESS, WERE YOU?

10:23AM  23   A.   OF COURSE NOT.

10:23AM  24   Q.   AND YOU DID NOT UNDERSTAND THAT ANYONE ELSE AT THERANOS

10:23AM  25   WAS TRYING TO DECEIVE ANYONE ELSE; CORRECT?

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4176

10:23AM  1      A.   CORRECT.

10:23AM  2      Q.   ALL RIGHT.  LET ME DIRECT YOUR ATTENTION TO THE TOP OF

10:23AM  3      THIS EMAIL.

10:23AM  4      A.   YES.

10:23AM  5      Q.   AND THERE'S A COMMUNICATION FROM DR. ANEKAL TO YOU.

10:23AM  6           DO YOU SEE THAT?

10:23AM  7      A.   YES.

10:23AM  8      Q.   AND HE SAYS, IF WE BLOW UP THE FIRST PARAGRAPH OF THAT

10:23AM  9      EMAIL, HE SAYS, "DAN, THE ASSAY TEAMS ARE PLANNING ON USING THE

10:24AM 10      3.5 DEVICES TOMORROW, BUT WE CAN MOVE ONE OF THE R&D UNITS IF

10:24AM 11      IT'S JUST FOR SHOW-AND-TELL."

10:24AM 12           DO YOU SEE THAT?

10:24AM 13      A.   YES.

10:24AM 14      Q.   AND HIS REFERENCE TO SHOW-AND-TELL THERE IS A REFERENCE TO

10:24AM 15      AN INSTANCE WHERE SOMEONE MIGHT JUST WANT TO SEE THE DEVICE;

10:24AM 16      CORRECT?

10:24AM 17      A.   CORRECT.

10:24AM 18      Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 7243.

10:24AM 19      A.   OKAY.

10:24AM 20      Q.   IS THIS AN EMAIL BETWEEN MS. HOLMES, YOURSELF, AND

10:24AM 21      DR. YOUNG REGARDING SETTING UP A DEMONSTRATION IN JULY AND

10:24AM 22      AUGUST OF 2012?

10:24AM 23      A.   YES.

10:24AM 24           MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

10:25AM 25      7243.

EDLIN CROSS BY MR. DOWNEY (RES.)

10:25AM  1              MR. BOSTIC:  NO OBJECTION.

10:25AM  2              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:25AM  3          (DEFENDANT'S EXHIBIT 7243 WAS RECEIVED IN EVIDENCE.)

10:25AM  4     BY MR. DOWNEY:

10:25AM  5     Q.  IF YOU GO TO THE EMAIL AT THE VERY BOTTOM, DO YOU SEE

10:25AM  6     THAT?

10:25AM  7          MS. HOLMES ASKS DR. YOUNG, "DO WE HAVE A COUPLE OF

10:25AM  8     MINILABS THAT ARE FULLY ASSEMBLED WITH FUNCTIONAL

10:25AM  9     SCREENS/ELECTRONICS THAT ARE EASY TO SHOW A CLIENT TOMORROW

10:25AM 10     MIDDAY?"

10:25AM 11          AND THEN IF YOU GO ABOVE THAT, DR. YOUNG SAYS, "YES, WE

10:25AM 12     HAVE FULLY FUNCTIONAL MINILABS.  I WILL MAKE SURE THE DISPLAY

10:25AM 13     IS READY."

10:25AM 14          AND THEN IN THE NEXT PARAGRAPH OF THAT, HE ASKS, WHERE IT

10:25AM 15     BEGINS, "ALSO, DO YOU WANT ANY TESTS RUN ON THE MACHINE, OR

10:25AM 16     JUST HAVE IT POWERED UP WITH THE DISPLAY SHOWING SOMETHING

10:26AM 17     INTERESTING?"

10:26AM 18          OKAY.  AND IF YOU GO -- DO YOU SEE THAT?

10:26AM 19     A.  YES.

10:26AM 20     Q.  AND IF YOU GO TO THE EMAIL ABOVE THAT, MS. HOLMES

10:26AM 21     RESPONDS, "WE CAN PUT THEM IN AN INTERVIEW ROOM."

10:26AM 22          CORRECT?

10:26AM 23     A.  YES.

10:26AM 24     Q.  AND SHE SAYS, "IF WE CAN EASILY HAVE THEM READY TO ACCEPT

10:26AM 25     CARTRIDGES WE SHOULD.  ALSO YES ON THE SCREEN... WE SHOULD NOT

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4178

10:26AM   1     DO A LOT OF EXTRA WORK FOR THIS."

10:26AM   2          DO YOU SEE THAT?

10:26AM   3     A.   YES.

10:26AM   4     Q.   AND IF YOU GO ABOVE THAT, DR. YOUNG SAYS -- I'M SORRY, TO

10:26AM   5     THE EMAIL FROM DR. YOUNG, HE SAYS HE WILL GET IT SET UP IN THAT

10:26AM   6     WAY, BUT HE SAYS, WE ARE NOT READY TO RUN WHOLE BLOOD SAMPLES

10:26AM   7     IN THE MINILAB THAT HE'S SETTING UP; CORRECT?

10:26AM   8          DO YOU SEE THAT?

10:26AM   9     A.   YES.

10:26AM   10    Q.   AND DO YOU SEE THE EMAIL FROM MS. HOLMES?  SHE SAYS,

10:26AM   11    "WE'RE NOT RUNNING SAMPLES - JUST DEMONSTRATING THE HARDWARE."

10:26AM   12         DO YOU SEE THAT?

10:27AM   13    A.   CORRECT.

10:27AM   14    Q.   NOW, I TAKE IT THAT YOU HAD A GENERAL SENSE OF WHAT THE

10:27AM   15    ENGINEERING WAS RELATED TO -- WELL, STRIKE THAT.

10:27AM   16         YOU'RE NOT AN ENGINEER; CORRECT?

10:27AM   17    A.   CORRECT.

10:27AM   18    Q.   AND YOU'RE NOT INTIMATELY FAMILIAR WITH ALL OF THE

10:27AM   19    DEVELOPMENT OF THE SOFTWARE IN CONNECTION WITH THESE PROTOCOLS;

10:27AM   20    CORRECT?

10:27AM   21    A.   CORRECT.

10:27AM   22    Q.   AND THAT WAS DONE BY MICHAEL CRAIG AND HIS TEAM; CORRECT?

10:27AM   23    A.   I'M NOT SURE IF HE LED THE TEAM, BUT I KNOW HE WAS ON THE

10:27AM   24    TEAM.

10:27AM   25    Q.   OKAY.  NOW, WE'VE BEEN TALKING ABOUT THE SCENARIO WHERE

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4179

10:27AM   1    PEOPLE DON'T WANT TO GET A BLOOD TEST, BUT THERE WERE TIMES

10:27AM   2    WHEN PEOPLE CAME IN AND SAID, I DO WANT TO GET A BLOOD TEST;

10:27AM   3    CORRECT?

10:27AM   4    A.    CORRECT.

10:27AM   5    Q.    AND THAT YOU REFERRED, WHEN YOU WERE TESTIFYING ON DIRECT

10:28AM   6    YESTERDAY, TO TWO DIFFERENT SCENARIOS WHEN SOMEONE WANTED TO

10:28AM   7    GET THEIR BLOOD TESTED; CORRECT?

10:28AM   8    A.    THERE WERE MULTIPLE SCENARIOS.

10:28AM   9    Q.    OKAY.  WELL, ONE WAS THAT YOU COULD ACTUALLY TEST THE

10:28AM   10   SAMPLE ON THE DEVICE; CORRECT?

10:28AM   11   A.    CORRECT.

10:28AM   12   Q.    AND THAT WAS DONE IN MANY INSTANCES; CORRECT?

10:28AM   13   A.    YES.

10:28AM   14   Q.    AND THE OTHER WAS TO TEST THE SAMPLE IN THE THERANOS

10:28AM   15   LABORATORY; CORRECT?

10:28AM   16   A.    CORRECT.

10:28AM   17   Q.    AND THAT, BY THE WAY, WAS NOT THE CLINICAL LABORATORY, WAS

10:28AM   18   IT?

10:28AM   19   A.    I DON'T KNOW EXACTLY.

10:28AM   20   Q.    OKAY.  BUT IT WAS DONE FOR PURPOSES OF RESEARCH AND

10:28AM   21   DEVELOPMENT; CORRECT?

10:28AM   22   A.    WHEN I WOULD HAND, WHEN I WOULD HAND OFF SAMPLES TO

10:28AM   23   SCIENTISTS, IT WAS NOT IN THE CLINICAL LAB.

10:28AM   24   Q.    OKAY.  NOW, YOU TALKED AT SOME LENGTH YESTERDAY ABOUT AN

10:28AM   25   AUGUST 2013 DEMONSTRATION THAT WAS PERFORMED FOR WALGREENS

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4180

10:28AM   1    EXECUTIVES.

10:28AM   2         DO YOU REMEMBER THAT?

10:28AM   3    A.   YES.

10:28AM   4    Q.   AND THAT WAS SHORTLY BEFORE THE LAUNCH OF RETAIL SERVICES

10:29AM   5    AT WALGREENS?

10:29AM   6    A.   YES.

10:29AM   7    Q.   AND IN CONNECTION WITH THIS DEMONSTRATION, THERE WERE A

10:29AM   8    NUMBER OF EXECUTIVES MEETING WITH MS. HOLMES AND MR. BALWANI;

10:29AM   9    CORRECT?

10:29AM  10    A.   CORRECT.

10:29AM  11    Q.   AND A DEMONSTRATION WAS GOING TO BE PERFORMED FOR THEM;

10:29AM  12    CORRECT?

10:29AM  13    A.   CORRECT.

10:29AM  14    Q.   AND YOU WERE INVOLVED IN HELPING TO SET UP AND PREPARE

10:29AM  15    THAT DEMONSTRATION; CORRECT?

10:29AM  16    A.   CORRECT.

10:29AM  17    Q.   LET ME SHOW YOU AGAIN 959.

10:29AM  18         IF YOU WOULD LOOK AT THE SECOND -- AT THE EMAIL ON PAGE 2,

10:29AM  19    LOOK AT THE FIRST PARAGRAPH AGAIN.

10:29AM  20         YOU'RE DIRECTING THE EQUIPMENT THAT YOU WERE REQUESTING BE

10:29AM  21    PUT IN THE INTERVIEW RAN.

10:29AM  22         DO YOU SEE THAT?

10:30AM  23    A.   YES.

10:30AM  24    Q.   AND THEN YOU DIRECT WHAT KIND OF PROTOCOLS ARE GOING TO BE

10:30AM  25    RUN ON EACH DEVICE; CORRECT?

EDLIN CROSS BY MR. DOWNEY (RES.)                    4181

10:30AM  1    A.  CORRECT.

10:30AM  2    Q.  AND YOU ALSO SAY IN THE FOURTH PARAGRAPH, "MOST LIKELY WE

10:30AM  3    WILL COLLECT A NUMBER OF SAMPLES AND STORE THEM IN THE SHIPPING

10:30AM  4    CONTAINER LIKE THE LAST MEETING WE HAD, AND THEN PROCESS THEM

10:30AM  5    SEPARATELY IN THE LAB."

10:30AM  6        CORRECT?

10:30AM  7    A.  CORRECT.

10:30AM  8    Q.  AND THAT'S REFERRING TO A PRIOR DEMONSTRATION THAT YOU DID

10:30AM  9    WHERE BLOOD SAMPLES WERE COLLECTED AT A MEETING; CORRECT?

10:30AM  10   A.  CORRECT.

10:30AM  11   Q.  AND THE SAMPLES, WHEN THEY WERE TAKEN, WERE PLACED IN THE

10:30AM  12   TINY LITTLE NANOTAINER; CORRECT?

10:30AM  13   A.  CORRECT.

10:30AM  14   Q.  AND THE NANOTAINER WAS PLACED IN THE SHIPPING CONTAINER

10:30AM  15   BOX; CORRECT?

10:30AM  16   A.  CORRECT.

10:30AM  17   Q.  AND THE BOX WAS TAKEN AND TAKEN TO THE LAB AND TESTING WAS

10:30AM  18   PERFORMED THERE; CORRECT?

10:30AM  19   A.  CORRECT.

10:30AM  20   Q.  AGAIN, THAT WAS NOT DONE TO DECEIVE ANYONE, WAS IT?

10:30AM  21   A.  NO.

10:30AM  22   Q.  YOU KNEW AT THE STAGE THAT THIS MEETING WAS TAKING PLACE

10:31AM  23   THAT THE RELATIONSHIP BETWEEN THERANOS AND WALGREENS HAD

10:31AM  24   CHANGED FROM ITS ORIGINAL CONCEPTION OF DEPLOYING DEVICES IN

10:31AM  25   STORES; CORRECT?

EDLIN CROSS BY MR. DOWNEY (RES.)                              4182

10:31AM   1          LET ME ALTER THAT.

10:31AM   2          DID YOU -- YOU KNEW THAT WHEN TESTS WERE TO BE DONE AT

10:31AM   3    WALGREENS STORES, THEY WOULD NOT BE PERFORMED ON SITE AT THE

10:31AM   4    WALGREENS STORES; CORRECT?

10:31AM   5    A.   CORRECT.

10:31AM   6    Q.   INSTEAD WHEN A TEST WAS DONE AT A WALGREENS STORE, THE

10:31AM   7    BLOOD WOULD BE TAKEN INTO THE NANOTAINER; CORRECT?

10:31AM   8    A.   CORRECT.

10:31AM   9    Q.   PLACED INTO A CARTRIDGE; CORRECT?

10:31AM   10   A.   CORRECT.

10:31AM   11   Q.   PLACED INTO A --

10:31AM   12   A.   I'M SORRY.  IT WAS PLACED INTO A SHIPPING CONTAINER.

10:31AM   13   Q.   SORRY, PLACED INTO A NANOTAINER; CORRECT?

10:31AM   14   A.   CORRECT.

10:31AM   15   Q.   AND THE NANOTAINER WAS PLACED IN THE SHIPPING CONTAINER;

10:31AM   16   CORRECT?

10:31AM   17   A.   CORRECT.

10:31AM   18   Q.   AND SHIPPED TO THERANOS'S CENTRAL LAB; CORRECT?

10:31AM   19   A.   CORRECT.

10:31AM   20   Q.   AND SO WATCHING THIS DEMONSTRATION IN AUGUST OF 2013 IN

10:32AM   21   THE CONFERENCE ROOM AT THERANOS WOULD MIMIC THE PROCESS THAT

10:32AM   22   WAS ABOUT TO HAPPEN AT WALGREENS IN A FEW WEEKS; CORRECT?

10:32AM   23   A.   YES, WITHOUT THE ASSOCIATED SOFTWARE APPLICATIONS THAT

10:32AM   24   WERE IN THE WALGREENS STORES.

10:32AM   25          BUT FROM THE COLLECTION PROCESS --

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4183

10:32AM   1     Q.   RIGHT.

10:32AM   2     A.   -- AND GETTING THAT SAMPLE TO THE LAB, YES.

10:32AM   3     Q.   IF YOU WATCHED THAT PROCESS, YOU COULD SEE EXACTLY HOW IT

10:32AM   4     WAS GOING TO WORK FROM THE PERSPECTIVE OF A PATIENT AT

10:32AM   5     WALGREENS; CORRECT?

10:32AM   6     A.   CORRECT.

10:32AM   7     Q.   OKAY.  NOW, DURING THE DEMONSTRATION, DO YOU RECALL

10:32AM   8     DISCUSSING WITH MR. BOSTIC THAT YOU ARE THE PERSON WHO ACTUALLY

10:32AM   9     BROUGHT THE SAMPLES BACK TO THE LAB; CORRECT?

10:33AM  10     A.   YES.

10:33AM  11     Q.   AND DO YOU RECALL HOW MANY OF THE EXECUTIVES ACTUALLY GAVE

10:33AM  12     A BLOOD SAMPLE AT THAT MEETING?

10:33AM  13     A.   I BELIEVE IT WAS FIVE OR SIX.

10:33AM  14     Q.   AND DID YOU ACTUALLY DRAW THEIR BLOOD?

10:33AM  15     A.   I DON'T BELIEVE SO.  I THINK THERE WERE PHLEBOTOMISTS WHO

10:33AM  16     DID THAT.

10:33AM  17     Q.   OKAY.  ON SOME OCCASIONS, EVEN YOU WOULD DRAW THEIR BLOOD;

10:33AM  18     CORRECT?

10:33AM  19     A.   ON EARLY OCCASIONS BEFORE PHLEBOTOMISTS TOOK OVER THAT

10:33AM  20     ROLE FULL TIME.

10:33AM  21     Q.   EARLY IN YOUR TIME AT THERANOS?

10:33AM  22     A.   CORRECT.

10:33AM  23     Q.   OKAY.  AND BY THE WAY, THERANOS HAD BELIEVED THAT IT EVEN

10:33AM  24     HAD SPECIAL PROCESSES FOR EXTRACTING BLOOD FROM THE FINGER;

10:33AM  25     CORRECT?

EDLIN CROSS BY MR. DOWNEY (RES.)                                   4184

10:33AM  1    A.   CORRECT.

10:33AM  2    Q.   AND IT OBTAINED INTELLECTUAL PROPERTY IN CONNECTION WITH

10:33AM  3    THAT; CORRECT?

10:33AM  4    A.   CORRECT.

10:33AM  5    Q.   AND YOU HOLD A PATENT IN CONNECTION WITH THAT; CORRECT?

10:33AM  6    A.   I'M NOT SURE WHAT THE STATUS OF THE PATENT IS, BUT I WAS

10:33AM  7    LISTED, RIGHT, FOR THE GRIP TECHNIQUE FOR THE COLLECTION.

10:33AM  8    Q.   OKAY.  I'D LIKE TO INFORM YOU IT'S BEEN GRANTED, SO

10:33AM  9    CONGRATULATIONS.

10:34AM 10    A.   THANK YOU.

10:34AM 11    Q.   BUT I -- AND THAT WAS JUST ANOTHER INSTANCE WHERE THERANOS

10:34AM 12    THOUGHT IT WAS DEVELOPING INNOVATIVE METHODS ON ELEMENTS OF

10:34AM 13    BLOOD COLLECTION; CORRECT?

10:34AM 14    A.   YES.

10:34AM 15    Q.   NOW, I THINK YOU WERE SHOWN SOME EMAILS YESTERDAY BY

10:34AM 16    MR. BOSTIC RELATING TO THE DISCUSSION OF THE RESULTS OF THAT

10:34AM 17    DEMONSTRATION ON WALGREENS EXECUTIVES; CORRECT?

10:34AM 18    A.   CORRECT.

10:34AM 19    Q.   DO YOU REMEMBER THAT?

10:34AM 20    A.   YES.

10:34AM 21    Q.   AND LET ME ASK YOU TO LOOK AT EXHIBIT 966, WHICH WAS

10:34AM 22    SHOWED TO YOU BY MR. BOSTIC.

10:34AM 23        AND DO YOU SEE THIS IS AN EMAIL FROM DR. YOUNG REPORTING

10:35AM 24    ON WHAT HAS HAPPENED WITH THE RESULTS; CORRECT?

10:35AM 25    A.   YES.

EDLIN CROSS BY MR. DOWNEY (RES.)                    4185

10:35AM   1    Q.   AND HE PUTS IN QUOTATIONS THAT HE CORRECTED THE ASSAY

10:35AM   2    RESULTS; CORRECT?

10:35AM   3    A.   CORRECT.

10:35AM   4    Q.   AND HE REPORTS THAT THE RESULTS LOOK GOOD; CORRECT?

10:35AM   5    A.   THE GC RESULTS, YES.

10:35AM   6    Q.   YES.

10:35AM   7    A.   YEP.

10:35AM   8    Q.   AND HE INDICATED THAT THERE WERE SOME -- HE REMOVED

10:35AM   9    THYROID RESULTS IN SOME INSTANCES WHERE HE THOUGHT THEY WEREN'T

10:35AM  10    ACCURATE; CORRECT?

10:35AM  11    A.   YES.

10:35AM  12    Q.   AND HE ALSO NOTED A FEW OUT OF RANGE RESULTS; CORRECT?

10:35AM  13    A.   YES.

10:35AM  14    Q.   AND HE SPECULATED THAT THERE MIGHT BE SOMETHING WRONG

10:35AM  15    RELATIVE TO SOME OF THE ASSAYS IN CONNECTION WITH THE

10:35AM  16    DEMONSTRATION; CORRECT?

10:35AM  17    A.   CORRECT.

10:35AM  18    Q.   AND YOU WERE RELIANT ON HIM TO TRANSMIT THESE RESULTS TO

10:36AM  19    ANY EXECUTIVE AT WALGREENS; CORRECT?

10:36AM  20    A.   IN THIS CASE, YES.

10:36AM  21    Q.   OKAY.

10:36AM  22    A.   AND IN OTHER CASES IF I WERE TO, OR IF THE LAB WERE TO

10:36AM  23    SUBMIT THE RESULTS, WE RELIED ON DANIEL TO REVIEW AND APPROVE

10:36AM  24    THE RESULTS.

10:36AM  25    Q.   OKAY.  AND YOU NEVER RECALL AN INSTANCE WHERE YOU

EDLIN CROSS BY MR. DOWNEY (RES.)                              4186

10:36AM   1    CONTRADICTED HIS JUDGMENT ON WHAT WAS AN APPROPRIATE RESULT IN

10:36AM   2    A BLOOD TEST, DO YOU?

10:36AM   3    A.   NEVER.

10:36AM   4    Q.   LET ME ASK YOU TO LOOK AT THE ATTACHMENT TO THIS EXHIBIT,

10:36AM   5    WHICH I BELIEVE HAS BEEN REDACTED.

10:36AM   6         BEFORE WE PUT IT UP, CAN WE JUST VERIFY THAT THERE'S A

10:36AM   7    REDACTION.

10:36AM   8         THE PATIENT NAME IN CONNECTION WITH THIS DEMONSTRATION HAS

10:36AM   9    BEEN REDACTED.   ORDINARILY I THINK IT APPEARS AT THE TOP.

10:36AM   10        BUT DO YOU SEE THAT THE DATE OF THIS WAS AUGUST 13TH,

10:37AM   11   2013?  DO YOU SEE THAT DOWN UNDER TEST DETAIL?

10:37AM   12   A.   I DO.

10:37AM   13   Q.   AND THAT'S THE DATE OF THIS WALGREENS DEMONSTRATION;

10:37AM   14   CORRECT?

10:37AM   15   A.   CORRECT.

10:37AM   16   Q.   AND DO YOU SEE AT THE TOP THAT THIS IS REFERRED TO AS A

10:37AM   17   TEST REPORT TECHNOLOGY DEMONSTRATION; CORRECT?

10:37AM   18   A.   CORRECT.

10:37AM   19   Q.   AND DO YOU SEE UNDER PATIENT INFORMATION, ALL OF THOSE

10:37AM   20   CATEGORIES DO NOT PROVIDE ANY INFORMATION ABOUT THE

10:37AM   21   PATIENT'S --

10:37AM   22   A.   YES.

10:37AM   23   Q.   -- DATE OF BIRTH, THEIR GENDER OR THEIR MEDICATIONS, ET

10:37AM   24   CETERA; IS THAT CORRECT?

10:37AM   25   A.   THAT'S RIGHT.

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4187

10:37AM   1    Q.   AND THAT'S BECAUSE YOU WERE NOT AT THERANOS PERFORMING A

10:37AM   2    CLINICAL EVALUATION WHEN DOING THESE DEMONSTRATIONS; CORRECT?

10:37AM   3    A.   RIGHT.   UNLESS THE LAB TEST WAS ORDERED BY A PHYSICIAN,

10:37AM   4    ALL OF THE DEMONSTRATIONS WERE, I BELIEVE, LABELLED TECHNOLOGY

10:37AM   5    DEMONSTRATION.

10:37AM   6    Q.   OKAY.   AND A PATIENT COULD BRING THEIR OWN LAB TEST ORDER

10:37AM   7    FORM, CORRECT, AND HAVE A DEMONSTRATION IF THEY WERE OTHERWISE

10:38AM   8    TOURING THERANOS?

10:38AM   9    A.   I BELIEVE IN THOSE CASES TESTS WERE ACTUALLY PROCESSED

10:38AM  10    THROUGH THE CLINICAL LAB WITH THE ACTUAL PHYSICIAN ORDER.

10:38AM  11    Q.   OKAY.   SO THEY WERE NOT --

10:38AM  12    A.   AND THE TECHNOLOGY DEMONSTRATION WAS SEPARATE FROM THAT.

10:38AM  13    Q.   OKAY.   SO THE TECHNOLOGY -- THE DEMONSTRATIONS WERE NEVER

10:38AM  14    USED FOR CLINICAL EVALUATION OF THE PERSON RECEIVING IT?

10:38AM  15    A.   THEY WERE LABELLED TECHNOLOGY DEMONSTRATION SO THAT IT

10:38AM  16    WOULD BE DISTINGUISHED FROM A CLINICAL VALUE OR SOMETHING THAT

10:38AM  17    COULD BE USED FOR CLINICAL USE.

10:38AM  18    Q.   RIGHT.   AND YOU CAN SEE THAT RIGHT ON THE TOP OF THE PAGE;

10:38AM  19    CORRECT?

10:38AM  20    A.   CORRECT.

10:38AM  21    Q.   NOW, SOMETIMES PATIENTS WOULD -- SOMETIMES PERSONS GETTING

10:38AM  22    THE DEMONSTRATION WOULD COMPARE IT TO THEIR RESULTS IN OTHER

10:38AM  23    TESTS; CORRECT?

10:38AM  24    A.   CORRECT.

10:38AM  25    Q.   AND SOMETIMES NOT; CORRECT?

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4188

10:38AM   1     A.   CORRECT.

10:38AM   2     Q.   I WANT TO ASK YOU ABOUT A FEW OF THE EXAMPLES THAT

10:39AM   3     MR. BOSTIC WENT THROUGH WITH YOU YESTERDAY AND ASK YOU TO LOOK

10:39AM   4     AT EXHIBIT 860.

10:39AM   5          THIS IS ALREADY IN EVIDENCE.

10:39AM   6          JUST TAKE A MOMENT TO LOOK THROUGH THAT.

10:39AM   7          DO YOU RECALL THIS DISCUSSION OF A DEMONSTRATION THAT WAS

10:39AM   8     PERFORMED IN NEW YORK IN 2013?

10:39AM   9     A.   YES.

10:39AM  10     Q.   AND IS IT THE CASE THAT INDIVIDUALS WHO WERE RECEIVING

10:39AM  11     THIS DEMONSTRATION WERE CLINICAL LAB SCIENTISTS AT

10:39AM  12     SLOAN KETTERING?

10:39AM  13     A.   THEY WERE MEDICAL PROFESSIONALS.  I'M NOT SURE OF THEIR

10:39AM  14     EXACT TITLES.

10:39AM  15     Q.   OKAY.  DO YOU KNOW THAT SOME OF THEM WERE CLINICAL LAB

10:39AM  16     SPECIALISTS?

10:39AM  17     A.   I DON'T RECALL.

10:39AM  18     Q.   BUT, BUT IN ANY EVENT --

10:40AM  19     A.   THEY ALL WORKED IN -- THEY WERE ALL PART OF THE HOSPITAL,

10:40AM  20     YEAH.

10:40AM  21     Q.   OKAY.  AND THERANOS WAS DEMONSTRATING ITS TECHNOLOGY TO

10:40AM  22     PEOPLE AT THAT HOSPITAL; CORRECT?

10:40AM  23     A.   CORRECT.

10:40AM  24     Q.   MEDICAL PROFESSIONALS?

10:40AM  25     A.   CORRECT.

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4189

10:40AM 1    Q.   AND THERE WASN'T ANY EFFORT, AGAIN, TO DECEIVE ANY OF

10:40AM 2    THOSE PERSONNEL AS TO WHAT WAS GOING ON IN THE DEMONSTRATION;

10:40AM 3    CORRECT?

10:40AM 4    A.   CORRECT.

10:40AM 5    Q.   YOU SAW IN THE EMAIL EXCHANGE THAT'S CONTAINED IN

10:40AM 6    EXHIBIT 860 THAT THERE WAS A DISCUSSION OF TWO SAMPLES BEING

10:40AM 7    RUN; CORRECT?

10:40AM 8    A.   CORRECT.

10:40AM 9    Q.   YOU DON'T REMEMBER TODAY WHY THAT WAS DONE; IS THAT RIGHT?

10:40AM 10   A.   I THINK THERE WAS INTEREST IN SEEING HOW THE SAMPLES --

10:40AM 11   THEM SEEING TEST RESULTS FROM NEW YORK AND IN PALO ALTO.

10:40AM 12   Q.   AND SO ONE OF THE SAMPLES WAS TESTED ON THE DEVICE IN

10:41AM 13   NEW YORK; CORRECT?

10:41AM 14   A.   CORRECT.

10:41AM 15   Q.   AND ANOTHER WAS PACKAGED IN A CONTAINER AND TAKEN BACK TO

10:41AM 16   PALO ALTO; CORRECT?

10:41AM 17   A.   CORRECT.

10:41AM 18   Q.   AND THAT TEST WAS RUN LATER; CORRECT?

10:41AM 19   A.   CORRECT.

10:41AM 20   Q.   AND THEN YOU HAD THE ISSUE THAT THE RESULTS DID NOT AGREE

10:41AM 21   WITH EACH OTHER; CORRECT?

10:41AM 22   A.   CORRECT.

10:41AM 23   Q.   AND THERE THEN WAS A DIALOGUE BETWEEN MS. HOLMES,

10:41AM 24   DR. YOUNG, AND YOU WERE AT LEAST COPIED ON SOME OF THOSE

10:41AM 25   EMAILS; CORRECT?

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4190

10:41AM   1    A.   CORRECT.

10:41AM   2    Q.   LET ME ASK YOU TO LOOK AT PAGE 6 OF THE EXHIBIT.

10:41AM   3         IF YOU GO TO THE TOP OF THIS EMAIL, YOU WILL SEE -- ON THE

10:41AM   4    PRIOR PAGE -- YOU WILL SEE THAT THIS IS AN EMAIL FROM DR. YOUNG

10:41AM   5    TO MS. HOLMES, MR. BALWANI, AND YOU ARE COPIED.

10:41AM   6         DO YOU SEE THAT?

10:41AM   7    A.   I THINK SUNNY IS COPIED HERE, BUT -- BASED ON WHAT I'M

10:42AM   8    SEEING ON MY SCREEN.

10:42AM   9    Q.   YES.

10:42AM   10   A.   YES.

10:42AM   11   Q.   AND IF YOU GO TO THE NEXT PAGE, I WANT TO FOCUS ON THE

10:42AM   12   PARAGRAPH THAT BEGINS "FOR MUMPS IGG."

10:42AM   13   A.   YES.

10:42AM   14   Q.   AND DR. YOUNG, TALKING ABOUT THE DISCREPANT RESULTS, SAYS,

10:42AM   15   "I AM INCLINED TO BELIEVE THAT THE RUN IN PALO ALTO IS CORRECT

10:42AM   16   FOR A NUMBER OF REASONS."

10:42AM   17        CORRECT?

10:42AM   18   A.   YES.

10:42AM   19   Q.   AND HE GOES ON TO BELIEVE -- TO DETAIL ALL OF THE REASONS

10:42AM   20   THAT HE THINKS THE PALO ALTO RUN IS BETTER THAN THE RUN THAT

10:42AM   21   WAS DONE IN NEW YORK.

10:42AM   22        DO YOU SEE THAT?

10:42AM   23   A.   YES.

10:42AM   24   Q.   AND THEN IF YOU GO TO THE PRIOR PAGE, MS. HOLMES ASKS

10:42AM   25   DR. YOUNG AT THE TOP OF THAT PAGE, "DANIEL - IS OUR READ THAT

EDLIN CROSS BY MR. DOWNEY (RES.)                              4191

10:42AM   1    THE SECOND RUN IN PALO ALTO IS THE MOST ACCURATE FOR ALL THREE

10:43AM   2    DISCREPANCIES?"

10:43AM   3         DO YOU SEE THAT?

10:43AM   4    A.   YES.

10:43AM   5    Q.   AND SO SHE WAS ASKING HIM HIS VIEW AS TO WHICH RESULTS

10:43AM   6    WERE THE RIGHT RESULTS; CORRECT?

10:43AM   7    A.   CORRECT.

10:43AM   8    Q.   AND THEN IF YOU GO TO THE PAGE BEFORE THAT, DR. YOUNG

10:43AM   9    SAYS, "YES, I TRUST THE SECOND RUN IN PALO ALTO."

10:43AM  10         AND HE GOES ON TO EXPLAIN HIS REASON; CORRECT?

10:43AM  11    A.   CORRECT.

10:43AM  12    Q.   NOW, BOTH OF THESE ANALYSES WERE RUN ON SMALL SAMPLES;

10:43AM  13    CORRECT?

10:43AM  14    A.   CORRECT.

10:43AM  15    Q.   AND BOTH WERE RUN WITH THERANOS ASSAYS; CORRECT?

10:43AM  16    A.   CORRECT.

10:43AM  17    Q.   AND A JUDGMENT HAD TO BE MADE WHEN THERE WAS A DIFFERENCE

10:43AM  18    BETWEEN THE TWO RESULTS; CORRECT?

10:43AM  19    A.   CORRECT.

10:43AM  20    Q.   AND YOU WOULD HAVE DEFERRED TO DR. YOUNG AND HIS JUDGMENT;

10:43AM  21    CORRECT?

10:43AM  22    A.   CORRECT.

10:43AM  23    Q.   AND IN THIS INSTANCE MS. HOLMES DEFERRED TO DR. YOUNG AND

10:43AM  24    HIS JUDGMENT; CORRECT?

10:43AM  25    A.   I THINK SHE ASKED FOR HIS OPINION AND THEN OFFERED HER

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4192

10:44AM  1    OPINION AS WELL.

10:44AM  2    Q.   RIGHT.  IF YOU CONTINUE TO SCROLL THROUGH, THERE'S FURTHER

10:44AM  3    DISCUSSION?

10:44AM  4    A.   RIGHT.

10:44AM  5    Q.   RIGHT?  BUT IF YOU LOOK AT THE FIRST PAGE, THE ULTIMATE

10:44AM  6    DECISION IS TO REPORT THE PALO ALTO RESULTS; CORRECT?

10:44AM  7    A.   CORRECT.

10:44AM  8    Q.   ALL RIGHT.  NOW, IN CONNECTION WITH DOING THAT

10:44AM  9    DEMONSTRATION AT SLOAN KETTERING, YOU DON'T RECALL THAT THERE

10:44AM  10   WAS ANY CONCERN THAT THE DEMONSTRATION WOULD LEAD TO INACCURATE

10:44AM  11   RESULTS IN ADVANCE, DO YOU?

10:44AM  12   A.   NO.

10:44AM  13   Q.   AND THERANOS WAS EAGER TO SHOWCASE ITS TECHNOLOGY AT

10:44AM  14   SLOAN KETTERING, WASN'T IT?

10:44AM  15   A.   YES.

10:44AM  16   Q.   AND MS. HOLMES THOUGHT THIS MIGHT BE A GOOD OPPORTUNITY TO

10:44AM  17   EXPAND FUTURE BUSINESS AND RELATIONSHIPS FOR THERANOS; CORRECT?

10:44AM  18          MR. BOSTIC:  OBJECTION.  FOUNDATION.

10:45AM  19          MR. DOWNEY:  FAIR ENOUGH.  I'LL WITHDRAW THAT.

10:45AM  20          THE COURT:  THE QUESTION IS WITHDRAWN.

10:45AM  21   BY MR. DOWNEY:

10:45AM  22   Q.   OKAY.  YOU DON'T SEE ANY SIGN OF HESITATION ON EITHER

10:45AM  23   MS. HOLMES'S PART OR ANYONE ELSE IN CONDUCTING THIS

10:45AM  24   DEMONSTRATION IN NEW YORK?

10:45AM  25   A.   NO.

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4193

10:45AM  1    Q.   OKAY.  YOU WERE ALSO ASKED YESTERDAY ABOUT A JULY 2013

10:45AM  2    DEMONSTRATION THAT WAS DONE FOR A WALGREENS EXECUTIVE.

10:45AM  3         DO YOU REMEMBER THAT?

10:45AM  4    A.   YES.

10:45AM  5    Q.   LET ME ASK YOU TO LOOK BACK AT EXHIBIT 905.  IF YOU GO --

10:45AM  6    DO YOU SEE THIS IS THE EMAIL EXCHANGE IN JULY OF 2013 ABOUT

10:45AM  7    REPORTING THE RESULTS FROM THAT DEMONSTRATION?

10:45AM  8    A.   YES.

10:45AM  9    Q.   AND IF YOU GO TO PAGE 4 AND YOU LOOK AT DR. YOUNG'S EMAIL,

10:46AM  10   YOU SEE IN THE SECOND TO LAST PARAGRAPH THAT DR. YOUNG REPORTS

10:46AM  11   THAT THERE'S BEEN A LOW GLUCOSE RESULT; CORRECT?

10:46AM  12   A.   CORRECT.

10:46AM  13   Q.   AND HE INDICATES THAT, YOU KNOW, THE RESULT FOR SOMEONE

10:46AM  14   WHO IS FASTING PRIOR TO THE TEST IS LESS THAN 100; CORRECT?

10:46AM  15   A.   CORRECT.

10:46AM  16   Q.   TYPICALLY?  TO BE IN A NORMAL RANGE?

10:46AM  17   A.   CORRECT.

10:46AM  18   Q.   AND THEN HE ASKS MS. HOLMES, "DO WE KNOW THE STATE OF THE

10:46AM  19   PATIENT?"

10:46AM  20        CORRECT?

10:46AM  21   A.   CORRECT.

10:46AM  22   Q.   AND THEN SHE RESPONDS IN THE EMAIL ABOVE THAT, AND SHE

10:46AM  23   SAYS -- IT'S TOWARDS THE BOTTOM OF THE PAGE.  IF YOU COULD BLOW

10:46AM  24   THAT UP.

10:46AM  25        SHE SAYS, "I DON'T KNOW.  IT'S 50/50.  WE MIGHT FLAG IT."

EDLIN CROSS BY MR. DOWNEY (RES.)                              4194

10:47AM  1          RIGHT?

10:47AM  2      A.  RIGHT.

10:47AM  3      Q.  "IT'S 50/50 WHETHER THEY WERE OR NOT.  WE MIGHT FLAG IT

10:47AM  4      AND SPECIFY THAT HIGH OR LOW REFERENCE RANGE DEPENDS ON WHETHER

10:47AM  5      THE PATIENT WAS FASTING OR NOT."

10:47AM  6          DO YOU SEE THAT?

10:47AM  7      A.  YES.

10:47AM  8      Q.  AND SO SHE WANTED TO CONVEY TO THE PATIENT THAT THE RESULT

10:47AM  9      WAS UNCERTAIN; CORRECT?

10:47AM 10      A.  SHE WANTED TO INCLUDE THIS, THIS ADDITIONAL DISCLAIMER OR

10:47AM 11      THIS ADDITIONAL INFORMATION.

10:47AM 12      Q.  OKAY.

10:47AM 13      A.  YEAH.

10:47AM 14      Q.  BECAUSE IT WOULD HELP THE PATIENT IN THE EVENT THAT THEIR

10:47AM 15      GLUCOSE WASN'T ORDINARILY LOW, THEY WOULDN'T BE ALARMED IF THEY

10:47AM 16      HADN'T BEEN FASTING, FOR EXAMPLE?

10:47AM 17      A.  RIGHT.  IT PROVIDES INFORMATION AND CONTEXT.

10:47AM 18      Q.  LET ME ASK YOU TO LOOK AT EXHIBIT 1014.

10:48AM 19          THIS WAS ADMITTED INTO EVIDENCE YESTERDAY.

10:48AM 20          AND THIS RELATES TO THE DEMONSTRATION THAT WAS PERFORMED

10:48AM 21      AT THERANOS FOR THE JOURNALIST JOE RAGO.

10:48AM 22          DO YOU REMEMBER DISCUSSING THAT YESTERDAY?

10:48AM 23      A.  YES.

10:48AM 24      Q.  AND I THINK YOU TESTIFIED YESTERDAY THAT THIS

10:48AM 25      DEMONSTRATION WAS PROCESSED IN THERANOS'S LABORATORY; CORRECT?

EDLIN CROSS BY MR. DOWNEY (RES.)                              4195

10:48AM   1    A.   CORRECT.

10:48AM   2    Q.   AND AGAIN, THIS PROCESS FOR THIS DEMONSTRATION WAS THAT

10:48AM   3    THE BLOOD WAS COLLECTED FROM THE FINGER, PUT IN THE NANOTAINER,

10:48AM   4    PUT IN THE SHIPPING CONTAINER, AND TAKEN TO THE LAB; CORRECT?

10:48AM   5    A.   I BELIEVE SO.

10:48AM   6    Q.   IF YOU LOOK AT PAGE 2, JUST TO REORIENT YOU, AT THE BOTTOM

10:49AM   7    OF THAT PAGE, IF YOU WOULD BLOW THAT EMAIL UP.

10:49AM   8        YOU SAY, "I'M HEADING IN TO COLLECT THE FINGERSTICK

10:49AM   9    SAMPLE, PLEASE BE READY TO MEET IN THE LAB IN THE NEXT FEW

10:49AM  10    MINUTES."

10:49AM  11        CORRECT?

10:49AM  12    A.   YEAH.

10:49AM  13    Q.   AND SO THIS IS ANOTHER EXAMPLE OF THE SAMPLE BEING

10:49AM  14    COLLECTED IN THE ROOM AND TAKEN TO THE LAB; CORRECT?

10:49AM  15    A.   CORRECT.

10:49AM  16    Q.   AND, AGAIN, YOU DID NOT DO ANYTHING IN CONNECTION WITH

10:49AM  17    THIS TO TRY TO DECEIVE MR. RAGO, DID YOU?

10:49AM  18    A.   NO.

10:49AM  19    Q.   YOU WERE NOT TRYING TO CONVEY ANYTHING FALSE ABOUT

10:49AM  20    THERANOS, WERE YOU?

10:49AM  21    A.   NO.

10:49AM  22    Q.   YOU TOOK THE SAMPLE IN THE SHIPPING CONTAINER INTO THE LAB

10:49AM  23    FOR EVALUATION; CORRECT?

10:49AM  24    A.   CORRECT.

10:49AM  25    Q.   AND THEN MR. --

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4196

10:49AM  1    A.   I GAVE -- I GAVE IT TO SCIENTISTS WHO CONDUCTED THAT.

10:49AM  2    Q.   THAT'S CORRECT.

10:49AM  3    A.   RIGHT.

10:49AM  4    Q.   YOU DIDN'T PERFORM THE TESTS YOURSELF?

10:49AM  5    A.   RIGHT.

10:49AM  6    Q.   AND THEN MR. -- LATER MR. RAGO WROTE AN ARTICLE ABOUT

10:49AM  7    THERANOS; CORRECT?

10:49AM  8    A.   CORRECT.

10:49AM  9    Q.   AND I'D LIKE TO DIRECT YOUR ATTENTION TO EXHIBIT 1106,

10:50AM  10   WHICH IS ALREADY IN EVIDENCE.

10:50AM  11        AND I WANT TO BLOW UP A PARAGRAPH IN WHICH THE PROCESS FOR

10:50AM  12   THIS -- FOR THERANOS IS DESCRIBED.

10:50AM  13        DO YOU SEE IT'S THE BOTTOM PARAGRAPH?  WE'LL BLOW IT UP

10:50AM  14   FOR YOU.

10:50AM  15   A.   YES.

10:50AM  16   Q.   AND THIS IS MR. RAGO'S ARTICLE DISCUSSING THERANOS;

10:50AM  17   CORRECT?

10:50AM  18   A.   YES.

10:50AM  19   Q.   AND HE SAYS -- IT DESCRIBES HOW THERANOS'S TECHNICIANS GET

10:50AM  20   THE CIRCULATION GOING IN THE HANDS SO THAT THERE'S MORE BLOOD

10:50AM  21   CIRCULATION; CORRECT?

10:50AM  22   A.   CORRECT.

10:50AM  23   Q.   AND THEN HE DESCRIBES HOW THE BLOOD IS PLACED IN A

10:50AM  24   NANOTAINER; CORRECT?

10:50AM  25   A.   CORRECT.

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4197

10:50AM   1    Q.   AND THEN HE SAYS IT'S THEN RUN THROUGH ANALYZERS IN A

10:50AM   2    THERANOS LAB; CORRECT?

10:50AM   3    A.   CORRECT.

10:50AM   4    Q.   AND THAT'S EXACTLY THE PROCESS THAT HE HAD GOTTEN WHEN HE

10:50AM   5    VISITED THERANOS?

10:50AM   6    A.   CORRECT.

10:50AM   7    Q.   RIGHT?  AND THAT'S THE PROCESS THAT WAS BEING DEMONSTRATED

10:51AM   8    WHEN YOU TOOK THE SAMPLE FROM THE ROOM INTO THE THERANOS LAB?

10:51AM   9    A.   CORRECT.

10:51AM  10    Q.   I'M GOING TO TURN TO JUST BRIEFLY TO ANOTHER TOPIC.

10:51AM  11         AND THEN AFTER THIS, YOUR HONOR, IT MIGHT BE A GOOD TIME

10:51AM  12    FOR A BREAK.

10:51AM  13         DO YOU RECALL THAT WE'VE BEEN DISCUSSING A LOT OF

10:51AM  14    DEMONSTRATIONS THAT TOOK PLACE PRIOR TO THE, PRIOR TO THE

10:51AM  15    RETAIL LAUNCH AT WALGREENS; CORRECT?  A NUMBER OF PRESENTATIONS

10:51AM  16    AND A NUMBER OF DEMONSTRATIONS IN 2013?

10:51AM  17    A.   CORRECT.

10:51AM  18    Q.   DO YOU REMEMBER THAT AS THERANOS WAS WORKING ON ITS

10:51AM  19    PARTNERSHIP WITH WALGREENS, IT ALSO APPLIED TO THE FDA FOR

10:51AM  20    APPROVAL OF CERTAIN OF ITS TECHNOLOGIES?

10:51AM  21    A.   I'M NOT SURE EXACTLY WHICH TIME THAT WAS DONE, BUT I --

10:51AM  22    YES, I'M AWARE THAT THE COMPANY DID APPLY FOR FDA APPROVAL FOR

10:52AM  23    ITS TECHNOLOGIES.

10:52AM  24    Q.   OKAY.  AND DO YOU RECALL THAT THE FDA DID APPROVE

10:52AM  25    THERANOS'S TECHNOLOGY IN CONNECTION WITH TESTING FOR HSV-1?

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4198

10:52AM  1    A.   YES.

10:52AM  2    Q.   LET ME SHOW YOU EXHIBIT 13988.

10:52AM  3         IS THIS AN EMAIL THAT MS. HOLMES SENT IN JULY OF 2015 IN

10:52AM  4    CONNECTION WITH --

10:52AM  5         (CELL PHONE GOING OFF.)

10:52AM  6              THE WITNESS:  I DON'T BELIEVE I HAVE THAT EXHIBIT.

10:52AM  7              MR. DOWNEY:  I APOLOGIZE, YOUR HONOR.  WE'RE OVER

10:52AM  8    TECHNIFIED.

10:53AM  9    Q.   LET ME SHOW YOU --

10:53AM  10   A.   MY BINDER GOES TO 13983.

10:53AM  11   Q.   I'M SORRY.  MAYBE I MISREAD THE NUMBER.  MAYBE THAT'S THE

10:53AM  12   PROBLEM.

10:53AM  13        EXHIBIT 13988.  I HAVE AN EXTRA COPY HERE.

10:53AM  14             MR. BOSTIC:  I DON'T HAVE A COPY OF THAT EITHER,

10:53AM  15   COUNSEL.

10:53AM  16             MR. DOWNEY:  (HANDING.)

10:53AM  17             THE COURT:  IT DIDN'T MAKE IT INTO MY BINDER EITHER,

10:53AM  18   SO --

10:53AM  19             MR. DOWNEY:  MAY I APPROACH THE WITNESS, YOUR HONOR?

10:53AM  20             THE COURT:  PLEASE.

10:53AM  21   BY MR. DOWNEY:

10:53AM  22   Q.   (HANDING.)

10:53AM  23   A.   THANK YOU.

10:53AM  24   Q.   SHOWING YOU EXHIBIT 13988, IS THIS AN EMAIL FROM

10:54AM  25   MS. HOLMES TO ALL THERANOS EMPLOYEES IN JULY OF 2015?

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4199

10:54AM  1    A.   YES.

10:54AM  2              MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

10:54AM  3    13988.

10:54AM  4              MR. BOSTIC:  NO OBJECTION.

10:54AM  5              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:54AM  6         (DEFENDANT'S EXHIBIT 13988 WAS RECEIVED IN EVIDENCE.)

10:54AM  7              MR. DOWNEY:  JUST BLOW UP THE EMAIL AT THE TOP.

10:54AM  8    Q.   DO YOU SEE THE FIRST PARAGRAPH, IT INDICATES -- MS. HOLMES

10:54AM  9    IS INDICATING THAT THERANOS HAD RECEIVED IT'S FIRST FDA

10:54AM  10   CLEARANCE ON OUR SYSTEM AND THE FIRST LABORATORY DEVELOPED TEST

10:54AM  11   WE FILED:  HSV-1.

10:54AM  12        DO YOU SEE THAT?

10:54AM  13   A.   YES.

10:54AM  14   Q.   AND YOU YOURSELF DID NOT DEAL WITH THE FDA DURING THE

10:54AM  15   COURSE OF YOUR DUTIES AT THERANOS, DID YOU?

10:54AM  16   A.   NO.

10:54AM  17   Q.   BUT YOU UNDERSTOOD THAT THIS FDA APPROVAL WAS AN APPROVAL

10:54AM  18   FOR RUNNING THE HSV-1 ASSAY ON THERANOS SYSTEMS; CORRECT?

10:55AM  19   A.   YES.

10:55AM  20             MR. DOWNEY:  YOUR HONOR, THIS MIGHT BE A GOOD TIME

10:55AM  21   FOR A BREAK.

10:55AM  22             THE COURT:  LET'S TAKE OUR BREAK NOW, MR. DOWNEY.

10:55AM  23        LADIES AND GENTLEMEN, WE'LL TAKE A 30 MINUTE BREAK, A 30

10:55AM  24   MINUTE BREAK, PLEASE.  AND WE'LL SEE YOU BACK IN JUST A MOMENT.

10:55AM  25        THANK YOU.

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4200

10:55AM   1        YOU CAN STAND DOWN AS WELL, SIR.  THANK YOU.

10:55AM   2        (JURY OUT AT 10:55 A.M.)

10:55AM   3            THE COURT:  ALL RIGHT.  THANK YOU.  PLEASE BE

10:55AM   4    SEATED.  THANK YOU.

10:55AM   5        THE RECORD SHOULD REFLECT THAT THE JURY HAS LEFT, AND

10:55AM   6    MR. EDLIN IS LEAVING THE COURTROOM.  HE'S GONE NOW.  THANK YOU.

10:56AM   7        MR. DOWNEY, DURING YOUR EXAMINATION OF MR. EDLIN, THE

10:56AM   8    COURT DID HEAR A DEVICE THAT WENT OFF IN THE AUDIENCE, AND I

10:56AM   9    FOUND IT DISRUPTIVE.

10:56AM  10        I LOOKED OUT AT THE AUDIENCE AND I SAW THE GENTLEMAN IN

10:56AM  11    THE BLUE SHIRT SEATED IN THE BACK ROW FUMBLING WITH HIS DEVICE

10:56AM  12    AND TRYING TO TURN IT DOWN.

10:56AM  13        I JUST HAVE TO SAY THIS IS THE SECOND TIME THAT IT HAS

10:56AM  14    BEEN BROUGHT TO MY ATTENTION, SIR, THAT YOUR DEVICE HAS

10:56AM  15    DISRUPTED THESE PROCEEDINGS.

10:56AM  16        IF IT HAPPENS AGAIN, SIR, YOU'LL HAVE TO GO DOWN TO THE

10:56AM  17    OTHER ROOM AND WATCH THIS, SHOULD YOU CARE TO WATCH IT.

10:56AM  18        OTHERWISE I'LL ASK YOU TO LEAVE YOUR DEVICE WITH THE

10:56AM  19    UNITED STATES MARSHALS DOWNSTAIRS IF YOU HAVE DIFFICULTY IN

10:56AM  20    THAT REGARD.

10:56AM  21        IF YOU HAVE DIFFICULTY OPERATING YOUR MACHINE, I'LL CALL

10:56AM  22    THE MARSHAL UP NOW IF YOU WANT TO STAY HERE, AND PERHAPS HE CAN

10:56AM  23    HELP YOU DISABLE THAT DEVICE.  THEY'RE VERY GOOD AT THAT.

10:57AM  24        SO I WOULD ASK YOU, SIR, TO PLEASE -- AND EVERYONE -- SIR,

10:57AM  25    I'M CALLING YOU OUT BECAUSE I HEARD IT AND SAW YOU.

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4201

10:57AM   1        BUT EVERYONE ELSE, PLEASE DO RESPECT THESE PROCEEDINGS AND

10:57AM   2    DISABLE YOUR DEVICES.  IT'S DISRUPTIVE TO THE PROCEEDINGS.

10:57AM   3    IT'S NOT FAIR TO THE GOVERNMENT.  IT'S NOT FAIR TO MS. HOLMES

10:57AM   4    TO HAVE WITNESSES AND THE JURY BE DISTRACTED BY THAT.

10:57AM   5        SO THANK YOU VERY MUCH.

10:57AM   6        ANYTHING FURTHER, COUNSEL --

10:57AM   7            MR. BOSTIC:  NO, YOUR HONOR.

10:57AM   8            THE COURT:  -- BEFORE WE BREAK?

10:57AM   9            MR. DOWNEY:  NOTHING ON OUR SIDE.

10:57AM  10            THE COURT:  ALL RIGHT.  THANK YOU.

10:57AM  11            THE CLERK:  COURT IS IN RECESS.

10:57AM  12        (RECESS FROM 10:57 A.M. UNTIL 11:34 A.M.)

11:34AM  13        (JURY OUT AT 11:34 A.M.)

11:34AM  14            THE COURT:  ALL RIGHT.  THANK YOU.  WE'RE BACK ON

11:34AM  15    THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE

11:34AM  16    AGAIN.  WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.

11:34AM  17        COUNSEL, DID YOU WANT TO DISCUSS SOMETHING?

11:34AM  18            MR. DOWNEY:  YOUR HONOR, IT'S MY INTENTION TO

11:35AM  19    INTRODUCE SOME EXHIBITS DURING MR. EDLIN'S EXAMINATION WHICH

11:35AM  20    WON'T TAKE LONG, BUT WHICH ARE FAIRLY BULKY.  THEY ARE THE,

11:35AM  21    THEY ARE THE WEEKLY OR BIWEEKLY REPORTS OF CUSTOMER FEEDBACK

11:35AM  22    THAT MR. EDLIN AND MS. HOLMES RECEIVED IN AGGREGATED FORM.

11:35AM  23        AS I UNDERSTAND, MR. BOSTIC HAS AN ISSUE WITH IT.

11:35AM  24        I DON'T THINK I'M GOING TO GIVE YOUR HONOR THE -- WHAT THE

11:35AM  25    DOCUMENTS ARE.  I THINK THE EVIDENTIARY ISSUE IS THE SAME FOR

4202

EDLIN CROSS BY MR. DOWNEY (RES.)

| | | |
|---|---|---|
| 11:35AM | 1 | EVERY DOCUMENT, SO IT'S JUST ESSENTIALLY A REPEAT.  I WAS |
| 11:35AM | 2 | ACTUALLY HOPEFUL THAT WE MIGHT GET A STIPULATION. |
| 11:35AM | 3 | THE COURT:  MR. BOSTIC? |
| 11:35AM | 4 | MR. BOSTIC:  I HAVE A FEW CONCERNS ABOUT THIS |
| 11:35AM | 5 | CATEGORY OF EVIDENCE.  I UNDERSTAND A COPY HAS BEEN PROVIDED TO |
| 11:35AM | 6 | THE COURT. |
| 11:35AM | 7 | FROM MY BRIEF REVIEW, AND I RECEIVED THIS TODAY, THIS |
| 11:35AM | 8 | APPEARS TO BE A COLLECTION OF ANECDOTAL REPORTS OF CUSTOMER |
| 11:36AM | 9 | FEEDBACK FROM WALGREENS. |
| 11:36AM | 10 | EVERY ONE THAT I'VE SEEN SO FAR IS POSITIVE AS TO |
| 11:36AM | 11 | THERANOS. |
| 11:36AM | 12 | I'M NOT SURE -- FIRST, WITHOUT THE WITNESS ON THE STAND, |
| 11:36AM | 13 | I'M NOT SURE WHAT KIND OF FOUNDATION COULD BE LAID FOR THE |
| 11:36AM | 14 | ADMISSION OF THESE ACCOUNTS FOR THEIR TRUTH.  I THINK IT'S ONE |
| 11:36AM | 15 | THING IF THE WITNESS IS ABLE TO LAY A FOUNDATION FOR AN EMAIL, |
| 11:36AM | 16 | YOU KNOW, THAT HE WAS ON, BUT IT'S A DIFFERENT THING TO BE ABLE |
| 11:36AM | 17 | TO LAY A PROPER FOUNDATION SUCH THAT THESE ACCOUNTS -- AND |
| 11:36AM | 18 | THEY'RE VERY HIGH IN VOLUME -- SUCH THAT THESE ACCOUNTS CAN BE |
| 11:36AM | 19 | ADMITTED FOR THE TRUTH OF THE CONTENT OF THESE PATIENT |
| 11:36AM | 20 | ACCOUNTS. |
| 11:36AM | 21 | IT'S UNCLEAR FROM THE FACE OF THE DOCUMENTS WHO COLLECTED |
| 11:36AM | 22 | THEM, HOW THEY WERE COMPILED, WHETHER THEY WERE CURATED IN ANY |
| 11:36AM | 23 | WAY, WHETHER THIS IS A SELECTION OR A COMPLETE LIST, AND SO I |
| 11:36AM | 24 | HAVE SOME QUESTIONS ABOUT THAT AND SOME CONCERNS. |
| 11:36AM | 25 | SEPARATELY, I CONTINUE TO BE CONCERNED, AND THIS IS |

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4203

11:37AM  1    INCREASING MY CONCERNS ABOUT THE JURY BEING PRESENTED WITH AN

11:37AM  2    UNBALANCED VIEW OF WHAT CUSTOMER AND PATIENT FEEDBACK ABOUT

11:37AM  3    THERANOS WAS.

11:37AM  4        I THINK ADMITTING THE HIGH VOLUME OF POSITIVE CUSTOMER

11:37AM  5    SURVEY RESULTS OR FEEDBACK, ANECDOTES LIKE THIS, WITHOUT

11:37AM  6    ALLOWING THE JURY TO SEE THE OTHER SIDE, FOR EXAMPLE, THE

11:37AM  7    COMPLAINT LOGS THAT WE JUST TALKED ABOUT THE OTHER DAY, RISKS

11:37AM  8    GIVING THEM THE WRONG IMPRESSION.

11:37AM  9        AND SO, AGAIN, IF THIS DOES END UP COMING INTO EVIDENCE,

11:37AM 10    IT SHOULD REOPEN THE DISCUSSION ABOUT WHETHER COMPLAINT LOGS

11:37AM 11    NEED TO BE PRESENTED TO THE JURY.

11:37AM 12            THE COURT:  THOSE COMPLAINT LOGS WERE FROM -- WERE

11:37AM 13    THOSE FROM WALGREENS ALSO?

11:37AM 14            MR. BOSTIC:  SO, YOUR HONOR, I THINK THAT WOULD HAVE

11:37AM 15    COME IN DIRECTLY TO THERANOS.  IT'S NOT CLEAR WHETHER WALGREENS

11:37AM 16    STAFF OR THERANOS STAFF COLLECTED THE ACCOUNTS THAT WE'RE

11:37AM 17    LOOKING AT IN THIS BINDER.

11:37AM 18            THE COURT:  OKAY.

11:37AM 19            MR. DOWNEY:  I THINK I CAN SPEAK TO THAT A LITTLE

11:37AM 20    BIT, YOUR HONOR.

11:37AM 21            THE COURT:  SURE.

11:37AM 22            MR. DOWNEY:  THIS IS -- FIRST OF ALL, I'M NOT

11:38AM 23    OFFERING THE REPORTS FOR THE PURPOSES OF THEIR TRUTH.  THESE

11:38AM 24    ARE WEEKLY REPORTS WHICH WENT TO THE DEFENDANT AND THE EFFECT

11:38AM 25    OF HER STATE OF MIND ABOUT THERANOS SERVICES.

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4204

11:38AM  1          BUT THESE ARE WEEKLY REPORTS THAT ARE COMPILED FROM TWO

11:38AM  2      SOURCES.  ONE IS THAT THERE'S A THERANOS APP THAT ALLOWS

11:38AM  3      CUSTOMERS TO PROVIDE FEEDBACK IN WRITING, AND I THINK

11:38AM  4      MR. BOSTIC HAS ALREADY EFFECTIVELY ESTABLISHED THAT MUCH OF

11:38AM  5      THAT FEEDBACK IS GIVEN IN ADVANCE OF THE -- OF KNOWING TEST

11:38AM  6      RESULTS, AT LEAST FOR PATIENTS WHO ARE FIRST-TIME USERS.

11:38AM  7          THE OTHER SOURCE OF IT IS THAT PHLEBOTOMISTS IN THE STORES

11:38AM  8      ENGAGED WITH PATIENTS AND THEY ASKED THEM WHAT THEIR EXPERIENCE

11:38AM  9      WAS ON THIS VISIT, ON PRIOR VISITS, WHAT THE PURPOSE OF THEIR

11:38AM  10     CHOOSING THERANOS WAS, ET CETERA, AND THIS WAS COMPILED AND

11:38AM  11     SHARED WITH MR. EDLIN AND MS. HOLMES, ET CETERA.

11:39AM  12         I THINK IT'S, IT'S -- YOU KNOW, HE'S CERTAINLY FREE TO

11:39AM  13     CROSS-EXAMINE AS TO WHETHER IT'S, YOU KNOW, LIMITED BY, YOU

11:39AM  14     KNOW, SOME EFFORT TO FIND POSITIVE FEEDBACK, ET CETERA.

11:39AM  15         BUT I DON'T THINK IT'S INADMISSIBLE WHEN IT'S A DISCUSSION

11:39AM  16     OF, YOU KNOW, WHAT IS AT THE HEART OF THE CASE, WHICH IS THE

11:39AM  17     QUALITY OF THE BLOOD TESTING SERVICES PROVIDED BY THERANOS.

11:39AM  18             THE COURT:  WELL, IT SOUNDS LIKE THIS MIGHT BE A --

11:39AM  19     IS THIS A REVIEW OF THE PHLEBOTOMISTS THEMSELVES AS OPPOSED TO

11:39AM  20     JUST THE TECHNOLOGY?  IS THAT THE CUSTOMER SATISFACTION?  HOW

11:39AM  21     WAS YOUR EXPERIENCE?  WERE THE ROOMS WELL LIT?  WAS THE CARPET

11:39AM  22     CLEAN?  WAS THE SEATING COMFORTABLE?

11:39AM  23             MR. DOWNEY:  WELL, I THINK THERE'S SOME OF THAT, AND

11:39AM  24     THERE'S AN OVERWHELMING AMOUNT OF DISCUSSION OF THE PRICE, AND

11:39AM  25     THERE'S ALSO DISCUSSION OF THE RELATIVE COMFORT OF THE THERANOS

4205
EDLIN CROSS BY MR. DOWNEY (RES.)

11:39AM   1    METHOD OF DRAW DEMONSTRATES THE FREQUENCY WITH WHICH THE

11:39AM   2    FINGERSTICK METHOD WAS ACTUALLY USED IN THE STORES.

11:40AM   3        THE COURT:  SO I THINK WHAT IS RELEVANT, ISN'T IT,

11:40AM   4    IS THE TECHNOLOGY ITSELF.

11:40AM   5        DO THESE TALK ABOUT THE TECHNOLOGY OR THE EXPERIENCE?  AND

11:40AM   6    ARE THOSE SEVERABLE?

11:40AM   7        MR. DOWNEY:  WELL, YOUR HONOR, SOME OF THESE

11:40AM   8    ANECDOTES ARE FROM PATIENTS WHO HAVE USED THERANOS SERVICES AND

11:40AM   9    THERANOS TECHNOLOGY OVER A PERIOD OF, YOU KNOW, FROM THE TIME

11:40AM   10   OF THE LAUNCH UNTIL, YOU KNOW, THE TIME THE BLOOD TESTING

11:40AM   11   SERVICES WERE CEASED.

11:40AM   12       I DON'T THINK IT'S FAIR TO NECESSARILY ASK IF IT'S ABOUT

11:40AM   13   THE TECHNOLOGY.  I DON'T THINK THE WITNESSES THAT THE

11:40AM   14   GOVERNMENT HAS OFFERED, YOU KNOW, THE PATIENT THAT THE

11:40AM   15   GOVERNMENT OFFERED WAS COMMENTING ON THE TECHNOLOGY.

11:40AM   16       MR. BOSTIC:  SO, YOUR HONOR --

11:40AM   17       THE COURT:  WHAT ABOUT 5439?  5439?

11:40AM   18       MR. DOWNEY:  I THINK THERE WAS A FAILURE TO

11:40AM   19   ESTABLISH A FOUNDATION THAT ANY OF THAT INFORMATION WAS

11:40AM   20   COMMUNICATED TO MS. HOLMES OR THAT IT WAS A BUSINESS RECORD.

11:40AM   21       I UNDERSTAND THE ARGUMENT THAT THERE SHOULD BE PARITY

11:41AM   22   HERE, BUT I THINK THE QUESTION IS NOT PARITY BETWEEN THE SIDES

11:41AM   23   AS LAWYERS LITIGATING.  THE QUESTION IS, WHAT IS THE

11:41AM   24   DEFENDANT'S STATE OF MIND AT THE TIME?

11:41AM   25       MR. BOSTIC:  SO, YOUR HONOR, I THINK THAT'S TRUE IF

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4206

11:41AM  1      NONE OF THIS COMES IN FOR ITS TRUTH.

11:41AM  2          THE CONCERNS ABOUT PARITY AND PRESENTING A DISTORTED IMAGE

11:41AM  3   TO THE JURY ARE AT LEAST PARTLY ADDRESSED IF THERE'S AN

11:41AM  4   INSTRUCTION THAT NONE OF THESE ACCOUNTS ARE COMING IN FOR THE

11:41AM  5   TRUTH.

11:41AM  6          BUT THAT DOESN'T ADDRESS AT ALL THE RELEVANCE CONCERNS

11:41AM  7   THAT THE COURT JUST RAISED, AND I THINK THE COURT IS RIGHT TO

11:41AM  8   HIT ON THAT.

11:41AM  9          AT ISSUE IN THIS CASE IS NOT THE QUALITY OF THERANOS'S

11:41AM 10   SERVICES AT LARGE, WHETHER PATIENTS WERE HAPPY WITH THEIR

11:41AM 11   EXPERIENCE AT WALGREENS, WHETHER THE PHLEBOTOMIST WAS KIND TO

11:41AM 12   THEM, WHETHER THE PRICE WAS LOW, THESE THINGS AREN'T

11:41AM 13   NECESSARILY IN DISPUTE IN THE CASE.

11:41AM 14          WHAT IS IN DISPUTE IS THE ACCURACY OF THE TESTS AND THE

11:41AM 15   QUALITY OF THE RESULTS.

11:41AM 16          BASED ON MY READ OF THESE ANECDOTES, THEY APPEAR TO HAVE

11:42AM 17   BEEN GIVEN BY CUSTOMERS PROBABLY BEFORE THEY EVEN RECEIVED

11:42AM 18   THEIR RESULTS.

11:42AM 19          TESTIMONY FROM DR. ROSENDORFF SHOWS THAT IT'S UNCLEAR, OR

11:42AM 20   IT CAN BE UNCLEAR WHETHER A GIVEN LAB RESULT WAS ACCURATE OR

11:42AM 21   INACCURATE EVEN AFTER IT'S RECEIVED.

11:42AM 22          SO I JUST SEE THIS AS BEING TOO FAR AFIELD FROM THE ACTUAL

11:42AM 23   ISSUE IN THE CASE WHICH WAS, WERE THE TEST RESULTS ACCURATE?

11:42AM 24          THIS HAS TO DO MORE WITH THE EXPERIENCE OF PATIENTS AND

11:42AM 25   WHETHER THEY HAD A PLEASANT TIME AT THERANOS, AND I THINK THAT

EDLIN CROSS BY MR. DOWNEY (RES.)                                      4207

11:42AM   1    RAISES 401 AND 403 CONCERNS.

11:42AM   2              MR. DOWNEY:  YOUR HONOR, LET ME JUST --

11:42AM   3              THE COURT:  THAT'S MY CONCERN, MR. DOWNEY.  I'M

11:42AM   4    SORRY.

11:42AM   5              MR. DOWNEY:  YES.  LET ME JUST COMMENT ON THE

11:42AM   6    CHARACTERIZATION OF THE DOCUMENTS.

11:42AM   7        YOUR HONOR MAY RECALL THAT IN OPENING STATEMENT, MR. WADE

11:42AM   8    SHOWED AN EXCERPT OF ONE OF THESE DOCUMENTS IN WHICH A STANFORD

11:42AM   9    PHYSICIAN IS COMMENTING ON THE SERVICES OF THERANOS, AND HE

11:42AM  10    COMMENTS ON A COMPARISON BETWEEN OTHER BLOOD TESTING SERVICES

11:42AM  11    THAT HE'S RECEIVED AND THERANOS'S BLOOD TESTING SERVICES IN

11:43AM  12    LIGHT OF THE ACCURACY OF THE TESTS AND THE RELATIVE COSTS.

11:43AM  13              THE COURT:  WELL, THAT'S A WHOLE SEPARATE -- IT'S

11:43AM  14    ALWAYS INTERESTING IN OPENING STATEMENTS THAT COUNSEL WILL PUT

11:43AM  15    THINGS IN THAT HAVEN'T YET BEEN INTRODUCED INTO EVIDENCE, SO --

11:43AM  16              MR. DOWNEY:  NO, NO, I UNDERSTAND.  I'M JUST

11:43AM  17    RESPONDING TO MR. BOSTIC --

11:43AM  18              THE COURT:  YES.

11:43AM  19              MR. DOWNEY:  -- WHO IS SAYING THE FEEDBACK HAS

11:43AM  20    NOTHING TO DO WITH --

11:43AM  21              THE COURT:  SO THE ISSUE I HAVE, THE CONCERN I HAVE

11:43AM  22    IS THE MESSAGE FROM THE SURVEYS.

11:43AM  23        IS IT A PLEASANT EXPERIENCE BECAUSE PARKING WAS GOOD,

11:43AM  24    BECAUSE THE STORE WAS WELL LIT, BECAUSE THEY WERE GREETED, THAT

11:43AM  25    TYPE OF AN EXPERIENCE.

EDLIN CROSS BY MR. DOWNEY (RES.)                    4208

11:43AM  1      AND HOW DO YOU, CAN YOU, DO THEY SEPARATE THAT FROM

11:43AM  2   THERANOS AND THE TECHNOLOGY AND HOW IT -- HOW SATISFIED THEY

11:43AM  3   ARE WITH THE TESTING RESULTS.

11:43AM  4      IF THEY SAY, YEAH, THE FINGER TEST WAS TERRIFIC AND I

11:43AM  5   REALLY ENJOYED THAT EXPERIENCE, WHATEVER IT IS.

11:44AM  6      I DON'T KNOW HOW TO PARSE THAT OUT.  I HAVEN'T LOOKED AT

11:44AM  7   THESE.

11:44AM  8      BUT THAT'S MY CONCERN IS THAT THERE ARE GOING TO BE

11:44AM  9   SURVEYS FOR WALGREENS AS OPPOSED TO THERANOS.

11:44AM 10      AND I DON'T KNOW IF YOU CAN DO THAT.  I DON'T KNOW.

11:44AM 11          MR. DOWNEY:  WELL, YOUR HONOR, THE PHLEBOTOMISTS ARE

11:44AM 12   ALMOST ALWAYS THERANOS EMPLOYEES.  WALGREENS IS FUNCTIONING AS

11:44AM 13   A PARTNER, BUT A LOCATION AND PROVIDING COROLLARY SERVICES.  SO

11:44AM 14   I DON'T THINK IT'S RIGHT TO SAY IT'S AN EXPERIENCE ABOUT

11:44AM 15   WALGREENS.

11:44AM 16      IF ANYTHING, THIS ISN'T REALLY RELEVANT, BUT I THINK IF

11:44AM 17   YOU REVIEWED IT, A LOT OF THE COMPLAINTS ARE ABOUT SORT OF THE

11:44AM 18   ADJACENT WALGREENS SERVICES AND SO FORTH.

11:44AM 19          THE COURT:  SURE.

11:44AM 20          MR. DOWNEY:  BUT I DON'T THINK IT'S FAIR TO SAY

11:44AM 21   THAT, YOU KNOW, THE WHOLE EXPERIENCE OF THESE SERVICES, YOU

11:44AM 22   KNOW, IS NOT RELEVANT TO THE DEFENDANT'S STATE OF MIND AS TO,

11:44AM 23   YOU KNOW, HOW THE PRODUCT THAT IS BEING OFFERED IS BEING

11:44AM 24   RECEIVED BY THE PUBLIC.

11:45AM 25      I MEAN --

4209

EDLIN CROSS BY MR. DOWNEY (RES.)

11:45AM   1                THE COURT:  SO THIS IS BEING -- I'M SORRY TO CUT YOU

11:45AM   2    OFF.

11:45AM   3           THESE ARE BEING OFFERED, THE RELEVANCE OF THEM IS STATE OF

11:45AM   4    MIND.

11:45AM   5                MR. DOWNEY:  THAT'S RIGHT.

11:45AM   6                THE COURT:  YOUR CLIENT'S STATE OF MIND.

11:45AM   7                MR. DOWNEY:  THAT'S CORRECT, YOUR HONOR.

11:45AM   8                THE COURT:  BECAUSE SHE RECEIVED, AND MR. EDLIN

11:45AM   9    RECEIVED THESE ON A WEEKLY BASIS AND THEY AFFECT HER STATE OF

11:45AM  10    MIND IN WHICH MANNER?

11:45AM  11                MR. DOWNEY:  THAT'S CORRECT.

11:45AM  12                THE COURT:  THAT WAS A QUESTION.

11:45AM  13                MR. DOWNEY:  NO, THAT IS -- THAT IS THE REASON THAT

11:45AM  14    THEY'RE BEING OFFERED.

11:45AM  15           CERTAINLY THE POINTS THAT MR. BOSTIC MAKES, YOU KNOW, ARE,

11:45AM  16    ARE A FRUITFUL BASIS FOR HIS EXAMINATION ON REDIRECT THAT, YOU

11:45AM  17    KNOW --

11:45AM  18                THE COURT:  THAT WAS A QUESTION.  I WAS BEING

11:45AM  19    LITERAL.  THAT WAS A QUESTION.

11:45AM  20           WHAT IS THE STATE OF MIND THAT IT AFFECTS?  I DON'T

11:45AM  21    CAPTURE.

11:45AM  22                MR. DOWNEY:  WELL, CERTAINLY WHEN PATIENTS ARE

11:45AM  23    RETURNING TO THERANOS OVER A PERIOD OF MANY YEARS AND

11:45AM  24    DELIVERING POSITIVE REVIEWS, AND THERE ARE INDICATIONS OF THAT

11:45AM  25    TO THE DEFENDANT, IT'S CERTAINLY NOT AN INDICATION OF KNOWLEDGE

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4210

11:45AM   1    OF INACCURACY OR UNRELIABILITY IN THE BLOOD TESTING SERVICE

11:46AM   2    THAT IS BEING OFFERED, IF THAT'S RESPONSIVE TO YOUR HONOR'S

11:46AM   3    QUESTION.

11:46AM   4         MR. BOSTIC:  YOUR HONOR, THE POINT IS THAT THIS

11:46AM   5    DOESN'T SPEAK ONE WAY OR THE OTHER TO THE ACCURACY AND

11:46AM   6    RELIABILITY OF THESE TESTS, AND THAT'S WHAT AT ISSUE IN THE

11:46AM   7    CASE AND THAT'S WHAT IS ALLEGED IN THE INDICTMENT.

11:46AM   8         I OPENED TO A RANDOM PAGE -- AGAIN, I HAVEN'T HAD A CHANCE

11:46AM   9    TO REVIEW EVERYTHING HERE -- BUT MR. DOWNEY'S EXAMPLE OF THE

11:46AM  10    ACCOUNT THAT WAS PUBLISHED IN THE OPENING WHERE THE DOCTOR

11:46AM  11    COMPARED THE THERANOS TEST RESULTS TO A THIRD PARTY RESULT WITH

11:46AM  12    AN IMPLICATION ABOUT ACCURACY, THAT DOES NOT APPEAR TO BE

11:46AM  13    REPRESENTATIVE OF THE BULK OF THESE ACCOUNTS.

11:46AM  14         HERE'S ONE THAT TALKS ABOUT A FIRST-TIME GUEST WHO SAID

11:46AM  15    THAT HER DOCTOR RECOMMEND THAT SHE COME HERE SINCE SHE HAS A

11:46AM  16    HIGH DEDUCTIBLE FOR INSURANCE, SHE THOUGHT IT WAS CONVENIENT

11:46AM  17    AND CAME HERE TO HAVE BLOOD WORK AND GET MEDICATION IF SHE

11:46AM  18    NEEDS TO, THIS LOCATION IS TWO MINUTES AWAY FROM HER HOME,

11:46AM  19    WHICH SHE LOVED.

11:46AM  20         THERE'S A LOT OF POSITIVE FEEDBACK ABOUT THE PRICES AND

11:47AM  21    THE CONVENIENCE.

11:47AM  22         THOSE AREN'T ISSUES IN THE CASE, AND THE EFFECT THAT THEY

11:47AM  23    HAD ON MS. HOLMES'S MENTAL STATE ON THOSE TOPICS IS NOT

11:47AM  24    RELEVANT HERE.

11:47AM  25         BECAUSE THEY HAVE SUCH LOW PROBATIVE VALUE, IT MAKES IT

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4211

11:47AM  1   EASIER FOR THAT PROBATIVE VALUE TO BE GREATLY OUTWEIGHED BY THE

11:47AM  2   PREJUDICIAL VALUE OF HAVING A LARGE WEIGHT OF POSITIVE CUSTOMER

11:47AM  3   REVIEWS OF THERANOS RESULTS WITHOUT THE JURY BEING ABLE TO SEE

11:47AM  4   THE COMPLAINT RECORDS.

11:47AM  5          MR. DOWNEY:  WELL, RECALL ALSO, YOUR HONOR, THE

11:47AM  6   TECHNOLOGY IS AN ISSUE IN THE CASE.

11:47AM  7      BUT REMEMBER THAT MR. JHAVERI TESTIFIED, IN ESSENCE, AND

11:47AM  8   I'M PARAPHRASING, BUT THAT THE RELATIONSHIP WITH WALGREENS WAS

11:47AM  9   UNSUCCESSFUL FROM A CONSUMER EXPERIENCE PERSPECTIVE AND THAT,

11:47AM  10  THEREFORE, IT WAS KNOWN OR SHOULD HAVE BEEN KNOWN TO THE

11:47AM  11  DEFENDANT THAT THAT RELATIONSHIP WAS NOT GOING TO CONTINUE TO

11:47AM  12  EXPAND TOWARDS A NATIONAL ROLLOUT.

11:47AM  13     CERTAINLY CONTEMPORANEOUS FEEDBACK FROM HUNDREDS OF

11:47AM  14  PATIENTS WHO ARE USING THE SERVICES AT THE VERY TIME THERE'S NO

11:48AM  15  COMMUNICATION TO THE DEFENDANT BY MR. JHAVERI OF THOSE CONCERNS

11:48AM  16  IS RELEVANT TO THAT ISSUE IF NOT TO MEDICAL ISSUES IN THE CASE.

11:48AM  17         MR. BOSTIC:  AND, YOUR HONOR, I UNDERSTAND THOSE

11:48AM  18  CONCERNS FOCUSSED ON THE NUMBER OF VENOUS DRAWS THAT THERANOS

11:48AM  19  WAS NEEDING TO DO, THAT'S RELEVANT TO THE CAPABILITY OF THE

11:48AM  20  TECHNOLOGY, I DON'T SEE THAT TOPIC ADDRESSED IN ANY KIND OF

11:48AM  21  RIGOROUS WAY.

11:48AM  22         THE COURT:  I HAVEN'T LOOKED AT THEM.  I THINK I

11:48AM  23  WOULD HAVE TO.

11:48AM  24     BUT IT JUST SEEMS TO ME THAT GENERAL PLEASANT EXPERIENCE,

11:48AM  25  MR. BOSTIC POINTED ONE OUT, IT WAS CLOSE TO MY HOME.  THAT'S

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4212

11:48AM  1    NOT RELEVANT.  THE GEOGRAPHY OF SOMEONE'S RESIDENCE VIS-A-VIS

11:48AM  2    THEIR VISITING A STORE ISN'T RELEVANT AT ANY POINT IN THE CASE

11:48AM  3    OTHER THAN THEIR PLEASANT EXPERIENCE.

11:48AM  4        BUT -- SO I THINK THOSE KINDS OF THINGS WOULD HAVE TO BE

11:48AM  5    PARSED OUT.

11:48AM  6        AND I DON'T KNOW IF YOU CAN DO THAT TODAY OR NOT.

11:48AM  7            MR. DOWNEY:  NO, I DON'T THINK I CAN, YOUR HONOR.

11:49AM  8        WOULD IT BE ALL RIGHT IF I JUST AUTHENTICATED THE

11:49AM  9    DOCUMENTS WITH THIS WITNESS, AND THEN IF THERE'S A HEARSAY OR

11:49AM  10   RELEVANCE ISSUE, YOU KNOW, AND YOUR HONOR DECIDES NOT TO ADMIT

11:49AM  11   THEM, BUT I'LL DO IT WITH A REQUEST TO ADMIT AND I THINK --

11:49AM  12           THE COURT:  SURE.  YOU CAN ASK HIM -- I THINK IT'S

11:49AM  13   FAIR TO ASK HIM WHETHER OR NOT THERE WERE A CHAIN OF CUSTOMER

11:49AM  14   SURVEYS --

11:49AM  15           MR. DOWNEY:  YES.

11:49AM  16           THE COURT:  -- THAT CUSTOMERS, NOT ALL, BUT SOME

11:49AM  17   PARTICIPATED IN AND WHAT THAT WAS.

11:49AM  18       BUT I'M NOT LIKELY TO INTRODUCE THIS BINDER RIGHT NOW

11:49AM  19   WITHOUT HAVING IT PARSED THROUGH TO SEE IF THERE'S ANY OF THE

11:49AM  20   INFORMATION.  LIKE MR. BOSTIC POINTED OUT, I DON'T THINK THAT'S

11:49AM  21   RELEVANT.  I THINK YOU WOULD PROBABLY AGREE, YOU DON'T HAVE TO

11:49AM  22   STATE IT --

11:49AM  23           MR. DOWNEY:  I DON'T, BUT I UNDERSTAND.

11:49AM  24           THE COURT:  RIGHT.  ALL RIGHT.  LET'S DO THAT.

11:49AM  25           MR. DOWNEY:  SO I'LL ASK HIM IF THESE ARE AUTHENTIC

EDLIN CROSS BY MR. DOWNEY (RES.)                                4213

11:49AM  1      COPIES OF THAT.

11:50AM  2             THE COURT:  SURE.  THAT'S FINE.

11:50AM  3         DID OUR CSO LEAVE?  CAN WE GET HIM BACK?

11:50AM  4         LADIES AND GENTLEMEN, BEFORE WE CALL THE JURY IN, THIS

11:50AM  5      RELATES BACK TO THE NOISE IN THE COURTROOM.

11:50AM  6         MS. KRATZMANN HAS POINTED OUT TO ME THAT JURORS CONTINUE

11:50AM  7      TO HEAR KEYBOARDS AND IT'S DISTRACTING TO THEM.  THIS IS

11:50AM  8      PRIMARILY OUR JURORS WHO ARE SEATED IN THE -- NOT IN THE WELL

11:50AM  9      SECTION, BUT IN THE SEATS IN THE AUDIENCE.

11:50AM 10         WE DO HAVE A ROW BEHIND THEM THAT IS NOT SEATED, BUT THEY

11:50AM 11      HAVE, THE JURORS HAVE REPORTED THAT THEY CONTINUE TO HEAR

11:50AM 12      KEYBOARDS.

11:50AM 13         AND JUST TO BE FRANK AND CANDID AND TRANSPARENT, THE NOISE

11:50AM 14      THAT THEY HEAR IS COMING FROM MY LEFT SIDE OF THE COURTROOM.

11:50AM 15      THEY HAVE HEARD THAT.

11:50AM 16         I'M CALLING A CSO IN, A REPRESENTATIVE OF THE MARSHAL'S

11:50AM 17      OFFICE, AND I'VE ASKED THEM TO MONITOR AND SEE IF THEY HEAR ANY

11:51AM 18      OF THIS NOISE.

11:51AM 19         IT WAS DISTRACTING TO MR. DOWNEY'S EXAMINATION, AND THAT'S

11:51AM 20      NOT FAIR TO MS. HOLMES TO HAVE THAT TYPE OF DISTRACTION.  IT

11:51AM 21      CAN IMPAIR HER RIGHT TO A FAIR TRIAL.  IF A JUROR IS NOT

11:51AM 22      LISTENING OR IS DISTRACTED AT A KEY MOMENT WHEN A CRITICAL

11:51AM 23      PIECE OF EVIDENCE IS COMING IN, EXAMINATION IS COMING IN, THAT

11:51AM 24      IS NOT FAIR.  AND I INTEND TO HOLD A FAIR TRIAL FOR THE

11:51AM 25      DEFENDANT IN THIS CASE.

EDLIN CROSS BY MR. DOWNEY (RES.)                    4214

11:51AM  1      IF, IF I AM INFORMED THAT A KEYBOARD OR OTHER NOISE IS

11:51AM  2  INTERFERING WITH THAT FUNDAMENTAL CONSTITUTIONAL RIGHT, I'LL

11:51AM  3  PROVIDE AN ALTERNATIVE TO WHOEVER THAT IS USING THEIR KEYBOARD.

11:51AM  4      AND WE DO HAVE AN ALTERNATIVE.  YOU CAN -- I'M NOT GOING

11:51AM  5  TO BANISH YOU FROM THE COURTHOUSE, YOU CAN STILL CONTINUE TO

11:51AM  6  PARTICIPATE IN THIS TRIAL THROUGH OUR OVERFLOW ROOM WHERE WE

11:51AM  7  HAVE A SCREEN, THERE'S NO JURY PRESENT, AND YOU CAN WATCH AND

11:52AM  8  OBTAIN THE SAME EXPERIENCE THERE.

11:52AM  9      AND IT MAY BE THAT IF I HEAR ANY REPORTS THAT THE

11:52AM  10  KEYBOARD'S THERE, I'LL ASK OUR MARSHAL TO ESCORT THAT PERSON

11:52AM  11  DOWN SUCH THAT THEIR ABILITY TO CONTINUE TO PARTICIPATE AS AN

11:52AM  12  OBSERVER IN THIS PUBLIC PROCEEDING IS NOT INTERRUPTED, BUT THEY

11:52AM  13  DO IT IN A WAY THAT DOES NOT INTERFERE WITH THE DEFENDANT'S

11:52AM  14  SIXTH AMENDMENT RIGHT TO A TRIAL AND THE GOVERNMENT'S ABILITY

11:52AM  15  TO PROSECUTE THE CASE ACCORDINGLY.

11:52AM  16      SO I'VE ASKED AN OFFICIAL OF THE MARSHAL'S OFFICE TO BE

11:52AM  17  PRESENT.  I'VE GIVEN THAT MARSHAL INSTRUCTIONS THAT IF THERE'S

11:52AM  18  ANY DISTURBANCE, HE CAN TAKE ACTION ACCORDINGLY.

11:52AM  19      SO I JUST WANT TO LET EVERYONE KNOW THAT, AND I APOLOGIZE

11:52AM  20  TO COUNSEL FOR THAT DISRUPTION IN YOUR CASE.  THAT SHOULDN'T

11:52AM  21  HAPPEN IN A COURTROOM, PARTICULARLY IN ANY CRIMINAL CASE THAT

11:52AM  22  IS IMPORTANT TO -- THAT HAS LIBERTY RISKS, AND IT HAS ISSUES

11:53AM  23  THAT THE GOVERNMENT WISHES TO PRESENT IN THEIR PROSECUTION.

11:53AM  24      SO THANK YOU.  ANY -- I DON'T KNOW IF YOU WANT TO MAKE ANY

11:53AM  25  COMMENT, MR. BOSTIC?

EDLIN CROSS BY MR. DOWNEY (RES.)                                  4215

| | | |
|---|---|---|
| 11:53AM | 1 | MR. BOSTIC:  NO, YOUR HONOR.  THANK YOU. |
| 11:53AM | 2 | MR. DOWNEY:  THANK YOU. |
| 11:53AM | 3 | THE COURT:  ALL RIGHT.  SO WE'LL PROCEED ACCORDINGLY |
| 11:53AM | 4 | THEN, MR. DOWNEY. |
| 11:53AM | 5 | SHOULD WE BRING THE JURY IN THEN? |
| 11:53AM | 6 | THE CLERK:  YES, YOUR HONOR. |
| 11:54AM | 7 | (PAUSE IN PROCEEDINGS.) |
| 11:54AM | 8 | (JURY IN AT 11:54 A.M.) |
| 11:55AM | 9 | THE COURT:  ALL RIGHT.  THANK YOU.  PLEASE BE |
| 11:55AM | 10 | SEATED. |
| 11:55AM | 11 | WE'RE BACK ON THE RECORD.  ALL COUNSEL ARE PRESENT. |
| 11:55AM | 12 | MS. HOLMES IS PRESENT.  THE WITNESS IS ON THE STAND. |
| 11:55AM | 13 | MR. DOWNEY, YOU WOULD LIKE TO CONTINUE? |
| 11:55AM | 14 | MR. DOWNEY:  YES, SIR. |
| 11:55AM | 15 | Q.  MR. EDLIN, DO YOU RECALL YESTERDAY DISCUSSING WITH |
| 11:55AM | 16 | MR. BOSTIC THE SUBJECT OF COMPILING SLIDE DECKS FOR |
| 11:55AM | 17 | PRESENTATIONS? |
| 11:55AM | 18 | A.  YES. |
| 11:55AM | 19 | Q.  AND SOMETIMES THOSE PRESENTATION WERE SHARED WITH |
| 11:55AM | 20 | INVESTORS; CORRECT? |
| 11:55AM | 21 | A.  CORRECT. |
| 11:55AM | 22 | Q.  AND THEY WERE SHARED WITH STRATEGIC PARTNERS OF THERANOS; |
| 11:55AM | 23 | CORRECT? |
| 11:55AM | 24 | A.  CORRECT. |
| 11:55AM | 25 | Q.  AND THEY MIGHT BE SHARED WITH THE PRESS, FOR EXAMPLE? |

EDLIN CROSS BY MR. DOWNEY (RES.)                          4216

11:55AM   1    A.   WITH THE PRESS?

11:55AM   2    Q.   YEAH, WITH JOURNALISTS WHO WERE WRITING ABOUT THERANOS?

11:55AM   3    A.   I DON'T RECALL WHETHER THOSE PRESENTATIONS WERE SENT TO

11:56AM   4    THEM.

11:56AM   5    Q.   GIVE US A SENSE OF WHAT KINDS OF PEOPLE RECEIVED THOSE

11:56AM   6    PRESENTATIONS?

11:56AM   7    A.   IT WASN'T COMMON TO SEND THOSE PRESENTATIONS OVER AN

11:56AM   8    EMAIL, FOR EXAMPLE, BUT -- AND THE OVERVIEW PRESENTATIONS

11:56AM   9    DIFFERED BASED ON THE AUDIENCE.

11:56AM  10         SO THE BOARD, THERE WERE INVESTORS, BUSINESS PARTNERS,

11:56AM  11    HOSPITAL SYSTEMS.  SO THOSE TYPES OF PEOPLE AT LEAST VIEWED --

11:56AM  12    WELL, I WOULDN'T SAY THEY WERE GIVEN THE PRESENTATION.

11:56AM  13         IN A MEETING, CERTAIN SLIDES WOULD BE DISCUSSED.  BUT IT

11:56AM  14    WASN'T COMMON TO GO THROUGH THE PRESENTATION SLIDE BY SLIDE

11:56AM  15    SEQUENTIALLY.  IT KIND OF DEPENDED ON THE CONVERSATION.

11:56AM  16    Q.   OKAY.  AND THERE MIGHT BE SUBJECT MATTERS THAT MS. HOLMES

11:56AM  17    THOUGHT THAT A PARTICULAR AUDIENCE WAS INTERESTED IN?

11:56AM  18    A.   RIGHT.

11:56AM  19    Q.   SO SHE MIGHT DISCUSS CERTAIN SLIDES, BUT NOT OTHERS DURING

11:57AM  20    THE COURSE OF THE MEETING?

11:57AM  21    A.   CORRECT.

11:57AM  22    Q.   AND DID YOU MAINTAIN A KIND OF MASTER COPY OF A

11:57AM  23    PRESENTATION ON A SHARED DRIVE AT THERANOS?

11:57AM  24    A.   I'D SAY MULTIPLE PEOPLE HAD THE ABILITY TO EDIT AND

11:57AM  25    MAINTAIN IT, BUT THERE WAS A MASTER VERSION THAT WAS SAVED ON A

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4217

11:57AM   1     SHARED DRIVE.

11:57AM   2     Q.   OKAY.  AND THAT WAS SORT OF A STANDARD FORM THAT COULD BE

11:57AM   3     ALTERED BASED ON THE PARTICULAR AUDIENCE THAT WAS GOING TO

11:57AM   4     RECEIVE THE PRESENTATION?

11:57AM   5     A.   I RECALL THERE BEING MULTIPLE VERSIONS OF PRESENTATIONS

11:57AM   6     FOR AN INTENDED -- FOR A SPECIFIC AUDIENCE.

11:57AM   7     Q.   OKAY.  SO WERE THERE SOME PRESENTATIONS, FOR EXAMPLE, FOR

11:57AM   8     HOSPITALS?

11:57AM   9     A.   YES.

11:57AM   10    Q.   AND THEY WOULD BE DIFFERENT FROM PRESENTATIONS FOR

11:57AM   11    STRATEGIC PARTNERS?

11:57AM   12    A.   YES.

11:57AM   13    Q.   AND THEY MIGHT BE DIFFERENT, AGAIN, FROM PRESENTATIONS FOR

11:57AM   14    INVESTORS; CORRECT?

11:57AM   15    A.   CORRECT.

11:57AM   16    Q.   BUT WHAT ALL OF THEM HAD IN COMMON WAS THAT THEY SHARED

11:58AM   17    DATA ABOUT THERANOS'S ASSAY PERFORMANCE; CORRECT?

11:58AM   18    A.   GENERALLY, YES.

11:58AM   19    Q.   LET ME SHOW YOU AN EXHIBIT THAT IS MARKED AS 10464.

11:58AM   20         YOUR HONOR, THIS IS ANOTHER BULKY EXHIBIT, SO I JUST

11:58AM   21    SEPARATED IT INTO --

11:58AM   22             THE COURT:  THANK YOU.

11:58AM   23             MR. DOWNEY:  -- A SEPARATE BINDER WHICH I'LL PASS

11:58AM   24    UP.

11:58AM   25         (HANDING.)

| | | |
|---|---|---|
| 11:58AM | 1 | THE COURT:  OKAY. |
| 11:58AM | 2 | MR. DOWNEY:  MAY I APPROACH THE WITNESS? |
| 11:58AM | 3 | THE COURT:  YES.  THANK YOU. |
| 11:58AM | 4 | BY MR. DOWNEY: |
| 11:58AM | 5 | Q.   (HANDING.) |
| 11:58AM | 6 | A.   THANK YOU. |
| 11:58AM | 7 | Q.   LET'S TAKE A MOMENT TO REVIEW 10464 AND SEE IF IT'S |
| 11:59AM | 8 | SOMETHING THAT YOU RECOGNIZE. |
| 11:59AM | 9 | (PAUSE IN PROCEEDINGS.) |
| 11:59AM | 10 | THE WITNESS:  I DO RECOGNIZE IT AS A CONFIDENTIAL |
| 11:59AM | 11 | OVERVIEW PRESENTATION. |
| 11:59AM | 12 | BY MR. DOWNEY: |
| 11:59AM | 13 | Q.   OKAY. |
| 11:59AM | 14 | A.   BUT I CAN'T IDENTIFY WHO THE ACTUAL INTENDED AUDIENCE IS. |
| 11:59AM | 15 | Q.   DO YOU SEE ON THE FRONT THAT THIS IS AN EMAIL FROM YOU TO |
| 11:59AM | 16 | MS. HOLMES, MR. BALWANI, AND CHRISTIAN HOLMES? |
| 11:59AM | 17 | A.   ONE MOMENT. |
| 12:00PM | 18 | YES. |
| 12:00PM | 19 | MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF |
| 12:00PM | 20 | 10464. |
| 12:00PM | 21 | MR. BOSTIC:  NO OBJECTION. |
| 12:00PM | 22 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 12:00PM | 23 | (DEFENDANT'S EXHIBIT 10464 WAS RECEIVED IN EVIDENCE.) |
| 12:00PM | 24 | BY MR. DOWNEY: |
| 12:00PM | 25 | Q.   I'LL SHOW YOU THAT FIRST PAGE, AND THIS IS JUST AN EMAIL |

                                          4219
EDLIN CROSS BY MR. DOWNEY (RES.)

12:00PM   1    WITH YOU TRANSMITTING THE PRESENTATION TEMPLATE THAT EXISTED AS

12:00PM   2    OF JUNE 2013 TO MS. HOLMES; CORRECT?

12:00PM   3    A.   CORRECT.

12:00PM   4    Q.   AND IF YOU GO TO THE PRESENTATION THAT IS ATTACHED, IT'S A

12:00PM   5    VERY LONG PRESENTATION; CORRECT?

12:00PM   6    A.   YES.

12:00PM   7    Q.   OKAY.  AND IF YOU GO FORWARD IN THE PRESENTATION TO THE

12:00PM   8    SLIDE THAT IS MARKED AS SLIDE 28, AND YOU SEE THAT HAS THE WORD

12:00PM   9    IMMUNO CHEMISTRY; CORRECT?

12:00PM   10   A.   YES.

12:00PM   11   Q.   AND THAT'S A REFERENCE TO A CATEGORY OF ASSAY; CORRECT?

12:00PM   12   A.   YES.

12:00PM   13   Q.   AND IF YOU FLIP FORWARD THROUGH THAT TO THE FOLLOWING

12:01PM   14   PAGES IN THE EXHIBIT, YOU SEE THAT THERE ARE JUST DOZENS AND

12:01PM   15   DOZENS OF PAGES ABOUT THE PERFORMANCE OF THERANOS ASSAYS;

12:01PM   16   CORRECT?

12:01PM   17   A.   CORRECT.

12:01PM   18   Q.   AND SOMETIMES THIS WOULD BE SHARED WITH, I THINK WITH

12:01PM   19   POTENTIAL HOSPITAL PARTNERS; CORRECT?

12:01PM   20   A.   CORRECT.

12:01PM   21   Q.   AND SOMETIMES IT WOULD BE SHARED WITH AUDIENCES WHO

12:01PM   22   THEMSELVES DIDN'T HAVE THE ABILITY TO EVALUATE THE DATA;

12:01PM   23   CORRECT?

12:01PM   24   A.   CORRECT.

12:01PM   25   Q.   BUT THEY MIGHT, FOR EXAMPLE, CALL ON SOME THIRD PARTY TO

EDLIN CROSS BY MR. DOWNEY (RES.)                                      4220

12:01PM  1    EVALUATE THAT DATA FOR THEM?

12:01PM  2    A.   THAT SOUNDS ACCURATE, YES.

12:01PM  3    Q.   OKAY.  LET ME FOCUS ON THE PROCESS THAT YOU WENT

12:01PM  4    THROUGH -- AND YOU PARTICIPATED IN COMPILING SOME OF THE DATA

12:01PM  5    THAT IS IN THESE SLIDES; CORRECT?

12:01PM  6    A.   CORRECT.

12:01PM  7    Q.   LET ME FOCUS ON THAT PROCESS FOR A MINUTE.

12:01PM  8         FIRST OF ALL, YOU PERSONALLY DIDN'T GENERATE ANY OF THIS

12:02PM  9    DATA; CORRECT?

12:02PM  10   A.   CORRECT.

12:02PM  11   Q.   OKAY.  INSTEAD, MS. HOLMES WOULD ASK YOU TO REACH OUT TO

12:02PM  12   THE VARIOUS SCIENCE AND ENGINEERING TEAMS WITHIN THERANOS FOR

12:02PM  13   THE LATEST INFORMATION; CORRECT?

12:02PM  14   A.   CORRECT, THE LATEST AND GREATEST DATA.

12:02PM  15   Q.   WELL, IF YOU LOOK AT EXHIBIT 7217.  LET ME ASK YOU IF YOU

12:02PM  16   CAN IDENTIFY THIS AS AN EMAIL EXCHANGE BETWEEN YOURSELF,

12:02PM  17   MS. HOLMES, AND OTHERS AT THERANOS.

12:02PM  18   A.   IS THIS IN THE --

12:02PM  19   Q.   7217.

12:03PM  20   A.   OKAY.

12:03PM  21   Q.   AND DO YOU SEE THAT AT THE BOTTOM OF THE FIRST PAGE THERE,

12:03PM  22   THERE'S AN EMAIL EXCHANGE, AND THEN IT GOES UP FROM THERE, AND

12:03PM  23   IT'S BETWEEN MS. HOLMES, YOURSELF, AND OTHERS AT THERANOS?

12:03PM  24   A.   YES.

12:03PM  25             MR. DOWNEY:  I WOULD MOVE THE ADMISSION OF 7217,

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4221

12:03PM   1        YOUR HONOR.

12:03PM   2               MR. BOSTIC:  NO OBJECTION.

12:03PM   3               THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:03PM   4         (DEFENDANT'S EXHIBIT 7217 WAS RECEIVED IN EVIDENCE.)

12:03PM   5    BY MR. DOWNEY:

12:03PM   6    Q.   IF YOU LOOK AT THE BOTTOM OF THAT PAGE, THAT'S THE FIRST

12:03PM   7    EMAIL THAT IS FROM MS. HOLMES, AND THEN IT'S TO A GROUP OF

12:03PM   8    PEOPLE THERE.

12:03PM   9         DO YOU SEE THAT?

12:03PM  10    A.   YES.

12:03PM  11    Q.   AND THOSE ARE THE PRODUCT MANAGERS IN THERANOS; CORRECT?

12:03PM  12    A.   YES.

12:03PM  13    Q.   AND ALL OF THEM HAD DIFFERENT RESPONSIBILITIES IN

12:03PM  14    DIFFERENT AREAS OF THE COMPANY; CORRECT?

12:03PM  15    A.   CORRECT.

12:03PM  16    Q.   AND IT WAS COPIED TO MR. BALWANI.

12:03PM  17         DO YOU SEE THAT?

12:03PM  18    A.   YES.

12:03PM  19    Q.   AND IN THE EMAIL SHE SAYS, "WE HAVE A DOD MEETING TOMORROW

12:04PM  20    AT 8:45.  PLEASE TAKE A LOOK AT THE ATTACHED AND LET ME KNOW IF

12:04PM  21    THERE IS ANY UPDATED CONTENT WE HAVE THAT WE ARE MISSING, OR IF

12:04PM  22    THERE IS CONTENT THAT YOU WOULD UPDATE."

12:04PM  23         AND THEN YOU GO TO THE EMAIL ABOVE THAT.

12:04PM  24         AND DO YOU SEE HERE THAT SHE CC'S A NEW AUDIENCE OF PEOPLE

12:04PM  25    IN THIS EMAIL?

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4222

12:04PM   1      A.   YES.

12:04PM   2      Q.   AND SHE COPIES IN THE ASSAY LEADS AT THE COMPANY; CORRECT?

12:04PM   3      A.   YES.

12:04PM   4      Q.   AND SHE'S ASKING THEM IN THIS EMAIL, DO THEY HAVE MORE AND

12:04PM   5      RECENT DATA ABOUT THE PERFORMANCE OF THERANOS ASSAYS RELATIVE

12:04PM   6      TO OTHER -- EITHER A REFERENCE METHOD OR THE PERFORMANCE OF

12:04PM   7      OTHER COMPANY'S ASSAYS?

12:04PM   8      A.   YES.

12:04PM   9      Q.   AND IF YOU GO TO THE EMAIL ABOVE THAT, THERE'S AN EMAIL

12:04PM  10      FROM DR. PANGARKAR.

12:04PM  11           DO YOU SEE THAT?

12:04PM  12      A.   YES.

12:04PM  13      Q.   AND HE INDICATES IN THE EMAIL THAT THEY DO HAVE MORE DATA

12:05PM  14      ON ONE CATEGORY OF THE ASSAYS; CORRECT?

12:05PM  15      A.   CORRECT.

12:05PM  16      Q.   AND IF YOU GO TO THE TOP, MS. HOLMES ASKS THAT THAT

12:05PM  17      INFORMATION BE SENT?

12:05PM  18      A.   I DO SEE THAT.

12:05PM  19      Q.   OKAY.  AND THAT -- THIS WAS A FAIRLY STANDARD DISCUSSION

12:05PM  20      THAT WOULD HAPPEN IN CONNECTION WITH UPDATING THE PRESENTATION

12:05PM  21      DECK THAT WAS MAINTAINED AT THERANOS; CORRECT?

12:05PM  22      A.   CORRECT.

12:05PM  23      Q.   LET ME ASK YOU TO LOOK AT 10448.

12:05PM  24           DO YOU SEE THAT THIS IS AN EMAIL EXCHANGE BETWEEN YOU AND

12:05PM  25      DR. YOUNG?

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4223

| | | |
|---|---|---|
| 12:06PM | 1 | ARE YOU ABLE TO FIND THAT? |
| 12:06PM | 2 | A.   I WAS NOT ABLE TO FIND THAT. |
| 12:06PM | 3 | Q.   I HAVE A COPY HERE FOR YOU. |
| 12:06PM | 4 | THE COURT:  I DON'T THINK THAT MADE IT INTO MINE, |
| 12:06PM | 5 | EITHER.  10448? |
| 12:06PM | 6 | MR. DOWNEY:  LET ME PASS THAT EXHIBIT -- |
| 12:06PM | 7 | THE COURT:  SURE. |
| 12:06PM | 8 | MR. DOWNEY:  -- AND THEN I'LL COME BACK AND DO |
| 12:06PM | 9 | ANOTHER ONE. |
| 12:06PM | 10 | Q.   LET ME ASK YOU TO LOOK AT 104666? |
| 12:06PM | 11 | A.   10466? |
| 12:06PM | 12 | Q.   104666. |
| 12:06PM | 13 | MR. BOSTIC:  IT'S TOO MANY DIGITS. |
| 12:07PM | 14 | THE WITNESS:  I DON'T SEE 104666.  I SEE 10466. |
| 12:07PM | 15 | BY MR. DOWNEY: |
| 12:07PM | 16 | Q.   WELL, LET ME -- |
| 12:07PM | 17 | YOUR HONOR, DO YOU HAVE 104666? |
| 12:07PM | 18 | THE COURT:  I HAVE 10466, YES. |
| 12:07PM | 19 | IS THAT A 10-14 EMAIL? |
| 12:07PM | 20 | MR. DOWNEY:  YES, BUT I HAVE THAT MARKED AS 10466. |
| 12:07PM | 21 | THE COURT:  THAT'S WHAT I HAVE.  10466, DO YOU HAVE |
| 12:07PM | 22 | THAT, SIR? |
| 12:07PM | 23 | THE WITNESS:  TWO 6'S AT THE END. |
| 12:07PM | 24 | MR. DOWNEY:  YES. |
| 12:07PM | 25 | THE WITNESS:  YES. |

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4224

12:07PM  1    BY MR. DOWNEY:

12:07PM  2    Q.   IF, IF -- IS THIS AN EMAIL EXCHANGE BETWEEN YOU AND

12:07PM  3    VARIOUS SCIENTISTS AND MS. HOLMES AND MR. BALWANI AT THERANOS?

12:07PM  4    A.   YES.

12:07PM  5    Q.   AND IF YOU LOOK AT THE --

12:07PM  6         YOUR HONOR, I MOVE FOR THE ADMISSION OF 10466.

12:08PM  7              MR. BOSTIC:  NO OBJECTION, YOUR HONOR.

12:08PM  8              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:08PM  9         (DEFENDANT'S EXHIBIT 10466 WAS RECEIVED IN EVIDENCE.)

12:08PM 10    BY MR. DOWNEY:

12:08PM 11    Q.   IF YOU LOOK AT THE EMAIL AT THE BOTTOM OF 10466, YOU SEE

12:08PM 12    THAT MS. HOLMES IS AGAIN TELLING THE SCIENTISTS THAT THERE'S AN

12:08PM 13    EXTREMELY IMPORTANT MEETING AND SHE -- DO YOU SEE IN THE SECOND

12:08PM 14    SENTENCE THAT SHE SAYS, "DAN" -- REFERRING TO YOU?  IS THAT IN

12:08PM 15    REFERENCE TO YOU?

12:08PM 16    A.   YES.

12:08PM 17    Q.   -- "WILL BE SENDING THE RELEVANT SECTIONS FROM THE

12:08PM 18    PRESENTATION THAT DETAIL CLINICAL CORRELATIONS."

12:08PM 19         CORRECT?

12:08PM 20    A.   CORRECT.

12:08PM 21    Q.   AND SHE ASKED THAT THEY EACH REVIEW THE PRESENTATION TO

12:08PM 22    MAKE SURE THAT IT WAS ACCURATE; CORRECT?

12:08PM 23    A.   CORRECT.

12:08PM 24    Q.   AND AS PART OF YOUR RESPONSIBILITIES, YOU WOULD OFTEN

12:08PM 25    FOLLOW UP WITH THE SCIENTISTS MANY TIMES TO MAKE SURE THAT WHAT

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4225

12:08PM   1      WAS IN THOSE SLIDES WAS ACCURATE; CORRECT?

12:08PM   2      A.   YES.

12:08PM   3      Q.   LET ME ASK YOU TO LOOK AT THE BINDER THAT I GAVE YOU A

12:09PM   4      MOMENT AGO AT THE DOCUMENT THAT IS MARKED 3696.

12:09PM   5           DO YOU SEE THAT?

12:09PM   6      A.   YES.  YES, I SEE IT.

12:09PM   7      Q.   I'M GOING TO ASK YOU TO TAKE A MINUTE TO FLIP THROUGH THAT

12:09PM   8      DOCUMENT TO SEE IF YOU RECOGNIZE IT.

12:09PM   9      A.   IT LOOKS FAMILIAR.

12:09PM   10     Q.   OKAY.  IS THIS A PRESENTATION THAT WAS SENT TO AN INVESTOR

12:09PM   11     IN THERANOS?

12:09PM   12     A.   I DON'T KNOW.

12:09PM   13     Q.   DO YOU SEE THE REFERENCE IN THE BOTTOM OF THE DOCUMENT TO

12:09PM   14     MOSLEY FAMILY HOLDINGS?

12:09PM   15     A.   YES.

12:09PM   16     Q.   AND IS THAT A NAME THAT YOU RECOGNIZE?

12:09PM   17     A.   YES.

12:09PM   18     Q.   WHO IS THAT?

12:09PM   19     A.   AN INVESTOR.

12:10PM   20            MR. DOWNEY:  OKAY.  YOUR HONOR, I MOVE THE ADMISSION

12:10PM   21     OF EXHIBIT 3696.

12:10PM   22            MR. BOSTIC:  NO OBJECTION.

12:10PM   23            THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

12:10PM   24        (GOVERNMENT'S EXHIBIT 3696 WAS RECEIVED IN EVIDENCE.)

12:10PM   25     BY MR. DOWNEY:

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4226

12:10PM  1    Q.   SO THIS IS THE COVER PAGE THAT IS BEING DISPLAYED NOW ON

12:10PM  2    PAGE 1 OF THE EXHIBIT; CORRECT?

12:10PM  3    A.   CORRECT.

12:10PM  4    Q.   I'D LIKE TO ASK YOU TO GO FORWARD TO PAGE 23 OF THE

12:10PM  5    EXHIBIT, WHICH I'LL HAVE DISPLAYED ON THE SCREEN.

12:10PM  6    A.   OKAY.

12:10PM  7    Q.   DO YOU SEE THAT SLIDE?  IT'S LABELLED BETTER DATA FROM

12:10PM  8    FRESHER SAMPLES?

12:10PM  9    A.   YES.

12:10PM  10   Q.   AND DO YOU RECALL WORKING ON THE DEVELOPMENT OF THIS SLIDE

12:10PM  11   WHEN YOU WERE AT THERANOS?

12:10PM  12   A.   I DON'T RECALL SPECIFICALLY.

12:10PM  13   Q.   CAN YOU EXPLAIN TO US IF YOU KNOW WHAT THIS SLIDE CONVEYS?

12:10PM  14   A.   I'M NOT THE EXPERT HERE, BUT JUST BY READING THE

12:11PM  15   DESCRIPTION HERE, IT SAYS THAT THERANOS RAPIDLY PROCESSES

12:11PM  16   SAMPLES AND ALLOWS FOR ANALYSIS OF KEY MARKERS BEFORE THEIR

12:11PM  17   ANALYTE DECAY RATES AFFECT RESULT INTEGRITY.

12:11PM  18        I BELIEVE IT REFERS TO THE AMOUNT OF TIME THAT PASSED

12:11PM  19   BETWEEN WHEN A SAMPLE IS COLLECTED AND WHEN IT'S TESTED.

12:11PM  20   Q.   AND WAS IT TRYING TO CONVEY THAT BECAUSE THERANOS WAS ABLE

12:11PM  21   TO PROCESS ITS SAMPLES MORE QUICKLY THAN ITS COMPETITORS, THAT

12:11PM  22   LED TO BETTER DATA?

12:11PM  23   A.   YES.

12:11PM  24   Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 10469.

12:12PM  25   A.   OKAY.

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4227

| | | |
|---|---|---|
| 12:12PM | 1 | Q.   AND IT MIGHT BE HELPFUL AT THE SAME TIME TO LOOK AT |
| 12:12PM | 2 | EXHIBIT 10468, AND WE'LL DEAL WITH THEM IN SEQUENCE. |
| 12:12PM | 3 | A.   OKAY. |
| 12:12PM | 4 | Q.   OKAY.  IF YOU LOOK AT 10469, IS THIS AN EMAIL IN WHICH |
| 12:12PM | 5 | YOU'RE CONVEYING OPTIONS FOR A GRAPH TO MS. HOLMES ABOUT HOW |
| 12:12PM | 6 | THIS CONCEPT OF BETTER DATA FROM FRESHER SAMPLES MIGHT BE |
| 12:13PM | 7 | PRESENTED IN THE SLIDE DECK? |
| 12:13PM | 8 | A.   YES. |
| 12:13PM | 9 | Q.   BUT, BUT THE DATA THAT GOES INTO THIS SLIDE IS NOT DATA |
| 12:13PM | 10 | THAT YOU YOURSELF COMPILED; CORRECT? |
| 12:13PM | 11 | A.   CORRECT. |
| 12:13PM | 12 | Q.   IF YOU WOULD LOOK AT -- |
| 12:13PM | 13 | WELL, YOUR HONOR, I MOVE TO ADMIT 10469. |
| 12:13PM | 14 | MR. BOSTIC:  NO OBJECTION. |
| 12:13PM | 15 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 12:13PM | 16 | (DEFENDANT'S EXHIBIT 10469 WAS RECEIVED IN EVIDENCE.) |
| 12:13PM | 17 | BY MR. DOWNEY: |
| 12:13PM | 18 | Q.   AND IF YOU LOOK AT 10468, IS THIS AN EMAIL EXCHANGE |
| 12:13PM | 19 | BETWEEN MS. HOLMES, DR. YOUNG, AND YOURSELF RELATED TO THE SAME |
| 12:13PM | 20 | SLIDE? |
| 12:13PM | 21 | A.   YES. |
| 12:13PM | 22 | Q.   AND IF YOU LOOK AT THE EMAIL AT THE BOTTOM OF 10468, DO |
| 12:13PM | 23 | YOU SEE THAT THAT IS THE SAME EMAIL WITH YOU CONVEYING THE |
| 12:14PM | 24 | DRAFT SLIDES TO MS. HOLMES? |
| 12:14PM | 25 | A.   YES. |

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4228

12:14PM   1      Q.   AND THEN --

12:14PM   2           COULD WE PUBLISH 10468, YOUR HONOR?

12:14PM   3                THE COURT:  YES.

12:14PM   4                MR. BOSTIC:  IT'S NOT IN EVIDENCE.

12:14PM   5                MR. DOWNEY:  I'M SORRY.  I MOVE ITS ADMISSION.

12:14PM   6                MR. BOSTIC:  NO OBJECTION.

12:14PM   7                THE COURT:  IT MAY BE PUBLISHED, YES.

12:14PM   8           (DEFENDANT'S EXHIBIT 10468 WAS RECEIVED IN EVIDENCE.)

12:14PM   9      BY MR. DOWNEY:

12:14PM  10      Q.   IF YOU LOOK AT THE EMAIL AT THE BOTTOM, YOU WILL SEE THAT

12:14PM  11      THIS IS -- AT THE VERY BOTTOM IT'S AGAIN THE EMAIL OF YOU

12:14PM  12      FORWARDING OPTIONS TO MS. HOLMES AS TO HOW THE GRAPH MIGHT

12:14PM  13      LOOK?

12:14PM  14      A.   YES.

12:14PM  15      Q.   AND IF YOU SEE MS. HOLMES'S RESPONSE TO THAT EMAIL SAYING,

12:14PM  16      "DANIEL:  ARE YOU SAYING 2 HOURS FROM THE TIME IT BECOMES SERUM

12:14PM  17      IN THE BELOW GRAPH."

12:14PM  18           DO YOU SEE THAT?

12:14PM  19      A.   RIGHT.  AND THAT'S REFERRING TO DANIEL YOUNG.

12:14PM  20      Q.   RIGHT.  AND SHE'S RESPONDING TO YOUR EMAIL ON WHICH

12:14PM  21      DR. YOUNG WAS COPIED BY ASKING DR. YOUNG ABOUT THE CONTENT OF

12:15PM  22      THE EMAIL; CORRECT?

12:15PM  23      A.   CORRECT.

12:15PM  24      Q.   AND IF YOU GO ABOVE THAT TO THE NEXT SERIES OF EMAILS,

12:15PM  25      DR. YOUNG RESPONDS AND SAYS AT THE BOTTOM, HE TALKS ABOUT THE

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4229

12:15PM  1    TIME OF SAMPLE COLLECTION AND THE DECAY RATE OF THE BLOOD, ET

12:15PM  2    CETERA.

12:15PM  3    A.   CORRECT.

12:15PM  4    Q.   AND HE'S TELLING MS. HOLMES ABOUT HOW HE COMPILED THE DATA

12:15PM  5    HE HAD GIVEN TO YOU; CORRECT?

12:15PM  6    A.   YES.

12:15PM  7    Q.   AND THEN MS. HOLMES RESPONDS TO THAT ASKING A QUESTION

12:15PM  8    ABOUT REFRIGERATION; CORRECT?

12:15PM  9    A.   YES.

12:15PM  10   Q.   BECAUSE THE -- WHETHER OR NOT THE BLOOD SAMPLES WERE

12:15PM  11   REFRIGERATED COULD AFFECT THE DECAY RATE; CORRECT?

12:15PM  12   A.   YES.

12:15PM  13   Q.   AND THEN MS. HOLMES SUGGESTS -- DR. YOUNG RESPONDS IT

12:15PM  14   DOESN'T.

12:15PM  15        DO YOU SEE THAT?

12:15PM  16   A.   YES.

12:15PM  17   Q.   AND MS. HOLMES SAYS, WELL, "IF THEY CURRENTLY DO

12:16PM  18   REFRIGERATE THEN WE SHOULD REFLECT THAT SO WE ARE MAKING AN

12:16PM  19   ACCURATE CLAIM."

12:16PM  20        DO YOU SEE THAT?

12:16PM  21   A.   YES.

12:16PM  22   Q.   ALL RIGHT.  LET ME ASK YOU TO LOOK AT EXHIBIT 3696.  AND

12:16PM  23   I'M DIRECTING YOUR ATTENTION --

12:16PM  24   A.   WHICH BINDER IS THAT IN?

12:16PM  25   Q.   I BEG YOUR PARDON.  THIS WAS THE POWERPOINT THAT WE

4230
EDLIN CROSS BY MR. DOWNEY (RES.)

| 12:16PM | 1 | ADMITTED A MOMENT AGO, THE SLIDE DECK THAT WE ADMITTED A MOMENT |
| 12:16PM | 2 | AGO. |
| 12:16PM | 3 | A.   OKAY. |
| 12:16PM | 4 | Q.   AND I'LL POINT YOU ON THE SCREEN WHERE I WOULD LIKE TO GO. |
| 12:16PM | 5 | NOW I WANT TO LOOK AT PAGE 24. |
| 12:17PM | 6 | AND DO YOU SEE THAT THIS SLIDE IS ANOTHER SLIDE THAT IS |
| 12:17PM | 7 | COMMENTING ON THE ACCURACY OF THERANOS'S BLOOD TESTING |
| 12:17PM | 8 | SERVICES? |
| 12:17PM | 9 | A.   YES. |
| 12:17PM | 10 | Q.   AND DO YOU RECOGNIZE THIS AS A SLIDE THAT WAS INCLUDED IN |
| 12:17PM | 11 | SLIDE DECKS SENT TO OR DISCUSSED WITH EXTERNAL AUDIENCES? |
| 12:17PM | 12 | A.   YES. |
| 12:17PM | 13 | Q.   AND DO YOU RECOGNIZE IT AS ALSO SOMETHING WHICH APPEARED |
| 12:17PM | 14 | ON THE THERANOS WEBSITE AT CERTAIN TIMES? |
| 12:17PM | 15 | A.   YES. |
| 12:17PM | 16 | Q.   OKAY.  LET ME ASK YOU NOW TO LOOK AT EXHIBIT 10532. |
| 12:18PM | 17 | A.   OKAY. |
| 12:18PM | 18 | Q.   DO YOU SEE THAT THIS IS A SERIES OF EMAILS BETWEEN |
| 12:18PM | 19 | YOURSELF, DR. YOUNG, AND ANOTHER THERANOS EMPLOYEES NAMED |
| 12:18PM | 20 | JEFFREY BLICKMAN? |
| 12:18PM | 21 | A.   YES. |
| 12:18PM | 22 | Q.   AND MR. BLICKMAN WAS ANOTHER PRODUCT MANAGER AT THERANOS; |
| 12:18PM | 23 | CORRECT? |
| 12:18PM | 24 | A.   YES. |
| 12:18PM | 25 | Q.   AND HE WAS INVOLVED WITH THE CREATION OF SOME ELEMENTS OF |

EDLIN CROSS BY MR. DOWNEY (RES.)                          4231

12:18PM   1    THE WEBSITE; CORRECT?

12:18PM   2    A.   HE WORKED WITH A WEB DEVELOPMENT TEAM AND WAS THE MAIN

12:18PM   3    PRODUCT MANAGER WHO WORKED ON THAT PARTICULAR ASPECT.

12:18PM   4    Q.   OKAY.  AND HE IN THIS, IN THE EMAIL THAT IS AT THE --

12:18PM   5         YOUR HONOR, I MOVE THE ADMISSION OF 10532.

12:18PM   6         MR. BOSTIC:  NO OBJECTION.

12:18PM   7         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:18PM   8    (DEFENDANT'S EXHIBIT 10532 WAS RECEIVED IN EVIDENCE.)

12:18PM   9    BY MR. DOWNEY:

12:18PM  10    Q.   I'D LIKE TO HIGHLIGHT THE EMAIL AT THE BOTTOM, AND THEN

12:19PM  11    BRING UP THE NEXT PAGE AS WELL.

12:19PM  12         DO YOU SEE ON THE SECOND PAGE OF THE EXHIBIT THAT HE

12:19PM  13    PROPOSED A GRAPHIC WHICH WAS ABOUT HOW WELL THE VITAMIN D ASSAY

12:19PM  14    PERFORMED FOR THERANOS.

12:19PM  15         DO YOU SEE THAT?

12:19PM  16    A.   YES.

12:19PM  17    Q.   AND HE'S DISCUSSING THERE A DEGREE OF VARIANCE.

12:19PM  18         DO YOU SEE THAT?

12:19PM  19    A.   YES.

12:19PM  20    Q.   AND WHAT DOES THAT REFER TO?

12:19PM  21    A.   I BELIEVE IT REFERS TO ACCURACY.

12:19PM  22    Q.   AND HE'S IN THIS DRAFT CONVEYING THAT HIS UNDERSTANDING OF

12:19PM  23    THE DEGREE OF VARIANCE IS PLUS OR MINUS 3.0.

12:19PM  24         DO YOU SEE THAT?

12:19PM  25    A.   YES.

EDLIN CROSS BY MR. DOWNEY (RES.)                              4232

| | | |
|---|---|---|
| 12:19PM | 1 | Q.   OKAY.  AND IF YOU GO BACK TO THE FIRST PAGE, DO YOU SEE IN |
| 12:20PM | 2 | THE SECOND EMAIL FROM THE BOTTOM DR. YOUNG RESPONDS AND HE |
| 12:20PM | 3 | PROVIDES DATA REGARDING THE DEGREE OF VARIANCE FOR VITAMIN D. |
| 12:20PM | 4 | DO YOU SEE THAT? |
| 12:20PM | 5 | A.   YES. |
| 12:20PM | 6 | Q.   AND IN THE FOURTH PARAGRAPH, OR THIRD PARAGRAPH, HE SAYS, |
| 12:20PM | 7 | "I WOULD SAY THAT THE VARIANCE IS LESS THAN 10 PERCENT.  NOT |
| 12:20PM | 8 | SURE WHERE THE PLUS OR MINUS 3 CAME FROM." |
| 12:20PM | 9 | DO YOU SEE THAT? |
| 12:20PM | 10 | A.   YES. |
| 12:20PM | 11 | Q.   AND IF YOU LOOK BACK AT THE SLIDE THAT IS PART OF |
| 12:20PM | 12 | EXHIBIT 3696 ABOUT THIS ISSUE WITH VITAMIN D -- |
| 12:20PM | 13 | A.   RIGHT. |
| 12:20PM | 14 | Q.   -- DO YOU SEE THAT THIS IS THE FORM THAT EXISTED IN THE |
| 12:20PM | 15 | SLIDE DECK THAT YOU SENT OUT TO MR. MOSLEY? |
| 12:20PM | 16 | A.   I DON'T REMEMBER WHETHER I SENT IT TO MR. MOSLEY, BUT IT'S |
| 12:21PM | 17 | IN THE -- IT IS IN THE DECK RELATED TO MR. MOSLEY. |
| 12:21PM | 18 | Q.   OKAY.  IT'S IN THE SLIDE DECK AS OF 2014; CORRECT? |
| 12:21PM | 19 | A.   I'M NOT SURE EXACTLY WHEN THE DECK WAS SENT. |
| 12:21PM | 20 | Q.   ALL RIGHT.  WITHIN EXHIBIT 3696, CAN WE ALSO LOOK AT |
| 12:21PM | 21 | PAGE 27. |
| 12:21PM | 22 | A.   YES. |
| 12:21PM | 23 | Q.   AND DO YOU SEE THAT THE LABEL FOR THIS SLIDE IS FASTER |
| 12:21PM | 24 | RESULTS, FASTER ANSWERS; CORRECT? |
| 12:21PM | 25 | A.   YES. |

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4233

12:21PM  1    Q.   AND THIS IS A COMMENTARY ON HOW QUICKLY THERANOS COULD

12:21PM  2    TURN AROUND BLOOD TESTING RESULTS; CORRECT?

12:21PM  3    A.   YES.

12:21PM  4    Q.   AND IN THE SECOND PARAGRAPH, THE BOTTOM TWO PARAGRAPHS, IT

12:22PM  5    INDICATES, "DATA REPORTED IN HIGH QUALITY AND IN REAL-TIME

12:22PM  6    BECOMES ACTIONABLE INFORMATION FOR IMPROVED DECISION MAKING."

12:22PM  7        DO YOU SEE THAT?

12:22PM  8    A.   YES.

12:22PM  9    Q.   AND THAT WAS SOMETHING THAT THERANOS FREQUENTLY CONVEYED

12:22PM  10   TO EXTERNAL AUDIENCES; CORRECT?

12:22PM  11   A.   YES.

12:22PM  12   Q.   AND DO YOU SEE IN THE PARAGRAPH ABOVE THAT IT SAYS,

12:22PM  13   "THERANOS'S MICRO-SAMPLE ANALYSIS IS PERFORMED AT AMAZING

12:22PM  14   SPEEDS, SO WE CAN REPORT RESULTS FASTER THAN PREVIOUSLY

12:22PM  15   POSSIBLE."

12:22PM  16       DO YOU SEE THAT?

12:22PM  17   A.   YES.

12:22PM  18   Q.   AND NOW LET ME ASK YOU TO LOOK AT EXHIBIT 13935.

12:23PM  19   A.   OKAY.

12:23PM  20   Q.   DO YOU HAVE THAT?

12:23PM  21   A.   YES.

12:23PM  22   Q.   IS THIS AN EMAIL EXCHANGE ON WHICH YOU WERE COPIED

12:23PM  23   INVOLVING COMMUNICATIONS BY THERANOS PERSONNEL WITH AN OUTSIDE

12:23PM  24   BRANDING FIRM THAT IT HAD ENGAGED?

12:23PM  25   A.   YES.

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4234

12:23PM   1              MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

12:23PM   2      13935.

12:23PM   3              MR. BOSTIC:  NO OBJECTION.

12:23PM   4              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:23PM   5          (DEFENDANT'S EXHIBIT 13935 WAS RECEIVED IN EVIDENCE.)

12:23PM   6      BY MR. DOWNEY:

12:23PM   7      Q.  IF YOU LOOK AT THE FIRST PAGE OF THIS DOCUMENT, YOU SEE

12:23PM   8      IT'S AN EMAIL THAT IS FROM SOMEONE NAMED MIKE PEDITTO.  WHO WAS

12:24PM   9      MIKE PEDITTO?

12:24PM  10      A.  HE WAS A MANAGEMENT SUPERVISOR AND ACCOUNT MANAGER AT

12:24PM  11      TBWACHIAT/DAY.

12:24PM  12      Q.  AND YOU SEE YOU'RE LISTED AS ONE OF THE RECIPIENTS;

12:24PM  13      CORRECT?

12:24PM  14      A.  YES.

12:24PM  15      Q.  AND ANOTHER INDIVIDUAL NAMED STAN FIORITO IS LISTED.

12:24PM  16          DO YOU SEE THAT?

12:24PM  17      A.  YES.

12:24PM  18      Q.  AND WHO WAS HE?

12:24PM  19      A.  HE WAS AN ACCOUNT EXECUTIVE, IF NOT A HIGHER TITLE, AT

12:24PM  20      CHIAT/DAY.

12:24PM  21      Q.  OKAY.  AND IT SAYS BELOW THAT, PLEASE FIND A CONFERENCE

12:24PM  22      REPORT FROM A MEETING THAT HAD TAKEN PLACE THE WEDNESDAY

12:24PM  23      BEFORE; CORRECT?

12:24PM  24      A.  RIGHT.

12:24PM  25      Q.  AND THEN ATTACHED TO THIS IS A DOCUMENT WHICH LOOKS LIKE

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4235

12:24PM   1    IT'S SOME NOTES ON A MEETING THAT HAPPENED THE DAY BEFORE;

12:24PM   2    CORRECT?

12:24PM   3    A.   RIGHT.

12:24PM   4    Q.   AND IF YOU LOOK AT THE ATTENDEES, YOU SEE THAT THERE ARE

12:24PM   5    VARIOUS PEOPLE FROM THERANOS AND THERE ARE VARIOUS PEOPLE FROM

12:25PM   6    CHIAT/DAY, AND A COUPLE OF OTHER FIRMS; CORRECT?

12:25PM   7    A.   YES.

12:25PM   8    Q.   AND JUST TO REFER TO THEM, WORKING UP FROM THE BOTTOM,

12:25PM   9    GROW IS ANOTHER FIRM THAT THERANOS PAID FOR CONSULTATION IN

12:25PM  10    CONNECTION WITH BRANDING AND MEDIA; CORRECT?

12:25PM  11    A.   I'M NOT SURE OF THE EXACT STATUS OF THE PAYMENT, BUT THEY

12:25PM  12    DID WORK WITH GROW MARKETING, YES.

12:25PM  13    Q.   AND WHAT ABOUT PHD?

12:25PM  14    A.   I DON'T RECALL.

12:25PM  15    Q.   OKAY.  AND SHOPPER LAB?

12:25PM  16    A.   I ALSO DON'T RECALL.

12:25PM  17    Q.   OKAY.  BUT THIS IS A MEETING THAT IS ABOUT ANTICIPATING

12:25PM  18    SOME OF THE CONTENT THAT THERANOS MIGHT USE IN CONNECTION WITH

12:25PM  19    ITS WEBSITE AND OTHER PUBLIC FACING MATERIALS; CORRECT?

12:25PM  20    A.   RIGHT, IT'S A MARKETING AND COMMUNICATIONS MEETING.

12:25PM  21    Q.   OKAY.  AND LET ME ASK YOU TO LOOK AT PAGE 3.  AND IF YOU

12:25PM  22    GO TO THE SECTION ON PAGE 3 THAT IS COMMENTING ON A KEYNOTE

12:26PM  23    SPEECH, YOU SEE IT'S LABELLED A BETTER WAY?

12:26PM  24    A.   YES.

12:26PM  25    Q.   DO YOU SEE THE SECOND BULLET POINT UNDER THAT SAYS,

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4236

12:26PM   1      "CLIENT AND T/C/D?

12:26PM   2           IS T/C/D ANOTHER WAY OF SAYING CHIAT/DAY?

12:26PM   3      A.   YES.

12:26PM   4      Q.   AND THAT THEY DISCUSSED CHANGING THE CLOCK ON THE WEBSITE

12:26PM   5      TO REFLECT 30 MINUTE PROCESS.

12:26PM   6           DO YOU SEE THAT?

12:26PM   7      A.   YES.

12:26PM   8      Q.   AND IS THAT A REFERENCE TO THE FACT THAT THERANOS BELIEVED

12:26PM   9      IF A BLOOD TEST WERE RUN ON ITS DEVICE WHEN THE DEVICE WAS IN

12:26PM  10      THE LOCATION, IT WOULD TAKE AROUND 30 MINUTES?

12:26PM  11      A.   I DON'T KNOW IF IT WAS DEVICE SPECIFICALLY.  I THINK IT

12:26PM  12      WAS RELATED TO A THERANOS TEST.

12:26PM  13      Q.   OKAY.  AND OF COURSE WALGREENS AND THERANOS WERE NO LONGER

12:27PM  14      PLANNING TO DO THE TESTS ON SITE AT WALGREENS; CORRECT?

12:27PM  15      A.   I'M NOT SURE THAT WAS THE CASE AT THE TIME OF THIS EMAIL.

12:27PM  16      Q.   WELL, DO YOU SEE IN THE SECOND LINE IT SAYS, "SUNNY

12:27PM  17      BROUGHT UP THE FACT THAT THE INITIAL TURN AROUND IN WALGREENS

12:27PM  18      WILL BE UNDER 24 HOURS"?

12:27PM  19      A.   YES.

12:27PM  20      Q.   AND DOES THIS INDICATE THAT IT HAD BEEN AFTER THE TIME

12:27PM  21      THAT THERE HAD ALREADY BEEN A DECISION TO MOVE THE ANALYSIS OFF

12:27PM  22      SITE?

12:27PM  23      A.   I DON'T KNOW THAT FOR SURE.

12:27PM  24      Q.   OKAY.  LET ME ASK YOU TO LOOK BACK -- IN ANY EVENT, THE

12:27PM  25      SENTENCE "SUNNY BROUGHT UP THE FACT THAT INITIAL TURN AROUND IN

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4237

12:27PM   1    WALGREENS WILL BE UNDER 24 HOURS."

12:28PM   2         "T/C/D AND CLIENT" -- DOES "CLIENT" THERE REFER TO

12:28PM   3    THERANOS?

12:28PM   4    A.   I BELIEVE SO.

12:28PM   5    Q.   -- "ALIGNED TO USE CONSISTENT VERBIAGE TO REFLECT

12:28PM   6    UNPRECEDENTED TURN AROUND TIME, WITH NO SPECIFIC TIME MENTION."

12:28PM   7         DO YOU SEE THAT?

12:28PM   8    A.   YES.

12:28PM   9    Q.   AND IF YOU GO BACK TO EXHIBIT 3696 --

12:28PM  10    A.   YES.

12:28PM  11    Q.   -- AND YOU LOOK AT PAGE 27 --

12:28PM  12    A.   YES.

12:28PM  13    Q.   -- YOU SEE THAT THIS IS THE SLIDE SENT TO INVESTORS AND

12:28PM  14    DISPLAYED ON THE THERANOS WEBSITE THAT TALKS ABOUT THE SPEED

12:28PM  15    WITH WHICH TESTS WILL BE PERFORMED; CORRECT?

12:28PM  16    A.   CORRECT.

12:28PM  17    Q.   AND IT SAYS THAT THE RESULTS WILL BE IN HOURS, NOT DAYS.

12:28PM  18         DO YOU SEE THAT?

12:28PM  19    A.   YES.

12:28PM  20    Q.   BUT THERE'S NO CLAIM ABOUT THE SPEED BEING IN 30 MINUTES

12:28PM  21    OR ANYTHING LIKE THAT; CORRECT?

12:28PM  22    A.   CORRECT.

12:28PM  23    Q.   DID YOU HEAR THE TERM, WHEN YOU WERE AT THERANOS, AUTO

12:29PM  24    REFLEX TESTING?

12:29PM  25    A.   YES.

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4238

12:29PM   1    Q.   AND WHAT DID YOU UNDERSTAND THAT TO MEAN?

12:29PM   2    A.   I UNDERSTOOD THAT TO MEAN THAT ADDITIONAL TESTING COULD BE

12:29PM   3    PERFORMED ON A SAMPLE BASED ON THE INITIAL SET OF TESTS DONE

12:29PM   4    AND BASED ON THE RESULTS OF THE INITIAL SET OF TESTS DONE.

12:29PM   5    Q.   OKAY.  AND CAN I ASK YOU TO LOOK AT EXHIBIT 10467.

12:29PM   6    A.   OKAY.

12:29PM   7    Q.   IS THIS AN EMAIL EXCHANGE BETWEEN YOURSELF AND DR. YOUNG,

12:29PM   8    COPYING MR. BLICKMAN?

12:29PM   9         I BEG YOUR PARDON.  IS THIS AN EMAIL EXCHANGE BETWEEN

12:29PM  10    DR. YOUNG AND MR. BLICKMAN, COPYING YOU?

12:29PM  11    A.   YES.

12:30PM  12    Q.   AND IS THIS IN CONNECTION WITH PREPARING CONTENT TO BE

12:30PM  13    DISPLAYED ON THE THERANOS WEBSITE?

12:30PM  14    A.   YES.

12:30PM  15              MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

12:30PM  16    EXHIBIT 10467.

12:30PM  17              MR. BOSTIC:  NO OBJECTION.

12:30PM  18              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:30PM  19         (DEFENDANT'S EXHIBIT 10467 WAS RECEIVED IN EVIDENCE.)

12:30PM  20    BY MR. DOWNEY:

12:30PM  21    Q.   DO YOU SEE IN THE BOTTOM EMAIL ON THE SECOND TO THE LAST

12:30PM  22    PAGE, YOU SEND AN EMAIL TO DR. YOUNG ON AUGUST 9TH AT ABOUT

12:30PM  23    2:10 A.M.?

12:30PM  24    A.   YES.

12:30PM  25    Q.   AND YOU ASK HIM THERE -- YOU INDICATE YOU WANT TO ASK SOME

EDLIN CROSS BY MR. DOWNEY (RES.)                              4239

12:30PM   1    QUESTIONS BASED ON HIS EXPERTISE.

12:30PM   2         DO YOU SEE THAT?

12:30PM   3    A.   YES.   YES.

12:31PM   4    Q.   AND YOU LIST A NUMBER OF ITEMS ON THE NEXT PAGE THAT YOU

12:31PM   5    WANT TO ASK QUESTIONS ABOUT?

12:31PM   6    A.   YES.

12:31PM   7    Q.   AND IN NUMBER 3, YOU INDICATE ONE OF THE ITEMS IS AUTO

12:31PM   8    REFLEX TESTING.

12:31PM   9         DO YOU SEE THAT?

12:31PM  10    A.   YES.

12:31PM  11    Q.   AND YOU ASK HIM IN THE SECOND SENTENCE THERE, "CAN YOU

12:31PM  12    PROVIDE SOME EXAMPLE OF A COMMON TEST WITH ITS ASSOCIATED

12:31PM  13    REFLEX TESTS AND LIST ANY TESTS THAT WOULD COME BEFORE/AFTER IT

12:31PM  14    ON A LAB ORDER FORM."

12:31PM  15         DO YOU SEE THAT?

12:31PM  16    A.   YES.

12:31PM  17    Q.   AND YOU'RE TRYING TO GET AN UNDERSTANDING OF HOW THIS

12:31PM  18    COMPLEX CONCEPT COULD BE CONVEYED ON THE WEBSITE; CORRECT?

12:31PM  19    A.   CORRECT.

12:31PM  20    Q.   BUT IT'S A TOPIC ON WHICH YOU WOULD NEED INFORMATION FROM

12:31PM  21    AN EXPERT; CORRECT?

12:31PM  22    A.   CORRECT.

12:31PM  23    Q.   AND THAT'S WHY YOU WENT TO DR. YOUNG; CORRECT?

12:31PM  24    A.   CORRECT.

12:31PM  25    Q.   AND DR. YOUNG RESPONDS IN THE SECOND EMAIL FROM THE BOTTOM

EDLIN CROSS BY MR. DOWNEY (RES.)                                4240

| | | |
|---|---|---|
| 12:32PM | 1 | ON THE PRIOR PAGE, DO YOU SEE THAT, ABOUT 2:50 P.M. ON THE NEXT |
| 12:32PM | 2 | DAY? |
| 12:32PM | 3 | A.  YES. |
| 12:32PM | 4 | Q.  AND HE INDICATES AND OFFERS EXAMPLES OF SOME TESTS. |
| 12:32PM | 5 | DO YOU SEE THAT? |
| 12:32PM | 6 | A.  YES. |
| 12:32PM | 7 | Q.  AND THAT INITIATES A DISCUSSION OF THE DATA THAT YOU MIGHT |
| 12:32PM | 8 | USE TO DISPLAY THIS CONCEPT ON THE WEBSITE? |
| 12:32PM | 9 | A.  YES. |
| 12:32PM | 10 | Q.  AND IF YOU GO TO THE ULTIMATE -- IF YOU GO TO THE EMAIL |
| 12:32PM | 11 | THAT IS IN THE MIDDLE OF THE THIRD PAGE OF THE EXHIBIT, |
| 12:32PM | 12 | AUGUST 11TH AT 8:50 P.M. -- |
| 12:32PM | 13 | A.  YES. |
| 12:32PM | 14 | Q.  -- DO YOU SEE THAT? |
| 12:32PM | 15 | AND DR. YOUNG PROVIDES TO YOU AND MR. BLICKMAN BASIC |
| 12:33PM | 16 | REFLEX INFORMATION AND TESTS THAT IT ASSOCIATES WITH; CORRECT? |
| 12:33PM | 17 | A.  CORRECT. |
| 12:33PM | 18 | Q.  ALL RIGHT.  AND YOU KNOW THAT ONE CLAIM THAT THERANOS |
| 12:33PM | 19 | FREQUENTLY MADE WAS WITH RESPECT TO THE AFFORDABILITY OF ITS |
| 12:33PM | 20 | BLOOD TESTING PRODUCT; CORRECT? |
| 12:33PM | 21 | A.  CORRECT. |
| 12:33PM | 22 | Q.  AND ON THAT SUBJECT MATTER, YOU ALSO GAINED INFORMATION |
| 12:33PM | 23 | FROM OTHERS IN THE COMPANY ABOUT WHAT YOUR COMPETITORS WERE |
| 12:33PM | 24 | CHARGING AS RETAIL PRICES FOR BLOOD TESTING SERVICES; CORRECT? |
| 12:33PM | 25 | A.  CORRECT. |

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4241

12:33PM  1    Q.   SO ANY OF THE SUBJECT MATTERS THAT REQUIRED PARTICULARIZED

12:33PM  2    EXPERTISE, YOU WOULD GO TO THE RELEVANT PERSON AND, AND ASK FOR

12:33PM  3    INFORMATION THAT WOULD BE HELPFUL IN PREPARING A POTENTIAL

12:33PM  4    SLIDE; CORRECT?

12:33PM  5    A.   CORRECT.

12:33PM  6    Q.   OR CONFIRMING A SLIDE THAT CHIAT/DAY HAD PREPARED;

12:34PM  7    CORRECT?

12:34PM  8    A.   CORRECT.

12:34PM  9    Q.   I'D LIKE TO TALK FOR A FEW MINUTES ABOUT THE CONVERSATION

12:34PM  10   THAT YOU HAD YESTERDAY WITH MR. BOSTIC ABOUT JOURNALISTS AND

12:34PM  11   OTHERS BOTH MR. RAGO AND MR. PARLOFF.

12:34PM  12        DO YOU REMEMBER THE SERIES OF QUESTIONS THAT YOU WERE

12:34PM  13   ASKED ON THAT?

12:34PM  14   A.   YES.

12:34PM  15   Q.   AND WE MENTIONED A MOMENT AGO GROW MARKETING.

12:34PM  16        DO YOU RECALL THAT?

12:34PM  17   A.   YES.

12:34PM  18   Q.   AND DO YOU RECALL THAT THERANOS RETAINED GROW MARKETING TO

12:34PM  19   HELP WITH ITS PRESS STRATEGY AROUND ANNOUNCING ITS -- BOTH

12:34PM  20   ITSELF AS A CORPORATION AND ITS CONSUMER LAUNCH?

12:34PM  21   A.   YES.

12:34PM  22   Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 13979.

12:35PM  23   A.   OKAY.

12:35PM  24   Q.   DO YOU RECOGNIZE THIS?

12:35PM  25   A.   IT'S THE FIRST TIME I'VE SEEN IT IN A NUMBER OF YEARS,

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4242

12:35PM   1      BUT --

12:35PM   2      Q.   TAKE A MOMENT.

12:35PM   3      A.   OKAY.

12:36PM   4           (PAUSE IN PROCEEDINGS.)

12:36PM   5              THE WITNESS:  OKAY.  I RECOGNIZE IT.

12:36PM   6      BY MR. DOWNEY:

12:36PM   7      Q.   AND IS THIS AN EMAIL EXCHANGE BETWEEN A REPRESENTATIVE OF

12:36PM   8      GROW AND YOURSELF AND OTHER EMPLOYEES AT THERANOS?

12:36PM   9      A.   YES.

12:36PM   10     Q.   AND IS THIS EMAIL IN CONNECTION WITH GROW PROVIDING A

12:36PM   11     MEDIA TRAINING DECK FOR MS. HOLMES?

12:36PM   12     A.   YES.

12:36PM   13              MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

12:36PM   14     13979.

12:36PM   15              MR. BOSTIC:  YOUR HONOR, JUST A RELEVANCE QUESTION.

12:36PM   16       I DON'T SEE MS. HOLMES ON THIS EMAIL.

12:36PM   17              MR. DOWNEY:  THE WITNESS JUST TESTIFIED IT WAS MEDIA

12:36PM   18     TRAINING FOR MS. HOLMES.

12:36PM   19              THE COURT:  I'LL ALLOW IT.  IT'S ADMITTED.  IT MAY

12:36PM   20     BE PUBLISHED.

12:36PM   21       (DEFENDANT'S EXHIBIT 13979 WAS RECEIVED IN EVIDENCE.)

12:37PM   22     BY MR. DOWNEY:

12:37PM   23     Q.   I'LL ASK YOU TO LOOK AT SLIDE 8.

12:37PM   24       NOW, MS. HOLMES WAS GOING TO BE INTERVIEWED BY MR. RAGO IN

12:37PM   25     LATE AUGUST OF 2013; CORRECT?

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4243

12:37PM   1     A.   CORRECT.

12:37PM   2     Q.   AND GROW WAS PROVIDING ADVICE TO HER AS TO HOW SHE SHOULD

12:37PM   3     HANDLE THAT INTERVIEW; CORRECT?

12:37PM   4     A.   CORRECT.

12:37PM   5     Q.   AND THERE WERE MEDIA TRAINING SESSIONS WHERE GROW PROVIDED

12:37PM   6     ADVICE TO MS. HOLMES AS TO HOW SHE SHOULD ANSWER QUESTIONS;

12:37PM   7     CORRECT?

12:37PM   8     A.   CORRECT.

12:37PM   9     Q.   AND TOPICS SHE MIGHT WANT TO DISCUSS WITH THE REPORTER;

12:37PM  10     CORRECT?

12:37PM  11     A.   CORRECT.

12:37PM  12     Q.   IF YOU WOULD LOOK AT SLIDE, THE SLIDE THAT IS DESIGNATED

12:37PM  13     AS PAGE 8 IN THE EXHIBIT, IT HAS A HEADER COMPANY LAUNCH

12:37PM  14     OBJECTIVES.

12:37PM  15          DO YOU SEE THAT?

12:37PM  16     A.   YES.

12:37PM  17     Q.   AND IF YOU REVIEW THAT, DO YOU GENERALLY RECALL THAT GROW

12:38PM  18     MARKETING'S ADVICE WAS THAT THE MEDIA STRATEGY SHOULD SEEK TO

12:38PM  19     ACHIEVE THESE OBJECTIVES?

12:38PM  20     A.   YES.

12:38PM  21     Q.   DO YOU RECALL THAT IN CONNECTION WITH THE INITIAL LAUNCH,

12:38PM  22     MS. HOLMES DID NOT WANT TO TALK ABOUT THERANOS'S PROPRIETARY

12:38PM  23     DEVICE?

12:38PM  24     A.   I DO RECALL THAT.

12:38PM  25     Q.   LET ME ASK YOU NOW TO LOOK AT EXHIBIT 13980.

EDLIN CROSS BY MR. DOWNEY (RES.)                          4244

12:38PM   1      A.   OKAY.

12:38PM   2      Q.   DO YOU RECALL THAT IN CONNECTION WITH THE INTERVIEW WITH

12:38PM   3      MR. RAGO, GROW MARKETING COORDINATED PROVIDING INFORMATION TO

12:38PM   4      MR. RAGO ABOUT THERANOS?

12:38PM   5      A.   I DON'T RECALL SPECIFICALLY.

12:39PM   6      Q.   OKAY.

12:39PM   7      A.   BUT THEY DID HELP, I THINK, COORDINATE THAT CONVERSATION.

12:39PM   8      Q.   OKAY.  LET ME ASK YOU TO LOOK AT 13980, AND I'M ASKING IF

12:39PM   9      THIS IS AN EMAIL BETWEEN A REPRESENTATIVE OF GROW MARKETING AND

12:39PM   10     MS. HOLMES, YOURSELF, AND OTHERS?

12:39PM   11     A.   YES.

12:39PM   12          MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

12:39PM   13     13980.

12:39PM   14          MR. BOSTIC:  NO OBJECTION.

12:39PM   15          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:39PM   16     (DEFENDANT'S EXHIBIT 13980 WAS RECEIVED IN EVIDENCE.)

12:39PM   17     BY MR. DOWNEY:

12:39PM   18     Q.   DO YOU SEE ON THE FIRST PAGE THAT THERE'S AN EMAIL

12:39PM   19     BETWEEN -- SENT BY MS. ANDERSON AT GROW MARKETING?

12:39PM   20     A.   YES.

12:39PM   21     Q.   AND SHE WAS ONE OF THE MEDIA CONSULTING PEOPLE HELPING

12:40PM   22     THERANOS HERE?

12:40PM   23     A.   YES.

12:40PM   24     Q.   AND YOU SEE IN THE FIRST PARAGRAPH THAT SHE'S FORWARDING

12:40PM   25     AN ATTACHED -- AS AN ATTACHED, AN UPDATED THERANOS STORY

EDLIN CROSS BY MR. DOWNEY (RES.)                                   4245

12:40PM   1      DOCUMENT, INCLUDING STATISTICS?

12:40PM   2      A.   YES.

12:40PM   3      Q.   AND THOSE STATISTICS RELATED TO THINGS LIKE

12:40PM   4      OVER-PRESCRIPTION AND OTHER ISSUES IN THE HEALTH INDUSTRY THAT

12:40PM   5      WOULD MAKE THERANOS'S SERVICES ATTRACTIVE; CORRECT?

12:40PM   6      A.   CORRECT.

12:40PM   7      Q.   DID YOU PARTICIPATE IN THE MEDIA TRAINING THAT MS. HOLMES

12:40PM   8      RECEIVED FROM GROW MARKETING?

12:40PM   9      A.   I ATTENDED.  I WOULDN'T SAY I PARTICIPATED.

12:40PM   10     Q.   YOU WERE JUST AN OBSERVER IN CONNECTION WITH THAT?

12:40PM   11     A.   CORRECT.

12:40PM   12     Q.   OKAY.  NOW, WE DISCUSSED EARLIER THE WEBSITE AND

12:40PM   13     CHIAT/DAY'S ROLE IN ADVISING THERANOS WITH RESPECT TO THE

12:41PM   14     LAUNCH OF ITS WEBSITE.

12:41PM   15          WAS THAT DONE AROUND THE SAME TIME AS THE ARTICLE WAS

12:41PM   16     PUBLISHED BY MR. RAGO?

12:41PM   17     A.   YES.

12:41PM   18     Q.   AND CREATING THAT WEBSITE WAS A HUGE PROJECT, WASN'T IT?

12:41PM   19     A.   YES.

12:41PM   20     Q.   THERANOS HAD A VERY PRIMITIVE WEBSITE PRIOR TO THAT TIME?

12:41PM   21     A.   YES.

12:41PM   22     Q.   AND SEVERAL OF THE PRODUCT MANAGERS WERE INVOLVED IN THE

12:41PM   23     CREATION OF CONTENT RELATED TO THE WEBSITE; CORRECT?

12:41PM   24     A.   YES.

12:41PM   25     Q.   AND SEVERAL OF THE SCIENTISTS PROVIDED INFORMATION IN

EDLIN CROSS BY MR. DOWNEY (RES.)                                4246

12:41PM  1     CONNECTION WITH CREATION OF THE WEBSITE; CORRECT?

12:41PM  2     A.   CORRECT.

12:41PM  3     Q.   AND THERE WERE OUTSIDE BRANDING AND MEDIA ADVISORS WHO

12:41PM  4     ADVISED ON HOW THE WEBSITE SHOULD LOOK; CORRECT?

12:41PM  5     A.   CORRECT.

12:41PM  6     Q.   AND THERE WERE LAWYERS WHO REVIEWED THE CONTENT OF THE

12:41PM  7     WEBSITE PRIOR TO THE TIME THAT IT WAS -- WENT LIVE?

12:41PM  8     A.   CORRECT.

12:41PM  9     Q.   AND THEN AFTER THE WEBSITE WAS LAUNCHED, THERE CONTINUED

12:42PM  10    TO BE UPDATES TO THE WEBSITE EVERY FEW WEEKS OR SO; CORRECT?

12:42PM  11    A.   I DON'T RECALL THE CADENCE, BUT THERE WERE UPDATES MADE

12:42PM  12    AFTER IT LAUNCHED.

12:42PM  13    Q.   OKAY.  LET ME ASK YOU TO LOOK AT EXHIBIT 37 -- 7365.

12:42PM  14    7365.

12:42PM  15    A.   OKAY.

12:42PM  16    Q.   IS THIS AN EMAIL EXCHANGE INVOLVING MS. HOLMES, YOURSELF,

12:42PM  17    AND OTHERS AT THERANOS ABOUT THE THERANOS WEBSITE IN NOVEMBER

12:43PM  18    OF 2013?

12:43PM  19    A.   YES.

12:43PM  20         MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

12:43PM  21    EXHIBIT 7365.

12:43PM  22         MR. BOSTIC:  I'M STILL TRYING TO FIND THIS ONE.

12:43PM  23    WHICH BINDER IS THIS IN, COUNSEL?

12:43PM  24         MR. DOWNEY:  IT SHOULD BE IN THE BINDER THAT I GAVE

12:43PM  25    YOU YESTERDAY.

| | | |
|---|---|---|
| 12:43PM | 1 | (PAUSE IN PROCEEDINGS.) |
| 12:43PM | 2 | MR. BOSTIC:  NO OBJECTION. |
| 12:43PM | 3 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 12:43PM | 4 | (DEFENDANT'S EXHIBIT 7365 WAS RECEIVED IN EVIDENCE.) |
| 12:43PM | 5 | MR. DOWNEY:  GO TO THE BOTTOM EMAIL ON THE FIRST |
| 12:43PM | 6 | PAGE HERE. |
| 12:43PM | 7 | Q.  AND THIS IS AN EMAIL FROM MS. BLICKMAN -- OR MR. BLICKMAN |
| 12:43PM | 8 | TO MS. HOLMES AND YOU'RE COPIED. |
| 12:43PM | 9 | DO YOU SEE THAT? |
| 12:43PM | 10 | A.  YES. |
| 12:43PM | 11 | Q.  AND HE REPORTS IN THE FIRST PARAGRAPH THAT THE CALL CENTER |
| 12:43PM | 12 | AT THERANOS HAD RECEIVED COMPLAINTS ABOUT AN ENTRY ON THE |
| 12:43PM | 13 | WEBSITE NOT BEING CLEAR. |
| 12:43PM | 14 | DO YOU SEE THAT? |
| 12:43PM | 15 | A.  YES. |
| 12:43PM | 16 | Q.  AND THAT WEBSITE RELATED TO THE FACT THAT SOME PEOPLE WERE |
| 12:43PM | 17 | CALLING AND SAYING, I WASN'T EXPECTING TO GET A VENOUS DRAW; |
| 12:43PM | 18 | CORRECT? |
| 12:43PM | 19 | A.  I BELIEVE SO. |
| 12:43PM | 20 | Q.  AND SO HE PROPOSED THAT THERE BE A CLARIFICATION TO THE |
| 12:44PM | 21 | WEBSITE THAT HAD BEEN ADVISED BY CHIAT/DAY. |
| 12:44PM | 22 | DO YOU SEE THAT? |
| 12:44PM | 23 | A.  YES. |
| 12:44PM | 24 | Q.  AND IF YOU LOOK AT THE PROPOSAL BELOW, IT'S THE CLIP THAT |
| 12:44PM | 25 | BEGINS "THE ONLY THING"? |

EDLIN CROSS BY MR. DOWNEY (RES.)                    4248

12:44PM  1    A.   YES.

12:44PM  2    Q.   OKAY.  AND IN THE BODY OF THE EMAIL, IT SAYS, "INSTEAD OF

12:44PM  3    A BIG, INTIMIDATING NEEDLE, OUR CERTIFIED PHLEBOTOMISTS CAN USE

12:44PM  4    A TINY FINGERSTICK OR A MICRO-SAMPLE FROM A VENOUS DRAW."

12:44PM  5         DO YOU SEE THAT?

12:44PM  6    A.   YES.

12:44PM  7    Q.   AND THAT REFERS TO TWO OF THE WAYS THAT BLOOD WOULD BE

12:44PM  8    DRAWN IN CONNECTION WITH THERANOS BLOOD TESTING; CORRECT?

12:44PM  9    A.   CORRECT.

12:44PM 10    Q.   AND SOMETIMES THERE WOULD BE THE FINGERSTICK, WHICH WE'VE

12:44PM 11    BEEN DISCUSSING; CORRECT?

12:44PM 12    A.   CORRECT.

12:44PM 13    Q.   AND SOMETIMES THERE WOULD BE A MICRO-SAMPLE DRAWN FROM THE

12:44PM 14    ARM; CORRECT?

12:44PM 15    A.   THERE WOULD BE A VENOUS SAMPLE DRAWN FROM THE ARM.

12:44PM 16    Q.   RIGHT.  BUT THE SAMPLE THAT WAS DRAWN WAS SMALLER THAN A

12:45PM 17    TYPICAL VENOUS SAMPLE; CORRECT?

12:45PM 18    A.   YES.

12:45PM 19    Q.   AND THAT'S WHAT THE REFERENCE TO MICRO-SAMPLE IS; CORRECT?

12:45PM 20    A.   YES.

12:45PM 21    Q.   AND THEN THIS CLIP FROM CHIAT/DAY PROPOSED THAT THERE BE A

12:45PM 22    FOOTNOTE SAYING "OCCASIONALLY, A VENIPUNCTURE MAY BE REQUIRED,

12:45PM 23    BASED ON THE LAB ORDER."

12:45PM 24         DO YOU SEE THAT?

12:45PM 25    A.   YES.

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4249

12:45PM  1    Q.   "THIS IS UNCOMMON, AND WE AIM TO ELIMINATE THIS SCENARIO

12:45PM  2    ENTIRELY."

12:45PM  3         DO YOU SEE THAT?

12:45PM  4    A.   YES.

12:45PM  5    Q.   AND IN TERMS OF THE LAST PHRASE, DID YOU UNDERSTAND THAT

12:45PM  6    THERANOS WAS WORKING TO VALIDATE NEW ASSAYS ALL OF THE TIME?

12:45PM  7    A.   YES.

12:45PM  8    Q.   AND WHEN IT HAD NOT YET VALIDATED ASSAYS IN ITS CLIA LAB,

12:45PM  9    IT WAS STILL USING VENIPUNCTURE DRAW?

12:45PM 10    A.   YES.

12:45PM 11    Q.   AND SO MR. BLICKMAN FORWARDED CHIAT'S RECOMMENDATION, AND

12:46PM 12    LET'S LOOK AT MS. HOLMES'S RESPONSE.

12:46PM 13         DO YOU SEE THE FIRST PARAGRAPH SHE SAYS, "I DID NOT SEE

12:46PM 14    THIS CONCEPT OF THE ASTERISK SENT TO ME OR MENTIONED TO ME AT

12:46PM 15    ALL.  IF WE ARE GOING TO SAY SOMETHING LIKE THIS WE NEED TO OWN

12:46PM 16    IT AND NOT CONTRADICT OURSELVES.  SEE BELOW.  THIS COPY SHOULD

12:46PM 17    BE UPDATED ASAP."

12:46PM 18         AND DO YOU SEE IN THE NEXT PARAGRAPH SHE SAYS, "INSTEAD OF

12:46PM 19    A BIG, INTIMIDATING NEEDLE, OUR CERTIFIED PHLEBOTOMISTS CAN USE

12:46PM 20    A TINY FINGER STICK OR A MICRO-SAMPLE FROM A VENOUS DRAW."

12:46PM 21         AND SHE THEN INSERTS THE SENTENCE ABOUT VENIPUNCTURE INTO

12:46PM 22    THE TEXT THAT WILL APPEAR ON THE WEBSITE, AND IT SAYS, THE

12:46PM 23    VENIPUNCTURE MAY BE REQUIRED BUT IT IS UNCOMMON AND THE AIM IS

12:46PM 24    TO ELIMINATE IT.

12:46PM 25         DO YOU SEE THAT?

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4250

12:46PM    1    A.   YES.

12:46PM    2    Q.   AND IF YOU GO TO THE TOP, YOU SEE MR. BLICKMAN RESPONDS

12:46PM    3    THAT HE UNDERSTANDS AND THAT THE TEAM WILL MAKE THE CHANGE

12:46PM    4    ASAP.

12:46PM    5         DO YOU SEE THAT?

12:46PM    6    A.   CAN YOU ACTUALLY GO BACK TO YOUR PREVIOUS QUESTION?

12:46PM    7    Q.   SURE.

12:46PM    8    A.   IS THAT POSSIBLE?

12:47PM    9    Q.   SURE.  WELL, LET ME ASK YOU, DO YOU SEE THE SECTION OF THE

12:47PM   10    EMAIL FROM MS. HOLMES TO MR. BLICKMAN ON NOVEMBER 27TH, 2013,

12:47PM   11    AT 8:18 P.M.?

12:47PM   12         DO YOU SEE THAT?

12:47PM   13    A.   YES.

12:47PM   14    Q.   AND DO YOU SEE THAT SHE MOVED WHAT WAS PREVIOUSLY PROPOSED

12:47PM   15    TO BE A FOOTNOTE INTO THE TEXT; RIGHT?

12:47PM   16    A.   YES.

12:47PM   17    Q.   AND DO YOU SEE THEN AT THE TOP THAT THERE'S AN EMAIL FROM

12:47PM   18    MR. BLICKMAN TO MS. HOLMES; CORRECT?

12:47PM   19    A.   YES.

12:47PM   20    Q.   AND DO YOU SEE THAT HE SAYS, "UNDERSTOOD," AND HE'LL ASK

12:47PM   21    THE TEAM TO MAKE THIS UPDATE ASAP.

12:47PM   22         CORRECT?

12:47PM   23    A.   YES.  I THOUGHT I MISUNDERSTOOD YOUR QUESTION, BUT I DID

12:47PM   24    NOT.

12:47PM   25    Q.   I WANT TO JUST ASK YOU ABOUT A FEW OTHER DOCUMENTS RELATED

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4251

12:47PM   1    TO CHIAT/DAY, AND MY QUESTIONING WITH RESPECT TO THEM IS BRIEF.

12:48PM   2         LET ME ASK YOU TO LOOK AT EXHIBIT 10554.

12:48PM   3    A.   OKAY.

12:48PM   4    Q.   IS EXHIBIT 10554 AN EXHIBIT EXCHANGE BETWEEN

12:48PM   5    REPRESENTATIVES OF GROW MARKETING, MS. HOLMES, YOURSELF, AND

12:48PM   6    OTHERS AT THERANOS?

12:48PM   7    A.   YES.

12:48PM   8    Q.   AND LET ME ASK YOU TO LOOK AT THE EMAIL AT THE TOP --

12:49PM   9    WELL, AND YOU SEE THAT'S AN EMAIL THAT CHRISTIAN HOLMES SENT TO

12:49PM  10    A REPRESENTATIVE OF GROW MARKETING; CORRECT?

12:49PM  11    A.   YES.

12:49PM  12         MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

12:49PM  13    10554.

12:49PM  14         MR. BOSTIC:  NO OBJECTION.

12:49PM  15         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:49PM  16    (DEFENDANT'S EXHIBIT 10554 WAS RECEIVED IN EVIDENCE.)

12:49PM  17    BY MR. DOWNEY:

12:49PM  18    Q.   DO YOU SEE AT THE TOP MR. HOLMES IS PROVIDING A COMMENT ON

12:49PM  19    A STATS AND SOURCES DOCUMENT FOR THE JOE RAGO INTERVIEW.

12:49PM  20         DO YOU SEE THAT?

12:49PM  21    A.   YES.

12:49PM  22    Q.   AND DO YOU SEE WHERE HE INDICATES "A FEW COMMENTS ON THE

12:49PM  23    STATS/SOURCES."

12:49PM  24         AND THEN THERE'S A BULLET POINT THAT SAYS STANDARD

12:49PM  25    THERANOS STATISTICS.

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4252

12:49PM  1            DO YOU SEE THAT?

12:49PM  2       A.   YES.

12:49PM  3       Q.   AND IF YOU LOOK BELOW THAT -- NOW, THE WAY THAT THIS EMAIL

12:49PM  4       HAS BEEN CONSTRUCTED IS AT THE BOTTOM EMAIL, THE SECOND HALF,

12:50PM  5       THE BOTTOM EMAIL THERE'S AN EMAIL FROM MS. FOGELMAN, AND IN THE

12:50PM  6       SECOND PARAGRAPH SHE SAYS, "WE NEED YOUR HELP TO NAIL DOWN THE

12:50PM  7       FOLLOWING STATISTICS AND THEIR SOURCES ASAP."

12:50PM  8            DO YOU SEE THAT?

12:50PM  9       A.   YES.

12:50PM 10       Q.   AND SO SHE'S ASKING CHRISTIAN HOLMES AND OTHERS TO PROVIDE

12:50PM 11       HELP NAILING DOWN STATISTICS; CORRECT?

12:50PM 12       A.   CORRECT.

12:50PM 13       Q.   AND IF YOU LOOK, THE FIRST QUESTION SHE ASKS IS ABOUT

12:50PM 14       STANDARD THERANOS STATISTICS; CORRECT?

12:50PM 15       A.   CORRECT.

12:50PM 16       Q.   AND IF YOU GO DOWN A LITTLE FURTHER FROM THERE, SHE LISTS

12:50PM 17       A NUMBER OF QUESTIONS ABOUT PERCENTAGES OF LAB TESTING AND

12:50PM 18       BACKGROUND ON THE LAB INDUSTRY, ET CETERA?

12:50PM 19       A.   CORRECT.

12:50PM 20       Q.   AND IF YOU LOOK AT THE STATISTIC, THAT ONE STATISTIC THAT

12:51PM 21       SHE ASKED FOR RELATES TO ACCURACY AND RELIABILITY IN BLOOD

12:51PM 22       TESTING.

12:51PM 23            DO YOU SEE THAT THERE?

12:51PM 24       A.   WHICH BULLET?

12:51PM 25       Q.   THERE'S A BULLET AT THE TOP OF THE PAGE THAT SAYS, "THE

EDLIN CROSS BY MR. DOWNEY (RES.)                              4253

12:51PM  1    PRE AND POST ANALYTICAL PHASES OF THE LAB TESTING PROCESS

12:51PM  2    ACCOUNT FOR 93 PERCENT OF ERRORS."

12:51PM  3        DO YOU SEE THAT?

12:51PM  4    A.  I DO.

12:51PM  5    Q.  AND SHE ASKS, "IS THERE MORE A MORE RECENT STATISTIC THAN

12:51PM  6    THIS 1993 AACC ARTICLE."

12:52PM  7        DO YOU SEE THAT?

12:52PM  8    A.  I DO.

12:52PM  9    Q.  AND AACC IS A CLINICAL ORGANIZATION RELATING TO BLOOD

12:52PM 10    TESTING; CORRECT?

12:52PM 11    A.  YES.

12:52PM 12    Q.  AND IF YOU GO TO THE PRIOR PAGE AND YOU LOOK AT THE

12:52PM 13    RESPONSES THAT MR. HOLMES GIVES, IF YOU GO DOWN TO THE FOURTH

12:52PM 14    PARAGRAPH, MR. HOLMES TELLS MS. FOGELMAN, "THE SOURCE OF THIS

12:52PM 15    STAT CAME FROM A CLINICAL CHEMISTRY ARTICLE IN 1993," AND THEN

12:52PM 16    HE UPDATES IT AND SAYS THAT THERE IS ANOTHER ARTICLE IN 2009

12:52PM 17    WHICH ALSO INDICATES THE SAME STATISTICS; CORRECT?

12:52PM 18    A.  CORRECT.

12:52PM 19    Q.  AND THE POINT OF THAT EXCHANGE IS THAT THERANOS WAS MAKING

12:52PM 20    THE CLAIM THAT HUMAN INTERVENTION IN THE BLOOD TESTING PROCESS

12:52PM 21    WAS A CAUSE OF INACCURACY; CORRECT?

12:53PM 22    A.  YES.

12:53PM 23    Q.  AND THERANOS HOPED, THROUGH ITS BLOOD TESTING PROCESSES,

12:53PM 24    TO ELIMINATE OR LIMIT HUMAN INVENTION IN THE BLOOD TESTING

12:53PM 25    PROCESS; CORRECT?

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4254

| | | |
|---|---|---|
| 12:53PM | 1 | A.  CORRECT. |
| 12:53PM | 2 | Q.  AND GROW MARKETING IS ESSENTIALLY ASKING, WELL, HOW DO WE |
| 12:53PM | 3 | KNOW THAT HUMAN INVENTION IS THE SOURCE OF SO MANY ERRORS; |
| 12:53PM | 4 | CORRECT? |
| 12:53PM | 5 | A.  CORRECT. |
| 12:53PM | 6 | Q.  AND MR. HOLMES IS PROVIDING THIS BACKGROUND ACADEMIC |
| 12:53PM | 7 | LITERATURE; CORRECT? |
| 12:53PM | 8 | A.  CORRECT. |
| 12:53PM | 9 | Q.  ALL RIGHT.  LET ME ASK YOU TO LOOK AT EXHIBIT 10555. |
| 12:53PM | 10 | A.  I THINK THAT'S WHAT WE WERE -- OH, YES. |
| 12:53PM | 11 | Q.  IT SHOULD BE THE NEXT EXHIBIT IN YOUR BINDER. |
| 12:53PM | 12 | A.  YES. |
| 12:53PM | 13 | Q.  OKAY.  IS THIS ANOTHER EMAIL EXCHANGE BETWEEN |
| 12:54PM | 14 | REPRESENTATIVES OF THERANOS AND REPRESENTATIVES OF CHIAT/DAY |
| 12:54PM | 15 | ABOUT LAUNCHING THE THERANOS WEBSITE? |
| 12:54PM | 16 | A.  YES. |
| 12:54PM | 17 | MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF |
| 12:54PM | 18 | 10555. |
| 12:54PM | 19 | MR. BOSTIC:  NO OBJECTION. |
| 12:54PM | 20 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 12:54PM | 21 | (DEFENDANT'S EXHIBIT 10555 WAS RECEIVED IN EVIDENCE.) |
| 12:54PM | 22 | BY MR. DOWNEY: |
| 12:54PM | 23 | Q.  IF YOU LOOK AT THE SECOND EMAIL ON THE FIRST PAGE, YOU SEE |
| 12:54PM | 24 | IT'S AN EMAIL FROM CHRISTIAN HOLMES? |
| 12:54PM | 25 | A.  YES. |

                                                                    4255
EDLIN CROSS BY MR. DOWNEY (RES.)

12:54PM  1    Q.   AND DO YOU SEE THAT HE'S, HE'S PROVIDING COMMENT ON SOME

12:54PM  2    OF THE CONTENT FOR A WEBSITE OR THERANOS PUBLIC PRESENTATION?

12:55PM  3    A.   YES.

12:55PM  4    Q.   AND DO YOU SEE HE WRITES, "ANNIE -- FEW COMMENTS."

12:55PM  5         DO YOU SEE THAT THERE?

12:55PM  6    A.   YES.

12:55PM  7    Q.   AND UNDER WALGREENS -- W-A-G IS WALGREENS; CORRECT?

12:55PM  8    A.   YES.

12:55PM  9    Q.   AND HIS SECOND BULLET POINT REFERS TO A SLIDE 24.

12:55PM  10        DO YOU SEE THAT?

12:55PM  11   A.   YES.

12:55PM  12   Q.   AND HE SAYS, "PLEASE CHANGE THIS TO 'MORE ACCURATE, MORE

12:55PM  13   COMFORTABLE' (OR SOMETHING SIMILAR TO THIS).  WE CAN DISCUSS

12:55PM  14   THIS IN MORE DETAIL AFTER THE WALGREENS MEETING, BUT THE

12:55PM  15   CORRECT STATIC IS THAT HUMAN ERROR ACCOUNTS FOR 93 PERCENT OF

12:55PM  16   TESTING ERRORS, WHICH ARE ELIMINATED THROUGH THE THERANOS

12:55PM  17   PLATFORM."

12:55PM  18        DO YOU SEE THAT?

12:55PM  19   A.   YES.

12:55PM  20   Q.   AND THAT'S A COMMENT ON THE SAME SUBJECT THAT WE WERE

12:55PM  21   TALKING ABOUT A MOMENT AGO?

12:55PM  22   A.   YES.

12:55PM  23   Q.   LET ME ASK YOU NOW TO LOOK AT EXHIBIT 10558.

12:56PM  24   A.   OKAY.

12:56PM  25   Q.   DO YOU SEE THIS IS AN EMAIL FROM MR. HOLMES, FROM

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4256

12:56PM    1    CHRISTIAN HOLMES TO MIKE YAGI AT CHIAT?

12:56PM    2    A.   YES.

12:56PM    3    Q.   AND YOU'RE COPIED ON THIS EMAIL?

12:56PM    4    A.   YES.

12:56PM    5    Q.   AND THIS IS COMMENTING ON THE PREPARATION OF A BROCHURE

12:56PM    6    THAT WILL BE AVAILABLE AT WALGREENS PATIENT SERVICE CENTERS AT

12:56PM    7    WALGREENS STORES?

12:56PM    8    A.   YES.

12:56PM    9            MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

12:56PM   10    10558.

12:56PM   11            MR. BOSTIC:  NO OBJECTION.

12:56PM   12            THE COURT:  IT'S ADMITTED AND MAY BE PUBLISHED.

12:56PM   13        (DEFENDANT'S EXHIBIT 10558 WAS RECEIVED IN EVIDENCE.)

12:56PM   14    BY MR. DOWNEY:

12:56PM   15    Q.   DO YOU SEE IN THE EMAIL THAT CHRISTIAN HOLMES REPORTS TO

12:56PM   16    MIKE YAGI AT CHIAT.

12:56PM   17        DO YOU SEE THAT?

12:56PM   18    A.   YES.

12:56PM   19    Q.   AND I SAYS, "MIKE.

12:56PM   20        "I HOPE YOU'RE DOING WELL.  I JUST CAUGHT UP WITH

12:57PM   21    ELIZABETH - SHE HAD A CONVERSATION WITH OUR REGULATORY FOLKS

12:57PM   22    AND THEY WANT TO MAKE A FEW CHANGES ON THE BROCHURE FOR

12:57PM   23    WALGREENS.  THESE ARE RELATIVELY MINOR BUT WILL NEED TO

12:57PM   24    IMPLEMENT THEM AS SOON AS WE CAN FOR THE ADDITIONAL PRINTING OF

12:57PM   25    THE BROCHURE.  HERE IS THE FEEDBACK."

EDLIN CROSS BY MR. DOWNEY (RES.)                            4257

12:57PM   1        AND THEN HE GOES ON TO LIST THAT FEEDBACK.

12:57PM   2        DO YOU SEE THAT?

12:57PM   3   A.   YES.

12:57PM   4   Q.   AND THEN THE FIRST ITEM IS "THE BROCHURE DOES NOT DISCLOSE

12:57PM   5   THAT A PRESCRIPTION IS NEEDED."

12:57PM   6        DO YOU SEE THAT?

12:57PM   7   A.   YES.

12:57PM   8   Q.   AND THE SECOND IS THAT "IT SOUNDS AS IF THE PATIENT GETS

12:57PM   9   THE RESULTS DIRECTLY RATHER THAN THROUGH THEIR DOCTORS."

12:57PM  10        DO YOU SEE THAT?

12:57PM  11   A.   YES.

12:57PM  12   Q.   AND MS. HOLMES WAS CONVEYING THROUGH HER BROTHER THAT SHE

12:57PM  13   WANTED THAT CHANGED TO BE CLEARER TO PATIENTS; CORRECT?

12:57PM  14   A.   CORRECT.

12:57PM  15   Q.   AND THEN THE THIRD ENTRY SAYS "ON THE 'ONE TINY DROP

12:57PM  16   CHANGES EVERYTHING' PANEL, I WOULD SAY 'TINY' RATHER THAN 'THE

12:57PM  17   TINIEST.'"

12:57PM  18        DO YOU SEE THAT?

12:57PM  19   A.   YES.

12:57PM  20   Q.   AND THAT IS A REFERENCE TO DEPICTIONS TO THE AMOUNT OF

12:58PM  21   BLOOD THAT WOULD BE DRAWN AT THERANOS PATIENT SERVICE CENTERS;

12:58PM  22   CORRECT?

12:58PM  23   A.   YES.

12:58PM  24   Q.   AND THEN SHE SAYS, "ON 'ONE DROP A WORLD OF ANSWERS'

12:58PM  25   PANEL, I ASSUME WE ARE NOT PROVIDING EVERY TEST THAT ANYONE

12:58PM   1   MIGHT WANT.  YOU MIGHT WANT TO SAY 'A FULL RANGE OF

12:58PM   2   STANDARD/COMMON/MOST FREQUENT TESTS,' OR SOMETHING ALONG THOSE

12:58PM   3   LINES."

12:58PM   4        DO YOU SEE THAT?

12:58PM   5   A.   YES.

12:58PM   6   Q.   AND MS. HOLMES WAS CONVEYING THROUGH CHRISTIAN HOLMES THAT

12:58PM   7   SHE THOUGHT THE PROSPECT OF SUGGESTING THAT THE COMPANY OFFERED

12:58PM   8   EVERY TEST SHOULDN'T BE FEATURED IN THE BROCHURE; CORRECT?

12:58PM   9   A.   RIGHT.

12:58PM   10  Q.   AND THE FIFTH ITEM, THERE'S A COMMENT ON "'BETTER ANSWERS

12:58PM   11  FASTER,'" AND SHE CONVEYS THROUGH MR. HOLMES THAT IT IS A

12:58PM   12  TROUBLING HEADER BECAUSE IT CREATES AN UNDEFINED COMPARISON.

12:58PM   13       DO YOU SEE THAT?

12:58PM   14  A.   YES.

12:58PM   15  Q.   SHE SAYS, "BETTER THAN WHAT?  FASTER THAN WHAT?"

12:59PM   16       DO YOU SEE THAT?

12:59PM   17  A.   YES.

12:59PM   18  Q.   AND THE LAST ITEM IS, SHE SAYS, "IF THERE ARE RISKS OR

12:59PM   19  POPULATIONS WHO SHOULDN'T USE THIS SERVICE OR OTHER RISK-TYPE

12:59PM   20  INFORMATION, WE SHOULD THINK ABOUT DISCLOSING IT."

12:59PM   21       DO YOU SEE THAT?

12:59PM   22  A.   YES.

12:59PM   23  Q.   LET ME TALK ABOUT THE CONVERSATION THAT YOU HAD YESTERDAY

12:59PM   24  WITH MR. BOSTIC ABOUT ROGER PARLOFF.

12:59PM   25       DO YOU RECALL THAT?

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4259

12:59PM   1    A.   YES.

12:59PM   2    Q.   AND LET ME ASK YOU IF WE CAN DRAW UP EXHIBIT 1753, WHICH

12:59PM   3    IS ALREADY IN EVIDENCE.

01:00PM   4         DO YOU RECALL YESTERDAY THAT MR. BOSTIC SHOWED YOU A LIST

01:00PM   5    OF ITEMS AND WHO WAS RESPONSIBLE FOR PROVIDING FEEDBACK IN

01:00PM   6    CONNECTION WITH THOSE ITEMS?

01:00PM   7    A.   YES.

01:00PM   8    Q.   AND HE POINTED YOU TO A NUMBER OF ITEMS THAT MS. HOLMES

01:00PM   9    WAS RESPONSIBLE FOR PROVIDING FOLLOWUP ON?

01:00PM  10    A.   YES.

01:00PM  11    Q.   AND THERE WERE OTHER REQUESTS BY MR. PARLOFF THAT OTHERS

01:00PM  12    AT THERANOS WERE RESPONSIBLE FOR PROVIDING INFORMATION ON;

01:00PM  13    CORRECT?

01:00PM  14    A.   CORRECT.

01:00PM  15    Q.   IF YOU LOOK AT THE FIRST PAGE OF EXHIBIT 1753, YOU RECALL

01:00PM  16    THAT THIS IS YOUR EMAIL TO MS. HOLMES LISTING THE ACTION ITEMS

01:00PM  17    WITH REGARD TO MR. PARLOFF?

01:00PM  18    A.   YES.

01:00PM  19    Q.   AND THERE'S A LIST OF ITEMS, AND THEN THE PERSON

01:00PM  20    RESPONSIBLE IS ON THE RIGHT-HAND SIDE; CORRECT?

01:01PM  21    A.   CORRECT.

01:01PM  22    Q.   AND YOU SEE THAT WITH REGARD TO ITEMS 3 THROUGH 8, THERE

01:01PM  23    WAS APPARENTLY A REQUEST OR A DISCUSSION FOR SEVERAL ISSUES

01:01PM  24    RELATED TO THE SCIENCE OF THERANOS BLOOD TESTING.

01:01PM  25         DO YOU SEE THAT?

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4260

01:01PM  1      A.   YES.

01:01PM  2      Q.   AND DO YOU SEE THAT DR. YOUNG WAS LISTED AS THE

01:01PM  3   RESPONSIBLE PARTY FOR GATHERING THAT INFORMATION?

01:01PM  4      A.   YES.

01:01PM  5      Q.   IF YOU GO TO THE NEXT PAGE, WHICH IS PAGE 2.  WE CAN BLOW

01:01PM  6   UP ITEMS 33 AND 34.

01:01PM  7           DO YOU RECALL THAT THERE WAS A REQUEST BY MR. PARLOFF TO

01:01PM  8   SEE INFORMATION RELATED TO THERANOS'S INTELLECTUAL PORTFOLIO --

01:01PM  9   I MEAN INTELLECTUAL PROPERTY PORTFOLIO?

01:01PM 10      A.   YES.

01:02PM 11      Q.   AND ON THE RIGHT-HAND SIDE, THE IP TEAM WAS LISTED AS

01:02PM 12   BEING RESPONSIBLE; CORRECT?

01:02PM 13      A.   CORRECT.

01:02PM 14      Q.   AND THOSE ARE THE LAWYERS WHO PREPARED, FILED, AND

01:02PM 15   DEFENDED PATENTS FOR THERANOS; CORRECT?

01:02PM 16      A.   CORRECT.

01:02PM 17      Q.   AND YOU UNDERSTOOD WHEN YOU WERE AT THERANOS THAT THERANOS

01:02PM 18   BELIEVED IT HAD A VERY VALUABLE INTELLECTUAL PROPERTY

01:02PM 19   PORTFOLIO?

01:02PM 20      A.   YES.

01:02PM 21           MR. DOWNEY:  YOUR HONOR, IF I MIGHT HAVE ONE MOMENT?

01:02PM 22   I'M PRETTY CLOSE TO DONE.

01:02PM 23           THE COURT:  SURE.

01:03PM 24      (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

01:03PM 25           MR. DOWNEY:  YOUR HONOR, I'M GOING TO ASK ABOUT THE

EDLIN CROSS BY MR. DOWNEY (RES.)                              4261

01:03PM   1    SUBJECT MATTER THAT WE'VE DISCUSSED.

01:03PM   2                   THE COURT:  YES.

01:03PM   3                   MR. DOWNEY:  MAY I APPROACH THE WITNESS?

01:03PM   4                   THE COURT:  YES.

01:03PM   5                   MR. DOWNEY:  (HANDING.)

01:03PM   6                   THE COURT:  THANK YOU.

01:03PM   7    BY MR. DOWNEY:

01:04PM   8    Q.   MR. EDLIN, I'VE PLACED IN FRONT OF YOU A BINDER OF

01:04PM   9    ADDITIONAL DOCUMENTS, BUT DON'T WORRY, I'M NOT GOING TO ASK YOU

01:04PM   10   ABOUT ALL OF THEM.

01:04PM   11   A.   THANK YOU.

01:04PM   12   Q.   I'LL ASK YOU TO LOOK AT EXHIBIT 7476.

01:04PM   13   A.   OKAY.

01:04PM   14   Q.   DO YOU RECALL THAT THERANOS WOULD CONDUCT EXPERIENCE

01:04PM   15   SURVEYS OF PATIENTS WHO USED ITS BLOOD TESTING SERVICES?

01:04PM   16   A.   YES.

01:04PM   17   Q.   AND DO YOU RECALL THAT PHLEBOTOMISTS IN THERANOS PATIENT

01:05PM   18   SERVICE CENTERS WOULD ALSO INTERACT WITH PATIENTS FOR THEIR

01:05PM   19   FEEDBACK ON PATIENT SERVICES?

01:05PM   20   A.   YES.

01:05PM   21   Q.   AND DO YOU UNDERSTAND THAT THAT INFORMATION WAS THEN OFTEN

01:05PM   22   AGGREGATED INTO REPORTS?

01:05PM   23   A.   YES.

01:05PM   24   Q.   AND THOSE REPORTS WERE SHARED WITH, AMONG OTHERS, WITH

01:05PM   25   MS. HOLMES; CORRECT?

| | | |
|---|---|---|
| 01:05PM | 1 | A.    CORRECT. |
| 01:05PM | 2 | Q.    AND THAT WAS DONE ON A WEEKLY OR BIWEEKLY BASIS; CORRECT? |
| 01:05PM | 3 | A.    CORRECT. |
| 01:05PM | 4 | MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF |
| 01:05PM | 5 | 7476. |
| 01:05PM | 6 | MR. BOSTIC:  401. |
| 01:06PM | 7 | (PAUSE IN PROCEEDINGS.) |
| 01:06PM | 8 | THE COURT:  THIS IS WHAT WE DISCUSSED EARLIER, I |
| 01:06PM | 9 | THINK. |
| 01:06PM | 10 | MR. DOWNEY:  THAT'S CORRECT, YOUR HONOR. |
| 01:06PM | 11 | THE COURT:  I'M GOING TO SUSTAIN THE OBJECTION ON |
| 01:06PM | 12 | THIS.  THE OBJECTION IS SUSTAINED. |
| 01:06PM | 13 | MR. DOWNEY:  YOUR HONOR, ON THE SAME FOUNDATION, I |
| 01:06PM | 14 | WOULD HAVE MOVED TO ADMIT A SERIES OF ADDITIONAL EXHIBITS, |
| 01:06PM | 15 | WHICH I'LL JUST LIST FOR THE RECORD. |
| 01:06PM | 16 | EXHIBIT 7557, EXHIBIT 7561, EXHIBIT 7571, EXHIBIT 7573, |
| 01:06PM | 17 | EXHIBIT 7575, EXHIBIT 7576, EXHIBIT 7579, EXHIBIT 7583, AND |
| 01:07PM | 18 | EXHIBIT 7586. |
| 01:07PM | 19 | Q.    MR. EDLIN, DO YOU RECALL TESTIFYING YESTERDAY -- |
| 01:07PM | 20 | THE COURT:  I SHOULD PROBABLY RULE. |
| 01:07PM | 21 | MR. DOWNEY:  OH, I'M SORRY.  I THOUGHT THAT WAS |
| 01:07PM | 22 | IMPLICIT.  I HOPE I DO BETTER. |
| 01:07PM | 23 | THE COURT:  WELL, YOU NEVER KNOW. |
| 01:07PM | 24 | I DID WANT TO LOOK AT THESE.  WE DID TALK ABOUT THESE |
| 01:07PM | 25 | EARLIER.  I HAVEN'T HAD A CHANCE TO LOOK AT THEM. |

EDLIN CROSS BY MR. DOWNEY (RES.)                          4263

01:07PM   1      BUT IF YOU CAN REPRESENT TO ME THAT THESE CONTAIN THE

01:07PM   2   COMMENTS THAT WE DISCUSSED EARLIER, THEN I WOULD SUSTAIN THE

01:07PM   3   OBJECTION BASED ON 401 GROUNDS AND THE LIMITATION.

01:08PM   4      IF THERE'S SOME WAY TO PARSE OUT THESE EXHIBITS IN THE

01:08PM   5   MANNER THAT I HAD PREVIOUSLY DISCUSSED, I'LL LOOK AT THEM, I'LL

01:08PM   6   REVISIT THEM.

01:08PM   7      BUT THE COLLECTIVE, I THINK, IS -- I'M GOING TO SUSTAIN

01:08PM   8   THE OBJECTION.

01:08PM   9          MR. DOWNEY:  YOUR HONOR, IF THERE ARE PARTICULAR

01:08PM   10  SEGMENTS OF THEM THAT WE THINK ARE CONSISTENT WITH THE COURT'S

01:08PM   11  RULING, MAY WE CONSIDER THAT AN ADEQUATE FOUNDATION HAS BEEN

01:08PM   12  LAID BY THIS WITNESS TO ADMIT THEM, ASSUMING THEY'RE NOT

01:08PM   13  INADMISSIBLE ON SOME OF THE GROUNDS THAT WE DISCUSSED EARLIER?

01:08PM   14          THE COURT:  SURE.  I DON'T HAVE A PROBLEM WITH THAT,

01:08PM   15  YOU RAISING THOSE AGAIN, AND I'LL HEAR FROM MR. BOSTIC WHEN AND

01:08PM   16  IF YOU DECIDE TO PUT THAT COLLECTIVE BACK.

01:08PM   17      MR. BOSTIC, YOU'LL HAVE AN OPPORTUNITY TO COMMENT.

01:08PM   18          MR. BOSTIC:  UNDERSTOOD.  THANK YOU.

01:08PM   19          THE COURT:  ALL RIGHT.  THANK YOU.  SO THE OBJECTION

01:08PM   20  IS SUSTAINED.

01:08PM   21  BY MR. DOWNEY:

01:08PM   22  Q.   DO YOU RECALL TESTIFYING YESTERDAY, MR. EDLIN, ABOUT YOUR

01:08PM   23  RELATIONSHIP WITH DR. ROBERTSON?

01:08PM   24  A.   YES.

01:08PM   25  Q.   AND DO YOU RECALL AT THE END OF 2016 YOU PARTICIPATED WITH

EDLIN CROSS BY MR. DOWNEY (RES.)                                    4264

01:09PM   1    DR. ROBERTSON IN ASSEMBLING A TECHNOLOGY ADVISORY BOARD AT

01:09PM   2    THERANOS?

01:09PM   3    A.   YES.

01:09PM   4    Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 7687.

01:09PM   5    A.   IS THAT IN THE MOST RECENT BINDER THAT YOU GAVE?

01:09PM   6    Q.   IT SHOULD BE IN THE BINDER THAT I GAVE YOU YESTERDAY.  I

01:09PM   7    THINK YOU CAN PUT ASIDE THE BINDER THAT WE JUST TALKED ABOUT.

01:10PM   8    A.   CAN YOU REPEAT THE NUMBER, PLEASE.

01:10PM   9    Q.   7687.

01:10PM  10    A.   OKAY.

01:10PM  11    Q.   IS THIS AN EMAIL BETWEEN YOURSELF, DR. ROBERTSON AND

01:10PM  12    MS. HOLMES AND OTHERS FROM DECEMBER OF 2016 RELATED TO A

01:10PM  13    TECHNOLOGY ADVISORY BOARD AT THERANOS?

01:10PM  14    A.   YES.

01:10PM  15    Q.   AND WHAT -- WHO WERE THE MEMBERS OF THE TECHNOLOGY

01:10PM  16    ADVISORY BOARD AT THERANOS?

01:10PM  17    A.   I SEE HERE HOWIE ROSEN IS ANOTHER NAME.  I DON'T REMEMBER

01:11PM  18    THE OTHER NAMES SPECIFICALLY.

01:11PM  19    Q.   BUT THIS BOARD OF -- WAS DESIGNED TO BE A BOARD TO ADVISE

01:11PM  20    THERANOS REGARDING ITS TECHNOLOGY AND HARDWARE?

01:11PM  21         DO YOU RECALL THAT?

01:11PM  22    A.   THAT'S RIGHT.

01:11PM  23    Q.   AND IT CONSISTED OF A NUMBER OF EXPERT ENGINEERS; CORRECT?

01:11PM  24    A.   YES.

01:11PM  25    Q.   AND THEY WERE EXTERNAL TO THE COMPANY; CORRECT?

EDLIN CROSS BY MR. DOWNEY (RES.)                                4265

01:11PM   1    A.   CORRECT.

01:11PM   2    Q.   AND DR. ROBERTSON WAS INVOLVED WITH IT BECAUSE HE HAD

01:11PM   3    PARTICULAR EXPERTISE AS A CHEMICAL ENGINEER; CORRECT?

01:11PM   4    A.   CORRECT.

01:11PM   5              MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT

01:11PM   6    EXHIBIT 7687.

01:12PM   7              MR. BOSTIC:  AS TO THIS TOPIC, 401, 403, ALSO BEYOND

01:12PM   8    THE SCOPE.

01:12PM   9              THE COURT:  7687?

01:12PM  10              MR. DOWNEY:  YES.

01:12PM  11              THE COURT:  IT'S THE TWO-PAGE EMAIL?

01:12PM  12              MR. DOWNEY:  YES.

01:12PM  13              THE COURT:  I'LL ADMIT IT -- OBJECTION IS

01:12PM  14    OVERRULED -- AND IT MAY BE PUBLISHED.

01:12PM  15         (DEFENDANT'S EXHIBIT 7687 WAS RECEIVED IN EVIDENCE.)

01:12PM  16    BY MR. DOWNEY:

01:12PM  17    Q.   IF YOU LOOK AT THE EMAIL, IN THE SECOND HALF OF PAGE 1 OF

01:12PM  18    THIS EXHIBIT, YOU SEE THAT'S AN EMAIL FROM YOU TO DR. ROBERTSON

01:12PM  19    AND OTHERS; CORRECT?

01:12PM  20    A.   YES.

01:12PM  21    Q.   AND YOU'RE APPRISING HIM OF WHAT MATERIALS MIGHT BE SHARED

01:12PM  22    WITH THE TECHNOLOGY ADVISORY BOARD; CORRECT?

01:12PM  23    A.   YES.

01:12PM  24    Q.   AND THIS LIST OF MATERIALS IS A LIST OF MATERIALS THAT

01:12PM  25    DR. YOUNG HAD RECOMMENDED BE SHARED WITH THAT GROUP?

EDLIN REDIRECT BY MR. BOSTIC                                    4266

01:13PM  1     A.   CORRECT.

01:13PM  2     Q.   WE TALKED YESTERDAY ABOUT ASSAY DEVELOPMENT REPORTS AT

01:13PM  3     THERANOS.

01:13PM  4          DO YOU RECALL THAT?

01:13PM  5     A.   YES.

01:13PM  6     Q.   AND DO YOU RECALL THAT THOSE REPORTS WERE STORED AT

01:13PM  7     THERANOS?

01:13PM  8     A.   YES.

01:13PM  9     Q.   AND THAT THERE WERE FULL VERSIONS AND REDACTED VERSIONS?

01:13PM  10    A.   YES.

01:13PM  11    Q.   DO YOU RECALL THAT THERE WERE MORE THAN 300 ASSAY

01:13PM  12    DEVELOPMENT REPORTS?

01:13PM  13    A.   YES.

01:13PM  14            MR. DOWNEY:  YOUR HONOR, I MIGHT BE DONE.

01:13PM  15         (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

01:14PM  16            MR. DOWNEY:  YOUR HONOR, I HAVE NOTHING FURTHER ON

01:14PM  17    CROSS-EXAMINATION.

01:14PM  18            THE COURT:  ALL RIGHT.  THANK YOU.

01:14PM  19         MR. BOSTIC, DO YOU HAVE REDIRECT?

01:14PM  20            MR. BOSTIC:  I DO, YOUR HONOR.

01:14PM  21            THE COURT:  MR. BOSTIC, WE'LL TAKE OUR AFTERNOON

01:14PM  22    BREAK AT THE BOTTOM OF THE HOUR.

01:14PM  23            MR. BOSTIC:  UNDERSTOOD.  THANK YOU, YOUR HONOR.

01:14PM  24    ///

01:14PM  25                    **REDIRECT EXAMINATION**

| 01:14PM | 1 | BY MR. BOSTIC: |
| 01:14PM | 2 | Q.   GOOD AFTERNOON, MR. EDLIN. |
| 01:15PM | 3 | A.   GOOD AFTERNOON. |
| 01:15PM | 4 | Q.   I WANT TO FOLLOW UP ON A CONVERSATION THAT YOU HAD WITH |
| 01:15PM | 5 | MR. DOWNEY ABOUT THERANOS'S INVOLVEMENT WITH THE MILITARY. |
| 01:15PM | 6 |      DO YOU RECALL THAT TESTIMONY? |
| 01:15PM | 7 | A.   YES. |
| 01:15PM | 8 | Q.   ON DIRECT YOU TESTIFIED ABOUT WHETHER A THERANOS ANALYZER |
| 01:15PM | 9 | WAS EVER ACTUALLY USED BY THE MILITARY TO CONDUCT CLINICAL |
| 01:15PM | 10 | TESTING FOR SOLDIERS. |
| 01:15PM | 11 |      DO YOU RECALL THAT QUESTION? |
| 01:15PM | 12 | A.   YES. |
| 01:15PM | 13 | Q.   AND WHAT WAS YOUR ANSWER TO THAT QUESTION? |
| 01:15PM | 14 | A.   NO. |
| 01:15PM | 15 | Q.   AND DOES THAT REMAIN YOUR TESTIMONY? |
| 01:15PM | 16 | A.   YES. |
| 01:15PM | 17 | Q.   I'D LIKE TO JUST CIRCLE BACK TO A COUPLE OF THE INDIVIDUAL |
| 01:15PM | 18 | ENGAGEMENTS. |
| 01:15PM | 19 |      FIRST, LET'S TALK ABOUT THE BURN STUDY THAT WAS CONDUCTED |
| 01:15PM | 20 | WITH MILITARY INVOLVEMENT. |
| 01:15PM | 21 |      DO YOU RECALL THAT PARTICULAR ENGAGEMENT? |
| 01:16PM | 22 | A.   YES. |
| 01:16PM | 23 |           MR. BOSTIC:  MS. KRATZMANN, IF I COULD USE THE |
| 01:16PM | 24 | OVERHEAD. |
| 01:16PM | 25 | Q.   MR. EDLIN, I'M GOING TO SHOW YOU EXHIBIT 7694, WHICH IS IN |

                         EDLIN REDIRECT BY MR. BOSTIC                    4268

01:16PM   1      EVIDENCE.

01:16PM   2      A.   OKAY.

01:16PM   3      Q.   DO YOU RECOGNIZE THIS AS THE ARTICLE THAT WAS THE RESULT

01:16PM   4      OF THE STUDY THAT WAS CONDUCTED BY DR. CHUNG USING A THERANOS

01:16PM   5      ANALYZER?

01:16PM   6      A.   YES.

01:16PM   7      Q.   I JUST WANT TO POINT OUT A FEW DETAILS AND ASK YOUR

01:16PM   8      THOUGHTS.

01:16PM   9           FIRST, DO YOU SEE UNDER THE ABSTRACT THERE'S A SECTION

01:16PM   10     LABELLED RESULTS?

01:16PM   11     A.   YES.

01:16PM   12     Q.   IT SAYS THERE, "DURING A 4-YEAR PERIOD, A TOTAL OF NINE

01:17PM   13     SUBJECTS WERE ENROLLED FOR THE INVENTION DURING THE RAMP-IN

01:17PM   14     PHASE AND 28 SUBJECTS WERE RANDOMIZED, 14 EACH INTO THE CONTROL

01:17PM   15     AND HVHF ARMS RESPECTIVELY.  THE STUDY WAS TERMINATED DUE TO

01:17PM   16     SLOW ENROLLMENT."

01:17PM   17          DO YOU SEE THAT?

01:17PM   18     A.   I DO.

01:17PM   19     Q.   IS THAT CONSISTENT WITH YOUR UNDERSTANDING THAT

01:17PM   20     APPROXIMATELY 28 INDIVIDUALS PARTICIPATED IN THIS STUDY OVER A

01:17PM   21     FOUR YEAR PERIOD?

01:17PM   22     A.   YES.

01:17PM   23     Q.   IN THE SECTION ABOVE WHERE IT SAYS METHODS, IT TALKS ABOUT

01:17PM   24     HOW THIS WAS A CLINICAL TRIAL TO EVALUATE THE IMPACT OF HVHF.

01:17PM   25          DID YOU UNDERSTAND THAT TO REFER TO HIGH-VOLUME

EDLIN REDIRECT BY MR. BOSTIC                                    4269

01:17PM   1     HEMOFILTRATION?

01:17PM   2     A.   THAT SOUNDS RIGHT.

01:17PM   3     Q.   AND WAS THIS STUDY DESIGNED TO TEST WHETHER THAT TREATMENT

01:17PM   4     WAS BENEFICIAL TO BURN VICTIMS?

01:17PM   5     A.   I BELIEVE IT WAS.

01:17PM   6     Q.   WAS THAT HVHF TREATMENT DEVELOPED OR WORKED ON IN ANY WAY

01:18PM   7     BY THERANOS?

01:18PM   8     A.   NOT TO MY KNOWLEDGE.

01:18PM   9     Q.   ON PAGE 2 OF THIS EXHIBIT UNDER RESULTS, DO YOU SEE THAT

01:18PM   10    THERE'S A SECTION THAT BEGINS "ACROSS SEVEN PARTICIPATING BURN

01:18PM   11    CENTERS"?

01:18PM   12    A.   YES.

01:18PM   13    Q.   DO YOU KNOW OFFHAND WHAT THOSE SEVEN PARTICIPATING BURN

01:18PM   14    CENTERS WERE?

01:18PM   15    A.   I'M -- I DON'T THINK I KNOW ALL SEVEN OFFHAND.

01:18PM   16    Q.   DO YOU KNOW WHETHER THEY WERE ALL MILITARY AFFILIATED OR

01:18PM   17    WHETHER SOME WERE NONMILITARY?

01:18PM   18    A.   I BELIEVE SOME WERE ACADEMIC, UNIVERSITY AND MEDICAL

01:18PM   19    CENTERS.

01:18PM   20    Q.   SO, IN OTHER WORDS, THE PARTICIPANTS IN THIS STUDY WERE

01:18PM   21    NOT LIMITED TO SOLDIERS; IS THAT CORRECT?

01:18PM   22    A.   THAT'S MY UNDERSTANDING.

01:18PM   23    Q.   WE CAN PUT THAT ONE ASIDE.

01:19PM   24         I'D NEXT LIKE TO TALK TO YOU ABOUT THE DEALINGS THAT

01:19PM   25    THERANOS HAD WITH AFRICOM.

EDLIN REDIRECT BY MR. BOSTIC                                    4270

01:19PM   1              DO YOU HAVE THAT IN YOUR MIND?

01:19PM   2      A.   YES.

01:19PM   3      Q.   AND I'D LIKE TO SHOW YOU WHAT WAS ADMITTED AS

01:19PM   4      EXHIBIT 12251.

01:19PM   5              MR. EDLIN, DO YOU SEE EXHIBIT 12251 ON THE SCREEN?

01:19PM   6      A.   YES.

01:19PM   7      Q.   AND DO YOU RECALL DISCUSSING THIS EMAIL WITH MR. DOWNEY?

01:19PM   8      A.   YES.

01:19PM   9      Q.   THIS EMAIL HAS AN ATTACHMENT; IS THAT CORRECT?

01:20PM  10      A.   I BELIEVE SO.

01:20PM  11      Q.   AND DO YOU SEE ON THE SCREEN IN FRONT OF YOU THE ACTUAL

01:20PM  12      DRAFT PROTOCOL FOR THE AFRICOM STUDY?

01:20PM  13      A.   YES.

01:20PM  14      Q.   OKAY.  I'D LIKE TO SHOW YOU SOME INFORMATION ON THE SECOND

01:20PM  15      PAGE OF THAT PROTOCOL.

01:20PM  16              FIRST, DO YOU SEE UNDER STUDY DESIGN WHERE THERE'S A

01:20PM  17      SECTION LABELLED "INTERVENTIONS"?

01:20PM  18      A.   YES.

01:20PM  19      Q.   AND DO YOU SEE THERE HIGHLIGHTED THERE'S A SECTION

01:20PM  20      LABELLED "STANDARD PHYSICAL EXAM TESTS ON 5 VOLUNTEERS"?

01:20PM  21      A.   YES.

01:20PM  22      Q.   AND DO YOU SEE SPECIFIC ASSAYS LISTED UNDERNEATH THAT?

01:20PM  23      A.   YES.

01:20PM  24      Q.   AND THE ASSAYS ARE CBC, CHEMISTRY, LIVER PANEL, UA, AND

01:21PM  25      LIPIDS.

EDLIN REDIRECT BY MR. BOSTIC                                    4271

01:21PM   1          DO YOU SEE THAT?

01:21PM   2     A.   YES.

01:21PM   3     Q.   DO YOU KNOW WHETHER -- WELL, LET ME ASK FIRST, WAS IT AN

01:21PM   4     EDISON 3.0 THAT WAS GIVEN TO AFRICOM IN CONNECTION WITH THIS

01:21PM   5     STUDY?

01:21PM   6     A.   YES.

01:21PM   7     Q.   DO YOU KNOW WHETHER THE EDISON 3.0 WAS EVEN CAPABLE OF

01:21PM   8     CONDUCTING THE ASSAYS THAT ARE LISTED HERE?

01:21PM   9     A.   I DON'T BELIEVE IT WAS CAPABLE OF CONDUCTING ALL OF THE

01:21PM  10     ASSAYS.

01:21PM  11     Q.   GOING FURTHER DOWN IN THAT SAME PROTOCOL, I'D LIKE TO DRAW

01:21PM  12     YOUR ATTENTION TO SUBSECTION 3.  DO YOU SEE SOME HIGHLIGHTED

01:21PM  13     LANGUAGE THERE?

01:21PM  14     A.   YES.

01:21PM  15     Q.   IT READS THERE, "MOCK PATIENT SCENARIO REQUIRING

01:21PM  16     LABORATORY ASSESSMENT WITH SUBSEQUENT EVALUATION FOR

01:21PM  17     CONFIRMATORY TESTING."

01:22PM  18          DO YOU SEE THAT?

01:22PM  19     A.   YES.

01:22PM  20     Q.   AND I'LL MOVE DOWN TO THE BOTTOM OF THIS PAGE.

01:22PM  21          DO YOU SEE AT THE BOTTOM, UNDER RISK TO SUBJECTS, THERE'S

01:22PM  22     SOME LANGUAGE BEGINNING AT THE BOTTOM, "ALL CLINICAL DATA WILL

01:22PM  23     BE NOTIONAL."

01:22PM  24          DO YOU SEE THAT?

01:22PM  25     A.   YES.

EDLIN REDIRECT BY MR. BOSTIC

01:22PM 1    Q.   IT READS, "ALL CLINICAL DATA WILL BE NOTIONAL DATA,

01:22PM 2    CREATED AS A SCENARIO AND WILL NOT REPRESENT ANY TRUE CONDITION

01:22PM 3    OF THE RESEARCH SUBJECT."

01:22PM 4         DO YOU SEE THAT LANGUAGE?

01:22PM 5    A.   YES.

01:22PM 6    Q.   AND WHAT IS YOUR UNDERSTANDING OF WHAT THAT LANGUAGE

01:22PM 7    MEANS?

01:22PM 8    A.   THE RESULTS FOR EACH PATIENT WERE PREDETERMINED.

01:22PM 9    LIEUTENANT COLONEL GIVENS SENT TO THERANOS WHAT THE RESULTS FOR

01:22PM 10   EACH PATIENT SHOULD BE, AND THOSE WERE THE RESULTS FOR EACH

01:22PM 11   PATIENT THAT APPEARED ON THE DEVICE.

01:22PM 12   Q.   AND DOES THAT MEAN THAT IN CONNECTION WITH THIS AFRICOM

01:22PM 13   STUDY, THE ANALYZER ITSELF WASN'T ACTUALLY ANALYZING BLOOD AND

01:22PM 14   RETURNING RESULTS THAT WERE BEING USED?

01:22PM 15   A.   IT WASN'T RETURNING RESULTS THAT WERE BEING USED.  I'M NOT

01:22PM 16   SURE EXACTLY WHAT WAS DONE ON THE DEVICE.

01:22PM 17   Q.   BECAUSE THE RESULTS IN THE STUDY WERE PREDETERMINED AND

01:23PM 18   FICTIONAL; IS THAT CORRECT?

01:23PM 19   A.   THEY WERE -- I THINK THEY WERE DESCRIBED AS ARTIFICIAL.

01:23PM 20   Q.   I'D LIKE TO SHOW YOU NEXT WHAT WAS ADMITTED AS 10483.  AND

01:23PM 21   THIS WAS ADMITTED PREVIOUSLY.

01:23PM 22        MR. EDLIN, DO YOU RECALL DISCUSSING THIS EMAIL CHAIN WITH

01:23PM 23   LIEUTENANT COLONEL GIVENS WITH MR. DOWNEY?

01:23PM 24   A.   YES.

01:23PM 25   Q.   LET ME FIRST SHOW YOU AN EMAIL IN THIS CHAIN.  DO YOU SEE

4273
EDLIN REDIRECT BY MR. BOSTIC

01:24PM   1    ON THE PAGE IN FRONT OF YOU AN EMAIL FROM LIEUTENANT

01:24PM   2    COLONEL GIVENS, OR A PORTION OF AN EMAIL?

01:24PM   3    A.   YES.

01:24PM   4    Q.   AND DO YOU SEE IN THAT PORTION THERE'S HIGHLIGHTED

01:24PM   5    LANGUAGE THAT SAYS, "FOR THE 5 PATIENTS WHO ARE JUST HAVING

01:24PM   6    PHYSICAL EXAM TESTS - THESE CAN ALL BE NORMAL RESULTS.

01:24PM   7        "I SPECIFIED VALUES FOR THE REMAINING PATIENTS.  LET ME

01:24PM   8    KNOW IF I NEED TO INCLUDE UNITS."

01:24PM   9        DO YOU SEE THAT?

01:24PM  10    A.   YES.

01:24PM  11    Q.   IS THIS LIEUTENANT COLONEL GIVENS PROVIDING WHAT THE

01:24PM  12    ARTIFICIAL RESULTS ARE TO BE TO THERANOS IN ADVANCE OF THE

01:24PM  13    TEST?

01:24PM  14    A.   YES.

01:24PM  15    Q.   DO YOU RECALL THAT IN THIS EMAIL YOU ASKED A QUESTION

01:24PM  16    ABOUT WHAT THE CONDITIONS WOULD BE ON THE MEDEVAC FROM GERMANY

01:24PM  17    TO UGANDA?

01:24PM  18    A.   YES, YES.

01:24PM  19    Q.   LET ME SHOW YOU THAT LANGUAGE.

01:24PM  20        DO YOU SEE THAT ON THE SCREEN?

01:24PM  21    A.   YES.

01:25PM  22    Q.   AND THIS IS IN CONNECTION WITH THE QUESTION ABOUT HOW THE

01:25PM  23    DEVICE WAS GOING TO BE TRANSPORTED IN THE FIELD; IS THAT RIGHT?

01:25PM  24    A.   YES.

01:25PM  25    Q.   WAS IT YOUR UNDERSTANDING WHEN YOU WROTE THAT EMAIL THAT

EDLIN REDIRECT BY MR. BOSTIC                                          4274

01:25PM   1    THE DEVICE WAS GOING TO BE TRANSPORTED ON A MEDEVAC FROM

01:25PM   2    GERMANY TO UGANDA?

01:25PM   3    A.   YES.  OR I'M NOT SURE IF IT WAS A MEDEVAC, BUT I BELIEVE

01:25PM   4    IT WAS A HELICOPTER.

01:25PM   5    Q.   ON THE SCREEN IN FRONT OF YOU, DO YOU SEE LIEUTENANT

01:25PM   6    COLONEL GIVENS'S RESPONSE TO THAT QUESTION?

01:25PM   7    A.   YES.

01:25PM   8    Q.   SHE RESPONDS IN THAT SECOND PARAGRAPH THERE, "THE

01:25PM   9    EQUIPMENT AND CARTRIDGES WILL BE FLOWN COMMERCIAL AIR WITH ME

01:25PM   10   ON THE 23RD, AND I WILL FLY BACK TO GERMANY ON THE 2ND OF

01:25PM   11   JULY."

01:25PM   12       DO YOU SEE THAT?

01:25PM   13   A.   YES.

01:25PM   14   Q.   AND SHE THEN IN THE PARAGRAPH BELOW -- WELL, FIRST OF ALL,

01:25PM   15   DOES THIS INDICATE THAT THE DEVICE WAS NOT ACTUALLY TRANSPORTED

01:25PM   16   ON A MEDEVAC FROM GERMANY TO UGANDA?

01:26PM   17         THE COURT:  I'M SORRY, MR. BOSTIC.  WAS THIS

01:26PM   18   ADMITTED?

01:26PM   19         MR. BOSTIC:  IT WAS, YOUR HONOR.  I BELIEVE SO,

01:26PM   20   10483.

01:26PM   21         THE COURT:  MS. KRATZMANN, DO YOU SHOW THAT?

01:26PM   22         THE CLERK:  I DON'T SHOW THAT, YOUR HONOR, AS

01:26PM   23   ADMITTED.  I WENT UP TO 10480.

01:26PM   24         MR. BOSTIC:  I APOLOGIZE.  IT MAY HAVE BEEN A

01:26PM   25   DIFFERENT VERSION OF THIS EMAIL.

EDLIN REDIRECT BY MR. BOSTIC

01:26PM   1        YOUR HONOR, THE GOVERNMENT WOULD MOVE TO ADMIT 10483 IF

01:26PM   2    IT'S NOT.

01:26PM   3            THE COURT:  IT MAY HAVE COME IN ATTACHED TO

01:26PM   4    SOMETHING ELSE.

01:26PM   5        ANY OBJECTION TO THIS COMING IN, MR. DOWNEY?

01:26PM   6            MR. DOWNEY:  WELL, MAYBE THE EASIEST THING IS THAT I

01:26PM   7    COULD JUST GIVE THE NUMBER OF THE EXHIBIT THAT WAS ADMITTED IF

01:26PM   8    YOU'LL BEAR WITH ME.  IT'S 13993.

01:26PM   9            THE COURT:  THANK YOU.

01:26PM  10            MR. BOSTIC:  APOLOGIES, YOUR HONOR.  I'M HAPPY TO

01:26PM  11    USE THAT VERSION.

01:26PM  12        13993?

01:27PM  13            THE COURT:  IT'S THE SAME DOCUMENT AND IT JUST HAS A

01:27PM  14    DIFFERENT NUMBER FOR EACH BINDER, EACH RESPECTIVE BINDER.  BUT

01:27PM  15    IT IS THE SAME DOCUMENT.

01:27PM  16            MR. BOSTIC:  THANK YOU, YOUR HONOR.

01:27PM  17    Q.   MR. EDLIN, I'M NOT SURE WHETHER I GOT AN ANSWER TO THE

01:27PM  18    QUESTION.

01:27PM  19        DO YOU RECALL WHETHER, IN FACT, THE DEVICE WAS TRANSPORTED

01:27PM  20    COMMERCIALLY FROM GERMANY TO UGANDA AND NOT BY MEDEVAC?

01:27PM  21    A.   I WOULD JUST HAVE TO LOOK AT THE EMAIL IF YOU DON'T MIND.

01:27PM  22        (PAUSE IN PROCEEDINGS.)

01:27PM  23            THE WITNESS:  YES, THAT'S WHAT IS INDICATED HERE,

01:27PM  24    COMMERCIAL AIR.

01:27PM  25    BY MR. BOSTIC:

4276
EDLIN REDIRECT BY MR. BOSTIC

01:27PM  1    Q.   THERE'S DISCUSSION IN THAT SAME EMAIL --

01:28PM  2              THE COURT:  IT'S NOT ON THE SCREEN IN THE AUDIENCE.

01:28PM  3    IT'S NOT ON THE JURY SCREEN?

01:28PM  4              JUROR:  NO.

01:28PM  5         IT'S COMING.

01:28PM  6              THE CLERK:  NO?  YES?

01:28PM  7              JUROR:  YES.

01:28PM  8              MR. BOSTIC:  THANK YOU, YOUR HONOR.

01:28PM  9    Q.   MR. EDLIN, DO YOU SEE SOMETHING ON THE SCREEN ABOUT HOW

01:28PM  10   YOU IT WOULD BE FLYING FROM UGANDA AND HOW IT -- SURE.

01:28PM  11        DO YOU SEE IN THE EMAIL LANGUAGE ABOUT FLYING THE

01:28PM  12   EQUIPMENT FROM UGANDA AND HOW IT WOULD BE ON A NON-PRESSURIZED

01:28PM  13   AIRCRAFT AT ALTITUDES LESS THAN 10,000 FEET?

01:28PM  14   A.   YES.

01:28PM  15   Q.   DO YOU RECALL DURING DIRECT WE LOOKED AT SOME DOCUMENTS

01:28PM  16   THAT DISCUSSED THE POSSIBILITY THAT A THERANOS ANALYSIS WOULD

01:28PM  17   BE USED ON A MILITARY MEDEVAC?

01:28PM  18   A.   YES.

01:28PM  19   Q.   AND CAN YOU DESCRIBE WHAT THAT WOULD MEAN?  WHAT THAT USE

01:28PM  20   WOULD LOOK LIKE?

01:28PM  21   A.   THIS WOULD BE, LIKE, A HYPOTHETICAL.

01:29PM  22        IN ORDER FOR THE DEVICE TO OPERATE, IT WOULD HAVE TO BE

01:29PM  23   INFLUENCED INTO A POWER SOURCE AND I THINK IT WOULD JUST, IT

01:29PM  24   WOULD NEED TO HAVE A DESIGNATED LOCATION WITHIN THE VEHICLE,

01:29PM  25   AND THAT WOULD LIKELY HAVE TO BE SECURED, STATIONARY.

4277
EDLIN REDIRECT BY MR. BOSTIC

01:29PM  1   Q.   AND YOU SAID IN ORDER FOR THE DEVICE TO OPERATE, IT WOULD

01:29PM  2   NEED A POWER SOURCE?

01:29PM  3   A.   RIGHT.

01:29PM  4   Q.   THAT'S WHAT I'M GETTING AT.

01:29PM  5       WHEN THAT POSSIBILITY WAS CONTEMPLATED BY THERANOS, WAS

01:29PM  6   THAT REFERRING TO THE MERE TRANSPORT OF AN ANALYZER FROM ONE

01:29PM  7   LOCATION TO ANOTHER ON A MILITARY PLANE?  OR WAS IT THE ACTUAL

01:29PM  8   OPERATION AND USE OF THE ANALYZER ON A MILITARY AIRCRAFT?

01:29PM  9   A.   THE OPERATION AND USE.

01:29PM  10  Q.   SO THEN MY QUESTION FOR YOU IS THAT IN CONNECTION WITH THE

01:30PM  11  AFRICOM STUDY THAT WE'RE TALKING ABOUT NOW, DID THAT HAPPEN?

01:30PM  12  WAS A THERANOS ANALYZER ACTUALLY INSTALLED AND USED ON A

01:30PM  13  MILITARY MEDEVAC?

01:30PM  14  A.   NO.

01:30PM  15  Q.   DO YOU RECALL REVIEWING WITH MR. DOWNEY AN EMAIL FROM

01:30PM  16  LIEUTENANT COLONEL GIVENS WHERE SHE TALKED ABOUT HOW THE DEVICE

01:30PM  17  HAD PERFORMED WELL?

01:30PM  18  A.   YES.

01:30PM  19  Q.   JUST TO BE CLEAR, AS PART OF THE WORK THAT SHE DID WITH

01:30PM  20  THE DEVICE, DID SHE ACTUALLY RUN ANY SAMPLES AND REVIEW THE

01:30PM  21  RESULTS?

01:30PM  22  A.   NO.

01:30PM  23  Q.   THAT SAME EMAIL TALKED ABOUT HER DESIRE TO GET SOME

01:30PM  24  ADDITIONAL DEVICES INTO THE FIELD FOR MORE TESTING.

01:30PM  25       DO YOU RECALL THAT?

EDLIN REDIRECT BY MR. BOSTIC                                    4278

01:30PM   1   A.   YES.

01:30PM   2   Q.   DID THAT EVER HAPPEN?  DID AFRICOM EVER GET THOSE

01:31PM   3   ADDITIONAL DEVICES AND CONDUCT THE KIND OF TESTING THAT

01:31PM   4   LIEUTENANT COLONEL GIVENS WAS TALKING ABOUT?

01:31PM   5   A.   NO.

01:31PM   6          MR. BOSTIC:  YOUR HONOR, I HAVE MORE TO TALK ABOUT

01:31PM   7   ON THE MILITARY, BUT THIS MIGHT BE A GOOD STOPPING POINT IF THE

01:31PM   8   COURT WANTS TO TAKE A BREAK.

01:31PM   9          THE COURT:  LET'S DO THAT.  LET'S TAKE OUR AFTERNOON

01:31PM  10   BREAK.

01:31PM  11       I JUST WANT TO -- BEFORE WE TAKE OUR BREAK, I JUST WANT TO

01:31PM  12   CLEAR THE RECORD, COUNSEL, FOR SOME DOCUMENTS.

01:31PM  13       EXHIBIT 12251 WAS NOT ADMITTED.  I DON'T KNOW IF THERE'S

01:31PM  14   ANOTHER NUMBER FOR THAT.

01:31PM  15       AND THEN 10483 IS -- I BELIEVE WE'VE -- THAT IS 13993.  SO

01:32PM  16   13993 WAS ADMITTED WITH THE ATTACHMENTS, SO THAT IS IN THE

01:32PM  17   RECORD.

01:32PM  18       I THINK THE 10483 WAS ANOTHER COPY OF THE SAME EXHIBIT,

01:32PM  19   BUT YOU JUST EXAMINED ON THAT.

01:32PM  20       JUST TO BE CLEAR, 10483 WAS NOT ADMITTED, BUT THE SAME

01:32PM  21   DOCUMENT APPEARS IN 13993, WHICH WAS ADMITTED.

01:32PM  22       12251 I DON'T BELIEVE WAS ADMITTED, AND I WILL JUST LEAVE

01:32PM  23   THE RECORD AT THAT.

01:32PM  24          MR. BOSTIC:  I'LL FIND THE CORRECT NUMBER FOR THAT

01:32PM  25   ONE, YOUR HONOR.  THANK YOU.

EDLIN REDIRECT BY MR. BOSTIC                                    4279

01:32PM  1         THE COURT:  ALL RIGHT.  THANK YOU.

01:32PM  2         LET'S TAKE OUR AFTERNOON BREAK.  IS IT 30 MINUTES WOULD BE

01:32PM  3    SUFFICIENT THEN?  30 MINUTES, LADIES AND GENTLEMEN.

01:32PM  4         AND YOU CAN STAND DOWN, SIR.  THANK YOU.

01:33PM  5         (JURY OUT AT 1:33 P.M.)

01:33PM  6         THE COURT:  PLEASE BE SEATED.  WE'RE ON A BREAK.

01:33PM  7    THANK YOU.

01:33PM  8         THE CLERK:  COURT IS IN RECESS.

01:33PM  9         (RECESS FROM 1:33 P.M. UNTIL 2:03 P.M.)

02:03PM  10        THE COURT:  ALL RIGHT.  WE'RE BACK ON THE RECORD.

02:03PM  11   WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.

02:03PM  12        BEFORE WE BRING THE JURY IN, I JUST WANTED TO ALERT THE

02:03PM  13   PARTIES, I RECEIVED -- MS. KRATZMANN RECEIVED AN EMAIL FROM ONE

02:03PM  14   OF OUR JURORS REMINDING US OF A LACK OF AVAILABILITY.  I THINK

02:03PM  15   THIS CAME UP DURING VOIR DIRE, WON'T BE AVAILABLE FRIDAY,

02:03PM  16   NOVEMBER 12TH AND FRIDAY, DECEMBER 3RD.

02:03PM  17        AND I THINK, IF YOU RECALL, THERE WAS SOME DISCUSSION

02:03PM  18   ABOUT SOME WEDDINGS THAT A JUROR WAS INVOLVED IN.

02:03PM  19        MR. DOWNEY:  I THINK THAT'S RIGHT.

02:03PM  20        THE COURT:  RIGHT.  HE WANTED TO REMIND US OF THAT.

02:03PM  21        I MAY HAVE -- ALSO, I'LL NEED TO CHECK, BUT I HAVE A

02:04PM  22   NINTH CIRCUIT COMMITTEE THAT I SIT ON, AND I THINK IT'S MEETING

02:04PM  23   IN MAYBE THE SECOND WEEK OF DECEMBER.  I'LL KEEP YOU APPRISED

02:04PM  24   OF THAT, BUT I BELIEVE IT'S GOING TO BE A TUESDAY/WEDNESDAY

02:04PM  25   EVENT, BUT I'LL KEEP YOU APPRISED AS WE GO FORWARD.

EDLIN REDIRECT BY MR. BOSTIC                                    4280

02:04PM   1        ALL RIGHT.  ANYTHING ELSE BEFORE -- CAN I JUST GET A TIME

02:04PM   2    ESTIMATE?  DO YOU THINK WE'LL FINISH THIS WITNESS TODAY?

02:04PM   3             MR. BOSTIC:  SO, YOUR HONOR, I HAVE APPROXIMATELY

02:04PM   4    ANOTHER HALF HOUR WITH THIS WITNESS.

02:04PM   5             MR. DOWNEY:  I THINK WE'LL FINISH THIS WITNESS,

02:04PM   6    YOUR HONOR.

02:04PM   7             THE COURT:  OKAY.  GREAT.  LET'S COLLECT EVERYONE.

02:06PM   8        (PAUSE IN PROCEEDINGS.)

02:06PM   9        (JURY IN AT 2:06 P.M.)

02:06PM  10             THE COURT:  ALL RIGHT.  THANK YOU.  PLEASE BE

02:06PM  11    SEATED.  WE'RE BACK ON THE RECORD.  OUR JURY IS PRESENT.  ALL

02:06PM  12    COUNSEL ARE PRESENT.  MR. EDLIN IS ON THE STAND.

02:06PM  13        MR. BOSTIC, YOU'D LIKE TO CONTINUE WITH YOUR REDIRECT?

02:07PM  14             MR. BOSTIC:  YES, PLEASE, YOUR HONOR.  THANK YOU.

02:07PM  15        FIRST, THE GOVERNMENT MOVES TO ADMIT EXHIBIT 12251.  I

02:07PM  16    BELIEVE THE DEFENSE HAS STIPULATED.

02:07PM  17             MR. DOWNEY:  YES, YOUR HONOR.

02:07PM  18             THE COURT:  ALL RIGHT.  THANK YOU.  THAT IS

02:07PM  19    ADMITTED.  THANK YOU.

02:07PM  20        (DEFENDANT'S EXHIBIT 12251 WAS RECEIVED IN EVIDENCE.)

02:07PM  21    BY MR. BOSTIC:

02:07PM  22    Q.   MR. EDLIN, BEFORE THE BREAK WE TALKED ABOUT THE MILITARY

02:07PM  23    BURN STUDY AND THE DEALINGS WITH AFRICOM; IS THAT CORRECT?

02:07PM  24    A.   CORRECT.

02:07PM  25    Q.   LET'S TALK ABOUT CENTCOM NEXT.  I'D LIKE TO SHOW YOU SOME

EDLIN REDIRECT BY MR. BOSTIC                                4281

02:07PM  1    SECTIONS OF EXHIBIT 10457, WHICH I BELIEVE IS ALREADY IN

02:07PM  2    EVIDENCE.

02:07PM  3         MR. EDLIN, DO YOU SEE EXHIBIT 10457 IN FRONT OF YOU?

02:07PM  4    A.   YES.

02:07PM  5    Q.   DO YOU REMEMBER DISCUSSING THIS EMAIL WITH MR. DOWNEY?

02:07PM  6    A.   YES.

02:07PM  7    Q.   THIS EMAIL FROM YOU TO MS. HOLMES ATTACHES SOMETHING NAMED

02:07PM  8    THERANOS LOE PROTOCOL APPLICATION.

02:08PM  9         DO YOU SEE THAT?

02:08PM  10   A.   YES.

02:08PM  11   Q.   I'D LIKE TO SHOW YOU THAT ATTACHMENT.

02:08PM  12        OKAY.  DO YOU SEE THAT ON THE SCREEN?

02:08PM  13   A.   YES.

02:08PM  14   Q.   AND CAN YOU EXPLAIN IN GENERAL TERMS WHAT THIS IS?

02:08PM  15   A.   THIS IS AN OVERVIEW OF THE LIMITED OBJECTIVE EXPERIMENT TO

02:08PM  16   COMPARE THERANOS TESTING TO AVAILABLE EQUIPMENT AT THE --

02:08PM  17   AVAILABLE EQUIPMENT FOR THE MILITARY.

02:08PM  18   Q.   AND WHAT WAS THE OVERALL GOAL, AS YOU UNDERSTOOD IT, OF

02:08PM  19   THIS LIMITED OBJECTIVE EXPERIMENT?

02:08PM  20   A.   THE GOAL -- THIS EXPERIMENT WAS TO COMPARE THERANOS

02:08PM  21   TESTING TO THE AVAILABLE, COMMERCIALLY AVAILABLE TESTING.

02:08PM  22   Q.   AND WAS THAT TO SEE WHETHER IT WAS GOOD ENOUGH FOR ACTUAL

02:08PM  23   MILITARY CLINICAL USE?

02:08PM  24   A.   YES.

02:08PM  25   Q.   I'M SHOWING YOU SECTION 3 OF THIS PROTOCOL THAT'S LABELED

EDLIN REDIRECT BY MR. BOSTIC                                          4282

02:09PM   1   STUDY FACILITIES.

02:09PM   2        DO YOU SEE THAT?

02:09PM   3   A.   YES.

02:09PM   4   Q.   AND UNDER A HEADING THAT SAYS, LIST ALL LOCATIONS WHERE

02:09PM   5   STUDY PROCEDURES WILL BE PERFORMED, IT READS, "COMBINED JOINT

02:09PM   6   THEATRE HOSPITAL, BAGRAM AIR FORCE BASE, AFGHANISTAN."

02:09PM   7        DO YOU SEE THAT?

02:09PM   8   A.   YES.

02:09PM   9   Q.   IS THAT YOUR UNDERSTANDING OF WHERE THIS LOE WAS GOING TO

02:09PM  10   TAKE PLACE?

02:09PM  11   A.   YES.

02:09PM  12   Q.   DO YOU RECALL TESTIFYING ABOUT A TRIP THAT YOU TOOK TO

02:09PM  13   FLORIDA IN CONNECTION WITH THE DEALINGS WITH CENTCOM?

02:09PM  14   A.   YES.

02:09PM  15   Q.   THAT TRIP TO FLORIDA HAD NOTHING TO DO WITH ANY WORK IN

02:09PM  16   AFGHANISTAN, DID IT?

02:09PM  17   A.   THAT TRIP, I BELIEVE, WAS A PREREQUISITE TO THIS -- TO

02:09PM  18   ENGAGE IN THIS STUDY.  BUT THAT TRIP WAS SPECIFICALLY FOR

02:09PM  19   SECURITY TESTING.

02:09PM  20   Q.   AND THE SECURITY TESTING THAT OCCURRED ON THAT TRIP, DID

02:10PM  21   THAT INCORPORATE ANY BLOOD TESTING BY THE ANALYZER AT ALL?

02:10PM  22   A.   NO.

02:10PM  23   Q.   THIS SAYS THAT THIS PARTICULAR STUDY WAS GOING TO TAKE

02:10PM  24   PLACE IN AFGHANISTAN AT BAGRAM AIR FORCE BASE.

02:10PM  25        TO YOUR KNOWLEDGE, WERE DEVICES EVER SENT TO BAGRAM AIR

EDLIN REDIRECT BY MR. BOSTIC                                    4283

02:10PM  1    FORCE BASE IN AFGHANISTAN?

02:10PM  2    A.   NO.

02:10PM  3    Q.   THE EXPERIMENT THAT IS COVERED BY THIS DOCUMENT, DID IT

02:10PM  4    EVER ACTUALLY OCCUR ANYWHERE?

02:10PM  5    A.   NO.

02:10PM  6    Q.   I'D LIKE TO SHOW YOU SECTION 6 AT THE BOTTOM OF THIS PAGE.

02:10PM  7         DO YOU SEE A SECTION THAT READS TARGET POPULATIONS?

02:10PM  8    A.   YES.

02:10PM  9    Q.   AND I WANT TO TALK ABOUT WHAT THIS STUDY WAS GOING TO BE

02:10PM  10   HAD IT OCCURRED.

02:10PM  11        DO YOU SEE THERE'S A BOX CHECKED THAT SAYS, "OTHER:

02:10PM  12   PREEXISTING DE-IDENTIFIED LABORATORY SAMPLES"?

02:10PM  13   A.   YES.

02:10PM  14   Q.   I'M NOW SHOWING YOU A SECTION OF THE DOCUMENT MARKED

02:11PM  15   PROTOCOL.

02:11PM  16        DO YOU SEE THAT?

02:11PM  17   A.   YES.

02:11PM  18   Q.   AND IN THAT SECTION, THERE'S A HEADING, RESEARCH DESIGN

02:11PM  19   AND METHODS.

02:11PM  20        DO YOU SEE THAT?

02:11PM  21   A.   YES.

02:11PM  22   Q.   AND DO YOU SEE A BULLET WHERE IT SAYS, "TWO THERANOS

02:11PM  23   DEVICES WILL BE SENT FROM THE U.S. TO THE CJTH BAGRAM

02:11PM  24   LABORATORY"?

02:11PM  25   A.   YES.

EDLIN REDIRECT BY MR. BOSTIC                                    4284

| 02:11PM | 1 | Q.   DID THAT EVER HAPPEN? |
| 02:11PM | 2 | A.   NO. |
| 02:11PM | 3 | Q.   IT TALKS ABOUT WHAT WOULD HAPPEN NEXT. |
| 02:11PM | 4 | DO YOU SEE THAT? |
| 02:11PM | 5 | A.   YES. |
| 02:11PM | 6 | Q.   I'M SHOWING YOU SOME MORE BULLET POINTS THAT ARE PART OF |
| 02:11PM | 7 | THAT PROTOCOL. |
| 02:11PM | 8 | DO YOU SEE UNDER A SECTION MARKED SAMPLE CHARACTERISTICS, |
| 02:11PM | 9 | THERE'S A DESCRIPTION OF SUBJECTS? |
| 02:12PM | 10 | A.   YES. |
| 02:12PM | 11 | Q.   AND IT SAYS, "SAMPLES WILL BE SELECTED FROM PRE-EXISTING, |
| 02:12PM | 12 | LEFTOVER LABORATORY SPECIMENS OF ACTIVE DUTY U.S. SERVICE |
| 02:12PM | 13 | MEMBERS." |
| 02:12PM | 14 | DO YOU SEE THAT? |
| 02:12PM | 15 | A.   YES. |
| 02:12PM | 16 | Q.   AND IT SAYS THE SAMPLES WILL BE DE-IDENTIFIED PRIOR TO |
| 02:12PM | 17 | TESTING? |
| 02:12PM | 18 | A.   YES. |
| 02:12PM | 19 | Q.   IT SAYS, "THESE WILL BE SELECTED FROM LEFTOVER SAMPLES |
| 02:12PM | 20 | FROM PHYSICIAN ORDERED LABORATORY TESTS THAT ARE COLLECTED |
| 02:12PM | 21 | DURING THE EXECUTION OF THE PROTOCOL." |
| 02:12PM | 22 | DO YOU SEE THAT? |
| 02:12PM | 23 | A.   YES. |
| 02:12PM | 24 | Q.   SO HAD THIS EXPERIMENT TAKEN PLACE, WOULD THERE HAVE BEEN |
| 02:12PM | 25 | ANY WAY FOR THE RESULTS OF THE THERANOS BLOOD TESTS TO ACTUALLY |

EDLIN REDIRECT BY MR. BOSTIC                                    4285

02:12PM   1    BE USED IN THE TREATMENT OF SOLDIERS?

02:12PM   2    A.   NO.

02:12PM   3    Q.   WHY NOT?

02:12PM   4    A.   BECAUSE THESE WERE LEFTOVER SPECIMENS AND THEY WERE

02:12PM   5    DEIDENTIFIED.

02:12PM   6    Q.   IN OTHER WORDS, THERE WAS NO WAY TO MATCH A GIVEN SAMPLE

02:12PM   7    EVEN WITH THE PATIENT THAT IT WENT WITH?

02:12PM   8    A.   CORRECT.

02:12PM   9    Q.   JUST TO UNDERSCORE THAT POINT.

02:13PM   10        DO YOU SEE A SUBSECTION LABELLED E ON THE SCREEN?

02:13PM   11   A.   YES.

02:13PM   12   Q.   IT SAYS, "THE INDIVIDUALS CARING FOR THE PATIENTS WILL BE

02:13PM   13   DIFFERENT FROM AND DO NOT SHARE INFORMATION ABOUT THE PATIENT

02:13PM   14   WITH THOSE CONDUCTING THE INVESTIGATION."

02:13PM   15        DO YOU SEE THAT?

02:13PM   16   A.   YES.

02:13PM   17   Q.   SO, IN OTHER WORDS, THE DOCTORS TREATING THE PATIENTS

02:13PM   18   WOULD BE A DIFFERENT GROUP OF PEOPLE FROM THE ONES RUNNING THIS

02:13PM   19   EXPERIMENT IF IT HAD TAKEN PLACE?

02:13PM   20   A.   YES.

02:13PM   21   Q.   WAS SUCCESSFUL COMPLETION OF THIS STUDY THAT NEVER TOOK

02:13PM   22   PLACE A PREREQUISITE TO ACTUAL CLINICAL USE OF THE DEVICE BY

02:13PM   23   CENTCOM?

02:13PM   24   A.   YES.

02:13PM   25   Q.   NEXT, LET'S TALK ABOUT SOCOM.

EDLIN REDIRECT BY MR. BOSTIC                                    4286

02:13PM   1        DO YOU RECALL TESTIFYING THAT IN CONNECTION WITH THE

02:13PM   2    MILITARY'S -- I'M SORRY, WITH THERANOS'S DEALINGS WITH SOCOM,

02:13PM   3    DEVICES WERE SHIPPED TO A BASE IN KENTUCKY?  WAS THAT YOUR

02:14PM   4    TESTIMONY?

02:14PM   5    A.   YES.

02:14PM   6    Q.   THE DEVICES THAT WERE SHIPPED TO KENTUCKY, WERE THEY

02:14PM   7    CAPABLE OF RUNNING A CBC BLOOD TEST?

02:14PM   8    A.   NO.

02:14PM   9    Q.   DO YOU KNOW WHETHER THE MILITARY EVER ACTUALLY RAN TESTS

02:14PM  10    ON THE DEVICES THAT WERE SENT TO KENTUCKY?

02:14PM  11    A.   I DON'T BELIEVE THEY DID.

02:14PM  12    Q.   THERE WAS SOME DISCUSSION ALSO WITH MR. DOWNEY ABOUT

02:14PM  13    CLAIMS THAT WERE MADE IN THERANOS MEMOS AND PRESENTATIONS TO

02:14PM  14    THE MILITARY.

02:14PM  15        DO YOU RECALL THAT TESTIMONY?

02:14PM  16    A.   YES.

02:14PM  17    Q.   YOU TESTIFIED THAT YOU BELIEVED THE CLAIMS IN THOSE

02:14PM  18    PRESENTATIONS AND MEMORANDA WERE TRUE AT THE TIME; IS THAT

02:14PM  19    CORRECT?

02:14PM  20    A.   YES.

02:14PM  21    Q.   AND WHAT WAS THAT BELIEF BASED ON?

02:14PM  22    A.   IT WAS -- THAT BELIEF WAS BASED ON WHAT I WAS TOLD BY THE

02:15PM  23    EXPERTS IN THE COMPANY.

02:15PM  24    Q.   AND DID THOSE EXPERTS INCLUDE ELIZABETH HOLMES?

02:15PM  25    A.   YES.

EDLIN REDIRECT BY MR. BOSTIC                                          4287

```
02:15PM   1    Q.   YOU SPOKE WITH MR. DOWNEY ABOUT PEOPLE IN THE COMPANY THAT

02:15PM   2    YOU RELIED UPON FOR INFORMATION THAT YOU DIDN'T KNOW FIRSTHAND.

02:15PM   3         DO YOU RECALL THAT?

02:15PM   4    A.   YES.

02:15PM   5    Q.   AND WAS MS. HOLMES ON THAT LIST OF PEOPLE WHO PROVIDED YOU

02:15PM   6    WITH INFORMATION?

02:15PM   7    A.   YES.

02:15PM   8    Q.   WHAT KIND OF INFORMATION DID YOU RECEIVE FROM MS. HOLMES,

02:15PM   9    GENERALLY SPEAKING?

02:15PM  10    A.   COULD YOU BE MORE SPECIFIC?

02:15PM  11    Q.   DID MS. HOLMES EVER PROVIDE YOU WITH INFORMATION ABOUT THE

02:15PM  12    TECHNOLOGY BEING USED BY THERANOS?

02:15PM  13    A.   YES.

02:15PM  14    Q.   DID MS. HOLMES PROVIDE YOU WITH INFORMATION ABOUT WHAT THE

02:15PM  15    DEVICES COULD DO AT THERANOS?

02:15PM  16    A.   YES.

02:15PM  17    Q.   BETWEEN MS. HOLMES AND MR. BALWANI, DID YOU GET A SENSE OF

02:15PM  18    HOW THEY DIVIDED THEIR AREAS OF EXPERTISE OR INFLUENCE WITHIN

02:16PM  19    THE COMPANY?  DID YOU HAVE A SENSE OF THAT?

02:16PM  20    A.   I HAD A, I THINK A GENERAL SENSE.

02:16PM  21    Q.   HOW WOULD YOU DESCRIBE HOW THEY BROKE THAT DOWN?

02:16PM  22    A.   SUNNY, SUNNY'S AREAS OF EXPERTISE WERE SOFTWARE, THE

02:16PM  23    CLINICAL LAB, MOST OF THE WALGREENS OPERATION.

02:16PM  24         AND ELIZABETH, I BELIEVE, FOCUSSED MORE ON THE SCIENCE AND

02:16PM  25    TECHNOLOGY, THE R&D, IN ADDITION TO MARKETING, COMMUNICATIONS
```

EDLIN REDIRECT BY MR. BOSTIC                                        4288

02:16PM   1     AS -- ALONG WITH MANY OTHER AREAS.

02:16PM   2     Q.   MR. DOWNEY ASKED YOU ABOUT A PATENT WHERE YOU WERE

02:16PM   3     ACTUALLY NAMED AS AN INVENTOR.

02:16PM   4          DO YOU RECALL THAT?

02:16PM   5     A.   YES.

02:16PM   6     Q.   IS MS. HOLMES NAMED AS AN INVENTOR ON ANY PATENTS AS FAR

02:16PM   7     AS YOU KNOW?

02:16PM   8     A.   YES.

02:16PM   9     Q.   MULTIPLE PATENTS?

02:16PM  10     A.   YES.

02:16PM  11     Q.   I'D LIKE TO TALK ABOUT DEMOS WITH YOU SOME MORE.

02:17PM  12          DO YOU RECALL DISCUSSING THAT TOPIC WITH MR. DOWNEY?

02:17PM  13     A.   YES.

02:17PM  14     Q.   YOU WERE ASKED ABOUT THE NULL PROTOCOL.

02:17PM  15          TO BE CLEAR, AT ANY TIME WHEN YOU WERE AT THERANOS, WAS IT

02:17PM  16     YOUR INTENTION TO MISLEAD SOMEONE?

02:17PM  17     A.   NO.

02:17PM  18     Q.   YOU WERE ASKED A QUESTION ABOUT THAT IN CONNECTION WITH

02:17PM  19     THE NULL PROTOCOL.

02:17PM  20          DO YOU RECALL THAT?

02:17PM  21     A.   YES.

02:17PM  22     Q.   WERE YOU INVOLVED IN THE DEVELOPMENT OF THE NULL PROTOCOL?

02:17PM  23     A.   NO.

02:17PM  24     Q.   WAS IT YOUR DECISION THAT THE NULL PROTOCOL BE DEVELOPED

02:17PM  25     AT THERANOS?

EDLIN REDIRECT BY MR. BOSTIC                                    4289

02:17PM   1      A.   NO.

02:17PM   2      Q.   WAS IT YOUR DECISION -- LET'S SEE.  LET ME ASK, WHEN YOU

02:17PM   3      TALKED ABOUT WHETHER THERE WAS AN INTENT TO DECEIVE ANYONE,

02:17PM   4      WERE YOU SPEAKING JUST ABOUT YOUR INTENT OR WERE YOU MAKING

02:17PM   5      ASSUMPTIONS ABOUT ANYONE ELSE AT THE COMPANY?

02:17PM   6      A.   I WAS SPEAKING ABOUT BOTH MY INTENT AND ASSUMPTIONS OF

02:18PM   7      OTHER PEOPLE'S INTENT.

02:18PM   8      Q.   OKAY.  WHEN YOU TALK ABOUT OTHER PEOPLE'S INTENT, THOUGH,

02:18PM   9      DO YOU HAVE A WAY TO READ THEIR MIND AND KNOW WHAT THEIR INTENT

02:18PM  10      WAS, OR ARE THOSE JUST ASSUMPTIONS?

02:18PM  11      A.   ASSUMPTIONS.

02:18PM  12      Q.   IN ADDITION TO THE NULL PROTOCOL, WE SPOKE DURING YOUR

02:18PM  13      DIRECT EXAMINATION ABOUT THE DEMO APP.

02:18PM  14          DO YOU RECALL THAT?

02:18PM  15      A.   YES.

02:18PM  16      Q.   AND IN SHORT, WHAT DID THE DEMO APP DO?

02:18PM  17      A.   THE DEMO APP INCLUDED A NUMBER OF DIFFERENT PROTOCOLS THAT

02:18PM  18      COULD EITHER TEST FOR SAMPLES ON A CARTRIDGE OR NOT TEST FOR

02:18PM  19      SAMPLES ON A CARTRIDGE.

02:18PM  20      Q.   AND WHAT WAS SPECIAL ABOUT THE DEMO APP AS OPPOSED TO THE

02:19PM  21      NORMAL SOFTWARE THAT WAS RUNNING WHEN THE ANALYZER WAS RUNNING

02:19PM  22      SAMPLES?

02:19PM  23      A.   THE DEMO APP, AS DISCUSSED IN THE EARLIER TESTIMONY, IT

02:19PM  24      SHIELDED ERRORS FROM THE VIEWER.

02:19PM  25      Q.   SO, IN OTHER WORDS, IF AN ERROR OCCURRED DURING A TEST

EDLIN REDIRECT BY MR. BOSTIC                                    4290

02:19PM   1    RUN, IT WOULD NOT BE APPARENT TO ANYONE WATCHING THE DEVICE; IS

02:19PM   2    THAT TRUE?

02:19PM   3    A.   YES.

02:19PM   4    Q.   WHAT IS YOUR UNDERSTANDING OF THE REASON WHY THE DEMO APP

02:19PM   5    WAS CREATED?

02:19PM   6    A.   THE DEMO APP -- I RECALL THAT THE DEMO APP WAS CREATED TO

02:19PM   7    ACCOUNT FOR A NUMBER OF DIFFERENT SCENARIOS THAT COULD

02:19PM   8    POTENTIALLY HAPPEN DURING A TECHNOLOGY DEMONSTRATION, AND AS WE

02:19PM   9    DISCUSSED EARLIER, IF A VISITOR OR A VIP DID NOT WANT TO DO A

02:19PM   10   BLOOD TEST, OR SIMPLY THE HARDWARE OF THE TECHNOLOGY WAS BEING

02:20PM   11   DEMONSTRATED, THE DEMO APP WOULD NOT SHOW, LET'S SAY, AN ERROR

02:20PM   12   IF AN ERROR HAD NOT, IN FACT, TAKEN PLACE BASED ON THE, ON THE

02:20PM   13   INTENT OF WHAT THE PERSON SHOWING IT WAS TRYING TO CONVEY.

02:20PM   14   Q.   SO THE DEMO APP WAS INTENDED FOR USE SPECIFICALLY IN

02:20PM   15   CONNECTION WITH TECHNOLOGY DEMONSTRATIONS AS FAR AS YOU KNEW?

02:20PM   16   A.   YES.

02:20PM   17   Q.   THE MEETINGS THAT WE HAVE BEEN DISCUSSING WHERE THE VIP'S

02:20PM   18   WOULD COME TO A CONFERENCE ROOM AT THERANOS FOR THE BEGINNING

02:20PM   19   OF THESE TECHNOLOGY DEMONSTRATIONS, WERE YOU GENERALLY PRESENT

02:20PM   20   FOR THOSE ENTIRE MEETINGS?

02:20PM   21   A.   UM, IT VARIED.

02:20PM   22   Q.   GENERALLY SPEAKING, WHAT PORTIONS OF THE MEETINGS WOULD

02:20PM   23   YOU BE PRESENT FOR?

02:20PM   24   A.   IT DEPENDED ON THE SUBJECT MATTER OF THE MEETING.  IN SOME

02:21PM   25   INSTANCES THERE COULD BE A SHORT MEETING AND SOME INSTANCE

EDLIN REDIRECT BY MR. BOSTIC                                          4291

02:21PM   1    WHERE THERE WAS JUST AN HOUR LONG MEETING AND THERE'S A

02:21PM   2    DEMONSTRATION, AND THAT WAS IT.

02:21PM   3        AND OTHER TIMES THERE WERE MULTI-HOUR LONG MEETINGS WITH,

02:21PM   4    YOU KNOW, DIFFERENT SESSIONS, AND I WOULD ATTEND ONE OF THOSE

02:21PM   5    SESSIONS AND THE DEMO.

02:21PM   6        IN SOME CASES I ONLY ATTENDED ONE OF THOSE PARTS.

02:21PM   7    Q.   WERE THERE MEETINGS BETWEEN MS. HOLMES AND INVESTORS WHERE

02:21PM   8    YOU WERE NOT PRESENT FOR THE ENTIRETY OF THE MEETING?

02:21PM   9    A.   YES.

02:21PM  10    Q.   DO YOU HAVE ANY FIRSTHAND KNOWLEDGE OF ANYTHING THAT

02:21PM  11    MS. HOLMES MIGHT HAVE SAID TO THOSE INVESTORS DURING THE

02:21PM  12    PORTIONS OF THE MEETINGS WHERE YOU WEREN'T PRESENT?

02:21PM  13    A.   NO.

02:21PM  14    Q.   LET'S TAKE A LOOK AT EXHIBIT 905, WHICH IS IN EVIDENCE.

02:22PM  15        MS. HOLLIMAN, COULD WE PROJECT THIS.

02:22PM  16        OKAY.  MR. EDLIN, DO YOU RECALL DISCUSSING THIS EMAIL

02:22PM  17    CHAIN WITH MR. DOWNEY?

02:22PM  18    A.   YES.

02:22PM  19    Q.   AND DO YOU RECALL, IN CONNECTION WITH THIS EMAIL, THERE

02:22PM  20    WAS A QUESTION ABOUT WHETHER ONE OF THE SUBJECTS HAD BEEN

02:22PM  21    FASTING OR NOT?

02:22PM  22    A.   YES.

02:22PM  23    Q.   AND DO YOU RECALL THERE WAS AN EMAIL WHERE MS. HOLMES SAID

02:23PM  24    THAT IT MIGHT BE A GOOD IDEA TO FLAG THAT INFORMATION IN THE

02:23PM  25    TEST?

4292

EDLIN REDIRECT BY MR. BOSTIC

02:23PM  1    A.   YES.

02:23PM  2    Q.   I'LL ASK YOU TO LOOK AT PAGE 4 OF THIS EXHIBIT.

02:23PM  3         AND LET'S ZOOM IN ON THE BOTTOM.

02:23PM  4         AND TOWARDS THE BOTTOM OF THE SCREEN DO YOU SEE THAT

02:23PM  5    THERE'S A RECOMMENDATION ABOUT REMOVING CERTAIN RESULTS FROM

02:23PM  6    THIS DEMO?

02:23PM  7    A.   YES.

02:23PM  8    Q.   DO YOU SEE THAT, FOR EXAMPLE, AT THE BOTTOM OF THE PAGE,

02:23PM  9    FOR SUBJECT M5, DANIEL YOUNG WAS RECOMMENDING REMOVING THE OUT

02:23PM 10    OF RANGE RESULTS FOR ALKALINE PHOSPHATASE AND CHLORIDE?

02:23PM 11    A.   YES.

02:23PM 12    Q.   AND LET'S LOOK AT THE NEXT PAGE, PAGE 5.

02:24PM 13         DO YOU SEE HERE THERE IS SOME MORE LANGUAGE ABOUT WHETHER

02:24PM 14    THE TSH VALUES FOR THREE OF THE SUBJECTS WERE RUNNING LOW, AND

02:24PM 15    THERE'S A RECOMMENDATION THAT ALL THREE OF THOSE RESULTS BE

02:24PM 16    REMOVED?

02:24PM 17    A.   YES.

02:24PM 18    Q.   LET'S ZOOM IN ON THE BOTTOM HALF OF THIS PAGE.

02:24PM 19         AND, MR. EDLIN, DO YOU SEE HERE AN EMAIL FROM YOU

02:24PM 20    REPORTING THAT OTHER RESULTS HAD BEEN REMOVED FROM THESE

02:24PM 21    REPORTS, INCLUDING CREATININE, VITAMIN D, TT4, TT3, AND FT4?

02:24PM 22    A.   YES.

02:24PM 23    Q.   AND MS. HOLMES WAS ON ALL OF THESE EMAILS RELATING TO THE

02:24PM 24    REMOVAL OF RESULTS FROM THE DEMO REPORTS; CORRECT?

02:25PM 25    A.   YES.

EDLIN REDIRECT BY MR. BOSTIC

02:25PM  1    Q.  LET'S LOOK AT EXHIBIT 860 AGAIN BRIEFLY.  THAT'S IN

02:25PM  2    EVIDENCE.

02:25PM  3        MS. HOLLIMAN, IF WE COULD DISPLAY THAT.

02:25PM  4        MR. EDLIN, DO YOU RECALL DISCUSSING THIS EMAIL CHAIN AND

02:25PM  5    THIS DEMO WITH MR. DOWNEY?

02:25PM  6    A.  YES.

02:25PM  7    Q.  DO YOU RECALL THAT IN CONNECTION WITH THIS DEMONSTRATION,

02:25PM  8    THERE WERE INCONSISTENT RESULTS OBTAINED EVEN THOUGH THE SAME

02:25PM  9    PATIENT GAVE A SAMPLE THAT WAS RUN ON THE SAME THERANOS

02:25PM 10    ANALYZER?

02:25PM 11    A.  YES.

02:25PM 12    Q.  AND DO YOU RECALL THAT IN THIS CASE SOME OF THOSE RESULTS

02:25PM 13    WERE REPORTED AND OTHERS WERE NOT?

02:25PM 14    A.  YES.

02:25PM 15    Q.  IN THIS CASE WERE THE CONFLICTING RESULTS, THE

02:26PM 16    INCONSISTENT RESULTS, ACTUALLY REPORTED BACK TO THE SUBJECT?

02:26PM 17    A.  I BELIEVE JUST ONE RESULT WAS REPORTED BACK.

02:26PM 18    Q.  OKAY.  YOU TESTIFIED ON CROSS-EXAMINATION ABOUT THE

02:26PM 19    PURPOSE, AS YOU UNDERSTOOD IT, OF THE TECHNOLOGY

02:26PM 20    DEMONSTRATIONS.

02:26PM 21        DO YOU REMEMBER THAT?

02:26PM 22    A.  YES.

02:26PM 23    Q.  YOU SAID THAT THE PURPOSE WAS NOT FOR CLINICAL USE.

02:26PM 24        WAS THAT YOUR UNDERSTANDING?

02:26PM 25    A.  YES.

                                                                          4294
EDLIN REDIRECT BY MR. BOSTIC

02:26PM   1    Q.   WHAT WAS THE PURPOSE OF THE TECHNOLOGY DEMONSTRATIONS?

02:26PM   2    A.   THE PURPOSE WAS TO SHOWCASE OR DEMONSTRATE THE THERANOS

02:26PM   3    TECHNOLOGY.  IN SOME CASES, TESTS WERE RUN; IN SOME CASES,

02:26PM   4    OTHERS WEREN'T RUN.

02:26PM   5         AND THEN GENERALLY TO SHOW THE FUNCTIONALITY OF THERANOS'S

02:26PM   6    TECHNOLOGY.

02:26PM   7    Q.   WAS PART OF THAT A DESIRE TO SHOW THAT THE TECHNOLOGY

02:26PM   8    PERFORMED WELL?

02:27PM   9    A.   YES.

02:27PM   10   Q.   IN CONNECTION WITH THE DEMO APP THAT WOULD HIDE ERRORS,

02:27PM   11   HOW IS THE PURPOSE OF SHOWING HOW WELL THE TECHNOLOGY WORKS

02:27PM   12   SERVED BY HIDING RECORDS DURING A DEMO, IF YOU KNOW?

02:27PM   13   A.   I DON'T KNOW.

02:27PM   14   Q.   HOW ABOUT THE PRACTICE OF WITHHOLDING INDIVIDUAL RESULTS

02:27PM   15   FROM DEMO REPORTS?

02:27PM   16        HOW IS THE GOAL OF SHOWING HOW WELL THE TECHNOLOGY WORKS

02:27PM   17   SERVED BY WITHHOLDING RESULTS?

02:27PM   18   A.   I DON'T KNOW.

02:27PM   19   Q.   FINALLY, HOW ABOUT WHEN THERE ARE INCONSISTENT RESULTS AND

02:27PM   20   THE RESULTS DON'T MATCH THE WAY THEY SHOULD, HOW IS THAT GOAL

02:27PM   21   OF SHOWING HOW WELL THE TECHNOLOGY WORKS SERVED BY NOT

02:27PM   22   DISCLOSING THOSE INCONSISTENCIES?

02:27PM   23   A.   WELL, I THINK IT RELIES ON THE INTERPRETATION BY EXPERTS

02:28PM   24   IN THE COMPANY FOR CERTAIN OF RESULTS.

02:28PM   25        SO THAT IS, THAT IS PART OF THE PROCESS OF DEMONSTRATING

EDLIN REDIRECT BY MR. BOSTIC                                    4295

02:28PM  1    THE TECHNOLOGY.

02:28PM  2    Q.   DO YOU THINK THAT SOMEONE WHO WAS THE AUDIENCE FOR ONE OF

02:28PM  3    THESE DEMONSTRATIONS MIGHT HAVE WANTED TO KNOW ABOUT

02:28PM  4    INCONSISTENT RESULTS THAT CAME BACK DURING USE OF THE THERANOS

02:28PM  5    TECHNOLOGY?

02:28PM  6    A.   I PERSONALLY DON'T KNOW.  I CAN'T SPEAK FOR THEM.

02:28PM  7    Q.   THE CASES THAT WE LOOKED AT WHERE RESULTS WERE REMOVED

02:28PM  8    FROM DEMO REPORTS, WAS IT EVER YOUR DISCUSSION TO REMOVE THOSE

02:28PM  9    RESULTS?

02:28PM  10   A.   NO.

02:28PM  11   Q.   WHEN THERE WERE INCONSISTENCIES AND SOME CONFLICTING

02:28PM  12   RESULTS WEREN'T REPORTED, WAS THAT YOUR DECISION?

02:28PM  13   A.   NO.

02:28PM  14   Q.   WHO HAD FINAL SAY OVER WHAT RESULTS WERE REPORTED IN

02:29PM  15   CONNECTION WITH THE DEMO?

02:29PM  16   A.   DANIEL DID AND ELIZABETH DID.

02:29PM  17   Q.   LET'S SHIFT GEARS AND TALK ABOUT THERANOS'S FDA APPROVAL

02:29PM  18   FOR HSV.

02:29PM  19        DO YOU RECALL DISCUSSING THAT?

02:29PM  20   A.   YES.

02:29PM  21   Q.   AND DO YOU RECALL THE DATE WHEN THAT APPROVAL CAME

02:29PM  22   THROUGH?

02:29PM  23   A.   I BELIEVE IT WAS JULY OF 2015.

02:29PM  24   Q.   WAS THAT THERANOS'S FIRST FDA APPROVAL FOR ONE OF ITS

02:29PM  25   ASSAYS AS FAR AS YOU KNOW?

EDLIN REDIRECT BY MR. BOSTIC                                    4296

02:29PM  1    A.   I DON'T KNOW FOR SURE.  I RECALL IT WAS THE FIRST FDA

02:29PM  2    APPROVAL FOR THE THERANOS SYSTEM.

02:29PM  3    Q.   ARE YOU AWARE OF ANY FDA APPROVALS FOR THERANOS SPECIFIC

02:29PM  4    TESTS BEFORE JULY 2015?

02:29PM  5    A.   I DON'T -- NOT THAT I RECALL.

02:30PM  6    Q.   HOW ABOUT AFTER THE HSV APPROVAL?  ARE YOU AWARE OF ANY

02:30PM  7    OTHER ASSAYS THAT WERE THERANOS SPECIFIC THAT THE FDA APPROVED?

02:30PM  8    A.   NO.

02:30PM  9    Q.   WHAT IS THE HSV ASSAY?

02:30PM  10   A.   A HERPES TEST.

02:30PM  11   Q.   AND WAS THE FDA'S APPROVAL, AS YOU UNDERSTOOD IT, LIMITED

02:30PM  12   TO THAT ONE ASSAY?

02:30PM  13   A.   YES.

02:30PM  14   Q.   LET'S LOOK AT EXHIBIT 7365.

02:30PM  15       MS. KRATZMANN, IF I COULD USE THE OVERHEAD AGAIN.  I

02:31PM  16   BELIEVE THIS IS ADMITTED, 7365.

02:31PM  17           THE CLERK:  YES.

02:31PM  18   BY MR. BOSTIC:

02:31PM  19   Q.   MR. EDLIN, DO YOU RECALL DISCUSSING THIS EMAIL CHAIN WITH

02:31PM  20   MR. DOWNEY?

02:31PM  21   A.   YES.

02:31PM  22   Q.   AND THIS EMAIL CHAIN DEALT WITH LANGUAGE ON THE WEBSITE

02:31PM  23   ABOUT VENOUS DRAWS; IS THAT RIGHT?

02:31PM  24   A.   YES.

02:31PM  25   Q.   AND ON THE SCREEN RIGHT NOW, DO YOU SEE AN EMAIL FROM

EDLIN REDIRECT BY MR. BOSTIC                                           4297

02:31PM   1      MS. HOLMES ON NOVEMBER 27TH, 2013?

02:31PM   2      A.   YES.

02:31PM   3      Q.   AND IN THIS EMAIL, I'D LIKE TO DRAW YOUR ATTENTION TO THE

02:31PM   4      LANGUAGE THAT SHE IS SUGGESTING FOR THE WEBSITE.

02:31PM   5           DO YOU SEE THAT?

02:31PM   6      A.   YES.

02:31PM   7      Q.   AND IT SAYS, "INSTEAD OF A BIG, INTIMIDATING NEEDLE, OUR

02:31PM   8      CERTIFIED PHLEBOTOMISTS CAN USE A TINY FINGER STICK OR A

02:31PM   9      MICRO-SAMPLE FROM A VENOUS DRAW.  OCCASIONALLY, A VENIPUNCTURE

02:32PM   10     MAY BE REQUIRED BASED ON THE LAB ORDER, BUT THIS IS UNCOMMON,

02:32PM   11     AND OUR AIM IS TO ELIMINATE THAT SCENARIO ENTIRELY."

02:32PM   12          DO YOU SEE THAT?

02:32PM   13     A.   YES.

02:32PM   14     Q.   AS PART OF YOUR WORK ON THE WALGREENS PROJECT, DID YOU

02:32PM   15     HAVE A SENSE OF HOW COMMON IT WAS FOR PATIENTS TO GET A VEIN

02:32PM   16     DRAW INSTEAD OF A FINGERSTICK?

02:32PM   17     A.   NOT EXACTLY.

02:32PM   18     Q.   WOULD YOU BE SURPRISED TO HEAR THAT APPROXIMATELY

02:32PM   19     40 PERCENT OF WALGREENS'S PATIENTS GOT VEIN DRAWS?

02:32PM   20     A.   NO.

02:32PM   21     Q.   IF SOMETHING HAPPENS 40 PERCENT OF THE TIME, WOULD YOU

02:32PM   22     CHARACTERIZE THAT AS SOMETHING THAT IS UNCOMMON?

02:32PM   23     A.   NO.

02:32PM   24     Q.   LET'S LOOK NEXT AT EXHIBIT 10468.  I BELIEVE THAT'S IN

02:33PM   25     EVIDENCE.

EDLIN REDIRECT BY MR. BOSTIC                                    4298

02:33PM   1          OKAY.  MR. EDLIN, DO YOU SEE 10468 ON THE SCREEN?

02:33PM   2     A.   YES.

02:33PM   3     Q.   THIS WAS A SITUATION WHERE MS. HOLMES WAS WEIGHING IN ON

02:33PM   4     CONTENT FOR THE WEBSITE; IS THAT RIGHT?

02:33PM   5     A.   YES.

02:33PM   6     Q.   WAS THIS TO BE THERANOS'S PUBLIC WEBSITE THAT WAS VIEWABLE

02:33PM   7     BY ANYONE?

02:33PM   8     A.   YES.

02:33PM   9     Q.   AND DID THE COMPANY HAVE AN ESTIMATE OF HOW MANY PEOPLE

02:33PM   10    WERE GOING TO BE VIEWING THE WEBSITE?

02:33PM   11    A.   I'M SURE THE BACK END DEVELOPERS COULD DETERMINE THAT.

02:33PM   12    Q.   WOULD YOU ANTICIPATE THAT IT WOULD BE IN THE MANY

02:34PM   13    THOUSANDS AT LEAST?

02:34PM   14    A.   POTENTIALLY.

02:34PM   15    Q.   DO YOU RECALL A DISCUSSION DURING DIRECT AND SOME

02:34PM   16    DOCUMENTS THAT WE LOOKED AT RELATING TO CLAIMS ABOUT SUPERIOR

02:34PM   17    ACCURACY IN THE WEBSITE LANGUAGE?

02:34PM   18    A.   YES.

02:34PM   19    Q.   AND DO YOU RECALL MS. HOLMES SAYING IN CONNECTION WITH

02:34PM   20    THAT THAT THERE SHOULD NOT BE SUPERIOR ACCURACY CLAIMS ON THE

02:34PM   21    WEBSITE?

02:34PM   22    A.   THERE WAS SOME NUANCE.  I THINK THERE WAS A COMMENT ABOUT

02:34PM   23    UNRIVALLED ACCURACY AND A COMMENT ABOUT THE IMPROPER

02:34PM   24    COMPARISON.

02:34PM   25    Q.   TO YOUR KNOWLEDGE, DID CLAIMS ABOUT UNRIVALLED OR SUPERIOR

EDLIN REDIRECT BY MR. BOSTIC                                      4299

02:34PM  1    ACCURACY END UP APPEARING ON THE THERANOS PUBLIC WEBSITE?

02:34PM  2    A.   I BELIEVE THEY DID.

02:34PM  3    Q.   HOW ABOUT IN THE INVESTOR PRESENTATIONS?

02:34PM  4         DO YOU RECALL REVIEWING A PRESENTATION THAT WAS SENT TO

02:35PM  5    RUPERT MURDOCH?

02:35PM  6    A.   YES.

02:35PM  7    Q.   AND DO YOU RECALL SEEING THE LANGUAGE ABOUT THERANOS'S

02:35PM  8    ACCURACY AND THE CLAIMS THAT THAT PRESENTATION CONTAINED?

02:35PM  9    A.   YES.

02:35PM  10   Q.   THE INVESTOR PRESENTATIONS, WHAT WAS THE AUDIENCE FOR

02:35PM  11   THOSE?  HOW MANY PEOPLE WERE EXPECTED TO VIEW THEM?

02:35PM  12   A.   I THINK THEY WERE MEANT FOR INDIVIDUALS.

02:35PM  13   Q.   DID THERANOS REQUEST THAT THOSE INDIVIDUALS NOT SHARE

02:35PM  14   THOSE PRESENTATIONS WITH OTHERS?

02:35PM  15   A.   I BELIEVE THAT THERE WAS COMMENTARY THAT THE INFORMATION

02:35PM  16   WAS CONSIDERED CONFIDENTIAL.

02:35PM  17   Q.   SO, IN OTHER WORDS, THOSE INVESTOR PRESENTATIONS WERE NOT

02:35PM  18   FOR WIDE DISSEMINATION TO THE PUBLIC; IS THAT CORRECT?

02:35PM  19   A.   CORRECT.

02:35PM  20   Q.   LET'S LOOK AT 10558, WHICH I BELIEVE IS IN EVIDENCE.

02:36PM  21        I'LL CIRCLE BACK TO THAT ONE WHEN I CAN FIND IT.

02:36PM  22        DO YOU RECALL A DISCUSSION WITH MR. DOWNEY ABOUT THE

02:36PM  23   CONTENT OF THE INVESTOR PRESENTATIONS?

02:36PM  24   A.   YES.

02:36PM  25   Q.   AND YOU TALKED ABOUT WHERE THAT CONTENT CAME FROM.

EDLIN REDIRECT BY MR. BOSTIC                                        4300

02:36PM   1          DO YOU RECALL THAT?

02:36PM   2     A.   YES.

02:36PM   3     Q.   AND YOU SAID THAT SOME OF THE CONTENT IN THOSE

02:36PM   4     PRESENTATIONS WERE SOURCED FROM VARIOUS INDIVIDUALS IN THE

02:36PM   5     COMPANY?

02:36PM   6     A.   YES.

02:36PM   7     Q.   DID YOU HAVE THE ULTIMATE RESPONSIBILITY OF DOING THE

02:37PM   8     FINAL REVIEW OF THOSE PRESENTATIONS AND MAKING SURE THAT EACH

02:37PM   9     CLAIM WAS ACCURATE?

02:37PM   10    A.   NO.

02:37PM   11    Q.   AND WHO DID THE FINAL REVIEW OF THOSE PRESENTATIONS?

02:37PM   12    A.   ELIZABETH.

02:37PM   13    Q.   LET ME SHOW YOU -- ACTUALLY, LET ME ASK YOU, DO YOU RECALL

02:37PM   14    WITH MR. DOWNEY REVIEWING A DOCUMENT WHERE MS. HOLMES CONVEYED

02:37PM   15    INPUT ON WEBSITE LANGUAGE AFTER A CONVERSATION WITH REGULATORY?

02:37PM   16    A.   YES.

02:37PM   17    Q.   AND WHO WOULD THAT REFER TO?  WHO WAS REGULATORY?

02:37PM   18    A.   I DON'T KNOW WHO SPECIFICALLY THAT REFERRED TO.  THERANOS

02:37PM   19    DID HAVE IN-HOUSE COUNSEL, AND I BELIEVE EXTERNAL COUNSEL THAT

02:37PM   20    ADVISED ON THOSE TYPES OF MATTERS.

02:37PM   21    Q.   SO, IN OTHER WORDS, MS. HOLMES'S DIRECTION ON THE WEBSITE

02:38PM   22    CONTENT WAS FOLLOWING A CONVERSATION THAT SHE HAD HAD WITH

02:38PM   23    LAWYERS; IS THAT RIGHT?

02:38PM   24    A.   CORRECT.

02:38PM   25    Q.   WAS IT -- TO YOUR KNOWLEDGE, WAS IT PART OF THE USUAL WORK

EDLIN REDIRECT BY MR. BOSTIC                                    4301

02:38PM   1    WITH INVESTOR PRESENTATIONS THAT EACH INVESTOR PRESENTATION

02:38PM   2    WOULD BE REVIEWED BY LAWYERS?

02:38PM   3    A.   I'M NOT AWARE THAT THAT HAPPENED.

02:38PM   4    Q.   LET ME SHOW YOU NEXT EXHIBIT 13979.

02:39PM   5         I BELIEVE THIS IS IN EVIDENCE.

02:39PM   6         MR. EDLIN, DO YOU REMEMBER REVIEWING EXHIBIT 13979 WITH

02:39PM   7    MR. DOWNEY?

02:39PM   8    A.   YES.

02:39PM   9    Q.   AND YOU TESTIFIED THAT THE ATTACHED SLIDE PRESENTATION WAS

02:39PM   10   IN CONNECTION WITH MEDIA TRAINING THAT MS. HOLMES RECEIVED; IS

02:39PM   11   THAT RIGHT?

02:39PM   12   A.   YES.

02:39PM   13   Q.   I'D LIKE TO ASK YOU ABOUT A SLIDE THAT MR. DOWNEY DIDN'T

02:39PM   14   SHOW YOU.

02:39PM   15        DO YOU SEE IN FRONT OF YOU A SLIDE IN THIS MEDIA TRAINING

02:39PM   16   PRESENTATION TITLED MASTER BLOCKING AND BRIDGING?

02:39PM   17   A.   YES.

02:39PM   18   Q.   AND THE CONTENT HERE SAYS, "BLOCKING IS DEFTLY AVOIDING AN

02:39PM   19   UNWELCOME OR UNPRODUCTIVE QUESTION."

02:39PM   20        DO YOU SEE THAT?

02:40PM   21   A.   YES.

02:40PM   22   Q.   AND BELOW THAT IT SAYS, "BRIDGING IS TAKING THE DISCUSSION

02:40PM   23   FROM UNPRODUCTIVE TO PRODUCTIVE TERRITORY AND GETTING BACK TO

02:40PM   24   WHAT YOU WANT TO SAY."

02:40PM   25        DO YOU SEE THAT?

EDLIN REDIRECT BY MR. BOSTIC                                    4302

02:40PM   1    A.   YES.

02:40PM   2    Q.   THIS PRESENTATION CONTINUES ON THIS SAME TOPIC ON THE NEXT

02:40PM   3    SLIDE.

02:40PM   4         DO YOU SEE THAT?

02:40PM   5    A.   YES.

02:40PM   6    Q.   AND THE QUESTION IS, "WHAT IS AN UNWELCOME QUESTION?"

02:40PM   7         AND THE LIST SAYS, "NEEDLESSLY CONTROVERSIAL."

02:40PM   8         THE SECOND ITEM, "ASKS ABOUT SOMETHING YOU CANNOT OR DO

02:40PM   9    NOT WISH TO DISCLOSE."

02:40PM  10         DO YOU SEE THAT?

02:40PM  11    A.   YES.

02:40PM  12    Q.   AND THEN THE NEXT SLIDE ON THE SAME TOPIC SAYS, "HOW DO

02:40PM  13    YOU BLOCK AND BRIDGE?"

02:40PM  14         DO YOU SEE THAT?

02:40PM  15    A.   YES.

02:40PM  16    Q.   IT READS, "EITHER EXPLAIN WHY YOU CAN'T ANSWER OR RESPOND

02:40PM  17    TO THE DIRECT QUESTION QUICKLY AND MOVE ON."

02:40PM  18         IT SAYS, "AVOID 'NO COMMENT.'"

02:40PM  19         DO YOU SEE THAT?

02:40PM  20    A.   YES.

02:40PM  21    Q.   AND THE NEXT IS, "REFRAME THE QUESTION TO ONE YOU'D PREFER

02:41PM  22    TO ANSWER AND BRIDGE TO IT."

02:41PM  23         DO YOU SEE THAT?

02:41PM  24    A.   YES.

02:41PM  25    Q.   AND AT THE BOTTOM IT SAYS, "ONLY BLOCK A QUESTION WHEN

EDLIN REDIRECT BY MR. BOSTIC                                    4303

02:41PM  1    THERE IS GOOD REASON TO DO SO."

02:41PM  2         DO YOU SEE THAT?

02:41PM  3    A.   YES.

02:41PM  4    Q.   AND YOU WERE PRESENT AT THIS MEDIA TRAINING; IS THAT

02:41PM  5    RIGHT?

02:41PM  6    A.   YES.

02:41PM  7    Q.   AND THIS WAS PUT ON BY AN AGENCY CALLED GROW MARKETING; IS

02:41PM  8    THAT CORRECT?

02:41PM  9    A.   YES.

02:41PM  10   Q.   DURING THAT TRAINING, DID THE INDIVIDUALS FROM GROW GIVE

02:41PM  11   MS. HOLMES DIRECTION ON WHICH TOPICS TO USE THIS TECHNIQUE ON?

02:41PM  12   A.   I DON'T REMEMBER.

02:41PM  13   Q.   GENERALLY SPEAKING AT THERANOS, WHOSE DECISION WAS IT WHAT

02:41PM  14   INFORMATION WOULD BE DISCLOSED TO THE PUBLIC OR THE PRESS?

02:41PM  15   A.   IN MY EXPERIENCE, ELIZABETH WAS THE ONLY PERSON WHO

02:42PM  16   COMMUNICATED DIRECTLY WITH THE PRESS, SO --

02:42PM  17   Q.   AND IN YOUR EXPERIENCE, DID ANYONE ELSE MAKE DECISIONS

02:42PM  18   ABOUT WHAT SHE WAS ALLOWED TO SAY TO THE PRESS AND WHAT SHE WAS

02:42PM  19   NOT ALLOWED TO SAY?

02:42PM  20   A.   I DON'T KNOW IF SHE CONSULTED WITH ANYONE ABOUT THAT,

02:42PM  21   THAT -- THOSE DECISIONS.

02:42PM  22        MR. BOSTIC:  A MOMENT, YOUR HONOR?

02:42PM  23        (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

02:42PM  24   BY MR. BOSTIC:

02:42PM  25   Q.   FINALLY, MR. EDLIN, THERE WAS DISCUSSIONS ABOUT ACTIVITIES

EDLIN REDIRECT BY MR. BOSTIC                                              4304

02:42PM 1    AT THE COMPANY IN 2016.

02:42PM 2        DO YOU REMEMBER DISCUSSING THAT WITH MR. DOWNEY?

02:42PM 3    A.   YES.

02:42PM 4    Q.   REMIND US WHEN YOU DECIDED TO LEAVE THERANOS.

02:42PM 5    A.   DECEMBER OF 2016.

02:42PM 6    Q.   AND YOU MENTIONED THAT PART OF YOUR REASON TO LEAVE WAS

02:43PM 7    ABOUT THE DESIRE TO ATTEND BUSINESS SCHOOL?

02:43PM 8    A.   YES.

02:43PM 9    Q.   AND WERE THERE ALSO THINGS ABOUT THERANOS, OR THINGS THAT

02:43PM 10   YOU UNDERSTOOD, THAT CAUSED YOU TO NO LONGER WANT TO WORK

02:43PM 11   THERE?

02:43PM 12   A.   YES.

02:43PM 13   Q.   CAN YOU SUMMARIZE THOSE FOR US?

02:43PM 14   A.   WELL, IN THE YEAR AFTER THE INITIAL "WALL STREET JOURNAL"

02:43PM 15   ARTICLES CAME OUT, THE COMPANY CLAIMED THAT IT WOULD BE ABLE TO

02:43PM 16   PROVE THAT THE TECHNOLOGY WORKED AND PROVE THAT THOSE CLAIMS

02:43PM 17   WERE NOT TRUE, AND THE COMPANY WAS UNABLE TO CONVINCE ANYONE

02:43PM 18   THAT THOSE CLAIMS WERE UNTRUE AND THAT ITS TECHNOLOGY AND

02:43PM 19   SCIENCE WORKED, AND THAT GAVE ME SERIOUS DOUBTS AS TO WHETHER

02:43PM 20   THE COMPANY WAS CAPABLE OF PROVING THAT THE TECHNOLOGY WORKED.

02:43PM 21       AND THERE WERE A NUMBER OF DIFFERENT OPPORTUNITIES THAT

02:44PM 22   THE COMPANY HAD TO PROVE ITSELF, AND THEY ALL WERE

02:44PM 23   UNSUCCESSFUL.

02:44PM 24       AND I ULTIMATELY REACHED THE CONCLUSION THAT THOSE

02:44PM 25   ATTEMPTS WERE UNSUCCESSFUL BECAUSE THEY COULDN'T HAPPEN AND

EDLIN RECROSS BY MR. DOWNEY                                          4305

02:44PM   1      THEY WERE NEVER GOING TO HAPPEN.

02:44PM   2      Q.   THANK YOU, MR. EDLIN.

02:44PM   3           NO FURTHER QUESTIONS, YOUR HONOR.

02:44PM   4              THE COURT:   MR. DOWNEY.

02:44PM   5              MR. DOWNEY:   JUST SOME BRIEF QUESTIONS, YOUR HONOR.

02:44PM   6                        **RECROSS-EXAMINATION**

02:44PM   7      BY MR. DOWNEY:

02:45PM   8      Q.   MR. EDLIN, I JUST HAVE A FEW QUESTIONS.

02:45PM   9           FIRST, LET ME ASK YOU ABOUT YOUR EXCHANGE WITH MR. BOSTIC

02:45PM  10      ON THE AFRICOM SITUATION.

02:45PM  11           DO YOU RECALL MR. BOSTIC ASKING YOU ABOUT THE GENERATION

02:45PM  12      OF ARTIFICIAL DATA IN CONNECTION WITH THAT PROGRAM?

02:45PM  13      A.   YES.

02:45PM  14      Q.   AND THE DECISION TO HAVE THE DATA GENERATED BE ARTIFICIAL

02:45PM  15      WAS A DECISION OF DR. GIVENS; CORRECT?

02:45PM  16      A.   I BELIEVE IT WAS A JOINT DECISION.

02:45PM  17      Q.   AND IF YOU RECALL OUR DISCUSSION ON CROSS-EXAMINATION,

02:45PM  18      DR. GIVENS CONTACTED THERANOS IN LATE APRIL 2012 TO TALK ABOUT

02:45PM  19      A POTENTIAL PROGRAM; CORRECT?

02:45PM  20      A.   YES.

02:45PM  21      Q.   AND BY EARLY JUNE, YOU AND DR. GIVENS WERE EXCHANGING

02:45PM  22      EMAILS ABOUT THAT EXPERIMENT; CORRECT?

02:45PM  23      A.   YES.

02:45PM  24      Q.   AND LATER THAT MONTH, A THERANOS DEVICE WAS SENT TO

02:46PM  25      DR. GIVENS IN AFRICA TO CONDUCT THAT EXPERIMENT; CORRECT?

EDLIN RECROSS BY MR. DOWNEY                                           4306

02:46PM   1     A.   I'M NOT SURE EXACTLY WHEN IT WAS SENT.

02:46PM   2     Q.   LET ME ASK YOU TO JUST LOOK AT THE EXHIBIT THAT IS MARKED

02:46PM   3     AS 13993, WHICH WE WERE LOOKING AT ON YOUR REDIRECT.

02:46PM   4          IF YOU LOOK AT THE EMAIL ON THE BOTTOM OF THE FIRST PAGE,

02:46PM   5     DOES THAT REFRESH YOUR RECOLLECTION THAT YOU WERE SETTING UP

02:46PM   6     THE THERANOS DEMONSTRATION IN EARLY JUNE?

02:46PM   7     A.   YES.

02:46PM   8     Q.   SO THAT WAS JUST ABOUT 45 DAYS LATER AFTER YOU HAD

02:46PM   9     INITIATED THESE CONVERSATIONS; CORRECT?

02:46PM  10     A.   RIGHT.

02:46PM  11     Q.   AND ONE OF THE THOUGHTS THAT THERANOS AND DR. GIVENS HAD

02:47PM  12     AS TO WHY THE DATA WOULD BE ARTIFICIAL WAS TO AVOID THE

02:47PM  13     COMPLICATED APPROVAL REQUIREMENTS THAT WOULD BE IMPOSED ON THE

02:47PM  14     EXPERIMENT IF HUMAN SAMPLES WERE INVOLVED; CORRECT?

02:47PM  15     A.   I BELIEVE SO.

02:47PM  16     Q.   OKAY.  LET ME ASK YOU TO LOOK AT THE EMAIL THAT MR. BOSTIC

02:47PM  17     SHOWED YOU THAT IS THE CARRY-OVER EMAIL FROM PAGE 1 TO 2.

02:47PM  18          IF YOU LOOK AT YOUR EMAIL -- SORRY, DR. GIVENS'S EMAIL TO

02:47PM  19     YOU, SHE'S PROVIDING SOME DETAIL TO YOU ABOUT TRANSPORT OF THE

02:47PM  20     EQUIPMENT AND SO FORTH.

02:47PM  21          DO YOU SEE THAT?  DO YOU RECALL THAT?

02:47PM  22     A.   YES.

02:47PM  23     Q.   AND IF YOU GO TO THE EMAIL ON THE SECOND PAGE FROM YOU TO

02:47PM  24     DR. GIVENS, SHE'S RESPONDING IN THAT FIRST EMAIL TO QUESTIONS

02:47PM  25     YOU ASKED ABOUT HOW THE EQUIPMENT WOULD BE TRANSPORTED.

EDLIN RECROSS BY MR. DOWNEY                                        4307

02:48PM    1           DO YOU SEE THAT?

02:48PM    2      A.   YES.

02:48PM    3      Q.   OKAY.  AND IF YOU GO ALMOST ALL OF THE WAY TO THE BOTTOM

02:48PM    4      OF YOUR EMAIL, THE SECOND TO THE LAST BULLET POINT SAYS, "HOW

02:48PM    5      WILL THE DEVICE BE TRANSPORTED IN THE FIELD?"

02:48PM    6           DO YOU SEE THAT?

02:48PM    7      A.   YES.

02:48PM    8      Q.   AND YOU ASK, "DO YOU PLAN ON KEEPING THE DEVICE IN ITS

02:48PM    9      PACKAGING IN BETWEEN USE?"

02:48PM   10           DO YOU SEE THAT?

02:48PM   11      A.   YES.

02:48PM   12      Q.   AND IF YOU GO BACK TO HER RESPONSE ON THE CARRY-OVER

02:48PM   13      PARAGRAPH, YOU SEE THAT SHE TALKS AT THE END OF THE PARAGRAPH

02:48PM   14      BEGINNING, "I INTEND TO PLUG."

02:48PM   15           DO YOU SEE THAT?

02:48PM   16      A.   YES.

02:48PM   17      Q.   AND SHE TALKS ABOUT HOW THE DEVICE WILL BE TRANSPORTED;

02:48PM   18      CORRECT?

02:48PM   19      A.   YES.

02:48PM   20      Q.   AND SHE TALKS THEN ABOUT HOW THE DEVICE WILL BE

02:48PM   21      TRANSPORTED WHEN IT'S IN AFRICA; CORRECT?

02:48PM   22      A.   YES.

02:48PM   23      Q.   AND THE -- DO YOU SEE THE SENTENCE WHERE SHE SAYS, "WHEN

02:48PM   24      WE FLY THE EQUIPMENT FROM UGANDA IT WILL BE ON A

02:49PM   25      NON-PRESSURIZED AIRCRAFT AT ALTITUDES OF LESS THAN

EDLIN RECROSS BY MR. DOWNEY                                    4308

02:49PM  1    10,000 FEET."

02:49PM  2         DO YOU SEE THAT?

02:49PM  3    A.   YES.

02:49PM  4    Q.   AND SO THAT IS A DESCRIPTION OF THE TRANSPORT OF THE

02:49PM  5    DEVICE BETWEEN UGANDA AND CAMEROON AND SOUTH SUDAN; CORRECT?

02:49PM  6    A.   UM, I'M NOT SURE EXACTLY WHERE IT WENT FROM UGANDA, BUT

02:49PM  7    THOSE WERE OTHER GEOGRAPHIES THAT LIEUTENANT COLONEL GIVENS

02:49PM  8    REFERENCED.

02:49PM  9    Q.   OKAY.  WELL, SHE REFERENCED TRAVELLING ON NON-PRESSURIZED

02:49PM  10   AIRCRAFT.  SHE'S TALKING ABOUT TRAVEL WITHIN AFRICA; CORRECT?

02:49PM  11   A.   I BELIEVE SO.

02:49PM  12   Q.   AND DO YOU KNOW WHAT NON-PRESSURIZED AIRCRAFT THE DEVICE

02:49PM  13   WAS TRANSPORTED ON?

02:49PM  14   A.   I DON'T KNOW.

02:49PM  15   Q.   OKAY.  BUT YOU KNOW THAT THIS EXPERIMENT DID EVALUATE THE

02:50PM  16   DEVICE FLYING AT ALTITUDES LESS THAN 10,000 FEET; CORRECT?

02:50PM  17   A.   CAN YOU REPEAT THE QUESTION?

02:50PM  18   Q.   YOU KNOW THAT THIS EXPERIMENT EVALUATED THE DEVICE WHILE

02:50PM  19   FLYING AT ALTITUDES OF LESS THAN 10,000 FEET; CORRECT?

02:50PM  20   A.   THIS STATEMENT MENTIONS THAT IT WOULD TRAVEL THERE, BUT

02:50PM  21   I'M NOT SURE IF IT WAS EVALUATED IN THAT TIME.

02:50PM  22   Q.   OKAY.  BUT SHE REPORTED AT THE END OF THE TRIP THAT THE

02:50PM  23   DEVICE FUNCTIONED WELL; CORRECT?

02:50PM  24   A.   YES.

02:50PM  25   Q.   OKAY.  SO SHE DIDN'T REPORT ANY DAMAGE AS A RESULT OF THAT

EDLIN RECROSS BY MR. DOWNEY

02:50PM 1    TRAVEL; CORRECT?

02:50PM 2    A.    CORRECT.

02:50PM 3    Q.    OKAY.  AND MR. BOSTIC ASKED YOU ABOUT HOW THE DEVICE WAS

02:50PM 4    POWERED.

02:50PM 5        DO YOU SEE THAT?

02:50PM 6    A.    YES.

02:50PM 7    Q.    AND IF YOU GO TO THE DISCUSSION JUST ABOVE WHERE THE

02:50PM 8    AIRCRAFT IS DISCUSSED, SHE PROVIDES SOME INFORMATION ABOUT HOW

02:50PM 9    POWER WOULD BE GENERATED AT THE LOCATIONS IN AFRICA.

02:51PM 10       DO YOU SEE THAT?

02:51PM 11   A.    YES.

02:51PM 12   Q.    AND SHE INDICATES THAT FOR SOME TIME IT WILL BE -- SHE'LL

02:51PM 13   BE IN A LOCATION WHERE THERE IS POWER; CORRECT?

02:51PM 14   A.    CORRECT.

02:51PM 15   Q.    BUT FOR THE REMAINDER OF THAT TIME, THE DEVICE WOULD BE

02:51PM 16   OPERATED ON GENERATOR POWER.

02:51PM 17       DO YOU SEE THAT?

02:51PM 18   A.    YES.

02:51PM 19   Q.    AND DO YOU KNOW WHAT OPERATIONS THE UNITED STATES HAS IN

02:51PM 20   UGANDA AND CAMEROON AND SOUTH SUDAN?

02:51PM 21   A.    NOT SPECIFICALLY.

02:51PM 22   Q.    LET ME ASK YOU TO LOOK AT EXHIBIT 13979.

02:51PM 23       THIS IS THE POWERPOINT PRESENTATION PROVIDED BY GROW

02:52PM 24   MARKETING TO THERANOS.

02:52PM 25       DO YOU SEE THAT?

EDLIN RECROSS BY MR. DOWNEY                                    4310

02:52PM  1    A.   YES.

02:52PM  2    Q.   AND MR. BOSTIC REVIEWED SEVERAL OF THE SLIDES IN THAT

02:52PM  3    PRESENTATION WITH YOU?

02:52PM  4    A.   CORRECT.

02:52PM  5    Q.   AND THE ADVICE THAT WAS BEING CONVEYED IN THOSE SLIDES WAS

02:52PM  6    BEING CONVEYED BY GROW MEDIA TO THERANOS IN CONNECTION WITH

02:52PM  7    THAT MEDIA TRAINING; CORRECT?

02:52PM  8    A.   CORRECT.

02:52PM  9    Q.   YOU TALKED WITH MR. BOSTIC FOR A FEW MOMENTS ABOUT

02:52PM  10   DEMONSTRATIONS ON YOUR REDIRECT.

02:52PM  11        DO YOU REMEMBER THAT?

02:52PM  12   A.   YES.

02:52PM  13   Q.   AND YOU INDICATED -- YOU USE THE PHRASE THAT SAID, AGAIN,

02:52PM  14   AS YOU HAD ON YOUR DIRECT, THAT THE DEMO APP WOULD HIDE ERRORS;

02:52PM  15   CORRECT?

02:52PM  16   A.   CORRECT.

02:52PM  17   Q.   BUT THAT WAS FOR THE REASON THAT WE DISCUSSED ON YOUR

02:52PM  18   CROSS-EXAMINATION; CORRECT?

02:52PM  19   A.   CAN YOU REPEAT THE QUESTION?

02:52PM  20   Q.   SURE.  LET ME BE MORE SPECIFIC.

02:52PM  21        IN CERTAIN SETTINGS, THERE MIGHT BE AN ERROR IN CONNECTION

02:52PM  22   WITH OPERATION OF THE DEVICE BECAUSE THERE WAS, FOR EXAMPLE, NO

02:53PM  23   BLOOD SAMPLE IN THE DEVICE; CORRECT?

02:53PM  24   A.   CORRECT.

02:53PM  25   Q.   AND WITH THE DEMO APP, SOMEBODY GETTING A DEMONSTRATION

EDLIN RECROSS BY MR. DOWNEY

02:53PM 1    COULD STILL SEE THE USER INTERFACE OPERATING; CORRECT?

02:53PM 2    A.   YES.

02:53PM 3    Q.   AND YOU DID NOT, AS YOU OBSERVED ALL OF THAT, THINK THERE

02:53PM 4    WAS ANYTHING DECEPTIVE ABOUT IT; CORRECT?

02:53PM 5    A.   I DID NOT.

02:53PM 6    Q.   AND YOU GOT ADVICE FROM MR. CRAIG, DR. YOUNG, OTHERS ABOUT

02:53PM 7    WHICH APP WOULD BE APPROPRIATE FOR WHICH DEMONSTRATION;

02:53PM 8    CORRECT?

02:53PM 9    A.   YES.

02:53PM 10   Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 905.

02:53PM 11        YOUR HONOR, MAY I JUST RETRIEVE THAT FROM MY DESK?

02:53PM 12            THE COURT:  YES, YES, OF COURSE.

02:53PM 13   BY MR. DOWNEY:

02:54PM 14   Q.   AND I'M GOING TO ASK YOU TO LOOK IN EXHIBIT 905 AT PAGE 5

02:54PM 15   OF THE EXHIBIT.

02:54PM 16        DO YOU SEE THAT?

02:54PM 17   A.   YES.

02:54PM 18   Q.   NOW, THIS IS A DOCUMENT THAT MR. BOSTIC JUST REVIEWED WITH

02:54PM 19   YOU AND TALKED ABOUT THE REMOVAL OF RESULTS; CORRECT?

02:54PM 20   A.   YES.

02:54PM 21   Q.   IF YOU LOOK AT THE EMAIL THAT YOU SENT IN THE MIDDLE OF

02:54PM 22   THIS PAGE, DO YOU SEE THAT IT INDICATES UNDER "PLEASE NOTE THE

02:54PM 23   FOLLOWING," THE REMOVAL OF CERTAIN RESULTS?

02:54PM 24   A.   YES.

02:54PM 25   Q.   AND IN THE FIRST INSTANCE IT TALKS ABOUT A RESULT BEING

EDLIN RECROSS BY MR. DOWNEY                                    4312

02:54PM  1    REMOVED "PER PAUL'S SUGGESTION."

02:54PM  2         DO YOU SEE THAT?

02:54PM  3    A.   YES.

02:54PM  4    Q.   AND WHO DOES THAT REFER TO?

02:54PM  5    A.   THAT REFERS TO PAUL PATEL.

02:54PM  6    Q.   AND WHO WAS PAUL PATEL?

02:55PM  7    A.   HE WAS THE HEAD OF ONE OF THE ASSAY TEAMS.

02:55PM  8    Q.   OKAY.  AND IT WAS HIS SUGGESTION THAT RESULTS BE REMOVED

02:55PM  9    IN CONNECTION WITH THIS REPORT?

02:55PM 10    A.   YES.

02:55PM 11    Q.   LET ME ASK YOU ABOUT THE DIALOGUE THAT YOU HAD WITH

02:55PM 12    MR. BOSTIC AT THE END OF YOUR EXAMINATION.

02:55PM 13         DO YOU RECALL ON CROSS-EXAMINATION WE LOOKED AT AN EMAIL

02:55PM 14    BETWEEN YOU AND DR. ROBERTSON AND THE TECHNOLOGY ADVISORY

02:55PM 15    BOARD?

02:55PM 16    A.   YES.

02:55PM 17    Q.   HOW LONG WAS THAT EMAIL SENT BEFORE YOU DEPARTED FROM THE

02:55PM 18    COMPANY?

02:55PM 19    A.   ABOUT TEN DAYS.

02:55PM 20    Q.   AND HAD THE TECHNOLOGY ADVISORY BOARD BEGUN ITS WORK AT

02:55PM 21    THAT POINT?

02:55PM 22    A.   UM, I BELIEVE IT HAD, IT HAD FORMED OR IT WAS FORMING.

02:55PM 23    Q.   OKAY.  AND AGAIN, THE POINT OF THAT BOARD WAS TO EVALUATE

02:55PM 24    AND ADVISE ON THE COMPANY'S TECHNOLOGY; CORRECT?

02:55PM 25    A.   YES.

EDLIN RECROSS BY MR. DOWNEY                                    4313

02:55PM  1    Q.   OKAY.  AND YOU ASSISTED WITH ITS FORMATION; CORRECT?

02:55PM  2    A.   YES.

02:56PM  3    Q.   AND YOU DID THAT IN PART TO ASSIST THE COMPANY IN

02:56PM  4    ADDRESSING CONCERNS THAT HAD BEEN RAISED ABOUT THE TECHNOLOGY;

02:56PM  5    CORRECT?

02:56PM  6    A.   YES.

02:56PM  7    Q.   OKAY.  I HAVE NOTHING FURTHER.

02:56PM  8         THANK YOU, MR. EDLIN.

02:56PM  9              THE COURT:  MR. BOSTIC?

02:56PM 10              MR. BOSTIC:  NOTHING FURTHER, YOUR HONOR.

02:56PM 11              THE COURT:  MAY THIS WITNESS BE EXCUSED?

02:56PM 12              MR. BOSTIC:  YES, YOUR HONOR.

02:56PM 13              MR. DOWNEY:  YES, YOUR HONOR.

02:56PM 14              THE COURT:  ALL RIGHT.  THANK YOU, SIR.  YOU MAY BE

02:56PM 15    EXCUSED.  YOU CAN JUST LEAVE THE BINDERS THERE.

02:56PM 16         AND I THINK WE'VE EXHAUSTED OUR DAY TODAY, LADIES AND

02:56PM 17    GENTLEMEN.

02:56PM 18         WE'LL TAKE OUR RECESS NOW.

02:56PM 19         LET ME ASK YOU TO CONTINUE TO BE VIGILANT ON THE

02:56PM 20    ADMONITION.  DO NOT DO ANY INVESTIGATION, DO NOT READ OR

02:56PM 21    OTHERWISE TRY TO LEARN ANYTHING ABOUT THIS CASE OUTSIDE OF THE

02:56PM 22    COURTROOM, AND DO NOT FORM ANY OPINION ABOUT THIS CASE.

02:56PM 23         I'LL ASK YOU TOMORROW MORNING AGAIN WHETHER ANY OF THOSE

02:56PM 24    THINGS HAVE OCCURRED.

02:56PM 25         WE'RE NOT IN SESSION TOMORROW, THURSDAY.  WE WILL BE IN

4314

| | | |
|---|---|---|
| 02:56PM | 1 | SESSION FRIDAY, AND I'M HOPING WE CAN GO UNTIL 4:00 O'CLOCK |
| 02:57PM | 2 | FRIDAY. |
| 02:57PM | 3 | ANY OBJECTIONS TO THAT?  ANY PROBLEMS WITH THAT? |
| 02:57PM | 4 | I SEE NO HANDS.  THANK YOU.  THANK YOU FOR YOUR GENEROSITY |
| 02:57PM | 5 | WITH YOUR TIME.  I APPRECIATE IT. |
| 02:57PM | 6 | I'M GOING TO PROBABLY, AS WE GO FORWARD, GOING TO CONTINUE |
| 02:57PM | 7 | TO ASK YOU ABOUT EXTENDING.  AND ACTUALLY NOW LET ME SUGGEST |
| 02:57PM | 8 | THAT IT MIGHT BE 3:00 O'CLOCK WOULD BE OUR STANDARD TIME TO |
| 02:57PM | 9 | BREAK, AND I'D LIKE YOU TO THINK ABOUT THAT.  IF WE CAN DO THAT |
| 02:57PM | 10 | INSTEAD OF THE 2:00 O'CLOCK TIME? |
| 02:57PM | 11 | I FEEL GUILTY.  I FEEL LIKE I'VE KIND OF MORPHED YOU INTO |
| 02:57PM | 12 | THAT, HAVEN'T I?  AND NOW I'M SLOWLY STEPPING UP TO 4:00 |
| 02:57PM | 13 | O'CLOCK. |
| 02:57PM | 14 | BUT LET'S SEE WHERE THIS TAKES US.  I APPRECIATE YOUR |
| 02:57PM | 15 | CONSIDERATION. |
| 02:57PM | 16 | HAVE A GOOD EVENING.  WE'LL SEE YOU FRIDAY. |
| 02:57PM | 17 | THANK YOU. |
| 02:58PM | 18 | (JURY OUT AT 2:58 P.M.) |
| 02:58PM | 19 | THE COURT:  PLEASE BE SEATED.  THANK YOU. |
| 02:58PM | 20 | THE RECORD SHOULD REFLECT THAT THE JURY HAS LEFT, THE |
| 02:58PM | 21 | WITNESS, MR. EDLIN, HAS BEEN EXCUSED.  HE IS GONE. |
| 02:58PM | 22 | THE GOVERNMENT WILL HAVE A WITNESS ON FRIDAY, I TAKE IT? |
| 02:58PM | 23 | MR. LEACH:  YES, YOUR HONOR. |
| 02:58PM | 24 | THE COURT:  AND IS THAT THE WITNESS WE DISCUSSED, |
| 02:58PM | 25 | WEBER? |

| | | |
|---|---|---|
| 02:58PM | 1 | MR. LEACH:  WE HAVEN'T HAD A CHANCE TO DEBRIEF ABOUT |
| 02:58PM | 2 | THAT, BUT I ANTICIPATE -- |
| 02:58PM | 3 | THE COURT:  YOU WILL HAVE A WITNESS? |
| 02:58PM | 4 | MR. LEACH:  -- WE WILL HAVE MORE THAN ONE WITNESS. |
| 02:58PM | 5 | THE COURT:  OKAY. |
| 02:58PM | 6 | MR. LEACH:  AND I ANTICIPATE MR. WEBER. |
| 02:58PM | 7 | THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH. |
| 02:58PM | 8 | ANYTHING FROM YOUR SIDE? |
| 02:58PM | 9 | MR. DOWNEY:  NOTHING FROM OUR SIDE. |
| 02:58PM | 10 | THE COURT:  OKAY.  THANK YOU. |
| 02:58PM | 11 | I DO WANT TO INDICATE THAT AT THE BREAK -- THIS IS IN |
| 02:58PM | 12 | REGARDS TO THE TYPING AND THE NOISE ISSUE -- MS. KRATZMANN |
| 02:58PM | 13 | SPOKE WITH THE JURORS.  THE JURORS REPRESENTED THAT IT WAS |
| 02:58PM | 14 | BETTER REGARDING THE TYPING ISSUE. |
| 02:58PM | 15 | THEY, OF COURSE, DID NOT KNOW ANYTHING ABOUT THE COMMENTS |
| 02:59PM | 16 | THAT I MADE, BUT THEY DID REPORT THAT THE ISSUE WAS BETTER. |
| 02:59PM | 17 | I UNDERSTAND, THOUGH -- AND I DON'T KNOW IF YOU'VE |
| 02:59PM | 18 | NOTICED, YOUR BACKS HAVE BEEN TO THE DOOR -- BUT WE HAVE HAD A |
| 02:59PM | 19 | MARSHAL'S REPRESENTATIVE COME IN. |
| 02:59PM | 20 | I'LL CONTINUE TO DO THAT AND HAVE HE OR SHE COME IN JUST |
| 02:59PM | 21 | TO MONITOR THIS. |
| 02:59PM | 22 | AND THOSE OF YOU WHO ARE TYPING, I RESPECT AND APPRECIATE |
| 02:59PM | 23 | THE FACT THAT YOU'RE COMING TO YOUR COURT, YOUR PUBLIC COURT, |
| 02:59PM | 24 | THIS IS OPEN TO THE PUBLIC AND YOU HAVE AN OPEN INVITATION TO |
| 02:59PM | 25 | VISIT YOUR COURT AND TO SEE YOUR SYSTEM OF JUSTICE IN |

| | | |
|---|---|---|
| 02:59PM | 1 | OPERATION. |
| 02:59PM | 2 | THE ONLY THING I DO ASK, AS I'VE SAID EARLIER THIS |
| 02:59PM | 3 | AFTERNOON TO THOSE OF YOU WHO WERE HERE, IS TO PLEASE RESPECT |
| 02:59PM | 4 | THE DECORUM AND THE IMPORTANCE OF THE ISSUES THAT ARE BEING |
| 02:59PM | 5 | LITIGATED HERE, AND TO DO THAT, AS YOU KNOW IF YOU LOOK AT OUR |
| 02:59PM | 6 | WEBSITE REGARDING THIS CASE, WE HAVE PERMITTED, I HAVE |
| 02:59PM | 7 | PERMITTED TYPING DEVICES TO COME IN THE COURTROOM, BUT I'VE |
| 03:00PM | 8 | REQUESTED THAT YOU HAVE A SILENT KEYBOARD.  THOSE WOULD BE |
| 03:00PM | 9 | PERMITTED.  AND I UNDERSTAND THOSE ARE MARKETED AND AVAILABLE. |
| 03:00PM | 10 | IF YOU DON'T HAVE ONE OF THOSE OR IF YOU'RE UNABLE TO |
| 03:00PM | 11 | MANIPULATE YOUR KEYBOARD IN SUCH A WAY THAT IT CAN'T BE SILENT, |
| 03:00PM | 12 | THEN I'M GOING TO NOT ASK YOU TO NOT COME TO THE COURTROOM, OR |
| 03:00PM | 13 | COURTHOUSE, BUT AS I SAID BEFORE, SHIFT YOUR ABILITY TO WATCH |
| 03:00PM | 14 | THIS PROCEEDING IN OUR OVERFLOW ROOM, WHICH DOES HAVE LIVE, |
| 03:00PM | 15 | LIVE STREAM REALTIME CAMERAS SO YOU CAN HEAR AND SEE THE |
| 03:00PM | 16 | WITNESS, AS WELL AS ANY QUESTIONING EXAMINATION. |
| 03:00PM | 17 | AND IT MAY BE THAT IF WE -- IF I HEAR OF SOME OTHER |
| 03:00PM | 18 | DISRUPTIONS FROM THE JURY SUCH THAT IT'S DISTRACTING THEM, I |
| 03:00PM | 19 | MAY ASK SOMEONE TO LEAVE. |
| 03:00PM | 20 | BUT I'D LIKE YOU TO SELF-POLICE, IF YOU CAN, AND PLEASE DO |
| 03:00PM | 21 | THAT, AND BE RESPECTFUL OF THE JURY, BE RESPECTFUL OF THESE |
| 03:01PM | 22 | PROCEEDINGS. |
| 03:01PM | 23 | THAT'S ALL I HAVE TO SAY ON THE MATTER. |
| 03:01PM | 24 | I APPRECIATE YOUR COOPERATION WITH THAT. |
| 03:01PM | 25 | ANYTHING ELSE, COUNSEL? |

4317

03:01PM   1                      MR. BOSTIC:  NO, YOUR HONOR.

03:01PM   2                      MR. DOWNEY:  NOTHING, YOUR HONOR.

03:01PM   3                  THE COURT:  ALL RIGHT.  HAVE A GOOD EVENING.

03:01PM   4                  THE CLERK:  COURT IS ADJOURNED.

03:01PM   5              (COURT ADJOURNED AT 3:01 P.M.)

          6

          7

          8

          9

         10

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

1

2

3                    CERTIFICATE OF REPORTER

4

5

6

7        I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8    STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9    280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10   CERTIFY:

11       THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16       IRENE RODRIGUEZ, CSR, RMR, CRR
         CERTIFICATE NUMBER 8074

17

18
         DATED:  OCTOBER 20, 2021
19

20

21

22

23

24

25

1

2                      UNITED STATES DISTRICT COURT

3                    NORTHERN DISTRICT OF CALIFORNIA

4                          SAN JOSE DIVISION

5
    UNITED STATES OF AMERICA,        )   CR-18-00258-EJD
6                                    )
                     PLAINTIFF,      )   SAN JOSE, CALIFORNIA
7                                    )
              VS.                    )   VOLUME 23
8                                    )
    ELIZABETH A. HOLMES,             )   OCTOBER 22, 2021
9                                    )
                     DEFENDANT.      )   PAGES 4318 - 4576
10   _____)

11                  TRANSCRIPT OF TRIAL PROCEEDINGS
12            BEFORE THE HONORABLE EDWARD J. DAVILA
                   UNITED STATES DISTRICT JUDGE
13
    A P P E A R A N C E S:
14
    FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
15                        BY:  JOHN C. BOSTIC
                               JEFFREY B. SCHENK
16                        150 ALMADEN BOULEVARD, SUITE 900
                          SAN JOSE, CALIFORNIA 95113
17
                          BY:  ROBERT S. LEACH
18                             KELLY VOLKAR
                          1301 CLAY STREET, SUITE 340S
19                        OAKLAND, CALIFORNIA 94612

20        (APPEARANCES CONTINUED ON THE NEXT PAGE.)

21
    OFFICIAL COURT REPORTERS:
22                        IRENE L. RODRIGUEZ, CSR, RMR, CRR
                          CERTIFICATE NUMBER 8074
23                        LEE-ANNE SHORTRIDGE, CSR, CRR
                          CERTIFICATE NUMBER 9595
24
           PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25              TRANSCRIPT PRODUCED WITH COMPUTER

4319

```
1        A P P E A R A N C E S: (CONT'D)

2

3    FOR DEFENDANT HOLMES:    WILLIAMS & CONNOLLY LLP
                              BY:  KEVIN M. DOWNEY
4                                  LANCE A. WADE
                                   KATHERINE TREFZ
5                                  PATRICK LOOBY
                                   J.R. FLEURMONT
6                                  SEEMA ROPER
                              725 TWELFTH STREET, N.W.
7                             WASHINGTON, D.C. 20005

8                             LAW OFFICE OF JOHN D. CLINE
                              BY:  JOHN D. CLINE
9                             ONE EMBARCADERO CENTER, SUITE 500
                              SAN FRANCISCO, CALIFORNIA 94111
10

11   ALSO PRESENT:            FEDERAL BUREAU OF INVESTIGATION
                              BY:  ADELAIDA HERNANDEZ
12
                              OFFICE OF THE U.S. ATTORNEY
13                            BY:  LAKISHA HOLLIMAN, PARALEGAL
                                   MADDI WACHS, PARALEGAL
14
                              WILLIAMS & CONNOLLY
15                            BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL

16                            TBC
                              BY:  BRIAN BENNETT, TECHNICIAN
17

18

19

20

21

22

23

24

25
```

4320

1

<u>INDEX OF PROCEEDINGS</u>

2

GOVERNMENT'S:

3

**SHANE WEBER**

4    DIRECT EXAM BY MR. LEACH                P. 4358
     CROSS-EXAM BY MR. CLINE                 P. 4406

5    REDIRECT EXAM BY MR. LEACH              P. 4429

6

7    **JOHN BRYAN TOLBERT**
     DIRECT EXAM BY MR. SCHENK               P. 4433

8    CROSS-EXAM BY MR. DOWNEY                P. 4523
     REDIRECT EXAM BY MR. SCHENK             P. 4566

9    RECROSS-EXAM BY MR. DOWNEY              P. 4568

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        INDEX OF EXHIBITS

2
                                     IDENT.      EVIDENCE
3       GOVERNMENT'S:

4       143                                      4362
        159                                      4366
5       162                                      4372
        167, REDACTED PAGE 1                     4380
6       174                                      4393
        5387D                                    4404
7       3790                                     4440
        4871                                     4449
8       3940                                     4456
        949                                      4458
9       4030                                     4463
        1346                                     4466
10      1348                                     4472
        1349                                     4472
11      3530                                     4516

12


13
        DEFENDANT'S:
14
        10561                                    4426
15

16

17

18

19

20

21

22

23

24

25
```

|   |   |
|---|---|
| 1 | SAN JOSE, CALIFORNIA                    OCTOBER 22, 2021 |
| 08:41AM  2 | P R O C E E D I N G S |
| 08:41AM  3 | (COURT CONVENED AT 8:41 A.M.) |
| 08:41AM  4 | (JURY OUT AT 8:41 A.M.) |
| 08:41AM  5 | THE COURT:  LET'S GO ON THE RECORD IN THE HOLMES |
| 08:41AM  6 | MATTER.  ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT. |
| 08:41AM  7 | WE'RE OUTSIDE, EXCUSE ME, THE PRESENCE OF THE JURY.  I |
| 08:41AM  8 | WANTED TO TALK TO COUNSEL ABOUT A COUPLE OF MATTERS. |
| 08:41AM  9 | FIRST OF ALL, IN REGARDS TO EXHIBIT 5387, I THINK IT'S D, |
| 08:41AM  10 | WE -- I THINK WE ADMITTED THAT THE OTHER DAY.  WE DID THAT |
| 08:41AM  11 | OUTSIDE OF THE PRESENCE OF THE JURY, WHICH IS NOT PROPER.  WE |
| 08:41AM  12 | NEED TO DO THAT -- ANY EVIDENCE NEEDS TO BE INTRODUCED IN THE |
| 08:41AM  13 | JURY'S PRESENCE. |
| 08:41AM  14 | SO I NEGLECTED TO RECALL THAT, SO I'M GOING TO ASK |
| 08:41AM  15 | MS. VOLKAR AND MS. TREFZ TO COME FORWARD AGAIN WHEN THE JURY |
| 08:41AM  16 | COMES IN AND WE'LL GO THROUGH THAT PROCESS AGAIN. |
| 08:42AM  17 | I SEE MS. VOLKAR, AND I SEE MS. TREFZ HERE. |
| 08:42AM  18 | SO I THINK I HAVE THE EXHIBIT NUMBER RIGHT, IT IS D, |
| 08:42AM  19 | DAVID. |
| 08:42AM  20 | AND MS. VOLKAR, IF YOU WOULD BE SO KIND TO COME UP WHEN WE |
| 08:42AM  21 | HAVE OUR JURY IN, AND MS. TREFZ, THEN WE'LL DO THAT FORMALITY. |
| 08:42AM  22 | THE -- I THINK, MR. WADE, YOU WANTED TO TALK -- WHERE IS |
| 08:42AM  23 | MR. WADE?  THERE. |
| 08:42AM  24 | YOU WANTED TO TALK ABOUT BRYAN TOLBERT OR SOMETHING. |
| 08:42AM  25 | THE CLERK:  MR. DOWNEY. |

08:42AM 1      THE COURT:  MR. DOWNEY.  I'M SORRY.

08:42AM 2      MR. DOWNEY:  YES.  AND MR. SCHENK AND I HAVE TALKED

08:42AM 3  ABOUT SOME OF THIS, AND I THINK -- LET ME SAY THAT I THINK WE

08:42AM 4  AGREE IN PART ON SOME ISSUES, BUT JUST TO ORIENT THE COURT

08:42AM 5  BEFORE THIS IS IN FRONT OF THE JURY BECAUSE ONE OF THE ISSUES

08:42AM 6  HAS A LITTLE BIT MORE TO CONSIDER WITH IT, ALTHOUGH THE COURT

08:42AM 7  MAY NOT WANT TO DECIDE UNTIL THE ISSUE IS LIVE.

08:42AM 8      FIRST OF ALL, I THINK ON ONE ISSUE ACTUALLY MR. SCHENK AND

08:42AM 9  I AGREE.  THERE'S AN EXHIBIT, WHICH IS EXHIBIT 1344, WHICH IS A

08:43AM 10 SERIES OF NOTES FROM A CONFERENCE CALL WHICH WE'LL HEAR A TAPE

08:43AM 11 OF DURING THE TESTIMONY OF MR. TOLBERT.

08:43AM 12     THE NOTES THEMSELVES, I THINK MR. SCHENK AND I AGREE, ARE

08:43AM 13 NOT ADMISSIBLE.  THE NOTES ARE HEARSAY.  OF COURSE HE CAN SHOW

08:43AM 14 THEM TO THE WITNESS TO TRY TO REFRESH THE WITNESS'S

08:43AM 15 RECOLLECTION.

08:43AM 16     AND THERE ARE CIRCUMSTANCES UNDER WHICH THEY COULD BECOME

08:43AM 17 ADMISSIBLE, BUT I DON'T ANTICIPATE THOSE.  SO I THINK THAT IS

08:43AM 18 LARGELY RESOLVED.

08:43AM 19     THE COURT:  OKAY.

08:43AM 20     MR. DOWNEY:  THE SECOND ISSUE IS IN CONNECTION WITH

08:43AM 21 EXHIBIT 3086.  THIS IS AN EMAIL WHICH ACTUALLY DOESN'T HAVE

08:43AM 22 PARTICULAR RELEVANCE TO MR. TOLBERT, I THINK.

08:43AM 23     THIS IS AN EMAIL SENT BY THERANOS TO ALL SHAREHOLDERS IN

08:43AM 24 JANUARY OF 2016 -- I'M SORRY, YOUR HONOR, THIS IS 3086.

08:43AM 25     THE COURT:  YES.

08:43AM   1           MR. DOWNEY:  THIS IS A SHAREHOLDER LETTER THAT WAS

08:43AM   2    SENT TO ALL SHAREHOLDERS.  IT ESSENTIALLY REPEATS THE

08:44AM   3    ALLEGATIONS OF "THE WALL STREET JOURNAL" ARTICLE WHICH HAS

08:44AM   4    ALREADY BEEN RULED INADMISSIBLE, SO IT'S ANOTHER LAYER OF

08:44AM   5    HEARSAY RELATED TO THAT, AND IT REPEATS THE ALLEGATIONS

08:44AM   6    CONTAINED IN THE CMS REPORT, WHICH AS YOUR HONOR KNOWS, HAS

08:44AM   7    BEEN ADMITTED IN PART, BUT NOT ADMITTED IN PART.

08:44AM   8           AND THEN IT OFFERS, ON A HEARSAY BASIS, THE COMPANY'S SORT

08:44AM   9    OF OWN DEFENSES FOR BOTH OF THOSE EVENTS.

08:44AM   10          I DON'T THINK -- THIS WITNESS IS NOT PARTICULARLY

08:44AM   11   IMPORTANT AS TO THAT, BUT I THINK IN ANY EVENT THERE ARE A

08:44AM   12   COUPLE OF OTHER ISSUES WITH IT.

08:44AM   13          I DON'T KNOW THAT HIS TESTIMONY MATTERS.

08:44AM   14          FIRST OF ALL, THIS IS ALL OUTSIDE OF THE SCOPE OF THE

08:44AM   15   CONSPIRACY.  AS YOUR HONOR KNOWS, THE INVESTOR CONSPIRACY ENDS

08:44AM   16   IN 2015, SO THIS DISCUSSION OF THESE MATTERS AFTER THE END OF

08:44AM   17   THE CONSPIRACY IS NOT REALLY RELEVANT TO THE CONSPIRACY

08:44AM   18   ALLEGATION DURING THE COURSE OF THE CASE.

08:45AM   19          THE SECOND ISSUE, YOUR HONOR, THERE'S SORT OF MULTIPLE

08:45AM   20   LAYERS OF HEARSAY IN HERE.  THERE'S QUOTES OF "THE WALL STREET

08:45AM   21   JOURNAL" QUOTING WITNESSES, AND THEN QUOTES OF OTHER WITNESSES,

08:45AM   22   NOT DIRECT QUOTES, BUT SUMMARIZED QUOTES OF WHAT REFUTES THOSE

08:45AM   23   ALLEGATIONS ON THE PART OF THE COMPANY.  SO IT'S JUST A MESS IN

08:45AM   24   TERMS OF THE HEARSAY ISSUES, FRANKLY.

08:45AM   25          AND I THINK TO SORT IT OUT EITHER NOW OR IN REALTIME WOULD

08:45AM 1    BE VERY DIFFICULT.

08:45AM 2         I THINK ALSO THIS IS KIND OF WHAT THE CASE -- SOME OF THIS

08:45AM 3    IS WHAT PART OF THE CASE IS ABOUT, AND I THINK TO TRY TO

08:45AM 4    INTRODUCE A DOCUMENT THAT IS A PAGE AND A HALF EMAIL, YOU KNOW,

08:45AM 5    POST CONSPIRACY DISCUSSING IT IS -- YOU KNOW, RAISES A LOT OF

08:45AM 6    403 ISSUES.

08:45AM 7         WHEN MR. TOLBERT, YOU KNOW, HAPPENED TO RECEIVE THIS

08:45AM 8    EMAIL, YOU KNOW, DOESN'T REALLY ADD VERY MUCH.

08:45AM 9              THE COURT:  THANK YOU.

08:45AM 10        MR. SCHENK?

08:45AM 11             MR. SCHENK:  I'LL START IN TURN WITH 1344,

08:46AM 12   MR. TOLBERT'S NOTES.  I DO NOT INTEND TO OFFER THAT DURING

08:46AM 13   MR. TOLBERT'S DIRECT TESTIMONY TODAY.

08:46AM 14        IT IS, THOUGH, SOMETHING THAT COULD BE READ TO THE JURY

08:46AM 15   UNDER 803(5).  IT WOULDN'T BE ADMITTED AND GO BACK, BUT IT IS

08:46AM 16   SOMETHING THAT IS ADMISSIBLE UNDER THAT RULE OF EVIDENCE SHOULD

08:46AM 17   IT BECOME RELEVANT AND NECESSARY.

08:46AM 18        IT'S NOTES OF A CALL THAT WE HAVE A RECORDING OF, SO WE

08:46AM 19   CAN PLAY THAT AND I THINK SATISFY THE CONTENT OF THE RECORDING

08:46AM 20   IN A DIFFERENT WAY.

08:46AM 21        BUT QUESTIONS OF MR. TOLBERT ABOUT HIS RECOLLECTION OF THE

08:46AM 22   RECALL, I'M SORRY, OF THE CALL OR HIS INTERPRETATION OF THE

08:46AM 23   CALL COULD BE -- COULD MAKE IT RELEVANT UNDER THAT RULE OF

08:46AM 24   EVIDENCE.

08:46AM 25        AGAIN, I DON'T INTEND TO OFFER IT.

08:46AM 1          BUT I WANT TO BE CLEAR THAT THE GOVERNMENT IS NOT

08:46AM 2     CONCEDING THAT IT'S NOT RELEVANT OR ADMISSIBLE, AND AGAIN,

08:46AM 3     ADMISSIBLE IS A LITTLE BIT DIFFERENT NOT TO GO BACK TO THE

08:46AM 4     JURY, BUT RATHER TO BE READ INTO EVIDENCE AS A MARKED EXHIBIT.

08:47AM 5          I DON'T THINK THE COURT NEEDS TO MAKE A DECISION ON THAT

08:47AM 6     NOW BECAUSE I DON'T ANTICIPATE THAT BECOMING NECESSARY.

08:47AM 7          BUT IF IT DOES, IT WOULD BE ON THAT BASIS THAT THE

08:47AM 8     GOVERNMENT WOULD SEEK TO HAVE THE DOCUMENT READ, OR AT LEAST

08:47AM 9     PORTIONS OF THE DOCUMENT READ TO THE JURY.

08:47AM 10          THE COURT:  THANK YOU.

08:47AM 11          MR. SCHENK:  ON 3086, YOUR HONOR, THIS IS A DOCUMENT

08:47AM 12     WHERE THERANOS SENDS AN EMAIL TO ALL SHAREHOLDERS AND THEN

08:47AM 13     MR. TOLBERT TAKES THAT EMAIL AND SHARES IT WITH OTHER

08:47AM 14     INDIVIDUALS AT HALL GROUP.

08:47AM 15          LULLING STATEMENTS ARE RELEVANT AFTER THE FACT.  IT'S

08:47AM 16     ADMISSIBLE ON THAT GROUND.

08:47AM 17          THE DEFENSE HAS INTRODUCED ON MANY OCCASIONS IN THIS TRIAL

08:47AM 18     POST INVESTMENT EVIDENCE.  THE COURT HAS HEARD TESTIMONY ABOUT

08:47AM 19     AN INDIVIDUAL NAMED DAVID HELFET, THE COURT HAS HEARD TESTIMONY

08:47AM 20     ABOUT THE SCIENTIFIC AND ADVISORY BOARD, THE COURT HAS HEARD

08:48AM 21     TESTIMONY ABOUT CHANNING ROBERTSON'S ROLE AFTER THE FACT.

08:48AM 22          IT CANNOT BE THAT THE DEFENSE IS ALLOWED TO INTRODUCE POST

08:48AM 23     INVESTMENT EVIDENCE TO SUGGEST THAT EITHER THE THERANOS

08:48AM 24     TECHNOLOGY WORKED OR THAT MS. HOLMES DIDN'T HAVE AN INTENT TO

08:48AM 25     DEFRAUD, BUT THAT THE GOVERNMENT IS PRECLUDED FROM OFFERING

08:48AM  1    POST INVESTMENT EVIDENCE.

08:48AM  2         I THINK THAT THE EVIDENCE DISPROVES THE EXISTENCE OF

08:48AM  3    KNOWLEDGE, AND ALSO THIS PARTICULAR DOCUMENT BRAGS ABOUT A NEW

08:48AM  4    LAB DIRECTOR NAMED DR. DAS.

08:48AM  5         DR. DAS WILL BE A WITNESS IN THIS TRIAL.  THERANOS LIKED

08:48AM  6    HIM AND WANTED SHAREHOLDERS TO LIKE AND APPRECIATE THE WORK

08:48AM  7    THAT HE'S GOING TO DO, AND THAT'S AN IMPORTANT THING FOR THE

08:48AM  8    JURY TO KNOW WHEN DR. DAS TAKES THE STAND, THAT AT LEAST

08:48AM  9    INITIALLY THAT THERANOS WAS VERY PROUD TO BRING DR. DAS WITHIN

08:48AM  10   THE FOLD.

08:48AM  11        I THINK THAT I CAN AGREE NOT TO OFFER THIS IN DIRECT OF

08:49AM  12   TOLBERT BECAUSE MOST OF HIS TESTIMONY IS GOING TO BE ABOUT THE

08:49AM  13   DECISION TO MAKE THE INVESTMENT.

08:49AM  14        BUT IT CERTAINLY IS NOT THE CASE THAT THE GOVERNMENT

08:49AM  15   SHOULD BE PRECLUDED FROM OFFERING POST -- THE DATE HERE IS

08:49AM  16   DECEMBER 31ST, 2013.  THAT'S WHEN THE WIRE WENT FROM HALL TO

08:49AM  17   THERANOS.

08:49AM  18        POST DECEMBER 31ST, 2013 EVIDENCE IS CERTAINLY RELEVANT,

08:49AM  19   AND THE DEFENSE HAS ARGUED TO THE COURT AND TO THE JURY THAT

08:49AM  20   AFTER INVESTMENT EVIDENCE IS RELEVANT.

08:49AM  21        SO IT SHOULD NOT BE THE CASE THAT THE GOVERNMENT IS

08:49AM  22   PRECLUDED FROM OFFERING EVIDENCE FOLLOWING AN INVESTMENT,

08:49AM  23   ESPECIALLY EVIDENCE OF THIS SORT WHEN THE REPRESENTATIONS

08:49AM  24   REGARDING CMS OR THE SIGNIFICANCE OF THE CMS INVESTIGATION, THE

08:49AM  25   INDIVIDUALS WHO MIGHT BE SHARING INFORMATION, THE WHISTLE

08:49AM  1    BLOWERS AND THE WAY THAT THERANOS IS EXPLAINING THAT IS ALL

08:49AM  2    CERTAINLY RELEVANT.

08:49AM  3        IN OTHER CONTEXTS WE FOLLOWED THAT RULE.  ARTICLES, FOR

08:50AM  4    INSTANCE, AREN'T RELEVANT WHEN WE JUST WANT TO INTRODUCE THE

08:50AM  5    SPECIFIC ARTICLE.  THEY BECOME RELEVANT WHEN THERANOS SENDS

08:50AM  6    THAT ARTICLE TO SHAREHOLDERS SORT OF IN THE GUISE OF, YOU WANT

08:50AM  7    TO LEARN MORE ABOUT OUR TECHNOLOGY, READ THIS ARTICLE.

08:50AM  8        SO THINGS THAT MIGHT OTHERWISE BE EXCLUDABLE IN THIS CASE

08:50AM  9    BECOME RELEVANT ADMISSIBLE EVIDENCE WHEN THERANOS MAKES

08:50AM  10   REPRESENTATIONS TO SHAREHOLDERS THAT SHAREHOLDERS SHOULD RELY

08:50AM  11   ON THAT LULL THEM INTO BELIEVING THAT EVERYTHING IS STILL OKAY

08:50AM  12   AT THERANOS AND SORT OF IMPLICITLY DISCOURAGE SHAREHOLDERS FROM

08:50AM  13   CONTACTING LAW ENFORCEMENT THROUGH THOSE REPRESENTATIONS.

08:50AM  14       FOR ALL OF THOSE REASONS THIS IS RELEVANT AND ADMISSIBLE

08:50AM  15   EVIDENCE.

08:50AM  16       I CAN LIMIT MY QUESTIONS ON DIRECT TO AVOID THIS, BUT I

08:50AM  17   DON'T WANT THE COURT TO MAKE A RULING THAT THE GOVERNMENT'S

08:50AM  18   SHOULD BE PRECLUDED FROM OFFERING EVIDENCE OF THIS TYPE BECAUSE

08:50AM  19   OF THE DATE OR BECAUSE OF THE CONTENT.

08:50AM  20       THE COURT:  THANK YOU.

08:50AM  21       IS IT -- DO I HEAR YOU SAY THEN THAT YOUR INTENT IS NOT

08:51AM  22   SPECIFICALLY, AT LEAST INITIALLY, TO INTRODUCE THE DOCUMENT,

08:51AM  23   BUT RATHER TO PROBE THE ISSUES CONTAINED IN THE DOCUMENT?

08:51AM  24       MR. SCHENK:  I WOULD BE HAPPY TO LIMIT MR. TOLBERT'S

08:51AM  25   DIRECT UP THROUGH THE DATE OF THE INVESTMENT AND CUT IT OFF

08:51AM 1      THERE FOR TODAY'S PURPOSES.

08:51AM 2          I WOULD LIKE TO SEE THE KINDS OF QUESTIONS THAT THE

08:51AM 3   DEFENSE ASKS ON CROSS.  I WONDER IF THE DEFENSE IS GOING TO ASK

08:51AM 4   EVEN ONE QUESTION THAT CALLS ON EVENTS AFTER JANUARY 1, 2014.

08:51AM 5   THAT WOULD OPEN THE DOOR FOR THIS WITNESS.

08:51AM 6          BUT I DON'T WANT TO SUGGEST TO THE COURT THAT THE DOOR

08:51AM 7   NEEDS TO BE OPENED SORT OF FROM RIGHT NOW GOING FORWARD.

08:51AM 8              THE COURT:  SURE.

08:51AM 9              MR. SCHENK:  THEY'VE OPENED THE DOOR THROUGH

08:51AM 10  COUNTLESS WITNESSES WHEN THEY'VE TALKED ABOUT THE 2016/2017

08:51AM 11  EVENTS AT THERANOS AND THE DOOR IS OPENED, SO I DON'T WANT THE

08:51AM 12  COURT TO THINK I DON'T ALREADY BELIEVE I CAN GO THERE.

08:51AM 13         I JUST DON'T THINK IT'S NECESSARY TO GO THERE WITH

08:51AM 14  MR. TOLBERT.  LET'S SEE WHAT KIND OF QUESTIONS THAT THE DEFENSE

08:52AM 15  HAS.

08:52AM 16             THE COURT:  ALL RIGHT.

08:52AM 17             MR. DOWNEY:  YOUR HONOR, IF I MIGHT QUICKLY COMMENT?

08:52AM 18             THE COURT:  DO YOU WANT TO BE HEARD ABOUT DOORS,

08:52AM 19  MR. DOWNEY.

08:52AM 20             MR. DOWNEY:  FIRST OF ALL, LET ME JUST COMMENT ON

08:52AM 21  THE DATES.  I THINK IN MR. SCHENK'S FIRST COMMENT HE SAID 2013

08:52AM 22  AND HE MEANT 2015.

08:52AM 23         FIRST OF ALL, LULLING IS A COMPONENT OF A CONSPIRACY AND

08:52AM 24  CAN BE AN OVERT ACT IN FURTHERANCE OF A CONSPIRACY.

08:52AM 25         THIS WITNESS IS NOT RELEVANT TO ANY CONSPIRACY EVIDENCE

08:52AM   1      AFTER DECEMBER 31ST, 2015.

08:52AM   2          I'M NOT CERTAIN IF THERE'S A LOT OF EVIDENCE DURING THE

08:52AM   3      COURSE OF THE CONSPIRACY AFTER THE INVESTMENT.  WE CAN SEE WHAT

08:52AM   4      HAPPENS THERE.

08:52AM   5          BUT I CERTAINLY AGREE THAT EVIDENCE FROM AFTER

08:52AM   6      DECEMBER 31ST, 2015, WHICH IS THE TERMINATION OF THE

08:52AM   7      CONSPIRACY, OR SOME DATE IN 2015 BEFORE THAT, WON'T COME IN

08:52AM   8      THROUGH US OR THROUGH THEM.

08:52AM   9              THE COURT:  ALL RIGHT.  WELL, THIS IS A STAY TUNED

08:52AM  10      TYPE OF AN EVENT.  THANK YOU FOR HIGHLIGHTING THAT.

08:53AM  11              MR. DOWNEY:  YEAH.  AND I'LL JUST SAY, YOUR HONOR,

08:53AM  12      THIS IS A SIMPLER ISSUE, BUT THERE WILL BE A COUPLE OF

08:53AM  13      DOCUMENTS, AT LEAST MAYBE ONE, WHERE MR. TOLBERT'S NOTES WILL

08:53AM  14      BE SOUGHT TO INTRODUCE.  I'M NOT SURE WHAT THE LEVEL OF

08:53AM  15      FOUNDATION WILL BE THAT'S LAID IN CONNECTION WITH THEM, BUT

08:53AM  16      GENERALLY I DON'T THINK HANDWRITTEN NOTES OF AN INDIVIDUAL

08:53AM  17      EMPLOYEE OR TYPED NOTES OF AN INDIVIDUAL EMPLOYEE CONSTITUTE A

08:53AM  18      BUSINESS RECORD UNDER NINTH CIRCUIT LAW, SO I THINK WE'LL BE

08:53AM  19      OBJECTING TO THOSE.

08:53AM  20          1344 IS ONE EXAMPLE.

08:53AM  21          AGAIN, I'M NOT SURE THEY WILL BE OFFERED, BUT THEY ARE

08:53AM  22      AMONGST THE EXHIBITS THAT WE'VE BEEN PROFFERED.

08:53AM  23              THE COURT:  ALL RIGHT.  THANK YOU.

08:53AM  24          ANYTHING FURTHER, MR. SCHENK, ON THAT?

08:53AM  25              MR. SCHENK:  JUST ON THAT LAST POINT.  803(5)

08:53AM 1    DOESN'T REQUIRE BUSINESS RECORDS, SO I WOULDN'T LAY THE

08:53AM 2    FOUNDATION THAT WAY SHOULD 1344 BE A DOCUMENT THAT IS ENTITLED

08:53AM 3    TO BE READ TO THE JURY, BUT NOT ADMITTED FOR DELIBERATION.

08:53AM 4              THE COURT:  ALL RIGHT.  THANK YOU.

08:53AM 5         I WANTED TO TALK ABOUT THE SHANE WEBER EXHIBIT.  THAT MAY

08:54AM 6    BECOME RELEVANT THIS MORNING I THINK.

08:54AM 7              MR. DOWNEY:  I THINK THAT'S RIGHT.

08:54AM 8              MR. SCHENK:  YES.

08:54AM 9              MR. DOWNEY:  THERE ARE SOME OTHER ISSUES RELATED TO

08:54AM 10   WHAT WOULD BE THE FOURTH WITNESS TODAY, IF WE GOT TO THE FOURTH

08:54AM 11   WITNESS.  I THINK WE BOTH HAVE UNCERTAINTY AS TO WHETHER WE

08:54AM 12   WILL OR WHETHER WE --

08:54AM 13             THE COURT:  LET'S TAKE THAT UP AFTER OUR BREAK AND

08:54AM 14   SEE WHERE WE ARE ON THAT.

08:54AM 15             MR. DOWNEY:  YEAH.  AND THEY'RE ALSO NOT LARGE

08:54AM 16   ISSUES.

08:54AM 17             THE COURT:  THANK YOU.

08:54AM 18         TURNING TO THE WEBER DOCUMENT THAT WE DISCUSSED YESTERDAY,

08:54AM 19   AND WE HAD SOME ROBUST DISCUSSION ABOUT WHETHER OR NOT THE

08:54AM 20   DOCUMENT ITSELF SHOULD BE ADMITTED, I LISTENED TO THE ARGUMENTS

08:54AM 21   AND I'VE REVIEWED THE DOCUMENT ITSELF.

08:54AM 22         I THINK MR. CLINE'S OBJECTION -- WHERE ARE YOU MR. CLINE?

08:55AM 23   THERE YOU ARE -- I THINK MR. CLINE'S OBJECTIONS WERE THE

08:55AM 24   PEJORATIVE NATURE OF THE TERMS THAT WERE USED DESCRIBED

08:55AM 25   THINGS -- YOU CAN COME FORWARD IF YOU WOULD LIKE.  THANK YOU --

08:55AM   1    WERE OTHERWISE OFFENSIVE AND APPROPRIATE UNDER A 403 ANALYSIS.

08:55AM   2         WHAT I HEARD YOU SAY SEVERAL TIMES WAS THAT IT WAS

08:55AM   3    PROFOUNDLY UNFAIR -- AND WE'RE TALKING ABOUT UNDER A 403

08:55AM   4    ANALYSIS, WHETHER OR NOT PREJUDICE IS UNFAIR.  EVERYTHING THAT

08:55AM   5    THE PROSECUTION ADVANCES AGAINST YOUR CLIENT OBVIOUSLY IS

08:55AM   6    PREJUDICIAL TO HER INTEREST.

08:55AM   7         THE QUESTION THAT WE'RE LOOKING AT UNDER 403 IS, IS THIS

08:55AM   8    UNFAIR PREJUDICE?  AND IF SO, IN WHAT MANNER, AND WHAT IS THE

08:55AM   9    REMEDY IF IT IS?

08:55AM  10         AND I HEARD YOU SAY SEVERAL TIMES THAT YOUR CONCERN IS

08:55AM  11    THAT THE JURY WOULD HAVE THIS DOCUMENT AND THEY WOULD REVIEW IT

08:55AM  12    IN THEIR DELIBERATIONS AND WOULD HAVE THOSE PEJORATIVE TERMS,

08:55AM  13    AS YOU PUT IT, IN FRONT OF THEM.  THEY COULD DRAW CONCLUSIONS,

08:55AM  14    PERHAPS UNFAIR AND INAPPROPRIATE CONCLUSIONS, ABOUT THIS ONE

08:56AM  15    WITNESS, MR. WEBER'S EVALUATION.

08:56AM  16         AND WHAT WE KNOW, AGAIN, THE CHRONOLOGY OF THIS, AS I

08:56AM  17    UNDERSTAND FROM BOTH OF YOU, WAS THAT THERANOS REACHED OUT TO

08:56AM  18    PFIZER FOR BUSINESS RELATIONSHIP PURPOSES.  THERE WAS A

08:56AM  19    CONFERENCE CALL.  I THINK THAT WAS IN NOVEMBER OF 2008,

08:56AM  20    NOVEMBER 13TH, 2008.

08:56AM  21         IS THAT RIGHT?

08:56AM  22              MR. CLINE:  YES.

08:56AM  23         JUST TO BACK UP A TINY BIT.  THERE HAD BEEN A BUSINESS

08:56AM  24    RELATIONSHIP FOR A COUPLE OF YEARS AT THIS POINT.

08:56AM  25         IN NOVEMBER 2008, DR. WEBER IS ASKED TO REVIEW A REPORT

08:56AM   1     THAT THERANOS HAD SUBMITTED THAT'S AROUND THE BEGINNING OF

08:56AM   2     NOVEMBER, NOVEMBER 6TH, I THINK, 2008, AND THEN ON THE 13TH, AS

08:56AM   3     YOUR HONOR SAYS, THERE WAS THIS CONFERENCE CALL WITH DR. WEBER

08:56AM   4     ON ONE HAND AND A NUMBER OF THERANOS PEOPLE, INCLUDING

08:56AM   5     MS. HOLMES, ON THE OTHER.

08:56AM   6         THE COURT:  THANK YOU.

08:56AM   7         AND THEN HE -- "HE" MR. WEBER -- THEN WAS ASSIGNED

08:57AM   8     APPARENTLY TO EVALUATE THE RELATIONSHIP.  THERE WERE 25

08:57AM   9     QUESTIONS, I THINK, THAT WERE POSED.  HE WROTE HIS REPORT ON,

08:57AM   10    AT LEAST WE HAVE IT ON DECEMBER 31, 2008.  THAT'S THE DOCUMENT

08:57AM   11    IN QUESTION HERE.

08:57AM   12        MR. CLINE:  YES.

08:57AM   13        THE COURT:  AND THEN THERE WAS A FOLLOW-UP CALL WITH

08:57AM   14    MS. HOLMES AND MR. WEBER I THINK SOMETIME IN JANUARY OF 2009.

08:57AM   15        MR. CLINE:  CORRECT.

08:57AM   16        THE COURT:  I THINK THOSE ARE THE SEMINAL DATES AS

08:57AM   17    FAR AS THIS DOCUMENT IS CONCERNED.

08:57AM   18        AND IT SEEMS TO ME, AS I REREAD THIS SEVERAL TIMES, THE

08:57AM   19    CRITICISMS THAT I THINK YOU RAISE, MR. CLINE, ABOUT THE

08:57AM   20    LANGUAGE, IT SEEMS TO ME THAT THOSE CRITICISMS ARE NOT REALLY

08:57AM   21    SPECIFIC TO MS. HOLMES, AND I KNOW YOU WERE TALKING ABOUT THEY

08:57AM   22    COULD BE INFERRED AS HIS COMMENT ABOUT HER VERACITY, HER

08:57AM   23    PERSONAL VERACITY.

08:57AM   24        BUT WHEN I LOOK AT THOSE, IT SEEMS THAT HIS COMMENTS, HE'S

08:58AM   25    REALLY TALKING ABOUT THE TECHNICAL RESPONSES --

08:58AM  1                    MR. CLINE:  WELL --

08:58AM  2                    THE COURT:  -- AND THAT SEEMS TO BE WHAT HE'S

08:58AM  3     REFERRING TO WHEN HE'S CRITICAL OF THAT.

08:58AM  4          GO AHEAD.

08:58AM  5                    MR. CLINE:  I'M SORRY, YOUR HONOR.

08:58AM  6                    THE COURT:  NO, NO.  YOU'RE EAGER TO SPEAK AND YOU

08:58AM  7     WANT TO STOP ME.

08:58AM  8                    MR. CLINE:  I'M CHOMPING AT THE BIT HERE.

08:58AM  9          THERE ARE SORT OF TWO SETS OF RESPONSES HERE.  THERE ARE

08:58AM  10    THE RESPONSES TO THE ORAL QUESTIONS ON THE NOVEMBER 13TH CALL;

08:58AM  11    AND THEN THERE WRITTEN RESPONSES TO WHAT MR. FRENZEL SAID.

08:58AM  12          DR. WEBER IN HIS REPORT USES VERY SIMILAR LANGUAGE FOR

08:58AM  13    BOTH, EVASIVE -- I FORGET ALL OF THE DIFFERENT TERMS, BUT

08:58AM  14    THEY'RE PEJORATIVE TERMS AND I THINK THEY DO COMMENT ON THE

08:58AM  15    CREDIBILITY OF THE PERSON PROVIDING THE ANSWER.

08:58AM  16          ON THE NOVEMBER 13TH CALL, I BELIEVE DR. WEBER WILL

08:58AM  17    TESTIFY THAT ALTHOUGH THERE WERE A NUMBER OF THERANOS PEOPLE ON

08:58AM  18    THE LINE, MS. HOLMES DID ALL OF THE TALKING.

08:59AM  19                    THE COURT:  RIGHT.

08:59AM  20                    MR. CLINE:  SO WHEN HE SAYS THE ANSWERS ON THAT

08:59AM  21    NOVEMBER 13TH CALL WERE EVASIVE, DEFLECTIVE, WHATEVER TERMS HE

08:59AM  22    USES, HE'S TALKING ABOUT MS. HOLMES.  AND THAT IS A 403 ISSUE,

08:59AM  23    AND I THINK IT'S ALSO A 701 ISSUE ABOUT THE CREDIBILITY OF

08:59AM  24    MS. HOLMES.  AND I DON'T THINK THAT'S SHOULD COME IN.

08:59AM  25                    THE COURT:  SURE.  WHAT IS INTERESTING ABOUT THE

08:59AM  1    DOCUMENT, ISN'T IT, THAT DESPITE HIS CRITICISMS AND USE OF

08:59AM  2    THOSE TERMS, HE DOES SUGGEST THAT THEY SHOULD ENGAGE IN SIX

08:59AM  3    MONTHS TO SEE IF WHETHER OR NOT EITHER THE TECHNOLOGY HAS

08:59AM  4    CHANGED OR THE CONVERSATION HAS CHANGED SUCH THAT PFIZER WOULD

08:59AM  5    HAVE GREATER COMFORT IN CONTINUING, RENEWING, WHATEVER, THE

08:59AM  6    BUSINESS RELATIONSHIP.

08:59AM  7         ONE OF HIS CRITICISMS WAS THAT THERE WERE TOO MANY, THERE

08:59AM  8    ARE TOO MANY COOKS IN THE KITCHEN, SO TO SPEAK, AND HE WANTS TO

08:59AM  9    NARROW IT DOWN TO ONE GROUP, ONE TEAM THAT THERANOS COULD THEN

09:00AM  10   CONTACT, AND HE SUGGESTS DOING THAT IN SIX MONTHS.

09:00AM  11        THAT SEEMS TO TEMPER SOMEWHAT THE COMMENTS THAT YOU'VE

09:00AM  12   MADE ABOUT THE PEJORATIVE NATURE OF THOSE TERMS.

09:00AM  13        IT SUGGESTS, LIKE YOUR MATH TEACHER -- BUT NOT YOU,

09:00AM  14   MR. CLINE, BECAUSE I KNOW YOU EXCELLED IN MATH.

09:00AM  15             MR. CLINE:  I MADE IT THROUGH SOPHOMORE COLLEGE

09:00AM  16   MATH, JUST SO YOU KNOW.

09:00AM  17             THE COURT:  YOUR MATH TEACHER WOULD SAY, SHOW ME

09:00AM  18   YOUR WORK.  YOU HAVE TO SHOW ME YOUR WORK.

09:00AM  19        AND I DON'T MEAN TO MAKE LIGHT OF THIS, BUT THAT'S

09:00AM  20   SOMEWHAT I THINK THE WAY THE COMMENTS CAN BE INFERRED, AND

09:00AM  21   SUPPORTING THAT IS THE FACT THAT THE DOOR ISN'T CLOSED.  LET'S

09:00AM  22   REGROUP IN SIX MONTHS AND LET'S SEE WHAT YOU COME UP WITH.

09:00AM  23        SO I THINK TEMPERS IT.

09:00AM  24        NOW, LET ME SAY THIS:  I UNDERSTAND YOUR CONCERN NOW ABOUT

09:00AM  25   HAVING THIS DOCUMENT ADMITTED SUCH THAT THE JURY COULD HAVE IT.

09:00AM 1    I CAPTURE YOUR 403 CONCERNS ABOUT THAT.

09:00AM 2         WHAT I'M GOING TO DO, MR. LEACH, IS I'M GOING TO ALLOW

09:01AM 3    THIS DOCUMENT TO BE MARKED AS AN EXHIBIT, AND WHAT I INTEND TO

09:01AM 4    DO -- AND YOU'RE GOING TO LAY A FOUNDATION, I PRESUME, FOR ALL

09:01AM 5    OF THIS.

09:01AM 6         MR. LEACH:  YES, YOUR HONOR.

09:01AM 7         THE COURT:  AND THEN I'M GOING TO ALLOW THIS TO BE

09:01AM 8    USED NOW AS A DEMONSTRATIVE.  YOU'LL BE ABLE TO DISPLAY THIS TO

09:01AM 9    THE JURY, YOU'LL BE ABLE TO QUESTION, ASSUMING THE FOUNDATION

09:01AM 10   IS LAID, AND YOU'LL BE ABLE TO EXAMINE ON THIS, AS WILL YOU,

09:01AM 11   MR. CLINE.

09:01AM 12        WHETHER OR NOT IT'S INTRODUCED AS A FORMAL EXHIBIT OR NOT,

09:01AM 13   I'M GOING TO RESERVE JUDGMENT ON THAT.

09:01AM 14        SO IT CAN BE USED, MAY BE USED, AS A DEMONSTRATIVE, BOTH

09:01AM 15   THIS MORNING AND BY COUNSEL, IF YOU WISH, IN ARGUMENT.  IN

09:01AM 16   FINAL ARGUMENT IF YOU WISH TO USE IT, IT WILL BE A

09:01AM 17   DEMONSTRATIVE.

09:01AM 18        BUT AT THIS POINT I'M NOT GOING TO ALLOW IT TO GO IN

09:01AM 19   EVIDENCE ABSENT ANY ADDITIONAL FOUNDATION.

09:01AM 20        NOW, THIS ALSO -- WE ALSO TALKED ON -- YOU TOUCHED ON A

09:01AM 21   702 OBJECTION IN REGARDS TO SOME OF THE SCIENTIFIC TERMS, AND I

09:02AM 22   THINK THE FACT THAT IT'S USED AS A DEMONSTRATIVE I THINK ALSO

09:02AM 23   ACTS PROPHYLACTICALLY ABOUT ELIMINATING THAT ISSUE ABOUT THE

09:02AM 24   JURY TO RECEIVE THIS AND THE 702 ISSUE.

09:02AM 25        MY SENSE IS, MR. LEACH, YOU'RE NOT GOING TO EXAMINE ON ANY

4337

09:02AM   1    OF THOSE TOPICS.

09:02AM   2              MR. LEACH:  THAT'S CORRECT, YOUR HONOR.

09:02AM   3              THE COURT:  SO I THINK THAT TAKES CARE OF THAT 702

09:02AM   4    ISSUE.

09:02AM   5         SO THAT'S THE COURT'S RULING ON THE DOCUMENT, AND WE'LL

09:02AM   6    SEE IF IT COMES IN FOR SOME OTHER PURPOSE.

09:02AM   7              MR. LEACH:  THANK YOU, YOUR HONOR.

09:02AM   8              MR. CLINE:  YOUR HONOR, ONE THING.

09:02AM   9              THE COURT:  SURE.

09:02AM   10             MR. CLINE:  I'M GUESSING WHAT MR. LEACH WILL DO IS

09:02AM   11   LAY A FOUNDATION AND THEN OFFER THE DOCUMENT AS A

09:02AM   12   DEMONSTRATIVE.

09:02AM   13             THE COURT:  RIGHT.

09:02AM   14             MR. CLINE:  MAY MY OBJECTION TO THAT BE NOTED SO I

09:02AM   15   DON'T HAVE TO GET UP IN FRONT OF THE JURY?

09:02AM   16             THE COURT:  ABSOLUTELY, ABSOLUTELY.

09:02AM   17        YOU CAN GET UP IF YOU WANT, BUT I'LL NOTE YOUR OBJECTION

09:02AM   18   NOW IF YOU WANT.  YOUR OBJECTION IS PRESERVED.

09:03AM   19             MR. CLINE:  ALL RIGHT.

09:03AM   20             THE COURT:  ANYTHING FURTHER ON THAT, MR. LEACH?

09:03AM   21             MR. LEACH:  I DON'T WANT TO COMPLICATE MATTERS

09:03AM   22   UNDULY, YOUR HONOR, BUT WOULD IT BE POSSIBLE TO OFFER THE FIRST

09:03AM   23   PAGE INTO EVIDENCE AND DISPLAY THE REMAINDER OF THE DOCUMENT?

09:03AM   24   I THINK THE THRUST OF MR. CLINE'S CONCERNS ARE LIMITED TO THE

09:03AM   25   COMMENTARY.

09:03AM   1          THE COURT:  THE FIRST PAGE IS --

09:03AM   2          MR. LEACH:  THE FIRST PAGE INCLUDES AN OVERVIEW, THE

09:03AM   3   RECOMMENDATIONS, AND THEN IT BEGINS THE REVIEW AND COMMENTS ON

09:03AM   4   THERANOS-PROVIDED INFORMATION.

09:03AM   5      I THINK MANY OF THE COMMENTS MR. CLINE IS RAISING ABOUT

09:03AM   6   THE EVASIVE NATURE OF THE RESPONSES AND THE POORLY PREPARED

09:03AM   7   SUMMARY ARE LIMITED TO PAGE 2 AND 3.

09:03AM   8          THE COURT:  WELL, RIGHT.  AND THAT'S A GOOD

09:03AM   9   QUESTION.

09:03AM   10      I NOTE THAT, AS I LOOK THROUGH THIS, I WAS LOOKING, WHEN

09:03AM   11   DOES THE -- FOR MR. CLINE'S POSITION, WHEN DOES THE BAD STUFF

09:03AM   12   START?

09:04AM   13          MR. CLINE:  WELL, THE FIRST BIT OF BAD STUFF IS ON

09:04AM   14   PAGE 1 WHERE DR. WEBER SAYS, "THERANOS HAS BEEN EXCESSIVELY

09:04AM   15   PUSHY IN ACCESSING NEW POINTS OF CONTACT ONCE TURNED DOWN.

09:04AM   16   THEIR MULTIPLE INTERACTIONS CAUSED UNDUE DISTRACTION FROM OUR

09:04AM   17   ONGOING WORK."

09:04AM   18      I MEAN, AGAIN, NONE OF THIS GETS CONVEYED TO MS. HOLMES.

09:04AM   19   IT'S QUITE A DIFFERENT PICTURE THAT GETS CONVEYED.

09:04AM   20      AND SO WE -- IF PAGE 1 COMES IN, I WILL SAY THAT PAGE 1,

09:04AM   21   ASSUMING A FOUNDATION CAN BE LAID, A BUSINESS RECORDS

09:04AM   22   FOUNDATION, I'M ASSUMING MR. LEACH CAN DO THAT, OTHERWISE

09:04AM   23   PAGE 1 IS OKAY.

09:04AM   24      BUT I WOULD ASK THAT, BEGINNING WITH "THERANOS HAS BEEN

09:04AM   25   EXCESSIVELY PUSHY" --

09:04AM 1          THE COURT:  THIS IS IN ITEM 3, I THINK.

09:04AM 2          MR. CLINE:  YES.  FROM THERE UNTIL THE END OF THAT

09:04AM 3   PARAGRAPH OUGHT TO BE REDACTED.

09:04AM 4          AND WITH THAT REDACTION AND WITH AN APPROPRIATE

09:05AM 5   FOUNDATION, WHICH, AGAIN, I'M SURE MR. LEACH WILL LAY, WE DON'T

09:05AM 6   HAVE A PROBLEM WITH PAGE 1 COMING IN.

09:05AM 7          THE COURT:  ALL RIGHT.

09:05AM 8          MR. LEACH:  I DON'T SHARE THE CONCERN ABOUT

09:05AM 9   EXCESSIVELY PUSHY AND UNDUE DISTRACTION, YOUR HONOR, BUT THAT

09:05AM 10  CERTAINLY IS A REASONABLE SOLUTION HERE.

09:05AM 11         THE COURT:  ALL RIGHT.  WELL, THANK YOU.  IF YOU CAN

09:05AM 12  REDACT THAT, I THINK YOU CAN --

09:05AM 13         MR. LEACH:  YES.

09:05AM 14         THE COURT:  -- THEN UPON THE PROPER FOUNDATION, THEN

09:05AM 15  PAGE 1, PAGE 1 OF THE REPORT OF EXHIBIT 167.

09:05AM 16         MR. LEACH:  I CAN'T DO THAT, BUT MY SUPERSTAR

09:05AM 17  PARALEGAL, LAKISHA HOLLIMAN, CAN DO THAT.

09:05AM 18         THE COURT:  WELL, WE'VE SEEN HER WORK, AND BOTH OF

09:05AM 19  THE TECHNICIANS' WORK AND WE'RE GRATEFUL FOR THEM.

09:05AM 20      OKAY.  GREAT.

09:06AM 21         MR. LEACH:  THANK YOU, YOUR HONOR.

09:06AM 22         THE COURT:  ALL RIGHT.  NOW I NEED TO TALK TO

09:06AM 23  COUNSEL ABOUT ANOTHER MATTER THAT HAS COME UP, AND I'M GOING TO

09:06AM 24  ASK MS. KRATZMANN TO HAND DOWN SOME -- TWO TO EACH SIDE.

09:06AM 25         THE CLERK:  (HANDING.)

4340

09:06AM   1        (PAUSE IN PROCEEDINGS.)

09:06AM   2            THE COURT:  THANK YOU.  I'VE SHARED WITH COUNSEL AN

09:06AM   3   EMAIL THAT MS. KRATZMANN RECEIVED.

09:06AM   4        MY THOUGHT IS TO -- AND THIS REGARDS THE ABILITY OF A

09:07AM   5   JUROR, A SITTING JUROR, AND MY THOUGHT IS TO -- WELL, FIRST OF

09:07AM   6   ALL, LET ME SUGGEST TO COUNSEL, I WANT TO ADDRESS THIS BEFORE

09:07AM   7   WE BEGIN ANY EVIDENCE THIS MORNING, AND WHAT I THOUGHT I WOULD

09:07AM   8   DO IS INVITE THE JUROR IN.

09:07AM   9        IF YOUR TEAM WANTS TO IDENTIFY ONE LAWYER, WE'LL GO IN

09:07AM  10   CHAMBERS AND SPEAK WITH THIS JUROR ABOUT THIS ISSUE ON THE

09:07AM  11   RECORD.

09:07AM  12            MR. DOWNEY:  THAT'S FINE WITH US, YOUR HONOR.

09:07AM  13            MR. SCHENK:  YES, YOUR HONOR.

09:07AM  14            THE COURT:  ALL RIGHT.  THANK YOU.  WE'LL TAKE OUR

09:07AM  15   BREAK THEN BEFORE WE BEGIN EVIDENCE AND MS. KRATZMANN WILL

09:07AM  16   CONTACT YOU WHEN WE CAN BEGIN THAT.

09:07AM  17        MR. LEACH.

09:07AM  18            MR. LEACH:  YOUR HONOR, ONE OTHER MATTER WITH

09:07AM  19   RESPECT TO 167, AND I'M SORRY TO RAISE THIS NOW.

09:07AM  20            THE COURT:  YES.  NO, NO.

09:07AM  21            MR. LEACH:  I WAS CONVERSING WITH OUR TEAM, AND I

09:07AM  22   JUST WANT TO MAKE SURE THAT I UNDERSTAND THE COURT'S RULING.

09:07AM  23        WE WILL OFFER PAGE 1 WITH THE REDACTION INTO EVIDENCE, BUT

09:07AM  24   WE MAY STILL DISPLAY AS A DEMONSTRATIVE THE REMAINDER OF THE

09:07AM  25   DOCUMENT.

| | | |
|---|---|---|
| 09:07AM | 1 | THE COURT:  THAT'S CORRECT. |
| 09:08AM | 2 | MR. LEACH:  AND IS IT NECESSARY TO REDACT THE |
| 09:08AM | 3 | EXCESSIVELY PUSHY LANGUAGE AS TO THE DEMONSTRATIVE PORTION? |
| 09:08AM | 4 | THE COURT:  NO, NO.  I'M LETTING THAT IN.  HE CAN |
| 09:08AM | 5 | TALK ABOUT THAT. |
| 09:08AM | 6 | MR. LEACH:  OKAY. |
| 09:08AM | 7 | THE COURT:  HIS OBSERVATIONS -- "HIS" MR. WEBER'S -- |
| 09:08AM | 8 | OBSERVATIONS, THEY'RE HIS PERSONAL OBSERVATIONS, AND YOU CAN |
| 09:08AM | 9 | CERTAINLY CROSS-EXAMINE HIM ON HIS FEELINGS ABOUT -- I VIEW |
| 09:08AM | 10 | THIS AS THE SAME AS SOMEBODY TESTIFYING ABOUT THEIR -- WHICH A |
| 09:08AM | 11 | WITNESS CAN DO WHEN THEY TALK TO SOMEONE -- DID THEY APPEAR |
| 09:08AM | 12 | NERVOUS?  DID THEY APPEAR CALM?  WERE THEY EXCITED? |
| 09:08AM | 13 | MR. CLINE:  WELL, YOUR HONOR, IT KIND OF DEFEATS THE |
| 09:08AM | 14 | PURPOSE IF THE JURY IS SHOWN THE LANGUAGE AND THEN THE ADMITTED |
| 09:08AM | 15 | DOCUMENT HAS THAT LANGUAGE REDACTED, THE JURY IS GOING TO KNOW |
| 09:08AM | 16 | WHAT IS UNDER THE REDACTION AND THEY'RE GOING TO -- IF |
| 09:08AM | 17 | ANYTHING, IT WILL HEIGHTEN THE IMPORTANCE OF IT.  SO I WOULD |
| 09:08AM | 18 | ASK -- |
| 09:08AM | 19 | THE COURT:  OH, NO, I'M SORRY. |
| 09:08AM | 20 | YOU'RE TALKING ABOUT THE BALANCE OF THE REPORT.  THAT'S |
| 09:09AM | 21 | WHAT I THOUGHT YOU WERE TALKING ABOUT, MR. LEACH. |
| 09:09AM | 22 | MR. LEACH:  YES. |
| 09:09AM | 23 | THE COURT:  NOT PAGE 1.  PAGE 1 WILL BE ADMITTED |
| 09:09AM | 24 | WITH THE REDACTIONS.  IT WON'T BE SHOWN WITH THE REDACTIONS. |
| 09:09AM | 25 | THE BALANCE OF THE EXHIBIT THAT IS GOING TO BE A |

4342

09:09AM  1    DEMONSTRATIVE WILL HAVE THAT SAME LANGUAGE IN IT?

09:09AM  2              MR. CLINE:  THE SAME LANGUAGE IT CONTAINS NOW?

09:09AM  3              THE COURT:  CORRECT.

09:09AM  4              MR. CLINE:  SO THE DEMONSTRATIVE THAT HE'S GOING TO

09:09AM  5    PUT UP WILL NOT HAVE AN UNREDACTED PAGE 1 ON IT, IT WILL BE THE

09:09AM  6    REMAINING PAGES OF THE EXHIBIT.

09:09AM  7              THE COURT:  THE REMAINING PAGES WILL NOT BE

09:09AM  8    REDACTED.

09:09AM  9              MR. CLINE:  UNDERSTOOD.

09:09AM 10         BUT HERE'S WHAT I UNDERSTOOD MR. LEACH TO BE SAYING AND

09:09AM 11    WHAT I WANT TO MAKE SURE DOESN'T HAPPEN.  PAGE 1 IS GOING TO

09:09AM 12    COME IN WITH THAT REDACTION.

09:09AM 13              THE COURT:  CORRECT.

09:09AM 14              MR. CLINE:  MR. LEACH WILL BE PERMITTED TO PUT UP A

09:09AM 15    DEMONSTRATIVE.  THE DEMONSTRATIVE WILL NOT INCLUDE AN

09:09AM 16    UNREDACTED PAGE 1.

09:09AM 17              THE COURT:  THAT'S CORRECT.

09:09AM 18              MR. CLINE:  ALL RIGHT.

09:09AM 19              MR. LEACH:  I UNDERSTAND, YOUR HONOR.

09:09AM 20              THE COURT:  IT'S PAGE 2 ON, WHATEVER THEY ARE --

09:09AM 21              MR. CLINE:  YES.

09:09AM 22              MR. LEACH:  MAY BE DISPLAYED UNREDACTED?

09:09AM 23              THE COURT:  YES.

09:09AM 24              MR. LEACH:  BUT NOT COMING INTO EVIDENCE?

09:09AM 25              THE COURT:  RIGHT.

| | | |
|---|---|---|
| 09:09AM | 1 | MR. CLINE:  THANK YOU. |
| 09:10AM | 2 | THE COURT:  GREAT. |
| 09:10AM | 3 | THE CLERK:  COURT IS IN RECESS. |
| 09:10AM | 4 | (RECESS FROM 9:10 A.M. UNTIL 9:24 A.M.) |
| 09:39AM | 5 | (THE FOLLOWING PROCEEDINGS WERE HELD IN CHAMBERS.) |
| 09:39AM | 6 | THE COURT:  GOOD MORNING. |
| 09:39AM | 7 | JUROR:  GOOD MORNING. |
| 09:39AM | 8 | THE COURT:  WE ARE ON THE RECORD.  WE ARE IN MY |
| 09:39AM | 9 | CHAMBERS WITH JUROR NUMBER 5. |
| 09:39AM | 10 | ALSO PRESENT ARE MR. DOWNEY, MR. SCHENK, AND MY LAW CLERK |
| 09:39AM | 11 | STAFF, AND OUR COURTROOM DEPUTY. |
| 09:39AM | 12 | I WANTED TO HAVE THIS CONVERSATION WITH YOU, JUROR |
| 09:39AM | 13 | NUMBER 5.  I'M GOING TO ADDRESS YOU AS JUROR NUMBER 5. |
| 09:39AM | 14 | LET ME ASK YOU YOUR COMFORT ABOUT KEEPING YOUR MASK ON OR |
| 09:39AM | 15 | OFF.  WHAT WOULD YOU LIKE? |
| 09:39AM | 16 | JUROR:  I DON'T REALLY HAVE A PREFERENCE. |
| 09:39AM | 17 | THE COURT:  OKAY.  SHALL WE KEEP THEM ON THEN?  IS |
| 09:39AM | 18 | THAT WHAT YOU WOULD LIKE TO DO? |
| 09:39AM | 19 | JUROR:  SURE. |
| 09:39AM | 20 | THE COURT:  I CALLED YOU BACK HERE BECAUSE IT'S COME |
| 09:39AM | 21 | TO MY ATTENTION THAT DURING THE TESTIMONY OF OUR CASE JUST |
| 09:39AM | 22 | RECENTLY, THAT I THOUGHT I MAY HAVE OBSERVED, AND IT'S COME TO |
| 09:39AM | 23 | MY ATTENTION, THAT YOU MAY HAVE BEEN ENGAGED IN SOMETHING ELSE |
| 09:39AM | 24 | OTHER THAN LISTENING TO THE TESTIMONY. |
| 09:39AM | 25 | LET ME BE SPECIFIC.  I THINK IT WAS SUDOKU OR ONE OF THOSE |

09:39AM  1    NUMBER GAMES.

09:39AM  2                 JUROR:  UH-HUH.

09:39AM  3                 THE COURT:  AND I NEED TO ASK YOU ABOUT THAT, IF YOU

09:39AM  4    WERE, IN FACT, ENGAGED IN THAT.

09:39AM  5           AND I THINK YOU CAN APPRECIATE THE REASON WHY.  I NEED TO

09:39AM  6    KNOW WHETHER OR NOT YOU WERE FOCUSSED ON THE TRIAL AT HAND,

09:39AM  7    DISTRACTED, MISSED SOME TESTIMONY, AND THAT'S WHY I CALLED YOU

09:39AM  8    IN TO TALK TO YOU ABOUT THAT HERE.  I DIDN'T WANT TO DO THIS IN

09:39AM  9    FRONT OF YOUR COLLEAGUE JURORS, NOR IN THE PUBLIC SETTING,

09:39AM  10   ALTHOUGH THIS TRANSCRIPT IS GOING TO BE A PUBLIC TRANSCRIPT.

09:39AM  11          SO I JUST WANTED TO ASK YOU QUESTIONS ABOUT THAT, PLEASE.

09:39AM  12                JUROR:  SURE.  YEAH.  I DEFINITELY HAVEN'T MISSED

09:39AM  13   ANY TESTIMONY AT ALL, YEAH.

09:39AM  14                THE COURT:  OKAY.  WERE YOU -- WERE YOU -- AM I

09:39AM  15   CORRECT, WERE YOU PLAYING THIS SUDOKU?

09:39AM  16                JUROR:  I DO HAVE SUDOKU, BUT IT DOESN'T INTERFERE

09:39AM  17   WITH ME LISTENING.  I'M VERY FIDGETY, SO I NEED TO DO SOMETHING

09:39AM  18   WITH MY HANDS.  SO AT HOME I'LL CROCHET WHILE I'M WATCHING OR

09:39AM  19   LISTENING TO T.V.

09:39AM  20          OTHER THAN THAT, NO.

09:39AM  21                THE COURT:  SO WERE YOU PLAYING THE GAME WHILE

09:39AM  22   TESTIMONY WAS -- OR I DON'T KNOW IF THAT'S THE RIGHT TERM,

09:39AM  23   PLAYING THE SUDOKU OR FILLING OUT THE FORM -- WERE YOU ENGAGED

09:39AM  24   IN THAT WHILE TESTIMONY WAS GOING ON?

09:39AM  25                JUROR:  I DO DO IT INTERMITTENTLY THROUGH THE

09:39AM 1    TESTIMONY, BUT I'M FULLY ENGAGED.

09:39AM 2          THE COURT:  OKAY.  CAN YOU TELL ME HOW OFTEN YOU'VE

09:39AM 3    DONE THAT, AND CAN YOU TELL ME WHEN YOU'VE DONE THAT?

09:39AM 4          JUROR:  NOT TOO OFTEN.  SO I JUST HAVE IT THERE TO

09:39AM 5    HELP ME FIDGET BECAUSE I DON'T KNOW IF YOU NOTICE, I MOVE A LOT

09:39AM 6    IN THE SEAT, TOO.  I HAVE A HARD TIME SITTING STILL.

09:39AM 7          THE COURT:  RIGHT.  SO WHEN YOU'RE DOING THE GAME,

09:39AM 8    IT'S A -- YOU KNOW, YOU'RE FILLING OUT THAT GAME, HAVE YOU DONE

09:39AM 9    THAT EVERY DAY OF THE TRIAL?

09:39AM 10         JUROR:  NO.

09:39AM 11         THE COURT:  CAN YOU GIVE ME AN IDEA OF WHEN YOU'VE

09:39AM 12   DONE THAT AND HOW OFTEN, HOW LONG YOU DO IT DURING TESTIMONY?

09:39AM 13         JUROR:  PROBABLY -- MAYBE LIKE ONE GAME A TIME,

09:39AM 14   MAYBE.

09:39AM 15         THE COURT:  OKAY.  OKAY.

09:39AM 16         JUROR:  IF THAT DOESN'T -- I DON'T USUALLY FINISH

09:39AM 17   THEM, SO --

09:39AM 18         THE COURT:  I SEE.  AND IT LOOKS LIKE YOU TAKE --

09:39AM 19   YOU HAVE THE GAME PAPER, THE BOOK OUT THERE IN YOUR BINDER AND

09:39AM 20   YOU'RE FILLING IT OUT THEN.

09:39AM 21         JUROR:  YEAH, I HAVE THAT.  I HAVE IT ALONG WITH MY

09:39AM 22   NOTEBOOK.

09:39AM 23         THE COURT:  RIGHT.  RIGHT.

09:39AM 24         JUROR:  SO IF I LOOK AT IT AND I SEE IT A NUMBER, I

09:39AM 25   WRITE IT DOWN AND THEN I WRITE DOWN THE TESTIMONY.

4346

09:39AM 1          THE COURT:  SO HAS THIS DISTRACTED YOU FROM

09:39AM 2   LISTENING?

09:39AM 3          JUROR:  NO.

09:39AM 4          THE COURT:  HAVE YOU BEEN ABLE TO FOLLOW AND RETAIN

09:39AM 5   EVERYTHING THAT IS GOING ON IN THE COURTROOM?

09:39AM 6          JUROR:  OH, YEAH, DEFINITELY.

09:39AM 7          THE COURT:  DO YOU HAVE ANY DOUBT ABOUT THAT?

09:39AM 8          JUROR:  NO.

09:39AM 9          THE COURT:  WHAT -- IF I ASKED YOU TO STOP DOING

09:39AM 10  THIS, IS THAT SOMETHING THAT YOU CAN DO?

09:39AM 11         JUROR:  YEAH, THAT'S NOT A PROBLEM.

09:39AM 12         THE COURT:  WILL THAT AFFECT -- IF YOU DON'T PLAY

09:39AM 13  THIS WHILE YOU'RE SITTING AS A JUROR, WILL THAT AFFECT YOUR

09:39AM 14  ABILITY TO CONTINUE TO LISTEN AND ABSORB THE INFORMATION?

09:39AM 15         JUROR:  NO.

09:39AM 16         THE COURT:  YOU, YOU -- EXCUSE ME.  YOU SAID YOU GET

09:39AM 17  FIDGETY, AND I KNOW SITTING A LONG TIME IS PROBABLY SOMETHING

09:39AM 18  YOU DON'T DO AT WORK.

09:39AM 19         JUROR:  YEAH, I MOVE AROUND A LOT AT WORK.

09:39AM 20         THE COURT:  RIGHT.  AND ONE THING THAT MIGHT BE

09:39AM 21  HELPFUL AND I MAY SUGGEST TO THE JURY, IF THAT BECOMES AN

09:39AM 22  ISSUE, THEN LET ME KNOW AND WE'LL TAKE A STANDING BREAK.  I TRY

09:39AM 23  TO DO THAT WHEN WE HAVE TRANSITIONS BECAUSE I KNOW IT'S TEDIOUS

09:39AM 24  SITTING.

09:39AM 25         BUT LET ME GET BACK TO THIS.  JUROR NUMBER 5, I'M JUST

| | |
|---|---|
| 09:39AM | 1 |
| 09:39AM | 2 |
| 09:39AM | 3 |
| 09:39AM | 4 |
| 09:39AM | 5 |

09:39AM 1    GOING TO BE VERY CANDID WITH YOU.  I DO HAVE VERY SERIOUS

09:39AM 2    CONCERNS WHEN I HEAR AND SEE THAT SOMEONE IS ENGAGED IN

09:39AM 3    SOMETHING ELSE OTHER THAN GIVING THEIR FULL ATTENTION TO THE

09:39AM 4    EVIDENCE IN THE CASE.  IT CAUSES ME GREAT CONCERN AS TO WHETHER

09:39AM 5    OR NOT THAT PERSON, YOU, CAN STILL SERVE AS A JUROR BECAUSE

09:39AM 6    YOU'VE ABSORBED EVERYTHING, YOU'VE LISTENED TO EVERYTHING, SUCH

09:39AM 7    THAT YOU CAN SHARE YOUR OPINIONS WITH YOUR FELLOW JURORS WHEN

09:39AM 8    YOU GO INTO A DELIBERATION ROOM.  THAT'S WHAT A JUROR MUST DO.

09:39AM 9         JUROR:  UH-HUH.

09:39AM 10         THE COURT:  AND IT'S UNFAIR TO BOTH SIDES IF A JUROR

09:39AM 11    WERE TO GO IN AND SAY, OH, GOSH, I GUESS I DIDN'T HEAR THAT

09:39AM 12    BECAUSE I WAS DISTRACTED DOING SOMETHING ELSE.

09:39AM 13         JUROR:  NO, I TOTALLY UNDERSTAND YOUR CONCERNS.

09:39AM 14         THE COURT:  YEAH.  RIGHT.  SO WHAT DO YOU THINK

09:39AM 15    ABOUT THAT?

09:39AM 16         JUROR:  I DON'T FEEL IT HAS AFFECTED ME AT ALL.  I'M

09:39AM 17    VERY GOOD AT RETAINING INFORMATION.

09:39AM 18       SO I DEFINITELY HEARD EVERYTHING THAT HAS BEEN SAID, THE

09:39AM 19    EVIDENCE THAT HAS BEEN PRESENTED, THE QUESTIONS THAT HAVE BEEN

09:39AM 20    ASKED IN REGARDS TO THE EVIDENCE AND THE ANSWERS.  SO I'M

09:39AM 21    REALLY -- I DON'T HAVE ANY --

09:39AM 22         THE COURT:  OKAY.  LET ME JUST SAY, I HAVE -- I

09:39AM 23    WATCH, I TRY TO WATCH EVERYTHING AND I DO PAY ATTENTION TO THE

09:39AM 24    JURORS, AND I'VE SEEN AND WATCHED YOU AND SEEN YOU IN THE CHAIR

09:39AM 25    AS WE MOVE AROUND AND WE MOVE THE JURORS AROUND BECAUSE I WANT

09:39AM  1    THE JURORS TO HAVE A FULL EXPERIENCE.  IT'S UNUSUAL THE WAY OUR

09:39AM  2    SEATING IS.

09:39AM  3              JUROR:  YEAH.

09:39AM  4              THE COURT:  BUT I DON'T WANT SOME JURORS TO BE STUCK

09:39AM  5    OUT IN THE OUTSIDE OF THE WELL.  I WANT TO ROTATE EVERYBODY SO

09:39AM  6    THAT THEY CAN OBSERVE EVERYTHING IN THE SAME WAY.

09:39AM  7         BUT I HAVE WATCHED YOU AND I HAVE NOTICED THAT YOU

09:39AM  8    SOMETIMES TURN YOUR CHAIR.  I'VE NOTICED THAT YOU TAKE NOTES.

09:39AM  9    I'M NOT GOING TO ASK YOU TO TELL ME ANYTHING ABOUT ANYTHING

09:39AM  10   YOU'VE HEARD OR YOUR THOUGHTS OR ANYTHING, I DO -- I HAVE

09:39AM  11   NOTICED THAT YOU'RE TAKING NOTES.

09:39AM  12        I'VE NOTICED THAT -- AND THIS IS THE SAME OF ALL JURORS --

09:39AM  13   THERE ARE TIMES WHEN I THINK WE ALL GET TIRED.  THE LAWYERS GET

09:39AM  14   TIRED, THE COURT GETS TIRED.  THE ONLY ONE THAT IS NOT TIRED IS

09:39AM  15   THE COURT REPORTER.  SHE HAS ENERGY LIKE CRAZY.

09:39AM  16        EVERYONE ELSE GETS A LITTLE FATIGUED, I UNDERSTAND THAT.

09:39AM  17   AND WE ALL HAVE OUR MECHANISMS OF FIGHTING THAT OFF, AND

09:39AM  18   HOPEFULLY THE BREAKS WILL DO THAT.

09:39AM  19        IS THIS SOMETHING THAT -- IS THERE SOMETHING THAT I CAN DO

09:39AM  20   TO HELP YOU WITH THIS?  I KNOW YOU USED THE TERM "FIDGETY," YOU

09:39AM  21   GET FIDGETY AND NERVOUS.  IS THERE SOMETHING --

09:39AM  22              JUROR:  NOT PARTICULARLY NERVOUS.  I'M FIDGETY AT

09:39AM  23   WORK AND VERY ACTIVE AND I'M WORKING BACK AND FORTH AND I'M

09:39AM  24   DOING THINGS, TEN THINGS AT ONE TIME.

09:39AM  25        AND JUST SITTING DOWN AND DOING THAT ONE THING AND HAVING

09:39AM 1    TO LISTEN, IT IS HARD FOR ME TO NOT MOVE AROUND.

09:39AM 2            THE COURT:  OKAY.

09:39AM 3            JUROR:  SO I'M ROCKING AND TAPPING MY TOES AND

09:39AM 4    MOVING MY FINGERS AND CRACKING MY HANDS A LOT BECAUSE I DON'T

09:39AM 5    KNOW WHAT TO DO WHEN I'M NOT DOING ALL OF THESE THINGS.

09:39AM 6            THE COURT:  NO, I'VE SEEN YOU MOVE YOUR CHAIR.

09:39AM 7            JUROR:  I GO BACK AND FORTH.

09:39AM 8            THE COURT:  YOU ORIENT YOURSELF NORTH, WEST, SOUTH,

09:39AM 9    EAST, WEST.  I NOTICED THAT, AND THAT'S A SIGNAL TO ME SAYING,

09:39AM 10   GEE, I WOULD LIKE TO TAKE A BREAK, A STANDING BREAK AND THOSE

09:39AM 11   TYPES OF THINGS.

09:39AM 12       AGAIN, I'M JUST CONCERNS ABOUT WHETHER YOU'VE MISSED

09:39AM 13   SOMETHING.

09:39AM 14       AND WHEN YOU PLAY THE GAME, ARE YOU FOCUSSED ENTIRELY ON

09:39AM 15   THE GAME SUCH THAT EVERYTHING IS BLOCKED OUT?

09:39AM 16           JUROR:  OH, NO, NO.

09:39AM 17           THE COURT:  WHEN YOU PLAY THE GAME, ARE YOU ABLE TO

09:39AM 18   LISTEN AND --

09:39AM 19           JUROR:  OH, YEAH.  LIKE I SAID, I DID HEAR

09:39AM 20   EVERYTHING AND I'M TAKING EVERYTHING IN AND I'M WRITING NOTES

09:39AM 21   ON THE SIDE.

09:39AM 22           THE COURT:  SOME PEOPLE DOODLE I'M TOLD.

09:39AM 23           JUROR:  YEAH, I DOODLE, TOO, YEAH.  AND, AGAIN, IT'S

09:39AM 24   TRYING TO KEEP MY HANDS BUSY BECAUSE MOST OF IS IT LIKE

09:39AM 25   SCRIBBLING THROUGHOUT THE PAGE.

09:39AM 1    THE COURT:  DOES THAT INTERFERE WITH YOUR ABILITY TO

09:39AM 2  PAY ATTENTION OR PAY ATTENTION?

09:39AM 3    JUROR:  NO.

09:39AM 4    THE COURT:  LET ME ASK, JUROR NUMBER 5, DO YOU HAVE

09:39AM 5  ANY DOUBT THAT YOU COULD CONTINUE TO BE A JUROR IN THIS CASE

09:39AM 6  AND PAY ATTENTION AND FOCUS ON THE EVIDENCE AT HAND?  ANY DOUBT

09:39AM 7  ABOUT YOUR ABILITY TO DO THAT?

09:39AM 8    JUROR:  NO, NO DOUBT.

09:39AM 9    THE COURT:  DO YOU FEEL THAT BECAUSE OF YOUR PLAYING

09:39AM 10  THE GAME -- AND HOW MANY TIMES WAS IT?  DID YOU TELL US?

09:39AM 11    JUROR:  I SAID MAYBE ONE GAME AT A TIME.

09:39AM 12    THE COURT:  HOW MANY DAYS?

09:39AM 13    JUROR:  MAYBE SEVEN TO TEN DAYS OVER THE COURSE.

09:39AM 14    THE COURT:  OKAY.  DO YOU THINK IN ANY OF THOSE

09:39AM 15  TIMES THAT YOU PLAYED THAT GAME -- AND HOW LONG DID YOU DO

09:39AM 16  THAT?  HOW LONG WERE YOU PLAYING IT WHEN YOU PLAYED IT?  WAS IT

09:39AM 17  FOR HOURS?  IS IT FOR MINUTES?

09:39AM 18    JUROR:  USUALLY JUST MINUTES.

09:39AM 19    THE COURT:  OKAY.  DO YOU FEEL THAT YOU'VE LOST

09:39AM 20  ANYTHING, THAT IS, MISSED ANY PIECE OF EVIDENCE AT ALL?

09:39AM 21    JUROR:  NO.  NO.

09:39AM 22    THE COURT:  OKAY.  ALL RIGHT.  I'M GOING TO ASK

09:39AM 23  THESE LAWYERS IF THEY HAVE ANY QUESTIONS FOR YOU.

09:39AM 24    OKAY?

09:39AM 25    JUROR:  YES.

09:39AM  1              THE COURT:  MR. SCHENK?

09:39AM  2              MR. SCHENK:  NOTHING FOR ME.

09:39AM  3              MR. DOWNEY:  I DON'T HAVE ANYTHING.  THANK YOU.

09:39AM  4              THE COURT:  ALL RIGHT.  ANY QUESTIONS FOR ME?

09:39AM  5              JUROR:  NO.

09:39AM  6              THE COURT:  OKAY.  AS I SAID, THE TRANSCRIPT IS

09:39AM  7    GOING TO BE PUBLIC.  I'M NOT GOING TO DISCUSS THIS WITH YOUR

09:39AM  8    FELLOW JURORS, AND YOU DON'T HAVE TO EITHER.  YOU CAN KEEP

09:39AM  9    PRIVATE WHAT WE'VE TALKED ABOUT HERE.

09:39AM  10             JUROR:  ALL RIGHT.

09:39AM  11             THE COURT:  THANK YOU VERY MUCH.  THANK YOU FOR YOUR

09:39AM  12   TIME.  I APPRECIATE IT.

09:39AM  13             JUROR:  YOU'RE WELCOME.

09:39AM  14        (PROCEEDINGS HELD OUT OF THE PRESENCE OF JUROR NUMBER 5.)

09:39AM  15             THE COURT:  ALL RIGHT.  THE RECORD SHOULD REFLECT

09:39AM  16   JUROR NUMBER 5 HAS LEFT CHAMBERS.  COUNSEL REMAIN.

09:39AM  17        ANY COMMENTS?  MR. SCHENK?  MR. DOWNEY?

09:39AM  18             MR. SCHENK:  I THINK I WOULD LIKE TO SPEND A LITTLE

09:39AM  19   BIT OF TIME REFLECTING ON IT.  THE AMOUNT OF DAYS SEEMED LIKE A

09:39AM  20   HIGH NUMBER.  SEVEN TO TEN DAYS IS SEVERAL WEEKS OF THE TRIAL,

09:39AM  21   BUT THEN THE AMOUNT OF TIME EACH DAY SEEMED SMALL, AND SHE

09:39AM  22   CERTAINLY UNEQUIVOCALLY SAID SHE HAS CAPTURED THE TESTIMONY.

09:39AM  23   IT'S SOMETHING TO DISTRACT HER HANDS, BUT NOT HER MIND.

09:39AM  24        SO THERE'S A LITTLE BIT OF REFLECTING ON THE -- I DON'T

09:39AM  25   KNOW THAT I WOULD CALL IT TENSION BETWEEN THOSE POINTS, BUT

09:39AM  1    SOME THINGS RAISED CONCERNS AND SOME THINGS GAVE ME COMFORT,

09:39AM  2    AND I THINK I WOULD LIKE TO TALK TO MY TEAM AND JUST ALSO

09:39AM  3    REFLECT ON IT, IF THAT'S OKAY.

09:39AM  4              THE COURT:  MR. DOWNEY?

09:39AM  5              MR. DOWNEY:  YOUR HONOR, I ACTUALLY HAVE TO REQUEST

09:39AM  6    FOR A DISMISSAL.  SHE'S BEEN PLAYING A GAME WHICH IS, YOU KNOW,

09:39AM  7    AT A LEVEL OF DISTRACTION IT'S DIFFICULT FOR US TO MEASURE

09:39AM  8    BASED ON HER OWN COMMENTS.

09:39AM  9        WE DO KNOW THAT IT WAS SUFFICIENTLY NOTICEABLE TO ANOTHER

09:39AM  10   JUROR TO BRING IT TO OUR ATTENTION.

09:39AM  11       I THINK IT'S DIFFICULT FOR HER TO EVALUATE WHETHER SHE HAS

09:39AM  12   MISSED TESTIMONY OR EVIDENCE.  SHE KNOWS SHE'S HEARD WHAT SHE

09:39AM  13   HAS HEARD AND SHE KNOWS, OF COURSE, THAT SHE HAS MADE EVERY

09:39AM  14   EFFORT TO PAY ATTENTION.

09:39AM  15       BUT THAT'S, FRANKLY, IMPOSSIBLE FOR US TO EVALUATE.  SO TO

09:39AM  16   MY MIND IT FALLS IN THE SAME CATEGORY AS THE SLEEPING OR DOZING

09:39AM  17   OFF JUROR A LITTLE BIT, SO I HAVE TO REQUEST HER DISMISSAL.

09:39AM  18              THE COURT:  MR. SCHENK?

09:39AM  19              MR. SCHENK:  THE -- MY REVIEW LAST TIME WHEN WE HAD

09:39AM  20   A SIMILAR DISCUSSION OF THE CASES INVOLVING SLEEPING JURORS IS

09:39AM  21   WE DO NOT AUTOMATICALLY DISMISS THEM.  THERE'S INQUIRY INTO THE

09:39AM  22   AMOUNT OF TESTIMONY THAT THEY MISSED OR THE AMOUNT OF TIME THAT

09:39AM  23   THEY WERE SLEEPING, AND THE QUESTIONS THAT YOUR HONOR ASKED AND

09:39AM  24   THE RESPONSES THAT THEY ELICITED DIDN'T RAISE ANY OBVIOUS

09:39AM  25   CONCERNS REGARDING CHUNKS OF TESTIMONY THAT SHE MISSED.

09:39AM  1        BUT I SUPPOSE I GO BACK TO WHERE I STARTED, AND THAT IS IF

09:39AM  2   IT WOULD BE OKAY WITH THE COURT, I WOULD JUST LIKE TO REFLECT

09:39AM  3   ON IT FOR A LITTLE WHILE.  I DON'T KNOW THAT I'M IN A POSITION

09:39AM  4   NOW TO AGREE TO THE REQUEST TO DISMISS THE JUROR.

09:39AM  5        I DON'T THINK THE RECORD IS SUFFICIENT TO SAY IT'S OBVIOUS

09:39AM  6   THAT SHE MUST GO BASED ON AN EXPRESSION OF CHUNKS OF TESTIMONY

09:39AM  7   THAT WERE MISSED.

09:39AM  8        BUT, LOOK, I ACKNOWLEDGE WHAT MR. DOWNEY SAID AND THAT

09:39AM  9   IT'S VERY DIFFICULT TO KNOW EXACTLY HOW MUCH SHE MISSED, AND

09:39AM 10   WHEN SHE SAYS SHE WAS PLAYING THE GAME SEVEN TO TEN DAYS, I

09:39AM 11   HAVEN'T COUNTED, BUT MAYBE THAT'S HALF OF THE TRIAL DAYS.

09:39AM 12        THE COURT:  ALL RIGHT.  THANK YOU.

09:39AM 13        WELL, THAT'S A CONCERN THAT I HAVE.  SHE WAS VERY OPEN

09:39AM 14   ABOUT THE FACT THAT APPARENTLY THIS IS SOMETHING THAT SHE DOES

09:39AM 15   TO TAKE CARE OF HER FIDGETINESS, I THINK SHE SAID, BUT SHE TOLD

09:39AM 16   US THAT IT DOESN'T IMPACT HER ABILITY TO -- AT WORK, FOR

09:39AM 17   EXAMPLE.

09:39AM 18        AND THIS IS A DIFFERENT TYPE OF WORK.  BEING A JUROR IS A

09:39AM 19   DIFFERENT TYPE OF WORK AS WE KNOW.

09:39AM 20        INITIALLY I DID HAVE CONCERNS WHEN SHE TOLD US ABOUT

09:39AM 21   PLAYING THE GAME JUST A MINUTE OR TWO, AND I CAN UNDERSTAND

09:39AM 22   THAT.  IT'S VERY AKIN TO SOMEBODY DOODLING OR SOMETHING LIKE

09:39AM 23   THAT.

09:39AM 24        BUT I AGREE, WHEN SHE MENTIONED THE SEVEN TO TEN DAYS,

09:39AM 25   JUST THE ACCUMULATION OF THE TIME THERE -- AND I DON'T KNOW WHO

4354

09:39AM 1      THE WITNESS WAS, WHO WAS -- WAS IT, YOU KNOW, WAS IT YOUR

09:39AM 2      DIRECT OR YOUR CROSS, YOU KNOW, THAT CAUSES ME SOME CONCERN

09:39AM 3      ABOUT HOW DO WE PARSE THAT OUT AND HOW DO YOU ASK SOMEBODY TO,

09:39AM 4      YOU KNOW, TELL ME WHAT YOU'VE MISSED IN THE EVIDENCE, YOU KNOW.

09:39AM 5      WE CAN'T GET THAT FROM HER.

09:39AM 6          I DO HAVE SOME CONCERNS.  BUT, MR. SCHENK -- AND IF I'M

09:39AM 7      GOING TO EXCUSE THIS JUROR, I'D LIKE TO DO IT BEFORE WE START

09:39AM 8      TODAY'S TESTIMONY, JUST TO GET IT DONE AND MOVE ON.

09:39AM 9          SO WHY DON'T -- MR. SCHENK, I CAN YOU GIVE SOME TIME TO

09:39AM 10     MEET, AND THEN MAY I CALL YOU BOTH BACK HERE IN ABOUT TEN

09:39AM 11     MINUTES?  IS THAT FINE?

09:39AM 12             MR. DOWNEY:  THAT'S FINE, YOUR HONOR.

09:39AM 13             THE COURT:  GREAT.  WHY DON'T YOU DISCUSS WITH YOUR

09:39AM 14     TEAMS.  I'LL BE HERE.  YOU CAN LET MS. KRATZMANN KNOW WHEN YOU

09:39AM 15     WANT TO COME BACK.

09:39AM 16             MR. SCHENK:  THANK YOU, YOUR HONOR.

09:39AM 17             THE COURT:  AND WE'LL FINISH THIS UP.

09:39AM 18         GREAT.  THANK YOU.  WE'RE OFF THE RECORD.  THANK YOU.

09:39AM 19         (RECESS FROM 9:39 A.M. UNTIL 9:54 A.M.)

09:54AM 20             THE COURT:  WE'RE BACK ON THE RECORD.  BOTH COUNSEL

09:54AM 21     ARE PRESENT.  JUROR NUMBER 5 IS NOT PRESENT.  COURT STAFF IS

09:54AM 22     PRESENT ALSO.

09:54AM 23         COUNSEL, YOU'VE HAD AN OPPORTUNITY TO TALK WITH YOUR

09:54AM 24     TEAMS.

09:54AM 25             MR. SCHENK?

09:54AM  1          MR. SCHENK:  THANK YOU VERY MUCH, YOUR HONOR, FOR

09:54AM  2     GIVING US THAT TIME.

09:54AM  3          THE GOVERNMENT IS NOT GOING TO OPPOSE THE DEFENSE REQUEST

09:54AM  4     TO EXCUSE THIS JUROR.

09:54AM  5          I THINK THERE'S A LITTLE BIT OF UNCERTAINTY THE EXACT

09:54AM  6     AMOUNT OF TIME THAT SHE WAS DISTRACTED.  SHE SAID SEVEN TO TEN

09:54AM  7     DAYS SHE WAS PLAYING THE PUZZLES, AND SHE SAID A MINUTE OR TWO.

09:54AM  8     SO I DON'T KNOW IF THAT MEANS SEVEN TO TEN TOTAL MINUTES.

09:54AM  9          I DON'T THINK THAT'S PROBABLY ACCURATE.  I THINK THE

09:54AM 10     DISTRACTION WAS PROBABLY LONGER THAN THAT.

09:54AM 11          SO ONE OPTION WOULD BE TO ASK FURTHER QUESTIONS ON THE

09:54AM 12     TOTAL AMOUNT OF TIME OF DISTRACTION, BUT I DON'T THINK THAT'S

09:54AM 13     NECESSARY.

09:54AM 14          I APPRECIATE THE POINTS THAT MR. DOWNEY MADE AND THAT THE

09:54AM 15     COURT DEVELOPED THROUGH ITS QUESTIONING, AND THE GOVERNMENT IS

09:54AM 16     FINE WITH NOT OPPOSING THE REQUEST FROM THE DEFENSE.

09:54AM 17          THE COURT:  OKAY.  THANK YOU.

09:54AM 18          MR. DOWNEY, ANYTHING?

09:54AM 19          MR. DOWNEY:  I THINK, YOUR HONOR, I'VE SAID MY

09:54AM 20     PIECE.  IT'S A CONCERN FOR US, AND I APPRECIATE THE COURT'S

09:54AM 21     CONDUCTING THE QUESTIONING.

09:54AM 22          THE COURT:  ALL RIGHT.  THANK YOU.

09:54AM 23          THEN, MS. KRATZMANN, I AM GOING TO EXCUSE IT'S JUROR

09:54AM 24     NUMBER 5.  WE'LL EXCUSE HER, AND WE WILL ADVANCE THEN OUR

09:54AM 25     ALTERNATE WHO IS ALTERNATE JUROR NUMBER 3, I BELIEVE, WILL

09:54AM 1      REPLACE JUROR NUMBER 5.

09:54AM 2          AND IF YOU COULD THANK JUROR NUMBER 5 AND TELL HER THAT

09:54AM 3      SHE HAS BEEN EXCUSED.

09:54AM 4          WHEN WE COME OUT ON THE BENCH, I WILL INDICATE THAT JUROR

09:54AM 5      NUMBER 5 HAS BEEN EXCUSED, ALTERNATE NUMBER 3 HAS BEEN SEATED

09:54AM 6      TO REPLACE HER, AND THEN WE'LL PROCEED.

09:54AM 7          WE HAVE TWO ALTERNATES LEFT.

09:54AM 8          ALL RIGHT.  ANYTHING FURTHER, MR. SCHENK?

09:54AM 9              MR. SCHENK:  NO.  THANK YOU.

09:54AM 10             THE COURT:  MR. DOWNEY?

09:54AM 11             MR. DOWNEY:  NO, YOUR HONOR.

09:54AM 12             THE COURT:  ALL RIGHT.  THANK YOU.  WE'RE OFF THE

09:54AM 13     RECORD.

09:54AM 14         (PAUSE IN PROCEEDINGS.)

09:54AM 15         (PROCEEDINGS HELD IN OPEN COURT.)

10:01AM 16         (JURY IN AT 10:01 A.M.)

10:01AM 17             THE COURT:  ALL RIGHT.  THANK YOU.  GOOD MORNING.

10:01AM 18     WE'RE BACK ON THE RECORD.  ALL COUNSEL ARE PRESENT.  MS. HOLMES

10:01AM 19     IS PRESENT.

10:01AM 20         OUR JURY IS PRESENT.

10:01AM 21         THANK YOU FOR YOUR PATIENCE, LADIES AND GENTLEMEN.

10:01AM 22         LET ME FIRST INDICATE THAT WE HAVE -- THE COURT HAS FOUND

10:01AM 23     GOOD CAUSE TO EXCUSE A JUROR, JUROR NUMBER 5, AND WE HAVE

10:01AM 24     ADVANCED THEN ALTERNATE JUROR NUMBER 3 TO JUROR NUMBER 5'S

10:01AM 25     POSITION.  THANK YOU VERY MUCH.

| | | |
|---|---|---|
| 10:01AM | 1 | AND ALTERNATE JUROR NUMBER 3 WILL NOW BE A MEMBER OF THE |
| 10:01AM | 2 | SITTING JURY IN THIS MATTER. |
| 10:01AM | 3 | BEFORE WE CALL ANY ADDITIONAL WITNESSES, LADIES AND |
| 10:01AM | 4 | GENTLEMEN OF THE JURY, LET ME JUST ASK YOU MY QUESTION AGAIN. |
| 10:01AM | 5 | DURING OUR BREAK, HAVE ANY OF YOU HAD OCCASION TO COME |
| 10:01AM | 6 | ACROSS ANY INFORMATION, COMMUNICATION, DONE ANY RESEARCH, OR IN |
| 10:02AM | 7 | ANY OTHER WAY LEARNED ANYTHING ABOUT THIS CASE OUTSIDE OF THIS |
| 10:02AM | 8 | COURTROOM? |
| 10:02AM | 9 | IF SO, PLEASE RAISE YOUR HANDS. |
| 10:02AM | 10 | I SEE NO HANDS. |
| 10:02AM | 11 | THANK YOU VERY MUCH.  AND THANK YOU FOR YOUR CONTINUED |
| 10:02AM | 12 | VIGILANCE IN FOLLOWING MY ADMONITION. |
| 10:02AM | 13 | I KNOW IT CAN BE DIFFICULT AND IT PROBABLY CHANGES YOUR |
| 10:02AM | 14 | LIFESTYLES ABOUT WHEN A ROOMMATE OR FAMILY MIGHT TURN THE |
| 10:02AM | 15 | TELEVISION ON OR TURN A RADIO ON OR LOOK AT A NEWSPAPER AND YOU |
| 10:02AM | 16 | LEAVE THE ROOM TO AVOID THINGS, AND I APPRECIATE YOUR EFFORT. |
| 10:02AM | 17 | WE ALL APPRECIATE YOUR EFFORTS IN THAT REGARD.  SO THANK YOU. |
| 10:02AM | 18 | ALL RIGHT.  LET'S TURN TO THE GOVERNMENT. |
| 10:02AM | 19 | IS THERE ANOTHER WITNESS THAT YOU WOULD LIKE TO CALL, |
| 10:02AM | 20 | MR. LEACH? |
| 10:02AM | 21 | MR. LEACH:  YES, YOUR HONOR. |
| 10:02AM | 22 | THE UNITED STATES CALLS SHANE WEBER. |
| 10:02AM | 23 | THE COURT:  THANK YOU.  PLEASE COME FORWARD IF YOU |
| 10:03AM | 24 | WOULD.  AND I'LL INVITE YOU TO WALK OVER HERE TO OUR COURTROOM |
| 10:03AM | 25 | DEPUTY.  IF YOU WOULD FACE HER AND RAISE YOUR RIGHT HAND, SHE |

10:03AM  1      **HAS A QUESTION FOR YOU.**

10:03AM  2           **(GOVERNMENT'S WITNESS, SHANE WEBER, WAS SWORN.)**

10:03AM  3                THE WITNESS:  YES.

10:03AM  4                THE COURT:  THANK YOU.

10:03AM  5      PLEASE HAVE A SEAT UP HERE, SIR.  I'LL INVITE YOU TO HAVE

10:03AM  6  A SEAT THERE.  MAKE YOURSELF COMFORTABLE.  FEEL FREE TO ADJUST

10:03AM  7  THE CHAIR AND THE MICROPHONE AS YOU NEED.

10:03AM  8      I'LL ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE.

10:03AM  9      THERE'S SOME FRESH WATER THERE FOR REFRESHMENT.  SHOULD

10:03AM 10  YOU NEED IT, HELP YOURSELF.

10:03AM 11      WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

10:03AM 12  AND THEN SPELL IT, PLEASE.

10:03AM 13                THE WITNESS:  MY NAME IS SHANE WEBER.  FIRST NAME

10:03AM 14  S-H-A-N-E.  WEBER WITH ONE B, W-E-B-E-R.

10:03AM 15                THE COURT:  THANK YOU.  COUNSEL.

10:04AM 16                MR. LEACH:  THANK YOU, YOUR HONOR.

10:04AM 17                         **DIRECT EXAMINATION**

10:04AM 18  BY MR. LEACH:

10:04AM 19  Q.   MR. WEBER, IF YOU ARE VACCINATED, WITH THE COURT'S

10:04AM 20  PERMISSION AND IF YOU ARE COMFORTABLE, YOU CAN TESTIFY WITHOUT

10:04AM 21  A MASK.

10:04AM 22      THANK YOU.

10:04AM 23      WAS THERE A TIME WHEN YOU WORKED FOR A COMPANY CALLED

10:04AM 24  PFIZER?

10:04AM 25  A.   YES.

WEBER DIRECT BY MR. LEACH                                              4359

10:04AM   1      Q.   WHAT IS THE BUSINESS OF PFIZER?

10:04AM   2      A.   PFIZER IS A GLOBAL WORLDWIDE PHARMACEUTICAL COMPANY.

10:04AM   3      Q.   WHEN DID YOU WORK FOR PFIZER?

10:04AM   4      A.   I WORKED FOR PFIZER FROM 2008 THROUGH 2014.

10:04AM   5      Q.   AT A HIGH LEVEL, CAN YOU BRIEFLY DESCRIBE YOUR EDUCATIONAL

10:04AM   6      AND PROFESSIONAL BACKGROUND BEFORE YOU JOINED PFIZER IN 2008.

10:04AM   7      A.    MY EDUCATIONAL BACKGROUND, I HAVE A BACHELOR'S OF ART IN

10:04AM   8      BIOCHEMISTRY AND MOLECULAR BIOLOGY FROM NORTHWESTERN

10:04AM   9      UNIVERSITY.

10:04AM  10          THEN I HAVE A PH.D. IN BIOPHYSICS FROM OREGON STATE

10:05AM  11      UNIVERSITY FROM THE DEPARTMENT OF BIOCHEMISTRY AND BIOPHYSICS

10:05AM  12      THERE.

10:05AM  13          THEN ACADEMICALLY I DID A -- I WAS A POST-DOCTORAL FELLOW

10:05AM  14      AT THE UNIVERSITY OF ROCHESTER UPSTATE NEW YORK IN RADIATION

10:05AM  15      BIOLOGY AND BIOPHYSICS.

10:05AM  16          FOLLOWING THESE EDUCATIONAL EXPERIENCES, I FIRST WENT TO

10:05AM  17      EASTMAN KODAK IN ROCHESTER, NEW YORK AS A SCIENTIST IN A

10:05AM  18      PROTEIN ENGINEERING LAB.

10:05AM  19          FOLLOWING THAT, I WAS AT A SMALL, MEDIUM SIZED TECHNOLOGY

10:05AM  20      COMPANY IN CONNECTICUT CALLED PACKARD INSTRUMENTS WHERE I WAS A

10:05AM  21      SENIOR ASSAY ANALYST IN BUSINESS DEVELOPMENT.

10:05AM  22          FOLLOWING THAT, I WENT TO MILLENNIUM PHARMACEUTICALS --

10:06AM  23      ACTUALLY, IN BETWEEN THERE WAS A SIX MONTH TIME WHERE I WAS AT

10:06AM  24      A SMALL STARTUP CALLED AGLIX IN NEW HAVEN, CONNECTICUT.

10:06AM  25          THEN I WENT TO -- THERE I WAS THE SENIOR PROGRAM MANAGER

WEBER DIRECT BY MR. LEACH                                              4360

10:06AM  1    AT GENOMICS.

10:06AM  2        FOLLOWING THAT, I WENT TO MILLENNIUM PHARMACEUTICALS IN

10:06AM  3    CAMBRIDGE, MASSACHUSETTS WHERE I WAS A SENIOR SCIENTIST II IN

10:06AM  4    THE TRACE GENOMIC MICROARRAY PROFILING FACILITY.

10:06AM  5        IN BETWEEN THERE, I -- AFTER MILLENNIUM, I WENT BACK TO

10:06AM  6    NEW JERSEY WHERE I WAS A DIRECTOR OF DIAGNOSTICS AND ASSAYS IN

10:06AM  7    ORTHOCLINICAL DIAGNOSTICS AT JOHNSON & JOHNSON.

10:06AM  8        AND FOLLOWING THEM, I CAME TO PFIZER AS A DIRECTOR OF

10:06AM  9    DIAGNOSTICS IN MOLECULAR MEDICINE.

10:06AM  10   Q.   THANK YOU.

10:06AM  11       I HEARD YOU SAY THAT YOU HAVE A PH.D. IN BIOPHYSICS FROM

10:06AM  12   OREGON STATE.

10:06AM  13   A.   I DO.

10:07AM  14   Q.   OKAY.  WOULD YOU PREFER THAT I ADDRESS YOU AS MR. WEBER OR

10:07AM  15   DR. WEBER?

10:07AM  16   A.   MR. WEBER WOULD BE FINE.

10:07AM  17   Q.   OKAY.  AND YOU'VE WORKED FOR A NUMBER OF PHARMACEUTICAL

10:07AM  18   AND BIOTECHNOLOGY COMPANIES?

10:07AM  19   A.   I HAVE.

10:07AM  20   Q.   AND YOU JOINED PFIZER IN 2008 AND LEFT IN 2014?

10:07AM  21   A.   YES.

10:07AM  22   Q.   WHAT ARE YOU DOING TODAY?

10:07AM  23   A.   TODAY I'M RETIRED.

10:07AM  24   Q.   I WANT TO FOCUS MY QUESTIONS, MR. WEBER, STARTING IN THE

10:07AM  25   2008 TIME PERIOD WHEN YOU WERE FIRST HIRED BY PFIZER.

WEBER DIRECT BY MR. LEACH                                          4361

10:07AM  1        WHAT WERE YOU HIRED TO DO?

10:07AM  2    A.   I WAS HIRED AS A DIRECTOR OF DIAGNOSTICS TO ENABLE

10:07AM  3    DIAGNOSTICS TO MOVE PFIZER'S CLINICAL PROGRAMS FORWARD.

10:07AM  4    Q.   AND WHEN YOU SAY "DIRECTOR OF DIAGNOSTICS," WHAT, WHAT ARE

10:07AM  5    DIAGNOSTICS?

10:07AM  6    A.   WELL, DIAGNOSTICS -- I DON'T DEFINE THEM.  THE FEDERAL

10:07AM  7    FOOD AND DRUG ADMINISTRATION DEFINES DIAGNOSTICS.

10:07AM  8        DIAGNOSTICS ARE THOSE REAGENTS, INSTRUMENTS, AND SYSTEMS

10:08AM  9    INTENDED FOR THE DIAGNOSIS OF DISEASE OR OTHER CONDITIONS,

10:08AM  10   INCLUDING HEALTH, FOR THE PURPOSE OF TREATING, MITIGATING,

10:08AM  11   CURING, OR PREVENTING DISEASE.

10:08AM  12        DIAGNOSTICS, SUCH PRODUCTS ARE INTENDED FOR THE

10:08AM  13   COLLECTION, EXAMINATION, AND EVALUATION OF SAMPLES FROM HUMANS,

10:08AM  14   AND SUCH PRODUCTS ARE CONSIDERED TO BE REGULATED AS DEVICES

10:08AM  15   UNDER SECTION 201(H) OF THE FEDERAL FOOD DRUG AND COSMETIC ACT,

10:08AM  16   AND THEY ALSO MAY BE REGULATED AS BIOLOGICS UNDER THE PUBLIC

10:08AM  17   SERVICE HEALTH ACT, AND THEY'RE BROADLY REGULATED AS SAFE FOR

10:08AM  18   INTENDED USE UNDER 21 CFR 860.7.

10:08AM  19   Q.   THANK YOU.

10:08AM  20        AND AS DIRECTOR OF DIAGNOSTICS AT PFIZER IN 2008, DID YOU

10:09AM  21   BECOME FAMILIAR WITH A COMPANY CALLED THERANOS?

10:09AM  22   A.   I DID.

10:09AM  23   Q.   IN YOUR ROLE AS DIRECTOR OF DIAGNOSTICS AT PFIZER, WERE

10:09AM  24   YOU ASKED TO REVIEW THERANOS'S TECHNOLOGY AND ITS POTENTIAL USE

10:09AM  25   BY PFIZER?

| | | |
|---|---|---|
| 10:09AM | 1 | A.   I WAS. |
| 10:09AM | 2 | Q.   YOU SHOULD HAVE A BINDER UP THERE AT THE WITNESS STAND, A |
| 10:09AM | 3 | WHITE BINDER, AND I'D LIKE TO DRAW YOUR ATTENTION, PLEASE, TO |
| 10:09AM | 4 | WHAT HAS BEEN MARKED AS TRIAL EXHIBIT 143. |
| 10:09AM | 5 | YOUR HONOR, I MOVE EXHIBIT 143 INTO EVIDENCE.  I |
| 10:09AM | 6 | UNDERSTAND THERE'S A STIPULATION. |
| 10:09AM | 7 | MR. CLINE:  NO OBJECTION. |
| 10:09AM | 8 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 10:09AM | 9 | (GOVERNMENT'S EXHIBIT 143 WAS RECEIVED IN EVIDENCE.) |
| 10:09AM | 10 | BY MR. LEACH: |
| 10:09AM | 11 | Q.   DO YOU HAVE THAT IN FRONT OF YOU, SIR? |
| 10:09AM | 12 | A.   I DO. |
| 10:09AM | 13 | Q.   OKAY.  AND IF I COULD ASK MS. HOLLIMAN TO PLEASE ZOOM IN |
| 10:09AM | 14 | ON THE TOP HALF OF THIS EMAIL. |
| 10:10AM | 15 | MR. WEBER, DOES THIS APPEAR TO BE AN EMAIL FROM |
| 10:10AM | 16 | ELIZABETH HOLMES TO TWO INDIVIDUALS NAMED AIDEN POWER AND |
| 10:10AM | 17 | CRAIG LIPSET? |
| 10:10AM | 18 | A.   IT DOES APPEAR TO BE SO. |
| 10:10AM | 19 | Q.   WHO IS AIDEN POWER? |
| 10:10AM | 20 | A.   AIDEN POWER IS THE VICE PRESIDENT IN CHARGE OF MOLECULAR |
| 10:10AM | 21 | MEDICINE, WHICH IS A WORLDWIDE UNIT OF PFIZER. |
| 10:10AM | 22 | Q.   OKAY.  WERE YOU PART OF THE MOLECULAR MEDICINE GROUP? |
| 10:10AM | 23 | A.   I WAS. |
| 10:10AM | 24 | Q.   OKAY.  AND THERE'S ANOTHER NAME, CRAIG LIPSET.  WHO IS |
| 10:10AM | 25 | CRAIG LIPSET? |

WEBER DIRECT BY MR. LEACH

10:10AM 1   A.   CRAIG LIPSET WAS THE DIRECTOR OF CLINICAL INNOVATION AND

10:10AM 2   MOLECULAR MEDICINE.

10:10AM 3   Q.   WAS HE SOMEBODY THAT YOU WORKED WITH?

10:10AM 4   A.   YES, I WORKED WITH HIM.

10:10AM 5   Q.   OKAY.  HOW DID YOU GET THE ASSIGNMENT TO REVIEW THERANOS'S

10:10AM 6   TECHNOLOGY IN THIS LATE 2008 TIME PERIOD?

10:10AM 7   A.   AS I REMEMBER IT, THERE WAS AN EMAIL FROM CRAIG LIPSET TO

10:11AM 8   ME ASKING ME TO LOOK AT THE DIAGNOSTIC CAPABILITY OF THERANOS.

10:11AM 9   Q.   OKAY.  I WANT TO FOCUS ON -- AND THE DATE OF THIS IS

10:11AM 10   OCTOBER 11TH, 2008.

10:11AM 11       DO YOU SEE THAT?

10:11AM 12   A.   I DO.

10:11AM 13   Q.   AND IS THIS CONSISTENT WITH THE TIME PERIOD WHEN YOU WERE

10:11AM 14   ASKED TO REVIEW THERANOS'S TECHNOLOGY?

10:11AM 15   A.   YES, I WAS ASKED AFTER THIS DATE.

10:11AM 16   Q.   OKAY.  I KNOW YOU'RE NOT ON THIS EMAIL, BUT I'D LIKE TO

10:11AM 17   DRAW YOUR ATTENTION TO THE THIRD PARAGRAPH.

10:11AM 18       DO YOU SEE WHERE MS. HOLMES WROTE, "I AM VERY PLEASED TO

10:11AM 19   PRESENT YOU WITH THE FINAL DATA - SEE THE ATTACHED STUDY

10:11AM 20   REPORT."

10:11AM 21       DO YOU SEE THAT?  WE'RE IN THE THIRD PARAGRAPH, AND IT'S

10:11AM 22   HIGHLIGHTED ON THE SCREEN AS WELL.

10:11AM 23   A.   YES, I SEE THIS NOW.  "I AM VERY PLEASED," YES, I SEE THIS

10:11AM 24   THIRD PARAGRAPH.

10:11AM 25   Q.   OKAY.  AND SHE'S DRAWING ATTENTION TO AN ATTACHED STUDY

| | | |
|---|---|---|
| 10:12AM | 1 | REPORT. |
| 10:12AM | 2 | CAN I PLEASE ASK YOU TO LOOK AT PAGE 3 OF THIS DOCUMENT. |
| 10:12AM | 3 | A.   YES. |
| 10:12AM | 4 | Q.   DOES THIS APPEAR TO BE THE ATTACHED STUDY REPORT THAT |
| 10:12AM | 5 | MS. HOLMES REFERRED TO IN THE EMAIL? |
| 10:12AM | 6 | A.   IT WOULD SEEM TO BE SO. |
| 10:12AM | 7 | Q.   OKAY.  AND DO YOU SEE THE LOGO AT THE TOP WITH THERANOS |
| 10:12AM | 8 | REDEFINING HEALTH CARE? |
| 10:12AM | 9 | A.   YES. |
| 10:12AM | 10 | Q.   AND DO YOU SEE THE LABEL CONFIDENTIAL IN THE RIGHT CORNER |
| 10:12AM | 11 | ON THE TOP PAGE? |
| 10:12AM | 12 | A.   I DO. |
| 10:12AM | 13 | Q.   OKAY.  THE TITLE OF THIS IS THERANOS ANGIOGENESIS STUDY |
| 10:13AM | 14 | REPORT. |
| 10:13AM | 15 | DO YOU SEE THAT? |
| 10:13AM | 16 | A.   I DO. |
| 10:13AM | 17 | Q.   IN THIS LATE 2008 TIME PERIOD, WERE YOU MADE AWARE OF WORK |
| 10:13AM | 18 | BY PFIZER AND THERANOS RELATING TO AN ANGIOGENESIS PROGRAM? |
| 10:13AM | 19 | A.   YES. |
| 10:13AM | 20 | Q.   OKAY.  DO YOU SEE WHERE IT SAYS "PREPARED FOR |
| 10:13AM | 21 | DR. AIDAN POWER, PFIZER, INC.? |
| 10:13AM | 22 | A.   I DO. |
| 10:13AM | 23 | Q.   AND DO YOU SEE THAT THERE'S, BENEATH THAT, A DOCUMENT |
| 10:13AM | 24 | OUTLINE? |
| 10:13AM | 25 | A.   I DO. |

WEBER DIRECT BY MR. LEACH                                              4365

10:13AM  1     Q.   OKAY.  AND I'D LIKE TO FOCUS ON THE BULLET WITH

10:13AM  2     CONCLUSIONS.  DO YOU SEE THAT?  IT'S THE LAST BULLET UNDERNEATH

10:13AM  3     DOCUMENT OUTLINE.

10:13AM  4          AND MS. HOLLIMAN IS ZOOMING OUT ON THE SCREEN AND

10:13AM  5     HIGHLIGHTING THAT FOR US.

10:13AM  6          DO YOU SEE THAT?

10:13AM  7     A.   I SEE THAT.

10:13AM  8     Q.   OKAY.  COULD YOU NOW PLEASE TURN TO PAGE 26.

10:14AM  9     A.   OKAY, I SEE THIS.

10:14AM  10    Q.   OKAY.  DO YOU SEE THE THERANOS LOGO AT THE TOP WHERE IT

10:14AM  11    SAYS THERANOS REDEFINING HEALTH CARE?

10:14AM  12    A.   I DO.

10:14AM  13    Q.   AND DO YOU SEE THE HEADING CONFIDENTIAL TO THE RIGHT?

10:14AM  14    A.   I DO.

10:14AM  15    Q.   AND DO YOU SEE THAT THERE ARE A NUMBER OF CONCLUSIONS

10:14AM  16    LISTED?

10:14AM  17         AND IF WE COULD ZOOM OUT, MS. HOLLIMAN, SO WE CAN SEE

10:14AM  18    THERE ARE A NUMBER OF CONCLUSIONS LISTED HERE.

10:14AM  19         DO YOU SEE THAT?

10:14AM  20    A.   YES, I DO.

10:14AM  21    Q.   LET ME DRAW YOUR ATTENTION TO NUMBER 1.

10:14AM  22         DO YOU SEE WHERE IT SAYS, "THE THERANOS SYSTEM PERFORMED

10:14AM  23    WITH SUPERIOR PERFORMANCE TO REFERENCE ASSAYS WHILE RUNNING IN

10:14AM  24    A COMPLEX AMBULATORY ENVIRONMENT."

10:15AM  25         DO YOU SEE THAT?

WEBER DIRECT BY MR. LEACH                                              4366

10:15AM   1    A.   I DO.

10:15AM   2    Q.   AND DO YOU SEE NUMBER 5 UNDER TECHNICAL WHERE IT SAYS,

10:15AM   3    "INTER-SYSTEM ACCURACY IS EXCELLENT AND WAS DEMONSTRATED ON A

10:15AM   4    PLATFORM WITH SUPERIOR PERFORMANCE SPECIFICATIONS TO REFERENCE

10:15AM   5    METHODS"?

10:15AM   6    A.   I DO.

10:15AM   7    Q.   AND DO YOU SEE ANOTHER CONCLUSION, NUMBER 7, "GOOD

10:15AM   8    CORRELATIONS WERE SEEN TO VARIOUS COMMERCIALLY AVAILABLE

10:15AM   9    GOLD-STANDARDS"?

10:15AM  10    A.   I DO.

10:15AM  11    Q.   OKAY.  AND THIS IS IN A REPORT SENT BY MS. HOLMES TO

10:15AM  12    DR. POWER AND CRAIG LIPSET IN THE OCTOBER TIME PERIOD; IS THAT

10:15AM  13    FAIR?

10:15AM  14    A.   YES, AS I UNDERSTAND IT.

10:15AM  15    Q.   OKAY.  LET ME NEXT DRAW YOUR ATTENTION, PLEASE, TO WHAT WE

10:15AM  16    HAVE MARKED AS EXHIBIT 159, WHICH I'LL MOVE INTO EVIDENCE,

10:15AM  17    YOUR HONOR.  I UNDERSTAND THERE'S A STIPULATION.

10:15AM  18         MR. CLINE:  NO OBJECTION.

10:15AM  19         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:15AM  20    (GOVERNMENT'S EXHIBIT 159 WAS RECEIVED IN EVIDENCE.)

10:16AM  21    BY MR. LEACH:

10:16AM  22    Q.   MR. WEBER, I'D LIKE TO START ON PAGES -- ON PAGE 4 OF THIS

10:16AM  23    DOCUMENT.

10:16AM  24         DO YOU SEE AN EMAIL FROM MS. HOLMES TO CRAIG LIPSET ON OR

10:16AM  25    ABOUT NOVEMBER 6TH, 2008?

WEBER DIRECT BY MR. LEACH                                              4367

10:16AM   1    A.   I DO.

10:16AM   2    Q.   OKAY.  AND NOW IF WE COULD SHOW BOTH THE BOTTOM PORTION OF

10:16AM   3    PAGE 3 AND THE TOP PORTION OF PAGE 5, MS. HOLLIMAN.

10:16AM   4        DO YOU SEE AT THE BOTTOM OF PAGE 3, MR. WEBER, THERE'S AN

10:16AM   5    EMAIL FROM CRAIG LIPSET TO MS. HOLMES, YOU, AND GARY FRENZEL?

10:17AM   6    A.   I DO.

10:17AM   7    Q.   OKAY.  AND IS THIS CONSISTENT WITH THE TIME PERIOD WHERE

10:17AM   8    YOU WERE ASKED TO REVIEW AND EVALUATE THERANOS'S TECHNOLOGY?

10:17AM   9    A.   IT IS.

10:17AM   10   Q.   OKAY.  AND NOW FOCUSSING ON THE EMAIL AT THE TOP OF

10:17AM   11   PAGE 4 -- I THINK WE HAVE PAGE 4 -- OR 3 AND 5 UP,

10:17AM   12   MS. HOLLIMAN.  IF WE CAN GET PAGE 4.

10:17AM   13       WONDERFUL.

10:17AM   14       IT APPEARS THAT MR. LIPSET WROTE, "GARY - PLEASE

10:17AM   15   COORDINATE WITH SHANE WEBER, WHO LEADS OUR DIAGNOSTICS GROUP

10:17AM   16   HERE IN NEW YORK.  WHEN A TIME IS SET, PLEASE LET ME KNOW AS I

10:17AM   17   WOULD LIKE TO JOIN IF MY CALENDAR PERMITS."

10:17AM   18       DO YOU SEE THIS LANGUAGE?

10:17AM   19   A.   I DO.

10:17AM   20   Q.   AND IS THIS MR. LIPSET ESSENTIALLY GIVING DIRECTION TO THE

10:17AM   21   FOLKS AT THERANOS TO DIRECT INFORMATION TO YOU FOR YOUR REVIEW?

10:17AM   22   A.   YES.

10:17AM   23   Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO PAGE 1 OF

10:18AM   24   EXHIBIT 159.

10:18AM   25       MS. HOLLIMAN, IF WE CAN ZOOM IN ON THE BOTTOM EMAIL FROM

WEBER DIRECT BY MR. LEACH                                           4368

| | | |
|---|---|---|
| 10:18AM | 1 | MR. WEBER. |
| 10:18AM | 2 | IS THIS AN EMAIL FROM YOU TO GARY FRENZEL FOLLOWING UP ON |
| 10:18AM | 3 | CRAIG LIPSET'S REQUEST? |
| 10:18AM | 4 | A.   IT IS. |
| 10:18AM | 5 | Q.   AND I DRAW YOUR ATTENTION TO THE THIRD PARAGRAPH, THE |
| 10:18AM | 6 | THIRD AND FOURTH PARAGRAPHS.  YOU WRITE, "I AM INTERESTED MORE |
| 10:18AM | 7 | BROADLY AS TO WHAT THE INSTRUMENT IS AND PLANNED TO BE AND NOT |
| 10:18AM | 8 | JUST IN UNDERSTANDING THE PERFORMANCE AND UTILITY OF THE |
| 10:18AM | 9 | THERANOS SYSTEM IN THE ONCOLOGY STUDY." |
| 10:18AM | 10 | WHAT DID YOU MEAN BY THE "ONCOLOGY STUDY"? |
| 10:18AM | 11 | A.   I'M REFERRING TO THE STUDY AS I REMEMBERED IT AND |
| 10:18AM | 12 | UNDERSTOOD THAT WHAT'S IN THE DOCUMENT THAT WAS SUBMITTED IN |
| 10:19AM | 13 | THE FINAL REPORT TO AIDEN POWER AND THE STUDY THAT WAS |
| 10:19AM | 14 | UNDERNEATH THAT. |
| 10:19AM | 15 | Q.   THE DOCUMENT THAT WE LOOKED AT EARLIER IN YOUR TESTIMONY? |
| 10:19AM | 16 | A.   YES. |
| 10:19AM | 17 | Q.   OKAY.  AND YOU WROTE, "I AM RESPONSIBLE FOR PLATFORMS FOR |
| 10:19AM | 18 | WHICH PFIZER HAS A DIAGNOSTIC INTEREST AND FOR WHICH THERE IS A |
| 10:19AM | 19 | CLINICAL VALIDATION." |
| 10:19AM | 20 | WHAT DID YOU MEAN BY THAT? |
| 10:19AM | 21 | A.   WHAT I MEANT BY THIS STATEMENT IS THAT WITH OUR CLINICAL |
| 10:19AM | 22 | TRIALS IN ALL DISEASE AREAS, INCLUDING ONCOLOGY, WE WERE |
| 10:19AM | 23 | LOOKING FOR DIAGNOSTIC CAPABILITIES THAT WOULD OPEN THE DOOR |
| 10:19AM | 24 | FOR MORE EFFECTIVE INTAKE OF PATIENTS. |
| 10:19AM | 25 | BUT THOSE ASSAYS NEED TO BE, YOU KNOW, FDA REGULATED AND |

WEBER DIRECT BY MR. LEACH                                           4369

10:19AM   1    APPROVABLE AT A LEVEL THAT WE CAN INCLUDE THEM IN OUR CLINICAL

10:19AM   2    TRIALS.

10:19AM   3    Q.    YOU THEN WRITE IN THE FIFTH PARAGRAPH, "AS WE AGREED IN

10:19AM   4    OUR DISCUSSION, I WAS TO PROVIDE COPIES OF THE DOCUMENTS THAT I

10:19AM   5    AM WORKING OFF OF SO WE ARE ON THE SAME PAGE AND SOME QUESTIONS

10:20AM   6    OF INTEREST TO START OUR CONVERSATION ON THURSDAY."

10:20AM   7          WHAT WERE YOU GETTING AT THERE?

10:20AM   8    A.    WHAT I WAS GETTING AT WAS THAT IN MY NORMAL PRACTICE WHEN

10:20AM   9    I DO AN INTERACTION WITH A COMPANY, I TRY TO MAKE SURE THAT

10:20AM   10   WE'RE BOTH WORKING WITH THE SAME DECK OF CARDS SO THAT IT

10:20AM   11   DOESN'T CAUSE CONFUSION OR THAT I DON'T MISS SOMETHING.

10:20AM   12   Q.    AND THEN YOU WROTE, "FOR ME, THE GOAL IS TO UNDERSTAND THE

10:20AM   13   THERANOS SYSTEM.

10:20AM   14         "LET'S USE MY TELECONF CODES TO SAVE SOME THERANOS SOME

10:20AM   15   COSTS."

10:20AM   16         WERE YOU SETTING UP A CONFERENCE CALL WITH FOLKS AT

10:20AM   17   THERANOS SO YOU CAN GIVE THEM AN OPPORTUNITY TO DISCUSS THEIR

10:20AM   18   TECHNOLOGY WITH YOU?

10:20AM   19   A.    YES.

10:20AM   20   Q.    AND DOWN AT THE BOTTOM THERE IS SOME LANGUAGE, "I HAVE THE

10:21AM   21   THERANOS SUMMARY TO AIDEN POWER, THE INTRODUCTION TO THERANOS

10:21AM   22   SYSTEMS, THE INFORMED CONSENT AND THE IRB SUBMISSION.  I HAVE

10:21AM   23   READ THEM.  I ATTACH THESE SO WE ARE ALL WORKING OFF THE SAME

10:21AM   24   VERSIONS OF THE DOCUMENTS."

10:21AM   25         DO YOU SEE THAT LANGUAGE?

WEBER DIRECT BY MR. LEACH                                              4370

10:21AM  1    A.   I DO.

10:21AM  2    Q.   AND DID YOU ATTACH THOSE DOCUMENTS TO THE EMAIL THAT YOU

10:21AM  3    SENT TO MR. FRENZEL?

10:21AM  4    A.   I DID.   THESE ARE THE DOCUMENTS, AS I REMEMBER IT,

10:21AM  5    CRAIG LIPSET FORWARDED TO ME FROM THE INTERACTION THAT HE AND

10:21AM  6    AIDEN POWER WERE HAVING.

10:21AM  7    Q.   AND IF WE CAN CONTINUE TO THE NEXT PAGE, PAGE 2.   AND IF

10:21AM  8    WE CAN ZOOM IN ON THE TOP RIGHT UP TO "PLEASE," MS. HOLLIMAN.

10:21AM  9    RIGHT THERE.

10:21AM 10        MR. WEBER, YOU WROTE, "I HAVE ALSO READ U.S. PATENT," AND

10:21AM 11    THEN THERE'S A NUMBER.

10:21AM 12        DO YOU SEE THAT UP AT THE TOP?

10:22AM 13    A.   I DO.

10:22AM 14    Q.   WAS THAT A PATENT RELATING TO THERANOS?

10:22AM 15    A.   AS I REMEMBER IT, IT WOULD BE.

10:22AM 16    Q.   OKAY.   WHY DID YOU REVIEW THAT?

10:22AM 17    A.   THE REASON I WOULD REVIEW -- IN MY NORMAL PRACTICE I

10:22AM 18    REVIEW BOTH U.S. ISSUED PATENTS, WHICH IS A B LEVEL PATENT, AS

10:22AM 19    WELL AS A LEVEL PATENTS, AS WELL AS EUROPEAN OR WORLD TREATY

10:22AM 20    PATENTS.

10:22AM 21        PARTICULARLY I REVIEWED U.S. PATENTS BECAUSE THE U.S.

10:22AM 22    PATENT OFFICE DOES AN INDEPENDENT REVIEW OF THE TECHNOLOGY, AND

10:22AM 23    IN WHAT IS CALLED THE WRAPPER, THE DOCUMENTS ASSOCIATED WITH

10:22AM 24    THE PATENT, THE U.S. PATENT OFFICE PRESENTS WHAT THEY CONSIDER

10:22AM 25    PRIOR ART.

WEBER DIRECT BY MR. LEACH                                          4371

10:22AM  1    Q.   AND YOU MENTIONED SOMETHING ABOUT AN A PATENT AND A B

10:22AM  2    PATENT.

10:22AM  3         WHAT IS THE DISTINCTION THERE?

10:22AM  4    A.   THE DISTINCTION IS THAT A B PATENT ARE ISSUED PATENTS.  A

10:23AM  5    PATENTS ARE PATENTS THAT ARE IN THE PROCESS OF BEING REVIEWED.

10:23AM  6         SO THIS IS A B2, A FINAL ISSUED U.S. PATENT.

10:23AM  7    Q.   AND WAS THIS PART OF YOUR EFFORT TO UNDERSTAND THERANOS'S

10:23AM  8    TECHNOLOGY SO YOU COULD MAKE A RECOMMENDATION TO PFIZER?

10:23AM  9    A.   IT IS.

10:23AM  10   Q.   OKAY.  YOU ALSO WROTE, "WOULD YOU PLEASE SEND, PROVIDE, OR

10:23AM  11   ANSWER."

10:23AM  12        AND I DON'T WISH TO DISPLAY THEM, BUT ARE THERE A NUMBER

10:23AM  13   OF QUESTIONS LISTED BELOW THAT THAT YOU WERE SEEKING ANSWERS

10:23AM  14   FROM THERANOS ON?

10:23AM  15   A.   YES.

10:23AM  16   Q.   OKAY.  AND WHY WERE YOU -- AT A HIGH LEVEL, WHY WERE YOU

10:23AM  17   ASKING THESE TYPES OF QUESTIONS?

10:23AM  18   A.   IN MY NORMAL PROCESS OF INTERACTION AND DUE DILIGENCE WITH

10:23AM  19   COMPANIES, I HAVE A VERBAL DISCUSSION AND THEN FOLLOW WITH A

10:23AM  20   SET OF MORE DETAILED WRITTEN QUESTIONS.  THIS ALLOWS ME TO

10:23AM  21   UNDERSTAND THE DETAILS, AND IT'S A --

10:24AM  22   Q.   LET ME NEXT DRAW YOUR ATTENTION, PLEASE, TO EXHIBIT 162,

10:24AM  23   WHICH I'LL OFFER INTO EVIDENCE PURSUANT TO STIPULATION.

10:24AM  24            MR. CLINE:  NO OBJECTION.

10:24AM  25            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:24AM  1         (GOVERNMENT'S EXHIBIT 162 WAS RECEIVED IN EVIDENCE.)

10:24AM  2              MR. LEACH:  AND I'M SORRY, MS. HOLLIMAN.  I MEANT TO

10:24AM  3    GO -- I NEED TO GO BACK TO EXHIBIT 159 BRIEFLY.

10:24AM  4    Q.   MR. WEBER, I WANT TO DRAW YOUR ATTENTION TO PAGE 5 OF

10:24AM  5    EXHIBIT 159.

10:24AM  6         AND IF WE COULD PLEASE ZOOM IN ON THE TOP HALF OF THIS

10:24AM  7    DOCUMENT, MS. HOLLIMAN.  DOWN A LITTLE.  THAT'S FINE FOR NOW.

10:24AM  8    THANK YOU.

10:24AM  9         MR. WEBER, IS THIS A DOCUMENT THAT YOU ATTACHED TO YOUR

10:24AM 10    EMAIL TO MR. FRENZEL TO MAKE SURE THAT YOU WERE WORKING OFF OF

10:25AM 11    ALL OF THE SAME DOCUMENTS?

10:25AM 12    A.   THE DOCUMENT THAT I ATTACHED TO THE EMAIL OF GARY FRENZEL

10:25AM 13    WOULD BE THE ONE THAT I RECEIVED FROM AIDEN POWER VIA

10:25AM 14    CRAIG LIPSET.

10:25AM 15         IF THIS IS THE DOCUMENT THAT CAME DIRECTLY FROM

10:25AM 16    CRAIG LIPSET, THEN IT WOULD BE.

10:25AM 17    Q.   OKAY.  AND DO YOU SEE THE HEADING THERANOS REDEFINING

10:25AM 18    HEALTH CARE AT THE TOP?

10:25AM 19    A.   I DO.

10:25AM 20    Q.   AND DO YOU SEE THE LABEL CONFIDENTIAL ON THE RIGHT?

10:25AM 21    A.   I DO.

10:25AM 22    Q.   AND THE TITLE OF THIS DOCUMENT IS THERANOS ANGIOGENESIS

10:25AM 23    STUDY:

10:25AM 24         REPORT PREPARED FOR DR. AIDAN POWER.

10:25AM 25         PFIZER.

WEBER DIRECT BY MR. LEACH                                            4373

10:25AM   1          DO YOU SEE THAT?

10:25AM   2     A.   I DO.

10:25AM   3     Q.   I WANT TO DRAW YOUR ATTENTION TO THE FOURTH PARAGRAPH THAT

10:25AM   4     IS DOWN ON THE BOTTOM ON THE SCREEN.

10:25AM   5          DO YOU SEE "FOR THIS ANGIOGENESIS PROGRAM, THERANOS WAS

10:26AM   6     ASKED TO DEVELOP MULTIPLEXED POINT-OF-CARE ASSAYS IN VEGF AND

10:26AM   7     PLGF FOR USE IN MONITORING PATIENT PHARMACODYNAMIC RESPONSE TO

10:26AM   8     ANTI-ANGIOGENESIS THERAPIES."

10:26AM   9          DO YOU SEE THAT?

10:26AM  10     A.   I DO.

10:26AM  11     Q.   AND WHAT DID YOU UNDERSTAND THAT TO MEAN?

10:26AM  12     A.   I UNDERSTOOD THAT TO MEAN, AT THE TIME THAT I REMEMBER IT,

10:26AM  13     THAT IN THIS STUDY THERANOS WAS ASKED TO DO THESE THINGS AND TO

10:26AM  14     MEASURE SOME SAMPLES.

10:26AM  15     Q.   AND VEGF AND PLGF, WHAT ARE THOSE?

10:26AM  16     A.   WELL, THESE ARE WELL-KNOWN ANALYTIC MOLECULES IN

10:26AM  17     ANGIOGENESIS, WHICH IS, YOU KNOW, CAPILLARY DEVELOPMENT.

10:26AM  18          AND THE VEGF IS THE VACULAR EPIDERMAL GROWTH FACTOR --

10:26AM  19     THIS IS THE LIGIN FOR THE VEGF RECEPTOR.  SO AS I REMEMBER IT,

10:27AM  20     THAT'S THE VASCULAR EPIDERMAL GROWTH FACTOR.

10:27AM  21     Q.   AND WAS THERANOS TASKED WITH DEVELOPING ASSAYS TO MEASURE

10:27AM  22     VEGF AND PLGF AS YOU UNDERSTOOD IT?

10:27AM  23     A.   AS I UNDERSTOOD IT, YES.

10:27AM  24     Q.   AND THERE'S ALSO A REFERENCE HERE TO VEGFR2.

10:27AM  25          DO YOU SEE THAT?

WEBER DIRECT BY MR. LEACH                                                  4374

10:27AM   1    A.   I DO.

10:27AM   2    Q.   AND IS THAT ANOTHER SUBSTANCE THAT THERANOS WAS ASKED TO

10:27AM   3    MEASURE?

10:27AM   4    A.   IT WAS.  THAT'S THE RECEPTOR FOR VEGFR -- VEGF RECEPTOR 2.

10:27AM   5    Q.   IF I COULD ASK YOU TO MOVE FORWARD TO PAGE 12, AND IF WE

10:27AM   6    COULD.

10:27AM   7         DO YOU SEE DOWN HERE AT THE BOTTOM THERE ARE A NUMBER OF

10:27AM   8    CONCLUSIONS LISTED?

10:27AM   9    A.   YES, I SEE NINE CONCLUSIONS LISTED.

10:27AM  10    Q.   OKAY.  AND THE FIRST ONE IS, "THE THERANOS SYSTEM

10:28AM  11    PERFORMED WITH EQUIVALENT OR SUPERIOR PERFORMANCE TO REFERENCE

10:28AM  12    ASSAYS WHILE RUNNING IN AN EXTREMELY RUGGED AMBULATORY

10:28AM  13    ENVIRONMENT."

10:28AM  14         DO YOU SEE THAT?

10:28AM  15    A.   I DO.

10:28AM  16    Q.   AND IF WE CAN CONTINUE TO PAGE 13.

10:28AM  17         DO THE CONCLUSIONS CONTINUE ON THIS PAGE?

10:28AM  18    A.   THEY DO.

10:28AM  19    Q.   OKAY.  AND DO YOU SEE THE FOURTH CONCLUSION, "INTER-SYSTEM

10:28AM  20    ACCURACY IS EXCELLENT"?

10:28AM  21    A.   I DO.

10:28AM  22    Q.   AND THE FIFTH CONCLUSION, "VEGFR2 ASSAY ACCURACY IS QUITE

10:28AM  23    GOOD FOR TNONC VENOUS SAMPLES."

10:28AM  24         DO YOU SEE THAT?

10:28AM  25    A.   I DO.

WEBER DIRECT BY MR. LEACH                                              4375

10:28AM  1    Q.   NOW, IF WE COULD PLEASE GO TO EXHIBIT 162.

10:28AM  2         IF WE CAN ZOOM IN, MS. HOLLIMAN, ON THE BOTTOM EMAIL.

10:29AM  3         MR. WEBER, DOES THIS APPEAR TO BE AN EMAIL FROM

10:29AM  4    GARY FRENZEL TO YOU ON NOVEMBER 11TH, 2008?

10:29AM  5    A.   IT DOES.

10:29AM  6    Q.   OKAY.  AND MR. FRENZEL WROTE, "HI SHANE, IT SEEMS THAT YOU

10:29AM  7    DID NOT HAVE THE FINAL REPORT.  I HAVE ATTACHED IT AND THE NDA

10:29AM  8    TO THIS EMAIL."

10:29AM  9         DO YOU UNDERSTAND NDA IS AN ACRONYM FOR NONDISCLOSURE

10:29AM  10   AGREEMENT?

10:29AM  11   A.   I DO.

10:29AM  12   Q.   "ELIZABETH IS WORKING ON SOME OTHER DOCUMENTS AND WE WILL

10:29AM  13   BE GETTING THEM TO YOU SOON.  LOOKING FORWARD TO THE MEETING ON

10:29AM  14   THURSDAY."

10:29AM  15        DO YOU SEE THAT?

10:29AM  16   A.   I DO.

10:29AM  17   Q.   AND IS THAT A REFERENCE TO A MEETING THAT YOU HAD ARRANGED

10:29AM  18   WITH MS. HOLMES AND OTHERS AT THERANOS TO DISCUSS THERANOS'S

10:29AM  19   TECHNOLOGY?

10:29AM  20   A.   YES, AS I REMEMBER IT.

10:29AM  21   Q.   OKAY.  PLEASE LOOK AT PAGE 3 OF THIS DOCUMENT.

10:30AM  22        IF YOU CAN GO ALL OF THE WAY DOWN PAST THE CONCLUSIONS,

10:30AM  23   MS. HOLLIMAN, THAT WOULD BE GREAT.

10:30AM  24        SITTING HERE TODAY, DO YOU HAVE A MEMORY OF RECEIVING THIS

10:30AM  25   EMAIL FROM MR. FRENZEL?

WEBER DIRECT BY MR. LEACH                                           4376

10:30AM   1    A.   AS I REMEMBER IT -- I'M NOT REMEMBERING RECEIVING THIS

10:30AM   2    EMAIL, BUT IN MY NORMAL COURSE, IT'S CLEAR THAT I RECEIVED IT.

10:30AM   3    Q.   OKAY.  AND IN THE -- IN YOUR NORMAL COURSE, WOULD IT BE

10:30AM   4    YOUR PRACTICE TO REVIEW WHATEVER MATERIALS A COMPANY SENT YOU

10:30AM   5    WHOSE TECHNOLOGY YOU WERE ASKED TO REVIEW?

10:30AM   6    A.   IN MY NORMAL COURSE, YES, I WOULD TRY TO REVIEW THOSE.

10:30AM   7    THIS -- I DON'T REMEMBER THIS PARTICULAR SET OF DOCUMENTS.

10:30AM   8    Q.   OKAY.  DO YOU SEE AT THE BOTTOM OF THIS REPORT THERE IS A

10:30AM   9    BULLET FOR CONCLUSIONS?

10:31AM   10   A.   I DO.

10:31AM   11   Q.   OKAY.  AND IF I COULD DRAW YOUR ATTENTION TO PAGE 26 OF

10:31AM   12   THE EXHIBIT.

10:31AM   13        AND IF WE CAN ZOOM IN ON THE ENTIRETY OF THE CONCLUSIONS,

10:31AM   14   MS. HOLLIMAN.  IF WE CAN DISPLAY THE ENTIRETY OF THE TEXT.

10:31AM   15        MR. WEBER, DO YOU SEE THIS ITERATION OF THE REPORT HAS 13

10:31AM   16   CONCLUSIONS IN IT?

10:31AM   17   A.   I DO.

10:31AM   18   Q.   SO IT'S SLIGHTLY DIFFERENT FROM THE ONE THAT YOU ATTACHED

10:31AM   19   TO THE EMAIL THAT WE SAW TO GARY FRENZEL EARLIER?

10:31AM   20   A.   THE ATTACHMENT THAT I PUT INTO THE EMAIL TO GARY FRENZEL,

10:31AM   21   AS I REMEMBER IT, DOES NOT HAVE THESE ECONOMIC CONCLUSIONS IN

10:31AM   22   THE REPORT THAT I RECEIVED FROM CRAIG LIPSET AND AIDEN POWER.

10:32AM   23   Q.   OKAY.  BUT THE 13 CONCLUSIONS WERE IN THE INITIAL DOCUMENT

10:32AM   24   THAT WE SAW THAT MS. HOLMES SENT TO AIDAN POWER AND

10:32AM   25   CRAIG LIPSET, THE VERY FIRST ONE THAT WE LOOKED AT?

WEBER DIRECT BY MR. LEACH                                          4377

10:32AM  1    A.   CAN WE CONFIRM THAT AGAIN?  WHAT PAGE?

10:32AM  2    Q.   SURE.  IF I COULD DRAW YOUR ATTENTION TO 143, PAGE 26.

10:32AM  3    A.   YES, THEY ARE.

10:32AM  4    Q.   OKAY.  AFTER RECEIVING -- YOU'VE MADE REFERENCE TO A

10:32AM  5    MEETING OR A CONVERSATION THAT YOU HAD WITH MS. HOLMES AND THE

10:32AM  6    FOLKS FROM THERANOS ABOUT THERANOS'S TECHNOLOGY.

10:32AM  7         DID THAT HAPPEN?

10:32AM  8    A.   WE HAD A ONE HOUR TELECONFERENCE AT SOME DATE.

10:32AM  9    Q.   OKAY.  AS BEST YOU CAN TODAY, DESCRIBE THE SUBSTANCE OF

10:33AM  10   WHAT HAPPENED.

10:33AM  11   A.   IN THAT CONVERSATION THERE WERE -- MS. HOLMES, THE CEO OF

10:33AM  12   THERANOS, INTRODUCED HERSELF, AND THEN THERE WERE FIVE OR SIX

10:33AM  13   OTHER PEOPLE, DIRECTORS, WHO INTRODUCED THEMSELVES VERY

10:33AM  14   BRIEFLY.  I WAS NOT ABLE TO CATCH THE TITLES AND THE NAMES.

10:33AM  15        THERE WERE SIX QUESTIONS IN BROAD SCOPE THAT I HAD ASKED

10:33AM  16   NUMEROUS QUESTIONS AND ANGLES FROM, AND WE HAD THIS DISCUSSION.

10:33AM  17   BUT IT WAS ENTIRELY VOCALIZED BY MS. HOLMES.

10:33AM  18        AS I REMEMBER IT, NONE OF THE OTHER PEOPLE SPOKE.

10:33AM  19   Q.   AND WHEN YOU SAY "VOCALIZED BY MS. HOLMES," ARE YOU SAYING

10:33AM  20   THAT MS. HOLMES DID MOST OF THE TALKING ON THERANOS'S BEHALF ON

10:33AM  21   THIS CALL?

10:33AM  22   A.   YES.

10:33AM  23   Q.   AND WHAT WAS YOUR PURPOSE IN SPEAKING TO MS. HOLMES AND

10:34AM  24   MEMBERS OF HER TEAM ON THIS CALL?

10:34AM  25   A.   MY PURPOSE WAS TO GET A HOLISTIC UNDERSTANDING OF NOT JUST

WEBER DIRECT BY MR. LEACH                                      4378

10:34AM   1    WHERE THIS STUDY HAD DONE, BUT WHERE THERANOS'S ROADMAP WAS

10:34AM   2    GOING SO I COULD DETERMINE IF THERE WERE WAYS THAT -- IF THERE

10:34AM   3    WERE THERANOS TECHNOLOGIES THAT WOULD MATCH CLINICAL PROGRAM

10:34AM   4    NEEDS THAT WE ACTUALLY HAD ONGOING IN DEVELOPMENT AND IN

10:34AM   5    CLINICAL TRIALS.

10:34AM   6    Q.   AND WHEN YOU SAY "NOT JUST THIS STUDY," ARE YOU REFERRING

10:34AM   7    TO THE ANGIOGENESIS STUDY REPORT THAT YOU HAD RECEIVED?

10:34AM   8    A.   YES, I'M REFERRING TO THAT STUDY.

10:34AM   9    Q.   OKAY.  AND IN ADVANCE OF THIS PHONE CALL, DID YOU ALSO

10:34AM  10    SEND THERANOS WRITTEN DUE DILIGENCE QUESTIONS?

10:34AM  11    A.   AS I REMEMBER IT, MY WRITTEN DUE DILIGENCE QUESTIONS WOULD

10:34AM  12    HAVE FOLLOWED VERBAL CONVERSATIONS.  THAT'S MY NORMAL STANDARD

10:34AM  13    PRACTICE.

10:34AM  14    Q.   OKAY.  WELL, AFTER THIS PHONE CALL WITH MS. HOLMES, WHAT

10:35AM  15    DID YOU DO?

10:35AM  16    A.   I SENT A LIST OF QUESTIONS TO GARY FRENZEL FOR THEM TO

10:35AM  17    RESPOND TO AT THEIR DISCRETION.

10:35AM  18    Q.   OKAY.  AND WHAT HAPPENED AFTER THAT?

10:35AM  19    A.   AT SOME POINT, MAYBE A WEEK OR SO OR TWO WEEKS LATER --

10:35AM  20    YOU KNOW, IT'S A LONG TIME AGO -- I RECEIVED A LIST OF -- THAT

10:35AM  21    SET OF QUESTIONS WITH A SET OF ANSWERS TO THOSE QUESTIONS.

10:35AM  22    Q.   AND WITH ALL OF THE WRITTEN MATERIALS THAT YOU HAD

10:35AM  23    RECEIVED, THE PHONE CALL WITH MS. HOLMES AND HER TEAM AND THE

10:35AM  24    WRITTEN RESPONSES TO QUESTIONS, DID YOU PREPARE A REPORT WITH

10:35AM  25    RECOMMENDATIONS FOR PFIZER BASED ON YOUR ANALYSIS OF THERANOS'S

10:35AM  1    TECHNOLOGY?

10:35AM  2    A.   I DID.

10:35AM  3    Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO WHAT HAS BEEN

10:35AM  4    MARKED AS EXHIBIT 167.

10:36AM  5        DO YOU RECOGNIZE THIS DOCUMENT?

10:36AM  6    A.   I DO.

10:36AM  7    Q.   WHAT IS THIS?

10:36AM  8    A.   THIS IS MY FINAL SUMMARY REPORT AND RECOMMENDATIONS TO

10:36AM  9    PFIZER ON THE USE OF THE THERANOS TECHNOLOGY.

10:36AM  10   Q.   DO YOU SEE THE DATE OF DECEMBER 31ST, OR 12-31-08 AT THE

10:36AM  11   TOP?

10:36AM  12   A.   I DO.

10:36AM  13   Q.   DID YOU PREPARE THIS DOCUMENT IN THE ORDINARY COURSE OF

10:36AM  14   PFIZER'S BUSINESS?

10:36AM  15   A.   I DID.

10:36AM  16   Q.   DID YOU PREPARE THIS AT OR AROUND THE TIME OF YOUR

10:36AM  17   DIAGNOSTICS REVIEW?

10:36AM  18   A.   I DID, FOLLOWED UP BY A COUPLE OF WEEKS SO I COULD FULLY

10:36AM  19   INTEGRATE ALL OF THE INFORMATION THAT I WAS OBTAINING NOT ONLY

10:36AM  20   FROM PFIZER, BUT FROM VARIOUS POINTS IN THE OUTSIDE WORLD AND

10:36AM  21   MY CONTACTS INTERNAL.

10:37AM  22   Q.   AND DID YOU PREPARE REPORTS LIKE THIS IN THE ORDINARY

10:37AM  23   COURSE OF YOUR BUSINESS?

10:37AM  24   A.   YES, THIS IS MY STANDARD PRACTICE.

10:37AM  25   Q.   OKAY.  SO THIS ISN'T A ONE-OFF EXAMPLE?

WEBER DIRECT BY MR. LEACH                                              4380

10:37AM   1     A.    NO.

10:37AM   2     Q.    OKAY.  AND DID PFIZER KEEP YOUR REPORT IN THE ORDINARY

10:37AM   3     COURSE OF ITS BUSINESS?

10:37AM   4     A.    IT WOULD HAVE.

10:37AM   5     Q.    OKAY.

10:37AM   6          YOUR HONOR, I OFFER PAGE 1 OF EXHIBIT 167 WITH -- AND I

10:37AM   7     ASK LEAVE TO REDACT EVERYTHING AFTER THE WORDS "DEMONSTRATED

10:37AM   8     CAPABILITY" IN THE MIDDLE OF THE PAGE IN THAT LAST -- IN THAT

10:37AM   9     PARAGRAPH CONSISTENT WITH OUR -- THE COURT'S RULINGS.

10:37AM  10               THE COURT:  ALL RIGHT.  MR. CLINE.

10:37AM  11               MR. CLINE:  WITH THAT REDACTION, NO OBJECTION TO

10:37AM  12     PAGE 1.

10:37AM  13               THE COURT:  ALL RIGHT.  THANK YOU.  THAT WILL BE

10:37AM  14     REDACTED AND THE PAGE WILL BE ADMITTED AND IT MAY BE PUBLISHED.

10:38AM  15          (GOVERNMENT'S EXHIBIT 167, REDACTED PAGE 1, WAS RECEIVED

10:38AM  16     IN EVIDENCE.)

10:38AM  17     BY MR. LEACH:

10:38AM  18     Q.    MR. WEBER --

10:38AM  19          AND, MS. HOLLIMAN, IF WE COULD PLEASE ZOOM IN ON THE TOP

10:38AM  20     PORTION, EVERYTHING FROM THE TOP DOWN TO RECOMMENDATIONS.  NO,

10:38AM  21     THE ENTIRETY OF THAT PARAGRAPH.

10:38AM  22          WONDERFUL.  THANK YOU.

10:38AM  23          MR. WEBER, DO YOU SEE THE HEADING "DIAGNOSTICS REVIEW OF

10:38AM  24     THERANOS'S TECHNOLOGY AND FINAL RECOMMENDATIONS, SHANE WEBER"

10:38AM  25     AT THE TOP?

WEBER DIRECT BY MR. LEACH                                          4381

10:38AM   1     A.   I DO.

10:38AM   2     Q.   AND IS THAT A REFERENCE TO A REVIEW THAT YOU'D BEEN

10:38AM   3     CONDUCTING OF THERANOS'S TECHNOLOGY?

10:38AM   4     A.   IT IS.

10:38AM   5     Q.   OKAY.  IN THE FIRST PARAGRAPH, IN THE THIRD LINE TOWARDS

10:38AM   6     THE END, YOU WROTE -- WELL, FIRST, THE VERY FIRST SENTENCE

10:38AM   7     SAYS, "THERANOS SYSTEMS (THERANOS) PURPORTS TO HAVE A PATIENT

10:38AM   8     HOME USE IMMUNOASSAY IN VITRO DIAGNOSTIC DEVICE PLATFORM."

10:38AM   9          DO YOU SEE THAT?

10:38AM   10    A.   I DO.

10:39AM   11    Q.   AND IS THAT CONSISTENT WITH THE THERANOS PRODUCT?

10:39AM   12    A.   IT IS.

10:39AM   13    Q.   AND YOU WROTE, "THE PURPOSE OF THIS REVIEW WAS TO CLOSE

10:39AM   14    THE LOOP ON ALL PREVIOUS EFFORTS FOR THERANOS TO LOOK FOR

10:39AM   15    BUSINESS OPPORTUNITIES WITH PFIZER, AND TO MAKE FINAL

10:39AM   16    RECOMMENDATIONS REGARDING POTENTIAL FUTURE ATTEMPTS FOR

10:39AM   17    THERANOS TO ENGAGE DIFFERENT PARTS OF PFIZER IN THEIR

10:39AM   18    PLATFORM."

10:39AM   19         DO YOU SEE THAT?

10:39AM   20    A.   I DO.

10:39AM   21    Q.   IS THAT CONSISTENT WITH WHAT YOU UNDERSTOOD YOUR

10:39AM   22    ASSIGNMENT TO BE?

10:39AM   23    A.   IT WAS.

10:39AM   24    Q.   OKAY.

10:39AM   25         LET ME NEXT DRAW YOUR ATTENTION TO THE PARAGRAPH,

WEBER DIRECT BY MR. LEACH                                          4382

10:39AM  1    RECOMMENDATIONS.

10:39AM  2         DO YOU SEE THAT?

10:39AM  3    A.   I DO.

10:39AM  4    Q.   YOU WROTE, "THERANOS DOES NOT AT THIS TIME HAVE ANY

10:39AM  5    DIAGNOSTIC OR CLINICAL INTEREST TO PFIZER."

10:39AM  6         DO YOU SEE THAT?

10:39AM  7    A.   I DO.

10:39AM  8    Q.   WAS THAT YOUR RECOMMENDATION?

10:39AM  9    A.   IT WAS.

10:39AM  10   Q.   AND WHY WAS THAT YOUR RECOMMENDATION?

10:39AM  11   A.   SO THERE WAS NO DIAGNOSTIC OR CLINICAL INTEREST TO PFIZER

10:39AM  12   BECAUSE OUR INTERESTS WERE FOR MOLECULAR NUCLEIC ACID TESTS,

10:40AM  13   PARTICULARLY IN ONCOLOGY, AND THEY'RE FOR DIAGNOSTICS THAT ARE

10:40AM  14   READY TO USE IN A CLINICAL TRIAL AND SO THEY NEEDED TO BE

10:40AM  15   EITHER FDA APPROVED OR LABORATORY -- APPROVED LABORATORY

10:40AM  16   DEVELOPED TESTS UNDER THE CLIA LABORATORY PROCESS.

10:40AM  17        AND THE THERANOS PLATFORM WAS AN IMMUNOASSAY PLATFORM, SO

10:40AM  18   IT'S NOT NUCLEIC ACID.

10:40AM  19        AND IT ALSO WAS FOR HOME USE, AND WE NEEDED DIAGNOSTICS

10:40AM  20   THAT COULD BE USED AT PHYSICIAN'S CLINICAL INTAKE POINTS FOR

10:40AM  21   CLINICAL TRIALS.

10:40AM  22   Q.   YOU ALSO MADE REFERENCE TO DEVICES OR DIAGNOSTICS THAT ARE

10:40AM  23   READY FOR USE.

10:40AM  24        WAS IT YOUR JUDGMENT THAT THERANOS DIDN'T MEET THAT

10:40AM  25   STANDARD?

WEBER DIRECT BY MR. LEACH                                              4383

10:40AM    1      A.    IT WAS.

10:40AM    2      Q.    OKAY.  YOU NEXT WROTE, "IT IS RECOMMENDED THAT NO FURTHER

10:40AM    3      FINANCIAL INVESTMENT OR CLINICAL SAMPLE RESOURCES BE EXTENDED

10:40AM    4      TO THERANOS."

10:41AM    5            WAS THAT YOUR RECOMMENDATION?

10:41AM    6      A.    IT WAS.

10:41AM    7      Q.    AND WHY WAS IT YOUR RECOMMENDATION?

10:41AM    8      A.    WELL, THAT RECOMMENDATION REALLY FOLLOWS FROM THE FIRST,

10:41AM    9      THAT IF THERE'S NO MATCH BETWEEN THE USE OF THERANOS TECHNOLOGY

10:41AM   10      AND PFIZER'S CLINICAL PROGRAMS, THERE WAS NO NEED FOR FURTHER

10:41AM   11      FINANCIAL INVESTMENT OR RELEASE OF CLINICAL SAMPLES FROM OTHER

10:41AM   12      PFIZER TRIALS.

10:41AM   13      Q.    IN PARAGRAPH NUMBER 3 YOU WROTE, "GOING FORWARD, THERANOS

10:41AM   14      SHOULD BE MONITORED BY MOLECULAR MEDICINE'S DIAGNOSTIC GROUP."

10:41AM   15            IS THAT YOUR GROUP?

10:41AM   16      A.    IT IS, OR IT WAS.

10:41AM   17      Q.    YOU THEN WROTE, "A ONCE EVERY SIX MONTH PHONE CALL (OR AS

10:41AM   18      MAY BE REQUESTED BY THERANOS UPON A SIGNIFICANT IMPROVEMENT ON

10:41AM   19      THEIR PLATFORM) VIA SPECIFIED POINT OF CONTACTS ON BOTH SIDES

10:41AM   20      IS SUFFICIENT TO MONITOR AND DETERMINE IF THERANOS HAS ANY

10:41AM   21      DEMONSTRATED CAPABILITY."

10:41AM   22            DO YOU SEE THAT LANGUAGE?

10:41AM   23      A.    I DO.

10:41AM   24      Q.    AND WAS THAT YOUR RECOMMENDATION?

10:42AM   25      A.    IT WAS.

WEBER DIRECT BY MR. LEACH                                              4384

10:42AM  1    Q.   AND WHY WAS THAT YOUR RECOMMENDATION?

10:42AM  2    A.   THE WORLD CHANGES.  ONE NEVER KNOWS WHAT THE FUTURE MIGHT

10:42AM  3    BRING, AND SO A WAIT AND WATCH APPROACH SEEMED TO BE PRUDENT.

10:42AM  4    Q.   NOW IF WE CAN ZOOM OUT, MS. HOLLIMAN, AND FOCUS ON THE

10:42AM  5    LAST PARAGRAPH DOWN AT THE BOTTOM OR THE -- EVERYTHING DOWN IN

10:42AM  6    THE FIRST PARAGRAPH.

10:42AM  7         THAT'S FINE.  THANK YOU, MS. HOLLIMAN.

10:42AM  8         MR. WEBER, DO YOU SEE WHERE YOU WROTE, "REVIEW AND

10:42AM  9    COMMENTS ON" - I THINK YOU MEANT "THERANOS PROVIDED

10:42AM 10    INFORMATION."

10:42AM 11    A.   I DO.

10:42AM 12    Q.   AND YOU WROTE, "THE TECHNICAL ASSESSMENT REVIEW PROCESS

10:42AM 13    CONSISTED OF EXAMINING THERANOS CONFIDENTIAL SUMMARY REPORTS,

10:42AM 14    READING THEIR PUBLIC PATENT PUBLICATIONS, HEARING THEIR STORY

10:42AM 15    IN A ONE HOUR TELECONFERENCE WITH QUESTIONS AND ANSWERS,

10:42AM 16    READING THEIR ANSWERS TO A WRITTEN SET OF TECHNICAL DUE

10:42AM 17    DILIGENCE QUESTIONS SUBMITTED TO THEM, SURVEYING THE WEB FOR

10:43AM 18    PUBLIC INFORMATION," AND THEN IT CONTINUES.

10:43AM 19         DO YOU SEE THAT?

10:43AM 20    A.   I DO.

10:43AM 21    Q.   AND IS THIS A FAIR SUMMARY OF THE WORK THAT YOU DID AND

10:43AM 22    CONSIDERED?

10:43AM 23    A.   YES, IT IS.

10:43AM 24         MR. LEACH:  YOUR HONOR, WITH THE COURT'S PERMISSION,

10:43AM 25    I WOULD LIKE TO DISPLAY AS A DEMONSTRATIVE PAGE 2 OF

WEBER DIRECT BY MR. LEACH                                    4385

10:43AM    1       EXHIBIT 167.

10:43AM    2               THE COURT:  YES.

10:43AM    3          ANY FURTHER COMMENT OTHER THAN WHAT YOU'VE MADE

10:43AM    4     PREVIOUSLY, MR. CLINE?

10:43AM    5               MR. CLINE:  NO FURTHER COMMENT.

10:43AM    6               THE COURT:  ALL RIGHT.  THANK YOU.  I'LL NOTE YOUR

10:43AM    7     COMMENTS.

10:43AM    8          IT MAY BE DISPLAYED, THANK YOU, AS A DEMONSTRATIVE.

10:43AM    9               MR. LEACH:  AND IF WE CAN PLEASE ZOOM IN,

10:43AM   10     MS. HOLLIMAN, ON THE TOP PORTION DOWN TO THE BOLDED LANGUAGE.

10:43AM   11          PERFECT.  THANK YOU.

10:43AM   12     Q.   MR. WEBER, YOU WROTE AT THE TOP UP HERE, "THE INTRODUCTION

10:43AM   13     TO THERANOS SYSTEMS SLIDE DECK DOES NOT CONTAIN SUFFICIENT

10:43AM   14     INFORMATION ON THEIR PLATFORM TO DEMONSTRATE IN VITRO

10:43AM   15     DIAGNOSTIC ASSAY OR PLATFORM CAPABILITY."

10:44AM   16          DO YOU SEE THAT LANGUAGE?

10:44AM   17     A.   I DO.

10:44AM   18     Q.   AND THE "INTRODUCTION TO THERANOS SYSTEMS SLIDE DECK," IS

10:44AM   19     THAT A REFERENCE TO A POWERPOINT THAT WAS PROVIDED TO YOU?

10:44AM   20     A.   AS I REMEMBER IT, THIS IS REFERRING TO THE POWERPOINT THAT

10:44AM   21     AIDAN POWER AND CRAIG LIPSET SENT TO ME.

10:44AM   22     Q.   OKAY.  AND WHY DID YOU BELIEVE THE THERANOS SYSTEMS SLIDE

10:44AM   23     DECK DID NOT CONTAIN SUFFICIENT INFORMATION ON THEIR PLATFORM

10:44AM   24     TO DEMONSTRATE IN VITRO DIAGNOSTIC ASSAY OR PLATFORM

10:44AM   25     CAPABILITY?

WEBER DIRECT BY MR. LEACH                                              4386

10:44AM   1    A.   I BELIEVED THIS BASED UPON MY EXTENSIVE EXPERIENCE DOING

10:44AM   2    ASSAY DEVELOPMENT, ASSAY QUALIFICATION, RECEIVER OPERATOR CURVE

10:44AM   3    ANALYSIS, THAT THERE WAS NOT SUFFICIENT INFORMATION IN THIS

10:44AM   4    REPORT TO CONVINCE ME THAT THEY WERE -- THAT THE THERANOS

10:44AM   5    SYSTEM WAS READY TO BE TAKEN FORWARD FOR CLINICAL USE THROUGH

10:44AM   6    AN FDA OR CLIA LABORATORY PROCESS.

10:44AM   7    Q.   YOU THEN WROTE, "THERANOS HAS PROVIDED A POORLY PREPARED

10:45AM   8    SUMMARY DOCUMENT OF THEIR PLATFORM FOR HOME PATIENT USE WITH

10:45AM   9    ANTI-ANGIOGENIC THERAPIES."

10:45AM   10        DO YOU SEE THAT LANGUAGE?

10:45AM   11   A.   I DO.

10:45AM   12   Q.   AND WHAT WERE YOU REFERRING TO AS THE SUMMARY DOCUMENT?

10:45AM   13   A.   AS I REMEMBER IT, I'M REFERRING TO THE SUMMARY DOCUMENT ON

10:45AM   14   THE STUDY THAT WAS SENT TO ME VIA CRAIG LIPSET AND AIDAN POWER.

10:45AM   15   Q.   THERE'S THEN A NUMBER OF, OF NUMBERED ITEMS FURTHER BELOW.

10:45AM   16        FIRST OF ALL, BEFORE I GET TO THOSE, YOU WROTE, "A SMALL

10:45AM   17   NUMBER OF PATIENTS RECEIVING SUTENT" -- IS SUTENT A PFIZER

10:45AM   18   DRUG?

10:45AM   19   A.   IT IS A PFIZER DRUG.

10:45AM   20   Q.   AND WAS THAT THE SUBJECT OF THE ANGIOGENESIS PROGRAM IN

10:45AM   21   THE STUDY REPORT?

10:45AM   22   A.   IT IS AS I REMEMBER IT.

10:45AM   23   Q.   YOU WROTE ONE, "THERANOS SYSTEMS IN THE SLIDE DECK STATES

10:46AM   24   'HUGE VARIATION BETWEEN SUBJECTS, BOTH IN THE ABSOLUTE LEVELS

10:46AM   25   AND CHANGES OVER TIME VARY GREATLY.'  NO DISCUSSION OR RIGOROUS

WEBER DIRECT BY MR. LEACH                                        4387

10:46AM   1    GRAPHICAL MULTI-PARAMETER QUANTITATIVE ANALYSIS OF THE PATIENT

10:46AM   2    COHORT WAS DONE TO ELUCIDATE AND PROVIDE CLARITY OF CORRELATION

10:46AM   3    TO CLINICAL RESPONSE."

10:46AM   4         WHAT WERE YOU GETTING AT THERE?

10:46AM   5    A.   I WAS GETTING AT SEVERAL THINGS THERE.  WHAT I WAS GETTING

10:46AM   6    AT WAS THE ANALYSIS DIDN'T GET AT WHY WAS THIS HUGE VARIATION.

10:46AM   7    THERE WASN'T A MULTI PARAMETER APPROACH, WHICH IS OFTEN

10:46AM   8    REQUIRED FOR ONCOLOGY STUDIES IN ORDER TO UNDERSTAND WHAT WAS

10:46AM   9    GOING ON, AND THERE WASN'T A CORRELATION, AN ANALYSIS OF CLEAR

10:46AM   10   CORRELATION TO THE CLINICAL RESPONSE.

10:46AM   11   Q.   YOU THEN WROTE, "THERANOS UNCONVINCINGLY ARGUES --"

10:46AM   12        MR. CLINE:  YOUR HONOR, I APOLOGIZE TO MR. LEACH.

10:46AM   13        YOUR HONOR, APOLOGIES.

10:46AM   14        YOUR HONOR, THIS IS THE 702 ISSUE THAT I THOUGHT WE WERE

10:47AM   15   NOT GOING TO BE DISCUSSING.

10:47AM   16        THE COURT:  YES.  MR. LEACH, YOU DON'T INTEND TO GO

10:47AM   17   ANY FURTHER INTO DEFINITIONS OF THIS?  AND MAYBE YOU SHOULD

10:47AM   18   CLEAR UP WITH THE WITNESS ACCESSIBLE INFORMATION SUCH THAT IT

10:47AM   19   NEED NOT TOUCH ON ANY EXPERTISE.

10:47AM   20        MR. LEACH:  THANK YOU, YOUR HONOR.  THAT WAS NOT MY

10:47AM   21   INTENTION.

10:47AM   22   Q.   IS THIS A COMMENT, MR. WEBER, ON THE SLIDE DECK THAT WAS

10:47AM   23   PROVIDED TO YOU?

10:47AM   24   A.   IT WAS.

10:47AM   25   Q.   OKAY.  AND WITHOUT RELIANCE ON YOUR EXPERTISE, IS THE

WEBER DIRECT BY MR. LEACH                                           4388

| | | |
|---|---|---|
| 10:47AM | 1 | THRUST OF YOUR COMMENT HERE THAT IT WASN'T PERSUASIVE TO YOU? |
| 10:47AM | 2 | A.   IT WAS. |
| 10:47AM | 3 | Q.   OKAY.  THE NEXT BULLET SAYS, "THERANOS UNCONVINCINGLY |
| 10:47AM | 4 | ARGUES THE CASE FOR HAVING ACCOMPLISHED TASKS OF INTEREST TO |
| 10:47AM | 5 | PFIZER." |
| 10:47AM | 6 | DO YOU SEE THAT LANGUAGE? |
| 10:47AM | 7 | A.   I DO. |
| 10:47AM | 8 | Q.   AND WHAT IS THAT A REFERENCE TO? |
| 10:47AM | 9 | A.   IT'S A REFERENCE TO THAT I WAS NOT ABLE TO SEE A CLEAR SET |
| 10:48AM | 10 | OF GOALS THAT WERE ACCOMPLISHED BY THE STUDY. |
| 10:48AM | 11 | Q.   YOU THEN WROTE, "THE NINE CONCLUSIONS IN THEIR SUMMARY |
| 10:48AM | 12 | DOCUMENT ARE NOT BELIEVABLE BASED ON THE INFORMATION PROVIDED." |
| 10:48AM | 13 | DO YOU SEE THAT? |
| 10:48AM | 14 | A.   I DO. |
| 10:48AM | 15 | Q.   AND THE SUMMARY DOCUMENT, IS THAT A REFERENCE TO THE STUDY |
| 10:48AM | 16 | REPORT THAT YOU ATTACHED TO -- IN AN EMAIL TO MR. FRENZEL? |
| 10:48AM | 17 | I GUESS WHAT DID YOU MEAN BY "STUDY REPORT" OR "SUMMARY |
| 10:48AM | 18 | DOCUMENT"? |
| 10:48AM | 19 | A.   THE SUMMARY DOCUMENT, AS I REMEMBER IT, IS ONE OF THE FOUR |
| 10:48AM | 20 | DOCUMENTS THAT CRAIG LIPSET HAD FORWARDED TO ME TO ANALYZE. |
| 10:48AM | 21 | SO THAT'S THE -- I'M REFERRING TO, AS I REMEMBER IT, THE |
| 10:48AM | 22 | SUMMARY DOCUMENT. |
| 10:48AM | 23 | Q.   OKAY. |
| 10:48AM | 24 | A.   THE THERANOS SUMMARY DOCUMENT. |
| 10:48AM | 25 | Q.   YOU THEN WROTE, "THERANOS HAS PROVIDED NON-INFORMATIVE, |

WEBER DIRECT BY MR. LEACH                                          4389

10:48AM   1     TANGENTIAL, DEFLECTIVE OR EVASIVE ANSWERS TO A WRITTEN SET OF

10:48AM   2     TECHNICAL DUE DILIGENCE QUESTIONS."

10:49AM   3          DO YOU SEE THAT?

10:49AM   4     A.   I DO.

10:49AM   5     Q.   AND WAS THAT YOUR CONCLUSION AT THE TIME?

10:49AM   6     A.   IT WAS.

10:49AM   7     Q.   AND WHAT DO YOU MEAN BY THE "DUE DILIGENCE QUESTIONS"?  IS

10:49AM   8     THAT A REFERENCE TO WRITTEN QUESTIONS THAT YOU HAD SUBMITTED TO

10:49AM   9     THERANOS?

10:49AM  10     A.   IT'S -- I'M REFERRING TO THE LIST OF QUESTIONS, TECHNICAL

10:49AM  11     DUE DILIGENCE QUESTIONS I SUBMITTED TO THERANOS VIA

10:49AM  12     GARY FRENZEL.

10:49AM  13     Q.   IF WE CAN ZOOM OUT, MS. HOLLIMAN, AND LOOK AT THE SECOND

10:49AM  14     PART OF THIS.

10:49AM  15          MR. WEBER, DO YOU SEE THE HEADING "THERAPEUTIC AREA

10:49AM  16     MOLECULAR MEDICINE LEAD INTEREST IN THERANOS OR A THERANOS-LIKE

10:49AM  17     HOME PATIENT IMMUNOASSAY IN VITRO DIAGNOSTIC PLATFORM"?

10:49AM  18     A.   I DO.

10:49AM  19     Q.   AND WHAT IS SUMMARIZED HERE IN THIS PORTION OF YOUR

10:49AM  20     REPORT?

10:49AM  21     A.   WHAT IS SUMMARIZED HERE IS THAT I REACHED OUT TO THE

10:49AM  22     CLINICAL LEADS WHO ARE RESPONSIBLE FOR ONCOLOGY STUDIES, AND SO

10:50AM  23     I'M RELYING ON THEM TO STATE THAT THERE IS NO CLINICAL

10:50AM  24     DEVELOPMENT INTEREST IN USING SUCH TYPE ASSAYS.

10:50AM  25     Q.   AND THE FEEDBACK THAT YOU GOT FROM YOUR COLLEAGUES WAS

WEBER DIRECT BY MR. LEACH                                          4390

10:50AM   1      WHAT?

10:50AM   2      A.   THERE WAS NO INTEREST.

10:50AM   3      Q.   PLEASE LOOK AT PAGE 3, WHICH WE'LL DISPLAY AS A

10:50AM   4      DEMONSTRATIVE.

10:50AM   5           DO YOU SEE ON PAGE 3 THE HEADING "DUE DILIGENCE QUESTIONS

10:50AM   6      VERBALLY ASKED TO THERANOS IN NOVEMBER 13TH TELECONFERENCE"?

10:50AM   7      A.   I DO.

10:50AM   8      Q.   AND THERE ARE SIX QUESTIONS LISTED HERE.

10:50AM   9           DO YOU SEE THAT?

10:50AM   10     A.   I SEE THIS.

10:50AM   11     Q.   ARE THOSE QUESTIONS THAT YOU WENT OVER WITH MS. HOLMES AND

10:50AM   12     HER TEAM IN A CONFERENCE CALL?

10:50AM   13     A.   THEY ARE.

10:50AM   14     Q.   YOU WROTE, "THERANOS VERBALLY PROVIDED OBLIQUE,

10:50AM   15     DEFLECTIVE, OR EVASIVE NON-INFORMATIVE ANSWERS TO THESE

10:51AM   16     TECHNICAL DUE DILIGENCE QUESTIONS BELOW."

10:51AM   17          WAS THAT YOUR JUDGMENT AT THE TIME?

10:51AM   18     A.   IT WAS.

10:51AM   19     Q.   WHY WAS THAT?

10:51AM   20     A.   THESE SIX QUESTIONS, I SPENT 50 MINUTES IN THE CALL

10:51AM   21     ASKING, PROBING, TRYING TO FIND UNDERSTANDING OF THE ROAD MAP

10:51AM   22     OF WHERE THESE QUESTIONS WOULD LEAD AND WHAT WAS POSSIBLE FROM

10:51AM   23     THERANOS.

10:51AM   24     Q.   OKAY.  ONE OF THE QUESTIONS WAS, "WHAT IS THE APPROXIMATE

10:51AM   25     ANTICIPATED COST OF THE DEVICE IF 100 WERE DESIRED FOR A

WEBER DIRECT BY MR. LEACH                                                4391

10:51AM   1      CLINICAL STUDY ENROLLMENT?"

10:51AM   2           DO YOU SEE THAT?

10:51AM   3      A.   I SEE THAT QUESTION.

10:51AM   4      Q.   AND WHY WERE YOU INTERESTED IN THAT?

10:51AM   5      A.   WHY I WAS INTERESTED IS IF WE COULD POTENTIALLY SEE IF WE

10:51AM   6      COULD FIND A MATCH, A WORLDWIDE CLINICAL TRIAL MIGHT ANTICIPATE

10:51AM   7      NEEDING 100 OF SUCH DEVICES, SO I WANTED TO KIND OF GET JUST A

10:52AM   8      DIRECTIONAL SCOPE OF WHAT THE COST WOULD BE.

10:52AM   9      Q.   AFTER PREPARING THIS -- WELL, FIRST, IS WHAT WE'RE LOOKING

10:52AM  10      AT IN EXHIBIT 167 YOUR FINAL REPORT, MR. WEBER?

10:52AM  11      A.   THIS IS MY FINAL REPORT.

10:52AM  12      Q.   OKAY.  AND WHAT DID YOU DO WITH IT?

10:52AM  13      A.   I FORWARDED IT TO MY DIRECT LINE MANAGER, HAKAN SAKUL, WHO

10:52AM  14      WAS THE GLOBAL HEAD OF DIAGNOSTICS FOR PFIZER; TO CRAIG LIPSET,

10:52AM  15      THE DIRECTOR OF CLINICAL INNOVATION, MY COLLEAGUE THERE IN

10:52AM  16      NEW YORK CITY; AND TO AIDAN POWER, THE HEAD OF MOLECULAR

10:52AM  17      MEDICINE.

10:52AM  18      Q.   DID YOUR SUPERVISORS AGREE WITH YOUR RECOMMENDATION?

10:52AM  19      A.   THEY DID.

10:52AM  20      Q.   OKAY.  DID YOU EVER HEAR --

10:52AM  21           THE COURT:  I'M SORRY, SIR.  I BEG YOUR PARDON.

10:52AM  22      COULD YOU PLEASE SPELL YOUR DIRECT MANAGER'S NAME AGAIN,

10:52AM  23      PLEASE.

10:52AM  24           THE WITNESS:  OH, YES.

10:52AM  25           MY DIRECT MANAGER IS HAKAN SAKUL.  IT'S H-A-K-A-N, SAKUL,

10:53AM  1     S-A-K-U-L.

10:53AM  2              THE COURT:  THANK YOU VERY MUCH.  PARDON ME,

10:53AM  3     MR. LEACH.

10:53AM  4     BY MR. LEACH:

10:53AM  5     Q.   AND YOUR UNDERSTANDING WAS THAT YOUR SUPERVISORS AGREED

10:53AM  6     WITH YOUR RECOMMENDATION?

10:53AM  7     A.   IT WAS.

10:53AM  8     Q.   AND DID YOU EVER HEAR -- DID YOU EVER CHANGE YOUR

10:53AM  9     RECOMMENDATION AT ANY POINT?

10:53AM  10    A.   NO, I DID NOT.

10:53AM  11    Q.   OKAY.  LET ME NEXT DRAW YOUR ATTENTION, PLEASE, TO WHAT WE

10:53AM  12    HAVE -- BEFORE I MOVE ON TO THE NEXT EXHIBIT, EXHIBIT 167 IS AN

10:53AM  13    INTERNAL PFIZER DOCUMENT, MR. WEBER?

10:53AM  14    A.   IT IS.

10:53AM  15    Q.   AND DID YOU EVER SHARE THAT WITH THERANOS?

10:53AM  16    A.   NO, I DID NOT.

10:53AM  17    Q.   LET ME PLEASE DRAW YOUR ATTENTION TO WHAT HAS BEEN MARKED

10:53AM  18    AS EXHIBIT 174.

10:53AM  19         AND I OFFER 174 INTO EVIDENCE PURSUANT TO STIPULATION.

10:53AM  20              MR. CLINE:  NO OBJECTION.  MAY I CHECK WITH

10:53AM  21    MR. LEACH FOR ONE SECOND?

10:54AM  22              THE COURT:  SURE.  OF COURSE.

10:54AM  23         (DISCUSSION OFF THE RECORD.)

10:54AM  24              MR. CLINE:  NO OBJECTION.

10:54AM  25              THE COURT:  174 IS ADMITTED.  IT MAY BE PUBLISHED.

WEBER DIRECT BY MR. LEACH                                    4393

10:54AM   1              (GOVERNMENT'S EXHIBIT 174 WAS RECEIVED IN EVIDENCE.)

10:54AM   2      BY MR. LEACH:

10:54AM   3      Q.   MR. WEBER, IS THIS AN EMAIL THAT YOU SENT TO AIDAN POWER

10:54AM   4      WITH A CC TO CRAIG LIPSET AND HAKAN SAKUL ON OR ABOUT

10:54AM   5      JANUARY 30TH, 2009?

10:54AM   6      A.   IT IS.

10:54AM   7      Q.   AND THIS IS AFTER YOU SUBMITTED YOUR REPORT RELATING TO

10:54AM   8      THERANOS TO YOUR SUPERIORS?

10:54AM   9      A.   IT WAS.

10:54AM  10      Q.   OKAY.  AND IS THIS A PHONE CALL THAT YOU HAD WITH

10:54AM  11      MS. HOLMES FOLLOWING YOUR REVIEW?

10:54AM  12      A.   IT WAS, YES.

10:54AM  13      Q.   YOU WROTE, "TODAY I SPOKE WITH ELIZABETH HOLMES, CEO,

10:55AM  14      THERANOS AND EXPLAINED TO HER THAT PFIZER DID NOT HAVE AT THIS

10:55AM  15      TIME A FORESEEABLE USE OF THE THERANOS IMMUNOASSAY DEVICE FOR

10:55AM  16      AT PATIENT SELF USE AT HOME BUT SHE AND I AGREED TO STAY IN

10:55AM  17      TOUCH EVERY SIX MONTHS."

10:55AM  18           DO YOU SEE THAT?

10:55AM  19      A.   I DO.

10:55AM  20      Q.   AND THAT HAPPENED DURING THE PHONE CALL?

10:55AM  21      A.   YES.

10:55AM  22      Q.   OKAY.  YOU SEEM TO PAUSE.  WHY DO YOU PAUSE?

10:55AM  23      A.   IT WAS A LONG TIME AGO, 13 YEARS.  BUT AS I REMEMBER IT, I

10:55AM  24      WOULD HAVE BROACHED AND TRIED TO MAKE AN ARRANGEMENT TO STAY IN

10:55AM  25      TOUCH ON A REGULAR BASIS JUST TO KEEP IN TOUCH.

WEBER DIRECT BY MR. LEACH                                          4394

10:55AM   1    Q.   CONSISTENT WITH THE FINAL RECOMMENDATION IN YOUR REPORT?

10:55AM   2    A.   YES, CONSISTENT WITH MY FINAL REPORT RECOMMENDATION.

10:55AM   3    Q.   AND YOU WROTE, "I WAS POLITE, CLEAR, CRISP AND PATIENTLY

10:56AM   4    FIRM AS SHE PUSHED BACK."

10:56AM   5         WHAT DID YOU MEAN BY THAT?

10:56AM   6    A.   WELL, WHAT I MEANT WAS I, AS A MESSENGER, AM DELIVERING A

10:56AM   7    PIECE OF INFORMATION AND A POINT OF VIEW THAT WAS NOT DESIRED,

10:56AM   8    AND SO I HAD TO BE CLEAR THAT THIS IS REALLY PFIZER'S INTENT.

10:56AM   9    Q.   YOU THEN WROTE, "SHE ASKED FOR OTHER NAMES AT PFIZER TO

10:56AM  10    APPROACH AND I POLITELY DEFLECTED."

10:56AM  11         WHY DID YOU POLITELY DEFLECT?

10:56AM  12    A.   WELL, I POLITELY DEFLECTED BECAUSE IN TERMS OF BUSINESS

10:56AM  13    INEFFICIENCIES, WE HAD MADE OUR DETERMINATION OF WHAT PFIZER'S

10:56AM  14    CLINICAL PATH NEEDS ARE AND THAT THERANOS'S IMMUNOASSAY SYSTEM

10:56AM  15    WAS NOT GOING TO FIT A MODULE IN THERE, AND SO I DID NOT WANT

10:56AM  16    MULTIPLE OTHER POINTS OF THE COMPANY BEING CONTACTED AND BEING

10:57AM  17    DISTRACTED FROM THEIR CLINICAL TRIAL DUTIES.

10:57AM  18    Q.   IN THE NEXT PARAGRAPH YOU WROTE, "I DID RECEIVE HER

10:57AM  19    CONFIRMATION THAT THERANOS HAS BEEN PAID IN FULL FOR THE

10:57AM  20    PREVIOUS ALLIANCE CONTRACT."

10:57AM  21         WHAT DID YOU MEAN BY "THE PREVIOUS ALLIANCE CONTRACT"?

10:57AM  22    A.   WHAT I MEANT, AS I REMEMBER IT, THAT WAS THE CONTRACT

10:57AM  23    UNDER WHICH THE STUDY THAT HAD BEEN DESCRIBED AND SUBMITTED TO

10:57AM  24    AIDAN POWER WAS FUNDED BY.

10:57AM  25    Q.   YOU THEN WROTE, "I HAD CONFIRMED THIS BEFORE HAND AND THAT

WEBER DIRECT BY MR. LEACH                                          4395

10:57AM  1    IT CAME OUT OF STRATEGIC ALLIANCE BUDGET AND NOT MM BUDGET."

10:57AM  2         IS MM A REFERENCE TO MOLECULAR MEDICINE?

10:57AM  3    A.   IT IS.

10:57AM  4    Q.   AND THAT'S YOUR GROUP?

10:57AM  5    A.   IT IS.

10:57AM  6    Q.   AND WHAT DID YOU MEAN BY THIS SENTENCE?

10:57AM  7    A.   I AM INFORMING MY VICE PRESIDENT OF MOLECULAR MEDICINE

10:57AM  8    THAT HE DID NOT HAVE TO WORRY THAT THERE WAS GOING TO BE OTHER

10:58AM  9    FURTHER CHARGES COME OUT OF -- SURPRISE CHARGES GOING INTO THIS

10:58AM 10    COMING NEW YEAR AND THAT EVERYTHING HAD BEEN PAID FOR UNDER THE

10:58AM 11    CONTRACT AND PFIZER HAD MET ITS CONTRACTUAL OBLIGATIONS OF

10:58AM 12    PAYING FOR THE WORK.

10:58AM 13    Q.   IN THE NEXT PARAGRAPH YOU WROTE, "AS STEVE FELSTEAD'S

10:58AM 14    CLINICAL R&D VISION BECOMES MORE OPERATIONALLY CLEAR, I CAN

10:58AM 15    REVISIT THERANOS IF THERE ARE NEW NEEDS WHICH ARISE THAT

10:58AM 16    THERANOS CAN SOLVE IF THEIR DEVICE IS PLAUSIBLY ABLE TO DO SO."

10:58AM 17         DO YOU SEE THAT LANGUAGE?

10:58AM 18    A.   I DO.

10:58AM 19    Q.   AND WHAT DID YOU MEAN BY THAT?

10:58AM 20    A.   WHAT I MEANT BY THAT IS THAT MOLECULAR MEDICINE COMING

10:58AM 21    INTO THIS YEAR OF 2009 HAD BEEN REORGANIZED INTO A NEW CLINICAL

10:58AM 22    R&D WORLDWIDE ORGANIZATION, AND STEVE FELSTEAD WAS THE GLOBAL

10:58AM 23    HEAD OF THAT OUT OF THE SANDWICH UNITED KINGDOM SITE, AND THAT

10:58AM 24    WAS SOMEWHAT NEW TO US, THERE WAS GOING TO BE NEW POTENTIAL

10:59AM 25    PROGRAMS, AND PERHAPS THERE MIGHT BE SOMETHING IN A CLINICAL

WEBER DIRECT BY MR. LEACH

10:59AM  1    PROGRAM EFFORT THAT COULD USE AN IMMUNOASSAY AT HOME.

10:59AM  2    Q.   TO YOUR KNOWLEDGE, DID THAT EVER MATERIALIZE?

10:59AM  3    A.   NO, IT DID NOT.

10:59AM  4    Q.   SO WE'RE IN JANUARY OF 2009.  DO YOU SEE THAT AT THE TOP

10:59AM  5    OF THE EMAIL, MR. WEBER?

10:59AM  6    A.   I DO.

10:59AM  7    Q.   I'D LIKE TO DISPLAY FOR YOU AND DRAW YOUR ATTENTION TO

10:59AM  8    WHAT IS IN EVIDENCE AS EXHIBIT 291.

10:59AM  9         IF WE CAN ZOOM IN ON THE TOP EMAIL, MS. HOLLIMAN.

10:59AM  10        YOU ARE NOT ON THIS EMAIL, CORRECT, MR. WEBER?

10:59AM  11   A.   I AM NOT ON THIS EMAIL.

11:00AM  12   Q.   AND BEFORE MEETING WITH THE GOVERNMENT, HAD YOU EVER SEEN

11:00AM  13   THIS EMAIL?

11:00AM  14   A.   NO, I HAD NEVER SEEN THIS EMAIL BEFORE MEETING WITH THE

11:00AM  15   FEDERAL GOVERNMENT.

11:00AM  16   Q.   DO YOU SEE THAT THIS APPEARS TO BE AN EMAIL FROM

11:00AM  17   ELIZABETH HOLMES TO INDIVIDUALS AT WALGREENS?

11:00AM  18   A.   YES, I DO SEE THAT.

11:00AM  19   Q.   AND DO YOU SEE THAT ONE OF THE ATTACHMENTS IS "PFIZER

11:00AM  20   THERANOS SYSTEM VALIDATION FINAL REPORT.PDF."

11:00AM  21   A.   I SEE THAT.

11:00AM  22   Q.   DO YOU SEE THAT?

11:00AM  23        AND DO YOU SEE WHERE MS. HOLMES WROTE, "DEAR JAY, ALEX.

11:00AM  24        "AS PER OUR DISCUSSION, PLEASE FIND THREE INDEPENDENT DUE

11:00AM  25   DILIGENCE REPORTS ON THERANOS SYSTEMS ATTACHED TO THIS EMAIL.

WEBER DIRECT BY MR. LEACH

| | | |
|---|---|---|
| 11:00AM | 1 | THESE REPORTS ARE FROM GLAXOSMITHKLINE, PFIZER, AND |
| 11:00AM | 2 | SCHERING-PLOUGH, AFTER THEIR OWN TECHNICAL VALIDATION AND |
| 11:00AM | 3 | EXPERIENCE WITH THERANOS SYSTEMS IN THE FIELD." |
| 11:00AM | 4 | DO YOU SEE THAT LANGUAGE? |
| 11:00AM | 5 | A.  I DO SEE THAT. |
| 11:00AM | 6 | Q.  LET ME DRAW YOUR ATTENTION TO PAGE 8 OF THIS DOCUMENT. |
| 11:01AM | 7 | IF WE CAN ZOOM IN ON THE TOP HALF ALL OF THE WAY DOWN TO |
| 11:01AM | 8 | THE CONCLUSIONS, MS. HOLLIMAN. |
| 11:01AM | 9 | DO YOU SEE THE PFIZER LOGO UP IN THE LEFT-HAND CORNER; |
| 11:01AM | 10 | MR. WEBER? |
| 11:01AM | 11 | A.  I DO. |
| 11:01AM | 12 | Q.  DO YOU SEE THE THERANOS REDEFINING HEALTH CARE ON THE |
| 11:01AM | 13 | RIGHT? |
| 11:01AM | 14 | A.  I DO. |
| 11:01AM | 15 | Q.  AND DO YOU SEE WHERE IT SAYS THERANOS ANGIOGENESIS STUDY |
| 11:01AM | 16 | REPORT? |
| 11:01AM | 17 | A.  I DO. |
| 11:01AM | 18 | Q.  AND THEN THERE'S THE WORD PFIZER, INC. BENEATH THAT? |
| 11:01AM | 19 | A.  I DO. |
| 11:01AM | 20 | Q.  AND I'D LIKE TO NOW COMPARE THIS TO PAGE 3 OF EXHIBIT 143. |
| 11:01AM | 21 | IF WE'RE ABLE TO SPLIT THE SCREEN, MS. HOLLIMAN? |
| 11:02AM | 22 | ARE YOU ABLE TO SEE THAT ON THE SCREEN, MR. WEBER? |
| 11:02AM | 23 | A.  YES, I DO SEE THE TWO PAGES. |
| 11:02AM | 24 | Q.  OKAY.  PRIOR TO YOUR MEETINGS WITH THE GOVERNMENT, HAD YOU |
| 11:02AM | 25 | EVER SEEN A VERSION OF THE THERANOS ANGIOGENESIS STUDY REPORT |

WEBER DIRECT BY MR. LEACH                                    4398

11:02AM   1    WITH THE PFIZER LOGO ON IT?

11:02AM   2    A.   NO, I HAVE NOT SEEN THAT BEFORE EXCEPT FOR IN THE

11:02AM   3    INTERACTION WITH THE FEDERAL GOVERNMENT.

11:02AM   4        I HAVE NOT SEEN THIS BEFORE EXCEPT WITH THE INTERACTION

11:02AM   5    WITH THE FEDERAL GOVERNMENT.

11:02AM   6    Q.   OKAY.  DID YOU APPROVE USE OF THE PFIZER LOGO ON THE

11:02AM   7    DOCUMENT PROVIDED TO WALGREENS?

11:02AM   8    A.   I DID NOT.

11:02AM   9    Q.   TO YOUR KNOWLEDGE, DID ANYONE FROM PFIZER APPROVE USE OF

11:03AM  10    THE PFIZER LOGO ON THE DOCUMENT PROVIDED TO WALGREENS IN

11:03AM  11    EXHIBIT 29 -- EXHIBIT 291?

11:03AM  12    A.   I'M NOT AWARE OF ANY PFIZER APPROVAL FOR THE USE OF THE

11:03AM  13    PFIZER TRADEMARKED LOGO ON THIS DOCUMENT.

11:03AM  14    Q.   OKAY.  DOES IT DISAPPOINT YOU TO SEE THE PFIZER LOGO

11:03AM  15    APPLIED TO THIS?

11:03AM  16            MR. CLINE:  EXCUSE ME, YOUR HONOR.  OBJECTION TO

11:03AM  17    WHAT HE'S TALKING ABOUT.

11:03AM  18            THE COURT:  SUSTAINED.  SUSTAINED.

11:03AM  19    BY MR. LEACH:

11:03AM  20    Q.   DID YOU APPROVE USING THE PFIZER LOGO ON ANY VERSION OF

11:03AM  21    THE THERANOS ANGIOGENESIS STUDY REPORT?

11:03AM  22    A.   I DID NOT.

11:03AM  23    Q.   TO YOUR KNOWLEDGE, DID ANYBODY FROM PFIZER?

11:03AM  24    A.   NOT THAT I'M AWARE OF.

11:03AM  25    Q.   WOULD YOU HAVE APPROVED USING THE PFIZER LOGO ON THE

WEBER DIRECT BY MR. LEACH                                              4399

11:03AM  1      THERANOS ANGIOGENESIS STUDY REPORT?

11:03AM  2      A.   I WOULD NOT BE ABLE TO APPROVE THE USE OF A PFIZER LOGO ON

11:03AM  3      AN EXTERNAL DOCUMENT OF ANOTHER COMPANY.  THAT IS THE PURVIEW

11:04AM  4      OF PFIZER LEGAL AND TRADEMARK.

11:04AM  5      Q.   WOULD IT BE FAIR TO SAY, IN 2010 OR AFTER, THAT PFIZER

11:04AM  6      ENDORSED THERANOS'S TECHNOLOGY?

11:04AM  7      A.   NO.

11:04AM  8      Q.   WOULD IT BE FAIR TO SAY, IN 2010 OR AFTER, THAT PFIZER

11:04AM  9      COMPREHENSIVELY VALIDATED THERANOS'S TECHNOLOGY?

11:04AM  10     A.   NO.

11:04AM  11     Q.   CAN WE PLEASE GO TO PAGE 33 OF EXHIBIT 271, OR 291,

11:04AM  12     MS. HOLLIMAN.

11:04AM  13          AND IF WE CAN ZOOM IN ALL OF THE WAY DOWN TO CONCLUSION

11:04AM  14     NUMBER 10.

11:04AM  15          MR. WEBER, I'M DISPLAYING PAGE 33 OF EXHIBIT 291.

11:05AM  16          AND DO YOU HAVE THAT IN FRONT OF YOU?

11:05AM  17     A.   I DO.

11:05AM  18     Q.   OKAY.  AND DO YOU SEE THE PFIZER LOGO UP AT THE TOP OF THE

11:05AM  19     PAGE?

11:05AM  20     A.   I DO.

11:05AM  21     Q.   AND DO YOU SEE THE THERANOS LOGO TO THE RIGHT?

11:05AM  22     A.   I DO.

11:05AM  23     Q.   AND DO YOU SEE A NUMBER OF CONCLUSIONS THAT ARE LISTED IN

11:05AM  24     THIS DOCUMENT?

11:05AM  25     A.   I DO.

WEBER DIRECT BY MR. LEACH                                              4400

11:05AM   1    Q.   OKAY.  DID YOU APPROVE USE OF THE PFIZER LOGO ON THIS PAGE

11:05AM   2    OF THE DOCUMENT PROVIDED TO WALGREENS?

11:05AM   3    A.   NO, I DID NOT.

11:05AM   4    Q.   TO YOUR KNOWLEDGE, DID ANYONE FROM PFIZER DO THAT?

11:05AM   5    A.   NOT THAT I'M AWARE OF.

11:05AM   6    Q.   OKAY.  THIS SAYS -- THE FIRST CONCLUSION, "THE THERANOS

11:05AM   7    SYSTEM PERFORMED WITH SUPERIOR PERFORMANCE TO REFERENCE ASSAYS

11:05AM   8    WHILE RUNNING IN A COMPLEX AMBULATORY ENVIRONMENT."

11:05AM   9         DO YOU SEE THAT?

11:05AM   10   A.   I DO.

11:05AM   11   Q.   AND DO YOU AGREE WITH THAT?

11:05AM   12   A.   NO, I DO NOT.

11:05AM   13   Q.   TO YOUR KNOWLEDGE, DID ANYONE FROM PFIZER AGREE WITH THAT?

11:06AM   14   A.   NOT THAT I'M AWARE OF THAT.

11:06AM   15          MR. CLINE:  EXCUSE ME, YOUR HONOR.  I APOLOGIZE FOR

11:06AM   16   INTERRUPTING, MR. WEBER.

11:06AM   17     I THINK -- ASSUMING WE'RE GOING TO GO THROUGH THE WHOLE

11:06AM   18   LIST HERE, THIS IS 702 TERRITORY AND I OBJECT ON THAT BASIS.

11:06AM   19          THE COURT:  IS THE QUESTION GOING TO BE SIMILAR TO

11:06AM   20   THE ONE THAT YOU JUST ASKED, WHETHER OR NOT HE APPROVED IT OR

11:06AM   21   WHETHER --

11:06AM   22          MR. LEACH:  OR WHETHER OR NOT IT WAS HIS CONCLUSION,

11:06AM   23   HIS THOUGHTS AT THE TIME.

11:06AM   24          THE COURT:  RIGHT.  RIGHT.

11:06AM   25       NO, HE CAN TESTIFY ABOUT THAT.

11:06AM 1          THE OBJECTION IS OVERRULED ON 702 GROUNDS.

11:06AM 2     BY MR. LEACH:

11:06AM 3     Q.  DID YOU AGREE WITH THAT AT THE TIME, MR. WEBER, CONCLUSION

11:06AM 4     NUMBER 1?

11:06AM 5     A.  NO, I DID NOT AGREE WITH THIS CONCLUSION.

11:06AM 6     Q.  OKAY.  TO YOUR KNOWLEDGE, DID ANYONE FROM PFIZER -- DID

11:06AM 7     ANYONE FROM PFIZER TELL YOU THAT THEY AGREED WITH THAT

11:06AM 8     CONCLUSION?

11:06AM 9     A.  NO ONE FROM PFIZER TOLD ME THAT THEY AGREED WITH THIS

11:06AM 10    CONCLUSION AS I REMEMBER IT.

11:07AM 11    Q.  OKAY.  DID YOU EVER TELL ANYONE FROM THERANOS THAT THIS

11:07AM 12    WAS PFIZER'S CONCLUSION AFTER REVIEWING THERANOS'S TECHNOLOGY?

11:07AM 13    A.  NO, I DID NOT.

11:07AM 14    Q.  LET ME DRAW YOUR ATTENTION TO NUMBER 5.

11:07AM 15         DO YOU SEE WHERE IT SAYS, "INTER-SYSTEM ACCURACY IS

11:07AM 16    EXCELLENT AND WAS DEMONSTRATED ON A PLATFORM WITH SUPERIOR

11:07AM 17    PERFORMANCE SPECIFICATIONS TO REFERENCE METHODS."

11:07AM 18         DO YOU SEE THAT?

11:07AM 19    A.  I DO.

11:07AM 20    Q.  AND WAS THAT YOUR CONCLUSION?

11:07AM 21    A.  NO, IT WAS NOT.

11:07AM 22    Q.  TO YOUR KNOWLEDGE, WAS THAT THE CONCLUSION OF ANYBODY AT

11:07AM 23    PFIZER?

11:07AM 24    A.  NOT THAT I'M AWARE OF.  I'M NOT AWARE OF ANYONE AT PFIZER

11:07AM 25    THAT AGREED WITH THIS CONCLUSION, OR WOULD.

WEBER DIRECT BY MR. LEACH                                          4402

11:07AM  1    Q.   DID YOU EVER TELL SOMEBODY AT THERANOS THAT THIS WAS

11:07AM  2    PFIZER'S CONCLUSION?

11:07AM  3    A.   NO, I DID NOT.

11:07AM  4    Q.   ARE ANY OF THE CONCLUSIONS LISTED ON PAGE 29 CONCLUSIONS

11:07AM  5    THAT YOU HAD REACHED AFTER YOUR REVIEW OF THERANOS'S

11:07AM  6    TECHNOLOGY?

11:07AM  7    A.   NO, THEY ARE NOT.

11:08AM  8    Q.   TO YOUR KNOWLEDGE, AFTER 2010 DID PFIZER DO ANY WORK,

11:08AM  9    REVENUE GENERATING WORK WITH THERANOS?

11:08AM 10    A.   I'M NOT AWARE OF ANY REVENUE GENERATING WORK BY THERANOS

11:08AM 11    WITH PFIZER AT THAT TIME.

11:08AM 12    Q.   TO YOUR KNOWLEDGE, AFTER THIS ANGIOGENESIS PROGRAM, DID

11:08AM 13    THERANOS -- OR PFIZER PAY ANY MONEY TO THERANOS?

11:08AM 14    A.   I'M NOT AWARE OF ANY MONIES BEING PAID TO THERANOS OTHER

11:08AM 15    THAN FOR THAT ANGIOGENESIS STUDY.

11:08AM 16    Q.   THE ANGIOGENESIS STUDY THAT YOU WERE REVIEWING IN LATE

11:08AM 17    2008 AND THE EARLY PART OF 2009?

11:08AM 18    A.   YES.

11:08AM 19    Q.   TO YOUR KNOWLEDGE, DID PFIZER AND THERANOS HAVE ANY

11:08AM 20    MEANINGFUL BUSINESS DEALINGS AFTER 2008?

11:08AM 21    A.   TO MY AWARENESS AND -- THERE WAS NO FURTHER INTERACTION IN

11:09AM 22    ANY MEANINGFUL WAY BETWEEN THERANOS AND PFIZER.

11:09AM 23    Q.   DO YOU AGREE WITH THE STATEMENT THAT PFIZER VALIDATED

11:09AM 24    THERANOS'S TECHNOLOGY?

11:09AM 25    A.   NO, I DO NOT.

WEBER DIRECT BY MR. LEACH                                        4403

11:09AM   1    Q.   AND IS IT RIGHT THAT YOU CAME TO THE OPPOSITE CONCLUSION?

11:09AM   2    A.   I DID.

11:09AM   3              MR. LEACH:  MAY I HAVE A MOMENT, YOUR HONOR?

11:09AM   4              THE COURT:  YES.

11:09AM   5         (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

11:09AM   6              MR. LEACH:  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

11:09AM   7         THANK YOU.

11:09AM   8         THANK YOU, MR. WEBER.

11:09AM   9              THE COURT:  MR. CLINE, YOU'LL HAVE

11:09AM   10   CROSS-EXAMINATION?

11:09AM   11             MR. CLINE:  I WILL.

11:09AM   12             THE COURT:  LET'S, LET'S -- BEFORE WE TAKE THAT,

11:09AM   13   PLEASE, I THINK WE'LL TAKE OUR MORNING BREAK NOW, LADIES AND

11:09AM   14   GENTLEMEN, FOR ABOUT 30 MINUTES.

11:09AM   15        BEFORE WE DO THAT, MR. LEACH, THERE IS AN EXHIBIT THAT I

11:09AM   16   THINK WE NEED TO DEAL WITH.  I THINK IT'S 5387D, DAVID, AND I

11:09AM   17   BELIEVE THAT THAT WAS GOING TO BE OFFERED.

11:10AM   18             MR. LEACH:  YES, YOUR HONOR.  THE GOVERNMENT MARKED

11:10AM   19   DURING THE TESTIMONY OF JUSTICE OFFEN EXHIBIT 5387A.  IT

11:10AM   20   ADMITTED A NUMBER OF TEXT MESSAGES FROM 5387B.

11:10AM   21        IN THE COURSE OF VARIOUS WITNESS TESTIMONY, WE HAVE ALSO

11:10AM   22   INTRODUCED 5387C.

11:10AM   23        WE ARE NOW OFFERING 5387D, WHICH INCLUDES ALL OF A, ALL OF

11:10AM   24   B, AND ALL OF C, AND SOME ADDITIONAL MESSAGES THAT THE DEFENSE

11:10AM   25   HAS OFFERED.

4404

| | | |
|---|---|---|
| 11:10AM | 1 | AT THIS TIME WE OFFER 5387D. |
| 11:10AM | 2 | THE COURT:  MS. TREFZ. |
| 11:10AM | 3 | MS. TREFZ:  WE HAVE NO OBJECTION AT THIS POINT, |
| 11:10AM | 4 | YOUR HONOR.  IT'S SUBJECT TO POTENTIAL OBJECTIONS TO PARTICULAR |
| 11:10AM | 5 | USES IF IT COMES UP. |
| 11:10AM | 6 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 11:10AM | 7 | THIS IS ADMITTED THEN.  5387D, DAVID, IS ADMITTED.  THANK |
| 11:10AM | 8 | YOU FOR THE CLARIFICATION OF THAT.  THAT IS ADMITTED.  THAT |
| 11:11AM | 9 | EXHIBIT IS ADMITTED. |
| 11:11AM | 10 | (GOVERNMENT'S EXHIBIT 5387D WAS RECEIVED IN EVIDENCE.) |
| 11:11AM | 11 | MR. LEACH:  THANK YOU, YOUR HONOR. |
| 11:11AM | 12 | THE COURT:  SUBJECT TO ANY FURTHER COMMENT FROM THE |
| 11:11AM | 13 | DEFENSE. |
| 11:11AM | 14 | ALL RIGHT.  LADIES AND GENTLEMEN, LET'S TAKE OUR BREAK. |
| 11:11AM | 15 | SO 30 MINUTES, PLEASE, 30 MINUTES. |
| 11:11AM | 16 | SIR, YOU CAN STAND DOWN AND WE'LL SEE YOU BACK IN HALF AN |
| 11:11AM | 17 | HOUR. |
| 11:11AM | 18 | THE WITNESS:  THANK YOU. |
| 11:11AM | 19 | (JURY OUT AT 11:11 A.M.) |
| 11:11AM | 20 | THE COURT:  ALL RIGHT.  THANK YOU.  PLEASE BE |
| 11:11AM | 21 | SEATED. |
| 11:11AM | 22 | THE RECORD SHOULD REFLECT THAT OUR JURY HAS LEFT.  THE |
| 11:11AM | 23 | WITNESS, MR. WEBER, HAS LEFT THE COURTROOM. |
| 11:11AM | 24 | I JUST WANT TO CHECK WITH COUNSEL, ANYTHING BEFORE WE |
| 11:11AM | 25 | BREAK, COUNSEL? |

4405

11:11AM    1                    MR. LEACH:  NO, YOUR HONOR.

11:11AM    2                    MR. CLINE:  NO, YOUR HONOR.

11:11AM    3                    THE COURT:  ALL RIGHT.  THANK YOU.

11:12AM    4                    THE CLERK:  COURT IS IN RECESS.

11:46AM    5               (LUNCH RECESS TAKEN AT 11:11 A.M.)

           6

           7

           8

           9

          10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

WEBER CROSS BY MR. CLINE                                              4406

| | | |
|---|---|---|
| 11:51AM | 1 | **AFTERNOON SESSION** |
| 11:51AM | 2 | (JURY IN AT 11:51 A.M.) |
| 11:51AM | 3 | THE COURT:  ALL RIGHT.  THANK YOU.  PLEASE BE |
| 11:51AM | 4 | SEATED.  WE'RE BACK ON THE RECORD. |
| 11:51AM | 5 | ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN. |
| 11:51AM | 6 | OUR JURY IS PRESENT, AND WE'LL JUST SUMMON THE WITNESS. |
| 11:51AM | 7 | MR. CLINE, YOU'LL HAVE CROSS-EXAMINATION. |
| 11:51AM | 8 | THANK YOU. |
| 11:51AM | 9 | MR. CLINE, YOU HAVE QUESTIONS? |
| 11:52AM | 10 | MR. CLINE:  I DO. |
| 11:52AM | 11 | **CROSS-EXAMINATION** |
| 11:52AM | 12 | BY MR. CLINE: |
| 11:52AM | 13 | Q.  MR. WEBER, YOU CAN TAKE OFF YOUR MASK IF YOU WOULD LIKE. |
| 11:52AM | 14 | A.  THANK YOU. |
| 11:52AM | 15 | Q.  MY NAME IS JOHN CLINE AND I'M A LAWYER FOR MS. HOLMES. |
| 11:52AM | 16 | YOUR HONOR, MAY I APPROACH? |
| 11:52AM | 17 | THE COURT:  YES. |
| 11:52AM | 18 | BY MR. CLINE: |
| 11:52AM | 19 | Q.  MR. WEBER, I'M GOING TO HAND YOU A BINDER, AND I MAY REFER |
| 11:52AM | 20 | YOU TO ITEMS IN THAT BINDER FROM TIME TO TIME (HANDING). |
| 11:52AM | 21 | A.  THANK YOU. |
| 11:52AM | 22 | Q.  MR. WEBER, IS IT FAIR TO SAY THAT YOUR INVOLVEMENT IN |
| 11:52AM | 23 | THERANOS WHILE YOU WERE AT PFIZER SPANNED ABOUT THREE MONTHS? |
| 11:52AM | 24 | A.  MY EXAMINATION OF THE DOCUMENTS AND ASSESSMENT SPANNED |
| 11:52AM | 25 | THREE, FOUR MONTHS. |

WEBER CROSS BY MR. CLINE                                                4407

11:52AM  1    Q.   YOU WERE INTRODUCED TO THERANOS BY MR. LIPSET IN EARLY

11:52AM  2    NOVEMBER 2008; RIGHT?

11:52AM  3    A.   YES.

11:52AM  4    Q.   AND YOU HAD YOUR PHONE CALL WITH MS. HOLMES WHERE YOU

11:52AM  5    CONVEYED THE MESSAGE FROM PFIZER AT THE END OF JANUARY 2009;

11:52AM  6    RIGHT?

11:53AM  7    A.   YES, AS I REMEMBER IT.

11:53AM  8    Q.   ALL RIGHT.  SO THAT'S NOVEMBER, DECEMBER, AND JANUARY;

11:53AM  9    RIGHT?

11:53AM  10   A.   THREE MONTHS.

11:53AM  11   Q.   WE CAN AGREE THAT THAT'S THREE MONTHS?

11:53AM  12   A.   OKAY.

11:53AM  13   Q.   AND DURING THAT THREE MONTH PERIOD, YOU WERE THE DIRECTOR

11:53AM  14   OF THE DIAGNOSTICS GROUP WITHIN THE MOLECULAR MEDICINE GROUP AT

11:53AM  15   PFIZER; RIGHT?

11:53AM  16   A.   I WAS THE DIRECTOR OF DIAGNOSTICS IN MOLECULAR MEDICINE.

11:53AM  17   Q.   ALL RIGHT.  AND I THINK YOU TESTIFIED ON DIRECT THAT

11:53AM  18   MOLECULAR MEDICINE WAS A WORLDWIDE UNIT OF PFIZER.

11:53AM  19        DID I GET THAT RIGHT?

11:53AM  20   A.   YES.

11:53AM  21   Q.   AND WAS MOLECULAR MEDICINE PART, ITSELF PART OF SOME

11:53AM  22   LARGER BUSINESS UNIT AT PFIZER?

11:53AM  23   A.   YES.

11:53AM  24   Q.   AND WHAT WAS IT PART OF?

11:53AM  25   A.   IT WAS PART OF, IN '08, PART OF THE RESEARCH UNIT

WEBER CROSS BY MR. CLINE                                        4408

11:53AM  1    WORLDWIDE, AND THEN IN JANUARY, AS I REMEMBER, WE MOVED

11:53AM  2    DIRECTLY INTO CLINICAL DEVELOPMENT OPERATIONS.

11:53AM  3    Q.   ALL RIGHT.  BUT IN ANY EVENT, THROUGHOUT THIS PERIOD

11:54AM  4    MOLECULAR MEDICINE WAS PART OF SOME LARGER BUSINESS UNIT;

11:54AM  5    RIGHT?

11:54AM  6    A.   YES.

11:54AM  7    Q.   AND WITHIN MOLECULAR MEDICINE, YOU'VE TESTIFIED THAT YOU

11:54AM  8    WERE PART OF THE DIAGNOSTIC GROUP; RIGHT?

11:54AM  9    A.   YES.

11:54AM  10   Q.   WERE THERE OTHER GROUPS WITHIN MOLECULAR MEDICINE AS WELL?

11:54AM  11   A.   THERE WERE.

11:54AM  12   Q.   HOW MANY ROUGHLY WERE THERE?

11:54AM  13   A.   MAYBE EIGHT.

11:54AM  14   Q.   ALL RIGHT.  SO DIAGNOSTIC WAS ONE OF ROUGHLY EIGHT GROUPS

11:54AM  15   WITHIN MOLECULAR MEDICINE, WHICH WAS PART OF A LARGER BUSINESS

11:54AM  16   UNIT?

11:54AM  17   A.   YES.

11:54AM  18   Q.   NOW, IT WAS MR. LIPSET WHO ASKED YOU TO GET INVOLVED WITH

11:54AM  19   THE THERANOS REVIEW; IS THAT RIGHT?

11:54AM  20   A.   YES.

11:54AM  21   Q.   AND MR. LIPSET AT THE TIME -- WE'RE TALKING NOVEMBER OF

11:54AM  22   2008 NOW -- HE WAS ANOTHER DIRECTOR WITHIN MOLECULAR MEDICINE;

11:54AM  23   RIGHT?

11:54AM  24   A.   YES.

11:54AM  25   Q.   SO HE WAS YOUR -- BASICALLY ON THE SAME LEVEL AS YOU IN

WEBER CROSS BY MR. CLINE                                          4409

11:55AM  1   THE CORPORATE HIERARCHY?

11:55AM  2   A.   NO.   HE WAS ONE STEP HIGHER.

11:55AM  3   Q.   OH.   SO HE WAS -- WAS HE YOUR BOSS OR WAS HE JUST HIGHER

11:55AM  4   IN THE CORPORATE LADDER?

11:55AM  5   A.   HE WAS NOT MY BOSS.   HE WAS A PEER AT NEW YORK CITY.

11:55AM  6        HE WAS ONE OF THE COMMAND LEADERSHIP TEAM FOR MOLECULAR

11:55AM  7   MEDICINE UNDERNEATH AIDAN POWER, THE VICE PRESIDENT.

11:55AM  8   Q.   ALL RIGHT.   BUT HE WAS ONE LEVEL UP FROM YOU IN THE

11:55AM  9   CORPORATE STRUCTURE?

11:55AM 10   A.   YES.

11:55AM 11   Q.   AND BOTH YOU AND MR. LIPSET REPORTED TO DR. AIDAN POWER;

11:55AM 12   IS THAT RIGHT?

11:55AM 13   A.   CRAIG LIPSET REPORTED DIRECTLY TO AIDAN POWER.   I REPORTED

11:55AM 14   TO HAKAN SAKUL, WHO IS A PEER OF CRAIG LIPSET, AND THEN HAKAN

11:55AM 15   REPORTED TO CRAIG LIPSET.

11:55AM 16   Q.   ALL RIGHT.   AND DR. POWER WAS THE VICE PRESIDENT IN CHARGE

11:55AM 17   OF MOLECULAR MEDICINE; RIGHT?

11:56AM 18   A.   YES.

11:56AM 19   Q.   NOW, WHEN MR. LIPSET PUT YOU IN TOUCH WITH THERANOS -- AND

11:56AM 20   THIS WAS, AGAIN, EARLY NOVEMBER OF 2008; RIGHT?

11:56AM 21   A.   CORRECT.

11:56AM 22   Q.   WAS THAT YOUR FIRST CONTACT WITH THERANOS?

11:56AM 23   A.   YES.

11:56AM 24   Q.   IN FACT, AT THAT POINT IN NOVEMBER OF 2008, HAD YOU HEARD

11:56AM 25   OF THERANOS BEFORE?

WEBER CROSS BY MR. CLINE                                          4410

11:56AM  1    A.   I CAN'T REMEMBER.  IT WAS A LONG TIME AGO.  THERANOS WAS

11:56AM  2    ONE OF MANY COMPANIES ON, YOU KNOW, THE BIOTECH WORLD.

11:56AM  3    Q.   OKAY.  SO THE SHORT ANSWER IS YOU DON'T RECALL WHETHER YOU

11:56AM  4    EVER HEARD OF THERANOS BEFORE AT THAT POINT?

11:56AM  5    A.   YES, I DO NOT REMEMBER WHETHER I HAD HEARD OF THERANOS

11:56AM  6    BEFORE THEN.

11:56AM  7    Q.   NOW, AS OF NOVEMBER 2008, YOU HAD BEEN AT PFIZER JUST A

11:56AM  8    FEW MONTHS; RIGHT?

11:56AM  9    A.   I HAD BEEN THERE SINCE MAY AS I REMEMBER IT, SO ABOUT

11:56AM  10   MAYBE FIVE MONTHS, FOUR MONTHS.

11:56AM  11   Q.   ALL RIGHT.  YOU WERE HIRED AT PFIZER IN MAY OF 2008;

11:56AM  12   RIGHT?

11:56AM  13   A.   YES, AS I REMEMBER IT.

11:57AM  14   Q.   NOW, AFTER MR. LIPSET INTRODUCED YOU TO THERANOS, HE

11:57AM  15   PROVIDED YOU SOME MATERIALS; RIGHT?

11:57AM  16   A.   YES.

11:57AM  17   Q.   AND MR. FRENZEL, GARY FRENZEL AT THERANOS, PROVIDED YOU

11:57AM  18   SOME MATERIALS; RIGHT?

11:57AM  19   A.   YES.

11:57AM  20   Q.   AND WE WENT THROUGH THOSE MATERIALS ON YOUR DIRECT

11:57AM  21   EXAMINATION; RIGHT?  AT LEAST SOME OF THEM?

11:57AM  22   A.   YES.

11:57AM  23   Q.   AND YOU LEARNED FROM REVIEWING THOSE MATERIALS THAT

11:57AM  24   THERANOS HAD BEEN WORKING WITH PFIZER AT THAT POINT FOR A

11:57AM  25   COUPLE OF YEARS; RIGHT?

WEBER CROSS BY MR. CLINE                                    4411

11:57AM  1    A.   THAT'S MY UNDERSTANDING.

11:57AM  2    Q.   AND, OF COURSE, YOU HADN'T BEEN AT PFIZER DURING THAT

11:57AM  3    TIME, SO YOU HAD NO INVOLVEMENT WITH ANY OF THAT WORK; RIGHT?

11:57AM  4    A.   I HAD RECEIVED ALL OF THE DOCUMENTATION AND THE STUDIES,

11:57AM  5    SO I HAD THE BODY OF KNOWLEDGE THAT I WOULD NEED FOR AN

11:57AM  6    ASSESSMENT.

11:57AM  7    Q.   YEAH, THAT WASN'T QUITE MY QUESTION.

11:57AM  8    A.   OKAY.

11:57AM  9    Q.   YOU WEREN'T AT THERANOS DURING THE PERIOD THAT THIS WORK

11:57AM  10   WAS GOING ON, AND SO YOU WERE NOT INVOLVED IN IT PERSONALLY;

11:58AM  11   RIGHT?

11:58AM  12   A.   NO, I WAS NOT PERSONALLY INVOLVED IN IT.

11:58AM  13   Q.   THIS WAS AN ONCOLOGY STUDY THAT THERANOS HAD WORKED WITH

11:58AM  14   PFIZER ON; RIGHT?

11:58AM  15   A.   YES.

11:58AM  16   Q.   AND OVER THE YEARS THAT THERANOS HAD BEEN WORKING WITH

11:58AM  17   PFIZER BEFORE YOUR REVIEW, THERANOS HAD WORKED WITH A NUMBER OF

11:58AM  18   PFIZER SCIENTISTS; CORRECT?

11:58AM  19   A.   CORRECT.

11:58AM  20   Q.   NOW, AFTER YOU GOT INVOLVED, YOU HAD A, WHICH I THINK YOU

11:58AM  21   DESCRIBED ON DIRECT, A ROUGHLY ONE HOUR PHONE CALL WITH

11:58AM  22   MS. HOLMES AND OTHERS AT THERANOS; RIGHT?

11:58AM  23   A.   YES.

11:58AM  24   Q.   AND THAT WAS NOVEMBER 13TH, 2008; RIGHT?

11:58AM  25   A.   AS I REMEMBER IT FROM THE DOCUMENTS.

WEBER CROSS BY MR. CLINE                                              4412

11:58AM   1    Q.   YES.  AND THAT'S -- YOU'RE FREE TO REFRESH YOUR

11:58AM   2    RECOLLECTION FROM THE DOCUMENT.

11:58AM   3         SO THAT WAS ABOUT A WEEK AFTER YOU GOT INVOLVED; RIGHT?

11:58AM   4    A.   YES -- WELL, YEAH.

11:58AM   5    Q.   AND THEN YOU EMAILED SOME QUESTIONS TO THERANOS; RIGHT?

11:59AM   6    A.   YES.

11:59AM   7    Q.   AND THAT WAS NOVEMBER 17TH, 2008; RIGHT?

11:59AM   8    A.   AS I REMEMBER IT.

11:59AM   9    Q.   ALL RIGHT.  SO NOW YOU'RE ROUGHLY TWO WEEKS INTO YOUR

11:59AM  10    INVOLVEMENT; RIGHT?

11:59AM  11    A.   YES.

11:59AM  12    Q.   AND YOU SENT THOSE QUESTIONS TO MR. FRENZEL AT THERANOS;

11:59AM  13    RIGHT?

11:59AM  14    A.   I DID.

11:59AM  15    Q.   AND HE RESPONDED IN LATE NOVEMBER.

11:59AM  16         DO YOU RECALL THAT?

11:59AM  17    A.   I DO.

11:59AM  18    Q.   NOW, YOU REVIEWED THERANOS'S PUBLICLY FILED PATENT,

11:59AM  19    PATENTS; CORRECT?

11:59AM  20    A.   YES.

11:59AM  21    Q.   DID YOU REVIEW BOTH APPLICATIONS AND FINAL PATENTS OR JUST

11:59AM  22    THE APPROVED PATENTS?

11:59AM  23    A.   I REVIEWED ALL PUBLICLY AVAILABLE APPLICATIONS AND

11:59AM  24    APPROVED PATENTS.

11:59AM  25    Q.   YOU DID NOT, I TAKE IT, VISIT THE THERANOS HEADQUARTERS OR

WEBER CROSS BY MR. CLINE                                          4413

| | | |
|---|---|---|
| 11:59AM | 1 | UNIT IN CALIFORNIA; RIGHT? |
| 12:00PM | 2 | A.   NO, I DID NOT. |
| 12:00PM | 3 | Q.   AND YOU DID NOT PHYSICALLY EXAMINE THE THERANOS DEVICE; |
| 12:00PM | 4 | RIGHT? |
| 12:00PM | 5 | A.   NO, I DID NOT. |
| 12:00PM | 6 | Q.   PART OF YOUR PURPOSE IN CONDUCTING THIS REVIEW WAS TO |
| 12:00PM | 7 | DETERMINE WHETHER PFIZER HAD ANY CURRENT BUSINESS USE FOR |
| 12:00PM | 8 | THERANOS TECHNOLOGY; RIGHT? |
| 12:00PM | 9 | A.   I DID, OR I DO, YES, YES. |
| 12:00PM | 10 | Q.   THAT WAS PART OF YOUR PURPOSE; RIGHT? |
| 12:00PM | 11 | AND IN THE COURSE OF MAKING THAT DETERMINATION, YOU TALKED |
| 12:00PM | 12 | WITH SOME OF YOUR COLLEAGUES IN MOLECULAR MEDICINE; RIGHT? |
| 12:00PM | 13 | A.   I DID. |
| 12:00PM | 14 | Q.   YOU TALKED WITH A COUPLE OF THERAPEUTIC AREA MOLECULAR |
| 12:00PM | 15 | MEDICINE LEADS; RIGHT? |
| 12:00PM | 16 | A.   YES. |
| 12:00PM | 17 | Q.   AND THAT'S -- ARE THEY COMMONLY REFERRED TO AS TAMML'S? |
| 12:00PM | 18 | A.   WE CALLED THEM TAMML'S. |
| 12:00PM | 19 | Q.   ALL RIGHT.  ONE WAS DR. ANDY WILLIAMS IN CALIFORNIA? |
| 12:00PM | 20 | A.   YES. |
| 12:00PM | 21 | Q.   AND ONE WAS DR. MICHAEL ROBBINS IN NEW YORK; RIGHT? |
| 12:01PM | 22 | A.   YES. |
| 12:01PM | 23 | Q.   AND THEY TOLD YOU THAT THEY HAD NO CURRENT OR FORESEEABLE |
| 12:01PM | 24 | INTEREST IN A PATIENT IN HOME IN VITRO IMMUNOASSAY DIAGNOSTIC |
| 12:01PM | 25 | IN ANY CLINICAL TRIAL; RIGHT? |

WEBER CROSS BY MR. CLINE                                    4414

12:01PM   1     A.   YES.

12:01PM   2     Q.   AND YOU UNDERSTOOD THAT THAT'S WHAT THERANOS WAS OFFERING,

12:01PM   3     AN IMMUNOASSAY DEVICE FOR PATIENT IN HOME USE; CORRECT?

12:01PM   4     A.   THAT'S WHAT I LARGELY UNDERSTOOD FROM THE DOCUMENTATION

12:01PM   5     PROVIDED, BUT I ALSO HAD PROBED FURTHER FUTURE PATHS IN MY

12:01PM   6     VERBAL DISCUSSION WITH THEM.

12:01PM   7     Q.   RIGHT.  AND THAT'S THE UNDERSTANDING THAT YOU CAME TO;

12:01PM   8     CORRECT?

12:01PM   9     A.   I COULD NOT MAKE A DETERMINATION OF WHAT THEIR FUTURE

12:01PM   10    PATHS WERE, BUT I DID -- WAS ABLE TO DETERMINE THAT THEY HAD AN

12:01PM   11    IMMUNOASSAY PLATFORM THAT THEY WERE OFFERING FOR IN HOME USE AT

12:01PM   12    THAT TIME.

12:01PM   13    Q.   ALL RIGHT.  AND, IN FACT, ON THE VERY FIRST PAGE OF YOUR

12:01PM   14    OVERVIEW IN YOUR REPORT YOU SAY THERANOS PURPORTS TO HAVE A

12:02PM   15    PATIENT IN HOME USE IMMUNOASSAY IN VITRO DIAGNOSTIC DEVICE

12:02PM   16    PLATFORM; RIGHT?

12:02PM   17    A.   I DO.

12:02PM   18    Q.   AND YOU WERE ASSESSING WHETHER PFIZER HAD ANY CURRENT

12:02PM   19    BUSINESS USE FOR SUCH A PLATFORM; CORRECT?

12:02PM   20    A.   CORRECT.

12:02PM   21    Q.   YOU ALSO -- GOING BACK TO YOUR DISCUSSION WITH YOUR

12:02PM   22    COLLEAGUES IN MOLECULAR MEDICINE, YOU ALSO TALKED WITH PEOPLE

12:02PM   23    IN YOUR OWN DIAGNOSTIC GROUP; CORRECT?

12:02PM   24    A.   UM, UM, I CAN'T REMEMBER, BUT --

12:02PM   25    Q.   ALL RIGHT.  TAKE A LOOK IN EITHER BINDER AT EXHIBIT 167,

WEBER CROSS BY MR. CLINE                                                    4415

```
12:02PM   1      PAGE 2.

12:02PM   2           WE'RE NOT GOING TO PUT THAT UP.  WE DON'T NEED TO PUT THAT

12:02PM   3      UP.

12:02PM   4           I JUST WANT TO REFRESH YOUR RECOLLECTION DOWN TOWARD THE

12:02PM   5      BOTTOM OF PAGE 2.

12:02PM   6      A.   167, PAGE 2.

12:02PM   7      Q.   DO YOU SEE THERE'S A REFERENCE THERE TO DIAGNOSTIC GROUP

12:02PM   8      MOLECULAR MEDICINE INTEREST IN THERANOS?

12:02PM   9      A.   YES.

12:03PM  10      Q.   AND DOES THAT REFRESH YOUR RECOLLECTION THAT YOU TALKED TO

12:03PM  11      COLLEAGUES IN THE DIAGNOSTIC GROUP ABOUT WHETHER THEY HAD ANY

12:03PM  12      CURRENT INTEREST IN THERANOS TECHNOLOGY?

12:03PM  13      A.   YES.

12:03PM  14      Q.   ALL RIGHT.  AND THEY TOLD YOU THAT THEIR -- AND YOU'RE

12:03PM  15      WELCOME TO FOLLOW ALONG WITH ME HERE -- THAT THEIR DIAGNOSTIC

12:03PM  16      ONCOLOGY ASSAY NEEDS WERE CURRENTLY FOR MOLECULAR NUCLEIC ACID

12:03PM  17      TESTS RUN IN PHYSICIAN CARE SITES AS POINT OF CARE DECISIONS

12:03PM  18      FOR PATIENT ENROLLMENT IN CLINICAL STUDIES; RIGHT?

12:03PM  19      A.   YES.

12:03PM  20      Q.   SO TO PUT THAT IN COMPREHENSIBLE ENGLISH, THEY WERE

12:03PM  21      LOOKING FOR A DEVICE THAT WOULD PERFORM A DIFFERENT KIND OF

12:03PM  22      TEST AND WOULD DO SO IN A POINT OF CARE, SO IN A DOCTOR'S

12:03PM  23      OFFICE, FOR EXAMPLE, AND NOT IN HOME; RIGHT?

12:03PM  24      A.   YES, IN A DOCTOR'S OFFICE FOR PATIENT ENROLLMENT, OR IT

12:03PM  25      WOULD BE AT A MEDICAL CENTER.
```

WEBER CROSS BY MR. CLINE                                            4416

12:03PM   1    Q.   ALL RIGHT.  AND SOMETHING THAT DID A DIFFERENT KIND OF

12:04PM   2    TEST, NOT IMMUNOASSAY; RIGHT?

12:04PM   3    A.   YES, AN ENTIRELY DIFFERENT PLATFORM TECHNOLOGY.

12:04PM   4    Q.   SO BASED ON THE INFORMATION THAT YOU GATHERED, YOU

12:04PM   5    PREPARED THE REPORT THAT WE TALKED ABOUT; RIGHT?  YES?

12:04PM   6    A.   YES.

12:04PM   7    Q.   DATED DECEMBER 31ST, 2008; RIGHT?

12:04PM   8    A.   YES.

12:04PM   9    Q.   AND IN THE HEADING TO THAT REPORT, YOU SAY THAT IT'S YOUR

12:04PM  10    FINAL REPORT; RIGHT?

12:04PM  11    A.   IT IS.

12:04PM  12    Q.   AND AS FAR AS YOU'RE CONCERNED, THAT IS YOUR FINAL REPORT?

12:04PM  13    A.   IT WAS MY FINAL REPORT.

12:04PM  14    Q.   AND YOU ALSO PUT DOWN AT THE BOTTOM, SUBJECT TO ONGOING

12:04PM  15    MANAGEMENT REVIEW; RIGHT?

12:04PM  16    A.   YES.

12:04PM  17    Q.   AND THAT'S SOMETHING THAT YOU COMMONLY PUT; RIGHT?

12:04PM  18    A.   THAT I WOULD COMMONLY PUT ON THE APPROPRIATE DOCUMENTS.

12:04PM  19    Q.   YES.  AND YOU WOULD PUT THAT THERE BECAUSE IT'S TRUE,

12:04PM  20    RIGHT, IT'S SUBJECT TO ONGOING MANAGEMENT REVIEW; RIGHT?

12:04PM  21    A.   IT'S A SUBJECT FOR COMMUNICATION GOING FORWARD SO IT WAS A

12:04PM  22    LIVING DOCUMENT, SO AS A FINAL REPORT PEOPLE COULD BE AWARE OF

12:04PM  23    THAT DOCUMENT.

12:04PM  24    Q.   YES.

12:04PM  25    A.   IT COULD BE COMMUNICATED TO OTHER VICE PRESIDENTS IN THE

WEBER CROSS BY MR. CLINE                                                    4417

12:05PM  1      COMPANY.

12:05PM  2      Q.   UNDERSTOOD.  NOW, YOU SENT THIS REPORT TO YOUR BOSS'S

12:05PM  3      BOSS, DR. POWER; RIGHT?

12:05PM  4      A.   (NODS HEAD UP AND DOWN.)

12:05PM  5      Q.   YES?

12:05PM  6      A.   YES.

12:05PM  7      Q.   I'M SORRY.  I NEED YOU TO GIVE A VERBAL ANSWER.  I KNOW

12:05PM  8      WHAT YOU MEAN WHEN YOU NOD BUT IT DOESN'T SHOW UP ON THE

12:05PM  9      RECORD.

12:05PM 10      A.   I SEE.  THANK YOU.

12:05PM 11      Q.   AND YOU ALSO SENT IT TO MR. LIPSET?

12:05PM 12      A.   YES.

12:05PM 13      Q.   AND YOU SENT IT TO YOUR BOSS, DR. SAKUL; RIGHT?

12:05PM 14      A.   YES.

12:05PM 15      Q.   AND YOU DID NOT SEND THIS REPORT TO THERANOS; RIGHT?

12:05PM 16      A.   I DID NOT.

12:05PM 17      Q.   YOU DID NOT SEND THIS REPORT TO ELIZABETH HOLMES; RIGHT?

12:05PM 18      A.   I DID NOT.

12:05PM 19      Q.   YOU DID NOT SEND THIS REPORT TO MR. LIPSET; RIGHT?

12:05PM 20      A.   I DID SEND THE REPORT TO MR. LIPSET.

12:05PM 21      Q.   I'M SORRY, I GOT THE NAME WRONG.

12:05PM 22           MR. FRENZEL?

12:05PM 23      A.   OH.

12:05PM 24      Q.   MR. FRENZEL WAS AT THERANOS; RIGHT?

12:05PM 25      A.   YES.

WEBER CROSS BY MR. CLINE                                         4418

| | | |
|---|---|---|
| 12:05PM | 1 | Q.   AND YOU DID NOT SEND THIS REPORT TO HIM? |
| 12:05PM | 2 | A.   I DID NOT. |
| 12:05PM | 3 | Q.   AND YOU DID SEND IT TO MR. LIPSET, WHO WAS AT PFIZER; |
| 12:05PM | 4 | CORRECT? |
| 12:05PM | 5 | A.   YES, TO DR. LIPSET, YES, I SEND IT.  I DID NOT SEND IT TO |
| 12:06PM | 6 | DOCTOR -- OR TO GARY FRENZEL. |
| 12:06PM | 7 | Q.   ALL RIGHT.  I THINK I UNDERSTOOD YOU TO SAY IN YOUR DIRECT |
| 12:06PM | 8 | EXAMINATION THAT -- IS IT DR. LIPSET? |
| 12:06PM | 9 | A.   IT IS. |
| 12:06PM | 10 | Q.   ALL RIGHT.  I'M SORRY.  I'VE BEEN CALLING HIM MR. LIPSET. |
| 12:06PM | 11 | DR. LIPSET, DR. SAKUL, AND DR. POWER AGREED WITH YOUR |
| 12:06PM | 12 | ASSESSMENT. |
| 12:06PM | 13 | WAS THAT YOUR TESTIMONY ON DIRECT? |
| 12:06PM | 14 | A.   YES. |
| 12:06PM | 15 | Q.   ALL RIGHT.  YOU'VE MET WITH THE GOVERNMENT MORE THAN ONCE; |
| 12:06PM | 16 | RIGHT? |
| 12:06PM | 17 | A.   YES. |
| 12:06PM | 18 | Q.   BEFORE YOUR TESTIMONY HERE? |
| 12:06PM | 19 | A.   YES. |
| 12:06PM | 20 | Q.   AND THE FIRST SUCH MEETING WAS IN FEBRUARY 2020 IN PERSON; |
| 12:06PM | 21 | RIGHT? |
| 12:06PM | 22 | A.   YES. |
| 12:06PM | 23 | Q.   DO YOU REMEMBER RIGHT BACK BEFORE THE PANDEMIC MADE IT |
| 12:06PM | 24 | IMPOSSIBLE TO HAVE IN-PERSON MEETINGS? |
| 12:06PM | 25 | A.   YES, YES, I REMEMBER THAT NOW. |

WEBER CROSS BY MR. CLINE                                                    4419

| | | |
|---|---|---|
| 12:06PM | 1 | Q.   AND YOU MET IN NEW YORK CITY; RIGHT? |
| 12:06PM | 2 | A.   YES. |
| 12:06PM | 3 | Q.   IN THE OFFICES OF PFIZER'S LAWYERS; RIGHT? |
| 12:07PM | 4 | A.   YES. |
| 12:07PM | 5 | Q.   AND PRESENT THERE WERE MR. LEACH, THE PROSECUTOR WHO WAS |
| 12:07PM | 6 | ASKING YOU QUESTIONS THIS MORNING; RIGHT? |
| 12:07PM | 7 | A.   YES. |
| 12:07PM | 8 | Q.   AND MR. BOSTIC WAS THERE. |
| 12:07PM | 9 |      DO YOU REMEMBER? |
| 12:07PM | 10 | A.   I DON'T REMEMBER THE NAMES. |
| 12:07PM | 11 | Q.   THIS GENTLEMAN SITTING HERE AT THE COUNSEL TABLE |
| 12:07PM | 12 | (INDICATING)? |
| 12:07PM | 13 | A.   I BELIEVE SO. |
| 12:07PM | 14 | Q.   ALL RIGHT.  AND AT LEAST ONE FEDERAL AGENT WAS THERE; |
| 12:07PM | 15 | RIGHT? |
| 12:07PM | 16 | A.   YES. |
| 12:07PM | 17 | Q.   AND PFIZER'S LAWYERS WERE THERE; RIGHT? |
| 12:07PM | 18 | A.   YES. |
| 12:07PM | 19 | Q.   AND, AND YOU UNDERSTOOD, OF COURSE, THAT IT WAS IMPORTANT |
| 12:07PM | 20 | FOR YOU TO GIVE TRUTHFUL, COMPLETE ANSWERS TO THE QUESTIONS |
| 12:07PM | 21 | THAT YOU WERE ASKED; RIGHT? |
| 12:07PM | 22 | A.   YES. |
| 12:07PM | 23 | Q.   AND IN THE COURSE OF THAT MEETING, YOU TOLD THE ASSEMBLED |
| 12:07PM | 24 | MULTITUDE THAT YOUR FINAL ASSESSMENT WAS MET WITH SILENCE FROM |
| 12:07PM | 25 | LIPSET, SAKUL, AND POWER, WHICH WAS NOT UNUSUAL. |

WEBER CROSS BY MR. CLINE                                          4420

| | | |
|---|---|---|
| 12:07PM | 1 | DO YOU REMEMBER TELLING THEM THAT? |
| 12:07PM | 2 | A.   NO, I DO NOT. |
| 12:08PM | 3 | Q.   ALL RIGHT.  LET ME SEE IF I CAN HELP REFRESH YOUR |
| 12:08PM | 4 | RECOLLECTION. |
| 12:08PM | 5 | MAY I APPROACH? |
| 12:08PM | 6 | THE COURT:  YES. |
| 12:08PM | 7 | BY MR. CLINE: |
| 12:08PM | 8 | Q.   I'M GOING TO HAND YOU A MEMORANDUM OF THAT INTERVIEW, AND |
| 12:08PM | 9 | I'M GOING TO POINT YOU TO A PARTICULAR PORTION OF IT, BUT |
| 12:08PM | 10 | YOU'RE WELCOME TO READ AS MUCH AS YOU WANT. |
| 12:08PM | 11 | OKAY? |
| 12:08PM | 12 | THE COURT:  DOES THE GOVERNMENT HAVE THIS? |
| 12:08PM | 13 | MR. CLINE:  IT'S THEIR -- IT'S THEIR MEMO. |
| 12:08PM | 14 | THE COURT:  MAYBE YOU CAN JUST REFERENCE WHAT YOU'RE |
| 12:08PM | 15 | SHOWING THE WITNESS. |
| 12:08PM | 16 | MR. CLINE:  YES.  IT'S THE FEBRUARY 26TH, 2020 |
| 12:08PM | 17 | INTERVIEW MEMORANDUM, PAGE 4. |
| 12:08PM | 18 | MR. LEACH:  I DON'T HAVE A COPY, YOUR HONOR. |
| 12:08PM | 19 | MR. CLINE:  I'LL GIVE HIM A COPY. |
| 12:08PM | 20 | MR. LEACH:  IS HE REFRESHING HIM WITH THIS? |
| 12:08PM | 21 | THE COURT:  YES. |
| 12:08PM | 22 | BY MR. CLINE: |
| 12:08PM | 23 | Q.   JUST READ THAT TO YOURSELF, MR. WEBER (HANDING). |
| 12:09PM | 24 | A.   OKAY.  I'VE READ THIS COUPLE OF LINES HERE. |
| 12:09PM | 25 | Q.   ALL RIGHT.  HAVE YOU HAD A CHANCE TO READ AS MUCH AS YOU |

WEBER CROSS BY MR. CLINE                                                    4421

12:09PM  1    NEED TO READ TO UNDERSTAND THE CONTEXT?

12:09PM  2    A.   I THINK SO.

12:09PM  3    Q.   ALL RIGHT.  DOES THAT REFRESH YOUR RECOLLECTION THAT WHAT

12:09PM  4    YOU TOLD THE FEDERAL AGENT AND THE PROSECUTORS AND THE PFIZER

12:09PM  5    LAWYERS ON FEBRUARY 26TH, 2020 WAS THAT YOUR FINAL ASSESSMENT

12:09PM  6    WAS MET WITH SILENCE FROM LIPSET, SAKUL, AND POWER?

12:09PM  7    A.   WELL, I DON'T THINK THIS IS REALLY DESCRIBING THE FULL

12:09PM  8    SITUATION.  YOU KNOW, I SPOKE WITH THEM --

12:09PM  9    Q.   EXCUSE ME, MR. WEBER.  I'M SORRY TO INTERRUPT.

12:09PM  10       MY QUESTION IS, DOES THIS REFRESH YOUR RECOLLECTION THAT

12:09PM  11   ON FEBRUARY 26TH, 2020, YOU TOLD THE AGENT, THE PROSECUTOR, AND

12:09PM  12   OTHERS, THAT YOUR FINAL ASSESSMENT WAS MET WITH SILENCE FROM

12:09PM  13   LIPSET, SAKUL, AND POWER, WHICH WAS NOT UNUSUAL?

12:09PM  14   A.   UM, AS I SEE THIS NOW, APPARENTLY I REMEMBER THIS.

12:10PM  15   Q.   WELL, DO YOU OR DON'T YOU?

12:10PM  16   A.   YOU KNOW, IT'S A WRITTEN SET OF WORDS.  I MUST HAVE SAID

12:10PM  17   IT IF IT'S RECORDED DOWN.

12:10PM  18   Q.   ALL RIGHT.  GOOD ENOUGH.

12:10PM  19       NOW, YOU SPOKE TO MS. HOLMES ABOUT A MONTH AFTER YOUR --

12:10PM  20   YOU SENT YOUR REPORT TO THE PEOPLE AT PFIZER; RIGHT?

12:10PM  21   A.   YES.

12:10PM  22   Q.   JANUARY 30TH, 2009.

12:10PM  23       DOES THAT SOUND RIGHT?

12:10PM  24   A.   IT SOUNDS RIGHT.

12:10PM  25   Q.   ALL RIGHT.  CAN WE PUT UP EXHIBIT 174, WHICH I THINK IS IN

WEBER CROSS BY MR. CLINE                                                     4422

```
12:10PM   1     EVIDENCE.

12:10PM   2          DO YOU RECALL THIS, MR. WEBER, AS AN EMAIL THAT YOU WROTE?

12:10PM   3     A.   I'M TO BE LOOKING AT 174.

12:11PM   4     Q.   174.  IT'S IN BOTH BINDERS, SO EITHER ONE IS FINE.

12:11PM   5     A.   OH, THIS IS SOMETHING FROM THE ATTORNEY LEACH'S OFFICE.

12:11PM   6     I'M NOT --

12:11PM   7     Q.   I'M SORRY, GO TO THE NEXT PAGE.  THERE YOU GO.

12:11PM   8     A.   OH, OKAY.

12:11PM   9          YES, I SEE THIS DOCUMENT AND REMEMBER IT.

12:11PM   10    Q.   ALL RIGHT.  NOW, THIS IS AN EMAIL THAT YOU WROTE ON

12:11PM   11    JANUARY 30TH, 2009; RIGHT?

12:11PM   12    A.   YES.

12:11PM   13    Q.   AND YOU WROTE IT TO YOUR BOSS, DR. SAKUL; RIGHT?  YES?

12:11PM   14    A.   YES.

12:11PM   15    Q.   YOUR BOSS'S BOSS, DR. POWER; RIGHT?

12:11PM   16    A.   YES.

12:11PM   17    Q.   AND TO MR. -- OR DR. LIPSET?

12:11PM   18    A.   YES.

12:11PM   19    Q.   AND I ASSUME THAT YOU INTENDED THIS EMAIL TO BE AN

12:12PM   20    ACCURATE AND COMPLETE ACCOUNT OF YOUR CONVERSATION WITH

12:12PM   21    MS. HOLMES THAT DAY; RIGHT?

12:12PM   22    A.   YES.

12:12PM   23    Q.   AND WHAT YOU TOLD MS. HOLMES -- AND AGAIN, MS. HOLMES

12:12PM   24    DIDN'T HAVE THIS REPORT THAT YOU SPENT SO MUCH TIME ON DIRECT

12:12PM   25    TALKING ABOUT, RIGHT?  YOU DIDN'T SEND THAT TO HER?
```

WEBER CROSS BY MR. CLINE                                               4423

12:12PM   1     A.   NO, I DIDN'T SEND THAT TO HER.

12:12PM   2     Q.   SO LET'S LOOK AT -- CAN WE PULL THAT BACK UP, 174.  MY

12:12PM   3     SCREEN -- OH, THERE IT IS.  OKAY.

12:12PM   4          CAN WE BLOW UP THE FIRST PARAGRAPH?

12:12PM   5               MS. TREFZ:  YOUR HONOR, I'M NOT SURE IF IT'S --

12:12PM   6               THE COURT:  APPARENTLY IT'S NOT ON THE MONITORS.

12:12PM   7          DID IT COME UP ON THE JURY MONITORS?

12:12PM   8               JUROR:  IT'S COMING.

12:12PM   9               THE CLERK:  YES?

12:12PM  10               THE COURT:  IT LOOKS LIKE IT'S ON.  OKAY.

12:12PM  11               MR. CLINE:  WE HAVE IT.

12:12PM  12     Q.   SO WHAT YOU WRITE TO YOUR BOSS, YOUR BOSS'S BOSS, AND TO

12:12PM  13     DR. LIPSET IS, "TODAY I SPOKE WITH ELIZABETH HOLMES, CEO,

12:13PM  14     THERANOS AND EXPLAINED TO HER THAT PFIZER DID NOT HAVE AT THIS

12:13PM  15     TIME A FORESEEABLE USE FOR THE THERANOS IMMUNOASSAY DEVICE FOR

12:13PM  16     AT PATIENT SELF USE AT HOME BUT SHE AND I AGREED TO STAY IN

12:13PM  17     TOUCH EVERY SIX MONTHS."

12:13PM  18          RIGHT?

12:13PM  19     A.   YES.

12:13PM  20     Q.   AND THAT EMAIL WRITTEN SHORTLY AFTER YOUR CONVERSATION

12:13PM  21     WITH MS. HOLMES TO YOUR BOSS AND YOUR BOSS'S BOSS WAS ACCURATE;

12:13PM  22     RIGHT?

12:13PM  23     A.   ACCURATE?  WELL, I GUESS YES.

12:13PM  24     Q.   I MEAN, YOU WEREN'T TRYING TO MISLEAD THEM, WERE YOU?

12:13PM  25     A.   NO.

WEBER CROSS BY MR. CLINE                                              4424

12:13PM   1     Q.   NO.  YOU WERE TRYING TO TELL THEM WHAT YOU HAD TOLD

12:13PM   2     MS. HOLMES; RIGHT?

12:13PM   3     A.   YES, TRYING TO CLOSE THAT LOOP.

12:13PM   4     Q.   AND WHAT YOU TOLD MS. HOLMES THERE WAS CONSISTENT WITH

12:13PM   5     WHAT YOU HAD HEARD WHEN YOU TALKED TO YOUR COLLEAGUES IN THE

12:14PM   6     MOLECULAR MEDICINE SECTION; RIGHT?

12:14PM   7     A.   YES.

12:14PM   8     Q.   THE TAMML AND THE PEOPLE IN YOUR GROUP; RIGHT?

12:14PM   9     A.   YES, THE TAMML'S WERE THE ONCOLOGY REPRESENTATIVES WHO

12:14PM   10    WERE IN TOUCH WITH ALL ONCOLOGY CLINICAL TRIALS, YES.

12:14PM   11    Q.   YES.  AND THEN YOU TALKED TO YOUR OWN PEOPLE IN YOUR OWN

12:14PM   12    DIAGNOSTIC GROUP; RIGHT?

12:14PM   13    A.   YES.

12:14PM   14    Q.   AND THEY TOLD YOU THAT THEY WERE LOOKING FOR A DEVICE THAT

12:14PM   15    RAN A DIFFERENT KIND OF TEST AND THAT WAS MEANT FOR POINT OF

12:14PM   16    CAR, THAT IS, DOCTOR'S OFFICE TYPE USE; RIGHT?

12:14PM   17    A.   IT WAS MEANT FOR NOT NECESSARILY POINT OF CARE, BUT FOR

12:14PM   18    INTAKE OF PATIENTS INTO CLINICAL STUDIES.  SO IT WASN'T GOING

12:14PM   19    TO BE -- WE WERE LOOKING FOR DEVICES THAT WERE NOT GOING TO BE

12:14PM   20    USED IN THE HOME, THEY WERE USED IN A REGULATED MEDICAL

12:14PM   21    SITUATION.

12:14PM   22    Q.   ALL RIGHT.  AND AGAIN, YOUR UNDERSTANDING AT THE TIME WAS

12:14PM   23    THAT THERANOS -- WHAT THERANOS HAD IN MIND WAS A DEVICE THAT

12:14PM   24    WOULD BE USED IN THE HOME TO RUN IMMUNOASSAYS; RIGHT?

12:14PM   25    A.   THAT WAS MY UNDERSTANDING.  I HAD ASKED IN MY DUE

WEBER CROSS BY MR. CLINE                                              4425

12:15PM  1     DILIGENCE QUESTIONS ABOUT SINGLE INPUT --

12:15PM  2     Q.   I'M NOT QUESTIONING ANY OF THAT.  THAT WAS JUST YOUR

12:15PM  3     UNDERSTANDING AT THE TIME; RIGHT?

12:15PM  4     A.   YES.

12:15PM  5     Q.   NOW, YOU CONFIRMED IN THAT CONVERSATION WITH MS. HOLMES,

12:15PM  6     AND I THINK YOU REFLECTED IN YOUR EMAIL, THAT PFIZER HAD PAID

12:15PM  7     THERANOS IN FULL; CORRECT?

12:15PM  8     A.   THAT WAS MY UNDERSTANDING OF WHAT I HAD ACCOMPLISHED BY

12:15PM  9     CHECKING ON THE FINANCES.

12:15PM  10    Q.   SO THE ANSWER IS YES?

12:15PM  11    A.   YES.

12:15PM  12    Q.   AND THE TOTAL AMOUNT WAS $900,000; RIGHT?

12:15PM  13    A.   I DID NOT KNOW WHAT THE AMOUNT OF MONEY WAS INVOLVED.

12:15PM  14    Q.   NOW, THIS JANUARY 30TH, 2009 CALL THAT IS MEMORIALIZED IN

12:15PM  15    EXHIBIT 174 HERE, THAT WAS YOUR LAST CONTACT WITH MS. HOLMES;

12:15PM  16    RIGHT?

12:15PM  17    A.   AS I REMEMBER IT, YES.

12:16PM  18    Q.   AND YOU DIDN'T SEE HER OR SPEAK WITH HER AGAIN UNTIL YOU

12:16PM  19    WALKED INTO THIS COURTROOM; RIGHT?

12:16PM  20    A.   YES.

12:16PM  21    Q.   NOW, TAKE A LOOK AT EXHIBIT 10561 IN THE BLACK NOTEBOOK.

12:16PM  22         ARE YOU THERE?

12:16PM  23    A.   YES.

12:16PM  24         MR. CLINE:  YOUR HONOR, I BELIEVE THIS IS ADMITTED

12:16PM  25    BY AGREEMENT, EXHIBIT 10561.

WEBER CROSS BY MR. CLINE                                              4426

12:16PM   1            MR. LEACH:  THAT'S CORRECT, YOUR HONOR.

12:16PM   2            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:16PM   3            (DEFENDANT'S EXHIBIT 10561 WAS RECEIVED IN EVIDENCE.)

12:16PM   4            MR. CLINE:  ALL RIGHT.  SO WE CAN PULL THAT UP.

12:16PM   5    Q.   THIS IS AN EMAIL, MR. WEBER, AN EMAIL EXCHANGE BETWEEN YOU

12:16PM   6    AND MR. FRENZEL OF THERANOS; RIGHT?

12:16PM   7    A.   YES.

12:16PM   8    Q.   AND IF YOU START AT THE BOTTOM, MR. FRENZEL WRITES TO YOU,

12:17PM   9    "HELLO SHANE.

12:17PM  10        "WE ARE IN THE PROCESS OF RELEASING OUR FERTILITY PANELS

12:17PM  11    AND RECALLED OUR DISCUSSION ON PREECLAMPSIA."

12:17PM  12        AM I PRONOUNCING THAT RIGHT?

12:17PM  13    A.   YOU ARE.

12:17PM  14    Q.   "ARE YOU STILL INTERESTED IN PURSUING THIS?  IF YOU HAVE

12:17PM  15    ANY FURTHER THOUGHTS AND WOULD LIKE TO DISCUSS, PLEASE LET ME

12:17PM  16    KNOW.

12:17PM  17        "GARY."

12:17PM  18        RIGHT?

12:17PM  19    A.   YES.

12:17PM  20    Q.   AND YOU WRITE BACK TO HIM; RIGHT?

12:17PM  21    A.   UH-HUH.

12:17PM  22    Q.   AND WOULD YOU READ YOUR EMAIL THERE AT THE TOP OF 10561

12:17PM  23    THAT YOU WROTE TO MR. FRENZEL?

12:17PM  24    A.   "HI GARY.

12:17PM  25        "THANKS FOR CONTACTING ME.

WEBER CROSS BY MR. CLINE                                              4427

12:17PM  1          "PFIZER HAS NO INTEREST IN PREECLAMPSIA.

12:17PM  2          "BEST OF LUCK, YOU ARE ON TO SOMETHING GOOD.

12:17PM  3          "HAVE A NICE WEEKEND."

12:17PM  4     Q.   AND THAT WAS YOUR VERY LAST CONTACT WITH THERANOS; RIGHT?

12:17PM  5     A.   I THINK SO.  I DON'T REMEMBER ANY FURTHER CONTACTS.  THIS

12:18PM  6     WAS 12 YEARS AGO.  YES.

12:18PM  7     Q.   AND I UNDERSTAND YOUR MEMORY IS FALLIBLE, BUT TO THE BEST

12:18PM  8     OF YOUR RECOLLECTION, THIS IS YOUR LAST CONTACT WITH THERANOS;

12:18PM  9     RIGHT?

12:18PM 10     A.   YES.

12:18PM 11     Q.   AND AS FAR AS YOU KNOW -- BY THE WAY, YOU LEFT PFIZER IN

12:18PM 12     2014; RIGHT?

12:18PM 13     A.   YES.

12:18PM 14     Q.   AND I THINK YOU TOLD THE GOVERNMENT THAT YOU WERE

12:18PM 15     DOWNSIZED; IS THAT THE TERM YOU USED?

12:18PM 16     A.   IT CERTAINLY COULD HAVE BEEN A TERM I USED, YES.

12:18PM 17     Q.   AND PFIZER WAS GOING THROUGH A LOT OF CHANGES DURING THE

12:18PM 18     PERIOD THAT YOU WERE THERE; RIGHT?

12:18PM 19     A.   YES.

12:18PM 20     Q.   AND IN THE COURSE OF THOSE CHANGES, SOME NEW PEOPLE CAME

12:18PM 21     ON AND SOME PEOPLE WHO WERE THERE WERE LET GO; RIGHT?

12:18PM 22     A.   YES.

12:18PM 23     Q.   AND IS THAT WHAT HAPPENED WITH YOU?

12:18PM 24     A.   YES.

12:18PM 25     Q.   ALL RIGHT.  BETWEEN FEBRUARY 2009 AND YOUR DEPARTURE IN

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 17, 2023.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Amy Mason Saharia*
AMY MASON SAHARIA

April 17, 2023