No. 22-10312

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ELIZABETH A. HOLMES

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 5:18-CR-00258
Hon. Edward J. Davila

---

## EXCERPTS OF RECORD
## VOL. XXIX of LVII | ER-8041 to ER-8339

---

JOHN D. CLINE
LAW OFFICE OF JOHN D. CLINE
  600 Stewart Street
  Suite 400
  Seattle, WA 98101
  (360) 320-6435

KEVIN M. DOWNEY
LANCE A. WADE
AMY MASON SAHARIA
KATHERINE A. TREFZ
WILLIAMS & CONNOLLY LLP
  680 Maine Ave. S.W.
  Washington, D.C. 200024
  (202) 434-5000
  asaharia@wc.com

WEBER CROSS BY MR. CLINE                                          4428

12:18PM   1    2014, YOU WERE NOT INVOLVED IN ANY CONTACTS BETWEEN PFIZER AND

12:19PM   2    THERANOS TO THE BEST OF YOUR RECOLLECTION; RIGHT?

12:19PM   3    A.   YES.

12:19PM   4    Q.   AND AS FAR AS YOU KNEW, PFIZER AND THERANOS HAD FULLY

12:19PM   5    SEPARATED AFTER YOUR JANUARY 30TH, 2009 CONVERSATION WITH

12:19PM   6    MS. HOLMES; RIGHT?

12:19PM   7    A.   YES.

12:19PM   8    Q.   YOU'RE NOT AWARE OF ANY CONTACTS BETWEEN YOUR COLLEAGUE,

12:19PM   9    DR. LIPSET, AND THERANOS AFTER JANUARY 30TH, 2009; CORRECT?

12:19PM  10    A.   YES.

12:19PM  11    Q.   THAT'S CORRECT, YOU'RE NOT AWARE OF ANY?

12:19PM  12    A.   I'M NOT AWARE OF ANY FURTHER CONTACTS.

12:19PM  13    Q.   YOU'RE NOT AWARE OF ANY FURTHER CONTACTS BETWEEN YOUR

12:19PM  14    BOSS, DR. SAKUL, AND THERANOS AFTER JANUARY 30TH, 2009;

12:19PM  15    CORRECT?

12:19PM  16    A.   I MEAN, I VAGUELY REMEMBER MAYBE 2011 IN A GROUP

12:19PM  17    TELECONFERENCE THAT HAKAN HAD MENTIONED THE NAME THERANOS, I

12:19PM  18    DON'T REMEMBER WHAT, AND I SAID I HAD WRITTEN A REPORT.

12:19PM  19    Q.   OTHER THAN THAT, YOU DON'T RECALL ANY -- YOU'RE NOT AWARE

12:20PM  20    OF ANY CONTACT BETWEEN DR. SAKUL AND THERANOS AFTER JANUARY

12:20PM  21    30TH, 2009; RIGHT?

12:20PM  22    A.   YES, I'M NOT AWARE.

12:20PM  23    Q.   AND OTHER THAN THAT VAGUE RECOLLECTION FROM 2011, YOU'RE

12:20PM  24    NOT AWARE OF ANY CONTACTS ANYONE ELSE AT PFIZER HAD WITH

12:20PM  25    THERANOS AFTER JANUARY 30TH, 2009; RIGHT?

WEBER REDIRECT BY MR. LEACH                                    4429

12:20PM   1    A.   CORRECT.

12:20PM   2    Q.   THANK YOU, YOUR HONOR.

12:20PM   3         THAT'S ALL OF MY QUESTIONS.

12:20PM   4              THE COURT:   REDIRECT?

12:20PM   5              MR. LEACH:   THANK YOU, YOUR HONOR.

12:20PM   6                    **REDIRECT EXAMINATION**

12:20PM   7    BY MR. LEACH:

12:21PM   8    Q.   BRIEFLY.  GOOD AFTERNOON, MR. WEBER.

12:21PM   9         IF WE COULD PLEASE DISPLAY EXHIBIT 174.  AND IF WE CAN

12:21PM  10    ZOOM IN, PLEASE, ON THE TOP HALF, MS. HOLLIMAN.

12:21PM  11         THANK YOU.

12:21PM  12         MR. WEBER, YOU WERE ASKED -- EXCUSE ME, I'LL REMOVE MY

12:21PM  13    MASK.

12:21PM  14         YOU WERE ASKED A NUMBER OF QUESTIONS ABOUT STATEMENTS YOU

12:21PM  15    MADE IN AN INTERVIEW WITH THE GOVERNMENT BACK IN 2020 BEFORE

12:21PM  16    THE PANDEMIC.

12:21PM  17         DO YOU RECALL THAT LINE OF QUESTIONING?

12:21PM  18    A.   I DO.

12:21PM  19    Q.   OKAY.  I'VE PLACED ON THE SCREEN AN EMAIL THAT YOU SENT TO

12:21PM  20    CRAIG LIPSET, HAKAN SAKUL, AND DR. POWER.

12:21PM  21         DO YOU SEE THAT?

12:21PM  22    A.   I DO.

12:21PM  23    Q.   OKAY.  AT THE TIME THAT YOU SENT THIS EMAIL, WERE YOU

12:21PM  24    SATISFIED THAT THEY HAD SUFFICIENT CONTEXT FOR WHAT YOU WERE

12:21PM  25    WRITING ABOUT IN TERMS OF A THERANOS WRAP UP?

WEBER REDIRECT BY MR. LEACH                                              4430

12:21PM    1        A.   I DO.

12:22PM    2        Q.   AND SITTING HERE TODAY, DO YOU RECALL DISCUSSIONS WITH

12:22PM    3    THEM ABOUT THE SUBSTANCE OF YOUR REPORT?

12:22PM    4        A.   I DO.

12:22PM    5        Q.   OKAY.  WHEN YOU TOLD THE GOVERNMENT IT WAS INITIALLY MET

12:22PM    6    WITH SILENCE, WHAT DID YOU MEAN BY THAT?

12:22PM    7        A.   THAT THIS WAS A MATTER THAT THEY HAD SEEN MY REPORT AND

12:22PM    8    BRIEFLY HAD ASKED, DO YOU THINK THAT THERE'S ANYTHING ELSE TO

12:22PM    9    BE DONE?  I SAID NO, AND THEY WERE SILENT AND MOVED ON.

12:22PM   10        THESE ARE VERY BUSY PEOPLE.

12:22PM   11        Q.   OKAY.  BUT YOU WERE SATISFIED THAT THEY AGREED WITH YOUR

12:22PM   12    CONCLUSIONS?

12:22PM   13        A.   YES.

12:22PM   14        Q.   MR. CLINE ALSO ASKED YOU ABOUT EXHIBIT 10561, AND THERE

12:22PM   15    WAS A STATEMENT BY YOU IN FEBRUARY OF 2009 TO THE EFFECT OF YOU

12:22PM   16    WERE ON TO SOMETHING GOOD.

12:22PM   17        DO YOU RECALL THAT TESTIMONY?

12:22PM   18        A.   I DO.

12:22PM   19        Q.   OKAY.  DID YOU MEAN BY THAT THAT PFIZER HAD

12:22PM   20    COMPREHENSIVELY VALIDATED THERANOS'S TECHNOLOGY?

12:22PM   21        A.   NO.

12:22PM   22        Q.   DID THAT REFLECT YOUR AGREEMENT TO THE 13 CONCLUSIONS THAT

12:23PM   23    WE SAW LISTED IN THE THERANOS ANGIOGENESIS STUDY REPORT?

12:23PM   24        A.   NO.

12:23PM   25        Q.   OKAY.  YOU WERE ALSO ASKED A NUMBER OF QUESTIONS ABOUT

WEBER REDIRECT BY MR. LEACH                                          4431

12:23PM   1      INTERACTIONS OTHERS MAY HAVE HAD WITH THERANOS POST 2009.

12:23PM   2           DO YOU RECALL THOSE QUESTIONS?

12:23PM   3   A.   I DO.

12:23PM   4   Q.   OKAY.

12:23PM   5           MAY I HAVE ONE MOMENT, YOUR HONOR?

12:23PM   6             THE COURT:   YES.

12:23PM   7      (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

12:23PM   8             MR. LEACH:   COULD WE PLEASE DISPLAY, MS. HOLLIMAN,

12:23PM   9   EXHIBIT 7753, WHICH IS IN EVIDENCE.

12:23PM  10           AND IF WE COULD GO TO THE ATTACHMENT, ATTACHMENT 2.

12:24PM  11   Q.   MR. WEBER, DO YOU SEE AN EXCEL SPREADSHEET ON YOUR SCREEN?

12:24PM  12   A.   I DO.

12:24PM  13   Q.   AND DO YOU SEE IN ROW 12 THERE'S A LINE FOR PFIZER?

12:24PM  14   A.   I DO.

12:24PM  15   Q.   AND DO YOU SEE THERE'S A $500,000 AMOUNT IN COLUMN B IN

12:24PM  16   THE YEAR 2007?

12:24PM  17   A.   I DO.

12:24PM  18   Q.   DO YOU SEE THERE'S A $400,000 ENTRY IN THE YEAR 2008?

12:24PM  19   A.   I DO.

12:24PM  20   Q.   OKAY.  DO THOSE TWO ADD UP TO 900,000?

12:24PM  21   A.   THEY DO.

12:24PM  22   Q.   OKAY.  AND I THINK YOU TESTIFIED ON CROSS-EXAMINATION THAT

12:24PM  23   YOU DON'T RECALL THE AMOUNT OF THE CONTRACT FOR THE ONCOLOGY OR

12:24PM  24   THE ANGIOGENESIS PROGRAM; IS THAT RIGHT?

12:24PM  25   A.   NO.

| | | |
|---|---|---|
| 12:24PM | 1 | Q.   OKAY.  IF WE COULD MOVE FROM THE RIGHT, MS. HOLLIMAN, FROM |
| 12:24PM | 2 | 2008 ALL OF THE WAY UNTIL 2015. |
| 12:25PM | 3 | MR. WEBER, DO YOU SEE ANY OTHER ENTRIES OTHER THAN THE TWO |
| 12:25PM | 4 | AMOUNTS THAT ADDS UP TO 900,000 IN THE GRAND TOTAL? |
| 12:25PM | 5 | A.   I DO NOT. |
| 12:25PM | 6 | Q.   AND THAT'S ALL OF THE WAY UP THROUGH 2014? |
| 12:25PM | 7 | A.   ACCORDING TO THIS EXCEL FILE, YES. |
| 12:25PM | 8 | Q.   OKAY. |
| 12:25PM | 9 | THANK YOU, YOUR HONOR.  I HAVE NO FURTHER QUESTIONS. |
| 12:25PM | 10 | MR. CLINE:  NO FURTHER QUESTIONS. |
| 12:25PM | 11 | THE COURT:  MAY THIS WITNESS BE EXCUSED? |
| 12:25PM | 12 | MR. LEACH:  HE MAY.  THANK YOU, YOUR HONOR. |
| 12:25PM | 13 | MR. CLINE:  YES, YOUR HONOR. |
| 12:25PM | 14 | THE COURT:  YOU'RE EXCUSED, SIR.  THANK YOU.  YOU |
| 12:25PM | 15 | CAN JUST LEAVE THOSE BINDERS THERE.  THANK YOU. |
| 12:25PM | 16 | FOLKS, IF YOU WOULD LIKE TO STAND AND STRETCH WHILE WE DO |
| 12:25PM | 17 | THE TRANSITION, FEEL FREE TO. |
| 12:25PM | 18 | THE GOVERNMENT HAS ANOTHER WITNESS, I TAKE IT. |
| 12:25PM | 19 | MR. SCHENK:  YES, YOUR HONOR. |
| 12:25PM | 20 | THE UNITED STATES CALLED BRYAN TOLBERT. |
| 12:26PM | 21 | THE COURT:  SIR, IF YOU COULD STAND THERE FOR JUST A |
| 12:26PM | 22 | MOMENT RIGHT THERE AND FACE OUR COURTROOM DEPUTY.  SHE HAS A |
| 12:26PM | 23 | QUESTION FOR YOU. |
| 12:26PM | 24 | **(GOVERNMENT'S WITNESS, JOHN BRYAN TOLBERT, WAS SWORN.)** |
| 12:26PM | 25 | THE WITNESS:  YES. |

4433

TOLBERT DIRECT BY MR. SCHENK

12:26PM  1          THE COURT:  PLEASE HAVE A SEAT HERE, SIR, AND MAKE

12:26PM  2     YOURSELF COMFORTABLE.

12:26PM  3          FEEL FREE TO ADJUST THE CHAIR AND MICROPHONE AS YOU NEED.

12:26PM  4     I'LL ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE.

12:26PM  5          WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

12:26PM  6     AND THEN SPELL IT, PLEASE.

12:26PM  7          THE WITNESS:  CAN I TAKE MY MASK OFF?

12:27PM  8          THE COURT:  YOU KNOW, MR. SCHENK IS GOING TO ASK YOU

12:27PM  9     A QUESTION ABOUT THAT IN JUST A MOMENT.

12:27PM  10         THE WITNESS:  OKAY.  JOHN BRYAN TOLBERT.

12:27PM  11    T-O-L-B-E-R-T.

12:27PM  12         THE COURT:  THANK YOU.  MR. SCHENK.

12:27PM  13         MR. SCHENK:  THANK YOU, YOUR HONOR.

12:27PM  14                    **DIRECT EXAMINATION**

12:27PM  15    BY MR. SCHENK:

12:27PM  16    Q.  MR. TOLBERT, IF YOU ARE FULLY VACCINATED, AND WITH THE

12:27PM  17    COURT'S PERMISSION, YOU MAY TESTIFY WITHOUT A MASK ON.

12:27PM  18         I WILL ALSO REMOVE MINE.  THANK YOU.

12:27PM  19         MR. TOLBERT, DO YOU WORK CURRENTLY FOR A COMPANY CALLED

12:27PM  20    HALL GROUP?

12:27PM  21    A.  I DO.

12:27PM  22    Q.  HOW LONG HAVE YOU WORKED FOR HALL GROUP?

12:27PM  23    A.  SINCE 1999.

12:27PM  24    Q.  DURING YOUR WORK AT HALL, DID YOU BECOME FAMILIAR WITH

12:27PM  25    ANOTHER COMPANY CALLED THERANOS?

TOLBERT DIRECT BY MR. SCHENK                                    4434

12:27PM    1    A.   I DID.

12:27PM    2    Q.   AND THROUGH YOUR WORK AT HALL GROUP, DID YOU MAKE AN

12:27PM    3    INVESTMENT IN THERANOS IN LATE 2013?

12:27PM    4    A.   WE DID.

12:27PM    5    Q.   WAS THE INVESTMENT ABOUT $5 MILLION?

12:28PM    6    A.   CORRECT.

12:28PM    7    Q.   WE'LL COME BACK TO THAT IN A MOMENT.

12:28PM    8         I WONDER IF WE CAN NOW TURN TO YOUR EDUCATIONAL

12:28PM    9    BACKGROUND.  WOULD YOU DESCRIBE FOR THE JURY YOUR UNDERGRADUATE

12:28PM   10    AND ANY GRADUATE DEGREES THAT YOU HAVE?

12:28PM   11    A.   SURE.  I DID AN UNDERGRADUATE AND A BACHELOR'S OF SCIENCE

12:28PM   12    IN PSYCHOLOGY AT THE UNIVERSITY OF GEORGIA.

12:28PM   13         AND THEN AFTER THAT I WENT TO BYU, BRIGHAM YOUNG

12:28PM   14    UNIVERSITY, AND GOT A MASTER'S IN BUSINESS.

12:28PM   15    Q.   OKAY.  AND WHAT DO YOU CURRENTLY DO AT HALL GROUP?

12:28PM   16    A.   SO I WORK IN FINANCE AND INVESTMENTS, SO I DO SOME

12:28PM   17    CORPORATE FINANCE FUNCTIONS, AS WELL AS OVERSEE OUR INVESTMENTS

12:28PM   18    IN OTHER COMPANIES.

12:28PM   19    Q.   WHERE IS HALL LOCATED?

12:28PM   20    A.   WE'RE LOCATED IN DALLAS, TEXAS.

12:28PM   21    Q.   WHAT IS YOUR CURRENT TITLE?

12:28PM   22    A.   VICE PRESIDENT OF FINANCE.

12:28PM   23    Q.   HAVE YOU HAD THAT TITLE, THE VICE PRESIDENT OF FINANCE,

12:28PM   24    SINCE YOU STARTED AT HALL?

12:28PM   25    A.   I HAVE NOT.  SO I STARTED AS A FINANCIAL ANALYST AND HAVE

4435

TOLBERT DIRECT BY MR. SCHENK

| | | |
|---|---|---|
| 12:29PM | 1 | BEEN VICE PRESIDENT OF FINANCE MAYBE FOR TEN YEARS. |
| 12:29PM | 2 | Q.   WHAT ARE THE RESPONSIBILITIES THAT YOU HAVE WITH YOUR |
| 12:29PM | 3 | CURRENT JOB, THE VICE PRESIDENT OF FINANCE? |
| 12:29PM | 4 | A.   SO, LIKE I SAID, I DO SOME CORPORATE FINANCE WORK, SO |
| 12:29PM | 5 | BUDGETS AND CASH FLOWS, CORPORATE FINANCE. |
| 12:29PM | 6 | AND THEN I ALSO OVERSEE OUR INVESTMENT OF -- OR OUR |
| 12:29PM | 7 | PORTFOLIO OF INVESTMENTS IN PRIVATE COMPANIES. |
| 12:29PM | 8 | Q.   AND WHAT ARE THE CIRCUMSTANCES UNDER WHICH HALL MAKES |
| 12:29PM | 9 | INVESTMENTS IN PRIVATE COMPANIES? |
| 12:29PM | 10 | A.   SO THERE ARE TIMES WHEN WE BECOME AWARE OF DIFFERENT |
| 12:29PM | 11 | OPPORTUNITIES TO INVEST IN PRIVATE COMPANIES.  WE LOOK AT, YOU |
| 12:29PM | 12 | KNOW, THOSE OPPORTUNITIES AS THEY COME UP AND ARE PRESENTED TO |
| 12:29PM | 13 | US.  AND, YOU KNOW, WE DO THAT REGULARLY I GUESS. |
| 12:29PM | 14 | BUT -- SO I GUESS WE, WE HAVE A REGULAR FLOW OF DEALS THAT |
| 12:30PM | 15 | WE LOOK AT TO POTENTIALLY INVEST IN. |
| 12:30PM | 16 | Q.   OKAY.  WOULD YOU SAY THAT THAT IS THE MAIN BUSINESS OF |
| 12:30PM | 17 | HALL, INVESTMENT IN PRIVATE COMPANIES? |
| 12:30PM | 18 | A.   IT IS NOT. |
| 12:30PM | 19 | Q.   WHAT IS THE MAIN BUSINESS? |
| 12:30PM | 20 | A.   SO THE MAIN BUSINESS OF HALL GROUP IS INVESTING IN REAL |
| 12:30PM | 21 | ESTATE, OWNING AND DEVELOPING REAL ESTATE, AS WELL AS A |
| 12:30PM | 22 | BUSINESS OF MAKING LOANS, CONSTRUCTION LOANS TO DIFFERENT REAL |
| 12:30PM | 23 | ESTATE RELATED PROJECTS. |
| 12:30PM | 24 | Q.   IS THE REAL ESTATE THAT HALL INVESTS IN OR WORKS WITH |
| 12:30PM | 25 | LOCATED IN TEXAS OR IN OTHER PLACES? |

TOLBERT DIRECT BY MR. SCHENK                                              4436

| | | |
|---|---|---|
| 12:30PM | 1 | A.   IT'S ALL OVER THE COUNTRY. |
| 12:30PM | 2 | Q.   OKAY.  LET'S TURN TO THE PRIVATE COMPANY INVESTMENTS. |
| 12:30PM | 3 | ARE THERE TIMES WHEN YOU, YOURSELF, MAKE THE DECISION ON |
| 12:30PM | 4 | BEHALF OF HALL TO INVEST? |
| 12:30PM | 5 | A.   YOU KNOW, THAT DECISION WOULD BE MADE PRIMARILY BETWEEN ME |
| 12:30PM | 6 | AND MY BOSS, MR. HALL.  TOGETHER THAT DECISION WOULD BE MADE. |
| 12:31PM | 7 | Q.   OKAY.  AND IS IT THROUGH THIS PROCESS, THE INVESTMENTS IN |
| 12:31PM | 8 | PRIVATE COMPANIES, THAT YOU BECAME FAMILIAR WITH THERANOS? |
| 12:31PM | 9 | A.   IT IS. |
| 12:31PM | 10 | Q.   WHEN DID YOU FIRST BECOME FAMILIAR WITH THERANOS IF YOU |
| 12:31PM | 11 | RECALL? |
| 12:31PM | 12 | A.   IT WOULD BE -- IT WOULD HAVE BEEN IN THE FALL OF 2006. |
| 12:31PM | 13 | Q.   AND HOW DID YOU FIRST BECOME FAMILIAR WITH IT? |
| 12:31PM | 14 | A.   YOU KNOW, AS I RECALL, MR. HALL CAME TO ME ONE DAY AND |
| 12:31PM | 15 | SAID THAT, YOU KNOW, HE HAD BECOME -- HE HAD RECEIVED SOME |
| 12:31PM | 16 | INFORMATION ABOUT A POTENTIAL INVESTMENT IN A COMPANY ABOUT A |
| 12:31PM | 17 | COMPANY CALLED THERANOS AND ASKED ME IF I WOULD TAKE A LOOK AT |
| 12:31PM | 18 | IT. |
| 12:31PM | 19 | SO WE DISCUSSED IT WHEN HE BROUGHT IT TO MY ATTENTION. |
| 12:31PM | 20 | Q.   SO MR. HALL TASKED YOU WITH BEGINNING A PROCESS, IS IT |
| 12:31PM | 21 | CALLED DUE DILIGENCE? |
| 12:31PM | 22 | A.   CORRECT. |
| 12:31PM | 23 | Q.   AND WHAT DID YOU DO AT THIS TIME? |
| 12:31PM | 24 | A.   EXCUSE ME? |
| 12:31PM | 25 | Q.   WHAT DID YOU DO?  WHAT WERE YOUR FIRST STEPS? |

4437

TOLBERT DIRECT BY MR. SCHENK

12:31PM  1    A.   SO, YOU KNOW, OUR FIRST STEPS WERE TO DO A GOOGLE SEARCH

12:32PM  2    TO SEE IF THERE WAS ANYTHING THAT WE COULD LEARN ABOUT IT.

12:32PM  3    THERE WASN'T MUCH AT THAT TIME.

12:32PM  4         AND SO WE SET UP A PHONE CALL, OR A SERIES OF PHONE CALLS,

12:32PM  5    TO HAVE SOME DISCUSSIONS ABOUT WHAT THE OPPORTUNITY WAS AND THE

12:32PM  6    PREMISE OF THE UNDERLYING COMPANY.

12:32PM  7    Q.   AND THESE EARLY CALLS, DID YOU SPEAK WITH SOMEONE AT

12:32PM  8    THERANOS?

12:32PM  9    A.   I DID.

12:32PM  10   Q.   AND WHO DID YOU SPEAK WITH?

12:32PM  11   A.   I SPOKE WITH ELIZABETH.

12:32PM  12   Q.   OKAY.

12:32PM  13        YOUR HONOR, MAY I APPROACH?

12:32PM  14             THE COURT:   YES.

12:32PM  15             MR. SCHENK:   (HANDING.)

12:32PM  16   Q.   MR. TOLBERT, I'VE HANDED YOU A BINDER OF DOCUMENTS, AND

12:32PM  17   I'LL ASK YOU TO OPEN THE BINDER AND NOW TURN TO TAB 3790.

12:33PM  18        DO YOU RECOGNIZE THIS DOCUMENT?

12:33PM  19   A.   I DO.

12:33PM  20   Q.   WHAT IS THIS?

12:33PM  21   A.   THIS IS AN EMAIL THAT I SENT TO MR. HALL IN OCTOBER OF

12:33PM  22   2006 REFERENCING SOME NOTES FROM A CONFERENCE CALL THAT WE HAD

12:33PM  23   HAD ABOUT THERANOS.

12:33PM  24   Q.   AND THERE'S A COUPLE OF PAGES AFTER THE EMAIL.  WHAT ARE

12:33PM  25   THOSE?

TOLBERT DIRECT BY MR. SCHENK

12:33PM   1   A.   THOSE WOULD HAVE BEEN MY NOTES THAT WERE ATTACHED TO THAT

12:33PM   2   EMAIL.

12:33PM   3   Q.   AND IS THIS THE CALL THAT YOU MENTIONED A MOMENT AGO WITH

12:33PM   4   MS. HOLMES?

12:33PM   5   A.   CORRECT.

12:33PM   6        MR. SCHENK:   YOUR HONOR, THE GOVERNMENT OFFERS 3790.

12:33PM   7        MR. DOWNEY:   YOUR HONOR, OBJECTION UNDER 801.

12:33PM   8        THE COURT:   801 OBJECTION.

12:33PM   9   ARE YOU OFFERING THIS FOR THE TRUTH?

12:33PM  10        MR. SCHENK:   I AM, YOUR HONOR, YES.

12:33PM  11        THE COURT:   CAN YOU LAY A FOUNDATION?

12:33PM  12        MR. SCHENK:   YES, YOUR HONOR.

12:33PM  13   Q.   WHEN YOU ARE PERFORMING YOUR DUE DILIGENCE, IS ONE OF THE

12:34PM  14   THINGS THAT YOU DO IN THAT PROCESS, AS IN THIS CASE, SPEAK TO

12:34PM  15   INDIVIDUALS THAT WORK AT THE COMPANY THAT YOU MAY INVEST IN?

12:34PM  16   A.   IT IS.

12:34PM  17   Q.   AND DO YOU TAKE NOTES ON THOSE CALLS?

12:34PM  18   A.   I DO.   SOMETIMES I DO.

12:34PM  19   Q.   AND IN THIS INSTANCE, DID YOU TAKE NOTES?

12:34PM  20   A.   YOU KNOW, I DID.   SO THIS WOULD REPRESENT -- SO THIS

12:34PM  21   DOCUMENT WOULD REPRESENT NOTES THAT I TOOK WHILE I WAS ON THE

12:34PM  22   CALL, AS WELL AS ADDITIONAL INFORMATION THAT HAD BEEN SENT TO

12:34PM  23   US.   SO KIND OF A COMBINATION OF THOSE TWO SOURCES.

12:34PM  24   Q.   I'M SORRY.   MULTIPLE SOURCES OF DUE DILIGENCE?

12:34PM  25   A.   CORRECT.

TOLBERT DIRECT BY MR. SCHENK                                    4439

12:34PM   1      Q.   AND WOULD YOU PUT THAT ALL INTO ONE DOCUMENT?

12:34PM   2      A.   CORRECT.

12:34PM   3      Q.   AND THEN WOULD YOU MAKE SURE THAT THE CONTENT OF THAT

12:34PM   4      DOCUMENT ACCURATELY SUMMARIZED THE ORIGINAL SOURCES OF

12:34PM   5      INFORMATION?

12:34PM   6      A.   I WOULD.

12:34PM   7      Q.   AND THEN YOU WOULD SEND THE DOCUMENT, AS IN THIS CASE, TO

12:34PM   8      MR. HALL?

12:34PM   9      A.   THAT'S CORRECT.

12:34PM   10     Q.   AND WHY WOULD YOU SEND IT TO MR. HALL?

12:34PM   11     A.   SO THAT, SO THAT HE AND I COULD REVIEW IT AND WALK THROUGH

12:35PM   12     THE THINGS THAT I HAD HEARD ON THE CALL, OR THE SOURCES OF

12:35PM   13     INFORMATION AS A BASIS TO UNDERSTAND ABOUT THE COMPANY IF IT

12:35PM   14     WAS SOMETHING THAT WE WANTED TO INVEST IN.

12:35PM   15     Q.   AND THEN DID YOU USE THIS TYPE OF DOCUMENT AS A BASIS TO

12:35PM   16     INFORM YOUR DECISION WHETHER OR NOT TO INVEST?

12:35PM   17     A.   CORRECT.

12:35PM   18     Q.   WAS THIS DOCUMENT ALSO SAVED OR PRESERVED BY HALL SO THAT

12:35PM   19     YOU COULD GO BACK AND LOOK AT THE DOCUMENT IN THE FUTURE IF YOU

12:35PM   20     HAD ADDITIONAL QUESTIONS?

12:35PM   21     A.   I DON'T KNOW -- I MEAN, I'M SURE IT WAS.  BUT IF WE WOULD

12:35PM   22     HAVE REFERENCED TO THIS, IT WOULD HAVE JUST BEEN A REFERENCE TO

12:35PM   23     WHATEVER WAS ATTACHED TO THAT EMAIL.

12:35PM   24     Q.   THE ATTACHMENT?

12:35PM   25     A.   CORRECT.

TOLBERT DIRECT BY MR. SCHENK                                    4440

12:35PM   1              MR. SCHENK:  THANK YOU.

12:35PM   2         YOUR HONOR, THE GOVERNMENT OFFERS 3790.

12:35PM   3              THE COURT:  I'LL ALLOW IT UNDER 803(6).

12:35PM   4              MR. SCHENK:  AND PERMISSION TO PUBLISH.

12:35PM   5              THE COURT:  YES.

12:35PM   6         (GOVERNMENT'S EXHIBIT 3790 WAS RECEIVED IN EVIDENCE.)

12:35PM   7    BY MR. SCHENK:

12:36PM   8    Q.   MR. TOLBERT, FIRST THE FROM LINE.  IS THAT YOUR EMAIL?

12:36PM   9    A.   THAT IS.

12:36PM  10    Q.   AND THE TO LINE, IS THAT THE BEGINNING OF THE EMAIL

12:36PM  11    ADDRESS FOR MR. HALL?

12:36PM  12    A.   IT IS.

12:36PM  13    Q.   SO IN OCTOBER OF 2006, YOU WROTE, "ATTACHED ARE MY NOTES

12:36PM  14    FROM THE CONFERENCE CALL RE: THERANOS YESTERDAY."

12:36PM  15         YOU'RE WAITING ON ADDITIONAL INFORMATION FROM THEM.  IS

12:36PM  16    THE "THEM" THERANOS?

12:36PM  17    A.   YOU KNOW, THAT "THEM" WOULD REFERENCE A COMBINATION OF

12:36PM  18    THERANOS AND CHRIS LUCAS, BOTH OF WHOM HAD SERVED AS SOURCES OF

12:36PM  19    INFORMATION ABOUT THE INVESTMENT.

12:36PM  20    Q.   AND WHO IS CHRIS LUCAS?

12:36PM  21    A.   SO CHRIS LUCAS, HE WAS AN INVESTOR IN THERANOS AND HE HAD

12:36PM  22    A FUND THAT WE INVESTED THROUGH.  WE WERE PART OF HIS FUND.

12:36PM  23    Q.   AND WHEN YOU SAY THAT "WE INVESTED THROUGH," WHO IS THE

12:36PM  24    "WE"?

12:36PM  25    A.   I MEAN THE HALL GROUP WOULD HAVE INVESTED THROUGH

TOLBERT DIRECT BY MR. SCHENK                                        4441

| | | |
|---|---|---|
| 12:36PM | 1 | CHRIS LUCAS'S FUND. |
| 12:36PM | 2 | Q.   AND WHEN WAS THAT INVESTMENT MADE? |
| 12:37PM | 3 | A.   THAT WOULD HAVE BEEN IN -- THAT WOULD HAVE BEEN THE |
| 12:37PM | 4 | INVESTMENT THAT WE MADE IN LATE 2006. |
| 12:37PM | 5 | Q.   SO HALL MADE AN INVESTMENT IN 2006, AND ALSO ONE IN 2013? |
| 12:37PM | 6 | A.   CORRECT. |
| 12:37PM | 7 | Q.   THE ONE IN 2006, THAT WAS THROUGH THIS INDIVIDUAL |
| 12:37PM | 8 | CHRIS LUCAS? |
| 12:37PM | 9 | A.   IT WAS THROUGH ONE OF HIS INVESTMENT FUNDS. |
| 12:37PM | 10 | Q.   HOW ABOUT THE ONE IN 2013, WAS THAT ALSO THROUGH ONE OF |
| 12:37PM | 11 | MR. LUCAS'S INVESTMENT FUNDS? |
| 12:37PM | 12 | A.   IT WAS NOT. |
| 12:37PM | 13 | IN 2013 WE HAD HAD SOME DISCUSSIONS WITH BOTH CHRIS AND |
| 12:37PM | 14 | ELIZABETH TO SAY THAT OUR PREFERENCE WAS TO INVEST DIRECTLY IN |
| 12:37PM | 15 | THERANOS AND NOT THROUGH A THIRD PARTY, AND SO IN 2013 WE |
| 12:37PM | 16 | BECAME A DIRECT INVESTOR. |
| 12:37PM | 17 | Q.   OKAY.  LET'S TURN NOW TO THE ATTACHMENT, PAGE 2 OF THE |
| 12:37PM | 18 | EXHIBIT. |
| 12:37PM | 19 | THERE ARE SOME CONTACTS AT THE TOP. |
| 12:37PM | 20 | IF WE CAN FIRST JUST HAVE YOU EXPLAIN TO THE JURY WHO |
| 12:37PM | 21 | THESE INDIVIDUALS ARE. |
| 12:37PM | 22 | THE FIRST IS MS. HOLMES; IS THAT RIGHT? |
| 12:38PM | 23 | A.   SO THE FIRST NAME IS ELIZABETH HOLMES. |
| 12:38PM | 24 | THE SECOND NAME IS GARY NORDHEIMER.  GARY IS A FRIEND OF |
| 12:38PM | 25 | MR. HALL, AND I THINK IS THE FIRST ONE THAT, THAT MADE MR. HALL |

4442

TOLBERT DIRECT BY MR. SCHENK

| | | |
|---|---|---|
| 12:38PM | 1 | AWARE OF AN OPPORTUNITY TO INVEST IN THERANOS.  SO THEY'RE |
| 12:38PM | 2 | FRIENDS. |
| 12:38PM | 3 | AND HE HAD REACHED OUT TO MR. HALL, I BELIEVE, AND HAD |
| 12:38PM | 4 | INDICATED THAT THERE WAS A POTENTIAL INVESTMENT OPPORTUNITY. |
| 12:38PM | 5 | AS I UNDERSTAND IT, MR. NORDHEIMER WAS AN INVESTOR THROUGH |
| 12:38PM | 6 | CHRIS LUCAS, AND HIS INVESTMENT FUND AS WELL, AND THAT'S THE |
| 12:38PM | 7 | THIRD NAME ON THE LIST IS CHRIS LUCAS. |
| 12:38PM | 8 | Q.  AND THAT'S THE GENTLEMAN THAT WE JUST SPOKE ABOUT WHO |
| 12:38PM | 9 | OWNED THE FUND THAT THE 2006 INVESTMENT WAS MADE THROUGH? |
| 12:38PM | 10 | A.  CORRECT. |
| 12:38PM | 11 | Q.  NOW, IF WE CAN LOOK A LITTLE FURTHER DOWN, THERE'S A LIST |
| 12:38PM | 12 | OF INVESTORS. |
| 12:38PM | 13 | UNDER DONALD LUCAS, TOWARDS THE END OF THAT LINE, WE SEE |
| 12:38PM | 14 | HE'S THE UNCLE OF CHRIS LUCAS WHO OWNS BLACK DIAMOND VENTURES. |
| 12:39PM | 15 | FIRST, DO YOU KNOW WHO DONALD LUCAS IS? |
| 12:39PM | 16 | A.  I DO. |
| 12:39PM | 17 | Q.  AND WHO IS HE? |
| 12:39PM | 18 | A.  SO DONALD LUCAS WAS ONE OF THE, I THINK, ORIGINAL |
| 12:39PM | 19 | INVESTORS IN THERANOS, WAS THE CHAIRMAN OF THE BOARD, AND WAS A |
| 12:39PM | 20 | WELL-KNOWN VENTURE CAPITALIST IN CALIFORNIA. |
| 12:39PM | 21 | Q.  AND THE REFERENCE HERE, CHAIRMAN OF THE BOARD, THAT'S OF |
| 12:39PM | 22 | THERANOS; IS THAT RIGHT? |
| 12:39PM | 23 | A.  CORRECT. |
| 12:39PM | 24 | Q.  OKAY.  AND CHRIS LUCAS OWNS BLACK DIAMOND VENTURES.  WHAT |
| 12:39PM | 25 | IS BLACK DIAMOND VENTURES? |

                                                                    4443
TOLBERT DIRECT BY MR. SCHENK

12:39PM  1    A.   SO BLACK DIAMOND VENTURES IS THE NAME OF THE FUND OR THE

12:39PM  2    COMPANY THAT CHRIS LUCAS OWNED THAT MADE THE INVESTMENT IN

12:39PM  3    THERANOS.

12:39PM  4         WE INVESTED IN BLACK DIAMOND VENTURES, WHO INVESTED IN

12:39PM  5    THERANOS.

12:39PM  6    Q.   IN 2006?

12:39PM  7    A.   IN 2006, CORRECT.

12:39PM  8    Q.   I SEE.  BUT THE 2013 INVESTMENT WAS NOT INTO BLACK DIAMOND

12:39PM  9    VENTURES?

12:39PM 10    A.   CORRECT.  THE 2013 INVESTMENT WAS DIRECTLY INTO THERANOS.

12:39PM 11    Q.   I SEE.  OKAY.

12:39PM 12         AND THEN THERE'S A FURTHER LIST OF INVESTORS, AND IF WE GO

12:39PM 13    DOWN TO THE PARAGRAPH AT THE BOTTOM -- FIRST, BEFORE I READ YOU

12:40PM 14    PARTS OF IT, I'M WONDERING WHAT WAS THE SOURCE, IF YOU RECALL,

12:40PM 15    OF THIS INFORMATION, THE PARAGRAPH THAT BEGINS "FIRST RAISE"?

12:40PM 16    A.   SO THIS PARAGRAPH WOULD REFERENCE MY NOTES FROM THAT

12:40PM 17    CONFERENCE CALL.

12:40PM 18    Q.   THE CONFERENCE CALL THAT MS. HOLMES WAS ON?

12:40PM 19    A.   CORRECT.  THE LIST OF INVESTORS ABOVE, I'M NOT A FAST

12:40PM 20    ENOUGH TYPIST TO HAVE GATHERED ALL OF THAT FROM THE CALL, SO AS

12:40PM 21    I REMEMBER, CHRIS LUCAS WOULD HAVE, OR SOMEBODY WOULD HAVE SENT

12:40PM 22    INFORMATION THAT WOULD HAVE LISTED WHO THE INVESTORS WERE AND I

12:40PM 23    WOULD HAVE CUT AND PASTE THAT LIST INTO THESE NOTES.

12:40PM 24    Q.   OKAY.

12:40PM 25    A.   BUT THE PARAGRAPH ON THE BOTTOM REPRESENTED MY NOTES FROM

TOLBERT DIRECT BY MR. SCHENK

| | | |
|---|---|---|
| 12:40PM | 1 | THAT CALL. |
| 12:40PM | 2 | Q.   IT READS, "THE FIRST RAISE WAS $16 MILLION.  THIS ROUND IS |
| 12:40PM | 3 | $30 MILLION WITH A $125 MILLION PRE-MONEY VALUATION.  EXPECTS |
| 12:40PM | 4 | THIS TO BE FINAL RAISE PRE-IPO." |
| 12:41PM | 5 | WHAT DOES THAT MEAN? |
| 12:41PM | 6 | A.   SO THAT MEANS ON THE CALL THERE WAS DISCUSSION ABOUT THE |
| 12:41PM | 7 | FACT THAT THERE WOULD BE AN IPO LIKELY THAT WOULD COME AND THAT |
| 12:41PM | 8 | THIS ROUND OF INVESTMENT WOULD BE ENOUGH TO CARRY THE COMPANY |
| 12:41PM | 9 | THROUGH IPO. |
| 12:41PM | 10 | Q.   AND WHAT IS AN IPO? |
| 12:41PM | 11 | A.   AN INITIAL PUBLIC OFFERING WHERE A COMPANY WOULD FILE TO |
| 12:41PM | 12 | GO PUBLIC ON ONE OF THE PUBLIC STOCK EXCHANGES. |
| 12:41PM | 13 | Q.   OKAY.  HE -- IT CONTINUES, "THE IPO IS ANTICIPATED IN THE |
| 12:41PM | 14 | FIRST QUARTER OF 2008.  EXPECT THE IPO TO BE VALUED AROUND |
| 12:41PM | 15 | $1 BILLION." |
| 12:41PM | 16 | WAS THAT COMMUNICATED DURING THIS CALL? |
| 12:41PM | 17 | A.   THAT WOULD HAVE BEEN. |
| 12:41PM | 18 | Q.   PARDON ME? |
| 12:41PM | 19 | A.   THAT -- CORRECT, IT WOULD HAVE BEEN NOTED ON THE CALL. |
| 12:41PM | 20 | Q.   OKAY.  "$30 MILLION TO BE USED FOR 1) MANUFACTURING - |
| 12:41PM | 21 | MOVING FROM A MANUAL ASSEMBLY INFRASTRUCTURE TO A FULLY |
| 12:41PM | 22 | AUTOMATED SYSTEM AND 2) CONTINUE TO FUND SUCCESSIVE ITERATIONS |
| 12:42PM | 23 | OF THE TECHNOLOGY INCLUDING DECREASING AMOUNT OF BLOOD REQUIRED |
| 12:42PM | 24 | IN THE PINPRICK AND NUMBER OF ASSAYS IN THE CARTRIDGE." |
| 12:42PM | 25 | WHAT WAS YOUR UNDERSTANDING OF WHAT THERANOS DID?  WHAT |

4445
TOLBERT DIRECT BY MR. SCHENK

| | | |
|---|---|---|
| 12:42PM | 1 | WAS THE TECHNOLOGY AT THIS POINT? |
| 12:42PM | 2 | A.   SO MY UNDERSTANDING AT THIS TIME WAS THAT, YOU KNOW, THERE |
| 12:42PM | 3 | WAS AN ABILITY TO TAKE A FINGER PRICK OF BLOOD AND PUT THAT |
| 12:42PM | 4 | DROP OF BLOOD IN A CARTRIDGE.  IT WOULD HAVE BEEN PUT IN A |
| 12:42PM | 5 | READER.  THAT READER COULD THEN GO AND DO DIFFERENT TESTS ON |
| 12:42PM | 6 | THE BLOOD AND RETURN RESULTS. |
| 12:42PM | 7 | YOU KNOW, THE EXPECTATION AT THIS TIME, AS THIS NOTES, |
| 12:42PM | 8 | THAT PART OF THE INVESTMENT PROCEEDS WOULD BE USED TO KIND OF |
| 12:42PM | 9 | FURTHER ADVANCE WHAT THAT TECHNOLOGY WAS ABLE TO DO, THE NUMBER |
| 12:42PM | 10 | OF TESTS IT WOULD BE ABLE TO BE PERFORMED, OR, YOU KNOW, THE |
| 12:42PM | 11 | AMOUNT OF BLOOD THAT WOULD BE REQUIRED. |
| 12:42PM | 12 | IT WAS ALSO TO BE USED FOR MANUFACTURING.  AS I UNDERSTOOD |
| 12:43PM | 13 | IT IN THESE EARLY DAYS, YOU KNOW, THERE WAS A MANUFACTURING |
| 12:43PM | 14 | SYSTEM THAT THINGS WERE PUT TOGETHER BY HAND, AND THAT THE |
| 12:43PM | 15 | INTENT WAS TO SCALE UP AND MEET WHAT WAS EXPECTED TO BE LARGE |
| 12:43PM | 16 | DEMAND, THAT THERE WOULD HAVE TO BE SOME KIND OF AUTOMATED |
| 12:43PM | 17 | MANUFACTURING SYSTEM BUILT. |
| 12:43PM | 18 | Q.   WHAT DID YOU UNDERSTAND THERANOS MANUFACTURED? |
| 12:43PM | 19 | A.   SO THERANOS MANUFACTURED THE CARTRIDGES THAT THE BLOOD |
| 12:43PM | 20 | WOULD BE PLACED INTO, AS WELL AS THE READER THAT WOULD PERFORM |
| 12:43PM | 21 | THE ACTUAL TESTS ON THE BLOOD ON THE CARTRIDGE. |
| 12:43PM | 22 | Q.   IS "DEVICE" ANOTHER WORD FOR "READER" AS YOU'RE USING IT? |
| 12:43PM | 23 | A.   CORRECT. |
| 12:43PM | 24 | Q.   AND DID YOU HAVE AN UNDERSTANDING OF WHETHER, IN 2006, THE |
| 12:43PM | 25 | DEVICE WAS A MATURE TECHNOLOGY OR WHETHER IT WAS STILL GROWING, |

TOLBERT DIRECT BY MR. SCHENK                                      4446

```
12:43PM   1    DEVELOPING DIFFERENT GENERATIONS?

12:43PM   2    A.   YOU KNOW CERTAINLY, CERTAINLY MY UNDERSTANDING WAS THAT IT

12:44PM   3    WORKED AT THIS TIME.  YOU KNOW, THERE WERE PROJECTIONS THAT WE

12:44PM   4    HAD SEEN ABOUT DIFFERENT TRIALS AND DIFFERENT PHARMACEUTICAL

12:44PM   5    TRIALS THAT WOULD BE UNDERTAKEN, AND IN ORDER FOR THOSE TO BE

12:44PM   6    DONE, THERE HAD TO BE SOME KIND OF FUNCTIONING, YOU KNOW,

12:44PM   7    DEVICE OR READER SYSTEM.

12:44PM   8         THE EXPECTATION WAS THAT THAT WOULD CONTINUE TO ADVANCE

12:44PM   9    AND GET, YOU KNOW, MORE ROBUST OVER TIME.

12:44PM   10        BUT THERE WAS AT THIS TIME A FUNCTIONING PRODUCT.

12:44PM   11   Q.   IF YOU'LL TURN NOW TO THE NEXT PAGE, PAGE 3 OF THE

12:44PM   12   EXHIBIT.

12:44PM   13        AT THE TOP THERE'S A SUMMARY OF MS. HOLMES'S BACKGROUND.

12:44PM   14        DO YOU RECALL, WAS THAT DISCUSSED ON THE CALL?

12:44PM   15   A.   IT WAS.

12:44PM   16   Q.   AND THEN BELOW THAT THERE'S A SECTION CALLED FINANCIALS,

12:45PM   17   AND IT READS, "THE CURRENT BURN RATE $1 MILLION PER MONTH."

12:45PM   18        WHAT DOES THAT MEAN?

12:45PM   19   A.   THAT MEANS THAT THE COMPANY WAS SPENDING AROUND A MILLION

12:45PM   20   DOLLARS A MONTH IN OVERHEAD COSTS.

12:45PM   21   Q.   "$3 MILLION IN REVENUES SHOULD BE RECEIVED FOR 2 CONTRACTS

12:45PM   22   WHICH HAVE ALREADY BEEN SHIPPED.

12:45PM   23        "HAS SIGNED/IN NEGOTIATIONS CONTRACTS THROUGH 2007 FOR

12:45PM   24   $30-$50 MILLION.

12:45PM   25        "EXPECTS TO BE CASH FLOW POSITIVE BY THE FOURTH QUARTER OF
```

TOLBERT DIRECT BY MR. SCHENK

12:45PM  1   2007."

12:45PM  2        EXPLAIN TO ME THE SIGNIFICANCE OF THESE SIGNED CONTRACTS,

12:45PM  3   OR IN NEGOTIATION CONTRACTS AND CASH FLOW POSITIVE.

12:45PM  4   A.   CERTAINLY.  SO, YOU KNOW, AS WE HAD LOOKED AT FINANCIAL

12:45PM  5   PROJECTIONS AT THIS TIME, YOU KNOW, THAT WERE ANTICIPATED, YOU

12:45PM  6   KNOW, OUR UNDERSTANDING WAS THAT THERE WAS A SIGNIFICANT AMOUNT

12:45PM  7   OF REVENUES THAT WERE ALREADY IN PLACE BASED ON CONTRACTS THAT

12:46PM  8   HAD PRODUCT OUT THE DOOR TO THOSE COMPANIES, AS WELL AS, YOU

12:46PM  9   KNOW, SIGNIFICANT CONTRACTS THAT WERE SIGNED OR IN

12:46PM  10  NEGOTIATIONS, WHICH FELT LIKE, YOU KNOW, THAT WAS AN EXTREMELY

12:46PM  11  EXCITING PROSPECT.

12:46PM  12       AND THE LAST NOTE I MADE, "EXPECTS TO BE CASH FLOW

12:46PM  13  POSITIVE BY 4TH QUARTER 2007," SO THAT MEANS THAT THE CONTRACTS

12:46PM  14  THAT WOULD HAVE BEEN SHIPPED OR REVENUE WOULD HAVE BEEN

12:46PM  15  RECEIVED ON WOULD HAVE BEEN FOR MORE THAN ENOUGH CASH TO COVER

12:46PM  16  ALL OF THE OPERATIONAL EXPENSES SO THE COMPANY WOULD BE

12:46PM  17  PROFITABLE AT THAT POINT.

12:46PM  18  Q.   WERE THE STATEMENTS THAT YOU RECEIVED ABOUT GENERATION OF

12:46PM  19  REVENUE AND GOING CASH FLOW POSITIVE IN THE FOURTH QUARTER OF

12:46PM  20  2007 RELEVANT TO YOUR DUE DILIGENCE PROCESS?

12:47PM  21  A.   THEY WERE.

12:47PM  22  Q.   WHY?

12:47PM  23  A.   YOU KNOW, AS WE LOOK TO EVALUATE ANY INVESTMENT

12:47PM  24  OPPORTUNITY, YOU KNOW, THERE NEEDS TO BE A SYSTEM OR A BUSINESS

12:47PM  25  IN PLACE THAT CAN GENERATE ENOUGH MONEY TO MAKE THAT INVESTMENT

TOLBERT DIRECT BY MR. SCHENK                                    4448

12:47PM   1    WORTHWHILE TO MAKE, AND, YOU KNOW, THESE PROJECTIONS WERE SUCH

12:47PM   2    THAT IT MEANT THAT OUR INVESTMENT WOULD INCREASE AND BE WORTH

12:47PM   3    SOMETHING MORE THAN WE INVESTED INTO IT IN THE FIRST PLACE.

12:47PM   4         AND SO THAT'S WHY THESE ARE IMPORTANT NUMBERS TO LOOK AT.

12:47PM   5    Q.   YOU RECEIVED THIS INFORMATION AROUND OCTOBER OF 2006; IS

12:47PM   6    THAT RIGHT?

12:47PM   7    A.   CORRECT.

12:47PM   8    Q.   AND THE PROJECTIONS WERE FOR 2007, THE NEXT YEAR?

12:47PM   9    A.   CORRECT.

12:47PM  10    Q.   IS THAT CLOSE IN TIME SO YOU WOULD EXPECT THEM TO BE MORE

12:47PM  11    ACCURATE, OR IS THAT FAR INTO THE FUTURE SO THAT YOU APPRECIATE

12:48PM  12    THAT THERE IS A LACK OF CERTAINTY?

12:48PM  13    A.   WELL, AND I GUESS MAYBE TO CLARIFY, AS I REMEMBER, AND I

12:48PM  14    DON'T -- AS I REMEMBER, THOSE PROJECTIONS WERE FOR 2007 AND

12:48PM  15    2008, SO FOR TWO YEARS.

12:48PM  16         AND, YOU KNOW, CERTAINLY THE FARTHER OUT IN THE FUTURE THE

12:48PM  17    PROJECTIONS ARE, THE MORE VARIABILITY THERE MAY BE INTO HOW

12:48PM  18    THOSE ARE ACTUALLY RECEIVED.

12:48PM  19         BUT WE FELT SOME COMFORT OR SOME EXCITEMENT AROUND, YOU

12:48PM  20    KNOW, THE FACT THAT THE 2007 PROJECTIONS REPRESENTED WHAT WE

12:48PM  21    BELIEVED WERE CONTRACTS THAT HAD BEEN SIGNED OR WERE DEEP IN

12:48PM  22    NEGOTIATIONS.

12:48PM  23         IN FACT, I BELIEVE THERE WAS ACTUALLY A LIST OF WHAT

12:48PM  24    THOSE, YOU KNOW, DIFFERENT CONTRACTS WERE.  SO IT FELT LIKE

12:48PM  25    THERE WAS SOME MEASURE OF CERTAINTY AROUND THOSE.

TOLBERT DIRECT BY MR. SCHENK                                        4449

| | | |
|---|---|---|
| 12:48PM | 1 | Q. BECAUSE THE CONTRACTS ACTUALLY WERE SIGNED? |
| 12:49PM | 2 | A. SOME PORTION OF THEM HAD BEEN SIGNED. |
| 12:49PM | 3 | Q. OKAY. IF YOU'LL TURN IN YOUR BINDER NOW TO 4871. |
| 12:49PM | 4 | YOUR HONOR, THE GOVERNMENT OFFERS THIS BY STIPULATION. |
| 12:49PM | 5 | MR. DOWNEY: THAT'S CORRECT, YOUR HONOR. |
| 12:49PM | 6 | THE COURT: IT'S ADMITTED. IT MAY BE PUBLISHED. |
| 12:49PM | 7 | (GOVERNMENT'S EXHIBIT 4871 WAS RECEIVED IN EVIDENCE.) |
| 12:49PM | 8 | BY MR. SCHENK: |
| 12:49PM | 9 | Q. MR. TOLBERT, I'M GOING TO ASK YOU SOME QUESTIONS ABOUT THE |
| 12:49PM | 10 | INFORMATION ON PAGE 8 OF THE DOCUMENT, BUT IF YOU COULD JUST |
| 12:49PM | 11 | TAKE A MOMENT AND LOOK THROUGH THIS EXHIBIT AND EXPLAIN TO THE |
| 12:49PM | 12 | JURY WHAT THIS EXHIBIT IS, 4871. |
| 12:49PM | 13 | A. SO THIS DOCUMENT REPRESENTS INFORMATION THAT WOULD HAVE |
| 12:49PM | 14 | BEEN GIVEN TO US IN THAT DUE DILIGENCE PROCESS IN 2006. IT |
| 12:49PM | 15 | WOULD HAVE CONTAINED SOME DETAILED INFORMATION ABOUT, YOU KNOW, |
| 12:49PM | 16 | WHO THE OFFICERS AND DIRECTORS OF THE COMPANY WERE, KIND OF |
| 12:50PM | 17 | WHAT THE COMPANY DID, AS WELL AS THE FINANCIAL PROJECTIONS |
| 12:50PM | 18 | THEN. |
| 12:50PM | 19 | Q. YOU RECEIVED THIS INFORMATION BEFORE YOU MADE A DECISION |
| 12:50PM | 20 | TO INVEST IN 2006? |
| 12:50PM | 21 | A. CORRECT. |
| 12:50PM | 22 | Q. IF YOU'LL LOOK AT PAGE 8, THERE ARE SOME CHARTS AND THE |
| 12:50PM | 23 | ONE THAT WE'RE LOOKING AT NOW, THE TOP IS CALLED THERANOS PLAN |
| 12:50PM | 24 | '06, BASE FORECAST, AND THEN THERE IS INCOME STATEMENT WITH A |
| 12:50PM | 25 | LINE FOR REVENUE. |

4450
TOLBERT DIRECT BY MR. SCHENK

12:50PM 1         DO YOU SEE THAT?

12:50PM 2    A.   I DO SEE THAT.

12:50PM 3    Q.   AND THEN WE SEE TIME GOING ACROSS THE COLUMNS ALONG THE

12:50PM 4    RIGHT.

12:50PM 5         IS THAT CORRECT?

12:50PM 6    A.   THAT IS CORRECT.

12:50PM 7    Q.   FROM THE THIRD QUARTER OF 2006 THROUGH THE FOURTH QUARTER

12:50PM 8    OF 2008?

12:50PM 9    A.   CORRECT.

12:50PM 10    Q.   IF YOU COULD EXPLAIN TO THE JURY, WHAT IS HAPPENING TO THE

12:50PM 11    REVENUE OVER THAT PERIOD OF TIME?

12:50PM 12    A.   SO THE REVENUE IN, YOU KNOW, Q4 OF '06 WHEN WE WERE HAVING

12:50PM 13    THESE DISCUSSIONS WAS ZERO, BUT, YOU KNOW, IT STARTS IN THE

12:51PM 14    BEGINNING OF 2007 TO BE -- I CAN'T TELL IF THAT'S A --

12:51PM 15    4.6 MILLION IN THE FIRST QUARTER GROWING TO 67 MILLION IN THE

12:51PM 16    FOURTH QUARTER OF '08, SO A SIGNIFICANT INCREASE IN REVENUE

12:51PM 17    OVER THAT PERIOD OF TIME.

12:51PM 18    Q.   YOU SAID THAT THE NUMBER FOR Q1 2007 IS ABOUT

12:51PM 19    $4.6 MILLION; IS THAT RIGHT?

12:51PM 20    A.   CORRECT.

12:51PM 21    Q.   AND CNA YOU EXPLAIN TO THE JURY THE CONVENTION THAT'S USED

12:51PM 22    FOR REVENUE AND IF THE ZEROS ARE ADDED?

12:51PM 23    A.   SO TYPICALLY ON THESE STATEMENTS, IN ORDER TO MAKE THE

12:51PM 24    NUMBERS EASY TO READ AND DEAL WITH, YOU TAKE OFF THE LAST THREE

12:51PM 25    ZEROS.  SO YOU DIVIDE IT BY 1,000.

4451

TOLBERT DIRECT BY MR. SCHENK

12:51PM  1       SO THESE NUMBERS WOULD ALL HAVE HAD, YOU KNOW, THREE

12:51PM  2   ZEROS, OR HAVE BEEN IN THE MILLIONS OF DOLLARS.

12:51PM  3   Q.   OKAY.  AND NOW IF WE'LL LOOK AT THE BOTTOM OF THIS CHART

12:52PM  4   THAT YOU'RE LOOKING AT NOW, THE ROW CALLED NET INCOME, IT

12:52PM  5   BEGINS IN 2006 WITH NUMBERS THAT ARE IN PARENTHETICALS, BUT

12:52PM  6   THEN IT STOPS THAT AS WE MOVE ALONG IN TIME.

12:52PM  7       WHAT IS THAT INDICATING?

12:52PM  8   A.   SO THAT NET INCOME LINE REPRESENTS WHAT THE REVENUE AND

12:52PM  9   INCOME WAS, MINUS THE EXPENSES.  AND SO WHEN WE WERE

12:52PM 10   ANTICIPATING THIS INVESTMENT IN 2006, YOU CAN SEE THAT FOR THE

12:52PM 11   FOURTH QUARTER, THE COMPANY EXPECTED TO SPEND $5 MILLION MORE

12:52PM 12   THAN IT MADE.

12:52PM 13       SO THE NET INCOME WAS NEGATIVE $5 MILLION.

12:52PM 14       BUT OVER TIME, BASED ON WHAT THE PROJECTIONS FOR THEIR

12:52PM 15   REVENUE WAS, MINUS THOSE EXPENSES, GREW TO ABOUT $12 MILLION A

12:52PM 16   QUARTER.

12:52PM 17   Q.   AND WE SEE THE NUMBER BECOMING POSITIVE IN THE FOURTH

12:53PM 18   QUARTER OF 2007?

12:53PM 19   A.   CORRECT.

12:53PM 20   Q.   AND WAS THAT REFLECTED IN THE NOTES THAT WE LOOKED AT A

12:53PM 21   MOMENT AGO?

12:53PM 22   A.   CORRECT.  SO THAT WAS, THAT WAS WHAT THE DISCUSSION HAD

12:53PM 23   BEEN THAT -- AND IN '07 IS WHEN THINGS TURNED INTO A POSITIVE

12:53PM 24   CASH FLOW POSITION.

12:53PM 25   Q.   IN ADDITION TO THE PHONE CALL THAT YOU TALKED ABOUT AND

4452

TOLBERT DIRECT BY MR. SCHENK

12:53PM  1    REVIEWING DOCUMENTS, AS PART OF DUE DILIGENCE, DID YOU ALSO GO

12:53PM  2    FROM TEXAS TO CALIFORNIA AT SOME POINT?

12:53PM  3    A.   I DID MAKE A TRIP TO CALIFORNIA.

12:53PM  4    Q.   DO YOU REMEMBER GENERALLY WHEN THAT WAS?

12:53PM  5    A.   I BELIEVE IT WAS EARLY NOVEMBER OF 2006.

12:53PM  6    Q.   WAS THAT BEFORE A DECISION REGARDING AN INVESTMENT WAS

12:53PM  7    MADE?

12:53PM  8    A.   IT WAS.

12:53PM  9    Q.   AND WHAT DID YOU DO IN CALIFORNIA?

12:53PM  10   A.   SO AS PART OF MY TRIP, I WENT TO DINNER WITH DON LUCAS AND

12:53PM  11   CHRIS LUCAS AND ELIZABETH HOLMES AND, YOU KNOW, WE SPENT, AS I

12:53PM  12   REMEMBER, A FEW HOURS AT DINNER THAT NIGHT TALKING ABOUT WHAT

12:54PM  13   THERANOS DID, TALKING ABOUT ELIZABETH'S VISION FOR THE COMPANY.

12:54PM  14        YOU KNOW, WE ALSO, I'M SURE, HEARD SOME FUN STORIES FROM

12:54PM  15   DON LUCAS, YOU KNOW, ABOUT HIS INVESTMENT CAREER.

12:54PM  16        BUT IT WAS MOSTLY FOCUSSED ON THERANOS AND WHAT THE

12:54PM  17   OPPORTUNITY WAS.

12:54PM  18   Q.   DID MS. HOLMES DESCRIBE TO YOU THE TECHNOLOGY?

12:54PM  19   A.   SHE DID.

12:54PM  20   Q.   AND DID THAT DESCRIPTION CHANGE YOUR UNDERSTANDING?

12:54PM  21        YOU DESCRIBED EARLIER THINKING THAT THEY HAD A READER THAT

12:54PM  22   TESTED BLOOD ON A CARTRIDGE DRAWN FROM A FINGERSTICK.

12:54PM  23        WAS THE DESCRIPTION THAT YOU RECEIVED DURING DINNER

12:54PM  24   CONSISTENT WITH THAT, OR DID YOU LEARN SOMETHING DIFFERENT?

12:54PM  25   A.   YEAH, I WOULD SAY IT DIDN'T, IT DIDN'T CHANGE IT THAT

TOLBERT DIRECT BY MR. SCHENK                                    4453

12:54PM   1    MUCH.  IT AMPLIFIED IT.  I CAME AWAY WITH A MUCH BETTER

12:54PM   2    UNDERSTANDING OF WHAT IT WOULD DO AND WHAT THE VISION WAS FOR

12:54PM   3    WHERE IT MAY GO.

12:54PM   4        BUT THE BASIC THESIS WAS THE SAME.

12:55PM   5    Q.   AND DID YOU ALSO VISIT THERANOS HEADQUARTERS DURING THIS

12:55PM   6    TRIP?

12:55PM   7    A.   YOU KNOW, AS I RECALL I DID.  IT WAS EITHER THAT DAY

12:55PM   8    BEFORE DINNER OR MAYBE THE NEXT MORNING.  I DON'T REMEMBER.

12:55PM   9    Q.   DID YOU LOOK AT ANY OF THE DEVICES THAT THERANOS

12:55PM   10   MANUFACTURED?

12:55PM   11   A.   YOU KNOW, I DON'T RECALL KIND OF TAKING A TOUR AND SEEING

12:55PM   12   THE DEVICES.  I DO KNOW -- I MAY HAVE.  I JUST DON'T REMEMBER.

12:55PM   13       I DID COME HOME FROM THAT TRIP WITH A CARTRIDGE, AN EARLY

12:55PM   14   VERSION OF THE CARTRIDGE THAT HAD A PLACE WHERE THE FINGERSTICK

12:55PM   15   BLOOD WOULD GO IN.

12:55PM   16       SO AT SOME POINT, YOU KNOW, I SAW SOMETHING THAT WOULD

12:55PM   17   HAVE BEEN RELATED TO THOSE DEVICES.  BUT I, I DON'T REMEMBER

12:55PM   18   TAKING A TOUR.

12:55PM   19   Q.   DID MS. HOLMES GIVE YOU THAT CARTRIDGE?

12:55PM   20   A.   I DON'T REMEMBER IF SHE DID OR IF SOMEBODY ELSE DID WHILE

12:55PM   21   I WAS THERE.

12:55PM   22   Q.   WHEN YOU THEN RETURNED TO TEXAS, DID YOU MAKE A

12:55PM   23   RECOMMENDATION REGARDING AN INVESTMENT IN THERANOS?

12:55PM   24   A.   YOU KNOW, AT SOME POINT AFTER THAT I WOULD HAVE RECOUNTED,

12:56PM   25   YOU KNOW, THE EXPERIENCE THAT I HAD AND MY TAKEAWAYS FROM THAT,

TOLBERT DIRECT BY MR. SCHENK

12:56PM 1    AND AT SOME POINT AFTER THAT MR. HALL AND I MADE A DECISION TO

12:56PM 2    INVEST.

12:56PM 3    Q.   AND HOW MUCH DID YOU DECIDE TO INVEST?

12:56PM 4    A.   SO OUR INVESTMENT IN 2006 WAS $2 MILLION.

12:56PM 5    Q.   AND, AGAIN, THAT WAS THROUGH BLACK DIAMOND VENTURES; IS

12:56PM 6    THAT RIGHT?

12:56PM 7    A.   CORRECT.  SO IN ESSENCE WE JOINED CHRIS LUCAS'S FUND.  WE

12:56PM 8    COMMITTED $2 MILLION TO THAT FUND THAT WAS ULTIMATELY

12:56PM 9    AGGREGATED WITH OTHER INVESTORS, I BELIEVE, AND INVESTED INTO

12:56PM 10   THE COMPANY.

12:56PM 11   Q.   OKAY.  AND WAS THAT LATE 2006, OR SOMETIME AFTER THE

12:56PM 12   EVENTS THAT WE HAVE TALKED ABOUT IN 2006?

12:56PM 13   A.   YES, IT'S AFTER -- IT'S AFTER MY TRIP OUT.

12:56PM 14   Q.   I'D LIKE TO NOW TAKE A CHUNK OF TIME ALL AT ONCE WITH YOU.

12:56PM 15       FROM THIS TIME IN 2006 WHEN THIS INVESTMENT WAS MADE UNTIL

12:57PM 16   2013, HOW MUCH, IF ANY, COMMUNICATION DID YOU HAVE WITH

12:57PM 17   MS. HOLMES DURING THAT PERIOD OF TIME?

12:57PM 18   A.   NONE THAT I RECALL.

12:57PM 19   Q.   HOW ABOUT WITH ANYBODY FROM THERANOS?

12:57PM 20   A.   YOU KNOW, I DON'T RECALL ANY, ANY DIRECT COMMUNICATION

12:57PM 21   WITH ANYBODY AT THE COMPANY OVER THAT PERIOD OF TIME.

12:57PM 22   Q.   DID YOU RECEIVE ANY UPDATES AT ALL ABOUT YOUR INVESTMENT

12:57PM 23   IN THERANOS?

12:57PM 24   A.   I DID.

12:57PM 25       BECAUSE WE HAD INVESTED THROUGH CHRIS LUCAS'S, THROUGH

4455

TOLBERT DIRECT BY MR. SCHENK

12:57PM   1    BLACK DIAMOND VENTURES, I HAD REGULAR CONVERSATIONS WITH

12:57PM   2    MR. LUCAS ABOUT, YOU KNOW, ABOUT OUR INVESTMENT, ABOUT HOW

12:57PM   3    THINGS WERE GOING.

12:57PM   4         YOU KNOW, AS I UNDERSTOOD, MR. LUCAS WAS A PRETTY REGULAR

12:57PM   5    VISITOR AT THE COMPANY HEADQUARTERS AND, YOU KNOW, MAY HAVE HAD

12:57PM   6    SOME PROJECTS THAT HE WAS WORKING ON.

12:57PM   7         ANYWAY, HE WAS A REGULAR SOURCE OF INFORMATION FOR US

12:57PM   8    THROUGH THOSE YEARS.

12:57PM   9    Q.   OKAY.  WERE THERE ANY OTHER SOURCES OF INFORMATION DURING

12:57PM   10   THAT PERIOD OF TIME?  DID YOU LOOK ON THE INTERNET OR ANY OTHER

12:58PM   11   PUBLIC SOURCES?

12:58PM   12   A.   YOU KNOW, CERTAINLY I WOULD HAVE LOOKED AT GOOGLE OR THE

12:58PM   13   INTERNET.

12:58PM   14        YOU KNOW, DURING THAT TIME, AS I RECALL, THERE WAS NOT

12:58PM   15   MUCH PUBLIC INFORMATION THAT WAS PUBLICLY AVAILABLE.

12:58PM   16        YOU KNOW, IN MY CONVERSATIONS WITH CHRIS, I THINK THAT WAS

12:58PM   17   BY DESIGN, OR I UNDERSTOOD IT WAS BY DESIGN, THAT THE COMPANY

12:58PM   18   DIDN'T WANT TO LOSE A COMPETITIVE ADVANTAGE BY HAVING, YOU

12:58PM   19   KNOW, LOTS OF INFORMATION OUT IN THE PUBLIC DOMAIN.

12:58PM   20   Q.   YOU WEREN'T SURPRISED THAT THERE WASN'T MORE IN THE PUBLIC

12:58PM   21   DOMAIN?

12:58PM   22   A.   NO.  IN FACT, I WAS ENCOURAGED BECAUSE IT FELT LIKE A --

12:58PM   23   IT DID FEEL LIKE A REVOLUTIONARY TECHNOLOGY THAT YOU WANTED TO

12:58PM   24   KIND OF PRESERVE AN ADVANTAGE.

12:58PM   25   Q.   OKAY.  WE SAW IN YOUR NOTES FROM 2006 THE IPO, AND I THINK

TOLBERT DIRECT BY MR. SCHENK

| 12:58PM | 1 | IT WAS THE FIRST QUARTER OF 2008. |
| 12:58PM | 2 | DID YOU KNOW WHETHER THAT HAPPENED? |
| 12:58PM | 3 | A.   IT DID NOT HAPPEN. |
| 12:58PM | 4 | Q.   OKAY.  WE SAW IN YOUR NOTES THAT THE COMPANY WAS GOING TO |
| 12:59PM | 5 | BECOME CASH FLOW POSITIVE AT ONE POINT. |
| 12:59PM | 6 | DID YOU RECEIVE ANY INFORMATION ABOUT WHETHER THAT |
| 12:59PM | 7 | HAPPENED? |
| 12:59PM | 8 | A.   YOU KNOW, CHRIS AND I WOULD HAVE HAD SOME CONVERSATIONS |
| 12:59PM | 9 | ABOUT THAT.  I DON'T RECALL WITH SPECIFICS, YOU KNOW, KNOWING |
| 12:59PM | 10 | IF OR WHEN THE COMPANY BECAME CASH FLOW POSITIVE. |
| 12:59PM | 11 | Q.   OKAY.  LET'S NOW TURN TO 2013, AND IF YOU'LL LOOK IN THAT |
| 12:59PM | 12 | BINDER AT 3940. |
| 12:59PM | 13 | MR. TOLBERT, IS THIS AN EMAIL FROM CHRIS LUCAS TO YOU |
| 12:59PM | 14 | ABOUT THERANOS? |
| 12:59PM | 15 | A.   IT IS. |
| 12:59PM | 16 | MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 3940. |
| 12:59PM | 17 | MR. DOWNEY:  NO OBJECTION, YOUR HONOR. |
| 12:59PM | 18 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 12:59PM | 19 | (GOVERNMENT'S EXHIBIT 3940 WAS RECEIVED IN EVIDENCE.) |
| 01:00PM | 20 | MR. SCHENK:  THANK YOU. |
| 01:00PM | 21 | Q.   FIRST LET'S NOTE THE TIME.  IT'S JULY NOW, THE END OF |
| 01:00PM | 22 | JULY 2013. |
| 01:00PM | 23 | CHRIS LUCAS SENDS YOU AN EMAIL AND THE SUBJECT IS THERANOS |
| 01:00PM | 24 | NEW BOARD MEMBERS. |
| 01:00PM | 25 | DO YOU SEE THAT? |

TOLBERT DIRECT BY MR. SCHENK                                    4457

01:00PM  1    A.   I DO.

01:00PM  2    Q.   "THERANOS LAUNCHED THEIR NEW WEBSITE THIS MORNING AND

01:00PM  3    ANNOUNCED NEW BOARD MEMBERS.

01:00PM  4         "SHE IS CLEARLY ASSEMBLING AN IMPRESSIVE GROUP.

01:00PM  5         "HOPEFULLY, THIS ALSO MEANS THAT WE WILL START RECEIVING

01:00PM  6    MORE COMMUNICATION FROM THE COMPANY."

01:00PM  7         FIRST, IS THIS THE TYPE OF INFORMATION THAT YOU WOULD

01:00PM  8    RECEIVE FROM MR. LUCAS OVER THE YEARS?

01:00PM  9    A.   CERTAINLY THIS KIND OF INFORMATION, OR ANYTHING THAT FELT

01:00PM 10    LIKE IT WAS NEWS OR DEVELOPMENT I FELT LIKE HE WOULD RELAY TO

01:00PM 11    ME.

01:00PM 12         SO, YOU KNOW, WE HAD HAD SOME CONVERSATIONS IN ADVANCE OF

01:00PM 13    JULY ABOUT, YOU KNOW, THE POSSIBILITY THAT THERE WOULD BE AN

01:00PM 14    ANNOUNCEMENT OF A BOARD.

01:00PM 15         AND SO, YOU KNOW, HE WAS, AS I REMEMBER, EXCITED TO HAVE

01:01PM 16    SOMETHING TO SEND TO ME THAT WAS PUBLIC THAT, YOU KNOW,

01:01PM 17    EVIDENCED SOME GREAT MOMENTUM ON THE COMPANY'S PART.

01:01PM 18    Q.   MR. LUCAS WROTE THAT, HOPEFULLY, THIS MEANS THAT WE WILL

01:01PM 19    START RECEIVING MORE INFORMATION FROM THE COMPANY.

01:01PM 20         WHAT DID YOU TAKE THAT TO MEAN?

01:01PM 21    A.   YOU KNOW, CHRIS AND I HAD HAD LOTS OF CONVERSATIONS OVER

01:01PM 22    THOSE INTERVENING YEARS ABOUT, YOU KNOW, JUST WANTING

01:01PM 23    INFORMATION, MORE FINANCIAL INFORMATION, AND MORE VISIBILITY AS

01:01PM 24    TO WHAT WAS GOING ON.

01:01PM 25         SO AS I RECALL, WE HAD SOME SPECIFIC CONVERSATIONS AROUND

TOLBERT DIRECT BY MR. SCHENK                          4458

01:01PM   1   THIS TIME THAT MAYBE THIS MEANT THERE WAS A DAY THAT THAT

01:01PM   2   CONVERSATION WOULD BECOME MORE FREQUENT, MORE OPEN.

01:01PM   3   Q.   AND DID YOU AGREE WITH THIS SENTIMENT, THAT THE COMPANY

01:01PM   4   HADN'T PROVIDED A LOT OF INFORMATION AND HOPEFULLY THEY WOULD

01:02PM   5   START TO PROVIDE MORE?

01:02PM   6   A.   CORRECT.

01:02PM   7   Q.   AND IS AN EXAMPLE OF THEM PROVIDING MORE INFORMATION A

01:02PM   8   PHONE CALL, FOR INSTANCE, BETWEEN YOU AND MS. HOLMES WHERE YOU

01:02PM   9   COULD LEARN MORE ABOUT THE COMPANY?  IS THAT THE KIND OF THING

01:02PM  10   THAT YOU WANTED?

01:02PM  11   A.   YOU KNOW, CERTAINLY THAT WOULD HAVE WELCOMED.  BECAUSE WE

01:02PM  12   WEREN'T A DIRECT INVESTOR AT THIS POINT, I WOULDN'T HAVE

01:02PM  13   EXPECTED THAT KIND OF DIRECT COMMUNICATION FROM THE COMPANY.

01:02PM  14        YOU KNOW, I WOULD HAVE EXPECTED SOME DIRECT COMMUNICATION

01:02PM  15   WITH CHRIS, WHO THEN WOULD HAVE KIND OF REFLECTED THAT TO US.

01:02PM  16   Q.   I SEE.

01:02PM  17        IF YOU'LL NOW TURN TO EXHIBIT 949.

01:02PM  18        IS THIS AN EMAIL CHAIN FROM AN EMPLOYEE AT CHRIS LUCAS'S

01:02PM  19   FUND, AND YOU, CONTAINING INFORMATION ABOUT THERANOS?

01:02PM  20   A.   THAT'S CORRECT.

01:02PM  21             MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 949.

01:03PM  22             MR. DOWNEY:  NO OBJECTION.

01:03PM  23             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:03PM  24        (GOVERNMENT'S EXHIBIT 949 WAS RECEIVED IN EVIDENCE.)

01:03PM  25   BY MR. SCHENK:

4459

TOLBERT DIRECT BY MR. SCHENK

01:03PM  1    Q.   LET'S ACTUALLY START AT THE TOP OF THIS DOCUMENT,

01:03PM  2    MR. TOLBERT.

01:03PM  3         FIRST, THIS IS FROM SOMEONE NAMED ANA QUINTANA.

01:03PM  4         DO YOU KNOW WHO THAT IS?

01:03PM  5    A.   I DO.  SHE WORKS WITH CHRIS LUCAS AT BLACK DIAMOND

01:03PM  6    VENTURES.

01:03PM  7    Q.   SO SHE'S WRITING TO YOU IN AUGUST, SO A FEW DAYS LATER

01:03PM  8    FROM THAT EMAIL FROM MR. LUCAS, "PLEASE FIND THE SHAREHOLDER

01:03PM  9    LETTER BELOW.

01:03PM  10        THE SUBJECT LINE IS BLACK DIAMOND VENTURES THERANOS

01:03PM  11   SHAREHOLDER LETTER.

01:03PM  12        DO YOU SEE THAT?

01:03PM  13   A.   YES, I DO.

01:03PM  14   Q.   AND BELOW THIS EMAIL NOW, AT THE BOTTOM OF THIS FIRST

01:03PM  15   PAGE, MS. QUINTANA IS FORWARDING TO YOU ANOTHER EMAIL THAT

01:04PM  16   SAYS, "BELOW PLEASE FIND A SHAREHOLDER UPDATE LETTER FROM

01:04PM  17   THERANOS CEO ELIZABETH HOLMES."

01:04PM  18        DO YOU SEE THAT?

01:04PM  19   A.   I DO SEE THAT.

01:04PM  20   Q.   SO THAT'S AT THE VERY BOTTOM OF THIS FIRST PAGE.

01:04PM  21        NOW, IF YOU'LL TURN WITH ME TO PAGE 2.

01:04PM  22        THERE'S AN EMAIL FROM AND TO THERANOS FROM JULY OF 2013,

01:04PM  23   "DEAR SHAREHOLDER.

01:04PM  24        "IT IS WITH GREAT PLEASURE THAT I WRITE TO INFORM YOU OF

01:04PM  25   OUR UPCOMING CONSUMER LAUNCH."

TOLBERT DIRECT BY MR. SCHENK

01:04PM  1      DID YOU KNOW WHAT THAT WAS A REFERENCE TO?

01:04PM  2   A.   AT THIS TIME THERANOS WAS UNDERTAKING A CONSUMER LAUNCH

01:04PM  3   WHERE, IN PARTNERSHIP WITH DIFFERENT RETAIL ESTABLISHMENTS, TO

01:05PM  4   BE ABLE TO TAKE THEIR TECHNOLOGY DIRECTLY TO THE CONSUMER AND

01:05PM  5   PUT IT IN CLOSE PROXIMITY TO WHERE THE CONSUMERS WERE.

01:05PM  6   Q.   DO YOU KNOW IF, AT THIS TIME, YOU KNEW WHICH STORES OR

01:05PM  7   WHICH COMPANIES THERANOS WAS IN PARTNERSHIP WITH?

01:05PM  8   A.   YOU KNOW, AT THIS TIME IN JULY I DON'T BELIEVE THAT I KNEW

01:05PM  9   SPECIFICALLY.  CHRIS AND I HAD HAD SEVERAL CONVERSATIONS OVER

01:05PM 10   THE YEARS.

01:05PM 11      I SAY "OVER THE YEARS."  IN THOSE CONVERSATIONS THAT CHRIS

01:05PM 12   AND I WOULD HAVE HAD, I KNEW THAT THERE WAS A BUILDOUT BY SOME

01:05PM 13   MAJOR RETAIL CHAINS.  I THINK I KNEW THAT SAFEWAY WAS ONE OF

01:05PM 14   THOSE.  YOU KNOW, AND THERE WAS SPECULATION ABOUT WHO THE

01:05PM 15   OTHERS WOULD HAVE BEEN.

01:05PM 16      BUT I DON'T, I DON'T RECALL IF I KNEW KIND OF WHO AND

01:05PM 17   WHERE EXACTLY AT THIS POINT.

01:05PM 18   Q.   OKAY.  THE EMAIL CONTINUES.  "AS YOU ALL KNOW, WE HAVE

01:05PM 19   BEEN WORKING IN STEALTH MODE FOR SEVERAL YEARS TO PREPARE FOR

01:05PM 20   THIS."

01:05PM 21      WHAT IS STEALTH MODE A REFERENCE TO, IF YOU KNOW?

01:06PM 22   A.   YOU KNOW, I ASSUME IT'S, YOU KNOW, TRYING TO WORK BELOW

01:06PM 23   THE RADAR SO THAT YOU DON'T LOSE A COMPETITIVE ADVANTAGE BY

01:06PM 24   HAVING, YOU KNOW, OTHER PEOPLE KNOW THAT THE TECHNOLOGY IS

01:06PM 25   COMING AND IT'S GOING TO BE ROLLED OUT.

TOLBERT DIRECT BY MR. SCHENK

01:06PM  1      AND SO, YOU KNOW, IN PART THAT'S WHY I THINK -- OR AT

01:06PM  2  LEAST THAT'S WHY I HADN'T BEEN AS CONCERNED THROUGH THOSE YEARS

01:06PM  3  AT THE LACK OF INFORMATION THAT WE HAD BECAUSE IT FELT LIKE

01:06PM  4  THERE WAS A SPECIFIC PURPOSE THAT, YOU KNOW, WAS BEING

01:06PM  5  ANTICIPATED.

01:06PM  6      BUT TO ANSWER YOUR QUESTION, WORKING IN STEALTH MODE WAS

01:06PM  7  TO TRY TO DO IT SO THAT THEY COULD CAPITALIZE ON THE MARKET

01:06PM  8  WITHOUT A LOT OF COMPETITION AT THE MOMENT WHEN THEY LAUNCHED.

01:06PM  9  Q.   SO WAS THE LACK OF INFORMATION THAT YOU RECEIVED FROM AT

01:06PM  10  LEAST 2006 TO 2013 SOMETHING THAT YOU THOUGHT WAS INTENTIONAL,

01:07PM  11  INTENTIONAL BY THERANOS?

01:07PM  12  A.   I CERTAINLY THOUGHT THAT IT WAS INTENTIONAL THAT THEY WERE

01:07PM  13  TRYING TO KEEP THINGS UNDER WRAPS.

01:07PM  14  Q.   THE NEXT SENTENCE IS, "WITH THIS LAUNCH, WE WILL BEGIN

01:07PM  15  SENDING INFORMATION TO OUR SHAREHOLDERS THROUGH EMAIL BRIEFS."

01:07PM  16      WHAT DID THAT MEAN TO YOU?

01:07PM  17  A.   YOU KNOW, IT MEANT THAT, YOU KNOW, BECAUSE THEY HAD COME

01:07PM  18  TO A POINT IN TIME WHERE THEY ANTICIPATED BEING MORE PUBLIC

01:07PM  19  ABOUT THE PROGRESS THE COMPANY WAS MAKING WITH THE

01:07PM  20  SHAREHOLDERS, THAT THEY WOULD SEND OUT EMAILS DIRECTLY TO THE

01:07PM  21  SHAREHOLDERS WITH UPDATED INFORMATION.

01:07PM  22  Q.   AND IT CONTINUES.

01:07PM  23      OUR FIRST WEBSITE CONTENT IS UP TODAY.  THE BOARD IS

01:07PM  24  PUBLICLY LISTED AND THEY DID THEIR COMPANY'S FIRST PRESS

01:07PM  25  RELEASE.

TOLBERT DIRECT BY MR. SCHENK                                          4462

```
01:07PM   1              DO YOU SEE THAT?

01:07PM   2      A.   I DO.

01:07PM   3      Q.   AND THEN ON THE NEXT PAGE AT THE BOTTOM, DO YOU SEE

01:08PM   4      INFORMATION REGARDING THE ADDITION OF MEMBERS OF THE BOARD OF

01:08PM   5      DIRECTORS?

01:08PM   6      A.   I DO.

01:08PM   7      Q.   "THERANOS ANNOUNCED TODAY THAT RICHARD KOVACEVICH AND

01:08PM   8      GENERAL JAMES MATTIS WERE APPOINTED TO ITS BOARD OF DIRECTORS."

01:08PM   9              DO YOU SEE THAT?

01:08PM  10      A.   I DO SEE THAT.

01:08PM  11      Q.   AND THEN FURTHER DOWN THERE'S SOME PRESS LINKS, A MARKET

01:08PM  12      WATCH AND A CNBC.

01:08PM  13              DO YOU SEE THAT?

01:08PM  14      A.   I DO.

01:08PM  15      Q.   WERE THERE OCCASIONS WHEN THERANOS SENT INFORMATION TO YOU

01:08PM  16      THAT INCLUDED LINKS TO ARTICLES IN THE PRESS?

01:08PM  17      A.   YOU KNOW, JUST TO BE CLEAR, THEY DIDN'T SEND IT TO ME

01:08PM  18      BECAUSE WE WERE NOT A DIRECT INVESTOR.  BUT THEY WOULD HAVE

01:08PM  19      SENT IT TO MR. LUCAS, AND MR. LUCAS WOULD HAVE FORWARDED IT TO

01:08PM  20      ME AND SO I WOULD HAVE RECEIVED THE LINKS.

01:08PM  21      Q.   YOU RECEIVED THIS THROUGH YOUR INVESTMENT IN BLACK DIAMOND

01:08PM  22      VENTURES?

01:08PM  23      A.   CORRECT.

01:08PM  24      Q.   AND DID YOU THINK THE CONTENT OF THESE ARTICLES THAT WAS

01:08PM  25      SENT ALONG TO INVESTORS WOULD BE ACCURATE?
```

TOLBERT DIRECT BY MR. SCHENK                                    4463

01:09PM   1    A.   I DID.

01:09PM   2    Q.   IF YOU'LL NOW TURN TO EXHIBIT 4030, EXHIBIT 4030.

01:09PM   3         MR. TOLBERT, WHAT IS THIS DOCUMENT?

01:09PM   4    A.   THIS IS AN EMAIL THAT WE WOULD HAVE GOTTEN FROM

01:09PM   5    MR. LUCAS'S BLACK DIAMOND VENTURES ABOUT AN ANNUAL MEETING THAT

01:09PM   6    THEY WERE HAVING TO REVIEW THE INVESTMENTS THAT WERE MADE IN

01:09PM   7    THEIR FUND.

01:09PM   8    Q.   AND THEN THERE'S AN ATTACHMENT BEGINNING ON PAGE 3.

01:09PM   9         DO YOU RECOGNIZE THAT ATTACHMENT?

01:09PM   10   A.   CORRECT.   SO ONE OF THEIR PORTFOLIO INVESTMENT COMPANIES

01:09PM   11   WAS OBVIOUSLY THERANOS, AND SO THIS WAS A, YOU KNOW, AN UPDATE

01:10PM   12   ON THEIR INVESTMENT AT THERANOS THAT THEY FORWARDED ALONG IN

01:10PM   13   ANTICIPATION OF THEIR SHAREHOLDER MEETING.

01:10PM   14           MR. SCHENK:   YOUR HONOR, THE GOVERNMENT OFFERS 4030.

01:10PM   15           MR. DOWNEY:   NO OBJECTION, YOUR HONOR.

01:10PM   16           THE COURT:   IT'S ADMITTED.   IT MAY BE PUBLISHED.

01:10PM   17       (GOVERNMENT'S EXHIBIT 4030 WAS RECEIVED IN EVIDENCE.)

01:10PM   18   BY MR. SCHENK:

01:10PM   19   Q.   MR. TOLBERT, THE EMAIL IS FROM AN INDIVIDUAL NAMED

01:10PM   20   YASMIN IBARRA.

01:10PM   21       DO YOU KNOW WHO THAT IS?

01:10PM   22   A.   SHE WAS AN EMPLOYEE AT BLACK DIAMOND VENTURES.

01:10PM   23   Q.   AND ALSO LOOK AT THE ATTACHMENT STARTING ON PAGE 6.

01:10PM   24       ON PAGE 6 AT THE BOTTOM OF THE SLIDE, WELL, AT THE TOP IT

01:10PM   25   READS "NEWLY DEVELOPED WEBSITE."

TOLBERT DIRECT BY MR. SCHENK

01:10PM   1        DID YOU UNDERSTAND THAT THERANOS HAD RECENTLY UPDATED OR

01:10PM   2    DEVELOPED ITS WEBSITE?

01:10PM   3    A.   I DID.  I WOULD HAVE -- AS SOON AS THE WEBSITE WOULD HAVE

01:10PM   4    BEEN AVAILABLE, I WOULD HAVE LOOKED AT IT.

01:10PM   5    Q.   AT THE BOTTOM IT READS, "FOR THE FIRST TIME, THERANOS IS

01:10PM   6    INTRODUCING CLIA-CERTIFIED LABORATORY SERVICES WITH THE ABILITY

01:11PM   7    TO RUN ITS TEST ON MICRO-SAMPLES."

01:11PM   8        IS THAT CONSISTENT WITH YOUR UNDERSTANDING OF THE THERANOS

01:11PM   9    TECHNOLOGY?

01:11PM   10   A.   IT IS.

01:11PM   11   Q.   AND IS THAT ALSO CONSISTENT WITH THE WAY THAT MS. HOLMES

01:11PM   12   EXPLAINED THE TECHNOLOGY TO YOU?

01:11PM   13   A.   YEAH.  I MEAN, I WILL SAY THAT WHEN -- SO WHEN THIS --

01:11PM   14   BEAR WITH ME.

01:11PM   15       WHEN THIS WAS SENT, THIS WAS NOVEMBER OF 2013, SO THE LAST

01:11PM   16   TIME I TALKED WITH MS. HOLMES AS I REMEMBER WAS IN 2006, SO

01:11PM   17   THAT WOULD HAVE BEEN A LOT OF YEARS BEFORE.

01:11PM   18       BUT THIS WAS CERTAINLY THE VISION THAT I FELT HAD BEEN

01:11PM   19   LAID OUT IN THE BEGINNING.

01:11PM   20   Q.   IN 2006, DID MS. HOLMES DESCRIBE THE TECHNOLOGY TO YOU?

01:11PM   21   A.   SHE DID.

01:11PM   22   Q.   AND ALSO HER VISION?

01:11PM   23   A.   CORRECT.

01:11PM   24   Q.   AND WAS THIS CONSISTENT WITH BOTH HER DESCRIPTION OF THE

01:11PM   25   TECHNOLOGY AND THE VISION?

TOLBERT DIRECT BY MR. SCHENK                              4465

01:11PM   1   A.   YEAH.  I MEAN, I DON'T REMEMBER HOW SPECIFICALLY IT LINED

01:11PM   2   UP, BUT I KNEW DIRECTIONALLY IT WAS.

01:11PM   3   Q.   AND DID YOU READ THIS AND WERE YOU SURPRISED THAT -- DID

01:12PM   4   THIS STRIKE YOU AS INCONSISTENT?

01:12PM   5   A.   NO.  I MEAN, IT CERTAINLY MADE SENSE, AND SO THAT'S WHERE

01:12PM   6   THINGS WERE HEADED.

01:12PM   7   Q.   OKAY.

01:12PM   8   A.   AND IN MY CONVERSATIONS WITH MR. LUCAS THROUGH THE YEARS,

01:12PM   9   THAT EVOLUTION OF WHERE THE TECHNOLOGY WAS HEADED, THIS MADE

01:12PM  10   PERFECT SENSE.

01:12PM  11   Q.   IF YOU'LL TURN NOW TO PAGE 7, THE NEXT PAGE.  THIS SLIDE

01:12PM  12   IN THE MIDDLE SAYS "THE LAB TEST, REINVENTED."

01:12PM  13        DO YOU SEE THAT?

01:12PM  14   A.   I DO.

01:12PM  15   Q.   AND THERE'S AN IMAGE OF A DEVICE CALLED A NANOTAINER.

01:12PM  16        DO YOU SEE THAT?

01:12PM  17   A.   I DO.

01:12PM  18   Q.   IS THAT ALSO CONSISTENT WITH THE WAY THAT YOU UNDERSTOOD

01:12PM  19   THAT THE THERANOS TECHNOLOGY TO BE BASED ON MS. HOLMES'S

01:12PM  20   STATEMENTS TO YOU AND HER DESCRIPTION OF THE VISION?

01:12PM  21   A.   IT IS.

01:12PM  22   Q.   IF YOU'LL NOW TURN TO PAGE 8.  UNDER "WELCOME TO

01:13PM  23   THERANOS," THERE'S SOME LANGUAGE.

01:13PM  24        IS THAT CLEAR ENOUGH FOR YOU TO READ?  CAN YOU SEE IT?

01:13PM  25   A.   I CAN.

TOLBERT DIRECT BY MR. SCHENK                                        4466

01:13PM  1

01:13PM  2      Q.   "THERANOS'S LABORATORY CAN ANALYZE SMALLER SAMPLES THAN

01:13PM  3      PREVIOUSLY POSSIBLE WITH SPEED AND THE HIGHEST LEVELS OF

01:13PM  4      ACCURACY.  IT'S EASIER ON YOUR PATIENTS AND HELPS YOU MAKE THE

01:13PM  5      BEST DIAGNOSIS AS FAST AS POSSIBLE."

01:13PM  6           I'M GOING TO ASK YOU, ACTUALLY, IF THIS IS CONSISTENT WITH

01:13PM  7      SOMETHING THAT YOU LEARNED A LITTLE BIT LATER.

01:13PM  8           BUT FOR NOW, DID I READ THAT CORRECTLY?

01:13PM  9      A.   YOU DID.

01:13PM  10     Q.   IF YOU'LL NOW TURN TO 1346.

01:13PM  11          IS 1346 ANOTHER EMAIL FROM MS. QUINTANA REGARDING YOUR

01:13PM  12     INVESTMENT IN THERANOS THROUGH BLACK DIAMOND VENTURES?

01:13PM  13     A.   IT IS.

01:14PM  14              MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 1346.

01:14PM  15              MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

01:14PM  16              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:14PM  17          (GOVERNMENT'S EXHIBIT 1346 WAS RECEIVED IN EVIDENCE.)

01:14PM  18     BY MR. SCHENK:

01:14PM  19     Q.   FIRST, AT THE VERY TOP WE SEE YOUR NAME ABOVE THE BLACK

01:14PM  20     LINE.

01:14PM  21          DO YOU SEE THAT?

01:14PM  22     A.   I DO.

01:14PM  23     Q.   AND EVEN THOUGH ON THE TO LINE IT JUST SAYS ANA QUINTANA,

01:14PM  24     DID YOU RECEIVE THIS EMAIL?

01:14PM  25     A.   CORRECT.  SHE SENT IT TO SEVERAL INVESTORS I THINK AND I

TOLBERT DIRECT BY MR. SCHENK

01:14PM  1    WAS ONE OF THOSE WHO WAS COPIED ON THAT.

01:14PM  2    Q.   THE DATE IS DECEMBER 18TH, 2013.

01:14PM  3         SO WE'RE COMING UP TOWARDS THE END OF THE YEAR.

01:14PM  4         SHE WRITES, "DEAR BLACK DIAMOND INVESTOR.  AN INVESTOR

01:14PM  5    CONFERENCE CALL HAS BEEN SCHEDULED FOR THIS FRIDAY,

01:14PM  6    DECEMBER 20TH, PROMPTLY STARTING AT 10:15 A.M. PACIFIC.  THE

01:14PM  7    CONFIDENTIAL UPDATE CALL WILL BE PRESENTED BY THERANOS'S CEO,

01:15PM  8    ELIZABETH HOLMES."

01:15PM  9         WAS THERE A CONFERENCE CALL ON DECEMBER 20TH?

01:15PM 10    A.   THERE WAS.

01:15PM 11    Q.   AND DID YOU PARTICIPATE IN THAT CALL?

01:15PM 12    A.   I DID.

01:15PM 13    Q.   AND WAS MS. HOLMES ALSO ON THE CALL?

01:15PM 14    A.   SHE WAS.

01:15PM 15    Q.   THE NEXT PARAGRAPH TALKS ABOUT THE THERANOS LAUNCH TO

01:15PM 16    CONSUMER HEALTH CARE THIS YEAR, THEY ARE RAPIDLY SCALING TO

01:15PM 17    ESTABLISH A NATIONAL FOOTPRINT AND CAPTURE THE OPPORTUNITY WE

01:15PM 18    HAVE TO SERVE AS THE ONLY CERTIFIED NATIONAL LABORATORY CAPABLE

01:15PM 19    OF RUNNING ANY OF ITS LABORATORY TESTS FROM A FEW TINY DROPLETS

01:15PM 20    OF BLOOD.

01:15PM 21         WAS THAT SOMETHING THAT WAS DISCUSSED ON THE CALL TWO DAYS

01:15PM 22    AFTER THIS EMAIL?

01:15PM 23    A.   IT WAS.

01:15PM 24    Q.   THE NEXT PARAGRAPH READS, "AS PART OF THIS INITIATIVE,

01:15PM 25    THEY'RE COMPLETING A SERIES OF FINANCIAL TRANSACTIONS WITH

TOLBERT DIRECT BY MR. SCHENK                                    4468

01:15PM  1    STRATEGIC PARTNERS THAT PROVIDE ACCESS TO ADDITIONAL CAPITAL IN

01:15PM  2    ORDER TO ACCELERATE THEIR GROWTH."

01:15PM  3         AND THEN A SENTENCE OR TWO DOWN IT CONTINUES, "THE PRICE

01:16PM  4    PER SHARE OF THERANOS SERIES C-1 PREFERRED STOCK IN THE

01:16PM  5    TRANSACTIONS CLOSING BETWEEN NOW AND DECEMBER 31ST, 2013 IS $75

01:16PM  6    PER SHARE (PRE-SPLIT)."

01:16PM  7         DID YOU EVENTUALLY SEND MONEY TO THERANOS TO INVEST AT THE

01:16PM  8    END OF THIS YEAR?

01:16PM  9    A.   WE DID.  SO ON DECEMBER 31ST, WE DID MAKE AN INVESTMENT OF

01:16PM 10    $5 MILLION AT THE $75 SHARE LEVEL.

01:16PM 11    Q.   THAT'S MY QUESTION.  YOU BOUGHT AT $75 PER SHARE?

01:16PM 12    A.   CORRECT.

01:16PM 13    Q.   AND WERE THEY THE SERIES C-1?

01:16PM 14    A.   THEY WERE.

01:16PM 15    Q.   IN 2016, DO YOU RECALL WHAT THE SHARE PRICE WAS?

01:16PM 16    A.   YOU KNOW, SO THE 2 MILLION WE INVESTED WAS A LITTLE LESS

01:16PM 17    THAN $3 A SHARE.

01:16PM 18    Q.   AND NOW THEY'RE SELLING SHARES AT $75?

01:16PM 19    A.   CORRECT.

01:16PM 20    Q.   AND DID YOU UNDERSTAND THAT BETWEEN NOW -- IT READS THE

01:17PM 21    TRANSACTIONS CLOSING BETWEEN NOW AND DECEMBER 31ST, 2013, MEANT

01:17PM 22    THAT FROM THE CALL, WHICH WAS DECEMBER 20TH, YOU HAD ABOUT 10

01:17PM 23    OR 11 DAYS TO MAKE THE INVESTMENT?

01:17PM 24    A.   CORRECT.  AS I UNDERSTOOD IT, THE INVESTMENT WINDOW CLOSED

01:17PM 25    ON DECEMBER 31ST, AND SO THERE WAS A LIMITED AMOUNT OF TIME TO

4469

TOLBERT DIRECT BY MR. SCHENK

| | | |
|---|---|---|
| 01:17PM | 1 | REACT AND TO MAKE AN INVESTMENT DECISION. |
| 01:17PM | 2 | Q.   OKAY.  SO YOU MENTIONED A MOMENT AGO THAT THERE WAS A |
| 01:17PM | 3 | CALL, THE CALL HAPPENED ON DECEMBER 20TH; IS THAT RIGHT? |
| 01:17PM | 4 | A.   THERE WAS A CALL. |
| 01:17PM | 5 | Q.   AND DID YOU PARTICIPATE IN THIS CALL? |
| 01:17PM | 6 | A.   I DID. |
| 01:17PM | 7 | Q.   AND DID YOU RECORD THE CALL? |
| 01:17PM | 8 | A.   I DID RECORD THE CALL. |
| 01:17PM | 9 | Q.   AND WHEN DID YOU MAKE THE DECISION TO RECORD THE CALL? |
| 01:17PM | 10 | A.   THE MORNING OF THE CALL, OR I GUESS AS THE CALL WAS |
| 01:17PM | 11 | GETTING READY TO START. |
| 01:17PM | 12 | Q.   WHY?  WHY DID YOU DECIDE TO RECORD THE CALL? |
| 01:17PM | 13 | A.   YOU KNOW, SO MR. HALL AND I, THROUGH CONVERSATIONS THAT I |
| 01:18PM | 14 | HAD HAD WITH CHRIS LUCAS, WE KNEW THAT THERE WAS A POTENTIAL |
| 01:18PM | 15 | INVESTMENT OPPORTUNITY AND, YOU KNOW, WE HAD KIND OF DISCUSSED |
| 01:18PM | 16 | THERANOS AND THE PROGRESS THAT THEY HAD MADE AND, YOU KNOW, |
| 01:18PM | 17 | KIND OF ANTICIPATED WHAT A FURTHER INVESTMENT WOULD LOOK LIKE. |
| 01:18PM | 18 | WE HAD ALSO HAD SOME FRUSTRATION THAT WE HADN'T, YOU KNOW, |
| 01:18PM | 19 | THROUGH THOSE YEARS, HAD THE KIND OF FINANCIAL INFORMATION THAT |
| 01:18PM | 20 | WE WOULD HAVE HAD FROM A NORMAL INVESTMENT. |
| 01:18PM | 21 | AND SO MR. HALL AND I DISCUSSED DIFFERENT QUESTIONS THAT |
| 01:18PM | 22 | WE WANTED TO ASK ELIZABETH, OR HEAR ASKED ON THIS CALL. |
| 01:18PM | 23 | AND MR. HALL WAS GOING TO BE TRAVELLING POTENTIALLY, OR |
| 01:18PM | 24 | NOT HAVE AN ABILITY TO BE ON THE CALL AND SO, YOU KNOW, THAT |
| 01:18PM | 25 | MORNING, AS I THOUGHT ABOUT HOW TO CAPTURE THE INFORMATION ON |

4470

TOLBERT DIRECT BY MR. SCHENK

01:18PM  1    THE CALL, I'M NOT A VERY FAST TYPIST, AND SO I ELECTED TO

01:19PM  2    RECORD THE CALL TO MAKE SURE THAT I COULD RELAY TO MR. HALL ALL

01:19PM  3    OF THE PERTINENT INVESTMENT INFORMATION THAT WAS ON IT.

01:19PM  4    Q.   AND WHERE WERE YOU WHEN YOU WERE PARTICIPATING IN THE

01:19PM  5    CALL?

01:19PM  6    A.   I WAS IN MY OFFICE IN FRISCO, TEXAS.

01:19PM  7    Q.   DO YOU KNOW WHETHER MR. HALL -- WHERE WAS MR. HALL?  DO

01:19PM  8    YOU KNOW?

01:19PM  9    A.   DO YOU KNOW, HE WAS TRAVELLING, AND SO WHEN THE CALL

01:19PM  10   STARTED, I DIDN'T KNOW WHERE HE WAS OR EVEN IF HE WOULD BE ON

01:19PM  11   THE CALL.

01:19PM  12   Q.   DURING THE CALL, DID YOU LEARN WHETHER MR. HALL MADE IT TO

01:19PM  13   PARTICIPATE IN THE CALL?

01:19PM  14   A.   I DO.  HE ASKED A QUESTION, SO I ANTICIPATED HE WAS ON.

01:19PM  15   Q.   OKAY.  WHEN YOU HEARD HIM ASK A QUESTION ON THE CALL, DID

01:19PM  16   YOU SAY, WELL, I DON'T NEED THE TAPE ANYMORE, AND TURN OFF THE

01:19PM  17   TAPE?

01:19PM  18   A.   NO.  AT THAT POINT I WAS RECORDING AND I JUST CONTINUED TO

01:19PM  19   TYPE AND MAKE MY NOTES OF THE CALL, BUT CONTINUED TO RECORD IT.

01:19PM  20   Q.   AND AFTER THE CALL WAS OVER, DID YOU SAVE OR PRESERVE THE

01:20PM  21   TAPE?

01:20PM  22   A.   I DID.  I PUT THE TAPE IN MY DESK DRAWER AND THAT'S WHERE

01:20PM  23   IT STAYED.

01:20PM  24   Q.   AND AT SOME POINT, DID YOU THEN PRODUCE THAT TAPE TO THE

01:20PM  25   FEDERAL GOVERNMENT?

4471

TOLBERT DIRECT BY MR. SCHENK

01:20PM 1    A.   I DIDN'T PRODUCE IT TO THE FEDERAL GOVERNMENT.

01:20PM 2         AT SOME POINT A FEW YEARS LATER WHEN I REMEMBERED I HAD

01:20PM 3    IT, I GAVE IT TO MY ATTORNEY AND I ASSUME THAT MY ATTORNEY MUST

01:20PM 4    HAVE PRODUCED IT.

01:20PM 5    Q.   AND HAVE YOU LISTENED TOD THAT RECORDING?

01:20PM 6    A.   I HAVE.

01:20PM 7    Q.   AND IN 2006, YOU SAID YOU HAD DINNER WITH MS. HOLMES?

01:20PM 8    A.   I DID.

01:20PM 9    Q.   AND DID YOU HAVE AN OPPORTUNITY TO OBSERVE HER VOICE AT

01:20PM 10   THAT DINNER?

01:20PM 11   A.   I DID.

01:20PM 12   Q.   AND WHEN YOU LISTENED TO THE RECORDING, DID YOU ALSO HAVE

01:20PM 13   AN OPPORTUNITY TO HEAR HER VOICE?

01:20PM 14   A.   I HEARD HER ON THE CALL.

01:20PM 15   Q.   AND DID YOU RECOGNIZE THE VOICE AS THE VOICE OF

01:20PM 16   MS. HOLMES?

01:20PM 17   A.   I DID.

01:20PM 18   Q.   DO YOU -- WHEN YOU LISTENED TO THE RECORDING, DO YOU

01:20PM 19   RECOGNIZE IT AS A RECORDING OF THIS DECEMBER 20TH, 2013 CALL?

01:21PM 20   A.   I DO.

01:21PM 21   Q.   AND DO YOU THINK THAT IT ACCURATELY RECORDS OR CAPTURES

01:21PM 22   THE CALL AS YOU HEARD IT THAT DAY?

01:21PM 23   A.   IT DOES.

01:21PM 24         MR. SCHENK:  SO THE RECORDING IS EXHIBITS 1348 AND

01:21PM 25   1349.

UNITED STATES COURT REPORTERS

4472
TOLBERT DIRECT BY MR. SCHENK

01:21PM 1        YOUR HONOR, AT THIS TIME THE GOVERNMENT WOULD OFFER 1348

01:21PM 2   AND 1349.

01:21PM 3             MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

01:21PM 4             THE COURT:  THOSE EXHIBITS ARE ADMITTED.

01:21PM 5        (GOVERNMENT'S EXHIBITS 1348 AND 1349 WERE RECEIVED IN

01:21PM 6   EVIDENCE.)

01:21PM 7             THE COURT:  WHAT DO YOU INTEND TO DO WITH THOSE

01:21PM 8   EXHIBITS?

01:21PM 9             MR. SCHENK:  YOUR HONOR, I'VE TALKED TO THE DEFENSE

01:21PM 10  ABOUT 106 ISSUES.  WE'VE AGREED ON CLIPS TO PLAY.

01:21PM 11       SO WITH THE COURT'S PERMISSION, I WOULD LIKE TO PLAY A

01:21PM 12  HANDFUL OF CLIPS FROM 1348 AND 1349.

01:21PM 13            THE COURT:  THANK YOU.  DO YOU HAVE -- ARE YOU GOING

01:21PM 14  TO OFFER TRANSCRIPTS AT ALL OF THESE CALLS?

01:21PM 15            MR. SCHENK:  NO, YOUR HONOR.

01:21PM 16            THE COURT:  ALL RIGHT.  THANK YOU.

01:21PM 17       LADIES AND GENTLEMEN, WE'RE GOING TO -- YOU'RE NOW GOING

01:21PM 18  TO HEAR CLIPS, AS MR. SCHENK SAYS, FROM PHONE CALLS.

01:21PM 19       AND I'LL ASK YOU, MR. SCHENK, TO AUTHENTICATE THESE BEFORE

01:21PM 20  THE CLIP IS PLAYED, JUST THE DATE AND TIME, AND IF THEY RELATE

01:22PM 21  TO THE TESTIMONY THAT WE JUST HEARD.

01:22PM 22       YOU WILL NOT HAVE A TRANSCRIPT TO FOLLOW OF THESE, SO

01:22PM 23  PLEASE, LADIES AND GENTLEMEN, PLEASE LISTEN CLOSELY TO THE

01:22PM 24  CONVERSATIONS AND THE CONTENTS OF THE TAPES.

01:22PM 25       AND WHICH ONE WILL YOU PLAY FIRST?

TOLBERT DIRECT BY MR. SCHENK                                        4473

01:22PM   1          GO AHEAD, MR. SCHENK.

01:22PM   2              MR. SCHENK:  THANK YOU.

01:22PM   3    Q.   MR. TOLBERT, ON THE FIRST CALL -- I'M SORRY, THE FIRST

01:22PM   4    EXHIBIT, 1348, I HAVE SEVEN CLIPS THAT I'D LIKE TO PLAY FOR

01:22PM   5    YOU, SO I'LL REFER TO THEM AS 1348-1 THROUGH 1348-7, AND THEN I

01:22PM   6    HAVE ONE CLIP ON 1349, SO THAT WILL JUST BE 1349-1.

01:22PM   7          JUST A COUPLE OF QUESTIONS BEFORE WE GET STARTED ON THAT.

01:22PM   8          DID MS. HOLMES KNOW THAT YOU WERE RECORDING?

01:22PM   9    A.   SHE DID NOT.

01:22PM   10   Q.   ON THE RECORDING WE CAN HEAR SOME TYPING.  HAVE YOU

01:22PM   11   NOTICED THAT?

01:22PM   12   A.   I HAVE.

01:22PM   13   Q.   WHO IS THAT?

01:22PM   14   A.   THAT'S ME TYPING.

01:22PM   15   Q.   THAT'S YOU TAKING NOTES DURING THE CALL?

01:23PM   16   A.   CORRECT.

01:23PM   17              MR. SCHENK:  OKAY.  SO THEN AGAIN WITH YOUR

01:23PM   18   PERMISSION, YOUR HONOR, WE'LL START WITH 1348-1.

01:23PM   19              THE COURT:  ARE YOU ASKING THAT THESE RECORDINGS

01:23PM   20   NEED NOT BE RECORDED BY THE COURT REPORTERS?

01:23PM   21              MR. SCHENK:  YES, I THINK THAT THAT'S FINE, BUT I

01:23PM   22   THINK I PROBABLY WOULD THEN APPEND TO THE TRANSCRIPT, APPEND TO

01:23PM   23   THE TRAIL TRANSCRIPT A TRANSCRIPT OF THE RECORDINGS, BUT I CAN

01:23PM   24   MEET AND CONFER WITH THE DEFENSE ON THAT.

01:23PM   25              THE COURT:  IF YOU'LL AGREE TO THAT, AN AGREED

TOLBERT DIRECT BY MR. SCHENK

01:23PM  1    TRANSCRIPT THAT COULD BE APPENDED, THAT WOULD BE ACCEPTABLE.

01:23PM  2    THEN OUR COURT REPORTERS NEED NOT TRANSCRIBE THESE CALLS.

01:23PM  3         MR. SCHENK:  YES, THANK YOU.

01:23PM  4         THE COURT:  DO YOU AGREE WITH THAT, MR. DOWNEY?

01:23PM  5         MR. DOWNEY:  WELL, I WOULD RATHER CONFER.  I HAD

01:23PM  6    ASKED IF THEY WOULD HAVE A TRANSCRIPT IN ADVANCE AND THEY SAID

01:23PM  7    NO, SO I GUESS IF IT'S AN ISSUE OF THE COURT REPORTERS

01:23PM  8    RECORDING THE TRANSCRIPT NOW.

01:24PM  9         I'M GOING TO TURN TO THE COURT REPORTER AND SEE IF IT'S

01:24PM  10   POSSIBLE TO RECORD THEM NOW.

01:24PM  11        (DISCUSSION OFF THE RECORD.)

01:24PM  12        THE COURT:  OUR COURT REPORTER SAYS SHE CAN TAKE

01:24PM  13   THESE DOWN.  I DON'T KNOW HOW FAST THE SPEAKING IS, BUT IF

01:24PM  14   THERE'S A PROBLEM WITH THIS, THE COURT REPORTER WILL LET US

01:24PM  15   KNOW AND OR WE CAN STOP OR WE CAN REPLAY IT.

01:24PM  16        MR. SCHENK:  YES.

01:24PM  17        MR. DOWNEY:  I SHOULD SAY ALSO, WE'LL HAVE NO

01:24PM  18   OBJECTION AT THE TIME THE JURY DELIBERATES TO RELISTENING TO

01:24PM  19   THE RECORDING.

01:24PM  20        THE COURT:  ALL RIGHT.  THANK YOU.  OKAY.  GO AHEAD,

01:24PM  21   MR. SCHENK.

01:24PM  22        MR. SCHENK:  THANK YOU VERY MUCH.

01:24PM  23        SO, MS. HOLLIMAN, IF WE COULD START WITH 1348-1.

01:24PM  24   Q.   I'LL PLAY THE WHOLE CLIP FOR YOU, AND SOMETIMES I MIGHT

01:24PM  25   HAVE SOME FOLLOW-UP QUESTIONS, AND SOMETIMES WE MIGHT JUST MOVE

4475

TOLBERT DIRECT BY MR. SCHENK

01:24PM  1    TO THE NEXT CLIP.

01:24PM  2              THE COURT:  I'M SORRY, MR. SCHENK.  CAN YOU TELL US,

01:24PM  3    HOW LONG ARE THESE CLIPS?

01:24PM  4              MR. SCHENK:  THE LONGEST IS EIGHT MINUTES, BUT MOST

01:24PM  5    OF THEM ARE CLOSER TO TWO TO FOUR MINUTES.

01:25PM  6              THE COURT:  THAT'S HELPFUL.  THANK YOU.

01:25PM  7              MR. DOWNEY:  YOUR HONOR, MAY I JUST TALK TO

01:25PM  8    MR. SCHENK?

01:25PM  9              THE COURT:  YES, OF COURSE.

01:25PM  10         (DISCUSSION OFF THE RECORD.)

01:26PM  11             MR. DOWNEY:  YOUR HONOR, JUST THE APPROACH OF

01:26PM  12   PLAYING IT, I THOUGHT THAT OUR AGREEMENT WAS THAT WE WOULD PLAY

01:26PM  13   THE ENTIRE TAPE AND NOT BREAK IT UP, WHICH WAS THE SUBJECT OF

01:26PM  14   OUR 106 DISCUSSIONS.

01:26PM  15        I THINK MR. SCHENK HAD A DIFFERENT UNDERSTANDING, SO WE'RE

01:26PM  16   AT A LITTLE BIT OF A -- WE'LL NEED SOME GUIDANCE.

01:26PM  17             THE COURT:  OH.

01:26PM  18             MR. SCHENK:  YOUR HONOR, MY UNDERSTANDING IS THAT

01:26PM  19   THE DEFENSE IS REQUESTING THAT WE PLAY ALL -- THERE ARE EIGHT

01:26PM  20   TOTAL CLIPS, WE PLAY ALL EIGHT CLIPS, AND THEN I GO BACK AND

01:26PM  21   PLAY EACH ONE SEPARATELY AND ASK FOLLOW-UP QUESTIONS.

01:26PM  22        IN OUR MEET AND CONFER, MY UNDERSTANDING WAS THAT THE

01:26PM  23   DEFENSE WANTED TWO OF THE CLIPS TO BE PLAYED CONSECUTIVELY

01:26PM  24   BECAUSE IT CARRIES OVER.  THE LAST ONE OF 1348 AND THE FIRST

01:26PM  25   ONE OF 1349 ARE ABOUT THE SAME TOPIC.

TOLBERT DIRECT BY MR. SCHENK

| | | |
|---|---|---|
| 01:26PM | 1 | SO I INTENDED TO DO THAT AND TO NOT SEPARATE THOSE TWO. |
| 01:27PM | 2 | SO MY INTENTION WAS NOT TO PLAY ALL OF THEM AND THEN |
| 01:27PM | 3 | REPLAY ALL OF THEM, BUT RATHER TO CAPTURE JUST THAT ONE. |
| 01:27PM | 4 | BUT I MIGHT HAVE MISUNDERSTOOD DURING OUR MEET AND CONFER. |
| 01:27PM | 5 | MR. DOWNEY:  YES, I APOLOGIZE.  I THINK WE DID NOT |
| 01:27PM | 6 | CONNECT ON THAT. |
| 01:27PM | 7 | I THINK WE VIEW THE ENTIRE CONVERSATION AS RELEVANT FOR |
| 01:27PM | 8 | THE CONTEXT, AND I UNDERSTAND THAT, LIKE A DOCUMENT, THERE MAY |
| 01:27PM | 9 | BE INDIVIDUAL PIECES OF IT THAT MR. SCHENK WANTS TO QUESTION |
| 01:27PM | 10 | ABOUT, AND THAT'S OBVIOUSLY FAIR GAME. |
| 01:27PM | 11 | AND HE'S GIVEN US SOME CLIPS WITH WHICH HE INTENDS TO DO |
| 01:27PM | 12 | THAT. |
| 01:27PM | 13 | SO I JUST WOULD HAVE THE RECORD REFLECT THAT I DIDN'T |
| 01:27PM | 14 | CONSENT TO KIND OF SPLITTING THE TAPE UP AS IT'S PLAYED. |
| 01:27PM | 15 | THE COURT:  ALL RIGHT.  BUT IT SOUNDS LIKE THE 1348 |
| 01:27PM | 16 | AND 1349 WILL BE PLAYED CONSECUTIVE FOR 106 PURPOSES AT LEAST |
| 01:27PM | 17 | AS TO THAT. |
| 01:27PM | 18 | MR. SCHENK:  YES. |
| 01:27PM | 19 | THE COURT:  AND YOU DON'T HAVE ANY PROBLEM WITH THAT |
| 01:27PM | 20 | OF COURSE. |
| 01:27PM | 21 | MR. DOWNEY:  THAT'S FINE. |
| 01:27PM | 22 | THE COURT:  ALL RIGHT.  WELL, THANK YOU FOR THIS. |
| 01:27PM | 23 | I THINK, MR. SCHENK, WHY DON'T YOU PLAY THEM THE WAY THAT |
| 01:27PM | 24 | YOU'VE INDICATED THAT YOU INTEND TO.  YOU'LL PLAY AND THEN |
| 01:28PM | 25 | YOU'RE GOING TO EXAMINE, AND THEN PLAY AND THEN EXAMINE; IS |

TOLBERT DIRECT BY MR. SCHENK                                    4477

01:28PM  1        THAT RIGHT.

01:28PM  2                MR. SCHENK:  YES, YOUR HONOR.

01:28PM  3                THE COURT:  I THINK THAT MAKES SENSE TO PROCEED THAT

01:28PM  4        WAY.

01:28PM  5                MR. DOWNEY:  FAIR ENOUGH.

01:28PM  6                THE COURT:  THANK YOU.

01:28PM  7                MR. SCHENK:  PERMISSION TO PUBLISH?

01:28PM  8                THE COURT:  YES, PLEASE.

01:28PM  9                MR. SCHENK:  SO, MS. HOLLIMAN, IF WE COULD START

01:28PM 10        WITH 1348-1.

01:28PM 11            (AUDIO PLAYED IN OPEN COURT ON THE RECORD.)

01:28PM 12            "MS. HOLMES:  ABSOLUTELY.  IT'S WONDERFUL TO SPEAK WITH

01:28PM 13        YOU ALL.  AND IT'S WONDERFUL TO -- TO BE IN A PLACE IN WHICH WE

01:28PM 14        CAN BEGIN TO TALK ABOUT THIS.  AS YOU ALL KNOW, WE HAVE BEEN

01:28PM 15        WORKING VERY HARD FOR A LONG TIME TO BUILD UP THIS

01:28PM 16        INFRASTRUCTURE.

01:28PM 17            "AND WHEN I STARTED THE COMPANY, WE KNEW THAT IT WOULD

01:28PM 18        TAKE US A LONG TIME TO BE ABLE TO ESTABLISH AN INFRASTRUCTURE

01:28PM 19        THAT COULD DO ANY LAB TEST THAT IS RUN IN A TRADITIONAL LAB

01:28PM 20        FROM A MICRO SAMPLE OR THESE TINY DROPLETS THAT WE TAKE NOW

01:28PM 21        FROM THE FINGER.

01:28PM 22            "AND WE THUS BUILT A BUSINESS AROUND OUR PARTNERSHIPS WITH

01:29PM 23        PHARMACEUTICAL COMPANIES AND OUR CONTRACTS WITH THE MILITARY

01:29PM 24        WHEREIN WE COULD DEPLOY OUR FRAMEWORK IN THE ONE CASE FOR

01:29PM 25        HELPING TO ACCELERATE CLINICAL TRIALS AND IN THE OTHER FOR

TOLBERT DIRECT BY MR. SCHENK                                    4478

01:29PM  1    EXTREME USE CASE SITUATIONS IN TRAUMA AND OTHER AREAS WHERE

01:29PM  2    THERE WAS A VERY COMPELLING VALUE PROPOSITION.

01:29PM  3        "IN ORDER TO BUILD OUT OUR TEST MENU AND OUR

01:29PM  4    INFRASTRUCTURE TO BE ABLE TO GET TO THIS POINT, SEVERAL YEARS

01:29PM  5    AGO WE REALIZED THAT WE HAD CREATED AN INFRASTRUCTURE THAT

01:29PM  6    COULD, IN FACT, MAKE IT POSSIBLE TO GET RID OF PHLEBOTOMY OR

01:29PM  7    THE BIG TUBES OF BLOOD THAT ARE DRAWN FROM THE ARM IN ITS

01:29PM  8    ENTIRETY.

01:29PM  9        "AND WE BEGAN THIS WORK TO BE ABLE TO CREATE A FRAMEWORK

01:30PM  10   WHEREIN WORKING WITH INSURANCE COMPANIES, WORKING WITH

01:30PM  11   MEDICARE, WORKING WITH MEDICAID, WORKING WITH PHYSICIAN AND

01:30PM  12   HOSPITALS GROUPS, AND NOW RETAIL, WE COULD ESTABLISH WHAT HAS

01:30PM  13   THE OPPORTUNITY TO BE ULTIMATELY THE LARGEST LAB IN THE

01:30PM  14   COUNTRY.

01:30PM  15       "AND MOST IMPORTANTLY, TO CHANGE THE REALITY IN LAB

01:30PM  16   TESTING TODAY, WHICH IS THAT IT'S VERY PAINFUL AND 50 PERCENT

01:30PM  17   OF THE POPULATION DOESN'T DO IT IN TERMS OF COMPLIANCE WITH THE

01:30PM  18   REQUISITION FROM A PHYSICIAN TO DO A TEST BECAUSE THE FEAR OF

01:30PM  19   NEEDLES IS SUCH A GREAT PHOBIA.  AND EQUALLY THE FEAR OF HAVING

01:30PM  20   TO WAIT LONG PERIODS OF TIME FOR THE RESULTS DETERS MANY PEOPLE

01:30PM  21   FROM GETTING TESTED IN THE FIRST PLACE BECAUSE THEY DON'T WANT

01:30PM  22   TO BE SITTING AROUND WORRYING WHETHER THEY'RE POSITIVE WITH

01:31PM  23   SOMETHING OR NOT, FOR EXAMPLE."

01:31PM  24       MR. SCHENK:  THAT'S THE END OF 1348-1.

01:31PM  25       YOUR HONOR, I WONDER IF IT WOULD BE HELPFUL TO PROVIDE THE

TOLBERT DIRECT BY MR. SCHENK

| | | |
|---|---|---|
| 01:31PM | 1 | COURT REPORTER A COPY OF THE TRANSCRIPT, EVEN IF WE'RE NOT |
| 01:31PM | 2 | ATTACHING IT. |
| 01:31PM | 3 | THE COURT:  IT WOULD BE.  I THINK IT WOULD BE, YES, |
| 01:31PM | 4 | IF YOU HAVE ONE. |
| 01:31PM | 5 | MR. SCHENK:  YES. |
| 01:32PM | 6 | (DISCUSSION OFF THE RECORD.) |
| 01:32PM | 7 | MR. SCHENK:  I HAVE A COPY FOR THE COURT. |
| 01:32PM | 8 | THE COURT:  THAT WOULD BE HELPFUL.  THANK YOU. |
| 01:32PM | 9 | I HAVE JUST BEEN INFORMED THAT OUR OVERFLOW ROOM, THE |
| 01:32PM | 10 | REMOTE CONNECTION WE HAVE SOMEHOW IS DISCONNECTED, AND THEY'RE |
| 01:32PM | 11 | ATTEMPTING TO REESTABLISH THAT. |
| 01:32PM | 12 | SO MAYBE WE'LL TAKE OUR BREAK NOW, IF THAT'S CONVENIENT TO |
| 01:32PM | 13 | EVERYONE.  WE'LL TAKE OUR BREAK.  LET'S TAKE 30 MINUTES. |
| 01:32PM | 14 | THE OVERFLOW ROOM HAS A ZOOM CONNECTION.  APPARENTLY THE |
| 01:32PM | 15 | ZOOM HAS DROPPED, AND IN FAIRNESS TO THE PUBLIC WHO ARE |
| 01:32PM | 16 | WATCHING THIS TRIAL -- I AM INFORMED THERE ARE MEMBERS OF THE |
| 01:32PM | 17 | PUBLIC IN THAT ROOM, AND IN FAIRNESS TO THEM, I THINK WE SHOULD |
| 01:32PM | 18 | TRY TO GET THAT CONNECTION STARTED. |
| 01:32PM | 19 | SO WE'LL TAKE OUR BREAK NOW.  30 MINUTES, I BELIEVE, |
| 01:32PM | 20 | 30 MINUTES, AND WE'LL SEE IF WE CAN GET THAT RESOLVED. |
| 01:32PM | 21 | THANK YOU.  WE'LL BE IN RECESS FOR 30 MINUTES. |
| 01:33PM | 22 | THE CLERK:  COURT IS IN RECESS. |
| 01:33PM | 23 | (RECESS FROM 1:33 P.M. UNTIL 2:02 P.M.). |
| 02:02PM | 24 | (JURY IN AT 2:02 P.M.) |
| 02:02PM | 25 | THE COURT:  THANK YOU.  PLEASE BE SEATED. |

4480
TOLBERT DIRECT BY MR. SCHENK

02:02PM  1      WE'RE BACK ON THE RECORD.  WE'LL GET OUR WITNESS BACK.

02:02PM  2          MR. SCHENK:  YES, YOUR HONOR.

02:02PM  3          THE COURT:  BEFORE WE CONCLUDE FOR THE DAY, I'VE

02:02PM  4  GONE OVER OUR SCHEDULE AND I WANTED TO OFFER SOME CHANGES TO

02:02PM  5  OUR SCHEDULE AT THE END OF THE DAY TODAY FOR EVERYONE'S BENEFIT

02:02PM  6  AND ASK OUR JURY TO DO SOME RESEARCH WITH THEIR SCHEDULES OVER

02:02PM  7  THE WEEKEND.  BUT WE'LL SHARE THAT AT THE END OF THE DAY TODAY.

02:02PM  8          MR. SCHENK:  THANK YOU.

02:03PM  9      (PAUSE IN PROCEEDINGS.)

02:03PM 10          THE COURT:  WE'RE BACK ON THE RECORD.  ALL COUNSEL

02:03PM 11  ARE PRESENT.  MS. HOLMES IS PRESENT.  OUR JURY IS PRESENT.

02:03PM 12  MR. TOLBERT IS BACK ON THE STAND.

02:03PM 13      MR. SCHENK.

02:03PM 14          MR. SCHENK:  THANK YOU VERY MUCH.

02:03PM 15  Q.  MR. TOLBERT, I'LL REMIND YOU THAT YOU'RE STILL UNDER OATH.

02:03PM 16      BEFORE WE BROKE, I PLAYED FOR YOU THE FIRST CLIP.  IT'S

02:03PM 17  LABELLED 1348-1.

02:03PM 18      DO YOU RECALL THAT?

02:03PM 19  A.  I DO.

02:03PM 20  Q.  THE VOICE ON THE TAPE, DO YOU RECOGNIZE THAT VOICE?

02:03PM 21  A.  THAT WAS MS. HOLMES.

02:04PM 22  Q.  ON THAT, ON THAT SECTION, MS. HOLMES SAYS THAT WHEN SHE

02:04PM 23  STARTED THE COMPANY, SHE KNEW IT WOULD TAKE A LONG TIME TO

02:04PM 24  ESTABLISH AN INFRASTRUCTURE THAT COULD DO ANY LAB TESTS THAT

02:04PM 25  COULD DO ANY LAB TEST THAT IS RUN IN A TRADITIONAL LAB WITH A

TOLBERT DIRECT BY MR. SCHENK

02:04PM  1    MICRO SAMPLE OR THESE TINY DROPLETS THAT WE NOW TAKE FROM A

02:04PM  2    FINGER.

02:04PM  3         WHEN WE HEARD THAT, DID YOU DRAW ANY CONCLUSIONS ABOUT THE

02:04PM  4    CURRENT CAPABILITIES OF THE THERANOS TECHNOLOGY?

02:04PM  5    A.   WELL, MY UNDERSTANDING WAS THAT, YOU KNOW, WHEN THINGS HAD

02:04PM  6    STARTED IN 2006 OR WHEN WE HAD, YOU KNOW, THAT OPPORTUNITY TO

02:04PM  7    EXPLORE THINGS IN 2006, THAT WAS TRUE THAT THERE HAD BEEN A

02:04PM  8    PROGRESSION OF THINGS IN 2013 WHEN THE INVESTOR CALL WAS MADE.

02:04PM  9         SO MY UNDERSTANDING WAS THAT OVER THE YEARS THE

02:05PM  10   TECHNOLOGY, THEY HAD PERFECTED IT OR IMPROVED IT AND MADE LOTS

02:05PM  11   OF ADVANCES FROM BEING ABLE TO DO, YOU KNOW, SOME TEST, AND

02:05PM  12   BEING ABLE TO DO LOTS AND LOTS OF TESTS ON THE SAME DROP OF

02:05PM  13   BLOOD.

02:05PM  14   Q.   WAS THAT REPRESENTATION IMPORTANT TO YOU AND YOUR DECISION

02:05PM  15   TO INVEST LATER IN DECEMBER OF 2013?

02:05PM  16   A.   IT WAS.

02:05PM  17   Q.   WHY?

02:05PM  18   A.   WELL, YOU KNOW, IF THEY HAD SPENT SEVEN YEARS WORKING ON

02:05PM  19   BUILDING A DEVICE THAT COULD DO TESTS AND THEY COULDN'T DO ANY

02:05PM  20   MORE TESTS THAN THEY DID SEVEN YEARS PRIOR, THEN IT WOULD HAVE

02:05PM  21   BEEN CONCERNING BECAUSE THERE WOULDN'T HAVE BEEN A LOT OF

02:05PM  22   PROGRESS THAT WOULD HAVE BEEN MADE.

02:05PM  23        BUT MY UNDERSTANDING WAS THAT THINGS REALLY PROGRESSED AND

02:05PM  24   IT REALLY PRESENTED AN OPPORTUNITY TO ENGAGE IN THIS CONSUMER

02:05PM  25   ROLLOUT WHERE ANYBODY COULD GO TO THEIR DOCTOR AND GET AN ORDER

TOLBERT DIRECT BY MR. SCHENK                                        4482

02:05PM  1    TO HAVE THE TEST DONE AND THAT TEST COULD BE DONE ON THIS

02:06PM  2    DEVICE.

02:06PM  3    Q.   LATER IN THAT SAME CLIP WHEN MS. HOLMES SAYS, "WE HAVE

02:06PM  4    THUS BUILT A BUSINESS AROUND OUR PARTNERSHIPS WITH

02:06PM  5    PHARMACEUTICAL COMPANIES AND OUR CONTRACTS WITH THE MILITARY

02:06PM  6    WHEREIN WE CAN DEPLOY OUR FRAMEWORK IN THE ONE CASE FOR HELPING

02:06PM  7    TO ACCELERATE CLINICAL TRIALS AND IN THE OTHER FOR EXTREME USE

02:06PM  8    CASE SITUATIONS IN TRAUMA AND OTHER AREAS WHERE THERE WAS A

02:06PM  9    VERY COMPELLING VALUE PROPOSITION."

02:06PM  10        DID YOU UNDERSTAND MS. HOLMES TO BE MAKING STATEMENTS

02:06PM  11   ABOUT THE WORK THAT THERANOS HAD DONE FIRST WITH PHARMACEUTICAL

02:06PM  12   COMPANIES AND SECOND WITH THE MILITARY?

02:06PM  13   A.   I DID.

02:06PM  14   Q.   AND WERE THOSE REPRESENTATIONS IMPORTANT WHEN YOU DECIDED

02:06PM  15   TO INVEST LATER THAT MONTH?

02:06PM  16   A.   THEY WERE.

02:06PM  17   Q.   WHY?

02:06PM  18   A.   WELL, IT REPRESENTED BUSINESS THAT THERANOS NEEDED TO HAVE

02:06PM  19   TO GENERATE REVENUE.  IF THEY HAD NOT HAD, YOU KNOW, AN ABILITY

02:06PM  20   TO DO WHAT THEY SET OUT TO DO, THEN THERE WOULDN'T HAVE BEEN A

02:07PM  21   REASON TO INVEST.

02:07PM  22   Q.   LATER ON IN THAT CLIP MS. HOLMES SAYS, "WE COULD ESTABLISH

02:07PM  23   WHAT HAS THE OPPORTUNITY TO BE ULTIMATELY THE LARGEST LAB IN

02:07PM  24   THE COUNTRY."

02:07PM  25        DID YOU UNDERSTAND THAT AT THIS TIME IN DECEMBER OF 2013

TOLBERT DIRECT BY MR. SCHENK                                          4483

02:07PM  1    THERANOS WAS NOT YET THE LARGEST LAB IN THE COUNTRY?

02:07PM  2    A.   OH, I DIDN'T -- YOU KNOW, IN MY MIND I DIDN'T REALLY THINK

02:07PM  3    ABOUT THERANOS AS ITS OWN LAB.

02:07PM  4         I THOUGHT THAT THERE WERE THESE, YOU KNOW, DEVICES THAT A

02:07PM  5    DROP OF BLOOD WOULD BE, YOU KNOW, KIND OF TESTED ON SITE AND

02:07PM  6    SO, YOU KNOW, I GUESS MAYBE THINKING ABOUT ALL OF THOSE DEVICES

02:07PM  7    AS BEING CONNECTED AS A LABORATORY THAT WOULD HAVE MADE SENSE,

02:07PM  8    BUT I DIDN'T REALIZE, YOU KNOW, EXACTLY WHAT THAT -- I DIDN'T

02:07PM  9    THINK ABOUT THERANOS AS ONE BIG LAB.  I THOUGHT ABOUT IT AS

02:08PM  10   THIS DISTRIBUTED NETWORK OF, YOU KNOW, TESTING CAPABILITIES, IT

02:08PM  11   COULD KIND OF BE DEPLOYED ANYWHERE.

02:08PM  12   Q.   AND WHEN MS. HOLMES SAID THAT THEY HAD THE OPPORTUNITY TO

02:08PM  13   ULTIMATELY BE THE LARGEST LAB, DID YOU UNDERSTAND HER TO, IN

02:08PM  14   THAT INSTANCE, TO BE FORWARD LOOKING, SOMETHING THAT THEY HAD

02:08PM  15   NOT YET ACCOMPLISHED, BUT THAT THEY COULD ACCOMPLISH

02:08PM  16   POTENTIALLY IN THE FUTURE?

02:08PM  17   A.   WELL, I CERTAINLY THOUGHT THAT THERE WOULD BE CONTINUED

02:08PM  18   GROWTH OF CAPABILITIES, YOU KNOW, WELL INTO THE FUTURE.  I

02:08PM  19   DIDN'T THINK THAT THE TECHNOLOGY HAD FINISHED EVOLVING OR WAS

02:08PM  20   AT A PERFECT STATE.

02:08PM  21        YOU KNOW, I THOUGHT THAT IT REPRESENTED AN OPPORTUNITY TO

02:08PM  22   GO HAVE TESTS DONE, YOU KNOW, BY ANY, ANY CONSUMER OR BY, YOU

02:08PM  23   KNOW, ON THOSE PHARMACEUTICAL TRIALS OR IN MILITARY

02:08PM  24   APPLICATIONS.

02:08PM  25        SO, YOU KNOW, MY UNDERSTANDING WAS THAT THERE WAS

TOLBERT DIRECT BY MR. SCHENK                                    4484

02:08PM   1    SIGNIFICANT CAPABILITY AT THIS MOMENT IN TIME, BUT THAT IT

02:09PM   2    WOULD CONTINUE TO PROGRESS AND BE PERFECTED.

02:09PM   3    Q.   OKAY.

02:09PM   4         YOUR HONOR, WITH PERMISSION I'LL NOW PUBLISH 1348-2.

02:09PM   5              THE COURT:  YES.

02:09PM   6    BY MR. SCHENK:

02:09PM   7    Q.   MR. TOLBERT, THE VOICE THAT WE'RE GOING TO HEAR IS ALSO

02:09PM   8    MS. HOLMES'S VOICE?

02:09PM   9    A.   I ASSUME IT WILL BE.

02:09PM   10   Q.   OKAY.  I'LL ASK YOU THAT WHEN THE CLIP IS OVER.

02:09PM   11   A.   OKAY.

02:09PM   12   Q.   THANK YOU.

02:09PM   13        (AUDIO PLAYED IN OPEN COURT ON THE RECORD.)

02:09PM   14        "MS. HOLMES:  AND SO NOW IN THIS FRAMEWORK THAT WE HAVE

02:09PM   15   CREATED, WE'VE BUILT AN OPPORTUNITY FOR PEOPLE TO BE ABLE TO DO

02:09PM   16   THEIR TEST IN A WHOLE NEW WAY AND BECOME MORE COMPLIANT WITH

02:09PM   17   BEING ABLE TO GET ACCESS TO THIS LABORATORY DATA, WHICH IS

02:09PM   18   INCREDIBLY POWERFUL INFORMATION THAT DRIVES SO MUCH OF CLINICAL

02:09PM   19   DECISION MAKING AND IN DOING SO CREATES A RICHER DATA FRAMEWORK

02:09PM   20   FOR THE PURPOSE OF BEING ABLE TO BETTER CHARACTERIZE THE

02:10PM   21   PROGRESSION OF CERTAIN CONDITIONS BY VIRTUE OF THE FACT THAT

02:10PM   22   NOT ONLY ARE WE HELPING TO GET PEOPLE TESTED -- BECAUSE IT'S A

02:10PM   23   SMALL SAMPLE, WE CAN GET PEOPLE TESTED AT THE NEEDED

02:10PM   24   FREQUENCIES.

02:10PM   25        "AND BECAUSE NOW THE SAMPLE IS FRESH AND IT'S NOT, YOU

TOLBERT DIRECT BY MR. SCHENK

| | | |
|---|---|---|
| 02:10PM | 1 | KNOW, A BIG SERIES OF TUBES OF BLOOD THAT ARE SITTING ON A |
| 02:10PM | 2 | COUNTER AND EXPOSED TO TEMPERATURE, WE DON'T SUFFER THE RATES |
| 02:10PM | 3 | OF DECAY OF KEY ANALYTES THAT HAPPEN WHEN YOU SHIP SAMPLES OFF |
| 02:10PM | 4 | TO A CENTRAL LAB. |
| 02:10PM | 5 | "AND THEN BY VIRTUE OF THE FACT THAT OUR ANALYTICAL |
| 02:10PM | 6 | INFRASTRUCTURE IS STANDARDIZED SO WE DON'T HAVE THE VARIABILITY |
| 02:10PM | 7 | THAT IS ASSOCIATED WITH TRADITIONAL LABORATORY TESTING. |
| 02:10PM | 8 | MEANING, TODAY IF YOU GO TO A LAB IN SAN FRANCISCO AND YOU GO |
| 02:10PM | 9 | TO A LAB IN L.A. ON THE SAME DAY FOR THE SAME VALUE, ONE COULD |
| 02:11PM | 10 | REPORT A RESULT THAT IS, FOR EXAMPLE, ON A TEST LIKE HDL |
| 02:11PM | 11 | CHOLESTEROL, PLUS OR MINUS 30 PERCENT FROM SOME STANDARD AND BE |
| 02:11PM | 12 | CONSIDERED ACCURATE IN THE EYES OF REGULATORS. |
| 02:11PM | 13 | "WHICH MEANS ON THE SAME DAY FOR A SINGLE TEST, BASED ON |
| 02:11PM | 14 | THE FACT THAT EACH LAB IS CENTRALIZED AND HAS ITS OWN LAB |
| 02:11PM | 15 | DIRECTOR AND HAS ITS OWN REFERENCE RANGE AND USES ITS OWN |
| 02:11PM | 16 | EQUIPMENT WHICH IS DIFFERENT FROM WHAT OTHER LABS USE, YOU |
| 02:11PM | 17 | COULD SEE A 60 PERCENT VARIANCE IN DATA. |
| 02:11PM | 18 | "AND IF YOU START TO THINK ABOUT HOW THAT COMPOUNDS OVER |
| 02:11PM | 19 | TIME, IT MAKES IT VERY DIFFICULT TO LOOK LONGITUDINALLY AT THE |
| 02:11PM | 20 | PROGRESSION OF A CONDITION BY VIRTUE OF THE FACT THAT THERE'S |
| 02:11PM | 21 | SO MUCH NOISE BETWEEN TIME POINTS. |
| 02:11PM | 22 | "AND HERE BECAUSE THIS IS A SINGLE FRAMEWORK AND WE HAVE |
| 02:12PM | 23 | BUILT THIS OUT IN SUCH A WAY IN WHICH WE HAVE A LESS THAN |
| 02:12PM | 24 | 5 PERCENT VARIANCE ON OUR TESTS, IF WE BEGIN TO SEE A CHANGE OF |
| 02:12PM | 25 | 30 PERCENT IN PATIENT VALUES OVER TIME, IT'S BECAUSE IT'S |

TOLBERT DIRECT BY MR. SCHENK                                    4486

02:12PM   1    CLINICAL.

02:12PM   2         "AND THIS IS A RICHNESS OF DATA FOR THE PHYSICIAN

02:12PM   3    COMMUNITY THAT HAS NOT BEEN ACCESSIBLE BEFORE.  AND IT ALLOWS

02:12PM   4    THE PHYSICIAN TO BEGIN LOOKING AT LABORATORY DATA IN THE SAME

02:12PM   5    WAY THAT PEOPLE TALK ABOUT LOOKING AT A TEST FOR PSA, FOR

02:12PM   6    CANCER, PROSTATE CANCER, CALLED PSA, WHICH THEY FOCUS MORE ON

02:12PM   7    THE RATE OF RANGE OR ITS VELOCITY THAN THEY DO ON ITS ABSOLUTE

02:12PM   8    CONCENTRATION AT ANY GIVEN POINT IN TIME.

02:12PM   9         "AND WE'RE GOING TO BE ABLE TO START PRESENTING THIS

02:12PM   10   LABORATORY INFORMATION IN THAT WAY SO THAT IT CAN BE USED MORE

02:12PM   11   TOWARDS EARLY DETECTION."

02:12PM   12   BY MR. SCHENK:

02:12PM   13   Q.   MR. TOLBERT, THAT'S THE END OF 1348-2.

02:13PM   14        DID YOU RECOGNIZE THE VOICE ON THAT RECORDING?

02:13PM   15   A.   I DID.  THAT WAS MS. HOLMES.

02:13PM   16   Q.   IN THAT PORTION WHEN MS. HOLMES SAYS THAT "BECAUSE NOW THE

02:13PM   17   SAMPLE IS FRESH AND IT'S NOT, YOU KNOW, A BIG SERIES OF TUBES

02:13PM   18   OF BLOOD THAT ARE SITTING ON A COUNTER AND EXPOSED TO

02:13PM   19   TEMPERATURE, WE DON'T SUFFER THE RATES OF DECAY OF KEY ANALYTES

02:13PM   20   THAT HAPPEN WHEN YOU SHIP SAMPLES OFF TO A CENTRAL LAB."

02:13PM   21        WHEN MS. HOLMES SAYS IT'S NOT "A BIG SERIES OF TUBES OF

02:13PM   22   BLOOD," DID YOU UNDERSTAND THAT TO BE A REPRESENTATION ABOUT

02:13PM   23   THE WAY THERANOS, AND THE VOLUME OF BLOOD THAT THERANOS

02:13PM   24   COLLECTS?

02:13PM   25   A.   I DID.

TOLBERT DIRECT BY MR. SCHENK                                    4487

02:13PM   1     Q.   WHAT DID YOU UNDERSTAND THAT TO MEAN?

02:13PM   2     A.   WELL, WHEN I GO TO THE DOCTOR AND HAVE A LAB TEST, THEY

02:13PM   3     DRAW LOTS OF VIALS OF BLOOD AND THOSE GET SHIPPED OFF TO A

02:13PM   4     CENTRAL LABORATORY SITE WHERE THEY GET TESTED.

02:13PM   5          YOU KNOW, MY UNDERSTANDING OF THERANOS IS THAT I WOULD

02:14PM   6     POTENTIALLY GO TO THE DOCTOR, OR WHEREVER, AND GIVE A FINGER

02:14PM   7     PRICK OF BLOOD AND THEY CAN RUN THOSE TESTS ON SITE WITHOUT

02:14PM   8     HAVING TO BE SHIPPED OFF BECAUSE BEING SHIPPED OFF CAUSE SOME

02:14PM   9     VARIABILITY IN THE RESULTS.

02:14PM   10         AND SO, YOU KNOW, IT FELT LIKE IT WAS A BIG ADVANTAGE TO

02:14PM   11    BE ABLE TO DO THAT TESTING KIND OF IN HOUSE OR ON SITE.

02:14PM   12    Q.   AND HOW ABOUT THE VOLUME ALSO?  FOR INSTANCE, WHEN YOU GO

02:14PM   13    TO YOUR DOCTOR AND YOU GET BLOOD DRAWN FROM THE VEIN IN YOUR

02:14PM   14    ARM, IS THE VOLUME DIFFERENT THAN WHAT YOU UNDERSTOOD THERANOS

02:14PM   15    TO BE OFFERING?

02:14PM   16    A.   SURE.  THAT'S ONE OF THE REASONS WHY I WAS SO EXCITED

02:14PM   17    ABOUT IT.  I -- WHEN I SEE THOSE FOUR OR FIVE VIALS OF BLOOD

02:14PM   18    COMING OUT, I START FEELING A LITTLE -- THE EFFECTS OF THAT.

02:14PM   19         THE IDEA OF BEING ABLE TO HAVE MY FINGER STUCK AND GIVE

02:14PM   20    THAT SAMPLE AND HAVE THOSE TESTS RUN FROM THAT SMALL SAMPLE

02:15PM   21    SIZE WAS INTRIGUING, AND, YOU KNOW, CERTAINLY SEEMED TO SPEAK

02:15PM   22    TO WHAT -- TO THE REFERENCE THAT HAD BEEN MADE THAT MORE AND

02:15PM   23    MORE PEOPLE WOULD DO MORE AND MORE TESTS BECAUSE IT WOULD BE

02:15PM   24    MUCH LESS INVASIVE.

02:15PM   25    Q.   IF THERANOS DREW THOSE BIG TUBES OR VIALS OF BLOOD FROM

TOLBERT DIRECT BY MR. SCHENK                                      4488

| | | |
|---|---|---|
| 02:15PM | 1 | THE VEIN IN THE ARM, WOULD YOU LOSE THIS ADVANTAGE THAT YOU |
| 02:15PM | 2 | JUST DESCRIBED TO ME? |
| 02:15PM | 3 | A.   CERTAINLY. |
| 02:15PM | 4 | Q.   FURTHER ON IN THIS PORTION MS. HOLMES SAYS, "BECAUSE THIS |
| 02:15PM | 5 | IS A SINGLE FRAMEWORK AND WE HAVE BUILT THIS OUT IN SUCH A WAY |
| 02:15PM | 6 | IN WHICH WE HAVE A LESS THAN 5 PERCENT VARIANCE ON OUR TESTS, |
| 02:15PM | 7 | IF WE BEGIN TO SEE A CHANGE OF 30 PERCENT IN PATIENT VALUES |
| 02:15PM | 8 | OVER TIME, IT'S BECAUSE IT'S CLINICAL." |
| 02:15PM | 9 | DID YOU UNDERSTAND MS. HOLMES TO BE MAKING REPRESENTATIONS |
| 02:15PM | 10 | ABOUT THE VARIANCE IN THERANOS TEST RESULTS DEVICE TO DEVICE |
| 02:15PM | 11 | BEING LESS THAN THE VARIANCE IN, LET'S SAY, ONE LAB TO ANOTHER |
| 02:16PM | 12 | LAB WITH TRADITIONAL PHLEBOTOMY? |
| 02:16PM | 13 | A.   I DID. |
| 02:16PM | 14 | Q.   AND WAS THAT REPRESENTATION SIGNIFICANT IN YOUR DECISION |
| 02:16PM | 15 | TO INVEST? |
| 02:16PM | 16 | A.   IT WAS.  CERTAINLY IF, YOU KNOW, IF A NORMAL LAB COMPANY |
| 02:16PM | 17 | HAD A 30 PERCENT OR GREATER VARIANCE AND I COULD GO IN AND HAVE |
| 02:16PM | 18 | A LOT MORE CONFIDENCE THAT THE RESULTS DIDN'T HAVE THAT KIND OF |
| 02:16PM | 19 | VARIANCE, I WOULD -- YOU KNOW, IT WOULD BE A MUCH MORE VALUABLE |
| 02:16PM | 20 | TEST. |
| 02:16PM | 21 | MY UNDERSTANDING FROM THE BEGINNING HAD ALSO BEEN THAT ONE |
| 02:16PM | 22 | OF THE ADVANTAGES TO THE PHARMACEUTICAL COMPANIES IS WHEN THEY |
| 02:16PM | 23 | DO THOSE DRUG TRIALS THAT, YOU KNOW, SOMEBODY TAKES A DRUG AND |
| 02:16PM | 24 | THEN THEY MAY BE TESTED ONCE A WEEK OR ONCE A DAY. |
| 02:16PM | 25 | BUT IF WE COULD NOW TEST, BECAUSE IT WAS IN A LOT LESS |

TOLBERT DIRECT BY MR. SCHENK                                    4489

02:16PM   1    INVASIVE WAY, THOSE TESTS COULD BE PERFORMED MUCH MORE

02:17PM   2    FREQUENTLY THAN WE -- I SAY "WE" -- THAT THERANOS WOULD HAVE

02:17PM   3    BEEN ABLE TO, YOU KNOW, CAPITALIZED ON DOING SOMETHING THAT

02:17PM   4    HADN'T BEEN DONE BEFORE.

02:17PM   5    Q.    OKAY.  WITH PERMISSION, YOUR HONOR, I WOULD NOW PLAY

02:17PM   6    1348-3.

02:17PM   7              THE COURT:  YES.

02:17PM   8         (AUDIO PLAYED IN OPEN COURT ON THE RECORD.)

02:17PM   9         "MS. HOLMES:  WE HAVE LAUNCHED OUR RETAIL INFRASTRUCTURE.

02:17PM  10    WE ARE OPERATING NOW IN CALIFORNIA AND IN ARIZONA.  AND WE HAVE

02:17PM  11    OPENED OUR FIRST STORES AND HAVE PATIENTS COMING IN LIVE EVERY

02:17PM  12    DAY.  AND WE ARE WORKING TO EXPAND THAT AS FAST AS POSSIBLE.

02:17PM  13    THE SPEED WITH WHICH WE EXPAND IS CRITICAL IN THE CONTEXT OF

02:17PM  14    CAPTURING THE MARKET OPPORTUNITY THAT WE HAVE CREATED.

02:17PM  15         "AND WE'RE PUTTING A LOT OF RESOURCES INTO ESTABLISHING A

02:17PM  16    NATIONAL FOOTPRINT AS FAST AS WE CAN.  BUT THAT STARTS WITH

02:18PM  17    EXCELLENCE IN EACH LOCAL MARKET AND CAPTURING MARKET SHARE IN

02:18PM  18    EACH LOCAL MARKET, WHICH IS WHERE WE ARE FOCUSSED NOW.  AND AS

02:18PM  19    WE DO THAT, WE'RE LEVERAGING CAPITAL FROM OUR STRATEGIC

02:18PM  20    PARTNERS AND ALSO FROM EQUITY OPPORTUNITIES THAT WE HAVE ON THE

02:18PM  21    TABLE TO BE ABLE TO GROW VERY FAST.

02:18PM  22         "AND AS YOU ALL KNOW, WE HAVE RECENTLY ISSUED SHARES AT

02:18PM  23    $75 A SHARE.  AND FOR REFERENCE, THE INITIAL INVESTMENT IN

02:18PM  24    THERANOS THAT YOU ALL MADE WAS AT 82 CENTS.  AND SO WE ARE

02:18PM  25    ALREADY CREATING SIGNIFICANT VALUE.  AND OF COURSE, WE'RE --

TOLBERT DIRECT BY MR. SCHENK

02:18PM  1    WE'RE JUST GETTING STARTED IN THE CONTEXT OF BEING ABLE TO

02:18PM  2    ESTABLISH AND ROLL OUT THIS INFRASTRUCTURE.

02:19PM  3         AS WE GO FORWARD INTO 2014, IN ADDITION TO THE SPEED OF

02:19PM  4    SCALE PUTTING THE RESOURCES INTO THE BUSINESS TO BE ABLE TO

02:19PM  5    BUILD THE ORGANIZATIONS THAT ARE REQUIRED TO HANDLE THIS TYPE

02:19PM  6    OF CONSUMER TYPE BUSINESS IS ANOTHER CORE AREA OF FOCUS FOR US.

02:19PM  7    OBVIOUSLY, A GREAT CONTRAST IN THE CONTEXT OF A PHARMACEUTICAL

02:19PM  8    DEAL COULD BE VERY GREAT FINANCIALLY, BUT IT WAS VERY SMALL

02:19PM  9    RELATIVELY SPEAKING IN THE CONTEXT OF VOLUME.  AND NEXT TO WHAT

02:19PM  10   WE'RE FACING NOW, THERE'S, YOU KNOW, 7 MILLION PEOPLE IN THE

02:19PM  11   BAY AREA, 39 MILLION IN CALIFORNIA.  AND THAT SCALE IS VERY

02:19PM  12   DIFFERENT FROM THE SCALE ON WHICH WE'VE OPERATED IN THE PAST.

02:19PM  13        "SO WE'RE VERY FOCUSSED ON BEING ABLE TO ESTABLISH THE

02:20PM  14   OPERATIONAL FRAMEWORK TO BE ABLE TO HANDLE THAT TYPE OF VOLUME.

02:20PM  15   AND IT'S -- IT'S AN AREA THAT WE'RE SPENDING A LOT OF TIME ON

02:20PM  16   NOW.

02:20PM  17        "THE RETAIL INFRASTRUCTURE IS THE FOUNDATION FOR BEING

02:20PM  18   ABLE TO REACTIVATE A LOT OF THE PHARMACEUTICAL PROGRAMS THAT WE

02:20PM  19   DID THAT ALLOWED US TO BUILD THE BUSINESS FROM CASH FROM

02:20PM  20   OPERATIONS SINCE WE DID OUR SERIES C ROUND IN 2006.  AND

02:20PM  21   THERE'S A VERY STRONG SYNERGY BETWEEN THE ABILITY TO RUN

02:20PM  22   CLINICAL TRIALS AT RETAIL AND THE ABILITY TO SPEED AND ROLL IT

02:20PM  23   AND BETTER DEMONSTRATE THAT IT'S POSSIBLE TO DELIVER THERAPIES

02:20PM  24   IN A NEW WAY BY VIRTUE OF THE FACT THAT THIS TESTING CAN BE

02:20PM  25   DONE PRACTICALLY INSIDE A RETAIL PHARMACY WHERE THE DRUG IS

4491

TOLBERT DIRECT BY MR. SCHENK

02:21PM 1    DELIVERED IN AND OF ITSELF.

02:21PM 2        "SO -- AND THE FOCUS ON THE PHARMACEUTICAL BUSINESS IS

02:21PM 3    STILL A SIGNIFICANT FOCUS FOR US AND WILL CONTINUE EFFECTIVELY

02:21PM 4    AS A BUSINESS UNIT AS WE NOW GROW AND WILL BE VERY SYNERGISTIC

02:21PM 5    WITH WHAT WE HAVE ESTABLISHED IN RETAIL.

02:21PM 6        "SO MAYBE -- CHRIS, LET ME PAUSE THERE AND JUST SEE OUT OF

02:21PM 7    WHAT I HAVE SAID SO FAR IF THERE'S ANY QUESTIONS ON ANYTHING WE

02:21PM 8    HAVE COVERED UP TO NOW."

02:21PM 9    BY MR. SCHENK:

02:21PM 10   Q.   MR. TOLBERT, THAT WAS THE END OF 1348-3.  WAS THAT

02:21PM 11   MS. HOLMES VOICE?

02:21PM 12   A.   YES, IT WAS.

02:21PM 13   Q.   AND WHEN MS. HOLMES SAYS "WE'RE LEVERAGING CAPITAL FROM

02:21PM 14   OUR STRATEGIC PARTNERS AND ALSO FROM EQUITY OPPORTUNITIES THAT

02:21PM 15   WE HAVE ON THE TABLE TO BE ABLE TO GROW VERY FAST," WHAT DID

02:21PM 16   YOU UNDERSTAND THAT TO BE SPEAKING TO?

02:22PM 17   A.   IF I REMEMBER RIGHT, THE WALGREENS PARTNERSHIP HAD BEEN

02:22PM 18   ANNOUNCED AND THERE WAS A POTENTIAL OF 8,000-PLUS RETAIL

02:22PM 19   LOCATIONS THAT NEEDED TO BE OUTFITTED, YOU KNOW, WITH EQUIPMENT

02:22PM 20   BUILDOUT AND PEOPLE, AND THAT THE PROCEEDS OF THIS FUND RAISE

02:22PM 21   THAT WAS UNDERWAY WOULD BE USED TO SCALE THAT OPPORTUNITY AGAIN

02:22PM 22   SO THAT, YOU KNOW, SO THAT THERE WEREN'T OTHER COMPETITORS THAT

02:22PM 23   WOULD COME IN AND TAKE ADVANTAGE OF UNDERSTANDING WHAT THERANOS

02:22PM 24   WAS DOING.

02:22PM 25   Q.   WHEN YOU JUST SAID THE PROCEEDS OF THIS FINANCIAL RAISE,

4492

TOLBERT DIRECT BY MR. SCHENK

02:22PM 1   THIS FUND RAISING, DID YOU MEAN IF YOU INVESTED, THIS IS HOW

02:22PM 2   YOUR MONEY WOULD BE SPENT?

02:22PM 3   A.   CORRECT.  I THOUGHT THE INVESTMENT CASE, THE USE OF THE

02:22PM 4   PROCEEDS FROM OUR INVESTMENT THAT WE ULTIMATELY WOULD MAKE, AS

02:22PM 5   WELL AS OTHERS THAT WERE REFERENCED THERE BY STRATEGIC, BY

02:22PM 6   OTHER NOT JUST INVESTORS LIKE US, BUT BY RETAIL PARTNERS AND

02:23PM 7   OTHERWISE WOULD BE TO, YOU KNOW, TO SPEED THAT ROLLOUT AND TO

02:23PM 8   MAKE IT GO FASTER AND, YOU KNOW, KIND OF ACCOMPLISH WHAT IT WAS

02:23PM 9   DESIGNED TO ACCOMPLISH.

02:23PM 10  Q.   AND ARE YOU NOW DRAWING A DISTINCTION BETWEEN YOUR MONEY

02:23PM 11  BEING SPENT ON THE RETAIL ROLLOUT AS OPPOSED TO R&D AT

02:23PM 12  THERANOS, RESEARCH AND DEVELOPMENT TO ACTUALLY CREATE THE

02:23PM 13  TECHNOLOGY NECESSARY TO DO THE BLOOD TESTING?

02:23PM 14  A.   CORRECT.  IT FELT LIKE THE PROCEEDS OF THIS FUND RAISE

02:23PM 15  WERE NOT ABOUT PERFECTING THE TECHNOLOGY, ALTHOUGH I'M

02:23PM 16  CONFIDENT THAT THAT WOULD HAVE CONTINUED TO EVOLVE, BUT IT WAS

02:23PM 17  NOW AT A PLACE, RIGHT, WHERE THE COMPANY WAS OUT OF STEALTH

02:23PM 18  MODE, THEY ANNOUNCED THIS PARTNERSHIP, AND WE'RE GOING TO PUT

02:23PM 19  THESE, THIS CAPABILITY IN ALL OF THESE LOCATIONS JUST COSTS A

02:24PM 20  LOT OF MONEY TO PHYSICALLY DO THAT, AND SO THE POINT OF RAISING

02:24PM 21  THIS MONEY WAS TO BE ABLE TO ACCELERATE THAT DEPLOYMENT.

02:24PM 22  Q.   WAS THIS IMPORTANT IN YOUR DECISION TO INVEST, AND BY THIS

02:24PM 23  I MEAN THAT YOUR MONEY WOULD BE SPENT TO ACCELERATE THE

02:24PM 24  DEPLOYMENT THAT YOU JUST DESCRIBED?

02:24PM 25  A.   THAT'S CORRECT.  YOU KNOW, IF IT FELT TO US LIKE THE

4493

TOLBERT DIRECT BY MR. SCHENK

| | | |
|---|---|---|
| 02:24PM | 1 | TECHNOLOGY STILL WAS IN ITS INFANCY OR DIDN'T WORK THE WAY IT |
| 02:24PM | 2 | SEEMED TO, YOU KNOW, OUR INVESTMENT CONSIDERATION WOULD HAVE |
| 02:24PM | 3 | BEEN A LOT DIFFERENT. |
| 02:24PM | 4 | Q.   AND THAT SAME PORTION WHERE MS. HOLMES SAYS, "THE RETAIL |
| 02:24PM | 5 | INFRASTRUCTURE IS THE FOUNDATION FOR BEING ABLE TO REACTIVATE A |
| 02:24PM | 6 | LOT OF THE PHARMACEUTICAL PROGRAMS THAT WE DID THAT ALLOWED US |
| 02:24PM | 7 | TO BUILD THE BUSINESS FROM CASH FROM OPERATIONS SINCE WE DID |
| 02:24PM | 8 | OUR SERIES C ROUND IN 2006." |
| 02:25PM | 9 | WHAT DID YOU UNDERSTAND THAT TO BE A REFERENCE TO, |
| 02:25PM | 10 | BUILDING THE BUSINESS FROM CASH FROM OPERATIONS? |
| 02:25PM | 11 | A.   WELL, MY UNDERSTANDING FROM THE TIME WE MADE OUR FIRST |
| 02:25PM | 12 | INVESTMENT WAS THE BACKBONE OF THE BUSINESS HAD BEEN THESE |
| 02:25PM | 13 | PHARMACEUTICAL TRIALS THAT THERANOS WAS ABLE TO HELP, AND SO |
| 02:25PM | 14 | THERE WAS A LOT OF VALUE FOR THE PHARMACEUTICAL COMPANIES TO DO |
| 02:25PM | 15 | THAT. |
| 02:25PM | 16 | SO I HAD, YOU KNOW, ANTICIPATED FROM THAT FIRST INVESTMENT |
| 02:25PM | 17 | THAT THE COMPANY HAD BEEN ABLE TO RECOGNIZE SIGNIFICANT AMOUNTS |
| 02:25PM | 18 | OF CASH, PROFIT, TO BE ABLE TO REINVEST NOT ONLY IN R&D, BUT TO |
| 02:25PM | 19 | KIND OF COVER ITS OWN OPERATIONAL BURN RATES. |
| 02:25PM | 20 | AND THAT, YOU KNOW, WE WERE NOW AT A POINT WHERE THE |
| 02:25PM | 21 | RETAIL FOCUS WOULD TAKE OVER. |
| 02:25PM | 22 | BUT STILL, EVEN FROM DAY ONE AS I UNDERSTOOD IT, IT STILL |
| 02:26PM | 23 | REPRESENTED A GREAT ADVANCEMENT FOR THESE PHARMACEUTICAL |
| 02:26PM | 24 | COMPANIES BECAUSE NOW INSTEAD OF HAVING TO RECRUIT PATIENTS FOR |
| 02:26PM | 25 | DRUG TRIALS TO COME TO SPECIFIC LOCATIONS, THEY COULD ENROLL |

TOLBERT DIRECT BY MR. SCHENK

02:26PM  1    PEOPLE IN TRIALS THAT COULD JUST GO TO THEIR DOCTOR'S OFFICE OR

02:26PM  2    LOCAL PHARMACY.

02:26PM  3         AND SO IT REPRESENTED A GREAT GAIN AND EFFICIENCY FOR

02:26PM  4    THESE PHARMACEUTICAL COMPANIES TO CONTINUE AS WELL.

02:26PM  5    Q.   OKAY.  AND I WANT TO BE CLEAR, YOU SAID THAT YOU HAD AN

02:26PM  6    UNDERSTANDING THAT THERANOS WAS DOING SOME OF THIS

02:26PM  7    PHARMACEUTICAL WORK FROM BACK IN YOUR 2006 INVESTMENT AND ON,

02:26PM  8    SOMETIME AFTER THAT.

02:26PM  9         DID YOU GET THAT UNDERSTANDING IN PART FROM CHRIS LUCAS?

02:26PM  10   A.   CORRECT.  SO THOSE CONVERSATIONS THAT I HAD WITH CHRIS

02:26PM  11   OVER THE YEARS SUGGESTED THAT THOSE PHARMACEUTICAL TRIALS, YOU

02:26PM  12   KNOW, CONTINUED TO BE SOMETHING THAT THERANOS HAD AS A STAPLE

02:26PM  13   OF BUSINESS.

02:27PM  14   Q.   AND NOW ON THIS CALL, IS MS. HOLMES CONFIRMING THAT FOR

02:27PM  15   YOU, THAT THE PHARMACEUTICAL WORK WAS GENERATING CASH FOR

02:27PM  16   OPERATIONS?

02:27PM  17          MR. DOWNEY:  EXCUSE ME, YOUR HONOR.  OBJECTION,

02:27PM  18   YOUR HONOR, TO THOSE TWO STATEMENTS.

02:27PM  19     I THINK HE CAN CERTAINLY COMMENT ON HIS UNDERSTANDING,

02:27PM  20   WHICH HE HAS.

02:27PM  21     I THINK TO LINK STATEMENTS FROM TWO PEOPLE TOGETHER AND

02:27PM  22   TRY TO GET A CONFIRMATION IS INAPPROPRIATE.

02:27PM  23          THE COURT:  OVERRULED.

02:27PM  24          MR. SCHENK:  YOUR HONOR, WITH PERMISSION, I'LL NOW

02:27PM  25   TURN TO -- OH, I'M SORRY.  ONE MORE QUESTION.

TOLBERT DIRECT BY MR. SCHENK

02:27PM  1    Q.   ON 1348-3, WHAT WE HAVE JUST LISTENED TO, WHEN MS. HOLMES

02:27PM  2    SAYS "THE FOCUS ON THE PHARMACEUTICAL BUSINESS IS STILL A

02:27PM  3    SIGNIFICANT FOCUS FOR US," WHAT DID YOU TAKE THAT TO MEAN?

02:28PM  4    A.   JUST THAT FROM THE VERY BEGINNING, LIKE I DESCRIBED, I

02:28PM  5    THOUGHT PHARMACEUTICAL, THE PHARMACEUTICAL BUSINESS, YOU KNOW,

02:28PM  6    WAS A PROFITABLE OR A FOUNDATIONAL PART OF WHAT THERANOS WAS

02:28PM  7    DOING AND SO, YOU KNOW, I HAD NO INDICATION THAT THAT HAD NEVER

02:28PM  8    BEEN THE CASE.

02:28PM  9    Q.   AND WHEN SHE SAID IT IS STILL A SIGNIFICANT FOCUS AND YOU

02:28PM  10   HAD THIS CALL IN DECEMBER OF 2013 --

02:28PM  11   A.   DECEMBER OF 2013.

02:28PM  12   Q.   YES, I'M SORRY.  DID YOU THINK THAT THAT PHARMACEUTICAL

02:28PM  13   BUSINESS WAS STILL, IN DECEMBER OF 2013, A SIGNIFICANT FOCUS?

02:28PM  14   A.   I DID.

02:28PM  15         MR. SCHENK:  YOUR HONOR, WITH YOUR PERMISSION, I'LL

02:28PM  16   NOW PLAY 1348-4.

02:28PM  17         THE COURT:  YES.

02:28PM  18         MR. SCHENK:  THANK YOU.

02:28PM  19   (AUDIO PLAYED IN OPEN COURT ON THE RECORD.)

02:28PM  20   "QUESTIONER:  THANK YOU.  HI, ELIZABETH.  I GUESS I HAVE A

02:28PM  21   TWO-PART QUESTION.  FIRST OF ALL, IF YOU COULD JUST COVER

02:29PM  22   GENERALLY THE CURRENT CAPITALIZATION IN TERMS OF WHAT THE --

02:29PM  23   WHAT THE $75 A SHARE, WHAT THE CAPITALIZATION WOULD BE AND WHAT

02:29PM  24   YOU'RE LOOKING TO RAISE AND WHAT THE -- I TAKE IT FROM WHAT

02:29PM  25   YOU'VE SAID, BUT MAYBE YOU COULD GO INTO A LITTLE MORE OF THE

4496

TOLBERT DIRECT BY MR. SCHENK

02:29PM   1    USE.  IS IT -- IS IT HEAVILY WEIGHTED TOWARD THE RETAIL BUILD

02:29PM   2    OUT WHICH YOU'RE LOOKING TO DO ON A NATIONAL BASIS AND HOW LONG

02:29PM   3    DO YOU EXPECT THE TIME-WISE TO DO THE BUILD OUT OF THE RETAIL

02:29PM   4    SIDE OF IT?

02:29PM   5        "MS. HOLMES:  ABSOLUTELY.  SO AND -- SO WHEN YOU ALL CAME

02:29PM   6    IN IN THE SERIES B AT PRE MONEY WAS ABOUT $20 MILLION VALUATION

02:29PM   7    OF THE COMPANY AND THAT WAS -- IT WAS PREVIOUSLY ASSOCIATED

02:29PM   8    WITH THE SERIES A PRICE OF 75 CENTS A SHARE.  NOW THE VALUATION

02:29PM   9    OF THE COMPANY IS -- IS JUST OVER $7 BILLION AND THAT'S AT THE

02:30PM  10    $75 A SHARE.

02:30PM  11        "AND THE RETAIL IS EXACTLY WHERE WE'RE FOCUSSING OUR

02:30PM  12    INVESTMENT AND THE -- IT'S REALLY NOW A QUESTION OF HOW FAST DO

02:30PM  13    WE SCALE, YOU KNOW, WHAT -- THE FACT THAT WE WILL SCALE IS A

02:30PM  14    GIVEN.  OUR RETAIL PARTNERS HAVE INVESTED HUNDREDS OF MILLIONS

02:30PM  15    OF DOLLARS IN BUILDING OUT THIS FRAMEWORK.  AND WE TOO HAVE

02:30PM  16    BEEN PREPARING FOR THIS FOR MANY YEARS NOW.  AND THE GOAL IS TO

02:30PM  17    BE ABLE TO BE NATIONAL VERY, VERY, VERY QUICKLY.

02:30PM  18        "SO THE IMMEDIATE FOCUS IS CALIFORNIA AND ARIZONA.

02:30PM  19    CERTAINLY, YOU KNOW, AS WE GO INTO 2014, ONE OF OUR GOALS FOR

02:30PM  20    2014 IS TO HAVE THOSE MARKETS AND BEACH HEADS IN TERMS OF

02:30PM  21    REALLY OWNING THE MARKETPLACE AND BEING ABLE TO EXPAND FROM

02:30PM  22    THEM.

02:30PM  23        "BUT THE ABILITY TO EXPAND THROUGHOUT RETAIL, ONCE YOU'VE

02:31PM  24    OPERATIONALIZED A GIVEN MARKET, IT IS -- IT'S NOT VERY

02:31PM  25    COMPLICATED.  AND, YOU KNOW, COMPANIES LIKE WALGREENS HAVE DONE

TOLBERT DIRECT BY MR. SCHENK

| | | |
|---|---|---|
| 02:31PM | 1 | THIS VERY WELL IN AREAS LIKE THE FLU SHOT OR VACCINATION |
| 02:31PM | 2 | BUSINESS WHERE THEY TRAINED ALL OF THEIR PHARMACISTS AND HAD IT |
| 02:31PM | 3 | DEPLOYED NATIONALLY WITHIN, I THINK, ABOUT AN 18-MONTH PERIOD. |
| 02:31PM | 4 | "AND THERE'S -- THERE'S A PARALLEL TO WHAT CAN BE DONE |
| 02:31PM | 5 | HERE AND WE'RE WORKING TO DO THAT." |
| 02:31PM | 6 | BY MR. SCHENK: |
| 02:31PM | 7 | Q.   MR. TOLBERT, I'VE PLAYED FOR YOU NOW 1348-4. |
| 02:31PM | 8 | DO YOU RECOGNIZE TWO INVOICES ON THIS PORTION? |
| 02:31PM | 9 | A.   I DO. |
| 02:31PM | 10 | Q.   AND WHO ARE THOSE INDIVIDUALS? |
| 02:31PM | 11 | A.   THE FIRST INDIVIDUAL WAS CRAIG HALL, WHO IS MY BOSS, AND |
| 02:31PM | 12 | THE SECOND WAS ELIZABETH HOLMES. |
| 02:31PM | 13 | Q.   SO WAS THIS THE MOMENT YOU REALIZED MR. HALL DID MAKE IT |
| 02:31PM | 14 | TO THE CALL? |
| 02:31PM | 15 | A.   IT WAS. |
| 02:31PM | 16 | Q.   AND I THINK YOU SAID YOU DIDN'T STOP THE RECORDING? |
| 02:32PM | 17 | A.   I DID NOT. |
| 02:32PM | 18 | Q.   AND DESCRIBE FOR THE JURY FOR A MOMENT THE STRUCTURE OF |
| 02:32PM | 19 | THE CALL.  THE FIRST CLIPS WE HEARD MS. HOLMES TALKING, AND |
| 02:32PM | 20 | THIS TIME WE HEARD A QUESTION. |
| 02:32PM | 21 | A.   SO AT THE BEGINNING OF THE CALL, CHRIS LUCAS HAD JUST HAD |
| 02:32PM | 22 | AN INTRODUCTORY COMMENT OR TWO AND THEN TURNED IT OVER TO |
| 02:32PM | 23 | ELIZABETH. |
| 02:32PM | 24 | YOU KNOW, SHE KIND OF WALKED THROUGH AN UPDATE OF WHERE |
| 02:32PM | 25 | THE COMPANY WAS AND WHAT WAS GOING ON. |

4498

TOLBERT DIRECT BY MR. SCHENK

02:32PM  1          AND THEN AT THIS POINT, OR AT SOME POINT AROUND THIS TIME

02:32PM  2     ON THE CALL, IT OPENED UP FOR Q AND A, AND THIS WAS ONE OF THE

02:32PM  3     FIRST QUESTIONS.

02:32PM  4     Q.   SO THE FIRST PORTION THAT I'VE PLAYED FOR YOU BEFORE

02:32PM  5     MR. HALL, WAS THAT MS. HOLMES SPEAKING NOT IN RESPONSE TO

02:32PM  6     QUESTIONS, BUT RATHER GIVING, AS YOU SAID, I THINK AN OVERVIEW?

02:32PM  7     A.   CORRECT.

02:32PM  8     Q.   AND THEN THE INDIVIDUALS ON THE CALL HAD THE OPPORTUNITY

02:32PM  9     TO ASK QUESTIONS?

02:32PM  10    A.   CORRECT.

02:32PM  11    Q.   AND WHEN SHE RESPONDS TO MR. HOLMES'S QUESTION BY SAYING,

02:32PM  12    "IT'S REALLY NOW A QUESTION OF HOW WE SCALE.  YOU KNOW, THE

02:33PM  13    FACT THAT WE WILL SCALE IS A GIVEN."

02:33PM  14         WHAT DID YOU UNDERSTAND THAT TO MEAN?

02:33PM  15    A.   WELL, WE KNEW THAT WALGREENS WAS A BIG OPPORTUNITY WITH

02:33PM  16    SOMETHING OVER 8,000 LOCATIONS.  I THINK AT THE TIME OF THIS

02:33PM  17    CALL THERE MAY HAVE BEEN, YOU KNOW, A DOZEN LOCATIONS OPENED OR

02:33PM  18    SOMETHING.

02:33PM  19         AND SO THE NEED TO GO FROM, YOU KNOW, 10 TO 8,000 IS

02:33PM  20    PRETTY SUBSTANTIAL.

02:33PM  21         SO IT FELT LIKE IT WAS GOING TO HAPPEN, IT'S JUST HOW FAST

02:33PM  22    CAN WE MAKE IT HAPPEN?  HOW FAST CAN WE GET IN ALL OF THESE

02:33PM  23    LOCATIONS?

02:33PM  24    Q.   AND WAS THAT SIGNIFICANT OR IMPORTANT IN YOUR DECISION TO

02:33PM  25    INVEST?

TOLBERT DIRECT BY MR. SCHENK                                    4499

02:33PM  1     A.   IT WAS.  I MEAN, THAT -- YOU KNOW, THE OPPORTUNITY TO DO

02:33PM  2     THAT VOLUME OF TESTS, RIGHT, IF IT'S IN 8,000 LOCATIONS AND

02:33PM  3     REPRESENTED A SIGNIFICANT OPPORTUNITY, AND SO, YOU KNOW,

02:34PM  4     CERTAINLY IF, IF WE HAD THOUGHT THAT THOSE LOCATIONS WOULD NOT

02:34PM  5     BECOME OPERATIONAL, IT WOULD HAVE BEEN A BIG NEGATIVE FOR THE

02:34PM  6     INVESTMENT.

02:34PM  7           MR. SCHENK:  YOUR HONOR, WITH PERMISSION I'LL PLAY

02:34PM  8     1348-5.

02:34PM  9           THE COURT:  YES.

02:34PM  10    (AUDIO PLAYED IN OPEN COURT ON THE RECORD.)

02:34PM  11    "MEETING OPERATOR:  THANK YOU.  THE NEXT QUESTION COMES

02:34PM  12    FROM LARRY (INAUDIBLE).  PLEASE GO AHEAD.  LARRY, ARE YOU

02:34PM  13    THERE?

02:34PM  14    "QUESTIONER:  YES, I AM.

02:34PM  15    "HI ELIZABETH, THIS IS LARRY (INAUDIBLE).

02:34PM  16    "MS. HOLMES:  HI LARRY, HOW ARE YOU?

02:34PM  17    "QUESTIONER:  GOOD.  GOOD.  CONGRATULATIONS ON ALL OF THIS

02:34PM  18    PROGRESS.

02:34PM  19    "MS. HOLMES:  WELL, THANK YOU.

02:34PM  20    "QUESTIONER:  NOW, ELIZABETH, YOU MENTIONED THAT YOU MIGHT

02:34PM  21    HAVE SOME ADDITIONAL EQUITY ROUNDS THAT ARE COMING UP.  CAN YOU

02:34PM  22    GIVE ANY INDICATION OF HOW MUCH MONEY YOU WANT TO RAISE AND

02:34PM  23    WHAT MARKET CAPS YOU WOULD LIKE TO SEE YOURSELF ACHIEVE IN

02:34PM  24    THOSE ROUNDS?

02:34PM  25    "MS. HOLMES:  SURE.  ABSOLUTELY.  SO WE -- THIS RECENT

4500

TOLBERT DIRECT BY MR. SCHENK

02:34PM  1    TRANSACTION AT $75 A SHARE IS ACTUALLY PART OF CONTRACTS THAT

02:35PM  2    WE HAVE WITH STRATEGIC ENTITIES AND PARTNERS WHO PREVIOUSLY HAD

02:35PM  3    AN EQUITY RELATIONSHIP WITH THERANOS AND HAD AN OPTION TO

02:35PM  4    EXERCISE TO INVEST ADDITIONAL CAPITAL BEFORE THE END OF 2013,

02:35PM  5    WHICH THEY LITERALLY JUST EXERCISED.  AND SO WE'RE WORKING

02:35PM  6    THROUGH THAT NOW, AS MANY OF YOU ALL KNOW IN SOME OF THE RECENT

02:35PM  7    SHAREHOLDER CONSENT AND -- AND THAT VALUATION THAT I PREVIOUSLY

02:35PM  8    MENTIONED IS ASSOCIATED WITH THOSE TRANSACTIONS.

02:35PM  9        "WE DO HAVE OFFERS ON THE TABLE RIGHT NOW FROM FINANCIAL

02:35PM 10    INSTITUTIONS THAT ARE IN THE SEVERAL HUNDRED MILLION DOLLAR

02:35PM 11    RANGE IN TERMS OF THE AMOUNT OF CAPITAL AND WE'RE CONSIDERING

02:35PM 12    THAT IN THE CONTEXT OF HOW WE -- HOW WE INVEST.  AND ALSO WE'RE

02:36PM 13    AWARE THAT CERTAIN SHAREHOLDERS HAVE SOME LIQUIDITY NEEDS.  AND

02:36PM 14    SO THE ABILITY TO PUT A LARGE AMOUNT OF CAPITAL INTO THE

02:36PM 15    COMPANY AND THEN WHEREIN AS RELEVANT AND AT THE RIGHT TIME FOR

02:36PM 16    THE BUSINESS ADDRESS THAT.  LIQUIDITY IS -- IS HOW WE'RE

02:36PM 17    LOOKING AT THAT AND THERE'S A VERY HIGH LIKELIHOOD THAT WE

02:36PM 18    WILL -- WE WILL DO TRANSACTIONS THAT ARE IN THE SEVERAL HUNDRED

02:36PM 19    MILLION DOLLAR RANGE.

02:36PM 20        "INSOFAR AS THE VALUATION, WE KNOW THAT IT IS HIGHER THAN

02:36PM 21    $75 A SHARE.  WE ARE HAVING NEGOTIATIONS RIGHT NOW ABOUT

02:36PM 22    EXACTLY WHAT PRICE WE PICK AND MORE IMPORTANTLY WHO WE PICK AS,

02:36PM 23    YOU KNOW, THE INVESTOR BASE HERE.

02:36PM 24        "AND SOME OF THIS IN TERMS OF WHAT THE ACTUAL PRICE PER

02:36PM 25    SHARE AND THEREFORE THE ASSOCIATED EQUITY CAPITALIZATION OF THE

4501

TOLBERT DIRECT BY MR. SCHENK

02:36PM   1    COMPANY WILL BE IS GOING TO DEPEND ON HOW THAT PLAYS OUT, BUT

02:37PM   2    THAT'S SOMETHING THAT -- THAT IS GOING ON AS WE SPEAK AND --

02:37PM   3    AND WILL LIKELY BE EFFECTED EARLY IN Q1."

02:37PM   4            MR. SCHENK:   THAT'S THE END OF 1348-5.

02:37PM   5    Q.   MR. TOLBERT, DID WE HEAR A QUESTION AND MS. HOLMES'S VOICE

02:37PM   6    IN RESPONSE?

02:37PM   7    A.   WE DID.

02:37PM   8    Q.   AND MS. HOLMES MAKES A STATEMENT ABOUT THE AMOUNT OF MONEY

02:37PM   9    SHE INTENDED TO RAISE AND SHARE PRICE.

02:37PM   10        WAS THAT STUFF THAT WAS ALSO IMPORTANT TO YOU IN YOUR

02:37PM   11   DECISION TO INVEST?

02:37PM   12   A.   THEY WERE.   CERTAINLY TO THE EXTENT LIKE WE FELT LIKE IF

02:37PM   13   WE INVESTED, THERE WERE SEVERAL HUNDRED MILLION DOLLARS

02:37PM   14   ADDITIONAL INVESTMENT THAT WOULD COME THAT WOULD HELP

02:37PM   15   ACCOMPLISH THE DESIGNS OF THIS ROLLOUT THAT, YOU KNOW, IT WOULD

02:37PM   16   MAKE IT A LOT MORE CERTAIN THAT THERE WOULD BE A POSITIVE

02:37PM   17   OUTCOME TO IT.

02:37PM   18   Q.   SO IF THE -- AS YOU TESTIFIED A MOMENT AGO, IF THE

02:37PM   19   INVESTOR MONEY WOULD BE SPENT FOR THE WALGREENS ROLLOUT, IT WAS

02:37PM   20   IMPORTANT TO YOU THAT THERE WAS MORE MONEY COMING IN, NOT JUST

02:37PM   21   YOUR 5 MILLION?

02:37PM   22   A.   CORRECT.   YOU KNOW, THE ADDITIONAL MONEY THAT WOULD COME

02:38PM   23   IN JUST REPRESENTED ADDITIONAL SPEED AND CAPABILITY AND MORE

02:38PM   24   MARKETS THAT COULD BE SERVICED, PUT INTO SERVICE SOONER.

02:38PM   25   Q.   THANK YOU.

4502

TOLBERT DIRECT BY MR. SCHENK

02:38PM 1          MR. SCHENK:  YOUR HONOR, WITH YOUR PERMISSION I'LL

02:38PM 2    NOW PLAY 1348-6.

02:38PM 3          THE COURT:  YES.

02:38PM 4    "QUESTIONER:  HI, ELIZABETH.  ALSO CONGRATULATIONS FROM

02:38PM 5    US.  THAT'S REMARKABLE WHAT YOU HAVE ACCOMPLISHED.

02:38PM 6    "AND JUST TO FOLLOW ON WHAT YOU WERE JUST DISCUSSING, I

02:38PM 7    ASSUME THAT WOULD ALL BE PRIVATE AND I'M WONDERING IF YOU SEE A

02:38PM 8    PUBLIC LIQUIDITY EVENT AT SOME POINT WHERE YOU GO OUT WITH AN

02:38PM 9    IPO.  I'M WONDERING ABOUT THAT.

02:38PM 10   "AND AS LONG AS I'M SPEAKING, I WAS -- I WAS ALSO CURIOUS

02:38PM 11   IF THERE'S A MILITARY ASPECT THAT YOU'RE GOING TO PURSUE.

02:38PM 12   "AND, AGAIN, SINCE I HAVE THE FLOOR, WITH REGARD TO

02:39PM 13   COMPETITION, CHRIS HAD MENTIONED THAT THERE DOESN'T APPEAR TO

02:39PM 14   BE ANY OUT THERE.  I'M WONDERING IF YOUR PATENT SIDE IS LOOKING

02:39PM 15   AT ANY CONCERNS THERE OR IF YOU THINK THERE'S ANY POSSIBILITY

02:39PM 16   FOR PATENT INFRINGEMENT OR -- OR OTHERS DOING SOMETHING SIMILAR

02:39PM 17   AND COMPETING WITH YOU.

02:39PM 18   "MS. HOLMES:  ABSOLUTELY.  AND I WILL START WITH THE FIRST

02:39PM 19   ONE.  SO THESE IMMEDIATE TRANSACTIONS WHEN WE'RE TALKING IN

02:39PM 20   DECEMBER, JANUARY, EARLY Q1 TIMEFRAME ARE ALL PRIVATE

02:39PM 21   TRANSACTIONS.

02:39PM 22   "WE HAVE PUT A CORPORATE STRUCTURE IN PLACE THAT POSITIONS

02:39PM 23   US TO BE ABLE TO PROCEED WITH FUTURE EQUITY RELATED EVENTS AND

02:39PM 24   RETAIN THE CONTROL TO REALIZE THE LONG-TERM VISION THAT WE

02:39PM 25   HAVE.  AND AS YOU KNOW, THIS COMPANY IS ABOUT BEING ABLE TO

4503

TOLBERT DIRECT BY MR. SCHENK

02:40PM  1    CHANGE THE HEALTH CARE INDUSTRY.  AND THAT'S SOMETHING THAT,

02:40PM  2    YOU KNOW, WE PLAN ON DOING FOR THE NEXT 10, 20, 30, 40, 50,

02:40PM  3    60 YEARS.

02:40PM  4        "WE HAVE THE OPPORTUNITY TO CREATE AN INDUSTRY HERE AND

02:40PM  5    THAT'S WHAT THIS IS ABOUT.  SO WE HAVE ALWAYS BEEN VERY

02:40PM  6    LONG-TERM IN OUR MINDSET.  AND THE POTENTIAL FOR SOME TYPE OF

02:40PM  7    PUBLIC TRANSACTION, A PUBLIC OFFERING TRANSACTION DOWN THE ROAD

02:40PM  8    IS THERE.

02:40PM  9        "RIGHT NOW WE THINK THERE'S A LOT OF ADVANTAGES TO

02:40PM  10   CONTINUING TO OPERATE AS A PRIVATE COMPANY, ESPECIALLY IN THE

02:40PM  11   CONTEXT OF WHAT WE'VE JUST DONE WHERE WE MADE SOME VERY

02:40PM  12   DIFFICULT DECISIONS WHEN WE SIGNED OUR RETAIL CONTRACTS TO

02:40PM  13   EFFECTIVELY AGREE TO CONTRACTS THAT SAID WE COULDN'T TALK ABOUT

02:40PM  14   THIS BECAUSE THESE COMPANIES WERE PUTTING HUNDREDS OF MILLIONS

02:40PM  15   OF DOLLARS INTO THE INFRASTRUCTURE AND THEY HADN'T ANNOUNCED IT

02:40PM  16   TO THE STREET AND IT WAS MATERIAL AND PUBLIC INFORMATION AND

02:40PM  17   SOME OF IT STILL IS.

02:41PM  18       "AND SO -- AND SO WHAT WE GOT OUT OF THAT IS WE GOT A LEAD

02:41PM  19   TIME AND WE WERE ABLE TO LAUNCH AND -- AND REALLY SURPRISE THE

02:41PM  20   MARKET IN TERMS OF THE EXISTENCE OF THIS CAPABILITY AND THERE'S

02:41PM  21   A LOT OF POWER IN THAT FROM A MARKET OWNERSHIP STANDPOINT.  BUT

02:41PM  22   WE ARE -- WE ARE LOOKING AT LIQUIDITY OPTIONS AND AN IPO WOULD

02:41PM  23   BE ONE OF THEM.

02:41PM  24       "IN TERMS OF THE MILITARY ASPECT OF THIS, MILITARY IS A

02:41PM  25   BIG DEAL FOR US AND I CAN TELL YOU CONFIDENTIALLY A COUPLE OF

02:41PM  1    THE AREAS WHICH WE HAVE BEEN FOCUSSED THERE.

02:41PM  2        "ONE IS IN THE CONTEXT OF WORK IN THE MIDDLE EAST AND

02:41PM  3    SPECIFICALLY IN AFGHANISTAN.  THE SURVIVAL RATE OF OUR MEN AND

02:41PM  4    WOMEN IN THE FIELD WHEN THEY'RE HIT IS 98 PERCENT IF THEY GET

02:42PM  5    THROUGH THE DOORS OF AN EMERGENCY ROOM WITHIN 60 MINUTES FROM

02:42PM  6    THE POINT OF INJURY.  AND IF WE MISS THAT WINDOW THAT'S WHERE

02:42PM  7    THE BULK OF OUR FATALITIES OCCUR.

02:42PM  8        "AND SO THE ABILITY TO TAKE A TECHNOLOGY LIKE THIS AND PUT

02:42PM  9    IT IN FLIGHT, SPECIFICALLY ON A MEDEVAC, HAS THE POTENTIAL TO

02:42PM  10   CHANGE SURVIVAL RATES.  AND WHAT IT DOES IS IT MAKES IT

02:42PM  11   POSSIBLE TO BEGIN TRANSFUSION AND STABILIZATION IN PLACE.  AND

02:42PM  12   SO WE'RE BEEN DOING A LOT OF WORK THERE.

02:42PM  13       "WE HAVE ALSO BEEN DOING A LOT OF WORK FOR SPECIAL

02:42PM  14   OPERATIONS COMMAND IN THE CONTEXT OF MISSIONS IN REMOTE AREAS

02:42PM  15   WHERE NOT ONLY IS THERE NO CAPABILITY TO DO TESTING FOR CERTAIN

02:42PM  16   THINGS THAT NEED TO BE MEASURED, BUT IF SITUATIONS ARISE IN

02:42PM  17   WHICH THOSE TESTS ARE WARRANTED, THE MISSION IS ABORTED AND

02:43PM  18   PEOPLE ARE EVACUATED GENERALLY OUT OF CONTINENT.  AND SO WE'VE,

02:43PM  19   YOU KNOW, CREATED A DISTRIBUTED SYSTEM THAT CAN BE USED IN

02:43PM  20   REMOTE AREAS AND THAT IS -- THAT IS ANOTHER VENUE AND FOCUS FOR

02:43PM  21   US.  AND AS WE NOW REACH THIS STAGE IN OUR BUSINESS AND GOING

02:43PM  22   BACK TO THE COMMENT THAT I MADE EARLIER ON ORGANIZATION THAT

02:43PM  23   REALLY IS ANOTHER BUSINESS UNIT.

02:43PM  24       "AND SO THAT, THE PHARMACEUTICAL BUSINESS AND RETAIL ARE

02:43PM  25   THESE THREE UNITS THAT WE HAVE.  OBVIOUSLY TO BE ABLE TO DO

TOLBERT DIRECT BY MR. SCHENK                                    4505

| | | |
|---|---|---|
| 02:43PM | 1 | WHAT WE'VE JUST DONE, WE HAD TO PAUSE A LARGE NUMBER OF OUR |
| 02:43PM | 2 | ONGOING PHARMACEUTICAL AND MILITARY PROGRAMS SO THAT WE COULD |
| 02:43PM | 3 | FOCUS LIKE A LASER ON THIS AND EXECUTING ON THIS. |
| 02:43PM | 4 | "AND THE SCALE OF THIS RETAIL INFRASTRUCTURE NOW IS WHERE |
| 02:43PM | 5 | WE WILL CONTINUE TO FOCUS LIKE A LASER.  BUT AS WE GET THE |
| 02:43PM | 6 | RESOURCES AND ORGANIZATIONS TO CAPTURE SOME OF THESE ADDITIONAL |
| 02:44PM | 7 | OPPORTUNITIES IN PARALLEL, WE WILL PROCEED WITH THE |
| 02:44PM | 8 | PHARMACEUTICAL AND MILITARY BUSINESS IN LEVERAGING SOME OF THIS |
| 02:44PM | 9 | INFRASTRUCTURE AND THE RESOURCES FROM IT THAT WE'RE BUILDING |
| 02:44PM | 10 | OUT NOW.  SO THAT, FOR THE LONG-TERM, WILL BE AN IMPORTANT |
| 02:44PM | 11 | THING FOR US.  AND IT'S ALSO VERY SYMBOLIC BECAUSE IT'S OUR WAY |
| 02:44PM | 12 | OF BEING ABLE TO HELP MAKE A DIFFERENCE IN WHATEVER SMALL WAY |
| 02:44PM | 13 | WE CAN THERE." |
| 02:44PM | 14 | MR. SCHENK:  THAT'S THE END OF 1348-6. |
| 02:44PM | 15 | WITH THE COURT'S PERMISSION, I'LL CONTINUE PLAYING 1348-7 |
| 02:44PM | 16 | AND THEN 1349-1.  IT'S ALL A CONTINUATION. |
| 02:44PM | 17 | THE COURT:  YES, PLEASE. |
| 02:44PM | 18 | (AUDIO PLAYED IN OPEN COURT ON THE RECORD.) |
| 02:44PM | 19 | "QUESTIONER:  INSOFAR AS COMPETITION IS CONCERNED, EXACTLY |
| 02:45PM | 20 | THE REASON THAT WE WERE SO AGGRESSIVE ABOUT BEING IN SELF-MODE |
| 02:45PM | 21 | WAS TO PRESERVE THE WINDOW FOR CAPTURING AS MUCH MARKET SHARE |
| 02:45PM | 22 | AS POSSIBLE WITHOUT DIRECT COMPETITION.  WE HAVE NOT SEEN OTHER |
| 02:45PM | 23 | COMPANIES DOING THIS THAT --" |
| 02:45PM | 24 | MR. SCHENK:  AND THEN THAT'S THE END OF 1348-7. |
| 02:45PM | 25 | Q.  MR. TOLBERT, DOES THE RECORDING CUT OFF AT THAT POINT? |

TOLBERT DIRECT BY MR. SCHENK                          4506

02:45PM   1    A.   IT DOES.

02:45PM   2    Q.   AND THEN WHAT DID YOU DO?

02:45PM   3    A.   AND THEN I FLIPPED THE TAPE OVER AND STARTED RECORDING ON

02:45PM   4    THE SECOND SIDE OF THE TAPE.

02:45PM   5              MR. SCHENK:   OKAY.   MS. HOLLIMAN NOW, WITH THE

02:45PM   6    COURT'S PERMISSION, IF WE CAN PLAY 1349-1.

02:45PM   7              THE COURT:   YES.

02:45PM   8         (AUDIO PLAYED IN OPEN COURT ON THE RECORD.)

02:45PM   9         "MS. HOLMES:   -- LIKE, FOR EXAMPLE, THE ABILITY TO USE THE

02:45PM  10    CLOUD TO CONTROL A HEALTH DEVICE OR THE ABILITY TO RUN ANY

02:46PM  11    COMBINATION OF LAB TESTS ON, YOU KNOW, THESE DISTRIBUTED

02:46PM  12    DEVICES.   AND, OBVIOUSLY, WE HAVE COMPLIMENTED THOSE WITH A

02:46PM  13    VERY BROAD PORTFOLIO OF VERY NARROW CLAIMS, YEAH, BUT -- BUT WE

02:46PM  14    HAVE BEEN PREPARING FOR LITIGATION IN THE CONTEXT OF BEING ABLE

02:46PM  15    TO PROTECT THEM AND INTEND TO PROTECT THEM VERY AGGRESSIVELY.

02:46PM  16         "IN OUR CASE, IP LITIGATION IS NOT ABOUT LICENSING -- OR

02:46PM  17    IP PROSECUTION IS NOT ABOUT LICENSING, BUT IT'S ABOUT BEING

02:46PM  18    ABLE TO MAINTAIN OUR OWNERSHIP OF THIS SPACE.   WE HAVE A GREAT

02:46PM  19    LAWYER, DAVID BOIES, WHO JOINS US AT ALL OF OUR BOARD MEETINGS

02:46PM  20    WHO ALSO DOES OUR IP LITIGATION.   AND WE DID FILE A LAWSUIT

02:46PM  21    ABOUT A YEAR AND A HALF AGO OR TWO YEARS AGO AGAINST A PATENT

02:46PM  22    TROLL WHO HAD GONE TO SOME ELABORATE MEANS TO ATTEMPT TO STEAL

02:47PM  23    FROM AN INTELLECTUAL PROPERTY.

02:47PM  24         "AND OUR MAIN POINT THERE IS WE WILL NOT SETTLE ON ANY

02:47PM  25    INTELLECTUAL PROPERTY VIOLATION.   IN THAT CASE, THE SPECIFIC

TOLBERT DIRECT BY MR. SCHENK                                    4507

02:47PM  1    PATENT IN QUESTION WAS -- WAS NOT -- WE HAVE THAT CONTENT

02:47PM  2    COVERED BY OTHER OF OUR PATENTS, BUT -- BUT SETTING THE

02:47PM  3    PRECEDENT THAT WE HAVE A ZERO TOLERANCE APPROACH TO

02:47PM  4    INTELLECTUAL PROPERTY VIOLATIONS OR PEOPLE TRYING TO THREATEN

02:47PM  5    US OR TRYING TO GET US TO SETTLE AND PAY THEM MONEY.  IT'S JUST

02:47PM  6    NOT SOMETHING THAT WE'RE GOING TO DO.

02:47PM  7        "AND I THINK ULTIMATELY AS WE GO FORWARD, OBVIOUSLY

02:47PM  8    CONTINUING TO BUILD OUT THE PORTFOLIO AND DEFENDING IT

02:47PM  9    AGGRESSIVELY ARE GOING TO BE TWO VERY IMPORTANT THINGS WHICH WE

02:47PM  10   WILL DO IN A BIG WAY.  BUT ULTIMATELY, OUR REAL STRATEGY HERE

02:47PM  11   IS THE SPEED OF EXECUTION AND THE WAY WE PRICE IN THE MARKET

02:47PM  12   WHICH IS A BIG DEAL.

02:48PM  13       "WE HAVEN'T TALKED ABOUT THIS DIRECTLY ON THIS CALL, BUT

02:48PM  14   WE ARE CHANGING THE COST STRUCTURE OF LABORATORY TESTING.  AND

02:48PM  15   THAT, YOU KNOW, ALSO HAS A COMPETITIVE ASPECT TO IT IN TERMS OF

02:48PM  16   WINNING AND OWNING THIS SPACE.  AND THEN DOING WHAT -- WHAT WE

02:48PM  17   LOVE AND TRY TO DO BEST, WHICH IS BEING ON VERSION 12 OF THIS

02:48PM  18   TYPE OF SYSTEM BY THE TIME ANYBODY ELSE CAN TRY TO BE ON

02:48PM  19   VERSION 1.  AND THAT'S A -- THAT'S AN ONGOING FOCUS FOR US

02:48PM  20   INTERNALLY."

02:48PM  21       "MEETING OPERATOR:  THERE ARE NO FURTHER QUESTIONS AT THIS

02:48PM  22   TIME.

02:48PM  23       "MR. LUCAS:  WELL, IF THERE'S ANYONE, PLEASE QUEUE UP WITH

02:48PM  24   DAWN IF THERE'S ANY OTHER QUESTIONS.

02:48PM  25       "ELIZABETH, JUST AS -- AS, YOU KNOW, AS AN OBSERVATION,

TOLBERT DIRECT BY MR. SCHENK                                    4508

02:48PM   1    WHEN YOU PUBLISHED YOUR PRICES ON THE WEBSITE THAT ARE

02:48PM   2    SIGNIFICANTLY CLEARLY LOWER THAN -- THAN WHAT TYPICALLY LABS

02:49PM   3    CHARGE, HOW DOES THAT STRATEGY EVOLVE AND AS IT RELATES TO

02:49PM   4    MEDICAID OR MEDICARE AND SO FORTH?

02:49PM   5        "MS. HOLMES:  ABSOLUTELY.  AND I -- SO -- SO THERE'S --

02:49PM   6    THERE'S MULTIPLE ASPECTS OF THIS.  ONE IS OUR BELIEF THAT

02:49PM   7    ACCESS TO THIS LABORATORY INFORMATION, THIS BIOCHEMICAL

02:49PM   8    INFORMATION WHICH DRIVES MOST OF CLINICAL DECISIONS, IS A BASIC

02:49PM   9    HUMAN RIGHT AND IT SHOULD COST THE SAME NO MATTER WHO YOU ARE,

02:49PM   10   IF YOU'RE INSURED, YOU'RE UNINSURED, YOU'RE MEDICARE, YOU'RE

02:49PM   11   MEDICAID.  AND THAT -- THAT IS VERY DIFFERENT THAN THE WAY THAT

02:49PM   12   OTHER COMPANIES OPERATE IN THIS SPACE."

02:49PM   13       "MR. LUCAS:  OH, GOOD.  THANK YOU, ELIZABETH.

02:50PM   14       "MS. HOLMES:  WE ALSO BELIEVE THAT THE ABILITY TO CREATE A

02:50PM   15   TECHNOLOGY DRIVEN BUSINESS MODEL WHERE WE'RE GOING AFTER VOLUME

02:50PM   16   IN A BIG WAY AND MAKE THESE TESTS AVAILABLE AT REALLY LOW COSTS

02:50PM   17   AT THE SAME TIME HAS A GREAT POTENTIAL.

02:50PM   18       "AND IT'S ALSO DIFFERENT FROM WAYS PEOPLE HAVE OPERATED IN

02:50PM   19   THIS SPACE.  BECAUSE GENERALLY THE CONVERSATION IS, OH,

02:50PM   20   WE'VE -- YOU INVENTED THIS NEW TEST AND IT'S GOING TO BE REALLY

02:50PM   21   GOOD SO WE'RE GOING TO GO TRY TO CONVINCE MEDICARE TO PAY

02:50PM   22   $5,000 FOR THE TEST.  WE'RE TAKING THE SAME TESTS AND MAKING

02:50PM   23   THEM AVAILABLE FOR $30 AND WE'LL CONTINUE TO DO THAT.  WE ARE

02:50PM   24   THE FIRST COMPANY WHO HAS BILLED MEDICARE AND MEDICAID AT A

02:50PM   25   FRACTION OF WHAT THEY'RE WILLING TO REIMBURSE.  AND THAT'S VERY

4509

TOLBERT DIRECT BY MR. SCHENK

02:50PM  1    INTERESTING BECAUSE WHAT HAPPENS AS A RESULT IS THAT THEY

02:50PM  2    SURVEY EVERY YEAR WHAT THEY'RE BEING BILLED AND REDUCE THEIR

02:51PM  3    REIMBURSEMENT THRESHOLDS ACCORDINGLY.

02:51PM  4         "AND SO IN THE CONTEXT OF THIS LOWER PRICING, THEIR

02:51PM  5    REIMBURSEMENT THRESHOLD WILL FALL AND WILL BE REDUCED OVER

02:51PM  6    TIME.  AND THE SAVINGS TO MEDICARE AND MEDICAID ARE SIGNIFICANT

02:51PM  7    AT -- IT'S PROJECTED TO BE AT LEAST $160 BILLION IN DIRECT OUT

02:51PM  8    OF POCKET SAVINGS OVER THE COURSE OF THE NEXT TEN YEARS.

02:51PM  9         "AND THERE ARE ADDITIONAL SAVINGS THAT COME WITH THE WAY

02:51PM  10   THAT IT CHANGES THE CARE PROCESS, MEANING WHAT'S HAPPENING

02:51PM  11   RIGHT NOW IN PALO ALTO IS THAT UNLIKE IN THE PAST WHERE I WOULD

02:51PM  12   GO SEE MY DOC.  THE DOC WOULD SAY, ELIZABETH, I HAVEN'T SEEN

02:51PM  13   YOU FOR A YEAR AND GO DO A TEST.

02:51PM  14        "I WOULD GO AND DO MY TEST AND COME BACK.  AND THE DOC

02:51PM  15   SAYS, OH, YOU KNOW, YOUR HEMOGLOBIN WAS SEVEN AND THAT MEANS

02:52PM  16   YOU'RE REALLY ANEMIC.  I DON'T KNOW WHAT KIND OF ANEMIA IT IS

02:52PM  17   SO I'M GOING TO PUT YOU ON THIS ANEMIA DRUG IMMEDIATELY AND GO

02:52PM  18   DO ANOTHER TEST SO I CAN FIGURE OUT WHAT KIND OF ANEMIA IT IS.

02:52PM  19        "SO I GO GET MY PRESCRIPTION, THE HEAVY DUTY DRUG.  AND IN

02:52PM  20   THE MEANTIME I DO MY SECOND LAB TEST AND I COME BACK FOR MY

02:52PM  21   THIRD OFFICE VISIT.  AND THE DOC SAYS, OH, IRON DEFICIENCY.

02:52PM  22   GET OFF THE DRUG AND TAKE SOME IRON PILLS.

02:52PM  23        "AND YOU HAVE THIS SIX-WEEK PROCESS WITH THREE OFFICE

02:52PM  24   VISITS, TWO LABS, ONE UNNECESSARY PRESCRIPTION.  AND BECAUSE WE

02:52PM  25   HAVE MADE IT POSSIBLE TO RUN ANY COMBINATION OF LAB TESTS FROM

TOLBERT DIRECT BY MR. SCHENK

02:52PM 1   THESE TINY SAMPLES, THE PHYSICIAN CAN NOW SAY ON THE LAB FORM

02:52PM 2   IF, IN MY EXAMPLE, HEMOGLOBIN IS LOW, AUTOMATICALLY RUN IRON

02:52PM 3   AND B12 AND OTHER TESTS ON THE SAME SAMPLE BECAUSE BIG

02:52PM 4   DEDICATED TUBES OF BLOOD ARE NO LONGER REQUIRED TO RUN EACH OF

02:53PM 5   THOSE DIFFERENT ASSAY METHODOLOGIES WHICH REQUIRE THEIR OWN BIG

02:53PM 6   ANALYZERS IN A TRADITIONAL LAB.

02:53PM 7       "AND SO WE GET THESE LAB FORMS THAT SAY, OKAY, YOU KNOW,

02:53PM 8   IF THIS IS OUT OF RANGE, THEN RUN THIS.  AND ON THE SAME SAMPLE

02:53PM 9   IN THAT SAME WINDOW WHEN WE'RE PROCESSING THE SAMPLE, WE CAN DO

02:53PM 10  WHAT WE CALL THIS AUTOMATED REFLEX TO THOSE ADDITIONAL TESTS

02:53PM 11  AND THEN SEND THE DATA BACK TO THE DOC.  AND BECAUSE WE'VE

02:53PM 12  GENERATED THE DATA SO FAST, NAMELY, WITHIN HOURS, I, AS A

02:53PM 13  PATIENT, THEN COULD GO SEE MY DOC THAT AFTERNOON AND THE DOC

02:53PM 14  ALREADY HAS THE DATA.

02:53PM 15      "SO WE'RE STARTING TO SEE A SHIFT IN THE WORKFLOW WHERE,

02:53PM 16  FOR PEOPLE WHO HAVE PHYSICIANS, THEY'RE SENDING THE TESTS AHEAD

02:53PM 17  OF TIME AND THEN THEY'RE SEEING THE PATIENT.  AND THAT

02:53PM 18  SIGNIFICANTLY CHANGES SOME OF THE REDUNDANCY IN COSTS AROUND

02:53PM 19  VISITS THAT ARE ASSOCIATED WITH FOLLOW UP LAB TESTS AND/OR NOT

02:54PM 20  HAVING THE INFORMATION THAT IS NEEDED AT THE TIME A DIAGNOSIS

02:54PM 21  IS MADE.

02:54PM 22      "SO FROM A SAVINGS PERSPECTIVE TO MEDICARE AND MEDICAID

02:54PM 23  THAT IS A MUCH BIGGER DEAL THAN THE DIRECT OUT OF POCKET

02:54PM 24  SAVINGS THAT I PREVIOUSLY REFERENCED AND ULTIMATELY WILL LEAD

02:54PM 25  TO -- TO BETTER CARE IS THE GOAL."

4511

TOLBERT DIRECT BY MR. SCHENK

02:54PM  1    BY MR. SCHENK:

02:54PM  2    Q.   MR. TOLBERT, FOR THE RECORD I'VE JUST PLAYED FOR YOU

02:54PM  3    1348-6, 1348-7, AND 1349-1.

02:54PM  4        ON EACH OF THOSE, DID YOU HEAR AND RECOGNIZE MS. HOLMES'S

02:54PM  5    VOICE?

02:54PM  6    A.   I DID.

02:54PM  7    Q.   AND IF WE COULD WORK THROUGH THEM BACKWARDS, SO THE MOST

02:54PM  8    RECENT ONE, 1349-1, DID YOU HEAR A GENTLEMAN ASK A QUESTION?

02:54PM  9    A.   I DID.

02:54PM  10   Q.   DID YOU RECOGNIZE THAT VOICE?

02:54PM  11   A.   I BELIEVE IT WAS CHRIS LUCAS.

02:54PM  12   Q.   IN MS. HOLMES'S RESPONSE SHE SAYS, "AND BECAUSE WE HAVE

02:55PM  13   MADE IT POSSIBLE TO RUN ANY COMBINATION OF LAB TESTS FROM THESE

02:55PM  14   TINY SAMPLES."

02:55PM  15       DID YOU BELIEVE -- WHAT DID YOU TAKE THAT TO MEAN?

02:55PM  16   A.   WELL, I TOOK IT AT FACE VALUE, RIGHT?  THAT THERE WAS AN

02:55PM  17   OPPORTUNITY OUT OF A FINGERSTICK OF BLOOD TO RUN MULTIPLE TESTS

02:55PM  18   ON IT, AND TO RUN REFLECTS OF TESTS SO THAT IF TEST A SAID I

02:55PM  19   HAD A CERTAIN RESULT, THEN TEST B OR TEST C OR TEST D COULD BE

02:55PM  20   RUN.

02:55PM  21   Q.   AND WHEN SHE SAID THAT IT WAS POSSIBLE TO RUN ANY

02:55PM  22   COMBINATION OF THESE LAB TESTS, YOU SAID YOU TOOK IT AT FACE

02:55PM  23   VALUE.  DID YOU TRUST THAT SHE WAS TELLING YOU SOMETHING THAT

02:55PM  24   THERANOS CURRENTLY COULD DO, IT WAS A PRESENT CAPABILITY?

02:55PM  25   A.   I BELIEVE IT WAS A CAPABILITY THAT THEY HAD AT THAT POINT.

4512

TOLBERT DIRECT BY MR. SCHENK

02:55PM 1    Q.   WHEN SHE SAID THAT "BIG DEDICATED TUBES OF BLOOD ARE NO

02:55PM 2    LONGER REQUIRED," WHAT DID YOU TAKE THAT TO MEAN?

02:55PM 3    A.   THAT THE TECHNOLOGY WAS AT A PLACE THAT A FINGERSTICK OF

02:56PM 4    BLOOD COULD BE USED TO DO THOSE TESTS AND THAT, YOU KNOW, IT

02:56PM 5    NEGATED THE NEED FOR THE BIG TUBES OF BLOOD.

02:56PM 6    Q.   AND SHE TALKED ABOUT SOMETHING THAT SHE CALLED AUTOMATED

02:56PM 7    REFLEX.

02:56PM 8         DID YOU UNDERSTAND WHAT SHE WAS TALKING ABOUT THERE?

02:56PM 9    A.   I DID.

02:56PM 10   Q.   AND WHAT DID YOU TAKE THAT TO MEAN?

02:56PM 11   A.   WELL, IF TEST A GIVES A CERTAIN RESULT, THEN TEST B OR

02:56PM 12   TEST C OR TEST D COULD HAVE BEEN RUN, AND, YOU KNOW, IN

02:56PM 13   RESPONSE TO WHAT TEST A SHOWED.

02:56PM 14   Q.   AND WHEN SHE SAID "WE CAN DO WHAT WE CALL THIS AUTOMATED

02:56PM 15   REFLEX," DID YOU UNDERSTAND THAT SHE WAS DESCRIBING REFLEX

02:56PM 16   TESTING AS A PRESENT CAPABILITY?

02:56PM 17   A.   I DID.

02:56PM 18   Q.   IF WE TURN BACK TO 1348-6.

02:56PM 19        DO YOU RECALL MS. HOLMES MAKING SOME STATEMENTS ABOUT THE

02:56PM 20   MILITARY?

02:56PM 21   A.   I DO.

02:56PM 22   Q.   AND I'D LIKE TO ASK YOU SOME QUESTIONS ABOUT THAT.

02:56PM 23        SHE SAYS, "IN TERMS OF A MILITARY ASPECT OF THIS, MILITARY

02:56PM 24   IS A BIG DEAL FOR US AND I CAN TELL YOU CONFIDENTIALLY A COUPLE

02:57PM 25   THE AREAS IN WHICH WE HAVE BEEN FOCUSSED THERE."

4513

TOLBERT DIRECT BY MR. SCHENK

```
02:57PM   1          WHEN SHE SAID THE WORD THERE THAT SHE COULD TELL YOU

02:57PM   2     CONFIDENTIALLY, WHAT DID YOU TAKE THAT TO MEAN?

02:57PM   3     A.   THAT THIS IS INFORMATION THAT WASN'T PUBLIC AND THAT

02:57PM   4     WASN'T TO BE SHARED PUBLICLY, BUT THAT IT REPRESENTED

02:57PM   5     CAPABILITIES THAT THERANOS AND THE COMPANY HAD DEVELOPED AND

02:57PM   6     WERE, YOU KNOW, WERE OPERATIONAL AT THAT POINT.

02:57PM   7     Q.   AND WHEN SHE SAID, "ONE IS IN THE CONTEXT OF WORK IN THE

02:57PM   8     MIDDLE EAST AND SPECIFICALLY AFGHANISTAN," DID YOU TAKE THAT TO

02:57PM   9     MEAN THAT THERANOS HAD DONE WORK IN AFGHANISTAN?

02:57PM  10     A.   I DID.

02:57PM  11     Q.   AND SO WHEN SHE SAID "THE ABILITY TO TAKE A TECHNOLOGY

02:57PM  12     LIKE THIS AND PUT IT IN FLIGHT, SPECIFICALLY ON A MEDEVAC, HAS

02:57PM  13     THE POTENTIAL TO CHANGE SURVIVAL RATES," WHAT DID YOU TAKE THAT

02:57PM  14     TO MEAN?

02:57PM  15     A.   YOU KNOW, MY UNDERSTANDING FROM WHAT WE LISTENED TO WAS

02:57PM  16     THAT THE SOONER A TEST COULD BE ADMINISTERED TO FIGURE OUT, YOU

02:58PM  17     KNOW, HOW TO ADDRESS WHATEVER TRAUMATIC SITUATION THAT

02:58PM  18     HAPPENED, THAT SURVIVAL RATES WENT UP EXPONENTIALLY.

02:58PM  19          YOU KNOW, THIS IS SOMETHING THAT REALLY RESONATED WITH ME.

02:58PM  20     I HAVE A BROTHER WHO IS IN THE MARINES, AND HE DID A TOUR IN

02:58PM  21     AFGHANISTAN, SO THE THOUGHT THAT OUR SERVICE MEN AND WOMEN, IF

02:58PM  22     THEY GOT HURT, THERE WAS AN ABILITY TO, YOU KNOW, DO EVERYTHING

02:58PM  23     THAT WE COULD TO HELP THEM WAS SOMETHING THAT I THOUGHT

02:58PM  24     THERANOS WAS DOING.

02:58PM  25     Q.   SHE CONTINUES.  "AND WHAT IT DOES IS IT MAKES IT MAKES IT
```

TOLBERT DIRECT BY MR. SCHENK                                    4514

02:58PM  1    POSSIBLE TO BEGIN TRANSFUSION AND STABILIZATION IN PLACE.  AND

02:58PM  2    SO WE HAVE BEEN DOING A LOT OF WORK THERE."

02:58PM  3        WHAT DID YOU UNDERSTAND THAT TO MEAN?

02:58PM  4    A.   SO I UNDERSTOOD THAT THERE HAD BEEN SIGNIFICANT WORK BEING

02:58PM  5    DONE TO DEPLOY THE THERANOS SYSTEM IN THEATRE AS IT WERE.

02:58PM  6    Q.   SHE SAYS, "WE HAVE ALSO BEEN DOING A LOT OF WORK FOR

02:58PM  7    SPECIAL OPERATIONS COMMAND IN THE CONTEXT OF MISSIONS IN REMOTE

02:59PM  8    AREAS WHERE NOT ONLY IS THERE NO CAPABILITY TO DO TESTING FOR

02:59PM  9    CERTAIN THINGS THAT NEED TO BE MEASURED, BUT IF SITUATIONS

02:59PM  10   ARISE IN WHICH THOSE TESTS ARE WARRANTED, THE MISSION IS

02:59PM  11   ABORTED AND PEOPLE ARE EVACUATED GENERALLY OUT OF CONTINENT."

02:59PM  12       WHAT DID YOU TAKE HER STATEMENTS ABOUT SPECIAL OPERATIONS

02:59PM  13   COMMAND?

02:59PM  14   A.   MY UNDERSTANDING WAS THAT THERANOS HAD BEEN, YOU KNOW,

02:59PM  15   WORKING WITH SPECIAL OPERATIONS COMMAND AND IT REPRESENTED A

02:59PM  16   PORTION OF THE BUSINESS THAT THEY HAD BEEN ENGAGED IN.

02:59PM  17       AND LIKE WE HEARD EARLIER, IT WASN'T THE PRIMARY FOCUS AT

02:59PM  18   THIS MOMENT IN TIME, BUT IT CERTAINLY REPRESENTED A CAPABILITY

02:59PM  19   AND A BUSINESS THAT THEY HAD PURSUED.

02:59PM  20   Q.   SHE SAYS, "AND SO WE'VE, YOU KNOW, CREATED A DISTRIBUTED

02:59PM  21   SYSTEM THAT CAN BE USED IN REMOTE AREAS AND THAT IS -- THAT IS

02:59PM  22   ANOTHER VENUE AND FOCUS FOR US."

02:59PM  23       WHAT DID YOU TAKE THAT TO MEAN?

03:00PM  24   A.   THAT THESE, YOU KNOW, DEPLOYMENTS IN MILITARY KIND OF

03:00PM  25   SITUATIONS WAS ONE OF THE THREE, YOU KNOW, BUSINESS UNITS THAT

4515

TOLBERT DIRECT BY MR. SCHENK

03:00PM 1    HAD BEEN REPRESENTED TO KIND OF COMPLEMENT, YOU KNOW, THE

03:00PM 2    PHARMACEUTICAL BUSINESS AND THE CURRENT BIG RETAIL OPPORTUNITY

03:00PM 3    THAT WAS THE GENESIS FOR THIS CALL.

03:00PM 4    Q.   DID MS. HOLMES'S STATEMENTS ABOUT THE MILITARY PLAY A ROLE

03:00PM 5    IN YOUR DECISION TO INVEST?

03:00PM 6    A.   CERTAINLY THEY WOULD HAVE BEEN SUPPORTIVE TO AN INVESTMENT

03:00PM 7    DECISION TO PROCEED.

03:00PM 8    Q.   WHY?

03:00PM 9    A.   WELL, IF -- YOU KNOW, THIS WAS A SITUATION WHERE THERE WAS

03:00PM 10   AN INVESTMENT OPPORTUNITY THAT REPRESENTED A POTENTIAL TO MAKE

03:00PM 11   MONEY ON OUR INVESTMENT, BUT IT'S ALSO ONE THAT REPRESENTED AN

03:00PM 12   OPPORTUNITY TO DO GOOD AND TO, YOU KNOW, TO HELP CHANGE AN

03:00PM 13   INDUSTRY FOR THE BETTER.

03:00PM 14       AND SO, YOU KNOW, UNDERSTANDING THAT THERE WAS AN ABILITY

03:01PM 15   FOR, FOR WORK TO BE DONE WITH THE MILITARY TO HELP SERVICE MEN

03:01PM 16   AND WOMEN WHO WERE INJURED REPRESENTED, YOU KNOW, SOMETHING

03:01PM 17   THAT WAS AN EXCITING PART OF THE INVESTMENT BASIS FOR US.

03:01PM 18   Q.   AND MS. HOLMES SAYS, "AND IT'S ALSO VERY SYMBOLIC BECAUSE

03:01PM 19   IT'S OUR WAY TO HELP MAKE A DIFFERENCE IN WHATEVER SMALL WAY WE

03:01PM 20   CAN THERE."

03:01PM 21       DID YOU TAKE HER TO BE AGREEING WITH THE SENTIMENT THAT

03:01PM 22   YOU JUST EXPRESSED THAT YOU CAN MAKE MONEY, BUT YOU CAN ALSO DO

03:01PM 23   GOOD?

03:01PM 24   A.   YOU KNOW, CERTAINLY THAT'S WHAT I TOOK AWAY FROM THOSE

03:01PM 25   COMMENTS IS THAT, YOU KNOW, THERANOS WASN'T JUST ABOUT AN

TOLBERT DIRECT BY MR. SCHENK

03:01PM  1    OPPORTUNITY TO MAKE MONEY, BUT THAT IT WAS ABOUT -- IT WAS

03:01PM  2    ABOUT AN OPPORTUNITY TO MAKE MONEY, BUT TO DO SO IN A WAY THAT

03:01PM  3    WAS BENEFICIAL FOR LOTS AND LOTS AND LOTS OF PEOPLE.

03:01PM  4    Q.   AND THEN ON THE WHOLE OR IN GENERAL, WAS THIS CALL

03:01PM  5    IMPORTANT IN YOUR DECISION TO INVEST $5 MILLION?

03:01PM  6    A.   IT WAS.

03:01PM  7    Q.   WHY?

03:02PM  8    A.   WELL, YOU KNOW, LIKE I DESCRIBED BEFORE, AS WE, YOU KNOW,

03:02PM  9    HAD MADE AN INITIAL INVESTMENT AND HAD OVER TIME LEARNED ABOUT

03:02PM  10   WHAT THE COMPANY WAS DOING AND HAD SEEN THE PROGRESS THAT WE

03:02PM  11   FELT ALONG THE WAY, THIS FELT LIKE VALIDATION OF WHAT THAT

03:02PM  12   PROGRESS WAS.

03:02PM  13       BUT IT ALSO REPRESENTED A GREAT FUTURE OPPORTUNITY.  YOU

03:02PM  14   KNOW, THERE WOULD BE AN ABILITY TO SEE THIS ROLLOUT HAPPEN AND

03:02PM  15   TO HAVE, TO HAVE THE BENEFITS COME OUT OF THAT.

03:02PM  16       AND SO IT -- AND THIS CALL WAS CENTRAL TO, YOU KNOW, TO

03:02PM  17   OUR DECISION TO INVEST FURTHER FUNDS.

03:02PM  18   Q.   MR. TOLBERT, NOW, IF YOU'LL GO BACK TO THE BINDER IN FRONT

03:02PM  19   OF YOU AND TURN TO 3530.  3530.

03:02PM  20       YOUR HONOR, THE GOVERNMENT OFFERS 3530 BY STIPULATION.

03:02PM  21           MR. DOWNEY:  THAT'S CORRECT, YOUR HONOR.

03:03PM  22           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:03PM  23       (GOVERNMENT'S EXHIBIT 3530 WAS RECEIVED IN EVIDENCE.)

03:03PM  24           MR. SCHENK:  THANK YOU, YOUR HONOR.

03:03PM  25   Q.   MR. TOLBERT, DO YOU RECOGNIZE THE DOCUMENT LOCATED AT

4517

TOLBERT DIRECT BY MR. SCHENK

| | | |
|---|---|---|
| 03:03PM | 1 | 3530? |
| 03:03PM | 2 | A.   I DO. |
| 03:03PM | 3 | Q.   WHAT IS THIS DOCUMENT? |
| 03:03PM | 4 | A.   THIS IS THE STOCK PURCHASE AGREEMENT THAT REPRESENTED THE |
| 03:03PM | 5 | ABILITY TO PURCHASE STOCK IN 2013. |
| 03:03PM | 6 | Q.   OKAY.  AND WAS THIS AN AGREEMENT THAT YOU ENTERED INTO |
| 03:03PM | 7 | AFTER THAT CALL WHEN YOU INVESTED THE 5 MILLION THAT WE'VE BEEN |
| 03:03PM | 8 | TALKING ABOUT? |
| 03:03PM | 9 | A.   IT WAS. |
| 03:03PM | 10 | Q.   AND DID YOU BUY IN SERIES C-1? |
| 03:03PM | 11 | A.   CORRECT. |
| 03:03PM | 12 | Q.   AND IF YOU'LL LOOK AT PAGE 5 OF THE EXHIBIT AT THE TOP IN |
| 03:03PM | 13 | THAT FIRST PARAGRAPH.  IT SAYS, "AMENDED AND RESTATED SERIES |
| 03:03PM | 14 | C-1 PREFERRED STOCK PURCHASE AGREEMENT." |
| 03:03PM | 15 | SO DID YOU THINK THAT WHEN YOU WERE SIGNING THIS DOCUMENT, |
| 03:03PM | 16 | YOU WERE BUYING THE SHARES OF SERIES C-1 STOCK WE'VE TALKED |
| 03:03PM | 17 | ABOUT? |
| 03:03PM | 18 | A.   I DID. |
| 03:03PM | 19 | Q.   IF YOU WILL TURN TO PAGE 11 AT THE BOTTOM, 4.4, AND THEN |
| 03:04PM | 20 | IT WILL CARRY ON OVER TO THE NEXT PAGE. |
| 03:04PM | 21 | 4.4 READS, "SPECULATIVE NATURE OF INVESTMENT.  SUCH |
| 03:04PM | 22 | INVESTOR UNDERSTANDS AND ACKNOWLEDGES THAT THE COMPANY HAS A |
| 03:04PM | 23 | LIMITED FINANCIAL AND OPERATING HISTORY AND THAT AN INVESTMENT |
| 03:04PM | 24 | IN THE COMPANY IS," AND THEN IT CONTINUES ON THE NEXT PAGE, |
| 03:04PM | 25 | "HIGHLY SPECULATIVE AND INVOLVES SUBSTANTIAL RISKS.  SUCH |

TOLBERT DIRECT BY MR. SCHENK

03:04PM  1    INVESTOR CAN BEAR THE ECONOMIC RISK OF SUCH INVESTOR'S

03:04PM  2    INVESTMENT AND IS ABLE, WITHOUT IMPAIRING SUCH INVESTOR'S

03:04PM  3    FINANCIAL CONDITION, TO HOLD THE SHARES AND THE CONVERSION

03:04PM  4    SHARES FOR AN INDEFINITE PERIOD OF TIME AND TO SUFFER A

03:04PM  5    COMPLETE LOSS OF SUCH INVESTOR'S INVESTMENT."

03:04PM  6        THIS SECTION HAS SOME REPRESENTATIONS ABOUT YOU OR HALL'S

03:04PM  7    GROUP ABILITY TO BEAR THE LOSS.

03:04PM  8        WERE THOSE ALL TRUE AT THE TIME YOU SIGNED THIS?

03:04PM  9    A.   THEY WERE TRUE.

03:05PM  10   Q.   AND EARLIER ON IN THIS SECTION IT TALKS ABOUT LIMITED

03:05PM  11   FINANCIAL AND OPERATING HISTORY.

03:05PM  12       DID YOU ALSO UNDERSTAND THAT TO BE TRUE?

03:05PM  13   A.   I DID.

03:05PM  14   Q.   AND DID YOU UNDERSTAND THAT ONE OF THE RISKS, OR ONE OF

03:05PM  15   THE SPECULATIVE ASPECTS OF THIS INVESTMENT WAS THAT INFORMATION

03:05PM  16   THAT MS. HOLMES WOULD PROVIDE TO YOU WOULD BE INACCURATE?  WAS

03:05PM  17   THAT A RISK THAT YOU UNDERSTOOD?

03:05PM  18   A.   THAT IS NOT.

03:05PM  19   Q.   4.5, ACCESS TO DATA IS JUST BELOW THE SECTION I READ TO

03:05PM  20   YOU.

03:05PM  21       IT SAYS THAT YOU HAD, "SUCH INVESTOR HAS HAD AN

03:05PM  22   OPPORTUNITY TO ASK QUESTIONS OF, AND RECEIVE ANSWERS FROM, THE

03:05PM  23   OFFICERS OF THE COMPANY CONCERNING THE AGREEMENTS, THE EXHIBITS

03:05PM  24   AND SCHEDULES," AND IT CONTINUES.

03:05PM  25       DID YOU HAVE THE OPPORTUNITY TO ASK MS. HOLMES QUESTIONS?

4519

TOLBERT DIRECT BY MR. SCHENK

| | | |
|---|---|---|
| 03:05PM | 1 | A. WE DID ON THAT CALL. |
| 03:05PM | 2 | Q. WE LISTENED TO THE CALL; IS THAT RIGHT? |
| 03:05PM | 3 | A. CORRECT. |
| 03:05PM | 4 | Q. WERE THE ANSWERS THAT SHE GAVE ON THAT CALL PUT INTO THIS |
| 03:05PM | 5 | AGREEMENT? |
| 03:05PM | 6 | A. THE ANSWERS WERE NOT APPENDED TO THIS AGREEMENT, NO. |
| 03:05PM | 7 | Q. SO DID YOU UNDERSTAND THAT WHEN IT TALKS ABOUT YOU HAD THE |
| 03:06PM | 8 | OPPORTUNITY TO ASK QUESTIONS, YOU RECEIVED ANSWERS TO THOSE, |
| 03:06PM | 9 | AND THAT'S ALSO WHAT CAUSED YOU TO INVEST? |
| 03:06PM | 10 | A. CORRECT. |
| 03:06PM | 11 | Q. 4.6 SAID ACCREDITED INVESTOR. THAT'S JUST BELOW THE |
| 03:06PM | 12 | SECTION THAT I JUST READ TO YOU. |
| 03:06PM | 13 | "THE INVESTOR IS AN ACCREDITED INVESTOR WITHIN THE MEANING |
| 03:06PM | 14 | OF REGULATION D." |
| 03:06PM | 15 | HAVE YOU HEARD THAT PHRASE, AN ACCREDITED INVESTOR? |
| 03:06PM | 16 | A. I HAVE. |
| 03:06PM | 17 | Q. AND WERE YOU AND HALL GROUP AN ACCREDITED INVESTOR AT THE |
| 03:06PM | 18 | TIME THAT YOU SIGNED? |
| 03:06PM | 19 | A. THEY WERE. WE WERE. |
| 03:06PM | 20 | Q. WOULD YOU NOW TURN TO PAGE 24 OF THIS EXHIBIT. |
| 03:06PM | 21 | ABOVE THE NAME ELIZABETH HOLMES, CHIEF EXECUTIVE OFFICER, |
| 03:06PM | 22 | IS THERE A SIGNATURE? |
| 03:06PM | 23 | A. THERE IS. |
| 03:06PM | 24 | Q. AND IF YOU WILL TURN TO PAGE 32. |
| 03:07PM | 25 | ON PAGE 32 UNDER SOMETHING CALLED HALL BLACK DIAMOND, IS |

TOLBERT DIRECT BY MR. SCHENK                                    4520

03:07PM   1    THAT YOUR SIGNATURE?

03:07PM   2    A.    THAT IS MY SIGNATURE.

03:07PM   3    Q.    AND ALSO DID YOU WRITE IN YOUR NAME AND DATE IT?

03:07PM   4    A.    I DID.

03:07PM   5    Q.    AND WHAT IS HALL BLACK DIAMOND?

03:07PM   6    A.    HALL BLACK DIAMOND IS THE ENTITY THAT WE USED TO INVEST

03:07PM   7    THE $5 MILLION.

03:07PM   8    Q.    AND JUST TO BE CLEAR, THE ADDRESS THAT WE'RE SEEING,

03:07PM   9    THAT'S NOT YOUR PERSONAL ADDRESS, THAT'S HALL GROUP'S ADDRESS;

03:07PM   10   IS THAT RIGHT?

03:07PM   11   A.    CORRECT.

03:07PM   12   Q.    AND THEN THERE'S A SIGNATURE ON THAT SAME PAGE ABOVE

03:07PM   13   ELIZABETH HOLMES, CHIEF EXECUTIVE OFFICER.

03:07PM   14         DO YOU SEE THAT?

03:07PM   15   A.    I DO.

03:07PM   16   Q.    THIS IS DATED 12/31/2013.  IS THAT THE DATE THAT YOU

03:07PM   17   SIGNED AND SENT A WIRE TRANSFER TO PURCHASE THESE SHARES?

03:07PM   18   A.    THAT IS THE DATE.

03:07PM   19         MR. SCHENK:  YOUR HONOR, WE WOULD ADMIT 4845,

03:08PM   20   PAGE 20, THE CUSTODIAN FROM THE FEDERAL RESERVE BANK.

03:08PM   21         THE COURT:  YES.

03:08PM   22   BY MR. SCHENK:

03:08PM   23   Q.    I THINK IT IS ALSO IN YOUR BINDER IF IT'S EASIER FOR YOU

03:08PM   24   TO SEE, MR. TOLBERT.

03:08PM   25   A.    IF YOU BLOW IT UP I CAN SEE IT.

TOLBERT DIRECT BY MR. SCHENK                                        4521

03:08PM  1    Q.   OKAY.  IF WE COULD -- THAT'S GREAT.

03:08PM  2         ARE YOU FAMILIAR WITH TEXAS CAPITAL BANK?

03:08PM  3    A.   I AM.

03:08PM  4    Q.   AND THEN THERE IS, UNDER AMOUNT, 4,875,000.

03:08PM  5         DOES THAT AMOUNT LOOK FAMILIAR TO YOU?

03:08PM  6    A.   THAT IS.  THAT IS THE AMOUNT THAT WE SENT IN.

03:08PM  7    Q.   WE'VE BEEN TALKING, YOU AND I, ABOUT $5 MILLION.  THE WIRE

03:08PM  8    TRANSFER IS FOR A LITTLE OVER 4.8 MILLION.  CAN YOU EXPLAIN

03:08PM  9    THAT?

03:08PM  10   A.   I CAN.  SO, YOU KNOW, OUR FIRST INVESTMENT HAD BEEN

03:09PM  11   THROUGH CHRIS LUCAS'S INVESTMENT FUND, BLACK DIAMOND VENTURES.

03:09PM  12        YOU KNOW, OUR DESIRE WAS TO BE A DIRECT INVESTOR INTO THE

03:09PM  13   COMPANY SO THAT WE WOULD HAVE ACCESS OF THE DIRECT

03:09PM  14   COMMUNICATION FROM THE COMPANY TO ITS SHAREHOLDERS AND NOT RELY

03:09PM  15   ON CHRIS TO BE OUR SOLE SOURCE OF INFORMATION.

03:09PM  16        AND SO OUR AGREEMENT, THE AGREEMENT WE CAME TO WITH CHRIS

03:09PM  17   AND ELIZABETH AROUND THIS INVESTMENT WAS THAT WE WOULD PAY

03:09PM  18   CHRIS A COMMISSION TO BE A DIRECT INVESTOR AND TO NOT BE

03:09PM  19   INVESTED THROUGH HIS FUND.

03:09PM  20        AND SO THE $125,000 DIFFERENCE HERE REPRESENTS THE CASH

03:09PM  21   THAT WE PAID TO CHRIS FOR HIS COMMISSION ON THAT INVESTMENT.

03:09PM  22   Q.   I SEE.  A LITTLE FURTHER DOWN ON THIS DOCUMENT, THERE'S

03:09PM  23   SOMETHING CALLED HALL PHOENIX INWOOD LTD.

03:10PM  24        DO YOU SEE THAT?

03:10PM  25   A.   YES.

TOLBERT DIRECT BY MR. SCHENK                                       4522

03:10PM   1    Q.   AND WHAT IS THAT?

03:10PM   2    A.   SO HALL PHOENIX INWOOD IS THE PRIMARY OPERATING COMPANY OF

03:10PM   3    HALL GROUP, AND HALL PHOENIX INWOOD WOULD HAVE WIRED THIS MONEY

03:10PM   4    ON BEHALF OF HALL BLACK DIAMOND TO --

03:10PM   5    Q.   TO WHERE?  WHERE DID THE WIRE GO?

03:10PM   6    A.   THE WIRE WOULD HAVE GONE TO THERANOS.  IT SAYS HERE ON THE

03:10PM   7    LINE IT WENT TO THEIR ACCOUNT AT COMERICA BANK.

03:10PM   8    Q.   OKAY.  I UNDERSTAND MULTIPLE PEOPLE WORK AT HALL GROUP.

03:10PM   9    DID YOU PUT IN PLACE OR INITIATE THE WIRE TRANSFER?

03:10PM  10    A.   I GAVE AUTHORIZATION FOR THE WIRE TO BE INITIATED, AND

03:10PM  11    THEN ONCE IT HAD BEEN INITIATED, I APPROVED IT.

03:10PM  12    Q.   OKAY.  AND HOW ABOUT THE AMOUNT, THE DOLLAR AMOUNT?  DID

03:10PM  13    YOU DECIDE THE AMOUNT THAT HALL GROUP WOULD INVEST IN THERANOS?

03:10PM  14    A.   I DID.  MR. HALL AND I HAD DISCUSSIONS ABOUT WHAT THAT

03:11PM  15    AMOUNT WOULD BE, AND, YOU KNOW, THE $5 MILLION THAT WE SETTLED

03:11PM  16    ON IS THE ONE THAT I INDICATED WE WOULD SEND, AND SO WE SENT

03:11PM  17    THAT AMOUNT.

03:11PM  18    Q.   OKAY.  AND DO YOU KNOW WHETHER ULTIMATELY MR. HALL LEFT IT

03:11PM  19    UP TO YOU TO DECIDE THE EXACT AMOUNT, OR MAYBE EVEN WHETHER YOU

03:11PM  20    INVESTED?

03:11PM  21    A.   HE DID.

03:11PM  22    Q.   OKAY.

03:11PM  23         YOUR HONOR, MAY I JUST HAVE ONE MOMENT?

03:11PM  24              THE COURT:  YES.

03:11PM  25         (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

TOLBERT CROSS BY MR. DOWNEY                                        4523

03:11PM   1            MR. SCHENK:  THANK YOU, YOUR HONOR.

03:11PM   2        NO FURTHER QUESTIONS AT THIS TIME.

03:11PM   3            THE COURT:  CROSS-EXAMINATION?

03:11PM   4            MR. DOWNEY:  YES, YOUR HONOR.

03:11PM   5            THE COURT:  FOLKS, FEEL FREE TO STAND UP AND STRETCH

03:11PM   6    WHILE WE DO THE TRANSITION IF YOU WOULD LIKE.

03:11PM   7        SAME WITH YOU, MR. TOLBERT, IF YOU WOULD LIKE TO STAND AND

03:11PM   8    STRETCH.

03:11PM   9            THE WITNESS:  THANK YOU, YOUR HONOR.

03:11PM   10       (STRETCHING.)

03:12PM   11                     **CROSS-EXAMINATION**

03:12PM   12   BY MR. DOWNEY:

03:12PM   13   Q.  GOOD AFTERNOON, MR. TOLBERT.  MY NAME IS KEVIN DOWNEY, AND

03:12PM   14   I REPRESENT MS. HOLMES.

03:12PM   15       I WANT TO START BY ASKING YOU ABOUT HOW THE RELATIONSHIP

03:12PM   16   WITH THERANOS BEGAN IN VERY SUMMARY FORM, BECAUSE I THINK WE'VE

03:12PM   17   HEARD ABOUT IT DURING THE COURSE OF YOUR DIRECT.

03:13PM   18       AS I UNDERSTAND IT, MR. HALL GOT A PHONE CALL FROM

03:13PM   19   SOMEBODY THAT INFORMED HIM ABOUT THERANOS AND A POTENTIAL

03:13PM   20   OPPORTUNITY TO INVEST; IS THAT RIGHT?

03:13PM   21   A.  I BELIEVE THAT'S CORRECT.

03:13PM   22   Q.  AND THAT TELEPHONE CALL CAME FROM DON LUCAS, DIDN'T IT?

03:13PM   23   A.  THAT -- I DON'T BELIEVE THAT'S CORRECT.

03:13PM   24   Q.  OKAY.  WELL, DO YOU KNOW -- DID THE TELEPHONE CALL COME

03:13PM   25   FROM GARY NORDHEIMER?

4524

TOLBERT CROSS BY MR. DOWNEY

03:13PM 1    A.   I BELIEVE THAT'S CORRECT.

03:13PM 2    Q.   AND GARY NORDHEIMER WAS AN INDIVIDUAL WHO WAS AN INVESTOR

03:13PM 3    IN THERANOS; CORRECT?

03:13PM 4    A.   YOU KNOW, I DON'T KNOW IF HE WAS A PRIOR INVESTOR, BUT I

03:13PM 5    KNOW HE WAS CONTEMPLATING AN INVESTMENT IN 2006.

03:13PM 6    Q.   OKAY.

03:13PM 7    A.   AND SO HE CALLED MR. HALL TO PUT THE OPPORTUNITY ON HIS

03:13PM 8    RADAR SCREEN.

03:13PM 9    Q.   OKAY.  AND DID HE SUGGEST TO MR. HALL OR TO YOU THAT YOU

03:14PM 10   SPEAK WITH DON LUCAS ABOUT THE POTENTIAL OPPORTUNITY TO INVEST?

03:14PM 11   A.   HE MAY HAVE.  HE MAY HAVE REFERENCED THAT WITH MR. HALL.

03:14PM 12        I NEVER TALKED WITH MR. NORDHEIMER DIRECTLY AT THAT POINT.

03:14PM 13   Q.   SO THE CONVERSATION THAT MR. HALL WOULD HAVE HAD WITH

03:14PM 14   MR. LUCAS YOU'RE PERSONALLY NOT AWARE OF?

03:14PM 15   A.   I AM NOT.

03:14PM 16   Q.   SO MR. HALL GOT IN TOUCH WITH YOU AND ASKED YOU TO DO DUE

03:14PM 17   DILIGENCE; CORRECT?

03:14PM 18   A.   CORRECT.

03:14PM 19   Q.   AND THAT WOULD INVOLVE GETTING AS MUCH INFORMATION ABOUT

03:14PM 20   THE COMPANY AS YOU COULD GET; CORRECT?

03:14PM 21   A.   CORRECT.

03:14PM 22   Q.   DID YOU KNOW AT THE OUTSET THAT THE ARRANGEMENT WOULD BE

03:14PM 23   ONE THAT WOULD HAVE TO GO THROUGH, THROUGH A THIRD PARTY, OR

03:14PM 24   DID YOU THINK THIS MIGHT BE AN OPPORTUNITY WHERE YOU COULD

03:14PM 25   INVEST DIRECTLY IN THERANOS?

TOLBERT CROSS BY MR. DOWNEY                                    4525

03:14PM  1    A.    NO.   MY UNDERSTANDING WAS THAT IT WAS AN INVESTMENT

03:14PM  2    THROUGH CHRIS LUCAS, YOU KNOW, THROUGH THAT SERIES OF

03:14PM  3    CONVERSATIONS THAT HE'S THE ONE THAT PRESENTED THE OPPORTUNITY

03:14PM  4    TO US AND SO THE INVESTMENT WOULD GO THROUGH THAT, THROUGH HIS

03:15PM  5    VEHICLE.

03:15PM  6    Q.    OKAY.   SO SOMEHOW THE OPPORTUNITY BECAME NOTICED -- THE

03:15PM  7    HALL GROUP BECAME AWARE OF THE OPPORTUNITY, MR. HALL SPOKE TO

03:15PM  8    SOMEONE ABOUT THE OPPORTUNITY, HE ASKED YOU TO DO DUE

03:15PM  9    DILIGENCE, AND YOU CALLED CHRIS LUCAS; IS THAT RIGHT?

03:15PM  10   A.    CORRECT.

03:15PM  11   Q.    AND THEN YOU HAD A -- I BELIEVE YOU HAD AT LEAST ONE OR

03:15PM  12   TWO TELEPHONE CONVERSATIONS WITH -- INVOLVING MR. LUCAS BEFORE

03:15PM  13   YOU WENT TO THERANOS?

03:15PM  14   A.    BEFORE I MADE THE TRIP TO THERANOS?

03:15PM  15   Q.    YES.

03:15PM  16   A.    CORRECT.

03:15PM  17   Q.    AND YOU TALKED ABOUT THOSE CONVERSATIONS THUS FAR,

03:15PM  18   EITHER -- MS. HOLMES WAS EITHER ON ONE OR TWO OF THOSE CALLS;

03:15PM  19   IS THAT RIGHT?

03:15PM  20   A.    CORRECT.

03:15PM  21   Q.    AND THEN YOU TOOK THE TRIP TO THERANOS AND YOU HAD THE

03:15PM  22   DINNER THAT YOU DESCRIBED; CORRECT?

03:15PM  23   A.    CORRECT.

03:15PM  24   Q.    AND IN ADDITION TO YOURSELF, MS. HOLMES, DON LUCAS, AND

03:15PM  25   CHRIS LUCAS WERE AT THAT DINNER; CORRECT?

TOLBERT CROSS BY MR. DOWNEY                                      4526

03:16PM  1      A.   THEY BOTH WERE.

03:16PM  2      Q.   OKAY.  AND DID YOU, AT THAT DINNER, ASK FOR INFORMATION

03:16PM  3      FROM ALL THREE ABOUT THERANOS?

03:16PM  4      A.   YOU KNOW, CERTAINLY IN THE DISCUSSIONS WE HAD THAT NIGHT

03:16PM  5      ALL THREE OF THEM PARTICIPATED.

03:16PM  6      Q.   DID YOU LEARN THAT DON LUCAS WAS THE CHAIR OF THE BOARD OF

03:16PM  7      THERANOS?

03:16PM  8      A.   I DID.

03:16PM  9      Q.   AND DID YOU UNDERSTAND THAT CHRIS LUCAS WAS HIS NEPHEW?

03:16PM 10      A.   I DID.

03:16PM 11      Q.   AND DID YOU ASK, AT ANY POINT, YOURSELF TO SPEAK WITH

03:16PM 12      DON LUCAS TO HAVE A ONE-ON-ONE CONVERSATION ABOUT INFORMATION

03:16PM 13      THAT HE KNEW ABOUT THERANOS?

03:16PM 14      A.   I DID NOT.

03:16PM 15      Q.   OKAY.  DO YOU KNOW IF MR. HALL HAD THAT TYPE OF A

03:16PM 16      CONVERSATION?

03:16PM 17      A.   I DON'T REMEMBER.

03:16PM 18      Q.   OKAY.  SO YOU HAD A COUPLE OF CALLS, THE DINNER, AND THEN

03:16PM 19      YOU VISITED THE FACILITY THE NEXT MORNING; CORRECT?

03:16PM 20      A.   I BELIEVE THAT'S CORRECT.

03:16PM 21      Q.   OKAY.  AND THEN FROM THAT TIME FOR THE FOLLOWING SIX

03:17PM 22      YEARS, YOU'VE NEVER HAD ANY DIRECT CONTACT WITH THERANOS; IS

03:17PM 23      THAT RIGHT?

03:17PM 24      A.   CORRECT.

03:17PM 25      Q.   AND THEN YOU PARTICIPATED IN THE PHONE CALL, A PORTION OF

4527

TOLBERT CROSS BY MR. DOWNEY

03:17PM  1    WHICH WE'VE HEARD THIS AFTERNOON; CORRECT?

03:17PM  2    A.   CORRECT.

03:17PM  3    Q.   AND THEN YOU MADE YOUR SECOND INVESTMENT DIRECTLY IN

03:17PM  4    THERANOS; CORRECT?

03:17PM  5    A.   THAT'S CORRECT.

03:17PM  6    Q.   SO THE ONLY CONTACTS THAT YOU HAD WITH MS. HOLMES DURING

03:17PM  7    THOSE SIX YEARS WERE -- SEVEN YEARS, WERE THOSE LIMITED

03:17PM  8    OCCASIONS; CORRECT?

03:17PM  9    A.   THAT'S CORRECT.

03:17PM  10   Q.   OKAY.  LET ME ASK YOU ABOUT THE CONTACT THAT YOU HAD WITH

03:17PM  11   MR. LUCAS IN THE INTERVENING PERIOD.

03:17PM  12       HOW OFTEN WOULD YOU TALK TO CHRIS LUCAS DURING THAT PERIOD

03:17PM  13   ABOUT THERANOS?

03:17PM  14   A.   YOU KNOW, AS I RECALL, I WOULD PROBABLY TALK TO HIM THREE

03:17PM  15   OR FOUR TIMES A YEAR.

03:17PM  16   Q.   OKAY.  SO YOU HAD A QUARTERLY CALL, LET'S SAY, WITH

03:17PM  17   MR. LUCAS?

03:17PM  18   A.   SOMETHING LIKE THAT.

03:17PM  19   Q.   AND YOUR CONVERSATIONS WITH CHRIS LUCAS WERE BECAUSE YOUR

03:18PM  20   INVESTMENT WAS THROUGH HIM; CORRECT?

03:18PM  21   A.   THAT'S CORRECT.

03:18PM  22   Q.   AND, IN FACT, YOU WERE PAYING HIM TO MANAGE THAT

03:18PM  23   INVESTMENT; CORRECT?

03:18PM  24   A.   CORRECT, WE DID HAVE A MANAGEMENT FEE THAT WE WERE PAYING

03:18PM  25   TO HIM.

TOLBERT CROSS BY MR. DOWNEY                                                4528

03:18PM 1    Q.   AND SO A PERCENTAGE OF THE MONEY THAT YOU INVESTED WITH

03:18PM 2    THERANOS EACH YEAR YOU WERE PAYING TO HIM; CORRECT?

03:18PM 3    A.   WELL, YOU KNOW, TO BE CLEAR ABOUT IT, WE PAID HIM A

03:18PM 4    MANAGEMENT FEE FOR A CERTAIN PERIOD OF TIME, FOR TWO YEARS.

03:18PM 5    AND SO AS I RECALL, IT WAS TWO YEARS, AND SO THAT MANAGEMENT

03:18PM 6    FEE WE PAID TWO YEARS.

03:18PM 7         AND THEN AN ADDITIONAL SEVEN OR SIX YEARS, WHATEVER IT

03:18PM 8    WOULD BE, WE DID NOT PAY A MANAGEMENT FEE.

03:18PM 9    Q.   AND THE FEE THAT YOU PAID HIM IN THE FIRST TWO YEARS WAS A

03:18PM 10   PERCENTAGE OF THE AMOUNT THAT YOU HAD INVESTED; CORRECT?

03:18PM 11   A.   I BELIEVE THAT'S CORRECT.

03:18PM 12   Q.   AND DID YOU AT ANY TIME TRY TO CONTACT MS. HOLMES DURING

03:18PM 13   THAT PERIOD?

03:18PM 14   A.   NOT DIRECTLY TO MY RECOLLECTION.

03:18PM 15   Q.   OKAY.  DID YOU TRY TO CONTACT ANY THERANOS EMPLOYEE DURING

03:18PM 16   THAT TIME PERIOD?

03:19PM 17   A.   I DID NOT.

03:19PM 18   Q.   OKAY.  DID YOU ASK, THROUGH MR. LUCAS, FOR ANY FINANCIAL

03:19PM 19   STATEMENTS THAT THERANOS HAD GIVEN HIM?

03:19PM 20   A.   I DID.

03:19PM 21   Q.   AND DID HE PROVIDE YOU ANY FINANCIAL STATEMENTS?

03:19PM 22   A.   WELL, AS I RECALL, HE HAD NOT RECEIVED ANY FINANCIALS, SO

03:19PM 23   I NEVER RECEIVED ANY FROM HIM DURING THOSE INTERVENING YEARS.

03:19PM 24   Q.   AND HE TOLD YOU HE HAD NOT RECEIVED THEM?

03:19PM 25   A.   YOU KNOW, THAT WAS MY RECOLLECTION.  WHEN I WOULD ASK HIM

4529
TOLBERT CROSS BY MR. DOWNEY

03:19PM 1    FOR FINANCIALS, HE WOULD SAY, I HAVEN'T RECEIVED ANYTHING

03:19PM 2    SPECIFICALLY FROM THE COMPANY.

03:19PM 3    Q.   OKAY.  DID HE TELL YOU WHETHER HE HAD BEEN GIVEN ANY

03:19PM 4    ACCESS TO INFORMATION FROM THE COMPANY FOR PURPOSES OF

03:19PM 5    PREPARING REVENUE PROJECTIONS?

03:19PM 6            MR. SCHENK:  OBJECTION.  HEARSAY.

03:19PM 7            THE COURT:  OVERRULED.

03:19PM 8        IF YOU KNOW.

03:19PM 9            THE WITNESS:  OH, CAN YOU --

03:19PM 10   BY MR. DOWNEY:

03:19PM 11   Q.   I'M ONLY ASKING WHAT YOU WERE TOLD.

03:19PM 12       DID MR. LUCAS TELL YOU THAT HE HAD BEEN GIVEN FINANCIAL

03:19PM 13   INFORMATION ABOUT THE COMPANY FOR PURPOSES OF PREPARING

03:20PM 14   FINANCIAL PROJECTIONS?

03:20PM 15   A.   I DON'T KNOW IF -- I DON'T RECALL HIM SAYING THAT HE HAD

03:20PM 16   RECEIVED INFORMATION TO PREPARE PROJECTIONS.

03:20PM 17       I KNEW THAT MR. LUCAS HAD TOLD ME THAT HE WAS, YOU KNOW,

03:20PM 18   AT THE COMPANY HEADQUARTERS A LOT, THAT HE WAS -- THERE WERE

03:20PM 19   SOME KIND OF PROJECTS THAT HE WAS INVOLVED IN THAT GAVE HIM

03:20PM 20   ACCESS TO INFORMATION, BUT I DIDN'T KNOW SPECIFICALLY WHAT THAT

03:20PM 21   WAS OR FOR WHAT PURPOSE IT WAS.

03:20PM 22   Q.   DID HE EVER TELL YOU SPECIFICALLY THAT I, CHRIS LUCAS,

03:20PM 23   HAVE PREPARED FINANCIAL PROJECTIONS FOR THE COMPANY?

03:20PM 24   A.   HE DID NOT.

03:20PM 25   Q.   DID YOU EVER, DURING THAT PERIOD, HAVE ANY FURTHER CONTACT

TOLBERT CROSS BY MR. DOWNEY                                    4530

03:20PM   1     WITH MR. DON LUCAS?

03:20PM   2     A.   NOT DIRECTLY I DID NOT.

03:20PM   3     Q.   DID THE FACT THAT MR. LUCAS, MR. DON LUCAS WAS INVOLVED IN

03:21PM   4     THE INVESTMENT PLAY ANY ROLE IN THE HALL GROUP'S INITIAL

03:21PM   5     DECISION TO MAKE AN INVESTMENT?

03:21PM   6     A.   IT CERTAINLY WAS A POSITIVE.  YOU KNOW, WE -- YOU KNOW, I

03:21PM   7     BECAME AWARE OF WHO MR. LUCAS WAS AND OF HIS, YOU KNOW,

03:21PM   8     INVESTMENT BACKGROUND, AND SOME OF THE THINGS -- SOME OF THE

03:21PM   9     OPPORTUNITIES THAT HE HAD HELPED CULTIVATE ALONG, AND SO THAT

03:21PM   10    WAS, THAT WAS A POSITIVE.

03:21PM   11    Q.   YOU KNEW THAT HE HAD A REPUTATION AS A SAVVY INVESTOR IN

03:21PM   12    TECHNOLOGY; CORRECT?

03:21PM   13    A.   I DID.

03:21PM   14    Q.   AND YOU KNEW THAT HE HAD EXPERIENCE WITH A NUMBER OF

03:21PM   15    TECHNOLOGY COMPANIES THAT HAD GROWN FROM STARTUPS INTO WELL

03:21PM   16    RESPECTED NATIONAL COMPANIES; CORRECT?

03:21PM   17    A.   THAT'S CORRECT.

03:21PM   18    Q.   AND YOU KNEW THAT HE WAS AN INVESTOR IN THERANOS; CORRECT?

03:21PM   19    A.   I DID.

03:21PM   20    Q.   AND YOU KNEW THAT CHRIS LUCAS WAS AN INVESTOR IN THERANOS?

03:21PM   21    A.   I DID.

03:21PM   22    Q.   YOU WERE TASKED WITH PERFORMING DUE DILIGENCE DURING THIS

03:21PM   23    PERIOD; CORRECT?

03:22PM   24    A.   THAT'S CORRECT.

03:22PM   25    Q.   PRIOR TO THE FIRST INVESTMENT; CORRECT?

4531

TOLBERT CROSS BY MR. DOWNEY

03:22PM  1    A.   CORRECT.

03:22PM  2    Q.   DID DON LUCAS TALK TO YOU AT ALL ABOUT THE DUE DILIGENCE

03:22PM  3    THAT HE HAD PERFORMED BEFORE HIS DECISION TO MAKE AN

03:22PM  4    INVESTMENT?

03:22PM  5    A.   NO, I HAD NO CONVERSATIONS WITH DON LUCAS, SO HE WOULDN'T

03:22PM  6    HAVE HAD AN OCCASION TO.

03:22PM  7    Q.   OKAY.  WELL, I THOUGHT YOU SAID HE WAS AT THE DINNER WITH

03:22PM  8    YOU.

03:22PM  9    A.   OH, AT THE DINNER.

03:22PM  10   Q.   IN 2006?

03:22PM  11   A.   OH, I THOUGHT YOU WERE TALKING ABOUT SUBSEQUENT OR AFTER

03:22PM  12   THAT.

03:22PM  13   Q.   NO.  I'M ASKING YOU NOW ABOUT YOUR INITIAL INVESTMENT

03:22PM  14   DECISION --

03:22PM  15   A.   OH, OKAY.

03:22PM  16   Q.   -- IN 2006.

03:22PM  17        DID HE PROVIDE ACCESS TO ANY OF THE DUE DILIGENCE THAT HE

03:22PM  18   HAD DONE?

03:22PM  19   A.   NO, HE DID NOT.  THERE WAS -- HE DIDN'T COMMUNICATE

03:22PM  20   ANYTHING TO ME OTHER THAN AT THE DINNER.  HE DIDN'T SEND ME ANY

03:22PM  21   ADDITIONAL INFORMATION.

03:22PM  22   Q.   OKAY.  DID HE TELL YOU, FOR EXAMPLE, THAT HE HAD PERFORMED

03:22PM  23   DUE DILIGENCE ON THE PATENT PORTFOLIO OF THE COMPANY?

03:22PM  24   A.   HE DID NOT.

03:23PM  25   Q.   NOW, AFTER SIX YEARS, I THINK YOU TESTIFIED ABOUT THE

TOLBERT CROSS BY MR. DOWNEY                                          4532

03:23PM  1    CONTACT THAT HAD LED YOU TO WANT TO MAKE THE SECOND INVESTMENT,

03:23PM  2    AND THAT'S IN CONNECTION WITH THIS CALL AND YOUR CONVERSATIONS

03:23PM  3    WITH CHRIS LUCAS AROUND THAT TIME PERIOD; CORRECT?

03:23PM  4    A.   CORRECT.

03:23PM  5    Q.   HAD CHRIS LUCAS SAID TO YOU AT ANY POINT IN 2013, THE

03:23PM  6    OPPORTUNITY TO INVEST MIGHT PRESENT ITSELF DURING THE COURSE OF

03:23PM  7    THIS YEAR?

03:23PM  8    A.   AS I RECALL, IN SOME OF OUR -- IN SOME OF OUR PHONE CALLS

03:23PM  9    EARLIER IN THAT YEAR -- AND IT WASN'T JUST IN THAT YEAR, AT

03:23PM  10   OTHER TIMES OVER THAT PERIOD OF TIME HE HAD REFERENCED THAT

03:23PM  11   THERE MAY BE A FURTHER INVESTMENT OPPORTUNITY.

03:23PM  12       BUT CERTAINLY IN 2013 HE DID INDICATE THAT THERE WOULD

03:23PM  13   LIKELY BE ANOTHER INVESTMENT OPPORTUNITY COMING.

03:23PM  14   Q.   OKAY.  AND WHEN YOU HEARD THAT, DID YOU ASK ANY QUESTIONS

03:23PM  15   OF HIM ABOUT, YOU KNOW, WHAT THE OPPORTUNITY WOULD BE AND THE

03:24PM  16   STATE OF THERANOS'S BUSINESS?

03:24PM  17   A.   YEAH, CERTAINLY.  I WAS ALWAYS ASKING HIM ABOUT THE STATE

03:24PM  18   OF THERANOS'S BUSINESS BECAUSE IT FELT LIKE HE HAD ACCESS TO

03:24PM  19   INFORMATION AND I WAS TRYING TO ELICIT THAT FROM HIM.

03:24PM  20   Q.   OKAY.  SO THE STATE OF THE RELATIONSHIP UP UNTIL REALLY

03:24PM  21   THAT TELEPHONE CALL WAS YOU PERCEIVED HIM TO KNOW A LOT ABOUT

03:24PM  22   THERANOS; CORRECT?

03:24PM  23   A.   THAT'S CORRECT.

03:24PM  24   Q.   AND YOU WOULD ASK HIM QUESTIONS; CORRECT?

03:24PM  25   A.   THAT'S CORRECT.

TOLBERT CROSS BY MR. DOWNEY                                          4533

03:24PM   1    Q.   AND HE WOULD PROVIDE YOU INFORMATION; CORRECT?

03:24PM   2    A.   THAT'S CORRECT.

03:24PM   3    Q.   AND THAT WOULD BE IN THESE QUARTERLY CALLS?

03:24PM   4    A.   YEAH, THAT WOULD BE IN THESE CALLS, THAT'S CORRECT.

03:24PM   5    Q.   OKAY.  DID HE PROVIDE ANY INFORMATION ABOUT THE TECHNOLOGY

03:24PM   6    OF THERANOS DURING THAT PERIOD IN THE NATURE OF ANY KIND OF AN

03:24PM   7    ANALYSIS OR WRITTEN PRESENTATION OF HOW THERANOS WAS PLANNING

03:24PM   8    TO ROLL OUT ITS TECHNOLOGY?

03:24PM   9    A.   NOT THAT I RECALL.

03:24PM   10   Q.   WOULD YOU HAVE BELIEVED THAT WAS RESPONSIVE TO YOUR

03:25PM   11   REQUEST FOR THE INFORMATION THAT YOU WERE SEEKING?

03:25PM   12   A.   I WOULD HAVE.

03:25PM   13   Q.   YOU HAD HEARD, I THINK, DURING THE COURSE OF THAT SEVEN

03:25PM   14   YEAR PERIOD SOME INFORMATION ABOUT THE PROSPECT THAT THERE

03:25PM   15   WOULD BE RETAIL PARTNERSHIPS WITH SOME LARGE RETAILERS;

03:25PM   16   CORRECT?

03:25PM   17   A.   THAT'S CORRECT.

03:25PM   18   Q.   AND IS THAT INFORMATION THAT YOU LEARNED THROUGH

03:25PM   19   CHRIS LUCAS AS WELL?

03:25PM   20   A.   THAT'S WHERE I WOULD HAVE LEARNED THAT.

03:25PM   21   Q.   AND IS IT FAIR TO SAY THAT IN THE TELEPHONE CALL THAT YOU

03:25PM   22   HAD IN DECEMBER OF 2013 THAT MS. HOLMES INDICATED THAT DURING

03:25PM   23   THAT PERIOD THAT WOULD FOLLOW THE INVESTMENT, THAT THE COMPANY

03:25PM   24   WOULD BE FOCUSSED INTENSELY ON THAT RETAIL OUTLET?

03:25PM   25   A.   I DID --

4534
TOLBERT CROSS BY MR. DOWNEY

03:25PM  1    Q.   RETAIL ROLLOUT?

03:25PM  2    A.   THAT'S CORRECT.  I MEAN, THAT WAS THE CENTRAL FOCUS OF

03:26PM  3    WHAT THAT ADDITIONAL INVESTMENT OPPORTUNITY WAS ABOUT.

03:26PM  4    Q.   INDEED, MR. SCHENK PLAYED YOU SOME TAPES IN WHICH THERE

03:26PM  5    WERE REFERENCES TO THE PHARMACEUTICAL BUSINESS AND THE MILITARY

03:26PM  6    BUSINESS.

03:26PM  7         DO YOU RECALL THAT?

03:26PM  8    A.   I DO.

03:26PM  9    Q.   BUT DURING THE COURSE OF THE CALL, MS. HOLMES TOLD YOU

03:26PM  10   THAT, IN FACT, THERANOS WAS GOING TO PAUSE ITS WORK ON THOSE

03:26PM  11   BUSINESSES IN ORDER TO FOCUS ON THE RETAIL BUSINESS ROLLOUT;

03:26PM  12   CORRECT?

03:26PM  13   A.   YEAH.  I DON'T REMEMBER THE EXACT LANGUAGE, BUT I DO

03:26PM  14   REMEMBER THAT REFERENCE.

03:26PM  15   Q.   WELL, LET ME PLAY THAT PORTION OF THE TAPE FOR YOU.

03:26PM  16   A.   OKAY.

03:26PM  17        MR. DOWNEY:  YOUR HONOR, I'VE DIVIDED OUR CLIPS BY

03:26PM  18   LETTER JUST TO AVOID CONFUSION IN THAT REGARD.  SO I WILL OFFER

03:26PM  19   1348F.

03:27PM  20        "OBVIOUSLY TO BE ABLE TO DO."

03:27PM  21        THE COURT:  I BEG YOUR PARDON.  MR. SCHENK?

03:27PM  22        MR. SCHENK:  IS THIS SOMETHING THAT HAS ALREADY BEEN

03:27PM  23   PLAYED?

03:27PM  24        MR. DOWNEY:  THIS HAS ALREADY BEEN PLAYED.

03:27PM  25        THE COURT:  THAT WAS MY UNDERSTANDING.  CAN YOU JUST

TOLBERT CROSS BY MR. DOWNEY                                        4535

| | | |
|---|---|---|
| 03:27PM | 1 | IDENTIFY FOR THE PARTIES WHERE IT IS? |
| 03:27PM | 2 | MR. DOWNEY: ON THE TRANSCRIPT I HAVE, IT'S ON |
| 03:27PM | 3 | PAGE 6. I DON'T HAVE THE TRANSCRIPT THAT THE GOVERNMENT |
| 03:27PM | 4 | PREPARED. |
| 03:27PM | 5 | THE COURT: OH, I SEE. |
| 03:27PM | 6 | MR. DOWNEY: YEAH. |
| 03:27PM | 7 | THE COURT: CAN YOU JUST TAKE A MOMENT TO SHARE YOUR |
| 03:27PM | 8 | TRANSCRIPTS? IS THAT POSSIBLE. |
| 03:27PM | 9 | (DISCUSSION OFF THE RECORD.) |
| 03:27PM | 10 | MR. DOWNEY: ACTUALLY, I THINK I CAN IDENTIFY IT, |
| 03:27PM | 11 | YOUR HONOR. |
| 03:27PM | 12 | THE COURT: SURE. |
| 03:28PM | 13 | (PAUSE IN PROCEEDINGS.) |
| 03:28PM | 14 | MR. DOWNEY: MAY I CONFER WITH MR. SCHENK? THIS |
| 03:28PM | 15 | DOESN'T MATCH. |
| 03:28PM | 16 | THE COURT: YES, PLEASE. |
| 03:28PM | 17 | (DISCUSSION OFF THE RECORD.) |
| 03:29PM | 18 | MR. DOWNEY: YOUR HONOR, I JUST WANT TO RETRIEVE |
| 03:29PM | 19 | MINE. |
| 03:29PM | 20 | THE COURT: SURE. |
| 03:29PM | 21 | (PAUSE IN PROCEEDINGS.) |
| 03:30PM | 22 | MR. DOWNEY: YOUR HONOR, I DON'T SEE IT ON THIS |
| 03:30PM | 23 | TRANSCRIPT EITHER, SO LET ME JUST HAVE ONE MORE MOMENT. |
| 03:30PM | 24 | THE COURT: OF COURSE. |
| 03:31PM | 25 | (PAUSE IN PROCEEDINGS.) |

TOLBERT CROSS BY MR. DOWNEY                                    4536

03:31PM  1          (DISCUSSION OFF THE RECORD.)

03:31PM  2                MR. DOWNEY:  YOUR HONOR, THIS WILL BE ON THE

03:31PM  3     TRANSCRIPT THAT WE GOT FROM THE GOVERNMENT ON PAGE 18 OF SIDE

03:32PM  4     A, STARTING AT LINE 19.

03:32PM  5                THE COURT:  THANK YOU.  AND YOU'D LIKE TO PLAY THAT

03:32PM  6     NOW?

03:32PM  7                MR. DOWNEY:  I'D LIKE TO PLAY IT.

03:32PM  8     Q.   BUT JUST TO REORIENT US TO WHERE WE WERE, MY QUESTION TO

03:32PM  9     YOU IS, MS. HOLMES TOLD YOU DURING THE COURSE OF THIS CALL THAT

03:32PM  10    THERANOS WOULD BE PUTTING A PAUSE ON ITS RETAIL AND MILITARY

03:32PM  11    BUSINESSES; CORRECT?

03:32PM  12    A.   I BELIEVE ON THE PHARMACEUTICAL AND RETAIL --

03:32PM  13    PHARMACEUTICAL AND MILITARY BUSINESSES.

03:32PM  14                MR. DOWNEY:  OKAY.  I'D LIKE TO JUST PLAY THAT

03:32PM  15    SECTION OF THE TAPE.

03:32PM  16                THE COURT:  SURE.

03:32PM  17         "MS. HOLMES:  OBVIOUSLY, TO BE ABLE TO DO WHAT WE JUST

03:32PM  18    HAVE DONE, WE HAD TO PAUSE A LARGE NUMBER OF OUR ONGOING

03:32PM  19    PHARMACEUTICAL AND MILITARY PROGRAMS SO THAT WE COULD FOCUS

03:32PM  20    LIKE A LASER ON THIS AND EXECUTING ON THIS.

03:32PM  21         "AND THE SCALE OF THIS RETAIL INFRASTRUCTURE NOW IS WHERE

03:32PM  22    WE WILL CONTINUE TO FOCUS LIKE A LASER.  BUT AS WE GET THE

03:33PM  23    RESOURCES AND ORGANIZATIONS TO CAPTURE SOME OF THESE ADDITIONAL

03:33PM  24    OPPORTUNITIES IN PARALLEL, WE WILL PROCEED WITH THE

03:33PM  25    PHARMACEUTICAL AND MILITARY BUSINESS IN LEVERAGING SOME OF THIS

TOLBERT CROSS BY MR. DOWNEY

| | | |
|---|---|---|
| 03:33PM | 1 | INFRASTRUCTURE AND RESOURCES FROM IT THAT WE'RE BUILDING OUT |
| 03:33PM | 2 | NOW.  SO THAT, FOR THE LONG-TERM, WILL BE AN IMPORTANT THING |
| 03:33PM | 3 | FOR US.  AND IT'S ALSO VERY SYMBOLIC BECAUSE IT'S OUR WAY OF |
| 03:33PM | 4 | BEING ABLE TO HELP MAKE A DIFFERENCE IN WHATEVER SMALL WAY WE |
| 03:33PM | 5 | CAN THERE." |
| 03:33PM | 6 | BY MR. DOWNEY: |
| 03:33PM | 7 | Q.   WAS THAT MS. HOLMES'S VOICE THAT YOU JUST HEARD? |
| 03:33PM | 8 | A.   IT WAS. |
| 03:33PM | 9 | Q.   AND MAY I ASK YOU, DID YOU ASK ANY QUESTIONS DURING THE |
| 03:33PM | 10 | CALL? |
| 03:33PM | 11 | A.   I DID NOT. |
| 03:33PM | 12 | Q.   DID YOU FOLLOW UP AT ALL ON THAT COMMENT TO FIND OUT WHAT |
| 03:33PM | 13 | THE PAUSE WOULD BE OR HOW LONG IT WOULD BE? |
| 03:33PM | 14 | A.   I DIDN'T.  I MEAN, AS I JUST LISTENED TO IT, IT DIDN'T |
| 03:33PM | 15 | SOUND LIKE IT WAS A COMPLETE PAUSE.  IT SOUNDED LIKE IT WAS A |
| 03:33PM | 16 | PAUSE THAT -- I DON'T REMEMBER THE EXACT WORDING -- BUT IT |
| 03:34PM | 17 | WASN'T COMPLETE. |
| 03:34PM | 18 | BUT, NO, I DID NOT FOLLOW UP WITH ANY SPECIFIC QUESTIONS |
| 03:34PM | 19 | ABOUT THAT. |
| 03:34PM | 20 | Q.   OKAY.  DID YOU FOLLOW UP AFTER THE CALL TO ASK TO SEE ANY |
| 03:34PM | 21 | CONTRACTS OR OTHER AGREEMENTS BETWEEN THERANOS AND THE |
| 03:34PM | 22 | MILITARY? |
| 03:34PM | 23 | A.   I DID NOT. |
| 03:34PM | 24 | Q.   DID YOU FOLLOW UP AFTERWARDS TO SEE ANY CONTRACTS OR OTHER |
| 03:34PM | 25 | ARRANGEMENT THAT WERE IN PLACE WITH PHARMACEUTICAL COMPANIES? |

TOLBERT CROSS BY MR. DOWNEY                                              4538

03:34PM   1    A.   I DID NOT.

03:34PM   2    Q.   OKAY.  DURING THE COURSE OF THE CALL, MR. HALL DID ASK

03:34PM   3    SOME QUESTIONS; CORRECT?

03:34PM   4    A.   CORRECT.

03:34PM   5    Q.   DID ANY OF THE QUESTIONS THAT MR. HALL ASKED RELATE TO THE

03:34PM   6    MILITARY ASPECT OF THERANOS'S BUSINESS?

03:34PM   7    A.   YOU KNOW, I DON'T BELIEVE SO.  I MEAN, I'D HAVE TO LOOK

03:34PM   8    BACK AT THE TRANSCRIPT TO KNOW FOR SURE.

03:34PM   9    Q.   OKAY.

03:34PM  10    A.   BUT I DON'T BELIEVE.

03:34PM  11    Q.   DID, DID, DID -- DID MR. HALL, TO YOUR KNOWLEDGE, DO ANY

03:34PM  12    FOLLOWUP TO ASK FOR FURTHER INFORMATION FROM THERANOS AFTER THE

03:34PM  13    CALL ABOUT THOSE TWO BUSINESS UNITS?

03:35PM  14    A.   YOU KNOW, I -- HERE'S -- LET ME ANSWER YOUR QUESTION THIS

03:35PM  15    WAY.

03:35PM  16         SO PRIOR TO THIS CALL --

03:35PM  17    Q.   WELL, LET ME JUST GET AN ANSWER TO THE QUESTION I'VE

03:35PM  18    ASKED.

03:35PM  19         DO YOU KNOW -- AND IF YOU DON'T, IT'S FINE.  DID MR. HALL

03:35PM  20    FOLLOW UP TO ASK FOR MORE INFORMATION ABOUT THOSE TWO BUSINESS

03:35PM  21    UNITS?

03:35PM  22    A.   SO I KNOW MR. HALL HAD A FOLLOW-ON CONVERSATION WITH

03:35PM  23    ELIZABETH A FEW DAYS LATER.

03:35PM  24    Q.   OKAY.

03:35PM  25    A.   I DON'T KNOW IF HE SPECIFICALLY ASKED THOSE QUESTIONS OR

TOLBERT CROSS BY MR. DOWNEY                                          4539

03:35PM   1      NOT.

03:35PM   2      Q.   OKAY.  AND WAS -- IS THE RECORDING OF THE CALL THE FIRST

03:35PM   3      TIME THAT YOU HAVE ANY RECORDED COMMUNICATION WITH THERANOS OR

03:35PM   4      ANYONE ELSE REFERENCING A MILITARY BUSINESS AT THERANOS?

03:35PM   5      A.   THAT'S THE FIRST RECORDING THAT I HAVE, PERIOD.

03:35PM   6      Q.   WELL, DID YOU HAVE ANY -- DID YOU RECEIVE ANY WRITTEN

03:35PM   7      INFORMATION IN ADVANCE OF THIS CALL ABOUT A MILITARY BUSINESS

03:35PM   8      AT THERANOS?

03:35PM   9      A.   NOT THAT I REMEMBER.

03:35PM   10     Q.   OKAY.  DID YOU KNOW THE PARTICULAR PHARMACEUTICAL

03:36PM   11     COMPANIES THAT THERANOS HAD WORKED WITH PRIOR TO 2013?

03:36PM   12     A.   NOT BY NAME.

03:36PM   13     Q.   OKAY.  DID YOU UNDERSTAND FROM MR. CHRIS LUCAS THAT THERE

03:36PM   14     HAD BEEN REFINEMENT AND DEVELOPMENT OF THE TECHNOLOGY PRIOR TO

03:36PM   15     2013?

03:36PM   16     A.   I DID.

03:36PM   17     Q.   AND DID HE GIVE PERIODIC UPDATES ON THAT DURING THE COURSE

03:36PM   18     OF THOSE YEARS?

03:36PM   19     A.   YOU KNOW, CERTAINLY IN OUR CONVERSATIONS I WOULD HAVE

03:36PM   20     ASKED HIM, OR WE WOULD HAVE HAD DISCUSSIONS ABOUT THE STATE OF

03:36PM   21     THE TECHNOLOGY.

03:36PM   22     Q.   OKAY.  AND DO YOU RECALL IF HE MENTIONED THAT THERE WERE

03:36PM   23     VARIOUS SERIES OF THE TECHNOLOGY THAT THERANOS HAD DEVELOPED?

03:36PM   24     A.   I DON'T REMEMBER SPECIFIC CONVERSATIONS ABOUT SERIES.

03:36PM   25     Q.   OKAY.  DO YOU RECALL WHEN THERE WAS A FIRST CONVERSATION

4540
TOLBERT CROSS BY MR. DOWNEY

03:37PM 1    THAT THERE HAD BEEN A REFERENCE TO A THERANOS 1.0 DEVICE?

03:37PM 2    A.   I REMEMBER SEEING 1.0 --

03:37PM 3    Q.   YEAH.

03:37PM 4    A.   -- IN SOME OF THOSE EARLY MATERIALS THAT WE RECEIVED.

03:37PM 5    Q.   OKAY.  AND DO YOU KNOW WHAT SERIES THERANOS HAD DEVELOPED

03:37PM 6    TO BY 2013?

03:37PM 7    A.   I DON'T KNOW THE SPECIFICS SERIES NUMBER.

03:37PM 8    Q.   OKAY.  YOU DIDN'T HAVE THE DETAILED INFORMATION ABOUT

03:37PM 9    WHERE THEY WERE IN THE DEVELOPMENT OF THEIR TECHNOLOGY?

03:37PM 10   A.   WELL, I KNEW THE TECHNOLOGY HAD STARTED FROM A LIMITED SET

03:37PM 11   OF TESTS, OR A SMALL SET OF TESTS TO, YOU KNOW, I THINK AROUND

03:37PM 12   THIS 2013 TIMEFRAME THERE WERE THOUSANDS OF TESTS THAT COULD BE

03:37PM 13   RUN AND SO THAT REPRESENTED A SUBSTANTIAL IMPROVEMENT.

03:37PM 14        SO I DON'T KNOW IF IT WENT FROM 1.0 TO 12.0 OR 10.0, BUT

03:37PM 15   THERE WAS --

03:37PM 16   Q.   DID MS. HOLMES MAKE REFERENCE IN THE RECORDING WE JUST

03:37PM 17   HEARD TO THOUSANDS OF TESTS?

03:37PM 18   A.   SHE DID NOT.

03:37PM 19   Q.   DID SHE ASSOCIATE THERANOS'S DEVICE AT THAT TIME WITH

03:38PM 20   THOUSANDS OF TESTS?

03:38PM 21   A.   NOT ON THAT CALL.

03:38PM 22   Q.   OKAY.  NOW, YOU WERE ASKED QUESTIONS ABOUT THE PORTION OF

03:38PM 23   THIS CONVERSATION THAT RELATED TO QUESTIONING OF MS. HOLMES;

03:38PM 24   CORRECT?

03:38PM 25   A.   I'M SORRY, I DON'T UNDERSTAND.

TOLBERT CROSS BY MR. DOWNEY                                            4541

03:38PM   1    Q.   WELL, THE PORTIONS OF THE CALL THAT HAVE BEEN PLAYED THUS

03:38PM   2    FAR ARE PORTIONS OF A CALL WHERE MS. HOLMES IS PRESENT ON THE

03:38PM   3    CALL; CORRECT?

03:38PM   4    A.   CORRECT.

03:38PM   5    Q.   BUT THEN THE TAPE CONTINUED; CORRECT?

03:38PM   6    A.   THAT'S CORRECT.

03:38PM   7    Q.   AND INDIVIDUALS ON THE CALL HAD THE OPPORTUNITY TO ASK

03:38PM   8    QUESTIONS OF CHRIS LUCAS; CORRECT?

03:38PM   9    A.   CORRECT.

03:38PM   10   Q.   AND DID YOU ASK ANY QUESTIONS OF CHRIS LUCAS DURING THAT

03:38PM   11   TIME?

03:38PM   12   A.   NOT ON THAT CALL.

03:38PM   13   Q.   DID MR. HALL ASK QUESTIONS OF CHRIS LUCAS DURING THAT

03:39PM   14   PERIOD?

03:39PM   15   A.   I THINK HE MAY HAVE ASKED A FOLLOWUP.

03:39PM   16   Q.   LET ME ASK THAT THE FOLLOWING SEGMENT OF 1349 BE PLAYED.

03:39PM   17        1349-A.

03:39PM   18        MR. SCHENK:   I'M SORRY.   IS THIS SOMETHING THAT HAS

03:39PM   19   BEEN PREVIOUSLY PUBLISHED?

03:39PM   20        MR. DOWNEY:   WELL, IT'S WITHIN THE RECORDING THAT HE

03:39PM   21   HAS ALREADY AUTHENTICATED, YES.

03:39PM   22        THE COURT:   OKAY.   THAT'S FINE.   THAT CAN BE PLAYED

03:39PM   23   NOW.

03:39PM   24        "MEETING OPERATOR:   THANK YOU.   THE NEXT QUESTION COMES

03:39PM   25   FROM CRAIG HALL.   PLEASE GO AHEAD."

| | | |
|---|---|---|
| 03:39PM | 1 | MR. SCHENK:  I'M SORRY, YOUR HONOR.  OBJECTION. |
| 03:39PM | 2 | THIS IS NOT SOMETHING THAT WAS PREVIOUSLY PLAYED FOR THE |
| 03:39PM | 3 | JURY.  THIS IS A DIFFERENT PART OF 1349.  HEARSAY. |
| 03:39PM | 4 | MR. DOWNEY:  IT'S PART OF THE SAME RECORDING.  THIS |
| 03:39PM | 5 | IS JUST A SEGMENT THAT WE WISH TO PLAY FOR THE BENEFIT OF THE |
| 03:39PM | 6 | JURY. |
| 03:39PM | 7 | THE COURT:  WELL, LET'S SEE.  ALL RIGHT.  LET'S |
| 03:40PM | 8 | IDENTIFY THIS SO I CAN FIND IT. |
| 03:40PM | 9 | THIS IS IN 1349.  THIS IS SIDE B THEN? |
| 03:40PM | 10 | MR. SCHENK:  YES, YOUR HONOR. |
| 03:40PM | 11 | THE COURT:  AND DO YOU HAVE -- MR. DOWNEY, DO YOU |
| 03:40PM | 12 | HAVE THE GOVERNMENT'S TRANSCRIPT THAT YOU COULD GUIDE ME TO? |
| 03:40PM | 13 | MR. DOWNEY:  I DO, YOUR HONOR, AND IT WILL BE |
| 03:40PM | 14 | TOWARDS THE BACK OF THE TRANSCRIPT. |
| 03:40PM | 15 | MR. SCHENK:  YOUR HONOR, I BELIEVE IT'S ON PAGE 18, |
| 03:40PM | 16 | LINE 6. |
| 03:40PM | 17 | THE COURT:  YES.  THIS WAS NOT PLAYED PREVIOUSLY. |
| 03:40PM | 18 | MR. DOWNEY:  IT WAS NOT PLAYED PREVIOUSLY, BUT IT IS |
| 03:40PM | 19 | PART OF THE SAME RECORDING THAT MR. SCHENK PLAYED. |
| 03:40PM | 20 | MR. SCHENK:  YOUR HONOR, WE MET ON 106 AND THIS WAS |
| 03:40PM | 21 | NOT PRESENTED TO THE GOVERNMENT. |
| 03:40PM | 22 | MR. DOWNEY:  I BEG YOUR PARDON, I THOUGHT IT WAS. |
| 03:40PM | 23 | THE COURT:  LET ME LET YOU MEET AND CONFER FOR JUST |
| 03:40PM | 24 | A MOMENT ABOUT THIS WHILE I LOOK AT THIS.  THANK YOU. |
| 03:41PM | 25 | (DISCUSSION OFF THE RECORD.) |

4543
TOLBERT CROSS BY MR. DOWNEY

03:42PM  1          MR. SCHENK:  YOUR HONOR, WE STILL OBJECT ON HEARSAY,

03:42PM  2     AND I'M NOT SURE -- THIS HAS NOT BEEN PREVIOUSLY PLAYED FOR THE

03:42PM  3     JURY.  IT HASN'T BEEN MOVED INTO EVIDENCE YET, SO I THINK WE

03:42PM  4     HAVE TO GET OVER THAT HURDLE BEFORE IT COMES IN.

03:42PM  5          THE COURT:  IT ALSO SEEMS TO BE A DIFFERENT PARTY

03:42PM  6     SPEAKING.

03:42PM  7          MR. SCHENK:  YES, YOUR HONOR.

03:42PM  8          MR. DOWNEY:  IT IS THE PARTY THROUGH WHOM

03:42PM  9     MR. TOLBERT HAS TESTIFIED HE INVESTED AND RECEIVED INFORMATION

03:42PM 10     ABOUT THE COMPANY FOR THE PRIOR SEVEN YEARS, AND IT'S AN

03:43PM 11     EXCHANGE THAT COMPLETES THE CALL AND PURPORTS TO EXPLAIN

03:43PM 12     PORTIONS OF THE CALL THAT HAVE PREVIOUSLY -- IN WHICH

03:43PM 13     MS. HOLMES PREVIOUSLY PARTICIPATED AND --

03:43PM 14          THE COURT:  I SEE THAT.

03:43PM 15       BUT THE SPEAKER IS NOT MS. HOLMES.  IT'S SOMEBODY ELSE

03:43PM 16     ANSWERING A QUESTION --

03:43PM 17          MR. DOWNEY:  THAT'S CORRECT.

03:43PM 18          THE COURT:  -- THAT'S POSED ABOUT A DIFFERENT TOPIC.

03:43PM 19          MR. DOWNEY:  THAT'S CORRECT.

03:43PM 20          THE COURT:  AND I DON'T SEE THE 106 CONNECTION

03:43PM 21     THERE.  THAT'S MY PROBLEM.

03:43PM 22          MR. DOWNEY:  WELL, THIS WITNESS HAS BEEN TESTIFYING

03:43PM 23     ABOUT WHAT'S IMPORTANT TO HIS ENTITY AS AN INVESTOR.

03:43PM 24       THE QUESTION IS THE ONLY QUESTION THAT HIS ENTITY ASKS,

03:43PM 25     OTHER THAN THE ONE THAT HAS BEEN PLAYED.

4544

TOLBERT CROSS BY MR. DOWNEY

03:44PM  1          THE COURT:  WELL, THE QUESTION IS TO -- AS I READ

03:44PM  2   THE TRANSCRIPT, MR. DOWNEY, I JUST DON'T SEE THE RELATIONSHIP

03:44PM  3   BETWEEN THAT AND THE QUESTION THAT HE'S PREVIOUSLY ASKED.  I

03:44PM  4   JUST DON'T SEE IT IN THE 106 CONTEXT.

03:44PM  5          MAYBE YOU CAN ASK SOME MORE QUESTIONS ABOUT THIS FOR

03:44PM  6   FOUNDATION.

03:44PM  7          MR. DOWNEY:  SURE.

03:44PM  8          THE COURT:  WELL, MR. LOOBY IS GOING TO GIVE YOU A

03:44PM  9   LIFELINE HERE.

03:44PM  10          MR. DOWNEY:  YOUR HONOR, IF THERE ARE PORTIONS OF

03:44PM  11   THIS -- WELL, LET ME EXPLAIN AGAIN FOR JUST ONE MOMENT.

03:44PM  12          I THINK THE WITNESS ALREADY TESTIFIED THAT THE ENTIRE TAPE

03:44PM  13   IS A TAPE RECORDING OF THE SAME CONVERSATION.  THE ONLY

03:44PM  14   VARIATION IS PARTICIPANTS GOING IN AND OUT.

03:44PM  15          THERE'S ONLY A PORTION OF THE TAPE FOR MS. HOLMES IS A

03:44PM  16   PARTICIPANT.

03:45PM  17          THE TAPE THEN CONTINUES AND THEN THERE'S A DISCUSSION,

03:45PM  18   WHICH IS A DISCUSSION OF INFORMATION THAT IS IMPORTANT TO

03:45PM  19   POTENTIAL INVESTORS, INCLUDING THE WITNESS'S GROUP, AS TO

03:45PM  20   WHETHER TO INVEST OR NOT AT THIS TIME.

03:45PM  21          I WOULD CERTAINLY THINK IT GOES TO MATERIALITY.

03:45PM  22          THERE'S NOT -- I DON'T KNOW IF THERE'S A HEARSAY CONCERN

03:45PM  23   OR WHAT THE CONCERN IS.  IT'S NOT A 106 CONCERN CERTAINLY.

03:45PM  24          THE COURT:  WELL, THE RELEVANCE OF THIS IS YOU'RE

03:45PM  25   TRYING TO SEE WHETHER OR NOT THIS INFORMATION WAS MATERIAL TO

TOLBERT CROSS BY MR. DOWNEY                                             4545

03:45PM   1    THIS WITNESS'S INVESTMENT?

03:45PM   2            MR. DOWNEY:  THAT'S CORRECT.

03:45PM   3            THE COURT:  AND MAYBE YOU SHOULD HAND THE WITNESS

03:45PM   4    THE TRANSCRIPT AND SEE IF THAT ANSWER -- HE READS THE

03:45PM   5    TRANSCRIPT AND THEN YOU CAN ASK THE QUESTION, AND IF IT WAS,

03:45PM   6    THEN MAYBE YOU PLAY IT.

03:45PM   7            MR. DOWNEY:  SURE.

03:45PM   8        IS THERE A REASON, YOUR HONOR, WE CAN'T -- I DON'T

03:46PM   9    UNDERSTAND THE BASIS ON WHICH WE WOULDN'T BE ABLE TO PLAY

03:46PM   10   PORTIONS OF THE SAME CALL WHERE THE DISCUSSION IS ALL RELATED

03:46PM   11   TO THE SAME THING.

03:46PM   12           THE COURT:  WELL, WHAT YOU'VE TOLD ME IS THAT THE

03:46PM   13   BASIS OF THIS COMING IN IS THAT YOU THINK IT'S MATERIAL TO

03:46PM   14   THAT.

03:46PM   15       BUT IF IT'S NOT MATERIAL, THEN IT'S NOT RELEVANT, IS IT?

03:46PM   16           MR. DOWNEY:  THAT'S RIGHT.

03:46PM   17       BUT THE GOVERNMENT WAS ALLOWED TO PLAY THE ENTIRE TAPES

03:46PM   18   AND THEN HAVE THE DISCUSSION AFTER THE TAPE WAS PLAYED.

03:46PM   19           THE COURT:  RIGHT.  BUT YOU'RE OFFERING THIS FOR --

03:46PM   20   I GUESS I'M JUST SAYING, SHOULDN'T WE FIND OUT WHETHER OR NOT

03:46PM   21   THIS WAS MATERIAL TO HIS DECISION?

03:46PM   22           MR. DOWNEY:  WELL, IT'S NOT ENTIRELY DEPENDENT ON

03:46PM   23   HIS TESTIMONY.  IT'S CONTEMPORANEOUS EVIDENCE OF WHAT WAS

03:46PM   24   IMPORTANT.

03:46PM   25           THE COURT:  WELL, THEN WE'RE BACK TO THE 106 THEN.

4546

TOLBERT CROSS BY MR. DOWNEY

03:46PM  1    WE'RE KIND OF GOING IN A CIRCLE HERE.

03:46PM  2              MR. DOWNEY:  I DON'T THINK IT'S A 106 ISSUE.

03:46PM  3         MR. SCHENK HAS HAD THE OPPORTUNITY TO, TO REVIEW IT.  I

03:46PM  4    MEAN, WE CAN PLAY THE ENTIRE TAPE, WHICH I SUGGESTED BEFORE,

03:46PM  5    BUT I JUST DON'T -- WE'VE ALREADY HEARD THE ONE QUESTION THAT

03:46PM  6    THIS ENTITY ASKED.

03:46PM  7         I JUST WANT TO PLAY THE OTHER ONE.

03:46PM  8              THE COURT:  AND YOU'D LIKE TO PLAY FROM LINE 6 --

03:47PM  9    PAGE 18, LINE 6, THROUGH PAGE 20, LINE 22?  OR LESS THAN THAT?

03:47PM  10             MR. DOWNEY:  YES -- PAGE 18, LINE 6, THROUGH PAGE

03:47PM  11   20, LINE 25.

03:47PM  12             THE COURT:  DOWN TO THE BOTTOM.

03:47PM  13        AND YOU HAVE QUESTIONS FOR THIS WITNESS REGARDING THIS

03:47PM  14   COLLOQUY?

03:47PM  15             MR. DOWNEY:  I DO.

03:47PM  16             THE COURT:  SO IS IT POSSIBLE -- CAN YOU FRAME YOUR

03:47PM  17   QUESTION AND THEN PLAY THE TAPE AND ASK HIM IF IT ANSWERS THE

03:48PM  18   QUESTION.

03:48PM  19             MR. DOWNEY:  WELL, I THINK I HAVE A SERIES OF

03:48PM  20   QUESTIONS.  THE FIRST QUESTION WILL BE WHETHER THE VOICE THAT

03:48PM  21   IS ASKING THE QUESTION IS, IN FACT, MR. HALL TO WHOM HE

03:48PM  22   REPORTS.

03:48PM  23        BUT THEN THE SECOND QUESTION WILL -- I DON'T PLAN TO

03:48PM  24   QUESTION IN DETAIL HERE.  THIS WAS THE QUESTION --

03:48PM  25             THE COURT:  I'M NOT TRYING TO GIVE YOU TROUBLE HERE.

4547
TOLBERT CROSS BY MR. DOWNEY

03:48PM  1              MR. DOWNEY:  YES.

03:48PM  2              THE COURT:  WE'RE DISCUSSING WHETHER THIS IS AN

03:48PM  3      8 TRACK TAPE, A CASSETTE, OR A MICROCASSETTE.

03:48PM  4          BUT -- WELL, I'LL ALLOW THIS TO BE PLAYED.  IT'S LINE 6

03:48PM  5      THROUGH -- ON PAGE 18, THROUGH PAGE 20, LINE 25.

03:48PM  6          DO YOU HAVE THAT CUED UP ALREADY?

03:48PM  7              MR. DOWNEY:  YES.

03:48PM  8              THE COURT:  AND YOU'D LIKE TO PLAY THE ENTIRETY?

03:48PM  9      YOU HAVE THE EXAMINATION FOLLOWING THAT?

03:48PM 10              MR. DOWNEY:  YES.

03:48PM 11              THE COURT:  ALL RIGHT.  THANK YOU.  WE'LL PLAY THAT.

03:48PM 12      THANK YOU.

03:48PM 13          "MEETING OPERATOR:  THANK YOU.  OUR NEXT QUESTION COMES

03:48PM 14      FROM CRAIG HALL.  PLEASE GO AHEAD.

03:48PM 15          "QUESTIONER:  HI, CHRIS.  I'M CONFUSED A LITTLE BIT ON THE

03:48PM 16      SHARE PRICING.  ELIZABETH TALKED FAIRLY QUICKLY ABOUT 13.4 OR 5

03:49PM 17      MILLION AND UP TO THAT NUMBER AT $15 A SHARE.  AND THEN 225

03:49PM 18      MILLION AT HIGHER SHARE PRICES ALL RELATED TO SOME STRATEGIC

03:49PM 19      PARTNER AGREEMENT.  AND THEN SHE TALKED ABOUT A SHARE SPLIT AND

03:49PM 20      EARLIER SHE TALKED ABOUT $75 IN SHARE.  SO IS THE $15 THE SAME

03:49PM 21      THING AS THE $75 AFTER THE MULTIPLE OR -- HOW DOES IT ALL

03:49PM 22      RELATE TO THE CAPITALIZATION AND KIND OF WHERE WE ARE NOW AT

03:49PM 23      WHAT IS BEING OFFERED HERE?  IT'S A LITTLE HARD FOR ME TO

03:49PM 24      FOLLOW THE BOUNCING BALL.

03:49PM 25          "MR. LUCAS:  SO, CRAIG, THANKS.  HI.  SO, YES, SHE RAN

TOLBERT CROSS BY MR. DOWNEY                                      4548

03:49PM   1    THROUGH THOSE NUMBERS QUICKLY AND -- I WAS DOING THE MATH ALSO

03:49PM   2    IN MY HEAD.  SO TO BE CLEAR, WHEN THE -- WE'VE INVESTED TWICE

03:49PM   3    IN THERANOS, SERIES B AND SERIES C.  SERIES B WE INVESTED AT

03:50PM   4    ABOUT 90 CENTS A SHARE.  SERIES C WAS A LITTLE UNDER $3 PER

03:50PM   5    SHARE.  OKAY?  AND THAT RELATES TO THE $75 VALUE.  SO THAT'S

03:50PM   6    ALL PRE-SPLIT SHARES.  SO, IF YOU PAID $3, YOU KNOW, IN SERIES

03:50PM   7    C, THAT $3 IS NOW WORTH $75.

03:50PM   8         "WHAT THEY EFFECTED, AND THESE ARE IN SOME OF THE

03:50PM   9    DOCUMENTS I'VE SIGNED, IS A FIVE FOR ONE FORWARD SPLIT.  SO

03:50PM   10   THERE ARE FIVE TIMES AS MANY SHARES THAT THE COMPANY HAS AND

03:50PM   11   THAT WE OWN AND SO NOW THE PRICE IS AT $15 PER SHARE.  SO

03:50PM   12   THAT'S THE PRICE THAT SHE'S TALKING ABOUT.

03:50PM   13        "GOING FORWARD -- NOW, IF I WAS DOING THE MATH CORRECTLY,

03:50PM   14   SHE SAYS THERE'S ABOUT 13 MILLION SHARES THAT CAN BE EXERCISED

03:51PM   15   THIS YEAR.  AND SO IF YOU MULTIPLY 15 TIMES 13 THAT'S, YOU

03:51PM   16   KNOW, CLOSE TO $200 MILLION THAT SHE TALKED ABOUT.  THEN IF WE

03:51PM   17   GO FORWARD, SHE SAID NEXT YEAR THERE ARE A COUPLE HUNDRED

03:51PM   18   MILLION SHARES THAT ARE AUTHORIZED.

03:51PM   19        "SO I SHOULD SAY THAT ACTIONS THAT SHE'S TAKING JUST

03:51PM   20   COOPERATE-WISE IN THE DOCUMENTS THAT I HAVE BEEN SIGNING

03:51PM   21   RECENTLY, FIRST OFF, I SHOULD SAY SHE -- SHE HAS CONTROLLING

03:51PM   22   INTERESTS OF THE COMPANY.  SHE HAS A FIRM GRASP ON THE COMPANY.

03:51PM   23   OKAY?  LET THERE BE NO MISTAKE, BOTH IN HOW SHE LEADS IT AND

03:51PM   24   THEN LEGALLY AND CONTRACTUALLY.

03:51PM   25        "SHE HAS DONE SOME THINGS IN THOSE DOCUMENTS THAT ALLOWS

4549

TOLBERT CROSS BY MR. DOWNEY

03:51PM   1    HER TO MAINTAIN CONTROL BECAUSE SHE IS CONCERNED ABOUT SOME

03:51PM   2    FOLKS THAT MAY END UP INVESTING IN THE COMPANY, A PARTNER AND

03:52PM   3    SO FORTH, WHERE, GEE, THEY AREN'T ACTING RESPONSIBLY AS A

03:52PM   4    PARTNER AND SO MAYBE SHE WOULD WANT TO CASH THEM OUT.  SO SHE

03:52PM   5    WOULD HAVE THE RIGHT TO DO THAT.

03:52PM   6        "SO LET THERE BE NO MISTAKE, JUST LIKE SOME OF THE OTHER

03:52PM   7    HIGH FLYING COMPANIES IN SILICON VALLEY, THE STRUCTURE IS IN

03:52PM   8    PLACE THAT EVEN AFTER THE COMPANY GOES PUBLIC -- AND THAT IS

03:52PM   9    WHY THE SPLIT AND SO FORTH AND DIFFERENT CLASSES OF STOCK --

03:52PM   10   THAT EVEN AFTER THE COMPANY GOES PUBLIC, SHE WILL MAINTAIN THE

03:52PM   11   ESSENTIAL CONTROL, WHICH HAS BEEN BRILLIANTLY PLANNED BY

03:52PM   12   THEMSELVES AND THEIR LAW FIRM.  AND HAVING SAID THAT, FOLLOWING

03:52PM   13   THE SAME PLAY BOOK AS SOME OF THE OTHER NOTABLE COMPANIES.

03:52PM   14       "I WOULD MAKE ANOTHER COMMENT JUST IN THIS FINANCING, AS

03:52PM   15   SHE SAID, THERE ARE A HOST OF HIGH PROFILE COMPANIES THAT ARE

03:52PM   16   INTERESTED IN INVESTING AT THAT HIGHER DOLLAR AMOUNT.  SO IT

03:53PM   17   GIVES ME CONFIDENCE THAT THIS IS BEING WELL-VETTED BY THE VERY

03:53PM   18   SOPHISTICATED MONEY.  AND AS YOU CAN IMAGINE, THE TOP TIER

03:53PM   19   BANKS AROUND THE COUNTRY ARE ALL OVER WANTING TO PARTICIPATE IN

03:53PM   20   THIS.

03:53PM   21       "SO HOPEFULLY, CRAIG, THAT ANSWERS WHAT YOU'RE ASKING.

03:53PM   22   AND IF NOT, PLEASE, YOU KNOW, ASK OR CALL ME, CERTAINLY."

03:53PM   23   BY MR. DOWNEY:

03:53PM   24   Q.   MR. TOLBERT, DO YOU RECOGNIZE THE VOICE OF THE PERSON WHO

03:53PM   25   ASKED THAT QUESTION AS CRAIG HALL?

TOLBERT CROSS BY MR. DOWNEY                                                4550

03:53PM  1    A.   I DO.

03:53PM  2    Q.   AND DO YOU RECOGNIZE THE VOICE OF THE PERSON WHO ANSWERED

03:53PM  3    THAT QUESTION AS CHRIS LUCAS?

03:53PM  4    A.   I DO.

03:53PM  5    Q.   AND IN SUMMARY FORM, DID MR. HALL'S QUESTION RELATE TO THE

03:53PM  6    AMOUNT OF MONEY THAT THE HALL GROUP WOULD HAVE REALIZED ON THE

03:53PM  7    PROFIT IT HAD MADE THUS FAR?

03:53PM  8    A.   I THINK HIS QUESTION RELATED TO WHAT THE VALUE WAS THAT WE

03:54PM  9    WERE INVESTING, THAT OUR 2013 POTENTIAL INVESTMENT WOULD BE

03:54PM  10   MADE AT.

03:54PM  11   Q.   OKAY.  BUT HE DID NOT ASK ANY QUESTION OF MR. LUCAS EITHER

03:54PM  12   ABOUT THE PHARMA BUSINESS; CORRECT?

03:54PM  13   A.   NOT IN THAT INTERCHANGE.

03:54PM  14   Q.   AND HE DID NOT ASK MR. LUCAS ANY QUESTIONS ABOUT WHAT

03:54PM  15   MS. HOLMES HAD JUST SAID ABOUT THE MILITARY BUSINESS; CORRECT?

03:54PM  16   A.   NOT IN THAT INTERCHANGE.

03:54PM  17   Q.   AND ARE THERE ANY OTHER QUESTIONS THAT YOU ARE AWARE OF

03:54PM  18   THAT MR. HALL ASKED DURING THE COURSE OF THAT TAPE OR

03:54PM  19   CONVERSATION?

03:54PM  20   A.   I DON'T BELIEVE THERE'S ANY OTHERS.

03:54PM  21   Q.   OKAY.  HOW SOON AFTER THAT CONVERSATION DID THE HALL GROUP

03:54PM  22   DECIDE TO MAKE AN INVESTMENT IN THERANOS?

03:54PM  23   A.   SO I BELIEVE THAT PHONE CALL WAS ON DECEMBER 20TH.  WE

03:55PM  24   MADE THE INVESTMENT AND WIRED THE FUNDS ON DECEMBER 31ST, SO

03:55PM  25   THAT WOULD HAVE BEEN 11 DAYS.

4551
TOLBERT CROSS BY MR. DOWNEY

03:55PM 1     Q.   DO YOU KNOW IN THAT INTERIM WHEN THE DECISION WAS MADE?

03:55PM 2     A.   NOT SPECIFICALLY.

03:55PM 3     Q.   AND AGAIN, BETWEEN THE 20TH OF DECEMBER AND THE 31ST OF

03:55PM 4     DECEMBER, DID YOU REQUEST ANY FURTHER INFORMATION -- YOU

03:55PM 5     PERSONALLY REQUEST ANY FURTHER INFORMATION OF THERANOS?

03:55PM 6     A.   NOT DIRECTLY.

03:55PM 7     Q.   WHEN YOU SAY "NOT DIRECTLY," DID YOU ASK FOR INFORMATION

03:55PM 8     INDIRECTLY?

03:55PM 9     A.   I THINK I PROBABLY HAD A CONVERSATION WITH CHRIS LUCAS --

03:55PM 10    WELL, I KNOW I HAD SEVERAL CONVERSATIONS WITH CHRIS AFTER THIS

03:55PM 11    PHONE CALL ON THE 20TH AND BEFORE THE 31ST, AND SO I WOULD HAVE

03:55PM 12    ASKED HIM FOR -- WE WOULD HAVE HAD ADDITIONAL DISCUSSION AND

03:55PM 13    THERE WOULD HAVE BEEN THINGS THAT I ASKED HIM FOR.

03:55PM 14    Q.   DID YOU ASK HIM TO GO AND GET DOCUMENTS, FOR EXAMPLE, FROM

03:55PM 15    THERANOS?

03:55PM 16    A.   I DON'T REMEMBER SPECIFICALLY.

03:55PM 17    Q.   OKAY.  DID YOU ASK HIM TO GET ANY OF THE CONTRACTS THAT

03:56PM 18    THERANOS HAD IN PLACE WITH RETAILERS, FOR EXAMPLE?

03:56PM 19    A.   I DID NOT ASK HIM THAT.

03:56PM 20    Q.   YOU HEARD DURING THE COURSE OF THE CALL SEGMENTS THAT

03:56PM 21    MR. SCHENK PLAYED TO YOU THAT THERE WAS REFERENCE TO STRATEGIC

03:56PM 22    PARTNERS MAKING AN INVESTMENT.

03:56PM 23         YOU HEARD THAT?  DO YOU RECALL THAT?

03:56PM 24    A.   I DID, YEP.

03:56PM 25    Q.   AND DO YOU KNOW WHAT HAD HAPPENED TO CHANGE THE TERMS OF

TOLBERT CROSS BY MR. DOWNEY                                          4552

03:56PM  1    THOSE RELATIONSHIPS AND LED TO AN INVESTMENT AT THE END OF

03:56PM  2    2013?

03:56PM  3    A.    WELL, MY UNDERSTANDING FROM THOSE PERIODIC PHONE CALLS

03:56PM  4    WITH MR. LUCAS IS THAT THE COMPANY WAS MAKING GREAT PROGRESS

03:56PM  5    AND IT WAS EVIDENCED BY COMING OUT OF STEALTH MODE AND THE

03:56PM  6    ANNOUNCEMENT OF THE PARTNERSHIP WITH WALGREENS.

03:56PM  7         SO THOSE WERE THE THINGS THAT I THOUGHT KIND OF INDICATED

03:56PM  8    THAT THERE WAS MOMENTUM AROUND THOSE RELATIONSHIPS.

03:56PM  9    Q.    DID YOU KNOW ANYTHING ABOUT AGREEMENTS THAT WERE SIGNED IN

03:56PM  10   THAT WINDOW BETWEEN DECEMBER 20TH AND DECEMBER 31ST BETWEEN

03:57PM  11   RETAILERS AND THERANOS?

03:57PM  12   A.    I HADN'T SEEN SPECIFIC CONTRACTS.

03:57PM  13   Q.    AND YOU HADN'T ASKED FOR SPECIFIC CONTRACTS; RIGHT?

03:57PM  14   A.    NO.

03:57PM  15   Q.    AND DID YOU IN THAT PERIOD GO TO ONE OF THE WALGREENS

03:57PM  16   STORES WHERE, YOU KNOW, THE THERANOS OPERATION WAS IN PLACE?

03:57PM  17   A.    NOT IN 2013.

03:57PM  18   Q.    OKAY.  YOU WENT AT A LATER TIME; CORRECT?

03:57PM  19   A.    I DID GO AT A LATER TIME.

03:57PM  20   Q.    AND WHEN YOU WENT AT A LATER TIME, DID YOU HAVE AN ORDER

03:57PM  21   FROM YOUR PHYSICIAN FOR A BLOOD TEST?

03:57PM  22   A.    I DID.

03:57PM  23   Q.    AND WHEN YOU GAVE THAT ORDER TO THE PHLEBOTOMIST OR TO THE

03:57PM  24   PERSON AT WALGREENS, THEY TOLD YOU THAT YOUR BLOOD WOULD HAVE

03:57PM  25   TO BE DRAWN BY VENOUS DRAW; CORRECT?

4553

TOLBERT CROSS BY MR. DOWNEY

03:57PM   1     A.   WELL, ON THE ORDER -- JUST TO BE CLEAR, ON THE ORDER THERE

03:57PM   2     WERE TWO OR THREE DIFFERENT TESTS THAT WERE NOTED, AND THEY

03:57PM   3     TOLD ME THAT FOR ONE OF THE TESTS THERE WOULD HAVE TO BE A

03:57PM   4     VENOUS DRAW DONE.

03:57PM   5     Q.   OKAY.  AND DID YOU THEN HAVE THE VENOUS DRAW DONE?

03:58PM   6     A.   I DID NOT.  I HAD THE FINGERSTICK DONE FOR THE PORTION

03:58PM   7     THAT I COULD DO THAT WAY.  BUT I DID NOT HAVE THE VENOUS DRAW

03:58PM   8     DONE.

03:58PM   9     Q.   SO YOU CANCELLED OUT ESSENTIALLY ONE OF THE ORDERS THAT

03:58PM   10    YOUR DOCTOR HAD FILLED OUT IN THE FORM FOR YOU; IS THAT RIGHT?

03:58PM   11    A.   CORRECT.

03:58PM   12    Q.   NOW, I THINK YOU HAD TESTIFIED THAT YOUR UNDERSTANDING IN

03:58PM   13    THIS CALL IN 2013 WAS THAT, YOU KNOW, THERANOS HAD MADE VENOUS

03:58PM   14    DRAWS NO LONGER NECESSARY.  IS THAT THE ESSENCE OF WHAT YOU

03:58PM   15    SAID TO MR. SCHENK?

03:58PM   16    A.   THAT'S WHAT I BELIEVED IN 2013.

03:58PM   17    Q.   AND SO WERE YOU SHOCKED WHEN YOU WENT IN 2015 AND HAD TO

03:58PM   18    HAVE A VENOUS DRAW?

03:58PM   19    A.   I WAS SURPRISED.

03:58PM   20    Q.   AND DID YOU CONTACT MR. CHRIS LUCAS AT THAT TIME?

03:58PM   21    A.   YOU KNOW, I DIDN'T -- I BELIEVE I DID HAVE A CONVERSATION

03:58PM   22    WITH CHRIS WHERE I REFERENCED THAT EXPERIENCE.

03:58PM   23    Q.   OKAY.  AND DID YOU CONTACT MS. HOLMES ABOUT THAT

03:58PM   24    EXPERIENCE?

03:58PM   25    A.   I DID NOT CALL MS. HOLMES.

4554

TOLBERT CROSS BY MR. DOWNEY

| | | |
|---|---|---|
| 03:58PM | 1 | Q.   AND DID YOU CALL ANYONE ELSE AT THERANOS ABOUT THAT |
| 03:58PM | 2 | EXPERIENCE? |
| 03:58PM | 3 | A.   I DID NOT. |
| 03:58PM | 4 | Q.   I'D LIKE TO SHOW YOU A DOCUMENT THAT IS MARKED AS |
| 03:59PM | 5 | EXHIBIT 1393. |
| 03:59PM | 6 | A.   IS THAT ONE IN THE BINDER THAT I CURRENTLY HAVE OR IS THAT |
| 03:59PM | 7 | IN THE -- |
| 03:59PM | 8 | Q.   IT SHOULD BE IN THE BINDER THAT YOU CURRENTLY -- LET ME -- |
| 03:59PM | 9 | ACTUALLY, I DON'T THINK I'VE GIVEN YOU YOUR BINDER YET, SO -- |
| 03:59PM | 10 | YOUR HONOR, MAY I APPROACH THE WITNESS? |
| 03:59PM | 11 | THE COURT:  YES. |
| 04:00PM | 12 | (PAUSE IN PROCEEDINGS.) |
| 04:00PM | 13 | THE COURT:  MR. DOWNEY, LET ME JUST ASK YOU, SIR, |
| 04:00PM | 14 | HOW MUCH LONGER DO YOU THINK YOU HAVE? |
| 04:00PM | 15 | MR. DOWNEY:  MAYBE 15 TO 20 MINUTES. |
| 04:00PM | 16 | THE COURT:  AND I'M JUST TRYING TO TIME THIS. |
| 04:00PM | 17 | AND I THINK THIS IS AN OUT OF TOWN WITNESS.  IS THAT |
| 04:00PM | 18 | RIGHT? |
| 04:00PM | 19 | MR. DOWNEY:  I BELIEVE IT IS, YES. |
| 04:00PM | 20 | MR. SCHENK:  YES. |
| 04:00PM | 21 | THE COURT:  AND THEN, MR. SCHENK, WHAT DO YOU |
| 04:00PM | 22 | THINK -- I'M TRYING TO SEE HOW MUCH TIME WE HAVE LEFT WITH THIS |
| 04:00PM | 23 | WITNESS AND THEN I CAN ASK THE JURY WHETHER OR NOT IT'S, |
| 04:01PM | 24 | THEY'RE WILLING TO STAY TO COMPLETE THIS WITNESS'S TESTIMONY |
| 04:01PM | 25 | JUST BECAUSE OF THE TRAVEL. |

TOLBERT CROSS BY MR. DOWNEY                                          4555

04:01PM   1              MR. SCHENK:  MR. DOWNEY SAID 15 TO 20 MINUTES?  I

04:01PM   2    THINK IF WE WENT TO THE BOTTOM OF THE HOUR -- ONE QUESTION

04:01PM   3    REMAINS THAT WE HAD DISCUSSED THIS MORNING ABOUT TIMING AND

04:01PM   4    WHETHER DOCUMENTS AFTER A CERTAIN DATE WOULD COME IN, AND

04:01PM   5    THAT'S STILL UNKNOWN TO ME AND SO THAT MIGHT AFFECT IT.

04:01PM   6              MR. DOWNEY:  I DON'T THINK THAT WILL BE -- I DON'T

04:01PM   7    THINK THAT WILL EVENTUATE, YOUR HONOR.

04:01PM   8              THE COURT:  IT SOUNDS LIKE THAT'S NOT GOING TO BE AN

04:01PM   9    ISSUE.

04:01PM  10              MR. SCHENK:  I WOULD THINK I HAVE 15 MINUTES IN

04:01PM  11    REDIRECT, MAYBE LESS.

04:01PM  12              THE COURT:  IT SOUNDS LIKE WE WOULD BE GOING BEFORE

04:01PM  13    5:00 O'CLOCK, IF I WERE TO ASK THIS GOOD JURY IF THEY WOULD

04:01PM  14    STAY UNTIL 5:00 O'CLOCK.

04:01PM  15              MR. DOWNEY:  I THINK FOR CERTAIN, YOUR HONOR, YES.

04:01PM  16              THE COURT:  OKAY.  LET ME TURN TO THE JURY.

04:01PM  17          LADIES AND GENTLEMEN, I -- I WANT TO KNOW IF I CAN PRESS

04:01PM  18    ON YOU THIS AFTERNOON FOR ANOTHER 40 MINUTES OR SO TO FINISH

04:01PM  19    THIS WITNESS.

04:02PM  20          DOES ANYONE HAVE AN ISSUE WITH THAT?

04:02PM  21          THANK YOU SO MUCH.  I DON'T SEE ANY HANDS.  THAT'S VERY

04:02PM  22    GENEROUS OF YOU.

04:02PM  23              MR. DOWNEY:  AND I'LL TRY TO GO THROUGH IT QUICKLY.

04:02PM  24              THE WITNESS:  YOUR HONOR, CAN I SAY THANK YOU AS

04:02PM  25    WELL?

TOLBERT CROSS BY MR. DOWNEY                                      4556

04:02PM   1            (LAUGHTER.)

04:02PM   2                  THE COURT:  TO OUR JURY, YES.

04:02PM   3                  MR. DOWNEY:  YOUR HONOR, I'VE PASSED UP THROUGH

04:02PM   4       MS. KRATZMANN A COPY FOR THE COURT.

04:02PM   5       Q.   MR. TOLBERT, CAN I ASK YOU TO LOOK AT EXHIBIT 1393 IN THAT

04:02PM   6       NOTEBOOK?

04:02PM   7                  MR. SCHENK:  YOUR HONOR, I DON'T HAVE THAT DOCUMENT.

04:03PM   8                  THE WITNESS:  I DON'T SEE THAT ONE.

04:03PM   9                  THE COURT:  IT DIDN'T GET IN HERE YET.

04:03PM  10                  MR. DOWNEY:  I'M SORRY.  IT'S NUMBERED TWICE, BUT

04:03PM  11       IT'S 7384.

04:03PM  12                  THE COURT:  THANK YOU.

04:03PM  13                  THE CLERK:  SO FOR THE RECORD, COUNSEL, THE EXHIBIT

04:03PM  14       IS 7384?

04:03PM  15                  MR. DOWNEY:  THAT'S CORRECT.

04:03PM  16            (PAUSE IN PROCEEDINGS.)

04:04PM  17       BY MR. DOWNEY:

04:04PM  18       Q.   HAVE YOU HAD AN OPPORTUNITY TO REVIEW THAT?

04:04PM  19       A.   I HAVE.

04:04PM  20       Q.   DO YOU RECOGNIZE THIS AS AN EMAIL EXCHANGE RELATED TO THE

04:04PM  21       INVESTMENT THAT THE HALL GROUP MADE IN THERANOS BETWEEN

04:04PM  22       YOURSELF AND OTHERS?

04:04PM  23       A.   I DO.

04:04PM  24                  MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

04:04PM  25       7384.

TOLBERT CROSS BY MR. DOWNEY

04:04PM   1                 MR. SCHENK:  YOUR HONOR, TWO OBJECTIONS.  FIRST,

04:04PM   2       IT'S HEARSAY.  SECOND, IT IS AFTER THE DATE WE DISCUSSED,

04:04PM   3       12-31-2013.

04:04PM   4                 MR. DOWNEY:  YOUR HONOR, I THINK THE EMAIL IS FROM

04:04PM   5       2014.  THE DATE WE DISCUSSED WAS THE END OF 2015.

04:05PM   6                 THE COURT:  AND IS IT HEARSAY?

04:05PM   7                 MR. DOWNEY:  WELL, I -- LET ME SEE.

04:05PM   8                 THE COURT:  SURE.

04:05PM   9       BY MR. DOWNEY:

04:05PM  10       Q.   IS THIS AN EMAIL THAT WAS EXCHANGED DURING THE COURSE OF

04:05PM  11       BUSINESS OF THE HALL GROUP RELATED TO ITS INVESTMENTS IN

04:05PM  12       COMPANIES?

04:05PM  13       A.   IT WAS.

04:05PM  14       Q.   AND IS THERE A SYSTEM IN PLACE AT THE HALL GROUP TO

04:05PM  15       PRESERVE THE EMAILS THAT IT SENDS?

04:05PM  16       A.   THERE IS.

04:05PM  17       Q.   AND WAS THIS EMAIL -- EXCHANGE OF EMAILS, ARE THOSE

04:05PM  18       EMAILS, WHEN THEY ARE EXCHANGED, DO THEY -- ARE THEY GENERALLY

04:05PM  19       MADE AT OR NEAR THE TIME OF THE EVENTS THAT THEY REFER TO?

04:05PM  20       A.   YEAH, I GUESS I DON'T -- I DON'T UNDERSTAND THAT QUESTION,

04:05PM  21       SO --

04:05PM  22       Q.   WELL, DO THEY RELATE TO EVENTS THAT ARE CURRENT AT THE

04:05PM  23       TIME THAT IS EXCHANGED IN THE EMAIL?

04:05PM  24       A.   YES.

04:05PM  25       Q.   AND DO PERSONS AT THE HALL GROUP STRIVE FOR THE EMAILS TO

TOLBERT CROSS BY MR. DOWNEY                                    4558

04:06PM  1    ACCURATELY REFLECT WHAT IS GOING ON?

04:06PM  2    A.   I BELIEVE SO.

04:06PM  3    Q.   OKAY.

04:06PM  4         MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

04:06PM  5    7384.

04:06PM  6         MR. SCHENK:  YOUR HONOR, SAME OBJECTION.  IT'S FROM

04:06PM  7    MR. HALL'S AOL TO SOMEONE WHO DOESN'T WORK AT HALL, AND THE

04:06PM  8    INDIVIDUAL THAT IT'S SENT TO I THINK WAS NOT PART OF THE

04:06PM  9    ORDINARY BUSINESS OF THE HALL GROUP.  I THINK IT HAD TO DO WITH

04:06PM 10    A SPECIAL ARRANGEMENT THAT MR. HALL MADE WITH SOME OTHER

04:06PM 11    INDIVIDUAL.  THIS IS NOT A BUSINESS RECORD.

04:06PM 12         MR. DOWNEY:  YOUR HONOR, I WOULD JUST SAY COUPLE OF

04:06PM 13    THINGS.  FIRST, THIS WITNESS HAS ACTUALLY HIMSELF SIGNED AN

04:06PM 14    AUTHENTICATION OF DOCUMENTS THAT HAVE BEEN PRODUCED AS BUSINESS

04:06PM 15    RECORDS.

04:06PM 16       SECOND, THIS EMAIL GOES TO THIS WITNESS AT THE BUSINESS

04:06PM 17    ADDRESS, I BELIEVE, OF THE HALL GROUP.  AND SO IT WAS PRINTED,

04:06PM 18    I THINK, THERE.

04:06PM 19         THE COURT:  WELL, THERE'S -- LET ME JUST SAY, I

04:06PM 20    THINK THERE'S A FEW GAPS HERE AS FAR AS 803(6).

04:07PM 21       BUT -- AND THE QUESTION IS RELIABILITY.

04:07PM 22       WHY DON'T YOU JUST ASK -- I'LL ALLOW THIS TO COME IN BASED

04:07PM 23    ON YOU --

04:07PM 24         MR. DOWNEY:  WELL, I DON'T HAVE TO PUBLISH IT,

04:07PM 25    YOUR HONOR, IF THAT'S THE ISSUE.

TOLBERT CROSS BY MR. DOWNEY

04:07PM   1                     THE COURT:  SURE.  WHY DON'T YOU JUST PROBE THIS AND

04:07PM   2       GET WHAT YOU NEED OUT OF IT.  MINE IT FOR WHAT YOU NEED AND

04:07PM   3       THEN WE CAN MOVE ON.

04:07PM   4                     MR. DOWNEY:  OKAY.

04:07PM   5       Q.   DO YOU RECALL THAT MR. HALL LEFT TO TAKE A TRIP DURING THE

04:07PM   6       LATTER PART OF 2013 WHEN THIS INVESTMENT WAS UNDER

04:07PM   7       CONSIDERATION?

04:07PM   8       A.   I DO.

04:07PM   9       Q.   AND DO YOU RECALL THAT WHEN HE LEFT, THE HALL GROUP HAD

04:07PM  10       NOT YET MADE A DECISION AS TO WHETHER OR NOT TO INVEST?

04:07PM  11       A.   I DO.

04:07PM  12       Q.   AND DO YOU RECALL THAT HE ADVISED YOU THAT THERE WAS A

04:07PM  13       RANGE OF INVESTMENT AMOUNT AND YOU COULD SELECT THAT WHEN THE

04:07PM  14       INVESTMENT DECISION WAS MADE?

04:07PM  15       A.   THAT'S CORRECT.

04:07PM  16       Q.   AND DO YOU RECALL THAT HE TOLD YOU YOU COULD EVEN CHOOSE

04:07PM  17       NOT TO INVEST IF YOU THOUGHT THAT WAS APPROPRIATE?

04:08PM  18       A.   CORRECT.

04:08PM  19       Q.   AND SO WAS IT THE CASE THAT YOU PERSONALLY ULTIMATELY MADE

04:08PM  20       THE DECISION TO INVEST IN THERANOS?

04:08PM  21       A.   YEAH.  YOU KNOW, SO WE -- MY DISCUSSIONS WITH MR. HALL HAD

04:08PM  22       BEEN THAT WE WERE, THAT WE WERE GOING TO INVEST UP TO

04:08PM  23       $5 MILLION.

04:08PM  24            WHEN HE LEFT, HE ANTICIPATED THAT WE WERE GOING TO MAKE AN

04:08PM  25       INVESTMENT.  SO HE WOULD HAVE BEEN SURPRISED IF WE HAD NOT

TOLBERT CROSS BY MR. DOWNEY                                    4560

04:08PM   1     INVESTED ANYTHING.

04:08PM   2         BUT I THINK YOU'RE ACCURATE THAT, YOU KNOW, IF I WOULD

04:08PM   3     HAVE CHOSEN NOT TO MAKE AN INVESTMENT, THAT WOULD HAVE BEEN

04:08PM   4     OKAY.

04:08PM   5     Q.   AND DO YOU RECALL THAT HE HAD A TECHNICAL ISSUE RELATED

04:08PM   6     TO -- THAT RAISED A CONCERN FOR HIM IN CONNECTION WITH THE

04:08PM   7     INVESTMENT?

04:08PM   8     A.   I'M NOT AWARE OF IT.  I MEAN, MY DISCUSSIONS WITH MR. HALL

04:08PM   9     HAD BEEN PRIMARILY AROUND THE FACT THAT WE WANTED TO BE A

04:08PM  10     DIRECT INVENTOR WITH THERANOS, AND SO I THINK THAT THE TECH

04:09PM  11     ISSUE THAT HE REFERS TO HERE IS A TECHNICAL ISSUE, AN ISSUE OF

04:09PM  12     WANTING TO MAKE SURE THAT WE WOULD BE A DIRECT INVESTOR OF THE

04:09PM  13     COMPANY.

04:09PM  14     Q.   DO YOU RECALL DISCUSSING WITH MR. HALL HIS VIEW OF

04:09PM  15     ANALYZING AND DILIGENCE THAT COULD BE DONE ON THE INVESTMENT?

04:09PM  16     A.   CERTAINLY WE HAD HAD LOTS OF DISCUSSIONS ABOUT HOW TO

04:09PM  17     ANALYZE THE OPPORTUNITY THAT, YOU KNOW, EXISTED.

04:09PM  18     Q.   OKAY.  DID HE TELL YOU THAT HE THOUGHT IT WAS A DEAL THAT

04:09PM  19     HAD HUGE POTENTIAL?

04:09PM  20     A.   CERTAINLY.  YEAH, IN THOSE DISCUSSIONS WE BOTH FELT LIKE

04:09PM  21     THERE WAS POTENTIAL.

04:09PM  22     Q.   OKAY.  AND DO YOU THINK THAT HE -- DO YOU RECALL HIM

04:09PM  23     HAVING THE VIEW THAT THE DEAL WAS REALLY HARD TO ANALYZE OR

04:09PM  24     UNDERSTAND?

04:09PM  25     A.   YOU KNOW, I KNOW HE REFERENCES THAT HERE.  YOU KNOW, I

TOLBERT CROSS BY MR. DOWNEY                                          4561

04:09PM  1    KNOW THAT WE BOTH, OVER THOSE LOTS OF YEARS LIKE WE TALKED

04:09PM  2    ABOUT, HAD WISHED WE HAD MORE CONCRETE FINANCIAL INFORMATION.

04:10PM  3         AND, YOU KNOW, SO IT'S HARD TO -- I MEAN, I KNOW HE SAYS

04:10PM  4    HERE THAT IT'S HARD TO UNDERSTAND OR ANALYZE.

04:10PM  5         I DON'T KNOW SPECIFICALLY WHAT THINGS HE WAS TALKING

04:10PM  6    ABOUT.  BUT I WOULD AGREE THAT IT WAS HARD TO ANALYZE.

04:10PM  7    Q.   BUT YOUR BEST UNDERSTANDING AT THE TIME THAT YOU MADE THE

04:10PM  8    INVESTMENT WAS THAT THERANOS -- FIRST, THAT THERANOS WAS IN

04:10PM  9    RETAIL PARTNERSHIPS AND THOSE STORES WOULD ROLL OUT; CORRECT?

04:10PM  10   A.   CORRECT.

04:10PM  11   Q.   AND THEN IF THAT WAS SUCCESSFUL, THEY MIGHT RETURN TO

04:10PM  12   OTHER AREAS OF THEIR BUSINESS, INCLUDING THE PHARMACEUTICAL

04:10PM  13   BUSINESS AND THE MILITARY BUSINESS; CORRECT?

04:10PM  14   A.   WELL, LIKE I SAID, I DIDN'T REALIZE THAT WAS A COMPLETE

04:10PM  15   PAUSE, AND FROM THE LANGUAGE WE READ EARLIER, IT DIDN'T SEEM

04:10PM  16   LIKE A COMPLETE PAUSE.

04:10PM  17        BUT, YOU KNOW, I DID KNOW THAT RETAIL REPRESENTED A LARGE

04:10PM  18   ENOUGH OPPORTUNITY AND A LARGE ENOUGH INVESTMENT OF TIME AND

04:10PM  19   CAPITAL THAT IT WAS THE PRIMARY OPPORTUNITY AT THE MOMENT.

04:10PM  20   Q.   AND YOU THOUGHT THE FACT THAT WALGREENS HAD MADE A

04:10PM  21   DECISION TO ENTER INTO A RETAIL PARTNERSHIP WITH THERANOS WAS

04:11PM  22   SIGNIFICANT; CORRECT?

04:11PM  23   A.   I DID THINK IT WAS VERY SIGNIFICANT.

04:11PM  24   Q.   AND YOU THOUGHT THAT WALGREENS HAD LIKELY DONE A FAIR

04:11PM  25   AMOUNT OF DUE DILIGENCE IN CONNECTION WITH ITS DECISION TO DO

TOLBERT CROSS BY MR. DOWNEY                                    4562

04:11PM   1    THAT; CORRECT?

04:11PM   2    A.   I WOULD HAVE BELIEVED THAT.

04:11PM   3    Q.   AND THAT WOULD HAVE BEEN IMPORTANT TO YOU IN MAKING YOUR

04:11PM   4    DECISION; CORRECT?

04:11PM   5    A.   IT WOULD HAVE FACTORED INTO IT.

04:11PM   6    Q.   AND YOU ALSO KNEW DURING THE PERIOD IN BETWEEN YOUR TWO

04:11PM   7    INVESTMENTS THAT DON LUCAS AND CHRIS LUCAS HAD SOME INVOLVEMENT

04:11PM   8    IN CONNECTION WITH THERANOS; CORRECT?

04:11PM   9    A.   I DID.

04:11PM   10   Q.   AND I THINK AS WE DISCUSSED BEFORE, DON LUCAS WAS A VERY

04:11PM   11   SOPHISTICATED INVESTOR AND A PERSON WITH A SUBSTANTIAL

04:11PM   12   REPUTATION AS A TECHNOLOGY INVESTOR; CORRECT?

04:11PM   13   A.   CORRECT.

04:11PM   14   Q.   AND THAT WAS IMPORTANT TO YOU IN MAKING YOUR DECISION;

04:11PM   15   CORRECT?

04:11PM   16   A.   THAT FACTORED INTO IT.

04:11PM   17   Q.   AND I THINK WE SAW DURING YOUR --

04:11PM   18   A.   NOW, LET ME SAY THIS.  SO, YOU KNOW, DON'S INVOLVEMENT

04:12PM   19   FACTORED IN A BIG WAY INTO OUR FIRST INVESTMENT.

04:12PM   20        AND TO THIS 2013 INVESTMENT, I DON'T REMEMBER WITH

04:12PM   21   CLARITY.  I KNOW AT SOME POINT HE STEPPED AWAY FROM THE

04:12PM   22   COMPANY, OR AT LEAST STEPPED FARTHER AWAY, AND SO I DON'T

04:12PM   23   REMEMBER EXACTLY WHEN IN THE TIMEFRAME, BUT CERTAINLY HIS

04:12PM   24   INVOLVEMENT -- OR HIS INVOLVEMENT I DON'T THINK WAS AS MUCH

04:12PM   25   AROUND THIS SECOND INVESTMENT AS IT WAS AROUND THE FIRST.

TOLBERT CROSS BY MR. DOWNEY                                    4563

04:12PM   1    Q.   BUT YOU ASSUMED IN CONNECTION WITH THE RELATIONSHIP THAT

04:12PM   2    HALL GROUP HAD WITH THERANOS THROUGH THOSE YEARS THAT HE HAD

04:12PM   3    DONE -- HE HAD THE ABILITY TO EVALUATE THERANOS; CORRECT?

04:12PM   4    A.   I -- CORRECT.

04:12PM   5    Q.   AND YOU KNEW HE WAS CHAIRMAN OF THE BOARD; CORRECT?

04:12PM   6    A.   CORRECT.

04:12PM   7    Q.   AND YOU ASSUMED THE BOARD OF DIRECTORS HAD REGULAR

04:12PM   8    MEETINGS, FOR EXAMPLE; CORRECT?

04:12PM   9    A.   I DID ASSUME THAT.

04:12PM  10    Q.   AND THAT WOULD HAVE INFLUENCED YOU AS TO WHETHER THERANOS

04:12PM  11    WOULD HAVE CONTINUED ITS DEVELOPMENT THROUGH THOSE YEARS;

04:13PM  12    CORRECT?

04:13PM  13    A.   CORRECT.

04:13PM  14    Q.   AND I THINK MR. SCHENK SHOWED YOU A RELEASE THAT THERANOS

04:13PM  15    PUT OUT IN THE MIDDLE OF 2013 RELATED TO ITS BOARD; CORRECT?

04:13PM  16    A.   CORRECT.

04:13PM  17    Q.   AND IS IT SAFE TO SAY THAT RECOGNIZING THAT THEY HAD A

04:13PM  18    BOARD WITH PEOPLE WHO WERE WELL REGARDED WAS -- INFLUENCED YOU

04:13PM  19    IN CONNECTION WITH MAKING YOUR 2013 INVESTMENT?

04:13PM  20    A.   THAT CERTAINLY WOULD HAVE BEEN A POSITIVE, NOT A NEGATIVE.

04:13PM  21    Q.   OKAY.  IS THAT SOMETHING THAT YOU TYPICALLY EVALUATE IN

04:13PM  22    CONNECTION WITH MAKING INVESTMENTS?

04:13PM  23    A.   YOU KNOW, CERTAINLY WE LOOK AT MANAGEMENT TEAMS AND BOARD

04:13PM  24    OF DIRECTORS AND EXPERTISE THAT THEY HAVE.

04:13PM  25    Q.   OKAY.  AND IS IT FAIR TO SAY THAT YOU UNDERSTOOD THAT

TOLBERT CROSS BY MR. DOWNEY                                            4564

04:13PM  1    THERANOS HAD A VERY SUBSTANTIAL PATENT PORTFOLIO?

04:13PM  2    A.   I DID.

04:13PM  3    Q.   AND DID THAT INFLUENCE YOUR DECISION TO MAKE AN INVESTMENT

04:13PM  4    IN 2013?

04:13PM  5    A.   YOU KNOW, I DON'T KNOW IN 2013.  IT CERTAINLY DID IN 2006.

04:14PM  6    Q.   OKAY.  DID YOU GAIN ANY MORE INFORMATION THAT YOU RECALL

04:14PM  7    IN THE PERIOD 2006 TO 2013 ABOUT THE PATENT PORTFOLIO?

04:14PM  8    A.   YOU KNOW, I BELIEVE IN MY CONVERSATIONS WITH CHRIS WE

04:14PM  9    WOULD HAVE REFERENCED ONCE OR TWICE THAT THERE WOULD HAVE BEEN

04:14PM 10    ONGOING PATENTS THAT WOULD HAVE BEEN APPLIED FOR AND GRANTED,

04:14PM 11    OR THAT THERE WERE -- THERE WAS A LOT OF WORK RELATIVE TO THE

04:14PM 12    INTELLECTUAL PROPERTY THAT WAS ONGOING.

04:14PM 13         IN FACT, I THINK IT WAS EVEN REFERENCED ON ONE OF THE

04:14PM 14    TAPES, ONE OF THE SEGMENTS OF THE TAPE THAT WE LISTENED TO.

04:14PM 15    Q.   OKAY.  BUT IT'S FAIR TO SAY THAT YOU, YOU -- IN MAKING THE

04:14PM 16    INVESTMENT, YOU VIEWED THIS AS A COMPANY THAT HAD A LOT OF

04:14PM 17    POTENTIAL FOR THE FUTURE; CORRECT?

04:14PM 18    A.   THAT'S CORRECT.

04:14PM 19    Q.   AND YOU WERE ATTRACTED TO ITS MISSION; CORRECT?

04:14PM 20    A.   I WAS, CORRECT.

04:14PM 21    Q.   AND YOU FELT THAT THE -- AS A RESULT OF ALL OF THE

04:14PM 22    INFORMATION THAT YOU HAD BEEN ABLE TO GATHER OVER THE YEARS,

04:14PM 23    THE INVESTMENT MADE SENSE; CORRECT?

04:14PM 24    A.   I DID.

04:14PM 25    Q.   AND YOU HAD THE ABILITY TO PARTICIPATE OR NOT PARTICIPATE

TOLBERT CROSS BY MR. DOWNEY                                              4565

04:15PM  1    IN THE INVESTMENT; CORRECT?

04:15PM  2    A.   CORRECT.

04:15PM  3    Q.   MR. SCHENK SHOWED YOU THE LANGUAGE IN THE LEGAL DOCUMENTS

04:15PM  4    RELATED TO ACTUALLY MAKING THE INVESTMENT; CORRECT?

04:15PM  5    A.   THAT'S CORRECT.

04:15PM  6    Q.   ARE THOSE THE ONLY DOCUMENTS THAT YOU RECEIVED FROM

04:15PM  7    THERANOS IN THE WINDOW BETWEEN DECEMBER 20TH AND DECEMBER 31ST?

04:15PM  8    A.   I BELIEVE THEY ARE.

04:15PM  9    Q.   DID THOSE DOCUMENTS ACCURATELY DESCRIBE THE SOPHISTICATION

04:15PM  10   OF THE HALL GROUP AS INVESTORS?

04:15PM  11   A.   THEY DID.

04:15PM  12   Q.   AND WAS IT THE CASE THAT YOU HAD ASKED ALL OF THE

04:15PM  13   QUESTIONS THAT YOU WANTED TO ASK PRIOR TO THE TIME THAT YOU

04:15PM  14   MADE THE INVESTMENT?

04:15PM  15   A.   YOU KNOW, CERTAINLY WE HAD LOTS OF ADDITIONAL QUESTIONS

04:15PM  16   THAT WE WOULD HAVE LIKED TO HAVE ASKED, BUT WE FELT SATISFIED

04:15PM  17   THAT WE HAD ENOUGH INFORMATION TO MOVE FORWARD WITH THE

04:15PM  18   INVESTMENT.

04:15PM  19   Q.   OKAY.

04:15PM  20        YOUR HONOR, I THINK I MIGHT BE DONE, BUT ONE MOMENT?

04:15PM  21            THE COURT:  SURE.

04:16PM  22   (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

04:16PM  23            MR. DOWNEY:  YOUR HONOR, THAT'S ALL FOR

04:16PM  24   CROSS-EXAMINATION.

04:16PM  25            THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

TOLBERT REDIRECT BY MR. SCHENK                              4566

04:16PM  1          THANK YOU, MR. DOWNEY.

04:16PM  2          MR. SCHENK.

04:16PM  3              MR. SCHENK:  YES.  THANK YOU.

04:16PM  4                      **REDIRECT EXAMINATION**

04:16PM  5    BY MR. SCHENK:

04:16PM  6    Q.    MR. TOLBERT, MR. DOWNEY ASKED YOU SOME QUESTIONS AND

04:16PM  7    PLAYED A PORTION OF A RECORDING THAT I PLAYED FOR YOU.  IT

04:16PM  8    WAS --

04:16PM  9          YOUR HONOR, FOR THE RECORD, IT'S AT LINE 22 ON PAGE 18 OF

04:16PM 10    SIDE A.

04:16PM 11          AND IN THIS SECTION I WANT TO GIVE YOU AN OPPORTUNITY TO

04:16PM 12    EXPAND.  YOU SAID, I DON'T THINK THAT THEY WERE PAUSING

04:16PM 13    EVERYTHING, ALL MILITARY AND ALL PHARMACEUTICAL WORK.

04:16PM 14          MS. HOLMES SAYS, "OBVIOUSLY, TO BE ABLE TO DO WHAT WE HAVE

04:17PM 15    JUST DONE, WE HAD TO PAUSE A LARGE NUMBER OF OUR ONGOING

04:17PM 16    PHARMACEUTICAL AND MILITARY PROGRAMS SO THAT WE COULD FOCUS

04:17PM 17    LIKE A LASER ON THIS AND EXECUTING ON THIS."

04:17PM 18          IS THERE MORE YOU WANTED TO TESTIFY ABOUT FOR THAT

04:17PM 19    CONCEPT?

04:17PM 20    A.    WELL, YOU KNOW WE, WE -- MY UNDERSTANDING WAS THAT THERE

04:17PM 21    WERE LOTS OF PHARMACEUTICAL CONTRACTS AND WORK GOING ON AND

04:17PM 22    THERE WAS A LARGE NUMBER OF, YOU KNOW, MILITARY DEPLOYMENT

04:17PM 23    APPLICATIONS.

04:17PM 24          AND SO WHEN IT SAID WE'RE PAUSING -- WHAT WAS THE LANGUAGE

04:17PM 25    AGAIN?

TOLBERT REDIRECT BY MR. SCHENK                                    4567

04:17PM  1    Q.   A LARGE NUMBER.

04:17PM  2    A.   -- A LARGE NUMBER, YOU KNOW, I DIDN'T TAKE THAT TO MEAN A

04:17PM  3    MAJORITY OR ALL OF THEM.

04:17PM  4         I JUST THOUGHT IT MEANT IF THERE WAS 100 GOING ON, MAYBE

04:17PM  5    WE WOULD PAUSE 30 OR 40, OR WHATEVER THE CASE MAY BE.

04:17PM  6         SO, YOU KNOW, I DIDN'T -- WHEN I HEARD THAT, I DIDN'T

04:17PM  7    THINK, OH, EVERYTHING HAS STOPPED EXCEPT FOR RETAIL.

04:17PM  8    Q.   WHEN MS. HOLMES SAID THAT THEY HAD TO PAUSE ONGOING

04:18PM  9    PHARMACEUTICAL WORK, DID YOU THINK THAT THERANOS HAD ONGOING

04:18PM  10   PHARMACEUTICAL WORK IN DECEMBER OF 2013?

04:18PM  11   A.   I BELIEVE THEY DID.

04:18PM  12   Q.   WHEN MS. HOLMES SAID THAT SHE HAD TO PAUSE ONGOING

04:18PM  13   MILITARY PROGRAMS, DID YOU THINK THAT THEY HAD ONGOING MILITARY

04:18PM  14   PROGRAMS IN DECEMBER OF 2013?

04:18PM  15   A.   I DID.

04:18PM  16   Q.   MR. DOWNEY ALSO ASKED YOU IF THERE WAS A TIME DURING THE

04:18PM  17   CALL WHERE MS. HOLMES SAID THAT THE TECHNOLOGY COULD DO

04:18PM  18   THOUSANDS OF TESTS.

04:18PM  19        DO YOU REMEMBER THAT QUESTION?

04:18PM  20   A.   I DO.

04:18PM  21   Q.   AND DO YOU RECALL MS. HOLMES SAYING, "AND BECAUSE WE HAVE

04:18PM  22   MADE IT POSSIBLE TO RUN ANY COMBINATION OF LAB TESTS FROM THESE

04:18PM  23   TINY SAMPLES, THE PHYSICIAN CAN NOW SAY ON THE LAB FORM IF IN

04:18PM  24   MY EXAMPLE HEMOGLOBIN IS LOW, AUTOMATICALLY RUN IRON AND B12

04:18PM  25   AND OTHER TESTS ON THE SAME SAMPLE BECAUSE BIG DEDICATED TUBES

TOLBERT RECROSS BY MR. DOWNEY                                    4568

04:18PM  1    OF BLOOD ARE NO LONGER REQUIRED TO RUN EACH OF THOSE DIFFERENT

04:18PM  2    ASSAY METHODOLOGIES WHICH REQUIRE THEIR OWN BIG ANALYZERS IN A

04:18PM  3    TRADITIONAL LAB."

04:19PM  4         DO YOU RECALL MS. HOLMES SAYING THAT?

04:19PM  5    A.   I DO.

04:19PM  6    Q.   AND INSTEAD OF MS. HOLMES SAYING THEY COULD RUN THOUSANDS

04:19PM  7    OF TESTS, THE QUESTION THAT MR. DOWNEY ASKED YOU, DID SHE SAY

04:19PM  8    THAT THEY COULD RUN ANY COMBINATION OF LAB TESTS FROM THESE

04:19PM  9    TINY SAMPLES?

04:19PM  10   A.   CORRECT.

04:19PM  11   Q.   THANK YOU.

04:19PM  12        NO FURTHER QUESTIONS, YOUR HONOR.

04:19PM  13        THE COURT:  MR. DOWNEY?

04:19PM  14                  **RECROSS-EXAMINATION**

04:19PM  15   BY MR. DOWNEY:

04:19PM  16   Q.   JUST TWO QUESTIONS I THINK.

04:19PM  17        YOU RECALL THE QUESTION AND ANSWER BETWEEN MR. HALL AND

04:19PM  18   MS. HOLMES THAT APPEARED ON THE TAPE?

04:19PM  19        YOU HAVE TO GIVE A VERBAL AUDIBLE ANSWER.

04:19PM  20   A.   YES, I DO REMEMBER.

04:19PM  21   Q.   AND DO YOU RECALL THAT MR. HALL ASKED, REALLY WHAT IS THE

04:19PM  22   PURPOSE OF THESE INVESTMENTS?

04:19PM  23        DO YOU RECALL THAT?

04:19PM  24   A.   I DO.

04:19PM  25   Q.   AND DO YOU RECALL THAT MS. HOLMES ANSWERED BY DESCRIBING

TOLBERT RECROSS BY MR. DOWNEY                                    4569

04:19PM  1    DEVELOPMENTS THAT WOULD TAKE PLACE IN CONNECTION WITH THE

04:19PM  2    RETAIL PROJECTS OF THERANOS?

04:20PM  3    A.    I DO.

04:20PM  4              MR. DOWNEY:  THAT'S ALL I HAVE, YOUR HONOR.

04:20PM  5              THE COURT:  THANK YOU.

04:20PM  6              MR. SCHENK:  NO FURTHER QUESTIONS.

04:20PM  7              THE COURT:  MAY THIS WITNESS BE EXCUSED?

04:20PM  8              MR. SCHENK:  YES.

04:20PM  9              MR. DOWNEY:  YES, YOUR HONOR.

04:20PM  10             THE COURT:  YOU'RE EXCUSED, SIR.  THANK YOU.

04:20PM  11             THE WITNESS:  THANK YOU.

04:20PM  12             THE COURT:  YOU'RE WELCOME.  JUST LEAVE THAT THERE.

04:20PM  13   THANK YOU.

04:20PM  14        ALL RIGHT.  THANK YOU, LADIES AND GENTLEMEN.  WE'LL NOW

04:20PM  15   TAKE OUR WEEKEND BREAK.  THANK YOU FOR YOUR GENEROSITY OF GOING

04:20PM  16   OVER THIS.  THIS WITNESS WAS FROM OUT OF TOWN AND, AS HE SAID,

04:20PM  17   HE WAS GRATEFUL ALSO FOR THE ABILITY TO LEAVE ON A FRIDAY.

04:20PM  18        I DO WANT TO, BEFORE WE ADJOURN, I DID WANT TO TALK TO YOU

04:20PM  19   ABOUT A SCHEDULE CHANGE FOR -- THIS IS FOR EVERYONE'S BENEFIT.

04:20PM  20        I'D LIKE TO CAPTURE SOME TIME.  I'VE TALKED TO YOU ABOUT

04:20PM  21   OUR DEFAULT NOW IS 3:00 O'CLOCK.  I'M GOING TO THINK ABOUT 4:00

04:21PM  22   O'CLOCK.  I'LL ASK YOU TO CONSIDER THAT, PLEASE.

04:21PM  23        BUT I ALSO WANT TO ASK YOU TO WRITE THESE DATES DOWN

04:21PM  24   BECAUSE THIS MIGHT -- I'M GOING TO ASK YOU IF WE CAN MEET ON

04:21PM  25   THESE DATES IN ADDITION.

TOLBERT RECROSS BY MR. DOWNEY                            4570

04:21PM  1        NEXT WEEK, THE 28TH.  WE DON'T MEET ON THURSDAYS, AS YOU

04:21PM  2    KNOW, AND WE'RE NOT MEETING ON THE 29TH.

04:21PM  3        I'M CURIOUS IF WE CAN MEET ON THE 28TH AT SOME TIME.  THAT

04:21PM  4    SOME TIME WOULD BE AFTER -- I THINK I HAVE SOME MATTERS IN THE

04:21PM  5    MORNING FROM 9:00 TO MAYBE 10:00 O'CLOCK, MAYBE 11:00 O'CLOCK,

04:21PM  6    SO IF WE CAN MEET MAYBE AT NOON FOR SOME TIME, I THINK THAT

04:21PM  7    MIGHT INTERFERE WITH ONE OF OUR JUROR'S TRAVEL TIME, THOUGH.

04:21PM  8        SO LET ME MOVE TO THE NEXT MONTH.  THAT IS NOVEMBER.

04:21PM  9        WE HAVE -- WE'RE NOT IN SESSION ON MONDAYS, AND I THINK I

04:21PM 10    TOLD YOU I HAVE AN AFTERNOON CALENDAR, TYPICALLY MONDAY

04:22PM 11    AFTERNOONS.  BUT I DO HAVE MONDAY MORNINGS AVAILABLE.  IF YOU

04:22PM 12    CAN CHECK WITH WHATEVER YOU NEED TO, YOUR EMPLOYERS AND OTHERS,

04:22PM 13    IF THERE'S A POSSIBILITY OF MEETING ON MONDAY MORNINGS.

04:22PM 14        AND THIS WOULD BE THE -- WE HAVE FIVE MONDAYS IN NOVEMBER,

04:22PM 15    AND IF YOU CAN CHECK YOUR SCHEDULES TO SEE IF IT'S PERMITTED

04:22PM 16    FOR YOU TO COME MONDAY MORNING FROM 9:00 TO NOON, THAT WOULD BE

04:22PM 17    HELPFUL.  I THINK 9:00 TO 1 :00.

04:22PM 18        COUNSEL, THIS IS FOR YOU ALSO OF COURSE.

04:22PM 19        I'M ALSO -- CURRENTLY WE'RE SCHEDULED TO BE HERE ON

04:22PM 20    NOVEMBER 24TH.  AS YOU ALL KNOW, NOVEMBER 25TH IS THE

04:22PM 21    THANKSGIVING HOLIDAY.

04:22PM 22        I'M WONDERING IF YOU WOULD AGREE TO SWAP NOVEMBER 18TH FOR

04:22PM 23    NOVEMBER 24TH.  THAT MIGHT BE SOMETHING THAT WOULD BE HELPFUL.

04:22PM 24    THAT IS, WE'LL MEET ON THE 18TH.  WE'RE NOT SCHEDULED TO MEET

04:22PM 25    ON THE 18TH NOW, BUT I CAN MAKE OURSELVES AVAILABLE, THIS COURT

4571
TOLBERT RECROSS BY MR. DOWNEY

04:23PM 1    AVAILABLE, FOR THE 18TH IF PARTIES WISH TO.  WE DON'T HAVE TO

04:23PM 2    MEET ON THE 24TH IF THAT'S CONVENIENT FOR FOLKS.

04:23PM 3        I JUST WANT TO OFFER THOSE DATES OUT, AND THEN WE'LL THINK

04:23PM 4    ABOUT THAT OVER THE WEEKEND, AND COUNSEL AS WELL, YOUR TEAMS.

04:23PM 5        AND MONDAY WE'LL TAKE THOSE UP TO SEE IF WE CAN CAPTURE

04:23PM 6    SOME ADDITIONAL TIME.

04:23PM 7        I ALSO HAVE TO SAY ON THE 17TH, I THINK I'VE TOLD YOU

04:23PM 8    THIS -- MAYBE NOT -- THE 17TH OF NOVEMBER I'M UNAVAILABLE FOR

04:23PM 9    AN HOUR FROM 10:30 TO 11:30.  SO HOPEFULLY WE CAN GET A BREAK.

04:23PM 10   NOVEMBER 17TH, THAT'S A WEDNESDAY.

04:23PM 11       AND I BELIEVE THAT'S ALL THE CHANGES THAT I HAVE TO

04:23PM 12   SUGGEST NOW.

04:23PM 13       SO PLEASE THINK ABOUT THOSE THINGS.  WE'LL TALK ABOUT

04:24PM 14   THOSE MONDAY.

04:24PM 15       BEFORE YOU LEAVE, PLEASE DO NOT DISCUSS THIS CASE, DO NOT

04:24PM 16   FORM ANY OPINIONS ABOUT ANYTHING ON THIS CASE UNTIL YOU HAVE

04:24PM 17   BEEN ASSIGNED TO THAT TASK FOR YOUR FINAL DELIBERATIONS.

04:24PM 18       DO NOT WATCH, DO ANY INVESTIGATION, WATCH OR LISTEN TO ANY

04:24PM 19   NEWS CASTS, DO NOT READ ANYTHING OR DO ANYTHING THAT MIGHT

04:24PM 20   CAUSE YOU ANY INFORMATION ABOUT THE CASE, EXCEPT WHAT YOU HEAR

04:24PM 21   IN THE COURTROOM.

04:24PM 22       THANK YOU VERY MUCH.  HAVE A GOOD WEEKEND.

04:24PM 23       I THINK IT'S GOING TO BE -- I THINK IT'S GOING TO BE RAINY

04:24PM 24   SUNDAY, RIGHT?  THAT'S WHAT I HEAR.  SO PLEASE USE CAUTION WHEN

04:24PM 25   YOU'RE DRIVING.

TOLBERT RECROSS BY MR. DOWNEY                                        4572

04:24PM   1            MR. CLINE?

04:24PM   2                 MR. CLINE:  YOUR HONOR, I APOLOGIZE.  THIS MAY BE

04:24PM   3    ONLY MY CONFUSION, BUT YOU MENTIONED POSSIBLY MEETING ON

04:24PM   4    MONDAY, AND THEN YOU SAID JUST NOW THAT YOU WOULD TALK WITH US

04:24PM   5    ON MONDAY.

04:24PM   6            IS THERE SESSION ON MONDAY?

04:24PM   7                 THE COURT:  THERE'S NO SESSION ON MONDAY, NO.  WE'RE

04:24PM   8    GOING TO TALK ABOUT -- MONDAYS WOULD BE IN NOVEMBER,

04:25PM   9    NOVEMBER 1ST.  WE'RE GOING TO TALK ABOUT IT -- EXCUSE ME.

04:25PM  10    WE'LL TALK ABOUT IT ON TUESDAY.  YES, WE'LL TALK ABOUT IT AT

04:25PM  11    OUR NEXT SESSION.

04:25PM  12            IT'S THE END OF THE WEEK, MR. CLINE.  GIVE ME A BREAK

04:25PM  13    HERE.

04:25PM  14            (LAUGHTER.)

04:25PM  15                 THE COURT:  ALL RIGHT.  THANKS EVERYONE.  HAVE A

04:25PM  16    GOOD WEEKEND.  WE'LL SEE YOU.

04:25PM  17            COUNSEL, IF YOU WOULD JUST REMAIN FOR A MOMENT.

04:25PM  18            (JURY OUT AT 4:25 P.M.)

04:25PM  19                 THE COURT:  PLEASE BE SEATED.  THANK YOU.

04:25PM  20            THE RECORD SHOULD REFLECT THAT OUR JURY HAS LEFT FOR THE

04:25PM  21    WEEKEND.  ALL COUNSEL AND MS. HOLMES ARE PRESENT.

04:25PM  22            I JUST WANT TO ASK, ANYTHING ELSE BEFORE WE LEAVE FOR THE

04:26PM  23    WEEKEND, MR. SCHENK, FROM YOUR TEAM?

04:26PM  24                 MR. SCHENK:  YOUR HONOR, I'M NOT SURE IF THIS WAS

04:26PM  25    UNCLEAR OR NOT.

4573
TOLBERT RECROSS BY MR. DOWNEY

04:26PM   1      I JUST WANT THE RECORD TO REFLECT THAT THE RECORDINGS THAT

04:26PM   2   I PLAYED TODAY, I PROVIDED ALL OF THEM TO THE DEFENSE BEFORE

04:26PM   3   TODAY, AND I ONLY PLAYED RECORDINGS THAT I PROVIDED TO THEM, I

04:26PM   4   THINK IT WAS SEPTEMBER 23RD.  WE SENT A LIST OF WHAT WE

04:26PM   5   INTENDED TO PLAY.

04:26PM   6      AND THE DEFENSE, ABOUT A WEEK OR SO AGO, SENT US THEIR 106

04:26PM   7   ADDITIONS.  WE INCORPORATED EVERYTHING THAT THEY ASKED, AND

04:26PM   8   THEN THAT IS WHAT WAS PLAYED TODAY.

04:26PM   9      I THINK THAT THAT WAS CLEAR ON THE RECORD, BUT I JUST WANT

04:26PM  10   TO MAKE CLEAR.

04:26PM  11          THE COURT:  THANK YOU.

04:26PM  12      MR. DOWNEY.

04:26PM  13          MR. DOWNEY:  LET ME SAY TO MR. SCHENK, I APOLOGIZE

04:26PM  14   TO MR. SCHENK IF THAT IS THE CASE.

04:26PM  15      MY UNDERSTANDING IS THAT I PLAYED ONE CLIP WHICH WAS NOT

04:26PM  16   PART OF HIS TAPE AND WHICH OBVIOUSLY CAUSED SUBSTANTIAL

04:26PM  17   CONFUSION AND DELAY.

04:26PM  18      I BELIEVE IT IS THE CASE THAT WE SENT IT, BUT IF HE SAYS

04:26PM  19   IT IS NOT, I ACCEPT HIS WORD AND I APOLOGIZE.

04:27PM  20          THE COURT:  THANK YOU.  THANK YOU.  I APPRECIATE IT.

04:27PM  21      IT DID CAUSE A LITTLE HICCUP, BUT THIS JURY IS WONDERFUL

04:27PM  22   ABOUT GETTING DONE WHAT WE NEED TO GET DONE.  THANK YOU.

04:27PM  23      MR. DOWNEY, ANYTHING ELSE FROM YOUR TEAM?

04:27PM  24      MR. WADE?

04:27PM  25          MR. WADE:  I JUST WANT TO FLAG AND GET SOME GUIDANCE

TOLBERT RECROSS BY MR. DOWNEY                                    4574

04:27PM   1      FROM THE COURT.

04:27PM   2           THE MEMBERS OF OUR TEAM HAVE INDICATED THAT THE ECF IS

04:27PM   3      DOWN THIS WEEKEND, WHICH IS --

04:27PM   4              THE COURT:  WHAT'S WRONG WITH THAT?

04:27PM   5      (LAUGHTER.)

04:27PM   6              MR. WADE:  WHICH IS WELCOME NEWS TO I'M SURE MANY IN

04:27PM   7      THE COURTROOM.

04:27PM   8           WE INTEND TO MEET AND CONFER WITH THE GOVERNMENT ON THE

04:27PM   9      WITNESSES COMING UP.  I ASSUME IF THERE'S SOME MOTION THAT

04:27PM  10      COMES UP, SHOULD WE EMAIL IT THROUGH MS. KRATZMANN THIS

04:27PM  11      WEEKEND?

04:27PM  12           OUR HOPE IS THAT THERE ISN'T, BUT IN THE EVENT THAT WE

04:27PM  13      NEED TO PUT THE COURT ON NOTICE OF A PLEADING, SHOULD WE -- HOW

04:27PM  14      SHOULD WE DO THAT?  SHOULD WE DO IT ON THE WEEKEND AND FILE IT

04:27PM  15      WHEN THE ECF IS BACK UP?

04:27PM  16              THE COURT:  YEAH, I DON'T KNOW WHAT -- I CAN'T

04:28PM  17      REMEMBER IF IT'S DOWN ALL WEEKEND OR NOT.

04:28PM  18              THE CLERK:  IT IS ALL WEEKEND.

04:28PM  19              MR. WADE:  AND OBVIOUSLY IF WE DO IT, WE WANT TO GET

04:28PM  20      IT TO THE COURT AS QUICKLY AS WE CAN TO GIVE AS MUCH NOTICE AS

04:28PM  21      POSSIBLE.

04:28PM  22           THERE MAY NOT BE ISSUES.  WE'RE GOING TO MEET AND CONFER.

04:28PM  23              THE COURT:  I'M VERY CONFIDENT THERE WON'T BE.

04:28PM  24      (DISCUSSION OFF THE RECORD.)

04:28PM  25              THE CLERK:  6:00 A.M. SATURDAY, OCTOBER 23RD, TO

                        UNITED STATES COURT REPORTERS

TOLBERT RECROSS BY MR. DOWNEY                                    4575

04:28PM   1    6:00 A.M. MONDAY, OCTOBER 25TH.

04:28PM   2         (PAUSE IN PROCEEDINGS.)

04:28PM   3              MR. WADE:  WHATEVER THE COURT'S PREFERENCE IS.  I

04:28PM   4    JUST --

04:29PM   5              THE COURT:  WELL, I DON'T THINK THERE'S ANYTHING

04:29PM   6    ELSE WE CAN DO.  ECF IS DOWN, SO YOU WON'T BE ABLE TO FILE IT,

04:29PM   7    ANYTHING ELSE YOU HAVE.

04:29PM   8         I THINK WE'RE AT THE MERCY OF ECF.  IF YOU FILE IT AT 6:00

04:29PM   9    A.M., YOU KNOW, WE'LL DO THE BEST WE CAN.  THAT'S ALL I CAN

04:29PM  10    TELL YOU.

04:29PM  11         YOU KNOW, WE'RE NOT IN SESSION ON MONDAY, SO SHOULD IT BE

04:29PM  12    NECESSARY, WE'LL JUST, WE'LL JUST -- JUST FILE IT WHEN YOU CAN

04:29PM  13    AND WE'LL DO WHAT WE CAN DO.

04:29PM  14              MR. WADE:  WOULD YOU LIKE US TO SEND A COURTESY COPY

04:29PM  15    TO THE COURT IF IT'S AVAILABLE BEFORE ECF GOES BACK UP?

04:29PM  16              THE COURT:  IS THERE -- LET ME ASK, IS THERE AN

04:29PM  17    EMAIL?  DO WE HAVE A GENERAL EMAIL THAT I CAN ACCESS?

04:29PM  18         (DISCUSSION OFF THE RECORD.)

04:30PM  19              THE COURT:  THANK YOU.  I THINK YOU CAN SEND IT TO

04:30PM  20    OUR COURT REPORTER AND SHE'LL GET IT TO ME.  IT SOUNDS LIKE

04:30PM  21    THAT.  BUT WHY DON'T YOU STICK AROUND AND SPEAK WITH HER.

04:30PM  22         THE CONDITION IS THAT YOU'RE GOING TO HAVE TO BE WITH HERE

04:30PM  23    AT 5:00 A.M.

04:30PM  24              MR. WADE:  THAT'S THE CONDITION WITH A LOT OF

04:30PM  25    AUDIOTAPES.  HOPEFULLY THAT WILL BE AN INCENTIVE WITHOUT HAVING

TOLBERT RECROSS BY MR. DOWNEY                                    4576

04:30PM  1    TO BURDEN ANYONE.

04:30PM  2         THANK YOU, YOUR HONOR.

04:30PM  3              THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

04:30PM  4              MR. DOWNEY:  AS FOR NEXT WEEK, DO WE KNOW THAT THE

04:30PM  5    JUROR'S SCHEDULE WILL INCLUDE A THURSDAY SITTING OR --

04:30PM  6              THE COURT:  I'M SORRY.  SAY AGAIN?

04:31PM  7              MR. DOWNEY:  I THINK YOUR HONOR HAD BEGUN TO SAY TO

04:31PM  8    CHECK OUR SCHEDULE FOR THE AVAILABILITY OF THURSDAY, AND THEN

04:31PM  9    YOU COMMENTED ABOUT THE POTENTIAL TRAVEL SCHEDULE, AND I

04:31PM  10   UNDERSTAND WHY WE DID IT THAT WAY.  I JUST WANTED TO SEE IF WE

04:31PM  11   ALREADY KNOW.

04:31PM  12             THE COURT:  I THINK WE DO.  ONE OF OUR JURORS WHO'S

04:31PM  13   TRAVELLING, WHO HAS THE FUNERAL OUT OF TOWN, SIGNALLED THAT SHE

04:31PM  14   WAS NOT AVAILABLE.  I THINK SHE'S FLYING OUT THURSDAY.  SO

04:31PM  15   THAT'S NOT AVAILABLE.

04:31PM  16        (DISCUSSION OFF THE RECORD.)

04:31PM  17             THE COURT:  AND I'M ALSO INFORMED THAT THAT JUROR IS

04:31PM  18   NOT AVAILABLE MONDAY, THE 1ST, FOR A POSSIBLE MONDAY MEETING.

04:31PM  19        SO WE'VE GOT FOUR OTHER MONDAYS TO WORK WITH.

04:31PM  20             MR. DOWNEY:  GOOD ENOUGH.  THANK YOU, YOUR HONOR.

04:31PM  21             THE COURT:  ALL RIGHT.  HAVE A GOOD EVENING.

04:31PM  22             MR. SCHENK:  THANK YOU, YOUR HONOR.

04:31PM  23             THE CLERK:  COURT IS ADJOURNED.

04:31PM  24        (COURT ADJOURNED AT 4:31 P.M.)

         25

1

2

3                    CERTIFICATE OF REPORTERS

4

5

6

7        WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11       THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16       _____
         IRENE RODRIGUEZ, CSR, CRR
         CERTIFICATE NUMBER 8076
17

18       _____

19       LEE-ANNE SHORTRIDGE, CSR, CRR
         CERTIFICATE NUMBER 9595
20

21       DATED:  OCTOBER 22, 2021

22

23

24

25

1

2                      UNITED STATES DISTRICT COURT

3                    NORTHERN DISTRICT OF CALIFORNIA

4                          SAN JOSE DIVISION

5

    UNITED STATES OF AMERICA,      )   CR-18-00258-EJD
6                                  )
                   PLAINTIFF,      )   SAN JOSE, CALIFORNIA
7                                  )
         VS.                       )   VOLUME 24
8                                  )
    ELIZABETH A. HOLMES,           )   OCTOBER 26, 2021
9                                  )
                   DEFENDANT.      )   PAGES 4577 - 4869
10   _____)   **PAGES 4674 TO 4677 SEALED**

11

12                 TRANSCRIPT OF TRIAL PROCEEDINGS
                 BEFORE THE HONORABLE EDWARD J. DAVILA
13                  UNITED STATES DISTRICT JUDGE

14   A P P E A R A N C E S:

15   FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                           BY:  JOHN C. BOSTIC
16                              JEFFREY B. SCHENK
                           150 ALMADEN BOULEVARD, SUITE 900
17                         SAN JOSE, CALIFORNIA 95113

18                         BY:  ROBERT S. LEACH
                               KELLY VOLKAR
19                         1301 CLAY STREET, SUITE 340S
                           OAKLAND, CALIFORNIA 94612
20

         (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21

22   OFFICIAL COURT REPORTERS:
                           IRENE L. RODRIGUEZ, CSR, RMR, CRR
23                         CERTIFICATE NUMBER 8074
                           LEE-ANNE SHORTRIDGE, CSR, CRR
24                         CERTIFICATE NUMBER 9595

25        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                TRANSCRIPT PRODUCED WITH COMPUTER

```
 1       A P P E A R A N C E S: (CONT'D)

 2


 3     FOR DEFENDANT HOLMES:    WILLIAMS & CONNOLLY LLP
                                BY:  KEVIN M. DOWNEY
 4                                   LANCE A. WADE
                                     KATHERINE TREFZ
 5                                   SEEMA ROPER
                                     PATRICK LOOBY
 6                                   RICHARD CLEARY
                                     J.R. FLEURMONT
 7                              725 TWELFTH STREET, N.W.
                                WASHINGTON, D.C. 20005
 8
                                LAW OFFICE OF JOHN D. CLINE
 9                              BY:  JOHN D. CLINE
                                ONE EMBARCADERO CENTER, SUITE 500
10                              SAN FRANCISCO, CALIFORNIA 94111

11
       ALSO PRESENT:           FEDERAL BUREAU OF INVESTIGATION
12                             BY:  ADELAIDA HERNANDEZ

13                             OFFICE OF THE U.S. ATTORNEY
                               BY:  LAKISHA HOLLIMAN, PARALEGAL
14                                  MADDI WACHS, PARALEGAL

15                             WILLIAMS & CONNOLLY
                               BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL
16
                               TBC
17                             BY:  BRIAN BENNETT, TECHNICIAN

18

19

20

21

22

23

24

25
```

INDEX OF PROCEEDINGS

GOVERNMENT'S:


**LISA PETERSON**
DIRECT EXAM BY MR. LEACH                    P. 4634
CROSS-EXAM BY MR. WADE                      P. 4710

1                          INDEX OF EXHIBITS

2
                                        IDENT.      EVIDENCE
3        GOVERNMENT'S:

4        1944                                       4640
         5432                                       4643
5        2015                                       4646
         2073                                       4651
6        4858                                       4663
         2107                                       4690
7        2166                                       4692
         3152                                       4703
8        2170                                       4719
         4197                                       4735
9        2097                                       4812
         2098                                       4814
10       2139                                       4819

11

         DEFENDANT'S:
12

13       12751                                      4728
         14089                                      4801
         14106, PARAGRAPH 2, REDACTED               4809
14       12856                                      4816
         14080                                      4820
15       13987                                      4820
         14081                                      4822
16

17

18

19

20

21

22

23

24

25

```
 1    SAN JOSE, CALIFORNIA                    OCTOBER 26, 2021

 2                      P R O C E E D I N G S

 3           (COURT CONVENED AT 8:31 A.M.)

 4           (JURY OUT AT 8:31 A.M.)

 5               THE COURT:  LET'S GO ON THE RECORD IN THE HOLMES

 6    MATTER.  ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT.

 7           WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.  I UNDERSTAND

 8    THERE'S A FEW THINGS THAT WE SHOULD TAKE UP BEFORE WE BEGIN

 9    EVIDENCE.

10           MR. WADE?

11               MR. WADE:  GOOD MORNING, YOUR HONOR.  THANK YOU.

12    LANCE WADE FOR MS. HOLMES.

13           WE HAVE TWO WITNESSES THAT WE WOULD LIKE TO RAISE SOME

14    MATTERS WITH THE COURT IN ADVANCE OF TESTIMONY.  THE FIRST IS

15    LISA PETERSON, WHO I UNDERSTAND FROM THE GOVERNMENT WILL BE THE

16    FIRST WITNESS TODAY.

17           AND THEN MR. DOWNEY WILL ADDRESS A COUPLE OF ISSUES

18    RELATING TO ALAN EISENMAN, WHO IS AN INVESTOR WHO WE UNDERSTAND

19    MAY TESTIFY LATE IN THE DAY OR TOMORROW DEPENDING ON HOW THE

20    TRIAL PROCEEDS.

21           WITH RESPECT TO MS. PETERSON, THERE ARE, I THINK, THREE

22    ISSUES.  ONE RELATES TO THE ADMISSION OF CERTAIN VIDEO

23    EVIDENCE.  WE WANTED TO RAISE THESE ISSUES WITH THE COURT TO

24    TRY AND AVOID ISSUES LIKE THE KIND WE HAD LAST WEEK.

25               THE COURT:  SURE.
```

08:33AM   1            MR. WADE:  AND WE'VE BEEN MEETING AND CONFERRING

08:33AM   2    WITH THE GOVERNMENT TO TRY TO GET SOME CLARITY ON THAT.

08:33AM   3        THE SECOND RELATES TO NO NOTES.  I THINK I RAISED --

08:33AM   4    FLAGGED FOR THE COURT THAT WE MAY HAVE CONCERNS ABOUT THE

08:33AM   5    NOTES.

08:33AM   6        I THINK BASED UPON THE EXHIBITS THAT WERE DISCLOSED BY THE

08:33AM   7    GOVERNMENT, I THINK WE PROBABLY ARE OKAY WITH THE NOTES.  WE

08:33AM   8    WOULDN'T STIPULATE TO THEM, BUT WE'LL SEE IF THEY LAY A

08:33AM   9    FOUNDATION.  THERE MAY BE THE -- THE ONE PAGE THEY INTEND TO

08:33AM   10   OFFER MAY BE APPROPRIATE.

08:33AM   11       AND THEN FINALLY, THERE ARE STATEMENTS CONCERNING

08:33AM   12   MATERIALITY.

08:33AM   13       WITH RESPECT TO THE VIDEOS, THERE ARE THREE VIDEOS THAT I

08:33AM   14   THINK MAY BE AT ISSUE, ALTHOUGH I'M NOT SURE WHAT THE

08:33AM   15   GOVERNMENT'S POSITION IS WITH RESPECT TO THE THIRD.

08:34AM   16       IT'S MY UNDERSTANDING THAT THE GOVERNMENT INTENDS TO OFFER

08:34AM   17   A VIDEO FROM JIM CRAMER'S "MAD MONEY" ON CNBC ON WHICH THE

08:34AM   18   CLIENT APPEARED.  IT'S A SEGMENT.  I'M NOT SURE HOW LONG, MAYBE

08:34AM   19   EIGHT MINUTES IN TOTAL.

08:34AM   20       IT'S MY UNDERSTANDING THAT THE GOVERNMENT WANTS TO OFFER

08:34AM   21   EXCERPTS OF THAT VIDEO.

08:34AM   22       WE THINK THE VIDEO IN ITS ENTIRETY SHOULD BE OFFERED.

08:34AM   23   INITIALLY WE UNDERSTOOD THAT'S WHAT WAS GOING TO BE OFFERED,

08:34AM   24   AND THEN THEY WOULD JUST PLAY CERTAIN EXCERPTS.

08:34AM   25       I BELIEVE THE GOVERNMENT DOES NOT NOW INTEND TO OFFER THE

08:34AM 1    COMPLETE VIDEO, BUT JUST WANTS TO OFFER THE EXCERPTS.

08:34AM 2        THIS IS A SEGMENT ON A NEWS PROGRAM.  I'M SURE THE COURT

08:34AM 3    HAS SEEN A MILLION OF THEM, IF NOT THIS ONE.

08:34AM 4        AND WE JUST THINK THAT THE CONTEXT AND THE TOTALITY IS

08:34AM 5    IMPORTANT.  IT'S NOT VERY LONG.  WE THINK IT SHOULD BE PLAYED.

08:34AM 6        IF THE GOVERNMENT CHOOSES NOT TO PLAY IT, WE WOULD

08:35AM 7    PROBABLY JUST PLAY THE WHOLE THING ON CROSS.

08:35AM 8        SIMILARLY, THERE'S A "TODAY SHOW" --

08:35AM 9            THE COURT:  I'M SORRY.  IS THIS AN INTERVIEW OF YOUR

08:35AM 10   CLIENT?  OR --

08:35AM 11           MR. WADE:  IT'S A SEGMENT THAT INCLUDES AN INTERVIEW

08:35AM 12   OF THE CLIENT.

08:35AM 13           THE COURT:  I SEE.  OKAY.

08:35AM 14           MR. WADE:  SO I ACTUALLY DON'T KNOW THE PURPOSE FOR

08:35AM 15   WHICH THE GOVERNMENT IS OFFERING IT.

08:35AM 16       I'M ASSUMING THERE'S SOME FOUNDATION OF RELEVANCE.  I KNOW

08:35AM 17   THE WITNESS HAS SAID -- MS. PETERSON HAS SAID SHE SAW THE TWO

08:35AM 18   VIDEOS.

08:35AM 19       I ACTUALLY DON'T KNOW EXACTLY --

08:35AM 20           THE COURT:  OKAY.

08:35AM 21           MR. WADE:  -- WHAT THE BASIS FOR IT BEING OFFERED

08:35AM 22   IS.

08:35AM 23       MR. LEACH MAY BE ABLE TO GIVE US SOME WINDOW INTO THAT.

08:35AM 24       BUT TO THE EXTENT THAT THEY SEEK TO OFFER ANY OF IT, WE

08:35AM 25   THINK THEY SHOULD OFFER ALL OF IT.

08:35AM  1           THE COURT:  OKAY.

08:35AM  2           MR. WADE:  OUR ARGUMENT AND POSITION IS ESSENTIALLY

08:35AM  3   THE SAME WITH RESPECT TO A "TODAY SHOW" SEGMENT THAT INCLUDES

08:35AM  4   STATEMENTS FROM OUR CLIENT.  SAME ISSUES.

08:35AM  5           THE COURT:  OKAY.

08:35AM  6           MR. WADE:  SO WE DON'T KNOW EXACTLY WHAT ABOUT THE

08:35AM  7   VIDEO THE GOVERNMENT -- WHY THE GOVERNMENT THINKS IT'S

08:36AM  8   RELEVANT, WHAT ITS POSITION IS, BUT IF THEY WANT TO OFFER IT,

08:36AM  9   WE THINK THEY SHOULD JUST SHOW THE WHOLE THING.  WE THINK IT'S

08:36AM  10  TAKEN OUT OF CONTEXT AND SOME OF THESE STATEMENTS COULD BE

08:36AM  11  CONFUSING.

08:36AM  12          THE COURT:  IS THERE -- AND THE "TODAY SHOW" IS AN

08:36AM  13  INTERVIEW OF YOUR CLIENT AS WELL?

08:36AM  14          MR. WADE:  IT INVOLVES AN INTERVIEW OF THE CLIENT,

08:36AM  15  YES.

08:36AM  16          THE COURT:  AND HOW LONG IS THAT, DO YOU KNOW?

08:36AM  17          MR. LEACH:  IT'S ABOUT FOUR MINUTES, YOUR HONOR.

08:36AM  18          THE COURT:  OH, OKAY.  IN TOTAL.  OKAY.

08:36AM  19          MR. WADE:  AND AGAIN, I THINK THE GOVERNMENT IS

08:36AM  20  INTENDING TO OFFER SEGMENTS.  I DON'T KNOW THE THEORY OF

08:36AM  21  RELEVANCE OR WHY THEY WANT TO OFFER IT.  I CAN IMAGINE A FEW.

08:36AM  22          THE COURT:  OKAY.  AND THEN WHAT IS YOUR THIRD

08:36AM  23  ISSUE?  I'M SORRY.

08:36AM  24          MR. WADE:  THE THIRD ISSUE IS A LONGER VIDEO AND IT

08:36AM  25  RELATES TO A PRESENTATION AT THE AACC, WHICH IS THE AMERICAN

08:36AM  1    ASSOCIATION OF CLINICAL CHEMISTRY, WHICH IS ESSENTIALLY A LAB

08:36AM  2    TRADE ASSOCIATION WHERE ALL OF THE CLINICAL CHEMISTS GATHER AND

08:36AM  3    HAVE AN ANNUAL CONVENTION.

08:37AM  4        OUR CLIENT GAVE A PRESENTATION OF TECHNOLOGY AT THAT

08:37AM  5    MEETING, AND -- A RELATIVELY LENGTHY PRESENTATION OF TECHNOLOGY

08:37AM  6    AT THAT MEETING, WHICH WAS OBSERVED BY A NUMBER OF WITNESSES IN

08:37AM  7    THE CASE, INCLUDING MS. PETERSON, WHO ACTUALLY ATTENDED THE

08:37AM  8    PRESENTATION AND PROVIDED CONTEMPORANEOUS THOUGHTS AND ANALYSIS

08:37AM  9    OF THE PRESENTATION THAT COMPARE THE PRESENTATION BACK TO HER

08:37AM  10   VIEWS OF THE TECHNOLOGY AT THE TIME SHE VISITED THE COMPANY.

08:37AM  11       SO WE THINK, WE THINK EXCERPTS OF THAT ARE RELEVANT.  WE

08:37AM  12   WOULD BE HAPPY TO PLAY THE WHOLE THING, BUT FOR --

08:37AM  13            THE COURT:  HOW LONG IS THAT?

08:37AM  14            MR. WADE:  THAT'S AN HOUR AND A HALF.  BUT IN THE

08:37AM  15   INTEREST OF --

08:37AM  16            THE COURT:  AND IT'S, AND IT'S TECHNOLOGY AND IT

08:38AM  17   SOUNDS LIKE IT'S RATHER DENSE.

08:38AM  18            MR. WADE:  IT'S RATHER EXCITING, YOUR HONOR, I WOULD

08:38AM  19   SUGGEST.

08:38AM  20            THE COURT:  WHAT DID YOU DO THIS WEEKEND, MR. WADE?

08:38AM  21            MR. WADE:  I VIEWED THIS VIDEO A COUPLE OF TIMES.

08:38AM  22       WELL, THE GIANTS AREN'T IN THE SERIES, SO WHAT ELSE DO WE

08:38AM  23   HAVE TO DO?

08:38AM  24       (LAUGHTER.)

08:38AM  25            MR. WADE:  WE WOULD INTEND TO OFFER EXCERPTS, I

4586

08:38AM  1    THINK TOTALLING MAYBE 20 MINUTES INTERSPERSED WITH SOME

08:38AM  2    Q AND A.  WE DO THAT -- SO THERE ARE TWO PARTS OF THE

08:38AM  3    PRESENTATION.  ONE IS A PRESENTATION BY THE CLIENT, IT INVOLVED

08:38AM  4    VIDEO AND IT INVOLVES A POWERPOINT.  THAT'S ABOUT AN HOUR.  WE

08:38AM  5    WOULD PLAY EXCERPTS OF THAT.

08:38AM  6         WE ACTUALLY, IN ALL SERIOUSNESS, DO THINK IT WOULD BE

08:38AM  7    USEFUL TO THE JURY BECAUSE IT DOES SHOW SOME OF THE TECHNOLOGY

08:38AM  8    THAT HAS BEEN TALKED ABOUT A LOT, WHICH HASN'T REALLY BEEN SEEN

08:39AM  9    ALL THAT MUCH, AND I THINK THE JURY MAY TAKE INTEREST IN SORT

08:39AM  10   OF HOW SOME OF THIS STUFF FUNCTIONS AND IT MAY GIVE THEM

08:39AM  11   IMPORTANT CONTEXTS.

08:39AM  12        THE SECOND PIECE IS A Q AND A WHICH INVOLVES THREE EXPERTS

08:39AM  13   WHO ARE QUESTIONING MS. HOLMES AND THREE SCIENTISTS WHO WORK AT

08:39AM  14   THERANOS.  THAT IS 30 MINUTES.  WE HAD INTENDED TO PLAY

08:39AM  15   EXCERPTS OF THAT IN THE INTEREST OF TIME.

08:39AM  16        I CERTAINLY DON'T WANT TO BE ACCUSED OF CHERRY PICKING AND

08:39AM  17   HAVE A SITUATION WHERE WE PLAY EXCERPTS IN THE INTEREST OF TIME

08:39AM  18   AND THEN THERE'S A SUGGESTION CREATED THAT WE'RE HIDING OTHER

08:39AM  19   EXCERPTS.  WE'RE HAPPY TO PLAY THE ENTIRE 30 MINUTES OF THE

08:39AM  20   Q AND A.

08:39AM  21        BUT WE THINK, WE THINK EITHER WOULD BE APPROPRIATE FOR THE

08:39AM  22   JURY GIVEN ITS RELEVANCE TO SOME OF THE WITNESSES IN THE CASE

08:39AM  23   AND THE FACT THAT THE GOVERNMENT APPEARS TO BE INTERESTED IN

08:40AM  24   GOING BEYOND THE SORT OF INVESTMENT PERIOD INTO "THE

08:40AM  25   WALL STREET JOURNAL" PERIOD AND THE POST "WALL STREET JOURNAL"

08:40AM 1    PERIOD.

08:40AM 2         SO WE WOULD INTEND TO OFFER THOSE EXCERPTS.

08:40AM 3         I ACTUALLY DON'T KNOW WHAT THE GOVERNMENT'S POSITION IS ON

08:40AM 4    THAT.  WE HAVEN'T RECEIVED THE GOVERNMENT'S POSITION ON THE

08:40AM 5    ADMISSION OF THAT.

08:40AM 6         SO THAT'S IT FOR THE VIDEOS.

08:40AM 7         AND THEN WE HAVE SOME MATERIALITY CONCERNS, BUT MAYBE I'LL

08:40AM 8    PAUSE THERE.

08:40AM 9              THE COURT:  LET'S TALK ABOUT THE VIDEOS.  THANK YOU.

08:40AM 10        MR. LEACH?

08:40AM 11             MR. LEACH:  THANK YOU, YOUR HONOR.

08:40AM 12        LET ME TAKE THEM IN ORDER AND GIVE THE COURT A LITTLE MORE

08:40AM 13   CONTEXT.

08:40AM 14        THE FIRST VIDEO IS THE "MAD MONEY" INTERVIEW.  IT'S ON THE

08:40AM 15   DAY ON OCTOBER 15TH OR 16TH, 2015, THE DAY "THE

08:40AM 16   WALL STREET JOURNAL" ARTICLE BY JOHN CARREYROU COMES OUT, AND

08:40AM 17   MS. HOLMES IS ASKED ABOUT THE VERACITY OF CERTAIN STATEMENTS IN

08:40AM 18   "THE WALL STREET JOURNAL" ARTICLE.

08:40AM 19        IT'S THE EQUIVALENT OF A POLICE INTERROGATION WHERE SHE'S

08:40AM 20   ASKED, IS THIS TRUE?  IS THIS TRUE?  AND WE THINK SOME OF HER

08:40AM 21   RESPONSES ARE, AT BEST, MISLEADING AND ARGUABLY FALSE.

08:41AM 22        SO THE RELEVANCE IS THAT SHE'S MAKING FALSE EXCULPATORY

08:41AM 23   STATEMENTS AT THE TIME THAT SHE'S CONFRONTED WITH NEGATIVE

08:41AM 24   INFORMATION.

08:41AM 25        IT'S CLEARLY RELEVANT, AND WHAT THE DEFENSE IS LOOKING

08:41AM 1    OVER IS THE HEARSAY ISSUE THAT IS BAKED INTO ALL OF THIS.  HER

08:41AM 2    STATEMENTS, WHEN OFFERED BY THE DEFENSE -- EXCUSE ME -- ARE

08:41AM 3    HEARSAY.  WHEN THEY'RE OFFERED BY THE GOVERNMENT, THEY'RE

08:41AM 4    ADMISSIBLE.

08:41AM 5         AND SHE'S ASKED VERY DIRECT QUESTIONS.  I DON'T -- I

08:41AM 6    HAVEN'T HEARD AN ARGUMENT ABOUT THE RULE OF COMPLETENESS, BUT

08:41AM 7    THE ANSWER TO WHY ONLY SOME OF THE CLIPS IS HER STATEMENTS ARE

08:41AM 8    HEARSAY WHEN OFFERED BY THE DEFENSE.  THEY'RE NOT HEARSAY WHEN

08:41AM 9    OFFERED BY THE GOVERNMENT.

08:41AM 10        WE WANT TO PLAY THE RESPONSE TO TWO QUESTIONS, TWO VERY

08:41AM 11   DIRECT QUESTIONS, AND THE REMAINDER SHOULD NOT COME IN OVER A

08:41AM 12   HEARSAY OBJECTION.

08:41AM 13             THE COURT:  ARE THESE STATEMENTS THAT THE WITNESS --

08:41AM 14   I'M JUST TRYING TO GET FOUNDATIONALLY, IS THIS -- MS. PETERSON

08:42AM 15   IS GOING TO SAY SOMETHING ABOUT THIS?

08:42AM 16             MR. LEACH:  MS. PETERSON IS GOING TO SAY, I WATCHED

08:42AM 17   THE VIDEO.

08:42AM 18             THE COURT:  I SEE.

08:42AM 19             MR. LEACH:  I DON'T WANT TO SPEAK FOR HER, BUT IN A

08:42AM 20   SENSE --

08:42AM 21             THE COURT:  RIGHT.

08:42AM 22             MR. LEACH:  -- IT WAS A POSITIVE FACT TO SEE HER GO

08:42AM 23   ON T.V. AND DENY SOME VERY SERIOUS ALLEGATIONS, AND THIS

08:42AM 24   STARTED A PROCESS WHERE SHE WANTED TO GET MORE INFORMATION FROM

08:42AM 25   THE DEFENDANT.

4589

08:42AM 1          SO THIS IS -- WE WANT TO GET MS. PETERSON'S RESPONSE TO

08:42AM 2     SOME OF THE THINGS SHE HEARD.

08:42AM 3          BUT PUTTING THAT ASIDE, THESE ARE STATEMENTS BY THE

08:42AM 4     DEFENDANT AT THE TIME THAT NEGATIVE INFORMATION IS PRESENTED.

08:42AM 5     IT COULD NOT BE MORE RELEVANT, AND IT'S SIMPLY THE RULE OF

08:42AM 6     HEARSAY THAT THE DEFENSE DOES NOT GET TO PUT IN SELF-SERVING

08:42AM 7     STATEMENTS THAT THEY WANT TO PUT IN BECAUSE SHE'S NOT UNDER

08:42AM 8     OATH.

08:42AM 9              THE COURT:  OKAY.

08:42AM 10             MR. LEACH:  THE "TODAY SHOW" VIDEO IS SLIGHTLY

08:42AM 11    DIFFERENT IN THE SENSE THAT IT'S A COMBINATION OF BOTH

08:42AM 12    STATEMENTS BY A REPORTER, YOU KNOW, SUMMARIZING INFORMATION,

08:42AM 13    AND SEGMENTS OF AN INTERVIEW OF MS. HOLMES.

08:43AM 14         WE PROPOSE PLAYING SOME OF THE STATEMENTS ONLY BY

08:43AM 15    MS. HOLMES IN THAT INTERVIEW.

08:43AM 16         THE REMAINDER, I'M NOT SURE I APPRECIATE THE RELEVANCE OF

08:43AM 17    IT.  AND PERHAPS IF THE DEFENSE LAYS MORE FOUNDATION, I, I CAN

08:43AM 18    SEE THE ENTIRETY COMING IN.  I'M NOT SURE I HAVE A PROBLEM WITH

08:43AM 19    THAT.

08:43AM 20         BUT THERE'S A HEARSAY ISSUE THERE.  AND IT'S NOT JUST AN

08:43AM 21    INTERVIEW.  IT'S STATEMENTS BY A REPORTER WHICH, IF OFFERED FOR

08:43AM 22    THE TRUTH, THERE MAY BE HEARSAY ISSUES BEHIND IT.

08:43AM 23         AND I HAVE TRANSCRIPTS OF THE -- OF BOTH THE "MAD MONEY"

08:43AM 24    AND THE "TODAY SHOW" INTERVIEW.

08:43AM 25         WITH RESPECT TO THE THIRD VIDEO --

08:43AM  1          THE COURT:  PARDON ME.  IS MS. PETERSON ALSO GOING

08:43AM  2   TO SPEAK TO THE "TODAY SHOW" INTERVIEW?

08:43AM  3          MR. LEACH:  YES, YES.

08:43AM  4          THE COURT:  SAME?

08:43AM  5          MR. LEACH:  SHE WILL SAY, I VIEWED IT AND I WAS

08:43AM  6   PLEASED TO SEE THE DEFENDANT OUT THERE.

08:43AM  7          THE COURT:  OKAY.

08:43AM  8          MR. LEACH:  AND MS. PETERSON HAS A MEETING WITH

08:44AM  9   MS. HOLMES IN PALO ALTO SHORTLY AFTER THAT INTERVIEW, AND I

08:44AM  10  WANT TO ASK HER ABOUT THINGS MS. HOLMES SAID PUBLICLY AND

08:44AM  11  THINGS MS. HOLMES SAID TO MS. PETERSON PRIVATELY.

08:44AM  12         THE COURT:  OKAY.

08:44AM  13         MR. LEACH:  AND JUST FOR CONTEXT, YOUR HONOR, THAT

08:44AM  14  "TODAY SHOW" INTERVIEW IS APRIL OF 2016.

08:44AM  15     WITH RESPECT TO THE THIRD VIDEO, THIS IS NOT ONE THAT THE

08:44AM  16  GOVERNMENT INTENDS TO OFFER, IT'S ONE THE DEFENSE INTENDS TO

08:44AM  17  OFFER DURING CROSS-EXAMINATION.  I HAVEN'T SEEN WHICH EXCERPTS

08:44AM  18  THEY'RE THINKING OF, BUT THIS IS A PRESENTATION FROM AUGUST OF

08:44AM  19  2016, SO NEARLY A YEAR AFTER "THE WALL STREET JOURNAL" ARTICLE

08:44AM  20  COMES OUT.

08:44AM  21     IT'S LARGELY STATEMENTS BY MS. HOLMES, WHICH COULD NOT

08:44AM  22  PRESENT A GREATER HEARSAY PROBLEM.  I REALLY DON'T UNDERSTAND

08:44AM  23  THE -- YOU KNOW, I DON'T UNDERSTAND THE BASIS FOR ADMITTING

08:44AM  24  MINUTES UPON POSSIBLY HOURS OF THE DEFENDANT'S UNSWORN

08:45AM  25  STATEMENTS ABOUT WHAT HER TECHNOLOGY SUPPOSEDLY CAN OR CAN'T

4591

08:45AM  1    DO.

08:45AM  2        WHAT I HEARD FROM MR. WADE RIGHT NOW IS THAT IT POSSIBLY

08:45AM  3    RELATES TO MS. PETERSON'S STATE OF MIND, MS. PETERSON'S STATE

08:45AM  4    OF MIND IN AUGUST OF 2016.

08:45AM  5        BUT I DON'T THINK MS. PETERSON'S STATE OF MIND IN AUGUST

08:45AM  6    OF 2016 IS REMOTELY RELEVANT.  THE INVESTMENT SHE MADE WAS BACK

08:45AM  7    IN 2014 BY -- THIS IS MORE THAN A YEAR AFTER "THE

08:45AM  8    WALL STREET JOURNAL."

08:45AM  9        SO WE DON'T UNDERSTAND THE RELEVANCE OF THE AACC

08:45AM  10   PRESENTATION, AND WE CERTAINLY OBJECT TO WHOLESALE STATEMENTS

08:45AM  11   BY THE DEFENDANT, UNSWORN, ABOUT WHAT HER TECHNOLOGY CAN DO.

08:45AM  12       IF SHE WANTS TO STAND BY THOSE STATEMENTS, SHE SHOULD TAKE

08:45AM  13   THE STAND AND SAY IT UNDER OATH SUBJECT TO CROSS-EXAMINATION.

08:45AM  14       BUT IT'S MASSIVE HEARSAY.

08:45AM  15           THE COURT:  SO YOU DON'T, YOU DON'T INTEND TO DO

08:45AM  16   ANYTHING WITH THE THIRD VIDEO?  THAT'S NOT YOURS, THAT'S

08:45AM  17   MR. WADE'S?

08:46AM  18           MR. LEACH:  CORRECT.

08:46AM  19           THE COURT:  I SEE.  OKAY.

08:46AM  20           MR. WADE:  YOUR HONOR, IF I MIGHT ADDRESS THESE

08:46AM  21   ISSUES AND GIVE SOME CONTEXT.

08:46AM  22       OF COURSE YOUR HONOR HEARD DAN EDLIN'S TESTIMONY LAST WEEK

08:46AM  23   IN WHICH THE GOVERNMENT NOT ONCE, BUT TWICE, WENT AND SOLICITED

08:46AM  24   ANSWERS ABOUT THE REASONS HE LEFT THE COMPANY IN DECEMBER OF

08:46AM  25   2016 RELATING TO THE TECHNOLOGY AND EFFORTS MADE TO

4592

08:46AM 1    REHABILITATE THE TECHNOLOGY THAT HE THOUGHT WERE NOT

08:46AM 2    SUCCESSFUL.

08:46AM 3        THE GOVERNMENT HAS OPENED THE DOOR ON THIS EVIDENCE IN

08:46AM 4    TERMS OF THE TECHNOLOGICAL CAPACITY IN THAT TIME PERIOD THROUGH

08:46AM 5    SOLICITING THAT EVIDENCE WHICH WAS, FRANKLY, VERY PREJUDICIAL,

08:46AM 6    NOT ONCE, BUT TWICE, SO WE SHOULD HAVE THE ABILITY TO REBUT

08:46AM 7    THAT.

08:46AM 8        NUMBER TWO, WE'RE NOT OFFERING ANY OF THESE FOR THE TRUTH

08:46AM 9    OF THE MATTER ASSERTED.  WE'RE OFFERING THEM FOR NONHEARSAY

08:46AM 10   PURPOSES.  THEY REFLECT OUR CLIENT'S STATE OF MIND AT THE TIME

08:46AM 11   SHE'S MAKING THE STATEMENTS, AND THEY ARE RELEVANT FOR THE

08:46AM 12   EFFECT ON THE LISTENER IN ALL OF THEM.

08:47AM 13       IN FACT, MR. LEACH JUST SAID HE SOUGHT TO ELICIT THIS

08:47AM 14   EVIDENCE -- THE REACTION OF THE LISTENER TO VIEWING THIS

08:47AM 15   EVIDENCE.

08:47AM 16       MS. PETERSON, AS WE UNDERSTAND IT, NOT ONLY VIEWED THE

08:47AM 17   "MAD MONEY" CLIP, AND HE'S GOING TO ASK QUESTIONS ABOUT THAT,

08:47AM 18   MY UNDERSTANDING IS THAT SHE THEN VIEWED THE "TODAY SHOW" CLIP,

08:47AM 19   AND HE'S GOING TO ASK QUESTIONS ABOUT THAT.

08:47AM 20       SO WE'RE ENTITLED TO GET THE WHOLE PICTURE IN FRONT OF THE

08:47AM 21   JURY AND ASK QUESTIONS ABOUT THE EFFECT OF THE WHOLE SEGMENTS

08:47AM 22   ON MS. PETERSON.

08:47AM 23       HE ALSO SAID THAT THEY'RE GOING TO TALK ABOUT A MEETING

08:47AM 24   THAT HAPPENED IN APRIL OF 2016, WHICH IS ALSO WELL AFTER THE

08:47AM 25   PERIOD BECAUSE HE WANTS -- BECAUSE HE THINKS WHATEVER

08:47AM  1    MS. PETERSON HAS TO SAY ABOUT THAT IS RELEVANT TO THEIR CASE.

08:47AM  2        WELL, I DON'T KNOW WHAT THE DIFFERENCE BETWEEN THAT AND

08:48AM  3    THE STATEMENTS IN AUGUST OF 2016 ARE.

08:48AM  4        IN FACT, THE STATEMENTS IN APRIL OF 2016, IN THE WITNESS'S

08:48AM  5    NOTES THERE ARE STATEMENTS ABOUT THE FACT THAT THEY'RE GOING TO

08:48AM  6    GO TO THE AACC PRESENTATION AND DISPLAY THIS TECHNOLOGY, AND

08:48AM  7    THEY SHOULD ATTEND THE PRESENTATION AND OBSERVE THAT.  THAT'S

08:48AM  8    REFERENCED IN THE VERY MEETING THAT MR. LEACH WANTS TO OPEN THE

08:48AM  9    DOOR ON.

08:48AM  10       SO ALL OF THIS STUFF IS RELEVANT BASED UPON WHAT THE

08:48AM  11   GOVERNMENT WANTS TO PUT IN.  THEY CAN'T PUT IN THE CRAMER VIDEO

08:48AM  12   AND THE "TODAY SHOW" VIDEO AND THEN SAY THERE IS SOME MAGIC

08:48AM  13   LINE OR MAGIC CURTAIN THAT COMES DOWN IN APRIL AND EVERYTHING

08:48AM  14   PAST THAT IN TERMS OF THE EFFECT ON MS. PETERSON IS IRRELEVANT.

08:48AM  15           THE COURT:  WHAT ABOUT, WHAT ABOUT THE FACT THAT, AS

08:48AM  16   YOU KNOW, A DEFENDANT CAN'T GET IN STATEMENTS THAT GO TO HER

08:49AM  17   DEFENSE IN THIS CASE UNLESS SHE TESTIFIES, THESE HEARSAY

08:49AM  18   STATEMENTS, MR. LEACH'S POINT?

08:49AM  19       ISN'T THAT WHAT THIS DOES?  ISN'T THIS A NEGATING HER

08:49AM  20   STATE OF MIND, OR YOUR CLIENT'S STATE OF MIND IN THIS EFFECT?

08:49AM  21           MR. WADE:  THESE WERE, THESE WERE STATEMENTS THAT

08:49AM  22   WERE OBSERVED BY THE WITNESSES THAT THE GOVERNMENT HAS CHOSEN

08:49AM  23   TO CALL IN THIS CASE.

08:49AM  24           THE COURT:  RIGHT.

08:49AM  25           MR. WADE:  AND SO --

4594

08:49AM 1          THE COURT:  BUT LET'S SAY IF HE DIDN'T, LET'S SAY

08:49AM 2   MR. LEACH DIDN'T WANT TO PUT THESE IN, YOU COULDN'T DO THEM;

08:49AM 3   RIGHT?

08:49AM 4          MR. WADE:  IF MR. LEACH DIDN'T WANT TO OPEN THE DOOR

08:49AM 5   FOR STATEMENTS DURING THIS PERIOD OF TIME, IN OTHER WORDS,

08:49AM 6   REACTIONS TO "THE WALL STREET JOURNAL" COVERAGE, IT'S NOT CLEAR

08:49AM 7   TO ME THAT WE COULD PUT THESE IN, AT LEAST NOT THROUGH

08:49AM 8   MS. PETERSON.

08:49AM 9      YOU KNOW, I RESERVE OUR RIGHTS AS TO WHAT ISSUES MAY COME

08:49AM 10  UP WITH RESPECT TO OTHER WITNESSES.

08:49AM 11     BUT HE DOES WANT TO OPEN THE DOOR, AND SO HE DOES WANT

08:50AM 12  TO -- HE JUST WANTS TO PUT IT A CRACK OPEN AND SAYS THAT, YOU

08:50AM 13  KNOW, IT CAN'T GO -- IT CAN'T SWING A LITTLE BIT FURTHER.

08:50AM 14         THE COURT:  RIGHT.  BUT TO MR. LEACH'S POINT, HE

08:50AM 15  SAYS, LOOK, WE CAN PUT THIS ON, WE'RE PROSECUTING, AND THESE

08:50AM 16  ARE STATEMENTS OF A DEFENDANT THAT ARE ADMISSIBLE, AND WHAT HE

08:50AM 17  SAYS IS, BUT THE DEFENSE CAN'T SAY, OKAY, WELL, LET US PUT OUR

08:50AM 18  STATEMENTS OF OUR CLIENT ON WITHOUT PUTTING THE CLIENT ON.

08:50AM 19         MR. WADE:  AGAIN, WE'RE NOT SEEKING -- THE REASON

08:50AM 20  WE'RE SEEKING TO OFFER THIS EVIDENCE IS BECAUSE THROUGH THIS

08:50AM 21  WITNESS THEY'RE INTENDING TO OPEN THE DOOR ON THIS ISSUE AND ON

08:50AM 22  THE POST "WALL STREET JOURNAL" IMPACT ON THE REACTION FROM

08:50AM 23  MS. HOLMES AND THE COMPANY ON THIS EVIDENCE.

08:50AM 24     THEY CAN'T OPEN THAT DOOR AND SAY THEY CAN ONLY OFFER THE

08:50AM 25  EVIDENCE THAT THEY WANT WHEN THE WITNESS OBSERVED MANY OTHER

| | | |
|---|---|---|
| 08:50AM | 1 | THINGS. |
| 08:50AM | 2 | THE COURT:  WELL, I'M TALKING ABOUT -- I'M STARTING |
| 08:51AM | 3 | CHRONOLOGICALLY WITH THE "MAD MONEY." |
| 08:51AM | 4 | MR. WADE:  RIGHT. |
| 08:51AM | 5 | THE COURT:  THEY WANT TO PUT ON A FEW CLIPS OF YOUR |
| 08:51AM | 6 | CLIENT'S STATEMENTS DURING "MAD MONEY" AND YOU WANT TO PLAY THE |
| 08:51AM | 7 | WHOLE THING. |
| 08:51AM | 8 | MR. WADE:  WE WANT TO PLAY THE WHOLE THING.  WE |
| 08:51AM | 9 | THINK IT'S A RULE OF COMPLETENESS ISSUE.  WE THINK TAKING THE |
| 08:51AM | 10 | STATEMENTS OUT OF CONTEXT IN A NEWS SEGMENT IS MISLEADING, |
| 08:51AM | 11 | PARTICULARLY IN, PARTICULARLY IN THE "MAD MONEY" SEGMENT. |
| 08:51AM | 12 | WE THINK YOU NEED THE CONTEXT IN WHICH THE QUESTIONS ARE |
| 08:51AM | 13 | ASKED.  IT'S A VERY SHORT SEGMENT. |
| 08:51AM | 14 | IN THE CONTEXT OF -- |
| 08:51AM | 15 | THE COURT:  BUT, MR. LEACH, WHAT IS YOUR POINT ON |
| 08:51AM | 16 | THIS? |
| 08:51AM | 17 | MR. LEACH:  YOUR HONOR, THIS IS THE EQUIVALENT OF A |
| 08:51AM | 18 | POLICE INTERVIEW.  THE DEFENDANT CAN'T SAY, IF IT WERE A ONE |
| 08:51AM | 19 | HOUR INTERVIEW AND THE GOVERNMENT WANTS TO ELICIT FIVE MINUTES |
| 08:51AM | 20 | IN RESPONSE TO ONE QUESTION, WE THEREFORE GET TO SUBMIT THE |
| 08:51AM | 21 | WHOLE THING. |
| 08:51AM | 22 | I HAVEN'T HEARD A PARTICULAR QUESTION OR ANSWER THAT IS |
| 08:51AM | 23 | MISLEADING UNDER THE RULE OF COMPLETENESS HERE.  IT'S JUST, YOU |
| 08:51AM | 24 | NEED THE COMPLETE CONTEXT. |
| 08:51AM | 25 | RULE 106 IS LIMITED.  I CAN GIVE THE COURT THE TRANSCRIPT |

4596

08:52AM 1    OF THE PARTICULAR QUESTIONS AND ANSWERS.  I DON'T KNOW WHY YOU

08:52AM 2    NEED THE REMAINDER IN ORDER TO UNDERSTAND HER RESPONSE TO THAT

08:52AM 3    PARTICULAR QUESTION.

08:52AM 4         AND I JUST NEED TO GO BACK, YOUR HONOR.

08:52AM 5         THESE CLIPS ARE RELEVANT BECAUSE THEY SHOW THE DEFENDANT'S

08:52AM 6    STATE OF MIND, MS. HOLMES'S STATE OF MIND, WHICH THE GOVERNMENT

08:52AM 7    CAN DO.  SHE'S, IN THE CRAMER INTERVIEW, YOU KNOW, NOT

08:52AM 8    RESPONDING TO THE QUESTION OF HOW MANY TESTS YOUR EDISON DEVICE

08:52AM 9    CAN DO.

08:52AM 10        IN THE "TODAY SHOW" INTERVIEW, SHE'S SAYING, I'M THE CEO

08:52AM 11   OF THE COMPANY, I'M RESPONSIBLE FOR EVERYTHING.

08:52AM 12        SHE'S -- YOU KNOW, INSTEAD OF BLAMING THE LAB DIRECTOR

08:52AM 13   LIKE SHE DOES IN THIS COURTROOM, SHE'S SAYING, NO, I'M

08:52AM 14   RESPONSIBLE FOR THIS.

08:52AM 15        THAT'S AN ADMISSION.  THAT SHOWS HER STATE OF MIND.  YOU

08:52AM 16   KNOW, THE FACT THAT IT HAPPENED TO BE SOMETHING THAT

08:52AM 17   MS. PETERSON SAW IS NEITHER HERE NOR THERE.

08:52AM 18        AND THE FACT THAT WE WANT TO OFFER THESE STATEMENTS BY A

08:52AM 19   DEFENDANT DOESN'T OPEN THE DOOR TO EVERYTHING A DEFENDANT EVER

08:53AM 20   SAID TO A WITNESS OR EVER SAID TO A POLICE OFFICER.

08:53AM 21        THE RULE THAT MR. WADE IS PROPOSING WOULD SWALLOW UP THE

08:53AM 22   HEARSAY RULE, AND I JUST DON'T SEE WHY MS. PETERSON'S STATE OF

08:53AM 23   MIND IN 2016 HAS ANY RELEVANCE ON WHY THEY MADE THE INVESTMENT.

08:53AM 24        SO THAT'S THE GOVERNMENT'S POINT THERE, YOUR HONOR.

08:53AM 25             MR. WADE:  MR. LEACH JUST SAID WHY WE WANT TO OFFER

08:53AM 1    THE CASE, OR OFFER ALL OF THE EVIDENCE.  HE JUST SAID IT'S

08:53AM 2    RELEVANT TO THE CLIENT'S STATE OF MIND, AND THAT'S WHY THEY

08:53AM 3    WANT TO OFFER IT.

08:53AM 4        THAT'S WHY WE WANT TO OFFER IT, TOO.

08:53AM 5        WE'RE HAPPY TO HAVE AN INSTRUCTION THAT IT DOESN'T GO --

08:53AM 6    IT'S NOT BEING OFFERED FOR THE TRUTH OF THE MATTER ASSERTED,

08:53AM 7    BUT THE PROFFERED BASIS WHICH THE GOVERNMENT JUST GAVE IS

08:53AM 8    PERMISSIBLE AS A NONHEARSAY ADMISSION OF ALL OF THIS EVIDENCE

08:53AM 9    GIVEN THAT THE GOVERNMENT WANTS TO GO INTO THIS PERIOD OF TIME.

08:53AM 10           THE COURT:  GO AHEAD.

08:53AM 11           MR. LEACH:  THAT'S JUST SO WRONG, YOUR HONOR, AND IT

08:53AM 12   WOULD SWALLOW UP THE HEARSAY RULE.  WE MIGHT AS WELL PUT IN

08:54AM 13   EVERY EMAIL THAT MS. HOLMES EVER WROTE TO SHOW HER STATE OF

08:54AM 14   MIND.

08:54AM 15           THE COURT:  I'M NOT CERTAIN, MR. WADE, THAT THE

08:54AM 16   COMPLETENESS APPLIES TO WHAT YOU'RE TALKING ABOUT HERE, AND I'M

08:54AM 17   LOOKING AT THE "MAD MONEY" AND THE "TODAY SHOW" FIRST AND

08:54AM 18   SEPARATING THOSE TWO OUT.

08:54AM 19       SO THE GOVERNMENT WANTS TO PLAY CERTAIN EXCERPTS.  THEY

08:54AM 20   CAN DO THAT.  AND THEY'RE STATEMENTS OF YOUR CLIENT.  THEY ARE

08:54AM 21   ADMISSIBLE FOR THAT PURPOSE.

08:54AM 22       BUT THEN THE QUESTION IS, CAN YOU THEN GET IN STATEMENTS

08:54AM 23   OF YOUR OWN CLIENT IN THE SAME VIDEO AS TESTIMONIAL?  IS THAT

08:54AM 24   WHAT YOU'RE TRYING TO DO?

08:54AM 25           MR. WADE:  NO, I DON'T WANT IT.  I SPECIFICALLY DO

4598

08:54AM  1    NOT WANT IT AS TESTIMONIAL.  I WANT IT TO SHOW HER STATE OF

08:54AM  2    MIND AND I WANT IT TO SHOW THE EFFECTS ON THE LISTENER.

08:54AM  3        THEY INTEND TO ASK QUESTIONS ABOUT -- MR. LEACH JUST SAID

08:54AM  4    THAT THEY INTEND TO ASK QUESTIONS ABOUT THE EFFECT OF THAT

08:54AM  5    STATEMENT ON THE LISTENER.

08:54AM  6        I'M ENTITLED TO PUT THE WHOLE STATEMENT IN AND ASK MY OWN

08:55AM  7    QUESTIONS ABOUT THE EFFECT ON THE LISTENER AS PART OF

08:55AM  8    CROSS-EXAMINATION.

08:55AM  9        AND SO I'M NOT OFFERING IT AS A TESTIMONIAL STATEMENT.

08:55AM  10   I'M HAPPY TO HAVE AN INSTRUCTION THAT IT'S NOT OFFERED FOR THE

08:55AM  11   TRUTH OF THE MATTER ASSERTED.  THAT'S NOT WHAT WE'RE SEEKING.

08:55AM  12       AND SO FOR BOTH OF THOSE, ONE, IT'S A NONHEARSAY PURPOSE;

08:55AM  13   AND, TWO, WE THINK IN CONTEXT WHEN YOU LOOK AT THE VIDEO, IT'S

08:55AM  14   MISLEADING WITHOUT GETTING THE FULL STATEMENT.

08:55AM  15           THE COURT:  BECAUSE IT EXPOSES YOUR CLIENT'S STATE

08:55AM  16   OF MIND, YOUR CLIENT'S STATE OF MIND IN A DIFFERENT WAY?

08:55AM  17           MR. WADE:  YEAH.

08:55AM  18           THE COURT:  SHE DIDN'T MEAN THAT?

08:55AM  19           MR. WADE:  WE THINK -- YES.

08:55AM  20           THE COURT:  BECAUSE YOU CAN'T PUT YOUR CLIENT'S

08:55AM  21   STATE OF MIND IN THROUGH THIS TYPE OF EVIDENCE.

08:55AM  22           MR. WADE:  WE CAN ADMIT STATEMENT -- WE CAN ADMIT

08:55AM  23   THINGS FOR A NONHEARSAY PURPOSE.  THERE ARE MULTIPLE NONHEARSAY

08:55AM  24   PURPOSES AS OFFERED THROUGH THIS WITNESS.

08:55AM  25           THE COURT:  YEAH, BUT IF YOU'RE TRYING TO -- IF YOU

08:55AM   1    WANT THIS TO COME IN AND THEN TO ARGUE, SEE, MY CLIENT'S STATE

08:56AM   2    OF MIND AS TO AN ELEMENT HERE, SHE DIDN'T INTEND TO DEFRAUD,

08:56AM   3    THAT'S -- THERE'S SOME CASE LAW ON THAT THAT SAYS YOU CAN'T DO

08:56AM   4    THAT.

08:56AM   5             MR. WADE:  NO.  BUT THE GOVERNMENT WANTS TO OFFER

08:56AM   6    PART OF THIS STATEMENT AND TALK ABOUT THE EFFECT IT HAS ON

08:56AM   7    WITNESSES IN THE CASE.  THAT'S EXACTLY WHAT MR. LEACH SAID THAT

08:56AM   8    THEY'RE INTENDING TO DO.  THAT IS NOT A HEARSAY -- THAT'S A

08:56AM   9    NONHEARSAY PURPOSE FOR THE ADMISSION OF THE STATEMENT.

08:56AM  10    HE JUST WANTS THEM TO HAVE THE -- TO REACT ONLY TO THE

08:56AM  11    PIECES OF THE STATEMENT THAT HE WANTS THEM TO REACT TO WHEN

08:56AM  12    IT'S NOT FAIR TO SAY, WHAT WAS YOUR REACTION TO THOSE TWO

08:56AM  13    QUESTIONS, WHEN CLEARLY IF THE WITNESS SAW THE STATEMENT, THE

08:56AM  14    SEGMENT, THEY SAW THE WHOLE SEGMENT.

08:56AM  15    SO IF HE WANTS TO ASK THE WITNESS WHAT THE REACTION TO THE

08:56AM  16    SEGMENT IS, IT'S TOTALLY UNFAIR TO SAY, WE'RE ONLY GOING TO

08:56AM  17    GIVE YOU THIS PIECE AND THIS PIECE WITH RESPECT TO THE --

08:56AM  18    THAT'S ON THE CRAMER PIECE.

08:56AM  19    ON THE "MAD MONEY" PIECE -- OR I'M SORRY, ON THE "TODAY

08:57AM  20    SHOW" PIECE, IT ARGUABLY SHOULDN'T BE ADMITTED BECAUSE OF RULE

08:57AM  21    OF COMPLETENESS CONCERNS ANYWAY BECAUSE THE SEGMENTS WITHIN,

08:57AM  22    WITHIN -- WE DON'T HAVE THE ROUGH TRANSCRIPT.  THEY COULD HAVE

08:57AM  23    SUBPOENAED THE "TODAY SHOW" AND GOTTEN ALL OF THE Q AND A.

08:57AM  24    INSTEAD, WE'RE TALKING ABOUT DISCRETE SEGMENTS, YOU KNOW,

08:57AM  25    TAKEN OUT OF CONTEXT WITHIN THAT -- WITHIN A LONGER INTERVIEW.

4600

08:57AM 1          SO, YOUR HONOR MAY KNOW WHEN ONE OF THESE THINGS IS

08:57AM 2     CONDUCTED, AND IN THIS CASE IT IS MARIA SHRIVER, SHE COMES OUT

08:57AM 3     TO THE COMPANY AND SHE DOES A LENGTHY INTERVIEW.

08:57AM 4          THE GOVERNMENT WANTS TO OFFER VERY NARROW SEGMENTS.  WE

08:57AM 5     DON'T KNOW THE CONTEXT OF THAT, SO THERE'S ARGUABLY A RULE OF

08:57AM 6     COMPLETENESS CONCERN JUST WITH RESPECT TO OFFERING THOSE

08:57AM 7     SEGMENTS BECAUSE WE DON'T KNOW.

08:57AM 8          BUT THERE'S PARTICULAR PREJUDICE WHEN YOU TAKE IT OUT OF

08:57AM 9     THE CONTEXT OF THE BROADER, OF THE BROADER NARRATIVE OF THE

08:57AM 10    STORY.  IT'S JUST MISLEADING.  IT'S A FOUR MINUTE SEGMENT.

08:58AM 11         AND IF THEY WANT TO ASK ABOUT THE REACTION OF THIS

08:58AM 12    WITNESS, THEN THEY -- WE SHOULD BE ABLE TO GET THE REACTION TO

08:58AM 13    THE WHOLE THING, NOT JUST TO THE PIECES THAT THE GOVERNMENT

08:58AM 14    WANTS TO OFFER.

08:58AM 15         WITH RESPECT TO THE AACC VIDEO, THIS WITNESS TOOK NOTES

08:58AM 16    THE DAY OF THE VIDEO THAT SAID, "MUCH OF THE MEDIA COVERAGE

08:58AM 17    I'VE READ SO FAR IN THE PRESENTATION CALLS THE PRESENTATION A

08:58AM 18    BAIT AND SWITCH.  SHE'S PRESENTING THE PUBLIC WITH A NEW

08:58AM 19    MACHINE WHILE IGNORING THE ISSUES OF THE OLD MACHINE.  I DIDN'T

08:58AM 20    SEE IT THAT WAY.  HAVING BEEN PRIVY TO SEEING THE MACHINE IN

08:58AM 21    2014, AND SEEING IT TODAY, I DO SEE THE MACHINES AS

08:58AM 22    FUNDAMENTALLY SIMILAR.  THE COMPANY JUST CAME OUT TOO SOON,

08:58AM 23    OVERPROMISED, AND WOEFULLY FAILED IN EXECUTION THE FIRST TIME

08:58AM 24    AROUND, MADE MUCH WORSE BY A TOTAL LACK OF COMMUNICATION AND A

08:58AM 25    PERCEPTION OF ARROGANCE."

4601

08:58AM  1        IT'S NOT -- THAT'S HER STATE OF MIND, HER REACTION TO THIS

08:59AM  2    PRESENTATION.

08:59AM  3            THE COURT:  AFTER HER INVESTMENT?

08:59AM  4            MR. WADE:  AFTER HER INVESTMENT.

08:59AM  5        BUT, AGAIN, THE GOVERNMENT --

08:59AM  6            THE COURT:  SO WHAT IS THE RELEVANCE OF THAT?

08:59AM  7            MR. WADE:  WELL, THE GOVERNMENT WANTS TO GET IN ALL

08:59AM  8    OF THESE STATEMENTS, YOUR HONOR.

08:59AM  9            THE COURT:  NO, I UNDERSTAND.  BUT WHAT IS THE

08:59AM  10   RELEVANCE OF HER -- THIS IS BEYOND THE CHARGING PERIOD;

08:59AM  11   CORRECT?

08:59AM  12           MR. WADE:  WELL --

08:59AM  13           THE COURT:  IS THAT RIGHT?

08:59AM  14           MR. WADE:  THE STATEMENT -- ALL OF THESE STATEMENTS,

08:59AM  15   I THINK, ARE BEYOND THE CHARGING PERIOD, WITH THE POSSIBLE

08:59AM  16   EXCEPTION OF THE CRAMER STATEMENT, ALTHOUGH IT'S LONG AFTER --

08:59AM  17   IT'S A YEAR AFTER THE INVESTMENT WAS MADE IN THIS CASE.

08:59AM  18       BUT, YOUR HONOR, THE RELEVANCE IS WHAT I JUST SAID, WHICH

08:59AM  19   IS THE COMPANY -- HAVING BEEN PRIVY TO SEEING THE MACHINE IN

08:59AM  20   2014 AND SEEING IT TODAY, I DO SEE THE MACHINES AS

08:59AM  21   FUNDAMENTALLY SIMILAR.

08:59AM  22       SO SHE'S, SHE'S LOOKING AT THE TECHNOLOGY, WHICH THE

09:00AM  23   GOVERNMENT IN THIS PERIOD OF TIME HAS PUT AT ISSUE AS A RESULT

09:00AM  24   OF MR. EDLIN'S TESTIMONY, SHE'S LOOKING AT THE TECHNOLOGY AND

09:00AM  25   SHE'S SAYING, YEAH, THIS SEEMS SIMILAR TO WHAT I OBSERVED WHEN

4602

09:00AM  1    I WENT TO VISIT THE COMPANY.

09:00AM  2            THE COURT:  OKAY.

09:00AM  3            MR. LEACH:  MS. PETERSON'S STATE OF MIND IN 2016 IS

09:00AM  4    IRRELEVANT, YOUR HONOR.  THE PURPOSE OF THE "MAD MONEY" AND THE

09:00AM  5    "TODAY SHOW" CLIPS IS TO SHOW THE DEFENDANT'S RESPONSE TO

09:00AM  6    QUESTIONING ABOUT THE ALLEGATION -- THE ALLEGATIONS IN THIS

09:00AM  7    CASE.  HOW MANY TESTS CAN YOUR EDISON DO?  SHE DEFLECTS.  ARE

09:00AM  8    YOU IN CHARGE OF THIS COMPANY OR ARE YOU NOT?  SHE ANSWERS

09:00AM  9    THAT, I AM.

09:00AM  10           MS. PETERSON IS AN AUTHENTICATING WITNESS FOR THESE

09:00AM  11   VIDEOS, HER REACTION IS, FRANKLY, NEITHER HERE NOR THERE, AND

09:00AM  12   HER STATE OF MIND IN 2016 TWO YEARS AFTER THE INVESTMENT AT ONE

09:00AM  13   ISOLATED POINT IN TIME BASED ON AN UNSWORN HOUR LONG SCIENTIFIC

09:01AM  14   PRESENTATION BY MS. HOLMES WHICH WE CANNOT CROSS-EXAMINE ON

09:01AM  15   UNLESS SHE TESTIFIES HAS NO BEARING ON THE ALLEGATIONS IN THIS

09:01AM  16   CASE.  IT'S HEARSAY.  IT'S 403.

09:01AM  17           I DON'T KNOW WHY WHAT MS. PETERSON THOUGHT IN AUGUST OF

09:01AM  18   2016, TWO YEARS AFTER HER INVESTMENT, REALLY MATTERS IN THIS

09:01AM  19   CASE.

09:01AM  20           THE COURT:  WELL, MR. WADE SAYS THAT SHE'S PERHAPS

09:01AM  21   HAD AN EPIPHANY AFTER LOOKING AT THIS AND DECIDED, OH, MAYBE

09:01AM  22   THE MACHINES ARE THE SAME.

09:01AM  23           MR. LEACH:  I'M QUITE CONFIDENT, WHEN ASKED ABOUT

09:01AM  24   THAT, YOUR HONOR, SHE WILL DENY HAVING AN EPIPHANY, THAT SHE'LL

09:01AM  25   SAY THE BAIT AND SWITCH IS MORE A REFERENCE TO WHAT TYPE OF

4603

| | | |
|---|---|---|
| 09:01AM | 1 | PROMISES HAD BEEN MADE IN THE PRESENTATION, AND SHE HAS A |
| 09:01AM | 2 | RESPONSE TO THAT AND IT'S NOT, I WAS HAPPY WITH THE INVESTMENT |
| 09:01AM | 3 | AND REALLY CONFIDENT THAT THINGS WERE GOING TO WORK OUT. |
| 09:01AM | 4 | AND IT OPENS UP, YOUR HONOR -- I MEAN, THERE'S A CONTEXT |
| 09:01AM | 5 | AFTER THIS WHERE RDV IS TAKING STEPS, YOU KNOW, TO TRY TO |
| 09:02AM | 6 | MAXIMIZE ITS INVESTMENT.  SHE'S HEARING LOTS OF THINGS FROM |
| 09:02AM | 7 | LOTS OF PEOPLE ABOUT LOTS OF DIFFERENT ISSUES, ALL OF WHICH IS |
| 09:02AM | 8 | HEARSAY. |
| 09:02AM | 9 | AND IF WE'RE GOING INTO AUGUST OF 2016, THERE'S A WHOLE |
| 09:02AM | 10 | ADDITIONAL CONTEXT THAT THE GOVERNMENT IS GOING TO WANT TO |
| 09:02AM | 11 | ELICIT AND IT BECOMES A MINI TRIAL OVER WHAT HAPPENED TO THE |
| 09:02AM | 12 | INVESTMENT. |
| 09:02AM | 13 | AND I JUST DON'T SEE THE RELEVANCE.  IT RAISES A NUMBER OF |
| 09:02AM | 14 | 403 ISSUES, AND I -- IT SHOULDN'T COME IN. |
| 09:02AM | 15 | MR. WADE:  YOUR HONOR, WITH RESPECT, IF THE |
| 09:02AM | 16 | GOVERNMENT TAKES THAT POSITION, THEY SHOULDN'T HAVE ELICITED |
| 09:02AM | 17 | THAT TESTIMONY FROM DAN EDLIN TWICE.  THEY OPENED THE DOOR TO |
| 09:02AM | 18 | THIS.  THERE'S ALSO -- WE DON'T HAVE VIDEO OF IT, BUT -- |
| 09:02AM | 19 | THE COURT:  DID YOU OBJECT TO THAT TESTIMONY? |
| 09:02AM | 20 | MR. WADE:  NO. |
| 09:02AM | 21 | THE COURT:  I DON'T THINK I HEARD AN OBJECTION TO |
| 09:02AM | 22 | THAT. |
| 09:02AM | 23 | MR. WADE:  NO.  YOUR HONOR, BELIEVE ME, IT'S ONE OF |
| 09:02AM | 24 | THOSE CIRCUMSTANCES WHERE A TRIAL LAWYER HAS TO MAKE A JUDGMENT |
| 09:02AM | 25 | AS TO WHETHER YOU OBJECT IN FRONT OF THE JURY OR NOT, AND THE |

09:02AM  1    JUDGMENT WAS MADE NOT TO DO IT.  BUT THAT DOESN'T MEAN THAT THE

09:02AM  2    DOOR HAS NOT BEEN OPENED.  IT'S OPEN.

09:02AM  3         SO THE GOVERNMENT MADE THAT DECISION.  IT WASN'T AN

09:03AM  4    ACCIDENT.  IT DID IT TWICE.  IT DID IT ON REDIRECT AS WELL.

09:03AM  5         AND TO NOW SAY, ONCE THEY HAVE MR. EDLIN COME IN AND SAY,

09:03AM  6    I THOUGHT AS A RESULT OF ALL OF THESE INTERACTIONS THAT THE

09:03AM  7    TECHNOLOGY DIDN'T WORK OR WOULDN'T WORK OR COULDN'T WORK, WHEN

09:03AM  8    AT THE AACC PRESENTATION THERE'S A DEMONSTRATION OF THE

09:03AM  9    TECHNOLOGY, THERE'S Q AND A IN WHICH THREE OTHER EXPERTS

09:03AM  10   COMMENT ON THE TECHNOLOGY --

09:03AM  11        THE COURT:  RIGHT.  AND THAT'S WHERE I'M -- SORRY TO

09:03AM  12   INTERRUPT YOU, MR. WADE.  BUT I THINK I SEE WHERE YOU'RE GOING

09:03AM  13   WITH THAT.

09:03AM  14        SO MR. EDLIN SAYS HE LOST FAITH, HE LOST FAITH IN THE

09:03AM  15   COMPANY FOR WHATEVER REASON, THERE COULD HAVE BEEN OTHER

09:03AM  16   REASONS, AND YOU COULD HAVE PROBED THAT, BUT HE SAID, I LOST

09:03AM  17   FAITH, COULDN'T DO IT, AND SO I DECIDED TO LEAVE.

09:03AM  18        NOW, MS. PETERSON, YOU WANT HER TO TESTIFY BASICALLY TO

09:03AM  19   SAY, WELL, ACTUALLY, IN MY OPINION, BASED ON WHAT I HAVE SEEN

09:03AM  20   AT THIS OTHER -- AT THIS CONFERENCE, ACTUALLY, I THINK THE

09:03AM  21   TECHNOLOGY WAS -- IT SOUNDS LIKE THEY COULD HAVE DONE WHAT THEY

09:04AM  22   SAID THEY WERE GOING TO DO.

09:04AM  23        AND THIS IS TO SOFTEN MR. EDLIN'S STATEMENT.

09:04AM  24        SO AREN'T WE TALKING ABOUT -- ISN'T THIS REALLY TO TRY TO

09:04AM  25   SOMEHOW BUFFER EDLIN'S STATEMENT ABOUT HIS BELIEF IN THIS, IN

09:04AM 1    THE TECHNOLOGY, AND NOW YOU'RE TRYING TO SAY MS. PETERSON, HER

09:04AM 2    BELIEF IN THE TESTIMONY, WHICH, WHAT IS THE RELEVANCE OF THAT?

09:04AM 3    I JUST DON'T CAPTURE IT.

09:04AM 4        MR. WADE:  WELL, THE RELEVANCE IN THE CASE IS, IS

09:04AM 5    PUT AT ISSUE BY THE GOVERNMENT OPENING THE DOOR ON THE ISSUE

09:04AM 6    GENERALLY WITH EDLIN, AND IT WAS THEIR JUDGMENT TO DO THAT.

09:04AM 7        ONCE THOSE ISSUES ARE IN THE CASE, WE HAVE THE ABILITY TO

09:04AM 8    REBUT IT.

09:04AM 9        WHETHER IT'S WITHIN THE SCOPE OF CROSS --

09:04AM 10        THE COURT:  REBUT THE FACT THAT EDLIN LOST FAITH?

09:04AM 11        MR. WADE:  NO, IT'S NOT THAT HE LOST FAITH,

09:04AM 12   YOUR HONOR.  IF YOU LOOK AT THE STATEMENTS, HE MADE THEM TWICE.

09:04AM 13   HE COMMENTED SPECIFICALLY ON HIS BELIEF IN THE TECHNOLOGY AS A

09:04AM 14   RESULT OF POST "WALL STREET JOURNAL" ACTIONS.  I THINK HE MAYBE

09:05AM 15   EVEN SAID THE AACC.  AND IT CAME UP IN HIS TESTIMONY THAT THERE

09:05AM 16   WERE EVENTS IN DECEMBER OF 2016, WHICH WE WANT TO GET INTO AS

09:05AM 17   WELL.

09:05AM 18        THIS WITNESS WAS INVOLVED IN -- THIS WITNESS -- THE

09:05AM 19   GOVERNMENT WANTS TO PUT IN A MEETING IN APRIL OF 2016 --

09:05AM 20        THE COURT:  BUT WHAT IS IT THAT YOU'RE TRYING TO

09:05AM 21   SHOW, THAT EDLIN WAS WRONG?  HE WAS WRONG IN HIS ASSESSMENT

09:05AM 22   BECAUSE MS. PETERSON WAS RIGHT?  AND THEN WE GET INTO THIS MINI

09:05AM 23   TRIAL ABOUT WHO IS CORRECT AND WHO IS NOT?

09:05AM 24        SO WHAT WE KNOW IS EDLIN SAID WHAT HE SAID.  HE LEFT

09:05AM 25   BECAUSE OF HIS OWN PERSONAL BELIEFS.  RIGHT, WRONG, OR

09:05AM  1    WHATEVER, HE LEFT.

09:05AM  2         NOW, WHAT DOES MS. PETERSON'S ASSESSMENT OF THE TECHNOLOGY

09:05AM  3    HAVE TO DO WITH EDLIN?

09:05AM  4         MR. WADE:  THE EVIDENCE THAT WILL COME IN THROUGH

09:05AM  5    MS. PETERSON, BECAUSE THE GOVERNMENT WANTS TO OPEN THE DOOR TO

09:05AM  6    POST "WALL STREET JOURNAL" INTERACTIONS AND REACTIONS FROM THE

09:06AM  7    COMPANY, IF IT CHOOSES NOT TO DO THAT, WE WON'T OFFER THE AACC

09:06AM  8    PRESENTATION.  IF IT DOESN'T WANT TO OFFER THE CRAMER

09:06AM  9    STATEMENTS, IF IT DOESN'T WANT TO OFFER THE APRIL SEGMENT, THE

09:06AM  10   APRIL MEETING --

09:06AM  11        THE COURT:  I THINK THAT'S OFF THE TABLE.  WE'VE

09:06AM  12   BEEN TALKING ABOUT THIS ALREADY.

09:06AM  13        I'M JUST -- I JUST DON'T SEE HOW MS. PETERSON, THE AACC

09:06AM  14   TESTIMONY IS RELEVANT.

09:06AM  15        MR. WADE:  WELL, IT ALL IS EVIDENCE OF THE COMPANY'S

09:06AM  16   GOOD FAITH BELIEF THAT THE TECHNOLOGY WORKS, WHICH -- AND

09:06AM  17   IT'S --

09:06AM  18        THE COURT:  WHEN YOU SAY "THE COMPANY," WHO ARE YOU

09:06AM  19   REFERRING TO?

09:06AM  20        MR. WADE:  I'M SAYING THERANOS AS AN ENTITY,

09:06AM  21   INCLUDING MS. HOLMES.  THERE WERE FIVE PEOPLE -- FOUR PEOPLE ON

09:06AM  22   THE STAGE IN THE AACC --

09:06AM  23        THE COURT:  BUT WHAT YOU'VE JUST TOLD ME IS THAT

09:06AM  24   IT'S EVIDENCE THAT THE COMPANY BELIEVED IT WORKED, AND THE

09:06AM  25   COMPANY IS NOT ON TRIAL HERE, YOUR CLIENT IS.  AND THAT GOES TO

4607

09:06AM   1    STATE OF MIND.

09:06AM   2         SO DOESN'T THAT THEN COME IN TO TRY TO NEGATE AN ELEMENT

09:07AM   3    OF THE OFFENSE USING HEARSAY THAT YOU'RE NOT ENTITLED TO DO?

09:07AM   4         MR. WADE:  WE CAN OFFER EVIDENCE THAT GOES TO THAT

09:07AM   5    FOR A NONHEARSAY PURPOSE.  EVIDENCE THAT REFLECTS A DEFENDANT'S

09:07AM   6    STATE OF MIND, YOU KNOW, CAN BE OFFERED.

09:07AM   7         IN THIS CASE, THE FACT THAT THEY WALKED INTO A

09:07AM   8    PRESENTATION WITH 2500 -- THE GOVERNMENT HAS AN ALLEGATION IN

09:07AM   9    ITS 404(B) NOTICE THAT THEY HID THIS DEVICE FROM THE PUBLIC AND

09:07AM  10    THAT THAT CONCEALMENT IS EVIDENCE OF CRIMINAL INTENT.

09:07AM  11         THIS IS THE OPPOSITE OF THAT.  THEY WENT IN FRONT OF 2500

09:07AM  12    PEOPLE AT A CLINICAL CHEMISTRY CONVENTION, THE WORLD'S EXPERTS,

09:07AM  13    SKEPTICS, PEOPLE WHOSE JOBS MIGHT BE ELIMINATED IF THIS

09:07AM  14    TECHNOLOGY WORKS, AND SAID, HERE'S OUR TECHNOLOGY.

09:07AM  15         THAT'S, THAT'S THE -- THE VERY ACT IS EVIDENCE AND IT

09:07AM  16    NEGATES CRIMINAL INTENT.

09:07AM  17         THE COURT:  OKAY.  ARE THERE OTHER ISSUES WE WANT TO

09:08AM  18    TALK ABOUT?  WE'RE PAST 9:00 HERE.  I SHOULD HAVE STARTED THIS

09:08AM  19    CONVERSATION AT 8:00.  I APOLOGIZE FOR THAT.  I WANT TO CAPTURE

09:08AM  20    SOME TIME HERE.

09:08AM  21         IS THERE ANYTHING ELSE WE NEED TO TALK ABOUT?

09:08AM  22         MR. WADE:  THERE IS ONE ISSUE FOR MS. PETERSON AND

09:08AM  23    THEN MAYBE WE CAN TAKE MR. EISENMAN EITHER NOW OR AT A BREAK

09:08AM  24    DEPENDING ON WHAT THE COURT'S PREFERENCE IS.

09:08AM  25         THE COURT:  OKAY.

4608

09:08AM  1          MR. WADE:  IT'S MY UNDERSTANDING THAT THE GOVERNMENT

09:08AM  2    MAY SEEK TO OFFER EVIDENCE OF STATEMENTS FROM MS. PETERSON WITH

09:08AM  3    RESPECT TO MATERIALITY, YOU KNOW, HERE'S THIS STATEMENT, DID

09:08AM  4    YOUR EMPLOYER CONSIDER THAT THE -- DID THE ENTITY THAT EMPLOYS

09:08AM  5    YOU CONSIDER THAT TO BE MATERIAL TO THE INVESTMENT DECISION?

09:08AM  6          AS CONTEXT, YOUR HONOR, THE ENTITY THAT THE INVESTOR WHO

09:08AM  7    MS. PETERSON WORKED FOR IS RDV CORPORATION, WHICH IS THE FAMILY

09:08AM  8    OFFICE OF THE DEVOS FAMILY.

09:08AM  9          MS. PETERSON PLAYED NO ROLE IN MAKING THE INVESTMENT

09:09AM  10   DECISION.  SHE WAS NOT A DECISION-MAKER.  MR. TUBERGEN,

09:09AM  11   JERRY TUBERGEN, AND FOUR MEMBERS OF THE DEVOS FAMILY WERE THE

09:09AM  12   DECISION MAKERS.  THEY WERE INVOLVED IN A WHOLE OTHER SERIES OF

09:09AM  13   INTERACTIONS THAT MS. PETERSON WAS NOT INVOLVED IN.  THEY MADE

09:09AM  14   THE INVESTMENT DECISION INDEPENDENT OF MS. PETERSON.  SHE'S

09:09AM  15   BEEN ASKED UNDER OATH, WHAT ROLE DID YOU PLAY IN THOSE

09:09AM  16   DISCUSSIONS, AND SHE SAID NONE.

09:09AM  17          AND SO WE JUST WANT TO MAKE CLEAR THAT THE GOVERNMENT

09:09AM  18   SHOULD NOT THEREFORE BE IN A POSITION TO SAY, HERE'S THIS

09:09AM  19   STATEMENT, WAS THAT IMPORTANT TO RDV IN MAKING ITS INVESTMENT

09:09AM  20   DECISION?  BECAUSE SHE DOESN'T HAVE, YOU KNOW, A FOUNDATION TO

09:09AM  21   MAKE SUCH STATEMENTS.

09:09AM  22          THE COURT:  I SEE.  OKAY.

09:09AM  23          MR. LEACH:  YOUR HONOR, I THINK THAT DOES NOT PAINT

09:09AM  24   A COMPLETE PICTURE OF MS. PETERSON'S ROLE.  SHE'S THE

09:09AM  25   INVESTMENT PROFESSIONAL WITHIN RDV WHO WAS TASKED TO ANALYZE

| 09:10AM | 1 | THIS INVESTMENT.  SHE ATTENDS ALL OF THE CRITICAL INVESTOR |
| 09:10AM | 2 | PRESENTATIONS BY MS. HOLMES; SHE PARTICIPATES IN A ONE HOUR |
| 09:10AM | 3 | PHONE CALL WITH MS. HOLMES; SHE PREPARES THE DOCUMENT FOR RDV |
| 09:10AM | 4 | BY WHICH THE INVESTMENT COMMITTEE APPROVES THE INVESTMENT. |
| 09:10AM | 5 | SHE HEARS ALL OF THE STATEMENTS.  SHE'S PERFECTLY |
| 09:10AM | 6 | CAPABLE -- AND SHE MAKES INVESTMENTS FOR RDV, OR RECOMMENDS |
| 09:10AM | 7 | INVESTMENTS FOR RDV ALL OF THE TIME, SO SHE'S PERFECTLY CAPABLE |
| 09:10AM | 8 | TO TESTIFY TO HER REACTIONS TO PARTICULAR STATEMENTS. |
| 09:10AM | 9 | WHY SHE INCLUDED INFORMATION IN THE APPROVAL MEMO FOR THE |
| 09:10AM | 10 | INVESTMENT, WAS THIS RELEVANT TO HER ANALYSIS, I THINK ALL |
| 09:10AM | 11 | OF -- YOU KNOW, MATERIALITY IS AN OBJECTIVE STANDARD. |
| 09:10AM | 12 | WE DON'T NEED TO PROVE RELIANCE.  WE NEED TO PROVE |
| 09:10AM | 13 | OBJECTIVE TO A REASONABLE PERSON.  MS. PETERSON IS A REASONABLE |
| 09:10AM | 14 | PERSON WHO WAS IN THE ROOM FOR ALL OF THIS. |
| 09:10AM | 15 | THE COURT:  SO SHE IS GOING TO TESTIFY -- |
| 09:11AM | 16 | FOUNDATIONALLY SHE'LL TESTIFY ABOUT WHO SHE IS EMPLOYED BY, WHO |
| 09:11AM | 17 | IS AN INVESTOR, I PRESUME, AND SHE'LL TALK ABOUT HER DUTIES, |
| 09:11AM | 18 | THE JOB TITLES, HER RESPONSIBILITIES, WHAT SHE'S TASKED TO DO, |
| 09:11AM | 19 | MUCH LIKE THE WITNESS LAST WEEK? |
| 09:11AM | 20 | MR. LEACH:  YES. |
| 09:11AM | 21 | THE COURT:  AND THEN SHE'LL TELL US WHAT SHE DID |
| 09:11AM | 22 | BASED ON HER RESEARCH, HER ANALYSIS? |
| 09:11AM | 23 | MR. LEACH:  YES. |
| 09:11AM | 24 | THE COURT:  WHAT HER JOB SCOPE WAS AND WHAT SHE DID |
| 09:11AM | 25 | WITH THAT INFORMATION? |

09:11AM  1                    MR. LEACH:  YES.

09:11AM  2                    THE COURT:  AND SHE DIDN'T PERSONALLY WRITE A CHECK,

09:11AM  3       BUT THIS IS PART OF HER JOB FOR THE CORPORATION, I ASSUME?

09:11AM  4                    MR. WADE:  YOUR HONOR, WITH APPROPRIATE RESPECT AND

09:11AM  5       DEFERENCE, ALMOST EVERYTHING THAT MR. LEACH JUST SAID IS NOT

09:11AM  6       TRUE.

09:11AM  7                    THE COURT:  OH.

09:11AM  8                    MR. WADE:  IT WAS A HALF HOUR PHONE CALL THAT SHE

09:11AM  9       PARTICIPATED IN.  THAT WAS A VERY HIGH LEVEL MEETING.

09:11AM  10          SHE WAS NOT INVOLVED IN A CRITICAL MEETING THAT HAPPENED

09:11AM  11      BEFORE THAT, SO SHE WAS NOT INVOLVED IN ALL OF THE DECISIONS.

09:11AM  12                   THE COURT:  I WAS JUST ASKING A GENERAL JOB

09:11AM  13      DESCRIPTION THAT SHE HAS.  SHE'LL TESTIFY THAT SHE'S EMPLOYED

09:11AM  14      BY THIS COMPANY, WHAT SHE DOES, WHAT SHE'S TASKED TO DO,

09:12AM  15      WHATEVER THE LENGTH OF RESEARCH SHE DID, SHE'LL SAY WHAT SHE

09:12AM  16      DID, AND SHE'LL THEN SAY, I THEN WROTE A REPORT THAT EITHER WAS

09:12AM  17      THUMBS UP, THUMBS DOWN, WHATEVER IT WAS, AND I GAVE IT TO THE

09:12AM  18      COMPANY AND THEY DID WHAT THEY DID.

09:12AM  19                   MR. WADE:  BUT MY POINT IS THAT ALMOST ALL OF THAT

09:12AM  20      IS ACTUALLY NOT TRUE.

09:12AM  21                   THE COURT:  OH.

09:12AM  22                   MR. WADE:  SO THAT'S WHY WE'RE RAISING THE ISSUE,

09:12AM  23      AND WE WOULD BE HAPPY TO VOIR DIRE THE WITNESS.

09:12AM  24                   THE COURT:  SHE DIDN'T DO ANY OF THAT?

09:12AM  25                   MR. WADE:  LET ME EXPLAIN WHAT SHE DID DO.  LET ME

4611

09:12AM 1    EXPLAIN THE RELATIONSHIP.

09:12AM 2         THE COURT:  SURE.

09:12AM 3         MR. WADE:  THERE WAS AN INITIAL MEETING THAT

09:12AM 4    HAPPENED BETWEEN MS. PETERSON'S BOSS'S BOSS, JERRY TUBERGEN,

09:12AM 5    WHO IS THE CEO AND CHIEF INVESTMENT OFFICER OF RDV.

09:12AM 6       HE HAD A BUNCH OF INTERACTIONS AROUND THAT MEETING AND

09:12AM 7    RECEIVED INFORMATION IN THAT MEETING WHICH WAS NOT CONVEYED TO

09:12AM 8    MS. PETERSON IN TOTAL.

09:12AM 9       MR. TUBERGEN THEN HAD EXTENSIVE INTERACTIONS WITH MANY

09:12AM 10   MEMBERS OF THE DEVOS FAMILY WHO HAVE LEGAL AUTHORITY TO MAKE

09:13AM 11   THE INVESTMENT DECISION.

09:13AM 12      HE THEN COMES BACK FROM THIS CONFERENCE.  HE IS IN HIS

09:13AM 13   OFFICE.  HE RECEIVES MATERIALS.  HE HAS A 30 MINUTE PHONE

09:13AM 14   CONVERSATION WITH MS. HOLMES WITH MS. PETERSON PRESENT.  IT WAS

09:13AM 15   A HIGH-LEVEL CONVERSATION, ACCORDING TO THE TESTIMONY OF

09:13AM 16   MS. PETERSON, ABOUT VISION, WHAT SHOULD HAPPEN AT ANOTHER

09:13AM 17   MEETING THAT WAS TO COME.

09:13AM 18      THEY SEND 12 INCHES OF MATERIALS TO MR. TUBERGEN.

09:13AM 19   MS. PETERSON'S GIVEN THE MATERIALS.  SHE WRITES A MEMO.  SHE

09:13AM 20   DOES NOT KNOW IF MR. TUBERGEN REVIEWED THE MEMO OR IF ANY

09:13AM 21   MEMBER OF THE DEVOS FAMILY REVIEWED THE MEMO ACCORDING TO HER

09:13AM 22   TESTIMONY.

09:13AM 23      SHE ATTENDS A TRIP.  THERE ARE EXTENSIVE ADDITIONAL

09:13AM 24   INTERACTIONS HAPPENING BETWEEN MR. TUBERGEN AND MEMBERS OF THE

09:13AM 25   DEVOS INVESTMENT COUNSEL, WHO ARE THE DECISION MAKERS TOGETHER,

09:14AM  1    THOSE TWO PEOPLE.

09:14AM  2         MEMBERS OF THE DEVOS FAMILY AND MR. TUBERGEN AND

09:14AM  3    LISA PETERSON FLY TO CALIFORNIA, THEY VISIT WITH THE COMPANY,

09:14AM  4    AND THEY MAKE AN INVESTMENT COMMITMENT ON THE SPOT.

09:14AM  5         THAT'S MS. PETERSON'S TESTIMONY.  THEY MAKE THE

09:14AM  6    INVESTMENT, AND THERE ARE CONTEMPORANEOUS DOCUMENTS THAT SHOW

09:14AM  7    THAT.

09:14AM  8         THE MEMO IS PREPARED LATER.  IT IS SIGNED.  WE DON'T KNOW

09:14AM  9    EXACTLY WHEN.  MONTHS LATER.

09:14AM  10        WE HAVE EVIDENCE THAT IT WAS SIGNED WELL AFTER THE

09:14AM  11   DOCUMENTS ON THE INVESTMENT WERE SIGNED.  AND IT WAS WELL AFTER

09:14AM  12   THE PERIOD WHERE THE INVESTMENT WAS FUNDED.

09:14AM  13        SO THE DOCUMENTS GO, THE WIRE GOES, SOME PERIOD OF TIME

09:14AM  14   LATER THAT MEMO WAS SIGNED.  WE DON'T KNOW -- MS. PETERSON

09:15AM  15   DOESN'T KNOW WHO REVIEWED IT.  I MEAN, SHE KNOWS WHO SIGNED IT,

09:15AM  16   BUT SHE DOESN'T KNOW WHO REVIEWED IT OR WHEN.

09:15AM  17        SO THE FACT THAT -- THEY CAN'T USE THAT DEVICE TO PAPER

09:15AM  18   THE FILE -- ALL OF THE EVIDENCE MAKES CLEAR THAT THE INVESTMENT

09:15AM  19   DECISION WAS MADE BY MEMBERS OF THE DEVOS FAMILY AND

09:15AM  20   MR. TUBERGEN IN THE ROOM IN PALO ALTO WHEN THEY VISITED.

09:15AM  21        SO THIS ISN'T THE CASE WHERE -- YOUR HONOR HAS PROBABLY

09:15AM  22   SEEN MANY DIFFERENT, YOU KNOW, SCENARIOS WHERE SOME ANALYST

09:15AM  23   WRITES UP A REPORT AND THEY GIVE THE REPORT AND IT'S APPROVED.

09:15AM  24        THAT'S NOT WHAT THIS IS.  IT'S A TOTALLY DIFFERENT

09:15AM  25   RELATIONSHIP THAT IS A UNIQUE INVESTMENT SITUATION ACCORDING TO

4613

09:15AM   1    ALL INVOLVED, AND IT'S HIGHLY PREJUDICIAL FOR HER TO BE ABLE TO

09:15AM   2    SAY, THIS WAS IMPORTANT, THIS MATTERED, WHEN THERE WERE A LOT

09:15AM   3    OF FACTS THAT SHE DOESN'T KNOW ABOUT THAT MAY WELL HAVE

09:15AM   4    MATTERED AND WE CAN'T CROSS-EXAMINE THEM.

09:15AM   5            THE COURT:  SURE.  CAN SHE SAY WHAT MATTERED AT

09:15AM   6    LEAST TO HER KNOWLEDGE?

09:15AM   7            MR. WADE:  I DON'T THINK SO.  I THINK IT CREATES A

09:16AM   8    MISLEADING PICTURE FOR THE JURY BECAUSE SHE DOESN'T HAVE -- SHE

09:16AM   9    DIDN'T PLAY ANY ACTUAL ROLE IN THE INVESTMENT DECISION.

09:16AM   10           THE COURT:  BUT CAN SHE TESTIFY, JUST AS YOU

09:16AM   11   DESCRIBED IT, CAN'T SHE TESTIFY ABOUT THE FAMILY STRUCTURE,

09:16AM   12   WHAT HER JOB IS, THEY FLEW OUT.

09:16AM   13       WAS THERE AN INVESTMENT?  YES.

09:16AM   14       DID YOU SEE THE "TODAY SHOW"?  DID YOU SEE "MAD MONEY"?  I

09:16AM   15   DID.

09:16AM   16       DID YOU GIVE THAT INFORMATION TO THEM, YES OR NO?

09:16AM   17       CAN'T SHE TESTIFY ABOUT THAT?

09:16AM   18           MR. WADE:  SOME OF -- THE "MAD MONEY" AND THE OTHER

09:16AM   19   THINGS, THOSE HAPPENED AFTER THE INVESTMENT, WHICH IS PART OF

09:16AM   20   THE REASON WHY WE DON'T THINK THEY SHOULD COME IN.

09:16AM   21           THE COURT:  SURE.

09:16AM   22           MR. WADE:  BUT SHE CAN SAY, I'VE GOT TWO BINDERS OR

09:16AM   23   TWO THINGS, OR A FOOT, A STACK OF TWO BINDERS.

09:16AM   24           THE COURT:  AND IT SOUNDS LIKE YOU HAVE PLENTY OF

09:16AM   25   FODDER FOR CROSS-EXAMINATION.

09:16AM  1        MR. WADE:  BUT IT'S NOT APPROPRIATE TESTIMONY IN THE

09:16AM  2    FIRST INSTANCE, YOUR HONOR.

09:16AM  3        IF SHE JUST WANTS TO TESTIFY AS TO THE FACTS, THIS IS WHAT

09:16AM  4    WAS HERE, THIS IS WHAT WAS SAID, THIS IS WHAT I PUT IN THE

09:16AM  5    MEMO, THIS IS WHAT I CONVEYED TO THE INVESTMENT PEOPLE, THIS IS

09:17AM  6    WHAT HAPPENED DURING THE MEETING, THAT'S FINE.

09:17AM  7        THE COURT:  AND AN INVESTMENT WAS MADE.

09:17AM  8        MR. WADE:  AND AN INVESTMENT WAS MADE.

09:17AM  9        BUT CAN SHE SAY, WAS THIS IMPORTANT TO RDV'S INVESTMENT

09:17AM 10    DECISION?  SHE CANNOT DO THAT.  SHE DOESN'T HAVE A FOUNDATION

09:17AM 11    TO OFFER THOSE KINDS OF FACTS.

09:17AM 12        THE COURT:  MR. LEACH?

09:17AM 13        MR. LEACH:  FIRST OF ALL, YOUR HONOR, THAT SOUNDS

09:17AM 14    LIKE EFFECTIVE CROSS-EXAMINATION.  NOTHING TO UNDERMINE THE

09:17AM 15    RELEVANCE OR THE PERCIPIENT KNOWLEDGE OF THIS PARTICULAR

09:17AM 16    WITNESS.

09:17AM 17        SHE ATTENDS THE MEETING WHERE, ACCORDING TO MR. WADE, THE

09:17AM 18    INVESTMENT DECISION WAS MADE.  THEY DID NOT WRITE A CHECK AT

09:17AM 19    THAT MEETING.  THEY WERE IMPRESSED, THEY WERE EXCITED, THEY

09:17AM 20    WERE TRENDING TOWARD AN INVESTMENT.  BUT I THINK IT'S AN

09:17AM 21    OVERSTATEMENT TO SAY THE INVESTMENT WAS MADE.  SHE WAS THERE IN

09:17AM 22    THE ROOM.  SHE HEARD THE STATEMENTS.  SHE'S PERFECTLY COMPETENT

09:17AM 23    TO SAY, WAS THAT IMPRESSIVE?  WAS THAT RELEVANT TO YOU?  WAS

09:17AM 24    THAT SOMETHING THAT YOU THOUGHT WAS IMPRESSIVE?

09:17AM 25        SHE PREPARES THE APPROVAL DOCUMENT THAT RDV ALWAYS USES

4615

09:18AM 1     FOR ITS INVESTMENTS.  THE FACT THAT SHE IS PREPARING THAT SHOWS

09:18AM 2     HER INVOLVEMENT.

09:18AM 3          NOW, IF THEY WANT TO ARGUE SOMETHING ABOUT THE TIMING OR

09:18AM 4     NOBODY REVIEWED IT, THAT'S CERTAINLY FODDER FOR

09:18AM 5     CROSS-EXAMINATION.

09:18AM 6          BUT SHE'S THE INVESTMENT PROFESSIONAL WITHIN RDV WHO IS

09:18AM 7     ASSIGNED TO THIS TASK.  AND THEY WANT TO SUGGEST THAT THAT'S AN

09:18AM 8     EMPTY GESTURE, FINE.  BUT IT DOESN'T UNDERCUT THE RELEVANCE OF

09:18AM 9     WHAT SHE'S GOING TO SAY.

09:18AM 10              THE COURT:  THIS GETS BACK TO -- LET ME GO BACK TO

09:18AM 11    THESE TWO VIDEOS, THOUGH, MR. LEACH.

09:18AM 12         WHAT IS THE -- IF THE VIDEOS WERE AFTER THE INVESTMENT,

09:18AM 13    THEN WHAT IS THE RELEVANCE OF THOSE?

09:18AM 14              MR. LEACH:  YOUR HONOR, DEFENDANTS SOMETIMES MAKE

09:18AM 15    STATEMENTS AFTER THE OFFENSE THAT ARE STILL RELEVANT.  YOU

09:18AM 16    KNOW, MS. HOLMES TESTIFIED BEFORE THE S.E.C. IN 2017 ABOUT THE

09:18AM 17    EVENTS.

09:18AM 18              THE COURT:  RIGHT.

09:18AM 19              MR. LEACH:  NO ONE WOULD QUESTION THE RELEVANCE OF

09:18AM 20    THAT.

09:18AM 21              THE COURT:  NO.  I'M JUST TRYING TO DETERMINE THE

09:18AM 22    ORDER OF INTRODUCING THESE STATEMENTS THROUGH THIS WITNESS.

09:19AM 23              MR. LEACH:  THOSE WILL COME AT THE END OF THE

09:19AM 24    EXAMINATION, BUT -- AND THEY'RE A YEAR AFTER THE INVESTMENT.

09:19AM 25              THE COURT:  RIGHT.

4616

09:19AM 1     MR. LEACH:  AND SO THE TIMING IS AFTER THE FACT.

09:19AM 2   THE STATEMENTS ARE RELEVANT NOT BECAUSE THEY WERE MADE TO

09:19AM 3 MS. PETERSON.  IT'S SIMPLY THE DEFENDANT'S FALSE STATEMENT WHEN

09:19AM 4 CONFRONTED WITH EVIDENCE ABOUT HOW MANY TESTS THE EDISON CAN

09:19AM 5 DO, AND IT'S HER ADMISSION OF RESPONSIBILITY FOR HER OWN

09:19AM 6 COMPANY.

09:19AM 7    THE COURT:  SO THEN MS. PETERSON'S OBSERVATION OF

09:19AM 8 THOSE TWO VIDEOS HAS NOTHING TO DO WITH THE INVESTMENT?

09:19AM 9    MR. LEACH:  CORRECT.

09:19AM 10    THE COURT:  WHAT THEY'RE -- SHE'LL TESTIFY AS

09:19AM 11 ANYONE, I GUESS YOU COULD CALL ANYONE AS FOUNDATIONAL FOR

09:19AM 12 THOSE.  DID YOU SEE THIS?  DID YOU HEAR HER MAKE THAT

09:19AM 13 STATEMENT?  YES, I DID.

09:19AM 14    MR. LEACH:  WE COULD CALL ANYBODY, YOUR HONOR.

09:19AM 15    THE COURT:  THAT'S WHAT I'M --

09:19AM 16    MR. LEACH:  WE'RE PUTTING IT IN THROUGH HER BECAUSE

09:19AM 17 SHE HAPPENS TO HAVE SEEN THEM, BUT WE COULD DO IT THROUGH

09:20AM 18 ANYBODY.

09:20AM 19    MR. WADE:  AND THERE ARE A COUPLE OF ISSUES, RIGHT?

09:20AM 20   YOUR HONOR IS RIGHT TO FOCUS ON THE FACT THAT IT IS AFTER

09:20AM 21 THE INVESTMENT DECISION.

09:20AM 22   THE CONCERN THAT I WAS TRYING TO EXPRESS WITH THE COURT IS

09:20AM 23 THAT ONCE THEY OPEN THE DOOR TO THAT PERIOD, THEY CAN'T CRACK

09:20AM 24 IT AND NOT OPEN IT, AND SO IF THEY WANT TO JUST INTRODUCE THE

09:20AM 25 VIDEO AND PLAY IT TO THE JURY LIKE THEY'VE BEEN PLAYING SOME OF

4617

09:20AM 1    THESE TEXT MESSAGES OR WHATEVER THROUGH DIFFERENT WITNESSES

09:20AM 2    BECAUSE MAYBE THEY'RE ADMISSIBLE, THAT'S A DIFFERENT ISSUE.

09:20AM 3        I THINK MR. LEACH STARTED THE DISCUSSION BY SAYING HE

09:20AM 4    WANTED HER COMMENTARY AND REACTION FROM IT, AND THAT'S WHERE WE

09:20AM 5    GET INTO ALL OF THE POST-INVESTMENT INTERACTIONS AND THOSE

09:20AM 6    BECOME FAIR GAME.

09:20AM 7        WITH RESPECT TO THIS ISSUE -- AND I JUST WANT TO BE VERY

09:20AM 8    CLEAR BECAUSE IT'S A UNIQUE SET OF CIRCUMSTANCES HERE,

09:20AM 9    YOUR HONOR -- THIS WITNESS WAS ASKED UNDER OATH, WHEN WAS THE

09:20AM 10   INVESTMENT COMMITMENT MADE?  THE INVESTMENT COMMITMENT WAS MADE

09:20AM 11   AT THE END OF THE MEETING IN PALO ALTO.

09:20AM 12       WHAT INPUT DID YOU HAVE REGARDING THAT COMMITMENT?  NONE.

09:21AM 13       THAT'S HER TESTIMONY.  SO FOR HER -- AGAIN, SHE CAN

09:21AM 14   TESTIFY AS TO WHAT HAPPENED THERE, BUT FOR HER TO SAY, WAS THIS

09:21AM 15   SIGNIFICANT?  WAS THIS IMPORTANT?  WAS THIS -- YOU KNOW, WE'VE

09:21AM 16   HEARD --

09:21AM 17            THE COURT:  YOU MEAN THE VIDEOS YOU'RE TALKING

09:21AM 18   ABOUT?

09:21AM 19            MR. WADE:  NO, NO.  I'M TALKING ABOUT -- SHE

09:21AM 20   SHOULDN'T BE ABLE TO ASK -- ANSWER THOSE QUESTIONS ABOUT ANY

09:21AM 21   FACTS IN THE CASE BECAUSE SHE DIDN'T MAKE THE INVESTMENT

09:21AM 22   DECISION.

09:21AM 23       THE U.S. SUPREME COURT CASE ON THIS, WHICH IS IRONICALLY

09:21AM 24   NAMED PETERSON --

09:21AM 25            THE COURT:  SHE SHOULD BE ABLE TO TESTIFY ABOUT HER

4618

| | | |
|---|---|---|
| 09:21AM | 1 | JOB AND WHAT SHE DID AND ALL OF THAT, AND THAT'S WHAT I THINK |
| 09:21AM | 2 | HE'S GOING TO ELICIT, WHAT IS YOUR JOB AND WHAT DID YOU DO? |
| 09:21AM | 3 | ALL RIGHT.  EVEN IF THE DECISION WAS MADE IN PALO ALTO ON |
| 09:21AM | 4 | THE SPOT, OKAY. |
| 09:21AM | 5 | MR. WADE:  ALL FAIR GAME, YOUR HONOR. |
| 09:21AM | 6 | THE COURT:  RIGHT. |
| 09:21AM | 7 | MR. WADE:  THE ISSUE IS, CAN HE SAY, WHICH HE DID, |
| 09:21AM | 8 | CAN MR. LEACH ASK, AS THEY DID IN DIFFERENT INTERVIEWS AND AT |
| 09:21AM | 9 | TIMES IN GRAND JURY APPEARANCES, WAS THIS IMPORTANT TO THE RDV |
| 09:22AM | 10 | INVESTMENT DECISION? |
| 09:22AM | 11 | THAT SHE HAS NO BASIS TO -- |
| 09:22AM | 12 | THE COURT:  WHAT IS THIS?  WHAT IS THIS? |
| 09:22AM | 13 | MR. WADE:  WAS THIS REFERENCED IN A SLIDE DECK |
| 09:22AM | 14 | IMPORTANT TO RDV'S INVESTMENT DECISION?  WAS THIS -- |
| 09:22AM | 15 | THE COURT:  SO HE COULD ASK HER, TO YOUR KNOWLEDGE, |
| 09:22AM | 16 | WHAT WAS IMPORTANT IN THE RDV INVESTMENT DECISION? |
| 09:22AM | 17 | MR. WADE:  RIGHT. |
| 09:22AM | 18 | THE COURT:  HE COULD ASK THAT QUESTION? |
| 09:22AM | 19 | MR. WADE:  I GUESS HE COULD IF HE LAYS A FOUNDATION |
| 09:22AM | 20 | THAT SHE HAS KNOWLEDGE AS TO WHAT IS IMPORTANT TO THE |
| 09:22AM | 21 | INVESTMENT DECISION. |
| 09:22AM | 22 | THE COURT:  WELL, SHE PROBABLY HAS WORKED THERE FOR |
| 09:22AM | 23 | SOME PERIOD OF TIME AND HAS THE TRUST OF THE COMPANY TO |
| 09:22AM | 24 | CONTINUE IN HER EMPLOYMENT. |
| 09:22AM | 25 | MR. WADE:  THE FACTUAL RECORD IS PRETTY CLEAR ON |

4619

09:22AM 1    THIS, YOUR HONOR.  SHE HAS NO INTERACTION WITH -- VERY LITTLE

09:22AM 2    INTERACTION IN ADVANCE OF THE INVESTMENT DECISION WITH

09:22AM 3    THE DECISION MAKERS.

09:22AM 4            THE COURT:  ALL RIGHT.  WELL, THIS SOUNDS MORE LIKE

09:22AM 5    THE JURY IS GOING TO HAVE TO DECIDE WHAT TO DO WITH IT.  IT'S

09:22AM 6    MORE OF A WEIGHT ISSUE THAN AN ADMISSIBILITY ISSUE, IT SEEMS

09:22AM 7    LIKE.

09:22AM 8            MR. WADE:  I THINK IT'S A FOUNDATION ISSUE, YOUR

09:22AM 9    HONOR.  I THINK IT EFFECTIVELY SHIFTS THE BURDEN OF MATERIALITY

09:23AM 10   TO US BECAUSE WE CAN'T CROSS-EXAMINE THE ACTUAL DECISION

09:23AM 11   MAKERS.

09:23AM 12       THEY WANT TO MISLEAD THE JURY INTO THINKING SHE'S THE

09:23AM 13   DECISION-MAKER AND, THEREFORE, SHE THOUGHT THIS WAS IMPORTANT,

09:23AM 14   THAT IT WAS IMPORTANT, WHEN SHE ACTUALLY HAD NO ROLE IN THAT.

09:23AM 15           THE COURT:  WELL, IT SOUNDS LIKE YOU'LL BE VERY

09:23AM 16   EFFECTIVE IN CROSS-EXAMINING AND LETTING THE JURY KNOW THAT

09:23AM 17   NONE OF THAT IS ACCURATE.

09:23AM 18           MR. WADE:  IT SHOULDN'T COME IN IN THE FIRST

09:23AM 19   INSTANCE, YOUR HONOR.

09:23AM 20       BUT I WOULD ASK THAT -- I'LL OBJECT, BUT I WOULD JUST ASK

09:23AM 21   FOR A STANDING OBJECTION WITH RESPECT TO ANY QUESTIONS OF THIS

09:23AM 22   NATURE BECAUSE WE THINK ANY QUESTIONS THAT THEY'RE GOING TO ASK

09:23AM 23   THIS WITNESS ABOUT WAS THIS IMPORTANT --

09:23AM 24           THE COURT:  DON'T BE CONCERNED ABOUT OBJECTING.  WE

09:23AM 25   HAD A -- I TOLD THE JURY IN VOIR DIRE, AS YOU REMEMBER, THAT

09:23AM 1    THIS WILL BE A LONG CASE AND THERE WILL BE OBJECTIONS AND THEY

09:23AM 2    SHOULD EXPECT OBJECTIONS, AND I THINK I -- I CRAFTED A

09:23AM 3    PRELIMINARY INSTRUCTION TELLING THEM THAT THEY SHOULD NOT, AND

09:23AM 4    WILL NOT, CONSIDER THE NUMBER AND WHO MAKES IT AND THAT HAS

09:23AM 5    NOTHING TO DO WITH THEIR DECISION PROCESS.

09:24AM 6        SO BOTH SIDES DON'T BE AFRAID TO OBJECT AND STAND ON YOUR

09:24AM 7    POSITIONS.

09:24AM 8        I KNOW THERE ARE STRATEGIC REASONS WHY THAT'S NOT

09:24AM 9    HAPPENING, TOO.

09:24AM 10            MR. WADE:  AND I JUST WANT TO ASK THE COURT, IF THE

09:24AM 11   COURT IS GOING TO LET IN QUESTIONS OF THIS NATURE, IF I COULD

09:24AM 12   HAVE A STANDING OBJECTION SO I DON'T HAVE TO OBJECT TO EVERY

09:24AM 13   QUESTION.

09:24AM 14            THE COURT:  RIGHT.  AND I CAN SAY THAT IN FRONT OF

09:24AM 15   THE JURY AS WELL IF YOU WOULD LIKE SO THEY KNOW AT LEAST YOUR

09:24AM 16   POSITION.

09:24AM 17       OKAY.  WHAT ELSE DO WE NEED TO TALK ABOUT?

09:24AM 18            MR. DOWNEY:  YOUR HONOR, WE HAVE A WITNESS --

09:24AM 19            MR. LEACH:  NOTHING FROM THE GOVERNMENT.

09:24AM 20            MR. DOWNEY:  -- MR. EISENMAN, WHO I THINK WILL COME

09:24AM 21   NOT UNTIL AFTER CERTAINLY THE FIRST AND MAYBE THE SECOND BREAK.

09:24AM 22   I WAS WONDERING IF WE COULD --

09:24AM 23            THE COURT:  LET'S DO THAT SO WE CAN GET STARTED THIS

09:24AM 24   MORNING.

09:24AM 25       THANK YOU, MR. DOWNEY:  I APPRECIATE THAT.

4621

| | | |
|---|---|---|
| 09:24AM | 1 | ANYTHING ELSE THAT THE PARTIES WANTED TO TALK ABOUT THIS |
| 09:24AM | 2 | MORNING? |
| 09:24AM | 3 | MR. LEACH:  NO, YOUR HONOR. |
| 09:24AM | 4 | IF THE COURT WOULD LIKE TRANSCRIPTS OF THE "TODAY SHOW" OR |
| 09:24AM | 5 | "MAD MONEY," I HAVE THEM. |
| 09:24AM | 6 | THE COURT:  THAT WOULD BE HELPFUL.  THANK YOU. |
| 09:25AM | 7 | DO YOU HAVE THESE TOO, MR. WADE? |
| 09:25AM | 8 | MR. WADE:  I DON'T. |
| 09:25AM | 9 | MR. LEACH:  I HAVE ONE FOR THE DEFENSE. |
| 09:25AM | 10 | THE COURT:  OKAY.  LET ME JUST TALK ABOUT SOME OTHER |
| 09:25AM | 11 | SCHEDULING MATTERS. |
| 09:25AM | 12 | PLEASE RECALL I ASKED IF WE COULD RESCHEDULE TO CAPTURE |
| 09:25AM | 13 | MORE TIME.  AS I UNDERSTAND IT, WE WILL NOT BE ABLE TO MEET |
| 09:25AM | 14 | ON -- LET'S START WITH MONDAYS.  I'VE ADVANCED MONDAY MORNINGS |
| 09:25AM | 15 | AS POSSIBILITIES.  WE WILL NOT BE ABLE TO DO THAT ON THE 1ST |
| 09:25AM | 16 | NOR THE 8TH, BUT IT SOUNDS LIKE THE 15TH, THE 22ND, AND THE |
| 09:25AM | 17 | 29TH WOULD BE AVAILABLE FOR EVERYONE. |
| 09:25AM | 18 | I SUGGESTED SWAPPING THE DAY BEFORE THANKSGIVING TO THE |
| 09:25AM | 19 | 18TH, AND THAT SEEMS TO BE ACCEPTABLE.  SO WE'LL TRY TO DO |
| 09:25AM | 20 | THAT. |
| 09:25AM | 21 | AND THEN WE'LL LOOK AND SEE -- DECEMBER 3RD, REMEMBER, WE |
| 09:26AM | 22 | CAN'T BE IN SESSION.  A JUROR IS TRAVELLING ON THAT DAY.  WE'LL |
| 09:26AM | 23 | JUST SEE WHERE WE CAN FIT OTHER THINGS IN. |
| 09:26AM | 24 | MR. WADE:  DID THE COURT WANT TO EXPLORE SWAPPING |
| 09:26AM | 25 | THE THURSDAY FOR THE FRIDAY IN DECEMBER?  I KNOW YOU HAVE A |

4622

09:26AM 1    CALENDAR, SO IT MAY NOT WORK.  I JUST -- PLEASE LET THE PARTIES

09:26AM 2    KNOW.

09:26AM 3           THE COURT:  YEAH, WE'LL LOOK AT THAT AND SEE.  I MAY

09:26AM 4    HAVE TO FIND SOME OTHER TIME.  I DON'T KNOW WHERE WE ARE AS FAR

09:26AM 5    AS TIMING GOES IN THE CASE.

09:26AM 6      I DON'T KNOW, MR. LEACH, IF YOU CAN GIVE US ANY GUIDANCE,

09:26AM 7    YOU DON'T HAVE TO CERTAINLY, ABOUT WHERE YOU'RE AT IN YOUR

09:26AM 8    PRESENTATION OR HOW MANY MORE DAYS YOU THINK YOU NEED.

09:26AM 9      OF COURSE, THAT'S DEPENDENT, I UNDERSTAND, ON

09:26AM 10   CROSS-EXAMINATION.

09:26AM 11          MR. LEACH:  CERTAINLY THE SECOND HALF, YOUR HONOR.

09:26AM 12   I'M NOT SURE I COULD GIVE GREATER CLARITY THAN THAT, BUT I'M

09:26AM 13   NOT SURE IT'S NECESSARY TO RESOLVE DATES IN DECEMBER NOW.

09:27AM 14          THE COURT:  THAT'S FINE.

09:27AM 15     LET ME SHARE WITH YOU, WE RECEIVED AN EMAIL FROM A JUROR,

09:27AM 16   AND AGAIN, THIS IS FOR -- ACTUALLY, THIS IS INFORMATIONAL FOR

09:27AM 17   THE PARTIES, BUT ALSO DIRECTIONAL TO OUR GUESTS WHO ARE VIEWING

09:27AM 18   THIS, THAT IS, THE PUBLIC.

09:27AM 19     MS. KRATZMANN RECEIVED AN EMAIL FROM A JUROR WHO -- I'LL

09:27AM 20   JUST PARAPHRASE IT HERE.  HE THANKED THE COURT FOR COMMENTING

09:27AM 21   REGARDING THE NOTE TAKING AND THE PROCEEDINGS AND THEY HAVE HAD

09:27AM 22   SOME HELP.

09:27AM 23     THIS JUROR REPORTS, SPEAKING FOR THE JURY, IT CONTINUES TO

09:27AM 24   BE A DISTRACTION.  SEVERAL JURORS -- ONE PARTICULAR INDIVIDUAL

09:27AM 25   WHOSE TYPING WAS DISTRACTING.  THE JUROR INDICATES HE WAS

4623

09:27AM  1    TEMPTED TO RAISE HIS HAND AND REQUEST THAT THE COURT DO

09:27AM  2    SOMETHING ABOUT THIS.

09:28AM  3         I JUST WANT TO INDICATE AGAIN THAT THOSE WHO ARE HERE

09:28AM  4    TAKING NOTES, YOU'RE SUPPOSED TO HAVE SILENT KEYBOARDS AND BE

09:28AM  5    ABLE TO KNOW HOW TO USE THE SILENT KEYBOARD.

09:28AM  6         I WILL BRING ANOTHER MARSHAL IN TO MONITOR THIS.  I DON'T

09:28AM  7    LIKE TO DO THAT, BUT WE DO HAVE THE OVERFLOW ROOM THAT IS

09:28AM  8    AVAILABLE, AND I INVITE THOSE OF YOU WITH KEYBOARDS TO USE THAT

09:28AM  9    ROOM.

09:28AM 10         I'LL HAVE TO ASK YOU TO GO THERE IF IT BECOMES A PROBLEM.

09:28AM 11    I JUST WANT TO SAY THAT.

09:28AM 12         AND THIS IS PARTICULARLY FOR, I THINK I'M SPEAKING FOR THE

09:28AM 13    JURORS WHO ARE SEATED IN THE -- OUTSIDE OF THE WELL AREA,

09:28AM 14    THEY'RE IN THE PUBLIC AREA.

09:28AM 15         SO THOSE OF YOU WHO FEEL THE NEED TO TYPE, PLEASE DO IT

09:28AM 16    SILENTLY.

09:28AM 17         IF I GET ANOTHER COMPLAINT ABOUT IT SUCH THAT THIS JURY IS

09:28AM 18    BEING DISTRACTED IN A WAY THAT IMPAIRS MS. HOLMES'S RIGHT TO

09:28AM 19    HER FAIR TRIAL OR THE GOVERNMENT'S ABILITY TO PUT ON A FULSOME

09:29AM 20    PROSECUTION, I'M GOING TO HAVE ANYONE WHO WANTS TO TYPE TO GO

09:29AM 21    TO THE OVERFLOW ROOM AND DO YOUR TYPING THERE AND NOT BE IN

09:29AM 22    THIS ROOM.  IT'S DISTRACTING, IT'S NOT FAIR TO MS. HOLMES, IT'S

09:29AM 23    NOT FAIR TO THE GOVERNMENT, AND IT CERTAINLY, CERTAINLY IS

09:29AM 24    INAPPROPRIATE FOR THE JURY TO HAVE TO FEND WITH THAT WHILE THEY

09:29AM 25    LISTEN TO THE TESTIMONY HERE.

4624

| | | |
|---|---|---|
| 09:29AM | 1 | SO I WOULD APPRECIATE IT VERY MUCH IF FOLKS COULD POLICE |
| 09:29AM | 2 | THEMSELVES WITH THEIR KEYBOARDS, AND IF NOT, THEN I'LL HAVE TO |
| 09:29AM | 3 | ENGAGE A PROCESS FOR THAT.  I DON'T WANT TO DO THAT.  I REALLY |
| 09:29AM | 4 | DON'T. |
| 09:29AM | 5 | SO HOPEFULLY YOU CAN -- THOSE OF YOU WHO ARE TYPING CAN |
| 09:29AM | 6 | MANAGE IT ON YOUR OWN. |
| 09:29AM | 7 | ALL RIGHT. |
| 09:29AM | 8 | MR. WADE:  YOUR HONOR, IF WE MIGHT, MAYBE WHEN YOU |
| 09:29AM | 9 | GIVE YOUR STANDARD MORNING GREETING WITH THE JURY, MAYBE IT |
| 09:29AM | 10 | WOULD BE A GOOD IDEA TO ACTUALLY ENCOURAGE THEM TO RAISE THEIR |
| 09:29AM | 11 | HAND IF THERE'S A CIRCUMSTANCE WHERE THEY'RE UNABLE TO PAY |
| 09:30AM | 12 | ATTENTION SO WE CAN PAUSE THE PROCEEDINGS AT THAT POINT. |
| 09:30AM | 13 | OBVIOUSLY WE WANT TO MAKE SURE THAT THAT DOESN'T PERSIST IN |
| 09:30AM | 14 | THAT MOMENT.  SO MAYBE JUST EMBOLDENING THE JURY TO DO THAT |
| 09:30AM | 15 | WOULD BE A GOOD IDEA. |
| 09:30AM | 16 | THE COURT:  I THINK I'M GOING TO DO THAT AND ASK |
| 09:30AM | 17 | THEM TO COMMENT ON THAT.  AGAIN, THAT'S A DISTRACTION WITH THE |
| 09:30AM | 18 | EVIDENCE. |
| 09:30AM | 19 | THERE'S SOMEONE RAISING THEIR HAND IN THE AUDIENCE, AND |
| 09:30AM | 20 | I'LL HAVE THAT PERSON TALK TO MS. KRATZMANN AT THE BREAK IF |
| 09:30AM | 21 | THEY WANT TO BE HEARD. |
| 09:30AM | 22 | THAT'S THE INTENT OF THE COURT.  THIS IS A PUBLIC |
| 09:30AM | 23 | COURTROOM.  THE PUBLIC OWNS THIS COURT BUILDING.  THE PUBLIC |
| 09:30AM | 24 | OWNS THESE FACILITIES AND THEY HAVE A RIGHT TO ACCESS TO THEM. |
| 09:30AM | 25 | WHEN WE'RE IN TRIAL AND WE'RE IN THIS COURTROOM, THE |

4625

| | | |
|---|---|---|
| 09:30AM | 1 | RESPONSIBILITY FOR CONDUCTING A FAIR TRIAL SUCH THAT ALL |
| 09:30AM | 2 | PARTIES HAVE ACCESS TO THIS COURTROOM FALLS UPON THE JUDGE, AND |
| 09:30AM | 3 | THAT'S WHAT I'M TRYING TO DO IS TO BALANCE INDIVIDUAL'S ACCESS |
| 09:30AM | 4 | TO THEIR COURTHOUSES WITH THE PARTIES' RIGHTS TO A FAIR TRIAL, |
| 09:30AM | 5 | AND SOMETIMES THERE ARE SOME TENSION BETWEEN THOSE TWO.  WE |
| 09:31AM | 6 | HAVE THE OVERFLOW ROOM WHICH IS AVAILABLE TO MEDIATE THAT |
| 09:31AM | 7 | SITUATION, AND I HOPE IT'S SUCCESSFULLY USED BY THE PARTIES. |
| 09:31AM | 8 | OKAY.  WE'LL TAKE A BREAK AND THEN WE'LL BRING THE JURY IN |
| 09:31AM | 9 | IN JUST A MOMENT. |
| 09:31AM | 10 | MR. LEACH:  THANK YOU, YOUR HONOR. |
| 09:31AM | 11 | (RECESS FROM 9:31 A.M. UNTIL 9:41 A.M.) |
| 09:41AM | 12 | (PROCEEDINGS HELD IN CHAMBERS.) |
| 09:58AM | 13 | THE COURT:  LET'S GO ON THE RECORD.  WE ARE ON THE |
| 09:58AM | 14 | RECORD IN CHAMBERS WITH COUNSEL. |
| 09:58AM | 15 | YOU CAN TAKE YOUR MASKS OFF, COUNSEL, IF YOU WOULD LIKE, |
| 09:58AM | 16 | MR. DOWNEY, MR. SCHENK.  WE'RE OUTSIDE OF THE PRESENCE OF OTHER |
| 09:58AM | 17 | COUNSEL AND THE DEFENDANT. |
| 09:58AM | 18 | ███████████████████████████████ |
| 09:58AM | 19 | ██████████████████████████████████ |
| 09:58AM | 20 | █████████████████████████████████ |
| 09:58AM | 21 | ███████████████████████████████████ |
| 09:58AM | 22 | ████████████████████████ |
| 09:58AM | 23 | I BELIEVE HER FATHER, THE CHILD'S GRANDFATHER, IS TENDING |
| 09:58AM | 24 | TO THAT NOW. |
| 09:58AM | 25 | SHE HAS A PHONE, AND SHE'S GOING TO BE TEXTED SHOULD SHE |

4626

09:58AM 1    NEED TO LEAVE OR SHOULD ANYTHING COME UP.

09:58AM 2         SHE'LL HAVE THE PHONE WITH HER AT HER HAND, AND PER

09:58AM 3    MS. KRATZMANN.  SHE SAID SHE'S NOT GOING TO -- SHE'LL LOOK AT

09:58AM 4    IT WHEN IT LIGHTS UP AND WE CAN LET HER KNOW THAT SHE COULD

09:58AM 5    RAISE HER HAND AND WE'LL TAKE A BREAK.  THAT'S THE PROTOCOL

09:58AM 6    THAT I WOULD LIKE TO ENGAGE.

09:58AM 7         I WANTED TO LET COUNSEL KNOW, AND ANYTHING YOU WOULD LIKE

09:58AM 8    TO SAY OR ANY SUGGESTIONS OR OBJECTIONS TO PROCEEDING IN THIS

09:58AM 9    MANNER.

09:58AM 10             MR. SCHENK:  CERTAINLY NO OBJECTIONS.  I CAN'T THINK

09:58AM 11   OF A SUGGESTION OTHER THAN WHAT THE COURT HAS OUTLINED.  THAT'S

09:58AM 12   FINE.

09:58AM 13             MR. DOWNEY:  I THINK IT'S FINE WITH US, YOUR HONOR.

09:58AM 14   IT MAKES SENSE, AND WE'LL SEE WHAT HAPPENS.

09:58AM 15             THE COURT:  RIGHT.  IT -- MS. KRATZMANN, WHAT ELSE?

09:58AM 16   ANYTHING ELSE ABOUT THAT?

09:58AM 17             THE CLERK:  SHE JUST INDICATED SHE WOULD BE CHECKING

09:58AM 18   HER PHONE AND IF SHE HAD PERMISSION TO DO THAT, AND I SAID IF

09:58AM 19   THERE'S ANYTHING THAT YOU NEED THE COURT'S ATTENTION, PLEASE

09:58AM 20   RAISE YOUR HAND, OR IF YOU NEED TO GO, JUST RAISE YOUR HAND AND

09:58AM 21   GET HIS HONOR'S ATTENTION AND WE'LL ATTEND TO WHAT YOU NEED.

09:58AM 22             THE COURT:  OKAY.  ALL RIGHT.

09:58AM 23        I JUST WANTED TO ALERT COUNSEL.  YOU CAN NOTIFY YOUR

09:58AM 24   TEAMS.

09:58AM 25             AND MAYBE BE -- MAYBE SOME OF YOUR TEAMS CAN KEEP AN EYE

09:58AM   1    ON THIS JUROR ALSO.

09:58AM   2          MR. SCHENK:  DID THE COURT -- DID THE JURORS CHANGE

09:58AM   3    SEATS THIS MORNING?

09:58AM   4          THE COURT:  I THINK WE ARRANGED THEM.

09:58AM   5          THE CLERK:  SO THEY ARE SITTING AS THEY ARE

09:58AM   6    NUMBERED.  MR. HANG IS IN NUMBER 1, AND THEY'RE ALL SEATED

09:58AM   7    THROUGH 12, AND WE HAVE THE TWO ALTERNATES IN THE PEW.

09:58AM   8          THE COURT:  OKAY.  THANK YOU.

09:58AM   9       (PAUSE IN PROCEEDINGS.)

09:58AM   10         THE COURT:  LET'S GO BACK ON THE RECORD.  WE'RE BACK

09:58AM   11   ON THE RECORD.

09:58AM   12      WE HAD A DISCUSSION ABOUT A JUROR'S CHILD AND HEALTH

09:58AM   13   CONDITION, AND I'M GOING TO ORDER THAT PORTION OF THE

09:58AM   14   TRANSCRIPT SEALED OTHER THAN TO SAY THERE WAS A HEALTH

09:58AM   15   CONDITION.  BUT THE SPECIFICS SHOULD BE SEALED, AS WELL AS THE

09:58AM   16   JUROR'S NAME.  THERE WAS A JUROR'S NAME THAT WAS MENTIONED AND

09:58AM   17   THAT SHOULD BE REDACTED.  SO REDACT THE JUROR NAME AND THE

09:58AM   18   HEALTH CONDITION.

10:04AM   19      (JURY IN AT 10:04 A.M.)

10:04AM   20         THE COURT:  ALL RIGHT.  THANK YOU.  GOOD MORNING

10:04AM   21   EVERYONE.

10:04AM   22      WE'RE BACK ON THE RECORD IN THE HOLMES MATTER.  ALL

10:04AM   23   COUNSEL ARE PRESENT AND MS. HOLMES IS PRESENT.

10:04AM   24      AND OUR JURY IS PRESENT.  THANK YOU FOR YOUR PATIENCE,

10:04AM   25   LADIES AND GENTLEMEN.

4628

| | | |
|---|---|---|
| 10:04AM | 1 | LET ME -- BEFORE WE BEGIN, LET ME ASK YOU MY STANDARD |
| 10:04AM | 2 | QUESTION. |
| 10:04AM | 3 | FIRST OF ALL, I HOPE YOU HAD A PLEASANT WEEKEND, THAT YOU |
| 10:04AM | 4 | ENJOYED THE RAIN THAT WE HAD AND SOAKED THAT UP. |
| 10:04AM | 5 | BUT LET ME ASK YOU, DURING THE WEEKEND, DID ANY OF YOU |
| 10:04AM | 6 | HAVE ANY OCCASION TO COME ACROSS ANY INFORMATION, TALK OR SEE |
| 10:04AM | 7 | ANYONE THAT HAD ANYTHING TO DO WITH THIS CASE?  IF SO, COULD |
| 10:04AM | 8 | YOU PLEASE RAISE YOUR HAND. |
| 10:04AM | 9 | I SEE NO HANDS. |
| 10:04AM | 10 | I WANT TO THANK YOU ON BEHALF OF ALL OF THE PARTICIPANTS |
| 10:04AM | 11 | IN THIS TRIAL FOR YOUR CONTINUED VIGILANCE IN THIS REGARD.  I'M |
| 10:04AM | 12 | REALLY GRATEFUL FOR YOUR EFFORTS IN THIS REGARD AND I THANK YOU |
| 10:04AM | 13 | FOR THAT. |
| 10:04AM | 14 | BEFORE WE BEGIN, I WANT TO -- LET ME JUST ASK, TIMING |
| 10:05AM | 15 | TODAY, 4:00 O'CLOCK?  IS THAT POSSIBLE, 4:00 O'CLOCK? |
| 10:05AM | 16 | OKAY.  I SEE NO HANDS OBJECTING TO THAT. |
| 10:05AM | 17 | WE'LL GO UNTIL 4:00. |
| 10:05AM | 18 | AND I SUGGESTED A CHANGE IN SCHEDULE OF ADDING SOME DAYS. |
| 10:05AM | 19 | I DON'T KNOW IF YOU, LADIES AND GENTLEMEN, HAVE HAD |
| 10:05AM | 20 | OCCASION TO LOOK AT YOUR SCHEDULES TO SEE IF THAT'S SOMETHING |
| 10:05AM | 21 | THAT WOULD WORK.  AGAIN, THIS WOULD MEAN MONDAYS THE 15TH, |
| 10:05AM | 22 | 22ND, AND 29TH IN THE MORNINGS, IF WE COULD MEET FOR SOME TIME |
| 10:05AM | 23 | THEN.  IF THAT WORKS FOR EVERYONE, WE'LL ADOPT THAT SCHEDULE. |
| 10:05AM | 24 | ALL RIGHT.  I SEE NO HANDS. |
| 10:05AM | 25 | OH, YES, I SEE -- YES, SIR. |

4629

10:05AM  1          JUROR:  YEAH, IT'S JUST GETTING HARD ON MY WORK

10:05AM  2     SCHEDULE TO LOSE THOSE HOURS.

10:05AM  3          THE COURT:  LET ME -- HANG ON JUST A SECOND.  I'M

10:05AM  4     GOING TO SEE IF WE CAN GET A MICROPHONE.

10:06AM  5        THIS IS ALTERNATE 5.  YES, SIR?

10:06AM  6          JUROR:  YES, IT'S GETTING TOUGH TO BALANCE THE

10:06AM  7     WORKLOAD, LOSING THOSE HOURS ON MY SIDE.

10:06AM  8          THE COURT:  GOTCHA.  OKAY.

10:06AM  9          JUROR:  IF NO ONE ELSE HAS ANY OBJECTIONS, I CAN

10:06AM 10     MOVE THE STUFF AROUND, BUT IT'S JUST GETTING VERY TOUGH FOR ME.

10:06AM 11          THE COURT:  WELL, THANK YOU.  I APPRECIATE THAT.

10:06AM 12        LET'S SEE -- LET ME PUT THOSE DAYS IN PLACE NOW.  MAYBE WE

10:06AM 13     CAN TAKE ONE OFF AS WE GO FORWARD.

10:06AM 14          JUROR:  UH-HUH.

10:06AM 15          THE COURT:  BUT I JUST WANT TO RESERVE THOSE FOR OUR

10:06AM 16     COURT PURPOSES FOR NOW.

10:06AM 17        THANK YOU SO MUCH.  THANK YOU.

10:06AM 18        AND I THINK PEOPLE WERE IN AGREEMENT THAT WE WOULD NOT

10:06AM 19     MEET ON THE 24TH OF NOVEMBER, THE DAY BEFORE THANKSGIVING, BUT

10:06AM 20     INSTEAD WE WOULD MEET ON THE 18TH.  I THINK THAT MEETS WITH

10:07AM 21     EVERYONE'S APPROVAL.

10:07AM 22        SO I WANT TO REMIND EVERYONE THAT WE'RE NOT IN SESSION

10:07AM 23     DECEMBER 3RD.  DECEMBER 3RD, WE WILL NOT BE IN SESSION ON THAT

10:07AM 24     DATE.

10:07AM 25        OKAY.  I THINK THAT'S THE UPDATE FOR SCHEDULING PURPOSES.

| | | |
|---|---|---|
| 10:07AM | 1 | LET ME TURN TO ANOTHER TOPIC THAT REGRETTABLY HAS BEEN A |
| 10:07AM | 2 | CONTINUOUS ISSUE HERE IN THIS COURTROOM FOR THIS TRIAL, AND |
| 10:07AM | 3 | THAT IS THE NOISE.  THIS IS REALLY -- AND I'M SPEAKING TO OUR |
| 10:07AM | 4 | PUBLIC AUDIENCE HERE.  I'M GRATEFUL THAT YOU ARE HERE.  I'M |
| 10:07AM | 5 | GRATEFUL THAT YOU ARE PARTICIPATING AND WITNESSING YOUR JUSTICE |
| 10:07AM | 6 | SYSTEM IN ACTION IN REALTIME. |
| 10:07AM | 7 | I HAVE PERMITTED INDIVIDUALS TO REPORT HERE WITH LAPTOPS |
| 10:07AM | 8 | AND OTHER DEVICES ON THE CONDITION THAT THEY HAVE SILENT |
| 10:07AM | 9 | KEYBOARDS, AND I JUST WANT EVERYONE TO KNOW THAT I HAVE |
| 10:07AM | 10 | RECEIVED REPORTS THROUGH MS. KRATZMANN THAT, INCLUDING FROM |
| 10:08AM | 11 | JURY MEMBERS AND OTHER PARTICIPANTS IN THE TRIAL, THAT THE |
| 10:08AM | 12 | NOISE LEVEL FROM THESE KEYBOARDS IS BECOMING DISTRACTING, HAS |
| 10:08AM | 13 | BEEN DISTRACTING AT TIMES THROUGHOUT THE TRIAL. |
| 10:08AM | 14 | AND I'M GOING TO ASK INDIVIDUALS AGAIN, IF YOU DON'T HAVE |
| 10:08AM | 15 | A SILENT KEYBOARD, YOU SHOULDN'T BE IN THIS COURTROOM.  YOU |
| 10:08AM | 16 | SHOULD BE IN THE OVERFLOW ROOM DOWNSTAIRS WHERE YOU CAN USE |
| 10:08AM | 17 | YOUR DEVICE. |
| 10:08AM | 18 | I UNDERSTAND THAT NOT ALL OF YOU HAVE THESE SILENT |
| 10:08AM | 19 | KEYBOARDS AND THAT SOMETIMES TYPING SPEED IS OF ESSENCE IN THE |
| 10:08AM | 20 | COMPLETION OF YOUR DUTIES, AND I RESPECT THAT. |
| 10:08AM | 21 | BUT I HOPE YOU ALSO ARE RECIPROCAL FOR THE JUDICIAL |
| 10:08AM | 22 | PROCESS AND THE TRIAL PROCESS AND THE NEED TO PROTECT |
| 10:08AM | 23 | MS. HOLMES'S RIGHT TO A FAIR TRIAL AND THE GOVERNMENT'S RIGHT |
| 10:08AM | 24 | TO PUT A PROSECUTION ON IN A FAIR AND FULSOME MANNER. |
| 10:08AM | 25 | THERE IS SOME TENSION BETWEEN THESE TWO, I MENTIONED |

10:08AM 1    EARLIER, AND THE SOLUTION THAT WE HAVE FOR THIS TENSION IS TO

10:09AM 2    ALLOW THOSE OF YOU TO PARTICIPATE IN REALTIME IN OUR OVERFLOW

10:09AM 3    ROOM WHERE YOUR TYPEWRITERS CAN BE USED WITHOUT ANY ISSUE ABOUT

10:09AM 4    DISTURBING THE TRIAL PROCESS DOWN THERE.

10:09AM 5        IT MAY BE, AND I HOPE IT DOESN'T COME TO THIS, BUT IF THIS

10:09AM 6    CONTINUES, IT MAY BE THAT I'LL HAVE ANYONE WHO IS GOING TO

10:09AM 7    TYPE, INCLUDING THOSE OF YOU WHO HAVE SILENT KEYBOARDS AND

10:09AM 8    THOSE WHO HAVE BEEN ABLE TO MONITOR YOUR TYPING AND KEEP YOUR

10:09AM 9    TYPING SILENT, I'LL HAVE TO ASK ALL OF YOU TO GO DOWN TO THAT

10:09AM 10   ROOM AND USE THE OVERFLOW ROOM.

10:09AM 11       AND I HATE TO SEND ALL OF YOU DOWN THERE, INCLUDING THOSE

10:09AM 12   OF YOU WHO ARE PRESCRIBING BY THE RULES OF BEING SILENT IN YOUR

10:09AM 13   DEVICES, BUT IT MAY CAUSE -- BECAUSE OF THE ACTIONS OF A FEW,

10:09AM 14   IT MAY CAUSE ALL OF YOU TO HAVE TO GO DOWN THERE AND SIT IN

10:10AM 15   THAT ROOM.

10:10AM 16       SO I JUST WANT TO PUT YOU ON NOTICE ABOUT THAT.

10:10AM 17       I MAY BRING UP ANOTHER MARSHAL TO MONITOR THINGS HERE SUCH

10:10AM 18   THAT WE CAN KEEP THAT PORTION OF THE COURTROOM SILENT SO THAT

10:10AM 19   EVERYONE, AND PARTICULARLY THE JURORS, CAN HEAR THESE

10:10AM 20   PROCEEDINGS IN A FAIR AND FULL MANNER.

10:10AM 21       SO I JUST WANT TO STATE THAT NOW.  AND I APPRECIATE

10:10AM 22   YOUR -- THOSE OF YOU WHO ARE TYPING HERE, I APPRECIATE YOUR

10:10AM 23   CONSIDERATION ABOUT THIS.  BUT I JUST HAVE TO GIVE YOU FAIR

10:10AM 24   WARNING, IT MAY BE THAT I'LL HAVE TO HAVE YOU ALL MOVE DOWN TO

10:10AM 25   THAT ROOM IF YOU'RE NOT ABLE TO KEEP YOUR DEVICES SILENT.

4632

10:10AM  1        AND LET ME SAY THAT ALSO INCLUDES TELEPHONE DEVICES.  THIS

10:10AM  2   MORNING I THINK WE HEARD TWO OR THREE RINGS, CHIMES OF PHONES

10:10AM  3   GOING OFF, AND IF I BRING A MARSHAL IN HERE AND IF SHE HEARS A

10:10AM  4   DEVICE, SHE'S GOING TO ASK YOU TO LEAVE, NOT JUST TURN OFF THE

10:10AM  5   DEVICE.

10:10AM  6        BUT YOU CAN'T BE HERE IN IF YOU'RE NOT ABLE TO POLICE IT.

10:11AM  7   THIS TRIAL HAS BEEN GOING ON FOR SEVERAL WEEKS.  MANY OF YOU

10:11AM  8   HAVE BEEN HERE EVERY DAY OF THE TRIAL, AND I THINK YOU KNOW

10:11AM  9   WHAT IS EXPECTED OF YOU.

10:11AM  10        SO THAT'S ALL I'M GOING TO SAY ON THE MATTER.  THANK YOU

10:11AM  11   VERY MUCH.

10:11AM  12        I THINK OUR JURORS WOULD BE GRATEFUL ALSO FOR THE ABILITY

10:11AM  13   TO KEEP THAT FROM BEING A DISTRACTION FROM THEIR DUTIES.

10:11AM  14        ALL RIGHT.  ANYTHING FURTHER FROM EITHER SIDE?

10:11AM  15            MR. DOWNEY:  YOUR HONOR, I JUST WANT TO REMIND THE

10:11AM  16   COURT THAT I THINK YOU WERE GOING TO ENGAGE A PROTOCOL IF THERE

10:11AM  17   WERE A DISTRACTION.

10:11AM  18            THE COURT:  THANK YOU.  THANK YOU, MR. DOWNEY.

10:11AM  19        LET ME JUST INDICATE THAT I RECOGNIZE THAT THERE MAY BE

10:11AM  20   SOMEONE WHO NEEDS TO TAKE A BREAK FOR WHATEVER REASON IN THE

10:11AM  21   JURY, AND IF YOU WOULD JUST RAISE YOUR HAND, PLEASE, RAISE YOUR

10:11AM  22   HAND IF YOU NEED TO TAKE A BREAK AND WE WILL STOP THE

10:11AM  23   PROCEEDING IMMEDIATELY AND WE CAN TAKE WHATEVER ACTION WE NEED

10:11AM  24   TO DO TO ALLOW THAT JUROR ACCESS TO WHATEVER NEED THEY NEED TO

10:12AM  25   ACCOMPLISH.  I JUST WANT THAT TO BE KNOWN.

4633

| | | |
|---|---|---|
| 10:12AM | 1 | SO PLEASE -- I KNOW THAT JUROR AND ALL OF YOU ARE GOING TO |
| 10:12AM | 2 | CONTINUE TO PAY ATTENTION TO THE TESTIMONY HERE, BUT SHOULD THE |
| 10:12AM | 3 | NEED ARISE THAT WE NEED TO TAKE A BREAK, PLEASE DO NOT BE SHY |
| 10:12AM | 4 | ABOUT PUTTING YOUR HAND UP, PUT YOUR HAND UP, AND WE'LL STOP |
| 10:12AM | 5 | THE PROCEEDINGS AND ALLOW THINGS TO GO FORWARD. |
| 10:12AM | 6 | ALL RIGHT.  THANK YOU.  THANK YOU, MR. DOWNEY.  I |
| 10:12AM | 7 | APPRECIATE IT. |
| 10:12AM | 8 | YOU HAVE A WITNESS? |
| 10:12AM | 9 | MR. LEACH:  WE DO, YOUR HONOR. |
| 10:12AM | 10 | THE UNITED STATES CALLS LISA PETERSON. |
| 10:12AM | 11 | THE COURT:  AND WE'RE GOING TO BREAK AT 11:00; IS |
| 10:12AM | 12 | THAT RIGHT? |
| 10:12AM | 13 | MS. TREFZ:  YES, IT IS. |
| 10:12AM | 14 | THE COURT:  11:00? |
| 10:12AM | 15 | MS. TREFZ:  YES. |
| 10:12AM | 16 | THE COURT:  GOOD MORNING.  IF YOU WOULD COME |
| 10:12AM | 17 | FORWARD, PLEASE. |
| 10:12AM | 18 | IF YOU COULD STAND HERE FACING OUR COURTROOM DEPUTY WHILE |
| 10:12AM | 19 | YOU RAISE YOUR RIGHT HAND, SHE HAS A QUESTION FOR YOU. |
| 10:13AM | 20 | **(GOVERNMENT'S WITNESS, LISA PETERSON, WAS SWORN.)** |
| 10:13AM | 21 | THE WITNESS:  YES. |
| 10:13AM | 22 | THE COURT:  LET ME INVITE YOU TO HAVE A SEAT HERE. |
| 10:13AM | 23 | FEEL FREE TO ADJUST THAT CHAIR AND MICROPHONE AS YOU MAKE |
| 10:13AM | 24 | YOURSELF COMFORTABLE. |
| 10:13AM | 25 | THERE'S SOME FRESH WATER IN THE CONTAINER, AND FEEL FREE |

PETERSON DIRECT BY MR. LEACH                                    4634

10:13AM  1    TO USE THAT AS YOU NEED.

10:13AM  2         WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

10:13AM  3    AND THEN SPELL IT, PLEASE.  AND I'LL ENCOURAGE YOU TO SPEAK

10:13AM  4    DIRECTLY INTO THE MICROPHONE.

10:13AM  5              THE WITNESS:  LISA PETERSON.  L-I-S-A,

10:13AM  6    P-E-T-E-R-S-O-N.

10:13AM  7              THE COURT:  THANK YOU.

10:13AM  8         COUNSEL.

10:13AM  9              MR. LEACH:  THANK YOU, YOUR HONOR.

10:13AM  10                      **DIRECT EXAMINATION**

10:13AM  11   BY MR. LEACH:

10:13AM  12   Q.   GOOD MORNING, MS. PETERSON.

10:13AM  13   A.   GOOD MORNING.

10:13AM  14   Q.   IF YOU'RE FULLY VACCINATED AND COMFORTABLE, YOU HAVE THE

10:13AM  15   COURT'S PERMISSION TO TESTIFY WITHOUT A MASK.

10:14AM  16        WHERE DO YOU WORK?

10:14AM  17   A.   I WORK FOR RDV CORPORATION IN GRAND RAPIDS, MICHIGAN.

10:14AM  18   Q.   AND WHAT IS RDV CORPORATION?

10:14AM  19   A.   RDV CORPORATION IS THE FAMILY OFFICE FOR THE DEVOS FAMILY,

10:14AM  20   AND WE'RE ALSO A REGISTERED INVESTMENT ADVISOR FOR OTHER

10:14AM  21   FAMILIES AS WELL.

10:14AM  22   Q.   WHAT DO YOU DO FOR RDV?

10:14AM  23   A.   I WORK IN THEIR INVESTMENT GROUP, AND I'M ONE OF TWO

10:14AM  24   PRIVATE EQUITY MANAGERS THAT MANAGES A PRIVATE EQUITY PORTFOLIO

10:14AM  25   FOR RDV CORPORATION.

PETERSON DIRECT BY MR. LEACH                                    4635

10:14AM  1    Q.   AND HOW LONG HAVE YOU SERVED IN THE INVESTMENT GROUP FOR

10:14AM  2    RDV CORPORATION?

10:14AM  3    A.   ABOUT 17 YEARS.

10:14AM  4    Q.   IN APPROXIMATELY OCTOBER OF 2014, DID RDV CORPORATION MAKE

10:14AM  5    AN INVESTMENT IN THERANOS?

10:14AM  6    A.   YES.

10:14AM  7    Q.   WE'LL COME BACK TO THAT, BUT FOR NOW, COULD YOU BRIEFLY

10:14AM  8    DESCRIBE YOUR EDUCATIONAL BACKGROUND FOR US?

10:14AM  9    A.   I GRADUATED FROM MICHIGAN STATE UNIVERSITY IN 1992 WITH A

10:14AM  10   FINANCE DEGREE.

10:14AM  11   Q.   AND COULD YOU BRIEFLY DESCRIBE YOUR PROFESSIONAL

10:15AM  12   BACKGROUND LEADING UP TO JOINING RDV CORPORATION?

10:15AM  13   A.   I WAS A COMMERCIAL LENDER AT NDB BANK, WHICH WAS BOUGHT BY

10:15AM  14   FIRST CHICAGO AND IS NOW PART OF JPMORGAN CHASE, I THINK, FOR

10:15AM  15   ABOUT THREE YEARS; AND THEN AFTER THAT I WAS AN INVESTMENT

10:15AM  16   BANKER WITH MACDONALD INVESTMENTS, WHICH GOT BOUGHT BY KEY

10:15AM  17   BANK, AND WAS THERE UNTIL I STARTED WITH RDV CORPORATION IN

10:15AM  18   2005.

10:15AM  19   Q.   AND SO YOU'VE BEEN WITH RDV FOR APPROXIMATELY 16 YEARS?

10:15AM  20   A.   YEAH.

10:15AM  21   Q.   OKAY.  MOST OF MY QUESTIONS RELATE TO THE 2014 TIME

10:15AM  22   PERIOD, MS. PETERSON.

10:15AM  23        IN THAT TIME PERIOD, WHAT WAS YOUR JOB AGAIN?

10:15AM  24   A.   SAME AS IT IS NOW.  I MANAGE A PORTFOLIO OF PRIVATE EQUITY

10:15AM  25   INVESTMENTS, WHICH MEANS I FIND AND MANAGE PRIVATE EQUITY

PETERSON DIRECT BY MR. LEACH                                    4636

10:15AM  1    FUNDS, INVESTMENTS IN THOSE PRIVATE EQUITY FUNDS, AND

10:15AM  2    OCCASIONALLY THOSE FUNDS WILL ASK US TO COINVEST ALONGSIDE OF

10:16AM  3    THEM.

10:16AM  4        AND SO I HAVE A PORTFOLIO OF PRIVATE EQUITY FUND MANAGERS

10:16AM  5    THAT I MANAGE AND A PORTFOLIO OF COINVESTMENTS ALONGSIDE OF

10:16AM  6    THOSE PRIVATE EQUITY MANAGERS THAT I MANAGE.

10:16AM  7    Q.   WHAT DO YOU MEAN BY A COINVESTMENT?

10:16AM  8    A.   A COINVESTMENT IS WHEN WE INVEST INSIDE THESE PRIVATE

10:16AM  9    EQUITY FUNDS, AND THERE'S SOMETIMES AN OPPORTUNITY THAT COMES

10:16AM  10   ALONG WHERE THE TRANSACTION THAT THEY'RE LOOKING AT IS A LITTLE

10:16AM  11   BIT BIGGER THAN WHAT THE FUND CAN DO ON ITS OWN.  THEY WILL ASK

10:16AM  12   US IF WE WANT TO COINVEST ALONGSIDE THE FUND.

10:16AM  13       SO WE'LL HAVE AN INVESTMENT IN THAT COMPANY THROUGH THE

10:16AM  14   PRIVATE EQUITY FUND, AND WE'LL ALSO HAVE A SIDE COINVESTMENT IN

10:16AM  15   THAT COMPANY AS A COINVESTMENT.

10:16AM  16   Q.   AS PRIVATE EQUITY MANAGER WITHIN RDV, IS IT IMPORTANT FOR

10:16AM  17   YOU TO UNDERSTAND THE INVESTING PRIORITIES FOR RDV CORPORATION?

10:16AM  18   A.   YES.

10:16AM  19   Q.   CAN YOU EXPLAIN THAT A LITTLE BIT?

10:17AM  20   A.   WELL, WE HAVE A STRATEGY THAT WE FOLLOW AND WE TRY TO STAY

10:17AM  21   DISCIPLINED TO THAT STRATEGY.  SO IT'S IMPORTANT FOR ME TO KNOW

10:17AM  22   WHAT THE FAMILY AND MY BOSS IS LOOKING FOR IN TERMS OF WHAT

10:17AM  23   TYPE OF PRIVATE EQUITY FUNDS ARE WE GOING TO LOOK FOR AND

10:17AM  24   INVEST WITH, AND THEN WHAT TYPE OF COINVESTMENTS WOULD WE DO

10:17AM  25   WITH THOSE GROUPS.

PETERSON DIRECT BY MR. LEACH                                    4637

10:17AM   1        SO, YES, IT'S IMPORTANT THAT I KNOW WHAT THE STRATEGY IS

10:17AM   2    THAT WE'RE DOING.

10:17AM   3    Q.   I WANT TO STAY WITH YOU IN THE TIME PERIOD 2014.

10:17AM   4    A.   UH-HUH.

10:17AM   5    Q.   IN OR AROUND THAT TIME, DID YOU BECOME AWARE OF A COMPANY

10:17AM   6    CALLED THERANOS?

10:17AM   7    A.   YES.

10:17AM   8    Q.   AND HOW DID YOU BECOME AWARE OF THERANOS?

10:17AM   9    A.   I WAS ON A PLANE RIDE BACK FROM CHICAGO WITH MY BOSS,

10:17AM   10   RANDY DAMSTRA, AT THE TIME, AND ALSO THE PERSON THAT RAN OUR

10:17AM   11   GROUP, OUR CEO AND CIO, JERRY TUBERGEN, AND JERRY HAD JUST HAD

10:17AM   12   A MEETING WITH ELIZABETH HOLMES AND HER BROTHER CHRISTIAN AT A

10:17AM   13   CONFERENCE THAT HE HAD ATTENDED.

10:17AM   14   Q.   AND WERE YOU GIVEN ANY RESPONSIBILITIES WITH RESPECT TO A

10:18AM   15   POSSIBLE INVESTMENT IN THERANOS?

10:18AM   16   A.   YEAH.   WE TALKED ABOUT IT ON THE PLANE RIDE BACK TO

10:18AM   17   GRAND RAPIDS AND I HAD ASKED IF I COULD WORK ON THE TRANSACTION

10:18AM   18   BECAUSE I HAD A NUMBER OF HEALTH CARE INVESTMENTS, FUNDS THAT I

10:18AM   19   WORKED WITH, AND I LIKE HEALTH CARE AND IT WAS VERY INTERESTING

10:18AM   20   TO ME.

10:18AM   21        MY HUSBAND IS TYPE 1 DIABETIC AND DOES A LOT OF BLOOD

10:18AM   22   TESTING, AND SO IT WAS VERY INTERESTING TO ME AND SO I WANTED

10:18AM   23   TO WORK ON THAT ONE.

10:18AM   24   Q.   WHEN YOU SAY YOU WANTED TO WORK ON THAT, WHAT WERE YOU

10:18AM   25   SIGNING UP FOR?

PETERSON DIRECT BY MR. LEACH

10:18AM 1    A.    SO I WAS SIGNING UP TO HELP FACILITATE AND INFORM AND DO

10:18AM 2    ALL OF THE WORK ASSOCIATED WITH MAKING AN INVESTMENT IN THAT

10:18AM 3    AND INFORMING THE FAMILY.

10:18AM 4        SO THIS ONE WAS DIFFERENT THAN A TYPICAL COINVESTMENT

10:18AM 5    BECAUSE THERE WASN'T ANY PRIVATE EQUITY FUND IN THE MIDDLE OF

10:18AM 6    THE TRANSACTION.

10:18AM 7        NORMALLY THERE'S A PRIVATE EQUITY FUND THAT MAKES AN

10:18AM 8    INVESTMENT AND THEN WE COINVEST ALONGSIDE THEM.

10:19AM 9        THIS ONE WAS A LITTLE BIT DIFFERENT IN THAT THERE WAS NO

10:19AM 10   PRIVATE EQUITY FUND AND WE WANTED -- THE FAMILY IS VERY -- HAS

10:19AM 11   A LOT OF AFFINITY TOWARDS HEALTH CARE AND EDUCATION AND JERRY

10:19AM 12   WANTED THE FAMILY TO TAKE A LOOK AT THIS INVESTMENT.

10:19AM 13       IT WAS VERY MUCH CHARACTERIZED TO JERRY THAT THIS WAS AN

10:19AM 14   OPPORTUNITY THAT WE WERE BEING INVITED TO LOOK AT, AND HE

10:19AM 15   WANTED TO TAKE THE OPPORTUNITY TO THE FAMILY AND SEE IF THEY

10:19AM 16   WANTED TO MAKE AN INVESTMENT.

10:19AM 17       SO MY ROLE WAS TO WORK WITH JERRY AND INFORM THE FAMILY ON

10:19AM 18   EVERYTHING AND ATTEND CALLS AND MEETINGS AND PREPARE EVERYTHING

10:19AM 19   THAT WOULD GO TO THE INVESTMENT COMMITTEE, WHICH IS MADE UP OF

10:19AM 20   FAMILY MEMBERS.

10:19AM 21          MR. WADE:  OBJECTION, YOUR HONOR.  THERE WAS HEARSAY

10:19AM 22   WITHIN THE ANSWER TO THAT QUESTION.

10:19AM 23          THE COURT:  MR. LEACH, WILL YOU ASK -- WAS THIS

10:19AM 24   FOUNDATIONAL AS TO HER EMPLOYMENT THEN?

10:20AM 25          MR. LEACH:  YES.

PETERSON DIRECT BY MR. LEACH                                    4639

10:20AM  1          THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, THE

10:20AM  2     TESTIMONY THAT YOU HEARD, THIS IS REGARDING THE -- WHAT'S HIS

10:20AM  3     NAME?  JERRY?

10:20AM  4          THE WITNESS:  TUBERGEN.

10:20AM  5          THE COURT:  TUBERGEN, THANK YOU.

10:20AM  6        YES, THE STATEMENTS ATTRIBUTED TO MR. TUBERGEN WERE NOT

10:20AM  7     OFFERED FOR THE TRUTH OF THE MATTER ASSERTED BY HIM, BUT RATHER

10:20AM  8     AS FOUNDATIONAL FOR THIS WITNESS'S EMPLOYMENT AND HER DUTIES

10:20AM  9     AND HER ENGAGEMENT IN THAT REGARD AS FOUNDATION.

10:20AM  10        SO GO AHEAD, MR. LEACH.

10:20AM  11          MR. LEACH:  THANK YOU, YOUR HONOR.

10:20AM  12    Q.   AND DID I HEAR YOU SAY THAT YOU IN SOME SENSE VOLUNTEERED

10:20AM  13    FOR THIS PROJECT?

10:20AM  14    A.   YES.

10:20AM  15    Q.   AND WHY WAS THAT?

10:20AM  16    A.   BECAUSE IT DIDN'T COME IN THROUGH ONE OF MY PRIVATE EQUITY

10:20AM  17    FUNDS, SOMEONE HAD TO WORK ON IT ON THE INVESTMENT TEAM.  AND

10:20AM  18    SO I WANTED TO, SO HE SAID, SURE, I WOULD LOVE FOR YOU TO WORK

10:20AM  19    ON IT.

10:20AM  20    Q.   AND WHY DID YOU WANT TO?

10:20AM  21    A.   BECAUSE I HAD A LITTLE BIT OF KNOWLEDGE IN THE HEALTH CARE

10:20AM  22    SPACE AND IT INTRIGUED ME.

10:20AM  23          MR. LEACH:  MAY I APPROACH, YOUR HONOR?

10:20AM  24          THE COURT:  YES.

10:21AM  25          MR. LEACH:  (HANDING.)

PETERSON DIRECT BY MR. LEACH                                  4640

10:21AM   1      Q.   MS. PETERSON, I'VE PLACED BEFORE YOU A BINDER OF

10:21AM   2      DOCUMENTS, AND I'D LIKE TO DRAW YOUR ATTENTION, PLEASE, TO WHAT

10:21AM   3      HAS BEEN MARKED AS EXHIBIT 1944.

10:21AM   4           DOES THIS APPEAR TO BE AN EMAIL DATED SEPTEMBER 18TH,

10:21AM   5      2014?

10:21AM   6      A.   YES.

10:21AM   7      Q.   AND IS THIS CONSISTENT WITH THE TIME PERIOD WHEN YOU WERE

10:21AM   8      APPROACHED BY MR. TUBERGEN ABOUT A POSSIBLE INVESTMENT

10:21AM   9      OPPORTUNITY IN THERANOS?

10:21AM  10      A.   YES.

10:21AM  11      Q.   OKAY.  THERE'S AN ATTACHMENT TO EXHIBIT 1944.

10:22AM  12           DO YOU SEE THAT?

10:22AM  13      A.   YES.

10:22AM  14      Q.   AND AT SOME POINT DID MR. TUBERGEN PROVIDE YOU WITH THIS

10:22AM  15      ATTACHMENT?

10:22AM  16      A.   YES.

10:22AM  17      Q.   OKAY.  DO YOU KNOW WHERE HE GOT IT?

10:22AM  18      A.   NO, I DON'T KNOW WHERE HE GOT IT.

10:22AM  19      Q.   OKAY.  WAS IT PART OF THE INFORMATION THAT YOU CONSIDERED

10:22AM  20      IN CONNECTION WITH A POSSIBLE INVESTMENT IN THERANOS?

10:22AM  21      A.   YES.

10:22AM  22              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 1944.

10:22AM  23              MR. WADE:  NO OBJECTION, YOUR HONOR.

10:22AM  24              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:22AM  25           (GOVERNMENT'S EXHIBIT 1944 WAS RECEIVED IN EVIDENCE.)

PETERSON DIRECT BY MR. LEACH                                    4641

10:22AM   1              MR. LEACH:  AND IF WE CAN START, MS. HOLLIMAN, ON

10:22AM   2      PAGE 2.  AND IF WE CAN ZOOM IN ON THE TOP PORTION.

10:22AM   3      Q.  DO YOU SEE THE EMAIL, MS. PETERSON, FROM JERRY TUBERGEN TO

10:23AM   4      DICK DEVOS, DOUG DEVOS, DAN DEVOS, AND CHERI DEVOS?

10:23AM   5      A.  YES.

10:23AM   6      Q.  AND WHO ARE THEY?

10:23AM   7      A.  THEY ARE THE CHILDREN OF RICH DEVOS AND THE MEMBERS THAT

10:23AM   8      WE WORKED FOR AT THE TIME.

10:23AM   9      Q.  MEMBERS OF THE INVESTMENT COMMITTEE YOU MENTIONED?

10:23AM  10      A.  SOME OF THEM ARE ON THE INVESTMENT COMMITTEE, YES.  DOUG

10:23AM  11      IS THE CHAIRMAN.

10:23AM  12      Q.  OKAY.  AND THE FIRST SENTENCE OF THIS READS, "ALL.

10:23AM  13          "THIS MORNING, I HAD ONE OF THE MOST INTERESTING MEETINGS

10:23AM  14      I CAN RECALL WITH THE WOMAN PROFILED IN THE ATTACHED 'FORTUNE'

10:23AM  15      MAGAZINE ARTICLE."

10:23AM  16          DO YOU SEE THAT?

10:23AM  17      A.  YES.

10:23AM  18      Q.  AND IS THE ATTACHMENTS THE "FORTUNE" MAGAZINE ARTICLE, A

10:23AM  19      COPY OF WHICH YOU AT SOME POINT GOT?

10:23AM  20      A.  YES.

10:23AM  21      Q.  OKAY.  LET'S LOOK AT PAGE 2.

10:23AM  22          AND IF WE COULD ZOOM IN ON UP AT THE TOP.

10:23AM  23          MS. PETERSON, THERE APPEARS TO BE SOME LANGUAGE -- WELL,

10:24AM  24      BEFORE I ASK THAT QUESTION, DO YOU SEE THAT THIS IS AN ARTICLE

10:24AM  25      BY ROGER PARLOFF?

PETERSON DIRECT BY MR. LEACH                                    4642

10:24AM   1    A.   YES.

10:24AM   2    Q.   AND UP AT THE TOP IT SAYS "1/1000TH THERANOS TESTS CAN BE

10:24AM   3    PERFORMED ON JUST A FEW DROPS OF BLOOD, OR ABOUT 1/100TH TO

10:24AM   4    1/1000TH OF ORDINARY AMOUNT."

10:24AM   5         DO YOU SEE THAT LANGUAGE?

10:24AM   6    A.   YES.

10:24AM   7    Q.   AND WAS THAT OF INTEREST TO YOU?

10:24AM   8    A.   VERY.

10:24AM   9    Q.   WHY?

10:24AM   10   A.   BECAUSE NO ONE HAD BEEN ABLE TO DO THAT BEFORE.

10:24AM   11   Q.   LET ME DRAW YOUR ATTENTION TO THE NEXT PAGE, PAGE 4.

10:24AM   12        DO YOU SEE AN IMAGE THERE?

10:24AM   13   A.   YES.

10:24AM   14   Q.   AND DO YOU RECOGNIZE THE PERSON IN THAT IMAGINE?

10:24AM   15   A.   YES.

10:24AM   16   Q.   AND WHO IS IT?

10:24AM   17   A.   THAT'S ELIZABETH HOLMES.

10:24AM   18   Q.   AND DO YOU SEE MS. HOLMES HERE IN THE COURTROOM TODAY?

10:24AM   19   A.   YES.

10:24AM   20   Q.   AND WHERE IS SHE SEATED?

10:24AM   21   A.   RIGHT THERE (INDICATING).

10:24AM   22   Q.   AT THE DEFENSE TABLE?

10:24AM   23   A.   YES.

10:24AM   24   Q.   AND CAN YOU JUST DESCRIBE FOR THE RECORD WHAT SHE'S

10:24AM   25   WEARING?

PETERSON DIRECT BY MR. LEACH                                          4643

10:24AM  1    A.   SHE HAS A GREEN MASK ON.

10:25AM  2    Q.   OKAY.  THANK YOU.

10:25AM  3         WHAT DID YOU DO WITH THIS ARTICLE?

10:25AM  4    A.   READ IT.

10:25AM  5    Q.   AND WAS THIS SORT OF THE FIRST INFORMATION THAT YOU GOT IN

10:25AM  6    CONNECTION WITH THERANOS?

10:25AM  7    A.   YES, AND THEN STARTED DOING SOME GOOGLE SEARCHES ALSO.

10:25AM  8    Q.   OKAY.  LET ME NEXT DRAW YOUR ATTENTION TO EXHIBIT 5432.

10:25AM  9         DO YOU HAVE THAT IN FRONT OF YOU?

10:25AM  10   A.   YES.

10:25AM  11   Q.   OKAY.  DO YOU SEE AT THE TOP AN EMAIL FROM JERRY TUBERGEN

10:25AM  12   TO ELIZABETH HOLMES WITH A COPY TO DANIEL EDLIN AND AMI NEIL?

10:25AM  13   A.   AMI, YES.

10:25AM  14   Q.   AND WHO IS MS. NEIL?

10:25AM  15   A.   AMI NEIL IS JERRY'S SECRETARY OR ASSISTANT AT THE TIME.

10:25AM  16   Q.   AND DOES IT APPEAR TO BE FORWARDING A MESSAGE FROM

10:26AM  17   MS. HOLMES ON OR ABOUT SEPTEMBER 24TH, 2014?

10:26AM  18   A.   YES.

10:26AM  19        MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5432 INTO

10:26AM  20   EVIDENCE.

10:26AM  21        MR. WADE:  NO OBJECTION.

10:26AM  22        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:26AM  23        (GOVERNMENT'S EXHIBIT 5432 WAS RECEIVED IN EVIDENCE.)

10:26AM  24   BY MR. LEACH:

10:26AM  25   Q.   LET'S START DOWN ON THE BOTTOM, MS. PETERSON.  THERE'S AN

PETERSON DIRECT BY MR. LEACH                                    4644

```
10:26AM    1    EMAIL FROM JERRY TUBERGEN WITH A CC TO D. MOSLEY, AND THE

10:26AM    2    SUBJECT IS CONFIDENTIAL DISCLOSURE AGREEMENT.

10:26AM    3         DO YOU SEE THAT?

10:26AM    4    A.   YES.

10:26AM    5    Q.   WHO WAS D. MOSLEY?

10:26AM    6    A.   DAN MOSLEY WAS AN ESTATE ATTORNEY FOR THE FAMILY, AND HE'S

10:26AM    7    THE ONE WHO INTRODUCED US TO ELIZABETH HOLMES.

10:26AM    8    Q.   DO YOU KNOW WHETHER MR. MOSLEY ULTIMATELY INVESTED IN

10:26AM    9    THERANOS?

10:26AM   10    A.   I BELIEVE SO, YES.

10:26AM   11    Q.   AND AT OR AROUND THIS TIME, DID RDV EXECUTE A CONFIDENTIAL

10:26AM   12    DISCLOSURE AGREEMENT SO IT COULD CONSIDER INFORMATION ABOUT

10:27AM   13    THERANOS?

10:27AM   14    A.   YES.

10:27AM   15    Q.   LET'S MOVE FORWARD IN THE EMAIL CHAIN TO THE MESSAGE FROM

10:27AM   16    MS. HOLMES.

10:27AM   17         DO YOU SEE WHERE IT SAYS, "GOT IT.  WE'RE VERY MUCH

10:27AM   18    LOOKING FORWARD TO OUR MEETING"?

10:27AM   19    A.   YES.

10:27AM   20    Q.   AND DO YOU SEE MS. HOLMES WROTE, "I'VE HAD OUR TEAM

10:27AM   21    PREPARE MATERIALS FOR YOU - LET US KNOW THE BEST ADDRESS TO

10:27AM   22    WHICH TO SEND THEM AND WE'LL GET THEM OUT TO YOU."

10:27AM   23         DO YOU SEE THAT?

10:27AM   24    A.   YES.

10:27AM   25    Q.   AND ULTIMATELY DID YOU RECEIVE SOME MATERIALS RELATING TO
```

PETERSON DIRECT BY MR. LEACH                                        4645

10:27AM   1      THERANOS?

10:27AM   2      A.   YES.

10:27AM   3      Q.   DESCRIBE FOR US WHAT YOU GOT.

10:27AM   4      A.   TWO VERY LARGE BINDERS AND A COVER LETTER.

10:27AM   5      Q.   OKAY.  AND DID YOU REVIEW THOSE MATERIALS?

10:27AM   6      A.   ALL OF IT, YES.

10:27AM   7      Q.   WHY DID YOU REVIEW ALL OF IT?

10:27AM   8      A.   TRYING TO LEARN WHAT THIS COMPANY WAS ALL ABOUT, AS WELL

10:28AM   9      AS MY PRIMARY JOB WAS TO INFORM THE FAMILY AND THE INVESTMENT

10:28AM   10     COMMITTEE ON THIS OPPORTUNITY.

10:28AM   11     Q.   AND DID YOU -- DID YOU VIEW YOUR ROLE AS INFORMING THE

10:28AM   12     FAMILY ABOUT WHAT WAS IMPORTANT AND RELEVANT TO AN INVESTMENT?

10:28AM   13     A.   YES.

10:28AM   14     Q.   DID YOU ULTIMATELY SPEAK TO MS. HOLMES BY TELEPHONE?

10:28AM   15     A.   JERRY AND I DID, YES.

10:28AM   16     Q.   OKAY.  ROUGHLY WHEN WAS THAT?

10:28AM   17     A.   FIRST COUPLE OF DAYS OF OCTOBER 2014.

10:28AM   18     Q.   OKAY.  BY THAT POINT IN TIME, HAD YOU REVIEWED THE

10:28AM   19     MATERIALS THAT THERANOS HAD SENT?

10:28AM   20     A.   I HAD I THINK JUST GOTTEN THEM THAT MORNING FROM JERRY.

10:28AM   21     Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO WHAT WE HAVE MARKED

10:28AM   22     AS EXHIBIT 2015.

10:28AM   23          DO YOU RECOGNIZE THIS DOCUMENT?

10:28AM   24     A.   YES.

10:28AM   25     Q.   WHAT IS THIS?

PETERSON DIRECT BY MR. LEACH                                    4646

10:28AM   1    A.    THIS WAS THE NOTES FROM THE CALL THAT WE HAD WITH

10:29AM   2    ELIZABETH ON THAT DAY, WHICH WAS THE START OF A LOT OF

10:29AM   3    INFORMATION THAT WE PULLED TOGETHER, THAT I PULLED TOGETHER FOR

10:29AM   4    THIS IN PREPARATION FOR A LONGER MEETING AT THE COMPANY A WEEK

10:29AM   5    OR TWO LATER.

10:29AM   6    Q.    DID YOU PREPARE THESE NOTES IN THE ORDINARY COURSE OF

10:29AM   7    BUSINESS?

10:29AM   8    A.    YES.

10:29AM   9    Q.    AND DID YOU MAKE AN EFFORT TO BE ACCURATE IN YOUR NOTES?

10:29AM   10   A.    VERY.

10:29AM   11   Q.    AND WAS IT YOUR REGULAR PRACTICE TO TAKE NOTES OF CALLS OF

10:29AM   12   POTENTIAL INVESTMENT OPPORTUNITIES?

10:29AM   13   A.    YES.

10:29AM   14   Q.    OKAY.

10:29AM   15         YOUR HONOR, I OFFER EXHIBIT 215.

10:29AM   16             MR. WADE:  NO OBJECTION.

10:29AM   17             MR. LEACH:  2015.  EXCUSE ME.

10:29AM   18             THE COURT:  2015 IS ADMITTED, AND IT MAY BE

10:29AM   19   PUBLISHED.

10:29AM   20         (GOVERNMENT'S EXHIBIT 2015 WAS RECEIVED IN EVIDENCE.)

10:29AM   21   BY MR. LEACH:

10:29AM   22   Q.    LET'S LOOK AT THE TOP PORTION OF YOUR NOTES, MS. PETERSON.

10:29AM   23         UP AT THE TOP IT SAYS, "THERANOS CONF CALL NOTES."

10:30AM   24         DO YOU SEE THAT?

10:30AM   25   A.    YES.

PETERSON DIRECT BY MR. LEACH                                    4647

10:30AM  1    Q.   AND OCTOBER 3RD, 2014, THAT'S THE DATE OF THE MEETING?

10:30AM  2    A.   YES.

10:30AM  3    Q.   OR THE PHONE CALL?

10:30AM  4         YOU WROTE "ELIZABETH HOLMES.

10:30AM  5         "JLT, LP"

10:30AM  6         WHAT DOES THAT REFER TO?

10:30AM  7    A.   THE PEOPLE ON THE CALL.  SO ELIZABETH WAS ON THE CALL FROM

10:30AM  8    HER SIDE, AND JLT IS JERRY TUBERGEN, AND LP IS ME.

10:30AM  9    Q.   AND YOU WROTE, "WHAT IS THE LONG-TERM VISION OF THERANOS?"

10:30AM  10        WHAT WAS THAT GETTING AT?

10:30AM  11   A.   THE BOLD THINGS IN THIS MEMO ARE THE QUESTIONS THAT JERRY

10:30AM  12   AND I HAD THOUGHT OF BEFORE THE CALL.  SO THESE ARE THE

10:30AM  13   QUESTIONS THAT WE WANTED TO ASK, WITH THE REST OF IT BEING THE

10:30AM  14   ANSWERS THAT WE GOT.

10:30AM  15   Q.   OKAY.  THERE'S AN ENTRY "WALGREENS (MARKET:  11 MM."

10:30AM  16        IS THAT MILLION?

10:30AM  17   A.   YES.

10:30AM  18   Q.   " -- (TESTS/MONTH).

10:30AM  19        "BOOTS IN EUROPE."

10:30AM  20        WHAT IS THAT REFERRING TO?

10:30AM  21   A.   THE SIZE OF THE MARKET, THE PHARMACEUTICAL TESTING MARKET

10:31AM  22   WITH WALGREENS.

10:31AM  23   Q.   AND WAS THAT SOMETHING THAT YOU DISCUSSED WITH MS. HOLMES

10:31AM  24   ON THIS OCTOBER 2014 PHONE CALL?

10:31AM  25   A.   YES.

PETERSON DIRECT BY MR. LEACH                                4648

10:31AM 1    Q.   AND THERE'S A REFERENCE TO "INSURANCE, HOSPITALS/DOC

10:31AM 2    GROUPS."

10:31AM 3        WHAT DOES THAT REFER TO?

10:31AM 4    A.   THE SAME, THAT THESE WERE -- WE WERE TRYING TO GET A SENSE

10:31AM 5    OF THE MARKET.  SHE HAD REFERENCED CONTRACTS WITH MANY OF THESE

10:31AM 6    GROUPS, SO WE WERE TRYING TO GET A SENSE OF IF THEY COULD

10:31AM 7    PENETRATE THE MARKET, HOW BIG WOULD THAT BE, HOW BIG IS THE

10:31AM 8    MARKET?

10:31AM 9    Q.   IF WE CAN ZOOM OUT, MS. HOLLIMAN, AND THERE'S A BOLD ENTRY

10:31AM 10   FOR WALGREENS.  THE BOTTOM HALF OF THE PAGE WOULD BE GREAT.

10:31AM 11   THANK YOU.

10:31AM 12       DO YOU SEE THE REFERENCE TO, "WALGREENS, NATIONAL ROLLOUT,

10:31AM 13   PROJECTIONS BASED ON 900 STORES?

10:31AM 14   A.   YES.

10:31AM 15   Q.   AND WHAT DOES THAT REFER TO?

10:31AM 16   A.   WE TALKED ABOUT WALGREENS CONTRACTS WHICH WERE VERY MUCH

10:32AM 17   IN THE PRESS AT THE TIME, AND SHE WAS GOING THROUGH THAT THEY

10:32AM 18   HAD THIS CONTRACT AND THAT THEY WERE IN STORES IN ARIZONA AND

10:32AM 19   THAT THEY WERE PREPPING FOR A NATIONAL ROLLOUT AND THAT THE

10:32AM 20   PROJECTIONS THAT WERE IN -- THERE WERE TWO PAGES OF PROJECTIONS

10:32AM 21   IN THE BINDER THAT WE RECEIVED, AND THAT THE PROJECTIONS THAT

10:32AM 22   WERE THERE WERE BASED ON A ROLLOUT OF 900 STORES FOR WALGREENS

10:32AM 23   IN 2015.

10:32AM 24   Q.   SO MS. HOLMES TOLD YOU THAT THE PROJECTIONS YOU HAD WERE

10:32AM 25   BASED ON 900 STORES --

PETERSON DIRECT BY MR. LEACH                          4649

```
10:32AM   1    A.   YES.

10:32AM   2    Q.   -- FOR WALGREENS.

10:32AM   3         BENEATH THAT, THERE'S A BOLD HEADING, "RISKS."

10:32AM   4         "WE NOW HAVE LONG-TERM CONTRACTS, SO RISK IS EXECUTION."

10:32AM   5         WHAT DID MS. HOLMES TELL YOU ABOUT THE RISKS OF AN

10:32AM   6    INVESTMENT IN THIS PARTICULAR CALL?

10:32AM   7    A.   THAT'S EXACTLY -- WE ASKED HER WHAT THE RISKS WERE, AND

10:32AM   8    THAT WAS HER ANSWER.

10:32AM   9    Q.   WHAT DID THAT MEAN, "NOW HAVE LONG-TERM CONTRACTS, SO RISK

10:32AM  10    IS EXECUTION"?

10:33AM  11    A.   TO US IT MEANT THAT SHE HAD THESE LONG-TERM CONTRACTS AND

10:33AM  12    THEY WERE ALREADY USING THEM IN WALGREENS STORES, AND THE

10:33AM  13    EXECUTION WAS THE PEOPLE THAT SHE HAD AROUND HER AND THE

10:33AM  14    ABILITY FOR WALGREENS TO ROLL OUT AND LAUNCH IT IN DIFFERENT

10:33AM  15    MARKETS THAN JUST ARIZONA.

10:33AM  16    Q.   WAS THERE ANY DISCUSSION OF THERE BEING RISK AROUND THE

10:33AM  17    UTILITY OF THE TECHNOLOGY?

10:33AM  18    A.   NONE.

10:33AM  19    Q.   LET'S LOOK AT THE NEXT PAGE, PLEASE.  IF WE CAN ZOOM IN ON

10:33AM  20    THE HEADING.  THERE YOU GO.  THANK YOU, MS. HOLLIMAN.

10:33AM  21         DO YOU SEE HEADING, "GOALS FOR OCTOBER 14" AT THE TOP?

10:33AM  22    A.   YES.

10:33AM  23    Q.   WHAT DOES THAT REFER TO?

10:33AM  24    A.   THAT WAS THE DATE THAT WE HAD AN IN PERSON MEETING WITH

10:33AM  25    HER WITH A FEW PEOPLE FROM THE INVESTMENT COMMITTEE.
```

PETERSON DIRECT BY MR. LEACH                                    4650

| | | |
|---|---|---|
| 10:33AM | 1 | Q. OKAY. AND THEN THERE'S SOME WRITING UNDERNEATH THAT, "GET |
| 10:34AM | 2 | TO KNOW THE PEOPLE WHO ARE MAKING THE INVESTMENT AND WILL BE |
| 10:34AM | 3 | KEY IN THE RELATIONSHIP GOING FORWARD." |
| 10:34AM | 4 | DO YOU SEE THAT? |
| 10:34AM | 5 | A. YES. |
| 10:34AM | 6 | Q. AND DURING THIS TIME PERIOD, DID YOU FEEL AS IF THERANOS |
| 10:34AM | 7 | WAS SELECTING YOU AS AN INVESTOR? |
| 10:34AM | 8 | A. VERY MUCH SO. |
| 10:34AM | 9 | Q. EXPLAIN THAT FOR US. |
| 10:34AM | 10 | A. WE WERE VERY MUCH -- THE SITUATION WAS CHARACTERIZED THAT |
| 10:34AM | 11 | SHE WAS KIND OF HAND PICKING FIVE OR SIX PRIVATE FAMILIES TO |
| 10:34AM | 12 | INVEST IN HER COMPANY. SHE DIDN'T WANT LARGE PRIVATE EQUITY |
| 10:34AM | 13 | FIRMS OR INSTITUTIONAL INVESTORS BECAUSE THEIR TIMEFRAMES WERE |
| 10:34AM | 14 | TOO SHORT. THEY WANTED TO MONETIZE THAT INVESTMENT QUICKER |
| 10:34AM | 15 | THAN SHE WANTED TO. |
| 10:34AM | 16 | AND OFTENTIMES THEY WANT TO GO PUBLIC, AND SHE WANTED TO |
| 10:34AM | 17 | STAY A PRIVATE COMPANY. |
| 10:34AM | 18 | SO IT WAS VERY MUCH CHARACTERIZED AND WRITTEN IN HER |
| 10:34AM | 19 | LETTER TO US WITH THE BINDERS THAT SHE WAS INVITING US TO |
| 10:35AM | 20 | PARTICIPATE IN THIS OPPORTUNITY. |
| 10:35AM | 21 | SO THE GET TO KNOW THE PEOPLE WHO ARE MAKING THE |
| 10:35AM | 22 | INVESTMENT WAS WHAT SHE WAS SAYING, THAT THEY REALLY WANTED TO |
| 10:35AM | 23 | GET TO KNOW US AS MUCH AS WE WANTED TO DO DUE DILIGENCE ON |
| 10:35AM | 24 | THEM. THEY WANTED TO UNDERSTAND WHO THE INVESTORS WERE THAT |
| 10:35AM | 25 | WERE INVESTING WITH THEM. |

PETERSON DIRECT BY MR. LEACH                              4651

| | | |
|---|---|---|
| 10:35AM | 1 | Q.   LET ME MOVE FORWARD IN TIME AND DRAW YOUR ATTENTION TO |
| 10:35AM | 2 | WHAT HAS BEEN MARKED AS EXHIBIT 2073. |
| 10:35AM | 3 | DO YOU HAVE THAT, MS. PETERSON? |
| 10:35AM | 4 | A.   YES. |
| 10:35AM | 5 | Q.   AND DO YOU RECOGNIZE THIS? |
| 10:35AM | 6 | A.   YES. |
| 10:35AM | 7 | Q.   AND WHAT IS THIS? |
| 10:35AM | 8 | A.   SO AFTER THAT PHONE CALL, I PUT TOGETHER A VERY THOROUGH |
| 10:35AM | 9 | MEMO OF ALL OF THE THINGS THAT I HAD READ IN THE BINDER AND |
| 10:35AM | 10 | EVERYTHING THAT WAS SAID ON THE PHONE CALL AND PUT IT TOGETHER |
| 10:35AM | 11 | INTO A MEMO THAT THE FAMILY COULD UTILIZE IN REVIEWING THIS |
| 10:36AM | 12 | OPPORTUNITY, AND WE WERE GOING TO REVIEW THIS MEMO ON THE PLANE |
| 10:36AM | 13 | RIDE ON THE WAY TO THE OCTOBER 14TH MEETING. |
| 10:36AM | 14 | Q.   OKAY.  WHY DID YOU PREPARE THIS MEMO? |
| 10:36AM | 15 | A.   TO CONSOLIDATE ALL OF THE INFORMATION THAT WE HAD RECEIVED |
| 10:36AM | 16 | SO FAR FROM MS. HOLMES -- |
| 10:36AM | 17 | Q.   SO -- |
| 10:36AM | 18 | A.   -- IN THE BINDERS. |
| 10:36AM | 19 | Q.   SO THAT RDV COULD MAKE AN INVESTMENT DECISION? |
| 10:36AM | 20 | A.   CORRECT. |
| 10:36AM | 21 | MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 2073 INTO |
| 10:36AM | 22 | EVIDENCE. |
| 10:36AM | 23 | MR. WADE:  NO OBJECTION. |
| 10:36AM | 24 | THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED. |
| 10:36AM | 25 | (GOVERNMENT'S EXHIBIT 2073 WAS RECEIVED IN EVIDENCE.) |

PETERSON DIRECT BY MR. LEACH                                    4652

10:36AM  1           MR. LEACH:  AND, MS. HOLLIMAN, IF WE CAN ZOOM IN ON

10:36AM  2    THE SUBSTANCE.

10:36AM  3    Q.   MS. PETERSON, LET ME JUST GET SOME BACKGROUND FROM YOU.

10:37AM  4         DO YOU SEE THE DATE OCTOBER 12TH, 2014?

10:37AM  5    A.   YES.

10:37AM  6    Q.   AND THAT'S A FEW DAYS IN ADVANCE OF THE MEETING OUT IN

10:37AM  7    PALO ALTO?

10:37AM  8    A.   CORRECT.

10:37AM  9    Q.   AND THERE WERE SOME FOLKS.  WE TALKED ABOUT MR. TUBERGEN,

10:37AM  10   HE WAS YOUR BOSS AT THE TIME?

10:37AM  11   A.   YES.

10:37AM  12   Q.   AND IN THE CC LINE THERE'S AN INDIVIDUAL MICHAEL LUNT.

10:37AM  13   WHO IS HE?

10:37AM  14   A.   OUR IN-HOUSE COUNSEL.

10:37AM  15   Q.   AND RANDY DAMSTRA, I THINK YOU MENTIONED HIM EARLIER, BUT

10:37AM  16   WHO IS HE?

10:37AM  17   A.   HE RAN THE INVESTMENT GROUP.

10:37AM  18   Q.   YOU WRITE TO THIS GROUP IN THE THIRD LINE, "I THINK IT

10:37AM  19   GIVES YOU AND THE FAMILY MEMBERS GOING ON THIS TRIP A SHORT BUT

10:37AM  20   SOLID BASIS OF THE COMPANY, ITS OBJECTIVES, ITS HISTORY, ITS

10:37AM  21   ADVANTAGES, ITS SKEPTIC'S VIEWS, ET CETERA, AND ENOUGH OF A

10:37AM  22   VIEW TO HAVE AN ENGAGED AND PRODUCTIVE MEETING ON TUESDAY

10:37AM  23   WITHOUT HAVING TO READ THROUGH THE FOOT OF MATERIALS SHE SENT."

10:37AM  24        IS THAT A FAIR SUMMARY OF WHAT YOU WERE TRYING TO DO?

10:37AM  25   A.   YES.

PETERSON DIRECT BY MR. LEACH                                    4653

10:37AM   1     Q.   AND THE FOOT OF MATERIALS, THOSE WERE THE BINDERS THAT YOU

10:38AM   2     PERSONALLY REVIEWED?

10:38AM   3     A.   YES.

10:38AM   4     Q.   AND LET'S LOOK AT YOUR MEMO.  IF WE CAN GO TO PAGE 4, AND

10:38AM   5     IF WE CAN ZOOM IN ON THE TOP HALF.

10:38AM   6          PERFECT, MS. HOLLIMAN.  THANK YOU.

10:38AM   7          DO YOU SEE WHERE IT SAYS, "RECAP OF CONVERSATIONS WITH

10:38AM   8     ELIZABETH HOLMES, FOUNDER AND CEO OF THERANOS, AND EXCERPTS

10:38AM   9     FROM WRITTEN MATERIALS PROVIDED TO RDV ON THE COMPANY"?

10:38AM   10    A.   YES.

10:38AM   11    Q.   AND AT THIS POINT, DID YOU HAVE ANY OTHER SOURCE OF

10:38AM   12    INFORMATION FROM THERANOS BESIDES MS. HOLMES?

10:38AM   13    A.   THE PHONE CALL FROM MS. HOLMES AND THE BINDERS WERE THE

10:38AM   14    TWO THINGS, AS WELL AS WHAT I COULD FIND ON THE INTERNET.

10:38AM   15    Q.   OKAY.  YOU WRITE UNDER THE HEADING, "WHAT IS THERANOS

10:38AM   16    TODAY?

10:38AM   17         "INSTEAD OF VIALS OF BLOOD (ONE FOR EVERY TEST NEEDED),

10:38AM   18    THERANOS REQUIRES ONLY A PINPRICK AND A DROP OF BLOOD TO

10:38AM   19    PERFORM HUNDREDS OF TESTS, FROM STANDARD CHOLESTEROL CHECKS TO

10:39AM   20    SOPHISTICATED GENETIC ANALYSES."

10:39AM   21         DO YOU SEE THAT?

10:39AM   22    A.   YES.

10:39AM   23    Q.   WHERE DID YOU GET THAT INFORMATION?

10:39AM   24    A.   FROM MS. HOLMES AND THE MATERIALS.

10:39AM   25    Q.   AND WAS THAT RELEVANT TO YOU?

PETERSON DIRECT BY MR. LEACH                                        4654

10:39AM   1    A.   YES.

10:39AM   2    Q.   WHY?

10:39AM   3    A.   BECAUSE IT SAID THAT THEY COULD DO HUNDREDS OF TESTS WITH

10:39AM   4    A PINPRICK WITH A FINGERSTICK OF BLOOD.

10:39AM   5    Q.   IT THEN SAYS, "THE RESULTS ARE FASTER (COUPLE HOURS), MORE

10:39AM   6    ACCURATE (100 PERCENT AUTOMATED, NO MANUAL HANDLING OF THE

10:39AM   7    SAMPLE), AND FAR CHEAPER THAN CONVENTIONAL METHODS."

10:39AM   8         DO YOU SEE THAT LANGUAGE?

10:39AM   9    A.   YES.

10:39AM   10   Q.   AND WHERE DID YOU GET THAT INFORMATION?

10:39AM   11   A.   THAT WAS IN THE MATERIALS, AND WE TALKED ABOUT IT ON THE

10:39AM   12   PHONE CALL AS WELL.

10:39AM   13   Q.   WAS THAT RELEVANT TO YOUR ANALYSIS OF THERANOS?

10:39AM   14   A.   YES.

10:39AM   15   Q.   HOW SO?

10:39AM   16   A.   IT SHOWED THAT THIS WAS GOING TO BE A GAME CHANGER FOR

10:39AM   17   HEALTH CARE.

10:40AM   18   Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PAGE 5 OF THE

10:40AM   19   EXHIBIT.

10:40AM   20        DO YOU SEE THE HEADING, "WHAT ARE THE MAIN RISKS THAT

10:40AM   21   THERANOS FACES?"

10:40AM   22   A.   YES.

10:40AM   23   Q.   AND IN THAT FIRST SENTENCE, YOU WROTE, "HOLMES BELIEVES

10:40AM   24   THE COMPANY'S PRIMARY RISK IS THE EXECUTION OF ITS BUSINESS

10:40AM   25   PLAN RATHER THAN TECHNOLOGY, VALIDATION, AND CUSTOMER

PETERSON DIRECT BY MR. LEACH                                    4655

10:40AM  1    ACCEPTANCE."

10:40AM  2        DO YOU SEE THAT LANGUAGE?

10:40AM  3    A.   YES.

10:40AM  4    Q.   AND WHERE DID YOU GET THAT INFORMATION?

10:40AM  5    A.   WE TALKED ABOUT THAT ON THE PHONE, AS WELL AS IT'S IN HER

10:40AM  6    PACKET OF INFORMATION.

10:40AM  7    Q.   AND WAS IT RELEVANT TO YOU THAT THE COMPANY'S PRIMARY RISK

10:40AM  8    WAS EXECUTION RATHER THAN TECHNOLOGY VALIDATION?

10:40AM  9    A.   YES.

10:40AM  10   Q.   HOW SO?

10:40AM  11   A.    IT GOES ON FURTHER TO SAY THAT IT HAD BEEN DOING WORK FOR

10:40AM  12   PHARMACEUTICAL COMPANIES FOR THE LAST 9 YEARS, 10 OF THE TOP

10:41AM  13   15, AND THAT LENDED A LOT OF CREDIBILITY THAT WHAT SHE WAS

10:41AM  14   SAYING WAS TRUE, THAT THESE TESTS, THE FINGERSTICK TESTS

10:41AM  15   WORKED.

10:41AM  16   Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO THE BOTTOM OF

10:41AM  17   PAGE 5.

10:41AM  18       DO YOU SEE THE HEADING, "WHAT ARE THERANOS'S KEY

10:41AM  19   OBJECTIVES FOR THE MEETING ON OCTOBER 14TH?"

10:41AM  20   A.   YES.

10:41AM  21   Q.   AND THE LAST SENTENCE SAYS, "THUS, HOLMES AND THE THERANOS

10:41AM  22   TEAM WANT TO GET TO KNOW THE PEOPLE MAKING THE INVESTMENT,

10:41AM  23   UNDERSTANDING THEIR INVESTMENT PHILOSOPHY, AND TARGET

10:41AM  24   INVESTMENT PROFILE, AS WELL AS MEET IN PERSON THOSE WHO WILL BE

10:41AM  25   INTERACTING WITH THE COMPANY ON A GO-FORWARD BASIS."

PETERSON DIRECT BY MR. LEACH                                    4656

10:41AM   1            IS THAT WHAT WE TALKED ABOUT EARLIER IN TERMS OF THERE WAS

10:41AM   2    AN ELEMENT OF THERANOS SELECTING YOU FOR THIS?

10:41AM   3    A.   YES, AND WE TALKED ABOUT THAT SPECIFICALLY ON THE PHONE

10:41AM   4    CALL.

10:41AM   5    Q.   AND "YOU" MEANING RDV, NOT "YOU" LISA PETERSON?

10:41AM   6    A.   CORRECT.

10:41AM   7    Q.   LET'S LOOK BRIEFLY AT PAGE 6.

10:42AM   8            AND IF WE CAN ZOOM IN ON THE TOP HALF OF THE PAGE,

10:42AM   9    MS. HOLLIMAN.  THAT'S GOOD.

10:42AM  10            UP AT THE TOP, IT READS, "APPENDIX - STATISTICS AND

10:42AM  11    NOTEWORTHY ITEMS."

10:42AM  12            DO YOU SEE THAT, MS. PETERSON?

10:42AM  13    A.   YES.

10:42AM  14    Q.   AND WHAT DID YOU MEAN BY THAT?

10:42AM  15    A.   A LOT OF THIS WAS TAKEN FROM THE BINDERS THAT WE RECEIVED,

10:42AM  16    OTHER THAN THIS SKEPTIC COMMENT AT THE BOTTOM OF THE PAGE,

10:42AM  17    WHICH WERE MORE FOUND ONLINE.

10:42AM  18    Q.   AND WHY DID YOU INCLUDE THIS IN YOUR MEMO?

10:42AM  19    A.   BECAUSE I WANTED THE FAMILY MEMBERS GOING ON THE TRIP AND

10:42AM  20    THE INVESTMENT COMMITTEE TO UNDERSTAND ALL OF THE THINGS THAT

10:42AM  21    IT COULD DO.

10:42AM  22    Q.   OKAY.  AND ALL OF THE INFORMATION THAT YOU THOUGHT WAS

10:42AM  23    IMPORTANT?

10:42AM  24    A.   YES.

10:42AM  25    Q.   LET ME DRAW YOUR ATTENTION TO THE THIRD BULLET.

PETERSON DIRECT BY MR. LEACH                                    4657

10:42AM  1       DO YOU SEE WHERE IT SAYS IN THE SECOND SENTENCE, "THERANOS

10:42AM  2   AUTOMATES THE PRE- AND POST-ANALYTIC PROCESSES (NO MANUAL

10:43AM  3   HANDLING OF THE SAMPLE), DRASTICALLY MINIMIZING THE HUMAN

10:43AM  4   ELEMENTS OF PROCESSING IS WHICH IS PROVEN TO CAUSE THE MAJORITY

10:43AM  5   OF LAB TEST ERRORS."

10:43AM  6       DO YOU SEE THAT?

10:43AM  7   A.   YES.

10:43AM  8   Q.   AND WHERE DID YOU GET THAT INFORMATION?

10:43AM  9   A.   I BELIEVE IT WAS BOTH IN THE BINDERS, AND WE ALSO TALKED

10:43AM  10  ABOUT THAT AS WELL, THAT SHE HAD MENTIONED THAT MOST OF THE

10:43AM  11  ISSUES -- THINGS THAT WENT WRONG WAS FROM THE PEOPLE PERSONALLY

10:43AM  12  HANDLING THE BLOOD AND THE ASSAYS.

10:43AM  13  Q.   AND WAS THIS ATTRACTIVE TO YOU?

10:43AM  14  A.   YES.

10:43AM  15  Q.   LET'S MOVE DOWN TO THE BOTTOM HALF OF THE PAGE.  AND I

10:43AM  16  WANT TO DRAW YOUR ATTENTION, MS. PETERSON, TO THE THIRD BULLET

10:43AM  17  ON THE SCREEN WHERE IT SAYS, "THERANOS USES THEIR OWN ANALYZER

10:43AM  18  EQUIPMENT."

10:44AM  19      DO YOU SEE THAT LANGUAGE?

10:44AM  20  A.   YES.

10:44AM  21  Q.   AND WHY WERE YOU INCLUDING THIS IN YOUR MEMO?

10:44AM  22  A.   BECAUSE THIS WAS THE REASON GIVEN THAT THEY DIDN'T HAVE TO

10:44AM  23  HAVE FDA APPROVAL.

10:44AM  24  Q.   AND WHERE DID YOU GET THIS INFORMATION, THAT "THERANOS

10:44AM  25  USES THEIR OWN ANALYZER EQUIPMENT"?

PETERSON DIRECT BY MR. LEACH                                      4658

10:44AM    1     A.   BOTH FROM CONVERSATIONS AND THE BINDERS.

10:44AM    2     Q.   CONVERSATIONS WITH MS. HOLMES?

10:44AM    3     A.   YES.

10:44AM    4     Q.   AND WAS THAT IMPORTANT TO YOU?

10:44AM    5     A.   YES.

10:44AM    6     Q.   WHY?

10:44AM    7     A.   BECAUSE, AGAIN, IT ALL LENDS CREDIBILITY TO THE FACT THAT

10:44AM    8     THE ANALYZER WORKS.

10:44AM    9     Q.   OKAY.  IN THE NEXT BULLET, IT SAYS, "A THERANOS ANALYZER

10:44AM   10     STATION IS A SMALL FRACTION OF THE SIZE OF A CURRENT LAB,

10:44AM   11     MAKING IT POSSIBLE TO PLACE A THERANOS LAB IN THE OPERATING

10:44AM   12     ROOM OR IN A MILITARY EVACUATION HELICOPTER, ON SHIPS, IN

10:44AM   13     REFUGEE CAMPS, VIRTUALLY ANYWHERE."

10:44AM   14          DO YOU SEE THAT LANGUAGE?

10:44AM   15     A.   YES.

10:44AM   16     Q.   AND WAS THAT RELEVANT TO YOU?

10:44AM   17     A.   VERY MUCH SO.

10:45AM   18     Q.   OKAY.

10:45AM   19     A.   IT MADE IT PORTABLE.

10:45AM   20     Q.   AND WHERE DID YOU GET THIS INFORMATION?

10:45AM   21     A.   FROM THE CONVERSATIONS AND THE BINDERS.  MOSTLY THAT ONE

10:45AM   22     IN THE CONVERSATIONS.  WE TALKED ABOUT CERTAIN INSTANCES IN

10:45AM   23     WHICH THEY WERE USING THE ANALYZER IN REAL LIFE.

10:45AM   24     Q.   MS. HOLMES TOLD YOU THAT?

10:45AM   25     A.   YES.

PETERSON DIRECT BY MR. LEACH                                    4659

10:45AM   1    Q.   AND WHAT DID SHE SAY?

10:45AM   2    A.   THAT THEY WERE USING THEM ON MILITARY HELICOPTERS, AND

10:45AM   3    AGAIN, THEY WERE USING THEM IN CLINICAL TRIALS WITH

10:45AM   4    PHARMACEUTICAL COMPANIES.

10:45AM   5    Q.   IN THE NEXT BULLET IT SAYS, "INCUMBENT PLAYERS CRITICIZE

10:45AM   6    THERANOS'S LACK OF PUBLICATION OF ANY VALIDATION STUDIES IN

10:45AM   7    PEER-REVIEW JOURNALS."

10:45AM   8         DO YOU SEE THAT LANGUAGE?

10:45AM   9    A.   YES.

10:45AM   10   Q.   AND THEN FURTHER ON IT SAYS, "UNLIKE MOST LABS, THERANOS

10:45AM   11   DOES NOT BUY ANALYZER EQUIPMENT FROM A THIRD PARTY, AND THEY DO

10:45AM   12   NOT SELL THEIR ANALYZERS TO OTHER LABS."

10:45AM   13        DO YOU SEE THAT?

10:45AM   14   A.   YES.

10:45AM   15   Q.   AND WHERE DID YOU GET THAT INFORMATION?

10:45AM   16   A.   FROM OUR CONVERSATION AND THE BINDERS.  MOSTLY OUR

10:46AM   17   CONVERSATION AROUND THAT ONE.

10:46AM   18   Q.   WAS THAT RELEVANT TO YOU?

10:46AM   19   A.   VERY.

10:46AM   20   Q.   AND WHY WAS IT RELEVANT THAT THERANOS DID NOT BUY ANALYZER

10:46AM   21   EQUIPMENT FROM THIRD PARTIES?

10:46AM   22   A.   BECAUSE IT WAS DIFFERENT THAN THE COMPETITORS AND IT MEANT

10:46AM   23   THAT THEY DIDN'T HAVE TO HAVE FDA APPROVAL.

10:46AM   24   Q.   DID MS. HOLMES EVER TALK TO YOU ABOUT THE CONCEPT OF A LAB

10:46AM   25   IN A BOX?

PETERSON DIRECT BY MR. LEACH                                    4660

10:46AM   1      A.   YES.

10:46AM   2      Q.   AND TELL US ABOUT THAT, PLEASE.

10:46AM   3      A.   THAT WAS ESSENTIALLY WHAT -- HOW SHE DESCRIBED HER

10:46AM   4      ANALYZER, THAT IT WAS A LAB IN A BOX AND IT WAS PORTABLE AND

10:46AM   5      THAT THEY COULD DO HUNDREDS OF TESTS ON THAT BOX, AND THE GOAL

10:46AM   6      WAS TO GET WITHIN, LIKE, FIVE MILES OF EVERY CONSUMER.

10:46AM   7      Q.   LET ME MOVE FORWARD IN TIME TO THE MEETING THAT YOU

10:46AM   8      DESCRIBED IN PALO ALTO.

10:46AM   9           DID THAT HAPPEN ON OR ABOUT OCTOBER 14TH?

10:46AM   10     A.   YES.

10:46AM   11     Q.   AND YOU FLEW OUT PERSONALLY FOR THAT MEETING?

10:46AM   12     A.   YES.

10:46AM   13     Q.   AND WHO ELSE WAS THERE?

10:46AM   14     A.   DOUG DEVOS WAS THERE, WHO CHAIRED THE INVESTMENT

10:46AM   15     COMMITTEE; RICK DEVOS, WHO WAS ON THE INVESTMENT COMMITTEE;

10:47AM   16     CHERI DEVOS, WHO WAS A SIBLING OF DOUG DEVOS; AND

10:47AM   17     JERRY TUBERGEN AND MYSELF.

10:47AM   18     Q.   AND WHY DID YOU ATTEND?

10:47AM   19     A.   AGAIN, I WAS FACILITATING ALL OF THE INFORMATION AND

10:47AM   20     HELPING THEM WITH INFORMING THEM ON THE INVESTMENT AND

10:47AM   21     LISTENING AND TAKING A LOT OF NOTES.

10:47AM   22     Q.   AND WHO WAS THERE FROM THE THERANOS SIDE?

10:47AM   23     A.   ELIZABETH HOLMES AND SUNNY BALWANI.

10:47AM   24     Q.   DID YOU -- WAS THERE SOME TYPE OF POWERPOINT PRESENTATION

10:47AM   25     DURING THE MEETING?

PETERSON DIRECT BY MR. LEACH                                    4661

10:47AM   1     A.   NO.

10:47AM   2     Q.   OKAY.  DID YOU SEE ANY DEVICES DURING YOUR TIME?

10:47AM   3     A.   YES.

10:47AM   4     Q.   AND WHAT DID YOU SEE?

10:47AM   5     A.   THEY SHOWED US THE ANALYZER AND RAN IT, AND THEN

10:47AM   6     EVENTUALLY TOWARDS THE END OF THE TOUR CHERI HAD HER BLOOD

10:47AM   7     TESTED.

10:47AM   8     Q.   AND DESCRIBE THE ANALYZER THAT YOU SAW FOR US.

10:47AM   9     A.   IT LOOKED LIKE A COMPUTER TOWER.  IT WAS SMALL AND

10:48AM   10    PORTABLE.

10:48AM   11    Q.   OKAY.  AND DID THEY SHOW YOU ANY THIRD PARTY DEVICES?

10:48AM   12    A.   NO.

10:48AM   13    Q.   DID YOU SEE ANY OF THE PRODUCTION FACILITIES?

10:48AM   14    A.   NO.

10:48AM   15    Q.   DID YOU STEP INTO THE CLINICAL LABORATORY?

10:48AM   16    A.   NO, NO.

10:48AM   17    Q.   OKAY.  YOU SAID CHERI DEVOS'S BLOOD WAS DRAWN?

10:48AM   18    A.   YES.

10:48AM   19    Q.   AND DESCRIBE THAT FOR US, PLEASE.

10:48AM   20    A.   THEY HAD -- A PART OF THE BUILDING THAT THEY WERE IN HAD

10:48AM   21    A -- WHAT LOOKED LIKE SOME SMALL LITTLE WALK-IN CLINICAL

10:48AM   22    CLINIC, AND SHE WENT IN AND THEY DID A FINGERSTICK TEST ON HER

10:48AM   23    AND, TO MY KNOWLEDGE, SHE RECEIVED THE RESULTS.

10:48AM   24    Q.   BUT YOU NEVER SAW THE RESULTS?

10:48AM   25    A.   NO, HUH-UH.

PETERSON DIRECT BY MR. LEACH                                    4662

10:48AM  1    Q.   AND WAS THIS IN THE ROOM WITH THE ANALYZER THAT YOU

10:48AM  2    DESCRIBED?

10:48AM  3    A.   NOT THE ONE THAT WE -- THERE WERE TWO DIFFERENT ROOMS.  WE

10:48AM  4    WENT IN ONE ROOM WHERE THEY SHOWED US HOW IT WORKED, AND THEN

10:48AM  5    CHERI WENT INTO A LITTLE CLINIC AREA WITH ANOTHER ANALYZER, TWO

10:49AM  6    DIFFERENT AREAS OF THE BUILDING.

10:49AM  7    Q.   AND HOW LONG DID THIS MEETING LAST?

10:49AM  8    A.   ABOUT FOUR OR FIVE HOURS.

10:49AM  9    Q.   HOW DID IT END?

10:49AM 10    A.   HOW DID IT END?  WE, WE TALKED FOR A LONG, LONG TIME AND

10:49AM 11    EVERYTHING WAS VERY FAVORABLE TOWARDS THE END.  AND WE DEPARTED

10:49AM 12    AND CAUCUSED IN THE -- I WAS GOING IN A DIFFERENT LOCATION AND

10:49AM 13    EVERYONE ELSE WAS GOING BACK ON THE PLANE, AND WE CAUCUSED OUT

10:49AM 14    WHERE WE PARKED FOR, I DON'T KNOW, A GOOD 15 OR 20 MINUTES.

10:49AM 15    Q.   DID YOU WRITE A CHECK THEN AND THERE?

10:49AM 16    A.   NO.  NO.  BUT THERE WAS CONVERSATION AROUND MOVING OUR

10:49AM 17    AMOUNT.  WHEN WE WENT TO THAT MEETING, THE THOUGHT WAS TO DO

10:49AM 18    50 MILLION POTENTIALLY, THAT'S WHAT WE WERE LOOKING AT; AND

10:49AM 19    WHEN WE LEFT THE MEETING -- THEY HAD TALKED IN THE MEETING

10:50AM 20    ABOUT OTHER INVESTORS COMING IN FOR 100 MILLION, AND SO THE

10:50AM 21    FAMILY, DOUG AND JERRY, THOUGHT THAT 100 MIGHT BE A BETTER

10:50AM 22    NUMBER FOR US TO DO.

10:50AM 23    Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO WHAT HAS BEEN

10:50AM 24    MARKED AS EXHIBIT 4858 IN YOUR BINDER.

10:50AM 25        DO YOU RECOGNIZE THIS DOCUMENTED?

PETERSON DIRECT BY MR. LEACH                                    4663

10:50AM   1    A.   YES.

10:50AM   2    Q.   AND WHAT IS IT?

10:50AM   3    A.   THIS IS PART OF THE BINDERS THAT CAME AS PART OF THE

10:50AM   4    DILIGENCE PACKETS.

10:50AM   5    Q.   AND DID YOU REVIEW THIS --

10:50AM   6    A.   YES.

10:50AM   7    Q.   LET ME PLEASE FINISH MY QUESTION.

10:50AM   8         DID YOU REVIEW THIS AS PART OF PROVIDING INFORMATION TO

10:50AM   9    RDV SO THAT IT COULD MAKE AN INVESTMENT DECISION?

10:50AM  10    A.   YES, THOROUGHLY.

10:50AM  11              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 4858.

10:51AM  12              MR. WADE:  LET ME JUST BE CLEAR.  WAS THIS THE

10:51AM  13    ENTIRE BINDER THAT WAS OFFERED, OR IS THIS AN EXCERPT?

10:51AM  14              MR. LEACH:  I'LL ASK THE WITNESS.

10:51AM  15    Q.   DO YOU KNOW, IS THIS THE ENTIRETY OF THE BINDER OR A

10:51AM  16    PORTION OF THE BINDER?

10:51AM  17    A.   NO.  NO.

10:51AM  18              MR. WADE:  NO OBJECTION.

10:51AM  19              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:51AM  20         (GOVERNMENT'S EXHIBIT 4858 WAS RECEIVED IN EVIDENCE.)

10:51AM  21    BY MR. LEACH:

10:51AM  22    Q.   DO YOU SEE THE HEADING THERANOS CONFIDENTIAL OVERVIEW,

10:51AM  23    MS. PETERSON?

10:51AM  24    A.   YES.

10:51AM  25    Q.   AND LET ME PLEASE DRAW YOUR ATTENTION TO PAGE 3.  THERE'S

PETERSON DIRECT BY MR. LEACH                                    4664

10:51AM   1    SOME HIGHLIGHTING AND SOME HANDWRITING ON PAGE 3.

10:51AM   2         DO YOU SEE THAT?

10:51AM   3    A.   YES.

10:51AM   4    Q.   IS THAT YOUR HIGHLIGHTING AND HANDWRITING?

10:52AM   5    A.   YES.

10:52AM   6    Q.   OKAY.  IT SAYS IN BLACK IN THE -- WHERE THE HIGHLIGHTING

10:52AM   7    IS, "THERANOS'S PROPRIETARY PATENTED TECHNOLOGY RUNS

10:52AM   8    COMPREHENSIVE BLOOD TESTS FROM A FINGERSTICK AND TESTS FOR

10:52AM   9    MICRO-SAMPLES OF OTHER MATRICES AND GENERATES SIGNIFICANTLY

10:52AM  10    HIGHER INTEGRITY DATA THAN CURRENTLY POSSIBLE."

10:52AM  11         DO YOU SEE THAT LANGUAGE?

10:52AM  12    A.   YES.

10:52AM  13    Q.   AND IS THAT CONSISTENT WITH STATEMENTS THAT MS. HOLMES

10:52AM  14    MADE TO YOU ON YOUR PHONE CALL WITH HER AND IN PALO ALTO?

10:52AM  15    A.   YES.

10:52AM  16    Q.   AND WAS THIS IMPORTANT TO YOU?

10:52AM  17    A.   VERY, YES.

10:52AM  18    Q.   IN THE NEXT ENTRY IT SAYS, "THERANOS IS THE WORLD'S FIRST

10:52AM  19    AND ONLY CLIA-CERTIFIED LABORATORY RUNNING ITS TESTS ON

10:52AM  20    MICRO-SAMPLES."

10:52AM  21         AND THEN YOU WROTE "CLINICAL LAB IMPROVEMENT AMENDMENTS."

10:52AM  22         IS THAT THE ACRONYM FOR CLIA?

10:52AM  23    A.   YES.

10:52AM  24    Q.   BEFORE THIS INVESTMENT, DID YOU HAVE ANY EXPERIENCE WITH

10:53AM  25    CLIA?

PETERSON DIRECT BY MR. LEACH                                    4665

10:53AM   1    A.   NO.

10:53AM   2    Q.   LET'S LOOK AT PAGE 5, PLEASE.

10:53AM   3         DO YOU SEE THE HEADING, "THERANOS IS CERTIFIED AS A HIGH

10:53AM   4    COMPLEXITY CLIA LABORATORY"?

10:53AM   5    A.   YES.

10:53AM   6    Q.   AND THEN THERE'S A GREEN BAR, "HIGH COMPLEXITY REQUIRES

10:53AM   7    THE HIGHEST LEVEL OF TRAINING, TECHNIQUE, RESULT

10:53AM   8    INTERPRETATION, MOST STRINGENT STANDARDS, LABS ARE SURVEYED

10:53AM   9    ROUTINELY AND RANDOMLY."

10:53AM   10        WAS THIS IMPRESSIVE TO YOU?

10:53AM   11   A.   YES.

10:53AM   12   Q.   HOW SO?

10:53AM   13   A.   IT SHOWED THAT IT WAS A HIGH COMPLEXITY LAB, THAT THEY

10:53AM   14   WERE RUNNING SOMETHING THAT WAS VERY COMPLEX AND DOING IT

10:53AM   15   ACCURATELY.

10:53AM   16   Q.   AND WAS THAT SOMETHING THAT MS. HOLMES HELD OUT TO YOU IN

10:53AM   17   YOUR MEETING OUT IN CALIFORNIA?

10:53AM   18   A.   YES.

10:53AM   19   Q.   OKAY.  LET'S LOOK AT PAGE 7, PLEASE.

10:54AM   20        DO YOU SEE THE HEADING, "THERANOS PROFICIENCY TESTING AND

10:54AM   21   AUDITS"?

10:54AM   22   A.   YES.

10:54AM   23   Q.   AND DO YOU SEE THE LANGUAGE, "SINCE 2011 THERANOS'S CLIA

10:54AM   24   LAB HAS BEEN SUBJECTED TO REGULAR PROFICIENCY TESTING BY

10:54AM   25   MULTIPLE NATIONALLY RECOGNIZED AGENCIES"?

PETERSON DIRECT BY MR. LEACH                                    4666

10:54AM   1          DO YOU SEE THAT LANGUAGE?

10:54AM   2     A.   YES.

10:54AM   3     Q.   AND WAS THIS IMPRESSIVE TO YOU?

10:54AM   4     A.   YES.

10:54AM   5     Q.   AND DID YOU UNDERSTAND THAT THERANOS'S MINILAB DEVICE WAS

10:54AM   6     BEING USED IN THE CLIA LAB SINCE 2011?

10:54AM   7     A.   YES.

10:54AM   8     Q.   AND DID YOU UNDERSTAND THAT THIS PROFICIENCY TESTING WAS

10:54AM   9     DONE WITH RESPECT TO THERANOS'S MINILAB DEVICES BETWEEN 2011

10:54AM  10     AND 2014?

10:54AM  11     A.   YES.

10:54AM  12     Q.   AND IF THIS PROFICIENCY TESTING HAD RELATED TO ORDINARY

10:54AM  13     FDA APPROVED MACHINES, WOULD THAT HAVE BEEN AS IMPRESSIVE TO

10:54AM  14     YOU?

10:54AM  15     A.   IT WOULDN'T HAVE BEEN AS IMPRESSIVE.  IT WOULD HAVE BEEN

10:54AM  16     IMPRESSIVE, BUT NOT AS IMPRESSIVE AS THIS BECAUSE THIS HADN'T

10:54AM  17     BEEN DONE BEFORE, THE FINGERSTICK.

10:55AM  18     Q.   PLEASE GO FORWARD TO PAGE 8.

10:55AM  19          DO YOU SEE THE HEADING "VALIDATION OF THERANOS TESTS"?

10:55AM  20     A.   YES.

10:55AM  21     Q.   AND BENEATH THAT IT SAYS, "THERANOS HAS BEEN

10:55AM  22     COMPREHENSIVELY VALIDATED OVER THE COURSE OF THE LAST SEVEN

10:55AM  23     YEARS BY 10 OF THE 15 LARGEST PHARMACEUTICAL COMPANIES, WITH

10:55AM  24     HUNDREDS OF THOUSANDS OF ASSAYS PROCESSED."

10:55AM  25          I THINK YOU MENTIONED THIS EARLIER IN RESPECT OF YOUR

PETERSON DIRECT BY MR. LEACH                                    4667

10:55AM  1    MEMO.  WAS THIS IMPRESSIVE TO YOU?

10:55AM  2    A.   YES.

10:55AM  3    Q.   HOW SO?

10:55AM  4    A.   IT, IT SAYS THAT THE -- WE TALKED ABOUT IT ALSO AT THE

10:55AM  5    OCTOBER 14TH MEETING.  I MEAN, IT WAS VERY IMPRESSIVE TO US

10:55AM  6    THAT THEY HAD BEEN WORKING WITH PHARMACEUTICAL COMPANIES FOR

10:55AM  7    THE LAST SO MANY YEARS AND DOING CLINICAL TRIALS.

10:55AM  8         THEY WENT ON TO SAY THAT THEIR FINGERSTICK TECHNOLOGY WAS

10:55AM  9    GREAT BECAUSE THEY COULD TEST SUBJECTS MULTIPLE TIMES A DAY,

10:56AM  10   WHERE YOU COULDN'T DO THAT WITH A VENOUS TEST.

10:56AM  11        AND, YES, IT WAS -- IT DEFINITELY LENT CREDIBILITY THAT

10:56AM  12   THE TECHNOLOGY WORKS.

10:56AM  13   Q.   PLEASE MOVE FORWARD TO PAGE 12.

10:56AM  14        DO YOU SEE THE HEADING "OVERVIEW OF CURRENT LABORATORY"?

10:56AM  15   A.   YES.

10:56AM  16   Q.   AND THERE IS SOME HIGHLIGHTING AND HANDWRITING.  IS THAT

10:56AM  17   YOUR HIGHLIGHTING AND HANDWRITING?

10:56AM  18   A.   YES.

10:56AM  19   Q.   OKAY.  IN THE FIRST BULLET IT SAYS, "DECADES OLD BUSINESS

10:56AM  20   PROCESSES - AND TECHNOLOGY INVESTMENTS AROUND THOSE BUSINESS

10:56AM  21   PROCESSES - WITH VERY LITTLE MOTIVATION TO INNOVATE, HAS

10:56AM  22   CREATED A DUOPOLY OF BUSINESSES BURDENED WITH INFRASTRUCTURE

10:56AM  23   COSTS AND LITTLE/NO R&D."

10:56AM  24        DO YOU SEE THAT?

10:56AM  25   A.   YES.

PETERSON DIRECT BY MR. LEACH                                         4668

10:56AM   1     Q.   AND YOU WROTE QUEST LAB CORP. TO THE RIGHT.

10:57AM   2          WHY DID YOU WRITE THAT?

10:57AM   3     A.   THAT WAS REFERRING TO THE DUOPOLY.

10:57AM   4     Q.   AND WHAT DID MS. HOLMES SAY TO YOU IN TERMS OF THERANOS'S

10:57AM   5     INFRASTRUCTURE COSTS AND R&D INVESTMENTS?

10:57AM   6     A.   THAT THEY WERE OFFERING THE MARKET TEST RESULTS AT 50 TO

10:57AM   7     90 PERCENT LESS COSTS, WHICH WAS GOING TO BE VERY BIG FOR THE

10:57AM   8     HEALTH CARE INDUSTRY.

10:57AM   9     Q.   PLEASE LOOK AT PAGE 14.  DO YOU SEE THE HEADING "COST

10:57AM  10     SAVINGS"?

10:57AM  11     A.   YES.

10:57AM  12     Q.   AND IS THIS ANOTHER SLIDE THAT YOU REVIEWED AS PART OF

10:57AM  13     YOUR REVIEW OF THE THERANOS OPPORTUNITY?

10:57AM  14     A.   YES.

10:57AM  15     Q.   AND GENERALLY SPEAKING, WAS THE INFORMATION IN THIS

10:57AM  16     POWERPOINT RELEVANT TO YOU?

10:57AM  17     A.   YES, VERY.

10:57AM  18     Q.   OKAY.  THIS SAYS, "THE FULL RANGE OF TESTS.  A FRACTION OF

10:58AM  19     THE COSTS."

10:58AM  20          AND THEN YOU HIGHLIGHTED 50 PERCENT.

10:58AM  21          WHAT DID YOU UNDERSTAND THIS TO MEAN?

10:58AM  22     A.   WE WERE TOLD MULTIPLE TIMES THAT THEY COULD OFFER HUNDREDS

10:58AM  23     OF TESTS.  OUR THOUGHT WAS 200 TO 300 TESTS VIA FINGERSTICK ON

10:58AM  24     THE ANALYZER, AND THEY WERE DONE AT 50 TO 90 PERCENT OF THE

10:58AM  25     COSTS, AND ALL OF THE COSTS SHE SAID WERE PUBLISHED ON THEIR

PETERSON DIRECT BY MR. LEACH                                      4669

```
10:58AM   1    WEBSITE.
10:58AM   2    Q.   AND THIS COST SAVINGS SLIDE CONTINUES ON TO PAGE 15.  IF
10:58AM   3    WE COULD PLEASE LOOK AT THAT.
10:58AM   4         AND THERE'S SOME MORE HIGHLIGHTING AND HANDWRITING DOWN AT
10:58AM   5    THE BOTTOM.  THERE'S A BULLET, "THE UNPRECEDENTED LACK OF
10:58AM   6    VARIATION FROM SYSTEM TO SYSTEM YIELDS HIGHER INTEGRITY DATA."
10:58AM   7         DO YOU SEE THAT?
10:58AM   8    A.   YES.
10:58AM   9    Q.   AND YOU WROTE "THERANOS IS STANDARDIZED"?
10:58AM  10    A.   YES.
10:58AM  11    Q.   WHAT DID THAT REFER TO?
10:58AM  12    A.   THAT THERE WASN'T ANY KIND OF MANUAL HUMAN INTERACTION
10:59AM  13    WITH THE MACHINE, SO IT WAS MY WAY OF SAYING IT WAS
10:59AM  14    STANDARDIZED.
10:59AM  15    Q.   OKAY.  AND THAT'S INFORMATION THAT YOU GOT FROM
10:59AM  16    MS. HOLMES?
10:59AM  17    A.   YES.
10:59AM  18    Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO PAGE 28.
10:59AM  19         DO YOU SEE THE HEADING, "SAME TESTS, A WHOLE NEW
10:59AM  20    APPROACH"?
10:59AM  21    A.   YES.
10:59AM  22    Q.   AND BENEATH THAT, "THE ACTIONABLE INFORMATION YOU NEED
10:59AM  23    1/1000TH THE SIZE OF A TYPICAL BLOOD DRAW."
10:59AM  24         AND THERE ARE SOME IMAGES OF FINGERS AND TO THE RIGHT A
10:59AM  25    SMALL VIAL.
```

PETERSON DIRECT BY MR. LEACH                                    4670

10:59AM   1          DO YOU SEE THAT?

10:59AM   2     A.   YES.

10:59AM   3     Q.   AND WHAT DID YOU UNDERSTAND THAT TO BE?

10:59AM   4     A.   THAT THAT WAS THE AMOUNT OF BLOOD THAT THEY NEEDED TO RUN

10:59AM   5     THEIR HUNDREDS OF TESTS.

10:59AM   6     Q.   AND YOU HIGHLIGHTED, "THERANOS RUNS ANY TEST AVAILABLE IN

10:59AM   7     CENTRAL LABORATORIES, AND PROCESSES ALL SAMPLE TYPES."

10:59AM   8          WHY DID YOU HIGHLIGHT THAT?

10:59AM   9     A.   AGAIN, IT WAS JUST IN WRITING WHAT SHE HAD BEEN SAYING,

11:00AM  10     THAT THEY WERE RUNNING HUNDREDS OF TESTS ON THIS ANALYZER.

11:00AM  11     Q.   AT THE BOTTOM IT SAYS, "THERANOS PROVIDES THE HIGHEST

11:00AM  12     LEVEL OF OVERSIGHT, AUTOMATION, AND STANDARDIZATION IN OUR PRE-

11:00AM  13     AND POST-ANALYTIC PROCESSES, ENSURING THE HIGHEST LEVELS OF

11:00AM  14     ACCURACY AND PRECISION."

11:00AM  15          WAS IT IMPRESSIVE TO YOU THAT THERANOS PROVIDED THE

11:00AM  16     HIGHEST LEVELS OF ACCURACY AND PRECISION?

11:00AM  17     A.   YES, OF COURSE.

11:00AM  18               MR. LEACH:  YOUR HONOR, I STILL HAVE MORE ON THIS

11:00AM  19     DOCUMENT, BUT I KNOW IT'S 11:00 O'CLOCK.

11:00AM  20               THE COURT:  LET'S TAKE OUR BREAK.  I SAID WE WOULD

11:00AM  21     TAKE OUR BREAK AT 11:00, SO LET'S TAKE A 30 MINUTE BREAK AND

11:00AM  22     WE'LL COME BACK.  SO WE'LL BE IN RECESS.

11:01AM  23          (JURY OUT AT 11:01 A.M.)

11:01AM  24               THE COURT:  MS. PETERSON, YOU CAN STAND DOWN.

11:01AM  25               PLEASE BE SEATED.  THANK YOU.  ALL RIGHT.  THE RECORD

PETERSON DIRECT BY MR. LEACH

11:01AM   1   SHOULD REFLECT THAT THE JURY HAS LEFT FOR A RECESS, AND THE

11:01AM   2   WITNESS HAS LEFT THE COURTROOM.

11:01AM   3       MR. DOWNEY?

11:01AM   4           MR. DOWNEY:  YOUR HONOR, I JUST WANTED TO REQUEST

11:01AM   5   THAT AT SOME POINT DURING THE BREAK THAT MR. SCHENK AND I HAVE

11:01AM   6   A CHANCE TO HAVE A BRIEF CONVERSATION WITH YOU.

11:01AM   7           THE COURT:  SURE.  WE CAN DO THAT RIGHT NOW IF YOU

11:01AM   8   WOULD LIKE.  SURE.  I'LL ASK THE REPORTER TO JOIN US.

11:02AM   9           THE CLERK:  COURT IS IN RECESS.

11:02AM  10       (PROCEEDINGS HELD IN CHAMBERS.)

11:15AM  11           THE COURT:  COME ON IN.  I'M SORRY.

11:15AM  12       ALL RIGHT.  WE'RE ON THE RECORD IN CHAMBERS WITH

11:15AM  13   MR. DOWNEY AND MR. SCHENK AT MR. DOWNEY'S REQUEST.

11:15AM  14           MR. DOWNEY:  YOUR HONOR, I WAS OBSERVING DURING OUR

11:15AM  15   FIRST SESSION JUROR NUMBER 5.  I THINK SHE'S CLEARLY DOING THE

11:15AM  16   BEST THAT SHE CAN TO TRY TO FOLLOW THE PROCEEDINGS.

11:15AM  17       THERE WERE INTERIM PERIODS WHERE I THINK SHE WAS

11:15AM  18   COMPLETELY DISTRACTED FROM MY VANTAGE POINT.

11:15AM  19       SO I AM -- I'M NOT SURE THAT WHAT WE'RE ASKING HER TO DO

11:15AM  20   IN THE CURRENT CIRCUMSTANCE IS REALLY A FAIR REQUEST.

11:15AM  21       I WONDER IF WE MIGHT ADJOURN WITH THE BALANCE OF TODAY AND

11:15AM  22   ALLOW HER TO GET HER ARMS AROUND THE SITUATION, AND THEN WE CAN

11:15AM  23   DECIDE WHAT THAT MEANS FOR THE REST OF THE PROCEEDING.

11:15AM  24       BUT I'M CONCERNED ABOUT ONE JUROR BEING DISTRACTED DURING

11:15AM  25   DIFFERENT PERIODS OF THE TRIAL.  OBVIOUSLY IT'S NOT IN THE

PETERSON DIRECT BY MR. LEACH                                    4672

| | | |
|---|---|---|
| 11:15AM | 1 | GOVERNMENT'S DIRECT, BUT I'M CONCERNED ABOUT IT. |
| 11:15AM | 2 | THE COURT:  SURE. |
| 11:15AM | 3 | MR. SCHENK? |
| 11:15AM | 4 | MR. SCHENK:  FROM MY SEAT I DID NOT HAVE THE |
| 11:15AM | 5 | OPPORTUNITY TO OBSERVE THE JUROR.  I'D BE HAPPY TO GO BACK AND |
| 11:15AM | 6 | ASK OTHER PEOPLE ON MY TEAM IF THEY HAD THE OPPORTUNITY TO |
| 11:15AM | 7 | OBSERVE HER, OR THE COURT COULD ASK HER, IF THE COURT IS |
| 11:15AM | 8 | INCLINED TO ADJOURN FOR THE DAY AND ASK HER IF THAT WOULD BE |
| 11:15AM | 9 | HELPFUL FOR THIS JUROR. |
| 11:15AM | 10 | I DON'T KNOW THAT I'M IN A POSITION TO COMMENT.  I JUST |
| 11:15AM | 11 | DIDN'T SEE IT FROM WHERE I SIT. |
| 11:15AM | 12 | THE COURT:  THANK YOU.  I WAS KEEPING AN EYE ON HER |
| 11:15AM | 13 | THROUGH THE -- THIS MORNING FOR, I GUESS WE'VE BEEN IN |
| 11:15AM | 14 | TESTIMONY FOR MAYBE AN HOUR OR 45 MINUTES, AN HOUR. |
| 11:15AM | 15 | AT ONE POINT I NOTICED HER HEAD WAS DOWN, SHE WAS LOOKING |
| 11:15AM | 16 | TOWARDS HER LAP, AND I THOUGHT SHE WAS -- IT LOOKED LIKE SHE |
| 11:15AM | 17 | WAS MANIPULATING A PHONE, MAYBE TEXTING, AND THEN SHE CAME UP |
| 11:15AM | 18 | AND SHE UNWRAPPED A PIECE OF FOIL AND PUT SOME GUM IN HER |
| 11:15AM | 19 | MOUTH. |
| 11:15AM | 20 | AND I THOUGHT, WELL, OKAY.  I DIDN'T SEE HER -- I THINK I |
| 11:15AM | 21 | NOTICED HER LOOKING DOWN AT HER LAP AGAIN A COUPLE OF TIMES, |
| 11:15AM | 22 | BUT I DIDN'T SEE HER DO THE MANIPULATION. |
| 11:15AM | 23 | I THINK IT'S A GOOD IDEA, THOUGH, I THINK THAT SUGGESTION |
| 11:15AM | 24 | TO BRING HER IN AND ASK HER HER THOUGHTS MAYBE NOW WOULD BE |
| 11:15AM | 25 | BETTER THAN JUST TO GET HER REAL-TIME THOUGHTS ON WHERE THIS |

PETERSON DIRECT BY MR. LEACH                                                4673

11:15AM   1        IS.

11:15AM   2             SO, MS. KRATZMANN.

11:15AM   3             THE CLERK:  SO, WHEN THE JURORS WERE EXITING, SHE

11:15AM   4   STARTED TO PUT HER AIR BUDS IN AND WAS GOING TO MAKE A CALL, SO

11:15AM   5   I ASSUME SHE'S COMMUNICATING.

11:15AM   6             THE COURT:  COULD YOU ASK HER TO COME IN?

11:15AM   7             THE CLERK:  OKAY.

11:15AM   8             MR. DOWNEY:  COULD WE RELOCATE OURSELVES, JUDGE?

11:15AM   9             THE COURT:  YEAH.  LET'S HAVE YOU SIT BACK WHERE YOU

11:15AM  10   WERE IF YOU DON'T MIND.  THANKS.

11:15AM  11         WOULD YOU GUYS LIKE SOME COFFEE OR TEA OR ANYTHING?

11:15AM  12             MR. SCHENK:  NO.  THANK YOU.

11:15AM  13         (PAUSE IN PROCEEDINGS.)

11:15AM  14             THE CLERK:  YOUR HONOR, I BELIEVE SHE HAS STEPPED

11:15AM  15   OUTSIDE.  DO YOU WANT ME TO WAIT UNTIL SHE RETURNS?

11:15AM  16             THE COURT:  CAN YOU POKE YOUR HEAD OUT IN THE

11:15AM  17   HALLWAY THERE?

11:15AM  18             THE CLERK:  YES.  AND IF SHE'S NOT OUT THERE, I

11:15AM  19   PRESUME SHE'S NOT IN THE BUILDING.

11:15AM  20             THE COURT:  YES.  OKAY.

11:15AM  21         (PAUSE IN PROCEEDINGS.)

11:15AM  22         (THE FOLLOWING PROCEEDINGS WERE HELD IN CHAMBERS IN SEALED

11:15AM  23   PROCEEDINGS WITH JUROR NUMBER 5 PRESENT, PAGES 4674- 4677.)

         24

         25

4678

|         |    |                                                              |
|---------|----|--------------------------------------------------------------|
| 11:15AM | 1  | **AFTERNOON SESSION**                                        |
| 11:42AM | 2  | (IN OPEN COURT.)                                             |
| 11:42AM | 3  | (JURY IN AT 11:42 A.M.)                                      |
| 11:42AM | 4  | THE COURT:  THANK YOU.  PLEASE BE SEATED.  WE'RE             |
| 11:42AM | 5  | BACK ON THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT |
| 11:42AM | 6  | ONCE AGAIN.                                                  |
| 11:42AM | 7  | MS. PETERSON IS BACK ON THE STAND.  THANK YOU.               |
| 11:42AM | 8  | MR. LEACH.                                                   |
| 11:42AM | 9  | MR. LEACH:  THANK YOU, YOUR HONOR.                           |
| 11:43AM | 10 | Q.  GOOD MORNING, MS. PETERSON.                              |
| 11:43AM | 11 | WHEN WE BROKE WE WERE GOING THROUGH PORTIONS OF THE          |
| 11:43AM | 12 | POWERPOINT THAT YOU REVIEWED, AND I WANT TO DRAW YOUR        |
| 11:43AM | 13 | ATTENTION, PLEASE, TO PAGE 30 OF EXHIBIT 4858.              |
| 11:43AM | 14 | DO YOU SEE THE HEADING, "A NEW STANDARD IN QUALITY.          |
| 11:43AM | 15 | "THE HIGHEST LEVELS OF ACCURACY."                           |
| 11:43AM | 16 | A.  YES.  IS THAT ON OKAY?  YES.                             |
| 11:43AM | 17 | Q.  DO YOU SEE THE HEADING, "A NEW STANDARD IN QUALITY.      |
| 11:43AM | 18 | "THE HIGHEST LEVELS OF ACCURACY"?                           |
| 11:43AM | 19 | A.  YES.                                                     |
| 11:43AM | 20 | Q.  AND IS THAT A CONCEPT THAT MS. HOLMES SPOKE ABOUT IN YOUR |
| 11:43AM | 21 | MEETING IN CALIFORNIA IN PALO ALTO?                          |
| 11:43AM | 22 | A.  YES.                                                     |
| 11:43AM | 23 | Q.  AND DO YOU SEE WHERE IT SAYS, "BY SYSTEMATICALLY         |
| 11:43AM | 24 | CONTROLLING AND STANDARDIZING OUR PROCESSES, THERANOS OFFERS |
| 11:43AM | 25 | TESTS WITH THE HIGHEST LEVELS OF ACCURACY."                 |

| | | |
|---|---|---|
| 11:43AM | 1 | WAS THAT IMPORTANT TO YOU? |
| 11:43AM | 2 | A.   YES, IT LENDED CREDIBILITY, AGAIN, TO THE ACCURACY OF THE |
| 11:44AM | 3 | ANALYZER. |
| 11:44AM | 4 | Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO PAGE 32. |
| 11:44AM | 5 | DO YOU SEE THE HEADING "NEW POSSIBILITIES IN LAB"? |
| 11:44AM | 6 | A.   YES. |
| 11:44AM | 7 | Q.   AND BENEATH THE COLUMN "ROUTINE, SPECIALTY, AND ESOTERIC |
| 11:44AM | 8 | TESTING," DO YOU SEE WHERE IT SAYS, "COMPREHENSIVE LABORATORY |
| 11:44AM | 9 | TEST MENU AVAILABLE THROUGH THERANOS. |
| 11:44AM | 10 | "THERANOS RUNS ANY TEST AVAILABLE IN CENTRAL LABORATORIES. |
| 11:44AM | 11 | "THERANOS CAN PROCESS ANY SAMPLE TYPE." |
| 11:44AM | 12 | IS THAT CONSISTENT WITH REPRESENTATIONS THAT MS. HOLMES |
| 11:44AM | 13 | MADE TO YOU? |
| 11:44AM | 14 | A.   YES, VERY. |
| 11:44AM | 15 | Q.   AND LET ME DRAW YOUR ATTENTION, PLEASE, TO PAGE 38. |
| 11:44AM | 16 | DO YOU SEE THE HEADING "THERANOS LABORATORY MARKET"? |
| 11:44AM | 17 | A.   YES. |
| 11:44AM | 18 | Q.   AND IN THE FOURTH BULLET IT READS, "REPLACES OLD |
| 11:45AM | 19 | INFRASTRUCTURE WITH NEW." |
| 11:45AM | 20 | WHAT DID YOU UNDERSTAND THAT TO MEAN? |
| 11:45AM | 21 | A.   I WOULD TAKE THAT TO MEAN AT THE TIME THAT IT WAS |
| 11:45AM | 22 | REPLACING THE OLD DUOPOLY INFRASTRUCTURE FROM QUEST AND |
| 11:45AM | 23 | LAB CORP. AND MAKING IT MORE AUTOMATED AND PORTABLE. |
| 11:45AM | 24 | Q.   AND WHAT DO YOU MEAN BY "INFRASTRUCTURE"? |
| 11:45AM | 25 | A.   THE BOX ITSELF, THE ANALYZER. |

4680

| | | |
|---|---|---|
| 11:45AM | 1 | Q.   LET ME MOVE FORWARD TO PAGE 40. |
| 11:45AM | 2 | DO YOU SEE THE HEADING "THERANOS'S FOOTPRINT UPON NATIONAL |
| 11:45AM | 3 | DEPLOYMENT: |
| 11:45AM | 4 | "THERANOS WELLNESS CENTERS IN WALGREENS"? |
| 11:45AM | 5 | A.   YES. |
| 11:45AM | 6 | Q.   AND DID YOU DISCUSS THE WALGREENS ROLLOUT WITH MS. HOLMES |
| 11:45AM | 7 | IN YOUR MEETING IN CALIFORNIA ON OR ABOUT OCTOBER 14TH? |
| 11:45AM | 8 | A.   YES. |
| 11:45AM | 9 | Q.   AND THIS IS IN 2014? |
| 11:45AM | 10 | A.   YES. |
| 11:45AM | 11 | Q.   OKAY.  DID MS. HOLMES OR MR. BALWANI SAY ANYTHING TO THE |
| 11:46AM | 12 | EFFECT THAT THE WALGREENS ROLLOUT WAS STALLING OR SLOWING? |
| 11:46AM | 13 | A.   NOT AT ALL. |
| 11:46AM | 14 | Q.   DID THEY SAY ANYTHING TO THE EFFECT THAT WALGREENS WAS |
| 11:46AM | 15 | FRUSTRATED BY THE NUMBER OF VENOUS DRAWS? |
| 11:46AM | 16 | A.   NOT AT ALL. |
| 11:46AM | 17 | Q.   DID YOU HAVE ANY CONCEPT THAT THERANOS WAS DOING VENOUS |
| 11:46AM | 18 | DRAWS? |
| 11:46AM | 19 | A.   NONE WHATSOEVER. |
| 11:46AM | 20 | Q.   PLEASE LOOK AT PAGE 49. |
| 11:46AM | 21 | DO YOU SEE THE HEADING "RECENT PRESS"? |
| 11:46AM | 22 | A.   YES. |
| 11:46AM | 23 | Q.   AND TO THE RIGHT THERE'S AN IMAGE OF A "FORTUNE" MAGAZINE |
| 11:46AM | 24 | ARTICLE, "THIS CEO IS OUT FOR BLOOD." |
| 11:46AM | 25 | ARE THESE PRESS ARTICLES THAT MS. HOLMES REFERRED -- OR |

4681

11:46AM 1    THAT THIS POWERPOINT REFERRED YOU TO?

11:46AM 2    A.   YES.

11:46AM 3    Q.   AND DID YOU MAKE AN EFFORT TO REVIEW WHATEVER PUBLIC

11:46AM 4    INFORMATION YOU COULD FIND ABOUT THERANOS?

11:46AM 5    A.   YES.

11:46AM 6    Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO PAGE 103 OF THIS

11:47AM 7    DOCUMENT.

11:47AM 8        IS THIS A PORTION OF THE MATERIALS IN THE BINDER THAT YOU

11:47AM 9    REVIEWED, MS. PETERSON?

11:47AM 10   A.   YES.

11:47AM 11   Q.   OKAY.  AND DO YOU SEE WHERE IT SAYS, "EXEMPLARY REPORTS

11:47AM 12   FROM PHARMACEUTICAL PARTNERS"?

11:47AM 13   A.   YES.

11:47AM 14   Q.   PLEASE LOOK AT THE NEXT PAGE, PAGE 140, OR 104.

11:47AM 15       AND IF WE CAN ZOOM IN, MS. HOLLIMAN, ON EVERYTHING DOWN TO

11:47AM 16   THE WORD "CONCLUSIONS" AND THE THREE BULLETS.  THERE YOU GO.

11:47AM 17       THANK YOU.

11:47AM 18       DOES THIS APPEAR TO BE SOMETHING CALLED "THERANOS

11:47AM 19   ANGIOGENESIS STUDY REPORT"?

11:47AM 20   A.   YES.

11:47AM 21   Q.   AND DO YOU SEE THE PFIZER LOGO UP IN THE LEFT-HAND CORNER?

11:47AM 22   A.   YES.

11:47AM 23   Q.   AND DO YOU SEE THE THERANOS LOGO IN THE RIGHT-HAND CORNER?

11:48AM 24   A.   YES.

11:48AM 25   Q.   OKAY.  DID YOU BELIEVE THIS REPORT WAS PREPARED BY PFIZER?

| | | |
|---|---|---|
| 11:48AM | 1 | A.   YES. |
| 11:48AM | 2 | Q.   WHY DID YOU BELIEVE THAT? |
| 11:48AM | 3 | A.   BECAUSE THE LOGO WAS ON IT. |
| 11:48AM | 4 | Q.   DID YOU EVER SEE A VERSION OF THIS REPORT WITH ONLY THE |
| 11:48AM | 5 | THERANOS LOGO ON IT? |
| 11:48AM | 6 | A.   NO. |
| 11:48AM | 7 | Q.   DID YOU EVER SEE A VERSION OF THIS REPORT WHERE UNDERNEATH |
| 11:48AM | 8 | THE HEADING "THERANOS ANGIOGENESIS STUDY REPORT" IT SAYS |
| 11:48AM | 9 | "PREPARED FOR DR. AIDAN POWER"? |
| 11:48AM | 10 | A.   I DON'T RECALL THAT. |
| 11:48AM | 11 | Q.   OKAY.  HAVE YOU EVER HEARD OF SOMEBODY CALLED |
| 11:48AM | 12 | DR. AIDAN POWER? |
| 11:48AM | 13 | A.   NO. |
| 11:48AM | 14 | Q.   DID MS. HOLMES EVER TELL YOU THAT THIS REPORT WAS |
| 11:48AM | 15 | THERANOS'S WORK AND WAS NOT APPROVED BY PFIZER? |
| 11:48AM | 16 | A.   NO. |
| 11:48AM | 17 | Q.   OKAY.  WAS IT RELEVANT TO YOU THAT THIS CAME FROM PFIZER? |
| 11:48AM | 18 | A.   VERY RELEVANT. |
| 11:48AM | 19 | Q.   WHY? |
| 11:48AM | 20 | A.   AGAIN, IT CAME FROM A LARGE COMPANY.  IT VALIDATED |
| 11:48AM | 21 | EVERYTHING THAT SHE WAS TELLING US FROM A LARGE EXTERNAL |
| 11:49AM | 22 | INDEPENDENT THIRD PARTY. |
| 11:49AM | 23 | Q.   LET'S LOOK, PLEASE, AT PAGE 129. |
| 11:49AM | 24 | DO YOU SEE THE PFIZER LOGO AGAIN, MS. PETERSON? |
| 11:49AM | 25 | A.   YES. |

4683

11:49AM   1      Q.   AND THE THERANOS LOGO TO THE RIGHT?

11:49AM   2      A.   YES.

11:49AM   3      Q.   OKAY.  AND THERE'S A NUMBER OF CONCLUSIONS LISTED ON THIS.

11:49AM   4      WE SEE ON THE SCREEN 1 THROUGH 9.

11:49AM   5      A.   YES.

11:49AM   6      Q.   AND ON THE DOCUMENT ARE THERE SOME ADDITIONAL ONES, 10

11:49AM   7      THROUGH 13?

11:49AM   8      A.   I DIDN'T -- I DON'T HAVE IT IN THE BINDER HERE, BUT --

11:49AM   9      Q.   OKAY.  THERE YOU GO.

11:49AM  10      A.   YES.

11:49AM  11      Q.   DID YOU BELIEVE THESE TO BE CONCLUSIONS THAT PFIZER HAD

11:49AM  12      REACHED AFTER ITS WORK?

11:49AM  13      A.   YES.

11:49AM  14      Q.   OKAY.  ASSUMING THESE WERE JUST THE VIEWS OF THERANOS,

11:49AM  15      WOULD THAT HAVE HAD RELEVANCE TO YOU?

11:49AM  16      A.   NOT NEAR AS MUCH, NO.

11:49AM  17      Q.   WHY IS THAT?

11:49AM  18      A.   BECAUSE PFIZER IS A LARGE REPUTABLE PHARMACEUTICAL COMPANY

11:50AM  19      THAT WE THOUGHT USED THE ANALYZER AND WAS SAYING THAT THE

11:50AM  20      RESULTS WERE ACCURATE.

11:50AM  21      Q.   OKAY.  LET ME DRAW YOUR ATTENTION, PLEASE, TO ANOTHER

11:50AM  22      DOCUMENT.  IT'S EXHIBIT 1853.  I BELIEVE THIS IS IN EVIDENCE.

11:50AM  23      A.   I'M SORRY, WHAT IS THE NUMBER AGAIN?

11:50AM  24      Q.   1853.

11:50AM  25      A.   18 -- OKAY.

4684

| | | |
|---|---|---|
| 11:50AM | 1 | Q.   DO YOU RECOGNIZE THIS DOCUMENT? |
| 11:50AM | 2 | A.   YES. |
| 11:50AM | 3 | Q.   WHAT IS THIS? |
| 11:50AM | 4 | A.   THESE ARE THE FINANCIAL STATEMENTS, FINANCIALS THAT WE |
| 11:50AM | 5 | RECEIVED AS PART OF THE DILIGENCE BINDER, AND THE WRITING IS |
| 11:50AM | 6 | MINE. |
| 11:50AM | 7 | Q.   YOU RECEIVED THIS FROM THERANOS? |
| 11:50AM | 8 | A.   YES. |
| 11:50AM | 9 | Q.   AND DID YOU DISCUSS THIS PROJECTED STATEMENT OF INCOME |
| 11:50AM | 10 | WITH MS. HOLMES IN YOUR MEETING IN CALIFORNIA IN OCTOBER OF |
| 11:51AM | 11 | 2014? |
| 11:51AM | 12 | A.   YES, WITH BOTH MS. HOLMES AND MR. BALWANI. |
| 11:51AM | 13 | Q.   OKAY.  AND YOU SEE THE LINE "PROJECTED STATEMENT OF |
| 11:51AM | 14 | INCOME" TO THE LEFT? |
| 11:51AM | 15 | A.   YES. |
| 11:51AM | 16 | Q.   AND THEN THERE IS A COLUMN FOR DECEMBER 31ST, 2014. |
| 11:51AM | 17 |      DO YOU SEE THAT? |
| 11:51AM | 18 | A.   YES. |
| 11:51AM | 19 | Q.   AND DID YOU BELIEVE THIS TO BE THERANOS'S REVENUE |
| 11:51AM | 20 | PROJECTIONS FOR THE YEAR ENDING 2014? |
| 11:51AM | 21 | A.   YES. |
| 11:51AM | 22 | Q.   OKAY.  WHAT MONTH DID RDV RECEIVE THESE PROJECTED |
| 11:51AM | 23 | FINANCIAL STATEMENTS? |
| 11:51AM | 24 | A.   OCTOBER. |
| 11:51AM | 25 | Q.   OCTOBER OF 2014? |

4685

11:51AM   1    A.   YES.

11:51AM   2    Q.   AND DID THAT GIVE YOU ANY COMFORT THAT THERANOS WOULD BE

11:51AM   3    BETTER ABLE TO HIT THOSE PROJECTIONS?

11:51AM   4    A.   YES.

11:51AM   5    Q.   EXPLAIN THAT FOR US.

11:51AM   6    A.   ONE WOULD ASSUME IN OCTOBER THAT THERE WERE -- IF THEY

11:51AM   7    WERE PUTTING FORTH A PROJECTION FOR DECEMBER OF THAT YEAR, THAT

11:51AM   8    THEY WERE AT OR CLOSE TO THAT PROJECTION.

11:51AM   9    Q.   THE FIRST LINE UNDER REVENUE U.S. COMMERCIAL ONLY SAYS,

11:52AM  10    "LAB SERVICES FROM U.S. RETAIL PHARMACIES."

11:52AM  11         AND THEN FOR 2014 THE AMOUNT IS 42 MILLION.

11:52AM  12         DO YOU SEE THAT?

11:52AM  13    A.   YES.

11:52AM  14    Q.   AND DID YOU UNDERSTAND THAT TO BE REVENUE FROM THE

11:52AM  15    WALGREENS RELATIONSHIP?

11:52AM  16    A.   YES.

11:52AM  17    Q.   AND THEN THERE'S TWO ENTRIES FOR PHYSICIAN OFFICES AND LAB

11:52AM  18    SERVICES REVENUE FROM HOSPITALS IN THE AMOUNT OF 11 MILLION AND

11:52AM  19    47 MILLION.

11:52AM  20         DO YOU SEE THAT?

11:52AM  21    A.   YES.

11:52AM  22    Q.   AND WHAT DID YOU UNDERSTAND THAT TO MEAN?

11:52AM  23    A.   THERE WERE A NUMBER OF HOSPITALS THAT SHE MENTIONED THEY

11:52AM  24    HAD CONTRACTED WITH, LIKE INTERMOUNTAIN AND UCSF AND DIGNITY

11:52AM  25    HEALTH WERE SOME THAT SHE NAMED.  WE WERE ASSUMING THAT THOSE

| 11:52AM | 1 | WERE REVENUES COMING FROM THOSE CONTRACTS. |
| 11:52AM | 2 | Q.   THERE IS ALSO AN ENTRY FOR PHARMACEUTICAL SERVICES IN THE |
| 11:52AM | 3 | AMOUNT OF $40 MILLION. |
| 11:52AM | 4 |    DO YOU SEE THAT? |
| 11:52AM | 5 | A.   YES. |
| 11:52AM | 6 | Q.   AND WHAT DID YOU UNDERSTAND THAT TO REFER TO? |
| 11:52AM | 7 | A.   REVENUE COMING FROM THE CLINICAL STUDIES FROM PEOPLE LIKE |
| 11:53AM | 8 | PFIZER AND OTHER -- THE TOP 10 OF THE 15 PHARMACEUTICAL |
| 11:53AM | 9 | COMPANIES, THAT THERE WAS REVENUE COMING IN FROM THOSE. |
| 11:53AM | 10 | Q.   THERE'S SOME QUESTION MARKS NEXT TO PHARMACEUTICAL |
| 11:53AM | 11 | SERVICES AND DOD. |
| 11:53AM | 12 |    DO YOU SEE THAT? |
| 11:53AM | 13 | A.   YES. |
| 11:53AM | 14 | Q.   AND CAN YOU EXPLAIN WHAT YOU MEANT BY THAT, OR WHAT THAT |
| 11:53AM | 15 | REFERS TO? |
| 11:53AM | 16 | A.   THE QUESTION MARKS -- THERE'S TWO DIFFERENT INKS ON HERE. |
| 11:53AM | 17 | THE QUESTION MARKS AND QUESTION OF ORDER OF MAGNITUDE WITH THE |
| 11:53AM | 18 | QUESTION MARKS.  THE QUESTION MARKS WERE PUT ON THERE BEFORE |
| 11:53AM | 19 | THE MEETING AND DISCUSSED AND ANSWERED NOT SO MUCH ON THIS |
| 11:53AM | 20 | PAGE, BUT IN MY MEMO FOLLOWING THE MEETING. |
| 11:53AM | 21 | Q.   OKAY.  SO DO I UNDERSTAND YOU TO BE SAYING THAT THE |
| 11:53AM | 22 | LIGHTER INK IS QUESTIONS THAT YOU HAD GOING INTO THE MEETING, |
| 11:53AM | 23 | AND THEN THE DARKER INK IS WHAT YOU LEARNED IN THE MEETING? |
| 11:53AM | 24 | A.   CORRECT. |
| 11:53AM | 25 | Q.   OKAY.  IN THE OCTOBER 2014 MEETING, DID MS. HOLMES OR |

4687

11:53AM 1     MR. BALWANI TELL YOU THAT THERANOS HAD ZERO REVENUE FROM

11:54AM 2     PHARMACEUTICAL COMPANIES IN 2013?

11:54AM 3     A.   NO, NO.

11:54AM 4     Q.   HOW ABOUT ZERO REVENUE FROM PHARMACEUTICAL COMPANIES IN

11:54AM 5     2012?

11:54AM 6     A.   NO.

11:54AM 7     Q.   WOULD THAT HAVE BEEN RELEVANT TO YOU?

11:54AM 8     A.   YES, VERY.

11:54AM 9     Q.   WHY?

11:54AM 10    A.   BECAUSE IT WAS CONTRARY TO WHAT THEY WERE SAYING, THAT

11:54AM 11    THEY HAD SIX OR SEVEN YEARS OF DOING WORK FOR MAJOR

11:54AM 12    PHARMACEUTICAL COMPANIES.

11:54AM 13    Q.   OKAY.  THE TOTAL AMOUNT OF REVENUE UNDER DECEMBER 31ST,

11:54AM 14    2014 IS $140 MILLION.

11:54AM 15         DO YOU SEE THAT?

11:54AM 16    A.   YES.

11:54AM 17    Q.   AND WAS THAT IMPRESSIVE TO YOU?

11:54AM 18    A.   YES.

11:54AM 19    Q.   OKAY.  TO THE RIGHT THERE'S SOME NUMBERS FOR 2015.

11:54AM 20         DO YOU SEE THOSE?

11:54AM 21    A.   YES.

11:54AM 22    Q.   AND YOU'VE CROSSED OUT THE NUMBERS FOR PHYSICIAN'S OFFICES

11:54AM 23    ON SITE SERVICES REVENUE FROM HOSPITALS AND PHARMACEUTICAL

11:54AM 24    SERVICES AND HAVE WRITTEN SOME NUMBERS TO THE RIGHT.

11:54AM 25         CAN YOU EXPLAIN WHAT THAT MEANS?

4688

| | | |
|---|---|---|
| 11:54AM | 1 | A.   DURING THE MEETING THEY HAD MADE SOME CHANGES TO THOSE |
| 11:55AM | 2 | NUMBERS, BUT THEY WERE MINOR.  THE 160 IS 160 MILLION.  IT'S |
| 11:55AM | 3 | NOT 160,000.  IT'S JUST MY SHORTHAND. |
| 11:55AM | 4 | Q.   OKAY.  SO THE 60,000 OR ASSOCIATED -- |
| 11:55AM | 5 | A.   $60 MILLION.  YES, YES. |
| 11:55AM | 6 | THE COURT:  WHY DON'T YOU ASK YOUR QUESTION AGAIN? |
| 11:55AM | 7 | MR. LEACH:  I WILL. |
| 11:55AM | 8 | THANK YOU, MS. RODRIGUEZ. |
| 11:55AM | 9 | Q.   SO THE 60,000 TO THE RIGHT OF THE CROSSED OUT 62 MILLION, |
| 11:55AM | 10 | YOU'RE CONVEYING 60 MILLION THERE? |
| 11:55AM | 11 | A.   YES. |
| 11:55AM | 12 | Q.   AND THAT'S THE LEVEL OF -- AND DOES THAT REFLECT THE |
| 11:55AM | 13 | CONVERSATION THAT YOU HAD WHERE MS. HOLMES AND MR. BALWANI WERE |
| 11:55AM | 14 | SAYING IN 2015 IT'S ACTUALLY GOING TO BE $2 MILLION LESS? |
| 11:55AM | 15 | A.   YES. |
| 11:55AM | 16 | Q.   AND THE TOTAL REVENUE THAT MS. HOLMES AND MR. BALWANI WERE |
| 11:55AM | 17 | PROJECTING FOR DECEMBER 31ST, 2005 WAS $990 MILLION? |
| 11:55AM | 18 | A.   YES. |
| 11:55AM | 19 | Q.   AND WAS THAT IMPRESSIVE TO YOU? |
| 11:55AM | 20 | A.   YES. |
| 11:55AM | 21 | Q.   ABOVE THE COLUMN, YOU WROTE THE WORDS, "900 LOCATIONS." |
| 11:56AM | 22 | WHAT DOES THAT REFER TO? |
| 11:56AM | 23 | A.   THAT REFERRED TO WALGREENS, THE ROLLOUT THAT THEY WERE |
| 11:56AM | 24 | PLANNING.  THE NUMBERS IN HERE WERE BASED ON A ROLLOUT AT |
| 11:56AM | 25 | WALGREENS OF 900 LOCATIONS FOR 2015. |

4689

| | | |
|---|---|---|
| 11:56AM | 1 | THERE'S ALSO 300 SAFEWAY LOCATIONS IN THAT NUMBER.  AGAIN, |
| 11:56AM | 2 | THERE'S, THERE'S -- NOT ALL OF MY NOTES ON ARE THIS PAGE.  THEY |
| 11:56AM | 3 | ALL CULMINATED INTO ANOTHER MEMO THAT WAS WRITTEN. |
| 11:56AM | 4 | Q.   AND IF WE CAN ZOOM OUT, MS. HOLLIMAN, AND FOCUS ON THE NET |
| 11:56AM | 5 | INCOME DOWN AT THE BOTTOM. |
| 11:56AM | 6 | THANK YOU. |
| 11:56AM | 7 | DOES THIS REFLECT THAT MS. HOLMES AND MR. BALWANI WERE |
| 11:56AM | 8 | PROJECTING NET INCOME OF A $3 MILLION LOSS IN DECEMBER OF 2014? |
| 11:56AM | 9 | A.   YES. |
| 11:56AM | 10 | Q.   FOR THE YEAR? |
| 11:56AM | 11 | A.   YES. |
| 11:56AM | 12 | Q.   AND DOES THIS REFLECT THAT THEY WERE PROJECTING A PROFIT |
| 11:57AM | 13 | OF 230 MILLION BY THE END OF 2015? |
| 11:57AM | 14 | A.   YES. |
| 11:57AM | 15 | Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO WHAT HAS BEEN |
| 11:57AM | 16 | MARKED AS EXHIBIT 2107. |
| 11:57AM | 17 | DOES THIS APPEAR TO BE AN EMAIL FROM SUNNY BALWANI TO |
| 11:57AM | 18 | JERRY TUBERGEN, WITH A COPY TO MS. HOLMES, ATTACHING VARIOUS |
| 11:57AM | 19 | INVESTMENT DOCUMENTS? |
| 11:57AM | 20 | A.   YES. |
| 11:57AM | 21 | Q.   AND DID YOU ULTIMATELY REVIEW THE ITERATIONS OF THE |
| 11:57AM | 22 | INVESTMENT DOCUMENTS THAT ARE ATTACHED TO THIS EMAIL? |
| 11:57AM | 23 | A.   YES, ALONG WITH OUR INHOUSE COUNSEL. |
| 11:58AM | 24 | MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 2107 INTO |
| 11:58AM | 25 | EVIDENCE. |

4690

11:58AM  1          MR. WADE:  THE COURT'S INDULGENCE FOR ONE MOMENT.

11:58AM  2          (PAUSE IN PROCEEDINGS.)

11:58AM  3          MR. WADE:  NO OBJECTION.

11:58AM  4          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:58AM  5          (GOVERNMENT'S EXHIBIT 2107 WAS RECEIVED IN EVIDENCE.)

11:58AM  6          MR. LEACH:  MS. HOLLIMAN, IF WE CAN PLEASE ZOOM IN

11:58AM  7     ON THE TOP HALF OF THIS EMAIL ON PAGE 1.

11:58AM  8     Q.   MS. PETERSON, DO YOU SEE THERE ARE SOME ATTACHMENTS TO

11:59AM  9     THIS INVESTOR MASTER SIGNATURE PAGE, SERIES C-2.

11:59AM  10          WHAT IS C-2?

11:59AM  11    A.   THAT WAS THE SERIES OF SECURITIES THAT WE WERE BUYING

11:59AM  12    INTO.

11:59AM  13    Q.   AND THERE'S NEW INVESTOR.ZIP AND THERANOS BANK WIRE

11:59AM  14    INSTRUCTION.PDF.

11:59AM  15          I WANT TO DRAW YOUR ATTENTION, PLEASE, TO PAGE 56.

11:59AM  16          DO YOU SEE THE HEADING "THERANOS, INC.

11:59AM  17          "SERIES C-2 PREFERRED STOCK PURCHASE AGREEMENT"?

11:59AM  18    A.   YES.

11:59AM  19    Q.   AND IS THIS A LENGTHY LEGAL DOCUMENT RELATING TO THE TERMS

11:59AM  20    OF THE POTENTIAL STOCK PURCHASE BY RDV?

11:59AM  21    A.   YES.

11:59AM  22    Q.   PLEASE LOOK AT PAGE 61.

11:59AM  23          DO YOU SEE SECTION 4 DOWN AT THE BOTTOM, "REPRESENTATIONS

11:59AM  24    AND WARRANTIES OF THE INVESTORS"?

11:59AM  25    A.   YES.

| | | |
|---|---|---|
| 11:59AM | 1 | Q.   AND IN THIS CIRCUMSTANCE, RDV OR ITS AFFILIATE IS THE |
| 12:00PM | 2 | INVESTOR? |
| 12:00PM | 3 | A.   CORRECT. |
| 12:00PM | 4 | Q.   OKAY.  AND IF WE CAN CONTINUE, PLEASE, TO PAGE 62. |
| 12:00PM | 5 | DO YOU SEE THAT THERE ARE CERTAIN REPRESENTATIONS RELATING |
| 12:00PM | 6 | IN 4.3, 4.4, 4.5, AND 4.6 RELATING TO THE INVESTOR'S INVESTMENT |
| 12:00PM | 7 | EXPERIENCE, THE NATURE OF THE INVESTMENT, ACCESS TO DATA, AND |
| 12:00PM | 8 | THE INVESTOR'S ACCREDITED STATUS? |
| 12:00PM | 9 | A.   YES. |
| 12:00PM | 10 | Q.   AND WERE THESE REPRESENTATIONS TRUE OF RDV AT THE TIME? |
| 12:00PM | 11 | A.   AT THE TIME, YES. |
| 12:00PM | 12 | Q.   OKAY.  THANK YOU, MS. HOLLIMAN.  WE CAN TAKE THAT DOWN. |
| 12:00PM | 13 | LET ME NEXT DRAW YOUR ATTENTION, PLEASE, TO EXHIBIT 2166. |
| 12:01PM | 14 | DO YOU RECOGNIZE THIS DOCUMENT? |
| 12:01PM | 15 | A.   YES. |
| 12:01PM | 16 | Q.   AND WHAT IS THIS? |
| 12:01PM | 17 | A.   THIS IS THE DOCUMENT WE PUT TOGETHER FOR ALL INVESTMENTS |
| 12:01PM | 18 | THAT GO TO OUR INVESTMENT COMMITTEE. |
| 12:01PM | 19 | Q.   WHEN YOU SAY "WE," DOES THAT INCLUDE YOU? |
| 12:01PM | 20 | A.   YES, I PUT THIS TOGETHER. |
| 12:01PM | 21 | Q.   OKAY.  WHY DID YOU PUT THIS TOGETHER? |
| 12:01PM | 22 | A.   BECAUSE WE NEEDED TO PUT TOGETHER EVERYTHING THAT WE HAD |
| 12:01PM | 23 | LEARNED ON THE INVESTMENT AND PRESENT IT TO THE INVESTMENT |
| 12:01PM | 24 | COMMITTEE. |
| 12:01PM | 25 | Q.   OKAY.  AND DID YOU PREPARE THIS IN THE ORDINARY COURSE OF |

4692

| 12:01PM | 1 | BUSINESS? |

12:01PM   1    BUSINESS?

12:01PM   2    A.   YES.

12:01PM   3    Q.   OKAY.  DID YOU PREPARE THIS AT OR FROM -- AT OR AROUND THE

12:01PM   4    TIME OF THE THERANOS INVESTMENT?

12:01PM   5    A.   YES, IN BETWEEN -- RIGHT AFTER THE MEETING THAT WE HAD ON

12:01PM   6    THE 14TH OF OCTOBER.

12:01PM   7    Q.   OKAY.  AND WAS IT RDV'S PRACTICE TO PREPARE APPROVAL

12:01PM   8    DOCUMENTS SUCH AS THESE?

12:01PM   9    A.   YES.

12:01PM   10            MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 2166.

12:01PM   11            MR. WADE:  NO OBJECTION.

12:01PM   12            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:02PM   13        (GOVERNMENT'S EXHIBIT 2166 WAS RECEIVED IN EVIDENCE.)

12:02PM   14            MR. LEACH:  IF WE CAN PLEASE ZOOM IN, MS. HOLLIMAN,

12:02PM   15    TO THE TOP HALF OF THE PAGE ALL OF THE WAY DOWN TO THE SECOND

12:02PM   16    PARAGRAPH IN COMPANY OVERVIEW.  A LITTLE BIT MORE.

12:02PM   17        PERFECT.

12:02PM   18    Q.   WHO ELSE HAD A HAND IN PREPARING THIS, IF ANYONE,

12:02PM   19    MS. PETERSON?

12:02PM   20    A.   THIS WAS, THIS WAS ALL ME THAT PREPARED THIS.

12:02PM   21    Q.   OKAY.  UP AT THE TOP IT SAYS, "RDV APPROVAL DOCUMENT - NEW

12:02PM   22    EQUITY INVESTMENT.

12:02PM   23        "DIRECT INVESTMENT:  THERANOS, INC."

12:02PM   24        DO YOU SEE THAT?

12:02PM   25    A.   YES.

4693

| | | |
|---|---|---|
| 12:02PM | 1 | Q.   AND TO THE RIGHT DO YOU SEE "CLOSED:  OCTOBER 31ST, 2014"? |
| 12:02PM | 2 | A.   YES. |
| 12:02PM | 3 | Q.   IS THAT APPROXIMATELY THE DATE OF RDV'S INVESTMENT? |
| 12:02PM | 4 | A.   YES. |
| 12:02PM | 5 | Q.   IN THE RDV OPPORTUNITY SECTION YOU WROTE IN THE THIRD |
| 12:02PM | 6 | LINE, "TO DATE, THE COMPANY HAS RAISED OVER $400 FROM VARIOUS |
| 12:03PM | 7 | INDIVIDUAL INVESTORS AND VENTURE CAPITAL FIRMS.  THE LAST |
| 12:03PM | 8 | EQUITY RAISE WAS COMPLETED IN JAN-2014 AT A $9,000 VALUATION." |
| 12:03PM | 9 | WHAT DO YOU MEAN BY THAT $9,000 VALUATION? |
| 12:03PM | 10 | A.   IT'S 9 BILLION AND THE ZEROS ARE OMITTED. |
| 12:03PM | 11 | Q.   SO THAT'S ANOTHER INSTANCE WHERE, FOR EASE OF REFERENCE, |
| 12:03PM | 12 | YOU'RE OMITTING THE ZEROS? |
| 12:03PM | 13 | A.   YES. |
| 12:03PM | 14 | Q.   HALFWAY DOWN IN THE COMPANY OVERVIEW IT READS, "THERANOS |
| 12:03PM | 15 | MANUFACTURES ITS ANALYZER EQUIPMENT." |
| 12:03PM | 16 | DO YOU SEE THAT? |
| 12:03PM | 17 | A.   YES. |
| 12:03PM | 18 | Q.   AND WHY DID YOU INCLUDE THIS IN THE RDV APPROVAL DOCUMENT? |
| 12:03PM | 19 | A.   BECAUSE IT'S VERY RELEVANT TO OUR UNDERWRITING OF THE |
| 12:03PM | 20 | INVESTMENT. |
| 12:03PM | 21 | Q.   IF WE COULD ZOOM OUT NOW, PLEASE, MS. HOLLIMAN.  AND IF WE |
| 12:03PM | 22 | COULD FOCUS ON THAT THIRD PARAGRAPH IN THE COMPANY OVERVIEW. |
| 12:04PM | 23 | IN THAT LAST SENTENCE OF THE THIRD PARAGRAPH IT READS, |
| 12:04PM | 24 | "THROUGH THIS WORK THERANOS HAS BEEN COMPREHENSIVELY VALIDATED |
| 12:04PM | 25 | SINCE 2015 BY 10 MAJOR PHARMACEUTICAL COMPANIES, WITH HUNDREDS |

12:04PM  1    OF THOUSANDS ASSAYS PROCESSED."

12:04PM  2    A.   BY 2005.

12:04PM  3    Q.   2005, EXCUSE ME.

12:04PM  4         WHY DID YOU INCLUDE THIS IN THE RDV APPROVAL DOCUMENT?

12:04PM  5    A.   BECAUSE IT'S VERY RELEVANT TO OUR UNDERWRITING OF THIS

12:04PM  6    INVESTMENT THAT THEY WERE VALIDATED BY TEN MAJOR PHARMACEUTICAL

12:04PM  7    COMPANIES, INCLUDING PFIZER.

12:04PM  8              MR. WADE:   YOUR HONOR, I MOVE TO STRIKE THIS ANSWER

12:04PM  9    AND THE LAST ANSWER UNDER 602 FOR THE REASONS THAT WE

12:04PM 10    PREVIOUSLY RAISED.

12:05PM 11              THE COURT:   OVERRULED.   THE ANSWER WILL REMAIN.

12:05PM 12    BY MR. LEACH:

12:05PM 13    Q.   LET'S LOOK AT PAGE 3, MS. PETERSON.

12:05PM 14         DO YOU SEE THE ROW "GROWTH PLANS" TO THE LEFT?   THERE'S A

12:05PM 15    HEADING FOR THAT ROW CALLED -- OR THE FIRST PART CALLED "GROWTH

12:05PM 16    PLANS"?

12:05PM 17    A.   YES.

12:05PM 18    Q.   AND IN THE BODY TO THE RIGHT IT READS, "WITH THE

12:05PM 19    SUCCESSFUL BUILD-OUT OF THE PHOENIX MARKET, THERANOS WILL BE

12:05PM 20    READY IN 2015 TO BEGIN A BROADER NATIONAL ROLLOUT.   WALGREENS

12:05PM 21    AND THERANOS PLAN TO HAVE 900 WELLNESS CENTER LOCATIONS IN 5

12:05PM 22    MAJOR METROPOLITAN MARKETS NEXT YEAR."

12:05PM 23         WHERE DID THAT INFORMATION COME FROM?

12:05PM 24    A.   FROM THE CONVERSATION THAT WE HAD IN PALO ALTO.

12:05PM 25    Q.   OKAY.   AND DID MS. HOLMES OR MR. BALWANI SAY ANYTHING TO

12:05PM  1    THE EFFECT THAT WALGREENS WAS SCALING BACK THE NUMBER OF

12:05PM  2    LOCATIONS?

12:05PM  3    A.   NO.

12:05PM  4    Q.   IF WE CAN GO FURTHER DOWN TO THE FINANCIAL SUMMARY

12:05PM  5    PORTION.  ARE THESE FINANCIAL METRICS DRAWN FROM THE

12:06PM  6    SPREADSHEET THAT WE LOOKED AT EARLIER WITH YOUR HANDWRITING,

12:06PM  7    MS. PETERSON?

12:06PM  8    A.   YES.

12:06PM  9    Q.   AND THIS WAS INFORMATION THAT YOU GOT FROM MS. HOLMES AND

12:06PM  10   MR. BALWANI?

12:06PM  11   A.   YES.

12:06PM  12   Q.   WHY WERE YOU INCLUDING THIS IN THE RDV APPROVAL DOCUMENT?

12:06PM  13   A.   BECAUSE THE FINANCIALS ARE ONE OF THE FUNDAMENTALS OF

12:06PM  14   UNDERWRITING THE INVESTMENT THAT WE LOOK AT.

12:06PM  15   Q.   LET'S GO TO PAGE 6, PLEASE.

12:06PM  16        DOES THIS SECTION RELATES TO INVESTMENT STRENGTHS?

12:06PM  17   A.   YES.

12:06PM  18   Q.   AND IF WE CAN GO DOWN A LITTLE BIT MORE, MS. HOLLIMAN.

12:06PM  19        DO YOU SEE THE BULLET THAT READS, "A THERANOS ANALYZER

12:06PM  20   STATION IS A SMALL FRACTION OF THE SIZE OF A CURRENT LAB,

12:07PM  21   MAKING IT POSSIBLE TO PLACE A THERANOS LAB IN THE OPERATING

12:07PM  22   ROOM OR IN A MILITARY EVACUATION HELICOPTER, ON SHIPS, IN

12:07PM  23   REFUGEE CAMPS - VIRTUALLY ANYWHERE."

12:07PM  24        IS THAT INFORMATION THAT YOU GOT FROM MS. HOLMES AND

12:07PM  25   MR. BALWANI?

4696

| | | |
|---|---|---|
| 12:07PM | 1 | A.   YES. |
| 12:07PM | 2 | Q.   AND WHY WERE YOU INCLUDING THAT IN THIS MEMO? |
| 12:07PM | 3 | A.   BECAUSE, AGAIN, IT WAS CRITICAL TO OUR UNDERSTANDING OF |
| 12:07PM | 4 | THE INVESTMENT, THAT IT COULD DO THIS AND THAT IT WAS PORTABLE |
| 12:07PM | 5 | AND IT WAS VERY GAME CHANGING FROM -- FOR THIS INDUSTRY. |
| 12:07PM | 6 | Q.   OKAY.  AND IF WE CAN GO TO THE LAST PAGE, PLEASE, PAGE 7. |
| 12:07PM | 7 | AND IF WE CAN ZOOM IN ON THE ENTIRETY OF THE SUBSTANCE. |
| 12:07PM | 8 | DO YOU SEE MR. TUBERGEN'S SIGNATURE IN THE SIGNATURE |
| 12:07PM | 9 | BLOCK? |
| 12:07PM | 10 | A.   YES. |
| 12:07PM | 11 | Q.   AND IS THAT MR. DAMSTRA'S SIGNATURE TO THE RIGHT? |
| 12:07PM | 12 | A.   YES. |
| 12:07PM | 13 | Q.   OKAY.  IN THE RISK SECTION IT READS, "FURTHERMORE, UNLIKE |
| 12:08PM | 14 | MOST LABS, THERANOS DOES NOT BUY ANALYZER EQUIPMENT FROM A |
| 12:08PM | 15 | THIRD PARTY AND THEY DO NOT SELL THEIR ANALYZERS TO OTHER |
| 12:08PM | 16 | LABS." |
| 12:08PM | 17 | IS THAT INFORMATION THAT YOU GOT FROM MS. HOLMES AND |
| 12:08PM | 18 | MR. BALWANI? |
| 12:08PM | 19 | A.   YES. |
| 12:08PM | 20 | Q.   AT ANY POINT IN TIME PRIOR TO INVESTING, DID MS. HOLMES |
| 12:08PM | 21 | TELL YOU THERANOS WAS USING THIRD PARTY MACHINES TO DO SOME OF |
| 12:08PM | 22 | ITS TESTING? |
| 12:08PM | 23 | A.   NEVER. |
| 12:08PM | 24 | Q.   DID THEY TELL YOU THEY WERE USING THIRD PARTY MACHINES TO |
| 12:08PM | 25 | DO THE MAJORITY OF THEIR TESTING? |

4697

```
12:08PM   1    A.   NO.

12:08PM   2    Q.   PRIOR TO THE INVESTMENT, WERE YOU EVER TOLD THAT THERANOS

12:08PM   3    WAS USING IT'S TSPU FOR NO MORE THAN 12 ASSAYS?

12:08PM   4    A.   NO.

12:08PM   5    Q.   WOULD THAT HAVE MATTERED TO YOU?

12:08PM   6    A.   YES.

12:08PM   7    Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO WHAT IS IN EVIDENCE

12:08PM   8    AS EXHIBIT 4845.

12:08PM   9         AND WITH LEAVE, YOUR HONOR, I WOULD LIKE TO DISPLAY THAT.

12:09PM  10              THE COURT:  YES.

12:09PM  11              MR. LEACH:  IF WE COULD GO TO PAGE 22.

12:09PM  12              THE WITNESS:  I SHOW 4858.

12:09PM  13    BY MR. LEACH:

12:09PM  14    Q.   WE'LL DISPLAY 4845 ON THE SCREEN, MS. PETERSON.  I DON'T

12:09PM  15    THINK IT'S IN YOUR BINDER.

12:09PM  16    A.   OH, OKAY.

12:09PM  17    Q.   AND IF WE CAN PLEASE ZOOM IN, MS. HOLLIMAN, ON THE

12:09PM  18    SUBSTANCE.

12:09PM  19         DOWN TOWARDS THE BOTTOM, MS. PETERSON, UNDER THE BOLD

12:09PM  20    HEADING "ORIGINATOR INFORMATION," THE LAST LINE SAYS "LINE 1,

12:09PM  21    DYNASTY FINANCIAL II LLC."

12:09PM  22         ARE YOU FAMILIAR WITH THAT ENTITY?

12:09PM  23    A.   YES.

12:09PM  24    Q.   AND WHAT IS IT?

12:09PM  25    A.   IT'S AN ENTITY CREATED BY RDV CORP. THAT HOUSES A NUMBER
```

| | | |
|---|---|---|
| 12:09PM | 1 | OF INVESTMENTS, INCLUDING THIS ONE. |
| 12:09PM | 2 | Q.   AND SO DYNASTY FINANCIAL II LLC IS THE LEGAL ENTITY THAT |
| 12:10PM | 3 | MADE THE INVESTMENT IN THERANOS ON RDV'S BEHALF? |
| 12:10PM | 4 | A.   YES. |
| 12:10PM | 5 | Q.   AND IF WE GO UP UNDER THE HEADING "BASIC INFORMATION" IN |
| 12:10PM | 6 | LINE 4, THERE'S AN AMOUNT OF $99,999,984. |
| 12:10PM | 7 | DO YOU SEE THAT? |
| 12:10PM | 8 | A.   YES. |
| 12:10PM | 9 | Q.   AND IS THAT THE AMOUNT OF RDV'S INVESTMENT? |
| 12:10PM | 10 | A.   YES. |
| 12:10PM | 11 | Q.   AND DO YOU SEE ABOVE THAT IN THE LINE OMAD, THERE'S A DATE |
| 12:10PM | 12 | 2014-10-31, OR THE NUMBERS. |
| 12:10PM | 13 | DO YOU SEE THAT? |
| 12:10PM | 14 | A.   YES. |
| 12:10PM | 15 | Q.   AND IS OCTOBER 31ST, 2014 THE APPROXIMATE DATE OF THE |
| 12:10PM | 16 | INVESTMENT? |
| 12:10PM | 17 | A.   YES. |
| 12:10PM | 18 | Q.   THERE'S A REFERENCE TO SOMETHING CALLED LAKESHORE CAPITAL |
| 12:10PM | 19 | MANAGEMENT.  WHAT IS THAT? |
| 12:11PM | 20 | A.   IT'S ONE OF OUR CASH ACCOUNTS. |
| 12:11PM | 21 | Q.   THANK YOU, MS. HOLLIMAN.  WE CAN TAKE THAT DOWN. |
| 12:11PM | 22 | I'D LIKE TO MOVE FORWARD IN TIME, MS. PETERSON, TO THE |
| 12:11PM | 23 | TIME PERIOD OF OCTOBER OF 2015. |
| 12:11PM | 24 | DO YOU HAVE THAT TIME PERIOD IN MIND? |
| 12:11PM | 25 | A.   YES. |

4699

12:11PM  1    Q.   AT OR AROUND THAT TIME, DID YOU LEARN THAT "THE

12:11PM  2    WALL STREET JOURNAL" HAD WRITTEN AN ARTICLE RAISING ISSUES

12:11PM  3    ABOUT THERANOS?

12:11PM  4    A.   YES.

12:11PM  5    Q.   AND DID YOU KNOW THE AUTHOR OF THAT ARTICLE TO BE SOMEONE

12:11PM  6    NAMED JOHN CARREYROU?

12:11PM  7    A.   YES.

12:11PM  8    Q.   AND AT OR ABOUT THAT TIME, DID YOU VIEW AN INTERVIEW OF

12:11PM  9    MS. HOLMES ON THE T.V. SHOW "MAD MONEY"?

12:11PM  10   A.   YES.

12:11PM  11   Q.   PRIOR TO TESTIFYING, DID YOU HAVE A CHANCE TO REVIEW CLIPS

12:11PM  12   OF THAT "MAD MONEY" INTERVIEW?

12:11PM  13   A.   YES.

12:11PM  14        MR. LEACH:  YOUR HONOR, AT THIS TIME I WOULD LIKE TO

12:11PM  15   PLAY CLIPS OF THAT "MAD MONEY" INTERVIEW, 2851, CLIPS 1, 2 AND

12:12PM  16   3.

12:12PM  17        THE COURT:  2851?  AND I'M SORRY, IT'S CLIPS?

12:12PM  18        MR. LEACH:  2851-1, 2851-2, AND 2851-3.

12:12PM  19        THE COURT:  ALL RIGHT.  AND CAN YOU TELL US WHAT IS

12:12PM  20   THE APPROXIMATE LENGTH OF EACH OF THOSE CLIPS?

12:12PM  21        MR. LEACH:  THE FIRST CLIP IS ABOUT 5 SECONDS, THE

12:12PM  22   SECOND CLIP IS LESS THAN A MINUTE, AND THE THIRD CLIP IS ONE TO

12:12PM  23   TWO MINUTES.

12:12PM  24        THE COURT:  OKAY.  THANK YOU.

12:12PM  25        MR. WADE:  WE HAVE OBJECTIONS INITIALLY ON

4700

```
12:12PM   1    FOUNDATION.  I BELIEVE THE WITNESS TESTIFIED THAT SHE READ IT

12:12PM   2    BEFORE SHE TESTIFIED.  I DON'T KNOW HOW IT CONNECTS TO THE

12:12PM   3    EVENTS IN THE CASE AND WHAT THE RELEVANCE IS, SO I DON'T THINK

12:12PM   4    WE HAVE A FOUNDATION PRELIMINARILY.

12:12PM   5        WE ALSO HAVE 106 OBJECTIONS.

12:12PM   6            THE COURT:  ALL RIGHT.  THANK YOU.  SO, MR. LEACH,

12:13PM   7    THIS WITNESS HAS TESTIFIED ABOUT THE INVESTMENT AND HER

12:13PM   8    PARTICIPATION IN THAT.

12:13PM   9        IS THIS A SEPARATE AREA, THEN, THAT IS CONNECTED TO THE

12:13PM  10    INVESTMENT, OR IS THIS OFFERED SEPARATE FROM THE INVESTMENT

12:13PM  11    ITSELF?

12:13PM  12            MR. LEACH:  IT'S SEPARATE FROM THE INVESTMENT,

12:13PM  13    YOUR HONOR.

12:13PM  14        BUT I BELIEVE ON THE VIDEO THE DEFENDANT MAKES STATEMENTS

12:13PM  15    RELATING TO THE SAME REPRESENTATIONS THAT INDUCED THE

12:13PM  16    INVESTMENT, BUT IT'S A YEAR REMOVED FROM THE INVESTMENT ITSELF.

12:13PM  17            THE COURT:  ALL RIGHT.

12:13PM  18            MR. LEACH:  BUT THE, THE --

12:13PM  19            THE COURT:  GO AHEAD.

12:13PM  20            MR. LEACH:  THE DEFENDANT IS PRESENTED WITH

12:13PM  21    ASSERTIONS FROM THE ARTICLE AND GIVEN THE OPPORTUNITY TO GIVE

12:13PM  22    HER RESPONSE, AND THIS RELATES TO STATEMENTS THAT WERE MADE TO

12:13PM  23    MS. PETERSON DURING THE COURSE OF THE INVESTMENT.

12:13PM  24            THE COURT:  ALL RIGHT.  THANK YOU.

12:13PM  25        I'LL NOTE THE OBJECTIONS THAT WERE MADE AND YOUR
```

4701

| | | |
|---|---|---|
| 12:13PM | 1 | OBJECTIONS, MR. WADE, CURRENTLY. |
| 12:13PM | 2 | I'LL OVERRULE THE OBJECTIONS AND ALLOW THESE TO BE PLAYED. |
| 12:14PM | 3 | SO YOU'LL PLAY THEM SEQUENTIALLY? |
| 12:14PM | 4 | MR. LEACH:  YES, YOUR HONOR. |
| 12:14PM | 5 | THE COURT:  ALL RIGHT.  SO DO YOU HAVE NUMBER 1 |
| 12:14PM | 6 | QUEUED UP NOW THEN?  LET'S SEE IF WE CAN GET THIS ON THE |
| 12:14PM | 7 | SCREEN. |
| 12:14PM | 8 | (VIDEO PLAYING OFF THE RECORD.) |
| 12:14PM | 9 | THE COURT:  THAT WAS THE FIRST CLIP? |
| 12:14PM | 10 | MR. LEACH:  THAT WAS THE FIRST CLIP, YOUR HONOR. |
| 12:14PM | 11 | THE COURT:  AND LET ME JUST ASK FOR CLARITY'S SAKE, |
| 12:14PM | 12 | ARE YOU ASKING THAT THE COURT REPORTER NOT REPORT THIS, WHAT IS |
| 12:14PM | 13 | ON THE VIDEOS, OR DO YOU WANT THEM REPORTED? |
| 12:14PM | 14 | MR. LEACH:  WE HAVE A TRANSCRIPT WHICH WE'VE |
| 12:14PM | 15 | PROVIDED THE DEFENSE.  I'M HAPPY TO APPEND THAT.  I DON'T THINK |
| 12:14PM | 16 | IT'S NECESSARY FOR THE COURT REPORTER TO TAKE IT DOWN. |
| 12:14PM | 17 | THE COURT:  OKAY. |
| 12:14PM | 18 | ANY OBJECTION TO THE COURT REPORTER NOT REPORTING THIS? |
| 12:14PM | 19 | MR. WADE:  NO OBJECTION, YOUR HONOR.  IT WILL BE IN |
| 12:14PM | 20 | EVIDENCE ONE WAY OR THE OTHER. |
| 12:14PM | 21 | THE COURT:  ALL RIGHT.  THANK YOU.  SO THE COURT |
| 12:14PM | 22 | REPORTER WILL NOT HAVE TO TRANSCRIBE THE VIDEOS.  THANK YOU. |
| 12:14PM | 23 | (VIDEO PLAYING OFF THE RECORD.) |
| 12:16PM | 24 | MR. LEACH:  THAT COMPLETES 2851-2, YOUR HONOR, AND |
| 12:17PM | 25 | WE WILL PLAY NOW 2851-3. |

4702

| | | |
|---|---|---|
| 12:17PM | 1 | THE COURT:  ALL RIGHT. |
| 12:17PM | 2 | (VIDEO PLAYING OFF THE RECORD.) |
| 12:19PM | 3 | MR. LEACH:  THAT COMPLETES CLIP 2851-3, YOUR HONOR. |
| 12:19PM | 4 | Q.  MS. PETERSON, I WANT TO MOVE FORWARD IN TIME TO APRIL OF |
| 12:19PM | 5 | 2016. |
| 12:19PM | 6 | DO YOU HAVE THAT TIME PERIOD IN MIND? |
| 12:19PM | 7 | A.  YES. |
| 12:19PM | 8 | Q.  AT OR AROUND THAT TIME, DID YOU REVIEW A SEGMENT ON THE |
| 12:19PM | 9 | "TODAY SHOW" FEATURING MS. HOLMES? |
| 12:19PM | 10 | A.  YES. |
| 12:19PM | 11 | Q.  AND DID YOU OBSERVE MS. HOLMES MAKING STATEMENTS ABOUT HER |
| 12:19PM | 12 | LEVEL OF INVOLVEMENT IN HER COMPANY? |
| 12:19PM | 13 | A.  YES. |
| 12:19PM | 14 | Q.  AND THIS WAS IN APPROXIMATELY APRIL OF 2016? |
| 12:19PM | 15 | A.  CORRECT. |
| 12:19PM | 16 | Q.  IT WAS THE "TODAY SHOW"? |
| 12:19PM | 17 | A.  I DON'T REMEMBER WHICH ONE.  ONE OF THOSE MORNING SHOWS. |
| 12:19PM | 18 | Q.  PRIOR TO TESTIFYING TODAY, DID YOU HAVE AN OPPORTUNITY TO |
| 12:19PM | 19 | REVIEW SEGMENTS OF A NEWS STORY IN APRIL OF 2016? |
| 12:19PM | 20 | A.  YES. |
| 12:19PM | 21 | Q.  OKAY. |
| 12:19PM | 22 | YOUR HONOR, I WOULD LIKE TO OFFER THE INTERVIEW SEGMENT |
| 12:20PM | 23 | FROM THE "TODAY SHOW."  IT'S EXHIBIT 3152, AND I'LL OFFER THE |
| 12:20PM | 24 | EXHIBIT IN ITS ENTIRETY. |
| 12:20PM | 25 | THE COURT:  ALL RIGHT.  THANK YOU.  DID YOU -- |

4703

12:20PM 1    BEFORE WE DO THAT, I'M NOT SURE THAT THIS WITNESS TESTIFIED

12:20PM 2    THAT WHAT WE JUST SAW, THE THREE CLIPS, WERE THE ONES THAT SHE

12:20PM 3    SAW.

12:20PM 4              MR. LEACH:  I CAN ASK THAT, YOUR HONOR.  I'M

12:20PM 5    CONSCIOUSLY NOT GETTING INTO REACTION OR STATE OF MIND ON THAT,

12:20PM 6    BUT --

12:20PM 7              THE COURT:  CORRECT.  FOUNDATIONALLY -- I THINK YOU

12:20PM 8    ASKED HER IF SHE SAW THEM, BUT I'M NOT CERTAIN THAT SHE

12:20PM 9    TESTIFIED THAT WHAT WE SAW WAS WHAT SHE WAS REFERENCING.

12:20PM 10             MR. LEACH:  I'LL ASK THE FOLLOWUP.

12:20PM 11   Q.   WE LOOKED AT THREE SEGMENTS FROM "MAD MONEY,"

12:20PM 12   MS. PETERSON, CLIPS 2851-1, -2, AND -3.  ARE THOSE PORTIONS OF

12:20PM 13   THE "MAD MONEY" CLIPS THAT YOU VIEWED?

12:20PM 14   A.   YES.

12:20PM 15             THE COURT:  ALL RIGHT.  THANK YOU.

12:21PM 16         MR. WADE?

12:21PM 17             MR. WADE:  JUST THE SAME.

12:21PM 18             THE COURT:  SAME OBJECTIONS?

12:21PM 19         ALL RIGHT.  THANK YOU.  WE'LL NOTE THAT, AND THE

12:21PM 20   OBJECTIONS ARE OVERRULED, AND YOU CAN PLAY THE CLIP.

12:21PM 21             MR. LEACH:  ALL RIGHT.  THANK YOU.  AND I'M GOING TO

12:21PM 22   PLAY THE ENTIRETY OF THE CLIP.

12:21PM 23             MR. WADE:  YES.

12:21PM 24             MR. LEACH:  THANK YOU.

12:21PM 25             (GOVERNMENT'S EXHIBIT 3152 WAS RECEIVED IN EVIDENCE.)

12:22PM  1          THE COURT:  EXCUSE ME.  COULD WE STOP THIS FOR JUST

12:22PM  2   A SECOND?  MS. HOLLIMAN, CAN WE STOP THERE FOR JUST A SECOND?

12:22PM  3          I'M SORRY.  AND I NEED TO TALK TO COUNSEL FOR A MOMENT.

12:22PM  4   WHY DON'T WE DO THAT?  LET'S GO IN CHAMBERS RATHER THAN CLEAR

12:23PM  5   EVERYONE.

12:23PM  6          THE CLERK:  LET ME TAKE THIS DOWN, YOUR HONOR.

12:23PM  7          THE COURT:  YES, GO AHEAD AND TAKE THAT DOWN.  I

12:23PM  8   JUST NEED CLARIFICATION ON SOMETHING.  I'M SORRY.

12:23PM  9      SO LET'S SEE -- I THINK THIS WILL JUST TAKE A SECOND.  SO

12:23PM  10  WE CAN DO THAT IN THE LITTLE ROOM BACK HERE, MR. WADE.

12:23PM  11         MR. WADE:  SURE.

12:23PM  12         THE COURT:  FOLKS, THIS WILL TAKE JUST A COUPLE OF

12:23PM  13  MINUTES, BUT YOU CAN STAND AND STRETCH.  DON'T LEAVE THE ROOM,

12:23PM  14  PLEASE.

12:23PM  15      (CONFERENCE ON THE RECORD IN THE JURY ROOM WITH COUNSEL.)

12:29PM  16         THE COURT:  WE'RE ON THE RECORD.  WE'RE IN --

12:29PM  17  OUTSIDE OF THE PRESENCE OF THE JURY.

12:29PM  18      MR. LEACH IS HERE AND MR. WADE IS HERE.

12:29PM  19      I STOPPED THIS, AND WE CAN REWIND IT ACCORDINGLY.  BUT

12:29PM  20  THIS WAS GOING TO BE A VIDEO OF HER MAKING HER -- MS. HOLMES,

12:29PM  21  PARDON ME, MAKING STATEMENTS.

12:29PM  22      MY CONCERN IS THAT THERE'S COMMENTARY FROM THE REPORTERS

12:29PM  23  TALKING ABOUT REPORTING AND GETTING THAT INFORMATION IN, WHICH

12:29PM  24  I THINK IS ADDITIONAL TO THOSE STATEMENTS.

12:29PM  25      THAT'S MY CONCERN, AND I HAVE SOME CONCERN ABOUT THE

4705

12:29PM  1    INTRODUCTION, MS. SHRIVER, THE REPORTER TALKING AND OFFERING

12:29PM  2    THAT COMMENTARY.

12:29PM  3        I DON'T THINK YOU MENTIONED THIS, MR. WADE, IN YOUR

12:29PM  4    COMMENTS EARLIER, BUT I GUESS I'M CONCERNED ABOUT WHAT I SHOULD

12:29PM  5    TELL THE JURY ABOUT THAT OR WHETHER OR NOT -- I THOUGHT

12:29PM  6    HONESTLY THIS WAS GOING TO BE A -- THE SAME THING AS THE "MAD

12:29PM  7    MONEY," QUESTION, ANSWER, QUESTION, ANSWER.

12:29PM  8            MR. LEACH:  FIRST, YOUR HONOR, LET ME APOLOGIZE.

12:29PM  9            THE COURT:  I SHOULD HAVE READ THE TRANSCRIPT A

12:29PM 10    LITTLE CLOSER.

12:29PM 11            MR. LEACH:  THE GOVERNMENT ONLY PROPOSED THE

12:29PM 12    PORTIONS WHERE MS. HOLMES IS SPEAKING, AND AS I UNDERSTAND THE

12:29PM 13    DEFENSE'S OBJECTION, IF THAT WAS GOING TO COME IN, THEY WANTED

12:29PM 14    THE ENTIRETY OF THE INTERVIEW.

12:29PM 15            MR. WADE:  (NODS HEAD UP AND DOWN.)

12:29PM 16            MR. LEACH:  SO AFTER OUR COLLOQUY, LISTENING TO THE

12:29PM 17    DEFENSE OBJECTION THAT THEY WANTED THE ENTIRE VIDEO IN, TO

12:29PM 18    AVOID THE OBJECTION, I OFFERED THE ENTIRE VIDEO.

12:29PM 19            THE COURT:  I SEE.

12:29PM 20            MR. LEACH:  I DON'T KNOW WHAT THEIR POSITION ON THE

12:29PM 21    COMMENTARY IS, BUT WE WANTED MS. HOLMES'S STATEMENTS IN.  WE

12:29PM 22    STILL WANT MS. HOLMES'S STATEMENTS IN.

12:29PM 23            THE COURT:  RIGHT.

12:29PM 24            MR. LEACH:  AND IF THE OBJECTION IS A RULE 106

12:29PM 25    OBJECTION FOR COMPLETENESS AND PLAY THE WHOLE THING, WE'RE FINE

4706

12:29PM   1    WITH THAT, TOO.  IT'S INITIALLY NOT WHAT WE WANTED TO OFFER,

12:29PM   2    BUT IN RESPONSE TO THE DEFENSE'S OBJECTION, I UNDERSTOOD THE

12:29PM   3    WHOLE THING COULD COME IN.

12:29PM   4         MR. WADE:  BUT I DON'T THINK WE'RE PLAYING ALL OF

12:29PM   5    THE STATEMENTS, RIGHT?  WE'RE ONLY PLAYING SELECTIVE

12:29PM   6    STATEMENTS?

12:29PM   7         THE COURT:  OF THIS, OF THIS "TODAY" INTERVIEW?

12:29PM   8         MR. WADE:  YEAH, YEAH.

12:29PM   9         THE COURT:  IT SOUNDS LIKE IT'S THE WHOLE TAPE.

12:29PM  10         MR. WADE:  YOUR INITIAL PROPOSAL.

12:29PM  11         MR. LEACH:  OUR INITIAL PROPOSAL WAS SOME OF

12:29PM  12    MS. HOLMES'S STATEMENTS IN THE INTERVIEW.  THE DEFENSE OBJECTED

12:29PM  13    THAT THEY WANTED THE ENTIRETY OF THE CLIP IN.

12:29PM  14         THE COURT:  OKAY.

12:29PM  15         MR. LEACH:  IN RESPONSE TO THAT OBJECTION, I'M FINE

12:29PM  16    WITH THE ENTIRE CLIP COMING IN --

12:29PM  17         THE COURT:  OKAY.

12:29PM  18         MR. LEACH:  -- INCLUDING STATEMENTS BY MS. HOLMES

12:29PM  19    THAT THE GOVERNMENT HAD NOT INITIALLY OFFERED.

12:29PM  20         THE COURT:  OKAY.  ALL RIGHT.  YOU'RE GOOD WITH

12:29PM  21    THAT?

12:29PM  22         MR. WADE:  I'M FINE WITH THAT.

12:29PM  23         THE COURT:  OKAY.  THANK YOU.  I WAS -- I LOOKED AT

12:29PM  24    IT, AND JUST FOR THE RECORD, THE REASON I STOPPED THE

12:29PM  25    PROCEEDING -- AND WE'LL PLAY THIS AGAIN AND START IT BECAUSE I

4707

12:29PM  1    SAW THAT THERE WAS COMMENTARY AND I DIDN'T -- I KNOW THAT YOU

12:29PM  2    DIDN'T OBJECT.  I JUST WANTED TO BE CLEAR AND MAKE SURE THAT I

12:29PM  3    HAVE THAT NOW, THAT'S ON THE RECORD NOW, THAT THE ENTIRETY OF

12:29PM  4    THIS CAN BE PLAYED.

12:29PM  5         YOU'VE HEARD MY REASON I STOPPED THIS WAS --

12:29PM  6              MR. WADE:  NO, I APPRECIATE THE CAUTION, YOUR HONOR.

12:29PM  7    BECAUSE IT WAS A LITTLE -- I THINK IT WAS A LAST MINUTE

12:29PM  8    ADJUSTMENT BY MR. LEACH, WHICH WE UNDERSTAND AND --

12:29PM  9              THE COURT:  AND I'M NOT POINTING --

12:29PM  10             MR. WADE:  SO I'M GLAD WE'RE CLEAR ON THAT.

12:29PM  11             THE COURT:  THANK YOU FOR THAT.  I'M SORRY FOR THE

12:29PM  12   DISRUPTION.  I'M NOT POINTING FINGERS.  I JUST WANTED CLARITY.

12:29PM  13             MR. WADE:  NO.  THAT'S ALWAYS BETTER SAFE THAN

12:29PM  14   SORRY.  THANK YOU, YOUR HONOR.

12:29PM  15             THE COURT:  SO LET'S -- WE'RE STILL ON THE RECORD

12:29PM  16   HERE.

12:29PM  17        SHOULD WE START THE TAPE AGAIN?  I CAN'T RECALL WHERE I

12:29PM  18   STOPPED IT.  I THINK IT WAS JUST AFTER MS. SHRIVER, THE

12:29PM  19   REPORTER, WAS INTRODUCED.  SHOULD WE START IT THERE?

12:29PM  20             MR. LEACH:  I'M FINE STARTING IT WHERE WE STOPPED.

12:29PM  21             MR. WADE:  THAT'S FINE.  WE CAN START WHERE IT IS.

12:29PM  22             THE COURT:  WELL, I WAS TALKING AND IT WAS RUNNING.

12:29PM  23             MR. WADE:  MAYBE BACK IT UP 15 SECONDS OR SO.

12:29PM  24             THE COURT:  WHY DON'T WE START WHEN THE REPORTER,

12:29PM  25   MS. SHRIVER, IS INTRODUCED, AND THEN IT BREAKS AWAY INTO THE

4708

12:29PM   1      INTERVIEW.  IS THAT ALL RIGHT WITH YOU?

12:29PM   2                MR. LEACH:  THAT'S FINE.

12:29PM   3                MR. WADE:  THAT'S FINE.  SURE.

12:29PM   4                THE COURT:  THANK YOU.  SORRY FOR THE DISRUPTION.

12:29PM   5                MR. WADE:  NO.  NO PROBLEM AT ALL, YOUR HONOR.

12:29PM   6           (END OF CONFERENCE ON THE RECORD IN THE JURY ROOM WITH

12:29PM   7      COUNSEL.)

12:29PM   8                THE COURT:  ALL RIGHT.  THANK YOU, COUNSEL.  THANK

12:29PM   9      YOU.  AND I APOLOGIZE FOR THE INTERRUPTION.

12:29PM  10           WE'RE BACK ON THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT

12:29PM  11      ARE PRESENT ONCE AGAIN.  OUR WITNESS IS STILL ON THE STAND.

12:29PM  12           MR. LEACH, IF YOU COULD QUEUE UP THE RECORDING AGAIN.

12:29PM  13      PERHAPS WE CAN START IT JUST AS THE REPORTER, MS. SHRIVER, WAS

12:29PM  14      BEING INTRODUCED.  WOULD THAT BE ALL RIGHT TO START THERE?

12:29PM  15                MR. LEACH:  YES, YOUR HONOR.

12:29PM  16                THE COURT:  WOULD THAT BE ALL RIGHT TO START THERE?

12:29PM  17                MR. WADE:  YES, YOUR HONOR.

12:29PM  18                THE COURT:  OKAY.

12:29PM  19           (VIDEO PLAYING OFF THE RECORD.)

12:34PM  20                MR. LEACH:  THAT COMPLETES THE VIDEO CLIP,

12:34PM  21      YOUR HONOR, EXHIBIT 3152.

12:34PM  22      Q.   MS. PETERSON, DID YOU VIEW THAT SEGMENT IN OR AROUND APRIL

12:34PM  23      OF 2016?

12:34PM  24      A.   YES.

12:34PM  25      Q.   AND SHORTLY AFTER THAT VIDEO SEGMENT, DID YOU MEET WITH

| | | |
|---|---|---|
| 12:35PM | 1 | MS. HOLMES PERSONALLY IN PALO ALTO? |
| 12:35PM | 2 | A.   YES, JERRY AND I DID. |
| 12:35PM | 3 | Q.   AND WHO ELSE WAS AT THIS MEETING IN PALO ALTO? |
| 12:35PM | 4 | A.   DAN MOSLEY -- IT WAS DAN MOSLEY, JERRY TUBERGEN AND |
| 12:35PM | 5 | MYSELF, AS WELL AS PEOPLE FROM THE OTHER SIDE, TOO. |
| 12:35PM | 6 | Q.   AND DID MS. HOLMES DISCUSS THE CMS INSPECTION? |
| 12:35PM | 7 | A.   THERE WAS A NUMBER OF THINGS DISCUSSED.  WE ASKED ABOUT |
| 12:35PM | 8 | EVERYTHING -- THIS WAS THE FIRST TIME THAT WE HAD A CHANCE TO |
| 12:35PM | 9 | ACTUALLY TALK TO HER IN PERSON SINCE WE MADE THE INVESTMENT, |
| 12:35PM | 10 | AND A LOT HAD HAPPENED SINCE, SO WE WERE ASKING REALLY WHAT WAS |
| 12:35PM | 11 | GOING ON. |
| 12:35PM | 12 | AND THERE WAS A LOT OF CONVERSATION BY HER AROUND THE LAB |
| 12:35PM | 13 | AND THINGS THAT WERE GOING ON, AND IT WAS MORE ALONG THE LINES |
| 12:35PM | 14 | OF THE PROCESS WASN'T -- CMS WAS QUESTIONING THE PROCESS, NOT |
| 12:36PM | 15 | THE ACCURACY OF THE TESTS. |
| 12:36PM | 16 | Q.   AND DID MS. HOLMES SAY, IN SUBSTANCE, THERANOS CAN'T |
| 12:36PM | 17 | TRIVIALIZE THE ISSUES IN THE PRESS? |
| 12:36PM | 18 | A.   YES. |
| 12:36PM | 19 | Q.   AND DID SHE SAY, IN SUBSTANCE, THAT IN REALITY THERANOS |
| 12:36PM | 20 | DOESN'T FEEL THE ISSUES ARE MAJOR? |
| 12:36PM | 21 | A.   CORRECT.  VERY MUCH DOWNPLAYED WHAT HAD BEEN HAPPENING IN |
| 12:36PM | 22 | THE PRESS, AND MUCH OF THE CORRESPONDENCE THAT WE HAD RECEIVED |
| 12:36PM | 23 | FROM THE COMPANY SINCE THE INVESTMENT WAS DOWNPLAYING WHAT HAD |
| 12:36PM | 24 | BEEN SAID IN THE NEWS. |
| 12:36PM | 25 | MR. LEACH:  MAY I HAVE A MOMENT, YOUR HONOR? |

PETERSON CROSS BY MR. WADE                                            4710

12:36PM   1              THE COURT:  YES.

12:36PM   2              (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

12:36PM   3              MR. LEACH:  NO FURTHER QUESTIONS, YOUR HONOR.

12:36PM   4         THANK YOU.  THANK YOU, MS. PETERSON.

12:36PM   5              THE COURT:  ANY CROSS-EXAMINATION?

12:36PM   6              MR. WADE:  I DO, YOUR HONOR.  MAYBE A STANDING BREAK

12:36PM   7         AS I TRANSITION?

12:37PM   8              THE COURT:  SURE.

12:37PM   9         FOLKS, FEEL FREE TO STAND AND STRETCH AS YOU WOULD LIKE

12:37PM  10         DURING THE TRANSITION HERE.

12:37PM  11         I THINK WE'RE GOING TO TAKE A BREAK AT 1:30, LADIES AND

12:37PM  12         GENTLEMEN, RIGHT AROUND 1:30.

12:37PM  13         YOU CAN STAND AS WELL, MS. PETERSON, IF YOU WOULD LIKE TO

12:37PM  14         STRETCH.

12:38PM  15              (STRETCHING.)

12:38PM  16              MR. WADE:  MAY I APPROACH, YOUR HONOR?

12:38PM  17              THE COURT:  YES.

12:38PM  18              MR. WADE:  (HANDING.)

12:39PM  19                        **CROSS-EXAMINATION**

12:39PM  20         BY MR. WADE:

12:39PM  21         Q.   GOOD AFTERNOON, MS. PETERSON.

12:39PM  22         A.   HI.

12:39PM  23         Q.   MY NAME IS LANCE WADE.  I REPRESENT MS. HOLMES.  I'LL ASK

12:39PM  24         YOU A FEW QUESTIONS HERE THIS AFTERNOON.

12:39PM  25         DO YOU RECALL BEING ASKED SOME QUESTIONS ABOUT A PFIZER

PETERSON CROSS BY MR. WADE                                        4711

12:39PM  1    REPORT THAT YOU REVIEWED IN CONNECTION --

12:39PM  2    A.   DO I RECALL?

12:39PM  3    Q.   YEAH.

12:39PM  4    A.   YES.

12:39PM  5    Q.   TELL US WHAT YOU REMEMBER ABOUT THAT REPORT.

12:39PM  6    A.   THERE WERE A LOT OF PAGES IN THE DUE DILIGENCE BINDER

12:39PM  7    AROUND THAT, AND I JUST RECALL READING IT, AND THE TAKE AWAY

12:39PM  8    FOR ME WAS THE ACCURACY OF THE TESTING THAT THEY HAD DONE.

12:39PM  9    Q.   WHAT WAS THE KIND OF STUDY THAT WAS DONE BY PFIZER?

12:39PM  10   A.   I DON'T RECALL.

12:39PM  11   Q.   WHERE WAS IT DONE?

12:39PM  12   A.   I DON'T RECALL THAT.

12:39PM  13   Q.   WHAT WAS THE DRUG INVOLVED?

12:39PM  14   A.   I DON'T RECALL THE SPECIFICS.

12:39PM  15   Q.   DO YOU RECALL ANYTHING ABOUT THAT STUDY?

12:40PM  16   A.   NOT TODAY, NO.

12:40PM  17   Q.   JUST THE LOGO?  JUST THE LOGO, THAT'S ALL YOU RECALL?

12:40PM  18   A.   NO.  I RECALL READING THEM AT THE TIME AND

12:40PM  19   UNDERSTANDING -- THE TAKE AWAY FOR ME IN LOOKING AT IT WAS THAT

12:40PM  20   IT WAS LENDING CREDIBILITY TO THE ACCURACY OF THE ANALYZERS AND

12:40PM  21   THAT IT HAD DONE WORK AND, AS ELIZABETH HAD SAID, THEY HAD DONE

12:40PM  22   WORK FOR THE PHARMACEUTICAL COMPANIES FOR THE LAST FIVE TO

12:40PM  23   SEVEN YEARS.

12:40PM  24        SO, YES, I WAS LOOKING AT -- THAT THAT WAS TRUE, AND

12:40PM  25   EVERYTHING I WAS READING, THE TAKE AWAY WAS ACCURACY OF THE

PETERSON CROSS BY MR. WADE                                         4712

12:40PM   1    TESTS THAT WAS DONE.

12:40PM   2    Q.   BUT YOU DON'T RECALL THE ACTUAL WORK THAT WAS DONE WITH

12:40PM   3    PFIZER BY THE COMPANY?

12:40PM   4    A.   NO, NOT THE SPECIFIC TESTS THAT WERE RUN, NO.

12:40PM   5    Q.   OKAY.  WE'LL COME BACK TO THE PFIZER REPORT IN A MINUTE.

12:40PM   6         LET ME START WITH YOUR EMPLOYER.  YOU WORK FOR RDV; IS

12:40PM   7    THAT RIGHT?  RDV CORPORATION?

12:40PM   8    A.   CORRECT.

12:40PM   9    Q.   AND WHAT DOES RDV STAND FOR?

12:41PM   10   A.   RICHARD DEVOS.

12:41PM   11   Q.   AND HE'S THE FOUNDER OF AMWAY; IS THAT RIGHT?

12:41PM   12   A.   HE'S A COFOUNDER, THE PATRIARCH OF THE FAMILY THAT I WORK

12:41PM   13   FOR, YES.

12:41PM   14   Q.   AND JUST FOR THE BENEFIT OF THE JURY, BECAUSE SOME OF US

12:41PM   15   MAY NOT UNDERSTAND WHAT AN ENTITY LIKE THAT IS, THAT'S

12:41PM   16   SOMETIMES REFERRED TO AS A FAMILY OFFICE; IS THAT RIGHT?

12:41PM   17   A.   CORRECT.

12:41PM   18   Q.   AND COULD YOU EXPLAIN TO US WHAT A FAMILY OFFICE IS, OR

12:41PM   19   WHAT THIS FAMILY OFFICE IS?  HOW'S THAT?

12:41PM   20   A.   THIS FAMILY OFFICE IS VERY MUCH A FAMILY -- THERE'S A

12:41PM   21   FAMILY SERVICES PART OF THE OFFICE THAT DOES A LOT OF SERVICES

12:41PM   22   DIRECTLY FOR THE FAMILY, LIKE MANAGING THEIR I.T. AND THEIR

12:41PM   23   PHONES AND CUTTING THEIR CHECKS AND DOING ALL OF THE STUFF THAT

12:41PM   24   YOU DO FOR A FAMILY, FOR A LARGE FAMILY LIKE THIS, HIRING THEIR

12:41PM   25   STAFF.

PETERSON CROSS BY MR. WADE                                    4713

```
12:41PM   1        AND THEN THERE'S THE INVESTMENT SIDE, WHICH IS WHERE I

12:41PM   2   WAS.

12:41PM   3   Q.   OKAY.  AND ABOUT HOW MANY PEOPLE ARE THERE ON THE

12:41PM   4   INVESTMENT SIDE?

12:41PM   5   A.   ON THE INVESTMENT SIDE AT THE TIME?

12:41PM   6   Q.   (NODS HEAD UP AND DOWN.)

12:41PM   7   A.   ABOUT 12 TO 15.

12:41PM   8   Q.   ABOUT 12 TO 15.

12:41PM   9        AND TO WHOM DID YOU REPORT AT THE TIME THE INVESTMENT?

12:42PM  10   A.   DIRECTLY TO RANDY DAMSTRA.

12:42PM  11   Q.   TO RANDY DAMSTRA.  AND WHAT WAS HIS TITLE?

12:42PM  12   A.   SENIOR MANAGING DIRECTOR OF PRIVATE EQUITY.

12:42PM  13   Q.   AND TO WHOM DID MR. DAMSTRA REPORT?

12:42PM  14   A.   DIRECTLY TO JERRY TUBERGEN.

12:42PM  15   Q.   AND TO WHOM DID MR. TUBERGEN REPORT?

12:42PM  16   A.   TO THE FAMILY.

12:42PM  17   Q.   WHAT DOES THAT MEAN IN PRACTICE?

12:42PM  18   A.   THE FAMILY MEMBERS, AND IT ROTATED, MADE UP THE INVESTMENT

12:42PM  19   COMMITTEE.

12:42PM  20        SO JERRY REPORTED TO THE FAMILY DIRECTLY AND TO THE

12:42PM  21   INVESTMENT COMMITTEE, AND THEY HAVE A BOARD, RDV HAS A BOARD OF

12:42PM  22   DIRECTORS WHICH IS MADE UP OF FAMILY MEMBERS, AND JERRY

12:42PM  23   REPORTED TO THEM.

12:42PM  24   Q.   OKAY.  SO -- AND AS PART OF THE INVESTMENT PORTFOLIO, IT'S

12:42PM  25   THE JOB OF RDV PEOPLE TO MANAGE THE ASSETS OF THE DEVOS FAMILY?
```

PETERSON CROSS BY MR. WADE                                              4714

12:42PM   1    IS THAT A FAIR HIGH LEVEL SUMMARY?

12:42PM   2    A.   CORRECT.

12:43PM   3    Q.   AND OBVIOUSLY TO TRY AND GET GAINS TO THE EXTENT POSSIBLE;

12:43PM   4    RIGHT?

12:43PM   5    A.   CORRECT.

12:43PM   6    Q.   AND HOW MANY -- YOU HAD TESTIFIED THAT I THINK YOU HAD

12:43PM   7    BEEN THERE HOW MANY YEARS AGAIN?  I'M SORRY.

12:43PM   8    A.   TODAY?  GOING ON 17.  I STARTED IN 2005.

12:43PM   9    Q.   OKAY.  SO FROM 2005 TO 2014, HOW MANY OTHER DIRECT

12:43PM   10   INVESTMENTS IN PRIVATE COMPANIES DID YOU DO THAT WERE NOT

12:43PM   11   AFFILIATED WITH PRIVATE EQUITY INVESTMENTS?

12:43PM   12   A.   NONE.

12:43PM   13   Q.   NONE?  THIS WAS THE FIRST ONE?

12:43PM   14   A.   CORRECT.

12:43PM   15   Q.   AND THIS WAS SOMEWHAT UNIQUE?

12:43PM   16   A.   YES.

12:43PM   17   Q.   AND THIS WAS AN INVESTMENT THAT HAD TO BE APPROVED BEFORE

12:43PM   18   IT COULD BE FUNDED; RIGHT?

12:43PM   19   A.   CORRECT.

12:43PM   20   Q.   AND WHO, WHO HAD AUTHORITY -- DID YOU HAVE AUTHORITY TO

12:43PM   21   APPROVE THE INVESTMENT?

12:43PM   22   A.   NO.

12:43PM   23   Q.   WHO HAD AUTHORITY TO MAKE THE INVESTMENT DECISION?

12:43PM   24   A.   THE MEMBERS OF THE INVESTMENT COMMITTEE.

12:44PM   25   Q.   OKAY.  SO THAT'S A -- MEMBERS OF THE DEVOS FAMILY?

PETERSON CROSS BY MR. WADE                                        4715

12:44PM   1    A.   CORRECT.

12:44PM   2    Q.   AND HOW FREQUENTLY DID YOU COMMUNICATE DIRECTLY WITH THE

12:44PM   3    MEMBERS OF THE DEVOS FAMILY ABOUT THE THERANOS INVESTMENT?

12:44PM   4    A.   WE HAD A LOT OF CONVERSATION, I DID DIRECTLY WITH THE

12:44PM   5    INVESTMENT -- THE TWO INVESTMENT COMMITTEE MEMBERS THAT WERE ON

12:44PM   6    THE AIRPLANE ON THE RIDE TO THE DILIGENCE MEETING THAT WE HAD.

12:44PM   7         AND THEN EVERYTHING FROM THERE WENT THROUGH

12:44PM   8    JERRY TUBERGEN.

12:44PM   9    Q.   OKAY.  SO YOU TALKED TO -- I'M SORRY, WERE YOU DONE?  I

12:44PM  10    DIDN'T MEAN TO INTERRUPT.

12:44PM  11    A.   YES.

12:44PM  12    Q.   OKAY.  YOU TALKED ON THE PLANE RIDE OUT TO THE COMPANY?

12:44PM  13    A.   YES.

12:44PM  14    Q.   AND IS THAT IT?

12:44PM  15    A.   DIRECTLY WITH THE FAMILY MEMBERS?

12:44PM  16    Q.   YEAH.

12:44PM  17    A.   THERE MIGHT HAVE BEEN ONE OR TWO EMAIL EXCHANGES WITH

12:44PM  18    RICK DEVOS AND THAT WAS ABOUT IT.

12:44PM  19    Q.   AND IS RICK DEVOS WHAT THEY CALL A GENERATION THREE FAMILY

12:44PM  20    MEMBER?  IS THAT RIGHT?

12:45PM  21    A.   YES.

12:45PM  22    Q.   SO THAT MEANS THAT HE'S --

12:45PM  23    A.   THE OLDEST OF THE GRANDCHILDREN OF THE PATRIARCH.

12:45PM  24    Q.   SO THAT'S KIND OF TWO LEVELS DOWN FROM THE PATRIARCH; IS

12:45PM  25    THAT RIGHT?

PETERSON CROSS BY MR. WADE                                    4716

12:45PM   1     A.   YES.

12:45PM   2     Q.   AND HE WAS ON THE INVESTMENT COMMITTEE?

12:45PM   3     A.   AT THE TIME, YES.

12:45PM   4     Q.   AND HE TOOK THE TRIP OUT TO THERANOS?

12:45PM   5     A.   YES.

12:45PM   6     Q.   OKAY.  AND JUST SO WE HAVE A SENSE OF WHERE THE OTHER

12:45PM   7     FOLKS FALL, WHERE IN THE GENERATIONS DO THE OTHER INVESTMENT

12:45PM   8     COMMITTEE MEMBERS FALL?

12:45PM   9     A.   DOUG DEVOS WAS THE CHAIRMAN OF THE INVESTMENT COMMITTEE AT

12:45PM  10     THE TIME AND HE'S ONE OF THE SONS OF THE PATRIARCH; AND THEN

12:45PM  11     THERE'S CHERI DEVOS WHO WENT ON THE TRIP, AND SHE WAS NOT ON

12:45PM  12     THE INVESTMENT COMMITTEE, BUT SHE'S A FAMILY MEMBER AND THEY

12:45PM  13     OFTEN -- FAMILY MEMBERS KIND OF CAME IN AND OUT OF THE

12:45PM  14     INVESTMENT COMMITTEE.  SO IT WASN'T UNUSUAL FOR HER TO GO.

12:45PM  15         AND THEN THE OTHER TWO MEMBERS OF THE INVESTMENT COMMITTEE

12:45PM  16     FROM THE GENERATION TWO WAS DOUG DEVOS -- OR I'M SORRY --

12:45PM  17     DAN DEVOS AND I BELIEVE DICK DEVOS.

12:46PM  18     Q.   OKAY.  SO IS IT DAN DEVOS, DOUG DEVOS, AND DICK DEVOS

12:46PM  19     REPRESENTED GENERATION TWO?

12:46PM  20     A.   YES.

12:46PM  21     Q.   AND RICK DEVOS REPRESENTED GENERATION ONE ON THE

12:46PM  22     INVESTMENT COMMITTEE?

12:46PM  23     A.   GENERATION THREE.

12:46PM  24     Q.   GENERATION THREE, I APOLOGIZE.

12:46PM  25     A.   AND THEN THERE WERE TWO OTHER GENERATION THREE MEMBERS ON

PETERSON CROSS BY MR. WADE                                    4717

12:46PM  1    THE INVESTMENT COMMITTEE AT THE TIME.

12:46PM  2    Q.   AND MR. TUBERGEN REPORTS DIRECTLY TO THE INVESTMENT

12:46PM  3    COMMITTEE AND TO THE DEVOS FAMILY; IS THAT RIGHT?

12:46PM  4    A.   YES.

12:46PM  5    Q.   OKAY.  AND THE ENTITY THAT ACTUALLY INVESTED IN THIS

12:46PM  6    COMPANY WAS CALLED DYNASTY FINANCIAL II LLC; CORRECT?

12:46PM  7    A.   YES.

12:46PM  8    Q.   AND DO YOU KNOW WHO OWNS THAT?

12:46PM  9    A.   I DON'T KNOW THE BENEFICIAL OWNERS OF THE ENTITY, NO.

12:46PM 10    Q.   DO YOU KNOW -- WHAT DO YOU KNOW ABOUT THE ENTITY?  DOES

12:46PM 11    THE ENTITY HAVE A BOARD?

12:47PM 12    A.   NO.

12:47PM 13    Q.   IT DOESN'T?

12:47PM 14    A.   NO.  WE USUALLY CREATE A NEW ENTITY FOR ALL OF OUR

12:47PM 15    INVESTMENTS.  THIS PARTICULAR ONE I KNOW HAD MULTIPLE ASSETS IN

12:47PM 16    IT, BUT I'M NOT PRIVY TO ALL OF THE OWNERS OF THAT ENTITY.

12:47PM 17    Q.   OKAY.  THE INVESTMENT IN TOTAL WAS $100 MILLION; IS THAT

12:47PM 18    RIGHT?

12:47PM 19    A.   99 SOMETHING RATHER, YES.

12:47PM 20    Q.   OKAY.  AND THERE ARE DOCUMENTS WITHIN THE RDV THAT SUGGEST

12:47PM 21    80 MILLION OF THAT IS ATTRIBUTED TO RDV.  ARE YOU FAMILIAR WITH

12:47PM 22    THAT?

12:47PM 23    A.   NO.

12:47PM 24    Q.   DO YOU KNOW -- DO YOU KNOW WHETHER THERE WAS ANOTHER

12:47PM 25    ENTITY THAT HELD 20 MILLION?

PETERSON CROSS BY MR. WADE

| | | |
|---|---|---|
| 12:47PM | 1 | A.   THE ONLY OTHER INDIVIDUALS OUTSIDE OF THE FAMILY THAT |
| 12:47PM | 2 | WOULD HAVE BEEN INVESTING AT THAT POINT IN TIME WAS THE |
| 12:47PM | 3 | EXECUTIVE STAFF. |
| 12:47PM | 4 | Q.   OKAY. |
| 12:47PM | 5 | A.   JERRY. |
| 12:47PM | 6 | Q.   SO SENIOR LEADERSHIP COULD CHOOSE TO PARTICIPATE IN THAT, |
| 12:47PM | 7 | TOO? |
| 12:47PM | 8 | A.   CORRECT. |
| 12:47PM | 9 | Q.   AND YOU DON'T KNOW WHETHER THEY DID OR NOT? |
| 12:47PM | 10 | A.   I DON'T. |
| 12:47PM | 11 | Q.   OKAY.  THERE ARE DOCUMENTS THAT REFER TO WINDQUEST. |
| 12:48PM | 12 | A.   YES. |
| 12:48PM | 13 | Q.   AND WHAT IS WINDQUEST? |
| 12:48PM | 14 | A.   WINDQUEST IS DICK AND BETSY'S FAMILY OFFICE.  IT'S THE |
| 12:48PM | 15 | NAME OF THEIR FAMILY OFFICE.  SO THERE ARE THE C-2 GENERATION, |
| 12:48PM | 16 | THE FOUR SIBLINGS EACH HAVE THEIR OWN OUTSIDE INTERESTS OUTSIDE |
| 12:48PM | 17 | OF RDV CORPORATION, IN WHICH THEY HAVE -- SOME OF THEM HAVE |
| 12:48PM | 18 | FAMILY OFFICES, NAMES OF THEIR FAMILY OFFICES, AND THAT WOULD |
| 12:48PM | 19 | BE ONE OF THEM. |
| 12:48PM | 20 | Q.   DID YOU SAY THERE WERE FOUR GENERATION TWO DEVOS MEMBERS? |
| 12:48PM | 21 | A.   YES. |
| 12:48PM | 22 | Q.   AND THEY HAVE INDIVIDUAL FAMILY OFFICES IN ADDITION TO THE |
| 12:48PM | 23 | RDV FAMILY OFFICE? |
| 12:48PM | 24 | A.   YES. |
| 12:48PM | 25 | Q.   AND DO YOU KNOW WHETHER WINDQUEST INVESTED IN THE THERANOS |

PETERSON CROSS BY MR. WADE                                          4719

12:48PM    1    TRANSACTION?

12:48PM    2    A.   I DON'T KNOW.

12:48PM    3    Q.   OKAY.  DOUG DEVOS WHO, YOU MENTIONED, HE'S ALSO THE CEO OF

12:48PM    4    AMWAY; IS THAT RIGHT?

12:48PM    5    A.   HE WAS.  HE'S NO LONGER.

12:49PM    6    Q.   OKAY.  CAN I DRAW YOUR ATTENTION TO 2170 IN YOUR BINDER.

12:49PM    7         THE CLERK:  2107?

12:49PM    8         MR. WADE:  NO.  IT'S A NEW EXHIBIT.

12:49PM    9         THE WITNESS:  OKAY.

12:49PM   10    BY MR. WADE:

12:49PM   11    Q.   LET ME KNOW WHEN YOU HAVE THAT IN FRONT OF YOU.

12:49PM   12    A.   I DO.

12:49PM   13    Q.   DO YOU RECOGNIZE THAT TO BE AN EMAIL RELATING TO THE

12:50PM   14    CLOSING OF THE THERANOS INVESTMENT THAT YOU'RE ON?

12:50PM   15    A.   I'M SORRY, SAY THE QUESTION AGAIN.

12:50PM   16    Q.   DO YOU RECOGNIZE THAT THIS IS AN EMAIL THAT RELATES TO THE

12:50PM   17    CLOSING OF THE THERANOS INVESTMENT?

12:50PM   18    A.   YES.

12:50PM   19    Q.   AND DO YOU SEE YOUR NAME IS ON THE EMAIL?

12:50PM   20    A.   YES.

12:50PM   21    Q.   OKAY.

12:50PM   22         MOVE THE ADMISSION OF 2170.

12:50PM   23         MR. LEACH:  NO OBJECTION.

12:50PM   24         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:50PM   25         (DEFENDANT'S EXHIBIT 2170 WAS RECEIVED IN EVIDENCE.)

PETERSON CROSS BY MR. WADE                                    4720

| | | |
|---|---|---|
| 12:50PM | 1 | BY MR. WADE: |
| 12:50PM | 2 | Q.   AND WE CAN JUST LOOK AT THE TOP. |
| 12:50PM | 3 | DO YOU SEE THAT THIS INDICATES THAT THE INVESTMENT, THE |
| 12:50PM | 4 | SIGNED INVESTMENT DOCUMENTATION WAS SENT BY MR. TUBERGEN TO |
| 12:50PM | 5 | MR. BALWANI ON 10-31-2014? |
| 12:50PM | 6 | DO YOU SEE THAT? |
| 12:50PM | 7 | A.   YES. |
| 12:50PM | 8 | Q.   AND IF WE GO TO THE SECOND PAGE, THIS IS THE, THIS IS THE |
| 12:51PM | 9 | EXECUTED MASTER SIGNATURE PAGE? |
| 12:51PM | 10 | A.   CORRECT. |
| 12:51PM | 11 | Q.   AND ON YOUR DIRECT TESTIMONY, MR. LEACH SHOWED YOU SOME |
| 12:51PM | 12 | ELECTRONIC FILES WITH ALL OF THE PAPERWORK FOR THE INVESTMENT. |
| 12:51PM | 13 | DO YOU RECALL THAT? |
| 12:51PM | 14 | A.   YES. |
| 12:51PM | 15 | Q.   AND THIS IS THE EXECUTED VERSION OF IT; CORRECT? |
| 12:51PM | 16 | A.   IT'S THE SIGNATURE PAGE FOR THOSE DOCUMENTS, YES. |
| 12:51PM | 17 | Q.   OKAY.  AND WHO IS THE PERSON WHO IS SIGNING HERE?  WHO IS |
| 12:51PM | 18 | THAT PERSON? |
| 12:51PM | 19 | A.   ROBERT SCHIERBEEK. |
| 12:51PM | 20 | Q.   AND WHO IS HE? |
| 12:51PM | 21 | A.   HE RUNS THE FAMILY SIDE OF THE OFFICE, AND HE WAS THE COO |
| 12:51PM | 22 | OF RDV CORPORATION WHICH OWNED DYNASTY FINANCIAL, AND HE'S THE |
| 12:51PM | 23 | SIGNOR FOR THE ENTITY. |
| 12:51PM | 24 | Q.   OKAY.  SO IS THAT THE NUMBER 2 -- IS HE THE NUMBER 2 |
| 12:51PM | 25 | PERSON WITHIN THE FAMILY OFFICE? |

PETERSON CROSS BY MR. WADE                                            4721

| 12:51PM | 1 | A.   MR. SCHIERBEEK AND -- MR. DAMSTRA WOULD BE ON THE |
|---|---|---|
| 12:51PM | 2 | INVESTMENT SIDE, AND MR. SCHIERBEEK WAS RUNNING THE FAMILY |
| 12:52PM | 3 | SERVICES SIDE. |
| 12:52PM | 4 | Q.   OKAY. |
| 12:52PM | 5 | A.   THE FAMILY SIDE CONTROLS THE BANK, THE MONEY, AND THAT'S |
| 12:52PM | 6 | WHY HE'S THE SIGNER. |
| 12:52PM | 7 | Q.   OKAY.  SO ONCE THERE'S, THERE'S APPROVAL OF THE |
| 12:52PM | 8 | INVESTMENT, THEN MR. -- IS IT SCHIERBEEK? |
| 12:52PM | 9 | A.   SCHIERBEEK. |
| 12:52PM | 10 | Q.   -- SCHIERBEEK HAS THE AUTHORITY TO DISBURSE THE FUNDS TO |
| 12:52PM | 11 | FUND THE INVESTMENT? |
| 12:52PM | 12 | A.   CORRECT. |
| 12:52PM | 13 | Q.   OKAY.  LET ME BACK UP TO THE START OF THE RELATIONSHIP |
| 12:53PM | 14 | WITH THERANOS. |
| 12:53PM | 15 | IS IT YOUR UNDERSTANDING THAT MR. DAN MOSLEY INTRODUCED |
| 12:53PM | 16 | RDV TO THE THERANOS INVESTMENT? |
| 12:53PM | 17 | A.   THAT'S MY UNDERSTANDING, YES. |
| 12:53PM | 18 | Q.   AND MR. MOSLEY WAS A PARTNER AT THE LAW FIRM OF |
| 12:53PM | 19 | CRAVATH, SWAINE & MOORE IN NEW YORK CITY? |
| 12:53PM | 20 | A.   YES. |
| 12:53PM | 21 | Q.   AND HE HAD PREVIOUSLY DONE SOME WORK FOR THE DEVOS FAMILY? |
| 12:53PM | 22 | A.   YES. |
| 12:53PM | 23 | Q.   AND CRAVATH IS ONE OF THE MOST REPUTABLE CORPORATE LAW |
| 12:53PM | 24 | FIRMS IN THE WORLD; CORRECT? |
| 12:53PM | 25 | A.   I DON'T KNOW. |

PETERSON CROSS BY MR. WADE                                    4722

12:53PM   1    Q.   OKAY.  DO YOU KNOW IT TO BE A HIGHLY REPUTABLE CORPORATE

12:53PM   2    LAW FIRM?

12:53PM   3    A.   I DON'T KNOW.

12:53PM   4    Q.   OKAY.  DO YOU KNOW THAT MR. MOSLEY ALSO HAD CLOSE TIES

12:53PM   5    WITH BDT CAPITAL?

12:53PM   6    A.   NOT AT THE TIME, NO.

12:53PM   7    Q.   BUT YOU KNOW THAT NOW?

12:53PM   8    A.   YES.

12:53PM   9    Q.   OKAY.  HE NOW WORKS AT BDT CAPITAL; RIGHT?

12:54PM  10    A.   YES, I KNOW THAT.

12:54PM  11    Q.   AND THE MEETING THAT WAS SCHEDULED -- THAT YOU TESTIFIED

12:54PM  12    TO ON DIRECT WHERE MR. TUBERGEN AND MS. HOLMES MET INITIALLY,

12:54PM  13    THAT WAS AT THE BDT CAPITAL CONFERENCE; CORRECT?

12:54PM  14    A.   YES.

12:54PM  15    Q.   OKAY.  AND THAT'S A MEETING IN CHICAGO; RIGHT?

12:54PM  16    A.   YES.

12:54PM  17    Q.   AND THAT'S HOSTED BY THAT INVESTMENT FIRM; CORRECT?

12:54PM  18    A.   CORRECT.

12:54PM  19    Q.   AND BDT CAPITAL IS A FIRM THAT WAS FOUNDED BY

12:54PM  20    MR. BYRON TROTT?

12:54PM  21    A.   YES.

12:54PM  22    Q.   AND MR. TROTT IS A FORMER SENIOR BANKER AT GOLDMAN SACHS;

12:54PM  23    CORRECT?

12:54PM  24    A.   YES.

12:54PM  25    Q.   AND HE STARTED THIS FIRM FOCUSSING ON A NICHE RELATED TO

PETERSON CROSS BY MR. WADE                                        4723

| 12:54PM | 1 | PRIVATE FAMILY INVESTMENT; IS THAT RIGHT? |
| 12:54PM | 2 | A.   YES. |
| 12:54PM | 3 | Q.   AND IS IT FAIR TO SAY, IF YOU KNOW, THAT MR. TROTT IS |
| 12:55PM | 4 | REPUTED TO BE ONE OF THE WISEST INVESTMENT BANKERS AROUND IN |
| 12:55PM | 5 | THIS SPACE? |
| 12:55PM | 6 | A.   YES. |
| 12:55PM | 7 | Q.   AND, IN FACT, THE DEVOS FAMILY INVESTS MONEY NOW WITH |
| 12:55PM | 8 | MR. TROTT; CORRECT? |
| 12:55PM | 9 | A.   WE DID IN THEIR FUND 2, AND WE DID NOT IN THEIR FUND 3. |
| 12:55PM | 10 | Q.   OKAY.  AND MR. TUBERGEN WAS IN CHICAGO TO ATTEND THE |
| 12:55PM | 11 | CONFERENCE THAT BDT HOSTS EVERY YEAR; RIGHT? |
| 12:55PM | 12 | A.   YES. |
| 12:55PM | 13 | Q.   AND HE WAS ACTUALLY THERE TO SPEAK AT THE CONFERENCE; |
| 12:55PM | 14 | RIGHT? |
| 12:55PM | 15 | A.   MR. TUBERGEN? |
| 12:55PM | 16 | Q.   YES. |
| 12:55PM | 17 | A.   NOT MY RECOLLECTION. |
| 12:55PM | 18 | Q.   DO YOU RECALL THAT MR. TUBERGEN SPOKE AT THE CONFERENCE |
| 12:56PM | 19 | AND GAVE A PRESENTATION ON HOW TO HAVE INVESTMENT SUCCESS? |
| 12:56PM | 20 | A.   I WAS NOT TOLD THAT.  I DON'T KNOW. |
| 12:56PM | 21 | Q.   LET'S TAKE A LOOK AT 1938 TO SEE IF THAT REFRESHES YOUR |
| 12:56PM | 22 | RECOLLECTION. |
| 12:56PM | 23 | THE CLERK:  WHAT EXHIBIT NUMBER, COUNSEL? |
| 12:56PM | 24 | MR. WADE:  1938. |
| 12:56PM | 25 | THE CLERK:  THANK YOU. |

PETERSON CROSS BY MR. WADE                                    4724

12:56PM   1              THE WITNESS:  OKAY.

12:56PM   2       BY MR. WADE:

12:56PM   3       Q.   DO YOU RECOGNIZE THAT TO BE AN AGENDA FOR THAT BDT CAPITAL

12:56PM   4       CONFERENCE?

12:56PM   5       A.   NO.  I WAS NOT THERE.  I WAS AT A DIFFERENT MEETING.  WE

12:56PM   6       ONLY FLEW HOME TOGETHER.

12:56PM   7       Q.   RIGHT.  DO YOU RECOGNIZE THAT IT IS CAPTIONED AS A --

12:56PM   8       A.   I'VE NEVER SEEN THIS BEFORE.

12:56PM   9       Q.   OKAY.  TAKE A LOOK AT THE FOURTH PAGE -- OR, I'M SORRY,

12:56PM  10       THE LAST PAGE, THE EIGHTH PAGE IN THE DOCUMENT.

12:57PM  11       A.   THE EIGHTH PAGE?

12:57PM  12       Q.   THE LAST PAGE IN THE DOCUMENT.

12:57PM  13       A.   OKAY.

12:57PM  14       Q.   DO YOU SEE THAT?

12:57PM  15       A.   YES.

12:57PM  16       Q.   DOES THAT REFRESH YOUR RECOLLECTION THAT MR. TUBERGEN

12:57PM  17       SPOKE ON A PANEL WHERE HE PROVIDED EXPERT ADVICE ON INVESTMENT

12:57PM  18       SUCCESS?

12:57PM  19       A.   I DID NOT KNOW THAT.

12:57PM  20       Q.   DID YOU CONSIDER HIM TO BE AN EXPERT ON INVESTMENTS,

12:57PM  21       MR. TUBERGEN?

12:57PM  22       A.   YES.

12:57PM  23       Q.   WERE YOU AWARE THAT -- WERE YOU GIVEN A BRIEFING OF

12:57PM  24       EVERYTHING THAT HAPPENED AT THE BDT CONFERENCE BY MR. TUBERGEN?

12:57PM  25       A.   AT THE CONFERENCE, NO.

PETERSON CROSS BY MR. WADE                                          4725

12:57PM   1    Q.   WERE YOU GIVEN A DEBRIEFING ON ALL OF HIS INTERACTIONS

12:57PM   2    WITH DAN MOSLEY?

12:57PM   3    A.   NO.

12:57PM   4    Q.   WERE YOU GIVEN A BRIEFING ON ALL OF HIS INTERACTIONS WITH

12:58PM   5    BYRON TROTT?

12:58PM   6    A.   NO.

12:58PM   7    Q.   AND WERE YOU GIVEN A DEBRIEFING ON ALL OF HIS INTERACTIONS

12:58PM   8    WITH THE WALTON FAMILY?

12:58PM   9    A.   NO.

12:58PM   10   Q.   AND DO YOU KNOW WHO THE WALTON FAMILY IS?

12:58PM   11   A.   YES.

12:58PM   12   Q.   AND THAT'S THE WAL-MART HEIRS?

12:58PM   13   A.   YES.

12:58PM   14   Q.   AND YOU UNDERSTOOD THAT THEY LATER INVESTED IN THERANOS?

12:58PM   15   A.   YES, I KNOW THAT.

12:58PM   16   Q.   AND WERE YOU AWARE THAT THEY ATTENDED THE BDT CONFERENCE?

12:58PM   17   A.   NO.

12:58PM   18   Q.   WERE YOU AWARE THAT THEY WERE CLIENTS OF DAN MOSLEY?

12:58PM   19   A.   NO.  AND AT THE TIME WE WEREN'T AWARE THAT THEY WERE AN

12:58PM   20   INVESTOR.

12:58PM   21   Q.   OKAY.  WE'LL GET TO THAT.

12:58PM   22       BUT COMING OUT OF THIS CONFERENCE, YOU DIDN'T GET A

12:58PM   23   DEBRIEFING FROM MR. TUBERGEN ABOUT THE INTERACTIONS THAT HE HAD

12:58PM   24   WITH RESPECT TO THOSE INDIVIDUALS?

12:58PM   25   A.   NO.

UNITED STATES COURT REPORTERS
**ER-8336**

PETERSON CROSS BY MR. WADE                                                4726

12:58PM  1    Q.   AND DID YOU GET A DEBRIEFING WITH RESPECT TO ALL OF THE

12:58PM  2    INTERACTIONS AND DISCUSSIONS THAT HE MAY HAVE HAD WITH -- ABOUT

12:58PM  3    THERANOS?

12:58PM  4    A.   WE TALKED ABOUT THERANOS.  WE TALKED A LOT ABOUT THE, THE

12:59PM  5    MEETING THAT JERRY HAD DIRECTLY WITH CHRISTIAN AND

12:59PM  6    ELIZABETH HOLMES.

12:59PM  7    Q.   ALL RIGHT.  SO YOU TALKED ABOUT THE MEETING, AND I'LL ASK

12:59PM  8    YOU SOME QUESTIONS ABOUT THAT IN A SECOND.

12:59PM  9    A.   UH-HUH.

12:59PM  10   Q.   DID YOU TALK -- DID YOU TALK AT ALL WITH MR. TUBERGEN

12:59PM  11   ABOUT ANY OTHER INTERACTIONS THAT HE HAD AT THE BDT CAPITAL

12:59PM  12   CONFERENCE WITH RESPECT TO THERANOS?

12:59PM  13   A.   NO, NO.

12:59PM  14   Q.   OKAY.  ARE YOU AWARE THAT, ARE YOU AWARE THAT MS. HOLMES

12:59PM  15   SPOKE ON A PANEL AT THE BDT CONFERENCE?

12:59PM  16   A.   NO.

12:59PM  17   Q.   OKAY.  ARE YOU AWARE THAT MS. HOLMES HOSTED A DINNER WITH

12:59PM  18   TOBY COSGROVE FROM THE CLEVELAND CLINIC AT THE BDT CONFERENCE?

12:59PM  19   A.   NO.

12:59PM  20   Q.   AND YOU DIDN'T HAVE ANY DISCUSSIONS WITH MR. TUBERGEN

12:59PM  21   ABOUT ANY OF THOSE KINDS OF TOPICS?

12:59PM  22   A.   NO.

01:00PM  23        (PAUSE IN PROCEEDINGS.)

01:00PM  24   BY MR. WADE:

01:00PM  25   Q.   NOW, YOU TALKED ABOUT THE MEETING THAT MR. TUBERGEN HAD

PETERSON CROSS BY MR. WADE                                               4727

```
01:00PM   1    WITH ELIZABETH HOLMES, CHRISTIAN HOLMES, AND DAN MOSLEY.

01:00PM   2         DO YOU RECALL THAT?

01:00PM   3    A.   YES.

01:00PM   4    Q.   AND THAT HAPPENED AT THAT CONFERENCE; CORRECT?

01:00PM   5    A.   YES.

01:00PM   6    Q.   AND THAT WAS A MEETING THAT WAS BROKERED BY MR. MOSLEY;

01:00PM   7    CORRECT?

01:00PM   8    A.   THAT'S MY UNDERSTANDING.

01:00PM   9    Q.   AND, AGAIN, YOU DON'T KNOW WHAT INFORMATION MR. MOSLEY

01:00PM  10    IMPARTED TO MR. TUBERGEN IN ADVANCE OF THAT MEETING; CORRECT?

01:00PM  11    A.   NO.  ONLY THAT HE WAS EXCITED ABOUT THE OPPORTUNITY.

01:00PM  12    Q.   OKAY.  AND ARE YOU AWARE IF MR. MOSLEY PROVIDED

01:01PM  13    MR. TUBERGEN WITH ANY MATERIALS IN ADVANCE OF THAT MEETING?

01:01PM  14    A.   NO.

01:01PM  15    Q.   TAKE A LOOK AT 12571.

01:01PM  16    A.   125 --

01:01PM  17    Q.   12571.

01:01PM  18              THE COURT:  12751?

01:01PM  19              MR. WADE:  YES, YOUR HONOR, 12751.  MY APOLOGIES.

01:02PM  20              THE WITNESS:  OKAY.

01:02PM  21    BY MR. WADE:

01:02PM  22    Q.   AND DO YOU SEE THIS IS AN EMAIL ON SEPTEMBER 17TH, 2014

01:02PM  23    FROM DAN MOSLEY TO JERRY TUBERGEN?

01:02PM  24    A.   YES, I SEE THAT.

01:02PM  25    Q.   ATTACHING THE "FORTUNE" ARTICLE THAT YOU LOOKED AT
```

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 17, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Amy Mason Saharia
AMY MASON SAHARIA

April 17, 2023