No. 22-10312

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ELIZABETH A. HOLMES

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 5:18-CR-00258
Hon. Edward J. Davila

---

## EXCERPTS OF RECORD
## VOL. XXX of LVII | ER-8340 to ER-8638

---

JOHN D. CLINE
LAW OFFICE OF JOHN D. CLINE
 600 Stewart Street
 Suite 400
 Seattle, WA 98101
 (360) 320-6435

KEVIN M. DOWNEY
LANCE A. WADE
AMY MASON SAHARIA
KATHERINE A. TREFZ
WILLIAMS & CONNOLLY LLP
 680 Maine Ave. S.W.
 Washington, D.C. 200024
 (202) 434-5000
 asaharia@wc.com

PETERSON CROSS BY MR. WADE                                      4728

01:02PM  1    EARLIER; CORRECT?

01:02PM  2    A.   YES.

01:02PM  3    Q.   OKAY.  AND DO YOU RECALL THAT WHEN YOU WERE RIDING BACK TO

01:02PM  4    MICHIGAN FROM CHICAGO THAT MR. MOSLEY PULLED UP ON HIS COMPUTER

01:02PM  5    THE ARTICLE AND SHOWED IT TO YOU?

01:02PM  6    A.   NO.  NO, I DON'T RECALL THAT.

01:02PM  7    Q.   DO YOU RECALL MAKING PRIOR STATEMENTS IN CONNECTION WITH

01:02PM  8    PROCEEDINGS AND RELATING TO THERANOS THAT THAT'S WHAT HAPPENED?

01:02PM  9    A.   I THINK HE HAD IT IN -- ON PAPER.

01:02PM  10   Q.   OKAY.  DID -- IS THIS THE VERSION THAT HE SHOWED YOU?

01:02PM  11   A.   YES.

01:02PM  12   Q.   OKAY.

01:02PM  13        MOVE THE ADMISSION OF 12751.

01:03PM  14           MR. LEACH:  NO OBJECTION, YOUR HONOR.

01:03PM  15           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:03PM  16        (DEFENDANT'S EXHIBIT 12751 WAS RECEIVED IN EVIDENCE.)

01:03PM  17   BY MR. WADE:

01:03PM  18   Q.   OKAY.  YOU SEE 12751 AND YOU SEE THE ATTACHMENT THAT'S

01:03PM  19   SEPTEMBER 17TH, 2014?

01:03PM  20        DO YOU SEE THAT?

01:03PM  21   A.   YES.

01:03PM  22   Q.   AND THAT'S THE DATE OF THE MEETING THAT HAPPENED WITH

01:03PM  23   MS. HOLMES; CORRECT?

01:03PM  24   A.   YES.

01:03PM  25   Q.   AND YOU WROTE BACK THE NEXT DAY AFTER THAT MEETING ON THE

PETERSON CROSS BY MR. WADE                                          4729

| 01:03PM | 1 | 18TH; CORRECT? |

01:03PM   2    A.   YES.

01:03PM   3    Q.   OKAY.  AND I THINK -- DO YOU SEE THERE THAT THE ATTACHMENT

01:03PM   4    SAYS THERANOS.PDF?

01:04PM   5         DO YOU SEE THAT?

01:04PM   6    A.   YES.

01:04PM   7    Q.   AND DO YOU RECOGNIZE THAT AS THE SAME FILE NAME AS THE

01:04PM   8    ATTACHMENT OF THE DOCUMENT THAT MR. LEACH SHOWED YOU PREVIOUSLY

01:04PM   9    WHERE MR. TUBERGEN SENT THE DOCUMENT TO THE DEVOS FAMILY?

01:04PM  10    A.   I'M SORRY, WHAT IS THE QUESTION?  IS THIS THE SAME ONE

01:04PM  11    THAT MR. LEACH SHOWED ME?  YES.

01:04PM  12    Q.   ALL RIGHT.  WE'LL TAKE THEM ONE AT A TIME TO MAKE SURE THE

01:04PM  13    RECORD IS CLEAR.

01:04PM  14    A.   YES.

01:04PM  15    Q.   YOU SEE IT'S THERANOS.PDF SENT 9-17-2014?

01:04PM  16    A.   YES.

01:04PM  17    Q.   AND THAT'S FROM DAN MOSLEY TO JERRY TUBERGEN; CORRECT?

01:04PM  18    A.   YES.

01:04PM  19    Q.   YOUR BOSS'S BOSS?

01:04PM  20    A.   YES.

01:04PM  21    Q.   LET'S PULL UP 1944.

01:04PM  22         THE CLERK:  IS THAT IN EVIDENCE, COUNSEL?

01:04PM  23         MR. WADE:  WHICH IS IN EVIDENCE.

01:04PM  24    Q.   AND DO YOU SEE THE ATTACHMENT THERE IS THERANOS.PDF?

01:05PM  25         DO YOU SEE THAT?

PETERSON CROSS BY MR. WADE                                    4730

```
01:05PM   1      A.   YES.

01:05PM   2      Q.   AND THAT'S THE SAME, THAT'S THE SAME "FORTUNE" ARTICLE

01:05PM   3   THAT MR. TUBERGEN HAD SENT ON TO MEMBERS OF THE DEVOS FAMILY?

01:05PM   4           DO YOU SEE THAT?

01:05PM   5      A.   YES.

01:05PM   6      Q.   AND THOSE COMMUNICATIONS HAPPENED THE DAY AFTER THE

01:05PM   7   MEETING THAT MS. HOLMES HAD WITH MR. TUBERGEN; CORRECT?

01:05PM   8      A.   YES.

01:05PM   9      Q.   OKAY.  AND DO YOU SEE IN THIS DOCUMENT, IF YOU LOOK ON THE

01:05PM  10   THIRD LINE, IT SAYS, "I'D LIKE TO SEE IF WE CAN FIND 15 MINUTES

01:05PM  11   TOMORROW TO SHARE WITH YOU AND DISCUSS A VERY UNIQUE INVESTMENT

01:05PM  12   OPPORTUNITY WE MAY HAVE WITH HER COMPANY."

01:05PM  13           DO YOU SEE THAT?

01:05PM  14      A.   YES.

01:05PM  15      Q.   AND DO YOU KNOW WHETHER THAT MEETING HAPPENED?

01:06PM  16      A.   I DON'T KNOW.

01:06PM  17      Q.   DO YOU KNOW WHETHER A CALL HAPPENED?  WHETHER A CALL

01:06PM  18   HAPPENED?

01:06PM  19      A.   NO, I DON'T KNOW SPECIFICALLY.  I WAS NOT ON IT.

01:06PM  20      Q.   OKAY.  DO YOU KNOW WHETHER -- DO YOU KNOW WHETHER, AROUND

01:06PM  21   THIS TIME, MR. TUBERGEN WAS HAVING ANY COMMUNICATIONS WITH THE

01:06PM  22   MEMBERS OF THE DEVOS FAMILY?

01:06PM  23      A.   YES, HE WAS.

01:06PM  24      Q.   HE WAS.

01:06PM  25      A.   YES.
```

PETERSON CROSS BY MR. WADE                                        4731

01:06PM   1    Q.   BUT YOU DON'T KNOW WHAT THE SUBSTANCE WAS?

01:06PM   2    A.   CORRECT.

01:06PM   3    Q.   YOU WEREN'T INVOLVED IN THOSE COMMUNICATIONS?

01:06PM   4    A.   I WASN'T INVOLVED IN THE COMMUNICATIONS, BUT I WAS ASKED

01:06PM   5    TO WORK ON IT, SO I KNOW THERE WAS COMMUNICATION GOING ON.

01:06PM   6    Q.   AND YOU SAY -- AND YOU WANTED TO WORK ON IT; CORRECT?

01:06PM   7    A.   YES.

01:06PM   8    Q.   AND YOU HAD A CONVERSATION ON THE PLANE ON THE 18TH WITH

01:06PM   9    MR. TUBERGEN AND MR. DAMSTRA; CORRECT?

01:06PM  10    A.   YES.

01:06PM  11    Q.   AND THEN ABOUT 12 DAYS WENT BY AND YOU HADN'T HEARD

01:06PM  12    ANYTHING, SO YOU ACTUALLY FOLLOWED UP WITH MR. DAMSTRA AND

01:06PM  13    SAID, IF THERE'S AN OPPORTUNITY, I'D LIKE TO, I'D LIKE TO WORK

01:06PM  14    ON THIS.

01:06PM  15         DO YOU RECALL THAT?

01:06PM  16    A.   I WAS ENTHUSED FROM THE VERY BEGINNING, AND I'M NOT ON THE

01:07PM  17    BDT RELATIONSHIP, SO I THOUGHT THAT THIS MIGHT GO TO THE PERSON

01:07PM  18    THAT WAS IN CHARGE OF BDT.

01:07PM  19    Q.   OKAY.  SO UNDER MR. DAMSTRA THERE'S A PERSON KIND OF AT

01:07PM  20    YOUR LEVEL, IF YOU WILL?

01:07PM  21    A.   YES.

01:07PM  22    Q.   I MEAN NO OFFENSE WHEN I SAY THAT, BUT A SIMILAR POSITION

01:07PM  23    WITHIN THE FAMILY OFFICE?

01:07PM  24    A.   YES.

01:07PM  25    Q.   AND THEY WERE RESPONSIBLE FOR BDT?

PETERSON CROSS BY MR. WADE                                                    4732

01:07PM   1    A.   CORRECT.

01:07PM   2    Q.   AND COMING OUT OF THIS, COMING OUT OF THIS MEETING,

01:07PM   3    BETWEEN THE TIME THAT YOU HAD THOSE INTERACTIONS WITH

01:07PM   4    MR. TUBERGEN AND THE TIME THAT YOU GOT ON THE PLANE TO GO TO

01:07PM   5    CALIFORNIA, YOU DIDN'T HAVE ANY INTERACTIONS WITH THE DEVOS

01:08PM   6    FAMILY MEMBERS ABOUT THIS?

01:08PM   7    A.   OTHER THAN SHARING MY MEMOS, NO.

01:08PM   8    Q.   WELL, YOU DON'T ACTUALLY KNOW WHETHER THEY GOT YOUR MEMOS,

01:08PM   9    DO YOU?

01:08PM  10    A.   YES, BECAUSE WE TALKED ABOUT IT ON THE PLANE.

01:08PM  11    Q.   DO YOU RECALL --

01:08PM  12    A.   WE WENT THROUGH THE MEMO ON THE PLANE.

01:08PM  13    Q.   OKAY.  DO YOU RECALL GIVING TESTIMONY IN THIS CASE IN

01:08PM  14    CONNECTION WITH THERANOS MATTERS PREVIOUSLY?

01:08PM  15    A.   YES.

01:08PM  16    Q.   OKAY.  DO YOU RECALL YOU WERE DEPOSED?  DO YOU REMEMBER

01:08PM  17    THAT?

01:08PM  18    A.   YES.

01:08PM  19    Q.   IN MICHIGAN?

01:08PM  20    A.   YES.

01:08PM  21    Q.   DO YOU RECALL THAT?

01:08PM  22         AND THERE WAS A COURT REPORTER LIKE OUR COURT REPORTER

01:08PM  23    HERE TAKING DOWN EVERYTHING THAT YOU SAID?

01:08PM  24         DO YOU RECALL THAT?

01:08PM  25    A.   YES.

PETERSON CROSS BY MR. WADE                                              4733

01:08PM  1    Q.   OKAY.  AND YOU WERE UNDER OATH; RIGHT?

01:08PM  2    A.   YES.

01:08PM  3    Q.   AND YOU TOLD THE TRUTH IN THAT TESTIMONY, DID YOU NOT?

01:08PM  4    A.   IF YOU CAN SHOW ME WHAT YOU'RE REFERRING TO, MAYBE IT WILL

01:08PM  5    REFRESH MY MEMORY.

01:08PM  6    Q.   MY QUESTION IS JUST WHETHER YOU TOLD THE TRUTH.

01:08PM  7    A.   YES.

01:08PM  8    Q.   AND DID YOU TESTIFY IN THAT DEPOSITION THAT YOU DON'T KNOW

01:08PM  9    WHETHER THE DEVOS FAMILY MEMBERS REVIEWED ANY OF YOUR MEMOS?

01:09PM  10   A.   I KNOW THAT WE TALKED ABOUT ALL OF THE WORK THAT I HAD

01:09PM  11   DONE ON THE AIRPLANE ON THE WAY HERE, SO YES.

01:09PM  12   Q.   OKAY.

01:09PM  13   A.   I DON'T KNOW IF THEY HAD ACTUALLY PHYSICALLY PUT THEIR

01:09PM  14   EYES ON THE MEMO, BUT WE DEFINITELY TALKED ABOUT THE SUBSTANCE

01:09PM  15   OF MY MEMO ON THE PLANE.

01:09PM  16   Q.   OKAY.  OKAY.  I JUST WANT TO MAKE SURE OUR RECORD IS

01:09PM  17   CLEAR.

01:09PM  18        YOU DON'T KNOW WHETHER THEY READ YOUR MEMO; CORRECT?

01:09PM  19   A.   CORRECT.

01:09PM  20   Q.   BUT YOU DID HAVE DISCUSSIONS WITH THEM ON THE PLANE RIDE

01:09PM  21   ON THE WAY?

01:09PM  22   A.   YES, LOTS OF THEM.

01:09PM  23   Q.   OKAY.  DO YOU HAVE NOTES OF THOSE CONVERSATIONS?

01:09PM  24   A.   NO.

01:09PM  25   Q.   OKAY.  THE NEXT INTERACTION THAT YOU HAD WITH THERANOS --

PETERSON CROSS BY MR. WADE                                          4734

01:09PM  1    WELL, LET ME STEP BACK.  LET ME ASK YOU ANOTHER QUESTION ABOUT

01:09PM  2    MR. MOSLEY.

01:09PM  3        ARE YOU AWARE THAT -- I WANT TO SHOW YOU A DOCUMENT.  IF

01:10PM  4    YOU LOOK AT 4197.

01:10PM  5    A.   OKAY.

01:10PM  6    Q.   AND THIS IS A DOCUMENT THAT YOU'VE SEEN BEFORE; CORRECT?

01:10PM  7    A.   I DON'T RECALL.  DEFINITELY NOT PRIOR TO OUR MAKING THE

01:11PM  8    INVESTMENT.

01:11PM  9    Q.   OKAY.  DO YOU RECALL -- LET'S TAKE IT ONE PIECE AT A TIME.

01:11PM  10       DO YOU RECALL WHETHER YOU'VE SEEN THIS DOCUMENT BEFORE?

01:11PM  11   A.   I DON'T RECALL.

01:11PM  12   Q.   OKAY.  LET'S LOOK AT 10587.  ACTUALLY, BEFORE I DO THAT,

01:11PM  13   LET ME JUST ASK A QUESTION ABOUT DO YOU KNOW WHETHER -- LET'S

01:11PM  14   GO TO 10587.

01:11PM  15           THE COURT:  10587?

01:12PM  16           MR. WADE:  YES.

01:12PM  17   Q.   DO YOU SEE THAT THIS IS AN EMAIL THAT WAS SENT TO YOU BY

01:12PM  18   HUGH FREUND IN 2017?  I'M LOOKING AT THE COVER EMAIL RIGHT NOW.

01:12PM  19   A.   YES.

01:12PM  20   Q.   OKAY.  AND DO YOU SEE THAT HE ATTACHES THE DOCUMENT THAT I

01:12PM  21   WAS REFERRING TO AS EXHIBIT 4197?

01:12PM  22   A.   OKAY, YES.

01:12PM  23   Q.   OKAY.

01:12PM  24       MOVE THE ADMISSION OF --

01:12PM  25       AND THIS IS AN INVESTMENT ANALYSIS THAT MR. MOSLEY DID IN

PETERSON CROSS BY MR. WADE                                              4735

01:12PM   1      CONNECTION WITH THERANOS; CORRECT?

01:12PM   2      A.   CORRECT.

01:12PM   3      Q.   OKAY.

01:12PM   4           MOVE THE ADMISSION OF 10587.

01:13PM   5                MR. LEACH:  HEARSAY ON 10587, YOUR HONOR.  I HAVE NO

01:13PM   6      OBJECTION TO THE PRIOR EXHIBIT THAT WE WERE LOOKING AT.

01:13PM   7                THE COURT:  WILL THAT WORK FOR YOU, MR. WADE?

01:13PM   8                MR. WADE:  WHY DON'T WE TRY IT?

01:13PM   9                THE COURT:  4197?

01:13PM   10               MR. WADE:  IF THE GOVERNMENT IS OKAY WITH ME ASKING

01:13PM   11     QUESTIONS OF 4197, MAYBE I'LL JUST ASK THE QUESTION.

01:13PM   12               THE COURT:  SURE.

01:13PM   13               MR. WADE:  I MOVE THE ADMISSION OF 4197.

01:13PM   14               MR. LEACH:  NO OBJECTION.

01:13PM   15               THE COURT:  THAT'S ADMITTED, AND IT MAY BE

01:13PM   16     PUBLISHED.

01:13PM   17          (GOVERNMENT'S EXHIBIT 4197 WAS RECEIVED IN EVIDENCE.)

01:13PM   18     BY MR. WADE:

01:13PM   19     Q.   OKAY.  DO YOU SEE HERE THIS IS A DAY -- THIS IS A DAY --

01:13PM   20     OR A DOCUMENT FROM MR. MOSLEY.

01:13PM   21          DO YOU SEE THAT?

01:13PM   22     A.   YES.

01:13PM   23     Q.   AND THIS ONE IS ADDRESSED TO DR. KISSINGER?

01:13PM   24     A.   YES.

01:13PM   25     Q.   DO YOU RECOGNIZE THAT TO BE HENRY KISSINGER?

PETERSON CROSS BY MR. WADE                                          4736

01:13PM   1    A.   YES.

01:13PM   2    Q.   OKAY.  AND ATTACHED TO THIS, IF YOU GO TO THE SECOND PAGE,

01:14PM   3    AND IT'S SEPTEMBER 2ND -- I'M SORRY.  IT'S SEPTEMBER 2ND, 2014;

01:14PM   4    RIGHT?

01:14PM   5    A.   BUT I DIDN'T SEE THIS UNTIL THREE YEARS LATER.

01:14PM   6    Q.   THAT'S NOT MY QUESTION, BUT WE'LL GET TO THAT.

01:14PM   7    A.   OKAY.  OKAY.

01:14PM   8    Q.   YOU SEE THAT IT'S DATED SEPTEMBER 2ND, 2014?

01:14PM   9    A.   YES.

01:14PM   10   Q.   OKAY.  AND THAT IS A COUPLE OF WEEKS BEFORE THE MEETING

01:14PM   11   THAT MR. MOSLEY AND MR. TUBERGEN AND MS. HOLMES HAD IN CHICAGO

01:14PM   12   AT THE BDT CONFERENCE; CORRECT?

01:14PM   13   A.   YES.

01:14PM   14   Q.   OKAY.  LET'S GO TO THE SECOND PAGE.

01:14PM   15        AND IF YOU LOOK, AND I WON'T GO THROUGH THE DETAILS OF IT

01:14PM   16   NOW, BUT IF WE JUST SCROLL THROUGH THE PAGES, THERE'S A PRETTY

01:14PM   17   DETAILED ANALYSIS THAT MR. MOSLEY HAD DONE WITH RESPECT TO

01:14PM   18   THERANOS; CORRECT?

01:14PM   19   A.   IT APPEARS THAT WAY, YES.

01:15PM   20   Q.   OKAY.  OKAY.

01:15PM   21        AND DO YOU KNOW WHETHER THIS DOCUMENT WAS COMMUNICATED TO

01:15PM   22   MR. TUBERGEN BEFORE HIS MEETING WITH MS. HOLMES?

01:15PM   23   A.   NOT TO MY KNOWLEDGE.

01:15PM   24   Q.   OKAY.  BUT YOU DON'T KNOW; CORRECT?

01:15PM   25   A.   I DON'T KNOW.

PETERSON CROSS BY MR. WADE                                              4737

| | | |
|---|---|---|
| 01:15PM | 1 | Q.   OKAY.  AND DO YOU KNOW WHETHER THE SUBSTANCE OF THIS |
| 01:15PM | 2 | ANALYSIS WAS COMMUNICATED ORALLY BY MR. MOSLEY TO MR. TUBERGEN |
| 01:15PM | 3 | IN PART OR IN WHOLE? |
| 01:15PM | 4 | A.   I DON'T KNOW. |
| 01:15PM | 5 | Q.   OKAY.  THIS DOCUMENT, DO YOU RECALL THAT THIS DOCUMENT WAS |
| 01:15PM | 6 | LATER COMMUNICATED TO YOU IN YOUR GMAIL ACCOUNT? |
| 01:15PM | 7 | A.   YES. |
| 01:15PM | 8 | Q.   AND DO YOU ORDINARILY USE YOUR GMAIL ACCOUNT FOR BUSINESS |
| 01:16PM | 9 | MATTERS? |
| 01:16PM | 10 | A.   NOT REGULARLY, NO. |
| 01:16PM | 11 | Q.   OKAY.  AND DO YOU RECALL THEN THAT YOU FORWARDED THIS |
| 01:16PM | 12 | DOCUMENT FROM YOUR GMAIL ACCOUNT TO A GMAIL ACCOUNT AND A HOME |
| 01:16PM | 13 | ACCOUNT RELATING TO MR. TUBERGEN? |
| 01:16PM | 14 | A.   YES. |
| 01:16PM | 15 | Q.   OKAY.  DO YOU NORMALLY COMMUNICATE WITH MR. TUBERGEN ABOUT |
| 01:16PM | 16 | MATTERS WITH WORK EMAIL? |
| 01:16PM | 17 | A.   NO. |
| 01:16PM | 18 | Q.   NO? |
| 01:16PM | 19 | A.   I NORMALLY COMMUNICATE WITH MR. TUBERGEN WITH MY WORK |
| 01:16PM | 20 | EMAIL, YES. |
| 01:16PM | 21 | Q.   YOU DO? |
| 01:16PM | 22 | A.   YES. |
| 01:16PM | 23 | Q.   SO NORMALLY YOU SEND IT FROM YOUR WORK EMAIL TO HIS WORK |
| 01:16PM | 24 | EMAIL; RIGHT? |
| 01:16PM | 25 | A.   YES. |

PETERSON CROSS BY MR. WADE                                             4738

01:16PM  1    Q.   OKAY.  AND WERE -- IS THE FACT THAT IT WAS BEING

01:16PM  2    COMMUNICATED BY GMAIL SOME INDICATION THAT YOU WERE TRYING TO

01:17PM  3    HIDE THE DOCUMENT?

01:17PM  4    A.   EVERYTHING AROUND THIS, WE WERE TRYING TO UNDERSTAND

01:17PM  5    MR. MOSLEY'S ROLE IN THE THERANOS INVESTMENT, AND WE COULDN'T

01:17PM  6    FIGURE IT OUT, AND WE HAD NOT SEEN THIS.

01:17PM  7         AND ONE OF THE OTHER -- ONCE WE UNDERSTOOD WHO THE OTHER

01:17PM  8    INVESTORS WERE, ONE OF THE OTHER INVESTORS GAVE US THIS.

01:17PM  9    Q.   OKAY.

01:17PM  10   A.   AND UNTIL WE UNDERSTOOD WHAT HIS ROLE WAS IN ALL OF THIS.

01:17PM  11   Q.   NO, I UNDERSTAND THAT.  FAIR ENOUGH.

01:17PM  12   A.   UH-HUH.

01:17PM  13   Q.   YOU WERE DOING SOME WORK TO FIGURE OUT -- THIS IS YEARS

01:17PM  14   LATER; RIGHT?

01:17PM  15   A.   YES.

01:17PM  16   Q.   AND YOU WERE DOING SOME WORK TO FIGURE OUT WHAT

01:17PM  17   MR. MOSLEY'S ROLE IN THE INVESTMENTS WAS; RIGHT?

01:17PM  18   A.   CORRECT, AND WHETHER HE WAS COMPENSATED.

01:17PM  19   Q.   AND HE HAD ACTUALLY -- PRIOR TO THE INVESTMENT, HE HAD

01:17PM  20   DONE LEGAL WORK FOR THE DEVOS FAMILY; CORRECT?

01:17PM  21   A.   CORRECT.

01:17PM  22   Q.   OKAY.  MY QUESTION IS, AS YOU'RE TRYING TO FIGURE THIS

01:18PM  23   OUT, IS THERE A REASON THAT THESE DOCUMENTS ARE BEING

01:18PM  24   COMMUNICATED IN GMAIL AS OPPOSED TO WORK EMAIL?

01:18PM  25   A.   BECAUSE AT THIS TIME THERE WAS ALL KINDS OF ISSUES GOING

PETERSON CROSS BY MR. WADE                                    4739

01:18PM  1    ON AROUND THE COMPANY, AND WE DIDN'T KNOW WHETHER MR. MOSLEY --

01:18PM  2    WHAT HIS ROLE WAS IN ALL OF THIS AND, FRANKLY, WE DID NOT WANT

01:18PM  3    TO GET HIM IN TROUBLE.

01:18PM  4    Q.   OKAY.  SO YOU WANTED TO KEEP IT UNDER YOUR HAT?

01:18PM  5    A.   CORRECT.

01:18PM  6    Q.   SO YOU KIND OF HID THE DOCUMENT?

01:18PM  7         IS THAT FAIR?

01:18PM  8    A.   SOMEWHAT, YES.

01:18PM  9    Q.   DO YOU KNOW -- YOU TESTIFIED THAT MR. MOSLEY WORKED AT THE

01:18PM 10    LAW FIRM OF CRAVATH, SWAINE & MOORE.

01:18PM 11         DO YOU RECALL THAT?

01:18PM 12    A.   YES.

01:18PM 13    Q.   AND DO YOU RECALL THAT LEARNING, DURING YOUR WORK RELATING

01:18PM 14    TO THERANOS, THAT HE USED -- THAT THERANOS HAD A LAWYER BY THE

01:18PM 15    NAME OF MR. DAVID BOIES?

01:18PM 16    A.   YES, I KNEW THAT.

01:18PM 17    Q.   AND WERE YOU AWARE THAT MR. DAVID BOIES USED TO BE LAW

01:19PM 18    PARTNERS WITH MR. MOSLEY AT CRAVATH, SWAINE & MOORE?

01:19PM 19    A.   NO.

01:19PM 20    Q.   WERE YOU AWARE AT ANY TIME THAT MR. MOSLEY WAS DOING DUE

01:19PM 21    DILIGENCE AND OBTAINING INFORMATION FROM DAVID BOIES IN

01:19PM 22    CONNECTION WITH THERANOS?

01:19PM 23    A.   NO.

01:19PM 24              MR. LEACH:  FOUNDATION.  RELEVANCE.

01:19PM 25              THE COURT:  I'LL ALLOW IT.  YOU CAN --

PETERSON CROSS BY MR. WADE                                              4740

01:19PM   1    BY MR. WADE:

01:19PM   2    Q.   ARE YOU -- DO YOU KNOW WHETHER MR. TUBERGEN LEARNED OF ANY

01:19PM   3    OF THOSE FACTS IN CONNECTION WITH THE INVESTMENT?

01:19PM   4    A.   NOT TO MY KNOWLEDGE.

01:19PM   5    Q.   OKAY.  MR. TUBERGEN CAME OUT OF THE MEETING WITH

01:20PM   6    MS. HOLMES VERY EXCITED ABOUT THE POTENTIAL INVESTMENT;

01:20PM   7    CORRECT?

01:20PM   8    A.   YES.

01:20PM   9    Q.   HE -- THIS WAS BEFORE -- THIS WAS BASED ON THE INITIAL

01:20PM  10    INTERACTION; RIGHT?

01:20PM  11    A.   CORRECT.

01:20PM  12    Q.   AND WHATEVER OTHER INTERACTIONS HE HAD IN ADVANCE OF THAT;

01:20PM  13    CORRECT?

01:20PM  14    A.   I DON'T KNOW WHAT OTHER INTERACTIONS HE HAD, BUT HE WAS

01:20PM  15    VERY EXCITED ABOUT THE MEETING THAT HE HAD WITH CHRISTIAN AND

01:20PM  16    ELIZABETH.

01:20PM  17    Q.   RIGHT.  AND HE CAME, HE CAME BACK HIGHLY INTERESTED IN

01:20PM  18    DOING THE INVESTMENT; CORRECT?

01:20PM  19    A.   HE CAME BACK HIGHLY INTERESTED AND LOOKING AT THE

01:20PM  20    OPPORTUNITY AND TAKING IT TO THE FAMILY.

01:20PM  21    Q.   AND DO YOU RECALL THAT HE REALLY WANTED TO MAKE IT HAPPEN?

01:21PM  22         DO YOU RECALL THAT?

01:21PM  23    A.   I DON'T SEE HIS BEHAVIOR ANY DIFFERENT THAN NORMAL.  HE

01:21PM  24    WAS, HE WAS EXCITED ABOUT AN OPPORTUNITY THAT WE HAD A CHANCE

01:21PM  25    TO LOOK AT, AND WE LOOKED AT IT, AND IT WENT THROUGH THE PROPER

PETERSON CROSS BY MR. WADE                                                    4741

01:21PM  1    PROCESS OF GOING THROUGH THE INVESTMENT COMMITTEE.

01:21PM  2    Q.   DO YOU RECALL, DO YOU RECALL WHAT DROVE THE INVESTMENT WAS

01:21PM  3    MR. TUBERGEN'S BELIEF THAT THERANOS WAS A UNICORN?

01:21PM  4    A.   I DON'T RECALL THAT.

01:21PM  5    Q.   OKAY.  DO YOU KNOW WHAT A UNICORN IS?

01:21PM  6    A.   CAN YOU EXPLAIN IT?

01:21PM  7    Q.   I'M ASKING YOU.  YOU'RE THE INVESTMENT PROFESSIONAL.  I'M

01:21PM  8    WONDERING IF YOU KNOW WHAT A UNICORN IS.

01:21PM  9    A.   (LAUGHTER.)

01:21PM  10       IT'S NOT SOMETHING THAT WE NORMALLY INVEST WITH.  HIGH

01:21PM  11   GROWTH INVESTMENTS LIKE THAT, WE DON'T AT ALL INVEST WITH

01:21PM  12   THOSE.

01:21PM  13   Q.   AND WHEN YOU SAY "HIGH GROWTH INVESTMENTS," UNICORNS ARE

01:22PM  14   USUALLY INVESTMENTS THAT CAN REALLY POP; CORRECT?

01:22PM  15   A.   THAT'S YOUR DEFINITION, YES.  THAT'S YOUR DEFINITION,

01:22PM  16   OKAY?

01:22PM  17   Q.   WHAT IS YOUR DEFINITION?

01:22PM  18   A.   I DON'T DEAL IN INVESTING IN UNICORNS, SO --

01:22PM  19   Q.   OKAY.  AND YOU DON'T RECALL THAT WHAT DROVE THE INVESTMENT

01:22PM  20   IN THE CASE OF THERANOS WAS MR. TUBERGEN'S BELIEF THAT THERANOS

01:22PM  21   WAS A UNICORN?

01:22PM  22   A.   I DON'T BELIEVE THAT WAS THE CASE.  WE WERE RELYING ON

01:22PM  23   FOUR KEY ELEMENTS OF THIS, WHICH WERE THE FINANCIALS THAT WERE

01:22PM  24   SOLID, THE CONTRACTS THAT WERE IN PLACE, THE FACT THAT THEY HAD

01:22PM  25   DONE WORK FOR THE LAST FIVE TO SEVEN YEARS WITH PHARMACEUTICAL

PETERSON CROSS BY MR. WADE                                          4742

01:22PM  1    COMPANIES THAT, THAT SUBSTANTIATED THE ACCURACY OF IT.

01:23PM  2        THOSE ARE WHAT WE BASED OUR INVESTMENT DECISION ON.

01:23PM  3    Q.   WELL, YOU DIDN'T MAKE THE INVESTMENT DECISION; RIGHT?

01:23PM  4    A.   I INFORMED THE INVESTMENT COMMITTEE THAT MADE THE

01:23PM  5    INVESTMENT DECISION, YES, AS WELL AS THEM GOING IN THE MEETING.

01:23PM  6    Q.   JUST TO BE CLEAR, YOU DID NOT ATTEND THE INVESTMENT

01:23PM  7    COMMITTEE MEETING; CORRECT?

01:23PM  8    A.   CORRECT.

01:23PM  9    Q.   AND YOU DON'T KNOW WHETHER ANY OF YOUR MEMOS WERE EVER

01:23PM 10    READ BY THE INVESTMENT COMMITTEE; RIGHT?

01:23PM 11    A.   CORRECT.

01:23PM 12    Q.   OKAY.  AND, IN FACT, THE INVESTMENT IN THERANOS WAS

01:23PM 13    COMMITTED TO BEFORE YOU EVEN PREPARED THAT MEMO, THE SECOND

01:23PM 14    MEMO; CORRECT?

01:23PM 15    A.   THAT'S NOT CORRECT.

01:23PM 16    Q.   OKAY.  WE'LL GET TO THAT.

01:23PM 17        BUT STICKING WITH THE UNICORN, DO YOU RECALL THAT YOU GAVE

01:23PM 18    AN INTERVIEW WITH THE S.E.C. AND THE DEPARTMENT OF JUSTICE IN

01:23PM 19    APRIL OF 2017?

01:23PM 20    A.   YES.

01:23PM 21    Q.   AND DO YOU RECALL THAT WAS, THAT WAS A MEETING WHERE,

01:24PM 22    WHERE MANY OF THE -- A COUPLE OF THE PROSECUTORS MAYBE HERE

01:24PM 23    ATTENDED.

01:24PM 24        DO YOU RECALL THAT?

01:24PM 25    A.   I DON'T RECALL WHO WAS IN THE ROOM EXACTLY, BUT I REMEMBER

UNITED STATES COURT REPORTERS
**ER-8355**

PETERSON CROSS BY MR. WADE                                    4743

01:24PM    1     THE INTERVIEW.

01:24PM    2     Q.   AND THERE WERE SOME S.E.C. ATTORNEYS.

01:24PM    3          DO YOU RECALL THAT?

01:24PM    4     A.   YES.

01:24PM    5     Q.   AND IT WAS IN SAN FRANCISCO, I THINK.

01:24PM    6     A.   YES.

01:24PM    7     Q.   OKAY.  AND YOU WERE REPRESENTED BY COUNSEL; RIGHT?

01:24PM    8     A.   YES.

01:24PM    9     Q.   OKAY.  AND DO YOU RECALL, IN CONNECTION WITH THAT, THAT

01:24PM   10     YOUR ATTORNEYS HAD MEETINGS IN ADVANCE WITH THE S.E.C.?

01:24PM   11     A.   I DON'T RECALL ANY OF THAT, NO.

01:24PM   12     Q.   OKAY.  DO YOU RECALL IN ADVANCE THAT YOUR ATTORNEYS TOLD

01:24PM   13     THE S.E.C. AND DOJ THAT WHAT DROVE THE INVESTMENT WAS A

01:24PM   14     UNICORN?

01:24PM   15               MR. LEACH:  OBJECTION.

01:24PM   16               THE COURT:  SUSTAINED.

01:24PM   17               THE WITNESS:  I DON'T RECALL THAT.

01:24PM   18               THE COURT:  SUSTAINED.  SUSTAINED.  THE ANSWER IS

01:24PM   19     STRICKEN.

01:24PM   20          YOU CAN ASK ANOTHER QUESTION.

01:24PM   21     BY MR. WADE:

01:24PM   22     Q.   I'M TRYING TO REFRESH YOUR RECOLLECTION.  IF YOU CAN LOOK

01:24PM   23     AT EXHIBIT 11453.

01:25PM   24     A.   CAN YOU DIRECT ME TO WHAT YOU'RE REFERRING TO?

01:25PM   25     Q.   YEAH, I WILL.  AND JUST SO WE'RE CLEAR, READ IT TO

PETERSON CROSS BY MR. WADE                                          4744

| | | |
|---|---|---|
| 01:25PM | 1 | YOURSELF.  PLEASE DON'T SPEAK UNTIL AFTER I ASK YOU A QUESTION |
| 01:25PM | 2 | JUST SO NEITHER ONE OF US GET IN TROUBLE, OKAY? |
| 01:25PM | 3 | THE -- IF YOU CAN LOOK ABOUT TWO-THIRDS OF THE WAY DOWN |
| 01:25PM | 4 | THE PAGE, MAYBE THREE QUARTERS OF THE WAY, DO YOU SEE WHAT |
| 01:25PM | 5 | DROVE INVESTMENT?  DO YOU SEE THAT LANGUAGE? |
| 01:25PM | 6 | IF I COULD APPROACH, I CAN POINT IT OUT, YOUR HONOR. |
| 01:25PM | 7 | THE COURT:  SURE.  GO RIGHT AHEAD.  GO RIGHT AHEAD. |
| 01:25PM | 8 | YES. |
| 01:25PM | 9 | THE WITNESS:  I DON'T RECALL EVER SAYING THAT WORD. |
| 01:25PM | 10 | I SEE THAT.  I DO NOT EVER RECALL SAYING THAT WORD.  IT'S |
| 01:26PM | 11 | NOT SOMETHING I WOULD EVER USE. |
| 01:26PM | 12 | I DO RECALL IT SAYS RELIED ON LONG-TERM CONTRACTS WITH |
| 01:26PM | 13 | WALGREENS AND SAFEWAY. |
| 01:26PM | 14 | BY MR. WADE: |
| 01:26PM | 15 | Q.  SO DO YOU THINK YOUR ATTORNEYS GOT THOSE FACTS RIGHT WHEN |
| 01:26PM | 16 | THEY GAVE THE PROFFER? |
| 01:26PM | 17 | MR. LEACH:  OBJECTION. |
| 01:26PM | 18 | THE COURT:  SUSTAINED.  WHY DON'T WE MOVE ON? |
| 01:26PM | 19 | THE WITNESS:  I WOULD NEVER USE THE WORD "UNICORN." |
| 01:26PM | 20 | BY MR. WADE: |
| 01:26PM | 21 | Q.  JUST TO BE CLEAR, JUST SO THE RECORD IS CLEAR, I WAS NEVER |
| 01:26PM | 22 | SUGGESTING THAT YOU WERE. |
| 01:26PM | 23 | DO YOU RECALL THAT YOUR LAWYERS ON YOUR BEHALF PROFFERED |
| 01:26PM | 24 | THOSE FACTS? |
| 01:26PM | 25 | MR. LEACH:  OBJECTION.  FOUNDATION. |

PETERSON CROSS BY MR. WADE                                    4745

01:26PM   1            THE COURT:  DO YOU HAVE ANOTHER QUESTION?

01:26PM   2            MR. WADE:  I DO.

01:26PM   3            THE COURT:  GREAT.

01:27PM   4    BY MR. WADE:

01:27PM   5    Q.  AFTER YOUR MEETING WITH MR. TUBERGEN ON THE AIRPLANE, WHEN

01:27PM   6    DID YOU NEXT MEET WITH HIM IN CONNECTION WITH THE THERANOS

01:27PM   7    INVESTMENT?

01:27PM   8    A.  I BELIEVE HE -- WE TALKED THE DAY OF THE CALL WITH

01:27PM   9    ELIZABETH HOLMES.

01:27PM   10   Q.  DID -- WHEN YOU DID THE CALL, WERE YOU IN THE SAME

01:27PM   11   PHYSICAL SPACE?

01:27PM   12   A.  YES.

01:27PM   13   Q.  OKAY.  IN HIS OFFICE?

01:27PM   14   A.  YES.

01:27PM   15   Q.  OKAY.  AND SO YOU MET THAT DAY AND MADE THE CALL TO

01:28PM   16   MS. HOLMES?

01:28PM   17   A.  YES.

01:28PM   18   Q.  AND THAT WAS THE CALL THAT YOU REFERRED TO, THE

01:28PM   19   OCTOBER 3RD CALL?

01:28PM   20   A.  CORRECT.

01:28PM   21   Q.  OKAY.

01:28PM   22   A.  WE TALKED AHEAD OF THE CALL AND AFTER THE CALL.

01:28PM   23   Q.  OKAY.  AND THAT WAS THE POINT AT WHICH MR. TUBERGEN GAVE

01:28PM   24   YOU THE BINDERS; IS THAT RIGHT?

01:28PM   25   A.  YES.

PETERSON CROSS BY MR. WADE                                                4746

01:28PM   1    Q.   AND THERE WERE TWO -- I BELIEVE YOU'VE SAID PREVIOUSLY

01:28PM   2    THAT THERE WERE TWO BINDERS; IS THAT RIGHT?

01:28PM   3    A.   THERE WERE TWO BINDERS.  I WENT UP AND GOT THE BINDERS

01:28PM   4    EARLY THAT MORNING AND STARTED GOING THROUGH THEM AND

01:28PM   5    DEVELOPING QUESTIONS FOR THE CALL LATER THAT DAY.

01:28PM   6    Q.   I THOUGHT YOU SAID IT WAS IN THE MEETING THAT HE GAVE YOU

01:28PM   7    THE BINDERS.

01:28PM   8    A.   NO.  HE EMAILED ME AND SAID THAT THERE WAS GOING TO BE A

01:28PM   9    CALL THAT DAY AND COULD I ATTEND, AND I SAID YES.

01:28PM   10   AND THEN HE SAID THAT THE BINDERS HAD ARRIVED AND THEY

01:28PM   11   WERE ON HIS DESK, AND SO I WENT AND GOT THEM AND MADE A COPY.

01:28PM   12   Q.   OKAY.

01:28PM   13   A.   AND I BEGAN LOOKING AT THEM AHEAD OF THE CALL THAT WAS

01:28PM   14   LATER THAT AFTERNOON.

01:28PM   15   Q.   OKAY.  AND WITH RESPECT TO THAT CALL, DO YOU RECALL THAT

01:29PM   16   THAT WAS ABOUT LESS THAN HALF AN HOUR?

01:29PM   17   A.   IT WAS PROBABLY HALF AN HOUR.

01:29PM   18   Q.   OKAY.  THE MINUTES -- YOU TOOK NOTES OF THE CALL; CORRECT?

01:29PM   19   A.   YES.

01:29PM   20   Q.   AND YOU WERE LOOKING AT THOSE NOTES EARLIER; CORRECT?

01:29PM   21   A.   CORRECT.

01:29PM   22   Q.   AND I THINK THAT'S 2015, WHICH IS PROBABLY IN BOTH

01:29PM   23   BINDERS.

01:30PM   24   DO YOU HAVE THAT IN FRONT OF YOU?

01:30PM   25   A.   YES.

PETERSON CROSS BY MR. WADE                                              4747

01:30PM   1    Q.   OKAY.  AND DO YOU SEE AT THE TOP THE FIRST HEADING IS

01:30PM   2    "WHAT IS THE LONG-TERM VISION OF THERANOS?"

01:30PM   3    A.   YES.

01:30PM   4    Q.   AND THAT WAS SOMETHING THAT MR. TUBERGEN WAS VERY FOCUSSED

01:30PM   5    ON; CORRECT?

01:30PM   6    A.   NO.  IT'S JUST A QUESTION THAT WE HAD.

01:30PM   7    Q.   OKAY.  DO YOU RECALL HIM, WHEN HE CAME BACK WITH THE

01:30PM   8    FAMILY AND WITH YOU, HE WAS SPEAKING ABOUT THE LONG-TERM VISION

01:30PM   9    THAT THE COMPANY HAD?

01:30PM   10   A.   WELL, I THINK IT'S ONE OF MANY ASPECTS IN UNDERWRITING

01:30PM   11   THAT WE UNDERTAKE WHAT IS THE LONG-TERM VISION AND GROWTH OF

01:30PM   12   THE COMPANY.

01:30PM   13   Q.   RIGHT.  I WAS ASKING SPECIFICALLY WITH RESPECT TO

01:31PM   14   MR. TUBERGEN.  DO YOU RECALL HIM SPEAKING ABOUT THE VISION OF

01:31PM   15   THE COMPANY, HIS INTEREST IN THE LONG-TERM VISION OF THE

01:31PM   16   COMPANY?

01:31PM   17   A.   YEAH, BUT IT WASN'T THE ONLY THING THAT HE WAS FOCUSSED

01:31PM   18   ON.

01:31PM   19   Q.   OKAY.  IT WAS THE FIRST QUESTION THAT HE ASKED MS. HOLMES;

01:31PM   20   CORRECT?

01:31PM   21   A.   IT WAS THE FIRST QUESTION ON MY LIST OF QUESTIONS.

01:31PM   22          THE CLERK:  ZOOM JUST WENT DOWN.

01:31PM   23          THE COURT:  OKAY.  EXCUSE ME JUST A SECOND.

01:31PM   24       WHY DON'T WE TAKE OUR BREAK NOW?  I UNDERSTAND THAT

01:31PM   25   THEY'RE HAVING PROBLEMS WITH THE ZOOM FEED.

UNITED STATES COURT REPORTERS

**ER-8360**

PETERSON CROSS BY MR. WADE                                    4748

01:31PM   1            MR. WADE:  DOWNSTAIRS?  OKAY.

01:31PM   2            THE COURT:  SO LET'S TAKE A BREAK NOW.  30 MINUTES,

01:31PM   3     30 MINUTE BREAK, PLEASE.

01:31PM   4         (PAUSE IN PROCEEDINGS.)

01:32PM   5         (RECESS FROM 1:32 P.M. UNTIL 2:02 P.M.)

02:02PM   6            THE COURT:  THANK YOU.  PLEASE BE SEATED.  THANK

02:02PM   7     YOU.

02:02PM   8         WE'RE BACK ON THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT

02:02PM   9     ARE PRESENT ONCE AGAIN.

02:02PM  10         MS. HOLMES IS PRESENT.

02:02PM  11         MR. WADE, YOU HAVE ADDITIONAL QUESTIONS?

02:03PM  12            MR. WADE:  I DO, YOUR HONOR.  THANK YOU.

02:03PM  13     Q.  MS. PETERSON, I THINK WE WERE ABOUT TO TALK A LITTLE BIT

02:03PM  14     ABOUT THE CALL THAT YOU HAD WITH MS. HOLMES.

02:03PM  15         DO YOU RECALL THAT THE PURPOSE OF THE CALL WAS TO GET A

02:03PM  16     BETTER SENSE OF HER VISION?

02:03PM  17     A.  THE PURPOSE OF THE CALL WAS TO BE ASKING SOME QUESTIONS.

02:03PM  18     Q.  OKAY.  DO YOU RECALL IN ONE OF YOUR EARLIER MEETINGS WITH

02:03PM  19     THE GOVERNMENT IN THIS CASE THAT YOU TOLD THEM THE PURPOSE OF

02:03PM  20     THE CALL WAS TO GET A BETTER SENSE OF THE VISION?

02:03PM  21     A.  I DON'T RECALL THAT, BUT I -- WE HAD LISTED OUT THESE

02:03PM  22     QUESTIONS.  THESE ARE THE KIND OF THINGS THAT WE WERE -- THE

02:03PM  23     DARKER, THE DARKER WORDS IN HERE ARE THE QUESTIONS THAT WE HAD

02:03PM  24     GOING INTO THE CALL.

02:03PM  25     Q.  MY QUESTION WAS DID, DID -- DO YOU RECALL TELLING THE

PETERSON CROSS BY MR. WADE                                          4749

02:04PM   1    GOVERNMENT THAT THE PURPOSE OF THE CALL WAS TO GET A BETTER

02:04PM   2    SENSE OF HER VISION?

02:04PM   3    A.   I MAY HAVE.  I DON'T RECALL EXACTLY.

02:04PM   4    Q.   OKAY.  LET'S TAKE A LOOK.  IF YOU WOULD LOOK IN YOUR

02:04PM   5    BINDER AT EXHIBIT 11249.  TELL ME WHEN YOU HAVE THAT IN FRONT

02:04PM   6    OF YOU.

02:04PM   7        AGAIN, PLEASE READ THIS TO YOURSELF AND WAIT FOR MY

02:04PM   8    QUESTION AFTER I DIRECT YOU TO THE SPOT.

02:04PM   9        DO YOU HAVE THAT IN FRONT OF YOU?

02:04PM   10   A.   YES.

02:04PM   11   Q.   OKAY.  AND DO YOU RECALL THAT YOU MET WITH PEOPLE IN THE

02:04PM   12   U.S. ATTORNEY'S OFFICE IN APRIL OF 2017?

02:04PM   13   A.   YES.

02:04PM   14   Q.   OKAY.  I WANT YOU TO LOOK IN THE ONE, TWO -- IN THE FOURTH

02:05PM   15   PARAGRAPH, I THINK ABOUT FOUR SENTENCES IN THE SENTENCE THAT

02:05PM   16   STARTS WITH "PETERSON HAD."

02:05PM   17   A.   I'M SORRY, WHICH PARAGRAPH?

02:05PM   18   Q.   THE FOURTH PARAGRAPH ON THE FIRST PAGE.

02:05PM   19   A.   UH-HUH.

02:05PM   20   Q.   DO YOU SEE THE SENTENCE "PETERSON HAD" MIDWAY THROUGH THAT

02:05PM   21   PARAGRAPH?

02:05PM   22   A.   YES.

02:05PM   23   Q.   READ THAT TO YOURSELF.

02:05PM   24       HAVE YOU READ THAT TO YOURSELF?

02:05PM   25   A.   YES.

PETERSON CROSS BY MR. WADE                                        4750

02:05PM   1    Q.   AND DOES THAT REFRESH YOUR RECOLLECTION THAT YOU TOLD THE

02:05PM   2    GOVERNMENT THAT THE PURPOSE OF THE CALL WAS TO GET A BETTER

02:05PM   3    SENSE OF HER VISION?

02:05PM   4    A.   THAT'S NOT MY RECOLLECTION EXACTLY.

02:05PM   5    Q.   OKAY.

02:05PM   6    A.   THE CALL WAS TO BEGIN DOING DILIGENCE.

02:05PM   7    Q.   DID YOU DO A FULL DUE DILIGENCE ON THIS INVESTMENT?

02:05PM   8    A.   THIS WAS THE START OF QUESTIONS.  THAT'S DILIGENCE FOR US.

02:06PM   9    Q.   OKAY.  YOU DID A FULL, FULL -- EXHAUSTIVE DUE DILIGENCE ON

02:06PM   10   THE INVESTMENT?

02:06PM   11   A.   THAT'S NOT WHAT I SAID.

02:06PM   12   Q.   WELL, THAT'S MY QUESTION.

02:06PM   13   A.   WE DID ALL, WE DID -- YES, ALL OF THE DILIGENCE THAT WE

02:06PM   14   WERE GOING TO DO ON THIS INVESTMENT AT THE TIME.

02:06PM   15   Q.   WHEN YOU SAY "ALL OF THE DILIGENCE THAT YOU WERE GOING TO

02:06PM   16   DO ON THE INVESTMENT," WHAT DOES THAT MEAN?

02:06PM   17   A.   WE DID -- WE DID THE CALL AND WE WENT ON SITE AND WE

02:06PM   18   DID -- THAT WAS OUR DILIGENCE.

02:06PM   19   Q.   OKAY.  DO YOU BELIEVE THAT YOU DID APPROPRIATE DUE

02:06PM   20   DILIGENCE IN CONNECTION WITH THIS INVESTMENT?

02:06PM   21   A.   YES.

02:06PM   22   Q.   AND DO YOU BELIEVE THAT YOU DID THOROUGH DUE DILIGENCE IN

02:06PM   23   CONNECTION WITH THIS INVESTMENT?

02:06PM   24   A.   I THINK WE DID APPROPRIATE DUE DILIGENCE FOR WHAT WE WERE

02:06PM   25   DOING, YES.

PETERSON CROSS BY MR. WADE                                    4751

02:06PM   1    Q.   OKAY.  THE, THE -- IF YOU CAN BRING BACK IN FRONT OF YOU

02:07PM   2    THE DOCUMENT THAT WE LEFT OFF WITH IN 2015.

02:07PM   3         DO YOU HAVE THAT IN FRONT OF YOU?

02:07PM   4    A.   YES.

02:07PM   5    Q.   OKAY.  CAN WE BRING THAT UP?  IT'S IN EVIDENCE.

02:07PM   6         OKAY.  YOU WERE ASKED SOME QUESTIONS ABOUT THIS ON DIRECT;

02:07PM   7    DO YOU RECALL?

02:07PM   8    A.   YES.

02:07PM   9    Q.   AND THE FIRST QUESTION IS ABOUT THE LONG-TERM VISION OF

02:07PM  10    THERANOS.

02:07PM  11         DO YOU SEE THAT?

02:07PM  12    A.   YES.

02:07PM  13    Q.   AND THEN -- AND IT GIVES SOME DETAILS.

02:07PM  14         WAS THIS INFORMATION IN RESPONSE TO QUESTIONS THAT YOU HAD

02:07PM  15    ASKED?

02:07PM  16    A.   YES.

02:07PM  17    Q.   OKAY.  LET'S GO TO WALGREENS.

02:07PM  18         DO YOU SEE THAT?

02:07PM  19    A.   YES.

02:07PM  20    Q.   NOW, THIS WAS, THIS WAS -- YOU'RE AWARE THAT THEY HAD A

02:07PM  21    WALGREENS ROLLOUT; CORRECT?

02:08PM  22    A.   YES.

02:08PM  23    Q.   AND DID YOU GO AND VISIT A WALGREENS LOCATION?

02:08PM  24    A.   NO.

02:08PM  25    Q.   DID YOU PULL THE PUBLIC ANNOUNCEMENTS OF --

PETERSON CROSS BY MR. WADE                                          4752

02:08PM   1    A.   WE ACTUALLY DID PULL THE 10K FROM THE -- FROM 2013.

02:08PM   2    Q.   AND THE PRESS RELEASE ANNOUNCING THE --

02:08PM   3    A.   IT SAID THAT THEY WERE GOING TO GO AND BEGIN LAUNCHING

02:08PM   4    THEIR -- WITH THERANOS.  IT WAS TWO OR THREE SENTENCES IN THE

02:08PM   5    10K.

02:08PM   6    Q.   OKAY.  DID YOU LOOK AT THE PRESS RELEASE THAT ANNOUNCED

02:08PM   7    THE PARTNERSHIP?

02:08PM   8    A.   I DON'T RECALL.

02:08PM   9    Q.   OKAY.  LET'S LOOK AT 1113.  IT'S IN EVIDENCE.

02:09PM   10        IT'S UP ON YOUR SCREEN IF YOU'D LIKE AND IF IT'S EASIER.

02:09PM   11   A.   OKAY.

02:09PM   12   Q.   DO YOU SEE IT?

02:09PM   13   A.   YES.

02:09PM   14   Q.   OKAY.  AND IN LOOKING AT 1113, DO YOU RECOGNIZE THAT AS

02:09PM   15   THE JOINT PRESS RELEASE BETWEEN WALGREENS AND THERANOS?

02:09PM   16        DO YOU SEE THAT?

02:09PM   17   A.   YES.

02:09PM   18   Q.   AND THAT WAS OUT ON THE INTERNET.  DO YOU KNOW IF YOU

02:09PM   19   FOUND THIS AS PART OF YOUR INTERNET RESEARCH?

02:09PM   20   A.   I DON'T RECALL.

02:09PM   21   Q.   OKAY.  IF YOU, IF YOU -- DO YOU RECALL YOUR TESTIMONY ON

02:09PM   22   DIRECT THAT YOU WEREN'T AWARE OF ANY VENOUS DRAWS BEING DONE AT

02:09PM   23   THERANOS?

02:09PM   24   A.   CORRECT.

02:09PM   25   Q.   OKAY.  AND YOU DIDN'T GO TO A WALGREENS LOCATION AT THE

PETERSON CROSS BY MR. WADE                                              4753

```
02:09PM   1    TIME AND SEE WHAT KIND OF DRAWS THEY USED; CORRECT?

02:09PM   2    A.   CORRECT.

02:09PM   3    Q.   AND IF YOU LOOK AT THE LAST SENTENCE IN THIS PRESS

02:09PM   4    RELEASE, IF WE CAN JUST HIGHLIGHT THAT, DO YOU SEE IT SAYS,

02:09PM   5    "THE SAMPLES ARE EITHER TAKEN FROM A TINY FINGERSTICK OR A

02:09PM   6    MICRO-SAMPLE TAKEN FROM TRADITIONAL METHODS."

02:10PM   7         DO YOU SEE THAT?

02:10PM   8    A.   I SEE THAT.

02:10PM   9    Q.   AND DO YOU KNOW WHAT "TRADITIONAL METHODS" MEANS?

02:10PM  10    A.   I DON'T RECALL LOOKING AT THIS.

02:10PM  11    Q.   OKAY.  WOULD YOU UNDERSTAND TRADITIONAL METHODS TO MEAN

02:10PM  12    VENOUS DRAW?

02:10PM  13    A.   YES.

02:10PM  14    Q.   AND DO YOU KNOW WHETHER YOU WENT AND LOOKED AT -- YOU SAID

02:10PM  15    YOU DID INTERNET RESEARCH; CORRECT?

02:10PM  16    A.   SOME, YES.

02:10PM  17    Q.   WELL, I THOUGHT YOU SAID YOU DID THOROUGH DUE DILIGENCE,

02:10PM  18    DID YOU NOT?

02:10PM  19    A.   WE DID ADEQUATE DILIGENCE FOR THIS DEAL, YES.

02:10PM  20    Q.   OKAY.  AND IN CONNECTION WITH THAT, DID YOU GO INTO THE

02:10PM  21    COMPANY THERANOS'S WEBSITE?

02:10PM  22    A.   YES.

02:10PM  23    Q.   OKAY.  DID YOU GO TO THE WALGREENS WEBSITE?

02:10PM  24    A.   I DON'T RECALL.  I REMEMBER GOING ON THERANOS'S WEBSITE

02:10PM  25    AND LOOKING AT THE PRICE LISTINGS AND EVERYTHING ELSE THAT SHE
```

PETERSON CROSS BY MR. WADE                                          4754

02:10PM  1    HAD TALKED ABOUT.

02:10PM  2    Q.   OKAY.

02:10PM  3    A.   TRYING TO VERIFY THAT THAT WAS TRUE.

02:10PM  4    Q.   OKAY.  SO YOU WENT THERE TO LOOK AT THE TEST MENU?

02:10PM  5    A.   YES.

02:10PM  6    Q.   AND HOW MANY?  DO YOU RECALL?

02:10PM  7    A.   IT WAS A LOT.  I DIDN'T COUNT THEM.

02:10PM  8    Q.   IT WAS A LOT.  OKAY.

02:10PM  9         AND WHEN YOU WERE THERE, YOU DON'T RECALL WHETHER YOU

02:10PM  10   LOOKED AT THIS PRESS RELEASE ON EITHER OF THE COMPANIES'

02:11PM  11   WEBSITES?

02:11PM  12   A.   NO.

02:11PM  13   Q.   OKAY.  DID YOU LOOK -- DO YOU RECALL ASKING ANY FOLLOW-UP

02:11PM  14   QUESTIONS ABOUT WALGREENS AND HOW THE RELATIONSHIP WORKED OF

02:11PM  15   THERANOS?

02:11PM  16   A.   WE ASKED A LOT OF QUESTIONS ABOUT WALGREENS AND

02:11PM  17   SPECIFICALLY WHAT THE ROLLOUT PLAN WAS AND WHERE WERE THEY AT

02:11PM  18   THE MOMENT, IN 42 OR -- 40 OR 42 LOCATIONS IN ARIZONA, AND WE

02:11PM  19   ASKED SPECIFICALLY ABOUT WHAT THE ROLLOUT PLAN WAS.

02:11PM  20        THEY WERE ALREADY OPERATING IN WALGREENS STORES, SO THE

02:11PM  21   PRESS RELEASE WASN'T THAT RELEVANT TO US.

02:11PM  22   Q.   OKAY.  AND --

02:11PM  23   A.   WE WANTED TO KNOW WHAT LOCATIONS WERE THEY GOING TO OPEN

02:11PM  24   IN AND WHEN, AND WE WENT THROUGH THAT.

02:11PM  25   Q.   OKAY.  DID YOU LEARN HOW THE WALGREENS -- HOW IT WORKED AT

PETERSON CROSS BY MR. WADE                                              4755

02:11PM   1    WALGREENS WITH THERANOS, I MEAN, WHAT THE EXPERIENCE WAS LIKE?

02:11PM   2    A.   WELL, CHERI WAS TESTED, SO IT WAS SIMILAR TO WHAT WE WERE

02:12PM   3    TOLD.  CHERI WAS TESTED AT THEIR LOCATION AND, LIKE I SAID,

02:12PM   4    THEY HAD PUT SOME TINY CLINIC INSIDE OF THEIR BUILDING AND THEY

02:12PM   5    SAID THIS WAS VERY MUCH THE LOOK AND FEEL OF THE CLINIC INSIDE

02:12PM   6    OF A WALGREENS.

02:12PM   7    Q.   OKAY.  THAT WASN'T MY QUESTION.

02:12PM   8         MY QUESTION WAS, DID YOU LEARN ABOUT WHAT IT WAS LIKE, HOW

02:12PM   9    THEY WERE OPERATING WITHIN THE WALGREENS AND WITH DIFFERENT

02:12PM   10   WALGREENS LOCATIONS?

02:12PM   11   A.   LEARN HOW THEY WERE OPERATING?

02:12PM   12   Q.   YES, HOW IT WORKED.

02:12PM   13   A.   EVERYTHING THAT SHE HAD TOLD US WAS THAT THEY WERE DOING

02:12PM   14   FINGERSTICK AT WALGREENS.

02:12PM   15   Q.   OH, I UNDERSTAND THAT.  YOU'VE SAID THAT.

02:12PM   16        BUT EXPLAIN TO ME WHAT HAPPENED WHEN A PATIENT GOES INTO A

02:12PM   17   WALGREENS AT THERANOS IN THIS PERIOD BEFORE YOU ARE MAKING THE

02:12PM   18   INVESTMENT.

02:12PM   19   A.   IT WAS OUR UNDERSTANDING THAT THEY WOULD GO IN, EXACTLY

02:12PM   20   LIKE CHERI DID, INTO A CLINIC AND HAVE A FINGERSTICK DRAW.

02:12PM   21   Q.   AND THEN WHAT HAPPENS?

02:12PM   22   A.   AND THEN IT WAS TESTED RIGHT THERE.

02:12PM   23   Q.   IT WAS TESTED RIGHT THERE?  THAT'S YOUR TESTIMONY?

02:12PM   24   A.   IN THE MACHINES, YEAH.

02:13PM   25   Q.   AND IT WAS YOUR TESTIMONY THAT THEY TESTED IT IN THE

PETERSON CROSS BY MR. WADE                                        4756

02:13PM 1    MACHINES IN THE WALGREENS STORE?

02:13PM 2    A.   YES.

02:13PM 3    Q.   AND THAT THEY WEREN'T RUNNING OUT OF A CENTRAL LAB?

02:13PM 4    A.   THEY, THEY SAID THEY HAD A LAB THAT WAS RUNNING SOME OF

02:13PM 5    THE TESTS, BUT EVERYTHING WAS FINGERSTICK.

02:13PM 6         BUT EVERYTHING THAT WAS GOING ON IN THE 42 WALGREENS

02:13PM 7    STORES, IT WAS OUR IMPRESSIONS THAT THIS WAS DONE AT WALGREENS.

02:13PM 8    Q.   WAS IT YOUR IMPRESSION OR DID THEY TELL YOU THAT?

02:13PM 9    A.   THEY TOLD US THAT.

02:13PM 10   Q.   OKAY.  YOU'RE SURE ABOUT THAT?

02:13PM 11   A.   YES.

02:13PM 12   Q.   OKAY.  AND --

02:13PM 13   A.   THERE WERE OTHER TESTS THAT THEY WERE DOING AND THEY SAID

02:13PM 14   THAT THEY WERE DOING WORK FOR THESE PHARMACEUTICAL COMPANIES

02:13PM 15   AND EVERYTHING ELSE, WHICH IS WHAT WE THOUGHT THEY WERE DOING

02:13PM 16   AT THEIR LAB.

02:13PM 17   Q.   AND WHY DID THEY HAVE -- SO THEY HAD A CLIA LAB JUST FOR

02:13PM 18   THE PHARMACIES?

02:13PM 19   A.   FOR OTHER THINGS BESIDES WALGREENS.

02:13PM 20   Q.   DID YOU EVER TAKE THE TIME IN ANY OF THESE MEETINGS TO

02:13PM 21   CLARIFY ANY OF THESE ISSUES AND ASK QUESTIONS?

02:13PM 22   A.   WE ASKED QUESTIONS AND WE GOT ANSWERS THAT WE WERE

02:13PM 23   SATISFIED WITH THAT ARE DIFFERENT THAN WHAT CAME OUT LATER.

02:14PM 24   Q.   UNDERSTOOD.  YOU WENT UNDER THE -- BUT YOU NEVER ACTUALLY

02:14PM 25   WENT TO ONE OF THOSE WALGREENS LOCATIONS AND FIGURED OUT WHAT

PETERSON CROSS BY MR. WADE                                                4757

02:14PM  1    HAPPENED ONCE THE BLOOD WAS GIVEN?

02:14PM  2    A.   NO.

02:14PM  3    Q.   OKAY.

02:14PM  4    A.   BECAUSE THEY SAID IT WAS VERY MUCH LIKE THE EXPERIENCE

02:14PM  5    THAT CHERI HAD AT THE OFFICE, THE CLINIC.

02:14PM  6    Q.   OKAY.  I THINK YOU TESTIFIED IN YOUR INTERNET RESEARCH

02:14PM  7    THAT YOU WENT ONTO THE WEBSITES OF BOTH COMPANIES.

02:14PM  8    A.   BOTH COMPANIES?

02:14PM  9    Q.   WALGREENS AND THERANOS?

02:14PM 10    A.   I WENT AND PULLED THE 10K, YES --

02:14PM 11    Q.   DID YOU GO --

02:14PM 12    A.   -- FROM WALGREENS.

02:14PM 13    Q.   BUT --

02:14PM 14    A.   BUT I DID NOT GO ON THE WEBSITE OF WALGREENS.

02:14PM 15    Q.   DID YOU GO ON THE WEBSITE OF THERANOS?

02:14PM 16    A.   YES.

02:14PM 17    Q.   AND DID YOU READ THE LANGUAGE WHERE THEY TALKED ABOUT

02:14PM 18    USING VENOUS DRAWS ON THE WEBSITE OF THERANOS?

02:14PM 19    A.   I DON'T RECALL EVER SEEING THAT, NO.

02:14PM 20    Q.   DID YOU JUST LOOK AT THE TEST MENUS, OR DID YOU LOOK

02:14PM 21    AROUND AT OTHER SITES?

02:14PM 22    A.   I DON'T RECALL WHAT I LOOKED AT THERE EXACTLY.

02:14PM 23    Q.   BUT YOU DIDN'T SEE THE WEB PAGE THAT TALKS ABOUT THE FACT

02:15PM 24    THAT THEY USE VENOUS TESTS?

02:15PM 25    A.   NO.  THAT WAS NOT MADE AWARE TO US UNTIL AFTER "THE

PETERSON CROSS BY MR. WADE                                    4758

02:15PM  1    WALL STREET JOURNAL" ARTICLE.

02:15PM  2    Q.   WELL, THEY DIDN'T PREVENT YOU FROM REVIEWING THE WEBSITE?

02:15PM  3    A.   NO, BUT WE DID NOT DO THAT.

02:15PM  4    Q.   THEY DIDN'T TELL YOU YOU COULD NOT REVIEW THE WEBSITE;

02:15PM  5    RIGHT?

02:15PM  6    A.   NO.

02:15PM  7    Q.   OKAY.  DID YOU EVER ASK FOR ANY OF THE DETAILED

02:15PM  8    INFORMATION ABOUT HOW IT -- HOW THE EXPERIENCE WORKED AT

02:15PM  9    WALGREENS?  DID YOU ASK FOR DOCUMENTS OR ANYTHING LIKE THAT?

02:15PM  10   A.   YES.  WE ASKED HOW IT WORKED AND WE WERE SHOWN HOW IT

02:15PM  11   WORKED WITH CHERI.

02:15PM  12   Q.   OKAY.  ISN'T IT THE CASE THAT YOU ACTUALLY WANTED TO CALL

02:15PM  13   YOUR CONTACT AT WALGREENS?

02:15PM  14   A.   I HAD SUGGESTED IT BECAUSE I DID KNOW THE CIO OF WALGREENS

02:15PM  15   AT THE TIME, YES.

02:15PM  16   Q.   SO THE ANSWER IS YES?

02:15PM  17   A.   YES.

02:15PM  18   Q.   OKAY.  AND MR. TUBERGEN TOLD YOU NOT TO DO THAT; CORRECT?

02:15PM  19   A.   HE SAID -- YES, HE ADVISED NOT TO DO THAT.

02:16PM  20       THE KEY THING THERE WAS, YOU KNOW, THIS WAS LARGELY AN

02:16PM  21   INVITATION ONLY, AND WE FELT THAT IF WE HAD CIRCUMVENTED SOME

02:16PM  22   OF THE PROCESS THAT WE FELT THAT WE WERE IN, THAT WE WOULD BE

02:16PM  23   UNINVITED TO PARTICIPATE IN THIS OPPORTUNITY.

02:16PM  24       SO WE WERE VERY CAREFUL NOT TO CIRCUMVENT THINGS AND UPSET

02:16PM  25   ELIZABETH.

PETERSON CROSS BY MR. WADE                                          4759

02:16PM   1    Q.   SO THE ANSWER TO THE QUESTION ABOUT -- MR. TUBERGEN TOLD

02:16PM   2    YOU NOT TO CONTACT WALGREENS; CORRECT?

02:16PM   3    A.   CORRECT.

02:16PM   4    Q.   OKAY.  DID HE TELL YOU NOT TO LOOK AT THE WALGREENS

02:16PM   5    WEBSITE?

02:16PM   6    A.   NO.

02:16PM   7    Q.   OKAY.  THERE WAS NOTHING THAT PREVENTED YOU FROM DOING

02:16PM   8    THAT?

02:16PM   9    A.   CORRECT.

02:16PM  10    Q.   OKAY.  DID HE TELL YOU NOT TO GO TO WALGREENS?

02:16PM  11    A.   THE WALGREENS WAS IN ARIZONA.  NO, I DID NOT GO TO

02:16PM  12    ARIZONA.

02:16PM  13    Q.   WELL, THE FAMILY HAS PLANES THAT THEY CAN USE; CORRECT?

02:16PM  14    A.   THAT IS NOT PART OF WHAT WE WOULD HAVE DONE.

02:16PM  15    Q.   OKAY.

02:17PM  16    A.   WE WERE RELYING ON WHAT WE WERE TOLD.

02:17PM  17    Q.   I APOLOGIZE.

02:17PM  18         YOU'VE DONE A LOT OF INVESTMENTS IN YOUR CAREER; CORRECT?

02:17PM  19    A.   YES.

02:17PM  20    Q.   AND YOU'RE FAMILIAR WITH THE CONCEPT CALLED DUE DILIGENCE;

02:17PM  21    CORRECT?

02:17PM  22    A.   YES.

02:17PM  23    Q.   AND DUE DILIGENCE IS A PROCESS WHERE PEOPLE, BEFORE THEY

02:17PM  24    MAKE AN INVESTMENT, DO RESEARCH SO THAT THEY FULLY UNDERSTAND

02:17PM  25    THE INVESTMENT; RIGHT?

PETERSON CROSS BY MR. WADE                                              4760

```
02:17PM   1    A.   YES.

02:17PM   2    Q.   OKAY.  AND YOU SAW WITHIN THE AGREEMENT MR. LEACH SHOWED

02:17PM   3    YOU THAT YOU HAD THE ABILITY TO DO DUE DILIGENCE; CORRECT?

02:17PM   4    A.   CORRECT.

02:17PM   5    Q.   THERE WAS CONTRACTUALLY NOTHING THAT PROHIBITED YOUR

02:17PM   6    ABILITY TO DO DUE DILIGENCE; RIGHT?

02:17PM   7    A.   WE DID DO DUE DILIGENCE.

02:17PM   8    Q.   AND THERE WAS --

02:17PM   9    A.   WE WERE ON SITE FOR FIVE HOURS.  THAT WAS A LOT OF DUE

02:17PM  10    DILIGENCE FOR US.

02:17PM  11    Q.   THAT WASN'T MY QUESTION.

02:17PM  12         MY QUESTION WAS, THERE WAS NOTHING IN THE CONTRACT THAT

02:17PM  13    PREVENTED YOU FROM DOING DUE DILIGENCE; CORRECT?

02:17PM  14    A.   CORRECT.

02:17PM  15    Q.   OKAY.  SO YOU WERE FREE TO DO WHATEVER INVESTIGATION YOU

02:17PM  16    WANTED TO MAKE SURE THAT YOU HAD A FULL AND ACCURATE

02:17PM  17    UNDERSTANDING OF HOW THE COMPANY WAS OPERATING AT THE TIME;

02:17PM  18    CORRECT?

02:17PM  19    A.   IT WAS CHARACTERIZED TO US.  WE THOUGHT THAT IF WE DID

02:18PM  20    MORE THAN WHAT -- IF WE DID TOO MUCH, WE WOULDN'T BE INVITED

02:18PM  21    BACK TO INVEST.  THAT WAS THE ISSUE.

02:18PM  22    Q.   I UNDERSTAND HOW YOU -- HOW SOME PEOPLE AT RDV MAY HAVE

02:18PM  23    FELT, BUT THAT WASN'T MY QUESTION.

02:18PM  24         MY QUESTION WAS, THERE WASN'T NOTHING THAT PREVENTED

02:18PM  25    YOU FROM --
```

PETERSON CROSS BY MR. WADE                                              4761

02:18PM   1      A.   CORRECT.

02:18PM   2      Q.   -- DOING ALL OF THAT RESEARCH; RIGHT?

02:18PM   3      A.   OTHER THAN THE FEAR OF BEING UNINVITED TO INVEST.

02:18PM   4      Q.   RIGHT.  BUT GOING ON A WEBSITE ISN'T GOING TO PROMPT THAT,

02:18PM   5      IS IT?

02:18PM   6      A.   NO.

02:18PM   7      Q.   AND GOING ON A VISIT TO A LOCATION ISN'T GOING TO PROMPT

02:18PM   8      THAT, IS IT?

02:18PM   9      A.   NO.

02:18PM   10     Q.   AND YOU COULD PROBABLY CALL OTHER PEOPLE AND THERANOS

02:18PM   11     WOULD NEVER KNOW ABOUT IT; RIGHT?

02:18PM   12          YOU DO THAT ALL OF THE TIME IN INVESTMENTS, DON'T YOU?

02:18PM   13     A.   YES, BUT THAT'S NOT WHAT WE DID HERE.

02:18PM   14     Q.   OKAY.  BUT YOU COULD?  YOU'VE DONE IT IN OTHER CASES

02:18PM   15     THOUGH; CORRECT?

02:18PM   16     A.   CORRECT, BUT THAT'S NOT WHAT WE DID HERE.

02:19PM   17     Q.   BACK TO 2015.

02:19PM   18          MR. LEACH FOCUSSED YOU ON THE DISCUSSION OF THE WALGREENS

02:19PM   19     AND THE ROLLOUT.

02:19PM   20          DO YOU SEE THAT?

02:19PM   21          AND THAT SAYS THE PROJECTIONS WERE BASED ON 900 STORES.

02:19PM   22          DO YOU SEE THAT?

02:19PM   23     A.   YES.

02:19PM   24     Q.   AND THAT'S THE PROJECTIONS THAT WERE IN THE BINDER; RIGHT?

02:19PM   25     A.   YES, FOR 2015.

PETERSON CROSS BY MR. WADE                                            4762

02:19PM   1    Q.   WE'LL ASK SOME QUESTIONS ABOUT THAT IN A SECOND.

02:19PM   2         YOU UNDERSTOOD THOSE WERE PROJECTIONS; RIGHT?

02:19PM   3    A.   YES, AND FOR CONTRACTS, WE WERE TOLD THAT THERE WERE

02:19PM   4    CONTRACTS THAT SUBSTANTIATED WHAT THE PROJECTION SAID.

02:19PM   5    Q.   I UNDERSTAND.  MY QUESTION IS, YOU UNDERSTOOD THOSE WERE

02:19PM   6    PROJECTIONS; CORRECT?

02:19PM   7    A.   CORRECT.

02:19PM   8    Q.   OKAY.  AND YOU KNEW HOW MANY STORES THEY HAD AT THE TIME;

02:20PM   9    RIGHT?

02:20PM   10   A.   YES.

02:20PM   11   Q.   HOW MANY?

02:20PM   12   A.   FORTY OR FORTY-TWO.

02:20PM   13   Q.   OKAY.  AND UNDER THE RISKS, DO YOU SEE THE RISK THAT IS

02:20PM   14   FOCUSSED ON THERE IS THE RISK OF AN EXECUTION; RIGHT?

02:20PM   15   A.   CORRECT.

02:20PM   16   Q.   AND FOR A YOUNG COMPANY, THAT'S ALWAYS A RISK; RIGHT?

02:20PM   17   A.   YES.

02:20PM   18   Q.   AND TO GO FROM, WHATEVER, 42 STORES YOU SAID, TO 900

02:20PM   19   STORES IN A YEAR IS A LOT; CORRECT?

02:20PM   20   A.   CORRECT.

02:20PM   21   Q.   OKAY.  AND SO THE PRIMARY RISK THAT MS. HOLMES ALERTED YOU

02:20PM   22   TO WAS THE RISK OF BEING ABLE TO EXECUTE ON THAT AND GROW AT

02:20PM   23   THAT RATE; CORRECT?

02:20PM   24   A.   YES.

02:20PM   25   Q.   OKAY.  LET'S GO TO THE SECOND PAGE.

PETERSON CROSS BY MR. WADE                                              4763

02:21PM   1            THIS SETS FORTH THE GOALS FOR OCTOBER 14TH.

02:21PM   2            DO YOU SEE THAT?

02:21PM   3    A.   YES.

02:21PM   4    Q.   AND THAT WAS THE VISIT THAT THE FAMILY WAS GOING TO TAKE

02:21PM   5    OUT TO THE COMPANY; RIGHT?

02:21PM   6    A.   CORRECT.

02:21PM   7    Q.   AND SO THE GOAL WAS REALLY SORT OF A RELATIONSHIP

02:21PM   8    GET-TO-KNOW-YOU GOAL?

02:21PM   9    A.   PART OF IT.

02:21PM   10   Q.   WELL --

02:21PM   11   A.   THIS WAS OUR GOALS FOR THE OCTOBER 14TH.

02:21PM   12            AND IN HERS, SHE MADE IT VERY SPECIFIC THAT SHE WANTED TO

02:21PM   13   GET TO KNOW THE PEOPLE WHO ARE MAKING THE INVESTMENT.

02:21PM   14   Q.   WELL, IN FACT, MR. TUBERGEN SAID THAT THAT WAS ONE OF THE

02:21PM   15   PRINCIPLES OF --

02:21PM   16   A.   CORRECT.

02:21PM   17   Q.   RIGHT?

02:21PM   18            BECAUSE THE DEVOS FAMILY WANTED A LONG-TERM INVESTMENT;

02:21PM   19   RIGHT?

02:21PM   20   A.   CORRECT.

02:21PM   21   Q.   AND THEY WANTED TO BE A COMMITTED PARTNER IN THE

02:21PM   22   INVESTMENT; RIGHT?

02:21PM   23   A.   CORRECT.

02:21PM   24   Q.   AND BEFORE THEY DID THAT, THEY WANTED TO GET TO KNOW

02:21PM   25   ELIZABETH AND OTHER PEOPLE AT THERANOS; RIGHT?

PETERSON CROSS BY MR. WADE                                              4764

02:21PM  1      A.   CORRECT.

02:21PM  2      Q.   AND SO ONE OF THE CORE PRINCIPLES IN GOING OUT THERE WAS

02:21PM  3      SO THAT THERE COULD BE INTERACTION THAT WOULD ALLOW PEOPLE TO

02:22PM  4      GET COMFORTABLE WITH ONE ANOTHER; RIGHT?

02:22PM  5      A.   ON BOTH SIDES, CORRECT.

02:22PM  6      Q.   RIGHT.  ON BOTH SIDES?

02:22PM  7      A.   YES.

02:22PM  8      Q.   AND THAT WAS DISCUSSED IN ADVANCE; RIGHT?

02:22PM  9      A.   YES.

02:22PM  10     Q.   AND, IN FACT, ULTIMATELY LATER WHEN, WHEN YOU WENT OUT

02:22PM  11     THERE, THERE WAS A LOT OF DISCUSSION GOING BOTH WAYS ABOUT THE

02:22PM  12     PHILOSOPHIES OF BOTH SIDES; RIGHT?

02:22PM  13     A.   CORRECT.

02:22PM  14     Q.   AND THERE WAS DISCUSSION FROM MR. DEVOS, ONE OF THE

02:22PM  15     MR. DEVOS'S ABOUT --

02:22PM  16     A.   DOUG.

02:22PM  17     Q.   DOUG, ABOUT THE BUSINESS RELATIONSHIPS THAT THE COMPANY

02:22PM  18     HAD HAD AND ITS PHILOSOPHY AND APPROACH TO MAKING INVESTMENTS;

02:22PM  19     RIGHT?

02:22PM  20     A.   YES.

02:22PM  21     Q.   AND HOW HE GREW THE AMWAY BUSINESS AND HIS BUSINESS

02:22PM  22     PHILOSOPHY FROM A MANAGEMENT PERSPECTIVE; RIGHT?

02:22PM  23     A.   YES, THAT WAS DISCUSSED.

02:22PM  24     Q.   RIGHT.  AND THERE WERE SIMILAR DISCUSSIONS ABOUT

02:22PM  25     MS. HOLMES'S VISION, AND SHE HAD A LONG-TERM VIEW OF THE

PETERSON CROSS BY MR. WADE                                         4765

02:22PM  1    BUSINESS; CORRECT?

02:22PM  2    A.   CORRECT.

02:22PM  3    Q.   AND HOW SHE WANTED TO SEE THIS OVER THE LONG TERM IN ORDER

02:22PM  4    TO HAVE THE TYPE OF IMPACT IN HEALTH CARE THAT SHE WANTED TO

02:23PM  5    HAVE; RIGHT?

02:23PM  6    A.   CORRECT.

02:23PM  7    Q.   AND MR. TUBERGEN ACTUALLY SPECIFICALLY SAID IN THIS

02:23PM  8    PRE-CALL THAT IT NEEDED TO BE -- IT NEEDED TO BE UNDERSTOOD

02:23PM  9    THAT THESE WEREN'T HIGHLY SCIENTIFIC PEOPLE, RIGHT, THE DEVOS

02:23PM  10   FAMILY, AND THIS NEEDED TO BE KEPT AT A LEVEL THAT WAS NOT A

02:23PM  11   TECHNICAL MEETING, BUT MORE OF A RELATIONSHIP MEETING; RIGHT?

02:23PM  12   A.   I DON'T RECALL HIM SAYING THAT, BUT, YES, I CAN -- NONE OF

02:23PM  13   US WERE SCIENTISTS, SO KEEPING IT AT A LEVEL THAT WE ALL COULD

02:23PM  14   UNDERSTAND WAS IMPORTANT.

02:23PM  15   Q.   RIGHT.  AND YOU WEREN'T SEEKING OR YOU DIDN'T ASK FOR ANY

02:23PM  16   TESTING DATA; CORRECT?

02:23PM  17   A.   WE DID NOT ASK FOR THAT, NO.

02:23PM  18   Q.   OKAY.  AND YOU DIDN'T BRING IN A CONSULTANT WHO HAS

02:23PM  19   GREATER EXPERTISE IN THIS AREA TO LOOK AT THE TECHNOLOGY OR THE

02:23PM  20   DATA, DID YOU?

02:23PM  21   A.   NO.

02:23PM  22   Q.   AND YOU DIDN'T BRING IN A REGULATORY EXPERT TO LOOK AT THE

02:23PM  23   REGULATORY ISSUES THAT WERE PRESENT IN CONNECTION WITH THIS

02:23PM  24   INVESTMENT; RIGHT?

02:24PM  25   A.   NO.

PETERSON CROSS BY MR. WADE                                    4766

02:24PM  1    Q.   OKAY.  YOU DIDN'T BRING IN A LAWYER WHO IS WITH EXPERTISE

02:24PM  2    WHO COULD MAKE THOSE KINDS OF JUDGMENTS; RIGHT?

02:24PM  3    A.   NO.  WE WERE RELYING ON WHAT WE WERE TOLD BY THEM ON THE

02:24PM  4    ACCURACY OF THE ANALYZER.

02:24PM  5    Q.   YOU'RE NOT AN EXPERT IN THE -- IN FDA OR CMS RELATED

02:24PM  6    ISSUES, ARE YOU?

02:24PM  7    A.   NO.

02:24PM  8    Q.   AND NO ONE IN THE FAMILY IS EITHER; RIGHT?

02:24PM  9    A.   NO.

02:24PM  10   Q.   AND NO ONE IN THE COMPANY SAID YOU COULDN'T HIRE ANY OF

02:24PM  11   THOSE PEOPLE; RIGHT?

02:24PM  12   A.   NO.  BUT THEY ALSO SAID THAT THEY DIDN'T NEED FDA

02:24PM  13   REGULATORY APPROVAL FROM THE FDA TO DO IT.

02:24PM  14   Q.   I UNDERSTAND.  THAT WASN'T MY QUESTION.

02:24PM  15        MY QUESTION WAS, NO ONE SAID THAT YOU, YOU COULDN'T HIRE

02:24PM  16   ANY OF THOSE EXPERTS TO COME IN AND HELP YOU UNDERSTAND THE

02:24PM  17   TECHNICAL ISSUES; RIGHT?

02:24PM  18   A.   NO ONE DID, BUT WE DIDN'T KNOW WHY WE WOULD NEED THAT.

02:24PM  19   Q.   OKAY.  WELL, YOU'RE NOT A TECHNICAL EXPERT IN THIS CASE;

02:24PM  20   CORRECT?

02:24PM  21   A.   NO, BUT THEY WERE TELLING US THAT IT WORKED.

02:24PM  22   Q.   THAT WASN'T MY QUESTION.

02:24PM  23        MY QUESTION WAS WHETHER YOU UNDERSTOOD THE FDA AND CMS

02:25PM  24   TECHNICAL ISSUES.  DID YOU?

02:25PM  25   A.   WE UNDERSTOOD WHAT THEY TOLD US.

PETERSON CROSS BY MR. WADE                                          4767

```
02:25PM   1    Q.   OKAY.  AND DID YOU -- AND NO ONE PREVENTED YOU --

02:25PM   2    A.   CORRECT.

02:25PM   3    Q.   -- FROM BRINGING IN SOMEONE WHO HAS EXPERTISE TO GIVE

02:25PM   4    ADDITIONAL PERSPECTIVE ON THAT; CORRECT?

02:25PM   5    A.   WE DIDN'T THINK THAT WE NEEDED IT.

02:25PM   6    Q.   OKAY.  YOU THEN TALKED ABOUT THE RDV INVESTMENT PHILOSOPHY

02:25PM   7    THERE AND HOW IT WAS A GOAL IN THE MEETING.  THIS IS KIND OF

02:25PM   8    ONE OF THE ISSUES THAT YOU WERE TALKING ABOUT; RIGHT?

02:25PM   9    A.   YES.

02:25PM  10    Q.   AND THAT WAS ONE OF THE THINGS THAT THERANOS WANTED TO

02:25PM  11    LEARN FROM THE FAMILY?

02:25PM  12    A.   YES.

02:25PM  13    Q.   AND, IN FACT, IT WASN'T USUAL FOR THE DEVOS FAMILY TO GO

02:25PM  14    OUT ON AN INVESTMENT; RIGHT?

02:25PM  15    A.   THEY'VE NEVER GONE ON AN INVESTMENT WITH ME.

02:25PM  16    Q.   OKAY.  SO THIS WAS SORT OF A UNIQUE SITUATION; RIGHT?

02:25PM  17    A.   YES.

02:25PM  18    Q.   AND IT WAS MORE OF A RELATIONSHIP SITUATION; RIGHT?

02:26PM  19    A.   NO.  NO.  THIS WAS AN INVESTMENT AND ONE THAT CAME WITH

02:26PM  20    IT, WE WANTED TO MAKE SURE -- WITH ANYONE WE INVEST WITH, WE

02:26PM  21    WANT TO HAVE A GOOD PARTNERSHIP, LONG-TERM PARTNERSHIP WITH

02:26PM  22    ANYONE WE INVEST WITH.

02:26PM  23         THIS WASN'T ANY DIFFERENT THAN ANYTHING ELSE.

02:26PM  24    Q.   UNDERSTOOD.  YOU SEE THE REFERENCE THERE TO THE IMPORTANCE

02:26PM  25    OF THE RELATIONSHIP GOING FORWARD.  DO YOU SEE THAT?
```

PETERSON CROSS BY MR. WADE                                          4768

02:26PM   1    A.   IT IS.

02:26PM   2    Q.   THAT WAS IMPORTANT TO BOTH SIDES; RIGHT?

02:26PM   3    A.   IT IS.  BUT THAT WASN'T UNIQUE TO THIS DEAL.

02:26PM   4    Q.   OKAY.  I WAS JUST ASKING WHETHER THAT WAS PART OF THE

02:26PM   5    DISCUSSION GOING INTO THE MEETING.

02:26PM   6    A.   CORRECT.  IT JUST WASN'T UNIQUE TO THIS DEAL.

02:26PM   7    Q.   OKAY.  LET'S GO TO THE NEXT PAGE, OR THE NEXT PIECE.

02:26PM   8    YEAH, LET'S GET THE REST OF IT.

02:26PM   9         OKAY.  AND THIS IS THE BALANCE OF THE DISCUSSION THERE;

02:26PM   10   RIGHT?

02:26PM   11   A.   YES.

02:26PM   12   Q.   YOU DISCUSSED WHAT THE EXPECTATION WAS ON SOME OF THE

02:26PM   13   NUMBERS; RIGHT?

02:26PM   14   A.   WE TALKED ABOUT WHAT THEY MIGHT RAISE IN THIS FUND

02:27PM   15   RAISING, YES.

02:27PM   16   Q.   RIGHT.  THAT THEY MIGHT RAISE 500 MILLION.

02:27PM   17        DO YOU SEE THAT?

02:27PM   18   A.   YES.

02:27PM   19   Q.   AND 50 MILLION WAS A GOOD NUMBER TO START; RIGHT?

02:27PM   20   A.   WE ALWAYS KIND OF ASKED SIZING, WHAT MAKES THE MOST SENSE,

02:27PM   21   AND SO JERRY HAD BROUGHT UP 50 MILLION.

02:27PM   22        IS THAT A GOOD NUMBER FOR US TO CONSIDER?  WE ALWAYS WANT

02:27PM   23   TO KNOW WHAT WE'RE TO CONSIDER IN AN INVESTMENT.

02:27PM   24   Q.   UNDERSTOOD.  AND A LOT OF THE ISSUES THAT YOU TALKED ABOUT

02:27PM   25   IN YOUR MEMO, WHICH WE'RE GOING TO TALK ABOUT IN A LITTLE BIT

PETERSON CROSS BY MR. WADE                                          4769

02:27PM   1    ABOUT THE PARTICULARS, AREN'T REFERENCED IN YOUR NOTES

02:27PM   2    ANYWHERE; RIGHT?

02:27PM   3    A.   THIS WAS JUST MY SHORTHAND FROM THE CALL.  EVERYTHING ELSE

02:27PM   4    THAT WE TALKED ABOUT IS REFERENCED IN THE MEMO THAT WENT TO THE

02:27PM   5    FAMILY.

02:27PM   6    Q.   OKAY.  SO, SO THERE WAS A LOT OF STUFF THAT HAPPENED ON

02:27PM   7    THIS CALL THAT YOU DIDN'T WRITE DOWN IN YOUR NOTES; IS THAT

02:27PM   8    YOUR --

02:27PM   9    A.   YES, THIS WAS SHORTHAND OF ALL OF THE POINTS, THE

02:28PM  10    QUESTIONS THAT WE HAD AND THE ANSWERS, AND THEN THERE'S --

02:28PM  11    THERE WAS MORE.

02:28PM  12         AND ALSO I INCORPORATED IN SOME OF THE STUFF THAT I READ

02:28PM  13    FROM THE DUE DILIGENCE BINDERS.

02:28PM  14    Q.   NO.  I UNDERSTAND THAT.  WE'LL TALK ABOUT THE

02:28PM  15    INCORPORATION OF THE DUE DILIGENCE BINDERS.

02:28PM  16         BUT WE'RE TALKING ABOUT A 30 MINUTE CALL HERE; RIGHT?

02:28PM  17    A.   UH-HUH.

02:28PM  18    Q.   AND YOU WENT THROUGH THESE TWO -- YOU COVERED EVERYTHING

02:28PM  19    IN THESE PAGES; RIGHT?

02:28PM  20    A.   YEAH, BUT THIS IS FAIRLY SHORTHAND FOR -- THIS ISN'T

02:28PM  21    EXACTLY WHAT WAS SAID.

02:28PM  22    Q.   OKAY.  AND ALL OF THE TECHNICAL STUFF THAT RELATES TO YOUR

02:28PM  23    MEMO, YOU DIDN'T PUT THAT IN THE NOTES; IS THAT RIGHT?

02:28PM  24    A.   CORRECT.

02:28PM  25    Q.   OKAY.  LET'S TAKE A LOOK AT YOUR MEMO.  I BELIEVE IT'S IN

PETERSON CROSS BY MR. WADE                                    4770

| 02:28PM | 1 | YOUR -- THE GOVERNMENT BINDER AT 2073. |
|---|---|---|

02:28PM 1    YOUR -- THE GOVERNMENT BINDER AT 2073.

02:28PM 2    A.   YOUR BINDER OR THIS BINDER?

02:28PM 3    Q.   YOU CAN STAY IN THAT BINDER.  I THINK IT'S IN THE NEXT

02:29PM 4    BINDER, THE WHITE BINDER.

02:29PM 5    A.   I'M IN THE BLACK BINDER.

02:29PM 6    Q.   I THINK IT'S IN BOTH, BUT I HAPPEN TO BE LOOKING AT THE

02:29PM 7    GOVERNMENT VERSION 2073, WHICH I THINK IS IN EVIDENCE.

02:29PM 8         DO YOU HAVE THAT?  DO YOU SEE THAT IN FRONT OF YOU?

02:29PM 9              THE COURT:  THAT'S ALSO IN YOUR BINDER AS WELL,

02:29PM 10   2073.

02:29PM 11             MR. WADE:  SURE, LET'S STAY IN OUR BINDER.  WE'LL

02:29PM 12   LOOK AT 2073.

02:29PM 13             THE WITNESS:  OKAY.  YES.

02:29PM 14   BY MR. WADE:

02:29PM 15   Q.   AND I JUST WANT TO MAKE SURE.  THERE'S A REFERENCE HERE

02:29PM 16   TO -- THIS IS AN OVERVIEW FOR THE MEMO -- FOR THE MEETING IN

02:29PM 17   ADVANCE; CORRECT?

02:29PM 18   A.   CORRECT.

02:29PM 19   Q.   OKAY.  AND THIS WAS PREPARED AFTER THAT CALL?

02:29PM 20   A.   YES.

02:29PM 21   Q.   AND THEN THE MATERIALS THAT YOU REFERENCED IN THERE, IT'S

02:30PM 22   YOUR TESTIMONY THAT ALL OF THOSE MATERIALS WERE PRINCIPALLY

02:30PM 23   FROM THE 30 MINUTE CONVERSATION WITH MS. HOLMES AND THE BINDERS

02:30PM 24   THAT YOU WERE SENT?

02:30PM 25   A.   AND THE BINDERS, YES.

PETERSON CROSS BY MR. WADE                                          4771

02:30PM  1    Q.   OKAY.

02:30PM  2    A.   OTHER THAN THE SKEPTIC PARTS THAT I PUT IN THE BACK OF

02:30PM  3    THIS --

02:30PM  4    Q.   OKAY.

02:30PM  5    A.   -- WHICH I READ ONLINE.

02:30PM  6    Q.   OKAY.  ISN'T IT, ISN'T IT ACTUALLY THE CASE THAT A LOT OF

02:30PM  7    THE MATERIAL IN THERE CAME DIRECTLY OUT OF THE "FORTUNE"

02:30PM  8    ARTICLE?

02:30PM  9    A.   NO.  A LOT OF THIS CAME OUT OF THE BINDERS, AND SOME OF IT

02:30PM  10   COULD HAVE COME OUT OF WHAT I READ, YES.

02:30PM  11   Q.   OKAY.  YOU RECEIVED THAT "FORTUNE" ARTICLE THAT WAS SENT

02:30PM  12   FROM MR. MOSLEY TO MR. TUBERGEN; CORRECT?

02:30PM  13   A.   CORRECT.

02:30PM  14   Q.   OKAY.  AND YOU HAD THAT ARTICLE; CORRECT?

02:31PM  15   A.   YES.

02:31PM  16   Q.   OKAY.  AND I KNOW YOU'VE TESTIFIED THAT YOU -- I KNOW THAT

02:31PM  17   YOU'VE TESTIFIED THAT YOU RELIED ON THE BINDER MATERIALS, BUT

02:31PM  18   ISN'T IT TRUE THAT A LOT OF THE ITEMS IN YOUR MEMO ACTUALLY

02:31PM  19   CAME ALMOST DIRECTLY FROM THE "FORTUNE" ARTICLE?

02:31PM  20   A.   THAT'S NOT MY RECOLLECTION.

02:31PM  21   Q.   OKAY.  LET'S TAKE A LOOK.  WHY DON'T -- I'LL -- LET'S

02:31PM  22   START WITH PAGE 6 OF YOUR MEMO.

02:31PM  23        DO YOU SEE THAT?  THAT'S THE APPENDIX?

02:31PM  24   A.   YES.

02:31PM  25   Q.   AND DO YOU SEE THAT THERE ARE A LOT OF BULLET POINTS

PETERSON CROSS BY MR. WADE                                          4772

02:32PM   1      THERE?

02:32PM   2      A.   A LOT OF THE APPENDIX -- THAT'S WHY IT SAYS STATISTICS AND

02:32PM   3      NOTEWORTHY ITEMS.  A LOT OF THAT WAS WHATEVER I COULD FIND.

02:32PM   4      Q.   YEAH.  DO YOU RECALL IN YOUR TESTIMONY WHERE YOU WERE

02:32PM   5      GOING THROUGH AND MR. LEACH WAS ASKING YOU, WAS THAT BASED UPON

02:32PM   6      THE BINDER AND THE MATERIALS THAT MS. HOLMES GAVE YOU?  AND YOU

02:32PM   7      SAID YES, YES, YES, YES, EXCEPT FOR THE LAST ONE.

02:32PM   8          DO YOU RECALL THAT?

02:32PM   9      A.   MUCH OF THIS WAS IN THE BINDER, YES.

02:32PM  10      Q.   YES.  BUT MUCH OF IT WAS IN OTHER ITEMS; RIGHT?

02:32PM  11      A.   IT WAS IN MULTIPLE PLACES, YES.

02:32PM  12      Q.   OKAY.  WELL, DID YOU TAKE THINGS RIGHT OUT OF THE

02:32PM  13      "FORTUNE" ARTICLE AND PUT THEM INTO THE MEMO?  DO YOU REMEMBER?

02:32PM  14      A.   I MIGHT HAVE, YES.

02:32PM  15      Q.   OKAY.  LET'S TAKE A LOOK AT THE 11TH PARAGRAPH, OKAY?  OR

02:32PM  16      THE 11TH NUMBER WHICH STARTS, "THERANOS USES THEIR OWN ANALYZER

02:32PM  17      EQUIPMENT."

02:32PM  18          DO YOU SEE THAT?

02:32PM  19      A.   YES.

02:32PM  20      Q.   OKAY.  AND IF -- CAN WE DO A SPLIT SCREEN?  LET'S DO A

02:32PM  21      SPLIT SCREEN AND PULL UP THE "FORTUNE" ARTICLE.

02:33PM  22          I'LL DO IT ON THE SCREEN, BUT YOU'RE WELCOME TO REFERENCE

02:33PM  23      THIS AT ANY TIME.  THE "FORTUNE" ARTICLE IS 1944, OKAY?

02:33PM  24          OKAY.  LET'S LOOK AT PAGE -- LET'S LOOK AT PAGE 4, AND

02:33PM  25      LET'S BLOW UP THE PARAGRAPH WITH THE P.

PETERSON CROSS BY MR. WADE                                    4773

02:33PM  1          I'M GOING TO GIVE YOU A MINUTE TO LOOK AT THAT.

02:33PM  2          THAT BULLET IS LIFTED RIGHT FROM THE "FORTUNE" ARTICLE,

02:33PM  3    CORRECT, THAT YOU GOT FROM MR. MOSLEY?

02:33PM  4    A.   YES, UH-HUH.

02:33PM  5    Q.   ALL RIGHT.

02:33PM  6    A.   BUT WE ALSO DISCUSSED THIS WITH ELIZABETH.

02:34PM  7    Q.   LET'S GO TO, LET'S GO TO PAGE 5 OF THE ARTICLE.

02:34PM  8          LET'S LOOK AT THE PARAGRAPH -- THE TWO PARAGRAPHS ON THE

02:34PM  9    RIGHT COLUMN, "IMPORTANTLY" AND "IT TAKES."

02:34PM  10         LET'S BLOW THOSE UP.

02:34PM  11         AND LET'S GO TO THE MEMO AND BLOW UP THE NEXT BULLET

02:34PM  12   THERE, 12.  OKAY.

02:34PM  13         TAKE A MINUTE TO REVIEW THOSE.

02:34PM  14         (PAUSE IN PROCEEDINGS.)

02:34PM  15             THE WITNESS:  UH-HUH.

02:34PM  16   BY MR. WADE:

02:34PM  17   Q.   DO YOU SEE THAT YOU'RE LIFTING THAT ALMOST DIRECTLY FROM

02:34PM  18   THE "FORTUNE" ARTICLE?

02:34PM  19   A.   NOT EXACTLY.  AND WE TALKED ABOUT -- WE TALKED ABOUT HER

02:35PM  20   USING THE MACHINE IN THE MILITARY AND USING IT -- THEY WERE

02:35PM  21   WORKING ON EBOLA AT THE TIME.  THERE WAS A LOT OF DISCUSSION

02:35PM  22   AROUND WHAT THEY WERE DOING WITH THE GOVERNMENT.

02:35PM  23   Q.   AND, AND IN THE 30 MINUTE CALL?

02:35PM  24   A.   YES.  THERE WAS, THERE WAS -- WE WERE TALKING ABOUT WHERE

02:35PM  25   THEY WERE USING IT AND IS IT ACCURATE.

PETERSON CROSS BY MR. WADE                                              4774

02:35PM   1    Q.   IN THE 30 MINUTE CALL?  I'M JUST TRYING TO UNDERSTAND

02:35PM   2    WHERE YOU'RE GETTING THIS KNOWLEDGE.

02:35PM   3    A.   I DON'T RECALL WHICH ONE EXACTLY, BUT WE -- I KNOW WE

02:35PM   4    TALKED ABOUT IT AT LENGTH IN THE MEETING ON THE 14TH.

02:35PM   5    Q.   OKAY.  SO TO THE EXTENT THAT THERE ARE LANGUAGE

02:35PM   6    SIMILARITIES BETWEEN THESE TWO PARAGRAPHS, THAT'S JUST A

02:35PM   7    COINCIDENCE?  OR DID YOU LIFT IT FROM THE "FORTUNE" ARTICLE?

02:35PM   8    A.   I DON'T RECALL.

02:35PM   9    Q.   OKAY.  LET'S FOCUS ON THAT MILITARY SENTENCE THAT MAKES

02:35PM   10   IT -- LET'S HIGHLIGHT THE SENTENCE ON THE RIGHT THAT SAYS "THAT

02:35PM   11   MAKES IT POSSIBLE TO IMAGINE ONE DAY."

02:36PM   12        LET'S HIGHLIGHT THE REST OF THAT.

02:36PM   13        DO YOU SEE THAT?

02:36PM   14   A.   YES.

02:36PM   15   Q.   THAT, THAT DOESN'T SAY THAT THEY'RE DOING IT RIGHT NOW;

02:36PM   16   CORRECT?

02:36PM   17   A.   CORRECT.

02:36PM   18   Q.   OKAY.  IT SAYS IT MAKES IT POSSIBLE TO DO IT; CORRECT?

02:36PM   19   A.   CORRECT.

02:36PM   20   Q.   AND THEY WERE DOING A LOT OF RESEARCH AND HAVING A LOT OF

02:36PM   21   MEETINGS AND TRYING TO DO THAT, WEREN'T THEY?

02:36PM   22   A.   CORRECT.  BUT THAT'S WHY WE ASKED ABOUT IT WHEN WE WENT

02:36PM   23   THERE ON THE 14TH OF WHAT IS GOING ON?  WHERE ARE YOU USING IT?

02:36PM   24        AND WE TALKED ABOUT IT BEING USED WITH THE GOVERNMENT.

02:36PM   25   Q.   RIGHT.  I -- IT WASN'T -- I THOUGHT YOU SAID IT WAS IN THE

PETERSON CROSS BY MR. WADE                                        4775

02:36PM   1    OCTOBER 3RD CALL?

02:36PM   2    A.   BOTH.

02:36PM   3    Q.   IT WAS IN BOTH?

02:36PM   4    A.   WE DEFINITELY TALKED ABOUT -- WE DEFINITELY ASKED THE

02:36PM   5    QUESTION WHEN WE WERE THERE AROUND THIS WHOLE CONVERSATION

02:36PM   6    WHETHER IT WAS BEING USED.

02:36PM   7         WE WERE ASKING ABOUT WHETHER THAT WAS TRUE OR NOT.

02:36PM   8    Q.   RIGHT.

02:36PM   9    A.   ON THE 14TH.

02:36PM   10   Q.   AND THEY SAID IT WAS POSSIBLE IN THE ARTICLE; CORRECT?

02:36PM   11   A.   CORRECT.  AND THAT'S WHAT IT SAYS.  IT SAYS MAKING IT

02:37PM   12   POSSIBLE TO PLACE A THERANOS LAB.  I DIDN'T SAY THAT THEY WERE.

02:37PM   13   Q.   RIGHT.  AND, IN FACT --

02:37PM   14   A.   BUT THIS WAS SOMETHING THAT WE ASKED ABOUT.

02:37PM   15   Q.   MY APOLOGIES FOR INTERRUPTING.

02:37PM   16        I BELIEVE IN YOUR DIRECT TESTIMONY YOU DID SAY THAT THEY

02:37PM   17   WERE, BUT THAT'S NOT WHAT THE ARTICLE SAYS; RIGHT?

02:37PM   18   A.   I'M MAYBE MIXING THE CALL WITH THE MEETING.

02:37PM   19   Q.   OKAY.  THE ARTICLE DOES NOT SAY THAT; CORRECT?  IT SAYS

02:37PM   20   IT'S POSSIBLE; RIGHT?

02:37PM   21   A.   CORRECT, AND SO DO MY NOTES.

02:37PM   22   Q.   AND YOUR STATEMENT SAYS THAT IT'S POSSIBLE; CORRECT?

02:37PM   23   A.   CORRECT.

02:37PM   24   Q.   OKAY.  AND, IN FACT, THEY TOLD YOU IN THE MEETING THAT

02:37PM   25   THEY WERE PAUSING THEIR WORK WITH THE MILITARY AND PHARMA AND

PETERSON CROSS BY MR. WADE                                           4776

02:37PM   1    FOCUSSING ALL OF THEIR EFFORTS ON RETAIL; CORRECT?

02:37PM   2    A.   I DON'T RECALL THEM SAYING THAT THEY PAUSED IT.

02:37PM   3    Q.   YOU DON'T REMEMBER WRITING THAT IN YOUR MEMO?

02:37PM   4    A.   I DON'T RECALL THEM SAYING THAT THEY PAUSED DOING THAT.

02:37PM   5         THEY WERE FOCUSSING THEIR EFFORTS ON WALGREENS AND MOVING

02:37PM   6    FORWARD.  THAT WAS THE DIRECTION THAT THEY WERE GOING TO TAKE.

02:37PM   7         BUT IT WAS IMPORTANT TO US WHAT THEY WERE DOING

02:38PM   8    HISTORICALLY, WHICH WAS WORKING WITH THE MILITARY AND WORKING

02:38PM   9    WITH PHARMACEUTICAL COMPANIES.

02:38PM  10         THAT WAS IMPORTANT TO VALIDATE THE ACCURACY OF THE MACHINE

02:38PM  11    AND THEIR TESTING.

02:38PM  12         ALL OF THAT WAS IMPORTANT.

02:38PM  13    Q.   UNDERSTOOD.  LET ME GO TO THE NEXT BULLET POINT.

02:38PM  14         THIS PARAGRAPH IS FROM THE "FORTUNE" ARTICLE AS WELL;

02:38PM  15    CORRECT?

02:38PM  16    A.   UH-HUH.

02:38PM  17    Q.   RIGHT?

02:38PM  18    A.   YES.

02:38PM  19    Q.   OKAY.  ON YOUR DIRECT TESTIMONY YOU SAID IT WAS FROM

02:38PM  20    MS. HOLMES AND IN THE MEETING, RIGHT?  BUT IT WAS ACTUALLY

02:38PM  21    ALMOST VERBATIM FROM THE "FORTUNE" ARTICLE; RIGHT?

02:38PM  22    A.   NO.  I SAID THAT SOME OF THE SKEPTICISM I PULLED FROM OUT

02:38PM  23    OF THE INTERNET, AND THAT'S WHAT THIS IS, INCUMBENT PLAYERS

02:38PM  24    CRITICIZED THERANOS.

02:38PM  25         THIS DIDN'T COME FROM THERANOS SAYING THIS.

PETERSON CROSS BY MR. WADE

02:38PM  1          I WAS TRYING TO GIVE THE FAMILY MEMBERS AN IDEA OF WHAT

02:39PM  2     THE MARKET WAS SAYING ABOUT THEM, WHICH PART OF IT DID COME

02:39PM  3     FROM ARTICLES THAT I HAD READ.

02:39PM  4     Q.   RIGHT.

02:39PM  5     A.   MORE THAN JUST THIS ONE.

02:39PM  6     Q.   AND, IN FACT, IT'S IN THIS, IN THIS PARAGRAPH RIGHT HERE

02:39PM  7     IN THE ARTICLE; CORRECT?

02:39PM  8     A.   CORRECT.

02:39PM  9     Q.   AND THE NEXT PARAGRAPH IS FROM THE "FORTUNE" ARTICLE THAT

02:39PM  10    YOU GOT FROM MR. MOSLEY AS WELL; CORRECT?

02:39PM  11    A.   CORRECT.

02:39PM  12    Q.   OKAY.  YOU RECALL THAT ONE?

02:39PM  13    A.   I DO RECALL THE BOTTOM PART OF THAT AND I -- WE DID NOT

02:39PM  14    HEAR FROM HER WHAT HER SKEPTICS WERE.  YOU KNOW, THAT WAS STUFF

02:39PM  15    THAT I WAS PULLING OUT OF THE INTERNET IN CERTAIN THINGS LIKE

02:39PM  16    THIS AND OTHER THINGS THAT I HAD READ, YES.

02:39PM  17    Q.   OKAY.  AND YOU MENTIONED THE -- YOU MENTIONED THAT THE

02:39PM  18    WALGREENS RELATIONSHIP WAS IMPORTANT TO --

02:39PM  19    A.   VERY.

02:39PM  20    Q.   -- YOU, OR RELEVANT TO YOU; CORRECT?

02:39PM  21    A.   YES.

02:39PM  22    Q.   LET'S GO TO PAGE 5 OF YOUR MEMO AND HIGHLIGHT THE FIRST

02:40PM  23    HALF OF THAT DOWN TO "ALLIANCE BOOTS."

02:40PM  24          YOU SEE THAT'S FROM YOUR MEMO; RIGHT?

02:40PM  25    A.   YES.

PETERSON CROSS BY MR. WADE                                            4778

| | | |
|---|---|---|
| 02:40PM | 1 | Q.   EXHIBIT 5; RIGHT? |
| 02:40PM | 2 | A.   YES. |
| 02:40PM | 3 | Q.   PAGE 2 OF THE MEMO? |
| 02:40PM | 4 | A.   YES. |
| 02:40PM | 5 | Q.   AND YOU MENTION BEFORE 44 LOCATIONS, BUT HERE YOU HAVE 22 |
| 02:40PM | 6 | LOCATIONS; RIGHT? |
| 02:40PM | 7 | A.   YES. |
| 02:40PM | 8 | Q.   AND THAT'S BECAUSE YOU GOT THE WALGREENS INFORMATION FROM |
| 02:40PM | 9 | THE "FORTUNE" ARTICLE; RIGHT? |
| 02:40PM | 10 | A.   IT COULD BE, YES.  THE 40 CAME FROM THE MEETING TOGETHER. |
| 02:40PM | 11 | Q.   AND IF WE JUST GO DOWN TO THE KEY OBJECTIVES, IF WE JUST |
| 02:41PM | 12 | GO BACK TO YOUR MEMO, THE BOTTOM, WE CAN BRING THE "FORTUNE" |
| 02:41PM | 13 | ARTICLE DOWN. |
| 02:41PM | 14 | THESE WERE WHAT YOU IDENTIFIED AS THE KEY OBJECTIVES FOR |
| 02:41PM | 15 | THE MEETING IN YOUR MEMO? |
| 02:41PM | 16 | A.   YES. |
| 02:41PM | 17 | Q.   YEAH.  AND WAS THAT ACCURATE AT THE TIME TO THE BEST OF |
| 02:41PM | 18 | YOUR KNOWLEDGE? |
| 02:41PM | 19 | A.   YES. |
| 02:42PM | 20 | Q.   OKAY.  AND YOU ASKED MR. TUBERGEN -- |
| 02:42PM | 21 | A.   CAN I SAY ONE OTHER THING?  THIS IS THERANOS -- |
| 02:42PM | 22 | Q.   THERE'S NO QUESTION PENDING.  SO THE WAY THIS GENERALLY |
| 02:42PM | 23 | WORKS IS THAT THE GOVERNMENT CAN DO FOLLOWUP WITH YOU, BUT -- |
| 02:42PM | 24 | THE COURT:  HE'LL ASK YOU ANOTHER QUESTION. |
| 02:42PM | 25 | MR. WADE:  YEAH, I'LL ASK YOU ANOTHER QUESTION. |

PETERSON CROSS BY MR. WADE                                    4779

02:42PM   1              THE WITNESS:  OKAY.

02:42PM   2      BY MR. WADE:

02:42PM   3      Q.   THE -- MR. TUBERGEN -- YOU ASKED MR. TUBERGEN IN ADVANCE

02:42PM   4      WHETHER THERE WAS ANY SORT OF MODELING OR ANYTHING THAT SHOULD

02:42PM   5      BE DONE IN CONNECTION WITH THE THERANOS INVESTMENT; CORRECT?

02:42PM   6      A.   CORRECT.

02:42PM   7      Q.   AND HE TOLD YOU NO; RIGHT?

02:42PM   8      A.   HE JUST SAID THAT IT WASN'T NECESSARY FOR THIS.

02:42PM   9      Q.   OKAY.  BUT FINANCIAL MODELING IS SOMETHING THAT IS

02:42PM  10      FREQUENTLY DONE IN DUE DILIGENCE; RIGHT?

02:42PM  11      A.   IT'S -- YES.

02:42PM  12      Q.   OKAY.  BUT MR. TUBERGEN TOLD YOU NOT TO DO IT IN THIS

02:42PM  13      CASE; RIGHT?

02:42PM  14      A.   HE SAID WE WERE RELYING ON WHAT WE WERE GIVEN BY THE

02:43PM  15      COMPANY.

02:43PM  16      Q.   RIGHT.  AND YOU ACTUALLY RAISED A COUPLE OF POTENTIAL

02:43PM  17      TECHNICAL PEOPLE THAT YOU COULD TALK TO AS WELL.

02:43PM  18           DO YOU RECALL THAT?

02:43PM  19      A.   I DON'T RECALL WHAT YOU MEAN.

02:43PM  20      Q.   WERE YOU AWARE THAT MEMBERS OF THE DEVOS FAMILY RAISED

02:43PM  21      WITH MR. TUBERGEN THAT THERE MIGHT BE SOME TECHNICAL PEOPLE WHO

02:43PM  22      COULD BE USED TO CONSULT ON THIS RELATIONSHIP?

02:43PM  23      A.   I DON'T --

02:43PM  24      Q.   YOU DON'T?

02:43PM  25      A.   -- KNOW WHAT YOU'RE REFERRING TO.

PETERSON CROSS BY MR. WADE                                          4780

02:43PM   1    Q.   I'M JUST WONDERING IF YOU RECALL THAT COMING UP IN ADVANCE

02:43PM   2    OF THE MEETING.

02:43PM   3    A.   NO.

02:43PM   4    Q.   OKAY.  YOU MENTIONED THAT YOU DID LOOK AT THE TWO BINDERS

02:43PM   5    OF MATERIALS; RIGHT?

02:43PM   6    A.   YES.

02:43PM   7    Q.   AND MR. LEACH SHOWED YOU, I DON'T KNOW, TWO INCHES OF THEM

02:43PM   8    MAYBE?  IS THAT FAIR?

02:43PM   9    A.   OKAY.

02:43PM   10   Q.   IS IT --

02:43PM   11   A.   YES.

02:43PM   12   Q.   OKAY.  I BELIEVE IN YOUR PRIOR TESTIMONY YOU SAID THERE

02:43PM   13   WERE ABOUT A FOOT OF MATERIALS.

02:43PM   14   A.   YES.

02:43PM   15   Q.   AND WHAT WERE THE OTHER MATERIALS IN THE BINDER?

02:43PM   16   A.   I CAN'T RECALL ALL OF THE SPECIFICS OF THAT, BUT IT WAS

02:44PM   17   VERY MUCH -- ONE BINDER WAS VERY MUCH THERANOS AND THE COMPANY

02:44PM   18   AND WHAT IT DOES AND WHAT IT HAD TO OFFER, AND THE SECOND

02:44PM   19   BINDER WAS VERY CLINICAL.

02:44PM   20   Q.   VERY CLINICAL.  WAS IT DATA?

02:44PM   21   A.   YES, YES.

02:44PM   22   Q.   OKAY.  SO THEY SENT YOU -- DID THEY SEND YOU LIKE A REAM

02:44PM   23   OF DATA BASICALLY?

02:44PM   24   A.   YES.

02:44PM   25   Q.   OKAY.  DID YOU ASK ANYONE TO LOOK AT THAT?

PETERSON CROSS BY MR. WADE                                    4781

02:44PM   1    A.   NO.

02:44PM   2    Q.   OKAY.  SO THERE'S DATA.  WHAT ELSE DO YOU RECALL ABOUT

02:44PM   3    WHAT THEY SENT?

02:44PM   4    A.   THAT'S WHAT I RECALL.

02:44PM   5    Q.   OKAY.  DID YOU REVIEW THE DATA YOURSELF, OR TRY TO REVIEW

02:44PM   6    THE DATA?

02:44PM   7    A.   I FLIPPED THROUGH ALL OF THE PAGES OF BOTH BINDERS AND THE

02:44PM   8    KEY THINGS THAT WERE IMPORTANT TO US WAS THE WORK WITH THE

02:44PM   9    PHARMACEUTICAL COMPANIES AND THE FINANCIALS AND THE CONTRACTS

02:44PM  10    AND THE MANY TIMES THAT IT STATED THAT -- THE ACCURACY OF THE

02:44PM  11    TEST.

02:44PM  12    Q.   YEAH, I UNDERSTAND YOUR TESTIMONY.

02:44PM  13         BUT YOU ACTUALLY DIDN'T MAKE THE INVESTMENT DECISION;

02:45PM  14    RIGHT?

02:45PM  15    A.   CORRECT.

02:45PM  16    Q.   OKAY.  THE -- LET'S LOOK AT THE MATERIALS YOU WERE SENT.

02:45PM  17    IT'S 4858.

02:45PM  18         AND YOU'RE THE ONLY PERSON AT RDV WHO LOOKED AT THESE

02:45PM  19    MATERIALS; RIGHT?

02:45PM  20    A.   I DON'T KNOW.

02:45PM  21    Q.   OKAY.  YOU'RE NOT AWARE OF ANYONE ELSE LOOKING AT THOSE?

02:45PM  22    A.   I'M NOT AWARE, NO.

02:45PM  23    Q.   AND WHEN MR. TUBERGEN GOT THEM, HE ASKED YOU TO LOOK AT

02:45PM  24    THEM; RIGHT?

02:45PM  25    A.   CORRECT.

PETERSON CROSS BY MR. WADE                                          4782

02:45PM   1    Q.   OKAY.  AND DO YOU RECALL PREVIOUSLY MAKING STATEMENTS TO

02:46PM   2    THE EFFECT OF YOU'RE THE ONLY ONE WHO DID A DETAILED REVIEW OF

02:46PM   3    THE BINDERS?

02:46PM   4    A.   YES.

02:46PM   5    Q.   OKAY.  THAT'S BECAUSE YOU DON'T KNOW OF ANYONE ELSE DOING

02:46PM   6    IT; RIGHT?

02:46PM   7    A.   CORRECT.

02:46PM   8    Q.   OKAY.  AND WITHIN THESE MATERIALS -- SO THEY SENT THE TWO

02:46PM   9    BINDERS.  DID YOU ASK IN FOLLOWUP FOR ANY ADDITIONAL

02:46PM  10    INFORMATION IN WRITING?

02:46PM  11    A.   NO.

02:46PM  12    Q.   OKAY.  AND --

02:46PM  13    A.   WE WERE GOING TO GO AND VISIT THEM, SO WE DIDN'T THINK IT

02:46PM  14    WAS NECESSARY TO ASK FOR MORE.

02:46PM  15    Q.   I UNDERSTAND.  BUT MY QUESTION WAS WHETHER -- YOU

02:46PM  16    UNDERSTAND THAT IN A TYPICAL DUE DILIGENCE PROCESS, FREQUENTLY

02:46PM  17    THERE ARE LISTS OF REQUESTS; RIGHT?

02:46PM  18    A.   UH-HUH.

02:46PM  19    Q.   OKAY.  AND THEN YOU SEND THAT TO THE OTHER SIDE, RIGHT, IN

02:46PM  20    A TYPICAL DUE DILIGENCE PROCESS; RIGHT?

02:46PM  21    A.   YES.

02:46PM  22    Q.   AND THEN THEY SEND YOU BACK MATERIALS; RIGHT?

02:46PM  23    A.   YES.

02:46PM  24    Q.   AND YOU DIDN'T DO THAT IN THIS CASE?

02:46PM  25    A.   WE WERE GOING TO SEE THEM PERSONALLY AND SPEND A DAY

PETERSON CROSS BY MR. WADE                                          4783

02:46PM   1    THERE, SO WE WERE GOING TO HANDLE IT THEN.

02:46PM   2    Q.   I UNDERSTAND.  BUT WITH RESPECT TO WRITTEN MATERIALS OR

02:46PM   3    MORE DETAILED INFORMATION --

02:46PM   4    A.   NO, WE DID NOT ASK FOR MORE.

02:47PM   5    Q.   OKAY.  AND IS IT YOUR TESTIMONY THAT YOU DID REVIEW IN

02:47PM   6    DETAIL ALL OF THE MATERIAL WITHIN THE SUBGROUP?

02:47PM   7    A.   SUBGROUP?

02:47PM   8    Q.   WITHIN TWO -- 4858, DID YOU LOOK CAREFULLY AND REVIEW ALL

02:47PM   9    OF THIS MATERIAL?

02:47PM  10    A.   I HAVE A 4859 AND 4734.

02:47PM  11    Q.   I'M SORRY.  IT'S IN THE WHITE BINDER BECAUSE MR. LEACH

02:47PM  12    REFERRED TO IT EARLIER.

02:47PM  13    A.   WHAT NUMBER?

02:47PM  14    Q.   4858.

02:48PM  15    A.   YES.  AND ALL OF THE HIGHLIGHTING WAS DONE EARLY.

02:48PM  16    Q.   OKAY.  SO YOU'VE REVIEWED EVERYTHING IN THIS EXHIBIT IN

02:48PM  17    DETAIL?

02:48PM  18    A.   YES.

02:48PM  19    Q.   OKAY.  DO YOU SEE IN THE BACK THERE'S A VERY DETAILED LIST

02:48PM  20    OF INTELLECTUAL PROPERTY MATERIALS?

02:48PM  21    A.   YOU'LL HAVE TO GIVE ME A PAGE NUMBER.

02:48PM  22    Q.   SURE.  I BELIEVE IT'S 12805 IN THE BOTTOM RIGHT CORNER, OR

02:48PM  23    ON THE EXHIBIT IN THE MIDDLE IT'S 133.

02:48PM  24    A.   YES.

02:48PM  25    Q.   OKAY.  AND IN CONNECTION WITH THIS, THE GOVERNMENT -- OR,

PETERSON CROSS BY MR. WADE                                              4784

02:48PM   1    I'M SORRY -- THE COMPANY SENT YOU A LIST OF ALL OF THEIR

02:48PM   2    INTELLECTUAL PROPERTY MATERIALS; CORRECT?

02:48PM   3    A.   YES.

02:48PM   4    Q.   AND DID YOU DO -- DID YOU REVIEW THIS AND LOOK AT THE

02:49PM   5    PATENTS THAT THE COMPANY HAD FILED?

02:49PM   6    A.   WE, WE KNEW THAT THEY HAD PATENTS.  I CAN'T SAY THAT I

02:49PM   7    REVIEWED THEM OR KNEW WHAT THE PATENTS WERE.

02:49PM   8    Q.   OKAY.  SO THIS WASN'T REVIEWED IN DETAIL?

02:49PM   9    A.   THIS LENDS CREDIBILITY TO THE FACT THAT IT WORKS.  YES, I

02:49PM  10    FLIPPED THROUGH EVERYTHING.

02:49PM  11    Q.   OKAY.

02:49PM  12    A.   BUT I'M NOT A SCIENTIST, SO I DON'T KNOW EXACTLY WHAT SOME

02:49PM  13    OF THESE ARE SAYING.

02:49PM  14        BUT I DO -- I CAN FIGURE OUT WHETHER THINGS ARE LENDING

02:49PM  15    CREDIBILITY TO WHAT THEY WERE TELLING US.

02:49PM  16    Q.   NO, I UNDERSTAND.  I JUST -- YOU UNDERSTAND THAT OFTEN IN

02:49PM  17    DUE DILIGENCE ON TECHNOLOGY COMPANIES THAT PEOPLE DO PRETTY

02:49PM  18    DETAILED REVIEWS OF INTELLECTUAL PROPERTY PORTFOLIOS; RIGHT?

02:49PM  19    A.   OKAY.

02:49PM  20    Q.   THEY'LL HIRE EXPERTS.  ARE YOU AWARE OF THAT?

02:49PM  21    A.   YES.

02:49PM  22    Q.   AND DID YOU DO THAT?

02:49PM  23    A.   NO.

02:49PM  24    Q.   AND YOU DIDN'T HIRE AN EXPERT; CORRECT?

02:49PM  25    A.   NO.

PETERSON CROSS BY MR. WADE                                                4785

02:49PM   1    Q.   AND YOU DIDN'T, BY YOURSELF, LOOK UP ANY OF THESE

02:49PM   2    MATERIALS IN A PUBLIC RECORD OR ASK FOR ANY INFORMATION

02:50PM   3    RELATING TO THESE MATERIALS?

02:50PM   4    A.   NO.  WE TRUSTED WHAT WE READ.

02:50PM   5    Q.   WELL, BUT DID YOU WANT ANY MORE INFORMATION?  FOR EXAMPLE,

02:50PM   6    A LOT OF THESE --

02:50PM   7    A.   NO, NO.

02:50PM   8    Q.   -- SOME OF THESE PATENTS AND APPLICATIONS RELATE TO THE

02:50PM   9    USE OF SMALL SAMPLES ON COMMERCIAL DEVICES.

02:50PM   10   A.   NO.

02:50PM   11   Q.   DID YOU LOOK INTO THAT AT ALL?

02:50PM   12   A.   NO.  WHAT WAS RELEVANT TO US WAS THAT THEY SAID THAT'S

02:50PM   13   WHAT THEY WERE DOING.

02:50PM   14        AGAIN, IT GOES BACK TO THE KEY THINGS OF WHAT WE WERE

02:50PM   15   UNDERWRITING, WHICH WERE THE FINANCIALS, THE CONTRACTS, AND THE

02:50PM   16   VALIDITY OF THE ANALYZER WORKING BY ALL THE PHARMACEUTICAL

02:50PM   17   COMPANIES AND THE GOVERNMENT.

02:50PM   18   Q.   I'M GLAD YOU BROUGHT UP THE CONTRACTS.

02:50PM   19        WHAT WAS YOUR UNDERSTANDING OF THE WALGREENS CONTRACT?

02:51PM   20   A.   THAT IT WAS BEGINNING TO LAUNCH AND ROLL OUT IN ADDITIONAL

02:51PM   21   LOCATIONS.  THERE WAS NO SUGGESTION THAT THERE WAS ANYTHING

02:51PM   22   WRONG WITH THE WALGREENS CONTRACTS.

02:51PM   23   Q.   DID YOU LOOK --

02:51PM   24   A.   AND THAT SAFEWAY WAS GOING TO ROLL OUT AS WELL.

02:51PM   25   Q.   DID YOU LOOK AT THE CONTRACTS?

PETERSON CROSS BY MR. WADE                                        4786

02:51PM   1    A.   NO.

02:51PM   2    Q.   OKAY.  YOU UNDERSTAND THAT'S A PRETTY TYPICAL THING TO

02:51PM   3    REQUEST IN DUE DILIGENCE?

02:51PM   4    A.   YES.

02:51PM   5    Q.   MATERIAL CONTRACTS?

02:51PM   6         YOU DIDN'T ASK FOR THEM?

02:51PM   7    A.   NO.

02:51PM   8    Q.   DID YOU ASK FOR A SUMMARY OF THE RELATIONSHIP?

02:51PM   9    A.   WE TALKED ABOUT THE WALGREENS RELATIONSHIP AND IT WAS ALL

02:51PM   10   VERY POSITIVE.

02:51PM   11   Q.   AND THEY TOLD YOU ABOUT THE PHASE I AND PHASE II OF THE

02:51PM   12   WALGREENS RELATIONSHIP?

02:51PM   13   A.   I DON'T RECALL THAT SPECIFICALLY.

02:51PM   14   Q.   DO YOU RECALL IT GENERALLY?

02:51PM   15   A.   IN GENERAL.  I MEAN, WE TALKED ABOUT, WE ASKED ABOUT

02:51PM   16   WHAT -- AGAIN, AT THE MEETING, WE WANTED TO KNOW WHERE THEY

02:51PM   17   WERE GOING TO GO NEXT, WHAT -- WERE THEY GOING TO BIG CITIES

02:51PM   18   AND HOW MANY CITIES AND HOW MANY LOCATIONS WERE THEY GOING TO

02:51PM   19   OPEN IN THE NEXT YEAR OR TWO?  AND THAT'S WHAT THE DISCUSSION

02:51PM   20   WAS AROUND.

02:51PM   21   Q.   WHAT WAS YOUR UNDERSTANDING OF THE PHASE I AND PHASE II OF

02:52PM   22   THE WALGREENS RELATIONSHIP?

02:52PM   23   A.   I DON'T KNOW WHAT YOU MEAN BY PHASE I AND PHASE II OF THE

02:52PM   24   WALGREENS RELATIONSHIP.  THEY WERE IN 40 STORES AT THE TIME,

02:52PM   25   AND THEY WERE GOING TO ROLL OUT TO 900 THE FOLLOWING YEAR.

PETERSON CROSS BY MR. WADE                                    4787

02:52PM   1     Q.   OKAY.

02:52PM   2     A.   AND THEY WERE GOING TO ROLL INTO I WANT TO SAY FOUR

02:52PM   3     METROPOLITAN AREAS FIRST, AND THEY WERE VERY SPECIFIC ABOUT HOW

02:52PM   4     MANY LOCATIONS -- HOW MANY METROPOLITAN AREAS THEY WERE GOING

02:52PM   5     TO GO IN EACH YEAR.

02:52PM   6     Q.   RIGHT.  THEY HAD A PLAN --

02:52PM   7     A.   CORRECT.

02:52PM   8     Q.   -- THAT THEY WERE GOING TO IMPLEMENT; RIGHT?

02:52PM   9     A.   CORRECT.

02:52PM   10    Q.   THEY HAD THE EXECUTION LIST, BUT THEY HAD --

02:52PM   11    A.   THEY HAD A ROLLOUT PLAN.

02:52PM   12    Q.   THEY HAD A ROLLOUT PLAN?

02:52PM   13    A.   YES.

02:52PM   14    Q.   BUT MY QUESTION WAS MORE, DO YOU RECALL ANY DISCUSSION OR

02:52PM   15    ASKING ANY QUESTIONS ABOUT TWO DIFFERENT PHASES OF THE

02:52PM   16    WALGREENS RELATIONSHIP THAT WAS SET FORTH IN WALGREENS

02:52PM   17    CONTRACTS?

02:52PM   18    A.   THAT'S NOT HOW IT WAS CHARACTERIZED TO US.

02:52PM   19    Q.   OKAY.  THE DOCUMENT JUST PRIOR TO THIS IS THE PFIZER

02:53PM   20    THERANOS DOCUMENT THAT IF YOU LOOK ON PAGE --

02:53PM   21    A.   YES.

02:53PM   22    Q.   -- 104.  ACTUALLY, IF YOU CAN BRING UP 109, 109 OF THE

02:53PM   23    EXHIBIT, WHICH IS PAGE 6 OF THIS DOCUMENT.

02:53PM   24         (PAUSE IN PROCEEDINGS.)

02:53PM   25    BY MR. WADE:

PETERSON CROSS BY MR. WADE                                          4788

02:53PM   1    Q.   DO YOU SEE THIS DOCUMENT?

02:53PM   2    A.   YES.

02:53PM   3    Q.   OKAY.  AND THIS SETS FORTH THE DETAILS OF THE

02:54PM   4    RELATIONSHIP, DO YOU SEE THAT, OF THE PROJECT THAT THEY WERE

02:54PM   5    DOING?

02:54PM   6    A.   WHERE ARE YOU LOOKING?

02:54PM   7    Q.   I'M JUST LOOKING AT PAGE 109.

02:54PM   8    A.   YES, ON THE PAGE.

02:54PM   9    Q.   AND DO YOU SEE -- IF YOU LOOK UP ON THE SCREEN, DO YOU SEE

02:54PM  10    THIS?

02:54PM  11    A.   YES.

02:54PM  12    Q.   IT SAYS "FOR THIS STUDY, AN INSTRUMENT WAS DEPLOYED IN THE

02:54PM  13    HOME OF EACH PATIENT."

02:54PM  14    A.   YES.

02:54PM  15    Q.   "FOUR OTHERS WERE INSTALLED AT THE CANCER CENTER."

02:54PM  16         DO YOU SEE THAT?

02:54PM  17    A.   YES.

02:54PM  18    Q.   OKAY.  AND DO YOU UNDERSTAND THAT THIS WAS A THERANOS

02:54PM  19    DEVICE?

02:54PM  20    A.   YES.

02:54PM  21    Q.   AND IT THEN TALKS ABOUT HOW THREE ASSAYS WERE PERFORMED

02:54PM  22    SIMULTANEOUSLY IN MULTIPLEX.

02:54PM  23         DO YOU SEE THAT?

02:54PM  24    A.   YES.

02:54PM  25    Q.   AND DO YOU KNOW WHAT THAT MEANS?

PETERSON CROSS BY MR. WADE                                    4789

02:54PM  1    A.  NO.

02:54PM  2    Q.  IT MEANS THAT AT THE TIME THEY ARE RUNNING THE TESTS, THAT

02:55PM  3    THEY'RE RUNNING THREE DIFFERENT TESTS AT THE SAME TIME.

02:55PM  4        DID YOU UNDERSTAND THAT AT THE TIME?

02:55PM  5    A.  NO.

02:55PM  6    Q.  AND WAS THERE ANY DISCUSSION OF EXACTLY WHAT HAPPENED IN

02:55PM  7    CONNECTION WITH THIS?

02:55PM  8    A.  NO.  THE PAGES THAT WE WERE FOCUSSED IN ON ARE THE ONES

02:55PM  9    THAT SAY THAT THE THERANOS SYSTEM PERFORMED WITH SUPERIOR

02:55PM  10   PERFORMANCE TO REFERENCE ASSAYS WHILE RUNNING IN A COMPLEX

02:55PM  11   AMBULATORY ENVIRONMENT AND THINGS LIKE THAT.

02:55PM  12       WE WERE MUCH MORE AT THE SUMMARY LEVEL THAN GOING THROUGH

02:55PM  13   AND MAKING SURE THAT THE PROCESS THAT THEY USED OR WHAT THEY

02:55PM  14   WERE DOING WAS -- WE DIDN'T NEED TO UNDERSTAND THE PROCESS THAT

02:55PM  15   THEY WERE USING, JUST THE OUTCOME.

02:55PM  16   Q.  OKAY.  MY QUESTION THEN IS THIS:  WHAT DID THEY DO IN

02:55PM  17   THIS?  WHAT WAS THIS REPORT?

02:55PM  18   A.  THIS, THIS WAS -- THIS DEFINITELY TOLD US THAT, THAT

02:55PM  19   PFIZER WAS USING THEIR MACHINES AND IT WAS PERFORMING

02:55PM  20   EXCEPTIONALLY WELL IN THEIR TESTS.

02:55PM  21   Q.  DID YOU UNDERSTAND THAT PFIZER -- THAT THE MACHINES WERE

02:55PM  22   DEPLOYED IN THE HOME OF A NUMBER OF PATIENTS?

02:56PM  23   A.  I DON'T RECALL THAT.  IT WAS A LONG TIME AGO.

02:56PM  24   Q.  OKAY.

02:56PM  25   A.  THE SPECIFICS OF THE REPORT.

PETERSON CROSS BY MR. WADE                                          4790

02:56PM   1    Q.   RIGHT.  YOU JUST RECALL THE SPECIFIC PARTS THAT THE

02:56PM   2    GOVERNMENT POINTED YOU TO?  IS THAT THE LIMIT OF YOUR

02:56PM   3    RECOLLECTION?

02:56PM   4    A.   NO, NO.  I COMPLETELY REMEMBER WHEN WE WERE DOING THIS

02:56PM   5    THAT THAT -- THE TAKE AWAY FROM THIS IS THAT LARGE

02:56PM   6    PHARMACEUTICAL BUSINESSES, COMPANIES, WERE USING THEIR ANALYZER

02:56PM   7    AND THEY WEREN'T HAVING ANY ISSUES WITH IT.

02:56PM   8    Q.   RIGHT.  NO.  I UNDERSTAND THAT POINT.

02:56PM   9    A.   THAT WAS THE TAKE AWAY.

02:56PM   10   Q.   I UNDERSTAND.

02:56PM   11        BUT YOU TALKED ABOUT HOW IT VALIDATED THE TECHNOLOGY, AND

02:56PM   12   TO VALIDATE THE TECHNOLOGY, YOU KIND OF NEED TO KNOW WHAT

02:56PM   13   HAPPENED AND HOW IT WORKED; RIGHT?

02:56PM   14   A.   NO.  I JUST NEED TO KNOW THAT THEY SAID IT WORKED.

02:56PM   15   Q.   OKAY.  AND YOU UNDERSTOOD THAT THEY WERE TESTING THIS IN

02:56PM   16   CONNECTION WITH THE USE OF -- THAT THIS WAS A THERANOS DEVICE;

02:56PM   17   RIGHT?

02:56PM   18   A.   YES.

02:56PM   19   Q.   AND THAT THIS WAS TESTED IN CONNECTION WITH A PFIZER DRUG;

02:56PM   20   RIGHT?

02:56PM   21   A.   YES.

02:56PM   22   Q.   OKAY.  THAT BOTH COMPANIES WERE INVOLVED IN THIS; RIGHT?

02:56PM   23   YOU KNEW THAT?

02:56PM   24   A.   THAT -- I DON'T RECALL THAT.  I DON'T RECALL EXACTLY.

02:57PM   25        I JUST KNOW THAT THEY WERE USING THEIR ANALYZERS IN

PETERSON CROSS BY MR. WADE                                          4791

02:57PM   1   CLINICAL TRIALS.

02:57PM   2   Q.   OKAY.  AND IF YOU GO TO PAGE 8 -- I'M SORRY, ONE MORE

02:57PM   3   PAGE.

02:57PM   4        DO YOU HAVE ANY FAMILIARITY WITH CHARTS OF THIS KIND?

02:57PM   5   A.   NO.

02:57PM   6   Q.   OKAY.  THIS IS A MEASURE OF ACCURACY.  DO YOU HAVE ANY --

02:57PM   7   WAS THERE ANY DISCUSSION OF THE R SQUARED OF THIS PARTICULAR

02:57PM   8   ASSAY?

02:57PM   9   A.   NO.

02:57PM  10   Q.   OKAY.  LET'S GO BACK TO THE START OF THE DOCUMENT.  IF WE

02:57PM  11   GO TO -- LET'S GO TO PAGE 3.  OKAY.  HERE -- DO YOU SEE THE

02:58PM  12   REFERENCE TO THERANOS'S PROPRIETARY PATENTED TECHNOLOGY?

02:58PM  13   A.   YES.

02:58PM  14   Q.   OKAY.  AND THEY ATTENDED -- APPENDED ALL OF THE PATENTS TO

02:58PM  15   THIS PRESENTATION; RIGHT?

02:58PM  16   A.   THEY -- I'M SORRY?

02:58PM  17   Q.   THEY APPENDED A LIST OF ALL OF THEIR PATENTS?

02:58PM  18        DO YOU RECALL THAT?

02:58PM  19   A.   YES.

02:58PM  20   Q.   OKAY.  WHAT DO YOU UNDERSTAND TO BE THE BREADTH OF

02:58PM  21   THERANOS'S PROPRIETARY PATENTED TECHNOLOGY AS REFERENCED IN

02:58PM  22   THIS STATEMENT?

02:58PM  23   A.   THAT IT WAS CAPABLE OF DOING FINGERSTICK BLOOD TESTING --

02:58PM  24   Q.   AND WHAT IS "IT"?

02:58PM  25   A.   -- ON THEIR ANALYZER.

PETERSON CROSS BY MR. WADE                                        4792

02:58PM  1    Q.   I'M SORRY, I THOUGHT YOU WERE DONE.

02:58PM  2         WHAT IS "IT"?

02:58PM  3    A.   "IT"?

02:58PM  4    Q.   YEAH, YOU SAID "IT IS CAPABLE."  WHAT IS "IT"?

02:58PM  5    A.   THAT THE ANALYZER IS CAPABLE OF DOING FINGERSTICK

02:58PM  6    TECHNOLOGY BECAUSE OF ITS IP --

02:58PM  7    Q.   NO.  MY QUESTION IS --

02:58PM  8    A.   -- AND IS DOING IT ACCURATELY.

02:58PM  9    Q.   MY QUESTION WAS, WHAT DOES THERANOS PROPRIETARY PATENTED

02:59PM  10   TECHNOLOGY REFER TO?  WHAT IS THE BREADTH OF THE TECHNOLOGY?

02:59PM  11   A.   THE WAY THAT THE ANALYZER WORKS AND RUNS FINGERSTICK BLOOD

02:59PM  12   TESTING ON IT.

02:59PM  13   Q.   SO IS IT YOUR TESTIMONY THAT THERANOS PROPRIETARY PATENTED

02:59PM  14   TECHNOLOGY REFERS TO JUST THE DEVICE?

02:59PM  15   A.   AND HOW IT DOES -- HOW IT DOES THE BLOOD TESTING WITHIN

02:59PM  16   THE DEVICE, YES.

02:59PM  17   Q.   OKAY.

02:59PM  18   A.   WITH THE ASSAYS.

02:59PM  19   Q.   OKAY.  IT DOESN'T SAY "DEVICE" THERE?  YOU'LL AGREE WITH

02:59PM  20   ME; RIGHT?

02:59PM  21   A.   I THINK IT'S IMPLIED.

02:59PM  22   Q.   OKAY.  AND THAT WAS YOUR UNDERSTANDING AT THE TIME;

02:59PM  23   CORRECT?

02:59PM  24   A.   YES.

02:59PM  25   Q.   OKAY.  YOU UNDERSTOOD THAT A LOT OF THESE SLIDES WERE

PETERSON CROSS BY MR. WADE                                          4793

```
03:00PM   1    FORWARD LOOKING; RIGHT?

03:00PM   2    A.   NO.

03:00PM   3    Q.   YOU DIDN'T UNDERSTAND THAT?

03:00PM   4    A.   NO.

03:00PM   5    Q.   YOU THOUGHT THEY WERE ALL PRESENT?

03:00PM   6    A.   YES.

03:00PM   7    Q.   OKAY.  SO LET'S LOOK AT -- I KNOW MR. LEACH SHOWED YOU

03:00PM   8    SOME.

03:00PM   9         LET'S LOOK AT -- LET'S GO TO 19, WHICH IS -- YEAH, 19.

03:00PM   10   IT'S 19 ON BOTH DOCUMENTS.

03:00PM   11        DO YOU SEE THAT?

03:00PM   12   A.   YES.

03:00PM   13   Q.   NOW, THIS IS FORWARD LOOKING; RIGHT?

03:00PM   14   A.   CORRECT.

03:00PM   15   Q.   AND THIS IS TALKING ABOUT THE FUTURE; RIGHT?

03:00PM   16   A.   WITH HOW IT'S GOING TO SAVE THE GOVERNMENT MONEY.

03:00PM   17   Q.   RIGHT.  AND THIS IS A GOAL; RIGHT?

03:00PM   18   A.   CORRECT.

03:00PM   19   Q.   THIS IS IN PART THE VISION THAT MS. HOLMES HAD WAS TO TRY

03:01PM   20   TO CHANGE HEALTH CARE IN A WAY WHERE THERE WERE SAVINGS TO THE

03:01PM   21   WHOLE SYSTEM; RIGHT?

03:01PM   22   A.   CORRECT.

03:01PM   23   Q.   OKAY.  AND IF YOU LOOK AT THE NEXT SLIDE, IT'S SIMILAR;

03:01PM   24   RIGHT?

03:01PM   25   A.   YES.
```

PETERSON CROSS BY MR. WADE                                              4794

03:01PM   1    Q.   AND IF YOU LOOK AT THE NEXT SLIDE, IT'S SIMILAR?

03:01PM   2    A.   YES.

03:01PM   3    Q.   AND IF WE CAN CLICK THROUGH A COUPLE MORE.

03:01PM   4         THESE ARE FORWARD LOOKING ITEMS; RIGHT?

03:01PM   5    A.   YES.

03:01PM   6    Q.   OKAY.  IF YOU WOULD LOOK AT 40, WHICH MR. LEACH TALKED TO

03:01PM   7    YOU ABOUT THIS.  THIS IS FORWARD LOOKING; RIGHT?

03:01PM   8    A.   YES.

03:01PM   9    Q.   AND THEY WEREN'T NATIONALLY DEPLOYED AT THIS TIME?

03:01PM  10    A.   NO.

03:01PM  11    Q.   THEY WERE TALKING ABOUT THE VISION THAT THEY HAD FOR THE

03:01PM  12    COMPANY; RIGHT?

03:02PM  13    A.   NO.  BUT IT WAS VERY CLEAR THAT THEY WERE GOING TO DO 900

03:02PM  14    THE NEXT YEAR.

03:02PM  15    Q.   AND THIS TALKS ABOUT 8,000; RIGHT?

03:02PM  16    A.   YES.

03:02PM  17    Q.   OKAY.  AND THAT HAD NOT HAPPENED YET; RIGHT?

03:02PM  18    A.   CORRECT.

03:02PM  19    Q.   AND MOST OF THE DOTS ON THIS WERE NOT THERE?

03:02PM  20    A.   CORRECT.

03:02PM  21    Q.   OKAY.  AND IF YOU LOOK AT THE NEXT SLIDE, THAT, TOO, THAT

03:02PM  22    TALKS ABOUT THE PROXIMITY OF THERANOS TO PATIENTS; RIGHT?

03:02PM  23    A.   YES.

03:02PM  24    Q.   AND HOW IT COMPARES TO OTHER LABS; RIGHT?

03:02PM  25    A.   YES.

PETERSON CROSS BY MR. WADE                                          4795

03:02PM   1    Q.   BUT THAT WASN'T -- THAT DIDN'T HAPPEN YET; RIGHT?

03:02PM   2    A.   NO.   THAT WAS --

03:02PM   3    Q.   FORWARD LOOKING; RIGHT?

03:02PM   4    A.   THAT WAS HER VISION, YES.

03:02PM   5    Q.   ALL RIGHT.   AND IF YOU GO TO, IF YOU GO TO SLIDE 28, DO

03:03PM   6    YOU SEE THAT?   YOU WERE ASKED ABOUT THAT?

03:03PM   7    A.   YES.

03:03PM   8    Q.   YOU HIGHLIGHTED THAT?

03:03PM   9    A.   YES.

03:03PM   10   Q.   AND DO YOU SEE WHERE IT SAYS, "PROCESSES ALL SAMPLE

03:03PM   11   TYPES"?

03:03PM   12   A.   YES.

03:03PM   13   Q.   AND WHAT DID YOU UNDERSTAND THAT TO MEAN?

03:03PM   14   A.   I'M FOCUSSED IN ON "THERANOS RUNS ANY TEST AVAILABLE IN

03:03PM   15   CENTER LABORATORIES," AND WE WERE TOLD THAT THEY COULD DO

03:03PM   16   HUNDREDS OF THEM, 2- TO 300 OF THEM.

03:03PM   17   Q.   MY QUESTION WAS ABOUT THE LANGUAGE "AND PROCESSES ALL

03:03PM   18   SAMPLE TYPES."

03:03PM   19        DO YOU SEE THAT?

03:03PM   20   A.   YES.

03:03PM   21   Q.   WHAT DOES THAT REFER TO?

03:03PM   22   A.   I DON'T KNOW WHAT THEY MEANT BY THAT.

03:03PM   23   Q.   DOES IT REFER TO VENOUS DRAWS?

03:03PM   24   A.   I DON'T KNOW.

03:03PM   25   Q.   OKAY.

PETERSON CROSS BY MR. WADE                                    4796

03:03PM   1     A.   IT'S NOT IN THE PICTURE.

03:03PM   2     Q.   AND AGAIN, I BELIEVE IT WAS YOUR TESTIMONY THERE WERE NO

03:03PM   3     SLIDES AT THE MEETING THAT YOU WENT TO --

03:03PM   4     A.   CORRECT.

03:03PM   5     Q.   -- IN CALIFORNIA; CORRECT?

03:03PM   6     THESE WERE SENT TO YOU IN ADVANCE; RIGHT?

03:03PM   7     A.   CORRECT.

03:03PM   8     Q.   AND YOU DIDN'T BRING THESE SLIDES AND GO THROUGH A LIST OF

03:04PM   9     QUESTIONS ITEM BY ITEM; RIGHT?

03:04PM  10     A.   NO.

03:04PM  11     Q.   AND IN FACT, YOU DIDN'T TAKE ANY NOTES, OTHER THAN ON THE

03:04PM  12     FINANCIAL DOCUMENT, AT THE MEETING; RIGHT?

03:04PM  13     A.   NO, I TOOK NOTES.

03:04PM  14     Q.   DO YOU RECALL PREVIOUSLY TESTIFYING THAT YOU TOOK NO NOTES

03:04PM  15     BECAUSE IT WAS A HIGH LEVEL MEETING?

03:04PM  16     A.   I TOOK ENOUGH NOTES TO WRITE THE MEMO AFTERWARDS, YES.

03:04PM  17     Q.   AND SO IF YOU TESTIFIED PREVIOUSLY, THAT WAS MISTAKEN?

03:04PM  18     A.   I --

03:04PM  19          MR. LEACH:  OBJECTION.  ARGUMENTATIVE.

03:04PM  20          THE COURT:  OVERRULED.

03:04PM  21     YOU CAN ANSWER THE QUESTION.

03:04PM  22          THE WITNESS:  YES, MY MAIN JOB WAS TO SIT AND

03:04PM  23     LISTEN.  BUT I WAS TAKING NOTES, YES.

03:04PM  24     BY MR. WADE:

03:04PM  25     Q.   OKAY.  BUT AGAIN, NOT WITH RESPECT TO THIS POWERPOINT

PETERSON CROSS BY MR. WADE                                                    4797

03:04PM   1    BECAUSE IT WASN'T DISCUSSED; CORRECT?

03:04PM   2    A.   CORRECT.   THE PAGES THAT WERE PRESENTED WERE THE

03:04PM   3    FINANCIALS IN THE MEETING.

03:04PM   4    Q.   LET'S -- SINCE YOU BROUGHT IT UP, WHY DON'T WE TALK ABOUT

03:04PM   5    THE FINANCIALS.

03:04PM   6         I BELIEVE THAT'S ITEM 1853.

03:05PM   7         DO YOU SEE THAT?

03:05PM   8    A.   WHICH BINDER?

03:05PM   9    Q.   I'M SORRY.   THE WHITE BINDER, 1853.

03:05PM   10   A.   YES.

03:05PM   11   Q.   YOU WERE ASKED QUESTIONS ABOUT THIS DOCUMENT.

03:05PM   12        DO YOU RECALL THAT?

03:05PM   13   A.   YES.

03:05PM   14   Q.   AND YOU UNDERSTOOD -- JUST HIGHLIGHT THE LANGUAGE IN THE

03:05PM   15   UPPER LEFT-HAND CORNER.

03:05PM   16        AGAIN, YOU UNDERSTOOD THAT THESE WERE PROJECTIONS; RIGHT?

03:05PM   17   A.   YES.

03:05PM   18   Q.   AND IF YOU GO -- MR. LEACH DIDN'T FOCUS YOU I DON'T THINK

03:05PM   19   ON THE SECOND PAGE.   LET'S TAKE A LOOK AT THAT.

03:05PM   20        OKAY.   AND YOU SEE THIS WAS INCLUDED WITHIN THE MATERIALS

03:05PM   21   AS WELL.

03:05PM   22        DO YOU RECALL THAT?

03:05PM   23   A.   YES.

03:05PM   24   Q.   OKAY.   AND IT IDENTIFIES THAT THERE'S ALMOST $163 MILLION

03:05PM   25   IN CASH AT THE TIME.

PETERSON CROSS BY MR. WADE                                        4798

```
03:05PM   1              DO YOU SEE THAT?

03:05PM   2        A.    YES.

03:05PM   3        Q.    AND YOU CIRCLED THAT; RIGHT?

03:05PM   4        A.    YES.

03:05PM   5        Q.    AND THEN DOWN BELOW THERE'S $168 MILLION IN -- ALMOST

03:05PM   6        $169 MILLION IN DEFERRED REVENUE AND CUSTOMER'S DEPOSITS;

03:06PM   7        RIGHT?

03:06PM   8        A.    YES.

03:06PM   9        Q.    AND YOU CIRCLED THAT; RIGHT?

03:06PM  10        A.    YES.

03:06PM  11        Q.    OKAY.  AND YOU SEE IN THE UPPER LEFT-HAND CORNER THAT

03:06PM  12        THESE FINANCIALS THAT YOU WERE PROVIDED WERE PREPARED FOR THE

03:06PM  13        PERIOD ENDING JULY 14TH, 2014?

03:06PM  14        A.    UH-HUH, YES.

03:06PM  15        Q.    AND DID YOU ASK FOR UPDATED FINANCIALS OR PROJECTIONS THAT

03:06PM  16        WERE BEYOND THAT DATE?

03:06PM  17        A.    WHAT, WHAT WE HAD IN THE BINDERS, THESE TWO PAGES IS WHAT

03:06PM  18        WE WERE GIVEN.

03:06PM  19        Q.    RIGHT.  SO AS OF JULY 14TH, 2014?

03:06PM  20        A.    YES.

03:06PM  21        Q.    MY QUESTION IS, DID YOU ASK FOR AN UPDATE IN OCTOBER?

03:06PM  22        A.    I DON'T RECALL IF WE ASKED FOR A SPECIFIC UPDATE.

03:06PM  23        Q.    OKAY.  I'M DONE WITH THE FINANCIAL DOCUMENT.

03:07PM  24              DID YOU ASK, DURING YOUR MEETING, WHETHER THE COMPANY USED

03:07PM  25        CASH OR ACCRUAL ACCOUNTING?
```

PETERSON CROSS BY MR. WADE                                            4799

03:07PM   1     A.   I DON'T RECALL.

03:07PM   2     Q.   OKAY.  IS THAT SOMETHING THAT YOU THINK YOU WOULD HAVE

03:07PM   3     NOTED IN YOUR MEMO IF YOU HAD?

03:07PM   4     A.   I DON'T RECALL ASKING OR TALKING ABOUT THAT.

03:07PM   5     Q.   YOU TALKED A FAIR AMOUNT ABOUT THE "FORTUNE" ARTICLE;

03:08PM   6     RIGHT?

03:08PM   7     A.   UH-HUH.

03:08PM   8     Q.   AND THAT WAS -- THOSE WERE THE MATERIALS THAT MR. TUBERGEN

03:08PM   9     CAME BACK WITH; RIGHT?

03:08PM   10    A.   YES.

03:08PM   11    Q.   AND HE WAS VERY EXCITED; RIGHT?

03:08PM   12    A.   YES.

03:08PM   13    Q.   OKAY.  DID YOU READ THE WHOLE ARTICLE?

03:08PM   14    A.   I BELIEVE SO.

03:08PM   15    Q.   OKAY.  WE'LL COME BACK TO THAT IN A SECOND.

03:08PM   16         IN ADVANCE OF THE MEETING OUT THERE, OR IN THE MEETING OUT

03:08PM   17    THERE, DO YOU RECALL MAKING THE STATEMENT THAT THIS WAS NOT A

03:08PM   18    DUE DILIGENCE MEETING?

03:08PM   19    A.   I DON'T RECALL THAT.

03:08PM   20    Q.   OKAY.  DID YOU -- IN YOUR MIND THIS WAS NOT A DUE

03:08PM   21    DILIGENCE MEETING; CORRECT?

03:08PM   22    A.   THIS WAS AN OPPORTUNITY TO ASK QUESTIONS, YES.  WE WERE --

03:08PM   23    IT WAS AN ON SITE VISIT.

03:08PM   24    Q.   OKAY.  DO YOU RECALL TELLING THE GOVERNMENT THAT IN YOUR

03:08PM   25    VIEW THIS WAS NOT A DUE DILIGENCE MEETING?

PETERSON CROSS BY MR. WADE                                          4800

03:08PM   1    A.   I DON'T RECALL SAYING THAT.

03:08PM   2    Q.   WHY DON'T YOU TAKE A LOOK AT EXHIBIT 11249 AT PAGE 6.

03:09PM   3    A.   OKAY.

03:09PM   4    Q.   DO YOU HAVE THAT IN FRONT OF YOU?

03:09PM   5    A.   YES.

03:09PM   6    Q.   IF YOU LOOK AT THE BOTTOM OF 6, DO YOU SEE THE LAST

03:09PM   7    SENTENCE ON THE PAGE?

03:09PM   8    A.   WHERE ARE THE PAGE NUMBERS?

03:09PM   9    Q.   GOOD QUESTION.  IN THE UPPER RIGHT-HAND CORNER.

03:09PM  10         AGAIN, THIS IS ONE OF THOSE DOCUMENTS WHERE YOU SHOULD

03:09PM  11    READ IT TO YOURSELF AND THEN I'LL ASK A QUESTION.  IF YOU COULD

03:09PM  12    READ THE LAST SENTENCE THERE.

03:09PM  13         (PAUSE IN PROCEEDINGS.)

03:10PM  14    BY MR. WADE:

03:10PM  15    Q.   DO YOU SEE THAT LAST SENTENCE?

03:10PM  16    A.   I'M STILL READING HERE.

03:10PM  17         (PAUSE IN PROCEEDINGS.)

03:10PM  18         THE WITNESS:  I DON'T RECALL -- I DIDN'T SAY THAT.

03:10PM  19    BY MR. WADE:

03:10PM  20    Q.   HERE'S MY QUESTION.  DOES THAT REFRESH YOUR RECOLLECTION

03:10PM  21    THAT YOU TOLD THE GOVERNMENT THAT YOU DID NOT VIEW THE MEETING

03:10PM  22    IN PALO ALTO AS A DUE DILIGENCE MEETING?

03:11PM  23    A.   I DON'T RECALL SAYING THAT.

03:11PM  24    Q.   OKAY.  DO YOU RECALL DURING THE MEETING THAT THERE WAS A

03:11PM  25    SIGNIFICANT AMOUNT OF DISCUSSION ABOUT MS. HOLMES'S VISION IN

PETERSON CROSS BY MR. WADE                                           4801

03:11PM   1    THE MEETING?

03:11PM   2    A.   THERE WAS A LOT OF DISCUSSION ABOUT A LOT OF THINGS.

03:11PM   3    THERE WAS A LOT --

03:11PM   4    Q.   THAT WASN'T MY QUESTION.  MY QUESTION WAS, DO YOU RECALL

03:11PM   5    THAT THERE WAS A SIGNIFICANT AMOUNT OF DISCUSSION ABOUT

03:11PM   6    MS. HOLMES'S VISION IN THE MEETING?

03:11PM   7    A.   YES.

03:11PM   8    Q.   OKAY.  I BELIEVE YOU TESTIFIED ON CROSS BEFORE WE TOOK OUR

03:11PM   9    BREAK THAT YOU DIDN'T KNOW WHETHER THE WALTONS INVESTED?

03:11PM   10   A.   CORRECT.

03:11PM   11   Q.   OKAY.

03:12PM   12   A.   AT THE TIME OF THE INVESTMENT.

03:12PM   13   Q.   CAN I DRAW YOUR ATTENTION TO 14089?

03:12PM   14   A.   OKAY.

03:12PM   15   Q.   DO YOU HAVE THAT IN FRONT OF YOU?

03:12PM   16   A.   I DO.

03:12PM   17   Q.   AND THAT WAS AN EMAIL BETWEEN YOU AND MR. TUBERGEN AND THE

03:12PM   18   DEVOSES?

03:12PM   19   A.   YES.

03:12PM   20   Q.   ABOUT THE THERANOS INVESTMENT?

03:12PM   21   A.   YES.

03:12PM   22             MR. WADE:  I MOVE THE ADMISSION OF 14089.

03:12PM   23             MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:12PM   24             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:12PM   25             (DEFENDANT'S EXHIBIT 14089 WAS RECEIVED IN EVIDENCE.)

PETERSON CROSS BY MR. WADE                                          4802

03:13PM  1    BY MR. WADE:

03:13PM  2    Q.   AND IF WE CAN JUST BLOW UP -- DO YOU SEE AT THE TOP THIS

03:13PM  3    IS AN EMAIL ON 10-24-2014?

03:13PM  4    A.   YES.

03:13PM  5    Q.   OKAY.  AND IF YOU GO TO THAT FIRST SENTENCE, DO YOU SEE

03:13PM  6    THAT?

03:13PM  7    A.   YES.

03:13PM  8    Q.   DO YOU SEE MR. TUBERGEN REPORTING THAT THE WALTON FAMILY

03:13PM  9    FOR SURE IS INVESTING?

03:13PM 10    A.   YES.

03:13PM 11         I DON'T REMEMBER THIS.

03:13PM 12    Q.   WERE YOU A PART OF THE DISCUSSIONS THAT HE WAS HAVING WITH

03:13PM 13    REPRESENTATIVES OF THE WALTON FAMILY?

03:13PM 14    A.   NO.

03:13PM 15    Q.   WERE YOU A PART OF ANY DISCUSSIONS AFTER THE MEETING AT

03:13PM 16    THERANOS WITH MR. MOSLEY?

03:13PM 17    A.   SAY AGAIN.  I'M SORRY.

03:13PM 18    Q.   WITH MR. MOSLEY?  WERE YOU PART OF ANY DISCUSSIONS WITH

03:13PM 19    MR. MOSLEY?

03:13PM 20    A.   NO.

03:13PM 21    Q.   IN THAT FOLLOWING MONTH?

03:13PM 22    A.   NO.

03:13PM 23    Q.   AND WERE YOU INVOLVED IN ANY DISCUSSIONS AFTER THE VISIT

03:13PM 24    TO THERANOS WITH MR. TROTT?

03:13PM 25    A.   NO.

PETERSON CROSS BY MR. WADE                                              4803

03:13PM   1      Q.   OKAY.

03:13PM   2      A.   MY BOSS WAS.

03:13PM   3      Q.   MR. DAMSTRA?

03:14PM   4      A.   YES.

03:14PM   5      Q.   AND ARE YOU AWARE THAT MR. TUBERGEN WAS TALKING WITH

03:14PM   6      MR. TROTT AS WELL?

03:14PM   7      A.   I ONLY HAD DISCUSSIONS WITH MR. DAMSTRA AROUND BDT.  I

03:14PM   8      KNEW THAT THEY WERE POTENTIALLY GOING TO LOOK AT THE INVESTMENT

03:14PM   9      AND MAYBE INVEST.

03:14PM   10     Q.   OKAY.  I THINK ON YOUR DIRECTION TESTIMONY YOU MADE A LOT

03:14PM   11     OF STATEMENTS RELATING TO INFORMATION THAT YOU LEARNED IN THAT

03:14PM   12     MEETING.

03:14PM   13          DO YOU RECALL THAT?

03:14PM   14     A.   WHICH MEETING?

03:14PM   15     Q.   IN THE MEETING IN PALO ALTO.

03:14PM   16     A.   YES.

03:14PM   17     Q.   HADN'T YOU PREVIOUSLY TESTIFIED THAT YOU DIDN'T RECALL THE

03:14PM   18     SPECIFICS OF THAT MEETING?

03:14PM   19     A.   I -- WE'VE HAD A LOT OF TIME TO THINK ABOUT IT.  WE'VE

03:15PM   20     TALKED ABOUT A LOT OF THINGS AND I HAD THE OPPORTUNITY TO READ

03:15PM   21     THROUGH ALL OF THE MEMOS THAT I DID, AND THERE'S -- AND WE DID

03:15PM   22     TALK ABOUT A LOT OF THINGS.

03:15PM   23     Q.   OKAY.  AND, AND YOU GAVE THAT DEPOSITION THAT WE TALKED

03:15PM   24     ABOUT BEFORE IN MARCH OF 2019; RIGHT?

03:15PM   25     A.   MARCH OF 2019?  OKAY, YES.

PETERSON CROSS BY MR. WADE                                      4804

03:15PM  1    Q.   THAT'S WHEN YOU GAVE THE DEPOSITION.  THAT WAS A COUPLE

03:15PM  2    YEARS AGO, TWO AND A HALF YEARS AGO; RIGHT?

03:15PM  3    A.   YES.

03:15PM  4    Q.   THAT WAS CLOSER IN TIME TO THE MEETING; RIGHT?

03:15PM  5    A.   YES.

03:15PM  6    Q.   AND IN THE DEPOSITION YOU WERE SHOWN A LOT OF THE SAME

03:15PM  7    DOCUMENTS THAT YOU'VE LOOKED AT TODAY; RIGHT?

03:15PM  8    A.   YES, BUT I'VE HAD A LOT OF TIME TO REFLECT AND READ

03:15PM  9    THROUGH A LOT OF THINGS THAT WAS GOING ON AT THAT POINT IN

03:15PM  10   TIME.

03:15PM  11   Q.   OKAY.  AND SO YOU'RE NOT DISPUTING THAT YOU SAID THAT YOU

03:15PM  12   DON'T RECALL THE SPECIFICS IN THAT DEPOSITION?

03:15PM  13   A.   NOT AT THAT TIME, NO.

03:15PM  14   Q.   OKAY.  SO YOUR MEMORY HAS IMPROVED OVER TIME; IS THAT YOUR

03:15PM  15   TESTIMONY?

03:15PM  16   A.   I'VE, I'VE RECOLLECTED A LOT OF THINGS FROM WHAT I'VE

03:16PM  17   READ, YES.  I HAVE A TENDENCY TO WRITE A LOT DOWN.

03:16PM  18   Q.   OKAY.  THE RECOLLECTION THAT YOU GOT FROM REVIEWING A LOT

03:16PM  19   OF THINGS, IS THAT REVIEWING IT IN CONNECTION WITH YOUR

03:16PM  20   TESTIMONY HERE TODAY?

03:16PM  21   A.   YEAH.  I'VE REVIEWED ALL OF MY NOTES, YES.

03:16PM  22   Q.   AND YOU WERE ACTUALLY SHOWN ALL OF YOUR NOTES IN THAT

03:16PM  23   DEPOSITION; RIGHT?

03:16PM  24   A.   THERE WASN'T ANYTHING THAT HASN'T BEEN IN THESE BINDERS.

03:16PM  25   Q.   RIGHT.  AND MY POINT IS THAT IN THAT DEPOSITION YOU WERE

PETERSON CROSS BY MR. WADE                                           4805

03:16PM   1   ACTUALLY SHOWN YOUR NOTES; RIGHT?

03:16PM   2   A.   I WAS TOLD NOT TO PREPARE AT ALL FOR ANY OF THOSE

03:16PM   3   DEPOSITIONS, TO WHICH I DIDN'T.  I DIDN'T GO BACK AND READ ANY

03:16PM   4   OF MY NOTES FROM BEFORE.

03:16PM   5   Q.   NOW, YOU ALSO TOLD THE GOVERNMENT IN 2017 THAT YOU DIDN'T

03:17PM   6   TAKE ANY NOTES DURING THAT MEETING.  WAS THAT -- ARE YOU -- DO

03:17PM   7   YOU BELIEVE THAT YOU DID NOT SAY THAT?

03:17PM   8             MR. LEACH:  OBJECTION, YOUR HONOR.  CALLS FOR

03:17PM   9   HEARSAY.

03:17PM  10             THE WITNESS:  YEAH, I --

03:17PM  11             THE COURT:  EXCUSE ME.  EXCUSE ME, MA'AM.

03:17PM  12             THE WITNESS:  I DON'T RECALL SAYING THAT.

03:17PM  13             THE COURT:  HANG ON A SECOND.

03:17PM  14        ARE YOU ABOUT DONE WITH THIS AREA, OR?

03:17PM  15             MR. WADE:  I'VE GOT A LITTLE MORE.

03:17PM  16             THE COURT:  OKAY.  SUSTAINED.

03:17PM  17   BY MR. WADE:

03:17PM  18   Q.   WELL, WHY DON'T YOU LOOK AT 11249, PAGE 7.

03:17PM  19        (PAUSE IN PROCEEDINGS.)

03:17PM  20   BY MR. WADE:

03:18PM  21   Q.   AND DOES THAT REFRESH YOUR RECOLLECTION WHETHER YOU TOOK

03:18PM  22   ANY NOTES?

03:18PM  23   A.   I'M SORRY.  IT'S A LONG MEMO.  WHAT AM I LOOKING AT?

03:18PM  24   Q.   PAGE 7.  PAGE 7.

03:18PM  25   A.   PAGE 7.

PETERSON CROSS BY MR. WADE                                         4806

03:18PM   1            (PAUSE IN PROCEEDINGS.)

03:19PM   2       BY MR. WADE:

03:19PM   3       Q.   IF YOU LOOK AT THE FIRST FULL PARAGRAPH.

03:19PM   4       A.   I DON'T RECALL SAYING THAT.

03:19PM   5       Q.   AND DO YOU RECALL THAT -- TELLING THE GOVERNMENT THAT IT

03:19PM   6       ONLY CONTAINED HIGH LEVEL INFORMATION?

03:19PM   7       A.   I DO RECALL THAT, AND I DO RECALL -- IT SAYS PETERSON DID

03:19PM   8       NOT HEAR ANYTHING AT THE MEETING THAT CHANGED HER UNDERSTANDING

03:19PM   9       OF THERANOS.

03:19PM  10       Q.   OKAY.  SO YOU RECALL THAT THE DISCUSSION FOCUSSED ON HIGH

03:19PM  11       LEVEL INFORMATION?

03:19PM  12       A.   THE DISCUSSION FOCUSSED AROUND EVERYTHING THAT WE HAD READ

03:19PM  13       IN THE BINDERS AND QUESTIONS AROUND THE CONTRACTS AND THE

03:20PM  14       FINANCIALS AND WHERE THEY HAD DONE WORK PREVIOUSLY WITH THE

03:20PM  15       ANALYZER AND WHERE THEY WERE GOING TO ROLL OUT AND THE VISION

03:20PM  16       OF THE COMPANY, YES.

03:20PM  17       Q.   OKAY.  THAT WASN'T MY QUESTION.  MY QUESTION WAS, DO YOU

03:20PM  18       RECALL THAT THE MEETING FOCUSSED ON HIGH LEVEL INFORMATION?

03:20PM  19       YES OR NO?

03:20PM  20       A.   IT DEPENDS ON THE DEFINITION OF "HIGH LEVEL."  THOSE WERE

03:20PM  21       THE TOPICS THAT WE DISCUSSED THAT I JUST LISTED.

03:20PM  22       Q.   DO YOU RECALL ON DIRECT YOU GAVE TESTIMONY ABOUT THE FACT

03:20PM  23       THAT THE SIZE OF THE INVESTMENT INCREASED ON SITE?

03:20PM  24       A.   YES.

03:20PM  25       Q.   ISN'T IT THE CASE THAT ACTUALLY BEFORE THE DEVOSES AND

PETERSON CROSS BY MR. WADE                                    4807

03:20PM   1    MR. TUBERGEN AND YOU WENT OUT THERE THAT THERE WAS DISCUSSION

03:21PM   2    AND A BELIEF THAT THEY SHOULD INCREASE THE INVESTMENT TO

03:21PM   3    $100 MILLION?

03:21PM   4    A.   NOT THAT I RECALL.

03:21PM   5    Q.   TAKE A LOOK AT 14106.

03:21PM   6         (PAUSE IN PROCEEDINGS.)

03:21PM   7              THE WITNESS:  OKAY.

03:21PM   8    BY MR. WADE:

03:21PM   9    Q.   DO YOU HAVE 14106 IN FRONT OF YOU?

03:21PM  10    A.   YES.

03:21PM  11    Q.   AND AGAIN, MR. SCHIERBEEK IS THE CONUMBER 2 PERSON WITHIN

03:22PM  12    THE RDV OFFICE; IS THAT RIGHT?

03:22PM  13    A.   YES.

03:22PM  14    Q.   OKAY.

03:22PM  15         MOVE THE ADMISSION OF 14106.

03:22PM  16              MR. LEACH:  OBJECTION.  HEARSAY, FOUNDATION.  SHE'S

03:22PM  17    NOT ON THIS.

03:22PM  18              MR. WADE:  WE'VE LET IN MANY DOCUMENTS THAT SHE'S

03:22PM  19    NOT ON.

03:22PM  20              THE COURT:  OKAY.  GIVE ME JUST A MOMENT, PLEASE.

03:22PM  21         (PAUSE IN PROCEEDINGS.)

03:22PM  22              MR. WADE:  AND FOR THE BENEFIT OF THE COURT, I'M

03:22PM  23    FOCUSSED ON NUMBER 2 WITHIN THAT COMMUNICATION.

03:22PM  24              THE WITNESS:  YES.  OH.

03:22PM  25              MR. WADE:  FOR THE JUDGE'S BENEFIT.  WE'LL WAIT FOR

PETERSON CROSS BY MR. WADE                                           4808

03:22PM  1    HIM.

03:22PM  2          (PAUSE IN PROCEEDINGS.)

03:22PM  3              THE COURT:  DO YOU WANT TO JUST PROBE THIS THEN?  IS

03:23PM  4    THAT WHAT YOU WANT TO DO IS PROBE THIS?  OR DID YOU --

03:23PM  5    BY MR. WADE:

03:23PM  6    Q.   ARE YOU AWARE THAT THERE WAS ACTUALLY DISCUSSION AND A

03:23PM  7    BELIEF GOING INTO THE TRIP TO CALIFORNIA THAT MR. TUBERGEN WAS

03:23PM  8    VERY BULLISH ON THE POTENTIAL INVESTMENT AND THAT THEY PROBABLY

03:23PM  9    WOULD MAKE $100 MILLION INVESTMENT?

03:23PM 10    A.   HE WAS VERY BULLISH ON THE OPPORTUNITY.  I DON'T RECALL

03:23PM 11    CONVERSATION AROUND 100 MILLION UNTIL AFTER THE MEETING, AND

03:23PM 12    BOB DIDN'T -- MR. SCHIERBEEK DIDN'T HAVE ANYTHING REALLY TO DO

03:23PM 13    WITH THIS DEAL.

03:23PM 14    Q.   BUT HE'S A SENIOR OFFICER IN THE COMPANY; RIGHT?

03:23PM 15    A.   YES, BUT HE'S ON THE FAMILY SERVICES SIDE.  HE'S NOT PART

03:23PM 16    OF THE INVESTMENT GROUP.

03:23PM 17    Q.   I UNDERSTAND YOUR VIEW.  BUT YOU WERE NOT A PART OF EVERY

03:23PM 18    CONVERSATION THAT MR. TUBERGEN HAD WITH MR. SCHIERBEEK; RIGHT?

03:23PM 19    A.   CORRECT.  BUT I DON'T KNOW -- I DON'T KNOW WHERE HE WOULD

03:24PM 20    HAVE GOTTEN THAT PROBABLY 100 MILLION INVESTMENT.  THAT WASN'T

03:24PM 21    THE DISCUSSION THAT WE HAD HAD ON THE PLANE.

03:24PM 22    Q.   BUT YOU UNDERSTAND HE WAS OF THE VIEW THAT IT WAS PROBABLY

03:24PM 23    A $100 MILLION INVESTMENT?

03:24PM 24    A.   HE WAS, RIGHT, BUT HE WASN'T WORKING ON THIS DEAL.

03:24PM 25    Q.   YOU UNDERSTOOD THAT HE COMMUNICATED WITH MR. TUBERGEN

PETERSON CROSS BY MR. WADE                                    4809

03:24PM   1    ABOUT THE THERANOS TRANSACTION; RIGHT?

03:24PM   2    A.   SURE.  THEY COMMUNICATED.  I DON'T KNOW IF THEY TALKED

03:24PM   3    ABOUT THERANOS.

03:24PM   4    Q.   HE'S ULTIMATELY THE GUY WHO SIGNED THE AGREEMENT; RIGHT?

03:24PM   5    A.   CORRECT.

03:24PM   6    Q.   HE'S THE GUY WHO AUTHORIZED THE WIRE; RIGHT?

03:24PM   7    A.   YES.  BUT HE WASN'T PART OF THE INVESTMENT COMMITTEE AND

03:24PM   8    HE'S NOT IN THE INVESTMENT GROUP.  HE CONTROLS THE CASH.

03:24PM   9         MR. WADE:  I MOVE THE ADMISSION OF THE DOCUMENT.

03:24PM  10         THE COURT:  WELL, THERE'S SOME OTHER INFORMATION ON

03:24PM  11    HERE -- THAT'S WHY I ALLOWED YOU TO PROBE.

03:24PM  12         MR. WADE:  I COULD REDACT -- I'D BE WILLING TO

03:24PM  13    REDACT EVERYTHING BUT THAT PARAGRAPH.

03:24PM  14         THE COURT:  OKAY.  I'LL ALLOW IT IN, JUST THAT

03:24PM  15    NUMBER 2 PARAGRAPH, AND I'M SURE YOUR TEAM CAN REDACT THAT.

03:24PM  16      (DEFENDANT'S EXHIBIT 14106, PARAGRAPH 2, REDACTED, WAS

03:25PM  17    RECEIVED IN EVIDENCE.)

03:25PM  18         MR. WADE:  YEAH.  CAN YOU GIVE ME ONE SECOND SO I

03:25PM  19    CAN LET MY COLLEAGUE WORK?

03:25PM  20         THE COURT:  OKAY.

03:25PM  21         MR. WADE:  OKAY.  LET ME KNOW WHEN YOU'RE READY,

03:25PM  22    MR. BENNETT.

03:25PM  23         THE COURT:  OKAY.  AND WHY DON'T YOU TAKE A LOOK AT

03:25PM  24    IT TO MAKE SURE THAT IT CONFORMS.  THAT WOULD PROBABLY BE A

03:25PM  25    GOOD IDEA.

03:25PM   1                    MR. WADE:  THANK YOU, YOUR HONOR.

03:25PM   2                    THE COURT:  FOLKS, WHY DON'T YOU STAND UP AND

03:25PM   3       STRETCH IF YOU WOULD LIKE.

03:25PM   4             (STRETCHING.)

03:25PM   5                    MR. WADE:  JUST TO MAKE SURE WE'RE ON THE SAME PAGE,

03:25PM   6       WE'RE GOING TO INCLUDE THE HEADER AND THAT PARAGRAPH.

03:25PM   7                    THE COURT:  RIGHT, UP TO SUBJECT AND NUMBER 2.

03:25PM   8                    MR. WADE:  RIGHT.  EVERYTHING ELSE WILL BE REDACTED.

03:25PM   9                    THE COURT:  GREAT.

03:26PM  10             WHILE THAT HAPPENING, CAN I JUST ASK A TIME ESTIMATE FOR

03:26PM  11       THIS WITNESS?  WILL WE CONCLUDE THIS WITNESS TODAY?

03:26PM  12                    MR. WADE:  PROBABLY NOT.

03:26PM  13                    THE COURT:  OKAY.

03:26PM  14                    MR. WADE:  WE HAVE ANOTHER 30 MINUTES?

03:26PM  15                    THE COURT:  THAT'S WHAT WE HAVE.  THAT'S WHAT I TOLD

03:26PM  16       THE JURY.

03:26PM  17                    MR. WADE:  I DON'T THINK SO.

03:26PM  18                    THE COURT:  OKAY.

03:26PM  19       BY MR. WADE:

03:26PM  20       Q.   OKAY.  DO YOU SEE THAT IN FRONT OF YOU ON THE SCREEN NOW?

03:26PM  21       A.   YES.

03:26PM  22       Q.   AND THIS IS -- 10-14, AGAIN, IS A COUPLE OF DAYS BEFORE

03:26PM  23       YOU, OR MAYBE THE DAY THAT YOU WERE HEADED OUT TO PALO ALTO;

03:26PM  24       CORRECT?

03:26PM  25       A.   YES.

PETERSON CROSS BY MR. WADE                                              4811

03:26PM  1      Q.   OKAY.  AND IN THIS EMAIL THEY TALK ABOUT JERRY, AND THAT'S

03:26PM  2      JERRY TUBERGEN; RIGHT?

03:27PM  3      A.   YES.

03:27PM  4      Q.   AND HE'S TRAVELLING OUT TO MEET WITH THE FOUNDER,

03:27PM  5      ELIZABETH HOLMES.

03:27PM  6           DO YOU SEE THAT?

03:27PM  7      A.   YES.

03:27PM  8      Q.   AND HE'S BEEN VERY BULLISH ON THIS POTENTIAL

03:27PM  9      RELATIONSHIP/INVESTMENT.

03:27PM  10          DO YOU SEE THAT?

03:27PM  11     A.   YES.

03:27PM  12     Q.   AND THE FAMILY WAS TRAVELLING WITH HIM AND THAT IT WAS

03:27PM  13     PROBABLY A $100 MILLION INVESTMENT; CORRECT?  THAT'S WHAT HE

03:27PM  14     SAYS THERE?

03:27PM  15     A.   YES.

03:27PM  16     Q.   OKAY.  AND THE INVESTMENT -- THE DECISION TO -- OR THE

03:27PM  17     COMMITMENT TO INVEST WAS MADE ACTUALLY IN THE ROOM AT THERANOS;

03:27PM  18     CORRECT?

03:27PM  19     A.   WE TALKED ABOUT SIZING, AND ALONG WITH WHAT SOME OF THE

03:27PM  20     OTHER INVESTORS WERE GOING TO INVEST AT, AND, YES, WE DISCUSSED

03:27PM  21     LOOKING AT IT, OR CONSIDERING THE 100 MILLION INSTEAD OF THE

03:28PM  22     50 MILLION.

03:28PM  23     Q.   WELL, ACTUALLY, THERE WAS AN ACTUAL COMMITMENT MADE BY

03:28PM  24     MR. TUBERGEN AND MR. DEVOS TO A $100 MILLION COMMITMENT IN THE

03:28PM  25     MEETING WITH THERANOS; CORRECT?

UNITED STATES COURT REPORTERS

**ER-8424**

PETERSON CROSS BY MR. WADE                                        4812

03:28PM   1    A.   THERE WASN'T A COMMITMENT, NO.  THAT'S NOT HOW IT WORKS.

03:28PM   2    IT HAS TO GO THROUGH OUR INVESTMENT COMMITTEE PROCESS.

03:28PM   3         THEY MAY HAVE SAID THAT THEY WOULD LOOK AT 100 MILLION OR

03:28PM   4    WERE WILLING TO DO 100 MILLION, BUT IT STILL HAD TO BE -- IT

03:28PM   5    STILL HAD TO GO THROUGH THE PROCESS.  THERE WERE A NUMBER OF

03:28PM   6    PEOPLE NOT THERE THAT WERE ON THE INVESTMENT COMMITTEE, AND

03:28PM   7    JERRY IS NOT ON OUR INVESTMENT COMMITTEE.

03:28PM   8    Q.   DO YOU RECALL PREVIOUSLY TESTIFYING THAT THE COMMITMENT

03:28PM   9    WAS MADE IN THE ROOM?

03:28PM   10   A.   I DON'T RECALL.

03:28PM   11   Q.   OKAY.  WE'LL GO THROUGH THAT IN A SECOND, BUT BEFORE I DO,

03:29PM   12   LET'S LOOK AT THE -- LET'S LOOK AT 204 -- I'M SORRY, 2097.

03:29PM   13        DO YOU SEE THAT IN FRONT OF YOU?

03:29PM   14   A.   YES.

03:29PM   15   Q.   OKAY.  AND THAT'S AN EMAIL BETWEEN YOU AND ONE OF YOUR

03:29PM   16   COLLEAGUES THAT DISCUSSES THE THERANOS INVESTMENT.

03:29PM   17        DO YOU SEE THAT?

03:29PM   18   A.   YEAH, SHE'S A COWORKER, FRIEND.

03:29PM   19   Q.   OKAY.

03:29PM   20        MOVE THE ADMISSION OF 2097.

03:29PM   21             MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:30PM   22             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:30PM   23        (GOVERNMENT'S EXHIBIT 2097 WAS RECEIVED IN EVIDENCE.)

03:30PM   24   BY MR. WADE:

03:30PM   25   Q.   LET ME BLOW UP THE MIDDLE EMAIL.

PETERSON CROSS BY MR. WADE                                          4813

```
03:30PM   1        THIS IS AN EMAIL THAT YOU WROTE ON OCTOBER 20TH, 2014;

03:30PM   2   RIGHT?

03:30PM   3   A.   YES.

03:30PM   4   Q.   THAT'S LESS THAN A WEEK AFTER THE DATE OF THE MEETING;

03:30PM   5   CORRECT?

03:30PM   6   A.   YES.

03:30PM   7   Q.   AND DO YOU SEE DOWN BELOW WHERE IT SAYS, "JERRY COMMITTED

03:30PM   8   ON THE SPOT $100 MILLION WITH DOUG AND CHERI IN COMPLETE

03:30PM   9   AGREEMENT"?

03:30PM  10        DO YOU SEE THAT?

03:30PM  11   A.   YES.

03:30PM  12   Q.   AND WAS THAT TRUE AT THE TIME?

03:30PM  13   A.   IT DOESN'T WORK THAT WAY.  I THINK THAT HE HAD SIGNALLED

03:30PM  14   AND DOUG AND CHERI WERE IN AGREEMENT TO DO THE 100 AND WE

03:30PM  15   TALKED ABOUT THE 100 AFTERWARD.  BUT IT STILL HAS TO GO THROUGH

03:30PM  16   THE PROCESS OF GOING THROUGH INVESTMENT COMMITTEE.

03:30PM  17        THAT'S JUST MY CHARACTERIZATION TO A FRIEND AND A

03:30PM  18   COWORKER.

03:30PM  19   Q.   OKAY.  SO YOU DON'T RECALL THEM COMMITTING IN THE ROOM TO

03:31PM  20   THE $100 MILLION INVESTMENT?

03:31PM  21   A.   WE TALKED ABOUT IT.  I DON'T -- THERE'S, THERE'S NOT A

03:31PM  22   COMMITMENT BECAUSE IT HAS TO GO THROUGH INVESTMENT COMMITTEE.

03:31PM  23   Q.   LET ME JUST ASK IF THE LANGUAGE -- IF THAT IS AN ACCURATE

03:31PM  24   STATEMENT AT THE TIME THAT YOU MADE IT.

03:31PM  25   A.   IT WAS MY CHARACTERIZATION OF WHAT I SAW GOING ON, YES.
```

PETERSON CROSS BY MR. WADE                                    4814

03:31PM  1    Q.   AND LET ME GO TO 2098.

03:31PM  2    A.   YES.

03:31PM  3    Q.   OKAY.  THIS IS AN EMAIL RELATING TO THE THERANOS

03:31PM  4    INVESTMENT THAT YOU ARE ON; CORRECT?

03:31PM  5    A.   IT'S -- WHICH PART ARE YOU ON?  IT'S A FEW PAGES LONG.

03:31PM  6    Q.   THE BOTTOM PART OF THE EMAIL IS AN EMAIL BETWEEN

03:31PM  7    MR. TUBERGEN, MS. HOLMES, MR. BALWANI, AND MR. DEVOS, CORRECT,

03:32PM  8    THE LATER PART OF THE EMAIL?  AND THEN IT'S FORWARDED TO YOU;

03:32PM  9    CORRECT?

03:32PM 10    A.   YES.

03:32PM 11          MR. WADE:  I MOVE THE ADMISSION OF 2098.

03:32PM 12          MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:32PM 13          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:32PM 14       (GOVERNMENT'S EXHIBIT 2098 WAS RECEIVED IN EVIDENCE.)

03:32PM 15          MR. WADE:  IF WE CAN GO TO THE SECOND PAGE AND BLOW

03:32PM 16    UP THE BOTTOM EMAIL.  I'M SORRY.  ACTUALLY, LET'S GO TO THE

03:32PM 17    THIRD PAGE AND GET MR. TUBERGEN'S EMAIL.

03:32PM 18    Q.   DO YOU SEE THIS IS AN EMAIL FROM MR. TUBERGEN?

03:33PM 19    A.   YES.

03:33PM 20    Q.   TO MS. HOLMES AND MR. BALWANI COPYING DOUG DEVOS?

03:33PM 21       DO YOU SEE THAT?

03:33PM 22    A.   YES.

03:33PM 23    Q.   OKAY.  AND DO YOU SEE IN THE MIDDLE PARAGRAPH WHERE IT

03:33PM 24    SAYS, "WE WOULD LOVE TO MOVE FORWARD AND BE A PART OF THE NEW

03:33PM 25    SHAREHOLDER BASE YOU ARE ASSEMBLING.  AS WE DISCUSSED, AN

PETERSON CROSS BY MR. WADE                                            4815

03:33PM   1   INVESTMENT OF $100 MILLION SEEMS TO FIT, IF THAT WORKS FOR YOU

03:33PM   2   AND THE COMPANY."  RIGHT?

03:33PM   3   A.   YES, THAT'S PRETTY MUCH HOW IT WAS DISCUSSED IN THE

03:33PM   4   MEETING.

03:33PM   5   Q.   RIGHT.  AND THAT'S FOUR DAYS AFTER THE MEETING THEY'RE

03:33PM   6   SAYING THEY MADE THE COMMITMENT; CORRECT?

03:33PM   7   A.   IT DOESN'T NECESSARILY SAY THEY MADE THE COMMITMENT, BUT

03:33PM   8   YES.

03:33PM   9   Q.   ALL RIGHT.  LET'S GO FORWARD AND LOOK AT MS. HOLMES'S

03:33PM  10   EMAIL.

03:33PM  11        DO YOU SEE THAT?  AND SHE SAYS, "WE HAVE RESERVED THE

03:33PM  12   $100 MILLION ALLOCATION FOR YOU AND THE FAMILY."

03:34PM  13        DO YOU SEE THAT?

03:34PM  14   A.   YES.

03:34PM  15   Q.   AND THEN THIS IS LATER FORWARDED TO YOU SO THAT SUNNY CAN

03:34PM  16   BE IN TOUCH ON THE DOCUMENTATION; RIGHT?

03:34PM  17   A.   YES.

03:34PM  18   Q.   OKAY.  LET'S GO TO 12856.

03:34PM  19        DO YOU SEE THAT?

03:34PM  20   A.   WHERE?  I'M SORRY?

03:34PM  21   Q.   DO YOU HAVE 12856 IN FRONT OF YOU, THAT EMAIL?

03:34PM  22   A.   THERE'S NOTHING ON MY SCREEN.  IS THERE SUPPOSED TO BE?

03:35PM  23   Q.   NO, NOT YET.

03:35PM  24   A.   OKAY.

03:35PM  25   Q.   I'M SORRY.  THE WAY IT WORKS IS THAT ONCE WE INTRODUCE IT,

PETERSON CROSS BY MR. WADE                                              4816

03:35PM   1   WE CAN PUT IT UP ON THE SCREEN.  BUT UNTIL IT IS IN EVIDENCE,

03:35PM   2   WE CAN'T PUT IT UP ON THE SCREEN.

03:35PM   3       MY APOLOGIES.

03:35PM   4   A.  I DON'T -- I'M NOT SEEING 12856.  I'M SORRY.

03:35PM   5   Q.  YOU DON'T HAVE THAT IN THE BLACK BINDER?

03:35PM   6   A.  WHERE AM I LOOKING?

03:35PM   7   Q.  DO YOU SEE A TAB WITH 12856?

03:35PM   8   A.  I THOUGHT WE WERE STILL ON THAT SERIES OF EMAILS.  I'M

03:35PM   9   SORRY.

03:35PM  10   Q.  NO.

03:35PM  11   A.  12 --

03:35PM  12   Q.  I'M SORRY IF I --

03:35PM  13           MR. LEACH:  YOUR HONOR, I HAVE NO OBJECTION TO THIS

03:35PM  14   EXHIBIT IF YOU WANT TO JUST DISPLAY IT.

03:35PM  15           MR. WADE:  OKAY.

03:35PM  16           THE COURT:  DO YOU WANT TO INTRODUCE IT?

03:35PM  17           MR. WADE:  YES, PLEASE.

03:35PM  18           THE COURT:  ALL RIGHT.  IT'S ADMITTED, AND IT MAY BE

03:35PM  19   PUBLISHED.

03:35PM  20       (DEFENDANT'S EXHIBIT 12856 WAS RECEIVED IN EVIDENCE.)

03:35PM  21           MR. WADE:  IF WE CAN BLOW UP THE THIRD EMAIL DOWN.

03:35PM  22   YEAH, THE --

03:36PM  23   Q.  DO YOU SEE THAT THIS IS THAT EMAIL THAT WE WERE JUST

03:36PM  24   TALKING ABOUT WHERE MS. HOLMES RESPONDED IN THE SEPARATE CHAIN

03:36PM  25   THAT WAS FORWARDED TO YOU?

PETERSON CROSS BY MR. WADE                                          4817

03:36PM   1    A.   YES, YES.

03:36PM   2    Q.   OKAY.  NOW, LET'S JUST GO UP THE CHAIN AND LOOK AT THE

03:36PM   3    NEXT EMAIL.

03:36PM   4         MR. TUBERGEN SAYS, "THANKS VERY MUCH."

03:36PM   5         AND THEN WE'LL KEEP WORKING UP.

03:36PM   6         THIS IS FOR -- HE THEN FORWARDS IT TO DOUG DEVOS?

03:36PM   7    A.   YES.

03:36PM   8    Q.   AND THERE'S A SEPARATE COMMUNICATION BETWEEN MR. DEVOS AND

03:36PM   9    MR. TUBERGEN.

03:36PM  10         DO YOU SEE THAT?

03:36PM  11    A.   YES.

03:36PM  12    Q.   AND HE SAYS, "WELL DONE, IT LOOKS LIKE WE'RE THERE."

03:36PM  13         DO YOU SEE THAT?

03:36PM  14    A.   YES.

03:36PM  15    Q.   "EXCITING TO BE A PART OF THIS TREMENDOUS EFFORT TO CHANGE

03:36PM  16    THE WORLD FOR THE BETTER."

03:36PM  17         DO YOU SEE THAT?

03:36PM  18    A.   YES.

03:36PM  19    Q.   THE LAST LANGUAGE WE REFLECTED WAS THE FORWARD LONG-TERM

03:36PM  20    FOCUS THAT THE DEVOS FAMILY HAD; CORRECT?

03:36PM  21    A.   YES.

03:36PM  22    Q.   OKAY.  LET'S LOOK UP THE CHAIN.

03:37PM  23         MR. TUBERGEN CONFIRMS, "THANKS, DOUG.  YUP, WE'RE THERE."

03:37PM  24         RIGHT?  DO YOU SEE THAT?

03:37PM  25    A.   YES.

PETERSON CROSS BY MR. WADE                                    4818

03:37PM   1    Q.   THE -- YOU'VE TALKED A LITTLE BIT ABOUT THE MEMO THAT YOU

03:37PM   2    PREPARED.

03:37PM   3         DO YOU RECALL THAT?

03:37PM   4    A.   YES.   THE MEMO SUMMARIZED WHAT WAS DISCUSSED AT THE

03:37PM   5    MEETING --

03:37PM   6    Q.   RIGHT.

03:37PM   7    A.   -- ALONG WITH EVERYTHING ELSE.

03:37PM   8    Q.   I UNDERSTAND.   BUT THE INVESTMENT DECISION WAS PREPARED

03:37PM   9    BEFORE THE MEMO --

03:37PM   10             THE COURT:   LET HIM FINISH.

03:37PM   11   BY MR. WADE:

03:37PM   12   Q.   I APOLOGIZE.   NORMALLY WE HAVE CONVERSATIONS, BUT WE HAVE

03:37PM   13   TO LET ME FINISH, AND THEN I'LL TRY NOT TO INTERRUPT YOU, TOO.

03:37PM   14   I THINK I'VE DONE THAT A FEW TIMES.   I'M SORRY.

03:37PM   15   A.   OKAY.

03:37PM   16   Q.   THE INVESTMENT DECISION WAS MADE BEFORE THE MEMO WAS

03:38PM   17   PREPARED; CORRECT?

03:38PM   18   A.   IT STILL HAS TO GO TO INVESTMENT COMMITTEE, SO IN MY -- IN

03:38PM   19   MY FINISHING OF THIS, THE ONLY WAY THAT WE CAN FINALIZE

03:38PM   20   EVERYTHING IS IT HAS TO -- THE MEMO HAS TO GO OUT AND BE SIGNED

03:38PM   21   AND APPROVED THROUGH THE INVESTMENT COMMITTEE, BUT JERRY AND

03:38PM   22   DOUG WERE EMAILING THAT THEY WERE THERE.   SO YES.

03:38PM   23   Q.   SO THE -- AGAIN, I UNDERSTAND THAT YOU HAD SOME -- ON YOUR

03:38PM   24   END, YOU HAD SOME PROCESSING THAT YOU NEEDING TO PERFORM --

03:38PM   25   A.   CORRECT.

PETERSON CROSS BY MR. WADE                                      4819

```
03:38PM   1    Q.   -- AND SOME LOGISTICAL ISSUES, BUT THE INVESTMENT WAS DONE

03:38PM   2    BEFORE THE MEMO WAS PREPARED; CORRECT?

03:38PM   3    A.   HMM -- THEY STILL -- WE STILL DIDN'T WIRE THE MONEY UNTIL

03:38PM   4    AFTER OUR PROCESS WAS COMPLETED.

03:38PM   5    Q.   BUT YOU SEE HERE THE COMMITMENT IS MADE; RIGHT?

03:38PM   6    A.   IT'S NOT REALLY A COMMITMENT UNTIL YOU SEND THE DOCUMENTS.

03:38PM   7    Q.   OKAY.  LET'S KEEP GOING.  2139.

03:39PM   8         DO YOU HAVE THAT DOCUMENT IN FRONT OF YOU?

03:39PM   9    A.   YES.

03:39PM  10    Q.   AND THIS IS A COMMUNICATION --

03:39PM  11         MOVE THE ADMISSION OF 2139.

03:39PM  12             MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:39PM  13             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:39PM  14    (GOVERNMENT'S EXHIBIT 2139 WAS RECEIVED IN EVIDENCE.)

03:39PM  15    BY MR. WADE:

03:39PM  16    Q.   THIS IS A COMMUNICATION BETWEEN YOU AND MR. BALWANI WHERE

03:39PM  17    YOU'RE WORKING TO PAPER THE DEAL AND GET SIGNATURES AND THE

03:39PM  18    LIKE; RIGHT?

03:39PM  19    A.   CORRECT.

03:39PM  20    Q.   OKAY.  AND THEN DO YOU RECALL THERE BEING WORD THAT THEY

03:39PM  21    WANTED TO FUND IT PRETTY QUICKLY AND IT WAS FUNDED WITHIN A

03:39PM  22    COUPLE OF DAYS AFTER THAT?

03:39PM  23    A.   AFTER THIS MEMO, OR AFTER WHAT?

03:39PM  24    Q.   AFTER THIS EMAIL.

03:39PM  25    A.   YES.
```

PETERSON CROSS BY MR. WADE                                              4820

03:39PM   1    Q.   OKAY.  AND IF WE GO TO 14080.

03:40PM   2    A.   14080.  OKAY.  OKAY.

03:40PM   3    Q.   THIS IS A DOCUMENT CONFIRMING RECEIPT OF THE SIGNATURE

03:40PM   4    PAGE ON OCTOBER 31ST; CORRECT?

03:41PM   5    A.   CORRECT.

03:41PM   6         MR. WADE:  MOVE THE ADMISSION OF 14080.

03:41PM   7         MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:41PM   8         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:41PM   9    (DEFENDANT'S EXHIBIT 14080 WAS RECEIVED IN EVIDENCE.)

03:41PM  10    BY MR. WADE:

03:41PM  11    Q.   I JUST WANT TO FOCUS ON THE DATE.  THAT'S 10-31; CORRECT?

03:41PM  12    A.   CORRECT.

03:41PM  13    Q.   EXECUTED DOCUMENTS?

03:41PM  14    A.   YES.

03:41PM  15    Q.   OKAY.  NOW LET'S GO TO 13987.

03:41PM  16    A.   YES.

03:41PM  17    Q.   OKAY.  AND DO YOU SEE THIS IS AN EMAIL ABOUT THE THERANOS

03:42PM  18    INVESTMENT THAT YOU'RE ON?

03:42PM  19    A.   YES.

03:42PM  20         MR. WADE:  I MOVE THE ADMISSION OF 13987.

03:42PM  21         MR. LEACH:  NO OBJECTION.

03:42PM  22         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:42PM  23    (DEFENDANT'S EXHIBIT 13987 WAS RECEIVED IN EVIDENCE.)

03:42PM  24    BY MR. WADE:

03:42PM  25    Q.   AND IF YOU LOOK AT THE BOTTOM, YOU SEE THERE'S AN EMAIL

PETERSON CROSS BY MR. WADE                                              4821

03:42PM  1    FROM YOU TO A GROUP OF PEOPLE WITHIN RDV?

03:42PM  2    A.   YES.

03:42PM  3    Q.   DO YOU SEE THAT?

03:42PM  4         ARE THOSE SORT OF ACCOUNTING AND FINANCIAL PEOPLE?

03:42PM  5    A.   YES, INTERNAL.

03:42PM  6    Q.   OKAY.  AND THERE IT SAYS, "JERRY WANTS TO BRING THERANOS

03:42PM  7    TO IC.  NOT SURE WHEN THAT WILL BE, NOR IS IT RELEVANT GIVEN

03:42PM  8    WE'VE FUNDED, BUT FYI I WON'T HAVE A SIGNATURE ON APPROVAL DOC

03:42PM  9    FOR A BIT."

03:42PM  10        DO YOU SEE THAT?

03:42PM  11   A.   YES.

03:42PM  12   Q.   OKAY.  AND THIS IS FIVE OR SIX DAYS AFTER THE MONEY WAS

03:42PM  13   WIRED AND THE DOCUMENTS WERE SIGNED; RIGHT?

03:42PM  14   A.   CORRECT.

03:42PM  15   Q.   OKAY.

03:43PM  16   A.   BUT THE MEMO HAD GONE OUT ON THE 23RD OF OCTOBER.

03:43PM  17   Q.   RIGHT.

03:43PM  18        DO YOU KNOW WHEN IT WAS SIGNED?  IT WASN'T SIGNED AS OF

03:43PM  19   NOVEMBER 5TH; RIGHT?

03:43PM  20   A.   CORRECT.

03:43PM  21   Q.   AND DO YOU KNOW WHEN THE INVESTMENT COMMITTEE GOT IT?

03:43PM  22   A.   ON THE 20 -- IT WAS DONE ON THE 23RD AND SENT TO JERRY.

03:43PM  23   Q.   RIGHT.  DO YOU KNOW WHEN THE INVESTMENT COMMITTEE GOT IT?

03:43PM  24   A.   I BELIEVE THEY GOT IT THEN.  I DON'T KNOW EXACTLY.

03:43PM  25   Q.   OKAY.  DO YOU KNOW WHEN THE NEXT INVESTMENT COMMITTEE

PETERSON CROSS BY MR. WADE                                              4822

03:43PM   1    MEETING WAS?

03:43PM   2    A.   IN DECEMBER.

03:43PM   3    Q.   OKAY.  LET'S LOOK AT 14081.  IT WAS DECEMBER 17TH;

03:43PM   4    CORRECT?

03:43PM   5    A.   YES.

03:43PM   6    Q.   AND THESE ARE THE DEVOS FAMILY COUNCIL MINUTES; CORRECT?

03:43PM   7    A.   YES.

03:43PM   8         MR. WADE:  AND I'D MOVE THE ADMISSION.  I THINK

03:43PM   9    THEY'RE APPROPRIATELY REDACTED ALREADY, YOUR HONOR.

03:44PM  10         MAYBE WE CAN REDACT THE -- AFTER PETER EVANS NAMES.

03:44PM  11         THE COURT:  ON THE FRONT PAGE?

03:44PM  12         MR. WADE:  YES, IF THAT --

03:44PM  13         THE COURT:  MR. LEACH?

03:44PM  14         MR. LEACH:  I DON'T OBJECT TO THE EXHIBIT,

03:44PM  15    YOUR HONOR.  THE REDACTIONS SOUND APPROPRIATE.

03:44PM  16         THE COURT:  WITH THOSE REDACTIONS, THEN IT WILL BE

03:44PM  17    ADMITTED.

03:44PM  18         MR. LEACH, YOU HAVE NO OBJECTION?

03:44PM  19         MR. LEACH:  NO OBJECTION.

03:44PM  20         THE COURT:  ALL RIGHT.

03:44PM  21         (DEFENDANT'S EXHIBIT 14081 WAS RECEIVED IN EVIDENCE.)

03:44PM  22         MS. TREFZ:  MR. WADE, CAN YOU JUST COME AND SEE?

03:45PM  23    SORRY.

03:45PM  24    BY MR. WADE:

03:45PM  25    Q.   OKAY.  THIS IS THE DEVOS -- THESE ARE MINUTES OF THE DEVOS

PETERSON CROSS BY MR. WADE                                             4823

03:45PM   1    FAMILY COUNCIL MEETING; CORRECT?

03:45PM   2    A.    YES.

03:45PM   3    Q.    AND THAT'S WHERE THEY ACT ON A VARIETY OF CORPORATE

03:45PM   4    MATTERS; CORRECT?

03:45PM   5    A.    YES.  THIS ISN'T THE INVESTMENT COMMITTEE.

03:45PM   6    Q.    RIGHT, I UNDERSTAND.

03:45PM   7         BUT FOR THE FAMILY OFFICE, THEY -- THEY'LL ACT OFTEN AT

03:45PM   8    THESE MEETINGS; CORRECT?

03:45PM   9    A.    THEY WHAT?

03:45PM  10    Q.    THEY'LL ACT OFTEN AT THESE MEETINGS; IS THAT RIGHT?

03:45PM  11    A.    ACT OFTEN?  I'M NOT SURE I'M FOLLOWING.

03:45PM  12    Q.    OKAY.  LET ME TRY AGAIN.  LIKE A CORPORATION SOMETIMES

03:45PM  13    ACTS THROUGH ITS BOARD OF DIRECTORS, THE DEVOS FAMILY WILL TAKE

03:45PM  14    CORPORATE ACTIONS AT MEETINGS OF THIS KIND; IS THAT RIGHT?

03:45PM  15    A.    FAMILY COUNCIL IS DIFFERENT THAN INVESTMENT COMMITTEE.

03:46PM  16         OFTENTIMES THERE WILL BE AN UPDATE ON THINGS, BUT IT'S NOT

03:46PM  17    A FORMAL INVESTMENT COMMITTEE MEETING.

03:46PM  18    Q.    OKAY.  SO DO YOU -- I'M SORRY.  I DIDN'T MEAN TO

03:46PM  19    INTERRUPT.

03:46PM  20    A.    THOSE, THOSE CAN OFTEN BE DONE VIA TELEPHONE, AND WE DO

03:46PM  21    HAVE TWO OR THREE A YEAR, FORMAL ONES.

03:46PM  22    Q.    OKAY.  AS YOU SIT HERE TODAY, DO YOU KNOW THE DATE ON

03:46PM  23    WHICH THE INVESTMENT COMMITTEE ACTED, OR IF THEY ACTED?

03:46PM  24    A.    IT WAS MY UNDERSTANDING THAT THERE WAS A PHONE CALL OR

03:46PM  25    DISCUSSION RIGHT AFTER -- BETWEEN THE 23RD AND THE 30TH, 31ST

PETERSON CROSS BY MR. WADE                                                    4824

03:46PM   1    WHEN WE WIRED THE MONEY, THAT ALL WAS GREEN LIGHTED TO GO.

03:46PM   2    Q.   AND HAVE YOU SEEN ANY DOCUMENTS TO THAT EFFECT?

03:46PM   3    A.   IT'S JUST JERRY TELLING ME.

03:46PM   4    Q.   OKAY.  JERRY TOLD YOU THAT?

03:46PM   5    A.   YES.

03:46PM   6    Q.   OKAY.  WERE YOU PRESENT FOR THE MEETING?

03:46PM   7    A.   NO.

03:47PM   8    Q.   OKAY.  IF I CAN PULL UP 13987, AND BRING UP THAT BOTTOM

03:47PM   9    EMAIL AGAIN.

03:47PM   10        IF YOUR RECOLLECTION IS RIGHT, WHY IS IT THAT THE DOCUMENT

03:47PM   11   WASN'T SIGNED ON NOVEMBER 5TH, 2014?

03:47PM   12   A.   I DON'T KNOW IF HE JUST HADN'T SIGNED IT YET.

03:47PM   13        BUT THERE HAD TO HAVE BEEN A DISCUSSION AROUND IT WITH THE

03:47PM   14   OTHER MEMBERS OF THE INVESTMENT COMMITTEE.  IT COULD HAVE

03:47PM   15   HAPPENED ON THE PLANE AS WELL.  I DON'T KNOW HOW MANY PEOPLE

03:47PM   16   HAD TO -- ON THE WAY HOME.  I DON'T KNOW HOW MANY HAD TO OKAY

03:47PM   17   THE INVESTMENT --

03:47PM   18   Q.   OKAY.

03:47PM   19   A.   -- AS PART OF THE INVESTMENT COMMITTEE.

03:48PM   20        (PAUSE IN PROCEEDINGS.)

03:48PM   21   BY MR. WADE:

03:48PM   22   Q.   AFTER YOUR INTERACTIONS IN THE MEETING WITH MS. HOLMES,

03:49PM   23   WERE YOUR NEXT INTERACTIONS WITH PEOPLE FROM THERANOS THE

03:49PM   24   INTERACTIONS WITH MR. BALWANI?

03:49PM   25   A.   THROUGH THE EMAILS AND A CONVERSATION ON THE TELEPHONE?

PETERSON CROSS BY MR. WADE                                        4825

03:49PM  1    Q.   YES.

03:49PM  2    A.   YES.

03:49PM  3    Q.   AND WERE THOSE THE LAST COMMUNICATIONS THAT YOU HAD IN

03:49PM  4    2014 AND '15?

03:49PM  5    A.   YES.

03:49PM  6    Q.   OKAY.  AND COMMUNICATIONS THAT HAPPENED THEREAFTER WERE

03:49PM  7    COMMUNICATIONS THAT HAPPENED AFTER "THE WALL STREET JOURNAL"?

03:49PM  8    A.   CORRECT.

03:49PM  9    Q.   OKAY.  AND YOU TESTIFIED ON DIRECT THAT -- OR YOU WERE

03:50PM  10   SHOWN THE JIM CRAMER CLIP.

03:50PM  11        DO YOU RECALL THAT?

03:50PM  12   A.   YES.

03:50PM  13   Q.   AND WERE YOU SHOWN -- DID YOU WATCH THAT AT THE TIME?

03:50PM  14   A.   YES.

03:50PM  15   Q.   OKAY.  DO YOU RECALL OTHER -- YOU HAD OTHER INTERACTIONS

03:50PM  16   WITH MS. HOLMES IN THE PERIOD FOLLOWING THAT CLIP?  YOU TALKED

03:50PM  17   ABOUT SOME OF THEM.

03:50PM  18        DO YOU RECALL THAT?

03:50PM  19   A.   I DON'T RECALL THE EXACT DATE OF THAT CLIP.  THE NEXT TIME

03:50PM  20   THAT WE SAW ELIZABETH WAS APRIL -- LATE APRIL OF 2016.

03:50PM  21   Q.   AND THAT WAS THE MEETING THAT -- THAT WAS THE MEETING THAT

03:51PM  22   MR. LEACH ASKED YOU ABOUT?

03:51PM  23   A.   YES.

03:51PM  24   Q.   OKAY.  AND THAT WAS ATTENDED BY, I THINK YOU SAID,

03:51PM  25   MR. MOSLEY, MR. TUBERGEN, AND SOME OTHERS AT THERANOS?

PETERSON CROSS BY MR. WADE                                                4826

03:51PM    1              DO YOU RECALL THAT?

03:51PM    2     A.   MYSELF AND LEGAL COUNSEL, HEATHER KING, AND DAN EDLIN, AND

03:51PM    3     ELIZABETH.

03:51PM    4     Q.   OKAY.   AND DO YOU RECALL THAT THEY GAVE YOU AN UPDATE ON

03:51PM    5     THE REGULATORY ISSUES AT THAT MEETING?

03:51PM    6     A.   YES.

03:51PM    7     Q.   AND THEY GAVE YOU AN UPDATE ON SOME CHANGES THAT WERE

03:51PM    8     BEING MADE WITHIN MANAGEMENT?

03:51PM    9              DO YOU RECALL THAT?

03:51PM   10     A.   YES.

03:51PM   11     Q.   AND THEY GAVE YOU AN UPDATE ABOUT CHANGES THAT WERE MADE

03:51PM   12     IN THE BOARD?

03:51PM   13     A.   YES.

03:51PM   14     Q.   AND SET FORTH WHAT THEY THOUGHT WAS THEIR STRATEGY GOING

03:51PM   15     FORWARD TO TRY TO REGAIN CREDIBILITY IN THE MARKETPLACE?

03:52PM   16              DO YOU RECALL THAT?

03:52PM   17     A.   YES.

03:52PM   18     Q.   AND ONE OF THOSE WAS TO TRY TO FOCUS ON, TRY TO WORK TO

03:52PM   19     GET SOME PEER REVIEW PUBLICATIONS.

03:52PM   20              DO YOU RECALL THAT?

03:52PM   21     A.   RIGHT.

03:52PM   22     Q.   AND THERE WAS ALSO A PLAN TO FORM SOME COMMITTEES TO GIVE

03:52PM   23     SCIENTIFIC AND TECHNICAL ADVICE TO THE COMPANY?

03:52PM   24              DO YOU RECALL THAT?

03:52PM   25     A.   YES.

PETERSON CROSS BY MR. WADE                                          4827

03:52PM   1    Q.   AND THEY ALSO GAVE YOU A REPORT ON THE FINANCIAL STATE OF

03:52PM   2    THE COMPANY AT THAT TIME?

03:52PM   3    A.   NO.

03:52PM   4    Q.   YOU DON'T BELIEVE THEY DID?

03:52PM   5    A.   THEY DIDN'T GIVE US ANY PAPER AT THAT MEETING.

03:52PM   6    Q.   DID YOU --

03:52PM   7    A.   WE DIDN'T LEAVE WITH ANYTHING.  THERE MIGHT HAVE BEEN SOME

03:52PM   8    VERBAL AROUND WHERE THE CASH WAS OF THE COMPANY, BUT I DON'T

03:52PM   9    RECALL SPECIFICALLY.

03:52PM   10   Q.   OKAY.  DO YOU RECALL THAT THERE WAS DISCUSSION ABOUT HOW

03:52PM   11   THEY HAD ABOUT $375 MILLION IN CASH AT THAT TIME?

03:53PM   12   A.   I DON'T RECALL THE EXACT NUMBERS.

03:53PM   13   Q.   OKAY.

03:53PM   14   A.   YES, WE WERE TALKING ABOUT THE CASH POSITION OF THE

03:53PM   15   COMPANY.

03:53PM   16   Q.   AND --

03:53PM   17   A.   BUT THERE WERE NO FINANCIALS SHOWN.

03:53PM   18   Q.   UNDERSTOOD.  AND DID THEY TELL YOU THAT THEY WERE ACTUALLY

03:53PM   19   IN THE PROCESS OF TRYING TO IMPROVE THE FINANCIALS OF THE

03:53PM   20   COMPANY IN THAT TIME?

03:53PM   21   A.   I DON'T RECALL THAT PART OF THE CONVERSATION.

03:53PM   22   Q.   DO YOU RECALL THAT THEY WERE BRINGING IN NEW PEOPLE INTO

03:53PM   23   THE FINANCIAL OPERATIONS TO TRY TO IMPROVE THE ACCOUNTING

03:53PM   24   FUNCTION?

03:53PM   25   A.   I RECALL WE SENT AHEAD A LIST OF QUESTIONS THAT WE HAD,

PETERSON CROSS BY MR. WADE                                            4828

03:53PM  1    AND A LOT OF IT WAS AROUND THE FINANCIALS AND EVERYTHING, AND

03:53PM  2    WE DIDN'T RECEIVE ANY HARD CORE -- ANYTHING TO TAKE BACK WITH

03:53PM  3    US.  THAT IS WHAT I REMEMBER.

03:53PM  4    Q.   OKAY.  DO YOU REMEMBER THAT, AS PART OF THAT, THE COMPANY

03:53PM  5    TOLD YOU THAT THEY -- PART OF THEIR STRATEGY FOR MOVING FORWARD

03:53PM  6    WAS TO INCREASE ENGAGEMENT WITH THE SCIENTIFIC COMMUNITY?

03:54PM  7         DO YOU RECALL THAT?

03:54PM  8    A.   YES.

03:54PM  9    Q.   AND TO BE MORE TRANSPARENT?

03:54PM  10   A.   YES.

03:54PM  11   Q.   OKAY.  AND THAT THEY WERE WORKING, THAT THEY HAD PLANNED

03:54PM  12   TO GIVE A PRESENTATION ABOUT THE TECHNOLOGY, THEIR TECHNOLOGY

03:54PM  13   AT THE AACC --

03:54PM  14   A.   YES.

03:54PM  15   Q.   -- MEETING?

03:54PM  16        DO YOU RECALL BEING TOLD THAT IN THAT APRIL MEETING?

03:54PM  17   A.   YES.  BUT WE WERE ALSO TOLD IN THAT MEETING -- MUCH OF

03:54PM  18   WHAT YOU HEARD IN THE TWO CLIPS THAT WERE SHOWN IS THE SAME

03:54PM  19   THING THAT SHE WAS SAYING IN THAT MEETING, THAT A LOT OF IT WAS

03:54PM  20   ERRONEOUS AND UNFOUNDED AND DONE BY A VERY OVERZEALOUS REPORTER

03:54PM  21   WHO WANTED TO WIN A PULITZER.

03:54PM  22        THERE WAS A LOT OF CONVERSATION AROUND WE WERE TRYING TO

03:54PM  23   UNDERSTAND WHAT WAS GOING ON IN THE NEWSPAPER AND TRYING TO GET

03:54PM  24   HER TO EXPLAIN A LOT OF IS IT TRUE OR IS IT NOT TRUE?

03:55PM  25        AND SHE DOWNPLAYED A LOT OF IT.

PETERSON CROSS BY MR. WADE                                          4829

03:55PM   1         AND THAT WAS MUCH OF THE CONVERSATION, MUCH MORE SO AROUND

03:55PM   2    THAT NOT BEING BASED ON FACT OF WHAT WAS BEING WRITTEN IN THE

03:55PM   3    NEWSPAPER THAN THE CHANGING OF THE PEOPLE.

03:55PM   4              MR. WADE:  YOUR HONOR, I WOULD MOVE TO STRIKE

03:55PM   5    EVERYTHING AFTER THE IMMEDIATE ANSWER TO MY QUESTION.

03:55PM   6         (PAUSE IN PROCEEDINGS.)

03:55PM   7              THE COURT:  ALL RIGHT.  I'LL STRIKE -- EVERYTHING

03:55PM   8    AFTER "YES" IS STRICKEN AS NONRESPONSIVE.

03:55PM   9    BY MR. WADE:

03:55PM   10   Q.   AND ONE OF THE THINGS THAT YOU CAME AWAY FROM THAT MEETING

03:55PM   11   WAS A REQUEST TO GET -- YOU WANTED TO GET AN INVITE TO THE AACC

03:55PM   12   PRESENTATION?

03:55PM   13   A.   YES.

03:55PM   14   Q.   AND DID YOU GET SUCH AN INVITE?

03:56PM   15   A.   YES.

03:56PM   16   Q.   AND DID YOU GO TO THE PRESENTATION?

03:56PM   17   A.   YES.

03:56PM   18   Q.   AND THE AACC IS A PROFESSIONAL ORGANIZATION OF PEOPLE WHO

03:56PM   19   WORK IN CLINICAL CHEMISTRY?

03:56PM   20   A.   YES.

03:56PM   21   Q.   AND THERE WERE APPROXIMATELY 2500 PEOPLE AT THAT

03:56PM   22   CONFERENCE?

03:56PM   23   A.   YES.

03:56PM   24   Q.   DO YOU RECALL THAT?

03:56PM   25   A.   YES.

PETERSON CROSS BY MR. WADE                                              4830

03:56PM   1      Q.   AND IT WAS A PRETTY HOSTILE ENVIRONMENT; RIGHT?

03:56PM   2      A.   YES.

03:56PM   3      Q.   AND THEY WERE VERY SKEPTICAL OF THERANOS GOING IN; RIGHT?

03:56PM   4      A.   YES.  THAT WAS MY VIEW OF THINGS, YES.

03:56PM   5      Q.   BUT THERANOS WENT IN AND GAVE -- A NUMBER OF PEOPLE GAVE A

03:56PM   6      PRESENTATION AND PARTICIPATED IN THE Q AND A WITH RESPECT TO

03:56PM   7      THEIR TECHNOLOGY; CORRECT?

03:56PM   8      A.   A NUMBER OF -- I'M SORRY, SAY AGAIN.

03:56PM   9      Q.   LET ME TAKE IT IN TWO STEPS.

03:56PM  10           DO YOU RECALL THAT THERE WERE SEVERAL PEOPLE FROM THERANOS

03:57PM  11      AT THAT MEETING, AT THAT CONFERENCE?

03:57PM  12      A.   I ONLY RECALL ELIZABETH TALKING.

03:57PM  13      Q.   OKAY.  YOU RECALL MS. HOLMES WAS THERE?

03:57PM  14      A.   YES.

03:57PM  15      Q.   AND SHE GAVE PART OF A PRESENTATION; RIGHT?

03:57PM  16      A.   YES.

03:57PM  17      Q.   OKAY.  AND DO YOU RECALL THAT AFTER HER PRESENTATION THERE

03:57PM  18      WAS A Q AND A WITH A PANEL OF PEOPLE?

03:57PM  19      A.   YES -- I DON'T RECALL EXACTLY, NO.

03:57PM  20      Q.   AND DO YOU RECALL THAT THERE WERE THREE PEOPLE FROM AACC

03:57PM  21      REPRESENTATIVES AND ABOUT FOUR PEOPLE FROM THERANOS?

03:57PM  22      A.   I DON'T REMEMBER THAT, NO.

03:57PM  23      Q.   OKAY.  DO YOU RECALL -- LET ME GIVE YOU NAMES AND SEE IF

03:57PM  24      YOU REMEMBER THAT.

03:57PM  25           DO YOU RECALL THAT DR. YOUNG WAS THERE?

PETERSON CROSS BY MR. WADE                                          4831

03:57PM  1      A.   NO.

03:57PM  2      Q.   DO YOU RECALL THAT DR. PANGARKAR WAS THERE?

03:57PM  3      A.   NO.

03:57PM  4      Q.   DO YOU RECALL THAT DR. ANEKAL WAS THERE?

03:57PM  5      A.   NO.

03:57PM  6      Q.   OKAY.  AND YOU OBSERVED THE WHOLE PRESENTATION IN THE

03:57PM  7      Q AND A?

03:57PM  8      A.   I DON'T RECALL OBSERVING THAT PART OF IT.

03:58PM  9           I REMEMBER HER PRESENTING, YES.

03:58PM 10      Q.   OKAY.  AND YOU PREPARED A SUMMARY OF THAT PRESENTATION;

03:58PM 11      CORRECT?

03:58PM 12      A.   I JUST PREPARED A SUMMARY OF WHAT I OBSERVED.

03:58PM 13      Q.   AND YOU --

03:58PM 14      A.   I DIDN'T, I DIDN'T TRY TO SUMMARIZE WHAT SHE WAS TRYING TO

03:58PM 15      SAY.

03:58PM 16      Q.   UM --

03:58PM 17      A.   THE WHOLE PURPOSE OF GOING WAS TO TRY TO FIGURE OUT

03:58PM 18      WHETHER THE TECHNOLOGY WORKED OR NOT.  WE WERE STILL TRYING TO

03:58PM 19      FIGURE OUT WHAT WAS GOING ON.

03:58PM 20      Q.   I UNDERSTAND.  MY QUESTION WAS, YOU PREPARED A SUMMARY --

03:58PM 21      A.   YES.

03:58PM 22      Q.   -- OF WHAT YOU OBSERVED IN THAT MEETING; CORRECT?

03:58PM 23      A.   YES.

03:58PM 24      Q.   CAN YOU LOOK AT 5273.

03:59PM 25      A.   YES.

PETERSON CROSS BY MR. WADE                                          4832

03:59PM   1    Q.   AND IS THIS THE SUMMARY THAT YOU PREPARED OF THAT MEETING?

03:59PM   2    A.   YES.

03:59PM   3              MR. WADE:  MOVE THE ADMISSION OF 5273.

03:59PM   4              MR. LEACH:  YOUR HONOR, RELEVANCE AND HEARSAY, 403.

04:00PM   5         (PAUSE IN PROCEEDINGS.)

04:01PM   6              THE COURT:  I'M JUST CURIOUS HERE ABOUT THE TIME

04:01PM   7    DIFFERENCE AND THE RELEVANCE.

04:01PM   8              MR. WADE:  WELL, I WONDER IF, GIVEN THE HOUR, MAYBE

04:01PM   9    WE CAN BREAK HERE AND THEN DISCUSS THIS WITHOUT BURDENING THE

04:01PM   10   JURY AND START BACK WITH THIS TOMORROW?

04:02PM   11             THE COURT:  LET'S DO THAT THEN.

04:02PM   12        LADIES AND GENTLEMEN, LET'S TAKE OUR RECESS FOR THE DAY.

04:02PM   13   WE'LL RESUME TOMORROW AT 9:00 O'CLOCK.

04:02PM   14        AGAIN, LET ME ADMONISH YOU TO CONTINUE YOUR VIGILANCE NOT

04:02PM   15   TO READ, LISTEN, OR DISCUSS THIS CASE IN ANY WAY WITH ANYONE OR

04:02PM   16   TO FORM ANY OPINIONS ABOUT THIS CASE UNTIL THE CASE HAS BEEN

04:02PM   17   DELIVERED TO YOU FOR YOUR DELIBERATIONS.  PLEASE CONTINUE TO DO

04:02PM   18   THAT.

04:02PM   19        I'LL ASK YOU TOMORROW IF ANY OF YOU HAVE INADVERTENTLY

04:02PM   20   COME ACROSS ANY SUBJECT MATTER.

04:02PM   21        LET ME ALSO TELL YOU ANOTHER SCHEDULING ISSUE.

04:02PM   22   NOVEMBER 4TH WE'RE IN SESSION, THAT'S NEXT THURSDAY, BUT WE

04:02PM   23   WON'T START UNTIL 9:30.  9:30 THAT MORNING I EXPECT IS WHEN OUR

04:02PM   24   START TIME WILL BE.  I JUST WANT TO LET YOU KNOW THAT FOR

04:02PM   25   PLANNING PURPOSES.

4833

04:02PM 1        TOMORROW WE'LL GO UNTIL 4:00 O'CLOCK I HOPE.  IS THAT A

04:02PM 2    PROBLEM FOR ANYONE?

04:02PM 3        OKAY.  LET'S SHOOT FOR 4:00 O'CLOCK.

04:03PM 4        OTHER THAN THAT, WE'LL BE IN RECESS FOR THE DAY.  THANK

04:03PM 5    YOU VERY MUCH.

04:03PM 6        MS. PETERSON, YOU CAN STAND DOWN AS WELL.  THANK YOU.

04:03PM 7    WE'LL SEE YOU TOMORROW AT 9:00 O'CLOCK, PLEASE.

04:03PM 8        (JURY OUT AT 4:03 P.M.)

04:03PM 9            THE COURT:  PLEASE BE SEATED.  THANK YOU.

04:03PM 10       ALL RIGHT.  THANK YOU.  THE RECORD SHOULD REFLECT THAT THE

04:04PM 11   JURY HAS LEFT FOR THE DAY AND MS. PETERSON HAS LEFT THE

04:04PM 12   COURTROOM.  ALL COUNSEL AND MS. HOLMES ARE PRESENT.

04:04PM 13       ALL RIGHT.  THANK YOU.

04:04PM 14       THIS IS 5273.  THIS IS WHAT WE DISCUSSED THIS MORNING I

04:04PM 15   THINK AND --

04:04PM 16           MR. LEACH:  YES, YOUR HONOR.

04:04PM 17           THE COURT:  -- MY QUESTIONS ARE THE INVESTMENT WAS

04:04PM 18   IN 2014, I BELIEVE.  IS THAT RIGHT?

04:04PM 19           MR. LEACH:  YES, YOUR HONOR.

04:04PM 20           THE COURT:  AND SO WHAT IS THE RELEVANCE TIME-WISE

04:04PM 21   ABOUT HER OPINIONS?

04:04PM 22       AND I THINK WHAT WE'RE TALKING ABOUT IS EXPRESSED IN THE

04:04PM 23   LAST PARAGRAPH ON THIS PAGE.

04:04PM 24           MR. WADE:  THAT'S THE GIST OF IT, YOUR HONOR.

04:04PM 25       AND IT RELATES TO -- YOU KNOW, THE GOVERNMENT OPENED THE

4834

04:04PM  1    DOOR ON THIS BY GOING INTO A NUMBER OF THESE INTERACTIONS AFTER

04:04PM  2    THE INVESTMENT PERIOD.  THEY WENT INTO BOTH THE REACTION TO THE

04:04PM  3    CRAMER PIECE, AND THEY WENT INTO THE REACTION TO -- IN APRIL,

04:04PM  4    THEY DECIDED THEY WANTED TO GO INTO THAT MEETING.

04:04PM  5         I EXPLAINED -- I THINK AT THE OUTSET I OBJECTED TO THE

04:05PM  6    ADMISSION OF EVIDENCE RELATING TO THAT.

04:05PM  7         THIS FLOWS DIRECTLY OUT OF THAT APRIL MEETING.  THEY HAD A

04:05PM  8    MEETING TO TRY TO FIGURE OUT WHAT IS GOING ON, TO TRY TO

04:05PM  9    UNDERSTAND THE TECHNOLOGY.

04:05PM 10         SHE'S -- SHE CHARACTERIZED THAT MEETING IN HER TESTIMONY,

04:05PM 11    AND THIS ACTUALLY REFLECTS HER ACTUAL CONTEMPORANEOUS

04:05PM 12    UNDERSTANDING OF IT.

04:05PM 13              THE COURT:  WELL, THIS IS IN AUGUST, NOT APRIL.

04:05PM 14              MR. WADE:  WELL, IT RELATES DIRECTLY TO THAT BECAUSE

04:05PM 15    ONE OF THE THINGS THEY WANTED TO ASSESS, SHE SAID, WAS THE

04:05PM 16    TECHNOLOGY AND THEY'RE TRYING TO FIGURE IT OUT AND THEY DID

04:05PM 17    THAT AT THIS MEETING AND IT'S REFLECTED IN THIS, IN THIS MEMO.

04:05PM 18         THERE'S A SIMILAR --

04:05PM 19              THE COURT:  SO WHAT -- I GUESS WHAT I'M -- AND HELP

04:05PM 20    ME OUT HERE, MR. WADE.

04:05PM 21         WHAT IS THE RELEVANCE OF THIS WITNESS'S OPINION ABOUT WHAT

04:05PM 22    WAS GOING ON AT THERANOS AFTER THE, AFTER THE DEAL?  WHAT IS

04:05PM 23    THE RELEVANCE OF THAT?

04:06PM 24              MR. WADE:  THAT'S WHY I OBJECTED TO THE EVIDENCE

04:06PM 25    COMING IN, YOUR HONOR.  THE GOVERNMENT OPENED THE DOOR.

4835

04:06PM 1        THE COURT:  THAT CAME IN FOR A DIFFERENT PURPOSE.

04:06PM 2   THOSE WERE STATEMENTS, I THINK, OF YOUR CLIENT THAT THE

04:06PM 3   GOVERNMENT COULD GET IN.  THAT'S WHAT YOU'RE TALKING ABOUT.

04:06PM 4        MR. WADE:  NO, BUT THEY ALSO ASKED ABOUT THE MEETING

04:06PM 5   THAT THEY HAD AND THEY TRIED TO CONTRAST THE INTERACTIONS IN

04:06PM 6   THAT MEETING WITH THE STATEMENTS.

04:06PM 7        THE COURT:  THE APRIL MEETING?

04:06PM 8        MR. WADE:  YEAH.  AND PART OF THE INTERACTION, AND

04:06PM 9   MY CLIENT'S GOOD FAITH INTERACTION WITH THAT SHAREHOLDER AT

04:06PM 10  THAT TIME WAS TELLING THEM WHAT THEY WERE GOING TO DO TO TRY TO

04:06PM 11  ADDRESS THE SITUATION, TO SAY THAT THEY BELIEVED IN THE

04:06PM 12  TECHNOLOGY, THAT A LOT OF WHAT WAS BEING WRITTEN WAS NOT TRUE.

04:06PM 13       THE COURT:  OKAY.

04:06PM 14       MR. WADE:  AND THIS SPECIFIC EVENT WAS REFERENCED

04:06PM 15  AND THEY SAID SPECIFICALLY IN THAT MEETING THAT THEY WANTED TO

04:06PM 16  COME AND SEE IT, AND THEY DID.

04:06PM 17       THE COURT:  WELL, THAT WAS RAISED BY YOU, I THINK,

04:06PM 18  ON CROSS; RIGHT?  I DON'T THINK MR. LEACH TOUCHED ON THAT.

04:06PM 19  MAYBE HE DID.

04:06PM 20       MR. WADE:  WELL, MR. LEACH WENT INTO THE MEETING.

04:06PM 21   BUT ONCE -- HE GOES IN TO TRY TO CREATE A NEGATIVE

04:07PM 22  IMPLICATION WITH RESPECT TO MS. HOLMES, OVER MY OBJECTION.

04:07PM 23   SO ONCE HE GOES INTO THE MEETING AND THESE POST-INVESTMENT

04:07PM 24  ACTIVITIES, THE DOOR HAS BEEN OPENED AND IT'S ONLY FAIR IF YOU

04:07PM 25  GET THE FULL PICTURE OF HOW THIS INVESTOR FELT AFTER THE

4836

| | 1 | MEETING. |
|---|---|---|

04:07PM   1   MEETING.

04:07PM   2        RIGHT NOW THEY HAVE A PARTIAL PICTURE BASED UPON THE

04:07PM   3   INTERACTIONS THAT MR. LEACH ELICITED IN CONNECTION WITH VIDEO

04:07PM   4   CLIPS.

04:07PM   5        I WOULD HAVE PREFERRED THAT NONE OF IT COME IN THROUGH

04:07PM   6   THIS WITNESS, BUT IT HAS OVER OUR OBJECTION AND --

04:07PM   7        THE COURT:  WELL, LET ME HEAR FROM MR. LEACH AND

04:07PM   8   THEN I'LL HAVE AN OBSERVATION.

04:07PM   9        MR. LEACH:  YOUR HONOR, THE CRAMER PIECE WAS

04:07PM   10   RELEVANT BECAUSE THE DEFENDANT IS ASKED POINT-BLANK, HOW MANY

04:07PM   11   TESTS CAN YOUR EDISON RUN?

04:07PM   12        AND HER STATEMENTS, WHETHER IT'S MS. PETERSON LISTENING TO

04:07PM   13   IT OR SOMEBODY ELSE, ARE EVIDENCE OF THE DEFENDANT'S --

04:07PM   14   ADMISSIONS BY A DEFENDANT.

04:07PM   15        I ASKED NO QUESTION OF THIS WITNESS WHAT SHE THOUGHT ABOUT

04:07PM   16   THAT.

04:07PM   17        THE "TODAY SHOW" INTERVIEW WAS RELEVANT BECAUSE THIS

04:07PM   18   DEFENDANT, UNLIKE THE DEFENSE WE HEAR HERE THAT IT'S ALL THE

04:08PM   19   LAB DIRECTOR'S FAULT, WAS SAYING, I'M THE CEO OF THE COMPANY,

04:08PM   20   I'M RESPONSIBLE FOR THIS.

04:08PM   21        I ASKED A SINGLE QUESTION ABOUT THE -- LIMITED QUESTIONS

04:08PM   22   ABOUT THE APRIL MEETING 11 DAYS LATER ABOUT WHETHER OR NOT

04:08PM   23   MS. HOLMES TRIVIALIZED THE CMS INSPECTION, YOU KNOW, DAYS AFTER

04:08PM   24   SHE WAS SAYING, I FEEL DEVASTATED ABOUT THIS.

04:08PM   25        THAT DOES NOT OPEN -- AND ALL OF THIS IS TIED TO WHAT THE

4837

04:08PM 1    DEFENDANT SAID.  YOU KNOW, IF THE DEFENDANT WANTS TO SAY WHAT

04:08PM 2    SHE SAID AT THE AACC CONFERENCE, SHE CAN TAKE THE STAND AND SAY

04:08PM 3    ALL OF THOSE THINGS.

04:08PM 4        ALL OF THIS IS ASKING FOR A REACTION TO SOMETHING THAT THE

04:08PM 5    DEFENDANT SAID IN AUGUST OF 2016.

04:08PM 6        AND IT'S ALL PREMISED ON HEARSAY, IT'S NOT RELEVANT.

04:08PM 7        AND IT DOESN'T STOP THERE, YOUR HONOR, BECAUSE THERE ARE

04:08PM 8    ADDITIONAL INTERACTIONS AFTERWARDS AND WE CAN ASK HER TODAY,

04:08PM 9    HOW DO YOU FEEL ABOUT THE TECHNOLOGY, AND SHE'LL GIVE ANSWERS,

04:08PM 10   YOU KNOW, I DON'T THINK MR. WADE WOULD LIKE.

04:08PM 11       SO THERE HAS TO BE A CUTOFF.  THE APRIL MEETING WAS

04:09PM 12   RELEVANT BECAUSE IT'S 11 DAYS TIED TO A PUBLIC STATEMENT THAT

04:09PM 13   I'M RESPONSIBLE FOR EVERYTHING IN THE LAB AND CMS -- WE TAKE

04:09PM 14   CMS REALLY, REALLY SERIOUSLY, AND 11 DAYS LATER SHE'S

04:09PM 15   TRIVIALIZING IT.

04:09PM 16       THAT DOESN'T OPEN THE DOOR TO EVERY STATEMENT THAT

04:09PM 17   MS. HOLMES MAKES AFTER THE FACT AND SOMEBODY'S REACTION TO IT.

04:09PM 18          THE COURT:  SO -- THANK YOU.  SO THAT'S ONE OF THE

04:09PM 19   CONCERNS THAT I HAVE AND IT IS -- I'M NOT CERTAIN OF THE

04:09PM 20   RELEVANCE OF IT.

04:09PM 21       I UNDERSTAND, MR. WADE, YOU'D LIKE TO GET A FULL PICTURE

04:09PM 22   OF THIS AND HAVE THIS WITNESS OFFER THIS PARAGRAPH, OR HER

04:09PM 23   MEMO, OBSERVATIONS IN 2016.

04:09PM 24       I STILL DON'T KNOW WHAT THE RELEVANCE OF THAT IS, HER

04:09PM 25   OPINION.  THE INVESTMENT'S DONE.  AS YOU POINT OUT, SHE WAS

4838

04:09PM 1    NOT -- SHE DIDN'T WRITE THE CHECK, SHE DIDN'T SIGN IT.  YOU

04:09PM 2    CROSS-EXAMINED HER ON WHAT HER DUTIES AND LIMITATIONS WERE.

04:09PM 3         LET ME JUST MAKE AN OBSERVATION HERE.  IF THIS COMES IN,

04:10PM 4    IF SHE TESTIFIES ABOUT THIS, I'M GOING TO PERMIT THE

04:10PM 5    GOVERNMENT, IF THEY WANT TO, TO REHABILITATE, IN ESSENCE TO

04:10PM 6    BASICALLY GO THROUGH, THAT WAS YOUR OPINION THEN?  AND WHAT IS

04:10PM 7    YOUR OPINION TODAY?

04:10PM 8         AND AS MR. LEACH POINTS OUT, SHE MIGHT SAY SOMETHING THAT,

04:10PM 9    THAT MIGHT NOT BE HELPFUL, AND BECAUSE I THINK WHAT -- I'M JUST

04:10PM 10   SAYING WE CAN EXPECT THAT SHE'S GOING TO DEFEND HERSELF IN

04:10PM 11   THIS -- AS TO THIS STATEMENT.

04:10PM 12        YOU HAVE TO DECIDE THE VALUE OF WHETHER THIS COMES IN OR

04:10PM 13   NOT, AND THE COST/BENEFIT ANALYSIS FOR THIS, AND I'M NOT TRYING

04:10PM 14   TO STAND WHERE YOU'RE STANDING AND TRY TO RUN THE CASE.  IT'S

04:10PM 15   YOUR CASE.

04:10PM 16            MR. WADE:  I WISH YOU COULD SEE MY SMILE,

04:10PM 17   YOUR HONOR.

04:10PM 18        I DON'T THINK THIS -- I DON'T THINK THIS WITNESS HAS BEEN

04:10PM 19   RESTRAINED IN OFFERING HER CURRENT VIEWS OF THINGS.

04:10PM 20            THE COURT:  WELL, THAT'S WHAT I'M SAYING.

04:10PM 21            MR. WADE:  SO --

04:10PM 22            THE COURT:  YOU'RE GOING TO GET THAT, AREN'T YOU?

04:10PM 23            MR. WADE:  MY VIEW IS IT'S TUMBLED IN, WHETHER I'VE

04:11PM 24   ASKED THE QUESTION OR NOT, REPEATEDLY, WHETHER IT'S RESPONSIVE

04:11PM 25   OR NOT.

4839

04:11PM  1    IT DOESN'T ALIGN WITH WHAT SHE ACTUALLY SAID AT THE TIME

04:11PM  2    IN NUMEROUS DOCUMENTS.

04:11PM  3        THERE'S ANOTHER DOCUMENT THAT THE COURT WILL NOTE AT 14104

04:11PM  4    WHERE IT IS TOTALLY INCONSISTENT WITH, WITH THE CONCLUSIONS AND

04:11PM  5    HER TAKE AWAYS HERE.

04:11PM  6        THE COURT:  IS 14104 IN EVIDENCE?

04:11PM  7        MR. WADE:  IT'S NOT, BUT WE MIGHT AS WELL PREVIEW

04:11PM  8    TOMORROW'S 8:30 GIVEN THIS DISCUSSION.

04:11PM  9        AND I WASN'T NECESSARILY INTENDING TO OFFER THE DOCUMENT

04:11PM  10   BECAUSE THEY'RE NOTES, BUT I WAS -- UNLIKE --

04:11PM  11        THE COURT:  THESE ARE HER NOTES ALSO?

04:11PM  12        MR. WADE:  MY UNDERSTANDING IS THAT THESE ARE HER

04:11PM  13   NOTES.

04:11PM  14        THE OTHER, YOU'LL NOTE, IS A REPORT TO HER TWO

04:11PM  15   SUPERVISORS, HER TWO SUPERIORS, RIGHT?  SO THEY'RE NOT NOTES.

04:11PM  16   IT'S A COMMUNICATION, A PRETTY LENGTHY ONE, TO HER TWO

04:12PM  17   SUPERIORS.

04:12PM  18        THIS IS A DIFFERENT ONE.

04:12PM  19        BUT HER REACTION IN REALTIME PRIOR TO --

04:12PM  20        THE COURT:  IF YOU WANT TO TAKE YOUR MASK OFF, GO

04:12PM  21   AHEAD.

04:12PM  22        MR. WADE:  PRIOR TO EXTRAORDINARY AMOUNTS OF

04:12PM  23   NEGATIVE PUBLICITY, WHICH IS WHAT WE SAW TODAY, WAS

04:12PM  24   FUNDAMENTALLY DIFFERENT IN REALTIME.

04:12PM  25        AND SO I KNOW THAT I'M GOING TO GET -- I APPRECIATE THE

4840

04:12PM   1    COURT'S CAUTION, BUT --

04:12PM   2         THE COURT:  I LOOK AT THIS AND I STILL HAVE SOME

04:12PM   3    PROBLEMS WITH THE RELEVANCE OF HER OPINION IS AFTER THE

04:12PM   4    INVESTMENT AND AFTER GOING AND HEARING A BUNCH OF HEARSAY.

04:12PM   5    IT'S -- WHAT SHE'S GOING TO TESTIFY ABOUT IS HER, AND WHAT SHE

04:12PM   6    TOLD US, I THINK, IS I DON'T REMEMBER THE PANEL, I DON'T

04:12PM   7    REMEMBER Q AND A.

04:12PM   8         I REMEMBER MS. HOLMES AND I REMEMBER WHAT SHE SAID.

04:13PM   9         THAT'S REFLECTED IN THE LAST PARAGRAPH, APPARENTLY, IN

04:13PM   10   THIS EMAIL.

04:13PM   11        AND I'M, I'M STRUGGLING TO FIND THE RELEVANCE OF THAT.

04:13PM   12        CONCURRENT WITH THAT, THOUGH, IF THIS COMES IN, I THINK

04:13PM   13   IT'S -- I DON'T WANT TO GET INTO MINI TRIALS, BUT YOU'LL HAVE

04:13PM   14   TO SIT ON YOUR HANDS WHILE I GIVE MR. LEACH LATITUDE TO

04:13PM   15   REHABILITATE WITH THIS.

04:13PM   16        MR. WADE:  NO, I UNDERSTAND, AND WE'LL TAKE THE

04:13PM   17   COURT'S COMMENTS OVERNIGHT.

04:13PM   18        I WILL NOTE, AGAIN, THE POST-INVESTMENT EVIDENCE CAME IN

04:13PM   19   OVER MY OBJECTION, SO IT'S NOT -- I DIDN'T OPEN THE DOOR.  I'M

04:13PM   20   JUST HAVING TO DEAL WITH IT GIVEN THAT THIS WITNESS HAS OFFERED

04:13PM   21   TESTIMONY ABOUT IT, AND, YOU KNOW, HAVING TO MEET THE

04:13PM   22   OBLIGATIONS.

04:13PM   23        THERE'S NO MAGIC TO APRIL.  HOW IS IT THAT THE GOVERNMENT

04:13PM   24   CAN PICK THE ONE INTERACTION AFTER THIS THAT THEY WANT TO

04:13PM   25   OFFER, BUT WE CAN'T PROBE --

4841

04:13PM  1          THE COURT:  I'M SORRY, APRIL?  YOU MEAN THE MEETING

04:13PM  2    IN PALO ALTO?

04:13PM  3          MR. WADE:  NO, NO.  THE GOVERNMENT HAS CHOSEN A

04:14PM  4    POST-INVESTMENT INTERACTION TO QUESTION THE WITNESS ABOUT,

04:14PM  5    APRIL 2016.

04:14PM  6       THEY SHOWED VIDEO, I THINK THEY LIKED THE PROXIMITY OF

04:14PM  7    THAT INTERACTION TO THE VIDEO, THEY WANTED TO SHOW IT, THEY

04:14PM  8    WANTED TO PORTRAY MY CLIENT IN A CERTAIN LIGHT.  IN OUR VIEW IT

04:14PM  9    SHOULDN'T HAVE COME IN, IT WASN'T RELEVANT.

04:14PM 10       IT'S COME IN.

04:14PM 11       THERE'S NO MATERIAL DIFFERENCE BETWEEN AN APRIL

04:14PM 12    POST-INVESTMENT INTERACTION AND AN AUGUST ONE OR A

04:14PM 13    DECEMBER ONE.  AND SO --

04:14PM 14          THE COURT:  BUT I THINK MR. LEACH WOULD TELL US HE

04:14PM 15    INTRODUCED THOSE AND QUERIED WHETHER OR NOT THIS WAS THE

04:14PM 16    WITNESS -- HE COULD HAVE GOT THIS IN THROUGH ANY WITNESS,

04:14PM 17    CANDIDLY.  ANY WITNESS COULD HAVE COME IN AND SAID, YEAH, I SAW

04:14PM 18    IT, YEAH, THAT'S WHAT SHE SAID.  IT'S A STATEMENT, RIGHT?  IT'S

04:14PM 19    HER STATEMENT.

04:14PM 20          MR. WADE:  THE VIDEO, BUT NOT THE MEETING RELATED TO

04:14PM 21    IT.  HE DIDN'T JUST ASK ABOUT THE VIDEO.  IT WOULD BE A

04:14PM 22    DIFFERENT KETTLE OF FISH IF WE ASKED JUST ABOUT THE VIDEO.

04:14PM 23          THE COURT:  BUT HERE YOU'RE ASKING THIS WITNESS TO

04:15PM 24    COMMENT ON HER OPINIONS OF YOUR CLIENT'S STATEMENTS SOME MONTHS

04:15PM 25    AFTER THE INVESTMENT, AND I JUST -- WHAT IS THE RELEVANCE OF

4842

04:15PM  1    HER -- OF THAT NOW?

04:15PM  2            MR. WADE:  WELL, IT, IT -- IT'S RELEVANT FOR THE

04:15PM  3    REASONS THAT WE'VE BEEN DISCUSSING.  I DON'T HAVE A LOT TO ADD

04:15PM  4    ABOUT IT.

04:15PM  5        AGAIN, IT'S -- WHAT MR. LEACH ASKED ABOUT WAS NOT

04:15PM  6    RELEVANT, BUT IT'S AS RELEVANT AS HIS IRRELEVANT STUFF, AND SO

04:15PM  7    AS A MATTER OF FAIRNESS AND TO NOT MISLEAD THE JURY, WE THINK

04:15PM  8    WE SHOULD BE ABLE TO PROBE IT.

04:15PM  9        I WOULD SAY THE OTHER POINT, YOUR HONOR, AS I NOTED I

04:15PM 10    THINK THIS MORNING, MAYBE I DIDN'T, THE STATEMENT AT THE BOTTOM

04:15PM 11    TIES THE OBSERVATIONS OF THE TECHNOLOGY AND ITS FUNCTIONALITY

04:15PM 12    BACK TO THE OBSERVATIONS THAT WERE MADE AT THE TIME OF THE

04:15PM 13    INVESTMENT.

04:15PM 14            THE COURT:  YOU KNOW, LET ME JUST BE CANDID SINCE

04:16PM 15    WE'RE DEAR FRIENDS HERE, ALL OF US, SINCE WE HAVE SPENT SOME

04:16PM 16    TIME TOGETHER.  SHE'S GOT -- TOMORROW SHE MAY VERY WELL, AND

04:16PM 17    NOBODY IS TALKING TO HER OF COURSE IN THE INTERIM, BUT SHE

04:16PM 18    COULD COME IN AND SHE COULD SAY SOMETHING, YEAH, I WAS FOOLED

04:16PM 19    AGAIN, AND ARE YOU GOING TO LIVE WITH THAT ANSWER?

04:16PM 20        YOU KNOW, PARDON ME, I DON'T MEAN TO BE FLIP HERE, BUT I'M

04:16PM 21    JUST -- YOU KNOW, YOU'RE EXPERIENCED TRIAL LAWYERS AND THERE'S

04:16PM 22    A RISK THERE.

04:16PM 23            MR. WADE:  AGAIN, I WOULD ANTICIPATE THAT,

04:16PM 24    NOTWITHSTANDING THE CONTEMPORANEOUS DOCUMENTS, I HAVE A SENSE

04:16PM 25    OF WHAT THE WITNESS IS GOING TO SAY.  I'VE HAD TO USE THE

4843

| | | |
|---|---|---|
| 04:16PM | 1 | CONTEMPORANEOUS DOCUMENTS TO DEAL WITH THAT, AND SO THAT'S THE |
| 04:16PM | 2 | NATURE OF THE JOB. |
| 04:16PM | 3 | THE COURT:  OKAY. |
| 04:16PM | 4 | MR. LEACH:  I JUST WANT TO SAY ONE MORE THING ABOUT |
| 04:16PM | 5 | OPENING THE DOOR, YOUR HONOR. |
| 04:16PM | 6 | MY QUESTIONS TO THIS WITNESS WERE, WHAT DID THE DEFENDANT |
| 04:16PM | 7 | SAY TO YOU ON THESE DATES? |
| 04:16PM | 8 | THAT DOESN'T OPEN THE DOOR TO EVERY OTHER THING THAT THE |
| 04:16PM | 9 | DEFENDANT SAID IN EVERY OTHER UNIVERSE. |
| 04:16PM | 10 | I DID NOT ASK THE WITNESS, WHAT DID YOU THINK ABOUT THAT? |
| 04:17PM | 11 | I DID NOT ASK THE WITNESS, WHAT WAS YOUR STATE OF MIND? |
| 04:17PM | 12 | THEY WANT TO USE LISA PETERSON'S STATE OF MIND YEARS AFTER |
| 04:17PM | 13 | THE INVESTMENT AS A SPRINGBOARD TO GET ALL OF THE DEFENDANT'S |
| 04:17PM | 14 | HEARSAY STATEMENTS INTO EVIDENCE, AND IT MAY FEEL LIKE A |
| 04:17PM | 15 | ONE-WAY STREET TO THE DEFENSE, BUT THAT'S BECAUSE OF THE |
| 04:17PM | 16 | HEARSAY RULE. |
| 04:17PM | 17 | AND SIMPLY BY ASKING, WHAT DID MS. HOLMES SAY ON |
| 04:17PM | 18 | APRIL 28TH, 2016, DOESN'T MEAN THAT YOU GET TO ASK, WHAT DID |
| 04:17PM | 19 | MS. HOLMES SAY AT THE AACC CONFERENCE AND WHAT DID YOU THINK |
| 04:17PM | 20 | ABOUT THAT AFTER THE FACT, WITNESS? |
| 04:17PM | 21 | AND IT IS NOT JUST A MINI TRIAL ON MS. PETERSON'S STATE OF |
| 04:17PM | 22 | MIND, YOUR HONOR.  THERE'S TWO YEARS AFTER THIS OF RDV TRYING |
| 04:17PM | 23 | TO GET INFORMATION FROM THE DEFENDANT, TRYING TO FIGURE OUT |
| 04:17PM | 24 | WHAT IS GOING ON, LEARNING ABOUT LAWSUITS, S.E.C. |
| 04:17PM | 25 | INVESTIGATIONS, DOJ INVESTIGATIONS, AND IF HER STATE OF MIND |

4844

04:17PM  1    REALLY MATTERS IN THIS TRIAL, WE'RE GOING TO HAVE TO EXPLORE

04:17PM  2    THAT.

04:17PM  3          AND I JUST DON'T THINK THAT YOU CAN USE THE DEFENDANT'S

04:17PM  4    HEARSAY OUT OF COURT STATEMENTS AS A SPRINGBOARD TO ASK ABOUT A

04:18PM  5    WITNESS'S STATE OF MIND YEARS AFTER THE INVESTMENT.

04:18PM  6              MR. WADE:  ONE FINAL POINT, YOUR HONOR.

04:18PM  7          THE GOVERNMENT WANTS TO HAVE THEIR CAKE AND EAT IT, TOO.

04:18PM  8    THEY WANT TO GET IN ALL OF THE POST "WALL STREET JOURNAL"

04:18PM  9    NEGATIVE EVIDENCE THAT THEY LIKE, ALL OF THE WAY THROUGH TO

04:18PM  10   MR. EDLIN OFFERING HIS VIEW OF THE TECHNOLOGY AT THE END OF

04:18PM  11   2016, BUT THEY DON'T WANT US TO HAVE ANY OF THE EVIDENCE THAT

04:18PM  12   IS ACTUALLY FAVORABLE AND CONSISTENT WITH THE CLIENT'S GOOD

04:18PM  13   FAITH AND INTENT.

04:18PM  14         SO IT'S NOT --

04:18PM  15             THE COURT:  YOU WILL HAVE A TIME TO PUT THAT ON IF

04:18PM  16   YOU WANT.

04:18PM  17             MR. WADE:  SURE.  BUT I THINK THIS WITNESS IS HERE

04:18PM  18   AND IT RELATES TO THE MEETING THAT SHE TALKED ABOUT.  THERE'S A

04:18PM  19   DIRECT LINE --

04:18PM  20             THE COURT:  LET ME ASK YOU THIS.  WHAT ABOUT -- IN

04:18PM  21   HER MEMO SHE'S QUOTING YOUR CLIENT.  ARE YOU ASKING THAT YOUR

04:18PM  22   CLIENT'S STATEMENTS BE ADMITTED AS WELL, OR JUST THIS WITNESS'S

04:18PM  23   OBSERVATION AND EVALUATION?

04:18PM  24         I THINK THOSE ARE TWO DIFFERENT THINGS.

04:18PM  25             MR. WADE:  I CAN LOOK AT THAT, YOUR HONOR.

4845

04:19PM  1          THE COURT:  RIGHT.  SO I THINK WE WILL CONTINUE OUR

04:19PM  2     CONVERSATION ON THIS TOMORROW MORNING, BUT THOSE ARE THE -- AND

04:19PM  3     WE HAD A DISCUSSION ABOUT WHETHER OR NOT A DEFENDANT CAN

04:19PM  4     INTRODUCE STATEMENTS, UNLIKE THE PROSECUTION CAN, AND I THINK

04:19PM  5     THERE'S AN ISSUE HERE WITH THAT AS WELL, IF THAT'S WHAT YOU'RE

04:19PM  6     TRYING TO GET IN.

04:19PM  7          IF YOU WANT TO GET IN THE QUOTES HERE -- I TOOK SOME TIME

04:19PM  8     READING THIS WHEN IT WAS OFFERED IN, AND MAYBE WE'LL READ IT

04:19PM  9     AGAIN TONIGHT A LITTLE CLOSER.  BUT THERE CERTAINLY SEEM TO BE

04:19PM 10     SOME QUOTES HERE THAT I DON'T THINK WOULD COME IN.  YOU MIGHT

04:19PM 11     HAVE TO ASK YOUR I.T. SPECIALIST TO DO SOME REDACTION IF THIS

04:19PM 12     COMES IN AGAIN.

04:19PM 13          MR. WADE:  HE CAN WORK WONDERS.

04:19PM 14      SO WE'LL CONSIDER THE COURT'S COMMENTS AND MAYBE WE'LL

04:19PM 15     COME BACK AT 8:30 TOMORROW TO ADDRESS THIS, OR WHENEVER THE

04:19PM 16     COURT WOULD LIKE.

04:19PM 17          THE COURT:  I THINK SO.  I'LL DEFER THE 5:00 A.M.

04:19PM 18     START MY COURT REPORTER LIKES.  WE'LL STICK TO 8:00, 8:15,

04:20PM 19     SOMETHING LIKE THAT.

04:20PM 20          MR. WADE:  GOOD.

04:20PM 21          THE COURT:  ANYTHING YOU WANT TO SAY, MR. LEACH,

04:20PM 22     BEFORE WE END FOR THE DAY?

04:20PM 23          MR. LEACH:  NO, THANK YOU.

04:20PM 24          THE COURT:  AND FOR THE DEFENSE?

04:20PM 25          MR. WADE:  NO.  AND I DON'T THINK WE'LL BE MUCH

4846

| | | |
|---|---|---|
| 04:20PM | 1 | LONGER WITH THIS WITNESS.  I DON'T KNOW IF -- THERE WERE SOME |
| 04:20PM | 2 | ISSUES AT THE BEGINNING OF THE DAY WITH RESPECT TO |
| 04:20PM | 3 | MR. EISENMAN.  I DON'T KNOW IF -- |
| 04:20PM | 4 | MR. DOWNEY:  YOUR HONOR, I THINK IF I CAN IDENTIFY |
| 04:20PM | 5 | THE ISSUES? |
| 04:20PM | 6 | THE COURT:  SURE.  LET'S TALK ABOUT THOSE. |
| 04:20PM | 7 | ANYTHING FURTHER, MR. WADE, ON THIS? |
| 04:20PM | 8 | WE'LL CONTINUE OUR CONVERSATION ABOUT THIS TOMORROW, |
| 04:20PM | 9 | MR. LEACH? |
| 04:20PM | 10 | MR. WADE:  NO.  THANK YOU. |
| 04:20PM | 11 | MR. DOWNEY:  LET ME JUST SAY THEM BY CATEGORY, AND |
| 04:20PM | 12 | MR. BOSTIC AND I HAVE DISCUSSED THESE, AND IF I MISSTATE |
| 04:20PM | 13 | ANYTHING HE'S SAID, I'M SURE HE'LL LET US KNOW. |
| 04:20PM | 14 | I THINK THERE ARE REALLY BASICALLY A COUPLE OF ISSUES, AND |
| 04:20PM | 15 | THEY MAY AFFECT BOTH THE TESTIMONY AND A FEW OF THE EXHIBITS |
| 04:20PM | 16 | THAT THE GOVERNMENT INTENDS TO PROFFER WITH ALAN EISENMAN, WHO |
| 04:20PM | 17 | IS AN INVESTOR WHOSE INVESTMENT DATE IS IN LATE 2013. |
| 04:20PM | 18 | MR. EISENMAN HAS REALLY, THROUGHOUT THE 302'S, THROUGHOUT |
| 04:21PM | 19 | THOSE INTERVIEWS WITH THE GOVERNMENT HAS MADE STATEMENTS ABOUT |
| 04:21PM | 20 | THE EFFECT OF THE LOSS OF THE INVESTMENT ON HIS RETIREMENT, ON |
| 04:21PM | 21 | HIS GRANDCHILDREN, ET CETERA. |
| 04:21PM | 22 | HE DID SO IN REALTIME WHEN HE WAS UNABLE TO LIQUIDATE THE |
| 04:21PM | 23 | INVESTMENT IN 2014 AND 2015 IN CONTEMPORANEOUS DOCUMENTS. |
| 04:21PM | 24 | EVIDENCE ABOUT THE EFFECT OF THE INVESTMENT LOSS ON HIM IS |
| 04:21PM | 25 | NOT RELEVANT TO WHAT WE'RE TRYING, AND IT MAY INDEED INTRODUCE |

04:21PM   1    A SUBSTANTIAL AMOUNT OF PREJUDICE TO THE DEFENDANT.

04:21PM   2         THERE'S ALSO THE PROSPECT THAT IT WOULD INTRODUCE

04:21PM   3    UNPLEASANT AND IRRELEVANT MINI TRIALS.  THE GRANDCHILD THAT

04:21PM   4    HE'S WORRYING ABOUT IS THE GRANDDAUGHTER OF A BILLIONAIRE AND I

04:21PM   5    THINK SOME OF THE CONCERNS MAY HAVE LESS MERIT THAN HE

04:21PM   6    ARTICULATES.

04:21PM   7         I DON'T WANT TO GET INTO THAT.  I JUST WANT TO KEEP THAT

04:22PM   8    OUT OF THE CASE.

04:22PM   9         IT OCCURS -- COMMENTARY TO THAT EFFECT OCCURS IN THREE

04:22PM   10   DOCUMENTS IN A LIMITED WAY.  I THINK THE GOVERNMENT INTENDS TO

04:22PM   11   OFFER THOSE DOCUMENTS.

04:22PM   12        BUT I PROPOSE THAT THOSE BE REDACTED, AND I HAVE THE

04:22PM   13   PLACES WHERE IT WOULD GET REDACTED, AND I CAN GIVE YOUR HONOR A

04:22PM   14   COPY OF THAT AND MR. BOSTIC A COPY OF THAT TO LOOK AT

04:22PM   15   OVERNIGHT.  SO THAT'S ISSUE NUMBER ONE.

04:22PM   16        ISSUE NUMBER TWO IS THAT MR. EISENMAN HAS DISCUSSED, IN

04:22PM   17   HIS MOST RECENT 302 WITH THE GOVERNMENT, A NARRATIVE ABOUT

04:22PM   18   HAVING SEVERAL CONVERSATIONS WITH MS. HOLMES IN THE TIME PERIOD

04:22PM   19   BETWEEN 2006 AND 2010, THE POTENTIAL FOR AN INITIAL PUBLIC

04:22PM   20   OFFERING OF THERANOS STOCK.

04:22PM   21        TO BE CLEAR, I MENTIONED HIS 2013 INVESTMENT.  HE ALSO HAD

04:22PM   22   MADE AN INVESTMENT NEAR THE BIRTH OF THE COMPANY IN 2006.  SO

04:22PM   23   HE WAS AN INVESTOR IN THAT PERIOD, BUT OUTSIDE THE CONSPIRACY

04:23PM   24   PERIOD AND NOT THE SUBJECT OF THE COUNT IN THE INDICTMENT.

04:23PM   25        THE GIST OF HIS TESTIMONY IS, I KEPT BEING PUT OFF ABOUT

4848

04:23PM 1    WHEN THERE WOULD BE AN IPO.

04:23PM 2        THAT UNTO ITSELF IS A LENGTHY SUBJECT FOR EXPLORATION.

04:23PM 3        THE TRUTH IS, AFTER HAVING ALL OF THOSE CONVERSATIONS AND

04:23PM 4    BEING FRUSTRATED THAT THERE WASN'T AN IPO, HE CHOSE TO INVEST

04:23PM 5    AGAIN IN 2013.  SO IT'S OF LIMITED RELEVANCE IN THE CASE.

04:23PM 6        IT, TOO, IS THE SUBJECT OF DISCUSSION IN SOME OF THE

04:23PM 7    DOCUMENTS, AGAIN, IN A VERY LIMITED WAY AND I THINK IT COULD BE

04:23PM 8    REDACTED -- YOU KNOW, THE DOCUMENTS COULD BE REDACTED TO CURE

04:23PM 9    THAT PROBLEM.

04:23PM 10       THE THIRD ISSUE IS ONE THAT MR. BOSTIC AND I HAVE TALKED

04:23PM 11   ABOUT.  I DON'T ANTICIPATE ISSUES WITH THIS, BUT JUST TO FLAG

04:23PM 12   IT FOR THE GOVERNMENT.  THERE'S A LONG COMPOSITE EXHIBIT OF

04:24PM 13   EMAILS AND NOTES AND SO FORTH THAT IS EXHIBIT 14.

04:24PM 14       I DON'T THINK MR. BOSTIC INTENDS TO OFFER THAT TO BE

04:24PM 15   ADMITTED IN THE CASE, AND I WOULD JUST ASK THAT IF THAT IS

04:24PM 16   ADMITTED, THAT HE CARVE THAT UP INTO SUBEXHIBITS BECAUSE IT'S

04:24PM 17   AN AGGREGATION OF MATERIAL THAT DOESN'T GO TOGETHER.  I'M

04:24PM 18   ACTUALLY NOT SURE WHY IT'S AGGREGATED IN THE WAY THAT IT IS.

04:24PM 19       BUT FOR PURPOSES OF THE RECORD, THE DOCUMENTS THAT RELATE

04:24PM 20   TO THE PERSONAL FINANCIAL SITUATION OF MR. EISENMAN ARE

04:24PM 21   EXHIBIT 2216, 2468, AND IN A LIMITED WAY 1371.

04:24PM 22       AND MY REQUEST, I SHOULD SAY, IN CONNECTION WITH THAT,

04:24PM 23   YOUR HONOR, IS NOT ONLY THAT THAT BE ADJUDGED NOT TESTIMONY OR

04:24PM 24   AN EXHIBIT THAT SHOULD COME IN, BUT ALSO THAT THE WITNESS BE

04:24PM 25   SPECIFICALLY ADMONISHED BECAUSE I THINK THERE'S A REAL DANGER

04:25PM  1    OF IT BASED ON WHAT IT APPEARS TO BE HIS BEHAVIOR IN THE CASE

04:25PM  2    TO DATE.

04:25PM  3                THE COURT:  THAT'S JUST RELATED TO NUMBER THREE,

04:25PM  4    YOUR --

04:25PM  5                MR. DOWNEY:  WELL, THAT RELATES TO NUMBERS ONE AND

04:25PM  6    TWO.

04:25PM  7                THE COURT:  I SEE, OKAY.

04:25PM  8                MR. DOWNEY:  THOSE ARE JUST TOPICS THAT HE HAS

04:25PM  9    BROUGHT UP WITH SOME FREQUENCY, AND I'LL LEAVE IT THAT.

04:25PM 10                THE COURT:  OKAY.  THANK YOU.

04:25PM 11                MR. DOWNEY:  SO I CAN HAND UP HOW THE EXHIBITS,

04:25PM 12    WHICH I THINK WOULD OTHERWISE BE ADMITTED, WOULD BE AFFECTED.

04:25PM 13                THE COURT:  MR. BOSTIC?

04:25PM 14                MR. DOWNEY:  AND I'LL GIVE MR. BOSTIC A COPY OF THE

04:25PM 15    SAME.

04:25PM 16          THAT'S FOR YOU (HANDING).

04:25PM 17          AND THIS IS WHAT THE DOCUMENT WOULD LOOK LIKE REDACTED.

04:25PM 18          DO YOU HAVE THE UNREDACTED VERSION?

04:25PM 19          THAT'S 2216, AND THIS IS 2468, AND THEN THERE IS 1371.

04:26PM 20                THE COURT:  THE HIGHLIGHTED PORTION, WHAT IS THAT?

04:26PM 21                MR. DOWNEY:  YEAH, THAT'S THE PROPOSED REDACTION.

04:26PM 22                THE COURT:  I SEE.

04:26PM 23                MR. DOWNEY:  I SHOULD SAY, I THINK ON 1371, THE

04:26PM 24    REDACTION MAY NOT BE NECESSARY BECAUSE MR. BOSTIC HAD INFORMED

04:26PM 25    ME THAT HE ONLY INTENDS TO OFFER REALLY THE FIRST FIVE PAGES,

4850

04:26PM 1    SO IT MAY BE THAT OVERNIGHT HE CAN DIVIDE THAT EXHIBIT AND

04:26PM 2    WE'LL BE ABLE TO DO IT THAT WAY.

04:26PM 3           THE COURT:  OKAY.  THANK YOU.

04:26PM 4        MR. BOSTIC?

04:26PM 5           MR. BOSTIC:  YOUR HONOR, I'LL TRY TO TAKE THE ISSUES

04:26PM 6    FROM SIMPLEST TO MOST COMPLICATED.

04:26PM 7        FIRST, WHEN IT COMES TO EXHIBIT 14, WHICH IS MENTIONED

04:26PM 8    THIRD BY MR. DOWNEY, HE'S CORRECT THAT THE GOVERNMENT CURRENTLY

04:26PM 9    DOESN'T PLAN TO OFFER THAT INTO EVIDENCE.

04:26PM 10       IF IT DOES BECOME APPROPRIATE TO OFFER IT AT SOME POINT,

04:26PM 11   EITHER TO REPLACE THE WITNESS'S RECOLLECTION UNDER 803 OR FOR

04:26PM 12   SOME OTHER APPROPRIATE PURPOSE, THE GOVERNMENT WILL ATTEMPT TO

04:27PM 13   DO THAT IN A WAY THAT DOESN'T CREATE CONFUSION OR BURDEN THE

04:27PM 14   EVIDENCE RECORD.  BUT I THINK THAT IS A MOOT POINT.

04:27PM 15          THE COURT:  OKAY.  THANK YOU.

04:27PM 16          MR. BOSTIC:  ON POINT NUMBER ONE, I THINK THERE'S NO

04:27PM 17   DISAGREEMENT OVER THE PRINCIPLE THAT THE COURT HAS RULED ON THE

04:27PM 18   ADMISSIBILITY OF DOWNSTREAM EFFECTS, FINANCIAL EMOTIONAL HARM

04:27PM 19   SUFFERED BY VICTIMS IN THIS CASE.

04:27PM 20       THE GOVERNMENT HAS REVIEWED THAT ORDER, UNDERSTANDS IT.  I

04:27PM 21   WILL REVIEW IT AGAIN BEFORE MR. EISENMAN'S TESTIMONY TO MAKE

04:27PM 22   SURE WE COMPLY WITH IT IN ELICITING TESTIMONY FROM HIM, AND

04:27PM 23   IT'S ALSO OUR PRACTICE TO HAVE CONVERSATIONS WITH WITNESSES

04:27PM 24   ABOUT AREAS THAT NEED TO BE AVOIDED IN ORDER TO COMPLY WITH THE

04:27PM 25   COURT'S ORDERS.

4851

04:27PM 1        BUT I WANT TO MAKE SURE THAT WE'RE ON THE SAME PAGE,

04:27PM 2    BECAUSE THE DEFENSE AND THE PROSECUTION DON'T ALWAYS AGREE ON

04:27PM 3    WHERE THE LINE IS WHEN IT COMES TO THAT DOWNSTREAM EFFECT

04:27PM 4    TESTIMONY.

04:27PM 5        I JUST RECEIVED DEFENSE COUNSEL'S PROPOSED REDACTIONS.  I

04:27PM 6    WOULD LIKE THE EVENING TO LOOK AT THOSE IF I COULD AND THEN

04:28PM 7    PERHAPS WE CAN FINISH THIS CONVERSATION TOMORROW MORNING IF THE

04:28PM 8    COURT IS AMENABLE.

04:28PM 9        FOR NOW I'LL JUST SAY THAT PART OF MR. EISENMAN'S

04:28PM 10   TESTIMONY IS GOING TO INVOLVE EFFORTS THAT HE MADE TO GET

04:28PM 11   INFORMATION FROM MS. HOLMES BEFORE AND AFTER HIS 2013

04:28PM 12   INVESTMENT.

04:28PM 13       THE WILLINGNESS OF AN ALLEGED FRAUDSTER TO PROVIDE

04:28PM 14   INFORMATION TO A VICTIM IS RELEVANT IN A CASE LIKE THIS.  TO

04:28PM 15   THE EXTENT THAT SOMEONE WHO HAS DECEIVED SOMEONE PREVIOUSLY IS

04:28PM 16   WILLING TO PROVIDE ADDITIONAL INFORMATION OR STONEWALLS THAT

04:28PM 17   PERSON, REFUSING TO PROVIDE THEM DETAIL IS RELEVANT TO THAT

04:28PM 18   INDIVIDUAL'S INTENT AND KNOWLEDGE.

04:28PM 19       IN THIS CASE, ONE OF THE TOPICS THAT MR. EISENMAN WAS

04:28PM 20   SEEKING INFORMATION ON WAS THE POTENTIAL FOR A LIQUIDITY EVENT

04:28PM 21   RELATING TO THERANOS, WHETHER THAT WAS AN IPO OR SOMETHING

04:29PM 22   ELSE.

04:29PM 23       SO WE SEE IN THE CONVERSATION BETWEEN MR. EISENMAN AND

04:29PM 24   MS. HOLMES THAT HE'S ASKING HER QUESTIONS ABOUT A POTENTIAL

04:29PM 25   LIQUIDITY EVENT, THE POSSIBILITY OF SELLING HIS SHARES EITHER

4852

04:29PM  1    TO THERANOS OR TO A THIRD PARTY, AND IN CONNECTION WITH THAT,

04:29PM  2    HE EXPLAINS SOME LIFE CIRCUMSTANCES THAT CREATE, IN HIS MIND,

04:29PM  3    HIS NEED TO HAVE THAT INFORMATION IN ORDER TO WEIGH THINGS FOR

04:29PM  4    HIS RETIREMENT OR FAMILY OBLIGATIONS.

04:29PM  5         THOSE ARE THERE, IN MY VIEW, FOR CONTEXT RELATING TO HIS

04:29PM  6    REQUEST FOR MORE INFORMATION.  THEY'RE NOT CENTRAL TO HIS

04:29PM  7    TESTIMONY.  WE DON'T PLAN TO HIGHLIGHT THEM.

04:29PM  8         AND I DON'T BELIEVE THAT THE INFORMATION THAT HE DISCLOSES

04:29PM  9    IN THESE EXHIBITS RUNS AFOUL OF THE COURT'S ORDER, BUT I'M

04:29PM 10    SENSITIVE TO MR. DOWNEY'S CONCERNS, SO I WILL TAKE A CLOSER

04:29PM 11    LOOK.

04:29PM 12         THE COURT:  WELL, IF HE'S GOING TO TESTIFY IN THE

04:29PM 13    BROAD SCHEME, THIS WAS IMPORTANT TO MY FINANCIAL PLANNING, MY

04:30PM 14    RETIREMENT, MY WHATEVER IT IS, THAT GENERAL TYPE OF DESCRIPTION

04:30PM 15    I THINK IS APPROPRIATE.  IT'S PART OF HIS PLANNING, AND HE CAN

04:30PM 16    TALK ABOUT THAT.

04:30PM 17         IF HE -- AND I THINK WE START TO GET INTO GRAVEL WHEN HE

04:30PM 18    SAYS, WELL, THIS WAS CRITICAL FOR WHATEVER REASON AND GETS

04:30PM 19    TESTIMONY IN ABOUT, YOU KNOW, PERSONAL FEELINGS AND THOSE TYPES

04:30PM 20    OF THINGS, THAT'S WHERE WE'LL GET INTO THE WEEDS A LITTLE BIT I

04:30PM 21    THINK.

04:30PM 22         BUT GENERAL TOPICS ABOUT, WELL, IT'S IMPORTANT FOR MY

04:30PM 23    FINANCIAL PLANNING AND MY HEIRS, THOSE TYPES OF THING, AND

04:30PM 24    GENERALLY, I DON'T KNOW IF THAT'S WHAT HE'S GOING TO TALK

04:30PM 25    ABOUT, I DON'T HAVE A PROBLEM WITH THAT, AND I DON'T THINK

4853

| | | |
|---|---|---|
| 04:30PM | 1 | MR. DOWNEY WOULD EITHER, IF IT'S GENERAL ESTATE PLANNING AND |
| 04:30PM | 2 | THE REASON AND THE IMPORTANCE OF IT, TO CARE FOR YOUR FAMILY OR |
| 04:30PM | 3 | WHATEVER. |
| 04:31PM | 4 | AND WHAT EXHIBIT GOES TO NUMBER ONE?  WHICH ONE OF THESE? |
| 04:31PM | 5 | MR. DOWNEY:  IT'S THREE EXHIBITS.  IT'S 2468, 2216, |
| 04:31PM | 6 | AND 1371. |
| 04:31PM | 7 | THE COURT:  OH, ALL OF THESE WOULD GO TO -- |
| 04:31PM | 8 | MR. DOWNEY:  YEAH, THEY WILL ALL BE -- AND YOU'LL |
| 04:31PM | 9 | SEE THE PROPOSED TEXT. |
| 04:31PM | 10 | THE COURT:  OKAY. |
| 04:31PM | 11 | MR. DOWNEY:  YOUR HONOR, I'M TEMPTED TO SAY I'M GLAD |
| 04:31PM | 12 | THAT WE HAD THIS CONVERSATION, BECAUSE SOMETHING THAT |
| 04:31PM | 13 | MR. BOSTIC SAID MADE ME WANT TO COMMENT. |
| 04:31PM | 14 | THE PURPOSE FOR WHICH HE INTENDS TO PROFFER THAT EVIDENCE |
| 04:31PM | 15 | IS TOTALLY INAPPROPRIATE.  THIS IS A SHAREHOLDER PROCEEDING |
| 04:31PM | 16 | PURSUANT TO A SHAREHOLDER AGREEMENT WHICH DEFINES THE RIGHTS OF |
| 04:31PM | 17 | HIM AND EVERY OTHER SHAREHOLDER. |
| 04:31PM | 18 | HIS REQUEST FOR INFORMATION OR REQUEST FOR UNIQUE |
| 04:31PM | 19 | INFORMATION THAT NO OTHER SHAREHOLDER HAD, TO PUT IN FRONT OF |
| 04:31PM | 20 | THE JURY THAT THAT IS SOME OBFUSCATION BY THE DEFENDANT TO |
| 04:31PM | 21 | INSIST THAT THE SHARING OF INFORMATION BE UNIFORM ACROSS ALL |
| 04:31PM | 22 | SHAREHOLDERS AND TO IMPLY THAT THAT IS SOME FORM OF OBFUSCATION |
| 04:32PM | 23 | IS TOTALLY INAPPROPRIATE. |
| 04:32PM | 24 | MR. BOSTIC:  YOUR HONOR, HERE'S ANOTHER SITUATION |
| 04:32PM | 25 | WHERE THE TWO PARTIES VIEW THE FACTS DIFFERENTLY.  THAT'S |

4854

04:32PM   1    CERTAINLY NOT HOW I WOULD DESCRIBE WHAT HAPPENED HERE.

04:32PM   2         MR. EISENMAN HAD A HISTORY OF QUARTERLY CALLS WITH

04:32PM   3    MS. HOLMES FOR A WHILE.  AT A CERTAIN POINT THOSE CALLS

04:32PM   4    STOPPED.

04:32PM   5         MR. EISENMAN WAS -- I THINK IN HIS COMMUNICATIONS AND IN

04:32PM   6    HIS TESTIMONY, IT WILL BE CLEAR THAT HE WAS NOT NECESSARILY

04:32PM   7    ASKING FOR INFORMATION BEYOND WHAT OTHER INVESTORS WERE

04:32PM   8    RECEIVING.  HE WANTED INFORMATION.  FULL STOP.

04:32PM   9         AND IF THAT MEANT THAT MS. HOLMES WOULD ENGAGE MORE WITH

04:32PM  10    ALL INVESTORS, THEN THAT WOULD HAVE SATISFIED HIM.

04:32PM  11         HE WASN'T ASKING FOR SPECIAL TREATMENT PER SE.  HE WANTED

04:32PM  12    TO KNOW WHAT WAS HAPPENING WITH THE COMPANY.  HE FELT THAT HIS

04:32PM  13    MILLION DOLLAR-PLUS INVESTMENT ENTITLED HIM -- ALTHOUGH HE

04:32PM  14    UNDERSTANDS THE LIMITATIONS TO HIS RIGHTS TO INFORMATION, HE

04:32PM  15    FELT THAT IT WAS APPROPRIATE FOR MS. HOLMES TO TELL HIM MORE

04:33PM  16    ABOUT WHAT WAS GOING ON WITH THE COMPANY SO THAT HE COULD

04:33PM  17    DECIDE WHAT TO DO WITH HIS INVESTMENT.

04:33PM  18         MR. DOWNEY:  IT'S TRUE THAT HE HAD A QUARTERLY

04:33PM  19    MEETING WITH MS. HOLMES FOR A PERIOD.  HE WAS UNIQUE IN THAT

04:33PM  20    REGARD AMONGST THE SCORES OF SHAREHOLDERS THAT ARE AT ISSUE

04:33PM  21    HERE.

04:33PM  22         IT'S CLEAR FROM WHAT MR. BOSTIC SAID THAT THEY WANT TO

04:33PM  23    CREATE AN IMPRESSION THAT EITHER WHAT MS. HOLMES SAID TURNED

04:33PM  24    OUT NOT TO EVENTUATE OR THAT BY FAILING TO PROVIDE COMPARABLE

04:33PM  25    INFORMATION LATER, THAT EVIDENCE IS SOME INTENT OF A CRIME.

4855

04:33PM  1      UNDER THE DOCUMENTS THAT HE SIGNED, PLAIN AND SIMPLE ON

04:33PM  2   THE FACE OF THE AGREEMENT, HE AGREES THAT HE HAS NO ACCESS TO

04:33PM  3   DATA WHATSOEVER; AND, SECOND, ANY PLANNING THAT THE COMPANY

04:33PM  4   PROVIDES TO HIM IS CONDITIONAL SUBJECT TO CHANGE AND NOT

04:33PM  5   SOMETHING ON WHICH HE IS GOING TO RELY.

04:33PM  6      THE NOTION THAT DECLINING TO GIVE HIM THAT INFORMATION

04:33PM  7   DEMONSTRATES, YOU KNOW, GUILTY INTENT IN CONNECTION WITH

04:34PM  8   CHARGES LIKE THESE IS, I THINK, A TERRIBLE, UNFAIR, AND

04:34PM  9   PREJUDICIAL IMPLICATION TO CREATE IN FRONT OF THE JURY.

04:34PM 10      THE COURT:  IS IT, IS IT APPROPRIATE FOR THE JURY TO

04:34PM 11   LEARN THAT THERE WAS A HISTORY OF QUARTERLY MEETINGS THAT WAS

04:34PM 12   AFFORDED THIS INVESTOR AND THAT THEY STOPPED SOMEHOW?  I DON'T

04:34PM 13   KNOW WHO STOPPED IT, BUT THEY STOPPED.  SHOULDN'T THEY KNOW

04:34PM 14   THAT?

04:34PM 15      MR. DOWNEY:  I THINK WITHOUT GOING INTO THE CONTENT

04:34PM 16   OF THOSE MEETINGS TO IMPLY THAT EITHER NOT GETTING COMPARABLE

04:34PM 17   INFORMATION IS SOMEHOW SUSPICIOUS OR THAT, YOU KNOW, THEY

04:34PM 18   PROJECTED THERE WOULD BE AN IPO AT SOME POINT AND THEY DECIDED

04:34PM 19   TO REMAIN A PRIVATE COMPANY THEREAFTER, YOU KNOW, THE FACT THAT

04:34PM 20   THERE WERE QUARTERLY MEETINGS ALONE MIGHT BE CAPABLE OF BEING

04:34PM 21   ADMITTED, AS WOULD BE THE FACT THAT HE WAS UNIQUE WITH RESPECT

04:34PM 22   TO GETTING THESE QUARTERLY MEETINGS.

04:34PM 23      THE COURT:  WELL, IF HE HAD ACCESS TO A QUARTERLY

04:34PM 24   MEETING THAT NO ONE ELSE HAD, THAT MUST HAVE BEEN A MUTUAL

04:35PM 25   DECISION.  I DON'T KNOW.

4856

04:35PM 1          MR. DOWNEY:  IT WAS PURSUANT TO HIS REQUEST AND IT

04:35PM 2    WAS STOPPED BECAUSE OF THE FEROCITY WITH WHICH HE WAS -- ON

04:35PM 3    SOME OCCASIONS, THE DOCUMENTS REFLECT DAILY CALLING THE COMPANY

04:35PM 4    AND ASKING FOR INFORMATION NOT IN THE PERIOD THAT IS THE

04:35PM 5    CONSPIRACY PERIOD THAT WE'RE DEALING WITH, AS BROAD AS THAT

04:35PM 6    PERIOD IS, NOT IN THE PERIOD AROUND HIS 2013 INVESTMENT, BUT

04:35PM 7    FOR THE ENTIRETY OF HIS INVOLVEMENT WITH THIS COMPANY AND

04:35PM 8    THEREAFTER.

04:35PM 9          SO I JUST -- I THINK IT'S AN IMPRESSION THAT -- THE

04:35PM 10   GOVERNMENT KNOWS THE RECORD.  THE GOVERNMENT, YOU KNOW, TO --

04:35PM 11   THERE'S PLENTY THAT THEY COULD DO WITH THIS WITNESS THAT

04:35PM 12   DOESN'T RELATE TO TRYING TO CREATE THAT IMPRESSION, WHICH IS

04:35PM 13   FALSE.

04:35PM 14          THE COURT:  MR. BOSTIC?

04:35PM 15          MR. BOSTIC:  YOUR HONOR, I THINK THE DEFENSE CAN

04:35PM 16   EXPLORE THIS IN CROSS-EXAMINATION TO THE EXTENT THAT THEY NEED

04:35PM 17   TO.

04:35PM 18          THE RECORD AND THE EVIDENCE REFLECT THE TRUTH HERE.  I

04:35PM 19   THINK THE PARTIES JUST SEE IT DIFFERENTLY.

04:35PM 20          WHEN IT COMES TO THE HISTORY OF COMMUNICATION HERE, I

04:35PM 21   THINK THE DEFENSE HAS ITS ARGUMENTS ABOUT WHAT THE CONTRACTS

04:36PM 22   REQUIRE.

04:36PM 23          BUT THIS WITNESS SHOULD BE ALLOWED TO EXPLAIN WHY HE TOOK

04:36PM 24   THE ACTIONS HE DID, WHY HE SOUGHT MORE INFORMATION FROM

04:36PM 25   MS. HOLMES AND FROM THERANOS, AND HIS EXPERIENCE, HIS FUTILE

4857

04:36PM   1    EXPERIENCE IN MAKING THOSE ATTEMPTS TO TRY TO GET THAT

04:36PM   2    INFORMATION AND GET ANSWERS TO HIS QUESTIONS, SOME OF WHICH

04:36PM   3    BEAR -- OR MANY OF WHICH BEAR DIRECTLY ON THE SUBJECTS THAT

04:36PM   4    MS. HOLMES WAS DECEPTIVE ABOUT IN CONNECTION WITH NEWS ARTICLES

04:36PM   5    AND IN THE OTHER INVESTOR CONVERSATIONS THAT WE HAVE HEARD

04:36PM   6    ABOUT SO FAR IN TRIAL.

04:36PM   7         THE COURT:  AND ALL OF THIS WAS WITHIN THE CHARGED

04:36PM   8    PERIOD OF TIME?

04:36PM   9         MR. BOSTIC:  IT INCLUDES CONVERSATIONS DURING THE

04:36PM  10    CHARGED PERIOD OF TIME, YOUR HONOR.

04:36PM  11         THE HISTORY OF COMMUNICATION THAT WE'RE TALKING ABOUT

04:36PM  12    EXTENDS TO THE PAST ALSO.

04:36PM  13         AS WAS THE CASE WITH MR. TOLBERT'S TESTIMONY, WHICH I

04:36PM  14    BELIEVE ALSO COVERED SOME INTERACTION IN A PRE-2010 TIME

04:36PM  15    PERIOD, THE FACT THAT THE GOVERNMENT CHARGES A FRAUD SPANNING

04:36PM  16    FROM 2010 ON DOESN'T ERASE HISTORY BEFORE THAT.

04:36PM  17         I THINK THERE'S NOTHING WRONG WITH GIVING THE JURY THE

04:37PM  18    THREAD OF A CONVERSATION THAT CONTINUES INTO THE PAST, BUT THEN

04:37PM  19    HAS RELEVANT PORTIONS DURING THE TIME PERIOD ALLEGED IN THE

04:37PM  20    INDICTMENT.

04:37PM  21         AND I HAVEN'T ADDRESSED THE ISSUE OF THE IPO YET, BUT

04:37PM  22    THAT'S RELEVANT FOR SIMILAR REASONS.  IT'S PART OF

04:37PM  23    MR. EISENMAN'S CONVERSATIONS WITH THE DEFENDANT ABOUT WHETHER

04:37PM  24    THERE WAS GOING TO BE A LIQUIDITY EVENT OR NOT.

04:37PM  25         IN PARTICULAR, THAT CONVERSATION CONTINUED INTO THE

4858

04:37PM 1     POST-2010 TIME PERIOD.

04:37PM 2           AND I SHOULD POINT OUT, THIS ISN'T JUST, YOU KNOW, AN

04:37PM 3     UNRELATED TOPIC HERE.

04:37PM 4           AS MR. EISENMAN UNDERSTOOD IT, I EXPECT THAT HE'LL TESTIFY

04:37PM 5     THAT THERANOS'S WILLINGNESS OR INTENTION TO MOVE FORWARD WITH

04:37PM 6     AN IPO TOLD HIM SOMETHING ABOUT THE STATE OF THE COMPANY'S

04:37PM 7     FINANCIAL HEALTH, AND THE STATE OF THE TECHNOLOGY AS WELL.

04:37PM 8           SO REPRESENTATIONS MADE BY HOLMES TO HIM ABOUT THE

04:37PM 9     LIKELIHOOD OR THE TIMING OF AN IPO WERE NOT JUST ABOUT A

04:38PM 10    LIQUIDITY EVENT FOR HIM AND A CHANCE TO REALIZE GAIN ON HIS

04:38PM 11    INVESTMENT, BUT WERE ALSO IMPLICIT, CLEAR REPRESENTATIONS ABOUT

04:38PM 12    WHERE THE COMPANY STOOD IN TERMS OF ITS FINANCIAL GROWTH,

04:38PM 13    COMMERCIAL SUCCESS, AND THE DEVELOPMENT OF ITS TECHNOLOGY, AND

04:38PM 14    THAT'S WHY IT'S RELEVANT.

04:38PM 15          MR. DOWNEY:  WELL, TO BE CLEAR, YOUR HONOR, THIS IS

04:38PM 16    AN EFFORT TO INJECT ESSENTIALLY A DIFFERENT CONSPIRACY INTO

04:38PM 17    THIS CASE, AN UNCHARGED, UNNOTICED CONSPIRACY THAT THERE WERE

04:38PM 18    LIES ABOUT WHETHER OR NOT THE COMPANY COMMITTED TO CONDUCTING

04:38PM 19    AN IPO KNOWING IT WAS NOT GOING TO CONDUCT AN IPO, WHICH IN AND

04:38PM 20    OF ITSELF, IF THAT WERE CHARGED AND THAT'S WHAT WE WERE

04:38PM 21    DEBATING ABOUT, I WOULD BE QUITE COMFORTABLE WITH THAT CASE.

04:38PM 22          THE ISSUE IS THAT I SHOULD NOT HAVE TO TRY THAT CASE, AND

04:38PM 23    I PARTICULARLY SHOULD NOT HAVE TO TRY IT WHEN, AS THE

04:38PM 24    GOVERNMENT KNOWS, THIS DEFENDANT REPRESENTED THAT HE UNDERSTOOD

04:38PM 25    THERE WAS NOT A PUBLIC MARKET, HE UNDERSTOOD THAT THERE MAY

4859

04:39PM 1    NEVER BE A PUBLIC MARKET, HE UNDERSTOOD THAT ANY PROJECTION OR

04:39PM 2    ESTIMATE OF THE COMPANY AS TO WHAT MIGHT HAPPEN IN THE FUTURE

04:39PM 3    WAS NOT RELIABLE.

04:39PM 4        I MEAN, THAT'S THE FRAMEWORK UNDER WHICH ALL OF THESE

04:39PM 5    INTERACTIONS THAT HE'S CHARACTERIZING HAPPENED.  THERE'S A

04:39PM 6    SIGNIFICANCE DISPUTE BETWEEN THE PARTIES IN REALTIME AS TO WHO

04:39PM 7    SAID WHAT, AND I THINK TO THROW THAT INTO THIS TRIAL WHEN ALL

04:39PM 8    OF THAT WITH MS. HOLMES IS YEARS BEFORE THE INVESTMENT DECISION

04:39PM 9    IN 2013.

04:39PM 10       THE PROBLEM THE GOVERNMENT HAS HERE IS THE OFFER TO

04:39PM 11   MR. EISENMAN TO INVEST IN 2013 IS IN A LIMITED WINDOW BETWEEN

04:39PM 12   DECEMBER 15TH AND DECEMBER 31ST.  MR. EISENMAN DOESN'T SPEAK TO

04:39PM 13   MS. HOLMES DURING THAT PERIOD.  HE HAS NOT SPOKEN TO HER FOR A

04:39PM 14   SUBSTANTIAL PERIOD PRIOR TO THAT TIME.  HE'S TAKEN NO

04:39PM 15   REPRESENTATIONS FROM HER ABOUT THIS PARTICULAR INVESTMENT

04:40PM 16   OPPORTUNITY OTHER THAN WHAT IS GENERALLY AVAILABLE TO

04:40PM 17   SHAREHOLDERS.

04:40PM 18       THEY, THEREFORE, WANT TO IMPORT ALL OF THESE PAST

04:40PM 19   INTERACTIONS FOR PURPOSES OF BOLSTERING, YOU KNOW, THE CLAIM

04:40PM 20   THAT SOMEHOW THE INVESTMENT LOSS OF MR. EISENMAN RELATES TO THE

04:40PM 21   DEFENDANT.

04:40PM 22       HE DOES HAVE INTERACTIONS WITH MR. BALWANI AND THEY CAN --

04:40PM 23   YOU KNOW, I UNDERSTAND MR. BALWANI IS ALLEGED TO BE A

04:40PM 24   COCONSPIRATOR AND THAT CAN COME IN.  BUT I'M NOT CONCERNED

04:40PM 25   ABOUT THAT.  THAT'S FAIR GAME.

4860

04:40PM 1          MR. BOSTIC:  YOUR HONOR, JUST A COUPLE OF POINTS ON

04:40PM 2     THAT.

04:40PM 3          THE FACT IS THE STORY OF MR. EISENMAN'S INTERACTIONS WITH

04:40PM 4     THERANOS AND MS. HOLMES DID NOT START IN 2010.  IT WOULD BE

04:40PM 5     DECEPTIVE AND PRESENTING AN INCOMPLETE PICTURE TO THE JURY TO

04:40PM 6     BEGIN HIS TESTIMONY THERE WITHOUT, AGAIN, ALLOWING THE JURY TO

04:40PM 7     UNDERSTAND THE CONTEXT OF THOSE LATER INTERACTIONS, TO

04:40PM 8     UNDERSTAND WHAT MR. EISENMAN HAD PREVIOUSLY BEEN TOLD, AND WHAT

04:40PM 9     INFORMATION WAS AVAILABLE TO HIM IN FULL AT THE TIME THAT HE

04:40PM 10    MADE HIS DECISION TO INVEST IN 2013.

04:41PM 11         THE COURT:  WELL, IT SEEMS LIKE -- AND I DON'T

04:41PM 12    THINK, MR. DOWNEY, YOU ARE OBJECTING TO THE JURY KNOWING ABOUT

04:41PM 13    THE DURATION OF THE RELATIONSHIP.

04:41PM 14         MR. DOWNEY:  NO, I DON'T OBJECT TO THAT, AND I DON'T

04:41PM 15    OBJECT TO THE FACT THAT THEY KNOW THAT HE WAS AN INVESTOR.

04:41PM 16         BUT I DON'T SEE WHAT ELSE ABOUT THAT PERIOD -- IF THERE'S

04:41PM 17    ANYTHING, YOU KNOW, THAT IS DIRECTLY RELEVANT TO THE CONSPIRACY

04:41PM 18    ALLEGATIONS THAT HE WANTS TO TESTIFY TO THAT HE THINKS HE KNEW

04:41PM 19    ABOUT THE COMPANY, FOR EXAMPLE, HE MAKES SOME STATEMENTS ABOUT

04:41PM 20    WHAT HE THINKS HE KNEW ABOUT THE RELATIONSHIP BETWEEN THERANOS

04:41PM 21    AND PHARMACEUTICAL COMPANIES, I THINK THAT'S, YOU KNOW, FAIR

04:41PM 22    GAME.

04:41PM 23         THIS IS A DIFFERENT ISSUE.  THIS IS INJECTING A WHOLE NEW

04:41PM 24    THEORY OF LIABILITY INTO THE CASE.

04:41PM 25         WE'VE GOT PLENTY HERE TO DEAL WITH.

4861

04:41PM 1          MR. BOSTIC:  YOUR HONOR, JUST ONE FINAL POINT.

04:41PM 2          MR. DOWNEY HAS REFERENCED SEVERAL TIMES LANGUAGE IN THE

04:41PM 3   STOCK PURCHASE AGREEMENT, A LEGAL DOCUMENT ENTERED INTO BETWEEN

04:41PM 4   MR. EISENMAN AND THERANOS.

04:42PM 5          LANGUAGE IN THAT CONTRACT WHERE THE INVESTOR SAID THAT

04:42PM 6   THEY HAVE ACCESS TO ALL OF THE INFORMATION THAT THEY NEED,

04:42PM 7   WHERE THEY SAY THAT THEY UNDERSTAND THE COMPANY'S HIGH RISK,

04:42PM 8   PROVISIONS LIKE THAT MIGHT HAVE A GREATER EFFECT WERE THIS A

04:42PM 9   CIVIL CASE BROUGHT BY THE INVESTOR AGAINST THE COMPANY WHERE

04:42PM 10  THE DECISION MIGHT TURN ON WHETHER THE INVESTOR HAD WAIVED

04:42PM 11  CERTAIN RIGHTS BY MAKING THOSE STATEMENTS.

04:42PM 12         THEY DO NOT, HOWEVER, RENDER INADMISSIBLE A VICTIM'S

04:42PM 13  STATEMENTS OR TESTIMONY ABOUT MISREPRESENTATIONS THAT A

04:42PM 14  FRAUDSTER MADE TO HIM BEFORE THE SIGNING OF THAT CONTRACT.

04:42PM 15         THEY CANNOT BE USED AS A SHIELD TO KEEP OUT TESTIMONY

04:42PM 16  ABOUT PREVIOUS MISREPRESENTATIONS.

04:42PM 17         THE COURT:  OKAY.

04:42PM 18         MR. DOWNEY:  YOUR HONOR, ONE OTHER THING.  I JUST

04:42PM 19  WANTED TO COMMENT ON YOUR HONOR'S COMMENT ABOUT TO CONSIDER,

04:42PM 20  NOT TO BELABOR THE COURT FOR THE COURT, BUT JUST WITH RESPECT

04:43PM 21  TO THE SCOPE ON THE EFFECT OF THE INVESTMENT ON HIS RETIREMENT

04:43PM 22  PLANNING AND SO FORTH, WITH RESPECT, I DISAGREE THAT COMMENTS

04:43PM 23  ABOUT HERE'S WHAT I WAS THINKING IN TERMS OF WHAT I WOULD DO

04:43PM 24  WITH THE MONEY, THAT HAS TO DO WITH HIS STATE OF MIND IF HE

04:43PM 25  REALIZES A RETURN.

04:43PM 1        IT DOESN'T HAVE TO DEAL -- IT HAS NOTHING TO DO WITH WHAT

04:43PM 2   IS MATERIAL IN HIS MAKING THE INVESTMENT DECISION OR THE STATE

04:43PM 3   OF MIND OF THE DEFENDANT.  THOSE ARE THE RELEVANT ISSUES.

04:43PM 4        SO HOW MONEY IS GOING TO BE USED, WHETHER IT'S LOST OR

04:43PM 5   REPRESENTS A SUBSTANTIAL GAIN, THAT'S NOT RELEVANT IN THE CASE.

04:43PM 6        SO I THINK THE SCOPE OF THE ADMONITION, YOU KNOW, SHOULD

04:43PM 7   INCLUDE THOSE ISSUES, AND I THINK THAT'S THE -- I THINK IT'S A

04:43PM 8   HELPFUL CONVERSATION.  THAT'S THE NUM OF OUR DISAGREEMENT.

04:43PM 9        THE COURT:  WELL, I THINK IT'S -- WHEN I SAID I

04:43PM 10  THINK HE CAN SAY, THIS IS PART OF MY PLANNING --

04:43PM 11        MR. DOWNEY:  YEAH.

04:43PM 12        THE COURT:  -- I DON'T SEE ANY HARM IN THAT.  THAT'S

04:44PM 13  COMMON KNOWLEDGE.  PEOPLE DO THAT.  AND THIS IS WHAT HE WAS

04:44PM 14  DOING AS PART OF HIS FINANCIAL PLANNING.

04:44PM 15        AND IT'S AN INVESTMENT.  WHATEVER IT IS, THAT'S FINE.

04:44PM 16        MR. DOWNEY:  I THINK THAT FAR IS FINE.  IT'S GOING

04:44PM 17  BEYOND THAT.

04:44PM 18        THE COURT:  WELL, I THINK THAT'S WHAT WE'RE TALKING

04:44PM 19  ABOUT, TOO.  IF HE TALKS ABOUT SOMETHING THAT IS REAL OR NOT

04:44PM 20  THAT SEEKS TO INJECT SYMPATHY OR SOMETHING LIKE THAT, IT MIGHT

04:44PM 21  NOT BE APPROPRIATE FOR THAT.  THAT'S WHAT I'M THINKING ABOUT.

04:44PM 22  THAT'S WHAT I HEARD.

04:44PM 23        BUT GENERAL TERMS ABOUT FINANCIAL PLANNING, I THINK

04:44PM 24  THAT'S -- WHY ELSE WOULD HE INVEST?  WHY DO PEOPLE DO THAT?

04:44PM 25        MR. DOWNEY:  HE HARDLY NEEDS TO SAY IT.

4863

04:44PM 1          MR. BOSTIC:  YOUR HONOR, JUST ON THAT POINT, THE

04:44PM 2     LANGUAGE THAT WE'RE TALKING ABOUT -- AND I EXPECT THE LANGUAGE

04:44PM 3     THAT IS REDACTED IN THESE EMAILS -- IT ALL OCCURS BEFORE THE

04:44PM 4     ACTUAL LOSS IN THIS CASE, SO NONE OF IT IS OF THE SORT THAT I

04:44PM 5     THINK THE COURT WAS TARGETING IN ITS MOTION IN LIMINE ORDER --

04:44PM 6          THE COURT:  RIGHT.

04:44PM 7          MR. BOSTIC:  -- RELATING TO THE HARM AND THE

04:45PM 8     DOWNSTREAM EFFECTS THAT MIGHT HAVE FLOWED FROM THE LOSS.

04:45PM 9          THE COURT:  WELL, WE'LL ALL LOOK AT THIS.

04:45PM 10      SO WHAT IS THE SCHEDULE THEN?  WE'LL FINISH MS. PETERSON,

04:45PM 11    I THINK MR. WADE HAS ABOUT SEVEN MINUTES LEFT, AND THEN SOME

04:45PM 12    REDIRECT?

04:45PM 13         MR. DOWNEY:  I THINK DR. CULLEN, IT SOUNDS LIKE

04:45PM 14    SHE'LL BE AN HOUR IN TOTAL PERHAPS.

04:45PM 15         THE COURT:  AND THEN WE'RE GOING TO CALL THE DOCTOR

04:45PM 16    I GUESS; IS THAT RIGHT?

04:45PM 17         MR. SCHENK:  YOUR HONOR, I NEED TO SPEAK WITH THE

04:45PM 18    AGENTS.  THE DEFENSE ASKED US A COUPLE OF DAYS AGO FOR NAMES OF

04:45PM 19    WITNESSES AND WITNESS ORDER TODAY.  THEY ASKED FOR THREE NAMES

04:45PM 20    THAT DAY, INCLUDING MS. PETERSON.

04:45PM 21      SO WE WERE UNDER THE IMPRESSION THAT WE COULD ACCOMPLISH

04:45PM 22    MS. PETERSON'S TESTIMONY AND TWO OTHER WITNESSES TODAY.

04:45PM 23         THE COURT:  TODAY.

04:45PM 24         MR. SCHENK:  AGAIN, THAT WAS BASED ON ASKING FOR

04:45PM 25    ADDITIONAL NAMES, REQUESTS FROM THE DEFENSE FOR ADDITIONAL

4864

04:45PM 1    NAMES.

04:45PM 2        WE HAD TO TAKE A WITNESS OUT OF ORDER.  WE CALLED

04:46PM 3    MS. PETERSON FIRST BECAUSE DR. CULLEN HAD TRAVEL ISSUES

04:46PM 4    PREVENTING HER FROM FLYING IN YESTERDAY.  SHE ARRIVED THIS

04:46PM 5    MORNING, AND SO WE PUT MS. PETERSON ON THE STAND FIRST.

04:46PM 6        I DO NOT KNOW -- MS. -- DR. CULLEN HAD A FLIGHT OUT

04:46PM 7    TONIGHT.  I TOLD HER SHE WOULD GET ON THE STAND TODAY AND SHE

04:46PM 8    WOULD GET OFF THE STAND TODAY BECAUSE THAT'S THE IMPRESSION I

04:46PM 9    WAS UNDER.

04:46PM 10       I DON'T KNOW WHETHER SHE'S GOING TO GET ON THAT FLIGHT AND

04:46PM 11   FLY HOME TONIGHT AND WE WILL BRING HER BACK NEXT WEEK OR AT

04:46PM 12   SOME OTHER POINT BECAUSE WE THOUGHT SHE WOULD FINISH TODAY.

04:46PM 13       SO I DON'T KNOW WHO THE NEXT WITNESS IS.  I'D LIKE TO

04:46PM 14   SPEND SOME TIME THIS EVENING INQUIRING ABOUT THAT.

04:46PM 15            THE COURT:  SURE.

04:46PM 16            MR. SCHENK:  IT WOULD BE VERY HELPFUL IF WE COULD

04:46PM 17   GET A REALISTIC ESTIMATE FROM THE DEFENSE ON THE LENGTH OF

04:46PM 18   CROSS REMAINING FOR PETERSON, AS WELL AS EISENMAN, BECAUSE

04:46PM 19   SOMETIMES WE'VE BROUGHT TOO MANY WITNESSES BECAUSE WE THOUGHT

04:46PM 20   THAT THE CROSSES WOULD END IN TIME, AND IT WOULD BE HELPFUL TO

04:46PM 21   PROVIDE ESTIMATES THAT WERE MORE REALISTIC.

04:47PM 22            THE COURT:  WELL, I'M SURE -- THANK YOU.

04:47PM 23       I'M SURE MR. WADE HAS MORE THAN SEVEN MINUTES TOMORROW.

04:47PM 24            MR. WADE:  I DON'T ANTICIPATE A LOT.  I ANTICIPATE A

04:47PM 25   VERY SHORT AMOUNT OF --

4865

04:47PM 1            THE COURT:  WHAT I'VE LEARNED IS THAT THOSE TERMS

04:47PM 2    ARE QUITE RELATIVE IN THIS TRIAL.

04:47PM 3            MR. WADE:  YEAH.

04:47PM 4            THE COURT:  SO WHAT DO YOU THINK?  CAN WE FINISH TWO

04:47PM 5    WITNESSES?  CAN WE FINISH MS. PETERSON AND A WITNESS TOMORROW?

04:47PM 6            MR. WADE:  I THINK IT PROBABLY DEPENDS ON WHO THE

04:47PM 7    SECOND WITNESS IS.

04:47PM 8            MR. DOWNEY:  I THINK CERTAINLY DR. CULLEN.  MY

04:47PM 9    IMPRESSION IS THAT THAT'S A BRIEF WITNESS.

04:47PM 10           MR. SCHENK:  I DON'T THINK THERE'S ANY QUESTION THAT

04:47PM 11   DR. CULLEN WOULD FINISH IF SHE'S STILL IN TOWN.

04:47PM 12       I'M WONDERING IF EISENMAN, WHO IS IN TOWN, IF EISENMAN

04:47PM 13   FOLLOWS PETERSON, CAN -- WILL THE GOVERNMENT NEED A WITNESS

04:47PM 14   AFTER EISENMAN OR WILL EISENMAN NOT FINISH TOMORROW?

04:47PM 15           MR. DOWNEY:  THAT I DON'T KNOW, YOUR HONOR.  SOME OF

04:47PM 16   IT RELATES TO THE RULINGS ON THESE ISSUES BECAUSE THEY TAKE US

04:47PM 17   INTO COMPLEX AREAS.

04:47PM 18       BUT I WOULD -- I WOULD THINK WE WOULD GET VERY CLOSE WITH

04:48PM 19   EISENMAN IF NOT FINISH TOMORROW.

04:48PM 20           THE COURT:  DIRECT IS GOING TO BE AN HOUR OR SO WITH

04:48PM 21   HIM MAYBE?

04:48PM 22           MR. BOSTIC:  I'D ESTIMATE BETWEEN 60 AND 90 MINUTES,

04:48PM 23   YOUR HONOR.

04:48PM 24           MR. DOWNEY:  YEAH.  SO IT SOUNDS LIKE -- WELL, IT

04:48PM 25   SOUNDS LIKE WE WOULD ONLY HAVE ABOUT 90 MINUTES THEN.  I'M NOT

4866

04:48PM 1    SURE WE WOULD FINISH THAT.

04:48PM 2          THE COURT:  YEAH.  MR. WADE HAS SOME TIME TO GO IN

04:48PM 3    HIS REDIRECT AND THERE'S RECROSS, AND THAT'S TWO HOURS RIGHT

04:48PM 4    THERE I'M SURE.

04:48PM 5          MR. DOWNEY:  I'M SURE THAT'S TWO HOURS.

04:48PM 6          MR. SCHENK:  FOR PETERSON?

04:48PM 7          MR. WADE:  I WOULDN'T ANTICIPATE IT'S GOING TO BE

04:48PM 8    TWO HOURS, YOUR HONOR.  MY HOPE IS IT WOULD BE AN HOUR MAX.

04:48PM 9          THE COURT:  IN TOTAL?

04:48PM 10         MR. WADE:  I DON'T KNOW HOW MUCH MR. LEACH HAS,

04:48PM 11   BUT --

04:48PM 12         THE COURT:  YOU'RE GOING TO BE LESS THAN AN HOUR YOU

04:48PM 13   THINK?

04:48PM 14         MR. WADE:  I BELIEVE I WILL BE, YEAH.

04:48PM 15         THE COURT:  OKAY.  WELL, I DON'T KNOW IF THAT'S

04:48PM 16   HELPFUL TO YOU.

04:48PM 17         MR. SCHENK:  IF I COULD JUST CLARIFY?  IT SOUNDED

04:49PM 18   LIKE MR. DOWNEY WAS SAYING, EVEN WITH SIX HOURS REMAINING IN

04:49PM 19   THE DAY, IF PETERSON, LET'S SAY, TAKES TWO HOURS OR SO, MAYBE

04:49PM 20   AN HOUR, IF WE GO UNTIL 4:00, WE STILL MIGHT NOT FINISH AND THE

04:49PM 21   GOVERNMENT'S --

04:49PM 22         MR. DOWNEY:  I THOUGHT YOU WERE SAYING WITH CULLEN

04:49PM 23   IN BETWEEN.

04:49PM 24         MR. SCHENK:  CULLEN MAY GET ON A PLANE AND LEAVE

04:49PM 25   TONIGHT.  WE MAY HAVE TO GO DIRECTLY TO EISENMAN TOMORROW.  I

4867

| | | |
|---|---|---|
| 04:49PM | 1 | NEED TO WORK ON THAT WHEN WE LEAVE. |
| 04:49PM | 2 | THE COURT:  RIGHT. |
| 04:49PM | 3 | MR. SCHENK:  WHAT I'M WONDERING IS, CAN I TELL |
| 04:49PM | 4 | CULLEN, YOU'RE GUARANTEED TO FINISH TOMORROW?  OR NOT?  AND I |
| 04:49PM | 5 | HAVE SOME CONCERN. |
| 04:49PM | 6 | MR. CLINE:  CULLEN OR EISENMAN? |
| 04:49PM | 7 | THE COURT:  THIS IS CULLEN TOMORROW. |
| 04:49PM | 8 | MR. DOWNEY:  GOING AFTER PETERSON? |
| 04:49PM | 9 | MR. SCHENK:  GOING AFTER PETERSON OR GOING AFTER |
| 04:49PM | 10 | EISENMAN DEPENDING ON THE LENGTH. |
| 04:49PM | 11 | MR. CLINE:  I'M DOING CULLEN, DR. CULLEN.  I'M NOT |
| 04:49PM | 12 | SURE HOW LONG THE DIRECT WILL BE, BUT MY CROSS WON'T BE MORE |
| 04:49PM | 13 | THAN 20 MINUTES.  AND LET'S JUST SAY 30 TO BE ABSOLUTELY SAFE. |
| 04:50PM | 14 | DEFINITELY NOT MORE THAN 30 MINUTES. |
| 04:50PM | 15 | THE COURT:  CULLEN'S DIRECT I CAN'T IMAGINE WILL BE |
| 04:50PM | 16 | MORE THAN AN HOUR. |
| 04:50PM | 17 | MR. SCHENK:  CULLEN, IT SOUNDS LIKE, WILL CERTAINLY |
| 04:50PM | 18 | FINISH AFTER PETERSON IF SHE STAYS IN TOWN.  JUST ONE MOMENT. |
| 04:50PM | 19 | THE COURT:  SURE. |
| 04:50PM | 20 | (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.) |
| 04:50PM | 21 | MR. SCHENK:  SO FAR WHAT I WAS SUGGESTING IS |
| 04:50PM | 22 | EISENMAN ALSO HAS TO FINISH.  HE HAS COMMITMENTS, AND WE'RE |
| 04:50PM | 23 | DARK THURSDAY, FRIDAY.  HE CAN'T BE HERE NEXT WEEK. |
| 04:50PM | 24 | THE COURT:  RIGHT. |
| 04:50PM | 25 | MR. SCHENK:  SO I WAS TRYING TO FIGURE OUT IF CULLEN |

4868

04:50PM  1    STAYS, DOES SHE TESTIFY BEFORE OR AFTER EISENMAN?  BECAUSE WE

04:50PM  2    NEED TO FINISH BOTH OF THEM.  AND IF CULLEN JUST LEAVES TONIGHT

04:50PM  3    AND WE PUT EISENMAN ON TOMORROW AND HE'S DONE AND WE DON'T HAVE

04:50PM  4    A CARRY-OVER PROBLEM WITH CULLEN, OR IS THERE A CHANCE THEY

04:50PM  5    BOTH FINISH SO WE DON'T HAVE TO CONCERN OURSELVES WITH THE

04:50PM  6    ORDER?

04:50PM  7            THE COURT:  IT SOUNDS TO ME LIKE IT'S GOING TO BE

04:50PM  8    VERY DIFFICULT, IF NOT IMPOSSIBLE, TO FINISH TWO WITNESSES, TWO

04:51PM  9    ADDITIONAL WITNESSES FROM MS. PETERSON'S FINISHING.

04:51PM 10        SO IS THIS THEN A CHOICE -- IS IT EISENMAN?  IS THAT HIS

04:51PM 11    NAME?

04:51PM 12            MR. SCHENK:  EISENMAN.

04:51PM 13            THE COURT:  HE'S NOT AVAILABLE NEXT WEEK?

04:51PM 14            MR. SCHENK:  CORRECT.

04:51PM 15            THE COURT:  SO MAYBE THAT'S -- WE NEED TO FOCUS ON

04:51PM 16    HIM FOR TOMORROW AND HOPE THAT HE FINISHES TOMORROW.

04:51PM 17            MR. SCHENK:  THAT'S WHAT IT IS SOUNDING LIKE TO ME.

04:51PM 18            THE COURT:  YEAH.

04:51PM 19        SORRY, MR. CLINE.  WE'LL HAVE TO DEFER.

04:51PM 20            MR. CLINE:  I WAS SO READY FOR DR. CULLEN TO COME.

04:51PM 21            THE COURT:  SHARPENING YOUR KNIVES ALL WEEKEND.

04:51PM 22            MR. DOWNEY:  AND IT MAY EVENTUALLY.  WE'LL SEE WHAT

04:51PM 23    HAPPENS.

04:51PM 24        YOU'RE SENDING DR. CULLEN HOME THEN?

04:51PM 25            MR. SCHENK:  I WOULD LIKE TO SPEND SOME TIME THIS

4869

04:51PM  1    EVENING FIGURING THAT OUT.

04:51PM  2            MR. DOWNEY:  I WOULD SAY THERE'S A DIFFERENCE

04:51PM  3    BETWEEN A BOSTIC HOUR AND A BOSTIC HOUR AND A HALF, TOO.  SO I

04:51PM  4    APPRECIATE YOUR COMMENTS ON THE CROSSES, BUT I -- AND WE'RE

04:52PM  5    DOING THE BEST WE CAN.

04:52PM  6            THE COURT:  BOTH SIDES, EVERYONE IS.  THAT INCLUDES

04:52PM  7    ME, TOO.

04:52PM  8            MR. DOWNEY:  I KNOW THAT.

04:52PM  9        AND MR. SCHENK IS RIGHT, WE ARE TRYING TO WORK WITH HIM SO

04:52PM  10   THAT HE CAN BE PREDICTIVE AS TO WHAT HAPPENS.

04:52PM  11           THE COURT:  ALL RIGHT.  WELL, IT SOUNDS LIKE -- IT

04:52PM  12   SOUNDS LIKE EISENMAN, MR. EISENMAN, WE NEED TO GET HIM DONE.

04:52PM  13   OTHERWISE HE'S GOING TO BE DRAGGED BACK IN WEEKS AFTER.

04:52PM  14           MR. SCHENK:  RIGHT.

04:52PM  15           THE COURT:  WELL, ALL RIGHT.  WE'LL LET YOU DISCUSS,

04:52PM  16   AND WE'LL LOOK AT THIS, AND WE'LL SEE YOU TOMORROW ABOUT 8:15.

04:52PM  17           MR. DOWNEY:  GREAT.  THANKS, JUDGE.

04:52PM  18           THE COURT:  THANK YOU.

04:52PM  19           MR. SCHENK:  THANK YOU.

04:52PM  20           THE COURT:  ALL RIGHT.

04:52PM  21           THE CLERK:  COURT IS ADJOURNED.

04:52PM  22       (COURT ADJOURNED AT 4:52 P.M.)

       23

       24

       25

1

2

3                    CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8     UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9     CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10    HEREBY CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16         _____
           IRENE RODRIGUEZ, CSR, CRR
           CERTIFICATE NUMBER 8076
17

18

19         _____
           LEE-ANNE SHORTRIDGE, CSR, CRR
           CERTIFICATE NUMBER 9595
20

21         DATED:  OCTOBER 26, 2021

22

23

24

25

1

2                  UNITED STATES DISTRICT COURT

3                 NORTHERN DISTRICT OF CALIFORNIA

4                      SAN JOSE DIVISION

5

    UNITED STATES OF AMERICA,        )  CR-18-00258-EJD
6                                    )
                     PLAINTIFF,      )  SAN JOSE, CALIFORNIA
7                                    )
             VS.                     )  VOLUME 25
8                                    )
    ELIZABETH A. HOLMES,             )  OCTOBER 27, 2021
9                                    )
                     DEFENDANT.      )  PAGES 4870 - 4902
10   _____)

11              TRANSCRIPT OF TRIAL PROCEEDINGS
12          BEFORE THE HONORABLE EDWARD J. DAVILA
                UNITED STATES DISTRICT JUDGE
13
    A P P E A R A N C E S:
14
    FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
15                         BY:  JOHN C. BOSTIC
                                JEFFREY B. SCHENK
16                         150 ALMADEN BOULEVARD, SUITE 900
                           SAN JOSE, CALIFORNIA 95113
17
                           BY:  ROBERT S. LEACH
18                              KELLY VOLKAR
                           1301 CLAY STREET, SUITE 340S
19                         OAKLAND, CALIFORNIA 94612

20       (APPEARANCES CONTINUED ON THE NEXT PAGE.)

21

    OFFICIAL COURT REPORTERS:
22                         IRENE L. RODRIGUEZ, CSR, RMR, CRR
                           CERTIFICATE NUMBER 8074
23                         LEE-ANNE SHORTRIDGE, CSR, CRR
                           CERTIFICATE NUMBER 9595
24
           PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25              TRANSCRIPT PRODUCED WITH COMPUTER

1    A P P E A R A N C E S: (CONT'D)

2

3    FOR DEFENDANT HOLMES:    WILLIAMS & CONNOLLY LLP
                              BY:  KEVIN M. DOWNEY
4                                  LANCE A. WADE
                                   KATHERINE TREFZ
5                                  PATRICK LOOBY
                                   ANDREW LEMENS
6                                  RICHARD CLEARY
                              725 TWELFTH STREET, N.W.
7                             WASHINGTON, D.C. 20005

8                             LAW OFFICE OF JOHN D. CLINE
                              BY:  JOHN D. CLINE
9                             ONE EMBARCADERO CENTER, SUITE 500
                              SAN FRANCISCO, CALIFORNIA 94111
10

11   ALSO PRESENT:           FEDERAL BUREAU OF INVESTIGATION
                             BY:  ADELAIDA HERNANDEZ
12
                              OFFICE OF THE U.S. ATTORNEY
13                            BY:  LAKISHA HOLLIMAN, PARALEGAL
                                   MADDI WACHS, PARALEGAL
14
                              WILLIAMS & CONNOLLY
15                            BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL

16                            TBC
                              BY:  BRIAN BENNETT, TECHNICIAN
17

18

19

20

21

22

23

24

25

4872

```
 1    SAN JOSE, CALIFORNIA                    OCTOBER 27, 2021

 2                    P R O C E E D I N G S

 3         (COURT CONVENED AT 8:14 A.M.)

 4         (JURY OUT AT 8:14 A.M.)

 5              THE COURT:  ALL RIGHT.  LET'S GO ON THE RECORD IN

 6    THE HOLMES MATTER.  ALL COUNSEL ARE PRESENT.  MS. HOLMES IS

 7    PRESENT.

 8         WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.  IT'S ABOUT

 9    8:15.  OUR COURT DAY WITH EVIDENCE STARTS AT 9:00 A.M.

10         WE HAD AGREED TO COME THIS MORNING TO MEET AND SPEAK ON

11    SOME OTHER EVIDENTIARY ISSUES, I THINK REGARDING THREE ITEMS.

12         BUT I THINK WE ALL LEARNED THIS MORNING THAT APPARENTLY A

13    BLOCK FROM HERE, NORTH OF THE COURTHOUSE ON SECOND AND

14    SAN FERNANDO STREETS, THERE'S A WATER PIPE THAT BURST.

15         I'M JUST INFORMED FROM OUR BUILDING MANAGER THAT WATER IS

16    OUT ALL ON SECOND STREET FROM SANTA CLARA STREET SOUTH, WHICH

17    INCLUDES THIS BUILDING.  I'M INFORMED THE WATER WILL NOT -- THE

18    ESTIMATED TIME TO REPAIR IS, AT THE EARLIEST, 2:00 P.M. THIS

19    AFTERNOON.

20         THE CHIEF JUDGE HAS BEEN NOTIFIED.  MY SENSE IS THAT HE,

21    THE CHIEF JUDGE, WILL PROBABLY CLOSE THE BUILDING FOR HEALTH

22    AND SANITATION REASONS, AND I EXPECT THAT'S GOING TO HAPPEN

23    SHORTLY.  I HAVEN'T HEARD OR TALKED WITH JUDGE SEEBORG, BUT

24    THAT'S MY SENSE OF IT.

25         BUT IF, IN FACT, WE'RE NOT GOING TO HAVE WATER UNTIL 2:00
```

08:15AM 1      P.M., I JUST DON'T THINK THAT WE CAN PROCEED WITH THE TRIAL

08:15AM 2      THIS MORNING.

08:15AM 3          I'M HAPPY TO HEAR FROM YOU, BUT HAVING 15 JURORS AND

08:15AM 4      HAVING ALL OF YOU AND THE PUBLIC WITHOUT WATER AVAILABLE IS --

08:15AM 5      I THINK THAT ASKS TOO MUCH.

08:15AM 6          BUT I'M HAPPY TO HEAR FROM COUNSEL IF YOU HAVE ANY

08:15AM 7      THOUGHTS OR SUGGESTIONS.

08:15AM 8              MR. SCHENK:  THANK YOU, YOUR HONOR.

08:15AM 9          NO, WE AGREE.  WE DON'T HAVE ANY OTHER SUGGESTIONS.  IT

08:16AM 10     MAKES SENSE NOT TO HAVE THE JURY COME IN IF THEY CAN'T WASH

08:16AM 11     THEIR HANDS OR DO ANYTHING THAT IS NECESSARY THESE DAYS.

08:16AM 12             THE COURT:  MR. DOWNEY?

08:16AM 13             MR. DOWNEY:  YEAH, WE AGREE, YOUR HONOR.  WE DON'T

08:16AM 14     HAVE ANY REASON TO --

08:16AM 15             THE COURT:  AND NOT TO MENTION THE PUBLIC HERE AND

08:16AM 16     ALL OF YOU, I APOLOGIZE.  I DON'T KNOW WHAT HAPPENED.  I SAW --

08:16AM 17     MAYBE SOME OF YOU SAW WHO WERE COMING IN FROM THE NORTH,

08:16AM 18     THERE'S A HOLE DOWN ON THE CORNER OF SAN FERNANDO AND FIRST

08:16AM 19     STREET WITH A LOT OF MEN WITH YELLOW JACKETS STARING DOWN THE

08:16AM 20     HOLE, SO THAT SUGGESTS SOMETHING.

08:16AM 21         (LAUGHTER.)

08:16AM 22             THE COURT:  WELL, ALL RIGHT.

08:16AM 23         WHY DON'T WE -- MS. KRATZMANN, HAS THE JURY -- I SAW SOME

08:16AM 24     JURORS COMING IN.

08:16AM 25             THE CLERK:  I'M SURE THERE'S A FEW HERE, YOUR HONOR,

08:16AM 1    BUT USUALLY THE LAST OF THEM DON'T COME IN UNTIL JUST BEFORE

08:16AM 2    9:00.

08:16AM 3            THE COURT:  OKAY.  WELL, I THINK WHAT WE'LL DO IS

08:17AM 4    WAIT FOR THE COLLECTIVE JURY TO COME AND THEN I'LL FORMALLY

08:17AM 5    INFORM THEM OF THIS, AND THEN WE CAN TAKE A RECESS.

08:17AM 6        I'M JUST WONDERING IF THERE'S ANYTHING THAT WE CAN DO IN

08:17AM 7    THEIR ABSENCE, BUT THAT STILL PUTS ALL OF US AT A PROBLEM WITH

08:17AM 8    THE WATER ISSUE, AND I DON'T WANT TO IMPOSE ON ANYONE.

08:17AM 9        WELL, LET'S JUST SEE WHAT HAPPENS.  WHEN THE JURY COMES

08:17AM 10   IN, I'LL CALL THEM IN, AND MAYBE BY THAT TIME I WILL HAVE HEARD

08:17AM 11   FROM THE CHIEF JUDGE.  IF NOT, IF THE ETA FOR REPAIR REMAINS AS

08:17AM 12   SUCH AT 2:00 P.M., I THINK WE JUST HAVE TO CANCEL TODAY

08:17AM 13   REGRETTABLY.

08:17AM 14       AND I'M SORRY FOR YOUR WITNESSES.  I KNOW THEY HAVE FLOWN

08:17AM 15   IN.

08:17AM 16       I'M PAUSING BECAUSE I'M THINKING, WELL, MAYBE WE CAN ALL

08:17AM 17   MOVE TO SAN FRANCISCO AND GET IN ONE OF THEIR GRAND COURTROOMS,

08:17AM 18   BUT I DON'T THINK THAT WOULD WORK.

08:17AM 19       ALL RIGHT.  WELL, I JUST WANTED TO GIVE YOU THAT

08:18AM 20   INFORMATION.  I THINK YOU ALL KNEW IT, AND I APOLOGIZE FOR

08:18AM 21   THAT.

08:18AM 22           MR. DOWNEY:  YOUR HONOR, JUST ON THE SCHEDULE, SINCE

08:18AM 23   I AM HERE, I DID WANT TO MENTION IT, AND I DIDN'T HAVE A CHANCE

08:18AM 24   TO MENTION IT TO MR. SCHENK, JUST IN TERMS OF THE CURRENT

08:18AM 25   WITNESSES THAT WE HAVE FOR PLANNING PURPOSES -- AND THIS IS NOW

| 08:18AM | 1 | UP IN THE AIR, I REALIZE, WITH THE SCHEDULE -- BUT I DON'T |
|---|---|---|
| 08:18AM | 2 | THINK THAT THE COMPLETION OF MS. PETERSON WILL TAKE VERY LONG |
| 08:18AM | 3 | AT ALL. |
| 08:18AM | 4 | I THINK THAT'S PROBABLY MORE A MATTER FOR THE |
| 08:18AM | 5 | CROSS-EXAMINATION OF SOMETHING LIKE A QUARTER HOUR, HALF AN |
| 08:18AM | 6 | HOUR. |
| 08:18AM | 7 | MR. WADE:  AN HOUR. |
| 08:18AM | 8 | MR. DOWNEY:  LESS THAN AN HOUR. |
| 08:18AM | 9 | I DON'T THINK, IF MR. BOSTIC IS SOMEWHERE BETWEEN AN HOUR |
| 08:18AM | 10 | AND AN HOUR AND A HALF, I CERTAINLY THINK ON A 4:00 P.M. DAY, |
| 08:18AM | 11 | IF MS. PETERSON FINISHED, WE WOULD ALSO FINISH MR. EISENMAN |
| 08:18AM | 12 | BASED ON WHAT WE ANTICIPATE. |
| 08:18AM | 13 | SO TO THE EXTENT THAT'S HELPFUL TO THE GOVERNMENT. |
| 08:18AM | 14 | THE COURT:  THANK YOU.  I APPRECIATE, I APPRECIATE |
| 08:18AM | 15 | YOUR EFFORTS IN WORKING THAT OUT. |
| 08:18AM | 16 | MR. SCHENK:  MAY I JUST HAVE ONE MOMENT? |
| 08:18AM | 17 | THE COURT:  OF COURSE. |
| 08:19AM | 18 | (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.) |
| 08:19AM | 19 | MR. SCHENK:  YOUR HONOR, I WAS JUST WONDERING |
| 08:19AM | 20 | WHETHER IT MADE SENSE TO TRY TO FINISH MS. PETERSON THIS |
| 08:19AM | 21 | MORNING?  SHE'S AN OUT-OF-TOWN WITNESS.  AND IF IT'S VERY |
| 08:19AM | 22 | BRIEF, IT'S AN OPTION. |
| 08:19AM | 23 | THE COURT:  I HAD THE SAME THOUGHT AS SOON AS |
| 08:19AM | 24 | MR. DOWNEY FINISHED THAT. |
| 08:19AM | 25 | MR. DOWNEY:  I MENTION IT FOR THAT REASON, ALTHOUGH |

4876

08:19AM  1    I WAS REMINDED BY MS. KRATZMANN THAT SOME OF THE JURORS HAVE

08:19AM  2    COME A DISTANCE TO COME IN AND THE PROBLEM COULD PRESENT ITSELF

08:19AM  3    QUICKLY, SO I DON'T WANT TO PRESUME ON THEM.

08:19AM  4        OBVIOUSLY I THINK IT WOULD BE BOTH OF OUR PREFERENCE TO

08:19AM  5    FINISH WHAT IS PENDING.

08:19AM  6            THE COURT:  RIGHT.  WELL, LET'S WAIT FOR THE JURY.

08:20AM  7    WHEN THEY ARRIVE, IF I TELL THEM WE NEED 30 MINUTES OF THEIR

08:20AM  8    TIME THIS MORNING, IS THAT A FAIR STATEMENT?

08:20AM  9            MR. DOWNEY:  MAYBE AN HOUR.

08:20AM  10           THE COURT:  RESTRAIN YOUR ENTHUSIASM, MR. WADE.  YOU

08:20AM  11   THINK AN HOUR?

08:20AM  12           MR. DOWNEY:  THAT SOUNDS -- I WOULDN'T --

08:20AM  13           THE COURT:  THAT'S MAYBE PUSHING IT.

08:20AM  14           MR. DOWNEY:  MAYBE SO.  OKAY.

08:20AM  15           THE COURT:  WELL, WE'LL CHECK IN AND SEE.

08:20AM  16           MR. SCHENK:  THANK YOU.

08:20AM  17           MR. DOWNEY:  THANK YOU.

08:20AM  18           THE CLERK:  COURT IS IN RECESS.

08:20AM  19       (RECESS FROM 8:20 A.M. UNTIL 8:34 A.M.)

08:34AM  20           THE COURT:  ALL RIGHT.  WE'RE BACK ON THE RECORD IN

08:35AM  21   THE HOLMES MATTER OUTSIDE OF THE PRESENCE OF THE JURY.  ALL

08:35AM  22   COUNSEL AND MS. HOLMES ARE PRESENT.

08:35AM  23       AS WE DISCUSSED EARLIER, WE RECEIVED WORD FROM

08:35AM  24   SAN FRANCISCO THAT THE COURTHOUSE, SAN JOSE COURTHOUSE, WILL BE

08:35AM  25   CLOSED IMMEDIATELY, AND WE HAVE INSTRUCTIONS TO VACATE THE

08:35AM   1    BUILDING, EVERYONE IN THE BUILDING.

08:35AM   2         WE'RE WAITING FOR OUR JURY TO ARRIVE SO WE CAN -- SO I CAN

08:35AM   3    INFORM THEM OF THIS.

08:35AM   4         BUT IN THE INTERIM, I THOUGHT WE WOULD USE THIS TIME TO

08:35AM   5    DISCUSS SOME OF THE ISSUES THAT WE -- WHILE WE WAIT FOR THE

08:35AM   6    JURY, THAT WE TALKED ABOUT.

08:35AM   7         LET'S -- I TALKED ABOUT THE LISA PETERSON DOCUMENT AGAIN,

08:36AM   8    AND, MR. WADE, I THINK THIS IS SOMETHING THAT WE DISCUSSED

08:36AM   9    YESTERDAY.

08:36AM   10        MR. WADE:  WE DID DISCUSS IT YESTERDAY, YOUR HONOR,

08:36AM   11   AND I HAD THE BENEFIT OF BEING ABLE TO GO BACK AND LOOK AT THE

08:36AM   12   TRANSCRIPT OF WHAT HAPPENED YESTERDAY, THE QUESTIONING OF

08:36AM   13   MR. LEACH AND THE CONTEXT AROUND THAT THAT I WAS ABLE TO GET IN

08:36AM   14   ALREADY, AND I THINK, AS IT SITS TODAY, I'M PREPARED TO NOT

08:36AM   15   PLOW INTO, FURTHER INTO THE POST-INVESTMENT PERIOD, ASSUMING

08:36AM   16   THE GOVERNMENT DOESN'T INTEND TO GO BACK TO IT IN REDIRECT.

08:36AM   17        IN THE EVENT THAT THEY DO, I WOULD RESERVE THE RIGHT TO GO

08:36AM   18   DEEP INTO THAT TERRITORY, BECAUSE I'M JUST TRYING TO FIND AN

08:36AM   19   APPROPRIATE BALANCE GIVEN WHAT MR. LEACH DID AND WHAT I DID.  I

08:36AM   20   THINK AS WE SIT RIGHT NOW, I THINK I'M COMFORTABLE LEAVING IT

08:36AM   21   WHERE IT IS.

08:36AM   22        THE COURT:  OKAY.  THANK YOU FOR THAT.

08:36AM   23   MR. LEACH?

08:36AM   24        MR. LEACH:  YOUR HONOR, I'D LIKE A MINUTE OR TWO TO

08:37AM   25   THINK ABOUT IT, OR MAYBE MORE THAN A MINUTE, BUT I -- MY

4878

08:37AM 1    INSTINCT IS THAT I WOULD NOT INTEND TO GO BACK TO THE CRAMER

08:37AM 2    INTERVIEW OR THE "TODAY SHOW" INTERVIEW OR THE APRIL 2016

08:37AM 3    MEETING.

08:37AM 4        I DO THINK THAT THE DEFENSE, BY EXPLORING A NUMBER OF

08:37AM 5    ISSUES FROM THAT MEETING, OPENED THE DOOR TO A NUMBER OF

08:37AM 6    ISSUED, BUT I'M NOT INTENDING TO PRESS IT RIGHT NOW BASED ON

08:37AM 7    COUNSEL'S REPRESENTATION.  I'D LIKE A LITTLE TIME TO THINK

08:37AM 8    ABOUT THAT, BUT THAT'S WHERE I'M TRENDING.

08:37AM 9        THE COURT:  OKAY.  WELL, THANK YOU.  THAT'S HELPFUL

08:37AM 10   I THINK FOR ALL OF US.  WE'RE NOT GOING TO GET TESTIMONY TODAY,

08:37AM 11   SO THIS IS HELPFUL ALSO FOR GAUGING THE LENGTH OF

08:37AM 12   MS. PETERSON'S -- THE REST OF HER, THE BALANCE OF HER

08:37AM 13   TESTIMONY.

08:37AM 14       MR. WADE:  AND WE'RE PREPARED TO MOVE AS QUICKLY AS

08:37AM 15   WE CAN ON THAT.  WE HAVE A FEW ITEMS TO GO, BUT --

08:37AM 16       THE COURT:  SURE.

08:37AM 17       MR. WADE:  -- THE COURT WILL KNOW THAT I WILL NOT BE

08:38AM 18   BRINGING MY MULTIPLE BINDERS UP, I JUST HAVE A FEW EXHIBITS TO

08:38AM 19   GO THROUGH WITH THE WITNESS.

08:38AM 20       THE COURT:  IT'S A GOOD TIME TO SEGUE TO FOLDERS

08:38AM 21   FROM BINDERS.

08:38AM 22       MR. WADE:  THAT'S KIND OF WHERE I WAS HEADED,

08:38AM 23   YOUR HONOR.

08:38AM 24       THE COURT:  OKAY.

08:38AM 25       MR. LEACH:  THERE'S A SEPARATE ISSUE WITH RESPECT TO

08:38AM 1    MS. PETERSON, YOUR HONOR.  IT DIDN'T COME UP YESTERDAY, BUT

08:38AM 2    AFTER REVIEWING THE TRANSCRIPT, I WANTED TO RAISE IT.

08:38AM 3        THERE WERE A NUMBER OF -- PRIOR TO TRIAL, THE GOVERNMENT

08:38AM 4    BROUGHT A MOTION IN LIMINE TO PRECLUDE EVIDENCE AND ARGUMENT OF

08:38AM 5    VICTIM BLAMING.  THE COURT GRANTED THAT MOTION AT PAGE 80 TO 82

08:38AM 6    OF ITS MOTION IN LIMINE ORDER.  THE COURT INSTRUCTED THE

08:38AM 7    DEFENSE IF IT WAS GOING TO GET INTO AREAS WHERE IT WAS BLAMING

08:38AM 8    THE VICTIM, TO FRONT THAT TYPE OF EVIDENCE.

08:38AM 9        YESTERDAY DURING THE CROSS-EXAMINATION, THE DEFENSE ASKED

08:38AM 10   A NUMBER OF QUESTIONS ABOUT RDV'S DUE DILIGENCE AND COMPARED

08:38AM 11   THAT DUE DILIGENCE TO WHAT IS TYPICAL OR WHAT IS COMMON.

08:38AM 12       I THINK THE STRONGEST EXAMPLE I SAW IN THE TRANSCRIPT WAS

08:39AM 13   AT PAGE 4784 AND 4786 WHERE THE QUESTION WAS, "OFTEN IN DUE

08:39AM 14   DILIGENCE ON TECH COMPANIES, PEOPLE DO PRETTY DETAILED REVIEWS

08:39AM 15   OF INTELLECTUAL PROPERTY; ISN'T THAT RIGHT?"

08:39AM 16       I THINK THIS TYPE OF COMPARING THE QUESTIONS THAT WERE

08:39AM 17   ASKED HERE TO QUESTIONS THAT ARE TYPICALLY ASKED SERVE NO

08:39AM 18   PURPOSE OTHER THAN TO FAULT RDV'S DUE DILIGENCE, TO ESSENTIALLY

08:39AM 19   SAY THE NEGLIGENCE OF THE VICTIM IS RELEVANT HERE.

08:39AM 20       AS THE COURT KNOWS, THE NEGLIGENCE OF THE VICTIM -- OR THE

08:39AM 21   DILIGENCE OF THE VICTIM IS IRRELEVANT IN A WIRE FRAUD CASE, AND

08:39AM 22   WE THINK A CURATIVE INSTRUCTION UNDER THE CIRCUMSTANCES IS

08:39AM 23   APPROPRIATE.

08:39AM 24       THE COURT:  THANK YOU.

08:39AM 25       DO YOU WANT TO BE HEARD, MR. WADE?

4880

08:39AM 1        MR. WADE:  THIS IS THE FIRST I'VE HEARD OF THIS

08:39AM 2  ISSUE, SO I WOULD CERTAINLY LIKE TO LOOK BACK AT THE TRANSCRIPT

08:39AM 3  HE'S REFERENCING AND THE ORDER THAT MR. LEACH IS REFERENCING.

08:39AM 4        AS THE COURT KNOWS AND AS THE WITNESS TESTIFIED, THERE'S

08:40AM 5  AN AGREEMENT THAT GOVERNS THIS RELATIONSHIP.  THAT AGREEMENT

08:40AM 6  SETS FORWARD DUE DILIGENCE RIGHTS IN CONNECTION WITH THE

08:40AM 7  INVESTMENT AND THE RIGHTS OF THE INVESTORS TO GET INFORMATION

08:40AM 8  AS PART OF THE INVESTMENT DECISION.

08:40AM 9        MATERIALITY IS AN ELEMENT OF THE OFFENSE, AND THERE'S BEEN

08:40AM 10  A SUGGESTION BY THE GOVERNMENT, IN FACT, MUCH OF THE CASE OF

08:40AM 11  THE GOVERNMENT IS ABOUT INFORMATION THAT WAS EITHER CONCEALED

08:40AM 12  OR WAYS IN WHICH INVESTORS WERE MISLED.

08:40AM 13        SO I THINK IT'S APPROPRIATE TO PROBE WHETHER THERE WERE

08:40AM 14  LIMITATIONS ON THEIR ABILITY TO GET INFORMATION IN CONNECTION

08:40AM 15  WITH THEIR INVESTMENT DECISION.

08:40AM 16        IT'S A PARTICULARLY FALSE EXERCISE TO A DEGREE IN THIS

08:40AM 17  CASE BECAUSE WE DIDN'T HAVE A DECISION-MAKER AS -- ON THE

08:40AM 18  WITNESS STAND AS I MENTIONED IN ADVANCE OF YESTERDAY, AND

08:40AM 19  OBVIOUSLY IT HAS COME UP DURING TESTIMONY.

08:40AM 20        BUT I DON'T SEE THIS AS CERTAINLY -- I DON'T SEE THIS IN

08:41AM 21  ANY WAY AS INAPPROPRIATE AND I DON'T SEE IT AS ANYTHING THAT

08:41AM 22  WARRANTS A CURATIVE INSTRUCTION.  BUT, AGAIN, I WOULD LIKE TO

08:41AM 23  LOOK AT THE PORTIONS OF THE TRANSCRIPT TO WHICH MR. LEACH

08:41AM 24  REFERS.

08:41AM 25        THE COURT:  WELL, THANK YOU.

08:41AM   1        THE MOTION IN LIMINE ORDER WAS, IN ESSENCE, BLAMING THE

08:41AM   2    VICTIM, AND I UNDERSTAND MR. LEACH'S POINT HERE.

08:41AM   3        AND I THINK IT GETS PERHAPS, MR. LEACH, TO ARGUMENT,

08:41AM   4    WHETHER OR NOT THE DEFENSE WOULD BE PERMITTED TO ARGUE THAT,

08:41AM   5    AND THAT'S REALLY, I THINK, THE SPIRIT OF THE MOTION IS THAT

08:41AM   6    YOU WILL NOT BE PERMITTED TO SAY, WELL, THEY DIDN'T DO DUE

08:41AM   7    DILIGENCE AND THEREFORE IT'S THEIR FAULT.  THAT'S THE CLASSIC

08:41AM   8    BLAMING THE VICTIM.

08:41AM   9        THE PROBING THAT YOU DID, AND I UNDERSTAND MR. LEACH'S

08:41AM   10   COMMENT IN RAISING IT NOW, PERHAPS SUGGESTS -- AND MAYBE THIS

08:41AM   11   IS PROPHYLACTIC -- THAT, GEE, JUDGE, ARE YOU GOING TO LET THEM

08:41AM   12   ARGUE THAT?

08:41AM   13       AND I THINK WHEN YOU LOOK AT THE ORDER IN DOCKET 798, I

08:42AM   14   GRANTED THE MOTION PRECLUDING THE BLAMING THE VICTIM, IF YOU

08:42AM   15   WILL, WHICH WOULD PRECLUDE THAT TYPE OF ARGUMENT.

08:42AM   16       NOW, WHETHER OR NOT THE EVIDENCE NOW SHOULD REMAIN STATIC

08:42AM   17   FOR WHATEVER PURPOSE, WE CAN'T UNRING THE BELL, AS WE KNOW.

08:42AM   18   BUT FURTHER INQUIRY ON THAT SHOULDN'T BE HAD.  I THINK YOU'VE

08:42AM   19   HAD AN OPPORTUNITY TO RAISE THE POINT, WHAT SHE DID, WHAT SHE

08:42AM   20   DIDN'T DO.

08:42AM   21       THERE WAS NO OBJECTION DURING THAT TESTIMONY ABOUT THAT,

08:42AM   22   SO THE RECORD -- THE EVIDENCE IS THERE.

08:42AM   23       BUT WHAT TO DO WITH THE EVIDENCE NOW, WITH THE TESTIMONY

08:42AM   24   IS I THINK WHAT THE SPIRIT OF THE COURT'S RULING ON THE

08:42AM   25   IN LIMINE MOTION WAS THAT THE GOVERNMENT -- THAT THE DEFENSE

4882

08:42AM  1   CAN'T ARGUE A LACK OF DUE DILIGENCE AS A DEFENSE IN THE CASE.

08:42AM  2          MR. WADE:  AGAIN, I'D LIKE TO --

08:42AM  3          THE COURT:  BLAMING THE VICTIM, OF COURSE.

08:42AM  4          MR. WADE:  YEAH, WE'RE NOT IN ANY WAY TRYING TO

08:42AM  5   BLAME THE VICTIM.

08:43AM  6      WE'RE JUST TRYING TO GIVE CONTEXT TO THE INVESTMENT

08:43AM  7   DECISION THAT WAS MADE AND THE CONTRACTUAL RIGHTS UNDER THE

08:43AM  8   AGREEMENT.

08:43AM  9      BUT I UNDERSTAND THE COURT'S COMMENTS AND I WANT TO LOOK

08:43AM  10  BACK -- AS THE COURT UNDOUBTEDLY RECALLS, IT'S A PRETTY LENGTHY

08:43AM  11  ORDER, AND SO I WANT TO LOOK BACK AT THE PARTICULAR PORTION

08:43AM  12  THAT IS CITED.  BUT I CAN'T IMAGINE THAT WE'LL MAKE THE

08:43AM  13  ARGUMENT OF THE KIND THAT WOULD CONCERN THE GOVERNMENT.

08:43AM  14      OBVIOUSLY WE'LL ARGUE MATERIALITY, OR MAY ARGUE

08:43AM  15  MATERIALITY, AND WE MAY ARGUE I THINK MUCH OF THE CASE IS ABOUT

08:43AM  16  THE INFORMATION THAT WAS AVAILABLE TO INVESTORS AND WHAT THEY

08:43AM  17  KNEW AND DIDN'T KNOW AND WHAT THEY UNDERSTOOD AND DIDN'T

08:43AM  18  UNDERSTAND.

08:43AM  19      SO OBVIOUSLY THAT'S GOING TO BE FAIR GAME.

08:43AM  20          MR. LEACH:  JUST TO BE CLEAR, YOUR HONOR, THE

08:43AM  21  QUESTIONS WENT FURTHER THAN WHAT DID YOU KNOW, WHAT DID YOU NOT

08:43AM  22  KNOW.

08:43AM  23      IT WENT INTO COMPARING IT TO WHAT IS TYPICAL.  THE IMPORT

08:43AM  24  IS THAT YOU DIDN'T LIVE UP TO A STANDARD OF CARE AND YOU WERE

08:43AM  25  NEGLIGENT OR RECKLESS.

4883

08:43AM 1      THE WORDS "DUE DILIGENCE" ARE NOT GOING TO BE IN THE JURY

08:43AM 2  INSTRUCTIONS, OR THE GOVERNMENT'S POSITION IS THAT IT SHOULD

08:44AM 3  NOT BE IN THE JURY INSTRUCTIONS.

08:44AM 4      SO I THINK THE IMPORT OF THE QUESTIONS WENT A LOT FURTHER

08:44AM 5  THAN SIMPLY, WHAT DID YOU KNOW AND WHAT DID YOU NOT KNOW AND

08:44AM 6  WHAT DID THE CONTRACT SAY?

08:44AM 7      WE WOULD PREFER A CURATIVE INSTRUCTION NOW, BUT I THINK

08:44AM 8  THIS IS SOMETHING THAT WE'LL BE PARTICULARLY ALIGNED TO AT THE

08:44AM 9  FINAL INSTRUCTION PHASE AND THE LIMITS ON ARGUMENT.

08:44AM 10         THE COURT:  SURE.  I APPRECIATE THAT.

08:44AM 11     JURY INSTRUCTIONS ARE INTERESTING CREATURES, AREN'T THEY?

08:44AM 12  THEY SOMETIMES ARE HELPFUL, BUT SOMETIMES THEY HAVE JUST THE

08:44AM 13  OPPOSITE EFFECT OF DRAWING ATTENTION --

08:44AM 14         MR. LEACH:  TRUE.

08:44AM 15         THE COURT:  -- TO TESTIMONY, PARTICULARLY IN A LONG

08:44AM 16  TRIAL THAT -- AND PARTICULARLY IN A LONG TRIAL THAT SEEMS TO BE

08:44AM 17  BROKEN UP BY EVENTS THAT WE HAVE NO CONTROL OVER.

08:44AM 18     (LAUGHTER.)

08:44AM 19         THE COURT:  ALL RIGHT.  WELL, THANK YOU FOR THAT.

08:44AM 20  AND THANKS FOR YOUR DISCUSSION.

08:44AM 21     ANYTHING FURTHER ON THE PETERSON DOCUMENT THEN?  IT SOUNDS

08:44AM 22  LIKE MR. WADE IS NOT GOING TO GO INTO THIS.  YOU WOULD LIKE

08:45AM 23  TIME TO LOOK AT THIS?

08:45AM 24         MR. LEACH:  I WOULD LIKE A LITTLE BIT MORE TIME TO

08:45AM 25  THINK ABOUT IT, BUT ABSENT FURTHER WORD, I DON'T INTEND TO GO

08:45AM  1    BACK TO IT.

08:45AM  2              THE COURT:  THANK YOU.

08:45AM  3         AND THEN EISENMAN, DO WE WANT TO TALK A LITTLE BIT ABOUT

08:45AM  4    THAT?  IT SOUNDS LIKE, WITH OUR SCHEDULE, HE WILL NOT BE

08:45AM  5    TESTIFYING FOR SOME TIME.  MR. BOSTIC, IS THAT CORRECT?

08:45AM  6              MR. BOSTIC:  YES, YOUR HONOR.

08:45AM  7         MR. EISENMAN UNFORTUNATELY IS NOT AVAILABLE NEXT WEEK.  HE

08:45AM  8    WILL BE OUT OF THE COUNTRY, SO HE WON'T BE TESTIFYING IN THE

08:45AM  9    NEXT TEN DAYS OR SO.

08:45AM  10             THE COURT:  THANK YOU.  ALL RIGHT.

08:45AM  11        MS. KRATZMANN, DO YOU WANT TO CHECK IF OUR JURORS ARE

08:45AM  12   HERE?

08:45AM  13             THE CLERK:  YES, YOUR HONOR.

08:45AM  14             THE COURT:  THANK YOU.

08:45AM  15             THE CLERK:  SO I'VE LOOKED AT THE DOCUMENTS, THE

08:45AM  16   EMAILS AND THINGS THAT WERE PROVIDED TO ME YESTERDAY, INCLUDING

08:45AM  17   THE REDACTIONS THAT MR. DOWNEY SUGGESTED.

08:45AM  18        MR. BOSTIC, WHAT -- DO YOU HAVE ANY COMMENT ON ANY OF

08:45AM  19   THIS?

08:45AM  20             MR. BOSTIC:  YES, YOUR HONOR.  THANK YOU.

08:45AM  21        I'VE HAD A CHANCE TO REVIEW THOSE REDACTIONS AS WELL.  I

08:45AM  22   DON'T SEE WHAT IS INAPPROPRIATE ABOUT THAT EVIDENCE, AND I

08:46AM  23   THINK BEFORE FULLY RESPONDING I SHOULD GIVE MR. DOWNEY A CHANCE

08:46AM  24   TO ARTICULATE WHY THAT LANGUAGE IS INADMISSIBLE.

08:46AM  25        I WENT BACK AND FURTHER REVIEWED THE COURT'S MOTION IN

08:46AM 1    LIMINE RULING ON A RELATED TOPIC, WHICH WAS THE ADMISSIBILITY

08:46AM 2    OF PATIENT HARM, DOWNSTREAM FINANCIAL, EMOTIONAL PHYSICAL HARM

08:46AM 3    RESULTING FROM INACCURATE TEST RESULTS IN THIS CASE.  THAT'S

08:46AM 4    SOMETHING THAT THE DEFENSE MOVED TO EXCLUDE BEFORE TRIAL.

08:46AM 5        TO MY KNOWLEDGE, THE DEFENSE HAS NOT RAISED THE ISSUE OF

08:46AM 6    INVESTOR SIDE FINANCIAL HARM OR A SIMILAR ISSUE ON THE INVESTOR

08:46AM 7    SIDE.

08:46AM 8        THOSE TWO PARTS OF THE CASE ARE DIFFERENT.  AND EVEN WHEN

08:46AM 9    IT COMES TO THE INVESTOR SIDE, CERTAINLY THE GOVERNMENT

08:46AM 10   UNDERSTANDS THAT RULE 403 IS OPERATIVE.  IT IMPOSES A LINE AND

08:46AM 11   THERE IS A POINT BEYOND WHICH THE POTENTIAL PREJUDICIAL VALUE

08:46AM 12   OF EVIDENCE ABOUT HARM TO AN INVESTOR MIGHT OUTWEIGH ITS

08:47AM 13   PROBATIVE VALUE.  THE GOVERNMENT UNDERSTANDS THAT.

08:47AM 14       THE COURT IN RULING ON THE PATIENT HARM MOTION NOTED THAT

08:47AM 15   THERE WAS NO NEED TO TAKE AN ALL OR NOTHING APPROACH,

08:47AM 16   RECOGNIZING THAT THIS WAS A LINE DRAWING ISSUE.

08:47AM 17       HERE, I JUST DON'T SEE HOW THE LANGUAGE THAT THE DEFENSE

08:47AM 18   HAS HIGHLIGHTED COMES ANYWHERE CLOSE TO AN APPROPRIATE LINE.

08:47AM 19       MR. EISENMAN IN TALKING ABOUT CHANGES IN LIFE CIRCUMSTANCE

08:47AM 20   AS AN EXPLANATION FOR WHY HE'S SEEKING MORE INFORMATION FROM

08:47AM 21   MS. HOLMES.  IT DOESN'T HAVE ANYTHING TO DO WITH FINANCIAL HARM

08:47AM 22   TO HIM OR DOWNSTREAM EFFECT OF A LOSS.  IN FACT, ALL OF THE

08:47AM 23   COMMUNICATIONS INVOLVED HERE ARE BEFORE ANY LOSS ACTUALLY

08:47AM 24   OCCURRED.

08:47AM 25       THEY'RE SIMPLY, LIKE I SAID, TO PROVIDE BACKGROUND AND

4886

08:47AM 1    CONTEXT FOR HIS REQUEST FOR MORE TRANSPARENCY AND DISCLOSURES

08:47AM 2    FROM THE COMPANY.

08:47AM 3            THE COURT:  MR. DOWNEY?

08:47AM 4            MR. DOWNEY:  WELL, YOUR HONOR, I THINK THERE IS AN

08:47AM 5    ARTICULATION -- THERE ARE PROBABLY THREE ISSUES.

08:47AM 6        I THINK WE'RE PRETTY CLOSE TO AGREEING THAT VICTIM IMPACT,

08:48AM 7    WHETHER IT AFFECTS A PATIENT IN THE PATIENT CASE OR WHATEVER

08:48AM 8    THE EFFECT IS IN THE INVESTMENT CASE, IS NOT SOMETHING THAT

08:48AM 9    SHOULD COME IN, AND ALLOWING WITNESSES TO REHEARSE WHAT EFFECT

08:48AM 10   IT HAS HAD ON THEM, THEIR LIVES, ET CETERA, WILL ENGENDER

08:48AM 11   SYMPATHY, BUT IT'S ACTUALLY NOT RELEVANT TO WHETHER THERE'S AN

08:48AM 12   OFFENSE.  SO IT HAS 401 AND 403 IMPLICATIONS.

08:48AM 13       THE STATEMENT OF HIS MOTIVE AS TO WHY HE IS SEEKING

08:48AM 14   INFORMATION HERE HAS ALL OF THE SAME CONSEQUENCES.  IF THE

08:48AM 15   ARGUMENT THAT THE GOVERNMENT WANTS TO MAKE IS HE WAS SEEKING

08:48AM 16   INFORMATION BECAUSE IT WAS RELEVANT TO HIS RETIREMENT, IF HE

08:48AM 17   WAS SEEKING INFORMATION BECAUSE HE WANTED TO BUY SOMETHING FOR

08:48AM 18   HIS GRANDDAUGHTER, THAT HAS NOTHING TO DO WITH THE TRANSACTIONS

08:48AM 19   BETWEEN HIM AND THERANOS IN TERMS OF HIS REQUEST AND THEIR

08:48AM 20   REACTIONS TO IT.

08:48AM 21       WHAT IS RELEVANT TO THAT IS THE AGREEMENTS THAT GOVERN

08:48AM 22   THAT, THEIR BEHAVIOR, COMPARABLE BEHAVIOR TOWARDS OTHER

08:49AM 23   SHAREHOLDERS, YOU KNOW, WHAT HE ARTICULATED AS HIS REASON FOR

08:49AM 24   NEEDING THAT INFORMATION UNDER THOSE AGREEMENTS.

08:49AM 25       THE FACT THAT HE IS SAYING TO THEM IN REALTIME, YOU KNOW,

08:49AM 1    THIS IS SO I CAN PLAN FOR MY RETIREMENT WHEN HE HAS NO -- WE'RE

08:49AM 2    NOT TALKING ABOUT A PUBLIC COMPANY HERE.  HE HAS NO RIGHT TO

08:49AM 3    SELL THESE SHARES.  THE REASON THAT HE IS INQUIRING ABOUT IT IS

08:49AM 4    THAT HE WANTS TO SELL THE SHARES AGAINST THAT RIGHT, AND HE'S

08:49AM 5    TRYING TO GET THEM TO BUY THE SHARES FROM THEM.

08:49AM 6        YOU'LL SEE THAT, OVER TIME, THIS GENTLEMEN RECEIVED I

08:49AM 7    THINK FOUR OR FIVE OFFERS TO BUY HIS SHARES AT HUGE PREMIUMS,

08:49AM 8    YOU KNOW, FOUR OR FIVE TIMES HIS INVESTMENT AT ONE POINT,

08:49AM 9    TWENTY-FIVE TIMES HIS INVESTMENT AT ANOTHER POINT.  HE TURNED

08:49AM 10   THEM ALL DOWN BECAUSE HE WANTED A BETTER PRICE.

08:49AM 11       TO INJECT INTO THAT A DISCUSSION ABOUT A PURPORTED EFFECT

08:49AM 12   ON HIS RETIREMENT OR ON HIS GRANDDAUGHTER I THINK IS TOTALLY

08:49AM 13   INAPPROPRIATE.

08:49AM 14       I THINK ALSO, YOUR HONOR, I WOULD SAY A 403 ISSUE, ASIDE

08:50AM 15   FROM PREJUDICE HERE, IS THERE'S A LOT OF REASON TO DOUBT THE

08:50AM 16   CREDIBILITY OF WHAT HE IS ASSERTING TOWARDS THERANOS AS HIS

08:50AM 17   PURPORTED REASONS.  I THINK IT WILL NOT BE ALL THAT DIFFICULT

08:50AM 18   FOR ME TO SHOW, BUT I SHOULDN'T HAVE TO.

08:50AM 19           THE COURT:  ALL RIGHT.  THANK YOU.

08:50AM 20       AND WHEN I LOOK AT THE SEPARATE EMAILS HERE, I THINK

08:50AM 21   THE -- LET'S SEE.  IT'S A NOVEMBER 19TH.  THIS IS 2216, PAGE 1.

08:50AM 22           MR. DOWNEY:  YES, YOUR HONOR.

08:50AM 23           THE COURT:  AND THE FIRST EMAIL, I THINK IT'S YOUR

08:50AM 24   FIRST HIGHLIGHT.

08:50AM 25           MR. DOWNEY:  YES.

4888

08:50AM  1          THE COURT:  IT SEEMS TO ME, MR. BOSTIC, THAT THE

08:50AM  2   STATEMENT "I HAVE MOST OF MY NET WORTH IN YOUR COMPANY" IS --

08:50AM  3   THAT'S, I THINK, TO COUNSEL'S POINT THAT I DON'T KNOW WHAT --

08:51AM  4   HOW HELPFUL THAT IS.

08:51AM  5          MR. BOSTIC:  I NOTICED THAT LINE AS WELL,

08:51AM  6   YOUR HONOR.

08:51AM  7      I THINK IN ALL OF THE DEFENSE'S PROPOSED REDACTIONS,

08:51AM  8   THAT'S THE ONE LINE THAT I THINK COMES CLOSEST TO THIS GREY

08:51AM  9   AREA WHERE REDACTION MIGHT BE APPROPRIATE.

08:51AM  10      I STILL DON'T THINK IT'S IN THAT ZONE.  AGAIN, THIS IS

08:51AM  11   BEFORE THE LAUNCH OR -- I'M SORRY.  THIS IS BEFORE THE ACTUAL

08:51AM  12   LOSS OCCURS.

08:51AM  13      SO THIS ISN'T ABOUT THE AMOUNT OF HARM SUFFERED BY THIS

08:51AM  14   PARTICULAR WITNESS.

08:51AM  15      TO THE EXTENT THAT HE IS ASKED TO COMMENT ON THAT LINE, I

08:51AM  16   EXPECT HE WOULD EXPLAIN THAT THAT COMMENT IS BASED ON HIS

08:51AM  17   CURRENT UNDERSTANDING OF THE INCREASED VALUE OF HIS STAKE IN

08:51AM  18   THERANOS AT THAT TIME.

08:51AM  19      SO I DON'T THINK THIS IS THE SAME AS SAYING THAT LOSING

08:51AM  20   THE THERANOS INVESTMENT WOULD RESULT IN HIM LOSING MOST OF HIS

08:51AM  21   NET WORTH.  I DON'T THINK THAT'S HIS CLAIM FOR WHAT THAT'S

08:52AM  22   WORTH.

08:52AM  23      BUT TO THE EXTENT THAT THE COURT THINKS THAT LINE IS

08:52AM  24   PROBLEMATIC, IT'S NOT A CENTRAL PART OF THIS EXHIBIT OR THE

08:52AM  25   ACCOMPANYING TESTIMONY.

08:52AM  1    I JUST THINK THAT, YOU KNOW, BY WAY OF PROVIDING CONTEXT

08:52AM  2  FOR THE REASON WHY HE WANTED MORE INFORMATION, I DON'T THINK

08:52AM  3  IT'S INAPPROPRIATE FOR HIM TO HAVE SAID THAT TO MR. BALWANI.  I

08:52AM  4  DON'T THINK IT'S INAPPROPRIATE FOR THE JURY TO KNOW THAT THAT'S

08:52AM  5  WHY HE WAS EXPLAINING -- OR THAT'S HOW HE WAS EXPLAINING HIS

08:52AM  6  NEED FOR ADDITIONAL INFORMATION.

08:52AM  7    THE COURT:  I FIND THAT THAT FIRST "I HAVE MOST OF

08:52AM  8  MY NET WORTH IN YOUR COMPANY," PERIOD, I THINK I WOULD BE

08:52AM  9  INCLINED TO STRIKE THAT.

08:52AM  10    MR. DOWNEY, I'M NOT SO CERTAIN ABOUT THE REMAINDER OF

08:52AM  11  THAT, IF THAT REALLY HAS THE NEGATIVE IMPACT THAT YOU SUGGEST.

08:52AM  12    LET ME TURN TO 2468.

08:53AM  13    MICHELLE, ARE THEY HERE?

08:53AM  14    (DISCUSSION OFF THE RECORD.)

08:53AM  15    THE COURT:  I'M SORRY, WE'RE BACK AT 2468.

08:53AM  16    LET ME ASK YOUR COMMENT, MR. DOWNEY, I THINK YOU'VE

08:53AM  17  HIGHLIGHTED THE CAT AND MOUSE LINE.

08:53AM  18    MR. DOWNEY:  YES, YOUR HONOR.  AND THEN THERE'S A

08:54AM  19  CONTINUATION SORT OF OF THE SAME DIALOGUE THAT IS IN THE

08:54AM  20  PARAGRAPH AT THE TOP OF THE NEXT PAGE.

08:54AM  21    THIS IS SORT OF ALL PART OF THE SAME MANTRA, THAT THIS IS

08:54AM  22  MY RETIREMENT MONEY AND THAT MY DAUGHTER IS HAVING A BABY AND

08:54AM  23  CAN'T BUY A HOUSE AND NEEDS THAT LIQUIDITY.

08:54AM  24    I JUST WANTED TO GIVE A LITTLE BIT OF CONTEXT TO

08:54AM  25  MR. BOSTIC'S COMMENTS IN THE REAL WORLD.

08:54AM 1          IT IS TRUE THAT LITERALLY WHAT THIS GENTLEMAN IS SAYING IS

08:54AM 2    MY STOCK IN THERANOS AT THIS POINT IS WORTH $25 MILLION AND I

08:54AM 3    DON'T HAVE $50 MILLION WORTH OF NET WORTH.

08:54AM 4          I THINK TO ALLOW HIM TO COME IN AND SAY, YOU KNOW, IT'S

08:54AM 5    AFFECTING MY GRANDDAUGHTER, AFFECTING MY RETIREMENT, ET CETERA,

08:54AM 6    OR, YOU KNOW, AT HIS STAGE OF LIFE HAS AN EFFECT ON HIM I THINK

08:54AM 7    IS POTENTIALLY QUITE PREJUDICIAL IN A WAY THAT IS, YOU KNOW,

08:55AM 8    CONTRARY TO FACT.

08:55AM 9          BUT I DON'T THINK ALL OF THAT NEEDS TO BE REHEARSED.  I

08:55AM 10   THINK IT JUST SHOULD NOT BE PART OF THE TRIAL.

08:55AM 11          THE COURT:  THE 50 MILLION IS IN RELATION TO THE

08:55AM 12   BUYOUT.  IT LOOKS LIKE IN ONE OF THE EMAILS THERE WAS A

08:55AM 13   POTENTIAL TO SELL, BUT YOU HAD TO HAVE A NET WORTH OF

08:55AM 14   50 MILLION I THINK.  IS THAT WHAT YOU'RE REFERENCING?

08:55AM 15          MR. DOWNEY:  NO.  WHAT I'M REFERENCING, YOUR HONOR,

08:55AM 16   IS THAT HE BOUGHT HIS STOCK AT -- THE FIRST INVESTMENT THAT HE

08:55AM 17   MADE WAS OF A MILLION DOLLARS IN 2006.

08:55AM 18          BY 2013, SHARES OF THAT SAME STOCK -- IT WAS AT $3 WHEN HE

08:55AM 19   BOUGHT IT.  SHARES OF THAT SAME STOCK WERE AT $75 AND THAT'S

08:55AM 20   WHAT WALGREENS PAID AS PART OF ITS DEAL.

08:55AM 21          SO HE RECOGNIZED THAT THAT WAS THE CURRENT VALUATION THAT

08:55AM 22   SOPHISTICATED PARTIES WERE GIVING TO THE STOCK.

08:55AM 23          TO SAY WHAT HIS NET WORTH IS VALUES THAT STOCK AT

08:55AM 24   $25 MILLION AND TO SAY THAT IT'S MORE THAN HALF OF MY NET WORTH

08:56AM 25   IS TO SAY I DON'T HAVE A NET WORTH GREATER THAN $50 MILLION.

4891

08:56AM  1      BUT THE IMPLICATION IS VERY DIFFERENT WITHIN THE EMAIL.

08:56AM  2           MR. BOSTIC:  AND, YOUR HONOR, I DON'T SEE THAT

08:56AM  3      IMPLICATION IN HERE.  I DON'T SEE THAT THIS IS HURTING ME,

08:56AM  4      YOU'RE HARMING ME.

08:56AM  5      I SEE AN EXPLANATION FOR WHY HE WANTS, AND HE WOULD SAY

08:56AM  6      NEEDS, MORE INFORMATION FROM MS. HOLMES AND FROM THERANOS.

08:56AM  7      HE WAS IN A DIFFERENT STAGE OF LIFE.  THERE'S NO REASON TO

08:56AM  8      DOUBT THE STATEMENTS ABOUT HIS DAUGHTER HAVING HAD A BABY AND

08:56AM  9      NEEDING LIQUIDITY TO BUY A HOUSE.

08:56AM  10     NEEDING LIQUIDITY IS NOT THE SAME THING AS THE KIND OF

08:56AM  11     DOWNSTREAM HARM EFFECTS THAT RUN INTO PROHIBITION UNDER

08:56AM  12     RULE 403 AND I THINK WE'RE DRIVING THE COURT'S ORDER ON THE

08:56AM  13     PATIENT SIDE.

08:56AM  14     HERE I THINK, YOU KNOW, ESPECIALLY WHEN IT COMES TO HIS

08:56AM  15     COMMENTS IT'S UNFAIR FOR YOU TO PLAY THIS CAT AND MOUSE GAME

08:56AM  16     WITH ME, I THINK -- I'M SORRY, BUT THE DEFENSE IS JUST TRYING

08:56AM  17     TO SENSOR INFORMATION THAT IS CRITICAL OF MS. HOLMES.

08:56AM  18     I DON'T THINK THAT THAT'S A PERMISSIBLE REASON TO EXCLUDE

08:57AM  19     EVIDENCE HERE.

08:57AM  20     AND I THINK IN THAT FIRST PAGE ON 2468, MR. EISENMAN KIND

08:57AM  21     OF SUMS UP WHY THIS INFORMATION IS IMPORTANT AND WHY IT SHOULD

08:57AM  22     BE ADMISSIBLE.  HE SAYS I CAN'T MAKE A RATIONAL DECISION TO

08:57AM  23     HOLD OR SELL MY STOCK WITH THE LACK OF INFORMATION THAT YOU

08:57AM  24     HAVE PROVIDED.

08:57AM  25     SO HE'S EXPLAINING WHY HE'S CONSIDERING SELLING HIS STOCK,

4892

08:57AM 1    AND THAT INVOLVES GIVING MS. HOLMES SOME BACKGROUND ON HIS LIFE

08:57AM 2    CIRCUMSTANCES.  THAT'S WHY HE'S ASKING FOR MORE INFORMATION AND

08:57AM 3    HE'S SAYING I CAN'T WEIGH THESE OPPORTUNITIES THAT I'M BEING

08:57AM 4    PRESENTED WITH WITHOUT KNOWING WHAT IS GOING ON WITH THE

08:57AM 5    COMPANY.  PLEASE TELL ME WHAT IS GOING ON WITH THE COMPANY.

08:57AM 6          THE COURT:  THANK YOU.  ON PAGE 2 OF 2468 YOU HAVE,

08:57AM 7    MR. DOWNEY, HIGHLIGHTED NUMBER 1, WHEN I FIRST SPOKE TO

08:57AM 8    ELIZABETH OVER NINE YEARS AGO AND MADE MY INVESTMENT, SHE

08:57AM 9    THOUGHT THE COMPANY WOULD IPO AT THREE TO FIVE YEARS.

08:57AM 10          MR. DOWNEY:  YEAH, THIS WAS THE OTHER ISSUE THAT I

08:58AM 11   RAISED YESTERDAY, YOUR HONOR, YES.

08:58AM 12      THIS IS A CLAIM THAT THE GOVERNMENT IS IMPLICITLY TRYING

08:58AM 13   TO PUT IN FRONT OF THE JURY, WHICH IS A FALSE STATEMENT IN

08:58AM 14   CONNECTION WITH A PROMISE OR SUGGESTION THAT THERE WOULD BE AN

08:58AM 15   IPO.

08:58AM 16      IN FACT, THE AGREEMENT BETWEEN THESE PARTIES WAS THAT IT

08:58AM 17   WAS UNCERTAIN THAT THERE WOULD BE AN IPO AT ANY POINT IN THE

08:58AM 18   FUTURE, AND THAT ANY PROJECTIONS OF THAT WERE SUBJECT TO

08:58AM 19   CHANGE.

08:58AM 20      AND BEYOND ALL THAT, BEYOND THE FACTUAL CONTEXT, THIS IS

08:58AM 21   NOT CHARGED IN THE INDICTMENT AND NOT NOTICED UNDER 404(B).

08:58AM 22   IT'S NOT SOMETHING THAT SHOULD BE IN THE CASE.

08:58AM 23      AS I SAID TO YOUR HONOR YESTERDAY, HE ALSO WANTS TO MAKE

08:58AM 24   STATEMENTS ABOUT WHAT HE WAS TOLD WITH REGARD TO PHARMA

08:58AM 25   COMPANIES DURING 2006 TO 2010.  THAT'S FAIR GAME.  I RECOGNIZE

4893

08:58AM 1    THAT.  THAT'S CHARGED CONDUCT IN CONNECTION WITH THE

08:58AM 2    INDICTMENT, AND IF HE WANTS TO SAY HIS KNOWLEDGE OF THAT

08:59AM 3    SOMEHOW INFORMED HIS LATER KNOWLEDGE WHEN HE MADE HIS 2016

08:59AM 4    INVESTMENT, I RECOGNIZE I HAVE TO DEAL WITH THAT.

08:59AM 5        A WHOLE NEW THEORY WHICH IS NOT PART OF THE INDICTMENT,

08:59AM 6    WHICH IS THAT HE WAS LIED TO IN CONNECTION WITH AN IPO IS NOT

08:59AM 7    SOMETHING THAT SHOULD BE INJECTED INTO THE CASE MIDWAY BY THIS

08:59AM 8    WITNESS.

08:59AM 9        MR. BOSTIC:  YOUR HONOR, ON THAT LET ME CLARIFY.  SO

08:59AM 10   IT'S NOT THE CASE THAT THE GOVERNMENT IS INJECTING A NEW THEORY

08:59AM 11   OF FRAUD HERE, NOR IS THIS 404(B).

08:59AM 12       THE GOVERNMENT AT NO TIME WILL ARGUE THAT MS. HOLMES LIED

08:59AM 13   TO MR. EISENMAN ABOUT THE LIKELIHOOD OF AN IPO OR HER INTENTION

08:59AM 14   TO PROCEED WITH AN IPO.  THAT'S NOT THE POINT OF THIS EVIDENCE.

08:59AM 15       BUT THE CONVERSATION BETWEEN MS. HOLMES AND MR. EISENMAN

08:59AM 16   ABOUT THE LIKELIHOOD OF AN IPO TOLD HIM ABOUT THE OVERALL STATE

08:59AM 17   OF THE COMPANY, TOLD HIM ABOUT THE COMMERCIAL SUCCESS AND THE

08:59AM 18   FINANCIAL HEALTH OF THE COMPANY.  IT WAS POTENTIALLY RELEVANT

08:59AM 19   TO THE STATE OF THE TECHNOLOGY.

08:59AM 20       SO THAT'S PART OF WHAT HE FACTORED IN IN MAKING HIS

09:00AM 21   INVESTMENT DECISION WAS HOW CLOSE HE UNDERSTOOD THE COMPANY TO

09:00AM 22   BE TO AN IPO.

09:00AM 23       IT WAS IMPORTANT TO HIM FOR OTHER REASONS, BUT THAT'S NOT

09:00AM 24   WHY THIS TESTIMONY ABOUT AN IPO WAS NECESSARY.

09:00AM 25       I SHOULD ALSO POINT OUT THAT MR. DOWNEY SAID THAT THIS

09:00AM 1    SHOULDN'T BE IN THE CASE.  THIS IS ALREADY IN THE CASE.

09:00AM 2         MR. TOLBERT, WHEN HE WAS ON THE STAND, TESTIFIED ABOUT HIS

09:00AM 3    2006 CONVERSATIONS WITH MS. HOLMES ABOUT THE LIKELIHOOD OF AN

09:00AM 4    IPO.

09:00AM 5         MY UNDERSTANDING OR RECOLLECTION IS THAT THE DEFENSE DID

09:00AM 6    NOT OBJECT TO THAT TESTIMONY AT THE TIME.

09:00AM 7         SO THIS IS SOMETHING THAT THE JURY HAS ALREADY HEARD

09:00AM 8    ABOUT.  IT SHOULD COME IN NOW BECAUSE IT WAS RELEVANT TO

09:00AM 9    MR. EISENMAN'S THOUGHT PROCESS AND DECISION MAKING IN DECIDING

09:00AM 10   TO INVEST.

09:00AM 11        THIS IS NOT AN ATTEMPT TO CREATE ANOTHER THEORY OF FRAUD

09:00AM 12   OR LIABILITY FOR THE DEFENDANT.

09:00AM 13            MR. DOWNEY:  THERE'S NO -- MR. TOLBERT DID NOT TRY

09:00AM 14   TO EQUATE A BIG PROMISED SOMETHING WHICH DID NOT OCCUR.

09:00AM 15   THERE'S A VERY DIFFERENT APPROACH THAT THESE WITNESSES HAVE TO

09:00AM 16   INTERPRETING THAT INFORMATION.

09:00AM 17        WHEN AN IPO IS PROJECTED HAS NOTHING TO DO WITH THIS VAGUE

09:01AM 18   THEORY OF THE, QUOTE-UNQUOTE, STATE OF THE TECHNOLOGY OR THE

09:01AM 19   STATE OF THE COMPANY.

09:01AM 20        THE GOVERNMENT IS VERY CLEAR IN SPECIFYING, AS IT MUST BE,

09:01AM 21   IN ITS INDICTMENT IN SPECIFYING WHAT THE THEORIES WERE AS TO

09:01AM 22   WHAT WAS SAID THAT WAS FALSE.

09:01AM 23        TRYING TO INJECT ALL OF THESE OTHER THEORIES UNDER THE

09:01AM 24   THEORY THAT THEY SOMEHOW SUBSTITUTE FOR THE SAME INFORMATION

09:01AM 25   WHEN THERE'S NO LOGICAL LINK I THINK IS UNFAIR CERTAINLY AT

4895

09:01AM 1    THIS STAGE OF THE TRIAL.

09:01AM 2        IT'S VERY DIFFERENT FOR A WITNESS TO SAY, I HAD THIS

09:01AM 3    CONVERSATION, AND FOR A WITNESS TO SAY, I HAD THIS CONVERSATION

09:01AM 4    AND I WAS MISLED, WHICH IS WHAT THIS EMAIL IS DOING.

09:01AM 5            MR. BOSTIC:  I DISAGREE THAT THAT'S WHAT THIS EMAIL

09:01AM 6    IS DOING, YOUR HONOR.

09:01AM 7        AND I WOULD JUST POINT OUT THAT HOW A WITNESS FEELS ABOUT

09:01AM 8    A CERTAIN CONVERSATION IS NOT THE SAME THING AS HOW THE WITNESS

09:01AM 9    WILL TESTIFY NECESSARILY ABOUT THE CONVERSATION.

09:01AM 10       THIS MIGHT BE A SITUATION WHERE WE NEED TO SEE WHAT

09:01AM 11   MR. EISENMAN ACTUALLY SAYS AND WHAT THE QUESTIONS ARE ON THIS

09:01AM 12   TOPIC.

09:01AM 13           THE COURT:  WELL, IT COULD BE THAT -- AND BASED ON

09:02AM 14   YOUR REPRESENTATION, MR. BOSTIC, THAT A FOUNDATION MIGHT HAVE

09:02AM 15   TO BE LAID ABOUT HIS INVESTMENT THOUGHTS BEFORE I WOULD ALLOW

09:02AM 16   THIS TO COME IN, AND IF IT DOES COME IN, AND I'M NOT SAYING IT

09:02AM 17   IS, WHAT I'M GOING TO DO IS TO DEFER RULING ON THIS UNTIL WE

09:02AM 18   HAVE EISENMAN ON THE STAND.

09:02AM 19       BUT IF THIS DOES COME IN, AND MINDFUL OF MR. DOWNEY'S

09:02AM 20   COMMENTS, IT WOULD BE THAT I WOULD INSTRUCT THE JURY THAT THEY,

09:02AM 21   THEY CANNOT CONSIDER THIS AS PART OF THE CHARGED CONDUCT AND

09:02AM 22   THEY WOULDN'T BE PERMITTED TO CONSIDER THIS EVIDENCE WHEN THEY

09:02AM 23   CONSIDER THE CHARGED CONDUCT BECAUSE THIS DID NOT OCCUR AND

09:02AM 24   THIS WASN'T ANY MATERIALITY -- IT DID NOT HAVE MATERIALITY AS

09:02AM 25   TO THE CHARGED CONDUCT.

4896

09:02AM  1          BUT THAT RUNS SOME OTHER RISKS AS WELL, BUT I JUST WANT TO

09:02AM  2    SAY THAT THAT IS, THAT IS -- IF THIS DOES COME IN, THAT IS

09:02AM  3    SOMETHING THAT I WOULD BE INCLINED TO DO TO INFORM THE JURY.

09:03AM  4          I THINK, TO MR. DOWNEY'S POINT, IT WOULD BE UNFAIR TO HAVE

09:03AM  5    THEM CONSIDER SOMETHING OUTSIDE AS PART OF MATERIALITY.

09:03AM  6          SO I JUST WANT YOU TO THINK ABOUT THAT.

09:03AM  7          I'M INFORMED THE JURY IS HERE NOW.

09:03AM  8               MR. DOWNEY:  OKAY.

09:03AM  9               THE COURT:  SO THANK YOU FOR YOUR COMMENTS ON THESE.

09:03AM 10    THAT'S HELPFUL.

09:03AM 11               MR. DOWNEY:  YOUR HONOR, COULD I JUST SAY ONE MORE

09:03AM 12    THING ABOUT THAT?

09:03AM 13               THE COURT:  YES.  SURE.

09:03AM 14               MR. DOWNEY:  IT'S THAT WE KNOW WHAT WAS PROMISED IN

09:03AM 15    CONNECTION WITH AN IPO BECAUSE IT'S WRITTEN DOWN AND AGREED TO,

09:03AM 16    AND I THINK THE NOTION THAT THERE'S SOME EXTRINSIC PROMISE, I

09:03AM 17    THINK CURATIVE INSTRUCTIONS, AS YOUR HONOR COMMENTED, WITH

09:03AM 18    RESPECT TO ANOTHER ISSUE A FEW MOMENTS AGO, THEY CAN SERVE

09:03AM 19    MULTIPLE PURPOSES.

09:03AM 20          I DON'T THINK AND -- AND HAVE MULTIPLE EFFECTS.  I DON'T

09:03AM 21    THINK IT'S SUFFICIENT HERE.

09:03AM 22               THE COURT:  OKAY.

09:03AM 23               MR. DOWNEY:  THANK YOU, YOUR HONOR.

09:03AM 24               THE COURT:  HOPEFULLY WE WON'T HAVE TO GET TO THAT,

09:03AM 25    BUT WE'LL SEE.

4897

| | | |
|---|---|---|
| 09:03AM | 1 | MR. DOWNEY:  THANK YOU. |
| 09:03AM | 2 | THE COURT:  THANK YOU. |
| 09:03AM | 3 | MR. BOSTIC:  THANK YOU. |
| 09:03AM | 4 | THE COURT:  I'LL BRING THE JURY IN NOW. |
| 09:03AM | 5 | (JURY IN AT 9:03 A.M.) |
| 09:05AM | 6 | THE COURT:  ALL RIGHT.  THANK YOU.  PLEASE BE |
| 09:05AM | 7 | SEATED.  THANK YOU. |
| 09:05AM | 8 | WE'RE BACK IN SESSION IN THE HOLMES MATTER.  ALL COUNSEL |
| 09:05AM | 9 | ARE PRESENT, MS. HOLMES IS PRESENT, OUR JURY AND ALTERNATES ARE |
| 09:06AM | 10 | PRESENT. |
| 09:06AM | 11 | GOOD MORNING, LADIES AND GENTLEMEN. |
| 09:06AM | 12 | I THINK YOU'VE PROBABLY HEARD BY NOW THE SITUATION IN OUR |
| 09:06AM | 13 | COURTHOUSE.  I BELIEVE ABOUT A BLOCK NORTH OF US THERE'S A HOLE |
| 09:06AM | 14 | IN THE GROUND, AND I UNDERSTAND THERE'S A WATER PIPE THAT'S |
| 09:06AM | 15 | BEING REPAIRED.  THAT PIPE SUPPLIES WATER TO THIS COURTHOUSE. |
| 09:06AM | 16 | I'M INFORMED THAT THERE'S -- WATER IS OUT FOR THE ENTIRE BLOCK. |
| 09:06AM | 17 | WE HAVE NO WATER IN THE COURTHOUSE TODAY. |
| 09:06AM | 18 | I RECEIVED A MESSAGE EARLIER FROM SAN FRANCISCO, THE |
| 09:06AM | 19 | HEADQUARTERS FOR THE NORTHERN DISTRICT, AND I WAS INFORMED THAT |
| 09:06AM | 20 | THIS BUILDING WILL BE SHUT DOWN, AND WE WERE ORDERED TO |
| 09:06AM | 21 | EVACUATE THE BUILDING IMMEDIATELY, AND THAT WAS A FEW MINUTES |
| 09:06AM | 22 | AGO. |
| 09:06AM | 23 | SO WE WILL NOT BE ABLE TO HAVE OUR TRIAL TODAY, AND I |
| 09:06AM | 24 | APOLOGIZE FOR THOSE OF YOU WHO TRAVELLED, THOSE OF YOU WHO CAME |
| 09:06AM | 25 | TO COURT.  WE'RE NOT GOING TO, BECAUSE OF HEALTH REASONS, OF |

| | | |
|---|---|---|
| 09:06AM | 1 | COURSE, FOR LACK OF WATER, WE CAN'T -- I CAN'T KEEP YOU HERE, |
| 09:07AM | 2 | AND I'M NOT GOING TO ASK YOU TO DO THAT, AND I'VE BEEN ORDERED |
| 09:07AM | 3 | AND NOT TO DO THAT. |
| 09:07AM | 4 | SO WE WILL ADJOURN TODAY FOR WHAT WILL BE A LONG WEEKEND. |
| 09:07AM | 5 | I'D LIKE TO GO OVER WITH YOU OUR SCHEDULE, IF I MAY. |
| 09:07AM | 6 | I THINK -- ADRIANA, DO THEY HAVE THE SCHEDULES? |
| 09:07AM | 7 | THE CLERK:  NO, THEY DON'T, YOUR HONOR. |
| 09:07AM | 8 | THE COURT:  I'LL PROVIDE YOU A SCHEDULE, |
| 09:07AM | 9 | MS. KRATZMANN WILL PROVIDE YOU WITH A SCHEDULE. |
| 09:07AM | 10 | OUR NEXT SESSION WILL BE TUESDAY, NOVEMBER 2ND, TUESDAY |
| 09:07AM | 11 | NOVEMBER 2ND. |
| 09:07AM | 12 | WE'LL BE IN SESSION WEDNESDAY, THE 3RD.  EXCUSE ME. |
| 09:07AM | 13 | AND THEN THURSDAY, THE 4TH.  THE 4TH WILL BEGIN AT 9:30. |
| 09:07AM | 14 | THE OTHER DAYS WILL BEGIN AT 9:00 A.M. |
| 09:07AM | 15 | FRIDAY THERE'S NO TRIAL. |
| 09:07AM | 16 | THE 9TH AND 10TH WE'LL HAVE TRIAL. |
| 09:07AM | 17 | THERE'S NO TRIAL ON THE 11TH AND 12TH. |
| 09:07AM | 18 | THE 15TH, THAT'S A MONDAY, WE WILL BE IN SESSION IN THE |
| 09:07AM | 19 | MORNING. |
| 09:07AM | 20 | AND TUESDAY WE'LL BE IN SESSION REGULAR.  THAT'S THE 16TH. |
| 09:08AM | 21 | THE 17 TH, WE'LL START AT 9:00.  WE'LL HAVE A BREAK FROM |
| 09:08AM | 22 | 10:30 TO 11:30, AND THEN WE'LL BE IN SESSION. |
| 09:08AM | 23 | AND WE'LL BE IN SESSION ON THE 18TH AND 19TH.  EXCUSE ME. |
| 09:08AM | 24 | THE 22ND IS MONDAY.  IN THE MORNING, WE'LL BE IN SESSION. |
| 09:08AM | 25 | THE 23RD WILL BE ALL DAY, AND THAT WILL BE THE BALANCE OF |

4899

09:08AM  1    THE TRIAL.  THAT'S THANKSGIVING WEEK.  SO WE WON'T BE IN TRIAL

09:08AM  2    WEDNESDAY, THURSDAY, OR FRIDAY THAT WEEK.

09:08AM  3        THE 29TH IN THE MORNING, THAT'S MONDAY MORNING.

09:08AM  4        AND THEN THE 30TH OF NOVEMBER, ALL DAY.

09:08AM  5        I'M GOING TO, AND I'D LIKE TO ASK YOU, BECAUSE OF THESE

09:08AM  6    BREAKS -- AND OF COURSE THIS WAS UNPLANNED AND WHO KNEW WHAT

09:08AM  7    WOULD HAPPEN TODAY -- I AM GOING TO TALK TO COUNSEL, BUT I WANT

09:08AM  8    TO SUGGEST TO YOU, IT MAY BE THAT I'M GOING TO ASK IF WE CAN GO

09:08AM  9    UNTIL 4:00 O'CLOCK ON OUR REGULAR DAYS, AND MAYBE EVEN EXTEND

09:09AM  10   UNTIL 5:00 O'CLOCK IF WE CAN.

09:09AM  11       I DON'T LIKE TO -- I TYPICALLY LET JURORS GO BEFORE

09:09AM  12   5:00 O'CLOCK HOPING TO AVOID TRAFFIC SITUATIONS, SO IT MAY BE

09:09AM  13   WE'LL END AT 4:45, SOMETHING LIKE THAT.  BUT I WOULD LIKE TO

09:09AM  14   EXTEND OUR DAYS A BIT, IF IT COMPORTS WITH YOUR SCHEDULES, JUST

09:09AM  15   SO WE CAN CAPTURE SOME TIME.

09:09AM  16       I DO THINK THAT WE HAVE SOME MOMENTUM GOING.  I DID TALK

09:09AM  17   WITH THE LAWYERS THIS MORNING, AND WE WERE TALKING ABOUT

09:09AM  18   WITNESS SCHEDULING, AND I THINK IF WE EXTEND OUR DAYS A LITTLE

09:09AM  19   BIT, I THINK THAT WOULD BE HELPFUL TO THE TRIAL PROCESS AND

09:09AM  20   COMING TO A CULMINATION WITHIN THE SCHEDULE THAT I ANNOUNCED TO

09:09AM  21   YOU AT THE START OF THE TRIAL.

09:09AM  22       SO THAT'S OUR SCHEDULE.  MS. KRATZMANN WILL PROVIDE YOU

09:09AM  23   WITH HARD COPIES OF THIS SCHEDULE AND SHE'LL EMAIL IT TO YOU

09:09AM  24   AND GET THAT TO YOU.

09:09AM  25       COUNSEL, ANY COMMENTS REGARDING THE SCHEDULE?

| | | |
|---|---|---|
| 09:09AM | 1 | MR. SCHENK:  NO, YOUR HONOR. |
| 09:09AM | 2 | MR. DOWNEY:  NOTHING FROM US, YOUR HONOR. |
| 09:09AM | 3 | THE COURT:  OKAY.  ANYTHING FURTHER BEFORE I -- |
| 09:09AM | 4 | MR. SCHENK:  NO, YOUR HONOR. |
| 09:09AM | 5 | MR. DOWNEY:  NO, YOUR HONOR. |
| 09:09AM | 6 | THE COURT:  OKAY.  SO, LADIES AND GENTLEMEN, I |
| 09:09AM | 7 | APOLOGIZE FOR THE PROBLEMS, AND THANK YOU FOR COMING HERE. |
| 09:10AM | 8 | I THINK MS. KRATZMANN HAD DONUTS FOR YOU.  I HOPE YOU CAN |
| 09:10AM | 9 | TAKE A DONUT AS A PARTING GIFT ON YOUR WAY OUT AND ENJOY THAT. |
| 09:10AM | 10 | BUT LET ME REMIND YOU AGAIN OF THE ADMONITION. |
| 09:10AM | 11 | PLEASE, OVER THE LONG BREAK, PLEASE AVOID AND DO NOT DO |
| 09:10AM | 12 | ANY RESEARCH ON ANYTHING ABOUT THIS CASE, AVOID ANY |
| 09:10AM | 13 | COMMUNICATIONS, MEDIA DISCUSSIONS ABOUT ANYTHING TO DO WITH |
| 09:10AM | 14 | THIS CASE. |
| 09:10AM | 15 | IF YOU DO COME ACROSS SOMETHING INADVERTENTLY, YOU'LL TELL |
| 09:10AM | 16 | ME ABOUT IT NEXT TUESDAY WHEN I ASK YOU THAT. |
| 09:10AM | 17 | SO PLEASE ENJOY YOUR TIME OFF.  I APOLOGIZE FOR THE DELAY. |
| 09:10AM | 18 | I JUST WANT TO ASSURE YOU, I'VE TALKED WITH COUNSEL ABOUT |
| 09:10AM | 19 | THIS, THAT IS, THE SCHEDULING, AND WE'RE ALL EARNESTLY PUTTING |
| 09:10AM | 20 | OUR HEADS TOGETHER TO SEE IF WE CAN PROMOTE AND ENGAGE A |
| 09:10AM | 21 | SCHEDULE THAT WILL BE MORE EFFICIENT AS WE GO FORWARD. |
| 09:10AM | 22 | SO I APPRECIATE YOUR CONSIDERATION ON THAT. |
| 09:10AM | 23 | HAVE A GOOD BREAK.  WE'LL SEE YOU NEXT WEEK. |
| 09:11AM | 24 | (JURY OUT AT 9:11 A.M.) |
| 09:11AM | 25 | THE COURT:  ALL RIGHT.  THANK YOU.  PLEASE BE |

09:11AM 1    SEATED.

09:11AM 2        THE RECORD SHOULD REFLECT THAT THE JURY HAS LEFT FOR THE

09:11AM 3    BREAK.

09:11AM 4        COUNSEL, ANYTHING FURTHER BEFORE WE BREAK?

09:11AM 5            MR. SCHENK:  NO.  THANK YOU.

09:11AM 6            MR. DOWNEY:  YOUR HONOR, JUST ONE HOUSEKEEPING

09:11AM 7    ITEM --

09:11AM 8            THE COURT:  SURE.

09:11AM 9            MR. DOWNEY:  -- FOR THE COURT TO CONSIDER OVER THE

09:11AM 10   BREAK.

09:11AM 11       I THINK THE COURT MENTIONED ON THE RECORD YESTERDAY THAT

09:11AM 12   THERE HAD BEEN A JUROR COMMUNICATION PERHAPS IN WRITING BY

09:11AM 13   SOMEONE ON BEHALF OF THE JURY RELATED TO DISTRACTION OR NOISE

09:11AM 14   LEVELS.

09:11AM 15       I WOULD JUST ASK THE COURT TO CONSIDER IF IT COULD BE

09:11AM 16   SHARED WITH BOTH PARTIES, AND THE COURT CAN LET US KNOW NEXT

09:12AM 17   WEEK.

09:12AM 18           THE COURT:  OKAY.  ALL RIGHT.  THAT WAS AN EMAIL, I

09:12AM 19   BELIEVE, TO MS. KRATZMANN.

09:12AM 20           MR. DOWNEY:  OKAY.

09:12AM 21           THE COURT:  RIGHT.  AND I'LL SEE IF SHE CAN FIND

09:12AM 22   THAT.

09:12AM 23           MR. DOWNEY:  GOOD.  THANKS, YOUR HONOR.

09:12AM 24           THE COURT:  ALL RIGHT.  THANK YOU.  HAVE A GOOD

09:12AM 25   BREAK.

4902

09:12AM  1              MR. SCHENK:  THANK YOU, YOUR HONOR.

09:12AM  2              THE CLERK:  COURT IS ADJOURNED.

09:12AM  3          (COURT ADJOURNED AT 9:12 A.M.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    CERTIFICATE OF REPORTERS

4

5

6

7        WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11       THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16       _____
         IRENE RODRIGUEZ, CSR, CRR
         CERTIFICATE NUMBER 8076
17

18       _____
19       LEE-ANNE SHORTRIDGE, CSR, CRR
         CERTIFICATE NUMBER 9595
20

21                    DATED:  OCTOBER 27, 2021

22

23

24

25

1

2                    UNITED STATES DISTRICT COURT

3                  NORTHERN DISTRICT OF CALIFORNIA

4                        SAN JOSE DIVISION

5
     UNITED STATES OF AMERICA,        )  CR-18-00258-EJD
6                                     )
                       PLAINTIFF,     )  SAN JOSE, CALIFORNIA
7                                     )
              VS.                     )  VOLUME 36
8                                     )
     ELIZABETH A. HOLMES,             )  NOVEMBER 2, 2021
9                                     )
                       DEFENDANT.     )  PAGES 4903 - 5186
10   _____  )

11                  TRANSCRIPT OF TRIAL PROCEEDINGS
12            BEFORE THE HONORABLE EDWARD J. DAVILA
                  UNITED STATES DISTRICT JUDGE
13   A P P E A R A N C E S:

14
     FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
15                          BY:  JOHN C. BOSTIC
                                 JEFFREY B. SCHENK
16                          150 ALMADEN BOULEVARD, SUITE 900
                            SAN JOSE, CALIFORNIA 95113
17
                            BY:  ROBERT S. LEACH
18                               KELLY VOLKAR
                            1301 CLAY STREET, SUITE 340S
19                          OAKLAND, CALIFORNIA 94612

20        (APPEARANCES CONTINUED ON THE NEXT PAGE.)

21
     OFFICIAL COURT REPORTERS:
22                          IRENE L. RODRIGUEZ, CSR, RMR, CRR
                            CERTIFICATE NUMBER 8074
23                          LEE-ANNE SHORTRIDGE, CSR, CRR
                            CERTIFICATE NUMBER 9595
24
          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25              TRANSCRIPT PRODUCED WITH COMPUTER

```
 1        A P P E A R A N C E S:  (CONT'D)

 2

 3     FOR DEFENDANT HOLMES:    WILLIAMS & CONNOLLY LLP
                               BY:  KEVIN M. DOWNEY
 4                                  LANCE A. WADE
                                    KATHERINE TREFZ
 5                                  J.R. FLEURMONT
                                    RICHARD CLEARY
 6                                  SEEMA ROPER
                                    PATRICK LOOBY
 7                             725 TWELFTH STREET, N.W.
                               WASHINGTON, D.C. 20005
 8
                               LAW OFFICE OF JOHN D. CLINE
 9                             BY:  JOHN D. CLINE
                               ONE EMBARCADERO CENTER, SUITE 500
10                             SAN FRANCISCO, CALIFORNIA 94111

11

12     ALSO PRESENT:           FEDERAL BUREAU OF INVESTIGATION
                               BY:  ADELAIDA HERNANDEZ

13                             OFFICE OF THE U.S. ATTORNEY
                               BY:  LAKISHA HOLLIMAN, PARALEGAL
14                                  MADDI WACHS, PARALEGAL

15                             WILLIAMS & CONNOLLY
                               BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL
16
                               TBC
17                             BY:  BRIAN BENNETT, TECHNICIAN

18
       TELEPHONICALLY FOR
19     ROGER PARLOFF:          JOSHUA KOLTUN
                               DAVID KORZENIK
20

21

22

23

24

25
```

1

INDEX OF PROCEEDINGS

2

GOVERNMENT'S:

3

4       **LISA PETERSON**
        CROSS-EXAM BY MR. WADE (RES.)               P. 4931
5       REDIRECT EXAM BY MR. LEACH                  P. 4982
        RECROSS-EXAM BY MR. WADE                    P. 5016
6
        **CONSTANCE CULLEN**
7       DIRECT EXAM BY MR. SCHENK                   P. 5018
        CROSS-EXAM BY MR. CLINE                     P. 5048
8
9       **DANIEL MOSLEY**
        DIRECT EXAM BY MR. SCHENK                   P. 5070
10      CROSS-EXAM BY MR. WADE                      P. 5154

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        INDEX OF EXHIBITS

2
                                        IDENT.    EVIDENCE
3          GOVERNMENT'S:

4          1992                                    4945
           200                                     5029
5          201                                     5032
           192                                     5033
6          223                                     5037
           259                                     5039
7          262                                     5042
           4163                                    5074
8          4173                                    5078
           3387                                    5086
9          3844                                    5116
           4202                                    5118
10         4221                                    5138
           4284                                    5141
11         4286                                    5145
           4303                                    5149
12         2172                                    5150

13

14         DEFENDANT'S:

15         14212                                   4942
           14076                                   4947
16         10588                                   4975
           10570                                   5050
17         10571                                   5052
           7079                                    5055
18         10572                                   5062
           10573                                   5064
19         10574                                   5066
           14129                                   5170
20         14130                                   5172
           14206                                   5175
21

22

23

24

25

```
 1    SAN JOSE, CALIFORNIA                    NOVEMBER 2, 2021

 2                      P R O C E E D I N G S

 3         (COURT CONVENED AT 8:25 A.M.)

 4         (JURY OUT AT 8:25 A.M.)

 5              THE COURT:  THANK YOU.  PLEASE BE SEATED.  WE'RE ON

 6    THE RECORD IN THE HOLMES MATTER.  ALL COUNSEL ARE PRESENT.

 7    MS. HOLMES IS PRESENT.

 8         WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.  I THOUGHT WE

 9    WOULD TAKE UP SOME MATTERS BEFORE THE JURY IS CALLED.

10         LET'S SEE.  LET ME JUST CALL OUT WHAT I HAVE ON MY NOTES

11    FOR AGENDA.  WE HAVE DOCKET 1103, WHICH IS A MOTION TO EXCLUDE

12    WITNESS PARLOFF; DOCKET 1116, WHICH IS A MOTION TO EXCLUDE

13    WITNESS INITIALS BB.  I THINK WE WERE GOING TO TALK ABOUT THOSE

14    TWO THINGS TODAY.

15         ANYTHING ELSE WE SHOULD ADD TO THE AGENDA FROM EITHER

16    SIDE?

17         MR. SCHENK?

18              MR. SCHENK:  GOOD MORNING.  YES, THANK YOU.

19         TODAY AFTER MS. PETERSON, THE NEXT WITNESS IS DR. CULLEN.

20    WE DON'T EXPECT DR. CULLEN TO TAKE TOO LONG.

21         AFTER DR. CULLEN, THE GOVERNMENT WILL CALL DANIEL MOSLEY.

22    MR. MOSLEY WAS AN INVESTOR.  MR. MOSLEY INVESTED IN ABOUT

23    OCTOBER OF 2014.

24         AND I MET AND CONFERRED WITH THE DEFENSE REGARDING CERTAIN

25    2015 DOCUMENTS.  MR. MOSLEY HAD EMAIL EXCHANGES WITH OTHER
```

The time notations in left margin: 08:25AM for lines 3-18, 08:26AM for lines 19-25.

08:26AM 1    POTENTIAL INVESTORS, ONE IN PARTICULAR, IN 2015.  AND I ASKED

08:26AM 2    THE DEFENSE IF THEY WERE PLANNING TO SEEK TO USE THOSE OR ADMIT

08:26AM 3    THOSE DURING CROSS, AND THEY, WHILE NOT IDENTIFYING SPECIFIC

08:26AM 4    DOCUMENTS FOR ME, SAID THAT THEY DID ANTICIPATE OFFERING

08:26AM 5    EVIDENCE FROM 2015.

08:26AM 6         AND I THINK WE WOULD BENEFIT FROM SOME GUIDANCE FROM THE

08:26AM 7    COURT ON THIS ISSUE OF COMMUNICATIONS BY INVESTORS AFTER

08:26AM 8    THEY'VE INVESTED, BUT NOT WITH THE DEFENDANT.

08:26AM 9         THE COURT WILL RECALL THAT WE TALKED ABOUT THE ISSUE WITH

08:27AM 10   REGARD TO POST-INVESTMENT CONDUCT THAT INVOLVES THE DEFENDANT,

08:27AM 11   THE DEFENDANT'S STATE OF MIND.

08:27AM 12        BUT I THINK THIS IS AN INSTANCE WHERE THE ONLY RELEVANCE

08:27AM 13   WOULD BE AN INVESTOR'S KNOWLEDGE AFTER THE INVESTOR INVESTED,

08:27AM 14   AND I THINK IT'S BEEN THE GOVERNMENT'S POSITION THROUGHOUT

08:27AM 15   TRIAL, AND WE MADE THIS ARGUMENT TO YOUR HONOR DURING

08:27AM 16   MR. TOLBERT'S TESTIMONY, THAT THE INVESTOR'S KNOWLEDGE AFTER,

08:27AM 17   IN THIS CASE SIX MONTHS OR SO AFTER, INVESTING JUST ISN'T

08:27AM 18   RELEVANT, AND INSTEAD OF RAISING THIS ISSUE THROUGH AN

08:27AM 19   OBJECTION AT THE MOMENT THE DOCUMENT WAS OFFERED, I HAVE COPIES

08:27AM 20   OF THE DOCUMENTS, AT LEAST SOME OF THE ONES THAT I'VE

08:27AM 21   IDENTIFIED.

08:27AM 22        I'D BE HAPPY TO PASS THOSE UP, AND WE CAN TAKE IT UP

08:27AM 23   WHENEVER IT IS CONVENIENT FOR THE COURT, A BREAK BEFORE

08:27AM 24   MR. MOSLEY OR NOW, WHATEVER WORKS FOR THE COURT.

08:27AM 25             THE COURT:  ALL RIGHT.  THANK YOU.  I'M HAPPY TO

08:27AM   1    RECEIVE THOSE JUST TO HAVE THEM IN ADVANCE.

08:27AM   2         MR. WADE, ARE YOU SPEAKING TO THIS?

08:28AM   3         ADRIANA.

08:28AM   4             MR. SCHENK:  (HANDING.)

08:28AM   5             MR. WADE:  I AM, YOUR HONOR.

08:28AM   6         MAYBE IT MAKES SENSE FOR THE COURT TO LOOK AT THE

08:28AM   7    DOCUMENTS.  WE CAN ADDRESS THESE DURING THE BREAK SO EVERYONE

08:28AM   8    IS ON THE SAME PAGE AND IT WOULD BE MOST EFFICIENT.

08:28AM   9         WE DON'T KNOW EXACTLY WHAT MR. MOSLEY WILL TESTIFY TO.

08:28AM   10        I DID INDICATE TO THE GOVERNMENT THAT WE MAY SEEK TO OFFER

08:28AM   11   THESE DOCUMENTS, AND OBVIOUSLY WE WOULD NEED TO LAY A

08:28AM   12   FOUNDATION FOR THEM TO BE ADMISSIBLE.

08:28AM   13        I'M NOT SURE IF THE GOVERNMENT'S POSITION IS THAT WITH

08:28AM   14   RESPECT TO THE INVESTOR CONSPIRACY, NO EVENTS RELATING TO THIS

08:28AM   15   SPECIFIC INVESTOR'S IDENTIFIED, OTHER THAN THOSE IDENTIFIED

08:28AM   16   SPECIFICALLY, IN THE INDICTMENT.

08:28AM   17        AND SUBSTANTIVE COUNTS ARE RELEVANT, BUT THEIR CONSPIRACY

08:28AM   18   COUNT IS OBVIOUSLY BROADER THAN THAT.  MAYBE TO THE EXTENT THAT

08:28AM   19   THEY'RE NARROWING THAT, THAT WOULD BE -- THAT WOULD CERTAINLY

08:28AM   20   BE RELEVANT FOR THE DEFENSE TO KNOW.

08:28AM   21        I THINK MR. MOSLEY, JUST TO GIVE THE COURT A LITTLE BIT OF

08:29AM   22   CONTEXT, I THINK YOU HEARD A LITTLE BIT THROUGH MS. PETERSON,

08:29AM   23   HE WAS A PARTNER AT CRAVATH IN NEW YORK.  A NUMBER OF HIS

08:29AM   24   CLIENTS ENDED UP INVESTING IN THERANOS, MANY OF THEM THROUGH AN

08:29AM   25   INTRODUCTION PROVIDED BY MR. MOSLEY.

08:29AM 1      MR. MOSLEY CONTINUED TO INTERACT WITH BOTH OF THOSE

08:29AM 2  INVESTORS AND HIS CLIENTS, THOSE INVESTORS WHO ARE HIS CLIENTS.

08:29AM 3      AND IN THIS CASE MR. SLACK, WHO IS A REPRESENTATIVE OF THE

08:29AM 4  OPPENHEIMER FAMILY, IT'S MR. OPPENHEIMER -- MR. SLACK IS NOT A

08:29AM 5  CLIENT OF MR. MOSLEY, BUT HE WAS A FRIEND OF        HENRY

08:29AM 6  KISSINGER, AND SECRETARY KISSINGER WAS A CLIENT OF --

08:29AM 7          THE COURT:  LET ME JUST -- I THINK WE JUST HEARD

08:29AM 8  SOMEBODY COUGH ON A TELEPHONE.

08:29AM 9      IF ANYONE WHO IS ON A PHONE, IF YOU WOULD PLEASE MUTE YOUR

08:30AM 10  PHONE, WE ALL HERE IN CALIFORNIA WOULD APPRECIATE IT.  THANK

08:30AM 11  YOU.

08:30AM 12      I'M SORRY, MR. WADE, FOR THE INTERRUPTION.

08:30AM 13          MR. WADE:  NO PROBLEM AT ALL, YOUR HONOR.

08:30AM 14      DR. KISSINGER WAS A CLIENT OF MR. MOSLEY, AND I BELIEVE AT

08:30AM 15  DR. KISSINGER'S REQUEST MR. MOSLEY WAS INTERACTING WITH

08:30AM 16  MR. SLACK OF THE OPPENHEIMER FAMILY.

08:30AM 17      THERE WERE A LOT OF INTERACTIONS THAT MR. MOSLEY HAS

08:30AM 18  THROUGHOUT THE FALL OF 2014 THAT I THINK ARE RELEVANT BOTH

08:30AM 19  BECAUSE HE PERSONALLY MAKES AN INVESTMENT DECISION, SOME OF HIS

08:30AM 20  CLIENTS MAKE INVESTMENTS, AND HE SORT OF IS PICKING INFORMATION

08:30AM 21  UP THROUGHOUT THE FALL.

08:30AM 22      AND SO SOME OF THOSE INTERACTIONS RELATED TO THE FINANCIAL

08:30AM 23  PROJECTIONS THAT THE COURT HAS HEARD EVIDENCE COME IN ABOUT,

08:30AM 24  AND SOME OF THE EMAILS THAT WE MAY SEEK TO OFFER REFLECT

08:30AM 25  MR. MOSLEY'S VIEW OF WHAT WAS REALISTIC IN TERMS OF THE

08:31AM  1      FINANCIAL NUMBERS AND THE PROJECTIONS THAT WERE PROVIDED AS

08:31AM  2      COMMUNICATED TO MR. SLACK.

08:31AM  3          SO IT REFLECTS MR. MOSLEY'S UNDERSTANDING OF INFORMATION

08:31AM  4      HE WAS OBTAINING ABOUT THE FINANCES OF THE COMPANY AS HE WAS

08:31AM  5      DEALING WITH THERANOS THROUGHOUT THE FALL OF 2014.

08:31AM  6          SO THAT'S A LITTLE BIT OF CONTEXT.

08:31AM  7              THE COURT:  IS THAT POST-INVESTMENT THEN?

08:31AM  8              MR. WADE:  IT'S POST-INVESTMENT, BUT WE THINK IT

08:31AM  9      REFLECTS HIS UNDERSTANDING AS TO LIMITATIONS ON THE

08:31AM 10      PROJECTIONS, WHICH IT'S HARD TO SEGREGATE JUST HIS INVESTMENT

08:31AM 11      DECISION HERE, YOUR HONOR, BECAUSE I THINK AS YOU'LL HEAR,

08:31AM 12      THERE ARE A LOT OF INTERACTIONS THAT MR. MOSLEY HAS STARTING IN

08:31AM 13      AUGUST OF 2014 AND CONTINUING THROUGHOUT THE FALL.

08:31AM 14          HE ULTIMATELY MAKES A PERSONAL INVESTMENT DECISION IN LATE

08:31AM 15      OCTOBER 2014, BUT THERE ARE -- THERE ARE A VARIETY OF

08:32AM 16      INTERACTIONS THAT HAPPEN THROUGHOUT THAT PERIOD, INCLUDING SOME

08:32AM 17      OF THE FINANCIAL PROJECTIONS AND THINGS RELATED TO THE COMPANY.

08:32AM 18          SO WHEN HE'S COMMUNICATING WITH MR. SLACK IN THE FUTURE,

08:32AM 19      WE THINK THAT'S EVIDENCE OF WHAT HE UNDERSTOOD EARLIER IN TIME

08:32AM 20      BECAUSE HE'S SUGGESTING THAT THERE ARE LIMITATIONS ON THE

08:32AM 21      ABILITY TO PROJECT FIVE YEARS OUT, FOR EXAMPLE, THAT

08:32AM 22      MR. BALWANI WOULD NOT BE IN A POSITION TO DO THAT, ET CETERA.

08:32AM 23          SO WE THINK THAT --

08:32AM 24              THE COURT:  I'M SORRY.  I APOLOGIZE.  BUT JUST SO I

08:32AM 25      CAN KEEP IT BEFORE I LOSE IT --

4912

08:32AM  1          MR. WADE:  YEAH.

08:32AM  2          THE COURT:  -- SO HIS POST-INVESTMENT COMMENTS VIA

08:32AM  3   EMAIL AND OTHERS WOULD BE RELEVANT BECAUSE IT SHOWS HIS

08:32AM  4   CONTINUED THOUGHTS OR PROJECTIONS ABOUT HIS INVESTMENT IN 2014

08:32AM  5   LOOKING BACKWARDS?

08:32AM  6       I GUESS IS THAT HOW --

08:32AM  7          MR. WADE:  THERE'S NO INDICATION THAT HE GOT

08:32AM  8   ADDITIONAL INFORMATION ABOUT THE FINANCES AFTER HIS INVESTMENT

08:32AM  9   DECISION.

08:32AM  10      SO I THINK IT'S EVIDENCE OF WHAT HE UNDERSTOOD ABOUT THE

08:33AM  11  FINANCES AT THE TIME HE MADE THE INVESTMENT DECISION, BUT WE

08:33AM  12  CAN CERTAINLY -- IF THE UNDERSTANDING OF THAT IS NOT RIGHT, THE

08:33AM  13  WITNESS CAN CERTAINLY CLARIFY THAT.

08:33AM  14      IT WOULD BE, FOR EXAMPLE, IF I HAD INTERACTIONS WITH THE

08:33AM  15  COURT AND ONE OF MY COLLEAGUES WAS GOING TO COME OUT AND ARGUE

08:33AM  16  WITH YOU, AND ARGUE IN FRONT OF YOU AND I SAID TO ONE OF MY

08:33AM  17  COLLEAGUES, JUDGE DAVILA IS A VERY PLEASANT JUDGE, HE GIVES YOU

08:33AM  18  A CHANCE TO MAKE YOUR ARGUMENT, HE ASKS A LOT OF QUESTIONS,

08:33AM  19  HE'S WELL PREPARED.

08:33AM  20      EVEN THOUGH I'M COMMUNICATING THAT THREE MONTHS IN THE

08:33AM  21  FUTURE, THAT IS AN INDICATION OF THE INFORMATION I'VE OBTAINED

08:33AM  22  AS A RESULT OF MY EXPERIENCE, YOU KNOW, HERE TODAY.

08:33AM  23      AND SO I THINK IT'S SIMILAR EVIDENCE THAT RELATES TO THAT.

08:33AM  24      BUT MAYBE THE COURT CAN LOOK AT THE EMAILS AND I THINK

08:33AM  25  YOU'LL GET A SENSE OF, YOU KNOW, A SENSE OF THAT.

08:33AM 1     ONE OTHER ISSUE THAT I WANT TO FLAG FOR THE COURT WITH

08:33AM 2    RESPECT TO MR. MOSLEY.  HE IS A LAWYER, OR WAS A LAWYER AT THE

08:34AM 3    TIME THAT HE WAS INTERACTING.  HE HAS ASSERTED PRIVILEGE OVER A

08:34AM 4    LOT OF COMMUNICATIONS INVOLVING VARIOUS CLIENTS, AND I JUST

08:34AM 5    WANTED TO MAKE THE COURT AWARE OF THAT SO IT DIDN'T COME AS A

08:34AM 6    SURPRISE.

08:34AM 7         WE HAVE A SENSE OF WHERE THOSE ASSERTIONS ARE AND WE'RE OF

08:34AM 8    COURSE GOING TO DO OUR BEST TO STEER CLEAR OF ANYTHING OTHER

08:34AM 9    THAN JUST SORT OF PRIVILEGE LOG LEVEL INFORMATION AS BEST WE

08:34AM 10   CAN.

08:34AM 11        BUT I JUST WANTED TO RAISE THAT IN THE EVENT THAT IT COMES

08:34AM 12   UP DURING THE TESTIMONY OF MR. MOSLEY, BECAUSE THROUGHOUT THE

08:34AM 13   PERIOD WHERE HE'S CONSIDERING THE INVESTMENT, HE'S HAVING

08:34AM 14   PRIVILEGED COMMUNICATIONS WITH VARIOUS CLIENTS.

08:34AM 15        THE COURT:  SO IT SOUNDS LIKE YOUR EXAMINATION WOULD

08:34AM 16   SKIRT THOSE ISSUES SO IT DOESN'T HAVE TO BE RAISED TO THE

08:34AM 17   EXTENT THAT HIS TESTIMONY IS SOUGHT BY YOU.

08:34AM 18        MR. WADE:  IT WILL COME UP IN HIS TESTIMONY TO THE

08:35AM 19   EXTENT THAT HE IS HAVING COMMUNICATIONS, AND WHEN HE'S HAVING

08:35AM 20   COMMUNICATIONS, THE SUBSTANCE OF THOSE COMMUNICATIONS, YOU

08:35AM 21   KNOW, IT OBVIOUSLY WOULD NOT BE APPROPRIATE FOR US TO ASK ABOUT

08:35AM 22   GIVEN HE'S ASSERTED THE PRIVILEGE.

08:35AM 23        SO THERE ARE A COUPLE OF OCCASIONS WHERE A CERTAIN LEVEL

08:35AM 24   OF INFORMATION IS COMMUNICATED TO THIRD PARTIES.  FOR EXAMPLE,

08:35AM 25   HE MAY HAVE A COMMUNICATION WITH DR. KISSINGER, THE CONTENTS OF

4914

08:35AM  1    WHICH WE DON'T REALLY KNOW, BUT THEN HE WILL COMMUNICATE A VERY

08:35AM  2    LIMITED PIECE OF INFORMATION TO MS. HOLMES LIKE, "I HAD A

08:35AM  3    CONVERSATION, I HOPE WE CAN MEET AGAIN IN THE FUTURE."  YOU

08:35AM  4    KNOW, NONE OF THE SUBSTANCE OF THE PRIVILEGE INFORMATION, BUT

08:35AM  5    IT'S CLEAR THAT HE IS HAVING A PRIVILEGED COMMUNICATION.

08:35AM  6         SO THE FACT OF THOSE COMMUNICATIONS WILL COME UP, BUT I

08:35AM  7    JUST WANTED TO ALERT THE COURT TO THE ISSUE SO NO ONE WAS

08:36AM  8    CAUGHT OFF GUARD.  AND WE'LL OF COURSE DO OUR BEST TO KIND OF

08:36AM  9    CAREFULLY NAVIGATE OUR WAY THROUGH THOSE ISSUES.

08:36AM  10         THE COURT:  SURE.  THANK YOU.  IT SOUNDS LIKE YOU'RE

08:36AM  11   NOT GOING TO BE CALLING UPON THE WITNESS OR THE COURT TO MAKE A

08:36AM  12   DECISION AS TO WHETHER OR NOT A PRIVILEGE SHOULD BE

08:36AM  13   APPROPRIATE.

08:36AM  14         MR. WADE:  WE DON'T INTEND TO DO THAT, YOUR HONOR.

08:36AM  15         THE COURT:  AND I'M INFORMED OF THAT.

08:36AM  16   IT SOUNDS LIKE YOUR CROSS WILL BE LENGTHY OF THIS WITNESS.

08:36AM  17         MR. WADE:  IT COULD BE.  YEAH, YEAH.

08:36AM  18         THE COURT:  OKAY.

08:36AM  19   MR. SCHENK, LET ME DRAW YOU BACK TO THE POST-INVESTMENT

08:36AM  20   COMMENT AND THE OBSERVATIONS, AS MR. WADE HAS INDICATED.

08:36AM  21         MR. SCHENK:  THANK YOU, YOUR HONOR.  TWO POINTS.

08:36AM  22    FIRST, THE GOVERNMENT IS NOT NARROWING THE CONSPIRACY

08:36AM  23   PERIOD, SIMPLY QUESTIONING THE RELEVANCE OF SPECIFIC DOCUMENTS

08:36AM  24   IN THE 2015 TIME PERIOD.

08:36AM  25         THE LINE THAT MR. WADE IS ATTEMPTING TO DRAW FOR THE

4915

08:36AM 1    COURT, AND THAT IS 2015 STATEMENTS, THOUGHTS ARE RELEVANT IF

08:37AM 2    THEY WERE HELD BY THE WITNESS BEFORE HE INVESTED IS FAIR GAME

08:37AM 3    FOR CROSS.  IT JUST DOESN'T REQUIRE THE ADMISSION OF THESE

08:37AM 4    DOCUMENTS, AND THAT'S THE LINE THAT I'M ADVOCATING FOR.

08:37AM 5         IT'S APPROPRIATE FOR MR. WADE TO ASK THE WITNESS WHAT HE

08:37AM 6    KNEW IN 2014.  THAT DOES NOT REQUIRE MR. WADE TO DO IT BY

08:37AM 7    INTRODUCING DOCUMENTS FROM 2015 AND THEN SAYING, WAS THAT WHAT

08:37AM 8    YOU THOUGHT IN 2014?

08:37AM 9         THAT'S NOT NECESSARY, AND IT'S INTRODUCING IRRELEVANT

08:37AM 10   EVIDENCE.

08:37AM 11        WHAT IS RELEVANT IS, WHAT DID MR. MOSLEY THINK BEFORE HE

08:37AM 12   INVESTED?  AND I'M NOT OBJECTING TO THAT.  I THINK THAT THAT IS

08:37AM 13   APPROPRIATE.

08:37AM 14        BUT IT SHOULDN'T BE DONE THROUGH THE INTRODUCTION OF 2015

08:37AM 15   DOCUMENTS.

08:37AM 16           THE COURT:  SO, SO IF HE SAYS, WHAT WERE YOU

08:37AM 17   THINKING IN 2014 AND HE GETS A RESPONSE, CAN HE -- PARDON ME.

08:37AM 18   CAN HE ASK, DID YOU MEMORIALIZE THAT IN AN EMAIL IN 2015?  DID

08:37AM 19   YOU SAY THE SAME THING?  DID YOUR MIND CHANGE IN 2015?  YES OR

08:37AM 20   NO?  DID YOU MEMORIALIZE THAT IN SOME FASHION?  WITHOUT GETTING

08:38AM 21   THE DOCUMENT IN.

08:38AM 22           MR. SCHENK:  IF IN YOUR HONOR'S EXAMPLE THE TWO ARE

08:38AM 23   CONSISTENT, HE SAYS SOMETHING IN 2014 THAT'S MEMORIALIZED IN

08:38AM 24   2015, I SUPPOSE IF THE QUESTION IS, DID YOU WRITE THAT DOWN IN

08:38AM 25   AN EMAIL IN 2015, I DON'T HAVE AN OBJECTION TO IT.

4916

08:38AM  1      WHAT CONCERNS ME IS TO SUGGEST THAT THIS OUT-OF-COURT

08:38AM  2  STATEMENT TO SOMEONE THAT MR. MOSLEY -- MR. WADE EXPLAINED THE

08:38AM  3  TENUOUS RELATIONSHIP.  IT'S NOT A CLIENT OF MR. MOSLEY'S, IT'S

08:38AM  4  A FRIEND OF A FRIEND, AND MR. MOSLEY SENDS AN EMAIL TO THIS

08:38AM  5  FRIEND OF A FRIEND.

08:38AM  6      I DON'T THINK THAT DOCUMENT NEEDS TO COME IN EVEN IF IT IS

08:38AM  7  CONSISTENT.  THIS AFTER-THE-FACT CONSISTENT STATEMENT IS

08:38AM  8  HEARSAY AND JUST NOT RELEVANT.

08:38AM  9          THE COURT:  SURE.

08:38AM 10      SO IF HIS OPINION OF THE INVESTMENT IN 2014 CONTINUED

08:38AM 11  THROUGH 2015, CAN'T YOU JUST ASK HIM THAT, MR. WADE?  DID YOUR

08:38AM 12  MIND CHANGE?

08:38AM 13      NO, IT DIDN'T.

08:38AM 14      AND YOU MEMORIALIZED THAT?  YOU WERE CONSISTENT IN THAT

08:38AM 15  OPINION?

08:38AM 16      YES, I WAS.

08:38AM 17      THANK YOU VERY MUCH.

08:38AM 18      WHY DO YOU NEED THE DOC?  AND I'LL LOOK AT THE DOCS.  I

08:39AM 19  DON'T KNOW, MAYBE THEY HAVE SOME OTHER INFORMATION, BUT --

08:39AM 20          MR. WADE:  IT MAY BE THAT THE QUESTIONING WILL

08:39AM 21  ADEQUATELY REVEAL IT.

08:39AM 22      BUT JUST TO MAKE THE EXAMPLE CONCRETE HERE, AS I SAID,

08:39AM 23  MR. MOSLEY IS COMMUNICATING WITH THERANOS AT DIFFERENT POINTS

08:39AM 24  IN TIME THROUGHOUT THE FALL.  HE ULTIMATELY MAKES A PERSONAL

08:39AM 25  INVESTMENT DECISION.  HE HAS MANY CLIENTS WHO MAKE INVESTMENT

4917

08:39AM  1    DECISIONS IN THE FALL AND INTO THE LATE FALL.

08:39AM  2         ON FEBRUARY 5TH, 2015, HE COMMUNICATES WITH MR. SLACK, WHO

08:39AM  3    HE HAS BEEN COMMUNICATING WITH FREQUENTLY.  THERE ARE FREQUENT

08:39AM  4    COMMUNICATIONS AT THE REQUEST OF DR. KISSINGER.

08:39AM  5         ONE OF THE THINGS THEY ASK ABOUT ARE, MR. SLACK'S

08:39AM  6    COLLEAGUES ASK ABOUT ARE DETAILED PROJECTIONS.

08:39AM  7         AND IF YOU LOOK AT EXHIBIT 4380, MR. MOSLEY RESPONDS, "I

08:39AM  8    SUSPECT IT WILL BE VERY HARD FOR SUNNY TO GIVE MUCH RELIABLE

08:39AM  9    GUIDANCE ON A FIVE YEAR BASIS GIVEN HOW FAST THINGS ARE MOVING

08:40AM  10   AND THE VARIABLES.  I THINK IT WILL BE EASY TO GET SUNNY TO

08:40AM  11   EXPLAIN THE MARKET SHARE THEY ARE TARGETING AND THE VALUES

08:40AM  12   LIKELY GENERATED BY THAT SHARE."

08:40AM  13        SO THAT CLEARLY -- HE'S NOT -- HE'S INTERACTED WITH

08:40AM  14   MR. BALWANI ABOUT THESE FINANCIAL ISSUES.  THIS CLEARLY

08:40AM  15   REFLECTS HIS UNDERSTANDING AS TO THE LIMITATIONS ON THE

08:40AM  16   PROJECTIONS, AND THE NUMBER OF QUICKLY MOVING VARIABLES.

08:40AM  17        IN OTHER WORDS -- AND WE'LL SEE.  MAYBE IT WON'T BE

08:40AM  18   RELEVANT.  MAYBE HE'LL CONCEDE THAT THERE WAS A TREMENDOUS

08:40AM  19   AMOUNT OF UNCERTAINTY RELATED TO THE PROJECTIONS, AND MAYBE WE

08:40AM  20   DON'T NEED TO GET INTO THIS, BUT IF THE WITNESS SUPPORTS A VIEW

08:40AM  21   THAT DEPARTS FROM WHAT HE COMMUNICATES TO MR. SLACK, I THINK

08:40AM  22   IT'S APPROPRIATE IMPEACHMENT BY CONTRADICTION EVIDENCE.

08:40AM  23             THE COURT:  WELL, THERE'S A LOT OF OTHER INFORMATION

08:40AM  24   IN THIS EMAIL.  THE NEXT PARAGRAPH SPEAKS TO YOUR CLIENT AND

08:41AM  25   THINGS ABOUT HER.  I'M NOT SURE YOU WANTED THAT ALSO.

08:41AM  1        BUT IT SEEMS THAT THIS GIVES -- IT'S HIS OPINION OF WHAT

08:41AM  2    MR. BALWANI WOULD DO, COULD DO, AND SHOULD DO, AND I'M NOT SURE

08:41AM  3    THAT'S APPROPRIATE.  BUT LET'S LOOK AT THIS AS WE GET -- LET ME

08:41AM  4    LOOK AT THESE THINGS, THESE EMAILS, AND WE'LL -- I THINK IT'S

08:41AM  5    WISE TO TAKE IT UP AS YOU SUGGEST, MAYBE AT A BREAK PRIOR TO

08:41AM  6    THE WITNESS'S TESTIMONY.

08:41AM  7        MR. WADE:  SURE.

08:41AM  8        THE COURT:  GREAT.  THANK YOU.

08:41AM  9      I TALKED ABOUT THE OTHER ITEMS THAT I HAD ON MY AGENDA,

08:41AM 10    BUT ARE THERE ANY OTHER ITEMS THAT WE SHOULD DISCUSS THIS

08:41AM 11    MORNING?

08:41AM 12        MR. SCHENK:  NO, YOUR HONOR.

08:41AM 13        THE COURT:  OKAY.  I MENTIONED 1116, THAT WAS A

08:41AM 14    MOTION TO EXCLUDE WITNESS BB.  THAT'S ON THE TABLE NOW.  SHOULD

08:41AM 15    WE DEFER THAT?

08:41AM 16      GOOD MORNING, MR. BOSTIC.

08:41AM 17        MR. BOSTIC:  GOOD MORNING, YOUR HONOR.

08:41AM 18      IT'S THE GOVERNMENT'S REQUEST THAT WE TAKE THAT UP PERHAPS

08:41AM 19    TOMORROW.  THAT MOTION WAS FILED BY THE DEFENSE ON SATURDAY.

08:42AM 20    THIS WITNESS WILL NOT TESTIFY TODAY, AND MOST LIKELY NOT

08:42AM 21    TOMORROW EITHER.

08:42AM 22      THE GOVERNMENT WOULD LIKE TO FILE A WRITTEN RESPONSE TO

08:42AM 23    THE DEFENSE'S MOTION, AND IT INTENDS TO DO THAT SOMETIME TODAY.

08:42AM 24    SO OUR REQUEST, IF THE COURT IS AMENABLE, IS THAT WE TALK ABOUT

08:42AM 25    IT TOMORROW AT THIS TIME, OR POSSIBLY THURSDAY.

4919

08:42AM  1              THE COURT:  MS. TREFZ, GOOD MORNING.

08:42AM  2              MS. TREFZ:  GOOD MORNING.

08:42AM  3         I'M HAPPY TO TALK ABOUT IT TOMORROW.

08:42AM  4         ONE THING I WOULD REQUEST IS THAT IF YOU GUYS HAVE UPDATED

08:42AM  5    INFORMATION, WE'VE ONLY GOT ONE 302 FROM ALMOST A YEAR AND A

08:42AM  6    HALF AGO OR MORE AT THIS POINT.  SO IF YOU DO HAVE UPDATED

08:42AM  7    INFORMATION, WE WOULD LOVE TO GET IT BEFORE WE DO THE ARGUMENT.

08:42AM  8              MR. BOSTIC:  WE CAN DO THAT, YOUR HONOR.

08:42AM  9              THE COURT:  GREAT.  OKAY.  THANK YOU.

08:42AM 10              MS. TREFZ:  SURE.

08:42AM 11              THE COURT:  SO WE'LL DEFER 1116 FOR TOMORROW MORNING

08:42AM 12    THEN.

08:42AM 13              MS. TREFZ:  OKAY.

08:42AM 14              THE COURT:  AND THEN I HAD 1103, WHICH WAS A MOTION

08:42AM 15    ABOUT MR. PARLOFF.

08:42AM 16         MR. CLINE, GOOD MORNING.

08:42AM 17              MR. CLINE:  GOOD MORNING, YOUR HONOR.

08:42AM 18         JOHN CLINE FOR MS. HOLMES.

08:43AM 19         WOULD IT BE POSSIBLE FOR ME TO TAKE THIS OFF WHILE WE'RE

08:43AM 20    TALKING?

08:43AM 21              THE COURT:  IT'S SO BECOMING, MR. CLINE, I'M NOT

08:43AM 22    SURE.

08:43AM 23         (LAUGHTER.)

08:43AM 24              THE COURT:  SURE.  GO RIGHT AHEAD.

08:43AM 25              MR. CLINE:  THANK YOU VERY MUCH.

08:43AM  1          YOUR HONOR, WE HAVE FILED 1103, WHICH IS A MOTION IN

08:43AM  2    LIMINE CONCERNING MR. PARLOFF'S TESTIMONY.  PROBABLY THE BEST

08:43AM  3    EXPRESSION OF OUR POSITION IS THE REPLY, WHICH IS 1117 FILED

08:43AM  4    YESTERDAY.

08:43AM  5          RELATED TO THIS IS 1102, WHICH IS OUR OBJECTIONS TO

08:43AM  6    MAGISTRATE JUDGE COUSINS'S ORDER QUASHING OUR SUBPOENA TO

08:43AM  7    MR. PARLOFF.

08:43AM  8          AND THE REASON THEY'RE RELATED IS THAT I THINK THE

08:43AM  9    PRINCIPAL CONCERN WITH THE SUBPOENA HAS TO DO WITH RELEVANCE OF

08:43AM  10   THE MATERIALS WE'RE SELECTING, AND IN OUR VIEW THE BROADER THE

08:43AM  11   SCOPE OF MR. PARLOFF'S TESTIMONY, THE MORE APPARENT THE

08:43AM  12   RELEVANCE OF THE MATERIALS THAT WE'RE SEEKING, AND THE REVERSE

08:43AM  13   IS TRUE AS WELL.

08:43AM  14         I THINK MR. PARLOFF'S LAWYERS, MR. KORZENIK AND

08:44AM  15   MR. KOLTUN, ARE ON THE PHONE SUPPOSEDLY TO ADDRESS THE SUBPOENA

08:44AM  16   ISSUE AS YOUR HONOR WANTS TO ADDRESS IT.

08:44AM  17            THE COURT:  OKAY.  THANK YOU.  IS THIS RELEVANT TO

08:44AM  18   TALK ABOUT THIS MORNING?

08:44AM  19            MR. CLINE:  WE DON'T HAVE TO.

08:44AM  20         MR. PARLOFF IS NOT COMING UNTIL WHEN?  NEXT WEEK.

08:44AM  21            MR. BOSTIC:  MR. PARLOFF IS NOT COMING THIS WEEK.

08:44AM  22   WE'RE HAPPY TO DISCUSS IT ANY TIME THE COURT WISHES.

08:44AM  23            THE COURT:  THANK YOU.  I'M COGNIZANT OF TIME.  IT'S

08:44AM  24   ABOUT QUARTER TILL THE HOUR, AND THIS MAY TAKE A LITTLE LONGER

08:44AM  25   THAN THAT.  MAYBE NOT.

08:44AM 1        MR. CLINE:  I THINK THIS WILL TAKE A LITTLE WHILE.

08:44AM 2   WE MAY WANT TO PUT IT OFF UNTIL TOMORROW MORNING.  I DON'T

08:44AM 3   THINK IT'S URGENT THAT WE DECIDE IT TODAY.

08:44AM 4        THE COURT:  DO YOU AGREE WITH THAT?

08:44AM 5        MR. KORZENIK:  YOUR HONOR, DAVID KORZENIK SPEAKING.

08:44AM 6    WE WILL BE AVAILABLE WHENEVER AT THE COURT'S CONVENIENCE

08:44AM 7   TO DISCUSS IT.  IT APPEARS THAT MUCH OF IT IS MOOT AT THIS

08:44AM 8   POINT.

08:44AM 9        THE COURT:  THANK YOU.  PLEASE STATE YOUR NAME

08:44AM 10  AGAIN.

08:44AM 11       MR. KORZENIK:  MY NAME IS DAVID KORZENIK, K-O-R-Z,

08:45AM 12  AS IN ZEBRA, E-N-I-K, AND WE'RE APPEARING ON BEHALF OF

08:45AM 13  JOURNALIST AND WITNESS ROGER PARLOFF.

08:45AM 14       THE COURT:  THANK YOU.  AND YOU'RE APPEARING

08:45AM 15  TELEPHONICALLY FOR THIS HEARING; IS THAT RIGHT?

08:45AM 16       MR. KORZENIK:  THAT'S CORRECT.

08:45AM 17       THE COURT:  MR. BOSTIC?

08:45AM 18       MR. BOSTIC:  THAT'S CORRECT, YOUR HONOR.

08:45AM 19    ON TIMING, YES, THIS WITNESS WILL TESTIFY POSSIBLY NEXT

08:45AM 20  WEEK AT THE EARLIEST, SO WHENEVER IT IS CONVENIENT FOR THE

08:45AM 21  COURT AND THE DEFENSE TO RAISE THIS ISSUE, WE'LL BE READY.

08:45AM 22       THE COURT:  OKAY.  THANK YOU.  I DID NOTE YOUR

08:45AM 23  OPPOSITION, WHICH IS 1115, AND THAT SEEMS TO LIMIT THE -- AT

08:45AM 24  LEAST IT INFORMS THE PARTIES THAT THE GOVERNMENT -- AS TO THE

08:45AM 25  LIMITS OF THE GOVERNMENT'S EXAMINATION OF THE WITNESS.

4922

08:45AM  1      I WILL SAY, THOUGH, I DO HAVE AND I HAVE READ THAT, OF

08:45AM  2  COURSE, AND YOUR REPLY.  I DID HAVE SOME QUESTIONS, AND WHAT

08:45AM  3  WE'LL DISCUSS WHEN WE TALK ABOUT THIS, I THINK MR. BOSTIC, YOU

08:45AM  4  INFORM SIX BASIC AREAS OF INQUIRY, QUESTIONS I GUESS, IN YOUR

08:46AM  5  PLEADINGS, AND I THINK WHAT I'M FOCUSSED ON IS REALLY THE --

08:46AM  6  AND THANK YOU FOR THAT, FOR THAT LIMITATION.

08:46AM  7      I THINK THAT DOES TAKE CARE OF MANY ITEMS.

08:46AM  8      WHAT CONCERNS ME, THOUGH, IS WHEN YOU DESCRIBE THE

08:46AM  9  CONTEXTUAL NATURE OF THE EXAMINATION AND WHAT THAT MEANS, AND

08:46AM 10  THAT'S WHAT I'M GOING TO BE ASKING YOU ABOUT, WHAT DOES THAT

08:46AM 11  MEAN AND HOW MIGHT THAT TRAVEL INTO THE CONVERSATION, THE

08:46AM 12  EXAMINATION?  I JUST DON'T KNOW WHAT YOU HAD IN MIND ABOUT

08:46AM 13  THAT, BUT I -- YOU'LL TELL ME.

08:46AM 14          MR. CLINE:  AND, YOUR HONOR, WE AGREE THAT'S THE

08:46AM 15  ISSUE AT THIS POINT, AND WE'LL BE PREPARED TO DISCUSS IT AS

08:46AM 16  WELL.

08:46AM 17          THE COURT:  RIGHT.

08:46AM 18      AND IT MAY BE THAT, YOU KNOW, THE CONTEXT MEANS A

08:46AM 19  FOUNDATION, THAT'S ALL, DID YOU WRITE THE ARTICLE?  DID YOU

08:46AM 20  DO -- WERE YOU ASSIGNED A TASK?  DID YOU INVESTIGATE?  DID YOU

08:46AM 21  INTERVIEW?  DID YOU ASK THESE QUESTIONS?  DID SHE SAY -- WHAT

08:46AM 22  WERE HER ANSWERS?  THANK YOU VERY MUCH.

08:47AM 23      IS THAT THE CONTEXT?

08:47AM 24          MR. CLINE:  YOUR HONOR, THAT IS THE CONTEXT, AND

08:47AM 25  NONE OF IT IS OBJECTIONABLE.  IT'S THE BROADER ISSUES THAT

08:47AM 1    WE'LL BE PREPARED TO ADDRESS.

08:47AM 2         THE COURT:  RIGHT.  I THINK THERE WAS ANOTHER LINE

08:47AM 3    THAT COMES TO MIND, MR. BOSTIC, ABOUT THE REASONS WHY CERTAIN

08:47AM 4    QUESTIONS WERE ASKED AND OTHERS WERE NOT, AND THAT'S CONTEXTUAL

08:47AM 5    ALSO, BUT WE CAN TALK ABOUT THAT.

08:47AM 6    I JUST WANT TO GIVE YOU -- THAT'S WHERE I'M GOING TO NEED

08:47AM 7    SOME HELP FROM YOUR SIDE.

08:47AM 8         MR. BOSTIC:  I APPRECIATE THAT, YOUR HONOR.  WE'LL

08:47AM 9    BE READY TO DISCUSS IT.

08:47AM 10    JUST TO BRIEFLY PREVIEW IT FOR THE COURT, WHAT WE'RE

08:47AM 11    SEEKING TO HAVE MR. PARLOFF TESTIFY TO IS WHAT WE WOULD ASK ANY

08:47AM 12    WITNESS WHO IS TESTIFYING ABOUT A CONVERSATION THAT HE

08:47AM 13    PARTICIPATED IN.

08:47AM 14    SO THE CONTEXT WILL INCLUDE INFORMATION NECESSARY FOR THE

08:47AM 15    JURY TO PLACE THE SPECIFIC STATEMENTS THAT THEY'RE GOING TO

08:47AM 16    HEAR IN THE CONTEXT OF A SERIES OF CONVERSATIONS THAT LASTED

08:47AM 17    MANY HOURS.

08:47AM 18    WE DO NOT INTEND TO PLAY THE ENTIRETY OF THE RECORDINGS.

08:47AM 19    THAT WOULD TAKE MORE THAN A TRIAL DAY TO PUT IN FRONT OF THE

08:47AM 20    JURY.

08:47AM 21    SO INSTEAD WE WOULD LIKE THE JURY TO HAVE THE BENEFIT OF

08:47AM 22    MR. PARLOFF'S GENERAL STATEMENTS AND CONTEXTUAL INFORMATION

08:48AM 23    ABOUT HOW SPECIFIC STATEMENTS SPIT IN -- SORRY, FIT INTO THE

08:48AM 24    OVERALL CONVERSATIONS.  BUT WE'LL BE READY TO DISCUSS THAT.

08:48AM 25         THE COURT:  I SEE.  THANK YOU.

08:48AM  1      AND THE OTHER ISSUES THAT PERHAPS INTERESTS MR. PARLOFF'S

08:48AM  2   LAWYERS WHO ARE ON THE LINE IS TO WHETHER OR NOT THE

08:48AM  3   EXAMINATION WILL NECESSARILY CALL UPON OUTSIDE MATERIAL THAT I

08:48AM  4   THINK WAS THE FORM OF YOUR 17 SUBPOENA AND THOSE ISSUES.

08:48AM  5           MR. CLINE:  RIGHT.  AND I WILL READILY

08:48AM  6   ACKNOWLEDGE -- AND, AGAIN, WE CAN GET INTO THIS IN MORE

08:48AM  7   DETAIL -- THAT THE MORE THAT MR. PARLOFF IS SIMPLY

08:48AM  8   AUTHENTICATING TAPES AND RECOUNTING CONVERSATIONS THAT AREN'T

08:48AM  9   TAPED, AUTHENTICATING HIS ARTICLE, THE LESS RELEVANCE THE

08:48AM 10   MATERIALS HAVE.

08:48AM 11      THE BROADER THE SCOPE OF HIS TESTIMONY, THE MORE HE GETS

08:48AM 12   INTO HIS SUBJECTIVE REASONING ABOUT ALL OF THIS AND THAT, ALL

08:48AM 13   OF WHICH WE SAY IS IRRELEVANT, THE MORE THOSE MATERIALS BECOME

08:48AM 14   RELEVANT.

08:48AM 15      SO THAT'S THE CONNECTION BETWEEN THE TWO.  AND I DON'T

08:48AM 16   WANT TO SPEAK FOR MR. KORZENIK, BUT I THINK THAT'S PROBABLY THE

08:49AM 17   REASON WHY IN HIS OWN PLEADING HE SAYS BASICALLY THE TESTIMONY

08:49AM 18   IS GOING TO BE VERY CONSTRICTED.

08:49AM 19           THE COURT:  I THINK YOU'RE RIGHT.

08:49AM 20      AND THEN TO YOUR TEAM, MR. CLINE, IF THERE IS SUCH A

08:49AM 21   LIMITATION, OF COURSE YOU COULDN'T OPEN THAT DOOR ON

08:49AM 22   CROSS-EXAMINATION AND THEN SAY, OH, NOW WE NEED THAT MATERIAL.

08:49AM 23   IF MR. BOSTIC LIMITS HIS EXAMINATION, I'M TELLING YOU BASIC

08:49AM 24   THINGS, BUT I JUST WANT TO SET THE TABLE FOR YOU.

08:49AM 25           MR. CLINE:  IF THE TESTIMONY IS LIMITED AS WE THINK

08:49AM 1    IS APPROPRIATE, I WILL BE EXTRAORDINARILY CONSCIOUS OF DOOR

08:49AM 2    OPENING.

08:49AM 3              THE COURT:  OKAY.  ALL RIGHT.  THANKS VERY MUCH.

08:49AM 4    WE'LL TAKE -- WE'LL TAKE THIS UP.

08:49AM 5              MR. KORZENIK:  YOUR HONOR, JUST A QUESTION -- THIS

08:49AM 6    IS DAVID KORZENIK SPEAKING -- THAT YOU MAY BE -- WE SHOULD BE

08:49AM 7    AVAILABLE PERHAPS TOMORROW MORNING AT THIS TIME?

08:49AM 8              THE COURT:  WELL, IT MAY BE WE'LL DISCUSS THIS

08:49AM 9    TOMORROW MORNING.  IF YOU WOULD LIKE TO PHONE IN, WE'RE HAPPY

08:49AM 10   TO HEAR FROM YOU.

08:49AM 11             MR. KORZENIK:  OKAY.

08:50AM 12             THE COURT:  ALL RIGHT.

08:50AM 13             MR. KORZENIK:  IT SEEMS LIKE MUCH OF IT IS KIND OF

08:50AM 14   MOOT AT THIS POINT AND THAT THE RULING OF MAGISTRATE

08:50AM 15   JUDGE COUSINS WILL STAND, AND THAT REALLY THE RULE 17 ISSUES

08:50AM 16   AND OBJECTIONS THAT MR. CLINE IS RAISING HAVE KIND OF FALLEN BY

08:50AM 17   THE WAYSIDE.

08:50AM 18             MR. CLINE:  I THINK, YOUR HONOR, THAT'S A BIT OF AN

08:50AM 19   OVERSTATEMENT, BUT THAT MAY BE THE ULTIMATE OUTCOME.

08:50AM 20             MR. KORZENIK:  YEAH, BECAUSE I DON'T REALLY SEE HOW

08:50AM 21   ANY OF THESE OTHER INTERVIEWEES WOULD HAVE A BEARING ON ANY

08:50AM 22   KIND OF CONTEXT ISSUE, BROAD OR NARROW.

08:50AM 23             THE COURT:  WELL, WE'LL -- THANK YOU FOR YOUR

08:50AM 24   OBSERVATIONS.  WE'RE HERE ON THE WEST COAST AND I APPRECIATE

08:50AM 25   THE EAST COAST VIEW OF THINGS.

4926

08:50AM   1        (LAUGHTER.)

08:50AM   2            THE COURT:  WE'RE GOING TO TAKE THIS UP TOMORROW

08:50AM   3    AGAIN, I THINK IN THE MORNING, SO WE'RE HAPPY TO HEAR ABOUT

08:50AM   4    YOUR THOUGHTS AGAIN THEN.  BUT THANKS FOR YOUR OBSERVATIONS.

08:51AM   5        IT MAY BE -- THIS IS WHAT HAPPENS IN A TRIAL WHEN YOU HAVE

08:51AM   6    GOOD LAWYERS WHO MEET AND CONFER AND RECOGNIZE ISSUES AND PARE

08:51AM   7    THEM DOWN, AND WE'LL HAVE THAT DISCUSSION TOMORROW, SIR.  AND

08:51AM   8    IF WE NEED SOME HELP FROM YOU, WE'LL BE HAPPY TO HEAR FROM YOU.

08:51AM   9    THANK YOU.

08:51AM  10            MR. KORZENIK:  I'LL BE AVAILABLE.

08:51AM  11            MR. BOSTIC:  THANK YOU.

08:51AM  12            MR. CLINE:  THANK YOU.

08:51AM  13            THE COURT:  LET ME -- I DO WANT TO ASK THE PARTIES A

08:51AM  14    QUESTION, OR FIRST GIVE SOME INFORMATION.

08:51AM  15        JUROR NUMBER 5, AS TO OUR SCHEDULE -- WE'RE GOING TO

08:51AM  16    DISCONNECT OUR FRIENDS FROM THE EAST COAST NOW.

08:51AM  17            MR. KORZENIK:  GOOD.

08:51AM  18        (DISCONNECTED.)

08:51AM  19            THE COURT:  AND FOR JUROR NUMBER 5, I BELIEVE ON

08:51AM  20    NOVEMBER 3RD, WE NEED TO END AT 3:00 P.M.

08:51AM  21        IS THAT RIGHT, MS. KRATZMANN?

08:51AM  22            THE CLERK:  YES, YOUR HONOR.

08:51AM  23            THE COURT:  AND THEN ALSO NOVEMBER 29TH IS A MONDAY,

08:52AM  24    AND WE'LL NEED TO START PERHAPS AT 10:00 A.M.  THERE'S SOME

08:52AM  25    TRAVEL WITH THIS WITNESS.  SHE'LL BE AT THE SAN JOSE AIRPORT AT

4927

08:52AM  1    9:15.  SO WE'LL SHOOT FOR 10:00 O'CLOCK TO START ON

08:52AM  2    NOVEMBER 29TH.

08:52AM  3         AND IT MAY BE, MS. KRATZMANN, LET'S SEE IF WE CAN -- MAYBE

08:52AM  4    WE CAN MOVE OUR CRIMINAL CALENDAR THAT DAY TO DECEMBER 3RD IN

08:52AM  5    THE AFTERNOON.

08:52AM  6         THE CLERK:  YES, YOUR HONOR.

08:52AM  7         THE COURT:  AND THAT WOULD GIVE US THE ENTIRETY OF

08:52AM  8    THAT MONDAY IF I CAN DO THAT.  WE'LL FREE UP THAT AFTERNOON FOR

08:52AM  9    US.  I HOPE THAT WORKS FOR THE JURY.

08:52AM  10        I WANT TO ASK ANOTHER QUESTION REGARDING AN EMAIL THAT WAS

08:53AM  11   PROVIDED TO COUNSEL AT COUNSEL'S REQUEST LAST WEEK.  I THINK,

08:53AM  12   MR. DOWNEY, YOU MADE A REQUEST ABOUT RECEIVING A COPY OF AN

08:53AM  13   EMAIL.  I THINK WE PROVIDED IT TO THE GOVERNMENT AND TO YOU.

08:53AM  14        I JUST WANT TO ASK NOW, IS THERE ANYTHING YOU, MR. DOWNEY,

08:53AM  15   YOU WOULD LIKE TO DO WITH THE COURT OR ANYTHING YOU WANT TO DO

08:53AM  16   IN REGARDS TO THAT DOCUMENT THAT YOU RECEIVED?

08:53AM  17        MR. DOWNEY:  NO, YOUR HONOR, NOT AT THIS TIME.

08:53AM  18        WE'RE MINDFUL OF THE ISSUES THAT THE COURT HAS ADDRESSED

08:53AM  19   SEVERAL TIMES BEFORE WITH NOISE AND DISTRACTION, AND WE'LL KEEP

08:53AM  20   MONITORING IT AS WELL.

08:53AM  21        THE COURT:  OKAY.

08:53AM  22   MR. SCHENK, ANYTHING?

08:53AM  23        MR. SCHENK:  NO.  NOTHING FURTHER.  THANK YOU.

08:53AM  24        THE COURT:  THANK YOU.

08:53AM  25        SO IF THE PARTIES WANT TO RAISE ANYTHING WITH THE COURT,

| | | |
|---|---|---|
| 08:53AM | 1 | OR YOU FEEL THAT THINGS DEVELOP TO A POINT WHERE IT'S IMPAIRING |
| 08:53AM | 2 | YOUR ABILITY TO PRESENT YOUR CASE, YOU SHOULD LET ME KNOW.  YOU |
| 08:53AM | 3 | HAVE AN OPEN INVITATION TO LET ME KNOW AND THEN WE CAN TAKE |
| 08:53AM | 4 | THAT MATTER UP.  OTHERWISE I'LL ASSUME THAT IT'S A DISTRACTION, |
| 08:54AM | 5 | BUT NOT TO THE POINT OF ANY NECESSARY COURT INTERVENTION. |
| 08:54AM | 6 | IS THAT FAIR? |
| 08:54AM | 7 | MR. SCHENK:  YES.  THANK YOU. |
| 08:54AM | 8 | MR. DOWNEY:  YES, YOUR HONOR. |
| 08:54AM | 9 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 08:54AM | 10 | ANYTHING ELSE WE SHOULD TAKE UP BEFORE WE -- BEFORE I STEP |
| 08:54AM | 11 | DOWN AND MAYBE WE GET STARTED ON TIME? |
| 08:54AM | 12 | MR. SCHENK:  NOTHING FURTHER. |
| 08:54AM | 13 | MR. DOWNEY:  NOTHING FROM US, YOUR HONOR. |
| 08:54AM | 14 | THE COURT:  OKAY.  GREAT.  THANK YOU VERY MUCH. |
| 08:54AM | 15 | (RECESS FROM 8:54 A.M. UNTIL 9:11 A.M.) |
| 09:11AM | 16 | (JURY IN AT 9:11 A.M.) |
| 09:11AM | 17 | THE COURT:  THANK YOU.  WE'RE BACK ON THE RECORD IN |
| 09:11AM | 18 | THE HOLMES MATTER.  ALL COUNSEL ARE PRESENT.  MS. HOLMES IS |
| 09:11AM | 19 | PRESENT. |
| 09:11AM | 20 | OUR JURY AND ALTERNATES ARE PRESENT. |
| 09:11AM | 21 | IT'S NICE TO SEE YOU AGAIN.  I HOPE YOU ENJOYED THE TIME |
| 09:11AM | 22 | OFF, THE LONG TIME OFF. |
| 09:11AM | 23 | BEFORE WE BEGIN, LET ME ASK YOU THAT QUESTION, I KNOW YOU |
| 09:11AM | 24 | HAVEN'T FORGOTTEN IT.  DURING THE BREAK, HAVE ANY OF YOU HAD |
| 09:11AM | 25 | OCCASION TO EITHER SEE, HEAR, READ, OR HAVE DISCUSSIONS WITH |

09:11AM  1      ANYONE ABOUT ANYTHING TO DO WITH THIS CASE, THAT IS, BY

09:11AM  2      READING, LISTENING, OR CONVERSATION WITH ANOTHER PERSON?

09:11AM  3          IF SO, PLEASE RAISE YOUR HAND.

09:11AM  4          I SEE NO HANDS.

09:11AM  5          THANK YOU AGAIN FOR YOUR CONTINUED VIGILANCE AND ADHERENCE

09:11AM  6      TO MY REQUEST.  I APPRECIATE THAT, AND I KNOW THE LAWYERS DO AS

09:11AM  7      WELL.  SO THANK YOU FOR THAT.

09:11AM  8          BEFORE WE BEGIN, I DO WANT TO TAKE UP WHAT HAS BEEN A

09:12AM  9      DISCUSSION WE'VE HAD BEFORE, AND THAT'S ABOUT NOISE IN THE

09:12AM 10      COURTROOM.  WE DID HAVE A HEARING THIS MORNING WHERE I NEEDED

09:12AM 11      SOME ASSISTANCE FROM THE LAWYERS AND PARTIES OUTSIDE OF THE

09:12AM 12      PRESENCE OF THE JURY, AND DURING THAT PROCEEDING, THERE WAS --

09:12AM 13      I JUST WANT TO SAY IT WAS AUDIBLE, THERE WAS TYPING THAT WAS

09:12AM 14      AUDIBLE TO THE COURT, PERHAPS TO COUNSEL AT THEIR TABLES.  I'M

09:12AM 15      NOT GOING TO ASK THEM THAT.  BUT IT WAS CERTAINLY AUDIBLE TO

09:12AM 16      THE COURT.

09:12AM 17          I HAVE MADE COMMENTS BEFORE ABOUT THIS, THAT UNNECESSARY

09:12AM 18      DISTRACTIONS IN THE COURTROOM DIMINISH THE QUALITY OF THE

09:12AM 19      PROCEEDINGS AND COULD POTENTIALLY INTERFERE WITH THE

09:12AM 20      PROCEEDINGS.

09:12AM 21          I THINK I SAID LAST WEEK THAT IF THAT PERSISTS, THERE ARE

09:12AM 22      GOING TO BE -- I'M GOING TO BE FORCED, CANDIDLY, TO ASK ANYONE

09:12AM 23      WITH A KEYBOARD WHO IS DOING TYPING TO GO TO OUR OVERFLOW ROOM

09:12AM 24      SO YOU CAN, THOSE WHO USE THOSE DEVICES CAN PARTICIPATE IN THE

09:12AM 25      TRIAL, OBSERVE THE TRIAL, AND CONTINUE TO PARTICIPATE IN THE

| | | |
|---|---|---|
| 09:13AM | 1 | TRIAL IN THAT ROOM SUCH THAT THERE'S NO DISTRACTION IN THIS |
| 09:13AM | 2 | ROOM. |
| 09:13AM | 3 | I SAY THAT ON BEHALF OF ALL OF THE PARTIES HERE, AS WELL |
| 09:13AM | 4 | AS OUR JURY WHO ARE -- AS THOSE WHO KNOW HAVE BEEN ATTENTIVE |
| 09:13AM | 5 | THROUGHOUT THE PROCEEDINGS, AND I DO NOT WANT ANYTHING TO |
| 09:13AM | 6 | INTERFERE WITH THE EXAMINATION OF THE WITNESSES OR THE JURORS' |
| 09:13AM | 7 | ABILITY TO ACCURATELY FOLLOW THE PROCEEDINGS. |
| 09:13AM | 8 | SO AGAIN, I'M REACHING OUT TO THOSE OF YOU, OUR FRIENDS IN |
| 09:13AM | 9 | THE AUDIENCE WHO HAVE KEYBOARDS, IF YOU WOULD PLEASE, PLEASE |
| 09:13AM | 10 | MONITOR YOUR TYPING IF YOU CAN. |
| 09:13AM | 11 | AND IF YOU CAN'T, I INVITE YOU TO GO TO THE OVERFLOW ROOM |
| 09:13AM | 12 | AND YOU CAN TYPE THERE AS YOU WISH WITHOUT ANY FEAR OF THE |
| 09:13AM | 13 | NOISE IMPAIRING THE PROCEEDINGS. |
| 09:13AM | 14 | I'M GOING TO ASK YOU TO SELF-POLICE THAT.  WE HAVE A |
| 09:13AM | 15 | MEMBER FROM THE SHERIFF'S OFFICE, EXCUSE ME, THE MARSHAL'S |
| 09:14AM | 16 | OFFICE HERE.  I'M GOING TO CONTINUE TO BE VIGILANT ON THAT SUCH |
| 09:14AM | 17 | THAT THE PROCEEDINGS ARE NOT DISRUPTED. |
| 09:14AM | 18 | AND I DO INDICATE THAT I COMPLETELY RESPECT THE PRESS AND |
| 09:14AM | 19 | WHOEVER ELSE IS IN HERE, THE PUBLIC, AND TYPING, MAKING NOTES. |
| 09:14AM | 20 | I DON'T WANT TO DISRUPT YOUR ABILITY TO CAPTURE YOUR WORK AND |
| 09:14AM | 21 | DO YOUR WORK. |
| 09:14AM | 22 | BUT I HOPE YOU WOULD BE EXPRESSING RECIPROCITY TO US, AND |
| 09:14AM | 23 | ME, TO ALLOW US TO DO THE WORK THAT WE NEED TO DO. |
| 09:14AM | 24 | SO THANK YOU VERY MUCH.  THANKS FOR THE BREAK.  THANK YOU |
| 09:14AM | 25 | FOR LETTING ME COMMENT ON THAT. |

PETERSON CROSS BY MR. WADE (RES.)                                    4931

09:14AM   1            WE DO HAVE A WITNESS THAT NEEDS TO RETURN I THINK.

09:14AM   2            IS THAT MS. PETERSON?

09:14AM   3                 MR. LEACH:  YES, YOUR HONOR.

09:15AM   4                 THE COURT:  GOOD MORNING, MS. PETERSON.

09:15AM   5                 THE WITNESS:  GOOD MORNING.

09:15AM   6                 THE COURT:  PLEASE MAKE YOURSELF COMFORTABLE AGAIN.

09:15AM   7      FEEL FREE TO REMOVE YOUR MASK.

09:15AM   8            THERE IS FRESH WATER THERE FOR YOUR REFRESHMENT IF YOU

09:15AM   9      WOULD LIKE TO TAKE ADVANTAGE OF IT.

09:15AM   10           MAKE YOURSELF COMFORTABLE.

09:15AM   11           WHEN YOU ARE COMFORTABLE, I'LL ASK YOU TO PLEASE STATE

09:15AM   12      YOUR NAME AGAIN, PLEASE.

09:15AM   13                THE WITNESS:  LISA PETERSON.

09:15AM   14                THE COURT:  THANK YOU.  AND I'LL REMIND YOU YOU ARE

09:15AM   15      STILL UNDER OATH.

09:15AM   16                THE WITNESS:  YES.

09:15AM   17                THE COURT:  THANK YOU.

09:15AM   18           **(GOVERNMENT'S WITNESS, LISA PETERSON, WAS PREVIOUSLY**

09:15AM   19      **SWORN.)**

09:15AM   20                MR. WADE:  MAY I PROCEED, YOUR HONOR?

09:15AM   21                THE COURT:  YES, THANK YOU.

09:15AM   22                     **CROSS-EXAMINATION (RESUMED)**

09:15AM   23      BY MR. WADE:

09:15AM   24      Q.   THANK YOU.

09:15AM   25           GOOD MORNING, MS. PETERSON.

PETERSON CROSS BY MR. WADE (RES.)                                    4932

| | | |
|---|---|---|
| 09:15AM | 1 | A.   GOOD MORNING. |
| 09:15AM | 2 | Q.   WHEN WE MET LAST WEEK, WE WERE ASKING -- OR WE WERE HAVING |
| 09:15AM | 3 | SOME DISCUSSION RELATING TO THE INVESTMENT BY THE DEVOS FAMILY. |
| 09:15AM | 4 | DO YOU RECALL THAT? |
| 09:15AM | 5 | A.   YES. |
| 09:15AM | 6 | Q.   AND I ASKED YOU DURING THAT DISCUSSION ABOUT A NUMBER OF |
| 09:15AM | 7 | DIFFERENT DEVOS FAMILY MEMBERS WHO ARE A PART OF THE DIFFERENT |
| 09:15AM | 8 | GENERATIONS THAT THE RDV CORPORATION SERVES. |
| 09:16AM | 9 | DO YOU RECALL THAT? |
| 09:16AM | 10 | A.   YES. |
| 09:16AM | 11 | Q.   OKAY.  AND I JUST WANTED TO ASK WHETHER YOU ARE AWARE -- |
| 09:16AM | 12 | DO YOU RECALL I ASKED YOU ABOUT WHETHER YOU WERE AWARE OF |
| 09:16AM | 13 | CERTAIN INTERACTIONS THAT MR. TUBERGEN HAD WITH CERTAIN MEMBERS |
| 09:16AM | 14 | OF THE DEVOS FAMILY? |
| 09:16AM | 15 | DO YOU RECALL THAT? |
| 09:16AM | 16 | A.   YES, IN GENERAL. |
| 09:16AM | 17 | Q.   AND I THINK YOU SAID THERE WERE PROBABLY SOME OF THOSE |
| 09:16AM | 18 | CONVERSATIONS THAT YOU WERE NOT A PARTY TO; IS THAT RIGHT? |
| 09:16AM | 19 | A.   CORRECT. |
| 09:16AM | 20 | Q.   OKAY.  AND THERE WERE A COUPLE OF PEOPLE I'M NOT SURE I |
| 09:16AM | 21 | ASKED YOU ABOUT.  ARE YOU AWARE WHETHER, WHETHER MR. TUBERGEN |
| 09:16AM | 22 | DISCUSSED THE POTENTIAL THERANOS INVESTMENT WITH DICK DEVOS? |
| 09:16AM | 23 | A.   I WASN'T PRIVY TO THOSE.  I DON'T KNOW. |
| 09:16AM | 24 | Q.   OKAY.  HOW ABOUT WITH BETSY DEVOS? |
| 09:16AM | 25 | A.   I WASN'T PRIVY TO THOSE.  BETSY IS NOT ON THE INVESTMENT |

PETERSON CROSS BY MR. WADE (RES.)                                    4933

09:16AM  1    COMMITTEE THOUGH.

09:16AM  2    Q.   OKAY.

09:16AM  3    A.   DICK WAS.

09:16AM  4    Q.   AND DO YOU KNOW WHETHER -- DO YOU KNOW WHETHER

09:17AM  5    MR. TUBERGEN HAD DISCUSSIONS WITH THEM ABOUT THE THERANOS

09:17AM  6    INVESTMENT?

09:17AM  7    A.   DICK WAS ON THE INVESTMENT COMMITTEE, AND I'M AWARE AND

09:17AM  8    UNDERSTAND FROM MR. TUBERGEN THAT HE HAD LOTS OF DISCUSSIONS

09:17AM  9    AROUND THIS TRANSACTION WITH THE INVESTMENT COMMITTEE MEMBERS.

09:17AM  10   Q.   OKAY.  AND ARE YOU AWARE THAT IT WAS IMPORTANT TO DICK AND

09:17AM  11   BETSY DEVOS THAT RICK DEVOS BE INVOLVED IN THE DECISION?

09:17AM  12   A.   I'M NOT AWARE OF THEIR FEELINGS AROUND THAT.

09:17AM  13   Q.   OKAY.  WE ASKED -- YOU GAVE SOME TESTIMONY WITH RESPECT TO

09:17AM  14   SOME FINANCIAL PROJECTIONS THAT YOU RECEIVED FROM THE COMPANY.

09:17AM  15        DO YOU RECALL THAT TESTIMONY?

09:17AM  16   A.   YES.

09:17AM  17   Q.   OKAY.  LET'S PULL UP TRIAL EXHIBIT 1853, WHICH IS IN

09:17AM  18   EVIDENCE.

09:18AM  19        AND IT'S ON THE SCREEN.  YOU'RE WELCOME TO PULL UP THE

09:18AM  20   DOCUMENT.

09:18AM  21   A.   IS IT IN THIS ONE?

09:18AM  22   Q.   I BELIEVE IT'S IN THE WHITE BINDER, BUT IT'S ON THE

09:18AM  23   SCREEN.

09:18AM  24   A.   OKAY.

09:18AM  25   Q.   BUT I'M JUST GOING TO ASK A COUPLE OF QUICK QUESTIONS.

PETERSON CROSS BY MR. WADE (RES.)                                    4934

09:18AM   1    A.   YES.

09:18AM   2    Q.   DO YOU RECALL THIS WAS A TWO-PAGE DOCUMENT.  YOU CAN FLIP

09:18AM   3    TO THE SECOND PAGE?

09:18AM   4    A.   YES.

09:18AM   5         THE CLERK:  JUST A MOMENT, YOUR HONOR.  GIVE ME A

09:18AM   6    MOMENT TO COULD A RESET.

09:18AM   7         THE WITNESS:  WHAT'S THE NUMBER AGAIN?

09:18AM   8    BY MR. WADE:

09:18AM   9    Q.   1853.

09:18AM   10   A.   OKAY.

09:18AM   11   Q.   AND FOR THE RECORD, WE'RE JUST WAITING TO MAKE SURE THE

09:18AM   12   JURORS ARE ABLE TO SEE THE EXHIBITS.  WE'LL PAUSE FOR A MOMENT,

09:18AM   13   YOUR HONOR.

09:18AM   14        THE COURT:  THANK YOU.  THERE'S ONE MONITOR THAT IS

09:18AM   15   STILL PROBLEMATIC.

09:18AM   16        THE CLERK:  NO?  STILL NO?  GIVE ME ONE SECOND TO

09:18AM   17   RESTART.  GIVE ME ONE SECOND.

09:18AM   18     (PAUSE IN PROCEEDINGS.)

09:18AM   19        MR. WADE:  YOUR HONOR, I THINK ON ONE OCCASION WHEN

09:19AM   20   WE RESET THE T.V. OR RESET THE SCREEN, IT DID COME BACK.  MAYBE

09:19AM   21   WE CAN TRY THE OLD ON AND OFF.

09:19AM   22        THE COURT:  YOU HAVE A CUP OF WATER THERE, MR. WADE.

09:19AM   23   YOU'RE NOT SUGGESTING TO GET ANYWHERE CLOSE TO THAT MONITOR

09:19AM   24   WITH THE WATER?

09:19AM   25        MR. WADE:  I AM TEMPTED AT TIMES, YOUR HONOR.

PETERSON CROSS BY MR. WADE (RES.)                                    4935

09:19AM  1              (LAUGHTER.)

09:19AM  2              (PAUSE IN PROCEEDINGS.)

09:19AM  3                   THE COURT:  WHY DON'T YOU CHECK NOW, MS. KRATZMANN.

09:19AM  4                   THE CLERK:  IT WAS ON THIS MORNING.

09:19AM  5         I JUST HAVE TO THREATEN IT.

09:19AM  6              (LAUGHTER.)

09:19AM  7                   THE COURT:  I THINK WE'RE ON NOW.  GREAT.  OKAY.

09:19AM  8                   MR. WADE:  AND I'LL ADD, YOUR HONOR, THE PLUMBING IS

09:19AM  9         WORKING TODAY, SO WE'RE REALLY ROLLING.

09:19AM  10                  THE COURT:  WOULD YOU KNOCK ON WOOD BEFORE YOU BEGIN

09:19AM  11        YOUR EXAMINATION.  THANK YOU.

09:19AM  12             (KNOCKING.)

09:19AM  13        BY MR. WADE:

09:19AM  14        Q.   DO YOU HAVE 1853 IN FRONT OF YOU, MA'AM?

09:19AM  15        A.   YES.

09:19AM  16        Q.   OKAY.  AND YOU RECALL YOU GAVE SOME TESTIMONY WITH RESPECT

09:20AM  17        TO THIS DOCUMENT?

09:20AM  18        A.   YES.

09:20AM  19        Q.   AND DO YOU RECALL -- AND THIS WAS A DOCUMENT THAT WAS

09:20AM  20        PRODUCED BY RDV IN CONNECTION WITH LITIGATION?

09:20AM  21        A.   NO.  THIS WAS PART OF THE DILIGENCE BINDER THAT ELIZABETH

09:20AM  22        HAD GIVEN US.

09:20AM  23        Q.   RIGHT.  I'M SORRY I WASN'T CLEAR.

09:20AM  24        A.   WE DIDN'T PRODUCE THIS.

09:20AM  25        Q.   AND DO YOU SEE IF YOU GO TO THE FIRST -- WELL, EITHER

PETERSON CROSS BY MR. WADE (RES.)                                   4936

09:20AM  1    PAGE, IN THE CORNER DO YOU SEE THE RDV BATES LABEL DOWN IN THE

09:20AM  2    CORNER THERE (INDICATING)?

09:20AM  3    A.   YES.

09:20AM  4    Q.   AND IS IT YOUR UNDERSTANDING THAT THIS DOCUMENT WAS

09:20AM  5    PRODUCED BY RDV TO THE GOVERNMENT?

09:20AM  6    A.   OKAY.  YES.

09:20AM  7    Q.   OKAY.

09:20AM  8    A.   BUT WE DIDN'T PRODUCE WHAT IS ON THE PAGE.

09:20AM  9    Q.   YOU DIDN'T CREATE IT; CORRECT?

09:20AM  10   A.   CORRECT.

09:20AM  11   Q.   BUT IT CAME INTO THIS CASE BECAUSE RDV SENT IT TO THE

09:20AM  12   GOVERNMENT IN RESPONSE TO A SUBPOENA; IS THAT RIGHT?

09:20AM  13   A.   YES.

09:20AM  14   Q.   OKAY.  AND DO YOU RECALL WHETHER -- DID YOU GATHER

09:20AM  15   MATERIALS IN CONNECTION WITH RESPONDING TO THAT SUBPOENA?  WERE

09:21AM  16   YOU ASKED TO GATHER MATERIALS TO GIVE TO THE GOVERNMENT?

09:21AM  17   A.   THEY TOOK ALL OF OUR EMAILS, EVERYTHING THAT WAS IN OUR

09:21AM  18   EMAILS AND IN OUR DOCUMENT MANAGEMENT SYSTEM WENT TO THE

09:21AM  19   GOVERNMENT.

09:21AM  20   Q.   OKAY.  AND WAS THIS DOCUMENT IN YOUR DOCUMENT MANAGEMENT

09:21AM  21   SYSTEM?

09:21AM  22   A.   YES.

09:21AM  23   Q.   OKAY.  AND DO YOU RECALL YOUR TESTIMONY LAST WEEK THAT YOU

09:21AM  24   GAVE, YOU WERE GIVEN ACTUALLY ABOUT A FOOT OF DOCUMENTS WHEN

09:21AM  25   YOU FIRST GOT MATERIALS FROM THERANOS?

PETERSON CROSS BY MR. WADE (RES.)                                    4937

| | | |
|---|---|---|
| 09:21AM | 1 | A.   YES. |
| 09:21AM | 2 | Q.   DO YOU RECALL WHETHER, WHEN YOU GOT THIS, THIS DOCUMENT, |
| 09:21AM | 3 | WHETHER IN ADDITION TO THESE TWO PAGES YOU ALSO RECEIVED A PRO |
| 09:21AM | 4 | FORMA STATEMENT OF CASH? |
| 09:21AM | 5 | A.   THE TWO FINANCIAL PAGES THAT WE RECEIVED ARE THE ONES THAT |
| 09:21AM | 6 | YOU'RE LOOKING AT RIGHT HERE. |
| 09:21AM | 7 | Q.   OKAY.  LET ME SEE IF I CAN REFRESH YOUR RECOLLECTION. |
| 09:21AM | 8 | YOUR HONOR, MAY I APPROACH? |
| 09:21AM | 9 | THE COURT:  YES. |
| 09:22AM | 10 | MR. WADE:  (HANDING.) |
| 09:22AM | 11 | Q.   I'VE SHOWN YOU -- I'VE HANDED YOU WHAT HAS BEEN MARKED AS |
| 09:22AM | 12 | EXHIBIT 14210. |
| 09:22AM | 13 | DO YOU SEE THAT? |
| 09:22AM | 14 | A.   WHERE AM I LOOKING? |
| 09:22AM | 15 | Q.   DO YOU HAVE THAT DOCUMENT IN FRONT OF YOU, 14210? |
| 09:22AM | 16 | A.   YES. |
| 09:22AM | 17 | Q.   DO YOU SEE THAT IN THE UPPER RIGHT-HAND CORNER? |
| 09:22AM | 18 | A.   YES. |
| 09:22AM | 19 | Q.   OKAY.  I'D LIKE YOU TO JUST LOOK AT THE SECOND PAGE.  DOES |
| 09:22AM | 20 | THAT REFRESH YOUR RECOLLECTION THAT YOU ALSO RECEIVED FROM THE |
| 09:22AM | 21 | COMPANY -- |
| 09:22AM | 22 | A.   OKAY. |
| 09:22AM | 23 | Q.   I BELIEVE IT'S BATES LABELLED ON THE BOTTOM -- |
| 09:23AM | 24 | A.   THE BACK OF THE FIRST PAGE? |
| 09:23AM | 25 | Q.   YES.  MFH 00482.  AND JUST READ IT TO YOURSELF, PLEASE. |

PETERSON CROSS BY MR. WADE (RES.)                                4938

09:23AM  1    A.   I DON'T RECALL THIS PAGE EXACTLY, NO.

09:23AM  2    Q.   OKAY.  THAT DOESN'T REFRESH YOUR RECOLLECTION THAT YOU

09:23AM  3    ALSO RECEIVED A PRO FORMA STATEMENT OF CASH FLOW FROM THE

09:23AM  4    COMPANY?

09:23AM  5    A.   NO.

09:23AM  6    Q.   OKAY.

09:23AM  7              MR. LEACH:  YOUR HONOR --

09:23AM  8              THE WITNESS:  THE TWO PAGES I REMEMBER VIVIDLY ARE

09:23AM  9    THE OTHER TWO PAGES.

09:23AM  10              THE COURT:  EXCUSE ME, MS. PETERSON.

09:23AM  11              MR. LEACH:  I OBJECT TO THE LINE OF QUESTIONING

09:23AM  12    USING A DOCUMENT NOT FROM THIS WITNESS TO TRY TO REFRESH HER

09:23AM  13    RECOLLECTION THAT SHE RECEIVED THIS.  I THINK IT'S IMPROPER

09:23AM  14    REFRESHING.

09:23AM  15              THE WITNESS:  I DON'T RECALL --

09:23AM  16              THE COURT:  MS. PETERSON, I'M SORRY.

09:23AM  17              THE WITNESS:  I'M SORRY.

09:23AM  18              THE COURT:  ANYTHING CAN BE USED TO REFRESH A

09:23AM  19    WITNESS'S RECOLLECTION, A SHOE, A SOCK, SO --

09:23AM  20              MR. WADE:  I'LL KEEP MY SHOES ON, YOUR HONOR.

09:24AM  21              THE COURT:  THANK YOU FOR THAT.  BUT I NOTE -- I

09:24AM  22    THINK I UNDERSTAND THE TENOR OF YOUR OBJECTION, MR. LEACH.

09:24AM  23       BUT YOU CAN PROCEED.

09:24AM  24              MR. WADE:  I DON'T HAVE ANY FURTHER QUESTIONS THAT

09:24AM  25    DIDN'T REFRESH THE WITNESS'S RECOLLECTION.

PETERSON CROSS BY MR. WADE (RES.)                                    4939

09:24AM    1            THE COURT:  OKAY.

09:24AM    2    BY MR. WADE:

09:24AM    3    Q.   IF WE CAN PULL UP 14106, WHICH IS IN EVIDENCE.

09:24AM    4         DO YOU RECALL THIS EMAIL FROM MR. SCHIERBEEK?

09:24AM    5    A.   YES.

09:24AM    6    Q.   AND YOU GAVE SOME TESTIMONY WITH RESPECT TO THAT.

09:24AM    7         DO YOU RECALL THAT?

09:24AM    8    A.   YES.

09:24AM    9    Q.   AND I THINK YOUR TESTIMONY AT THE TIME WAS THAT

09:24AM   10    MR. SCHIERBEEK WAS NOT INVOLVED OR AUTHORIZED IN THE INVESTMENT

09:24AM   11    DECISION; CORRECT?

09:24AM   12    A.   MR. SCHIERBEEK DID NOT WORK ON THE THERANOS OPPORTUNITY AT

09:24AM   13    ALL, AND HE'S NOT PART OF THE INVESTMENT GROUP AND HE'S NOT ON

09:25AM   14    THE INVESTMENT COMMITTEE.

09:25AM   15    Q.   RIGHT.  AND I THINK YOU TESTIFIED TO THAT LAST WEEK.

09:25AM   16         DO YOU RECALL THAT?

09:25AM   17    A.   YES.

09:25AM   18    Q.   AND -- BUT HE IS A SENIOR PERSON WITHIN RDV; CORRECT?

09:25AM   19    A.   YES.

09:25AM   20    Q.   AND HE RUNS THE FINANCIAL OPERATION SIDE OF THE HOUSE;

09:25AM   21    CORRECT?

09:25AM   22    A.   NO.  HE RUNS THE FAMILY SERVICES SIDE OF THE HOUSE.

09:25AM   23    Q.   AND THAT'S THE SIDE THAT CONTROLS THE CASH I THINK YOU

09:25AM   24    TESTIFIED TO?

09:25AM   25    A.   IT HAS THE CASH, YES.

PETERSON CROSS BY MR. WADE (RES.)                              4940

09:25AM   1    Q.   OKAY.  SO IF AN INVESTMENT DECISION IS ULTIMATELY MADE ON

09:25AM   2    THE INVESTMENT SIDE OF THE HOUSE, MR. SCHIERBEEK WOULD BE THE

09:25AM   3    PERSON WHO WOULD -- OR HIS OPERATION WOULD MAKE THE

09:25AM   4    ARRANGEMENTS TO PROVIDE THE CASH IN CONNECTION WITH THE

09:25AM   5    INVESTMENT?

09:25AM   6    A.   ONLY UPON A GREEN LIGHT FROM JERRY, RANDY IS HE ABLE TO

09:25AM   7    SEND THE MONEY.

09:25AM   8    Q.   RIGHT.  SO HIS -- THE COMMUNICATIONS THAT HE MIGHT HAVE

09:25AM   9    MIGHT RELATE TO, I'M GOING TO GIVE YOU A GREEN LIGHT, YOU

09:26AM  10    SHOULD GET THE CASH READY.  OR HERE'S A GREEN LIGHT, GET THE

09:26AM  11    CASH READY.

09:26AM  12         RIGHT?

09:26AM  13    A.   NO.  THAT DOESN'T HAPPEN UNTIL I GET THE GREEN LIGHT FROM

09:26AM  14    THE INVESTMENT COMMITTEE OR JERRY, AND THEN WE WORK WITH THAT

09:26AM  15    SIDE OF THE HOUSE TO ACTUALLY FUND THE INVESTMENT.

09:26AM  16         HE DOESN'T HAVE ANYTHING TO DO WITH INVESTMENT DECISIONS

09:26AM  17    UP UNTIL THE POINT WHERE WE'VE DECIDED TO GO AND THERE'S A WIRE

09:26AM  18    THAT HAS TO BE MADE.

09:26AM  19    Q.   OKAY.  I UNDERSTAND THAT.

09:26AM  20         MY QUESTION IS, BUT HE'S THE ONE WHO PROVIDES THE CASH AND

09:26AM  21    MAKES SURE THAT THERE'S CASH TO FUND THE INVESTMENT; CORRECT?

09:26AM  22    A.   HE JUST MANAGES THE BANK RELATIONSHIP TO WHICH WE HAVE TO

09:26AM  23    DO THE WIRE.

09:26AM  24    Q.   RIGHT.  IS THAT CASH THAT IS WIRED?

09:26AM  25    A.   YES, BUT THAT'S --

PETERSON CROSS BY MR. WADE (RES.)                                    4941

09:26AM  1    Q.   OKAY.

09:26AM  2    A.   -- NOT DONE UNTIL EVERYTHING IS AGREED TO, AND EITHER

09:26AM  3    MYSELF OR JERRY GIVES IT A GREEN LIGHT TO GO AHEAD AND WIRE THE

09:26AM  4    CASH.

09:26AM  5    Q.   OKAY.  IF THERE'S GOING TO BE --

09:26AM  6    A.   AND HE'S A SIGNOR ON DOCUMENTS.

09:26AM  7    Q.   IF THERE'S GOING TO BE -- RIGHT.

09:27AM  8         YOU RECALL THAT HE'S THE ONE WHO ACTUALLY SIGNED THE

09:27AM  9    INVESTMENT AGREEMENT; RIGHT?

09:27AM  10   A.   HE'S JUST A SIGNOR TO THE ENTITY THAT MADE THIS

09:27AM  11   INVESTMENT, YES.

09:27AM  12   Q.   HE SIGNED THE DOCUMENTS IN THIS CASE; RIGHT?

09:27AM  13   A.   HE'S --

09:27AM  14             MR. LEACH:  OBJECTION.  ASKED AND ANSWERED.

09:27AM  15             THE COURT:  WELL, YOU CAN ANSWER THE QUESTION.

09:27AM  16             THE WITNESS:  HE CAN ONLY SIGN UNLESS IT'S APPROVED

09:27AM  17   BY OTHER PEOPLE.

09:27AM  18   BY MR. WADE:

09:27AM  19   Q.   RIGHT.  OKAY.

09:27AM  20   A.   BUT, YES, HE HAS SIGNING AUTHORITY ON THAT PARTICULAR

09:27AM  21   ENTITY.  WE HAVE HUNDREDS OF ENTITIES.

09:27AM  22   Q.   I UNDERSTAND.  AND SO IF AN INVESTMENT DECISION IS MADE BY

09:27AM  23   MR. TUBERGEN, HE COULD TALK TO MR. SCHIERBEEK --

09:27AM  24   A.   UH-HUH.

09:27AM  25   Q.   -- TO MAKE ARRANGEMENTS TO PROVIDE THE CASH?

PETERSON CROSS BY MR. WADE (RES.)                                    4942

```
09:27AM    1    A.   NO.  NO.

09:27AM    2         THAT COMES OUT OF THE INVESTMENT GROUP.  THAT GREEN LIGHT

09:27AM    3    GOES FROM JERRY TO ME TO THE ACCOUNTING GROUP.

09:27AM    4              MR. WADE:  MAY I APPROACH, YOUR HONOR?

09:27AM    5              THE COURT:  YES.

09:27AM    6              MR. WADE:  (HANDING.)

09:28AM    7    Q.   DO YOU SEE I'VE PLACED IN FRONT OF YOU DOCUMENT 14212?

09:28AM    8    A.   YES.

09:28AM    9    Q.   AND THAT'S AN EMAIL BETWEEN MR. SCHIERBEEK AND MR. BRINKS

09:28AM   10    AND MR. LAMBERT ON OCTOBER 6TH, 2014 ON THE BOTTOM; CORRECT?

09:28AM   11    A.   YES.

09:28AM   12    Q.   AND THAT REFERENCES A THERANOS PRIVATE INVESTMENT;

09:28AM   13    CORRECT?

09:28AM   14    A.    IT REFERENCES TWO ACTIVE COINVESTMENTS THAT -- THEY'RE

09:28AM   15    TRYING TO DO CASH FLOW PLANNING.

09:28AM   16              MR. WADE:  I MOVE FOR THE ADMISSION OF 14212.

09:28AM   17              MR. LEACH:  NO OBJECTION, YOUR HONOR.

09:28AM   18              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:28AM   19         (DEFENDANT'S EXHIBIT 14212 WAS RECEIVED IN EVIDENCE.)

09:29AM   20              MR. WADE:  LET'S BLOW --

09:29AM   21    Q.   DO YOU SEE IN THE BOTTOM EMAIL IT'S AN EMAIL ON

09:29AM   22    OCTOBER 6TH, 2014, FROM MR. SCHIERBEEK TO MR. BRINKS AND

09:29AM   23    MR. LAMBERT?

09:29AM   24         DO YOU SEE THAT?

09:29AM   25    A.   YES.
```

PETERSON CROSS BY MR. WADE (RES.)                                    4943

09:29AM    1    Q.   AND WHO -- MR. BRINKS IS IN THE ACCOUNTING FUNCTION; IS

09:29AM    2    THAT RIGHT?

09:29AM    3    A.   YES, HE'S THE CONTROLLER, AND MR. LAMBERT AT THE TIME WAS

09:29AM    4    THE CFO.

09:29AM    5    Q.   AND DO MR. LAMBERT AND MR. BRINKS DEAL WITH WIRE TRANSFERS

09:29AM    6    AND CASH MANAGEMENT?

09:29AM    7    A.   YES, AND CASH FLOW PLANNING FOR THE FAMILY, YES.

09:29AM    8    Q.   OKAY.  AND DO YOU SEE THERE IN THE SECOND PARAGRAPH IT

09:29AM    9    SAYS, "THERE ARE TWO VERY 'ACTIVE' CO-INVESTMENTS (NOT IN OUR

09:29AM   10    CASH FLOW MODEL) THAT WILL LIKELY TAKE PLACE AT OR NEAR MONTH

09:29AM   11    END."

09:29AM   12         DO YOU SEE THAT?

09:29AM   13    A.   YES.

09:29AM   14    Q.   AND IT THEN SAYS, "THERANOS - PRIVATE CO-INVESTMENT

09:30AM   15    $100 MILLION."

09:30AM   16         CORRECT?

09:30AM   17    A.   YES.

09:30AM   18    Q.   AND THE DATE OF OCTOBER 6TH WAS THE DATE OF THE PHONE CALL

09:30AM   19    WITH MS. HOLMES; CORRECT?

09:30AM   20    A.   YES.

09:30AM   21    Q.   AND THAT WAS THE DATE THAT YOU PREPARED YOUR MEMO COMING

09:30AM   22    OUT OF THAT PHONE CALL; CORRECT?

09:30AM   23    A.   YES.

09:30AM   24    Q.   AND IT WAS BEFORE YOUR VISIT TO PALO ALTO; CORRECT?

09:30AM   25    A.   YES.

PETERSON CROSS BY MR. WADE (RES.)                                    4944

09:30AM  1    Q.   OKAY.  AND DO YOU KNOW WHETHER YOU HAD ANY COMMUNICATIONS

09:30AM  2    WITH MR. SCHIERBEEK IN CONNECTION WITH THIS?

09:30AM  3    A.   NO.

09:30AM  4         BUT THIS IS ALL CASH FLOW PLANNING.  THIS IS NOT UNCOMMON

09:30AM  5    AT ALL.  WE HAVE NINE DEALS IN THE HOPPER RIGHT NOW.  SOME GO,

09:30AM  6    SOME DON'T GO.

09:30AM  7         THEY'RE JUST TRYING TO UNDERSTAND HOW MUCH CASH IS

09:30AM  8    AVAILABLE GIVEN ALL OF THE ACTIVITY THAT WE WERE LOOKING AT AT

09:30AM  9    THE MOMENT.

09:30AM 10              MR. WADE:  MOVE TO STRIKE EVERYTHING AFTER "NO."

09:30AM 11              THE COURT:  ALL RIGHT.  EVERYTHING AFTER THE

09:30AM 12    RESPONSE "NO" IS STRICKEN.  IT'S NONRESPONSIVE.

09:31AM 13    BY MR. WADE:

09:31AM 14    Q.   THE -- I DON'T HAVE ANY FURTHER QUESTIONS ABOUT THAT.  YOU

09:31AM 15    CAN SET THAT ASIDE.

09:31AM 16         ACTUALLY, I HAVE ONE MORE QUESTION.  DO YOU KNOW WHETHER

09:31AM 17    MR. TUBERGEN HAD ANY CONVERSATIONS WITH MR. SCHIERBEEK IN

09:31AM 18    CONNECTION WITH CASH FLOW PLANNING RELATING TO THERANOS?

09:31AM 19    A.   WE HAVE CASH FLOW PLANNING CONVERSATIONS ALL OF THE TIME.

09:31AM 20         AROUND THIS?  NO, I WASN'T PRIVY TO THOSE CONVERSATIONS.

09:31AM 21    Q.   OKAY.  MY QUESTION WAS, DO YOU KNOW WHETHER MR. TUBERGEN

09:31AM 22    HAD ANY COMMUNICATIONS WITH MR. SCHIERBEEK IN CONNECTION WITH

09:31AM 23    CASH FLOW PLANNING RELATING TO THE THERANOS INVESTMENT IN THIS

09:31AM 24    OCTOBER 6TH TIME PERIOD?

09:31AM 25    A.   I CAN ONLY SURMISE THAT THEY DID TALK ABOUT IT BECAUSE

PETERSON CROSS BY MR. WADE (RES.)                                4945

09:31AM  1    HE'S TRYING TO FIGURE OUT HOW MUCH CASH DOES THE FAMILY HAVE IN

09:31AM  2    ORDER TO DO SOME OF THESE INVESTMENTS THAT WE WERE LOOKING AT.

09:31AM  3    Q.   RIGHT.  BUT YOU'RE NOT AWARE OF THOSE CONVERSATIONS AS YOU

09:31AM  4    SIT HERE TODAY?

09:31AM  5    A.   NO.

09:31AM  6    Q.   AND YOU WEREN'T A PART OF THOSE CONVERSATIONS; CORRECT?

09:31AM  7    A.   NOT AT THAT TIME, NO.

09:31AM  8    Q.   OKAY.  IF YOU COULD TURN TO DOCUMENT 1992.

09:32AM  9    A.   1992 OR 1192?

09:32AM  10   Q.   1992, WHICH I THINK IS PROBABLY IN THE BLACK BOOK.

09:32AM  11   A.   11 OR 19?  BECAUSE IT ONLY GOES TO 4.

09:32AM  12   Q.   1992.

09:32AM  13   A.   OKAY.

09:32AM  14   Q.   DO YOU HAVE THAT IN FRONT OF YOU?

09:32AM  15   A.   YES.

09:32AM  16   Q.   AND IS THIS AN EMAIL BETWEEN YOU AND MR. DAMSTRA RELATING

09:33AM  17   TO YOUR POTENTIAL INVOLVEMENT IN THE THERANOS INVESTMENT?

09:33AM  18   A.   YES.

09:33AM  19        MR. WADE:  MOVE THE ADMISSION OF 1992.

09:33AM  20        MR. LEACH:  NO OBJECTION.

09:33AM  21        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:33AM  22   (GOVERNMENT'S EXHIBIT 1992 WAS RECEIVED IN EVIDENCE.)

09:33AM  23   BY MR. WADE:

09:33AM  24   Q.   AND DO YOU RECALL IN YOUR TESTIMONY LAST WEEK YOU TALKED

09:33AM  25   ABOUT HOW YOU HAD DISCUSSIONS WITH MR. TUBERGEN ON A PLANE RIDE

PETERSON CROSS BY MR. WADE (RES.)                                    4946

09:33AM   1      BACK FROM CHICAGO IN MID-SEPTEMBER ABOUT POSSIBLY WORKING ON

09:33AM   2      THE THERANOS INVESTMENT?

09:33AM   3      A.   YES.

09:33AM   4      Q.   AND DOES THIS EMAIL INDICATE THAT BETWEEN THAT DATE,

09:33AM   5      NOVEMBER 18TH, AND NOVEMBER 30TH, YOU HADN'T DONE ANY WORK ON

09:33AM   6      THE THERANOS INVESTMENT YET; IS THAT RIGHT?

09:33AM   7      A.   THAT DOESN'T INDICATE THAT, NO.

09:34AM   8      Q.   OKAY.  YOU WERE TRYING TO, THROUGH THIS EMAIL, TO OFFER

09:34AM   9      YOUR SERVICES AND GET INVOLVED IN THAT INVESTMENT; IS THAT

09:34AM   10     RIGHT?

09:34AM   11     A.   YES.  AS I MENTIONED LAST WEEK, BDT WASN'T MY

09:34AM   12     RELATIONSHIP, SO I WASN'T SURE WHO WAS GOING TO END UP WORKING

09:34AM   13     ON THIS ONE, AND I WANTED TO RAISE MY HAND.

09:34AM   14     Q.   OKAY.  AND YOU DIDN'T HAVE ANY ACTIVE PARTICIPATION WITH

09:34AM   15     MR. TUBERGEN BETWEEN THE PLANE RIDE THAT YOU HAD WITH HIM AND

09:34AM   16     THIS DATE; IS THAT CORRECT?

09:34AM   17     A.   I DON'T REMEMBER.

09:34AM   18     Q.   OKAY.  YOU CAN SET THAT ONE ASIDE.

09:34AM   19          CAN WE -- CAN I DRAW YOUR ATTENTION TO 14076.

09:35AM   20     A.   OKAY.

09:35AM   21     Q.   DO YOU HAVE THAT IN FRONT OF YOU?

09:35AM   22     A.   YES.

09:35AM   23     Q.   AND DO YOU RECOGNIZE THIS TO BE A COVER LETTER FROM

09:35AM   24     MS. HOLMES TO MR. TUBERGEN THAT WAS ATTACHED TO THE BINDERS OF

09:35AM   25     INFORMATION THAT WERE SENT TO RDV?

PETERSON CROSS BY MR. WADE (RES.)                                    4947

09:35AM  1    A.   YES.

09:35AM  2              MR. WADE:  I MOVE THE ADMISSION OF 14076.

09:35AM  3              MR. LEACH:  NO OBJECTION, YOUR HONOR.

09:35AM  4              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:35AM  5         (DEFENDANT'S EXHIBIT 14076 WAS RECEIVED IN EVIDENCE.)

09:35AM  6              MR. WADE:  IF I CAN BLOW UP THE LAST SENTENCE IN THE

09:35AM  7    SECOND PARAGRAPH, "WE ALSO BELIEVE."

09:35AM  8    Q.   DO YOU SEE THERE DISCUSSION OR STATEMENTS BY MS. HOLMES

09:35AM  9    RELATING TO THE DESIRE TO TERM -- TO OBTAIN A LONG-TERM VISION

09:36AM 10    FOR THERANOS?

09:36AM 11         DO YOU SEE THAT?

09:36AM 12    A.   YES.

09:36AM 13    Q.   AND DO YOU SEE THAT THERE'S REFERENCE TO THE FACT THAT THE

09:36AM 14    COMPANY WANTS TO STAY PRIVATE OVER THE LONG-TERM?

09:36AM 15         DO YOU SEE THAT?

09:36AM 16    A.   YES.

09:36AM 17    Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO THE PARAGRAPH

09:36AM 18    STARTING WITH "ONCE."

09:36AM 19         DO YOU SEE THAT?

09:36AM 20         AND DO YOU SEE THAT THEY -- THERE'S REFERENCE TO THE

09:36AM 21    WALGREENS CONTRACT IN THE FALL OF 2013.

09:36AM 22         DO YOU SEE THAT?

09:36AM 23    A.   YES.

09:36AM 24    Q.   AND THAT WAS IMPORTANT TO RDV; RIGHT?

09:36AM 25    A.   YES.

PETERSON CROSS BY MR. WADE (RES.)

09:36AM   1    Q.   OKAY.  AND DO YOU SEE AT THE END THE LAST SENTENCE WHERE

09:36AM   2    IT SAYS, "ALL CURRENT RESOURCES ARE FOCUSSED ON THIS COMMERCIAL

09:36AM   3    LABORATORY BUSINESS"?

09:36AM   4        DO YOU SEE THAT?

09:36AM   5    A.   YES.

09:36AM   6    Q.   AND THEN IT SAYS, "FUTURE GROWTH IN THE PHARMACEUTICAL,

09:37AM   7    MILITARY, AND OTHER BUSINESS WILL FOLLOW THE SUCCESSFUL

09:37AM   8    ESTABLISHMENT OF THERANOS'S COMMERCIAL LABORATORY

09:37AM   9    INFRASTRUCTURE NATIONWIDE."

09:37AM   10       DO YOU SEE THAT?

09:37AM   11   A.   I SEE THAT.

09:37AM   12       BUT I ALSO SEE TWO PARAGRAPHS UP WHERE IT SAYS,

09:37AM   13   "HISTORICALLY THERANOS'S WORK WAS FOCUSSED ON CONTRACTS WITH

09:37AM   14   PHARMACEUTICAL AND MILITARY CLIENTS."

09:37AM   15           MR. WADE:  MOVE TO STRIKE THAT.

09:37AM   16           THE COURT:  THAT'S STRICKEN.

09:37AM   17   BY MR. WADE:

09:37AM   18   Q.   I DO NOTE OTHER REFERENCES TO THE HISTORICAL WORK OF THE

09:37AM   19   COMPANY ABOVE; CORRECT?  THERE WERE REFERENCES TO THE

09:37AM   20   HISTORICAL WORK THAT THE COMPANY HAD WITH MILITARY AND

09:37AM   21   PHARMACEUTICAL COMPANIES ABOVE; RIGHT?

09:37AM   22   A.   YES, AND THAT WAS VERY RELEVANT.

09:37AM   23   Q.   AND YOU SEE WHERE IT SAYS THAT ALL OF THAT WORK IS ON HOLD

09:37AM   24   BECAUSE THEY'RE FOCUSSED ON -- --

09:37AM   25   A.   THEY'RE COMMERCIALIZING.

PETERSON CROSS BY MR. WADE (RES.)                                    4949

| | | |
|---|---|---|
| 09:37AM | 1 | Q.   THEY HAVE ALL OF THEIR EFFORTS FOCUSSED ON THE COMMERCIAL |
| 09:37AM | 2 | LABORATORY BUSINESS. |
| 09:37AM | 3 |      DO YOU SEE THAT? |
| 09:37AM | 4 | A.   YES. |
| 09:37AM | 5 | Q.   AND DO YOU SEE ANYWHERE IN THIS LETTER THAT REFERS TO A |
| 09:38AM | 6 | THERANOS DEVICE OR AN EDISON OR A MINILAB? |
| 09:38AM | 7 | A.   THE WHOLE BINDER THAT THIS LETTER WAS ATTACHED TO WAS |
| 09:38AM | 8 | REFERRING TO THE DEVICE. |
| 09:38AM | 9 | Q.   RIGHT.  AND I'M ASKING YOU ABOUT THE LETTER. |
| 09:38AM | 10 | A.   OKAY. |
| 09:38AM | 11 | Q.   DO YOU HAVE THE LETTER IN FRONT OF YOU? |
| 09:38AM | 12 | A.   YES. |
| 09:38AM | 13 | Q.   AND THAT'S 14076? |
| 09:38AM | 14 | A.   YES. |
| 09:38AM | 15 | Q.   AND DO YOU SEE ANYWHERE WHERE IT REFERS TO A DEVICE? |
| 09:38AM | 16 | A.   NOT SPECIFICALLY.  BUT IT WAS ATTACHED TO THE BINDER THAT |
| 09:38AM | 17 | REFERENCED THE DEVICE AND EVERYTHING ELSE. |
| 09:38AM | 18 | Q.   I UNDERSTAND. |
| 09:38AM | 19 |      DO YOU UNDERSTAND MY QUESTION IS, DO YOU SEE ANYWHERE IN |
| 09:38AM | 20 | THE LETTER THAT REFERS TO THE DEVICE? |
| 09:38AM | 21 | A.   NO. |
| 09:38AM | 22 | Q.   OKAY.  AND, IN FACT, IT REFERS TO THERANOS AS A SENSORS |
| 09:38AM | 23 | AND SOFTWARE COMPANY; CORRECT? |
| 09:38AM | 24 | A.   YES. |
| 09:38AM | 25 | Q.   CAN YOU GO TO 14 -- 18 -- I'M SORRY, LET ME START OVER -- |

PETERSON CROSS BY MR. WADE (RES.)                                    4950

09:39AM  1    4858, WHICH SHOULD BE IN THE WHITE BINDER.

09:39AM  2    A.   YES.

09:39AM  3    Q.   DO YOU HAVE THAT IN FRONT OF YOU?

09:39AM  4    A.   YES.

09:39AM  5    Q.   OKAY.  AND DO YOU RECALL YOU PREPARED A MEMO IN

09:39AM  6    MID-OCTOBER RELATING TO YOUR DISCUSSIONS AND YOUR REVIEW OF THE

09:39AM  7    MATERIALS PROVIDED BY THERANOS.

09:39AM  8         DO YOU RECALL THAT?

09:39AM  9    A.   I DID TWO MEMOS, ONE BEFORE GOING TO PALO ALTO AND ONE

09:39AM  10   AFTER.

09:39AM  11   Q.   RIGHT.  DO YOU RECALL THE ONE -- THE ONE GOING BEFORE

09:39AM  12   PALO ALTO YOU PREPARED MAYBE OCTOBER 12TH TO 15TH, IN THAT

09:40AM  13   PERIOD?

09:40AM  14   A.   YES, I SUMMARIZED THE DUE DILIGENCE BINDERS AND OUR CALLS

09:40AM  15   WITH MS. HOLMES.

09:40AM  16   Q.   OKAY.  AND ON DIRECT EXAMINATION MR. LEACH WALKED YOU

09:40AM  17   THROUGH 4858, MANY OF THE SLIDES IN THAT.

09:40AM  18   A.   YES.

09:40AM  19   Q.   DO YOU RECALL THAT?

09:40AM  20        AND HE ASKED YOU QUESTIONS ABOUT DIFFERENT STATEMENTS IN

09:40AM  21   THOSE SLIDES; RIGHT?

09:40AM  22   A.   YES.

09:40AM  23   Q.   OKAY.  CAN YOU -- YOUR -- JUST FOR YOUR REFERENCE, WE

09:40AM  24   WON'T PUBLISH IT, BUT YOUR, YOUR MEMO, MID-OCTOBER MEMO IS AT

09:40AM  25   2073.  CAN YOU IDENTIFY ANY STATEMENT IN 2073 --

PETERSON CROSS BY MR. WADE (RES.)                                    4951

09:40AM   1    A.   THE FIRST MEMO OR THE SECOND ONE?

09:40AM   2    Q.   THE FIRST MEMO AT 2073, WHICH WILL BE IN FRONT OF YOU.

09:40AM   3    A.   YES.

09:40AM   4    Q.   AND I'M WONDERING IF YOU'RE AWARE OF ANY STATEMENT AT ALL

09:40AM   5    THAT COMES FROM THIS SLIDE DECK AND MADE IT INTO YOUR MEMO.

09:40AM   6    A.   THE MEMO CAME FROM EVERYTHING THAT I HAD READ AND

09:40AM   7    EVERYTHING THAT WE HAD HEARD HER SAY IN THE PHONE CALL.

09:40AM   8         I DIDN'T MAKE UP ANY OTHER STUFF.

09:41AM   9         PLUS WHATEVER WE COULD READ ON THE INTERNET.

09:41AM   10   Q.   RIGHT.  RIGHT.

09:41AM   11        DO YOU RECALL THAT A LOT OF THE STATEMENTS I THINK WE

09:41AM   12   ESTABLISHED DURING YOUR EXAMINATION LAST WEEK CAME OUT OF THE

09:41AM   13   FOR "FORTUNE" ARTICLE.

09:41AM   14        DO YOU RECALL THAT?

09:41AM   15   A.   NO, IT WASN'T A LOT.

09:41AM   16   Q.   SEVERAL?  DO YOU RECALL THAT?

09:41AM   17   A.   A FEW IN THE APPENDIX, YES.  I THOUGHT THAT WAS RELEVANT

09:41AM   18   FOR THE FAMILY TO KNOW WHAT SHE WAS SAYING IN THE MEDIA.

09:41AM   19   Q.   OKAY.  ARE YOU ABLE TO TRACK ANY STATEMENTS SPECIFICALLY

09:41AM   20   FROM THIS SLIDE DECK TO YOUR MEMO?

09:41AM   21   A.   NOT AT THE MOMENT, NO.

09:41AM   22        BUT EVERYTHING IN THAT MEMO CAME FROM THESE BINDERS OR A

09:41AM   23   CONVERSATION WITH HER.

09:41AM   24   Q.   RIGHT.  AND ARE YOU ABLE TO IDENTIFY -- I'VE REVIEWED THE

09:41AM   25   EXHIBIT AND I'VE REVIEWED YOUR MEMO.

PETERSON CROSS BY MR. WADE (RES.)                                    4952

09:41AM  1            CAN YOU -- AND I ASSUME YOU HAVE; CORRECT?

09:41AM  2                MR. LEACH:  OBJECTION.  COUNSEL IS TESTIFYING.

09:41AM  3                THE WITNESS:  IF YOU PUT SOME STUFF --

09:41AM  4                THE COURT:  EXCUSE ME, MS. PETERSON.

09:41AM  5            YOU WEREN'T TESTIFYING THERE --

09:41AM  6                MR. WADE:  NO.

09:41AM  7                THE COURT:  -- FOR THE BENEFIT OF THE JURY

09:41AM  8       INDICATING WHAT YOU'VE DONE.

09:41AM  9            THIS WAS FOUNDATIONAL?

09:41AM  10                MR. WADE:  THIS IS FOUNDATIONAL.

09:41AM  11      Q.   YOU'VE REVIEWED BOTH OF THESE DOCUMENTS; CORRECT?

09:42AM  12      A.   YES.

09:42AM  13      Q.   AND ARE YOU AWARE, IN REVIEWING THESE DOCUMENTS, OF ANY

09:42AM  14      STATEMENT THAT COMES FROM THIS SLIDE DECK THAT APPEARED IN

09:42AM  15      EXHIBIT 2073?

09:42AM  16      A.   THE ONLY WAY I PUT THE MEMO TOGETHER WAS BASED ON WHAT I

09:42AM  17      READ AND WHAT WE HEARD.

09:42AM  18      Q.   EVERYTHING THAT YOU READ AND HEARD; RIGHT?

09:42AM  19      A.   I DON'T KNOW IF IT WAS EVERYTHING THAT I READ AND HEARD,

09:42AM  20      BUT THE MEMO WAS BASED ON MY DILIGENCE OF THE BINDERS AND WHAT

09:42AM  21      WE HEARD ON THE PHONE CALL, YES.

09:42AM  22            WE WERE PREPPING THE FAMILY.  WE TALKED ABOUT THE

09:42AM  23      OPPORTUNITY AT LENGTH ON THE PLANE, AND THEN THEY HEARD MUCH OF

09:42AM  24      WHAT WAS IN THE MEMO, THEY HEARD IN PERSON WHEN WE WERE AT THE

09:42AM  25      MEETING IN PALO ALTO.

PETERSON CROSS BY MR. WADE (RES.)                                    4953

09:42AM   1    Q.   DO YOU -- BUT AS YOU SIT HERE TODAY, YOU'RE NOT AWARE OF

09:42AM   2    ANY STATEMENT THAT COMES FROM THE SLIDE DECK DIRECTLY INTO THE

09:42AM   3    MEMO LIKE THOSE "FORTUNE" STATEMENTS; IS THAT CORRECT?

09:42AM   4    A.   I DIDN'T MEMORIZE THE WHOLE FOOT OF PAPER TO TELL YOU WHAT

09:43AM   5    CAME FROM THERE IN MY MEMO OR NOT.

09:43AM   6    Q.   LET'S LOOK AT THE INCH OF PAPER.

09:43AM   7         IF I COULD TURN YOUR ATTENTION TO PAGE 51 OF THE SLIDE

09:43AM   8    DECK AT 12723.

09:43AM   9         DO YOU HAVE THAT IN FRONT OF YOU?  IT'S ON THE SCREEN

09:43AM  10    THERE AS WELL IF THAT'S EASIER.

09:43AM  11    A.   OKAY.

09:43AM  12    Q.   DO YOU SEE THAT TO BE A PICTURE OF THE THERANOS

09:43AM  13    HEADQUARTERS?

09:43AM  14    A.   YES.

09:43AM  15    Q.   IS THAT THE BUILDING THAT YOU WENT TO WHEN YOU WENT ON THE

09:43AM  16    VISIT WITH THE DEVOS FAMILY?

09:43AM  17    A.   I BELIEVE THAT'S THE NEW BUILDING.  WE WENT TO THE OLD

09:43AM  18    BUILDING.

09:43AM  19    Q.   YOU WENT TO THE OLD BUILDING?

09:44AM  20    A.   YES.

09:44AM  21    Q.   LET'S GO TO THE NEXT PAGE.  YOU DIDN'T GO -- DID YOU GO TO

09:44AM  22    NEWARK?

09:44AM  23    A.   NO.  WE ASKED.  THEY SAID WE COULDN'T GO THERE.

09:44AM  24    Q.   YOU COULDN'T LOOK AT THE MANUFACTURING EQUIPMENT?

09:44AM  25    A.   NO.

PETERSON CROSS BY MR. WADE (RES.)                                    4954

09:44AM  1      Q.   OKAY.

09:44AM  2      A.   IT WAS TOP SECRET.

09:44AM  3      Q.   OKAY.  DO YOU KNOW WHAT THIS IS IN THIS PICTURE?

09:44AM  4      A.   WE WERE TOLD THAT'S WHERE THEY MADE THE MACHINES.

09:44AM  5      Q.   OKAY.

09:44AM  6      A.   THE ANALYZER EQUIPMENT.

09:44AM  7      Q.   LET'S GO TO PAGE 54.

09:44AM  8           DO YOU SEE -- WAS THIS MATERIAL THAT YOU RECEIVED IN

09:44AM  9      CONNECTION WITH YOUR INVESTMENT?

09:44AM  10     A.   I BELIEVE SO.

09:44AM  11     Q.   IT WAS IN THE SLIDE DECK; RIGHT?

09:44AM  12     A.   YES.

09:44AM  13     Q.   DID YOU REVIEW IT?

09:44AM  14     A.   YES.

09:44AM  15     Q.   OKAY.  AND DID YOU CONSIDER THIS INFORMATION IN THE SLIDE

09:44AM  16     DECK?

09:44AM  17     A.   YES.

09:44AM  18     Q.   OKAY.  AND LET'S GO TO THE NEXT PAGE.

09:44AM  19          DO YOU CONSIDER THIS -- DO YOU SEE THIS, THAT IT IS MORE

09:44AM  20     OF THE SAME?  THESE ARE FEEDBACK FROM CUSTOMERS?

09:45AM  21          DO YOU SEE THAT?

09:45AM  22     A.   YES.  AND MY TAKEAWAY WAS THAT THE WORK THAT THEY WERE

09:45AM  23     DOING IN WALGREENS WAS WORKING.

09:45AM  24     Q.   OKAY.

09:45AM  25     A.   AND PEOPLE WERE SATISFIED.

PETERSON CROSS BY MR. WADE (RES.)                                    4955

09:45AM   1    Q.   OKAY.  AND YOU CONSIDERED THAT.

09:45AM   2         AND SIMILARLY, IF WE CAN GO TO SLIDE 57, THERE'S FEEDBACK

09:45AM   3    FROM PHYSICIANS.

09:45AM   4         DO YOU SEE THAT?

09:45AM   5         ACTUALLY, LET'S TURN OFF THAT PAGE AND GO UP ONE, PLEASE.

09:45AM   6         LET'S JUST LEAVE THAT DOWN.  IT'S NOT -- THERE'S SOME

09:45AM   7    NAMES THAT ARE NOT REDACTED.

09:45AM   8         BUT IF YOU CAN JUST HAVE IN FRONT OF YOU, DO YOU SEE THAT

09:45AM   9    THERE'S ALSO FEEDBACK ON SLIDE 57 FROM DIFFERENT PHYSICIANS WHO

09:45AM   10   GAVE REVIEWS OF THE WORK PERFORMED AT THERANOS?

09:45AM   11   A.   YES.

09:45AM   12   Q.   AND YOU CONSIDERED THAT IN CONNECTION WITH YOUR INVESTMENT

09:45AM   13   DECISION?

09:45AM   14   A.   YES, VERY RELEVANT.

09:45AM   15   Q.   OKAY.  NOW -- AND YOU RECOGNIZE THAT MANY OF THE COMMENTS

09:46AM   16   IN THERE REFERRED TO THE FAVORABLE PRICING THAT THERANOS HAD;

09:46AM   17   IS THAT RIGHT?

09:46AM   18   A.   THE FAVORABLE PRICING, AS WELL AS THE FACT THAT THE

09:46AM   19   FINGERSTICK TECHNOLOGY WORKED.  IT LENDED CREDIBILITY TO THAT,

09:46AM   20   YES.

09:46AM   21   Q.   I'M SORRY TO INTERRUPT.

09:46AM   22        BUT SOME PEOPLE LIKED THE FINGERSTICK TECHNOLOGY AS WELL;

09:46AM   23   RIGHT?

09:46AM   24   A.   YES.

09:46AM   25   Q.   AND SOME PEOPLE LIKED TO KNOW HOW MUCH THEY WERE GOING TO

PETERSON CROSS BY MR. WADE (RES.)                                    4956

09:46AM   1        PAY IN ADVANCE; RIGHT?

09:46AM   2        A.   YES.

09:46AM   3        Q.   AND SOME PEOPLE LIKED THE FACT THAT INSURED AND UNINSURED

09:46AM   4        WERE PAID -- WERE PAID THE SAME AMOUNT; RIGHT?

09:46AM   5        A.   YES.

09:46AM   6        Q.   OKAY.  LET'S GO TO EXHIBIT -- PAGE 73.

09:46AM   7             AND DO YOU SEE THIS IS A REFERENCE TO THE DIFFERENT

09:47AM   8        LOCATIONS WHERE THEY WERE PROVIDING SERVICES AT THAT TIME?

09:47AM   9        A.   THAT'S WHAT I WOULD HAVE ASSUMED, YES.

09:47AM  10        Q.   OKAY.  AND DO YOU SEE THAT MANY OF THE LOCATIONS PROVIDE

09:47AM  11        SERVICES FROM 6:00 A.M. TO 10:00 P.M.

09:47AM  12             DO YOU SEE THAT?

09:47AM  13        A.   YES.

09:47AM  14        Q.   AND ON SATURDAYS AND SUNDAYS?

09:47AM  15        A.   OKAY.

09:47AM  16        Q.   AND THAT CONVENIENCE WAS A PRETTY SIGNIFICANT FACTOR,

09:47AM  17        SIGNIFICANT PORTION OF THERANOS'S OFFERING.

09:47AM  18             DO YOU RECALL THAT?

09:47AM  19        A.   YES.

09:47AM  20        Q.   OKAY.  LET ME BRING YOU TO PAGE 44.

09:47AM  21             I'M SORRY, LET'S GO TO -- WELL, WE CAN GO TO 44.

09:47AM  22             DO YOU SEE THOSE ARE PICTURES OF THE THERANOS WELLNESS

09:47AM  23        CENTER?

09:47AM  24        A.   YES.

09:47AM  25        Q.   AND YOU DON'T SEE ANY DEVICES IN THE WELLNESS CENTER

PETERSON CROSS BY MR. WADE (RES.)                                    4957

09:48AM  1    PICTURES, DO YOU?

09:48AM  2    A.   IN THEIR BUILDING THEY HAD SOMETHING JUST LIKE THIS WHERE

09:48AM  3    CHERI WAS TESTED AND WE WERE TOLD THAT THIS IS PRETTY MUCH WHAT

09:48AM  4    THEIR WELLNESS CENTERS LOOKED LIKE INSIDE OF WALGREENS.

09:48AM  5    Q.   RIGHT.  MY QUESTION WAS, DO YOU SEE ANY PICTURES OF THE

09:48AM  6    DEVICE IN THESE PHOTOS?

09:48AM  7    A.   NO.  BUT I SAW IT FIRST HAND.  I WASN'T RELYING ON THIS

09:48AM  8    PICTURE.  I WAS RELYING ON THE TOUR THAT WE GOT OF THE WELLNESS

09:48AM  9    CENTER INSIDE OF THEIR BUILDING.

09:48AM  10           MR. WADE:  MOVE TO STRIKE EVERYTHING AFTER THE

09:48AM  11   INITIAL ANSWER, YOUR HONOR.

09:48AM  12           THE COURT:  WHAT WAS OBSERVED AT THE WELLNESS

09:48AM  13   CENTER -- EXCUSE ME, AT THE THERANOS BUILDING IS STRICKEN.

09:48AM  14           MR. WADE:  LET'S GO TO PAGE 90 OF THE EXHIBIT.

09:48AM  15   Q.   DID YOU READ THIS PAGE IN CONNECTION WITH YOUR INVESTMENT?

09:48AM  16   A.   I DON'T REMEMBER IT OFF THE TOP OF MY HEAD, BUT I'M SURE I

09:49AM  17   READ IT.  I READ EVERYTHING IN THE BINDERS AT THE TIME.  IT WAS

09:49AM  18   A LONG TIME AGO.

09:49AM  19   Q.   OKAY.  AND DO YOU SEE, DO YOU SEE WHERE IT SAYS PATIENTS

09:49AM  20   RECEIVE -- OR THAT DOCTORS WILL GET PATIENTS' RESULTS BACK IN

09:49AM  21   LESS THAN 48 HOURS ON AVERAGE?

09:49AM  22       DO YOU SEE THAT?

09:49AM  23   A.   YES.

09:49AM  24   Q.   AND DO YOU HAVE ANY SENSE FOR WHY IT WOULD TAKE 48 HOURS

09:49AM  25   IF THE DEVICE WAS IN THE WELLNESS CENTER?

PETERSON CROSS BY MR. WADE (RES.)                                    4958

09:49AM   1    A.   WELL, WE WERE TOLD THAT IT WOULDN'T TAKE THAT LONG.   IN

09:49AM   2    FACT, CHERI WAS TOLD THAT SHE WOULD HAVE EMAIL RESULTS RATHER

09:49AM   3    QUICKLY.

09:49AM   4    Q.   AND YOU DON'T KNOW WHEN SHE GOT HER RESULTS; RIGHT?

09:49AM   5    A.   I BELIEVE -- I KNOW SHE HAD THEM EMAILED THAT DAY, BUT I

09:49AM   6    DON'T KNOW WHAT THEY SAID.

09:49AM   7    Q.   BUT YOU SAID YOU WERE TOLD THAT, BUT YOU WERE ACTUALLY

09:49AM   8    TOLD RIGHT HERE THAT THE RESULTS WERE GIVEN LESS THAN 48 HOURS

09:49AM   9    ON AVERAGE.

09:49AM   10        DO YOU SEE THAT?

09:49AM   11   A.   ON AVERAGE.   BUT THAT'S NOT WHAT SHE WAS VERBALLY SAYING.

09:50AM   12   Q.   I'M JUST ASKING -- I HAVE A QUESTION WITH RESPECT TO

09:50AM   13   NUMBER 3.

09:50AM   14        DO YOU SEE THAT?

09:50AM   15   A.   OKAY.

09:50AM   16   Q.   DO YOU HAVE AN UNDERSTANDING AS TO WHY THAT STATEMENT SAYS

09:50AM   17   48 HOURS?

09:50AM   18   A.   NO.

09:50AM   19   Q.   OKAY.   I BELIEVE YOU TESTIFIED WITH RESPECT TO YOUR -- YOU

09:50AM   20   TESTIFIED WITH RESPECT TO YOUR BELIEF THAT THE TESTS WERE

09:50AM   21   PERFORMED ON THE DEVICES IN THE WALGREENS AT THE TIME THAT YOU

09:50AM   22   WENT TO THERANOS; IS THAT RIGHT?

09:50AM   23   A.   SAY THE QUESTION AGAIN.

09:50AM   24   Q.   YOU SAID THAT THE DEVICE -- YOU WERE OF THE VIEW, OR OF

09:50AM   25   THE UNDERSTANDING, THAT THE DEVICES WERE IN THE ACTUAL

PETERSON CROSS BY MR. WADE (RES.)                                    4959

09:50AM   1    WALGREENS LOCATIONS AT THE TIME THAT YOU MET WITH THERANOS?

09:50AM   2    A.   YES.  THERE WAS NO OTHER REASON TO THINK ANYTHING ELSE.

09:50AM   3    Q.   OKAY.  AND YOU TESTIFIED THAT YOU DID SOME INTERNET

09:51AM   4    RESEARCH; RIGHT?

09:51AM   5    A.   YES.

09:51AM   6    Q.   OKAY.  AND IN CONNECTION WITH THE INTERNET RESEARCH, DID

09:51AM   7    YOU GO TO THE FIRST PAGE OF THE THERANOS SITE?

09:51AM   8    A.   I DON'T KNOW.

09:51AM   9    Q.   OKAY.  DO YOU RECALL WHETHER YOU SAW A SITE THAT ON THE

09:51AM  10    FIRST PAGE OF THE THERANOS SITE SAYS THAT THE TESTS AT

09:51AM  11    WALGREENS ARE PERFORMED IN THE CLIA LAB?

09:51AM  12    A.   EVERYTHING THAT WAS TOLD TO US WAS -- SUGGESTED THAT

09:51AM  13    EVERYTHING THAT WAS BEING DONE WAS ON THE ANALYZER EQUIPMENT.

09:51AM  14    Q.   OKAY.

09:51AM  15    A.   WE DID NOT KNOW THAT THERE WAS VENOUS TESTING UNTIL WE

09:51AM  16    READ "THE WALL STREET JOURNAL" ARTICLE A YEAR LATER.

09:51AM  17         IT'S NOT WHAT WE HAD INVESTED IN.  IT'S NOT WHAT WE HAD

09:51AM  18    THOUGHT WE HAD INVESTED IN.

09:51AM  19              MR. WADE:  MOVE TO STRIKE, YOUR HONOR.

09:51AM  20              THE COURT:  OVERRULED.

09:51AM  21    BY MR. WADE:

09:51AM  22    Q.   THE -- MY QUESTION RELATED TO THE WEBSITE AND WHETHER YOU

09:51AM  23    SAW REFERENCES ON THE WEBSITE RELATING TO THE FACT THAT

09:52AM  24    WALGREENS TESTS WERE PERFORMED IN THE CLIA LAB.

09:52AM  25         DID YOU SEE THAT REFERENCE?

PETERSON CROSS BY MR. WADE (RES.)                                    4960

09:52AM   1    A.   I DON'T -- I CAN'T ANSWER THAT QUESTION.  I DON'T

09:52AM   2    REMEMBER.

09:52AM   3    Q.   SO YOU DON'T REMEMBER SEEING THAT REFERENCE; CORRECT?

09:52AM   4    A.   I DON'T REMEMBER SEEING THAT REFERENCE.

09:52AM   5         I'M JUST TELLING YOU WHAT WE KNEW AT THE TIME, WHICH WAS

09:52AM   6    THAT EVERYTHING WAS BEING DONE ON THE ANALYZER EQUIPMENT.

09:52AM   7         THERE WAS NEVER ANY CONVERSATION AROUND VENOUS DRAWS EVER.

09:52AM   8              MR. WADE:  MOVE TO STRIKE THE LAST PORTION.

09:52AM   9              THE WITNESS:  SORRY.

09:52AM  10              THE COURT:  EXCUSE ME.  WAIT FOR HIS QUESTION AND

09:52AM  11    THEN YOU CAN ANSWER IT.

09:52AM  12         THAT LAST RESPONSE IS STRICKEN.

09:53AM  13    BY MR. WADE:

09:53AM  14    Q.   NOW, IF I CAN DRAW YOUR ATTENTION TO 104, PAGE 104 OF THE

09:53AM  15    SAME EXHIBIT.

09:53AM  16         DO YOU HAVE THAT IN FRONT OF YOU?

09:53AM  17    A.   YES.

09:53AM  18    Q.   AND DO YOU RECALL THAT MR. LEACH ASKED YOU SOME QUESTIONS

09:53AM  19    ABOUT THIS?

09:53AM  20    A.   YES.

09:53AM  21    Q.   AND DO YOU RECALL THAT YOU GAVE TESTIMONY THAT YOU

09:53AM  22    BELIEVED THAT THIS WAS PREPARED BY PFIZER; CORRECT?

09:53AM  23    A.   YES.

09:53AM  24    Q.   OKAY.  DO YOU RECALL THAT, DO YOU RECALL THAT YOU MET WITH

09:53AM  25    THE GOVERNMENT IN 2017?

PETERSON CROSS BY MR. WADE (RES.)                                    4961

09:54AM    1    A.   YES.

09:54AM    2    Q.   OKAY.  AND DO YOU RECALL THAT IN THAT INTERVIEW YOU TOLD

09:54AM    3    THE GOVERNMENT THAT YOU DIDN'T KNOW WHO WROTE THE REPORT

09:54AM    4    INCLUDED IN THE SET WITH THE PFIZER LOGO?

09:54AM    5    A.   I DON'T RECALL SAYING THAT.

09:54AM    6    Q.   OKAY.  LET ME SEE IF I CAN REFRESH YOUR RECOLLECTION.

09:54AM    7         CAN YOU PULL THAT INTERVIEW UP.  IT'S 11249.

09:54AM    8         LET ME KNOW -- AND I'M LOOKING AT PAGE 2 OF 11249.

09:55AM    9         DO YOU HAVE THAT IN FRONT OF YOU?

09:55AM   10    A.   YES.

09:55AM   11    Q.   GO -- LOOK AT THE BOTTOM OF PAGE 2, LAST SENTENCE, AND

09:55AM   12    PLEASE JUST READ IT TO YOURSELF AND WAIT FOR MY QUESTION.

09:55AM   13         HAVE YOU READ THAT TO YOURSELF?

09:55AM   14    A.   YES.

09:55AM   15    Q.   AND DOES THAT REFRESH YOUR RECOLLECTION THAT YOU TOLD THE

09:55AM   16    GOVERNMENT THAT YOU DID NOT KNOW WHO WROTE THE REPORT INCLUDED

09:55AM   17    IN THE SET OF DOCUMENTS WITH PFIZER'S LOGO?

09:55AM   18    A.   THAT'S NOT EXACTLY HOW I RECALL IT, NO.

09:55AM   19    Q.   OKAY.

09:55AM   20    A.   I MEAN, I DON'T KNOW WHO ELSE WOULD HAVE WRITTEN IT BUT

09:55AM   21    PFIZER OR THERANOS.

09:55AM   22    Q.   WHEN YOU -- JUST SO WE'RE CLEAR, AND I'M SURE I KNOW THE

09:55AM   23    ANSWER TO THIS, BUT YOU TOLD THE TRUTH WHEN YOU MET WITH THE

09:55AM   24    GOVERNMENT; RIGHT?

09:56AM   25    A.   YES, OF COURSE.

PETERSON CROSS BY MR. WADE (RES.)                                    4962

09:56AM   1    Q.   AND THERE WERE AGENTS THERE TAKING NOTES?

09:56AM   2    A.   YES.

09:56AM   3    Q.   YES.

09:56AM   4         AND YOU WERE CAREFUL IN WHAT YOU SAID TO TRY TO MAKE SURE

09:56AM   5    THAT IT WAS ACCURATE; RIGHT?

09:56AM   6    A.   YES.

09:56AM   7    Q.   IF I CAN CALL YOUR ATTENTION -- NOW, THIS PFIZER DOCUMENT

09:56AM   8    THAT IS UP ON THE SCREEN, YOU DIDN'T SPECIFICALLY MENTION THAT

09:56AM   9    PFIZER DOCUMENT IN EITHER ONE OF YOUR MEMOS, DID YOU?

09:56AM  10    A.   NO.  BUT AS I SAID, PFIZER -- IN REVIEWING THAT, IT LENDED

09:56AM  11    CREDIBILITY.  I DIDN'T SUMMARIZE THIS PFIZER STUDY.  IT JUST

09:56AM  12    LENDED CREDIBILITY THAT THEY HAD DONE WORK WITH PFIZER AND

09:56AM  13    PFIZER WAS OKAYING THAT THE ANALYZER DID WORK.  THAT'S WHAT

09:56AM  14    THIS WAS -- THAT'S THE TAKEAWAY FROM THIS FOR US.

09:56AM  15         MR. WADE:  MOVE TO STRIKE EVERYTHING AFTER "NO."

09:56AM  16         THE COURT:  I WILL STRIKE THAT NOW.

09:56AM  17    BUT, MR. WADE, SOME OF YOUR QUESTIONS LEND THEMSELVES TO

09:57AM  18    AN EXPLANATION SO --

09:57AM  19         MR. WADE:  OKAY.  THANK YOU, YOUR HONOR.

09:57AM  20    Q.   IF YOU GO TO THE BOTTOM -- LET'S GO TO THE BOTTOM OF THE

09:57AM  21    PAGE.  THE VERY BOTTOM, I'M SORRY, NOT THE PARAGRAPH.  THE

09:57AM  22    FOOTER.

09:57AM  23         DO YOU SEE THE FOOTER?

09:57AM  24    A.   YES.

09:57AM  25    Q.   AND WHOSE ADDRESS IS THAT?

PETERSON CROSS BY MR. WADE (RES.)                                    4963

09:57AM   1    A.   I DON'T KNOW.

09:57AM   2    Q.   YOU DON'T KNOW WHOSE ADDRESS THAT IS?

09:57AM   3    A.   NOT OFF THE TOP OF MY HEAD, NO.

09:57AM   4    Q.   OKAY.  DO YOU SEE THAT IT'S A -- DO YOU SEE THE THERANOS

09:57AM   5    WEBSITE THERE?

09:57AM   6    A.   YES.

09:57AM   7    Q.   OKAY.  LET'S GO TO THE SECOND PAGE.  LET'S LOOK AT THAT

09:57AM   8    SAME LANGUAGE IN THE FOOTER.

09:57AM   9         DO YOU SEE THAT IS THERANOS'S WEBSITE THERE?

09:57AM   10   A.   YES.

09:57AM   11   Q.   AND DO YOU RECOGNIZE THAT TO BE THERANOS'S ADDRESS?

09:57AM   12   A.   I, I DON'T KNOW.

09:57AM   13   Q.   OKAY.  AND THAT FOOTER IS ON EVERY PAGE OF THIS REPORT;

09:57AM   14   RIGHT?

09:57AM   15        CORRECT?

09:58AM   16   A.   I DON'T KNOW.  I WOULD IMAGINE YES.  IT'S A LONG TIME AGO.

09:58AM   17   Q.   DO YOU RECALL BEING ASKED SOME QUESTIONS ABOUT WHEN THE

09:58AM   18   INVESTMENT COMMITMENT WAS MADE?

09:58AM   19   A.   YES.

09:58AM   20   Q.   OKAY.  AND IT WAS IN CONNECTION WITH A MEETING THAT

09:58AM   21   HAPPENED AT THERANOS ON OCTOBER 15TH; CORRECT?

09:58AM   22   A.   CORRECT.

09:58AM   23   Q.   AND ISN'T IT TRUE THAT A DECISION HAD BEEN MADE AT THE END

09:58AM   24   OF THAT MEETING TO INVEST A HUNDRED MILLION DOLLARS?

09:59AM   25   A.   THEY HAD TALKED ABOUT THAT BEING OUR COMMITMENT, YES.

PETERSON CROSS BY MR. WADE (RES.)                                    4964

09:59AM   1    Q.   AND SO THE DECISION -- MY QUESTION WAS THE DECISION HAD

09:59AM   2    BEEN MADE --

09:59AM   3    A.   I WOULDN'T SAY.

09:59AM   4         THE COURT:  MS. PETERSON, LET HIM FINISH HIS

09:59AM   5    QUESTION SO YOU'LL HAVE THE FULL BENEFIT OF IT.

09:59AM   6         THE WITNESS:  SORRY.

09:59AM   7    BY MR. WADE:

09:59AM   8    Q.   MY QUESTION IS THAT THE DECISION HAD BEEN MADE AT THE END

09:59AM   9    OF THAT MEETING TO INVEST $100 MILLION; CORRECT?

09:59AM   10   A.   THAT'S NOT A YES OR NO QUESTION FOR ME.

09:59AM   11   Q.   WELL, YOU RECALL GIVING TESTIMONY --

09:59AM   12   A.   THE FAMILY WAS VERY WELL --

09:59AM   13   Q.   THERE'S NO QUESTION PENDING RIGHT NOW.

09:59AM   14        DO YOU RECALL GIVING TESTIMONY IN A DEPOSITION?  WE TALKED

09:59AM   15   ABOUT THAT LAST WEEK; RIGHT?

09:59AM   16   A.   YES.

09:59AM   17   Q.   OKAY.  AND YOU RECALL THAT YOU WERE UNDER OATH?

09:59AM   18   A.   YES.

09:59AM   19   Q.   YES.  AND YOU RECALL THAT YOU WERE UNDER THE PAINS AND

09:59AM   20   PENALTIES OF PERJURY TO GIVE TRUTHFUL ANSWERS?

09:59AM   21        DO YOU RECALL THAT?

09:59AM   22   A.   YES.

09:59AM   23   Q.   COULD I DRAW YOUR ATTENTION TO 1125, PAGE 74.

10:00AM   24        THE COURT:  LET'S STOP FOR JUST A SECOND.

10:00AM   25        AND, FOLKS, LET'S TAKE TWO MINUTES TO STAND AND STRETCH,

PETERSON CROSS BY MR. WADE (RES.)                                    4965

10:00AM  1      PLEASE.  LET'S JUST TAKE A STRETCHING BREAK HERE.

10:00AM  2           (STRETCHING.)

10:01AM  3               MR. WADE:  WHILE WE TAKE A BREAK, YOUR HONOR, MAY I

10:01AM  4      CONFER WITH COUNSEL?

10:01AM  5               THE COURT:  YES, OF COURSE.

10:01AM  6           (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

10:01AM  7               THE COURT:  THANK YOU.  MR. WADE.

10:01AM  8      BY MR. WADE:

10:01AM  9      Q.   DO YOU HAVE PAGE 74 IN FRONT OF YOU?

10:01AM  10     A.   PAGE 74 IS JUST THE "FORTUNE" ARTICLE.

10:01AM  11     Q.   I'M SORRY, 11253.  IT SHOULD BE YOUR DEPOSITION TESTIMONY.

10:01AM  12          DO YOU SEE THAT?

10:01AM  13     A.   OKAY.  YES.

10:02AM  14     Q.   DO YOU RECOGNIZE THAT TO BE YOUR DEPOSITION TESTIMONY?

10:02AM  15     A.   YES.

10:02AM  16     Q.   OKAY.  I WOULD DRAW YOURS, COUNSEL, AND THE COURT'S

10:02AM  17     ATTENTION TO PAGE 74, LINE 13.

10:02AM  18          YOU WERE ASKED, "SO THE DECISION HAD BEEN MADE AT THE END

10:02AM  19     OF THAT MEETING TO INVEST 100 MILLION?"

10:02AM  20          AND YOU ANSWERED, "CORRECT."

10:02AM  21          IS THAT RIGHT?

10:02AM  22     A.   OKAY.  YES.

10:02AM  23     Q.   OKAY.  DID I READ THAT CORRECTLY?

10:02AM  24     A.   YES, WE TALKED ABOUT THAT, YES.

10:02AM  25     Q.   OKAY.  OKAY.  AND THIS WAS -- THIS DECISION HAD BEEN MADE

PETERSON CROSS BY MR. WADE (RES.)                              4966

10:02AM    1    BEFORE YOU CREATED YOUR SECOND MEMO; CORRECT?

10:02AM    2    A.   YES.

10:02AM    3    Q.   OKAY.  AND YOU DID NOT HAVE ANY SEPARATE MEETINGS OR

10:02AM    4    VERBAL COMMUNICATIONS WITH MR. DEVOS OR MR. TUBERGEN BEFORE

10:03AM    5    THEY MADE THAT COMMITMENT IN THAT MEETING ON THAT DAY; CORRECT?

10:03AM    6    A.   I DID NOT -- SAY IT AGAIN.

10:03AM    7    Q.   THERE WASN'T A SIDE MEETING THAT HAPPENED BEFORE THAT

10:03AM    8    COMMITMENT WAS MADE; RIGHT?

10:03AM    9    A.   THERE WERE LOTS OF DISCUSSIONS ON THE WAY TO THE MEETING

10:03AM   10    IN THE PLANE WHERE WE DISCUSSED EVERYTHING.

10:03AM   11         WE WENT THROUGH THE FIVE HOUR MEETING IN WHICH DOUG WAS

10:03AM   12    APART OF IT AND SO WAS RICK, WHO WERE BOTH ON THE INVESTMENT

10:03AM   13    COMMITTEE.  WE CAUCUSED OUTSIDE.  THEY TALKED ABOUT DOING 100

10:03AM   14    IN THE MEETING.  THAT WAS KIND OF WHERE THEY LANDED.

10:03AM   15         FROM THAT POINT FORWARD I NEEDED THE GREEN LIGHT FROM

10:03AM   16    JERRY IN ORDER TO MOVE FORWARD WITH CLOSING THE INVESTMENT.

10:03AM   17         SO, YES, HAD THEY DECIDED TO MOVE FORWARD -- DO THE WORK

10:03AM   18    AND PROCESS THAT WE GO THROUGH TO CLOSE ON A TRANSACTION, YES,

10:03AM   19    THAT WAS WHAT WAS DISCUSSED IN THE PARKING LOT BEFORE WE

10:03AM   20    DISBURSED.

10:03AM   21    Q.   OKAY.  LET ME BRING YOU BACK TO THE MEETING, OKAY?

10:04AM   22    A.   OKAY.

10:04AM   23    Q.   I'M FOCUSSED ON WHAT WAS HAPPENING IN THE MEETING INSIDE

10:04AM   24    OF THERANOS.

10:04AM   25    A.   YES.

UNITED STATES COURT REPORTERS

PETERSON CROSS BY MR. WADE (RES.)                                    4967

10:04AM  1    Q.   AND I THINK WE JUST ESTABLISHED THAT THE DECISION TO MAKE

10:04AM  2    THE $100 MILLION INVESTMENT WAS MADE IN THE MEETING; CORRECT?

10:04AM  3    A.   YES, THAT'S WHAT WAS DISCUSSED.

10:04AM  4    Q.   OKAY.  AND THAT WAS BEFORE YOU PREPARED THE MEMO THAT YOU

10:04AM  5    REFERRED TO AFTER THE MEETING; CORRECT?

10:04AM  6    A.   CORRECT.  BUT THE EARLIER MEMO WAS VERY MUCH WHAT WAS IN

10:04AM  7    THE FINAL MEMO, WHICH WE HAD ALREADY DISCUSSED ON THE WAY

10:04AM  8    THERE.

10:04AM  9    Q.   OKAY.  I WASN'T ASKING -- I'M NOT ASKING YOU ABOUT THE

10:04AM  10   EARLIER MEMO.  I'M ASKING YOU SPECIFIC QUESTIONS.

10:04AM  11        OKAY?

10:04AM  12   A.   OKAY.

10:04AM  13   Q.   AND YOU WERE IN A MEETING AT THERANOS; CORRECT?

10:04AM  14   A.   YES.

10:04AM  15   Q.   AND THERE WAS DISCUSSION BACK AND FORTH.  WE TALKED ABOUT

10:04AM  16   IT LAST WEEK; RIGHT?

10:04AM  17   A.   YES, FOUR HOURS WORTH.

10:04AM  18   Q.   AND MEMBERS OF THE DEVOS INVESTMENT COMMITTEE WERE

10:04AM  19   PRESENT; CORRECT?

10:04AM  20   A.   YES.

10:04AM  21   Q.   YOU WERE PRESENT?

10:04AM  22   A.   YES.

10:04AM  23   Q.   AND MR. TUBERGEN WAS PRESENT?

10:04AM  24   A.   YES.

10:04AM  25   Q.   AND BEFORE THAT COMMITMENT WAS EXPRESSED IN THAT MEETING,

PETERSON CROSS BY MR. WADE (RES.)                                    4968

10:05AM  1    YOU DID NOT PROVIDE ANY INPUT IN A SIDE MEETING TO ANY OF THOSE

10:05AM  2    INVESTMENT COMMITTEE MEMBERS OR TO MR. TUBERGEN THAT DAY, DID

10:05AM  3    YOU?

10:05AM  4    A.   OTHER THAN THE THREE HOURS ON THE PLANE ON THE WAY THERE,

10:05AM  5    NO.

10:05AM  6    Q.   OKAY.  NOTHING IN THAT MEETING; CORRECT?

10:05AM  7    A.   NO.

10:05AM  8    Q.   OKAY.  IF WE CAN PULL UP 2098 WHICH I BELIEVE IS IN

10:05AM  9    EVIDENCE AND GO TO THE SECOND PAGE.

10:05AM  10       OKAY.  LET ME KNOW WHEN YOU HAVE 2098, PAGE 2 IN FRONT OF

10:06AM  11   YOU.

10:06AM  12   A.   OKAY.

10:06AM  13   Q.   DO YOU HAVE THAT IN FRONT OF YOU?

10:06AM  14   A.   YES.

10:06AM  15   Q.   OKAY.  AND DO YOU RECALL LAST WEEK WE WENT THROUGH CERTAIN

10:06AM  16   ASPECTS OF THIS EMAIL AND THERE WAS COMMUNICATION ABOUT THE

10:06AM  17   FACT THAT, THAT YOU WERE NOT INCLUDED ON AND THEN YOU WERE

10:06AM  18   LOOPED IN LATER.

10:06AM  19       DO YOU RECALL THAT?

10:06AM  20   A.   SAY THAT AGAIN.

10:06AM  21   Q.   LET ME JUST FOCUS ON THE DOCUMENT.

10:06AM  22       DO YOU SEE THAT THERE WERE COMMUNICATIONS BETWEEN

10:06AM  23   MS. HOLMES, MR. TUBERGEN, MR. BALWANI, AND DOUG DEVOS?

10:06AM  24       DO YOU SEE THAT?

10:06AM  25   A.   YES, YES.

PETERSON CROSS BY MR. WADE (RES.)                              4969

10:06AM  1    Q.   AND THEN FURTHER UP THE EMAIL CHAIN YOU ARE LOOPED IN;

10:06AM  2    CORRECT?

10:06AM  3    A.   YES.

10:06AM  4    Q.   AND YOU SEE MR. TUBERGEN LOOPS YOU IN TO LET YOU -- TO

10:06AM  5    KEEP YOU POSTED.

10:06AM  6         DO YOU SEE THAT?

10:06AM  7    A.   YES.

10:06AM  8    Q.   AND WE DIDN'T FOCUS ON IT, BUT IF YOU GO -- IF YOU LOOK AT

10:06AM  9    THE BOTTOM OF THE FIRST PAGE, BOTTOM OF THE FIRST -- NOPE.  THE

10:06AM  10   HEADER JUST ON THE BOTTOM THERE, PLEASE.  THANK YOU.

10:07AM  11        DO YOU SEE THIS IS AN EMAIL FROM YOU TO MR. TUBERGEN ON

10:07AM  12   OCTOBER 20TH; CORRECT?

10:07AM  13   A.   YES.

10:07AM  14   Q.   AND LET'S LOOK AT THE EMAIL, WHICH IS ON THE TOP OF THE

10:07AM  15   SECOND PAGE.  AND DO YOU SEE THAT MR. TUBERGEN APOLOGIZES FOR

10:07AM  16   HAVING FAILED TO INCLUDE YOU PREVIOUSLY.

10:07AM  17        DO YOU SEE THAT?

10:07AM  18   A.   YES.

10:07AM  19   Q.   BUT HE WAS LOOPING YOU IN NOW; RIGHT?

10:07AM  20   A.   YES.

10:07AM  21   Q.   AND HE SAYS, "GOOD NEWS IS WE ARE IN AND I'M VERY

10:07AM  22   ENCOURAGED BY THIS DEAL."

10:07AM  23        DO YOU SEE THAT?

10:07AM  24   A.   YES.

10:07AM  25   Q.   OKAY.  AND THIS IS ON OCTOBER 20TH; CORRECT?

PETERSON CROSS BY MR. WADE (RES.)                                    4970

10:07AM  1    A.   YES.

10:07AM  2    Q.   AND LET'S GO ONE EMAIL UP THE CHAIN.

10:07AM  3         YOU RESPOND; CORRECT?

10:07AM  4    A.   YES.

10:07AM  5    Q.   AND YOU SAY, "NO WORRIES.  I'LL DOCUMENT SOMETHING FOR THE

10:07AM  6    FILE THAT YOU CAN SIGN AS 'APPROVED.'"

10:07AM  7         CORRECT?

10:08AM  8    A.   YES.

10:08AM  9    Q.   OKAY.  IF YOU CAN GO TO 2166, WHICH I BELIEVE IS IN

10:08AM  10   EVIDENCE.

10:08AM  11   A.   YES.

10:08AM  12   Q.   AND IF I CAN CALL YOUR ATTENTION TO THE LAST PAGE.

10:08AM  13        THIS IS THE MEMO THAT WAS PREPARED FOR THE FILE AFTER THE

10:08AM  14   MEETING; CORRECT?

10:08AM  15   A.   YES.

10:08AM  16   Q.   AND DO YOU SEE THE SIGNATURES THERE?

10:08AM  17   A.   YES.

10:08AM  18   Q.   AND THERE'S NO DATE ON THE SIGNATURES; CORRECT?

10:08AM  19   A.   CORRECT.

10:08AM  20   Q.   OKAY.  THERE IS A LINE THAT CALLS FOR THE DATE THOUGH;

10:08AM  21   RIGHT?

10:08AM  22   A.   THIS WAS SENT TO JERRY ON THE 23RD OF OCTOBER, AND I HAVE

10:09AM  23   SPECIFICALLY ASKED BACK, ARE WE OKAY TO MOVE FORWARD TO

10:09AM  24   DOCUMENT THE DEAL, TO WHICH HE RESPONDED YES.

10:09AM  25   Q.   RIGHT.  DO YOU RECALL THAT WE JUST LOOKED AT THE EMAIL

PETERSON CROSS BY MR. WADE (RES.)                                    4971

10:09AM  1    THAT SAID THAT YOU DOCUMENT SOMETHING FOR THE FILE; RIGHT?

10:09AM  2    A.   YES, YES.

10:09AM  3    Q.   AND HE INFORMED YOU THAT THE DEAL WAS DONE; CORRECT?

10:09AM  4    A.   HE INFORMED ME THAT I WAS -- WE WERE IN, WHICH MEANT THAT

10:09AM  5    SHE HAD ACCEPTED US INTO THIS DEAL.

10:09AM  6         WE STILL HAD TO CLOSE IT.

10:09AM  7    Q.   OKAY.  THE -- I WANT TO CALL YOUR ATTENTION -- MY, MY --

10:09AM  8    THERE'S A BLANK FOR THE DATE AND THERE'S NO DATE IN THE BLANK;

10:09AM  9    CORRECT?

10:09AM 10    A.   CORRECT.

10:09AM 11    Q.   I WANT TO CALL YOUR ATTENTION TO THE SENTENCE IN THE

10:09AM 12    MIDDLE OF THE PARAGRAPH THAT SAYS "FURTHERMORE."

10:09AM 13         DO YOU SEE THAT?

10:10AM 14    A.   YES.

10:10AM 15    Q.   AND DO YOU RECALL THAT MR. LEACH ASKED YOU SOME QUESTIONS

10:10AM 16    ABOUT THIS?

10:10AM 17    A.   YES.

10:10AM 18    Q.   AND YOU TESTIFIED THAT YOU GOT THIS INFORMATION FROM

10:10AM 19    MS. HOLMES AND MR. BALWANI.

10:10AM 20         DO YOU RECALL THAT?

10:10AM 21    A.   SHE TALKED ABOUT THIS, YES.

10:10AM 22    Q.   OKAY.  ISN'T IT THE CASE THAT YOU ACTUALLY TOOK THIS

10:10AM 23    LANGUAGE DIRECTLY OUT OF THE "FORTUNE" ARTICLE?

10:10AM 24    A.   WE ASKED ABOUT THIS BECAUSE WE WANTED TO KNOW WHY THEY

10:10AM 25    DIDN'T HAVE TO HAVE FDA APPROVAL.

PETERSON CROSS BY MR. WADE (RES.)                                    4972

10:10AM   1    Q.   OKAY.  MY QUESTION IS, ISN'T IT THE CASE THAT YOU TOOK

10:10AM   2    THIS LANGUAGE DIRECTLY OUT OF THE "FORTUNE" ARTICLE?

10:10AM   3    A.   BUT WE ASKED ABOUT IT AND GOT AN ANSWER AND THIS WAS WHAT

10:10AM   4    THE ANSWER WAS.

10:10AM   5              MR. WADE:  MOVE TO STRIKE THE ANSWER.  I CAN ASK A

10:10AM   6    THIRD QUESTION.

10:10AM   7              THE WITNESS:  I DON'T KNOW.

10:10AM   8              THE COURT:  LISTEN TO HIS QUESTION AND HE'LL ASK YOU

10:10AM   9    ONE MORE TIME.

10:10AM  10              THE WITNESS:  OKAY.

10:10AM  11    BY MR. WADE:

10:10AM  12    Q.   ISN'T IT THE CASE THAT THAT LANGUAGE CAME DIRECTLY OUT OF

10:10AM  13    THE "FORTUNE" ARTICLE?

10:10AM  14    A.   IT MAY HAVE, BUT WE ASKED ABOUT IT SPECIFICALLY.

10:10AM  15    Q.   OKAY.  LET'S TAKE A LOOK AT EXHIBIT 1944.  IF WE CAN DO

10:10AM  16    THAT ON A SPLIT SCREEN.

10:11AM  17         YEAH, IF WE CAN CALL UP PAGE ENDING 5014 IN THE BOTTOM

10:11AM  18    CORNER, A DIFFERENT VERSION HERE.  PAGE 69 OF THE ARTICLE.

10:11AM  19    PAGE 6 OF 9.  I'M SORRY.  TOO MANY DIFFERENT PAGE NUMBERS.

10:11AM  20    PAGE 6 OF 9.  AND IF WE CAN BLOW UP THE PARAGRAPH STARTING WITH

10:11AM  21    "THERANOS" IN THE LEFT-HAND COLUMN.

10:11AM  22         ISN'T THAT ALMOST VERBATIM THE LANGUAGE OUT OF THE

10:12AM  23    "FORTUNE" ARTICLE?

10:12AM  24    A.   YES.  BUT AS I SAID, WE ASKED ABOUT THAT SPECIFICALLY AT

10:12AM  25    THE MEETING.  WE WANTED TO KNOW WHAT THE FDA REGULATIONS WERE,

PETERSON CROSS BY MR. WADE (RES.)                           4973

10:12AM  1    AND THAT WAS THE ANSWER THAT WE WERE GIVEN.

10:12AM  2         AND THEN SHE TOLD US THAT THEY WERE MOVING TO DO FDA

10:12AM  3    APPROVAL ON EVERY TEST.

10:12AM  4    Q.   AND WHAT WAS YOUR UNDERSTANDING AS TO WHY FDA APPROVAL WAS

10:12AM  5    NEEDED?

10:12AM  6    A.   SHE SAID IT WASN'T NEEDED.

10:12AM  7    Q.   OKAY.  BUT WHAT WAS YOUR UNDERSTANDING WHY THEY WERE

10:12AM  8    GETTING FDA APPROVAL?

10:12AM  9    A.   BECAUSE THEY MADE THEIR OWN ANALYZER EQUIPMENT.  THAT WAS

10:12AM  10   THE ANSWER THAT SHE GAVE.

10:12AM  11   Q.   RIGHT.  AND IN ORDER FOR THEM TO DISTRIBUTE THEIR ANALYZER

10:12AM  12   EQUIPMENT, THEY HAD TO GET FDA APPROVAL; CORRECT?

10:12AM  13   A.   THAT'S NOT WHAT THE -- SHE -- WE ASKED SPECIFICALLY, DO

10:12AM  14   YOU NEED FDA APPROVAL?

10:12AM  15        AND SHE SAID, NO, BECAUSE WE MAKE OUR OWN ANALYZER.

10:12AM  16        AND THEN SHE SAID WE'RE GOING TO TAKE IT ONE STEP FURTHER

10:12AM  17   AND APPROVE EVERY ONE OF OUR TESTS.

10:12AM  18   Q.   OKAY.  THAT WAS YOUR UNDERSTANDING IN THAT MEETING; RIGHT?

10:12AM  19   A.   YES.

10:12AM  20   Q.   OKAY.  AND DID YOU DO ANY RESEARCH TO MAKE SURE THAT YOU

10:12AM  21   UNDERSTOOD THAT CORRECTLY?

10:12AM  22   A.   NO.

10:12AM  23   Q.   OKAY.

10:12AM  24   A.   WE RELIED ON WHAT SHE SAID.

10:12AM  25   Q.   THIS STATEMENT -- THE STATEMENT THAT WE'RE REFERRING TO

PETERSON CROSS BY MR. WADE (RES.)                                      4974

10:13AM   1    COMES DIRECTLY OUT OF THE ARTICLE; RIGHT?

10:13AM   2    A.   YES.

10:13AM   3    Q.   OKAY.  AND YOU SAID, YOU SAID LAST WEEK THAT YOU HAD NOTES

10:13AM   4    OF THE MEETING --

10:13AM   5    A.   YES.

10:13AM   6    Q.   -- THAT HAPPENED AT THERANOS?

10:13AM   7    A.   YES.

10:13AM   8    Q.   DO YOU STILL HAVE THOSE NOTES?

10:13AM   9    A.   NO.

10:13AM   10   Q.   DID YOU DESTROY THEM?

10:13AM   11   A.   THEY TURNED INTO MY MEMO.

10:13AM   12   Q.   OKAY.

10:13AM   13   A.   THAT'S VERY TYPICAL FOR ME.  I WRITE STUFF OUT, I TYPE UP

10:13AM   14   A MEMO, AND I TOSS THE NOTES AND PUT THE MEMO IN THE FILE.

10:13AM   15   Q.   LET ME CALL YOUR ATTENTION TO 10588.

10:13AM   16        AND WHILE WE'RE BRINGING THAT UP, DO YOU RECALL PREVIOUSLY

10:13AM   17   TELLING THE GOVERNMENT THAT YOU DIDN'T TAKE NOTES IN THAT

10:13AM   18   MEETING APART FROM THE NOTES IN THE FINANCIAL STATEMENTS?

10:14AM   19   A.   I DON'T RECALL SAYING THAT, AND IT WAS A LONG MEETING.

10:14AM   20        AND I DEFINITELY TOOK NOTES ON THE FINANCIALS, SO --

10:14AM   21   Q.   RIGHT.  SO DID YOU TAKE ANY -- DO YOU RECALL TELLING THE

10:14AM   22   GOVERNMENT THAT YOU DIDN'T TAKE ANY NOTES OTHER THAN THE NOTES

10:14AM   23   ON THE FINANCIAL STATEMENTS?

10:14AM   24   A.   I DON'T RECALL SAYING THAT.  THE DETAILS IN THE MEMO CAME

10:14AM   25   FROM THAT MEETING.

PETERSON CROSS BY MR. WADE (RES.)                                    4975

10:14AM  1    Q.   DO YOU HAVE EXHIBIT 10588 IN FRONT OF YOU?

10:14AM  2    A.   YES.

10:14AM  3    Q.   OKAY.  AND DO YOU RECALL THAT MR. LEACH ASKED YOU SOME

10:14AM  4    QUESTIONS ABOUT THIS DOCUMENT?

10:14AM  5    A.   YES.

10:14AM  6    Q.   AND QUICKLY, YOU UNDERSTOOD THIS IS THE CONTRACTUAL

10:14AM  7    AGREEMENT BETWEEN THE PARTIES?

10:14AM  8    A.   YES.

10:14AM  9    Q.   A LEGALLY BINDING DOCUMENT; RIGHT?

10:14AM  10   A.   YES.

10:14AM  11   Q.   OKAY.  LET'S GO TO PAGE 7 OF THE DOCUMENT.  THERE MAY BE A

10:15AM  12   DIFFERENT VERSION OF THIS.

10:15AM  13        I MOVE EXHIBIT 10588 INTO EVIDENCE.

10:15AM  14        I THINK YOU WERE PREVIOUSLY SHOWN AN UNSIGNED VERSION.

10:15AM  15             MR. LEACH:  NO OBJECTION, YOUR HONOR.

10:15AM  16             THE COURT:  10588 IS ADMITTED, AND IT MAY BE

10:15AM  17   PUBLISHED.

10:15AM  18        (DEFENDANT'S EXHIBIT 10588 WAS RECEIVED IN EVIDENCE.)

10:15AM  19   BY MR. WADE:

10:15AM  20   Q.   AND JUST SO THE RECORD IS CLEAR, YOU RECALL THAT MR. LEACH

10:15AM  21   SHOWED YOU I THINK A VERSION OF THIS DOCUMENT THAT WAS ATTACHED

10:15AM  22   TO AN EMAIL?

10:15AM  23   A.   YES.

10:15AM  24   Q.   AND DO YOU SEE THAT THIS DOCUMENT IS A VERSION THAT ON

10:15AM  25   PAGE BATES LABELLED 6816 IS ACTUALLY SIGNED BY MS. HOLMES?

PETERSON CROSS BY MR. WADE (RES.)                                    4976

10:15AM  1          IT'S ON THE SCREEN FOR YOU.

10:15AM  2     A.   OKAY.  YES.

10:15AM  3     Q.   OKAY.  THE -- LET'S GO TO PAGE 7.  LET'S GO TO

10:16AM  4     PARAGRAPH 4.4.

10:16AM  5          AND DO YOU SEE THERE THAT THERE'S AN ACKNOWLEDGEMENT BY

10:16AM  6     RDV THAT THIS IS A SPECULATIVE INVESTMENT?

10:16AM  7     A.   YES.

10:16AM  8     Q.   OKAY.  AND IT NOTES SPECIFICALLY THAT THE COMPANY HAS

10:16AM  9     LIMITED FINANCIAL AND OPERATING HISTORY.

10:16AM 10          DO YOU SEE THAT?

10:16AM 11     A.   I SEE THE NOTE, YES.

10:16AM 12     Q.   AND THAT AN INVESTMENT IN THE COMPANY IS HIGHLY

10:16AM 13     SPECULATIVE AND IT INVOLVES SUBSTANTIAL RISKS.

10:16AM 14          DO YOU SEE THAT?

10:16AM 15     A.   YES.

10:16AM 16     Q.   AND RDV ACKNOWLEDGED THAT WHEN IT MADE THIS INVESTMENT;

10:16AM 17     CORRECT?

10:16AM 18     A.   IT DID.  BUT WE ALSO RELIED ON WHAT WE HEARD.

10:17AM 19               MR. WADE:  MOVE TO STRIKE THE LAST PART, YOUR HONOR.

10:17AM 20               THE COURT:  THE LAST COMMENT IS STRICKEN.

10:17AM 21               MR. WADE:  AFTER "WE DID."

10:17AM 22               THE COURT:  YES.  IT'S STRICKEN, YES.

10:17AM 23               MR. WADE:  LET'S GO TO 4.5.

10:17AM 24     Q.   DO YOU SEE THAT THIS PARAGRAPH TALKS ABOUT ACCESS TO DATA?

10:17AM 25     A.   YES.

PETERSON CROSS BY MR. WADE (RES.)                                    4977

10:17AM  1    Q.    OKAY.  AND IT TALKS ABOUT HOW THE INVESTOR HAD AN

10:17AM  2    OPPORTUNITY TO ASK QUESTIONS OF, RECEIVE ANSWER FROM, AND

10:17AM  3    REVIEW WHATEVER MATERIALS IT FELT THAT IT NEEDED TO; CORRECT?

10:17AM  4    A.    YES.

10:17AM  5    Q.    OKAY.  AND IF YOU GO DOWN A FEW LINES, THERE'S A SENTENCE

10:17AM  6    ON THE VERY RIGHT THAT STARTS WITH "SUCH."

10:17AM  7         DO YOU SEE THAT?

10:17AM  8         IT SAYS, "SUCH INVESTOR UNDERSTANDS THAT SUCH DISCUSSIONS,

10:18AM  9    AS WELL AS ANY INFORMATION ISSUED BY THE COMPANY, WERE INTENDED

10:18AM  10   TO DESCRIBE CERTAIN ASPECTS OF THE COMPANY'S BUSINESS AND

10:18AM  11   PROSPECTS, BUT WERE NOT NECESSARILY A THOROUGH OR EXHAUSTIVE

10:18AM  12   DESCRIPTION."

10:18AM  13        DO YOU SEE THAT?

10:18AM  14   A.    YES.

10:18AM  15   Q.    OKAY.  AND RDV AGREED TO THIS; RIGHT?

10:18AM  16   A.    YES.

10:18AM  17   Q.    OKAY.  NOW, LET'S GO -- LET'S LOOK AT THE NEXT SENTENCE.

10:18AM  18        DO YOU RECALL THAT THERE WAS A LOT OF DISCUSSION ABOUT

10:18AM  19   PROJECTIONS; RIGHT?

10:18AM  20   A.    YES.

10:18AM  21   Q.    AND PROJECTIONS ARE FORWARD LOOKING STATEMENTS; RIGHT?

10:18AM  22   A.    YES.

10:18AM  23   Q.    AND SO THERE CAN BE A FAIR AMOUNT OF UNCERTAINTY

10:18AM  24   ASSOCIATED WITH THOSE PROJECTIONS; RIGHT?

10:18AM  25   A.    THERE CAN BE.

PETERSON CROSS BY MR. WADE (RES.)                                    4978

10:18AM  1    Q.   OKAY.  LET'S LOOK AT THE LANGUAGE HERE.

10:18AM  2         DO YOU SEE WHERE IT SAYS THAT "SUCH INVESTOR ACKNOWLEDGES

10:18AM  3    THAT ANY BUSINESS PLANS PREPARED BY THE COMPANY HAVE BEEN, AND

10:18AM  4    CONTINUE TO BE, SUBJECT TO CHANGE."

10:19AM  5         DO YOU SEE THAT?

10:19AM  6    A.   YES.

10:19AM  7    Q.   AND THAT MEANS THAT WHEN YOU INVEST IN A COMPANY, YOU

10:19AM  8    DON'T NECESSARILY GET TO MAKE ALL OF THE DECISIONS ABOUT HOW

10:19AM  9    IT'S RUN ON A DAY-TO-TO BASIS; RIGHT?

10:19AM  10   A.   CORRECT.

10:19AM  11   Q.   AND SOMETIMES THINGS CHANGE; RIGHT?

10:19AM  12   A.   YES.

10:19AM  13   Q.   OKAY.  AND THEN IT SAYS IT SPECIFICALLY ADDRESSES

10:19AM  14   PROJECTIONS.  DO YOU SEE?  AND IT SAYS, "ANY PROJECTIONS

10:19AM  15   INCLUDED IN SUCH BUSINESS PLANS OR OTHERWISE ARE NECESSARILY

10:19AM  16   SPECULATIVE IN NATURE, AND IT CAN BE EXPECTED THAT SOME OR ALL

10:19AM  17   OF THE ASSUMPTIONS UNDERLYING THE PROJECTIONS WILL NOT

10:19AM  18   MATERIALIZE OR WILL VARY SIGNIFICANTLY FROM ACTUAL RESULTS."

10:19AM  19        DO YOU SEE THAT?

10:19AM  20   A.   WE WERE SITTING IN AN OFFICE IN MID-OCTOBER WITH 150

10:19AM  21   MILLION OF REVENUE ON THE BOOKS AND A BREAK EVEN CASH FLOW.

10:19AM  22        IF THERE WAS -- IF THEY WERE GOING TO END WILDLY DIFFERENT

10:19AM  23   FROM THAT, THEY SHOULD HAVE SAID SO.  THERE WERE TWO MONTHS TO

10:19AM  24   GO IN THE YEAR.

10:19AM  25             MR. WADE:  I MOVE TO STRIKE THAT ANSWER, YOUR HONOR,

PETERSON CROSS BY MR. WADE (RES.)                                4979

10:20AM   1    AS NONRESPONSIVE.

10:20AM   2            THE COURT:  MS. PETERSON, I'M GOING TO ASK MR. WADE

10:20AM   3    TO REPEAT HIS QUESTION AGAIN, AND THEN JUST PLEASE LISTEN TO

10:20AM   4    HIS QUESTION AND SEE IF YOU CAN ANSWER.

10:20AM   5            THE WITNESS:  OKAY.

10:20AM   6    BY MR. WADE:

10:20AM   7    Q.   OKAY.  DO YOU SEE HERE IN THE AGREEMENT THAT RDV SIGNED

10:20AM   8    WITH THE COMPANY THAT SAYS, "IT CAN BE EXPECTED THAT SOME OR

10:20AM   9    ALL OF THE ASSUMPTIONS UNDERLYING THE PROJECTIONS WILL NOT

10:20AM  10    MATERIALIZE OR WILL VARY SIGNIFICANTLY FROM THE ACTUAL

10:20AM  11    RESULTS"?

10:20AM  12            DO YOU SEE THAT?

10:20AM  13    A.   YES, I SEE THAT.

10:20AM  14    Q.   OKAY.  AND RDV AGREED TO THAT; CORRECT?

10:20AM  15    A.   YES.

10:20AM  16    Q.   OKAY.  AND DO YOU SEE BELOW IT -- I'M DONE WITH THIS

10:20AM  17    PARAGRAPH.

10:20AM  18            DO YOU SEE IN 4.6 IT REFERS TO AN ACCREDITED INVESTOR?

10:20AM  19    A.   YES.

10:20AM  20    Q.   OKAY.  AND YOU KNOW THERE ARE SPECIAL RULES THAT APPLY TO

10:20AM  21    ACCREDITED INVESTORS?

10:20AM  22            ARE YOU AWARE OF THAT?

10:20AM  23    A.   YES.

10:20AM  24    Q.   AND AS A GENERAL MATTER, IS IT FAIR TO SAY THAT THESE

10:20AM  25    ARE -- THIS IS A CERTIFICATION THAT YOU'RE SLIGHTLY MORE

PETERSON CROSS BY MR. WADE (RES.)                          4980

10:21AM  1    SOPHISTICATED THAN A BEGINNING INVESTOR?

10:21AM  2    A.   YES.

10:21AM  3    Q.   AND OFTENTIMES IT'S BASED ON NET WORTH AND THE LIKE?

10:21AM  4    A.   YES.

10:21AM  5    Q.   OKAY.  AND THAT'S BECAUSE SOME -- FOR CERTAIN KINDS OF

10:21AM  6    TRANSACTIONS, THEY'RE COMPLICATED; RIGHT?

10:21AM  7    A.   YES.

10:21AM  8    Q.   AND BOTH PARTIES WANT TO ASSURE THAT THERE'S A LEVEL OF

10:21AM  9    SOPHISTICATION THAT EXISTS SO THAT PEOPLE UNDERSTAND THINGS;

10:21AM 10    RIGHT?

10:21AM 11    A.   YES.

10:21AM 12    Q.   OKAY.  AND RDV WAS AN ACCREDITED INVESTOR; CORRECT?

10:21AM 13    A.   YES.

10:21AM 14    Q.   OKAY.

10:21AM 15    A.   BUT YOU'RE TRYING TO MEASURE OUR SOPHISTICATION AS AN

10:21AM 16    INVESTOR WHEN WE WEREN'T GIVEN COMPLETE INFORMATION.

10:21AM 17         MR. WADE:  MOVE TO STRIKE THE LAST STATEMENT.

10:21AM 18         THE COURT:  THAT LAST PORTION IS STRICKEN.

10:21AM 19    AND, MS. PETERSON, JUST WAIT FOR HIS QUESTIONS AND THEN

10:21AM 20    YOU CAN ANSWER HIS QUESTIONS, PLEASE.

10:21AM 21         THE WITNESS:  OKAY.

10:21AM 22         MR. WADE:  LET'S GO TO 7.8.  IT'S ON PAGE 17.

10:22AM 23    Q.   DO YOU SEE THIS AGREEMENT?  DO YOU SEE THIS SECTION

10:22AM 24    "ENTIRE AGREEMENT"?

10:22AM 25    A.   YES.

PETERSON CROSS BY MR. WADE (RES.)                                    4981

10:22AM  1   Q.   AND THAT TALKS ABOUT HOW, "THIS AGREEMENT, INCLUDING THE

10:22AM  2   EXHIBITS ATTACHED HERETO, CONSTITUTE THE FULL AND ENTIRE

10:22AM  3   UNDERSTANDING AND AGREEMENT AMONG THE PARTIES WITH REGARD TO

10:22AM  4   ANY SUBJECTS HEREOF AND SUPERSEDE ANY PRIOR AGREEMENTS OR

10:22AM  5   UNDERSTANDINGS WITH RESPECT TO THE SUBJECT MATTER HEREOF."

10:22AM  6        DO YOU SEE THAT?

10:22AM  7   A.   YES.

10:22AM  8   Q.   AND RDV AGREED TO THAT; CORRECT?

10:22AM  9   A.   YES.

10:22AM  10  Q.   OKAY.  AND ULTIMATELY MR. SCHIERBEEK SIGNED THIS

10:22AM  11  AGREEMENT; CORRECT?

10:22AM  12  A.   YES, ON BEHALF OF DYNASTY II.

10:23AM  13  Q.   AND DO YOU RECALL THAT THE COMPANY PAID $17 A SHARE?

10:23AM  14  A.   YES.

10:23AM  15  Q.   AND SO JUST A COUPLE OF MORE QUESTIONS TO MAKE SURE THAT I

10:23AM  16  AM CLEAR.

10:23AM  17       WITHIN RDV, MR. TUBERGEN ORIGINATED THIS INVESTMENT;

10:23AM  18  CORRECT?

10:23AM  19  A.   YES.

10:23AM  20  Q.   AND HE BROUGHT IT BACK TO THE DEVOS FAMILY; CORRECT?

10:23AM  21  A.   YES.

10:23AM  22  Q.   AND SPECIFICALLY TO THE MEMBERS OF THE INVESTMENT

10:23AM  23  COMMITTEE; RIGHT?

10:23AM  24  A.   YES, TO THE MEMBERS OF THE G2.

10:23AM  25  Q.   AND IT WAS THOSE MEMBERS OF THE INVESTMENT COMMITTEE THAT

UNITED STATES COURT REPORTERS

**ER-8596**

10:23AM  1    WERE EMPOWERED TO MAKE THE DECISION TO MAKE AN INVESTMENT ON

10:23AM  2    BEHALF OF RDV; CORRECT?

10:23AM  3    A.   YES.

10:23AM  4    Q.   OKAY.  AND ULTIMATELY THEY'RE THE ONES WHO MADE THAT

10:23AM  5    DECISION IN CONSULTATION WITH MR. TUBERGEN; RIGHT?

10:23AM  6    A.   YES.

10:23AM  7    Q.   AND THE PEOPLE WHO MADE THE DECISION WERE RICK DEVOS,

10:24AM  8    DOUG DEVOS, DAN DEVOS, AND DICK DEVOS; CORRECT?

10:24AM  9    A.   YES.

10:24AM  10          MR. WADE:  I HAVE NO FURTHER QUESTIONS AT THIS TIME,

10:24AM  11   YOUR HONOR.

10:24AM  12          THE COURT:  MR. LEACH, REDIRECT?

10:24AM  13          MR. LEACH:  YES, YOUR HONOR.  THANK YOU.

10:24AM  14      (PAUSE IN PROCEEDINGS.)

10:25AM  15          MR. LEACH:  MAY I INQUIRE, YOUR HONOR?

10:25AM  16          THE COURT:  YES, THANK YOU.

10:25AM  17                 **REDIRECT EXAMINATION**

10:25AM  18   BY MR. LEACH:

10:25AM  19   Q.   GOOD MORNING, MS. PETERSON.  WELCOME BACK.

10:25AM  20   A.   GOOD MORNING.

10:25AM  21   Q.   LET ME START WHERE MR. WADE CONCLUDED, WITH SOME QUESTIONS

10:25AM  22   ABOUT THE LEGAL DOCUMENTS THAT RDV SIGNED IN CONNECTION WITH

10:25AM  23   THE INVESTMENT, AND I THINK HE WALKED THROUGH SOME LANGUAGE

10:25AM  24   THAT THE GOVERNMENT HAD ALSO GONE THROUGH ABOUT RDV'S

10:25AM  25   ACCREDITED INVESTMENT STATUS AND THE NATURE OF THE INVESTMENT.

PETERSON REDIRECT BY MR. LEACH                                    4983

10:25AM   1          DO YOU RECALL THAT TESTIMONY?

10:25AM   2     A.   YES.

10:25AM   3     Q.   AND HE SHOWED YOU SOME LANGUAGE ABOUT THIS BEING THE

10:26AM   4     ENTIRE AGREEMENT.

10:26AM   5          DID YOU UNDERSTAND THAT TO MEAN THAT ANYTHING THAT

10:26AM   6     MS. HOLMES OR MR. BALWANI HAD SAID TO RDV TO INDUCE THE

10:26AM   7     INVESTMENT WAS, THEREFORE, NOT SOMETHING THAT YOU COULD RELY

10:26AM   8     ON?

10:26AM   9     A.   NO.

10:26AM   10    Q.   WHAT DID YOU UNDERSTAND THAT ENTIRE AGREEMENT LANGUAGE TO

10:26AM   11    MEAN?

10:26AM   12    A.   ANYTHING THAT WAS --

10:26AM   13              MR. WADE:  YOUR HONOR, I THINK THIS GOES INTO 701,

10:26AM   14    702.

10:26AM   15              THE COURT:  I DON'T THINK IT'S A 702 ISSUE.  I THINK

10:26AM   16    THERE WAS A LOT OF QUESTIONING ABOUT HER, WHAT SHE DID FOR THE

10:26AM   17    COMPANY.  I THINK WE KNOW THAT.

10:26AM   18         AND I DO THINK IT IS APPROPRIATE FOR HER TO ANSWER THE

10:26AM   19    FULSOMENESS OF WHAT SHE DID.

10:26AM   20         SO I'M GOING TO OVERRULE THE OBJECTION.

10:26AM   21              MR. WADE:  OKAY.

10:26AM   22    BY MR. LEACH:

10:26AM   23    Q.   WHAT WAS YOUR UNDERSTANDING, MS. PETERSON?

10:26AM   24    A.   EVERYTHING THAT WAS SAID TO US WE BELIEVE IS FAIR GAME FOR

10:26AM   25    US TO MAKE OUR INVESTMENT DECISION ON AND WHAT WE RELIED ON,

PETERSON REDIRECT BY MR. LEACH                                    4984

10:26AM   1    NOT JUST WHAT WE READ IN WRITING, BUT ALSO WHAT WE WERE TOLD.

10:26AM   2    Q.   WAS THERE ANYTHING IN THE DOCUMENT THAT YOU SAW THAT SAID

10:26AM   3    RDV SHOULD NOT RELY ON THE VERBAL REPRESENTATIONS BY MS. HOLMES

10:27AM   4    OR THE WRITTEN MATERIALS THAT YOU RECEIVED?

10:27AM   5    A.   NO.

10:27AM   6    Q.   OKAY.  HE ALSO ASKED YOU SOME QUESTIONS ABOUT THE

10:27AM   7    PROJECTIONS THAT WERE PROVIDED TO RDV, AND YOU UNDERSTAND THE

10:27AM   8    PROJECTIONS ARE FORWARD LOOKING; CORRECT?

10:27AM   9    A.   YES.

10:27AM   10   Q.   AND YOU HAD -- AND YOU REVIEWED THOSE PROJECTIONS

10:27AM   11   CAREFULLY; CORRECT?

10:27AM   12   A.   YES.

10:27AM   13   Q.   DID YOU IN ANY WAY DREAM THAT THERANOS WOULD HAVE -- AND

10:27AM   14   YOU RECALL THE PROJECTIONS WERE FOR 140 MILLION --

10:27AM   15   A.   YES.

10:27AM   16   Q.   -- IN 2014?  I THINK YOU VOLUNTEERED THAT NUMBER?

10:27AM   17   A.   YES.

10:27AM   18   Q.   DID YOU IN ANY WAY DREAM THE REVENUE FOR THAT YEAR WOULD

10:27AM   19   BE ZERO?

10:27AM   20   A.   NO.

10:27AM   21   Q.   DID YOU IN ANY WAY DREAM THAT THE REVENUE IN 2015 WOULD BE

10:27AM   22   LESS THAN $500,000?

10:27AM   23   A.   NO.

10:27AM   24   Q.   OKAY.  AND IT SEEMED LIKE YOU WANTED TO EXPLAIN WHY EVEN

10:27AM   25   THOUGH THESE ARE FORWARD LOOKING, YOU WERE STILL SURPRISED BY

PETERSON REDIRECT BY MR. LEACH                                    4985

10:27AM   1     NOT HITTING THE PROJECTIONS.

10:27AM   2          CAN YOU EXPLAIN?

10:28AM   3     A.   PROJECTIONS, IS N OUR WORLD, THEY SHOULD BE SOMEWHAT

10:28AM   4     CLOSE.   THERE'S DEFINITE RISK IN ACCEPTING PROJECTIONS.

10:28AM   5          BUT WE WERE TOLD THERE WAS 900 WAL-MART -- OR WALGREENS

10:28AM   6     STORES THAT WERE GOING TO OPEN THAT BACKED UP THE PROJECTIONS

10:28AM   7     FOR THE NEXT YEAR, ALONG WITH 300 SAFEWAY STORES.

10:28AM   8          IT WAS THAT THAT WE USED TO BASE OUR THOUGHT AROUND THE

10:28AM   9     PROJECTIONS, COULD THEY REACH THAT NUMBER.

10:28AM   10         EVEN IF THEY DIDN'T REACH THE $990 MILLION THAT THEY SAID

10:28AM   11    THEY WERE GOING TO DO FOR THE NEXT YEAR, EVEN IF THEY HAD

10:28AM   12    REACHED 300 MILLION, THAT WOULD HAVE BEEN A SUCCESSFUL DEAL FOR

10:28AM   13    US.

10:28AM   14         THEY WERE MOVING THE BALL FORWARD.

10:28AM   15         BUT THE FACT THAT THEY JUST DID ZERO TELLS US THAT WHAT

10:28AM   16    THEY WERE TELLING US WASN'T TRUE.

10:28AM   17    Q.   YOU WERE ALSO ASKED A NUMBER OF QUESTIONS ABOUT THE

10:28AM   18    "FORTUNE" ARTICLE THAT YOU WERE PROVIDED AT SOME POINT IN

10:28AM   19    SEPTEMBER OF '14.

10:29AM   20    A.   YES.

10:29AM   21    Q.   DO YOU RECALL THAT TESTIMONY?

10:29AM   22    A.   YES.

10:29AM   23    Q.   AND IF I COULD -- AND YOU WERE ASKED -- YOU GOT

10:29AM   24    INFORMATION FROM THE "FORTUNE" ARTICLE, FROM OTHER PUBLIC

10:29AM   25    SOURCES, FROM A CONVERSATION WITH MS. HOLMES, AND A MEETING

| | | |
|---|---|---|
| 10:29AM | 1 | WITH MS. HOLMES AND MR. BALWANI IN PALO ALTO. |
| 10:29AM | 2 | IS THAT A FAIR SUMMARY? |
| 10:29AM | 3 | A.   YES. |
| 10:29AM | 4 | Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO EXHIBIT 455, OR 4858. |
| 10:29AM | 5 | A.   OKAY. |
| 10:29AM | 6 | Q.   DO YOU RECALL THIS TO BE THE POWERPOINT DECK AMONG THE |
| 10:29AM | 7 | INVESTMENT MATERIALS THAT THERANOS PROVIDED TO RDV? |
| 10:29AM | 8 | A.   YES. |
| 10:29AM | 9 | Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO PAGE 49. |
| 10:30AM | 10 | AND IF WE COULD PLEASE DISPLAY THIS, MS. HOLLIMAN. |
| 10:30AM | 11 | DO YOU SEE THE FIRST PAGE OF THIS SLIDE DECK ON THE |
| 10:30AM | 12 | SCREEN, MS. PETERSON? |
| 10:30AM | 13 | A.   YES. |
| 10:30AM | 14 | Q.   AND IF WE COULD PLEASE GO TO PAGE 49. |
| 10:30AM | 15 | DO YOU SEE THE TITLE "RECENT PRESS"? |
| 10:30AM | 16 | A.   YES. |
| 10:30AM | 17 | Q.   AND DO YOU SEE TO THE RIGHT AN IMAGE OF MS. HOLMES |
| 10:30AM | 18 | UNDERNEATH THE HEADING "FORTUNE," "THIS CEO IS OUT FOR BLOOD"? |
| 10:30AM | 19 | A.   YES. |
| 10:30AM | 20 | Q.   AND DID YOU UNDERSTAND THIS TO BE THERANOS REFERRING YOU |
| 10:30AM | 21 | TO THIS SPECIFIC ARTICLE AS PART OF THE UNIVERSE OF INFORMATION |
| 10:31AM | 22 | THAT YOU SHOULD CONSIDER? |
| 10:31AM | 23 | A.   YES. |
| 10:31AM | 24 | Q.   IN YOUR MEETING IN PALO ALTO WITH MS. HOLMES, DID YOU ASK |
| 10:31AM | 25 | HER QUESTIONS ABOUT SOME OF THE FACTS THAT WERE ASSERTED IN THE |

PETERSON REDIRECT BY MR. LEACH                                    4987

10:31AM   1    ARTICLE?

10:31AM   2    A.   YES.

10:31AM   3    Q.   AND AT ANY POINT IN TIME, DID SHE SAY, DON'T RELY ON THAT

10:31AM   4    PIECE OF INFORMATION FROM THE PARLOFF ARTICLE, THAT'S NOT

10:31AM   5    RIGHT?

10:31AM   6    A.   NEVER, NO.

10:31AM   7    Q.   DID SHE SAY ANYTHING TO THE EFFECT OF THAT LINE ABOUT

10:31AM   8    THIRD PARTY -- US NOT USING THIRD PARTY DEVICES, THAT'S NOT

10:31AM   9    RIGHT, LET ME CORRECT YOUR UNDERSTANDING THERE?

10:31AM   10   A.   NO.

10:31AM   11   Q.   SHE HELD THAT OUT AS SOMETHING YOU SHOULD RELY ON; IS THAT

10:31AM   12   FAIR?

10:31AM   13   A.   YES.

10:31AM   14   Q.   YOU WERE ALSO ASKED A NUMBER OF QUESTIONS ABOUT

10:31AM   15   FORWARD-LOOKING STATEMENTS IN THE POWERPOINT.

10:31AM   16        AND I THINK MR. WADE ASKED YOU ABOUT PAGE 19.

10:31AM   17        IF WE COULD DISPLAY THAT.

10:31AM   18        AND DO YOU SEE THERE TO BE SOME COST SAVINGS ESTIMATES

10:32AM   19   FROM 2014 TO 2023 IN THE LEFT GRAPH, AND THEN THE SAME PERIOD

10:32AM   20   IN THE RIGHT GRAPH?

10:32AM   21   A.   YES.

10:32AM   22   Q.   AND YOU UNDERSTOOD AT THE TIME THAT THESE WERE FORWARD

10:32AM   23   LOOKING PROJECTIONS?

10:32AM   24   A.   YES.

10:32AM   25   Q.   AND DO YOU SEE WHERE IT SAYS, FOR 2014, THERE'S AN E AFTER

UNITED STATES COURT REPORTERS

**ER-8602**

PETERSON REDIRECT BY MR. LEACH                                    4988

10:32AM   1      THAT?

10:32AM   2      A.   YES.

10:32AM   3      Q.   AND THAT E CONTINUES ALL OF THE WAY OUT TO 2023.

10:32AM   4           DO YOU SEE THAT?

10:32AM   5      A.   YES.

10:32AM   6      Q.   AND IS THAT WHAT HELPED YOU UNDERSTAND THAT THESE WERE

10:32AM   7      FORWARD-LOOKING STATEMENTS?

10:32AM   8      A.   YES.

10:32AM   9      Q.   AND THE E STANDS FOR ESTIMATE?

10:32AM   10     A.   YES, AND THOSE YEARS HADN'T HAPPENED YET.

10:32AM   11     Q.   OKAY.  SO THERE WAS INFORMATION ON THIS SLIDE THAT TOLD

10:32AM   12     YOU THAT THIS SLIDE WAS FORWARD LOOKING?

10:32AM   13     A.   YES.

10:32AM   14     Q.   AND MR. WADE ALSO SHOWED YOU PAGE 20.  IF WE CAN PLEASE

10:32AM   15     LOOK AT THAT.

10:32AM   16          IS THIS ANOTHER EXAMPLE WHERE THE USE OF E'S NEXT TO

10:32AM   17     FUTURE TIME PERIODS INDICATED TO YOU THAT THIS WAS SLIDE WAS

10:32AM   18     FORWARD LOOKING?

10:32AM   19     A.   YES.

10:32AM   20     Q.   AND I THINK MR. WADE ALSO SHOWED YOU PAGE 40.

10:33AM   21          DO YOU SEE WHERE IT SAYS, "THERANOS'S FOOTPRINT UPON

10:33AM   22     NATIONAL DEPLOYMENT"?

10:33AM   23     A.   YES.

10:33AM   24     Q.   AND YOU UNDERSTOOD "UPON" TO REFER TO SOMETHING THAT WOULD

10:33AM   25     HAPPEN IN THE FUTURE?

PETERSON REDIRECT BY MR. LEACH                                      4989

10:33AM  1    A.   YES.

10:33AM  2    Q.   LET ME SHOW YOU SOME OTHER SLIDES.  IF WE COULD GO,

10:33AM  3    PLEASE, TO PAGE 3.

10:33AM  4         AND IN THE FIRST SUBSTANTIVE PARAGRAPH IT SAYS,

10:33AM  5    "THERANOS'S PROPRIETARY, PATENTED TECHNOLOGY RUNS COMPREHENSIVE

10:33AM  6    BLOOD TESTS FROM A FINGERSTICK."

10:33AM  7         DO YOU SEE THAT?

10:33AM  8    A.   YES.

10:33AM  9    Q.   AND I WANT TO FOCUS ON THE WORD "RUNS."

10:33AM  10        DID YOU UNDERSTAND THAT TO BE THE PRESENT TENSE?

10:33AM  11   A.   YES.

10:33AM  12   Q.   AND DID YOU UNDERSTAND THAT TO BE FORWARD LOOKING?

10:33AM  13   A.   NO.

10:33AM  14   Q.   DOES THIS SAY "WILL IN THE FUTURE RUN"?

10:34AM  15   A.   IT SAYS THEY'RE DOING IT NOW AND WILL CONTINUE TO DO IT IN

10:34AM  16   THE FUTURE, YES.

10:34AM  17   Q.   AND THAT'S WHAT YOU UNDERSTOOD AT THE TIME?

10:34AM  18   A.   YES.

10:34AM  19   Q.   IF WE COULD LOOK, PLEASE, AT --

10:34AM  20        OH, AND IN THE THIRD PARAGRAPH IT SAYS, "CURRENT AND PAST

10:34AM  21   CLIENTS INCLUDE 10 OF THE TOP 15 MAJOR PHARMACEUTICAL

10:34AM  22   COMPANIES, MIDSIZED BIO-PHARMAS, PROMINENT RESEARCH

10:34AM  23   INSTITUTIONS, HEALTH CARE PAYORS, AND U.S. AND FOREIGN

10:34AM  24   GOVERNMENT HEALTH AND MILITARY ORGANIZATIONS."

10:34AM  25        DO YOU SEE THAT LANGUAGE?

PETERSON REDIRECT BY MR. LEACH                                    4990

10:34AM  1    A.   YES.

10:34AM  2    Q.   AND YOU UNDERSTOOD THESE TO BE STATEMENTS ABOUT WHAT WAS

10:34AM  3    CURRENT AND WHAT HAPPENED IN THE PAST; IS THAT RIGHT?

10:34AM  4    A.   YES.

10:34AM  5    Q.   AND SO WHEN YOU TESTIFIED THAT MS. HOLMES TOLD YOU THAT

10:34AM  6    THERANOS WAS USING THE ANALYZER ON MILITARY HELICOPTERS --

10:34AM  7    A.   YES.

10:34AM  8    Q.   -- YOU THOUGHT THAT THAT WAS SOMETHING THAT THERANOS HAD

10:34AM  9    DONE?

10:34AM  10   A.   YES.

10:34AM  11   Q.   LET'S LOOK AT PAGE 7, PLEASE.

10:34AM  12        DO YOU RECALL TESTIFYING ABOUT THE PROFICIENCY TESTING

10:35AM  13   RESULTS THAT THERANOS HELD OUT TO YOU?

10:35AM  14   A.   YES.

10:35AM  15   Q.   AND YOU BELIEVED THAT THESE WERE PROFICIENCY TESTING

10:35AM  16   RESULTS THAT WERE ACHIEVED IN THE PAST, NOT SOMETHING THAT WAS

10:35AM  17   GOING TO HAPPEN IN THE FUTURE; CORRECT?

10:35AM  18   A.   CORRECT, BASED ON THE DATES.

10:35AM  19   Q.   AND YOU BELIEVED THESE PROFICIENCY TESTING RESULTS RELATED

10:35AM  20   TO THE ANALYZER THAT YOU HAD SEEN?

10:35AM  21   A.   YES.

10:35AM  22   Q.   OKAY.  NOBODY TOLD YOU THAT THERANOS WASN'T USING THE

10:35AM  23   ANALYZER IN THE CLIA LAB IN 2011?

10:35AM  24   A.   NO.

10:35AM  25   Q.   AND NO ONE TOLD YOU THAT THERANOS WAS NOT USING THE

PETERSON REDIRECT BY MR. LEACH                                    4991

10:35AM   1      ANALYZER IN THE CLIA LAB IN 2012?

10:35AM   2      A.   NO.

10:35AM   3      Q.   OR 2013?

10:35AM   4      A.   NO.

10:35AM   5      Q.   LET ME DRAW YOUR ATTENTION TO PAGE 8.

10:35AM   6           DO YOU SEE WHERE IT SAYS, "THERANOS HAS BEEN

10:35AM   7      COMPREHENSIVELY VALIDATED OVER THE COURSE OF THE LAST SEVEN

10:35AM   8      YEARS BY TEN OF THE FIFTEEN LARGEST PHARMACEUTICAL COMPANIES"?

10:35AM   9      A.   YES.

10:35AM   10     Q.   AND DID YOU UNDERSTAND THAT TO BE A STATEMENT OF WHAT HAD

10:35AM   11     HAPPENED IN THE PAST?

10:36AM   12     A.   YES.

10:36AM   13     Q.   NOT SOMETHING THAT WAS FORWARD LOOKING?

10:36AM   14     A.   CORRECT, AND IT'S PERMANENTLY IN MY MEMO.

10:36AM   15     Q.   AND LET ME DRAW YOUR ATTENTION, PLEASE, TO PAGE 28.

10:36AM   16          DO YOU SEE WHERE IT SAYS, "THERANOS RUNS ANY TEST

10:36AM   17     AVAILABLE IN CENTRAL LABS"?

10:36AM   18     A.   YES.

10:36AM   19     Q.   AND RUNS AS IN THE PRESENT TENSE?

10:36AM   20     A.   YES.

10:36AM   21     Q.   NOT IN THE FUTURE TENSE?

10:36AM   22     A.   CORRECT.

10:36AM   23     Q.   AND THAT'S SOMETHING THAT YOU UNDERSTOOD THERANOS WAS

10:36AM   24     DOING AT THE TIME?

10:36AM   25     A.   YES.

PETERSON REDIRECT BY MR. LEACH                                      4992

10:36AM   1    Q.   MR. WADE ALSO ASKED YOU ABOUT THAT LANGUAGE AT THE END,

10:36AM   2    "PROCESSES ALL SAMPLE TYPES."

10:36AM   3         DID YOU THINK THAT THAT REFERRED TO SAMPLES SUCH AS URINE

10:36AM   4    OR BLOOD OR SOME OTHER MATRIX?

10:36AM   5              MR. WADE:  OBJECT TO THE FORM OF THE QUESTION,

10:36AM   6    YOUR HONOR.

10:36AM   7              THE COURT:  ASKING HER UNDERSTANDING, YES,

10:36AM   8    SUSTAINED.

10:36AM   9    BY MR. LEACH:

10:36AM   10   Q.   WHAT WAS YOUR UNDERSTANDING OF WHAT THAT MEANT?

10:36AM   11   A.   I TOOK IT TO MEAN THAT IT PROCESSES ALL TYPES OF SAMPLES

10:37AM   12   THAT CAN DO ALL TYPES OF TESTS.

10:37AM   13   Q.   OKAY.  DID YOU IN ANY WAY THINK THAT IT RELATED TO VENOUS

10:37AM   14   DRAWS?

10:37AM   15   A.   NO.

10:37AM   16   Q.   DID MS. HOLMES EVER EXPLAIN TO YOU THAT WE -- WHEN WE SAID

10:37AM   17   THAT LANGUAGE, WE MEANT VENOUS DRAWS?

10:37AM   18   A.   NO, WE DIDN'T HEAR THAT UNTIL THE "JOURNAL" ARTICLE.

10:37AM   19   Q.   DID THE IDEA OF THE VENOUS DRAWS EVER COME UP IN YOUR

10:37AM   20   CONVERSATIONS WITH MS. HOLMES?

10:37AM   21   A.   NO.

10:37AM   22   Q.   MR. WADE ASKED YOU A NUMBER OF QUESTIONS ABOUT 14212.

10:37AM   23        IF I COULD USE THE ELMO FOR THIS, MS. KRATZMANN.

10:37AM   24              THE CLERK:  YES.

10:37AM   25   BY MR. LEACH:

PETERSON REDIRECT BY MR. LEACH                                      4993

10:37AM  1    Q.   DO YOU RECALL BEING ASKED QUESTIONS ABOUT THIS DOCUMENT,

10:37AM  2    MS. PETERSON?

10:37AM  3    A.   YES.

10:37AM  4    Q.   AND CAN YOU GIVE US THE CONTEXT FOR WHAT THIS IS?

10:37AM  5    A.   SO THIS IS BOB AND OUR CFO AND OUR CONTROLLER JUST TRYING

10:38AM  6    TO UNDERSTAND WHERE THE FAMILY STANDS WITH FREE CASH AT THE

10:38AM  7    MOMENT, BECAUSE I'M SURE THERE WERE LOTS OF OTHER INVESTMENTS,

10:38AM  8    INCLUDING THIS ONE THAT WE'RE LOOKING AT, AND WE'RE CONSTANTLY

10:38AM  9    TRYING TO CASH FLOW PLAN WHEN AND WHAT IS COMING.

10:38AM  10        IT DOESN'T MEAN ANYTHING MORE THAN THAT IT COULD HAPPEN.

10:38AM  11   Q.   WHEN YOU SAY, "IT DOESN'T MEAN ANYTHING MORE THAN WHAT

10:38AM  12   COULD HAPPEN," WHAT DO YOU MEAN BY THAT?

10:38AM  13   A.   THEY NEED TO BE PREPARED IF WE WERE TO DO SOMETHING LIKE

10:38AM  14   THIS, BUT IT DOESN'T MEAN THAT WE WERE DOING IT.

10:38AM  15   Q.   DOES THAT MEAN IN YOUR MIND ANYTHING THAT YOU LEARN IN

10:38AM  16   YOUR SUBSEQUENT DILIGENCE OR OUT IN THE MEETING IN PALO ALTO

10:38AM  17   HAD NO RELEVANCE TO YOU?

10:38AM  18   A.   THAT'S NOT IT AT ALL, NO.  WE COULD HAVE LEARNED SOMETHING

10:38AM  19   THAT WOULD HAVE STOPPED THAT INVESTMENT, YES.

10:38AM  20   Q.   OKAY.  MR. WADE ALSO ASKED YOU SOME QUESTIONS ABOUT 14076.

10:39AM  21        DO YOU RECALL BEING ASKED QUESTIONS ABOUT THIS LETTER?

10:39AM  22   A.   YES.

10:39AM  23   Q.   AND YOUR MEMORY IS THAT THIS IS THE LETTER THAT

10:39AM  24   ACCOMPANIED THE BINDERS OF MATERIALS THAT YOU REVIEWED?

10:39AM  25   A.   YES.

PETERSON REDIRECT BY MR. LEACH                                    4994

10:39AM   1    Q.   OKAY.  AND MR. WADE WAS ASKING YOU QUESTIONS ABOUT THE

10:39AM   2    PARAGRAPH BEGINNING "ONCE THE COMPANY WAS READY."

10:39AM   3         YOU WANTED TO FOCUS ON THE THIRD PARAGRAPH, "HISTORICALLY,

10:39AM   4    THERANOS'S WORK WAS FOCUSSED ON CONTRACTS WITH PHARMACEUTICAL

10:39AM   5    AND MILITARY CLIENTS."

10:39AM   6         DO YOU RECALL BEING ASKED QUESTIONS ABOUT THE FIFTH

10:39AM   7    PARAGRAPH?

10:39AM   8    A.   YES.

10:39AM   9    Q.   OKAY.  AND WHAT WAS IT YOU WANTED TO SAY ABOUT THE THIRD

10:39AM  10    PARAGRAPH?

10:39AM  11    A.   THAT THEY HAD BEEN DOING WORK IN THE PAST, THAT SHE'S

10:39AM  12    SAYING IT RIGHT THERE IN HER LETTER, AND THAT WAS IMPORTANT TO

10:40AM  13    US.  WE REALLY RELIED ON THE FACT THAT THEY HAD BEEN DOING WORK

10:40AM  14    FOR PHARMACEUTICAL COMPANIES AND THE GOVERNMENT FOR YEARS.

10:40AM  15    Q.   I ALSO WANTED TO DRAW YOUR ATTENTION TO THE LAST PARAGRAPH

10:40AM  16    WHERE IT SAYS, "I AM HAPPY TO PROVIDE MORE BACKGROUND ON ANY OF

10:40AM  17    THE ABOVE, OR ANY OF THE MATERIALS ENCLOSED IN THIS PACKAGE.

10:40AM  18    THERANOS'S INVESTMENT DOCUMENTS ARE ENCLOSED HEREIN.  THE

10:40AM  19    ADDITIONAL MATERIALS FOCUS ON THE INFRASTRUCTURE THERANOS HAS

10:40AM  20    DEVELOPED AND THE INITIAL MARKET OF COMMERCIAL LABORATORY

10:40AM  21    TESTING."

10:40AM  22         DO YOU SEE THAT LANGUAGE?

10:40AM  23    A.   YES.

10:40AM  24    Q.   AND DID YOU UNDERSTAND THAT TO BE MS. HOLMES REFERRING YOU

10:40AM  25    TO THE FOOT OF MATERIALS THAT RDV HAD RECEIVED?

PETERSON REDIRECT BY MR. LEACH                                      4995

10:40AM   1    A.   YES.

10:40AM   2    Q.   YOU WERE ALSO ASKED SOME QUESTIONS ABOUT THE -- YOU WERE

10:40AM   3    ALSO ASKED QUESTIONS ABOUT A DOCUMENT WITH THE PFIZER LOGO.

10:40AM   4         AND IF WE CAN CALL THAT UP AT EXHIBIT 4858, PAGE 1 OF 6,

10:41AM   5    MS. HOLLIMAN.

10:41AM   6         AND IF WE CAN GO TO PAGE -- I'M SORRY, PLEASE GO TO

10:41AM   7    PAGE 129.

10:41AM   8         DO YOU RECALL BEING ASKED QUESTIONS ABOUT THIS DOCUMENT?

10:41AM   9    A.   YES.

10:41AM   10   Q.   AND AT THE TIME YOU REVIEWED THIS, YOU WERE NOT A

10:41AM   11   SCIENTIST?

10:41AM   12   A.   CORRECT.

10:41AM   13   Q.   OKAY.  YOU WERE RELYING ON THE HIGH LEVEL CONCLUSIONS OF

10:41AM   14   THE DOCUMENT?

10:41AM   15   A.   YES.

10:41AM   16   Q.   AND YOU BELIEVED THESE TO BE THE CONCLUSIONS OF PFIZER,

10:41AM   17   NOT THERANOS?

10:41AM   18   A.   YES.

10:41AM   19   Q.   DID THE FACT THAT THE THERANOS ADDRESS WAS LISTED ON PAGES

10:41AM   20   OF THE DOCUMENT IN ANY WAY CHANGE YOUR MIND ABOUT THAT?

10:41AM   21   A.   NO, NOT WHEN PFIZER'S LOGO IS ON THE PAGE.

10:41AM   22   Q.   OKAY.  AND YOU DO NOT MAKE REFERENCE TO THE PFIZER REPORT

10:41AM   23   ITSELF IN THE RDV APPROVAL DOCUMENT.

10:42AM   24        WHY IS THAT?

10:42AM   25   A.   BECAUSE WE THOUGHT IT WAS ONE OF MANY PHARMACEUTICAL

PETERSON REDIRECT BY MR. LEACH                                    4996

| | | |
|---|---|---|
| 10:42AM | 1 | COMPANIES THAT THEY WORKED WITH.  IT WAS, IT WAS THE TOTALITY |
| 10:42AM | 2 | OF DOING WORK FOR 10 OUT OF THE 15 LARGEST PHARMACEUTICAL |
| 10:42AM | 3 | COMPANIES THAT WE RELIED ON, THAT THEIR ANALYZER HAD BEEN |
| 10:42AM | 4 | TESTED AND WORKED FOR THOSE COMPANIES IN THEIR CLINICAL TRIALS. |
| 10:42AM | 5 | Q.   AND IF IT WERE THE CASE THAT THESE WERE NOT THE |
| 10:42AM | 6 | CONCLUSIONS OF PFIZER, WOULD THAT HAVE BEEN RELEVANT TO YOU? |
| 10:42AM | 7 | A.   YES. |
| 10:42AM | 8 | Q.   OKAY.  HOW SO? |
| 10:42AM | 9 | A.   WE, WE WANTED -- THERE'S, THERE'S A COUPLE OF THINGS THAT |
| 10:42AM | 10 | WE REALLY RELIED ON, AND ONE OF THE BIGGEST THINGS WAS THE FACT |
| 10:42AM | 11 | THAT THIRD PARTY PHARMACEUTICAL COMPANIES AND THE GOVERNMENT |
| 10:42AM | 12 | WAS USING THE ANALYZER IN THE FIELD. |
| 10:42AM | 13 | MR. WADE:  YOUR HONOR, MOVE TO STRIKE UNDER 602 FOR |
| 10:42AM | 14 | THE ISSUES REFERRED TO PREVIOUSLY. |
| 10:43AM | 15 | (PAUSE IN PROCEEDINGS.) |
| 10:43AM | 16 | THE COURT:  PARDON ME.  IT APPEARS THAT SOMEONE MAY |
| 10:43AM | 17 | BE TAKING PHOTOGRAPHS. |
| 10:43AM | 18 | LET'S TAKE OUR BREAK NOW.  LET'S TAKE OUR BREAK, LADIES |
| 10:43AM | 19 | AND GENTLEMEN.  I'M GOING TO TAKE A 30 MINUTE BREAK AND WE'LL |
| 10:43AM | 20 | COME BACK IN 30 MINUTES. |
| 10:43AM | 21 | MR. LEACH:  THANK YOU, YOUR HONOR. |
| 10:43AM | 22 | (JURY OUT AT 10:43 A.M.) |
| 10:44AM | 23 | THE COURT:  YOU CAN STAND DOWN, MS. PETERSON.  THANK |
| 10:44AM | 24 | YOU. |
| 10:44AM | 25 | PLEASE BE SEATED, LADIES AND GENTLEMEN. |

PETERSON REDIRECT BY MR. LEACH                                    4997

10:44AM  1          ALL RIGHT.  THANK YOU.  THE RECORD SHOULD REFLECT

10:44AM  2   THAT OUR JURY HAS LEFT, THE WITNESS HAS LEFT THE COURTROOM.

10:44AM  3          A GENTLEMAN WHO IS STANDING BY THE BACK DOOR THERE, SIR,

10:44AM  4   WHY DON'T YOU JUST COME UP TO THE FRONT HERE, IF YOU WOULD,

10:44AM  5   PLEASE.

10:44AM  6          THANK YOU.  YOU CAN STAND THERE.

10:45AM  7          SIR, IT COMES TO MY ATTENTION THAT YOU TOOK A PHOTOGRAPH

10:45AM  8   INSIDE OF THIS COURTROOM, AND MY COURTROOM DEPUTY INFORMS ME

10:45AM  9   THAT SHE TALKED WITH YOU ABOUT THIS AND THAT SHE ASKED YOU TO

10:45AM  10  DELETE THE PHOTOGRAPH.

10:45AM  11         IS THAT WHAT HAPPENED, SIR?

10:45AM  12             GENTLEMAN WITH PHONE:  THAT'S CORRECT.

10:45AM  13             THE COURT:  SIR, DID YOU SEE THE SIGNS OUT FRONT OF

10:45AM  14  THE COURTHOUSE HERE AND THE COURTROOM?

10:45AM  15             GENTLEMAN WITH PHONE:  I DID NOT.  I APOLOGIZE.

10:45AM  16             THE COURT:  THERE'S A SIGN THERE.  I'LL INVITE YOUR

10:45AM  17  ATTENTION TO IT, SIR.  IT INDICATES THAT THERE IS NO RECORDING,

10:45AM  18  NOR IS THERE PHOTO PHOTOGRAPHY OR VIDEO RECORDING OF THESE

10:45AM  19  PROCEEDINGS OF ANY, ANY TYPE.

10:45AM  20         DO YOU UNDERSTAND THAT, SIR?

10:45AM  21             GENTLEMAN WITH PHONE:  I DO.

10:45AM  22             THE COURT:  DO YOU HAVE ANY QUESTION ABOUT THAT THAT

10:45AM  23  YOU WANT TO ASK ME ABOUT?

10:45AM  24             GENTLEMAN WITH PHONE:  NO, YOUR HONOR.  THANK YOU.

10:45AM  25             THE COURT:  SIR, IT'S NOT PERMITTED, AND YOU MAY NOT

PETERSON REDIRECT BY MR. LEACH                                    4998

| 10:45AM | 1 | DO THAT. |

10:45AM  2        IF IT COMES TO MY ATTENTION AGAIN, I'LL HAVE TO TAKE SOME

10:45AM  3   ACTION.  I WON'T, BUT I'LL SUMMON THE PEOPLE WHO ARE

10:45AM  4   RESPONSIBLE.  THEY'RE CALLED THE UNITED STATES MARSHAL, AND

10:46AM  5   THEY'LL TAKE WHATEVER ACTION THAT THEY FEEL APPROPRIATE.

10:46AM  6        DO YOU UNDERSTAND THAT, SIR?

10:46AM  7             GENTLEMAN WITH PHONE:  UNDERSTOOD.

10:46AM  8             THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH, SIR.

10:46AM  9        ANYTHING FURTHER BEFORE WE TAKE OUR BREAK?

10:46AM 10             MR. DOWNEY:  NOT FROM US, YOUR HONOR.

10:46AM 11             MR. LEACH:  NO, YOUR HONOR.

10:46AM 12             THE COURT:  ALL RIGHT.  THANK YOU.

10:46AM 13        (RECESS FROM 10:46 A.M. UNTIL 11:22 A.M.)

11:23AM 14        (JURY IN AT 11:23 A.M.)

11:23AM 15             THE COURT:  PLEASE BE SEATED.  WE'RE BACK ON THE

11:23AM 16   RECORD.  OUR JURY IS PRESENT.

11:23AM 17        COUNSEL AND MS. HOLMES ARE PRESENT.

11:23AM 18        THE WITNESS IS BACK ON THE STAND.

11:23AM 19        MR. WADE -- EXCUSE ME, MR. LEACH, DO YOU WANT TO CONTINUE

11:23AM 20   WITH YOUR EXAMINATION?

11:23AM 21             MR. LEACH:  BRIEFLY, YOUR HONOR.  THANK YOU.

11:23AM 22             THE COURT:  THERE WAS A PENDING OBJECTION BEFORE WE

11:23AM 23   WERE INTERRUPTED.  IT WAS BY MR. WADE ON 602 GROUNDS IN

11:23AM 24   RESPONSE TO THE QUESTION.

11:23AM 25        THE QUESTION WAS ASKING A FOLLOW-UP QUESTION OF HOW SO,

PETERSON REDIRECT BY MR. LEACH                                    4999

11:24AM  1    THAT IS, THIS -- MS. PETERSON'S COMMENT ON PHARMACEUTICAL

11:24AM  2    COMPANIES.

11:24AM  3         I'M GOING TO OVERRULE THE OBJECTION.  SHE CAN ANSWER THE

11:24AM  4    QUESTION.

11:24AM  5         WHY DON'T YOU ASK THE QUESTION AGAIN, MR. LEACH.

11:24AM  6    BY MR. LEACH:

11:24AM  7    Q.   I BELIEVE WE WERE ASKING QUESTIONS, MS. PETERSON, ABOUT

11:24AM  8    THE PFIZER REPORT AS YOU UNDERSTOOD IT AND WHAT WAS MEANINGFUL

11:24AM  9    TO YOU IN CONNECTION WITH CONSIDERATION OF THE INVESTMENT, AND

11:24AM  10   IF YOU CAN JUST EXPLAIN YOUR THINKING FOR US, PLEASE?

11:24AM  11   A.   SURE.  THE PFIZER REPORT IN THERE WAS IMPORTANT -- WAS

11:24AM  12   VERY IMPORTANT TO US, BUT IT ALSO WAS ONE OF MANY THAT WE WERE

11:24AM  13   RELYING ON.

11:24AM  14        THE STATEMENT OF THEY WORKED FOR 10 OF THE TOP 15 WAS

11:24AM  15   SUPER IMPORTANT TO US.  IT LENDED CREDIBILITY TO THE ANALYZER

11:24AM  16   WORKING, AND IT WAS AN OUTSIDE INDEPENDENT THIRD PARTY THAT HAD

11:24AM  17   DONE WORK WITH THE ANALYZER AND THAT IT WORKED.

11:25AM  18   Q.   YOU ALSO WERE ASKED QUESTIONS ABOUT A COMPANY CALLED BDT.

11:25AM  19        DO YOU REMEMBER BEING ASKED ABOUT BDT?

11:25AM  20   A.   YES.

11:25AM  21   Q.   AND WHAT IS BDT AGAIN?

11:25AM  22   A.   BDT IS A PRIVATE EQUITY FIRM RUN BY BYRON TROTT.

11:25AM  23   Q.   DO YOU KNOW WHETHER BDT INVESTED IN THERANOS?

11:25AM  24   A.   NO.

11:25AM  25   Q.   DO YOU KNOW WHETHER BDT EVER CONSIDERED MAKING AN

PETERSON REDIRECT BY MR. LEACH                              5000

11:25AM   1    INVESTMENT IN THERANOS?

11:25AM   2    A.   YES, THEY DID.

11:25AM   3    Q.   AND YOU WERE ALSO ASKED SOME QUESTIONS ABOUT WHETHER OR

11:25AM   4    NOT YOU VISITED A WALGREENS.

11:25AM   5         DO YOU RECALL BEING ASKED THOSE QUESTIONS?

11:25AM   6    A.   YES.

11:25AM   7    Q.   AND I UNDERSTOOD YOUR ANSWER YOU'RE IN MICHIGAN AND YOU

11:25AM   8    DID NOT TRAVEL TO ARIZONA TO VISIT ONE OF THE WALGREENS STORES

11:25AM   9    THERE?

11:25AM   10   A.   NO.   CORRECT.   AND WE ALSO HAD GONE INTO THE WELLNESS

11:25AM   11   CENTER AT THE BUILDING AND PRETTY MUCH GOT THE FEEL FOR WHAT IT

11:25AM   12   WAS, YES.

11:25AM   13   Q.   OKAY.

11:25AM   14        MAY I APPROACH, YOUR HONOR?

11:25AM   15            THE COURT:   YES.

11:26AM   16            MR. WADE:   (HANDING.)

11:26AM   17   Q.   MS. PETERSON, I'VE PLACED BEFORE YOU WHAT WE HAVE MARKED

11:26AM   18   AS EXHIBIT 2065.

11:26AM   19        DO YOU HAVE THAT IN FRONT OF YOU?

11:26AM   20   A.   WHAT YOU JUST HANDED ME?

11:26AM   21   Q.   YES.

11:26AM   22        DO YOU SEE UP AT THE TOP THAT THIS APPEARS TO BE AN EMAIL

11:26AM   23   FROM CHRISTIAN HOLMES TO SUNNY BALWANI AND ELIZABETH HOLMES?

11:26AM   24   A.   YES.

11:26AM   25   Q.   AND DO YOU SEE THE SUBJECT LINE WITH A REFERENCE TO BDT

PETERSON REDIRECT BY MR. LEACH                                    5001

11:26AM   1      AND WAG?

11:26AM   2      A.   YES.

11:26AM   3      Q.   AND IN YOUR EXPERIENCE, IS WAG AN ACRONYM FOR WALGREENS?

11:26AM   4      A.   YES.

11:26AM   5      Q.   AND THE DATE OF THIS IS OCTOBER 10TH, 2014.

11:26AM   6           IS THAT IN THE MONTH WHEN, WHEN RDV WAS CONSIDERING AN

11:27AM   7      INVESTMENT DECISION?

11:27AM   8      A.   YES.

11:27AM   9           MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 2065 INTO

11:27AM  10      EVIDENCE.

11:27AM  11           MR. WADE:  YOUR HONOR, I DON'T SEE ANY FOUNDATION OR

11:27AM  12      RELEVANCE TO THIS DOCUMENT FROM THIS WITNESS, AND HEARSAY.

11:27AM  13           (PAUSE IN PROCEEDINGS.)

11:27AM  14           THE COURT:  CAN YOU LAY A LITTLE MORE FOUNDATION ON

11:27AM  15      THIS, AND TELL ME HOW IT RELATES TO THE REDIRECT AGAIN.

11:27AM  16           MR. LEACH:  YOUR HONOR, THIS WITNESS WAS ASKED

11:27AM  17      QUESTIONS ABOUT WHETHER OR NOT RDV VISITED A WALGREENS IN THIS

11:27AM  18      TIME PERIOD.  THIS RELATES TO ANOTHER POTENTIAL INVESTOR IN THE

11:27AM  19      SAME TIME PERIOD.

11:27AM  20           IT'S NOT HEARSAY BECAUSE IT'S A STATEMENT OF AN AGENT.

11:27AM  21           IT'S ALSO 801(D)(2)(E), AND I THINK MR. EDLIN LAID A

11:28AM  22      FOUNDATION UNDER THE BUSINESS RECORD EXCEPTION.

11:28AM  23           I ALSO OFFER IT FOR THE NONHEARSAY PURPOSE FOR STATE OF

11:28AM  24      MIND TO THE RECIPIENT.

11:28AM  25           AND IT RELATES TO -- THE QUESTIONS WERE ASKED ABOUT THE

PETERSON REDIRECT BY MR. LEACH                         5002

11:28AM   1   DILIGENCE AND WHAT SHE DID AND DIDN'T DO, AND THIS TOUCHES ON

11:28AM   2   THAT.

11:28AM   3           MR. WADE:  YOUR HONOR, I HATE TO DO THIS RIGHT AFTER

11:28AM   4   THE BREAK, BUT THIS IS THE FIRST THAT WE HAVE SEEN OF THIS

11:28AM   5   DOCUMENT.  I WOULD ASK FOR A SIDE-BAR ON THIS ISSUE BEFORE WE

11:28AM   6   GO INTO THIS.

11:28AM   7           THE COURT:  ALL RIGHT.  LET'S -- CAN YOU CONTINUE

11:28AM   8   YOUR EXAMINATION WITHOUT REFERENCE TO THIS DOCUMENT RIGHT NOW?

11:28AM   9           MR. LEACH:  I CAN, YOUR HONOR, YES.

11:28AM  10           THE COURT:  THANK YOU.  I APPRECIATE THAT.

11:28AM  11       AND THEN WE'LL REVISIT THIS.

11:28AM  12           MR. LEACH:  OKAY.

11:28AM  13   Q.   AND YOU UNDERSTOOD IN THIS TIMEFRAME THAT BDT WAS ALSO

11:28AM  14   CONSIDERING AN INVESTMENT IN THERANOS?

11:28AM  15   A.   YES.

11:28AM  16   Q.   AND HOW DID YOU GET THAT UNDERSTANDING?

11:28AM  17   A.   MY BOSS HAD LET ME KNOW THAT THEY WERE LOOKING AT IT.

11:28AM  18   Q.   LET ME SHIFT TOPICS.  LAST TOPIC OF EXAMINATION,

11:29AM  19   MS. PETERSON.

11:29AM  20       YOU WERE ASKED SOME QUESTIONS ABOUT YOUR APPROVAL

11:29AM  21   DOCUMENT, EXHIBIT 2166.

11:29AM  22       IF WE CAN PLEASE -- WHICH IS IN EVIDENCE.  IF WE CAN

11:29AM  23   PLEASE CALL THAT UP, MS. HOLLIMAN.  IF WE CAN GO TO PAGE 6.

11:29AM  24       ACTUALLY, IF WE CAN PLEASE GO TO THE NEXT PAGE,

11:29AM  25   MS. HOLLIMAN.  PAGE 7 OF THE DOCUMENT.  EXCUSE ME.

PETERSON REDIRECT BY MR. LEACH                                    5003

| | | |
|---|---|---|
| 11:29AM | 1 | JUROR:  YOUR HONOR, IT'S NOT ON. |
| 11:29AM | 2 | THE CLERK:  THAT ONE IS OUT AGAIN? |
| 11:29AM | 3 | I'M GOING TO SHUT DOWN AND RESTART. |
| 11:30AM | 4 | (PAUSE IN PROCEEDINGS.) |
| 11:30AM | 5 | THE CLERK:  THE MONITOR IS ON, BUT IT'S NOT |
| 11:30AM | 6 | PROJECTING.  IT'S BEYOND MY CONTROL. |
| 11:30AM | 7 | THE COURT:  OH, BROTHER. |
| 11:30AM | 8 | MR. LEACH:  YOUR HONOR, I CAN TRY TO CONTINUE MY |
| 11:31AM | 9 | EXAMINATION WITHOUT THE DOCUMENT ON THE SCREEN, AND PERHAPS |
| 11:31AM | 10 | DURING THE SIDE-BAR WE CAN WORK OUT THE TECHNICAL ISSUES. |
| 11:31AM | 11 | THE COURT:  WE'LL TRY TO FIGURE IT OUT.  I DON'T |
| 11:31AM | 12 | KNOW IF YOU HAVE THIS AVAILABLE FOR USE ON THE ELMO OR IF YOU |
| 11:31AM | 13 | WANT TO GO THAT FAR. |
| 11:31AM | 14 | OKAY. |
| 11:31AM | 15 | BY MR. LEACH: |
| 11:31AM | 16 | Q.  MS. PETERSON, DO YOU HAVE EXHIBIT 2166 IN FRONT OF YOU? |
| 11:31AM | 17 | A.  IT'S ON THE SCREEN AT THIS POINT. |
| 11:31AM | 18 | Q.  OKAY.  I THINK SOME OF THE JURORS DON'T HAVE IT, SO LET'S |
| 11:31AM | 19 | WORK FROM THE HARD COPY IF WE CAN? |
| 11:31AM | 20 | A.  OKAY. YES. YES. |
| 11:31AM | 21 | Q.  THIS IS ENTITLED RDV APPROVAL DOCUMENT. |
| 11:31AM | 22 | WHY DID YOU PREPARE THIS? |
| 11:31AM | 23 | A.  WE PREPARE THESE FOR EVERY INVESTMENT THAT WE DO.  WE NEED |
| 11:31AM | 24 | TO HAVE THIS COMPLETED BEFORE WE CAN WIRE THE MONEY AND CLOSE |
| 11:31AM | 25 | THE DOCUMENTS. |

PETERSON REDIRECT BY MR. LEACH                                5004

```
11:31AM   1      Q.   IS THIS AN IMPORTANT PART OF YOUR PROCESS?

11:31AM   2      A.   YES.

11:31AM   3      Q.   AND IS IT IMPORTANT, WHEN PREPARING THIS, TO MEMORIALIZE

11:31AM   4    WHAT YOU UNDERSTOOD ARE THE SALIENT FACTS RELATING TO THE

11:31AM   5    INVESTMENT?

11:31AM   6      A.   CORRECT.  IT PUTS IT IN WRITING.

11:31AM   7      Q.   HALFWAY DOWN THE LINE THERE'S A RECOMMENDATION AND IT SAYS

11:32AM   8    R&D INVESTMENT GROUP RECOMMENDS A $100 MILLION INVESTMENT IN

11:32AM   9    THE EQUITY OF THERANOS.

11:32AM  10           DO YOU SEE THAT LANGUAGE?

11:32AM  11      A.   YES.

11:32AM  12      Q.   AND WHAT IS THE RDV INVESTMENT GROUP?

11:32AM  13      A.   THAT'S THE GROUP THAT I WORK FOR.

11:32AM  14      Q.   AND SO THE GROUP THAT INCLUDES YOU?

11:32AM  15      A.   YES.

11:32AM  16      Q.   OKAY.

11:32AM  17           I HAVE NOTHING FURTHER BEYOND EXHIBIT 2065, YOUR HONOR.

11:32AM  18               THE COURT:  OKAY.  WELL, LET'S TAKE THAT UP BEFORE

11:32AM  19    WE -- LET ME -- WHY DON'T WE HAVE -- I THINK IT WOULD BE MORE

11:32AM  20    EFFICIENT TO HAVE A SIDE-BAR IN THE JURY ROOM.  SO WE'LL TAKE

11:32AM  21    JUST A MOMENT.

11:32AM  22           LADIES AND GENTLEMEN, I NEED TO SPEAK WITH THE LAWYERS

11:32AM  23    OUTSIDE OF YOUR PRESENCE, SO WE'LL DO THAT.  THIS WON'T TAKE

11:32AM  24    LONG.

11:32AM  25           MS. PETERSON, IF YOU COULD JUST REMAIN THERE, PLEASE.
```

PETERSON REDIRECT BY MR. LEACH                            5005

11:32AM  1          THE WITNESS:  OKAY.

11:32AM  2          THE COURT:  WHILE WE'RE GONE, PLEASE DO NOT DISCUSS

11:32AM  3   AMONGST YOURSELVES, LADIES AND GENTLEMEN OF THE JURY, ANYTHING.

11:32AM  4      YOU CAN STAND AND STRETCH, OF COURSE, BUT DO NOT DISCUSS

11:32AM  5   ANYTHING ABOUT THIS CASE.

11:33AM  6      AND I'LL SEE COUNSEL IN THE BACK JUST NOW.

11:33AM  7      (SIDE-BAR CONFERENCE ON THE RECORD.)

11:51AM  8          THE COURT:  OKAY.  LET'S GO ON THE RECORD.

11:51AM  9      WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.  MR. LEACH IS

11:51AM 10   PRESENT.  MR. WADE IS PRESENT.

11:51AM 11      THIS IS IN REGARDS TO 2065, WHICH IS -- IT LOOKS LIKE IT'S

11:51AM 12   AN EMAIL STRING.

11:51AM 13      MR. LEACH?

11:51AM 14          MR. LEACH:  YOUR HONOR, DURING MS. PETERSON'S

11:51AM 15   CROSS-EXAMINATION, THE DEFENSE ASKED A NUMBER OF QUESTIONS

11:51AM 16   ABOUT WHETHER RDV WENT TO A WALGREENS AS PART OF DUE DILIGENCE

11:51AM 17   AND WHETHER IT WOULD HAVE LEARNED THAT THERE WERE DEVICES IN

11:51AM 18   THE STORES OR HOW THE BLOOD WAS DRAWN BY GOING TO A WALGREENS.

11:51AM 19      THIS COMMUNICATION, WHICH IS CONTEMPORANEOUS, SUGGESTS

11:51AM 20   THAT FOLKS WITHIN THERANOS WERE MAKING ARRANGEMENTS FOR WHAT

11:51AM 21   SHOULD HAPPEN IF ANOTHER INVESTOR WENT INTO WALGREENS AND

11:51AM 22   TAKING STEPS TO CONCEAL THAT THERE WERE VENOUS DRAWS BEING

11:51AM 23   DONE.

11:51AM 24      THIS IS NOT HEARSAY.  CHRISTIAN HOLMES IS AN AGENT OF

11:51AM 25   ELIZABETH HOLMES.  HE REPORTS DIRECTLY TO HER.

PETERSON REDIRECT BY MR. LEACH

11:51AM  1      IT IS ALSO A, WE WOULD ARGUE, A STATEMENT OF A

11:51AM  2   COCONSPIRATOR IN FURTHERANCE OF THE CONSPIRACY.

11:51AM  3      THERE'S NO ISSUE WITH AUTHENTICATION.  WE STIPULATED THAT

11:51AM  4   THE DOCUMENTS WITH THE TS BATES PREFIX ARE AUTHENTIC.

11:51AM  5      I THINK THIS IS -- IN ADDITION, DAN EDLIN LAID A

11:51AM  6   FOUNDATION FOR THE USE OF EMAIL TO COORDINATE DEMOS, SO I THINK

11:51AM  7   THERE'S A BUSINESS RECORDS EXCEPTION.

11:51AM  8      FINALLY, WE WOULD OFFER IT FOR MS. HOLMES'S KNOWLEDGE OF

11:51AM  9   WHAT WOULD HAPPEN IF AN INVESTOR WENT INTO WALGREENS TO TRY TO

11:51AM 10   GET THEIR BLOOD TESTED.

11:51AM 11      THERE'S A LINE IN HERE THAT SAYS ASSUMPTIONS HERE ARE FROM

11:51AM 12   EAH, THAT'S ELIZABETH HOLMES, SO THAT WE MUST NOT DO A VENOUS

11:51AM 13   DRAW FOR THIS VERY IMPORTANT INVESTOR.

11:51AM 14      I THINK IT'S DIRECTLY RELEVANT TO THE DILIGENCE THAT RDV

11:51AM 15   IS BEING ACCUSED OF NOT DOING, AND IT SHOULD COME IN AT THIS

11:51AM 16   TIME.

11:51AM 17          THE COURT:  THANK YOU.  WHO WAS THE -- WHO, AS TO

11:51AM 18   THE 801(D)(2)(E), WHO IS THE COCONSPIRATOR?  THIS IS FROM

11:51AM 19   CHRISTIAN HOLMES AND HE'S NOT A COCONSPIRATOR.  HE'S NOT IN THE

11:51AM 20   INDICTMENT ANYWAY.

11:51AM 21          MR. LEACH:  HE'S NOT IN THE INDICTMENT, YOUR HONOR,

11:51AM 22   BUT THAT DOESN'T MEAN THE EXCEPTION CAN'T APPLY TO HIM.

11:51AM 23      BUT HE'S ALSO AN AGENT.

11:51AM 24          MR. WADE:  A FEW POINTS.  ONE, THIS IS WELL OUTSIDE

11:51AM 25   OF THE SCOPE OF CROSS.  THEY TESTIFIED THAT THEY DIDN'T GO TO A

PETERSON REDIRECT BY MR. LEACH                                     5007

11:51AM  1    WALGREENS.

11:51AM  2         THE IDEA THAT THAT SOMEHOW OPENS THE DOOR ON REDIRECT AS

11:51AM  3    TO ANYTHING THAT EVER HAPPENED WITHIN A WALGREENS WITH RESPECT

11:51AM  4    TO ANYONE I THINK IS, YOU KNOW, IS WAY OUTSIDE OF THE SCOPE OF

11:51AM  5    THE DIRECT.  THIS IS THE FIRST THAT WE HAVE HEARD OF THE

11:51AM  6    DOCUMENT.  IT OPENS UP A WHOLE NEW SET OF ISSUES THROUGH THIS

11:51AM  7    WITNESS, AND IT WOULD REQUIRE EXPLORATION.

11:51AM  8         IT'S ALSO -- THE 801(D)(2)(E) EXCEPTION DOESN'T -- SO IT'S

11:51AM  9    NOT APPROPRIATE FOR THIS WITNESS.

11:51AM  10        I CAN SORT OF PARK THAT THERE BECAUSE NOW ALL OF A SUDDEN

11:51AM  11   WE HAVE SOME WHOLE NEW ISSUE THAT IS WELL OUTSIDE OF THE SCOPE

11:51AM  12   OF ANY OF THE EXAMINATION THAT, YOU KNOW, I DON'T EVEN KNOW

11:51AM  13   WHAT TO DO.

11:51AM  14        WE DIDN'T HAVE NOTICE THAT THIS MIGHT COME IN.  WE ASK --

11:51AM  15   IF THE COURT IS GOING TO LET IT IN, WE WOULD ASK FOR THE COURT

11:51AM  16   TO TAKE A RECESS AND ALLOW US TO PREPARE TO CONFRONT THE

11:51AM  17   WITNESS ON THIS DOCUMENT BECAUSE WE'RE NOT PRESENTLY PREPARED

11:51AM  18   TO DO THAT.

11:51AM  19        THE 801(D)(2)(E) ISSUE, AS THE COURT WELL KNOWS, UNDER THE

11:51AM  20   COURT LOCAL RULES AND THE NEW RULES OF EVIDENCE, THERE IS A

11:51AM  21   NOTICE PROVISION THAT IS REQUIRED AND THIS WAS NOT NOTICED AS

11:51AM  22   801(D)(2)(E), AND I DON'T THINK THAT THEY CAN MAKE THE

11:51AM  23   THRESHOLD SHOWING TO DO THAT.

11:51AM  24        SO IT WOULD BE FUNDAMENTALLY UNFAIR TO DROP THIS INTO THIS

11:51AM  25   EXAMINATION AT THIS TIME.

PETERSON REDIRECT BY MR. LEACH                                    5008

11:51AM   1          I'LL ADD THAT WITH RESPECT TO BDT, THE WITNESS TESTIFIED

11:51AM   2     THAT SHE DIDN'T HAVE ANY INTERACTIONS WITH BDT ABOUT THERANOS.

11:51AM   3     SO A HEARSAY STATEMENT CAME IN RELATING TO THAT, BUT APART FROM

11:51AM   4     THAT, WHICH I CHOSE NOT TO OBJECT TO, BUT APART FROM THAT, SHE

11:51AM   5     HAS NO FIRSTHAND KNOWLEDGE OF ANYTHING RELATING TO BDT.

11:51AM   6          SO THERE ARE MULTIPLE LEVELS OF FACTS THAT IT WOULD BE

11:51AM   7     FUNDAMENTALLY UNFAIR TO DEAL WITH IT THROUGH THIS WITNESS.

11:51AM   8               THE COURT:  MR. LEACH?

11:51AM   9               MR. LEACH:  YOUR HONOR, THE DEFENSE INJECTED BDT

11:51AM  10     INTO THE CROSS-EXAMINATION.  THERE WAS 15 MINUTES OF CROSS

11:51AM  11     ABOUT HOW DID THIS INVESTMENT COME TO RDV'S ATTENTION.  DID YOU

11:51AM  12     GO TO THE CONFERENCE?  DID YOU KNOW THAT MS. HOLMES SPOKE AT

11:51AM  13     THE CONFERENCE?

11:51AM  14          THIS IS CONTEMPORANEOUS WITH THE RDV INVESTMENT AND RIGHT

11:51AM  15     AFTER THAT CONFERENCE.

11:51AM  16          SO -- AND THE SUGGESTION WAS MADE THAT IF RDV HAD BEEN

11:51AM  17     MORE DILIGENT, HAD THEY GONE TO A WALGREENS, THAT THEY WOULD

11:51AM  18     HAVE FIGURED OUT EVERYTHING THAT THERE IS TO KNOW ABOUT HOW THE

11:51AM  19     BLOOD WAS DRAWN AND VENOUS DRAWS, AND THIS WOULD SUGGEST THAT

11:51AM  20     DID NOT HAPPEN, AND IT WAS DIRECTLY RELEVANT TO THE

11:51AM  21     CROSS-EXAMINATION.

11:51AM  22          THIS IS REDIRECT, SO I'M NOT AWARE OF A NOTICE.  THIS HAS

11:51AM  23     BEEN ON OUR EXHIBIT LIST FOR SOME PERIOD OF TIME, AND I THINK

11:51AM  24     IT TIES DIRECTLY TO THE IMPLICATION THAT DEFENSE WAS TRYING TO

11:51AM  25     RAISE IN THE CROSS-EXAMINATION WITH THIS WITNESS.

PETERSON REDIRECT BY MR. LEACH                                    5009

11:51AM  1            MR. WADE:  WE ASKED WHETHER THEY WENT TO A

11:51AM  2      WALGREENS, AND SHE DID NOT.

11:51AM  3            THE IDEA THAT THEN ANYTHING THAT HAPPENS -- THAT OPENS THE

11:51AM  4      DOOR TO ANYTHING THAT THAT HAPPENS WITHIN A WALGREENS IS WELL

11:51AM  5      OUTSIDE OF THE SCOPE.

11:51AM  6            AGAIN, IF THE COURT DECIDES TO DO THAT, I WOULD JUST, FOR

11:51AM  7      THE RECORD, ASK FOR AN ADJOURNMENT FOR THE DAY SO THAT WE CAN,

11:51AM  8      SO WE CAN COME BACK.

11:51AM  9            IT'S NOT MY PREFERENCE, BUT THIS IS AN ISSUE THAT IS

11:51AM  10     TOTALLY UNRELATED TO THIS WITNESS, AND THE IDEA THAT WE WOULD

11:51AM  11     BE ON NOTICE BECAUSE IT'S AMONG THE, I DON'T KNOW, 10,000

11:51AM  12     DOCUMENTS THAT THEY PUT ON THEIR EXHIBIT LIST IS JUST NOT TRUE.

11:51AM  13            THE COURT:  SO, MR. LEACH, YOU'D LIKE TO EXAMINE

11:51AM  14     THIS WITNESS ON THE ISSUE OF BDT BECAUSE MR. WADE DID ASK SOME

11:51AM  15     QUESTIONS ABOUT IT.  HE ASKED SOME QUESTIONS ABOUT WALGREENS.

11:51AM  16     THERE WAS THIS COLLOQUY ABOUT DO YOU SEE THE PHOTOGRAPH, AND

11:51AM  17     THEN SHE VOLUNTEERED.  I CAN'T REMEMBER IF I STRUCK IT OR NOT,

11:51AM  18     BUT SHE VOLUNTEERED, WELL, THAT'S NOT -- WE LOOKED AT THE -- WE

11:51AM  19     SAW THE LAB AS IT WAS SET UP WITH THE EDISON INSIDE OF

11:51AM  20     THERANOS.  SO THAT LINE OF QUESTIONING.

11:51AM  21            AND THIS, I'M JUST TRYING TO CAPTURE AGAIN, THE -- WHAT

11:51AM  22     YOU'RE ATTEMPTING TO DO ABOUT THIS WITH BDT, TO ASK THIS

11:51AM  23     WITNESS ABOUT BDT?

11:51AM  24            MR. LEACH:  IT'S HONESTLY, IT'S AN APPROPRIATE TIME

11:51AM  25     TO ADMIT THE EXHIBIT BECAUSE IT RELATES TO THE SUBJECT MATTER

PETERSON REDIRECT BY MR. LEACH                                    5010

11:51AM  1      OF THE CROSS-EXAMINATION.

11:51AM  2          I DON'T HAVE ADDITIONAL -- SIGNIFICANT ADDITIONAL

11:51AM  3      QUESTIONS OF THIS WITNESS BEYOND WHY YOU DIDN'T GO TO A

11:51AM  4      WALGREENS, DID YOU NONETHELESS KNOW ABOUT VENOUS DRAWS.

11:51AM  5          SO I DON'T HAVE MORE THAN THAT ON THIS PARTICULAR

11:51AM  6      DOCUMENT.  BUT THERE'S NO REASON THAT THIS DOCUMENT COULDN'T

11:51AM  7      COME IN NOW OR, FRANKLY, ANY OTHER TIME GIVEN THE STIPULATION

11:51AM  8      TO AUTHENTICITY AND THE ABSENCE OF A HEARSAY ISSUE.

11:51AM  9              THE COURT:  THANK YOU.  SO IS THE, IS THE -- IS

11:51AM 10      THIS -- THIS SEEMS TO INDICATE THE PROTOCOL THAT IS USED FOR

11:51AM 11      VENOUS DRAWS AT THE WALGREENS, IS THAT WHAT THIS STATES?

11:51AM 12              MR. LEACH:  YES.  IT'S AN INSTRUCTION ON WHAT

11:51AM 13      HAPPENS IF A BDT -- IF A REPRESENTATIVE OF BDT, A POTENTIAL

11:51AM 14      INVESTOR ASKS FOR A TEST THAT REQUIRES A VENOUS DRAW, AND

11:51AM 15      THERE'S SCENARIO 1 WITH A CASE A AND A CASE B; AND SCENARIO 2,

11:51AM 16      IF BDT ORDERS TESTS THAT CAN ALL BE DONE ON FINGERSTICK.

11:51AM 17          SO IT'S A ROAD MAP FOR THE FOLKS WITHIN THERANOS IF BDT

11:51AM 18      ORDERS A TEST REQUIRED OF VENOUS DRAW TO DO IT IN A WAY THAT

11:51AM 19      WON'T BRING TO ATTENTION THAT IT'S A VENOUS DRAW.

11:51AM 20              THE COURT:  RIGHT.  OKAY.  I'M JUST CURIOUS ABOUT

11:51AM 21      THE TIMING UNDER THIS WITNESS, AND I KNOW THERE WAS

11:51AM 22      CONVERSATION ABOUT BDT AND ALL OF THAT.  I'M NOT CERTAIN THAT

11:51AM 23      THAT'S -- I GUESS THAT THE TIMING IS RIGHT TO GET THIS IN

11:51AM 24      THROUGH THIS WITNESS AT THIS TIME, NOTWITHSTANDING THE FACT

11:51AM 25      THAT THERE WAS BDT MENTIONED.

PETERSON REDIRECT BY MR. LEACH                                    5011

11:51AM  1          I DO SEE THAT IT LOOKS LIKE THAT THIS -- AT THE BOTTOM IT

11:51AM  2     SAYS IT'S FROM SUNNY BALWANI.

11:51AM  3          WHAT DOES THAT MEAN?

11:51AM  4          MR. LEACH:  I THINK THE BOTTOM EMAIL IS FROM

11:51AM  5     SUNNY BALWANI, BUT THE TOP EMAIL WITH THE SUBSTANCE OF THE ROAD

11:51AM  6     MAP IS FROM CHRISTIAN HOLMES --

11:51AM  7          THE COURT:  RIGHT.

11:51AM  8          MR. LEACH:  -- TO SUNNY BALWANI AND MS. HOLMES.

11:51AM  9          AND ANOTHER RESPONSE TO THE HEARSAY IS THAT THIS GOES TO

11:51AM 10     HER STATE OF MIND AT THE TIME THAT SHE'S SOLICITING INVESTMENTS

11:51AM 11     FROM BOTH BDT AND RDV.

11:51AM 12          MR. WADE:  YOUR HONOR, MIGHT I SUGGEST GIVEN WE HAVE

11:51AM 13     THE JURY HERE, I THINK THERE ARE OTHER ISSUES, JUST IN THE

11:51AM 14     INTEREST OF EFFICIENCY WITH THE TRIAL TIME, MR. MOSLEY IS GOING

11:51AM 15     TO TESTIFY.  THERE'S GOING TO BE A LOT OF DISCUSSION ABOUT BDT

11:51AM 16     WITH MR. MOSLEY.  I EXPECT THAT MR. MOSLEY IS GOING TO CARRY

11:51AM 17     OVER.

11:51AM 18          WHY DON'T WE WAIT AND RAISE THIS ISSUE, GIVE US A CHANCE

11:51AM 19     TO READ THIS AND GIVE IT SOME CONTEXT.

11:51AM 20          THE OTHER THING THAT CONCERNS ME SLIGHTLY WITH THIS,

11:51AM 21     YOUR HONOR, IS THAT IT BRINGS IN A WHOLE ANOTHER AREA OF

11:51AM 22     ISSUES, AND THERE'S A POTENTIAL MINI TRIAL ISSUE RELATING TO

11:51AM 23     BDT AS A POTENTIAL INVESTOR.

11:51AM 24          AND IF THE GOVERNMENT DECIDES THAT THEY WANT TO OPEN THE

11:51AM 25     DOOR WITH RESPECT TO CERTAIN BDT INTERACTIONS AS A POTENTIAL

PETERSON REDIRECT BY MR. LEACH                    5012

11:51AM  1    INVESTOR, THAT POTENTIALLY OPENS THE DOOR TO A WHOLE OTHER SET

11:51AM  2    OF EVIDENCE.

11:51AM  3         AND RATHER THAN DOING THIS ON THE FLY WHEN WE'RE TRYING TO

11:51AM  4    FINISH UP WITH A WITNESS WHO IS NOT NECESSARY FOR THE ADMISSION

11:51AM  5    OF THIS DOCUMENT, WHY DON'T WE CLOSE THIS WITNESS, KEEP GOING,

11:51AM  6    AND ADDRESS THIS ISSUE WHEN WE'RE NOT HOLDING A JURY OUTSIDE.

11:51AM  7              THE COURT:  WELL, I APPRECIATE THAT.

11:51AM  8         BUT BDT WAS MENTIONED.  SO I UNDERSTAND THE TIMING OF IT.

11:51AM  9         MR. LEACH SAYS, WELL, THAT WAS MENTIONED.

11:51AM  10        IT COMES IN FOR NOT SO MUCH, AT LEAST AS I UNDERSTAND IT

11:51AM  11   NOW, FOR THE FLOW OF THIS WITNESS'S TESTIMONY BUT RATHER IT

11:51AM  12   COMES IN AS TO -- THIS EMAIL DOES TALK ABOUT WHAT EAH,

11:51AM  13   ELIZABETH HOLMES'S, PROTOCOL, AND WHAT SHE THINKS SHOULD HAPPEN

11:51AM  14   IN THAT.  IT'S INSTRUCTIVE FROM HER.

11:51AM  15        I UNDERSTAND WHY -- I THINK I UNDERSTAND WHY MR. LEACH

11:51AM  16   WOULD SEEK TO INTRODUCE IT NOW BECAUSE THE BDT WAS RAISED ON

11:51AM  17   YOUR EXAMINATION AND SUCH THAT THE JURY WOULD NOT HAVE -- WOULD

11:51AM  18   HAVE A FULL STORY ABOUT BDT AT LEAST AS TO THIS.

11:51AM  19        THE TIMING OF IT, THOUGH, IS -- THERE'S CONVERSATION ABOUT

11:51AM  20   BDT.

11:51AM  21        I COULD SEE HOW THIS WOULD COME IN.  AND LET ME JUST STATE

11:51AM  22   AS A SEPARATE NOTE, I HAVE BEEN TAKING NOTES ABOUT THE EVIDENCE

11:51AM  23   AND THE STATEMENTS FROM VARIOUS PARTIES.

11:51AM  24        I HAVE NOT -- YOU HAVE NOT ASKED ME TO MAKE A FINDING AS

11:51AM  25   TO WHETHER OR NOT A PRIMA FACIE CASE OF CONSPIRACY HAS BEEN

PETERSON REDIRECT BY MR. LEACH                                          5013

11:51AM  1      SHOWN SUCH THAT STATEMENTS CAN BE ENTERED.

11:51AM  2          I THINK THIS IS THE FIRST TIME THAT THAT HAS COME UP IN

11:51AM  3      THE TRIAL WHERE, MR. LEACH, YOU MENTIONED IT COULD COME IN AS A

11:51AM  4      STATEMENT OF A COCONSPIRATOR IN FURTHERANCE OF UNDER

11:51AM  5      801(D)(2)(E).

11:51AM  6          I'VE TAKEN NOTES.  I DON'T KNOW IF YOU WANT TO KNOW MY

11:51AM  7      OPINION ABOUT IT.  IT SEEMS TO ME THAT THERE HAS BEEN AT LEAST

11:51AM  8      FOR PRIMA FACIE SHOWING, IT SEEMS LIKE SOME OF THE STATEMENTS

11:51AM  9      AND THE EVIDENCE THAT HAS COME IN DOES ESTABLISH AT LEAST FOR

11:51AM  10     EVIDENTIARY PURPOSES A PRIMA FACIE CASE.

11:51AM  11         I DON'T KNOW IF YOU WANT TO COMMENT.  I'M NOT TRYING TO

11:51AM  12     TAKE US DOWN A SIDE ROAD BUT --

11:51AM  13             MR. WADE:  I'D LIKE TO ADDRESS THAT MORE

11:51AM  14     THOUGHTFULLY, FRANKLY, YOUR HONOR, RATHER THAN DOING IT ON THE

11:51AM  15     FLY WITH RESPECT TO THIS ISSUE.

11:51AM  16         OF COURSE, THERE'S A NOTICE CONCERN THAT COMES WITH

11:51AM  17     801(D)(2)(E) --

11:51AM  18             THE COURT:  RIGHT.

11:51AM  19             MR. WADE:  -- THAT THE NORTHERN DISTRICT TAKES VERY

11:51AM  20     SERIOUSLY, AND I KNOW THE COURT DOES AS WELL.  THIS WAS NOT

11:51AM  21     NOTICED UNDER 801(D)(2)(E), AND THAT IS NOW ALSO A REQUIREMENT

11:51AM  22     UNDER THE FEDERAL RULES OF EVIDENCE.  THEY ACTUALLY -- THE

11:51AM  23     NORTHERN DISTRICT WAS ACTUALLY A LITTLE IN FRONT OF THE RULES

11:51AM  24     COMMITTEE ON THAT.

11:51AM  25         SO I THINK IT WOULD BE UNFAIR TO CONCLUDE ON THIS WITHOUT

PETERSON REDIRECT BY MR. LEACH                                5014

11:51AM  1    NOTICE.  ARGUABLY IT'S EXCLUDABLE AS OFFERED UNDER THAT AS A

11:51AM  2    RESULT OF THE LACK OF NOTICE, BUT AT A MINIMUM, I WOULD LIKE TO

11:51AM  3    HAVE THE OPPORTUNITY TO ADDRESS THAT.

11:51AM  4        AGAIN, THIS WITNESS OFFERS NO TESTIMONY ON THIS.  BDT WAS

11:51AM  5    ADDRESSED, BUT IT WASN'T ADDRESSED IN CONNECTION WITH

11:51AM  6    WALGREENS.  IT WAS ADDRESSED IN CONNECTION WITH A CONFERENCE.

11:51AM  7    SHE DIDN'T HAVE ANY INTERACTIONS OR KNOWLEDGE OF BDT APART FROM

11:51AM  8    WHAT MR. LEACH JUST PULLED OUT ON REDIRECT, WHICH HE CAN'T OPEN

11:51AM  9    HIS OWN DOOR.

11:51AM  10       I ASKED QUESTIONS ABOUT WHETHER SHE HAD INTERACTIONS WITH

11:51AM  11   BDT OR WHETHER SHE KNEW ABOUT INTERACTIONS, WHETHER SHE WAS

11:51AM  12   THERE, AND HER ANSWER UNDER ALL OF THAT WAS NO.

11:51AM  13       SO I THINK IT'S A HUGE STRETCH TO PUT THIS IN.  IT DOESN'T

11:51AM  14   NEED TO COME IN NOW.  I'D LIKE THE OPPORTUNITY TO, YOU KNOW, TO

11:51AM  15   CONSIDER THIS AND ADDRESS THIS OUTSIDE OF THE CONTEXT GIVEN

11:51AM  16   THAT WE DIDN'T GET NOTICE AND IT'S BEING OFFERED AS A

11:51AM  17   COCONSPIRATOR EXCEPTION.

11:51AM  18          THE COURT:  WELL, AMONGST OTHERS, BUT THERE ARE

11:51AM  19   OTHER REASONS WHY MR. LEACH PROFFERS THIS.  HE DID OFFER IT FOR

11:51AM  20   THAT PURPOSE.

11:51AM  21       BUT I DO -- I SEE SOME RELEVANCE AS TO THIS.  WHETHER OR

11:51AM  22   NOT TIMING IS APPROPRIATE NOW TO INTRODUCE IT -- YOU KNOW,

11:51AM  23   MR. LEACH, I'M GOING TO SUSTAIN THE OBJECTION AS TO THIS

11:51AM  24   WITNESS.  I JUST DON'T THINK THE TIMING IS RIGHT AND THE

11:51AM  25   FOUNDATION IS THERE TO GET THIS IN NOW.

PETERSON REDIRECT BY MR. LEACH                                    5015

11:51AM  1        I MADE MY COMMENTS ABOUT AT LEAST GENERALLY FINDING THE

11:51AM  2    EVIDENCE SHOWS BASED UPON TEXT MESSAGES, AND I DON'T HAVE ALL

11:51AM  3    OF MY NOTES HERE, BUT I'VE MADE NOTES ABOUT ASPECTS OF

11:51AM  4    CONVERSATIONS AND OTHERS THAT COULD SHOW A PRIMA FACIE CASE OF

11:51AM  5    A CONSPIRACY IN FURTHERANCE OF DURING THE CHARGING PERIOD,

11:51AM  6    WHICH WOULD THEN OPEN THE DOOR FOR OTHER HEARSAY STATEMENT OR

11:51AM  7    OTHER STATEMENTS OF THE PARTIES.  I JUST WANT TO LET YOU KNOW

11:51AM  8    THAT, AND I'M DOING THIS OUTSIDE OF THE PRESENCE OF THE JURY,

11:51AM  9    OF COURSE, JUST TO KEEP YOU APPRISED OF THAT.

11:51AM 10        BUT ALL OF THE NOTICE AND ALL OF THE OTHER RULES, OF

11:51AM 11    COURSE, APPLY.

11:51AM 12        BUT SINCE YOU RAISED IT, MR. LEACH, TALKING ABOUT THIS, I

11:51AM 13    THOUGHT I WOULD GIVE YOU AT LEAST THE BENEFIT OF MY THOUGHTS ON

11:51AM 14    THAT, RIGHT OR WRONG, BUT I JUST WANTED TO SHARE THAT WITH YOU.

11:51AM 15            MR. LEACH:  THANK YOU, YOUR HONOR.

11:51AM 16            THE COURT:  SO YOU CAN EXPLORE BDT.  IT WAS TALKED

11:51AM 17    ABOUT.

11:51AM 18        I JUST THINK GETTING THE DOCUMENT IN NOW THROUGH THIS

11:51AM 19    WITNESS IS NOT APPROPRIATE AT THIS TIME.

11:51AM 20        SO AT THIS TIME I'LL SUSTAIN THE OBJECTION.  I'LL DO IT

11:51AM 21    OUT THERE IN FRONT OF THE JURY.

11:51AM 22            MR. LEACH:  OKAY.

11:51AM 23            MR. WADE:  OKAY.  THANK YOU, YOUR HONOR.

11:51AM 24            MR. LEACH:  THANK YOU, YOUR HONOR.

11:51AM 25        (END OF DISCUSSION AT SIDE-BAR.)

PETERSON RECROSS BY MR. WADE                                        5016

11:52AM   1          THE COURT:  ALL RIGHT.  THANK YOU FOR YOUR PATIENCE.

11:52AM   2    WE'RE BACK ON THE RECORD.

11:52AM   3          ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

11:52AM   4          AS TO THE OBJECTION, I'LL SUSTAIN THE OBJECTION AT THIS

11:52AM   5    TIME.  THANK YOU.

11:52AM   6          MR. LEACH, YOU CAN ASK ANY OTHER QUESTIONS THAT YOU HAVE.

11:52AM   7          MR. LEACH:  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

11:52AM   8    THANK YOU, MS. PETERSON.

11:52AM   9          THE COURT:  ALL RIGHT.

11:52AM  10          MR. WADE:  ONE OR TWO QUESTIONS, YOUR HONOR.

11:52AM  11    BRIEFLY.

11:52AM  12                      **RECROSS-EXAMINATION**

11:52AM  13    BY MR. WADE:

11:52AM  14    Q.  MS. PETERSON, IF WE COULD JUST PULL UP BRIEFLY 14210.  I'M

11:53AM  15    SORRY, 1853.  EXHIBIT 1853, WHICH IS IN EVIDENCE.

11:53AM  16          DO YOU RECALL JUST BEING ASKED SOME QUESTIONS ABOUT THIS

11:53AM  17    ONCE AGAIN?

11:53AM  18    A.  YES.

11:53AM  19    Q.  AND I'M SORRY, CAN WE PULL THIS ONE DOWN.

11:53AM  20          DO WE -- I JUST WANT TO MAKE SURE THAT WE HAVE 1853 UP.

11:53AM  21          IS THAT CORRECT?

11:53AM  22          I'M SORRY.  I THOUGHT WE HAD THE WRONG DOCUMENT UP THERE

11:53AM  23    FOR A SECOND.

11:53AM  24          OKAY.  DO YOU RECALL BEING ASKED QUESTIONS ABOUT THIS

11:53AM  25    DOCUMENT?

PETERSON RECROSS BY MR. WADE                                                    5017

| | | |
|---|---|---|
| 11:53AM | 1 | A.   YES. |
| 11:53AM | 2 | Q.   AND I JUST WANT TO GO TO THE SECOND PAGE.  THIS RELATED -- |
| 11:53AM | 3 | I'M SORRY.  BACK TO THE FIRST PAGE FOR ONE SECOND. |
| 11:53AM | 4 | AND THIS RELATED TO THE REVENUE PROJECTIONS OF 140 MILLION |
| 11:53AM | 5 | FOR 2014. |
| 11:53AM | 6 | DO YOU SEE THAT? |
| 11:53AM | 7 | A.   YES. |
| 11:53AM | 8 | Q.   OKAY.  I JUST WANT TO GO TO THE SECOND PAGE AGAIN. |
| 11:53AM | 9 | AND DO YOU SEE THE DEFERRED REVENUE THAT YOU CIRCLED |
| 11:53AM | 10 | THERE? |
| 11:53AM | 11 | A.   YES. |
| 11:53AM | 12 | Q.   AND THAT'S $168,808; CORRECT? |
| 11:54AM | 13 | A.   YES. |
| 11:54AM | 14 | MR. WADE:  NO FURTHER QUESTIONS, YOUR HONOR. |
| 11:54AM | 15 | THE COURT:  MR. LEACH? |
| 11:54AM | 16 | MR. LEACH:  NOTHING FURTHER, YOUR HONOR.  THANK YOU. |
| 11:54AM | 17 | THE COURT:  MAY THIS WITNESS BE EXCUSED? |
| 11:54AM | 18 | MR. LEACH:  YES. |
| 11:54AM | 19 | MR. WADE:  YES, YOUR HONOR. |
| 11:54AM | 20 | THE COURT:  THANK YOU. |
| 11:54AM | 21 | MS. PETERSON, YOU'RE EXCUSED. |
| 11:54AM | 22 | DOES THE UNITED STATES HAVE ANOTHER WITNESS? |
| 11:55AM | 23 | MR. SCHENK:  YES, YOUR HONOR. |
| 11:55AM | 24 | THE UNITED STATES CALLS CONSTANCE CULLEN. |
| 11:55AM | 25 | THE COURT:  GOOD MORNING.  IF YOU COULD APPROACH OUR |

CULLEN DIRECT BY MR. SCHENK                                        5018

| | | |
|---|---|---|
| 11:55AM | 1 | COURTROOM DEPUTY.  AND AS YOU FACE HER, IF YOU'D RAISE YOUR |
| 11:55AM | 2 | RIGHT HAND, SHE HAS A QUESTION FOR YOU. |
| 11:55AM | 3 | **(GOVERNMENT'S WITNESS, CONSTANCE CULLEN, WAS SWORN.)** |
| 11:55AM | 4 | THE WITNESS:  YES. |
| 11:55AM | 5 | THE COURT:  LET ME INVITE YOU TO HAVE A SEAT UP HERE |
| 11:55AM | 6 | AND MAKE YOURSELF COMFORTABLE. |
| 11:55AM | 7 | FEEL FREE TO ADJUST THE CHAIR AND MICROPHONE AS YOU NEED. |
| 11:55AM | 8 | THERE'S SOME FRESH WATER THERE FOR YOUR CONVENIENCE IF YOU |
| 11:55AM | 9 | WISH. |
| 11:55AM | 10 | THE WITNESS:  THANK YOU. |
| 11:55AM | 11 | THE COURT:  WHEN YOU ARE COMFORTABLE, IF WOULD YOU |
| 11:55AM | 12 | PLEASE STATE YOUR NAME AND SPELL IT, PLEASE.  I'LL ENCOURAGE |
| 11:55AM | 13 | YOU TO SPEAK DIRECTLY INTO THE MICROPHONE. |
| 11:55AM | 14 | THE WITNESS:  YES.  MY NAME IS CONSTANCE CULLEN. |
| 11:55AM | 15 | C-O-N-S-T-A-N-C-E.  C-U-L-L-E-N. |
| 11:56AM | 16 | THE COURT:  THANK YOU. |
| 11:56AM | 17 | MR. SCHENK. |
| 11:56AM | 18 | MR. SCHENK:  THANK YOU, YOUR HONOR. |
| 11:56AM | 19 | **DIRECT EXAMINATION** |
| 11:56AM | 20 | BY MR. SCHENK: |
| 11:56AM | 21 | Q.   DR. CULLEN, IF YOU ARE FULLY VACCINATED AND WITH THE |
| 11:56AM | 22 | COURT'S PERMISSION, YOU MAY TESTIFY WITHOUT A MASK ON IF YOU'RE |
| 11:56AM | 23 | COMFORTABLE. |
| 11:56AM | 24 | A.   YES. |
| 11:56AM | 25 | Q.   THANK YOU.  I WILL DO THE SAME. |

CULLEN DIRECT BY MR. SCHENK                                        5019

11:56AM   1          DID YOU USED TO WORK FOR A COMPANY CALLED SCHERING-PLOUGH?

11:56AM   2     A.   YES.

11:56AM   3     Q.   AND WHEN YOU WORKED THERE, DID YOU HAVE THE OPPORTUNITY TO

11:56AM   4     WORK WITH ANOTHER COMPANY CALLED THERANOS?

11:56AM   5     A.   YES.

11:56AM   6     Q.   DO YOU REMEMBER ABOUT WHAT YEAR THAT WAS?

11:56AM   7     A.   YES.  IT WAS 2009.

11:56AM   8     Q.   WOULD YOU MIND PULLING THE MICROPHONE A LITTLE BIT CLOSER

11:56AM   9     TO YOU?

11:56AM   10    A.   SURE.  IT WAS 2009.

11:56AM   11    Q.   THANK YOU.  WE'LL COME BACK TO THAT IN JUST A MOMENT.

11:56AM   12         WILL YOU SUMMARIZE YOUR EDUCATIONAL BACKGROUND, PLEASE,

11:56AM   13    FOR THE JURY?

11:56AM   14    A.   YES.  I HAVE A PH.D. IN MOLECULAR IMMUNOLOGY AND A

11:56AM   15    BACHELOR'S DEGREE IN MICROBIOLOGY.

11:56AM   16    Q.   THANK YOU.

11:56AM   17         AND WE KNOW YOU WORKED FOR SCHERING-PLOUGH.  WHEN WAS

11:56AM   18    THAT?  WHEN DID YOU WORK FOR SCHERING?

11:56AM   19    A.   I BEGAN WORKING FOR SCHERING-PLOUGH IN 1996, AND MY

11:57AM   20    SERVICE ENDED IN 2016.

11:57AM   21    Q.   FROM 1996 TO 2016?

11:57AM   22    A.   YES.

11:57AM   23    Q.   AND --

11:57AM   24    A.   I'M SORRY, I JUST WANTED TO CLARIFY.  SCHERING-PLOUGH WAS

11:57AM   25    ACQUIRED BY MERCK AT THE END OF 2009.

CULLEN DIRECT BY MR. SCHENK                                        5020

11:57AM  1    Q.   SO YOU'RE INCLUDING A PERIOD OF TIME WHEN YOU WERE DOING

11:57AM  2    THE SAME OR SIMILAR WORK, BUT NOW FOR A COMPANY CALLED MERCK?

11:57AM  3    A.   CORRECT.

11:57AM  4    Q.   I SEE.  MUCH OF YOUR TESTIMONY TODAY IS GOING TO FOCUS ON

11:57AM  5    THE TIMEFRAME FROM ABOUT 2009 TO 2010.

11:57AM  6        WOULD YOU TELL THE JURY WHAT YOU WERE DOING FOR

11:57AM  7    SCHERING-PLOUGH AND MERCK AT THAT TIME?

11:57AM  8    A.   YES.  I WAS THE DIRECTOR OF WHAT IS CALLED THE

11:57AM  9    BIOANALYTICAL LABORATORY.  SO MY LABORATORY WAS RESPONSIBLE FOR

11:57AM  10   DEVELOPING AND VALIDATING ASSAYS FOR MEASUREMENT OF DRUG

11:57AM  11   LEVELS, WHAT WE CALL BIOMARKERS, SO MARKERS OF DRUG EFFICACY

11:58AM  12   AND DRUG ANTIBODIES IN THE CASE OF DEVELOPMENT OF PROTEIN-BASED

11:58AM  13   THERAPEUTICS.

11:58AM  14   Q.   OKAY.  WOULD YOU MIND EXPLAINING THAT LAST PART?

11:58AM  15   PROTEIN-BASED, WHAT IS THAT?

11:58AM  16   A.   SO THERE ARE ESSENTIALLY TWO BASIC CATEGORIES OF DRUGS.

11:58AM  17   ONE IS REFERRED TO GENERALLY IN THE FIELD AS SMALL MOLECULES,

11:58AM  18   SO ASPIRIN IS THE CLASSIC EXAMPLE OF A SMALL MOLECULE DRUG.

11:58AM  19       THE OTHER CATEGORY OF DRUG IS WHAT WE CALL LARGE

11:58AM  20   MOLECULES, SO THOSE TEND TO BE PROTEIN-BASED MONOCLONAL

11:58AM  21   ANTIBODY.  A WELL-KNOWN EXAMPLE OF A PROTEIN-BASED DRUG WOULD

11:58AM  22   BE HUMIRA.

11:58AM  23   Q.   YOU ALSO DESCRIBED PART OF YOUR JOB BEING TO DETERMINE THE

11:58AM  24   EFFICACY OF DRUGS.

11:58AM  25       WHAT DOES THAT MEAN?

CULLEN DIRECT BY MR. SCHENK                                    5021

11:58AM   1    A.   SO ONE USES A VARIETY OF DIFFERENT MEASUREMENTS TO

11:58AM   2    DETERMINE WHETHER A DRUG IS WORKING IN THE PATIENT POPULATION

11:58AM   3    THAT IT IS BEING TESTED IN.

11:59AM   4         SOME OF THOSE TESTS ARE MEASURING THE ACTUAL DRUG LEVELS

11:59AM   5    IN PATIENT BLOOD SAMPLES OR MEASURING OTHER WELL-KNOWN

11:59AM   6    CHARACTERIZED MARKERS OF THEIR DISEASE STATE.

11:59AM   7    Q.   YOU SAID YOU BECAME FAMILIAR WITH A COMPANY CALLED

11:59AM   8    THERANOS.  WAS THAT AROUND THE 2009 TIMEFRAME?

11:59AM   9    A.   YES, IT WAS.

11:59AM  10    Q.   DO YOU REMEMBER THE CIRCUMSTANCES WHEN -- WHAT CAUSED YOU

11:59AM  11    TO BECOME FAMILIAR WITH THERANOS?

11:59AM  12    A.   SURE.  YES.  SO WITHIN SCHERING-PLOUGH MY BOSS HAD ASKED

11:59AM  13    ME TO EVALUATE THE TECHNOLOGY.  THIS WAS DONE AT THE REQUEST OF

11:59AM  14    THE HEAD OF OUR EARLY CLINICAL RESEARCH ORGANIZATION, AND THEY

11:59AM  15    WERE INTERESTED IN THIS TECHNOLOGY BECAUSE THE CLAIM WAS THAT

11:59AM  16    IT WOULD FACILITATE AND EXPEDITE TESTING OF DRUGS IN CLINICAL

11:59AM  17    TRIALS.

11:59AM  18    Q.   CAN WE FILL IN SOME NAMES.  YOU FIRST STARTED BY SAYING

12:00PM  19    YOUR BOSS.

12:00PM  20    A.   YES.

12:00PM  21    Q.   AND WHO IS THAT PERSON?

12:00PM  22    A.   HIS NAME IS STEVE FARRAND.

12:00PM  23    Q.   DO YOU MIND SPELLING THE LAST NAME FOR US, PLEASE?

12:00PM  24    A.   F-A-R-R-A-N-D.

12:00PM  25    Q.   OKAY.  AND I THINK IN YOUR DESCRIPTION YOU DESCRIBED

CULLEN DIRECT BY MR. SCHENK                                    5022

12:00PM   1    ANOTHER INDIVIDUAL.  WHO WAS THAT?

12:00PM   2    A.   HIS NAME WAS JIM MCLEOD, M-C-C-L-E-O-D, I THINK.

12:00PM   3    Q.   OKAY.  AND WHAT WAS MR. MCLEOD'S ROLE AGAIN IN YOU

12:00PM   4    BECOMING INVOLVED IN THERANOS?

12:00PM   5    A.   YES.  SO HE WAS THE LEADER OF WHAT WE CALLED AN EARLY

12:00PM   6    CLINICAL RESEARCH AND EXPERIMENTAL MEDICINE GROUP.

12:00PM   7         SO THAT GROUP WAS CHARGED WITH THE EARLIEST CLINICAL

12:00PM   8    STUDIES, AND TO MAKE INITIAL ASSESSMENTS OF WHETHER OR NOT THE

12:00PM   9    DRUGS WERE GOING TO BE GOOD ENOUGH TO BE PURSUED IN ADDITIONAL

12:00PM   10   CLINICAL STUDIES.

12:00PM   11   Q.   I SEE.

12:00PM   12        NOW, IF YOU WOULD EXPLAIN TO ME WHERE YOU FIT INTO THIS?

12:00PM   13   YOU DESCRIBED MR. MCLEOD'S ROLE.  HOW DID YOU GET INTO THIS

12:01PM   14   THERANOS WORK?

12:01PM   15   A.   SO, I MEAN, THE REQUEST WAS MADE, AS I MENTIONED, BY MY

12:01PM   16   BOSS AND JIM MCCLEOD.  THEY WERE INTERESTED IN EVALUATING THE

12:01PM   17   TECHNOLOGY.  BECAUSE MY LABORATORY HAD HISTORICALLY DONE

12:01PM   18   SIMILAR TYPES OF ASSAYS, THEY ASKED ME TO PARTICIPATE IN

12:01PM   19   EVALUATING THE TECHNOLOGY.

12:01PM   20   Q.   OKAY.  AND WHAT DOES "EVALUATING THE TECHNOLOGY" MEAN?

12:01PM   21   A.   SO WE ACTUALLY DID BETA TESTING.  WE HAD RECEIVED TWO

12:01PM   22   INSTRUMENTS FROM THERANOS.

12:01PM   23        IN ADDITION, I TRAVELLED WITH A GROUP OF COLLEAGUES ON A

12:01PM   24   DUE DILIGENCE VISIT TO THE THERANOS SITE.

12:01PM   25   Q.   OKAY.  AND WERE THOSE TWO SEPARATE PROJECTS, WHAT YOU

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 17, 2023.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Amy Mason Saharia*
AMY MASON SAHARIA

April 17, 2023