No. 22-10312

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ELIZABETH A. HOLMES

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 5:18-CR-00258
Hon. Edward J. Davila

---

## EXCERPTS OF RECORD
### VOL. XXXI of LVII | ER-8639 to ER-8937

---

JOHN D. CLINE
LAW OFFICE OF JOHN D. CLINE
  600 Stewart Street
  Suite 400
  Seattle, WA 98101
  (360) 320-6435

KEVIN M. DOWNEY
LANCE A. WADE
AMY MASON SAHARIA
KATHERINE A. TREFZ
WILLIAMS & CONNOLLY LLP
  680 Maine Ave. S.W.
  Washington, D.C. 200024
  (202) 434-5000
  asaharia@wc.com

CULLEN DIRECT BY MR. SCHENK                                    5023

12:01PM   1      DESCRIBED AS BETA TESTING, AND THEN THE TRAVEL TO THERANOS?

12:01PM   2      A.   YES.

12:01PM   3      Q.   AND WHAT WORK WAS DONE THAT CAUSED YOU TO TRAVEL TO

12:01PM   4      THERANOS?  WHAT WAS THAT PROJECT?

12:01PM   5      A.   IT WASN'T NECESSARILY RELATED TO THE WORK.  IT WAS JUST A

12:02PM   6      PART OF EVALUATION OF ANY NEW TECHNOLOGY THAT MIGHT BE BROUGHT

12:02PM   7      INTO THE COMPANY.

12:02PM   8      Q.   I SEE.  SO THERANOS PROVIDED SOME DEVICES TO YOU; IS THAT

12:02PM   9      RIGHT?

12:02PM  10      A.   THAT'S CORRECT.

12:02PM  11      Q.   AND WHERE WERE YOU?  WHAT STATE WERE YOU IN WHEN THAT

12:02PM  12      HAPPENED?

12:02PM  13      A.   IN NEW JERSEY.

12:02PM  14      Q.   SO THERANOS PROVIDED SOME DEVICES TO YOU IN NEW JERSEY,

12:02PM  15      AND YOU ALSO HAD THE OPPORTUNITY TO TRAVEL TO CALIFORNIA; IS

12:02PM  16      THAT RIGHT?

12:02PM  17      A.   THAT'S CORRECT.

12:02PM  18      Q.   THANK YOU.

12:02PM  19           YOUR HONOR, MAY I APPROACH?

12:02PM  20               THE COURT:  YES.

12:02PM  21               MR. SCHENK:  THANK YOU (HANDING).

12:02PM  22      Q.   DR. CULLEN, I'VE HANDED YOU A BINDER OF DOCUMENTS, AND

12:02PM  23      I'LL ASK YOU TO OPEN IT AND TURN TO TAB 188.

12:02PM  24           YOUR HONOR, THE GOVERNMENT OFFERS 188 PURSUANT TO A

12:02PM  25      STIPULATION OF THE PARTIES.

CULLEN DIRECT BY MR. SCHENK                                              5024

12:02PM  1           MR. CLINE:  NO OBJECTION.

12:02PM  2           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:02PM  3       (GOVERNMENT'S EXHIBIT 188 WAS RECEIVED IN EVIDENCE.)

12:02PM  4  BY MR. SCHENK:

12:02PM  5  Q.   DR. CULLEN, THE EXHIBIT AT 188 SHOULD ALSO IN A MOMENT

12:03PM  6  APPEAR ON THE SCREEN IN FRONT OF YOU, AND WHICHEVER ONE IS

12:03PM  7  EASIER FOR YOU TO FOLLOW ALONG WITH, FEEL FREE.

12:03PM  8       IN THE EMAIL THAT WE'RE LOOKING AT, IF WE LOOK FROM THE

12:03PM  9  BOTTOM UP, IT LOOKS LIKE IT'S AN EMAIL FROM MS. HOLMES TO YOU

12:03PM 10  IN FEBRUARY OF 2009.

12:03PM 11       DO YOU SEE THAT?

12:03PM 12  A.   YES.

12:03PM 13  Q.   AND MS. HOLMES REFERENCES A CALL WITH JIM MCLEOD.

12:03PM 14       THAT'S THE INDIVIDUAL THAT YOU WERE JUST SPEAKING OF?

12:03PM 15  A.   THAT'S CORRECT.

12:03PM 16  Q.   AND SHE ASKS FOR A CONVENIENT TIME TO TALK TO YOU.

12:03PM 17       DO YOU SEE THAT?

12:03PM 18  A.   YES.

12:03PM 19  Q.   AND THEN IN THE TOP EMAIL, ANOTHER EMAIL FROM MS. HOLMES

12:03PM 20  TO YOU, NOW WE'RE AT THE BEGINNING OF MARCH OF 2009, AND

12:03PM 21  MS. HOLMES SAYS, "TAKE A LOOK AT THE ATTACHED PER OUR

12:03PM 22  CONVERSATION.

12:03PM 23       "IF WE GO DOWN THIS PATH, THERE ARE TWO SETS OF DOCUMENTS

12:03PM 24  THAT WILL COMPLEMENT THIS SUMMARY - ONE IS A DETAILED PROTOCOL

12:03PM 25  FOR RUNNING THESE EXPERIMENTS.  THE OTHER IS THE CARTRIDGE

CULLEN DIRECT BY MR. SCHENK                                5025

12:03PM    1      INSERTS."

12:04PM    2           HELP ME UNDERSTAND THE REFERENCE TO A DETAILED PROTOCOL

12:04PM    3      FOR RUNNING THESE EXPERIMENTS.

12:04PM    4      A.   SO A PROTOCOL IS JUST ESSENTIALLY A WRITTEN DOCUMENT THAT

12:04PM    5      DICTATES WHAT YOU'RE GOING TO DO TO EVALUATE THE INSTRUMENT OR

12:04PM    6      THE TECHNOLOGY THAT YOU'RE TESTING.  IT GENERALLY COMES WITH A

12:04PM    7      PREDETERMINED ACCEPTANCE CRITERIA AGAINST WHICH YOU EVALUATE

12:04PM    8      THE RESULTS ONCE THEY'RE AVAILABLE.

12:04PM    9      Q.   I SEE.  AND IF YOU'LL TURN TO THE SECOND PAGE, THE

12:04PM   10      ATTACHMENT, IS THIS THE BEGINNING OF THE PROTOCOL?

12:04PM   11      A.   YES.

12:04PM   12      Q.   AND IN THE HEADING SECTION ON THE SECOND LINE THERE'S A

12:04PM   13      REFERENCE TO CRP, IL-6, AND TNF-A MULTIPLEX.

12:04PM   14           DO YOU SEE THAT?

12:04PM   15      A.   YES, I DO.

12:04PM   16      Q.   HELP ME UNDERSTAND, WHAT IS THAT A REFERENCE TO?

12:05PM   17      A.   SO CRP STANDS FOR C REACTIVE PROTEIN, IL-6 STANDS FOR

12:05PM   18      INTERLEUKIN 6, AND TNF-A STANDS FOR TUMOR NECROSIS FACTOR

12:05PM   19      ALPHA.

12:05PM   20           THOSE ARE MARKERS OF INFLAMMATION THAT PEOPLE OFTEN

12:05PM   21      MEASURE TO UNDERSTAND WHETHER OR NOT A PATIENT IS HAVING AN

12:05PM   22      INFLAMMATORY RESPONSE, AND IN OUR CASE WHETHER OR NOT A DRUG

12:05PM   23      THAT WAS DELIVERED TO A PATIENT WAS EFFICACIOUS IN REDUCING

12:05PM   24      THESE INFLAMMATORY MARKERS.

12:05PM   25      Q.   OKAY.  AND THEN THE WORK MULTIPLEX, WHAT DOES THAT MEAN?

CULLEN DIRECT BY MR. SCHENK                                                5026

12:05PM   1    A.   SO MULTIPLEX MEANS THAT INSTEAD OF DEVELOPING EACH OF

12:05PM   2    THOSE THREE TESTS INDIVIDUALLY, ONE COULD DEVELOP THEM

12:06PM   3    SIMULTANEOUSLY SUCH THAT A SINGLE SAMPLE WOULD BE SUFFICIENT TO

12:06PM   4    MEASURE ALL THREE.

12:06PM   5    Q.   I SEE.

12:06PM   6         A MOMENT AGO YOU TOLD ME THAT THERE WERE SORT OF TWO

12:06PM   7    PROJECTS THAT SCHERING-PLOUGH WAS DOING.  ONE WAS A BETA TEST

12:06PM   8    AND THERE WAS ANOTHER ONE.

12:06PM   9         WHICH ONE IS THIS?

12:06PM   10   A.   THIS WOULD HAVE BEEN THE VALIDATION, SO INDEPENDENT OF THE

12:06PM   11   BETA TEST.

12:06PM   12   Q.   OKAY.  SO THE BETA TEST, IS THAT THE ONE WHERE THERANOS

12:06PM   13   SENT DEVICES TO NEW JERSEY?

12:06PM   14   A.   THAT'S CORRECT.

12:06PM   15   Q.   AND THEN WHAT IS HAPPENING HERE?  WHERE ARE THE DEVICES

12:06PM   16   AND WHERE IS THE WORK BEING DONE?

12:06PM   17   A.   ON THIS PARTICULAR DOCUMENT?

12:06PM   18   Q.   YES, MA'AM.

12:06PM   19   A.   SO THIS -- THE WORK THAT WAS DONE IN SUPPORT OF THIS

12:06PM   20   PROTOCOL WAS COMPLETED AT THERANOS.

12:06PM   21   Q.   OKAY.  THESE -- ARE THEY CALLED ASSAYS THE CRH, IL-6?

12:06PM   22   A.   YES, SOMETIMES WE REFER TO THEM AS ASSAYS.

12:06PM   23   Q.   SO WHERE WOULD THESE ASSAYS THEN PHYSICALLY BE WHILE THE

12:06PM   24   WORK IS BEING DONE?

12:07PM   25   A.   THEY WOULD HAVE BEEN IN THERANOS.

CULLEN DIRECT BY MR. SCHENK                                    5027

12:07PM 1    Q.   OKAY.  AND I THINK YOU DESCRIBED MULTIPLEX AS A REFERENCE

12:07PM 2    TO A CARTRIDGE.

12:07PM 3    A.   CORRECT.  THAT WAS OUR LIMITED UNDERSTANDING OF THE

12:07PM 4    TECHNOLOGY WAS THAT ALL THREE OF THESE ASSAYS COULD BE

12:07PM 5    INCORPORATED ONTO A SINGLE CARTRIDGE.

12:07PM 6    Q.   AND WHERE WOULD THAT CARTRIDGE BE?

12:07PM 7    A.   WITHIN THE INSTRUMENT AT THERANOS.

12:07PM 8    Q.   OKAY.

12:07PM 9    A.   YES.

12:07PM 10   Q.   AND THEN HELP ME UNDERSTAND WHAT ROLE SCHERING-PLOUGH WAS

12:07PM 11   PLAYING IN THAT, NOT THE BETA TESTING, BUT IN THIS VALIDATION?

12:07PM 12   A.   NO ROLE OTHER THAN REVIEW OF DOCUMENTS.

12:07PM 13   Q.   OKAY.  IF YOU COULD NOW TURN TO THE NEXT PAGE, IT'S

12:07PM 14   PAGE 3.  THERE'S A PARAGRAPH UNDER ESTIMATED SCHEDULE.

12:07PM 15       DO YOU SEE THAT?

12:07PM 16   A.   YES.

12:07PM 17   Q.   AND IT SAYS THAT THE "STANDARD THERANOS INSTRUMENT

12:07PM 18   RUN-TIME WILL BE ACCELERATED.  THE TOTAL NUMBER OF CARTRIDGES

12:08PM 19   PROVIDED WILL BE ABOUT 2700," AND THEN IT REPEATS THESE ASSAYS;

12:08PM 20   IS THAT RIGHT?

12:08PM 21   A.   THAT'S CORRECT.

12:08PM 22   Q.   "UP TO TEN ADDITIONAL INSTRUMENTS WILL BE SHIPPED.  THE

12:08PM 23   TOTAL EXPECTED RUNTIME IS AROUND ONE MONTH.  THE TOTAL HUMAN

12:08PM 24   CAPITAL COMMITMENT WILL ONLY BE FIVE DAYS OVER THE ENTIRE

12:08PM 25   PROGRAM DURATION AS IT ONLY TAKES UP TO TEN MINUTES TO PREPARE

CULLEN DIRECT BY MR. SCHENK                                    5028

12:08PM   1    AND LOAD A SAMPLE ON A SINGLE INSTRUMENT, AFTER WHICH THE

12:08PM   2    INSTRUMENTS RUN ON THEIR OWN."

12:08PM   3        SO THERE'S A REFERENCE HERE TO THE TOTAL EXPECTED RUN TIME

12:08PM   4    BEING ONE MONTH.

12:08PM   5        WHAT DOES THAT MEAN?

12:08PM   6    A.   I BELIEVE THAT THAT WOULD BE IN REFERENCE TO THE AMOUNT OF

12:08PM   7    TOTAL TIME THAT IT WOULD TAKE TO EXECUTE THE PROTOCOL.

12:08PM   8    Q.   SO THIS VALIDATION WORK THAT THERANOS WAS DOING IN

12:08PM   9    CALIFORNIA WOULD TAKE ONE MONTH?

12:08PM   10   A.   CORRECT.

12:08PM   11   Q.   AND THERE'S ALSO A REFERENCE TO CARTRIDGES AND INSTRUMENTS

12:09PM   12   IN THOSE FIRST COUPLE OF SENTENCES.

12:09PM   13       WHAT IS THAT A REFERENCE TO?

12:09PM   14   A.   SO THE CARTRIDGES WERE DISPOSABLES THAT WERE REQUIRED IN

12:09PM   15   ORDER TO RUN THE INSTRUMENT AND GET THE RESULTS.

12:09PM   16       AND THEN, I'M SORRY, COULD YOU REPEAT THE SECOND HALF OF

12:09PM   17   YOUR QUESTION?

12:09PM   18   Q.   YES.  THERE'S A REFERENCE TO UP TO TEN ADDITIONAL

12:09PM   19   INSTRUMENTS WILL BE SHIPPED.

12:09PM   20   A.   RIGHT.  SO THE INSTRUMENT IS IN REFERENCE TO THE ACTUAL

12:09PM   21   THERANOS MACHINE INTO WHICH THE CARTRIDGES ARE PLACED.

12:09PM   22   Q.   OKAY.  AND FOR THIS VALIDATION, AGAIN, WHERE WERE THE

12:09PM   23   INSTRUMENTS?

12:09PM   24   A.   THE INSTRUMENTS WERE IN THERANOS.

12:09PM   25   Q.   OKAY.  THE ASSAYS THAT WE'VE TALKED ABOUT ON THE CARTRIDGE

CULLEN DIRECT BY MR. SCHENK                                        5029

12:09PM   1      INTO THE DEVICE, THAT ALL HAPPENED AT THERANOS?

12:09PM   2      A.   CORRECT.

12:09PM   3      Q.   THAT DID NOT HAPPEN AT SCHERING-PLOUGH?

12:09PM   4      A.   THAT IS CORRECT.

12:09PM   5      Q.   THERE WERE, I THINK YOU TESTIFIED, TWO SEPARATE

12:09PM   6      INSTRUMENTS THAT WERE SHIPPED TO SCHERING-PLOUGH FOR DIFFERENT

12:09PM   7      WORK.

12:09PM   8      A.   THAT IS CORRECT.

12:09PM   9      Q.   OKAY.  WE'LL GET TO THAT IN A MOMENT.

12:09PM  10           IF YOU WOULD NOW TURN TO TAB 200 IN YOUR BINDER.

12:10PM  11           YOUR HONOR, THE GOVERNMENT OFFERS EXHIBIT 200 PURSUANT TO

12:10PM  12      STIPULATION?

12:10PM  13              MR. CLINE:  NO OBJECTION.

12:10PM  14              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:10PM  15           (GOVERNMENT'S EXHIBIT 200 WAS RECEIVED IN EVIDENCE.)

12:10PM  16      BY MR. SCHENK:

12:10PM  17      Q.   DR. CULLEN, THIS IS A DOCUMENT LABELLED SERVICES

12:10PM  18      AGREEMENT.

12:10PM  19           DO YOU SEE THAT?

12:10PM  20      A.   YES, I DO.

12:10PM  21      Q.   AND IS THIS AN AGREEMENT BETWEEN SCHERING AND THERANOS

12:10PM  22      REGARDING THE VALIDATION THAT WE'VE TALKED ABOUT?

12:10PM  23      A.   IT IS AN AGREEMENT BETWEEN SCHERING AND THERANOS.

12:10PM  24           WHAT I'M NOT CLEAR ABOUT IS WHETHER THIS WAS DOCUMENTING

12:10PM  25      THE VALIDATION.

CULLEN DIRECT BY MR. SCHENK                                    5030

| | | |
|---|---|---|
| 12:10PM | 1 | Q.   OKAY.  IN NUMBER 1, PROJECT, IT SAYS -- IS SPRI, IS THAT |
| 12:10PM | 2 | SCHERING-PLOUGH? |
| 12:10PM | 3 | A.   YES, IT STANDS FOR SCHERING-PLOUGH RESEARCH INSTITUTE, |
| 12:10PM | 4 | WHICH WAS THE DIVISION WITHIN SCHERING-PLOUGH. |
| 12:10PM | 5 | Q.   OKAY.  THE SERVICES INCLUDING, BUT NOT LIMITED TO, |
| 12:10PM | 6 | COMPREHENSIVE VALIDATION OF THE THERANOS -- IS THAT WORD |
| 12:11PM | 7 | CYTOKINE? |
| 12:11PM | 8 | A.   YES, CYTOKINE. |
| 12:11PM | 9 | Q.   WHAT IS THE THERANOS CYTOKINE PANEL? |
| 12:11PM | 10 | A.   SO IT WOULD HAVE BEEN THE THREE ANALYTES THAT WERE |
| 12:11PM | 11 | PREVIOUSLY DISCUSSED.  SO TUMOR NECROSIS FACTOR, INTERLEUKIN-6, |
| 12:11PM | 12 | AND C REACTIVE PROTEIN. |
| 12:11PM | 13 | Q.   OKAY.  SO DOES THAT CLARIFY FOR US WHICH TYPE OF WORK THIS |
| 12:11PM | 14 | AGREEMENT APPLIED TO? |
| 12:11PM | 15 | A.   YES. |
| 12:11PM | 16 | Q.   OKAY.  AT THE BOTTOM, NUMBER 4, THERE'S A PAYMENT TERMS |
| 12:11PM | 17 | SECTION. |
| 12:11PM | 18 |     DO YOU SEE THAT? |
| 12:11PM | 19 | A.   YES. |
| 12:11PM | 20 | Q.   AND THE PAYMENT IS $279,000? |
| 12:11PM | 21 | A.   YES. |
| 12:11PM | 22 | Q.   IS THAT MONEY THAT SCHERING-PLOUGH WAS PAYING TO THERANOS, |
| 12:11PM | 23 | OR THE OTHER WAY AROUND? |
| 12:11PM | 24 | A.   YES, SCHERING-PLOUGH WOULD HAVE PAID THAT TO THERANOS. |
| 12:11PM | 25 | Q.   WHY?  WHAT WORK WAS THERANOS DOING THAT WAS BENEFICIAL OR |

CULLEN DIRECT BY MR. SCHENK                                          5031

12:12PM   1    WORTH PAYING FOR?

12:12PM   2    A.   IT WOULD HAVE BEEN TO COVER THE COST OF THE VALIDATION FOR

12:12PM   3    THOSE THREE, THREE ANALYTES.

12:12PM   4    Q.   THE THREE ANALYTES THAT WERE RUN AT THERANOS ON THERANOS

12:12PM   5    MACHINES?

12:12PM   6    A.   CORRECT.

12:12PM   7    Q.   GOT IT.  OKAY.

12:12PM   8         IF YOU'LL TURN NOW TO PAGE 13 ON THIS DOCUMENT.  WE SEE AN

12:12PM   9    INVOICE HERE FROM THERANOS BILLING SCHERING-PLOUGH.

12:12PM   10        DO YOU SEE THAT?

12:12PM   11   A.   YES.

12:12PM   12   Q.   AND THE AMOUNT IS $279,000?

12:12PM   13   A.   THAT'S CORRECT.

12:12PM   14   Q.   AND LISTED NEXT TO IT WE SEE A REFERENCE TO THOSE

12:12PM   15   CARTRIDGES, THE ROUGHLY 2700 MULTIPLEX CARTRIDGES; IS THAT

12:12PM   16   CORRECT?

12:12PM   17   A.   CORRECT.

12:12PM   18   Q.   SO THAT IS WHAT -- IS THAT WHAT SCHERING-PLOUGH WAS PAYING

12:12PM   19   FOR?

12:12PM   20   A.   YES.

12:12PM   21   Q.   IF WE CAN NOW TURN TO TAB 201.

12:13PM   22        YOUR HONOR, THE GOVERNMENT OFFERS 201 PURSUANT TO

12:13PM   23   STIPULATION.

12:13PM   24             MR. CLINE:  NO OBJECTION.

12:13PM   25             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

CULLEN DIRECT BY MR. SCHENK                                5032

12:13PM   1              (GOVERNMENT'S EXHIBIT 201 WAS RECEIVED IN EVIDENCE.)

12:13PM   2       BY MR. SCHENK:

12:13PM   3       Q.   AND IF WE CAN START ON THE SECOND PAGE OF THIS EXHIBIT.

12:13PM   4            DR. CULLEN, THERE'S AN EMAIL FROM MS. HOLMES TO JIM MCLEOD

12:13PM   5       AND YOU ON APRIL 15TH, 2009.

12:13PM   6            DO YOU SEE THAT?

12:13PM   7       A.   YES, I DO.

12:13PM   8       Q.   SHE WRITES, "DEAR JIM.

12:13PM   9            "IN FOLLOW UP TO OUR DISCUSSIONS WITH CONNIE" -- THAT'S

12:13PM   10      YOU?

12:13PM   11      A.   CORRECT.

12:13PM   12      Q.   -- "WE HAVE CEMENTED A COMPREHENSIVE VALIDATION PROGRAM ON

12:13PM   13      ONE OF OUR MULTIPLEXED CYTOKINE PANELS.  I HAVE ATTACHED THE

12:13PM   14      INVOICE AND PROGRAM OVERVIEW TO THIS EMAIL."

12:13PM   15            DO YOU SEE THAT?

12:13PM   16      A.   YES.

12:13PM   17      Q.   AND THEN IN THE NEXT PARAGRAPH SHE THEN WRITE, "WE DID OF

12:13PM   18      COURSE WORK THROUGH THE VALIDATION PROGRAM WITH CONNIE IN GREAT

12:13PM   19      DETAIL.  WE WILL PRESENT THE RESULTS OF THE VALIDATION BY YOUR

12:13PM   20      VISIT IN MAY.  WE CAN THEN USE THAT VISIT TO DISCUSS THE DATA

12:13PM   21      AND THE BEST WAYS TO CREATE VALUE IN ONGOING PROGRAMS GIVEN THE

12:14PM   22      ABILITY TO COLLECT HIGHER INTEGRITY DATA, FASTER."

12:14PM   23            THERE'S A REFERENCE HERE TO A VISIT IN MAY.

12:14PM   24      A.   YES.

12:14PM   25      Q.   AND WHAT IS THAT IN REGARDS TO?

CULLEN DIRECT BY MR. SCHENK                                    5033

12:14PM   1      A.   SO THAT WAS THE DUE DILIGENCE VISIT.

12:14PM   2      Q.   AND WHAT DO YOU MEAN BY THAT?  WHAT DUE DILIGENCE?

12:14PM   3      A.   SO DUE DILIGENCE IS A GROUP OF INDIVIDUALS WITH VARYING

12:14PM   4      SUBJECT MATTER EXPERTISE GO TO VISIT IN PERSON A SITE FOR WHICH

12:14PM   5      WE ARE EVALUATING TECHNOLOGY OR CONSIDERING USING THE

12:14PM   6      TECHNOLOGY.

12:14PM   7      Q.   AND WERE YOU PART OF THE INDIVIDUALS THAT WENT TO

12:14PM   8      THERANOS?

12:14PM   9      A.   I WAS.

12:14PM   10     Q.   OKAY.  IF WE COULD NOW TURN TO 192, EXHIBIT 192.

12:14PM   11          YOUR HONOR, THE GOVERNMENT OFFERS EXHIBIT 192 PURSUANT TO

12:14PM   12     STIPULATION.

12:14PM   13              MR. CLINE:  NO OBJECTION.

12:14PM   14              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:14PM   15          (GOVERNMENT'S EXHIBIT 192 WAS RECEIVED IN EVIDENCE.)

12:14PM   16     BY MR. SCHENK:

12:14PM   17     Q.   DR. CULLEN, THIS APPEARS TO BE A CALENDAR INVITE.  IT WAS

12:14PM   18     SENT AT THE END OF MARCH 2009, BUT FOR A MEETING MAY 5TH, 2009.

12:15PM   19          DO YOU SEE THAT?

12:15PM   20     A.   YES.

12:15PM   21     Q.   AND THERE'S A LIST OF PARTICIPANTS FROM SCHERING-PLOUGH.

12:15PM   22          IS YOUR NAME ONE OF THEM?

12:15PM   23     A.   YES.

12:15PM   24     Q.   AND A LITTLE BIT FURTHER DOWN, IT LOOKS LIKE THERE'S A

12:15PM   25     LIST OF REQUESTED AGENDA ITEMS FROM SCHERING-PLOUGH.

CULLEN DIRECT BY MR. SCHENK                                          5034

| | | |
|---|---|---|
| 12:15PM | 1 | IS THAT RIGHT? |
| 12:15PM | 2 | A.   CORRECT. |
| 12:15PM | 3 | Q.   DO YOU MIND JUST BRIEFLY SUMMARIZING FOR THE JURY WHAT |
| 12:15PM | 4 | THESE ARE?  WHAT WAS SCHERING-PLOUGH INTERESTED IN DISCUSSING |
| 12:15PM | 5 | AT THIS MAY 2009 MEETING AT THERANOS? |
| 12:15PM | 6 | A.   RIGHT.  SO WE WERE INTERESTED IN UNDERSTANDING HOW |
| 12:15PM | 7 | THERANOS WOULD APPROACH THE VALIDATION OF THE ASSAYS, TIMING. |
| 12:15PM | 8 | WE WERE ALSO INTERESTED IN THE DEVELOPMENT OF PROPRIETARY |
| 12:15PM | 9 | ASSAYS THAT WOULD BE EXCLUSIVE TO SCHERING-PLOUGH AS OPPOSED TO |
| 12:15PM | 10 | THE ALREADY AVAILABLE CYTOKINE PANELS THAT THERANOS HAD. |
| 12:15PM | 11 | AND THEN UNDERSTANDING MORE OF THE TECHNICAL DETAILS WITH |
| 12:15PM | 12 | RESPECT TO THE MULTIPLEXING, WHICH IS BEING ABLE TO MEASURE |
| 12:16PM | 13 | MULTIPLE ANALYTES SIMULTANEOUSLY. |
| 12:16PM | 14 | WE WERE INTERESTED IN COMPUTER SYSTEM VALIDATION BECAUSE |
| 12:16PM | 15 | THAT IS A REQUIREMENT FOR PROVIDING THESE DATA FOR |
| 12:16PM | 16 | CONSIDERATION BY THE FOOD AND DRUG ADMINISTRATION, |
| 12:16PM | 17 | UNDERSTANDING PATIENT CONFIDENTIALITY, AND THE LAST ITEM ON THE |
| 12:16PM | 18 | LIST IS WHAT IS CALLED INCURRED SAMPLE REANALYSIS. |
| 12:16PM | 19 | THIS IS ALSO A REQUIREMENT OF THE FOOD AND DRUG |
| 12:16PM | 20 | ADMINISTRATION TO SHOW THE REPRODUCIBILITY OF THE ASSAYS THAT |
| 12:16PM | 21 | ARE VALIDATED. |
| 12:16PM | 22 | Q.   THANK YOU. |
| 12:16PM | 23 | IF YOU WOULD TURN TO THE NEXT PAGE, PAGE 2 OF THIS |
| 12:16PM | 24 | EXHIBIT. |
| 12:16PM | 25 | IS THIS AN AGENDA FROM THE MAY MEETING? |

UNITED STATES COURT REPORTERS

CULLEN DIRECT BY MR. SCHENK                                    5035

12:16PM   1     A.   YES, IT IS.

12:16PM   2     Q.   AND, AGAIN, YOU ATTENDED THIS MEETING IN PERSON?

12:16PM   3     A.   I DID.

12:16PM   4     Q.   AND DID MS. HOLMES ATTEND IN PERSON?

12:16PM   5     A.   YES, SHE DID.

12:16PM   6     Q.   WAS THAT THE FIRST TIME THAT YOU MET MS. HOLMES IN PERSON?

12:16PM   7     A.   YES.

12:16PM   8     Q.   AND WHAT DO YOU RECALL FROM THIS MEETING?  DID YOU ASK

12:17PM   9     QUESTIONS DURING THE MEETING?

12:17PM   10    A.   YES, I ASKED A LOT OF QUESTIONS.  MY RECOLLECTION IS THAT

12:17PM   11    THE ANSWERS TO THE QUESTIONS WERE NOT NECESSARILY FORTHCOMING.

12:17PM   12    SO I WAS DISSATISFIED, QUITE HONESTLY, WITH THE RESPONSE TO THE

12:17PM   13    QUESTIONS IN THAT THERE WAS INSUFFICIENT TECHNICAL DETAIL FOR

12:17PM   14    US TO BE ABLE TO EVALUATE THE TECHNOLOGY.

12:17PM   15    Q.   WHAT DO YOU MEAN WHEN YOU SAY "INSUFFICIENT DETAIL"?

12:17PM   16    A.   SO WHEN A SPONSOR, SUCH AS SCHERING-PLOUGH, USES A

12:17PM   17    TECHNOLOGY IN SUPPORT OF THEIR DRUG DEVELOPMENT EFFORTS, WHICH

12:17PM   18    EVENTUALLY GETS SUBMITTED TO THE FOOD AND DRUG ADMINISTRATION,

12:17PM   19    WE ARE EXPECTED TO BE ABLE TO UNDERSTAND AND BE SUPPORTIVE FROM

12:17PM   20    A SCIENTIFIC PERSPECTIVE OF THE TECHNOLOGY THAT WE USE TO

12:17PM   21    MEASURE THOSE ANALYTES.

12:18PM   22    Q.   WHEN YOU ASKED QUESTIONS DURING THE MEETING, DO YOU RECALL

12:18PM   23    WHETHER MS. HOLMES WAS THE ONE THAT ANSWERED OR OTHER EMPLOYEES

12:18PM   24    FROM THERANOS?

12:18PM   25    A.   ALMOST EXCLUSIVELY MS. HOLMES WAS THE ONE WHO ANSWERED THE

CULLEN DIRECT BY MR. SCHENK                              5036

```
12:18PM   1    QUESTIONS, IRRESPECTIVE OF TO WHOM THE QUESTION WAS ADDRESSED.

12:18PM   2    Q.   WHAT DO YOU MEAN BY THAT?

12:18PM   3    A.   I MEAN THAT ON A COUPLE OF OCCASIONS I ATTEMPTED TO ASK

12:18PM   4    QUESTIONS OF OTHER THERANOS STAFF WHO WERE IN THE MEETING AND

12:18PM   5    IT -- THE RESPONSE WAS INTERRUPTED BY MS. HOLMES.

12:18PM   6    Q.   WHY DID YOU TRY TO DIRECT SOME QUESTIONS TO OTHER THERANOS

12:18PM   7    EMPLOYEES?

12:18PM   8    A.   BECAUSE THEY WERE BROUGHT INTO THE MEETING AS SUBJECT

12:18PM   9    MATTER EXPERTS, AND ALSO, QUITE HONESTLY, I WANTED TO TRY TO

12:18PM  10    GET ADDITIONAL INFORMATION WHICH, AS I MENTIONED, DID NOT SEEM

12:18PM  11    TO BE FORTHCOMING.

12:18PM  12    Q.   WHAT DO YOU MEAN WHEN YOU SAY INFORMATION WAS NOT

12:18PM  13    FORTHCOMING?

12:18PM  14    A.   I MEAN THAT THERE WERE NO DIRECT ANSWERS TO QUESTIONS, AND

12:19PM  15    THE QUESTIONS ARE FAIRLY TECHNICAL, SO THE ANSWERS SHOULD BE

12:19PM  16    FAIRLY TECHNICAL AND DIRECT.

12:19PM  17        AND SO, YOU KNOW, THERE WERE WHAT I DESCRIBE AS CAGEY

12:19PM  18    RESPONSES OR ATTEMPTS TO REDIRECT TO OTHER TOPICS OF

12:19PM  19    DISCUSSION.

12:19PM  20    Q.   NOW, I APPRECIATE THE MEETING WAS IN 2009.

12:19PM  21        DO YOU HAVE A SENSE OF THE TOPICS, THE KINDS OF QUESTIONS

12:19PM  22    THAT WERE DISCUSSED?  WE'VE TALKED ABOUT THE AGENDA ITEMS.

12:19PM  23    A.   RIGHT.

12:19PM  24    Q.   BUT WHAT MADE IT INTO THE ACTUAL MEETING?

12:19PM  25    A.   CERTAINLY WE DISCUSSED THE VALIDATION AND HOW THE SOFTWARE
```

CULLEN DIRECT BY MR. SCHENK                                          5037

12:19PM   1    REDUCES THE DATA, BECAUSE THAT WAS OF CRITICAL CONCERN TO US,

12:19PM   2    AND WE CERTAINLY DISCUSSED, OR TRIED TO DISCUSS OR GET DETAILED

12:20PM   3    INFORMATION ON HOW THE INSTRUMENT ACTUALLY WORKED FROM A

12:20PM   4    TECHNICAL PERSPECTIVE.

12:20PM   5    Q.   OKAY.  DO YOU REMEMBER WHETHER AT THE END OF THE MEETING

12:20PM   6    YOU EXPRESSED YOUR CONCERNS THAT YOU'VE JUST DESCRIBED TO US?

12:20PM   7    YOU USED THE WORD "CAGEY."  DID YOU SAY AT THE END OF THE

12:20PM   8    MEETING, I FEEL THIS WAY ABOUT THIS MEETING?  DO YOU HAVE THAT

12:20PM   9    RECOLLECTION?

12:20PM  10    A.   I DID NOT SAY IT AT THE MEETING.  I SHARED MY THOUGHTS

12:20PM  11    PRIVATELY WITH SOME OF MY COLLEAGUES.

12:20PM  12    Q.   WHY DIDN'T YOU SAY IT AT THE MEETING?

12:20PM  13    A.   UM, IT'S AWKWARD.

12:20PM  14    Q.   OKAY.  IF YOU'LL NOW TURN TO EXHIBIT 223 IN YOUR BINDER.

12:20PM  15         YOUR HONOR, THE GOVERNMENT OFFERS EXHIBIT 223 PURSUANT TO

12:20PM  16    STIPULATION.

12:20PM  17             MR. CLINE:  NO OBJECTION.

12:20PM  18             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:20PM  19         (GOVERNMENT'S EXHIBIT 223 WAS RECEIVED IN EVIDENCE.)

12:20PM  20    BY MR. SCHENK:

12:20PM  21    Q.   DR. CULLEN, WE'VE NOW MOVED INTO JUNE OF 2009, AND IF WE

12:21PM  22    START AT THE BOTTOM, THERE'S AN EMAIL FROM YOU TO SOMEONE NAMED

12:21PM  23    GARY FRENZEL.

12:21PM  24         DO YOU SEE THAT?

12:21PM  25    A.   YES, I DO.

CULLEN DIRECT BY MR. SCHENK                                    5038

12:21PM  1    Q.   DID MR. FRENZEL WORKS AT THERANOS?

12:21PM  2    A.   YES, HE DID.

12:21PM  3    Q.   AND YOU WRITE -- AND THE MEETING THAT YOU JUST TALKED

12:21PM  4    ABOUT, THAT WAS IN MAY?

12:21PM  5    A.   CORRECT.

12:21PM  6    Q.   SO WE'RE INTO THE NEXT MONTH; IS THAT RIGHT?

12:21PM  7    A.   THAT IS CORRECT.

12:21PM  8    Q.   AND YOU'RE ASKING MR. FRENZEL TO CHECK IN AND GET AN ASSAY

12:21PM  9    DEVELOPMENT UPDATE FOR THE TEAM?

12:21PM 10    A.   YES.

12:21PM 11    Q.   AND WHAT IS "THE TEAM" A REFERENCE TO?

12:21PM 12    A.   SO THE TEAM WOULD HAVE BEEN MYSELF, JIM MCLEOD, WHO AS I

12:21PM 13    MENTIONED WAS THE HEAD OF OUR EARLY CLINICAL RESEARCH, AND

12:21PM 14    OTHERS WHO WOULD HAVE PARTICIPATED ON THE DUE DILIGENCE

12:21PM 15    MEETING.

12:21PM 16    Q.   I SEE.  AND WHEN YOU'RE ASKING FOR SOMETHING CALLED AN

12:21PM 17    ASSAY DEVELOPMENT UPDATE, WHAT WERE YOU LOOKING FOR?

12:21PM 18    A.   SO I WAS LOOKING ON PROGRESS AGAINST THE PROTOCOL THAT YOU

12:21PM 19    HAD MENTIONED OR SHOWN EARLIER.

12:21PM 20    Q.   I SEE.  AND A MOMENT AGO YOU SAID AT THE MEETING IN

12:22PM 21    PALO ALTO, YOU FELT THAT THERANOS WAS LESS THAN FORTHCOMING; IS

12:22PM 22    THAT FAIR?

12:22PM 23    A.   YES.

12:22PM 24    Q.   AND WHY, IF THAT WAS YOUR IMPRESSION, DID YOU WRITE A

12:22PM 25    MONTH LATER ASKING FOR MORE INFORMATION ON ASSAY DEVELOPMENT?

CULLEN DIRECT BY MR. SCHENK                                    5039

12:22PM   1    A.   BECAUSE SCHERING-PLOUGH HAD PAID $279,000 FOR THIS WORK.

12:22PM   2    WE HAD EXPECTED TO RECEIVE IT AT THAT MAY DUE DILIGENCE

12:22PM   3    MEETING, AND WE DID NOT.

12:22PM   4    Q.   ABOVE THIS EMAIL, MR. FRENZEL FORWARDS IT TO MS. HOLMES.

12:22PM   5         DO YOU SEE THAT, FORWARDS YOUR EMAIL TO MS. HOLMES?

12:22PM   6    A.   YES.

12:22PM   7    Q.   IF YOU'LL NOW TURN TO TAB 259.

12:22PM   8         YOUR HONOR, THE GOVERNMENT OFFERS 259 PURSUANT TO

12:22PM   9    STIPULATION.

12:22PM  10             MR. CLINE:  NO OBJECTION.

12:22PM  11             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:22PM  12         (GOVERNMENT'S EXHIBIT 259 WAS RECEIVED IN EVIDENCE.)

12:22PM  13    BY MR. SCHENK:

12:22PM  14    Q.   THE FIRST DOCUMENT IN 259 AT THE BOTTOM APPEARS TO BE AN

12:22PM  15    EMAIL FROM MR. FRENZEL TO YOU.

12:23PM  16         DO YOU SEE THAT?

12:23PM  17    A.   YES.

12:23PM  18    Q.   AND LET ME NOTE THAT THIS IS NOW IN DECEMBER.  THE EMAIL

12:23PM  19    THAT WE WERE JUST TALKING ABOUT WAS IN JUNE; IS THAT RIGHT?

12:23PM  20    A.   THAT'S RIGHT.

12:23PM  21    Q.   SO ABOUT SIX MONTHS LATER, MR. FRENZEL WRITES, "HI

12:23PM  22    CONNIE."

12:23PM  23         THE SUBJECT WAS VALIDATION REPORT?

12:23PM  24    A.   UH-HUH.

12:23PM  25    Q.   WAS THAT A YES?

CULLEN DIRECT BY MR. SCHENK                                    5040

12:23PM   1    A.   YES.

12:23PM   2    Q.   "HI CONNIE, I WAS ASKED TO SEND THIS REPORT ON TO YOU, AND

12:23PM   3    IF YOU CAN FORWARD TO THE PROPER PEOPLE.  AFTER YOU AND YOUR

12:23PM   4    GROUP HAVE AN OPPORTUNITY TO GO THROUGH IT, LET US KNOW IF YOU

12:23PM   5    WOULD LIKE TO ARRANGE A PHONE CONFERENCE TO DISCUSS THE

12:23PM   6    RESULTS."

12:23PM   7         DO YOU SEE THAT?

12:23PM   8    A.   I DO.

12:23PM   9    Q.   AND THEN ABOVE THIS EMAIL, MR. FRENZEL FORWARDS IT ALMOST

12:23PM   10   TWO MONTHS LATER, THE END OF JANUARY 2010, TO SOMEONE NAMED

12:23PM   11   DENNIS YAM.

12:23PM   12        DO YOU SEE THAT?

12:23PM   13   A.   YES.

12:23PM   14   Q.   LET'S GO NOW TO THE ATTACHMENT.  LET'S START ON PAGE 3.

12:23PM   15        WHAT IS THIS DOCUMENT?  WHAT ARE WE LOOKING AT?

12:23PM   16   A.   SO THIS WAS THE VALIDATION REPORT THAT THERANOS HAD

12:23PM   17   PROVIDED.

12:23PM   18   Q.   OKAY.  THE REPORT THAT YOU MENTIONED EXPECTING TO SEE IN

12:24PM   19   MAY AND WRITING ABOUT IN JUNE?

12:24PM   20   A.   CORRECT.

12:24PM   21   Q.   OKAY.  AND ON THIS PAGE, IF WE COULD ZOOM OUT, IN THE

12:24PM   22   UPPER LEFT CORNER, DO YOU SEE THERANOS'S LOGO?

12:24PM   23   A.   I DO.

12:24PM   24   Q.   IN THE UPPER RIGHT CORNER, DO YOU SEE A SCHERING-PLOUGH

12:24PM   25   LOGO?

CULLEN DIRECT BY MR. SCHENK                                    5041

12:24PM   1    A.   I DO NOT.

12:24PM   2    Q.   IF WE COULD NOW TURN TO PAGE 5.  THERE IS DATA ON PAGE 5.

12:24PM   3         DO YOU SEE THAT?

12:24PM   4    A.   YES.

12:24PM   5    Q.   AND IS THIS SCHERING-PLOUGH DATA?

12:24PM   6    A.   NO.

12:24PM   7    Q.   WHO GENERATED THIS DATA?

12:24PM   8    A.   THERANOS.

12:24PM   9    Q.   ON PAGE 19, IF YOU'LL TURN TO PAGE 19, THERE'S A SECTION

12:24PM  10    ENTITLED CONCLUSIONS.

12:24PM  11         DO YOU SEE THAT?

12:24PM  12    A.   I DO.

12:24PM  13    Q.   AND WHOSE CONCLUSIONS ARE THESE?

12:24PM  14    A.   THOSE WOULD HAVE BEEN THERANOS'S CONCLUSIONS SINCE THEY

12:24PM  15    WROTE THE REPORT.

12:24PM  16    Q.   DID -- LET ME FOCUS YOUR ATTENTION ON THE VERY FIRST

12:24PM  17    SENTENCE OF THE CONCLUSIONS.  IT READS, "THE THERANOS'S IL-6,

12:25PM  18    TNF-A, AND CRP ASSAY MULTIPLEX HAS BEEN SHOWN TO GIVE ACCURATE

12:25PM  19    AND PRECISE RESULTS FOR THREE INDEPENDENTLY CALIBRATED

12:25PM  20    CARTRIDGE LOTS AND ALL THE MANY INSTRUMENTS USED."

12:25PM  21         IS THAT A CONCLUSION THAT YOU REACHED?

12:25PM  22    A.   NO.

12:25PM  23    Q.   TO YOUR KNOWLEDGE, IS THAT A CONCLUSION THAT ANYBODY AT

12:25PM  24    SCHERING-PLOUGH REACHED?

12:25PM  25    A.   NO.

CULLEN DIRECT BY MR. SCHENK                                          5042

12:25PM   1    Q.   WHEN YOU RECEIVED THIS DOCUMENT, YOU SAW THAT THE FIRST

12:25PM   2    PAGE OF THIS EXHIBIT WAS MR. FRENZEL SENDING THIS TO YOU IN

12:25PM   3    DECEMBER, DID YOU WRITE HIM BACK AND SAY, I AGREE WITH THESE

12:25PM   4    CONCLUSIONS?

12:25PM   5    A.   NO.

12:25PM   6    Q.   WAS THERE EVER AN OCCASION WHEN YOU SAID THESE CONCLUSIONS

12:25PM   7    ARE ACCURATE?

12:25PM   8    A.   NO.

12:25PM   9    Q.   TO YOUR KNOWLEDGE, WAS THERE EVER AN OCCASION WHEN ANYBODY

12:25PM  10    AT SCHERING-PLOUGH SAID THIS DOCUMENT OR THESE CONCLUSIONS ARE

12:25PM  11    ACCURATE?

12:25PM  12    A.   NO.

12:25PM  13    Q.   WOULD YOU NOW TURN TO PAGE 262?  I'M SORRY, EXHIBIT 262.

12:26PM  14         YOUR HONOR, THE GOVERNMENT OFFERS 262 TO PURSUANT TO

12:26PM  15    STIPULATION.

12:26PM  16             MR. CLINE:  NO OBJECTION.

12:26PM  17             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:26PM  18         (GOVERNMENT'S EXHIBIT 262 WAS RECEIVED IN EVIDENCE.)

12:26PM  19    BY MR. SCHENK:

12:26PM  20    Q.   YOU'LL SEE THIS IS A CONTINUATION OF A PRIOR EMAIL CHAIN.

12:26PM  21    IF YOU START ON THE PAGE 2, THERE IS THAT EMAIL FROM

12:26PM  22    MR. FRENZEL TO YOU IN DECEMBER WITH A VALIDATION REPORT.

12:26PM  23         DO YOU SEE THAT?

12:26PM  24    A.   YES.

12:26PM  25    Q.   AND NOW IF WE COME BACK TO THE FIRST PAGE OF THIS EXHIBIT

CULLEN DIRECT BY MR. SCHENK                           5043

12:26PM   1    AT THE BOTTOM, A FEW DAYS LATER, ON THE 9TH OF DECEMBER,

12:26PM   2    MR. FRENZEL FOLLOWS UP.

12:26PM   3        "HI CONNIE, I JUST WANTED TO MAKE SURE THAT YOU RECEIVED

12:26PM   4    THIS REPORT.  WE ARE LOOKING FORWARD TO DISCUSSING IT WITH

12:26PM   5    YOU."

12:26PM   6        AND THEN YOU RESPOND ON THAT SAME DAY, "I'M SORRY FOR THE

12:27PM   7    SLOW RESPONSE.  I DID RECEIVE THE REPORT, I'D ACTUALLY LIKE TO

12:27PM   8    DEFER OUR DISCUSSIONS UNTIL JANUARY.  WE ARE TOTALLY SWAMPED

12:27PM   9    WITH THE MERGER WITH MERCK."

12:27PM  10        IS MERCK THE MERGER THAT YOU REFERENCED AT THE BEGINNING

12:27PM  11    OF YOUR TESTIMONY?

12:27PM  12    A.   THAT'S CORRECT.

12:27PM  13    Q.   AND DO YOU RECALL HAVING THIS CONVERSATION?  YOU

12:27PM  14    REFERENCED DEFERRING A DISCUSSION UNTIL JANUARY.

12:27PM  15        DO YOU RECALL IN JANUARY HAVING THAT CONVERSATION WITH

12:27PM  16    MR. FRENZEL?

12:27PM  17    A.   NO.

12:27PM  18    Q.   DO YOU RECALL, AT ANY POINT AFTER DECEMBER OF 2009, HAVING

12:27PM  19    FURTHER CONVERSATIONS WITH THERANOS WHERE YOU SAID ANYTHING

12:27PM  20    POSITIVE ABOUT THAT VALIDATION REPORT?

12:27PM  21    A.   NO.

12:27PM  22    Q.   WOULD YOU NOW TURN TO EXHIBIT 291.

12:27PM  23        YOUR HONOR, 291 HAS BEEN PREVIOUSLY ADMITTED.  PERMISSION

12:27PM  24    TO PUBLISH?

12:27PM  25             THE COURT:  YES.

CULLEN DIRECT BY MR. SCHENK                                       5044

| | | |
|---|---|---|
| 12:27PM | 1 | MR. SCHENK:  THANK YOU. |
| 12:27PM | 2 | Q.   DR. CULLEN, I'M SHOWING YOU THIS EMAIL.  YOU'RE NOT ON IT. |
| 12:27PM | 3 | AT THE TOP, IT'S TO EMPLOYEES AT WALGREENS, PEOPLE AT |
| 12:28PM | 4 | WALGREENS.COM EMAIL ADDRESSES. |
| 12:28PM | 5 | DO YOU SEE THAT? |
| 12:28PM | 6 | A.   I DO. |
| 12:28PM | 7 | Q.   THIS EMAIL WAS SENT IN APRIL OF 2010. |
| 12:28PM | 8 | AND DO YOU SEE THE THIRD ATTACHMENT? |
| 12:28PM | 9 | A.   THIRD ATTACHMENT?  NO.  I'M SORRY. |
| 12:28PM | 10 | Q.   UNDER THE SUBJECT? |
| 12:28PM | 11 | A.   OH.  OH, YES, I DO. |
| 12:28PM | 12 | Q.   THE THIRD ATTACHMENT READS THERANOS MULTIPLEXED PANEL |
| 12:28PM | 13 | VALIDATION REPORT UNDERSCORE SCHERING-PLOUGH. |
| 12:28PM | 14 | DO YOU SEE THAT? |
| 12:28PM | 15 | A.   I DO. |
| 12:28PM | 16 | Q.   AND THEN MS. HOLMES WRITES DEAR -- I'M SORRY.  SHE WRITES, |
| 12:28PM | 17 | "DR. JAY, ALEX. |
| 12:28PM | 18 | "AS PER OUR DISCUSSION, PLEASE FIND THREE INDEPENDENT DUE |
| 12:28PM | 19 | DILIGENCE REPORTS ON THERANOS SYSTEMS ATTACHED TO THIS EMAIL. |
| 12:28PM | 20 | THESE REPORTS ARE FROM GLAXOSMITHKLINE, PFIZER, AND |
| 12:28PM | 21 | SCHERING-PLOUGH AFTER THEIR OWN TECHNICAL VALIDATION AND |
| 12:28PM | 22 | EXPERIENCE WITH THERANOS SYSTEMS IN THE FIELD." |
| 12:28PM | 23 | DID I READ THAT RIGHT? |
| 12:29PM | 24 | A.   THAT'S CORRECT. |
| 12:29PM | 25 | Q.   THE VALIDATION REPORT THAT YOU AND I HAVE SPOKEN ABOUT, |

CULLEN DIRECT BY MR. SCHENK                                    5045

12:29PM  1    WOULD YOU CALL THAT SCHERING-PLOUGH'S OWN TECHNICAL VALIDATION?

12:29PM  2    A.   NO.

12:29PM  3    Q.   WE ALSO HAVE TALKED ABOUT SOME BETA TESTING.  WOULD YOU

12:29PM  4    DESCRIBE FOR THE JURY WHAT THAT WAS?

12:29PM  5    A.   YES.  BETA TESTING WAS WE HAD TWO INSTRUMENTS IN THE

12:29PM  6    LABORATORY AND WE HAD A VOLUNTEER FROM THE LAB PROVIDE A BLOOD

12:29PM  7    SAMPLE AND WE MEASURED C REACTIVE PROTEIN.

12:29PM  8         TO MY RECOLLECTION IT WAS A SINGLE DETERMINATION.

12:29PM  9    Q.   WHAT DOES THAT MEAN, A SINGLE DETERMINATION?

12:29PM  10   A.   IT MEANS WE TESTED ONE SAMPLE ONCE.

12:29PM  11   Q.   THE PHRASE IN THIS EMAIL THAT I HIGHLIGHTED FOR YOU,

12:29PM  12   SCHERING-PLOUGH'S OWN TECHNICAL VALIDATION, YOU SAID THAT WOULD

12:29PM  13   NOT BE ACCURATE FOR THE REPORT, THE VALIDATION REPORT?

12:29PM  14   A.   THAT IS CORRECT.

12:29PM  15   Q.   WOULD THAT BE ACCURATE FOR THE BETA TESTING?

12:30PM  16   A.   NO, IT WOULD NOT.

12:30PM  17   Q.   WHY?

12:30PM  18   A.   TOO FEW SAMPLES, NO PROTOCOL WITH PREDEFINED ACCEPTANCE

12:30PM  19   CRITERIA.

12:30PM  20   Q.   IF YOU'LL TURN TO IN EXHIBIT 291, PAGE 34 OF THE EXHIBIT.

12:30PM  21        DO YOU SEE A COPY OF THE THERANOS MULTIPLEXED VALIDATION

12:30PM  22   AND A REFERENCE AGAIN TO IL-6, TNF-ALPHA, AND CRP?

12:30PM  23   A.   I DO.

12:30PM  24   Q.   AND AGAIN, IS THIS THE VALIDATION REPORT THAT YOU HAVE

12:30PM  25   TESTIFIED ABOUT PREVIOUSLY FROM TODAY?

CULLEN DIRECT BY MR. SCHENK                                    5046

12:30PM   1    A.   YES.

12:30PM   2    Q.   AND IN THE UPPER LEFT-HAND CORNER, WHAT DO YOU SEE?

12:30PM   3    A.   I SEE THE SCHERING-PLOUGH LOGO.

12:30PM   4    Q.   OKAY.

12:30PM   5        IF I COULD, MS. HOLLIMAN, IF IT'S POSSIBLE IF WE COULD

12:30PM   6    BRING UP 259, PAGE 3, AND EXHIBIT 291, PAGE 34 AT THE SAME

12:31PM   7    TIME.

12:31PM   8        THE DOCUMENT ON THE LEFT, DR. CULLEN, IS 259, PAGE 3.

12:31PM   9        IS THAT THE VERSION THAT WAS EMAILED TO YOU BY

12:31PM   10   MR. FRENZEL?

12:31PM   11   A.   YES.

12:31PM   12   Q.   AND WHAT I'M SHOWING ON THE RIGHT, IS THAT A VERSION THAT

12:31PM   13   WAS SENT AT LEAST IN THE EMAIL TO WALGREENS?

12:31PM   14   A.   I DON'T KNOW WHAT DOCUMENT WOULD HAVE BEEN SENT TO

12:31PM   15   WALGREENS.

12:31PM   16   Q.   IN EXHIBIT 291 THAT I'VE SHOWED YOU, THOUGH, IS THAT --

12:31PM   17   A.   YES, YES.

12:31PM   18   Q.   -- IT IS THAT SAME DOCUMENT; IS THAT RIGHT?

12:31PM   19   A.   YES.

12:31PM   20   Q.   AND MS. HOLLIMAN, IF WE COULD ALSO BRING UP 259, PAGE 19,

12:31PM   21   AND 291, PAGE 51.

12:31PM   22       DR. CULLEN, A MOMENT AGO I READ FOR YOU THE CONCLUSION

12:31PM   23   SECTION IN THE VALIDATION REPORT THAT WAS SENT TO

12:32PM   24   SCHERING-PLOUGH.

12:32PM   25       DO YOU RECALL THAT?

5047

CULLEN DIRECT BY MR. SCHENK

12:32PM 1    A.   YES.

12:32PM 2    Q.   AND THAT'S APPEARING NOW AT THE TOP OF THE SCREEN, THAT

12:32PM 3    THE THERANOS MULTIPLEXED ASSAYS WERE SHOWN TO GIVE ACCURATE AND

12:32PM 4    PRECISE RESULTS FOR THREE INDEPENDENTLY CALIBRATED CARTRIDGE

12:32PM 5    LOTS.

12:32PM 6         DO YOU SEE THAT?

12:32PM 7    A.   YES.

12:32PM 8    Q.   AND I THINK YOU TOLD US THAT WAS NOT A SCHERING-PLOUGH

12:32PM 9    CONCLUSION; IS THAT RIGHT?

12:32PM 10   A.   THAT IS CORRECT.

12:32PM 11   Q.   AND IN EXHIBIT 291, THE VERSION THAT WAS ATTACHED TO THE

12:32PM 12   WALGREENS EMAIL, THE FIRST SENTENCE OF THE CONCLUSIONS NOW

12:32PM 13   READS, "THE THERANOS IL-6, TNF-ALPHA, CRP ASSAYS MULTIPLEX HAS

12:32PM 14   BEEN SHOWN TO GIVE MORE ACCURATE AND PRECISE RESULTS FOR THREE

12:32PM 15   INDEPENDENTLY CALIBRATED CARTRIDGE LOTS AND ALL OF THE MANY

12:32PM 16   INSTRUMENTS USED THAN CURRENT 'GOLD STANDARD' REFERENCE

12:32PM 17   METHODS."

12:32PM 18        DID I READ THAT RIGHT?

12:32PM 19   A.   YES.

12:32PM 20   Q.   IT MAY GO WITHOUT SAYING, BUT YOU DID NOT APPROVE THE

12:32PM 21   VERSION ON TOP, THE ONE THAT WAS SENT TO YOU; IS THAT CORRECT?

12:33PM 22   A.   THAT'S CORRECT.

12:33PM 23   Q.   AND THE ENHANCED CONCLUSION, IS THAT SOMETHING THAT YOU

12:33PM 24   WOULD AGREE WITH?

12:33PM 25   A.   NO.

CULLEN CROSS BY MR. CLINE                                        5048

12:33PM   1    Q.   IS THAT SOMETHING THAT, TO YOUR KNOWLEDGE, ANYBODY FROM

12:33PM   2    SCHERING-PLOUGH AGREED WITH?

12:33PM   3    A.   NO.

12:33PM   4            MR. SCHENK:  YOUR HONOR, MAY I HAVE ONE MOMENT?

12:33PM   5            THE COURT:  YES.

12:33PM   6         (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

12:33PM   7            MR. SCHENK:  THANK YOU.  NO FURTHER QUESTIONS.

12:33PM   8            THE COURT:  MR. CLINE, DO YOU HAVE

12:33PM   9    CROSS-EXAMINATION?

12:33PM  10            MR. CLINE:  I DO.

12:33PM  11                    **CROSS-EXAMINATION**

12:33PM  12    BY MR. CLINE:

12:33PM  13    Q.   DR. CULLEN, GOOD AFTERNOON.

12:34PM  14    A.   GOOD AFTERNOON.

12:34PM  15    Q.   MY NAME IS JOHN CLINE AND I'M ONE OF THE LAWYERS FOR

12:34PM  16    MS. HOLMES.

12:34PM  17         LET ME START BY TAKING CARE A LITTLE BIT OF ADMINISTRATIVE

12:34PM  18    STUFF HERE.

12:34PM  19         YOUR HONOR, MAY I APPROACH THE WITNESS?

12:34PM  20            THE COURT:  YES.

12:34PM  21    BY MR. CLINE:

12:34PM  22    Q.   DR. CULLEN, I'M GOING TO HAND YOU ANOTHER BINDER --

12:34PM  23    A.   OKAY.

12:34PM  24    Q.   -- WHICH HAS SOME OTHER EXHIBITS IN IT THAT I WILL BE

12:34PM  25    REFERRING YOU TO AS WE GO ALONG (HANDING.)

CULLEN CROSS BY MR. CLINE                                      5049

12:34PM  1          DR. CULLEN, LET ME START WITH THAT BETA TESTING THAT

12:34PM  2    MR. SCHENK MENTIONED TO YOU.  THAT'S WHERE YOU GOT THE ACTUAL

12:34PM  3    PHYSICAL MACHINES FROM THERANOS?

12:34PM  4    A.   CORRECT.

12:34PM  5    Q.   AND HOW MANY DID YOU GET?  YOU GOT TWO?

12:34PM  6    A.   MY RECOLLECTION IS THAT WE GOT TWO.

12:34PM  7    Q.   ALL RIGHT.  AND YOU RAN ONE ASSAY, ONE SAMPLE?

12:35PM  8    A.   CORRECT.

12:35PM  9    Q.   WAS IT ON ONE MACHINE?  TWO MACHINES?

12:35PM  10   A.   I DON'T RECALL IF IT WAS ON ONE OR TWO MACHINES.

12:35PM  11   Q.   ALL RIGHT.  AND THE -- YOU AND YOUR TEAM THOUGHT THAT THE

12:35PM  12   DEVICE WORKED WELL; CORRECT?

12:35PM  13   A.   YES.

12:35PM  14   Q.   AND YOU THOUGHT IT APPEARED TO PROVIDE ACCURATE RESULTS;

12:35PM  15   RIGHT?

12:35PM  16   A.   AS FAR AS WE COULD TELL.

12:35PM  17   Q.   THAT WAS YOUR THOUGHT AT THE TIME, THOUGH, THAT IT

12:35PM  18   APPEARED TO PROVIDE ACCURATE RESULTS?

12:35PM  19   A.   AS FAR AS WE COULD TELL.

12:35PM  20   Q.   YES.  AND YOU WERE -- YOU AND YOUR TEAM WERE IMPRESSED

12:35PM  21   WITH ITS SENSITIVITY; CORRECT?

12:35PM  22   A.   WE WERE IMPRESSED WITH THE SENSITIVITY.

12:35PM  23   Q.   ALL RIGHT.  SO LET ME NOW TURN TO THE SECOND PART OF WHAT

12:35PM  24   YOU TESTIFIED ABOUT, WHICH IS THE, THE VALIDATION PART.

12:35PM  25        OKAY?

CULLEN CROSS BY MR. CLINE                                                5050

12:35PM   1    A.   OKAY.

12:35PM   2    Q.   IF YOU COULD GO TO EXHIBIT 10570 IN THE BINDER THAT I'VE

12:35PM   3    JUST HANDED YOU.

12:36PM   4         DO YOU SEE THAT?  DID YOU FIND THAT, DR. CULLEN?

12:36PM   5    A.   I DID.

12:36PM   6    Q.   ALL RIGHT.  AND THAT IS AN EMAIL FROM YOU -- I'M SORRY,

12:36PM   7    FROM MS. HOLMES TO YOU, WITH VARIOUS PEOPLE COPIED; RIGHT?

12:36PM   8    A.   CORRECT.

12:36PM   9         MR. CLINE:  YOUR HONOR, I THINK WE'VE AGREED THAT

12:36PM  10    THIS IS ADMISSIBLE, SO I'LL OFFER 10570.

12:36PM  11         MR. SCHENK:  THAT'S CORRECT.

12:36PM  12         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:36PM  13         (DEFENDANT'S EXHIBIT 10570 WAS RECEIVED IN EVIDENCE.)

12:36PM  14         MR. CLINE:  ALL RIGHT.  IF WE CAN PUT THAT UP,

12:36PM  15    PLEASE.  THAT'S FINE.

12:36PM  16    Q.   NOW, THE SUBJECT LINE ON THIS IS FOLLOW UP TO OUR CALL.

12:36PM  17         DO YOU SEE THAT?

12:36PM  18    A.   YES.

12:36PM  19    Q.   AND THE DATE OF THIS IS NOVEMBER THE 12TH, 2008.

12:36PM  20    A.   CORRECT.

12:36PM  21    Q.   DOES THIS HELP YOU RECALL THAT YOUR INITIAL COMMUNICATION

12:36PM  22    WITH MS. HOLMES WAS IN LATE 2008?

12:37PM  23    A.   I MEAN, I CAN'T DISAGREE WITH THE EMAIL, BUT I DON'T

12:37PM  24    RECALL THAT.

12:37PM  25    Q.   ALL RIGHT.  I RECOGNIZE THAT THIS WAS A LONG TIME AGO.

CULLEN CROSS BY MR. CLINE                                          5051

12:37PM   1    A.   RIGHT.

12:37PM   2    Q.   I'M JUST ASKING YOU TO GIVE YOUR BEST --

12:37PM   3    A.   SURE.

12:37PM   4    Q.   -- ESTIMATE.  LET'S PUT IT THAT WAY.

12:37PM   5         AND THE SUBJECT IS FOLLOW UP TO OUR CALL.

12:37PM   6         MS. HOLMES SAYS, "CONNIE.

12:37PM   7         "GREAT TO CONNECT."

12:37PM   8         SUGGESTING THAT THE TWO OF YOU HAVE HAD SOME SORT OF A

12:37PM   9    PHONE CALL; RIGHT?

12:37PM  10    A.   CORRECT.

12:37PM  11    Q.   AND THEN SHE SAYS, "WE HAVE ATTACHED SEVERAL REPORTS FROM

12:37PM  12    PROGRAMS WE HAVE DONE WITH OTHER PHARMACEUTICAL COMPANIES."

12:37PM  13         DO YOU SEE THAT?

12:37PM  14    A.   YES.

12:37PM  15    Q.   AND THEN I'M NOT GOING TO ASK YOU TO GO THROUGH ALL OF THE

12:37PM  16    ATTACHMENTS, BUT THERE'S AN ATTACHMENT FROM, FOR EXAMPLE,

12:37PM  17    SOMETHING FROM NOVARTIS, THERE'S AN ATTACHMENT WITH SOMETHING

12:37PM  18    FROM GSK.

12:37PM  19         DO YOU SEE THAT?

12:37PM  20    A.   YES.

12:37PM  21    Q.   AND YOU RECOGNIZE NOVARTIS AND GSK AS MAJOR PHARMACEUTICAL

12:37PM  22    COMPANIES; CORRECT?

12:37PM  23    A.   I DO.

12:37PM  24    Q.   AND DO YOU RECALL, SITTING HERE TODAY, IF YOU LOOKED

12:37PM  25    THROUGH THESE REPORTS WHEN MS. HOLMES SENT THEM TO YOU?

CULLEN CROSS BY MR. CLINE                          5052

| | | |
|---|---|---|
| 12:38PM | 1 | A.   I BELIEVE THAT I DID. |
| 12:38PM | 2 | Q.   OKAY.  NOW, LET'S GO TO 10571. |
| 12:38PM | 3 | AGAIN, YOUR HONOR, THIS IS ONE THAT WE AGREE CAN BE |
| 12:38PM | 4 | ADMITTED. |
| 12:38PM | 5 | MR. SCHENK:  CORRECT. |
| 12:38PM | 6 | MR. CLINE:  SO I'LL OFFER 10571. |
| 12:38PM | 7 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 12:38PM | 8 | (DEFENDANT'S EXHIBIT 10571 WAS RECEIVED IN EVIDENCE.) |
| 12:38PM | 9 | BY MR. CLINE: |
| 12:38PM | 10 | Q.   NOW, DR. CULLEN, IF YOU LOOK DOWN AT THE VERY BOTTOM OF |
| 12:38PM | 11 | THIS EXHIBIT, YOU'LL SEE THAT THAT'S THE NOVEMBER 12TH, 2008 |
| 12:38PM | 12 | EMAIL THAT WE WERE TALKING ABOUT. |
| 12:38PM | 13 | DO YOU SEE THAT? |
| 12:38PM | 14 | A.   YES. |
| 12:38PM | 15 | Q.   AND THEN MOVING UP THE PAGE AND FORWARD IN TIME, THERE'S |
| 12:38PM | 16 | AN EMAIL FROM YOU TO MS. HOLMES. |
| 12:38PM | 17 | DO YOU SEE THAT? |
| 12:38PM | 18 | A.   CORRECT, YES, I DO. |
| 12:38PM | 19 | Q.   DECEMBER 10TH, 2008. |
| 12:38PM | 20 | AND IT'S COPIED A MS. CAROLYN BALKENHOL. |
| 12:39PM | 21 | DO YOU SEE THAT? |
| 12:39PM | 22 | A.   YES. |
| 12:39PM | 23 | Q.   AND MR. FRENZEL. |
| 12:39PM | 24 | DO YOU SEE THAT? |
| 12:39PM | 25 | A.   YES. |

5053

CULLEN CROSS BY MR. CLINE

12:39PM 1    Q.   AND DO YOU RECALL THAT THEY WERE BOTH THERANOS EMPLOYEES

12:39PM 2    WHO WERE PART OF THE EFFORT TO INTERACT WITH SCHERING-PLOUGH?

12:39PM 3    A.   I REMEMBER GARY FRENZEL.  I DO NOT REMEMBER

12:39PM 4    CAROLYN BALKENHOL.

12:39PM 5    Q.   AND IN THAT EMAIL FROM YOU TO ELIZABETH HOLMES, YOU SAY,

12:39PM 6    "ELIZABETH.

12:39PM 7        "I WAS WONDERING IF YOU COULD PROVIDE YOUR VALIDATION

12:39PM 8    REPORTS ON ANY OF THESE ASSAYS?"

12:39PM 9        AND THAT REFERS TO THE REPORTS THAT WE WERE JUST TALKING

12:39PM 10   ABOUT; CORRECT?

12:39PM 11   A.   CORRECT.

12:39PM 12   Q.   AND GSK AND NOVARTIS?

12:39PM 13   A.   (NODS HEAD UP AND DOWN.)

12:39PM 14   Q.   I'M SORRY.  I NEED AN AUDIBLE ANSWER.

12:39PM 15   A.   THAT'S CORRECT.

12:39PM 16   Q.   AND YOU SAY, "THE REPORTS THAT YOU PROVIDED SHOWED

12:39PM 17   CORRELATIONS BETWEEN YOUR ASSAYS AND CORRESPONDING COMMERCIAL

12:39PM 18   ASSAYS WHICH IS IMPORTANT, BUT I WAS MORE INTERESTED IN THE

12:39PM 19   VALIDATION REPORTS FOR YOUR ASSAYS."

12:39PM 20       DO YOU SEE THAT?

12:39PM 21   A.   YES, I DO.

12:39PM 22   Q.   AND THEN THE TOP EMAIL DATED DECEMBER 13TH, 2008 IS FROM

12:40PM 23   MS. BALKENHOL TO YOU, COPYING MR. FRENZEL AND MS. HOLMES.

12:40PM 24       DO YOU SEE THAT?

12:40PM 25   A.   YES, I DO.

CULLEN CROSS BY MR. CLINE                                    5054

12:40PM   1    Q.   AND MS. BALKENHOL ATTACHES A TOTAL OF FOUR VALIDATION

12:40PM   2    SUMMARY REPORTS; CORRECT?

12:40PM   3    A.   CORRECT.

12:40PM   4    Q.   AND YOU HAD ASKED FOR TWO OF THEM, AND I GUESS

12:40PM   5    MS. BALKENHOL OR SOMEBODY AT THERANOS DECIDED TO PUT IN TWO

12:40PM   6    MORE; RIGHT?

12:40PM   7    A.   CORRECT.

12:40PM   8    Q.   YES.

12:40PM   9         AND DID YOU, DR. CULLEN, REVIEW THESE SUMMARY REPORTS WHEN

12:40PM  10    YOU HAD SEEN THEM?

12:40PM  11    A.   I PROBABLY REVIEWED THE INFLAMMATORY ONES.  I CAN'T SAY

12:40PM  12    FOR SURE WHETHER I REVIEWED THE OTHER TWO REPORTS.

12:40PM  13    Q.   SO THE INFLAMMATORY ONE IS WHICH ONE?

12:40PM  14    A.   SORRY.  INTERLEUKIN-6 AND TUMOR NECROSIS FACTOR ALPHA.

12:40PM  15    Q.   SO THE IL-6 AND TNF-ALPHA?

12:41PM  16    A.   CORRECT.

12:41PM  17    Q.   SO LET'S GO FORWARD NOW TO EXHIBIT 7079, OR ACTUALLY

12:41PM  18    YOU'RE PROBABLY GOING BACKWARDS, 7079.  FORWARD IN TIME,

12:41PM  19    BACKWARDS IN THE BOOK.

12:41PM  20         ARE YOU WITH ME?

12:41PM  21    A.   YES.

12:41PM  22         MR. CLINE:  YOUR HONOR, I THINK 7079 WE'VE AGREED

12:41PM  23    CAN BE ADMITTED, SO I'LL OFFER IT.

12:41PM  24         MR. SCHENK:  YES.

12:41PM  25         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

CULLEN CROSS BY MR. CLINE                                      5055

12:41PM   1              (DEFENDANT'S EXHIBIT 7079 WAS RECEIVED IN EVIDENCE.)

12:41PM   2        BY MR. CLINE:

12:41PM   3        Q.   NOW, DR. CULLEN, THIS IS AN EMAIL FROM MS. HOLMES TO

12:41PM   4        MR. MCLEOD AND YOU; RIGHT?

12:41PM   5        A.   THAT'S CORRECT.

12:41PM   6        Q.   WAS MR. MCLEOD, WAS HE YOUR BOSS AT THE TIME?  A

12:42PM   7        COLLEAGUE?  WHERE DID YOU --

12:42PM   8        A.   NO.  HE WAS MY BOSS'S COLLEAGUE, I GUESS.

12:42PM   9        Q.   ALL RIGHT.

12:42PM  10        A.   SO HE WAS LEADING THE EARLY CLINICAL MEDICINE GROUP.

12:42PM  11        Q.   OKAY.  SO IN THE NO DOUBT COMPLICATED CORPORATE STRUCTURE

12:42PM  12        OF SCHERING-PLOUGH, HE WAS ABOVE YOU, BUT SORT OF TO THE SIDE?

12:42PM  13        A.   CORRECT.

12:42PM  14        Q.   SO, MS. HOLMES SAYS, "DEAR JIM.

12:42PM  15             "IN FOLLOW UP TO OUR DISCUSSIONS WITH CONNIE" -- AND

12:42PM  16        CONNIE IS YOU; RIGHT?

12:42PM  17        A.   THAT'S CORRECT.

12:42PM  18        Q.   -- "WE HAVE CEMENTED A COMPREHENSIVE VALIDATION PROGRAM ON

12:42PM  19        ONE OF OUR MULTIPLEXED CYTOKINE" -- AM I PRONOUNCING THAT

12:42PM  20        RIGHT?

12:42PM  21        A.   CYTOKINE.

12:42PM  22        Q.   -- "CYTOKINE PANELS.  I HAVE ATTACHED THE INVOICE AND

12:42PM  23        PROGRAM OVERVIEW TO THIS EMAIL."

12:42PM  24             AND IN THE NEXT PARAGRAPH MS. HOLMES SAYS, "WE DID OF

12:43PM  25        COURSE WORK THROUGH THE VALIDATION PROGRAM WITH CONNIE IN GREAT

CULLEN CROSS BY MR. CLINE                                    5056

| | | |
|---|---|---|
| 12:43PM | 1 | DETAIL." |
| 12:43PM | 2 | AND THAT WAS TRUE; RIGHT? |
| 12:43PM | 3 | A.   I DON'T KNOW HOW TRUE IT WAS.  THEY PROVIDED A VALIDATION |
| 12:43PM | 4 | PROTOCOL WHICH WAS SHOWN EARLIER.  IT'S NOT -- I MEAN, IT HIT |
| 12:43PM | 5 | THE REQUIREMENTS. |
| 12:43PM | 6 | BUT AT THE END OF THE DAY, THE EXECUTION WOULD NOT HAVE |
| 12:43PM | 7 | BEEN IN ALIGNMENT WITH FDA OR HEALTH AUTHORITY REQUIREMENTS FOR |
| 12:43PM | 8 | VALIDATION. |
| 12:43PM | 9 | Q.   WELL, LET ME ASK YOU THIS:  YOU AND MS. HOLMES, OR YOU AND |
| 12:43PM | 10 | OTHERS AT THERANOS HAD DISCUSSED THIS VALIDATION PROTOCOL |
| 12:43PM | 11 | BEFORE IT WAS SENT TO MR. MCLEOD; RIGHT? |
| 12:43PM | 12 | A.   I DON'T KNOW WHETHER OR NOT WE DISCUSSED IT PRIOR TO IT |
| 12:43PM | 13 | BEING SENT TO MCLEOD. |
| 12:43PM | 14 | WE WOULD HAVE DISCUSSED IT AS PEERS PRIOR TO THIS EMAIL IF |
| 12:43PM | 15 | THAT'S WHAT YOU'RE ASKING. |
| 12:43PM | 16 | Q.   THAT'S WHAT I'M ASKING. |
| 12:43PM | 17 | A.   OKAY. |
| 12:43PM | 18 | Q.   YOU AND EITHER MS. HOLMES OR SOMEONE ELSE AT THERANOS HAD |
| 12:44PM | 19 | DISCUSSED THIS VALIDATION PROTOCOL BEFORE IT WAS SENT TO -- |
| 12:44PM | 20 | BEFORE THIS EMAIL; RIGHT? |
| 12:44PM | 21 | A.   CORRECT. |
| 12:44PM | 22 | Q.   OKAY.  SO LET'S -- AND I TAKE IT THAT AT LEAST IN ANY SORT |
| 12:44PM | 23 | OF EMAIL FORM OR IN ANY SORT OF COMMUNICATION WITH MS. HOLMES, |
| 12:44PM | 24 | YOU DID NOT, UPON RECEIVING THIS EMAIL, SAY, THAT'S AN |
| 12:44PM | 25 | INADEQUATE VALIDATION PROTOCOL; RIGHT? |

CULLEN CROSS BY MR. CLINE                                      5057

| | | |
|---|---|---|
| 12:44PM | 1 | A. THAT'S CORRECT, WITH RESPECT TO THE PROTOCOL. |
| 12:44PM | 2 | Q. ALL RIGHT.  SO LET'S MOVE FORWARD THROUGH THIS A LITTLE |
| 12:44PM | 3 | BIT. |
| 12:44PM | 4 | IF YOU CAN FLIP TO THE NEXT PAGE.  ARE YOU WITH ME? |
| 12:44PM | 5 | A. YES. |
| 12:44PM | 6 | Q. AND THAT'S THE -- AT LEAST A SORT OF DRAFT OF THE INVOICE |
| 12:44PM | 7 | THAT WE LOOKED AT BEFORE; RIGHT? |
| 12:44PM | 8 | A. CORRECT. |
| 12:44PM | 9 | Q. AND IF YOU GO OVER TO THE SECOND PAGE OF THE INVOICE, THE |
| 12:44PM | 10 | THIRD PAGE OF THE EXHIBIT -- |
| 12:45PM | 11 | CAN WE BLOW UP THE VERY TOP, PLEASE?  THAT'S FINE. |
| 12:45PM | 12 | THE INVOICE SAYS, "KEY PROJECT OBJECTIVE." |
| 12:45PM | 13 | DO YOU SEE THAT? |
| 12:45PM | 14 | A. YES. |
| 12:45PM | 15 | Q. AND CAN YOU JUST READ THAT TO US, PLEASE? |
| 12:45PM | 16 | A. YES.  "COMPREHENSIVE VALIDATION OF THE THERANOS CYTOKINE |
| 12:45PM | 17 | PANEL UNDER FDA/ICH GUIDELINES, ACCORDING TO THE FULL |
| 12:45PM | 18 | VALIDATION PROTOCOL BELOW.  PROJECT SUCCESS CRITERIA INCLUDE |
| 12:45PM | 19 | ANALYSIS OF BLINDED SAMPLES PROVIDED BY SCHERING-PLOUGH." |
| 12:45PM | 20 | Q. ALL RIGHT.  AND ON THIS VERSION OF THE INVOICE, THE |
| 12:45PM | 21 | EXPECTED START DATE IS APRIL 15TH, 2009. |
| 12:45PM | 22 | DO YOU SEE THAT? |
| 12:45PM | 23 | A. YES, I DO. |
| 12:45PM | 24 | Q. AND THE EXPECTED END DATE IS TO BE DETERMINED; RIGHT? |
| 12:45PM | 25 | A. CORRECT. |

5058

CULLEN CROSS BY MR. CLINE

| | | |
|---|---|---|
| 12:45PM | 1 | Q.   AND SIMILARLY, THE TOTAL DURATION OF SERVICES IS TO BE |
| 12:45PM | 2 | DETERMINED; CORRECT? |
| 12:45PM | 3 | A.   CORRECT. |
| 12:45PM | 4 | Q.   AND THEN IF WE GO TO THE NEXT PAGE, WE FIND THE THERANOS |
| 12:46PM | 5 | SYSTEM FULL VALIDATION PROTOCOL, WHICH I BELIEVE YOU TESTIFIED |
| 12:46PM | 6 | ABOUT BEFORE; CORRECT? |
| 12:46PM | 7 | A.   CORRECT. |
| 12:46PM | 8 | Q.   SO NOW LET'S GO TO EXHIBIT 200. |
| 12:46PM | 9 | AND BY THE WAY, THIS VALIDATION PROTOCOL THAT YOU'VE |
| 12:46PM | 10 | TESTIFIED ABOUT, THAT WAS THE VALIDATION PROTOCOL THAT GOVERNED |
| 12:46PM | 11 | THE VALIDATION PORTION OF SCHERING-PLOUGH'S INTERACTIONS WITH |
| 12:46PM | 12 | THERANOS; CORRECT? |
| 12:46PM | 13 | A.   CORRECT. |
| 12:46PM | 14 | Q.   ALL RIGHT.  SO LET'S GO TO EXHIBIT 200, WHICH I THINK |
| 12:46PM | 15 | YOU'VE ALREADY TESTIFIED ABOUT, AND WHICH IS IN EVIDENCE. |
| 12:46PM | 16 | THIS IS THE SERVICES AGREEMENT BETWEEN SCHERING-PLOUGH AND |
| 12:46PM | 17 | THERANOS; RIGHT? |
| 12:46PM | 18 | A.   CORRECT. |
| 12:46PM | 19 | Q.   SO THIS IS THE AGREEMENT THAT GOVERNS THE RELATIONSHIP |
| 12:46PM | 20 | BETWEEN THE TWO COMPANIES WITH RESPECT TO THE VALIDATION; |
| 12:46PM | 21 | RIGHT? |
| 12:46PM | 22 | A.   CORRECT. |
| 12:46PM | 23 | Q.   AND AS I THINK MR. SCHENK POINTED OUT ON DIRECT, IF YOU |
| 12:47PM | 24 | LOOK ON PAGE 1, THE FIRST NUMBERED PARAGRAPH, IN DESCRIBING THE |
| 12:47PM | 25 | PROJECT, THIS AGREEMENT SAYS, "PROVIDER WILL PROVIDE TO |

CULLEN CROSS BY MR. CLINE                                      5059

12:47PM  1      SCHERING-PLOUGH SERVICES INCLUDING BUT NOT LIMITED TO

12:47PM  2      COMPREHENSIVE VALIDATION OF THE THERANOS CYTOKINE PANEL UNDER

12:47PM  3      FDA/ICH GUIDELINES-SCHERING-PLOUGH 001 AS FURTHER DESCRIBED IN

12:47PM  4      ATTACHMENT C (INVOICE)."

12:47PM  5          DO YOU SEE THAT?

12:47PM  6      A.   YES, I DO.

12:47PM  7      Q.   AND THIS AGREEMENT WAS SIGNED BY MR. MCLEOD; CORRECT?

12:47PM  8      A.   THAT'S MY UNDERSTANDING, YES.

12:47PM  9      Q.   ALL RIGHT.  SO IF YOU -- IF WE MOVE FORWARD IN THIS, LET'S

12:47PM 10      GO TO PAGE 9.

12:47PM 11          MS. HOLMES SIGNS FOR THERANOS; CORRECT?

12:48PM 12      A.   CORRECT.

12:48PM 13      Q.   AND MR. MCLEOD SIGNS FOR SCHERING-PLOUGH; RIGHT?

12:48PM 14      A.   CORRECT.

12:48PM 15      Q.   AND IT LOOKS LIKE THEY BOTH SIGN APRIL 29TH, 2009; RIGHT?

12:48PM 16      A.   YES.

12:48PM 17      Q.   SO PRESUMABLY THAT APRIL 15TH, 2009 START DATE IS NOW

12:48PM 18      INOPERATIVE?

12:48PM 19      A.   CORRECT.

12:48PM 20      Q.   AND IF WE GO A FEW PAGES FURTHER, PAGE 13 OF EXHIBIT 200,

12:48PM 21      WE NOW FIND AN INITIALLED VERSION OF THE INVOICE.

12:48PM 22          DO YOU SEE THAT?

12:48PM 23      A.   YES, I DO.

12:48PM 24      Q.   AND THE INVOICE DATE IS APRIL 29TH, 2009; RIGHT?

12:48PM 25      A.   I SEE 30 APRIL 2009.

CULLEN CROSS BY MR. CLINE                                    5060

12:48PM  1     Q.   LOOK AT THE --

12:48PM  2     A.   OH, THE DATE.  I'M SORRY.  I THOUGHT YOU WERE REFERRING TO

12:49PM  3     THE SIGNATURE.

12:49PM  4     Q.   OKAY.  BUT YOU SEE THE DATE APRIL 29TH, 2009?

12:49PM  5     A.   I DO.

12:49PM  6     Q.   AND THE INITIAL IS A LITTLE BIT HARD TO MAKE OUT, BUT DOES

12:49PM  7     IT LOOK TO YOU LIKE MR. MCLEOD'S INITIAL THERE?

12:49PM  8     A.   YES.

12:49PM  9     Q.   WHICH SUGGESTS TO YOU THAT HE HAD REVIEWED AND APPROVED

12:49PM 10     THIS, I TAKE IT?

12:49PM 11     A.   I WOULD GUESS SO.

12:49PM 12              MR. SCHENK:  OBJECTION.  CALLS FOR SPECULATION.

12:49PM 13              THE COURT:  IF YOU KNOW?  DO YOU KNOW?

12:49PM 14              THE WITNESS:  I DON'T KNOW.

12:49PM 15     BY MR. CLINE:

12:49PM 16     Q.   ALL RIGHT.  I DON'T WANT YOU TO SPECULATE.

12:49PM 17          AND IF YOU LOOK OVER ON THE NEXT PAGE OF THIS INVOICE, YOU

12:49PM 18     SEE, "KEY PROJECT OBJECTIVE"?

12:49PM 19     A.   YES, I DO.

12:49PM 20     Q.   AND THAT'S THE SAME KEY PROJECT OBJECTIVE THAT YOU READ A

12:49PM 21     MOMENT AGO; IS THAT RIGHT?

12:49PM 22     A.   YES.

12:49PM 23     Q.   AND WHICH IS "COMPREHENSIVE VALIDATION OF THE THERANOS

12:49PM 24     CYTOKINE PANEL UNDER FDA/ICH GUIDELINES, ACCORDING TO ATTACHED

12:49PM 25     FULL VALIDATION PROTOCOL."

CULLEN CROSS BY MR. CLINE                                        5061

12:49PM  1        DO YOU SEE THAT?

12:50PM  2    A.   CORRECT, YES.

12:50PM  3    Q.   AND THE START DATE, THE EXPECTED START DATE IS NOW

12:50PM  4    MAY 1ST, 2009.

12:50PM  5        DO YOU SEE THAT?

12:50PM  6    A.   I DO.

12:50PM  7    Q.   AND THE END DATE IS STILL TBD?

12:50PM  8    A.   CORRECT.

12:50PM  9    Q.   AND THE TOTAL DURATION IS TBD; RIGHT?

12:50PM 10    A.   CORRECT.

12:50PM 11    Q.   NOW, MAY 1ST, 2009 WAS JUST FOUR DAYS BEFORE YOU ACTUALLY

12:50PM 12    VISITED THERANOS; CORRECT?

12:50PM 13    A.   CORRECT.

12:50PM 14    Q.   SO REALISTICALLY, THIS WAS NOT GOING TO BE DONE BEFORE YOU

12:50PM 15    VISITED; RIGHT?

12:50PM 16    A.   ONE OF THE, ONE OF THE SELLING FEATURES OF THE TECHNOLOGY

12:50PM 17    WAS SPEED.

12:50PM 18        BUT IN MY ESTIMATION, NO, IT COULD NOT HAVE BEEN COMPLETED

12:50PM 19    IN FOUR DAYS.

12:50PM 20    Q.   ALL RIGHT.  I MEAN, IT TOOK 14 DAYS JUST TO GET THIS

12:50PM 21    INVOICE UPDATED; RIGHT?  SO IT'S UNLIKELY THAT THIS PROJECT IS

12:50PM 22    GOING TO BE ACCOMPLISHED IN FOUR DAYS; RIGHT?

12:50PM 23    A.   CORRECT.

12:50PM 24    Q.   NOW, IF YOU -- IF WE CONTINUE WITH EXHIBIT 200, YOU SEE

12:50PM 25    THAT IT INCLUDES THE THERANOS SYSTEM FULL VALIDATION PROTOCOL;

5062

CULLEN CROSS BY MR. CLINE

| | | |
|---|---|---|
| 12:51PM | 1 | RIGHT? |
| 12:51PM | 2 | DO YOU SEE THAT? |
| 12:51PM | 3 | A.   CORRECT. |
| 12:51PM | 4 | Q.   AND AGAIN, THAT WAS THE PROTOCOL THAT WAS ATTACHED TO THAT |
| 12:51PM | 5 | APRIL 15TH, 2009 EMAIL; RIGHT? |
| 12:51PM | 6 | A.   THAT'S CORRECT. |
| 12:51PM | 7 | Q.   NOW, IT IS INCLUDED IN THE AGREEMENT BETWEEN THE PARTIES |
| 12:51PM | 8 | HERE; RIGHT? |
| 12:51PM | 9 | A.   CORRECT. |
| 12:51PM | 10 | Q.   NOW, LET'S GO FORWARD TO EXHIBIT 10572. |
| 12:51PM | 11 | I THINK WE AGREED ON THIS, DIDN'T WE? |
| 12:51PM | 12 | MR. SCHENK:  YES. |
| 12:51PM | 13 | MR. CLINE:  I'LL OFFER 10572. |
| 12:51PM | 14 | MR. SCHENK:  NO OBJECTION. |
| 12:51PM | 15 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 12:51PM | 16 | (DEFENDANT'S EXHIBIT 10572 WAS RECEIVED IN EVIDENCE.) |
| 12:51PM | 17 | BY MR. CLINE: |
| 12:51PM | 18 | Q.   NOW, YOU'VE TESTIFIED THAT YOU AND SEVERAL OF YOUR |
| 12:51PM | 19 | COLLEAGUES FROM SCHERING-PLOUGH VISITED THERANOS ON MAY 5TH, |
| 12:51PM | 20 | 2009; RIGHT? |
| 12:52PM | 21 | A.   CORRECT. |
| 12:52PM | 22 | Q.   AND THIS IS THE AGENDA FOR THAT MEETING; CORRECT? |
| 12:52PM | 23 | A.   CORRECT. |
| 12:52PM | 24 | Q.   AND THIS WAS, I TAKE IT, SHARED AMONG THE PARTICIPANTS SO |
| 12:52PM | 25 | YOU WOULD KNOW SORT OF THE ROADMAP OF WHERE YOU WERE GOING FOR |

CULLEN CROSS BY MR. CLINE                                    5063

12:52PM   1      THE DAY?

12:52PM   2      A.   CORRECT.

12:52PM   3      Q.   DID MR. -- LOOKING DOWN AT THE BOTTOM NOW, DID MR. MCLEOD

12:52PM   4      JOIN BY PHONE, DO YOU RECALL?

12:52PM   5      A.   I DON'T RECALL.

12:52PM   6      Q.   OKAY.  NOW, ACCORDING TO THE AGENDA, YOU WERE STARTING AT

12:52PM   7      8:00 O'CLOCK AND YOU'RE ENDING AT 4:30 OR AFTER.

12:52PM   8           DO YOU SEE THAT?

12:52PM   9      A.   YES.

12:52PM   10     Q.   IS IT YOUR RECOLLECTION THAT THIS MEETING LASTED PRETTY

12:52PM   11     MUCH A FULL DAY?

12:52PM   12     A.   YES.

12:52PM   13     Q.   AND THE COLLEAGUES FROM SCHERING-PLOUGH WHO CAME WITH YOU,

12:52PM   14     IF I SCAN THEIR QUALIFICATIONS QUICKLY, IT LOOKS LIKE THEY ALL

12:52PM   15     EITHER HAD PH.D.'S OR WERE MEDICAL DOCTORS, OR BOTH; RIGHT?

12:53PM   16     A.   CORRECT.

12:53PM   17     Q.   NOW, I THINK YOU TESTIFIED THAT YOU DIDN'T FEEL AS THOUGH

12:53PM   18     YOU HAD RECEIVED THE INFORMATION THAT YOU NEEDED OR DIRECT

12:53PM   19     ANSWERS TO THE TECHNICAL QUESTIONS THAT YOU ASKED; CORRECT?

12:53PM   20     A.   CORRECT.

12:53PM   21     Q.   BUT I THINK YOU ALSO TESTIFIED THAT YOU DID NOT VOICE

12:53PM   22     THOSE CONCERNS TO MS. HOLMES OR TO THERANOS OUT OF POLITENESS

12:53PM   23     OR AWKWARDNESS OR SOME REASON LIKE THAT; CORRECT?

12:53PM   24     A.   CORRECT.

12:53PM   25     Q.   YOU VOICED THEM TO YOUR COLLEAGUES, BUT NOT TO THERANOS?

CULLEN CROSS BY MR. CLINE                                              5064

| | | |
|---|---|---|
| 12:53PM | 1 | A.   CORRECT. |
| 12:53PM | 2 | Q.   AND THERE'S A FOLLOW-ON EMAIL JUNE 16TH OF 2009, WHICH I |
| 12:53PM | 3 | THINK YOU TALKED ABOUT ON DIRECT, TO MR. FRENZEL WHERE YOU'RE |
| 12:53PM | 4 | ASKING HIM TO SORT OF GIVE ME A STATUS REPORT. |
| 12:53PM | 5 |     APART FROM THAT, ARE YOU AWARE OF ANY EMAILS FROM |
| 12:53PM | 6 | SCHERING-PLOUGH ON ONE HAND TO THERANOS ON THE OTHER ASKING FOR |
| 12:54PM | 7 | MORE INFORMATION? |
| 12:54PM | 8 | A.   I AM NOT. |
| 12:54PM | 9 | Q.   NOW, IF WE COULD GO TO 10573. |
| 12:54PM | 10 |     AND I BELIEVE THIS IS -- WE'VE AGREED TO ADMIT THIS? |
| 12:54PM | 11 |         MR. SCHENK:  YES. |
| 12:54PM | 12 |         MR. CLINE:  I'LL OFFER 10573. |
| 12:54PM | 13 |         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 12:54PM | 14 |     (DEFENDANT'S EXHIBIT 10573 WAS RECEIVED IN EVIDENCE.) |
| 12:54PM | 15 | BY MR. CLINE: |
| 12:54PM | 16 | Q.   AND IT MAY BE THAT THIS IS IDENTICAL TO AN EXHIBIT THAT |
| 12:54PM | 17 | YOU HAVE ALREADY LOOKED AT? |
| 12:54PM | 18 | A.   YES. |
| 12:54PM | 19 | Q.   BUT IT'S NOW DECEMBER OF 2009, AND MR. FRENZEL IS EMAILING |
| 12:54PM | 20 | YOU THE VALIDATION REPORT; CORRECT? |
| 12:54PM | 21 | A.   THAT'S CORRECT. |
| 12:54PM | 22 | Q.   AND HE SENDS IT TO YOU DECEMBER 3RD, 2009.  THE SUBJECT |
| 12:54PM | 23 | LINE IS VALIDATION REPORT. |
| 12:54PM | 24 |     AND THEN A FEW DAYS LATER, DECEMBER 9TH, 2009, HE WRITES |
| 12:55PM | 25 | TO YOU AGAIN AND SAYS, "I JUST WANTED TO MAKE SURE THAT YOU |

CULLEN CROSS BY MR. CLINE                                          5065

12:55PM   1   RECEIVED THIS REPORT.  WE ARE LOOKING FORWARD TO DISCUSSING IT

12:55PM   2   WITH YOU."

12:55PM   3       RIGHT?

12:55PM   4   A.   CORRECT.

12:55PM   5   Q.   NOW, AT ABOUT THIS TIME, SCHERING-PLOUGH WAS IN THE

12:55PM   6   PROCESS OF MERGING WITH OR BEING ACQUIRED BY MERCK; IS THAT

12:55PM   7   RIGHT?

12:55PM   8   A.   THAT'S CORRECT.

12:55PM   9   Q.   AND YOU WERE VERY BUSY WITH THAT PROCESS; CORRECT?

12:55PM  10   A.   CORRECT.

12:55PM  11   Q.   AND ULTIMATELY YOU ENDED UP WITH A POSITION AT MERCK;

12:55PM  12   RIGHT?

12:55PM  13   A.   THAT'S CORRECT.

12:55PM  14   Q.   AND WAS IT A PROMOTION FROM THE POSITION THAT YOU HAD

12:55PM  15   PREVIOUSLY HELD AT SCHERING-PLOUGH?

12:55PM  16   A.   IT WAS NOT A PROMOTION, BUT THEY DID MAKE ME RESPONSIBLE

12:55PM  17   FOR THE COMBINED GROUP BETWEEN THE SCHERING-PLOUGH AND THE

12:55PM  18   MERCK ORGANIZATIONS.

12:55PM  19   Q.   THAT SOUNDS LIKE A BIG COMPANY.  NO PROMOTION, BUT MORE

12:55PM  20   RESPONSIBILITY?

12:55PM  21   A.   I EVENTUALLY GOT THE PROMOTION.

12:55PM  22   Q.   OKAY.  GLAD TO HEAR IT.

12:56PM  23       SO IF WE GO NOW TO EXHIBIT 262, WHICH I THINK IS IN

12:56PM  24   EVIDENCE.  SORRY TO BE MOVING YOU BACK AND FORTH.

12:56PM  25       AND 262, I THINK, IS IN THE GOVERNMENT'S BINDER, BUT WE'LL

5066
CULLEN CROSS BY MR. CLINE

12:56PM  1    PUT IT UP ON THE SCREEN SO THAT YOU CAN SEE IT.

12:56PM  2        YOU WRITE BACK QUICKLY TO MR. FRENZEL AFTER HE SENDS THAT

12:56PM  3    DECEMBER 9TH EMAIL AND YOU SAY, "I'M SORRY FOR THE SLOW

12:56PM  4    RESPONSE.  I DID RECEIVE THE REPORT.  I'D ACTUALLY LIKE TO

12:56PM  5    DEFER OUR DISCUSSIONS UNTIL JANUARY.  WE ARE TOTALLY SWAMPED

12:56PM  6    WITH THE MERGER WITH MERCK."

12:56PM  7        DO YOU SEE THAT?

12:56PM  8    A.   THAT'S CORRECT, YES.

12:56PM  9    Q.   AND, IN FACT, THAT'S WHAT WAS GOING ON; RIGHT?

12:56PM  10   A.   THAT'S CORRECT.

12:56PM  11   Q.   SO LET'S GO FORWARD NOW TO 10574.

12:57PM  12       AND AGAIN, YOUR HONOR, I BELIEVE WE HAVE AGREED THAT THIS

12:57PM  13   CAN BE ADMITTED.

12:57PM  14            MR. SCHENK:  YES, NO OBJECTION.

12:57PM  15            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:57PM  16       (DEFENDANT'S EXHIBIT 10574 WAS RECEIVED IN EVIDENCE.)

12:57PM  17   BY MR. CLINE:

12:57PM  18   Q.   ALL RIGHT.  SO LET ME -- LET'S START WITH THE BOTTOM EMAIL

12:57PM  19   THERE.

12:57PM  20       WE'RE NOW IN MARCH OF 2010; RIGHT?

12:57PM  21   A.   CORRECT.

12:57PM  22   Q.   AND MS. HOLMES WRITES TO YOU.  THE SUBJECT IS FOLLOW UP.

12:57PM  23       AND SHE SAYS "CONNIE --

12:57PM  24       "CAROLYN LET ME KNOW YOU TWO CONNECTED" -- THAT WOULD BE

12:57PM  25   CAROLYN BALKENHOL, DO YOU EXPECT?

CULLEN CROSS BY MR. CLINE                                    5067

12:57PM   1    A.   I WOULD EXPECT.

12:57PM   2    Q.   -- "I AM REALLY LOOKING FORWARD TO OUR NEXT CONVERSATION.

12:57PM   3    PLEASE LET ME KNOW IF THERE IS ANYTHING WE CAN DO FROM OUR END

12:57PM   4    TO HELP FACILITATE THINGS MOVING FORWARD IN THE MEANTIME."

12:57PM   5         THEN SHE SAYS CONGRATULATIONS ON YOUR NEW ROLE WHERE YOU

12:57PM   6    HAD MORE RESPONSIBILITY BUT NO PROMOTION, "I WAS HAPPY TO HEAR

12:57PM   7    ABOUT IT."

12:57PM   8    A.   YES.

12:57PM   9    Q.   AND YOU WRITE BACK THE NEXT DAY AND SAY "HI ELIZABETH.

12:58PM  10         "THANKS FOR THE NOTE BELOW.  THINGS WILL SETTLE DOWN

12:58PM  11    EVENTUALLY.  IN THE MEANTIME, I'VE ASKED A SCIENTIST FROM MY

12:58PM  12    GROUP (DON LEE) TO REACH OUT TO GARY TO DISCUSS THE SPECIFICS

12:58PM  13    OF THE VALIDATION."

12:58PM  14         DO YOU SEE THAT?

12:58PM  15    A.   I DO.

12:58PM  16    Q.   NOW, WOULD IT BE DR. LEE, THE SCIENTIST?

12:58PM  17    A.   IT WAS NOT DR. LEE.

12:58PM  18    Q.   MR. LEE?

12:58PM  19    A.   MR. LEE.

12:58PM  20    Q.   DID MR. LEE REACH OUT TO GARY, DO YOU KNOW?

12:58PM  21    A.   I DON'T KNOW.

12:58PM  22    Q.   AND I TAKE IT YOU HAD SO MUCH GOING ON, I TAKE IT YOU

12:58PM  23    DIDN'T FOLLOW UP ON THIS?

12:58PM  24    A.   THAT'S CORRECT.

12:58PM  25    Q.   AND MS. HOLMES SIX DAYS LATER WRITES AGAIN AND SHE SAYS,

CULLEN CROSS BY MR. CLINE                                      5068

12:58PM   1    "THANKS CONNIE.  PLEASE LET ME KNOW IF THERE IS ANYTHING WE CAN

12:58PM   2    DO ON OUR END TO HELP FACILITATE THIS."

12:58PM   3        RIGHT?

12:58PM   4    A.   CORRECT.

12:58PM   5    Q.   AND IS IT FAIR TO SAY THAT, FROM THE BEST OF YOUR

12:58PM   6    RECOLLECTION SITTING HERE TODAY, THAT THAT'S THE LAST

12:58PM   7    COMMUNICATION THAT YOU HAD WITH MS. HOLMES?

12:58PM   8    A.   THAT'S PROBABLY CORRECT, BUT I CAN'T SAY FOR SURE.

12:58PM   9    Q.   ALL RIGHT.  YOU WERE ASKED ON DIRECT IF YOU HAD EVER TOLD

12:59PM   10   ANYONE AT THERANOS THAT THE REPORT THAT WAS SENT TO YOU BY

12:59PM   11   MR. FRENZEL IN DECEMBER WAS, WAS ACCURATE, GOOD, BAD, WHATEVER.

12:59PM   12       AND THE ANSWER WAS THAT YOU HAD NOT TOLD ANYONE AT

12:59PM   13   THERANOS THAT; RIGHT?

12:59PM   14   A.   THAT'S CORRECT.

12:59PM   15   Q.   YOU SIMILARLY DIDN'T TELL ANYONE AT THERANOS THAT THERE

12:59PM   16   WERE ANY PROBLEMS WITH THE REPORT; RIGHT?

12:59PM   17   A.   THAT IS CORRECT.

12:59PM   18   Q.   YOU JUST DIDN'T RESPOND AT ALL IN THE END; RIGHT?

12:59PM   19   A.   THAT IS CORRECT.

12:59PM   20   Q.   ALL RIGHT.

12:59PM   21       THAT'S ALL OF MY QUESTIONS, YOUR HONOR.

12:59PM   22       THANK YOU, YOUR HONOR.

12:59PM   23       THANK YOU, DR. CULLEN.

12:59PM   24           THE COURT:  MR. SCHENK?

12:59PM   25           MR. SCHENK:  NO FURTHER QUESTIONS.

5069

| | | |
|---|---|---|
| 12:59PM | 1 | THE COURT:  MAY THIS WITNESS BE EXCUSED? |
| 12:59PM | 2 | MR. SCHENK:  YES. |
| 12:59PM | 3 | MR. CLINE:  YES. |
| 12:59PM | 4 | THE COURT:  YOU'RE EXCUSED. |
| 12:59PM | 5 | THE WITNESS:  THANK YOU. |
| 12:59PM | 6 | THE COURT:  YOU'RE WELCOME. |
| 12:59PM | 7 | FOLKS, FEEL FREE TO STAND AND STRETCH FOR A MOMENT WHILE |
| 01:00PM | 8 | WE GET READY FOR THE NEXT WITNESS. |
| 01:01PM | 9 | (PAUSE IN PROCEEDINGS.) |
| 01:01PM | 10 | THE COURT:  ARE WE BREAKING AT 1:30?  IS THAT RIGHT? |
| 01:01PM | 11 | MS. TREFZ:  YES. |
| 01:01PM | 12 | THE COURT:  SO, LADIES AND GENTLEMEN, WE'LL TAKE OUR |
| 01:01PM | 13 | NEXT BREAK AT 1:30, AT THE BOTTOM OF THE HOUR. |
| 01:01PM | 14 | BUT I THINK THAT THE GOVERNMENT HAS A WITNESS TO CALL IN |
| 01:01PM | 15 | THE INTERIM. |
| 01:01PM | 16 | MR. SCHENK:  YES. |
| 01:01PM | 17 | YOUR HONOR, THE UNITED STATES CALLS DANIEL MOSLEY. |
| 01:01PM | 18 | THE COURT:  SIR, IF YOU WOULD JUST COME FORWARD |
| 01:01PM | 19 | HERE, AND IF YOU WOULD FACE OUR COURTROOM DEPUTY WHILE YOU |
| 01:01PM | 20 | RAISE YOUR RIGHT HAND, SHE HAS A QUESTION FOR YOU. |
| 01:01PM | 21 | **(GOVERNMENT'S WITNESS, DANIEL MOSLEY, WAS SWORN.)** |
| 01:01PM | 22 | THE WITNESS:  YES. |
| 01:02PM | 23 | THE COURT:  PLEASE HAVE A SEAT UP HERE, SIR.  MAKE |
| 01:02PM | 24 | YOURSELF COMFORTABLE. |
| 01:02PM | 25 | THE WITNESS:  THANK YOU. |

| 01:02PM | 1 | THE COURT: YOU'RE WELCOME. |

01:02PM  1          THE COURT:  YOU'RE WELCOME.

01:02PM  2          FEEL FREE TO ADJUST THE CHAIR AND MICROPHONE AS YOU NEED.

01:02PM  3          THE WITNESS:  OKAY.

01:02PM  4          THE COURT:  AND WHEN YOU ARE COMFORTABLE, I'LL

01:02PM  5   ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE, AND PLEASE

01:02PM  6   STATE YOUR NAME.

01:02PM  7          THE WITNESS:  OKAY.  DANIEL LYNN MOSLEY.

01:02PM  8          THE COURT:  THANK YOU.  COULD YOU SPELL THAT FOR US,

01:02PM  9   PLEASE.

01:02PM 10          THE WITNESS:  M-O-S-L-E-Y.

01:02PM 11          THE COURT:  THANK YOU.

01:02PM 12      MR. SCHENK.

01:02PM 13                    **DIRECT EXAMINATION**

01:02PM 14   BY MR. SCHENK:

01:02PM 15   Q.   THANK YOU.

01:02PM 16      MR. MOSLEY, IF YOU ARE FULLY VACCINATED, AND WITH THE

01:02PM 17   COURT'S PERMISSION, YOU MAY TESTIFY WITHOUT YOUR MASK ON.

01:02PM 18   A.   OKAY.  THANK YOU.

01:02PM 19   Q.   ONE HOUSEKEEPING THING.  I THINK YOUR MIDDLE NAME WAS

01:02PM 20   LYNN; IS THAT RIGHT?

01:02PM 21   A.   LIN.

01:02PM 22   Q.   AND COULD YOU SPELL THAT?

01:02PM 23   A.   L-Y-N-N.

01:02PM 24   Q.   AND DANIEL IS THE USUAL SPELLING?

01:02PM 25   A.   YES, D-A-N-I-E-L.

MOSLEY DIRECT BY MR. SCHENK                                                    5071

01:02PM   1      Q.   THANK YOU, SIR.

01:03PM   2           GOOD AFTERNOON, MR. MOSLEY.

01:03PM   3           IN AROUND 2013 DID YOU INVEST IN A COMPANY CALLED

01:03PM   4      THERANOS?

01:03PM   5      A.   YES, I DID.

01:03PM   6      Q.   ABOUT HOW MUCH WAS THAT INVESTMENT?

01:03PM   7      A.   JUST A LITTLE UNDER $6 MILLION.

01:03PM   8      Q.   WE'LL COME BACK TO THAT IN A MOMENT.

01:03PM   9           WOULD YOU NOW DESCRIBE FOR THE JURY YOUR EDUCATIONAL

01:03PM  10      BACKGROUND?

01:03PM  11      A.   I GRADUATED COLLEGE AT THE UNIVERSITY OF ALABAMA; LAW

01:03PM  12      SCHOOL AT THE UNIVERSITY OF ALABAMA; AND I GOT A MASTER'S IN

01:03PM  13      TAX LAW FROM NEW YORK UNIVERSITY.

01:03PM  14      Q.   AND AFTER YOU GOT YOUR LLM, DID YOU BECOME A PRACTICING

01:03PM  15      ATTORNEY?

01:03PM  16      A.   YES.

01:03PM  17      Q.   WHERE DID YOU WORK?

01:03PM  18      A.   INITIALLY AT A FIRM IN NEW YORK CITY, SULLIVAN & CROMWELL.

01:03PM  19      Q.   AND AFTER SULLIVAN & CROMWELL, DID YOU GO TO ANOTHER LAW

01:03PM  20      FIRM?

01:03PM  21      A.   I WENT TO CRAVATH, SWAINE & MOORE, ALSO IN NEW YORK CITY.

01:03PM  22      Q.   HOW LONG DID YOU WORK FOR THE CRAVATH LAW FIRM?

01:04PM  23      A.   I WAS AT CRAVATH FROM FEBRUARY OF 1984 UNTIL FEBRUARY OF

01:04PM  24      2018.

01:04PM  25      Q.   OKAY.  AND AFTER 2018, DID YOU CONTINUE WORKING?

MOSLEY DIRECT BY MR. SCHENK                                                5072

01:04PM  1    A.   YES, I DID.

01:04PM  2    Q.   WHERE DID YOU WORK AFTER THAT?

01:04PM  3    A.   BDT & COMPANY.

01:04PM  4    Q.   AND WHAT IS BDT INITIALS FOR?

01:04PM  5    A.   BYRON D. TROTT.

01:04PM  6    Q.   OKAY.  WHEN YOU PRACTICED LAW AT CRAVATH, WHAT TYPE OF LAW

01:04PM  7    DID YOU PRACTICE?

01:04PM  8    A.   TRUSTS AND ESTATES.

01:04PM  9    Q.   AND IN YOUR TIME WORKING ON TRUSTS AND ESTATES, DID YOU

01:04PM  10   ALSO GAIN EXPERIENCE REVIEWING VARIOUS CORPORATE DOCUMENTS?

01:04PM  11   A.   YES, I DID.

01:04PM  12   Q.   AND WHEN WOULD THAT COME UP?  WHEN WOULD YOU, IN PRACTICE

01:04PM  13   IN TRUSTS AND ESTATES, HAVE OR GAIN EXPERIENCE WITH CORPORATE

01:04PM  14   DOCUMENTS?

01:04PM  15   A.   WELL, IF -- YOU KNOW, IF A CLIENT WAS MAKING A CORPORATE

01:04PM  16   INVESTMENT AND ASKED FOR MY ADVICE ON THE CORPORATE -- LEGAL

01:04PM  17   ASPECTS OF THE INVESTMENT OR -- IT CAME UP ON A REGULAR BASIS.

01:05PM  18   Q.   OKAY.  NOW, LET'S TURN TO YOUR EXPERIENCE WITH THERANOS.

01:05PM  19        WHEN DID YOU FIRST BECOME FAMILIAR WITH THERANOS?

01:05PM  20   A.   I BELIEVE IT WAS JULY OF 2013.

01:05PM  21   Q.   YOU SAID 2013?

01:05PM  22   A.   OF 2014, I'M SORRY.

01:05PM  23   Q.   OKAY.  IN JULY OF 2014, YOU THINK YOU FIRST BECAME

01:05PM  24   FAMILIAR WITH THERANOS?

01:05PM  25   A.   YES.

MOSLEY DIRECT BY MR. SCHENK

01:05PM   1    Q.   AND HOW SO?

01:05PM   2    A.   THROUGH A CLIENT OF MINE, DR. HENRY KISSINGER.

01:05PM   3    Q.   DR. KISSINGER WAS A CLIENT OF YOURS AT THAT TIME IN JULY

01:05PM   4    OF 2014?

01:05PM   5    A.   YES, HE WAS.

01:05PM   6    Q.   AND DO YOU KNOW ROUGHLY HOW LONG HE HAD BEEN A CLIENT OF

01:05PM   7    YOURS?

01:05PM   8    A.   PROBABLY FOR WELL OVER 15 YEARS, MAYBE 20 YEARS.  FOR A

01:05PM   9    VERY LONG TIME.

01:05PM   10   Q.   OKAY.  AND YOU SAID IT WAS THROUGH DR. KISSINGER THAT YOU

01:05PM   11   BECAME FAMILIAR WITH THERANOS.

01:05PM   12        DESCRIBE THAT CIRCUMSTANCE TO US.  WHAT DO YOU RECALL?

01:05PM   13   A.   WELL, DR. KISSINGER EXPLAINED TO ME THAT HE WAS ON THE

01:05PM   14   BOARD OF THERANOS AND THAT, YOU KNOW, THAT IT WAS A VERY

01:05PM   15   INTERESTING COMPANY.

01:06PM   16        AND HE SAID, YOU KNOW, IT WOULD BE TERRIFIC IF YOU WOULD

01:06PM   17   TAKE THE TIME TO LEARN ABOUT THE COMPANY AND GIVE ME YOUR VIEWS

01:06PM   18   ON IT.

01:06PM   19   Q.   OKAY.  AND WHAT DID YOU DO IN RESPONSE TO THAT WHEN HE

01:06PM   20   MADE THAT REQUEST?

01:06PM   21   A.   AS I REMEMBER, HE SAID, I'LL PUT YOU IN TOUCH WITH

01:06PM   22   ELIZABETH HOLMES, WHO IS THE PERSON WHO FOUNDED THE COMPANY.

01:06PM   23   Q.   GREAT.

01:06PM   24        YOUR HONOR, MAY I APPROACH?

01:06PM   25             THE COURT:  YES.

MOSLEY DIRECT BY MR. SCHENK                                         5074

01:06PM   1              MR. SCHENK:  (HANDING.)

01:06PM   2              THE WITNESS:  THANK YOU.

01:06PM   3              MR. SCHENK:  SURE.

01:06PM   4              THE COURT:  YOUR COLLEAGUE OPPOSITE HAS THIS?

01:06PM   5              MR. SCHENK:  YES.

01:06PM   6              MR. WADE:  WE DO, YOUR HONOR.

01:06PM   7      BY MR. SCHENK:

01:06PM   8      Q.   MR. MOSLEY, I'VE HANDED YOU A BINDER.  IF YOU WILL TURN IN

01:06PM   9      THE BINDER TO EXHIBIT 4163.

01:07PM  10      A.   I HAVE IT.

01:07PM  11      Q.   IS THIS AN EMAIL BETWEEN YOU AND MS. HOLMES IN JULY OF

01:07PM  12      2014?

01:07PM  13      A.   YES.

01:07PM  14              MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 4163.

01:07PM  15              MR. WADE:  NO OBJECTION.

01:07PM  16              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:07PM  17          (GOVERNMENT'S EXHIBIT 4163 WAS RECEIVED IN EVIDENCE.)

01:07PM  18      BY MR. SCHENK:

01:07PM  19      Q.   MR. MOSLEY, I AM -- COULD WE BRING THAT -- OH, OKAY.

01:07PM  20      THANK YOU.

01:07PM  21          MR. MOSLEY, I'M SHOWING YOU AN EMAIL SENT IN JULY FROM YOU

01:07PM  22      TO MS. HOLMES.  YOU WRITE THAT "IT WAS A PLEASURE SPEAKING WITH

01:07PM  23      YOU YESTERDAY."

01:07PM  24          DO YOU RECALL A CONVERSATION WITH MS. HOLMES A DAY PRIOR

01:07PM  25      TO THIS EMAIL?

MOSLEY DIRECT BY MR. SCHENK                                    5075

01:07PM   1    A.   GENERALLY, YES.

01:07PM   2    Q.   WHEN YOU SAY "GENERALLY," WHAT DO YOU MEAN?

01:07PM   3    A.   I MEAN, I DON'T REMEMBER SPECIFICALLY EXACTLY WHAT WAS

01:07PM   4    SAID, BUT I DO REMEMBER HAVING A CONVERSATION WITH ELIZABETH

01:07PM   5    THE DAY BEFORE.

01:07PM   6    Q.   OKAY.   YOU CONTINUE, "ONCE I RECEIVE THE PRIVATE PLACEMENT

01:08PM   7    MEMORANDUM, I WILL GIVE YOU A CALL OR SEND YOU AN EMAIL TO FIND

01:08PM   8    A TIME TO GET A BRIEFING FROM EITHER YOU OR SOMEONE ON YOUR

01:08PM   9    STAFF."

01:08PM   10        WHAT DID YOU MEAN BY THAT?

01:08PM   11   A.   WELL, I MEANT AFTER I GOT THE DOCUMENTS THAT WOULD EXPLAIN

01:08PM   12   A LOT OF THINGS ABOUT THE COMPANY, THAT I WOULD FOLLOW UP WITH

01:08PM   13   ELIZABETH TO FIND A TIME TO TALK MORE ABOUT WHAT I HAD READ OR

01:08PM   14   LEARNED FROM THOSE DOCUMENTS.

01:08PM   15   Q.   AND ARE YOU FAMILIAR WITH DOCUMENTS CALLED A PRIVATE

01:08PM   16   PLACEMENT MEMORANDUM?

01:08PM   17   A.   YES.

01:08PM   18   Q.   WHAT WERE YOU LOOKING FOR WHEN YOU REQUESTED THAT

01:08PM   19   DOCUMENT?

01:08PM   20   A.   WELL, GENERALLY A PRIVATE PLACEMENT MEMORANDUM IS A

01:08PM   21   DOCUMENT PREPARED BY A COMPANY WHEN IT IS RAISING FUNDS THAT

01:08PM   22   LAYS OUT A LOT OF INFORMATION ABOUT THE COMPANY.

01:08PM   23   Q.   AND WHY WERE YOU ASKING TO GAIN INFORMATION FROM

01:08PM   24   MS. HOLMES ABOUT THERANOS, FOR WHAT PURPOSE?

01:08PM   25   A.   WELL, AS I MENTIONED, DR. KISSINGER HAD ASKED ME, HE SAID

MOSLEY DIRECT BY MR. SCHENK                                    5076

01:08PM   1    IT WOULD BE TERRIFIC IF YOU WOULD TAKE THE TIME TO GET TO KNOW

01:09PM   2    ELIZABETH AND GET TO KNOW THE COMPANY AND GIVE ME YOUR VIEWS ON

01:09PM   3    IT.

01:09PM   4    Q.   YOU TOLD US AT THE BEGINNING OF YOUR TESTIMONY THAT YOU

01:09PM   5    WERE AN INVESTOR EVENTUALLY IN THERANOS.

01:09PM   6    A.   YES.

01:09PM   7    Q.   WAS THAT IN MIND AT THIS TIME?  WERE YOU REQUESTING THESE

01:09PM   8    DOCUMENTS TO EVALUATE A PERSONAL INVESTMENT OPPORTUNITY?

01:09PM   9    A.   NO, BECAUSE I DIDN'T, I DIDN'T REALLY KNOW ANYTHING ABOUT

01:09PM  10    THE COMPANY, SO I COULDN'T HAVE DEVELOPED ANY VIEW.

01:09PM  11    Q.   OKAY.  YOU CONTINUE WITH A STATEMENT ABOUT SOMEBODY NAMED

01:09PM  12    GREG PENNER.

01:09PM  13       DO YOU SEE THAT?

01:09PM  14    A.   I DO.

01:09PM  15    Q.   YOU SAY THAT HE'S ROB WALTON'S SON-IN-LAW AND IS THE

01:09PM  16    CURRENT VICE CHAIR OF WAL-MART?

01:09PM  17    A.   RIGHT.

01:09PM  18    Q.   HE WOULD LIKE TO REVIEW THE PPM.  IS THE PRIVATE PLACEMENT

01:09PM  19    MEMORANDUM ALSO KNOWN AS THE PPM?

01:09PM  20    A.   YES.

01:09PM  21    Q.   AND THEN YOU PROVIDE SOME CONTACT INFORMATION.

01:09PM  22       DO YOU SEE THAT?

01:09PM  23    A.   I DO.

01:09PM  24    Q.   AND WHY DID YOU SEND MS. HOLMES CONTACT INFORMATION FOR

01:09PM  25    MR. PENNER?

| | | |
|---|---|---|
| 01:09PM | 1 | A.   WELL, IN MY -- AS I REMEMBER, IN MY INITIAL CONVERSATION |
| 01:09PM | 2 | WITH ELIZABETH, SHE SUGGESTED THAT SHE WAS LOOKING FOR A FEW |
| 01:10PM | 3 | INVESTORS THAT WERE, YOU KNOW, HIGH QUALITY FAMILIES THAT WOULD |
| 01:10PM | 4 | HAVE A GOOD LONG-TERM RELATIONSHIP WITH THE COMPANY. |
| 01:10PM | 5 | Q.   OKAY.  AND WHAT DID YOU UNDERSTAND THAT TO MEAN?  I THINK |
| 01:10PM | 6 | YOU USED THE WORD "HIGH QUALITY"? |
| 01:10PM | 7 | A.   WELL, YOU KNOW, PERHAPS FAMILIES AND COMPANIES THAT WERE |
| 01:10PM | 8 | ENGAGED IN COMMERCE IN THE U.S., AND IT MIGHT BE HELPFUL TO |
| 01:10PM | 9 | HAVE THEM SUPPORTIVE OF THERANOS. |
| 01:10PM | 10 | Q.   OKAY.  DID SHE EXPLAIN WHY, DO YOU RECALL? |
| 01:10PM | 11 | A.   I DON'T RECALL. |
| 01:10PM | 12 | Q.   OKAY.  HOW ABOUT WHAT THERANOS DID?  AND LET'S TRANSITION |
| 01:10PM | 13 | FROM THE KINDS OF PEOPLE YOU MIGHT INTRODUCE HER TO. |
| 01:10PM | 14 | DID YOU HAVE ANY UNDERSTANDING AT THIS POINT OF THE |
| 01:10PM | 15 | TECHNOLOGY OR THE BUSINESS LINE THAT THERANOS WAS INVOLVED IN? |
| 01:10PM | 16 | A.   YOU KNOW, I THINK I KNEW FROM DR. KISSINGER THAT IT WAS |
| 01:10PM | 17 | BLOOD TESTING. |
| 01:10PM | 18 | Q.   OKAY. |
| 01:10PM | 19 | A.   AND I'M QUITE SURE HE TOLD ME IT WAS SORT OF REVOLUTIONARY |
| 01:10PM | 20 | IN ITS APPROACH. |
| 01:10PM | 21 | Q.   AND HOW -- FORGIVE ME. |
| 01:11PM | 22 | HOW ABOUT THE PHONE CALL THAT YOU HAD WITH MS. HOLMES?  DO |
| 01:11PM | 23 | YOU REMEMBER THE SUBJECT OF THE LINE OF BUSINESS OR THE |
| 01:11PM | 24 | TECHNOLOGY COMING UP? |
| 01:11PM | 25 | A.   I DON'T REMEMBER SPECIFICALLY, BUT I SUSPECT THAT IT |

MOSLEY DIRECT BY MR. SCHENK                                    5078

01:11PM  1    ABSOLUTELY DID COME UP.  I SUSPECT IT CAME UP.

01:11PM  2    Q.   OKAY.  YOU JUST DON'T HAVE A SPECIFIC RECOLLECTION?

01:11PM  3    A.   I DON'T HAVE A SPECIFIC.

01:11PM  4    Q.   THANK YOU.

01:11PM  5         IF YOU'LL NOW TURN TO THE NEXT TAB, IT'S 4173.

01:11PM  6         IS THIS A LETTER THAT MS. HOLMES SENT TO YOU?

01:11PM  7    A.   IT IS.

01:11PM  8    Q.   IN AUGUST OF 2014, THE NEXT MONTH?

01:11PM  9    A.   CORRECT.

01:11PM  10        MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 4173.

01:11PM  11        MR. WADE:  NO OBJECTION.

01:11PM  12        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:11PM  13    (GOVERNMENT'S EXHIBIT 4173 WAS RECEIVED IN EVIDENCE.)

01:11PM  14        MR. SCHENK:  THANK YOU.

01:11PM  15   Q.   MR. MOSLEY, THIS LETTER WAS SENT TO YOU BY MS. HOLMES ON

01:11PM  16   AUGUST 18TH, 2014.

01:11PM  17        AND IT BEGINS, "DEAR DAN.

01:11PM  18        "IT IS WITH GREAT PLEASURE I WRITE THIS LETTER AND ENCLOSE

01:11PM  19   THIS PACKAGE FOR YOU."

01:12PM  20        WHAT IS THAT A REFERENCE TO, "ENCLOSE THIS PACKAGE"?

01:12PM  21   A.   I THINK THERE WERE A NUMBER OF DOCUMENTS ATTACHED TO IT

01:12PM  22   THAT HAD A FAIR AMOUNT OF INFORMATION ON THE COMPANY.

01:12PM  23   Q.   AND DO YOU REMEMBER HOW YOU RECEIVED THIS?  AND WHAT I

01:12PM  24   MEAN IS BY EMAIL OR BY PAPER COPY?

01:12PM  25   A.   I BELIEVE IT WAS PAPER COPY.

MOSLEY DIRECT BY MR. SCHENK                                          5079

01:12PM   1    Q.   OKAY.

01:12PM   2    A.   BUT I DON'T REMEMBER WHETHER IT CAME BY FEDEX OR REGULAR

01:12PM   3    MAIL.

01:12PM   4    Q.   YOU SAID THAT THERE WERE A NUMBER OF DOCUMENTS ATTACHED TO

01:12PM   5    IT.

01:12PM   6         DO YOU HAVE A RECOLLECTION OF -- DID THE DOCUMENTS FIT IN

01:12PM   7    A SMALL PACKAGE OR WAS IT BINDERS OF MATERIAL?

01:12PM   8    A.   IT WAS A FAIR AMOUNT OF MATERIAL.  IT WAS SOME RATHER

01:12PM   9    THICK PRESENTATIONS ON THE COMPANY (INDICATING).

01:12PM   10   Q.   OKAY.  AND FOR THE RECORD, YOU HELD UP YOUR FINGERS.

01:12PM   11        CAN YOU ESTIMATE ROUGHLY ABOUT THE SIZE OF THE STACK?

01:12PM   12   A.   I DON'T REMEMBER SPECIFICALLY, BUT I THINK IT WAS AT LEAST

01:12PM   13   THAT MUCH, SOMETHING IN THAT ORDER (INDICATING).

01:12PM   14        THE COURT:  WELL, LET'S GET YOUR BEST ESTIMATE OF

01:12PM   15   HOW THICK THAT IS.

01:12PM   16        THE WITNESS:  WELL, I THINK IT WAS AT LEAST THREE

01:13PM   17   INCHES.

01:13PM   18        THE COURT:  GREAT.  THANK YOU.

01:13PM   19        MR. SCHENK:  THANK YOU FOR NOT MAKING ME ESTIMATE

01:13PM   20   THAT, YOUR HONOR.

01:13PM   21   Q.   THE NEXT PARAGRAPH CONTINUES, "BY WAY OF BACKGROUND."

01:13PM   22        DO YOU SEE THAT?

01:13PM   23   A.   I SEE THAT.

01:13PM   24   Q.   MS. HOLMES SAYS SHE FOUNDED THE COMPANY TO MAKE A

01:13PM   25   DIFFERENCE IN THE WORLD AND SHE'S RETAINED MAJORITY CONTROL OF

MOSLEY DIRECT BY MR. SCHENK                                    5080

01:13PM  1    THE SHARES IN ORDER TO REALIZE THAT VISION FOR THE LONG-TERM.

01:13PM  2         SHE CONTINUES WITH THE PHRASE "VERY LONG-TERM MISSION."

01:13PM  3         IT CONTINUES, "WE HAVE BENEFITTED GREATLY FROM THE ABILITY

01:13PM  4    TO EXECUTE, SHIFT, TRANSFORMATIONAL AND DISRUPTIVE TECHNOLOGY."

01:13PM  5         AND FINALLY, IN THIS PARAGRAPH, "THE COMPANY PLANS TO BE

01:13PM  6    PRIVATE FOR THE LONG-TERM."

01:13PM  7         DO YOU REMEMBER READING THIS AND LEARNING ABOUT THE

01:13PM  8    COMPANY?  AND BY "THIS" I MEAN THE LETTER.

01:13PM  9    A.   I CERTAINLY REMEMBER READING THE LETTER AND READING THAT

01:13PM  10   PARAGRAPH, BUT I THINK THAT WAS ALL CONSISTENT WITH WHAT

01:13PM  11   ELIZABETH TOLD ME IN PREVIOUS CONVERSATIONS.

01:14PM  12   Q.   OKAY.  TWO PARAGRAPHS DOWN THERE'S A SENTENCE, OR A

01:14PM  13   PARAGRAPH, THAT BEGINS WITH THE WORD "HISTORICALLY."

01:14PM  14        DO YOU SEE THAT?

01:14PM  15   A.   YES.

01:14PM  16   Q.   "HISTORICALLY THERANOS'S WORK WAS FOCUSSED ON CONTRACTS

01:14PM  17   WITH PHARMACEUTICAL AND MILITARY CLIENTS."

01:14PM  18        WHAT DID THAT MEAN TO YOU, AND PARTICULARLY THE WORD

01:14PM  19   "HISTORICALLY"?

01:14PM  20   A.   WELL, IT MEANS THAT UP UNTIL THIS POINT THEY'VE FOCUSSED

01:14PM  21   MAINLY ON THEIR CONTRACTS, WHICH MEANS BINDING AGREEMENTS, AND

01:14PM  22   TO DO WORK WITH PHARMACEUTICAL AND MILITARY CLIENTS.

01:14PM  23   Q.   WAS THAT IMPORTANT TO YOU?  AND BY "THAT" I MEAN THAT

01:14PM  24   THERE HAD BEEN WORK WITH PHARMACEUTICAL AND MILITARY CLIENTS?

01:14PM  25   A.   IT WAS IMPORTANT.

MOSLEY DIRECT BY MR. SCHENK                                      5081

01:14PM   1    Q.   WHY?

01:14PM   2    A.   WELL, I -- OBVIOUSLY THE PHARMACEUTICAL CLIENTS ARE,

01:14PM   3    THEY'RE BIG COMPANIES, VERY SOPHISTICATED COMPANIES, AND

01:14PM   4    OBVIOUSLY THEY'RE IN A POSITION TO MAKE JUDGMENTS ABOUT

01:14PM   5    TECHNOLOGY.

01:14PM   6         AND THE U.S. MILITARY ALSO IS A VERY BIG, SOPHISTICATED

01:14PM   7    ORGANIZATION THAT WOULD ALSO HAVE PRESUMABLY ACCESS TO EXPERTS

01:15PM   8    TO MAKE JUDGMENTS.

01:15PM   9    Q.   THE -- THERE'S A PARAGRAPH TWO DOWN.

01:15PM   10        IT BEGINS, "ONCE THE COMPANY."

01:15PM   11        DO YOU SEE THAT?

01:15PM   12   A.   YES.

01:15PM   13   Q.   "ONCE THE COMPANY WAS READY TO LAUNCH ITS COMMERCIAL

01:15PM   14   LABORATORY AND ANNOUNCED ITS NATIONAL CONTRACT WITH WALGREENS

01:15PM   15   IN FALL OF 2013, THERANOS BEGAN OPERATING IN THE CONSUMER,

01:15PM   16   PHYSICIAN, AND HOSPITAL LABORATORY TESTING BUSINESS IN THE

01:15PM   17   UNITED STATES, WITH PLANS FOR INTERNATIONAL EXPANSION."

01:15PM   18        WHEN THE PHRASE "ONCE THE COMPANY WAS READY" WAS USED,

01:15PM   19   WHAT DID THAT MEAN TO YOU?

01:15PM   20   A.   IT WOULD NORMALLY MEAN TO ME THAT WHEN THE TECHNOLOGY HAD

01:15PM   21   SORT OF PROVEN ITSELF AND WAS CAPABLE OF BEING ROLLED OUT TO

01:15PM   22   THE NEW CONSUMERS AND SUCH, THAT'S WHEN IT WAS READY.

01:15PM   23   Q.   AND WHEN YOU READ THIS, DID YOU THINK THAT THERANOS HAD

01:15PM   24   PREMATURELY LAUNCHED WITH CONSUMERS?

01:16PM   25   A.   I DON'T THINK I THOUGHT ONE WAY OR THE OTHER.  I DIDN'T

MOSLEY DIRECT BY MR. SCHENK                                          5082

01:16PM   1    KNOW ENOUGH HONESTLY.

01:16PM   2    Q.   I'M SORRY.  YOU WEREN'T THINKING ABOUT THAT YET?

01:16PM   3    A.   I WASN'T THINKING ABOUT THAT.

01:16PM   4    Q.   OKAY.  WILL YOU NOW TURN TO THE NEXT PAGE, PAGE 2.

01:16PM   5         THE SECOND PARAGRAPH DOWN, IT READS, "THERANOS HAS GROWN

01:16PM   6    FROM CASH FROM ITS CONTRACTS FOR SOME TIME."

01:16PM   7         DO YOU SEE THAT?

01:16PM   8    A.   I DO.

01:16PM   9    Q.   AND WHAT DID THAT MEAN TO YOU?  DO YOU RECALL THAT?

01:16PM  10    A.   WHAT IT WOULD MEAN TO ME IS THAT UP UNTIL THAT POINT THEY

01:16PM  11    HAD RECEIVED CASH FROM THE CONTRACTS THAT THEY HAD IN PLACE AND

01:16PM  12    THAT IT HELPED THEM SUPPORT THE COMPANY AS IT GREW.

01:16PM  13    Q.   OKAY.  AND NOW ABOUT THREE PARAGRAPHS DOWN THERE'S A

01:16PM  14    PARAGRAPH THAT BEGINS, "WITH THIS LETTER."

01:16PM  15         DO YOU SEE THAT?

01:16PM  16    A.   YES.

01:16PM  17    Q.   "WITH THIS LETTER AND AS PROMISED ON OUR CALL, I WOULD

01:16PM  18    LIKE TO FORMALLY EXTEND TO YOU THE INVITATION TO PARTICIPATE IN

01:16PM  19    THIS EQUITY TRANSACTION TO WHATEVER EXTENT YOU ARE INTERESTED."

01:16PM  20         WHAT DID THAT MEAN?

01:17PM  21    A.   I THINK AT SOME POINT IN OUR CONVERSATIONS I SAID TO

01:17PM  22    ELIZABETH, THIS SOUNDS LIKE A VERY INTERESTING IDEA AND A VERY

01:17PM  23    EXCITING COMPANY AND IT'S SOMETHING THAT I MIGHT LIKE

01:17PM  24    PERSONALLY TO INVEST IN.

01:17PM  25    Q.   DO YOU RECALL WHEN THAT HAPPENED?  YOU DESCRIBED FOR THE

MOSLEY DIRECT BY MR. SCHENK                                    5083

01:17PM  1    JURY ORIGINALLY REACHING OUT TO MS. HOLMES BECAUSE OF YOUR

01:17PM  2    RELATIONSHIP WITH DR. KISSINGER; IS THAT RIGHT?

01:17PM  3    A.   RIGHT.

01:17PM  4    Q.   BUT AT SOME POINT IT TRANSITIONED OR PIVOTED TO YOUR

01:17PM  5    EVALUATING AN INVESTMENT OPPORTUNITY FOR YOURSELF?

01:17PM  6    A.   YOU KNOW, I DON'T KNOW IF IT PIVOTED IN THE SENSE THAT I

01:17PM  7    WAS STILL LOOKING AT IT WITH AN INTENT TO TELL DR. KISSINGER

01:17PM  8    WHAT I THOUGHT ABOUT IT, AND I THINK MY COMMENT WAS SIMPLY

01:17PM  9    THAT, YOU KNOW, IT REALLY DOES SOUND EXCITING AND THAT'S

01:17PM  10   SOMETHING THAT WOULD PERSONALLY INTEREST ME.

01:17PM  11       SO, I MEAN, IT WAS JUST A -- PROBABLY UP UNTIL THAT POINT

01:17PM  12   IT WAS JUST SORT OF A, A COMMENT ABOUT HOW INTERESTING I FOUND

01:17PM  13   IT, AND THAT I MIGHT FIND IT PERSONALLY INTERESTING AS AN

01:17PM  14   INVESTMENT.

01:17PM  15   Q.   I SEE.  SO YOUR WORK FOR DR. KISSINGER DIDN'T STOP?

01:18PM  16   A.   IT DID NOT.

01:18PM  17   Q.   YOU PURSUED BOTH AT THE SAME TIME; IS THAT FAIR?

01:18PM  18   A.   WELL, I DON'T REALLY HONESTLY KNOW WHETHER I WAS PURSUING

01:18PM  19   AN INVESTMENT AT THAT POINT.  I WAS REALLY DOING WHAT

01:18PM  20   DR. KISSINGER HAD ASKED ME.

01:18PM  21       AND, YOU KNOW, YOU CAN'T READ SOMETHING WITHOUT THINKING

01:18PM  22   ABOUT IT IN A BROADER SCOPE.

01:18PM  23   Q.   I SEE.  OKAY.

01:18PM  24       AND NOW THE LAST PARAGRAPH READS, "I AM HAPPY TO PROVIDE

01:18PM  25   MORE BACKGROUND ON ANY OF THE ABOVE, OR ANY OF THE MATERIALS

MOSLEY DIRECT BY MR. SCHENK                                    5084

01:18PM   1    ENCLOSED IN THIS PACKAGE.  THERANOS'S INVESTMENT DOCUMENTS ARE

01:18PM   2    ENCLOSED HEREIN.  THE ADDITIONAL MATERIALS FOCUS ON THE

01:18PM   3    INFRASTRUCTURE THERANOS HAS DEVELOPED AND INITIAL MARKET OF

01:18PM   4    COMMERCIAL LABORATORY TESTING THAT THERANOS HAS ENTERED."

01:18PM   5         AND I WANT TO FOCUS YOUR ATTENTION ON THE USE OF THE WORD

01:18PM   6    "HAS."

01:18PM   7         MS. HOLMES WRITES THAT "THE ADDITIONAL MATERIALS FOCUS ON

01:18PM   8    THE INFRASTRUCTURE THERANOS HAS DEVELOPED."

01:18PM   9         WHAT DID THAT MEAN TO YOU?

01:18PM  10    A.   REALLY JUST THAT -- I DON'T KNOW WHAT TO SAY OTHER THAN

01:19PM  11    THEY WERE MAKING GREAT PROGRESS IN HAVING DEVELOPED THE

01:19PM  12    TECHNOLOGY AND INFRASTRUCTURE AROUND IT.

01:19PM  13    Q.   AND THE SECOND PART OF THAT SENTENCE CONTINUES, "AND

01:19PM  14    INITIAL MARKET OF COMMERCIAL LABORATORY TESTING THAT THERANOS

01:19PM  15    HAS ENTERED."

01:19PM  16         WHAT DID THAT MEAN TO YOU?

01:19PM  17    A.   I THINK I THOUGHT THAT REFERRED TO THE FACT THAT THEY HAD

01:19PM  18    ENTERED INTO AN ARRANGEMENT WITH WALGREENS TO BEGIN TESTING.

01:19PM  19    Q.   WERE YOU AWARE OF THAT AT OR AROUND THIS TIME?

01:19PM  20    A.   I WAS.  I THINK -- I BELIEVE THERE WAS AN ARTICLE IN "THE

01:19PM  21    WALL STREET JOURNAL" THAT PRECEDED THIS THAT DESCRIBED THAT IN

01:19PM  22    SOME DETAIL.

01:19PM  23    Q.   OKAY.  SOMETIME AROUND THIS TIME, YOU THINK YOU BECAME

01:19PM  24    AWARE OF IT?

01:19PM  25    A.   RIGHT.  AND I THINK ELIZABETH MAY HAVE -- PROBABLY HAD

MOSLEY DIRECT BY MR. SCHENK                                    5085

01:19PM   1    ALSO DESCRIBED IT TO ME AS WELL.

01:19PM   2    Q.   OKAY.  DO YOU KNOW WHAT THEY WERE DOING WITH WALGREENS,

01:19PM   3    WHAT THERANOS WAS DOING WITH WALGREENS?

01:19PM   4    A.   WELL, I KNOW WHAT I KNEW FROM "THE WALL STREET JOURNAL"

01:20PM   5    ARTICLE, AND THE MATERIALS THAT WERE INCLUDED WITH THIS PACKAGE

01:20PM   6    HAD INFORMATION ABOUT IT, AND I THINK I KNEW SOMETHING ABOUT IT

01:20PM   7    FROM CONVERSATIONS WITH ELIZABETH.

01:20PM   8    Q.   AND IN A BROAD SENSE AT LEAST, WHAT WAS IT?

01:20PM   9    A.   WELL, IT WAS OFFERING, YOU KNOW, TESTING WHERE PEOPLE

01:20PM  10    COULD GO INTO WALGREENS AND HAVE THEIR BLOOD TESTED AND GET THE

01:20PM  11    RESULTS BACK.

01:20PM  12    Q.   BLOOD TESTING?

01:20PM  13    A.   BLOOD TESTING.

01:20PM  14    Q.   OKAY.  COULD I ASK YOU NOW TO TURN BACK IN YOUR BINDER TO

01:20PM  15    EXHIBIT 3387.  IT'S A LARGE EXHIBIT, AND INITIALLY I WOULD LIKE

01:20PM  16    YOU TO JUST LOOK THROUGH IT AND TELL ME IF THIS IS SOME OF THE

01:20PM  17    MATERIALS THAT WERE INCLUDED WITH THE LETTER THAT WE JUST READ.

01:21PM  18    A.   YES, I DO BELIEVE TO THE BEST OF MY RECOLLECTION THIS WAS

01:21PM  19    SOME OF THE MATERIAL, OR MAYBE ALL OF THE MATERIAL, THAT WAS IN

01:21PM  20    THAT PACKAGE.

01:21PM  21    Q.   OKAY.

01:21PM  22         YOUR HONOR, THE GOVERNMENT OFFERS 3387.

01:21PM  23             MR. WADE:  NO OBJECTION.

01:21PM  24             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:21PM  25         (GOVERNMENT'S EXHIBIT 3387 WAS RECEIVED IN EVIDENCE.)

MOSLEY DIRECT BY MR. SCHENK                                    5086

01:21PM  1      BY MR. SCHENK:

01:21PM  2      Q.   CAN WE START WITH PAGE 128.  THERE'S PAGE NUMBERS AT THE

01:21PM  3      BOTTOM IN THE MIDDLE, MR. MOSLEY.

01:21PM  4      A.   OKAY.  OKAY.

01:21PM  5      Q.   THIS IS ENTITLED CERTIFICATE OF DESIGNATION OF SERIES C-2

01:21PM  6      PREFERRED STOCK.

01:21PM  7           DO YOU SEE THAT?

01:21PM  8      A.   I DO.

01:21PM  9      Q.   WHAT IS THAT?

01:21PM  10     A.   IT'S A CERTIFICATE THAT IS NORMALLY ADOPTED BY A BOARD OF

01:21PM  11     DIRECTORS OF A COMPANY TO AUTHORIZE A PARTICULAR CLASS OF STOCK

01:22PM  12     OR PARTICULAR SERIES OF STOCK.

01:22PM  13     Q.   AND THIS ONE IS CALLED C-2; IS THAT RIGHT?

01:22PM  14     A.   THAT'S CORRECT.

01:22PM  15     Q.   EVENTUALLY WHEN YOU PURCHASED STOCK IN THERANOS, WHICH

01:22PM  16     SERIES DID YOU BUY?

01:22PM  17     A.   C-2.

01:22PM  18     Q.   ON THIS PAGE THERE'S A NUMBER 2, LIQUIDATION RIGHTS.

01:22PM  19           DO YOU SEE THAT?

01:22PM  20     A.   I DO.

01:22PM  21     Q.   AND ON THIS PAGE AND THROUGHOUT THE DOCUMENT, THERE IS

01:22PM  22     SOME UNDERLINING IN IT.

01:22PM  23           DO YOU SEE THAT?

01:22PM  24     A.   I DO.

01:22PM  25     Q.   AND WHOSE UNDERLINING IS THAT?

MOSLEY DIRECT BY MR. SCHENK                                          5087

01:22PM   1      A.   IT'S MINE.

01:22PM   2      Q.   AND WHAT WERE YOU DOING?  DESCRIBE FOR THE JURY THE

01:22PM   3      PROCESS HERE.  YOU RECEIVED THESE DOCUMENTS AND NOW WE SEE

01:22PM   4      UNDERLINING.

01:22PM   5           WHAT WAS HAPPENING?

01:22PM   6      A.   WELL, I WAS READING THE DOCUMENTS AND, YOU KNOW,

01:22PM   7      UNDERLINING THINGS THAT WERE OF PARTICULAR IMPORTANCE FROM MY

01:22PM   8      STANDPOINT.

01:22PM   9      Q.   IMPORTANT TO WHAT?

01:22PM  10      A.   WELL, IMPORTANT TO IN THIS CASE UNDERSTANDING WHAT THE C-2

01:22PM  11      PREFERRED STOCK WAS AND WHAT RIGHTS IT HAD.

01:22PM  12      Q.   AND WHEN WE'RE LOOKING THROUGH THESE DOCUMENTS, ARE WE --

01:23PM  13      WERE THESE DOCUMENTS THAT YOU RELIED UPON TO MAKE YOUR

01:23PM  14      INVESTMENT IN THERANOS?

01:23PM  15      A.   THEY'RE SOME OF THE DOCUMENTS THAT I RELIED UPON, YES.

01:23PM  16      Q.   YOU SAID THEY'RE SOME OF.  WHAT DO YOU MEAN?

01:23PM  17      A.   WELL, I THINK THERE WERE OTHER DOCUMENTS THAT I ULTIMATELY

01:23PM  18      RECEIVED BEFORE I ULTIMATELY MADE MY INVESTMENTS.

01:23PM  19      Q.   I SEE.  THESE DOCUMENTS, IN ADDITION TO OTHER DOCUMENTS?

01:23PM  20      A.   THAT'S CORRECT.

01:23PM  21      Q.   WHAT IS THIS LIQUIDATION RIGHTS TELLING US, AND HELP ME

01:23PM  22      UNDERSTAND WHY YOU UNDERLINED THINGS?

01:23PM  23      A.   WELL, IT'S REALLY SAYING IF THE -- IF THERE WAS A PROBLEM

01:23PM  24      WITH THE COMPANY, IF SOMETHING WENT THE WRONG DIRECTION, IN

01:23PM  25      WHAT ORDER -- AND THERE WERE ASSETS TO BE DISTRIBUTED TO THE

MOSLEY DIRECT BY MR. SCHENK                                    5088

01:23PM  1    STOCKHOLDERS, AFTER PAYING OFF DEBT OBVIOUSLY, IF THERE WAS

01:23PM  2    MONEY TO BE DISTRIBUTED TO THE STOCKHOLDERS, WHAT ORDER WOULD

01:23PM  3    THAT MONEY BE DISTRIBUTED AMONG THE VARIOUS SERIES OR CLASSES

01:23PM  4    OF STOCK.

01:24PM  5    Q.    AND IN WHICH RANKING OR WHAT PREFERRED STATUS WOULD C-2

01:24PM  6    HAVE?

01:24PM  7    A.    WELL, C-2 WOULD BE ENTITLED TO GET BACK ITS FACE AMOUNT,

01:24PM  8    DESIGNATED AMOUNT BEFORE ANY PREVIOUS CLASS OF PREFERRED STOCK.

01:24PM  9         SO IT WOULD BE FIRST IN THE ORDER OF RECEIVING PROCEEDS IN

01:24PM  10   THE EVENT OF A LIQUIDATION OF THE COMPANY.

01:24PM  11   Q.    I SEE.  SO C-2 WOULD GET PROCEEDS BEFORE SERIES B, FOR

01:24PM  12   INSTANCE?

01:24PM  13   A.    THAT IS CORRECT.

01:24PM  14   Q.    AND TO USE B AS AN EXAMPLE, DID YOU KNOW WHO OWNED MUCH OF

01:24PM  15   SERIES B?

01:24PM  16   A.    I DON'T THINK I KNEW.

01:24PM  17   Q.    OKAY.  ON THE NEXT PAGE, PAGE 129, THERE'S A SECTION

01:24PM  18   ENTITLED MANDATORY REDEMPTION.

01:24PM  19        DO YOU SEE THAT?

01:24PM  20   A.    I DO.

01:24PM  21   Q.    AND WHAT IS THAT?

01:24PM  22   A.    IT'S A, IT'S A CLAUSE THAT ESSENTIALLY SAID THAT THE

01:24PM  23   COMPANY COULD, AT ITS OPTION AT ANY PARTICULAR TIME IT CHOSE,

01:25PM  24   CHOOSE TO BUY IN OR REPURCHASE THE C -2 PREFERRED SHARES AT A

01:25PM  25   PRICE PER SHARE THAT THEY DETERMINED IN GOOD FAITH BY THE BOARD

MOSLEY DIRECT BY MR. SCHENK                                    5089

01:25PM   1    AS BEING FAIR MARKET VALUE.

01:25PM   2    Q.   OKAY.  AND YOU UNDERLINED SOME LANGUAGE IN THAT AS WELL.

01:25PM   3    WHY DID YOU DO THAT?

01:25PM   4    A.   TO ME IT WAS A LITTLE -- IT WAS AN UNUSUAL -- IT WAS AN

01:25PM   5    UNUSUAL PROVISION, AND THAT'S WHY I UNDERLINED IT.

01:25PM   6    Q.   OKAY.  WHY DO YOU SAY IT WAS UNUSUAL?

01:25PM   7    A.   WELL, IT WAS UNUSUAL BECAUSE NORMALLY IF YOU WERE

01:25PM   8    INVESTING IN THE STOCK OF A COMPANY, IT WOULD BE VERY UNUSUAL

01:25PM   9    TO SAY THAT THE COMPANY'S BOARD COULD GO OUT AND DECIDE AT SOME

01:25PM   10   LATER DATE WHAT THEY THOUGHT THE FAIR MARKET VALUE OF THE STOCK

01:25PM   11   THAT YOU OWNED WAS AND THEN ELECT TO BUY IT FROM YOU, AND IN

01:25PM   12   PARTICULAR THIS ALLOWED THEM TO NOT BUY PRO RATA ACROSS ALL OF

01:25PM   13   THE SHARES, BUT THEY COULD COME TO ONE SHAREHOLDER AND SAY

01:26PM   14   WE'RE LIQUIDATING YOUR SHARES.

01:26PM   15   Q.   AT SOME POINT IN THE FUTURE, DID YOU HAVE A CONVERSATION

01:26PM   16   WITH MS. HOLMES ABOUT THIS MANDATORY REDEMPTION PROVISION?

01:26PM   17   A.   I DID.

01:26PM   18   Q.   AND DID YOU END UP CREATING A SEPARATE ARRANGEMENT WITH

01:26PM   19   MS. HOLMES REGARDING THE APPLICATION OF THE MANDATORY

01:26PM   20   REDEMPTION PROVISION?

01:26PM   21   A.   YES, I RECEIVED A LETTER OR A SHORT DOCUMENT FROM

01:26PM   22   ELIZABETH WITH REGARD TO THIS PROVISION.

01:26PM   23   Q.   GREAT.  OKAY.  WE'LL GET TO THAT DOCUMENT IN A MOMENT.

01:26PM   24        YOUR HONOR, I'M GOING TO TRANSITION INTO ANOTHER TOPIC.

01:26PM   25   I'M HAPPY TO START IT OR TAKE OUR BREAK.

MOSLEY DIRECT BY MR. SCHENK                                          5090

01:26PM   1            THE COURT:  WHY DON'T WE TAKE OUR BREAK NOW.  WE'RE

01:26PM   2   CLOSE ENOUGH TO THE BOTTOM OF THE HOUR.

01:26PM   3       LET'S TAKE OUR AFTERNOON 30 MINUTE BREAK, PLEASE,

01:26PM   4   30 MINUTES.

01:26PM   5            THE WITNESS:  THANK YOU.

01:26PM   6       (JURY OUT AT 1:26 P.M.)

01:27PM   7            THE COURT:  YOU CAN STAND DOWN NOW, SIR.  THANK YOU.

01:27PM   8            THE WITNESS:  CAN I GO OUT THIS DOOR?

01:27PM   9            THE COURT:  YOU CAN GO OUT THE DOOR YOU CAME IN.

01:27PM  10   THANK YOU.

01:27PM  11       PLEASE BE SEATED.  THANK YOU.

01:27PM  12       ALL RIGHT.  THE RECORD SHOULD REFLECT THAT THE JURY HAS

01:27PM  13   LEFT FOR THEIR AFTERNOON BREAK AND THE WITNESS HAS LEFT THE

01:27PM  14   COURTROOM.

01:27PM  15       I JUST WANT TO CHECK IN, ANYTHING BEFORE WE BREAK,

01:27PM  16   MR. SCHENK?

01:27PM  17            MR. SCHENK:  YOUR HONOR, WE RAISED THE ISSUE THIS

01:27PM  18   MORNING ABOUT THE 2015 DOCUMENTS.  I ANTICIPATE THAT WE'LL GET

01:27PM  19   TO THAT THIS AFTERNOON, OR AT LEAST NOW COULD BE A CONVENIENT

01:27PM  20   TIME TO DISCUSS THAT IF THE COURT IS IN A POSITION TO HAVE

01:27PM  21   FURTHER DISCUSSIONS.

01:27PM  22            THE COURT:  OKAY.  DO YOU THINK WE'LL GET TO THIS?

01:28PM  23   IS THIS GOING TO COME IN THROUGH YOUR DIRECT?

01:28PM  24            MR. SCHENK:  NO, IT WILL NOT.

01:28PM  25            THE COURT:  I SEE.

MOSLEY DIRECT BY MR. SCHENK                                    5091

```
01:28PM   1              MR. WADE:  I'M NOT SURE HOW MUCH LONGER MR. SCHENK

01:28PM   2    HAS.  I THINK -- I CAN CERTAINLY AVOID THAT TOPIC.  WE CAN

01:28PM   3    DISCUSS IT IN THE MORNING IF THAT'S -- OR AFTER COURT.  IT

01:28PM   4    DEPENDS ON --

01:28PM   5              THE COURT:  ALL RIGHT.  WELL, LET'S DO THAT.  LET'S

01:28PM   6    TAKE OUR BREAK AND WE'LL DEFER DISCUSSION.

01:28PM   7         IF IT DOES -- IF MR. SCHENK ENDS AND YOU BEGIN YOUR

01:28PM   8    CROSS-EXAMINATION, YOU DON'T NEED TO GO INTO THIS THIS

01:28PM   9    AFTERNOON I TAKE IT?

01:28PM  10              MR. WADE:  I DON'T THINK SO.  I THINK, BASED ON THE

01:28PM  11    TIMING AS I SEE IT, I THINK WE CAN AVOID GOING INTO THAT, YEAH.

01:28PM  12              THE COURT:  ALL RIGHT.  FAIR ENOUGH.  THANK YOU.

01:28PM  13              MR. WADE:  THANK YOU, YOUR HONOR.

01:28PM  14              THE CLERK:  COURT IS IN RECESS.

01:28PM  15         (RECESS FROM 1:28 P.M. UNTIL 2:03 P.M.)

02:03PM  16         (JURY IN AT 2:03 P.M.)

02:03PM  17              THE COURT:  PLEASE BE SEATED.  WE'RE BACK ON THE

02:03PM  18    RECORD.  ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT AGAIN.  OUR

02:03PM  19    JURY IS PRESENT.  OUR WITNESS IS ON THE STAND.

02:03PM  20         I'M SORRY, MR. SCHENK.

02:03PM  21         I JUST WANTED TO LET EVERYONE KNOW THAT IT SEEMS WARM TO

02:03PM  22    ME IN THE COURTROOM, AND I DON'T KNOW WHAT THAT HAS TO DO WITH

02:03PM  23    OUR ISSUE LAST WEEK WITH WATER, BUT WE'RE TRYING TO GET THAT --

02:04PM  24    THE TEMPERATURE ADJUSTED A LITTLE BIT SO IT CAN COOL OFF A

02:04PM  25    LITTLE BIT HERE.  SO I APOLOGIZE FOR THE INCONVENIENCE.
```

                                                                    5092
MOSLEY DIRECT BY MR. SCHENK

02:04PM   1         IF ANY MEMBER OF THE JURY, IF IT BECOMES UNTENABLE OR A

02:04PM   2    PROBLEM, PLEASE LET ME KNOW AND RAISE YOUR HAND, AND WE'LL DO

02:04PM   3    WHAT WE CAN.

02:04PM   4         OTHERWISE -- OR ANY PARTY, TOO.  PLEASE LET ME KNOW.

02:04PM   5         ALL RIGHT.  THANK YOU.

02:04PM   6         MR. SCHENK, YOU'D LIKE TO CONTINUE?

02:04PM   7              MR. SCHENK:  YES.  THANK YOU.

02:04PM   8    Q.   GOOD AFTERNOON AGAIN, MR. MOSLEY.

02:04PM   9    A.   HELLO.

02:04PM  10    Q.   WHEN WE FINISHED OFF WE WERE LOOKING AT EXHIBIT 3387.

02:04PM  11         DO YOU RECALL THAT?

02:04PM  12    A.   I DO.

02:04PM  13    Q.   AND I THINK YOU TESTIFIED THAT THESE WERE AMONG THE

02:04PM  14    DOCUMENTS THAT YOU REVIEWED AND ASSISTED IN YOUR DECISION TO

02:04PM  15    INVEST IN THERANOS?

02:04PM  16    A.   YES.

02:04PM  17    Q.   AND WOULD YOU TURN TO PAGE 144 OF THIS EXHIBIT,

02:04PM  18    EXHIBIT 3387.

02:04PM  19    A.   YES.

02:04PM  20    Q.   EXHIBIT PAGE 144, MS. HOLLIMAN, PLEASE.

02:05PM  21         DO YOU SEE THAT DOCUMENT?

02:05PM  22    A.   I DO.

02:05PM  23    Q.   AND WHAT ARE WE LOOKING AT?

02:05PM  24    A.   THESE ARE SOME HANDWRITTEN NOTES THAT ARE IN MY

02:05PM  25    HANDWRITING.

                                                                    5093
MOSLEY DIRECT BY MR. SCHENK

02:05PM  1    Q.   OKAY.  AND DID YOU TAKE THESE NOTES WHILE YOU WERE

02:05PM  2    REVIEWING THE MATERIALS THAT WE'RE LOOKING AT, OR ON A PHONE

02:05PM  3    CALL?

02:05PM  4         DO YOU RECALL?

02:05PM  5    A.   I DON'T HONESTLY KNOW.  I DON'T REMEMBER.

02:05PM  6    Q.   OKAY.  THESE ARE NOTES ABOUT THERANOS, BUT YOU DON'T

02:05PM  7    REMEMBER THE CIRCUMSTANCES OF TAKING THEM?

02:05PM  8    A.   THAT'S CORRECT.

02:05PM  9    Q.   OKAY.  LET'S WALK THROUGH SOME OF THEM AND IF YOU CAN HELP

02:05PM  10   US WITH THE HANDWRITING.

02:05PM  11        WHAT IS NUMBER 1?

02:05PM  12   A.   IT SAYS PENETRATION ASSUMED IN 2015, AND THE HASH MARK

02:05PM  13   MEANS NUMBERS TO ME.

02:05PM  14   Q.   OKAY.

02:05PM  15   A.   AND --

02:05PM  16   Q.   I'M SORRY?

02:05PM  17   A.   DO YOU WANT ME TO READ THE REST OF 1?

02:05PM  18   Q.   SURE.  WHY DON'T YOU READ IT AND THEN I'LL ASK YOU

02:05PM  19   QUESTIONS.

02:05PM  20   A.   SURE.  FIRST LOCATION IN PALO ALTO IN 2012.

02:06PM  21        AND THEN NOW.

02:06PM  22        AND THEN P/S MEANS PARTNERSHIP WITH WALGREENS FALL OF

02:06PM  23   2013.

02:06PM  24        AND THEN THE NEXT IS NOW IN 30 WALGREENS, AND UNDER THAT

02:06PM  25   IT SAYS 29 ARIZONA, 1 PALO ALTO.

MOSLEY DIRECT BY MR. SCHENK                                        5094

02:06PM   1          AND THEN IT SAYS WALGREENS IN 10,000 STORES IN 10

02:06PM   2     COUNTRIES.

02:06PM   3          AND THEN IT SAYS COLLABORATIONS WITH 3 HOSPITAL GROUPS.

02:06PM   4          AS REFERENCE LABS.

02:06PM   5          QUOTE, "MASSIVE UNDERTAKING."

02:06PM   6     Q.   THANK YOU.  LET'S GO TO THE TOP, PENETRATION ASSUMED IN

02:06PM   7     2015 NUMBERS.

02:06PM   8          WHAT IS THAT A REFERENCE TO?

02:06PM   9     A.   IT WOULD BE A REFERENCE TO WHAT THE -- WHAT WERE THE

02:06PM  10     ASSUMPTIONS BAKED INTO THE FINANCIAL NUMBERS.

02:06PM  11     Q.   DID MS. HOLMES PROVIDE YOU FINANCIAL NUMBERS BEFORE YOU

02:06PM  12     INVESTED?

02:06PM  13     A.   I BELIEVE THERE ARE FINANCIAL NUMBERS IN THIS BOOK, OR I

02:06PM  14     CERTAINLY HAD FINANCIAL NUMBERS BEFORE I INVESTED.

02:06PM  15     Q.   OKAY.  I'LL SHOW THOSE TO YOU IN A MOMENT, BUT WHAT ARE

02:07PM  16     YOU TALKING ABOUT -- YOU USED THE WORD "BAKED IN."  WHAT WERE

02:07PM  17     YOU REFERRING TO?

02:07PM  18     A.   WELL, I MEANT THE FINANCIAL -- THE ASSUMPTIONS THAT WERE

02:07PM  19     USED IN COMING TO THE FINANCIAL NUMBERS.

02:07PM  20     Q.   OKAY.  AND WHAT IS "PENETRATION" A REFERENCE TO?

02:07PM  21     A.   IT WOULD MEAN THE DEGREE OF ADOPTION INTO THE MARKET.  SO

02:07PM  22     SAYING, YOU KNOW, 30 WALGREENS WOULD BE AN EXAMPLE OF WHAT PART

02:07PM  23     OF THE MARKET THE COMPANY WAS THEN SERVICING.

02:07PM  24     Q.   I SEE.  SO YOU WROTE IN HERE THAT AT THIS POINT THERE WERE

02:07PM  25     30 WALGREENS LOCATIONS THAT WERE OFFERING THERANOS BLOOD

MOSLEY DIRECT BY MR. SCHENK                                    5095

02:07PM   1    TESTING SERVICES?

02:07PM   2    A.   YES.

02:07PM   3    Q.   AND PENETRATION ASSUMED IN 2015 NUMBERS.

02:07PM   4         IS THAT A STATEMENT ABOUT INCREASED WALGREENS ADOPTION?

02:07PM   5    A.   I, I DON'T KNOW.  I DON'T REMEMBER.

02:07PM   6    Q.   OKAY.  BUT PENETRATION OR ADOPTION BY WALGREENS OF

02:08PM   7    THERANOS WAS RELEVANT TO THE 2015 FINANCIAL PROJECTIONS?

02:08PM   8    A.   WELL, IT HAD TO, BECAUSE ONE LINE WAS OBVIOUSLY FROM

02:08PM   9    PHARMACIES, ONE -- AS I REMEMBER IN THE FINANCIAL STATEMENTS,

02:08PM  10    ONE LINE WAS IN SOME WAY DESIGNATED AS REVENUE FROM PHARMACY --

02:08PM  11    WALGREENS PHARMACIES.

02:08PM  12    Q.   I SEE.  SO THE NUMBER OF WALGREENS LOCATIONS WOULD

02:08PM  13    DETERMINE OR HAVE AN EFFECT ON THE AMOUNT OF REVENUE THAT

02:08PM  14    THERANOS GENERATED FROM WALGREENS?

02:08PM  15    A.   PRESUMABLY, YES.

02:08PM  16    Q.   I SEE.  AND THEN FURTHER DOWN YOU WRITE ABOUT HOSPITAL

02:08PM  17    GROUPS AND REFERENCE LABS.

02:08PM  18         WHAT IS THAT A REFERENCE TO?

02:08PM  19    A.   IT WAS A REFERENCE TO MY UNDERSTANDING THAT THEY WERE

02:08PM  20    CURRENTLY WORKING WITH THREE HOSPITAL GROUPS, COLLABORATIONS

02:08PM  21    MEANT THEY WERE WORKING WITH THREE HOSPITAL GROUPS, AND

02:09PM  22    PRESUMABLY THAT MEANT AS REFERENCE LABS OR, OR -- I DON'T

02:09PM  23    REALLY KNOW EXACTLY WHAT THAT MEANT HONESTLY.

02:09PM  24    Q.   OKAY.  YOU HAD AN UNDERSTANDING, I THINK YOU SAID, THAT

02:09PM  25    THEY WERE WORKING WITH, THERANOS WAS WORKING WITH THREE

MOSLEY DIRECT BY MR. SCHENK                                  5096

```
02:09PM   1     HOSPITAL GROUPS?

02:09PM   2     A.   THAT'S CORRECT.

02:09PM   3     Q.   BUT YOU, YOU DON'T REMEMBER EXACTLY WHAT THAT WORK

02:09PM   4     INVOLVED; IS THAT FAIR?

02:09PM   5     A.   I DON'T THINK I KNEW A LOT OF DETAIL.

02:09PM   6     Q.   OKAY.  IF YOU'LL NOW TURN TO PAGE 275 IN THIS EXHIBIT.

02:09PM   7     A.   OKAY.

02:09PM   8     Q.   AND THIS DOCUMENT IS PART OF THE BINDER AND IT'S LABELED

02:09PM   9     MEMO:  IMPLICATIONS OF THERANOS'S WORK FOR GLOBAL HEALTH,

02:09PM  10     PUBLIC POLICY, AND THOSE IN NEED.

02:09PM  11          DO YOU SEE THAT?

02:09PM  12     A.   I DO.

02:09PM  13     Q.   OKAY.  AND NOW IF YOU'LL LOOK AT THAT FIRST PARAGRAPH, IT

02:10PM  14     READS, "HEADQUARTERED IN PALO ALTO, THERANOS IS A CONSUMER

02:10PM  15     HEALTHCARE TECHNOLOGY COMPANY.  THERANOS'S CLINICAL LABORATORY

02:10PM  16     OFFERS COMPREHENSIVE LABORATORY TESTS FROM SAMPLES AS SMALL AS

02:10PM  17     A FEW DROPS OF BLOOD AT UNPRECEDENTED LOW PRICES."

02:10PM  18          IS THAT STATEMENT CONSISTENT WITH YOUR UNDERSTANDING AT

02:10PM  19     THE TIME ABOUT WHAT THERANOS DID?

02:10PM  20     A.   YES.

02:10PM  21     Q.   IF YOU'LL TURN TO THE SECOND PAGE OF THIS MEMO, WHICH IS

02:10PM  22     276, PAGE 276, AT THE TOP THERE'S A PARAGRAPH THAT BEGINS

02:10PM  23     "THERANOS."

02:10PM  24          DO YOU SEE THAT?

02:10PM  25     A.   YES.
```

UNITED STATES COURT REPORTERS

**ER-8713**

MOSLEY DIRECT BY MR. SCHENK                                            5097

02:10PM  1    Q.   IT READS, "THERANOS HAS BUILT A CERTIFIED LABORATORY

02:10PM  2    INFRASTRUCTURE POWERED BY THERANOS DEVICES THAT MAKE IT

02:10PM  3    POSSIBLE TO RUN ANY LABORATORY TEST FROM A MICRO-SAMPLE OF

02:10PM  4    BLOOD (TAKEN FROM A FINGER-STICK) OR OTHER" -- I'M SORRY, "OR

02:11PM  5    OTHER ANY OTHER FLUID (NASAL SWABS, THROAT SWABS, URINE)," IT

02:11PM  6    CONTINUES, "THERANOS'S TESTS ARE CAPABLE OF GENERATING RESULTS

02:11PM  7    IN LESS THAN AN HOUR FROM THE TIME A SAMPLE IS PROCESSED."

02:11PM  8         DO YOU SEE THAT?

02:11PM  9    A.   YES.

02:11PM 10    Q.   IN THAT FIRST SENTENCE, THERE IS SOME UNDERLINING.  IS

02:11PM 11    THAT YOUR HANDWRITING?

02:11PM 12    A.   YES, IT IS.

02:11PM 13    Q.   AND IT TALKS ABOUT THERANOS'S INFRASTRUCTURE THAT'S

02:11PM 14    POWERED BY THERANOS DEVICES.

02:11PM 15         WAS THAT YOUR UNDERSTANDING, THAT THERANOS USED THERANOS

02:11PM 16    DEVICES TO TEST BLOOD?

02:11PM 17    A.   IT WAS.

02:11PM 18    Q.   AND DID YOU KNOW WHETHER THERANOS USED DEVICES

02:11PM 19    MANUFACTURED BY THIRD PARTIES TO TEST BLOOD?

02:11PM 20    A.   I DID NOT.

02:11PM 21    Q.   YOU DID NOT KNOW THAT?

02:11PM 22    A.   I DID NOT KNOW.

02:11PM 23    Q.   IT CONTINUES, "DEVICES THAT MAKE IT POSSIBLE TO RUN ANY

02:11PM 24    LAB TEST FROM A MICRO-SAMPLE TAKEN FROM A FINGERSTICK."

02:11PM 25         IS THAT ALSO CONSISTENT WITH YOUR UNDERSTANDING AT THE

MOSLEY DIRECT BY MR. SCHENK                                          5098

02:11PM  1    TIME?

02:11PM  2    A.   IT IS.

02:11PM  3    Q.   THERANOS PERFORMED BLOOD TESTING THAT COULD DO ANY LAB

02:11PM  4    TEST FROM A MICRO-SAMPLE AND THAT MICRO-SAMPLE WAS TAKEN FROM A

02:12PM  5    FINGERSTICK.

02:12PM  6         IS THAT WHAT YOU UNDERSTOOD THIS TECHNOLOGY TO BE AT THE

02:12PM  7    TIME THAT YOU WERE CONSIDERING THIS INVESTMENT?

02:12PM  8    A.   YES, WITH THE EXCEPTION THAT OBVIOUSLY SOME OF THESE TYPES

02:12PM  9    OF FLUID SAMPLES WOULDN'T HAVE BEEN TAKEN BY A FINGERSTICK LIKE

02:12PM 10    A SWAB, A THROAT SWAB.  THAT'S THE ONLY THING.

02:12PM 11         BUT THE BLOOD, THE BLOOD DRAWS IN MY UNDERSTANDING WERE BY

02:12PM 12    A FINGERSTICK.

02:12PM 13    Q.   SO YOUR UNDERSTANDING WAS WHEN THEY WERE TESTING BLOOD, IT

02:12PM 14    WAS BLOOD DRAWN FROM A FINGER, BUT THEY MIGHT ALSO HAVE THE

02:12PM 15    ABILITY TO TEST --

02:12PM 16    A.   OTHER.

02:12PM 17    Q.   FORGIVE ME.

02:12PM 18         -- FLUIDS OR OTHER SAMPLES FROM OTHER PARTS OF THE BODY?

02:12PM 19    A.   THAT'S CORRECT.

02:12PM 20    Q.   THANK YOU.

02:12PM 21         IF YOU WILL NOW TURN TO PAGE 278.  THIS SECTION OF YOUR

02:12PM 22    MATERIALS LOOKS LIKE IT'S A GROUP OF POWERPOINT SLIDES.

02:12PM 23         DO YOU RECALL THAT?

02:12PM 24    A.   I DO.

02:12PM 25    Q.   AND DID YOU ALSO REVIEW THESE POWERPOINT SLIDES BEFORE YOU

MOSLEY DIRECT BY MR. SCHENK                                           5099

02:12PM   1    MADE THE DECISION TO INVEST $6 MILLION?

02:12PM   2    A.   I DID.

02:12PM   3    Q.   THE SLIDE THAT IS NUMBERED 279, THE NEXT PAGE.

02:13PM   4    A.   YES.

02:13PM   5    Q.   MS. KRATZMANN, CAN YOU CLEAR THE SCREEN.  THANK YOU.

02:13PM   6         ON 279 THERE'S AN IMAGE OF A CHILD AND THE PHRASE

02:13PM   7    "GOODBYE, BIG BAD NEEDLE."

02:13PM   8         DO YOU SEE THAT?

02:13PM   9    A.   I DO.

02:13PM  10    Q.   MR. MOSLEY, I THINK -- THE SCREEN IS A TOUCH SCREEN AND

02:13PM  11    YOUR BINDER MIGHT BE MAKING IMAGES.

02:13PM  12    A.   OH.  SORRY ABOUT THAT.

02:13PM  13    Q.   NO PROBLEM.  THANK YOU.

02:13PM  14         WHAT DID "GOODBYE, BIG BAD NEEDLE" MEAN TO YOU?

02:13PM  15    A.   IT MEANT THAT THEY COULD DO A BLOOD DRAW WITHOUT HAVING TO

02:13PM  16    USE A LARGE NEEDLE.

02:13PM  17    Q.   AND WHERE WOULD THE BLOOD BE TAKEN USING THE LARGE NEEDLE?

02:13PM  18    DID YOU HAVE AN IDEA?

02:13PM  19    A.   IT WOULD BE TAKEN FROM A VEIN.

02:13PM  20    Q.   OKAY.  WOULD YOU TURN TO 280, 2-8-0.

02:13PM  21         ON THIS SLIDE IT SAYS THAT "THERANOS'S PROPRIETARY,

02:13PM  22    PATENTED TECHNOLOGY RUNS COMPREHENSIVE BLOOD TESTS FROM A

02:14PM  23    FINGER-STICK AND TESTS FROM MICRO-SAMPLES OF OTHER MATRICES,

02:14PM  24    AND GENERATES SIGNIFICANTLY HIGHER INTEGRITY DATA THAN

02:14PM  25    CURRENTLY POSSIBLE."

MOSLEY DIRECT BY MR. SCHENK                                    5100

02:14PM  1          DO YOU SEE THAT?

02:14PM  2      A.   I DO.

02:14PM  3      Q.   AND WAS THAT CONSISTENT WITH YOUR UNDERSTANDING AT THE

02:14PM  4      TIME THAT YOU WERE CONSIDERING MAKING AN INVESTMENT WHAT THE

02:14PM  5      THERANOS TECHNOLOGY WAS?

02:14PM  6      A.   IT WAS.

02:14PM  7      Q.   AND DO YOU UNDERSTAND THAT THERANOS HAD ITS OWN TECHNOLOGY

02:14PM  8      THAT RAN THESE COMPREHENSIVE BLOOD TESTS?

02:14PM  9      A.   I DID.

02:14PM  10     Q.   IT CONTINUES, "THERANOS IS THE WORLD'S FIRST AND ONLY

02:14PM  11     CLIA-CERTIFIED LABORATORY RUNNING ITS TESTS ON MICRO-SAMPLES,"

02:14PM  12     AND CONTINUES, "CURRENT AND PAST CLIENTS INCLUDE 10 OF THE TOP

02:14PM  13     15 MAJOR PHARMACEUTICAL COMPANIES, MIDSIZED BIO-PHARMAS,

02:14PM  14     PROMINENT RESEARCH INSTITUTIONS, HEALTH CARE PAYORS, AND U.S.

02:14PM  15     AND FOREIGN GOVERNMENT HEALTH AND MILITARY ORGANIZATIONS."

02:14PM  16          WAS THAT WORK THAT THERANOS HAD DONE WITH THESE

02:15PM  17     ORGANIZATIONS, WAS THAT IMPORTANT TO YOU?

02:15PM  18     A.   IT WAS.

02:15PM  19     Q.   WHY?

02:15PM  20     A.   OBVIOUSLY THE PHARMACEUTICAL COMPANIES ARE EXTREMELY

02:15PM  21     SOPHISTICATED AND CAPABLE OF MAKING JUDGMENTS ABOUT THE

02:15PM  22     TECHNOLOGY.

02:15PM  23     Q.   AND THE RELATIONSHIP THAT THERANOS HAD WITH THESE, WITH

02:15PM  24     THESE COMPANIES, DID THAT SAY SOMETHING TO YOU ABOUT THE

02:15PM  25     THERANOS TECHNOLOGY?

MOSLEY DIRECT BY MR. SCHENK                                    5101

02:15PM  1    A.   I WOULD REGARD IT AS AN ENDORSEMENT THAT THEY HAD

02:15PM  2    CONFIDENCE IN THE TECHNOLOGY.

02:15PM  3    Q.   OKAY.  IF YOU'LL TURN NOW TO PAGE 285.

02:15PM  4         THIS SLIDE IS LABELLED VALIDATION OF THERANOS TESTS.

02:15PM  5         DO YOU SEE THAT?

02:15PM  6    A.   I DO.

02:15PM  7    Q.   IT READS, "THERANOS HAS BEEN COMPREHENSIVELY VALIDATED

02:15PM  8    OVER THE COURSE OF THE LAST SEVEN YEARS BY 10 OF THE 15 LARGEST

02:15PM  9    PHARMACEUTICAL COMPANIES, WITH HUNDREDS OF THOUSANDS OF ASSAYS

02:15PM 10    PROCESSED."

02:15PM 11         IS THIS A LITTLE BIT MORE THE POINT THAT YOU WERE JUST

02:15PM 12    MAKING TO ME ABOUT VALIDATION THROUGH THIS EXTERNAL WORK?

02:15PM 13    A.   YES.

02:15PM 14    Q.   THERE'S AN IMAGE AT THE BOTTOM, JOHNS HOPKINS MEDICINE.

02:16PM 15         DO YOU SEE THAT?

02:16PM 16    A.   I DO.

02:16PM 17    Q.   AND IT READS ABOVE THAT, "EXCERPTS FROM JOHNS HOPKINS DUE

02:16PM 18    DILIGENCE AND TECHNOLOGY VALIDATION."

02:16PM 19         WAS THAT THE WORK WITH JOHNS HOPKINS, WAS THAT IMPORTANT

02:16PM 20    TO YOU?

02:16PM 21    A.   IT WAS.

02:16PM 22    Q.   WHY?

02:16PM 23    A.   ONCE AGAIN, IT'S A VERY LARGE, VERY RESPECTED,

02:16PM 24    SOPHISTICATED HOSPITAL SYSTEM, AND THE FACT THAT THEY HAD

02:16PM 25    VALIDATED THE TECHNOLOGY WAS OBVIOUSLY IMPORTANT.

MOSLEY DIRECT BY MR. SCHENK                                           5102

02:16PM  1   Q.   AND YOU THOUGHT THAT JOHNS HOPKINS HAD VALIDATED THE

02:16PM  2   TECHNOLOGY?

02:16PM  3   A.   I DID.

02:16PM  4   Q.   WOULD YOU TURN NOW TO PAGE 299.

02:16PM  5        THIS SLIDE READS "SAME TESTS, A WHOLE NEW APPROACH.

02:16PM  6        "THE ACTIONABLE INFORMATION YOU NEED, 1/1,000 THE SIZE OF

02:16PM  7   A TYPICAL BLOOD DRAW."

02:16PM  8        THEN THERE ARE SOME IMAGES.

02:16PM  9        IT READS, "THERANOS RUNS ANY TEST AVAILABLE IN CENTRAL

02:16PM  10  LABORATORIES, AND PROCESSES ALL SAMPLE TYPES."

02:16PM  11       IS THAT CONSISTENT WITH YOUR UNDERSTANDING OF THE

02:17PM  12  CAPABILITIES OF THE TECHNOLOGY WHEN YOU INVESTED?

02:17PM  13  A.   YES.

02:17PM  14  Q.   AT THE BOTTOM IT READS THAT "THERANOS PROVIDES THE HIGHEST

02:17PM  15  LEVEL OF OVERSIGHT, AUTOMATION, AND STANDARDIZATION IN OUR PRE-

02:17PM  16  AND POST-ANALYTIC PROCESSES, ENSURING THE HIGHEST LEVELS OF

02:17PM  17  ACCURACY AND PRECISION."

02:17PM  18       WAS IT RELEVANT TO YOU THAT THERANOS SAID THAT IT ENSURED

02:17PM  19  THE HIGHEST LEVELS OF ACCURACY AND PRECISION?

02:17PM  20  A.   YES.

02:17PM  21  Q.   AND WHY DID THAT MATTER?

02:17PM  22  A.   WELL, IT WAS A STATEMENT THAT THEY HAD THE HIGHEST LEVEL

02:17PM  23  OF PRECISION, WHICH WAS OBVIOUSLY IMPORTANT, HIGHEST LEVEL OF

02:17PM  24  ACCURACY.

02:17PM  25  Q.   WHY?  FORGIVE ME, IT MIGHT BE OBVIOUS, BUT WHY WAS

MOSLEY DIRECT BY MR. SCHENK

02:17PM 1    ACCURACY IN BLOOD TESTING IMPORTANT TO YOU WHEN YOU WERE

02:17PM 2    CONSIDERING INVESTING?

02:17PM 3    A.   WELL, YOU KNOW, FROM AN ECONOMIC STANDPOINT, THE COMPANY

02:17PM 4    WOULD OBVIOUSLY DO A LOT BETTER IF IT HAD A HIGHLY EFFECTIVE

02:17PM 5    TEST, TECHNOLOGY WITH HIGH ACCURACY.

02:17PM 6    Q.   OKAY.  THANK YOU.

02:17PM 7         IF YOU'LL TURN TO 301, PAGE 301.  THIS SLIDES READS "A NEW

02:18PM 8    STANDARD IN QUALITY."

02:18PM 9         DO YOU SEE THAT?

02:18PM 10   A.   I DO.

02:18PM 11   Q.   AND IT SAYS THAT "BY SYSTEMATICALLY CONTROLLING AND

02:18PM 12   STANDARDIZING OUR PROCESSES, THERANOS OFFERS TESTS WITH THE

02:18PM 13   HIGHEST LEVELS OF ACCURACY."

02:18PM 14        ARE THERE -- ARE WE NOW LOOKING AT MULTIPLE INSTANCES IN

02:18PM 15   THIS SLIDE DECK WHERE YOU SEE REPRESENTATIONS ABOUT THE

02:18PM 16   ACCURACY OF THERANOS TESTS?

02:18PM 17   A.   YES.

02:18PM 18   Q.   WOULD YOU NOW TURN TO PAGE 303.  303 IS ENTITLED NEW

02:18PM 19   POSSIBILITIES IN LAB, AND ON THE LEFT SIDE IT SAYS, "ALL 1,000

02:18PM 20   PLUS CURRENTLY RUN TESTS/CPT CODES ARE AVAILABLE THROUGH

02:18PM 21   THERANOS.

02:18PM 22        "THERANOS RUNS ANY TEST AVAILABLE IN CENTRAL

02:18PM 23   LABORATORIES."

02:18PM 24        IS THAT ALSO CONSISTENT WITH YOUR UNDERSTANDING OF THE

02:19PM 25   TESTS THAT THERANOS COULD RUN IN ITS LAB?

MOSLEY DIRECT BY MR. SCHENK                                          5104

02:19PM  1    A.   IT WAS.

02:19PM  2    Q.   WOULD YOU NOW TURN TO PAGE 304.

02:19PM  3         304 READS "FASTER RESULTS.  FASTER ANSWERS."

02:19PM  4         AND IT CONTINUES, "THERANOS'S MICRO-SAMPLE ANALYSIS IS

02:19PM  5    PERFORMED AT AMAZING SPEEDS, SO WE CAN REPORT RESULTS FASTER

02:19PM  6    THAN PREVIOUSLY POSSIBLE."

02:19PM  7         WHAT DID THAT MEAN TO YOU?

02:19PM  8    A.   IT JUST MEANT THAT THE RESULTS OF THE BLOOD TESTS COULD BE

02:19PM  9    RECEIVED IN A SHORTER PERIOD OF TIME.

02:19PM  10   Q.   ON THERANOS'S ANALYSIS OR THERANOS'S USE OF MICRO-SAMPLES?

02:19PM  11   A.   THAT'S CORRECT.

02:19PM  12   Q.   AND IF THERANOS WAS ACTUALLY USING CONVENTIONAL MACHINES,

02:19PM  13   THE TYPES OF MACHINES THAT OTHER LABS USED, WOULD YOU THINK IT

02:19PM  14   WOULD BE ANY FASTER, THAT THERE WOULD BE AN ADVANTAGE TO USING

02:20PM  15   THERANOS?

02:20PM  16   A.   I THOUGHT THIS MEANT THERE WAS A REAL ADVANTAGE TO USING

02:20PM  17   THERANOS MACHINES.

02:20PM  18   Q.   WHY?

02:20PM  19   A.   BECAUSE THEY WERE FASTER.

02:20PM  20   Q.   IF YOU'LL NOW TURN TO PAGE 320.

02:20PM  21        ON THIS SLIDE WE SEE RECENT PRESS, AND THERE'S AN IMAGE OF

02:20PM  22   "FORTUNE" MAGAZINE.

02:20PM  23        AND TO THE LEFT OF THAT IMAGE, A SECOND LINE READS "THIS

02:20PM  24   CEO IS OUT FOR BLOOD."

02:20PM  25        DO YOU SEE THAT?

MOSLEY DIRECT BY MR. SCHENK                                    5105

02:20PM   1    A.   I SEE IT.

02:20PM   2    Q.   WERE THERE INSTANCES SUCH AS THIS WHEN YOU LEARNED

02:20PM   3    INFORMATION ABOUT THERANOS NOT JUST FROM THE BINDER OF

02:20PM   4    MATERIAL, BUT FROM OTHER SOURCES?

02:20PM   5    A.   YES.

02:20PM   6    Q.   AND WAS THIS ARTICLE, THIS "FORTUNE" ARTICLE, ONE OF THOSE

02:20PM   7    INSTANCES?

02:20PM   8    A.   YES.

02:20PM   9    Q.   AND WHAT DID YOU THINK ABOUT YOUR ABILITY TO RELY ON THE

02:20PM  10    ARTICLE BY THERANOS SENDING IT TO YOU?

02:20PM  11        DO YOU UNDERSTAND?

02:20PM  12    A.   WELL, I ASSUMED -- I ASSUMED THAT THE COMPANY AGREED WITH

02:21PM  13    WHAT WAS STATED IN THE ARTICLE.

02:21PM  14    Q.   WHY DID YOU MAKE THAT ASSUMPTION?

02:21PM  15    A.   PROBABLY TWO REASONS.  ONE, I ASSUMED THAT ELIZABETH HAD

02:21PM  16    COOPERATED IN THE ARTICLE, AND MAYBE THE COMPANY HAD

02:21PM  17    COOPERATED; AND, TWO, BY SENDING IT TO ME, THE COMPANY WAS

02:21PM  18    SAYING THIS IS A GOOD DESCRIPTION OF THE COMPANY.

02:21PM  19    Q.   OKAY.  AND DO YOU RECALL WHETHER YOU THEN, IN FACT, FOUND

02:21PM  20    THE "FORTUNE" ARTICLE AND READ IT OR IF IT WAS SENT TO YOU?  DO

02:21PM  21    YOU HAVE A RECOLLECTION?

02:21PM  22    A.   I DEFINITELY READ IT.  I DON'T KNOW HOW I PULLED IT TO

02:21PM  23    READ IT, BUT I DID READ THE ARTICLE.

02:21PM  24    Q.   OKAY.  WOULD YOU NOW TURN TO PAGE 333.

02:21PM  25        ON THIS SLIDE WE SEE SIX IMAGINES, AND I'D LIKE TO DRAW

5106
MOSLEY DIRECT BY MR. SCHENK

02:21PM 1    YOUR ATTENTION TO THE BOTTOM MIDDLE IMAGE.

02:21PM 2         IF WE CAN ZOOM IN ON THE TEXT OF THE BOTTOM MIDDLE --

02:22PM 3    A.   OKAY.

02:22PM 4    Q.   -- IMAGE.

02:22PM 5         DO YOU SEE THAT?

02:22PM 6    A.   SURE.

02:22PM 7    Q.   IT READS, "OUR CERTIFIED LABS PERFORM PRECISE TESTS ON A

02:22PM 8    SAMPLE 1/1,000TH THE SIZE OF A TYPICAL BLOOD DRAW.  NO MORE BIG

02:22PM 9    VIALS TO FILL.  NO MORE SEARCHING FOR A GOOD VEIN."

02:22PM 10        WHAT DID THAT MEAN TO YOU?

02:22PM 11   A.   IT MEANT TO ME THAT THEY WERE ABLE TO DO THE TEST WITH A

02:22PM 12   VERY SMALL AMOUNT OF BLOOD THAT DID NOT REQUIRE FILLING UP

02:22PM 13   LARGE TUBES WITH BLOOD.

02:22PM 14   Q.   IF YOU WILL NOW TURN TO 354.

02:22PM 15        THIS SLIDE IS ABOUT AUTOMATED REFLEX TESTING.

02:22PM 16        DO YOU SEE THAT?

02:22PM 17   A.   YES.

02:22PM 18   Q.   "ORDER REFLEX TESTS DIRECTLY FROM THE THERANOS LAB ORDER

02:23PM 19   FORM.

02:23PM 20        "IMMEDIATE FOLLOW-ON TESTING."

02:23PM 21        WERE YOU FAMILIAR WITH THIS CONCEPT OF AUTOMATED REFLEX

02:23PM 22   TESTING WHEN YOU WERE DECIDING TO INVEST?

02:23PM 23   A.   I WAS.  AT SOME POINT I SORT OF CAME TO UNDERSTAND WHAT I

02:23PM 24   THOUGHT IT MEANT.

02:23PM 25   Q.   AND WHAT WAS THAT UNDERSTANDING?

MOSLEY DIRECT BY MR. SCHENK

02:23PM  1   A.   IT WAS THE FACT THAT IN REQUESTING A LAB TEST, YOU COULD

02:23PM  2   SAY IF THIS PARTICULAR TEST COMES OUT IN A PARTICULAR WAY, YOU

02:23PM  3   WOULD BE ASKING AT THE SAME TIME THAT FOLLOW-ON TESTS WOULD BE

02:23PM  4   DONE THAT WOULD BE HELPFUL IN DETERMINING THE MEANING OF THE

02:23PM  5   FIRST TEST.

02:23PM  6   Q.   AND DID YOU UNDERSTAND THAT THAT WAS SOMETHING THAT

02:23PM  7   THERANOS WAS CURRENTLY CAPABLE OF DOING?

02:23PM  8   A.   YES.

02:23PM  9   Q.   WOULD YOU TURN TO PAGE 419.

02:24PM  10      ARE YOU FAMILIAR WITH A DOCUMENT THAT IS BEGINNING ON

02:24PM  11  PAGE 419?

02:24PM  12  A.   YES.

02:24PM  13  Q.   THIS DOCUMENT HAS THE PFIZER LOGO IN THE UPPER LEFT

02:24PM  14  CORNER, AND THE THERANOS LOGO IN THE UPPER RIGHT.

02:24PM  15      DO YOU SEE THAT?

02:24PM  16  A.   I DO.

02:24PM  17  Q.   AND IT READS, "THERANOS ANGIOGENESIS STUDY REPORT, PFIZER

02:24PM  18  INC."

02:24PM  19      AND THEN IF WE ZOOM OUT, ON THE BOTTOM THERE IS SOME

02:24PM  20  HIGHLIGHTING.

02:24PM  21      WHERE DID THE HIGHLIGHTING COME FROM?

02:24PM  22  A.   IT'S MY HIGHLIGHTING.

02:24PM  23  Q.   AND DID YOU READ THIS BEFORE YOU MADE THE DECISION TO

02:24PM  24  INVEST?

02:24PM  25  A.   I DID.

MOSLEY DIRECT BY MR. SCHENK                                        5108

02:24PM  1    Q.   AND LATER DID YOU WRITE A MEMO WHERE YOU SUMMARIZED YOUR

02:24PM  2    UNDERSTANDING OF THERANOS?

02:24PM  3    A.   I DID.

02:24PM  4    Q.   AND DID YOU INCLUDE SOME INFORMATION THAT YOU LEARNED FROM

02:24PM  5    THE PFIZER REPORT IN THAT MEMO?

02:24PM  6    A.   I DID.

02:24PM  7    Q.   WAS THIS PFIZER REPORT IMPORTANT TO YOU IN YOUR DECISION

02:24PM  8    TO INVEST?

02:24PM  9    A.   IT WAS.

02:24PM  10   Q.   WHY?

02:24PM  11   A.   AS I MENTIONED EARLIER, IT'S A -- PFIZER IS A VERY LARGE

02:25PM  12   PHARMACEUTICAL COMPANY THAT IS HIGHLY SOPHISTICATED AND HAS A

02:25PM  13   LARGE SCIENTIFIC STAFF, AND I BELIEVED THAT IF THEY HAD REACHED

02:25PM  14   THE CONCLUSIONS STATED IN THIS REPORT, THAT WAS A VERY GOOD

02:25PM  15   VALIDATION OF THE COMPANY.

02:25PM  16   Q.   WHO DID YOU THINK WROTE THIS REPORT?

02:25PM  17   A.   PFIZER.

02:25PM  18   Q.   WHY DID YOU THINK THAT?

02:25PM  19   A.   ONE, IT'S GOT THE PFIZER LOGO ON THE TOP LEFT OF IT, AND I

02:25PM  20   THINK THAT IS ON EVERY PAGE.

02:25PM  21       AND THERE ARE CERTAIN PARTS OF THE STUDY THAT CERTAINLY I

02:25PM  22   WOULD HAVE THOUGHT THAT PFIZER WAS THE ONLY ONE THAT WOULD HAVE

02:25PM  23   KNOWN THE INFORMATION THAT IS INCLUDED IN THE STUDY.

02:25PM  24   Q.   OKAY.  IF WE COULD ZOOM OUT ON THIS PAGE AND THEN ZOOM IN

02:25PM  25   AT THE VERY BOTTOM OF THIS DOCUMENT.  NEXT TO THE PAGE NUMBER

MOSLEY DIRECT BY MR. SCHENK                                      5109

02:26PM   1      THERE'S AN ADDRESS.

02:26PM   2           DO YOU SEE THAT?  IT IS SAYS 3200 HILLVIEW, PALO ALTO.

02:26PM   3           DO YOU SEE WHERE I AM?

02:26PM   4      A.  I SEE IT.

02:26PM   5      Q.  AND IT HAS A PHONE NUMBER AND A WEBSITE, THERANOS.COM.

02:26PM   6           DO YOU SEE THAT?

02:26PM   7      A.  I DO.

02:26PM   8      Q.  AND DO YOU KNOW WHAT IS LOCATED, OR WHAT WAS LOCATED AT

02:26PM   9      THAT ADDRESS, 3200?

02:26PM  10      A.  I DON'T KNOW FOR SURE, BUT I THINK IT WAS THERANOS'S

02:26PM  11      HEADQUARTERS AT ONE POINT.

02:26PM  12      Q.  FORGIVE ME.  AT ONE POINT?

02:26PM  13      A.  YEAH.

02:26PM  14      Q.  THIS DOCUMENT HAD THERANOS'S ADDRESS, WEBSITE, PHONE

02:26PM  15      NUMBER ON IT.  DID THAT MAKE YOU THINK THAT PFIZER DID NOT

02:26PM  16      WRITE THIS DOCUMENT?

02:26PM  17      A.  IT DID NOT.

02:26PM  18      Q.  WHY?  WHY DIDN'T -- I MEAN, YOU SAW THE THERANOS WEBSITE.

02:26PM  19      WHY DIDN'T THAT CHANGE YOUR MIND ABOUT WHO DRAFTED THE

02:26PM  20      DOCUMENT?

02:26PM  21      A.  WELL, THERE IS -- YOU GET TO THE BACK OF THE DOCUMENT AND

02:26PM  22      THERE ARE A LOT OF CONCLUSIONS ABOUT THE TECHNOLOGY, AND THEY

02:26PM  23      CERTAINLY READ AS THIRD PARTY CONCLUSIONS.

02:27PM  24      Q.  WHAT DO YOU MEAN, "THEY READ AS THIRD PARTY CONCLUSIONS"?

02:27PM  25      A.  WELL, THEY READ, TO ME, TO BE STATEMENTS EFFECTIVELY BY

MOSLEY DIRECT BY MR. SCHENK                                    5110

02:27PM  1    SOMEBODY OTHER THAN THERANOS ABOUT THE TECHNOLOGY, THERANOS'S

02:27PM  2    TECHNOLOGY.

02:27PM  3    Q.   OKAY.  IF YOU'LL NOW TURN TO PAGE 510.

02:27PM  4    A.   OKAY.

02:27PM  5    Q.   WHAT ARE WE LOOKING AT HERE?

02:27PM  6    A.   A CAP TABLE.

02:27PM  7    Q.   WHAT IS A CAP TABLE?

02:28PM  8    A.   IT'S NORMALLY A TABLE SHOWING THE STOCK THAT A COMPANY HAD

02:28PM  9    ISSUED AND AT WHAT PRICE AND THE AMOUNT OF PROCEEDS THAT HAD

02:28PM  10   COME TO THE COMPANY AS A RESULT OF ISSUING THAT STOCK.

02:28PM  11   Q.   PROCEEDS THAT HAD COME TO THE COMPANY BY ISSUING THE

02:28PM  12   STOCK, WHAT DOES THAT MEAN?

02:28PM  13   A.   WELL, ISSUING MEANS REALLY A COMPANY SELLING STOCK.  SO

02:28PM  14   THIS WOULD BE AN INDICATION OF THE SHARES SOLD AT DIFFERENT

02:28PM  15   DATES FOR DIFFERENT AMOUNTS AND HOW MUCH CAME TO THE COMPANY AS

02:28PM  16   A RESULT OF THE PROCEEDS OF THOSE SALES.

02:28PM  17   Q.   OKAY.  AND THEN THE COLUMN SECOND FROM THE LEFT, PER SHARE

02:28PM  18   PRICE, WHAT DOES THAT MEAN?

02:28PM  19   A.   IT -- WHEN THEY SOLD IN THAT PARTICULAR SERIES, THE PRICE

02:28PM  20   PER SHARE THAT WAS PAID BY THE PURCHASERS OF THE STOCK.

02:28PM  21   Q.   AND WHICH SERIES DID YOU END UP PURCHASING?

02:28PM  22   A.   THE SERIES C-2.

02:28PM  23   Q.   SO DOES THAT MEAN THAT YOU PAID $17 PER SHARE?

02:29PM  24   A.   IT DOES.

02:29PM  25   Q.   THE VALUATION DATE IS 2013.

MOSLEY DIRECT BY MR. SCHENK                                              5111

02:29PM   1        WHEN DID YOU INVEST, THOUGH?

02:29PM   2   A.   I THINK IT WAS AROUND THE END OF OCTOBER.

02:29PM   3   Q.   OF?

02:29PM   4   A.   2014.

02:29PM   5   Q.   IT WAS IN 2014.  THE PRICE DIDN'T CHANGE, YOU STILL GOT

02:29PM   6   THE 2013 PRICE?

02:29PM   7   A.   THAT IS CORRECT.

02:29PM   8   Q.   IF YOU'LL NOW TURN TO PAGE 512.

02:29PM   9        WE TALKED ABOUT THIS A MOMENT AGO.  YOU SAID YOU RECEIVED

02:29PM  10   SOME FINANCIAL INFORMATION FROM THE COMPANY WHEN YOU WERE

02:29PM  11   REVIEWING THE INVESTMENT OPPORTUNITY.

02:29PM  12        IS THIS SOME OF THE FINANCIAL INFORMATION THAT YOU WERE

02:29PM  13   REFERRING TO?

02:29PM  14   A.   YES.

02:29PM  15   Q.   IT'S CALLED A PROJECTED STATEMENT OF INCOME, AND IT HAS

02:29PM  16   TWO PERIODS, THE PERIOD ENDING 12/31/2014 AND THEN 12/31/2015.

02:29PM  17        DO YOU SEE THAT?

02:30PM  18   A.   I DO.

02:30PM  19   Q.   AND THIS DOCUMENT I THINK YOU SAID WAS PART OF MATERIALS

02:30PM  20   THAT MS. HOLMES SENT TO YOU WITH THAT COVER LETTER.  THAT COVER

02:30PM  21   LETTER WAS IN AUGUST OF 2014; IS THAT RIGHT?

02:30PM  22   A.   YES.

02:30PM  23   Q.   AND SO WOULD YOU HAVE BEEN REVIEWING THIS PROJECTED

02:30PM  24   STATEMENT OF INCOME ROUGHLY IN AUGUST OF 2014?

02:30PM  25   A.   YES.

5112
MOSLEY DIRECT BY MR. SCHENK

02:30PM  1    Q.   AND IT PROJECTS REVENUE BY THE END OF THIS YEAR, 2014,

02:30PM  2    FROM LAB SERVICES FOR U.S. RETAIL PHARMACIES AT $42 MILLION.

02:30PM  3         DO YOU SEE THAT?

02:30PM  4    A.   YES.

02:30PM  5    Q.   AND IT INCLUDES REVENUE FROM PHYSICIANS OFFICES,

02:30PM  6    HOSPITALS, REVENUE FROM PHARMACEUTICAL SERVICES FOR A TOTAL

02:30PM  7    REVENUE OF $140 MILLION.

02:30PM  8         DO YOU SEE THAT?

02:30PM  9    A.   I DO.

02:30PM  10   Q.   WHEN YOU WERE LOOKING AT THOSE NUMBERS IN AUGUST OF 2014,

02:30PM  11   AND THE PROJECTION IS FOR THE YEAR ENDING DECEMBER 31, 2014,

02:30PM  12   DID THAT SAY ANYTHING TO YOU ABOUT THE RELIABILITY OF THESE

02:30PM  13   PROJECTIONS?

02:30PM  14   A.   IT, IT DID.  BY DEFINITION THEY COULD NOT BE WHAT I MIGHT

02:31PM  15   CALL HARD NUMBERS, OR FINAL NUMBERS, FOR THE ACTUAL REVENUE IN

02:31PM  16   THAT PARTICULAR YEAR SINCE THE YEAR HAD NOT YET BEEN COMPLETED.

02:31PM  17   Q.   OKAY.  AND HOW ABOUT THE LIKELIHOOD THAT THOSE NUMBERS

02:31PM  18   ARE, WHILE NOT HARD NUMBERS, ARE CLOSE TO ACCURATE?  DID IT SAY

02:31PM  19   ANYTHING ABOUT THAT?

02:31PM  20   A.   YES, IT WOULD HAVE PROBABLY INDICATED TO ME THAT THEY WERE

02:31PM  21   PRETTY GOOD NUMBERS BECAUSE ROUGHLY THREE QUARTERS OF THE YEAR

02:31PM  22   HAD ALREADY PASSED, AND I WOULD EXPECT THAT PART OF THE NUMBERS

02:31PM  23   TO BE BASED ON ACTUAL, AND ONLY THE BALANCE OF THE YEAR WHICH

02:31PM  24   HAD NOT YET OCCURRED TO BE BASED ON PROJECTED.

02:31PM  25   Q.   SO KNOWING THAT THESE WERE NOT YET HARD NUMBERS, WOULD IT

MOSLEY DIRECT BY MR. SCHENK                                                5113

02:31PM  1    HAVE SURPRISED YOU IF THERANOS HAD VERY LITTLE REVENUE IN 2014

02:31PM  2    GIVEN THESE PROJECTIONS?

02:31PM  3    A.   IT WOULD HAVE.

02:31PM  4    Q.   WHY?

02:31PM  5    A.   BECAUSE AS I SAY, I WOULD HAVE EXPECTED THESE NUMBERS TO

02:32PM  6    BE PRETTY ACCURATE FOR THE FIRST THREE QUARTERS OF THE YEAR,

02:32PM  7    AND THREE QUARTERS OF THE YEAR HAD PASSED, AND I WOULD HAVE

02:32PM  8    EXPECTED THEM TO BE A GOOD FAITH ESTIMATE FOR THE BALANCE OF

02:32PM  9    THE YEAR BASED ON THE FIRST THREE QUARTERS OF THE YEAR.

02:32PM  10   Q.   OKAY.  AND NOW LET'S TURN TO THE 2015 NUMBERS.  LET'S HAVE

02:32PM  11   THAT SAME CONVERSATION FOR 2015 NUMBERS.

02:32PM  12        TALK TO ME ABOUT YOUR VIEW ON THE RELIABILITY OF NUMBERS

02:32PM  13   THAT ARE NOW PROJECTED OUT LET'S SAY 15 MONTHS, 16 MONTHS INTO

02:32PM  14   THE FUTURE?

02:32PM  15   A.   I WOULD HAVE CONSIDERED THEM FAR LESS RELIABLE BECAUSE NO

02:32PM  16   PART OF THAT YEAR HAD OCCURRED YET.

02:32PM  17   Q.   OKAY.  AND WHAT ABOUT THAT SAME QUESTION, IF IN 2015 THERE

02:32PM  18   WAS VERY LITTLE REVENUE, WOULD THAT HAVE SURPRISED YOU GIVEN

02:32PM  19   THE PROJECTION OF NEARLY A BILLION DOLLARS OF REVENUE?

02:32PM  20   A.   IT, IT WOULD HAVE SURPRISED ME BECAUSE THREE QUARTERS OF

02:32PM  21   2014 HAD ALREADY OCCURRED AND SO THE COMPANY WOULD HAVE SOME

02:33PM  22   VISIBILITY WITH THREE QUARTERS OF THAT YEAR HAVING OCCURRED,

02:33PM  23   SOME VISIBILITY NOT ONLY INTO THE FOURTH QUARTER OF 2014, BUT

02:33PM  24   PRESUMABLY, YOU KNOW, INTO 2015.

02:33PM  25   Q.   SO IS IT FAIR THAT SORT OF THE ACCURACY OF THE NUMBERS

MOSLEY DIRECT BY MR. SCHENK                                      5114

02:33PM  1    DECREASES OVER TIME?  THE FURTHER OUT YOU GET, THE LESS

02:33PM  2    RELIABLE YOU VIEW THE NUMBERS TO BE?

02:33PM  3    A.   ABSOLUTELY.

02:33PM  4    Q.   BUT THERE'S STILL, IS IT FAIR TO SAY, A BALLPARK?  IF

02:33PM  5    YOU'RE IN 2014, IN AUGUST, PROJECTING NUMBERS FOR 2015, DO YOU

02:33PM  6    VIEW THE PROJECTIONS TO SORT OF BE, LET'S SAY, A FEW STANDARD

02:33PM  7    DEVIATIONS FROM A BALLPARK?

02:33PM  8    A.   YOU KNOW, I PROBABLY WOULDN'T SAY THEY WERE THAT ACCURATE.

02:33PM  9         I WOULD JUST SAY THAT THEY ARE WHAT THE COMPANY THOUGHT

02:33PM  10   THEY COULD DO FOR THAT YEAR, OR WHAT THEY WERE SAYING THEY

02:33PM  11   THOUGHT THEY COULD DO FOR THAT YEAR.

02:33PM  12   Q.   AND A MOMENT AGO YOU USED THE PHRASE A GOOD FAITH

02:33PM  13   ESTIMATE.  WHAT DID YOU MEAN BY THAT?

02:33PM  14   A.   IT WAS A JUDGMENT THAT THEY WERE BASED ON A -- THAT IF

02:34PM  15   NUMBERS WERE -- I WOULD EXPECT PROJECTIONS TO BE ARRIVED AT IN

02:34PM  16   GOOD FAITH, WHICH MEANS THAT THEY WOULD BE BASED ON THE

02:34PM  17   INFORMATION THAT WAS AVAILABLE AT THAT TIME AND A REASONABLE

02:34PM  18   AND FAIR JUDGMENT OF WHAT THAT PORTRAYED FOR THE FUTURE.

02:34PM  19   Q.   OKAY.  THANK YOU.

02:34PM  20        WOULD YOU NOW TURN TO PAGE 516.

02:34PM  21        DO YOU RECOGNIZE THIS DOCUMENT?

02:34PM  22   A.   I DO.

02:34PM  23   Q.   AND IS THIS -- I THINK EARLIER YOU REFERENCED AN ARTICLE

02:34PM  24   IN "THE WALL STREET JOURNAL" ABOUT THE LAUNCH WITH WALGREENS;

02:34PM  25   IS THAT RIGHT?

MOSLEY DIRECT BY MR. SCHENK

02:34PM 1    A.   YES.

02:34PM 2    Q.   IS THAT THIS ARTICLE?

02:34PM 3    A.   YES, IT IS.

02:34PM 4    Q.   DID YOU -- DO YOU REMEMBER IF YOU READ THE ARTICLE AT THE

02:34PM 5    TIME?

02:34PM 6    A.   I DID.

02:34PM 7    Q.   AND THERE'S SOME HIGHLIGHTS IN IT.  ARE THOSE YOUR

02:34PM 8    HIGHLIGHTS?

02:34PM 9    A.   THEY ARE.

02:34PM 10   Q.   AND IF WE COULD NOW ZOOM IN THE SECOND COLUMN FURTHER

02:34PM 11   DOWN, IT'S THE SIXTH FULL PARAGRAPH IN THE SECOND COLUMN, IT

02:35PM 12   BEGINS, "THERANOS'S TECHNOLOGY ELIMINATES MULTIPLE LAB TRIPS."

02:35PM 13        DO YOU SEE THAT?

02:35PM 14   A.   JUST ONE SECOND.  IN THE SECOND COLUMN?

02:35PM 15   Q.   IN THE SECOND COLUMN.

02:35PM 16   A.   ONE, TWO, THREE, FOUR, FIVE.

02:35PM 17        YES, I DO.

02:35PM 18        MR. SCHENK:  MS. HOLLIMAN, IF WE CAN ZOOM OUT INTO

02:35PM 19   THE SECOND COLUMN.  FURTHER DOWN, THE SIXTH FULL PARAGRAPH

02:35PM 20   DOWN, THERE'S A PARAGRAPH THAT BEGINS -- IT'S ACTUALLY THREE

02:35PM 21   PARAGRAPHS UP FROM THE BOTTOM.  MAYBE THAT'S EASIER.

02:35PM 22   Q.   IT SAYS, "THERANOS'S TECHNOLOGY ELIMINATES MULTIPLE LAB

02:35PM 23   TRIPS BECAUSE IT CAN RUN ANY COMBINATION OF TESTS, INCLUDING

02:35PM 24   SETS OF FOLLOW-ON TESTS."

02:35PM 25        DO YOU SEE THAT?

MOSLEY DIRECT BY MR. SCHENK                                    5116

02:35PM  1     A.   I DO.

02:35PM  2     Q.   AND WAS THAT CONSISTENT WITH YOUR UNDERSTANDING OF THE

02:35PM  3     THERANOS TECHNOLOGY WHEN YOU WERE CONSIDERING INVESTING?

02:35PM  4     A.   IT WAS.

02:35PM  5     Q.   WOULD YOU NOW TURN TO PAGE 523.

02:36PM  6          WE SEE ANOTHER IMAGE OF THE "FORTUNE" ARTICLE AT 523.

02:36PM  7          DID MS. HOLMES PROVIDE YOU WITH THIS "FORTUNE" ARTICLE

02:36PM  8     BEFORE YOU DECIDED TO INVEST?

02:36PM  9     A.   I THINK THAT IT MAY HAVE BEEN, AT LEAST THE COVER MAY HAVE

02:36PM  10    BEEN IN THE MATERIALS, BUT I DON'T KNOW FOR SURE.

02:36PM  11    Q.   OKAY.  DO YOU THINK THAT YOU READ IT BEFORE YOU DECIDED TO

02:36PM  12    INVEST?

02:36PM  13    A.   I HAD ABSOLUTELY READ IT BEFORE I INVESTED.

02:36PM  14    Q.   ALL RIGHT.  IF YOU WILL NOW TURN TO EXHIBIT 3844.

02:36PM  15         DO YOU SEE THIS DOCUMENT?

02:36PM  16    A.   IT HAS JOHNS HOPKINS AT THE TOP?

02:36PM  17    Q.   YES?

02:36PM  18    A.   YES.

02:36PM  19    Q.   WAS THIS DOCUMENT ALSO PROVIDED TO YOU WHEN YOU WERE

02:36PM  20    CONSIDERING MAKING AN INVESTMENT?

02:37PM  21    A.   IT WAS.

02:37PM  22              MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 3844.

02:37PM  23              MR. WADE:  NO OBJECTION.

02:37PM  24              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:37PM  25         (GOVERNMENT'S EXHIBIT 3844 WAS RECEIVED IN EVIDENCE.)

MOSLEY DIRECT BY MR. SCHENK                                              5117

02:37PM   1     BY MR. SCHENK:

02:37PM   2     Q.   IN THE POWER POINTS THAT WE LOOKED AT, WE SAW THE LOGOS

02:37PM   3     FROM THE JOHNS HOPKINS MEDICAL SCHOOL.

02:37PM   4          DO YOU RECALL THAT?

02:37PM   5     A.   I DO.

02:37PM   6     Q.   AND THERE WAS SOME DISCUSSION ABOUT VALIDATION WORK.

02:37PM   7          WAS THIS SOME SUPPORTING MATERIAL THAT YOU RECEIVED

02:37PM   8     REGARDING THE WORK JOHNS HOPKINS HAD DONE?

02:37PM   9     A.   IT WAS.

02:37PM  10     Q.   DO YOU KNOW WHAT JOHNS HOPKINS DID TO VALIDATE OR TO

02:37PM  11     INVESTIGATE THE THERANOS TECHNOLOGY?

02:37PM  12     A.   I THINK I WAS -- I THINK I WAS AWARE THAT THEY HAD TESTED

02:37PM  13     AT LEAST, OR HAD SEEN THE THERANOS MACHINES TESTED.

02:37PM  14     Q.   AND DO YOU REMEMBER --

02:37PM  15     A.   I SAID I THINK THEY HAD REVIEWED THE TECHNOLOGY AND SEEN

02:37PM  16     THE EQUIPMENT IN USE.

02:37PM  17     Q.   DO YOU REMEMBER WHERE YOU LEARNED THAT OR WHERE YOU GOT

02:38PM  18     THAT FROM?

02:38PM  19     A.   I DON'T KNOW.

02:38PM  20     Q.   OKAY.  WOULD YOU NOW TURN TO 4202.

02:38PM  21          IS 4202 AN EMAIL EXCHANGE BETWEEN YOU AND MS. HOLMES IN

02:38PM  22     SEPTEMBER OF 2014 REGARDING A VISIT THAT YOU TWO MIGHT HAVE?

02:38PM  23     A.   YES.

02:38PM  24              MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 4202.

02:38PM  25              MR. WADE:  NO OBJECTION.

MOSLEY DIRECT BY MR. SCHENK                                    5118

02:38PM   1            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:38PM   2            (GOVERNMENT'S EXHIBIT 4202 WAS RECEIVED IN EVIDENCE.)

02:38PM   3       BY MR. SCHENK:

02:38PM   4       Q.   IF WE CAN START ON PAGE 2 OF THIS EXHIBIT, THE EMAIL ON

02:38PM   5       THE BOTTOM FROM YOU TO MS. HOLMES, IT'S DATED SEPTEMBER 2ND,

02:38PM   6       2014.

02:38PM   7            DO YOU SEE THAT?

02:38PM   8       A.   YES.

02:38PM   9       Q.   NOW, IN SEPTEMBER YOU'RE THANKING MS. HOLMES FOR THE

02:39PM  10       EXTENSIVE MATERIALS ON THERANOS.

02:39PM  11            IS THAT A REFERENCE TO AT LEAST SOME OF THE MATERIALS THAT

02:39PM  12       YOU AND I JUST TALKED ABOUT?

02:39PM  13       A.   YES, IT IS.

02:39PM  14       Q.   YOU "ENJOYED READING THE MATERIALS AND CAN'T TELL YOU HOW

02:39PM  15       APPRECIATIVE AND THANKFUL I AM FOR THE OPPORTUNITY TO BECOME

02:39PM  16       ONE OF YOUR SHAREHOLDERS."

02:39PM  17            WAS THAT ACCURATE?  DID YOU FEEL HONORED OR APPRECIATIVE

02:39PM  18       TO BECOME A POTENTIAL SHAREHOLDER?

02:39PM  19       A.   ABSOLUTELY.

02:39PM  20       Q.   WHY?

02:39PM  21       A.   WELL, IT'S -- THIS IS A COMPANY THAT HAD ENORMOUS

02:39PM  22       POTENTIAL TO DO GOOD THINGS FOR PEOPLE, AND IT WAS ALSO LIKELY

02:39PM  23       TO BE VERY FINANCIALLY SUCCESSFUL, SO YOU WOULD BE APPRECIATIVE

02:39PM  24       OF THAT OPPORTUNITY.

02:39PM  25       Q.   AND YOU SAID IT HAD THE OPPORTUNITY TO BE ENORMOUSLY

MOSLEY DIRECT BY MR. SCHENK                                              5119

02:39PM   1    SUCCESSFUL FINANCIALLY TO DO GREAT THINGS.

02:39PM   2        WHERE DID YOU GET THAT IMPRESSION?

02:39PM   3    A.   YOU KNOW, LARGELY PROBABLY FROM ALL OF THE MATERIALS THAT

02:39PM   4    WERE INCLUDED IN THAT PACKAGE, AS WELL AS THE "FORTUNE" ARTICLE

02:40PM   5    AND SUCH.

02:40PM   6    Q.   SO THIS POTENTIAL THAT YOU'RE REFERRING TO, IS THAT AN

02:40PM   7    ASSUMPTION BASED ON THE ACCURACY OF THE MATERIALS THAT YOU

02:40PM   8    RECEIVED?

02:40PM   9    A.   YES.

02:40PM   10   Q.   YOU WROTE A SENTENCE OR TWO LATER THAT YOU PREPARED AN

02:40PM   11   OUTLINE OVER THE WEEKEND WITH YOUR THOUGHTS AND ANALYSIS WHICH

02:40PM   12   YOU'RE SENDING TO DR. KISSINGER; IS THAT RIGHT?

02:40PM   13   A.   THAT'S RIGHT.

02:40PM   14   Q.   AND WHY DID YOU PREPARE THE MEMO THAT IS REFERENCED HERE?

02:40PM   15   A.   WELL, AS I STATED EARLIER, WHEN DR. KISSINGER FIRST

02:40PM   16   BROUGHT UP THE COMPANY AND ELIZABETH TO ME, HE SAID IT WOULD BE

02:40PM   17   VERY HELPFUL TO ME IF YOU WOULD TALK TO ELIZABETH, LEARN ABOUT

02:40PM   18   THE COMPANY, AND GIVE ME YOUR THOUGHTS.

02:40PM   19       AND SO THE MEMO WAS REALLY MY HAVING GONE THROUGH THE

02:40PM   20   MATERIALS AND HAD CONVERSATIONS AND PULLING TOGETHER MY

02:40PM   21   THOUGHTS.

02:40PM   22   Q.   AND DID THE MEMO SERVE TWO PURPOSES OR JUST ONE?  WAS IT

02:40PM   23   SOMETHING THAT WAS USED ONLY FOR DR. KISSINGER, OR WAS IT ALSO

02:41PM   24   GATHERING YOUR THOUGHTS ON THE THERANOS INVESTMENT?

02:41PM   25   A.   WELL, IT WAS, IT WAS REALLY FOR DR. KISSINGER AT HIS

MOSLEY DIRECT BY MR. SCHENK                                    5120

02:41PM  1    REQUEST AND I, I GUESS YOU COULD SAY THAT IT HAD A DUAL PURPOSE

02:41PM  2    OF PULLING TOGETHER MY OWN THOUGHTS ABOUT THE COMPANY.

02:41PM  3    Q.   OKAY.  AND WHEN YOU DRAFTED THIS MEMO, HAD YOU DECIDED

02:41PM  4    WHETHER TO INVEST?  HAD YOU MADE THAT DECISION?

02:41PM  5    A.   AT THAT POINT I HAD NOT.

02:41PM  6    Q.   ABOVE THIS EMAIL THAT YOU AND I ARE READING RIGHT NOW, YOU

02:41PM  7    FOLLOW UP WITH ANOTHER EMAIL SAYING THAT YOU SEE THAT YOU,

02:41PM  8    MS. HOLMES, IS GOING TO BE SPEAKING AT BYRON TROTT'S

02:41PM  9    CONFERENCE, IT LOOKS LIKE IN MAYBE TWO WEEKS, A WEEK AND A

02:41PM  10   HALF, TUESDAY, SEPTEMBER 16TH IN CHICAGO.

02:41PM  11       DO YOU SEE THAT?

02:41PM  12   A.   I DO.

02:41PM  13   Q.   DID YOU GO TO THIS CONFERENCE IN CHICAGO?

02:41PM  14   A.   I DID.

02:41PM  15   Q.   DID SHE GO?

02:41PM  16   A.   SHE DID.

02:41PM  17   Q.   AND DID YOU MEET MS. HOLMES THERE?

02:42PM  18   A.   I DID.

02:42PM  19   Q.   AND DID YOU INTRODUCE MS. HOLMES TO OTHER INDIVIDUALS THAT

02:42PM  20   YOU THOUGHT MIGHT BE INTERESTED IN THERANOS AS WELL?

02:42PM  21   A.   WE DID.  I DID MEET WITH ELIZABETH AND SOME OF THE

02:42PM  22   INDIVIDUALS THAT I THOUGHT MIGHT HAVE AN INTEREST IN LOOKING AT

02:42PM  23   THE COMPANY.

02:42PM  24   Q.   AND WHY, WHY DID YOU -- WELL, LET ME ASK, DID YOU CREATE

02:42PM  25   THIS OPPORTUNITY FOR AN INTRODUCTION OR MEETING FOR MS. HOLMES

MOSLEY DIRECT BY MR. SCHENK                                    5121

02:42PM   1     TO MEET SOME OF THESE OTHER INDIVIDUALS?

02:42PM   2     A.   I THINK I DID, YES.

02:42PM   3     Q.   AND WHY DID YOU DO THAT?

02:42PM   4     A.   WELL, BECAUSE I THOUGHT THE COMPANY HAD ENORMOUS POTENTIAL

02:42PM   5     FOR GOOD IN THE WORLD, BEING ABLE TO DO THIS KIND OF TESTING AS

02:42PM   6     DESCRIBED, AND I OBVIOUSLY HAD CLIENTS THAT, YOU KNOW, WOULD

02:42PM   7     HAVE A SIMILAR VIEW TO MINE THAT THIS WAS BOTH A GOOD

02:42PM   8     INVESTMENT OPPORTUNITY, AS WELL AS A VERY GOOD THING TO BACK

02:42PM   9     BECAUSE OF THE POTENTIAL GOOD IN THE WORLD.

02:42PM  10     Q.   WHEN YOU ARRANGED THESE MEETINGS, DID YOU TELL THESE

02:42PM  11     CLIENTS THAT YOU WERE VOUCHING FOR THE TECHNOLOGY OR FOR THE

02:43PM  12     INVESTMENT?

02:43PM  13     A.   NO.  I BASICALLY TOLD THE INDIVIDUALS I INTRODUCED THAT

02:43PM  14     ELIZABETH IS SOMEBODY THAT I HAD COME ACROSS.  I WAS IMPRESSED

02:43PM  15     WITH HER IDEA AND TECHNOLOGY, AND THIS IS SOMEBODY THAT I

02:43PM  16     THOUGHT THEY WOULD ENJOY MEETING.

02:43PM  17     Q.   IF WE COULD NOW TURN TO 4 -- WELL, I'M SORRY.

02:43PM  18          DO YOU KNOW THE NAMES OF SOME -- WHEN YOU SAY "THESE

02:43PM  19     INDIVIDUALS," CAN YOU FILL IN THAT BLANK FOR US?

02:43PM  20     A.   WELL, THERE'S A REFERENCE TO MEMBERS OF THE WALTON FAMILY;

02:43PM  21     THERE WERE ALSO MEMBERS OF THE DEVOS FAMILY; AND I BELIEVE

02:43PM  22     MEMBERS OF THE COX FAMILY.

02:43PM  23     Q.   AND THE THREE GROUPS OF PEOPLE THAT YOU JUST REFERENCED,

02:43PM  24     WERE THEY CLIENTS OF YOURS?

02:43PM  25     A.   THEY WERE.

MOSLEY DIRECT BY MR. SCHENK                                    5122

02:43PM  1    Q.  DO YOU RECALL IF THREE SEPARATE MEETINGS HAPPENED IN

02:43PM  2    CHICAGO, OR DID EVERYBODY GET TOGETHER?  OR TOO LONG AGO AND

02:44PM  3    YOU DON'T REMEMBER?

02:44PM  4    A.  I DON'T REALLY REMEMBER, BUT I HAVE SOME -- I BELIEVE THEY

02:44PM  5    WERE LIKELY SEPARATE.

02:44PM  6    Q.  DID YOU PARTICIPATE IN SOME OF THESE MEETINGS?

02:44PM  7    A.  I PROBABLY SAT IN ON THEM.

02:44PM  8    Q.  DID MS. HOLMES SPEAK DURING THESE MEETINGS?

02:44PM  9    A.  YES.

02:44PM  10   Q.  DID MS. HOLMES DESCRIBE THE TECHNOLOGY OR THERANOS DURING

02:44PM  11   THESE MEETINGS?

02:44PM  12   A.  YES.

02:44PM  13   Q.  DID YOU LEARN SOMETHING DURING THESE MEETINGS THAT WAS

02:44PM  14   VASTLY DIFFERENT THAN THE IMAGE THAT WE JUST TALKED ABOUT

02:44PM  15   THROUGH THESE POWERPOINT SLIDES, THROUGH THE MATERIALS THAT

02:44PM  16   WERE SENT TO YOU?

02:44PM  17   A.  NO.

02:44PM  18   Q.  WAS THE DESCRIPTION THAT YOU WERE OBSERVING CONSISTENT

02:44PM  19   WITH THE UNDERSTANDING THAT YOU AND I JUST TALKED ABOUT WITH,

02:44PM  20   FOR INSTANCE, EXHIBIT 3387?

02:44PM  21   A.  YES.

02:44PM  22   Q.  COULD WE NOW TURN TO EXHIBIT 4197?

02:44PM  23       YOUR HONOR, 4197 HAS ALREADY BEEN ADMITTED.

02:44PM  24       PERMISSION TO PUBLISH?

02:44PM  25           THE COURT:  YES.

| | | |
|---|---|---|
| 02:44PM | 1 | MR. SCHENK:  THANK YOU. |
| 02:45PM | 2 | Q.   MR. MOSLEY, WHAT ARE WE -- |
| 02:45PM | 3 | A.   GIVE ME ONE SECOND IF YOU WOULD. |
| 02:45PM | 4 | OKAY. |
| 02:45PM | 5 | Q.   WHAT ARE WE LOOKING AT HERE? |
| 02:45PM | 6 | A.   IT'S A LETTER DATED SEPTEMBER THE 2ND, 2014, FROM ME TO |
| 02:45PM | 7 | DR. KISSINGER. |
| 02:45PM | 8 | Q.   AND IS THERE AN ATTACHMENT? |
| 02:45PM | 9 | A.   THERE IS. |
| 02:45PM | 10 | Q.   LET'S TURN TO PAGE 2. |
| 02:45PM | 11 | WHAT IS THE ATTACHMENT THAT BEGINS ON PAGE 2? |
| 02:45PM | 12 | A.   THIS IS THE MEMO THAT I REFERRED TO EARLIER HAVING WRITTEN |
| 02:45PM | 13 | FOR DR. KISSINGER WITH MY THOUGHTS AND ANALYSIS ABOUT THE -- |
| 02:45PM | 14 | REALLY THOUGHTS ABOUT THE COMPANY. |
| 02:45PM | 15 | Q.   ABOUT THERANOS? |
| 02:45PM | 16 | A.   ABOUT THERANOS. |
| 02:45PM | 17 | Q.   DESCRIBE FOR THE JURY THE SOURCES OF INFORMATION.  YOU |
| 02:45PM | 18 | WROTE A MEMO THAT DESCRIBED YOUR THOUGHTS ON THERANOS. |
| 02:45PM | 19 | WHERE DID YOU GET THE INFORMATION THAT YOU USED TO WRITE |
| 02:45PM | 20 | THIS MEMO? |
| 02:45PM | 21 | A.   IT WAS A COMBINATION OF THE MATERIALS THAT YOU'VE ALREADY |
| 02:46PM | 22 | ASKED ME ABOUT, THE PACKAGE THAT CAME TO ME IN AUGUST, PROBABLY |
| 02:46PM | 23 | THE "FORTUNE" ARTICLE, AND THEN THE PFIZER REPORT AND THE |
| 02:46PM | 24 | JOHNS HOPKINS PIECE OF PAPER. |
| 02:46PM | 25 | Q.   HOW ABOUT CONVERSATIONS WITH MS. HOLMES?  DO YOU KNOW IF |

MOSLEY DIRECT BY MR. SCHENK                                    5124

02:46PM   1    THAT WAS A SOURCE OF INFORMATION FOR YOU WHEN YOU WROTE THIS

02:46PM   2    MEMO?

02:46PM   3    A.   IT LIKELY WAS.  BUT I THINK IF YOU READ THIS, MOST OF THE

02:46PM   4    INFORMATION IN HERE IS DIRECTLY TRACEABLE TO THE MATERIALS.

02:46PM   5    Q.   OKAY.  WHERE WERE YOU LIVING, IN WHAT CITY, WHEN YOU WROTE

02:46PM   6    THIS MEMO?

02:46PM   7    A.   WHEN I WROTE THE MEMO I WAS LIVING IN CONNECTICUT.

02:46PM   8    Q.   DID YOU TRAVEL TO A WALGREENS IN ARIZONA AS PART OF YOUR

02:46PM   9    ANALYSIS HERE?

02:46PM   10   A.   I DID NOT.

02:46PM   11   Q.   AND HOW ABOUT A WALGREENS IN PALO ALTO?  DID YOU TRAVEL

02:46PM   12   THERE BEFORE YOU WROTE THE MEMO?

02:46PM   13   A.   I DID NOT.

02:46PM   14   Q.   I'M GOING TO ASK YOU A COUPLE OF QUESTIONS ABOUT THE

02:46PM   15   CONTENT OF THE MEMO.

02:46PM   16       ON PAGE 2 THERE'S A SECTION BELOW WHAT IS ON THE SCREEN

02:47PM   17   NOW.  NUMBER 1 IS "QUALITY OF THE TECHNOLOGY."

02:47PM   18       DO YOU SEE THAT?

02:47PM   19   A.   I DO.

02:47PM   20   Q.   YOU WRITE, "THERE IS SUBSTANTIAL DATA AND OTHER

02:47PM   21   INFORMATION ATTESTING TO THE QUALITY, PERFORMANCE, AND

02:47PM   22   RELIABILITY OF THE THERANOS TECHNOLOGY AND EQUIPMENT.  THERE

02:47PM   23   DOES NOT SEEM" -- I'M SORRY.

02:47PM   24       "THERE DOES NOT APPEAR TO BE ANY SIGN OF ANY QUESTION

02:47PM   25   ABOUT THE QUALITY, ACCURACY, OR RELIABILITY OF THERANOS'S BLOOD

                    MOSLEY DIRECT BY MR. SCHENK                    5125

02:47PM   1    TESTING TECHNOLOGY.  THE INFORMATION SUPPORTING THESE

02:47PM   2    CONCLUSIONS IS SUBSTANTIAL."

02:47PM   3         DID YOU FEEL THAT WAY IN SEPTEMBER OF 2014?

02:47PM   4    A.   I DID.

02:47PM   5    Q.   AND THEN THE BULLET POINTS THAT FOLLOW, THERE ARE ABOUT A

02:47PM   6    HALF DOZEN OF THEM, ARE THEY EXAMPLES OF THE MATERIALS THAT

02:47PM   7    SUPPORT THIS CONCLUSION THAT YOU REACHED?

02:47PM   8    A.   THEY ARE.

02:47PM   9    Q.   SO THE FIRST ONE IS THAT CLIA CERTIFICATION; IS THAT

02:47PM  10    RIGHT?

02:47PM  11    A.   THAT'S CORRECT.

02:47PM  12    Q.   AND THE SECOND ONE IS INSPECTIONS BY REGULATORS, THE

02:48PM  13    NEW YORK DEPARTMENT OF HEALTH?

02:48PM  14    A.   THAT'S CORRECT.

02:48PM  15    Q.   AND THE THIRD IS THIS STATEMENT ABOUT THERANOS HAVING

02:48PM  16    WORKED WITH 10 OF THE 15 LARGEST PHARMACEUTICAL COMPANIES.

02:48PM  17         DO YOU SEE THAT?

02:48PM  18    A.   I DO.

02:48PM  19    Q.   AND THEN THERE'S A REFERENCE THERE TO WORK WITH

02:48PM  20    GLAXOSMITHKLINE?

02:48PM  21    A.   YES.

02:48PM  22    Q.   WORK WITH PFIZER?

02:48PM  23    A.   YES.

02:48PM  24    Q.   AND WORK WITH SCHERING-PLOUGH?

02:48PM  25    A.   YES.

MOSLEY DIRECT BY MR. SCHENK                                          5126

02:48PM   1     Q.   WOULD YOU HAVE GOTTEN THAT FROM THE MATERIALS THAT YOU AND

02:48PM   2     I JUST SPENT SOME TIME LOOKING AT?

02:48PM   3     A.   I BELIEVE SO.

02:48PM   4     Q.   THE NEXT BULLET IS ABOUT WORK WITH HOSPITAL GROUPS.

02:48PM   5          DO YOU SEE THAT?

02:48PM   6     A.   I DO.

02:48PM   7     Q.   AND IT CONTINUES, THE DUE DILIGENCE, ON THE NEXT PAGE, THE

02:48PM   8     TOP OF PAGE 3, THE DUE DILIGENCE AND TECHNOLOGY REVIEW PREPARED

02:48PM   9     BY JOHNS HOPKINS, AND THEN YOU QUOTE IT.

02:48PM   10         DO YOU SEE THAT?

02:48PM   11    A.   I DO.

02:48PM   12    Q.   THE NEXT BULLET IS ABOUT WALGREENS; AND THEN THE FINAL ONE

02:48PM   13    IS "THE MOST EXTENSIVE EVIDENCE SUPPLIED REGARDING THE

02:48PM   14    RELIABILITY OF THE THERANOS TECHNOLOGY AND ITS APPLICATION IS A

02:48PM   15    STUDY REPORT PREPARED BY PFIZER BASED ON A CLINICAL CANCER

02:49PM   16    TREATMENT TRIAL."

02:49PM   17         DO YOU SEE THAT?

02:49PM   18    A.   I DO.

02:49PM   19    Q.   AND DID YOU THINK THAT AT THE TIME, THAT THE PFIZER

02:49PM   20    REPORT, AMONG ALL OF THESE INSTANCES OF PROOF, WAS THE MOST

02:49PM   21    EXTENSIVE EVIDENCE?

02:49PM   22    A.   THAT WAS MY JUDGMENT AT THE TIME.

02:49PM   23    Q.   WHY WAS THAT YOUR VIEW?

02:49PM   24    A.   WELL, IT'S A LENGTHY REPORT, IT'S MORE THAN 20 PAGES LONG,

02:49PM   25    AND IT GOES INTO A LOT OF DETAIL, AND IT OBVIOUSLY TO ME WAS A

MOSLEY DIRECT BY MR. SCHENK                                              5127

02:49PM  1    DEMONSTRATION THAT THE EQUIPMENT COULD WORK WELL IN THE FIELD

02:49PM  2    WHEN BEING OPERATED BY UNSOPHISTICATED PARTIES, AND IT COULD

02:49PM  3    PRODUCE GOOD QUALITY RESULTS AND COULD TRANSMIT THOSE RESULTS

02:49PM  4    BACK TO THE THERANOS SERVERS, COMPUTER SERVERS.

02:49PM  5    Q.   DID YOU REACH THOSE CONCLUSIONS BY READING THE PFIZER

02:49PM  6    REPORT THAT YOU WERE PROVIDED?

02:49PM  7    A.   I DID.

02:49PM  8    Q.   THE NEXT SECTION, SECTION B, IS A SUMMARY OF THE PFIZER

02:50PM  9    STUDY; IS THAT RIGHT?

02:50PM  10   A.   THAT IS CORRECT.

02:50PM  11   Q.   IN THE FIRST PARAGRAPH YOU DESCRIBE THAT THE PRIMARY TRIAL

02:50PM  12   SITE WAS WITH SOMETHING CALLED TENNESSEE ONCOLOGY.

02:50PM  13       DO YOU SEE THAT?

02:50PM  14   A.   I DO.

02:50PM  15   Q.   DID YOU, AS PART OF THIS DRAFTING OF THE MEMO, DID YOU

02:50PM  16   CONTACT TENNESSEE ONCOLOGY?

02:50PM  17   A.   I DID NOT.

02:50PM  18   Q.   WHY?

02:50PM  19   A.   I, YOU KNOW, ACCEPTED THAT -- YOU KNOW, I THOUGHT THE

02:50PM  20   REPORT HAD BEEN WRITTEN BY PFIZER, AND TO ME THAT WAS

02:50PM  21   SUFFICIENT VALIDATION OF THE CONTENTS TO THE PAPER.

02:50PM  22   Q.   FORGIVE ME.

02:50PM  23       TWO PARAGRAPHS DOWN IT BEGINS, "THE CONCLUSIONS IN THE

02:50PM  24   PFIZER STUDY REPORT ARE EXTRAORDINARILY COMPLIMENTARY AND

02:50PM  25   VALIDATE THE THERANOS TECHNOLOGY AND ITS APPLICATIONS.

MOSLEY DIRECT BY MR. SCHENK                                          5128

02:50PM  1          "SOME OF THE PRINCIPAL CONCLUSIONS FROM THE STUDY REPORT

02:50PM  2     ARE AS FOLLOWS."

02:50PM  3          AND THEN YOU SPEND ANOTHER ABOUT HALF DOZEN BULLETS

02:51PM  4     QUOTING CONCLUSIONS.

02:51PM  5          DID YOU THINK THAT THE CONCLUSIONS THAT YOU WERE QUOTING

02:51PM  6     WERE PFIZER'S CONCLUSIONS?

02:51PM  7     A.   I DID.

02:51PM  8     Q.   IF YOU HAD KNOWN THAT THOSE WERE THERANOS'S CONCLUSIONS,

02:51PM  9     WOULD THAT HAVE CHANGED YOUR OPINION?

02:51PM  10    A.   IT WOULD.

02:51PM  11    Q.   WHY?

02:51PM  12    A.   WELL, BECAUSE, AS I SAID, PFIZER IS A VERY LARGE

02:51PM  13    SOPHISTICATED PHARMACEUTICAL COMPANY WITH THE EXPERTISE TO

02:51PM  14    RENDER AN IMPORTANT JUDGMENT ABOUT THIS TECHNOLOGY.

02:51PM  15    Q.   IF YOU'LL TURN NOW TO PAGE 5 OF THIS DOCUMENT.

02:51PM  16         THIS IS UNDER A SECTION THAT WAS ENTITLED "THE THERANOS

02:51PM  17    BUSINESS APPROACH," AND I WANT TO ASK YOU QUESTIONS ABOUT THE

02:51PM  18    SECOND AND THIRD BULLETS.

02:51PM  19    A.   OKAY.

02:51PM  20    Q.   THE SECOND BULLET READS, "THE WORK WITH PHARMA COMPANIES

02:51PM  21    (WHICH WERE UNDOUBTEDLY REQUIRED TO SIGN CONFIDENTIALITY

02:51PM  22    AGREEMENTS) PROVIDED VALIDATION OF THE TECHNOLOGY AND

02:51PM  23    APPROACH."

02:51PM  24         WHAT DID YOU MEAN BY THAT, AND IN PARTICULAR THE

02:52PM  25    "UNDOUBTEDLY REQUIRED TO SIGN CONFIDENTIALITY AGREEMENTS"?

MOSLEY DIRECT BY MR. SCHENK                                    5129

02:52PM   1    A.   I DON'T -- AT THIS MOMENT, I CAN'T TELL YOU EXACTLY WHAT I

02:52PM   2    MEANT BY THAT.

02:52PM   3    Q.   YOU DON'T RECALL?

02:52PM   4    A.   I DON'T RECALL.

02:52PM   5    Q.   OKAY.  THE NEXT BULLET, "A COMBINATION OF," AND THEN YOU

02:52PM   6    HAVE FOUR SUBPARTS.

02:52PM   7         "THE PRICING OF TESTS BY THERANOS, THE SPEED OF THE

02:52PM   8    DELIVERY OF RESULTS, THE RELIABILITY OF THE TEST RESULTS, AND

02:52PM   9    THE ABILITY TO PERFORM A VAST ARRAY OF TESTS."

02:52PM  10         THERE'S ANOTHER 4.  "THE ABILITY TO PERFORM A VAST NUMBER

02:52PM  11    OF TESTS WITH ONLY A FEW DROPS OF BLOOD REQUIRING JUST A FINGER

02:52PM  12    PRICK, WILL MAKE THERANOS'S APPROACH DISRUPTIVE AND EXTREMELY

02:52PM  13    HARD TO COUNTER BY ITS COMPETITORS."

02:52PM  14         DO YOU RECALL WHAT YOU MEANT BY THIS?

02:52PM  15    A.   EXACTLY WHAT IT SAYS, THAT I THOUGHT IT WAS -- YOU KNOW,

02:52PM  16    FOR ALL OF THE REASONS THAT ARE LISTED THERE, THAT IT WAS

02:52PM  17    EXTREMELY DISRUPTIVE AND WOULD BE HARD TO REPLICATE BY ITS

02:53PM  18    COMPETITORS.

02:53PM  19    Q.   AND IF THE -- IF SOME OF THESE ASSUMPTIONS, YOU KNOW, YOUR

02:53PM  20    ROMAN NUMERALS I THROUGH V, IF THEY WEREN'T TRUE, WOULD THAT

02:53PM  21    MAKE THE TECHNOLOGY LESS DISRUPTIVE OR EASIER TO COUNTER?

02:53PM  22    A.   YES.

02:53PM  23    Q.   SO, FOR INSTANCE, IF THE TECHNOLOGY AND THE RESULTS WERE

02:53PM  24    NOT RELIABLE, IT MIGHT BE LESS DISRUPTIVE?

02:53PM  25    A.   YES.

MOSLEY DIRECT BY MR. SCHENK                                    5130

02:53PM  1    Q.   IF THE TECHNOLOGY DIDN'T HAVE THE ABILITY TO PERFORM A

02:53PM  2    VAST ARRAY OF TESTS, IT MIGHT BE LESS DISRUPTIVE?

02:53PM  3    A.   YES.

02:53PM  4    Q.   IT MIGHT BE EASIER TO COUNTER BY ITS COMPETITORS?

02:53PM  5    A.   YES.

02:53PM  6    Q.   IF WE CAN NOW GO TO PAGE 7.

02:53PM  7         ON PAGE 7, SECTION 4 IS "CURRENT AND PROJECTED FINANCIAL

02:53PM  8    RESULTS."

02:53PM  9         ARE YOU SUMMARIZING HERE SOME OF THE FINANCIAL INFORMATION

02:53PM  10   THAT YOU AND I HAD A CONVERSATION ABOUT A FEW MINUTES AGO?

02:54PM  11   A.   YES.

02:54PM  12   Q.   IN A YOU WRITE, "FOR CALENDAR YEAR 2014, THERANOS IS

02:54PM  13   PROJECTING $140 MILLION OF REVENUE WITH A NET LOSS OF 3

02:54PM  14   MILLION."

02:54PM  15        AND THEN YOU BREAK OUT THE REVENUE.

02:54PM  16        DID YOU GET THIS INFORMATION FROM THAT DOCUMENT THAT YOU

02:54PM  17   AND I LOOKED AT EARLIER?

02:54PM  18   A.   I DID.

02:54PM  19   Q.   AND THEN YOU DO THE SAME FOR 2015, THE PROJECTED REVENUE

02:54PM  20   AND THE BREAKOUT.

02:54PM  21        SO DID YOU ALSO GET THIS INFORMATION FROM THAT DOCUMENT

02:54PM  22   THAT YOU AND I LOOKED AT?

02:54PM  23   A.   YES, I DID.

02:54PM  24   Q.   FINALLY, IN V(B) TOWARDS THE BOTTOM OF THIS PAGE, YOU

02:54PM  25   WRITE, "ELIZABETH HOLMES OWNS ALL OF THE CLASS B COMMON SHARES,

MOSLEY DIRECT BY MR. SCHENK                                    5131

02:54PM  1    WHICH REPRESENT ALMOST 50 PERCENT OF THE VALUE OF THE COMPANY.

02:54PM  2    THE CLASS B SHARES HAVE 100 VOTES PER SHARE, AS COMPARED TO THE

02:54PM  3    CLASS A SHARES THAT HAVE ONE VOTE PER SHARE."

02:54PM  4        WHAT DOES THAT MEAN?

02:54PM  5    A.   WELL, IT MEANS THAT THE CLASS B COMMON SHARES HAVE 100

02:55PM  6    TIMES THE VOTE OF THE CLASS A COMMON SHARE.

02:55PM  7    Q.   WAS THAT IMPORTANT TO YOU OR SOMETHING THAT YOU NOTICED?

02:55PM  8    A.   IT WAS.

02:55PM  9    Q.   WHY?

02:55PM  10   A.   IT MEANT THAT ELIZABETH WOULD BE ABSOLUTELY IN CONTROL OF

02:55PM  11   THE COMPANY EVEN AFTER ALL OF THE PREFERRED SHARES THAT HAD

02:55PM  12   BEEN SOLD AND THAT WERE CONVERTIBLE INTO COMMON STOCK, THEY

02:55PM  13   WERE CONVERTIBLE INTO CLASS B SHARES -- OR CONVERTIBLE INTO

02:55PM  14   CLASS A SHARES RATHER, BUT SHE WOULD STILL HAVE ABSOLUTE

02:55PM  15   CONTROL OF THE COMPANY.

02:55PM  16   Q.   AND IN YOUR MIND, WAS MS. HOLMES MAINTAINING CONTROL OF

02:55PM  17   THE COMPANY A GOOD THING?

02:55PM  18   A.   IT WAS.

02:55PM  19   Q.   WHY?

02:55PM  20   A.   WELL, SHE WAS OBVIOUSLY THE VISIONARY THAT HAD CREATED

02:55PM  21   THIS COMPANY AND DEVELOPED THE TECHNOLOGY, AND HAVING HER IN

02:55PM  22   CONTROL OF THE COMPANY WAS A GOOD THING.

02:55PM  23   Q.   AND WHEN YOU REACHED THAT OPINION OR THAT CONCLUSION, WERE

02:55PM  24   YOU RELYING ON THE ACCURACY OF THE MATERIALS THAT WERE PROVIDED

02:55PM  25   TO YOU TO REACH THAT CONCLUSION?

MOSLEY DIRECT BY MR. SCHENK                                    5132

| | | |
|---|---|---|
| 02:55PM | 1 | A.   YES. |
| 02:56PM | 2 | Q.   EARLIER WE LOOKED AT SOME OF THE DOCUMENTS THAT TALKED |
| 02:56PM | 3 | ABOUT THE PRIORITY THAT INDIVIDUALS, INDIVIDUAL SHAREHOLDERS |
| 02:56PM | 4 | WOULD GET PAID BACK AND YOU DESCRIBED THAT TO ME. |
| 02:56PM | 5 | DO YOU REMEMBER? |
| 02:56PM | 6 | A.   I DO. |
| 02:56PM | 7 | Q.   AND WAS CLASS B A LOWER PRIORITY?  WOULD THE C-1 AND C-2 |
| 02:56PM | 8 | GET PAID BEFORE B? |
| 02:56PM | 9 | A.   YES, BECAUSE THE CLASS B SHARES ARE COMMON SHARES, AND |
| 02:56PM | 10 | COMMON SHARES RECEIVE ASSETS AND LIQUIDATION ONLY AFTER ALL OF |
| 02:56PM | 11 | THE PREFERRED SHARES RECEIVE THEIR STATED VALUE. |
| 02:56PM | 12 | Q.   I SEE.  SO THE SHARES THAT YOU'RE REFERRING TO HERE THAT |
| 02:56PM | 13 | MS. HOLMES HELD HAD A LOWER PRIORITY AT LIQUIDATION, BUT HAD |
| 02:56PM | 14 | MORE VOTING POWER? |
| 02:56PM | 15 | A.   THAT IS CORRECT. |
| 02:56PM | 16 | Q.   GOT IT. |
| 02:56PM | 17 | IF YOU'LL NOW TURN TO PAGE 9. |
| 02:57PM | 18 | IN THIS SECTION YOU TALK ABOUT, "QUESTIONS, CONCERNS AND |
| 02:57PM | 19 | RISKS." |
| 02:57PM | 20 | THERE ARE FIVE OF THEM; IS THAT RIGHT? |
| 02:57PM | 21 | A.   THAT IS CORRECT. |
| 02:57PM | 22 | Q.   WAS ONE OF THE RISKS IDENTIFIED THAT THE FOUNDER WOULD NOT |
| 02:57PM | 23 | BE ACCURATE IN HER DESCRIPTIONS OF THE COMPANY TO YOU? |
| 02:57PM | 24 | A.   IT'S NOT ONE OF THE RISKS LISTED HERE. |
| 02:57PM | 25 | Q.   WHY DIDN'T YOU WRITE THAT AS ONE OF THE RISKS? |

MOSLEY DIRECT BY MR. SCHENK                                    5133

02:57PM   1    A.   I DIDN'T -- I REALLY DIDN'T AT THE TIME BELIEVE THAT IT

02:57PM   2    WAS A RISK.

02:57PM   3    Q.   THE, THE SECOND RISK, YOU WRITE IN THAT SECOND SENTENCE,

02:57PM   4    "IN PARTICULAR, GIVEN THAT THERANOS IS CURRENTLY IN ROUGHLY 30

02:57PM   5    WALGREENS PHARMACIES, IT WOULD BE HELPFUL TO KNOW HOW MANY

02:57PM   6    PHARMACY LOCATIONS ARE ASSUMED IN THE 2015 PROJECTIONS."

02:57PM   7         HELP ME UNDERSTAND THE QUESTION OR THE RISK THAT YOU WERE

02:57PM   8    IDENTIFYING THERE.

02:57PM   9    A.   WELL, IT WAS -- YOU KNOW, OBVIOUSLY 140 TO 990 MILLION WAS

02:57PM  10    A VERY SUBSTANTIAL, AS I SAY.

02:57PM  11         AND IN MAKING A JUDGMENT ABOUT HOW LARGE THE OPPORTUNITY

02:58PM  12    IS, IT WOULD BE HELPFUL TO KNOW HOW MANY OF THE WALGREENS WERE

02:58PM  13    EXPECTED TO HAVE THERANOS FACILITIES IN 2015 THAT WOULD GET YOU

02:58PM  14    TO THAT KIND OF REVENUE NUMBER, WHICH WOULD THEN TELL YOU

02:58PM  15    PERHAPS HOW YOU COULD EXTRAPOLATE TO WHAT THE REVENUE MIGHT BE

02:58PM  16    WHEN IT WAS FULLY ROLLED OUT IF IT WERE IN ALL OF THE

02:58PM  17    WALGREENS.

02:58PM  18    Q.   DID YOU THINK THAT ONE OF THE RISKS RELATIVE TO WALGREENS

02:58PM  19    PENETRATION WAS THAT WALGREENS MISUNDERSTOOD OR DID NOT

02:58PM  20    APPRECIATE THE THERANOS TECHNOLOGY?  DID YOU THINK THAT THAT

02:58PM  21    WAS ONE OF THE RISKS?

02:58PM  22    A.   WELL, YOU KNOW, I REALIZED THAT WALGREENS WAS TESTING IT

02:58PM  23    IN 30 PHARMACIES, AND THERE, YOU KNOW, WOULD ALWAYS BE A RISK

02:59PM  24    THAT THEY WOULD NOT ROLL IT OUT TO ALL OF THE PHARMACIES.  I

02:59PM  25    DID REALIZE THAT THAT WAS A RISK.

MOSLEY DIRECT BY MR. SCHENK                                    5134

02:59PM  1    Q.   AND DID YOU HAVE FURTHER THOUGHTS ON THE REASONS WHY

02:59PM  2    WALGREENS MIGHT NOT ROLL IT OUT?  IF THEY WERE IN 30, YOU

02:59PM  3    UNDERSTOOD IT WASN'T GUARANTEED.  DID YOU HAVE A THOUGHT ON THE

02:59PM  4    KINDS OF THINGS THAT MIGHT AFFECT A ROLLOUT?

02:59PM  5    A.   AT THE TIME I HAD NO REASON TO THINK THAT WALGREENS WOULD

02:59PM  6    NOT CONTINUE WITH THE ROLLOUT.

02:59PM  7    Q.   WHY DO YOU SAY THAT?

02:59PM  8    A.   ALL OF THE INFORMATION ABOUT THE ACCURACY OF THE TEST, THE

02:59PM  9    VAST ARRAY OF THE TEST, THE PRICING OF THE TEST, THE SPEED AT

02:59PM 10    WHICH THE TEST RESULTS COULD BE DELIVERED, ALL OF THOSE MADE ME

02:59PM 11    EXPECT OR COME TO THE CONCLUSION THAT IT WAS LIKELY AT THAT

02:59PM 12    TIME THAT THEY WOULD CONTINUE TO ROLL OUT.

02:59PM 13    Q.   I SEE.  THE THINGS THAT YOU FOUND ATTRACTIVE ABOUT

02:59PM 14    THERANOS, YOU THOUGHT WALGREENS WOULD AS WELL?

02:59PM 15    A.   THAT'S CORRECT.

02:59PM 16    Q.   THE NEXT C, THE CONCERN OR QUESTION YOU RAISE IS WHY

03:00PM 17    THERANOS IS NOW WILLING TO SELL ADDITIONAL SHARES AND WISHES TO

03:00PM 18    RAISE ADDITIONAL CASH THEY COULD LIKELY BORROW.

03:00PM 19         SO YOU'RE WONDERING ABOUT THE EQUITY RAISED.  WHAT WERE

03:00PM 20    YOU GETTING AT HERE?

03:00PM 21    A.   WELL, WHEN YOU, WHEN YOU RAISE ADDITIONAL EQUITY, YOU

03:00PM 22    DILUTE THE OWNERSHIP OF ALL OF THE PEOPLE WHO INVESTED IN THE

03:00PM 23    COMPANY BEFORE THAT.

03:00PM 24         SO TYPICALLY COMPANIES ARE RELUCTANT TO RAISE MORE EQUITY

03:00PM 25    THAN THEY NEED CASH FLOW BECAUSE OF THAT POTENTIAL FOR

MOSLEY DIRECT BY MR. SCHENK                                          5135

03:00PM  1    DILUTION.

03:00PM  2    Q.   AND WHY WAS THIS LISTED AS A QUESTION OR A CONCERN OR A

03:00PM  3    RISK?

03:00PM  4    A.   IT WAS LISTED AS A QUESTION BECAUSE THE 2015 PROJECTION

03:00PM  5    NUMBER SHOWED IT MAKING A PROFIT, WHICH WOULD HAVE BEEN AN

03:00PM  6    INDICATION TO ME THAT PERHAPS IT DIDN'T NEED ADDITIONAL CAPITAL

03:00PM  7    GOING FORWARD.

03:00PM  8    Q.   I SEE.   D YOU WRITE ABOUT A FAIRLY UNUSUAL PROVISION.

03:01PM  9    IS -- WHAT IS THIS UNUSUAL PROVISION THAT YOU'RE WRITING ABOUT?

03:01PM  10   A.   IT'S THE PROVISION YOU ASKED ME ABOUT EARLIER.

03:01PM  11   Q.   THE MANDATORY REDEMPTION?

03:01PM  12   A.   WELL, THAT ALLOWED THE COMPANY TO MAKE A DECISION AND

03:01PM  13   HAVE -- ALLOWED THE BOARD TO HAVE THE FAIR MARKET VALUE OF THE

03:01PM  14   SHARES DETERMINED, AND THEN THE COMPANY COULD CHOOSE TO REDEEM

03:01PM  15   SHARES FROM ONE OR MORE SHAREHOLDERS AT THAT PRICE.

03:01PM  16   Q.   YOU LIST HERE SOME QUESTIONS.   DO YOU REMEMBER GETTING

03:01PM  17   ANSWERS TO THESE QUESTIONS BEFORE YOU DECIDED TO INVEST?

03:01PM  18   A.   I GOT ASSURANCE BEFORE I INVESTED FROM ELIZABETH THAT THIS

03:01PM  19   WOULD NOT BE EXERCISED IN MY CASE, OR IN THE CASE OF ANY OF MY

03:01PM  20   CLIENTS THAT ULTIMATELY, YOU KNOW, THROUGH THEIR OWN PROCESS

03:01PM  21   DECIDED TO INVEST.

03:01PM  22   Q.   AND BY THAT YOU'RE REFERRING TO D, THE MANDATORY

03:02PM  23   REDEMPTION?

03:02PM  24   A.   THAT IS CORRECT.

03:02PM  25   Q.   AND HOW ABOUT THE OTHER FOUR THAT YOU LIST HERE?   DO YOU

MOSLEY DIRECT BY MR. SCHENK                                    5136

03:02PM  1    REMEMBER HAVING FOLLOW-UP CONVERSATIONS OR ADDITIONAL

03:02PM  2    OPPORTUNITIES TO GET SOME CLARIFICATION ON THESE ISSUES BEFORE

03:02PM  3    YOU INVESTED, OR DO THESE REMAIN OUTSTANDING QUESTIONS?

03:02PM  4    A.   BY THE OTHER FOUR, YOU MEAN A, B, C AND E?

03:02PM  5    Q.   YES, SIR.

03:02PM  6    A.   I DON'T REMEMBER GETTING -- YOU KNOW, I GOT ADDITIONAL

03:02PM  7    MATERIALS, BUT I DON'T REMEMBER SPECIFICALLY ON EACH ONE OF

03:02PM  8    THESE POINTS GETTING ADDITIONAL INFORMATION, I DON'T.

03:02PM  9    Q.   SO NOTWITHSTANDING THESE OUTSTANDING QUESTIONS, YOU STILL

03:02PM  10   INVESTED?

03:02PM  11   A.   I DID.

03:02PM  12   Q.   WHY?

03:02PM  13   A.   BECAUSE I THOUGHT IT WAS A VERY, VERY ATTRACTIVE

03:02PM  14   OPPORTUNITY TO SUPPORT SOMETHING THAT WAS GOING TO ACHIEVE A

03:02PM  15   VERY, VERY GOOD RESULT FOR PEOPLE.

03:02PM  16   Q.   SO YOU IDENTIFIED SOME QUESTIONS, BUT THEY WERE NOT

03:02PM  17   OBSTACLES TO ULTIMATELY INVESTING?

03:03PM  18   A.   THEY WERE NOT.

03:03PM  19   Q.   OKAY.  IF YOU WOULD NOW TURN TO EXHIBIT 5387D IN YOUR

03:03PM  20   BINDER.

03:03PM  21        YOUR HONOR, 5387D IS TEXT MESSAGES THAT WERE PREVIOUSLY

03:03PM  22   ADMITTED.  I WOULD NOW SEEK PERMISSION TO PUBLISH TWO MESSAGES

03:03PM  23   ON PAGE 16 OF THIS EXHIBIT 5387D.

03:03PM  24        THERE ARE TWO MESSAGES ON THE BOTTOM OF PAGE 16, IF THE

03:03PM  25   COURT SEES 11/20/13 AT 3:38, AND THE ONE JUST AFTER THAT.

MOSLEY DIRECT BY MR. SCHENK                                      5137

03:03PM   1            THE COURT:  THANK YOU.  THESE HAVE BEEN ADMITTED,

03:03PM   2    AND THEY MAY BE PUBLISHED AGAIN.

03:03PM   3            MR. SCHENK:  THANK YOU, YOUR HONOR.

03:03PM   4        MS. HOLLIMAN, IF WE CAN BRING UP PAGE 16 OF EXHIBIT 5387D.

03:04PM   5    AND THE TWO MESSAGES ON THE BOTTOM OF THAT PAGE, IF WE CAN

03:04PM   6    EXPAND THEM.  THANK YOU.

03:04PM   7    Q.   THE FIRST ONE MS. HOLMES WRITES ON NOVEMBER 20TH, 2013 TO

03:04PM   8    MR. BALWANI, "AM PLANNING ON INCLUDING ALL WE SENT DST,

03:04PM   9    INCLUDING THE PFIZER REPORT.  LET ME KNOW IF U DISAGREE."

03:04PM   10           SHE CONTINUES, "ALSO THE HOSPITAL LIST."

03:04PM   11           MR. MOSLEY, YOU'VE TALKED A LITTLE BIT ABOUT THE

03:04PM   12   IMPORTANCE OF THE PFIZER REPORT TO YOUR DUE DILIGENCE, OR YOUR

03:04PM   13   EXAMINATION OF THE INVESTMENT.

03:04PM   14           WHEN YOU WERE READING THE PFIZER REPORT, CAN YOU REMIND

03:04PM   15   THE JURY WHO YOU THOUGHT AUTHORED THE PFIZER REPORT?

03:04PM   16   A.   PFIZER.

03:04PM   17   Q.   WOULD YOU NOW TURN IN YOUR BINDER TO 4221, EXHIBIT 4221.

03:05PM   18   A.   OKAY.

03:05PM   19   Q.   MR. MOSLEY, IS THIS AN EMAIL EXCHANGE BETWEEN YOU AND

03:05PM   20   MS. HOLMES ABOUT A TRIP TO CALIFORNIA AND ABOUT YOUR MEMO?

03:05PM   21   A.   ARE YOU REFERRING TO THE TOP EMAIL?

03:05PM   22   Q.   THE TRIP TO CALIFORNIA APPEARS IN THE MIDDLE EMAIL ON THE

03:05PM   23   FIRST PAGE, AND THERE'S A REFERENCE TO YOUR MEMO IN THAT EMAIL

03:05PM   24   AS WELL.

03:06PM   25   A.   YES, I SEE THE EMAIL.

MOSLEY DIRECT BY MR. SCHENK                                    5138

03:06PM   1              MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 4221.

03:06PM   2              MR. WADE:  NO OBJECTION.

03:06PM   3              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:06PM   4         (GOVERNMENT'S EXHIBIT 4221 WAS RECEIVED IN EVIDENCE.)

03:06PM   5    BY MR. SCHENK:

03:06PM   6    Q.   MR. MOSLEY, IF WE START ON PAGE 2, YOU WRITE TO MS. HOLMES

03:06PM   7    ON SEPTEMBER 18TH OF 2014 THAT YOU SENT THE BLANK CONFIDENTIAL

03:06PM   8    DISCLOSURE AGREEMENT TO BOTH THE COX FAMILY AND JERRY TUBERGEN

03:06PM   9    FROM THE DEVOS FAMILY.

03:06PM  10         DO YOU SEE THAT?

03:06PM  11    A.   I DO.

03:06PM  12    Q.   AND DO YOU REMEMBER WHY YOU DID THAT?

03:06PM  13    A.   BECAUSE THE -- YOU KNOW, I UNDERSTOOD THAT OBVIOUSLY ALL

03:06PM  14    OF THE -- I HAD DISCUSSED -- I HAD EXECUTED A NONDISCLOSURE

03:06PM  15    AGREEMENT, OR A CONFIDENTIAL DISCLOSURE AGREEMENT, WHICH MEANT

03:06PM  16    THAT I WAS NOT ALLOWED TO GIVE ANY OF THE INFORMATION THAT I

03:06PM  17    HAD RECEIVED TO ANYBODY ELSE WITHOUT THE CONSENT OF THE

03:07PM  18    COMPANY.

03:07PM  19         AND WHAT I WAS SAYING HERE WAS THAT BEFORE I WOULD PASS

03:07PM  20    ALONG ANY INFORMATION THAT I HAD LEARNED TO THESE INDIVIDUALS,

03:07PM  21    I WOULD FIRST GET THEM TO SIGN A CONFIDENTIAL DISCLOSURE

03:07PM  22    AGREEMENT.

03:07PM  23    Q.   I SEE.

03:07PM  24    A.   JUST CARRYING OUT MY OBLIGATIONS.

03:07PM  25    Q.   I SEE.  IF WE TURN TO PAGE 1, IN THE MIDDLE OF THE PAGE

MOSLEY DIRECT BY MR. SCHENK                                    5139

| | | |
|---|---|---|
| 03:07PM | 1 | YOU WRITE AN EMAIL TO MS. HOLMES ON SEPTEMBER 25TH.  YOU'RE |
| 03:07PM | 2 | LOOKING FORWARD TO GETTING OUT TO CALIFORNIA TO SEE HER AND |
| 03:07PM | 3 | MEET HER TEAM. |
| 03:07PM | 4 | DID THAT EVENTUALLY HAPPEN? |
| 03:07PM | 5 | A.   IT DID. |
| 03:07PM | 6 | Q.   YOU TALK ABOUT AN INDIVIDUAL NAMED ANDREAS. |
| 03:07PM | 7 | DO YOU SEE THAT? |
| 03:07PM | 8 | A.   YES, I DO. |
| 03:07PM | 9 | Q.   FROM THE STAVROS FOUNDATION? |
| 03:07PM | 10 | A.   YES. |
| 03:07PM | 11 | Q.   AND THEN THERE'S A REFERENCE IN THE NEXT PARAGRAPH TO |
| 03:07PM | 12 | GREG PENNER.  WE SAW THAT NAME EARLIER; IS THAT RIGHT? |
| 03:07PM | 13 | A.   THAT'S CORRECT. |
| 03:07PM | 14 | Q.   AND THEN MR. TUBERGEN FROM THE DEVOS FAMILY, OR FROM RDV; |
| 03:08PM | 15 | IS THAT RIGHT? |
| 03:08PM | 16 | A.   YES. |
| 03:08PM | 17 | Q.   AND THEN FINALLY, YOU SAY THAT DR. KISSINGER HAS MENTIONED |
| 03:08PM | 18 | OTHER FAMILIES THAT DR. KISSINGER KNOWS AS POSSIBLE INVESTOR |
| 03:08PM | 19 | CANDIDATES.  YOU REFERENCE A MEMO THAT YOU PREPARED, OR A |
| 03:08PM | 20 | SUMMARY, AND DISCUSS SHARING IT. |
| 03:08PM | 21 | WHAT MEMO IS THAT THAT YOU'RE REFERRING TO? |
| 03:08PM | 22 | A.   I BELIEVE IT WAS THE MEMO THAT I PREPARED FOR |
| 03:08PM | 23 | DR. KISSINGER. |
| 03:08PM | 24 | Q.   THE ONE THAT YOU AND I JUST REVIEWED? |
| 03:08PM | 25 | A.   YES, YES. |

MOSLEY DIRECT BY MR. SCHENK                                    5140

03:08PM   1    Q.   OKAY.  AND WHAT WAS YOUR QUESTION HERE?  WHAT WERE YOU

03:08PM   2    WONDERING?

03:08PM   3    A.   I'M NOT SURE.  WHAT LANGUAGE ARE YOU REFERRING TO?

03:08PM   4    Q.   I'LL BE MORE SPECIFIC.

03:08PM   5         YOU WRITE THAT YOU TOLD DR. KISSINGER THAT YOU WERE

03:08PM   6    COMFORTABLE SHARING THE MEMO WITH THESE OTHER FAMILIES THAT

03:08PM   7    DR. KISSINGER KNEW, BUT ONLY IF SOMETHING HAPPENED FIRST; IS

03:08PM   8    THAT RIGHT?

03:08PM   9    A.   YES.

03:08PM  10    Q.   WHY WAS --

03:08PM  11    A.   I HAD WRITTEN THE MEMO TO DR. KISSINGER FOR DR. KISSINGER,

03:09PM  12    AND I SAID I WAS OKAY IF HE WANTED TO SHOW IT WITH SOMEBODY,

03:09PM  13    BUT ONLY IF IT HAD BEEN CLEARED WITH ELIZABETH THAT THAT WAS

03:09PM  14    OKAY.

03:09PM  15    Q.   DO YOU -- FORGIVE ME.

03:09PM  16         DO YOU KNOW WHETHER THAT HAPPENED?  DO YOU REMEMBER

03:09PM  17    RECEIVING NOTICE FROM MS. HOLMES THAT YOU COULD SHARE THE MEMO?

03:09PM  18    A.   I BELIEVE I DID GET -- I WOULD NOT HAVE ULTIMATELY SAID TO

03:09PM  19    DR. KISSINGER, YOU CAN SEND IT TO SOMEBODY ELSE, WITHOUT

03:09PM  20    GETTING HER CONSENT.

03:09PM  21    Q.   OKAY.  THANK YOU.

03:09PM  22         IF YOU'LL NOW TURN TO 4284.

03:09PM  23         MR. MOSLEY, IS THIS A COUPLE OF EMAILS BETWEEN YOU AND

03:09PM  24    MS. HOLMES WHERE YOU TELL HER THAT YOU WILL INVEST AND THE

03:09PM  25    AMOUNT?

MOSLEY DIRECT BY MR. SCHENK                                     5141

03:09PM   1    A.   YES.

03:09PM   2              MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 4284.

03:10PM   3              MR. WADE:  NO OBJECTION.

03:10PM   4              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:10PM   5         (GOVERNMENT'S EXHIBIT 4284 WAS RECEIVED IN EVIDENCE.)

03:10PM   6    BY MR. SCHENK:

03:10PM   7    Q.   MR. MOSLEY, AT THE BOTTOM OF THIS EMAIL YOU -- THE BOTTOM

03:10PM   8    EMAIL, FORGIVE ME.  YOU WRITE, "ELIZABETH.

03:10PM   9         "IT WAS GOOD TO SEE YOU ON FRIDAY."

03:10PM  10         WHAT WAS THAT A REFERENCE TO?

03:10PM  11    A.   I THINK IT WAS A REFERENCE TO MY HAVING BEEN OUT AT

03:10PM  12    THERANOS IN CALIFORNIA ON FRIDAY, THE PREVIOUS FRIDAY.

03:10PM  13    Q.   SO IN OCTOBER OF 2014, DID YOU TRAVEL TO CALIFORNIA TO

03:10PM  14    MEET WITH MS. HOLMES?

03:10PM  15    A.   YES, I DID.

03:10PM  16    Q.   AND WHAT WAS THE PURPOSE OF THAT TRIP?

03:10PM  17    A.   I THINK THE PURPOSE OF THE TRIP WAS TO INTRODUCE

03:10PM  18    INDIVIDUALS AT THE STAVROS NIARCHOS FOUNDATION THAT WANTED TO

03:10PM  19    MEET WITH ELIZABETH SO THAT THEY COULD DO THEIR OWN ANALYSIS AS

03:10PM  20    TO WHETHER IT WAS SOMETHING OF INTEREST TO THEM.

03:10PM  21    Q.   AND THEN WHY DID YOU GO?  IF THE PURPOSE WAS FOR

03:11PM  22    MS. HOLMES TO MEET OTHER INDIVIDUALS, WHAT BROUGHT YOU TO

03:11PM  23    CALIFORNIA?

03:11PM  24    A.   THE FACT THAT, YOU KNOW, THEY HAD NEVER MET HER, AND

03:11PM  25    REALLY PRIMARILY TO DO THE INTRODUCTION.

MOSLEY DIRECT BY MR. SCHENK                                          5142

03:11PM  1    Q.   OKAY.  DO YOU REMEMBER MS. HOLMES TALKING DURING THIS

03:11PM  2    MEETING?

03:11PM  3    A.   I DO.

03:11PM  4    Q.   AND DO YOU REMEMBER HER TALKING ABOUT THE TECHNOLOGY OR

03:11PM  5    ABOUT THERANOS?

03:11PM  6    A.   AS I REMEMBER, WE HAD A LONG CONVERSATION ABOUT THERANOS

03:11PM  7    AND THE TECHNOLOGY.

03:11PM  8    Q.   AND DURING THAT MEETING, DO YOU REMEMBER LEARNING ANYTHING

03:11PM  9    THAT WAS DIFFERENT, THAT WAS SIGNIFICANTLY DIFFERENT THAN ALL

03:11PM  10   OF THE MATERIALS YOU AND I HAVE SPENT THIS AFTERNOON REVIEWING?

03:11PM  11   DID YOU LEARN THAT THE TECHNOLOGY WAS ACTUALLY SOMETHING

03:11PM  12   DIFFERENT, OR DID SOMETHING DIFFERENT?

03:11PM  13   A.   I DID NOT.

03:11PM  14   Q.   WAS THERE -- WERE THE REPRESENTATIONS THAT YOU HEARD IN

03:11PM  15   THIS MEETING LARGELY CONSISTENT WITH YOUR UNDERSTANDING OF THE

03:11PM  16   TECHNOLOGY WHEN YOU LEFT CONNECTICUT TO GO TO THIS MEETING?

03:11PM  17   A.   IT WAS.

03:11PM  18   Q.   AT THE BOTTOM -- I'M SORRY.  CLOSE TO THE BOTTOM OF THE

03:11PM  19   EMAIL, THERE'S A PARAGRAPH THAT BEGINS, "AS WE DISCUSSED."

03:12PM  20        DO YOU SEE THAT?

03:12PM  21   A.   YES.

03:12PM  22   Q.   "AS WE DISCUSSED, I WILL SPEAK WITH DAVID ABOUT THE

03:12PM  23   CONCERN WITH THE MANDATORY REDEMPTION CLAUSE IN THE CERTIFICATE

03:12PM  24   OF INCORPORATION."

03:12PM  25        WHO IS DAVID?

MOSLEY DIRECT BY MR. SCHENK                                    5143

03:12PM  1    A.   THAT WAS A REFERENCE TO DAVID BOIES.

03:12PM  2    Q.   AND DID YOU SPEAK WITH MR. BOIES?

03:12PM  3    A.   I DID.

03:12PM  4    Q.   IS THIS A REFERENCE TO THE MANDATORY REDEMPTION THAT YOU

03:12PM  5    AND I TALKED ABOUT?  YOU PUT IT AS ONE OF YOUR QUESTIONS OR

03:12PM  6    CONCERNS?

03:12PM  7    A.   IT IS.

03:12PM  8    Q.   OKAY.  AND THEN THE LAST PARAGRAPH, "PERSONALLY, I WOULD

03:12PM  9    BE DELIGHTED AND HONORED TO BE PART OF YOUR FIRST CLOSING.  MY

03:12PM  10   HOPE WOULD BE TO INVEST $6 MILLION, WHICH I WOULD PROPOSE TO

03:12PM  11   INVEST THROUGH AN LLC WHOLLY OWNED BY ME AND TRUSTS FOR MY

03:12PM  12   THREE DAUGHTERS, SO THAT IT WILL LIMIT THE NUMBER OF YOUR

03:12PM  13   SEPARATE SHAREHOLDERS RESULTING FROM MY INVESTMENT TO ONE."

03:12PM  14       YOU DECIDED ON AN INVESTMENT AMOUNT OF $6 MILLION; IS THAT

03:12PM  15   RIGHT?

03:12PM  16   A.   I DID.

03:12PM  17   Q.   HOW DID YOU PICK THAT NUMBER?  WHERE DID THAT COME FROM?

03:13PM  18   DO YOU KNOW?

03:13PM  19   A.   I DON'T REALLY REMEMBER.  YOU KNOW, JUST HAVING THOUGHT

03:13PM  20   ABOUT IT AND THOUGHT ABOUT MY PERSONAL FINANCIAL SITUATION, I

03:13PM  21   THOUGHT IT WAS SOMETHING THAT I COULD AFFORD TO INVEST.

03:13PM  22   Q.   OKAY.  ABOVE THIS EMAIL, MS. HOLMES RESPONDS TO YOU

03:13PM  23   THANKING YOU FOR THE EMAIL, AND SHE WRITES, "WE HAVE SPENT A

03:13PM  24   LOT OF TIME ON HOW WE'RE SIZING THIS TRANSACTION AND WHO WE'RE

03:13PM  25   BRINGING IN, AND I CAN HEREIN CONFIRM THE ALLOCATIONS FOR YOU,

MOSLEY DIRECT BY MR. SCHENK                                    5144

03:13PM  1    ANDREAS, AND THE COX'S IN ADDITION TO THE DEVOS COMMITMENT AT

03:13PM  2    THE NUMBERS BELOW.  WE WILL FOLLOW UP TOMORROW ON PAPERWORK

03:13PM  3    THERE."

03:13PM  4        YOU WROTE THAT YOU'RE DELIGHTED AND HONORED, AND

03:13PM  5    MS. HOLMES RESPONDS THAT THEY HAVE SPENT A LOT OF TIME

03:13PM  6    DETERMINING THE ALLOCATIONS.

03:13PM  7        DID YOU FEEL GRATEFUL THAT THE $6 MILLION THAT YOU WANTED

03:13PM  8    TO INVEST WAS ACCEPTED?

03:13PM  9    A.   I DID.

03:13PM  10   Q.   WHY?

03:13PM  11   A.   WELL, AS I SAY, YOU KNOW, I THOUGHT IT WAS, YOU KNOW, VERY

03:14PM  12   EXCITING TECHNOLOGY, AND I THOUGHT IT WAS A VERY INTERESTING

03:14PM  13   COMPANY, AND I THOUGHT THAT IT WOULD BOTH BE A GOOD INVESTMENT

03:14PM  14   AND ALSO SOMETHING THAT WAS SORT OF -- NOT SORT OF -- IT WAS

03:14PM  15   SOMETHING THAT WAS GOOD FOR EVERYBODY.

03:14PM  16   Q.   WHY DO YOU SAY THAT, "GOOD FOR EVERYBODY"?

03:14PM  17   A.   WELL, IT'S GOOD FOR PEOPLE BECAUSE THEY WOULD BE ABLE TO

03:14PM  18   GET BETTER BLOOD TESTING, GET THE RESULTS QUICKER, PAY LESS FOR

03:14PM  19   THE TESTING, AND I THOUGHT IT WOULD IMPROVE MEDICAL TREATMENT.

03:14PM  20   Q.   ALL OF THESE ADVANTAGES, THAT THE RESULTS WERE QUICKER,

03:14PM  21   THE PRICE, WAS THAT BASED ON A BELIEF THAT THE INFORMATION THAT

03:14PM  22   YOU HAD BEEN PROVIDING ABOUT THERANOS WAS ACCURATE?

03:14PM  23   A.   IT WAS.

03:14PM  24   Q.   WOULD YOU TURN NOW TO 4286.

03:15PM  25        IS THIS AN EMAIL FROM MR. BALWANI TO YOU, CC'ING

MOSLEY DIRECT BY MR. SCHENK                           5145

03:15PM   1    MS. HOLMES, INCLUDING SOME INVESTMENT DOCUMENTS?

03:15PM   2    A.   YES.

03:15PM   3         MR. SCHENK:   YOUR HONOR, THE GOVERNMENT OFFERS 4286.

03:15PM   4         MR. WADE:   THE COURT'S INDULGENCE FOR ONE MOMENT.

03:15PM   5    (PAUSE IN PROCEEDINGS.)

03:15PM   6         MR. WADE:   NO OBJECTION.

03:15PM   7         THE COURT:   IT'S ADMITTED AND IT MAY BE PUBLISHED.

03:15PM   8    (GOVERNMENT'S EXHIBIT 4286 WAS RECEIVED IN EVIDENCE.)

03:16PM   9    BY MR. SCHENK:

03:16PM   10   Q.   MR. MOSLEY, MR. BALWANI SENDS YOU INVESTMENT DOCUMENTS

03:16PM   11   HERE, AND IT'S OCTOBER 24TH, 2014.

03:16PM   12        DO YOU SEE THAT?

03:16PM   13   A.   I DO.

03:16PM   14   Q.   AND IF I COULD NOW DRAW YOUR ATTENTION TO PAGE 60 OF THIS

03:16PM   15   DOCUMENT.  THERE'S SOME SECTIONS IN IT THAT I WOULD LIKE TO ASK

03:16PM   16   YOU ABOUT.

03:16PM   17        FIRST, ARE YOU FAMILIAR WITH THIS DOCUMENT AS A WHOLE, THE

03:16PM   18   DOCUMENT THAT WE'RE LOOKING AT?

03:16PM   19   A.   YES, I AM.

03:16PM   20   Q.   AND WHAT IS IT GENERALLY?

03:16PM   21   A.   IT'S A STOCK PURCHASE AGREEMENT FOR C-2 SHARES.

03:16PM   22   Q.   C-2 SHARES IN THERANOS?

03:16PM   23   A.   THAT'S CORRECT.

03:16PM   24   Q.   NOW, IF ON PAGE 60 YOU'LL LOOK AT, THERE'S A SECTION THAT

03:16PM   25   I'D LIKE TO ASK YOU ABOUT, 4.3, INVESTMENT EXPERIENCE.

MOSLEY DIRECT BY MR. SCHENK                                         5146

03:16PM  1          DO YOU SEE THAT?

03:16PM  2     A.   YES.

03:16PM  3     Q.   AND IT TALKS ABOUT THE EXPERIENCE OF THE PURCHASER.

03:16PM  4          IS THAT YOU?

03:17PM  5     A.   IT IS.

03:17PM  6     Q.   AND WAS THIS ACCURATE WHEN YOU SIGNED IT?  IN OTHER WORDS,

03:17PM  7     DID YOU HAVE THIS RELEVANT INVESTMENT EXPERIENCE?

03:17PM  8     A.   I DID.

03:17PM  9     Q.   AND 4.4 REFERENCES THE SPECULATIVE NATURE OF THE

03:17PM 10     INVESTMENT.

03:17PM 11          IT SAYS THAT THE INVESTOR, THAT'S YOU, UNDERSTANDS AND

03:17PM 12     ACKNOWLEDGES THAT THE COMPANY HAS A LIMITED FINANCIAL AND

03:17PM 13     OPERATING HISTORY AND THAT AN INVESTMENT IN THE COMPANY IS

03:17PM 14     HIGHLY SPECULATIVE AND INVOLVES SUBSTANTIAL RISKS.

03:17PM 15          DID YOU UNDERSTAND THAT WHEN YOU INVESTED?

03:17PM 16     A.   YES, I DID.

03:17PM 17     Q.   DID YOU BELIEVE THAT ONE OF THE RISKS WAS THE INFORMATION

03:17PM 18     PROVIDED TO YOU WOULD NOT BE ACCURATE?

03:17PM 19     A.   I WAS NOT THINKING ABOUT THAT IN REFERENCE TO THIS

03:17PM 20     REFERENCE, TO THIS STATEMENT.

03:17PM 21     Q.   WHY NOT?  WHAT WERE YOU THINKING ABOUT WHEN YOU SAW THAT

03:17PM 22     THE INVESTMENT WAS SPECULATIVE?

03:17PM 23     A.   WELL, JUST RECOGNIZING THAT, YOU KNOW, IT WAS NEW

03:17PM 24     TECHNOLOGY AND SOMETHING COULD HAPPEN THAT WOULD NOT MAKE IT AS

03:17PM 25     DISRUPTIVE OR AS EFFECTIVE AS I THOUGHT IT WOULD BE.

MOSLEY DIRECT BY MR. SCHENK                                              5147

03:18PM  1    Q.   DID YOU UNDERSTAND THAT THOSE WERE SOME OF THE RISKS THAT

03:18PM  2    YOU WERE FACING, BUT ACCURACY MIGHT NOT BE ONE OF THE RISKS?

03:18PM  3    A.   I THOUGHT I WAS FACING THOSE RISKS.

03:18PM  4         BUT I THINK YOU'RE ASKING ME, DID I THINK RISK WAS THAT I

03:18PM  5    HAD INACCURATE INFORMATION?  NO.

03:18PM  6    Q.   YES, SIR.

03:18PM  7    A.   I DID NOT THINK THAT I HAD INACCURATE INFORMATION.

03:18PM  8    Q.   OKAY.  THAT SAME PARAGRAPH CONTINUES THAT YOU UNDERSTOOD

03:18PM  9    THAT THERE WAS THE POSSIBILITY THAT YOU WOULD SUFFER A COMPLETE

03:18PM  10   LOSS OF YOUR INVESTMENT.

03:18PM  11        DID YOU UNDERSTAND THAT WHEN YOU --

03:18PM  12   A.   I DID.

03:18PM  13   Q.   -- INVESTED?

03:18PM  14   A.   I DID.

03:18PM  15   Q.   AND THAT DIDN'T STOP YOU FROM INVESTING?

03:18PM  16   A.   IT DID NOT.

03:18PM  17   Q.   WHY DIDN'T IT?

03:18PM  18   A.   IT WAS A RISK I WAS WILLING TO TAKE BASED ON WHAT I KNEW.

03:18PM  19   Q.   WHAT DO YOU MEAN, "BASED ON WHAT YOU KNEW"?

03:18PM  20   A.   BASED ON ALL OF THE INFORMATION THAT WE HAVE GONE THROUGH

03:18PM  21   IN MY MEMORANDUM TO DR. KISSINGER WHICH SORT OF EXPLAINED MY

03:18PM  22   VIEWS OF THE COMPANY.

03:18PM  23   Q.   THE NEXT SECTION, 4.5, IS CALLED ACCESS TO DATA, AND IT

03:18PM  24   READS "THAT THE INVESTOR HAS HAD AN OPPORTUNITY TO ASK

03:19PM  25   QUESTIONS OF, AND RECEIVE ANSWERS FROM, THE OFFICERS OF THE

MOSLEY DIRECT BY MR. SCHENK                                    5148

03:19PM   1    COMPANY."

03:19PM   2         WAS THAT TRUE?  DID YOU HAVE AN OPPORTUNITY TO ASK

03:19PM   3    QUESTIONS?

03:19PM   4    A.   I DID.

03:19PM   5    Q.   THE QUESTIONS THAT YOU ASKED AND THE ANSWERS THAT YOU

03:19PM   6    RECEIVED, THEY DIDN'T MAKE THEIR WAY INTO THIS AGREEMENT; IS

03:19PM   7    THAT RIGHT?

03:19PM   8    A.   I'M NOT SURE WHAT YOU MEAN.

03:19PM   9    Q.   SO YOU SAID THAT YOU HAD THE OPPORTUNITY TO ASK QUESTIONS?

03:19PM  10    A.   I DID.

03:19PM  11    Q.   AND DID YOU MEMORIALIZE THE QUESTIONS AND THEN MAKE THEM

03:19PM  12    SECTIONS IN THIS AGREEMENT?

03:19PM  13    A.   I DID NOT.

03:19PM  14    Q.   SO DID YOU UNDERSTAND THAT WHILE YOU WERE SIGNING THIS

03:19PM  15    AGREEMENT, THINGS THAT LED YOU TO INVEST EXISTED OUTSIDE OF THE

03:19PM  16    AGREEMENT?

03:19PM  17    A.   I DID.

03:19PM  18    Q.   4.6 IS AN ACCREDITED INVESTOR.  WAS THAT TRUE WHEN YOU

03:19PM  19    SIGNED IT?  YOU WERE AN ACCREDITED INVESTOR?

03:19PM  20    A.   IT WAS TRUE.

03:19PM  21    Q.   AND THAT'S A TERM THAT YOU'RE FAMILIAR WITH?

03:19PM  22    A.   YES, I AM.

03:19PM  23    Q.   WOULD YOU TURN NOW TO 4303.

03:20PM  24         MR. MOSLEY, IS THIS AN EMAIL FROM YOU TO MS. HOLMES

03:20PM  25    ATTACHING SOME SIGNATURE PAGES?

MOSLEY DIRECT BY MR. SCHENK                                    5149

03:20PM  1    A.   IT WAS.

03:20PM  2              MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 4303.

03:20PM  3              MR. WADE:  NO OBJECTION.

03:20PM  4              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:20PM  5         (GOVERNMENT'S EXHIBIT 4303 WAS RECEIVED IN EVIDENCE.)

03:20PM  6    BY MR. SCHENK:

03:20PM  7    Q.   MR. MOSLEY, IT LOOKS LIKE YOU SENT ON YOUR WHAT IS CALLED

03:20PM  8    A MASTER SIGNATURE PAGE, AS WELL AS THAT OF SOMEONE NAMED

03:20PM  9    ANDREAS; IS THAT RIGHT?

03:20PM  10   A.   THAT IS CORRECT.

03:20PM  11   Q.   WHY DID YOU SEND ANDREAS'S SIGNATURE PAGE IN ADDITION TO

03:20PM  12   YOURS?

03:20PM  13   A.   BECAUSE ANDREAS TOLD ME THAT HE HAD INDEPENDENTLY DECIDED

03:20PM  14   TO MAKE AN INVESTMENT AND ASKED ME IF I WOULD TAKE HIS

03:20PM  15   SIGNATURE PAGE AND PASS IT ALONG WITH MINE TO THE COMPANY.

03:20PM  16   Q.   DID YOU ENCOURAGE HIM TO INVEST?

03:20PM  17   A.   NO.

03:20PM  18   Q.   IF YOU'LL LOOK NOW AT PAGE 2 OF THIS DOCUMENT.

03:21PM  19        IS THAT YOUR SIGNATURE?

03:21PM  20   A.   YES, IT IS.

03:21PM  21   Q.   AND YOUR -- AT THE TIME YOUR WORK ADDRESS?

03:21PM  22   A.   THAT IS CORRECT.

03:21PM  23   Q.   AND IS THIS THE SIGNATURE PAGE TO THE DOCUMENT THAT WE

03:21PM  24   WERE JUST LOOKING AT, THE ACCREDITED INVESTOR DOCUMENT?

03:21PM  25   A.   IT IS.

MOSLEY DIRECT BY MR. SCHENK                                    5150

03:21PM  1    Q.   IF YOU WILL NOW TURN TO EXHIBIT 2172, WHICH WOULD BE

03:21PM  2    TOWARDS THE BEGINNING OF THAT BINDER.

03:21PM  3    A.   I HAVE IT.

03:21PM  4    Q.   MR. MOSLEY, WHAT ARE WE LOOKING AT HERE?

03:21PM  5    A.   IT IS A SIGNED PIECE OF PAPER FROM THERANOS SIGNED BY

03:22PM  6    ELIZABETH HOLMES.

03:22PM  7    Q.   AND IS THIS IN REGARDS TO THE REDEMPTION, THE MANDATORY

03:22PM  8    REDEMPTION ISSUE THAT YOU AND I HAVE SPOKEN ABOUT?

03:22PM  9    A.   IT IS.

03:22PM 10            MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 2172.

03:22PM 11            MR. WADE:  NO OBJECTION.

03:22PM 12            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:22PM 13        (GOVERNMENT'S EXHIBIT 2172 WAS RECEIVED IN EVIDENCE.)

03:22PM 14    BY MR. SCHENK:

03:22PM 15    Q.   IN THIS DOCUMENT, MS. HOLMES WRITES, "THIS WILL CONFIRM

03:22PM 16    WITH RESPECT TO THE SERIES C-2 PREFERRED STOCK FOR WHICH YOUR

03:22PM 17    CLIENTS ARE SUBSCRIBING AT THIS TIME, IF THE COMPANY EXERCISES

03:22PM 18    ITS RIGHT PURSUANT TO SECTION 6 OF THE STOCK'S CERTIFICATE TO

03:22PM 19    REDEEM ANY OR ALL OF SUCH SHARES, THE PRICE PER SHARE SHALL NOT

03:22PM 20    BE LESS THAN $17."

03:22PM 21        DO YOU SEE THAT?

03:22PM 22    A.   I DO.

03:22PM 23    Q.   "YOU AND YOUR CLIENTS WILL HOLD THE EXISTENCE OF THIS

03:22PM 24    LETTER AND ITS CONTENTS AS PERTAINS TO EACH OF THEM IN

03:22PM 25    CONFIDENCE."

MOSLEY DIRECT BY MR. SCHENK                                    5151

03:22PM   1          IT'S DATED OCTOBER 31ST, 2014.

03:23PM   2          WAS THAT THE DATE THAT YOU INVESTED?

03:23PM   3     A.   UM --

03:23PM   4     Q.   I CAN SHOW YOU THE DOCUMENT IF YOU DON'T --

03:23PM   5     A.   YES, YOU CAN SHOW ME THE DOCUMENT.

03:23PM   6     Q.   OKAY.  THE REFERENCE TO "YOUR CLIENTS" IN HERE, WHAT DID

03:23PM   7     YOU UNDERSTAND THAT TO MEAN?

03:23PM   8     A.   WELL, AS A -- YOU KNOW, AS A LAWYER, OBVIOUSLY YOU HAVE A

03:23PM   9     DUTY TO YOUR CLIENTS, AND I HAD INTRODUCED VARIOUS PEOPLE TO

03:23PM  10     THE COMPANY, AND THEY WERE LOOKING AT THE COMPANY.

03:23PM  11          AND I WOULD NEVER -- KNOWING THAT I HAD CLIENTS LOOKING AT

03:23PM  12     THE COMPANY AND WHO MIGHT INVEST IN THE COMPANY, I WOULD NEVER

03:23PM  13     OBTAIN SOME PROTECTION FOR MYSELF THAT I THOUGHT WAS IMPORTANT

03:23PM  14     WITHOUT INCLUDING MY CLIENTS.

03:23PM  15     Q.   YOU UNDERSTOOD THAT SOME OF YOUR CLIENTS ALSO INVESTED IN

03:23PM  16     THERANOS?

03:23PM  17     A.   I THINK AT THE TIME I THOUGHT SOME OF MY CLIENTS WOULD

03:23PM  18     INVEST.

03:23PM  19          I DON'T KNOW AT THE TIME WHETHER ANY OF THEM HAD, BUT I

03:23PM  20     THOUGHT THAT THEY WERE INTERESTED AND THEY MIGHT WELL INVEST.

03:23PM  21     Q.   OKAY.  DID YOU ENCOURAGE ANY OF YOUR CLIENTS TO INVEST?

03:24PM  22     A.   NO.

03:24PM  23     Q.   IF YOU DIDN'T ENCOURAGE THEM, WHY DID YOU GET THIS BENEFIT

03:24PM  24     OR PROTECTION FOR THEM?

03:24PM  25     A.   WELL, THE SAME THING I JUST SAID.  YOU KNOW, I WOULD FEEL

MOSLEY DIRECT BY MR. SCHENK                                    5152

03:24PM   1    LIKE I HAD NOT DONE THE RIGHT THING HAD I GOTTEN THIS

03:24PM   2    PROTECTION FOR MYSELF AND IF LATER MY CLIENTS CHOSE TO INVEST

03:24PM   3    IN THE COMPANY AND THEY DID NOT HAVE THE BENEFIT OF THE SAME

03:24PM   4    PROTECTION.

03:24PM   5        AND SO WHEN I ASKED FOR IT, I ASKED FOR IT TO INCLUDE ME,

03:24PM   6    AS WELL AS ANY OF MY CLIENTS THAT MIGHT DECIDE TO INVEST.

03:24PM   7    Q.   THANK YOU.  IF YOU'LL NOW TURN TO 4845, 4845.

03:24PM   8        YOUR HONOR, THIS HAS BEEN ADMITTED PREVIOUSLY.  PERMISSION

03:24PM   9    TO PUBLISH PAGE 23?

03:24PM   10            THE COURT:  YES.

03:24PM   11            MR. SCHENK:  THANK YOU.

03:25PM   12   Q.   LET ME KNOW WHEN YOU'RE THERE, MR. MOSLEY.

03:25PM   13   A.   I'M THERE.

03:25PM   14   Q.   DO YOU SEE THE DOCUMENT AT PAGE 23 OF 4845?

03:25PM   15   A.   I DO.

03:25PM   16   Q.   AND WHEN YOU MADE THE INVESTMENT IN THERANOS, DID YOU BANK

03:25PM   17   WITH JPMORGAN CHASE?

03:25PM   18   A.   I DID.

03:25PM   19   Q.   AND WHERE WERE YOU, IN WHAT STATE, WHEN YOU INITIATED THE

03:25PM   20   WIRE TRANSFER?

03:25PM   21   A.   I WAS IN MY OFFICE IN NEW YORK.

03:25PM   22   Q.   THE AMOUNT THAT WE SEE HERE IS JUST UNDER $6 MILLION.

03:26PM   23        DO YOU SEE THAT?

03:26PM   24   A.   I DO.

03:26PM   25   Q.   AND DO YOU KNOW WHAT EXPLAINS THE DISCREPANCY?  YOU WROTE

MOSLEY DIRECT BY MR. SCHENK                                    5153

03:26PM  1      AN EMAIL THAT YOU WERE GOING TO INVEST 6 MILLION, AND THIS IS

03:26PM  2      JUST UNDER THAT.

03:26PM  3      A.   THIS IS THE DOLLAR AMOUNT THAT ROUNDED OUT, AT $17 A

03:26PM  4      SHARE, TO AN EVEN NUMBER OF SHARES.

03:26PM  5      Q.   I SEE.   OKAY.

03:26PM  6           AND THE BENEFICIARY AT THE BOTTOM IS THERANOS.

03:26PM  7           DO YOU SEE THAT?

03:26PM  8      A.   I DO.

03:26PM  9      Q.   MR. MOSLEY, WHEN YOU WERE DESCRIBING YOUR CLIENTS OR

03:26PM  10     OTHERS THAT YOU KNEW WERE CONTEMPLATING AN INVESTMENT AT THE

03:26PM  11     SAME TIME AS YOU, DID YOU KNOW WHETHER MR. TROTT OR BDT WAS

03:26PM  12     CONTEMPLATING AN INVESTMENT?

03:26PM  13     A.   I DID NOT KNOW.

03:26PM  14     Q.   YOU DID NOT KNOW WHETHER THEY WERE?

03:26PM  15     A.   I DID NOT.

03:26PM  16             MR. SCHENK:   YOUR HONOR, MAY I HAVE ONE MOMENT?

03:26PM  17             THE COURT:   YES.

03:26PM  18          (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

03:27PM  19             MR. SCHENK:   THANK YOU, YOUR HONOR.

03:27PM  20          NO FURTHER QUESTIONS.

03:27PM  21             THE COURT:   CROSS-EXAMINATION?

03:27PM  22             MR. WADE:   I DO, YOUR HONOR.   MAYBE NOW WOULD BE A

03:27PM  23     GOOD TIME FOR A STANDING BREAK.

03:27PM  24             THE COURT:   YES.   FOLKS, PLEASE STAND AND STRETCH.

03:27PM  25          (STRETCHING.)

MOSLEY CROSS BY MR. WADE                                          5154

| | | |
|---|---|---|
| 03:27PM | 1 | THE COURT:  I THINK WE SAID WE WOULD GO UNTIL |
| 03:27PM | 2 | 4:00 O'CLOCK TODAY.  I DON'T THINK I SUGGESTED 5:00 O'CLOCK FOR |
| 03:27PM | 3 | TODAY.  I THINK IT'S 4:00 O'CLOCK. |
| 03:27PM | 4 | MR. WADE:  4:00 O'CLOCK, YES.  ANOTHER 30 MINUTES I |
| 03:27PM | 5 | THINK. |
| 03:27PM | 6 | THE COURT:  RIGHT. |
| 03:27PM | 7 | (STRETCHING.) |
| 03:29PM | 8 | **CROSS-EXAMINATION** |
| 03:29PM | 9 | BY MR. WADE: |
| 03:29PM | 10 | Q.   GOOD AFTERNOON, MR. MOSLEY. |
| 03:29PM | 11 | A.   GOOD AFTERNOON. |
| 03:29PM | 12 | Q.   MY NAME IS LANCE WADE.  I'M A LAWYER, AND I REPRESENT |
| 03:29PM | 13 | MS. HOLMES. |
| 03:29PM | 14 | I'M GOING TO ASK YOU A FEW QUESTIONS TODAY, AND WE'LL |
| 03:29PM | 15 | PROBABLY GO INTO TOMORROW A BIT. |
| 03:29PM | 16 | I'D LIKE TO START BY ASKING YOU A LITTLE MORE ABOUT YOUR |
| 03:29PM | 17 | PRIOR OCCUPATION.  YOU'RE NOW A RECOVERING LAWYER; IS THAT |
| 03:29PM | 18 | RIGHT? |
| 03:29PM | 19 | A.   THAT IS CORRECT. |
| 03:29PM | 20 | Q.   OKAY.  AND BEFORE YOU TRANSITIONED CAREERS, YOU WORKED AT |
| 03:29PM | 21 | THE LAW FIRM OF CRAVATH, SWAINE & MOORE IN NEW YORK CITY? |
| 03:29PM | 22 | A.   I DID. |
| 03:29PM | 23 | Q.   AND IF I CAN ASK YOU TO BE IMMODEST IF I MIGHT -- I KNOW |
| 03:29PM | 24 | IT MAY NOT BE HOW YOU WERE RAISED -- IS IT FAIR TO SAY THAT |
| 03:29PM | 25 | CRAVATH IS ONE OF THE PREEMINENT LAW FIRMS IN THE WORLD? |

                                                                          5155
MOSLEY CROSS BY MR. WADE

03:29PM  1      A.   I BELIEVE IT IS.

03:29PM  2      Q.   IT'S BEEN AROUND FOR ABOUT 200 YEARS?

03:29PM  3      A.   THAT'S CORRECT.

03:29PM  4      Q.   ONE OF THE OLDEST LAW FIRMS IN THE UNITED STATES?

03:30PM  5      A.   THAT IS CORRECT.

03:30PM  6      Q.   AND IT REPRESENTS ITSELF AS HAVING THE MOST ACCOMPLISHED

03:30PM  7      LAWYERS ACROSS ALL PRACTICE AREAS.  IS THAT -- DO YOU THINK

03:30PM  8      THAT'S A FAIR ASSESSMENT?

03:30PM  9      A.   YOU KNOW, "MOST" IS AN EXTREME STATEMENT.  I WOULD SAY

03:30PM 10      EXTREMELY ACCOMPLISHED, YES.

03:30PM 11      Q.   AND IN PARTICULAR, YOU WORKED IN THE TRUSTS AND ESTATES

03:30PM 12      GROUP AT CRAVATH; CORRECT?

03:30PM 13      A.   I DID.

03:30PM 14      Q.   AND THAT'S A PARTICULARLY WELL REGARDED GROUP, IS IT NOT?

03:30PM 15      A.   I BELIEVE IT WAS.

03:30PM 16      Q.   AND YOU WORKED THERE FOR, WAS IT A LITTLE OVER 30 YEARS;

03:30PM 17      IS THAT RIGHT?

03:30PM 18      A.   THAT IS CORRECT.

03:30PM 19      Q.   AND DURING THAT TIME, YOU SERVICED ANY NUMBER OF PROMINENT

03:30PM 20      FAMILIES THROUGHOUT THE COUNTRY?

03:30PM 21      A.   I DID.

03:30PM 22      Q.   ON VARIOUS TRUSTS AND ESTATES MATTERS; IS THAT RIGHT?

03:30PM 23      A.   THAT'S CORRECT.

03:30PM 24      Q.   AND NOW YOU'VE, YOU'VE MOVED ON AND YOU WORK AT BDT?

03:31PM 25      A.   THAT IS CORRECT.

MOSLEY CROSS BY MR. WADE                                         5156

03:31PM  1    Q.   AND WHAT KIND OF SERVICES DO YOU PROVIDE AT BDT?

03:31PM  2    A.   I'M INVOLVED IN THE MANAGEMENT OF THE FIRM, I RUN THE

03:31PM  3    NEW YORK OFFICE.  WE ADVISE AND WORK WITH, YOU KNOW, HIGH NET

03:31PM  4    WORTH FAMILIES, AND I DO THAT TYPE OF WORK.

03:31PM  5    Q.   AND YOU'VE WORKED WITH A LOT OF VERY HIGH NET WORTH

03:31PM  6    FAMILIES IN YOUR WORK IN TRUSTS AND ESTATES PRACTICE AT

03:31PM  7    CRAVATH; IS THAT CORRECT?

03:31PM  8    A.   I DID.

03:31PM  9    Q.   AND YOU WOULD CREATE TRUSTS FOR THE FAMILIES, AMONG OTHER

03:31PM  10   THINGS?

03:31PM  11   A.   YES.

03:31PM  12   Q.   AND OCCASIONALLY REVIEW DOCUMENTS AND THE LIKE?

03:31PM  13   A.   YES.

03:31PM  14   Q.   AND YOU OCCASIONALLY WOULD INVEST YOURSELF; CORRECT?

03:31PM  15   A.   YEAH.  AS I HAD EXTRA FUNDS, I INVESTED FOR MY OWN

03:31PM  16   PERSONAL ACCOUNT, YES.

03:31PM  17   Q.   AND SO YOU HAVE SOME EXPERIENCE IN THE INVESTING WORLD

03:31PM  18   BEYOND JUST THE THERANOS INVESTMENT; IS THAT FAIR?

03:32PM  19   A.   I DO, YES.

03:32PM  20   Q.   IN FACT, THERE'S -- I BELIEVE THE ENTITY THROUGH WHICH YOU

03:32PM  21   INVESTED HERE IS CALLED MOSLEY FAMILY HOLDINGS; IS THAT

03:32PM  22   CORRECT?

03:32PM  23   A.   THAT'S CORRECT.

03:32PM  24   Q.   AND THAT'S AN ENTITY THAT YOU SET UP FOR INVESTMENT

03:32PM  25   PURPOSES; IS THAT CORRECT?

MOSLEY CROSS BY MR. WADE                                          5157

03:32PM  1    A.   THAT IS CORRECT.

03:32PM  2    Q.   OKAY.  AND THE CLIENTS -- THERE ARE A NUMBER OF PEOPLE WHO

03:32PM  3    ARE YOUR CLIENTS WHO YOU INTERACTED WITH IN CONNECTION WITH

03:32PM  4    THERANOS; IS THAT RIGHT?

03:32PM  5    A.   YEAH.  I WOULD SAY A SMALL NUMBER OF MY CLIENTS I

03:32PM  6    INTERACTED WITH IN CONNECTION WITH THERANOS.

03:32PM  7    Q.   OKAY.  AND YOU HAVE A LOT OF CLIENTS?  YOU HAD A LOT OF

03:32PM  8    CLIENTS?

03:32PM  9    A.   I HAD A LOT OF CLIENTS.

03:32PM  10   Q.   OKAY.  AND AMONG THE PEOPLE WHO YOU INTERACTED WITH WERE

03:32PM  11   MEMBERS OF THE WALTON FAMILY; CORRECT?

03:32PM  12   A.   THAT IS CORRECT.

03:32PM  13   Q.   AND THOSE ARE HEIRS OF THE WAL-MART FORTUNE, IF YOU WILL?

03:32PM  14   A.   THEY ARE, THEY ARE DECEDENTS OF SAM WALTON.

03:33PM  15   Q.   AND THE PEOPLE WHO YOU INTERACTED THERE WERE ROB WALTON;

03:33PM  16   CORRECT?

03:33PM  17   A.   CORRECT.

03:33PM  18   Q.   AND THAT WOULD BE SAM WALTON'S SON; IS THAT RIGHT?

03:33PM  19   A.   THAT IS CORRECT.

03:33PM  20   Q.   AND AT THE TIME OF THE THERANOS INVESTMENT, HE WAS THE

03:33PM  21   CHAIRMAN OF THE BOARD OF WAL-MART; IS THAT CORRECT?

03:33PM  22   A.   YES, I BELIEVE THAT'S CORRECT.

03:33PM  23   Q.   AND YOU INTERACTED WITH GREG PENNER; CORRECT?

03:33PM  24   A.   I DID.

03:33PM  25   Q.   AND GREG PENNER AT THE TIME WAS THE VICE CHAIRMAN OF

MOSLEY CROSS BY MR. WADE                                                    5158

```
03:33PM   1     WAL-MART CORPORATION; CORRECT?

03:33PM   2     A.   I BELIEVE HE WAS.

03:33PM   3     Q.   AND HE'S NOW THE CHAIRMAN OF WAL-MART CORPORATION;

03:33PM   4     CORRECT?

03:33PM   5     A.   HE IS.

03:33PM   6     Q.   AND HE IS THE SON-IN-LAW OF ROB WALTON?

03:33PM   7     A.   THAT'S CORRECT.

03:33PM   8     Q.   SO KIND OF THE THIRD GENERATION IF YOU WILL?

03:33PM   9     A.   THIRD GENERATION STARTING WITH SAM WALTON, YES.

03:33PM  10     Q.   OKAY.  AND IN ADDITION TO THAT, YOU INTERACTED A BIT WITH

03:33PM  11     ALICE WALTON AS WELL; CORRECT?

03:33PM  12     A.   I DID.

03:33PM  13     Q.   AND ALICE WALTON IS ALSO AN HEIR OF SAM WALTON; CORRECT?

03:33PM  14     A.   SHE IS ONE OF -- SHE IS ROB WALTON'S SISTER.

03:34PM  15     Q.   OKAY.  THAT'S ONE SET OF CLIENTS WHO YOU INTERACTED WITH

03:34PM  16     ON THERANOS; CORRECT?

03:34PM  17     A.   THAT'S CORRECT.

03:34PM  18     Q.   AND DO YOU RECALL THAT THEY INVESTED COLLECTIVELY ABOUT

03:34PM  19     $150 MILLION?

03:34PM  20     A.   I BELIEVE -- YOU KNOW, I WASN'T INVOLVED IN THEIR DECISION

03:34PM  21     AS TO HOW MUCH TO INVEST, BUT I THINK -- THAT'S WHAT I BELIEVE

03:34PM  22     THEY DID INVEST.

03:34PM  23     Q.   OKAY.

03:34PM  24     A.   I CERTAINLY HAVE HEARD THAT.

03:34PM  25     Q.   OKAY.  AND YOU ALSO INTERACTED A BIT WITH THE DEVOS
```

MOSLEY CROSS BY MR. WADE                                          5159

03:34PM  1    FAMILY; CORRECT?

03:34PM  2    A.   THAT IS CORRECT.

03:34PM  3    Q.   AND YOU'VE DONE WORK FOR THE DEVOS FAMILY FOR A LONG TIME

03:34PM  4    AS WELL; CORRECT?

03:34PM  5    A.   YES.

03:34PM  6    Q.   DECADES?

03:34PM  7    A.   UH, YES.

03:34PM  8    Q.   AND THEY HAVE A FAMILY OFFICE.  ARE YOU AWARE OF THAT?

03:34PM  9    A.   THEY DO, YES.

03:34PM  10   Q.   AND THAT'S RDV CORPORATION?

03:34PM  11   A.   THAT IS CORRECT.

03:34PM  12   Q.   AND THAT IS RUN BY A GENTLEMAN NAMED JERRY TUBERGEN;

03:34PM  13   CORRECT?

03:34PM  14   A.   AT THE TIME IT WAS, YES.

03:34PM  15   Q.   AND MR. TUBERGEN WAS A PERSON WHO YOU INTERACTED WITH IN

03:34PM  16   CONNECTION WITH THERANOS; CORRECT?

03:35PM  17   A.   YES.

03:35PM  18   Q.   DID YOU INTERACT WITH ANY OF THE DEVOS FAMILY MEMBERS

03:35PM  19   THEMSELVES WITH RESPECT TO THERANOS?

03:35PM  20   A.   YOU KNOW, I MAY HAVE AT ONE POINT HAD A CONVERSATION

03:35PM  21   CASUALLY WITH ONE OR MORE OF THEM BECAUSE THEY ASKED ME ABOUT

03:35PM  22   IT, BUT PRIMARILY I INTERACTED WITH -- I JUST INTRODUCED

03:35PM  23   JERRY TUBERGEN TO ELIZABETH HOLMES AND THE COMPANY.

03:35PM  24   Q.   OKAY.  WE'LL COME BACK TO SOME OF THE SPECIFICS.

03:35PM  25   A.   SURE.

                    MOSLEY CROSS BY MR. WADE                          5160

03:35PM   1    Q.   BUT THAT WAS -- THOSE WERE CLIENTS OF YOURS; RIGHT?

03:35PM   2    A.   THE DEVOS FAMILY WERE CLIENTS OF MINE.

03:35PM   3    Q.   AND YOU'RE AWARE THAT THEY INVESTED $100 MILLION IN

03:35PM   4    THERANOS; CORRECT?

03:35PM   5    A.   YOU KNOW, I WASN'T INVOLVED, BUT I DO -- THAT IS THE

03:35PM   6    NUMBER THAT I HAVE HEARD THAT THEY INVESTED, YES.

03:35PM   7    Q.   OKAY.  AND YOU ALSO INTERACTED WITH MEMBERS OF THE COX

03:35PM   8    FAMILY IN CONNECTION WITH THERANOS AS WELL; RIGHT?

03:35PM   9    A.   YES, I ALSO INTRODUCED MEMBERS OF THE COX FAMILY TO

03:35PM  10    THERANOS.

03:35PM  11    Q.   AND, AND IS THE COX FAMILY, IS THAT THE TED TURNER FAMILY?

03:36PM  12    IS THAT --

03:36PM  13    A.   NO, IT'S NOT.

03:36PM  14    Q.   OKAY.  TELL ME WHAT THE COX FAMILY IS?

03:36PM  15    A.   THEY OWN COX CABLE, COX ENTERPRISES.

03:36PM  16    Q.   IS THAT BASED IN ATLANTA?

03:36PM  17    A.   YES, IT IS.

03:36PM  18    Q.   AND YOU INTERACTED THERE WITH ALEX TAYLOR; IS THAT

03:36PM  19    CORRECT?

03:36PM  20    A.   THAT IS CORRECT.

03:36PM  21    Q.   AND JOHN DYER?

03:36PM  22    A.   THAT IS CORRECT.

03:36PM  23    Q.   AND IS THAT A CLIENT OF YOURS?  THOSE ARE CLIENTS OF

03:36PM  24    YOURS?

03:36PM  25    A.   YES, THE COX FAMILY WERE CLIENTS OF MINE.

MOSLEY CROSS BY MR. WADE                                          5161

03:36PM   1    Q.   OKAY.  IN ADDITION TO THAT, YOU HAD SOME DEALINGS WITH

03:36PM   2    MR. DRACOPOULOS; IS THAT RIGHT?

03:36PM   3    A.   THAT IS CORRECT.

03:36PM   4    Q.   AND HIS FIRST NAME IS ANDREAS?

03:36PM   5    A.   THAT IS CORRECT.

03:36PM   6    Q.   AND WHO IS MR. DRACOPOULOS?

03:36PM   7    A.   HE IS A RELATIVE OF THE LATE STAVROS NIARCHOS.

03:36PM   8    Q.   IS THAT THE GREEK SHIPPING MAGNATE?

03:36PM   9    A.   IT IS.

03:36PM  10    Q.   AND HE WAS A CLIENT OF YOURS FOR A PERIOD OF TIME BEFORE

03:37PM  11    YOU STARTED INTERACTING WITH THERANOS; IS THAT RIGHT?

03:37PM  12    A.   HE WAS.

03:37PM  13    Q.   AND YOU INTERACTED WITH JOHN ELKANN A BIT AS WELL, DID YOU

03:37PM  14    NOT?

03:37PM  15    A.   YES, I DID AT SOME POINT.

03:37PM  16    Q.   AND IS JOHN ELKANN A CLIENT OF YOURS?

03:37PM  17    A.   NO, HE IS NOT.

03:37PM  18    Q.   AND DO YOU KNOW HOW YOU CAME TO INTERACT WITH JOHN ELKANN

03:37PM  19    AS A RESULT OF THERANOS MATTERS?

03:37PM  20    A.   HE WAS A MEMBER OF A FAMILY THAT DR. KISSINGER HAD HAD A

03:37PM  21    LONG ASSOCIATION WITH, AND I THINK -- I DON'T REALLY KNOW, BUT

03:37PM  22    I SUSPECT THAT DR. KISSINGER MAY HAVE INTRODUCED HIM TO

03:37PM  23    ELIZABETH AND THERANOS.

03:37PM  24    Q.   OKAY.  AND IS -- AND DID DR. KISSINGER ASK YOU TO INTERACT

03:37PM  25    WITH MR. ELKANN?

MOSLEY CROSS BY MR. WADE                                    5162

03:37PM   1    A.   NO.

03:38PM   2    Q.   DO YOU KNOW WHO MR. ELKANN IS, WHAT HIS BACKGROUND IS?

03:38PM   3    A.   HE IS A MEMBER OF THE -- I DO KNOW THAT HE'S A MEMBER OF

03:38PM   4    THE ANGNELLI FAMILY FROM ITALY.

03:38PM   5    Q.   AND IS THAT THE FIAT RELATED FAMILY?

03:38PM   6    A.   IT IS.

03:38PM   7    Q.   OKAY.  AND, OF COURSE, YOU INTERACTED WITH DR. KISSINGER;

03:38PM   8    RIGHT?

03:38PM   9    A.   YES, I DID.

03:38PM   10   Q.   I THINK YOU SAID HE'S BEEN A CLIENT OF YOURS FOR DECADES?

03:38PM   11   A.   FOR A VERY LONG TIME.

03:38PM   12   Q.   OKAY.  AND IN ADDITION TO MR. DRACOPOULOS, IS THERE A

03:38PM   13   FOUNDATION THAT HE'S AFFILIATED WITH?

03:38PM   14   A.   YES.

03:38PM   15   Q.   AND WHAT IS THAT FOUNDATION?

03:38PM   16   A.   THE STAVROS NIARCHOS FOUNDATION.

03:38PM   17   Q.   AND YOU REPRESENTED THAT FOUNDATION AS WELL?

03:38PM   18   A.   I DID NOT.

03:38PM   19   Q.   YOU DID NOT?

03:38PM   20   A.   I DID NOT.

03:38PM   21   Q.   AND YOU'VE ALSO DONE LEGAL WORK FOR BDT; CORRECT?

03:38PM   22   A.   AT THIS POINT I DON'T THINK I HAD PERSONALLY DONE ANY WORK

03:39PM   23   FOR BDT WHATSOEVER.

03:39PM   24   Q.   OKAY.  I THINK I FAILED TO ASK WITH RESPECT TO

03:39PM   25   MR. DRACOPOULOS, YOU'RE AWARE THAT HE INVESTED $25 MILLION?

MOSLEY CROSS BY MR. WADE                                    5163

03:39PM   1      A.   YES.

03:39PM   2      Q.   AND ARE YOU AWARE THAT MR. ELKANN INVESTED $5 MILLION?

03:39PM   3      A.   ONLY BECAUSE SOMEBODY SAID IT AT SOME POINT.

03:39PM   4      Q.   OKAY.  AND MR. -- DR. KISSINGER, HE HAD SOME TRUSTS;

03:39PM   5      CORRECT?

03:39PM   6      A.   YES.

03:39PM   7      Q.   AND YOU'RE THE TRUSTEE OF SOME OF THOSE TRUSTS; CORRECT?

03:39PM   8      A.   I AM.

03:39PM   9      Q.   AND ONE OF HIS -- THE TRUSTS THAT YOU'RE A TRUSTEE FOR

03:39PM   10     INVESTED $3 MILLION; CORRECT?

03:39PM   11     A.   I THINK THAT'S RIGHT.

03:39PM   12     Q.   OKAY.  AND YOU'RE, OF COURSE, AWARE THAT IN CONNECTION

03:39PM   13     WITH SOME OF THESE MATTERS, YOU HAD ATTORNEY-CLIENT

03:39PM   14     COMMUNICATIONS; RIGHT?

03:39PM   15            MR. SCHENK:  OBJECTION.  RELEVANCE.

03:40PM   16            MR. WADE:  I JUST WANT TO SET THE FRAME SO THE

03:40PM   17     WITNESS UNDERSTANDS WHAT I'M NOT ASKING FOR WHEN I ASK

03:40PM   18     QUESTIONS.

03:40PM   19        I DON'T WANT ANY PRIVILEGED COMMUNICATIONS.  THAT'S THE

03:40PM   20     POINT.

03:40PM   21            THE COURT:  OKAY.  MAYBE YOU SHOULD PREFACE YOUR

03:40PM   22     QUESTION LIKE THAT.

03:40PM   23            MR. WADE:  SURE.

03:40PM   24     Q.   RECOGNIZING THAT YOU'RE A LAWYER AND YOU HAVE YOUR ETHICAL

03:40PM   25     OBLIGATIONS, I DON'T WANT TO -- WHEN I ASK YOU QUESTIONS THAT

MOSLEY CROSS BY MR. WADE                                    5164

03:40PM 1    RELATE TO ANY OF THESE CLIENTS, I'M NOT SEEKING ANY -- THE

03:40PM 2    CONTENTS OF ANY ATTORNEY-CLIENT COMMUNICATIONS.  OKAY?

03:40PM 3    A.  I UNDERSTAND.

03:40PM 4    Q.  OKAY.  AND IF THERE'S EVER ANY UNCERTAINTY THAT YOU HAVE

03:40PM 5    IN YOUR MIND AS TO WHETHER ANY OF THE QUESTIONS THAT I SEEK

03:40PM 6    CALL FOR SUCH INFORMATION, I ASSURE YOU IT'S NOT INTENTIONAL.

03:40PM 7    BUT LET'S BE CAUTIOUS THERE.  OKAY?

03:40PM 8    A.  I UNDERSTAND.

03:40PM 9    Q.  OKAY.

03:40PM 10          THE COURT:  SO TO THAT REGARD, SIR, IF YOU FEEL YOU

03:40PM 11   NEED TO EXERCISE A PRIVILEGE, YOU SHOULD DO SO.

03:40PM 12          THE WITNESS:  OKAY.  THANK YOU.

03:41PM 13   BY MR. WADE:

03:41PM 14   Q.  I BELIEVE IN YOUR DIRECT EXAMINATION YOU TESTIFIED THAT

03:41PM 15   YOU WERE ASKED BY DR. KISSINGER TO LOOK INTO THERANOS A BIT; IS

03:41PM 16   THAT RIGHT?

03:41PM 17   A.  THAT'S CORRECT.

03:41PM 18   Q.  NOW, YOU'RE AWARE THAT DR. KISSINGER WAS ON THE BOARD OF

03:41PM 19   THERANOS; RIGHT?

03:41PM 20   A.  YES.

03:41PM 21   Q.  WITHOUT REVEALING ANY PRIVILEGED COMMUNICATIONS, DO YOU

03:41PM 22   KNOW WHY IT IS THAT HE WAS ASKING YOU TO LOOK INTO THIS FROM AN

03:41PM 23   INVESTMENT STANDPOINT?

03:41PM 24          MR. SCHENK:  SPECULATION.

03:41PM 25          THE COURT:  SUSTAINED.

MOSLEY CROSS BY MR. WADE                                         5165

03:41PM   1    BY MR. WADE:

03:41PM   2    Q.   DO YOU KNOW WHY DR. KISSINGER -- DO YOU HAVE AN

03:41PM   3    UNDERSTANDING, BASED ON YOUR COMMUNICATIONS WITH DR. KISSINGER,

03:41PM   4    WHY IT WAS THAT HE WAS ASKING YOU TO DO THIS?

03:42PM   5    A.   HE SIMPLY WANTED MY VIEWS ON THE COMPANY AND -- AND ON THE

03:42PM   6    COMPANY IN GENERAL.

03:42PM   7    Q.   OKAY.  COULD I CALL YOUR ATTENTION TO EXHIBIT --

03:42PM   8         MAY I APPROACH, YOUR HONOR?

03:42PM   9              THE COURT:  YES.

03:42PM   10   BY MR. WADE:

03:42PM   11   Q.   (HANDING.)

03:42PM   12        I'VE HANDED YOU A COUPLE MORE BINDERS.  I KNOW YOU HAVE A

03:43PM   13   GROWING COLLECTION UP THERE.

03:43PM   14   A.   I DO.

03:43PM   15   Q.   I GUESS THAT'S THE LIFE OF A LAWYER, RIGHT?

03:43PM   16        COULD I ASK YOU TO TURN YOUR ATTENTION TO EXHIBIT 4162.

03:43PM   17        DO YOU HAVE THAT DOCUMENT IN FRONT OF YOU?

03:43PM   18   A.   I DO.

03:43PM   19   Q.   AND DO YOU RECOGNIZE THIS -- THE ATTACHMENT TO THIS

03:43PM   20   LETTER?  HAVE YOU SEEN THIS LETTER BEFORE?

03:43PM   21   A.   I DON'T REMEMBER.

03:44PM   22   Q.   DO YOU RECALL THAT IN JULY OF 2014, MR. -- THE

03:44PM   23   STAVROS NIARCHOS FOUNDATION ASKED YOU TO ENGAGE WITH THERANOS

03:44PM   24   ABOUT THE POTENTIAL INVESTMENT BY THE FOUNDATION?

03:44PM   25   A.   COULD YOU RESTATE THAT?  I DIDN'T QUITE UNDERSTAND THE

MOSLEY CROSS BY MR. WADE                                    5166

03:44PM   1    QUESTION.

03:44PM   2    Q.   YES.  DO YOU RECALL BEING ASKED BY THE STAVROS NIARCHOS

03:44PM   3    FOUNDATION TO ENGAGE WITH THERANOS IN CONNECTION WITH A

03:44PM   4    POSSIBLE INVESTMENT BY THE FOUNDATION IN THERANOS?

03:44PM   5    A.   I DON'T REMEMBER BEING ASKED TO BE ENGAGED IN THE SENSE OF

03:45PM   6    TO REPRESENT THEM AS A LAWYER IN CONNECTION WITH IT.  IS THAT

03:45PM   7    WHAT YOU'RE ASKING?

03:45PM   8    Q.   DO YOU RECALL BEING ASKED BY THE FOUNDATION TO ENGAGE IN

03:45PM   9    ANY WAY WITH THE POTENTIAL INVESTMENT IN THERANOS?

03:45PM  10    A.   YES, I THINK THEY ASKED ME TO PARTICIPATE IN THE

03:45PM  11    INTRODUCTION TO ELIZABETH HOLMES AND TO THE COMPANY.

03:45PM  12    Q.   OKAY.  AND AT THE TIME, HAD YOU MET MS. HOLMES?

03:45PM  13    A.   ON JULY THE 14TH, I HAD NOT.

03:45PM  14    Q.   OKAY.

03:45PM  15         I'LL MOVE THE ADMISSION OF 4162.

03:45PM  16              MR. SCHENK:  YOUR HONOR, FOUNDATION.  HEARSAY.

03:45PM  17              THE COURT:  CAN YOU LAY A LITTLE MORE FOUNDATION ON

03:45PM  18    THIS?

03:45PM  19              MR. WADE:  I CAN SKIP THE DOCUMENT.  I WAS JUST

03:45PM  20    DOING IT FOR THE CLARITY OF THE WITNESS.

03:45PM  21              THE COURT:  SURE.

03:45PM  22    BY MR. WADE:

03:45PM  23    Q.   DO YOU RECALL WHAT THE FOUNDATION ASKED YOU TO DO IN JULY

03:45PM  24    OF 2014?

03:45PM  25    A.   THEY ASKED ME TO HELP INTRODUCE THEM TO ELIZABETH HOLMES

MOSLEY CROSS BY MR. WADE                                    5167

03:45PM  1    AND THE COMPANY.

03:45PM  2    Q.   OKAY.  AND AT THIS POINT, THIS WAS BEFORE YOU HAD HAD ANY

03:46PM  3    OF THE INTERACTIONS RELATING TO THE KISSINGER ASSIGNMENT I

03:46PM  4    BELIEVE; ISN'T THAT RIGHT?

03:46PM  5    A.   NO.  I BELIEVE IT WAS -- YOU KNOW, I COULD BE WRONG ABOUT

03:46PM  6    THIS, BUT I BELIEVE IT WAS AFTER DR. KISSINGER HAD ASKED ME TO

03:46PM  7    BEGIN LOOKING AT THERANOS AND GIVE HIM MY VIEWS.

03:46PM  8    Q.   OKAY.  AND WAS THIS A MEETING THAT WAS FACILITATED -- OR

03:46PM  9    AN ENGAGEMENT BY YOU THAT WAS FACILITATED BY DR. KISSINGER?

03:46PM  10   A.   I'M NOT SURE WHAT YOU MEAN BY THAT.

03:46PM  11   Q.   DID DR. KISSINGER ASK YOU TO ENGAGE ON THIS?

03:46PM  12   A.   YOU KNOW, I THINK I MAY HAVE KNOWN THAT HE WANTED TO LET

03:46PM  13   SOME OF THE PEOPLE THAT HE HAD HAD A LONG ASSOCIATION WITH KNOW

03:46PM  14   ABOUT THIS OPPORTUNITY, AND I DON'T REMEMBER SPECIFICALLY, BUT

03:46PM  15   HE MIGHT WELL HAVE SAID TO ME, CAN YOU HELP ME IN TALKING TO

03:47PM  16   PEOPLE AT THE NIARCHOS FOUNDATION.

03:47PM  17   Q.   AND YOU HAD NOT DONE -- THE NIARCHOS FOUNDATION WAS NOT A

03:47PM  18   CLIENT OF YOURS AT THE TIME?

03:47PM  19   A.   I DON'T BELIEVE SO.  ANDREAS DRACOPOULOS WAS A CLIENT AND

03:47PM  20   HE WAS THE CO-CEO OF THE FOUNDATION.

03:47PM  21       I DON'T REMEMBER WHETHER I, YOU KNOW, I CERTAINLY DIDN'T

03:47PM  22   THINK OF THEM AS A CLIENT.  BUT I MIGHT WELL HAVE GIVEN HIM

03:47PM  23   ADVICE, OR SOMEBODY ELSE.  BUT I REALLY DON'T HAVE A COMPLETE

03:47PM  24   RECOLLECTION OF EVERYTHING.

03:47PM  25   Q.   OKAY.  WELL, WE'LL GO THROUGH SOME DOCUMENTS AND SEE IF WE

MOSLEY CROSS BY MR. WADE                                    5168

03:47PM   1     CAN REFRESH YOU.

03:47PM   2     A.   OKAY.  SURE.

03:47PM   3     Q.   THE NEXT, THE NEXT COMMUNICATION -- IF I COULD TURN YOUR

03:47PM   4     ATTENTION TO 4163, WHICH I BELIEVE IS IN EVIDENCE.

03:47PM   5             THE CLERK:  CORRECT.

03:48PM   6             MR. WADE:  PERMISSION TO PUBLISH?

03:48PM   7             THE COURT:  YES.

03:48PM   8     BY MR. WADE:

03:48PM   9     Q.   AND THIS IS RIGHT AROUND THE TIME WHEN YOU'RE BEING

03:48PM   10    ENGAGED WITH -- BY DR. KISSINGER FOR THE ASSIGNMENT THAT YOU

03:48PM   11    DISCUSSED; IS THAT RIGHT?

03:48PM   12    A.   YES, IT WAS.

03:48PM   13    Q.   AND AMONG THE FIRST THINGS THAT YOU DID, YOU HAD AN

03:48PM   14    INITIAL CONVERSATION WITH MS. HOLMES; IS THAT RIGHT?

03:48PM   15    A.   THAT IS CORRECT.

03:48PM   16    Q.   AND WAS THAT A BRIEF CONVERSATION?

03:48PM   17    A.   I DON'T REMEMBER HOW LONG THE CONVERSATION WAS.

03:48PM   18    Q.   IT WAS THE FIRST ONE THAT YOU HAD HAD WITH HER; IS THAT

03:48PM   19    RIGHT?

03:48PM   20    A.   IT WAS.

03:48PM   21    Q.   OKAY.  YOU HADN'T MET HER BEFORE; IS THAT RIGHT?

03:48PM   22    A.   NO, I HAD NOT.

03:48PM   23    Q.   OKAY.  IN THE SHORT TIME, IT LOOKS LIKE WITHIN THE NEXT

03:48PM   24    DAY YOU WERE REACHING OUT TO MEMBERS OF THE WALTON FAMILY;

03:48PM   25    CORRECT?

MOSLEY CROSS BY MR. WADE                                    5169

03:48PM   1    A.  I DON'T KNOW HOW MUCH TIME WAS IN BETWEEN MY CONVERSATION

03:49PM   2    WITH HER AND REACHING OUT TO GREG PENNER.  I DON'T KNOW HOW

03:49PM   3    MUCH TIME.

03:49PM   4    Q.  YOU SEE WHERE IT SAYS, "AS WE SPOKE YESTERDAY, I REACHED"?

03:49PM   5    A.  ALL RIGHT.  THEN MAYBE IT MEANS THE NEXT DAY.

03:49PM   6    Q.  OKAY.  SO YOU PRETTY QUICKLY REACHED OUT TO THE WALTON

03:49PM   7    FAMILY; CORRECT?

03:49PM   8    A.  YES.

03:49PM   9    Q.  AND MR. PENNER IS ACTUALLY -- HE RUNS A PRIVATE EQUITY

03:49PM  10    FUND AS WELL?

03:49PM  11    A.  YES, HE RUNS HIS PRIVATE INVESTMENT FIRM BY THE NAME OF

03:49PM  12    MADRONE.

03:49PM  13    Q.  AND THAT'S BASED SOMEWHERE HERE IN SILICON VALLEY?

03:49PM  14    A.  IT IS.

03:49PM  15    Q.  OKAY.  AND YOU REACHED OUT TO HIM IMMEDIATELY AND YOU WERE

03:49PM  16    WORKING TO FACILITATE PUTTING MS. HOLMES IN CONTACT WITH

03:49PM  17    MR. PENNER; CORRECT?

03:49PM  18    A.  I -- YES.

03:49PM  19    Q.  OKAY.  CAN I CALL YOUR ATTENTION TO 14129.

03:50PM  20    A.  IS THAT IN VOLUME 2?  IT IS.

03:50PM  21    Q.  I BELIEVE IT IS, YES.

03:50PM  22    A.  OKAY.

03:50PM  23    Q.  DO YOU HAVE THAT ONE IN FRONT OF YOU?

03:50PM  24    A.  I DO.

03:50PM  25    Q.  AND DO YOU SEE THAT'S A FOLLOW-UP EMAIL TO THIS CHAIN

MOSLEY CROSS BY MR. WADE                                          5170

03:50PM   1     ABOUT A WEEK LATER?

03:50PM   2     A.   YES.

03:50PM   3              MR. WADE:  MOVE THE ADMISSION OF 14129.

03:50PM   4              MR. SCHENK:  NO OBJECTION.

03:50PM   5              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:50PM   6         (DEFENDANT'S EXHIBIT 14129 WAS RECEIVED IN EVIDENCE.)

03:50PM   7     BY MR. WADE:

03:50PM   8     Q.   AND DO YOU SEE THE BOTTOM EMAIL THERE, IT'S THE SAME EMAIL

03:50PM   9     THAT WE WERE JUST LOOKING AT?

03:50PM   10    A.   THAT'S CORRECT.

03:50PM   11    Q.   AND LET'S FOCUS ON THE EMAIL UP THE CHAIN.

03:51PM   12    A.   UH-HUH.

03:51PM   13    Q.   AND DO YOU INFER FROM THIS EMAIL THAT ABOUT A WEEK HAD

03:51PM   14    PASSED AND MS. HOLMES APPEARS TO NOT HAVE FOLLOWED UP WITH

03:51PM   15    MR. PENNER?

03:51PM   16    A.   YES.

03:51PM   17    Q.   AND YOU WERE FOLLOWING UP TO CHECK IN?

03:51PM   18    A.   WELL, I POINTED OUT THAT I HADN'T RECEIVED THE MATERIALS

03:51PM   19    AND WAS LOOKING OUT FOR THEM, AND THAT GREG PENNER WAS DOING

03:51PM   20    THE SAME.

03:51PM   21    Q.   RIGHT.  YOU PROVIDED AN INTRODUCTION TO MR. PENNER, AND HE

03:51PM   22    HAD NOT GOTTEN THE BINDERS; RIGHT?

03:51PM   23    A.   THAT IS CORRECT.

03:51PM   24    Q.   AND YOU HADN'T GOTTEN THEM EITHER; IS THAT CORRECT?

03:51PM   25    A.   THAT IS CORRECT.

MOSLEY CROSS BY MR. WADE                                                5171

03:51PM  1    Q.   AND DO YOU SEE IN THAT SECOND LINE IT SAYS, "ROB WALTON

03:51PM  2    RAN INTO ONE OF YOUR BOARD MEMBERS OVER THE WEEKEND AT THE

03:51PM  3    GROVE"?

03:51PM  4    A.   YES.

03:51PM  5    Q.   AND WHAT IS THE GROVE?  DO YOU KNOW?

03:51PM  6    A.   YOU KNOW, I'M NOT -- I'M CERTAINLY BY NO MEANS AN EXPERT

03:51PM  7    ON THE GROVE, BUT I THINK IT'S A GROUP OF PEOPLE THAT GET

03:51PM  8    TOGETHER IN CALIFORNIA ON A PERIODIC BASIS.

03:51PM  9    Q.   AND IS IT MOSTLY PROMINENT FAMILIES?

03:52PM 10    A.   IT IS, PROMINENT INDIVIDUALS.

03:52PM 11    Q.   PROMINENT INDIVIDUALS, PRESIDENTS AND SENATORS AND THE

03:52PM 12    LIKE?

03:52PM 13    A.   RIGHT.

03:52PM 14    Q.   AND ARE YOU AWARE -- WITHOUT REVEALING PRIVILEGED

03:52PM 15    INFORMATION, ARE YOU AWARE OF WHO MR. WALTON SPOKE WITH AT THE

03:52PM 16    GROVE ABOUT THERANOS?

03:52PM 17    A.   NO.

03:52PM 18    Q.   OKAY.  AND IT APPEARED, AS A RESULT OF THESE INTERACTIONS,

03:52PM 19    THAT MR. WALTON AND MR. PENNER WERE EAGER TO RECEIVE

03:52PM 20    INFORMATION ABOUT THERANOS; CORRECT?

03:52PM 21    A.   THAT'S SORT OF WHAT IS IMPLIED HERE, YES.

03:52PM 22    Q.   AND GIVEN THAT YOU HAD PROVIDED THE INTRODUCTION, YOU WERE

03:52PM 23    TRYING TO ENCOURAGE THAT ALONG; IS THAT RIGHT?

03:52PM 24    A.   WELL, I OBVIOUSLY POINTED OUT THE FIRST THING WAS THAT I

03:52PM 25    HAD NOT RECEIVED THE MATERIALS, AND THEN I NOTED THAT NEITHER

MOSLEY CROSS BY MR. WADE                                                5172

03:52PM   1    HAD GREG PENNER.

03:52PM   2    Q.   AND WERE YOU EAGER IN THIS PERIOD TO RECEIVE THE

03:53PM   3    MATERIALS?

03:53PM   4    A.   I WAS LOOKING FORWARD TO RECEIVING THE MATERIALS.

03:53PM   5    Q.   OKAY.  IF I CAN -- DO YOU KNOW WHEN YOU NEXT SPOKE TO

03:53PM   6    MS. HOLMES?

03:53PM   7    A.   I DON'T.

03:53PM   8    Q.   AND CAN YOU -- LET'S LOOK AT 14130.  AND I CAN JUST ASK,

03:53PM   9    DOES THIS REFRESH YOUR RECOLLECTION THAT YOU NEXT SPOKE WITH

03:53PM   10   MS. HOLMES IN MID-AUGUST OF 2014?

03:53PM   11   A.   YOU KNOW, IT'S A MESSAGE SLIP FROM CRAVATH SAYING THAT

03:53PM   12   ELIZABETH HOLMES HAD CALLED, AND IT SAYS "PLEASE CALL HER ON

03:53PM   13   MONDAY" IS WHAT I'M LOOKING AT IF I'M ON THE RIGHT -- 14130?

03:54PM   14   Q.   YEAH.

03:54PM   15        I MOVE THE ADMISSION OF 14130?

03:54PM   16             THE COURT:  ANY OBJECTION?

03:54PM   17             MR. SCHENK:  NO OBJECTION.

03:54PM   18             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:54PM   19        (DEFENDANT'S EXHIBIT 14130 WAS RECEIVED IN EVIDENCE.)

03:54PM   20   BY MR. WADE:

03:54PM   21   Q.   THIS IS A MESSAGE SLIP FROM YOUR SECRETARY?

03:54PM   22   A.   UM, SHE WASN'T ACTUALLY MY SECRETARY, BUT SHE WAS IN THE

03:54PM   23   SUITE THAT I WAS LOCATED.

03:54PM   24   Q.   OKAY.  SO AN ASSISTANT WHO WAS HELPING SUPPORT YOU?

03:54PM   25   A.   YES.

MOSLEY CROSS BY MR. WADE                                          5173

03:54PM  1    Q.   AND SHE WAS ASKING FOR YOU TO CALL MS. HOLMES; CORRECT?

03:54PM  2    A.   YEAH, IT APPEARS TO BE AN INDICATION THAT ELIZABETH HAD

03:54PM  3    CALLED ME AND LEFT A TELEPHONE NUMBER AND SAID PLEASE CALL ME

03:54PM  4    ON MONDAY.

03:54PM  5    Q.   AND DO YOU RECALL WHEN THE NEXT INTERACTION WAS?

03:54PM  6    A.   I DON'T SPECIFICALLY RECALL.

03:54PM  7    Q.   OKAY.  LET'S TAKE A LOOK AT 4173.

03:55PM  8    A.   I'M THERE.

03:55PM  9    Q.   AND THAT'S IN EVIDENCE.

03:55PM  10        PERMISSION TO PUBLISH, YOUR HONOR?

03:55PM  11           THE COURT:  YES.

03:55PM  12   BY MR. WADE:

03:55PM  13   Q.   AND I THINK MR. SCHENK ASKED YOU SOME QUESTIONS ABOUT

03:55PM  14   THIS.

03:55PM  15        DO YOU RECALL?

03:55PM  16   A.   I DO.

03:55PM  17   Q.   AND THIS WAS THE COVER CORRESPONDENCE FOR THE BINDERS THAT

03:55PM  18   YOU RECEIVED; IS THAT RIGHT?

03:55PM  19   A.   I BELIEVE IT WAS.

03:55PM  20   Q.   OKAY.  AND I'M GOING TO OFFER -- I ONLY HAVE ONE COPY,

03:55PM  21   THANKFULLY, OF THIS.

03:55PM  22        YOUR HONOR, I'VE GIVEN THE GOVERNMENT NOTICE.

03:55PM  23        YOUR HONOR, I BELIEVE THIS IS JUST THE FULL BINDER SET, SO

03:55PM  24   IF HE ADMITS IT, WE'LL JUST DISPLAY IT ELECTRONICALLY TO SAVE

03:56PM  25   PAPER.

MOSLEY CROSS BY MR. WADE                                          5174

03:56PM  1                    THE COURT:  ALL RIGHT.

03:56PM  2              YOU HAVE A COPY OF THIS, MR. SCHENK?

03:56PM  3                    MR. SCHENK:  I HAVE AN ELECTRONIC COPY, YES.

03:56PM  4                    THE COURT:  OKAY.  THAT'S FINE.

03:56PM  5                    MR. WADE:  AND I HAVE AN ELECTRONIC COPY IF THE

03:56PM  6       COURT WOULD LIKE ONE, TOO.

03:56PM  7                    THE COURT:  THAT'S FINE.  GO AHEAD.

03:56PM  8                    MR. WADE:  MAY I APPROACH?

03:56PM  9                    THE COURT:  YES.

03:56PM  10                   MR. WADE:  (HANDING.)

03:56PM  11                   THE WITNESS:  THANK YOU.

03:56PM  12      BY MR. WADE:

03:56PM  13      Q.  NOW, I'VE HANDED YOU THREE VOLUMES OF DOCUMENTS.  I THINK

03:56PM  14      IF YOU, IF YOU LOOK AT THEM, YOU'LL NOTICE THAT THEY'RE BATES

03:56PM  15      LABELLED WITH THE MOSLEY BATES LABEL.

03:56PM  16         AND DO YOU RECOGNIZE THIS TO BE THE COMPLETE COLLECTION OF

03:56PM  17      MATERIALS THAT WAS SENT TO YOU BY?

03:57PM  18      A.  IT PROBABLY IS.  I CAN'T -- I MEAN, THAT WAS SEVEN YEARS

03:57PM  19      AGO AND I CAN'T -- BUT IT LOOKS LIKE -- IT LOOKS LIKE WHAT I

03:57PM  20      THINK I RECEIVED.

03:57PM  21      Q.  OKAY.

03:57PM  22                   MR. WADE:  MOVE THE ADMISSION OF 4173 -- I'M SORRY,

03:57PM  23      OF --

03:57PM  24                   THE COURT:  4173?

03:57PM  25                   MR. WADE:  I'M SORRY.

MOSLEY CROSS BY MR. WADE                                          5175

03:57PM  1    Q.   CAN YOU IDENTIFY THE EXHIBIT THAT I JUST -- IT'S ON THE

03:57PM  2    BINDER COVER.

03:57PM  3    A.   IT'S TX 14206.

03:57PM  4    Q.   14206.

03:57PM  5         MOVE THE ADMISSION OF 14206.

03:57PM  6              THE COURT:   14206?  I'M SORRY, MR. SCHENK?

03:57PM  7              MR. SCHENK:   NO OBJECTION.

03:57PM  8              THE COURT:   14206 CONSISTS OF THREE BINDERS?

03:57PM  9              MR. WADE:   THREE BINDERS, YES.

03:57PM  10             THE COURT:   THANK YOU.  IT'S ADMITTED, AND YOU CAN

03:57PM  11   PUBLISH THEM AS YOU EXAMINE.

03:57PM  12        (DEFENDANT'S EXHIBIT 14206 WAS RECEIVED IN EVIDENCE.)

03:57PM  13   BY MR. WADE:

03:57PM  14   Q.   LET ME GO BACK TO THE LETTER, 4173.

03:57PM  15        NOW, THESE BINDERS WERE SENT TO YOU, AND WHEN YOU HAD

03:58PM  16   DISCUSSIONS WITH MS. HOLMES, DID YOU MAKE ANY SPECIFIC REQUESTS

03:58PM  17   FOR MATERIALS?

03:58PM  18   A.   YOU KNOW, I DON'T REMEMBER WHETHER I ASKED FOR DOCUMENTS

03:58PM  19   OR SHE -- INFORMATION, OR SHE SAID, I'VE GOT A PACKAGE OF

03:58PM  20   MATERIALS I'LL SEND YOU.  I DON'T REMEMBER.

03:58PM  21   Q.   OKAY.  IN ANY EVENT, THE DOCUMENTS CAME IN IN EARLY

03:58PM  22   AUGUST.

03:58PM  23        DO YOU RECALL THAT?  OR MID-AUGUST?  I APOLOGIZE.

03:58PM  24   A.   YOU KNOW, I HAVE GENERALLY A RECOLLECTION THAT THAT'S WHEN

03:58PM  25   THEY CAME AND IT'S CONSISTENT WITH THE LETTER.

MOSLEY CROSS BY MR. WADE                                    5176

03:58PM  1    Q.   AND IF WE LOOK AT THE LAST PARAGRAPH OF THE LETTER -- I'M

03:58PM  2    SORRY, ON THE SECOND PAGE, THE LAST FINAL PARAGRAPH.

03:58PM  3        DO YOU SEE IT SAYS, "I AM HAPPY TO PROVIDE MORE BACKGROUND

03:58PM  4    ON ANY OF THE ABOVE, OR ANY OF THE MATERIALS ENCLOSED IN THIS

03:58PM  5    PACKAGE."

03:58PM  6        DO YOU SEE THAT?

03:58PM  7    A.   I DO SEE IT.

03:58PM  8    Q.   AND SO YOU UNDERSTOOD AT THE TIME THAT YOU GOT THESE

03:58PM  9    MATERIALS THAT THERE WAS AN OPEN INVITATION FOR YOU TO GO AND

03:58PM  10   SEEK OTHER INFORMATION; RIGHT?

03:58PM  11   A.   I DID.

03:58PM  12   Q.   AND IF THERE WAS ANYTHING WITHIN THE MATERIALS THAT YOU

03:58PM  13   THOUGHT WAS UNCLEAR, THAT YOU HAD AN INVITATION TO GO BACK TO

03:59PM  14   MS. HOLMES AND ASK FOR CLARITY ON THOSE MATERIALS; RIGHT?

03:59PM  15   A.   I DID.

03:59PM  16   Q.   AND YOU WOULD HAVE FELT FREE TO DO SO AT THIS POINT; IS

03:59PM  17   THAT FAIR?

03:59PM  18   A.   I WOULD HAVE.

03:59PM  19        MR. WADE:   OKAY.

03:59PM  20        YOUR HONOR, NOW MIGHT BE A GOOD TIME TO BREAK.  I WAS

03:59PM  21   GOING TO SHIFT, OR GO DEEPER INTO A TOPIC.

03:59PM  22        THE COURT:   YOU'RE RESTRAINING YOUR ENTHUSIASM FOR

03:59PM  23   STARTING THE BINDERS.

03:59PM  24        (LAUGHTER.)

03:59PM  25        MR. WADE:   I SEE THE WITNESS'S ENTHUSIASM AS WELL,

03:59PM 1    YOUR HONOR.

03:59PM 2          THE COURT:  LET'S DO THAT.  LET'S TAKE OUR EVENING

03:59PM 3    BREAK NOW, LADIES AND GENTLEMEN.  WE'LL RESUME AGAIN AT 9:00

03:59PM 4    O'CLOCK, 9:00 O'CLOCK TOMORROW MORNING, PLEASE.

03:59PM 5       LET ME REMIND YOU OF THE ADMONITION.  IT REMAINS IN PLACE.

03:59PM 6    YOU'VE BEEN DOING SO WONDERFULLY WITH IT.

03:59PM 7       PLEASE DO REFRAIN FROM COMING INTO CONTACT AS BEST YOU CAN

03:59PM 8    WITH ANY INFORMATION, ANY VERBAL INFORMATION, ANY RADIO,

03:59PM 9    TELEVISION, SOCIAL MEDIA, OR ANYTHING ELSE, INCLUDING

03:59PM 10   CONVERSATIONS, ANYTHING TO DO WITH THIS CASE.

03:59PM 11      I'LL ASK YOU TOMORROW MORNING IF YOU WERE ABLE TO, ONCE

04:00PM 12   AGAIN, SUCCESSFULLY ACCOMPLISH THAT.

04:00PM 13      HAVE A GOOD EVENING.  WE'LL SEE YOU TOMORROW.

04:00PM 14      LET ME SAY, I THINK -- I JUST WANT TO GO OVER -- MONDAY,

04:00PM 15   NOVEMBER 29TH, PLEASE RECALL WE'RE GOING TO START MONDAYS, I

04:00PM 16   THINK TWO MONDAYS FROM NOW, ON THE 29TH, I'M HOPING THAT WE CAN

04:00PM 17   BEGIN PROBABLY AROUND 10:00 O'CLOCK, I THINK, BUT WE'LL GET

04:00PM 18   MORE INFORMATION ON THAT AS WE GET CLOSER.

04:00PM 19         THE CLERK:  TOMORROW IS 3:00.

04:00PM 20         THE COURT:  AND TOMORROW IS 3:00 O'CLOCK, YES,

04:00PM 21   TOMORROW WE END AT 3:00 O'CLOCK.

04:00PM 22      LET ME ASK COUNSEL WHILE THE WITNESS IS HERE, IS IT LIKELY

04:00PM 23   WE'LL FINISH THIS WITNESS'S EXAMINATION TOMORROW?

04:00PM 24         MR. WADE:  I WOULD EXPECT SO, YES, YOUR HONOR.

04:00PM 25         THE COURT:  DO YOU AGREE WITH THAT, MR. SCHENK?

| | | |
|---|---|---|
| 04:00PM | 1 | MR. SCHENK:  I DO. |
| 04:00PM | 2 | THE WITNESS:  THANK YOU. |
| 04:00PM | 3 | THE COURT:  THAT'S HELPFUL INFORMATION. |
| 04:00PM | 4 | HAVE A GOOD EVENING, LADIES AND GENTLEMEN.  WE'LL SEE YOU |
| 04:00PM | 5 | TOMORROW MORNING. |
| 04:00PM | 6 | YOU CAN STAND DOWN, SIR.  THANK YOU. |
| 04:01PM | 7 | (JURY OUT AT 4:01 P.M.) |
| 04:01PM | 8 | MR. WADE:  IF YOU WANT TO LEAVE THOSE THERE, |
| 04:01PM | 9 | MR. MOSLEY, WE'LL KEEP THEM IN SAFEKEEPING.  THE COURT HAS |
| 04:01PM | 10 | MARSHALS. |
| 04:01PM | 11 | THE COURT:  THEY MAY GET LOST, MR. MOSLEY.  HOPE |
| 04:01PM | 12 | SPRINGS ETERNAL. |
| 04:01PM | 13 | WE'LL SEE YOU TOMORROW AT 9:00 O'CLOCK. |
| 04:01PM | 14 | THE WITNESS:  THANK YOU, YOUR HONOR. |
| 04:01PM | 15 | THE COURT:  PLEASE BE SEATED, LADIES AND GENTLEMEN. |
| 04:01PM | 16 | THE RECORD SHOULD REFLECT THAT THE JURY HAS LEFT FOR THE |
| 04:01PM | 17 | DAY, MR. MOSLEY HAS LEFT THE COURTROOM, AND ALL COUNSEL AND |
| 04:01PM | 18 | MS. HOLMES REMAIN PRESENT. |
| 04:02PM | 19 | I'M GOING TO CHECK ON THE HVAC.  GOSH, IT GETS WARM HERE |
| 04:02PM | 20 | IN THE AFTERNOON.  WE'LL SEE WHAT WE CAN DO TO ACCOMPLISH |
| 04:02PM | 21 | RECTIFYING THAT. |
| 04:02PM | 22 | I ALSO WANTED TO SHARE WITH COUNSEL, MS. KRATZMANN |
| 04:02PM | 23 | RECEIVED A COMMENT FROM THE JURORS THAT THEY APPARENTLY |
| 04:02PM | 24 | REQUESTED THAT -- I'M JUST GOING TO READ THIS -- IF WHEN THE |
| 04:02PM | 25 | BLOWUP OF AN EXHIBIT, IF THEY CAN RAISE IT HIGHER SO TEXT IS |

5179

04:02PM 1    NOT AT THE BOTTOM.

04:02PM 2         I'M SURE YOUR I.T. PEOPLE KNOW WHAT THAT MEANS.

04:02PM 3              MR. WADE:  THANK YOU.

04:02PM 4              THE COURT:  I'LL JUST PASS THAT ON.  THAT'S FROM THE

04:02PM 5    JURORS.

04:02PM 6              MR. SCHENK:  THANK YOU.

04:02PM 7              THE COURT:  ANYTHING ELSE THEN BEFORE WE LEAVE FOR

04:02PM 8    THE EVENING?

04:02PM 9         MR. SCHENK?

04:02PM 10             MR. SCHENK:  YES.  THANK YOU, YOUR HONOR.

04:02PM 11        JUST BRIEFLY.  I KNOW WE HAVE A BUSY SCHEDULE FOR TOMORROW

04:02PM 12   MORNING'S SESSION, SOME OF THE DISCUSSIONS WE WERE HAVING TODAY

04:02PM 13   WE PUNTED, AND I THINK ONE OF THE THINGS WE WERE THINKING ABOUT

04:02PM 14   TALKING ABOUT WAS THE MOSLEY 2015 DOCUMENTS.

04:03PM 15        I ASSUME WE CAN DEAL WITH THEM NOW VERY QUICKLY.  THE

04:03PM 16   COURT HAS SEEN THE DIRECT.  MR. MOSLEY -- I DIDN'T COVER 2015

04:03PM 17   WITH HIM, AND MR. MOSLEY HIMSELF SAID THAT THE FINANCIAL

04:03PM 18   PROJECTIONS IN 2015 WERE LESS RELIABLE BECAUSE THEY WERE

04:03PM 19   FURTHER INTO THE FUTURE.

04:03PM 20        SO THE COURT WILL RECALL MR. WADE SAID THIS EVIDENCE, THE

04:03PM 21   2015 DOCUMENTS, MIGHT BE APPROPRIATE IMPEACHMENT IF THE WITNESS

04:03PM 22   DOES NOT RECALL HAVING THE OPINION THAT PROJECTIONS INTO THE

04:03PM 23   FUTURE ARE CHALLENGING.

04:03PM 24        WE ARE NOT FACED WITH THAT SITUATION, AND IT NOW SEEMS TO

04:03PM 25   ME CLEAR THAT THE COURT CAN EXCLUDE THIS TYPE OF EVIDENCE, AND

5180

04:03PM 1    I DON'T THINK WE NEED TO TAKE TIME, MUCH MORE TODAY, OR ANY

04:03PM 2    TOMORROW.

04:03PM 3          MR. WADE:  I NOTED THE SAME THING MR. SCHENK DID

04:03PM 4    WITH RESPECT TO THE TESTIMONY, AND I THINK WHAT I WOULD ASK IS

04:03PM 5    MAYBE JUST TO HAVE A CHANCE TO LOOK AT IT IN THE TRANSCRIPT.

04:03PM 6      I THINK, I THINK MAYBE I WOULD ASK SOME QUESTIONS AROUND

04:04PM 7    THE TOPIC, BUT IT MAY WELL BE I DON'T NEED TO PUT IN A COUPLE

04:04PM 8    OF THOSE EMAILS.

04:04PM 9      BUT I'LL LOOK BACK AT IT, AND I'LL ADVISE MR. SCHENK IF I

04:04PM 10   FEEL OTHERWISE.

04:04PM 11         THE COURT:  OKAY.

04:04PM 12         MR. WADE:  I DON'T NECESSARILY OTHERWISE SEE THE

04:04PM 13   EXAMINATION GOING INTO THAT TIME PERIOD, AND IF WE'RE NOT GOING

04:04PM 14   TO GO INTO THOSE COMMUNICATIONS, THEN WE MAY HAVE THE RECORD WE

04:04PM 15   NEED ON THAT.

04:04PM 16     THERE IS ONE OTHER -- THAT RELATE TO, I THINK, TWO OR

04:04PM 17   THREE OF THE EMAILS THAT MR. SCHENK HANDED UP TO THE COURT.

04:04PM 18     THERE IS ANOTHER EMAIL THAT MR. -- OR ANOTHER DOCUMENT,

04:04PM 19   EMAIL AND ATTACHMENT I THINK THAT RELATES TO TEST RESULTS THAT

04:04PM 20   MR. MOSLEY RECEIVED AT A WALGREENS, AT A THERANOS CENTER AT A

04:04PM 21   WALGREENS, WHICH WAS IN 2015.

04:04PM 22     AND I THINK THAT WOULD BE -- I DON'T THINK WE ADDRESSED

04:05PM 23   THAT THIS MORNING.  IF WE DID, I DON'T RECALL.

04:05PM 24         THE COURT:  I DON'T RECALL DISCUSSING A TEST RESULT

04:05PM 25   FROM MR. MOSLEY.

5181

04:05PM 1           MR. WADE:  YEAH.  I THINK THAT DOCUMENT WOULD BE

04:05PM 2 ADMISSIBLE IN THE SAME WAY THAT MANY OTHER DOCUMENTS OF PATIENT

04:05PM 3 TEST RESULTS HAVE BEEN, YOU KNOW, ADMISSIBLE IN THIS CASE.

04:05PM 4           THE GOVERNMENT HAS OFFERED MANY OF THEM, HAS SUGGESTED

04:05PM 5 THEY'RE PROBATIVE OF ACCURACY AND RELIABILITY.

04:05PM 6           AS THE COURT KNOWS, WE SUGGESTED OTHERWISE IN MOTIONS

04:05PM 7 PRACTICE AT SOME LENGTH, AND WHILE IT HAS PROBABLY LIMITED

04:05PM 8 PROBATIVE VALUE, THERE HAVE BEEN OTHER TEST RESULTS THAT HAVE

04:05PM 9 COME IN FROM OTHER WITNESSES, AND WE THINK IT'S ONLY FAIR THAT

04:05PM 10 MR. MOSLEY BE PERMITTED TO TALK ABOUT HIS WHICH WERE, AS I

04:05PM 11 UNDERSTAND IT, ACCURATE OR CONSISTENT WITH HIS OTHER TEST

04:05PM 12 RESULTS.

04:05PM 13           THE COURT:  SO YOU INTEND TO ASK THE WITNESS, THIS

04:05PM 14 WITNESS, MR. MOSLEY, WHETHER HE WENT TO A WALGREENS, TOOK A

04:06PM 15 TEST USING THE THERANOS EQUIPMENT, FINGERSTICK, VENOUS,

04:06PM 16 WHATEVER IT IS, AND IF HE RECEIVED A TEST RESULT, AND WHAT THAT

04:06PM 17 TEST RESULT WAS?

04:06PM 18           MR. WADE:  ESSENTIALLY.  AND THAT HE FOUND IT TO BE

04:06PM 19 CONSISTENT WITH PRIOR TEST RESULTS THAT HE'S RECEIVED.

04:06PM 20           HE RECEIVED A FINGERSTICK TEST AT WALGREENS.

04:06PM 21           THE COURT:  IS THERE A COMPARATOR AT THE TIME PERIOD

04:06PM 22 THAT YOU WOULD COMPARE IT TO, OR --

04:06PM 23           MR. WADE:  I BELIEVE HIS STATEMENTS ARE THAT HE SENT

04:06PM 24 THEM TO HIS DOCTOR, I THINK.  I MAY HAVE CONFUSED HIS TEST

04:06PM 25 RESULTS WITH ANOTHER WITNESS'S.

5182

04:06PM  1            THE COURT:  OKAY.

04:06PM  2            MR. WADE:  BUT I THINK HE SENT THEM TO HIS DOCTOR.

04:06PM  3    I THINK HE SAID IT WAS A CHOLESTEROL TEST, AND I THINK THEY

04:06PM  4    WERE BASICALLY CONSISTENT WITH OTHER CHOLESTEROL TESTS.

04:06PM  5            THE COURT:  MR. SCHENK?

04:06PM  6            MR. SCHENK:  THIS MORNING I HANDED UP FOUR DOCUMENTS

04:06PM  7    TO YOUR HONOR.  MR. MOSLEY AND ACTUALLY HIS DAUGHTER'S TEST

04:06PM  8    RESULTS WERE PART OF THAT STACK, SO THE COURT HAS THE DOCUMENT

04:06PM  9    THAT MR. WADE IS REFERRING TO.

04:06PM  10           I WOULD SUGGEST THAT WE WAIT AND SEE.  I MAY HAVE

04:07PM  11   RELEVANCE OBJECTIONS DEPENDING ON THE FOUNDATION THAT IS

04:07PM  12   ESTABLISHED.

04:07PM  13           I'M NOT SURE IT IS PROBATIVE OF THE ACCURACY OF THERANOS

04:07PM  14   TESTS, BUT I THINK WE NEED TO WAIT AND SEE THE QUESTIONS AND

04:07PM  15   WHAT MR. MOSLEY UNDERSTOOD WAS OCCURRING THROUGH THIS PROCESS.

04:07PM  16           I -- IT IS OF A DIFFERENT SORT THAN MY 2015 OBJECTIONS.

04:07PM  17           THE COURT:  RIGHT.

04:07PM  18           MR. SCHENK:  MY 2015 OBJECTIONS WERE HIS KNOWLEDGE

04:07PM  19   IN '15 WAS NOT RELEVANT FOR INVESTMENT.

04:07PM  20           THIS IS DIFFERENT AND I DON'T OBJECT ON THE SAME GROUNDS,

04:07PM  21   BUT I'D LIKE TO WAIT AND SEE THE QUESTIONS.

04:07PM  22           THE COURT:  ALL RIGHT.  WELL, LET'S DO THAT.

04:07PM  23           LET ME JUST SAY, IN THE SPIRIT OF FULL DISCLOSURE, AFTER

04:07PM  24   YOUR DIRECT, MY QUESTION ASKING WHETHER WE WOULD FINISH WITH

04:07PM  25   THE WITNESS TOMORROW, MR. MOSLEY, WAS PREDICATED ON THE FACT

5183

04:07PM 1    THAT THERE IT SOUNDS LIKE THERE WAS NO FORAY INTO 2015, AND SO

04:07PM 2    I WAS THINKING THAT YOU PROBABLY WOULDN'T GO INTO WHAT YOU

04:07PM 3    WOULD -- WHAT WE TALKED ABOUT THIS MORNING BECAUSE THERE WAS NO

04:08PM 4    REASON TO.

04:08PM 5         BUT I APPRECIATE YOUR OBSERVATIONS.

04:08PM 6         YOU'RE GOING TO THINK ABOUT IT OVERNIGHT.  THAT'S PROBABLY

04:08PM 7    A GOOD THING.

04:08PM 8         TOMORROW I THINK WE'RE TALKING ABOUT SOME OTHER WITNESSES

04:08PM 9    THAT ARE NOT EVEN GOING TO BE TESTIFYING THIS WEEK.  SO I'D

04:08PM 10   LIKE TO -- AS I UNDERSTAND IT, I THINK.

04:08PM 11             MR. SCHENK:  I THINK THAT BB MAY TESTIFY THIS WEEK.

04:08PM 12             THE COURT:  OKAY.

04:08PM 13             MR. SCHENK:  I THINK IT'S MR. PARLOFF THAT WOULD

04:08PM 14   NOT.

04:08PM 15             THE COURT:  OKAY.  THANK YOU.  LET'S START OUR

04:08PM 16   CONVERSATION TOMORROW ON BB AND SEE WHERE WE GO WITH THAT.

04:08PM 17        I DON'T WANT TO INVEST TIME, NOT THAT PARLOFF IS NOT

04:08PM 18   IMPORTANT, BUT IT'S NOT IMPORTANT FOR THIS WEEK'S SCHEDULE, AND

04:08PM 19   I'D LIKE TO KEEP US GOING FORWARD AS BEST WE CAN.

04:08PM 20        SO LET'S DO THAT.

04:08PM 21        AND WHEN THE FOLKS CALL IN, OUR DEAR FRIENDS FROM THE EAST

04:08PM 22   COAST CALL IN, WE CAN KIND OF TELL THEM THAT THEY'RE KIND OF IN

04:08PM 23   A HOLDING PATTERN, AND LET'S SEE WHAT WE CAN GET ACCOMPLISHED

04:08PM 24   TOMORROW AT ABOUT 8:15 IF THAT WORKS.

04:08PM 25             MR. SCHENK:  YES, YOUR HONOR.

5184

04:08PM  1                    THE COURT:  OKAY.

04:09PM  2                    MR. WADE:  THE ONLY -- THE COURT'S INDULGENCE FOR

04:09PM  3       ONE SECOND?

04:09PM  4                    THE COURT:  SURE.

04:09PM  5            (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

04:09PM  6                    MR. WADE:  THE ONE ISSUE JUST TO ADDRESS, I DON'T

04:09PM  7       KNOW WHAT THE GOVERNMENT'S SCHEDULE IS WITH RESPECT TO

04:09PM  8       MR. PARLOFF, BUT MR. CLINE HAS A COMMITMENT TO ANOTHER COURT

04:09PM  9       AND WILL NOT BE HERE ON THURSDAY.

04:09PM  10                   THE COURT:  OH, SOMETHING THAT IS MORE IMPORTANT

04:09PM  11      THAN THIS COURT, MR. WADE?

04:09PM  12                   MR. WADE:  I QUESTIONED IT EXTENSIVELY AND I WOULD

04:09PM  13      WELCOME THE CROSS-EXAMINATION OF HIM.

04:09PM  14           (LAUGHTER.)

04:09PM  15                   MR. WADE:  BUT I THINK IT WAS SET AT A TIME WHERE WE

04:09PM  16      THOUGHT WE WERE DARK.

04:09PM  17                   THE COURT:  YES.

04:09PM  18                   MR. WADE:  WE WERE DARK ON THURSDAYS.  SO HE WON'T

04:09PM  19      BE HERE.

04:09PM  20           I ONLY RAISE THAT BECAUSE I DON'T THINK HE WOULD BE IN A

04:09PM  21      POSITION TO ADDRESS IT ON THURSDAY, AND SO I JUST WANTED TO BE

04:09PM  22      CLEAR WITH THE COURT.

04:09PM  23           I DON'T KNOW WHAT THE TIMING OF THE GOVERNMENT IS WITH

04:09PM  24      THAT WITNESS.

04:09PM  25                   MR. SCHENK:  WE WERE AWARE OF MR. CLINE'S CONFLICT.

5185

04:09PM 1    WE KNEW THAT DR. CULLEN WAS MR. CLINE'S WITNESS AND WE MADE

04:09PM 2    SURE SHE TESTIFIED ON A DAY THIS WEEK THAT MR. CLINE WAS

04:10PM 3    AVAILABLE.

04:10PM 4        I KNOW THAT -- I THINK WHAT MR. WADE IS GETTING AT IS, ARE

04:10PM 5    WE GOING TO DISCUSS MR. PARLOFF ON THURSDAY OR WAIT UNTIL THE

04:10PM 6    FOLLOWING WEEK, TUESDAY I THINK?

04:10PM 7            MR. WADE:  THAT'S CORRECT.

04:10PM 8            THE COURT:  RIGHT.  ARE WE AVAILABLE ON THE MONDAY,

04:10PM 9    ADRIANA, THE 8TH?

04:10PM 10           THE CLERK:  WE DO HAVE A CALENDAR, YOUR HONOR, IN

04:10PM 11   THE AFTERNOON.

04:10PM 12           THE COURT:  COULD WE TALK IN THE MORNING?

04:10PM 13           THE CLERK:  YOU'RE AVAILABLE IN THE MORNING.

04:10PM 14           THE COURT:  ARE YOU BACK, MR. WADE, ON THE 8TH?

04:10PM 15           MR. WADE:  MR. CLINE WOULD BE BACK TO DEAL WITH THAT

04:10PM 16   ISSUE, YES.

04:10PM 17           THE COURT:  OKAY.

04:10PM 18           MR. CLINE:  THAT WOULD BE FINE.

04:10PM 19           THE COURT:  OKAY.  SO MAYBE WE CAN DO IT THEN, I

04:10PM 20   THINK, ON A MONDAY MORNING.

04:10PM 21       MR. BOSTIC, DOES THAT WORK FOR YOU?

04:10PM 22           MR. BOSTIC:  THAT'S CERTAINLY FINE FOR THE

04:10PM 23   GOVERNMENT, YOUR HONOR.  MR. PARLOFF WILL NOT TESTIFY BEFORE

04:10PM 24   THE 9TH.

04:10PM 25       AM I REMEMBERING CORRECTLY THAT TRIAL IS NOT IN SESSION ON

5186

04:10PM  1    THE 8TH?

04:10PM  2              THE COURT:  THAT'S RIGHT.

04:10PM  3              MR. BOSTIC:  OKAY.  THE GOVERNMENT COULD CERTAINLY

04:11PM  4    BE AVAILABLE TO ARGUE THE ISSUE ON THAT DAY, THOUGH.

04:11PM  5              THE COURT:  IF, IF -- RIGHT.  OKAY.

04:11PM  6         THAT'S AN ALTERNATIVE, I THINK.  WE CAN JUST COME IN THE

04:11PM  7    MORNING, OR WHATEVER TIME WORKS FOR THE PARTIES THAT DAY, AND

04:11PM  8    WE CAN TALK ABOUT MR. PARLOFF.

04:11PM  9              MR. CLINE:  THAT'S FINE, YOUR HONOR.

04:11PM  10             THE COURT:  OKAY.  LET'S KEEP THAT AS A BACK-UP

04:11PM  11   SCHEDULE.  THANK YOU.  I APPRECIATE IT.  I APPRECIATE YOUR -- I

04:11PM  12   KNOW WE'RE NOT IN SESSION THAT DAY, BUT -- WITH THE JURY.  BUT

04:11PM  13   IF WE CAN GET SOME WORK DONE, I WOULD APPRECIATE IT.

04:11PM  14             MR. BOSTIC:  GREAT.

04:11PM  15             MR. WADE:  THANK YOU, YOUR HONOR.

04:11PM  16             THE COURT:  GREAT.  THANK YOU.

04:11PM  17        I THINK THAT'S IT.  I THINK THAT'S ALL I HAVE.  THANK YOU.

04:11PM  18        OKAY.  HAVE A GOOD EVENING.

04:11PM  19             MR. SCHENK:  THANK YOU, YOUR HONOR.

04:11PM  20             THE CLERK:  COURT IS ADJOURNED.

04:11PM  21        (COURT ADJOURNED AT 4:11 P.M.)

        22

        23

        24

        25

1

2

3                          CERTIFICATE OF REPORTERS

4

5

6

7        WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11       THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16        _____
          IRENE RODRIGUEZ, CSR, CRR
          CERTIFICATE NUMBER 8076
17

18        _____
19        LEE-ANNE SHORTRIDGE, CSR, CRR
          CERTIFICATE NUMBER 9595
20

21        DATED:  NOVEMBER 2, 2021

22

23

24

25

```
 1                    UNITED STATES DISTRICT COURT

 2                  NORTHERN DISTRICT OF CALIFORNIA

 3                        SAN JOSE DIVISION

 4
     UNITED STATES OF AMERICA,        )  CR-18-00258-EJD
 5                                    )
                      PLAINTIFF,      )  SAN JOSE, CALIFORNIA
 6                                    )
             VS.                      )  VOLUME 27
 7                                    )
     ELIZABETH A. HOLMES,             )  NOVEMBER 3, 2021
 8                                    )
                      DEFENDANT.      )  PAGES 5187 - 5382
 9   _____ )

10
                    TRANSCRIPT OF TRIAL PROCEEDINGS
11             BEFORE THE HONORABLE EDWARD J. DAVILA
                  UNITED STATES DISTRICT JUDGE
12
     A P P E A R A N C E S:
13
     FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
14                          BY:   JOHN C. BOSTIC
                                  JEFFREY B. SCHENK
15                          150 ALMADEN BOULEVARD, SUITE 900
                            SAN JOSE, CALIFORNIA 95113
16
                            BY:   ROBERT S. LEACH
17                                KELLY VOLKAR
                            1301 CLAY STREET, SUITE 340S
18                          OAKLAND, CALIFORNIA 94612

19        (APPEARANCES CONTINUED ON THE NEXT PAGE.)

20
     OFFICIAL COURT REPORTERS:
21                          IRENE L. RODRIGUEZ, CSR, RMR, CRR
                            CERTIFICATE NUMBER 8074
22                          LEE-ANNE SHORTRIDGE, CSR, CRR
                            CERTIFICATE NUMBER 9595
23
          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
24             TRANSCRIPT PRODUCED WITH COMPUTER

25
```

A P P E A R A N C E S: (CONT'D)


FOR DEFENDANT HOLMES:    WILLIAMS & CONNOLLY LLP
                         BY:  KEVIN M. DOWNEY
                              LANCE A. WADE
                              KATHERINE TREFZ
                              PATRICK LOOBY
                              RICHARD CLEARY
                              J.R. FLEURMONT
                              SEEMA ROPER
                              PATRICK LOOBY
                         725 TWELFTH STREET, N.W.
                         WASHINGTON, D.C. 20005

                         LAW OFFICE OF JOHN D. CLINE
                         BY:  JOHN D. CLINE
                         ONE EMBARCADERO CENTER, SUITE 500
                         SAN FRANCISCO, CALIFORNIA 94111


ALSO PRESENT:            FEDERAL BUREAU OF INVESTIGATION
                         BY:  ADELAIDA HERNANDEZ

                         OFFICE OF THE U.S. ATTORNEY
                         BY:  LAKISHA HOLLIMAN, PARALEGAL
                              MADDI WACHS, PARALEGAL

                         WILLIAMS & CONNOLLY
                         BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL

                         TBC
                         BY:  BRIAN BENNETT, TECHNICIAN

5189

1

2                        INDEX OF PROCEEDINGS

3          GOVERNMENT'S:

4          **DANIEL MOSLEY**
           CROSS-EXAM BY MR. WADE (RES.)            P. 5217
5          REDIRECT EXAM BY MR. SCHENK              P. 5374

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          INDEX OF EXHIBITS

2
                                       IDENT.      EVIDENCE
3        GOVERNMENT'S:

4        2110                                       5342

5


6


7        DEFENDANT'S:

8        14118                                      5226
         14119                                      5232
9        14149                                      5328
         14124                                      5330
10       14151                                      5336
         14152                                      5339
11       14153                                      5340
         14169                                      5348
12       14135                                      5353
         14207                                      5359
13       14208                                      5363

14

15

16

17

18

19

20

21

22

23

24

25

1    SAN JOSE, CALIFORNIA                    NOVEMBER 3, 2021

08:39AM    2                    P R O C E E D I N G S

08:39AM    3         (COURT CONVENED AT 8:39 A.M.)

08:39AM    4         (JURY OUT AT 8:39 A.M.)

08:39AM    5              THE COURT:  THANK YOU.  PLEASE BE SEATED.  LET'S GO

08:39AM    6    ON THE RECORD IN THE HOLMES MATTER.

08:39AM    7         ALL COUNSEL ARE PRESENT, MS. HOLMES IS PRESENT.

08:39AM    8         WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.  I'M JUST GOING

08:39AM    9    TO TAKE UP ONE MATTER THIS MORNING.  I BELIEVE THIS IS IN

08:39AM   10    RELATION TO THE WITNESS BB, I THINK IT IS.

08:39AM   11         MR. BOSTIC, WILL YOU SPEAK TO THAT?

08:39AM   12              MR. BOSTIC:  YES, YOUR HONOR.

08:40AM   13         GOOD MORNING, YOUR HONOR.

08:40AM   14         JOHN BOSTIC FOR THE UNITED STATES.

08:40AM   15              THE COURT:  THANK YOU.  GOOD MORNING.

08:40AM   16              MS. TREFZ:  GOOD MORNING, YOUR HONOR.

08:40AM   17         KATIE TREFZ FOR MS. HOLMES.

08:40AM   18              THE COURT:  THANK YOU.  GOOD MORNING.

08:40AM   19         AND THIS IS DOCKETED AT 1116.  MS. TREFZ, IT'S YOUR MOTION

08:40AM   20    TO EXCLUDE TESTIMONY OF BB.  THE GOVERNMENT'S OPPOSITION IS

08:40AM   21    1124, DOCUMENT 1124.

08:40AM   22         I'VE READ, I'VE READ THOSE.  I HAVE ALSO HAD OCCASION TO

08:40AM   23    REVIEW WHAT IS REFERENCED IN BOTH OF THESE MOTIONS.  IT'S

08:40AM   24    DOCUMENT 568, WHICH WAS OUR MOTION IN LIMINE DISCUSSION, AS

08:40AM   25    WELL AS DOCUMENT 711.  THOSE ARE BOTH THE DEFENDANT'S MOTION IN

5192

08:40AM   1    LIMINE TO EXCLUDE AND THEIR REPLY, AND THE GOVERNMENT'S 664,

08:40AM   2    WHICH WAS THE OPPOSITION TO THE MOTION IN LIMINE.

08:40AM   3        I THINK THOSE WERE RELEVANT, WILL BE RELEVANT FOR OUR

08:40AM   4    DISCUSSION.

08:40AM   5        I'VE ALSO REVIEWED DOCUMENT 798, WHICH YOU KNOW IS THE

08:41AM   6    COURT'S MIL ORDER.  PAGES 78 THROUGH 80 I BELIEVE SPEAK TO AND

08:41AM   7    GIVE US SOME INFORMATION ABOUT THE MOTION HERE.

08:41AM   8        AND OF COURSE, I'VE REVIEWED THE THIRD SUPERSEDING

08:41AM   9    INDICTMENT.  AND I THINK PARAGRAPH 16 IS THE ONE THAT IS

08:41AM  10    PERTINENT IF I'M NOT MISTAKEN, AND OTHERS.

08:41AM  11        SO I'VE LOOKED AT THOSE.  THOSE HAVE BEEN HELPFUL, AND I'M

08:41AM  12    EAGER TO HEAR FROM YOU.

08:41AM  13        SO, MS. TREFZ, WHAT WOULD YOU LIKE ME TO KNOW?  YOU'RE THE

08:41AM  14    MOVING PARTY HERE.

08:41AM  15            MS. TREFZ:  THANK YOU, YOUR HONOR.

08:41AM  16        SO WITHOUT KIND OF RESTATING WHAT I THINK IS OBVIOUS, THE

08:41AM  17    BASIS OF OUR MOTION IS THE FACT THAT THE PATIENT LISTED IN

08:41AM  18    COUNT NINE, BB, WHOSE TEST ITSELF IS NOT LISTED IN COUNT NINE,

08:41AM  19    HAD A TEST, AND THE ONLY TESTS THAT HE HAD FROM THERANOS, AS

08:41AM  20    FAR AS WE CAN TELL, ARE NOT LISTED IN THE INDICTMENT OR THE

08:41AM  21    BILL OF PARTICULARS.

08:41AM  22        AND WE THINK UNDER THE COURT'S ORDERS, AND OF WHICH THE

08:42AM  23    GOVERNMENT HAS HAD AMPLE OPPORTUNITY TO BRIEF AND TO SUPPLEMENT

08:42AM  24    IF NEEDED, THEN IT SHOULD BE -- THEN HIS TESTIMONY ABOUT THE

08:42AM  25    ACCURACY OF HIS TEST RESULT, AND, FRANKLY, HIS TEST RESULT

08:42AM  1      OVERALL SHOULD BE EXCLUDED.

08:42AM  2              THE COURT:  AND HIS -- I'M SORRY TO INTERRUPT YOU.

08:42AM  3              MS. TREFZ:  YEAH.

08:42AM  4              THE COURT:  BUT HIS TEST IS CBC?  IS THAT RIGHT?  IS

08:42AM  5      THAT THE NATURE OF IT?  SHOULD I BE CONCERNED ABOUT WHAT TEST

08:42AM  6      HE TOOK?

08:42AM  7              MS. TREFZ:  I THINK THAT YOU NEED TO BE CONCERNED

08:42AM  8      ABOUT IT FROM THE PERSPECTIVE OF THE FACT THAT IT'S NOT LISTED

08:42AM  9      IN THE INDICTMENT, AND THE CBC PANEL IS THE -- ARE THE TESTS

08:42AM 10      THAT HE GOT.

08:42AM 11         IT APPEARS THAT THE ISSUE THAT'S BEEN DISCLOSED VIA HIS

08:42AM 12      INTERVIEW MEMOS IS A SPECIFIC TEST ABOUT PLATELETS, WHICH IS

08:42AM 13      LIKE A SUBSIDIARY MEASUREMENT IN THE CBC PANEL, AND --

08:43AM 14              THE COURT:  SO AS I UNDERSTAND YOUR MOTION, AND

08:43AM 15      PLEASE CORRECT ME, AND I'M GOING TO ASK MR. BOSTIC ABOUT THIS,

08:43AM 16      IT SEEMS LIKE YOU'RE SAYING THAT HE, BB, CAN'T TESTIFY BECAUSE

08:43AM 17      CBC WAS NOT LISTED IN THE INDICTMENT.  THAT WASN'T A PANEL THAT

08:43AM 18      WAS LISTED.

08:43AM 19         AND IN ADDITION, THERE WAS CONVERSATION AT THE MIL MOTION

08:43AM 20      ABOUT THIS IN DOCUMENT 568 AND SOME OTHERS.

08:43AM 21         THE GOVERNMENT INDICATED THAT THEY WOULD NOT PUT THIS ON

08:43AM 22      FOR THE PURPOSE OF SHOWING INACCURACY IN THE TEST RESULTS, BUT

08:43AM 23      IT COULD BE ADMITTED FOR OTHER, OTHER REASONS TO SHOW THE

08:43AM 24      NUMBER OF TESTS.

08:43AM 25         I THINK YOU TALK ABOUT THIS, MR. BOSTIC, IN YOUR

08:43AM  1    PLEADINGS, THE NUMBER OF TESTS AND THE TYPE OF TESTS, BUT NOT

08:43AM  2    FOR THIS WITNESS TO TESTIFY THAT HE TOOK THE TEST.

08:43AM  3         HE CALLED THE COMPANY BECAUSE HE FELT THAT THE TEST WAS

08:43AM  4    INACCURATE.

08:44AM  5         AND THAT'S ONE QUESTION THAT I'M CURIOUS ABOUT.  WHAT IS

08:44AM  6    THE RELEVANCE OF BB'S TESTIMONY?  IS IT -- DOES IT GO TO

08:44AM  7    INACCURACY OR ACCURACY, AND IF SO, THERE MIGHT BE AN ISSUE WITH

08:44AM  8    THAT.

08:44AM  9         DOES IT GO TO SOME OTHER PURPOSE?

08:44AM  10        IS CBC -- HAS CBC BEEN INTRODUCED INTO THE CASE SUCH THAT

08:44AM  11   THERE IS SOME RELEVANCE AS TO THAT, NOT NECESSARILY AS TO HIM

08:44AM  12   TAKING THAT TEST, BUT FOR SOME OTHER PURPOSE, I SUPPOSE.

08:44AM  13        BUT THAT'S WHAT I SEE YOU SAYING, THAT HE CAN'T TESTIFY

08:44AM  14   ABOUT CBC BECAUSE IT'S NOT IN THE INDICTMENT, IT WASN'T LISTED,

08:44AM  15   AND IT DOESN'T COME IN FOR THAT PURPOSE.

08:44AM  16        SO, MR. BOSTIC, MAYBE YOU HAVE ANOTHER PURPOSE?

08:44AM  17        MS. TREFZ, MAYBE YOU WANT TO FOLLOW UP.

08:44AM  18             MS. TREFZ:  THE ONLY THING THAT I WANTED TO CLARIFY,

08:44AM  19   YOUR HONOR, IS THAT IT'S NOT JUST THAT IT'S NOT LISTED.  THE

08:45AM  20   GOVERNMENT ALSO WITHDREW A NOTICE ABOUT EXPERT TESTIMONY

08:45AM  21   RELATED TO CBC, AND THAT'S IMPORTANT BECAUSE I'M SURE YOU'LL

08:45AM  22   RECALL THAT WE WERE IN FRONT OF YOU SEVERAL TIMES ASKING FOR

08:45AM  23   ADDITIONAL EXPERT DISCLOSURES.

08:45AM  24        INITIALLY THERE WAS AN IDENTIFICATION OF CBC AS A

08:45AM  25   POTENTIAL EXPERT ISSUE, AND, IN FACT, THE GOVERNMENT KIND OF

08:45AM  1     SAID IN ITS OPPOSITION TO THE MOTION IN LIMINE, IT MIGHT BE

08:45AM  2     THAT PROFESSIONALS WILL TESTIFY ABOUT THE PREVALENCE OF CBC AS

08:45AM  3     A NORMAL TEST OR AS AN EXPECTED TEST.

08:45AM  4               THE COURT:  RIGHT.

08:45AM  5               MS. TREFZ:  AND WHAT HAPPENED HERE WAS THAT IN JUNE

08:45AM  6     THE GOVERNMENT REMOVED CBC, AND THEN AT THE END OF JULY WHEN

08:45AM  7     THEY DID THEIR FINAL AMENDED EXPERT DISCLOSURES, NOT ONLY CBC

08:45AM  8     BUT THE DOCTOR THAT WAS POTENTIALLY GOING TO TESTIFY ABOUT CBC

08:45AM  9     WAS REMOVED FROM THE DISCLOSURE AS WELL.

08:45AM 10          SO WE THINK THAT NOT ONLY IS IT AN ISSUE OF NOTICE, WHICH

08:45AM 11     IS THE PRIMARY BASIS FOR THE MOTION, BUT WITHOUT THAT, THEN

08:45AM 12     TESTIMONY FROM A PATIENT LIKE THIS IS -- WITHOUT KIND OF AN

08:46AM 13     ACCOMPANYING EXPERT TESTIMONY IS HIGHLY MISLEADING AND QUITE

08:46AM 14     PREJUDICIAL.

08:46AM 15          AND NOTABLY, THE ADDITIONAL -- ALL OF THE ADDITIONAL

08:46AM 16     PATIENTS THAT WE'VE HEARD FROM, INCLUDING THE OTHERS LISTED IN

08:46AM 17     THE INDICTMENT OR IDENTIFIED IN THE INDICTMENT, HAVE AN

08:46AM 18     ACCOMPANYING PROVIDER THAT WE UNDERSTAND WILL TESTIFY AND THAT

08:46AM 19     HAS BEEN DISCLOSED.

08:46AM 20          SO IT'S A NOTICE ISSUE, BUT IT'S ALSO KIND OF -- THE

08:46AM 21     ISSUES THAT ARE EMBEDDED IN IT GO DEEPER THAN THAT BECAUSE IT'S

08:46AM 22     NOT SIMPLY A MATTER OF, AS I UNDERSTAND THE GOVERNMENT TO

08:46AM 23     SUGGEST IN ITS OPPOSITION, HE'S IN THE INDICTMENT, LIKE YOU

08:46AM 24     SHOULD HAVE KNOWN.  THAT'S NOT REALLY -- YOU KNOW, WE --

08:46AM 25               THE COURT:  ISN'T THAT NOTICE, THOUGH?

08:46AM 1        THEY SAY, OKAY, WE RECEIVED -- AFTER WE HAD SOME

08:46AM 2    LITIGATION ON THIS, WE THEN FILED AN INFORMATION AND THEN THE

08:46AM 3    GRAND JURY ISSUED THE THIRD SUPERSEDING INDICTMENT.

08:47AM 4        AND YOU'VE HAD NOTICE ABOUT THAT.  AND YOU'VE HAD NOTICE

08:47AM 5    ABOUT BB IN AT LEAST THIS CONTEXT SINCE THE MIL MOTION ALSO.

08:47AM 6        SO AREN'T YOU -- DIDN'T YOU HAVE A FULSOME KNOWLEDGE ABOUT

08:47AM 7    THE POTENTIAL FOR HIM TESTIFYING?

08:47AM 8            MS. TREFZ:  WELL, THE POTENTIAL FOR HIM POTENTIALLY

08:47AM 9    TESTIFYING ABOUT SOMETHING, AND IF THE GOVERNMENT HAD ACTUALLY

08:47AM 10   TAKEN ANY ACTUAL ACTION AS OPPOSED TO EITHER INACTION OR MOVING

08:47AM 11   TO DISCLAIM THIS PARTICULAR TEST, FOR EXAMPLE, IF THE

08:47AM 12   GOVERNMENT HAD AMENDED ITS BILL OF PARTICULARS TO INCLUDE CBC

08:47AM 13   IN OUR -- THEN WE MIGHT BE IN A DIFFERENT SITUATION.

08:47AM 14       FOR EXAMPLE, IN OUR REPLY TO OUR MOTION IN LIMINE, WE

08:47AM 15   SPECIFICALLY IDENTIFIED THIS PATIENT AND THIS ISSUE.

08:47AM 16       THAT WAS SIX MONTHS BEFORE TRIAL EVEN BEGAN IN THIS CASE,

08:47AM 17   BEFORE JURY SELECTION EVEN BEGAN IN THIS CASE, AND YOU WOULD

08:47AM 18   HAVE EXPECTED DURING THAT TIME PERIOD IF THERE WAS SOME KIND OF

08:47AM 19   A MISTAKE OR THE GOVERNMENT REALIZED IT HAD -- IF THERE WAS

08:47AM 20   SOME ERROR OR OVERSIGHT, THEN IT WOULD HAVE SAID, OH, BY THE

08:48AM 21   WAY, YOU'RE WRONG ABOUT THAT ONE, EITHER HERE'S A SUPPLEMENTAL

08:48AM 22   PLEADING BEFORE THE MOTIONS IN LIMINE AND HERE'S A MOTION FOR A

08:48AM 23   BILL OF PARTICULARS THAT HAS ANOTHER TEST, OR YES, WE ACTUALLY

08:48AM 24   DO HAVE AN EXPERT TO TESTIFY ON THIS.

08:48AM 25       IT HAD PLENTY OF OPPORTUNITY TO DO THAT AND, IN FACT, IT

08:48AM 1    DIDN'T AND IT TOOK ACTIONS IN THE OPPOSITE DIRECTION.

08:48AM 2         THE COURT:  WELL, WE'LL ASK MR. BOSTIC ABOUT THIS.

08:48AM 3    I NOTICE ON DOCUMENT 664 ON PAGE 2 AT FOOTNOTE 1, I THINK

08:48AM 4    THE GOVERNMENT INDICATES THAT SHOULD YOU WISH TO ADD TO OR

08:48AM 5    AMEND THE BILL OF PARTICULARS PRIOR TO THE TESTIMONY, THE

08:48AM 6    GOVERNMENT WOULD DO THAT, AND I'M NOT CERTAIN THAT THAT HAS

08:48AM 7    OCCURRED.

08:48AM 8         MR. BOSTIC?

08:48AM 9         MR. BOSTIC:  YES, YOUR HONOR.

08:48AM 10   SO AS TO THAT LAST POINT, THE GOVERNMENT HAS NOT AMENDED

08:48AM 11   ITS BILL OF PARTICULARS, AND, FRANKLY, IF WE COULD GO BACK IN

08:48AM 12   TIME AND AMEND THE BILL OF PARTICULARS TO AVOID THIS DISPUTE,

08:48AM 13   OF COURSE WE WOULD DO SO.

08:48AM 14   OUR GOAL IS NOT TO CREATE DISPUTES OR ANY

08:49AM 15   MISUNDERSTANDINGS.

08:49AM 16   BUT THE POINT OF THE BILL OF PARTICULARS, TO BEGIN WITH --

08:49AM 17   AND THIS HAS BEEN SINCE BEFORE THE COURT EVEN ORDERED THE BILL

08:49AM 18   OF PARTICULARS CREATED IN THIS CASE -- THE PURPOSE OF THE

08:49AM 19   DOCUMENT IS TO MAKE SURE THAT THE DEFENSE HAS NOTICE AS TO THE

08:49AM 20   NATURE OF THE CHARGES.  IT'S A SUPPLEMENT TO THE INFORMATION IN

08:49AM 21   THE INDICTMENT.

08:49AM 22   AND DUE TO THE WAY THAT THE EVENTS OCCURRED IN THIS CASE

08:49AM 23   WHERE THE BILL OF PARTICULARS WAS ORDERED, SUBSEQUENTLY THE

08:49AM 24   GOVERNMENT INTERVIEWED THE PATIENT BB, GATHERED INFORMATION

08:49AM 25   ABOUT HIS INACCURATE PLATELET RESULTS.

08:49AM  1      AND JUST TO BE CLEAR, THE RESULTS ARE FROM THE PLATELET OR

08:49AM  2   THE PLT ASSAY, WHICH IS AN -- THE TEST AT ISSUE HERE IS THE

08:49AM  3   PLT, OR PLATELET ASSAY, AND IT'S ONE ASSAY THAT IS GROUPED IN

08:50AM  4   THE CBC PANEL OF TESTS.

08:50AM  5      SO REALLY THE ONLY TEST RESULT WHOSE ACCURACY IS AT ISSUE

08:50AM  6   IN CONNECTION WITH PATIENT BB IS THE PLATELET TEST, OR PLT.

08:50AM  7      THE --

08:50AM  8           THE COURT:  IS THAT -- I'M SORRY TO INTERRUPT YOU.

08:50AM  9      IS THAT IN THE BILL OF PARTICULARS, THE PLT?

08:50AM 10           MR. BOSTIC:  THE PLT IS NOT LISTED IN THE BILL OF

08:50AM 11   PARTICULARS, YOUR HONOR.

08:50AM 12      AND I THINK WHEN IT COMES TO NOTICE TO THE DEFENSE, THE

08:50AM 13   CRITICAL POINT IS THAT THE INTERVIEW WITH BB AND THE FACT THAT

08:50AM 14   THE ONLY ASSAY AT ISSUE WITH HIM IS PLT WAS DISCLOSED TO THE

08:50AM 15   DEFENSE IN THE FIRST HALF OF LAST YEAR.

08:50AM 16      IN MAY OF LAST YEAR THE GOVERNMENT FILED AN AMENDING

08:50AM 17   CHARGING DOCUMENT INCLUDING FOR THE FIRST TIME BB AS THE BASIS

08:50AM 18   FOR AN ACTUAL WIRE FRAUD COUNT AS ONE OF THREE PATIENTS THAT

08:50AM 19   CURRENTLY ARE IN THE OPERATIVE INDICTMENT.

08:50AM 20           THE COURT:  THIS IS COUNT NINE, I BELIEVE.

08:51AM 21           MR. BOSTIC:  THAT'S CORRECT, YOUR HONOR.

08:51AM 22           THE COURT:  AND IT'S A PHONE CALL FROM ARIZONA TO

08:51AM 23   CALIFORNIA FROM BB TO THERANOS, I THINK.  IS THAT RIGHT?

08:51AM 24           MR. BOSTIC:  CORRECT, CORRECT.  AND THE SOLE TOPIC

08:51AM 25   OF THAT CALL WAS THE ACCURACY -- OR CONCERNS ABOUT THE ACCURACY

5199

08:51AM 1      OF THIS PLT OR PLATELET TEST.

08:51AM 2          SO CERTAINLY AT LEAST SINCE MAY OF 2020 THE DEFENSE HAS

08:51AM 3      BEEN ON NOTICE THAT THIS IS A COUNT IN THE INDICTMENT, THAT THE

08:51AM 4      ONLY TOPIC, THE ONLY ASSAY THAT THIS PATIENT HAS DISCUSSED, THE

08:51AM 5      ONLY ASSAY THAT'S IMPACTED THIS PATIENT WAS THAT PLT, OR

08:51AM 6      PLATELET, ASSAY.

08:51AM 7          THE DEFENSE IS CORRECT THAT EARLIER THIS YEAR THE DEFENSE

08:51AM 8      NOTED IN A REPLY TO ITS MOTION ABOUT THE BILL OF PARTICULARS

08:51AM 9      THAT THAT PLATELET ASSAY WAS NOT LISTED IN THE BILL OF

08:51AM 10     PARTICULARS.

08:51AM 11         I THINK AT THAT TIME, IF MEMORY SERVES, FRANKLY, THERE MAY

08:51AM 12     HAVE BEEN SOME CONFUSION ON THE GOVERNMENT'S SIDE ABOUT WHETHER

08:51AM 13     THE PT ASSAY, WHICH IS LISTED IN THE INDICTMENT AND BILL OF

08:52AM 14     PARTICULARS, WAS THE SAME THING AS THE PLATELET ASSAY.  PT ALSO

08:52AM 15     INVOLVES CLOTTING, BLOOD CLOTTING.  SO I THINK THAT MIGHT HAVE

08:52AM 16     BEEN PART OF THE CONFUSION HERE.

08:52AM 17         TO THE DEFENSE'S CREDIT, THEY WERE NOT CONFUSED BY THAT.

08:52AM 18     THEY HAVE, THE RECORD SHOWS, UNDERSTOOD THE DIFFERENCE BETWEEN

08:52AM 19     THOSE TWO ASSAYS.

08:52AM 20         SO THEY'VE HAD THE BENEFIT OF UNDERSTANDING THAT BB WAS IN

08:52AM 21     THE CASE, WAS AN INTEGRAL PART OF THE CASE BY VIRTUE OF BEING

08:52AM 22     CONNECTED TO AN INDICTED COUNT, AND THAT HIS TESTIMONY RELATED

08:52AM 23     SOLELY TO THE ACCURACY OF THAT PLT RESULT.

08:52AM 24         SO IF THE PURPOSE OF THE BILL OF PARTICULARS WERE TO SET

08:52AM 25     UP TRAPS FOR THE GOVERNMENT WHERE THERE ARE VARIATIONS BETWEEN

5200

08:52AM 1        THE PROOF AT TRIAL AND WHAT IS STRICTLY LAID OUT IN THE BILL,

08:52AM 2     THEN THAT WOULD BE ONE THING.

08:52AM 3        BUT BECAUSE, AS THE GOVERNMENT UNDERSTANDS IT, THE PURPOSE

08:52AM 4     OF THE BILL OF PARTICULARS IS TO SIMPLY ENSURE THAT THERE IS

08:53AM 5     NOTICE -- AND AGAIN, IT'S THE SUPPLEMENT TO THE INFORMATION IN

08:53AM 6     THE INDICTMENT AND THE INDICTMENT HERE INCLUDES THE BB COUNT,

08:53AM 7     WHICH RELATES ONLY TO THE PLATELET TEST -- AND THE LIST OF

08:53AM 8     ASSAYS, BY THE WAY, IN PARAGRAPH 16 OF THE INDICTMENT DOES

08:53AM 9     INDICATE THAT THAT LIST IS A LIST OF THE ASSAYS THAT ARE AT

08:53AM 10    ISSUE IN THE CASE AND THE LANGUAGE DOES INCLUDE, "INCLUDING BUT

08:53AM 11    NOT LIMITING TO."

08:53AM 12       SO CERTAINLY WE WOULD SUBMIT THAT AS TO ASSAYS

08:53AM 13    SPECIFICALLY TIED TO INDICTED COUNTS IN THAT SAME DOCUMENT, THE

08:53AM 14    SAME CHARGING DOCUMENT, THE DEFENSE HAS FAIR NOTICE.

08:53AM 15          THE COURT:  THANK YOU.  WHAT ABOUT, WHAT ABOUT

08:53AM 16    DOCUMENT 798 AND THE COURT'S RULING ON PAGES 78 THROUGH 80?  I

08:53AM 17    KNOW YOU'VE READ THAT.  AND THE COURT INDICATED THAT THE

08:53AM 18    GOVERNMENT IS PRECLUDED FROM INTRODUCING ANY EVIDENCE OR

08:53AM 19    ARGUMENT REGARDING THE PURPORTED INACCURACY AND UNRELIABILITY

08:53AM 20    OF TESTS NOT IDENTIFIED IN THE GOVERNMENT'S BILL OF

08:54AM 21    PARTICULARS.

08:54AM 22       AND THE ORDER GOES FURTHER TO SAY THAT THE GOVERNMENT MAY

08:54AM 23    STILL INTRODUCE EVIDENCE OR TESTIMONY ABOUT TESTS NOT LISTED IN

08:54AM 24    THE BILL OF PARTICULARS FOR PURPOSES UNRELATED TO THE ACCURACY

08:54AM 25    AND RELIABILITY OF THOSE TESTS.

5201

08:54AM   1          I GUESS THE THRESHOLD QUESTION I SHOULD HAVE ASKED IS, IS

08:54AM   2     BB, IS HIS TESTIMONY RELATED TO ACCURACY AND RELIABILITY?

08:54AM   3          MR. BOSTIC:  IT IS, YOUR HONOR.  IT IS.

08:54AM   4          THE COURT:  RIGHT.

08:54AM   5          MR. BOSTIC:  I THINK AS TO THE COURT'S ORDER, WE

08:54AM   6     WOULD ASK THAT THE COURT CONSTRUE IT TO INCLUDE INFORMATION

08:54AM   7     DISCLOSED IN THE INDICTMENT AS A WHOLE, WHICH WOULD INCLUDE

08:54AM   8     BB'S COUNT RELATING TO PLATELETS.  BECAUSE THE DEFENSE HAS BEEN

08:54AM   9     ON NOTICE OF THAT, WE BELIEVE IT'S APPROPRIATE AND THAT THERE'S

08:54AM  10     NO PREJUDICE ISSUE INVOLVED IN HAVING HIM TESTIFY ON THAT

08:54AM  11     TOPIC.

08:54AM  12          MS. TREFZ:  SO I HEARD A COUPLE OF THINGS THAT I

08:54AM  13     JUST WANT TO RESPOND TO.

08:54AM  14          ONE IS THE IDEA THAT THE GOVERNMENT DIDN'T KNOW WHAT

08:55AM  15     ASSAYS IT WAS CHARGING AND IT THOUGHT THAT PT INR IS THE SAME

08:55AM  16     THING AS PLATELETS IS PRETTY SHOCKING.  IT'S THE FIRST THING --

08:55AM  17     IT'S THE FIRST TIME I'VE HEARD OF THIS PARTICULAR ARGUMENT.

08:55AM  18          AND, I MEAN, I CAN'T BELIEVE THAT THE GOVERNMENT WOULD GO

08:55AM  19     FORWARD WITH AN INDICTMENT AND PROCEED, YOU KNOW, SEVERAL

08:55AM  20     MONTHS BEYOND THAT INTO THE MOTIONS IN LIMINE STAGE AND BE

08:55AM  21     SUDDENLY SURPRISED AT I DON'T KNOW WHAT POINT TO LEARN THAT

08:55AM  22     PLATELETS ARE DIFFERENT THAN PROTHROMBIN.

08:55AM  23          BUT THESE ARE TOTALLY DIFFERENT ASSAYS.  THIS IS THE

08:55AM  24     GOVERNMENT'S CASE.  IT'S A SCIENTIFIC CASE.  THEY SHOULD KNOW

08:55AM  25     WHICH ASSAYS THEY'RE CHARGING WHEN THEY CHARGE IT.  THAT'S

5202

08:55AM  1    NUMBER ONE.

08:55AM  2         NUMBER TWO IS TO THE EXTENT THAT MR. BOSTIC ASKS THE COURT

08:55AM  3    TO CONSTRUE THE COURT'S ORDER TO INCLUDE TESTS BEYOND THE 25,

08:55AM  4    THE COURT'S ORDER IS CLEAR.  IT SAYS 25.  THE 25 TESTS LISTED

08:56AM  5    IN THE BILL OF PARTICULARS, AND THE TSI ALSO LISTED THE SAME 25

08:56AM  6    ASSAYS.

08:56AM  7         OF COURSE THE COURT'S ORDER SAYS THAT BECAUSE DURING THE

08:56AM  8    MOTIONS IN LIMINE BRIEFING, THAT'S WHAT WE WERE TALKING ABOUT.

08:56AM  9    IT WAS VERY CLEAR.  THAT'S WHY WE FILED THE MOTION IN LIMINE ON

08:56AM  10   THE BILL OF PARTICULARS.

08:56AM  11        WE SPECIFICALLY IDENTIFIED CBC AND THE FACT THAT BB WAS

08:56AM  12   ABOUT A DIFFERENT SET OF ASSAYS, AND THE GOVERNMENT NOT ONLY

08:56AM  13   DIDN'T FILE AN UPDATED BILL OF PARTICULARS AT THE TIME, THERE

08:56AM  14   WERE TWO AND A HALF MONTHS BETWEEN THE TIME OF OUR REPLY AND

08:56AM  15   THE MOTION IN LIMINE HEARINGS IN WHICH THE GOVERNMENT

08:56AM  16   PRESUMABLY COULD HAVE, YOU KNOW, SAID, HEY, YOU GUYS ARE

08:56AM  17   MISTAKEN.  SORRY, WE THOUGHT THIS WAS SOMETHING DIFFERENT.  BY

08:56AM  18   THE WAY, YOU'RE ON NOTICE OF THIS.

08:56AM  19        AND INSTEAD OF DOING THAT, WHAT THEY DID -- ALL OF THEIR

08:56AM  20   ACTIONS WERE TO TAKE STEPS TO ESSENTIALLY DISCLAIM OR, OR NO

08:56AM  21   ACTION AT ALL WITH RESPECT TO THESE ASSAYS.

08:56AM  22        MR. BOSTIC:  AND, YOUR HONOR, JUST ON THAT

08:57AM  23   DISCLAIMING POINT, I DO WANT TO ADDRESS THAT BECAUSE I'M NOT

08:57AM  24   EXACTLY SURE WHAT EXPERT NOTICE MS. TREFZ IS REFERRING TO, BUT

08:57AM  25   I DON'T BELIEVE IT WAS AN EXPERT NOTICE RELATING TO THE

5203

08:57AM 1    ACCURACY OF CBC OR THE PLATELET TEST.  IT'S CERTAINLY NOT AN

08:57AM 2    EXPERT NOTICE RELATING TO THE ACCURACY OF MR. -- EXCUSE ME, OF

08:57AM 3    BB'S TEST RESULT.

08:57AM 4        SO IT'S NOT THE CASE THAT THE GOVERNMENT TOOK ACTION TO

08:57AM 5    STEP AWAY FROM OFFERING EXPERT TESTIMONY ON THE ACCURACY OF

08:57AM 6    THIS TEST.

08:57AM 7        I THINK THERE MAY HAVE BEEN SOME CONTEMPLATED EXPERT

08:57AM 8    TESTIMONY ABOUT THE PREVALENCE OF THIS TEST, BUT THAT'S NOT

08:57AM 9    RELEVANT TO THIS PATIENT'S TESTIMONY.  IT'S RELEVANT TO THE

08:57AM 10   CAPABILITIES OF THE DEVICE GENERALLY, FOR EXAMPLE, WHETHER THE

08:57AM 11   MILITARY WOULD HAVE BEEN INTERESTED IN A DEVICE THAT COULD NOT

08:57AM 12   PERFORM A CBC TEST, OR WHETHER INVESTORS KNEW THAT THE THERANOS

08:57AM 13   ANALYZER COULD NOT PERFORM A COMMON TEST SUCH AS CBC.

08:57AM 14       SO THAT'S THE SCOPE OF THE EXPERT TESTIMONY THAT WOULD

08:57AM 15   HAVE BEEN INVOLVED HERE.

08:58AM 16       BY NOT OFFERING THAT OR REMOVING NOTICE OF THAT, IT REALLY

08:58AM 17   SHOULD NOT HAVE CREATED ANY CONFUSION IN THE DEFENSE'S MIND

08:58AM 18   ABOUT WHETHER THE GOVERNMENT INTENDED TO PRESENT TESTIMONY FROM

08:58AM 19   THIS PATIENT ABOUT THE ACCURACY OF THIS PATIENT'S TEST.

08:58AM 20   THERE'S NOTHING ELSE THAT THIS PATIENT WOULD TESTIFY ABOUT.

08:58AM 21       SO, AGAIN, I THINK THE DEFENSE HAS BEEN ON NOTICE, AND IF

08:58AM 22   NOTICE IS THE CENTRAL ISSUE, I THINK THAT SHOULD CARRY THE DAY.

08:58AM 23           MS. TREFZ:  I'M SORRY, YOUR HONOR.  I DON'T MEAN TO

08:58AM 24   PROLONG THIS LONGER THAN NECESSARY, BUT JUST AS A QUICK POINT,

08:58AM 25   THAT'S WHY WE INCLUDED IT SPECIFICALLY IN OUR REPLY TO THE

5204

08:58AM 1    MOTIONS IN LIMINE.  I THINK IT'S -- WE CAN READ THAT STATEMENT.

08:58AM 2    IT'S PRETTY CLEAR WHAT WE'RE TALKING ABOUT.

08:58AM 3        WE BASED -- WE ESSENTIALLY SAY THIS IS THE PANEL THAT THIS

08:58AM 4    PATIENT RECEIVED, IT'S NOT DISCLOSED, WE NEED TO KNOW WHAT ELSE

08:58AM 5    HE'S GOING TO TESTIFY TO.  THAT IS WHY WE MENTIONED IT IN THE

08:58AM 6    REPLY AND WE RECEIVED NO RESPONSE.

08:58AM 7        THEN -- AND JUST THE ADDITIONAL POINT THAT I WAS GOING TO

08:59AM 8    MAKE IS THIS PATIENT CAN'T COME IN AND TESTIFY ABOUT THE

08:59AM 9    INACCURACY OF HIS OWN TEST.  HE'S NOT A SCIENTIST.

08:59AM 10        THE GOVERNMENT HAS NOT EVEN INTERVIEWED HIS HEALTH CARE

08:59AM 11    PROVIDER, AND THERE'S NO EXPERT WHO CAN COME IN AND EXPLAIN THE

08:59AM 12    ACCURACY OR ISSUES RELATED TO HIS TEST.  I'M NOT --

08:59AM 13            THE COURT:  WELL, WHAT I THOUGHT HE WAS -- EXCUSE

08:59AM 14    ME.

08:59AM 15            MS. TREFZ:  YES.

08:59AM 16            THE COURT:  WHAT I THOUGHT HE WAS GOING TO TESTIFY

08:59AM 17    TO WAS HE'S KNOWLEDGEABLE ABOUT HIS HEALTH CONDITION AND HE

08:59AM 18    WOULD COMPARE BOTH TESTINGS THAT HE RECEIVED FROM OTHER

08:59AM 19    PROVIDERS AND THE NUMBERS WITH THE TESTING HE RECEIVED FROM

08:59AM 20    YOUR CLIENT'S COMPANY, AND THOSE NUMBERS WERE DISPARATE AND

08:59AM 21    THAT'S WHY HE CONTACTED AND REACHED OUT TO THE COMPANY TO MAKE

08:59AM 22    A COMPLAINT.

08:59AM 23        SO HE'LL SAY THE NUMBERS WERE -- CAUSED HIM SOME CONCERN.

08:59AM 24    THAT'S WITHIN HIS PERSONAL KNOWLEDGE, I WOULD PRESUME.

09:00AM 25            MS. TREFZ:  RIGHT.

09:00AM 1      BUT THE FACT THAT NUMBERS ARE DIFFERENT FROM A TEST

09:00AM 2  ACTUALLY DOESN'T MEAN ANYTHING ABOUT WHETHER THEY'RE CONSISTENT

09:00AM 3  OR INCONSISTENT.  NUMBERS ARE DIFFERENT FROM TESTS ALL OF THE

09:00AM 4  TIME.

09:00AM 5      AND IN PARTICULAR ABOUT THE -- WITH RESPECT TO THE

09:00AM 6  PARTICULAR TEST THAT WE UNDERSTAND IS AT ISSUE HERE, THE

09:00AM 7  NUMBERS ARE NOT INCONSISTENT AS A MATTER OF KIND OF CLIA

09:00AM 8  REGULATIONS, SO THAT'S WHY WE NEED A SCIENTIFIC -- WE NEED

09:00AM 9  SCIENTIFIC TESTIMONY TO UNDERSTAND WHETHER THEY'RE INCONSISTENT

09:00AM 10 OR NOT.

09:00AM 11      MY UNDERSTANDING IS THAT WHAT MR. B WAS GOING TO -- OR

09:00AM 12 WOULD POTENTIALLY TESTIFY TO IS THAT HE CALLED BECAUSE HE HAD

09:00AM 13 QUESTIONS ABOUT WHETHER THE -- THERE WAS AN EXPLANATION FOR THE

09:00AM 14 DISCREPANCY IN THE RESULTS, NOT THAT THEY ARE INHERENTLY

09:00AM 15 INCONSISTENT.

09:00AM 16      AND I DON'T THINK AS A LAYPERSON HE CAN TESTIFY THAT THEY

09:00AM 17 ARE INHERENTLY INCONSISTENT.  HE DOESN'T HAVE THAT TYPE OF

09:00AM 18 KNOWLEDGE, AND HE DOESN'T HAVE THAT TYPE OF KNOWLEDGE WITH

09:00AM 19 RESPECT TO EITHER THE COMPARATIVE TEST FROM ACCESS LABS OR THE

09:01AM 20 TESTS FROM THERANOS.

09:01AM 21      SO THESE ARE REALLY COMPLEX ISSUES AND THIS IS WHY WE'VE

09:01AM 22 SPENT SO MUCH TIME FOCUSSING ON WHICH ASSAYS, EXPERT TESTIMONY,

09:01AM 23 ACCURACY ISSUES, AND IT'S JUST -- I THINK IT'S PRETTY

09:01AM 24 PREJUDICIAL NOT JUST FROM A NOTICE PERSPECTIVE, BUT FROM THE

09:01AM 25 PERSPECTIVE OF, YOU KNOW, JUST MISLEADING TESTIMONY AND OUR

09:01AM   1    ABILITY TO CONFRONT THE WITNESS ABOUT HIS UNDERSTANDING, YOU

09:01AM   2    KNOW, AND ABOUT THE REALITY OF THE SITUATION.

09:01AM   3        AND IF THE GOVERNMENT DOESN'T HAVE SOMEBODY TO EXPLAIN

09:01AM   4    THAT THESE ARE ACTUALLY DIFFERENT, THEN, FRANKLY, IT WON'T BE

09:01AM   5    ABLE TO PROVE THAT IT'S AN INACCURATE TEST AND IT SHOULDN'T BE

09:01AM   6    ALLOWED TO SUGGEST THAT TO THE JURY IN THIS CIRCUMSTANCE.

09:01AM   7        THE COURT:  YOU'RE TALKING ABOUT A FOUNDATIONAL

09:01AM   8    HURDLE THAT THE GOVERNMENT HAS TO OVERCOME SEPARATE AND APART

09:01AM   9    FROM THE WITNESS'S TESTIMONY OR TO SUPPORT IT.

09:01AM   10       BUT LET ME ASK YOU YOUR THOUGHTS ABOUT -- MR. BOSTIC SAID

09:02AM   11   YOU'RE ON NOTICE BECAUSE THE DOCUMENT 469, WHICH IS THE TSI,

09:02AM   12   SUGGESTS ON PAGE 7 AT LINE 1, TESTS INCLUDING BUT NOT LIMITED

09:02AM   13   TO, AND THAT LANGUAGE, CONCURRENT WITH THE CONVERSATION ABOUT

09:02AM   14   THE OTHER, THE PLATELETS AND THE PLT AND THESE OTHERS, SHOULD

09:02AM   15   HAVE PUT YOU ON NOTICE.

09:02AM   16       WHY DOESN'T THAT PUT YOU ON NOTICE?

09:02AM   17       MS. TREFZ:  WELL, IT DOESN'T, YOUR HONOR, BECAUSE WE

09:02AM   18   MOVED TO EXCLUDE TESTS NOT SPECIFICALLY LISTED.  WE IDENTIFIED

09:02AM   19   THE TESTS THAT WERE LISTED.  EVERYBODY UNDERSTOOD THE TESTS

09:02AM   20   THAT WERE LISTED.

09:02AM   21       IT SOUNDS LIKE THE GOVERNMENT MAY HAVE BEEN CONFUSED AS TO

09:02AM   22   WHAT TESTS IT WAS CHARGING.

09:02AM   23       THAT IS NOT OUR FAULT.  MS. HOLMES SHOULD NOT BEAR THE

09:02AM   24   BURDEN OF THE GOVERNMENT'S FAILURE TO UNDERSTAND ITS OWN CASE.

09:02AM   25       AND SO I WOULD SAY WE SHOULDN'T FORGIVE THE GOVERNMENT'S

09:02AM 1    MISUNDERSTANDING, IF THAT'S WHAT IT WAS, BECAUSE WE RAISED THE

09:02AM 2    ISSUE REPEATEDLY.

09:02AM 3        THEY DIDN'T DISAGREE, AND NOW THEY'RE SAYING, OH, WAIT A

09:03AM 4    MINUTE.  YOU KNOW, I THINK IT'S PRETTY UNFAIR AND IT'S THE

09:03AM 5    UNITED STATES GOVERNMENT, THIS IS A CRIMINAL CASE, THEY SHOULD

09:03AM 6    BE HELD TO A HIGHER STANDARD THAN THAT.

09:03AM 7            THE COURT:  ALL RIGHT.  THANK YOU.

09:03AM 8        LET ME ASK, YOU KNOW, THE OTHER QUESTION -- AND I DON'T

09:03AM 9    WANT TO GET AHEAD OF OURSELVES HERE, BUT PARDON ME.  JUST

09:03AM 10   LOOKING AT THE 302, WHICH WAS EXHIBIT 1 TO THE ATTACHMENT, THE

09:03AM 11   REDACTED VERSION, PAGE 2 OF 2 IN THE LAST PARAGRAPH THERE, I

09:03AM 12   GUESS FOUNDATIONALLY, WOULD THIS WITNESS BE ABLE TO TESTIFY

09:03AM 13   ABOUT ANYTHING?  IT SEEMS LIKE HE DIDN'T HAVE A CONVERSATION

09:03AM 14   WITH THE COMPANY.  MAYBE HE DID.  BUT THE 302 SEEMS TO BE A BIT

09:03AM 15   OPAQUE ON THAT.

09:03AM 16           MR. BOSTIC:  I'M SORRY.  THE COURT IS LOOKING AT

09:03AM 17   1116-2?

09:03AM 18           THE COURT:  PAGE 2 OF 2 IN THE LAST -- IT SAYS,

09:03AM 19   "TRIED TO CALL, DID NOT GET A RESPONSE.  IF THEY DID SPEAK, THE

09:04AM 20   ANSWER WAS UNSATISFYING AND HE DID NOT REMEMBER IT."

09:04AM 21           MR. BOSTIC:  SO, YOUR HONOR, THERE ARE INTERNAL

09:04AM 22   THERANOS DOCUMENTS DOCUMENTING THE CALL THAT DID GO THROUGH AND

09:04AM 23   THAT WAS RECEIVED BY A CUSTOMER SERVICE REPRESENTATIVE IN

09:04AM 24   CALIFORNIA.

09:04AM 25           THE COURT:  I SEE.  OKAY.

5208

| | | |
|---|---|---|
| 09:04AM | 1 | MR. BOSTIC:  SO THE CALL DID TAKE PLACE AND THAT'S |
| 09:04AM | 2 | THE BASIS FOR THE WIRE CHARGE. |
| 09:04AM | 3 | THE COURT:  OKAY. |
| 09:04AM | 4 | MR. BOSTIC:  I'D LIKE TO RESPOND BRIEFLY ON THE |
| 09:04AM | 5 | EXPERT ISSUE. |
| 09:04AM | 6 | THE COURT:  PLEASE. |
| 09:04AM | 7 | MR. BOSTIC:  SO I THINK THE NECESSITY OF AN EXPERT |
| 09:04AM | 8 | IS OBVIOUSLY A DIFFERENT ARGUMENT THAN WHAT WAS RAISED IN THE |
| 09:04AM | 9 | BRIEFING HERE, AND I'M HAPPY TO ADDRESS IT. |
| 09:04AM | 10 | BUT I SHOULD POINT OUT THAT ARGUMENT, AS WELL AS THE |
| 09:04AM | 11 | ARGUMENT ABOUT THE INCLUSION OF THE PLATELET TEST AND BB'S |
| 09:04AM | 12 | RESULT IN THE BILL OF PARTICULARS, THESE ARE BOTH ISSUES THAT |
| 09:04AM | 13 | COULD HAVE BEEN RAISED PRETRIAL MONTHS AGO.  I'LL JUST NOTE |
| 09:04AM | 14 | THAT FOR THE RECORD. |
| 09:04AM | 15 | REGARDING THE EXPERT ISSUE, LET ME BE CLEAR THAT THIS |
| 09:04AM | 16 | WITNESS IS NOT GOING TO TAKE THE STAND AND RENDER AN OPINION, |
| 09:05AM | 17 | AN ULTIMATE OPINION ABOUT THE ACCURACY OF THE THERANOS RESULTS. |
| 09:05AM | 18 | UNLIKE A MEDICAL SERVICE PROVIDER, UNLIKE AN EXPERT, HE IS |
| 09:05AM | 19 | NOT QUALIFIED TO TAKE THAT ULTIMATE STEP AND SAY, I HAVE |
| 09:05AM | 20 | CONCLUDED THAT THAT TEST RESULT WAS INACCURATE. |
| 09:05AM | 21 | HE CAN, THOUGH, TESTIFY ABOUT HIS EXPERIENCE WITH OTHER |
| 09:05AM | 22 | TEST RESULTS AND, IN FACT, IN THIS CASE THERE'S A |
| 09:05AM | 23 | CONTEMPORANEOUS RESULT FROM THE SAME DAY FROM A CONVENTIONAL |
| 09:05AM | 24 | LAB THAT DOES SHOW A DISCREPANCY.  THAT DISCREPANCY WAS THE |
| 09:05AM | 25 | REASON FOR HIS CALL TO THERANOS. |

09:05AM 1    I UNDERSTAND THE DEFENSE'S ARGUMENTS, WHICH THEY'RE FREE

09:05AM 2    TO PRESENT TO THE JURY AND EXPLORE ON CROSS, BUT THIS DOESN'T

09:05AM 3    GO TO THE ADMISSIBILITY OF HIS TESTIMONY ABOUT WHAT IS HIS

09:05AM 4    PERSONAL KNOWLEDGE, NAMELY, HIS KNOWLEDGE OF HIS OWN HEALTH,

09:05AM 5    HOW RESULTS FROM THIS PARTICULAR ASSAY RELATE TO HIS SYMPTOMS,

09:05AM 6    AND THEN SEPARATELY, THE DIFFERENCES BETWEEN RESULTS THAT HE

09:05AM 7    GOT FROM A CONVENTIONAL LAB AND THERANOS ON THE SAME ASSAY ON

09:06AM 8    THE SAME DAY.  IT'S SIMPLE.

09:06AM 9         THE COURT:  AND THEN HE CALLS AND THAT'S THE BASIS

09:06AM 10   OF THE COUNT NINE IS THE PHONE CALL?

09:06AM 11        MR. BOSTIC:  YES, YOUR HONOR.  CORRECT.

09:06AM 12        THE COURT:  SO HE'LL SAY, I GOT DIFFERENT NUMBERS,

09:06AM 13   AND I CALLED TO EITHER COMPLAIN OR INQUIRE ABOUT THE NUMBERS,

09:06AM 14   AND THAT PHONE CALL THEN IS EVIDENCE OF FRAUD BECAUSE IT SHOWS

09:06AM 15   INACCURACY OR -- THAT'S WHAT I GUESS I'M STRUGGLING WITH.

09:06AM 16        MR. BOSTIC:  SURE.  SO THE PHONE CALL ITSELF I DON'T

09:06AM 17   THINK SHOWS THE INACCURACY OF THE TEST.  THE PHONE CALL IS AN

09:06AM 18   INTERSTATE WIRE COMMUNICATION IN FURTHERANCE OF THE SCHEME TO

09:06AM 19   DEFRAUD PATIENTS IN THIS CASE BECAUSE THERANOS SET UP ITS CALL

09:07AM 20   CENTER TO RECEIVE CALLS FROM PATIENTS, INCLUDING PATIENTS WHO

09:07AM 21   HAD RECEIVED QUESTIONABLE RESULTS.

09:07AM 22        SO I THINK THAT'S THE -- THAT'S WHY IT FORMS THE

09:07AM 23   APPROPRIATE BASIS FOR THE WIRE FRAUD COUNT.

09:07AM 24        BUT WHEN IT COMES TO THE ACCURACY OF THE TESTS, I THINK

09:07AM 25   THE EVIDENCE IS TWO-FOLD.  FIRST, THE PATIENT TESTIFYING ABOUT

5210

09:07AM   1    HOW RESULTS FROM THIS ASSAY HAVE CORRELATED IN HIS LENGTHY

09:07AM   2    EXPERIENCE TO THE PHYSICAL PRESENTATION OF THE SYMPTOMS OF THE

09:07AM   3    CONDITION THAT HE HAS; AND THEN, SECOND, SIMPLY THE CONCRETE

09:07AM   4    OBJECTIVE DIFFERENCES BETWEEN THE THERANOS TESTS AND THE

09:07AM   5    CONVENTIONAL LAB TESTS FOR THE PLATELET ASSAY ON THE SAME DAY.

09:07AM   6         THE COURT:  IN HIS PERSONAL EXPERIENCE.  THE NUMBERS

09:07AM   7    ARE DIFFERENT BASED ON HIS CONDITION, HIS FEELING, HIS

09:07AM   8    SYMPTOMS, WHATEVER IT IS.

09:07AM   9       HE'LL TESTIFY, WHEN I FEEL THIS WAY, MY NUMBERS ARE

09:07AM   10   USUALLY X.

09:08AM   11        MR. BOSTIC:  CORRECT, YOUR HONOR.

09:08AM   12        THE COURT:  WHEN I TOOK THEIR TESTS, THE NUMBERS

09:08AM   13   WERE Y AND I COULDN'T FIGURE THAT OUT AND I CALLED TO COMPLAIN.

09:08AM   14        MR. BOSTIC:  YES, YOUR HONOR.  THAT'S THE FIRST PART

09:08AM   15   OF HIS TESTIMONY.

09:08AM   16        THE COURT:  RIGHT.

09:08AM   17        MR. BOSTIC:  IT'S SEPARATE AND INDEPENDENT FROM THE

09:08AM   18   SIMPLE FACT THAT HE GOT COMPARISON TESTS ON THE SAME DAY AND

09:08AM   19   THE RESULTS ARE WHAT THEY ARE.

09:08AM   20        THE COURT:  OKAY.  BUT I'M STILL TROUBLED BY THE

09:08AM   21   MOTION AND WHAT IT REQUIRES THE COURT TO DO IN LIGHT OF THE

09:08AM   22   COURT'S RULING IN 798.

09:08AM   23      THE COURT WAS SPECIFIC IN THAT, INDICATING YOU CAN'T SHOW

09:08AM   24   ANY OTHER -- YOU CAN'T PUT ANY EVIDENCE ON.  YOU'RE LISTED --

09:08AM   25   YOU'RE RESTRICTED TO THOSE 25 ASSAYS OF WHATEVER THEY WERE, AND

09:08AM 1    IF YOU WANT TO USE THEM FOR A DIFFERENT PURPOSE OTHER THAN

09:08AM 2    ACCURACY, RELIABILITY, THEY'RE CERTAINLY ADMISSIBLE.

09:08AM 3        AND I THINK YOU'VE SAID THAT IN YOUR PLEADINGS, THEY COULD

09:08AM 4    COME IN TO SHOW SOMETHING ELSE, THE NUMBER OF TESTS, FOR

09:08AM 5    EXAMPLE, AND I THINK 711 I THINK IS YOUR RESPONSE.  I CAN'T

09:09AM 6    REMEMBER THE DOCKET, BUT YOU SUGGESTED THERE ARE MANY OTHER

09:09AM 7    REASONS THAT IT COULD COME IN APART FROM.

09:09AM 8        AND THEN IN YOUR RESPONSE YOU SAID, WE'RE NOT GOING TO

09:09AM 9    INTRODUCE THAT FOR, AS I POINTED OUT IN THAT FOOTNOTE.  SO

09:09AM 10   I'M -- I FEEL LIKE A LITTLE BIT IN A CORNER HERE WITH THAT

09:09AM 11   BECAUSE IF I DON'T GRANT THE MOTION, THEN I DO VIOLENCE TO THE

09:09AM 12   COURT'S ORDER IN THE MIL MOTION.

09:09AM 13       MR. BOSTIC:  I UNDERSTAND, YOUR HONOR.

09:09AM 14       I THINK IF THIS WERE A SITUATION WHERE THE GOVERNMENT WERE

09:09AM 15   SEEKING TO TRULY ADD A NEW ASSAY TO THE CASE, IF THE GOVERNMENT

09:09AM 16   WERE SEEKING TO INTRODUCE EVIDENCE ABOUT THE ACCURACY OF AN

09:09AM 17   ASSAY THAT WASN'T ADDRESSED IN THE INDICTMENT AT ALL, THAT

09:09AM 18   WOULD BE A DIFFERENT QUESTION AND A MORE DIFFICULT SITUATION TO

09:09AM 19   NAVIGATE.

09:09AM 20       I THINK HERE, BECAUSE THE OPERATIVE INDICTMENT INCLUDES A

09:09AM 21   LIST OF ASSAYS THAT IS EXPRESSLY NOT EXCLUSIVE, AND BECAUSE

09:09AM 22   THAT SAME DOCUMENT, THAT SAME INDICTMENT ALSO LISTS THREE

09:10AM 23   PATIENT COUNTS, EACH OF WHICH CONCERN THE ACCURACY OF AN ASSAY,

09:10AM 24   AND ONE OF THOSE PATIENT COUNTS IS THE BB COUNT THAT COULD ONLY

09:10AM 25   RELATE TO THE ACCURACY OF THE PLT OR PLATELET TEST, I DON'T

09:10AM 1 THINK IT IS CONTRARY TO AT LEAST THE SPIRIT OF THE COURT'S

09:10AM 2 ORDER.

09:10AM 3     TO THE EXTENT A MODIFICATION OF THAT ORDER IS NECESSARY,

09:10AM 4 OR LEAVE TO AMEND THE BILL OF PARTICULARS AND TO ADD THOSE

09:10AM 5 THREE LETTERS TO IT, WE WOULD ASK FOR THAT IF THE COURT FEELS

09:10AM 6 IT'S NECESSARY.

09:10AM 7         THE COURT:  SURE.  OKAY.

09:10AM 8         MS. TREFZ:  JUST TO BE CLEAR, IN THE INDICTMENT

09:10AM 9 THERE ARE THREE PATIENT COUNTS.  MR. BOSTIC IS RIGHT.  THE

09:10AM 10 ASSAYS RELEVANT TO COUNTS ELEVEN AND TWELVE ARE LISTED IN THE

09:10AM 11 25 ASSAYS.

09:10AM 12     THAT'S WHY WE FILED THE MOTION, ONE OF THE REASONS WHY WE

09:10AM 13 FILED THE MOTION BACK IN NOVEMBER.  IT'S ONE OF THE REASONS WHY

09:10AM 14 WE SPECIFICALLY RAISED THE BB COUNT.

09:11AM 15     IT SOUNDS LIKE WHAT IT ISN'T IS AN OVERSIGHT.  IT SOUNDS

09:11AM 16 LIKE MR. BOSTIC HAD SAID EARLIER THAT THE GOVERNMENT WAS

09:11AM 17 CONFUSED AS TO ITS ASSAYS.  THAT IS BAFFLING TO ME AS AN

09:11AM 18 ARGUMENT, AND THE GOVERNMENT SHOULD NOT BE REWARDED FOR FAILING

09:11AM 19 TO UNDERSTAND ITS INDICTMENT.

09:11AM 20         THE COURT:  OKAY.  THANK YOU VERY MUCH.

09:11AM 21     WELL, IT'S -- I LOOK AT THIS, AND I'VE BEEN -- AS I SAID,

09:11AM 22 I FOCUSSED ON THE DOCUMENTS THAT I MENTIONED EARLIER, AND I'M

09:11AM 23 PARTICULARLY CONCERNED ABOUT THE COURT'S ORDER IN 798 AND THE

09:11AM 24 RESTRICTIVE NATURE OF THAT.

09:11AM 25     HOWEVER, I DID ALLOW FOR OTHER EVIDENCE TO COME IN, AS

09:11AM 1    INDICATED ON PAGES 78 THROUGH 80, AND THE GOVERNMENT COULD HAVE

09:11AM 2    GIVEN NOTICE, AND/OR USING ANYTHING OUTSIDE OF THOSE 25 ASSAYS

09:11AM 3    FOR A DIFFERENT PURPOSE.  THE COURT DIDN'T HAVE ANY PROBLEM

09:11AM 4    WITH THAT.

09:11AM 5         AND LET ME ALSO NOTE -- I THINK I NOTED, MR. BOSTIC, IN

09:11AM 6    YOUR PLEADINGS, YOUR SIDE'S PLEADINGS, YOU SUGGESTED THERE

09:12AM 7    WASN'T A HEARING ON THIS, AND I THINK THAT'S RIGHT.  WE DIDN'T

09:12AM 8    DISCUSS THIS AT A FORMAL HEARING.  THERE WASN'T ANY ORAL

09:12AM 9    ARGUMENT ON THIS AT THE HEARING.

09:12AM 10        BUT IF MY RECOLLECTION IS CORRECT, I THINK THIS IS ONE OF

09:12AM 11   THOSE THREE OR FOUR MILS THAT THE PARTIES COLLECTIVELY SAID NO

09:12AM 12   ARGUMENT WAS NECESSARY.  I THINK THAT'S RIGHT.  I THINK THIS

09:12AM 13   FELL IN THAT CATEGORY.

09:12AM 14             MS. TREFZ:  YES, YOUR HONOR.

09:12AM 15             THE COURT:  AND THAT'S WHY WE DIDN'T HAVE AN ORAL

09:12AM 16   ARGUMENT ON IT.

09:12AM 17        WE HAD MANY OTHER THINGS TO TALK ABOUT, AND WE DID TALK

09:12AM 18   ABOUT, BUT THIS WAS ONE OF THREE OR FOUR YOU SAID WE'RE FINE

09:12AM 19   WITH, SO I RECOGNIZE THAT.

09:12AM 20        ALL RIGHT.  THANK YOU VERY MUCH FOR THIS.

09:12AM 21        LET ME JUST SAY, I'M GOING TO ISSUE A SHORT ORDER ON THIS.

09:12AM 22   I THINK IT'S APPROPRIATE TO GIVE YOU AN ORDER.

09:12AM 23        BUT, MR. BOSTIC, I'M TROUBLED BY THIS, AND THE COURT MAY

09:12AM 24   VERY WELL LIKELY GRANT THIS MOTION JUST BASED ON OUR

09:12AM 25   CONVERSATION HERE, AND THE COURT'S 798, AS WELL AS LOOKING BACK

| | | |
|---|---|---|
| 09:12AM | 1 | AT 568, 711, 664 AND THE OTHER DOCUMENTS THAT WE HAVE |
| 09:12AM | 2 | DISCUSSED.  THAT IS THE HISTORY OF HOW WE GOT HERE. |
| 09:13AM | 3 | SO I THINK I AM -- I THINK I OWE FIDELITY TO THE COURT'S |
| 09:13AM | 4 | 798, PAGES 78 THROUGH 80, IN THAT ANALYSIS HERE.  BUT I'LL GET |
| 09:13AM | 5 | A SHORT ORDER. |
| 09:13AM | 6 | THIS WITNESS IS SCHEDULED FOR NEXT WEEK, I BELIEVE. |
| 09:13AM | 7 | MR. BOSTIC:  YOUR HONOR, THIS WITNESS WAS SCHEDULED |
| 09:13AM | 8 | TO TESTIFY AS EARLY AS TOMORROW. |
| 09:13AM | 9 | THE COURT:  OH, DEAR. |
| 09:13AM | 10 | MR. BOSTIC:  HE IS IN TOWN, BUT CERTAINLY WE'RE |
| 09:13AM | 11 | GUIDED BY THE COURT'S ORDER. |
| 09:13AM | 12 | THE COURT:  OKAY. |
| 09:13AM | 13 | MR. BOSTIC:  I'LL ONLY JUST EMPHASIZE MY POINT, I |
| 09:13AM | 14 | THINK NOTICE TO THE DEFENSE SHOULD BE THE GUIDING PRINCIPLE |
| 09:13AM | 15 | HERE, AND THE FACT THAT THERE WAS A MISUNDERSTANDING BEFORE -- |
| 09:13AM | 16 | I THINK, YOU KNOW, WITH RESPECT TO DEFENSE COUNSEL, I DON'T |
| 09:13AM | 17 | THINK THE DEFENSE SHOULD BE REWARDED FOR SAVING THIS AS A TRAP |
| 09:13AM | 18 | TO SPRING ON THE GOVERNMENT THE WEEK THAT THE WITNESS IS |
| 09:13AM | 19 | PLANNING TO TESTIFY. |
| 09:13AM | 20 | BUT WITH THAT I'LL SUBMIT. |
| 09:13AM | 21 | THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.  THANK |
| 09:13AM | 22 | YOU. |
| 09:13AM | 23 | MS. TREFZ:  THANK YOU. |
| 09:13AM | 24 | THE COURT:  WELL, I'LL STEP DOWN AND THEN WE'LL |
| 09:13AM | 25 | BRING OUR JURY IN. |

5215

| | | |
|---|---|---|
| 09:13AM | 1 | ANYTHING BEFORE WE BRING THE JURY IN?  MR. SCHENK, |
| 09:14AM | 2 | ANYTHING? |
| 09:14AM | 3 | MR. SCHENK:  NOTHING FURTHER. |
| 09:14AM | 4 | MR. WADE:  NO, YOUR HONOR. |
| 09:14AM | 5 | THE COURT:  OKAY.  THANK YOU. |
| 09:14AM | 6 | THE CLERK:  COURT IS IN RECESS. |
| 09:14AM | 7 | (RECESS FROM 9:14 A.M. UNTIL 9:23 A.M.) |
| 09:28AM | 8 | (JURY IN AT 9:28 A.M.) |
| 09:28AM | 9 | THE COURT:  THANK YOU.  GOOD MORNING.  WE ARE BACK |
| 09:28AM | 10 | ON THE RECORD IN THE HOLMES MATTER.  ALL COUNSEL ARE PRESENT. |
| 09:28AM | 11 | MS. HOLMES IS PRESENT. |
| 09:28AM | 12 | OUR JURY IS PRESENT. |
| 09:28AM | 13 | THANK YOU FOR YOUR PATIENCE.  GOOD MORNING, LADIES AND |
| 09:28AM | 14 | GENTLEMEN. |
| 09:28AM | 15 | BEFORE WE BEGIN OUR SESSION TODAY, LET ME ASK THE JURORS |
| 09:28AM | 16 | THE QUESTION YOU ALL KNOW.  DURING OUR RECESS, DID ANY OF YOU |
| 09:28AM | 17 | HAVE ANY OCCASION TO HAVE CONTACT WITH OR COME ACROSS ANY |
| 09:28AM | 18 | INFORMATION ABOUT THIS CASE OUTSIDE OF THE COURT?  AND IF SO, |
| 09:28AM | 19 | PLEASE RAISE YOUR HAND. |
| 09:29AM | 20 | ONCE AGAIN, I SEE NO HANDS. |
| 09:29AM | 21 | THANK YOU AGAIN FOR YOUR VIGILANCE IN THAT REGARD. |
| 09:29AM | 22 | LET ME JUST SAY A COUPLE OF THINGS ABOUT OUR COURTROOM. |
| 09:29AM | 23 | YESTERDAY IT WAS OPPRESSIVELY HOT IN THE AFTERNOON HERE, AND |
| 09:29AM | 24 | WE'RE TRYING TO GET THE HVAC SYSTEM ORGANIZED, AND WE'LL WORK |
| 09:29AM | 25 | ON THAT.  IT MAY BE THAT IN THE AFTERNOON, AND I THINK I |

5216

09:29AM 1    MENTIONED TO THE LAWYERS THAT IF IT DOES CONTINUE THAT WAY,

09:29AM 2    WE'RE GOING TO TAKE SOME STANDING BREAKS IN THE MIDDLE OF

09:29AM 3    TESTIMONY JUST TO KEEP OUR BLOOD FLOWING.  I KNOW IT'S

09:29AM 4    DIFFICULT TO FOCUS WHEN IT'S WARM, AND WE'LL TRY TO DO WHAT WE

09:29AM 5    CAN ABOUT THAT.

09:29AM 6         TODAY WE GO UNTIL 3:00.  PLEASE RECALL WE GO UNTIL 3:00

09:29AM 7    TODAY, AND HOPEFULLY TOMORROW WE'LL GO UNTIL 4:00 AND WE'LL

09:29AM 8    TAKE SOME BREAKS.

09:29AM 9         AND WHEN WE MET SEVERAL WEEKS AGO, I INDICATED IF ANYBODY

09:29AM 10   NEEDS TO TAKE A BREAK, INCLUDING THE PARTIES HERE, FOR ANY

09:30AM 11   REASON AT ALL, INCLUDING A FATIGUE BREAK, IF SOMEBODY NEEDS,

09:30AM 12   LIKE I JUST NEED TO GET FRESH AIR SUCH THAT WE HAVE IT IN THE

09:30AM 13   COURTHOUSE, PLEASE DON'T BE SHY ABOUT RAISING YOUR HAND AND

09:30AM 14   LETTING MS. KRATZMANN KNOW, LADIES AND GENTLEMEN OF THE JURY.

09:30AM 15   I STRIVE TO MAKE THESE PROCEEDINGS AS COMFORTABLE FOR YOU SO

09:30AM 16   YOU CAN CONTINUE TO FOCUS, AS YOU HAVE BEEN DOING THROUGHOUT

09:30AM 17   THE TRIAL, AND YOU KNOW I'M LOOKING AT YOU, I'M PAYING

09:30AM 18   ATTENTION TO YOU.

09:30AM 19        SO, PLEASE, IF YOU NEED A BREAK FOR ANY REASON, DON'T BE

09:30AM 20   SHY ABOUT LETTING ME KNOW.  I WANT TO ACCOMMODATE ANY OF THOSE

09:30AM 21   REQUESTS.

09:30AM 22        ALL RIGHT.  THANK YOU.

09:30AM 23        COUNSEL, ANYTHING BEFORE WE BEGIN?

09:30AM 24             MR. SCHENK:  NO, YOUR HONOR.

09:30AM 25             MR. WADE:  NO, YOUR HONOR.

MOSLEY CROSS BY MR. WADE (RES.)                                    5217

09:30AM  1              THE COURT:  ALL RIGHT.  THANK YOU.  LET'S CALL OUR

09:30AM  2    WITNESS IN.

09:31AM  3         OH, YES.  AND TOMORROW WE BEGIN AT 9:30.

09:31AM  4         GOOD MORNING.

09:31AM  5              THE WITNESS:  GOOD MORNING.

09:31AM  6              THE COURT:  AND LET ME REMIND YOU TO ADJUST THE

09:31AM  7    CHAIR AND MICROPHONE AS YOU NEED.  YOU CAN REMOVE YOUR MASK IF

09:31AM  8    YOU WISH.

09:31AM  9              THE WITNESS:  THANK YOU.

09:31AM  10             THE COURT:  I'LL ENCOURAGE YOU TO SPEAK DIRECTLY

09:31AM  11   INTO THE MICROPHONE.

09:31AM  12        WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

09:31AM  13   AGAIN.

09:31AM  14             THE WITNESS:  DANIEL LYNN MOSLEY.

09:31AM  15        **(GOVERNMENT'S WITNESS, DANIEL MOSLEY, WAS PREVIOUSLY**

09:31AM  16   **SWORN.)**

09:31AM  17             THE COURT:  THANK YOU.

09:31AM  18             MR. WADE:  MAY I PROCEED, YOUR HONOR?

09:31AM  19             THE COURT:  YES, THANK YOU.

09:31AM  20                   **CROSS-EXAMINATION (RESUMED)**

09:31AM  21   BY MR. WADE:

09:31AM  22   Q.   AND YOU'LL RECALL YOU'RE STILL UNDER OATH HERE THIS

09:31AM  23   MORNING, RIGHT, MR. MOSLEY?

09:31AM  24   A.   I UNDERSTAND.

09:31AM  25   Q.   I'D LIKE TO PICK UP YOUR CALL AT THE BEGINNING OF

MOSLEY CROSS BY MR. WADE (RES.)                                5218

09:31AM  1    CROSS-EXAMINATION YESTERDAY.  I ASKED YOU SOME QUESTIONS ABOUT

09:31AM  2    SOME OF YOUR CLIENTS.

09:31AM  3        DO YOU RECALL THAT?

09:31AM  4    A.   I'M NOT SURE WHAT YOU'RE ASKING.

09:31AM  5    Q.   DO YOU RECALL WHEN I WAS ASKING YOU QUESTIONS ABOUT THE

09:31AM  6    WALTON FAMILY AND SOME OF THE OTHER FAMILIES THAT YOU DID WORK

09:32AM  7    FOR IN CONNECTION WITH THERANOS?

09:32AM  8    A.   YES, YOU WERE ASKING ME AND I SAID CLIENTS I INTRODUCED.

09:32AM  9    I DIDN'T NECESSARILY DO WORK FOR THOSE CLIENTS IN CONNECTION

09:32AM  10   WITH THERANOS.

09:32AM  11   Q.   OKAY.  BUT YOU RECALL THOSE QUESTIONS; CORRECT?

09:32AM  12   A.   I DO RECALL THOSE QUESTIONS.

09:32AM  13   Q.   AND DO YOU RECALL THAT YOU, YOU -- I BELIEVE YOU DIDN'T

09:32AM  14   RECALL FOR SURE WHETHER YOU REPRESENTED THE NIARCHOS

09:32AM  15   FOUNDATION?

09:32AM  16   A.   I SAID I DON'T REMEMBER SPECIFICALLY.  CERTAINLY

09:32AM  17   ANDREAS DRACOPOULOS WAS A CLIENT OF MINE AND I GAVE HIM A BROAD

09:32AM  18   RANGE OF ADVICE, PROBABLY IN MATTERS AFFECTING THE FOUNDATION

09:32AM  19   SINCE HE WAS THE PRESIDENT OR CO-PRESIDENT OF THE FOUNDATION.

09:32AM  20   Q.   OKAY.  COULD I HAVE YOU JUST LOOK IN YOUR BINDER AT TRIAL

09:32AM  21   EXHIBIT 4801?  AND IT'S A LEGAL DOCUMENT, A LEGAL SIZE

09:32AM  22   DOCUMENT, SO IT SHOULD BE EASY TO FIND IN THAT BINDER.

09:33AM  23   A.   I SEE IT.

09:33AM  24   Q.   DO YOU SEE THAT?

09:33AM  25   A.   I DO.

MOSLEY CROSS BY MR. WADE (RES.)                                    5219

09:33AM   1    Q.   AND COULD YOU JUST TAKE A MINUTE AND REVIEW THE FIRST

09:33AM   2    COUPLE OF PAGES AND SEE IF THAT REFRESHES YOUR RECOLLECTION

09:33AM   3    THAT YOU PROVIDED LEGAL SERVICES TO THE NIARCHOS FOUNDATION AS

09:33AM   4    WELL?

09:34AM   5         (PAUSE IN PROCEEDINGS.)

09:34AM   6    BY MR. WADE:

09:34AM   7    Q.   AND IN PARTICULAR, MR. MOSLEY, IF YOU COULD LOOK AT

09:34AM   8    ENTRIES, FOR EXAMPLE, 18, 13, 14, 15, THAT MIGHT BE HELPFUL.

09:34AM   9    A.   OKAY.

09:34AM   10        (PAUSE IN PROCEEDINGS.)

09:35AM   11            THE WITNESS:  I'VE READ THOSE.  IT WAS A RATHER LONG

09:35AM   12   DOCUMENT.

09:35AM   13   BY MR. WADE:

09:35AM   14   Q.   NO.   THAT'S FINE.

09:35AM   15   A.   OKAY.

09:35AM   16   Q.   YOU'VE HAD A CHANCE TO LOOK AT THOSE ENTRIES?

09:35AM   17   A.   YES, I HAVE.

09:35AM   18   Q.   AND DOES THAT REFRESH YOUR RECOLLECTION THAT YOU HAD

09:35AM   19   PRIVILEGED COMMUNICATIONS WITH THE NIARCHOS FOUNDATION?

09:35AM   20   A.   IT DOES NOT BECAUSE NOTHING ON HERE REFERS TO THE NIARCHOS

09:35AM   21   FOUNDATION AND, YOU KNOW, A NUMBER OF THE THINGS REFER TO

09:35AM   22   EMAILS AND THE EMAIL ADDRESS OF ANDREAS DRACOPOULOS.

09:35AM   23        I DON'T SEE ANY -- I GUESS I SEE A REFERENCE TO A FELLOW

09:35AM   24   BY THE NAME OF VASILI TSAMIS WHO DOES WORK AT THE NIARCHOS

09:35AM   25   FOUNDATION, BUT I DON'T SEE ANYTHING MORE SPECIFIC THAN THAT.

MOSLEY CROSS BY MR. WADE (RES.)                              5220

09:36AM  1    IS THERE SOMETHING THAT I'M MISSING?

09:36AM  2    Q.   WELL, DO YOU RECALL THAT YOU TOOK A TRIP WITH MEMBERS OF

09:36AM  3    THE NIARCHOS FOUNDATION TO THERANOS?

09:36AM  4    A.   YES, I DID.

09:36AM  5    Q.   AND DO YOU RECALL FROM REVIEWING THIS DOCUMENT THAT YOU

09:36AM  6    COMMUNICATED WITH SEVERAL MEMBERS OF THE NIARCHOS FOUNDATION IN

09:36AM  7    CONNECTION WITH THERANOS WORK?

09:36AM  8    A.   AS I SAID, I INTRODUCED -- ACTUALLY, I THINK IF YOU GO

09:36AM  9    BACK AND THE LETTER THAT YOU SHOWED ME LAST -- YESTERDAY,

09:36AM  10   DR. KISSINGER CONTACTED ANDREAS DRACOPOULOS AND THE NIARCHOS

09:36AM  11   FOUNDATION, AND I CERTAINLY INTRODUCED THEM TO ELIZABETH, AND I

09:36AM  12   CERTAINLY DID TAKE A TRIP WITH TWO MEMBERS FROM THE FOUNDATION

09:36AM  13   OUT TO SEE THERANOS WITH THEM AS PART OF AN INTRODUCTION.

09:36AM  14   Q.   AND DO YOU RECALL THAT YOU'VE, YOU'VE ASSERTED PRIVILEGE

09:36AM  15   OVER MANY COMMUNICATIONS WITH MEMBERS OF THE NIARCHOS

09:37AM  16   FOUNDATION?

09:37AM  17   A.   I'M -- YOU KNOW, I DID NOT HANDLE THIS DOCUMENT DISCOVERY,

09:37AM  18   SO I DIDN'T -- MAYBE PRIVILEGE WAS ASSERTED ON MY BEHALF BY MY

09:37AM  19   ATTORNEYS, BUT THAT'S NOT SOMETHING THAT I PERSONALLY DID.

09:37AM  20   Q.   OKAY.  SO AS YOU SIT HERE TODAY, DO YOU HAVE A VIEW ONE

09:37AM  21   WAY OR THE OTHER WHETHER YOU REPRESENTED THE NIARCHOS

09:37AM  22   FOUNDATION?

09:37AM  23   A.   AS I SAID, I REALLY DON'T HAVE ANY RECOLLECTION OF

09:37AM  24   REPRESENTING THE NIARCHOS FOUNDATION.

09:37AM  25        I HAD -- AS I SAID, ANDREAS DRACOPOULOS, WHO IS THE

MOSLEY CROSS BY MR. WADE (RES.)                    5221

09:37AM  1    CO-PRESIDENT OF THE NIARCHOS FOUNDATION, WAS A CLIENT OF MINE,

09:37AM  2    AND I CERTAINLY HAD A LOT OF COMMUNICATIONS WITH ANDREAS AS

09:37AM  3    PART OF HIS BEING INTRODUCED.

09:37AM  4         AND AS PART OF THE NIARCHOS FOUNDATION, I DID TAKE A TRIP

09:37AM  5    WITH THEM, AND OBVIOUSLY ON THAT TRIP I DID HAVE CONVERSATIONS

09:37AM  6    WITH HIM.

09:37AM  7         BUT I DID NOT VIEW MYSELF AS REPRESENTING THE NIARCHOS

09:37AM  8    FOUNDATION.

09:37AM  9    Q.   OKAY.  THE -- WE TALKED A LITTLE BIT YESTERDAY ABOUT THE

09:38AM 10    COX -- YOUR REPRESENTATION OF THE COX FAMILY.

09:38AM 11         DO YOU RECALL THAT?

09:38AM 12    A.   YES.

09:38AM 13    Q.   AND I DON'T BELIEVE I ASKED YOU, BUT DID -- YOU CAME TO

09:38AM 14    LEARN THAT THEY INVESTED $100 MILLION IN THERANOS?

09:38AM 15    A.   I DID COME AT SOME POINT TO LEARN THAT THEY INVESTED

09:38AM 16    100 MILLION.  IT'S THE NUMBER THAT I WAS TOLD.

09:38AM 17    Q.   RIGHT.

09:38AM 18    A.   I WASN'T PERSONALLY INVOLVED, SO I DON'T KNOW -- I HAVEN'T

09:38AM 19    SEEN EVIDENCE SPECIFICALLY TO THAT, BUT THAT IS THE NUMBER THAT

09:38AM 20    I UNDERSTAND.

09:38AM 21    Q.   OKAY.  AND I THINK YOU GAVE SOME TESTIMONY YESTERDAY WITH

09:38AM 22    RESPECT TO SOME COMMUNICATIONS THAT YOU HAD WITH MEMBERS OF THE

09:38AM 23    OPPENHEIMER FAMILY.

09:38AM 24         DO YOU RECALL THAT?

09:38AM 25    A.   YES.  I -- NO, I DON'T THINK WE TALKED ABOUT THAT.

MOSLEY CROSS BY MR. WADE (RES.)                                      5222

09:38AM   1      Q.   OKAY.  DO YOU RECALL YOU HAD SOME COMMUNICATIONS WITH

09:38AM   2      REPRESENTATIVES OF THE OPPENHEIMER FAMILY?

09:38AM   3      A.   I DID HAVE SOME COMMUNICATIONS, YES.

09:38AM   4      Q.   AND MR. SLACK IN PARTICULAR?

09:38AM   5      A.   YES.

09:38AM   6      Q.   AND HE WAS A FRIEND OF MR. KISSINGER'S?

09:38AM   7      A.   YES.

09:38AM   8      Q.   OR DR. KISSINGER'S?

09:38AM   9      A.   YES, HE WAS.

09:38AM   10     Q.   OKAY.  AND YOU UNDERSTAND THAT HE ULTIMATELY INVESTED

09:39AM   11     $20 MILLION?

09:39AM   12     A.   YOU KNOW, I WASN'T INVOLVED IN HOW MUCH THEY INVESTED, BUT

09:39AM   13     I WAS TOLD THAT THEY INVESTED 20 MILLION.

09:39AM   14     Q.   OKAY.  I'D LIKE TO USE A DEMONSTRATIVE.  I'LL PASS IT UP

09:39AM   15     TO THE COURT.

09:39AM   16          THE COURT'S INDULGENCE FOR ONE MOMENT?

09:39AM   17               THE COURT:  SURE.

09:39AM   18          (DISCUSSION OFF THE RECORD AMONGST COUNSEL FOR THE

09:39AM   19     GOVERNMENT AND DEFENSE.)

09:39AM   20               MR. WADE:  YOUR HONOR, I'VE PASSED UP A

09:39AM   21     DEMONSTRATIVE.  I WOULD JUST NOTE WITH RESPECT TO ONE OF THE

09:40AM   22     ENTRIES WITH RESPECT TO THE NIARCHOS FOUNDATION, WE'RE GOING TO

09:40AM   23     REMOVE THE ENTRY WITH RESPECT TO ATTORNEY THERE.

09:40AM   24          AND THEN I WOULD ASK TO DISPLAY THIS.

09:40AM   25               THE COURT:  DO YOU HAVE A COPY OF THIS, MR. SCHENK?

MOSLEY CROSS BY MR. WADE (RES.)                                    5223

09:40AM   1                MR. SCHENK:  YES.

09:40AM   2                THE COURT:  OKAY.

09:40AM   3                MR. WADE:  JUST AS A DEMONSTRATIVE.  I WOULD DO THIS

09:40AM   4     ON A FLIP CHART, BUT WE DON'T SEEM TO HAVE THE SPACE FOR THIS.

09:40AM   5                THE COURT:  OKAY.  THAT'S FINE.  THANK YOU.

09:40AM   6     BY MR. WADE:

09:40AM   7     Q.   AND DO YOU SEE THIS CHART IS A SUMMARY OF SOME OF THE,

09:40AM   8     SOME OF THE FAMILIES THAT WE TALKED ABOUT AND YOUR

09:40AM   9     RELATIONSHIPS WITH THOSE FAMILIES?

09:40AM  10          DO YOU SEE THAT?

09:40AM  11     A.   I DO.

09:40AM  12     Q.   AND I CHANGED THE NIARCHOS FOUNDATION ENTRY, BUT THAT

09:41AM  13     WOULD BE A FRIEND OF DR. KISSINGER AS WELL?

09:41AM  14     A.   A FOUNDATION BEING A FRIEND OF SOMEBODY'S?

09:41AM  15          IT WAS SOMEBODY THAT HE WAS AWARE OF AND INTRODUCED

09:41AM  16     ELIZABETH AND THERANOS TO.

09:41AM  17     Q.   FAIR ENOUGH.

09:41AM  18          AND WITH RESPECT TO, WITH RESPECT TO THOSE -- THESE

09:41AM  19     FAMILIES WHERE YOU HAD AN ATTORNEY-CLIENT RELATIONSHIP, DO YOU

09:41AM  20     RECALL THAT AT DIFFERENT POINTS THROUGHOUT THE FALL YOU HAD

09:41AM  21     COMMUNICATIONS WITH THEM ABOUT THERANOS MATTERS THAT WERE

09:41AM  22     PRIVILEGED?

09:41AM  23                MR. SCHENK:  OBJECTION.  RELEVANCE.

09:41AM  24                THE COURT:  SUSTAINED AS TO THE FORM OF THE

09:41AM  25     QUESTION.  YOU CAN REASK IT.

MOSLEY CROSS BY MR. WADE (RES.)                                    5224

09:41AM    1    BY MR. WADE:

09:41AM    2    Q.   DO YOU RECALL THAT YOU HAD COMMUNICATIONS WITH THE CLIENTS

09:42AM    3    WHO YOU REPRESENTED HERE WITH RESPECT TO THERANOS?

09:42AM    4    A.   SOME, SOME OF THESE.   I MEAN, THERE ARE SOME THAT I NEVER

09:42AM    5    HAD A CONVERSATION ABOUT THERANOS WITH.   BUT SOME OF THESE

09:42AM    6    INDIVIDUALS I DID HAVE CONVERSATIONS WITH.

09:42AM    7    Q.   OKAY.   AND, FOR EXAMPLE, AND WE'LL GO THROUGH SOME OF THE

09:42AM    8    COMMUNICATIONS, BUT YOU HAD COMMUNICATIONS WITH MR. PENNER,

09:42AM    9    MR. WALTON, AND MRS. WALTON?

09:42AM   10    A.   YES.

09:42AM   11    Q.   AND YOU HAD COMMUNICATIONS WITH MR. TUBERGEN?

09:42AM   12    A.   YES.

09:42AM   13    Q.   AND YOU HAD COMMUNICATIONS WITH MR. DYER AND MR. TAYLOR?

09:42AM   14    A.   I DID.

09:42AM   15    Q.   AND YOU HAD COMMUNICATIONS WITH MR. SLACK?

09:42AM   16    A.   YES, I DID.

09:42AM   17    Q.   OKAY.   YOU HAD COMMUNICATIONS WITH MR. DRACOPOULOS?

09:42AM   18    A.   YES, I DID.

09:42AM   19    Q.   YOU HAD COMMUNICATIONS WITH MR. KISSINGER?

09:42AM   20    A.   YES, I DID.

09:42AM   21    Q.   YOU HAD COMMUNICATIONS WITH OTHER MEMBERS OF THE NIARCHOS

09:42AM   22    FAMILY; CORRECT?

09:42AM   23    A.   NO.

09:42AM   24    Q.   NOT PRIVILEGED COMMUNICATIONS, YOU HAD COMMUNICATIONS WITH

09:42AM   25    MEMBERS OF THE NIARCHOS FOUNDATION OR ITS CO-PRESIDENT?

MOSLEY CROSS BY MR. WADE (RES.)                                    5225

09:43AM   1    A.   THE CO-PRESIDENT IS ANDREAS DRACOPOULOS, SO, YES, I DID

09:43AM   2    HAVE CONVERSATIONS WITH HIM.

09:43AM   3    Q.   OKAY.

09:43AM   4    A.   AND I DON'T SPECIFICALLY RECALL, BUT I WOULD SUSPECT THAT

09:43AM   5    I HAD COMMUNICATIONS WITH ONE OR MORE INDIVIDUALS AT -- BECAUSE

09:43AM   6    I TOOK A TRIP WITH THEM, AS YOU KNOW.

09:43AM   7    Q.   OKAY.  AND YOU RECALL THAT YOU HAD SOME COMMUNICATIONS

09:43AM   8    WITH A REPRESENTATIVE, MR. ELKANN?

09:43AM   9    A.   I DID.

09:43AM   10   Q.   AND IS THAT MR. OHANA WHO YOU COMMUNICATED WITH?

09:43AM   11   A.   I DON'T REMEMBER, BUT THAT SOUNDS LIKE THAT'S PROBABLY

09:43AM   12   RIGHT.

09:43AM   13   Q.   IF I CAN CALL YOUR ATTENTION TO EXHIBIT 14118, WHICH I

09:43AM   14   BELIEVE SHOULD BE IN VOLUME TWO.

09:44AM   15   A.   I HAVE IT.

09:44AM   16   Q.   OKAY.  AND DO YOU RECOGNIZE THIS TO BE AN EMAIL BETWEEN,

09:44AM   17   AMONG OTHERS, YOU AND MS. HOLMES RELATING TO THERANOS MATTERS?

09:44AM   18   A.   THERE ARE ONE -- THERE ARE AT LEAST THREE, FOUR, FIVE

09:44AM   19   EMAILS HERE.  ARE WE TALKING ABOUT THE TOP ONE?

09:44AM   20   Q.   DO YOU RECOGNIZE IT TO BE A STRING OF COMMUNICATIONS WITH

09:44AM   21   RESPECT TO THOSE MATTERS?

09:44AM   22   A.   I DO.

09:44AM   23   Q.   OKAY.

09:44AM   24        MOVE THE ADMISSION OF 14118.

09:44AM   25             MR. SCHENK:  NO OBJECTION.

| | | |
|---|---|---|
| 09:44AM | 1 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 09:44AM | 2 | (DEFENDANT'S EXHIBIT 14118 WAS RECEIVED IN EVIDENCE.) |
| 09:44AM | 3 | BY MR. WADE: |
| 09:45AM | 4 | Q.  IF WE CAN GO TO THE SECOND -- WELL, LET'S GO TO THE BOTTOM |
| 09:45AM | 5 | OF THE FIRST PAGE FOR A SECOND. |
| 09:45AM | 6 | DO YOU SEE THE LAST ENTRY ON THE BOTTOM OF THE FIRST PAGE |
| 09:45AM | 7 | INDICATES THAT THE EMAIL THAT FOLLOWS IS FROM MS. HOLMES? |
| 09:45AM | 8 | DO YOU SEE THAT? |
| 09:45AM | 9 | A.  THE ONE AUGUST THE 20TH? |
| 09:45AM | 10 | Q.  YES.  IT CONTINUES ONTO THE SECOND PAGE? |
| 09:45AM | 11 | A.  THE ONE FROM ME DATED ALSO AUGUST THE 20TH. |
| 09:45AM | 12 | Q.  I'M SORRY.  I'M PROBABLY NOT PROVIDING CLARITY FOR YOU |
| 09:45AM | 13 | HERE. |
| 09:45AM | 14 | DO YOU HAVE 14118 IN FRONT OF YOU? |
| 09:45AM | 15 | A.  I DO. |
| 09:45AM | 16 | Q.  AND IF YOU WOULD LOOK AT THE VERY LAST LINE ON THE BOTTOM |
| 09:45AM | 17 | OF THE PAGE? |
| 09:45AM | 18 | A.  OH, THE ONE THAT SAYS FROM MS. HOLMES? |
| 09:45AM | 19 | Q.  YEAH.  DO YOU SEE THAT? |
| 09:45AM | 20 | A.  I DO SEE THAT. |
| 09:45AM | 21 | Q.  AND DO YOU SEE THAT IT CONTINUES ACTUALLY OVER TO THE |
| 09:45AM | 22 | EMAIL ON THE SECOND PAGE? |
| 09:45AM | 23 | A.  I DO. |
| 09:45AM | 24 | Q.  AND LET'S LOOK AT THAT EMAIL.  DO YOU RECALL YESTERDAY |
| 09:45AM | 25 | THAT YOU SAID YOU HAD A CONVERSATION WITH MS. HOLMES ON |

MOSLEY CROSS BY MR. WADE (RES.)                                    5227

09:45AM  1    JULY 21ST I BELIEVE IT WAS INITIALLY.

09:45AM  2         DO YOU RECALL THAT?

09:46AM  3    A.   WHAT I RECALL IS THAT YOU SHOWED ME A MESSAGE SLIP THAT

09:46AM  4    SHE HAD CALLED ME ON A PARTICULAR DAY AND SAID -- LEFT HER

09:46AM  5    NUMBER AND SAID, PLEASE LET'S TALK ON MONDAY.

09:46AM  6         AND I TOLD YOU I DIDN'T REMEMBER WHETHER WE ACTUALLY SPOKE

09:46AM  7    ON MONDAY OR NOT.

09:46AM  8    Q.   YEAH.  FAIR ENOUGH.

09:46AM  9         I BELIEVE WE WERE ASKING AT THAT POINT ABOUT THE SECOND

09:46AM  10   CALL.  BUT DO YOU RECALL THAT THERE WAS AN INTRODUCTORY CALL

09:46AM  11   BEFORE THAT ON JULY 21ST, YOUR FIRST CALL WITH HER?

09:46AM  12   A.   I DON'T REMEMBER THE EXACT DATE, BUT, YES, I DID HAVE A

09:46AM  13   CALL SOMETIME AFTER DR. KISSINGER HAD INTRODUCED ME TO

09:46AM  14   ELIZABETH, YES.

09:46AM  15   Q.   AND THEN THERE WAS SOME COMMUNICATIONS ABOUT WAL-MART, OR

09:46AM  16   ABOUT THE WALTON FAMILY AFTER THAT.

09:46AM  17        DO YOU RECALL THAT?

09:46AM  18   A.   YES.

09:46AM  19   Q.   AND THEN WE WERE TRYING TO FIGURE OUT, I THINK WHEN WE

09:46AM  20   LEFT OFF OUR TESTIMONY, WHEN THE NEXT CONVERSATION WAS.  DO YOU

09:46AM  21   RECALL THAT?  AND I SHOWED YOU THAT MESSAGE.

09:46AM  22   A.   YOU SHOWED ME THE NEXT MESSAGE, YES.

09:47AM  23   Q.   AND LET'S LOOK AND SEE.  THIS WAS AN EMAIL FROM MS. HOLMES

09:47AM  24   TO YOU ON AUGUST 19TH, IN WHICH SHE SAYS IT WAS GREAT TO

09:47AM  25   CONNECT YESTERDAY.

MOSLEY CROSS BY MR. WADE (RES.)                          5228

09:47AM  1          DO YOU SEE THAT?

09:47AM  2     A.   YES.

09:47AM  3     Q.   AND SHE SENDS YOU A CDA.

09:47AM  4          DO YOU SEE THAT?

09:47AM  5     A.   YES.

09:47AM  6     Q.   AND WHAT IS A CDA?

09:47AM  7     A.   YES.

09:47AM  8     Q.   CAN YOU TELL THE JURY WHAT THAT IS?

09:47AM  9     A.   I TYPICALLY REFER IT TO AS AN NDA, A NONDISCLOSURE

09:47AM 10     AGREEMENT, AND CDA I THINK IT STANDS FOR THE SAME THING, A

09:47AM 11     CONFIDENTIAL DISCLOSURE AGREEMENT.

09:47AM 12          AND IT MERELY IS A DOCUMENT THAT SAYS WE'RE GOING TO GIVE

09:47AM 13     YOU INFORMATION THAT WE DON'T WANT YOU TO DISCLOSE TO OTHER

09:47AM 14     PEOPLE, AND BY GETTING THIS INFORMATION YOU AGREE YOU WILL KEEP

09:47AM 15     IT CONFIDENTIAL AND NOT GIVE IT TO ANYONE WITHOUT OUR CONSENT.

09:47AM 16     Q.   AND IN THE CORPORATE LEGAL WORLD, PRIVATE CLIENT WORLD IN

09:47AM 17     WHICH YOU'VE WORKED FOR DECADES, THESE ARE PRETTY COMMON;

09:48AM 18     RIGHT?

09:48AM 19     A.   I DON'T KNOW IF YOU WOULD SAY THEY'RE COMMON IN MY

09:48AM 20     PRACTICE, BUT THEY'RE COMMON WHEN YOU'RE DEALING WITH A

09:48AM 21     COMPANY.

09:48AM 22          INDIVIDUALS DON'T TYPICALLY HAVE THESE AGREEMENTS, BUT

09:48AM 23     WHEN YOU'RE DEALING WITH A COMPANY THAT HAS CONFIDENTIAL

09:48AM 24     INFORMATION THAT THEY DON'T WANT TO BE PUBLIC, IT IS VERY

09:48AM 25     COMMON TO BE ASKED TO SIGN AN NDA OR, IN THIS CASE, A CDA.

MOSLEY CROSS BY MR. WADE (RES.)                                    5229

```
09:48AM   1    Q.   OKAY.  AND DOES THIS EMAIL REFRESH YOUR RECOLLECTION THAT

09:48AM   2    IN ABOUT THIS TIMEFRAME YOU HAD ANOTHER CALL WITH MS. HOLMES?

09:48AM   3    A.   YOU KNOW, I -- SEVEN YEARS AGO, I CAN'T REMEMBER EXACTLY

09:48AM   4    EVERY CALL I HAD AND EXACTLY WHAT TIME.

09:48AM   5         BUT IT CERTAINLY IS AN INDICATION THAT I SPOKE WITH

09:48AM   6    ELIZABETH ON THE DAY BEFORE, WHICH WOULD HAVE BEEN AUGUST

09:48AM   7    THE 18TH.

09:48AM   8    Q.   OKAY.  AND LET'S LOOK AT THE NEXT EMAIL UP THE CHAIN,

09:48AM   9    WHICH IS AN EMAIL FROM YOU.

09:48AM  10         AND I THINK IT'S FAIR TO SAY THAT'S CONSISTENT WITH THAT

09:48AM  11    UNDERSTANDING; IS THAT RIGHT?  AS TO THE TIMING OF THE

09:49AM  12    CONVERSATION?

09:49AM  13    A.   YES, IT IS.

09:49AM  14    Q.   OKAY.  AND HERE YOU NOTE THAT YOU FULLY UNDERSTAND THE

09:49AM  15    IMPORTANCE OF THE CONFIDENTIAL DISCLOSURE AGREEMENT; RIGHT?

09:49AM  16    A.   ABSOLUTELY.  I THINK WHAT I'M SAYING HERE IS THAT I WILL

09:49AM  17    NOT DISCLOSE ANY INFORMATION THAT I HAVE GOTTEN FROM THERANOS

09:49AM  18    OR FROM ELIZABETH TO ANY OF THESE OTHER PARTIES THAT MIGHT HAVE

09:49AM  19    AN INTEREST IN THE COMPANY UNTIL THEY HAVE SIGNED THEIR OWN

09:49AM  20    CONFIDENTIAL DISCLOSURE AGREEMENT.  I'M CARRYING OUT MY

09:49AM  21    OBLIGATIONS.

09:49AM  22    Q.   RIGHT.  AND YOU HAD REVIEWED THE SUBSTANCE OF THAT

09:49AM  23    AGREEMENT?

09:49AM  24    A.   YES, I DID.

09:49AM  25    Q.   AND YOU CONSIDERED IT TO BE BALANCED AND REASONABLE;
```

MOSLEY CROSS BY MR. WADE (RES.)                                    5230

09:49AM   1    CORRECT?

09:49AM   2    A.   SUFFICIENTLY SO.  I OBVIOUSLY READ ONE AND SIGNED ONE

09:49AM   3    PERSONALLY.

09:49AM   4    Q.   AND YOU WROTE HERE IT'S A VERY BALANCED AND REASONABLE

09:49AM   5    DOCUMENT; CORRECT?

09:49AM   6    A.   I DID WRITE THAT, YES.

09:49AM   7    Q.   OKAY.  AND YOU BELIEVED THAT AT THE TIME, I ASSUME.

09:49AM   8    A.   I DID.

09:49AM   9    Q.   OKAY.  YOU SEE YOU THEN SAID THAT YOU WILL WORK TO GET IT

09:50AM  10    SIGNED BY THE FOUNDATION.

09:50AM  11         DO YOU SEE THAT?

09:50AM  12    A.   I SAID I WILL PROCEED TO GET IT SIGNED.

09:50AM  13    Q.   YEAH.  AND DO YOU RECALL DOING THAT?

09:50AM  14    A.   NOT SPECIFICALLY, BUT I BELIEVE IT HAPPENED BECAUSE I

09:50AM  15    WOULD NOT HAVE HAD ANY CONVERSATION WITH THE FOUNDATION ABOUT

09:50AM  16    THERANOS AND ANY OF ITS INFORMATION UNTIL THEY HAD SIGNED IT.

09:50AM  17    Q.   RIGHT.  AND YOU KNOW THAT YOU DID HAVE THOSE

09:50AM  18    CONVERSATIONS, SO YOU ASSUMED IT PROBABLY GOT SIGNED; CORRECT?

09:50AM  19    A.   EXACTLY.

09:50AM  20    Q.   OKAY.  AND IF WE LOOK AT THE NEXT LINE HERE, DO YOU SEE IT

09:50AM  21    SAYS YOU WILL ALSO GET IT SIGNED, AND YOU REFER TO MR. PENNER.

09:50AM  22         DO YOU SEE THAT?  AND YOU SAY YOU WILL GET IT SIGNED BY

09:50AM  23    MR. PENNER OR ANYONE IN THE WALTON FAMILY WHO WILL SEE THOSE

09:51AM  24    MATERIALS?

09:51AM  25    A.   YES, YES.

MOSLEY CROSS BY MR. WADE (RES.)                                    5231

09:51AM   1    Q.   AND THAT'S A SIMILAR LEVEL OF CAUTION THAT YOU WERE TAKING

09:51AM   2    IN THAT APPROACH; IS THAT RIGHT?

09:51AM   3    A.   I WAS CARRYING OUT MY COMMITMENT UNDER MY OWN PERSONAL

09:51AM   4    CONFIDENTIAL DISCLOSURE AGREEMENT.

09:51AM   5    Q.   OKAY.  AND, AND YOU SEE THE LINE ON THE BOTTOM WHERE IT

09:51AM   6    SAYS YOU LOOK FORWARD TO REVIEWING THE MATERIALS ONCE THEY'VE

09:51AM   7    COME.

09:51AM   8         DO YOU SEE THAT?

09:51AM   9    A.   I SEE THAT.

09:51AM   10   Q.   AND SO AS OF AUGUST 20TH, YOU HADN'T RECEIVED THOSE

09:51AM   11   MATERIALS YET; RIGHT?

09:51AM   12   A.   I BELIEVE THAT'S CORRECT.

09:51AM   13   Q.   OKAY.  AND, IN FACT, IF WE JUST JUMP UP TO THE EMAIL ON

09:51AM   14   THE TOP, IF WE CAN JUST GO ALL OF THE WAY TO THE TOP, YOU SEE

09:51AM   15   MS. HOLMES INDICATES HERE THAT THOSE MATERIALS WERE SENT OUT.

09:51AM   16        DO YOU SEE THAT?

09:51AM   17   A.   I DO.  I SEE IT.

09:51AM   18   Q.   AND, AND I THINK WE SAW A LETTER YESTERDAY THAT WAS DATED

09:51AM   19   AROUND THE 18TH, SO MAYBE IT TOOK A COUPLE OF DAYS FOR THOSE

09:51AM   20   MATERIALS TO ARRIVE; RIGHT?

09:51AM   21   A.   THAT MAKES SENSE.

09:51AM   22   Q.   OKAY.  AND THE, THE -- AND I THINK IF WE GO TO 4173, I

09:52AM   23   BELIEVE IT IS IN EVIDENCE.

09:52AM   24        PERMISSION TO PUBLISH, YOUR HONOR?

09:52AM   25             THE COURT:  YES.

MOSLEY CROSS BY MR. WADE (RES.)                    5232

09:52AM   1          THE WITNESS:  IS THAT 14173?

09:52AM   2     BY MR. WADE:

09:52AM   3     Q.  IT'S UP ON THE SCREEN IF IT'S HELPFUL.  I'M GOING TO ASK A

09:52AM   4     QUICK QUESTION ABOUT IT.

09:52AM   5     A.  OKAY.

09:52AM   6     Q.  AND YOU UNDERSTOOD THIS TO BE THE TRANSMISSION LETTER FROM

09:52AM   7     THOSE THREE BINDERS OF MATERIALS THAT I WAS KIND ENOUGH TO HAND

09:52AM   8     UP TO YOU YESTERDAY?

09:52AM   9     A.  I DO.

09:52AM  10     Q.  AND LET'S GO TO 14119.

09:52AM  11     A.  I HAVE IT.

09:53AM  12     Q.  AND DO YOU SEE THAT'S AN EMAIL FROM YOU -- THE BOTTOM

09:53AM  13     EMAIL IS AN EMAIL FROM YOU TO MS. HOLMES ON SEPTEMBER 2ND

09:53AM  14     RELATING TO THERANOS MATTERS?

09:53AM  15     A.  I SEE IT.

09:53AM  16          MR. WADE:  I MOVE THE ADMISSION OF 14119.

09:53AM  17          MR. SCHENK:  NO OBJECTION.

09:53AM  18          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:53AM  19     (DEFENDANT'S EXHIBIT 14119 WAS RECEIVED IN EVIDENCE.)

09:53AM  20     (PAUSE IN PROCEEDINGS.)

09:53AM  21          MR. WADE:  THE COURT'S INDULGENCE FOR A MOMENT.

09:54AM  22     (PAUSE IN PROCEEDINGS.)

09:54AM  23     BY MR. WADE:

09:54AM  24     Q.  DO YOU HAVE THAT IN FRONT OF YOU, SIR?

09:54AM  25     A.  I DO.

MOSLEY CROSS BY MR. WADE (RES.)                                          5233

09:54AM   1    Q.   AND I THINK I MOVED THE ADMISSION, AND I CAN'T REMEMBER IF

09:54AM   2    I DID.  IT'S BEEN ADMITTED; IS THAT RIGHT?

09:54AM   3         CAN I GO TO THE ELMO WHILE WE WORK OUT THE TECHNICAL

09:54AM   4    ISSUES HERE?

09:54AM   5             THE COURT:  SURE.

09:54AM   6             MR. WADE:  THANK YOU.  THANK GOODNESS.  I'M NEVER

09:54AM   7    GOOD WITH THIS ELMO.

09:55AM   8    Q.   DO YOU SEE THAT EMAIL UP ON THE SCREEN?

09:55AM   9         IF WE CAN GO TO THE BOTTOM EMAIL AND BLOW THAT UP?

09:55AM   10   A.   UH-HUH.

09:55AM   11   Q.   OKAY.  AND DO YOU SEE THIS IS SEPTEMBER 2ND, 2014?

09:55AM   12        DO YOU SEE THAT?

09:55AM   13   A.   I DO.

09:55AM   14   Q.   AND THAT'S THE SAME DATE AS THAT OUTLINE DOCUMENT THAT YOU

09:55AM   15   HAD PREPARED FOR DR. KISSINGER.

09:55AM   16        DO YOU RECALL THAT?

09:55AM   17   A.   THAT SOUNDS RIGHT.

09:55AM   18   Q.   OKAY.  AND, IN FACT, YOU REFER TO THAT IN THIS EMAIL?

09:55AM   19   A.   I DO.

09:55AM   20   Q.   OKAY.  AND I THINK YOU REFERENCE HERE THAT YOU HAD

09:55AM   21   ACTUALLY SPENT THE WEEKEND GOING THROUGH THE MATERIALS AND

09:55AM   22   PREPARING THAT OUTLINE; CORRECT?

09:55AM   23   A.   I DID.

09:55AM   24   Q.   AND YOU HAD NEVER SENT THE OUTLINE TO MS. HOLMES; CORRECT?

09:55AM   25   A.   I DON'T EVER RECALL SENDING IT TO HER.

MOSLEY CROSS BY MR. WADE (RES.)                                    5234

09:55AM   1    Q.   OKAY.  AND YOU DON'T RECALL EVER SENDING IT TO ANYONE ELSE

09:55AM   2    AT THERANOS; CORRECT?

09:55AM   3    A.   I DON'T RECALL SENDING IT -- I DON'T UNDERSTAND THE

09:56AM   4    QUESTION.

09:56AM   5    Q.   YOU DON'T RECALL SENDING IT TO ANYONE ELSE AT THERANOS;

09:56AM   6    CORRECT?

09:56AM   7    A.   I DON'T RECALL IT.  I DO NOT.

09:56AM   8    Q.   OKAY.  AND YOU TALKED ABOUT, IN CONNECTION WITH THIS

09:56AM   9    EMAIL, HOW IMPRESSED YOU WERE BY THE COMPANY AND THE MATERIALS

09:56AM   10   THAT YOU READ?

09:56AM   11   A.   YES.

09:56AM   12   Q.   AND YOU MENTION THAT YOU -- DO YOU SEE IN THE THIRD LINE

09:56AM   13   THERE, YOU SAID -- OR THE BOTTOM OF THIS -- THE LAST PART OF

09:56AM   14   THE SECOND LINE, OR THIRD LINE, YOU SAY YOU HAD A CONVERSATION

09:56AM   15   WITH MR. KISSINGER FOLLOWING UP ON THAT; RIGHT?

09:56AM   16   A.   YES, DR. KISSINGER.

09:56AM   17   Q.   YES, THANK YOU, DR. KISSINGER.

09:56AM   18        AND I DON'T WANT TO ASK ANYTHING ABOUT THE SUBSTANCE OF

09:56AM   19   THOSE COMMUNICATIONS.

09:56AM   20        HE WAS YOUR CLIENT; CORRECT?

09:56AM   21   A.   CORRECT.

09:56AM   22   Q.   OKAY.  AND YOU NOTE THERE THAT YOU WERE GOING TO SEND THAT

09:57AM   23   TO DR. KISSINGER; CORRECT?

09:57AM   24   A.   YES.

09:57AM   25   Q.   AND DID YOU, IN FACT, SEND IT TO DR. KISSINGER?

MOSLEY CROSS BY MR. WADE (RES.)                                    5235

09:57AM   1    A.   YES.  I THINK WE REVIEWED THE LETTER EARLIER THAT ENCLOSED

09:57AM   2    IT, YES.

09:57AM   3    Q.   I CERTAINLY SAW THE LETTER.

09:57AM   4         AND IT'S YOUR UNDERSTANDING THAT THAT WAS THEN ACTUALLY

09:57AM   5    COMMUNICATED TO DR. KISSINGER?

09:57AM   6    A.   YES.

09:57AM   7    Q.   OKAY.  YOU THEN -- YOU THEN, IN THE BOTTOM EMAIL, TALK

09:57AM   8    ABOUT THE WALTON FAMILY.

09:57AM   9         DO YOU SEE THAT?

09:57AM  10    A.   I DO.

09:57AM  11    Q.   AND YOU NOTE THAT YOU HAD CHECKED IN WITH MR. PENNER?

09:57AM  12    A.   YES.

09:57AM  13    Q.   AND YOU WERE HAVING -- AGAIN, NOT WANTING THE SUBSTANCE --

09:57AM  14    BUT AS HIS COUNSEL, YOU WERE HAVING SOME COMMUNICATIONS WITH

09:57AM  15    MR. PENNER IN THIS PERIOD.

09:57AM  16         DO YOU RECALL THAT?

09:57AM  17    A.   I WAS.  I DON'T KNOW IF I WOULD SAY "AS HIS COUNSEL."  I

09:57AM  18    WAS SIMPLY CHECKING TO SEE WHETHER HE HAD GOTTEN THE MATERIALS.

09:57AM  19    Q.   OKAY.  AND YOU NOTED HERE THAT HE HADN'T YET SEEN THOSE

09:57AM  20    MATERIALS?

09:57AM  21    A.   THAT'S WHAT IT SAYS.

09:57AM  22    Q.   BUT THAT HE SIGNED THE CDA.

09:57AM  23         DO YOU SEE THAT?

09:57AM  24    A.   THAT IS CORRECT.

09:57AM  25    Q.   AND SO GIVEN THAT, YOU WOULD HAVE FELT FREE TO COMMUNICATE

MOSLEY CROSS BY MR. WADE (RES.)                              5236

09:58AM   1    WITH MR. PENNER ABOUT THERANOS ISSUES; CORRECT?

09:58AM   2    A.   I WOULD HAVE, YES.

09:58AM   3    Q.   OKAY.  AND YOU WERE JUST CHECKING TO FOLLOW UP TO MAKE

09:58AM   4    SURE THAT THOSE MATERIALS WERE GOING TO BE SENT AGAIN.

09:58AM   5         DO YOU SEE THAT?

09:58AM   6    A.   YES.

09:58AM   7    Q.   OKAY.

09:58AM   8    A.   I THINK IT SAYS THAT I GOT TWO COPIES, AND I JUST WANTED

09:58AM   9    TO BE SURE THAT ONE OF THOSE COPIES WAS NOT INTENDED FOR

09:58AM   10   GREG PENNER.

09:58AM   11   Q.   UNDERSTOOD.  AND DO YOU SEE THE LAST LINE OF THE FIRST

09:58AM   12   PARAGRAPH, DO YOU SEE THERE IT SAYS, "I HAVE A FEW QUESTIONS

09:58AM   13   AND WANT TO FOLLOW UP ON YOUR OFFER OF A BRIEFING BUT THOUGHT I

09:58AM   14   WOULD WAIT UNTIL I HAVE ANY FURTHER QUESTIONS THAT MIGHT BE

09:58AM   15   RAISED BY THE NIARCHOS FOUNDATION PEOPLE AFTER THEY HAVE HAD A

09:58AM   16   CHANCE TO REVIEW THE MATERIALS AND MY OUTLINE."

09:58AM   17        DO YOU SEE THAT?

09:58AM   18   A.   I DO SEE THAT.

09:58AM   19   Q.   OKAY.  SO YOU KNEW THOSE MATERIALS THAT YOU LOOKED AT WERE

09:58AM   20   SORT OF THE FIRST SUBSTANTIVE MATERIALS ABOUT THERANOS THAT YOU

09:58AM   21   HAD SEEN; CORRECT?

09:59AM   22   A.   HUH -- YOU KNOW, I HAD CONVERSATIONS WITH ELIZABETH AND,

09:59AM   23   YES, THEY WERE THE FIRST SUBSTANTIVE MATERIALS.

09:59AM   24   Q.   AND NATURALLY AS A RESULT OF REVIEWING THREE BINDERS OF

09:59AM   25   MATERIALS, YOU HAD SOME QUESTIONS; RIGHT?

MOSLEY CROSS BY MR. WADE (RES.)                                    5237

09:59AM   1    A.  I DID.  I DID.

09:59AM   2    Q.  OKAY.  BUT YOU WANTED TO BE EFFICIENT IN HOW YOU

09:59AM   3    APPROACHED IT; IS THAT FAIR?

09:59AM   4    A.  SURE.

09:59AM   5    Q.  OKAY.  AND AT SUBSEQUENT TIMES THERE WERE OTHER

09:59AM   6    COMMUNICATIONS THAT YOU HAD WITH MS. HOLMES ABOUT THERANOS

09:59AM   7    MATTERS?

09:59AM   8    A.  SURE.

09:59AM   9    Q.  IN THE PERIOD FOLLOWING SEPTEMBER 2ND; CORRECT?

09:59AM   10   A.  ABSOLUTELY.  ABSOLUTELY.

09:59AM   11   Q.  OKAY.  AND LET'S GO -- SO ON THIS SAME DATE, YOU PREPARED

10:00AM   12   THAT OUTLINE WHICH MR. SCHENK ASKED YOU ABOUT.  LET'S TAKE A

10:00AM   13   LOOK AT THAT.  THAT'S 4197.

10:00AM   14   A.  CAN YOU TELL ME WHAT -- CAN YOU TELL ME WHAT BINDER THAT

10:00AM   15   IS IN?

10:00AM   16   Q.  IT'S PROBABLY IN A COUPLE.  IF YOU LOOK AT VOLUME ONE OF

10:00AM   17   THE BINDER I GAVE YOU, MR. MOSLEY, I THINK YOU'LL SEE --

10:00AM   18   A.  I'M IN VOLUME TWO.

10:00AM   19        OKAY.  I HAVE IT.

10:00AM   20   Q.  OKAY.  AND THIS WAS -- AGAIN, JUST TO SORT OF ORIENT US

10:00AM   21   HERE, THIS IS THE OUTLINE THAT YOU HAD PREPARED OVER THE

10:00AM   22   WEEKEND THAT YOU SAID YOU WERE GOING TO SEND OVER TO

10:01AM   23   DR. KISSINGER; CORRECT?

10:01AM   24   A.  YES.

10:01AM   25   Q.  AND THAT YOU -- I BELIEVE YOUR TESTIMONY WAS THAT YOU DID

MOSLEY CROSS BY MR. WADE (RES.)                                    5238

10:01AM   1    SEND IT TO DR. KISSINGER?

10:01AM   2    A.   YES, I DID.

10:01AM   3    Q.   AND TO YOUR KNOWLEDGE AS YOU SIT HERE TODAY, YOU NEVER

10:01AM   4    PREPARED AN UPDATED DRAFT OF THIS DOCUMENT IN THE FUTURE, DID

10:01AM   5    YOU?

10:01AM   6    A.   NO, I DIDN'T.

10:01AM   7    Q.   OKAY.  AND --

10:01AM   8    A.   NOT THAT I'M AWARE OF.

10:01AM   9    Q.   OKAY.  AND IN CONNECTION WITH THIS, IS IT FAIR TO SAY THAT

10:01AM  10    THE PRINCIPAL SOURCE OF THE MATERIAL THAT YOU REFERENCED HERE

10:01AM  11    ARE THE THREE BINDERS THAT YOU RECEIVED FROM MS. HOLMES?

10:01AM  12    A.   I THINK IN COMBINATION WITH THAT AND MY CONVERSATIONS WITH

10:01AM  13    ELIZABETH.

10:01AM  14    Q.   OKAY.  AND DID YOU HAVE ANY NOTES OR ANY DETAILED

10:01AM  15    INFORMATION THAT YOU RECEIVED FROM MS. HOLMES THAT YOU KNOW

10:01AM  16    THAT YOU WORKED INTO THIS ANALYSIS?

10:01AM  17    A.   I DON'T THINK SO.  I THINK MOST OF IT CAME DIRECTLY FROM

10:01AM  18    THE PRINTED MATERIALS.

10:01AM  19    Q.   OKAY.  AND YOU WANTED TO GET THOSE MATERIALS AND GET A

10:02AM  20    LITTLE MORE GROUNDED BEFORE YOU HAD A SUBSTANTIVE CONVERSATION

10:02AM  21    I THINK YOU MENTIONED IN YOUR EMAIL TO HER; CORRECT?

10:02AM  22    A.   RIGHT.

10:02AM  23    Q.   AND AS I LOOK THROUGH THIS, I DON'T SEE ANY REFERENCE, FOR

10:02AM  24    EXAMPLE, TO ANY MEDIA ARTICLES OR ANYTHING OF THAT NATURE

10:02AM  25    WITHIN YOUR OUTLINE.

MOSLEY CROSS BY MR. WADE (RES.)                    5239

10:02AM   1        DO YOU SEE ANY?

10:02AM   2    A.   I DON'T.

10:02AM   3    Q.   OKAY.  AND WOULD YOU THINK THAT YOU PROBABLY AT THAT POINT

10:02AM   4    HADN'T DONE ANY OF THAT KIND OF REVIEW?

10:02AM   5    A.   I WOULD, I WOULD BE SHOCKED IF I HADN'T DONE A GOOGLE

10:02AM   6    SEARCH AND READ WHATEVER MEDIA ARTICLES THAT I COULD EVEN

10:02AM   7    BEFORE I GOT THE MATERIALS.

10:02AM   8    Q.   OKAY.  AND WOULD YOU MAYBE POKE AROUND THE COMPANY WEBSITE

10:02AM   9    OR SOMETHING, TOO?

10:02AM  10    A.   I DON'T KNOW.

10:02AM  11    Q.   OKAY.

10:02AM  12    A.   BUT CERTAINLY I PROBABLY READ THE MEDIA ARTICLES.

10:02AM  13    Q.   OKAY.  BUT YOU DON'T SEE ANY REFERENCES TO ANY OF THOSE

10:02AM  14    SPECIFICALLY IN THE OUTLINE, DO YOU?

10:02AM  15    A.   NO.

10:02AM  16    Q.   OKAY.  AND AGAIN, AT THIS POINT IN TIME YOU HADN'T GONE

10:03AM  17    OUT AND DONE ANY INDEPENDENT RESEARCH OR ANYTHING ON THE

10:03AM  18    COMPANY THAT WAS SIGNIFICANT IN NATURE, HAD YOU?

10:03AM  19    A.   I DON'T THINK I HAD ANY WAY TO DO THAT AT THIS POINT.

10:03AM  20    Q.   WELL, DR. KISSINGER HAD ASKED YOU TO TAKE A LOOK AT THE

10:03AM  21    COMPANY?  I BELIEVE THAT WAS YOUR TESTIMONY; RIGHT?

10:03AM  22    A.   YES, HE ASKED ME TO SPEAK WITH ELIZABETH AND TAKE A LOOK

10:03AM  23    AT THE COMPANY, YES.

10:03AM  24    Q.   AND YOU GOT THE MATERIALS AND YOU PREPARED THE OUTLINE;

10:03AM  25    RIGHT?

MOSLEY CROSS BY MR. WADE (RES.)                    5240

10:03AM  1    A.   ABSOLUTELY.

10:03AM  2    Q.   OKAY.  IF WE GO TO -- LET'S GO TO THE LETTER, THE FIRST

10:03AM  3    PAGE, TO DR. KISSINGER.  AND DO YOU SEE THERE THE SECOND FULL

10:03AM  4    SENTENCE, IT SAYS, "ELIZABETH IS QUITE UNDERSTANDABLY VERY

10:03AM  5    CAREFUL ABOUT OBTAINING NONDISCLOSURE AGREEMENTS BEFORE

10:04AM  6    PROVIDING ANY IN-DEPTH INFORMATION ABOUT THERANOS"?

10:04AM  7         DO YOU SEE THAT?

10:04AM  8    A.   I DO.

10:04AM  9    Q.   AND YOU DID UNDERSTAND THAT; RIGHT?

10:04AM  10   A.   AND WE JUST TALKED ABOUT IT.  I CERTAINLY RESPECTED IT.

10:04AM  11   Q.   YEAH.

10:04AM  12   A.   AND FULLY UNDERSTOOD IT.

10:04AM  13   Q.   AND GIVEN THAT IT WAS A TECHNOLOGY COMPANY THAT HAD A LOT

10:04AM  14   OF INTELLECTUAL PROPERTY AND THE LIKE, YOU FELT LIKE IT WAS

10:04AM  15   APPROPRIATE TO BE PROTECTIVE OF THAT INFORMATION?

10:04AM  16   A.   YES.

10:04AM  17   Q.   YEAH.  AND YOU HAD -- YOU HAVE INFORMATION AS A LAWYER

10:04AM  18   THAT INFORMS YOUR UNDERSTANDING THERE; CORRECT?

10:04AM  19   A.   THAT'S CORRECT.

10:04AM  20   Q.   LET'S GO TO THE SECOND PAGE.

10:04AM  21        AND I WANT TO ASK YOU SOME QUESTIONS ABOUT YOUR OUTLINE.

10:04AM  22   OKAY?  AND THIS IS WHERE THOSE THREE BINDERS THAT I HANDED YOU

10:04AM  23   WILL COME INTO PLAY A LITTLE BIT.

10:04AM  24        DO YOU SEE THERE UNDER ROMAN NUMERAL I(A), THERE'S A

10:05AM  25   REFERENCE TO SUBSTANTIAL DATA THAT ATTEST TO THE QUALITY AND

MOSLEY CROSS BY MR. WADE (RES.)                                    5241

10:05AM   1    PERFORMANCE OF THE THERANOS TECHNOLOGY AND EQUIPMENT?

10:05AM   2    A.   I SEE IT.

10:05AM   3    Q.   AND DO YOU SEE SUBSTANTIAL IS UNDERLINED?

10:05AM   4    A.   YES.

10:05AM   5    Q.   AND BY THE WAY, DO YOU KNOW WHO UNDERLINED THAT?

10:05AM   6    A.   I BELIEVE IT WAS ME.

10:05AM   7    Q.   OKAY.

10:05AM   8    A.   IT LOOKS LIKE MY ATTEMPTED UNDERLYING.  I DON'T USE A

10:05AM   9    RULER, SO...

10:05AM   10   Q.   IT'S PRETTY STRAIGHT.

10:05AM   11        AND THE -- AND IF I COULD JUST LOOK, YOU HAVE THE THREE

10:05AM   12   BINDERS IN FRONT OF YOU?

10:05AM   13   A.   UH-HUH.

10:05AM   14   Q.   WHAT I'M GOING TO DO, I'M GOING TO ASK YOU SOME QUESTIONS

10:05AM   15   ABOUT THIS, AND THEN I'M GOING TO ASK YOU SOME QUESTIONS THAT

10:05AM   16   RELATE TO THE BINDERS THAT I THINK MIGHT BE RELATED.

10:05AM   17        IF I COULD MOVE YOUR ATTENTION OR DRAW YOUR ATTENTION,

10:05AM   18   WITHIN THE BINDER THREE OF THAT SET, TO PAGE 507.

10:06AM   19        AND THIS IS IN EVIDENCE, YOUR HONOR.  PERMISSION TO

10:06AM   20   PUBLISH?

10:06AM   21             THE COURT:  YES.

10:06AM   22             THE WITNESS:  JUST GIVE ME ONE SECOND.

10:06AM   23        (PAUSE IN PROCEEDINGS.)

10:06AM   24             THE WITNESS:  ALL RIGHT.

10:06AM   25   BY MR. WADE:

MOSLEY CROSS BY MR. WADE (RES.)                                    5242

10:06AM   1    Q.   IT SHOULD BE RIGHT NEAR THE FRONT OF BINDER THREE.

10:06AM   2    A.   I WAS LOOKING IN THE BACK.  IT IS RIGHT IN THE FRONT OF

10:06AM   3    BINDER THREE.

10:06AM   4    Q.   MY APOLOGIES.

10:06AM   5    A.   NO, NO.

10:06AM   6    Q.   DO YOU SEE THERE THAT IT SAYS INFECTIOUS DISEASE WORK AND

10:06AM   7    SELECT CLINICAL CORRELATIONS?

10:06AM   8    A.   I SEE THAT.

10:06AM   9    Q.   OKAY.  AND THIS WAS AMONG THE MATERIALS THAT YOU REVIEWED;

10:06AM   10   RIGHT?

10:06AM   11   A.   I BELIEVE IT WAS.

10:06AM   12   Q.   OKAY.  LET'S LOOK AT THE NEXT PAGE.

10:06AM   13   A.   OKAY.

10:07AM   14   Q.   OKAY.  AND DO YOU SEE HERE IT TALKS ABOUT THERANOS

10:07AM   15   INFECTIOUS DISEASE WORK AND SELECT CLINICAL CORRELATIONS, AND

10:07AM   16   IT PROVIDES AN OUTLINE -- I'LL GIVE YOU A SECOND.

10:07AM   17   A.   YEAH, I JUST NEED TO FIND IT AND KEEP SOME ORDER HERE.

10:07AM   18        (PAUSE IN PROCEEDINGS.)

10:07AM   19           THE WITNESS:  OKAY.  SORRY ABOUT THAT.  OKAY.

10:07AM   20   BY MR. WADE:

10:07AM   21   Q.   AND DO YOU SEE THAT DOCUMENT?  IT'S UP ON THE SCREEN.  OR

10:07AM   22   WHATEVER IS EASIER FOR YOU.

10:07AM   23   A.   I SEE IT.

10:07AM   24   Q.   OKAY.  AND DO YOU SEE THAT IT REFERENCES THERANOS

10:07AM   25   INFECTIOUS DISEASE WORK AND SELECT CLINICAL CORRELATIONS THERE?

MOSLEY CROSS BY MR. WADE (RES.)                5243

10:07AM  1    A.  I SEE IT.

10:07AM  2    Q.  AND THEN THERE ARE DIFFERENT CATEGORIES OF INFORMATION

10:07AM  3    THAT IT IDENTIFIES THAT ARE PROVIDED, FIVE DIFFERENT

10:07AM  4    CATEGORIES.

10:07AM  5        DO YOU SEE THAT?

10:07AM  6    A.  I DO.

10:07AM  7    Q.  AND YOU UNDERSTOOD AT THIS TIME THAT THERANOS -- AS PART

10:07AM  8    OF THERANOS'S FUTURE BUSINESS MODELS, IT WANTED TO GET INTO

10:08AM  9    INFECTIOUS DISEASE WORK.

10:08AM  10       DO YOU RECALL THAT?

10:08AM  11   A.  YES, I DO.

10:08AM  12   Q.  AND IT WASN'T NECESSARILY DOING A LOT OF IT NOW, BUT THAT

10:08AM  13   WAS PART OF ELIZABETH HOLMES'S VISION; CORRECT?

10:08AM  14   A.  YOU KNOW, I DON'T RECALL THINKING THAT THEY WEREN'T

10:08AM  15   ALREADY IN THAT BUSINESS, BUT I DO KNOW IT WAS VERY MUCH A PART

10:08AM  16   OF THE VISION.

10:08AM  17   Q.  OKAY.  AND THAT THERE WERE A VARIETY OF DIFFERENT

10:08AM  18   APPLICATIONS THAT COULD HAVE REAL BENEFITS AS THEY SORT OF

10:08AM  19   ROLLED THAT OUT OVER TIME.

10:08AM  20       DO YOU RECALL THAT?

10:08AM  21   A.  ABSOLUTELY.

10:08AM  22   Q.  OKAY.  AND THAT'S, AND THAT'S REFERENCED HERE ON THIS

10:08AM  23   PAGE.

10:08AM  24       AND DO YOU SEE THAT THERE'S ALSO A REFERENCE THERE TO --

10:08AM  25   NUMBER 2 IS A REFERENCE TO REAL-TIME SELF-LEARNING

MOSLEY CROSS BY MR. WADE (RES.)                              5244

10:08AM  1    EPIDEMIOLOGICAL MODELS?

10:08AM  2    A.   EPIDEMIOLOGICAL.

10:08AM  3    Q.   THANK YOU, MODELS.

10:08AM  4         DO YOU SEE THAT?

10:08AM  5    A.   I SEE THAT.

10:08AM  6    Q.   AND THE IDEA THERE, AND WE'LL TALK ABOUT IT IN A MINUTE,

10:08AM  7    WAS TO ENABLE THE CONTAINMENT OF OUTBREAKS THROUGH THE USE OF A

10:09AM  8    THERANOS SYSTEM; RIGHT?

10:09AM  9    A.   YES.

10:09AM  10   Q.   OKAY.  AND THEN BELOW THAT, THERE ARE A COUPLE OF

10:09AM  11   DIFFERENT CATEGORIES OF DIFFERENT TYPES OF ASSAYS AND DATA

10:09AM  12   RELATED TO THAT THAT ARE REFERENCED.

10:09AM  13        DO YOU SEE THAT?

10:09AM  14   A.   I DO.

10:09AM  15   Q.   AND IF WE JUST LOOK -- DO YOU RECOGNIZE THAT FROM THIS

10:09AM  16   PAGE 2 TO PAGE 204, THERE IS VERY DETAILED DATA THAT IS

10:09AM  17   PROVIDED WITH RESPECT TO THERANOS'S ASSAYS?

10:09AM  18   A.   YOU'RE NOW TALKING ABOUT THE PAGES THAT ARE BUILT INTO THE

10:09AM  19   SLIDES, NOT THE BOTTOM RIGHT CORNER?

10:09AM  20   Q.   YES, I'M TALKING ABOUT THE SLIDES.  DO YOU RECOGNIZE THAT

10:09AM  21   THERE ARE APPROXIMATELY 200 PAGES THERE OF DATA WITH RESPECT TO

10:10AM  22   TESTS?

10:10AM  23   A.   YES.

10:10AM  24   Q.   AND I JUST WANT TO ASK YOU SOME QUESTIONS ABOUT A COUPLE

10:10AM  25   OF THEM.  LET'S GO TO 12, WHICH IS BATES LABELED 518.

MOSLEY CROSS BY MR. WADE (RES.)                                    5245

10:10AM   1    A.   I HAVE IT.

10:10AM   2    Q.   AND DO YOU SEE THAT?

10:10AM   3    A.   YES.

10:10AM   4    Q.   AND HERE IT GIVES AN OVERVIEW OF SOME DIFFERENT PANELS IN

10:10AM   5    FURTHERANCE OF SOME OF THAT WORK THAT THERANOS WAS WORKING TO

10:10AM   6    DEVELOP.

10:10AM   7         DO YOU SEE THAT?

10:10AM   8    A.   YES, THERE'S A LIST OF PANELS.

10:10AM   9    Q.   AND RELATING TO DIFFERENT FORMS OF INFECTIOUS DISEASE THAT

10:10AM   10   THEY WERE DOING WORK ON HOPING TO UTILIZE IN THE FUTURE; RIGHT?

10:10AM   11   A.   YOU KNOW, ALL I CAN -- ALL I CAN SAY IS THAT THERE ARE A

10:10AM   12   LIST OF DIFFERENT PANELS.

10:11AM   13   Q.   OKAY.  AND YOU'RE NOT AN EXPERT ON LAB TESTING?

10:11AM   14   A.   I MOST CERTAINLY AM NOT.

10:11AM   15   Q.   AND YOU SEE SOMEWHAT FAMILIAR, FOR EXAMPLE, THERE ARE MANY

10:11AM   16   DIFFERENT CORONAVIRUS ASSAYS THERE.

10:11AM   17        DO YOU SEE THAT?

10:11AM   18   A.   YOU'LL HAVE TO POINT ME TO IT.

10:11AM   19   Q.   IN THE LEFT COLUMN IN THE MIDDLE BOX.

10:11AM   20   A.   THE LEFT COLUMN IN THE MIDDLE BOX?

10:11AM   21        YEAH, THERE'S A NUMBER THAT SAY CORONAVIRUS AND WITH SOME

10:11AM   22   DESIGNATIONS AFTER IT.

10:11AM   23   Q.   RIGHT.  AND THERE ARE DIFFERENT INFLUENZA ASSAYS.

10:11AM   24        DO YOU SEE THOSE REFERENCED?

10:11AM   25   A.   YES, IN THE SAME BOX RIGHT ON THE RIGHT-HAND SIDE.

MOSLEY CROSS BY MR. WADE (RES.)                                    5246

10:11AM   1   Q.   AND INFLUENZA AND VARIOUS OTHER INFECTIOUS DISEASES;

10:11AM   2   RIGHT?

10:11AM   3   A.   YES.

10:11AM   4   Q.   AND THIS WAS TO PROVIDE -- THIS INFORMATION WAS PROVIDED

10:11AM   5   TO GIVE YOU A SENSE OF THE TYPE OF WORK THAT THEY WERE DOING;

10:11AM   6   RIGHT?

10:11AM   7   A.   YES.

10:11AM   8   Q.   OKAY.  LET'S GO TO PAGE 45 OF THE SLIDE DECK, BATES

10:12AM   9   LABELLED 552.

10:12AM  10   A.   YES.

10:12AM  11   Q.   DID YOU UNDERSTAND THAT THERANOS ALSO HAD A DATA GROUP

10:12AM  12   THAT WAS WORKING TO DEVELOP ANALYTICAL TOOLS TO TRY TO HELP

10:12AM  13   ADDRESS FUTURE OUTBREAKS?

10:12AM  14   A.   YES, I DID UNDERSTAND THAT.  THAT WAS ONE OF THE THINGS

10:12AM  15   THAT THEY WERE WORKING ON.

10:12AM  16   Q.   OKAY.  AND SOME OF THE MATERIALS THAT ARE REFERENCED HERE

10:12AM  17   IS SORT OF A MOCK-UP OF HOW THAT MIGHT WORK IN PRACTICE;

10:12AM  18   CORRECT?

10:12AM  19   A.   UM, YOU KNOW, I DON'T KNOW.  I DON'T KNOW HOW TO INTERPRET

10:12AM  20   ALL OF THIS.

10:12AM  21   Q.   FAIR ENOUGH.

10:12AM  22        BUT YOU RECALL THERE WAS THAT KIND OF GROUP; CORRECT?

10:12AM  23   A.   I DO REMEMBER THAT WAS A REAL FOCUS THAT ELIZABETH HAD

10:12AM  24   DISCUSSED WITH ME.

10:13AM  25   Q.   AND THAT WAS ONE OF -- THAT WAS A BIG PART OF HER VISION

MOSLEY CROSS BY MR. WADE (RES.)                                    5247

10:13AM  1    FOR THE WAYS IN WHICH SHE THOUGHT THE TECHNOLOGY THAT WAS BEING

10:13AM  2    DEVELOPED COULD REALLY HAVE BENEFITS OVER THE LONG RUN; RIGHT?

10:13AM  3    A.    IT CERTAINLY SOUNDED LIKE IT, AND, YOU KNOW, IT WAS PART

10:13AM  4    OF THE ATTRACTIVENESS OF THIS, THAT IT COULD BE USED FOR THAT

10:13AM  5    PURPOSE, THIS TECHNOLOGY.

10:13AM  6    Q.    FAIR ENOUGH.

10:13AM  7          LET ME TURN YOU TO BATES LABELLED 632.

10:13AM  8    A.    IN THE SAME?

10:13AM  9    Q.    SAME DOCUMENT.

10:13AM  10   A.    OKAY.

10:13AM  11   Q.    OKAY.  AND HERE YOU SEE THEY'RE TALKING ABOUT SOME GENERAL

10:13AM  12   CHEMISTRY TESTS AND PROVIDING CORRELATION DATA?

10:13AM  13   A.    YES.

10:13AM  14   Q.    AND DO YOU SEE THE PURPOSE OF THESE TESTS ARE TO COMPARE

10:14AM  15   THERANOS'S TESTS TO REFERENCE RANGES?

10:14AM  16         DO YOU SEE THAT?

10:14AM  17   A.    THAT IS MY UNDERSTANDING OF IT, YES.

10:14AM  18   Q.    AND DID YOU UNDERSTAND THAT THAT WAS COMPARING THERANOS'S

10:14AM  19   REFERENCE TESTS TO SORT OF THE STANDARD FDA APPROVED TEST?

10:14AM  20   A.    YES.

10:14AM  21   Q.    AND IN THE MANY PAGES -- AND DO YOU KNOW AS YOU SIT HERE

10:14AM  22   WHAT, FOR EXAMPLE, IN THE UPPER LEFT-HAND CORNER WHAT AN

10:14AM  23   R SQUARED OF .997 MEANS?

10:14AM  24   A.    I DON'T, BUT MY INTERPRETATION OF IT WOULD BE THAT IT

10:14AM  25   MEANS HOW CLOSE THE CORRELATIONS ARE THAT ARE SHOWN ON THE

MOSLEY CROSS BY MR. WADE (RES.)                              5248

10:14AM   1    GRAPH.

10:14AM   2    Q.   OKAY.  AND DO YOU UNDERSTAND 1.0 TO BE IDEAL?

10:14AM   3    A.   I'M NOT, I'M NOT A CHEMIST.

10:14AM   4    Q.   FAIR ENOUGH.

10:14AM   5         BUT IN THE MANY PAGES THAT FOLLOW HERE, THERE'S

10:15AM   6    SUBSTANTIAL ADDITIONAL DATA WITH -- THAT'S PROVIDED IN

10:15AM   7    CONNECTION WITH THE VARIOUS ASSAYS THAT THERANOS HAD BEEN

10:15AM   8    WORKING TO DEVELOP; CORRECT?

10:15AM   9    A.   UM --

10:15AM   10   Q.   SIMILAR KINDS OF COMPARISONS; CORRECT?

10:15AM   11   A.   THERE ARE A LOT OF, THERE ARE A LOT OF CHARTS THAT SEEM TO

10:15AM   12   HAVE THE SAME ANALYSIS WHETHER -- THE CORRELATION LEVEL.

10:15AM   13   Q.   OKAY.  AND IF I COULD PULL YOU BACK TO EXHIBIT 4197,

10:15AM   14   PAGE 2.

10:15AM   15   A.   IS THIS BACK IN VOLUME TWO?

10:15AM   16   Q.   YEAH.  AND IT'S UP ON THE SCREEN THERE.

10:15AM   17   A.   THIS IS MY OUTLINE?

10:15AM   18   Q.   THIS IS YOUR OUTLINE.

10:15AM   19        AND YOU SEE THERE THAT YOU REFER TO THAT SUBSTANTIAL DATA?

10:15AM   20        DO YOU SEE THAT?

10:15AM   21   A.   YES.

10:15AM   22   Q.   OKAY.

10:15AM   23   A.   WHAT WAS THE, WHAT WAS THE CITE TO THAT?

10:16AM   24   Q.   SURE.  IT'S 4197, MR. MOSLEY.

10:16AM   25   A.   OKAY.  I HAVE IT.

MOSLEY CROSS BY MR. WADE (RES.)                    5249

10:16AM   1    Q.   OKAY.  AND I THINK YOU SAID THAT YOU SEE THAT YOU REFER TO

10:16AM   2    THAT SUBSTANTIAL DATA IN YOUR OUTLINE; CORRECT?

10:16AM   3    A.   I DO.

10:16AM   4    Q.   OKAY.  AND THEN IF WE CAN GO TO PAGE 3 OF THE MEMO, OR

10:16AM   5    OUTLINE.  I'M SORRY.

10:16AM   6    A.   OKAY.

10:16AM   7    Q.   AND IF WE CAN LOOK AT THE TOP, DO YOU SEE THERE'S THAT

10:16AM   8    REFERENCE TO THAT JOHNS HOPKINS RESEARCH?

10:16AM   9         DO YOU SEE THAT?

10:16AM   10   A.   ON PAGE 3 OF THE MEMO?

10:16AM   11   Q.   I'M SORRY.  PAGE 2.

10:16AM   12   A.   OKAY.  I DO SEE THAT REFERENCE.

10:16AM   13   Q.   OKAY.  AND YOU RECALL YESTERDAY THAT YOU ENDED UP GETTING

10:16AM   14   A COPY OF THAT DOCUMENT; CORRECT?

10:16AM   15   A.   YES, I DID.

10:16AM   16   Q.   OKAY.  AND YOU SEE THE SECOND REFERENCE THERE RELATES TO

10:17AM   17   WALGREENS?

10:17AM   18   A.   I SEE THAT.

10:17AM   19   Q.   DO YOU SEE THAT?

10:17AM   20        AND YOU WERE AWARE AT THIS TIME THAT THERANOS HAD ENTERED

10:17AM   21   INTO A WALGREENS -- A RELATIONSHIP WITH WALGREENS; CORRECT?

10:17AM   22   A.   YES, I WAS.

10:17AM   23   Q.   AND THAT WAS AN IMPORTANT ISSUE FOR YOU IN TERMS OF THE

10:17AM   24   DECISION TO INVEST IN THE COMPANY; RIGHT?

10:17AM   25   A.   YES, IT WAS.

MOSLEY CROSS BY MR. WADE (RES.)                                    5250

10:17AM   1    Q.   A COMPANY LIKE WALGREENS PROVIDED CREDIBILITY TO THE

10:17AM   2    COMPANY; IS THAT RIGHT?

10:17AM   3    A.   YES, IT DID.

10:17AM   4    Q.   AND YOU KNEW FROM YOUR EXPERIENCE THAT A COMPANY LIKE

10:17AM   5    WALGREENS WOULD DO PRETTY EXTENSIVE DUE DILIGENCE BEFORE THEY

10:17AM   6    WOULD GET INVOLVED IN THAT KIND OF A RELATIONSHIP; RIGHT?

10:17AM   7    A.   I WOULD EXPECT THAT, YES.

10:17AM   8    Q.   AND THAT THEY WOULD LOOK AT THE TECHNOLOGY; RIGHT?

10:17AM   9    A.   I WOULD CERTAINLY EXPECT THAT.

10:17AM   10   Q.   AND, AND YOU ASSUMED THAT WHEN YOU, WHEN YOU WERE

10:17AM   11   ANALYZING THESE MATERIALS AND MAKING YOUR INVESTMENT DECISION;

10:18AM   12   IS THAT FAIR?

10:18AM   13   A.   WELL, I OBVIOUSLY READ THE JOHNS HOPKINS REPORT WHICH

10:18AM   14   TALKED ABOUT WALGREENS, AND IT SEEMS TO BE COMMISSIONED BY

10:18AM   15   WALGREENS, AND CERTAINLY THE JOHNS HOPKINS REPORT WAS ONE OF

10:18AM   16   THE THINGS THAT IS BOTH COVERED IN THIS OUTLINE AND WAS

10:18AM   17   IMPORTANT.

10:18AM   18   Q.   AND YOU SEE THE REFERENCE THERE TO 30 WALGREENS CENTERS;

10:18AM   19   RIGHT?

10:18AM   20   A.   I DO.

10:18AM   21   Q.   AND YOU KNEW AT THE TIME THAT WALGREENS WAS -- THE

10:18AM   22   RELATIONSHIP WAS GOING TO BE IN A ROLLOUT OVER TIME; CORRECT?

10:18AM   23   A.   I WAS TOLD THAT.

10:18AM   24   Q.   OKAY.

10:18AM   25   A.   I DON'T BELIEVE -- I DON'T THINK I HAD SEEN -- I'M QUITE

MOSLEY CROSS BY MR. WADE (RES.)                    5251

10:18AM   1    SURE I HAD NOT SEEN THE CONTRACT WITH WALGREENS.

10:18AM   2    Q.   OKAY.  BUT YOU -- LET'S LOOK AT, LET'S LOOK BACK IN YOUR

10:19AM   3    BINDER SET, BINDER TWO OF YOUR THREE BINDER SET.  AND IF YOU

10:19AM   4    KEEP THAT ONE CLOSED, MR. MOSLEY, WE'RE GOING TO BE BACK AND

10:19AM   5    FORTH WITH YOUR OUTLINE HERE A BIT.

10:19AM   6    A.   OKAY.  AND WE'RE IN BINDER TWO?

10:19AM   7    Q.   WE'RE IN BINDER TWO OF THE MATERIALS THAT YOU RECEIVED.

10:19AM   8    A.   WHAT PAGE?

10:19AM   9    Q.   BATES PAGE 284.

10:19AM  10    A.   OKAY.

10:19AM  11    Q.   AND THAT'S EXHIBIT 14206.

10:19AM  12         DO YOU SEE THAT?  AND WITHIN THIS -- NOW, 14206, WE'RE

10:19AM  13    BACK IN THE BINDER SET THAT YOU HAD BEEN PROVIDED BY THE

10:20AM  14    COMPANY; CORRECT?

10:20AM  15    A.   CORRECT.

10:20AM  16    Q.   AND THIS WAS AMONG THE SLIDES THAT YOU HAD BEEN PRESENTED;

10:20AM  17    CORRECT?

10:20AM  18    A.   I BELIEVE IT WAS.

10:20AM  19    Q.   OKAY.  AND THEY WERE TALKING ABOUT HOW -- WITHIN THESE

10:20AM  20    SLIDES THEY TALK ABOUT HOW THERANOS SAW ITSELF GOING INTO THE

10:20AM  21    RETAIL SPACE; CORRECT?

10:20AM  22    A.   YES.

10:20AM  23    Q.   OKAY.  LET'S GO TO THE SECOND -- THE NEXT PAGE.  SORRY.

10:20AM  24    A.   OKAY.  IT'S LABELED THERANOS INFRASTRUCTURE?

10:20AM  25    Q.   RIGHT.

MOSLEY CROSS BY MR. WADE (RES.)                    5252

10:20AM   1    A.   OKAY.

10:20AM   2    Q.   AND DO YOU SEE HERE IT SAYS, "NATIONAL RETAIL FOOTPRINT

10:20AM   3    AND HEALTH PLAN PARTNERSHIPS THROUGHOUT THE UNITED STATES FOR

10:20AM   4    AN UNPRECEDENTED INFRASTRUCTURE WHICH EXCEED THAT OF ANY

10:20AM   5    COMMERCIAL LABORATORY IN TODAY'S MARKET"?

10:20AM   6         DO YOU SEE THAT?

10:20AM   7    A.   I DO.

10:20AM   8    Q.   AND KNEW AT THE TIME THAT THEY DIDN'T YET HAVE THAT

10:20AM   9    NATIONAL RETAIL FOOTPRINT; CORRECT?

10:20AM   10   A.   YES, I DID.  I UNDERSTOOD THAT.

10:20AM   11   Q.   THEY HAD ABOUT 30 STORES; RIGHT?

10:20AM   12   A.   YES.

10:20AM   13   Q.   MOST OF THEM IN ARIZONA, AND ONE IN CALIFORNIA?

10:21AM   14   A.   THAT'S WHAT I HAD BEEN TOLD, AND THAT'S WHAT I UNDERSTOOD.

10:21AM   15   Q.   BUT YOU UNDERSTOOD THAT THE GOAL WAS TO HAVE A NATIONAL

10:21AM   16   DEPLOYMENT WITH WALGREENS; RIGHT?

10:21AM   17   A.   THAT'S WHAT I UNDERSTOOD.

10:21AM   18   Q.   AND YOU UNDERSTOOD THAT THERE WERE A COUPLE OF PHASES TO

10:21AM   19   THAT, IF YOU WILL.  YOU KNEW THAT INITIALLY THE SAMPLES WERE

10:21AM   20   PICKED UP AT THE WALGREENS AND BROUGHT TO A THERANOS

10:21AM   21   LABORATORY; CORRECT?

10:21AM   22   A.   I THINK I DID KNOW THAT THE THERANOS MACHINE WAS NOT ON

10:21AM   23   SITE.  IT WAS LOCATED OFF SITE AT THE TIME.

10:21AM   24   Q.   RIGHT.  IT WAS NOT YET IN THE WALGREENS; RIGHT?

10:21AM   25   A.   I, I -- YOU KNOW, CERTAINLY I CAME TO KNOW THAT AT SOME

MOSLEY CROSS BY MR. WADE (RES.)                                    5253

10:21AM   1    POINT BEFORE I INVESTED, BUT I -- AND I DON'T KNOW AT THIS

10:21AM   2    PARTICULAR TIME WHETHER I KNEW THAT OR NOT, BUT I CERTAINLY

10:21AM   3    CAME TO KNOW THAT.

10:21AM   4    Q.   FAIR ENOUGH.

10:21AM   5         AND THAT THE GOAL OF THE COMPANY WAS TO GET FURTHER

10:21AM   6    REGULATORY APPROVAL AND THEN TO DISTRIBUTE THE DEVICES IN

10:22AM   7    VARIOUS GEOGRAPHIC LOCATIONS; CORRECT?

10:22AM   8    A.   I DIDN'T -- YOU KNOW, HONESTLY, I DIDN'T KNOW WHETHER

10:22AM   9    THERE WAS ANY FURTHER REGULATORY APPROVAL REQUIRED TO EXPAND

10:22AM  10    IT.  I DID NOT KNOW THAT.

10:22AM  11         OR, YOU KNOW, THAT'S -- YOU'RE ASKING ME IF I KNEW THAT?

10:22AM  12    NO.

10:22AM  13    Q.   OKAY.  I MIGHT BE ABLE TO REFRESH YOUR RECOLLECTION --

10:22AM  14    A.   SURE, SURE.

10:22AM  15    Q.   -- AND YOUR KNOWLEDGE ON THAT.  I KNOW IT'S BEEN A LONG

10:22AM  16    TIME.

10:22AM  17    A.   YEAH, ABSOLUTELY.

10:22AM  18    Q.   BUT YOU KNEW THAT AT SOME POINT IN THE FUTURE -- SETTING

10:22AM  19    ASIDE FOR THE TIME BEING THE REGULATORY APPROVAL -- YOU KNEW

10:22AM  20    THAT THERE WAS THIS DESIRE TO DEPLOY THESE DEVICES?

10:22AM  21    A.   ABSOLUTELY.

10:22AM  22    Q.   OKAY.  AND PART OF MS. HOLMES'S VISION THAT SHE

10:22AM  23    COMMUNICATED ABOUT IT IN TERMS OF THE APPLICATIONS THAT THE

10:22AM  24    TECHNOLOGY COULD HAVE WERE WHEN THE DEVICE WAS DISTRIBUTED OUT

10:22AM  25    IN VARIOUS SETTINGS; CORRECT?

MOSLEY CROSS BY MR. WADE (RES.)                                    5254

10:22AM   1    A.   YEAH, THAT WAS A BIG PART OF THE PLAN AS I UNDERSTOOD IT.

10:22AM   2    Q.   OKAY.  AND IF WE GO JUST COUPLE MORE SLIDES FORWARD HERE,

10:23AM   3    THE NEXT SLIDE, WHICH IS BATES 286, THIS SHOWS SORT OF THE HOPE

10:23AM   4    OF THAT NATIONAL FOOTPRINT WHEN FULLY IMPLEMENTED; CORRECT?

10:23AM   5    A.   I BELIEVE IT DOES.

10:23AM   6    Q.   AND LET'S GO ONE MORE SLIDE FORWARD.

10:23AM   7         AND THIS TALKS ABOUT -- DO YOU SEE IT SAYS, "THERANOS'S

10:23AM   8    FOOTPRINT AT RETAIL" THERE?

10:23AM   9    A.   I DO SEE IT.

10:23AM   10   Q.   BUT THIS WAS TALKING ABOUT THE FUTURE VISION OF IT?

10:23AM   11   A.   ABSOLUTELY.

10:23AM   12   Q.   OKAY.  AND PART OF MS. HOLMES'S FUTURE VISION WAS TO BE

10:23AM   13   WITHIN A FEW MILES OF BASICALLY EVERY CUSTOMER IN AMERICA;

10:23AM   14   RIGHT?

10:23AM   15   A.   I CLEARLY UNDERSTOOD THAT, YES.

10:23AM   16   Q.   OKAY.  AND THIS VISION AND THE PROMISE OF WHAT THE

10:24AM   17   TECHNOLOGY MIGHT BE ABLE TO DO WAS AN IMPORTANT THING TO YOU IN

10:24AM   18   CONNECTION WITH YOUR INVESTMENT?

10:24AM   19   A.   ABSOLUTELY.

10:24AM   20   Q.   OKAY.  AND LET'S GO BACK NOW TO YOUR MEMO, OR YOUR

10:24AM   21   OUTLINE, WHICH IS 4197.

10:24AM   22   A.   OKAY.  I HAVE IT.

10:24AM   23   Q.   AT PAGE 3.

10:24AM   24   A.   PAGE 3?

10:24AM   25   Q.   YEAH.

MOSLEY CROSS BY MR. WADE (RES.)                              5255

10:24AM   1    A.   OKAY.

10:24AM   2    Q.   DO YOU HAVE THAT IN FRONT OF YOU?

10:25AM   3    A.   I DO.

10:25AM   4    Q.   OKAY.  AND DO YOU SEE THERE IN THE BOTTOM YOU REFERENCED

10:25AM   5    THE PFIZER STUDY?

10:25AM   6         DO YOU SEE THAT?

10:25AM   7    A.   IT'S ON PAGE 2 OF THE MEMO OF THE OUTLINE.  BUT, YES, I DO

10:25AM   8    SEE IT.

10:25AM   9    Q.   I OFTENTIMES AM ONE OFF.

10:25AM  10    A.   SORRY.

10:25AM  11    Q.   JUST SO THE RECORD IS CLEAR, WE'RE ON PAGE 3 OF THE

10:25AM  12    EXHIBIT, PAGE 2 OF THE MEMO; CORRECT?

10:25AM  13    A.   I'M THERE.

10:25AM  14    Q.   OKAY.  AND YOU SEE THE PFIZER STUDY REFERENCE; CORRECT?

10:25AM  15    A.   I DO.

10:25AM  16    Q.   AND LET'S GO DOWN AND LOOK AT, JUST BRIEFLY, UP TOP HERE

10:25AM  17    WHEN YOU SET FORTH THE FACTS RELATING TO THE PFIZER STUDY.

10:25AM  18         YOU UNDERSTOOD THAT THIS WAS A STUDY WHERE THERANOS

10:25AM  19    DEVICES WERE ACTUALLY LOCATED OUT IN 32 REMOTE LOCATIONS WHERE

10:26AM  20    THEY WERE USED BY CONSUMERS TO DO TESTING?

10:26AM  21         RIGHT?

10:26AM  22    A.   YES.  I DON'T REMEMBER HOW MANY OF THOSE.  AS I REMEMBER

10:26AM  23    THE REPORT, SOME NUMBER OF THEM WERE IN INDIVIDUALS' HOMES, AND

10:26AM  24    THERE WERE MAYBE ONE OR TWO OR SOMETHING IN A PARTICULAR

10:26AM  25    CENTER.

MOSLEY CROSS BY MR. WADE (RES.)                                    5256

10:26AM   1        BUT, YES, THERE WAS SOMETHING LIKE 30-PLUS.

10:26AM   2   Q.   AND, IN FACT, IF YOU LOOK AT THE SECOND PARAGRAPH, YOU SEE

10:26AM   3   THERE, DO YOU SEE 27 WERE DEPLOYED DIRECTLY IN PATIENT'S HOMES,

10:26AM   4   AND 4 INSTRUMENTS WERE DEPLOYED AT THE CLINICAL SITE?

10:26AM   5   A.   I SEE THAT, YES.

10:26AM   6   Q.   YOU SEE THAT?

10:26AM   7        AND YOU UNDERSTOOD THAT THOSE WERE SHIPPED AND THEY WERE

10:26AM   8   USED SO THEY COULD TEST THIS HYPOTHESIS OF WHETHER THE DEVICE

10:26AM   9   COULD BE USED WITHIN A PATIENT'S HOME?

10:26AM  10   A.   THAT'S WHAT THE REPORT SAID, YES.

10:26AM  11   Q.   AND YOU THOUGHT THAT TO BE SIGNIFICANT, THE ABILITY TO DO

10:26AM  12   THAT; RIGHT?

10:26AM  13   A.   ABSOLUTELY.

10:27AM  14   Q.   OKAY.  AND AS YOU SIT HERE TODAY, YOU DON'T HAVE ANY

10:27AM  15   REASON TO BELIEVE THAT THEY DIDN'T DO EXACTLY THAT EXPERIMENT,

10:27AM  16   DO YOU?

10:27AM  17   A.   I HAVE NO, I HAVE NO REASON TO BELIEVE OR NOT BELIEVE.

10:27AM  18   Q.   OKAY.  BUT YOU WERE PROVIDED THE REPORT AND YOU NOTED

10:27AM  19   THOSE FACTS AND THE DESCRIPTION OF THAT WORK THAT WAS DONE AS A

10:27AM  20   FACTOR THAT WAS SIGNIFICANT TO YOU; CORRECT?

10:27AM  21   A.   ABSOLUTELY.

10:27AM  22   Q.   OKAY.  AND I THINK YOU -- ON YOUR DIRECT TESTIMONY YOU

10:27AM  23   SAID YOU CAME TO THE VIEW THAT PFIZER HAD DRAFTED THIS REPORT;

10:27AM  24   CORRECT?

10:27AM  25   A.   THAT WAS MY VIEW.

MOSLEY CROSS BY MR. WADE (RES.)                                        5257

10:27AM   1    Q.   OKAY.  AND YOU NEVER WENT BACK AND SOUGHT ANY

10:27AM   2    CLARIFICATION ON WHO ACTUALLY DRAFTED THE REPORT FROM THERANOS;

10:27AM   3    CORRECT?

10:27AM   4    A.   I DID NOT.

10:27AM   5    Q.   OKAY.  AND I WOULD LIKE TO GO TO PAGE 3 OF THE MEMO,

10:27AM   6    PAGE 4 OF THE EXHIBIT, AND LOOK AT THERANOS BUSINESS APPROACH.

10:28AM   7    A.   I'M THERE.

10:28AM   8    Q.   OKAY.  DO YOU SEE THERE YOU PROVIDE A SUMMARY OF SOME OF

10:28AM   9    YOUR ANALYSIS HERE?

10:28AM  10         DO YOU SEE THAT?

10:28AM  11    A.   YES.  I MEAN, YES.

10:28AM  12    Q.   AND A NUMBER OF BULLET THAT GO --

10:28AM  13    A.   WELL, I'M JUST TALKING ABOUT MY UNDERSTANDING OF THE

10:28AM  14    BUSINESS APPROACH AS RELAYED TO ME BY THE MATERIALS AND BY

10:28AM  15    ELIZABETH.

10:28AM  16    Q.   WHICH IS EXACTLY WHAT DR. KISSINGER ASKED YOU FOR; RIGHT?

10:28AM  17    A.   YEAH, HE ASKED ME FOR MY VIEWS ON IT, YES.

10:28AM  18    Q.   AND YOU PROVIDED THAT BASED ON THESE MATERIALS?

10:28AM  19    A.   YES.

10:28AM  20    Q.   AND IN DOING THAT, YOU SEE IN THAT FIRST BULLET THERE'S A

10:28AM  21    REFERENCE TO THE FACT THAT THE WALGREENS PARTNERSHIP WAS

10:28AM  22    PUBLICLY ANNOUNCED IN THE FALL OF 2013.

10:28AM  23         DO YOU SEE THAT?

10:29AM  24    A.   I DO.

10:29AM  25    Q.   AND DO YOU RECALL WHETHER YOU LOOKED AT ANY OF THE PRESS

MOSLEY CROSS BY MR. WADE (RES.)                                    5258

10:29AM    1    RELEASES OR ANYTHING RELATING TO THAT?

10:29AM    2    A.   I, I AM CERTAIN THAT I HAD READ "THE WALL STREET JOURNAL"

10:29AM    3    ARTICLE --

10:29AM    4    Q.   OKAY.

10:29AM    5    A.   -- THAT PRECEDED THIS THAT ANNOUNCED THE PARTNERSHIP.

10:29AM    6    Q.   OKAY.  DO YOU KNOW WHETHER -- WELL, LET ME SEE IF I CAN

10:29AM    7    REFRESH YOUR RECOLLECTION.

10:29AM    8         EXHIBIT 1113 IS IN EVIDENCE.  PERMISSION TO PUBLISH,

10:29AM    9    YOUR HONOR.

10:29AM   10              THE COURT:  YES.

10:29AM   11    BY MR. WADE:

10:29AM   12    Q.   YOU DON'T HAVE A COPY OF THAT, MR. MOSLEY, BUT I'LL

10:29AM   13    APPROACH AND GIVE YOU A COPY AND PUT ONE ON THE SCREEN.

10:29AM   14    A.   OKAY.

10:29AM   15    Q.   (HANDING.)

10:29AM   16         DOES THE COURT NEED A COPY?

10:29AM   17              THE COURT:  NO.  THAT'S FINE.  THANK YOU.

10:29AM   18    BY MR. WADE:

10:29AM   19    Q.   AND DO YOU SEE THAT THIS IS THE JOINT PRESS RELEASE OF

10:30AM   20    THERANOS AND WALGREENS ANNOUNCING THEIR PARTNERSHIP IN

10:30AM   21    SEPTEMBER OF 2013?

10:30AM   22    A.   IT CERTAINLY LOOKS LIKE A PRESS RELEASE.  I CAN'T -- YES,

10:30AM   23    IT DOES SAY THERANOS INC. AND WALGREENS ANNOUNCED TODAY.

10:30AM   24         I DON'T KNOW.  I CAN'T CHARACTERIZE IT AS A JOINT OR A

10:30AM   25    PRESS RELEASE OR A PRESS RELEASE BY ONE OF THE TWO COMPANIES.

MOSLEY CROSS BY MR. WADE (RES.)                                    5259

10:30AM   1      Q.   FAIR ENOUGH.

10:30AM   2      A.   I'M, I'M --

10:30AM   3      Q.   LET ME DRAW YOUR ATTENTION TO THE LAST SENTENCE IN THE

10:30AM   4      FIRST PARAGRAPH.

10:30AM   5      A.   YES.

10:30AM   6      Q.   DO YOU SEE THERE IN THE PRESS RELEASE IT SAYS, "THE

10:30AM   7      SAMPLES ARE EITHER TAKEN FROM A TINY FINGERSTICK OR A

10:30AM   8      MICRO-SAMPLE TAKEN FROM TRADITIONAL METHODS, ELIMINATING THE

10:30AM   9      NEED FOR LARGER NEEDLES AND NUMEROUS VIALS OF BLOOD REQUIRED

10:31AM  10      FOR MOST DIAGNOSTIC LAB TESTING."

10:31AM  11           DO YOU SEE THAT?

10:31AM  12      A.   I DO.

10:31AM  13      Q.   AND DO YOU REMEMBER WHETHER YOU REVIEWED THIS PRESS

10:31AM  14      RELEASE IN CONNECTION WITH THE PREPARATION OF YOUR MEMO?

10:31AM  15      A.   I'M NOT SURE WHETHER -- I REVIEWED IT AT THE TIME I

10:31AM  16      PREPARED THE MEMO OVER THE COURSE OF A WEEKEND, AND I DO NOT

10:31AM  17      KNOW WHETHER I HAD THIS AS PART OF THE MATERIALS.

10:31AM  18      Q.   OKAY.  AND YOU SEE THERE WHERE IT SAYS, "MICRO-SAMPLE

10:31AM  19      TAKEN FROM TRADITIONAL METHODS," DO YOU UNDERSTAND THAT TO MEAN

10:31AM  20      VENOUS METHODS?

10:31AM  21      A.   NO.  IT SAYS, "EITHER TAKEN FROM A TINY FINGERSTICK OR A

10:31AM  22      MICRO-SAMPLE TAKEN FROM TRADITIONAL METHODS."

10:31AM  23           I CAN'T SAY THAT I FOCUSSED ON THOSE WORDS AND REACHED ANY

10:31AM  24      CONCLUSION.

10:31AM  25      Q.   AND BASED ON YOUR EXPERIENCE, DO YOU KNOW HOW BLOOD IS

MOSLEY CROSS BY MR. WADE (RES.)                                5260

10:31AM   1    TRADITIONALLY DRAWN?

10:31AM   2    A.   YES, I DO, FROM A VEIN.

10:31AM   3    Q.   OKAY.  BUT YOU DON'T RECALL WHETHER YOU FOCUSSED ON THAT

10:32AM   4    LANGUAGE AT THE TIME THAT YOU WERE LOOKING AND PREPARING YOUR

10:32AM   5    OUTLINE?

10:32AM   6    A.   I DON'T, AND I DON'T KNOW WHETHER THIS MIGHT HAVE BEEN

10:32AM   7    REFERRING TO OTHER TYPES OF BODY FLUID.

10:32AM   8    Q.   SURE.  WE'LL TRY TO SEPARATE OUR --

10:32AM   9    A.   SORRY.

10:32AM  10    Q.   -- OUR FRIENDLY DIALOGUE HERE SO OUR COURT REPORTER IS

10:32AM  11    ABLE TO GET EVERYTHING DOWN.

10:32AM  12    A.   I'M SORRY.

10:32AM  13    Q.   YOU DON'T RECALL HAVING ANY DISCUSSION WITH ANYONE ABOUT

10:32AM  14    THAT EITHER, I TAKE IT THEN.

10:32AM  15    A.   I DON'T.

10:32AM  16    Q.   OKAY.  LET'S GO BACK TO 4197.

10:32AM  17    A.   OKAY.

10:32AM  18    Q.   BUT YOU DID UNDERSTAND, BASED UPON THE MEMO, THAT THAT

10:32AM  19    PARTNERSHIP HAD STARTED IN THE FALL OF 2013; RIGHT?

10:33AM  20    A.   THAT WAS MY UNDERSTANDING, YES.

10:33AM  21    Q.   AND SO AT THE TIME YOU WERE LOOKING AT THIS, IT WAS JUST

10:33AM  22    UNDER A YEAR OLD?

10:33AM  23    A.   THAT PARTNERSHIP, YES.

10:33AM  24    Q.   OKAY.  AND IF WE CAN -- DO YOU SEE A COUPLE BULLETS DOWN

10:33AM  25    IT SAYS THEY FILED PATENT APPLICATIONS FOR 400 OR MORE PATENTS

MOSLEY CROSS BY MR. WADE (RES.)                                   5261

10:33AM  1    IN THE U.S. AND IN A NUMBER OF DIFFERENT COUNTRIES.

10:33AM  2        DO YOU SEE THAT?

10:33AM  3    A.  I DO SEE IT.

10:33AM  4    Q.  AND DO YOU RECALL THAT THAT, AMONG THE MATERIALS PROVIDED

10:33AM  5    IN YOUR THREE BINDER SET, WAS A VERY EXTENSIVE LIST OF PATENT

10:33AM  6    APPLICATIONS, PATENTS THAT WERE APPROVED, AND VARIOUS OTHER

10:34AM  7    TRADEMARKS AND THE LIKE?

10:34AM  8    A.  I DO REMEMBER THERE BEING SOME LISTING OF PATENTS AND

10:34AM  9    TRADEMARKS, YES.

10:34AM  10   Q.  AND YOU UNDERSTOOD THAT PROTECTING INTELLECTUAL PROPERTY

10:34AM  11   WAS IMPORTANT?

10:34AM  12   A.  ABSOLUTELY.

10:34AM  13   Q.  OKAY.  PARTICULARLY FOR A TECHNOLOGY COMPANY?

10:34AM  14   A.  YES.

10:34AM  15   Q.  IF WE CAN GO TO THE TOP OF PAGE 4.  I'M SORRY, THE TOP OF

10:34AM  16   PAGE 5 OF THE EXHIBIT, WHICH IS PAGE 4 OF THE MEMO.

10:34AM  17   A.  YES.

10:34AM  18   Q.  JUST TO TRULY CONFUSE US ALL.

10:34AM  19       YOU SEE UP THERE IT SAYS, "ELIZABETH HOLMES AND THERANOS

10:34AM  20   APPEAR TO HAVE ACCOMPLISHED THIS BEFORE ITS MAJOR COMPETITORS

10:35AM  21   HAD A CHANCE TO UNDERSTAND HOW DISRUPTIVE THERANOS WOULD BE."

10:35AM  22       DO YOU SEE THAT?

10:35AM  23   A.  I DO.

10:35AM  24   Q.  AND YOU UNDERSTOOD THAT THEY WERE IN A KIND OF STEALTH

10:35AM  25   MODE FOR A LONG TIME AS THEY WERE DOING A LOT OF RESEARCH AND

MOSLEY CROSS BY MR. WADE (RES.)                    5262

10:35AM  1    DEVELOPMENT WORK?

10:35AM  2    A.   THAT WAS MY UNDERSTANDING.

10:35AM  3    Q.   AND THAT THEY HAD BEEN ABLE TO MAINTAIN THE SECRECY OF A

10:35AM  4    LOT OF THEIR INTELLECTUAL PROPERTY AND WHAT THEY WERE DOING

10:35AM  5    WHICH HAD COMPETITIVE BENEFITS FOR THEM?

10:35AM  6    A.   THAT WAS MY UNDERSTANDING.

10:35AM  7    Q.   AND YOU, YOU THOUGHT THAT WAS A SMART BUSINESS MOVE;

10:35AM  8    CORRECT?

10:35AM  9    A.   I DID.

10:35AM  10   Q.   OKAY.  AND IF WE GO TO A COUPLE OF BULLETS DOWN YOU SEE

10:35AM  11   THAT THERE'S A REFERENCE, THERE'S A REFERENCE THERE TO I

10:35AM  12   BELIEVE FIVE ITEMS BUT THERE ARE TWO ROMAN NUMERAL IV'S.

10:36AM  13       DO YOU SEE THAT?

10:36AM  14   A.   MY TYPO.

10:36AM  15   Q.   WE'RE ALL HUMAN.

10:36AM  16       AND DO YOU SEE ONE REFERENCE IS AN ARRAY OF TESTS.

10:36AM  17       DO YOU SEE THAT, THE FIRST ROMAN NUMERAL?

10:36AM  18   A.   YES, IT -- OH, THE -- I THINK YOU'RE TALKING ABOUT THE

10:36AM  19   FIRST ROMAN NUMERAL IV IT SAYS, "THE ABILITY TO PERFORM A VAST

10:36AM  20   NUMBER OF TESTS."

10:36AM  21   Q.   RIGHT.  AND DO YOU SEE THE SECOND ROMAN NUMERAL IV SAYS,

10:36AM  22   "THE ABILITY A VAST NUMBER OF TESTS WITH ONLY A FEW DROPS OF

10:36AM  23   BLOOD REQUIRING JUST A FINGER PRICK."

10:36AM  24       DO YOU SEE THAT?

10:36AM  25   A.   I DO SEE THAT.

MOSLEY CROSS BY MR. WADE (RES.)                                    5263

10:36AM   1      Q.   AND YOU UNDERSTOOD THAT THERE WERE SOME TESTS THAT

10:36AM   2      THERANOS COULDN'T PERFORM ON A FINGERSTICK; RIGHT?

10:36AM   3      A.   I DIDN'T KNOW THAT AT THE TIME, AND I'M NOT SURE THAT THIS

10:36AM   4      ASSESSED THAT.

10:36AM   5      Q.   OKAY.  ONE JUST TALKS ABOUT A VAST ARRAY OF TESTS;

10:37AM   6      CORRECT?

10:37AM   7      A.   THAT IS CORRECT.

10:37AM   8      Q.   AND THE OTHER TALKS ABOUT FINGERSTICK TESTS; RIGHT?

10:37AM   9      A.   YES, IT DOES.

10:37AM  10      Q.   AND DO YOU RECALL AT ONE POINT YOU WENT TO THE COMPANY AND

10:37AM  11      YOU SAW A HIGH THROUGHPUT COMMERCIAL MACHINE?

10:37AM  12      A.   I DID GO TO THE COMPANY AND I DID GET A, FROM ELIZABETH, A

10:37AM  13      TOUR OF SOME OF THE LABS, AND I DID SEE ONE, MAYBE ONE OR MORE,

10:37AM  14      I DON'T REMEMBER SPECIFICALLY, VERY LARGE PIECES OF EQUIPMENT.

10:37AM  15           BUT, FRANKLY, I'M NOT QUALIFIED TO TELL YOU WHAT IT WAS OR

10:37AM  16      WHAT IT WAS DOING.

10:37AM  17      Q.   OKAY.  AND -- BUT YOU SAW IT WHILE YOU WITH THERE ON THE

10:37AM  18      TOUR?

10:37AM  19      A.   I DID SEE ONE VERY LARGE PIECE OF EQUIPMENT, YES.

10:37AM  20      Q.   AND I THINK YOU SAID MAYBE MORE?

10:37AM  21      A.   AND THERE COULD HAVE BEEN MORE.

10:37AM  22      Q.   YEAH.  AND YOU DIDN'T FORM A COMPLETE UNDERSTANDING AS TO

10:37AM  23      WHAT THE CAPACITY OF THOSE MACHINES WERE?

10:38AM  24      A.   I DID NOT FORM -- I DIDN'T REALLY HAVE A JUDGMENT EVEN AS

10:38AM  25      TO WHAT THE MACHINES WERE.

MOSLEY CROSS BY MR. WADE (RES.)                    5264

10:38AM  1      Q.   OKAY.

10:38AM  2      A.   BUT I ASSUMED THAT THEY SOMEHOW INVOLVED THE WORK THAT

10:38AM  3      THERANOS WAS DOING.

10:38AM  4      Q.   FAIR ENOUGH.  BUT YOU SAW THOSE AS YOU WERE WALKING

10:38AM  5      THROUGH THE COMPANY?

10:38AM  6      A.   YES, I DID.

10:38AM  7      Q.   WE SHOULD MAKE SURE THAT I FINISH THE QUESTION.

10:38AM  8      A.   I'M SORRY.  I'M SORRY.

10:38AM  9      Q.   SO NEITHER ONE OF US GET IN TROUBLE HERE.

10:38AM 10           THE, THE -- YOU JUST SAW THIS AS MS. HOLMES WAS TAKING YOU

10:38AM 11      THROUGH THE COMPANY AND SHOWING YOU A VARIETY OF DIFFERENT

10:38AM 12      ITEMS; CORRECT?

10:38AM 13      A.   THAT IS CORRECT.

10:38AM 14      Q.   AND JUST SO WE'RE CLEAR, THAT WAS AFTER THE DATE OF THIS

10:38AM 15      MEMO; RIGHT?

10:38AM 16      A.   YES.

10:38AM 17      Q.   OKAY.  AND IF WE GO DOWN, AND IF WE CAN RESET THE BULLET

10:38AM 18      POINTS AND START WITH THE BULLET WITH "THE PARTNERSHIP WITH

10:39AM 19      WALGREENS IS BRILLIANT."

10:39AM 20           NO, NEXT ONE DOWN.  SORRY.

10:39AM 21           YES, I WANT TO MAKE SURE THAT EVERYONE CAN SEE THAT.

10:39AM 22           I'M SORRY, MR. BENNETT.  CAN WE GO UP ONE.  YEAH, THERE WE

10:39AM 23      GO.

10:39AM 24           DO YOU SEE THERE IN YOUR MEMO IT SAYS, "THE PARTNERSHIP

10:39AM 25      WITH WALGREENS IS BRILLIANT."

MOSLEY CROSS BY MR. WADE (RES.)                              5265

10:39AM  1          DO YOU SEE THAT?

10:39AM  2     A.   YES.

10:39AM  3     Q.   AND YOU BELIEVED THAT AT THE TIME?

10:39AM  4     A.   I DID.

10:39AM  5     Q.   AND THIS WAS AN IMPORTANT PART OF YOUR INVESTMENT?

10:39AM  6     A.   IT WAS.

10:39AM  7     Q.   AND THAT'S BECAUSE IT WAS GOING TO PROVIDE THIS

10:39AM  8     DISTRIBUTION CHANNEL WHERE THE COMPANY WAS GOING TO BE ABLE TO

10:39AM  9     START CENTRALIZED TESTING AND THEN DEPLOY ITS DEVICES; CORRECT?

10:39AM  10    A.   WELL, I THOUGHT IT WAS BRILLIANT BECAUSE IT WAS A WAY TO

10:39AM  11    GET THEIR TEST OUT TO INDIVIDUALS AND WIDELY DISTRIBUTE THEIR

10:39AM  12    TESTS BECAUSE OF THE NUMBER OF WALGREENS LOCATIONS.

10:39AM  13         AND WE LOOKED AT EARLIER THE DESCRIPTION OF THE PROXIMITY

10:40AM  14    OF THE WALGREENS STORES TO THE VAST ARRAY OF THE POPULATION OF

10:40AM  15    THE UNITED STATES.

10:40AM  16    Q.   FAIR ENOUGH.

10:40AM  17         AND IF YOU LOOK AT THAT, THE SECOND BULLET THAT IS UP ON

10:40AM  18    THE SCREEN THERE, IT TALKS ABOUT THOSE, THOSE CONCEPTS WHERE IT

10:40AM  19    TALKS ABOUT GREAT CONVENIENCE AND AFFORDABLE PRICING BEING A

10:40AM  20    SIGNIFICANT PART OF THE THERANOS APPROACH AND BENEFITS; RIGHT?

10:40AM  21    A.   YES.

10:40AM  22    Q.   OKAY.  AND THAT WAS SIGNIFICANT TO YOU IN TERMS OF YOUR

10:40AM  23    INVESTMENT DECISION?

10:40AM  24    A.   IT WAS.

10:40AM  25    Q.   OKAY.  AND IF WE CAN GO TO THE SECOND TO THE LAST BULLET

MOSLEY CROSS BY MR. WADE (RES.)                                5266

10:40AM   1    THAT IS ON THE SCREEN, DO YOU SEE IT SAYS, "THE WALGREENS

10:40AM   2    PARTNERSHIP INCENTS WALGREENS TO ROLL OUT THE THERANOS WELLNESS

10:41AM   3    CENTERS EXPEDITIOUSLY;" RIGHT?

10:41AM   4    A.   I SEE THAT.

10:41AM   5    Q.   BECAUSE IT WOULD BRING IN FOOT TRAFFIC TO WALGREENS, IS

10:41AM   6    THAT WHY YOU THOUGHT THAT?

10:41AM   7    A.   I'M NOT SURE WHY I THOUGHT THAT AT THE TIME.  I MEAN, I

10:41AM   8    THINK THE BENEFIT OF IT DRIVING FOOT TRAFFIC IN WALGREENS

10:41AM   9    STORES WAS CERTAINLY -- I WOULD HAVE THOUGHT THAT AS BEING AN

10:41AM  10    INCENTIVE TO WALGREENS TO ROLL THIS OUT, BUT I DON'T KNOW

10:41AM  11    EVERYTHING THAT WENT INTO THE THOUGHT BEHIND THAT SENTENCE.

10:41AM  12    Q.   OKAY.

10:41AM  13    A.   BUT I SUSPECT THAT THAT WAS PRINCIPALLY IT.

10:41AM  14    Q.   OKAY.  AND YOU UNDERSTOOD AT THIS TIME THAT THE KEY --

10:41AM  15    THAT THIS ROLLOUT WAS A PRETTY BIG UNDERTAKING; RIGHT?

10:41AM  16    A.   I DID.

10:41AM  17    Q.   YEAH.  TO GO FROM 30 STORES TO THOUSANDS OF STORES IS A

10:41AM  18    BIG DEAL; RIGHT?

10:41AM  19    A.   YES.

10:41AM  20    Q.   YOU HAVE SOME CLIENTS WHO HAVE SOME RETAIL EXPERIENCE AND

10:41AM  21    YOU KNOW THAT THAT'S A BIG AND TOUGH ASSIGNMENT; RIGHT?

10:42AM  22    A.   IT WAS A BIG UNDERTAKING, YES.

10:42AM  23    Q.   AND THE ABILITY TO HAVE -- I'LL WITHDRAW THE QUESTION.

10:42AM  24         LET ME GO DOWN TO THE -- IN THE MEMO TO THE SCOPE OF THE

10:42AM  25    THERANOS OPPORTUNITY.

MOSLEY CROSS BY MR. WADE (RES.)                                    5267

10:42AM  1        AND HERE YOU TALK ABOUT THE POTENTIAL SCOPE AS ENORMOUS;

10:42AM  2   RIGHT?

10:42AM  3   A.   YES.

10:42AM  4   Q.   AND YOU SAW A LOT OF POTENTIAL FOR THE PERFORMANCE OF THE

10:42AM  5   COMPANY BASED UPON THE VISION THAT YOU HAD HEARD; RIGHT?

10:42AM  6   A.   I DID.

10:42AM  7   Q.   OKAY.  AND LET'S GO TO THE NEXT PAGE, PAGE 5 OF THE MEMO,

10:42AM  8   PAGE 6 OF THE EXHIBIT SO THE RECORD IS CLEAR.

10:42AM  9        I WANT TO FOCUS YOU ON ITEM C THERE.

10:42AM 10        DO YOU SEE THAT?

10:43AM 11   A.   I DO.

10:43AM 12   Q.   AND THIS RELATES TO WHAT WE WERE JUST TALKING ABOUT;

10:43AM 13   RIGHT?

10:43AM 14   A.   IT DOES.

10:43AM 15   Q.   AND YOU RECOGNIZE THAT THE PENETRATION INTO WALGREENS AT

10:43AM 16   THIS TIME WAS PRETTY SMALL; RIGHT?

10:43AM 17   A.   I SAID IT WAS REALLY SMALL.

10:43AM 18   Q.   YEAH.  THEY JUST STARTED THE PARTNERSHIP IN SEPTEMBER OF

10:43AM 19   2013; CORRECT?

10:43AM 20   A.   CORRECT.

10:43AM 21   Q.   AND THEN THEY HAD 13 STORES; RIGHT?  OR 30 STORES?

10:43AM 22   A.   THIRTY STORES.

10:43AM 23   Q.   AND THERE WAS A LONG WAY TO GO?

10:43AM 24   A.   ABSOLUTELY.

10:43AM 25   Q.   OKAY.  AND IF WE CAN GO DOWN TO THE BOTTOM POINT IN G.

MOSLEY CROSS BY MR. WADE (RES.)                                    5268

10:43AM   1        DO YOU SEE THAT IT SAYS -- YOU TALK ABOUT SOME OF THE

10:43AM   2   PATENTS AND HOW IT SUGGESTS THAT THERE ARE OTHER POSSIBILITIES

10:43AM   3   THAT WERE CREATED BY THEIR INTELLECTUAL PROPERTY PORTFOLIO.

10:43AM   4        DO YOU SEE THAT?

10:43AM   5   A.   I DO.

10:43AM   6   Q.   AND YOU HAD DONE SOME -- I THINK YOU NOTED IN YOUR MEMO

10:44AM   7   THAT YOU HAD DONE SOME LOOKING AT THAT -- THOSE MATERIALS

10:44AM   8   RELATING TO THE PORTFOLIO?

10:44AM   9        DO YOU RECALL THAT?

10:44AM  10   A.   I DON'T REMEMBER AND, YOU KNOW, I CAN'T HONESTLY SAY THAT

10:44AM  11   I CAN LOOK AT A LIST OF PATENTS AND HAVE A GOOD JUDGMENT, BUT I

10:44AM  12   THINK I HAD SEEN REFERENCES, AND IT COULD HAVE BEEN IN THE

10:44AM  13   PRESS OR OTHER PLACES, TO THIS IDEA THAT THERE WOULD BE A

10:44AM  14   NUMBER OF OTHER DISRUPTIVE POTENTIALS OF THIS TECHNOLOGY.

10:44AM  15   Q.   AND, IN FACT, IF WE LOOK AT THE CARRYOVER OF THAT

10:44AM  16   LANGUAGE, BASED ON THEIR INTELLECTUAL PROPERTY, IT COULD BE

10:44AM  17   THERE COULD BE SOME WEARABLE DEVICES OR OTHER THINGS THAT COULD

10:44AM  18   BE DEVELOPED IN THE FUTURE?

10:44AM  19   A.   IT SAYS THAT, AND THAT WAS MY UNDERSTANDING.

10:44AM  20   Q.   OKAY.  NOW, LET'S GO -- LET'S CONTINUE THROUGH THE MEMO.

10:44AM  21        DO YOU SEE THERE IT SAYS, "THE CURRENT AND PROJECTED

10:45AM  22   FINANCIAL RESULTS"?

10:45AM  23   A.   I SEE IT.

10:45AM  24   Q.   OKAY.  AND I THINK MR. SCHENK HAD ASKED YOU A FEW

10:45AM  25   QUESTIONS ABOUT THIS.

MOSLEY CROSS BY MR. WADE (RES.)                          5269

10:45AM   1            DO YOU RECALL THAT?

10:45AM   2       A.   I DO.

10:45AM   3       Q.   AND IF I CAN CALL -- AND THIS MATERIAL CAME OUT OF SOME OF

10:45AM   4       THE PROJECTIONS, SPREADSHEETS THAT THE COMPANY PROVIDED TO YOU

10:45AM   5       IN THE THREE VOLUME SET OF MATERIALS; CORRECT?

10:45AM   6       A.   I BELIEVE THAT'S CORRECT.

10:45AM   7       Q.   OKAY.  IF I CAN DRAW YOUR ATTENTION TO THE BACK OF BINDER

10:45AM   8       TWO OF THE MATERIALS THERANOS PROVIDED YOU, WHICH IS

10:45AM   9       EXHIBIT 14206, BATES PAGE 481.

10:45AM  10       A.   VOLUME TWO OF THREE?

10:45AM  11       Q.   VOLUME TWO OF THREE, PLEASE.

10:45AM  12       A.   AND THAT PAGE NUMBER AGAIN, PLEASE.

10:45AM  13       Q.   481, SIR.  IT SHOULD BE RIGHT NEAR THE BACK.  MAYBE FOUR

10:46AM  14       OR FIVE PAGES IN.

10:46AM  15       A.   OKAY.  THANK YOU.

10:46AM  16            OKAY.

10:46AM  17       Q.   DO YOU HAVE THAT IN FRONT OF YOU, SIR?

10:46AM  18       A.   I DO.

10:46AM  19       Q.   OKAY.  AND THESE, THESE ARE, THESE ARE SOME OF THE

10:46AM  20       PROJECTIONS THAT MR. SCHENK WAS ASKING YOU ABOUT.

10:46AM  21            DO YOU RECALL THAT?

10:46AM  22       A.   I DO.

10:46AM  23       Q.   AND I THINK APART FROM JUST LOOKING AT THE DOCUMENTS, YOU

10:46AM  24       DON'T HAVE A SIGNIFICANT RECOLLECTION ABOUT A LOT OF THE

10:46AM  25       SPECIFICS WITHIN THESE SPREADSHEETS, DO YOU?

MOSLEY CROSS BY MR. WADE (RES.)                                5270

10:46AM   1    A.   NOT A LOT OF DETAILED.

10:46AM   2    Q.   OKAY.  DO YOU RECALL THAT -- AND I THINK IT'S REFERENCED

10:46AM   3    LATER IN YOUR MEMO, WHICH WE'LL GET TO.

10:46AM   4         BUT YOU HAD SOME QUESTIONS ABOUT SOME OF THE NUMBERS.

10:46AM   5         DO YOU RECALL THAT?

10:46AM   6    A.   YES.

10:46AM   7    Q.   AND DO YOU RECALL THAT YOU HAD SOME CONVERSATIONS OR YOU

10:46AM   8    HAD POSED SOME QUESTIONS TO MR. BALWANI ABOUT THE 2015

10:47AM   9    PROJECTIONS?

10:47AM   10   A.   YOU KNOW, I DID HAVE QUESTIONS ABOUT THE 2015 PROJECTIONS.

10:47AM   11   I DON'T REMEMBER WHO I ADDRESSED THEM TO OR WHEN I ADDRESSED

10:47AM   12   THEM.

10:47AM   13   Q.   OKAY.

10:47AM   14   A.   BUT I CERTAINLY HAD QUESTIONS.

10:47AM   15   Q.   OKAY.  YOU RECALL THAT YOU HAD A MEETING WITH THE

10:47AM   16   GOVERNMENT WAY BACK IN 2017.

10:47AM   17        DO YOU REMEMBER THAT?

10:47AM   18   A.   YES, I DID.

10:47AM   19   Q.   AND YOU SAT DOWN IN A CONFERENCE ROOM?

10:47AM   20   A.   RIGHT.

10:47AM   21   Q.   AND THEY ASKED YOU SOME QUESTIONS?

10:47AM   22   A.   UH-HUH.

10:47AM   23   Q.   AND YOU GAVE THEM ANSWERS.

10:47AM   24        DO YOU RECALL THAT?

10:47AM   25   A.   OH, YES, I WAS INTERVIEWED BY THE S.E.C. AND THE FBI.

MOSLEY CROSS BY MR. WADE (RES.)                                    5271

10:47AM  1   Q.   OKAY.  LET ME JUST SEE IF I CAN REFRESH YOUR RECOLLECTION

10:47AM  2   ON THIS POINT.  IF I CAN -- WE CAN LEAVE THIS DOCUMENT UP, BUT

10:47AM  3   IF YOU CAN GO TO 1 -- IN VOLUME TWO -- I'M SORRY, IN VOLUME ONE

10:48AM  4   OF --

10:48AM  5   A.   THIS ISN'T THE MATERIALS THAT I -- THIS ISN'T THE VOLUME

10:48AM  6   OF THE THREE SET, IT'S THE OTHER?

10:48AM  7   Q.   NO.  IF YOU CAN GO -- KEEP THAT CLOSE, THOUGH --

10:48AM  8   A.   OKAY.

10:48AM  9   Q.   -- BECAUSE WE'RE GOING TO LOOK AT THAT.

10:48AM 10   A.   UM --

10:48AM 11   Q.   IF YOU CAN GO TO --

10:48AM 12   A.   VOLUME ONE?

10:48AM 13   Q.   -- VOLUME ONE.

10:48AM 14        AND I'M GOING TO DRAW YOUR ATTENTION TO EXHIBIT 11115.  SO

10:48AM 15   FOUR 1'S AND A 5.

10:48AM 16   A.   OKAY.  I HAVE IT.

10:48AM 17   Q.   OKAY.  AND IF YOU CAN GO TO PAGE 3.

10:48AM 18        AND IF YOU -- DO YOU SEE THE FIRST FULL PARAGRAPH THERE

10:48AM 19   STARTING WITH "MOSLEY."

10:48AM 20   A.   THE ONE THAT SAYS, "MOSLEY SAW THESE DOCUMENTS"?

10:48AM 21   Q.   PLEASE DON'T READ IT.  I'M GOING TO ASK YOU TO READ IT TO

10:48AM 22   YOURSELF.  I'M JUST TRYING TO REFRESH YOUR RECOLLECTION.

10:48AM 23   A.   OKAY.  SORRY.

10:48AM 24   Q.   NOPE.  IF YOU CAN READ FROM THERE THROUGH THE WORD

10:49AM 25   "PROJECTIONS" ON THE FIFTH LINE -- SIXTH LINE TO YOURSELF.

MOSLEY CROSS BY MR. WADE (RES.)                    5272

10:49AM   1            MR. SCHENK:  YOUR HONOR, BEFORE WE DO THIS, I'M

10:49AM   2    GOING TO OBJECT ON RELEVANCE AND FOUNDATION.  WE NEED TO

10:49AM   3    IDENTIFY THE TIMEFRAME, IS THIS 2015 OR NOT, TO DETERMINE IF

10:49AM   4    IT'S RELEVANT.

10:49AM   5            MR. WADE:  I NEED TO SEE.

10:49AM   6            THE COURT:  DO YOU WANT TO DO THAT?

10:49AM   7            MR. WADE:  WELL, I NEED TO SEE IF I CAN REFRESH HIS

10:49AM   8    RECOLLECTION BEFORE I CAN KNOW THE TIMEFRAME.

10:49AM   9        WHY DON'T I SEE IF THIS REFRESHES HIS RECOLLECTION, AND

10:49AM  10    THEN I'LL ASK HIM ABOUT THE TIMEFRAME.

10:49AM  11            THE COURT:  ALL RIGHT.

10:49AM  12        (PAUSE IN PROCEEDINGS.)

10:49AM  13    BY MR. WADE:

10:49AM  14    Q.  HAVE YOU HAD A CHANCE, MR. MOSLEY, TO READ TO YOURSELF THE

10:49AM  15    FIRST SIX LINES OF THAT DOCUMENT?

10:49AM  16    A.  YES, I HAVE.

10:49AM  17    Q.  OKAY.  AND DOES THAT REFRESH YOUR RECOLLECTION THAT

10:49AM  18    MR. BALWANI PROVIDED YOU ANSWERS --

10:50AM  19            MR. SCHENK:  YOUR HONOR, THAT'S WHAT I'M GOING TO

10:50AM  20    OBJECT TO.

10:50AM  21            MR. WADE:  I DON'T KNOW HOW ELSE TO DO IT BECAUSE SO

10:50AM  22    FAR HE HAS TO BE ABLE TO SAY IT REFRESHED HIS RECOLLECTION.

10:50AM  23            THE COURT:  WELL, ARE YOU TALKING ABOUT A 2015 TIME

10:50AM  24    PERIOD OR WHAT TIME PERIOD ARE YOU TALKING ABOUT?

10:50AM  25            MR. WADE:  THE PROJECTIONS FOR 2015, WHICH ARE

MOSLEY CROSS BY MR. WADE (RES.)                    5273

| | | |
|---|---|---|
| 10:50AM | 1 | REFERENCED IN THE EXHIBIT THAT THE WITNESS HAS BEEN ASKED ABOUT |
| 10:50AM | 2 | EXTENSIVELY. |
| 10:50AM | 3 | THE COURT:  I SEE THAT.  I SEE THAT. |
| 10:50AM | 4 | MR. WADE:  YEAH. |
| 10:50AM | 5 | THE COURT:  I THINK MR. SCHENK'S OBJECTION IS A LACK |
| 10:50AM | 6 | OF FOUNDATION AS TO THE TIMING OF -- MAYBE YOU SHOULD LAY A |
| 10:50AM | 7 | FOUNDATION A LITTLE BIT MORE ABOUT -- |
| 10:50AM | 8 | MR. WADE:  I'M REFRESHING HIS RECOLLECTION.  WE |
| 10:50AM | 9 | DON'T HAVE AN ANSWER YET. |
| 10:50AM | 10 | THE COURT:  WHY DON'T YOU TRY IT AGAIN. |
| 10:50AM | 11 | MR. WADE:  OKAY. |
| 10:50AM | 12 | Q.   MR. MOSLEY, DO YOU RECALL THAT YOU HAD SOME COMMUNICATIONS |
| 10:50AM | 13 | WITH MR. BALWANI IN CONNECTION WITH THE FINANCIAL PROJECTIONS |
| 10:50AM | 14 | THAT WERE PROVIDED BY THE GOVERNMENT? |
| 10:50AM | 15 | A.   I DON'T REMEMBER IT SPECIFICALLY, BUT I MIGHT WELL HAVE |
| 10:51AM | 16 | HAD A CONVERSATION WITH HIM BECAUSE I DID HAVE QUESTIONS ABOUT |
| 10:51AM | 17 | THE 2015 PROJECTIONS. |
| 10:51AM | 18 | Q.   OKAY.  AND AS YOU SIT HERE TODAY, YOU DON'T REMEMBER |
| 10:51AM | 19 | WHETHER IT WAS MR. BALWANI WHO PROVIDED THAT INFORMATION TO |
| 10:51AM | 20 | YOU? |
| 10:51AM | 21 | A.   I DON'T. |
| 10:51AM | 22 | Q.   OKAY.  AND THE MATERIALS THAT YOU JUST READ DON'T REFRESH |
| 10:51AM | 23 | YOUR RECOLLECTION AS TO WHETHER HE PROVIDED THAT INFORMATION TO |
| 10:51AM | 24 | YOU IN CONNECTION WITH THESE PROJECTIONS THAT WERE IN YOUR |
| 10:51AM | 25 | BINDER? |

MOSLEY CROSS BY MR. WADE (RES.)                                    5274

10:51AM  1    A.   YOU KNOW, OBVIOUSLY WHEN I WAS INTERVIEWED I SAID WHAT I

10:51AM  2    KNEW AND UNDERSTOOD AT THAT TIME AND ASSUMING THAT THEY

10:51AM  3    CORRECTLY TOOK THAT DOWN, THEN I CERTAINLY THOUGHT AT THAT TIME

10:51AM  4    THAT SUNNY BALWANI HAD RESPONDED TO THOSE QUESTIONS.

10:51AM  5    Q.   OKAY.  OKAY.  AND IF WE CAN GO BACK TO THE DOCUMENT

10:52AM  6    ITSELF.

10:52AM  7         AND JUST SO WE'RE -- NO, I'M SORRY.  IF WE CAN GO BACK TO

10:52AM  8    THE SPREADSHEET THAT YOU WERE JUST ON, MR. BENNETT, 14206, 481.

10:52AM  9         OKAY.  YOU SEE IN THE UPPER LEFT-HAND CORNER THESE WERE

10:52AM 10    PROJECTED STATEMENT OF INCOME; RIGHT?

10:52AM 11    A.   I DO.

10:52AM 12    Q.   AND YOU KNEW THEY WEREN'T THE ACTUAL NUMBERS; CORRECT?

10:52AM 13    A.   YES.

10:52AM 14    Q.   AND THE GOVERNMENT ASKED YOU ABOUT SOME OF THESE

10:52AM 15    PROJECTIONS FOR THE DIFFERENT YEARS.

10:52AM 16         DO YOU RECALL THAT?

10:52AM 17    A.   YES.

10:52AM 18    Q.   OKAY.  I'D LIKE TO TURN YOUR ATTENTION TO THE SECOND PAGE

10:52AM 19    OR THE NEXT PAGE.

10:52AM 20         AND DO YOU SEE THAT THIS IS A PROJECTED STATEMENT OF CASH

10:52AM 21    FLOW?

10:52AM 22    A.   I SEE THAT.

10:53AM 23    Q.   DO YOU SEE THAT?

10:53AM 24    A.   I DO.

10:53AM 25    Q.   AND THIS IS A DOCUMENT THAT SETS FORTH THE CASH THAT THE

MOSLEY CROSS BY MR. WADE (RES.)                                    5275

10:53AM  1    COMPANY IS TO RECEIVE IN CONNECTION WITH IN 2000 -- I'M JUST

10:53AM  2    FOCUSSED ON '14 AND '15.

10:53AM  3         DO YOU SEE THAT?

10:53AM  4    A.  I DO.

10:53AM  5    Q.  AND DO YOU SEE THAT IN CONNECTION WITH THE SERVICES NBL BY

10:53AM  6    WALGREENS, THAT THERE IS NOTHING THERE?  THERE ARE ZEROS?

10:53AM  7    A.  ON '14 AND '15, YES.

10:53AM  8    Q.  OKAY.  AND YOU SEE ALSO IN CONNECTION WITH SAFEWAY THERE'S

10:53AM  9    ZEROS THERE FROM A CASH STANDPOINT?

10:53AM  10   A.  WELL, THERE'S A BLANK, OR JUST A DASH.

10:53AM  11   Q.  BUT THERE ARE NO NUMBERS?

10:53AM  12   A.  THERE ARE NO NUMBERS.

10:53AM  13   Q.  OKAY.  AND IF WE CAN GO TO THE NEXT PAGE, DO YOU RECOGNIZE

10:54AM  14   THIS DOCUMENT?

10:54AM  15   A.  I DO.

10:54AM  16   Q.  IT'S A BALANCE SHEET?

10:54AM  17   A.  YES.

10:54AM  18   Q.  OKAY.  AND YOU SEE THAT IT INDICATES THAT THE FINANCIAL

10:54AM  19   NUMBERS THAT WERE PROVIDED WERE THE PERIOD ENDED JULY 14TH,

10:54AM  20   2014?

10:54AM  21   A.  THAT'S THE DATE ON THIS BALANCE SHEET, YES.

10:54AM  22   Q.  OKAY.  AND IF WE JUST GO DOWN, DO YOU SEE THE LINE ENTRY

10:54AM  23   FOR DEFERRED REVENUE AND CUSTOMER DEPOSITS?

10:54AM  24        DO YOU SEE THAT?

10:54AM  25   A.  I DO SEE THAT.

MOSLEY CROSS BY MR. WADE (RES.)                                    5276

10:54AM   1    Q.   AND YOU UNDERSTAND THIS TO BE IN MILLIONS; CORRECT?

10:54AM   2    A.   YES, I DO.

10:54AM   3    Q.   AND SO THE NUMBER THERE IS 1 -- ALMOST $169 MILLION IN

10:54AM   4    DEFERRED REVENUE?

10:54AM   5    A.   THAT IS CORRECT.

10:54AM   6    Q.   OKAY.  AND, AND YOU UNDERSTAND THAT SOMETIMES EVENTS NEED

10:54AM   7    TO HAPPEN BEFORE REVENUE CAN ACTUALLY BE RECOGNIZED AND IT

10:54AM   8    NEEDS TO BE DEFERRED UNTIL THOSE EVENTS HAPPEN; RIGHT?

10:54AM   9    A.   I DO UNDERSTAND THAT.

10:55AM   10   Q.   IF WE CAN GO BACK TO YOUR MEMO AND GO TO THE NEXT PAGE.

10:55AM   11   A.   CAN YOU DIRECT ME BACK TO THE VOLUME NUMBER AND THE PAGE

10:55AM   12   NUMBER?

10:55AM   13   Q.   I APOLOGIZE.  I SHOULD HAVE JUST PRINTED OUT A SEPARATE

10:55AM   14   COPY FOR YOU.

10:55AM   15   A.   IS IT IN VOLUME ONE?

10:55AM   16   Q.   IT'S IN VOLUME ONE, EXHIBIT 4197.

10:56AM   17   A.   SORRY ABOUT THAT.  OKAY.

10:56AM   18   Q.   DO YOU HAVE THAT IN FRONT OF YOU?

10:56AM   19   A.   I DO.

10:56AM   20        MR. WADE:  MAY I APPROACH, YOUR HONOR?

10:56AM   21        THE COURT:  YES.

10:56AM   22   BY MR. WADE:

10:56AM   23   Q.   I HAVE AN EXTRA COPY OF 4197, AND I'LL JUST HAND IT TO YOU

10:56AM   24   AND MAYBE THAT WILL MAKE IT A LITTLE EASIER FOR YOU (HANDING).

10:56AM   25   A.   THAT WILL MAKE IT A LITTLE EASIER.  I APPRECIATE IT.

MOSLEY CROSS BY MR. WADE (RES.)                          5277

10:56AM   1    Q.   AND DO YOU SEE IN PARAGRAPH E YOU TALK A LITTLE BIT ABOUT

10:56AM   2    THE VALUATION OF THE COMPANY?  I'M ON EXHIBIT PAGE 8, MEMO

10:56AM   3    PAGE 7.

10:56AM   4    A.   MEMO PAGE 7.

10:57AM   5         I'M THERE.

10:57AM   6    Q.   OKAY.  AND DO YOU SEE THAT YOU SET THE VALUE OF THERANOS

10:57AM   7    AGAINST THE TWO PRINCIPAL PUBLICLY TRADED DIAGNOSTIC TEST

10:57AM   8    PROVIDERS?

10:57AM   9    A.   YES, THAT'S WHAT THIS PARAGRAPH DISCUSS.

10:57AM   10   Q.   AND THOSE -- THAT WAS QUEST AND LABCORP WERE THE TWO

10:57AM   11   COMPETITORS; CORRECT?

10:57AM   12   A.   THAT'S CORRECT.

10:57AM   13   Q.   AND THEY EACH HAD A MARKET CAP OF ABOUT $9 BILLION; IS

10:57AM   14   THAT CORRECT?

10:57AM   15   A.   THAT'S CORRECT.

10:57AM   16   Q.   AND YOU UNDERSTOOD THAT THE VALUATION BASED ON THE

10:57AM   17   OFFERING PRICE IN THE C-2 ROUND WOULD HAVE VALUED THERANOS AT

10:57AM   18   ABOUT 8.8 BILLION?

10:57AM   19   A.   I WAS AWARE OF THAT, YES.

10:57AM   20   Q.   OKAY.  AND LET'S GO TO PAGE 8 OF YOUR MEMO, PAGE 9 OF THE

10:57AM   21   EXHIBIT, WHICH WOULD BE THE NEXT PAGE.

10:57AM   22   A.   I HAVE IT.

10:57AM   23   Q.   AND HERE YOU SET FORTH SOME QUESTIONS, CONCERNS, AND

10:58AM   24   RISKS.

10:58AM   25        DO YOU SEE THAT?

MOSLEY CROSS BY MR. WADE (RES.)                                    5278

10:58AM  1    A.   I DO.

10:58AM  2    Q.   AND YOU UNDERSTAND GENERALLY THAT INVESTMENTS COME WITH

10:58AM  3    RISK; RIGHT?

10:58AM  4    A.   ABSOLUTELY.

10:58AM  5    Q.   AND THAT THIS INVESTMENT IN PARTICULAR WAS A SPECULATIVE

10:58AM  6    INVESTMENT.

10:58AM  7         DO YOU RECALL THAT?

10:58AM  8    A.   YOU KNOW, I DON'T KNOW IF I WOULD CHARACTERIZE IT QUITE

10:58AM  9    THE WAY YOU WOULD, BUT IT CERTAINLY INVOLVED RISK.

10:58AM  10   Q.   OKAY.  AND YOU RECALLED THE SHAREHOLDER AGREEMENT THAT

10:58AM  11   MR. SCHENK SHOWED YOU?

10:58AM  12   A.   I DO.

10:58AM  13   Q.   AND DO YOU RECALL THE PROVISION IN THERE, THE COVENANT

10:58AM  14   THAT REFERRED TO THIS AS A SPECULATIVE --

10:58AM  15   A.   I DO.

10:58AM  16   Q.   -- INVESTMENT?

10:58AM  17   A.   I DO.

10:58AM  18   Q.   OKAY.  AND YOU UNDERSTOOD THAT AT THE TIME; RIGHT?

10:58AM  19   A.   YES, I DID.

10:58AM  20   Q.   OKAY.  AND YOU KNEW THIS WAS A YOUNG COMPANY; RIGHT?

10:58AM  21   A.   I DID.

10:58AM  22   Q.   AND THAT THEY WERE LESS THAN A YEAR INTO THEIR PRINCIPAL

10:58AM  23   COMMERCIAL RELATIONSHIP; RIGHT?

10:59AM  24   A.   WITH WALGREENS, YES.

10:59AM  25   Q.   OKAY.  AND YOU KNEW IT HAD A YOUNG CEO; RIGHT?

MOSLEY CROSS BY MR. WADE (RES.)                          5279

10:59AM   1    A.   YES, I DID.

10:59AM   2    Q.   AND YOU KNEW THAT THERANOS ITSELF HAD -- DID NOT HAVE A

10:59AM   3    LOT OF RETAIL EXPERIENCE; RIGHT?

10:59AM   4    A.   I DID.

10:59AM   5    Q.   OKAY.  AND THAT AS A RESULT, THAT THIS WAS ONE OF THOSE

10:59AM   6    COMPANIES THAT HAD A FAIR AMOUNT OF RISK?  YOU COULD LOSE ALL

10:59AM   7    OF YOUR MONEY; RIGHT?

10:59AM   8    A.   IT CERTAINLY HAD RISK, AND IT WAS CERTAINLY POSSIBLE TO

10:59AM   9    LOSE ALL OF YOUR MONEY, YES.

10:59AM   10   Q.   OKAY.  BUT THERE WAS, THERE WAS -- YOU ALSO SAW A REAL

10:59AM   11   POTENTIAL IN THE COMPANY WITH RESPECT TO MS. HOLMES'S VISION AS

10:59AM   12   WE'VE DISCUSSED?

10:59AM   13   A.   I DID.

10:59AM   14   Q.   OKAY.  AND YOU'VE SET FORTH SOME OF THOSE RISKS HERE

10:59AM   15   WITHIN THIS DOCUMENT; RIGHT?

10:59AM   16   A.   I DID.

10:59AM   17   Q.   AND THIS WAS JUST BASED UPON YOUR PRELIMINARY ASSESSMENT;

10:59AM   18   RIGHT?

10:59AM   19   A.   THAT IS CORRECT.

10:59AM   20   Q.   I'M SURE IF YOU HAD UPDATED THIS MEMO, YOU MIGHT HAVE EVEN

10:59AM   21   ADDED SOME MORE RISKS; IS THAT FAIR?

11:00AM   22   A.   I HAVEN'T SAT DOWN AND THOUGHT ABOUT IT, BUT IT'S POSSIBLE

11:00AM   23   I WOULD HAVE ADDED MORE RISKS.

11:00AM   24   Q.   OKAY.  AND IN PARTICULAR, YOU NOTE THE RISK RELATING TO

11:00AM   25   WALGREENS AS THE FIRST RISK THERE; RIGHT?

MOSLEY CROSS BY MR. WADE (RES.)                                  5280

11:00AM  1      A.   YES.

11:00AM  2      Q.   AND YOU UNDERSTOOD THAT AT THE TIME?

11:00AM  3      A.   YES, I DID.

11:00AM  4      Q.   AND THE SECOND RISK THAT YOU IDENTIFY RELATES TO THE

11:00AM  5      PROJECTED INCREASE IN REVENUE.

11:00AM  6           DO YOU SEE THAT?

11:00AM  7      A.   I DO.

11:00AM  8      Q.   AND IN THAT, THE INCREASE IN REVENUES TO $990 MILLION IS A

11:00AM  9      VERY SUBSTANTIAL INCREASE; CORRECT?

11:00AM  10     A.   JUST WHAT I SAID.

11:00AM  11     Q.   SO, IS THAT CORRECT, IT WAS A VERY SUBSTANTIAL INCREASE?

11:00AM  12     A.   YES, VERY SUBSTANTIAL.

11:00AM  13     Q.   AND SO THIS IS ONE OF THE AREAS WHERE YOU ACTUALLY SAID

11:01AM  14     THAT YOU WANTED TO MAYBE GET A LITTLE MORE INFORMATION ON THAT;

11:01AM  15     RIGHT?

11:01AM  16     A.   I DID.

11:01AM  17     Q.   OKAY.  AND I THINK MR. SCHENK HAD ASKED YOU ABOUT SOME

11:01AM  18     NOTES THAT ACTUALLY RELATE TO THAT ISSUE; RIGHT?

11:01AM  19     A.   YES.

11:01AM  20     Q.   OKAY.  AND LET'S --

11:01AM  21     A.   SOME HANDWRITTEN NOTES, YES.

11:01AM  22     Q.   LET'S LOOK AT THAT.  THOSE NOTES WERE ACTUALLY ENTERED

11:01AM  23     INTO THAT BINDER?

11:01AM  24     A.   THIS BINDER (INDICATING)?

11:01AM  25     Q.   NO.  THEY WERE ENTERED INTO A PAGE ON THAT BINDER --

MOSLEY CROSS BY MR. WADE (RES.)                    5281

11:01AM  1    A.   I THINK THEY WERE, YEAH.  THEY WERE HANDWRITTEN ON A PAGE

11:01AM  2    IN THAT BINDER, YES.

11:01AM  3    Q.   OKAY.  LET'S TAKE A LOOK AT THAT.  THAT'S IN BINDER TWO

11:01AM  4    RIGHT NEAR THE FRONT, SIR.  IT'S 126.

11:02AM  5    A.   IT'S THE WRONG BINDER.

11:02AM  6    Q.   IT'S BINDER TWO OF YOUR INVESTMENT MATERIALS.

11:02AM  7    A.   YEAH, IT'S -- OKAY.  OH, THE MATERIALS THAT WERE OF THE

11:02AM  8    THREE SET BINDER.

11:02AM  9    Q.   YES.

11:02AM  10   A.   OKAY.

11:02AM  11   Q.   CORRECT, SIR.

11:02AM  12   A.   JUST GIVE ME ONE SECOND, PLEASE.

11:02AM  13        AND WHAT PAGE WAS THAT?

11:02AM  14   Q.   126.

11:02AM  15   A.   126.  I HAVE IT.

11:02AM  16   Q.   OKAY.  AND WE'VE PUT THAT UP ON THE SCREEN.

11:02AM  17        AND THESE ARE NOTES THAT YOU TOOK WHEN YOU WERE MAKING

11:02AM  18   INQUIRIES WITH RESPECT TO THAT ISSUE ON THE 2015 PROJECTIONS;

11:03AM  19   CORRECT?

11:03AM  20   A.   YOU KNOW, HONESTLY, I DON'T REMEMBER -- THEY'RE OBVIOUSLY

11:03AM  21   NOTES I TOOK, BUT I DON'T REMEMBER EXACTLY WHEN I TOOK THEM OR

11:03AM  22   WHAT IT WAS BASED ON, A CONVERSATION OR BASED ON THE MATERIALS.

11:03AM  23   Q.   OKAY.  BUT IN EITHER EVENT, YOU UNDERSTOOD THAT THE

11:03AM  24   2014 -- EXCUSE ME.  LET ME START OVER.

11:03AM  25        THE 2015 NUMBERS YOU UNDERSTOOD INCLUDED AN ASSUMPTION

MOSLEY CROSS BY MR. WADE (RES.)                                    5282

11:03AM   1     THAT THERE WOULD BE SIGNIFICANT PENETRATION WITHIN THE

11:03AM   2     WALGREENS RELATIONSHIP; RIGHT?

11:03AM   3     A.   I THOUGHT THAT, YES.

11:03AM   4     Q.   OKAY.  AND IF WE CAN GO BACK TO YOUR MEMO, WHICH I HOPE

11:03AM   5     YOU HAVE A LOOSE COPY IN FRONT OF YOU TO MAKE IT EASIER.

11:03AM   6     A.   I DO.  I DO.  THANKS.

11:03AM   7     Q.   AND IF WE CAN GO TO PARAGRAPH D.

11:03AM   8          DO YOU SEE THAT?

11:04AM   9     A.   I DO.

11:04AM   10    Q.   AND YOU RECALL MR. SCHENK ASKED YOU SOME QUESTIONS ABOUT

11:04AM   11    VARIOUS SHAREHOLDER RIGHTS ISSUES YOU IDENTIFIED?

11:04AM   12    A.   YES.

11:04AM   13    Q.   OKAY.  ONE OF THE ISSUES YOU IDENTIFIED WAS IN CONNECTION

11:04AM   14    WITH -- IT'S NOT RELATED TO THIS PARAGRAPH, BUT IT RELATED TO A

11:04AM   15    LIQUIDATION PREFERENCE.

11:04AM   16         DO YOU RECALL THAT?

11:04AM   17    A.   YES, WE DID TALK ABOUT LIQUIDATION PREFERENCE, YES.

11:04AM   18    Q.   OKAY.  AND WHAT THAT MEANT BASICALLY IS IF THERE WAS A

11:04AM   19    BANKRUPTCY OR SOMETHING, THAT THE C-2 INVESTORS WOULD SORT OF

11:04AM   20    BE AT THE FRONT OF THE LINE; CORRECT?

11:04AM   21    A.   THAT IS CORRECT.

11:04AM   22    Q.   AND MS. HOLMES OWNED CLASS B SHARES; CORRECT?

11:04AM   23    A.   CLASS B COMMON SHARES, YES.

11:04AM   24    Q.   RIGHT.  AND IN TERMS OF THAT LINE, IF THERE WAS A

11:04AM   25    BANKRUPTCY, SHE WOULD COME LOWER IN PRIORITY; RIGHT?

MOSLEY CROSS BY MR. WADE (RES.)                                    5283

11:04AM 1    A.   YES, SHE WOULD COME AT THE COMMON LEVEL, WHICH WOULD BE

11:04AM 2    BELOW ALL OF THE PREFERRED, YES.

11:04AM 3    Q.   AND, AND YOU ALSO UNDERSTAND, AS A RESULT OF REVIEWING THE

11:05AM 4    MATERIALS, THAT ESSENTIALLY THERE WAS A TIME WHERE MS. HOLMES

11:05AM 5    OWNED THE WHOLE COMPANY, OR SUBSTANTIALLY ALL OF THE COMPANY;

11:05AM 6    RIGHT?

11:05AM 7    A.   I SUSPECT WHEN IT WAS FIRST SET UP AND BEFORE THEY HAD

11:05AM 8    ISSUED ANY PREFERRED OR OTHER COMMON STOCK, SHE PROBABLY OWNED

11:05AM 9    100 PERCENT.

11:05AM 10   Q.   YEAH.

11:05AM 11   A.   I WOULD HAVE GUESSED THAT.

11:05AM 12   Q.   AND WITH FOUNDERS, OFTENTIMES OVER TIME AS THEY ISSUE

11:05AM 13   STOCK TO INVESTORS, THEY KIND OF DILUTE THEMSELVES?

11:05AM 14   A.   YES, THAT'S COMMON.

11:05AM 15   Q.   OKAY.  AND YET, MS. HOLMES MAINTAINED, BECAUSE OF THOSE

11:05AM 16   CLASS B SHARES, A VOTING MAJORITY WITHIN THE COMPANY; RIGHT?

11:05AM 17   A.   A VERY SUBSTANTIAL VOTING MAJORITY, YES.

11:05AM 18   Q.   OKAY.  AND AS A RESULT OF THAT, IF SHE HAD WANTED, SHE

11:05AM 19   COULD HAVE PUT HERSELF, VIRTUALLY BY HER OWN VOTE, INTO A

11:05AM 20   LIQUIDATION PREFERENCE OVER THE C-2 INVESTORS AND MADE HERSELF

11:06AM 21   BE FRONT OF THE LINE?

11:06AM 22   A.   THAT'S NOT MY UNDERSTANDING OF THE LAW.

11:06AM 23   Q.   IT'S NOT YOUR UNDERSTANDING OF THE LAW?

11:06AM 24   A.   NO.

11:06AM 25   Q.   OKAY.  YOU UNDERSTOOD, THOUGH, WHEN YOU WERE INVESTING

MOSLEY CROSS BY MR. WADE (RES.)                                    5284

11:06AM  1    THAT YOURSELF AND THE OTHER PEOPLE WHO WERE COMING IN WERE

11:06AM  2    GOING TO GET THAT PREFERENCE IN CONNECTION WITH THE INVESTMENT?

11:06AM  3    A.   YEAH.  I UNDERSTOOD ANYBODY, UNDER THE ARTICLES OF

11:06AM  4    INCORPORATION OF THE COMPANY, WHICH ARE LEGALLY BINDING, THAT

11:06AM  5    THE C-2 SHAREHOLDERS WOULD BE PAID OFF FIRST.

11:06AM  6    Q.   OKAY.  AND THE OTHER SHAREHOLDER ISSUE THAT YOU LOOKED AT

11:06AM  7    RELATED TO A REDEMPTION RIGHT ISSUE; RIGHT?

11:06AM  8    A.   THAT IS CORRECT.

11:06AM  9    Q.   AND WAS THE BASIC CONCEPT THERE THAT THE COMPANY HAD THE

11:06AM  10   RIGHT TO REPURCHASE SHARES IF IT WAS DETERMINED THAT THE VALUE

11:06AM  11   OF THE COMPANY DROPPED BELOW $15 OR SOMETHING LIKE THAT?

11:06AM  12   A.   THAT WAS NOT MY UNDERSTANDING OF IT.

11:06AM  13   Q.   WHAT WAS YOUR UNDERSTANDING OF IT?

11:06AM  14   A.   MY UNDERSTANDING, HAVING READ IT, AND I THINK THE -- MAYBE

11:06AM  15   THE QUOTE IS BURIED IN THIS PARAGRAPH D.  THERE WAS A PROVISION

11:07AM  16   IN THE ARTICLES OF INCORPORATION THAT BASICALLY SAID THAT AT

11:07AM  17   ANY TIME THE SHARE -- THE BOARD COULD HAVE THE COMPANY VALUED,

11:07AM  18   WHATEVER THE BOARD OR AN APPRAISER DETERMINED THE VALUE WAS AT

11:07AM  19   THAT TIME, AND THEN THE BOARD WOULD HAVE THE RIGHT TO REDEEM

11:07AM  20   SHARES FROM ANY, ANY ONE OR MORE SHAREHOLDERS AT WHATEVER PRICE

11:07AM  21   THE BOARD DETERMINED THE FAIR MARKET VALUE TO BE AT THAT TIME.

11:07AM  22   Q.   OKAY.  AND YOU WERE CONCERNED BECAUSE YOU WANTED TO MAKE

11:07AM  23   SURE THAT THEY COULDN'T REDEEM THE SHARES FOR BELOW $17, BELOW

11:07AM  24   THE INVESTMENT AMOUNT; RIGHT?

11:07AM  25   A.   YES.  WELL, BECAUSE IT WOULD BE, IN MY JUDGMENT,

MOSLEY CROSS BY MR. WADE (RES.)                                      5285

11:07AM   1     COMPLETELY INAPPROPRIATE TO BE -- TO SELL SHARES FOR $17 AND

11:07AM   2     THEN COME BACK SIX MONTHS LATER AND SAY, THE BOARD THINKS IT'S

11:07AM   3     WORTH 12, WE'RE GOING TO BUY YOUR SHARES BACK AT 12.

11:08AM   4     Q.   AND WE'LL GET TO THIS LATER, BUT YOU ULTIMATELY RAISED

11:08AM   5     THIS ISSUE WITH THE COMPANY; RIGHT?

11:08AM   6     A.   YES, I DID.

11:08AM   7     Q.   AND YOU REQUESTED A CHANGE FOR YOURSELF AND FOR YOUR

11:08AM   8     CLIENTS?

11:08AM   9          DO YOU RECALL THAT?

11:08AM   10    A.   YEAH, I REQUESTED A CLARIFICATION THAT THIS WOULDN'T BE

11:08AM   11    APPLIED.

11:08AM   12    Q.   AND THAT CHANGE WAS MADE; CORRECT?

11:08AM   13    A.   NO, THERE WAS NO CHANGE MADE IN THE ARTICLES OF

11:08AM   14    INCORPORATION.

11:08AM   15         BUT THERE WAS A SHORT NOTE THAT ELIZABETH SENT TO ME

11:08AM   16    SAYING THAT WE WOULD NOT INVOKE THIS WITH RESPECT TO YOU OR ANY

11:08AM   17    OF YOUR CLIENTS THAT HAPPENED TO INVEST.

11:08AM   18    Q.   FAIR ENOUGH.  THERE WAS A SIDE LETTER THAT --

11:08AM   19    A.   YES.

11:08AM   20    Q.   AND THAT MEMORIALIZED THE AGREEMENT, OR THE UNDERSTANDING?

11:08AM   21    A.   YES.

11:08AM   22    Q.   OKAY.

11:08AM   23         YOUR HONOR, NOW MIGHT BE A NICE TIME TO BREAK.

11:08AM   24              THE COURT:  IT WOULD BE.  LET'S TAKE OUR 30 MINUTE

11:08AM   25    BREAK, LADIES AND GENTLEMEN, 30 MINUTES.

| | | |
|---|---|---|
| 11:09AM | 1 | (RECESS FROM 11:09 A.M. UNTIL 11:46 A.M.) |
| 11:46AM | 2 | (JURY OUT AT 11:46 A.M.) |
| 11:46AM | 3 | THE COURT:  THANK YOU.  PLEASE BE SEATED.  WE'RE |
| 11:46AM | 4 | BACK ON THE RECORD OUTSIDE OF THE PRESENCE OF THE JURY. |
| 11:46AM | 5 | MR. BOSTIC, I THINK, DID YOU WANT TO AUGMENT THE RECORD, |
| 11:46AM | 6 | SIR, IN REGARDS TO OUR DISCUSSION THIS MORNING? |
| 11:46AM | 7 | MR. BOSTIC:  YES, YOUR HONOR. |
| 11:46AM | 8 | WITH THE COURT'S PERMISSION, I'LL SWITCH SIDES NOT TO |
| 11:46AM | 9 | DISTURB MR. WADE'S NOTES. |
| 11:46AM | 10 | THE COURT:  SURE.  RIGHT. |
| 11:46AM | 11 | MR. BOSTIC:  I GAVE MS. TREFZ A HEADS UP ABOUT THIS. |
| 11:46AM | 12 | I JUST WANTED TO RAISE ONE ADDITIONAL THOUGHT TO THE COURT |
| 11:46AM | 13 | REGARDING THE DEFENSE'S MOTION TO PRECLUDE THE TESTIMONY OF |
| 11:46AM | 14 | PATIENT VICTIM BB. |
| 11:46AM | 15 | THE COURT:  YES. |
| 11:46AM | 16 | MR. BOSTIC:  AND I UNDERSTAND THE COURT'S PREVIOUS |
| 11:46AM | 17 | COMMENTS. |
| 11:46AM | 18 | TO THE EXTENT THE COURT'S CONCERNS ARE ABOUT NOTICE TO THE |
| 11:46AM | 19 | DEFENSE AND THE DEFENSE'S OPPORTUNITY TO PREPARE, I HAD |
| 11:46AM | 20 | MENTIONED THAT THIS WITNESS WAS PREPARING TO TESTIFY AS EARLY |
| 11:46AM | 21 | AS TOMORROW. |
| 11:46AM | 22 | I JUST WANTED TO RAISE FOR THE COURT THAT THE GOVERNMENT |
| 11:47AM | 23 | IS, OF COURSE, WILLING TO DEFER THAT WITNESS'S TESTIMONY AND |
| 11:47AM | 24 | HAVE THE WITNESS TESTIFY TOWARDS THE VERY END OF THE |
| 11:47AM | 25 | GOVERNMENT'S CASE TO THE EXTENT THAT WOULD ADDRESS THE COURT'S |

MOSLEY CROSS BY MR. WADE (RES.)                    5287

11:47AM  1      CONCERN ABOUT NOTICE.

11:47AM  2          I COULDN'T HELP BUT NOTE THAT DURING THE ARGUMENT EARLIER,

11:47AM  3      MS. TREFZ CITED CLIA REGULATIONS AND THE PERMISSIBLE DEGREE OF

11:47AM  4      VARIATION WHEN IT CAME TO THE SPECIFIC ASSAY.

11:47AM  5          THAT MAKES ME OPTIMISTIC THAT THE DEFENSE IS EITHER

11:47AM  6      CURRENTLY PREPARED TO ADDRESS THIS ASSAY WITH THIS PATIENT, OR

11:47AM  7      COULD BE IN THAT POSITION GIVEN A LITTLE BIT OF ADDITIONAL

11:47AM  8      TIME.

11:47AM  9          SO I WANTED TO RAISE THAT IN CASE IT'S A SOLUTION TO THE

11:47AM  10     PROBLEM.

11:47AM  11             THE COURT:  THANK YOU.  THANK YOU.

11:47AM  12         MS. TREFZ.

11:47AM  13             MS. TREFZ:  IT WILL BE NO SURPRISE TO YOUR HONOR TO

11:47AM  14     LEARN THAT WE DO NOT THINK THAT THAT IS A SOLUTION TO THE

11:47AM  15     PROBLEM.

11:47AM  16         IT IS NOT A SOLUTION BECAUSE THESE ASSAYS ARE VERY

11:47AM  17     COMPLICATED, AND WE'VE RAISED THIS ISSUE FOR QUITE A LONG TIME.

11:47AM  18     I DON'T ASSUME THAT THE GOVERNMENT HAS SIX MONTHS LEFT IN ITS

11:48AM  19     CASE.  IF WE'RE WRONG, I'D LIKE TO KNOW THAT.

11:48AM  20         BUT WE'RE AT THIS POINT EIGHT MONTHS BEYOND WHERE WE

11:48AM  21     LITERALLY IDENTIFIED THIS PARTICULAR PATIENT AND THIS

11:48AM  22     PARTICULAR ISSUE, AND ESSENTIALLY I'M NOT SURE WHEN THE

11:48AM  23     GOVERNMENT FIRST UNDERSTOOD THAT PLATELETS ARE A DIFFERENT

11:48AM  24     ASSAY THAN PT, BUT I THINK THAT SHOULD GIVE THE COURT PAUSE IN

11:48AM  25     AND OF ITSELF THAT THIS WOULD -- THAT, YOU KNOW, ALLOWING THE

5288
MOSLEY CROSS BY MR. WADE (RES.)

11:48AM 1    GOVERNMENT TO FIX ITS CASE, YOU KNOW, AFTER MONTHS AND MONTHS

11:48AM 2    OF RELIANCE ON THE GOVERNMENT'S REPRESENTATIONS AND THE BILL OF

11:48AM 3    PARTICULARS, THE FACT THAT WE COULD POTENTIALLY COME UP WITH AN

11:48AM 4    ARGUMENT SIMPLY DOES NOT FIX THE ISSUE.

11:48AM 5        AND THE GOVERNMENT -- AND THE COURT SHOULD NOT HELP THE

11:48AM 6    GOVERNMENT CORRECT ITS CASE IN A CRIMINAL, IN A CRIMINAL CASE

11:48AM 7    LIKE THIS.

11:49AM 8        THE COURT:  WELL, THANK YOU.

11:49AM 9        MR. BOSTIC SUGGESTS THAT YOUR EXPRESSION SUGGESTS A GREAT

11:49AM 10   FLUENCY ABOUT THE TECHNOLOGY HERE AND THE ASSAYS SUCH THAT YOU

11:49AM 11   WOULD NOT SUFFER GREAT PREJUDICE, PARTICULARLY IF THE WITNESS

11:49AM 12   WERE PUT LATER ON THE LIST SUCH THAT YOU DIDN'T HAVE TO PREPARE

11:49AM 13   THIS WEEK, BUT PERHAPS IN THE WEEKS TO COME, AND THAT WOULD

11:49AM 14   THEREFORE MITIGATE ANY PREJUDICE THAT YOU MIGHT ENGAGE.

11:49AM 15       MS. TREFZ:  IS THE WITNESS GOING TO BE PERMITTED TO

11:49AM 16   TESTIFY AS TO SCIENTIFIC PRINCIPLES?  BECAUSE I DON'T THINK HE

11:49AM 17   HAS THE BASIS TO DO THAT.

11:49AM 18       AND I BELIEVE IT'S PROBLEMATIC FOR US TO BE PUT TO THE

11:49AM 19   BURDEN OF ESSENTIALLY COMING UP WITH THE SCIENTIFIC

11:49AM 20   UNDERSTANDING THAT, FRANKLY, THE GOVERNMENT HAS THE BURDEN TO

11:49AM 21   PUT ON AND HAS NO ABILITY TO DO THAT BASED ON THE CURRENT

11:49AM 22   DISCLOSURES THAT HAVE BEEN PENDING FOR A LONG TIME IN THIS

11:49AM 23   CASE.

11:49AM 24       SO I DON'T THINK THAT'S A SUFFICIENT SOLUTION.  I THINK

11:49AM 25   BASICALLY WHAT HAS BEEN PRETTY CLEAR HERE IS THAT THE

MOSLEY CROSS BY MR. WADE (RES.)                                    5289

| | | |
|---|---|---|
| 11:49AM | 1 | GOVERNMENT DID NOT UNDERSTAND THAT IT HAD THIS ISSUE, AND THAT |
| 11:50AM | 2 | IS THROUGH NO FAULT OF OURS.  WE RAISED THE ISSUE BACK IN |
| 11:50AM | 3 | FEBRUARY, AND ACTUALLY BEFORE THAT IN NOVEMBER. |
| 11:50AM | 4 | AND I BELIEVE THE COURT SHOULD CONTINUE TO HOLD THE |
| 11:50AM | 5 | GOVERNMENT TO THE HIGH STANDARD THAT IT SHOULD HOLD ITSELF TO |
| 11:50AM | 6 | IN A CRIMINAL CASE WHERE MY CLIENT IS FACING A LIBERTY, |
| 11:50AM | 7 | OBSTRUCTION OF HER LIBERTY. |
| 11:50AM | 8 | MR. BOSTIC:  I'LL ONLY ADD, YOUR HONOR, THAT THE |
| 11:50AM | 9 | PURPOSE OF THE BILL OF PARTICULARS, AS I SAID BEFORE, AND I |
| 11:50AM | 10 | THINK THIS IS THE COURT'S UNDERSTANDING, TOO, BASED ON THE |
| 11:50AM | 11 | RULING, WAS TO PROVIDE NOTICE TO THE DEFENSE. |
| 11:50AM | 12 | WE'RE SEARCHING FOR A PRACTICAL SOLUTION HERE THAT ALLOWS |
| 11:50AM | 13 | THIS VICTIM TO BE HEARD IN THIS CASE, WHILE AT THE SAME TIME |
| 11:50AM | 14 | NOT PREJUDICING THE DEFENSE.  WE BELIEVE WE HAVE SUGGESTED THAT |
| 11:50AM | 15 | SOLUTION, BUT WE LEAVE IT TO THE COURT'S JUDGMENT. |
| 11:50AM | 16 | THE COURT:  THANK YOU VERY MUCH.  THANK YOU BOTH |
| 11:50AM | 17 | VERY MUCH. |
| 11:50AM | 18 | THANK YOU, MR. BOSTIC. |
| 11:50AM | 19 | THANK YOU, MS. TREFZ.  AND WE CAN BRING THE JURY IN NOW. |
| 11:51AM | 20 | ARE WE GOING TO TAKE A BREAK AT 1:00 O'CLOCK -- OR EXCUSE |
| 11:51AM | 21 | ME, 1:30? |
| 11:52AM | 22 | MS. TREFZ:  THANK YOU. |
| 11:52AM | 23 | MR. BOSTIC:  THANK YOU. |
| 11:52AM | 24 | THE COURT:  MR. DOWNEY, MR. SCHENK, MAY I SEE YOU AT |
| 11:52AM | 25 | SIDE-BAR. |

MOSLEY CROSS BY MR. WADE (RES.)                          5290

| | | |
|---|---|---|
| 11:52AM | 1 | (SIDE-BAR DISCUSSION WITH MR. DOWNEY AND MR. SCHENK AND |
| 11:52AM | 2 | THE COURT OFF THE RECORD.) |
| 12:05PM | 3 | MR. WADE:  YOUR HONOR, IS IT OKAY IF I'M AT THE |
| 12:05PM | 4 | PODIUM? |
| 12:05PM | 5 | THE COURT:  YOU HAVE NO PLACE ELSE TO GO? |
| 12:05PM | 6 | MR. WADE:  I FEEL THE CHAIN. |
| 12:07PM | 7 | (PAUSE IN PROCEEDINGS.) |
| 12:07PM | 8 | (JURY IN AT 12:07 P.M.) |
| 12:07PM | 9 | THE COURT:  ALL RIGHT.  THANK YOU.  PLEASE BE |
| 12:07PM | 10 | SEATED. |
| 12:07PM | 11 | WE'RE BACK ON THE RECORD IN THE HOLMES MATTER.  ALL |
| 12:07PM | 12 | PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN. |
| 12:08PM | 13 | MR. MOSLEY IS ON THE STAND. |
| 12:08PM | 14 | MR. WADE, YOU'D LIKE TO CONTINUE? |
| 12:08PM | 15 | MR. WADE:  I WOULD, YOUR HONOR.  THANK YOU. |
| 12:08PM | 16 | Q.  GOOD AFTERNOON, MR. MOSLEY. |
| 12:08PM | 17 | A.  HI. |
| 12:08PM | 18 | Q.  DO YOU STILL HAVE 4197 IN FRONT OF YOU THERE? |
| 12:08PM | 19 | A.  I DO. |
| 12:08PM | 20 | Q.  OKAY.  I JUST HAVE A COUPLE MORE QUICK QUESTIONS. |
| 12:08PM | 21 | DO YOU HAVE THE FIRST PAGE OF THAT DOCUMENT UP, THE LETTER |
| 12:08PM | 22 | TO DR. KISSINGER? |
| 12:08PM | 23 | A.  YES, I DO. |
| 12:08PM | 24 | Q.  OKAY.  LET'S BLOW THAT UP. |
| 12:08PM | 25 | DO YOU SEE IN THE BOTTOM, DO YOU SEE HOW YOU MENTION THAT |

5291

MOSLEY CROSS BY MR. WADE (RES.)

| | | |
|---|---|---|
| 12:08PM | 1 | "IT WOULD BE BEST TO OBTAIN A NONDISCLOSURE AGREEMENT FROM |
| 12:08PM | 2 | ANYONE BEFORE PROVIDING THEM WITH A COPY OF MY OUTLINE"? |
| 12:08PM | 3 | DO YOU SEE THAT? |
| 12:08PM | 4 | A.   I DO SEE THAT. |
| 12:08PM | 5 | Q.   AND TO FACILITATE THAT, YOU ACTUALLY NOTE THAT YOU'VE |
| 12:08PM | 6 | ENCLOSED A COPY OF THE BLANK CONFIDENTIAL DISCLOSURE AGREEMENT |
| 12:09PM | 7 | THAT YOU GOT FROM THERANOS. |
| 12:09PM | 8 | A.   I SEE THAT. |
| 12:09PM | 9 | Q.   AND AS YOU SIT HERE TODAY, DO YOU KNOW WHETHER |
| 12:09PM | 10 | DR. KISSINGER DISBURSED THIS MEMO? |
| 12:09PM | 11 | A.   I DON'T. |
| 12:09PM | 12 | Q.   OKAY.  AND I NOTED WITHIN THE MEMO ITSELF -- AND, AGAIN, |
| 12:09PM | 13 | THIS MEMO WAS MEANT FOR DR. KISSINGER IN THE FIRST INSTANCE; |
| 12:09PM | 14 | CORRECT? |
| 12:09PM | 15 | A.   IN THE ONLY INSTANCE. |
| 12:09PM | 16 | Q.   OKAY.  AND YOU HAD COMMUNICATIONS WITH HIM, APART FROM |
| 12:09PM | 17 | THIS, WITHOUT ASKING ABOUT THE SUBSTANCE OF THE COMMUNICATIONS? |
| 12:09PM | 18 | A.   I TALKED TO HIM ON A REGULAR BASIS.  SO, YES, I BELIEVE I |
| 12:09PM | 19 | HAD COMMUNICATIONS WITH HIM OVER THIS PERIOD. |
| 12:09PM | 20 | Q.   OKAY.  AND SO AS A RESULT OF THAT, DID YOU NOT FEEL A NEED |
| 12:09PM | 21 | TO PUT ANY SORT OF LIMITATIONS ON THE MATERIALS THAT YOU HAD |
| 12:09PM | 22 | LOOKED AT OR REVIEWED IN CONNECTION WITH YOUR PREPARATION OF |
| 12:09PM | 23 | THIS DOCUMENT? |
| 12:09PM | 24 | A.   I'M NOT SURE I UNDERSTAND WHAT YOU'RE ASKING. |
| 12:10PM | 25 | Q.   WELL, YOU DIDN'T QUALIFY YOUR ANALYSIS WITHIN THE MEMO AS |

MOSLEY CROSS BY MR. WADE (RES.)                                    5292

12:10PM    1    ONE THAT WAS A PRELIMINARY ANALYSIS THAT WAS LIMITED IN SOME

12:10PM    2    NATURE; CORRECT?

12:10PM    3    A.    I THOUGHT THAT WAS SUFFICIENTLY CLEAR GIVEN THAT I WAS

12:10PM    4    PROVIDING IT TO HIM WITHIN A RELATIVELY SHORT PERIOD OF TIME OF

12:10PM    5    HAVING GOTTEN THE MATERIALS.

12:10PM    6    Q.    OKAY.  YOU THOUGHT THAT AS A RESULT -- AGAIN, WITHOUT

12:10PM    7    GOING INTO THE SUBSTANCE OF THE COMMUNICATION -- YOU THOUGHT

12:10PM    8    THAT WAS CLEAR TO DR. KISSINGER?

12:10PM    9    A.    I DID.

12:10PM   10    Q.    OKAY.  THE -- BEFORE THE BREAK WE HAD ASKED -- I HAD ASKED

12:10PM   11    YOU A COUPLE OF QUESTIONS ABOUT THE FDA AND CLIA REGULATIONS.

12:10PM   12        DO YOU RECALL THAT?

12:10PM   13    A.    I DON'T.

12:10PM   14    Q.    WELL, THE NEED FOR THE COMPANY'S DESIRE TO GO AND GET FDA

12:10PM   15    APPROVAL?

12:10PM   16    A.    I DON'T REMEMBER YOU ASKING.

12:11PM   17    Q.    OKAY.  DO YOU RECALL, DO YOU RECALL THAT THE COMPANY HAD

12:11PM   18    PLANS TO GO AND GET FDA APPROVAL IN A CLIA WAIVER?

12:11PM   19    A.    I CERTAINLY KNEW THAT THE COMPANY PLANNED TO GET FDA

12:11PM   20    APPROVAL, AND I THINK THE MATERIALS SAID THAT THEY HAD ALREADY

12:11PM   21    RECEIVED A CLIA WAIVER.

12:11PM   22    Q.    WELL, THE LAB WAS APPROVED?

12:11PM   23    A.    OKAY.

12:11PM   24    Q.    CORRECT?

12:11PM   25        BUT DID YOU UNDERSTAND -- DO YOU RECALL UNDERSTANDING THAT

MOSLEY CROSS BY MR. WADE (RES.)                                    5293

12:11PM   1    THE FDA APPROVAL AND A CLIA WAIVER WAS REQUIRED TO DISTRIBUTE

12:11PM   2    THE DEVICE?

12:11PM   3    A.  NO, I DID NOT.

12:11PM   4    Q.  OKAY.  LET ME SEE IF I CAN REFRESH YOUR RECOLLECTION.  IF

12:11PM   5    YOU CAN GO IN THE FIRST BINDER --

12:11PM   6    A.  OF THE MATERIALS?

12:11PM   7    Q.  -- OF MY MATERIALS.  NO, NOT YOUR MATERIALS, OF MY

12:11PM   8    MATERIALS.  I THINK WE'LL BE DONE WITH THE BINDERS PROBABLY FOR

12:11PM   9    THE BALANCE OF YOUR TESTIMONY.

12:12PM  10    A.  OKAY.

12:12PM  11    Q.  SO IF YOU GO INTO VOLUME ONE OF THE MATERIALS THAT I

12:12PM  12    PROVIDED YOU --

12:12PM  13    A.  OKAY.

12:12PM  14    Q.  -- AND GO TO EXHIBIT 11117, FOUR 1'S AND A 7.

12:12PM  15    A.  OKAY.

12:12PM  16    Q.  AND TELL ME WHEN YOU HAVE THAT EXHIBIT IN FRONT OF YOU.

12:12PM  17    A.  I DO.

12:12PM  18    Q.  OKAY.  IF I COULD DIRECT YOUR ATTENTION TO PAGE 151 OF THE

12:12PM  19    TESTIMONY?

12:12PM  20    A.  OKAY.  I'M THERE.

12:12PM  21    Q.  OKAY.  AND IF YOU COULD JUST READ TO YOURSELF 151 AND TELL

12:12PM  22    ME WHEN YOU'VE COMPLETED READING THAT TO YOURSELF.

12:12PM  23        (PAUSE IN PROCEEDINGS.)

12:13PM  24           THE WITNESS:  OKAY.  I'VE READ IT.

12:13PM  25    BY MR. WADE:

MOSLEY CROSS BY MR. WADE (RES.)                                 5294

12:13PM   1    Q.   OKAY.  AND JUST CALLING YOUR ATTENTION IN PARTICULAR TO

12:13PM   2    LINE 21.  DOES THIS REFRESH YOUR RECOLLECTION THAT YOU

12:13PM   3    UNDERSTOOD THAT THERANOS'S BUSINESS IN THE FUTURE WOULD DEPEND

12:13PM   4    ON GETTING AN FDA APPROVAL AND A CLIA WAIVER AND THAT THAT

12:13PM   5    MIGHT NOT HAPPEN?

12:13PM   6    A.   YOU KNOW, THIS DOESN'T REALLY -- I'M NOT, OBVIOUSLY, A

12:14PM   7    REGULATORY EXPERT BY ANY MEANS, BUT I DID NOT -- MY

12:14PM   8    UNDERSTANDING AT THE TIME -- AND THIS IS OBVIOUSLY A DEPOSITION

12:14PM   9    I GAVE.

12:14PM  10         BUT MY UNDERSTANDING, I BELIEVE AT ALL TIMES, WAS THAT FDA

12:14PM  11    APPROVAL WASN'T NEEDED, AND I HAD A NUMBER OF CONVERSATIONS

12:14PM  12    WITH ELIZABETH WHO SAID, WE INTEND TO GET FDA APPROVAL BECAUSE

12:14PM  13    THAT IS THE GOLD STANDARD.

12:14PM  14    Q.   OKAY.  JUST DRAWING YOUR ATTENTION TO THIS, YOU KNOW THIS

12:14PM  15    WAS A DEPOSITION THAT YOU GAVE UNDER OATH?

12:14PM  16    A.   YES, I DO.

12:14PM  17    Q.   IN A PRIOR PROCEEDING?

12:14PM  18    A.   UM, YES.

12:14PM  19    Q.   IN A PRIOR DEPOSITION, YOU RECALL THAT YOU --

12:14PM  20    A.   YES, I DO.

12:14PM  21    Q.   -- GAVE TESTIMONY --

12:14PM  22    A.   I DID.  OH, I'M SORRY.

12:14PM  23    Q.   YOU GAVE TESTIMONY UNDER OATH AND THERE WAS A COURT

12:14PM  24    REPORTER THERE WHO TOOK DOWN YOUR ANSWERS?

12:14PM  25    A.   YES, I DO REMEMBER THAT.

MOSLEY CROSS BY MR. WADE (RES.)                                    5295

| | | |
|---|---|---|
| 12:14PM | 1 | Q.   OKAY.  AND YOU RECALL IN CONNECTION WITH THAT YOU WERE |
| 12:15PM | 2 | ASKED, DID YOU UNDERSTAND THAT IF THERANOS'S -- THERANOS'S |
| 12:15PM | 3 | BUSINESS IN THE FUTURE WOULD DEPEND ON GETTING AN FDA APPROVAL |
| 12:15PM | 4 | AND A CLIA WAIVER, THAT THAT MIGHT NOT HAPPEN? |
| 12:15PM | 5 | AND YOU ANSWERED, YES, I UNDERSTOOD THAT IT WAS A |
| 12:15PM | 6 | CONDITION? |
| 12:15PM | 7 | DID I READ THAT CORRECTLY? |
| 12:15PM | 8 | A.   UM, JUST ONE SECOND.  LET ME READ THE -- YES, I SAID, |
| 12:15PM | 9 | "YES, I UNDERSTOOD THAT WAS A CONDITION." |
| 12:15PM | 10 | Q.   I READ THAT CORRECTLY? |
| 12:15PM | 11 | A.   YES, YOU DID. |
| 12:15PM | 12 | Q.   OKAY.  BACK TO YOUR MEMO AT 4197. |
| 12:16PM | 13 | IF WE CAN JUST GO IN THE BOTTOM RIGHT-HAND CORNER. |
| 12:16PM | 14 | DO YOU SEE THERE'S A BATES LABEL FOR DYNASTY. |
| 12:16PM | 15 | DO YOU SEE THAT? |
| 12:16PM | 16 | A.   I DO. |
| 12:16PM | 17 | Q.   AND DID YOU UNDERSTAND DYNASTY TO BE SECRETARY BETSY DEVOS |
| 12:16PM | 18 | AND MR. DICK DEVOS'S FAMILY ENTITY? |
| 12:16PM | 19 | A.   I CERTAINLY DIDN'T UNDERSTAND IT TO BE BECAUSE I NEVER |
| 12:16PM | 20 | REFERRED TO IT AS THAT. |
| 12:16PM | 21 | Q.   OKAY.  YOU'RE NOT FAMILIAR WITH THAT ENTITY? |
| 12:16PM | 22 | A.   I'M FAMILIAR WITH THEIR -- I'M FAMILIAR THAT DICK AND |
| 12:16PM | 23 | BETSY HAVE A FAMILY OFFICE, BUT I COULDN'T TELL YOU WHAT THEY |
| 12:16PM | 24 | CALL IT. |
| 12:16PM | 25 | Q.   OKAY.  FAIR ENOUGH. |

MOSLEY CROSS BY MR. WADE (RES.)                          5296

12:16PM  1          LET ME TURN YOUR ATTENTION TO 4202.

12:17PM  2     A.   VOLUME ONE OR VOLUME TWO?

12:17PM  3     Q.   VOLUME ONE.

12:17PM  4     A.   OKAY.

12:17PM  5     Q.   OKAY.  AND DO YOU RECOGNIZE THIS -- JUST TO SET US ON THE

12:17PM  6     DATES AGAIN, THE MEMO WAS DATED SEPTEMBER 2ND, 2014.  YOUR

12:17PM  7     OUTLINE FOR MR. -- FOR DR. KISSINGER WAS DATED SEPTEMBER 2ND,

12:17PM  8     2014; CORRECT?

12:17PM  9     A.   YES, YES.

12:17PM  10    Q.   AND DO YOU SEE THIS TO BE EMAIL CORRESPONDENCE STARTING ON

12:17PM  11    THAT DATE, AND THEN IN SOME DAYS AFTER THAT IN SEPTEMBER OF

12:17PM  12    2014 RELATING TO THERANOS?

12:17PM  13    A.   YES.

12:17PM  14    Q.   BETWEEN YOU AND MS. HOLMES?

12:17PM  15    A.   YES.

12:17PM  16    Q.   OKAY.

12:17PM  17         MOVE THE ADMISSION OF 1202.

12:18PM  18              THE COURT:  4202?

12:18PM  19              MR. WADE:  4202.

12:18PM  20              MR. SCHENK:  YOUR HONOR, IT'S BEEN DISPLAYED.  I

12:18PM  21    ASSUMED IT WAS ADMITTED.

12:18PM  22              MR. WADE:  OH, I APOLOGIZE.  GOVERNMENT COUNSEL MAY

12:18PM  23    HAVE ADMITTED THAT IN ITS EXAMINATION.

12:18PM  24    Q.   IF YOU GO TO THE BOTTOM OF THE EMAIL ON THE SECOND PAGE.

12:18PM  25         DO YOU JUST RECALL THIS WAS THE EMAIL WHERE YOU FOLLOWED

MOSLEY CROSS BY MR. WADE (RES.)                                    5297

12:18PM   1    UP WITH MS. HOLMES AFTER YOU REVIEWED THE MATERIALS?  DO YOU

12:18PM   2    REMEMBER WE LOOKED AT A DIFFERENT VERSION OF THIS EARLIER?

12:18PM   3    A.   YES.  YES.

12:18PM   4    Q.   OKAY.  AND THEN IF WE CAN GO UP TO YOUR RESPONSE HERE, YOU

12:18PM   5    SEND AN EMAIL ON SEPTEMBER 3RD TO MS. HOLMES.

12:18PM   6         DO YOU SEE THAT?

12:18PM   7    A.   I SEE IT.

12:18PM   8    Q.   AND YOU NOTED THAT YOUR -- THAT MS. HOLMES WAS GOING TO BE

12:18PM   9    SPEAKING AT BYRON TROTT'S CONFERENCE ON TUESDAY, SEPTEMBER 16TH

12:19PM   10   IN CHICAGO?

12:19PM   11   A.   YES.

12:19PM   12   Q.   DO YOU SEE THAT?

12:19PM   13   A.   YES, I DO.

12:19PM   14   Q.   AND, IN FACT, YOU WERE GOING TO BE SPEAKING AT THE SAME

12:19PM   15   CONFERENCE; IS THAT RIGHT?

12:19PM   16   A.   I WAS.

12:19PM   17   Q.   AND ATTENDING THE CONFERENCE AS WELL?

12:19PM   18   A.   YES.

12:19PM   19   Q.   AND YOU NOTED THAT HERE THAT IF -- YOU ALSO NOTED THAT

12:19PM   20   MR. PENNER WAS GOING TO BE THERE; CORRECT?

12:19PM   21   A.   YES, I DID.

12:19PM   22   Q.   AND MR. ROB WALTON WAS GOING TO BE THERE AS WELL?

12:19PM   23   A.   YES, I DID NOTE THAT.

12:19PM   24   Q.   OKAY.  AND YOU SUGGESTED THAT MAYBE IT WOULD WORK TO SET

12:19PM   25   UP A MEETING WITH THE WALTON FAMILY AT THE BDT CONFERENCE;

MOSLEY CROSS BY MR. WADE (RES.)                                    5298

12:19PM   1        CORRECT?

12:19PM   2        A.   YES, I DID.

12:19PM   3        Q.   OKAY.  LET'S GO UP THIS CHAIN.

12:19PM   4             DO YOU SEE THERE'S A RESPONSE FROM MS. HOLMES ABOUT THE

12:20PM   5        FACT THAT SHE WAS ALSO GOING TO BE HOSTING A DINNER THERE?

12:20PM   6             DO YOU SEE THAT?

12:20PM   7        A.   YES, I DO.

12:20PM   8        Q.   AND THAT WAS WITH TOBY COSGROVE.

12:20PM   9             DO YOU SEE THAT?

12:20PM  10        A.   I DO.

12:20PM  11        Q.   AND DO YOU KNOW WHO MR. COSGROVE IS?

12:20PM  12        A.   HE'S THE FORMER CEO OF CLEVELAND CLINIC.

12:20PM  13        Q.   OKAY.  IS IT DR. COSGROVE?

12:20PM  14        A.   I BELIEVE SO.

12:20PM  15        Q.   OKAY.  AND DID YOU ATTEND THAT DINNER?  DO YOU KNOW?

12:20PM  16        A.   I DID NOT.

12:20PM  17        Q.   OKAY.  AND IN ANY EVENT, THERE WAS FURTHER CORRESPONDENCE

12:20PM  18        UP THIS CHAIN ABOUT FACILITATING A MEETING WITH GREG PENNER AND

12:20PM  19        ROB WALTON; CORRECT?

12:20PM  20        A.   CORRECT.

12:20PM  21        Q.   AND DID YOU ACTUALLY THEN COME TO LEARN THAT ACTUALLY

12:20PM  22        MR. PENNER WENT TO VISIT THERANOS EVEN BEFORE THE BDT

12:20PM  23        CONFERENCE?

12:20PM  24        A.   I DIDN'T KNOW THAT.

12:21PM  25        Q.   OKAY.  LET'S --

UNITED STATES COURT REPORTERS
**ER-8916**

                        MOSLEY CROSS BY MR. WADE (RES.)                   5299

12:21PM   1    A.   OR I MAY HAVE AT THE TIME, BUT I CERTAINLY DON'T HAVE ANY

12:21PM   2    RECOLLECTION THAT HE DID, BUT I WOULDN'T BE SURPRISED.  HE HAD

12:21PM   3    ALREADY BEEN INTRODUCED TO ELIZABETH AND HE WAS FREE TO DO

12:21PM   4    ANYTHING HE WANTED TO DO AFTER THAT OBVIOUSLY.

12:21PM   5    Q.   SURE.  YOU HAD INTRODUCED THEM PREVIOUSLY?

12:21PM   6    A.   EXACTLY.

12:21PM   7    Q.   AND YOU KNEW THEY WERE COMMUNICATING; CORRECT?

12:21PM   8    A.   I PROBABLY DID.  I DON'T -- YOU KNOW, I DON'T HAVE ANY

12:21PM   9    PARTICULAR RECOLLECTION OF IT.  I REALLY WASN'T TERRIBLY

12:21PM  10    INVOLVED, BUT I SUSPECT THAT THEY WERE.

12:21PM  11    Q.   OKAY.  AND YOU WERE SETTING UP A MEETING WITH THE TWO OF

12:21PM  12    THEM, BUT YOU UNDERSTOOD THAT MR. PENNER WAS BASED LOCALLY HERE

12:21PM  13    IN SILICON VALLEY; CORRECT?

12:21PM  14    A.   YES, I DO.

12:21PM  15    Q.   OKAY.  LET'S LOOK AT THE EMAIL UP AT THE TOP.

12:21PM  16         AND DO YOU SEE IT SAYS THERE, MS. HOLMES REPORTS THAT SHE

12:21PM  17    HAD A MEETING WITH MR. PENNER THERE AT THERANOS THAT WEEK?

12:22PM  18    A.   I DO SEE THAT.

12:22PM  19    Q.   OKAY.  AND DOES THAT REFRESH YOUR RECOLLECTION THAT YOU'RE

12:22PM  20    AWARE THAT THERE WAS A MEETING?

12:22PM  21    A.   YOU KNOW, I DON'T -- I DON'T REMEMBER IT, BUT I THINK THIS

12:22PM  22    IS PROBABLY PRETTY GOOD EVIDENCE THAT THEY HAD MET, OR AT LEAST

12:22PM  23    ELIZABETH WAS TELLING ME THAT THEY HAD MET ON THE 13TH.

12:22PM  24    Q.   RIGHT.  AND THAT WAS BEFORE THE BDT CONFERENCE; CORRECT?

12:22PM  25    A.   YES.

MOSLEY CROSS BY MR. WADE (RES.)                                5300

12:22PM  1    Q.   AND THE BDT CONFERENCE, YOU ATTENDED THAT THIS YEAR IN

12:22PM  2    2014?

12:22PM  3    A.   I DID.

12:22PM  4    Q.   AND YOU HAD ATTENDED IT ON OTHER OCCASIONS; IS THAT RIGHT?

12:22PM  5    A.   I THINK THIS MAY HAVE BEEN THE FIRST ONE THAT I HAD

12:22PM  6    ATTENDED.

12:22PM  7    Q.   OKAY.  AND IS THAT SORT OF A WOODSTOCK FOR PRIVATE FAMILY

12:22PM  8    OFFICES, IF YOU WILL?

12:22PM  9    A.   I WOULDN'T DESCRIBE IT THAT WAY.  IT'S A SORT OF CONVENING

12:22PM  10   OF GROUPS OF INDIVIDUALS AND FAMILIES THAT ARE ASSOCIATED WITH

12:23PM  11   BDT FOR A CONFERENCE.

12:23PM  12   Q.   OKAY.  AND IT'S, FOR THE MOST PART, HIGH NET WORTH

12:23PM  13   INDIVIDUALS?

12:23PM  14   A.   YES.

12:23PM  15   Q.   AND MANY OF THEM ARE FAMILY BUSINESSES IN PARTICULAR; IS

12:23PM  16   THAT RIGHT?

12:23PM  17   A.   YES.

12:23PM  18   Q.   OKAY.  AND IT WAS ACTUALLY -- IT WAS AT BDT WHERE YOU MET

12:23PM  19   MS. HOLMES IN PERSON FOR THE FIRST TIME; IS THAT RIGHT?

12:23PM  20   A.   THAT IS CORRECT.

12:23PM  21   Q.   LET ME DRAW YOUR ATTENTION TO 1938.

12:23PM  22   A.   IS THAT IN THE SAME VOLUME?

12:23PM  23   Q.   RIGHT NEAR THE FRONT OF THE FIRST VOLUME, SIR?

12:23PM  24   A.   OKAY.  THANK YOU.

12:24PM  25        I SEE IT.

MOSLEY CROSS BY MR. WADE (RES.)                                    5301

12:24PM  1    Q.   AND TAKE A MINUTE TO REVIEW IT.  YOU SEE THAT IT'S A

12:24PM  2    MULTIPLE PAGE AGENDA FOR THE 2014 BDT CONFERENCE?

12:24PM  3    A.   I SEE THAT.

12:24PM  4    Q.   AND YOU ATTENDED THAT CONFERENCE?

12:24PM  5    A.   YES, I DID.  THIS IS THE ONE WE WERE JUST TALKING ABOUT.

12:24PM  6    Q.   YEP.

12:24PM  7         I MOVE THE ADMISSION OF 1938.

12:24PM  8              MR. SCHENK:  YOUR HONOR, RELEVANCE AND 403.

12:24PM  9              THE COURT:  WHAT'S -- I'M NOT CERTAIN OF THE

12:24PM  10   RELEVANCE OF THIS.

12:24PM  11             MR. WADE:  I'D BE HAPPY TO DO THIS NOW IN THE

12:24PM  12   PRESENCE OF THE JURY, OR TO APPROACH.

12:24PM  13        BUT IF YOUR HONOR LOOKS AT MANY OF THE ENTRIES, I THINK

12:24PM  14   YOU'LL SEE THAT MANY OF THE PEOPLE WHO MR. MOSLEY WAS

12:24PM  15   REPRESENTING SPOKE AT THE CONFERENCE, MR. MOSLEY SPOKE AT THE

12:24PM  16   CONFERENCE, AND MS. HOLMES SPOKE AT THE CONFERENCE.

12:25PM  17        AND THIS IS IN THE PERIOD WHERE THERE WERE MEETINGS AROUND

12:25PM  18   THE BDT CONFERENCE, AND SO PEOPLE WHO ARE INVESTING ARE

12:25PM  19   OBTAINING INFORMATION IN ADVANCE OF THE INVESTMENT DECISION AT

12:25PM  20   THE CONFERENCE.

12:25PM  21             THE COURT:  MAYBE YOU SHOULD LAY THAT FOUNDATION

12:25PM  22   FIRST.

12:25PM  23             MR. WADE:  OKAY.

12:25PM  24   Q.   YOU'LL RECALL THAT MR. WALTON AND MR. PENNER SPOKE AT THIS

12:25PM  25   CONFERENCE?

MOSLEY CROSS BY MR. WADE (RES.)                                    5302

12:25PM   1      A.   YES.  I THINK THEY WERE ON A PANEL --

12:25PM   2      Q.   OKAY.  AND YOU --

12:25PM   3      A.   -- DISCUSSION.

12:25PM   4      Q.   OH, I'M SORRY.  THEY WERE ON A PANEL DISCUSSION.

12:25PM   5           IN FACT, MR. PENNER WAS ON TWO PANEL DISCUSSIONS; RIGHT?

12:25PM   6      A.   YOU KNOW, I'D HAVE TO STUDY THIS, BUT -- LET ME SEE.  I

12:25PM   7      SEE ONE, AND I SEE A SECOND ONE, YES.

12:25PM   8      Q.   OKAY.  AND MS. HOLMES GAVE A -- SAT ON A PANEL DISCUSSION

12:25PM   9      IN FRONT OF THE AUDIENCE AT THIS CONFERENCE; CORRECT?

12:26PM  10      A.   I BELIEVE SHE DID.

12:26PM  11           CAN YOU TELL ME WHAT PAGE THAT WAS?

12:26PM  12      Q.   PAGE 2 MAY REFRESH YOUR RECOLLECTION AS TO THAT, SIR.

12:26PM  13      A.   OKAY.

12:26PM  14           (PAUSE IN PROCEEDINGS.)

12:26PM  15              THE WITNESS:  YES, I SEE THAT.

12:26PM  16      BY MR. WADE:

12:26PM  17      Q.   OKAY.  AND IF YOU GO TO PAGE 4, DO YOU RECALL MR. TUBERGEN

12:26PM  18      SPOKE AT THIS CONFERENCE?

12:26PM  19      A.   I DIDN'T RECALL THAT, BUT I'M JUST LOOKING DOWN A LIST

12:26PM  20      HERE TO SEE IF HE'S LISTED.  THERE WERE A LOT OF -- THERE WERE

12:26PM  21      A LOT OF SMALL BREAKOUTS ON PARTICULAR SUBJECTS.  SO AS YOU CAN

12:26PM  22      SEE, THERE'S A LOT OF ENTRIES HERE.

12:27PM  23      Q.   OKAY.  MAYBE PAGE 8 WILL REFRESH YOUR RECOLLECTION AS TO

12:27PM  24      WHETHER MR. TUBERGEN SPOKE.

12:27PM  25      A.   PAGE 8.  OKAY.

MOSLEY CROSS BY MR. WADE (RES.)                                    5303

12:27PM 1      YES, I DO SEE HIM LISTED ON A -- THIS WAS -- I SEE AT THE

12:27PM 2   TOP OF PAGE 7 IT SAYS CURRENT BREAKOUT SESSIONS.  THESE WERE

12:27PM 3   LITTLE SESSIONS THAT PEOPLE COULD INDIVIDUALLY CHOOSE TO GO TO,

12:27PM 4   AND IN SOME CASES THEY MIGHT ONLY HAVE TEN PEOPLE IN THERE.

12:27PM 5   Q.   RIGHT.  AND DO YOU RECALL THAT THERE WERE, ON THE AGENDA

12:27PM 6   THERE WERE SOME PRIVATE BREAKOUT DINNERS THAT PEOPLE ATTENDED

12:27PM 7   AS WELL IN THE EVENINGS?

12:27PM 8   A.   I, I HAVE SOME RECOLLECTION OF THAT, BUT I WASN'T --

12:27PM 9   OBVIOUSLY I WASN'T INVOLVED IN SETTING ALL OF THIS UP.

12:27PM 10      BUT I BELIEVE THERE WERE SOME -- I BELIEVE THAT THERE WERE

12:27PM 11  INDIVIDUAL DINNERS THAT WERE SET UP FOR VARIOUS GROUPS OF

12:27PM 12  PEOPLE.

12:27PM 13  Q.   OKAY.  AND SO REPRESENTATIVES OF THE WALTON FAMILY

12:27PM 14  ATTENDED THIS CONFERENCE; RIGHT?

12:27PM 15  A.   I BELIEVE THAT -- I BELIEVE THAT GREG PENNER, ROB WALTON,

12:28PM 16  AND I DON'T KNOW IF ANYBODY ELSE DID, BUT THEY MAY HAVE.

12:28PM 17  Q.   AND REPRESENTATIVES OF THE DEVOS FAMILY ATTENDED THIS

12:28PM 18  CONFERENCE?

12:28PM 19  A.   JERRY TUBERGEN WAS OBVIOUSLY THERE.  I DON'T KNOW WHETHER

12:28PM 20  ANYBODY ELSE WAS THERE.

12:28PM 21          MR. WADE:  YOUR HONOR, I MOVE THE ADMISSION OF 1938.

12:28PM 22          MR. SCHENK:  THE RELEVANCE OBJECTION WAS BASED ON

12:28PM 23  ITS CONNECTION TO THERANOS OR THIS CASE.

12:28PM 24          THE COURT:  I'M GOING TO SUSTAIN THE OBJECTION FOR

12:28PM 25  LACK OF FOUNDATION.

MOSLEY CROSS BY MR. WADE (RES.)                                    5304

12:28PM   1     BY MR. WADE:

12:28PM   2     Q.   DO YOU RECALL THAT MS. HOLMES WAS THERE SPEAKING ABOUT,

12:28PM   3     SPEAKING ABOUT HER WORK AT THERANOS?

12:28PM   4          DO YOU RECALL THAT, SIR?

12:28PM   5     A.   I DO RECALL SHE WAS THERE, AND I DO KNOW SHE PARTICIPATED

12:28PM   6     IN A PANEL.

12:28PM   7     Q.   AND THAT WAS IN THE, IN THE MAIN THEATRE OF THE

12:28PM   8     CONFERENCE; CORRECT?

12:28PM   9     A.   YES, I BELIEVE IT WAS.

12:28PM   10    Q.   AND THAT'S THE PART WHERE THE PEOPLE WOULD COME TO CONVENE

12:29PM   11    FOR THE MAIN SESSIONS OF THE CONFERENCE?

12:29PM   12    A.   I THINK THAT'S WHERE THE BIGGER SESSIONS WERE HELD.

12:29PM   13    Q.   OKAY.

12:29PM   14         I MOVE THE ADMISSION OF 1938.

12:29PM   15              THE COURT:  I DON'T SEE ANY RELEVANCE TO THE

12:29PM   16    ENTIRETY OF THE DOCUMENT.

12:29PM   17         IF YOU'RE TRYING TO ESTABLISH THAT MS. HOLMES SPOKE AT

12:29PM   18    THIS EVENT, YOU CAN DO THAT WITHOUT THE ENTIRETY OF THE

12:29PM   19    DOCUMENT.  THERE ARE OTHER BREAKOUTS AND OTHER SESSIONS

12:29PM   20    INVOLVED HERE THAT HAVE NOTHING TO DO, AT LEAST THERE'S NO

12:29PM   21    FOUNDATION YET --

12:29PM   22              MR. WADE:  OKAY.

12:29PM   23              THE COURT:  -- AS TO WHAT THEY HAVE TO DO.

12:29PM   24         THE FACT THAT MS. HOLMES WAS AT THIS CONFERENCE AND SPOKE,

12:29PM   25    THAT MAY HAVE SOME RELEVANCE.

MOSLEY CROSS BY MR. WADE (RES.)                                      5305

12:29PM   1          THE FACT THAT OTHER INVESTORS WERE AT THIS CONFERENCE AND

12:29PM   2   ATTENDED THE REFERENCE, I JUST DON'T SEE THE RELEVANCE YET.

12:29PM   3          ARE YOU GOING TO GO THROUGH EVERY INVESTOR AND ASK TO SEE

12:29PM   4   WHERE THEY VISITED AND WHAT CONFERENCE THEY ATTENDED?  IF IT

12:29PM   5   RELATES TO THEIR INVESTMENT DECISION IN REGARDS TO THE COMPANY

12:30PM   6   AND WHETHER OR NOT THEY WERE VICTIMS AND WHETHER OR NOT THEY

12:30PM   7   MADE DECISIONS BASED ON WHAT THEY HEARD THERE, THAT'S A

12:30PM   8   DIFFERENT THING.

12:30PM   9          BUT FOR NOW, MR. WADE, I DON'T SEE IT FOR THE ENTIRETY OF

12:30PM   10  THE DOCUMENT TO COME IN.  YOU ESTABLISHED THAT THERE WAS A

12:30PM   11  CONFERENCE AND YOUR CLIENT WAS AT THE CONFERENCE AND SHE SPOKE,

12:30PM   12  AND I DON'T THINK YOU NEED THE DOCUMENT IN FOR THAT.

12:30PM   13         AND PARDON ME FOR ME ANSWERING IN A SPEAKING ANSWER LIKE

12:30PM   14  THIS, BUT I JUST WANTED TO GIVE YOU MY THOUGHTS AND GUIDANCE ON

12:30PM   15  THE TOTALITY OF THE DOCUMENT.

12:30PM   16         I THINK THERE'S RELEVANCE ISSUES AS TO THE ENTIRETY OF THE

12:30PM   17  DOCUMENT THAT INCLUDES OTHER BREAKOUTS, OTHER SPEAKERS.

12:30PM   18             MR. WADE:  OKAY.  COULD I ASK THE COURT IF WE COULD

12:30PM   19  PRODUCE A REDACTED FORM OF THE VERSION THAT REFERENCES

12:30PM   20  MS. HOLMES'S SPEECH ON THE MAIN STAGE?

12:30PM   21             THE COURT:  LET'S SEE.  I THINK THAT'S ON PAGE 3 OF

12:30PM   22  THE DOCUMENT.

12:30PM   23             MR. WADE:  PAGE 2, I BELIEVE, YOUR HONOR, BATES

12:31PM   24  LABEL 4689 -- 4687.

12:31PM   25             THE COURT:  YES, IT'S TRIAL EXHIBIT 1938, PAGE 3.

MOSLEY CROSS BY MR. WADE (RES.)                                    5306

12:31PM    1              MR. WADE:  CORRECT, YOUR HONOR, YES.

12:31PM    2              THE COURT:  AND IF YOU WANT TO REDACT AND SHOW THAT

12:31PM    3    BETWEEN 8:05 AND 9:05, YOUR CLIENT APPEARED ON A PANEL WITH

12:31PM    4    OTHERS ENTITLED GAME CHANGERS.

12:31PM    5              MR. WADE:  MAYBE WE CAN BLOW UP THAT PORTION AND

12:31PM    6    DEAL WITH THE OTHER PORTION LATER.

12:31PM    7              THE COURT:  SURE.  I THINK SO.

12:31PM    8              MR. WADE:  THANK YOU.

12:31PM    9    Q.   AND WHILE WE'RE PULLING THAT UP, MR. MOSLEY, AT THE BDT

12:31PM   10    CONFERENCE, IT'S HELD WITHIN A THEATRE; CORRECT?

12:31PM   11    A.   NO.  I THINK I -- I THINK WHAT I POINTED OUT THAT THERE

12:31PM   12    WERE -- MY MEMORY OF IT, THERE WERE SOME SESSIONS IN THE

12:32PM   13    THEATRE AND THERE WERE SOME SESSIONS IN BREAKOUT ROOMS.

12:32PM   14         YOU'VE ALREADY POINTED OUT THERE WERE SOME DINNERS.

12:32PM   15    Q.   UH-HUH.

12:32PM   16    A.   SO IT'S A COMBINATION OF DIFFERENT ACTIVITIES.

12:32PM   17    Q.   OKAY.  AND THE MAIN -- WHEN THE CONFERENCE WOULD START IN

12:32PM   18    THE MORNING, A LOT OF PEOPLE WOULD START IN THE FEINBERG

12:32PM   19    THEATRE AND THERE WOULD BE GREETINGS AND THEN THERE WOULD BE

12:32PM   20    SOME MAIN STAGE PRESENTATIONS.

12:32PM   21         IS THAT NOT RIGHT?

12:32PM   22    A.   YOU KNOW, I REALLY WASN'T THAT DEEPLY INVOLVED, BUT I

12:32PM   23    THINK THE BIGGER SESSIONS WERE IN THE THEATRE IS MY

12:32PM   24    RECOLLECTION.

12:32PM   25    Q.   OKAY.  AND DO YOU RECALL THAT MS. HOLMES GAVE A

MOSLEY CROSS BY MR. WADE (RES.)                           5307

12:32PM   1    PRESENTATION IN THE THEATRE AT THAT CONFERENCE?

12:32PM   2    A.   YES, I DO.

12:32PM   3    Q.   AND DID YOU ATTEND THAT?

12:32PM   4    A.   YES, I DID.

12:32PM   5    Q.   OKAY.  AND DO YOU KNOW WHETHER, WHETHER MR. TUBERGEN

12:32PM   6    ATTENDED THAT?

12:32PM   7    A.   I HAVE NO IDEA.

12:32PM   8    Q.   DO YOU KNOW WHETHER ANY MEMBERS OF THE WALTON FAMILY

12:32PM   9    ATTENDED THAT?

12:32PM  10    A.   I DON'T KNOW.

12:32PM  11    Q.   OKAY.  DO YOU KNOW WHETHER ANY OF YOUR OTHER CLIENTS WHO

12:33PM  12    CONSIDERED THERANOS INVESTMENTS ATTENDED THAT?

12:33PM  13    A.   I REALLY DON'T KNOW.

12:33PM  14    Q.   OKAY.  AND IN CONNECTION WITH THIS PRESENTATION, I THINK

12:33PM  15    WE TALKED ABOUT THE DINNER, AND I BELIEVE YOUR TESTIMONY WAS

12:33PM  16    THAT YOU DID NOT ATTEND A DINNER WITH MS. HOLMES AND

12:33PM  17    DR. COSGROVE?

12:33PM  18    A.   I DID NOT.

12:33PM  19    Q.   OKAY.  DO YOU KNOW WHETHER ANY OF YOUR CLIENTS ATTENDED

12:33PM  20    THAT DINNER?

12:33PM  21    A.   I HAVE NO IDEA.

12:33PM  22    Q.   OKAY.  BY THE WAY, DO YOU RECALL MR. ELKANN ALSO ATTENDING

12:33PM  23    THE BDT CONFERENCE IN SEPTEMBER OF 2014?

12:33PM  24    A.   I DON'T.  I'M NOT SURE AT THIS POINT THAT I EVER MET HIM,

12:33PM  25    SO...

MOSLEY CROSS BY MR. WADE (RES.)                        5308

12:33PM  1    Q.   OKAY.  DO YOU RECALL THAT MR. HANK SLACK FROM THE

12:33PM  2    OPPENHEIMER FAMILY HAD ATTENDED THE BDT CONFERENCE?

12:33PM  3    A.   I DON'T.  I NEVER MET HIM UP UNTIL THIS POINT, SO I HAVE

12:34PM  4    NO IDEA WHETHER HE ATTENDED.

12:34PM  5    Q.   FAIR ENOUGH.

12:34PM  6         AT THE BDT CONFERENCE, YOU ENDED UP HAVING --

12:34PM  7    PARTICIPATING IN THREE MEETINGS THAT INVOLVED SOME OF YOUR

12:34PM  8    CLIENTS.

12:34PM  9         DO YOU RECALL THAT?

12:34PM  10   A.   I THINK THAT'S RIGHT.

12:34PM  11   Q.   OKAY.  AND I THINK I NEGLECTED TO ASK YOU, THE COX FAMILY

12:34PM  12   WAS ALSO IN ATTENDANCE AT THE 2014 CONFERENCE; RIGHT?

12:34PM  13   A.   I BELIEVE AT LEAST -- YOU KNOW, I BELIEVE AT LEAST ONE

12:34PM  14   MEMBER AND THEN ONE PERSON FROM THE COMPANY ATTENDED.

12:34PM  15   Q.   OKAY.

12:34PM  16   A.   I SHOULD SAY I DON'T KNOW WHETHER A PERSON ATTENDED FROM

12:34PM  17   THE COMPANY.  I SHOULD SAY I ONLY KNOW ONE PERSON WHO ATTENDED

12:34PM  18   FROM THE FAMILY.

12:34PM  19   Q.   AND WAS THAT ALEX TAYLOR?

12:34PM  20   A.   YES, IT WAS.

12:34PM  21   Q.   AND ALEX TAYLOR WAS A PERSON WITH WHOM YOU ARRANGED -- YOU

12:34PM  22   PARTICIPATED IN A MEETING WITH MS. HOLMES; CORRECT?

12:34PM  23   A.   YEAH, I HAD A MEETING TO INTRODUCE ALEX TO ELIZABETH.

12:34PM  24   Q.   OKAY.  AND WAS THIS A MEETING THAT HAPPENED SORT OF IN A

12:34PM  25   VENUE ADJACENT TO THE CONFERENCE?

MOSLEY CROSS BY MR. WADE (RES.)                                    5309

12:35PM   1      A.   I DON'T REMEMBER.

12:35PM   2      Q.   OKAY.  DO YOU REMEMBER ANYTHING ABOUT THAT MEETING?

12:35PM   3      A.   I THINK I JUST REMEMBER -- THE ONLY THING I REALLY

12:35PM   4      REMEMBER WAS THAT ELIZABETH SPOKE AND DESCRIBED THE COMPANY AND

12:35PM   5      WHAT SHE WAS TRYING TO ACCOMPLISH FOR ALEX SO HE COULD HAVE AN

12:35PM   6      UNDERSTANDING.

12:35PM   7      Q.   AND THIS WAS SORT OF AN INTRODUCTORY MEETING?

12:35PM   8      A.   IT WAS AN INTRODUCTION, YES.

12:35PM   9      Q.   OKAY.  AND YOU HAD A SIMILAR MEETING THERE WITH

12:35PM  10      MR. TUBERGEN; CORRECT?

12:35PM  11      A.   THAT IS CORRECT.

12:35PM  12      Q.   OKAY.  AND THAT WAS AN INTRODUCTORY MEETING AS WELL, WAS

12:35PM  13      IT NOT?

12:35PM  14      A.   YES.

12:35PM  15      Q.   OKAY.  AND DO YOU RECALL IN ADVANCE OF THAT MEETING THAT

12:35PM  16      YOU SENT MR. TUBERGEN A COPY OF THE "FORTUNE" ARTICLE THAT HAD

12:35PM  17      BEEN PUBLISHED RELATING TO MS. HOLMES?

12:35PM  18      A.   IT'S POSSIBLE, BUT I CERTAINLY DON'T REMEMBER.

12:35PM  19      Q.   OKAY.  LET'S TAKE A LOOK AT 12751.

12:36PM  20           I'M SORRY -- YEAH, 1 -- THE COURT'S INDULGENCE FOR ONE

12:36PM  21      SECOND.  LET ME MAKE SURE I GET THE RIGHT NUMBER.

12:36PM  22           (PAUSE IN PROCEEDINGS.)

12:36PM  23              MR. WADE:  12751, WHICH I BELIEVE IS IN EVIDENCE,

12:36PM  24      YOUR HONOR.

12:36PM  25              THE WITNESS:  OKAY.

MOSLEY CROSS BY MR. WADE (RES.)                                   5310

12:36PM    1        BY MR. WADE:

12:36PM    2        Q.   AND DO YOU SEE UP ON THE SCREEN, OR IN THE BOOK, WHICHEVER

12:36PM    3        IS EASIER FOR YOU, THAT YOU SENT MR. TUBERGEN A COPY OF THE

12:36PM    4        "FORTUNE" ARTICLE IN ADVANCE OF THE MEETING THAT YOU HAD WITH

12:36PM    5        MS. HOLMES?

12:36PM    6        A.   YEAH.  I'M ASSUMING THAT.  IT SAYS THERANOS.PDF AND -- AND

12:37PM    7        IT SAYS COVER STORY FROM "FORTUNE," SO I'M ASSUMING THAT'S WHAT

12:37PM    8        WAS ATTACHED, YES.

12:37PM    9        Q.   OKAY.  AND DO YOU RECALL GETTING A COPY OF THIS FROM

12:37PM   10        DR. KISSINGER?

12:37PM   11        A.   OF THIS?

12:37PM   12        Q.   OF THIS ARTICLE?

12:37PM   13        A.   I DON'T REMEMBER WHETHER I GOT IT FROM DR. KISSINGER OR I

12:37PM   14        GOT IT OUT OF "FORTUNE" MAGAZINE.  I HAVE NO RECOLLECTION.

12:37PM   15        Q.   OKAY.

12:37PM   16        A.   I CERTAINLY HAD GOTTEN THE ARTICLE AND READ THE ARTICLE,

12:37PM   17        YES.

12:37PM   18        Q.   OKAY.  AND YOU HAD READ THE ARTICLE AT SOME POINT AFTER

12:37PM   19        YOUR OUTLINE, BUT BEFORE THE BDT CONFERENCE; IS THAT FAIR?

12:37PM   20        A.   I, I CAN'T PICK THE TIME AT WHICH I READ THE ARTICLE.

12:37PM   21        Q.   FAIR ENOUGH.

12:37PM   22             LET'S GO TO THE FIRST PAGE OF THE ARTICLE THAT SAYS, "NEW

12:37PM   23        BLOOD."

12:37PM   24             DO YOU SEE THAT?

12:37PM   25        A.   I DO.

MOSLEY CROSS BY MR. WADE (RES.)                                    5311

12:37PM   1     Q.   OKAY.  AND YOU RECOGNIZE THAT THIS WAS SOMETHING OF A

12:37PM   2     PORTRAYAL OF MS. HOLMES AND HER MISSION WITH RESPECT TO

12:38PM   3     THERANOS; CORRECT?

12:38PM   4     A.   I DIDN'T QUITE UNDERSTAND WHAT YOU -- HOW YOU

12:38PM   5     CHARACTERIZED IT.

12:38PM   6     Q.   MAYBE I DIDN'T CHARACTERIZE IT WELL.

12:38PM   7          THIS ARTICLE TALKED ABOUT MS. HOLMES AND HER VISION AT

12:38PM   8     THERANOS; CORRECT?

12:38PM   9     A.   YES.

12:38PM   10    Q.   OKAY.  AND IF YOU LOOK AT THAT FIRST PAGE, YOU SEE THAT IN

12:38PM   11    THE TEXT THERE THAT IT -- LET'S BLOW THAT UP SO WE'RE SURE THE

12:38PM   12    JURY CAN SEE THAT.

12:38PM   13         YOU SEE IT TALKS ABOUT HOW SHE FOUNDED THIS COMPANY AS A

12:38PM   14    19-YEAR-OLD SOPHOMORE AT STANFORD.

12:38PM   15         DO YOU SEE THAT?

12:38PM   16    A.   I DO.

12:38PM   17    Q.   AND DO YOU SEE REFERENCES TO HER INTERACTIONS WITH A

12:38PM   18    CHEMICAL ENGINEERING PROFESSOR AT STANFORD NAMED

12:38PM   19    CHANNING ROBERTSON?

12:38PM   20    A.   I SEE THAT REFERENCE.

12:38PM   21    Q.   AND IT KIND OF GIVES A BIT OF THE ORIGIN STORY OF THE

12:39PM   22    COMPANY, OR STARTS TO; CORRECT?

12:39PM   23    A.   YES, I ASSUME THAT'S THE REASON FOR IT, YES.

12:39PM   24    Q.   AND IF YOU CAN CONTINUE ON PAGE 3 OF THE ARTICLE.

12:39PM   25         AND IF WE CAN JUST BLOW UP, IN THE LEFT-HAND COLUMN, THE

MOSLEY CROSS BY MR. WADE (RES.)                    5312

12:39PM   1      FIRST COUPLE OF PARAGRAPHS.

12:39PM   2          IT TALKS ABOUT SOME OF THE WORK THAT SHE DID THERE AND

12:39PM   3      THEN THE FOUNDING OF THE COMPANY.

12:39PM   4          DO YOU SEE THAT?

12:39PM   5      A.   I DO SEE IT.

12:39PM   6      Q.   AND THIS WAS A PRETTY COMPELLING STORY, WAS IT NOT?

12:39PM   7      A.   VERY COMPELLING.

12:39PM   8      Q.   OKAY.  AND IF YOU LOOK IN THE PARAGRAPH, THERE'S

12:39PM   9      DISCUSSION WITH PROFESSOR ROBERTSON ABOUT HIS OBSERVATIONS OF

12:39PM  10      MS. HOLMES WHEN SHE WAS 19 YEARS OLD; CORRECT?

12:39PM  11      A.   YOU'RE TALKING ABOUT THE SECOND PARAGRAPH THAT SAYS, "I

12:40PM  12      REMEMBER HER SAYING"?

12:40PM  13      Q.   YEAH.  JUST GENERALLY, YOU SEE PROFESSOR ROBERTSON IS

12:40PM  14      PROVIDING HIS VIEWS OF MS. HOLMES AS A TEENAGER JUST IN

12:40PM  15      COLLEGE.

12:40PM  16          DO YOU SEE THAT?

12:40PM  17      A.   YEAH, AND IT SAYS, "AND I KIND OF KICKED MYSELF.  I'D

12:40PM  18      CONSULTED IN THIS AREA FOR 30 YEARS, BUT I'D NEVER SAID, HERE,

12:40PM  19      WE CAN MAKE ALL OF THESE GIZMOS THAT MEASURE" -- YES, I SEE

12:40PM  20      THAT.

12:40PM  21      Q.   HE HAD BEEN WORKING IN THE AREA FOR 30 YEARS, BUT AS A

12:40PM  22      19-YEAR-OLD, SHE CAME UP WITH AN IDEA THAT HE HAD NEVER THOUGHT

12:40PM  23      OF.

12:40PM  24          DO YOU SEE THAT?

12:40PM  25      A.   I -- YOU KNOW, I CAN'T TELL YOU WHAT HE THOUGHT OF AND HAD

MOSLEY CROSS BY MR. WADE (RES.)                          5313

12:40PM   1    NOT THOUGHT OF.

12:40PM   2    Q.   BUT YOU SEE HOW HE'S QUOTED THERE; RIGHT?

12:40PM   3    A.   I SEE HIS QUOTE.

12:40PM   4    Q.   AND IF WE GO DOWN A COUPLE OF PARAGRAPHS, IN THE PARAGRAPH

12:41PM   5    THAT STARTS, "THAT CLINCHED IT FOR HIM," AND BLOW THAT UP.

12:41PM   6        IT TALKS ABOUT WHEN HE FINALLY CONNECTED -- "WHEN I

12:41PM   7    FINALLY CONNECTED WITH WHAT ELIZABETH FUNDAMENTALLY IS" --

12:41PM   8    A.   RIGHT.

12:41PM   9    Q.   HE SAYS, "I REALIZED THAT I COULD HAVE JUST AS WELL BEEN

12:41PM  10    LOOKING INTO THE EYES OF A STEVE JOBS OR BILL GATES."

12:41PM  11        DO YOU SEE THAT?

12:41PM  12    A.   I SEE THAT.

12:41PM  13    Q.   AND THIS IS A CHEMICAL ENGINEERING PROFESSOR AT STANFORD;

12:41PM  14    RIGHT?

12:41PM  15    A.   I DON'T KNOW MR. ROBERTSON, BUT I BELIEVE THAT'S WHAT HE

12:41PM  16    WAS, YES.

12:41PM  17    Q.   AND THIS WAS A PRETTY COMPELLING STORY, WAS IT NOT?

12:41PM  18    A.   A VERY COMPELLING STORY.

12:41PM  19    Q.   YEAH.   AND IF WE CAN JUMP TO PAGE 4, THE RIGHT-HAND

12:41PM  20    COLUMN, AND BLOW UP THAT FIRST PARAGRAPH.

12:42PM  21        YOU SEE THERE THE WALGREENS CEO, GREG WASSON, IS

12:42PM  22    REFERENCED?

12:42PM  23    A.   YES.

12:42PM  24    Q.   AND THIS IS IN CONNECTION WITH THE MOST IMPORTANT

12:42PM  25    COMMERCIAL RELATIONSHIP THAT THERANOS HAS AT THAT TIME; RIGHT?

MOSLEY CROSS BY MR. WADE (RES.)                                   5314

12:42PM  1    A.   CERTAINLY FOR RETAIL DISTRIBUTION OF THEIR EQUIPMENT, YES.

12:42PM  2    Q.   YEAH.  AND HE TALKS ABOUT, IN THIS ARTICLE, HOW HE HOPES

12:42PM  3    TO EVENTUALLY PUT THEM IN THE PHARMACIES OF THE COMPANY'S

12:42PM  4    EUROPEAN CHAINS AS WELL; RIGHT?

12:42PM  5         DO YOU SEE THAT?

12:42PM  6    A.   YES, THEIR EUROPEAN PARTNER, ALLIANCE BOOTS.

12:42PM  7    Q.   YEAH.  AND IF YOU GO DOWN -- AND YOU LEARNED FROM THIS

12:42PM  8    ARTICLE ABOUT SOME WORK IN CONNECTION WITH UCSF.

12:42PM  9         DO YOU RECALL THAT?

12:42PM 10    A.   I SEE THAT.  I SEE THAT IT DISCUSSES UCSF, YES.

12:42PM 11    Q.   AND DO YOU SEE THE CEO OF UCSF IS QUOTED IN THE ARTICLE

12:43PM 12    THERE, AND HE TALKS ABOUT HOW THIS IS THE TRUE TRANSFORMATION

12:43PM 13    OF HEALTH CARE RIGHT HERE IN FRONT OF US; RIGHT?

12:43PM 14    A.   I SEE THAT.

12:43PM 15    Q.   AND WAS -- IS IT FAIR TO SAY THAT THIS WAS A PRETTY

12:43PM 16    IMPACTFUL ARTICLE WHEN YOU READ IT AT THE TIME?

12:43PM 17    A.   YES, IT WAS VERY IMPORTANT.

12:43PM 18    Q.   YEAH.  AND IF WE CAN GO TO -- IF YOU LOOK AT THE BOTTOM,

12:43PM 19    AND DO YOU SEE THE QUOTE THAT STARTS AT THE BOTTOM, IT SAYS,

12:43PM 20    "THE FIRST TIME I HEARD ABOUT THIS, I THOUGHT IT WAS SNAKE

12:43PM 21    OIL," AND WE'LL CONTINUE UP, "AND MIRRORS."

12:43PM 22         AND IF WE CAN BLOW UP THE PARAGRAPH UP ON THE TOP.

12:43PM 23         DO YOU SEE THAT?

12:43PM 24    A.   I DO SEE THAT.

12:43PM 25    Q.   AND THAT'S A QUOTE FROM THE CHIEF OF ORTHOPEDIC TRAUMA AT

MOSLEY CROSS BY MR. WADE (RES.)                          5315

12:44PM  1      THE HOSPITAL FOR SPECIAL SURGERY IN MANHATTAN?

12:44PM  2      A.   I SEE THAT.

12:44PM  3      Q.   DO YOU SEE THAT?

12:44PM  4           AND THEN IT NOTES THAT, "BUT AFTER REVIEWING VOLUMINOUS

12:44PM  5      VALIDATION STUDIES SUPPLIED TO HIM BY THE COMPANY, HE HAS

12:44PM  6      BECOME A BELIEVER AND IS URGING HIS HOSPITAL TO CONSIDER

12:44PM  7      ADOPTION."

12:44PM  8           DO YOU SEE THAT?

12:44PM  9      A.   I DO SEE THAT.

12:44PM  10     Q.   OKAY.  AND IF WE LOOK AT THE LITTLE PIECE THAT FOLLOWS

12:44PM  11     THAT.

12:44PM  12          DR. HELFET SAYS THERE, "IT'S REAL DATA, HE SAYS.  IT'S NOT

12:44PM  13     THEIR INTERPRETATION."

12:44PM  14          DO YOU SEE THAT?

12:44PM  15     A.   I DO SEE THAT.

12:44PM  16     Q.   AND WAS THAT IMPACTFUL FOR YOU AT THE TIME?

12:44PM  17     A.   THAT'S AN IMPORTANT STATEMENT.

12:44PM  18     Q.   AND IF WE CAN GO TO PAGE 6 OF THE ARTICLE, AND IF WE CAN

12:44PM  19     BLOW UP THE PARAGRAPH THAT SAYS, "THERANOS" KIND OF IN THE

12:44PM  20     MIDDLE OF THE FIRST COLUMN.

12:45PM  21          I'M SORRY, NOT THAT.  I HAVE THE WRONG PARAGRAPH.

12:45PM  22          IF I CAN GO TO PAGE 7, AND IN THE RIGHT-HAND COLUMN WITH

12:45PM  23     THE "SHE LOOKS LIKE 19."

12:45PM  24          DO YOU SEE THAT?

12:45PM  25          OKAY.  AND DO YOU SEE THERE DR. KISSINGER, YOUR CLIENT, IS

MOSLEY CROSS BY MR. WADE (RES.)                                    5316

12:45PM   1    QUOTED?

12:45PM   2    A.   OKAY.  NOW WHAT -- THIS IS ON PAGE 7?

12:45PM   3    Q.   SURE.  IT'S ON THE SCREEN, BUT IT'S ON THE BOTTOM OF

12:45PM   4    PAGE 7 OF 9 IN THE RIGHT-HAND COLUMN.

12:45PM   5         DO YOU SEE DR. KISSINGER IS QUOTED IN THIS ARTICLE AS

12:45PM   6    WELL?

12:45PM   7    A.   I SEE HE IS.  I SEE HE'S QUOTED, YES.

12:45PM   8    Q.   AND YOU HAD RESPECT FOR HIM BASED ON YOUR RELATIONSHIP; IS

12:45PM   9    THAT FAIR?

12:45PM  10    A.   ENORMOUS RESPECT.

12:45PM  11    Q.   AND HE SAYS, "SHE LOOKS LIKE 19."

12:45PM  12         DO YOU SEE THAT?

12:45PM  13    A.   YES.

12:45PM  14    Q.   AND HE SAID "ASKED TO ASSESS HER AS A LEADER - BECAUSE

12:46PM  15    HE'S SEEN A FEW."

12:46PM  16         AND YOU THOUGHT THAT WAS A FAIR STATEMENT; CORRECT?

12:46PM  17    A.   YES, I DID.

12:46PM  18    Q.   DR. KISSINGER HAD SEEN A FEW LEADERS IN HIS DAY?

12:46PM  19    A.   HE WAS 91, YES.

12:46PM  20    Q.   AND HE HAD DONE WORK FOR, YOU KNOW, PRESIDENTS AND MANY

12:46PM  21    PROMINENT PEOPLE IN THE WORLD; CORRECT?

12:46PM  22    A.   HE HAD BEEN THE SECRETARY OF STATE.

12:46PM  23    Q.   YES.  AND THERE HE SAYS, "ASKED TO ASSESS HER AS A

12:46PM  24    LEADER -- BECAUSE HE'S SEEN A FEW -- HE RESPONDS, I CAN'T

12:46PM  25    COMPARE HER TO ANYONE ELSE BECAUSE I HAVEN'T SEEN ANYONE WITH

| | | |
|---|---|---|
| 12:46PM | 1 | HER SPECIAL ATTRIBUTES.  SHE HAS IRON WILL, STRONG |
| 12:46PM | 2 | DETERMINATION.  BUT NOTHING DRAMATIC.  THERE IS NO PERFORMANCE |
| 12:46PM | 3 | ASSOCIATED WITH HER.  I HAVE SEEN NO SIGN THAT FINANCIAL GAIN |
| 12:46PM | 4 | IS OF ANY INTEREST TO HER.  SHE'S LIKE A MONK.  SHE ISN'T |
| 12:46PM | 5 | FLASHY.  SHE WOULDN'T WALK INTO A ROOM AND TAKE IT OVER.  BUT |
| 12:46PM | 6 | SHE WOULD ONCE THE SUBJECT GETS TO HER FIELD." |
| 12:46PM | 7 | DO YOU SEE THAT? |
| 12:46PM | 8 | A.   I DO SEE THAT. |
| 12:47PM | 9 | Q.   THAT'S A PRETTY IMPACTFUL STATEMENT BY DR. KISSINGER, IS |
| 12:47PM | 10 | IT NOT? |
| 12:47PM | 11 | A.   IT'S VERY COMPLIMENTARY. |
| 12:47PM | 12 | MR. SCHENK:  OBJECTION.  COUNSEL IS TESTIFYING NOW. |
| 12:47PM | 13 | THE COURT:  CLOSE TO IT. |
| 12:47PM | 14 | WHY DON'T YOU ASK YOUR NEXT QUESTION? |
| 12:47PM | 15 | BY MR. WADE: |
| 12:47PM | 16 | Q.   IF WE CAN GO TO PAGE 9 AND BLOW UP THE PARAGRAPH IN THE |
| 12:47PM | 17 | RIGHT-HAND COLUMN THAT SAYS, "ALTHOUGH." |
| 12:47PM | 18 | IT SAYS, "ALTHOUGH I BELIEVE" -- I'M SORRY.  IN THE BOTTOM |
| 12:47PM | 19 | THERE.  "THERE ARE PIECES OF THE PUZZLE WE HAVEN'T SEEN YET." |
| 12:47PM | 20 | DO YOU SEE THAT? |
| 12:47PM | 21 | A.   JUST ONE SECOND PLEASE. |
| 12:47PM | 22 | YES, THERE ARE PIECES, RIGHT. |
| 12:48PM | 23 | Q.   OKAY.  DO YOU SEE WHERE IT SAYS THAT? |
| 12:48PM | 24 | A.   I DO SEE WHERE IT SAYS THAT. |
| 12:48PM | 25 | Q.   AND IT SAYS, "IN SOME CASES SHE MAY BE WAITING FOR |

MOSLEY CROSS BY MR. WADE (RES.)                              5318

12:48PM   1    REGULATORY APPROVAL."

12:48PM   2    A.   I DO SEE THAT.

12:48PM   3    Q.   "WHILE IN OTHERS SHE MAY JUST BE WAITING, LIKE STEVE JOBS,

12:48PM   4    TO FINISH PERFECTING HER NEXT PRODUCT BEFORE UNVEILING IT WITH

12:48PM   5    A FLOURISH."

12:48PM   6        DO YOU SEE THAT?

12:48PM   7    A.   I DO SEE THAT.

12:48PM   8    Q.   AND DID YOU UNDERSTAND AT THE TIME THAT THE COMPANY WAS

12:48PM   9    WORKING ON MULTIPLE FUTURE ITERATIONS OF ITS PRODUCT?

12:48PM  10    A.   I DID.

12:48PM  11    Q.   AND IN THIS ARTICLE, IN SHARING IT, YOU THOUGHT THIS WOULD

12:48PM  12    BE A GOOD INTRODUCTORY PIECE OR A QUICK READ TO GIVE

12:48PM  13    MR. TUBERGEN SOME FAMILIARITY; IS THAT FAIR?

12:48PM  14    A.   I DID.

12:48PM  15    Q.   OKAY.  AND AGAIN, THE MEETING WITH MR. TUBERGEN, THAT WAS

12:48PM  16    AT THAT POINT KIND OF AN INTRODUCTORY MEET AND GREET; IS THAT

12:49PM  17    FAIR?

12:49PM  18    A.   YEAH, IT WAS A PERSONAL INTRODUCTION OF JERRY TO

12:49PM  19    ELIZABETH.

12:49PM  20    Q.   JUST MORE CASUALLY ACROSS THE TABLE AS OPPOSED TO A SLIDE

12:49PM  21    PRESENTATION OR ANYTHING LIKE THAT?

12:49PM  22    A.   YES.

12:49PM  23    Q.   OKAY.  AND WOULD IT BE FAIR TO DESCRIBE YOU ALSO

12:49PM  24    PARTICIPATED IN A MEETING LIKE THAT WITH MR. TAYLOR?

12:49PM  25    A.   I DID.

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 17, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Amy Mason Saharia*
AMY MASON SAHARIA

April 17, 2023